No. 25-5327

# United States Court of Appeals for the Ninth Circuit

———————————————

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, et al.,

*Plaintiffs-Appellants*,

v.

LIANE M. RANDOLPH, in her official capacity as
Chair of the California Air Resources Board, et al.,

*Defendants-Appellees*.

## MOTION FOR INJUNCTION PENDING APPEAL

## ** RELIEF REQUESTED BY NOVEMBER 3, 2025 **

Stephanie A. Maloney
Kevin Palmer
CHAMBER OF COMMERCE OF
    UNITED STATES OF AMERICA
1615 H St., N.W.
Washington, DC 20062
(202) 659-6000

*Counsel for Plaintiff-Appellant*
*Chamber of Commerce of the*
*United States of America*

Eugene Scalia
Jonathan C. Bond
Brian A. Richman
GIBSON, DUNN & CRUTCHER LLP
1700 M St., N.W.
Washington, DC 20036
(202) 955-8500
EScalia@gibsondunn.com

Bradley J. Hamburger
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071
(213) 229-7000

*Counsel for*
*Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, undersigned counsel certifies that Plaintiffs-Appellants the U.S. Chamber of Commerce, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association have no parent corporations and no publicly held corporation owns 10% or more of their stock.

Dated:  September 15, 2025

*s/ Eugene Scalia*
Eugene Scalia
*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT............................................i

TABLE OF CONTENTS ...........................................................ii

TABLE OF AUTHORITIES ......................................................iii

INTRODUCTION ................................................................ 1

BACKGROUND.................................................................. 5

STANDARD OF REVIEW...................................................... 11

ARGUMENT.................................................................... 12

I.    Plaintiffs Are Likely To Succeed On Their Compelled-Speech
      Claim.................................................................. 13

      A.    SB 253 And SB 261 Fail Strict Scrutiny.......................... 13

      B.    The State Cannot Show That Lesser Scrutiny Applies....... 17

      C.    The Laws Fail Under Any Level Of Scrutiny ..................... 22

II.   The Equities Overwhelmingly Favor An Injunction .................... 25

      A.    Plaintiffs Face Irreparable Harm—Twice Over .................. 26

      B.    The Balance Of Equities And Public Interest Tip
            Sharply In Plaintiffs' Favor .................................. 28

CONCLUSION .................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023) ................................................................ 14

*Alliance for Fair Bd. Recruitment v. SEC*,
  125 F.4th 159 (5th Cir. 2024) ............................................... 24

*Alliance for Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ............................................... 11

*Am. Beverage Ass'n v. City of San Francisco*,
  916 F.3d 749 (9th Cir. 2019) ................................................. 29

*Am. Meat Inst. v. USDA*,
  760 F.3d 18 (D.C. Cir. 2014) ................................................. 24

*Ams. for Prosperity Found. v. Bonta*,
  594 U.S. 595 (2021) ................................................................ 23

*Bates v. State Bar of Arizona*,
  433 U.S. 350 (1977) ................................................................ 21

*Bolger v. Youngs Drug Prods. Corp.*,
  463 U.S. 60 (1983) ........................................................... 19, 20

*Brown v. Entm't Merchants Ass'n*,
  564 U.S. 786 (2011) ................................................................ 17

*Cal. Chamber of Com. v. Council for Educ. &*
  *Rsch. on Toxics*,
  29 F.4th 468 (9th Cir. 2022) ................................................. 26

*City of Cincinnati v. Discovery Network, Inc.*,
  507 U.S. 410 (1993) ................................................................ 17

*City of San Francisco v. U.S. Customs & Immigration Serv.*,
  981 F.3d 742 (9th Cir. 2020)..........................................28, 29

*CTIA – The Wireless Ass'n v. City of Berkeley*,
  928 F.3d 832 (9th Cir. 2019)..........................................18, 24

*Green v. Miss U.S. of Am., LLC*,
  52 F.4th 773 (9th Cir. 2022) ..............................................13

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
  515 U.S. 557 (1995)...........................................................13

*IMDb.com Inc. v. Becerra*,
  962 F.3d 1111 (9th Cir. 2020)...........................17, 18, 19, 20

*Int'l Dairy Foods Ass'n v. Amestoy*,
  92 F.3d 67 (2d Cir. 1996) ...................................................24

*Iowa v. SEC*,
  No. 24-1522 (8th Cir. Sept. 12, 2025)..................................25

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.,*
  *Council 31*,
  585 U.S. 878 (2018)...............................................................1

*Junior Sports Magazines Inc. v. Bonta*,
  80 F.4th 1109 (9th Cir. 2023) .............................................24

*Matsumoto v. Labrador*,
  122 F.4th 787 (9th Cir. 2024) .............................................28

*McCullen v. Coakley*,
  573 U.S. 464 (2014).............................................................16

*Meinecke v. City of Seattle*,
  99 F.4th 514 (9th Cir. 2024) .....................................3, 12, 14

*Nat'l Ass'n of Mfrs. v. SEC*,
  800 F.3d 518 (D.C. Cir. 2015)......................................15, 22

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
606 U.S. —, 2025 WL 2415669 (2025) ............................................... 28

*National Association of Wheat Growers v. Bonta*,
85 F.4th 1263 (9th Cir. 2023) ............................................................ 16

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
585 U.S. 755 (2018).................................................. 4, 13, 14, 16, 21, 22

*Nationwide Biweekly Admin., Inc. v. Owen*,
873 F.3d 716 (9th Cir. 2017)............................................................... 18

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024) ..................................................... 15, 26

*Nken v. Holder*,
556 U.S. 418 (2009)........................................................................... 28

*Pharm. Rsch. & Mfrs. of Am. v. Stolfi*,
— F.4th —, 2025 WL 2448851 (9th Cir. 2025) ................. 14, 18, 19, 20

*Retail Digital Network, LLC v. Prieto*,
861 F.3d 839 (9th Cir. 2017)............................................................... 16

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988)........................................................................... 13

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020)............................................................................. 26

*Rubin v. Coors Brewing Co.*,
514 U.S. 476 (1995).................................................................... 17, 24

*Ruckelshaus v. Monsanto Co.*,
463 U.S. 1315 (1983)......................................................................... 29

*S.F. Apartment Ass'n v. San Francisco*,
881 F.3d 1169 (9th Cir. 2018)............................................................. 18

*Southeast Alaska Conservation Council v. U.S. Army Corps of Eng'rs,*
   472 F.3d 1097 (9th Cir. 2006)................................................................. 11

*TGP Commc'ns, LLC v. Sellers,*
   2022 WL 17484331 (9th Cir. Dec. 5, 2022) ......................................... 11

*Washington v. Trump,*
   145 F.4th 1013 (9th Cir. 2025) ............................................................ 28

*Wooley v. Maynard,*
   430 U.S. 705 (1977)............................................................................. 15

*X Corp. v. Bonta,*
   116 F.4th 888 (9th Cir. 2024) ........................................... 17, 18, 20, 24

*Youth 71Five Ministries v. Williams,*
   2024 WL 3749842 (9th Cir. Aug. 8, 2024)........................................... 11

*Zauderer v. Office of Disciplinary Counsel,*
   471 U.S. 626 (1985)............................................................. 2, 20, 21, 22

**Statutes**

Act of Sept. 27, 2024, ch. 766, §1(c)(1) (Cal.).......................................... 29

**Other Authorities**

89 Fed. Reg. 21,668
   (SEC Mar. 28, 2024).......................................................................... 25

## INTRODUCTION

This case concerns two unprecedented compelled speech laws—California's SB 253 and SB 261—that conscript private companies into the State's climate-policy campaign. These laws compel speech indiscriminately from thousands of companies—regardless of what, if anything, they have ever said about climate change, or whether they have ever sold any products or services in California. The speech compelled is voluminous, wholly divorced from any particular product, service, or transaction, and on a topic the Supreme Court already has said is "controversial," warranting the highest level of constitutional scrutiny. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 913–14 (2018).

Plaintiffs respectfully seek an injunction against these laws as to their members pending appeal. The district court acknowledged that both laws compel speech and trigger First Amendment scrutiny. But it denied a preliminary injunction and refused to issue an injunction pending appeal of the preliminary-injunction order. Plaintiffs now face imminent, irreparable harm, with compelled speech due on or before January 1, 2026, and unrecoverable compliance burdens being incurred already.

1

To prevent irreversible constitutional injury, and to allow sufficient time to seek review from the Supreme Court (if necessary), Plaintiffs respectfully request a ruling on this motion by **November 3, 2025**.

The laws at issue here are highly unusual. Unlike traditional disclosure requirements that courts have upheld, SB 253 and SB 261 are triggered by company revenue thresholds, rather than by existing commercial speech or conduct. SB 253 and SB 261 are also not focused on any potential transaction, such as advertising a service or selling a product. And while permissible disclosure laws typically require only a brief factual clarification—like the single-sentence attorney-fee notice in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985)—SB 253 and SB 261 mandate standalone speech consisting of dozens of pages of speculative, judgment-laden narratives designed not to inform, but to pressure. The California Legislature said as much: the goal is to "embarras[s]" companies and "make sure the public actually knows who's green and who isn't." App. 7, 34.

This is not regulation of commercial transactions. It is an effort to manufacture and distort the public debate by forcing companies to say things that many would never choose to say, in terms they would not

2

choose to use, on an intensely controversial subject. That goes beyond content regulation; it is viewpoint discrimination.

Once Plaintiffs show that the laws compel speech—as the district court correctly held they do—the burden shifts to the State to prove that the laws satisfy the First Amendment. *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024). The State did not come close. The district court found that SB 261's disclosures are not purely factual, that the State's fraud-prevention rationale—offered to justify both SB 253 and SB 261—lacked evidentiary support, and that the emissions-reduction justification was equivocal (for SB 253) or nonexistent (for SB 261). It also recognized that the laws apply even to companies that chose not to enter the debate and do not speak on climate policy at all. Yet it denied relief. That was error.

California did not attempt below to show that these laws can survive strict scrutiny. It did not even try to justify these laws under the conventional test for commercial speech—intermediate scrutiny. Instead, it asked the court to recognize a new category of compelled speech subject to diminished protection—an effort the Supreme Court rejected

3

in invalidating other California compelled-speech laws in *National Institute of Family & Life Advocates v. Becerra* (*NIFLA*), 585 U.S. 755, 767 (2018). But even if this Court were to apply lesser scrutiny, both statutes still flunk it. They are not about supplementing transactional speech with neutral clarifications. They do not concern any particular product or service. And they are not plausibly purely factual and noncontroversial. Both statutes are instead ideological mandates untethered from any conceivable justification for diminished scrutiny.

The burdens of both laws are substantial and already being imposed. SB 261's disclosures must be posted "[o]n or before January 1, 2026" (§ 2(b)(1)(A)), with the State's reporting portal opening December 1 (App. 705, 759). Six months later, SB 253 will force companies to attribute greenhouse-gas emissions, including those of third parties, to themselves. App. 705, 759. All of this requires extensive work today. App. 543, 531. The required reports must include subjective assessments of climate-related issues, governance structures, board oversight, scenario analyses, and sustainability metrics (App. 264, 280)—topics many companies have deliberately chosen not to address (App. 532, 536). *See also* App. 705–08, 760–62, 740–43. These compelled narratives are not

4

brief factual clarifications; they are judgment-laden statements on matters of public controversy, designed to convey a state-endorsed philosophy of environmental responsibility. And once published, they cannot be retracted. App. 706, 762. The State continues to instruct companies that they must prepare now to meet the deadlines and that noncompliance will trigger penalties. App. 705, 545–46.

Absent relief, Plaintiffs' members will be forced to speak on or before January 1, 2026. That compelled speech cannot be undone. The Court should enjoin enforcement pending appeal so these unprecedented laws can be reviewed before the harm becomes irreversible.

## BACKGROUND

California Senate Bills 253 and 261 will compel thousands of companies to speak publicly on climate change—regardless of whether they want to enter the debate, have California investors, or sell products in the State. The laws apply to any company with sufficient revenue and minimal contacts—defined as "do[ing] business in California"—with no de minimis exception. SB 253 § 2(b)(2); SB 261 § 2(a)(4).

SB 261 is expected to cover more than 10,000 companies (App. 581)—specifically, any company with over $500 million in revenue

that "does business in California" (§ 2(a)(4)).  It requires covered entities to publish, biennially, what the statute calls "climate-related financial risk" reports (§ 2(b)(1)(A)), which must be posted on the company's website (§ 2(c)(1)).  Beginning December 1, 2025, the State will maintain a public docket where covered entities must submit the public link to their posted reports.  App. 737.  The reports' contents are dictated by the "Task Force on Climate-related Financial Disclosures" (TCFD)—a roughly 100-page manual (App. 259–332) incorporated by reference into SB 261. § 2(b)(1)(A)(i).

The TCFD requires companies to assess speculative climate-related issues, from "cyclones" to hypothetical "policy changes" (App. 271, 328); model future "climate-related scenarios" (App. 264); and explain how climate change could affect governance, capital allocation, R&D priorities, and executive compensation (App. 276, 280, 285, 295, 328).  The framework admits a "high degree of uncertainty," warns that compliance "may be challenging," and requires companies to speculate about "highly uncertain" future events.  App. 274, 292, 296, 302.  SB 261 mandates publication on company websites (§ 2(c)(1)), imposes penalties up to $50,000

6

per year (§ 2(e)(2)), and funds the program through mandatory fees (§ 2(c)(2)(A)).

SB 253 is expected to cover more than 5,000 companies (App. 581)—any business with over $1 billion in revenue that "does business in California" (§ 2(b)(2)). It requires each covered entity to annually report greenhouse-gas emissions across three categories: direct emissions from sources the company owns or controls (Scope 1), indirect emissions from purchased energy (Scope 2), and all other emissions across the value chain—including those from suppliers, contractors, and customers (Scope 3). § 2(b)(3)–(5), (c)(1).

By design, the statute thus requires each covered company to claim as "its emissions" the emissions of third parties. § 2(c)(1)(A)(ii). At the same time, it prohibits companies from including offsetting or avoided emissions in their totals (App. 87, 624)—ensuring that every company appears as a net polluter (App. 535–36). Reports must be submitted to a state-run database (§ 2(c)(1)–(2)) and are enforced through penalties of up to $500,000 per year (§ 2(f)(2)(A)).

The Legislature was explicit about its goal: to "embarras[s]" companies (App. 34) and "make sure the public actually knows who's green and

7

who isn't" (App. 7).  The statutes are designed to provoke public pressure and "encourage" companies to "d[o] their part" (App. 2, 93, 95)—not to correct deception or inform transactional decisions.  Legislators declared that "Californians . . . have a right to know who is" "destroying [their] planet."  App. 63.  SB 253 itself is titled the Climate Corporate Data *Accountability* Act (§ 2(a)) and declares that companies must take "responsibility for . . . their contributions to global [greenhouse-gas] emissions" (§ 1(f)).  SB 261 goes further still:  It requires companies to publish dozens of pages "assess[ing]" climate change (App. 338) to "illustrate" for the public "the real risks" and to "encourage" companies to "adopt" the State's preferred policies, as Governor Newsom explained in signing the law (App. 348).

Both statutes' burdens are substantial and immediate.  Covered companies must act now to meet the January 1, 2026 deadline for SB 261 (§ 2(b)(1)(A)) and the June 2026 deadline for SB 253 (App. 707, 762).  The State has instructed companies to begin compliance work "as quickly as possible" (App. 545–46) and the State's reporting portal opens December 1, 2025 (App. 759, 705).  Compliance requires building data systems, conducting scenario analyses, gathering information from suppliers, and

8

publishing reports on company websites or in a state-run database. App. 531, 542. These costs—exceeding $1 million annually—are unrecoverable and already being incurred. App. 531, 543. Declarations submitted by Chamber members confirm that companies are already diverting resources, restructuring operations, and preparing compelled speech they would not otherwise make. *See* App. 704–08, 760–63, 532–38, 542–43. Once published, these statements cannot be retracted. App. 762, 708.

Plaintiffs—the U.S. Chamber of Commerce, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association—moved for a preliminary injunction. ECF No. 78. The district court agreed that both laws compel speech, that SB 261's disclosures are not purely factual, and that the State's fraud rationale lacked evidentiary support. App. 642, 656–57, 667–70, 672. The State had relied heavily on a declaration by Dr. Angel Hsu, who claimed that 96% of companies with emissions targets exhibited at least one "indicator of greenwashing" (App. 597). *See* App. 569 (citing Dr. Hsu). But the court found that Dr. Hsu's so-called "indicators" of "greenwashing" did not demonstrate fraud or deception. App. 667–69. For example, one of

9

Dr. Hsu's indicators was that a company that reported and *met* emissions-reductions targets failed to issue "interim targets." App. 597. Another was a company's opposition to certain climate-change legislation. App. 598 ("lobbying activity that undermines climate action"). These factors, the court found, are irrelevant to fraud and are "concerning" (App. 669)—because by treating disfavored political speech and policy positions as deception, the State exposes its discriminatory purpose.

The court also found the emissions-reduction rationale equivocal and recognized that the laws apply even to companies that have never spoken on climate issues. App. 666, 669. Yet the court denied relief—crediting investor "interest" in climate change, speculation that disclosures "may" cause emissions reductions, and the notion that compelled climate narratives "function as advertis[ing]." App. 662, 665, 652.

Plaintiffs appealed (ECF No. 114) and moved the district court for an injunction pending appeal (ECF No. 116), which was denied (App. 772–76). In doing so, the court reiterated its reasoning from the preliminary-injunction order—stating that it had "previously considered," "and rejected," "Plaintiffs' argument"—without addressing the distinct context of an injunction pending appeal. App. 774–75. Nor did the

10

court grapple with the irreparable harm that will occur before appellate review is complete, including compelled speech that cannot be unsaid and unrecoverable compliance costs.  App. 775.

## STANDARD OF REVIEW

To obtain an injunction pending appeal, the applicant must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest.  *Southeast Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1100 (9th Cir. 2006).  Under this Court's "sliding scale" approach, serious questions on the merits and a balance of hardships that tips sharply toward the plaintiff also warrant an injunction.  *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  This Court has repeatedly recognized that injunctions pending appeal are particularly appropriate in First Amendment cases, where even temporary deprivations of constitutional rights constitute irreparable harm.  *See Youth 71Five Ministries v. Williams*, 2024 WL 3749842, at *4–5 (9th Cir. Aug. 8, 2024); *TGP Commc'ns, LLC v. Sellers*, 2022 WL 17484331, at *6 (9th Cir. Dec. 5, 2022).  For similar reasons, "'[i]n the First Amendment context,'" once the

11

plaintiff makes a "'colorable claim that its First Amendment rights have been infringed, or are threatened with infringement,'" the "'burden shifts to the government to justify'" the law under the applicable standard. *Meinecke*, 99 F.4th at 521.

## ARGUMENT

California should not be permitted to force thousands of companies to speak against their will on one of the most divisive issues of our time while this Court considers whether those mandates are constitutional. The challenged statutes inflict First Amendment injury of the highest order. Plaintiffs are likely to succeed on the merits because SB 253 and SB 261 cannot survive constitutional scrutiny: Both compel speech, on highly controversial policy issues, distort public debate on those issues, and fail the most basic requirements of tailoring. And the equities overwhelmingly favor an injunction. The laws impose immediate, unrecoverable compliance costs and force companies to publish judgment-laden messages that cannot be retracted. Once speech is compelled, the harm is done. Speech cannot be unsaid.

The Constitution demands a pause before California dictates companies' speech in an ongoing debate on controversial issues. The Court should enjoin the laws' enforcement while it considers Plaintiffs' appeal.

## I. Plaintiffs Are Likely To Succeed On Their Compelled-Speech Claim

The district court correctly held that SB 253 and SB 261 trigger First Amendment scrutiny. App. 642–45. But the court erred several times over in holding that the laws pass constitutional muster.

### A. SB 253 And SB 261 Fail Strict Scrutiny

The State admits that SB 253 and SB 261 "compel . . . speech." App. 362. Under settled precedent, that alone triggers strict scrutiny. The Supreme Court has repeatedly held that compelled speech is "'presumptively unconstitutional'" and demands the most exacting review. *NIFLA*, 585 U.S. at 766; *accord Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988); *Green v. Miss U.S. of Am., LLC*, 52 F.4th 773, 791 (9th Cir. 2022) ("Such compulsion is a content-based regulation under our caselaw, and as such warrants strict scrutiny."). These protections apply to statements of fact no less than opinion and to corporations as fully as individuals. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573–74 (1995).

13

SB 253 and SB 261 are paradigmatic examples of compelled speech. They force companies to speak when they would "prefer to remain silent," *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023), on one of the most divisive policy issues of our time. The burden therefore "shifts to the government" to prove that these compulsions are the least speech-burdening way to advance a compelling governmental interest. *Meinecke*, 99 F.4th at 521, 524.

The State never attempted to carry that burden. In the district court, it offered only a single, unexplained sentence asserting that "these laws would survive even strict scrutiny." App. 569. That perfunctory assertion underscores what is obvious: California knew it could not satisfy the standard, and did not try.

For good reason. "[V]iewpoint discrimination is inherent in the design and structure" of these laws, like other compelled-speech laws California has enacted that have been struck down. *NIFLA*, 585 U.S. at 779 (Kennedy, J., concurring). The State is not asking companies to make neutral, "product-specific" factual disclosures; it is forcing them to deliver "value-laden," "'politically fraught'" messages crafted to shame, pressure, and provoke. *Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, — F.4th —, 2025 WL

14

2448851, at *15 (9th Cir. 2025).  The Legislature was explicit:  Its goal is to "embarras[s]" companies and to "make sure the public knows who's green and who isn't."  App. 7, 34.  That expressive distortion is not incidental:  It is the *point*.  And it confirms that the laws are not narrowly tailored to any legitimate interest, but instead serve an ideological agenda.  The First Amendment does not permit the government to "skew public debate," *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015), by conscripting private speakers "to be an instrument" of the government's message, *Wooley v. Maynard*, 430 U.S. 705, 715 (1977).

That defect is compounded by the State's refusal to pursue obvious, less speech-burdensome alternatives.   As this Court explained in *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024)—in striking down yet another California speech compulsion—the State "could have easily" used "existing" fraud statutes to address allegedly misleading speech. *Id.* at 1121.  It could also have limited the laws to companies that advertise on climate-related grounds, with requirements tailored to the specific content of those advertisements.   "'[P]recision,'" the Supreme Court has emphasized, is the "'touchstone' when it comes to regulations

15

of speech." *NIFLA*, 585 U.S. at 775. But the State opted instead for blanket mandates on every company above a revenue threshold, "no matter" whether they have ever spoken about climate issues, or what they have said. *Id.* at 777.

The State also could have spoken for itself. It could have compiled its own reports on "physical and transition risks," SB 261 § 2(a)(2), or published its own estimates of greenhouse-gas emissions. Studies show that 90% of a company's emissions can be estimated using publicly available data—industry, size, and earnings growth. App. 241. As this Court explained in *National Association of Wheat Growers v. Bonta*, 85 F.4th 1263 (9th Cir. 2023), California could "post [such] information . . . on its own website," without "'co-opt[ing]'" private speakers. *Id.* at 1283. Yet the State never "seriously undertook" to use any of these less-speech-burdensome alternatives. *McCullen v. Coakley*, 573 U.S. 464, 494 (2014).

Instead, the State chose to compel speech—purportedly hoping that public pressure "may indirectly" drive behavioral change. App. 525. That choice is constitutionally indefensible. "[I]ndirect advancement" is not enough. *Retail Digital Network, LLC v. Prieto*, 861 F.3d 839, 851 (9th

16

Cir. 2017) (en banc).  The State cannot conscript speech as a proxy, because as the Court warned, "otherwise, 'a State could with ease'" burden speech "'in the service of other objectives that could not themselves justify a burden on'" speech.  *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995).  That is precisely what California has done here.

### B.    The State Cannot Show That Lesser Scrutiny Applies

The State's defense of SB 253 and SB 261 rests almost entirely on the premise that the laws compel commercial speech and therefore reduced scrutiny applies.  But accepting that premise would require "cordon[ing] off [a] new categor[y]" of speech that is untethered from any transaction, product, or service—exactly what this Court and the Supreme Court have warned against.  *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1124 (9th Cir. 2020); *see also Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 792 (2011).

Commercial speech is speech that "propose[s]" or "communicates" the "terms of an actual or potential transaction."  *X Corp. v. Bonta*, 116 F.4th 888, 901 (9th Cir. 2024).  That is "'*the test*'" the Supreme Court has articulated "'for identifying commercial speech.'"  *City of Cincinnati*

17

*v. Discovery Network, Inc.*, 507 U.S. 410, 423 (1993) (emphasis in original); *see IMDb.com*, 962 F.3d at 1122 ("Because IMDb's public profiles do not 'propose a commercial transaction,' we need" go no further.). And every category of commercial speech this Court has identified fits that description, including individualized solicitations, *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 731–32 (9th Cir. 2017); contract negotiations, *S.F. Apartment Ass'n v. San Francisco*, 881 F.3d 1169, 1177–78 (9th Cir. 2018); and retail product warnings, *CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019). Each of these examples, this Court has explained, shares a common feature: it "communicates the terms of an actual or potential transaction." *X Corp.*, 116 F.4th at 901.

The Court's recent decision in *Stolfi*, 2025 WL 2448851, reinforces the point: speech qualifies as commercial only when it communicates product-specific information closely tied to an actual or potential commercial transaction. There, the compelled speech was deemed commercial only *because* it required "product-specific economic information about prescription drugs that are available for purchase on the market,"

18

thereby "communicat[ing] the terms of potential commercial transactions." *Id.* at *14. The Court emphasized that this connection was essential, repeatedly noting that the reports were "closely tethered to the sale of a product." *Id.* at *15. Addressing a partial dissent, the Court made the "'limiting principle'" explicit: the speech was commercial only because of a "close tether between the speech compelled . . . and commercial pharmaceutical transactions." *Id.* at *15 n.18.

Yet here—as the district court acknowledged—the State does not even argue that the speech compelled by SB 253 or SB 261 meets this definition. App. 651. These laws do not concern prices, services, or sales. They require companies to opine on climate issues and report emissions—including those of third parties—regardless of whether the company sells anything in California or anywhere else. That is "not transactional." *IMDb.com*, 962 F.3d at 1122.

Even "if the question were close," *IMDb.com* resolves it. 962 F.3d at 1122. There, the Court applied what are commonly known as the *Bolger* factors—three indicia that help resolve whether a regulation concerns commercial speech: (1) whether the speech is an advertisement, (2) whether it refers to a particular product or service, and (3) whether it

19

is economically motivated. *See id.* (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67 (1983)). The Court held that the absence of the first two is dispositive: speech that is neither an advertisement nor refers to a product cannot be deemed commercial, regardless of motive. *Id.*

The same conclusion follows here. The district court found that the laws "do not compel speech in the form of advertisements" (App. 651–52); the State conceded they do not refer to any product or service (*see* App. 565)s; and companies produce them "out of legal obligation, not economic motivation," *Stolfi*, 2025 WL 2448851, at *10; *see X Corp.*, 116 F.4th at 901 (companies have "no economic motivation" in government-mandated reports). These laws thus fail not just two but all three *Bolger* factors. Under *IMDb.com*, that is dispositive and strict scrutiny applies.

The State's fallback—*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985)—fares no better. *Zauderer* applies only to a narrow category of compelled commercial-speech disclosures rooted in traditional consumer-protection principles: disclosure of risks, obligations, or otherwise unknowable attributes of what the speaker is offering that historically have been regarded as warranting disclosure. In *Zauderer* itself,

20

the Court upheld a requirement that attorneys advertising "no recovery, no legal fees" include a brief clarification that clients might still be liable for costs. *Id.* at 650–52. The Court emphasized three key limits: The compelled disclosure must be (1) a narrow supplement to the speaker's own message, (2) "purely factual and uncontroversial," and (3) about "the terms under which" a product or service is offered. *Id.* at 651.

SB 253 and SB 261 meet none of those requirements. They compel sprawling reports, not "limited supplement[s]." *Bates v. State Bar of Arizona*, 433 U.S. 350, 384 (1977). They demand company-wide narratives—aggregated emissions data and climate-risk assessments—rather than "'information about the terms'" under which a product or service is offered. *NIFLA*, 585 U.S. at 768. And they are neither "'purely factual'" nor "'uncontroversial,'" *id.*: SB 261 requires speculative, forward-looking risk analyses (App. 656–57 (so holding)), while SB 253 forces companies to take "responsibility" for third-party emissions using uncertain data (§ 1(f); *see* App. 413, 416–17). The Legislature itself confirmed the purpose was to "embarras[s]" companies and "make sure that the public actually knows who's green and who isn't." App. 7, 34. That is not a "'purely'" factual disclosure. *NIFLA*, 585 U.S. at 768. It is a "metaphor

21

that conveys moral responsibility" for climate change, an intensely controversial topic. *Nat'l Ass'n of Mfrs.*, 800 F.3d at 554; *cf.* App. 63 (Sen. Wiener, the author of SB 253, asserting that Californians "have a right to know" who is "destroying [their] planet").

## C. The Laws Fail Under Any Level Of Scrutiny

Even if the Court were to apply a lesser standard than strict scrutiny, SB 253 and SB 261 still fail. The State's asserted interests—preventing deception, reducing emissions, and providing information to investors—are variously unsupported, speculative, and legally insufficient. And the laws are not tailored to those interests. *See NIFLA*, 585 U.S. at 776 (holding that under *Zauderer,* speech compulsions may "extend 'no broader than reasonably necessary'"). Governor Newsom himself admitted the laws were overbroad and need "streamlin[ing]." App. 78, 348. They compel speech from thousands of companies regardless of whether they have ever spoken on climate, have California investors (or any public investors), or sell products in the State. The same extensive speech is required regardless of industry, product, or impact on the environment. That "lack of tailoring" is "present in every case" and fatal under any level

22

of First Amendment review. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021).

The deception rationale disintegrates upon inspection. The district court rejected it outright, finding no evidence of misleading speech. App. 548–51. The State's principal expert, Dr. Hsu, did not identify a single false statement. Instead, she claimed that 96% of companies with emissions targets "show[ed] signs of greenwashing," which she defined to include *entirely accurate statements* coupled with other conduct she disapproved of—such as lobbying against certain climate legislation, which is core political expression protected by the First Amendment. App. 477–78. Reliance on lobbying positions confirms the State is not targeting fraud; it is targeting disfavored viewpoints.

The emissions-reduction rationale fares no better. There is no evidence these laws will meaningfully reduce emissions. SB 261 does not concern emissions at all; it mandates climate narratives. App. 553–54. SB 253 requires company-wide totals rather than per-unit data, producing distorted results: a firm that slashes emissions' intensity but grows output will appear worse on paper even while reducing emissions overall. That perverse outcome "makes no rational sense" if the aim is actually

23

emissions reduction. *Rubin*, 514 U.S. at 488. Faced with this mismatch, the State retreated to the claim that "any" reduction, however trivial, suffices. App. 577. But the First Amendment demands more: a regulation must "'*significantly*' alleviate" the asserted harms, not merely gesture towards them. *Junior Sports Magazines Inc. v. Bonta*, 80 F.4th 1109, 1117 (9th Cir. 2023) (emphasis in original).

The investor-interest rationale is equally defective. Public demand for information is not, standing alone, a substantial government interest. *CTIA*, 928 F.3d at 844. The securities laws, for example, exist to protect investors "from fraud," not merely to "satisfy the demand" for more information. *Alliance for Fair Bd. Recruitment v. SEC*, 125 F.4th 159, 179 (5th Cir. 2024) (en banc). Were curiosity enough, the State could compel disclosures on any politically salient subject. *See X Corp.*, 116 F.4th at 902 n.10; *Am. Meat Inst. v. USDA*, 760 F.3d 18, 31–32 (D.C. Cir. 2014) (Kavanaugh, J., concurring); *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 74 (2d Cir. 1996). And even if investor interest were cognizable, these statutes are not tailored to it. They apply to companies with no California investors (including private companies), compel disclosures regardless of materiality, and require publication to the public at large rather

24

than to investors. The SEC's climate rule—legally suspect in its own right and stayed indefinitely (*see* Order, *Iowa v. SEC*, No. 24-1522 (8th Cir. Sept. 12, 2025))—at least purported to limit disclosures to material information. 89 Fed. Reg. 21,668, 21,733/1–2 (SEC Mar. 28, 2024). SB 253 and SB 261 do not.

The tailoring failures are also pervasive. The laws apply even to companies that have *never* spoken on climate, and they compel speech regardless of whether the State has identified any misleading statements. They ignore less speech-burdensome alternatives—such as targeted enforcement against fraud, or the government supplying information itself. And they impose sweeping mandates that go far beyond any documented informational need. That overbreadth is fatal under any standard the State might invoke.

## II. The Equities Overwhelmingly Favor An Injunction

This is the textbook case for interim relief. The laws will compel speech on a politically charged issue and impose unrecoverable compliance costs—all before this Court can determine their constitutionality.

25

## A.     Plaintiffs Face Irreparable Harm—Twice Over

The harm is immediate and irreversible.  First, the constitutional injury is automatic.  The district court held that SB 253 and SB 261 compel speech and trigger First Amendment scrutiny.  App. 523–26; *see NetChoice*, 113 F.4th at 1117 ("[T]he forced disclosure of information, even purely commercial information, triggers First Amendment scrutiny.").  That alone establishes irreparable harm.  "'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020).  This Court has repeatedly held that a colorable First Amendment claim alone establishes irreparable harm.  *See, e.g., Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) ("'Irreparable harm is relatively easy to establish in a First Amendment case'"; the "plaintiff 'need only demonstrate the existence of a colorable First Amendment claim.'").  And unlike *restrictions* on speech, which may be lifted to allow future expression, compelled speech causes a uniquely permanent injury: once a company is forced to speak, the message is out.  It cannot be unsaid.

26

Second, the compliance burden here is beyond dispute. U-Haul alone estimates—and attested in a declaration—that it must hire 30 new employees and spend over $3 million annually. *See* App. 412; *see also* App. 423–24. The State itself concedes that SB 253 and SB 261 will impose significant financial impacts, projecting that companies will spend up to 0.025% of annual revenue—amounting to hundreds of thousands of dollars for any business meeting SB 253's $1 billion threshold. App. 373, 20.

The burden is not speculative—it is being felt now. SB 261 requires companies to publish climate-risk reports "on or before January 1, 2026" (§ 2(b)(1)(A)), and the State's reporting portal opens this December 1 (App. 586, 640). SB 253 reports are due in June 2026 (App. 588, 643), and the State has instructed companies to "move toward full compliance as quickly as possible" and begin retaining data immediately (App. 427). That means companies must act now—building reporting systems, conducting scenario analyses, collecting supplier data, and implementing governance and compensation tracking protocols—at significant cost. *See* App. 531–37, 542–43. But because California enjoys sovereign immunity, those costs cannot be recouped.

27

The Supreme Court and this Court have repeatedly held that compliance burdens can constitute irreparable injury. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 606 U.S. —, 2025 WL 2415669, at *1 (2025) ("[W]hile the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be recouped' and are thus 'irrevocably expended.'"); *Washington v. Trump*, 145 F.4th 1013, 1036 (9th Cir. 2025) ("economic harm [was] irreparable" because "Defendants are federal officials," so "money damages are unavailable"); *City of San Francisco v. U.S. Customs & Immigration Serv.*, 981 F.3d 742, 762 (9th Cir. 2020).

Much of that harm can be measured in dollars, but some cannot. Compliance requires fundamental business changes—new systems, renegotiated contracts, and altered internal processes. App. 412–14, 423–24. Those changes cannot be undone.

## B.    The Balance Of Equities And Public Interest Tip Sharply In Plaintiffs' Favor

The equities here are not close. When the government is the opposing party, the equities and public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Matsumoto v. Labrador*, 122 F.4th 787, 816 (9th Cir. 2024). And because Plaintiffs have raised, at minimum, serious First

28

Amendment questions, that alone "'compels a finding'" that "'the balance of hardships tips sharply in [their] favor.'" *Am. Beverage Ass'n v. City of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (en banc).

The State's counterargument—that an injunction would delay enforcement—rings hollow. If California ultimately prevails, the only "harm" will amount to "no more than a temporary" return to the status quo "previously in effect for decades": the same disclosure regime California deemed adequate before enacting these laws. *City of San Francisco*, 981 F.3d at 762.

The State can hardly object to that brief delay, having caused delays itself—the Legislature extended the Air Resources Board's rulemaking deadline from January to July 2025, and even so, the Board has not met it. *See* Act of Sept. 27, 2024, ch. 766, § 1(c)(1) (Senate Bill No. 219). The State's "failure to act with greater dispatch" in implementing the laws "blunt[s]" any newfound "claim of urgency." *Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1318 (1983) (Blackmun, J., in chambers). The true urgency is in halting the State's command that Plaintiffs speak as soon as January 1—speech that, once compelled, cannot be retracted.

29

## CONCLUSION

The Court should enjoin Defendants from applying or taking any action to enforce SB 253 or SB 261 against Plaintiffs' members pending appeal.

Respectfully submitted,

Dated:  September 15, 2025          *s/ Eugene Scalia*

Stephanie A. Maloney
Kevin Palmer
CHAMBER OF COMMERCE OF
    UNITED STATES OF AMERICA
1615 H St., N.W.
Washington, DC 20062
(202) 659-6000

*Counsel for Plaintiff-Appellant*
*Chamber of Commerce of the*
*United States of America*

Eugene Scalia
Jonathan C. Bond
Brian A. Richman
GIBSON, DUNN & CRUTCHER LLP
1700 M St., N.W.
Washington, DC 20036
(202) 955-8500
EScalia@gibsondunn.com

Bradley J. Hamburger
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071
(213) 229-7000

*Counsel for*
*Plaintiffs-Appellants*

30

## CERTIFICATE OF COMPLIANCE

This motion complies with the word limit of Ninth Circuit Rules 27-1(1)(d) and 32-3 because it contains 5,596 words, excluding the portions exempted by Ninth Circuit Rule 27-1(1)(d) and Federal Rules of Appellate Procedure 27(a)(2)(B) and 32(f). This motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure (27)(d)(1)(E), 32(a)(5), and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point New Century Schoolbook font.

Dated:  September 15, 2025

　　　　　　　　　　　　　　*s/ Eugene Scalia*
　　　　　　　　　　　　　　Eugene Scalia
　　　　　　　　　　　　　　*Counsel for Plaintiffs-Appellants*

31