**No. 25-5327**

# United States Court of Appeals
# for the Ninth Circuit

_____

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, et al.,

*Plaintiffs-Appellants*,

v.

LIANE M. RANDOLPH, in her official capacity as
Chair of the California Air Resources Board, et al.,

*Defendants-Appellees*.

## APPENDIX TO MOTION

## FOR INJUNCTION PENDING APPEAL

Stephanie A. Maloney
Kevin Palmer
CHAMBER OF COMMERCE OF
    UNITED STATES OF AMERICA
1615 H St., N.W.
Washington, DC 20062
(202) 659-6000

*Counsel for Plaintiff-Appellant
Chamber of Commerce of the
United States of America*

Eugene Scalia
Jonathan C. Bond
Brian A. Richman
GIBSON, DUNN & CRUTCHER LLP
1700 M St., N.W.
Washington, DC 20036
(202) 955-8500
EScalia@gibsondunn.com

Bradley J. Hamburger
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071
(213) 229-7000

*Counsel for
Plaintiffs-Appellants*

## INDEX TO APPENDIX

| Document | Dkt. No. | App. Pages |
|---|---|---|
| Exhibit 1 to Declaration of Bradley J. Hamburger | 48-4 | App. 1-3 |
| Exhibit 2 to Declaration of Bradley J. Hamburger | 48-5 | App. 4-55 |
| Exhibit 7 to Declaration of Bradley J. Hamburger | 48-10 | App. 56-76 |
| Exhibit 12 to Declaration of Bradley J. Hamburger | 48-15 | App. 77-78 |
| Exhibit 17 to Declaration of Bradley J. Hamburger | 48-20 | App. 79-263 |
| Exhibit 19 to Declaration of Bradley J. Hamburger | 48-22 | App. 264-257 |
| Exhibit 20 to Declaration of Bradley J. Hamburger | 48-23 | App. 258-332 |
| Exhibit 23 to Declaration of Bradley J. Hamburger | 48-26 | App. 333-346 |
| Exhibit 25 to Declaration of Bradley J. Hamburger | 48-28 | App. 347-348 |
| Defendants' Opposition to Plaintiffs' Motion for Summary Judgment on Claim I | 52 | App. 349-380 |
| Defendants' Separate Statement of Genuine Disputes of Material Facts | 52-1 | App. 381-499 |
| Declaration of Thomas P. Lyon in Support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment on Claim 1 | 56 | App. 500-527 |
| Declaration of Edward J. Shoen | 78-3 | App. 528-538 |
| Declaration of Thomas Quaadman | 78-4 | App. 539-543 |

i

| Document | Dkt. No. | App. Pages |
|---|---|---|
| Exhibit A to Declaration of Bradley J. Hamburger | 78-6 | App. 544-546 |
| Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction | 89 | App. 547-577 |
| Exhibit 2 to Declaration of Caitlan McLoon | 89-5 | App. 578-590 |
| Declaration of Angel Hsu | 89-18 | App. 591-600 |
| Declaration of Thomas Lyon in Opposition to Notice of Motion and Motion for Preliminary Injunction | 90 | App. 601-633 |
| Order Denying Plaintiffs' Motion for Preliminary Injunction | 112 | App. 634-674 |
| Opposition re: Notice of Motion and Motion for Order for Injunction Pending Appeal | 120 | App. 675-701 |
| Declaration of Martin Durbin | 122-1 | App. 702-709 |
| Exhibit A to Durbin Declaration | 122-2 | App. 710-756 |
| Supplemental Declaration of Edward J. Shoen | 122-3 | App. 757-763 |
| Defendants' Objection to Plaintiffs' Evidence Submitted in Reply in Support of Motion for Injunction Pending Appeal | 123 | App. 764-767 |
| Plaintiffs' Response to Defendants' Objection to Evidence Submitted in Reply | 124 | App. 768-771 |
| Order Denying Plaintiffs' Motion for Injunction Pending Appeal | 125 | App. 772-776 |

# Exhibit 1

Senator Scott Wiener

September 17, 2023 Statement

Declaration of Bradley J. Hamburger In Support Of
Plaintiffs' Motion for Summary Judgment on Claim I
May 24, 2024

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.*,
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)

App.1

The Wayback Machine - https://web.archive.org/web/20231127231653/https://sd11.senate.ca.gov/print/1121



Published on *Senator Scott Wiener* (https://sd11.senate.ca.gov
(https://web.archive.org/web/20231127231653/https://sd11.senate.ca.gov/))

Home (/web/20231127231653/https://sd11.senate.ca.gov/) > Governor Newsom Announces Intention To Sign Senator Wiener's Landmark Climate Bill

(https://web.archive.org/web/20231127231653/https://www.addthis.com/bookmark.php?v=300) [1]
(https://web.archive.org/web/20231127231653/https://www.addthis.com/bookmark.php?v=300) [1]
(https://web.archive.org/web/20231127231653/https://www.addthis.com/bookmark.php?v=300) [1]

September 17, 2023

SACRAMENTO – At the Opening Ceremony of Climate Week NYC, Governor Gavin Newsom announced his intention to sign Senate Bill 253, the nation's first comprehensive greenhouse gas emissions disclosure requirement, authored by Senator Scott Wiener (D-San Francisco). In response, Senator Wiener issued the following statement:

"In announcing he will sign SB 253, Governor Newsom is reaffirming California's global climate leadership. These carbon disclosures are a simple but intensely powerful driver of decarbonization. When business leaders, investors, consumers, and analysts have full visibility into large corporations' carbon emissions, they have the tools and incentives to turbocharge their decarbonization efforts. This legislation will support those companies doing their part to tackle the climate crisis and create accountability for those that aren't. I applaud the Governor's bold climate leadership — the planet needs more climate champions like Gavin Newsom."

SB 253 will require any public or private company earning over a billion dollars in annual revenue that operates in California to publicly disclose the greenhouse gas emissions released from their operations and supply chain. These disclosures are a powerful accelerant to decarbonization, providing unprecedented clarity that will unlock new approaches and drive action to reduce emissions. The New York Times called the bill "a move with national and global repercussions in governments' efforts to fight climate change."

Disclosures have a long history of driving environmental progress. When the US EPA created the Toxic Release Inventory, a corporate toxics disclosure regime, total releases of substances covered by the disclosures dropped 54.5% from 1988-2001. A recent study in Science found that mandatory disclosures could cut total corporate emissions 70% by pushing laggard companies to cut emissions to the median level of their industry.

The announcement comes one day after Governor Gavin Newsom and Attorney General Rob Bonta announced a landmark case against five Big Oil companies for misleading the public about the catastrophic dangers of climate change. The suit—the most ambitious attempt by any American official to hold fossil fuel companies accountable for climate change—alleges that this dishonest conduct continues to the present day, as Big Oil companies attempt to mislead the public about their greenhouse gas emissions.

**Read more about the Climate Accountability Package here:**

California Lawmakers Vote to Require Disclosure of Greenhouse Emissions by Coral Davenport (https://web.archive.org/web/20231127231653/https://www.nytimes.com/2023/09/13/climate/california-emissions-businesses-climate.html) [2] (New York Times, September 13)

App.2

California's Climate Disclosure Bill Could Have Nationwide Impacts (https://web.archive.org/web/20231127231653/https://insideclimatenews.org/news/15092023/todays-climate-california-climate-disclosure-bill-nationwide-impacts-scope-3-emissions/) [3](Inside Climate News, September 15)

California Legislature Passes Sweeping Emissions Bill (https://web.archive.org/web/20231127231653/https://www.wsj.com/politics/policy/california-legislature-passes-sweeping-emissions-bill-398b586c) [4](Wall Street Journal, September 12)

**Source URL:** https://sd11.senate.ca.gov/news/20230917-governor-newsom-announces-intention-sign-senator-wiener%E2%80%99s-landmark-climate-bill

**Links**

[1] https://www.addthis.com/bookmark.php?v=300

[2] https://www.nytimes.com/2023/09/13/climate/california-emissions-businesses-climate.html

[3] https://insideclimatenews.org/news/15092023/todays-climate-california-climate-disclosure-bill-nationwide-impacts-scope-3-emissions/

[4] https://www.wsj.com/politics/policy/california-legislature-passes-sweeping-emissions-bill-398b586c

App.3

# Exhibit 2

Transcript of March 15 2023 California Senate Environmental Quality Committee Hearing, 01:53:42-02:30:34

Declaration of Bradley J. Hamburger In Support Of
Plaintiffs' Motion for Summary Judgment on Claim I
May 24, 2024

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.*,
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)

```
                                                    Page 1

 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11    3/15/2023 Senate Environmental Quality Committee

12    Hearing

13    https://www.senate.ca.gov/media/senate-

14    environmental-quality-committee-20230315/video

15    01:53:42 - 02:30:34

16

17

18

19

20

21

22

23

24

25
```

Page 2

```
1          CHAIR BENJAMIN ALLEN:  All right.  I
2   see Senator Wiener here to present our last bill
3   of the morning.  That's Item 6, SB 253.  You may
4   proceed when ready, Senator.
5          SENATOR SCOTT WIENER:  Thank you, Mr.
6   Chair.  It's good to see you on this bill after
7   we were in this committee two years ago on SB
8   260, which was the predecessor bill.  But we got
9   up to 40 votes on the assembly floor, but we
10  could not get vote number 41.  So we are back at
11  it.  And as noted in the analysis, this is a
12  narrower bill than what was before this committee
13  two years ago.
14          So colleagues, SB 253 is the Climate
15  Corporate Data Accountability Act, and it will
16  require all U.S.-based companies, both public and
17  privately held, with a billion dollars or more in
18  annual revenue, if they do business in California
19  to disclose their entire carbon footprint.  After
20  this disclosure, the state will be required to
21  basically contract out with a registry that will
22  then host this data on a website so that the
23  public, policymakers, investors will know which
24  corporations have what carbon footprint.
25          We know that there are large
```

Page 3

1    corporations that work very hard to be green to

2    reduce their carbon footprint.  There are others

3    that do not.  Unfortunately, among the ones that

4    really don't do a great job lowering their carbon

5    footprint, they will at times market themselves

6    as green, what we call green-washing.  Marketing

7    yourself as green when you're not.  We need to

8    make sure that the public actually knows who's

9    green and who isn't and to make sure we have that

10   transparency.  That's all this bill does,

11   transparency.  Information for the public.

12           So right now we do require carbon

13   disclosures for a limited set of companies,

14   basically large point source emitters through the

15   Cap-and-Trade Program, but the vast majority of

16   corporate California, corporate market is not

17   required to do this.

18           Some corporations do a great job

19   compiling this data.  Walmart is one of those

20   examples.  So anyone who tells you, including

21   some of the opponents, that this is somehow not

22   doable or a problem, some of the largest

23   corporations in the U.S. already do this.  In

24   fact, Walmart goes beyond what we're requiring in

25   this bill.  So that opposition claiming that this

Page 4

1  is not doable or a terrible burden is simply

2  inaccurate because we know that companies are

3  already doing this.

4           The EU is already requiring this.  The

5  SEC is trying to require a more limited version

6  of this.  There's been a lot of back-and-forth,

7  and I hope that the SEC succeeds, but we don't

8  know yet.  And so this is absolutely an idea

9  whose time has come, and California should do

10  this.

11           So colleagues, I just want to stress

12  that we have worked very hard over the last few

13  years with the opposition led by the chamber of

14  commerce.  We have -- we took amendments in the

15  last version of the bill, which we have all

16  honored in this bill.  For example, Scope 3,

17  which is probably the most contentious part, and

18  we know Scope 3 includes supply chain.

19           Scope 3 for many companies is about 90

20  percent of their carbon emissions that are

21  effectively contracting out their carbon

22  emissions, and Scope 3 is incredibly important.

23  We -- in the last version of the bill, the

24  opposition came to us and said this is going to

25  effectively sweep in small suppliers and also

Page 5

1    create a burden by having to track down suppliers

2    in different parts of the world.

3             And so we worked out an amendment to

4    allow, at their option, to use formulas and

5    estimates, which are very well established in

6    this methodology.  There's software for it.  It's

7    an established thing.  We're not creating

8    anything new.  And we did that to respond to this

9    issue of sweeping in small suppliers in the

10   global supply chain.

11            The main opposition letter once again

12   says we're going to sweep in small suppliers.

13   Respectfully, with all respect to the opposition,

14   that is absolutely untrue, and that was the

15   amendment that we took last year and that we have

16   honored.  We take -- we took other amendments

17   last year to make sure that implementation could

18   be as smooth as possible.

19            We took several amendments on the

20   enforcement structure in response to critiques

21   from the opposition.  We've honored all of those

22   amendments in this bill.  So I would be honored

23   to have your support, and I respectfully ask for

24   your aye vote.

25            With me today to testify are two lead

Case 2:24-cv-00801-ODW-PVC    Document 48-5    Filed 05/24/24    Page 7 of 52    Page ID #:398

Page 6

```
 1   witnesses, Sarah Sachs, who is Senior Associate
 2   of State Policy at Series, which is a business
 3   coalition that is a co-sponsor of this bill, and
 4   Alvaro Sanchez, the Vice President of Policy at
 5   the Greenlining Institute.  We also have, if
 6   questions arise, Catherine Atkin, the Director of
 7   Carbon Accountable, who has enormous technical
 8   expertise in this area if there are questions
 9   that we need to ask her to answer.
10           CHAIR BENJAMIN ALLEN:  Thank you.  All
11   right.
12           ALVARO SANCHEZ:  Hi.  Good morning,
13   Chair Allen and other members of the committee.
14   My name is Alvaro Sanchez.  I'm the Vice
15   President of Policy at the Greenlining Institute.
16   We work towards a future where communities of
17   color can build wealth, live in healthy places
18   filled with economic opportunity, and are ready
19   to meet the challenges posed by climate change.
20           In order to meet the challenges posed
21   by climate change, it is imperative to recognize
22   the right of communities to know how and if
23   corporations are working to reduce their
24   emissions and to verify corporate claims of
25   sustainable leadership.  The transparency
```

Case 2:24-cv-00801-ODW-PVC    Document 48-5    Filed 05/24/24    Page 8 of 52    Page ID #:399

Page 7

1   required by SB 253 provides Californians with the

2   necessary information to make informed decisions

3   about how to manage the emissions from

4   corporations.

5           By requiring reporting of direct

6   emissions from these corporations and any

7   emissions produced from their supply chains or

8   indirect emissions, SB 253 creates the data

9   infrastructure to drag down corporate carbon

10   emissions.  This mandate of comprehensive climate

11   pollution transparency would set the gold

12   standard for the rest of the nation and

13   establishes the right to know which companies are

14   polluting our environment, how much they are

15   emitting, and if they are decreasing or

16   increasing their climate emissions offering a

17   transparent and public way of verifying corporate

18   claims of climate leadership.

19           Now we know that California, thanks to

20   the hard work of many of you, is a global leader

21   in fighting climate change and reducing

22   emissions.  And we know that not only because of

23   the goals that we've set for ourselves, but more

24   importantly because of the climate actions, the

25   reporting, and the transparency that the state

Page 8

1   has for achieving our climate goals.

2           SB 253 is requiring that corporate

3   sector follow GHG emission reporting practices

4   that are the norm in other sectors and for the

5   state.  This reporting ensures accurate and

6   truthful reporting of corporate corporations'

7   climate carbon footprint.  Corporate emissions

8   contribute to over-pollute communities and deadly

9   climate outcomes from harsher wildfires, seasons,

10  and historic storms and floods.

11          The worst of these impacts

12  disproportionately fall on communities of color

13  and low-income communities.  And for all the

14  reasons above, the Greenlining Institute requests

15  your aye vote towards this measure.  Thank you.

16          CHAIR BENJAMIN ALLEN:  Thank you.  Next

17  we have Sarah.  And Sarah, I thought Series was

18  the goddess of agriculture.  Is that not true?

19          SARAH SACHS:  It's also a move I

20  believe for Saturn.  So no, there is --

21          CHAIR BENJAMIN ALLEN:  It's a moon of

22  Saturn.  Okay.

23          SARAH SACHS:  Very common.

24          CHAIR BENJAMIN ALLEN:  How did you guys

25  end up with that name?

```
                                              Page 9

 1              SARAH SACHS:  We initially started as

 2      an acronym.  So you'll --

 3              CHAIR BENJAMIN ALLEN:  Oh.

 4              SARAH SACHS: -- sometimes see it in all

 5      caps.

 6              CHAIR BENJAMIN ALLEN:  Okay.

 7              SARAH SACHS:  We got started in 1989

 8      after the Exxon Valdez oil spill and very much

 9      focused on ESG values, which leads us here today.

10              CHAIR BENJAMIN ALLEN:  Okay.

11              SARAH SACHS:  Well, good morning again,

12      Chair Allen and committee members.  Again, Sarah

13      Sachs on behalf of Series.  And in parallel with

14      Senator Stern's SB 261, we also believe that the

15      state has an opportunity to set a gold standard

16      on requiring corporate emissions data disclosure

17      with SB 263 and are pleased to support and serve

18      as a co-sponsor for this bill.

19              Some other climate risk reporting.  The

20      current voluntary climate emissions reporting

21      landscape is fragmented, incomplete, and often

22      unverified.  And this gap in publicly available

23      emissions data creates a massive blind spot for

24      consumers, investors, and policymakers who are

25      seeking to derive meaningful insights across the
```

```
                                              Page 10

 1    entire economy.

 2              In recent years we have begun to see

 3    more and more action on emissions data reporting

 4    from leading companies.  These businesses and

 5    many of their peers understand that climate

 6    change poses a significant risk to their long-

 7    term economic success, impacts the health and

 8    livelihood of the communities in which they

 9    operate and live, and disrupts the value chains

10    on which they rely.

11              Reporting emissions data in a

12    consistent standardized format that all companies

13    must follow will provide a competitive edge for

14    leading businesses with investors and consumers.

15    As a result, many companies are already

16    voluntarily reporting some form of their

17    emissions data, including over 80 percent of S&P

18    500 companies.

19              However, mandatory emissions

20    disclosure, including Scopes 1, 2, and 3, is

21    necessary to access the full picture across

22    companies' value chains.  This will level the

23    playing field by ensuring that all major public

24    and private companies disclose their full

25    emissions inventory.  And this bill will also
```

Page 11

```
 1   complement the SEC's proposed climate disclosure
 2   rule as well as the European Corporate
 3   Sustainability Reporting Directive that took
 4   effect in January, and global standards that are
 5   expected to be finalized this year by the IFRS --
 6   so many acronyms in the sustainability world --
 7   International Sustainability Standards Board.
 8            We'd also like to note that several
 9   major companies and institutions already support
10   this bill, including Patagonia, Ikea USA, Dignity
11   Health, Sierra Nevada Brewing Company, Avocado
12   Green Brands Growth Collaborative, and Everlane.
13   For all the reasons stated above, Series
14   respectfully requests your aye vote on this
15   measure.  Thank you for your time and
16   consideration.
17            CHAIR BENJAMIN ALLEN:  Thank you.
18   Other folks who want to voice support for the
19   bill who are here in person?  Just come on up to
20   the mic.
21            KATE CONNELLY:  Kate Connelly on behalf
22   of the SEIU in support.
23            CHAIR BENJAMIN ALLEN:  Thank you.
24            JANET COX:  Janet Cox for Climate
25   Action California in support.  Thank you for your
```

Page 12

1   perseverance.

2           CHRISTINA SCARINGE:  Christina Scaringe

3   with the Center for Biological Diversity in

4   support.

5           LIV BUTLER:  Liv Butler, Californians

6   Against Waste in support.

7           MELISSA ROMERO:  Melissa Romero,

8   California Environmental Voters proud co-sponsor

9   of SB 253.  Thank you.

10          CHAIR BENJAMIN ALLEN:  All right.  Yes.

11  Sorry.

12          MELISSA ROMERO:  Who was also asked to

13  voice the support of Community Water Center for

14  the bill.

15          CHAIR BENJAMIN ALLEN:  Great.  Thank

16  you.  All right.  Witnesses in opposition to the

17  bill who want to come up to the mic.

18          BRADY VAN ENGELEN:  Good morning.

19  Brady Van Engelen here on behalf of the

20  California Chamber of Commerce.  First I'd just

21  like to take a moment and thank Senator Wiener

22  for the work that he's done with us previously on

23  this bill.  He's really kind of served as a model

24  author of, you know, the kind of, you know,

25  collaboration that we'd like to see from members

Page 13

1   moving, you know, throughout this process.  So

2   just wanted to take a moment and acknowledge that

3   he has been very accommodating.

4           However, there are still some concerns

5   that we have, primarily the transition isn't

6   exactly happening, you know, through one sector.

7   The economic impact varies depending on which

8   sector, and which sector -- and which is why you

9   see companies in various stages of analysis

10  tracking and goal setting.  We respectfully

11  oppose this bill primarily because the outsize

12  impact it would on medium and small businesses,

13  particularly those located here in California.

14          It's impossible to remove the supply

15  chain from Scope 3, so it just creates a really

16  challenging dynamic.  Giving the breadth of

17  calculating Scope 3 emissions, it's still more of

18  an art than a science.  There isn't really an

19  objective criteria for calculating Scope 3.  And

20  this fundamentally compromises the notion that SB

21  253 is a -- intended to be a transparency

22  measure.

23          Data transparency is only valuable when

24  you're comparing apples to apples.  The different

25  methodologies are going to create different kinds

Page 14

1    of analyses, which makes things more complicated.

2    If it were created -- if SB 253 were adopted, it

3    would create yet another disclosure regime.  It

4    would only further complicate climate reporting,

5    which is happening at a national and global

6    scale.  There isn't yet broad consensus.  We're

7    seeing that through the SEC and through the Biden

8    Administration, and we just encourage that to be

9    contemplated if this bill is further revised to

10   contemplate that as well.

11             And at a minimum -- sorry.  And last --

12   but you know, another point to raise here is that

13   GHG emissions are an international issue.  This

14   bill doesn't really contemplate that either.

15   Thinking about this from a global perspective

16   rather than here in California where CARB's

17   regulatory authority really is confined really

18   complicates this issue as well.

19             For the reasons that I've noted above,

20   that's the reasons that we're opposed to this --

21   respectfully opposed to this bill.  Thank you.

22             CHAIR BENJAMIN ALLEN:  Thank you.

23   Thank you.  Other folks?  Yeah.

24             ROB SPIEGEL:  Hello again, Mr. Chair.

25   Rob Spiegel, Senior Policy Director for the

Page 15

1   California Manufacturers and Technology
2   Association.  Definitely concur with the comments
3   of my good colleague from Cal Chamber and also
4   definitely -- and deeply respect the efforts of
5   Senator Wiener in kind of bringing forward this
6   largely transparency measure.
7            But to give the committee and members a
8   little bit more of an optic as to how this
9   impacts the supply chain -- and I understand the
10  arguments surrounding, well, it doesn't impact
11  small businesses, well, the manufacturing sector,
12  not only California sector but internationally,
13  is going to be at the heart of this Scope 3
14  emission challenge.
15           We are the ones, as everybody knows,
16  manufacturing that finished product, that complex
17  product, the airplane, that vehicle, that
18  electronic device, the medical device.  And with
19  CMTA's own membership, we have members who are
20  manufacturers that rely on a supply chain
21  sometimes 10,000 or more subcontractors and
22  contractors to supply that finished product.
23           The only way in which the reportable
24  entity for Scope 3 emissions in this bill will be
25  able to comply is to go to each one of those

Page 16

1  10,000 manufacturers, those subcontractors, in
2  order to provide that emission data.  Now, I do
3  respect that there were modifications made in SB
4  260 last year, including industry average, a
5  proxy data, secondary data.  And those were all
6  fine and good, but the issue and the challenge
7  with primary and secondary data is it's not a
8  replacement for accuracy, and it's not a
9  replacement for completeness.
10       And that's what SB 253 is providing.
11  It relies upon average data, secondary data, not
12  the fundamental core component of what is that
13  emission target, and that's an issue.  So with
14  that as well -- and I'll wrap up here very
15  quickly, CMTA, our National Association of
16  Manufacturers as well in discussing the SEC
17  modifications, this has been ongoing now for
18  almost two years.  We're close to having that
19  finished.
20       But through that process, we've been
21  able to understand what the financial impact is
22  for all size businesses and manufacturers.  The
23  cost of the reporting requirements can extend in
24  the tens to hundreds of thousands of dollars to
25  millions of dollars for those manufacturers of

```
                                           Page 17

1    products with complex supply chains.  So this is

2    going to be an expensive endeavor for California

3    businesses and others to comply.  We do respect

4    what the author is trying to do, but for these

5    reasons and others, we do have to respectfully

6    oppose.

7               CHAIR BENJAMIN ALLEN:  Before you sit

8    down --

9               ROB SPIEGEL:  Chair Allen.

10              CHAIR BENJAMIN ALLEN:  -- can I -- can

11   you just respond to the idea that major

12   businesses such as Walmart, I mean the author

13   just mentioned they're complying with the basic

14   parameters of the bill.  So why -- how is it that

15   they're able to comply but it's so onerous for

16   everybody else?

17              ROB SPIEGEL:  I think onerous is in the

18   eye of the beholder, okay?  So for a manufacturer

19   -- and we don't -- obviously we don't represent

20   Walmart.  I don't represent Walmart.  For a

21   manufacturer, though, it's broader than just the

22   retail sector for what we have to do.  It's

23   broader than transportation.  It's broader than

24   bringing that final product to a retail

25   establishment and to a consumer.  As we build and
```

```
                                        Page 18
 1   construct that product --
 2              CHAIR BENJAMIN ALLEN:  You're
 3   incorporating lots of things.
 4              ROB SPIEGEL:  -- you're incorporating
 5   -- exactly.
 6              CHAIR BENJAMIN ALLEN:  But --
 7              ROB SPIEGEL:  So --
 8              CHAIR BENJAMIN ALLEN:  Yeah.
 9              ROB SPIEGEL:  -- on that level, it's --
10   again, to Brady's point, it's not an apples-to-
11   apples comparison.
12              CHAIR BENJAMIN ALLEN:  Is it any more
13   complicated than a big retailer that's bringing
14   in so many products from so many different
15   places, and has this complicated supply chain,
16   and all?  I don't know.  I'm --
17              ROB SPIEGEL:  I mean, in some ways it's
18   very similar.
19              CHAIR BENJAMIN ALLEN:  Yeah.
20              ROB SPIEGEL:  You take that final
21   product, the T-shirt, the television from
22   Walmart, they're requiring that manufacturer to
23   also provide that data I would assume.  Where --
24   what was the manufacturing profile of it?  What
25   were the emission targets of it?  Then from that
```

Page 19

1   supplier, Samsung or whoever the TV manufacturer

2   is, they're going to each one of those internal

3   components to provide that additional data,

4   whether it's the LCD screen with wiring or what

5   have you.  That is how we conceptually understand

6   this bill and how it conceptually works.

7         CHAIR BENJAMIN ALLEN:  All right.

8   Well, we can discuss it further, and obviously

9   stay here and I'm sure we'll have some

10  discussions but appreciate that.  Okay.  other

11  folks who want to just weigh in, in opposition,

12  make sure their opposition is recorded?

13        BRET GLADFELTY:  Good morning.  Bret

14  Gladfelty with Apex Group on behalf of the

15  Association of General Contractors and Financial

16  Services Institute, and unfortunately in

17  opposition.  Again, Scope 3 is the big issue

18  here.  I think we could find a middle ground if

19  we just resolve Scope 3.  Thank you.

20        CHAIR BENJAMIN ALLEN:  Thank you.

21        MATTHEW ALLEN:  Hi, Mr. Chair and

22  members of the committee.  Matthew Allen with

23  Western Growers also opposed.

24        CHAIR BENJAMIN ALLEN:  Thank you.

25        ZACH LEARY:  Hi there.  Zach Leary with

Page 20

1   the Western States Petroleum Association.  We're

2   opposed.

3              JOANNE BETTENCOURT:  Joanne Bettencourt

4   representing SIFMA, the Securities Industry and

5   Financial Markets Association in opposition.

6              NICK CHAFFEE:  Good morning.  Nick

7   Chaffee with the California Trucking Association

8   in respectful opposition.  Thank you.

9              CHAIR BENJAMIN ALLEN:  Thank you.

10             MELANIE CUEVAS:  Good morning.  Melanie

11   Cuevas with the California Bankers Association

12   also in respectful opposition.  Thank you.

13             CHAIR BENJAMIN ALLEN:  Thank you very

14   much.

15             DAN KREKELBERG:  Dan Krekelberg with

16   the Climate Registry.  We have concerns about

17   this bill, about some of the language in there.

18   We're not in opposition to the bill, but we do

19   have concerns.  Specifically we'd like to see

20   standards and protocols included in there that

21   ensure the integrity of the greenhouse gas

22   emissions that are being disclosed, including --

23             CHAIR BENJAMIN ALLEN:  The integrity of

24   the data, right?

25             DAN KREKELBERG:  The data.

```
                                            Page 21
 1            CHAIR BENJAMIN ALLEN:  Right.
 2            DAN KREKELBERG:  The data.
 3            CHAIR BENJAMIN ALLEN:  Yeah.
 4            DAN KREKELBERG:  If the intent to
 5   prevent greenwashing, then we want to make sure
 6   that verification is done correctly, measurement
 7   and reporting as well.  And that includes
 8   inclusion of the protocols that were developed by
 9   the voluntary registry created by the state of
10   California 20 years ago.  Thank you.
11            CHAIR BENJAMIN ALLEN:  Okay.  Okay.
12   Folks on the phone lines.  Folks on the phone
13   lines, do you want to raise concerns or support
14   for the bill?
15            WOMAN 1:  Thank you.  If you're in
16   support or opposition, you may press 1 and then
17   0.  Again, that is 1 and then 0 for support or
18   opposition.  We'll go to line 44.  Your line is
19   open.
20            MADDIE MUNSON:  Maddie Munson on behalf
21   of the Agricultural Energy Consumers Association
22   and California Poultry Federation in opposition.
23            WOMAN 1:  Thank you.  Next we'll go
24   Line 25.  Your line is open.  Line 25, your line
25   is open.
```

```
                                        Page 22

 1              JIM LINDBERG:  Jim Lindberg on behalf
 2     of the Friends Committee on Legislation of
 3     California in support.  Thank you.
 4              WOMAN 1:  Thank you.  Next we'll go to
 5     line 50.  Your line is open.
 6              ANDREA CORREIA:  Andrea Correia on
 7     behalf of the California Life Sciences in
 8     opposition.
 9              WOMAN 1:  Thank you.  Next we'll go to
10     line 49.  Your line is open.
11              MEGAN CLEVELAND:  Good morning.  Megan
12     Cleveland with the Nature Conservancy in support.
13              WOMAN 1:  Thank you.  Next we'll go to
14     line 24.  Your line is open.
15              VALERIE VENTRE-HUTTON:  Valerie Ventry-
16     Hutton with 350 Bay Area Action in support.
17              WOMAN 1:  Thank you.  Next we'll go to
18     line 35.  Your line is open.
19              WOMAN 2:  (Indiscernible) on behalf of
20     the American Pistachio Growers, California Apple,
21     Blueberry, Date, and Walnut Commission, Western
22     Plant Health Association, California All-Growers
23     Council, (Indiscernible) Farmers League,
24     (Indiscernible) Equipment Dealers, Cotton Ginners
25     and Growers Association, Fresh Fruit Association,
```

Page 23

1   and Western Ag Processors in opposition.  Thank

2   you.

3           WOMAN 1:  Thank you.  Next we'll go to

4   line 43.  Your line is open.

5           VICTORIA RODRIGUEZ:  Good morning.

6   Victoria Rodriguez with Nielsen Merksamer on

7   behalf of the Alliance for Automotive Innovation

8   in opposition.

9           WOMAN 1:  Thank you.  Next we'll go to

10  line 51.  Your line is open.

11          NATALIE BOUST:  Natalie Boust, the

12  California Business Roundtable respectfully

13  opposed.

14          WOMAN 1:  Thank you.  Line 48, your

15  line is open.

16          DARRYL LITTLE, JR.:  Darryl Little, Jr.

17  with the Natural Resources Defense Council in

18  support.  Thank you.

19          WOMAN 1:  Thank you.  Line 39, your

20  line is open.

21          STEVEN KING:  Hi, this is Steven King

22  with Environment California and CALPIRG, the

23  California Public Interest Research Group.  Both

24  groups are in support of SB 253.

25          WOMAN 1:  Thank you.  Next we'll go to

```
                                          Page 24
 1    line 45.  Your line is open.
 2              RYAN ALLAIN:  Good morning.  This is
 3    Ryan Allain with the California Retailers
 4    Association in opposition.  Thank you.
 5              WOMAN 1:  Thank you.  And next we'll go
 6    to line 47.  Your line is open.
 7              KATHY SCHAEFER:  Kathy Schaefer on
 8    behalf of the San Fernando Valley Climate Reality
 9    Project in support.  Thank you.
10              WOMAN 1:  Thank you.  We do have one
11    more in queue.  We're just waiting for their line
12    number.  It'll be just a moment.  Thank you.  And
13    next we'll go to line 52.  Your line is open.
14              JOHN WINGER:  Thanks, chair members.
15    John Winger on behalf of the California Fuels and
16    Convenience Alliance and the Advanced Medical
17    Technology Association in opposition.  Thanks.
18              WOMAN 1:  Thank you.  And we have no
19    further supporting or opposition in queue.
20              CHAIR BENJAMIN ALLEN:  All right.
21    Thank you.  We'll bring the bill back to the
22    committee for questions, discussion, concerns,
23    support.  Senator Hurtado.
24              SENATOR MELISSA HURTADO:  Thank you,
25    Mr. Chair.  And thank you, Senator Wiener.  I
```

Page 25

```
 1   know that last year I supported a similar bill
 2   that you had.  It was probably the exact same
 3   thing.  And I know that you made some changes to
 4   the bill.  I'm all for climate corporate data
 5   accountability, but I do have some new concerns
 6   in this area.  I mean, I like -- I love the fact
 7   that it puts the responsibility on corporations
 8   over $1 billion.  At the same time, I also have
 9   concern over those corporations having and
10   collecting information of, you know, of the
11   supply chain and what type of information they'll
12   have in their hands.
13             And I don't think that the bill is --
14   you know, clearly defines what needs to be
15   collected from those companies.  I believe that
16   it leaves the responsibility to a panel of
17   experts to advise CARB.  And I think without
18   having that information at -- you know, in my
19   hands, I can't support the bill because I just
20   don't know what will come about from it.
21             And the concern really is -- and there
22   was mention of Walmart.  Well, Walmart just picks
23   and chooses who they buy from.  And can they have
24   a competitive edge down the road because of the
25   information that is provided?  I mean, that's a
```

Page 26

1   concern that I have.  And I don't know if you

2   have anything to say on those issues there.

3           SENATOR SCOTT WIENER:  Sure.  I

4   appreciate it, Senator Hurtado.  And thank you

5   for your support of this bill last year.  This

6   bill is no broader than last year.  In fact, in

7   some ways it was somewhat narrowed in the

8   assembly.  So it's a very similar bill to last

9   year.

10          So first of all, Scope 3 is extremely

11  well-defined.  The GHG -- it's called the GHG

12  Protocols, which is what the bill is based on.

13  It's a well-flushed out and established

14  methodology that companies around the world are

15  using today.  And we gave Walmart as an example.

16  A lot of other companies big and small are using

17  it in the U.S., in the EU, and they're you know,

18  compiling Scope 3.

19          So this is -- we're not creating

20  anything new in this bill other than the

21  requirement to do it.  We're not creating a new

22  methodology, a new system.  This is all

23  established methodology and all very well

24  defined.  So I don't agree that this is -- it's

25  like a nebulous Scope 3.

Page 27

1           In addition, these companies, if they
2    want to, can already collect this -- or require
3    this data from their suppliers.  They have every
4    ability to do that, and some of them are already
5    doing it.  We -- and we're not even requiring
6    them to go to their suppliers because I know -- I
7    appreciate the opposition acknowledging that we
8    worked very hard with them in the last two years
9    to allow for Scope 3 use of formulas and
10   estimates, which is also an established
11   methodology.
12           So they do not -- so they're not
13   required to go to every single micro-supplier and
14   demand that data.  They can do that if they want,
15   and some companies are already doing it, but
16   we're not requiring them to do it.  So I think
17   that Scope 3 is very well established and we're
18   not doing anything new or out of the ordinary
19   here with that requirement.
20           SENATOR MELISSA HURTADO:  Thank you.  I
21   guess on my end I would love to learn a little
22   bit more about the formulas and the methodologies
23   --
24           SENATOR SCOTT WIENER:  Sure.
25           SENATOR MELISSA HURTADO:  -- that are

Page 28

1  being used.  Because I think that's what will get

2  me back to a position of aye on this measure.  I

3  want to support it.  I supported it last year.  I

4  do have, as I mentioned, new concerns.  However,

5  I do want to learn some more about the formulas

6  and methodologies and to be able to get myself

7  back to an aye vote.

8          SENATOR SCOTT WIENER:  We'll absolutely

9  be happy to work with you on that.

10          SENATOR MELISSA HURTADO:  Thank you.

11          CHAIR BENJAMIN ALLEN:  Thank you.  All

12  right.  Yes.  Senator Dahle.

13          VICE CHAIR BRIAN DAHLE:  Thank you, Mr.

14  Chairman.  So I listened to a lot of debate, and

15  obviously -- so I'm a producer of agriculture

16  commodities in California, which is amazing I'm

17  still here.  We have AB 32.  We have Air Board.

18  We have all kinds of things to meet goals of

19  reducing carbon in California and are just two

20  California businesses.

21          So I think the difference in -- you

22  know, you're talking about Walmart is doing it

23  already, and you're talking about these -- and

24  it's a billion-dollar company.  So I sell my

25  products to -- and I looked them up -- companies

Page 29

1   that are over -- will meet this threshold, and my

2   products go there.  And I'm not required to

3   report today, and they're not required to ask me.

4   They could use some formula I guess to try to

5   figure out what I do.

6           But when you add in the fact that they

7   can get a $50,000 fine or $100,000 penalty by the

8   AG's Office according to what I'm reading here,

9   is that there will be the ability to be able to

10  do that, and then we're going to talk later down

11  the road about, you know, how accurate they are

12  and what the ability is.  So I think that's the

13  nervousness of why people are concerned about

14  your piece of legislation.

15          So if you could address that issue and

16  give us some sort of secure answer in why it

17  would be, you know, not pushed down to those

18  smaller companies that are producing those

19  products that go to these large corporations --

20          SENATOR SCOTT WIENER:  Sure.

21          VICE CHAIR BRIAN DAHLE:  -- I think

22  that would be helpful --

23          SENATOR SCOTT WIENER:  I think the --

24          VICE CHAIR BRIAN DAHLE:  -- in this

25  debate.

```
                                                   Page 30

 1              SENATOR SCOTT WIENER:  -- some of the
 2      nervousness by large corporations is because they
 3      don't want to do the disclosure and they don't
 4      want to say what their carbon footprint is
 5      because they think they're going to be
 6      embarrassed by it.  I'm just being totally blunt.
 7      I think that's what the nervousness is.  Because
 8      we were -- again, we worked with -- they came
 9      forward and said it's going to be really hard for
10      us to go through the entire global supply chain.
11              Those 10,000 -- the 10,000 suppliers
12      that the folks from the manufacturers talked
13      about, we don't want to go to 10,000 people.  We
14      said, okay, we'll work with you and allow you the
15      option.  You can go to all of them if you want
16      to, but you don't have to.  You can use these
17      estimates and formulas, which are well-
18      established methodology.  It's an established
19      software.  It's an established thing, and you can
20      do that if you want to.
21              And now they come back and say, well,
22      on the one hand it's still going to affect our
23      suppliers, which it doesn't.  That's just not
24      accurate.  On the other hand, you accommodated us
25      by saying we could use formulas.  Now we're
```

Page 31

```
 1   saying it's not accurate enough to use formulas.
 2   Well, which way is it?  You're saying it's going
 3   to be too accurate and too hard to get that
 4   precise accuracy, and it's going to sweep in
 5   small suppliers and be too burdensome.  Okay.
 6   We'll use estimates.  Well, now it's not accurate
 7   enough.
 8            So I understand they oppose the bill,
 9   and I appreciate that they have worked with us,
10   but at some point the arguments stop making
11   sense.  I think that companies largely are going
12   to use the formulas.  That's what I -- I'm -- I
13   strongly suspect that.  If a company was bound
14   and determined to get precise data from its
15   suppliers, they would probably be doing that
16   already, right?
17            They don't like this bill.  They're not
18   going to go above and beyond what they're
19   required to do.  I'd be surprised if they did.
20   And so that -- that's my take on it.  And we did
21   this amendment, and we put a lot of work into it
22   precisely to lower the risk of smaller suppliers
23   being swept in.  That was our goal because my
24   goal has never been to require an impact on these
25   small suppliers.
```

Page 32

1        VICE CHAIR BRIAN DAHLE:  What about
2    out-of-country suppliers that aren't required to
3    give any information at all?
4        SENATOR SCOTT WIENER:  They can --
5    that's -- they can use the formulas and
6    estimates.  That's another -- there was -- the
7    two reasons for making the change were the small
8    suppliers, and the other one was, especially if
9    you're larger and you have a worldwide supply
10   chain, we get that it's -- you know, that micro-
11   supplier in Indonesia, you might struggle to get
12   information from them.  Different country,
13   different, you know, business atmosphere.
14       They may not be able to calculate it,
15   and that's why we gave companies the options of
16   using these established formulas to do it so that
17   they would not get caught up in that kind of
18   situation.
19       CHAIR BENJAMIN ALLEN:  Okay.  Joint
20   Author Gonzalez has moved this bill.
21       SENATOR SCOTT WIENER:  Thank you.
22       CHAIR BENJAMIN ALLEN:  We'll let you
23   close, Senator.
24       SENATOR SCOTT WIENER:  Thank you very
25   much, colleagues.  Just looking big picture, this

Page 33

1    is about information and transparency.  This bill
2    does not regulate these companies.  It does not
3    require them to do anything to change their
4    missions.  I know there are other bills that are
5    dealing with that, and that's its own debate.
6    All this does is they tell us what your carbon
7    footprint is just like all these other
8    corporations here and around the world are
9    already doing.
10           We have major corporations that are not
11   just doing this but are sponsoring this bill and
12   are submitting support letters saying this is
13   doable, we do this.  It should be standardized.
14   It is -- there's few things that are more
15   maddening when you see some like major -- I know
16   the oil companies oppose it.  The oil companies
17   that literally run around having like
18   greenwashing ads on network TV about how
19   incredibly green they are with all the green
20   imagery for oil companies that are polluting.
21           And you know, they can advertise
22   however they want, but they should at least have
23   to tell us what their carbon footprint is so that
24   members of the public don't just have to believe
25   what they see on TV.  I respectfully ask for your

```
                                              Page 34
 1   aye vote.
 2              CHAIR BENJAMIN ALLEN:  All right.
 3   Thank you, Senator.  Secretary, please call the
 4   roll.
 5              SECRETARY:  All right.  This is SB 253
 6   and the motion is due passed to the Senate
 7   Judiciary Committee.  Allen?
 8              CHAIR BENJAMIN ALLEN:  Aye.
 9              SECRETARY:  Allen aye.  Dahle?
10              VICE CHAIR BRIAN DAHLE:  No.
11              SECRETARY:  Dahle no.  Gonzalez?
12              SENATOR LENA GONZALEZ:  Aye.
13              SECRETARY:  Gonzalez aye.  Hurtado?
14   Menjivar?
15              SENATOR CAROLINE MENJIVAR:  Aye.
16              SECRETARY:  Menjivar aye.  Nguyen?
17              SENATOR JANET NGUYEN:  No.
18              SECRETARY:  Nguyen no.  Skinner?
19              SENATOR NANCY SKINNER:  Aye.
20              SECRETARY:  Skinner aye.
21              CHAIR BENJAMIN ALLEN:  Okay.
22              SECRETARY:  I'm sorry, 4-2.
23              CHAIR BENJAMIN ALLEN:  That's 4-2 with
24   one abstention so we'll close the roll on that.
25   All right.  Thank you, members.  Let's -- that
```

Page 35

1    concludes our agenda.  Let's just make sure we
2    got all the votes added on for everybody.  We
3    will start out with the SB 12, Item 1 on your
4    agendas, members.  Item 1, SB 12.  Secretary,
5    please call the roll.
6              SECRETARY:  SB 12, the motion -- I'm
7    sorry, SB 12 is File Item Number 1, and the
8    motion is due pass to the Senate Appropriations
9    Committee.  Current vote is 4-2, Chair voting
10   aye, Vice Chair voting no.  Hurtado?
11             CHAIR BENJAMIN ALLEN:  12, yeah.
12             SENATOR MELISSA HURTADO:  Aye.
13             SECRETARY:  Hurtado aye.  Final vote is
14   5-2.
15             CHAIR BENJAMIN ALLEN:  Okay.  That's 5-
16   2.  We'll close the roll on that item.  Oh,
17   before you go, can we take the consent calendar?
18             (End of requested portion)
19
20
21
22
23
24
25

Page 36

1                    C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certify that the

4      foregoing transcript is a true and accurate

5      record of the proceedings.

6

7

8

9      _____

10

11     Veritext Legal Solutions

12     330 Old Country Road

13     Suite 300

14     Mineola, NY 11501

15

16     Date: May 21, 2024

17

18

19

20

21

22

23

24

25

**[0 - ago]**                                                                 Page 1

| 0 |
| --- |
| **0**  21:17,17 |
| **01:53:42**  1:15 |

| 1 |
| --- |
| **1**  10:20 21:15 21:16,17,23 22:4,9,13,17 23:3,9,14,19,25 24:5,10,18 25:8 35:3,4,7 |
| **10,000**  15:21 16:1 30:11,11 30:13 |
| **100,000**  29:7 |
| **11501**  36:14 |
| **12**  35:3,4,6,7,11 |
| **12151**  36:8 |
| **1989**  9:7 |

| 2 |
| --- |
| **2**  10:20 22:19 35:16 |
| **20**  21:10 |
| **20230315**  1:14 |
| **2024**  36:16 |
| **21**  36:16 |
| **24**  22:14 |
| **25**  21:24,24 |
| **253**  2:3,14 7:1 7:8 8:2 12:9 13:21 14:2 16:10 23:24 34:5 |
| **260**  2:8 16:4 |

**261**  9:14
**263**  9:17

| 3 |
| --- |
| **3**  4:16,18,19,22 10:20 13:15,17 13:19 15:13,24 19:17,19 26:10 26:18,25 27:9 27:17 |
| **3/15/2023**  1:11 |
| **300**  36:13 |
| **32**  28:17 |
| **330**  36:12 |
| **35**  22:18 |
| **350**  22:16 |
| **39**  23:19 |

| 4 |
| --- |
| **4-2**  34:22,23 35:9 |
| **40**  2:9 |
| **41**  2:10 |
| **43**  23:4 |
| **44**  21:18 |
| **45**  24:1 |
| **47**  24:6 |
| **48**  23:14 |
| **49**  22:10 |

| 5 |
| --- |
| **5**  35:15 |
| **5-2**  35:14 |
| **50**  22:5 |
| **50,000**  29:7 |
| **500**  10:18 |

**51**  23:10
**52**  24:13

| 6 |
| --- |
| **6**  2:3 |

| 8 |
| --- |
| **80**  10:17 |

| 9 |
| --- |
| **90**  4:19 |

| a |
| --- |
| **ab**  28:17 |
| **ability**  27:4 29:9,12 |
| **able**  15:25 16:21 17:15 28:6 29:9 32:14 |
| **above**  8:14 11:13 14:19 31:18 |
| **absolutely**  4:8 5:14 28:8 |
| **abstention**  34:24 |
| **access**  10:21 |
| **accommodated**  30:24 |
| **accommodati...**  13:3 |
| **accountability**  2:15 25:5 |
| **accountable**  6:7 |
| **accuracy**  16:8 31:4 |

**accurate**  8:5 29:11 30:24 31:1,3,6 36:4
**achieving**  8:1
**acknowledge**  13:2
**acknowledging**  27:7
**acronym**  9:2
**acronyms**  11:6
**act**  2:15
**action**  10:3 11:25 22:16
**actions**  7:24
**actually**  3:8
**add**  29:6
**added**  35:2
**addition**  27:1
**additional**  19:3
**address**  29:15
**administration**  14:8
**adopted**  14:2
**ads**  33:18
**advanced**  24:16
**advertise**  33:21
**advise**  25:17
**affect**  30:22
**ag**  23:1
**ag's**  29:8
**agenda**  35:1
**agendas**  35:4
**ago**  2:7,13 21:10

**[agree - bill]**                                                Page 2

| | | | |
|---|---|---|---|
| **agree**  26:24 | **american**  22:20 | **atmosphere** 32:13 | **believe**  8:20 |
| **agricultural** 21:21 | **analyses**  14:1 | **author**  12:24 | 9:14 25:15 |
| **agriculture** 8:18 28:15 | **analysis**  2:11 13:9 | 17:4,12 32:20 | 33:24 |
| **air**  28:17 | **andrea**  22:6,6 | **authority**  14:17 | **benjamin**  2:1 |
| **airplane**  15:17 | **annual**  2:18 | **automotive** 23:7 | 6:10 8:16,21 |
| **allain**  24:2,3 | **answer**  6:9 29:16 | **available**  9:22 | 8:24 9:3,6,10 |
| **allen**  2:1 6:10 | **apex**  19:14 | **average**  16:4 | 11:17,23 12:10 |
| 6:13 8:16,21 | **apple**  22:20 | 16:11 | 12:15 14:22 |
| 8:24 9:3,6,10 | **apples**  13:24,24 | **avocado**  11:11 | 17:7,10 18:2,6 |
| 9:12 11:17,23 | 18:10,11 | **aye**  5:24 8:15 | 18:8,12,19 |
| 12:10,15 14:22 | **appreciate** | 11:14 28:2,7 | 19:7,20,24 |
| 17:7,9,10 18:2 | 19:10 26:4 | 34:1,8,9,12,13 | 20:9,13,23 |
| 18:6,8,12,19 | 27:7 31:9 | 34:15,16,19,20 | 21:1,3,11 |
| 19:7,20,21,22 | **appropriations** | 35:10,12,13 | 24:20 28:11 |
| 19:24 20:9,13 | 35:8 | | 32:19,22 34:2 |
| 20:23 21:1,3 | **area**  6:8 22:16 | **b** | 34:8,21,23 |
| 21:11 24:20 | 25:6 | | 35:11,15 |
| 28:11 32:19,22 | **arguments** | **back**  2:10 4:6 | **bettencourt** |
| 34:2,7,8,9,21 | 15:10 31:10 | 24:21 28:2,7 | 20:3,3 |
| 34:23 35:11,15 | **art**  13:18 | 30:21 | **beyond**  3:24 |
| **alliance**  23:7 | **asked**  12:12 | **bankers**  20:11 | 31:18 |
| 24:16 | **assembly**  2:9 | **based**  2:16 | **biden**  14:7 |
| **allow**  5:4 27:9 | 26:8 | 26:12 | **big**  18:13 19:17 |
| 30:14 | **associate**  6:1 | **basic**  17:13 | 26:16 32:25 |
| **alvaro**  6:4,12 | **association** | **basically**  2:21 | **bill**  2:2,6,8,12 |
| 6:14 | 15:2 16:15 | 3:14 | 3:10,25 4:15 |
| **amazing**  28:16 | 19:15 20:1,5,7 | **bay**  22:16 | 4:16,23 5:22 |
| **amendment**  5:3 | 20:11 21:21 | **begun**  10:2 | 6:3 9:18 10:25 |
| 5:15 31:21 | 22:22,25,25 | **behalf**  9:13 | 11:10,19 12:14 |
| **amendments** | 24:4,17 | 11:21 12:19 | 12:17,23 13:11 |
| 4:14 5:16,19 | **assume**  18:23 | 19:14 21:20 | 14:9,14,21 |
| 5:22 | **atkin**  6:6 | 22:1,7,19 23:7 | 15:24 17:14 |
| | | 24:8,15 | 19:6 20:17,18 |
| | | **beholder**  17:18 | 21:14 24:21 |
| | | | 25:1,4,13,19 |

**[bill - close]** Page 3

26:5,6,8,12,20
31:8,17 32:20
33:1,11
**billion**  2:17
25:8 28:24
**bills**  33:4
**biological**  12:3
**bit**  15:8 27:22
**blind**  9:23
**blueberry**
22:21
**blunt**  30:6
**board**  11:7
28:17
**bound**  31:13
**boust**  23:11,11
**brady**  12:18,19
**brady's**  18:10
**brands**  11:12
**breadth**  13:16
**bret**  19:13,13
**brewing**  11:11
**brian**  28:13
29:21,24 32:1
34:10
**bring**  24:21
**bringing**  15:5
17:24 18:13
**broad**  14:6
**broader**  17:21
17:23,23 26:6
**build**  6:17
17:25
**burden**  4:1 5:1

**burdensome**
31:5
**business**  2:18
6:2 23:12
32:13
**businesses**  10:4
10:14 13:12
15:11 16:22
17:3,12 28:20
**butler**  12:5,5
**buy**  25:23

**c**

**c**  36:1,1
**cal**  15:3
**calculate**  32:14
**calculating**
13:17,19
**calendar**  35:17
**california**  2:18
3:16 4:9 7:19
11:25 12:8,20
13:13 14:16
15:1,12 17:2
20:7,11 21:10
21:22 22:3,7
22:20,22 23:12
23:22,23 24:3
24:15 28:16,19
28:20
**californians**
7:1 12:5
**call**  3:6 34:3
35:5
**called**  26:11

**calpirg**  23:22
**cap**  3:15
**caps**  9:5
**carb**  25:17
**carb's**  14:16
**carbon**  2:19,24
3:2,4,12 4:20
4:21 6:7 7:9
8:7 28:19 30:4
33:6,23
**caroline**  34:15
**catherine**  6:6
**caught**  32:17
**center**  12:3,13
**certify**  36:3
**chaffee**  20:6,7
**chain**  4:18 5:10
13:15 15:9,20
18:15 25:11
30:10 32:10
**chains**  7:7 10:9
10:22 17:1
**chair**  2:1,6 6:10
6:13 8:16,21
8:24 9:3,6,10
9:12 11:17,23
12:10,15 14:22
14:24 17:7,9
17:10 18:2,6,8
18:12,19 19:7
19:20,21,24
20:9,13,23
21:1,3,11
24:14,20,25
28:11,13 29:21

29:24 32:1,19
32:22 34:2,8
34:10,21,23
35:9,10,11,15
**chairman**
28:14
**challenge**  15:14
16:6
**challenges**  6:19
6:20
**challenging**
13:16
**chamber**  4:13
12:20 15:3
**change**  6:19,21
7:21 10:6 32:7
33:3
**changes**  25:3
**chooses**  25:23
**christina**  12:2,2
**claiming**  3:25
**claims**  6:24
7:18
**clearly**  25:14
**cleveland**  22:11
22:12
**climate**  2:14
6:19,21 7:10
7:16,18,21,24
8:1,7,9 9:19,20
10:5 11:1,24
14:4 20:16
24:8 25:4
**close**  16:18
32:23 34:24

[close - council]                                                    Page 4

35:16
**cmta**  16:15
**cmta's**  15:19
**coalition**  6:3
**collaboration**
  12:25
**collaborative**
  11:12
**colleague**  15:3
**colleagues**  2:14
  4:11 32:25
**collect**  27:2
**collected**  25:15
**collecting**
  25:10
**color**  6:17 8:12
**come**  4:9 11:19
  12:17 25:20
  30:21
**comments**  15:2
**commerce**  4:14
  12:20
**commission**
  22:21
**committee**  1:11
  1:14 2:7,12
  6:13 9:12 15:7
  19:22 22:2
  24:22 34:7
  35:9
**commodities**
  28:16
**common**  8:23
**communities**
  6:16,22 8:8,12

8:13 10:8
**community**
  12:13
**companies**  2:16
  3:13 4:2,19
  7:13 10:4,12
  10:15,18,22,24
  11:9 13:9
  25:15 26:14,16
  27:1,15 28:25
  29:18 31:11
  32:15 33:2,16
  33:16,20
**company**  11:11
  28:24 31:13
**comparing**
  13:24
**comparison**
  18:11
**competitive**
  10:13 25:24
**compiling**  3:19
  26:18
**complement**
  11:1
**completeness**
  16:9
**complex**  15:16
  17:1
**complicate**
  14:4
**complicated**
  14:1 18:13,15
**complicates**
  14:18

**comply**  15:25
  17:3,15
**complying**
  17:13
**component**
  16:12
**components**
  19:3
**comprehensive**
  7:10
**compromises**
  13:20
**conceptually**
  19:5,6
**concern**  25:9
  25:21 26:1
**concerned**
  29:13
**concerns**  13:4
  20:16,19 21:13
  24:22 25:5
  28:4
**concludes**  35:1
**concur**  15:2
**confined**  14:17
**connelly**  11:21
  11:21
**consensus**  14:6
**consent**  35:17
**conservancy**
  22:12
**consideration**
  11:16
**consistent**
  10:12

**construct**  18:1
**consumer**
  17:25
**consumers**  9:24
  10:14 21:21
**contemplate**
  14:10,14
**contemplated**
  14:9
**contentious**
  4:17
**contract**  2:21
**contracting**
  4:21
**contractors**
  15:22 19:15
**contribute**  8:8
**convenience**
  24:16
**core**  16:12
**corporate**  2:15
  3:16,16 6:24
  7:9,17 8:2,6,7
  9:16 11:2 25:4
**corporations**
  2:24 3:1,18,23
  6:23 7:4,6 8:6
  25:7,9 29:19
  30:2 33:8,10
**correctly**  21:6
**correia**  22:6,6
**cost**  16:23
**cotton**  22:24
**council**  22:23
  23:17

[country - entire]                                                    Page 5

**country**  32:2
32:12 36:12
**cox**  11:24,24
**create**  5:1
13:25 14:3
**created**  14:2
21:9
**creates**  7:8 9:23
13:15
**creating**  5:7
26:19,21
**criteria**  13:19
**critiques**  5:20
**cuevas**  20:10
20:11
**current**  9:20
35:9

**d**

**dahle**  28:12,13
29:21,24 32:1
34:9,10,11
**dan**  20:15,15
20:25 21:2,4
**darryl**  23:16,16
**data**  2:15,22
3:19 7:8 9:16
9:23 10:3,11
10:17 13:23
16:2,5,5,7,11
16:11 18:23
19:3 20:24,25
21:2 25:4 27:3
27:14 31:14
**date**  22:21
36:16

**deadly**  8:8
**dealers**  22:24
**dealing**  33:5
**debate**  28:14
29:25 33:5
**decisions**  7:2
**decreasing**
7:15
**deeply**  15:4
**defense**  23:17
**defined**  26:11
26:24
**defines**  25:14
**definitely**  15:2
15:4
**demand**  27:14
**depending**  13:7
**derive**  9:25
**determined**
31:14
**developed**  21:8
**device**  15:18,18
**difference**
28:21
**different**  5:2
13:24,25 18:14
32:12,13
**dignity**  11:10
**direct**  7:5
**directive**  11:3
**director**  6:6
14:25
**disclose**  2:19
10:24

**disclosed**  20:22
**disclosure**  2:20
9:16 10:20
11:1 14:3 30:3
**disclosures**
3:13
**discuss**  19:8
**discussing**
16:16
**discussion**
24:22
**discussions**
19:10
**disproportion...**
8:12
**disrupts**  10:9
**diversity**  12:3
**doable**  3:22 4:1
33:13
**doing**  4:3 27:5
27:15,18 28:22
31:15 33:9,11
**dollar**  28:24
**dollars**  2:17
16:24,25
**drag**  7:9
**due**  34:6 35:8
**dynamic**  13:16

**e**

**e**  36:1
**economic**  6:18
10:7 13:7
**economy**  10:1
**edge**  10:13
25:24

**effect**  11:4
**effectively**  4:21
4:25
**efforts**  15:4
**either**  14:14
**electronic**
15:18
**embarrassed**
30:6
**emission**  8:3
15:14 16:2,13
18:25
**emissions**  4:20
4:22 6:24 7:3,6
7:7,8,10,16,22
8:7 9:16,20,23
10:3,11,17,19
10:25 13:17
14:13 15:24
20:22
**emitters**  3:14
**emitting**  7:15
**encourage**  14:8
**endeavor**  17:2
**energy**  21:21
**enforcement**
5:20
**engelen**  12:18
12:19
**enormous**  6:7
**ensure**  20:21
**ensures**  8:5
**ensuring**  10:23
**entire**  2:19 10:1
30:10

[entity - going]                                                    Page 6

**entity** 15:24
**environment**
  7:14 23:22
**environmental**
  1:11,14 12:8
**equipment**
  22:24
**esg** 9:9
**especially** 32:8
**established** 5:5
  5:7 26:13,23
  27:10,17 30:18
  30:18,19 32:16
**establishes**
  7:13
**establishment**
  17:25
**estimates** 5:5
  27:10 30:17
  31:6 32:6
**eu** 4:4 26:17
**european** 11:2
**everlane** 11:12
**everybody**
  15:15 17:16
  35:2
**exact** 25:2
**exactly** 13:6
  18:5
**example** 4:16
  26:15
**examples** 3:20
**expected** 11:5
**expensive** 17:2

**expertise** 6:8
**experts** 25:17
**extend** 16:23
**extremely**
  26:10
**exxon** 9:8
**eye** 17:18

### f

**f** 36:1
**fact** 3:24 25:6
  26:6 29:6
**fall** 8:12
**farmers** 22:23
**federation**
  21:22
**fernando** 24:8
**field** 10:23
**fighting** 7:21
**figure** 29:5
**file** 35:7
**filled** 6:18
**final** 17:24
  18:20 35:13
**finalized** 11:5
**financial** 16:21
  19:15 20:5
**find** 19:18
**fine** 16:6 29:7
**finished** 15:16
  15:22 16:19
**first** 12:20
  26:10
**floods** 8:10
**floor** 2:9

**flushed** 26:13
**focused** 9:9
**folks** 11:18
  14:23 19:11
  21:12,12 30:12
**follow** 8:3
  10:13
**footprint** 2:19
  2:24 3:2,5 8:7
  30:4 33:7,23
**foregoing** 36:4
**form** 10:16
**format** 10:12
**formula** 29:4
**formulas** 5:4
  27:9,22 28:5
  30:17,25 31:1
  31:12 32:5,16
**forth** 4:6
**forward** 15:5
  30:9
**fragmented**
  9:21
**fresh** 22:25
**friends** 22:2
**fruit** 22:25
**fuels** 24:15
**full** 10:21,24
**fundamental**
  16:12
**fundamentally**
  13:20
**further** 14:4,9
  19:8 24:19

**future** 6:16

### g

**gap** 9:22
**gas** 20:21
**general** 19:15
**ghg** 8:3 14:13
  26:11,11
**ginners** 22:24
**give** 15:7 29:16
  32:3
**giving** 13:16
**gladfelty** 19:13
  19:14
**global** 5:10
  7:20 11:4 14:5
  14:15 30:10
**go** 15:25 21:18
  21:23 22:4,9
  22:13,17 23:3
  23:9,25 24:5
  24:13 27:6,13
  29:2,19 30:10
  30:13,15 31:18
  35:17
**goal** 13:10
  31:23,24
**goals** 7:23 8:1
  28:18
**goddess** 8:18
**goes** 3:24
**going** 4:24 5:12
  13:25 15:13
  17:2 19:2
  29:10 30:5,9
  30:22 31:2,4

[going - inventory]                                      Page 7

31:11,18
**gold**  7:11 9:15
**gonzalez**  32:20
  34:11,12,13
**good**  2:6 6:12
  9:11 12:18
  15:3 16:6
  19:13 20:6,10
  22:11 23:5
  24:2
**great**  3:4,18
  12:15
**green**  3:1,6,6,7
  3:9 11:12
  33:19,19
**greenhouse**
  20:21
**greenlining**  6:5
  6:15 8:14
**greenwashing**
  21:5 33:18
**ground**  19:18
**group**  19:14
  23:23
**groups**  23:24
**growers**  19:23
  22:20,22,25
**growth**  11:12
**guess**  27:21
  29:4
**guys**  8:24

**h**

**hand**  30:22,24
**hands**  25:12,19

**happening**  13:6
  14:5
**happy**  28:9
**hard**  3:1 4:12
  7:20 27:8 30:9
  31:3
**harsher**  8:9
**health**  10:7
  11:11 22:22
**healthy**  6:17
**hearing**  1:12
**heart**  15:13
**held**  2:17
**hello**  14:24
**helpful**  29:22
**hi**  6:12 19:21
  19:25 23:21
**historic**  8:10
**honored**  4:16
  5:16,21,22
**hope**  4:7
**host**  2:22
**https**  1:13
**hundreds**
  16:24
**hurtado**  24:23
  24:24 26:4
  27:20,25 28:10
  34:13 35:10,12
  35:13
**hutton**  22:15
  22:16
**hyde**  36:3

**i**

**idea**  4:8 17:11
**ifrs**  11:5
**ikea**  11:10
**imagery**  33:20
**impact**  13:7,12
  15:10 16:21
  31:24
**impacts**  8:11
  10:7 15:9
**imperative**
  6:21
**implementati...**
  5:17
**important**  4:22
**importantly**
  7:24
**impossible**
  13:14
**inaccurate**  4:2
**included**  20:20
**includes**  4:18
  21:7
**including**  3:20
  10:17,20 11:10
  16:4 20:22
**inclusion**  21:8
**income**  8:13
**incomplete**
  9:21
**incorporating**
  18:3,4
**increasing**  7:16
**incredibly**  4:22
  33:19

**indirect**  7:8
**indiscernible**
  22:19,23,24
**indonesia**
  32:11
**industry**  16:4
  20:4
**information**
  3:11 7:2 25:10
  25:11,18,25
  32:3,12 33:1
**informed**  7:2
**infrastructure**
  7:9
**initially**  9:1
**innovation**
  23:7
**insights**  9:25
**institute**  6:5,15
  8:14 19:16
**institutions**
  11:9
**integrity**  20:21
  20:23
**intended**  13:21
**intent**  21:4
**interest**  23:23
**internal**  19:2
**international**
  11:7 14:13
**internationally**
  15:12
**inventory**
  10:25

**[investors - marketing]**                                           Page 8

| | | | |
|---|---|---|---|
| **investors** 2:23 9:24 10:14 | 25:10,14,18,20 26:1,17 27:6 28:22 29:11,17 32:10,13 33:4 33:15,21 | **legislation** 22:2 29:14 | **lower** 31:22 **lowering** 3:4 |

**investors** 2:23
9:24 10:14
**issue** 5:9 14:13
14:18 16:6,13
19:17 29:15
**issues** 26:2
**it'll** 24:12
**item** 2:3 35:3,4
35:7,16

**j**

**janet** 11:24,24
34:17
**january** 11:4
**jim** 22:1,1
**joanne** 20:3,3
**job** 3:4,18
**john** 24:14,15
**joint** 32:19
**jr** 23:16,16
**judiciary** 34:7

**k**

**kate** 11:21,21
**kathy** 24:7,7
**kind** 12:23,24
15:5 32:17
**kinds** 13:25
28:18
**king** 23:21,21
**know** 2:23,25
4:2,8,18 6:22
7:13,19,22
12:24,24 13:1
13:6 14:12
18:16 25:1,3

25:10,14,18,20
26:1,17 27:6
28:22 29:11,17
32:10,13 33:4
33:15,21
**knows** 3:8
15:15
**krekelberg**
20:15,15,25
21:2,4

**l**

**landscape** 9:21
**language** 20:17
**large** 2:25 3:14
29:19 30:2
**largely** 15:6
31:11
**larger** 32:9
**largest** 3:22
**lcd** 19:4
**lead** 5:25
**leader** 7:20
**leadership** 6:25
7:18
**leading** 10:4,14
**leads** 9:9
**league** 22:23
**learn** 27:21
28:5
**leary** 19:25,25
**leaves** 25:16
**led** 4:13
**ledanski** 36:3
**legal** 36:11

**legislation** 22:2
29:14
**lena** 34:12
**letter** 5:11
**letters** 33:12
**level** 10:22 18:9
**life** 22:7
**limited** 3:13 4:5
**lindberg** 22:1,1
**line** 21:18,18
21:24,24,24,24
22:5,5,10,10,14
22:14,18,18
23:4,4,10,10,14
23:15,19,20
24:1,1,6,6,11
24:13,13
**lines** 21:12,13
**listened** 28:14
**literally** 33:17
**little** 15:8 23:16
23:16 27:21
**liv** 12:5,5
**live** 6:17 10:9
**livelihood** 10:8
**located** 13:13
**long** 10:6
**looked** 28:25
**looking** 32:25
**lot** 4:6 26:16
28:14 31:21
**lots** 18:3
**love** 25:6 27:21
**low** 8:13

**lower** 31:22
**lowering** 3:4

**m**

**maddening**
33:15
**maddie** 21:20
21:20
**made** 16:3 25:3
**main** 5:11
**major** 10:23
11:9 17:11
33:10,15
**majority** 3:15
**make** 3:8,9
5:17 7:2 19:12
21:5 35:1
**makes** 14:1
**making** 31:10
32:7
**manage** 7:3
**mandate** 7:10
**mandatory**
10:19
**manufacturer**
17:18,21 18:22
19:1
**manufacturers**
15:1,20 16:1
16:16,22,25
30:12
**manufacturing**
15:11,16 18:24
**market** 3:5,16
**marketing** 3:6

**[markets - open]**                                          Page 9

**markets**  20:5
**massive**  9:23
**matthew**  19:21
  19:22
**mean**  17:12
  18:17 25:6,25
**meaningful**
  9:25
**measure**  8:15
  11:15 13:22
  15:6 28:2
**measurement**
  21:6
**media**  1:13
**medical**  15:18
  24:16
**medium**  13:12
**meet**  6:19,20
  28:18 29:1
**megan**  22:11
  22:11
**melanie**  20:10
  20:10
**melissa**  12:7,7
  12:12 24:24
  27:20,25 28:10
  35:12
**members**  6:13
  9:12 12:25
  15:7,19 19:22
  24:14 33:24
  34:25 35:4
**membership**
  15:19

**menjivar**  34:14
  34:15,16
**mention**  25:22
**mentioned**
  17:13 28:4
**merksamer**
  23:6
**methodologies**
  13:25 27:22
  28:6
**methodology**
  5:6 26:14,22
  26:23 27:11
  30:18
**mic**  11:20
  12:17
**micro**  27:13
  32:10
**middle**  19:18
**millions**  16:25
**mineola**  36:14
**minimum**
  14:11
**missions**  33:4
**model**  12:23
**modifications**
  16:3,17
**moment**  12:21
  13:2 24:12
**moon**  8:21
**morning**  2:3
  6:12 9:11
  12:18 19:13
  20:6,10 22:11
  23:5 24:2

**motion**  34:6
  35:6,8
**move**  8:19
**moved**  32:20
**moving**  13:1
**munson**  21:20
  21:20

**n**

**n**  36:1
**name**  6:14 8:25
**nancy**  34:19
**narrowed**  26:7
**narrower**  2:12
**natalie**  23:11
  23:11
**nation**  7:12
**national**  14:5
  16:15
**natural**  23:17
**nature**  22:12
**nebulous**  26:25
**necessary**  7:2
  10:21
**need**  3:7 6:9
**needs**  25:14
**nervousness**
  29:13 30:2,7
**network**  33:18
**nevada**  11:11
**never**  31:24
**new**  5:8 25:5
  26:20,21,22
  27:18 28:4
**nguyen**  34:16
  34:17,18

**nick**  20:6,6
**nielsen**  23:6
**norm**  8:4
**note**  11:8
**noted**  2:11
  14:19
**notion**  13:20
**number**  2:10
  24:12 35:7
**ny**  36:14

**o**

**o**  36:1
**objective**  13:19
**obviously**
  17:19 19:8
  28:15
**offering**  7:16
**office**  29:8
**oh**  9:3 35:16
**oil**  9:8 33:16,16
  33:20
**okay**  8:22 9:6
  9:10 17:18
  19:10 21:11,11
  30:14 31:5
  32:19 34:21
  35:15
**old**  36:12
**once**  5:11
**onerous**  17:15
  17:17
**ones**  3:3 15:15
**ongoing**  16:17
**open**  21:19,24
  21:25 22:5,10

**[open - proxy]**                                              Page 10

| | | | |
|---|---|---|---|
| 22:14,18 23:4 | **parameters** | **pleased** 9:17 | **probably** 4:17 |
| 23:10,15,20 | 17:14 | **point** 3:14 | 25:2 31:15 |
| 24:1,6,13 | **part** 4:17 | 14:12 18:10 | **problem** 3:22 |
| **operate** 10:9 | **particularly** | 31:10 | **proceed** 2:4 |
| **opponents** 3:21 | 13:13 | **policy** 6:2,4,15 | **proceedings** |
| **opportunity** | **parts** 5:2 | 14:25 | 36:5 |
| 6:18 9:15 | **pass** 35:8 | **policymakers** | **process** 13:1 |
| **oppose** 13:11 | **passed** 34:6 | 2:23 9:24 | 16:20 |
| 17:6 31:8 | **patagonia** | **pollute** 8:8 | **processors** 23:1 |
| 33:16 | 11:10 | **polluting** 7:14 | **produced** 7:7 |
| **opposed** 14:20 | **peers** 10:5 | 33:20 | **producer** 28:15 |
| 14:21 19:23 | **penalty** 29:7 | **pollution** 7:11 | **producing** |
| 20:2 23:13 | **people** 29:13 | **portion** 35:18 | 29:18 |
| **opposition** 3:25 | 30:13 | **posed** 6:19,20 | **product** 15:16 |
| 4:13,24 5:11 | **percent** 4:20 | **poses** 10:6 | 15:17,22 17:24 |
| 5:13,21 12:16 | 10:17 | **position** 28:2 | 18:1,21 |
| 19:11,12,17 | **perseverance** | **possible** 5:18 | **products** 17:1 |
| 20:5,8,12,18 | 12:1 | **poultry** 21:22 | 18:14 28:25 |
| 21:16,18,22 | **person** 11:19 | **practices** 8:3 | 29:2,19 |
| 22:8 23:1,8 | **perspective** | **precise** 31:4,14 | **profile** 18:24 |
| 24:4,17,19 | 14:15 | **precisely** 31:22 | **program** 3:15 |
| 27:7 | **petroleum** 20:1 | **predecessor** 2:8 | **project** 24:9 |
| **optic** 15:8 | **phone** 21:12,12 | **present** 2:2 | **proposed** 11:1 |
| **option** 5:4 | **picks** 25:22 | **president** 6:4 | **protocols** 20:20 |
| 30:15 | **picture** 10:21 | 6:15 | 21:8 26:12 |
| **options** 32:15 | 32:25 | **press** 21:16 | **proud** 12:8 |
| **order** 6:20 16:2 | **piece** 29:14 | **prevent** 21:5 | **provide** 10:13 |
| **ordinary** 27:18 | **pistachio** 22:20 | **previously** | 16:2 18:23 |
| **outcomes** 8:9 | **places** 6:17 | 12:22 | 19:3 |
| **outsize** 13:11 | 18:15 | **primarily** 13:5 | **provided** 25:25 |
| **own** 15:19 33:5 | **plant** 22:22 | 13:11 | **provides** 7:1 |
| | **playing** 10:23 | **primary** 16:7 | **providing** |
| **p** | **please** 34:3 | **private** 10:24 | 16:10 |
| **panel** 25:16 | 35:5 | **privately** 2:17 | **proxy** 16:5 |
| **parallel** 9:13 | | | |

**[public - samsung]**                                                      Page 11

| public 2:16,23 | reduce 3:2 6:23 | required 2:20 | retailers 24:3 |
|---|---|---|---|

**public** 2:16,23
  3:8,11 7:17
  10:23 23:23
  33:24
**publicly** 9:22
**pushed** 29:17
**put** 31:21
**puts** 25:7

**q**

**quality** 1:11,14
**questions** 6:6,8
  24:22
**queue** 24:11,19
**quickly** 16:15

**r**

**r** 36:1
**raise** 14:12
  21:13
**rather** 14:16
**reading** 29:8
**ready** 2:4 6:18
**reality** 24:8
**really** 3:4 12:23
  13:15,18 14:14
  14:17,17 25:21
  30:9
**reasons** 8:14
  11:13 14:19,20
  17:5 32:7
**recent** 10:2
**recognize** 6:21
**record** 36:5
**recorded** 19:12

**reduce** 3:2 6:23
**reducing** 7:21
  28:19
**regime** 14:3
**registry** 2:21
  20:16 21:9
**regulate** 33:2
**regulatory**
  14:17
**relies** 16:11
**rely** 10:10
  15:20
**remove** 13:14
**replacement**
  16:8,9
**report** 29:3
**reportable**
  15:23
**reporting** 7:5
  7:25 8:3,5,6
  9:19,20 10:3
  10:11,16 11:3
  14:4 16:23
  21:7
**represent**
  17:19,20
**representing**
  20:4
**requested**
  35:18
**requests** 8:14
  11:14
**require** 2:16
  3:12 4:5 27:2
  31:24 33:3

**required** 2:20
  3:17 7:1 27:13
  29:2,3 31:19
  32:2
**requirement**
  26:21 27:19
**requirements**
  16:23
**requiring** 3:24
  4:4 7:5 8:2
  9:16 18:22
  27:5,16
**research** 23:23
**resolve** 19:19
**resources**
  23:17
**respect** 5:13
  15:4 16:3 17:3
**respectful** 20:8
  20:12
**respectfully**
  5:13,23 11:14
  13:10 14:21
  17:5 23:12
  33:25
**respond** 5:8
  17:11
**response** 5:20
**responsibility**
  25:7,16
**rest** 7:12
**result** 10:15
**retail** 17:22,24
**retailer** 18:13

**retailers** 24:3
**revenue** 2:18
**revised** 14:9
**right** 2:1 3:12
  6:11,22 7:13
  12:10,16 19:7
  20:24 21:1
  24:20 28:12
  31:16 34:2,5
  34:25
**risk** 9:19 10:6
  31:22
**road** 25:24
  29:11 36:12
**rob** 14:24,25
  17:9,17 18:4,7
  18:9,17,20
**rodriguez** 23:5
  23:6
**roll** 34:4,24
  35:5,16
**romero** 12:7,7
  12:12
**roundtable**
  23:12
**rule** 11:2
**run** 33:17
**ryan** 24:2,3

**s**

**s&p** 10:17
**sachs** 6:1 8:19
  8:23 9:1,4,7,11
  9:13
**samsung** 19:1

**[san - stated]**                                          Page 12

| | | | |
|---|---|---|---|
| **san** 24:8 | **sec** 4:5,7 14:7 | **senior** 6:1 | **software** 5:6 |
| **sanchez** 6:4,12 | 16:16 | 14:25 | 30:19 |
| 6:14 | **sec's** 11:1 | **sense** 31:11 | **solutions** 36:11 |
| **sarah** 6:1 8:17 | **secondary** 16:5 | **series** 6:2 8:17 | **somewhat** 26:7 |
| 8:17,19,23 9:1 | 16:7,11 | 9:13 11:13 | **sonya** 36:3 |
| 9:4,7,11,12 | **secretary** 34:3 | **serve** 9:17 | **sorry** 12:11 |
| **saturn** 8:20,22 | 34:5,9,11,13,16 | **served** 12:23 | 14:11 34:22 |
| **saying** 30:25 | 34:18,20,22 | **services** 19:16 | 35:7 |
| 31:1,2 33:12 | 35:4,6,13 | **set** 3:13 7:11,23 | **sort** 29:16 |
| **says** 5:12 | **sector** 8:3 13:6 | 9:15 | **source** 3:14 |
| **sb** 2:3,7,14 7:1 | 13:8,8 15:11 | **setting** 13:10 | **specifically** |
| 7:8 8:2 9:14,17 | 15:12 17:22 | **several** 5:19 | 20:19 |
| 12:9 13:20 | **sectors** 8:4 | 11:8 | **spiegel** 14:24 |
| 14:2 16:3,10 | **secure** 29:16 | **shirt** 18:21 | 14:25 17:9,17 |
| 23:24 34:5 | **securities** 20:4 | **sierra** 11:11 | 18:4,7,9,17,20 |
| 35:3,4,6,7 | **see** 2:2,6 9:4 | **sifma** 20:4 | **spill** 9:8 |
| **scale** 14:6 | 10:2 12:25 | **signature** 36:8 | **sponsor** 6:3 |
| **scaringe** 12:2,2 | 13:9 20:19 | **significant** 10:6 | 9:18 12:8 |
| **schaefer** 24:7,7 | 33:15,25 | **similar** 18:18 | **sponsoring** |
| **science** 13:18 | **seeing** 14:7 | 25:1 26:8 | 33:11 |
| **sciences** 22:7 | **seeking** 9:25 | **simply** 4:1 | **spot** 9:23 |
| **scope** 4:16,18 | **seiu** 11:22 | **single** 27:13 | **stages** 13:9 |
| 4:19,22 13:15 | **sell** 28:24 | **sit** 17:7 | **standard** 7:12 |
| 13:17,19 15:13 | **senate** 1:11,13 | **situation** 32:18 | 9:15 |
| 15:24 19:17,19 | 34:6 35:8 | **size** 16:22 | **standardized** |
| 26:10,18,25 | **senator** 2:2,4,5 | **skinner** 34:18 | 10:12 33:13 |
| 27:9,17 | 9:14 12:21 | 34:19,20 | **standards** 11:4 |
| **scopes** 10:20 | 15:5 24:23,24 | **small** 4:25 5:9 | 11:7 20:20 |
| **scott** 2:5 26:3 | 24:25 26:3,4 | 5:12 13:12 | **start** 35:3 |
| 27:24 28:8 | 27:20,24,25 | 15:11 26:16 | **started** 9:1,7 |
| 29:20,23 30:1 | 28:8,10,12 | 31:5,25 32:7 | **state** 2:20 6:2 |
| 32:4,21,24 | 29:20,23 30:1 | **smaller** 29:18 | 7:25 8:5 9:15 |
| **screen** 19:4 | 32:4,21,23,24 | 31:22 | 21:9 |
| **seasons** 8:9 | 34:3,12,15,17 | **smooth** 5:18 | **stated** 11:13 |
| | 34:19 35:12 | | |

**[states - transportation]**                                                      Page 13

| | | | |
|---|---|---|---|
| **states** 20:1 | 22:12,16 23:18 | **target** 16:13 | 33:14 |
| **stay** 19:9 | 23:24 24:9,23 | **targets** 18:25 | **think** 17:17 |
| **stern's** 9:14 | 25:19 26:5 | **technical** 6:7 | 19:18 25:13,17 |
| **steven** 23:21,21 | 28:3 33:12 | **technology** | 27:16 28:1,21 |
| **stop** 31:10 | **supported** 25:1 | 15:1 24:17 | 29:12,21,23 |
| **storms** 8:10 | 28:3 | **television** 18:21 | 30:5,7 31:11 |
| **stress** 4:11 | **supporting** | **tell** 33:6,23 | **thinking** 14:15 |
| **strongly** 31:13 | 24:19 | **tells** 3:20 | **thought** 8:17 |
| **structure** 5:20 | **sure** 3:8,9 5:17 | **tens** 16:24 | **thousands** |
| **struggle** 32:11 | 19:9,12 21:5 | **term** 10:7 | 16:24 |
| **subcontractors** | 26:3 27:24 | **terrible** 4:1 | **threshold** 29:1 |
| 15:21 16:1 | 29:20 35:1 | **testify** 5:25 | **time** 4:9 11:15 |
| **submitting** | **surprised** | **thank** 2:5 6:10 | 25:8 |
| 33:12 | 31:19 | 8:15,16 11:15 | **times** 3:5 |
| **succeeds** 4:7 | **surrounding** | 11:17,23,25 | **today** 5:25 9:9 |
| **success** 10:7 | 15:10 | 12:9,15,21 | 26:15 29:3 |
| **suite** 36:13 | **suspect** 31:13 | 14:21,22,23 | **took** 4:14 5:15 |
| **supplier** 19:1 | **sustainability** | 19:19,20,24 | 5:16,19 11:3 |
| 27:13 32:11 | 11:3,6,7 | 20:8,9,12,13 | **totally** 30:6 |
| **suppliers** 4:25 | **sustainable** | 21:10,15,23 | **towards** 6:16 |
| 5:1,9,12 27:3,6 | 6:25 | 22:3,4,9,13,17 | 8:15 |
| 30:11,23 31:5 | **sweep** 4:25 | 23:1,3,9,14,18 | **track** 5:1 |
| 31:15,22,25 | 5:12 31:4 | 23:19,25 24:4 | **tracking** 13:10 |
| 32:2,8 | **sweeping** 5:9 | 24:5,9,10,12,18 | **trade** 3:15 |
| **supply** 4:18 | **swept** 31:23 | 24:21,24,25 | **transcript** 36:4 |
| 5:10 7:7 13:14 | **system** 26:22 | 26:4 27:20 | **transition** 13:5 |
| 15:9,20,22 | **t** | 28:10,11,13 | **transparency** |
| 17:1 18:15 | | 32:21,24 34:3 | 3:10,11 6:25 |
| 25:11 30:10 | **t** 18:21 36:1,1 | 34:25 | 7:11,25 13:21 |
| 32:9 | **take** 5:16 12:21 | **thanks** 7:19 | 13:23 15:6 |
| **support** 5:23 | 13:2 18:20 | 24:14,17 | 33:1 |
| 9:17 11:9,18 | 31:20 35:17 | **thing** 5:7 25:3 | **transparent** |
| 11:22,25 12:4 | **talk** 29:10 | 30:19 | 7:17 |
| 12:6,13 21:13 | **talked** 30:12 | **things** 14:1 | **transportation** |
| 21:16,17 22:3 | **talking** 28:22 | 18:3 28:18 | 17:23 |
| | 28:23 | | |

**[trucking - yeah]**                                                         Page 14

**trucking** 20:7
**true** 8:18 36:4
**truthful** 8:6
**try** 29:4
**trying** 4:5 17:4
**tv** 19:1 33:18
  33:25
**two** 2:7,13 5:25
  16:18 27:8
  28:19 32:7
**type** 25:11

### u

**u.s.** 2:16 3:23
  26:17
**understand**
  10:5 15:9
  16:21 19:5
  31:8
**unfortunately**
  3:3 19:16
**untrue** 5:14
**unverified** 9:22
**usa** 11:10
**use** 5:4 27:9
  29:4 30:16,25
  31:1,6,12 32:5
**used** 28:1
**using** 26:15,16
  32:16

### v

**valdez** 9:8
**valerie** 22:15
  22:15

**valley** 24:8
**valuable** 13:23
**value** 10:9,22
**values** 9:9
**van** 12:18,19
**varies** 13:7
**various** 13:9
**vast** 3:15
**vehicle** 15:17
**ventre** 22:15
**ventry** 22:15
**verification**
  21:6
**verify** 6:24
**verifying** 7:17
**veritext** 36:11
**version** 4:5,15
  4:23
**vice** 6:4,14
  28:13 29:21,24
  32:1 34:10
  35:10
**victoria** 23:5,6
**video** 1:14
**voice** 11:18
  12:13
**voluntarily**
  10:16
**voluntary** 9:20
  21:9
**vote** 2:10 5:24
  8:15 11:14
  28:7 34:1 35:9
  35:13

**voters** 12:8
**votes** 2:9 35:2
**voting** 35:9,10

### w

**waiting** 24:11
**walmart** 3:19
  3:24 17:12,20
  17:20 18:22
  25:22,22 26:15
  28:22
**walnut** 22:21
**want** 4:11
  11:18 12:17
  19:11 21:5,13
  27:2,14 28:3,5
  30:3,4,13,15,20
  33:22
**wanted** 13:2
**washing** 3:6
**waste** 12:6
**water** 12:13
**way** 7:17 15:23
  31:2
**ways** 18:17
  26:7
**we've** 5:21 7:23
  16:20
**wealth** 6:17
**website** 2:22
**weigh** 19:11
**western** 19:23
  20:1 22:21
  23:1
**wiener** 2:2,5
  12:21 15:5

24:25 26:3
27:24 28:8
29:20,23 30:1
32:4,21,24
**wildfires** 8:9
**winger** 24:14
  24:15
**wiring** 19:4
**witnesses** 6:1
  12:16
**woman** 21:15
  21:23 22:4,9
  22:13,17,19
  23:3,9,14,19,25
  24:5,10,18
**work** 3:1 6:16
  7:20 12:22
  28:9 30:14
  31:21
**worked** 4:12
  5:3 27:8 30:8
  31:9
**working** 6:23
**works** 19:6
**world** 5:2 11:6
  26:14 33:8
**worldwide** 32:9
**worst** 8:11
**wrap** 16:14
**www.senate....**
  1:13

### y

**yeah** 14:23
  18:8,19 21:3
  35:11

**[year - zach]**                                           Page 15

| | |
|---|---|
| **year**  5:15,17 |
|   11:5 16:4 25:1 |
|   26:5,6,9 28:3 |
| **years**  2:7,13 |
|   4:13 10:2 |
|   16:18 21:10 |
|   27:8 |
| **z** |
| **zach**  19:25,25 |

# Exhibit 7

## California Senate Judiciary Committee's April 14, 2023 Analysis of S.B. 253

Declaration of Bradley J. Hamburger In Support Of
Plaintiffs' Motion for Summary Judgment on Claim I
May 24, 2024

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.*,
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)

**SENATE JUDICIARY COMMITTEE**
**Senator Thomas Umberg, Chair**
**2023-2024  Regular  Session**

SB 253 (Wiener)
Version: January 30, 2023
Hearing Date:  April 18, 2023
Fiscal: Yes
Urgency: No
AWM

## SUBJECT

Climate Corporate Data Accountability Act

## DIGEST

This bill requires any partnership, corporation, limited liability company, or other U.S. business entity with total annual revenues in excess of one billion dollars and that does business in California to publicly report their annual greenhouse gas (GHG) emissions, as specified by the California Air Resources Board (CARB).

## EXECUTIVE SUMMARY

The window to prevent the most catastrophic effects of climate change is rapidly closing. Current law, however, does not give the state or its consumers significant insight into what steps, if any, large companies are taking to reduce GHG emissions, which is imperative to avoid the worst effects of climate change.

This bill requires the CARB to adopt regulations to partner with a nonprofit emissions registry and to require U.S.-based companies with annual revenues over $1 billion and that do business in California to annually report their scope 1, scope 2, and scope 3 GHG emissions—which encompass emissions from a company's direct operations as well as from its supply chain—to that registry. CARB must adopt the regulations for the reports by January 1, 2025, and the covered entities would be required to make their disclosures beginning in 2026 or a date to be determined by the CARB. The bill also requires the CARB, by January 1, 2027, to contract with an academic institution to prepare a publicly available report on the disclosures made by the reporting entities.

This bill is substantially similar to SB 260 (Wiener, 2021), which this Committee passed in an early version that required companies to report their emissions directly to the CARB. Following its passage in this Committee, the author continued to work with stakeholders and amended the bill to, among other things, require CARB to work with a third-party entity to create an emissions registry. SB 260 died on the Assembly Floor.

SB 253 (Wiener)
Page 2 of 20

This bill picks up where SB 260 left off, with additional changes made in response to
stakeholder concerns.

This bill is sponsored by Carbon Accountable, CA Enviro Voters, Ceres, Sunrise Bay
Area, and The Greenlining Institute, and is supported by over 60 environmental
organizations, labor groups, businesses, and community groups. This bill is opposed by
over 60 organizations including Chambers of Commerce, agricultural and
manufacturing groups, and businesses. This bill was passed out of the Senate
Environmental Quality Committee with a vote of 4-2.

## PROPOSED CHANGES TO THE LAW

Existing state law:

1) Establishes the CARB as the air pollution control agency in California and requires
   the CARB, among other things, to control emissions from a wide array of mobile
   sources and coordinate, encourage, and review the efforts of all levels of
   government as they affect air quality. (Health and Saf. Code, div. 26, part 2, §§ 39500
   et seq.)

2) Establishes the California Global Warming Solutions Act of 2006 (AB 32 (Nunez, Ch.
   488, Stats. 2006)), which declares that global warming poses a serious threat to the
   economic well-being, public health, natural resources, and the environment of
   California, and that action taken by California to reduce emissions of greenhouse
   gases will have far-reaching effects by encouraging other states, the federal
   government, and other countries to act. (Health & Saf. Code, div. 25.5, §§ 38500 et
   seq.)

3) Requires, as part of the California Global Warming Solutions Act of 2006, the CARB
   to determine the 1990 statewide GHG emissions level and approve a statewide GHG
   emissions limit that is equivalent to that level to be achieved by 2020. (Health & Saf.
   Code, § 38550.)

4) Requires the CARB to ensure that statewide GHG emissions are reduced to at least
   40 percent below the 1990 level by December 31, 2030, and allows the CARB, until
   December 31, 2030, to adopt regulations that utilize market-based compliance
   mechanisms (i.e., the cap-and-trade program) to reduce GHG emissions. (Health &
   Saf. Code, §§ 38562, 38566.)

5) Requires the CARB to adopt regulations that, among other things, require
   monitoring and annual reporting of GHG emissions from GHG emission sources
   within the state, beginning with the sources or categories of sources that contribute
   the most to statewide emissions; and provides that, for the cap-and-trade program,
   entities that voluntarily participated in the California Climate Action Registry prior

SB 253 (Wiener)
Page 3 of 20

to December 31, 2006, and had developed a GHG emission reporting program
would not be required to significantly alter their reporting or verification program
except as necessary for compliance. (Health & Saf. Code, § 38530.)

6) Requires the CARB to make available, and update annually, the emissions of GHGs,
criteria pollutants, and toxic air contaminants from each facility that reports to the
statute pursuant to AB 32. (Health & Saf. Code, § 38531.)

7) Requires the CARB to monitor compliance with and enforce the requirements of the
California Global Warming Solutions Act of 2006, and deems any violation to result
in an emission of an air contaminant that may result in criminal and civil penalties.
(Health & Saf. Code, § 38580.)

8) Defines "doing business" in California as engaging in any transaction for the
purpose of financial gain within California, being organized or commercially
domiciled in California, or having California sales, property, or payroll exceed
$610,395, $61,040, and $61,040, respectively, as of 2020. (Rev. & Tax. Code, §§17041,
23101.)

Existing federal law:

1) Gives Congress the authority to regulate commerce with foreign nations and
between states. (U.S. Const. art. I, § 8.)

2) Establishes the Clean Air Act, which declares as a primary goal encouraging or
otherwise promoting reasonable federal, state, and local governmental actions,
consistent with the provisions of this Act, for pollution prevention. (42 U.S.C.
§ 7401.)

This bill:

1) Establishes the Climate Corporate Data Accountability Act (the Act) within the
California Global Warming Solutions Act of 2006.

2) Makes findings and declarations regarding, among other things, the impacts of
climate change, the strength of California's economy, and the importance of accurate
emissions data in informing investors, consumers, and companies.

3) Defines relevant terms, including:
   a) "Emissions registry" is a nonprofit emissions registry organization,
   contracted by the CARB pursuant to 7), that (1) currently operates a voluntary
   greenhouse gas emission registry for organizations operating in the United
   States and (2) has experience with voluntary greenhouse gas emissions
   disclosure by entities operating in California.

SB 253 (Wiener)
Page 4 of 20

- b) "Reporting entity" is a partnership, corporation, limited liability company, or other business entity formed under the laws of the state, any other state in the United States, the District of Columbia, or under an act of Congress of the United States with total annual revenues in excess of $1 billion, and that does business in California.
- c) "Scope 1 emissions" is all direct GHG emissions that stem from sources that a reporting entity owns or directly controls, regardless of location, including, but not limited to, fuel combustion activities.
- d) "Scope 2 emissions" is indirect GHG emissions from electricity purchased and used by a reporting entity, regardless of location.
- e) "Scope 3 emissions" is indirect GHG emissions, other than scope 2 emissions, from activities of a reporting entity that stem from sources that the reporting entity does not own or directly control and may include emissions associated with the reporting entity's supply chain, business travel, employee commutes, procurement, waste, and water usage, regardless of location.

4) Requires the CARB, on or before January 1, 2025, to develop and adopt regulations to require a reporting entity to annually disclose to the emissions registry, and verify, all of the entity's scope 1, 2, and 3 emissions.

5) Requires the CARB to ensure that the regulations adopted pursuant to 4) require, at a minimum, all of the following:
- a) That a reporting entity, starting in 2026 or a date to be determined by the CARB, and annually thereafter, publicly disclose to the emissions registry all of its scope 1 and scope 2 emissions for the prior calendar year, and its scope 3 emissions for that same calendar year no later than 180 days after that date, using the Greenhouse Gas Protocol Corporate Accounting and Reporting Standard and the Greenhouse Gas Protocol Corporate Value Chain (Scope 3) Accounting and Reporting Standard developed by the World Resources Institute and the World Business Council for Sustainable Development, including guidance for scope 3 emissions calculations that detail acceptable use of both primary and secondary data sources, including the use of industry average data, proxy data, and other generic data in its scope 3 emissions calculations.
- b) That CARB, on or before January 1, 2030, shall review and update as necessary the public disclosure guidelines developed in 5)(a) to evaluate trends in scope 3 emissions reporting and consider changes to the disclosure deadlines to ensure that scope 3 emissions data are disclosed to the emissions registry as close in time as practicable to the deadline for disclosing scope 1 and 2 emissions data.
- c) The reporting timelines shall consider industry stakeholder input and shall take into account the timelines by which reporting entities typically receive scope 1, 2, and 3 emissions data, as well as the capacity for independent

SB 253 (Wiener)
Page 5 of 20

> verification to be performed by a third-party auditor, as approved by the CARB.
>
> d) That a reporting entity's public disclosure is made in a manner that is easily understandable to residents, investors, and other stakeholders of the state.
>
> e) That a reporting entity's public disclosure includes the name of the reporting entity and any fictitious names, trade names, assumed names, and logos used by the reporting entity.
>
> f) That a reporting entity's public disclosure is structured in ways that streamline and maximize reporting entities' ability to use reports used in meeting requirements of other leading climate disclosure programs and standards. The CARB shall determine leading program standards based on industry stakeholder and disclosure expert input.
>
> g) That a reporting entity's public disclosure is independently verified by the emissions registry or a third-party auditor approved by the CARB and with expertise in greenhouse gas emissions accounting. The reporting entity shall ensure that a copy of the complete, audited greenhouse gas emissions inventory, including the name of the approved third-party auditor, is provided to the emissions registry as part of or in connection with the reporting entity's public disclosure. The CARB shall establish auditor qualifications and a process for approval of auditors that ensures sufficient auditor capacity and timely reporting implementation for this purpose.

6) Requires the CARB, in developing the regulations in 5), to consult with all of the following:

   a) The Attorney General.

   b) Other government stakeholders, including, but not limited to, experts in climate science and corporate carbon emissions accounting.

   c) Investors.

   d) Stakeholders representing consumer and environmental justice interests.

   e) Reporting entities that have demonstrated leadership in full-scope greenhouse gas emissions accounting and public disclosure and greenhouse gas emissions reductions.

7) Requires the CARB to contract with an emissions registry to develop a reporting and registry program to receive and make publicly available disclosures required by this section pursuant to 4)(a).

8) Authorizes the CARB to adopt or develop any other regulations that it deems necessary and appropriate to implement the requirements of 4)-7).

9) Requires CARB, on or before July 1, 2027, to contract with the University of California, the California State University, a national laboratory, or another equivalent academic institution to prepare a report on the public disclosures made

SB 253 (Wiener)
Page 6 of 20

by reporting entities to the emissions registry pursuant to 4) and the regulations adopted by the CARB.

    a) In preparing the report, consideration shall be given to, at a minimum, greenhouse gas emissions from reporting entities in the context of state greenhouse gas emissions reduction and climate goals.

    b) The entity preparing the report shall not require reporting entities to report any information beyond what is required pursuant to 5) or the regulations adopted by the CARB pursuant to 8).

10) Requires the CARB to submit the report required by 9) to the emissions registry to be made publicly available on the digital platform required to be created pursuant to 10). The emissions registry must submit the report to the Legislature within 30 days of receipt to the relevant policy committees of the Legislature.

11) Requires the emissions registry contracted with pursuant to 7), on or before a date determined by the CARB, to create a publicly accessible digital platform to house all disclosures submitted by reporting entities to the emissions registry and the report prepared pursuant to 10).

    a) The emissions registry shall make the reporting entities' disclosures and the state board's report available on the digital platform within 30 days of receipt.

    b) The digital platform shall be capable of featuring individual reporting entity disclosures and shall allow consumers view to reported data elements aggregated in a variety of ways, including multiyear data, in a manner that is easily understandable and accessible to residents of the state. All data sets and customized views shall be available in electronic format for access and use by the public.

12) Provides that the criminal and civil penalties for violations of the California Global Warming Solutions Act of 2006 (Health & Saf. Code, div. 25.5) set forth in Health & Safety Code section 38580 do not apply to violations of this bill.

13) Authorizes the Attorney General, if the Attorney General finds that a reporting entity has violated or is violating this section or receives a complaint of noncompliance from the CARB, to bring a civil action against that reporting entity in the name of the State of California seeking civil penalties for the violations of the bill's requirements.

14) Includes a severability clause.

15) Provides that the bill's implementation is contingent upon an appropriation by the Legislature in the annual Budget Act or another statute for its purposes.

SB 253 (Wiener)
Page 7 of 20

# COMMENTS

1. Author's comment

According to the author:

> SB 253, the Climate Corporate Data Accountability Act, requires public and private US-based corporations who do business in California and which have over $1 billion in annual revenue to report their greenhouse gas emissions from their direct activities, the activities of their supply chain, and other major emission sources by 2025. This emissions data will be published publicly and accessible via an online platform.

> California has been at the forefront of climate policy in recent decades, establishing a successful cap and trade program, committing to preserve 30% of California's lands in their natural state, and setting and achieving ambitious emission reduction targets. These reductions were partially met, and continue to be bolstered by the emission reporting requirements as laid out in the California Global Warming Solutions Act. These requirements, however, only apply to electricity generators, industrial facilities, fuel suppliers, and other major emitters, missing many sources of corporate pollution. Without the same requirements for these corporate entities, California is left without proper information and will not be able to accurately regulate and reduce these emissions. Filling this gap with detailed data regarding corporate activities is a crucial next step for the state to ensure that we continue to decrease the rampant GHGs that are destroying our planet.

> California, like the rest of the world, is already deeply impacted by climate change, with worsening droughts, floods, and the unforgettable devastation brought on by an influx of massive wildfires – the top five largest wildfires in the state's history have all occurred in 2018 or later. We no longer have the time to rely on massive corporations to voluntarily report their emissions, and cannot afford any possibility that the emissions we are being told about have been altered or manipulated to ensure a positive public-facing appearance for a particular company. Rather, these corporations must be required to transparently report their activities and the emissions associated with them. Californians are watching their state get irrevocably harmed by climate change, and they have a right to know who is at the forefront of the pollution causing this. SB 253 would bolster California's position as a leader on climate change, will allow for consumers to make informed decisions regarding their patronage of these corporations, and will give policymakers the specific data required to significantly decrease corporate emissions.

App.63

SB 253 (Wiener)
Page 8 of 20

## 2.  Background: the threat of climate change and California's mitigation efforts

According to the National Oceanic and Atmospheric Administration (NOAA), global temperatures rose 1.8 degrees Fahrenheit between 1901 and 2020.[1] While that might not sound like much, global warming to date has caused dramatic global climate change, including increasingly rapid sea level rise, shrinking glaciers, and more erratic weather (such as floods and droughts).[2] The NOAA reports that "[g]reenhouse gases from human activities are the most significant driver of observed climate change since the mid-20th century."[3]

"California is one of the most 'climate-challenged' regions of North America."[4] Climate change will "have effects on all parts of California's society,"[5] with the effects disproportionately felt by "the State's most vulnerable citizens and communities."[6] While California has already taken steps to impose limits on GHG emissions and other causes of climate change—such as reducing GHG emissions to 1990 levels by 2020 (which the state accomplished early, in 2016;[7] implementing a cap-and-trade program;[8] and requiring the state to be carbon neutral by 2045[9]—research indicates that, without "[g]lobal warming of 1.5ºC and 2ºC will be exceeded during the 21st century unless deep reductions in $CO_2$ and other greenhouse gas emissions occur in the coming decades."[10]

## 3.  The "scope" framework for GHG emissions and existing reporting requirements

The Senate Environmental Quality Committee's analysis of this bill, which is incorporated here by reference, explains the three-scope emissions framework employed in this bill as follows:

> The "scope" framework was introduced in 2001 by the World Resources Institute (WRI) and World Business Council for Sustainable Development as part of their

---

[1] NOAA, Climate change impacts (last updated Aug. 13, 2021), https://www.noaa.gov/education/resource-collections/climate/climate-change-impacts. All links in this analysis are current as of April 14, 2023.

[2] *Ibid.*

[3] NOAA, Climate Change Indicators: Greenhouse Gases (last updated Aug. 1, 2022), https://www.epa.gov/climate-indicators/greenhouse-gases.

[4] California's Fourth Climate Change Assessment (Fourth Assessment), Statewide Summary Report (Jan. 16, 2019), p. 13.

[5] *Ibid.*

[6] *Id.* at p. 16.

[7] AB 32 (Nunez, Ch. 488, Stats. 2006); Kasler, *California beats its 2020 goals for cutting greenhouse gases*, Sacramento Bee (Jul. 11, 2018), *available at* https://www.sacbee.com/article214717585.html.

[8] Cal. Code Regs., tit. 17, div. 3, ch. 1, subchapter 10, art. 5, §§ 95801 et seq.

[9] Governor's Exec. Order No. B-55-18 (Sept. 10, 2018).

[10] Intergovernmental Panel on Climate Change, Report, *Climate Change 2021: The Physical Science Basis: Contribution of Working Group I to the Sixth Assessment Report of the Intergovernmental Palen on Climate Change* (2021), p. 14.

SB 253 (Wiener)
Page 9 of 20

Greenhouse Gas Protocol Corporate Accounting and Reporting Standard. The goal was to create a universal method for companies to measure and report the emissions associated with their business. The three scopes allow companies to differentiate between the emissions they emit directly into the air, which they have the most control over, and the emissions they contribute to indirectly.

Scope 1 covers direct emissions from owned or controlled sources, such as fuel combustion, company vehicles, or fugitive emissions. Scope 2 covers indirect emissions from the generation of purchased electricity, steam, heating and cooling consumed by the reporting company. Scope 3 includes all other indirect emissions that occur in a company's value chain. Recent research from CDP (formerly the Carbon Disclosure Project) found that among full-scope (i.e. 1, 2, and 3) reports, scope 3 supply chain emissions are on average 11.4 times higher than combined scope 1 and 2 emissions.

Scope 3 emissions are divided into fifteen categories: Purchased goods and services; capital goods; fuel-and energy-related activities; upstream transportation and distribution; waste generated in operations; business travel; employee commuting; upstream leased assets; downstream transportation and distribution; processing of sold products; end-of-life treatment of sold products; downstream leased assets; franchises; and investments.

While the range of categories is daunting, the U.S. Environmental Protection Agency (EPA) provides an extensive list of accepted emission factor (EF) values for common items. For instance, a business would not need to measure and calculate the GHG emissions associated with each and every vehicle its employees used to calculate "employee commuting," they could instead determine the total vehicle-miles traveled by their employees via different modes, then multiply those miles by the provided EF to get an acceptable estimation of the $CO_2$ associated with that travel.

The "scope" framework is not currently employed in federal law; federal GHG emissions reporting requirements are limited to certain large GHG emissions sources, fuel and industrial gas suppliers, and carbon dioxide injection sites in the United States.[11] The United States Securities and Exchange Commission (SEC), however, is considering a proposed rule that would require all publicly traded companies in the U.S. to disclose, as part of their initial offering materials and annually thereafter, information about their scope 1 and 2 emissions, and their scope 3 emissions if they are material or if the company has made a commitment that included reference to scope 3 emissions.[12] The SEC propounded the proposed rule after concluding that the existing

---

[11] 40 C.F.R. pt.98, §§ 98.1-98.478.
[12] See SEC Proposed Rules, The Enhancement and Standardization of Climate-Related Disclosures for Investors, 87 Fed.Reg. 21334-01, 21345 (Apr. 11, 2022).

SB 253 (Wiener)
Page 10 of 20

framework for emissions disclosures—much of it voluntary "has failed to produce the consistent, comparable, and reliable information that investors need. Instead, the proliferation of third-party reporting frameworks has contributed to reporting fragmentation, which can hinder investors' ability to understand and compare registrants' climate-related disclosures."[13]

Scope-based reporting requirements are being adopted internationally as well. At the beginning of 2023, the European Union finalized and implemented the Corporate Sustainability Reporting Directive (CSRD), which requires certain EU-based and non-EU companies to file sustainability disclosures that include, among other things, the company's scope 1 and 2 emissions and their scope 3 emissions if they are "material."[14] The CSRD's reporting requirement applies to EU-based companies, non-EU companies with a net annual turnover of €150 million or more, and companies with securities listed on a qualified EU market.[15] The United Kingdom has adopted a similar climate disclosure requirement for UK-incorporated companies with 500 or more employees and is (1) traded on a UK-regulated market, (2) a banking company, (3) an authorized insurance company, or (4) has a turnover of more than £500 million.[16] Specifically, companies must disclose scope 1 and scope 2 emissions, and disclose scope 3 emissions if they are "material" or if the company has set an emissions target or other climate-related goal.[17]

According to the sponsors of the bill, the EU's CSRD will cover approximately 50,000 companies, and the SEC rules, if adopted, would cover between 5,000 and 7,000 publicly traded companies.

4. <u>This bill requires the most profitable U.S.-based companies to disclose their enterprise-wide GHG emissions</u>

This bill implements an annual three-scope GHG emissions reporting requirement for companies with annual gross revenues in excess of $1 billion and that do business in California. Specifically, the bill requires the CARB to contract with an existing emissions registry for the receipt of the disclosure reports; beginning in 2026 or on a date later determined by the CARB, companies will be required to provide to the registry disclosures of their scope 1, 2, and 3 emissions, which must be either verified by the emissions registry or a third-party auditor with expertise in GHG emissions accounting. The CARB must consult with stakeholders including the Attorney General, investors,

---

[13] *Id.* at p. 21342.
[14] *See* Directive (EU) 2022/2464 of Eur. Parliament and the Council of 14 Dec. 2022, amending Regulation (EU) No 537/2014, Directive 2004/109/EC, Directive 2006/43/EC and Directive 2013/34/EU, as regards corporate sustainability reporting (OJ L. 322 (12/16/2022), pp. 15-80).
[15] *Ibid.*
[16] The Companies (Strategic Report) (Climate-related Financial Disclosure) Regulations 2022 (Jan. 17. 2022).
[17] *Ibid.*

SB 253 (Wiener)
Page 11 of 20

and representatives of consumer and environmental interest groups in developing regulations pursuant to this bill.

Company reports provided under this bill will be public. The bill also requires the emissions registry to create a public online portal that will allow the information provided to be viewed in a variety of ways, such as comparing companies' emissions year-to-year and presenting data by industry. Additionally, in 2027, the CARB must contract with an academic institution to develop a report on the disclosures that will consider the reported emissions in the context of the state's GHG reduction and climate goals. Collectively, these requirements will provide the public and policymakers with valuable information about companies' emissions and what further steps can be taken to decrease GHG emissions.

This bill is similar to SB 260 (Wiener, 2021), which this Committee heard and passed two years ago. SB 260 made it through the policy and fiscal committees in both houses but failed passage on the Assembly floor. For purposes of this Committee's jurisdiction, the relevant changes are: (1) unlike SB 260, this bill explicitly permits industry average, proxy, and other data to be used in scope 3 emissions calculations, and (2) the enforcement mechanism has changed from a penalty regime to be determined by the CARB to allowing the Attorney General to seek civil penalties for violations.

The environmental impact of this bill, including the debate over the value of disclosing scope 3 emissions, is discussed more thoroughly in the Senate Environmental Quality Committee's analysis of this bill. Relevant to this Committee's jurisdiction are the civil penalty provision and the potential constitutional issues raised by the bill. These are discussed below in Parts 5 and 6.

5.  <u>This bill authorizes the Attorney General to seek civil penalties from an entity that fails to comply with the disclosure requirements; the author is continuing to work with stakeholders to craft a more specific penalty framework</u>

As currently in print, this bill provides that the Attorney General can seek a civil penalty in a civil action against an entity that violates the bill's disclosure requirements. The lack of specificity of the penalty poses concerns about whether a covered entity has adequate notice about the consequences of a violation and whether a court would have adequate guidance in how to assess a penalty. The author, however, is committed to continuing to work with stakeholders as the bill works its way through the legislative process to develop a more specific penalty framework that implements proportional penalties in light of the harm caused by the failure to report and the size of the companies covered by this bill.

SB 253 (Wiener)
Page 12 of 20

6.  The bill does not present clear dormant interstate commerce clause issues

Section 8 of Article I of the United States Constitution grants the United States Congress the power to regulate interstate commerce.[18] Since the early nineteenth century, the Supreme Court has held that obverse proposition—that states may not usurp Congress's express power to regulate interstate commerce—must also be true.[19] This rule against state interference in interstate commerce, sometimes known as the dormant Commerce Clause, serves as an absolute bar to regulations that discriminate against interstate commerce, i.e., by favoring in-state businesses or excluding out-of-state businesses.[20] But when a state passes a law that " 'regulat[es] even-handedly [across all in-state and out-of-state businesses] to effectuate a legitimate local public interest,' " that law " 'will be upheld unless the burden imposed upon such commerce is clearly excessive in relation to the putative local benefits.' "[21]

There is no facial dormant Commerce Clause issue here. This bill grants no favoritism for in-state companies—all U.S.-based companies doing business in California with annual gross revenues in excess of $1 billion are subject to the bill's reporting requirement. That leaves only the questions of whether the bill's reporting requirement serves a legitimate local interest, and whether the burden imposed by the reporting requirement is clearly excessive in relation to the benefits conferred.

With respect to the first prong—whether requiring very large companies to report scope 1, 2, and 3 emissions serves a legitimate local interest—the answer must be yes. As discussed above in Part 2, serious efforts are needed to prevent catastrophic levels of global warming. California thus has a clear interest in ensuring its residents can make informed, environmentally sound consumer decisions about companies that do business in the state, particularly when so many companies make unverified climate "pledges" that may help sell products without making a meaningful difference. This bill's reporting requirement and resulting academic assessment of the reported emissions will inform California and its residents with about the full scope of GHG emissions from the country's largest companies that profit from California's substantial market power, as well as whether those companies are reducing emissions on a year-to-year basis. For companies, the knowledge that their emissions will be publicly available might encourage them to take meaningful steps to reduce GHG emissions.

For the second prong—whether the burden imposed by the reporting requirement is clearly excessive in relation to the benefit—the answer is likely no. The bill does not impose any new *restrictions* on GHG emissions—covered companies are required only to tabulate and report on what is already there, i.e., their enterprise-wide GHG emissions. Moreover, the bill limits its application to only the most profitable

---

[18] U.S. Const., art. I, § 8, cl. 3.
[19] *See Gibbons v. Ogden* (1824) 22 U.S. 1.
[20] *E.g., Dean Milk Co. v. Madison* (1951) 340 U.S. 349, 354.
[21] *South Dakota v. Wayfair, Inc.* (2018) 138 S.Ct. 2080, 2091.

SB 253 (Wiener)
Page 13 of 20

companies in the country and which do business in California, so the added economic cost of tabulating and auditing scope 1, 2, and 3 GHG emissions is unlikely to impose a significant burden on the affected companies.[22] By comparison, California reaches out and requires out-of-state companies to pay state sales taxes when their revenues exceed $610,395 in California;[23] imposing a GHG reporting requirement only on companies with annual revenues in excess of $1 billion appears to be a proportional burden.[24]

This bill, unlike SB 260, also explicitly allows scope 3 emissions to be calculated using approved indirect methods, such as using industry average data, proxy data, and other generic data. As the Senate Environmental Quality Committee's analysis notes, this mode of calculation is still a nontrivial endeavor, but this bill's express allowance of indirect calculation methods significantly simplifies the reporting requirement as compared to SB 260.

The bill's opponents argue that the economic impact of GHG reporting will be felt by smaller companies to the extent those companies' emissions will have to be counted as part of the reporting companies' scope 3 emissions. As an initial matter, as discussed in Part 3, many of the companies covered by this bill are already required, or may soon be required, to report material scope 3 emissions, so it is unclear how many new burdens this bill will impose. It is also unclear to what extent smaller companies will need to be involved in reporting companies' calculations of scope 3 emissions, because the bill authorizes a reporting entity to use industry data and other generic data in its scope 3 calculations. The use of indirect scope 3 calculation methods should significantly reduce the bill's burden on small and medium companies and, in turn, decrease the likelihood that the burden imposed by the bill is clearly excessive in relation to the benefits conferred. The author and stakeholders are continuing to discuss possible amendments that could provide additional clarity with respect to how scope 3 emissions may be calculated.

6.   <u>Arguments in support</u>

According to a coalition of over 50 organizations, including the bill's sponsors:

> Many communities in California are on the front lines of the climate crisis, facing the human impacts head-on…And while all of California is impacted, we know

---

[22] Research conducted on 14,400 publicly listed companies in 77 countries between 2005 and 2018 shows that voluntarily disclosing emissions actually reduces the cost of capital for the companies that do so, and provides greater market efficiency overall. (Bolton & Kacperczyk, *Signaling Through Carbon Disclosure*, Harvard Law School Forum on Corporate Governance (Mar. 30, 2021), https://corpgov.law.harvard.edu/2021/03/30/signaling-through-carbon-disclosure/).

[23] Rev. & Tax. Code, §§17041, 23101, 23151.

[24] California also already imposes extra-territorial reporting requirements, including requiring manufacturers and retail sellers with $100 million in gross revenue that do business in the state to disclose on their websites their efforts, if any, to prevent slavery and human trafficking within their supply chains. (Civ. Code, § 1714.43.)

SB 253 (Wiener)
Page 14 of 20

that climate impacts fall disproportionately on low-income communities and on Black people, Indigenous people, and People of Color. Yet the very corporations who are most responsible for the pollution which has caused the climate crisis ask individuals to make changes in their own lives to solve the problem, rather than own the responsibility to change their own practices.

This crisis is the direct result of the cumulative and growing emissions of [GHG] into our atmosphere and the private sector continues to play an outsized role in contributing to the crisis. For example, we know that 100 active fossil fuel producers are linked to 71% of global industrial GHG emissions since 1988. But the full picture of corporate climate emissions remains fragmented, complete, and unverified. When we do get corporate disclosures, they are often limited to a corporation's operations and other direct emissions, but supply chain emissions are now estimated to be 11.4 times more than a company's direct emissions from their direct operations on average. Without specific and comprehensive data detailing the sources and levels of corporate pollution, and whether emissions are increasing or decreasing, we will remain unable to effectively regulate, reduce, and restrict these sources of climate pollution that are threatening California and its residents.

By requiring reporting of both direct emissions from these corporations, and any emissions produced from their supply chains and other indirect emissions, SB 253 creates the data infrastructure to drive down corporate carbon emissions. This mandate of comprehensive climate pollution transparency would be the first in the nation and would establish a public right to know which companies are polluting our environmental commons, how much they are emitting, and if they are decreasing—or increasing—their climate emissions, offering a transparent and public way of verifying corporate claims of climate leadership.

7.  Arguments in opposition

According to a coalition of over 60 organizations writing in opposition:

Requiring reporting and limiting emissions associated with a company's entire supply chain will necessarily require that large businesses stop doing business with small and medium businesses that will struggle to accurately measure their greenhouse gas emissions let alone meet ambitious carbon emission requirements, leaving these companies without the contracts that enable them to grow and employ more workers. Further, the inability to meet the emission objectives may fall outside of the sphere of influence of small and medium businesses as the technology to transition to carbon neutrality may not yet even exist for their line of business. Yet, they will be subject to increasing costs and the potential loss of market opportunity. Forcing companies to make these decisions

SB 253 (Wiener)
Page 15 of 20

would have the effect of consolidating market share in the largest of companies rather than fostering competition and growth of smaller industries…

At this juncture, Scope 3 emissions reporting is more of an art than it is a science. Due to the likelihood of double counting, assessing Scope 3 emissions data with any degree of accuracy is not yet possible. For example, the guidelines were updated last fall to focus on Scope 3 emissions associated with land use and biogenic carbon and thus will impact Scope 3 emissions data for any materials derived from bio-based sources such as food/agricultural materials, etc. These updated guidelines not only underscore that Scope 3 emissions data reporting is still in its infancy stage, but it also raises compliance issues in terms of what guidance reporting entities must follow in the event the guidance, or portions thereof, are in the process of being updated in the future. Further, the State of California itself via CalPERS has requested at the Securities and Exchange Commission's (SEC) ongoing rulemaking process relating to climate-related disclosures that the information disclosed should be "material" to a financial investment.

Finally, we are not aware of any statutory authority that would provide the [CARB] the authority to regulate foreign and out-of-state companies delivering goods to California. It seems likely that out-of-state or non-California companies would challenge such authority. Because of this uncertainty, the burden will fall on California-based companies, giving out-of-state and foreign companies a market advantage, driving production out-of-state and increasing the cost of goods for California residents…California should continue to implement and build upon existing programs and policies to regulate in-state emissions rather than seek to obtain emissions data throughout the international supply chain, especially seeing how it would have no authority to regulate emissions beyond the California border.

## **SUPPORT**

California Environmental Voters (co-sponsor)
Carbon Accountable (co-sponsor
Ceres (co-sponsor)
Sunrise Movement Bay Area (co-sponsor)
The Greenlining Institute (co-sponsor)
350 Bay Area Action
350 Conejo/San Fernando Valley
350 Sacramento
350Marin.org
1000 Grandmothers for Future Generations
Active San Gabriel Valley
Alameda County Democratic Party

SB 253 (Wiener)
Page 16 of 20

Arcadia
Asian Pacific Environmental Network
Avocado Green Brands
California Alliance for Retired Americans
California Interfaith Power & Light
California Nurses for Environmental Health and Justice
California Public Interest Research Group
California Reinvestment Coalition
Californians Against Waste
Californians for Energy Choice
Center for Biological Diversity
Center for Climate Change and Health
Citizens' Climate Lobby Santa Cruz
CleanEarth4Kids.org
Climate Action California
Climate Action Campaign
Climate Equity Policy Center
Climate Hawks Vote
ClimatePlan
Coalition for Clean Air
Dignity Health
Elders Climate Action
Environmental Defense Fund
Environmental Working Group
Everlane
Fossil Free California
Friends Committee on Legislation of California
Friends of the Earth
Green New Deal at UC San Diego
Greenbelt Alliance
Grove Collaborative
Hammond Climate Solutions Foundation
Human Impact Partners
IKEA USA
Los Angeles County Democratic Party
Mono Lake Committee
Move LA
Natural Resources Defense Council
Patagonia
Pesticide Action Network
Planning and Conservation League
Sacramento Area Congregations Together
San Diego 350
San Fernando Valley Climate Reality Project

SB 253 (Wiener)
Page 17 of 20

San Francisco Baykeeper
SEIU California
Sierra Club California
Sierra Nevada Brewing Co.
Sunflower Alliance
Sunrise Movement San Diego
The Climate Center
Transformative Wealth Management, LLC
University Professional & Technical Employees
Voices for Progress
One individual

## **OPPOSITION**

Advanced Medical Technology Association
African American Farmers of California
Agricultural Council of California
Agricultural Energy Consumers Association
American Beverage Association
American Chemistry Council
American Composites Manufacturers Association
American Pistachio Growers
American Property Casualty Insurance Corporation
Antelope Valley Chambers of Commerce
Association of California Life and Health Insurance Companies
Association of General Contractors
B. Braun Medical Inc.
Building Owners and Managers Association
Cal Asian Chamber of Commerce
California Apartment Association
California Apple Commission
California Bankers Association
California Blueberry Association
California Blueberry Commission
California Building Industry Association
California Business Properties Association
California Cattlemen's Association
California Cement Manufacturers Environmental Coalition
California Chamber of Commerce
California Construction and Industrial Materials Association
California Cotton Ginners and Growers Association
California Date Commission
California Food Producers
California Fresh Fruit Association

App.73

SB 253 (Wiener)
Page 18 of 20

California Fuels and Convenience Alliance
California Hispanic Chamber of Commerce
California Independent Petroleum Assocation
California Life Sciences
California Manufacturers and Technology Association
California Poultry Federation
California Restaurant Association
California Retailers Association
California Trucking Association
California Walnut Commission
California Water Association
CalCIMA
CalTax
Carlsbad Chamber of Commerce
Chemical Industry Council of California
Chino Valley Chamber of Commerce
Citrus Heights Chamber
Costa Mesa Chamber of Commerce
Danville Area Chamber of Commerce
Far West Equipment Dealers Association
Financial Services Institute
Greater High Desert Chamber of Commerce
La Cañada Flintridge Chamber of Commerce
Long Beach Area Chamber of Commerce
Los Angeles Area Chamber of Commerce
National Association of Industrial and Office Properties
National Association of Mutual Insurance Companies
Nisei Farmers League
North San Diego Business Chamber of Commerce
Oceanside Chamber of Commerce
Olive Growers Council of California
Orange County Business Council
Pacific Merchant Shipping Association
Palos Verdes Peninsula Chamber of Commerce
Personal Insurance Federation of California
Plumbing Manufacturers International
Rancho Cordova Chamber of Commerce
Santa Barbara South Coast Chamber of Commerce
Santee Chamber of Commerce
Securities Industry and Financial markets Association
Specialty Equipment Market Association
Tenaska
TechNet
Torrance Area Chamber of Commerce

App.74

SB 253 (Wiener)
Page 19 of 20

Truck and Engine Manufacturers Association
Walnut Creek Chamber
West Precast Prestressed Concrete Institute
West Ventura County Business Alliance
Western Agricultural Processors Association
Western Growers Association
Western Plant Health Association
Western States Petroleum Association
Wine Institute

## RELATED LEGISLATION

Pending Legislation:

SB 390 (Limón, 2023) makes it unlawful for a person to certify or issue a voluntary carbon offset, to maintain on a registry a voluntary carbon offset, or to market, make available or offer for sale, or sell a voluntary carbon offset if the person knows or should know that the greenhouse gas reductions or greenhouse gas removal enhancements of the offset project related to the voluntary carbon offset are unlikely to be quantifiable, real, additional, and permanent. SB 390 is pending before the Senate Environmental Quality Committee.

SB 261 (Stern, 2023) requires businesses with total annual revenues over $500,000,000 and doing business in California to report the institution's climate-related financial risk and the measures it has taken to reduce and adapt to those risks; and requires the Climate-Related Risk Disclosure Advisory Group to review the information submitted by the covered businesses and annually report to the public on the data received and proposals for regulatory actions or reforms needed to mitigate climate-related financial risks. SB 261 is pending before this Committee.

SB 252 (Gonzalez, 2023) prohibits the boards of the Public Employees' Retirement System and the State Teachers' Retirement System from making new investments or renewing existing investments of public employee retirement funds in a fossil fuel company, as defined, and would require the boards to liquidate investments in a fossil fuel company on or before July 1, 2030. SB 252 is pending before the Senate Labor, Public Employment, and Retirement Committee.

Prior Legislation:

SB 449 (Stern, 2021) would have required certain California-based financial institutions to prepare and disclose climate-related financial risk reports disclosing the institution's climate-related financial risk and its measures to reduce and adapt to those risks; and established the Climate Change Financial Risk Task Force require certain California-based financial institutions to review the institutions' reports and prepare analysis of

SB 253 (Wiener)
Page 20 of 20

the systemic and sector-wide climate-related financial risk. SB 449 died in the Senate Appropriations Committee.

SB 260 (Wiener, 2021) would have required the CARB to develop regulations to require a reporting entity—defined as a business entity with total annual revenues over one billion dollars that does business in California—to report to an emissions registry, as defined, their Scope 1, Scope 2, and Scope 3 emissions, as defined. The bill also would have required the ARB to prepare a report by January 1, 2026, on those disclosures, and it requires the emissions registry to establish a public data platform to view the disclosures. SB 260 died on the Assembly Floor.

SB 775 (Wieckowski, 2017) would have imposed legislatively mandated requirements for the State's emissions cap-and-trade program adopted by the CARB under the California Global Warming Solutions Act of 2006 and created several funds to accomplish climate-change-related goals. SB 775 was held in the Senate Environmental Quality Committee.

AB 1516 (Cunningham, Ch. 561, Stats. 2017) required the CARB to adopt regulations requiring the monitoring and reporting of GHG emissions within the state, including accounting for GHG emissions from all electricity sources within the state.

AB 617 (Cristina Garcia, Ch. 136, Stats. 2017) required the CARB to establish a uniform, statewide system for stationary sources to report their emissions of pollutants and toxic air contaminants; created an expedited schedule for certain facilities covered under the state's cap-and-trade program to implement best achievable retrofit control technology for criteria pollutants and toxic air contaminants; required CARB to establish a clearinghouse of information on best achievable control technology and best achievable retrofit control technology; increased civil and criminal penalties for certain types of emissions; and created community emissions reduction programs for communities with a heavy exposure to criteria pollutants and toxic air contaminants.

AB 398 (Eduardo Garcia, Ch. 135, Stats. 2017) set legislatively mandated requirements for the State's emissions cap-and-trade program adopted by the CARB under the California Global Warming Solutions Act of 2006 and extended certain tax relief to businesses to help offset the costs of complying with reduced emissions requirements.

## **PRIOR VOTES:**

Senate Environmental Quality Committee (Ayes 4, Noes 2)

**\*\*\*\*\*\*\*\*\*\*\*\*\*\***

# Exhibit 12

Governor Gavin Newsom's October 7, 2023 Signing Statement for S.B. 253

Declaration of Bradley J. Hamburger In Support Of
Plaintiffs' Motion for Summary Judgment on Claim I
May 24, 2024

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.*,
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)



## OFFICE OF THE GOVERNOR

OCT **0 7** 2023

To the Members of the California State Senate:

I am signing Senate Bill 253 which would require, among other things, the California Air resources Board (CARB), by January 1, 2025, to develop and adopt regulations requiring businesses with total annual revenues over $1 billion and operating in California to disclose their greenhouse gas emissions to an emissions reporting organization.

This important policy, once again, demonstrates California's continued leadership with bold responses to the climate crisis, turning information transparency into climate action. However, the implementation deadlines in this bill are likely infeasible, and the reporting protocol specified could result in inconsistent reporting across businesses subject to the measure. I am directing my Administration to work with the bill's author and the Legislature next year to address these issues.

Additionally, I am concerned about the overall financial impact of this bill on businesses, so I am instructing CARB to closely monitor the cost impact as it implements this new bill and to make recommendations to streamline the program. I look forward to working with the Legislature on these modifications to ensure we achieve this bill's goals of "full transparency and consistency".

Sincerely,

Gavin Newsom

GOVERNOR GAVIN NEWSOM • SACRAMENTO, CA 95814 • (916) 445-2841

App.78

# Exhibit 17

## Greenhouse Gas Protocol's September 2011 Corporate Value Chain (Scope 3) Accounting and Reporting Standard

Declaration of Bradley J. Hamburger In Support Of
Plaintiffs' Motion for Summary Judgment on Claim I
May 24, 2024

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.*,
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)

Case 2:24-cv-00801-ODW-PVC    Document 48-20    Filed 05/24/24    Page 2 of 153   Page ID #:817



## GREENHOUSE GAS PROTOCOL

# *Corporate Value Chain (Scope 3) Accounting and Reporting Standard*

*Supplement to the GHG Protocol Corporate Accounting and Reporting Standard*







### GHG Protocol Team

Pankaj Bhatia, World Resources Institute

Cynthia Cummis, World Resources Institute

Andrea Brown, World Business Council for Sustainable Development

David Rich, World Resources Institute

Laura Draucker, World Resources Institute

Holly Lahd, World Resources Institute

### Steering Committee

Gerald Rebitzer, Amcor Ltd.

Nigel Topping, Frances Way, Carbon Disclosure Project (CDP)

Graham Sinden, The Carbon Trust

H. Scott Matthews, Carnegie Mellon University

Luc Larmuseau, DNV Climate Change Services

David A. Russell, Rob Rouse, The Dow Chemical Company

Jiang Kejun, Energy Research Institute, China's National Development and Reform Commission

Andrew Hutson, Environmental Defense Fund

Simon Aumônier, Environmental Resources Management

Ugo Pretato, Kirana Chomkhamsri, European Commission Joint Research Centre

Steven Meyers, General Electric

Sergio Galeano, Georgia Pacific, ISO TC207 U.S. Technical Advisory Group

Gregory A. Norris, Harvard University, New Earth, University of Arkansas

Klaus Radunsky, ISO 14067 Working Group Convener

Atsushi Inaba, Kogakuin University

Alison Watson, New Zealand Ministry of Agriculture and Forestry

Susan Cosper, Nick Shufro, PricewaterhouseCoopers LLP

Rasmus Priess, THEMA1 GmbH, Product Carbon Footprint World Forum

Wanda Callahan, Shell

James A. Fava, UNEP SETAC Life Cycle Initiative, Five Winds International

Matthias Finkbeiner, UNEP SETAC Life Cycle Initiative, Technische Universität Berlin

Henry King, Unilever

Susan Wickwire, John Sottong, United States Environmental Protection Agency

Maureen Nowak, United Kingdom Department of Environment, Food, and Rural Affairs

James Stanway, Miranda Ballentine, Walmart Stores Inc.



*CHAPTER 02* Defining Business Goals

## Table of Contents

### CHAPTERS

| | | |
|---|---|---|
| guidance | 1.  Introduction | 02 |
| guidance | 2.  Business Goals | 10 |
| requirements  guidance | 3.  Summary of Steps and Requirements | 18 |
| requirements  guidance | 4.  Accounting and Reporting Principles | 22 |
| guidance | 5.  Identifying Scope 3 Emissions | 26 |
| requirements  guidance | 6.  Setting the Scope 3 Boundary | 58 |
| guidance | 7.  Collecting Data | 64 |
| guidance | 8.  Allocating Emissions | 86 |
| requirements  guidance | 9.  Setting a GHG Reduction Target and Tracking Emissions Over Time | 98 |
| guidance | 10. Assurance | 112 |
| requirements  guidance | 11. Reporting | 118 |

### APPENDICES

| | |
|---|---|
| A.  Accounting for Emissions from Leased Assets | 124 |
| B.  Uncertainty in Scope 3 Emissions | 126 |
| C.  Data Management Plan | 129 |
| Abbreviations | 134 |
| Glossary | 135 |
| References | 142 |
| Recognitions | 143 |

[01]

# 01 *Introduction*





*guidance*

***E**missions of the anthropogenic greenhouse gases (GHG) that drive climate change and its impacts around the world are growing. According to climate scientists, global carbon dioxide emissions must be cut by as much as 85 percent below 2000 levels by 2050 to limit global mean temperature increase to 2 degrees Celsius above pre-industrial levels.[1] Temperature rise above this level will produce increasingly unpredictable and dangerous impacts for people and ecosystems. As a result, the need to accelerate efforts to reduce anthropogenic GHG emissions is increasingly urgent. Existing government policies will not sufficiently solve the problem. Leadership and innovation from business is vital to making progress.*

Corporate action in this arena also makes good business sense. By addressing GHG emissions, companies can identify opportunities to bolster their bottom line, reduce risk, and discover competitive advantages. As impacts from climate change become more frequent and prominent, governments are expected to set new policies and provide additional market-based incentives to drive significant reductions in emissions. These new policy and market drivers will direct economic growth on a low-carbon trajectory. Businesses need to start planning for this transition now as they make decisions that will lock in their investments for years to come.

An effective corporate climate change strategy requires a detailed understanding of a company's GHG impact. A corporate GHG inventory is the tool to provide such an understanding. It allows companies to take into account their emissions-related risks and opportunities and focus company efforts on their greatest GHG impacts. Until recently, companies have focused their attention on emissions from their own operations. But increasingly companies understand the need to also account for GHG emissions along their value chains and product portfolios to comprehensively manage GHG-related risks and opportunities.

Through the development of the *GHG Protocol Corporate Value Chain (Scope 3) Accounting and Reporting Standard,* the GHG Protocol has responded to the demand for an internationally accepted method to enable GHG management of companies' value chains. Following the release of this standard, the GHG Protocol and its partners will proactively work with industry groups and governments to promote its widespread use – along with the entire suite of GHG Protocol standards and tools – to enable more effective GHG management worldwide.

## 1.1    The Greenhouse Gas Protocol

The Greenhouse Gas Protocol (GHG Protocol) is a multi-stakeholder partnership of businesses, non-governmental organizations (NGOs), governments, and others convened by the World Resources Institute (WRI) and the World Business Council for Sustainable Development (WBCSD). Launched in 1998, the mission of the GHG Protocol is to develop internationally accepted greenhouse gas (GHG) accounting and reporting standards and tools, and to promote their adoption in order to achieve a low emissions economy worldwide.

The GHG Protocol has produced the following separate but complementary standards, protocols, and guidelines:

- **GHG Protocol Corporate Accounting and Reporting Standard (2004):** A standardized methodology for companies to quantify and report their corporate GHG emissions. Also referred to as the *Corporate Standard*.
- **GHG Protocol Product Life Cycle Accounting and Reporting Standard (2011):** A standardized methodology to quantify and report GHG emissions associated with individual products throughout their life cycle. Also referred to as the *Product Standard*.
- **GHG Protocol for Project Accounting (2005):** A guide for quantifying reductions from GHG-mitigation projects. Also referred to as the *Project Protocol*.
- **GHG Protocol for the U.S. Public Sector (2010):** A step-by-step approach to measuring and reporting emissions from public sector organizations, complementary to the *Corporate Standard*.
- **GHG Protocol Guidelines for Quantifying GHG Reductions from Grid-Connected Electricity Projects (2007):** A guide for quantifying reductions in emissions that either generate or reduce the consumption of electricity transmitted over power grids, to be used in conjunction with the *Project Protocol*.
- **GHG Protocol Land Use, Land-Use Change, and Forestry Guidance for GHG Project Accounting (2006):** A guide to quantify and report reductions from land use, land-use change, and forestry, to be used in conjunction with the *Project Protocol*.
- **Measuring to Manage: A Guide to Designing GHG Accounting and Reporting Programs (2007):** A guide for program developers on designing and implementing effective GHG programs based on accepted standards and methodologies.

## 1.2    Purpose of this standard

The *GHG Protocol Corporate Value Chain (Scope 3) Accounting and Reporting Standard* (also referred to as the *Scope 3 Standard*) provides requirements and guidance for companies and other organizations to prepare and publicly report a GHG emissions inventory that includes indirect emissions resulting from value chain activities (i.e., scope 3 emissions). The primary goal of this standard is to provide a standardized step-by-step approach to help companies understand their full value chain emissions impact in order to focus company efforts on the greatest GHG reduction opportunities, leading to more sustainable decisions about companies' activities and the products they buy, sell, and produce.

The standard was developed with the following objectives in mind:

- To help companies prepare a true and fair scope 3 GHG inventory in a cost-effective manner, through the use of standardized approaches and principles
- To help companies develop effective strategies for managing and reducing their scope 3 emissions through an understanding of value chain emissions and associated risks and opportunities
- To support consistent and transparent public reporting of corporate value chain emissions according to a standardized set of reporting requirements

Ultimately, this is more than a technical accounting standard. It is intended to be tailored to business realities and to serve multiple business objectives. Companies may find most value in implementing the standard using a phased approach, with a focus on improving the quality of the GHG inventory over time.

## 1.3    Relationship to the GHG Protocol Corporate Standard

The *GHG Protocol Scope 3 Standard* is a supplement to the *GHG Protocol Corporate Accounting and Reporting Standard, Revised Edition* (2004) and should be used in conjunction with it. The *Corporate Standard* – first launched in 2001 and revised in 2004 – has been widely adopted by businesses, NGOs, and governments around the world as the international standard for developing and reporting a company-wide GHG inventory.

**CHAPTER 01** *Introduction*

The *Scope 3 Standard* complements and builds upon the *Corporate Standard* to promote additional completeness and consistency in the way companies account for and report on indirect emissions from value chain activities.

The *Corporate Standard* classifies a company's direct and indirect GHG emissions into three "scopes," and requires that companies account for and report all scope 1 emissions (i.e., direct emissions from owned or controlled sources) and all scope 2 emissions (i.e., indirect emissions from the generation of purchased energy consumed by the reporting company). The *Corporate Standard* gives companies flexibility in whether and how to account for scope 3 emissions (i.e., all other indirect emissions that occur in a company's value chain). Figure 1.1 provides an overview of the three GHG Protocol scopes and categories of scope 3 emissions.

Since the *Corporate Standard* was revised in 2004, business capabilities and needs in the field of GHG accounting and reporting have grown significantly. Corporate leaders are becoming more adept at calculating scope 1 and scope 2 emissions, as required by the *Corporate Standard*. As GHG accounting expertise has grown, so has the realization that significant emissions – and associated risks and opportunities – result from value chain activities not captured by scope 1 and scope 2 inventories.

Scope 3 emissions can represent the largest source of emissions for companies and present the most significant opportunities to influence GHG reductions and achieve a variety of GHG-related business objectives (see chapter 2). Developing a full corporate GHG emissions inventory – incorporating scope 1, scope 2, and scope 3 emissions – enables companies to understand their full emissions

**Figure [1.1]** Overview of GHG Protocol scopes and emissions across the value chain



impact across the value chain and focus efforts where they can have the greatest impact.

Companies reporting their corporate GHG emissions have two reporting options (see table 1.1).

Under the *Corporate Standard,* companies are required to report all scope 1 and scope 2 emissions, while reporting scope 3 emissions is optional. The *Scope 3 Standard* is designed to create further consistency in scope 3 inventories through additional requirements and guidance for scope 3 accounting and reporting.

Companies should make and apply decisions consistently across both standards. For example, the selection of a consolidation approach (equity share, operational control or financial control) should be applied consistently across scope 1, scope 2, and scope 3. For more information, see section 5.2.

## 1.4    Who should use this standard?

This standard is intended for companies of all sizes and in all economic sectors. It can also be applied to other types of organizations and institutions, both public and private, such as government agencies, non-profit organizations, assurers and verifiers, and universities. Policymakers and designers of GHG reporting or reduction programs can use relevant parts of this standard to develop accounting and reporting requirements. Throughout this standard, the term "company" is used as shorthand to refer to the entity developing a scope 3 inventory.

## 1.5    Scope of the standard

This standard is designed to account for the emissions generated from corporate value chain activities during the reporting period (usually a period of one year), and covers the six main greenhouse gases:  carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$), hydrofluorocarbons (HFCs), perfluorocarbons (PFCs), and sulphur hexafluoride ($SF_6$). This standard does not address the quantification of avoided emissions or GHG reductions from actions taken to compensate for or offset emissions. These types of reductions are addressed by the *GHG Protocol for Project Accounting.*

Use of this standard is intended to enable comparisons of a company's GHG emissions over time. It is not designed to support comparisons between companies based on their scope 3 emissions. Differences in reported emissions may be a result of differences in inventory methodology or differences in company size or structure. Additional measures are necessary to enable valid comparisons across companies. Such measures include consistency in methodology and data used to calculate the inventory, and reporting of additional information such as intensity ratios or performance metrics. Additional consistency can be provided through GHG reporting programs or sector-specific guidance (see section 1.9).

**Table [1.1]** Corporate-level GHG Protocol reporting options

| Reporting Option | Scope 1 | Scope 2 | Scope 3 |
|---|---|---|---|
| **Report in conformance with the *GHG Protocol Corporate Standard*** | **Required** | **Required** | **Optional**: Companies may report any scope 3 emissions the company chooses |
| **Report in conformance with the *GHG Protocol Corporate Standard* and the *GHG Protocol Scope 3 Standard*** | **Required** | **Required** | **Required**: Companies shall report scope 3 emissions following the requirements of the *Scope 3 Standard* |

*CHAPTER 01* Introduction

### 1.6    How was this standard developed?

The GHG Protocol follows a broad and inclusive multi-stakeholder process to develop greenhouse gas accounting and reporting standards with participation from businesses, government agencies, NGOs, and academic institutions from around the world.

In 2008, WRI and WBCSD launched a three-year process to develop the *GHG Protocol Scope 3 Standard.* A 25-member Steering Committee of experts provided strategic direction throughout the process. The first draft of the *Scope 3 Standard* was developed in 2009 by Technical Working Groups consisting of 96 members (representing diverse industries, government agencies, academic institutions, and non-profit organizations worldwide). In 2010, 34 companies from a variety of industry sectors road-tested the first draft and provided feedback on its practicality and usability, which informed a second draft. Members of a Stakeholder Advisory Group (consisting of more than 1,600 participants) provided feedback on each draft of the standard.

### 1.7    Relationship to the GHG Protocol Product Standard

The *GHG Protocol Scope 3 Standard* and *GHG Protocol Product Standard* both take a value chain or life cycle approach to GHG accounting and were developed simultaneously. The *Scope 3 Standard* accounts for value chain emissions at the corporate level, while the *Product Standard* accounts for life cycle emissions at the individual product level. Together with the *Corporate Standard,* the three standards provide a comprehensive approach to value chain GHG measurement and management.

The reporting company's business goals should drive the use of a particular GHG Protocol accounting standard. The *Scope 3 Standard* enables a company to identify the greatest GHG reduction opportunities across the entire corporate value chain, while the *Product Standard* enables a company to target individual products with the greatest potential for reductions. The *Scope 3 Standard* helps a company identify GHG reduction opportunities, track performance, and engage suppliers at a corporate level,



while the *Product Standard* helps a company meet the same objectives at a product level.

Common data is used to develop scope 3 inventories and product inventories, including data collected from suppliers and other companies in the value chain. Since there can be overlap in data collection, companies may find added business value and efficiencies in developing scope 3 and product inventories in parallel.

While each standard can be implemented independently, both standards are mutually supportive. Integrated use might include:

- Applying the *Scope 3 Standard,* using the results to identify products with the most significant emissions, then using the *Product Standard* to identify mitigation opportunities in the selected products' life cycles
- Using product-level GHG data based on the *Product Standard* as a source of data to calculate scope 3 emissions associated with selected product types
- Applying either the *Scope 3 Standard* or the *Product Standard* and using the results to inform GHG-reduction strategies that reduce both product and corporate level (scope 3) emissions

The sum of the life cycle emissions of each of a company's products, combined with additional scope 3 categories (e.g., employee commuting, business travel, and investments), should approximate the company's total corporate GHG emissions (i.e., scope 1 + scope 2 + scope 3). In practice, companies are not expected or required to calculate life cycle inventories for individual products when calculating scope 3 emissions.

Figure 1.2 illustrates the relationship between the *Corporate Standard, Product Standard,* and *Scope 3 Standard.* In this simplified example, a company manufactures one product (Product A). The example shows how scopes of emissions at the corporate level correspond to life cycle stages[2] at the product level.

## 1.8    GHG calculation tools and guidance

To help companies implement the *Scope 3 Standard,* the GHG Protocol website provides a variety of useful GHG calculation tools and guidance, including:

- *Guidance for Calculating Scope 3 Emissions,* a companion document to the *Scope 3 Standard* that provides

**Figure [1.2]** Relationship between a scope 3 GHG inventory and a product GHG inventory (for a company manufacturing Product A)



scope 1 and 2 emissions required by the Corporate Standard

scope 3 emissions required by the Scope 3 Standard

product life cycle emissions required by the Product Standard

Case 2:24-cv-00801-ODW-PVC    Document 48-20    Filed 05/24/24    Page 12 of 153
Page ID #:827

**CHAPTER 01** *Introduction*



detailed guidance for calculating scope 3 emissions, including calculation methods, data sources, and examples of calculating scope 3 emissions

• A list of available data sources for calculating scope 3 emissions, including over 80 emission factor databases covering a variety of sectors and geographic regions

• Several cross-sector and sector-specific calculation tools, which provide step-by-step guidance, together with electronic worksheets to help companies calculate GHG emissions from specific sources or sectors

All GHG calculation tools and guidance are available at www.ghgprotocol.org.

### 1.9    Sector guidance

The development of sector-specific implementation guidance and tools can drive more consistent corporate GHG measurement, reporting, and performance tracking practices for a particular sector. Helpful sector-level information could include guidance on interpreting

the standard for a specific sector,  guidance and tools for calculating emissions from sector-specific activities, recommended performance metrics, specific guidance for identifying the largest sector emissions sources, and suggested data sources and emissions factors.

Sectors should develop guidance through an inclusive multi-stakeholder process to ensure broad acceptance and facilitate increased consistency and credibility.

### Endnotes

1   IPCC, Summary for Policymakers (Table SPM.5: Characteristics of post-TAR stabilization scenarios), in Climate Change 2007: Mitigation. Contribution of Working Group III to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change, ed. B. Metz, O.R. Davidson, P.R. Bosch, R. Dave, L.A. Meyer (Cambridge, United Kingdom and New York, NY, USA: Cambridge University Press, 2007).

2   A life cycle stage is one of the interconnected steps in a product's life cycle.

*02* ***Business Goals***





*guidance*

*D*eveloping a scope 3 inventory strengthens companies' understanding of their value chain GHG emissions as a step towards effectively managing emissions-related risks and opportunities and reducing value chain GHG emissions.

### Business goals of a scope 3 inventory

Before accounting for scope 3 emissions, companies should consider which business goal or goals they intend to achieve. See table 2.1 for a list of goals frequently cited by businesses as reasons for developing a scope 3 inventory.

### Identify and understand risks and opportunities associated with value chain emissions

GHG emissions from corporate activities are increasingly becoming a mainstream management issue for businesses. Potential liabilities from GHG exposure arise from unstable resource and energy costs, future resource scarcity, environmental regulations, changing consumer preferences, scrutiny from investors and shareholders, as well as reputational risk from other stakeholders. (See table 2.2 for examples of risks related to scope 3 GHG emissions.) By developing a scope 3 inventory, companies can understand the overall emissions profile of their upstream and downstream activities. This information provides companies with an understanding of where potential emissions and associated risks and opportunities lie in the value chain, as well as the relative risks and opportunities of scope 3 emissions compared to companies' direct emissions.

For some companies, developing a scope 3 inventory may improve planning for potential future carbon regulations. For example, energy or emissions taxes or regulations in a company's supply chain may significantly increase the cost of goods or components purchased by a company. Understanding scope 3 emissions helps companies plan for potential regulations and can guide corporate procurement decisions and product design.

Additionally, companies may find that there is a reputational risk if they do not understand the impacts of their broader corporate value chain activities. By undertaking a scope 3 inventory and understanding where their emissions are, companies can credibly communicate to their stakeholders the potential impacts of these emissions and the actions planned or taken to reduce the associated risks.

Companies can also use the results of the scope 3 inventory to identify new market opportunities for producing and selling goods and services with lower GHG

**Table [2.1]** Business goals served by a scope 3 GHG inventory

| Business goal | Description |
|---|---|
| **Identify and understand risks and opportunities associated with value chain emissions** | • Identify GHG-related risks in the value chain<br>• Identify new market opportunities<br>• Inform investment and procurement decisions |
| **Identify GHG reduction opportunities, set reduction targets, and track performance** | • Identify GHG "hot spots" and prioritize reduction efforts across the value chain<br>• Set scope 3 GHG reduction targets<br>• Quantify and report GHG performance over time |
| **Engage value chain partners in GHG management** | • Partner with suppliers, customers, and other companies in the value chain to achieve GHG reductions<br>• Expand GHG accountability, transparency, and management in the supply chain<br>• Enable greater transparency on companies' efforts to engage suppliers<br>• Reduce energy use, costs, and risks in the supply chain and avoid future costs related to energy and emissions<br>• Reduce costs through improved supply chain efficiency and reduction of material, resource, and energy use |
| **Enhance stakeholder information and corporate reputation through public reporting** | • Improve corporate reputation and accountability through public disclosure<br>• Meet needs of stakeholders (e.g., investors, customers, civil society, governments), enhance stakeholder reputation, and improve stakeholder relationships through public disclosure of GHG emissions, progress toward GHG targets, and demonstration of environmental stewardship<br>• Participate in government- and NGO-led GHG reporting and management programs to disclose GHG-related information |

emissions. As more companies in the value chain measure and manage GHG emissions, demand will grow for new products that reduce emissions throughout the value chain. See table 2.2 for examples of opportunities related to scope 3 emissions.

*Identify GHG reduction opportunities, set reduction targets, and track performance*

The scope 3 inventory provides a quantitative tool for companies to identify and prioritize emissions-reduction opportunities along their value chain. Scope 3 inventories provide detailed information on the relative size and scale of emission-generating activities within and across the various scope 3 categories. This information may be used

to identify the largest emission sources (i.e., "hot spots") in the value chain and focus efforts on the most effective emission-reduction opportunities, resulting in cost savings for companies.

For example, a company whose largest source of value chain emissions is contracted logistics may choose to optimize these operations through changes to product packaging to increase the volume per shipment, or by increasing the number of low-carbon logistics providers. Additionally, companies may utilize this information to change their procurement practices or improve product design or product efficiency, resulting in reduced energy use.

**CHAPTER 02** *Business Goals*

**Table [2.2]**  Examples of GHG-related risks and opportunities related to scope 3 emissions

| Type of risk | Examples |
|---|---|
| **Regulatory** | GHG emissions-reduction laws or regulations introduced or pending in regions where the company, its suppliers, or its customers operate |
| **Supply chain costs and reliability** | Suppliers passing higher energy- or emissions-related costs to customers; supply chain business interruption risk |
| **Product and technology** | Decreased demand for products with relatively high GHG emissions; increased demand for competitors' products with lower emissions |
| **Litigation** | GHG-related lawsuits directed at the company or an entity in the value chain |
| **Reputation** | Consumer backlash, stakeholder backlash, or negative media coverage about a company, its activities, or entities in the value chain based on GHG management practices, emissions in the value chain, etc. |

| Type of opportunity | Examples |
|---|---|
| **Efficiency and cost savings** | A reduction in GHG emissions often corresponds to decreased costs and an increase in companies' operational efficiency. |
| **Drive innovation** | A comprehensive approach to GHG management provides new incentives for innovation in supply chain management and product design. |
| **Increase sales and customer loyalty** | Low-emissions goods and services are increasingly more valuable to consumers, and demand will continue to grow for new products that demonstrably reduce emissions throughout the value chain. |
| **Improve stakeholder relations** | Improve stakeholder relationships through proactive disclosure and demonstration of environmental stewardship. Examples include demonstrating fiduciary responsibility to shareholders, informing regulators, building trust in the community, improving relationships with customers and suppliers, and increasing employee morale. |
| **Company differentiation** | External parties (e.g. customers, investors, regulators, shareholders, and others) are increasingly interested in documented emissions reductions. A scope 3 inventory is a best practice that can differentiate companies in an increasingly environmentally-conscious marketplace. |

Conducting a GHG inventory according to a consistent framework is also a prerequisite for setting credible public GHG reduction targets. External stakeholders, including customers, investors, shareholders, and others, are increasingly interested in companies' documented emissions reductions. Therefore, identifying reduction opportunities, setting goals, and reporting on progress to stakeholders may help differentiate a company in an increasingly environmentally-conscious marketplace.

### Engage value chain partners in GHG management

Developing a scope 3 inventory encourages the quantification and reporting of emissions from various partners across the value chain. For many companies, a primary goal of developing a scope 3 inventory is to encourage supplier GHG measurement and reduction, and to report on supplier performance. For example, a company may engage with its major suppliers to obtain emissions information on the products it purchases from them, as well as information on suppliers' GHG management plans. Successful engagement with suppliers often requires a company to work closely with its supply chain partners to build a common understanding of emissions-related information and the opportunities and benefits of achieving GHG reductions. Reporting on the progress of a company's engagement with its supply chain can be useful information for stakeholders external and internal to the reporting company.

Companies may also wish to engage with their customers by providing information on product use and disposal. For example, a company may want to work with stakeholders such as retailers, marketers or advertisers to convey information to customers on less energy intensive products, how to use a product more efficiently, or to encourage recycling. A scope 3 inventory enables companies to identify their downstream hot spots so that they can credibly engage with customers to reduce their value chain emissions.

By developing a scope 3 inventory, companies can identify where the largest energy, material and resource use is within the supply chain. This knowledge can inform cost savings through reducing material, energy and resource

---

### National Grid: Business objectives for scope 3 accounting

National Grid is an international electricity and gas company and one of the largest investor-owned energy companies in the world. At the heart of National Grid's corporate vision is "safeguarding our environment for future generations." One of National Grid's strategic objectives is to ensure that National Grid is a sustainable low carbon business. National Grid recognized that in order to deliver a fully effective greenhouse gas reduction plan, all emissions need to be taken into account. Therefore, National Grid developed a strategy for quantifying and reducing its scope 3 emissions, with several specific objectives in mind:

- Understanding the risks and opportunities associated with emissions across the entire value chain

**To deliver a fully effective greenhouse gas reduction plan, all emissions need to be taken into account**

- Considering the environmental impact in investment and other business decisions through internalization of carbon costs and assessment of benefits
- Becoming agents for change by working with customers and supply chain partners to drive GHG reductions and providing transparency and accountability within the value chain
- Working with governments and regulators to encourage allowable investments through carbon-trading mechanisms and clear legislation

To help achieve these objectives, National Grid used the GHG Protocol Scope 3 Standard to inventory its scope 3 emissions. After developing the full scope 3 inventory, a clear picture appeared with emissions from the use of sold products emerging as by far the biggest source of scope 3 emissions. This valuable insight helped National Grid understand the full impact of its business operations and provided more focused direction for future strategies and targets.

---

[14] *Corporate Value Chain (Scope 3) Accounting and Reporting Standard*

**CHAPTER 02** *Business Goals*



use, improving overall efficiency of companies' supply chains, reducing regulatory risks, and strengthening supplier and customer relationships.

### *Enhance stakeholder information and corporate reputation through public reporting*

As concerns over climate change grow, NGOs, investors, governments and other stakeholders are increasingly calling for greater disclosure of corporate activities and GHG information. They are interested in the actions companies are taking and in how companies are positioned relative to their competitors. For many companies, responding to this stakeholder interest by disclosing information on corporate emissions and reduction activities is a business objective of developing a scope 3 inventory.

Companies can improve stakeholder relationships through proactive disclosure and demonstration of environmental stewardship. Examples include demonstrating fiduciary responsibility to shareholders, informing regulators, building trust in the community,

improving relationships with customers and suppliers, and increasing employee morale.

Companies have a variety of avenues for communicating with stakeholders. Companies can disclose information through stand-alone corporate sustainability reports, mandatory government registries, industry groups, or through stakeholder-led reporting programs. Mandatory and voluntary reporting programs often offer companies assistance in setting GHG targets, provide industry-specific benchmarking information, and provide information on corporate activities to a specific stakeholder audience. An example of a global voluntary reporting program is the Carbon Disclosure Project, which requests corporate GHG performance information on behalf of a community of investors. Companies may also find that public reporting through a voluntary GHG reporting program can strengthen their standing with customers and differentiate them from their competitors.

### Abengoa: Business objectives of scope 3 supplier engagement

For Abengoa - a global technology and engineering company operating in over 70 countries - engaging with its suppliers to build its greenhouse gas inventory is a key component of the company's overall sustainability goals. Abengoa believes that working closely with its suppliers is the best way to encourage broader GHG measurement and management and to calculate its scope 3 GHG inventory.

Abengoa utilizes a number of methods that support the completion of their scope 3 inventory. All suppliers must agree to introduce a GHG reporting system for the products and services purchased by Abengoa. Abengoa then provides detailed guidelines for suppliers to determine emissions, based on the GHG Protocol standards, and includes calculation guidance, databases and guidance on emissions factors. The guidance also

*Abengoa believes that working closely with its suppliers is the best way to encourage broader GHG measurement and management*

includes data collection templates for suppliers to send to their suppliers further upstream, which introduces GHG emissions management throughout the overall Abengoa value chain. Abengoa also requires that supplier emissions data are verified by a third party, or are accompanied by the data used for calculating the GHG inventory. Finally, the company requires that all suppliers adhere to its Social Responsibility Code of Conduct, to ensure suppliers' senior management is committed to Abengoa's sustainability practices and objectives.



[16]  *Corporate Value Chain (Scope 3) Accounting and Reporting Standard*

App.97

*CHAPTER 02* Business Goals

## SC Johnson: Assessing scope 3 reduction opportunities

Making life better for people and the planet is a core mission at SC Johnson. The company completed a scope 3 inventory to better understand its scope 3 impacts and to provide input for the development of sustainability objectives in support of its core commitment to environmental leadership. Specific objectives of this effort were to:

- Gain a full understanding of the company's global carbon footprint to reveal potential hot spots and opportunities

- Provide a common carbon "currency" throughout the value chain to identify the highest-impact GHG reduction strategies and programs (see figure 2.1)
- Develop a framework to engage government, NGOs, supply chain partners, retailers, and consumers and to drive the innovation necessary to foster GHG improvements throughout the value chain

As a result of the scope 3 inventory effort, SC Johnson has initiated a process to incorporate scope 3 results into its sustainability program objective development, and has initiated outreach programs with its suppliers to help foster GHG improvements.

**Figure [2.1]** SC Johnson's framework to assess reduction opportunities along the value chain



*03* **Summary of Steps and Requirements**



App.100

[19]



**Figure [3.1]** Overview of steps in scope 3 accounting and reporting

*requirements*

*guidance*

This chapter provides a summary of the steps involved in scope 3 accounting and reporting, as well as a list of the requirements that must be followed for a scope 3 inventory to be in conformance with this standard.

### 3.1 Scope 3 accounting and reporting steps

This standard is organized according to the steps a company should follow when developing a scope 3 inventory. Figure 3.1 provides an overview of the steps in scope 3 accounting and reporting. Each step is described in detail in the following chapters.

### 3.2 Terminology: shall, should, and may

This standard uses precise language to indicate which provisions of the standard are requirements, which are recommendations, and which are permissible or allowable options that companies may choose to follow. The term "**shall**" is used throughout this standard to indicate what is required in order for a GHG inventory

to be in conformance with the *GHG Protocol Scope 3 Standard.* The term **"should"** is used to indicate a recommendation, but not a requirement. The term **"may"** is used to indicate an option that is permissible or allowable. The term "required" is used in the guidance to refer to requirements in the standard. "Needs," "can," and "cannot" may be used to provide guidance on implementing a requirement or to indicate when an action is or is not possible.

### 3.3    Summary of requirements

This standard presents accounting and reporting requirements to help companies prepare a GHG inventory that represents a true and fair account of their scope 3 emissions. Standardized approaches and principles are designed to increase the consistency and transparency of scope 3 inventories. Table 3.1 provides a list of all the requirements included in this standard. Each requirement is further explained in the following chapters. Requirements are also presented in a box at the beginning of each chapter that contains requirements (chapters 4, 6, 9, and 11).



*CHAPTER 03* Summary of Steps and Requirements

**Table [3.1]** List of requirements in this standard

| Chapter | Requirements |
|---|---|
| **Accounting and Reporting Principles**<br>**Chapter 4** | • GHG accounting and reporting of a scope 3 inventory shall be based on the following principles: relevance, completeness, consistency, transparency, and accuracy. |
| **Setting the Scope 3 Boundary**<br>**Chapter 6** | • Companies shall account for all scope 3 emissions and disclose and justify any exclusions.<br>• Companies shall account for emissions from each scope 3 category according to the minimum boundaries listed in table 5.4.<br>• Companies shall account for scope 3 emissions of $CO_2$, $CH_4$, $N_2O$, HFCs, PFCs, and $SF_6$, if they are emitted in the value chain.<br>• Biogenic $CO_2$ emissions that occur in the value chain shall not be included in the scopes, but shall be included and separately reported in the public report. |
| **Setting a GHG Target and Tracking Emissions over Time**<br>**Chapter 9** | When companies choose to track performance or set a reduction target, companies shall:<br>• Choose a scope 3 base year and specify their reasons for choosing that particular year;<br>• Develop a base year emissions recalculation policy that articulates the basis for any recalculations; and<br>• Recalculate base year emissions when significant changes in the company structure or inventory methodology occur. |
| **Reporting**<br>**Chapter 11** | Companies shall publicly report the following information:<br>• A scope 1 and scope 2 emissions report in conformance with the *GHG Protocol Corporate Standard*<br>• Total scope 3 emissions reported separately by scope 3 category<br>• For each scope 3 category, total GHG emissions reported in metric tons of $CO_2$ equivalent, excluding biogenic $CO_2$ emissions and independent of any GHG trades, such as purchases, sales, or transfers of offsets or allowances<br>• A list of scope 3 categories and activities included in the inventory<br>• A list of scope 3 categories or activities excluded from the inventory with justification of their exclusion<br>• Once a base year has been established: the year chosen as the scope 3 base year; the rationale for choosing the base year; the base year emissions recalculation policy; scope 3 emissions by category in the base year, consistent with the base year emissions recalculation policy; and appropriate context for any significant emissions changes that triggered base year emissions recalculations<br>• For each scope 3 category, any biogenic $CO_2$ emissions reported separately<br>• For each scope 3 category, a description of the types and sources of data, including activity data, emission factors and global warming potential (GWP) values, used to calculate emissions, and a description of the data quality of reported emissions data<br>• For each scope 3 category, a description of the methodologies, allocation methods, and assumptions used to calculate scope 3 emissions<br>• For each scope 3 category, the percentage of emissions calculated using data obtained from suppliers or other value chain partners |

**04** *Accounting and Reporting Principles*



App.104

[23]



s with financial accounting and reporting, generally accepted GHG accounting principles are intended to underpin and guide GHG accounting and reporting to ensure the reported inventory represents a faithful, true, and fair account of a company's GHG emissions. The five principles described below are adapted from the GHG Protocol Corporate Standard and are intended to guide the accounting and reporting of a company's scope 3 inventory.

## Requirements in this chapter

*GHG accounting and reporting of a scope 3 inventory shall be based on the following principles: relevance, completeness, consistency, transparency, and accuracy.*

GHG accounting and reporting of a scope 3 inventory shall be based on the following principles:

**Relevance:** Ensure the GHG inventory appropriately reflects the GHG emissions of the company and serves the decision-making needs of users – both internal and external to the company.

**Completeness:** Account for and report on all GHG emission sources and activities within the inventory boundary. Disclose and justify any specific exclusions.

**Consistency:** Use consistent methodologies to allow for meaningful performance tracking of emissions over time. Transparently document any changes to the data, inventory boundary, methods, or any other relevant factors in the time series.

**Transparency:** Address all relevant issues in a factual and coherent manner, based on a clear audit trail. Disclose any relevant assumptions and make appropriate references to the accounting and calculation methodologies and data sources used.

**Accuracy:** Ensure that the quantification of GHG emissions is systematically neither over nor under actual emissions, as far as can be judged, and that uncertainties are reduced as far as is practicable. Achieve sufficient accuracy to enable users to make decisions with reasonable confidence as to the integrity of the reported information.

requirements

guidance

## Guidance for applying the accounting and reporting principles

The primary function of these five principles is to guide the implementation of the *GHG Protocol Scope 3 Standard* and the assurance of the scope 3 inventory, particularly when application of the standard in specific situations is ambiguous.

In practice, companies may encounter tradeoffs between principles when completing a scope 3 inventory. For example, a company may find that achieving the most complete scope 3 inventory requires using less accurate data, compromising overall accuracy. Conversely, achieving the most accurate scope 3 inventory may require excluding activities with low accuracy, compromising overall completeness.

Companies should balance tradeoffs between principles depending on their individual business goals (see chapter 2 for more information). For example, tracking performance toward a specific scope 3 reduction target may require more accurate data. Over time, as the accuracy and completeness of scope 3 GHG data increases, the tradeoff between these accounting principles will likely diminish.

## Relevance

A relevant GHG report contains the information that users – both internal and external to the company – need for their decision making. Companies should use the principle of relevance when determining whether to exclude any activities from the inventory boundary (see description of "Completeness" below). Companies should also use the principle of relevance as a guide when selecting data sources. Companies should collect data of sufficient quality to ensure that the inventory is relevant (i.e., that it appropriately reflects the GHG emissions of the company and serves the decision-making needs of users). Selection of data sources depends on a company's individual business goals. More information on relevance and data collection is provided in chapter 7.

## Completeness

Companies should ensure that the scope 3 inventory appropriately reflects the GHG emissions of the company, and serves the decision-making needs of users, both internal and external to the company. In some situations, companies may be unable to estimate emissions due to a lack of data or other limiting factors. Companies should not exclude any activities from the scope 3 inventory that would compromise the relevance of the reported inventory. In the case of any exclusions, it is important that all exclusions be documented and justified. Assurance providers can determine the potential impact and relevance of the exclusion on the overall inventory report. More information on completeness is provided in chapter 6.

## Consistency

Users of GHG information typically track emissions information over time in order to identify trends and assess the performance of the reporting company. The consistent application of accounting approaches, inventory boundary, and calculation methodologies is essential to producing comparable GHG emissions data over time. If there are changes to the inventory boundary (e.g., inclusion of previously excluded activities), methods, data, or other factors affecting emission estimates, they need to be transparently documented and justified, and may warrant recalculation of base year emissions. More information on consistency when tracking performance over time is provided in chapter 9.

## Transparency

Transparency relates to the degree to which information on the processes, procedures, assumptions and limitations of the GHG inventory are disclosed in a clear, factual, neutral, and understandable manner based on clear documentation (i.e., an audit trail). Information should be recorded, compiled, and analyzed in a way that enables internal reviewers and external assurance providers to attest to its credibility. Specific exclusions need to be clearly identified and

**CHAPTER 04** *Accounting and Reporting Principles*

*Companies should balance tradeoffs between principles depending on their individual business goals.*

justified, assumptions disclosed, and appropriate references provided for the methodologies applied and the data sources used. The information should be sufficient to enable a party external to the inventory process to derive the same results if provided with the same source data. A transparent report will provide a clear understanding of the relevant issues and a meaningful assessment of emissions performance of the company's scope 3 activities. More information on reporting is provided in chapter 11.

### Accuracy

Data should be sufficiently accurate to enable intended users to make decisions with reasonable confidence that the reported information is credible. It is important that any estimated data be as accurate as possible to guide the decision-making needs of the company and ensure that the GHG inventory is relevant. GHG measurements, estimates, or calculations should be systemically neither over nor under the actual emissions value, as far as can be judged. Companies should reduce uncertainties in the quantification process as far as practicable and ensure the data are sufficiently accurate to serve decision-making needs. Reporting on measures taken to ensure accuracy and improve accuracy over time can help promote credibility and enhance transparency. More information on accuracy when collecting data is provided in chapter 7.





## 05 *Identifying Scope 3 Emissions*



*guidance*

*T*his chapter provides an overview of scope 3 emissions, including the list of scope 3 categories and descriptions of each category.

## 5.1    Overview of the scopes

The *GHG Protocol Corporate Standard* divides a company's emissions into direct and indirect emissions.

- **Direct emissions** are emissions from sources that are owned or controlled by the reporting company.
- **Indirect emissions** are emissions that are a consequence of the activities of the reporting company, but occur at sources owned or controlled by another company.

Emissions are further divided into three scopes (see table 5.1). Direct emissions are included in scope 1. Indirect emissions are included in scope 2 and scope 3. While a company has control over its direct emissions, it has influence over its indirect emissions. A complete GHG inventory therefore includes scope 1, scope 2, and scope 3.

Scope 1, scope 2, and scope 3 are mutually exclusive for the reporting company, such that there is no double counting of emissions between the scopes. In other words, a company's scope 3 inventory does not include any emissions already accounted for as scope 1 or scope 2 by the same company. Combined, a company's scope 1, scope 2, and scope 3 emissions represent the total GHG emissions related to company activities.

By definition, scope 3 emissions occur from sources owned or controlled by other entities in the value chain (e.g., materials suppliers, third-party logistics providers, waste management suppliers, travel suppliers, lessees and lessors, franchisees, retailers, employees, and customers). The scopes are defined to ensure that two or more companies do not account for the same emission within scope 1 or scope 2. By properly accounting for emissions as scope 1, scope 2, and scope 3, companies avoid double counting within scope 1 and scope 2. (For more information, see the *GHG Protocol Corporate Standard*, chapter 4, "Setting Operational Boundaries.")

In certain cases, two or more companies may account for the same emission within scope 3. For example, the scope 1 emissions of a power generator are the scope 2 emissions of an electrical appliance user, which are in turn the scope 3 emissions of both the appliance manufacturer and the appliance retailer. Each of these four companies has different and often mutually exclusive opportunities to reduce emissions. The power generator can generate power using lower-carbon sources. The electrical appliance user can use the appliance more efficiently. The appliance manufacturer can increase the efficiency of the

**Table [5.1]** Overview of the scopes

| Emissions type | Scope | Definition | Examples |
|---|---|---|---|
| Direct emissions | Scope 1 | Emissions from operations that are owned or controlled by the reporting company | Emissions from combustion in owned or controlled boilers, furnaces, vehicles, etc.; emissions from chemical production in owned or controlled process equipment |
| Indirect emissions | Scope 2 | Emissions from the generation of purchased or acquired electricity, steam, heating, or cooling consumed by the reporting company | Use of purchased electricity, steam, heating, or cooling |
| | Scope 3 | All indirect emissions (not included in scope 2) that occur in the value chain of the reporting company, including both upstream and downstream emissions | Production of purchased products, transportation of purchased products, or use of sold products |

appliance it produces, and the product retailer can offer more energy-efficient product choices.

By allowing for GHG accounting of direct and indirect emissions by multiple companies in a value chain, scope 1, scope 2, and scope 3 accounting facilitates the simultaneous action of multiple entities to reduce emissions throughout society. Because of this type of double counting, scope 3 emissions should not be aggregated across companies to determine total emissions in a given region. Note that while a single emission may be accounted for by more than one company as scope 3, in certain cases the emission is accounted for by each company in a different scope 3 category (see section 5.4). For more information on double counting within scope 3, see section 9.6.

## 5.2 Organizational boundaries and scope 3 emissions

Defining the organizational boundary is a key step in corporate GHG accounting. This step determines which operations are included in the company's organizational boundary and how emissions from each operation are consolidated by the reporting company. As detailed in the *GHG Protocol Corporate Standard*, a company has three options for defining its organizational boundaries as shown in table 5.2.

Companies should use a consistent consolidation approach across the scope 1, scope 2, and scope 3 inventories. The selection of a consolidation approach affects which activities in the company's value chain are categorized as direct emissions (i.e., scope 1 emissions) and indirect emissions (i.e., scope 2 and scope 3 emissions). Operations or activities that are excluded from a company's scope 1 and scope 2 inventories as a result of the organizational boundary definition (e.g., leased assets, investments, and

*CHAPTER 05* *Identifying Scope 3 Emissions*

**Table [5.2]** Consolidation approaches

| Consolidation approach | Description |
|---|---|
| **Equity share** | Under the equity share approach, a company accounts for GHG emissions from operations according to its share of equity in the operation. The equity share reflects economic interest, which is the extent of rights a company has to the risks and rewards flowing from an operation. |
| **Financial control** | Under the financial control approach, a company accounts for 100 percent of the GHG emissions over which it has financial control. It does not account for GHG emissions from operations in which it owns an interest but does not have financial control. |
| **Operational control** | Under the operational control approach, a company accounts for 100 percent of the GHG emissions over which it has operational control. It does not account for GHG emissions from operations in which it owns an interest but does not have operational control. |

franchises) may become relevant when accounting for scope 3 emissions (see box 5.1).

Scope 3 includes:

- Emissions from activities in the value chain of the entities included in the company's organizational boundary
- Emissions from leased assets, investments, and franchises that are excluded from the company's organizational boundary but that the company partially or wholly owns or controls (see box 5.1)

For example, if a company selects the equity share approach, emissions from any asset the company partially or wholly owns are included in its direct emissions (i.e., scope 1), but emissions from any asset the company controls but does not partially or wholly own (e.g., a leased asset) are excluded from its direct emissions and should be included in its scope 3 inventory.[1]

Similarly, if a company selects the operational control approach, emissions from any asset the company controls are included in its direct emissions (i.e., scope 1), but emissions from any asset the company wholly or partially owns but does not control (e.g., investments) are excluded from its direct emissions and should be included in its scope 3 inventory.

See the *GHG Protocol Corporate Standard*, chapter 3, "Setting Organizational Boundaries" for more information on each of the consolidation approaches.

### 5.3    Upstream and downstream scope 3 emissions

This standard divides scope 3 emissions into upstream and downstream emissions. The distinction is based on the financial transactions of the reporting company.

- **Upstream emissions** are indirect GHG emissions related to purchased or acquired goods and services.
- **Downstream emissions** are indirect GHG emissions related to sold[2] goods and services.

In the case of goods purchased or sold by the reporting company, upstream emissions occur up to the point of receipt by the reporting company, while downstream emissions occur subsequent to their sale by the reporting company and transfer of control from the reporting company to another entity (e.g., a customer). Emissions from activities under the ownership or control of the reporting company (i.e., direct emissions) are neither upstream nor downstream (see figure 5.2).

**Box [5.1]**  Example of how the consolidation approach affects the scope 3 inventory

A reporting company has an equity share in four entities (Entities A, B, C and D) and has operational control over three of those entities (Entities A, B, and C). The company selects the operational control approach to define its organizational boundary. Emissions from sources controlled by Entities A, B, and C are included in the company's scope 1 inventory, while emissions from sources controlled by Entity D are excluded from the reporting company's scope 1 inventory. Emissions in the value chain of Entities A, B, and C are included in the company's scope 3 inventory. Emissions from the operation of Entity D are included in the reporting company's scope 3 inventory as an investment (according to the reporting company's share of equity in Entity D). If the company instead selects the equity share approach to define its organizational boundary, the company would instead include emissions from sources controlled by Entities A, B, C, and D in its scope 1 inventory, according to its share of equity in each entity. See figure 5.1.

**Figure [5.1]** Example of how the consolidation approach affects the scope 3 inventory





*CHAPTER 05 Identifying Scope 3 Emissions*

## 5.4    Overview of scope 3 categories

This standard categorizes scope 3 emissions into 15 distinct categories, as listed in figure 5.2 and table 5.3. The categories are intended to provide companies with a systematic framework to organize, understand, and report on the diversity of scope 3 activities within a corporate value chain. The categories are designed to be mutually exclusive, such that, for any one reporting company, there is no double counting of emissions between categories.[3] Each scope 3 category is comprised of multiple scope 3 activities that individually result in emissions.

Table 5.4 includes descriptions of each of the 15 categories that comprise scope 3 emissions. Each category is described in detail in section 5.5. Companies are required to report scope 3 emissions by scope 3 category. Any scope 3 activities not captured by the list of scope 3 categories may be reported separately (see chapter 11).

### Minimum boundaries of scope 3 categories

Table 5.4 identifies the minimum boundaries of each scope 3 category in order to standardize the boundaries of each category and help companies understand which activities should be accounted for. The minimum boundaries are intended to ensure that major activities are included in the scope 3 inventory, while clarifying that companies need not account for the value chain emissions of each entity in its value chain, ad infinitum. Companies may include emissions from optional activities within each category. Companies may exclude scope 3 activities included in the minimum boundary of each category, provided that any exclusion is disclosed and justified. (For more information, see chapter 6.)

For some scope 3 categories (e.g., purchased goods and services, capital goods, fuel- and energy-related activities), the minimum boundary includes all upstream (cradle-to-gate[4]) emissions of purchased products to

**Figure [5.2]** Overview of GHG Protocol scopes and emissions across the value chain



**Table [5.3]** List of scope 3 categories

| Upstream or downstream | Scope 3 category |
|---|---|
| **Upstream scope 3 emissions** | 1. Purchased goods and services<br>2. Capital goods<br>3. Fuel- and energy-related activities<br>(not included in scope 1 or scope 2)<br>4. Upstream transportation and distribution<br>5. Waste generated in operations<br>6. Business travel<br>7. Employee commuting<br>8. Upstream leased assets |
| **Downstream scope 3 emissions** | 9. Downstream transportation and distribution<br>10. Processing of sold products<br>11. Use of sold products<br>12. End-of-life treatment of sold products<br>13. Downstream leased assets<br>14. Franchises<br>15. Investments |

ensure that the inventory captures the GHG emissions of products wherever they occur in the life cycle, from raw material extraction through purchase by the reporting company. For other categories (e.g., transportation and distribution, waste generated in operations, business travel, employee commuting, leased assets, franchises, use of sold products, etc.), the minimum boundary includes the scope 1 and scope 2 emissions of the relevant value chain partner (e.g., the transportation provider, waste management company, transportation carrier, employee, lessor, franchisor, consumer, etc.). For these categories, the major emissions related to the scope 3 category result from scope 1 and scope 2 activities of the entity (e.g., the fuel consumed in an airplane for business travel), rather than the emissions associated with manufacturing capital goods or infrastructure (e.g., the construction of an airplane or airport for business travel). Companies may account for additional emissions beyond the minimum boundary where relevant.

### Time boundary of scope 3 categories

This standard is designed to account for all emissions related to the reporting company's activities in the reporting year (e.g., emissions related to products purchased or sold in the reporting year). For some scope 3 categories, emissions occur simultaneously with the activity (e.g., from combustion of energy), so emissions occur in the same year as the company's activities (see figure 5.3). For some categories, emissions may have occurred in previous years. For other scope 3 categories, emissions are expected to occur in future years because the activities in the reporting year have long-term emissions impacts. For these categories, reported emissions have not yet happened, but are expected to happen as a result of the waste generated, investments made, and products sold in the reporting year. For these categories, the reported data should not be interpreted to mean that emissions have already occurred, but that emissions are expected to occur as a result of activities that occurred in the reporting year.

**CHAPTER 05** *Identifying Scope 3 Emissions*

**Figure [5.3]** Time boundary of scope 3 categories

| Scope 3 category | Past years | Reporting year | Future years |
|---|---|---|---|
| 1. Purchased goods & services | | | |
| 2. Capital goods | | | |
| 3. Fuel- and energy-related activities | | | |
| 4. Upstream transportation & distribution | | | |
| 5. Waste generated in operations | | | |
| 6. Business travel | | | |
| 7. Employee commuting | | | |
| 8. Upstream leased assets | | | |
| 9. Downstream transportation & distribution | | | |
| 10. Processing of sold products | | | |
| 11. Use of sold products | | | |
| 12. End of life treatment of sold products | | | |
| 13. Downstream leased assets | | | |
| 14. Franchises | | | |
| 15. Investments | | | |



**Table [5.4]** Description and boundaries of scope 3 categories

*Upstream scope 3 emissions*

| *Category* | *Category description* | *Minimum boundary* |
|---|---|---|
| **1. Purchased goods and services** | • Extraction, production, and transportation of goods and services purchased or acquired by the reporting company in the reporting year, not otherwise included in Categories 2 - 8 | • All upstream (cradle-to-gate) emissions of purchased goods and services |
| **2. Capital goods** | • Extraction, production, and transportation of capital goods purchased or acquired by the reporting company in the reporting year | • All upstream (cradle-to-gate) emissions of purchased capital goods |
| **3. Fuel- and energy-related activities (not included in scope 1 or scope 2)** | • Extraction, production, and transportation of fuels and energy purchased or acquired by the reporting company in the reporting year, not already accounted for in scope 1 or scope 2, including:<br><br>**a.** Upstream emissions of purchased fuels (extraction, production, and transportation of fuels consumed by the reporting company)<br><br>**b.** Upstream emissions of purchased electricity (extraction, production, and transportation of fuels consumed in the generation of electricity, steam, heating, and cooling consumed by the reporting company)<br><br>**c.** Transmission and distribution (T&D) losses (generation of electricity, steam, heating and cooling that is consumed (i.e., lost) in a T&D system) – reported by end user<br><br>**d.** Generation of purchased electricity that is sold to end users (generation of electricity, steam, heating, and cooling that is purchased by the reporting company and sold to end users) – reported by utility company or energy retailer only | **a.** For upstream emissions of purchased fuels: All upstream (cradle-to-gate) emissions of purchased fuels (from raw material extraction up to the point of, but excluding combustion)<br><br>**b.** For upstream emissions of purchased electricity: All upstream (cradle-to-gate) emissions of purchased fuels (from raw material extraction up to the point of, but excluding, combustion by a power generator)<br><br>**c.** For T&D losses: All upstream (cradle-to-gate) emissions of energy consumed in a T&D system, including emissions from combustion<br><br>**d.** For generation of purchased electricity that is sold to end users: Emissions from the generation of purchased energy |

**Table [5.4]** Description and boundaries of scope 3 categories (continued)

### Upstream scope 3 emissions

| Category | Category description | Minimum boundary |
|---|---|---|
| **4. Upstream transportation and distribution** | • Transportation and distribution of products purchased by the reporting company in the reporting year between a company's tier 1 suppliers and its own operations (in vehicles and facilities not owned or controlled by the reporting company)<br>• Transportation and distribution services purchased by the reporting company in the reporting year, including inbound logistics, outbound logistics (e.g., of sold products), and transportation and distribution between a company's own facilities (in vehicles and facilities not owned or controlled by the reporting company) | • The scope 1 and scope 2 emissions of transportation and distribution providers that occur during use of vehicles and facilities (e.g., from energy use)<br>• *Optional:* The life cycle emissions associated with manufacturing vehicles, facilities, or infrastructure |
| **5. Waste generated in operations** | • Disposal and treatment of waste generated in the reporting company's operations in the reporting year (in facilities not owned or controlled by the reporting company) | • The scope 1 and scope 2 emissions of waste management suppliers that occur during disposal or treatment<br>• *Optional:* Emissions from transportation of waste |
| **6. Business travel** | • Transportation of employees for business-related activities during the reporting year (in vehicles not owned or operated by the reporting company) | • The scope 1 and scope 2 emissions of transportation carriers that occur during use of vehicles (e.g., from energy use)<br>• *Optional:* The life cycle emissions associated with manufacturing vehicles or infrastructure |
| **7. Employee commuting** | • Transportation of employees between their homes and their worksites during the reporting year (in vehicles not owned or operated by the reporting company) | • The scope 1 and scope 2 emissions of employees and transportation providers that occur during use of vehicles (e.g., from energy use)<br>• *Optional:* Emissions from employee teleworking |
| **8. Upstream leased assets** | • Operation of assets leased by the reporting company (lessee) in the reporting year and not included in scope 1 and scope 2 – reported by lessee | • The scope 1 and scope 2 emissions of lessors that occur during the reporting company's operation of leased assets (e.g., from energy use)<br>• *Optional:* The life cycle emissions associated with manufacturing or constructing leased assets |

**Table [5.4]** Description and boundaries of scope 3 categories (continued)

*Downstream scope 3 emissions*

| Category | Category description | Minimum boundary |
|---|---|---|
| **9. Downstream transportation and distribution** | • Transportation and distribution of products sold by the reporting company in the reporting year between the reporting company's operations and the end consumer (if not paid for by the reporting company), including retail and storage (in vehicles and facilities not owned or controlled by the reporting company) | • The scope 1 and scope 2 emissions of transportation providers, distributors, and retailers that occur during use of vehicles and facilities (e.g., from energy use)<br>• *Optional:* The life cycle emissions associated with manufacturing vehicles, facilities, or infrastructure |
| **10. Processing of sold products** | • Processing of intermediate products sold in the reporting year by downstream companies (e.g., manufacturers) | • The scope 1 and scope 2 emissions of downstream companies that occur during processing (e.g., from energy use) |
| **11. Use of sold products** | • End use of goods and services sold by the reporting company in the reporting year | • The direct use-phase emissions of sold products over their expected lifetime (i.e., the scope 1 and scope 2 emissions of end users that occur from the use of: products that directly consume energy (fuels or electricity) during use; fuels and feedstocks; and GHGs and products that contain or form GHGs that are emitted during use)<br>• *Optional:* The indirect use-phase emissions of sold products over their expected lifetime (i.e., emissions from the use of products that indirectly consume energy (fuels or electricity) during use) |
| **12. End-of-life treatment of sold products** | • Waste disposal and treatment of products sold by the reporting company (in the reporting year) at the end of their life | • The scope 1 and scope 2 emissions of waste management companies that occur during disposal or treatment of sold products |
| **13. Downstream leased assets** | • Operation of assets owned by the reporting company (lessor) and leased to other entities in the reporting year, not included in scope 1 and scope 2 – reported by lessor | • The scope 1 and scope 2 emissions of lessees that occur during operation of leased assets (e.g., from energy use).<br>• *Optional:* The life cycle emissions associated with manufacturing or constructing leased assets |

**CHAPTER 05** *Identifying Scope 3 Emissions*

**Table [5.4]**  **Description and boundaries of scope 3 categories (continued)**

*Downtream scope 3 emissions*

| Category | Category description | Minimum boundary |
|---|---|---|
| **14. Franchises** | • Operation of franchises in the reporting year, not included in scope 1 and scope 2 – reported by franchisor | • The scope 1 and scope 2 emissions of franchisees that occur during operation of franchises (e.g., from energy use)<br>• *Optional:* The life cycle emissions associated with manufacturing or constructing franchises |
| **15. Investments** | • Operation of investments (including equity and debt investments and project finance) in the reporting year, not included in scope 1 or scope 2 | • See the description of category 15 (Investments) in section 5.5 for the required and optional boundaries |



## 5.5    Descriptions of scope 3 categories

This section provides detailed descriptions of each scope 3 category.

### Category 1: Purchased goods and services

This category includes all upstream (i.e., cradle-to-gate) emissions from the production of products purchased or acquired by the reporting company in the reporting year. Products include both goods (tangible products) and services (intangible products).

This category includes emissions from all purchased goods and services not otherwise included in the other categories of upstream scope 3 emissions (i.e., category 2 through category 8). Specific categories of upstream emissions are separately reported in category 2 through category 8 to enhance the transparency and consistency of scope 3 reports.

Cradle-to-gate emissions include all emissions that occur in the life cycle of purchased products, up to the point of receipt by the reporting company (excluding emissions from sources that are owned or controlled by the reporting company). Cradle-to-gate emissions may include:

- Extraction of raw materials
- Agricultural activities
- Manufacturing, production, and processing
- Generation of electricity consumed by upstream activities
- Disposal/treatment of waste generated by upstream activities
- Land use and land-use change[5]
- Transportation of materials and products between suppliers
- Any other activities prior to acquisition by the reporting company

Emissions from the use of products purchased by the reporting company are accounted for in either scope 1 (e.g., for fuel use) or scope 2 (e.g., for electricity use), rather than scope 3.

Companies may find it useful to differentiate between purchases of production-related and non-production-related products. Doing so may be aligned with existing procurement practices and therefore may be a useful way to more efficiently organize and collect data (see box 5.2).

Companies may also find it useful to differentiate between purchases of intermediate products, final products, and capital goods (see box 5.3).

### Box [5.2] Production-related and non-production-related procurement

A company's purchases can be divided into two types:

- Production-related procurement
- Non-production-related procurement

Production-related procurement (often called direct procurement) consists of purchased goods that are directly related to the production of a company's products. Production-related procurement includes:

- Intermediate goods (e.g., materials, components, and parts) that the company purchases to process, transform, or include in another product
- Final goods purchased for resale (for retail and distribution companies only)
- Capital goods (e.g., plant, property, and equipment) that the company uses to manufacture a product, provide a service, or sell, store, and deliver merchandise

Non-production-related procurement (often called indirect procurement) consists of purchased goods and services that are not integral to the company's products, but are instead used to enable operations. Non-production-related procurement may include capital goods, such as furniture, office equipment, and computers. Non-production-related procurement includes:

- Operations resource management: Products used in office settings such as office supplies, office furniture, computers, telephones, travel services, IT support, outsourced administrative functions, consulting services, and janitorial and landscaping services
- Maintenance, repairs, and operations: Products used in manufacturing settings, such as spare parts and replacement parts

*CHAPTER 05* Identifying Scope 3 Emissions

**Box [5.3]** Intermediate products, final products, and capital goods

**Intermediate products** are inputs to the production of other goods or services that require further processing, transformation, or inclusion in another product before use by the end consumer. Intermediate products are not consumed by the end user in their current form.

**Final products** are goods and services that are consumed by the end user in their current form, without further processing, transformation, or inclusion in another product. Final products include:

• Products consumed by end consumers
• Products sold to retailers for resale to end consumers (e.g., consumer products)
• Products consumed by businesses in their current form (e.g., office supplies)

**Capital goods** are final goods that are not immediately consumed or further processed by the company, but are instead used in their current form by the company to manufacture a product, provide a service, or sell, store, and deliver merchandise. Scope 3 emissions from capital goods are reported in category 2 (Capital goods), rather than category 1 (Purchased goods and services).

Intermediate goods and capital goods are both inputs to a company's operations. The distinction between intermediate goods and capital goods depends on the circumstances. For example, if a company includes an electrical motor in another product (e.g., a motor vehicle), the electrical motor is an intermediate good. If a company uses the electrical motor to produce other goods, it is a capital good consumed by the reporting company.

*Category 2: Capital goods*

This category includes all upstream (i.e., cradle-to-gate) emissions from the production of capital goods purchased or acquired by the reporting company in the reporting year. Emissions from the use of capital goods by the reporting company are accounted for in either scope 1 (e.g., for fuel use) or scope 2 (e.g., for electricity use), rather than scope 3.

Capital goods are final products that have an extended life and are used by the company to manufacture a product, provide a service, or sell, store, and deliver merchandise. In financial accounting, capital goods are treated as fixed assets or as plant, property, and equipment (PP&E). Examples of capital goods include equipment, machinery, buildings, facilities, and vehicles.

In certain cases, there may be ambiguity over whether a particular purchased product is a capital good (to be reported in category 2) or a purchased good (to be reported in category 1). Companies should follow their own financial accounting procedures to determine whether to account for a purchased product as a capital good in this category or as a purchased good or service in category 1. Companies should not double count emissions between category 1 and category 2.

**Box [5.4]** Accounting for emissions from capital goods

In financial accounting, capital goods (sometimes called "capital assets") are typically depreciated or amortized over the life of the asset. For purposes of accounting for scope 3 emissions companies should not depreciate, discount, or amortize the emissions from the production of capital goods over time. Instead companies should account for the total cradle-to-gate emissions of purchased capital goods in the year of acquisition, the same way the company accounts for emissions from other purchased products in category 1. If major capital purchases occur only once every few years, scope 3 emissions from capital goods may fluctuate significantly from year to year. Companies should provide appropriate context in the public report (e.g., by highlighting exceptional or non-recurring capital investments).

## BASF: Scope 3 emissions from purchased goods and services

BASF, a global chemical company, is committed to acting responsibly throughout its entire value chain in order to build stable and sustainable relationships with business partners. When making decisions, BASF chooses carriers, service providers, and suppliers not just on the basis of price, but also on the basis of their performance in environmental and social responsibility. When calculating scope 3 emissions from category 1 (Purchased goods and services), BASF accounted for emissions from raw materials, components, packaging materials, and other goods and services not included in the other upstream scope 3 categories. BASF found that, in 2009, scope 3 emissions from category 1 (Purchased goods and services) accounted for 24 percent of its total scope 3 emissions and 20 percent of its combined scope 1, scope 2, and scope 3 emissions.

### Calculating emissions from raw materials

BASF accounted for scope 3 emissions from 100 percent of its procured raw materials and component manufacturing at its suppliers' facilities (by weight). BASF calculated the cradle-to-gate emissions of raw materials, including all direct GHG emissions from raw material extraction, precursor manufacturing, and transport, as well as indirect emissions from energy use. To do so, BASF determined the quantity of each product purchased, then applied cradle-to-gate emission factors for about 90 percent of the purchased products (by weight), obtained from commercially and publically available data sources as well as from its own life cycle assessment database, which is based mainly on primary data. BASF multiplied the $CO_2e$ emissions per kilogram of each product by the respective quantity of the product purchased to determine

cradle-to-gate emissions. Finally, BASF extrapolated the resulting scope 3 emissions to 100 percent of total purchases in order to account for all procured raw materials and components.

### Calculating emissions from packaging

BASF first determined the types and quantities of packaging materials purchased in the reporting year (such as plastic, paper board, and steel) based on the number of containers purchased and the fractions of materials used in each container. BASF then calculated GHG emissions by multiplying the total amount of various materials by their respective cradle-to gate emission factors.

### Results

BASF found that 93 percent of its category 1 GHG emissions result from the raw materials purchased, while packaging, services and, equipment account for only 7 percent. This finding suggests the need to prioritize future scope 3 accounting and reduction efforts on raw materials. Working with suppliers to improve GHG performance will help BASF reduce its scope 3 emissions from raw materials over time. The company's results could also inform the development of sector-specific guidance for the chemical industry, by focusing on raw materials and components for the chemical sector.

*Scope 3 emissions from category 1 (Purchased goods and services) accounted for 24 percent of BASF's total scope 3 emissions and 20 percent of its combined scope 1, scope 2, and scope 3 emissions.*

---

[40]  *Corporate Value Chain (Scope 3) Accounting and Reporting Standard*



**CHAPTER 05** *Identifying Scope 3 Emissions*

### *Category 3: Fuel- and energy-related emissions not included in scope 1 or scope 2*

This category includes emissions related to the production of fuels and energy purchased and consumed by the reporting company in the reporting year that are not included in scope 1 or scope 2.

Category 3 excludes emissions from the combustion of fuels or electricity consumed by the reporting company, since they are already included in scope 1 or scope 2. Scope 1 includes emissions from the combustion of fuels by sources owned or controlled by the reporting company. Scope 2 includes the emissions from the combustion of fuels to generate electricity, steam, heating, and cooling purchased and consumed by the reporting company.

This category includes emissions from four distinct activities (see table 5.5).

**Table [5.5]** Activities included in category 3 (Fuel- and energy-related emissions not included in scope 1 or scope 2)

| Activity | Description | Applicability |
|---|---|---|
| **a. Upstream emissions of purchased fuels** | Extraction, production, and transportation of fuels consumed by the reporting company • Examples include mining of coal, refining of gasoline, transmission and distribution of natural gas, production of biofuels, etc. | Applicable to end users of fuels |
| **b. Upstream emissions of purchased electricity** | Extraction, production, and transportation of fuels consumed in the generation of electricity, steam, heating, and cooling that is consumed by the reporting company • Examples include mining of coal, refining of fuels, extraction of natural gas, etc. | Applicable to end users of electricity, steam, heating and cooling |
| **c. T&D losses** | Generation of electricity, steam, heating, and cooling that is consumed (i.e., lost) in a T&D system – reported by end user | Applicable to end users of electricity, steam, heating and cooling |
| **d. Generation of purchased electricity that is sold to end users** | Generation of electricity, steam, heating, and cooling that is purchased by the reporting company and sold to end users – reported by utility company or energy retailer • Note: This activity is particularly relevant for utility companies that purchase wholesale electricity supplied by independent power producers for resale to their customers. | Applicable to utility companies and energy retailers |

**Box [5.5]** Accounting for emissions from the production, transmission, and use of electricity

**Figure [5.4]** Emissions across an electricity value chain



Figure 5.4 illustrates an electricity value chain. A coal mining and processing company (A) directly emits 5 metric tons of $CO_2e$ per year from its operations and sells coal to a power generator (B), which generates 100 MWh of electricity and directly emits 100 metric tons of $CO_2$ per year. A utility (C) that owns and operates a T&D system purchases all of the generator's electricity. The utility consumes 10 MWh due to T&D losses (corresponding to 10 metric tons $CO_2$ of scope 2 emissions per year) and delivers the remaining 90 MWh to an end user (D), which consumes 90 MWh (corresponding to 90 metric tons $CO_2$ of scope 2 emissions per year).

Table 5.6 explains how each company accounts for GHG emissions. In this example, the emission factor of the electricity sold by Company B is 1 t $CO_2e$/MWh. All numbers are illustrative only.



*CHAPTER 05* Identifying Scope 3 Emissions

**Box [5.5]** Accounting for emissions from the production, transmission, and use of electricity (continued)

**Table [5.6]** Accounting for emissions across an electricity value chain

| Reporting company | Scope 1 | Scope 2 | Scope 3 |
|---|---|---|---|
| **Coal mining, processing, and transport (Company A)** | 5 t $CO_2$e | 0 (unless electricity is used during coal mining and processing) | 100 t $CO_2$e from the combustion of sold products (i.e., coal) <br><br> *Reported in category 11 (Use of sold products)* |
| **Power generator (Company B)** | 100 t $CO_2$e | 0 | 5 t $CO_2$e from the extraction, production, and transportation of fuel (i.e., coal) consumed by the reporting company <br><br> *Reported in Category 3 (Fuel- and energy-related activities)* <br><br> Note: The generator does not account for scope 3 emissions associated with sold electricity because the emissions are already accounted for in scope 1. |
| **Utility (Company C)** | 0 (unless $SF_6$ is released from the T&D system) | 10 t $CO_2$e from the generation of electricity purchased and consumed by Company  C | 0.5 t $CO_2$e from the extraction, production, and transportation of fuels (i.e., coal) consumed in the generation of electricity consumed by Company C (5 tons from coal mining x 10 percent of electricity generated by B that is consumed by C) <br><br> 94.5 t $CO_2$e from the generation of electricity purchased by  Company C and sold to Company D <br><br> *Both are reported in category 3 (Fuel- and energy-related activities)* |
| **End consumer of electricity (Company D)** | 0 | 90 t $CO_2$e from the generation of electricity purchased and consumed by Company D | 4.5 t $CO_2$e from the extraction, production, and transportation of coal consumed in the generation of electricity consumed by Company D <br><br> 10.5 t $CO_2$e from the generation of electricity that is consumed (i.e., lost) in transmission and distribution <br><br> *Both are reported in category 3 (Fuel- and energy-related activities)* |

### Category 4: Upstream transportation and distribution

This category includes emissions from the transportation and distribution of products (excluding fuel and energy products) purchased or acquired by the reporting company in the reporting year in vehicles and facilities not owned or operated by the reporting company, as well as other transportation and distribution services purchased by the reporting company in the reporting year (including both inbound and outbound logistics).

Specifically, this category includes:

- Transportation and distribution of products purchased by the reporting company in the reporting year, between a company's tier 1 suppliers[6] and its own operations (including multi-modal shipping where multiple carriers are involved in the delivery of a product)
- Third-party transportation and distribution services purchased by the reporting company in the reporting year (either directly or through an intermediary), including inbound logistics, outbound logistics (e.g., of sold products), and third-party transportation and distribution between a company's own facilities

Emissions may arise from the following transportation and distribution activities throughout the value chain:

- Air transport
- Rail transport
- Road transport
- Marine transport
- Storage of purchased products in warehouses, distribution centers, and retail facilities

Outbound logistics services purchased by the reporting company are categorized as upstream because they are a purchased service. Emissions from transportation and distribution of purchased products upstream of the reporting company's tier 1 suppliers (e.g., transportation between a company's tier 2 and tier 1 suppliers) are accounted for in scope 3, category 1 (Purchased goods and services). Table 5.7 explains the scope and scope 3 category where each type of transportation and distribution activity should be accounted for.

A reporting company's scope 3 emissions from upstream transportation and distribution include the scope 1 and scope 2 emissions of third-party transportation companies.

### Category 5: Waste generated in operations

This category includes emissions from third-party disposal and treatment of waste that is generated in the reporting company's owned or controlled operations in the reporting year. This category includes emissions from disposal of both solid waste and wastewater. Only waste treatment in facilities owned or operated by third parties is included in scope 3. Waste treatment at facilities owned or controlled by the reporting company is accounted for in scope 1 and scope 2. Treatment of waste generated in operations is categorized as an upstream scope 3 category because waste management services are purchased by the reporting company.

This category includes all future emissions that result from waste generated in the reporting year. (See section 5.4 for more information on the time boundary of scope 3 categories.)

Waste treatment activities may include:

- Disposal in a landfill
- Disposal in a landfill with landfill-gas-to-energy (LFGTE)— i.e., combustion of landfill gas to generate electricity
- Recovery for recycling
- Incineration
- Composting
- Waste-to-energy (WTE) or energy-from-waste (EfW) — i.e., combustion of municipal solid waste (MSW) to generate electricity
- Wastewater treatment

Companies may optionally include emissions from transportation of waste.

See box 5.6 for guidance on accounting for emissions from recycling.

A reporting company's scope 3 emissions from waste generated in operations include the scope 1 and scope 2 emissions of solid waste and wastewater management companies.

*CHAPTER 05 Identifying Scope 3 Emissions*

**Table [5.7]** Accounting for emissions from transportation and distribution activities in the value chain

| Transportation and distribution activity in the value chain | Scope and scope 3 category |
|---|---|
| Transportation and distribution in vehicles and facilities owned or controlled by the reporting company | **Scope 1 (for fuel use) or scope 2 (for electricity use)** |
| Transportation and distribution in vehicles and facilities leased by and operated by the reporting company (and not already included in scope 1 or scope 2) | **Scope 3, category 8 (Upstream leased assets)** |
| Transportation and distribution of purchased products, upstream of the reporting company's tier 1 suppliers (e.g., transportation between a company's tier 2 and tier 1 suppliers) | **Scope 3, category 1 (Purchased goods and services), since emissions from transportation are already included in the cradle-to-gate emissions of purchased products. These emissions are not required to be reported separately from category 1.** |
| Production of vehicles (e.g., ships, trucks, planes) purchased or acquired by the reporting company | **Account for the upstream (i.e., cradle-to-gate) emissions associated with manufacturing vehicles in Scope 3, category 2 (Capital goods)** |
| Transportation of fuels and energy consumed by the reporting company | **Scope 3, category 3 (Fuel- and energy-related emissions not included in scope 1 or scope 2)** |
| Transportation and distribution of products purchased by the reporting company, between a company's tier 1 suppliers and its own operations (in vehicles and facilities not owned or controlled by the reporting company) | **Scope 3, category 4 (Upstream transportation and distribution)** |
| Transportation and distribution services purchased by the reporting company in the reporting year (either directly or through an intermediary), including inbound logistics, outbound logistics (e.g., of sold products), and transportation and distribution between a company's own facilities (in vehicles and facilities not owned or controlled by the reporting company) | |
| Transportation and distribution of products sold by the reporting company between the reporting company's operations and the end consumer (if not paid for by the reporting company), including retail and storage (in vehicles and facilities not owned or controlled by the reporting company) | **Scope 3, category 9 (Downstream transportation and distribution)** |

**Box [5.6] Accounting for emissions from recycling**

Companies (e.g., plastic bottle manufacturers) may both purchase materials with recycled content (e.g., plastic) and sell products that are recyclable (e.g., plastic bottles). In this case, accounting for emissions from the recycling processes both upstream and downstream would double count emissions from recycling. To avoid double counting of emissions from recycling processes by the same company, companies should account for upstream emissions from recycling processes in category 1 and category 2 when the company purchases goods or materials with recycled content. In category 5 and category 12, companies should account for emissions from recovering materials at the end of their life for recycling, but should not account for emissions from recycling processes themselves (these are instead included in category 1 and category 2 by purchasers of recycled materials).

Companies should not report negative or avoided emissions associated with recycling in category 5 or category 12. Any claims of avoided emissions associated with recycling should not be included in, or deducted from, the scope 3 inventory, but may instead be reported separately from scope 1, scope 2, and scope 3 emissions. Companies that report avoided emissions should also provide data to support the claim that emissions are avoided (e.g., that recycled materials are collected, recycled, and used) and report the methodology, data sources, system boundary, time period, and other assumptions used to calculate avoided emissions. For more information on avoided emissions, see section 9.5.

### Category 6: Business travel

This category includes emissions from the transportation of employees for business-related activities in vehicles owned or operated by third parties, such as aircraft, trains, buses, and passenger cars.

Emissions from transportation in vehicles owned or controlled by the reporting company are accounted for in either scope 1 (for fuel use) or scope 2 (for electricity use). Emissions from leased vehicles operated by the reporting company not included in scope 1 or scope 2 are accounted for in scope 3, category 8 (Upstream leased assets). Emissions from transportation of employees to and from work are accounted for in scope 3, category 7 (Employee commuting).

Emissions from business travel may arise from:

- Air travel
- Rail travel
- Bus travel
- Automobile travel (e.g., business travel in rental cars or employee-owned vehicles other than employee commuting to and from work)
- Other modes of travel

Companies may optionally include emissions from business travelers staying in hotels.

A reporting company's scope 3 emissions from business travel include the scope 1 and scope 2 emissions of transportation companies (e.g., airlines).

### Category 7: Employee commuting

This category includes emissions from the transportation of employees[7] between their homes and their worksites.

Emissions from employee commuting may arise from:

- Automobile travel
- Bus travel
- Rail travel
- Air travel
- Other modes of transportation

Companies may include emissions from teleworking (i.e., employees working remotely) in this category.

A reporting company's scope 3 emissions from employee commuting include the scope 1 and scope 2 emissions of employees and third-party transportation providers.

Even though employee commuting is not always purchased or reimbursed by the reporting company, it is categorized as an upstream scope 3 category because it is a service that enables company operations, similar to purchased or acquired goods and services.

### Category 8: Upstream leased assets

This category includes emissions from the operation of assets that are leased by the reporting company in the reporting year and not already included in the reporting company's scope 1 or scope 2 inventories. This category is only applicable to companies that operate leased assets (i.e., lessees). For companies that own and lease assets to others (i.e., lessors), see category 13 (Downstream leased assets).

Leased assets may be included in a company's scope 1 or scope 2 inventory depending on the type of lease and the consolidation approach the company uses to define its organizational boundaries (see section 5.2).

If the reporting company leases an asset for only part of the reporting year, it should account for emissions for the portion of the year that the asset was leased. A reporting company's scope 3 emissions from upstream leased assets include the scope 1 and scope 2 emissions of lessors (depending on the lessor's consolidation approach).

See Appendix A for more information on accounting for emissions from leased assets.

### Category 9: Downstream transportation and distribution

This category includes emissions from transportation and distribution of products sold by the reporting company in the reporting year between the reporting company's operations and the end consumer (if not paid for by the reporting company), in vehicles and facilities not owned or controlled by the reporting company. This category includes emissions from retail and storage. Outbound transportation and distribution services that are purchased by the reporting company are excluded from category 9 and included in category 4 (Upstream transportation and distribution) because the reporting company purchases the service. Category 9 only includes transportation- and distribution-related emissions that occur after the reporting company pays to produce and distribute its products. See table 5.7 for guidance on accounting for emissions from transportation and distribution in the value chain.

Emissions from downstream transportation and distribution can arise from:

- Storage of sold products in warehouses and distribution centers
- Storage of sold products in retail facilities
- Air transport
- Rail transport
- Road transport
- Marine transport

Companies may include emissions from customers traveling to retail stores in this category, which can be significant for companies that own or operate retail facilities. See section 5.6 for guidance on the applicability of category 9 to final products and intermediate products sold by the reporting company. A reporting company's scope 3 emissions from downstream transportation and distribution include the scope 1 and scope 2 emissions of transportation companies, distribution companies, retailers, and (optionally) customers.

### Category 10: Processing of sold products

This category includes emissions from processing of sold intermediate products by third parties (e.g., manufacturers) subsequent to sale by the reporting company. Intermediate products are products that require further processing, transformation, or inclusion in another product before use (see box 5.3), and therefore result in emissions from processing subsequent to sale by the reporting company and before use by the end consumer. Emissions from processing should be allocated to the intermediate product.

In certain cases, the eventual end use of sold intermediate products may be unknown. For example, a company may produce an intermediate product with many potential downstream applications, each of which has a different GHG emissions profile, and be unable to reasonably estimate the downstream emissions associated with the various end uses of the intermediate product. See section 6.4 for guidance in cases where downstream emissions associated with sold intermediate products are unknown.

Companies may calculate emissions from category 10 without collecting data from customers or other value chain partners. For more information, see *Guidance for*

*Calculating Scope 3 Emissions*, available online at www.ghgprotocol.org. See also section 5.6 for guidance on the applicability of category 10 to final products and intermediate products sold by the reporting company. A reporting company's scope 3 emissions from processing of sold intermediate products include the scope 1 and scope 2 emissions of downstream value chain partners (e.g., manufacturers).

### Category 11: Use of sold products

This category includes emissions from the use of goods and services sold by the reporting company in the reporting year. A reporting company's scope 3 emissions from use of sold products include the scope 1 and scope 2 emissions of end users. End users include both consumers and business customers that use final products.

This standard divides emissions from the use of sold products into two types:

• Direct use-phase emissions
• Indirect use-phase emissions

The minimum boundary of category 11 includes direct use-phase emissions of sold products. Companies may also account for indirect use-phase emissions of sold products, and should do so when indirect use-phase emissions are expected to be significant. See table 5.8 for descriptions and examples of direct and indirect use-phase emissions.

This category includes the total expected lifetime emissions from all relevant products sold in the reporting year across the company's product portfolio. By doing so, the scope 3 inventory accounts for a company's total GHG emissions associated with its activities in the reporting year. (Refer to section 5.4 for more information on the time boundary of scope 3 categories.) See box 5.7 for an example of reporting product lifetime emissions and box 5.8 for guidance related to product lifetime and durability. Refer to the *GHG Protocol Product Standard* for information on accounting for GHG emissions from individual products over their life cycle.

Companies may optionally include emissions associated with maintenance of sold products during use.

See section 5.6 for guidance on the applicability of category 11 to final products and intermediate products sold by the reporting company.

Companies may calculate emissions from category 11 without collecting data from customers or consumers.

### Table [5.8] Emissions from use of sold products

| Type of emissions | Product type | Examples |
|---|---|---|
| **Direct use-phase emissions** (*Required*) | Products that directly consume energy (fuels or electricity) during use | Automobiles, aircraft, engines, motors, power plants, buildings, appliances, electronics, lighting, data centers, web-based software |
| | Fuels and feedstocks | Petroleum products, natural gas, coal, biofuels, and crude oil |
| | Greenhouse gases and products that contain or form greenhouse gases that are emitted during use | $CO_2$, $CH_4$, $N_2O$, HFCs, PFCs, $SF_6$, refrigeration and air-conditioning equipment, industrial gases, fire extinguishers, fertilizers |
| **Indirect use-phase emissions** (*Optional*) | Products that indirectly consume energy (fuels or electricity) during use | Apparel (requires washing and drying), food (requires cooking and refrigeration), pots and pans (require heating), and soaps and detergents (require heated water) |

*CHAPTER 05 Identifying Scope 3 Emissions*

Calculating emissions from category 11 typically requires product design specifications and assumptions about how consumers use products (e.g., use profiles, assumed product lifetimes, etc.). For more information, see *Guidance for Calculating Scope 3 Emissions*, available online at www.ghgprotocol.org. Companies are required to report a description of the methodologies and assumptions used to calculate emissions (see chapter 11).

Where relevant, companies should report additional information on product performance when reporting scope 3 emissions in order to provide additional transparency on steps companies are taking to reduce GHG emissions from sold products. Such information may include GHG intensity metrics, energy intensity metrics, and annual emissions from the use of sold products (see section 11.3). See section 9.3 for guidance on recalculating base year emissions when methodologies or assumptions related to category 11 change over time.

Any claims of avoided emissions related to a company's sold products must be reported separately from the company's scope 1, scope 2, and scope 3 inventories. (For more information, see section 9.5.)

### Box [5.7] Example of reporting product lifetime emissions

An automaker sells one million cars in 2010. Each car has an expected lifetime of ten years. The company reports the anticipated use-phase emissions of the one million cars it sold in 2010 over their ten year expected lifetime. The company also reports corporate average fuel economy (km per liter) and corporate average emissions (kg $CO_2e$/km) as relevant emissions-intensity metrics.

### Box [5.8] Product lifetime and durability

Because the scope 3 inventory accounts for total lifetime emissions of sold products, companies that produce more durable products with longer lifetimes could appear to be penalized because, as product lifetimes increase, scope 3 emissions increase, assuming all else is constant. To reduce the potential for emissions data to be misinterpreted, companies should also report relevant information such as product lifetimes and emissions intensity metrics to demonstrate product performance over time. Relevant emissions intensity metrics may include annual emissions per product, energy efficiency per product, emissions per hour of use, emissions per kilometer driven, emissions per functional unit, etc.

### *Category 12: End-of-life treatment of sold products*

This category includes emissions from the waste disposal and treatment of products sold by the reporting company (in the reporting year) at the end of their life.

This category includes the total expected end-of-life emissions from all products sold in the reporting year. (See section 5.4 for more information on the time boundary of scope 3 categories.) End-of-life treatment methods (e.g. landfilling, incineration) are described in category 5 (Waste generated in operations). A reporting company's scope 3 emissions from end-of-life treatment of sold products include the scope 1 and scope 2 emissions of waste management companies.

See section 5.6 for guidance on the applicability of category 12 to final products and intermediate products sold by the reporting company and box 5.6 for guidance on accounting for emissions from recycling, which applies to both category 5 and category 12. Calculating emissions from category 12 requires assumptions about the end-of-life treatment methods used by consumers. For more information, see *Guidance for Calculating Scope 3 Emissions*, available online at www.ghgprotocol.org. Companies are required to report a description of the methodologies and assumptions used to calculate emissions (see chapter 11).

## IKEA: Scope 3 emissions from the use of sold products

IKEA, an international home furnishings retailer, estimated its scope 3 emissions from all sold products that consume energy during the use-phase. The products included all types of appliances (e.g., refrigerators, freezers, stoves, and ovens) and lighting (e.g., incandescent light bulbs, compact fluorescent bulbs, and halogen lights) sold in approximately 25 countries. IKEA calculated GHG emissions by first grouping hundreds of products into 15 distinct product groups, then determining the average power demand (in watts), average annual use time, and average product lifetimes for each product group. IKEA obtained information on product-use profiles and lifetimes from IKEA's suppliers and other experts. IKEA calculated the products' expected lifetime energy use and applied an average electricity emission factor to calculate the expected lifetime GHG emissions.

The results showed that the use of sold products accounted for 20 percent of IKEA's combined scope 1, scope 2, and scope 3 emissions, or approximately 6 million metric tons of GHG emissions. With the help of the scope 3 inventory, IKEA realized that small changes in the efficiency of its sold products would have significant effects on IKEA's total GHG emissions. As a result, IKEA has adopted a target that, by 2015, all products sold will be 50 percent more efficient on average than the products on the market in 2008. IKEA expects this strategy to achieve annual GHG reductions of several million metric tons, significantly more than the company's total scope 1 and scope 2 emissions, which in 2010 was approximately 800,000 metric tons of $CO_2e$.

*IKEA has adopted a target that, by 2015, all products sold will be 50 percent more efficient on average than the products on the market in 2008.*

### Category 13: Downstream leased assets

This category includes emissions from the operation of assets that are owned by the reporting company (acting as lessor) and leased to other entities in the reporting year that are not already included in scope 1 or scope 2. This category is applicable to lessors (i.e., companies that receive payments from lessees). Companies that operate leased assets (i.e., lessees) should refer to category 8 (Upstream leased assets).

Leased assets may be included in a company's scope 1 or scope 2 inventory depending on the type of lease and the consolidation approach the company uses to define its organizational boundaries. (See section 5.2 for more information.) If the reporting company leases an asset for only part of the reporting year, the reporting company should account for emissions from the portion of the year that the asset was leased. See Appendix A for more information on accounting for emissions from leased assets.

In some cases, companies may not find value in distinguishing between products sold to customers (accounted for in category 11) and products leased to customers (accounted for in category 13). Companies may account for products leased to customers the same way the company accounts for products sold to customers (i.e., by accounting for the total expected lifetime emissions from all relevant products leased to other entities in the reporting year). In this case, companies should report emissions from leased products in category 11 (Use of sold products), rather than category 13 (Downstream leased assets) and avoid double counting between categories.

A reporting company's scope 3 emissions from downstream leased assets include the scope 1 and scope 2 emissions of lessees (depending on the lessee's consolidation approach).

*CHAPTER 05* *Identifying Scope 3 Emissions*

### Category 14: Franchises

This category includes emissions from the operation of franchises not included in scope 1 or scope 2. A franchise is a business operating under a license to sell or distribute another company's goods or services within a certain location. This category is applicable to franchisors (i.e., companies that grant licenses to other entities to sell or distribute its goods or services in return for payments, such as royalties for the use of trademarks and other services). Franchisors should account for emissions that occur from the operation of franchises (i.e., the scope 1 and 2 emissions of franchisees) in this category.

Franchisees (i.e., companies that operate franchises and pay fees to a franchisor) should include emissions from operations under their control in this category if they have not included those emissions in scope 1 and scope 2 due to their choice of consolidation approach. Franchisees may optionally report upstream scope 3 emissions associated with the franchisor's operations (i.e., the scope 1 and scope 2 emissions of the franchisor) in category 1 (Purchased goods and services).

### Category 15: Investments

This category includes scope 3 emissions associated with the reporting company's investments in the reporting year, not already included in scope 1 or scope 2. This category is applicable to investors (i.e., companies that make an investment with the objective of making a profit) and companies that provide financial services. Investments are categorized as a downstream scope 3 category because the provision of capital or financing is a service provided by the reporting company.[8]

Category 15 is designed primarily for private financial institutions (e.g., commercial banks), but is also relevant to public financial institutions (e.g., multilateral development banks, export credit agencies, etc.) and other entities with investments not included in scope 1 and scope 2.

Investments may be included in a company's scope 1 or scope 2 inventory depending on how the company defines its organizational boundaries. For example, companies that use the equity share approach include emissions from equity investments in scope 1 and scope 2. Companies that use a control approach account only for those equity investments that are under the

company's control in scope 1 and scope 2. Investments not included in the company's scope 1 or scope 2 emissions are included in scope 3, in this category. A reporting company's scope 3 emissions from investments are the scope 1 and scope 2 emissions of investees.

For purposes of GHG accounting, this standard divides financial investments into four types:

- Equity investments
- Debt investments
- Project finance
- Managed investments and client services

Table 5.9 and table 5.10 provide GHG accounting guidance for each type of financial investment. Table 5.9 provides the types of investments included in the minimum boundary of this category. Table 5.10 identifies types of investments that companies may optionally report, in addition to those provided in table 5.9.

Emissions from investments should be allocated to the reporting company based on the reporting company's proportional share of investment in the investee. Because investment portfolios are dynamic and can change frequently throughout the reporting year, companies should identify investments by choosing a fixed point in time, such as December 31 of the reporting year, or using a representative average over the course of the reporting year.



**Table [5.9]** Accounting for emissions from investments (required)

(Additional guidance on italicized terms is provided on the next page)

| Financial investment/ service | Description | GHG accounting approach (Required) |
|---|---|---|
| **Equity investments** | Equity investments made by the reporting company using the company's own capital and balance sheet, including:<br>• Equity investments in **subsidiaries** (or group companies), where the reporting company has financial control (typically more than 50 percent ownership)<br>• Equity investments in **associate companies** (or affiliated companies), where the reporting company has significant influence but not financial control (typically 20-50 percent ownership)<br>• Equity investments in **joint ventures** (Non-incorporated joint ventures/ partnerships/ operations), where partners have joint financial control | In general, companies in the financial services sector should account for emissions from equity investments in scope 1 and scope 2 by using the equity share consolidation approach to obtain representative scope 1 and scope 2 inventories.<br><br>If emissions from equity investments are not included in scope 1 or scope 2 (because the reporting company uses either the operational control or financial control consolidation approach and does not have control over the investee), account for *proportional scope 1 and scope 2 emissions* of equity investments that occur in the reporting year in scope 3, category 15 (Investments). |
| | • Equity investments made by the reporting company using the company's own capital and balance sheet, where the reporting company has **neither financial control nor significant influence** over the emitting entity (and typically has less than 20 percent ownership) | If not included in the reporting company's scope 1 and scope 2 inventories: Account for *proportional scope 1 and scope 2 emissions* of equity investments that occur in the reporting year in scope 3, category 15 (Investments). Companies may establish a threshold (e.g., equity share of 1 percent) below which the company excludes equity investments from the inventory, if disclosed and justified. |
| **Debt investments (with known use of proceeds)** | Corporate debt holdings held in the reporting company's portfolio, including corporate debt instruments (such as bonds or convertible bonds prior to conversion) or commercial loans, **with known use of proceeds** (i.e., where the use of proceeds is identified as going to a particular project, such as to build a specific power plant) | For each year during the term of the investment, companies should account for *proportional scope 1 and scope 2 emissions* of *relevant projects* that occur in the reporting year in scope 3, category 15 (Investments). In addition, if the reporting company is an initial sponsor or lender of a project: Also account for the *total projected lifetime scope 1 and scope 2 emissions* of *relevant projects* financed during the reporting year and report those emissions separately from scope 3. |
| **Project finance** | Long-term financing of projects (e.g., infrastructure and industrial projects) by the reporting company as either an equity investor (sponsor) or debt investor (financier) | |

*CHAPTER 05* Identifying Scope 3 Emissions

Additional guidance on key concepts italicized in table 5.9 is provided below.

- **Proportional** emissions from equity investments should be allocated to the investor based on the investor's proportional share of equity in the investee. Proportional emissions from project finance and debt investments with known use of proceeds should be allocated to the investor based on the investor's proportional share of total project costs (total equity plus debt). Companies may separately report additional metrics, such as total emissions of the investee, the investor's proportional share of capital investment in the investee, etc.
- **Scope 1 and scope 2 emissions** include the direct (scope 1) emissions of the investee or project, as well as the indirect scope 2 emissions from the generation of electricity consumed by the investee or project. Where relevant, companies should also account for the scope 3 emissions of the investee or project. For example, if a financial institution provides equity or debt financing to a light bulb manufacturer, the financial institution is required to account for the scope 1 and scope 2 emissions of the light bulb manufacturer (i.e., direct emissions during manufacturing and indirect emissions from electricity consumed during manufacturing). The financial institution should account for the scope 3 emissions of

the light bulb producer (e.g., scope 3 emissions from consumer use of light bulbs sold by the manufacturer) when scope 3 emissions are significant compared to other source of emissions or otherwise relevant.
- **Relevant projects** include those in GHG-intensive sectors (e.g., power generation), projects exceeding a specified emissions threshold (developed by the company or industry sector), or projects that meet other criteria developed by the company or industry sector. Companies should account for emissions from the GHG-emitting project financed by the reporting company, regardless of any financial intermediaries involved in the transaction.
- **Total projected lifetime** emissions are reported in the initial year the project is financed, not in subsequent years. Where there is uncertainty around a project's anticipated lifetime, companies may report a range of likely values (e.g., for a coal-fired power plant, a company may report a range over a 30- to 60-year time period). Companies should report the assumptions used to estimate total anticipated lifetime emissions. If project financing occurs only once every few years, emissions from project finance may fluctuate significantly from year to year. Companies should provide appropriate context in the public report (e.g., by highlighting exceptional or non-recurring project financing). See section 5.4 for more information on the time boundary of scope 3 categories.

---

### *Citi: Scope 3 emissions from project finance*

Citi, a global financial services company, annually reports GHG emissions from power plants it finances through its project finance business worldwide. Citi reports these emissions to provide transparency in GHG emissions from its project finance portfolio. Citi's reporting includes emissions from closed (i.e., completed) project financings of new capacity only, including expansions of existing plants, but not re-financings of existing plants. Emissions data are derived from the power plant's capacity and heat rate, the carbon content of the fuel, and projected capacity utilization. Citi accounts for the total estimated lifetime emissions of projects financed in the reporting year, and calculates project-specific emissions for both a

30- and 60-year assumed plant lifetime. To allocate power plant emissions to Citi, total emissions are multiplied by the ratio of Citi's project finance loan to total project costs (total debt plus equity).

In 2009, Citi financed one thermal power project via project finance with an estimated lifetime emissions of 8.7 to 17.4 million metric tons of $CO_2$e. (The lower end of the range represents a 30-year plant life and the higher number represents a 60-year plant life.) In 2008, Citi reported zero emissions from power plants, since Citi did not finance any fossil-fuel fired power plants in 2008.

Case 2:24-cv-00801-ODW-PVC    Document 48-20    Filed 05/24/24    Page 57 of 153
Page ID #:872

**Table [5.10]** Accounting for emissions from investments (optional)

| Financial investment/ service | Description | GHG accounting approach (Optional) |
|---|---|---|
| **Debt investments (without known use of proceeds)** | General corporate purposes debt holdings (such as bonds or loans) held in the reporting company's portfolio where the use of proceeds is not specified | Companies may account for scope 1 and scope 2 emissions of the investee that occur in the reporting year in scope 3, category 15 (Investments) |
| **Managed investments and client services** | Investments managed by the reporting company on behalf of clients (using clients' capital) or services provided by the reporting company to clients, including:<br>• Investment and asset management (equity or fixed income funds managed on behalf of clients, using clients' capital)<br>• Corporate underwriting and issuance for clients seeking equity or debt capital<br>• Financial advisory services for clients seeking assistance with mergers and acquisitions or requesting other advisory services | Companies may account for emissions from managed investments and client services in scope 3, category 15 (Investments) |
| **Other investments or financial services** | Other investments, financial contracts, or financial services not included above (e.g., pension funds, retirement accounts, securitized products, insurance contracts, credit guarantees, financial guarantees, export credit insurance, credit default swaps, etc.) | Companies may account for emissions from other investments in scope 3, category 15 (Investments) |



[54]  *Corporate Value Chain (Scope 3) Accounting and Reporting Standard*

App.135

*CHAPTER 05* Identifying Scope 3 Emissions



### 5.6 Applicability of downstream scope 3 categories to final and intermediate products

Upstream emissions are applicable for all types of purchased products. The applicability of downstream scope 3 categories depends on whether products sold by the reporting company are final products or intermediate products. (See box 5.3 for descriptions of final and intermediate products.) If a company produces an intermediate product (e.g., a motor), which becomes part of a final product (e.g., an automobile), the company accounts for downstream emissions associated with the intermediate product (the motor), not the final product (the automobile). Table 5.11 explains the applicability of downstream scope 3 categories to final and intermediate products sold by the reporting company. See section 6.4 for guidance on disclosing and justifying exclusions of downstream emissions from sold intermediate goods when their eventual end use is unknown.

Table [5.11] Applicability of downstream scope 3 categories to final and intermediate products sold by the reporting company

| Scope 3 category | Applicability to final products | Applicability to intermediate products |
|---|---|---|
| 9. Downstream transportation and distribution | Transportation and distribution of *final* products, between the point of sale by the reporting company to the end consumer, including retail and storage | Transportation and distribution of *intermediate* products between the point of sale by the reporting company and either 1) the end consumer (if the eventual end use of the intermediate product is known) or 2) business customers (if the eventual end use of the intermediate product is unknown) |
| 10. Processing of sold products | Not applicable to final products | Processing of sold intermediate products by customers (e.g., manufacturers) |
| 11. Use of sold products | The direct use-phase emissions of sold *final* products by the end user (i.e., emissions resulting from the use of sold *final* products that directly consume fuel or electricity during use, fuels and feedstocks, and GHGs or products that contain GHGs that are released during use). Companies may optionally include the indirect use-phase emissions of sold final products (see table 5.8) | The direct use-phase emissions of sold *intermediate* products[9] by the end user (i.e., emissions resulting from the use of sold *intermediate* products that directly consume fuel or electricity during use, fuels and feedstocks, and GHGs or products that contain GHGs that are released during use). Companies may optionally include the indirect use-phase emissions of sold intermediate products (see table 5.8) |
| 12. End-of-life treatment of sold products | Emissions from disposing of sold *final* products at the end of their life | Emissions from disposing of sold *intermediate* products at the end of their life |
| 13. Downstream leased assets | *Unrelated to product type:* Applicable to all companies with downstream leased assets | |
| 14. Franchises | *Unrelated to product type*: Applicable to all companies with franchises | |
| 15. Investments | *Unrelated to product type*: Applicable to all companies with investments | |

**CHAPTER 05** *Identifying Scope 3 Emissions*

## Endnotes

1   In certain cases, assets controlled by the reporting company that are excluded from its organizational boundary may not be captured by the list of scope 3 categories. In such a case, emissions from these assets should be reported separately as an "other" scope 3 activity.

2   Downstream emissions also include emissions from products that are distributed but not sold (i.e., without receiving payment).

3   If a company identifies any potential double counting of emissions between scope 3 categories or within a scope 3 category, the company should avoid double counting by only reporting scope 3 emissions from the activity once, clearly explaining where the emissions are reported, and providing cross-references, if needed.

4   Cradle-to-gate emissions include all emissions that occur in the life cycle of purchased products, up to the point of receipt by the reporting company (excluding emissions from sources that are owned or controlled by the reporting company).

5   For more information on land use and land-use change, refer to Appendix B of the *GHG Protocol Product Standard*.

6   Tier 1 suppliers are companies with which the reporting company has a purchase order for goods or services (e.g., materials, parts, components, etc.). Tier 2 suppliers are companies with which Tier 1 suppliers have a purchase order for goods and services (see figure 7.3).

7   "Employees" refers to employees of entities and facilities owned, operated, or leased by the reporting company. Companies may include employees of other relevant entities (e.g., franchises or outsourced operations) in this category, as well as consultants, contractors, and other individuals who are not employees of the company, but commute to facilities owned and operated by the company.

8   Equity investments do not easily fit into the upstream and downstream definitions, but are included along with other types of investments in Category 15 so that all investments are included in a single category.

9   In the case of a motor (an intermediate product) that becomes part of an automobile (a final product), the direct use phase emissions of the intermediate product by the end consumer are the emissions resulting from use of the motor, not the emissions resulting from use of the automobile. This estimation involves allocating emissions (see chapter 8).



# 06    *Setting the Scope 3 Boundary*



guidance

requirements

**D**etermining which scope 3 emissions to include in the inventory (i.e., setting the boundary) is a critical decision in the inventory process. The GHG Protocol Corporate Standard allows companies flexibility in choosing which, if any, scope 3 activities to include in the GHG inventory when the company defines its  operational boundaries. The GHG Protocol Scope 3 Standard is designed to create additional completeness and consistency in scope 3 accounting and reporting by defining scope 3 boundary requirements.

## Requirements in this chapter

- *Companies shall account for all scope 3 emissions and disclose and justify any exclusions.*

- *Companies shall account for emissions from each scope 3 category according to the minimum boundaries provided in table 5.4.*

- *Companies shall account for scope 3 emissions of $CO_2$, $CH_4$, $N_2O$, HFCs, PFCs, and $SF_6$, if they are emitted in the value chain.*

- *Biogenic $CO_2$ emissions that occur in the reporting company's value chain shall not be included in the scopes, but shall be included and separately reported in the public report.*

## 6.1   Mapping the value chain

Companies should map the value chain as a first step toward identifying the scope 3 activities that are included in the inventory. This step is a useful internal exercise to help companies identify scope 3 activities. To the extent possible, companies should create a complete value chain map and/or a complete list of activities in the company's value chain that includes:

- Each of the scope 3 categories and activities included in table 5.4
- A list of purchased goods and services and a list of sold goods and services
- A list of suppliers and other relevant value chain partners  (either by name, type, or spend category)

Because supply chains are dynamic and a company's supply chain partners can change frequently throughout the reporting year, companies may find it useful to choose a fixed point in time (such as December 31 of the reporting year) or use a representative average of products and suppliers over the course of the reporting year.

Companies should strive for completeness in mapping the value chain, but it is acknowledged that achieving 100 percent completeness may not be feasible. Companies may establish their own policy for mapping the value chain, which may include creating representative, rather than exhaustive, lists of purchased products, sold products, suppliers, and other value chain partners.

## 6.2    Boundary requirements

Companies shall account for all scope 3 emissions as defined in this standard and disclose and justify any exclusions. Companies shall account for emissions from each scope 3 category according to the minimum boundaries provided in table 5.4. Companies may include emissions from optional activities within each category. Companies shall account for scope 3 emissions of carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$), hydrofluorocarbons (HFCs), perfluorocarbons (PFCs), and sulphur hexafluoride ($SF_6$), if they are emitted in the value chain. Companies may exclude scope 3 activities from the inventory, provided that any exclusion is disclosed and justified.

Biogenic $CO_2$ emissions (e.g., $CO_2$ from the combustion of biomass) that occur in the reporting company's value chain shall not be included in the scopes, but shall be included and separately reported in the public report. Any GHG removals (e.g., biological GHG sequestration) shall not be included in scope 3, but may be reported separately. (For more information, see section 6.5 and chapter 11.)

## 6.3    Disclosing and justifying exclusions

Companies should strive for completeness, but it is acknowledged that accounting for all scope 3 emissions may not be feasible. Some categories may not be applicable to all companies. For example, some companies may not have leased assets or franchises. In such cases, companies should report zero emissions or "not applicable" for any categories that are not applicable.

In some situations, companies may have scope 3 activities, but be unable to estimate emissions due to a lack of data or other limiting factors. For example,

companies may find that based on initial estimates, some scope 3 activities are expected to be insignificant in size (compared to the company's other sources of emissions) and that for these activities, the ability to collect data and influence GHG reductions is limited. In such cases, companies may exclude scope 3 activities from the report, provided that any exclusion is disclosed and justified.

Companies should follow the principles of relevance, completeness, accuracy, consistency, and transparency when deciding whether to exclude any activities from the scope 3 inventory. Companies should not exclude any activity that would compromise the relevance of the reported inventory. (See table 6.1 for a list of criteria for determining relevance.) Companies should ensure that the scope 3 inventory appropriately reflects the GHG emissions of the company, and serves the decision-making needs of users, both internal and external to the company.

In particular, companies should not exclude any activity that is expected to contribute significantly to the company's total scope 3 emissions. (See section 7.1 for guidance on prioritizing emissions.)

Companies are required to disclose and justify any exclusions in the public report (see chapter 11).

See box 6.1 for an example of disclosing and justifying exclusions.

## 6.4    Accounting for downstream emissions

The applicability of downstream scope 3 categories depends on whether products sold by the reporting company are final products or intermediate products (see section 5.6). In certain cases, the eventual end use of sold intermediate products may be unknown. For example, a company may produce an intermediate product with many potential downstream applications, each of which has a different GHG emissions profile, and be unable to reasonably estimate the downstream emissions associated with the various end uses of the intermediate product. In such a case, companies may disclose and justify the exclusion of downstream emissions from categories 9, 10, 11, and 12 in the report (but should not selectively exclude a subset of those categories).

*CHAPTER 06* *Setting the Scope 3 Boundary*

**Table [6.1]** Criteria for identifying relevant scope 3 activities

| *Criteria* | *Description* |
|---|---|
| **Size** | They contribute significantly to the company's total anticipated scope 3 emissions (see section 7.1 for guidance on using initial estimation methods) |
| **Influence** | There are potential emissions reductions that could be undertaken or influenced by the company (see box 6.2) |
| **Risk** | They contribute to the company's risk exposure (e.g., climate change related risks such as financial, regulatory, supply chain, product and customer, litigation, and reputational risks) (see table 2.2) |
| **Stakeholders** | They are deemed critical by key stakeholders (e.g., customers, suppliers, investors, or civil society) |
| **Outsourcing** | They are outsourced activities previously performed in-house or activities outsourced by the reporting company that are typically performed in-house by other companies in the reporting company's sector |
| **Sector guidance** | They have been identified as significant by sector-specific guidance |
| **Other** | They meet any additional criteria for determining relevance developed by the company or industry sector |

**Box [6.1]** Example of disclosing & justifying exclusions

After mapping its value chain, a company uses initial GHG estimation methods to estimate the emissions from the various spend categories within category 1 (Purchased goods and services). The company finds that emissions from production-related procurement are significant compared to its other sources of scope 3 emissions. The company determines that emissions from non-production-related procurement are difficult to calculate and are not expected to contribute significantly to total scope 3 emissions. The company uses more accurate methods to calculate emissions from production-related procurement, but decides to exclude emissions from non-production-related procurement. The company discloses and justifies the exclusion of non-production-related procurement based on limited data availability and its expected insignificant contribution to total scope 3 emissions.

**Box [6.2]** Influence

By definition, scope 3 emissions occur from sources that are not owned or controlled by the reporting company, but occur from sources owned and controlled by other entities in the value chain (e.g., contract manufacturers, materials suppliers, third-party logistics providers, waste management suppliers, travel suppliers, lessees and lessors, franchisees, retailers, employees, and customers). Nevertheless, scope 3 emissions can be influenced by the activities of the reporting company, such that companies often have the ability to influence GHG reductions upstream and downstream of their operations. Companies should prioritize activities in the value chain where the reporting company has the potential to influence GHG reductions. See table 9.7 for illustrative examples of actions to influence scope 3 reductions.

## 6.5    Accounting for emissions and removals from biogenic sources

The *GHG Protocol Corporate Standard* requires that direct $CO_2$ emissions from the combustion of biomass be included in the public report, but reported separately from the scopes, rather than included in scope 1. The separate reporting requirement also applies to scope 3. Biogenic $CO_2$ emissions (e.g., $CO_2$ from the combustion of biomass) that occur in the reporting company's value chain are required to be included in the public report, but reported separately from scope 3 (see chapter 11).

The requirement to report biogenic $CO_2$ emissions separately refers to $CO_2$ emissions from combustion or biodegradation of biomass only, not to emissions of any other GHGs (e.g., $CH_4$ and $N_2O$), or to any GHG emissions that occur in the life cycle of biomass other than from combustion or biodegradation (e.g., GHG emissions from processing or transporting biomass).

Scope 1, scope 2, and scope 3 inventories include only emissions, not removals. Any removals (e.g., biological GHG sequestration) may be reported separately from the scopes. See examples 6.1 and 6.2.

### Example [6.1] Accounting for biogenic emissions

A manufacturing company contracts with a third-party transportation provider that uses both diesel and biodiesel in its vehicle fleet. The manufacturer accounts for upstream GHG emissions from the combustion of diesel fuel in scope 3, category 4 (Upstream transportation and distribution), since emissions from diesel fuel are of fossil origin. The manufacturer reports biogenic $CO_2$ emissions from the combustion of biodiesel separately. The manufacturer does not report any removals associated with the production of biodiesel in scope 3.

### PSEG: Setting the scope 3 boundary

Public Service Enterprise Group (PSEG), a diversified energy company and one of the ten largest electric companies in the U.S., developed a scope 3 inventory to understand its climate-related risks and opportunities along the value chain and to communicate this information transparently to stakeholders.

To set the inventory boundary, PSEG first identified all company assets and operations and developed detailed process maps to define all upstream and downstream activities that could emit GHGs. PSEG included all activities in each of the fifteen scope 3 categories, with the exception of certain types of financial investments and health-care expenses, which were determined to be immaterial. PSEG disclosed and justified exclusions consistent with the completeness and transparency principles.

To develop the inventory, PSEG used higher quality primary data for all activities that were significant in size, where data could easily be attained, or where having higher quality data was otherwise important. For activities that were small or immaterial, or where data

was hard to obtain, PSEG relied upon secondary or proxy data to estimate scope 3 emissions.

The scope 3 inventory gave PSEG greater clarity on its emissions risks and opportunities throughout the entire value chain. PSEG found significant downstream scope 3 emissions from category 11 (Use of sold products), which helped PSEG better understand the GHG emissions embedded in the electricity and natural gas that it delivers to its customers and the need to help customers reduce these emissions by investing in renewable energy and energy-efficiency programs. PSEG also found significant upstream scope 3 emissions in its fossil fuel supply chain. These insights provide business value by informing PSEG's strategy to provide safe, reliable, economic, and green energy well into the 21st century.

**The scope 3 inventory gave PSEG greater clarity on its emissions risks and opportunities throughout the entire value chain.**

**CHAPTER 06** *Setting the Scope 3 Boundary*

**Example [6.2]** Accounting for biogenic emissions and removals

A paper manufacturer purchases wood pulp from suppliers and sells finished paper products to consumers. The company accounts for GHG emissions from the production of wood pulp in scope 3, category 1 (Purchased goods and services). The company does not account for upstream $CO_2$ removals from biological carbon sequestration that occurs in trees in scope 3, but instead may report $CO_2$ removals separately. The company also does not account for downstream biogenic $CO_2$ emissions from the incineration of sold paper products at the end of their life in scope 3, but instead reports those emissions separately.



## Ocean Spray: Setting the scope 3 boundary

Ocean Spray, a leading producer of bottled juice drinks and dried fruit in North America, developed its first scope 3 inventory with the goal of informing an effective GHG-reduction strategy. At the outset, Ocean Spray identified a tension between the completeness of the inventory and the specificity of data used to calculate emissions. Ocean Spray decided that to best inform the company's GHG-reduction strategy, it should develop a scope 3 inventory by focusing on completeness over precision, and to disclose the sources and uncertainty of data used. A complete inventory showed Ocean Spray the full picture of its value chain GHG emissions, revealed the greatest reduction opportunities, and enabled effective decision making, which would have been hindered by excluding scope 3 activities from the inventory.

*A complete inventory showed Ocean Spray the full picture of its value chain GHG emissions, revealed the greatest reduction opportunities, and enabled effective decision making*

To develop a complete inventory, Ocean Spray first identified all scope 3 activities, such as growing and processing fruit, transforming fruit into food and beverage products, distributing products to customers, and use and disposal by consumers. Ocean Spray then collected primary data for activities such as the economic value of upstream ingredients, materials, and services. The company used economic input-output assessment to calculate emissions using the cost data on upstream suppliers. Where primary data was not available, the company calculated estimates based on assumptions, especially for downstream activities such as consumer disposal.

Through the scope 3 inventory process, Ocean Spray learned that scope 3 emissions account for most of its total scope 1, scope 2, and scope 3 emissions. The company's largest source of GHG emissions came from category 1 (Purchased goods and services) which accounted for more than half of combined scope 1, scope 2, and scope 3 emissions, driven primarily by raw material inputs.



# 07  Collecting Data



*guidance*

**A**fter a company has identified the activities to include in its scope 3 boundary, the next step is to collect the necessary data to calculate the company's scope 3 emissions.

Collecting scope 3 emissions data is likely to require wider engagement within the reporting company, as well as with suppliers and partners outside of the company, than is needed to collect scope 1 and scope 2 emissions data. Companies may need to engage several internal departments, such as procurement, energy, manufacturing, marketing, research and development, product design, logistics, and accounting.

This chapter provides a four-step approach to collecting and evaluating data (see figure 7.1).

Guidance for calculating scope 3 emissions from each scope 3 category is provided in a separate document, *Guidance for Calculating Scope 3 Emissions*, which is available at www.ghgprotocol.org.

### 7.1   Guidance for prioritizing data collection efforts

Companies should prioritize data collection efforts on the scope 3 activities that are expected to have the most significant GHG emissions, offer the most significant GHG reduction opportunities, and are most relevant to the company's business goals. Collecting higher quality data for priority activities allows companies to focus resources on the most significant GHG emissions in the value chain, more effectively set reduction targets, and track and demonstrate GHG reductions over time (see chapter 9).

Companies may use a combination of approaches and criteria to identify priority activities. For example, companies may seek higher quality data for all activities

**Figure [7.1]** Iterative process for collecting and evaluating data



that are significant in size, activities that present the most significant risks and opportunities in the value chain, and activities where more accurate data can be easily obtained. Companies may choose to rely on relatively less accurate data for activities that are expected to have insignificant emissions or where accurate data is difficult to obtain. (See Appendix C for guidance on developing a data management plan, including strategies for obtaining more accurate data over time).

### Prioritizing activities based on the magnitude of GHG emissions

The most rigorous approach to identifying priority activities is to use initial GHG estimation (or screening) methods to determine which scope 3 activities are expected to be most significant in size. A quantitative approach gives the most accurate understanding of the relative magnitudes of various scope 3 activities. To prioritize activities based on their expected GHG emissions, companies should:

- use initial GHG estimation (or screening) methods to estimate the emissions from each scope 3 activity (e.g., by using industry-average data, environmentally-extended input output data (see box 7.1), proxy data, or rough estimates); and
- rank all scope 3 activities from largest to smallest according to their estimated GHG emissions to determine which scope 3 activities have the most significant impact.

Calculation methods for each scope 3 category that can be used for screening are provided in a separate document, *Guidance for Calculating Scope 3 Emissions*, which is available at www.ghgprotocol.org.

### Prioritizing activities based on financial spend or revenue

As an alternative to ranking scope 3 activities based on their estimated GHG emissions, companies may choose to prioritize scope 3 activities based on their relative financial significance. Companies may use a financial spend analysis to rank upstream types of purchased products by their contribution to the company's total spend or expenditure (for an example, see the AkzoNobel case study). For downstream emissions, companies may likewise rank types of sold products by their contribution to the company's total revenue.

Companies should use caution in prioritizing activities based on financial contribution, because spend and revenue may not correlate well with emissions. For example, some activities have a high market value, but have relatively low emissions. Conversely, some activities have a low market value, but have relatively high emissions. As a result, companies should also prioritize activities that do not contribute significantly to financial spend or revenue, but are expected to have a significant GHG impact.

### Prioritizing activities based on other criteria

In addition to prioritizing data collection efforts on activities expected to contribute significantly to total scope 3 emissions or to spend, companies may prioritize any other activities expected to be most relevant for the company or its stakeholders, including activities that:

- the company has influence over;
- contribute to the company's risk exposure;
- stakeholders deem critical;
- have been identified as significant by sector-specific guidance; or
- meet any additional criteria developed by the company or industry sector (see table 6.1 for more information).

### Box [7.1] Environmentally-extended input output (EEIO) models

Environmentally-extended input output (EEIO) models estimate energy use and/or GHG emissions resulting from the production and upstream supply chain activities of different sectors and products within an economy. The resulting EEIO emissions factors can be used to estimate GHG emissions for a given industry or product category. EEIO data are particularly useful in screening emission sources when prioritizing data collection efforts.

EEIO models are derived by allocating national GHG emissions to groups of finished products based on economic flows between industry sectors. EEIO models vary in the number of sectors and products included and how often they are updated. EEIO data are often comprehensive, but the level of granularity is relatively low compared to other sources of data.

**CHAPTER 07** *Collecting Data*

## AkzoNobel: Prioritizing scope 3 emissions from purchased goods and services

AkzoNobel, the largest global paints and coatings company and a major producer of specialty chemicals, applied a financial spend analysis to prioritize its purchased goods and services before collecting data for category 1. In three representative businesses used, AkzoNobel set out to identify the purchased goods and services that collectively accounted for at least 80% of the total spend, as well as any category in the remaining 20% that was individually more than 1% of total spend. The graph below illustrates the results of a financial spend analysis for one of AkzoNobel's businesses. Based on the analysis, AkzoNobel focused data collection efforts on the raw materials that represented over 95% of total spend, marked in the graph.

*AkzoNobel focused data collection efforts on the raw materials that represented over 95 percent of total spend.*



category 1: purchased goods & services

To prioritize scope 3 activities, companies may also assess whether any GHG- or energy-intensive materials or activities appear in the value chain of purchased and sold products.

## 7.2 Overview of quantification methods and data types

There are two main methods to quantify emissions: direct measurement and calculation (see table 7.1). Each requires different types of data.

In practice, calculation will be used most often to quantify scope 3 emissions, which requires the use of two types of data: activity data and emission factors.

### Activity data

Activity data is a quantitative measure of a level of activity that results in GHG emissions. Examples of activity data are provided in table 7.2.

### Emission factors

An emission factor is a factor that converts activity data into GHG emissions data. Examples of emission factors are provided in table 7.2.

Companies are required to report a description of the types and sources of activity data and emission factors used to calculate the inventory (see chapter 11).

**Table [7.1]** Quantification methods

| Quantification method | Description | Relevant data types |
|---|---|---|
| Direct measurement | Quantification of GHG emissions using direct monitoring, mass balance or stoichiometry <br><br> GHG = Emissions Data x GWP | Direct emissions data |
| Calculation | Quantification of GHG emissions by multiplying activity data by an emission factor <br><br> GHG = Activity Data x Emission Factor x GWP | Activity data <br><br> Emission factors |

**Table [7.2]** Examples of activity data and emission factors

| Examples of activity data | Examples of emission factors |
|---|---|
| • Liters of fuel consumed <br> • Kilowatt-hours of electricity consumed <br> • Kilograms of material consumed <br> • Kilometers of distance traveled <br> • Hours of time operated <br> • Square meters of area occupied <br> • Kilograms of waste generated <br> • Kilograms of product sold <br> • Quantity of money spent | • kg $CO_2$ emitted per liter of fuel consumed <br> • kg $CO_2$ emitted per kWh of electricity consumed <br> • kg PFC emitted per kg of material consumed <br> • t $CO_2$ emitted per kilometer traveled <br> • kg $SF_6$ emitted per hour of time operated <br> • g $N_2O$ emitted per square meter of area <br> • g $CH_4$ emitted per kg of waste generated <br> • kg HFC emitted per kg of product sold <br> • kg $CO_2$ emitted per unit of currency spent |

*CHAPTER 07* Collecting Data

### Energy emission factors

Two types of emission factors are used to convert energy activity data into emissions data:

- Combustion emission factors, which include only the emissions that occur from combusting the fuel
- Life cycle emission factors, which include not only the emissions that occur from combusting the fuel, but all other emissions that occur in the life cycle of the fuel such as emissions from extraction, processing, and transportation of fuels

Combustion emission factors are used in the *GHG Protocol Corporate Standard* to calculate scope 1 emissions (in the case of fuels) and scope 2 emissions (in the case of electricity). Life cycle emission factors are used in the *GHG Protocol Product Standard* to calculate emissions from fuels and electricity. These two types of emission factors and their use are described in more detail below.

### Energy emission factors in scope 1 and scope 2 accounting

Scope 1 and scope 2 emissions are calculated using combustion emission factors following the *GHG Protocol Corporate Standard*. Scope 1 and scope 2 are defined to avoid double counting by two or more companies of the same emission within the same scope (see table 5.1).

Scope 2 includes emissions from the generation of purchased electricity, steam, heating, and cooling that is consumed by the reporting company. In some regions, electricity emission factors may include life cycle activities related to electricity, such as transmission and distribution of electricity, or extraction, processing and transportation of fuels used to generate electricity. Non-generation activities related to electricity are accounted for in scope 3, category 3 (Fuel- and energy-related activities not included in scope 1 or scope 2), rather than scope 2. As a result, companies should seek (and emission factor developers should provide) transparent, disaggregated electricity emission factors that allow separate accounting of emissions from electricity generation in scope 2 and non-generation activities related to electricity in scope 3. Proper accounting creates consistency in scope 2 accounting and reporting between companies and avoids double counting of the same emission within scope 2 by more than one company. See figure 7.2 for more information on different types of electricity emission factors.

**Figure [7.2]** Activities included in each type of electricity emission factor



EF = emission factor

### Energy emission factors in scope 3 accounting

Companies should use life cycle emission factors to calculate scope 3 emissions related to fuels and energy consumed in the reporting company's value chain, except for category 3 (fuel- and energy-related activities not included in scope 1 or scope 2) (see below). Compared to combustion emission factors, life cycle emission factors represent all emissions in the upstream supply chain of fuels and energy. Where possible, companies should use life cycle emission factors that are as specific as possible to the type and source of fuel consumed (e.g., specific to the technology used to produce a fuel).

### Emission factors for scope 3, category 3 (Fuel- and energy-related activities not included in scope 1 or scope 2)

Two activities within category 3 require special consideration when selecting emission factors:

- Upstream emissions of purchased fuels (i.e., extraction, production, and transportation of fuels consumed by the reporting company)
- Upstream emissions of purchased electricity (i.e., extraction, production, and transportation of fuels consumed in the generation of electricity, steam, heating, and cooling that is consumed by the reporting company)

To calculate emissions from these activities, companies should use life cycle emission factors that exclude emissions from combustion, since emissions from combustion are accounted for in scope 1 (in the case of fuels), in scope 2 (in the case of electricity), and in a separate memo item (in the case of direct $CO_2$ emissions from combustion of biomass or biofuels).

### Global warming potential (GWP) values

Global warming potential (GWP) values describe the radiative forcing impact (or degree of harm to the atmosphere) of one unit of a given GHG relative to one unit of carbon dioxide. GWP values convert GHG emissions data for non-$CO_2$ gases into units of carbon dioxide equivalent ($CO_2$e).

Companies should use GWP values provided by the Intergovernmental Panel on Climate Change (IPCC) based on a 100-year time horizon. Companies may either use the IPCC GWP values agreed to by United Nations Framework Convention on Climate Change (UNFCCC) or the most recent GWP values published by the IPCC. Companies should use consistent GWP values across their scope 1, scope 2, and scope 3 inventory and should maintain consistency in the source of GWP values used over time (by consistently following guidance provided by either the UNFCCC or IPCC, once selected). Companies that have already developed scope 1 and scope 2 GHG inventories should use the same GWP values for scope 3 to maintain consistency across the scopes. Companies that have not previously developed a corporate GHG inventory should use the most recent GWP values.

Companies are required to disclose the source of GWP values used to calculate the inventory (see chapter 11).

### Overview of primary data and secondary data

Companies may use two types of data to calculate scope 3 emissions:

- Primary data
- Secondary data

Table 7.3 provides definitions of these two types of data.

#### Table [7.3] Types of data

| Data type | Description |
|---|---|
| Primary Data | Data from specific activities within a company's value chain |
| Secondary Data | Data that is not from specific activities within a company's value chain |

*CHAPTER 07* Collecting Data

Primary data includes data provided by suppliers or other value chain partners related to specific activities in the reporting company's value chain. Such data may take the form of primary activity data, or emissions data calculated by suppliers that are specific to suppliers' activities.

Secondary data includes industry-average data (e.g., from published databases, government statistics, literature studies, and industry associations), financial data, proxy data, and other generic data. In certain cases, companies may use specific data from one activity in the value chain to estimate emissions for another activity in the value chain. This type of data (i.e., proxy data) is considered secondary data, since it is not specific to the activity whose emissions are being calculated.

Table 7.4 provides examples of primary and secondary data by scope 3 category.



### Kraft Foods: Collecting scope 3 data

For its first scope 3 inventory, Kraft Foods, a U.S.-based global food products company, focused on achieving a complete inventory of all scope 3 emissions, with the goal of supporting high-level strategic evaluations and internal understanding of its value chain GHG emissions.

To accomplish this goal, the company obtained industry-average life cycle inventory data from various public and commercial sources. Kraft Foods matched the emission factors with its own internal data on activities and purchases. For the company's supply chain, the secondary data approach allowed the company to understand its total scope 3 emissions with reasonable accuracy, cost, and speed, and with the ability to update as more precise secondary data became available.

*Kraft Foods found that scope 3 emissions comprise more than 90 percent of the company's combined scope 1, scope 2, and scope 3 emissions.*

Using secondary data also fit Kraft Foods' needs given that a large portion of its purchased commodities are produced in a global market where tracking the agricultural source of origin is challenging.

Kraft Foods found that scope 3 emissions comprise more than 90 percent of the company's combined scope 1, scope 2, and scope 3 emissions. Within scope 3, the company found that emissions from category 1 (Purchased goods and services), including raw materials, comprised 70 percent of its total scope 3 emissions, while transportation and distribution, energy-related activities, and the use of sold products accounted for the majority of the remaining 30 percent. Kraft Foods included an estimated uncertainty range for each scope 3 category in order to provide additional transparency.

Kraft Foods plans to continuously improve the quality of its GHG inventory to better understand the company's influence on climate change. Using the inventory results, the company will continue to expand and enhance its efforts to develop effective GHG-reduction strategies.

**Table [7.4]** Examples of primary and secondary data by scope 3 category

*Upstream scope 3 emissions*

| Category | Examples of primary data | Examples of secondary data |
|---|---|---|
| **1. Purchased goods and services** | • Product-level cradle-to-gate GHG data from suppliers calculated using site-specific data<br>• Site-specific energy use or emissions data from suppliers | • Industry average emission factors per material consumed from life cycle inventory databases |
| **2. Capital goods** | • Product-level cradle-to-gate GHG data from suppliers calculated using site-specific data<br>• Site-specific energy use or emissions data from capital goods suppliers | • Industry average emission factors per material consumed from life cycle inventory databases |
| **3. Fuel- and energy-related activities (not included in scope 1 or scope 2)** | • Company-specific data on upstream emissions (e.g. extraction of fuels)<br>• Grid-specific T&D loss rate<br>• Company-specific power purchase data and generator-specific emission rate for purchased power | • National average data on upstream emissions (e.g. from life cycle inventory database)<br>• National average T&D loss rate<br>• National average power purchase data |
| **4. Upstream transportation and distribution** | • Activity-specific energy use or emissions data from third-party transportation and distribution suppliers<br>• Actual distance traveled<br>• Carrier-specific emission factors | • Estimated distance traveled by mode based on industry-average data |
| **5. Waste generated in operations** | • Site-specific emissions data from waste management companies<br>• Company-specific metric tons of waste generated<br>• Company-specific emission factors | • Estimated metric tons of waste generated based on industry-average data<br>• Industry average emission factors |
| **6. Business travel** | • Activity-specific data from transportation suppliers (e.g., airlines)<br>• Carrier-specific emission factors | • Estimated distance traveled based on industry-average data |
| **7. Employee commuting** | • Specific distance traveled and mode of transport collected from employees | • Estimated distance traveled based on industry-average data |
| **8. Upstream leased assets** | • Site-specific energy use data collected by utility bills or meters | • Estimated emissions based on industry-average data (e.g. energy use per floor space by building type) |

**CHAPTER 07** *Collecting Data*

**Table [7.4]** Examples of primary and secondary data by scope 3 category (continued)

### *Downstream scope 3 emissions*

| Category | Examples of primary data | Examples of secondary data |
|---|---|---|
| **9. Transportation and distribution of sold products** | • Activity-specific energy use or emissions data from third-party transportation and distribution partners<br>• Activity-specific distance traveled<br>• Company-specific emission factors (e.g., per metric ton-km) | • Estimated distance traveled based on industry-average data<br>• National average emission factors |
| **10. Processing of sold products** | • Site-specific energy use or emissions from downstream value chain partners | • Estimated energy use based on industry-average data |
| **11. Use of sold products** | • Specific data collected from consumers | • Estimated energy used based on national average statistics on product use |
| **12. End-of-life treatment of sold products** | • Specific data collected from consumers on disposal rates<br>• Specific data collected from waste management providers on emissions rates or energy use | • Estimated disposal rates based on national average statistics<br>• Estimated emissions or energy use based on national average statistics |
| **13. Downstream leased assets** | • Site-specific energy use data collected by utility bills or meters | • Estimated emissions based on industry-average data (e.g., energy use per floor space by building type) |
| **14. Franchises** | • Site-specific energy use data collected by utility bills or meters | • Estimated emissions based on industry-average data (e.g., energy use per floor space by building type) |
| **15. Investments** | • Site-specific energy use or emissions data | • Estimated emissions based on industry-average data |

### 7.3    Guidance for selecting data

The quality of the scope 3 inventory depends on the quality of the data used to calculate emissions. Companies should collect data of sufficient quality to ensure that the inventory appropriately reflects the GHG emissions of the company, supports the company's goals, and serves the decision-making needs of users, both internal and external to the company. After prioritizing scope 3 activities (see section 7.1), companies should select data based on the following:

- The company's business goals (see chapter 2)
- The relative significance of scope 3 activities (see section 7.1)
- The availability of primary and secondary data
- The quality of available data

Companies may use any combination of primary and secondary data to calculate scope 3 emissions. See table 7.5 for a list of advantages and disadvantages of primary data and secondary data.

In general, companies should collect high quality, primary data for high priority activities (see section 7.1). To most effectively track performance, companies should use primary data collected from suppliers and other value chain partners for scope 3 activities targeted for achieving GHG reductions.

In some cases, primary data may not be available or may not be of sufficient quality. In such cases, secondary data

**Table [7.5]** Advantages and disadvantages of primary data and secondary data

|  | Primary data (e.g., supplier-specific data) | Secondary data (e.g., industry-average data) |
|---|---|---|
| **Advantages** | • Provide better representation of the company's specific value chain activities<br>• Enables performance tracking and benchmarking of individual value chain partners by allowing companies to track operational changes from actions taken to reduce emissions at individual facilities/companies and to distinguish between suppliers in the same sector based on GHG performance<br>• Expands GHG awareness, transparency, and management throughout the supply chain to the companies that have direct control over emissions<br>• Allows companies to better track progress toward GHG reduction targets (see chapter 9) | • Allows companies to calculate emissions when primary data is unavailable or of insufficient quality<br>• Can be useful for accounting for emissions from minor activities<br>• Can be more cost-effective and easier to collect<br>• Allows companies to more readily understand the relative magnitude of various scope 3 activities, identify hot spots, and prioritize efforts in primary data collection, supplier engagement, and GHG reduction efforts |
| **Disadvantages** | • May be costly<br>• May be difficult to determine or verify the source and quality of data supplied by value chain partners | • Data may not be representative of the company's specific activities<br>• Does not reflect operational changes undertaken by value chain partners to reduce emissions<br>• Could be difficult to quantify GHG reductions from actions taken by specific facilities or value chain partners<br>• May limit the ability to track progress toward GHG reduction targets (see chapter 9) |

*CHAPTER 07* Collecting Data

may be of higher quality than the available primary data for a given activity. Data selection depends on business goals. If the company's main goal is to set GHG reduction targets, track performance from specific operations within the value chain, or engage suppliers, the company should select primary data. If the company's main goal is to understand the relative magnitude of various scope 3 activities, identify hot spots, and prioritize efforts in primary data collection, the company should select secondary data. In general, companies should collect secondary data for:

• Activities not prioritized based on initial estimation methods or other criteria (see section 7.1)
• Activities for which primary data is not available (e.g., where a value chain partner is unable to provide data)
• Activities for which the quality of secondary data is higher than primary data (e.g., when a value chain partner is unable to provide data of sufficient quality)[1]

Companies are required to report a description of the types and sources of data (including activity data, emission factors, and GWP values) used to calculate emissions, and the percentage of emissions calculated using data obtained from suppliers or other value chain partners (see chapter 11).

### Data quality

Sources of primary data and secondary data can vary in quality. When selecting data sources, companies should use the data quality indicators in table 7.6 as a guide to obtaining the highest quality data available for a given emissions activity. The data quality indicators describe the representativeness of data (in terms of technology, time, and geography) and the quality of data measurements (i.e., completeness and reliability of data).

Companies should select data that are the most representative in terms of technology, time, and geography; most complete; and most reliable. Companies should determine the most useful method for applying the data quality indicators when selecting data and evaluating data quality. One example of applying the data quality indicators is presented in box 7.2.

To ensure transparency and avoid misinterpretation of data, companies are required to report a description of the data quality of reported emissions data (see chapter 11).

Because scope 3 emissions are emissions from activities not under the reporting company's ownership or control, companies are likely to face additional challenges related to collecting data and ensuring data quality for scope 3 than for activities under the reporting company's ownership or control. Scope 3 data collection challenges include:

• Reliance on value chain partners to provide data
• Lesser degree of influence over data collection and management practices
• Lesser degree of knowledge about data types, data sources, and data quality
• Broader need for secondary data
• Broader need for assumptions and modeling

These data collection challenges contribute to uncertainty in scope 3 accounting. Higher uncertainty for scope 3 calculations is acceptable as long as the data quality of the inventory is sufficient to support the company's goals and ensures that the scope 3 inventory is relevant (i.e., the inventory appropriately reflects the GHG emissions of the company, and serves the decision-making needs of users, both internal and external to the company). For example, companies may seek to ensure that data quality is sufficient to understand the relative magnitude of scope 3 activities across the value chain and to enable consistent tracking of scope 3 emissions over time. See Appendix B for more information on uncertainty.

To facilitate quality assurance and quality control when collecting data, companies should develop a data management plan that documents the GHG inventory process and the internal quality assurance and quality control (QA/QC) procedures in place to enable the preparation of the inventory from its inception through final reporting. For more information, see Appendix C.

Companies should select data that are the most representative in terms of technology, time, and geography; most complete; and most reliable.

**Table [7.6]** Data quality indicators

| Indicator | Description |
|-----------|-------------|
| **Technological representativeness** | The degree to which the data set reflects the actual technology(ies) used |
| **Temporal representativeness** | The degree to which the data set reflects the actual time (e.g., year) or age of the activity |
| **Geographical representativeness** | The degree to which the data set reflects the actual geographic location of the activity (e.g., country or site) |
| **Completeness** | The degree to which the data is statistically representative of the relevant activity.<br><br>Completeness includes the percentage of locations for which data is available and used out of the total number that relate to a specific activity. Completeness also addresses seasonal and other normal fluctuations in data. |
| **Reliability** | The degree to which the sources, data collection methods and verification procedures[2] used to obtain the data are dependable. |

*Adapted from B.P. Weidema and M.S. Wesnaes, "Data quality management for life cycle inventories – an example of using data quality indicators," Journal of Cleaner Production 4 no. 3-4 (1996): 167-174.*



[76]  *Corporate Value Chain (Scope 3) Accounting and Reporting Standard*

*CHAPTER 07 Collecting Data*

**Box [7.2]** Example of criteria to evaluate the data quality indicators

A qualitative approach to data quality assessment uses rating descriptions for each of the data quality indicators on direct emissions data, activity data, and emission factors as applicable. This rating system has elements of subjectivity. For example, some fuel emission factors have not changed significantly in many years. Therefore, a fuel emission factor that is over 10 years old, which would be assigned a temporal score of poor with the data quality in the table below, may not be different than a factor less than 6 years old (a temporal rating of good). Companies should consider the individual circumstances of the data when using the data quality results as a basis for collecting new data or evaluating data quality.

| Score | Representativeness to the activity in terms of: | | | | |
|---|---|---|---|---|---|
| | Technology | Time | Geography | Completeness | Reliability |
| **Very good** | Data generated using the same technology | Data with less than 3 years of difference | Data from the same area | Data from all relevant sites over an adequate time period to even out normal fluctuations | Verified[3] data based on measurements[4] |
| **Good** | Data generated using a similar but different technology | Data with less than 6 years of difference | Data from a similar area | Data from more than 50 percent of sites for an adequate time period to even out normal fluctuations | Verified data partly based on assumptions or non-verified data based on measurements |
| **Fair** | Data generated using a different technology | Data with less than 10 years of difference | Data from a different area | Data from less than 50 percent of sites for an adequate time period to even out normal fluctuations or more than 50 percent of sites but for a shorter time period | Non-verified data partly based on assumptions, or a qualified estimate (e.g. by a sector expert) |
| **Poor** | Data where technology is unknown | Data with more than 10 years of difference or the age of the data are unknown | Data from an area that is unknown | Data from less than 50 percent of sites for shorter time period or representativeness is unknown | Non-qualified estimate |

Adapted from B.P. Weidema and M.S. Wesnaes, "Data quality management for life cycle inventories – an example of using data quality indicators," *Journal of Cleaner Production 4 no. 3-4 (1996): 167-174.*

## 7.4    Guidance for collecting primary data

Primary activity data may be obtained through meter readings, purchase records, utility bills, engineering models, direct monitoring, mass balance, stoichiometry, or other methods for obtaining data from specific activities in the company's value chain.

Where possible, companies should collect energy or emissions data from suppliers and other value chain partners in order to obtain site-specific data for priority scope 3 categories and activities. To do so, companies should identify relevant suppliers from which to seek GHG data. Suppliers may include contract manufacturers, materials and parts suppliers, capital equipment suppliers, fuel suppliers, third party logistics providers, waste management companies, and other companies that provide goods and services to the reporting company.

Companies should first engage relevant tier 1 suppliers (see figure 7.3). Tier 1 suppliers are companies with which the reporting company has a purchase order for goods or services (e.g., materials, parts, components, etc.). Tier 1 suppliers have contractual obligations with the reporting company, providing the leverage needed to request GHG inventory data.

To be comprehensive, companies may seek to obtain GHG emissions data from all tier 1 suppliers. However, a company may have many small tier 1 suppliers that together comprise only a small share of a company's total activities and spending. Companies may develop their own policy for selecting relevant suppliers to target for primary data collection. For example, a company may select suppliers based on their contribution to its total spend (see box 7.3). A company may also seek data from tier 2 suppliers, where relevant (see box 7.5). Tier 2 suppliers are companies with which tier 1 suppliers have a purchase order for goods and services (see figure 7.3). Companies should use secondary data to calculate emissions from activities where supplier-specific data is not collected or is incomplete.

Companies are required to report the percentage of emissions calculated using data obtained from suppliers or other value chain partners (see chapter 11).

It is unlikely that all of a company's relevant suppliers will be able to provide GHG inventory data to the company. (See table 7.8 for a list of challenges and guidance for

**Figure [7.3]** Tier 1 suppliers in a supply chain



collecting primary data from suppliers.) In such cases, companies should encourage suppliers to develop GHG inventories in the future and may communicate their efforts to encourage more suppliers to provide GHG emissions data in the public report.

After selecting relevant suppliers, companies should determine the type and level of data to request from suppliers.

### Type of data

The type of data that should be collected varies by scope 3 category. For example, companies may send questionnaires to each relevant supplier or other value chain partner requesting the following items:

- Product life cycle GHG emissions data following the *GHG Protocol Product Standard*
- Scope 1 and scope 2 emissions data[5] for the reporting year[6] following the *GHG Protocol Corporate Standard* and according to the hierarchy provided in table 7.7
- The supplier's upstream scope 3 emissions and/or the types of activities that occur upstream of the supplier (if applicable)

Case 2:24-cv-00801-ODW-PVC     Document 48-20     Filed 05/24/24     Page 82 of 153
Page ID #:897



*CHAPTER 07 Collecting Data*

- A description of the methodologies used to quantify emissions and a description of the data sources used (including emission factors and GWP values)[7]
- The method(s) the supplier used to allocate emissions, or information the reporting company would need to allocate emissions (see chapter 8)
- Whether the data has been assured/verified, and if so, the type of assurance achieved
- Any other relevant information

For more information on types of data to collect by scope 3 category, see the GHG Protocol *Guidance for Calculating Scope 3 Emissions*, available at www.ghgprotocol.org.

### Level of data

Activity data and emissions data may be collected at varying levels of detail and granularity. When collecting primary data from value chain partners, companies should obtain the most product-specific data available (see table 7.7). Product-level data is more precise because it relates to the specific good or service purchased by the reporting company and avoids the need for allocation (see chapter 8).

In general, companies should seek activity data or emissions data from suppliers that is as specific as possible to the product purchased from the supplier, following the hierarchy in table 7.7. If product-level data is not available, suppliers should try to provide data at the activity-, process-, or production line-level. If activity-level

data is not available, suppliers should try to provide data at the facility level, and so on. Collecting more granular data is especially important from diversified suppliers that produce a wide variety of products (see box 7.4). Data collected at the activity, production line, facility, business unit, or corporate level may require allocation. (For guidance, see chapter 8.)

For more guidance on collecting primary data from suppliers, see *Guidance for Collecting Data from Suppliers*, available at www.ghgprotocol.org.

### Quality of supplier data

The quality of supplier data may vary widely and be difficult to determine. Suppliers should use the data-quality indicators in section 7.3 to select data that are most representative of their activities in terms of technology, time, and geography, and that are the most complete and reliable. Reporting companies should use the data-quality indicators to assess the quality of suppliers' data. To do so, companies should request that suppliers provide supporting documentation to explain their methodology and the sources and quality of data used. Companies may request that suppliers perform first party or third party assurance of their data to ensure its accuracy and completeness (see chapter 10).

See table 7.8 for a list of challenges and guidance for collecting primary data from suppliers.

**Box [7.3]** Example of prioritizing suppliers based on contribution to the company's total spend

As an example, a company may prioritize suppliers by following these steps:

1. Obtain a complete list of the reporting company's total spend or expenditure, by supplier
2. Rank tier 1 suppliers according to their contribution to the reporting company's total spend
3. Select the largest tier 1 suppliers that collectively account for at least 80 percent[8] of spend (see figure 7.4)
4. Within the remaining 20 percent of spend, select any additional suppliers that are individually more than 1 percent of spend or that are relevant to the company for other reasons (e.g., contract manufacturers, suppliers that are expected to have significant GHG emissions, suppliers that produce or emit HFCs, PFCs, or $SF_6$, suppliers of high emitting materials, suppliers in priority spend categories as defined by the company, etc.)

**Figure [7.4]** Ranking a company's tier 1 suppliers according to spend



In this example, A-Z represent individual suppliers. The company selects suppliers A through I because they collectively account for 80 percent of the company's spend. The company also selects supplier J because it individually represents more than 1 percent of supplier spend. The company uses secondary data to calculate emissions from activities where supplier-specific data is not collected or is incomplete.

**Table [7.7]** Levels of data (ranked in order of specificity)

| Data type | Description |
| --- | --- |
| Product-level data | Cradle-to-gate[9] GHG emissions for the product of interest |
| Activity-, process- or production line-level data | GHG emissions and/or activity data for the activities, processes, or production lines that produce the product of interest |
| Facility-level data | GHG emissions and/or activity data for the facilities or operations that produce the product of interest |
| Business unit-level data | GHG emissions and/or activity data for the business units that produce the product of interest |
| Corporate-level data | GHG emissions and/or activity data for the entire corporation |

*CHAPTER 07* *Collecting Data*

**Box [7.4]** Level of data and supplier type

The need to collect granular data from a supplier depends in part on the variety and diversity of products the supplier produces. Collecting data at the product, production line, or facility level is more important for diversified companies than for relatively homogeneous companies, for which business unit- or corporate-level data may yield representative GHG estimates. Below are two examples: A) a homogeneous supplier with relatively uniform emissions throughout its operations and B) a diversified supplier where GHG intensity varies widely between business units and facilities.





The reporting company purchases the same type of professional services from both suppliers. The reporting company needs to decide whether collecting corporate-level emissions from the suppliers will accurately reflect emissions related to the purchased product. The company makes a qualitative determination based on the nature of each supplier's business activities.

For Supplier A, the reporting company decides to use corporate level data to estimate emissions from the purchased service because the supplier only produces professional services, each of which has a similar GHG intensity. For Supplier B, however, the reporting company decides not to use corporate-level emissions data because the company is diversified and has business units in both professional services and manufacturing, which have widely different GHG intensities. As a result, using corporate-level data would not accurately reflect emissions from the purchased service. More granular data (e.g., facility- or business unit-level data) should be used instead.

**Table [7.8]** Challenges and guidance for collecting primary data from value chain partners

| Challenges | Guidance |
|---|---|
| **Large number of suppliers** | • Target most relevant suppliers based on spend and/or anticipated emissions impact<br>• Target suppliers where the reporting company has a higher degree of influence (e.g., contract manufacturers or suppliers where the reporting company accounts for a significant share of the supplier's total sales) |
| **Lack of supplier knowledge and experience with GHG inventories and accounting** | • Target suppliers with prior experience developing GHG inventories<br>• Identify the correct subject-matter expert at the company<br>• Explain the business value of investing in GHG accounting and management<br>• Request data suppliers already have collected, such as energy-use data, rather than emissions data<br>• Provide clear instructions and guidance with the data request<br>• Provide training, support, and follow-up |
| **Lack of supplier capacity and resources for tracking data** | • Make the data request as simple as possible<br>• Use a simple, user-friendly, standardized data template or questionnaire<br>• Provide a clear list of data required and where to find data (e.g., utility bills)<br>• Use an automated online data collection system to streamline data entry<br>• Consider use of a third party database to collect data<br>• Engage and leverage resources from suppliers' trade associations<br>• Coordinate GHG data request with other requests<br>• Follow up with suppliers |
| **Lack of transparency in the quality of supplier data** | • Request documentation on methodology and data sources used, inclusions, exclusions, assumptions, etc.<br>• Minimize errors by requesting activity data (e.g., kWh electricity used, kg of fuels used) and calculating GHG emissions separately<br>• Consider third party assurance |
| **Confidentiality concerns of suppliers** | • Protect suppliers' confidential and proprietary information (e.g., through nondisclosure agreements, firewalls, etc.)<br>• Ask suppliers to obtain third party assurance rather than submitting detailed activity data to avoid providing confidential information |
| **Language barriers** | • Translate the questionnaire and communications into local languages |



[82]  *Corporate Value Chain (Scope 3) Accounting and Reporting Standard*

**Box [7.5]** Expanding supplier GHG management beyond tier 1 suppliers

While companies should first engage tier 1 suppliers, significant value chain GHG impacts often lie upstream of a company's tier 1 suppliers. Tier 1 suppliers may outsource manufacturing or be several layers removed from the most GHG-intensive operations in a supply chain (e.g., raw material extraction or manufacturing).

As a result, companies may want to promote further proliferation of GHG management throughout the supply chain. As tier 1 data is gathered, companies may consider whether and how to approach deeper levels of the supply chain. Possible approaches include:

• Encouraging or requiring tier 1 suppliers to encourage their own tier 1 suppliers (i.e., the reporting company's tier 2 suppliers) to report their GHG inventories. Eventually ask tier 2 suppliers to require their tier 1 suppliers to do the same.

• Target specific tier 2 suppliers for GHG data requests in cases where tier 2 suppliers are responsible for the majority of GHG emissions associated with a product provided by a tier 1 supplier. In practice, this approach is likely to be difficult without close cooperation between a company and its complete supply chain. As an example, a firm that sells food products may work closely with both growers and processors in its supply chain.

Cascading GHG accounting and reporting throughout supply chains expands the number of companies directly involved in managing GHG emissions. Companies undertaking supply chain engagement efforts may optionally provide information about such efforts in the public report (see chapter 11).

## 7.5 Guidance for collecting secondary data and filling data gaps

### Collecting secondary data

When using secondary databases, companies should prioritize databases and publications that are internationally recognized, provided by national governments, or peer-reviewed. Companies should use the data-quality indicators in section 7.3 when selecting secondary data sources. The data-quality indicators should be used to select secondary data that are the most representative to the company's activities in terms of technology, time, and geography, and that are the most complete and reliable. A list of available secondary data sources is available at www.ghgprotocol.org.

### Using proxy data to fill data gaps

Companies should use the guidance in section 7.3 to assess the quality of available data. If data of sufficient quality are not available, companies may use proxy data to fill data gaps. Proxy data is data from a similar activity that is used as a stand-in for the given activity. Proxy data can be extrapolated, scaled up, or customized to be more representative of the given activity (e.g., partial data for an activity that is extrapolated or scaled up to represent 100 percent of the activity).

Examples of proxy data include:

• An emission factor exists for electricity in Ukraine, but not for Moldova. A company uses the electricity emission factor from Ukraine as a proxy for electricity in Moldova.

• A company collects data for 80 percent of its production for a given product category, but 20 percent is unknown. The company assumes the unknown 20 percent has similar characteristics to the known 80 percent so applies a linear extrapolation to estimate 100 percent of the production data.



### *7.6    Improving data quality over time*

Collecting data, assessing data quality, and improving data quality is an iterative process. Companies should first apply data quality indicators and assess data quality when selecting data sources (see section 7.3), then review the quality of data used in the inventory after data has been collected, using the same data quality assessment approach. In the initial years of scope 3 data collection, companies may need to use data of relatively low quality due to limited data availability. Over time, companies should seek to improve the data quality of the inventory by replacing lower quality data with higher quality data as it becomes available. In particular, companies should prioritize data quality improvement for activities that have the following:

•  Relatively low data quality (based on the data quality guidance in section 7.3)
•  Relatively high emissions

Companies are required to provide a description of the data quality of reported scope 3 emissions data to ensure transparency and avoid misinterpretation of data (see chapter 11). Refer to section 7.3 for guidance on describing data quality; Appendix B for guidance on uncertainty; and section 9.3 for guidance on recalculating base year emissions when making significant improvements in data quality over time.

---

*CHAPTER 07* Collecting Data

## *Endnotes*

1 For example, activity-specific secondary data may be of higher quality than corporate-level primary data received from a supplier.

2 Verification may take place in several ways, for example by on-site checking, reviewing calculations, mass balance calculations, or cross-checks with other sources.

3 Verification may take place in several ways, for example by on-site checking, reviewing calculations, mass balance calculations, or cross-checks with other sources.

4 Includes calculated data (e.g., emissions calculated using activity data) when the basis for calculation is measurements (e.g., measured inputs). If the calculation is based partly on assumptions, the score should be 'Good' or 'Fair.'

5 Suppliers' scope 1 and scope 2 emissions data should include emissions of $CO_2$, $CH_4$, $N_2O$, HFCs, PFCs, and $SF_6$, and may be aggregated to units of carbon dioxide equivalent rather than separately reported by individual greenhouse gas.

6 Some suppliers may collect data on a fiscal year basis, while others collect data on a calendar year basis. To the greatest extent possible, reporting companies should collect or adjust data to reflect a consistent 12-month period.

7 To the greatest extent possible, companies should encourage consistent use of sources of emission factors and GWP values across suppliers.

8 Eighty percent is an example threshold. Companies may define their own threshold. The percentage can be increased over time as the reporting company and its suppliers gain experience in managing GHG emissions.

9 Cradle-to-gate GHG emissions include all emissions that occur in the life cycle of purchased products, up to the point of receipt by the reporting company (excluding emissions from sources that are owned or controlled by the reporting company).





## 08    *Allocating Emissions*



*guidance*

*T*his chapter provides guidance on allocating emissions to calculate scope 3 emissions, including:

• *Overview of allocation (section 8.1)*

• *How to avoid or minimize allocation, if possible (section 8.2)*

• *Allocation methods (section 8.3)*

• *Examples of allocating emissions (section 8.4)*

## 8.1    Overview of allocation

When companies use primary data from suppliers or other value chain partners to calculate scope 3 emissions (see section 7.4), companies may need to allocate emissions. Likewise, companies may need to allocate emissions when providing primary data to customers that are accounting for their scope 3 emissions.

Allocation is the process of partitioning GHG emissions from a single facility or other system[1] (e.g., activity, vehicle, production line, business unit, etc.) among its various outputs (see figure 8.1).

### When allocation is needed

Allocation is necessary when:

• a single facility or other system produces multiple outputs; and
• emissions are only quantified for the entire facility or system as a whole.

In such a case, emissions from the shared facility or other system need to be allocated to (or divided between) the various outputs (see figure 8.1).

For example, a single production facility may produce many different products and co-products, while activity data (used to calculate GHG emissions) is collected for the plant as a whole. In this case, the facility's energy use and emissions need to be allocated to its various outputs.

Similarly, a company may purchase components from a supplier that manufactures a wide variety of products for many different customers. In this case, the supplier's activity data or emissions data need to be allocated among the various products so its customers know the emissions attributable to the specific products they buy, based on the fraction of total supplier production that is related to the customer's purchases.

**Figure [8.1]** The need for allocation



**When allocation is not needed**

When using primary data, allocation is not necessary if:

• a facility or other system produces only one output; or
• emissions from producing each output are separately quantified.

Allocation is not typically necessary when using secondary data to calculate scope 3 emissions, since the activity data and emission factors are typically in reference to a single product (e.g., calculating emissions from third-party transportation by multiplying weight-distance traveled by an emission factor).

### 8.2    Avoid or minimize allocation if possible

When using primary data to calculate scope 3 emissions, companies should avoid or minimize allocation if possible. Allocation adds uncertainty to the emissions estimates and may be especially inaccurate when an activity or facility produces a wide variety of products that differ significantly in their GHG contribution.

For example, a supplier may manufacture twenty different types of products and only supply one type of

product to the reporting company. Allocating the scope 1 and scope 2 emissions of the supplier would be inaccurate if the type of good supplied to the reporting company has a lower or higher emissions intensity than the average emissions intensity of the twenty products manufactured by the supplier. Therefore, allocation should be used only when more accurate data is not available.

Companies should avoid or minimize allocation by collecting more detailed data through one of the following approaches:

• Obtaining product-level GHG data from value chain partners following the *GHG Protocol Product Standard*[2]
• Separately sub-metering energy use and other activity data (e.g., at the production line level)[3]
• Using engineering models to separately estimate emissions related to each product produced[4]

### 8.3    Allocation methods

If avoiding allocation is not possible, companies should first determine total facility or system emissions, then determine the most appropriate method and factor for allocating emissions. (See table 8.1 for a list of allocation methods and factors.)

As a general rule, companies should follow the decision tree in figure 8.2 when deciding if allocation is needed and selecting an allocation method. However, the most appropriate allocation method for a given activity depends on individual circumstances (see section 8.4 for examples). Companies should select the allocation approach that:

• best reflects the causal relationship between the production of the outputs and the resulting emissions;
• results in the most accurate and credible emissions estimates;
• best supports effective decision-making and GHG reduction activities; and
• otherwise adheres to the principles of relevance, accuracy, completeness, consistency and transparency.

Different allocation methods may yield significantly different results. Companies that have a choice between multiple methods for a given activity should evaluate each method to determine the range of possible results

**CHAPTER 08** *Allocating Emissions*

**Figure [8.2]** Decision tree for selecting an allocation approach



before selecting a single method (e.g., conduct a sensitivity analysis).

Companies may use a combination of different allocation methods and factors to estimate emissions from the various activities in the scope 3 inventory. However, for each individual facility or system, a single, consistent allocation factor should be used to allocate emissions throughout the facility or system. The sum of the allocated emissions for each output of a system should equal 100 percent of emissions from the system. The use of multiple allocation methods for a single system can result in over-counting or under-counting of total emissions from the system.

To allocate emissions from a facility, multiply total facility emissions by the reporting company's purchases as a fraction of total production (see box 8.1). Either the reporting company or its suppliers can allocate supplier emissions to the reporting company (see box 8.2).

See table 8.2 for allocation guidance by scope 3 category.

Companies are required to report a description of the allocation methods used to calculate scope 3 emissions (see chapter 11). Where applicable, companies should disclose the range of results obtained through sensitivity analysis.

### No allocation for waste generated in production (e.g., within category 1, category 2, and category 10)

Waste is an output of a system that has no market value. While companies generate revenue through the sale of co-products, companies receive no revenue from waste and may instead pay to dispose of it. Waste may be generated from production processes included in category 1 (Purchased goods and services), category 2 (Capital goods), or category 10 (Processing of sold products). If a facility produces waste during production, no emissions from the facility should be allocated to the waste. All emissions from the facility should instead be allocated among the facility's other outputs. If waste becomes useful and marketable for use in another system, it is no longer considered waste and should be treated like other types of outputs.

The preceding guidance does not apply to category 5 (Waste generated in operations) or category 12 (End-of-life treatment of sold products). Companies should account for all emissions related to waste within category 5 and category 12.

**Box [8.1]** Equation for allocating emissions from a facility

$$\text{Allocated Facility Emissions} \; = \; \text{Total Facility Emissions} \; \times \; \frac{\text{Reporting Company's Purchases from the Facility}}{\text{Total Facility Production}}$$

Where both "Reporting Company's Purchases from the Facility" and "Total Facility Production" are measured in the same units (e.g., mass, volume, market value, number of products)

**Box [8.2]** Two approaches to allocating GHG emissions from suppliers

Companies may use two basic approaches for collecting and allocating GHG emissions from suppliers:

- **Supplier allocation:** Individual suppliers report pre-allocated emissions data to the reporting company and disclose the allocation metric used
- **Reporting company allocation:** The reporting company allocates supplier emissions by obtaining two types of data from individual suppliers: 1) total supplier GHG emissions data (e.g., at the facility or business unit level), and 2) the reporting company's share of the supplier's total production, based on either physical factors (e.g., units of production, mass, volume, or other metrics) or economic factors (e.g., revenue, spend).

Reporting company allocation is likely to ensure more consistency in methodologies for the reporting company, while the supplier allocation approach may be more practical by avoiding the need for suppliers to report confidential business information.

*CHAPTER 08* Allocating Emissions

**Table [8.1]** Allocation methods and factors

*Physical allocation:*  *Allocating the emissions of an activity based on an underlying physical relationship between the multiple inputs/outputs and the quantity of emissions generated*

| *Allocation factors* | *Examples of allocation factors and formulas* |
|---|---|
| **Mass** | Mass of co-products<br><br>$Allocated\ Facility\ Emissions\ = \dfrac{Mass\ of\ Products\ Purchased}{Total\ Mass\ of\ Products\ Produced} \times Total\ Emissions$ |
| **Volume** | Volume of cargo transported<br><br>$Allocated\ Facility\ Emissions\ = \dfrac{Volume\ of\ Products\ Purchased}{Total\ Volume\ of\ Products\ Produced} \times Total\ Emissions$ |
| **Energy** | Energy content of heat and electricity co-products<br><br>$Allocated\ Facility\ Emissions\ = \dfrac{Energy\ Content\ of\ Products\ Purchased}{Total\ Energy\ Content\ of\ Products\ Produced} \times Total\ Emissions$ |
| **Chemical** | Chemical composition of chemical co-products<br><br>$Allocated\ Facility\ Emissions\ = \dfrac{Chemical\ Content\ of\ Products\ Purchased}{Total\ Chemical\ Content\ of\ Products\ Produced} \times Total\ Emissions$ |
| **Number of units** | Number of units shipped<br><br>$Allocated\ Facility\ Emissions\ = \dfrac{Number\ of\ Units\ Purchased}{Total\ Number\ of\ Units\ Produced} \times Total\ Emissions$ |
| **Other factors** | Protein content of food co-products, floor space occupied by products<br><br>*Other formulas* |

*Economic allocation:*  *Allocating the emissions of an activity based on the market value of each output/product*

| *Allocation factors* | *Examples of allocation factors and formulas* |
|---|---|
| **Market value**[5] | Market value of co-products<br><br>$Allocated\ Facility\ Emissions\ = \dfrac{Market\ Value\ of\ Products\ Purchased}{Total\ Market\ Value\ of\ Products\ Produced} \times Total\ Emissions$ |

*Other methods:*  *Allocating the emissions of an activity based on industry-specific or company-specific allocation methods*

| *Allocation factors* | *Examples of allocation factors and formulas* |
|---|---|
| **Other factors** | *Other formulas* |

[91]

## 8.4    Examples of allocating emissions

This section provides examples and guidance for determining the most appropriate allocation method to use for various situations. The most appropriate method for a given activity is the one that best reflects the causal relationship between the production of the product and the resulting emissions, and depends on individual circumstances. Companies should establish a consistent policy for allocating emissions for various activities in the value chain. Table 8.2 provides guidance on choosing allocation methods for each scope 3 category.

### Using physical allocation

Physical allocation is expected to yield more representative emissions estimates in several situations, outlined below.

### Manufacturing

In certain cases, manufacturing facilities may produce multiple products, each of which requires similar energy and material inputs to produce, but which differ significantly in market value (e.g., due to higher brand value of one product than another). While the market value of the products differs, the physical quantity of

**Table [8.2]** Allocation guidance by scope 3 category

### Upstream scope 3 emissions

| Category | Examples of primary data requiring allocation | Allocation guidance |
|---|---|---|
| 1. **Purchased goods and services** | • Site-specific energy use or emissions data from suppliers | • Physical or economic allocation |
| 2. **Capital goods** | • Site-specific energy use or emissions data from capital goods suppliers | • Physical or economic allocation |
| 3. **Fuel- and energy-related activities (not included in scope 1 or scope 2)** | • Company-specific data on upstream emissions (e.g. extraction of fuels)<br>• Actual power purchase data for purchased power | • Physical allocation (energy) |
| 4. **Upstream transportation and distribution** | • Activity-specific energy use or emissions data from third-party transportation and distribution suppliers | • Physical allocation  (mass or volume) for shared vehicles<br>• Physical allocation (volume or area) for shared facilities |
| 5. **Waste generated in operations** | • Site-specific emissions data from waste management companies | • Physical or economic allocation |
| 6. **Business travel** | • Activity-specific emissions data from transportation suppliers (e.g., airlines) | • Physical allocation for shared vehicles (e.g., area occupied) |
| 7. **Employee commuting** | • Specific distance traveled and mode of transport collected from employees | • Physical allocation for shared vehicles (e.g., area occupied) |
| 8. **Upstream leased assets** | • Site-specific energy use data collected by utility bills or meters | • Physical allocation for shared facilities (e.g., area or volume) |

---

[92]  *Corporate Value Chain (Scope 3) Accounting and Reporting Standard*

*CHAPTER 08 Allocating Emissions*

emissions resulting from the production of each product is similar.

In such a case, physical factors are more closely correlated with emissions and better approximate actual emissions associated with producing each product. Companies should select the physical factor that most closely correlates to emissions, which may include units of production, mass, volume, energy, or other metrics. Companies should consider multiple physical factors when selecting the factor that is most appropriate.

### Transportation

Allocating emissions from the transportation of cargo (or freight) occurs when:

- a single vehicle (e.g., ship, aircraft, train, or truck) transports multiple products;
- activity data (e.g., fuel use) is collected at the vehicle level; and
- a company chooses to estimate emissions by allocating total vehicle emissions to one or more of the products shipped.

**Table [8.2]** Allocation guidance by scope 3 category (continued)

### Downstream scope 3 emissions

| Category | Examples of primary data requiring allocation | Allocation guidance |
|---|---|---|
| 9. Downstream transportation and distribution | • Activity-specific energy use or emissions data from third party transportation and distribution partners | • Physical allocation for shared vehicles (mass or volume)<br>• Physical allocation for shared facilities (volume or area) |
| 10. Processing of sold products | • Site-specific energy use or emissions from downstream value chain partners | • Physical or economic allocation |
| 11. Use of sold products | • Specific data collected from consumers | • Physical allocation, where applicable |
| 12. End-of-life treatment of sold products | • Specific data collected from waste management providers on emissions rates or energy use | • Physical allocation, where applicable |
| 13. Downstream leased assets | • Site-specific energy use data collected by utility bills or meters | • Physical allocation for shared facilities (volume or area) |
| 14. Franchises | • Site-specific energy use data collected by utility bills or meters | • Physical allocation for shared facilities (volume or area) |
| 15. Investments | • Site-specific energy use or emissions data | • Economic allocation based on the company's proportional share of equity or debt in the investee |

Companies should allocate emissions using physical allocation, since physical factors are expected to best reflect the causal relationship between the transportation of products and the resulting emissions. Companies should allocate using either weight, volume, or a combination of weight and volume, depending on whether the capacity of the vehicle is limited by weight, volume, or a combination of the two. The limiting factor depends on the mode of transportation (road, rail, air, or marine transport). For example, ocean-going vessels tend to be limited by volume, while trucks tend to be limited by weight.

Companies may also calculate emissions without allocating emissions by using secondary data (e.g., industry-average emission factors based on metric ton-km traveled).

### *Commercial buildings (e.g., leased assets, franchises)*

Commercial buildings include retail facilities, warehouses, distribution centers, and owned or leased office buildings. Allocating emissions from commercial buildings occurs when:

- activity data is collected at the facility/building level; and
- a company chooses to estimate emissions for a subset of products by allocating total facility emissions to one or more products located at the facility.

Companies should allocate emissions using physical allocation, since physical factors are expected to best reflect the causal relationship between the storage of products and the resulting emissions. Companies should allocate using either volume or area, depending on whether the capacity of the facility is limited by volume or area, and which is most closely correlated with energy use and emissions.

For example, to allocate emissions from a retail facility, a company may divide total facility emissions by the relative volume (e.g., quantity of shelf space) occupied by a given product within a retail facility.

Companies should obtain more accurate estimates by first separating total facility energy use and total quantity of products sold between refrigerated storage and non-refrigerated storage. Where the same product is stacked on pallets or shelves, companies may divide emissions per unit of volume or floor space by the total number of products occupying that area to determine emissions per unit of product.

Companies may also calculate emissions from retail and warehousing without allocating emissions by using secondary data (e.g., industry average emission factors expressed in units of emissions per volume or floor space).

**Box [8.3]** Equation for allocating vehicle emissions based on volume

$$\text{Allocated Emissions} \; = \; \frac{\text{Volume of Vehicle Occupied By The Product}}{\text{Total Volume of Vehicle}} \; x \; \text{Total Vehicle Emissions}$$

Note: This equation assumes the distance traveled by each product is the same.

**Box [8.4]** Equation for allocating emissions from a building based on area

$$\text{Allocated Emissions} \; = \; \frac{\text{Volume of Retail Facility Occupied By The Product}}{\text{Total Volume of Retail Facility}} \; x \; \text{Total Retail Facility Emissions}$$

*CHAPTER 08* *Allocating Emissions*

### Using economic allocation

Economic allocation is expected to yield more representative emissions estimates in certain situations, such as:

- when a physical relationship cannot be established;
- when a co-product would not be produced by the common facility or system without the market demand for the primary product and/or other valuable co-products (e.g., by-catch from lobster harvesting);
- when a co-product was previously a waste output that acquires value in the marketplace as a replacement for another product (e.g., fly ash in cement production);
- investments, where emissions should be allocated to the reporting company based on the reporting company's proportional share of equity or debt in the investee (see section 5.5, category 15); and

- other situations where economic allocation best reflects the causal relationship between the production of the outputs and the resulting emissions.

In situations other than those outlined above, companies should use economic allocation with caution, since economic allocation may yield misleading GHG estimates, especially when:

- prices change significantly or frequently over time;
- companies pay different prices for the same product (due to different negotiated prices); or
- prices are not well-correlated with underlying physical properties and GHG emissions (e.g., for luxury goods, products with high brand value, and products whose price reflects high research and development, marketing, or other costs, apart from production).

---

### Levi Strauss & Company: Allocating scope 3 emissions

Levi Strauss & Co. (LS&Co.) used multiple allocation methods within its scope 3 inventory depending on the types and granularity of data available.

**Category 1:**
**Purchased goods and services (upstream)**
LS&Co. collected primary data from a sample of suppliers throughout its supply chain, including fabric mills (facilities that create denim fabric from cotton fiber) and garment manufactures (facilities that assemble and finish final denim products). Allocation was necessary because both types of suppliers provided aggregated data at the facility level on total material use, energy use, production throughput, and waste streams for their full annual production. GHG emissions per product could be reasonably allocated by dividing total facility emissions by facility throughput, since both types of suppliers produce relatively uniform outputs (i.e., denim products).

LS&Co. allocated emissions from the fabric mills by mass, since mass is one of the main quantifiable determinants of material and energy inputs during the milling process and best reflects the causal relationship between production and emissions. LS&Co. allocated emissions from the garment manufacturers by the number of products produced at a facility, since assembly and

finishing are similar across a variety of denim products and emissions per unit are expected to be similar. Emissions per product were multiplied by the total number of units purchased by LS&Co. per facility to obtain total scope 3 emissions attributable to LS&Co.

**Category 9:**
**Downstream transportation and distribution**
**Distribution Centers:** After production, jeans are sent to a distribution center that packages and ships various products. LS&Co. estimated emissions per product by collecting primary data for total energy and materials used, allocated by total units of product shipped during a year. This method assumes that all units shipped result in the same emissions, which LS&Co. considered reasonable since all products go through the same processes at the distribution center.

**Retail:** Jeans are shipped from distribution centers to retail stores. Each retail store sells a variety of products, which requires allocating total store emissions to each product type. LS&Co. allocated emissions according to the retail floor space occupied by each product compared to the entire store. LS&Co. determined the average floor space and emissions of a retail store and the floor area (physical space) occupied by each product to determine emissions per individual unit from retail.

---

**Box [8.5]** Example of allocating emissions across a value chain

In this example, Company A produces a co-product during the production of a primary product. Company B transports the co-product to Company C, who consumes the co-product in its production process. The table below explains how each company should account for emissions from each activity.



|  | company that produces co-products A | company that transports co-products B | company that consumes co-products C |

| Activity | How Company A accounts for emissions | How Company C accounts for emissions |
|---|---|---|
| Production of co-products (by Company A) | **Scope:** Scope 1 because the facility that produces the co-product is owned and operated by Company A<br><br>**Allocation approach:** No need to allocate emissions; all emissions are accounted as scope 1 because the facility is owned and operated by Company A | **Scope:** Scope 3, "Purchased goods and services," because the co-product is a purchased material produced by a third party<br><br>**Allocation approach:** Scope 3 emissions from co-product production by Company A should be allocated using physical allocation if physical factors best reflect the causal relationship between production of the outputs and the resulting emissions and data are available on the physical quantities of outputs produced |
| Transportation of co-products (by Company B) | **Scope:** Scope 3, "Downstream transportation and distribution" because the vehicles are owned and operated by a third party and not paid for by Company A<br><br>**Allocation approach:** If vehicles transport multiple types of products and emissions are calculated using primary data provided by the transportation company: scope 3 emissions should be allocated to the co-product using physical allocation (mass or volume) (see section 8.4). Secondary data (based on metric ton-km traveled) may be used instead, which does not require allocation. | **Scope:** Scope 3, "Upstream transportation and distribution" because the vehicles are owned and operated by a third party and transporting products purchased by Company C<br><br>**Allocation approach:** If vehicles transport multiple types of products and emissions are calculated using primary data provided by the transportation company: scope 3 emissions should be allocated to the co-product using physical allocation (mass or volume) (see section 8.4). Secondary data (based on metric ton-km traveled) may be used instead, which does not require allocation. |

*CHAPTER 08* *Allocating Emissions*

**Box [8.5]** Example of allocating emissions across a value chain (continued)

| Activity | How Company A accounts for emissions | How Company C accounts for emissions |
|---|---|---|
| **Consumption of co-products (by Company C)** | **Scope:** Scope 3, "Processing of sold products," because the co-product is an intermediate product sold by Company A | **Scope:** Scope 1 because the facility is owned and operated by Company C<br><br>**Allocation approach:** No need to allocate emissions; all emissions are accounted as scope 1 because the facility is owned and operated by Company C |

## Endnotes

1   In this chapter, the term "system" is used to refer to any source of emissions (e.g., an activity, vehicle, production line, business unit, facility, etc.).

2   Product-level data refers to the cradle-to-gate GHG emissions of an individual product, i.e., all emissions that occur in the life cycle of purchased products, up to the point of receipt by the reporting company (excluding emissions from sources that are owned or controlled by the reporting company).

3   Separately sub-metering a production line allows a company to read an energy meter first before the line starts and again when the run of a product finishes. Sub-metering yields the quantity of the energy used to a specific product without the need for allocation.

4   Avoiding allocation by subdividing a process is called "process subdivision" in the *GHG Protocol Product Standard*.

5   When determining the "market value," companies should use the selling price (i.e., the price the reporting company pays to acquire products from the supplier), rather than the supplier's production cost (i.e., the costs incurred by the supplier to manufacture its products).



[97]

App.178

**09** *Setting a GHG Reduction Target and Tracking Emissions Over Time*



*G*reenhouse gas accounting and reporting allows companies to track and report their emissions performance over time. Companies may track scope 3 emissions in response to a variety of business goals (see chapter 2), including demonstrating performance toward achieving GHG reduction targets, managing risks and opportunities, and addressing the needs of stakeholders.

This chapter is organized according to the steps a company should follow to track scope 3 performance over time:

- Choosing a base year and determining base year emissions
- Setting scope 3 reduction goals
- Recalculating base year emissions (if necessary)
- Accounting for scope 3 emissions and reductions over time

The guidance in this chapter is adapted from the *GHG Protocol Corporate Standard* (chapters 5, 8, and 11).

### *Requirements in this chapter*

*When companies choose to track performance or set a reduction target, companies shall:*

- *choose a scope 3 base year and specify their reasons for choosing that particular year;*

- *develop a base year emissions recalculation policy that articulates the basis for any recalculations; and*

- *recalculate base year emissions when significant changes in the company structure or inventory methodology occur.*

[99]

## 9.1 Choosing a base year and determining base year emissions

A meaningful and consistent comparison of emissions over time requires that companies establish a base year against which to track performance. When companies choose to track scope 3 performance or set a scope 3 reduction target, companies shall choose a scope 3 base year and specify their reasons for choosing that particular year.

Companies should establish a single base year for scope 1, scope 2, and scope 3 emissions to enable comprehensive and consistent tracking of total corporate GHG emissions across all three scopes. However, companies that have already established a base year for scope 1 and scope 2 emissions may choose a more recent year for the scope 3 base year (e.g., the first year for which companies have complete and reliable scope 3 emissions data).

The scope 3 base year does not need to be the first year for which scope 3 emissions are reported. For example, a company may wait until the second or third year of scope 3 reporting to set a scope 3 base year, when the scope 3 inventory is sufficiently complete and reliable. In this case, the company is required to report the scope 3 base year only after it has established a scope 3 base year. Until a scope 3 base year is set, companies should report that they have not yet established a scope 3 base year.

When a base year is chosen, companies should determine base year emissions by following the requirements and guidance contained in this standard.

When setting a base year, companies shall develop a base year emissions recalculation policy (see section 9.3).

## 9.2 Setting scope 3 reduction targets

Any robust business strategy requires setting targets for revenues, sales, and other core business indicators, as well as tracking performance against those targets. Likewise, a key component of effective GHG management is setting a GHG target. Companies are not required to set a scope 3 reduction target, but should consider setting a target in the context of their business goals (see chapter 2).

Companies should consider several questions when setting a scope 3 GHG reduction target (see table 9.1).

### Target boundary

Companies may set a variety of scope 3 reduction goals, including:

- A single target for total scope 1 + scope 2 + scope 3 emissions
- A single target for total scope 3 emissions
- Separate targets for individual scope 3 categories
- A combination of targets, for example a target for total scope 1 + 2 + 3 emissions as well as targets for individual scope 3 categories

Each type of target boundary has advantages and disadvantages (see table 9.2).

Regardless of the type(s) of reduction targets set, companies should establish a single base year for all scope 3 categories. A single base year for all scope 3 categories simplifies scope 3 emissions tracking, avoids "cherry picking" of base years (or the perception thereof), and allows clearer communication of GHG emissions to stakeholders.

**Table [9.1]** Considerations when setting a GHG reduction target

| Issue | Description |
|---|---|
| Target type | Whether to set an absolute or intensity target |
| Target completion date | The duration of the target (e.g., short term or long term target) |
| Target level | The numerical value of the reduction target |
| Use of offsets or credits | Whether to use offsets or credits to meet GHG reduction targets |

*CHAPTER 09 Setting a GHG Reduction Target and Tracking Emissions Over Time*

### Target type

Companies can set either absolute targets, intensity targets, or a combination of absolute and intensity targets. An absolute target is expressed as a reduction in GHG emissions to the atmosphere over time in units of metric tons of $CO_2e$. An intensity target is expressed as a reduction in the ratio of GHG emissions relative to a business metric, such as output, production, sales or revenue. Advantages and disadvantages of each type of target are provided in table 9.3.

To ensure transparency, companies using an intensity target should also report the absolute emissions from sources covered by the target. Companies may find it most useful and credible to implement both absolute and intensity targets. For example, companies may establish an absolute target at the corporate level and a combination of intensity targets at lower levels of the company, or an absolute target for total scope 3 emissions and a combination of intensity targets for individual scope 3 categories.

**Table [9.2]** Advantages and disadvantages of different target boundaries

| Target boundary | Advantages | Disadvantages |
|---|---|---|
| A single target for total scope 1 + scope 2 + scope 3 emissions | • Ensures more comprehensive management of emissions across the entire value chain (i.e., all three scopes)<br>• Offers greater flexibility on where and how to achieve the most cost-effective GHG reductions<br>• Simple to communicate to stakeholders<br>• Does not require base year recalculation for shifting activities between scopes (e.g., outsourcing) | • May provide less transparency for each scope 3 category (if detail is not provided at the scope 3 category level)<br>• Requires the same base year for scope 1, scope 2, and scope 3 emissions, which may be difficult if scope 1 and scope 2 base years have already been established |
| A single target for total scope 3 emissions | • Ensures more comprehensive GHG management and greater flexibility on how to achieve GHG reductions across all scope 3 categories (compared to separate targets for selected scope 3 categories)<br>• Relatively simple to communicate to stakeholders | • May provide less transparency for each scope 3 category (if detail is not provided at the scope 3 category level)<br>• May require base year recalculation for shifting activities between scopes (e.g., outsourcing) |
| Separate targets for individual scope 3 categories | • Allows customization of targets for different scope 3 categories based on different circumstances<br>• Provides more transparency for each scope 3 category<br>• Provides additional metrics to track progress<br>• Does not require base year recalculations for adding additional scope 3 categories to the inventory<br>• Easier to track performance of specific activities | • May result in less comprehensive GHG management across the value chain (if multiple scope 3 targets are not set)<br>• May result in "cherry picking" (or the perception thereof) by setting targets only for categories that are easier to achieve<br>• More complicated to communicate to stakeholders<br>• May require base year recalculation for outsourcing or insourcing |

For more information on setting targets, see chapter 11 of the *GHG Protocol Corporate Standard.*

**Target completion date**
The target completion date determines whether the target is relatively short- or long-term. In general, companies should set long-term targets (e.g., a target period of ten years), since they facilitate long-term planning and large capital investments with significant GHG benefits. Companies may also set shorter-term targets to measure progress more frequently.

**Target level**
The target level represents the level of ambition of the reduction target. To inform the numerical value of the target, companies should examine potential GHG reduction opportunities (see table 9.7) and estimate their effects on total GHG emissions. In general, companies should set an ambitious target that reduces emissions significantly below the company's business-

as-usual scope 3 emissions trajectory. A "stretch goal" is expected to drive greater innovation within the company and the value chain and be seen as most credible by stakeholders.

**Use of offsets or credits**
A GHG target can be met entirely from internal reductions at sources included in the target boundary, or can be met through additionally using offsets that are generated from GHG reduction projects that reduce emissions (or enhance sinks) at sources external to the target boundary. Companies should strive to achieve reduction targets entirely from internal reductions from within the target boundary. Companies that are unable to meet GHG targets through internal reductions may use offsets generated from sources external to the target boundary.

Companies should specify whether offsets are used and, if so, how much of the target reduction was achieved using offsets. Companies should report

**Table [9.3]** Comparing absolute targets and intensity targets

| Target type | Examples | Advantages | Disadvantages |
|---|---|---|---|
| **Absolute target** | • Reduce total scope 3 emissions by 10 percent from 2010 levels by 2015<br>• Reduce scope 3 emissions from the use of sold products by 20 percent from 2010 levels by 2015 | • Designed to achieve a reduction in a specified quantify of GHGs emitted to the atmosphere<br>• Environmentally robust and more credible to stakeholders as it entails a commitment to reduce total GHGs by a specified amount | • Does not allow comparisons of GHG intensity/efficiency<br>• Reported reductions can result from declines in production/output rather than improvements in performance |
| **Intensity target** | • Reduce scope 3 emissions per unit of revenue by 25 percent from 2010 levels by 2015<br>• Improve the energy efficiency of sold products by 30 percent from 2010 levels by 2015 | • Reflects GHG performance improvements independent of business growth or decline<br>• May increase the comparability of GHG emissions among companies | • Less environmentally robust and less credible to stakeholders because absolute emissions may rise even if intensity decreases (e.g., because output increases more than GHG intensity decreases). If a monetary metric is used, such as dollar of revenue or sales, recalculation may be necessary for changes in product prices and inflation. |

*CHAPTER 09* Setting a GHG Reduction Target and Tracking Emissions Over Time

internal emissions in separate accounts from offsets used to meet the target, rather than providing a net figure. Any purchases or sales of offsets are required to be reported separately (see chapter 11).

Any offsets used should be based on credible accounting standards (for more information, see the *GHG Protocol for Project Accounting*). Companies should avoid double counting of offsets by multiple entities or in multiple GHG targets, for example through contracts between buyers and sellers that transfer ownership of offsets. For additional guidance on avoiding double counting of offsets, see chapter 11 of the *GHG Protocol Corporate Standard*.



**Box [9.1] Setting a reduction target for category 11 (Use of sold products)**

Companies that set a reduction target for category 11 should carefully choose the most appropriate metric to track performance and measure progress. Category 11 includes the total expected lifetime emissions from products sold in the reporting year. By doing so, the scope 3 inventory accounts for a company's total GHG impact associated with its activities that occur in the reporting year.

Tracking scope 3 emissions from category 11 can show GHG reductions from efficiency improvements, but not from durability improvements. Because the scope 3 inventory accounts for total lifetime emissions of sold products, increasing product durability has the effect of increasing reported scope 3 emissions from category 11. For example, a manufacturer of light bulbs may shift from selling incandescent bulbs to selling LED bulbs. LED bulbs are both more efficient and more durable than incandescent bulbs. Because the increase in durability is greater than the increase in efficiency, shifting to LED bulbs may have the effect of increasing reported scope 3 emissions.

In cases where product durability may change significantly over time, companies should consider using additional metrics to track and report emissions and performance, such as:

- Intensity metrics (e.g., average GHG intensity of sold products, average energy efficiency of sold products, average emissions per hour of use, average emissions per kilometer driven, etc.)
- Annual emissions from the use of sold products (i.e., emissions that occur in a single year from products sold in the reporting year)
- GHG emissions per functional unit (see *GHG Protocol Product Standard*)
- Average lifetime/durability of sold products
- Other metrics developed by the company or industry sector

Companies that use an additional metric to track performance are also required to report the total expected lifetime emissions from products sold in the reporting year in category 11. Companies should report the methodologies and assumptions used to calculate any additional metrics. To reduce the potential for emissions data to be misinterpreted, companies should also report additional information to provide context, such as the average lifetime/durability of sold products and a statement explaining why emissions from category 11 have increased or decreased over time.

## 9.3    Recalculating base year emissions

To consistently track scope 3 emissions over time, companies shall recalculate base year emissions when significant changes in company structure or inventory methodology occur. In such cases, recalculating base year emissions is necessary to maintain consistency and enable meaningful comparisons of the inventory over time.

Companies are required to recalculate base year emissions when the following changes occur and have a significant impact on the inventory:

- Structural changes in the reporting organization, such as mergers, acquisitions, divestments, outsourcing, and insourcing
- Changes in calculation methodologies, improvements in data accuracy, or discovery of significant errors
- Changes in the categories or activities included in the scope 3 inventory

In such cases, recalculating base year emissions is necessary to ensure the consistency and relevance of the reported GHG emissions data. Companies shall recalculate base year emissions for both GHG emissions increases and decreases. Significant changes result not only from single large changes, but also from several small changes that are cumulatively significant. As an alternative to recalculating base year emissions in the event of a major structural change, companies may reestablish the base year as a more recent year. Each type of change is elaborated further in the sections below.

### Establishing a base year recalculation policy

When setting a base year, companies shall develop a base year emissions recalculation policy and clearly articulate the basis and context for any recalculations. Whether base year emissions are recalculated depends on the significance of the changes. A significance threshold is a qualitative and/or quantitative criterion used to define any significant change to the data, inventory boundaries, methods, or any other relevant factors. For example, a significant change could be defined as one that alters base year emissions by at least ten percent. As part of the base year emissions recalculation policy, companies shall establish and disclose the significance threshold that triggers base year emissions recalculations. Companies shall apply the recalculation policy in a consistent manner.

### Recalculations for structural changes in ownership or control

Companies are required to retroactively recalculate base year emissions when significant structural changes occur in the reporting organization, such as mergers, acquisitions, or divestments. Structural changes trigger recalculation because they merely transfer emissions from one company to another without any change in emissions released to the atmosphere (e.g., an acquisition or divestment only transfers existing GHG emissions from one company's inventory to another).

For example, if a company divests a subsidiary in the third year of reporting, the company should recalculate its base year emissions by removing the scope 3 emissions of the subsidiary from the company's base year inventory. Doing so allows the company and its stakeholders to understand that the apparent decrease in emissions in the third year of reporting is a result of a structural change rather than a change in GHG management practices.

### Recalculations for outsourcing or insourcing

Scope 3 emissions include outsourced activities. If a company is reporting comprehensively on scope 1, scope 2, and scope 3, a change in ownership or control can have the effect of shifting emitting activities between the scopes.

If a company outsources an in-house activity to a third party, the activity shifts from scope 1 or scope 2 to scope 3. Conversely, a company may shift emissions from scope 3 to scope 1 or scope 2 by performing operations in-house that were previously performed by a third party.

Whether the outsourcing or insourcing of an activity triggers a base year emissions recalculation depends on whether:

- the company previously reported emissions from the activity;
- the company has a single base year or GHG target for all scopes or separate base years and GHG targets for each scope; and
- the outsourced or insourced activity contributes significantly to the company's emissions.

See table 9.4 for guidance on whether a recalculation of base year emissions is necessary.

*CHAPTER 09* *Setting a GHG Reduction Target and Tracking Emissions Over Time*

**Recalculations for changes in the scope 3 activities included in the scope 3 inventory over time**

Companies may add new activities or change the activities included in the scope 3 inventory over time. For example, a company may add a new scope 3 category to its inventory in the second year of reporting. In the third year of reporting, the company may add a new activity such as emissions from non-production-related procurement to category 1 (Purchased goods and services). Such changes may trigger base year emissions recalculations, depending on whether the company has established:

- A single base year and GHG target for total scope 3 emissions; or
- Separate base years and GHG targets for individual scope 3 categories.

See table 9.5 for guidance on whether a recalculation of base year emissions is necessary.

If the cumulative effect of adding or changing scope 3 categories or activities is significant, the company should include the new categories or activities in the base year inventory and backcast data for the base year based on available historical activity data (e.g., bill of materials data, spend data, product sales data, etc.).

**Table [9.4]** Criteria for determining whether to recalculate base year emissions due to changes in outsourcing or insourcing

| | The company previously reported emissions from the activity | The company did not previously report emissions from the activity |
|---|---|---|
| **The company has a single base year or GHG target for total scope 1 + 2 + 3 emissions** | No Recalculation | Recalculate (if the cumulative effect of outsourcing or insourcing is significant) |
| **The company has separate base years or GHG targets for individual scopes (1, 2, or 3) or individual scope 3 categories** | Recalculate (if the cumulative effect of outsourcing or insourcing is significant) | Recalculate (if the cumulative effect of outsourcing or insourcing is significant) |

**Table [9.5]** Criteria for determining whether to recalculate base year emissions for adding or changing the categories or activities included in the scope 3 inventory

| | Add entire categories | Add or change activities within categories |
|---|---|---|
| **The company has a single base year and GHG target for total scope 3 emissions** | Recalculate (if the cumulative effect of adding or changing the scope 3 categories or activities included in the inventory is significant) | Recalculate (if the cumulative effect of adding or changing the scope 3 categories or activities included in the inventory is significant) |
| **The company has separate base years and GHG targets for individual scope 3 categories** | No Recalculation | Recalculate (if the cumulative effect of adding or changing the scope 3 categories or activities included in the inventory is significant) |

***Recalculations for changes in calculation methodology or improvements in data accuracy over time***

A company might report the same sources of GHG emissions as in previous years, but measure or calculate them differently over time. For example, in its third year of reporting scope 3 emissions, a company may significantly improve its data quality by collecting more data from suppliers or increasing the accuracy and precision of emissions estimates. The company should ensure that changes in the inventory over time are a result of actual emissions increases or decreases, not changes in methodology, so that the company tracks "like with like" over time. Therefore, if changes in methodology or data sources result in significant differences in emissions estimates, companies are required to recalculate base year emissions applying the new data sources and/or methodology.

Sometimes the more accurate data input may not reasonably be applied to all past years or new data points may not be available for past years. The company may then have to backcast these data points, or the change in data source may simply be acknowledged without recalculation. This acknowledgment should be made in the report

**Box [9.2]** **Recalculations for category 11 (Use of sold products)**

Category 11 (Use of sold products) includes total expected lifetime emissions from the use of sold products, including emissions from future years expected to happen but that have not yet occurred. In certain cases, the assumptions underlying estimates of emissions from category 11 may change after products have been sold and emissions have been reported (e.g., due to changes in policy, technology, or consumer behavior that were unforeseen in the reporting year), making previously reported emissions estimates inaccurate. To address the inaccuracy and enable consistent tracking of emissions over time, companies should recalculate base year emissions for category 11 with updated product use assumptions when any significant changes in assumptions occur.

each year in order to enhance transparency and avoid misinterpretation of data by users of the report.

Any changes in emission factors or activity data that reflect real changes in emissions (i.e., changes in fuel type or technology) do not trigger a recalculation.

***No recalculation for organic growth or decline***

Base year emissions and any historic data are not recalculated for organic growth and decline. Organic growth/decline refers to increases or decreases in production output, changes in product mix, and closures and openings of operating units that are owned or controlled by the company. The rationale for this is that organic growth or decline results in a change of emissions to the atmosphere and therefore needs to be accounted for as an increase or decrease in the company's emissions profile over time.

## 9.4    Accounting for scope 3 emissions and reductions over time

There are two basic approaches to account for GHG reductions (see table 9.6). This standard uses the inventory method to account for changes in scope 3 emissions over time (see box 9.3). Reductions in corporate emissions are calculated by comparing changes in the company's actual emissions inventory over time relative to a base year. The inventory method allows companies to track the aggregate effect of their activities on total corporate GHG emissions over time.

Accounting for actual reductions in indirect emissions (i.e., scope 2 or scope 3 emissions) to the atmosphere is more complex than accounting for actual reductions in direct emissions (i.e., scope 1) to the atmosphere. Changes in a company's scope 2 or scope 3 inventory over time may not always correspond to actual changes in GHG emissions to the atmosphere, since there is not always a direct cause-and-effect relationship between the reporting company's activities and the resulting GHG emissions. For example, a reduction in business travel would reduce a company's scope 3 emissions from business travel (since the reduction is usually quantified based on an average emission factor of fuel use per passenger). However, how a reduction in business travel actually translates into a change in GHG

CHAPTER 09 *Setting a GHG Reduction Target and Tracking Emissions Over Time*

emissions to the atmosphere depends on several factors, including whether another person takes the "empty seat" or whether the unused seat contributes to reduced air traffic over the longer term. Generally, as long as the accounting of scope 3 emissions over time recognizes activities that in aggregate change global emissions, any such concerns should not inhibit companies from reporting and tracking their scope 3 emissions over time.

Companies may use the project method to undertake more detailed assessments of actual reductions from discrete scope 3 GHG mitigation projects (such as those listed in table 9.7), in addition to reporting comprehensive scope 3 GHG emissions using the inventory method. Any project-based reductions must be reported separately from the company's scope 1, scope 2, and scope 3 emissions. For more information on quantifying project-based GHG reductions, refer to the *GHG Protocol for Project Accounting* (available at www.ghgprotocol.org).

## 9.5   Accounting for avoided emissions

This standard is intended to assist companies in quantifying and reporting scope 3 reductions, where GHG reductions are determined by comparing changes in the company's scope 3 emissions from the fifteen scope 3 categories over time relative to a base year. In some cases, GHG reduction opportunities lie beyond a company's scope 1, scope 2, and scope 3 inventories. For example, some companies may track not only the emissions that arise from the use of their products (category 11), but also the avoided emissions in society that result from the use of their products and solutions compared to alternative products and solutions. Avoided emissions may also arise when accounting for emissions from recycling (category 5 or 13), or from activities in other scope 3 categories.

Accounting for avoided emissions that occur outside of a company's scope 1, scope 2, and scope 3 inventories requires a project accounting methodology. Any estimates of avoided emissions must be reported separately from a company's scope 1, scope 2, and scope 3 emissions, rather than included or deducted from the scope 3 inventory. Box 9.4 elaborates on accounting for avoided emissions from the use of sold products.

**Table [9.6]** Methods for accounting for GHG reductions

| Method | Description | Relevant GHG Protocol Publication |
|---|---|---|
| **Inventory method** | Accounts for GHG reductions by comparing changes in the company's actual emissions inventory over time relative to a base year | *GHG Protocol Corporate Standard*<br>*GHG Protocol Scope 3 Standard* |
| **Project method** | Accounts for GHG reductions by quantifying impacts from individual GHG mitigation projects relative to a baseline (i.e., a hypothetical scenario of what emissions would have been in the absence of the project) | *GHG Protocol for Project Accounting* |

**Box [9.3]** Quantifying changes in scope 3 emissions over time

*Change in emissions from a scope 3 category  =*

*Current year emissions from the scope 3 category  -  Base year emissions from the scope 3 category*

## 9.6    Addressing double counting of scope 3 reductions among multiple entities in a value chain

Scope 3 emissions are by definition the direct emissions of another entity. Multiple entities in a value chain influence both emissions and reductions, including raw material suppliers, manufacturers, distributors, retailers, consumers, and others. As a result, changes in emissions are not easily attributable to any single entity.

Double counting or double claiming occurs when two or more companies claim ownership for a single GHG reduction within the same scope. The *GHG Protocol Corporate Standard* defines scope 1 and scope 2 to ensure that two or more companies do not account for the same emissions within the same scope. (For more information, see chapter 4 of the *GHG Protocol Corporate Standard*.) By properly accounting for emissions as scope 1, scope 2, and scope 3, companies avoid double counting within scope 1 and scope 2.

Double counting within scope 3 occurs when two entities in the same value chain account for the scope 3 emissions from a single emissions source – for example, if a manufacturer and a retailer both account for the scope 3 emissions resulting from the third-party transportation of goods between them (see figure 9.1). This type of double counting is an inherent part of scope 3 accounting. Each entity in the value chain has some degree of influence over emissions and reductions. Scope 3 accounting facilitates the simultaneous action of multiple entities to reduce emissions throughout society. Because of this type of double counting, scope 3 emissions should not be aggregated across companies to determine total emissions in a given region. Note that while a single emission may be accounted for by more than one company as scope 3, in certain cases the emission is accounted for by each company in a different scope 3 category.

Companies may find double counting within scope 3 to be acceptable for purposes of reporting scope 3 emissions to stakeholders, driving reductions in value chain emissions, and tracking progress toward a scope 3 reduction target. To ensure transparency and avoid misinterpretation of data, companies should acknowledge any potential double counting of reductions or credits when making claims about scope 3 reductions. For example, a company may claim that it is working jointly with partners to reduce emissions, rather than taking exclusive credit for scope 3 reductions.

If GHG reductions take on a monetary value or receive credit in a GHG reduction program, companies should avoid double counting of credits from such reductions. To avoid double crediting, companies should specify exclusive ownership of reductions through contractual agreements.

## 9.7    Examples of actions to reduce scope 3 emissions

Companies may implement a variety of actions to reduce scope 3 emissions. Table 9.7 provides an illustrative list of actions that companies can take to reduce emissions in the value chain.

**Figure [9.1]** Type of double counting within scope 3



*CHAPTER 09* *Setting a GHG Reduction Target and Tracking Emissions Over Time*

**Box [9.4]** **Accounting for avoided emissions from the use of sold products**

To reduce scope 3 emissions from the use of sold products (category 11), companies may implement various GHG reduction strategies, such as redesigning products to be more efficient in the use-phase or replacing existing product lines with new zero-emitting product lines. These reduction activities can be tracked by comparing a company's scope 3 emissions inventory over time.

A company's products can also have broader impacts on GHG emissions in society when they provide the same or similar function as existing products in the marketplace but with significantly less GHG emissions. For example, a manufacturer of renewable energy technologies may be interested not only in tracking the emissions and reductions that occur during the use of its products, but also in assessing the reduction in society's GHG emissions as a result of using renewable energy technologies compared to generating electricity by combusting fossil fuels.

Examples of such products and solutions may include:

• Wind turbines or solar panels, compared to fossil fuel power plants
• LED bulbs, compared to incandescent bulbs
• Triple-pane windows, compared to double- or single-pane windows
• Insulation in a building, compared to no insulation
• Online meeting software, compared to business travel

Developing new products and solutions that achieve GHG reductions in society compared to other products and solutions is an important component of corporate sustainability strategies and offers significant opportunities for achieving large scale GHG reductions. These reductions are accounted for in scope 3 emissions to the extent that they decrease a company's emissions from the use of sold products over time, for example by redesigning products or replacing existing product lines with new product lines.

Avoided emissions from the use of sold products compared to a baseline are not included in a company's scope 3 emissions. Accounting for such reductions requires a project-based accounting methodology (see section 9.4) and poses several accounting challenges to ensuring that reduction claims are accurate and credible. Challenges include how to:

• Determine an appropriate baseline scenario (e.g., which technologies to compare)
• Determine the system boundaries (e.g., which emissions to include)
• Determine the time period (e.g., how many years to include)
• Accurately quantify avoided emissions
• Avoid "cherry picking" (e.g., account for both emissions increases and decreases across the company's entire product portfolio)
• Allocate reductions among multiple entities in a value chain (e.g., avoid double counting of reductions between producers of intermediate goods, producers of final goods, retailers, etc.)

If a company chooses to account for avoided emissions from the use of sold products, avoided emissions are not included in or deducted from the scope 3 inventory, but instead reported separately from scope 1, scope 2, and scope 3 emissions. Companies that report avoided emissions should also report the methodology and data sources used to calculate avoided emissions, the system boundaries, the time period considered, the baseline (and baseline assumptions) used to make the comparison, as well as a statement on completeness (avoiding "cherry picking") and ownership (avoiding double counting of reductions). For more information on quantifying project-based GHG reductions, refer to the *GHG Protocol for Project Accounting*, available at www.ghgprotocol.org.

**Table [9.7]** Illustrative examples of actions to reduce scope 3 emissions

*Upstream scope 3 emissions*

| Category | Examples of actions to reduce scope 3 emissions |
|---|---|
| 1. Purchased goods and services | • Replace high-GHG-emitting raw materials with low-GHG-emitting raw materials<br>• Implement low-GHG-procurement/purchasing policies<br>• Encourage tier 1 suppliers to engage their tier 1 suppliers (i.e., the reporting company's tier 2 suppliers) and disclose these scope 3 emissions to the customer in order to propagate GHG reporting throughout the supply chain |
| 2. Capital goods | • Replace high-GHG-emitting capital goods with low-GHG-emitting capital goods |
| 3. Fuel- and energy-related activities (not included in scope 1 or scope 2) | • Reduce energy consumption<br>• Change energy source (e.g., shift toward lower-emitting fuel/energy sources)<br>• Generate energy on site using renewable sources |
| 4. Upstream transportation and distribution | • Reduce distance between supplier and customer<br>• Source materials locally if it leads to net GHG reductions<br>• Optimize efficiency of transportation and distribution<br>• Replace higher-emitting transportation modes (e.g. air transport) with lower-emitting transportation modes (e.g. marine transport)<br>• Shift toward lower-emitting fuel sources |
| 5. Waste generated in operations | • Reduce quantity of waste generated in operations<br>• Implement recycling measures that lead to net GHG reductions<br>• Implement lower-emitting waste treatment methods |
| 6. Business travel | • Reduce the amount of business travel (e.g., encourage video conferencing and web-based meetings as an alternative to in-person meetings)<br>• Encourage more efficient travel<br>• Encourage lower-emitting modes of travel (e.g., rail instead of plane) |
| 7. Employee commuting | • Reduce commuting distance (e.g., locate offices/facilities near urban centers and public transit facilities)<br>• Create disincentives for commuting by car (e.g., parking policies)<br>• Provide incentives for use of public transit, bicycling, carpooling, etc.<br>• Implement teleworking/telecommuting programs<br>• Reduce number of days worked per week (e.g., 4 days x 10 hour schedule instead of 5 days x 8 hour schedule) |
| 8. Upstream leased assets | • Increase energy efficiency of operations<br>• Shift toward lower-emitting fuel sources |

*CHAPTER 09 Setting a GHG Reduction Target and Tracking Emissions Over Time*

Table [9.7] Illustrative examples of actions to reduce scope 3 emissions

*Downstream scope 3 emissions*

| Category | Examples of actions to reduce scope 3 emissions |
|---|---|
| 9. Transportation and distribution of sold products | • Reduce distance between supplier and customer<br>• Optimize efficiency of transportation and distribution<br>• Replace higher emitting transportation modes (e.g. air transport) with lower emitting transportation modes (e.g. marine transport)<br>• Shift toward lower-emitting fuel sources |
| 10. Processing of sold products | • Improve efficiency of processing<br>• Redesign products to reduce processing required<br>• Use lower-GHG energy sources |
| 11. Use of sold products | • Develop new low- or zero-emitting products<br>• Increase the energy efficiency of energy-consuming goods or eliminate the need for energy use<br>• Shift away from products that contain or emit GHGs<br>• Reduce the quantity of GHGs contained/released by products<br>• Decrease the use-phase GHG intensity of the reporting company's entire product portfolio<br>• Change the user instructions to promote efficient use of products |
| 12. End-of-life treatment of sold products | • Make products recyclable if it leads to net GHG reductions<br>• Implement product packaging measures that lead to net GHG reductions (e.g., decrease amount of packaging in sold products, develop new GHG-saving packaging materials, etc.)<br>• Implement recycling measures that lead to net GHG reductions |
| 13. Downstream leased assets | • Increase energy efficiency of operations<br>• Shift toward lower-emitting fuel sources |
| 14. Franchises | • Increase energy efficiency of operations (e.g., set efficiency standards)<br>• Shift toward lower-emitting fuel sources |
| 15. Investments | • Invest in lower-emitting investments, technologies, and projects |



**10** *Assurance*

App. 194

[113]

guidance

Assurance is the level of confidence that the inventory is complete, accurate, consistent, transparent, relevant, and without material misstatements.[1] While assurance is not a requirement of this standard, obtaining assurance over the scope 3 inventory is valuable for reporting companies and other stakeholders when making decisions using the inventory results.

## 10.1 Benefits of assurance

Assuring scope 3 inventory results can provide a variety of benefits, including:

- Increased senior management confidence in the reported information on which to base reduction targets and related decisions
- Enhanced internal accounting and reporting practices (e.g. data collection, calculation, and internal reporting systems), and facilitation of learning and knowledge transfer
- Improved efficiency in subsequent inventory update processes
- Greater stakeholder confidence in the reported information

Carefully and comprehensively documenting the inventory process in a data management plan is a vital step in preparing for assurance (see Appendix C).

## 10.2 Relationships of parties in the assurance process

Three key parties are involved in the assurance process:

1) The reporting company seeking assurance
2) Stakeholders using the inventory report
3) The assurer(s)

When the reporting company also performs the assurance, this is known as first party assurance. When a party other than the reporting company performs the assurance, this is known as third party assurance. These types are further described in table 10.1.

Companies should choose assurers that are independent of, and have no conflicts of interest with, the scope 3 inventory development and reporting process.

**Table [10.1]** Types of assurance

| Type of assurance | Description | Independence mechanism |
|---|---|---|
| First party assurance | Person(s) from within the reporting company but independent of the GHG inventory process conducts internal assurance | Different lines of reporting |
| Third party  assurance | Person(s) from an organization independent of the scope 3 inventory process conduct third party assurance | Different business entity from the reporting company |

Both first and third party assurers should follow similar procedures and processes. For external stakeholders, third party assurance is likely to increase the credibility of the GHG inventory. However, first party assurance can also provide confidence in the reliability of the inventory report, and it can be a worthwhile learning experience for a company prior to commissioning third party assurance.

Inherently, assurance provided by a third party offers a higher degree of objectivity and independence. Typical threats to independence may include financial and other conflicts of interest between the reporting company and the assurer. These threats should be assessed throughout the assurance process. Companies receiving first party assurance should report how potential conflicts of interest were avoided during the assurance process.

### 10.3    Competencies of assurers

Selecting a competent assurer is important for the assurance findings to have the credibility needed to support the reporting company's business goals and stakeholder needs. A competent scope 3 GHG inventory assurer has the following characteristics:

• Assurance expertise and experience using assurance frameworks
• Knowledge and experience in corporate GHG accounting and/or life cycle assessment, including familiarity with key steps in the scope 3 inventory process
• Knowledge of the company's activities and industry sector

• Ability to assess emission sources and the magnitude of potential errors, omissions, and misrepresentations
• Credibility, independence, and professional skepticism to challenge data and information

### 10.4    Assurance process

Assurance engagements,[2] whether performed by a first or third party, have common elements, including:

1. Planning and scoping (e.g., determining risks and material misstatements)
2. Identifying emission sources included in the scope 3 inventory
3. Performing the assurance process (e.g. gathering evidence, performing analytics, etc.)
4. Evaluating results
5. Determining and reporting conclusions

The nature and extent of assurance procedures can vary depending on whether the assurance engagement is designed to obtain reasonable or limited assurance.

### Levels of assurance:
### Limited and reasonable assurance

The level of assurance refers to the degree of confidence that stakeholders can have over the information in the inventory report. There are two levels of assurance: limited and reasonable. The level of assurance requested by the reporting company will determine the rigor of the assurance process and the amount of evidence required.

CHAPTER 10 *Assurance*

**Table [10.2]** Limited and reasonable assurance opinions

| Assurance opinion | Nature of opinion | Example wording of opinion |
|---|---|---|
| **Limited assurance** | Negative opinion | "Based on our review, we are not aware of any material modifications that should be made to the company's assertion that their scope 3 inventory is in conformance with the requirements of the *GHG Protocol Scope 3 Standard*." |
| **Reasonable assurance** | Positive opinion | "In our opinion the reporting company's assertion of their scope 3 emissions by category, as reported in the inventory report, is fairly stated, in all material respects, and is in conformance with the *GHG Protocol Scope 3 Standard*." |

The highest level of assurance that can be provided is a reasonable level of assurance. Absolute assurance is never provided since 100 percent of the inputs to the GHG inventory cannot be tested due to practical limitations.

The thoroughness with which the assurance evidence is obtained is less rigorous in limited assurance than with reasonable assurance. Table 10.2 provides examples of limited and reasonable assurance opinions for an assertion of scope 3 inventory emissions.

*Timing of the assurance process*

The assurance process is conducted before the public release of the inventory report by the reporting company. This allows for material misstatements to be corrected prior to the release of the opinion (or revised opinion) and assertion. The work should be initiated far enough in advance of the inventory report release so that the assurance work is useful in improving the inventory when applicable. The period for assurance is dependent on the nature and complexity of the subject matter and the level of assurance.

## 10.5    Key concepts in assurance

In the assurance field many different terms are used to describe various assurance processes (e.g. verification, validation, quality assurance, quality control, audit, etc.). Though not comprehensive, table 10.3 includes many key terms and concepts used in the assurance process that reporting companies may encounter.

*Materiality*

A material misstatement occurs when individual or aggregate errors, omissions, and misrepresentations have a significant impact on the GHG inventory results and could influence a user's decisions. Materiality has both quantitative and qualitative aspects. The assurer and reporting company should determine an appropriate threshold or benchmark of materiality during the assurance process.

Quantitative materiality is typically calculated as a percentage of the inventory (in total or on an individual line item basis). In determining the quantitative materiality benchmark, assurers should contemplate the risk of a potential misstatement and the history of previous misstatements. A materiality threshold (e.g. a point at which a discrepancy becomes material) can be pre-defined by the assurer. Qualitative misstatements tend to be those that have immaterial quantitative effects but could materially affect the reporting company's emissions in the future as well as those that mislead the intended user.

**Table [10.3]** Key assurance concepts

| Assurance concept | Description |
|---|---|
| **Assertion** | A statement by the reporting company on the company's scope 3 emissions by category. The assertion is presented to the assurer. <br><br> Example: The reported scope 3 emissions by category are calculated in conformance with the *GHG Protocol Corporate Value Chain (Scope 3) Accounting and Reporting Standard* as supplemented by our company-specific policies and methodologies described in the inventory report. |
| **Subject matter** | Scope 3 emissions by category and supporting information included in the inventory report. The type of assurance performed will determine which subject matter(s) should be assessed. |
| **Criteria** | The benchmarks used to evaluate or measure the subject matter. Criteria include the standard's requirements, methodological choices, data quality and uncertainty, and others determined to be suitable by the reporting company and assurer for public reporting. |
| **Evidence** | Data sources and documentation used to calculate emissions and support the subject matter of the reporting company's assertion. Evidence should be sufficient in quantity and appropriate in quality. |
| **Assurance standards** | Standards, used by assurers, which set requirements on how the assurance process is performed. (For example, ISO 14064-3: Specification with Guidance for the Validation and Verification of Greenhouse Gas Assertions). |
| **Assurance opinion** | The results of the assurer's assessment of the reporting company's assertion. In the event that the assurer determines that a conclusion cannot be expressed, the statement should cite the reason. |

Uncertainty is a separate concept from materiality because it is not a known error, but rather an indicator of how well the data represents the processes in the inventory.

## 10.6   Preparing for assurance

Preparing for assurance is a matter of ensuring that the evidence that the assurer requires is available or easily accessed. The type of evidence and documentation requested by the assurer will depend on the subject matter, the industry, and the type of assurance being sought. Maintaining documentation of the inventory process through the use of a data management plan (see Appendix C) is helpful for ensuring the assurance evidence is available.

Prior to starting the assurance process, the reporting company should ensure that the following are prepared and available to the assurer:

- The company's written assertion (e.g., inventory results)
- The complete data management plan (see Appendix C)
- Access to sufficient and appropriate evidence (e.g. invoices, bills of sale, etc.)

---

[116]   *Corporate Value Chain (Scope 3) Accounting and Reporting Standard*

*CHAPTER 10* Assurance



## 10.8   Assurance statement

The assurance statement conveys the assurer's conclusion about the inventory results. It may take different forms depending on whether the assurance was performed by a first or third party. The assurance statement should include the following:

***Introduction***
- A description of the reporting company
- A reference to the reporting company's assertion included in the inventory report

***Description of Assurance Process***
- The relevant competencies of the assurers
- A summary of the assurance process and work performed
- Description of the reporting company's and assurer's responsibilities
- List of the assurance criteria
- Whether the assurance was performed by a first or third party
- The assurance standard used to perform assurance
- How any potential conflicts of interest were avoided for first party assurance

***Conclusion Paragraph***
- Level of assurance achieved (limited or reasonable)
- The materiality threshold or benchmark, if set
- Any additional details regarding the assurer's conclusion, including details regarding any exceptions noted or issues encountered in performing the assurance

When there are material departures in the assertion from the assurance criteria, the reporting company should report the effect of the departures. Companies may report any recommendations from the assurer on improvements in future updates of the inventory.

## 10.7   Assurance challenges

There are several challenges in assuring scope 3 inventories. Emissions calculations rely on a mixture of data sources and assumptions. Inventory uncertainty, including scenario uncertainty related to the use and end-of-life treatment of sold products, may affect the quality of the inventory. It is important to consider the state of data collection systems and the integrity of the data and methodological choices when performing assurance.

One of the primary challenges is that the emission sources are removed from the reporting company's control, reducing the assurer's ability to obtain sufficient appropriate evidence.

Two approaches to addressing this diminishing control are to:

1. Change the level of assurance, or

2. Rely on the assurance statement of another assurer for emission and removal sources outside of the company's control (i.e., assurance over a supplier's emission sources by a different assurance firm)

## Endnotes

1  Adapted from ISO 14064-3, "Specification with guidance for the validation and verification of greenhouse gas assertions" (2005).

2   The process is referred to as verification in the *GHG Protocol Product Standard* to distinguish it from the critical review process that also provides assurance over product GHG inventories. The term verification is also used in chapter 10 of the *GHG Protocol Corporate Standard*.

# 11 Reporting



 *credible GHG emissions report presents information based on the principles of relevance, accuracy, completeness, consistency, and transparency. It should be based on the best data available and be transparent about its limitations.*

## Requirements in this chapter

> **Companies shall publicly report the information listed in section 11.1.**

### 11.1   Required information

Companies shall publicly report the following information:

- A scope 1 and scope 2 emissions report in conformance with the *GHG Protocol Corporate Standard*
- Total scope 3 emissions reported separately by scope 3 category
- For each scope 3 category, total emissions of GHGs ($CO_2$, $CH_4$, $N_2O$, HFCs, PFCs, and $SF_6$) reported in metric tons of $CO_2$ equivalent, excluding biogenic $CO_2$ emissions and independent of any GHG trades, such as purchases, sales, or transfers of offsets or allowances
- A list of scope 3 categories and activities included in the inventory
- A list of scope 3 categories or activities excluded from the inventory with justification of their exclusion

- Once a base year has been established: the year chosen as the scope 3 base year; the rationale for choosing the base year; the base year emissions recalculation policy; scope 3 emissions by category in the base year, consistent with the base year emissions recalculation policy; and appropriate context for any significant emissions changes that triggered base year emissions recalculations
- For each scope 3 category, any biogenic $CO_2$ emissions reported separately
- For each scope 3 category, a description of the types and sources of data, including activity data, emission factors and GWP values, used to calculate emissions, and a description of the data quality of reported emissions data
- For each scope 3 category, a description of the methodologies, allocation methods, and assumptions used to calculate scope 3 emissions
- For each scope 3 category, the percentage of emissions calculated using data obtained from suppliers or other value chain partners

## 11.2 Optional information

A public GHG emissions report should include, when applicable, the following additional information:

- Emissions data further subdivided where this adds relevance and transparency (e.g., by business unit, facility, country, source type, activity type, etc.)
- Emissions data further disaggregated within scope 3 categories where this adds relevance and transparency (e.g., reporting by different types of purchased materials within category 1, or different types of sold products within category 11)
- Emissions from scope 3 activities not included in the list of scope 3 categories (e.g., transportation of attendees to conferences/events), reported separately (e.g., in an "other" scope 3 category)
- Emissions of GHGs reported in metric tons of each individual gas
- Emissions of any GHGs other than $CO_2$, $CH_4$, $N_2O$, HFCs, PFCs, and $SF_6$ whose 100-year GWP values have been identified by the IPCC to the extent they are emitted in the company's value chain (e.g., CFCs, HCFCs, $NF_3$, $NO_x$, etc.) and a list of any additional GHGs included in the inventory
- Historic scope 3 emissions that have previously occurred, reported separately from future scope 3 emissions expected to occur as a result of the reporting company's activities in the reporting year (e.g., from Waste generated in operations, Use of sold products, End-of-life treatment of sold products)
- Qualitative information about emission sources not quantified
- Information on any GHG sequestration or removals, reported separately from scope 1, scope 2 and scope 3 emissions
- Information on project-based GHG reductions calculated using the project method (e.g., using the *GHG Protocol for Project Accounting*), reported separately from scope 1, scope 2, and scope 3 emissions
- Information on avoided emissions (e.g., from the use of sold products), reported separately from scope 1, scope 2, and scope 3 emissions
- Quantitative assessments of data quality
- Information on inventory uncertainty (e.g., information on the causes and magnitude of uncertainties in emission estimates) and an outline of policies in place to improve inventory quality

- The type of assurance performed (first or third party), the relevant competencies of the assurance provider(s), and the opinion issued by the assurance provider
- Relevant performance indicators and intensity ratios
- Information on the company's GHG management and reduction activities, including scope 3 reduction targets, supplier engagement strategies, product GHG reduction initiatives, etc.
- Information on supplier/partner engagement and performance
- Information on product performance
- A description of performance measured against internal and external benchmarks
- Information on purchases of GHG reduction instruments, such as emissions allowances and offsets, from outside the inventory boundary
- Information on reductions at sources inside the inventory boundary that have been sold/transferred as offsets to a third party
- Information on any contractual provisions addressing GHG-related risks or obligations
- Information on the causes of emissions changes that did not trigger a scope 3 base year emissions recalculation
- GHG emissions data for all years between the scope 3 base year and the reporting year (including details of and reasons for recalculations, if appropriate)
- Additional explanations to provide context to the data

## 11.3 Reporting guidance

By following the *GHG Protocol Scope 3 Standard* reporting requirements, companies adopt a comprehensive standard with the necessary detail and transparency for credible public reporting. The appropriate level of reporting of optional information categories can be determined by the objectives and intended audience for the report. For national or voluntary GHG programs, or for internal management purposes, reporting requirements may vary.

For public reporting, it is important to differentiate between a summary of a public report that is, for example, published on the internet or in sustainability/

CHAPTER 11 *Reporting*

corporate social responsibility reporting and a full public report that contains all the necessary data as specified by this standard. Not every circulated report must contain all information as specified by this standard, but a link or reference needs to be made to a publicly available full report where all information is available to be in conformance with the *Scope 3 Standard*.

Companies should strive to create a report that is as relevant, transparent, accurate, consistent and complete as possible. Including a discussion of the reporting company's strategy and goals for GHG accounting, any particular challenges or tradeoffs encountered, the context of decisions on boundaries and other accounting parameters, and an analysis of emissions trends will provide a more complete picture of the company's inventory efforts.

Guidance is provided below for implementing selected reporting requirements and optional information listed in sections 11.1 and 11.2. See the relevant chapters of this standard for guidance on implementing reporting requirements not listed below. A sample GHG reporting form is provided at www.ghgprotocol.org.

*Required reporting:*
*For each scope 3 category, total GHG emissions reported in metric tons of $CO_2$ equivalent, excluding biogenic $CO_2$ emissions*
Companies are required to include emissions of each of the 6 required greenhouse gases (i.e., $CO_2$, $CH_4$, $N_2O$, HFCs, PFCs, and $SF_6$) in the reported scope 3 emissions data, but are not required to separately report scope 3 emissions by individual gas. Companies may report aggregated emissions in units of $CO_2e$ only.

*Required reporting:*
*For each scope 3 category, a description of the methodologies, allocation methods, and assumptions used to calculate scope 3 emissions*
Companies should report assumptions underlying reported emissions for each of the 15 scope 3 categories. For example, for category 11 (Use of sold products), companies should report information on average use profiles, assumed product lifetimes and other underlying assumptions. For category 12 (End-of-life treatment

of sold products), companies should report underlying assumptions related to product lifetimes and waste treatment methods. Companies should also specify the time boundary of each scope 3 category.

*Optional reporting:*
*Information on supplier/partner engagement and performance*
Scope 3 accounting is focused on tracking the emissions associated with specific activities in the value chain, such as the production of purchased products, transportation of purchased products, and use of sold products. Because scope 3 emissions include the scope 1 and scope 2 emissions of a company's partners in the value chain (including suppliers, customers, service providers, etc.), reporting on a company's efforts to engage their partners in the value chain provides additional transparency on a company's scope 3 management and reduction activities.

A public GHG emissions report should include, when applicable, the following additional information:

- Supplier/partner engagement metrics, such as the number and percentage of suppliers and other partners that have:
  - Received a request from the reporting company to provide primary GHG emissions data
  - Provided primary GHG emissions data to the reporting company
  - Publicly reported entity-wide GHG emissions
  - Established a publicly-available entity-wide GHG reduction target

- Supplier/partner performance metrics, including the GHG emissions performance of suppliers and other partners over time
  - For example, the sum of the reporting company's tier 1 suppliers' scope 1 and scope 2 emissions, allocated to the reporting company; the methodology used to quantify and allocate supplier emissions data; and the percentage of tier 1 suppliers accounted for (as a percentage of the reporting company's total spend)

- Other relevant information

*Optional reporting:*
*Information on product performance*

To provide appropriate context related to category 11 (Use of sold products), a public GHG emissions report should include, when applicable, the following additional information:

- Product performance indicators and intensity metrics (e.g., average GHG intensity of sold products, average energy efficiency of sold products, average emissions per hour of use, average fuel efficiency of sold vehicles, average emissions per kilometer driven, GHG intensity of sold fuels, average emissions per functional unit, etc.)
- Annual emissions from the use of sold products (i.e., emissions that occur in a single year from products sold in the reporting year)
- Average lifetime/durability of sold products
- The methodologies and assumptions used to calculate product performance indicators and intensity metrics
- The percentage of sold products that are compliant with standards, regulations, and certifications, where applicable
- A statement explaining why emissions from category 11 (Use of sold products) have increased or decreased over time
- Any sold products not included in the inventory, with justification for their exclusion
- Other relevant information

*Optional reporting:*
*Historic scope 3 emissions that have previously occurred, reported separately from future scope 3 emissions expected to occur as a result of the reporting company's activities in the reporting year*

Emissions reported for category 5 (Waste generated in operations), category 11 (Use of sold products), and category 12 (End-of-life treatment of sold products) should not be interpreted to mean that emissions have already occurred, but rather that the reported emissions are expected to occur as a result of activities that occurred in the reporting year. Companies may separately report historic emissions (that have already occurred) from future emissions (that have not yet occurred) in order to avoid misinterpretation by stakeholders.

*Optional reporting:*
*Information on uncertainty*

Companies should describe the level of uncertainty of reported data, qualitatively or quantitatively, to ensure transparency and avoid misinterpretation of data. In cases where data uncertainty is high, companies should also describe efforts to address uncertainty. See Appendix B for more information on uncertainty.





## *Appendices*

# Appendix A. Accounting for Emissions from Leased Assets

This appendix provides additional guidance on accounting for emissions from leased assets.

## Introduction[1]

Many companies either lease assets (e.g., buildings, vehicles) to other entities or lease assets from other entities. This appendix explains whether to account for emissions from leased assets as scope 1 emissions, scope 2 emissions, scope 3 emissions in category 8 (Upstream leased assets), or scope 3 emissions in category 13 (Downstream leased assets).

How emissions from leased assets are accounted for in a company's GHG inventory depends on the company's selected organizational boundary approach (i.e., equity share, financial control, or operational control), and the type of lease.

## Differentiating types of leased assets

The first step in determining how to categorize emissions from leased assets is to understand the two different types of leases: finance or capital leases, and operating leases. One way to determine the type of lease is to check the company's audited financial statements.

- **Finance or capital lease:** This type of lease enables the lessee to operate an asset and also gives the lessee all the risks and rewards of owning the asset. Assets leased under a capital or finance lease are considered wholly owned assets in financial accounting and are recorded as such on the balance sheet.
- **Operating lease:** This type of lease enables the lessee to operate an asset, like a building or vehicle, but does not give the lessee any of the risks or rewards of owning the asset. Any lease that is not a finance or capital lease is an operating lease.[2]

The next step is to determine whether the emissions associated with the leased assets are categorized as scope 1, scope 2, or scope 3 by the reporting company. Proper categorization of emissions from leased assets by lessors and lessees ensures that emissions in scopes 1 and 2 are not double-counted. For example, if a lessee categorizes emissions from the use of purchased electricity as scope 2, the lessor categorizes the same emissions as scope 3, and vice versa.

**Table [A.1]** Leasing agreements and boundaries (lessee's perspective)

| | Type of leasing arrangement | |
|---|---|---|
| | **Finance/capital lease** | **Operating lease** |
| **Equity share or financial control approach used** | Lessee has ownership and financial control, therefore emissions associated with fuel combustion are scope 1 and use of purchased electricity are scope 2. | Lessee does not have ownership or financial control, therefore emissions associated with fuel combustion and use of purchased electricity are scope 3 (Upstream leased assets). |
| **Operational control approach used** | Lessee has operational control, therefore emissions associated with fuel combustion are scope 1 and use of purchased electricity are scope 2. | Lessee does have operational control, therefore emissions associated with fuel combustion at sources in the leased space are scope 1 and use of purchased electricity are scope 2.[3] |

*Appendix A. Accounting for Emissions from Leased Assets*

**Table [A.2]** Leasing agreements and boundaries (lessor's perspective)

| | Type of leasing arrangement | |
|---|---|---|
| | *Finance/capital lease* | *Operating lease* |
| **Equity share or financial control approach used** | Lessor does not have ownership or financial control, therefore emissions associated with fuel combustion and use of purchased electricity are scope 3 (Downstream leased assets). | Lessor has ownership and financial control, therefore emissions associated with fuel combustion are scope 1 and use of purchased electricity are scope 2. |
| **Operational control approach used** | Lessor does not have operational control, therefore emissions associated with fuel combustion and use of purchased electricity are scope 3 (Downstream leased assets). | Lessor does not have operational control, therefore emissions associated with fuel combustion and use of purchased electricity are scope 3 (Downstream leased assets).[4] |

### Lessee's perspective: Categorizing emissions from leased assets

Many companies lease assets from other companies (e.g., companies that lease office or retail space from real estate companies). Whether emissions from these assets are categorized by the lessee as scope 1, scope 2, or scope 3 depends on the organizational boundary approach and the type of leasing arrangement. See table A.1.

### Lessor's perspective: Categorizing emissions from leased assets

Some companies act as lessors and lease assets to other companies (e.g., real estate companies that lease office or retail space or vehicle companies that lease vehicle fleets). Whether emissions from these assets are categorized by the lessor as scope 1, scope 2, or scope 3 depends on the organizational boundary approach and the type of leasing arrangement. See table A.2.

### Endnotes

1   This text is adapted from GHG Protocol, "Categorizing GHG Emissions from Leased Assets," GHG Protocol Corporate Accounting and Reporting Standard (Revised Edition), Appendix F, June 2006, Version 1.0, provided at www.ghgprotocol.org.

2   Financial Accounting Standards Board, "Accounting for Leases," Statement of Financial Accounting Standards, no. 13 (1976).

3   Some companies may be able to demonstrate that they do not have operational control over a leased asset held under an operating lease. In this case, the company may report emissions from the leased asset as scope 3 as long as the decision is disclosed and justified in the public report.

4   Some companies may be able to demonstrate that they do have operational control over an asset leased to another company under an operating lease, especially when operational control is not perceived by the lessee. In this case, the lessor may report emissions from fuel combustion as scope 1 and emissions from the use of purchased electricity as scope 2 as long as the decision is disclosed and justified in the public report.

# Appendix B.  Uncertainty in Scope 3 Emissions

**T**his appendix provides an overview of concepts and procedures for evaluating sources of uncertainty in a scope 3 inventory.

## Introduction

Understanding uncertainty can be crucial for properly interpreting scope 3 inventory results. The term uncertainty assessment refers to a systematic procedure to quantify and/or qualify the sources of uncertainty in a scope 3 inventory. Identifying and documenting sources of uncertainty can assist companies in understanding the steps required to help improve the inventory quality and increase the level of confidence users have in the inventory results. Because the audience of a scope 3 inventory report is diverse, companies should make a thorough yet practical effort to communicate key sources of uncertainty in the inventory results.

## Guide to the uncertainty assessment process

Uncertainty assessment can be used within the GHG inventory process as a tool for guiding data quality improvements, as well as a tool for reporting uncertainty results. Companies should identify and track key uncertainty sources throughout the inventory process and iteratively check whether the confidence level of the results is adequate for the company's business goals. Identifying, assessing, and managing uncertainty is most effective when done during the inventory process.

Companies may choose a qualitative and/or quantitative approach to uncertainty assessment. Quantitative uncertainty assessment can provide more robust results than a qualitative assessment and better assist companies in prioritizing data improvement efforts on the sources that contribute most to uncertainty. Including quantitative uncertainty results in the inventory report also adds clarity and transparency to users of the inventory report. Companies should present both qualitative and quantitative (if completed) uncertainty information in the inventory report. Companies should also describe their efforts to reduce uncertainty in future revisions of the inventory.

## Overview of uncertainty types

Uncertainty is divided into three categories: parameter uncertainty, scenario uncertainty and model uncertainty. The categories are not mutually exclusive, but they can be evaluated and reported in different ways. Table B.1 illustrates these types of uncertainties and corresponding sources.

## Parameter uncertainty

Parameter uncertainty is uncertainty regarding whether a value used in the inventory accurately represents the activity in the company's value chain. If parameter

**Table [B.1]** Types of uncertainties and corresponding sources

| Types of Uncertainty | Sources |
|---|---|
| Parameter Uncertainty | • Direct emissions data |
| | • Activity data |
| | • Emission factor data |
| | • Global warming potential (GWP) values |
| Scenario Uncertainty | • Methodological choices |
| Model Uncertainty | • Model limitations |

*Appendix B.  Uncertainty in Scope 3 Emissions*

uncertainty can be determined, it can typically be represented as a probability distribution of possible values that include the chosen value used in the inventory results. In assessing the uncertainty of a result, parameter uncertainties can be propagated to provide a quantitative measure (also as a probability distribution) of uncertainty in the final inventory result.

### Single parameter uncertainty

Single parameter uncertainty refers to incomplete knowledge about the true value of a parameter.[1] Parameter uncertainty addresses how well data used to represent a parameter fits the activity in the company's value chain. Single parameter uncertainty can arise in three data types: direct emissions data, activity data, and emission factors. Measurement errors, inaccurate approximation, and how the data was modeled to fit the conditions of the activity influence parameter uncertainty. For example, two data points of similar measurement precision may result in very different levels of uncertainty depending on how the points represent the activity's specific context (i.e. in temporal, technological, and geographical representativeness, and completeness terms).

EXAMPLE

*An emission factor for the production of plastic used in a toner cartridge is 4.5 kg of $CO_2$ per kg of plastic resin produced. The emission factor data might be based on a limited sampling of producers of resin and may be from an older timeframe or different geography than that in which the current resin is produced. Therefore, there is parameter uncertainty in the emission factor value being used.*

Parameter uncertainty can be quantified based on one or more of the following:

• Measurement uncertainty (represented by standard deviations);
• Data quality indicators (see chapter 7);[2]
• Default uncertainty parameters defined for specific activities or industry data and reported in literature sources or elsewhere;[3]
• Probability distributions in databases or other data sources for data they contain; and
• Other approaches reported by literature.

### Propagated parameter uncertainty

Propagated parameter uncertainty is the combined effect of each parameter's uncertainty on the total inventory result. Methods are available to propagate parameter uncertainty from single data points. Two prominent methods are by random sampling (such as in the Monte Carlo method) and by analytical formulas (such as in the Taylor Series expansion method). These methods are described in the quantitative uncertainty guidance available at www.ghgprotocol.org.

EXAMPLE

*A company estimates total scope 3 emissions from business travel to be 155,000 metric tons $CO_2$e. The activity data, emission factor data and GWP values applied in this calculation each have a level of parameter uncertainty. This uncertainty is determined based on the impact of all of the single parameter uncertainties. The propagated parameter uncertainty assessment shows that there is a 95 percent confidence that the true value of business travel emissions is between 140,000 and 170,000 metric tons $CO_2$e. This can also be presented in the inventory total as 155,000 metric tons $CO_2$e (+/-15,000 metric tons $CO_2$e).*

### Box [B.1] Uncertainty of global warming potential (GWP) values

The uncertainty of the GWP values for the six main greenhouse gases is estimated to be ± 35% for the 90% confidence interval (5% to 95% of the distribution). This is based on information provided in the IPCC's Fourth Assessment Report. The range reflects the uncertainty in converting individual GHG emissions into units of $CO_2$e. Companies that choose to quantify inventory uncertainty may include the uncertainty of GWP values in their calculations.

## Scenario uncertainty

While parameter uncertainty is a measure of how close the data used to calculate emissions are to the true (though unknown) actual data and emissions, scenario uncertainty refers to variation in calculated emissions due to methodological choices. When there are multiple methodological choices available in the standard (e.g., the selection of appropriate allocation methods), scenario uncertainty is created. The use of standards results in a reduction in scenario uncertainty by constraining choices the user may make in their methodology. For example, the boundary setting requirements standardize the inventory approach for all companies.

Methodological choices may include:

- Allocation methods;
- Product use assumptions; and
- End-of-life assumptions.

To identify the influence of these selections on results, parameters (or combinations of parameters) are varied in an exercise known as scenario analysis. Scenario analysis is also commonly called sensitivity analysis. Scenario analysis can reveal differences in the inventory results due to methodological choices.[4]

**EXAMPLE**

*A company may choose to allocate facility electricity consumption between toner production and other production lines using physical allocation (e.g., the number of units produced). Using this factor, 30 percent of electricity consumption is allocated to the toner production process. However, using economic allocation, 40 percent of electricity consumption is allocated to the toner production process.*

## Model uncertainty

Model uncertainty arises from limitations in the ability of the modeling approaches used to reflect the real world. Simplifying the real world into a numeric model always introduces some inaccuracies. In many cases, model uncertainties can be represented, at least in part, through the parameter or scenario approaches described above. However, some aspects of model uncertainty might not be captured by those classifications and are otherwise very difficult to quantify.

**EXAMPLE**

*In representing the transport of materials to the site of toner cartridge manufacture, a model is used that predicts transport distances and modes based on known transport networks, likely routes, and speeds of travel. The model cannot perfectly predict the true transport logistics and so there is uncertainty regarding the true modes and distances that are used.*

*A model of soy production is involved in predicting emissions from the production of the cartridge's soy-based ink. Emissions of $N_2O$ due to application of nitrogen fertilizers are based on a linear modeling of interactions of the fertilizer with the soil and plant systems. As these interactions are more complicated than the model assumes, there is uncertainty regarding the emissions resulting from this model.*

## Reporting uncertainty

Uncertainty can be reported in many ways, including qualitative descriptions of uncertainty sources, and quantitative representations, such as error bars, histograms, probability density functions, etc. It is useful to provide as complete a disclosure of uncertainty information as is possible. Users of the information may then weigh the total set of information provided in judging their confidence in the information.

## Endnotes

1  Parameter refers to the value(s) assigned to activities within a company's value chain.

2  B.P. Weidema and M.S. Wesnaes, "Data quality management for life cycle inventories – an example of using data quality indicators," Journal of Cleaner Production 4 no. 3-4 (1996): 167-174.

3  See, for example, S.M. Lloyd and R. Ries, "Characterizing, Propagating, and Analyzing Uncertainty in Life-Cycle Assessment: A Survey of Quantitative Approaches," Journal of Industrial Ecology 11 (2007): 161–179.

4  Mark A. J. Huijbregts, "Application of uncertainty and variability in LCA. Part I: A general framework for the analysis of uncertainty and variability in life cycle assessment," International Journal of Life Cycle Assessment 3 no. 5 (1998): 273 - 280.

# *Appendix C.* Data Management Plan

*A* *data management plan documents the GHG inventory process and the internal quality assurance and quality control (QA/QC) procedures in place to enable the preparation of the inventory from its inception through to final reporting. The data management plan is a valuable tool to manage data and track progress of the inventory over time. Companies may already have similar procedures in place for other data collection efforts to guide their inventory process to meet the accounting requirements of the GHG Protocol, or for ISO standards. Where possible, these processes should be aligned to reduce data management burdens.*

The data management plan can also be useful as an assurance readiness measure as it contains much of the data that an assurance provider needs to perform assurance. The plan should be made available to assurance providers (internal or external to the reporting company), as a helpful tool to guide the assurance process.

The data management plan should be divided into two portions, quality control (QC) and quality assurance (QA), explained below.

### Quality control

The quality control portion of the data management plan outlines a system of routine technical activities to determine and control the quality of the inventory data and the data management processes. The purpose is to ensure that the inventory does not contain misstatements, including identifying and reducing errors and omissions; providing routine checks to maximize consistency in the accounting process; and facilitating internal and external inventory review and assurance.

### Quality assurance

The quality assurance portion of the data management plan involves peer review and audits to assess the quality of the inventory. Peer review involves reviewing the documentation of the GHG accounting methodology and results but does not rigorously review the data used or the references. This review aims to reduce or eliminate any inherent error or bias in the process used to develop the inventory and assess the effectiveness of the internal quality control procedures. The audit evaluates whether the inventory complies with the quality control specifications outlined in the data management plan. Peer review and audits should be conducted by someone not involved in the development of the product inventory.

At a minimum the data management plan should contain:

- Description of the scope 3 categories and activities included in the inventory
- Information on the entity(ies) or person(s) responsible for measurement and data collection procedures
- Data collection procedures
- Data sources, including activity data, emission factors and other data, and the results of any data quality assessment performed
- Calculation methodologies including unit conversions and data aggregation
- Length of time the data should be archived
- Data transmission, storage and backup procedures
- All QA/QC procedures for data collection, input and handling activities, data documentation and emissions calculations.

The process of setting up a data management system should involve establishing standard procedures to address all of the data management activities, including the quality control and quality assurance aspects of developing an inventory.

## Creating a data management plan

To develop a data management plan, the following steps should be undertaken and documented.

1. **Establish a GHG accounting quality person/ team.** This person/team should be responsible for implementing and maintaining the data management plan, continually improving the quality of the inventory, and coordinating internal data exchanges and external interactions (such as with suppliers, reporting programs and assurance providers).

2. **Develop data management plan.** The data management plan should cover the components outlined in the section above and in table C.1. Documenting this information should assist with updating the inventory, and assessing and improving the quality of the inventory over time. Development of the data management plan should begin before any data is collected to ensure all relevant information about the inventory is documented as it proceeds. The plan should evolve over time as data collection and processes are refined.

3. **Perform generic data quality checks based on data management plan.** Checks should be applied to all aspects of the inventory process, focusing on data quality, data handling, documentation, and calculation procedures (see table C.2 for data control activities).

4. **Perform specific data quality checks.** More in-depth checks should be made for those sources, processes and/or activities that are significant to the inventory and/or have high levels of uncertainty (see Appendix B for information on assessing uncertainty).

5. **Review final inventory and report.** Review procedures should be established that match the purpose of the inventory and the type of assurance that will be performed. Internal reviews should be undertaken in preparation for  the assurance process by the appropriate department within a company, such as an internal audit or accounting department.

6. **Establish formal feedback loops to improve data collection, handling and documentation processes.** Feedback loops can improve the quality of the inventory over time and to correct any errors or inconsistencies identified in the review process.

7. **Establish reporting, documentation and archiving procedures.** Establish record-keeping processes for what information should be documented to support data collection and calculation methodologies, and how the data should be stored over time. The process may also involve aligning or developing relevant database systems for record keeping. Systems may take time to develop and it is important to ensure that all relevant information is collected prior to the establishment of the system and then transferred to the system once it is operational.

The data management plan is likely to be an evolving document that is updated as data sources change, data handling procedures are refined, calculation methodologies improve, inventory responsibilities change within a company, or the business objectives of the inventory are updated.

The data management plan checklist in table C.1 outlines what components should be included in a data management plan and can be used as a guide for creating a plan or for pulling together existing documents to constitute the plan.

*Appendix C. Data Management Plan*

**Table [C.1]** Data management plan checklist

| Component | Information | Rationale |
|---|---|---|
| **Responsibilities** | Name and contact details of persons responsible for:<br>• Management of GHG inventory<br>• Data collection for each process<br>• Internal audit procedures<br>• External audit procedures | • This ensures institutional knowledge is maintained and allows relevant person(s) to be identified for:<br>  • Confirming and checking information during any internal or external audit procedures<br>  • Producing consistent future GHG inventories |
| **Boundary and inventory description** | • Description of the boundary decision based on the *GHG Protocol Corporate Standard*<br>• Description of what scope 3 categories and activities are included in the inventory<br>• Description of what categories are excluded and why (as the company may begin including these, as data becomes available, for example) | • To provide internal auditors, assurance providers, and those doing future GHG inventories sufficient information on the activities and categories included in the corporate inventory. |
| **Data summary** | • Data collection procedures, including data sources for each process | • Records all data sources and allows others to locate data sources (for audit and updates to inventory). Also provides information on which suppliers have been approached for data. |
| | • Quality of data collected for each process and if and how a data quality assessment was undertaken | • Enables data quality to be tracked over time and improved |
| | • Gap analysis identifying where better quality data is preferable and plan for how to improve that data | • Identifies where data sources should be improved over time, including those suppliers who were asked to provide data and those that were not |
| | • Information on how data assumptions were determined, including use profiles of sold products, product lifetimes, waste treatment profiles, and other relevant assumptions | • Allows internal auditors, assurance providers, and those doing future inventories sufficient information on how assumptions were determined, and identifies how this information may be improved |

**Table [C.1]** Data management plan checklist (continued)

| Component | Information | Rationale |
|---|---|---|
| **Data summary (continued)** | • Information on criteria used to determine when an inventory is to be re-evaluated, including the relevant information needed to be tracked, and how this should be tracked over time. | • This allows data and information sources to be tracked and compared overtime. It may also involve identifying a system (e.g., document tracking and identification system) to ensure data and information is easily located and under what conditions this information/data was used or collected |
| **Emissions calculations** | • Calculation methodologies used (and references), as well as areas where calculation methodologies are needed for the inventory but not available<br><br>• Changes in calculation methodologies over time | • Provides internal auditors, assurance providers, and those doing future inventories details on how emissions were calculated<br><br>• Noting methodological changes should allow discrepancies between inventories to be checked and ensures that the most updated methodologies are used |
| **Data storage procedures** | • How and where data is stored<br>• Length of time data is archived<br><br>• Backup procedures | • Allows information to be easily located<br>• Keeps a record of how long information is stored to prevent looking for information that is no longer kept<br>• Ensures backup procedures are implemented |
| **QA/QC procedures** | • QA/QC procedures used (see table C.2 for detailed guidance) | • Ensures that adequate processes are in place to check data collection, input and handling, data documentation, and emissions calculations |

**Table [C.2]** Quality assurance/quality control procedures

| Activity | Procedure |
|---|---|
| **Data collection, input and handling activities** | |
| • **Transcription errors in primary and secondary data** | • Check a sample of input data in each process (both direct measures and calculated estimations) for transcription errors |
| • **Uncertainty estimates** | • Check that any calculated uncertainties are complete and calculated correctly |

App.213

*Appendix C. Data Management Plan*

**Table [C.2]** Quality assurance/quality control procedures (continued)

| Activity | Procedure |
|---|---|
| **Data documentation** | |
| **Transcription errors in references and storage of all references used** | • Confirm bibliographical data references are properly cited<br>• Ensure all relevant references are archived |
| **Storing information on data and data quality** | • Check that emissions categories, boundaries, GHGs included, allocation methodologies uses, data sources and any relevant assumptions are documented and archived<br>• Check that all data quality indicators are described, documented and archived for each process |
| **Recording parameter and unit information** | • Check that all units are appropriately labeled in calculation sheets<br>• Check all units are correctly transferred through all calculations and aggregation of emissions in all processes<br>• Check conversion factors are correct |
| **Recording calculation methodologies** | • Check that all calculation methodologies are documented<br>• Check that any changes to calculation methodologies are documented |
| **Database/calculation sheet integrity** | • Ensure all fields and their units are labeled in database/calculation sheet<br>• Ensure database/calculation sheet is documented and the structure and operating details of the database/calculations sheets are archived |
| **Review of internal documentation and archiving** | • Check there is sufficient internal documentation to support the estimates and enable the reproduction of the emissions and data quality assessment, and uncertainty estimations<br>• Check all data, supporting data and records are archived and stored to facilitate a detailed review<br>• Check that the archive is securely stored |
| **Calculating emissions and checking calculations** | |
| **Aggregation of emissions** | • Ensure that the aggregation of emissions from all emissions activities is correct |
| **Emissions trends** | • Where possible compare emissions from each activity to previous estimates. If significant departures, check data inputs, assumptions and calculation methodologies |
| **Calculation methodology(ies)** | • Reproduce a sample set of emissions and removals calculations to cross-check application of calculation methodologies<br>• Where possible, cross-check calculation methodologies used against more or less complex methodologies to ensure similar results are achieved |

# *Abbreviations*

| | | | | |
|---|---|---|---|---|
| $CH_4$ | Methane | | QC | Quality Control |
| $CO_2$ | Carbon Dioxide | | $SF_6$ | Sulphur Hexafluoride |
| $CO_2e$ | Carbon Dioxide Equivalent | | t | Metric tons |
| EEIO | Environmentally-Extended Input Output | | T&D | Transmission and Distribution |
| EfW | Energy-from-Waste | | UNFCCC | United Nations Framework Convention on Climate Change |
| g | Grams | | | |
| GHG | Greenhouse Gas | | WBCSD | World Business Council for Sustainable Development |
| GWP | Global Warming Potential | | WRI | World Resources Institute |
| HFCs | Hydrofluorocarbons | | WTE | Waste-to-Energy |
| IAS | International Accounting Standard | | | |
| IPCC | Intergovernmental Panel on Climate Change | | | |
| ISO | International Organization for Standardization | | | |
| kg | Kilogram | | | |
| km | Kilometer | | | |
| kWh | Kilowatt-hour | | | |
| LCA | Life Cycle Assessment | | | |
| LFGTE | Landfill-gas-to-energy | | | |
| MSW | Municipal Solid Waste | | | |
| MWh | Megawatt-hour | | | |
| NGO | Non-Governmental Organization | | | |
| $N_2O$ | Nitrous Oxide | | | |
| PFCs | Perfluorocarbons | | | |
| PP&E | Plant, Property, and Equipment | | | |
| PSEG | Public Service Enterprise Group | | | |
| QA | Quality Assurance | | | |



[134]  *Corporate Value Chain (Scope 3) Accounting and Reporting Standard*

# *Glossary*

| | |
|---|---|
| **Activity** | See "Scope 3 Activity" |
| **Activity data** | A quantitative measure of a level of activity that results in GHG emissions. Activity data is multiplied by an emissions factor to derive the GHG emissions associated with a process or an operation. Examples of activity data include kilowatt-hours of electricity used, quantity of fuel used, output of a process, hours equipment is operated, distance traveled, and floor area of a building. |
| **Allocation** | The process of partitioning GHG emissions from a single facility or other system (e.g., vehicle, business unit, corporation) among its various outputs. |
| **Associate** | An entity in which the parent company has significant influence but neither financial control nor joint financial control. (section 5.5, category 15 (Investments)) |
| **Assurance** | The level of confidence that the inventory and report are complete, accurate, consistent, transparent, relevant, and without material misstatements. |
| **Assurer** | A competent individual or body who is conducting the assurance process, whether internally within the company or externally. |
| **Audit trail** | Well organized and transparent historical records documenting how the GHG inventory was compiled. |
| **Baseline** | A hypothetical scenario for what GHG emissions would have been in the absence of a GHG project or reduction activity. (chapter 9) |
| **Base year** | A historical datum (e.g., year) against which a company's emissions are tracked over time. (chapter 9) |
| **Base year emissions** | GHG emissions in the base year. (chapter 9) |
| **Base year emissions recalculation** | Recalculation of emissions in the base year to reflect a change in the structure of the company or a change in the accounting methodology used, to ensure data consistency over time. (chapter 9) |
| **Biomass** | Any material or fuel produced by biological processes of living organisms, including organic non-fossil material of biological origin (e.g., plant material), biofuels (e.g., liquid fuels produced from biomass feedstocks), biogenic gas (e.g., landfill gas), and biogenic waste (e.g., municipal solid waste from biogenic sources). |
| **Biogenic $CO_2$ emissions** | $CO_2$ emissions from the combustion or biodegradation of biomass. |
| **Business travel** | Transportation of employees for business-related activities. |

**Capital goods**  Final goods that have an extended life and are used by the company to manufacture a product, provide a service, or sell, store, and deliver merchandise. In financial accounting, capital goods are treated as fixed assets or plant, property and equipment (PP&E). Examples of capital goods include equipment, machinery, buildings, facilities, and vehicles.

**Category**  See "Scope 3 category"

**$CO_2$ equivalent ($CO_2e$)**  The universal unit of measurement to indicate the global warming potential (GWP) of each greenhouse gas, expressed in terms of the GWP of one unit of carbon dioxide. It is used to evaluate releasing (or avoiding releasing) different greenhouse gases against a common basis.

**Company**  The term company is used in this standard as shorthand to refer to the entity developing a scope 3 GHG inventory, which may include any organization or institution, either public or private, such as businesses, corporations, government agencies, non-profit organizations, assurers and verifiers, universities, etc.

**Component**  An intermediate product.

**Consumer**  The end consumer or final user of a product.

**Control**  The ability of a company to direct the policies of another operation. More specifically, it is defined as either operational control (the organization or one of its subsidiaries has the full authority to introduce and implement its operating policies at the operation) or financial control (the organization has the ability to direct the financial and operating policies of the operation with a view to gaining economic benefits from its activities).

**Co-product**  One of multiple products produced by a facility or other system that has a market value. (chapter 8)

**Cradle-to-gate**  All emissions that occur in the life cycle of purchased products, up to the point of receipt by the reporting company (excluding emissions from sources that are owned or controlled by the reporting company).

**Customer**  An entity that purchases or acquires the products of another entity (i.e., a supplier). A customer may be a business customer or an end consumer.

**Debt investment**  Investment in an entity (e.g., through loans or bonds) for a fixed period of time that entitles the holder to repayment of the original investment (i.e., principal sum) plus interest, but does not entitle the investor to ownership in the entity. (section 5.5, category 15 (Investments))

**Direct emissions**  Emissions from sources that are owned or controlled by the reporting company.

---

*Glossary*

| | |
|---|---|
| **Downstream emissions** | Indirect GHG emissions from sold goods and services. Downstream emissions also include emissions from products that are distributed but not sold (i.e., without receiving payment). |
| **Economic allocation** | Allocating the emissions of an activity based on the market value of each output/product. |
| **Emission factor** | A factor that converts activity data into GHG emissions data (e.g., kg $CO_2$e emitted per liter of fuel consumed, kg $CO_2$e emitted per kilometer traveled, etc.). |
| **Emissions** | The release of greenhouse gases into the atmosphere. |
| **Employee commuting** | Transportation of employees between their homes and their worksites. |
| **Equity investment** | A share of equity interest in an entity. The most common form is common stock. Equity entitles the holder to a pro rata ownership in the company. (section 5.5, category 15 (Investments)) |
| **Equity share approach** | A consolidation approach whereby a company accounts for GHG emissions from operations according to its share of equity in the operation. The equity share reflects economic interest, which is the extent of rights a company has to the risks and rewards flowing from an operation. |
| **Extrapolated data** | Data from a similar process or activity that is used as a stand-in for the given process or activity, and has been customized to be more representative of the given process or activity. |
| **Final product** | Goods and services that are consumed by the end user in their current form, without further processing, transformation, or inclusion in another product. Final products include not only products consumed by end consumers, but also products consumed by businesses in the current form (e.g., capital goods) and products sold to retailers for resale to end consumers (e.g., consumer products). |
| **Financial control** | The ability to direct the financial and operating policies of an entity with a view to gaining economic benefits from its activities. (chapter 5) |
| **Financial control approach** | A consolidation approach whereby a company accounts for 100 percent of the GHG emissions over which it has financial control. It does not account for GHG emissions from operations in which it owns an interest but does not have financial control. (chapter 5) |
| **First party assurance** | Person(s) from within the reporting company but independent of the GHG inventory process conducts internal assurance. (Also called "self-" or "internal-assurance.") |
| **Franchise** | A business operating under a license (granted by a franchisor) to sell or distribute the franchisor's goods or services within a certain location. |
| **Franchisee** | An entity that operates a franchise and pays fees to a company (i.e., the franchisor) for the license to sell or distribute the franchisor's goods or services. |

**Franchisor**            A company that grants licenses to other entities (i.e., franchisees) to sell or distribute its goods or services, and in return receives payments, such as royalties for the use of trademarks and other services.

**Good**            A tangible product.

**Global warming potential (GWP)**            A factor describing the radiative forcing impact (degree of harm to the atmosphere) of one unit of a given GHG relative to one unit of $CO_2$.

**Greenhouse gas inventory**            A quantified list of an organization's GHG emissions and sources.

**Greenhouse gases (GHG)**            For the purposes of this standard, GHGs are the six gases covered by the UNFCCC: carbon dioxide ($CO_2$); methane ($CH_4$); nitrous oxide ($N_2O$); hydrofluorocarbons (HFCs); perfluorocarbons (PFCs); and sulphur hexafluoride ($SF_6$).

**Indirect emissions**            Emissions that are a consequence of the activities of the reporting company, but occur at sources owned or controlled by another company.



[138]  *Corporate Value Chain (Scope 3) Accounting and Reporting Standard*

*Glossary*

| | |
|---|---|
| **Intermediate product** | Goods that are inputs to the production of other goods or services that require further processing, transformation, or inclusion in another product before use by the end consumer. Intermediate products are not consumed by the end user in their current form. |
| **Leased asset** | Any asset that is leased (e.g., facilities, vehicles, etc.). |
| **Lessee** | An entity that has the right to use an asset through a contract with the owner of the asset (i.e., the lessor). |
| **Lessor** | An entity that owns an asset and leases it to a third party (i.e., the lessee). |
| **Level of assurance** | Refers to the degree of confidence stakeholders can have over the information in the inventory report. |
| **Life cycle** | Consecutive and interlinked stages of a product system, from raw material acquisition or generation of natural resources to end of life. |
| **Life cycle assessment** | Compilation and evaluation of the inputs, outputs and the potential environmental impacts of a product system throughout its life cycle. |
| **Materiality** | Concept that individual or the aggregation of errors, omissions and misrepresentations could affect the GHG inventory and could influence the intended users' decisions. |
| **Material misstatement** | Individual or aggregate errors, omissions and misrepresentations that significantly impact the GHG inventory results and could influence a user's decisions. |
| **Non-production-related procurement** | Purchased goods and services that are not integral to the company's products, but are instead used to enable operations (also called indirect procurement). |
| **Operational boundaries** | The boundaries that determine the direct and indirect emissions associated with operations owned or controlled by the reporting company. |
| **Operational control** | A consolidation approach whereby a company accounts for 100 percent of the GHG emissions over which it has operational control. It does not account for GHG emissions from operations in which it owns an interest but does not have operational control. |
| **Organizational boundaries** | The boundaries that determine the operations owned or controlled by the reporting company, depending on the consolidation approach taken (equity or control approach). |
| **Outsourcing** | The contracting out of activities to other businesses. |
| **Parent company** | An entity that has one or more subsidiaries. (section 5.5, category 15 (Investments)) |
| **Physical allocation** | Allocating the emissions of an activity based on an underlying physical relationship between the multiple inputs/outputs and the quantity of emissions generated. |

**Primary data**  Data from specific activities within a company's value chain.

**Process**  A set of interrelated or interacting activities that transforms or transports a product.

**Product**  Any good or service.

**Production-related procurement**  Purchased goods that are directly related to the production of a company's products (also called direct procurement).

**Project finance**  Long term financing of projects (e.g., infrastructure and industrial projects) by equity investors (sponsors) and debt investors (financiers), based on the projected cash flows of the project rather than the balance sheet of the sponsors/lenders. (section 5.5, category 15 (Investments))

**Proxy data**  Data from a similar process or activity that is used as a stand-in for the given process or activity without being customized to be more representative of the given process or activity.

**Reporting**  Presenting data to internal management and external users such as regulators, shareholders, the general public or specific stakeholder groups.

**Reporting year**  The year for which emissions are reported.

**Scope 1 emissions**  Emissions from operations that are owned or controlled by the reporting company.

**Scope 2 emissions**  Emissions from the generation of purchased or acquired electricity, steam, heating or cooling consumed by the reporting company.

**Scope 3 emissions**  All indirect emissions (not included in scope 2) that occur in the value chain of the reporting company, including both upstream and downstream emissions.

**Scope 3 activity**  An individual source of emissions included in a scope 3 category.

**Scope 3 category**  One of the 15 types of scope 3 emissions.

**Secondary data**  Data that is not from specific activities within a company's value chain.

**Service**  An intangible product.

**Significant influence**  Power to participate in the financial and operating policy decisions but not control them. A holding of 20 percent or more of the voting power (directly or through subsidiaries) will indicate significant influence unless it can be clearly demonstrated otherwise. See International Accounting Standard (IAS) 28 for additional criteria for determining significant influence. (section 5.5, category 15 (Investments))

[140]  *Corporate Value Chain (Scope 3) Accounting and Reporting Standard*

| | |
|---|---|
| **Subsidiary** | An entity over which the parent company has control, including incorporated and non-incorporated joint ventures and partnerships over which the parent company has control. (section 5.5, category 15 (Investments)) |
| **Supplier** | An entity that provides or sells products to another entity (i.e., a customer). |
| **Supply chain** | A network of organizations (e.g., manufacturers, wholesalers, distributors and retailers) involved in the production, delivery, and sale of a product to the consumer. |
| **Third party assurance** | Person(s) from an organization independent of the GHG inventory process conducts third party assurance. (Also called "External assurance.") |
| **Tier 1 supplier** | A supplier that provides or sells products directly to the reporting company. A tier 1 supplier is a company with which the reporting company has a purchase order for goods or services. |
| **Tier 2 supplier** | A supplier that provides or sells products directly to the reporting company's tier 1 supplier. A tier 2 supplier is a company with which the reporting company's tier 1 supplier has a purchase order for goods and services. |
| **Uncertainty** | 1. Quantitative definition: Measurement that characterizes the dispersion of values that could reasonably be attributed to a parameter. 2. Qualitative definition: A general and imprecise term that refers to the lack of certainty in data and methodology choices, such as the application of non-representative factors or methods, incomplete data on sources and sinks, lack of transparency etc. |
| **Upstream emissions** | Indirect GHG emissions from purchased or acquired goods and services. |
| **Value chain** | In this standard, "value chain" refers to all of the upstream and downstream activities associated with the operations of the reporting company, including the use of sold products by consumers and the end-of-life treatment of sold products after consumer use. |
| **Value chain emissions** | Emissions from the upstream and downstream activities associated with the operations of the reporting company. |
| **Waste** | An output of a process that has no market value. |

# References

Financial Accounting Standards Board. "Accounting for Leases." *Statement of Financial Accounting Standards,* no. 13 (1976).

Huijbregts, Mark A. J. "Application of uncertainty and variability in LCA. Part I: A general framework for the analysis of uncertainty and variability in life cycle assessment." *International Journal of Life Cycle Assessment* 3 no. 5 (1998): 273-280.

International Organization for Standardization (ISO). "ISO 14064-3: Specification with guidance for the validation and verification of greenhouse gas assertions." (2005).

IPCC. Summary for Policymakers. In *Climate Change 2007: Mitigation. Contribution of Working Group III to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change,* ed. B. Metz, O.R. Davidson, P.R. Bosch, R. Dave, L.A. Meyer. Cambridge, United Kingdom and New York, NY, USA: Cambridge University Press, 2007.

Lloyd, S. M. and R. Ries. "Characterizing, Propagating, and Analyzing Uncertainty in Life-Cycle Assessment: A Survey of Quantitative Approaches." *Journal of Industrial Ecology* 11 (2007): 161-179.

Weidema, B.P. and M.S. Wesnaes. "Data quality management for life cycle inventories – an example of using data quality indicators." *Journal of Cleaner Production* 4 no. 3-4 (1996): 167-174.

WRI/WBCSD GHG Protocol. "Categorizing GHG Emissions from Leased Assets." *GHG Protocol Corporate Accounting and Reporting Standard (Revised Edition),* Appendix F, June 2006, Version 1.0, provided at www.ghgprotocol.org.



# Recognitions

## Advisors

Fabio Peyer, Amcor Ltd.
Jannie Bell, Dell Inc.
Björn Hannappel, Deutsche Post DHL
Carina Alles, DuPont
Lisa Grice, ENVIRON International Corporation

Matthew Bateson, World Business Council for Sustainable
  Development
Jennifer Morgan, World Resources Institute
Janet Ranganathan, World Resources Institute
Ranping Song, World Resources Institute

## Road Testing Companies

Abengoa
Acer
Airbus
AkzoNobel
Amcor Ltd.
Autodesk, Inc.
Baosteel Group Corporation
BASF
Coca-Cola Erfrischungsgetränke AG
Danisco
Deutsche Post DHL
Deutsche Telekom AG
Ford Motor Company
IBM Corporation
IKEA
Italcementi Group
Kraft Foods

Levi Strauss & Co.
National Grid
New Belgium Brewing
Ocean Spray Cranberries, Inc.
PE INTERNATIONAL
Pfizer Inc.
Pinchin Environmental Ltd.
PricewaterhouseCoopers Hong Kong
Public Service Enterprise Group, Inc.
SAP
S.C. Johnson & Son, Inc.
Shanghai Zidan Food Packaging and Printing Co., Ltd.
Siemens AG
Suzano Pulp and Paper
United States General Services Administration
Veolia Water
Webcor Builders

## Technical Working Group Members

Fiona van den Brink, AkzoNobel
Peter J. Nieuwenhuizen, AkzoNobel
Erik van Agtmaal, Altimedes Consulting
Marijn Vervoorn, Arthur D. Little
Sam Kramer, Baker & McKenzie LLP
Nicola Paczkowski, BASF SE
Marianna Pierobon, BASF
Peter Saling, BASF
George Gosieski, Business Ecosystems
Ryan Schuchard, BSR

Kathryn Thomsen, The Cadmus Group, Inc.
Andrea C. H. Smith, Carbon Disclosure Project (CDP)
Frances Way, Carbon Disclosure Project (CDP)
Christopher Weber, Carnegie Mellon University
Rosa Maria Jimenez, CESPEDES
Gemma Heddle, Chevron
Brian Glazebrook, Cisco Systems **(Chair)**
Darrel Stickler, Cisco Systems
Renaud des Rosiers, Cleargreen Advisors
Jens Rupp, Coca-Cola Hellenic Bottling Company

## Technical Working Group Members (continued)

S Majumdar, Confederation of Indian Industry
Rob Sinclair, Conscious Brands
Brian Bahor, Covanta Energy
Michael Van Brunt, Covanta Energy
Arthur Lee, Chevron Services Company
Jordi Avellaneda, Damco
Yasushi Iwao, Deloitte-TECO
Kenneth Stanvick, Design Chain Associates LLC
Peter Klein, EducatedChange Ltd
Laura Lundbeck, Ernst & Young
Alice Ryan, Google
Jay Celorie, HP
Jay Dietrich, IBM Corporation
Peter Clarke, ICF International
Olle Blidholm, IKEA
Xander van der Spree, IKEA
Jacob Kottackal Ninan, Independent Consultant
Enrique Ortega, Industrias Peñoles
Andrea Zomosa, Industrias Peñoles
Ted Reichelt, Intel
Chris Bayliss, International Aluminium Institute
Christine Copley, International Council on Mining and
    Metals (ICMM)
Manfred Lenzen, The University of Sydney
Yoshikazu Kato, The Japan Gas Association
Jochen Harnisch, KFW Development Bank
Rohitesh Dhawan, KPMG
Marianna Herold, KPMG
Ann Smith, Landcare Research, NZ Ltd.
Fabien Bronès, Natura Cosméticos
Nathan Sandwick, Natural Resources Defense Council
Reid Miner, NCASI
Harri Artinaho, Nokia
Timo Kolemainen, Nokia
Paivi Pirhonen, Nokia
Ari Virta, Nokia
Jostein Soreide, Norsk Hydro
Stefan Seum, Öko Institut
Peter Haenke, Origin Energy
Hiroko Kamei, Osaka Gas Co., Ltd.

Tomohito Okamura, Osaka Gas Co., Ltd.
Yuichiro Yamaguchi, Osaka Gas Co., Ltd.
Hannes Partl, PE INTERNATIONAL
Johannes Partl, PE INTERNATIONAL
Michael Spielmann, PE INTERNATIONAL
Vicente Schmall, Petroleo Brasileiro S.A. – Petrobras
Mark Goedkoop, PRé Consultants
Susan Cosper, PricewaterhouseCoopers, LLP
Marne L. Doman, PricewaterhouseCoopers, LLP
Nancy Newman-Limata, PricewaterhouseCooopers, LLP
Nick Shufro, PricewaterhouseCoopers, LLP **(Chair)**
Jon Dettling, Quantis International
Damien Friot, Quantis International
Rainer Ochsenkuehn, ROC One, LLC.
Stefan Johansson, Royal Institute of Technology,
    Stockholm
Charlotta Barthelson, Saab
Mats Jacobsson, Saab
Lori Duvall, SAP
Axel Brenner, Siemens AG
Ralf Pfitzner, Siemens AG
Joe Harriman, Stantec Consulting Ltd.
Kathryn Scales, Suncor Energy
Sam Balch, UK Department of Environment Food and
    Rural Affairs
Steve Leffin, United Parcel Service
Sara Hartwell, United States Environmental Protection
    Agency Office of Solid Waste
Barbara J. Moser, United Technologies Corporation
Dennis Pamlin, World Wildlife Fund
Alina Raviceanu, World Wildlife Fund Canada
Christopher Dey, The University of Sydney
Joy Murray, The University of Sydney
Karen R.H. Utt, Tennessee Valley Authority
Mark Newton, The Timberland Company
Patrick Racz, Trucost
James Salo, Trucost
Gu A'Lun, Tsinghua University
Laura Doze, Xcel Energy
Jim Turner, Xcel Energy

*Recognitions*

## Contributors

Jannick Schmidt, Aalborg University
Andrés Zancada Ruiz, Abengoa
Sam Lin, Acer
Hiroo Takahashi, AGC Group
Bruno Costes, Airbus
Ashley Crepiat, Airbus
Fiona van den Brink, AkzoNobel
Peter Remco Vellinga, AkzoNobel
Julian Maruschke, Apple
Arturo Cepeda, Artequim.com Ltd.
Shuichiro Sugimoto, Asahi Glass Co., Ltd.
Ben Thompson, Autodesk, Inc.
Yinghao Liu, Baosteel Group Corporation
Tao Liu, Baosteel Group Corporation
Hongzhi Shi, Baosteel Group Corporation
Christopher Bray, Barclays Capital
Rachelle Marburg, Barclays Capital
Nicola Paczkowski, BASF
Peter Saling, BASF
Gregory LeMay, Beverage Industry Environmental
   Roundtable,
Gabrielle Giner, BT plc
Annalisa Schilla, California Air Resources Board
Ian Lipton, The Carbon Accounting Company
Lois Guthrie, Carbon Disclosure Project (CDP)
James Leaton, Carbon Tracker
Patricia Ludewig, Caterpillar
Claude Loréa, CEMBUREAU
Jen McGraw, Center for Neighborhood Technology
Tommy Wiedmann, Centre for Sustainability Accounting
Meg Crawford, Ceres
Andrea Moffat, Ceres
Eliza Eubank, Citi
Corinne Reich-Weiser, Climate Earth
Peggy Foran, The Climate Registry
Christopher Gleadle, The CMG Consultancy
Harald Steinke, Coca-Cola Erfrischungsgetränke AG
Rudi Sueys, Coca-Cola Erfrischungsgetränke AG
Andrew Aulisi, Credit Suisse
Jette Hansen, Danisco
Steven Moore, Deloitte Touche Tohmatsu Limited
Björn Hannappel, Deutsche Post DHL
Klaus Hufschlag, Deutsche Post DHL

Mathis Lappenkpüper, Deutsche Post DHL
Patric Pütz, Deutsche Post DHL
Stephan Schablinski, Deutsche Post DHL
Hans-Jürgen Gerhardy, Deutsche Telekom AG
Reiner Lemke, Deutsche Telekom AG
Michael Zalan, Deutsche Telekom AG
Ivar Barlindhaug, Devoateam DaVinnci
Toshihide Maruyama, Diacel Chemical Industries, Ltd.
Dawn Rittenhouse, DuPont
Susan Veith, DuPont
Bo Weidema, Ecoinvent
Matt Molinaro, Ecolab Inc
Ali Rivers, Ecometrica
Nigel Carter, En-Venture
Mary Stewart, Energetics
Ines Sousa, ENXSUITE
Switzerland, Niels Jungbluth, ESU-services Ltd.
James Mahoney, Export-Import Bank of the U.S.
Jonathan Newton, Ford Motor Company
Monique Oxender, Ford Motor Company
Daniel Hall, Forest Ethics
Franky Mo, Gap Inc.
Angela Fisher, GE Global Research
William Flanagan, GE Global Research
Juergen Ritzek, GreenBusinessConsulting (GBC)
Terrie Boguski, Harmony Environmental, LLC
Thaddeus Owen, Herman Miller, Inc
Yoshiaki Ichikawa, Hitachi, Ltd.
Silvana Paniagua Tufinio, i4b
Hemant Bundele, ibLaunch Energy, Inc.
Thomas Schaefer, IKEA
Don Bain, Independent Consultant
Rose Nangah Mankaa, Italcement Group
Manuela Ojan, Italcementi Group
Jeffrey Tseng, Integrated Service Technology
Tim Higgs, Intel
Milena Breisinger, Inter-American Development Bank
Shilpa Patel, International Finance Corporation
Naoki Aoki, Japan Cement Association
Yasutoshi Hattori, The Japanese Gas Association
Yoshikazu Kato, The Japan Gas Association
Kato Yoshikazu, The Japan Gas Association
Dan Pettit, Kraft Foods

## Contributors (continued)

John Andrews, Landcare Research, NZ Ltd

Suzie Greenhalgh, Landcare Research, NZ Ltd

Janet Kidner, Lend Lease Europe

Barruch Ben-Zekry, Levi Strauss & Co.

Steve Priddy, London School of Business & Finance

Mads Stensen, Maersk Line

Kara E Reeve, Massachusetts Institute of Technology

Kenji Shima, Mitsubishi Chemical Holdings Corporation

Nana-Ama Appiah, National Grid

Leah Fry , National Grid

Juliana Grando, National Grid

David Goldstein, Natural Resources Defense Council

Rosemary Bissett, National Australia Bank

Jenn Orgolini, New Belgium Brewing

Brad Beck, Nike

Hitoshi Morooka, Nippon Steel-Blast-Furnace Slag Cement Co. Ltd.

Claus Frier, Novozymes A/S

Pauline Jeong, Ocean Spray Cranberries, Inc.

Narito Shibaike, Panasonic Corporation

Jonathan Sykes, Parsons Brinckerhoff

Julie Fox Gorte, PaxWorld Management LLC

Barbara Nebel, PE INTERNATIONAL

Robert ter Kuile, PepsiCo

Brian Sullivan, Pfizer Inc.

Christopher Ho, PricewaterhouseCoopers, LLP

Brigham McNaughton, PricewaterhouseCoopers, LLP

Kristine Chung, PricewaterhouseCoopers Hong Kong

Inez Ng, PricewaterhouseCoopers Hong Kong

Diederik Schowanek, Proctor & Gamble

Mark Scorsolini, Public Service Enterprise Group, Inc.

Josephine Przewodnik, Recarbon Deutschland GmbH

Hicham Elhalaby, Rogers Communications

Sandra Pocsay, SAP

Jim Sullivan, SAP

Alyssa Farrell, SAS

Daniel Lawson, S. C. Johnson & Son, Inc.

Franklyn Ericson, S. C. Johnson & Son, Inc.

Fubo Mu, Shanghai Zidan Food Packaging and Printing Co., Ltd.

Xavier Riera-Palou, Shell

Ronald Neuhaus, Siemens AG

Zoltán Hajdu, Soltub Ltd. Hungary

Hilary Zheng, Sovereign

Seigo Ishiguro, Sumitomo Metal Industries, Ltd.

Kazuki Inatsu, Sumitomo Osaka Cement Co., Ltd.

Marina Carlini, Suzano Pulp and Paper

Samuel Kwong, Swire Beverages

Makiki Ito, Tokyo Gas Co., Ltd

Sachio Hosohara, Toray Industries, Inc.

Gordon MacLeod, Transport Scotland

James Salo, Trucost

Verena Radulovic, United States Environmental Protection Agency

Nancy Gillis, United States General Services Administration

Guillaume Arama, Veolia Water

Laurence Hamon, Veolia Water

David Houdusse, Veolia Water

Sandeep Mehndiratta, Verdaes

Lisbeth Dahllöf, Volvo Technology

Barbara Harrison, VT plc

Janet Godfrey, Webcor Builders

Ted Huang, Webcor Builders

Phil Williams, Webcor Builders

Edie Sonne Hall, Weyerhaeuser Company

Antonia Gawel, World Business Council for Sustainable Development

Bernhard Gruenauer, World Business Council for Sustainable Development

John Finisdore, World Resources Institute

Stacy Kotorac, World Resources Institute

Laura Pocknell, World Resources Institute

Samantha Putt del Pino, World Resources Institute

Mary Sotos, World Resources Institute

Jon Strahl, World Resources Institute

Shally Venugopal, World Resources Institute

Chris Daniels, Xstrata

Case 2:24-cv-00801-ODW-PVC    Document 48-20    Filed 05/24/24    Page 150 of 153    Page ID #:965

*Recognitions*



### In-Kind Road Testing Support

| | |
|---|---|
| The Carbon Trust | PRé Consultants |
| China National Institute of Standardization | PricewaterhouseCoopers, LLP |
| DNV | SGS-CSTC Standards Technical Services Co., Ltd. |
| KPMG | SGS Hong Kong Limited |
| PE Consulting | |

### Consultants

| | |
|---|---|
| China National Institute of Standardization | Quantis |
| PricewaterhouseCoopers, LLP | RESET Carbon |

*WRI and WBCSD would like to thank the following organizations for their generous financial support: Alcoa Foundation, BP Foundation, Dell Inc., EMC Corporation, Intel Corporation, Kimberly Clark Corporation, PepsiCo, PricewaterhouseCoopers, LLP, Robertson Foundation, SC Johnson & Son, Inc., Siemens, United States Agency for International Development (USAID), United States Environmental Protection Agency (US EPA), United Technologies Corporation, UPS Foundation, and Walmart Foundation. WBCSD, funded by its member companies, also provided direct financial support.*



Copyright © World Resources Institute and World Business Council for Sustainable Development, September 2011

ISBN 978-1-56973-772-9

Printed in USA



Printed on Chorus Art Silk, an FSC-certified paper with 55% recycled and 30% pcw content and with inks that are of soy content.

[148]  *Corporate Value Chain (Scope 3) Accounting and Reporting Standard*

*Design: Alston Taggart, Studio Red Design*
*Cover: Futerra Sustainability Communications*

App.229

*Appendix*

## World Business Council for Sustainable Development (WBCSD)

The WBCSD is a CEO-led, global coalition of some 200 companies advocating for progress on sustainable development. Its mission is to be a catalyst for innovation and sustainable growth in a world where resources are increasingly limited. The Council provides a platform for companies to share experiences and best practices on sustainable development issues and advocate for their implementation, working with governments, non-governmental and intergovernmental organizations. The membership has annual revenues of USD 7 trillion, spans more than 35 countries and represents 20 major industrial sectors. The Council also benefits from a network of 60 national and regional business councils and partner organizations, a majority of which are based in developing countries.

## Disclaimer

The *GHG Protocol Corporate Value Chain (Scope 3) Accounting and Reporting Standard,* a supplement to the *GHG Protocol Corporate Accounting and Reporting Standard,* is designed to promote best practice GHG accounting and reporting. It has been developed through an inclusive multi-stakeholder process involving experts from businesses, non-governmental organizations (NGOs), governments, and others convened by the World Resources Institute (WRI) and the World Business Council for Sustainable Development (WBCSD). While WBCSD and WRI encourage use of the *Scope 3  Standard* by all corporations and organizations, the preparation and publication of reports or program specifications based fully or partially on this standard is the full responsibility of those producing them. Neither WBCSD, WRI, nor other individuals who contributed to this standard assume responsibility for any consequences or damages resulting directly or indirectly from its use in the preparation of reports or program specifications or the use of reported data based on the *Scope 3 Standard.*

## World Resources Institute (WRI)

The World Resources Institute is a global environmental think tank that goes beyond research to put ideas into action. We work with governments, companies, and civil society to build solutions to urgent environmental challenges. WRI's transformative ideas protect the earth and promote development because sustainability is essential to meeting human needs and fulfilling human aspirations in the future.

WRI spurs progress by providing practical strategies for change and effective tools to implement them. We measure our success in the form of new policies, products, and practices that shift the ways governments work, companies operate, and people act.

We operate globally because today's problems know no boundaries. We are avid communicators because people everywhere are inspired by ideas, empowered by knowledge, and moved to change by greater understanding. We provide innovative paths to a sustainable planet through work that is accurate, fair, and independent.

WRI organizes its work around four key goals:

- **People & Ecosystems:** Reverse rapid degradation of ecosystems and assure their capacity to provide humans with needed goods and services.
- **Governance:** Empower people and strengthen institutions to foster environmentally sound and socially equitable decision-making.
- **Climate Protection:** Protect the global climate system from further harm due to emissions of greenhouse gases and help humanity and the natural world adapt to unavoidable climate change.
- **Markets & Enterprise:** Harness markets and enterprise to expand economic opportunity and protect the environment.

In all its policy research and work with institutions, WRI tries to build bridges between ideas and action, meshing the insights of scientific research, economic and institutional analyses, and practical experience with the need for open and participatory decision-making.



# GREENHOUSE
# GAS PROTOCOL

*The Greenhouse Gas Protocol provides the foundation for sustainable climate strategies and more efficient, resilient and profitable organizations. GHG Protocol standards are the most widely used accounting tools to measure, manage and report greenhouse gas emissions.*

www.wri.org                www.wbcsd.org                www.ghgprotocol.org

# Exhibit 19

Professor Daniel J. Taylor's June 16, 2022 Comment Letter to the SEC's Proposed Rule on The Enhancement and Standardization of Climate-Related Disclosures for Investors

Declaration of Bradley J. Hamburger In Support Of
Plaintiffs' Motion for Summary Judgment on Claim I
May 24, 2024

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.*,
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)

Via E-mail: rule-comments@sec.gov
Securities and Exchange Commission,
100 F Street, N.E., Washington, DC 20549-1090.
Attention: Vanessa Countryman, Secretary

June 16, 2022

Re: Proposal on The Enhancement and Standardization of Climate-Related Disclosures for
Investors - File No. S7-10-22

Ladies and Gentlemen:

The Securities and Exchange Commission's (the "Commission") proposal The Enhancement and Standardization of Climate-Related Disclosures for Investors ("Proposal") is a watershed moment for the Commission. It expands considerably the scope of corporate disclosure and raises challenging questions of interest to academics and practitioners. I appreciate the opportunity to comment.

I have read the Proposal, the associated comment file for the Proposal (as of May 5), and attended many academic and practitioner seminars on various aspects of the Proposal. While there is an important debate about the rationales for the Proposal—including to facilitate policy objectives (e.g., achieve a "net zero economy") and compel companies to internalize externalities (e.g., externalities of pollution)—I will not discuss these. Instead, my comments seek to emphasize important issues that have either gone underappreciated or are lacking from the discussion.

My area of expertise is in corporate disclosure and enforcement-related matters. I have published extensively on these topics in leading academic journals; led seminars at dozens of top business schools across the globe; won numerous academic and industry awards; and regularly consult with practitioners on concerns about materiality (my vita appears at the end of this letter). As part of my expertise, I routinely conduct statistical analysis of price and trading data to assess the materiality of disclosures. Given my background, my comments will tend to focus on issues regarding materiality and enforcement/investor protection.

Part I of this letter introduces what it means for a risk to be "material" and provides comments and discussion on the broad concept of the risks posed by climate change ("climate-related risks"). It discusses how climate-related risks can be material, and when they are, they already fit within the scope of existing disclosure rules. Current rules require all material risks to be disclosed regardless of whether they are climate-related or non-climate-related. Thus, unless companies are withholding information on material risks, it seems unlikely that the additional climate disclosures required by the Proposal would reveal new material risks.

Part II of this letter discusses the academic evidence referenced in the Proposal, with a specific focus on the evidence surrounding the disclosure of greenhouse gas emissions (GHG disclosure). Most of the academic papers referenced by the Proposal do <u>not</u> study the implications of a company's GHG disclosures for that company's share price or other capital market outcomes. Indeed, the Proposal does not provide (or reference) any evidence on the materiality of GHG

i

App.233

disclosures using standard "event study" tests for materiality commonly employed and accepted by academics, legal practitioners, and US courts. Instead, the cited papers tend to focus on the relation between share prices and third-party Environmental, Social, and Governance (ESG) ratings (e.g., MSCI, Sustainalytics). I caution against extrapolating evidence from third-party ESG ratings to disclosure of GHG emissions.

Part III of this letter provides initial evidence on the materiality of GHG disclosures using standard event study tests commonly employed by academics and practitioners to assess materiality of a given disclosure. For the average company in the sample, I find no evidence of a statistically significant change in stock price or trading volume in response to GHG disclosures. The evidence suggests that—on average—the market behaves as if GHG disclosures are not material to the valuation of the company. Part III also discusses explanations for why this is the case, discusses related academic literature, and corroborates the evidence by discussing company's disclosure practices—many of which are at odds with the notion that GHG disclosures are material.

Part IV of this letter discusses the effect of the Proposal on investor protection. Unfortunately, the Commission's budget is inadequate to keep pace with changes in US capital markets. As a result, the substantial resources needed to implement and police the Proposal will necessarily come at the cost of other (non-climate) priorities. The Commissions' cost-benefit analysis should account for the effect of diminished resources in other (non-climate-related) areas on investors and markets. Depending on the source of resources used to fund the Proposal, individual investors could be harmed. Every dollar the Commission spends on the Proposal is a dollar that could be spent protecting individual investors from accounting fraud, rogue investment advisors, crypto scams, greenwashing, market manipulation, and other illicit activities that directly affect the day-to-day lives of individual investors.

Please feel free to contact me (██████████████████████) if you have any questions about this letter or associated analysis.

Sincerely,

Daniel Taylor
Arthur Andersen Professor
Director, Wharton Forensic Analytics Lab
The Wharton School

*A consulting client compensated me for the time it took to write this letter, but did not have input into its findings or conclusions.

ii

*Part I. Climate-Related Risks in the Context of Traditional Notions of Materiality*

In financial economics, a piece of information is traditionally considered material if knowledge of that information would alter a reasonable investors' valuation of the company or their proxy voting decision.[1] Material risks (and changes to these risks) must be disclosed as "risk factors" in a company's quarterly and annual filings with the SEC (i.e., 10-Qs and 10-Ks).

The Proposal states (p. 63): "*The proposed rules would require a registrant to disclose whether any climate-related risk is reasonably likely to have a material impact on a registrant, including its business or consolidated financial statements, which may manifest over the short, medium, and long term*."

Climate-related risks can be material; if and when they are, existing rules require these risks to be disclosed. Depending on the circumstances, the following hypothetical examples could theoretically be material:

(1) Despite more extreme weather in a particular region, a power company chooses to cut costs and not weatherize its equipment. In the event of extreme weather, this choice might cost the company significant damages either because the equipment freezes or contributes to forest fires. In this example, the choice not to weatherize could be material.

(2) A company operates offshore drilling equipment in an area that faces extreme weather events, and such events make work stoppages more frequent and increase the risk of catastrophic damage to the company's equipment. If climate change significantly increases the likelihood of extreme weather events, climate change could pose a material risk.

(3) A company anticipates very significant regulatory costs in the future because of its high levels of greenhouse gas emissions. If the expected value of these costs are sufficiently large, the company's emissions could pose a material risk.

(4) A company sells a single consumer product that runs on fossil fuels, and observes that significant trends in consumer purchasing of that product now prioritize products that use "green energy." Its competitors offer such products, but the company does not. These changes in consumer spending and competitive advantages could pose a material risk.

These examples illustrate several different scenarios that could give rise to material climate-related risks. When these risks are material (i.e., would alter a reasonable investor's valuation of the company), these risks are required to be disclosed under *existing* disclosure rules. In this regard, current SEC rules speak to material risks, and do not treat climate-related and non-climate-related risks differently.

Indeed, the Commission acknowledges that the determination of material climate-risk is similar to that for required risk factor disclosure (p. 65):

---

[1] Proposal, footnote 29.

1

App.235

> *"The materiality determination that a registrant would be required to make regarding climate-related risks under the proposed rules is similar to what is required when preparing the MD&A section in a registration statement or annual report. The Commission's rules require a registrant to disclose material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. As the Commission has stated, MD&A should include descriptions and amounts of matters that have had a material impact on reported operations as well as matters that are reasonably likely to have a material impact on future operations."*

This makes me wonder whether the Commission believes some firms are not disclosing climate-related risks that are in fact material. If the Commission feels material climate-related risks are not being disclosed—such an omission violates existing rules—this suggests the need for additional guidance. Indeed, the Division of Corporation Finance's sample letter dated September 2021, demonstrates that climate-related risks fit into the existing disclosure rules and how additional guidance can sharpen disclosures under existing rules.[2] Tellingly, Bloomberg reports that 25 of 26 companies that received inquiries from the SEC reported that "climate risk wasn't a material issue...".[3] Thus, unless companies are withholding information on material risks, it seems unlikely that the additional climate disclosures required by the Proposal would reveal new material risks.

*Part II. Academic Evidence on Materiality of GHG Disclosures*

A core aspect of the Proposal is that it would require companies to report Scope 1, 2, and/or 3 GHG emissions, provide auditor attestation of the emissions, and disclose disaggregated emissions by constituent gas (e.g., methane, carbon dioxide, etc.). While the Proposal cites many academic studies, few (if any) papers provide an analysis of the relation between GHG disclosures and share price—the sort of analysis that is commonly used to assess materiality. Indeed, the section of the Commission's economic analysis that discusses the benefits to disclosing GHG emissions metrics (Section IV.C.1.e) does not reference any academic papers studying corporate disclosures of such metrics.[4] Nor does the Proposal provide or cite any evidence that investors use disaggregated emissions data in their valuation or voting decisions.

In many places the Proposal cites evidence from studies that examine the relation between third-party ESG ratings (e.g., MSCI, Bloomberg, etc.) and share prices or mutual fund flows to support the notion that disclosures of climate-related risks are material.[5] Third party ESG ratings—and by extension, the academic papers studying them—do not speak to GHG emissions. ESG ratings are a hodgepodge of various environmental, social, and governance factors. As a result, the Commission should exercise extreme caution in extrapolating inferences using research relying on

---

[2] "Sample Letter to Companies Regarding Climate Change Disclosures," *U.S. Securities and Exchange Commission*, September 22, 2021, available at https://www.sec.gov/corpfin/sample-letter-climate-change-disclosures.

[3] Nicola M. White, "SEC Drops Hints About ESG Rule in Retorts to Vague Disclosures," *Bloomberg*, March 18, 2022, available at https://news.bloomberglaw.com/financial-accounting/sec-scrutiny-of-big-companies-sheds-light-on-climate-priorities.

[4] For example, footnote 877 of the Proposal references a paper studying mine safety disclosures; footnotes 886 and 887 reference academic papers studying where multinationals emit: onshore or offshore; and footnote 888 references two papers that suggest long-run risks generally affect asset prices.

[5] See papers referenced in Proposal footnotes 802, 804, 839, and 987.

third-party ESG ratings to justify the materiality of GHG disclosures. Indeed, the Proposal does not provide (or reference) any evidence on the materiality of GHG disclosures using standard "event study" tests for materiality commonly employed and accepted by academics, legal practitioners, and US courts. This is an important oversight, as the market reaction to a given disclosure—specifically whether and how prices and trading volume change in response to the disclosure—is critical to inferring the materiality of the disclosure.

*Part III. Market Reaction to GHG Disclosures*

In this section, I provide initial evidence of the market reaction to GHG disclosures. In particular, I use standard event study tests commonly employed in the academic literature to examine whether there was a statistically significant change in the level of trading volume and/or stock prices in response to a disclosure.[6] If so, it suggests the disclosure was material (i.e., altered a reasonable investor's valuation of the company).

I begin by collecting the set of GHG disclosures posted on the SEC's EDGAR system. I focus on GHG disclosures posted on EDGAR because EDGAR provides machine-readable information on the precise date the disclosure was made public. This date is necessary to estimate the event study tests. By focusing only on GHG disclosures posted on EDGAR, the sample is weighted toward highly visible disclosures of GHG emissions. If anything, I expect disclosure of GHG emissions on EDGAR to have a greater economic impact on markets than GHG emissions disclosed via other less visible channels. By focusing on GHG disclosures on EDGAR, the sample is arguably biased *in favor* of finding such disclosures are material.

In conducting this analysis, I found two alternative disclosure strategies that are not considered in my analysis but are nonetheless worth discussing.

(1) Some companies provide GHG emissions in an "ESG report" provided on their corporate website, but do not file the ESG report as an exhibit to an EDGAR filing.[7] Only ESG reports explicitly included as an exhibit in an EDGAR filing are included in my analysis.

(2) Many companies appear to be privately disclosing detailed information on GHG emissions, mitigation strategies, and risks to the Carbon Disclosure Project (CDP) but *not* disclosing this information to shareholders. The CDP then makes this information accessible to accountholders and paid subscribers. For example, NetApp discusses data on GHG emissions in a single sentence in their 2020 ESG Report (p. 20): *"We continue to measure, monitor, and report our GHG emissions (Scopes 1, 2, and 3) and we voluntarily report*

---

[6] The tests used in this section are standard and have been repurposed from prior academic studies I have previously conducted. I refer interested readers to Taylor, Daniel, et al. (2022), "Audit Process, Private Information, and Insider Trading," available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3264424; Taylor, Daniel et al. (2020), "Undisclosed SEC Investigations," *Management Science*, 67(6), available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3507083; and Lynch, Bradford and Taylor, Daniel (2021), "The Information Content of Corporate Websites," available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3791474.

[7] See for example IBM's 2021 ESG report, located on IBM's investor relation website but never filed as an exhibit to an EDGAR filing. See, "Reports & Policies," *IBM*, available at https://www.ibm.com/impact/reports-and-policies.

*annually to CDP."*[8] However, neither their 2020 ESG report, nor any document filed on EDGAR, discusses their 2020 Scope 1, 2, or 3 emissions, how they compare to 2011 base levels the company recorded, or provide disaggregated emissions data by facility. Nevertheless, NetApp disclosed all of this information in their 2020 report filed with the CDP.[9] This disclosure practice to CDP is commonplace. For example, one academic study estimated that 12.75% of the S&P 500 responded to the CDP's survey on climate-risks and GHG emissions but did not authorize CDP to make their responses publicly available.[10]

These two disclosure practices are not consistent with a view that GHG disclosures are material. For example, if information on GHG emissions is material—useful for valuation and voting decisions—then it would seem the widespread practice of selectively disclosing this information to a third-party (e.g., CDP) would violate Reg FD (which is supposed to prevent the selective disclosure of material non-public information). Thus, I infer from the prevalence of this disclosure strategy that companies and their counsel do not believe data on GHG emissions is material, otherwise they would not be selectively disclosing it. Regardless, I do not include GHG disclosures to the CDP in my analysis because (i) these disclosures are available only to CDP accountholders and paid subscribers; and (ii) the CDP does not have precise information on the date at which the company publicly disclosed their emissions data.

To compile the sample used in my analysis, I use the SEC's website to search EDGAR for all Form 8-Ks filed between January 2021 and March 2022 that include the keywords: "Scope 1," "Scope 2," or "Scope 3."[11] The search includes all Form 8-K exhibits and hyperlinked materials. I focus on keywords related to the various emission levels because I seek to identify disclosure related to emissions levels, not disclosures related to climate risk more broadly. I focus on Form 8-Ks, because alternative forms such as 10-Qs and 10-Ks include a wealth of financial statement information that would confound attributing changes in volume and price to the GHG disclosure itself.

This results in a sample of 371 Form 8-Ks. I then read each 8-K to determine whether the disclosure relates to emissions. I eliminate 46 that are parsing errors (e.g., a table of contents to a contract where the "Scope" is discussed on page 2), 115 that reference emissions but do not provide information about emissions levels (e.g., covenants on "green bonds"), and 94 that are duplicate disclosures of the same information (e.g., three different investor day presentations that all provide the same emissions levels). This suggests many companies either: (1) provide GHG emission data on their website as an ESG report without a corresponding 8-K, (2) disclose the information only to CDP, or (3) do not disclose GHG emission data. I interpret these findings as *prima facie* evidence that companies do not view the information as material for investors' valuation decisions.

I merge the sample of the remaining 116 8-Ks to price data from the Center for Research in Security Prices (CRSP), and focus on common stocks listed on the three major exchanges (e.g.,

---

[8] "NetApp 2020 ESG Report," *NetApp*, available at https://www.netapp.com/pdf html?item=/media/11875-netapp-2020-esg-report.pdf.
[9] "NetApp Inc. - Climate Change 2020," *CDP*. See https://www.dropbox.com/s/iq4wopk7yms4uz2/CDP.pdf.
[10] Matsumura, Ella M., et al. (2015), "Firm-Value Effects of Carbon Emissions and Carbon Disclosures," The Accounting Review, (89)2, available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1921809.
[11] "EDGAR Advanced Search," *U.S. Securities and Exchange Commission*, available at https://www.sec.gov/edgar/search/#.

excluding Real-Estate Investment Trusts and Limited Partnerships).[12] This leaves a sample of 87 GHG disclosures. Of these, 52 are bundled with an earnings announcement (or merger announcement). Trading volume and shares prices respond to earnings announcements even in the absence of any GHG disclosures. Thus, without a more rigorous and deeper investigation, one cannot disentangle whether the change in trading volume and prices are attributable to the GHG disclosure or the quarterly financials. I remove these observations from the sample.

For each of the remaining 8-Ks, I calculate the first date at which the market could have traded on the information in the 8-K.[13] I refer to this as "day 0." I then collect data on stock returns and trading volume over the thirty calendar days before and after this date, i.e., the [-30, +30] window around day 0, and test for statistically abnormal changes in trading volume and stock price on day 0. The final sample consists of 1,493 daily observations.

I compute trading volume as a percentage of shares outstanding (*Volume*), and price change as the absolute value of stock return in excess of the respective industry benchmark (|*Return*|).[14] I use absolute value of returns, because these tests seek to estimate whether the price changed once the 8-K was disclosed—which could be a positive price change (i.e., good news), or a negative price change (i.e., bad news).[15]

Table 1 presents mean and median absolute price change and trading volume on the day the disclosure is made public (i.e., "Day 0") and on all other days in the [-30, +30] window excluding Day 0 (i.e., "[-30, +30] ex Day 0"). Table 1 shows that the average (median) return is slightly elevated (or depressed) on day 0, and both average and median trading volumes are elevated.

### Table 1. Difference in Mean and Median Price Change and Trading Volume

|  | Day 0 | | [-30, +30] ex Day 0 | | Diff in Means | Diff in Medians |
|---|---|---|---|---|---|---|
|  | Mean | Median | Mean | Median |  |  |
| \|*Return*\| | 2.43 | 1.00 | 1.83 | 1.20 | 0.60 | -0.20 |
| *Volume* | 1.63 | 0.92 | 1.42 | 0.79 | 0.21 | 0.13 |

Table 2 presents statistical tests for whether the change in price and trading volume on day 0 is statistically abnormal (i.e., statistically different from all other days in the [-30, +30] window).

---

[12] I restrict the sample to CRSP share code 10 or 11.

[13] For 8-Ks filed during market hours, this is the date of the filing. For 8-Ks filed after hours, this is the next trading date.

[14] I use the 48 industry portfolios available from Ken French as the industry benchmark. Kenneth R. French, "Detail for 48 Industry Portfolios," 2022, available at
https://mba.tuck.dartmouth.edu/pages/faculty/ken french/Data_Library/det_48_ind_port.html.

[15] Focusing on whether price changed, not the direction of the change, is common in the literature that seeks to examine whether a disclosure provides the market with information. See e.g., Lynch, Bradford and Taylor, Daniel (2021), "The Information Content of Corporate Websites," available at SSRN:
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3791474.

**Table 2. Statistical Tests for Changes in Price and Trading Volume**

| | Dependent Variable: \|Return\| | | Dependent Variable: Volume | |
| | (1) | (2) | (3) | (4) |
| | Coeff. | Coeff. | Coeff. | Coeff. |
|---|---|---|---|---|
| *Day 0* | 0.60 | 0.46 | 0.21 | 0.05 |
| *p*-value | (0.20) | (0.33) | (0.47) | (0.77) |
| Date FE | No | Yes | No | Yes |
| Company-Year-Qtr FE | No | Yes | No | Yes |
| S.E. Cluster | Date | Date | Date | Date |
| *N* | 1,493 | 1,493 | 1,493 | 1,493 |

Column 1 presents results from a regression of the price change on an indicator variable for whether a given observation is day 0. Column 2 includes date and company-year-quarter fixed effects which adjust for the average price change on the respective date and during the respective company-fiscal quarter (e.g., average price change in Intel's Q1-2021). Columns 3 and 4 present analogous results using trading volume. The *p*-values (two-tailed) that indicate whether a given regression coefficient is statistically different from zero appear in parentheses. In the academic literature, *p*-values of 0.05 and below are traditionally considered "statistically significant." Across all tests, *p*-values are routinely above 0.05. Thus, there is no statistical evidence of a price or trading volume response to the GHG disclosures. In the academic literature, this would be interpreted as evidence that the average GHG disclosure did not contain material information.

Taken at face value, the evidence from this analysis suggests that—on average—investors do not update their beliefs about value (upward or downward) in light of the GHG emissions data. These findings are consistent with two other academic studies that use a similar event study design, and find no evidence of a price or volume response to the disclosure of corporate sustainability reports and no evidence of a price response to corporate press releases related to ESG.[16] The Proposal does not reference these studies, nor does it provide (or reference) any evidence on the materiality of GHG disclosures using standard "event study" tests for materiality.

I caution that this evidence does *not* suggest climate risk is immaterial, but rather it suggests that GHG emissions are not material. To highlight this distinction, consider the following. Suppose GHG emissions are relevant to investors because it helps them assess the risk the company will incur substantial regulatory costs in the future. If this risk is already adequately disclosed as a material risk factor in the company's 10-K, then GHG emissions data will not cause shareholders to update their beliefs about that risk. To trigger a market reaction, GHG emissions have to contain new information that is not already reflected elsewhere in the company's many disclosures (e.g., the risk factors in annual filings). If GHG emissions measure climate risks, and a company is

---

[16] For evidence on lack of price or volume response to corporate sustainability reports, see Burzillo, Suzanne, et al. (2022), "Who Uses Corporate Sustainability Reports?" available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3976550. For evidence on lack of price response to corporate press releases related to ESG, see Moss, Austin, et al. (2020), "The Irrelevance of ESG Disclosure to Retail Investors: Evidence from Robinhood," available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3604847.

already (appropriately) disclosing these climate risks elsewhere in their annual filings, then I would not expect GHG disclosures to be material.

One potential explanation for the above findings is that GHG emissions are highly correlated with other observable aspects of a company's operations that are already reflected in stock prices. For example, one academic study estimates that GHG emissions are extremely highly correlated over time (e.g., autocorrelation coefficient of 0.977).[17] This means that, on average, next year's GHG emissions will be almost the same as this year. This study also finds that 90% of GHG emissions are explained by observable aspects of a company's operations including industry membership; company size; sales growth; earnings growth; the value of plant, property, and equipment; capital expenditures; and profitability. Thus, 90% of the variation in GHG emissions can be inferred from information that is already publicly available. This information will already be reflected in stock prices, such that the level of GHG emissions itself (and potentially other climate-related information) may provide little *new* information beyond what can be inferred from observable aspects of the company's operations. This could explain why GHG disclosures examined above are not material to a company's valuation. It could also explain why two academic studies find no evidence of a price or volume response to the disclosure of corporate sustainability reports and no evidence of a price response to corporate press releases related to ESG.[18] Another academic study compares the market's valuation of actual GHG emissions and GHG emissions inferred from information on the company's balance sheet and income statement. This study finds no evidence of a difference in valuation between GHG emissions voluntarily disclosed by the company (to the CDP) and the valuation of GHG emissions inferred from publicly-observable information.[19]

The preceding analysis and discussion is subject to the caveat that the event study analysis is based on traditional notions of materiality embraced by academics and legal scholars. These tests are shareholder-centric and consider whether prices or trading volume in the company's stock changed as a result of the company's disclosure. The tests do not consider other stakeholders or other non-valuation uses of the information.

*Part IV. Investor Protections*

The Commission has recently made tremendous strides on investor protections. I commend the Commission for this progress and the Commission's renewed focus on robust enforcement. The Commission's budget has grown on average at 4% over the past five years (2017-2021).[20] This growth has not kept pace with the explosive growth in trading volume and recent capital markets developments (e.g., special purpose acquisition companies, high frequency trading, crypto, and non-fungible tokens). As a result, the Commission is being asked to regulate and police increasingly large portions of the economy with relatively less resources.

---

[17] Bolton, Patrick and Kacperczyk, Marcin T. (2019), "Do Investors Care about Carbon Risk?" *Journal of Financial Economics*, 142(2), available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3398441.

[18] See footnote 17 for references.

[19] Griffin, Paul A., et al. (2015), "The Relevance to Investors of Greenhouse Gas Emission Disclosures," *Contemporary Accounting Research*, 34(2), available at SSRN:
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1735555.

[20] "Budget History – BA vs. Actual Obligations ($ in 000s)," *U.S. Securities and Exchange Commission*, November 13, 2019, available at https://www.sec.gov/foia/docs/budgetact.htm.

Given its resource constraints, the Commission is already incapable of policing every violation of federal securities laws that it learns about. It routinely disregards enforcement of some violations of securities laws in favor of enforcing others. Against this backdrop, the Proposal dramatically expands the amount of resources the Commission would need to invest in implementing and policing disclosures of GHG emissions. The Commission's scarce resources dictate that this investment would necessarily come at the cost of other priorities. I am particularly concerned about the consequences for enforcement, and investor protections. Stretched resources imply less effectively policing of markets. Less effective policing implies reduced compliance with securities laws. Reduced compliance with laws erodes Americans' trust in markets and institutions.[21]

Mandatory GHG disclosures will undoubtedly benefit Blackrock, Ceres, and those niche funds that invest based on GHG levels. Rather than spend considerable effort and money researching what a company's GHG emissions are, they will be able to get such data directly from the company's mandatory SEC disclosures. Indeed, the Proposal will transfer the burden of calculating GHG emissions from the funds to the companies themselves. To the extent that such calculations are costly, even investors in the company who do not use such information will effectively be paying for the information to be produced. Indeed, research suggests most individual investors generally ignore such factors in their investment decisions.[22] It is this latter group that may suffer from the reallocation of Commission resources. In this regard, the Proposal nicely illustrates the distinction between the interests of the average dollar (e.g., those of certain high-profile institutional investors) and the interests of the average investor (e.g., those of the individual investors). In prioritizing the interests of the average dollar, the Commission may be acting against the interest of the average investor. Every dollar the Commission spends on the Proposal is a dollar that could be spent protecting individual investors from accounting fraud, rogue investment advisors, crypto scams, greenwashing, market manipulation, and other illicit activities that directly affect the day-to-day lives of individual investors.

Currently the Proposal's cost-benefit analysis does not speak to where the resources to implement the Proposal will come from, and what priorities might face fewer resources as a result of implementing the Proposal. The Commission's cost-benefit analysis should articulate what specific functions will be diminished as a result of the resources needed to implement the Proposal, and should account for the effect of diminished resources in other (non-climate-related) areas on investors and markets. This is a potential hidden cost of the Proposal that does not feature in the economic analysis.

---

[21] Gurbir S. Grewal, "PLI Broker/Dealer Regulation and Enforcement 2021," *U.S. Securities and Exchange Commission*, October 6, 2021, available at https://www.sec.gov/news/speech/grewal-pli-broker-dealer-regulation-and-enforcement-100621.

[22] For academic evidence see Moss, Austin, et al. (2020), "The Irrelevance of ESG Disclosure to Retail Investors: Evidence from Robinhood," available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3604847; and for survey evidence see Gary Mottola et al., "Consumer Insights: Money & Investing," FINRA Investor Education and NORC at the University of Chicago, March 2022, available at https://www.finrafoundation.org/sites/finrafoundation/files/Consumer-Insights-Money-and-Investing.pdf.

App.242

**Professional Profile for Dr. Daniel Taylor:**

Daniel Taylor is the Arthur Andersen Chaired Professor at The Wharton School, and is director of the Wharton Forensic Analytics Lab. He is an award-winning researcher and teacher with extensive expertise on corporate disclosures, insider trading, fraud prediction, and corporate governance. He has published extensively on these topics in leading academic journals; led seminars at dozens of top business schools across the globe; and won numerous academic and industry awards.

Professor Taylor's research targets practitioners and regulators, and aims to have direct relevance to current issues facing boards, shareholders, and enforcement agencies. His research frequently appears in the business media and has been cited in rules and regulations promulgated by the SEC. Most recently, his research on insider trading was the impetus behind proposed rule changes to 10B5-1 trading plans; Form 144 filings; the Holding Foreign Insiders Accountable Act; and multiple investigations by the SEC, FBI, Treasury, and DoJ.

Professor Taylor enjoys putting his research into practice and has provided expert and consulting services related to best practices in corporate disclosure, 10B5-1 trading plans, statistical analysis of trading activity, and fraud prediction, and has co-developed and licensed intellectual property related to parsing SEC filings. His consulting clients include the DoJ, hedge funds, plaintiff and defense firms, and a Big 4 auditor.

Professor Taylor teaches a cutting-edge undergraduate course—Forensic Analytics—that applies state-of-the-art analytics to corporate disclosures, and teaches a doctoral seminar on data analysis. His doctoral students have gone on to become faculty at a variety of leading business schools, including Stanford, MIT, and Chicago. Professor Taylor received his bachelor's degree from University of Delaware, his master's from Duke University, and his PhD from Stanford University.

June 2022

# Daniel J. Taylor

www.danieltayloranalytics.com

Arthur Andersen Professor                                      dtayl@wharton.upenn.edu
The Wharton School                                                    Cell: 302.897.0644
University of Pennsylvania                                           Fax: 215.573.2054

## EDUCATION

Stanford University
*Ph.D. Business, 2010*

Duke University
*M.A. Economics*, 2005

University of Delaware
*B.S. Economics*, 2003
*Minor: Information Systems; Cum Laude*

## ACADEMIC POSITIONS

The Wharton School of the University of Pennsylvania

| | |
|---|---|
| *Professor* | 2022 – present |

   Arthur Andersen Chair, 2020 – present
   Founder & Director, Wharton Forensic Analytics Lab, 2021 – present
   Wharton Teaching Excellence Award, 2019, 2020, 2021
   Analytics @Wharton Teaching Grant, 2020, 2021
   Analytics @Wharton Fellow, 2020 – present
   Wharton Faculty Fellow, 2019
   Dean's Research Grant, 2011-2013, 2019-2021
   Harold C. Stott Chair, 2013-2017

| | |
|---|---|
| *Associate Professor* | 2017 – 2022 |
| *Assistant Professor* | 2011 – 2017 |
| *Lecturer* | 2010 – 2011 |

## RESEARCH INTERESTS

insider trading, financial misreporting, corporate disclosure, corporate governance

1

## ACADEMIC PUBLICATIONS

**Causality Redux: The Evolution of Empirical Methods in Accounting Research**
(with C. Armstrong, J. Kepler, and D. Samuels) Journal of Accounting and Economics, forthcoming [invited, not peer reviewed]

**Disclosure Substitution**
(with M. Heinle and D. Samuels) Management Science, forthcoming

**Audit Process, Private Information, and Insider Trading**
(with S. Arif, J. Kepler, and J. Schroeder) Review of Accounting Studies, September 2022

- Winner, *Best Academic Paper Award,* Weinberg Corporate Governance Symposium (Mar 2019)

- Featured in *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Nov 2018); *Marketwatch* (Mar 2019); *Council of Institutional Investors, The Voice of Corporate Governance* (May, 2019); *Marketwatch* (Jun 2019);

**Voluntary Disclosure when Private Information and Disclosure Costs are Jointly Determined**
(with J.M. Kim and R. Verrecchia) Review of Accounting Studies, June 2021

**Undisclosed SEC Investigations**
(with T. Blackburne, J. Kepler, and P. Quinn) Management Science, June 2021

- Winner, *Outstanding Research Paper Award*, Jacobs Levy Center for Quantitative Financial Research (2020)

- Cited in the SEC's final ruling on exemptions to 404(b) of SOX "Amendments to the Accelerated Filer and Large Accelerated Filer Definitions" *SEC Release No. 34–88365*

- Featured in Columbia Law School Blue Sky Blog (Feb 2020); *Bloomberg Money Stuff* (Feb 2020), *Securities Regulation Daily* (Feb 2020); *Corporate Counsel* (Mar 2020); *Wall Street Journal* (Sept 2021)

**The Economics of Misreporting and the Role of Public Scrutiny**
(with D. Samuels and R. Verrecchia) Journal of Accounting and Economics, February 2021

- Featured in *CFO* (May 2018); *Barron's* (Jun 2018)

**Political Connections and the Informativeness of Insider Trades**
(with A. Jagolinzer, D. Larcker, and G. Ormazabal) Journal of Finance, August 2020

App.245

- Winner, *Outstanding Research Paper Award*, Jacobs Levy Center for Quantitative Financial Research (2019)

- Synopsis printed in *CATO Institute Research Briefs in Economic Policy* (Jan 2018)

- Featured in *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Sept 2016); *The Economist* (Feb 2018); *CNBC* (Feb 2018); *Apple News* (Mar 2020); *Bloomberg Law* (Mar 2020); *Bloomberg Money Stuff* (Mar 2020), *DailyMail* (Mar 2020); *Fox Business* (Mar 2020); *Law.com* (Mar 2020); *Reuters* (Mar 2020); *Securities Docket* (Mar 2020); *Yahoo Finance* (Mar 2020); *Yahoo News* (Mar 2020); *The Week* (Mar 2020); *US News and World Report* (Mar 2020), *Reuters* (Apr 2020), *New York Times* (Apr 2020); *US News and World Report* (Apr 2020); lead story on news aggregator *Drudgereport* (Mar 26-27, 2020)

- Almetrics media influence score in the top 5% of all academic research, ranked in top 0.5% within Journal of Finance.


## Economics of Managerial Taxes and Corporate Risk-Taking
(with C. Armstrong, S. Glaeser, and S. Huang) <u>The Accounting Review</u>, January 2019

- Featured in *Columbia Law School Blue Sky Blog* (Dec 2017)


## Linguistic Complexity in Firm Disclosures: Obfuscation or Information
(with B. Bushee and I. Gow) <u>Journal of Accounting Research</u>, March 2018

- Top five most highly-cited papers published in the journal since 2018

- A widely-used Perl command to calculate Fog Index, *Lingua:EN:Fathom*, was revised as a direct result of the computational errors identified in this paper (see v1.22 of this command)

- Synopsis printed in *CFA Digest* (December 2018)


## JOBS Act and Information Uncertainty in IPO Firms
(with M. Barth and W. Landsman) <u>The Accounting Review</u>, Nov 2017

- Winner, *AICPA Notable Contribution to Accounting Literature Award* (2020)

- Cited in the SEC's final ruling on amendments to Regulation A of the Securities Act, "Amendments for Small and Additional Issues Exemptions Under the Securities Act" *SEC Release No. 33–9741, 34–74578, 39–2501*

- Featured in *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Aug 2014); speech by SEC Commissioner Kara Stein (Dec 2016); *CFO* (Oct 2017); *CPA Practice Advisor* (Oct 2017); *MarketWatch* (Oct 2017); *The Intercept* (Feb 2018); speech by SEC Commissioner Kara Stein (Jun 2018); *Xconomy* (Apr 2019); *Accounting Today* (Aug 2020) *CPA Practice Advisor* (2020)

App.246

- Almetrics media influence score in the top 25% of all academic research, ranked in top 10% within The Accounting Review.

**Guiding Through the Fog: Financial Statement Complexity and Voluntary Disclosure**
(with W. Guay and D. Samuels) Journal of Accounting and Economics, Nov 2016

- Top five most highly-cited papers published in the journal since 2016

- Featured in *Columbia Law School Blue Sky Blog* (Mar 2015)

**Thoughts on the Divide Between Theoretical and Empirical Research in Accounting**
(with Q. Chen, J. Gerakos, and V. Glode) Journal of Financial Reporting, Fall 2016 [invited, not peer reviewed]

**From Casual to Causal Inference in Accounting Research: The Need for Theoretical Foundations**
(with J. Bertomeu and A. Beyer) Foundations and Trends in Accounting, Fall 2016

**Abnormal Accruals in Newly Public Companies: Misreporting or Economic Activity?**
(with C. Armstrong and G. Foster) Management Science, May 2016

**Asymmetric Reporting**
(with C. Armstrong and R. Verrecchia) Journal of Financial Reporting, Spring 2016

**Delegated Trade and the Pricing of Public and Private Information**
(with R. Verrecchia) Journal of Accounting and Economics, Dec 2015

**The Relation Between Equity Incentives and Misreporting: The Role of Risk-Taking Incentives**
(with C. Armstrong, D. Larcker, and G. Ormazabal) Journal of Financial Economics, Aug 2013

- Featured in Keynote Address by PCAOB Chair James Doty at *AICPA National Conference on Current SEC and PCAOB Developments* (Dec 2012); *Wall Street Journal* (May 2013); *Harvard Law School Forum on Corporate Governance and Financial Regulation* (May 2013)

**Why Do Pro Forma and Street Earnings Not Reflect Changes in GAAP?**
(with M. Barth and I. Gow) Review of Accounting Studies, Sep 2012

App.247

- Featured in *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Nov 2010); *Wall Street Journal* (May 2015)


### Asset Securitizations and Credit Risk
(with M. Barth and G. Ormazabal) <u>The Accounting Review,</u> Mar 2012


### Frictions in the CEO Labor Market: The Role of Talent Agents in CEO Compensation
(with S. Rajgopal and M. Venkatachalam) <u>Contemporary Accounting Research,</u> Spring 2012


### Corporate Governance and the Information Content of Insider Trades
(with A. Jagolinzer and D. Larcker) <u>Journal of Accounting Research,</u> Dec 2011

- Featured in *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Oct 2011); *Marketwatch* (Mar 2019);


### The Market Reaction to Corporate Governance Regulation
(with D. Larcker and G. Ormazabal) <u>Journal of Financial Economics</u>, Aug 2011

- Cited in the SEC's final ruling on proxy access (SEC Rules 14a-8 and 14a-11), "Facilitating Shareholder Director Nominations" *SEC Release No. 33-9136*

- Synopses printed in *CFA Digest* (Aug 2011)

- Featured in *Wall Street Journal* (Jul 2010); *New York Times* (Nov 2010); *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Sep 2010); *CFA Institute* (Aug 2014)


### When Does Information Asymmetry Affect the Cost of Capital?
(with C. Armstrong, J. Core, and R. Verrecchia) <u>Journal of Accounting Research</u>, Mar 2011

- Cited in the SEC's proposed rule regarding mandatory clawbacks "Listing Standards for Recovery of Erroneously Awarded Compensation" *SEC Release No. 33-9861, 34-75342*

- Cited in the SEC's proposed exemptions to Section 404(b) of SOX "Amendments to the Accelerated Filer and Large Accelerated Filer Definitions" *SEC Release No. 34–85814*


### Correcting for Cross-Sectional and Time-Series Dependence in Accounting Research
(with I. Gow and G. Ormazabal) <u>The Accounting Review</u>, Mar 2010

- Top 5 most highly-cited paper published in the journal since 2010

**In Defense of Fair Value: Weighing the Evidence on Earnings Management and Asset Securitizations**
    (with M. Barth) Journal of Accounting and Economics, Feb 2010 [invited, not peer reviewed]

**The Stock Market's Pricing of Customer Satisfaction**
    (with C. Ittner and D. Larcker) Marketing Science, Oct 2009 [invited, not peer reviewed]

## CURRENT ACADEMIC WORKING PAPERS

**Dark Side of Investor Conferences: Evidence of Managerial Opportunism**
    (with B. Bushee and C. Zhu)
- Featured in Columbia Law School Blue Sky Blog (Jan 2021); *Bloomberg Money Stuff* (Jan 2021)

**Long-Term Information in the Decision to Provide a Short-Term Forecast**
    (with M. Heinle, C. Kim, and F. Zhou)

**Measurement Error, Fixed Effects, and False Positives in Accounting Research**
    (with J. Jennings, J.M. Kim, and J. Lee)

**The Information Content of Corporate Websites**
    (with B. Lynch)
- Featured in 2021 NBER Big Data and Securities Markets Conference

**Holding Foreign Insiders Accountable**
    (with R. Jackson and B. Lynch)
- Featured in *Wall Street Journal* (April 2022); *Bloomberg Money Stuff* (April 2022); congressional testimony before the Senate Banking Committee (April 2022); *Council of Institutional Investors, The Voice of Corporate Governance* (June 2022); Harvard Law School Forum on Corporate Governance and Financial Regulation (June 2022)
- Based on this paper, Sen. Kennedy introduced the "Holding Foreign Insiders Accountable Act" into the US Senate in May 2022

## PRACTITIONER PUBLICATIONS AND REGULATORY COMMENT LETTERS

App.249

**Amicus Curiae in Support of Claims that Engineered Short Squeezes are a Form of Market Manipulation** (co-authored with six other academics authoring in support) US Court of Appeals, Tenth Circuit, Case 21-4126, Feb 2022.

**Amicus Curiae in Support of Claims that SPACs are Not Valued as Operating Companies** (lead author; 30 academics authoring in support) US District Court for the Southern District of New York, Case 1:21-cv-07072-JPO, Nov 2021.

**Amicus Curiae in Support of Claims that 10B5-1 Trading Plans Can Be Probative of Scienter** (lead coauthor with Joshua Mitts, 7 academics authoring in support) US Court of Appeals for the 10th Circuit, Case 21-4058, Sept 2021.

**OpEd: Insider Trading Loopholes Need to be Closed** (with SEC Commissioner Caroline Crenshaw) Bloomberg, Mar 2021.

**Comment Letter on the SEC's Proposed Rule 144 Holding Period and Form 144 Filings** (with David Larcker and Bradford Lynch), Mar 2021

- Featured in Harvard Law School Forum on Corporate Governance and Financial Regulation (Mar 2021); Council of Institutional Investor's Comment Letter to the SEC (Mar 2021)

- Cited in the SEC's Proposed Rule Changes on Rule 10B5-1 "Rule 10B5-1 and Insider Trading" *SEC Release No. 34-93782*, Dec 2021

- Cited in the SEC's Final Rule "EDGAR Filing Requirements and Form 144 Filings" *SEC Release No. 33-11070*, June 2022

**Gaming the System: Three Red Flags of Potential 10B5-1 Abuse** (with D. Larcker, B. Lynch, P. Quinn, and B. Tayan) Stanford Closer Look Series, Jan 2021: 1-17. Stanford University Press.

- Presented to the *SEC's Investor Advisory Committee* (June 2021); presentation covered in *Law360* (June 2021)

- Featured in Harvard Law School Forum on Corporate Governance and Financial Regulation (Jan 2021); *Cooley PubCo* (Feb 2021); Council of Institutional Investor's Comment Letter to the SEC (Mar 2021); speech by Chairman Gensler at WSJ-CFO Summit (June 2021); speech by SEC Commissioner Allison Herren Lee (Dec 2021); *Reuters* (June 2021, Dec 2021); *Bloomberg* (June 2021, Dec 2021); *Bloomberg Money Stuff* (June 2021, Sept 2021); *Financial Times* (June 2021, July 2021, Dec 2021); *Law360* (June 2021 x4; July 2021); *Wall Street Journal* (June 2021, Aug 2021, Dec 2021 x2); *Forbes* (Aug 2021); and letters to the SEC by the AFL-CIO (April 2022),

7

    Council of Institutional Investor's (April 2022), and New York City Employee Retirement System (April 2022);

- Cited extensively in the SEC's Proposed Rule Changes on Rule 10B5-1 "Rule 10B5-1 and Insider Trading" *SEC Release No. 34-93782*, Dec 2021

- Cited in New York City Comptroller's proxy challenge to Abbott Labs on 10b5-1 plans, supported by ISS and GlassLewis with 49% of the vote

### OpEd: How the SEC Can and Should Fix Insider Trading Rules

    (with A. Jagolinzer and D. Larcker) <u>The Hill</u>, Dec 2020.

- Our policy recommendations were adopted by Senators Brown, Van Hollen, and Warren in their Feb 10, 2021 letter to the SEC urging changes in insider trading rules

- Cited in the SEC's Proposed Rule Changes on Rule 10B5-1 "Rule 10B5-1 and Insider Trading" *SEC Release No. 34-93782*, Dec 2021

### Comment Letter on the SEC's Proposed Reporting Threshold for Institutional Investment Managers

    (with M. Barth, T. Dyer, and W. Landsman), Sept 2020

- Featured in *IR Magazine* (Sept 2020); *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Oct 2020); *Council of Institutional Investor's Comment Letter to the SEC* (Oct 2020)

### OpEd: The Covid-19 Economic War: Congress Must Open a Second Front

    (with Y. Gopalan and T. Lys) <u>The Hill</u>, July 2020.

### The Spread of Covid-19 Disclosures

    (with D. Larcker, B. Lynch, and B. Tayan) in <u>Stanford Closer Look Series</u>, June 2020: 1-5. Stanford University Press.

- Featured in *Bloomberg Money Stuff* (June 2020); *Cooley PubCo* (June 2020); *Harvard Law School Forum on Corporate Governance and Financial Regulation* (July 2020); included in NIRI's Covid-19 Crisis Response Library (July 2020)

- Private staff briefing to *House Financial Services Committee* (July 2020)

- Presented to the *SEC's Investor Advisory Committee* (Dec 2020); presentation covered in *Law360* (Dec 2020)

### OpEd: Are You Angry with the Fed? You Should Be

    (with T. Lys) <u>The Hill</u>, June 22, 2020.

App.251

- Fed President Mary Daly responded to our arguments regarding Fed-fueled income inequality in "The Fed Isn't Fueling US Inequality," (*Reuters* June 23, 2020).

### Governance of Corporate Insiders' Equity Trades

(with D. Larcker, J.Kepler, and B. Tayan) in <u>Stanford Closer Look Series</u>, Jan 2020: 1-5. Stanford University Press.

- Featured in *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Jan 2020)

### Comment Letter on the SEC's Proposed Exemption to Internal Control Audits under SOX 404(b)

(with M. Barth, W. Landsman, and J. Schroeder), Jul 2019

- Featured in *Wall Street Journal* (Jul 2019); *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Jul 2019); *Council of Institutional Investor's Comment Letter to the SEC* (Jul 2019); *Better Market's Comment Letter to the SEC*; *Wall Street Journal* (Aug 2019); *CFA Institute's Comment Letter to the SEC*; *Corporate Secretary* (Aug 2019); *Internal Audit 360* (Aug 2019); *Wall Street Journal* (Mar 2020)

  - Cited in the SEC's final ruling on exemptions to 404(b) of SOX "Amendments to the Accelerated Filer and Large Accelerated Filer Definitions" *SEC Release No. 34–88365*

  - Cited in SEC Commissioner Allison Herren Lee's "Statement on the Rollback of Auditor Attestation Requirements"

### Follow the Money: Compensation, Risk, and the Financial Crisis

(with D. Larcker, G. Ormazabal, and B. Tayan) in <u>Stanford Closer Look Series</u>, Sept 2014: 1-5. Stanford University Press.

**Post-Earnings Announcement Drift and Related Anomalies**

in <u>Handbook of Equity Market Anomalies</u> (2011): 91-115. Wiley Publishing. Ed. Len Zacks.

## CONFERENCE DISCUSSIONS AND PANELS

"Research on Forensic Finance and Accounting" *2021 UT Symposium on Financial Market Policy Development & Research*

"How policy-makers use academic research on disclosure and governance," *2020 UT Symposium on Financial Market Policy Development & Research*

"Theory and Inference in Accounting Research," *2019 Stanford Theory & Inference Conference*

"Surviving and Thriving in the Profession," *2019, 2020, 2021 AAA Doctoral Consortium*

"Change in Capitol: How a 60 Minutes Expose and the STOCK Act Affected the Investment Activity of U.S. Senators," *2017 FEA Conference*

"When and Why do IPO Firms Manage Earnings," *2017 Review of Accounting Studies Conference*
- Winner, Morgan-Stanley Best Discussant Prize *2017 Review of Accounting Studies Conference*

"Pre-IPO Communication and Analyst Research: Evidence Surrounding the JOBS Act," *2017 NYU/SEC Changing Role of Stock Markets in Capital Formation*

"Increased Creditor Rights, Institutional Investors, and Corporate Myopia," *2016 Harvard IMO Conference*

"Payoffs to Aggressiveness," *2015 AAA Annual Meeting*

"The Unification of Theory and Empirical Research and the Path toward Knowledge," *2015 Junior Accounting Theory Conference*

"Corporate Governance and Securitization Quality: The Impact of Shareholder Rights in the Banking Industry," *2014 AAA Annual Meeting*

"Earnings Co-Movement and Earnings Manipulation in Different Economic States," *2014 FARS Mid-year Conference*

"Managerial Incentives to Increase Firm Volatility Provided by Debt, Stock, and Options," *2013 Washington University St. Louis Nick Dopuch Conference*

"The Association Between Audit Committee Characteristics and Information Asymmetry," *2013 AAA Annual Meeting*

"Accounting Experts, Information Cost, and Implied Cost of Equity Capital," *2013 AAA Annual Meeting*

"Management Team Incentive Alignment and Firm Value," *2013 FARS Mid-year Conference*

## INVITED PRESENTATIONS

2022:   UT-Austin Law; Yale; Stanford

2021: SEC Investor Advisory Committee; UT Symposium on Financial Market Policy Development & Research; Michigan State; Chinese Univ of Hong Kong; University of Maryland; SEC Enforcement; DoJ Fraud Unit; Northwestern; Minnesota; Baruch; Tilburg; UT-Dallas; SEC Division of Economic and Risk Analysis; Journal of Accounting and Economics Conference; Florida State; SEC Chair's Office

2020: SEC Commission-wide seminar; Accounting Theory Group; Univ of Miami; staff of House Financial Services Committee; UT Symposium on Financial Market Policy Development & Research; NYU; Georgia; SEC Investor Advisory Committee; Iowa; Review of Accounting Studies Conference

2019: Stanford; Michigan; PCAOB; SEC Commissioner's Office (x2); Washington Univ; Weinberg Corporate Governance Symposium; Florida; Carnegie-Mellon; Miami; Stanford Theory and Inference; Notre Dame Conference; Columbia; Indiana; Hawaii

2018: MIT; Toronto

2017: UC-Davis; Minnesota Spring Conference; NYU/SEC Changing Role of Stock Markets in Capital Formation; Review of Accounting Studies conference; FEA conference

2016: Temple; Utah; Chicago; Cornell; Harvard IMO Conference; Securities & Exchange Commission; Texas A&M; Treasury; Southern District of New York; FBI

2015: Rochester; AAA Mid-Atlantic Doctoral Consortium; Delaware; Penn State Accounting Research Conference; Colorado Summer Camp; Junior Accounting Theory Conference; AAA Annual Meeting

2014: FARS Mid-year Meeting; University of Texas Corporate Governance conference; Junior Accounting Theory Conference; AAA Annual Meeting; Stanford Summer Camp; USC; SUNY-Binghamton; Northwestern

2013: FARS Mid-year Meeting; Duke; AAA Annual Meeting; Duke/UNC Fall Camp; LBS; Washington University St. Louis Nick Dopuch Conference

## INVITED CONFERENCES

2021: UT Symposium on Financial Market Policy Development & Research (panelist); JAE conference (presenter); RAST conference (invited participant)

2020: UT Symposium on Financial Market Policy Development & Research (panelist); Stanford Virtual Summer Camp (invited participant); JAR conference (invited participant); NYU Institute for Corporate Governance (invited participant); JAE conference (invited participant); RAST conference (presenter)

2019: Weinberg Corporate Governance Symposium (presenter); Theory and Inference in Accounting Research (moderator); Notre Dame Accounting Conference (presenter); Miami Winter Warm-Up Conference (invited participant)

11

App.254

2018:  JAR conference (invited participant); NYU Summer Camp (invited participant); Harvard IMO conference (invited participant); Wharton Spring Conference (invited participant); Harvard IMO conference (invited participant); NYU Summer Camp (invited participant); Stanford Summer Camp (invited participant); Junior Accounting Theory Conference (invited participant); Toronto Summer Camp (presenter); JAR/PCAOB conference (invited participant); JAE conference (invited participant)

2017:  Minnesota Empirical Conference (presenter); NYU/SEC Changing Role of Stock Markets in Capital Formation (discussant); JAR conference (invited participant); Wharton Spring Conference (invited participant); Review of Accounting Studies conference (discussant); JAR/PCAOB conference (invited participant); JAE conference (invited participant); FEA conference (discussant);

2016:  JAR conference (invited participant); Harvard IMO conference (discussant); Wharton Spring Conference (invited participant); Colorado Summer Camp (invited participant); Stanford Summer Camp (invited participant); RAST conference (invited participant); JAR/PCAOB conference (invited participant); JAE conference (invited participant);

2015:  AAA Mid-Atlantic Doctoral Consortium (presenter); Penn State Accounting Research Conference (presenter); JAR conference (invited participant); Colorado Summer Camp (presenter); Junior Accounting Theory Conference (moderator); AAA Annual Meeting (discussant); JAE conference (presenter); JAR/PCAOB conference (invited participant); Washington University Nick Dopuch Conference (invited participant);

2014:  FARS Mid-year Meeting (presenter, discussant); University of Texas Corporate Governance conference (presenter); JAR conference (invited participant); Junior Accounting Theory Conference (presenter); AAA Annual Meeting (discussant); Stanford Summer Camp (presenter); JAE conference (presenter); Causality Conference (invited participant)

2013:  FARS Mid-year Meeting (discussant); JAE/HBS Social Responsibility conference (invited participant); Colorado Summer Camp (invited participant); Stanford Summer Camp (invited participant); UNC Global Issues in Accounting conference (invited participant); NYU-Stern Summer Camp (invited participant); AAA Annual Meeting (discussant); Duke/UNC Fall Camp (presenter); Washington University Nick Dopuch Conference (discussant); JAE conference (invited participant)

## *INTERNAL AND EXTERNAL SERVICE*

Editorial Positions

| | | |
|---|---|---|
| Management Science | *Associate Editor* | 2018 – present |
| The Accounting Review | *Editor* | 2018 – present |
| The Accounting Review | *Editorial Board* | 2017 – 2018 |
| Review of Accounting Studies | *Editorial Board* | 2018 – present |

App.255

| | | | |
|---|---|---|---|
| SSRN Accounting Theory eJournal | *Editorial Board* | 2018 – present |
| Journal of Financial Reporting | *Editorial Board* | 2016 – present |
| Journal of Accounting and Economics | *Editorial Board* | 2015 – present |
| Journal of Accounting Research | *Editorial Board* | 2016 – 2021 |
| | *Reviewer of the Year* | 2019 |

DISSERTATION COMMITTEES & PLACEMENTS

| | | |
|---|---|---|
| Bradford Lynch | (on the market, 2022-2023) | 2023 |
| Jung Min Kim | (Northwestern) | 2022 |
| John Kepler | (Stanford) | 2019 |
| Delphine Samuels | (MIT) | 2017 |
| Michael Carniol | (Rutgers) | 2017 |
| Jason Xiao | (University of Rochester) | 2016 |
| David Tsui | (USC) | 2015 |
| Terrence Blackburne | (University of Washington) | 2013 |

PROFESSIONAL SERVICE

| | |
|---|---|
| Member, WRDS Advisory Board, | 2020 – present |
| Member, Wharton IT Steering Committee | 2017 – present |
| Member, Wharton Rookie Recruiting Committee | 2015 – present |
| Member, Wharton PhD Qualifying Exam Committee | 2012 – present |
| Member, Wharton Curriculum Innovation & Review Committee | 2020 – 2021 |
| Leader, AAA/Deloitte Doctoral Consortium | 2019 – 2021 |
| Organizer & Founder, Wharton Theory Boot Camp for Empiricists | 2018 – 2020 |
| Leader, AAA New Faculty Consortium | 2019 |
| Member, FARS Meeting Editorial Committee | 2017 |
| Member, FARS Best Dissertation Award Committee | 2016 |
| Member, Wharton PhD Curriculum Committee | 2016 |
| Organizer, Wharton Seminar Series | 2013 – 2015 |
| Member, AAA Meeting Editorial Committee | 2013 |

## COURSE DEVELOPMENT

FORENSIC ANALYTICS (Spring 2019 – present)

Created this experiential course for undergraduates interested in learning how to manipulate Big Data and mine SEC filings to predict earnings, detect fraud, and flag suspicious trading behavior. The course draws on cutting-edge academic research in each topic; features industry guest speakers; introduces basic SQL coding skills; and leverages the computing power of AWS and the datasets at Wharton Research Data Services.

13

<u>EMPIRICAL DESIGN IN ACCOUNTING RESEARCH</u> (Spring 2014 – present)

Created this course for Ph.D. students looking for an advanced course on empirical methodology and research design with application to the accounting literature. The course emphasizes applied econometrics and research design rather than topical coverage of the literature [mini-versions taught at Northwestern, Stanford, and Washington University].

<u>INTRODUCTION TO FINANCIAL ACCOUNTING</u> (Fall 2010 – Fall 2017)

Designed a custom course pack for ~800 students.

## *ADDITIONAL INFORMATION*

Citizenship: United States
Hobbies/Other: hiking, home renovations, landscaping, Eagle Scout

App.257

# Exhibit 20

## June 2017 Recommendations of the Task Force on Climate-Related Financial Disclosures

Declaration of Bradley J. Hamburger In Support Of
Plaintiffs' Motion for Summary Judgment on Claim I
May 24, 2024

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.*,
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)



**Final Report**

# Recommendations of the Task Force on Climate-related Financial Disclosures

**TCFD** | TASK FORCE ON CLIMATE-RELATED FINANCIAL DISCLOSURES

**June 2017**

June 15, 2017

Mr. Mark Carney
Chairman
Financial Stability Board
Bank for International Settlements
Centralbahnplatz 2
CH-4002 Basel
Switzerland

Dear Chairman Carney,

On behalf of the Task Force on Climate-related Financial Disclosures, I am pleased to present this final report setting out our recommendations for helping businesses disclose climate-related financial information.

As you know, warming of the planet caused by greenhouse gas emissions poses serious risks to the global economy and will have an impact across many economic sectors. It is difficult for investors to know which companies are most at risk from climate change, which are best prepared, and which are taking action.

The Task Force's report establishes recommendations for disclosing clear, comparable and consistent information about the risks and opportunities presented by climate change. Their widespread adoption will ensure that the effects of climate change become routinely considered in business and investment decisions. Adoption of these recommendations will also help companies better demonstrate responsibility and foresight in their consideration of climate issues. That will lead to smarter, more efficient allocation of capital, and help smooth the transition to a more sustainable, low-carbon economy.

The industry Task Force spent 18 months consulting with a wide range of business and financial leaders to hone its recommendations and consider how to help companies better communicate key climate-related information. The feedback we received in response to the Task Force's draft report confirmed broad support from industry and others, and involved productive dialogue among companies and banks, insurers, and investors. This was and remains a collaborative process, and as these recommendations are implemented, we hope that this dialogue and feedback continues.

Since the Task Force began its work, we have also seen a significant increase in demand from investors for improved climate-related financial disclosures. This comes amid unprecedented support among companies for action to tackle climate change.

I want to thank the Financial Stability Board for its leadership in promoting better disclosure of climate-related financial risks, and for its support of the Task Force's work. I am also grateful to the Task Force members and Secretariat for their extensive contributions and dedication to this effort.

The risk climate change poses to businesses and financial markets is real and already present. It is more important than ever that businesses lead in understanding and responding to these risks—and seizing the opportunities—to build a stronger, more resilient, and sustainable global economy.

Sincerely,

Michael R. Bloomberg

---

## Executive Summary

### Financial Markets and Transparency

One of the essential functions of financial markets is to price risk to support informed, efficient capital-allocation decisions. Accurate and timely disclosure of current and past operating and financial results is fundamental to this function, but it is increasingly important to understand the governance and risk management context in which financial results are achieved. The financial crisis of 2007-2008 was an important reminder of the repercussions that weak corporate governance and risk management practices can have on asset values. This has resulted in increased demand for transparency from organizations on their governance structures, strategies, and risk management practices. Without the right information, investors and others may incorrectly price or value assets, leading to a misallocation of capital.

> Increasing transparency makes markets more efficient and economies more stable and resilient.
> —Michael R. Bloomberg

### Financial Implications of Climate Change

One of the most significant, and perhaps most misunderstood, risks that organizations face today relates to climate change. While it is widely recognized that continued emission of greenhouse gases will cause further warming of the planet and this warming could lead to damaging economic and social consequences, the exact timing and severity of physical effects are difficult to estimate. The large-scale and long-term nature of the problem makes it uniquely challenging, especially in the context of economic decision making. Accordingly, many organizations incorrectly perceive the implications of climate change to be long term and, therefore, not necessarily relevant to decisions made today.

The potential impacts of climate change on organizations, however, are not only physical and do not manifest only in the long term. To stem the disastrous effects of climate change within this century, nearly 200 countries agreed in December 2015 to reduce greenhouse gas emissions and accelerate the transition to a lower-carbon economy. The reduction in greenhouse gas emissions implies movement away from fossil fuel energy and related physical assets. This coupled with rapidly declining costs and increased deployment of clean and energy-efficient technologies could have significant, near-term financial implications for organizations dependent on extracting, producing, and using coal, oil, and natural gas. While such organizations may face significant climate-related risks, they are not alone. In fact, climate-related risks and the expected transition to a lower-carbon economy affect most economic sectors and industries. While changes associated with a transition to a lower-carbon economy present significant risk, they also create significant opportunities for organizations focused on climate change mitigation and adaptation solutions.

For many investors, climate change poses significant financial challenges and opportunities, now and in the future. The expected transition to a lower-carbon economy is estimated to require around $1 trillion of investments a year for the foreseeable future, generating new investment opportunities.[1] At the same time, the risk-return profile of organizations exposed to climate-related risks may change significantly as such organizations may be more affected by physical impacts of climate change, climate policy, and new technologies. In fact, a 2015 study estimated the value at risk, as a result of climate change, to the total global stock of manageable assets as

---

[1] International Energy Agency, *World Energy Outlook Special Briefing for COP21*, 2015.

ranging from $4.2 trillion to $43 trillion between now and the end of the century.[2] The study highlights that "much of the impact on future assets will come through weaker growth and lower asset returns across the board." This suggests investors may not be able to avoid climate-related risks by moving out of certain asset classes as a wide range of asset types could be affected. Both investors and the organizations in which they invest, therefore, should consider their longer-term strategies and most efficient allocation of capital. Organizations that invest in activities that may not be viable in the longer term may be less resilient to the transition to a lower-carbon economy; and their investors will likely experience lower returns. Compounding the effect on longer-term returns is the risk that present valuations do not adequately factor in climate-related risks because of insufficient information. As such, long-term investors need adequate information on how organizations are preparing for a lower-carbon economy.

Furthermore, because the transition to a lower-carbon economy requires significant and, in some cases, disruptive changes across economic sectors and industries in the near term, financial policymakers are interested in the implications for the global financial system, especially in terms of avoiding financial dislocations and sudden losses in asset values. Given such concerns and the potential impact on financial intermediaries and investors, the G20 Finance Ministers and Central Bank Governors asked the Financial Stability Board to review how the financial sector can take account of climate-related issues. As part of its review, the Financial Stability Board identified the need for better information to support informed investment, lending, and insurance underwriting decisions and improve understanding and analysis of climate-related risks and opportunities. Better information will also help investors engage with companies on the resilience of their strategies and capital spending, which should help promote a smooth rather than an abrupt transition to a lower-carbon economy.

## Task Force on Climate-related Financial Disclosures

To help identify the information needed by investors, lenders, and insurance underwriters to appropriately assess and price climate-related risks and opportunities, the Financial Stability Board established an industry-led task force: the Task Force on Climate-related Financial Disclosures (Task Force). The Task Force was asked to develop voluntary, consistent climate-related financial disclosures that would be useful to investors, lenders, and insurance underwriters in understanding material risks. The 32-member Task Force is global; its members were selected by the Financial Stability Board and come from various organizations, including large banks, insurance companies, asset managers, pension funds, large non-financial companies, accounting and consulting firms, and credit rating agencies. In its work, the Task Force drew on member expertise, stakeholder engagement, and existing climate-related disclosure regimes to develop a singular, accessible framework for climate-related financial disclosure.

The Task Force developed four widely adoptable recommendations on climate-related financial disclosures that are applicable to organizations across sectors and jurisdictions (Figure 1). Importantly, the Task Force's recommendations apply to financial-sector organizations, including banks, insurance companies, asset managers, and asset owners. Large asset owners and asset managers sit at the top of the investment chain and, therefore, have an

> **Figure 1**
> ## Key Features of Recommendations
> – Adoptable by all organizations
> – Included in financial filings
> – Designed to solicit decision-useful, forward-looking information on financial impacts
> – Strong focus on risks and opportunities related to transition to lower-carbon economy

---

[2] The Economist Intelligence Unit, "The Cost of Inaction: Recognising the Value at Risk from Climate Change," 2015. Value at risk measures the loss a portfolio may experience, within a given time horizon, at a particular probability, and the stock of manageable assets is defined as the total stock of assets held by non-bank financial institutions. Bank assets were excluded as they are largely managed by banks themselves.

important role to play in influencing the organizations in which they invest to provide better climate-related financial disclosures.

In developing and finalizing its recommendations, the Task Force solicited input throughout the process.[3] First, in April 2016, the Task Force sought public comment on the scope and high-level objectives of its work. As the Task Force developed its disclosure recommendations, it continued to solicit feedback through hundreds of industry interviews, meetings, and other touchpoints. Then, in December 2016, the Task Force issued its draft recommendations and sought public comment on the recommendations as well as certain key issues, receiving over 300 responses. This final report reflects the Task Force's consideration of industry and other public feedback received throughout 2016 and 2017. Section E contains a summary of key issues raised by the industry as well as substantive changes to the report since December.

### Disclosure in Mainstream Financial Filings

The Task Force recommends that preparers of climate-related financial disclosures provide such disclosures in their mainstream (i.e., public) annual financial filings. In most G20 jurisdictions, companies with public debt or equity have a legal obligation to disclose material information in their financial filings—including material climate-related information. The Task Force believes climate-related issues are or could be material for many organizations, and its recommendations should be useful to organizations in complying more effectively with existing disclosure obligations.[4] In addition, disclosure in mainstream financial filings should foster shareholder engagement and broader use of climate-related financial disclosures, thus promoting a more informed understanding of climate-related risks and opportunities by investors and others. The Task Force also believes that publication of climate-related financial information in mainstream annual financial filings will help ensure that appropriate controls govern the production and disclosure of the required information. More specifically, the Task Force expects the governance processes for these disclosures would be similar to those used for existing public financial disclosures and would likely involve review by the chief financial officer and audit committee, as appropriate.

Importantly, organizations should make financial disclosures in accordance with their national disclosure requirements. If certain elements of the recommendations are incompatible with national disclosure requirements for financial filings, the Task Force encourages organizations to disclose those elements in other official company reports that are issued at least annually, widely distributed and available to investors and others, and subject to internal governance processes that are the same or substantially similar to those used for financial reporting.

### Core Elements of Climate-Related Financial Disclosures

The Task Force structured its recommendations around four thematic areas that represent core elements of how organizations operate: governance, strategy, risk management, and metrics and targets (Figure 2, p. v). The four overarching recommendations are supported by recommended disclosures that build out the framework with information that will help investors and others understand how reporting organizations assess climate-related risks and opportunities.[5] In addition, there is guidance to support all organizations in developing climate-related financial disclosures consistent with the recommendations and recommended disclosures. The guidance assists preparers by providing context and suggestions for implementing the recommended disclosures. For the financial sector and certain non-financial sectors, *supplemental* guidance was developed to highlight important sector-specific considerations and provide a fuller picture of potential climate-related financial impacts in those sectors.

---

[3] See Appendix 2: Task Force Objectives and Approach for more information.

[4] The Task Force encourages organizations where climate-related issues could be material in the future to begin disclosing climate-related financial information outside financial filings to facilitate the incorporation of such information into financial filings once climate-related issues are determined to be material.

[5] See Figure 4 on p. 14 for the Task Force's recommendations and recommended disclosures.



Figure 2

## Core Elements of Recommended Climate-Related Financial Disclosures

**Governance**
The organization's governance around climate-related risks and opportunities

**Strategy**
The actual and potential impacts of climate-related risks and opportunities on the organization's businesses, strategy, and financial planning

**Risk Management**
The processes used by the organization to identify, assess, and manage climate-related risks

**Metrics and Targets**
The metrics and targets used to assess and manage relevant climate-related risks and opportunities

**Climate-Related Scenarios**

One of the Task Force's key recommended disclosures focuses on the resilience of an organization's strategy, taking into consideration different climate-related scenarios, including a 2° Celsius or lower scenario.[6] An organization's disclosure of how its strategies might change to address potential climate-related risks and opportunities is a key step to better understanding the potential implications of climate change on the organization. The Task Force recognizes the use of scenarios in assessing climate-related issues and their potential financial implications is relatively recent and practices will evolve over time, but believes such analysis is important for improving the disclosure of decision-useful, climate-related financial information.

## Conclusion

Recognizing that climate-related financial reporting is still evolving, the Task Force's recommendations provide a foundation to improve investors' and others' ability to appropriately assess and price climate-related risk and opportunities. The Task Force's recommendations aim to be ambitious, but also practical for near-term adoption. The Task Force expects to advance the quality of mainstream financial disclosures related to the potential effects of climate change on organizations today and in the future and to increase investor engagement with boards and senior management on climate-related issues.

Improving the quality of climate-related financial disclosures begins with organizations' willingness to adopt the Task Force's recommendations. Organizations already reporting climate-related information under other frameworks may be able to disclose under this framework immediately and are strongly encouraged to do so. Those organizations in early stages of evaluating the impact of climate change on their businesses and strategies can begin by disclosing climate-related issues as they relate to governance, strategy, and risk management practices. The Task Force recognizes the challenges associated with measuring the impact of climate change, but believes that by moving climate-related issues into mainstream annual financial filings, practices and techniques will evolve more rapidly. Improved practices and techniques, including data analytics, should further improve the quality of climate-related financial disclosures and, ultimately, support more appropriate pricing of risks and allocation of capital in the global economy.

---

[6]  A 2° Celsius (2°C) scenario lays out an energy system deployment pathway and an emissions trajectory consistent with limiting the global average temperature increase to 2°C above the pre-industrial average. The Task Force is not recommending organizations use a specific 2°C scenario.

# Contents

Letter from Michael R. Bloomberg ................................................................................. i

Executive Summary ...................................................................................................... ii

A  Introduction ........................................................................................................... 1
  1. Background ............................................................................................................ 1
  2. The Task Force's Remit ......................................................................................... 2

B  Climate-Related Risks, Opportunities, and Financial Impacts ........................... 5
  1. Climate-Related Risks ........................................................................................... 5
  2. Climate-Related Opportunities ............................................................................. 6
  3. Financial Impacts ................................................................................................. 8

C  Recommendations and Guidance ....................................................................... 13
  1. Overview of Recommendations and Guidance ..................................................... 13
  2. Implementing the Recommendations ................................................................... 17
  3. Guidance for All Sectors ...................................................................................... 19

D  Scenario Analysis and Climate-Related Issues .................................................. 25
  1. Overview of Scenario Analysis ............................................................................. 25
  2. Exposure to Climate-Related Risks ...................................................................... 26
  3. Recommended Approach to Scenario Analysis .................................................... 27
  4. Applying Scenario Analysis ................................................................................. 29
  5. Challenges and Benefits of Conducting Scenario Analysis ................................... 30

E  Key Issues Considered and Areas for Further Work .......................................... 32
  1. Relationship to Other Reporting Initiatives .......................................................... 33
  2. Location of Disclosures and Materiality ............................................................... 33
  3. Scenario Analysis ............................................................................................... 35
  4. Data Availability and Quality and Financial Impact .............................................. 35
  5. GHG Emissions Associated with Investments ...................................................... 36
  6. Remuneration ..................................................................................................... 37
  7. Accounting Considerations .................................................................................. 37
  8. Time Frames for Short, Medium, and Long Term ................................................. 38
  9. Scope of Coverage .............................................................................................. 38
  10. Organizational Ownership .................................................................................. 39

F  Conclusion ........................................................................................................... 41

Appendix 1: Task Force Members ................................................................................ 44

Appendix 2: Task Force Objectives and Approach ...................................................... 46

Appendix 3: Fundamental Principles for Effective Disclosure ..................................... 51

Appendix 4: Select Disclosure Frameworks ................................................................ 54

Appendix 5: Glossary and Abbreviations .................................................................... 62

Appendix 6: References .............................................................................................. 65

# A Introduction

# A   Introduction

## 1. Background

It is widely recognized that continued emission of greenhouse gases will cause further warming of the Earth and that warming above 2° Celsius (2°C), relative to the pre-industrial period, could lead to catastrophic economic and social consequences.[7] As evidence of the growing recognition of the risks posed by climate change, in December 2015, nearly 200 governments agreed to strengthen the global response to the threat of climate change by "holding the increase in the global average temperature to well below 2°C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5°C above pre-industrial levels," referred to as the Paris Agreement.[8] The large-scale and long-term nature of the problem makes it uniquely challenging, especially in the context of economic decision making. Moreover, the current understanding of the potential financial risks posed by climate change—to companies, investors, and the financial system as a whole—is still at an early stage.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

There is a growing demand for decision-useful, climate-related information by a range of participants in the financial markets.[9] Creditors and investors are increasingly demanding access to risk information that is consistent, comparable, reliable, and clear. There has also been increased focus, especially since the financial crisis of 2007-2008, on the negative impact that weak corporate governance can have on shareholder value, resulting in increased demand for transparency from organizations on their risks and risk management practices, including those related to climate change.

The growing demand for decision-useful, climate-related information has resulted in the development of several climate-related disclosure standards. Many of the existing standards, however, focus on disclosure of climate-related information, such as greenhouse gas (GHG) emissions and other sustainability metrics. Users of such climate-related disclosures commonly cite the lack of information on the financial implications around the climate-related aspects of an organization's business as a key gap. Users also cite inconsistencies in disclosure practices, a lack of context for information, use of boilerplate, and non-comparable reporting as major obstacles to incorporating climate-related risks and opportunities (collectively referred to as climate-related issues) as considerations in their investment, lending, and insurance underwriting decisions over the medium and long term.[10] In addition, evidence suggests that the lack of consistent information hinders investors and others from considering climate-related issues in their asset valuation and allocation processes.[11]

In general, inadequate information about risks can lead to a mispricing of assets and misallocation of capital and can potentially give rise to concerns about financial stability since markets can be vulnerable to abrupt corrections.[12] Recognizing these concerns, the G20 (Group of 20) Finance Ministers and Central Bank Governors requested that the Financial Stability Board (FSB) "convene public- and private-sector participants to review how the financial sector can take account of climate-related issues."[13] In response to the G20's request, the FSB held a meeting of public- and private-sector representatives in September 2015 to consider the implications of climate-related issues for the financial sector. "Participants exchanged views on the existing work of the financial sector, authorities, and standard setters in this area and the challenges they face,

---

[7] Intergovernmental Panel on Climate Change, *Fifth Assessment Report*, Cambridge University Press, 2014.
[8] United Nations Framework Convention on Climate Change, "The Paris Agreement," December 2015.
[9] Avery Fellow, "Investors Demand Climate Risk Disclosure," Bloomberg, February 2013.
[10] Sustainability Accounting Standards Board (SASB), *SASB Climate Risk Technical Bulletin#: TB001-10182016*, October 2016.
[11] Mercer LLC, *Investing in a Time of Climate Change*, 2015.
[12] Mark Carney, "Breaking the tragedy of the horizon—climate change and financial stability," September 29, 2015.
[13] "Communiqué from the G20 Finance Ministers and Central Bank Governors Meeting in Washington, D.C. April 16-17, 2015," April 2015.

areas for possible further work, and the possible roles the FSB and others could play in taking that work forward. The discussions continually returned to a common theme: the need for better information."[14]

In most G20 jurisdictions, companies with public debt or equity have a legal obligation to disclose material risks in their financial reports—including material climate-related risks. However, the absence of a standardized framework for disclosing climate-related financial risks makes it difficult for organizations to determine what information should be included in their filings and how it should be presented. Even when reporting similar climate-related information, disclosures are often difficult to compare due to variances in mandatory and voluntary frameworks. The resulting fragmentation in reporting practices and lack of focus on financial impacts have prevented investors, lenders, insurance underwriters, and other users of disclosures from accessing complete information that can inform their economic decisions. Furthermore, because financial-sector organizations' disclosures depend, in part, on those from the companies in which they invest or lend, regulators face challenges in using financial-sector organizations' existing disclosures to determine system-wide exposures to climate-related risks.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

In response, the FSB established the industry-led Task Force on Climate-related Financial Disclosures (TCFD or Task Force) in December 2015 to design a set of recommendations for consistent "disclosures that will help financial market participants understand their climate-related risks."[15] See Box 1 (p. 3) for more information on the Task Force.

## 2. The Task Force's Remit

The FSB called on the Task Force to develop climate-related disclosures that "could promote more informed investment, credit [or lending], and insurance underwriting decisions" and, in turn, "would enable stakeholders to understand better the concentrations of carbon-related assets in the financial sector and the financial system's exposures to climate-related risks."[16,17] The FSB noted that disclosures by the financial sector in particular would "foster an early assessment of these risks" and "facilitate market discipline." Such disclosures would also "provide a source of data that can be analyzed at a systemic level, to facilitate authorities' assessments of the materiality of any risks posed by climate change to the financial sector, and the channels through which this is most likely to be transmitted."[18]

The FSB also emphasized that "any disclosure recommendations by the Task Force would be voluntary, would need to incorporate the principle of materiality and would need to weigh the balance of costs and benefits."[19] As a result, in devising a principle-based framework for voluntary disclosure, the Task Force sought to balance the needs of the users of disclosures with the challenges faced by the preparers. The FSB further stated that the Task Force's climate-related financial disclosure recommendations should not "add to the already well developed body of existing disclosure schemes."[20] In response, the Task Force drew from existing disclosure frameworks where possible and appropriate.

The FSB also noted the Task Force should determine whether the target audience of users of climate-related financial disclosures should extend beyond investors, lenders, and insurance underwriters. Investors, lenders, and insurance underwriters ("primary users") are the appropriate target audience. These primary users assume the financial risk and reward of the

---

[14] FSB, "FSB to establish Task Force on Climate-related Financial Disclosures," December 4, 2015.
[15] Ibid.
[16] FSB, "Proposal for a Disclosure Task Force on Climate-Related Risks," November 9, 2015.
[17] The term carbon-related assets is not well defined, but is generally considered to refer to assets or organizations with relatively high direct or indirect GHG emissions. The Task Force believes further work is needed on defining carbon-related assets and potential financial impacts.
[18] FSB, "Proposal for a Disclosure Task Force on Climate-Related Risks," November 9, 2015.
[19] Ibid.
[20] Ibid.

decisions they make. The Task Force recognizes that many other organizations, including credit rating agencies, equity analysts, stock exchanges, investment consultants, and proxy advisors also use climate-related financial disclosures, allowing them to push information through the credit and investment chain and contribute to the better pricing of risks by investors, lenders, and insurance underwriters. These organizations, in principle, depend on the same types of information as primary users.

This report presents the Task Force's recommendations for climate-related financial disclosures and includes supporting information on climate-related risks and opportunities, scenario analysis, and industry feedback that the Task Force considered in developing and then finalizing its recommendations. In addition, the Task Force developed a "stand-alone" document— *Implementing the Recommendations of the Task Force on Climate-related Financial Disclosures* (Annex)—for organizations to use when preparing disclosures consistent with the recommendations. The Annex provides supplemental guidance for the financial sector as well as for non-financial groups potentially most affected by climate change and the transition to a lower-carbon economy. The supplemental guidance assists preparers by providing additional context and suggestions for implementing the recommended disclosures.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

The Task Force's recommendations provide a foundation for climate-related financial disclosures and aim to be ambitious, but also practical for near-term adoption. The Task Force expects that reporting of climate-related risks and opportunities will evolve over time as organizations, investors, and others contribute to the quality and consistency of the information disclosed.



Box 1

## Task Force on Climate-related Financial Disclosures

The Task Force membership, first announced on January 21, 2016, has international representation and spans various types of organizations, including banks, insurance companies, asset managers, pension funds, large non-financial companies, accounting and consulting firms, and credit rating agencies—a unique collaborative partnership between the users and preparers of financial reports.

In its work, the Task Force drew on its members' expertise, stakeholder engagement, and existing climate-related disclosure regimes to develop a singular, accessible framework for climate-related financial disclosure. See Appendix 1 for a list of the Task Force members and Appendix 2 for more information on the Task Force's approach.

The Task Force is comprised of 32 global members representing a broad range of economic sectors and financial markets and a careful balance of users and preparers of climate-related financial disclosures.

16
Experts from the Financial Sector

8
Experts from Non-Financial Sectors

8
Other Experts

Case 2:24-cv-00801-ODW-PVC    Document 48-23    Filed 05/24/24    Page 13 of 75    Page ID #:1190

# B Climate-Related Risks, Opportunities, and Financial Impacts

## B  Climate-Related Risks, Opportunities, and Financial Impacts

Through its work, the Task Force identified a growing demand by investors, lenders, insurance underwriters, and other stakeholders for decision-useful, climate-related financial information. Improved disclosure of climate-related risks and opportunities will provide investors, lenders, insurance underwriters, and other stakeholders with the metrics and information needed to undertake robust and consistent analyses of the potential financial impacts of climate change.

The Task Force found that while several climate-related disclosure frameworks have emerged across different jurisdictions in an effort to meet the growing demand for such information, there is a need for a standardized framework to promote alignment across existing regimes and G20 jurisdictions and to provide a common framework for climate-related financial disclosures. An important element of such a framework is the consistent categorization of climate-related risks and opportunities. As a result, the Task Force defined categories for climate-related risks and climate-related opportunities. The Task Force's recommendations serve to encourage organizations to evaluate and disclose, as part of their annual financial filing preparation and reporting processes, the climate-related risks and opportunities that are most pertinent to their business activities. The main climate-related risks and opportunities that organizations should consider are described below and in Tables 1 and 2 (pp. 10-11).

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

### 1. Climate-Related Risks

The Task Force divided climate-related risks into two major categories: (1) risks related to the *transition* to a lower-carbon economy and (2) risks related to the *physical* impacts of climate change.

**a. Transition Risks**

Transitioning to a lower-carbon economy may entail extensive policy, legal, technology, and market changes to address mitigation and adaptation requirements related to climate change. Depending on the nature, speed, and focus of these changes, transition risks may pose varying levels of financial and reputational risk to organizations.

**Policy and Legal Risks**

Policy actions around climate change continue to evolve. Their objectives generally fall into two categories—policy actions that attempt to constrain actions that contribute to the adverse effects of climate change or policy actions that seek to promote adaptation to climate change. Some examples include implementing carbon-pricing mechanisms to reduce GHG emissions, shifting energy use toward lower emission sources, adopting energy-efficiency solutions, encouraging greater water efficiency measures, and promoting more sustainable land-use practices. The risk associated with and financial impact of policy changes depend on the nature and timing of the policy change.[21]

Another important risk is litigation or legal risk. Recent years have seen an increase in climate-related litigation claims being brought before the courts by property owners, municipalities, states, insurers, shareholders, and public interest organizations.[22] Reasons for such litigation include the failure of organizations to mitigate impacts of climate change, failure to adapt to climate change, and the insufficiency of disclosure around material financial risks. As the value of loss and damage arising from climate change grows, litigation risk is also likely to increase.

---

[21] Organizations should assess not only the potential direct effects of policy actions on their operations, but also the potential second and third order effects on their supply and distribution chains.

[22] Peter Seley, "Emerging Trends in Climate Change Litigation," *Law 360,* March 7, 2016.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

### Technology Risk

Technological improvements or innovations that support the transition to a lower-carbon, energy-efficient economic system can have a significant impact on organizations. For example, the development and use of emerging technologies such as renewable energy, battery storage, energy efficiency, and carbon capture and storage will affect the competitiveness of certain organizations, their production and distribution costs, and ultimately the demand for their products and services from end users. To the extent that new technology displaces old systems and disrupts some parts of the existing economic system, winners and losers will emerge from this "creative destruction" process. The timing of technology development and deployment, however, is a key uncertainty in assessing technology risk.

### Market Risk

While the ways in which markets could be affected by climate change are varied and complex, one of the major ways is through shifts in supply and demand for certain commodities, products, and services as climate-related risks and opportunities are increasingly taken into account.

### Reputation Risk

Climate change has been identified as a potential source of reputational risk tied to changing customer or community perceptions of an organization's contribution to or detraction from the transition to a lower-carbon economy.

### b. Physical Risks

Physical risks resulting from climate change can be event driven (acute) or longer-term shifts (chronic) in climate patterns. Physical risks may have financial implications for organizations, such as direct damage to assets and indirect impacts from supply chain disruption. Organizations' financial performance may also be affected by changes in water availability, sourcing, and quality; food security; and extreme temperature changes affecting organizations' premises, operations, supply chain, transport needs, and employee safety.

### Acute Risk

Acute physical risks refer to those that are event-driven, including increased severity of extreme weather events, such as cyclones, hurricanes, or floods.

### Chronic Risk

Chronic physical risks refer to longer-term shifts in climate patterns (e.g., sustained higher temperatures) that may cause sea level rise or chronic heat waves.

## 2. Climate-Related Opportunities

Efforts to mitigate and adapt to climate change also produce opportunities for organizations, for example, through resource efficiency and cost savings, the adoption of low-emission energy sources, the development of new products and services, access to new markets, and building resilience along the supply chain. Climate-related opportunities will vary depending on the region, market, and industry in which an organization operates. The Task Force identified several areas of opportunity as described below.

### a. Resource Efficiency

There is growing evidence and examples of organizations that have successfully reduced operating costs by improving efficiency across their production and distribution processes, buildings, machinery/appliances, and transport/mobility—in particular in relation to energy efficiency but also including broader materials, water, and waste management.[23] Such actions can

---

[23] UNEP and Copenhagen Centre for Energy Efficiency, *Best Practices and Case Studies for Industrial Energy Efficiency Improvement*, February 16, 2016.

result in direct cost savings to organizations' operations over the medium to long term and contribute to the global efforts to curb emissions.[24] Innovation in technology is assisting this transition; such innovation includes developing efficient heating solutions and circular economy solutions, making advances in LED lighting technology and industrial motor technology, retrofitting buildings, employing geothermal power, offering water usage and treatment solutions, and developing electric vehicles.[25]

### b. Energy Source

According to the International Energy Agency (IEA), to meet global emission-reduction goals, countries will need to transition a major percentage of their energy generation to low emission alternatives such as wind, solar, wave, tidal, hydro, geothermal, nuclear, biofuels, and carbon capture and storage.[26] For the fifth year in a row, investments in renewable energy capacity have exceeded investments in fossil fuel generation.[27] The trend toward decentralized clean energy sources, rapidly declining costs, improved storage capabilities, and subsequent global adoption of these technologies are significant. Organizations that shift their energy usage toward low emission energy sources could potentially save on annual energy costs.[28]

### c. Products and Services

Organizations that innovate and develop new low-emission products and services may improve their competitive position and capitalize on shifting consumer and producer preferences. Some examples include consumer goods and services that place greater emphasis on a product's carbon footprint in its marketing and labeling (e.g., travel, food, beverage and consumer staples, mobility, printing, fashion, and recycling services) and producer goods that place emphasis on reducing emissions (e.g., adoption of energy-efficiency measures along the supply chain).

### d. Markets

Organizations that pro-actively seek opportunities in new markets or types of assets may be able to diversify their activities and better position themselves for the transition to a lower-carbon economy. In particular, opportunities exist for organizations to access new markets through collaborating with governments, development banks, small-scale local entrepreneurs, and community groups in developed and developing countries as they work to shift to a lower-carbon economy.[29] New opportunities can also be captured through underwriting or financing green bonds and infrastructure (e.g., low-emission energy production, energy efficiency, grid connectivity, or transport networks).

### e. Resilience

The concept of climate resilience involves organizations developing adaptive capacity to respond to climate change to better manage the associated risks and seize opportunities, including the ability to respond to transition risks and physical risks. Opportunities include improving efficiency, designing new production processes, and developing new products. Opportunities related to resilience may be especially relevant for organizations with long-lived fixed assets or extensive supply or distribution networks; those that depend critically on utility and infrastructure networks or natural resources in their value chain; and those that may require longer-term financing and investment.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

---

[24] Environmental Protection Agency Victoria (EPA Victoria), "Resource Efficiency Case Studies: Lower your Impact."

[25] As described by Pearce and Turner, circular economy refers to a system in which resource input and waste, emission, and energy leakage are minimized. This can be achieved through long-lasting design, maintenance, repair, reuse, remanufacturing, refurbishing, and recycling. This is in contrast to a linear economy which is a "take, make, dispose" model of production.

[26] IEA, "Global energy investment down 8% in 2015 with flows signaling move towards cleaner energy," September 14, 2016.

[27] Frankfurt School-United Nations Environmental Programme Centre and Bloomberg New Energy Finance, "Global Trends in Renewable Energy Investment," 2017.

[28] Ceres, "Power Forward 3.0: How the largest US companies are capturing business value while addressing climate change," 2017.

[29] G20 Green Finance Study Group. G20 Green Finance Synthesis Report. 2016. The proposal to launch the Green Finance Study Group was adopted by the G20 Finance Ministers and Central Bank Deputies in December 2015.

---

### 3. Financial Impacts

Better disclosure of the financial impacts of climate-related risks and opportunities on an organization is a key goal of the Task Force's work. In order to make more informed financial decisions, investors, lenders, and insurance underwriters need to understand how climate-related risks and opportunities are likely to impact an organization's future financial position as reflected in its income statement, cash flow statement, and balance sheet as outlined in Figure 1. While climate change affects nearly all economic sectors, the level and type of exposure and the impact of climate-related risks differs by sector, industry, geography, and organization.[30]



Figure 1

**Climate-Related Risks, Opportunities, and Financial Impact**

A
Introduction

**B**
**Climate-Related Risks, Opportunities, and Financial Impacts**

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

Fundamentally, the financial impacts of climate-related issues on an organization are driven by the specific climate-related risks and opportunities to which the organization is exposed and its strategic and risk management decisions on managing those risks (i.e., mitigate, transfer, accept, or control) and seizing those opportunities. The Task Force has identified four major categories, described in Figure 2 (p. 9), through which climate-related risks and opportunities may affect an organization's current and future financial positions.

The financial impacts of climate-related issues on organizations are not always clear or direct, and, for many organizations, identifying the issues, assessing potential impacts, and ensuring material issues are reflected in financial filings may be challenging. Key reasons for this are likely because of (1) limited knowledge of climate-related issues within organizations; (2) the tendency to focus mainly on near-term risks without paying adequate attention to risks that may arise in the longer term; and (3) the difficulty in quantifying the financial effects of climate-related issues.[31] To assist organizations in identifying climate-related issues and their impacts, the Task Force developed Table 1 (p. 10), which provides examples of climate-related risks and their potential financial impacts, and Table 2 (p. 11), which provides examples of climate-related opportunities and their potential financial impacts. In addition, Section A.4 in the Annex provides more information on the major categories of financial impacts—revenues, expenditures, assets and liabilities, and capital and financing—that are likely to be most relevant for specific industries.

---

[30] SASB research demonstrates that 72 out of 79 Sustainable Industry Classification System (SICS™) industries are significantly affected in some way by climate-related risk.

[31] World Business Council for Sustainable Development, "Sustainability and enterprise risk management: The first step towards integration." January 18, 2017.

---

Figure 2

## Major Categories of Financial Impact

| Income Statement | Balance Sheet |
|---|---|
| **Revenues.** Transition and physical risks may affect demand for products and services. Organizations should consider the potential impact on revenues and identify potential opportunities for enhancing or developing new revenues. In particular, given the emergence and likely growth of carbon pricing as a mechanism to regulate emissions, it is important for affected industries to consider the potential impacts of such pricing on business revenues. | **Assets and Liabilities.** Supply and demand changes from changes in policies, technology, and market dynamics related to climate change could affect the valuation of organizations' assets and liabilities. Use of long-lived assets and, where relevant, reserves may be particularly affected by climate-related issues. It is important for organizations to provide an indication of the potential climate-related impact on their assets and liabilities, particularly long-lived assets. This should focus on existing and committed future activities and decisions requiring new investment, restructuring, write-downs, or impairment. |
| **Expenditures.** An organization's response to climate-related risks and opportunities may depend, in part, on the organization's cost structure. Lower-cost suppliers may be more resilient to changes in cost resulting from climate-related issues and more flexible in their ability to address such issues. By providing an indication of their cost structure and flexibility to adapt, organizations can better inform investors about their investment potential.<br><br>It is also helpful for investors to understand capital expenditure plans and the level of debt or equity needed to fund these plans. The resilience of such plans should be considered bearing in mind organizations' flexibility to shift capital and the willingness of capital markets to fund organizations exposed to significant levels of climate-related risks. Transparency of these plans may provide greater access to capital markets or improved financing terms. | **Capital and Financing.** Climate-related risks and opportunities may change the profile of an organization's debt and equity structure, either by increasing debt levels to compensate for reduced operating cash flows or for new capital expenditures or R&D. It may also affect the ability to raise new debt or refinance existing debt, or reduce future tenor of borrowing available to the organization. There could also be changes to capital and reserves from operating losses, asset write-downs, or the need to raise new equity to meet investment. |

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

The Task Force encourages organizations to undertake both historical and forward-looking analyses when considering the potential financial impacts of climate change, with greater focus on forward-looking analyses as the efforts to mitigate and adapt to climate change are without historical precedent. This is one of the reasons the Task Force believes scenario analysis is important for organizations to consider incorporating into their strategic planning or risk management practices.

Table 1

## Examples of Climate-Related Risks and Potential Financial Impacts

| Type | Climate-Related Risks[32] | Potential Financial Impacts |
|---|---|---|
| **Transition Risks** | **Policy and Legal**<br>– Increased pricing of GHG emissions<br>– Enhanced emissions-reporting obligations<br>– Mandates on and regulation of existing products and services<br>– Exposure to litigation | – Increased operating costs (e.g., higher compliance costs, increased insurance premiums)<br>– Write-offs, asset impairment, and early retirement of existing assets due to policy changes<br>– Increased costs and/or reduced demand for products and services resulting from fines and judgments |
| | **Technology**<br>– Substitution of existing products and services with lower emissions options<br>– Unsuccessful investment in new technologies<br>– Costs to transition to lower emissions technology | – Write-offs and early retirement of existing assets<br>– Reduced demand for products and services<br>– Research and development (R&D) expenditures in new and alternative technologies<br>– Capital investments in technology development<br>– Costs to adopt/deploy new practices and processes |
| | **Market**<br>– Changing customer behavior<br>– Uncertainty in market signals<br>– Increased cost of raw materials | – Reduced demand for goods and services due to shift in consumer preferences<br>– Increased production costs due to changing input prices (e.g., energy, water) and output requirements (e.g., waste treatment)<br>– Abrupt and unexpected shifts in energy costs<br>– Change in revenue mix and sources, resulting in decreased revenues<br>– Re-pricing of assets (e.g., fossil fuel reserves, land valuations, securities valuations) |
| | **Reputation**<br>– Shifts in consumer preferences<br>– Stigmatization of sector<br>– Increased stakeholder concern or negative stakeholder feedback | – Reduced revenue from decreased demand for goods/services<br>– Reduced revenue from decreased production capacity (e.g., delayed planning approvals, supply chain interruptions)<br>– Reduced revenue from negative impacts on workforce management and planning (e.g., employee attraction and retention)<br>– Reduction in capital availability |
| **Physical Risks** | **Acute**<br>– Increased severity of extreme weather events such as cyclones and floods<br><br>**Chronic**<br>– Changes in precipitation patterns and extreme variability in weather patterns<br>– Rising mean temperatures<br>– Rising sea levels | – Reduced revenue from decreased production capacity (e.g., transport difficulties, supply chain interruptions)<br>– Reduced revenue and higher costs from negative impacts on workforce (e.g., health, safety, absenteeism)<br>– Write-offs and early retirement of existing assets (e.g., damage to property and assets in "high-risk" locations)<br>– Increased operating costs (e.g., inadequate water supply for hydroelectric plants or to cool nuclear and fossil fuel plants)<br>– Increased capital costs (e.g., damage to facilities)<br>– Reduced revenues from lower sales/output<br>– Increased insurance premiums and potential for reduced availability of insurance on assets in "high-risk" locations |

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

[32] The sub-category risks described under each major category are not mutually exclusive, and some overlap exists.

Table 2

## Examples of Climate-Related Opportunities and Potential Financial Impacts

| Type | Climate-Related Opportunities[33] | Potential Financial Impacts |
|---|---|---|
| Resource Efficiency | – Use of more efficient modes of transport<br>– Use of more efficient production and distribution processes<br>– Use of recycling<br>– Move to more efficient buildings<br>– Reduced water usage and consumption | – Reduced operating costs (e.g., through efficiency gains and cost reductions)<br>– Increased production capacity, resulting in increased revenues<br>– Increased value of fixed assets (e.g., highly rated energy-efficient buildings)<br>– Benefits to workforce management and planning (e.g., improved health and safety, employee satisfaction) resulting in lower costs |
| Energy Source | – Use of lower-emission sources of energy<br>– Use of supportive policy incentives<br>– Use of new technologies<br>– Participation in carbon market<br>– Shift toward decentralized energy generation | – Reduced operational costs (e.g., through use of lowest cost abatement)<br>– Reduced exposure to future fossil fuel price increases<br>– Reduced exposure to GHG emissions and therefore less sensitivity to changes in cost of carbon<br>– Returns on investment in low-emission technology<br>– Increased capital availability (e.g., as more investors favor lower-emissions producers)<br>– Reputational benefits resulting in increased demand for goods/services |
| Products and Services | – Development and/or expansion of low emission goods and services<br>– Development of climate adaptation and insurance risk solutions<br>– Development of new products or services through R&D and innovation<br>– Ability to diversify business activities<br>– Shift in consumer preferences | – Increased revenue through demand for lower emissions products and services<br>– Increased revenue through new solutions to adaptation needs (e.g., insurance risk transfer products and services)<br>– Better competitive position to reflect shifting consumer preferences, resulting in increased revenues |
| Markets | – Access to new markets<br>– Use of public-sector incentives<br>– Access to new assets and locations needing insurance coverage | – Increased revenues through access to new and emerging markets (e.g., partnerships with governments, development banks)<br>– Increased diversification of financial assets (e.g., green bonds and infrastructure) |
| Resilience | – Participation in renewable energy programs and adoption of energy-efficiency measures<br>– Resource substitutes/diversification | – Increased market valuation through resilience planning (e.g., infrastructure, land, buildings)<br>– Increased reliability of supply chain and ability to operate under various conditions<br>– Increased revenue through new products and services related to ensuring resiliency |

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

[33] The opportunity categories are not mutually exclusive, and some overlap exists.

Case 2:24-cv-00801-ODW-PVC Document 48-23 Filed 05/24/24 Page 21 of 75 Page ID #:1198

# C Recommendations and Guidance

# C Recommendations and Guidance

## 1. Overview of Recommendations and Guidance

To fulfill its remit, the Task Force developed four widely adoptable recommendations on climate-related financial disclosures applicable to organizations across sectors and jurisdictions. In developing its recommendations, the Task Force considered the challenges for preparers of disclosures as well as the benefits of such disclosures to investors, lenders, and insurance underwriters. To achieve this balance, the Task Force engaged in significant outreach and consultation with users and preparers of disclosures and drew upon existing climate-related disclosure regimes. The insights gained from the outreach and consultations directly informed the development of the recommendations.

The Task Force structured its recommendations around four thematic areas that represent core elements of how organizations operate—governance, strategy, risk management, and metrics and targets. The four overarching recommendations are supported by key climate-related financial disclosures—referred to as recommended disclosures—that build out the framework with information that will help investors and others understand how reporting organizations think about and assess climate-related risks and opportunities. In addition, there is guidance to support all organizations in developing climate-related financial disclosures consistent with the recommendations and recommended disclosures as well as *supplemental* guidance for specific sectors. The structure is depicted in Figure 3 below, and the Task Force's recommendations and supporting recommended disclosures are presented in Figure 4 (p. 14).

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices



Figure 3

### Recommendations and Guidance

**Recommendations**

**Recommendations**
Four widely adoptable recommendations tied to: governance, strategy, risk management, and metrics and targets

**Recommended Disclosures**
Specific recommended disclosures organizations should include in their financial filings to provide decision-useful information

**Recommended Disclosures**

**Guidance for All Sectors**

**Guidance for All Sectors**
Guidance providing context and suggestions for implementing the recommended disclosures for all organizations

**Supplemental Guidance for Certain Sectors**
Guidance that highlights important considerations for certain sectors and provides a fuller picture of potential climate-related financial impacts in those sectors

**Supplemental Guidance for Certain Sectors**
Supplemental guidance is provided for the financial sector and for non-financial sectors potentially most affected by climate change

The Task Force's supplemental guidance is included in the Annex and covers the financial sector as well as non-financial industries potentially most affected by climate change and the transition to a lower-carbon economy (referred to as non-financial groups). The supplemental guidance provides these preparers with additional context and suggestions for implementing the recommended disclosures and should be used in conjunction with the guidance for all sectors.

Figure 4

**Recommendations and Supporting Recommended Disclosures**

| Governance | Strategy | Risk Management | Metrics and Targets |
|---|---|---|---|
| Disclose the organization's governance around climate-related risks and opportunities. | Disclose the actual and potential impacts of climate-related risks and opportunities on the organization's businesses, strategy, and financial planning where such information is material. | Disclose how the organization identifies, assesses, and manages climate-related risks. | Disclose the metrics and targets used to assess and manage relevant climate-related risks and opportunities where such information is material. |
| **Recommended Disclosures** | **Recommended Disclosures** | **Recommended Disclosures** | **Recommended Disclosures** |
| a) Describe the board's oversight of climate-related risks and opportunities. | a) Describe the climate-related risks and opportunities the organization has identified over the short, medium, and long term. | a) Describe the organization's processes for identifying and assessing climate-related risks. | a) Disclose the metrics used by the organization to assess climate-related risks and opportunities in line with its strategy and risk management process. |
| b) Describe management's role in assessing and managing climate-related risks and opportunities. | b) Describe the impact of climate-related risks and opportunities on the organization's businesses, strategy, and financial planning. | b) Describe the organization's processes for managing climate-related risks. | b) Disclose Scope 1, Scope 2, and, if appropriate, Scope 3 greenhouse gas (GHG) emissions, and the related risks. |
| | c) Describe the resilience of the organization's strategy, taking into consideration different climate-related scenarios, including a 2°C or lower scenario. | c) Describe how processes for identifying, assessing, and managing climate-related risks are integrated into the organization's overall risk management. | c) Describe the targets used by the organization to manage climate-related risks and opportunities and performance against targets. |

Figure 5 provides a mapping of the recommendations (governance, strategy, risk management, and metrics and targets) and recommended disclosures (a, b, c) for which supplemental guidance was developed for the financial sector and non-financial groups.

- **Financial Sector.** The Task Force developed supplemental guidance for the financial sector, which it organized into four major industries largely based on activities performed. The four industries are banks (lending), insurance companies (underwriting), asset managers (asset management), and asset owners, which include public- and private-sector pension plans, endowments, and foundations (investing).[34] The Task Force believes that disclosures by the financial sector could foster an early assessment of climate-related risks and opportunities, improve pricing of climate-related risks, and lead to more informed capital allocation decisions.

- **Non-Financial Groups.** The Task Force developed supplemental guidance for non-financial industries that account for the largest proportion of GHG emissions, energy usage, and water usage. These industries were organized into four groups (i.e., non-financial groups)—Energy; Materials and Buildings; Transportation; and Agriculture, Food, and Forest Products—based on similarities in climate-related risks as shown in Box 2 (p. 16). While this supplemental guidance focuses on a subset of non-financial industries, organizations in other industries with similar business activities may wish to review and consider the issues and topics contained in the supplemental guidance.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

**C
Recommendations and Guidance**

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices



Figure 5

**Supplemental Guidance for Financial Sector and Non-Financial Groups**

| Industries and Groups | | Governance | | Strategy | | | Risk Management | | | Metrics and Targets | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | a) | b) | a) | b) | c) | a) | b) | c) | a) | b) | c) |
| **Financial** | Banks | | | ■ | | | ■ | | | ■ | | |
| | Insurance Companies | | | | ■ | ■ | ■ | ■ | | ■ | | |
| | Asset Owners | | | | ■ | ■ | ■ | ■ | | ■ | ■ | |
| | Asset Managers | | | | ■ | ■ | ■ | ■ | | ■ | ■ | |
| **Non-Financial** | Energy | | | | ■ | ■ | | | | ■ | | |
| | Transportation | | | | ■ | ■ | | | | ■ | | |
| | Materials and Buildings | | | | ■ | ■ | | | | ■ | | |
| | Agriculture, Food, and Forest Products | | | | ■ | ■ | | | | ■ | | |

---

[34] The use of the term "insurance companies" in this report includes re-insurers.

Box 2

## Determination of Non-Financial Groups

In an effort to focus supplemental guidance on those non-financial sectors and industries with the highest likelihood of climate-related financial impacts, the Task Force assessed three factors most likely to be affected by both transition risk (policy and legal, technology, market, and reputation) and physical risk (acute and chronic)—GHG emissions, energy usage, and water usage.

The underlying premise in using these three factors is that climate-related physical and transition risks will likely manifest themselves primarily and broadly in the form of constraints on GHG emissions, effects on energy production and usage, and effects on water availability, usage, and quality. Other factors, such as waste management and land use, are also important, but may not be as determinative across a wide range of industries or may be captured in one of the primary categories.

In taking this approach, the Task Force consulted a number of sources regarding the ranking of various sectors and industries according to these three factors. The various rankings were used to determine an overall set of sectors and industries that have significant exposure to transition or physical risks related to GHG emissions, energy, or water. The sectors and industries were grouped into four categories of industries that have similar economic activities and climate-related exposures.

These four groups and their associated industries are intended to be indicative of the economic activities associated with these industries rather than definitive industry categories. Other industries with similar activities and climate-related exposures should consider the supplemental guidance as well.

The Task Force validated its approach using a variety of sources, including:

1    The TCFD Phase I report public consultation, soliciting more than 200 responses which ranked Energy, Utilities, Materials, Industrials and Consumer Staples/Discretionary, in that order, as the Global Industry Classification Standard (GICS) sectors most important for disclosure guidelines to cover.

2    Numerous sector-specific disclosure guidance documents to understand various breakdowns by economic activity, sector, and industries, including from the following sources: CDP, GHG Protocol, Global Real Estate Sustainability Benchmark (GRESB), Global Reporting Initiative (GRI), Institutional Investors Group on Climate Change (IIGCC), IPIECA (the global oil and gas industry association for environmental and social issues), and the Sustainability Accounting Standards Board (SASB).

3    The Intergovernmental Panel on Climate Change (IPCC) report "Climate Change 2014 – Mitigation of Climate Change" that provides an analysis of global direct and indirect emissions by economic sector. The IPCC analysis highlights the dominant emissions-producing sectors as Energy; Industry; Agriculture, Forestry, and Other Land Use; and Transportation and Buildings (Commercial and Residential).

4    Research and documentation from non-governmental organizations (NGOs) and industry organizations that provide information on which industries have the highest exposures to climate change, including those from Cambridge Institute of Sustainability Leadership, China's National Development and Reform Commission (NDRC), Environmental Resources Management (ERM), IEA, Moody's, S&P Global Ratings, and WRI/UNEPFI.

Based on its assessment, the Task Force identified the four groups and their associated industries, listed in the table below, as those that would most benefit from supplemental guidance.

| Energy | Transportation | Materials and Buildings | Agriculture, Food, and Forest Products |
|---|---|---|---|
| – Oil and Gas<br>– Coal<br>– Electric Utilities | – Air Freight<br>– Passenger Air Transportation<br>– Maritime Transportation<br>– Rail Transportation<br>– Trucking Services<br>– Automobiles and Components | – Metals and Mining<br>– Chemicals<br>– Construction Materials<br>– Capital Goods<br>– Real Estate Management and Development | – Beverages<br>– Agriculture<br>– Packaged Foods and Meats<br>– Paper and Forest Products |

## 2. Implementing the Recommendations

### a. Scope of Coverage

To promote more informed investing, lending, and insurance underwriting decisions, the Task Force recommends all organizations with public debt or equity implement its recommendations. Because climate-related issues are relevant for other types of organizations as well, the Task Force encourages all organizations to implement these recommendations. In particular, the Task Force believes that asset managers and asset owners, including public- and private-sector pension plans, endowments, and foundations, should implement its recommendations so that their clients and beneficiaries may better understand the performance of their assets, consider the risks of their investments, and make more informed investment choices.

### b. Location of Disclosures and Materiality

The Task Force recommends that organizations provide climate-related financial disclosures in their mainstream (i.e., public) annual financial filings.[35] In most G20 jurisdictions, public companies have a legal obligation to disclose material information in their financial filings—including material climate-related information; and the Task Force's recommendations are intended to help organizations meet existing disclosure obligations more effectively.[36] The Task Force's recommendations were developed to apply broadly across sectors and jurisdictions and should not be seen as superseding national disclosure requirements. Importantly, organizations should make financial disclosures in accordance with their national disclosure requirements. If certain elements of the recommendations are incompatible with national disclosure requirements for financial filings, the Task Force encourages organizations to disclose those elements in other official company reports that are issued at least annually, widely distributed and available to investors and others, and subject to internal governance processes that are the same or substantially similar to those used for financial reporting.

The Task Force recognizes that most information included in financial filings is subject to a materiality assessment. However, because climate-related risk is a non-diversifiable risk that affects nearly all industries, many investors believe it requires special attention. For example, in assessing organizations' financial and operating results, many investors want insight into the governance and risk management context in which such results are achieved. The Task Force believes disclosures related to its Governance and Risk Management recommendations directly address this need for context and should be included in annual financial filings.

For disclosures related to the Strategy and Metrics and Targets recommendations, the Task Force believes organizations should provide such information in annual financial filings when the information is deemed material. Certain organizations—those in the four non-financial groups that have more than one billion U.S. dollar equivalent (USDE) in annual revenue—should consider disclosing such information in other reports when the information is not deemed material and not included in financial filings.[37] Because these organizations are more likely than others to be financially impacted over time, investors are interested in monitoring how these organizations' strategies evolve.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

---

[35] Financial filings refer to the annual reporting packages in which organizations are required to deliver their audited financial results under the corporate, compliance, or securities laws of the jurisdictions in which they operate. While reporting requirements differ internationally, financial filings generally contain financial statements and other information such as governance statements and management commentary.

[36] The Task Force encourages organizations where climate-related issues could be material in the future to begin disclosing climate-related financial information outside financial filings to facilitate the incorporation of such information into financial filings once climate-related issues are determined to be material.

[37] The Task Force chose a one billion USDE annual revenue threshold because it captures organizations responsible for over 90 percent of Scope 1 and 2 GHG emissions in the industries represented by the four non-financial groups (about 2,250 organizations out of roughly 15,000).

App.283

The Task Force recognizes reporting by asset managers and asset owners is intended to satisfy the needs of clients, beneficiaries, regulators, and oversight bodies and follows a format that is generally different from corporate financial reporting. For purposes of adopting the Task Force's recommendations, asset managers and asset owners should use their existing means of financial reporting to their clients and beneficiaries where relevant and where feasible. Likewise, asset managers and asset owners should consider materiality in the context of their respective mandates and investment performance for clients and beneficiaries.[38]

The Task Force believes that climate-related financial disclosures should be subject to appropriate internal governance processes. Since these disclosures should be included in annual financial filings, the governance processes should be similar to those used for existing financial reporting and would likely involve review by the chief financial officer and audit committee, as appropriate. The Task Force recognizes that some organizations may provide some or all of their climate-related financial disclosures in reports other than financial filings. This may occur because the organizations are not required to issue public financial reports (e.g., some asset managers and asset owners). In such situations, organizations should follow internal governance processes that are the same or substantially similar to those used for financial reporting.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

### c. Principles for Effective Disclosures

To underpin its recommendations and help guide current and future developments in climate-related financial reporting, the Task Force developed seven principles for effective disclosure (Figure 6), which are described more fully in Appendix 3. When used by organizations in preparing their climate-related financial disclosures, these principles can help achieve high-quality and decision-useful disclosures that enable users to understand the impact of climate change on organizations. The Task Force encourages organizations to consider these principles as they develop climate-related financial disclosures.

The Task Force's disclosure principles are largely consistent with internationally accepted frameworks for financial reporting and are generally applicable to most providers of financial disclosures. The principles are designed to assist organizations in making clear the linkages between climate-related issues and their governance, strategy, risk management, and metrics and targets.

Figure 6

**Principles for Effective Disclosures**

1 Disclosures should represent relevant information

2 Disclosures should be specific and complete

3 Disclosures should be clear, balanced, and understandable

4 Disclosures should be consistent over time

5 Disclosures should be comparable among companies within a sector, industry, or portfolio

6 Disclosures should be reliable, verifiable, and objective

7 Disclosures should be provided on a timely basis

---

[38] The Task Force recommends asset managers and asset owners include carbon footprinting information in their reporting to clients and beneficiaries, as described in Section D of the Annex, to support the assessment and management of climate-related risks.

### 3. Guidance for All Sectors

The Task Force has developed guidance to support all organizations in developing climate-related financial disclosures consistent with its recommendations and recommended disclosures. The guidance assists preparers by providing context and suggestions for implementing the recommended disclosures. Recognizing organizations have differing levels of capacity to disclose under the recommendations, the guidance provides descriptions of the types of information that should be disclosed or considered.

#### a. Governance

Investors, lenders, insurance underwriters, and other users of climate-related financial disclosures (collectively referred to as "investors and other stakeholders") are interested in understanding the role an organization's board plays in overseeing climate-related issues as well as management's role in assessing and managing those issues. Such information supports evaluations of whether climate-related issues receive appropriate board and management attention.

A
Introduction

B
Climate-Related Risks,
Opportunities, and
Financial Impacts

C
Recommendations and
Guidance

D
Scenario Analysis and
Climate-Related Issues

E
Key Issues Considered and
Areas for Further Work

F
Conclusion

Appendices

| Governance | |
|---|---|
| **Disclose the organization's governance around climate-related risks and opportunities.** | |
| **Recommended Disclosure a)** Describe the board's oversight of climate-related risks and opportunities. | **Guidance for All Sectors** In describing the board's oversight of climate-related issues, organizations should consider including a discussion of the following: <br> – processes and frequency by which the board and/or board committees (e.g., audit, risk, or other committees) are informed about climate-related issues, <br> – whether the board and/or board committees consider climate-related issues when reviewing and guiding strategy, major plans of action, risk management policies, annual budgets, and business plans as well as setting the organization's performance objectives, monitoring implementation and performance, and overseeing major capital expenditures, acquisitions, and divestitures, and <br> – how the board monitors and oversees progress against goals and targets for addressing climate-related issues. |
| **Recommended Disclosure b)** Describe management's role in assessing and managing climate-related risks and opportunities. | **Guidance for All Sectors** In describing management's role related to the assessment and management of climate-related issues, organizations should consider including the following information: <br> – whether the organization has assigned climate-related responsibilities to management-level positions or committees; and, if so, whether such management positions or committees report to the board or a committee of the board and whether those responsibilities include assessing and/or managing climate-related issues, <br> – a description of the associated organizational structure(s), <br> – processes by which management is informed about climate-related issues, and <br> – how management (through specific positions and/or management committees) monitors climate-related issues. |

**b. Strategy**

Investors and other stakeholders need to understand how climate-related issues may affect an organization's businesses, strategy, and financial planning over the short, medium, and long term. Such information is used to inform expectations about the future performance of an organization.

A
Introduction

B
Climate-Related Risks,
Opportunities, and
Financial Impacts

C
Recommendations and
Guidance

D
Scenario Analysis and
Climate-Related Issues

E
Key Issues Considered and
Areas for Further Work

F
Conclusion

Appendices

| **Strategy**<br>Disclose the actual and potential impacts of climate-related risks and opportunities on the organization's businesses, strategy, and financial planning where such information is material. | |
|---|---|
| **Recommended Disclosure a)**<br>Describe the climate-related risks and opportunities the organization has identified over the short, medium, and long term. | **Guidance for All Sectors**<br>Organizations should provide the following information:<br><br>– a description of what they consider to be the relevant short-, medium-, and long-term time horizons, taking into consideration the useful life of the organization's assets or infrastructure and the fact that climate-related issues often manifest themselves over the medium and longer terms,<br><br>– a description of the specific climate-related issues for each time horizon (short, medium, and long term) that could have a material financial impact on the organization, and<br><br>– a description of the process(es) used to determine which risks and opportunities could have a material financial impact on the organization.<br><br>Organizations should consider providing a description of their risks and opportunities by sector and/or geography, as appropriate. In describing climate-related issues, organizations should refer to Tables 1 and 2 (pp. 10-11). |
| **Recommended Disclosure b)**<br>Describe the impact of climate-related risks and opportunities on the organization's businesses, strategy, and financial planning. | **Guidance for All Sectors**<br>Building on recommended disclosure (a), organizations should discuss how identified climate-related issues have affected their businesses, strategy, and financial planning.<br><br>Organizations should consider including the impact on their businesses and strategy in the following areas:<br><br>– Products and services<br><br>– Supply chain and/or value chain<br><br>– Adaptation and mitigation activities<br><br>– Investment in research and development<br><br>– Operations (including types of operations and location of facilities)<br><br>Organizations should describe how climate-related issues serve as an input to their financial planning process, the time period(s) used, and how these risks and opportunities are prioritized. Organizations' disclosures should reflect a holistic picture of the interdependencies among the factors that affect their ability to create value over time. Organizations should also consider including in their disclosures the impact on financial planning in the following areas:<br><br>– Operating costs and revenues<br><br>– Capital expenditures and capital allocation<br><br>– Acquisitions or divestments<br><br>– Access to capital<br><br>If climate-related scenarios were used to inform the organization's strategy and financial planning, such scenarios should be described. |

*The Task Force updated its guidance for all sectors for its Strategy and Metrics and Targets recommendations in October 2021. Please refer to the Task Force's 2021 Annex for the latest guidance.*

## Strategy

Disclose the actual and potential impacts of climate-related risks and opportunities on the organization's businesses, strategy, and financial planning where such information is material.

| Recommended Disclosure c) | Guidance for All Sectors |
|---|---|
| Describe the resilience of the organization's strategy, taking into consideration different climate-related scenarios, including a 2°C or lower scenario. | Organizations should describe how resilient their strategies are to climate-related risks and opportunities, taking into consideration a transition to a lower-carbon economy consistent with a 2°C or lower scenario and, where relevant to the organization, scenarios consistent with increased physical climate-related risks.

Organizations should consider discussing:

– where they believe their strategies may be affected by climate-related risks and opportunities;

– how their strategies might change to address such potential risks and opportunities; and

– the climate-related scenarios and associated time horizon(s) considered.

Refer to Section D for information on applying scenarios to forward-looking analysis. |

*The Task Force updated its guidance for all sectors for its Strategy and Metrics and Targets recommendations in October 2021. Please refer to the Task Force's 2021 Annex for the latest guidance.*

### c. Risk Management

Investors and other stakeholders need to understand how an organization's climate-related risks are identified, assessed, and managed and whether those processes are integrated into existing risk management processes. Such information supports users of climate-related financial disclosures in evaluating the organization's overall risk profile and risk management activities.

## Risk Management

Disclose how the organization identifies, assesses, and manages climate-related risks.

| Recommended Disclosure a) | Guidance for All Sectors |
|---|---|
| Describe the organization's processes for identifying and assessing climate-related risks. | Organizations should describe their risk management processes for identifying and assessing climate-related risks. An important aspect of this description is how organizations determine the relative significance of climate-related risks in relation to other risks.

Organizations should describe whether they consider existing and emerging regulatory requirements related to climate change (e.g., limits on emissions) as well as other relevant factors considered.

Organizations should also consider disclosing the following:

– processes for assessing the potential size and scope of identified climate-related risks and

– definitions of risk terminology used or references to existing risk classification frameworks used. |
| Recommended Disclosure b) | Guidance for All Sectors |
| Describe the organization's processes for managing climate-related risks. | Organizations should describe their processes for managing climate-related risks, including how they make decisions to mitigate, transfer, accept, or control those risks. In addition, organizations should describe their processes for prioritizing climate-related risks, including how materiality determinations are made within their organizations.

In describing their processes for managing climate-related risks, organizations should address the risks included in Tables 1 and 2 (pp. 10-11), as appropriate. |

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

## Risk Management

Disclose how the organization identifies, assesses, and manages climate-related risks.

| Recommended Disclosure c) | Guidance for All Sectors |
|---|---|
| Describe how processes for identifying, assessing, and managing climate-related risks are integrated into the organization's overall risk management. | Organizations should describe how their processes for identifying, assessing, and managing climate-related risks are integrated into their overall risk management. |

### d. Metrics and Targets

Investors and other stakeholders need to understand how an organization measures and monitors its climate-related risks and opportunities. Access to the metrics and targets used by an organization allows investors and other stakeholders to better assess the organization's potential risk-adjusted returns, ability to meet financial obligations, general exposure to climate-related issues, and progress in managing or adapting to those issues. They also provide a basis upon which investors and other stakeholders can compare organizations within a sector or industry.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

## Metrics and Targets

Disclose the metrics and targets used to assess and manage relevant climate-related risks and opportunities where such information is material.

| Recommended Disclosure a) | Guidance for All Sectors |
|---|---|
| Disclose the metrics used by the organization to assess climate-related risks and opportunities in line with its strategy and risk management process. | Organizations should provide the key metrics used to measure and manage climate-related risks and opportunities, as described in Tables 1 and 2 (pp. 10-11). Organizations should consider including metrics on climate-related risks associated with water, energy, land use, and waste management where relevant and applicable. |
| | Where climate-related issues are material, organizations should consider describing whether and how related performance metrics are incorporated into remuneration policies. |
| | Where relevant, organizations should provide their internal carbon prices as well as climate-related opportunity metrics such as revenue from products and services designed for a lower-carbon economy. |
| | Metrics should be provided for historical periods to allow for trend analysis. In addition, where not apparent, organizations should provide a description of the methodologies used to calculate or estimate climate-related metrics. |
| Recommended Disclosure b) | Guidance for All Sectors |
| Disclose Scope 1, Scope 2, and, if appropriate, Scope 3 greenhouse gas (GHG) emissions, and the related risks. | Organizations should provide their Scope 1 and Scope 2 GHG emissions and, if appropriate, Scope 3 GHG emissions and the related risks.[39] |
| | GHG emissions should be calculated in line with the GHG Protocol methodology to allow for aggregation and comparability across organizations and jurisdictions.[40] As appropriate, organizations should consider providing related, generally accepted industry-specific GHG efficiency ratios.[41] |
| | GHG emissions and associated metrics should be provided for historical |

---

[39] Emissions are a prime driver of rising global temperatures and, as such, are a key focal point of policy, regulatory, market, and technology responses to limit climate change. As a result, organizations with significant emissions are likely to be impacted more significantly by transition risk than other organizations. In addition, current or future constraints on emissions, either directly by emission restrictions or indirectly through carbon budgets, may impact organizations financially.

[40] While challenges remain, the GHG Protocol methodology is the most widely recognized and used international standard for calculating GHG emissions. Organizations may use national reporting methodologies if they are consistent with the GHG Protocol methodology.

[41] For industries with high energy consumption, metrics related to emission intensity are important to provide. For example, emissions per unit of economic output (e.g., unit of production, number of employees, or value-added) is widely used. See the Annex for examples of metrics.

## Metrics and Targets

Disclose the metrics and targets used to assess and manage relevant climate-related risks and opportunities where such information is material.

|  |  |
|---|---|
|  | periods to allow for trend analysis. In addition, where not apparent, organizations should provide a description of the methodologies used to calculate or estimate the metrics. |
| **Recommended Disclosure c)** Describe the targets used by the organization to manage climate-related risks and opportunities and performance against targets. | **Guidance for All Sectors** Organizations should describe their key climate-related targets such as those related to GHG emissions, water usage, energy usage, etc., in line with anticipated regulatory requirements or market constraints or other goals. Other goals may include efficiency or financial goals, financial loss tolerances, avoided GHG emissions through the entire product life cycle, or net revenue goals for products and services designed for a lower-carbon economy. In describing their targets, organizations should consider including the following: <br><br>  – whether the target is absolute or intensity based, <br><br>  – time frames over which the target applies, <br><br>  – base year from which progress is measured, and <br><br>  – key performance indicators used to assess progress against targets. <br><br> Where not apparent, organizations should provide a description of the methodologies used to calculate targets and measures. |

*The Task Force updated its guidance for all sectors for its Strategy and Metrics and Targets recommendations in October 2021. Please refer to the Task Force's 2021 Annex for the latest guidance.*

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

Case 2:24-cv-00801-ODW-PVC    Document 48-23    Filed 05/24/24    Page 33 of 75    Page ID #:1210

# D Scenario Analysis and Climate-Related Issues

# D  Scenario Analysis and Climate-Related Issues

Some organizations are affected by risks associated with climate change today. However, for many organizations, the most significant effects of climate change are likely to emerge over the medium to longer term and their timing and magnitude are uncertain. This uncertainty presents challenges for individual organizations in understanding the potential effects of climate change on their businesses, strategies, and financial performance. To appropriately incorporate the potential effects in their planning processes, organizations need to consider how their climate-related risks and opportunities may evolve and the potential implications under different conditions. One way to do this is through scenario analysis.

Scenario analysis is a well-established method for developing strategic plans that are more flexible or robust to a range of plausible future states. The use of scenario analysis for assessing the potential business implications of climate-related risks and opportunities, however, is relatively recent. While several organizations use scenario analysis to assess the potential impact of climate change on their businesses, only a subset have disclosed their assessment of forward-looking implications publicly, either in sustainability reports or financial filings.[42]

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

The disclosure of organizations' forward-looking assessments of climate-related issues is important for investors and other stakeholders in understanding how vulnerable individual organizations are to transition and physical risks and how such vulnerabilities are or would be addressed. As a result, the Task Force believes that organizations should use scenario analysis to assess potential business, strategic, and financial implications of climate-related risks and opportunities and disclose those, as appropriate, in their annual financial filings.

> Scenario analysis is an important and useful tool for understanding the strategic implications of climate-related risks and opportunities.

This section provides additional information on using scenario analysis as a tool to assess potential implications of climate-related risks and opportunities. In addition, a technical supplement, The Use of Scenario Analysis in Disclosure of Climate-Related Risks and Opportunities, on the Task Force's website provides further information on the types of climate-related scenarios, the application of scenario analysis, and the key challenges in implementing scenario analysis.

## 1. Overview of Scenario Analysis

Scenario analysis is a process for identifying and assessing the potential implications of a range of plausible future states under conditions of uncertainty. Scenarios are hypothetical constructs and not designed to deliver precise outcomes or forecasts. Instead, scenarios provide a way for organizations to consider how the future might look if certain trends continue or certain conditions are met. In the case of climate change, for example, scenarios allow an organization to explore and develop an understanding of how various combinations of climate-related risks, both transition and physical risks, may affect its businesses, strategies, and financial performance over time.

Scenario analysis can be qualitative, relying on descriptive, written narratives, or quantitative, relying on numerical data and models, or some combination of both. Qualitative scenario analysis

---

[42] Some organizations in the energy sector and some large investors have made public disclosures describing the results of their climate-related scenario analysis, including discussing how the transition might affect their current portfolios. In some instances, this information was published in financial filings.

explores relationships and trends for which little or no numerical data is available, while quantitative scenario analysis can be used to assess measurable trends and relationships using models and other analytical techniques.[43] Both rely on scenarios that are internally consistent, logical, and based on explicit assumptions and constraints that result in plausible future development paths.

As summarized in Figure 7, there are several reasons why scenario analysis is a useful tool for organizations in assessing the potential implications of climate-related risks and opportunities.

Figure 7

## Reasons to Consider Using Scenario Analysis for Climate Change

**1** Scenario analysis can help organizations consider issues, like climate change, that have the following characteristics:

– Possible outcomes that are highly uncertain (e.g., the **physical** response of the climate and ecosystems to higher levels of GHG emissions in the atmosphere)

– Outcomes that will play out over the medium to longer term (e.g., timing, distribution, and mechanisms of the **transition** to a lower-carbon economy)

– Potential disruptive effects that, due to uncertainty and complexity, are substantial

**2** Scenario analysis can enhance organizations' strategic conversations about the future by considering, in a more structured manner, what may unfold that is different from business-as-usual. Importantly, it broadens decision makers' thinking across a range of plausible scenarios, including scenarios where climate-related impacts can be significant.

**3** Scenario analysis can help organizations frame and assess the potential range of plausible business, strategic, and financial impacts from climate change and the associated management actions that may need to be considered in strategic and financial plans. This may lead to more robust strategies under a wider range of uncertain future conditions.

**4** Scenario analysis can help organizations identify indicators to monitor the external environment and better recognize when the environment is moving toward a different scenario state (or to a different stage along a scenario path). This allows organizations the opportunity to reassess and adjust their strategies and financial plans accordingly.[44]

**5** Scenario analysis can assist investors in understanding the robustness of organizations' strategies and financial plans and in comparing risks and opportunities across organizations.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

## 2. Exposure to Climate-Related Risks

The effects of climate change on specific sectors, industries, and individual organizations are highly variable. It is important, therefore, that all organizations consider applying a basic level of scenario analysis in their strategic planning and risk management processes. Organizations more significantly affected by transition risk (e.g., fossil fuel-based industries, energy-intensive manufacturers, and transportation activities) and/or physical risk (e.g., agriculture, transportation

---

[43] For example, see Mark D. A. Rounsevell, Marc J. Metzger, *Developing qualitative scenario storylines for environmental change assessment,* WIREs Climate Change 2010, 1: 606-619. doi: 10.1002/wcc.63, 2010 and Oliver Fricko, et. al., *Energy sector water use implications of a 2° C climate policy,* Environmental Research Letters, 11: 1-10, 2016.

[44] J.N. Maack, *Scenario analysis: a tool for task managers,* Social Analysis: selected tools and techniques, Social Development Papers, Number 36, the World Bank, June 2001, Washington, DC.

and building infrastructure, insurance, and tourism) should consider a more in-depth application of scenario analysis.

### a. Exposure to Transition Risks

Transition risk scenarios are particularly relevant for resource-intensive organizations with high GHG emissions within their value chains, where policy actions, technology, or market changes aimed at emissions reductions, energy efficiency, subsidies or taxes, or other constraints or incentives may have a particularly direct effect.

A key type of transition risk scenario is a so-called 2°C scenario, which lays out a pathway and an emissions trajectory consistent with holding the increase in the global average temperature to 2°C above pre-industrial levels. In December 2015, nearly 200 governments agreed to strengthen the global response to the threat of climate change by "holding the increase in the global average temperature to well below 2°C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5°C above pre-industrial levels," referred to as the Paris Agreement.[45] As a result, a 2°C scenario provides a common reference point that is generally aligned with the objectives of the Paris Agreement and will support investors' evaluation of the potential magnitude and timing of transition-related implications for individual organizations; across different organizations within a sector; and across different sectors.

### b. Exposure to Physical Risks

A wide range of organizations are exposed to climate-related physical risks. Physical climate-related scenarios are particularly relevant for organizations exposed to acute or chronic climate change, such as those with:

- long-lived, fixed assets;
- locations or operations in climate-sensitive regions (e.g., coastal and flood zones);
- reliance on availability of water; and
- value chains exposed to the above.

Physical risk scenarios generally identify extreme weather threats of moderate or higher risk before 2030 and a larger number and range of physical threats between 2030 and 2050. Although most climate models deliver scenario results for physical impacts beyond 2050, organizations typically focus on the consequences of physical risk scenarios over shorter time frames that reflect the lifetimes of their respective assets or liabilities, which vary across sectors and organizations.

## 3. Recommended Approach to Scenario Analysis

The Task Force believes that all organizations exposed to climate-related risks should consider (1) using scenario analysis to help inform their strategic and financial planning processes and (2) disclosing how resilient their strategies are to a range of plausible climate-related scenarios. The Task Force recognizes that, for many organizations, scenario analysis is or would be a largely qualitative exercise. However, organizations with more significant exposure to transition risk and/or physical risk should undertake more rigorous qualitative and, if relevant, quantitative scenario analysis with respect to key drivers and trends that affect their operations.

A critical aspect of scenario analysis is the selection of a set of scenarios (not just one) that covers a reasonable variety of future outcomes, both favorable and unfavorable. In this regard, the Task Force recommends organizations use a 2°C or lower scenario in addition to two or three other

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

---

[45] United Nations Framework Convention on Climate Change, "The Paris Agreement," December 2015.

---

scenarios most relevant to their circumstances, such as scenarios related to Nationally Determined Contributions (NDCs), physical climate-related scenarios, or other challenging scenarios.[46] In jurisdictions where NDCs are a commonly accepted guide for an energy and/or emissions pathway, NDCs may constitute particularly useful scenarios to include in an organization's suite of scenarios for conducting climate-related scenario analysis.

For an organization in the initial stages of implementing scenario analysis or with limited exposure to climate-related issues, the Task Force recommends disclosing how resilient, qualitatively or directionally, the organization's strategy and financial plans may be to a range of relevant climate change scenarios. This information helps investors, lenders, insurance underwriters, and other stakeholders understand the robustness of an organization's forward-looking strategy and financial plans across a range of possible future states.

Organizations with more significant exposure to climate-related issues should consider disclosing key assumptions and pathways related to the scenarios they use to allow users to understand the analytical process and its limitations. In particular, it is important to understand the critical parameters and assumptions that materially affect the conclusions drawn. As a result, the Task Force believes that organizations with significant climate-related exposures should *strive* to disclose the elements described in Figure 8.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

**D
Scenario Analysis and Climate-Related Issues**

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

| Figure 8 |
| --- |
| **Disclosure Considerations for Non-Financial Organizations**<br>Organizations with more significant exposure to climate-related issues should consider disclosing key aspects of their scenario analysis, such as the ones described below. |
| **1** The scenarios used, including the 2°C or lower scenario[47] |
| **2** Critical input parameters, assumptions, and analytical choices for the scenarios used, including such factors as:<br>– Assumptions about possible technology responses and timing (e.g., evolution of products/services, the technology used to produce them, and costs to implement)<br>– Assumptions made around potential differences in input parameters across regions, countries, asset locations, and/or markets<br>– Approximate sensitivities to key assumptions |
| **3** Time frames used for scenarios, including short-, medium-, and long-term milestones (e.g., how organizations consider timing of potential future implications under the scenarios used) |
| **4** Information about the resiliency of the organization's strategy, including strategic performance implications under the various scenarios considered, potential qualitative or directional implications for the organization's value chain, capital allocation decisions, research and development focus, and potential material financial implications for the organization's operating results and/or financial position |

---

[46] The Task Force's technical supplement, *The Use of Scenario Analysis in Disclosure of Climate-Related Risks and Opportunities* provides more information on scenario inputs, analytical assumptions and choices, and assessment and presentation of potential impacts.

[47] The objective of the Paris Agreement is to hold the increase in the global average temperature to well below 2°C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5°C. The IEA is developing a 1.5°C scenario that organizations may find useful.

App.294

## 4. Applying Scenario Analysis

While the Task Force recognizes the complexities of scenario analysis and the potential resources needed to conduct it, organizations are encouraged to use scenario analysis to assess climate-related risks and opportunities. For organizations just beginning to use scenario analysis, a qualitative approach that progresses and deepens over time may be appropriate.[48] Greater rigor and sophistication in the use of data and quantitative models and analysis may be warranted for organizations with more extensive experience in conducting scenario analysis. Organizations may decide to use existing external scenarios and models (e.g., those provided by third-party vendors) or develop their own, in-house modeling capabilities. The choice of approach will depend on an organization's needs, resources, and capabilities.

In conducting scenario analysis, organizations should *strive* to achieve:

- transparency around parameters, assumptions, analytical approaches, and time frames;
- comparability of results across different scenarios and analytical approaches;
- adequate documentation for the methodology, assumptions, data sources, and analytics;
- consistency of methodology year over year;
- sound governance over scenario analysis conduct, validation, approval, and application; and
- effective disclosure of scenario analysis that will inform and promote a constructive dialogue between investors and organizations on the range of potential impacts and resilience of the organization's strategy under various plausible climate-related scenarios.

In applying scenario analysis, organizations should consider general implications for their strategies, capital allocation, and costs and revenues, both at an enterprise-wide level and at the level of specific regions and markets where specific implications of climate change for the organization are likely to arise. Financial-sector organizations should consider using scenario analysis to evaluate the potential impact of climate-related scenarios on individual assets or investments, investments or assets in a particular sector or region, or underwriting activities.

The Task Force's supplemental guidance recognizes that organizations will be at different levels of experience in using scenario analysis. However, it is important for organizations to use scenario analysis and develop the necessary organizational skills and capabilities to assess climate-related risks and opportunities, with the expectation that organizations will evolve and deepen their use of scenario analysis over time. The objective is to assist investors and other stakeholders in better understanding:

- the degree of robustness of the organization's strategy and financial plans under different plausible future states of the world;
- how the organization may be positioning itself to take advantage of opportunities and plans to mitigate or adapt to climate-related risks; and
- how the organization is challenging itself to think strategically about longer-term climate-related risks and opportunities.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

---

[48] Organizations considering undertaking scenario analysis may wish to conduct various sensitivity analyses around key climate factors as a precursor to scenario analysis, recognizing that sensitivity analysis and scenario analysis are different, but complementary, processes.

App.295

## 5. Challenges and Benefits of Conducting Scenario Analysis

Scenario analysis is a well-established method for developing strategic plans that are more flexible and robust to a range of plausible future states. As previously discussed (Figure 7, p. 26) it is particularly useful for assessing issues with possible outcomes that are highly uncertain, that play out over the medium to longer term, and that are potentially disruptive. Scenario analysis can help to better frame strategic issues, assess the range of potential management actions that may be needed, engage more productively in strategic conversations, and identify indicators to monitor the external environment. Importantly, climate-related scenario analysis can provide the foundation for more effective engagement with investors on an organization's strategic and business resiliency.

Conducting climate-related scenario analysis, however, is not without challenges. First, most scenarios have been developed for global and macro assessments of potential climate-related impacts that can inform policy makers. These climate-related scenarios do not always provide the ideal level of transparency, range of data outputs, and functionality of tools that would facilitate their use in a business or investment context.

Second, the availability and granularity of data can be a challenge for organizations attempting to assess various energy and technology pathways or carbon constraints in different jurisdictions and geographic locations.

Third, the use of climate-related scenario analysis to assess potential business implications is still at an early stage. Although a handful of the largest organizations and investors are using climate-related scenario analysis as part of their strategic planning and risk management processes, many organizations are just beginning to explore its use. Sharing experiences and approaches to climate-related scenario analysis across organizations, therefore, is critical to advancing the use of climate-related scenario analysis. Organizations may be able to play an important role in this regard by facilitating information and experience exchanges among themselves; collectively developing tools, data sets, and methodologies; and working to set standards. Organizations across many different sectors will inevitably need to learn by doing. Some may seek guidance from other industry participants and experts on how to apply climate-related scenarios to make forward-looking analyses of climate-related risks and opportunities.

Addressing these challenges and advancing the use of climate-related scenario analysis will require further work. These challenges, however, are not insurmountable and can be addressed. Organizations should undertake scenario analysis in the near term to capture the important benefits for assessing climate-related risks and opportunities and improve their capabilities as tools and data progress over time.

A
Introduction

B
Climate-Related Risks,
Opportunities, and
Financial Impacts

C
Recommendations and
Guidance

**D
Scenario Analysis and
Climate-Related Issues**

E
Key Issues Considered and
Areas for Further Work

F
Conclusion

Appendices

# E Key Issues Considered and Areas for Further Work

# E  Key Issues Considered and Areas for Further Work

The diverse perspectives of Task Force members as well as outreach efforts, including two public consultations, resulting in over 500 responses, hundreds of industry interviews, several focus groups, and multiple webinars, provided valuable insight into the challenges that different organizations—both financial and non-financial—may encounter in preparing disclosures consistent with the Task Force's recommendations. The Task Force considered these issues and others in developing and then finalizing its recommendations and sought to balance the burden of disclosure on preparers with the need for consistent and decision-useful information for users (i.e., investors, lenders, and insurance underwriters). This section describes the key issues considered by the Task Force, significant public feedback received by the Task Force related to those issues, the ultimate disposition of the issues, and, in some cases, areas where further work may be warranted. Figure 9 summarizes areas the Task Force identified, through its own analysis as well as through public feedback, as warranting further research and analysis or the development of methodologies and standards.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

Figure 9

## Key Areas for Further Work

| | |
|---|---|
| **Relationship to Other Reporting Initiatives** | Encourage standard setting organizations and others to actively work toward greater alignment of frameworks and to support adoption |
| **Scenario Analysis** | Further develop applicable 2°C or lower transition scenarios and supporting outputs, tools, and user interfaces |
| | Develop broadly accepted methodologies, datasets, and tools for scenario-based evaluation of physical risk by organizations |
| | Make datasets and tools publicly available and provide commonly available platforms for scenario analysis |
| **Data Availability and Quality and Financial Impact** | Undertake further research and analysis to better understand and measure how climate-related issues translate into potential financial impacts for organizations in financial and non-financial sectors |
| | Improve data quality and further develop standardized metrics for the financial sector, including better defining carbon-related assets and developing metrics that address a broader range of climate-related risks and opportunities |
| | Increase organizations' understanding of climate-related risks and opportunities |
| **Example Disclosures[49]** | Provide example disclosures to assist preparers in developing disclosures consistent with the Task Force's recommendations |

[49] In response to the second consultation, organizations asked for example disclosures to gain a better understanding of how the recommended information may be disclosed. The Task Force acknowledges the development of these examples as an area of further work.

App.298

## 1. Relationship to Other Reporting Initiatives

Through the Task Force's outreach efforts, some organizations expressed concern that multiple disclosure frameworks and mandatory reporting requirements increase the administrative burden of disclosure efforts. Specifically, the additional time, cost, and effort required to analyze and disclose new climate-related information could penalize those with less capacity to respond.

The Task Force considered existing voluntary and mandatory climate-related reporting frameworks in developing its recommendations and provides information in the Annex on the alignment of existing frameworks, including those developed by the CDP (formerly the Carbon Disclosure Project), Climate Disclosure Standards Board (CDSB), the Global Reporting Initiative (GRI), the International Integrated Reporting Council (IIRC), and the Sustainability Accounting Standards Board (SASB), with the Task Force's recommended disclosures. The Task Force expects preparers disclosing climate-related information under other regimes will be able to use existing processes and content when developing disclosures based on the Task Force's recommendations.

The Task Force's recommendations provide a common set of principles that should help existing disclosure regimes come into closer alignment over time. Preparers, users, and other stakeholders share a common interest in encouraging such alignment as it relieves a burden for reporting entities, reduces fragmented disclosure, and provides greater comparability for users. The Task Force also encourages standard setting bodies to support adoption of the recommendations and alignment with the recommended disclosures.

## 2. Location of Disclosures and Materiality

In considering possible reporting venues, the Task Force reviewed existing regimes for climate-related disclosures across G20 countries. While many G20 countries have rules or regulatory guidance that require climate-related disclosure for organizations, most are *not* explicitly focused on climate-related *financial* information.[50] In addition, the locations of these disclosures vary significantly and range from surveys sent to regulators to sustainability reports to annual financial filings (see Appendix 4).

The Task Force also reviewed financial filing requirements applicable to public companies across G20 countries and found that in most G20 countries, issuers have a legal obligation to disclose material information in their financial reports—which includes material, climate-related information. Such reporting may take the form of a general disclosure of material information, but many jurisdictions require disclosure of material information in specific sections of the financial filing (e.g., in a discussion on risk factors).[51]

Based on its review, the Task Force determined that preparers of climate-related financial disclosures should provide such disclosures in their mainstream (i.e., public) annual financial filings.[52] The Task Force believes publication of climate-related financial information in mainstream financial filings will foster broader utilization of such disclosures, promoting an informed understanding of climate-related issues by investors and others, and support shareholder engagement. Importantly, in determining whether information is material, the Task Force believes organizations should determine materiality for climate-related issues consistent with how they determine the materiality of other information included in their financial filings. In addition, the Task Force cautions organizations against prematurely concluding that climate-

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

---

[50] Organization for Economic Co-operation and Development (OECD) and CDSB, *Climate Change Disclosure in G20 Countries: Stocktaking of Corporate Reporting Schemes*, November 18, 2015.

[51] N. Ganci, S. Hammer, T. Reilly, and P. Rodel, *Environmental and Climate Change Disclosure under the Securities Laws: A Multijurisdictional Survey*, Debevoise & Plimpton, March 2016.

[52] To the extent climate-related disclosures are provided outside of financial filings, organizations are encouraged to align the release of such reports with their financial filings.

App.299

related risks and opportunities are not material based on perceptions of the longer-term nature of some climate-related risks.

As part of the Task Force's second public consultation, some organizations expressed concern about disclosing information in financial filings that is not clearly tied to an assessment of materiality. The Task Force recognizes organizations' concerns about disclosing information in annual financial filings that is not clearly tied to an assessment of materiality. However, the Task Force believes disclosures related to the Governance and Risk Management recommendations should be provided in annual financial filings. Because climate-related risk is a non-diversifiable risk that affects nearly all sectors, many investors believe it requires special attention. For example, in assessing organizations' financial and operating results, many investors want insight into the governance and risk management context in which such results are achieved. The Task Force believes disclosures related to its Governance and Risk Management recommendations directly address this need for context and should be included in annual financial filings.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

For disclosures related to the Strategy and Metrics and Targets recommendations, the Task Force believes organizations should provide such information in annual financial filings when the information is deemed material. Certain organizations—those in the four non-financial groups that have more than one billion USDE in annual revenue—should consider disclosing information related to these recommendations in other reports when the information is not deemed material and not included in financial filings.[53,54] Because these organizations are more likely than others to be affected financially over time due to their significant GHG emissions or energy or water dependencies, investors are interested in monitoring how the organizations' strategies evolve.

In addition, the Task Force recognizes reporting by asset managers and asset owners to their clients and beneficiaries, respectively, generally occurs outside mainstream financial filings (Figure 10). For purposes of adopting the Task Force's recommendations, asset managers and asset owners should use their existing channels of financial reporting to their clients and beneficiaries where relevant and feasible. Likewise, asset managers and asset owners should consider materiality in the context of their respective mandates and investment performance for clients and beneficiaries.

**Figure 10**

## Reporting by Asset Owners
The financial reporting requirements and practices of asset owners vary widely and differ from what is required of organizations with public debt or equity. Some asset owners have no public reporting, while others provide extensive public reporting. For purposes of adopting the Task Force's recommendations, asset owners should use their existing channels of financial reporting to their beneficiaries and others where relevant and feasible.

## Reporting by Asset Managers
Reporting to clients by asset managers also takes different forms, depending on the requirements of the client and the types of investments made. For example, an investor in a mutual fund might receive quarterly, or download from the asset manager's website, a "fund fact sheet" that reports, among other information, the top holdings by value, the top performers by returns, and the carbon footprint of the portfolio against a stated benchmark. An investor in a segregated account might receive more detailed reporting, including items such as the aggregate carbon intensity of the portfolio compared with a benchmark, the portfolio's exposure to green revenue (and how this changes over time), or insight into portfolio positioning under different climate scenarios. The Task Force appreciates that climate-related risk reporting by asset managers is in the very early stages and encourages progress and innovation by the industry.

---

[53] The Task Force chose a one billion USDE annual revenue threshold because it captures organizations responsible for over 90% of Scope 1 and 2 GHG emissions in the industries represented by the four non-financial groups (about 2,250 organizations out of roughly 15,000).

[54] "Other reports" should be official company reports that are issued at least annually, widely distributed and available to investors and others, and subject to internal governance processes that are substantially similar to those used for financial reporting.

## 3. Scenario Analysis

As part of the Task Force's second public consultation, many organizations said scenario analysis is a useful tool to help assess risks and understand potential implications of climate change; however, they also identified areas where the Task Force's recommendations and guidance could be improved. In particular, organizations asked the Task Force to identify standardized climate-related scenarios for organizations to use and clarify the information related to scenarios that should be disclosed. They also noted expectations around disclosures and climate-related scenario analysis should be proportionate to the size of the reporting entity and not onerous for smaller organizations. In addition, some organizations noted that the disclosures related to strategy could put organizations at greater risk of litigation given the high degree of uncertainty around the future timing and magnitude of climate-related impacts.

In finalizing its recommendations and guidance, the Task Force clarified organizations should describe how resilient their strategies are to climate-related risks and opportunities, taking into consideration a transition to a lower-carbon economy consistent with a 2°C or lower scenario and, where relevant, scenarios consistent with more extreme physical risks. To address concerns about proportionality, the Task Force established a threshold for organizations in the four non-financial groups that should perform more robust scenario analysis and disclose additional information on the resiliency of their strategies.

On the issue of recommending specific standardized or reference climate-related scenarios for organizations to use, Task Force members agreed that while such an approach is intuitively appealing, it is not a practical solution at this time. Existing, publicly available climate-related scenarios are not structured or defined in such a way that they can be easily applied consistently across different industries or across organizations within an industry.

The Task Force recognizes that incorporating scenario analysis into strategic planning processes will improve over time as organizations "learn by doing." To facilitate progress in this area, the Task Force encourages further work as follows:

- further developing 2°C or lower transition scenarios that can be applied to specific industries and geographies along with supporting outputs, tools, and user interfaces;

- developing broadly accepted methodologies, data sets, and tools for scenario-based evaluation of physical risk by organizations;

- making these data sets and tools publicly available to facilitate use by organizations, reduce organizational transaction costs, minimize gaps between jurisdictions in terms of technical expertise, enhance comparability of climate-related risk assessments by organizations, and help ensure comparability for investors; and

- creating more industry specific (financial and non-financial) guidance for preparers and users of climate-related scenarios.

## 4. Data Availability and Quality and Financial Impact

The Task Force developed supplemental guidance for the four non-financial groups that account for the largest proportion of GHG emissions, energy usage, and water usage; and, as part of that supplemental guidance, the Task Force included several illustrative metrics around factors that may be indicative of potential financial implications for climate-related risks and opportunities. As part of the second public consultation, several organizations provided feedback on the illustrative metrics, and common themes included (1) improving the comparability and consistency of the metrics, (2) clarifying the links among the metrics, climate-related risks and opportunities, and potential financial implications, (3) simplifying the metrics, and (4) providing additional guidance on the metrics, including how to calculate key metrics. Organizations also raised concerns about

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

the lack of standardized data and metrics in the financial sector, which complicates preparers' ability to develop decision-useful metrics and users' ability to compare metrics across organizations.

The Task Force recognizes these concerns as well as broader challenges related to data availability and quality, as described below.

- The gaps in emissions measurement methodologies, including Scope 3 emissions and product life-cycle emissions methodologies, make reliable and accurate estimates difficult. [55,56]

- The lack of robust and cost-effective tools to quantify the potential impact of climate-related risks and opportunities at the asset and project level makes aggregation across an organization's activities or investment portfolios problematic and costly.

- The need to consider the variability of climate-related impacts across and within different sectors and markets further complicates the process (and magnifies the cost) of assessing potential climate-related financial impacts.

- The high degree of uncertainty around the timing and magnitude of climate-related risks makes it difficult to determine and disclose the potential impacts with precision.

In finalizing its supplemental guidance, the Task Force addressed the redundancy of the metrics; simplified the non-financial illustrative metrics tables; ensured consistent terminology was used; and clarified the links between the metrics, climate-related risks and opportunities, and potential financial implications. In addition, the Task Force encourages further research and analysis by sector and industry experts to (1) better understand and measure how climate-related issues translate into potential financial impacts; (2) develop standardized metrics for the financial sector, including better defining carbon-related assets; and (3) increase organizations' understanding of climate-related risks and opportunities. As it relates to the broader challenges with data quality and availability, the Task Force encourages preparers to include in their disclosures a description of gaps, limitations, and assumptions made as part of their assessment of climate-related issues.

## 5. GHG Emissions Associated with Investments

In its supplemental guidance for asset owners and asset managers issued on December 14, 2016, the Task Force asked such organizations to provide GHG emissions associated with each fund, product, or investment strategy normalized for every million of the reporting currency invested. As part of the Task Force's public consultation as well as in discussions with preparers, some asset owners and asset managers expressed concern about reporting on GHG emissions related to their own or their clients' investments given the current data challenges and existing accounting guidance on how to measure and report GHG emissions associated with investments. In particular, they voiced concerns about the accuracy and completeness of the reported data and limited application of the metric to asset classes beyond public equities. Organizations also highlighted that GHG emissions associated with investments cannot be used as a sole indicator for investment decisions (i.e., additional metrics are needed) and that the metric can fluctuate with share price movements since it uses investors' proportional share of total equity.[57]

In consideration of the feedback received, the Task Force has replaced the GHG emissions associated with investments metric in the supplemental guidance for asset owners and asset managers with a weighted average carbon intensity metric. The Task Force believes the weighted

A
Introduction

B
Climate-Related Risks,
Opportunities, and
Financial Impacts

C
Recommendations and
Guidance

D
Scenario Analysis and
Climate-Related Issues

E
Key Issues Considered
and Areas for Further
Work

F
Conclusion

Appendices

---

[55] Scope 3 emissions are all indirect emissions that occur in the value chain of the reporting company, including both upstream and downstream emissions. See Greenhouse Gas Protocol, "Calculation Tools, FAQ."

[56] Product life cycle emissions are all the emissions associated with the production and use of a specific product, including emissions from raw materials, manufacture, transport, storage, sale, use, and disposal. See Greenhouse Gas Protocol, "Calculation Tools, FAQ."

[57] Because the metric uses investors' proportional share of total equity, increases in the underlying companies' share prices, *all else equal*, will result in a decrease in the carbon footprinting number even though GHG emissions are unchanged.

average carbon intensity metric, which measures exposure to carbon-intensive companies, addresses many of the concerns raised. For example, the metric can be applied across asset classes, is fairly simple to calculate, and does not use investors' proportional share of total equity and, therefore, is not sensitive to share price movements.

The Task Force acknowledges the challenges and limitations of current carbon footprinting metrics, including that such metrics should not necessarily be interpreted as risk metrics. Nevertheless, the Task Force views the reporting of weighted average carbon intensity as a first step and expects disclosure of this information to prompt important advancements in the development of decision-useful, climate-related risk metrics. In this regard, the Task Force encourages asset owners and asset managers to provide other metrics they believe are useful for decision making along with a description of the methodology used. The Task Force recognizes that some asset owners and asset managers may be able to report the weighted average carbon intensity and other metrics on only a portion of their investments given data availability and methodological issues. Nonetheless, increasing the number of organizations reporting this type of information should help speed the development of better climate-related risk metrics.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

## 6. Remuneration

In the supplemental guidance for the Energy Group, the Task Force asked such organizations to consider disclosing whether and how performance metrics, including links to remuneration policies, take into consideration climate-related risks and opportunities. As part of its second public consultation, the Task Force asked whether the guidance should extend to organizations beyond those in the Energy group and, if so, to which types of organizations. The majority of organizations that commented on this issue responded that the guidance should be extended to other organizations; and many suggested that the guidance should apply to organizations more likely to be affected by climate-related risks. In consideration of the feedback received, the Task Force revised its guidance to ask organizations, where climate-related risks are material, to consider describing whether and how related performance metrics are incorporated into remuneration policies.

## 7. Accounting Considerations

As part of its work, the Task Force considered the interconnectivity of its recommendations with existing financial statement and disclosure requirements. The Task Force determined that the two primary accounting standard setting bodies, the International Accounting Standards Board (IASB) and the Financial Accounting Standards Board (FASB), have issued standards to address risks and uncertainties affecting companies. Both International Accounting Standard (IAS) 37 "Provisions, Contingent Liabilities and Contingent Assets" and Accounting Standards Codification (ASC) 450 "Contingencies" provide guidance on how to account for and disclose contingencies. Additionally, IAS 36 "Impairment of Assets" and ASC 360 "Long-lived Asset Impairment" provide guidance on assessing the impairment of long-lived assets. The disclosures of both contingencies and management's assessment and evaluation of long-lived assets for potential impairment are critically important in assisting stakeholders in understanding an organization's ability to meet future reported earnings and cash flow goals.

In most G20 countries, financial executives will likely recognize that the Task Force's disclosure recommendations should result in more quantitative financial disclosures, particularly disclosure of metrics, about the financial impact that climate-related risks have or could have on an organization. Specifically, asset impairments may result from assets adversely impacted by the effects of climate change and/or additional liabilities may need to be recorded to account for regulatory fines and penalties resulting from enhanced regulatory standards. Additionally, cash flows from operations, net income, and access to capital could all be impacted by the effects of

App.303

climate-related risks (and opportunities). Therefore, financial executives (e.g., chief financial officers, chief accounting officers, and controllers) should be involved in the organization's evaluation of climate-related risks and opportunities and the efforts undertaken to manage the risks and maximize the opportunities. Finally, careful consideration should be given to the linkage between scenario analyses performed to assess the resilience of an organization's strategy to climate-related risks and opportunities (as suggested in the Task Force's recommendations) and assumptions underlying cash flow analyses used to assess asset (e.g., goodwill, intangibles, and fixed assets) impairments.

## 8. Time Frames for Short, Medium, and Long Term

As part of the Task Force's second public consultation, some organizations asked the Task Force to define specific ranges for short, medium, and long term. Because the timing of climate-related impacts on organizations will vary, the Task Force believes specifying time frames across sectors for short, medium, and long term could hinder organizations' consideration of climate-related risks and opportunities specific to their businesses. The Task Force is, therefore, not defining time frames and encourages preparers to decide how to define their own time frames according to the life of their assets, the profile of the climate-related risks they face, and the sectors and geographies in which they operate.

In assessing climate-related issues, organizations should be sensitive to the time frames used to conduct their assessments. While many organizations conduct operational and financial planning over a 1-2 year time frame and strategic and capital planning over a 2-5 year time frame, climate-related risks may have implications for an organization over a longer period. It is, therefore, important for organizations to consider the appropriate time frames when assessing climate-related risks.

## 9. Scope of Coverage

To promote more informed investing, lending, and insurance underwriting decisions, the Task Force recommends all financial and non-financial organizations with public debt and/or equity adopt its recommendations.[58] Because climate-related risks and opportunities are relevant for organizations across all sectors, the Task Force encourages all organizations to adopt these recommendations. In addition, the Task Force believes that asset managers and asset owners, including public- and private-sector pension plans, endowments, and foundations, should implement its recommendations. The Task Force believes climate-related financial information should be provided to asset managers' clients and asset owners' beneficiaries so that they may better understand the performance of their assets, consider the risks of their investments, and make more informed investment choices.

Consistent with existing global stewardship frameworks, asset owners should engage with the organizations in which they invest to encourage adoption of these recommendations. They should also ask their asset managers to adopt these recommendations. Asset owners' expectations in relation to climate-related risk reporting from organizations and asset managers are likely to evolve as data availability and quality improves, understanding of climate-related risk increases, and risk measurement methodologies are further developed.

The Task Force recognizes that several asset owners expressed concern about being identified as the potential "policing body" charged with ensuring adoption of the Task Force's recommendations by asset managers and underlying organizations. The Task Force appreciates that expectations must be reasonable and that asset owners have many competing priorities, but

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

---

[58] Thresholds for climate-related financial disclosures should be aligned to the financial disclosure requirements more broadly in the jurisdictions where a preparer is incorporated and/or operates and is required to make financial disclosures.

encourages them to help drive adoption of the recommendations. Because asset owners and asset managers sit at the top of the investment chain, they have an important role to play in influencing the organizations in which they invest to provide better climate-related financial disclosures.

## 10. Organizational Ownership

Some organizations have not formalized responsibility for climate-related risk assessment and management. Even for organizations with clearly assigned responsibilities for climate-related issues, the relationship between those responsible for climate-related risk (e.g., "environmental, social and governance" experts, chief investment officers) and those in the finance function can range from regularly scheduled interactions and exchanges of information to minimal or no interaction. According to some preparers, lack of clarity around responsibility for climate-related risk assessments and management, compounded by a lack of integration into organizations' financial reporting processes, could adversely affect implementation of the recommendations.

The Task Force believes that by encouraging disclosure of climate-related financial information in public financial filings, coordination between organizations' climate-related risk experts and the finance function will improve. Similar to the way organizations are evolving to include cyber security issues in their strategic and financial planning efforts, so too should they evolve for climate-related issues.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

# F Conclusion

# F  Conclusion

The Task Force's recommendations are a foundation for improved reporting of climate-related issues in mainstream financial filings with several resulting benefits (outlined in Figure 11). The recommendations aim to be ambitious, but also practical for near-term adoption. The Task Force expects that reporting of climate-related risks and opportunities will evolve over time as organizations, investors, and others contribute to the quality and consistency of the information disclosed.

> **Figure 11**
> ## Benefits of Recommendations
>
> – Foundation for immediate adoption and flexible enough to accommodate evolving practices
>
> – Promote board and senior management engagement on climate-related issues
>
> – Bring the "future" nature of this issue into the present through scenario analysis
>
> – Support understanding of financial sector's exposure to climate-related risks
>
> – Designed to solicit decision-useful, forward-looking information on financial impacts

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

**F
Conclusion**

Appendices

## 1. Evolution of Climate-Related Financial Disclosures

The Task Force recognizes that challenges exist, but all types of organizations can develop disclosures consistent with its recommendations. The recommendations provide a foundation for immediate adoption and are flexible enough to accommodate evolving practices. As understanding, data analytics, and modeling of climate-related issues become more widespread, disclosures can mature accordingly.

Organizations already reporting climate-related financial information under other frameworks may be well positioned to disclose under this framework immediately and are encouraged to do so. For such organizations, significant effort has gone into developing processes and collecting information needed for disclosing under these regimes. The Task Force expects these organizations will be able to use existing processes when providing disclosures in annual financial filings based on the Task Force's recommendations.[59,60] Those with less experience can begin by considering and disclosing how climate-related issues may be relevant in their current governance, strategy, and risk management practices. This initial level of disclosure will allow investors to review, recognize, and understand how organizations consider climate-related issues and their potential financial impact.

Importantly, the Task Force recognizes organizations need to make financial disclosures in accordance with their national disclosure requirements. To the extent certain elements of the recommendations are incompatible with national disclosure requirements for financial filings, the Task Force encourages organizations to disclose those elements through other reports. Such other reports should be official company reports that are issued at least annually, widely distributed and available to investors and others, and subject to internal governance processes that are the same or substantially similar to those used for financial reporting.

## 2. Widespread Adoption Critical

In the Task Force's view, the success of its recommendations depends on near-term, widespread adoption by organizations in the financial and non-financial sectors. Through widespread adoption, financial risks and opportunities related to climate change will become a natural part of

---

[59] The Task Force recognizes the structure and content of financial filings differs across jurisdictions and, therefore, believes organizations are in the best position to determine where and how the recommended disclosures should be incorporated in financial filings.

[60] The Task Force encourages organizations where climate-related issues could be material in the future to begin disclosing climate-related financial information outside financial filings to facilitate the incorporation of such information into financial filings once climate-related issues are determined to be material.

organizations' risk management and strategic planning processes. As this occurs, organizations' and investors' understanding of the potential financial implications associated with transitioning to a lower-carbon economy and physical risks will grow, information will become more decision-useful, and risks and opportunities will be more accurately priced, allowing for the more efficient allocation of capital. Figure 12 outlines a possible path for implementation.

Widespread adoption of the recommendations will require ongoing leadership by the G20 and its member countries. Such leadership is essential to continue to make the link between these recommendations and the achievements of global climate objectives. Leadership from the FSB is also critical to underscore the importance of better climate-related financial disclosures for the functioning of the financial system.



Figure 12

**Implementation Path** *(Illustrative)*

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
**Conclusion**

Appendices

The Task Force is not alone in its work. A variety of stakeholders, including stock exchanges, investment consultants, credit rating agencies, and others can provide valuable contributions toward adoption of the recommendations. The Task Force believes that advocacy for these standards will be necessary for widespread adoption, including educating organizations that will disclose climate-related financial information and those that will use those disclosures to make financial decisions. To this end, the Task Force notes that strong support by the FSB and G20 authorities would have a positive impact on implementation. With the FSB's extension of the Task Force through September 2018, the Task Force will work to encourage adoption of the recommendations and support the FSB and G20 authorities in promoting the advancement of climate-related financial disclosures.

# Appendices

# Appendix 1: Task Force Members

## Chairman and Vice Chairs

**Michael Bloomberg**
Chair
Founder
Bloomberg LP and Bloomberg Philanthropies

**Denise Pavarina**
Vice Chair
Executive Director
Banco Bradesco

**Graeme Pitkethly**
Vice Chair
Chief Financial Officer
Unilever

**Christian Thimann**
Vice Chair
Group Head of Regulation, Sustainability, and
Insurance Foresight
AXA

**Yeo Lian Sim**
Vice Chair
Special Adviser, Diversity
Singapore Exchange

A
Introduction

B
Climate-Related Risks,
Opportunities, and
Financial Impacts

C
Recommendations and
Guidance

D
Scenario Analysis and
Climate-Related Issues

E
Key Issues Considered and
Areas for Further Work

F
Conclusion

**Appendices**

## Members

**Jane Ambachtsheer**
Partner, Chair – Responsible Investment
Mercer

**Matt Arnold**
Managing Director and Global Head of Sustainable
Finance
JPMorgan Chase & Co.

**Wim Bartels**
Partner Corporate Reporting
KPMG

**Bruno Bertocci**
Managing Director, Head of Sustainable Investors
UBS Asset Management

**David Blood**
Senior Partner
Generation Investment Management

**Richard Cantor**
Chief Risk Officer, Moody's Corporation
Chief Credit Officer, Moody's Investor Service

**Koushik Chatterjee**
Group Executive Director, Finance and Corporate
Tata Group

**Eric Dugelay**
Global Leader, Sustainability Services
Deloitte

**Liliana Franco**
Director, Accounting Organization and Methods
Air Liquide Group

**Udo Hartmann**
Senior Manager, Group Environmental Protection
& Energy Management
Daimler

**Neil Hawkins**
Corporate Vice President and Chief Sustainability
Officer
The Dow Chemical Company

**Thomas Kusterer**
Chief Financial Officer
EnBW Energie Baden-Württemberg AG

**Diane Larsen**
Audit Partner, Global Professional Practice
EY

**Stephanie Leaist**
Managing Director, Head of Sustainable Investing
Canada Pension Plan Investment Board

**Mark Lewis**
Managing Director, Head of European Utilities
Equity Research
Barclays

**Eloy Lindeijer**
Chief, Investment Management, member
Executive Committee
PGGM

## Members *(continued)*

**Ruixia Liu**
General Manager, Risk Department
Industrial and Commercial Bank of China

**Masaaki Nagamura**
Head, Corporate Social Responsibility
Tokio Marine Holdings

**Giuseppe Ricci**
Chief Refining and Marketing Officer
ENI

**Martin Skancke**
Chair, Risk Committee
Storebrand

**Andreas Spiegel**
Head Group Sustainability Risk
Swiss Re

**Steve Waygood**
Chief Responsible Investment Officer
Aviva Investors

**Fiona Wild**
Vice President, Sustainability and Climate Change
BHP Billiton

**Michael Wilkins**
Managing Director, Environmental & Climate Risk
Research
S&P Global Ratings

**Jon Williams**
Partner, Sustainability and Climate Change
PwC

**Deborah Winshel**
Managing Director, Global Head of Impact
Investing
BlackRock

## Special Adviser

**Russell Picot**
Chair, Audit and Risk Committee, LifeSight
Board Chair, HSBC Bank (UK) Pension Scheme
Trustee
Former Group Chief Accounting Officer, HSBC

## Secretariat

**Mary Schapiro**
Special Advisor to the Chair
Former Chair, U.S. Securities and Exchange
Commission

**Curtis Ravenel**
Global Head, Sustainable Business & Finance
Bloomberg LP

**Didem Nisanci**
Managing Director
Promontory Financial Group, an IBM Company

**Stacy Coleman**
Managing Director
Promontory Financial Group, an IBM Company

**Jeff Stehm**
Director
Promontory Financial Group, an IBM Company

**Mara Childress**
Principal
Promontory Financial Group, an IBM Company

**Veronika Henze**
Head of Communications
Bloomberg New Energy Finance

## Observers

**Susan Nash**
Member of Secretariat
Financial Stability Board

**Joe Perry**
Member of Secretariat
Financial Stability Board

**Rupert Thorne**
Deputy to the Secretary General
Financial Stability Board

A
Introduction

B
Climate-Related Risks,
Opportunities, and
Financial Impacts

C
Recommendations and
Guidance

D
Scenario Analysis and
Climate-Related Issues

E
Key Issues Considered and
Areas for Further Work

F
Conclusion

**Appendices**

---

App.311

# Appendix 2: Task Force Objectives and Approach

## 1. Objectives

The Task Force engaged with key stakeholders throughout the development of its recommendations to ensure that its work would (1) promote alignment across existing disclosure regimes, (2) consider the perspectives of users and the concerns of preparers of climate-related financial disclosures, and (3) be efficiently implemented by organizations in their financial reporting.

## 2. Approach

In addition to the expertise of its members, a broad range of external resources informed the Task Force's recommendations, including existing voluntary and mandatory climate-related reporting frameworks, governance and risk management standards, government reports and research, expert resources, and various other stakeholders such as industry participants, trade associations, and non-governmental organizations (NGOs).

**a. Leveraging Expertise**

Task Force members come from a range of companies, including large financial companies, large non-financial companies, accounting and consulting firms, and credit rating agencies, and brought a range of practical experience, expertise, and global perspectives on preparing and using climate-related financial disclosures. Through eight plenary meetings, Task Force members contributed significantly to developing a consensus-based, industry-led approach to climate-related financial disclosure.

Due to the technically challenging and broad focus of its work, the Task Force also sought input from experts in the field of climate change, particularly in relation to scenario analysis. The Task Force engaged Environmental Resources Management (ERM) to inform its work by developing a technical paper on scenario analysis—The Use of Scenario Analysis in Disclosure of Climate-Related Risks and Opportunities. Several members of the Task Force, joined by representatives from 2° Investing Initiative (2°ii), Bloomberg New Energy Finance (BNEF), Bloomberg Quantitative Risk Experts, Carbon Tracker, CDP, and the London School of Economics and Political Science led a working group to oversee ERM's technical considerations. A workshop was also held with experts from Oxford Martin School. Additionally, the International Energy Agency (IEA) provided input regarding how scenario analysis can be conducted and used.

**b. Research and Information Gathering**

The Task Force's work drew on publications and research conducted by governments, NGOs, industry participants, as well as disclosure regimes with a focus on climate-related issues. The Task Force reviewed existing mandatory and voluntary reporting regimes for climate-related disclosure to identify commonalities and gaps across existing regimes and to determine areas meriting further research and analysis by the Task Force. The work of organizations regarded as standard setters, as well as several organizations active in developing reporting mechanisms for climate-related issues, served as the primary references for the Task Force in developing its recommendations and supporting guidance. The Task Force also considered resources related to sector-specific climate issues in the development of the supplemental guidance.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

**Appendices**

### c. Outreach and Engagement

Engagement with users, preparers, and other stakeholders in relevant industries and sectors across G20 countries and other countries was important in developing the Task Force's recommendations. The Task Force conducted five types of engagement to support this effort: public consultation, industry interviews, focus groups, outreach events, and webinars.

Such engagement served two primary purposes: (1) to raise the level of awareness and educate stakeholders on the Task Force's work and (2) to solicit feedback from stakeholders on the Task Force's proposed recommended disclosures and supplemental guidance for specific sectors. In total, more than 2,700 individuals in 43 countries were included in the Task Force's outreach and engagement (Figure A2.1).

#### Public Consultations

The Task Force conducted two public consultations. The first followed the April 1, 2016 publication of the Task Force's Phase I Report, which set out the scope and high-level objectives for the Task Force's work. The Task Force solicited input to guide the development of its recommendations for voluntary climate-related financial disclosures. In total, 203 participants from 24 countries responded to the first public consultation. Respondents represented the financial sector, non-financial sectors, NGOs, and other organizations. Public consultation comments indicated support for disclosures on scenario analysis as well as disclosures tailored for specific sectors. Key themes from the first public consultation, which informed the Task Force's recommendations and guidance, are included in Table A2.1 (p. 48).

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

**Appendices**



Figure A2.1
## Outreach and Engagement

Table A2.1

## Key Themes of First Public Consultation (Scope of Work)

| Key Themes | Survey Response |
|---|---|
| Components of Disclosures | The majority of respondents were in agreement that disclosures should:<br>– be forward-looking,<br>– address the ability to achieve targets, with strategies for achievement, and<br>– align with material risks. |
| Sector-Specific Disclosures | Respondents were in favor of disclosures for specific sectors    62% |
| Scenario Analysis | Respondents see scenario analysis as a key component of disclosure    96% |

A second public consultation followed the release of the Task Force's report in December 2016. The Task Force conducted the second consultation through an online questionnaire designed to gather feedback on the recommendations, guidance, and key issues identified by the Task Force. The Task Force received 306 responses to its online questionnaire and 59 comment letters on the recommendations and guidance from a variety of organizations in 30 countries.[61] The majority of responses came from Europe (57 percent), followed by North America (20 percent), Asia Pacific (19 percent), South America (four percent), and the Middle East/Africa (less than one percent). Forty-five percent of respondents provided perspective as users of disclosure, 44 percent as preparers of disclosure, and 11 percent as "other." Respondents came from the financial sector (43 percent), non-financial sectors (18 percent), or other types of organizations (39 percent).[62]

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

**Appendices**

Table A2.2

## Responses to Second Public Consultation Questions

| Questions | Respondent | Percent Responding "Useful" |
|---|---|---|
| How useful are the recommendations and guidance for all sectors in preparing disclosures? | Preparers | 75% |
| How useful is the supplemental guidance in preparing disclosures? | Preparers | 66% |
| If organizations disclose the recommended information, how useful would it be for decision making? | Users | 77% |
| How useful is a description of potential performance across a range of scenarios to understanding climate-related impacts on an organization's businesses, strategy, and financial planning? | Financial | 74% |
| | Non-Financial | 17% |
| | Other | 86% |
| How useful are the illustrative examples of metrics and targets? | Financial | 74% |
| | Non-Financial | 33% |
| | Other | 72% |
| How useful would the disclosure of GHG emissions associated with investments be for economic decision-making? | Financial | 68% |
| | Other | 74% |

[61] Of the 59 respondents that submitted comment letters, 45 also completed the online questionnaire, resulting in a total of 320 unique responses.

[62] The other types of organizations included research and advocacy NGOs; standard setting NGOs; data analytics, consulting, and research organizations; academia; and accounting associations.

Overall, respondents were generally supportive of the Task Force's recommendations as shown in Table A2.2 (p. 48); however, several provided specific and constructive feedback on the report. The key themes from this feedback are included in Table A2.3. For additional information regarding the results of the second public consultation, please view the TCFD Public Consultation Summary 2017 on the Task Force's website.

Table A2.3

## Key Themes of Second Public Consultation (Recommendations)

| Key Themes | |
|---|---|
| **Materiality and Location of Disclosures** | Clarifying which recommended disclosures depend on materiality assessment and providing flexibility for organizations to provide some or all disclosures in reports other than financial filings. |
| **Scenario Analysis** | Improving ease of implementation, and comparability of scenario analysis by specifying standard scenario(s) and providing additional guidance and tools. |
| **Metrics for the Financial Sector** | Encouraging further development and standardization of metrics for the financial sector. |
| **Metrics for Non-Financial Sectors** | Improving comparability and consistency of the illustrative metrics for non-financial sectors, clarifying the links to financial impact and climate-related risks and opportunities. |
| **Implementation** | Providing disclosure examples to support preparers in developing relevant climate-related financial disclosures. |

**Industry Interviews and Focus Groups**

Prior to the December 2016 release of the Task Force's report for public consultation, the Task Force conducted 128 industry interviews with users and preparers of financial statements to gather feedback regarding the Task Force's draft recommendations, supplemental guidance for certain sectors, and other considerations. Industry interview participants included chief financial officers, investment officers, other finance and accounting officers, risk officers, sustainability officers, and others. Forty-three percent of the participants held finance, legal, or risk positions and 39 percent held environmental or sustainability roles.

Task Force representatives conducted two rounds of industry interviews. The initial round of interviews focused on the recommendations and guidance; the second round emphasized specific recommendations and sector-specific guidance. Organizations invited to participate in the interviews met two primary criteria: (1) represented industry and sector leaders likely to be impacted by climate-related risks and opportunities and (2) provided geographic diversity to ensure coverage from each G20 and Financial Stability Board (FSB) represented country.

The interviews provided valuable information that informed the Task Force's recommendations and guidance as reflected in the report issued for public consultation in December 2016. Industry interview themes were consistent with those identified in the second public consultation. Preparers raised concerns about the relationship of the Task Force's recommendations to other reporting initiatives and the accuracy and reliability of information requested. Users commented that establishing consistency in metrics would be beneficial, acknowledged data quality challenges, and provided thoughts on scenario analysis (e.g., would like preparers to use of a range of scenarios, interested in knowing how scenario analysis is used in the organization).

Subsequent to the December 2016 release of the Task Force's report for public consultation, the Task Force conducted five focus groups with 32 individuals from six countries representing organizations in specific sectors and industries to solicit feedback on scenario analysis and carbon footprinting metrics. In the two focus groups for the financial sector, participants expressed support for the Task Force's work, noting current challenges related to quality and consistency in

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

**Appendices**

reported climate-related information. Asset owners and asset managers also provided feedback on the benefits and limitations of different carbon footprinting metrics. In the three focus groups for non-financial sectors, participants in oil and gas and utilities industries provided specific feedback on their use of scenario analysis and challenges related to disclosing certain information in financial filings.

### Outreach Events

The Task Force sponsored 18 public outreach events in 13 countries, and Task Force members presented the recommendations at 91 other events including conferences, forums, and meetings sponsored by industry associations, NGOs, government agencies, corporations, and other organizations. The 18 Task Force-sponsored events informed stakeholders of the Task Force's work and recommendations and included panel discussions and keynote speeches by prominent climate-risk and financial experts. Attendees included representatives of financial and non-financial organizations who spanned a variety of corporate functions, including strategy, risk, accounting, portfolio and investment management, corporate sustainability, as well as representatives from industry associations, NGOs, government agencies, research providers, academia, accounting and consulting firms, and media.

### Webinars

Prior to the release of the report in December 2016 for public consultation, the Task Force offered seven webinars to educate and increase awareness of the Task Force's efforts as well as to collect additional feedback. Of the seven webinars, the Task Force hosted four webinars and participated in three additional webinars by partnering with the following organizations: Business for Social Responsibility, Global Financial Markets Association, and the National Association of Corporate Directors. These webinars served to supplement the in-person outreach events and offered global stakeholders, regardless of location, an opportunity to engage with the Task Force. The webinars included 538 attendees representing 365 organizations across 23 countries. After the release of the report, the Task Force held three webinars to present its recommendations and to solicit additional feedback. The three webinars included 255 attendees representing 209 organizations across 25 countries. In total, the Task Force offered ten webinars, reaching 793 attendees across 30 countries.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

# Appendix 3: Fundamental Principles for Effective Disclosure

To underpin its recommendations and help guide current and future developments in climate-related financial reporting, the Task Force developed a set of principles for effective disclosure.[63] As understanding of, and approaches to, climate-related issues evolve over time, so too will climate-related financial reporting. These principles can help achieve high-quality and decision-useful disclosures that enable users to understand the impact of climate change on organizations. The Task Force encourages organizations adopting its recommendations to consider these principles as they develop climate-related financial disclosures.

The Task Force's disclosure principles are largely consistent with other mainstream, internationally accepted frameworks for financial reporting and are generally applicable to most providers of financial disclosures. They are informed by the qualitative and quantitative characteristics of financial information and further the overall goals of producing disclosures that are consistent, comparable, reliable, clear, and efficient, as highlighted by the FSB in establishing the Task Force. The principles, taken together, are designed to assist organizations in making clear the linkages and connections between climate-related issues and their governance, strategy, risk management, and metrics and targets.

**Principle 1: Disclosures should present relevant information**

The organization should provide information specific to the potential impact of climate-related risks and opportunities on its markets, businesses, corporate or investment strategy, financial statements, and future cash flows.

- Disclosures should be eliminated if they are immaterial or redundant to avoid obscuring relevant information. However, when a particular risk or issue attracts investor and market interest or attention, it may be helpful for the organization to include a statement that the risk or issue is not significant. This shows that the risk or issue has been considered and has not been overlooked.

- Disclosures should be presented in sufficient detail to enable users to assess the organization's exposure and approach to addressing climate-related issues, while understanding that the type of information, the way in which it is presented, and the accompanying notes will differ between organizations and will be subject to change over time.

- Climate-related impacts can occur over the short, medium, and long term. Organizations can experience chronic, gradual impacts (such as impacts due to shifting temperature patterns), as well as acute, abrupt disruptive impacts (such as impacts from flooding, drought, or sudden regulatory actions). An organization should provide information from the perspective of the potential impact of climate-related issues on value creation, taking into account and addressing the different time frames and types of impacts.

- Organizations should avoid generic or boilerplate disclosures that do not add value to users' understanding of issues. Furthermore, any proposed metrics should adequately describe or serve as a proxy for risk or performance and reflect how an organization manages the risk and opportunities.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

**Appendices**

---

[63] These principles are adapted from those included in the Enhanced Disclosure Task Force's "Enhancing the Risk Disclosures of Banks."

**Principle 2: Disclosures should be specific and complete**

- An organization's reporting should provide a thorough overview of its exposure to potential climate-related impacts; the potential nature and size of such impacts; the organization's governance, strategy, processes for managing climate-related risks, and performance with respect to managing climate-related risks and opportunities.

- To be sufficiently comprehensive, disclosures should contain historical and future-oriented information in order to allow users to evaluate their previous expectations relative to actual performance and assess possible future financial implications.

- For quantitative information, the disclosure should include an explanation of the definition and scope applied. For future-oriented data, this includes clarification of the key assumptions used. Forward-looking quantitative disclosure should align with data used by the organization for investment decision making and risk management.

- Any scenario analyses should be based on data or other information used by the organization for investment decision making and risk management. Where appropriate, the organization should also demonstrate the effect on selected risk metrics or exposures to changes in the key underlying methodologies and assumptions, both in qualitative and quantitative terms.

**Principle 3: Disclosures should be clear, balanced, and understandable**

- Disclosures should be written with the objective of communicating financial information that serves the needs of a range of financial sector users (e.g., investors, lenders, insurers, and others). This requires reporting at a level beyond compliance with minimum requirements. The disclosures should be sufficiently granular to inform sophisticated users, but should also provide concise information for those who are less specialized. Clear communication will allow users to identify key information efficiently.

- Disclosures should show an appropriate balance between qualitative and quantitative information and use text, numbers, and graphical presentations as appropriate.

- Fair and balanced narrative explanations should provide insight into the meaning of quantitative disclosures, including the changes or developments they portray over time. Furthermore, balanced narrative explanations require that risks as well as opportunities be portrayed in a manner that is free from bias.

- Disclosures should provide straightforward explanations of issues. Terms used in the disclosures should be explained or defined for a proper understanding by the users.

**Principle 4: Disclosures should be consistent over time**

- Disclosures should be consistent over time to enable users to understand the development and/or evolution of the impact of climate-related issues on the organization's business. Disclosures should be presented using consistent formats, language, and metrics from period to period to allow for inter-period comparisons. Presenting comparative information is preferred; however, in some situations it may be preferable to include a new disclosure even if comparative information cannot be prepared or restated.

- Changes in disclosures and related approaches or formats (e.g., due to shifting climate-related issues and evolution of risk practices, governance, measurement methodologies, or accounting practices) can be expected due to the relative immaturity of climate-related disclosures. Any such changes should be explained.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

**Appendices**

App.318

**Principle 5: Disclosures should be comparable among organizations within a sector, industry, or portfolio**

- Disclosures should allow for meaningful comparisons of strategy, business activities, risks, and performance across organizations and within sectors and jurisdictions.

- The level of detail provided in disclosures should enable comparison and benchmarking of risks across sectors and at the portfolio level, where appropriate.

- The placement of reporting would ideally be consistent across organizations—i.e., in financial filings—in order to facilitate easy access to the relevant information.

**Principle 6: Disclosures should be reliable, verifiable, and objective**

- Disclosures should provide high-quality reliable information. They should be accurate and neutral—i.e., free from bias.

- Future-oriented disclosures will inherently involve the organization's judgment (which should be adequately explained). To the extent possible, disclosures should be based on objective data and use best-in-class measurement methodologies, which would include common industry practice as it evolves.

- Disclosures should be defined, collected, recorded, and analyzed in such a way that the information reported is verifiable to ensure it is high quality. For future-oriented information, this means assumptions used can be traced back to their sources. This does not imply a requirement for independent external assurance; however, disclosures should be subject to internal governance processes that are the same or substantially similar to those used for financial reporting.

**Principle 7: Disclosures should be provided on a timely basis**

- Information should be delivered to users or updated in a timely manner using appropriate media on, at least, an annual basis within the mainstream financial report.

- Climate-related risks can result in disruptive events. In case of such events with a material financial impact, the organization should provide a timely update of climate-related disclosures as appropriate.

Reporters may encounter tension in the application of the fundamental principles set out above. For example, an organization may update a methodology to meet the comparability principle, which could then result in a conflict with the principle of consistency. Tension can also arise within a single principle. For example, Principle 6 states that disclosures should be verifiable, but assumptions made about future-oriented disclosures often require significant judgment by management that is difficult to verify. Such tensions are inevitable given the wide-ranging and sometimes competing needs of users and preparers of disclosures. Organizations should aim to find an appropriate balance of disclosures that reasonably satisfy the recommendations and principles while avoiding overwhelming users with unnecessary information.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

**Appendices**

# Appendix 4: Select Disclosure Frameworks

To the extent there is corporate reporting of climate-related issues, it happens through a multitude of mandatory and voluntary schemes. Although a complete and comprehensive survey of existing schemes is beyond the scope of this report, the Task Force on Climate-related Financial Disclosures (TCFD or Task Force) considered a broad range of existing frameworks, both voluntary and mandatory. The tables in Appendix 4 outline select disclosure frameworks considered by the Task Force and describe a few key characteristics of each framework, including whether disclosures are mandatory or voluntary, what type of information is reported, who the target reporters and target audiences are, where the disclosed information is placed, and whether there are specified materiality standards.[64] These disclosure frameworks were chosen to illustrate the broad range of disclosure regimes around the world; the tables are broken out into disclosure frameworks sponsored by governments, stock exchanges, and non-governmental organizations (NGOs).

The information presented in the tables below (A4.1, A4.2, and A4.3) is based on information released by governments, stock exchanges, and standard setters and is supplemented by the United Nations Environment Programme (UNEP), "The Financial System We Need: Aligning the Financial System with Sustainable Development," October 2015, and the Organization for Economic Co-operation and Development (OECD), "Report to G20 Finance Ministers and Central Bank Governors," September 2015.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

---

[64] These tables were originally included in the Task Force's Phase I Report and have been updated where appropriate.

App.320

Table A4.1

## Select Disclosure Frameworks: Governments

| Region: Framework | Target Reporter | Target Audience | Mandatory or Voluntary | Materiality Standard | Types of Climate-Related Information | Disclosure Location | External Assurance Required |
|---|---|---|---|---|---|---|---|
| **Australia:** National Greenhouse and Energy Reporting Act (2007) | Financial and non-financial firms that meet emissions or energy production or consumption thresholds | General public | Mandatory if thresholds are met | Based on emissions above a certain threshold | GHG emissions, energy consumption, and energy production | Report to government | Regulator may, by written notice to corporation, require an audit of its disclosures |
| **European Union (EU):** EU Directive 2014/95 regarding disclosure of non-financial and diversity information (2014) | Financial and non-financial firms that meet size criteria (i.e., have more than 500 employees) | Investors, consumers, and other stakeholders | Mandatory; applicable for the financial year starting on Jan. 1, 2017 or during the 2017 calendar year | None specified | Land use, water use, GHG emissions, use of materials, and energy use | Corporate financial report or separate report (published with financial report or on website six months after the balance sheet date and referenced in financial report) | Member States must require that statutory auditor checks whether the non-financial statement has been provided<br><br>Member States may require independent assurance for information in non-financial statement |
| **France:** Article 173, Energy Transition Law (2015)<br><br>Additional requirements for institutional investors | Listed financial and non-financial firms | Investors, general public | Mandatory | None specified | Risks related to climate change, consequences of climate change on the company's activities and use of goods and services it produces. Institutional investors: GHG emissions and contribution to goal of limiting global warming | Annual report and website | Mandatory review on the consistency of the disclosure by an independent third party, such as a statutory auditor |
| **India:** National Voluntary Guidelines on Social, Environmental, and Economic Responsibilities of Business (2011) | Financial and non-financial firms | Investors, general public | Voluntary | None specified | Significant risk, goals and targets for improving performance, materials, energy consumption, water, discharge of effluents, GHG emissions, and biodiversity | Not specified; companies may furnish a report or letter from owner/chief executive officer | Guidelines include third-party assurance as a "leadership indicator" of company's progress in implementing the principles |

Table A4.1

## Select Disclosure Frameworks: Governments *(continued)*

| Region: Framework | Target Reporter | Target Audience | Mandatory or Voluntary | Materiality Standard | Types of Climate-Related Information | Disclosure Location | External Assurance Required |
|---|---|---|---|---|---|---|---|
| United Kingdom: Companies Act 2006 (Strategic Report and Directors' Report) Regulations 2013 | Financial and non-financial firms that are "Quoted Companies," as defined by the Companies Act 2006 | Investors / shareholders ("members of the company") | Mandatory | Information is material if its omission or misrepresentation could influence the economic decisions shareholders take on the basis of the annual report as a whole (section 5 of the UK FRC June 2014 Guidance on the Strategic Report) | The main trends and factors likely to affect the future development, performance, and position of the company's business, environmental matters (including the impact of the company's business on the environment), and GHG emissions | Strategic Report and Directors' Report | Not required, but statutory auditor must state in report on the company's annual accounts whether in the auditor's opinion the information given in the Strategic Report and the Directors' Report for the financial year for which the accounts are prepared is consistent with those accounts |
| United States: NAICs, 2010 Insurer Climate Risk Disclosure Survey | Insurers meeting certain premium thresholds - $100M in 2015 | Regulators | Mandatory if thresholds are met | None specified | General disclosures about climate change-related risk management and investment management | Survey sent to state regulators | Not specified |
| United States: SEC Guidance Regarding Disclosure Related to Climate Change | Financial and non-financial firms subject to Securities and Exchange Commission (SEC) reporting requirements | Investors | Mandatory | US securities law definition | Climate-related material risks and factors that can affect or have affected the company's financial condition, such as regulations, treaties and agreements, business trends, and physical impacts | Annual and other reports required to be filed with SEC | Depends on assurance requirements for information disclosed |

App.322

Table A4.2

## Select Disclosure Frameworks: Exchange Listing Requirements and Indices

| Region: Framework | Target Reporter | Target Audience | Mandatory or Voluntary | Materiality Standard | Types of Climate-Related Information | Disclosure Location | External Assurance Required |
|---|---|---|---|---|---|---|---|
| **Australia:** Australia Securities Exchange Listing Requirement 4.10.3; Corporate Governance Principles and Recommendations (2014) | Listed financial and non-financial firms | Investors | Mandatory (comply or explain) | A real possibility that the risk in question could substantively impact the listed entity's ability to create or preserve value for security holders over the short, medium or long term | General disclosure of material environmental risks | Annual report must include either the corporate governance statement or company website link to the corporate governance statement on company's website | Not specified, may depend on assurance requirements for annual report |
| **Brazil:** Stock Exchange (BM&FBovespa) Recommendation of report or explain (2012) | Listed financial and non-financial firms | Investors, regulator | Voluntary (comply or explain) | Criteria explained in Reference Form (Annex 24) of the Instruction CVM n° 480/09 | Social and environmental information including methodology used, if audited/reviewed by an independent entity, and link to information (i.e., webpage) | Discretion of company | Not specified |
| **China:** Shenzhen Stock Exchange Social Responsibility Instructions to Listed Companies (2006) | Listed financial and non-financial firms | Investors | Voluntary: social responsibilities Mandatory: pollutant discharge | None specified | Waste generation, resource consumption, and pollutants | Not specified | Not specified; companies shall allocate dedicated human resources for regular inspection of implementation of environmental protection policies |
| **Singapore:** Singapore Exchange Listing Rules 711A & 711B and Sustainability Reporting Guide (2016) ("Guide") | Listed financial and non-financial firms | Investors | Mandatory (comply or explain) | Guidance provided in the Guide, paragraphs 4.7-4.11 | Material environmental, social, and governance factors, performance, targets, and related information specified in the Guide | Annual report or standalone report, disclosed through SGXNet reporting platform and company website | Not required |

Table A4.2

## Select Disclosure Frameworks: Exchange Listing Requirements and Indices *(continued)*

| Region: Framework | Target Reporter | Target Audience | Mandatory or Voluntary | Materiality Standard | Types of Climate-Related Information | Disclosure Location | External Assurance Required |
|---|---|---|---|---|---|---|---|
| **South Africa:** Johannesburg Stock Exchange Listing Requirement Paragraph 8.63; King Code of Governance Principles (2009) | Listed financial and non-financial firms | Investors | Mandatory; (comply or explain) | None specified | General disclosure regarding sustainability performance | Annual report | Required |
| **World, regional, and country-specific indices:** S&P Dow Jones Indices Sustainability Index, Sample Questionnaires | Financial and non-financial firms | Investors | Voluntary | None specified | GHG emissions, SOx emissions, energy consumption, water, waste generation, environmental violations, electricity purchased, biodiversity, and mineral waste management | Nonpublic | Disclose whether external assurance was provided and whether it was pursuant to a recognized standard |

App.324

Table A4.3

## Select Disclosure Frameworks: Non-Governmental Organizations

*Click for November 2018 Update*

| Framework | Target Reporter | Target Audience | Mandatory or Voluntary | Materiality Standard | Types of Climate-Related Information | Disclosure Location | External Assurance Required |
|---|---|---|---|---|---|---|---|
| **Global:** Asset Owners Disclosure Project 2017 Global Climate Risk Survey | Pension funds, insurers, sovereign wealth funds >$2bn AUM | Asset managers, investment industry, government | Voluntary | None specified | Information on whether climate change issues are integrated in investment policies, engagement efforts, portfolio emissions intensity for scope 1 emissions, climate change-related portfolio risk mitigation actions | Survey responses; respondents are asked whether responses may be made public | Disclose whether external assurance was provided |
| **Global:** CDP Annual Questionnaire (2016) | Financial and non-financial firms | Investors | Voluntary | None specified | Information on risk management procedures related to climate change risks and opportunities, energy use, and GHG emissions (Scope 1-3) | CDP database | Encouraged; information requested about verification and third party certification |
| **Global:** CDSB CDSB Framework for Reporting Environmental Information & Natural Capital | Financial and non-financial firms | Investors | Voluntary | Environmental information is material if (1) the environmental impacts or results it describes are, due to their size and nature, expected to have a significant positive or negative effect on the organization's current, past or future financial condition and operational results and its ability to execute its strategy or (2) omitting, misstating, or mis-interpreting it could influence decisions that users of mainstream reports make about the organization | Environmental policies, strategy, and targets, including the indicators, plans, and timelines used to assess performance; material environmental risks and opportunities affecting the organization; governance of environmental policies, strategy, and information; and quantitative and qualitative results on material sources of environmental impact | Annual reporting packages in which organizations are required to deliver their audited financial results under the corporate, compliance or securities laws of the country in which they operate | Not required, but disclose if assurance has been provided over whether reported environmental information is in conformance with the CDSB Framework |

App.325

Table A4.3

## Select Disclosure Frameworks: Non-Governmental Organizations *(continued)*      *Click for November 2018 Update*

| Framework | Target Reporter | Target Audience | Mandatory or Voluntary | Materiality Standard | Types of Climate-Related Information | Disclosure Location | External Assurance Required |
|---|---|---|---|---|---|---|---|
| **Global:** CDSB Climate Change Reporting Framework, Ed. 1.1 (2012) | Financial and non-financial firms | Investors | Voluntary | Allow "investors to see major trends and significant events related to climate change that affect or have the potential to affect the company's financial condition and/or its ability to achieve its strategy" | The extent to which performance is affected by climate-related risks and opportunities; governance processes for addressing those effects; exposure to significant climate-related issues; strategy or plan to address the issues; and GHG emissions | Annual reporting packages in which organizations are required to deliver their audited financial results under the corporate, compliance or securities laws of the territory or territories in which they operate | Not required unless International Standards on Auditing 720 requires the auditor of financial statements to read information accompanying them to identify material inconsistencies between the audited financial statements and accompanying information |
| **Global:** GRESB Infrastructure Asset Assessment & Real Estate Assessment | Real estate asset/portfolio owners | Investors and industry stakeholders | Voluntary | None specified | Real estate sector-specific requirements related to fuel, energy, and water consumption and efficiencies as well as low-carbon products | Data collected through the GRESB Real Estate Assessment disclosed to participants themselves and: • for non-listed property funds and companies, to those of that company or fund's investors that are GRESB Investor Members; • for listed real estate companies, to all GRESB Investor Members that invest in listed real estate securities. | Not required, but disclose whether external assurance was provided |
| **Global:** GRI Sustainability Reporting Standards (2016) | Organizations of any size, type, sector, or geographic location | All stakeholders | Voluntary | Topics that reflect the reporting organization's significant economic, environmental, and social impacts or substantively influence the decisions of stakeholders | Materials, energy, water, biodiversity, emissions, effluents and waste, environmental compliance, and supplier environmental assessment | Stand-alone sustainability reports or annual reports or other published materials that include sustainability information | Not required, but advised |

App.326

Table A4.3

## Select Disclosure Frameworks: Non-Governmental Organizations *(continued)*     *Click for November 2018 Update*

| Framework | Target Reporter | Target Audience | Mandatory or Voluntary | Materiality Standard | Types of Climate-Related Information | Disclosure Location | External Assurance Required |
|---|---|---|---|---|---|---|---|
| **Global:** IIGCC Oil & Gas (2010) Automotive (2009) Electric Utilities (2008) | Oil and gas industries | Investors | Voluntary | None specified | GHG emissions and clean technologies data | Not specified | Not specified |
| | Automotive industry | Investors | Voluntary | None specified | GHG emissions and clean technologies data | Company's discretion | Not specified |
| | Electrical utilities | Investors | Voluntary | None specified | GHG emissions and electricity production | Company's discretion | Disclose how GHG emissions information was verified |
| **Global:** IIRC International Integrated Reporting Framework (2013) | Public companies traded on international exchanges | Investors | Voluntary | Substantively affect the company's ability to create value over the short, medium, and long term | General challenges related to climate change, loss of ecosystems, and resource shortages | Standalone sustainability or integrated report | Not specified; discussion paper released on issues relating to assurance |
| **Global:** IPIECA Oil and gas industry guidance on voluntary sustainability reporting | Oil and gas industries | All stakeholders | Voluntary | Material sustainability issues are those that, in the view of company management and its external stakeholders, affect the company's performance or strategy and/or assessments or decisions about the company | Energy consumption | Sustainability reporting | Not required, but encouraged |
| **Global:** PRI Reporting Framework (2016) | Investors | Investors | Voluntary | None specified | Investor practices | Transparency report | Not specified |
| **United States:** SASB Conceptual Framework (2013) and SASB Standards (Various) | Public companies traded on US exchanges | Investors | Voluntary | A substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of the information made available | Information on sustainability topics that are deemed material, standardized metrics tailored by industry | SEC filings | Depends on assurance requirements for information disclosed |

App.327

# Appendix 5: Glossary and Abbreviations

## Glossary

**BOARD OF DIRECTORS (or BOARD)** refers to a body of elected or appointed members who jointly oversee the activities of a company or organization. Some countries use a two-tiered system where "board" refers to the "supervisory board" while "key executives" refers to the "management board."[65]

**CLIMATE-RELATED OPPORTUNITY** refers to the potential positive impacts related to climate change on an organization. Efforts to mitigate and adapt to climate change can produce opportunities for organizations, such as through resource efficiency and cost savings, the adoption and utilization of low-emission energy sources, the development of new products and services, and building resilience along the supply chain. Climate-related opportunities will vary depending on the region, market, and industry in which an organization operates.

**CLIMATE-RELATED RISK** refers to the potential negative impacts of climate change on an organization. Physical risks emanating from climate change can be event-driven (acute) such as increased severity of extreme weather events (e.g., cyclones, droughts, floods, and fires). They can also relate to longer-term shifts (chronic) in precipitation and temperature and increased variability in weather patterns (e.g., sea level rise). Climate-related risks can also be associated with the transition to a lower-carbon global economy, the most common of which relate to policy and legal actions, technology changes, market responses, and reputational considerations.

**FINANCIAL FILINGS** refer to the annual reporting packages in which organizations are required to deliver their audited financial results under the corporate, compliance, or securities laws of the jurisdictions in which they operate. While reporting requirements differ internationally, financial filings generally contain financial statements and other information such as governance statements and management commentary.[66]

**FINANCIAL PLANNING** refers to an organization's consideration of how it will achieve and fund its objectives and strategic goals. The process of financial planning allows organizations to assess future financial positions and determine how resources can be utilized in pursuit of short- and long-term objectives. As part of financial planning, organizations often create "financial plans" that outline the specific actions, assets, and resources (including capital) necessary to achieve these objectives over a 1-5 year period. However, financial planning is broader than the development of a financial plan as it includes long-term capital allocation and other considerations that may extend beyond the typical 3-5 year financial plan (e.g., investment, research and development, manufacturing, and markets).

**GOVERNANCE** refers to "the system by which an organization is directed and controlled in the interests of shareholders and other stakeholders."[67] "Governance involves a set of relationships between an organization's management, its board, its shareholders, and other stakeholders. Governance provides the structure and processes through which the objectives of the organization are set, progress against performance is monitored, and results are evaluated."[68]

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

---

[65] OECD, *G20/OECD Principles of Corporate Governance,* OECD Publishing, Paris, 2015.
[66] Based on Climate Disclosure Standards Board, "CDSB Framework for Reporting Environmental Information and Natural Capital," June 2015.
[67] A. Cadbury, *Report of the Committee on the Financial Aspects of Corporate Governance,* London, 1992.
[68] OECD, *G20/OECD Principles of Corporate Governance,* OECD Publishing, Paris, 2015.

**GREENHOUSE GAS (GHG) EMISSIONS SCOPE LEVELS**[69]

- **Scope 1** refers to all direct GHG emissions.

- **Scope 2** refers to indirect GHG emissions from consumption of purchased electricity, heat, or steam.

- **Scope 3** refers to other indirect emissions not covered in Scope 2 that occur in the value chain of the reporting company, including both upstream and downstream emissions. Scope 3 emissions could include: the extraction and production of purchased materials and fuels, transport-related activities in vehicles not owned or controlled by the reporting entity, electricity-related activities (e.g., transmission and distribution losses), outsourced activities, and waste disposal. [70]

**INTERNAL CARBON PRICE** is an internally developed estimated cost of carbon emissions. Internal carbon pricing can be used as a planning tool to help identify revenue opportunities and risks, as an incentive to drive energy efficiencies to reduce costs, and to guide capital investment decisions.

**MANAGEMENT** refers to those positions an organization views as executive or senior management positions and that are generally separate from the board.

**NATIONALLY DETERMINED CONTRIBUTION (NDC)** refers to the post-2020 actions that a country intends to take under the international climate agreement adopted in Paris.

**ORGANIZATION** refers to the group, company, or companies, and other entities for which consolidated financial statements are prepared, including subsidiaries and jointly controlled entities.

**PUBLICLY AVAILABLE 2°C SCENARIO** refers to a 2°C scenario that is (1) used/referenced and issued by an independent body; (2) wherever possible, supported by publicly available datasets; (3) updated on a regular basis; and (4) linked to functional tools (e.g., visualizers, calculators, and mapping tools) that can be applied by organizations. 2°C scenarios that presently meet these criteria include: IEA 2DS, IEA 450, Deep Decarbonization Pathways Project, and International Renewable Energy Agency.

**RISK MANAGEMENT** refers to a set of processes that are carried out by an organization's board and management to support the achievement of the organization's objectives by addressing its risks and managing the combined potential impact of those risks.

**SCENARIO ANALYSIS** is a process for identifying and assessing a potential range of outcomes of future events under conditions of uncertainty. In the case of climate change, for example, scenarios allow an organization to explore and develop an understanding of how the physical and transition risks of climate change may impact its businesses, strategies, and financial performance over time.

**SECTOR** refers to a segment of organizations performing similar business activities in an economy. A sector generally refers to a large segment of the economy or grouping of business types, while "industry" is used to describe more specific groupings of organizations within a sector.

**STRATEGY** refers to an organization's desired future state. An organization's strategy establishes a foundation against which it can monitor and measure its progress in reaching that desired state. Strategy formulation generally involves establishing the purpose and scope of the

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

---

[69] World Resources Institute and World Business Council for Sustainable Development, *The Greenhouse Gas Protocol: A Corporate Accounting and Reporting Standard (Revised Edition)*, March 2004.
[70] IPCC, *Climate Change 2014 Mitigation of Climate Change*, Cambridge University Press, 2014.

organization's activities and the nature of its businesses, taking into account the risks and opportunities it faces and the environment in which it operates.

**SUSTAINABILITY REPORT** is an organizational report that gives information about economic, environmental, social, and governance performance and impacts. For companies and organizations, sustainability —the ability to be long-lasting or permanent—is based on performance and impacts in these four key areas.

**VALUE CHAIN** refers to the upstream and downstream life cycle of a product, process, or service, including material sourcing, production, consumption, and disposal/recycling. Upstream activities include operations that relate to the initial stages of producing a good or service (e.g., material sourcing, material processing, supplier activities). Downstream activities include operations that relate to processing the materials into a finished product and delivering it to the end user (e.g., transportation, distribution, and consumption).

## Abbreviations

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

**2°C** —2° Celsius

**ASC**—Accounting Standards Codification

**BNEF**—Bloomberg New Energy Finance

**CDSB**—Climate Disclosure Standards Board

**ERM**—Environmental Resources Management

**EU**—European Union

**FASB**—Financial Accounting Standards Board

**FSB**—Financial Stability Board

**G20**—Group of 20

**GHG**—Greenhouse gas

**GICS**—Global Industry Classification Standard

**GRI**—Global Reporting Initiative

**IAS**—International Accounting Standard

**IASB**—International Accounting Standards Board

**IEA**—International Energy Agency

**IIGCC**—Institutional Investors Group on Climate Change

**IIRC**—International Integrated Reporting Council

**IPCC**—Intergovernmental Panel on Climate Change

**NGO**—Non-governmental organization

**OECD**—Organization for Economic Co-operation and Development

**R&D**—Research and development

**SASB**—Sustainability Accounting Standards Board

**TCFD**—Task Force on Climate-related Financial Disclosures

**UN**—United Nations

**UNEP**—United Nations Environment Programme

**USDE**—U.S. Dollar Equivalent

**WRI**—World Resources Institute

# Appendix 6: References

"Communiqué from the G20 Finance Ministers and Central Bank Governors Meeting in Washington, D.C. April 16-17, 2015." April 2015. www.g20.org.tr/wp-content/uploads/2015/04/April-G20-FMCBG-Communique-Final.pdf.

Cadbury, A. *Report of the Committee on the Financial Aspects of Corporate Governance.* London, 1992. www.ecgi.org/codes/documents/cadbury.pdf.

Carney, Mark. "Breaking the tragedy of the horizon—climate change and financial stability." September 29, 2015. www.bankofengland.co.uk/publications/Pages/speeches/2015/844.aspx.

Ceres. "Power Forward 3.0: How the largest US companies are capturing business value while addressing climate change." 2017. https://www.worldwildlife.org/publications/power-forward-3-0-how-the-largest-us-companies-are-capturing-business-value-while-addressing-climate-change.

Climate Disclosure Standards Board (CDSB). "CDSB Framework for Reporting Environmental Information and Natural Capital." June 2015. www.cdsb.net/sites/cdsbnet/files/cdsb_framework_for_reporting_environmental_information_natural_capital.pdf.

Economist Intelligence Unit. "The Cost of Inaction: Recognising the Value at Risk from Climate Change." 2015. https://www.eiuperspectives.economist.com/sustainability/cost-inaction.

Enhanced Disclosure Task Force. *Enhancing the Risk Disclosures of Banks.* October 2012. www.fsb.org/wp-content/uploads/r_121029.pdf.

Environmental Protection Agency Victoria (EPA Victoria). "Resource Efficiency Case Studies, Lower your impact." www.epa.vic.gov.au/business-and-industry/lower-your-impact/resource-efficiency/case-studies.

Fellow, Avery. "Investors Demand Climate Risk Disclosure." *Bloomberg*, February 2013. www.bloomberg.com/news/2013-02-25/investors-demand-climate-risk-disclosure-in-2013-proxies.html.

Frankfurt School-United Nations Environmental Programme Centre and Bloomberg New Energy Finance. "Global Trends in Renewable Energy Investment 2017." 2017. fs-unep-centre.org/sites/default/files/publications/globaltrendsinrenewableenergyinvestment2017.pdf.

Fricko, Oliver et. al. *Energy sector water use implications of a 2° C climate policy.* Environmental Research Letters, 11: 1-10, 2016. www.cd-links.org/wp-content/uploads/2016/06/Fricko-et-al-2016.pdf.

FSB. "FSB to establish Task Force on Climate-related Financial Disclosures." December 4, 2015. www.fsb-tcfd.org/wp-content/uploads/2016/01/12-4-2015-Climate-change-task-force-press-release.pdf.

FSB. "Proposal for a Disclosure Task Force on Climate-Related Risks." November 9, 2015. www.fsb.org/wp-content/uploads/Disclosure-task-force-on-climate-related-risks.pdf.

G20 Green Finance Study Group. *G20 Green Finance Synthesis Report.* 2016. unepinquiry.org/wp-content/uploads/2016/09/Synthesis_Report_Full_EN.pdf.

Ganci, N., S. Hammer, T. Reilly, and P. Rodel. *Environmental and Climate Change Disclosure under the Securities Laws: A Multijurisdictional Survey.* Debevoise & Plimpton, March 2016. www.debevoise.com/insights/publications/2016/03/environmental-and-climate-change-disclosure.

Greenhouse Gas Protocol. "Calculation Tools, FAQ." ghgprotocol.org/calculationg-tools-faq.

Intergovernmental Panel on Climate Change (IPCC). *Fifth Assessment Report (AR5),* Cambridge University Press, 2014. http://www.ipcc.ch/report/ar5/.

IPCC. *Climate Change 2014 Mitigation of Climate Change.* Cambridge University Press, 2014.

International Energy Agency (IEA). "Global energy investment down 8% in 2015 with flows signaling move towards cleaner energy." September 14, 2016. www.iea.org/newsroom/news/2016/september/global-energy-investment-down-8-in-2015-with-flows-signalling-move-towards-clean.html.

IEA. *World Energy Outlook Special Briefing for COP21.* 2015. www.iea.org/media/news/WEO_INDC_Paper_Final_WEB.PDF.

Maack, J. *Scenario Analysis: A Tool for Task Managers.* Social Analysis: selected tools and techniques, Social Development Papers, Number 36, the World Bank, June 2001, Washington, DC. siteresources.worldbank.org/INTPSIA/Resources/ 490023-1121114603600/13053_scenarioanalysis.pdf.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

**Appendices**

Mercer LLC. *Investing in a Time of Climate Change.* 2015. www.mercer.com/our-thinking/investing-in-a-time-of-climate-change.html.

Organization for Economic Co-operation and Development (OECD) and Climate Disclosure Standards Board (CDSB). *Climate Change Disclosure in G20 Countries: Stocktaking of Corporate Reporting Schemes.* November 18, 2015. www.oecd.org/investment/corporate-climate-change-disclosure-report.htm.

OECD. *G20/OECD Principles of Corporate Governance.* OECD Publishing, Paris, 2015. dx.doi.org/10.1787/9789264236882-en.

Pearce, David W. and R. Kerry Turner. "Economics of Natural Resources and the Environment." Johns Hopkins University Press. 1989. ISBN 0-8018-3987-0.

Rounsevell, Mark D. A. and Marc J Metzger. *Developing qualitative scenario storylines for environmental change assessment.* WIREs Climate Change 2010, 1: 606-619. doi: 10.1002/wcc.63, 2010. wires.wiley.com/WileyCDA/WiresArticle/wisId-WCC63.html.

Seley, Peter. "Emerging Trends in Climate Change Litigation." *Law 360.* March 7, 2016. www.law360.com/articles/766214/emerging-trends-in-climate-change-litigation.

Sustainability Accounting Standards Board (SASB). *SASB Climate Risk Technical Bulletin#: TB001-10182016.* October, 2016. library.sasb.org/climate-risk-technical-bulletin.

Task Force on Climate-related Financial Disclosures. *Phase I Report of the Task Force on Climate-related Financial Disclosures.* March 31, 2016. www.fsb-tcfd.org/wp-content/uploads/2016/03/Phase_I_Report_v15.pdf.

United Nations Environment Programme (UNEP). *The Financial System We Need: Aligning the Financial System with Sustainable Development.* 2015. http://unepinquiry.org/wp-content/uploads/2015/11/The_Financial_System_We_Need_EN.pdf.

UNEP and Copenhagen Centre for Energy Efficiency. *Best Practices and Case Studies for Industrial Energy Efficiency Improvement.* February 16, 2016. www.energyefficiencycentre.org/Nyheder/Nyhed?id=b2bedb2b-05a3-444f-ae5e-55ee3c8f1a68.

United Nations Framework Convention on Climate Change. "The Paris Agreement," December 2015. unfccc.int/files/essential_background/convention/application/pdf/english_paris_agreement.pdf.

World Business Council for Sustainable Development. "Sustainability and enterprise risk management: The first step towards integration." January 18, 2017. www.wbcsd.org/contentwbc/download/2548/31131.

World Resources Institute and World Business Council for Sustainable Development. *The Greenhouse Gas Protocol:  A Corporate Accounting and Reporting Standard,* (Revised Edition). March 2004. www.ghgprotocol.org/standards/corporate-standard.

A
Introduction

B
Climate-Related Risks,
Opportunities, and
Financial Impacts

C
Recommendations and
Guidance

D
Scenario Analysis and
Climate-Related Issues

E
Key Issues Considered and
Areas for Further Work

F
Conclusion

Appendices

# Exhibit 23

California Senate Judiciary Committee's
April 14, 2023 Analysis of S.B. 261

Declaration of Bradley J. Hamburger In Support Of
Plaintiffs' Motion for Summary Judgment on Claim I
May 24, 2024

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.*,
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)

**SENATE JUDICIARY COMMITTEE**
**Senator Thomas Umberg, Chair**
**2023-2024 Regular Session**

SB 261 (Stern)
Version: April 10, 2023
Hearing Date: April 18, 2023
Fiscal: Yes
Urgency: No
AWM

## SUBJECT

Greenhouse gases: climate-related financial risk

## DIGEST

This bill requires companies that do business in California and have gross revenues exceeding $500 million annually, excluding insurance companies, to report on their climate-related financial risk, as specified; and requires the California Air Resources Board (CARB) to contract with a qualified climate reporting organization to review and publish an analysis of those reports, as specified.

## EXECUTIVE SUMMARY

Climate change is here; the question that remains is how catastrophic it will be. As the effects of climate change are felt around the world, businesses and governments increasingly have to account for climate-related financial risks—the uncertainties and threats caused by climate change that may affect decisionmaking.

The Taskforce on Climate-Related Financial Disclosure (TCFD), founded at the behest of the G20, has developed a recommended framework for corporate climate-risk reporting. The TCFD-recommended disclosures include identifying the actual and potential impacts of climate-related risks and opportunities on the organization's businesses, strategy, and financial planning, and disclosing how the organization identifies, assesses, and manages climate-related risks. A number of organizations have voluntarily published reports containing some or all of the TCFD-recommended disclosures, and the United Kingdom requires certain organizations to make TCFD disclosures on annual basis, but there is no domestic requirement for companies to make TCFD-recommended disclosures.

This bill requires companies with over $500 million in annual revenues that do business in California, beginning in 2024, to annually submit a report to the CARB disclosing their climate-related financial risks using the TCFD framework; the report must also be

App.334

SB 261 (Stern)
Page 2 of 13

posted to the entity's website. The bill further requires that CARB contract with a qualified climate reporting organization to review the reports and annually publish a report analyzing the information provided and a sector-by-sector breakdown of climate-related financial risks. The bill specifies that, if a similar reporting requirement is enacted at the federal level, a reporting entity can satisfy its obligations under this bill by submitting the federal report. Finally, the bill provides that a reporting entity's violation of the reporting requirements is punishable by a civil penalty of up to $500,000, which may be awarded in a civil action brought by the Attorney General.

This bill is sponsored by Ceres and is supported by over 80 organizations, including groups dedicated to minimizing the effects of climate change, businesses, and faith-based organizations. This bill is opposed by over 50 organizations, including the California Chamber of Commerce and local Chambers of Commerce and a range of organization representing various industries. This bill was passed out of the Senate Environmental Quality Committee with a vote of 4-2.

## PROPOSED CHANGES TO THE LAW

Existing state law:

1) Establishes the California Global Warming Solutions Act of 2006 (AB 32 (Nunez, Ch. 488, Stats. 2006)), which declares that global warming poses a serious threat to the economic well-being, public health, natural resources, and the environment of California, and that action taken by California to reduce emissions of greenhouse gases will have far-reaching effects by encouraging other states, the federal government, and other countries to act. (Health & Saf. Code, div. 25.5, §§ 38500 et seq.)

2) Requires the CARB to monitor compliance with and enforce the requirements of the California Global Warming Solutions Act of 2006, and deems any violation to result in an emission of an air contaminant that may result in criminal and civil penalties. (Health & Saf. Code, § 38580.)

3) Defines "doing business" in California as engaging in any transaction for the purpose of financial gain within California, being organized or commercially domiciled in California, or having California sales, property, or payroll exceed $610,395, $61,040, and $61,040, respectively, as of 2020. (Rev. & Tax. Code, §§17041, 23101.)

4) Requires, until January 31, 2035, California Public Employees' Retirement System (CalPERS) and California State Teachers' Retirement System (CalSTRS) to publicly report on its analysis of the climate-related financial risk in its public market portfolio, as specified. (Gov. Code, § 7510.5.)

App.335

SB 261 (Stern)
Page 3 of 13

Existing federal law:

1) Gives Congress the authority to regulate commerce with foreign nations and between states, i.e. the commerce clause. (U.S. Const. art. I, § 8.)

2) Directs specified federal officers and bodies, pursuant to an executive order, to develop a comprehensive, government-wide strategy regarding the measurement, assessment, mitigation, and disclosure of climate-related financial risk to federal government programs, assets, and liabilities in order to increase the long-term stability of federal operations. (Exec. Order No. 14030, 86 Fed.Reg. 27967 (May 20, 2021).)

This bill:

1) Makes findings and declarations regarding, among other things, the importance of climate risk in effective decision-making.

2) Defines the following terms:
   a) "Climate reporting organization" is a nonprofit climate reporting organization contracted by the CARB that (1) currently operates a voluntary climate reporting organization for organizations operating in the United States and (2) has experience with voluntary climate-related disclosure by entities operating in California.
   b) "Climate-related financial risk" is material risk of harm to immediate and long-term financial outcomes due to physical and transition risks, including, but not limited to, risks to corporate operations, provision of goods and services, supply chains, employee health and safety, capital and financial investments, institutional investments, financial standing of loan recipients and borrowers, shareholder value, consumer demand, and financial markets and economic health.
   c) "Climate-related financial risk report" is a report required by 3).
   d) "Covered entity" is a corporation, partnership, limited liability company, or other business entity formed under the laws of this state, the laws of any other state of the United States or the District of Columbia, or under an act of the Congress of the United States with total annual revenues in excess of $500,000,000 and that does business in California; the term does not include business entity that is subject to regulation by the Department of Insurance in this state, or that is in the business of insurance in any other state.

3) Requires a covered entity, on or before December 31, 2024, and annually thereafter, to prepare a climate-related financial risk report disclosing both of the following:
   a) Its climate-related financial risk, in accordance with the recommended framework and disclosures contained in the Final Report of Recommendations of the Task Force on Climate-Related Financial Disclosures

App.336

SB 261 (Stern)
Page 4 of 13

(June 2017) published by the Task Force on Climate-Related Financial Disclosures, or any subsequent publication thereto.

b) Its measures adopted to reduce and adapt to climate-related financial risk disclosed pursuant to 3)(a).

4) Requires a covered entity, on or before December 31, 2024, and annually thereafter, to submit to the CARB, and make available to the public on its own website, a copy of the report required by 3); and to submit to the Secretary of State a statement affirming, not under penalty of perjury, that the report prepared and filed pursuant to 3) discloses climate-related financial risk in accordance with the TCFD framework, as required.

5) Provides that, if a federal law or regulation enacted or promulgated after January 1, 2023, requires a covered entity to prepare an annual report disclosing information materially similar to the information described in 3), a report prepared pursuant to the federal requirement satisfies the requirements of 3) and a covered entity may satisfy its obligations under 4) by submitting the federal report to the CARB.

6) Requires the CARB to contract with a climate reporting organization to prepare an annual public report on the climate risk disclosures required under 3) and ensure the required climate risk disclosures remain consistent with current practices.

7) Requires the climate reporting organization contracted under 6) to do all of the following:

a) Annually prepare a report that contains: (1) a review of the disclosure of climate-related financial risk contained in the reports submitted to the CARB; (2) an analysis of the systematic and sector-wide climate-related financial risks facing the state based on the contents of the reports, including, but not limited to, potential impacts one economically vulnerable communities; and (3) identification of inadequate or insufficient reports.

b) Regularly convene representatives of sectors responsible for reporting climate-related financial risks, state agencies responsible for oversight of reporting sectors, investment managers, academic experts, and other stakeholders to offer input on current best practices regarding the disclosure of financial risks resulting from climate change, including, but not limited to, proposals to update the definition of "climate-related financial risk," and the framework or disclosure standard of "climate-related financial risk reports."

c) Monitor federal regulatory actions among agency members of the federal Financial Stability Oversight Council, as well as nonindependent regulators overseen by the White House.

8) Provides that if the Attorney General finds that a reporting entity has violated the requirements above of 3) or 4), or upon a report received from the CARB, the entity shall be liable for a civil penalty not to exceed $500,000 per violation, which may be

SB 261 (Stern)
Page 5 of 13

assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General in a court of competent jurisdiction.

9) Places 2)-6) within the California Global Warming Solutions Act of 2006.

## COMMENTS

1. Author's comment

According to the author:

> It is abundantly clear the worsening effects of climate change pose numerous environmental risks that include extreme drought, rising sea levels, catastrophic wildfires, and extreme weather events. These impacts not only [a]ffect our environment but they also [a]ffect how we live, what services we rely upon and which investments make the most sense. Major corporations and financial institutions face climate related financial risks in their business making decisions, so it is important for these businesses and institutions to assess and share the risks they have identified, and what efforts they are employing to mitigate them. This information is important to provide more transparency to policy makers, investors, and shareholders as it will result in improved decision making on where to invest private and public dollars. Climate related financial risk disclosures are ultimately about good business, partnerships, governance and the solutions and planning necessary to navigate the increasing burdens of a changing climate.

2. Background on climate-related financial disclosures

In 2015, the G20 Finance Ministers and Central Bank Governors asked the Financial Stability Board (FSB) to review how the financial sector could better account for climate-change-related issues.[1] The FSB formed the TCFD, and in 2017 the TCFD released a recommended framework for companies on climate-related financial disclosures.[2] The report explains that "climate change poses significant financial challenges and opportunities," but "[a]t the same time, the risk-return profile of organizations exposed to climate-related risks may change significantly as such organizations may be more affected by physical impacts of climate change, climate policy, and new technologies."[3] As such, the TCFD recommended that companies make climate disclosures in four key areas:

---

[1] Task Force on Climate-Related Financial Disclosures, History, https://www.fsb-tcfd.org/about/#history. All links in this analysis are current as of April 14, 2023.
[2] *See* TCFD, *Recommendations of the Task Force on Climate-related Financial Disclosures* (Jun. 2017), *available at* https://assets.bbhub.io/company/sites/60/2021/10/FINAL-2017-TCFD-Report.pdf.
[3] *Id.* at p. ii.

SB 261 (Stern)
Page 6 of 13

- Governance: disclose the organization's governance around climate-related risks and opportunities.
- Strategy: disclose the actual and potential impacts of the climate-related risks and opportunities on the organization's businesses, strategy, and financial planning where such information is material.
- Risk management: disclose how the organization identifies, assesses, and manages climate-related risks.
- Metrics and targets: disclose the metrics and targets used to assess and manage climate-related risks and opportunities where such information is material.[4]

The United Kingdom adopted the TCFD as a mandatory disclosure framework for publicly traded companies and large private companies in 2021.[5] As of March 2022, CDP—an organization that provides a platform for TCFD-aligned disclosures—reports that over 680 financial institutions with over $130 trillion in assets had called on nearly 10,400 companies to disclose TCFD climate-related data.[6] Major investment firms, such as BlackRock, have also made TCFD climate-risk reports.

Here in California, the Legislature in 2018 enacted SB 964 (Allen, Ch. 731, Stats. 2018), which requires CalPERS and CalSTRS to make public climate-related financial risk disclosures on a triannual basis.[7] CalSTRS, writing in support of the bill, has noted that the task of determining its own climate-related financial risk would be significantly simplified if companies covered by this bill were also required to make TCFD-aligned disclosures.

3.  <u>This bill requires very large companies doing business in California to disclose their climate-related financial risks beginning in 2024</u>

This bill requires companies who do business in California and whose gross revenues exceed $500 million annually, excluding insurance companies, to annually disclose their climate-related financial risks under the TCFD framework, beginning in 2024. The report must be submitted to the CARB and posted on the company's own website. Insurance companies are exempted because the National Association of Insurance Commissioners, which includes California's Insurance Commissioner, already require

---

[4] *Id.* at p. 14.
[5] United Kingdom Department for Business, Energy & Industrial Strategy, MD Treasury, Press Release, UK to enshrine mandatory climate disclosures for largest companies in law (Oct. 29, 2021), https://www.gov.uk/government/news/uk-to-enshrine-mandatory-climate-disclosures-for-largest-companies-in-law.
[6] CDP, *More than 680 financial institutions with US$130+ trillion in assets call on nearly 10,400 companies to disclose environmental data through CDP* (Mar. 14 2022), https://www.cdp.net/en/articles/media/More-than-680-financial-institutions-call-on-nearly-10400-companies-to-disclose-environmental-data-through-CDP.
[7] Gov. Code, § 7510.5. The requirement is set to sunset on January 31, 2035. (Gov. Code, § 7510.5(f).)

SB 261 (Stern)
Page 7 of 13

insurance companies to report their climate-related risks in alignment with TCFD.[8] The bill provides that a company that violates the bill's reporting requirements may be liable for a civil penalty of up to $500,000, which may be recovered in a civil action brought by the Attorney General in the name of the people of the State of California.

The bill also requires the CARB to contract with an experienced climate reporting organization to analyze the reports. The contracted entity must, on an annual basis, prepare a public report that reviews the climate-related financial risk disclosures and provides breakdowns of risk by sector and identify inadequate or insufficient reports.

An earlier version of the bill did not account for the possibility that the federal government may impose a similar climate-related-risk reporting requirement. As the Senate Environmental Quality Committee's analysis notes, the Securities and Exchange Commission (SEC) is considering its own potential climate disclosure rules which may overlap with this bill's disclosures. While the SEC's rules would apply only to publicly traded companies, imposing a dual reporting requirement could unduly burden companies or result in a conflict with federal requirements. The author has accordingly amended the bill to provide that, if federal laws or regulations are enacted to require climate-risk reporting, a covered entity can comply with this bill by submitting the federally required report to the CARB, rather than creating a second report.

4.   <u>This bill does not present a clear dormant interstate commerce clause issue</u>

Section 8 of Article I of the United States Constitution grants the United States Congress the power to regulate interstate commerce.[9] Since the early nineteenth century, the Supreme Court has held that obverse proposition—that states may not usurp Congress's express power to regulate interstate commerce—must also be true.[10] This rule against state interference in interstate commerce, sometimes known as the dormant interstate commerce clause, serves as an absolute bar to regulations that discriminate against interstate commerce, i.e., by favoring in-state businesses or excluding out-of-state businesses.[11] But when a state passes a law that " 'regulat[es] even-handedly [across all in-state and out-of-state businesses] to effectuate a legitimate local public interest,' " that law " 'will be upheld unless the burden imposed upon such commerce is clearly excessive in relation to the putative local benefits.' "[12]

There is no facial dormant Commerce Clause issue here. This bill grants no favoritism for in-state companies—all U.S.-based companies doing business in California with

---

[8] *See* National Association of Insurance Commissioners, U.S. Insurance Commissioners Endorse Internationally Recognized Climate Risk Disclosure Standard for Insurance Companies (Apr. 2, 2022), https://content.naic.org/article/us-insurance-commissioners-endorse-internationally-recognized-climate-risk-disclosure-standard.
[9] U.S. Const., art. I, § 8, cl. 3.
[10] *See Gibbons v. Ogden* (1824) 22 U.S. 1.
[11] *E.g., Dean Milk Co. v. Madison* (1951) 340 U.S. 349, 354.
[12] *South Dakota v. Wayfair, Inc.* (2018) 138 S.Ct. 2080, 2091.

SB 261 (Stern)
Page 8 of 13

annual revenues in excess of $500 million are subject to the bill's reporting requirement. That leaves only the questions of whether the bill's reporting requirement serves a legitimate local interest, and whether the burden imposed by the reporting requirement is clearly excessive in relation to the benefits conferred.

5.  Arguments in support

According to Ceres, the bill's sponsor:

> Climate change poses a significant risk to our long-term economic success, impacts the health and livelihood of the communities in which we operate and live, and disrupts the value chains on which we rely. Consistent, comparable, and reliable information at scale is necessary to fully assess companies' risk exposure and to navigate the path to a net-zero future.

> Companies need to invest in climate disclosure analysis and reporting because ignoring the risks will be very costly, while finding the path towards a net-zero future offers economic stability and growth. The current state of voluntary climate disclosure is inadequate for meeting rapidly accelerating climate risks, and the SEC's climate risk disclosure would only apply to publicly traded US entities. Climate disclosure is needed from non-listed actors as well. SB 261 sets the bar on robust, multi-sector disclosure and holds companies accountable for managing climate risk to ensure a sustainable, resilient, and prosperous future for California.

6.  Arguments in opposition

According to a coalition of over 50 organizations writing in opposition:

> By mandating an annual report in accordance with the Final Recommendations of the Task Force on Climate-Related Financial Disclosures, SB 261 is itself in conflict with the recommendations. The recommendations are designed to be voluntary and to maintain the standard of materiality, the report notes that "any disclosure recommendations by the Task Force would need to be voluntary, would need to incorporate the principle of materiality and would need to weigh the balance of costs and benefits." The recommendations also assert the need for flexibility. Further the report acknowledges the importance of a deliberate transition, noting that "As understanding, data analytics, and modeling of climate-related issues becomes more widespread, disclosures can mature accordingly." Unfortunately, SB 261 was drafted with a degree of rigidity that doesn't allow for flexibility based on the maturation of our understanding of data collection and analytics as noted in the Task Force's own findings.

App.341

SB 261 (Stern)
Page 9 of 13

The Task Force's recommendations seem to be designed to offer guidance to those in the business community on how best to mitigate risk, yet the approach taken by SB 261 would actually impose the greatest amount of risk on those most susceptible to financial uncertainty: the small business community. SB 261 takes a one-size fits all approach to the business community and applies a reporting standard that would impact a broad array of businesses here in California. The Task Force's own findings note that there should be a proportional approach to developing disclosure requirements to ensure that smaller organizations are not subject to risk. Risk that the report clearly identifies in the form of "litigation given the high degree of uncertainty around future timing and magnitude of climate-related impacts." While larger institutions might be able to assume that risk, that is often not the case for smaller businesses here in California. And, at an even more granular level, the impact to the small business community will vary based on geographic location, which is not accounted for in this proposal. Unfortunately, SB 261 does not follow the guidance offered in the report and puts the small business community at risk writ large.

## **SUPPORT**

Ceres (sponsor)
350 Bay Area Action
350 Conejo/San Fernando Valley
350 Humboldt
350 Juneau
350 Marin
350 Sacramento
350 South Bay Los Angeles
350 Southland Legislative Alliance
350 Ventura County Climate Hub
Alter Eco
Americans for Financial Reform
Avocado Green
Ban SUP (Single Use Plastic)
California Environmental Voters
California State Teachers' Retirement System (CalSTRS)
CALPIRG
Catholic Network US (Colorado)
Center for Biological Diversity
Citizens' Climate Lobby, Sacramento/Roseville Chapter
Climate 911
Climate Action California
Climate Action Campaign, Humboldt
Climate Hawks Vote

SB 261 (Stern)
Page 10 of 13

Climate Reality Project, Los Angeles
Climate Reality Project, San Fernando Valley
Coalition for Clean Air
Coastside Jewish Community
Colorado Businesses for a Livable Climate
Community for Sustainable Energy
Conejo Climate Coalition
Cool Planet Group of First Presbyterian Church, Palo Alto
Divest Oregon
DSM North America
E2
East Valley Indivisibles
Environment California
Environmental Defense Fund
Extinction Rebellion San Francisco Bay Area
Fossil Free California
Friends Committee on legislation of California
Friends of the Earth
Giniw Collective
Glendale Environmental Coalition
Greater New Orleans Housing Alliance
Grove Collaborative
Honor the Earth
Indivisible Alta Pasadena
Indivisible Ambassadors (Colorado)
Indivisible California Green Team
Indivisible California: StateStrong
Leading Change Consulting and Coaching
Littleton Business Alliance
Mental Health & Inclusion Ministries
Mind Eye World
Mothers Out Front California
Natural Resources Defense Council
North Range Concerned Citizens
Oil & Gas Action Network
Peninsula Interfaith Climate Action
Public Citizen
RapidShift Network
San Fernando Valley Climate Reality
San Francisco Bay Physicians for Social Responsibility
Santa Cruz Climate Action Network
Save EPA
Sierra Club California

SB 261 (Stern)
Page 11 of 13

Sierra Nevada Brewing Co.
Silicon Valley Youth Climate Action
SoCal 350 Climate Action
SolidarityINFOService
Southwest Organization for Sustainability
Spirit of the Sun, Inc.
Stand.earth
System Change Not Climate Change
The Climate Center
The Phoenix Group
The Vessel Project of Louisiana
Third Act
Transformative Wealth Management, LLC
Trinity Respecting Earth and Environment
Union of Concerned Scientists
Urban Ecology Project

## **OPPOSITION**

Advanced Medical Technology Association
African American Farmers of California
Agricultural Energy Consumers Association
American Beverage Association
American Composites Manufacturers Association
American Pistachio Growers
Antelope Valley Chambers of Commerce
Auto Care Association
Building Owners and Managers Association
California Advanced Biofuels Alliance
California Apartment Association
California Apple Commission
California Asphalt Pavement Association
California Blueberry Association
California Blueberry Commission
California Building Industry Association
California Business Properties Association
California Chamber of Commerce
California Construction and Industrial Materials Association
California Cotton Ginners and Growers Association
California Credit Union League
California Date Commission
California Fresh Fruit Association
California Fuels and Convenience Alliance
California Hispanic Chamber of Commerce

SB 261 (Stern)
Page 12 of 13

California Independent Petroleum Association
California Life Sciences
California Manufacturers & Technology Association
California Poultry Federation
California Retailers Association
California Walnut Commission
Can Manufacturers Institute
Carlsbad Chamber of Commerce
CAWA
Chino Valley Chamber of Commerce
Citrus Heights Chamber
Costa Mesa Chamber of Commerce
Danville Area Chambers of Commerce
Far West Equipment Dealers Association
La Cañada Flintridge Chamber of Commerce
Long Beach Area Chamber of Commerce
Los Angeles Area Chamber of Commerce
National Association of Industrial and Office Properties
Nisei Farmers League
North San Diego Chamber of Commerce
Oceanside Chamber of Commerce
Olive Growers Council of California
Orange County Business Council
Palos Verdes Peninsula Chamber of Commerce
Rancho Cordova Chamber of Commerce
Santa Barbara South Coast Chamber of Commerce
Securities Industry and Financial Markets Association
Southern California Leadership Council
Specialty Equipment Market Association
The Greater High Desert Chamber of Commerce
Torrance Area Chamber of Commerce
Walnut Creek Chamber of Commerce
West Precast Prestressed Concrete Institute
West Ventura County Business Alliance
Western Agricultural Processors Association
Western Growers Association
Western Plant Health Association
Western States Petroleum Association
Wine Institute

SB 261 (Stern)
Page 13 of 13

## RELATED LEGISLATION

Pending Legislation:

SB 253 (Wiener, 2023) requires any partnership, corporation, limited liability company, or other U.S. business entity with total annual revenues in excess of one billion dollars and that does business in California to publicly report their annual greenhouse gas (GHG) emissions, as specified by the CARB. SB 253 is pending before this Committee and is scheduled to be heard on the same date as this bill.

SB 252 (Gonzalez, 2023) prohibits the boards of the Public Employees' Retirement System and the State Teachers' Retirement System from making new investments or renewing existing investments of public employee retirement funds in a fossil fuel company, as defined, and would require the boards to liquidate investments in a fossil fuel company on or before July 1, 2030. SB 252 is pending before the Senate Judiciary Committee.

Prior Legislation:

SB 449 (Stern, 2021) was substantially similar to this bill, in that it would have required certain California-based financial institutions to prepare and disclose climate-related financial risk reports disclosing the institution's climate-related financial risk and its measures to reduce and adapt to those risks and established an entity to review the institutions' reports and prepare analysis of the systemic and sector-wide climate-related financial risk. SB 449 died in the Senate Appropriations Committee.

SB 260 (Wiener, 2021) would have required the CARB to develop regulations to require a reporting entity—defined as a business entity with total annual revenues over one billion dollars that does business in California—to report to an emissions registry, as defined, their Scope 1, Scope 2, and Scope 3 emissions, as defined. The bill also would have required the ARB to prepare a report by January 1, 2026, on those disclosures, and it requires the emissions registry to establish a public data platform to view the disclosures. SB 260 died on the Assembly Floor.

SB 964 (Allen, Ch. 731, Stats. 2018) requires CalPERS and CalSTRS to make public climate-related financial risk disclosures on a triannual basis until January 1, 2035.

## PRIOR VOTES:

Senate Environmental Quality Committee (Ayes 4, Noes 2)

**************

# Exhibit 25

## Governor Gavin Newsom's October 7, 2023 Signing Statement for S.B. 261

Declaration of Bradley J. Hamburger In Support Of
Plaintiffs' Motion for Summary Judgment on Claim I
May 24, 2024

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.*,
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)



## OFFICE OF THE GOVERNOR

OCT **0 7** 2023

To the Members of the California Senate:

I am signing Senate Bill 261 which would require, among other things, businesses with total annual revenues over $500 million and operating in California, beginning January 1, 2026, and biennially thereafter, to develop a report on its climate-related financial risks.

This policy will illustrate the real risks of climate change for businesses operating in California and will encourage them to adopt practices that seek to minimize and avoid these risks. However, the implementation deadlines fall short in providing the California Air Resources Board (CARB) with sufficient time to adequately carry out the requirements in this bill. I am directing my Administration to work with the bill's author and the Legislature next year to address this issue.

Additionally, I am concerned about the overall financial impact of this bill on businesses, so I am instructing CARB to closely monitor the cost impacts as it implements this new bill and to make recommendations to streamline the program. I look forward to working with the Legislature on these outstanding items to ensure that the bill's intent is achieved.

Sincerely,

Gavin Newsom

GOVERNOR GAVIN NEWSOM • SACRAMENTO, CA 95814 • (916) 445-2841

App.348

ROB BONTA
Attorney General of California
GARY E. TAVETIAN (SBN 117135)
MYUNG J. PARK (SBN 210866)
Supervising Deputy Attorneys General
M. ELAINE MECKENSTOCK (SBN 268861)
CAITLAN MCLOON (SBN 302798)
EMILY HAJARIZADEH (SBN 325246)
DYLAN REDOR (SBN 338136)
KATHERINE GAUMOND (SBN 349453)
Deputy Attorneys General
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6438
  Fax:  (916) 731-2128
  E-mail:  Caitlan.McLoon@doj.ca.gov
*Attorneys for Defendants Liane M. Randolph,*
*Steven S. Cliff, and Robert A. Bonta*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION,** | 2:24-cv-00801-ODW-PVC |
| | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON CLAIM I** |
| Plaintiffs, | Date:              September 9, 2024 |
| | Time:              1:30 PM |
| **v.** | Courtroom:    5D |
| | Judge:            The Honorable Otis D. Wright, II |
| **LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California,** | Trial Date:      Not Set |
| | Action Filed: 1/30/2024 |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

Introduction .................................................................................................. 1

Background ................................................................................................... 2

I.    Senate Bills 253 and 261 ................................................................... 2

    A.    Reporting Obligations Are An Ordinary and Expected Part of Doing Business ................................................. 2

    B.    Senate Bills 253 and 261 Build on Existing Corporate Climate-Related Reporting and Disclosure Practices in Wide Use ........................................................................ 3

    C.    Senate Bill 253 Requires the Largest Companies Doing Business in California to Report GHG Emissions in Accordance with Widely Accepted Protocols ...................... 4

    D.    Senate Bill 261 Requires the Largest Companies Doing Business in California to Disclose Climate-Related Financial Risk in Accordance with Widely Accepted Protocols ............................................................................. 5

II.    Procedural History ............................................................................ 6

Legal Standard ............................................................................................. 6

Argument ...................................................................................................... 7

I.    Senate Bills 253 and 261 Compel Commercial Speech and Thus Are Subject to Review Under a Lower Level of Scrutiny .................. 7

II.    The Disclosure Laws Are Constitutional Under Zauderer ................ 10

    A.    The required disclosures are "Purely Factual and Uncontroversial" .............................................................. 11

    B.    The Laws are Reasonably Related to a Substantial State Interest ........................................................................ 14

    C.    The Laws are Neither Unjustified nor Unduly Burdensome ................................................................... 17

III.    Alternatively The Disclosure Laws Are Constitutional Under *Central Hudson* ............................................................................... 18

IV.    The Regulatory Disclosure Requirements of Senate Bills 253 and 261 Are Not Subject to Strict Scrutiny ....................................... 20

V.    Senate Bills 253 and 261 Would Survive Review Under Strict Scrutiny ............................................................................................ 22

Conclusion .................................................................................................... 23

Certificate of Compliance ............................................................................ 24

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Am. Hosp. Ass'n v. Azar*
983 F.3d 528 (D.C. Cir. 2020) .......................................................... 8, 11, 15, 17

*Am. Meat Inst. v. U.S. Dep't of Ag.*
760 F.3d 18 (D.C. Cir. 2014) ............................................................... 14, 15

*Ambat v. City & County of San Francisco*
757 F.3d 1017 (9th Cir. 2014) .................................................................... 6

*Americans for Prosperity Found. v. Bonta*
594 U.S. 595 (2021) ........................................................................... 6, 18

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ................................................................................ 6

*Ariix, LLC v. NutriSearch Corp.*
985 F.3d 1107 (9th Cir. 2021) ................................................................. 8, 9

*Bd. of Trs. of State Univ. of N.Y. v. Fox*
492 U.S. 469 (1989) .............................................................................. 19

*Bolger v. Youngs Drug Prod. Corp.*
463 U.S. 60 (1983) ................................................................................. 9

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*
447 U.S. 557 (1980) ......................................................................... 7, 8, 19

*City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*
596 U.S. 61 (2022) (Breyer, J., concurring) .............................................. 20

*City of Cincinnati v. Discovery Network, Inc.*
507 U.S. 410 (1993) ............................................................................... 8

*CTIA – The Wireless Assoc. v. City of Berkeley*
928 F.3d 832 (9th Cir. 2019) ......................................................... 10, 12, 14

*Envtl. Def. Ctr. v. U.S. E.P.A.*
344 F.3d 832 (9th Cir. 2003) ......................................................... 11, 20, 21

ii

# TABLE OF AUTHORITIES
## (continued)

Page

*First Resort, Inc. v. Herrera*
 860 F.3d 1263 (9th Cir. 2017) ................................................................. 8

*Glickman v. Wileman Bros. & Elliott, Inc.*
 521 U.S. 457 (1997) ............................................................................... 20

*Iancu v. Brunetti*
 588 U.S. 388 (2019) ............................................................................... 22

*Ibanez v. Fla. Dep't of Bus. & Prof. Regul., Bd. of Acct.*
 512 U.S. 136 (1994) ............................................................................... 17

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*
 585 U.S. 878 (2018) ............................................................................... 13

*Jordan v. Jewel Food Stores, Inc.*
 743 F.3d 509 (7th Cir. 2014) ................................................................... 9

*Mass v. EPA*
 549 U.S. 497 (2007) ............................................................................... 13

*McSherry v. City of Long Beach*
 584 F.3d 1129 (9th Cir. 2009) ................................................................. 6

*Moody v. NetChoice*
 144 S. Ct. 2383 (2024) .............................................................. 6, 18, 20

*Nat'l Ass'n of Wheat Growers v. Becerra*
 468 F. Supp. 3d 1247 (E.D. Cal. 2020) ................................................ 18

*Nat'l Ass'n of Wheat Growers v. Bonta*
 85 F.4th 1263 (9th Cir. 2023) ................................................................ 14

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*
 272 F.3d 104 (2d Cir. 2001) ................................................................... 15

*Nat'l Inst. of Fam. and Life Advocs. v. Becerra*
 585 U.S. 755 (2018) .................................................................. 12, 20, 22

*National Ass'n of Manufacturers v. SEC*
 800 F.3d 518 (D.C. Cir. 2015) ........................................................ 12, 21

iii

# TABLE OF AUTHORITIES
### (continued)

Page

*Nationwide Biweekly Admin. v. Owen*
  873 F.3d 716 (9th Cir. 2017) ................................................................ 10

*Ohralik v. Ohio State Bar Ass'n*
  436 U.S. 447 (1978) ........................................................................... 21

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*
  475 U.S. 1 (1986) .............................................................................. 12

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*
  487 U.S. 781 (1988) ........................................................................... 16

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*
  547 U.S. 47 (2006) ............................................................................. 21

*S.E.C. v. Wall St. Publ'g Inst., Inc.*
  851 F.2d 365 (D.C. Cir. 1988) ............................................................ 21

*Sorrell v. IMS Health Inc.*
  564 U.S. 552 (2011) ............................................................................. 8

*State of Iowa, et al. v. SEC*
  24-1522 (8th Cir. Apr. 4, 2024) ............................................................ 3

*Turner Broad. Sys., Inc. v. FCC*
  512 U.S. 622 (1994) ........................................................................... 15

*Turner Broad. Sys., Inc. v. FCC*
  520 U.S. 180 (1997) ........................................................................... 15

*United States v. Edge Broad. Co.*
  509 U.S. 418 (1993) ........................................................................... 15

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*
  425 U.S. 748 (1976) ........................................................................ 1, 8

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*
  471 U.S. 626 (1985) ................................................................... *passim*

iv

# TABLE OF AUTHORITIES
## (continued)

Page

**STATUTES**

Cal. Stat., Chapter 383
§ 1 ................................................................................................. 3, 4

California Corporations Code
§ 1502 .................................................................................................. 2
§ 1502.1 ............................................................................................... 2
§ 2117 .................................................................................................. 2
§ 2117.1 ............................................................................................... 2
§ 25000 .............................................................................................. 20

Health and Safety Code
§ 38530 .............................................................................................. 20
§ 38532(b)(2) ....................................................................................... 4
§ 38532(b)(3)–(5) ................................................................................ 4
§ 38532(b)(4) ....................................................................................... 4
§ 38532(b)(5) ....................................................................................... 4
§ 38532(c)(1) ....................................................................................... 4
§ 38532(c)(1)(A)(ii) ........................................................................ 4, 11
§ 38532(c)(1)(D)(i) ......................................................................... 5, 18
§ 38532(c)(1)(F) ............................................................................. 5, 11
§ 38532(d)(1) ....................................................................................... 5
§ 38532(e)(1) ....................................................................................... 5
§ 38533(a)(2) .................................................................................. 5, 16
§ 38533(a)(4)–(b)(1)(A) ...................................................................... 5
§ 38533(b)(1)(A)(i) .............................................................................. 5
§ 38533(b)(4) ....................................................................................... 5
§ 38533(c)(1)–(2) ................................................................................ 6
§ 38533(e)(2) ....................................................................................... 5
§ 38562 .............................................................................................. 16
§ 38562.2 ........................................................................................... 16
§ 38566 .............................................................................................. 16

**COURT RULES**

Federal Rules of Civil Procedure
Rule 56(d) ............................................................................. 7, 14, 18, 20

v

**TABLE OF AUTHORITIES**
**(continued)**

Page

OTHER AUTHORITIES

89 Federal Register 21,668, 21,736 (Mar. 28, 2024) .................................................. 3

Senate Bill
    253 ............................................................................................................... 1, 4
    261 ............................................................................................................... 1, 5

vi

**INTRODUCTION**

Information forms the backbone of our political and economic system. Indeed, ensuring "the free flow of information" in an open marketplace of ideas serves core First Amendment goals: "enlighten[ing] public decisionmaking in a democracy," and allowing for "intelligent and well informed" economic decisions in a "predominantly free enterprise economy." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976). Accordingly, the Constitution gives the government greater latitude when it acts to increase, rather than restrict, the free flow of information to the marketplace. *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 650-52 (1985).

The Climate Corporate Data Accountability Act (Senate Bill 253) and the Climate-Related Financial Risk Act (Senate Bill 261) are designed to serve this very interest: "Information for the public." SSMF 2. The laws increase transparency and improve access to consistent, standardized information about the greenhouse gas (GHG) emissions and climate-related financial risks of the largest companies doing business in California. They do so to protect consumers and investors from fraudulent and misleading environmental claims and omissions, promote efficiency in the markets, SSMF 2, and correct "a massive blind spot for consumers, investors, and policymakers who are seeking to derive meaningful insights across the entire economy" in order to make informed decisions about where to spend their money, how to protect their investments from risk, and what to regulate in regards to one of the most pressing issues of our time. SSMF 92.

Neither law requires a reporting entity to take a position on any "politically salient" or "controversial" issue. MSJ 1. Indeed, they do not require statements on political or ideological issues at all. Rather, Senate Bill 253 simply asks companies to mathematically calculate their total GHG emissions and make that data public. And Senate Bill 261 asks companies to disclose corporate governance practices and risk management strategies—factual information increasingly requested by

1

App.356

1    insurance companies and underwriters, SSMF 93-94—so as to make data available

2    about whether and to what extent those companies are planning for climate change.

3    These disclosures require the application of traditional financial accounting

4    principles that are widely accepted.  SSMF 95-100.  Indeed, many companies

5    subject to the challenged laws already voluntarily report the required information

6    using these same principles.  SSMF 101-110.

7        Here, where the laws compel only factual and noncontroversial information

8    about commercial operations, and do not dictate the language of the disclosures or

9    hamper companies' ability to present their own messages on climate change, settled

10    precedent requires a lower level of First Amendment scrutiny.  *Zauderer*, 471 U.S.

11    at 651-52.  But Senate Bills 253 and 261 would survive under any level of scrutiny.

12    Plaintiffs' motion for summary judgment should be denied.

**BACKGROUND**

I.    **SENATE BILLS 253 AND 261**

    **A.**    **Reporting Obligations Are An Ordinary and Expected Part of Doing Business**

17        All companies doing business in California are subject to reporting

18    obligations.  Under the California Corporate Disclosure Act, every corporation

19    qualified to do business in California must make annual disclosures to the

20    California Secretary of State regarding the corporation's board of directors, officers

21    and operations.  Cal. Corp. Code §§ 1502, 1502.1, 2117, 2117.1.  And publicly

22    traded companies have to provide additional information regarding independent

23    auditors, audit reports, annual compensation to directors and officers, loans made to

24    members of the board at preferential loan rates, etc.  *Id.*

25        Under federal law, public companies are required to make a variety of

26    disclosures to the SEC, all of which are made publicly available to investors.  These

27    required disclosures include information about the company's operations, financial

28    condition, and risk factors; factors that increase the risk of investing in the

2

1    company; the company's securities performance; management's discussion of the

2    factors it believes have affected past performance and will affect future

3    performance; etc. *See* SSMF 111. Among the risks that SEC-regulated companies

4    have had to report are the impacts of the "Year 2000" (Y2K) problem, the Covid-19

5    pandemic, high rates of inflation, and Russia's war on Ukraine. SSMF 112-113.

6    **B.    Senate Bills 253 and 261 Build on Existing Corporate Climate-**

7    **Related Reporting and Disclosure Practices in Wide Use**

8    Senate Bills 253 and 261 were enacted in late 2023 against the backdrop of

9    an increasing number of voluntary and required climate-related disclosures.

10    Multinational companies or U.S.-based companies with international subsidiaries

11    are required—depending on size—to prepare emissions and climate risk reports

12    pursuant to the EU's Corporate Sustainability Reporting Directive, and/or the

13    International Sustainability Standards Board's IFRS Sustainability Disclosure

14    Standards. SSMF 114. The SEC recently finalized a rule governing the reporting,

15    by publicly traded companies, of climate-related financial risks and certain

16    categories of GHG emissions. 89 Fed. Reg. 21,668 (Mar. 28, 2024).[1] And

17    thousands of companies have for years publicly reported their climate risks and

18    other climate metrics under voluntary frameworks. SSMF 101-110. Under one

19    such voluntary program, the CDP (formerly the Carbon Disclosure Project), over

20    23,000 firms—including 86% of companies in the S&P 500—disclosed GHG

21    emissions and climate-related risk information in 2023. SSMF 102.

22    In passing Senate Bills 253 and 261, the California Legislature built on these

23    existing frameworks to create "the full transparency and consistency" needed by

24    California residents, consumers, and investors "to fully understand [] climate risks."

25    2023 Cal. Stat., ch. 382 § 1 (S.B. 253); *see also* 2023 Cal. Stat., ch. 383 § 1 (S.B.

26    261). The Legislature sought to solve the problem of inconsistent and misleading

27    _____

28    [1] The SEC voluntarily stayed its rule pending judicial review. *See* Dkt. ID 5380534, *State of Iowa, et al. v. SEC*, 24-1522 (8th Cir. Apr. 4, 2024).

3

1  reporting among companies doing business in the State, 2023 Cal. Stat., ch. 382 §

2  1, and "set mandatory and comprehensive risk disclosure requirements for public

3  and private entities to ensure a sustainable, resilient, and prosperous future for our

4  state," 2023 Cal. Stat., ch. 383 § 1.  *See also* SSMF 115-116.

5  **C.    Senate Bill 253 Requires the Largest Companies Doing Business**
    **in California to Report GHG Emissions in Accordance with**
6      **Widely Accepted Protocols**

7  S.B. 253 directs the California Air Resources Board (CARB) to "develop and

8  adopt regulations" that will require "reporting entit[ies]" to disclose their GHG

9  emissions.  Cal. Health & Safety Code § 38532(c)(1).  "Reporting entit[ies]" are

10  those "do[ing] business in California" with total annual revenues in excess of one

11  billion dollars.  *Id.* § 38532(b)(2).  CARB has not yet adopted the implementing

12  regulations required by the statute.

13  Once CARB's implementing regulations are in place, reporting entities will

14  report three categories of GHG emissions: Scope 1, Scope 2, and Scope 3.  *Id.*

15  § 38532(b)(3)–(5).  Scope 1 emissions are GHG gas emissions from sources owned

16  or directly controlled by the reporting entity.  *Id.* § 38532(b)(3).  Scope 2 emissions

17  are indirect emissions associated with the company's use of electricity, steam,

18  heating, and cooling.  *Id.* § 38532(b)(4).  Scope 3 emissions include all other

19  indirect emissions, such as emissions from "purchased goods and services, business

20  travel, employee commutes, and processing and use of sold products."  *Id.*

21  § 38532(b)(5).

22  The law provides that entities measure and report all three categories of

23  emissions "in conformance" with the "Greenhouse Gas Protocol standards and

24  guidance," *id.* § 38532(c)(1)(A)(ii), a globally accepted protocol for emissions

25  accounting.  SSMF 95-96.  This Protocol provides that Scope 3 emissions can be

26  determined through collection of relevant data (e.g., directly from suppliers), *or*

27  estimated using "secondary data sources," including "industry average data, proxy

28  data, and other generic data." Cal. Health & Safety Code § 38532(c)(1)(A)(ii);

4

SSMF 117.[2]  The law "minimizes duplication of effort" by allowing reporting entities to submit emissions data prepared to meet other national and international reporting requirements.  Cal. Health & Safety Code § 38532(c)(1)(D)(i).

The law requires third-party assurances to ensure the quality and accuracy of the data.  *Id.* § 38532(c)(1)(F).  To ensure the usefulness of the data for investors and consumers, the law directs an outside organization to create a publicly accessible digital platform featuring the emissions data, *id.* § 38532(e)(1), and prepare a report summarizing the data, *id.* § 38532(d)(1).

### D. Senate Bill 261 Requires the Largest Companies Doing Business in California to Disclose Climate-Related Financial Risk in Accordance with Widely Accepted Protocols

S.B. 261 requires U.S. entities with total annual revenues in excess of $500 million dollars that do business in California to prepare a biennial report disclosing their climate-related financial risk and any measures adopted to reduce and adapt to that risk.  Cal. Health & Safety Code § 38533(a)(4)–(b)(1)(A).  The bill defines "[c]limate-related financial risk" as the "material risk of harm to immediate and long-term financial outcomes due to physical and transition risks … ," such as disruptions to operations, the provision of goods and services, and employee health and safety.  *Id.* § 38533(a)(2).  The law directs entities to prepare their disclosures in alignment with "the Final Report of Recommendations of the Task Force on Climate-related Financial Disclosures," *id.* § 38533(b)(1)(A)(i), an widely adopted investor-driven protocol.  SSMF 97-98, 118.  Entities must take "good faith measures" to comply but need not adopt any particular climate-related risk management strategy or take any particular climate-risk mitigation actions.  Cal. Health & Safety Code § 38533(e)(2); SSMF 119-122.  Disclosures prepared under another framework with consistent requirements can be used to fulfill these requirements.  Cal. Health & Safety Code § 38533(b)(4).  Each reporting company

---

[2] Thus, Plaintiffs are incorrect that compliance costs would "flow up" the supply chain to family farmers or other small businesses.  *Cf.* MSJ 5.

5

1    must publish a copy of the report "on its own internet website." *Id.* at

2    § 38533(c)(1).

3    **II.   PROCEDURAL HISTORY**

4    Plaintiffs bring a facial challenge against Senate Bills 253 and 261 under the

5    First Amendment (Claim I), the "federal Constitution's Supremacy Clause" (Claim

6    II), and the "Constitution's limitations on extraterritorial regulation, including the

7    dormant commerce clause" (Claim III).  ECF No. 28.  Defendants moved to dismiss

8    Claims II and III.  ECF No. 38.  That motion remains undecided, and no discovery

9    has occurred.

10    **LEGAL STANDARD**

11    The party moving for summary judgment bears the "burden of showing that

12    there are no genuine issues of material fact . . . ."  *Ambat v. City & County of San*

13    *Francisco*, 757 F.3d 1017, 1031 (9th Cir. 2014).  The Court must determine

14    "whether the evidence presents a sufficient disagreement to require submission to a

15    jury or whether it is so one-sided that one party must prevail as a matter of law."

16    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  "In making this

17    determination, [courts] view the evidence in the light most favorable to [the non-

18    movant].  All justifiable inferences are to be drawn in his favor and his evidence is

19    to be believed."  *McSherry v. City of Long Beach*, 584 F.3d 1129, 1135 (9th Cir.

20    2009).

21    A party bringing a facial challenge to invalidate a law under the First

22    Amendment must show that "a substantial number of [a law's] applications are

23    unconstitutional, judged in relation to the statute's plainly legitimate sweep."

24    *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (cleaned up).

25    The Supreme Court has "made facial challenges hard to win" because such

26    challenges "threaten to short circuit the democratic process" by "preventing duly

27    enacted laws from being implemented in constitutional ways."  *Moody v.*

28    *NetChoice*, 144 S. Ct. 2383, 2397 (2024) (cleaned up).

6

**ARGUMENT**

Senate Bills 253 and 261 require disclosure of only factual and noncontroversial information about commercial operations and do not dictate the language of the disclosures or hamper companies' ability to present their own messages on climate change. Thus, Plaintiffs' argument that the laws trigger strict scrutiny fails. *See Zauderer*, 471 U.S. at 637. But in light of the compelling government interest in ensuring the free flow of material information to market participants, preventing fraud, and lowering GHG emissions, the laws would survive First Amendment review under any level of scrutiny. Thus, Plaintiffs' motion for summary judgment must be denied.[3]

**I.    SENATE BILLS 253 AND 261 COMPEL COMMERCIAL SPEECH AND THUS ARE SUBJECT TO REVIEW UNDER A LOWER LEVEL OF SCRUTINY**

In urging strict scrutiny here, Plaintiffs attempt to minimize the fact that Senate Bills 253 and 261 regulate only commercial speech. Courts have long examined regulations affecting commercial speech differently from those impacting other speech (e.g., political speech)—applying a lower level of scrutiny or declining to apply First Amendment protections entirely. *Zauderer*, 471 U.S. at 637; *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561-63 (1980). The Constitution accords the government greater latitude to regulate commercial speech, relative to other safeguarded forms of expression, because such speech "occurs in an area traditionally subject to government regulation." *Cent. Hudson*, 447 U.S. at 562.

The need to afford the government greater room to regulate is especially pronounced when the government action is intended to increase, rather than restrict, the free flow of accurate information to consumers. *See Zauderer*, 471 U.S. at 646.

---

[3] If this Court does not deny summary judgment outright, then alternatively, it should grant Defendants' concurrently filed Motion to Deny or Defer Plaintiffs' Motion for Summary Judgment on Claim I Under Federal Rule of Civil Procedure 56(d), to provide Defendants the opportunity to conduct the identified discovery.

7

1    For that reason, although *restrictions* on commercial speech are generally subject to

2    intermediate scrutiny, *Cent. Hudson*, 447 U.S. at 563-66, the Supreme Court has

3    applied a lower level of review where the challenged law requires the *disclosure* of

4    factual and noncontroversial information, *Zauderer*, 471 U.S. at 651. Because "the

5    extension of First Amendment protection to commercial speech is justified

6    principally by the value to consumers of the information such speech provides,"

7    *Zauderer*, 471 U.S. at 651, and the government has a "legitimate interest in

8    protecting consumers from 'commercial harms,'" commercial speech "can be

9    subject to greater governmental regulation than noncommercial speech," *Sorrell v.*

10   *IMS Health Inc.*, 564 U.S. 552, 566 (2011) (quoting *City of Cincinnati v. Discovery*

11   *Network, Inc.*, 507 U.S. 410, 426 (1993)); *see also Va. State Bd. of Pharmacy*, 425

12   U.S. at 763 (noting consumers' "keen" interest in the free flow of commercial

13   information).

14        Plaintiffs acknowledge that commercial speech is subject to a lower level of

15   scrutiny, but they suggest it is limited to speech proposing a "commercial

16   transaction." MSJ 15 (citing *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115

17   (9th Cir. 2021)). Commercial speech, however, is not so narrowly circumscribed.

18   *See Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020) (*Zauderer*

19   scrutiny is not "limited to restrictions on advertising and point-of-sale labeling").

20   Rather, the Supreme Court defines commercial speech to include "expression

21   related solely to the economic interests of the speaker and its audience." *Cent.*

22   *Hudson*, 447 U.S. at 561. This determination "is fact-driven, due to the inherent

23   difficulty of drawing bright lines that will clearly cabin commercial speech in a

24   distinct category." *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1272 (9th Cir.

25   2017) (cleaned up).

26        Here, the Legislature passed both laws specifically in response to the

27   expressed desires of commercial audiences—consumers and investors—to inform

28   investment and purchasing decisions and prevent misrepresentations. SSMF 123-

8

125.  Indeed, many businesses voluntarily disclose the same or similar metrics precisely for such commercial purposes: driving contract formation, obtaining insurance coverage, effectuating mergers and acquisitions, and responding to investors and consumers.  SSMF 110, 126-127.  The disclosures involved here require only factual information about (1) the emissions connected with an entity's business operations, and (2) the company's governance practices and business and financial plans pertaining to climate risk.  *See supra* Parts I.C, I.D.  This information is commercial speech.  *See Ariix*, 985 F.3d at 1116 (explaining that courts should "try to give effect to a common-sense distinction between commercial speech and other varieties of speech").

And even if Plaintiffs were correct that *Zauderer* applies only where the speech has a nexus to "commercial advertising," MSJ 16, there is such a connection here.  A vast swath of companies doing business in California are advertising their business as "green" or emissions-conscious.  SSMF 128.  Indeed, many of Plaintiffs' own member companies have advertised themselves as adhering to "net zero" emissions or other climate-related goals.  SSMF 129; *see Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 518 (7th Cir. 2014) ("An advertisement is no less 'commercial' because it promotes brand awareness or loyalty rather than explicitly proposing a transaction in a specific product or service.").  The disclosures required under Senate Bills 253 and 261 are, at least in part, a response to these potentially misleading statements, SSMF 2, and thus align with two of the "important guideposts" courts examine in identifying commercial speech: connection to advertisements and the "economic motivation" of the speaker.  *See Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66-67 (1983); *see also Ariix*, 985 F.3d at 1116 ("Courts have found commercial speech even when it involves indirect benefits, such as . . . improvements to a brand's image"); *Jordan*, 743 F.3d at 518 ("Modern commercial advertising is enormously varied in form and style.").

9

## II. THE DISCLOSURE LAWS ARE CONSTITUTIONAL UNDER *ZAUDERER*

The test for analyzing the constitutionality of compelled commercial disclosures—as opposed to "outright prohibitions on speech"—is established in *Zauderer*. 471 U.S. at 650. In that case, the Court found an attorney advertisement that claimed, "if there is no recovery, no legal fees are owed by our clients," had a "self-evident" capacity to mislead a layperson unaware of the distinction between legal fees and litigation costs. *Id.* at 652. Although "unjustified or unduly burdensome disclosure requirements might offend the First Amendment," there is only a "minimal" constitutionally protected interest in not providing "factual and uncontroversial information" about one's business or services. *Id.* at 651. "Under *Zauderer*, compelled disclosure of commercial speech complies with the First Amendment if the information in the disclosure is reasonably related to a substantial governmental interest[,] … is purely factual and uncontroversial," and is not unduly burdensome. *CTIA – The Wireless Assoc. v. City of Berkeley*, 928 F.3d 832, 845, 848-49 (9th Cir. 2019).

*Zauderer* and its progeny thus reflect the principle that "[t]he First Amendment does not generally protect corporations from being required to tell prospective customers the truth." *Nationwide Biweekly Admin. v. Owen*, 873 F.3d 716, 721 (9th Cir. 2017). Here, the compelled disclosures provide consumers and investors with more accurate and comparable data from companies choosing to do business in the state, facilitating informed market decisions. SSMF 86, 131-132. These disclosures do not require companies to act in a way that is inconsistent with their views about, or, indeed, to take any position on, climate change, SSMF 119; rather, these laws simply require the largest companies doing business in the state to disclose (1) quantitative data on emissions and (2) descriptive accounts of their internal risk planning. These laws pass constitutional muster.

10

### A.    The Required Disclosures are "Purely Factual and Uncontroversial"

**1.** S.B. 253 requires companies to disclose objective, factual information: the quantity of their greenhouse gas emissions.  Cal. Health & Safety Code § 38532(c)(1)(A)(ii).  Entities must measure and report their emissions "in conformance" with the "Greenhouse Gas Protocol standards and guidance," *id*. § 38532(c)(1)(A)(ii), which is a "globally accepted reporting framework" and "aligned with traditional financial reporting principles."  SSMF 95-96.  Third-party firms review such data to ensure its quality and accuracy, further underscoring the factual nature of this information.  Cal. Health & Safety Code § 38532(c)(1)(F).

Plaintiffs argue that the emissions disclosures are "more conjecture than fact," because alleged "gaps in emissions measurement methodologies" and the need to make "judgment calls" renders the calculation anything but "purely factual."  MSJ 17-18.  But the use of estimates under longstanding financial accounting principles does not render the disclosures "matters of opinion."  SSMF 132-135, 141; *see Envtl. Def. Ctr. v. U.S. E.P.A.*, 344 F.3d 832, 849 (9th Cir. 2003) (citations omitted).  To conclude otherwise would call into question a host of financial disclosure requirements and other commercial documents, many of which similarly rely on judgment calls and estimates.  SSMF 136-140.

Nor are the disclosures "misleading" because companies must disclose the emissions of "upstream and downstream" suppliers, among others, or because the Greenhouse Gas Protocol standards do not cover "avoided emissions."  MSJ 18.  To the contrary, allowing firms to report just partial emissions, or their emissions reduction projects (i.e., "avoided emissions"), in lieu of disclosing their total emissions, would be highly misleading.  SSMF 142; *see Am. Hosp. Assoc.*, 983 F.3d at 541.  The Greenhouse Gas Protocol provides industry-standard methodologies for calculating accurate and transparent factual information.  SSMF 95-96, 132.

11

1       S.B. 261 similarly requires the disclosure of only factual statements about the

2   reporting entities' own activities.  Companies must disclose their actual policies and

3   actual planning pertaining to climate-related financial risks as assessed by the

4   company.  SSMF 119-122, 143.  The law does not compel companies to address

5   matters of opinion, or to take a particular policy position in regards to climate

6   change—if an entity does not currently evaluate climate-related risks, its disclosure

7   could state merely that (i.e., that it has no climate-related governance, strategy, risk

8   management plans, or metrics and targets), and still comply with S.B. 261's

9   disclosure requirements.  SSMF 119-121.  A company's decision whether and how

10   to plan for climate-risks affecting its business is a subject of legitimate interest to

11   investors.  SSMF 123-126.

12       **2.**  Nor are the disclosures at issue "controversial."  A statement of fact does

13   not become controversial simply because it "can be tied in some way to a

14   controversial issue," *CTIA*, 928 F.3d at 845, or because a listener may use the fact

15   to form an opinion.  By contrast, courts have declined to apply *Zauderer* where the

16   speaker was forced to convey a message to which they are morally, religiously, or

17   ideologically opposed.  *See Nat'l Inst. of Fam. and Life Advocs. v. Becerra*, 585

18   U.S. 755, 768-69 (2018) (*NIFLA*); *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of

19   Cal.*, 475 U.S. 1, 15 n.12 (1986) (explaining states have "substantial leeway" to

20   impose "appropriate information disclosure requirements" on companies, but may

21   not "require corporations to carry the messages of third parties, where the messages

22   themselves are biased against or are expressly contrary to the [business]'s views").

23   For example, in *NIFLA*, California required clinics whose purpose was to oppose

24   abortion to provide information about state-sponsored abortion services—a

25   message "fundamentally at odds with [their] mission."  *CTIA*, 928 F.3d at 845.

26   And in *National Ass'n of Manufacturers v. SEC*, 800 F.3d 518, 530 (D.C. Cir.

27   2015) (*NAM*), the rule required companies to post a statement about whether its

28

1   diamonds are "conflict free," an ideological statement intertwined with moral

2   responsibility.

3       Plaintiffs claim that "climate change is undisputedly a 'controversial topic,'"

4   and thus *Zauderer* does not apply.  MSJ 18 (cleaned up).  But even crediting

5   Plaintiffs' claim that aspects of climate change are controversial, neither law

6   requires a company to take sides on any such topic.  The disclosure of emissions

7   data does not implicate any particular view about climate change.  Nor does it

8   require a company to take any steps inconsistent with its view (i.e. reducing

9   emissions).  Similarly, the disclosure of risk planning (or the lack thereof) does not

10  require companies to conclude that they have any particular climate risks.  *See* MSJ

11  19.  Companies remain free to determine what—if any—"climate risks" may

12  materially impact their business.  SSMF 120.

13      For those reasons, the Court need not reach the question of whether climate

14  change is a controversial topic.  If it does, however, the Court should find that

15  neither law implicates a controversial issue, because there is no legitimate debate in

16  the scientific community regarding the reality of climate change.  SSMF 144-145;

17  *see also Mass v. EPA*, 549 U.S. 497, 521 (2007) (concluding that "[t]he harms

18  associated with climate change are serious and well recognized").  Notably,

19  Plaintiffs have provided no evidence to the contrary.  *See* MSJ 18 (relying

20  exclusively on dicta from *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.,*

21  *Council 31*, 585 U.S. 878, 913 (2018)).  Nor is there any legitimate debate in the

22  business community that climate-risk is a factual metric relevant to companies'

23  business planning and risk management activities.  SSMF 146.  Indeed, Plaintiffs

24  provide only a single declaration from a company subject to the laws, and that

25  company does not deny the reality of climate change or the relevance of climate

26  change risks to its business planning.  It states only that S.B. 261 "would force U-

27  Haul to convey to the public a philosophy of environmental sustainability that it

28  does not believe."  ECF No. 48-30, ¶ 30.  That is inaccurate, as S.B. 261 only

13

App.368

1    requires the disclosure of the company's own assessment of risks, it does not force

2    companies to adopt *any* particular positions, much less on "environmental

3    sustainability" at all.  The fact that Plaintiffs can present no evidence that climate

4    change is a "hotly disputed" subject, MSJ 2, in either the scientific or business

5    communities, is fatal to this aspect of their argument.[4]  *Nat'l Ass'n of Wheat*

6    *Growers v. Bonta*, 85 F.4th 1263, 1279 (9th Cir. 2023) (looking for a "strong

7    scientific consensus" and indicating that "'uncontroversial' does not mean

8    'unanimous'").

9         Finally, relying on *NAM*, Plaintiffs claim that because "[a]ctivist groups" may

10    use the disclosed data to "embarrass" companies and "hold them to account," the

11    laws run afoul of the First Amendment.  MSJ 18-19.  But in *NAM*, the government

12    required companies to apply to their products specific language that carried a

13    political message.  Here, in contrast, there is no political message and, in fact, each

14    company effectively dictates its own message.  SSMF 119-122.  That third parties

15    could use the disclosed information to inform commercial choices or political

16    actions does not make the compelled speech controversial.  *See Am. Meat Inst. v.*

17    *U.S. Dep't of Ag.*, 760 F.3d 18, 21-22 (D.C. Cir. 2014).  Rather, it merely

18    underscores the role that disclosure plays in furthering First Amendment goals by

19    allowing consumers and investors to make decisions on the basis of accurate,

20    factual information, unencumbered by the government's own policy views.

21    **B.    The Laws are Reasonably Related to a Substantial State Interest**

22         S.B. 253 and 261 easily survive *Zauderer* scrutiny because they are

23    "reasonably related to a substantial governmental interest."  *CTIA*, 928 F.3d at 845.

24    Under *Zauderer*, the government need only show that its interest is "more than

25    trivial."  *Id.* at 844.

26

27    ───────────────────

28         [4] To the extent this Court disagrees, Defendants are entitled to discovery into Plaintiffs' claims.  *See* Rule 56(d) Motion.

14

1    In evaluating the government's interest, courts must give "substantial

2    deference to the predictive judgments of [the legislature]." *Turner Broad. Sys., Inc.*

3    *v. FCC*, 520 U.S. 180, 195 (1997) (cleaned up); *see also United States v. Edge*

4    *Broad. Co.*, 509 U.S. 418, 434 (1993) ("Within the bounds of the general protection

5    provided by the Constitution to commercial speech, we allow room for legislative

6    judgments"). Moreover, this Court can consider materials outside of the legislative

7    history, "to assure [itself] that, in formulating its judgments, [the Legislature] has

8    drawn reasonable inferences." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666

9    (1994); *see also Turner Broad. Sys.*, 520 U.S. at 196 (examining the government

10   interest based on "the evidence before Congress and . . . the further evidence

11   presented to the District Court on remand to supplement the congressional

12   determination").

13   The California Legislature identified at least three interests served by the laws.

14   *First*, California has a substantial interest in providing consistent, comparable,

15   and reliable information to investors, consumers, and employees, to enable them to

16   make informed judgments about the impact of climate-related risks on their

17   investment, consumer, and other economic choices. SSMF 86-87, 92, 123-124,

18   155-158. *See Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 115 (2d Cir. 2001)

19   (describing as "significant" the government's interest in "better inform[ing]

20   consumers about the products they purchase"); *Am. Hosp. Ass'n*, 983 F.3d at 540

21   (describing as "legitimate" the government's interest in "promoting price

22   transparency and lowering healthcare costs"); *Am. Meat Inst.*, 760 F.3d at 23

23   (finding "substantial" the government's interest in country-of-origin labeling

24   because the labels "enable[d] consumers to choose American-made products" and

25   responded to consumer interest in such labeling). S.B. 253 and 261 clearly advance

26   this interest by requiring companies to disclose information that is considered

27   material by investors, consumers, and employees, and hence is "closely tethered" to

28   market transactions. SSMB 147,150,159-160. Investors have expressed that

15

1 "consideration of climate-related financial risk and other factors is a necessary

2 component of being an informed and responsible investor," SSMB 152. And the

3 Legislature was well aware of the value of this information to each of these

4 stakeholders when passing the law. SSMF 86-87; Cal. Health & Safety Code

5 § 38533(a)(2).

6     *Second*, California has a substantial interest in protecting its investors,

7 consumers, and other stakeholders from fraud or misrepresentation. *See, e.g.*, *Riley*

8 *v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 792 (1988) ("interest

9 in protecting charities (and the public) from fraud is, of course, a sufficiently

10 substantial interest"). Lawmakers were aware of the prevalence of misleading

11 information on emissions and other metrics by companies doing business in the

12 state, and crafted SB 253 and 261 to prevent this behavior. SSMF 2. This problem

13 is not mere "conjecture," MSJ 9; evidence shows that voluntary disclosure leads to

14 selective disclosure, which is highly misleading, SSMF 162, and the volume of

15 misleading statements has exploded in recent years. SSMF 161. To prevent these

16 practices lawmakers appropriately required comprehensive disclosure of a firm's

17 overall carbon emissions—i.e. Scopes 1, 2, and 3—and climate risk reporting.

18 SSMF 164-165.

19     *Third*, the California Legislature considered that, by requiring greater

20 transparency about emissions and climate risks, S.B. 253 and 261 may encourage—

21 through the market forces of third parties' independent economic decisions and

22 actions—companies doing business in California to reduce their emissions and

23 thereby mitigate the risks California and its residents face from climate change.

24 SSMF 168. This, too, is a substantial state interest, both because California has

25 committed to meeting certain emissions reduction goals over time and because of

26 the severity of the risks the state faces. Health & Safety Code, §§ 38562, 38562.2,

27 38566. Research demonstrates a connection between reporting frameworks and

28 improved environmental performance, including in particular between carbon

1    disclosure and GHG emissions reductions.  SSMF 166-167.  Importantly, these

2    reductions come not through any *government* regulation of emissions at all,[5] or

3    *government* pressure to align with particular policy views, but through the provision

4    of material information to third-parties, who may then take intervening actions that

5    lead to reduced emissions.  SSMF 169.

6    **C.    The Laws are Neither Unjustified nor Unduly Burdensome**

7    A disclosure requirement could violate the First Amendment if it was so

8    "unjustified or unduly burdensome" that it chills or restricts constitutionally

9    protected commercial speech.  *Zauderer*, 471 U.S. at 651.  But neither is true here.

10   As discussed in Section II.B, the effectiveness of emission and climate-risk

11   disclosure laws at materially alleviating the harms identified by the government was

12   considered by the Legislature, and is supported by evidence.  *Ibanez v. Fla. Dep't*

13   *of Bus. & Prof. Regul., Bd. of Acct.*, 512 U.S. 136, 146 (1994).  Moreover, Plaintiffs

14   have not provided any evidence to suggest that their *speech* would be burdened by

15   either law.  Nor can they, as the laws do not interfere with any message companies

16   may wish to convey.  *Am. Hosp. Ass'n*, 983 F.3d at 541 (examining whether law

17   requires speaker "to endorse a particular viewpoint" or "prevents them from adding

18   their own message"); *cf. Ibanez*, 512 U.S. at 146 (holding that a disclosure was

19   "unduly burdensome" when it "effectively rule[d] out" the regulated entity's ability

20   to speak).

21   The only burden that Plaintiffs allege is a "financial" one.  But Plaintiffs "must

22   demonstrate a burden on *speech*," *Am. Hosp. Ass'n*, 983 F.3d at 541.  In any event,

23   any administrative and financial burden here is not "undue."  For one, a large

24   percentage of companies subject to the disclosure requirements already voluntarily

25   disclose some or all of this data, or are subject to other reporting requirements,

26   SSMF 101-109, reducing the marginal increase in cost for these companies to

---

27   [5] "[C]ourts routinely distinguish between pressure created by state laws and actual regulation by the State, and recognize only the latter as an actionable injury."  MTD 13 (ECF 38-

28   1); *see also* Reply iso MTD 7-8.

17

report under SB 253 and 261.  Cal. Health and Safety Code §§ 38532(c)(1)(D)(i) (avoiding duplication of reporting); 38533(b)(4) (same).  Moreover, because the laws only apply to the largest companies, the vast majority of covered companies already have the reporting infrastructure and data necessary to prepare the required information with minimal burden, SSMF 172-179, and need expend only 0.025 percent of their annual revenue in preparing the data.  SSMF 170.  Indeed, the frequency of voluntary reporting suggests that disclosures materially benefit many companies.

Thus, even if financial burden were a relevant consideration, Plaintiffs fail to establish that the laws will impose such burdens in "a substantial number of [their] applications." *Americans for Prosperity Foundation*, 594 U.S. at 615; *Moody*, 144 S. Ct. at 2398 (to evaluate a facial challenge to a law compelling speech a court must ask "as to each thing covered, whether the required disclosures unduly burden expression").  Plaintiffs' evidence of the financial burden of compliance is limited to a statement by the Governor that expresses concern over the *possibility* that the laws will have a negative "financial impact" on affected businesses and thus directs CARB to "closely monitor the cost impact as it implements" the new laws, SSMF 23, 41, and anecdotal statements from only two companies purportedly covered by the laws, SSMF 29, 62-65.  This is insufficient to satisfy Plaintiffs' burden on a facial challenge.[6]

## III.  ALTERNATIVELY THE DISCLOSURE LAWS ARE CONSTITUTIONAL UNDER *CENTRAL HUDSON*

If this Court does not apply *Zauderer* scrutiny because it finds the speech compelled under S.B. 253 or 261 is not factual or uncontroversial, then "the court should … proceed to examine the [laws] under *Central Hudson*'s intermediate scrutiny."  *See Nat'l Ass'n of Wheat Growers v. Becerra*, 468 F. Supp. 3d 1247,

---

[6] If this Court disagrees and finds such evidence relevant, Defendants are entitled to discovery into Plaintiffs' claims.  *See* Rule 56(d) Motion.

18

1258 (E.D. Cal. 2020).  Under *Central Hudson*, courts uphold government

regulation of commercial speech where it directly advances a substantial

government interest, and the regulation is no more restrictive than necessary to

serve that interest.  447 U.S. at 564.  *Central Hudson* merely requires a "fit"

between the government end and the means chosen to accomplish that end; that

means need not be the "best disposition" of the government's interest, "but one

whose scope is 'in proportion to the interest served.'"  *Bd. of Trs. of State Univ. of*

*N.Y. v. Fox*, 492 U.S. 469, 476-80 (1989).

S.B. 253 and 261 directly advance the government's substantial interests.  *See*

*supra*, Argument Section II.B-C.  And the scope of these laws is appropriate for the

interests served.  Plaintiffs argue that the laws are overbroad because they are not

tied to "whether [a] company has investors," "whether climate change is likely to

have a material impact on any product or service sold within the State," or whether

the law will have an impact on climate change.  MSJ 20.  These criticisms are

misplaced.  For one, the government's interest is not solely tied to investors, but

also to protecting consumers and other stakeholders.  SSMF 5, 24, 26.  Moreover,

the value of emissions and climate-risk information to California market

participants concerns the financial performance of the company as a whole and

whether the firm is an appropriate recipient of their money.  SSMF 154.  And

evidence indeed supports that disclosure requirements can reduce emissions, with

minimal burden compared to emission regulations.  SSMF 166-167.

While Plaintiffs argue the state can have no legitimate interest in information

from a company that "engages in a single transaction within the State," MSJ 20,

this concern appears to be purely hypothetical.  Plaintiffs offer no evidence that this

concern applies to any entity covered by the laws—those with annual revenues of

$500 million and $1 billion.  In any event, this concern is insufficient to

demonstrate "facial" invalidity of the laws, as Plaintiffs can point to no evidence

19

1    that this phenomenon is significant enough to burden constitutional rights in "a

2    substantial number of [its] applications." *Moody*, 144 S. Ct. at 2397.[7]

3    **IV. THE REGULATORY DISCLOSURE REQUIREMENTS OF SENATE BILLS 253 AND 261 ARE NOT SUBJECT TO STRICT SCRUTINY**

4

5    Plaintiffs argue that S.B. 253 and 261 "trigger[] strict scrutiny" because,

6    Plaintiffs claim, these are "content-based" laws that "burden" political speech. MSJ

7    7-8. Plaintiffs' argument, however, depends on this Court first concluding that the

8    laws cover something other than commercial speech, as in the commercial speech

9    context even a content-based restriction on speech is subject to lesser scrutiny.

10    *NIFLA*, 585 U.S. at 768-69 (citing *Zauderer*, 471 U.S. at 651). But even outside

11    the commercial speech context, the application of strict scrutiny is inappropriate

12    here.

13    *First*, the laws are part of a "broader regulatory apparatus" governing the

14    disclosure of commercial data.[8] *Env't Def. Ctr.*, 344 F.3d at 850 n.26; *see also*

15    *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 469 (1997) (evaluating

16    assessment "under the standard appropriate for the review of economic regulation"

17    rather than "under a heightened standard appropriate for the review of First

18    Amendment issues," because it was part of a broader "regulatory scheme"). While

19    courts "strictly scrutiniz[e] certain categories of laws that threaten to 'drive certain

20    ideas or viewpoints from the marketplace,'" "not all laws that distinguish between

21    speech based on its content fall into a category of this kind." *City of Austin, Texas*

22    *v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 78-79 (2022) (Breyer, J.,

23    concurring). Census reporting requirements, securities-related disclosures,

24    copyright infringement, tax disclosures, etc., arguably touch on the content of

25    speech, *id.*, but have been found not to implicate First Amendment concerns at all,

26

27    _____
    [7] To the extent this Court disagrees, Defendants are entitled to discovery into Plaintiffs' claims. *See* Rule 56(d) Motion.

28    [8] *See, e.g.*, Health & Safety Code, § 38530; Cal. Corp. Code § 25000, et seq. (California Corporate Securities Law of 1968).

20

1   much less implicate strict scrutiny.  *See, e.g., S.E.C. v. Wall St. Publ'g Inst., Inc.*,

2   851 F.2d 365, 373 (D.C. Cir. 1988); *see also Ohralik v. Ohio State Bar Ass'n*, 436

3   U.S. 447, 457 (1978).

4        *Second*, the laws do not attempt to "prescribe what shall be orthodox in

5   politics, nationalism, religion, or other matters of opinion or force [companies] to

6   confess by word or act their faith therein," and thus do not burden political speech.

7   *Env't Def. Ctr.*, 344 F.3d at 849.  California's laws require no affirmation, express

8   or implied, of private agreement with a government-favored viewpoint or position.

9   To be sure, certain policy responses to climate change are the subject of vigorous

10  political debate; but these disclosures do not implicate these debates.  And Plaintiffs

11  cite to no case suggesting that third parties' later use of this information to make

12  economic or policy decisions necessitates strict scrutiny in the disclosure of the

13  underlying facts themselves.  *See* MSJ 8.

14       Plaintiffs' other arguments for the application of strict scrutiny are equally

15  unavailing.  There is a long history of compelled commercial speech, in general,

16  and corporate disclosures, in particular, that supports the measures California

17  adopts here.  MSJ 13; *see supra* Background I.A, I.B.  Neither S.B. 253 or 261

18  compel companies to speak on California's terms, the concern expressed in *NAM*,

19  800 F.3d at 530.  MSJ 13.  Indeed, the laws leave the content of the disclosures to

20  the speaker, which militates against the application of strict scrutiny.  *See Rumsfeld*

21  *v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006) (only

22  compelled speech that "dictate[s] the content" of the speaker's message or involves

23  a "Government-mandated pledge or motto that the [speaker] must endorse" triggers

24  constitutional scrutiny); *see also Env't Def. Ctr.*, 344 F.3d at 848 (regulations

25  requiring distribution of educational materials did "not offend the First

26  Amendment" because the "broad requirements" of the regulations did "not dictate a

27  specific message").  And the laws are not vague—they integrate widely used and

28  accepted metrics for preparing disclosures of a kind that are already in frequent use

1    across the market.  SSMF 95-98.  As such, implementation of the laws is

2    straightforward, and Plaintiffs' concerns are misplaced.

3    **V.    SENATE BILLS 253 AND 261 WOULD SURVIVE REVIEW UNDER STRICT**
     **SCRUTINY**
4

5        Ultimately, S.B. 253 and 261 survive review even under strict scrutiny, if

6    applied.  *Iancu v. Brunetti*, 588 U.S. 388, 402-03 (2019) (Breyer, J., concurring in

7    part and dissenting in part).  Both laws are "narrowly tailored" to serve the

8    government's "compelling state interests," including the prevention of fraud and

9    misrepresentation, and the correction of market inefficiencies.  *NIFLA*, 585 U.S. at

10   766.

11       The only means of alleviating the climate-related information asymmetries

12   that exist in the current market is by requiring companies to disclose complete and

13   accurate information. Without mandatory, comprehensive disclosures, companies

14   are incentivized to selectively disclose information, causing gaps in data that

15   prevent the markets from obtaining information necessary for investors, consumers,

16   and employees to make rational decisions.  The information obtained through S.B.

17   253 and 261 is (1) material to investors, SSMF 147, consumers, SSMF 159, and

18   employees, SSMF 160; (2) effective at reducing fraud, SSMF 164-165; and (3)

19   effective at reducing GHG emissions, SSMF 166-167.  And the usefulness of this

20   data is significantly improved by the inclusion of Scope 3 emissions, SSMF 180-

21   182, for which the burdens of disclosure are significantly less than Plaintiffs

22   suggest, MSJ 5, SSMF 170, 175.

23       Plaintiffs argue that the government could collect the information itself.  MSJ

24   12.  But "companies possess more detailed and accurate data about their own

25   internal operations and impacts than do external observations."  SSMF 171.

26   Plaintiffs suggest that the application of the law to any business entity satisfying the

27   revenue threshold regardless of investment status or connection to a product is too

28   broad; but Plaintiffs ignore that the revenue threshold *is* a significant limitation on

22

1  the application of the laws.  SSUF 183-188.  There is a genuine issue of material

2  fact as to whether any business in California with over *$500 million* in annual

3  revenue lacks outside investors, whether public or private.  SSUF 189.  And the

4  application to companies that have low GHG emissions or face negligible financial

5  risk does not render the laws overbroad, MSJ 12; rather, their data serves the

6  government's interests in allowing stakeholders to consider this information in

7  making financial decisions.

## CONCLUSION

9  For the reasons stated above, Plaintiffs' motion for summary judgment should

10  be denied.

11

12

Dated:  July 24, 2024                    Respectfully submitted,

13

14                                       ROB BONTA
                                         Attorney General of California
15                                       GARY E. TAVETIAN
                                         MYUNG J. PARK
16                                       Supervising Deputy Attorneys General
                                         M. ELAINE MECKENSTOCK
17                                       EMILY HAJARIZADEH
                                         DYLAN REDOR
18                                       KATHERINE GAUMOND
                                         Deputy Attorneys General

19

20                                       */s/ Caitlan McLoon*

21

22                                       CAITLAN MCLOON
                                         Deputy Attorney General
23                                       *Attorneys for Defendants Liane M.*
                                         *Randolph, Steven S. Cliff, and Robert*
24                                       *A. Bonta*

25   SA2024300503
     66956020.docx
26

27

28

23

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for *Defendants Liane M. Randolph, Steven S. Cliff, and Robert A. Bonta*, certifies that this brief contains 6,999 words, which complies with the word limit of L.R. 11-6.1.

Dated:  July 24, 2024                    Respectfully submitted,

                                         ROB BONTA
                                         Attorney General of California
                                         GARY E. TAVETIAN
                                         MYUNG J. PARK
                                         Supervising Deputy Attorneys General
                                         M. ELAINE MECKENSTOCK
                                         EMILY HAJARIZADEH
                                         DYLAN REDOR
                                         KATHERINE GAUMOND
                                         Deputy Attorneys General


                                         */s/ Caitlan McLoon*

                                         CAITLAN MCLOON
                                         Deputy Attorney General
                                         *Attorneys for Defendants Liane M. Randolph, Steven S. Cliff, and Robert A. Bonta*

24

# CERTIFICATE OF SERVICE

Case Name:    **Chamber of Commerce of the United States of America, et al. v. Liane M. Randolph, et al.**

Case No.:    **2:24-cv-00801-ODW-PVC**

I hereby certify that on July 24, 2024, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON CLAIM I**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on July 24, 2024, at Los Angeles, California.

| Beatriz Davalos | /s/ Beatriz Davalos |
|---|---|
| Declarant | Signature |

1  ROB BONTA
   Attorney General of California
2  GARY E. TAVETIAN (SBN 117135)
   MYUNG J. PARK (SBN 210866)
3  Supervising Deputy Attorneys General
   M. ELAINE MECKENSTOCK (SBN 268861)
4  CAITLAN MCLOON (SBN 302798)
   EMILY HAJARIZADEH (SBN 325246)
5  DYLAN REDOR (SBN 338136)
   KATHERINE GAUMOND (SBN 349453)
6  Deputy Attorneys General
    300 South Spring Street, Suite 1702
7    Los Angeles, CA  90013-1230
    Telephone:  (213) 269-6438
8    Fax:  (916) 731-2128
    E-mail:  Caitlan.McLoon@doj.ca.gov
9  *Attorneys for Defendants Liane M. Randolph,*
   *Steven S. Cliff, and Robert A. Bonta*

10

11              IN THE UNITED STATES DISTRICT COURT

12           FOR THE CENTRAL DISTRICT OF CALIFORNIA

13

14 | **CHAMBER OF COMMERCE OF** | 2:24-cv-00801-ODW-PVC
   | **THE UNITED STATES OF** |
15 | **AMERICA, CALIFORNIA** |
   | **CHAMBER OF COMMERCE,** | **DEFENDANTS' SEPARATE**
16 | **AMERICAN FARM BUREAU** | **STATEMENT OF GENUINE**
   | **FEDERATION, LOS ANGELES** | **DISPUTES OF MATERIAL FACTS**
17 | **COUNTY BUSINESS** |
   | **FEDERATION, CENTRAL** | Date:          September 9, 2024
18 | **VALLEY BUSINESS** | Time:          1:30 p.m.
   | **FEDERATION, and WESTERN** | Courtroom:  5D
19 | **GROWERS ASSOCIATION,** | Judge:         Hon. Otis D. Wright, II
20 |                          Plaintiffs, | Trial Date:   Not Set
   |                          | Action Filed: 1/30/2024
21 | **v.** |

22 **LIANE M. RANDOLPH, in her**
   **official capacity as Chair of the**
23 **California Air Resources Board, and**
   **STEVEN S. CLIFF, in his official**
24 **capacity as the Executive Officer of**
   **the California Air Resources Board,**
25 **and ROBERT A. BONTA, in his**
   **official capacity as Attorney General**
26 **of California,**

27                          Defendants.

28

1

1    **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2        Pursuant to Local Rule 56-2, Defendants Liane M. Randolph, in her official

3    capacity as Chair of CARB, Steven S. Cliff, in his official capacity as the Executive

4    Director of CARB, and Robert A. Bonta, in his official capacity as Attorney

5    General of California (collectively, "Defendants") hereby respond to Plaintiffs

6    Chamber of Commerce of the United States of America, California Chamber of

7    Commerce, American Farm Bureau Federation, Los Angeles County Business

8    Federation, Central Valley Business Federation, and Western Growers

9    Association's (collectively, "Plaintiffs") Separate Statement of Uncontroverted

10   Facts in Support of Plaintiffs' Motion for Summary Judgment on Claim I (ECF No.

11   48-2).

| No. | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 1. | Senator Scott Wiener, the author of S.B. 253, has stated that the purpose of S.B. 253 is to "support those companies doing their part to tackle the climate crisis and create accountability for those that aren't." <br><br> Declaration of Bradley J. Hamburger ("Hamburger Decl."), Ex. 1 (Statement of Senator Wiener, Sept. 17, 2023) at 1. | Undisputed that the quoted text appears in the cited document. <br><br> Disputed that the quoted text establishes "the purpose of S.B. 253." Disputed to the extent Plaintiffs seek to establish, by taking the quotation out of context, that S.B. 253 and 261 "attempt, through compelled speech, to 'create accountability for those that aren't' 'doing their part to tackle the climate crisis.'" Plaintiffs' Motion for Summary Judgment (MSJ) (ECF No. |

2

| | | |
|---|---|---|
| | | 48-1) at 2:16–17.  The document speaks for itself. To the extent Senator Wiener's statements are relevant, the Court should review them in their complete form and in the context in which they were made.<br><br>*Evidence*: SSMF 86 (Declaration of Caitlan McLoon (McLoon Decl.) Ex. 1 at 5–6) ("Purpose of bill"); SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 –33:9). |
| 2. | At a March 15, 2023 California Senate Environmental Quality Committee Hearing, Senator Wiener said the following regarding S.B. 253: "We know that there are large corporations that work very hard to be green to reduce their carbon footprint.  There are others that do not.  Unfortunately, among the ones that really don't do a great job lowering their carbon footprint, they will at times market themselves as green, what we call green-washing.  Marketing yourself as green when you're not.  We need to | Undisputed that the quoted text appears in the cited document.<br><br>Undisputed that there are companies doing business in California that engage in "greenwashing," or "[m]arket[ing] yourself as green when you're not."  Undisputed that S.B. 253 seeks to improve corporate "transparency" and provide "[i]nformation for the public."<br><br>Disputed to the extent Plaintiffs seek to establish, by taking the quotation out of context, that S.B. 253 and 261 |

3

| | | |
|---|---|---|
| | make sure that the public actually knows who's green and who isn't and to make sure we have that transparency.  That's all this bill does, transparency.  Information for the public." | "attempt, through compelled speech, to 'create accountability for those that aren't' 'doing their part to tackle the climate crisis.'" MSJ at 2:16–17. The document speaks for itself.  To the extent Senator Weiner's statements are relevant, the Court should review them in their complete form and in the context in which they were made. |
| | Hamburger Decl., Ex. 2 (Transcript of Senate Environmental Quality Committee Hearing, 01:53:42-02:30:34 (Cal. Mar. 15, 2023)) at pp 2:25-3:11. | *Evidence:* SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 – 33:9). |
| 3. | At a March 15, 2023 California Senate Environmental Quality Committee Hearing, Senator Wiener said the following regard S.B. 253: "[S]ome of the nervousness by large corporations is because they don't want to do the disclosure and they don't want to say what their carbon footprint is because they think they're going to be embarrassed by it.  I'm just being totally blunt.  I think that's what the nervousness is." | Objection: The statement lacks foundation or personal knowledge, and is speculative.

Undisputed that the quoted text appears in the cited document.

Disputed to the extent Plaintiffs seek to establish, by taking the quotation out of context, that "the goal of S.B. 253 is to compel companies to release information even though 'they don't want to do the |

4

| | | |
|---|---|---|
| | Hamburger Decl., Ex. 2 at p 30:1-7. | disclosure' because (in the State's view) 'they think they're going to be embarrassed by it.'" MSJ at 2:24–27. The document speaks for itself and does not support that statement.  To the extent they are relevant, the Court should review Senator Weiner's statements in their complete form and in the context in which they were made.<br><br>*Evidence:* SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 – 33:9). |
| 4. | At a March 15, 2023 California Senate Environmental Quality Committee Hearing, Alvaro Sanchez from the Greenlining Institute said the following regarding S.B. 253: "In order to meet the challenges posed by climate change, it is imperative to recognize the right of communities to know how and if corporations are working to reduce their emissions and to verify corporate claims of sustainable leadership." | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiffs seek to establish, by taking the quotation out of context, that S.B. 253 and 261 "attempt, through compelled speech, to 'create accountability for those that aren't' 'doing their part to tackle the climate crisis.'"  MSJ at 2:16–17. Neither the quoted text nor the surrounding text supports that claim. The document speaks for itself.  To |

5

| | | |
|---|---|---|
| | Hamburger Decl., Ex. 2 at p 6:20-25. | the extent they are relevant, the Court should review Alvaro Sanchez' statements in their complete form and in the context in which they were made. |
| | | *Evidence:* SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 – 33:9). |
| 5. | At an April 18, 2023 California Senate Judiciary Committee Hearing, Senator Wiener said the following regarding S.B. 253: The law "will require these large corporations doing business in California to, in a standardized way, report this data so the consumers, investors, and others can know which corporations are actually engaging in climate action and which aren't." <br><br> Hamburger Decl., Ex. 3 at pp 2:21-3:1. | Undisputed that the quoted text appears in the cited document. <br><br> Undisputed that S.B. 253 will require certain "large corporations doing business in California to, in a standardized way, report [GHG emissions] data." <br><br> Disputed to the extent Plaintiffs suggest there is one particular way that consumers, investors, and others will use this data. <br><br> Disputed to the extent Plaintiffs seek to establish, by taking the quotation out of context, that S.B. 253 "will empower participants in the climate |

6

debate to use companies' disclosures about emissions, and about their plans to address them, as a basis to criticize the companies or to call for increased regulation or other concerted action, whether by regulators or by the companies themselves." MSJ 12:15–18. Neither the quoted text nor the surrounding text supports that claim. The document speaks for itself. To the extent they are relevant, the Court should review Senator Weiner's statements in their complete form and in the context in which they were made.

*Evidence*: *E.g.* SSMF 124 (Hamburger Decl., Ex. 2 (ECF No. 48-5) at 10:11-14; Hamburger Decl., Ex. 6 (ECF No. 48-9) at 5:3–13; Hamburger Decl., Ex. 7 (ECF No. 48-10) at 12) (explaining benefits of disclosures for consumers); SSMF 125 (Hamburger Decl., Ex. 5 (ECF 48-8) at 7:4–11; Decl. McLoon Ex. 2 (Senate Committee on

7

| | | Environmental Quality Analysis for January 15, 2023 hearing) at 2–3) (explaining benefits of disclosures for investors); SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 – 33:9). |
|---|---|---|
| 6. | At an April 18, 2023 California Senate Judiciary Committee Hearing, Catherine Atkin from Carbondale Accountable said the following regarding S.B. 253: "Many of our California companies are already leading and reporting, and SB 253 will level the playing field for our in-state companies by ensuring that public and private companies from outside of California disclose as well." <br><br> Hamburger Decl., Ex. 3 at p 5:11-16. | Undisputed that the quoted text appears in the cited document. Undisputed that many California companies "are already … reporting." <br><br> Disputed to the extent Plaintiffs seek to establish, by taking the quotation out of context, that S.B. 253 "will empower participants in the climate debate to use companies' disclosures about emissions, and about their plans to address them, as a basis to criticize the companies or to call for increased regulation or other concerted action, whether by regulators or by the companies themselves."  MSJ 12:15–18. Neither the quoted text nor the surrounding text supports that claim. The document speaks for itself.  To |

8

| | | | |
|---|---|---|---|
| | | | the extent they are relevant, the Court should review Catherine Atkin's statements in their complete form and in the context in which they were made.<br><br>*Evidence:* SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 – 33:9). |
| 7. | During a May 30, 2023 California Senate Floor Session debate on S.B. 253, Senator Wiener said that "SB 253 will allow for much-needed transparency," and that "SB 253 is the next step California must take in climate action to ensure that corporate actors in our state are aligned with our goals and are working as diligently as we need them to be. And we can't do that unless we have transparency."<br><br>Hamburger Decl., Ex. 4 (Transcript of Senate Floor Session Debate, 04:21:02-04:25:00 (Cal. May 30, 2023)) at p 3:2-3, 3:12-17. | | Disputed to the extent that Plaintiffs' omit both text and context from Senator Weiner's statement.<br><br>Disputed to the extent Plaintiffs rely on these statements, by taking them out of context, to support their allegation that S.B. 253 will "'check the climate crisis' by letting the public 'hold [companies] accountable,' . . . for 'emitting greenhouse gasses.'" MSJ at 2:20–19. And disputed to the extent Plaintiffs take the quotation out of context in an effort to establish that S.B. 253 "will empower participants in the climate debate to use companies' disclosures about |

9

| | | |
|---|---|---|
| | | emissions, and about their plans to address them, as a basis to criticize the companies. . . ." MSJ 12:15–18. Neither the quoted text nor the surrounding text supports these claims. To the extent they are relevant, the Court should review the Senator Wiener's statements in their complete form and in the context in which they were made. <br><br> *Evidence:* Hamburger Decl., Ex. 4 (ECF 48-7) at p 3:2–11 (full context of statement); SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 – 33:9). |
| 8. | During a July 10, 2023 California Assembly Natural Resources Committee Hearing, Melanie Morales from the Greenlining Institute said the following regarding S.B. 253: "Creating solutions to climate change for low-income communities and communities of color requires unlocking the potential of the private sector to drive meaningful | Undisputed that the quoted text appears in the cited document. <br><br> Disputed to the extent Plaintiffs seek to take the quoted text out of context; the document speaks for itself. To the extent they are relevant, the Court should review Melanie Morales' statements in their complete form and in the context in which they were made. |

10

| | | |
|---|---|---|
| | change as well as holding businesses accountable for their impact on the climate." | *Evidence:* SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 – 33:9). |
| | Hamburger Decl., Ex. 5 (Transcript of Assembly Natural Resources Committee Hearing, 04:06:16-04:33:07 (Cal. July 10, 2023)) at p 6:13-18. | |
| 9. | During a September 11, 2023 California Assembly Floor Session debate on S.B. 253, Assemblymember Christopher Ward said the following: "This data, along with the accompanying report, will then be published on a public facing website for all Californians to see.  Now, you can't regulate what you don't know, and as the State continues to curb its emissions across public sectors, we have a clear idea of what work is remaining and what action needs to be taken to continue progress. However, the same can't be said today for the private sector." | Undisputed that the quoted text appears in the cited document. Undisputed that the data collected under S.B. 253 will be published on a public facing website. Cal. Health & Saf. Code § 38532(e)(1) Disputed to the extent Plaintiffs seek to establish, by taking the quotation out of context, that S.B. 253 "will empower participants in the climate debate to use companies' disclosures about emissions, and about their plans to address them, as a basis to criticize the companies. . . ."  MSJ 12:15–18 (citing this fact).  The document speaks for itself. To the |

11

| | | |
|---|---|---|
| | Hamburger Decl., Ex. 6 (Transcript of Assembly Floor Session Debate, 05:13:50-05:32:50 (Cal. Sept. 11, 2023)) at pp 2:18-3:2. | extent they are relevant, the Court should review the Senate Judiciary Committee's statements in their complete form and in the context in which they were made. |
| | | *Evidence*: SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 – 33:9). |
| 10. | During a September 11, 2023 California Assembly Floor Session debate on S.B. 253, Assemblymember Ward said the following: "But to not even know, to not even understand what company X is producing in the terms of a million tons of carbon dioxide emissions in a year, that's a standard which would then challenge themselves to say, okay, if I'm at a million this year, how do I get down to 800,000 next year? How do I get down to 600,000 the year after that?"<br><br>Hamburger Decl., Ex. 6 at p 17:5-12. | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiffs seek to establish, by taking the quotation out of context, that SB 253 will "'check the climate crisis' by letting the public 'hold [companies] accountable,' [] for "emitting greenhouse gasses[.]'" MSJ 2:19–21 (citing this fact); *see, contra*, SSMF 88. The document speaks for itself. To the extent they are relevant, the Court should review Assemblymember Ward's statements in their complete form and in the context in which they were made. |

12

| | | |
|---|---|---|
| | | *Evidence:* SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 – 33:9). |
| 11. | During a September 11, 2023 California Assembly Floor Session debate on S.B. 253, Assemblymember Ward said the following: "[I]n California, our policy should be to not look the other way when there are bad actors out there miscalculating what their impact is and not holding themselves accountable, not allowing the public to hold themselves accountable."<br><br>Hamburger Decl., Ex. 6 at p 18:16-21. | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiffs seek to establish, by taking the quotation out of context, that SB 253 will "'check the climate crisis' by letting the public 'hold [companies] accountable,' [] for "emitting greenhouse gasses[.]'" MSJ 2:19–21 (citing this fact); *see, contra*, SSMF 88. The document speaks for itself. To the extent they are relevant, the Court should review the Assemblymember Ward's statements in their complete form and in the context in which they were made.<br><br>*Evidence:* SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 – 33:9). |
| 12. | During a September 11, 2023 California Assembly Floor Session debate on S.B. 253, | Objection: The statement is inadmissible hearsay. |

| | | |
|---|---|---|
| | Assemblymember Rick Zbur characterized S.B. 253 as follows: "[A] bill that the 'Los Angeles Times' described as 'groundbreaking legislation with the potential to reach far beyond California's borders by forcing some of the world's biggest businesses to be honest about the damage they might be causing.'" <br><br> Hamburger Decl., Ex. 6 at pp 5:22-6:2. | Undisputed that the quoted text appears in the cited document. <br><br> Disputed to the extent Plaintiffs seek to take the quotation out of context. The document speaks for itself. To the extent they are relevant, the Court should review Assemblymember Zbur's statements in their complete form and in the context in which they were made. |
| 13. | During a September 11, 2023 California Assembly Floor Session debate on S.B. 253, Assemblymember Rick Zbur characterized S.B. 253 as follows: "This bill standardizes the measurements of these emissions, makes them transparent, and gives companies a huge incentive to take steps to reduce their entire life cycle carbon footprints." <br><br> Hamburger Decl., Ex. 6 at p 7:11-15. | Undisputed that the quoted text appears in the cited document. <br><br> Disputed to the extent Plaintiffs seek to establish, by taking the quotation out of context, that S.B. 253 "will empower participants in the climate debate to use companies' disclosures about emissions, and about their plans to address them, as a basis to criticize the companies. . . ." MSJ 12:15–18 (citing this fact). The document speaks for itself. To the extent they are relevant, the Court |

14

| | | |
|---|---|---|
| | | should review the Assemblymember Zbur's statements in their complete form and in the context in which they were made.<br><br>*Evidence*: SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 – 33:9). |
| 14. | The California Senate Judiciary Committee April 14, 2023 analysis of S.B. 253 attributes climate change to "global warming."<br><br>Hamburger Decl., Ex. 7 (California Senate Judiciary Committee Analysis of S.B. 253, 2023-2024 Reg. Session (Apr. 14, 2023)) at 2. | Undisputed that the quoted text "global warming" appears in the cited document at the pincite provided by Plaintiffs.<br><br>Disputed that the statement "attributes climate change to 'global warming'" occurs at that pincite. *Contra*, SSMF 89.<br><br>Also disputed to the extent Plaintiffs seek to establish more, including by taking the quotation out of context. The document speaks for itself. To the extent they are relevant, the Court should review the California Senate Judiciary Committee's statements in their complete form |

15

| | | and in the context in which they were made.<br><br>*Evidence:* SSMF 89 (Hamburger Decl., Ex. 7 (ECF 48-10) at 8). |
|---|---|---|
| 15. | The California Senate Judiciary Committee April 14, 2023, analysis of S.B. 253 states that greenhouse-gases "are destroying our planet" and that "Californians are watching their state get irrevocably harmed by climate change, and they have a right to know who is at the forefront of the pollution causing this."<br><br>Hamburger Decl., Ex. 7 at 7 | Undisputed that the quoted text appears in the cited document.<br><br>Disputed that the California Senate Judiciary Committee April 14, 2023 analysis of S.B. 253 made the statement as quoted because Plaintiffs omit both text and context. *Contra*, SSMF 90. The document speaks for itself. To the extent they are relevant, the Court should review the Senate Judiciary Committee's statements in their complete form and in the context in which they were made.<br><br>*Evidence:* SSMF 90 (Hamburger Decl., Ex. 7 (ECF 48-10) at 7). |
| 16. | The California Senate Judiciary Committee April 14, 2023 analysis of S.B. 253 states that the "requirements" of S.B. 253 "will | Undisputed that the quoted text appears in the cited document. |

| | | |
|---|---|---|
| | provide . . . policymakers with" information.<br><br>Hamburger Decl., Ex. 7 at 11. | Disputed to the extent Plaintiffs seek to establish, by taking the quotation out of context, that the "laws' sponsors" admitted "that the speech compelled will only fuel the policy debate." MSJ 8:21–22 (citing this fact). Plaintiffs omit both text and context. The document speaks for itself. To the extent they are relevant, the Court should review the Senate Judiciary Committee's statements in their complete form and in the context in which they were made.<br><br>*Evidence:* SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25–33:9). |
| 17. | The California Senate Judiciary Committee April 14, 2023 analysis of S.B. 253 states that "For companies, the knowledge that their emissions will be publicly available might encourage them to take meaningful steps to reduce their [greenhouse-gas] emissions." | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiffs seek to establish more, including by taking the quotation out of context. Plaintiffs mischaracterize this statement as tending to prove that |

17

| | | | |
|---|---|---|---|
| | | Hamburger Decl., Ex. 7 at 12. | "the State is attempting to force companies to make controversial disclosures that invite public opprobrium . . . ."  MSJ at 1:13–14; *contra*, SSMF 91.  The document speaks for itself.  To the extent they are relevant, the Court should review the California Senate Judiciary Committee's statements in their complete form and in the context in which they were made.<br><br>*Evidence:* SSMF 91 (Hamburger Decl., Ex. 7 (ECF 48-10) at 12). |
| 18. | The California Senate Rules Committee September 11, 2023 analysis of S.B. 253 states that "Reducing scope 1 and 2 emissions by outsourcing polluting processes does not lead to a real, global reduction of GHG emissions and underscores the need for scope 3 reporting to capture the climate impacts of a business's full supply chain." | | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiffs seek to establish more, including by taking the quotation out of context. The document speaks for itself. To the extent they are relevant, the Court should review the Senate Rules Committee's statements in their complete form and in the context in which they were made. |

| | | |
|---|---|---|
| | Hamburger Decl., Ex. 8 (California Senate Rules Committee Analysis of S.B. 253, 2023-2024 Reg. Session (Sept. 11, 2023)) at 5. | |
| 19. | In a September 12, 2023, press release regarding S.B. 253, Clara Vondrich, senior policy council with Public Citizen's Climate Program, states: "For the nation to check the climate crisis, the first step is transparency on how our biggest emitters are navigating the energy transition: Are emissions going up, down, or staying the same? This legislation will let the public and regulators track companies' decarbonization progress and hold them accountable to their climate promises."<br><br>Hamburger Decl., Ex. 9 (California Lawmakers Approve Groundbreaking Climate Disclosure Bill, Public Citizen (Sept. 12, 2023)) at 1. | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiffs seek to establish more, including by taking the quotation out of context. *See, e.g.*, SSMF 88.  To the extent they are relevant, the Court should review Clara Vondrich's statements in their complete form and in the context in which they were made.<br><br>*Evidence:* SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25–33:9). |

19

| | | |
|---|---|---|
| 20. | In an August 22, 2023 press release from Ceres, a nonprofit organization, Assemblymember Tasha Boerner states "SB 253 and 261 is a bold action that helps us combat the climate crisis by providing transparency and ensuring accountability for those emitting greenhouse gasses."<br><br>Hamburger Decl., Ex. 10 (Sacramento Rally to Unite for Climate Transparency & Passage of SB 253 & SB 261, CERES (Aug. 22, 2023)) at 4. | Objection: The statement is inadmissible hearsay.<br><br>Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiffs seek to establish, by misstating the text, that "supporters have said [S.B. 253 and 261] will 'check the climate crisis' by letting the public 'hold [companies] accountable,' for 'emitting greenhouse gasses.'"  MSJ 2:19-21 (citing this fact). The document speaks for itself. To the extent they are relevant, the Court should review the Senate Judiciary Committee's statements in their complete form and in the context in which they were made.<br><br>*Evidence:* SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 –33:9). |
| 21. | At a May 2022 shareholder meeting of Shell plc, demonstrators | Objection: The statement is inadmissible hearsay. |

| | |
|---|---|
| interrupted the proceedings, with one supporter stating: "We're here to embarrass them and hold them to account." | Undisputed that the quoted text appears in the cited document. |
| Hamburger Decl., Ex. 11 (Shareholders Back Shell's Climate Strategy After Raucous Meeting, Reuters (May 24, 2022)) at 4. | Disputed because this fact is not a material fact relevant to the matter at issue, which concerns only whether the climate disclosure laws result in a facial violation of the First Amendment. This statement has no connection to S.B. 253 or 261, nor to the First Amendment issues raised by Plaintiffs in this case. |
| | Disputed further because Plaintiffs mischaracterize the quoted material as establishing that "Activist groups will use information from the disclosures to . . . 'embarrass' companies and try to 'hold them to account.'" MSJ 18:27–19:1 (citing this fact). Nothing in this document connects the actions of these protestors with S.B. 253 or 261 in any way. |

21

| 22. | In his October 7, 2023 signing statement for S.B. 253, Governor Newsom states that "the implementation deadlines in this bill are likely infeasible, and the reporting protocol specified could result in inconsistent reporting across businesses subject to the measure. I am directing my Administration to work with the bill's author and the Legislature next year to address these issues."<br><br>Hamburger Decl., Ex. 12 (Signing Statement of Governor Newsom for S.B. 253 (Oct. 7, 2023)) at 1. | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiffs rely on this statement for anything other than its existence. Specifically, disputed to the extent Plaintiffs rely on this statement to argue that the implementation deadlines in S.B. 253 for companies *are* infeasible. The referenced implementation deadlines might well be those for the agency rulemaking. Moreover, the statement merely posits the possibility of timing challenges, without support, and evidence indicates that the law's timelines are feasible for companies. Many companies subject to the laws already disclose the required information, or can draw upon existing capabilities within the company to comply with minimal burden.<br><br>Further disputed that this statement establishes that the Greenhouse Gas |

| | | |
|---|---|---|
| | | Protocol "could result in inconsistent reporting across businesses subject to the measure." Again, that statement is not specific or supported.  In any event, the Greenhouse Gas Protocol provides widely-accepted methodologies for calculating accurate, transparent, and comparable emissions information.<br><br>*Evidence:* SSMF 131 (Lyon Decl. ¶ 28; Burton Decl. ¶ 21); SSMF 132 (Burton Decl. ¶¶ 23–25, 28–33; Georgiev Decl. ¶¶ 18-19, 23-27); SSMF 170 (Hamburger Decl., Ex. 6 (ECF 48-9) at 8:14-18); SSMF 172-175 (Burton Decl. ¶¶ 13–16, 19–25, 29–30, 31(h), 34(c), 37; Georgiev Decl. ¶¶ 46, 48-49, 50(e)). |
| 23. | In his October 7, 2023, signing statement for S.B. 253, Governor Newsom states that "I am concerned about the overall financial impact of this bill on businesses, so I am instructing | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiffs rely on this statement to argue that S.B. 253 will have a negative "financial |

App.403

| | |
|---|---|
| CARB to closely monitor the cost impact as it implements this new bill and to make recommendations to streamline the program." Hamburger Decl., Ex. 12 at 1. | impact . . . on businesses," as the statement suggests only a "concern," and evidence indicates the financial impact will be minimal.  For one, the statement recognizes that the governing regulations had yet to be designed and could potentially mitigate concerns about cost.  For another, a large percentage of companies subject to the disclosure requirements already voluntarily disclose some or all of this data, or are subject to other reporting requirements, reducing the marginal increase in cost for these companies. Moreover, because the laws only apply to the largest companies, the vast majority of covered companies already have the reporting infrastructure and data necessary to prepare the required information with minimal burden, and estimates suggest that companies need expend only 0.025 percent of their annual revenue in preparing the data. |

24

| | | |
|---|---|---|
| | | *Evidence:* Cal. Health and Safety Code §§ 38532(c)(1)(D)(i) (avoiding duplication of reporting); SSMF 101-110 (Burton Decl. ¶¶ 10–11, 13–16, 36, 37(c); Cashion Decl. ¶ 17; Lyon Decl. ¶¶ 6, fn 1, 43–46; Georgiev Decl. ¶ 30; McLoon Decl., Ex. 3-4); SSMF 170 (Hamburger Decl., Ex. 6 (ECF 48-9) at 8:14-18); SSMF 172-175 (Burton Decl. ¶¶ 13-16, 19–25, 29–30, 31(h), 34(c), 37; Georgiev Decl. ¶¶ 46, 48-49, 50(e)). |
| 24. | The California Legislature's legislative findings for S.B. 253 include the following: "California investors, consumers, and other stakeholders deserve transparency from companies regarding their greenhouse gas (GHG) emissions to inform their decisionmaking."<br><br>Hamburger Decl., Ex. 13 (Senate Bill No. 253), § 1(e). | Undisputed that the legislative findings for S.B. 253 include the quoted text.<br><br>Disputed to the extent Plaintiffs seek to establish more.  The statute/document speaks for itself. |

25

| | | |
|---|---|---|
| 25. | The California Legislature's legislative findings for S.B. 253 include the following: "The people, communities, and other stakeholders in California, facing the existential threat of climate change, have a right to know about the sources of carbon pollution, as measured by the comprehensive GHG emissions data of those companies benefiting from doing business in the state, in order to make informed decisions."<br><br>Hamburger Decl., Ex. 13 (Senate Bill No. 253), § 1(j). | Undisputed that the legislative findings for S.B. 253 include the quoted text.<br><br>Disputed to the extent Plaintiffs seek to establish more.  The statute/document speaks for itself. |
| 26. | The California Legislature's legislative findings for S.B. 253 include the following: "Mandating annual, full-scope GHG emissions data reporting to the emissions reporting organization for all United States companies with total annual revenues in excess of $1,000,000,000 that do business in California, as well as ensuring | Undisputed that the legislative findings for S.B. 253 include the quoted text.<br><br>Disputed to the extent Plaintiffs seek to establish more.  The statute/document speaks for itself. |

26

| | | public access to the data in a manner that is easily understandable and accessible, will inform investors, empower consumers, and activate companies to improve risk management in order to move towards a net-zero carbon economy and is a critical next step that California must take to protect the state and its residents." | |
| | | Hamburger Decl., Ex. 13 (Senate Bill No. 253), § 1(*l*). | |
| 27. | | S.B. 253 will require approximately 5,300 U.S. businesses to report their emissions. | Objection: The phrase "S.B. 253 will require" is either a legal conclusion or ambiguous. |
| | | Hamburger Decl., Ex. 14 (California Assembly Floor Analysis of S.B. 253, 2023-2024 Reg. Session (Sept. 7, 2023)) at 2. | Undisputed that the California Assembly Floor Analysis of S.B. 253 stated that "According to Ceres, one of the sponsors of the bill, of the 5,300 U.S. corporations that would have to report their emissions. . . ." |

27

App.407

| | | Hamburger Decl., Ex. 14 (ECF No. 48-17) at 2.

Disputed to the extent Plaintiffs intend to state more than that. Defendants do not know precisely how many U.S. businesses will be required to disclose under the regulations that will be adopted pursuant to S.B. 253 and the cited evidence does not establish that any particular company or number of companies are subject to these disclosure requirements.

To the extent that the number of U.S. corporations that would have to report emissions under S.B. 253's implementing regulations becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
| 28. | Of the approximately 5,300 business that will be required to report their emissions under S.B. | Objection: The phrase "will be required to report their emissions under S.B. 253" is either a legal conclusion or ambiguous. |

| | |
|---|---|
| 253, 73% are estimated to be private companies.<br><br>Hamburger Decl., Ex. 14 at 2. | Undisputed that the California Assembly Floor Analysis of S.B. 253 stated that "According to Ceres, one of the sponsors of the bill, of the 5,300 U.S. corporations that would have to report their emissions about 73% are private companies."<br><br>Disputed to the extent Plaintiffs intend to state more than that. Defendants do not know precisely how many or which U.S. businesses will be required to disclose under S.B. 253's implementing regulations once those regulations are adopted, and the cited evidence does not establish these facts. To the extent that the number of public and private U.S. corporations that would have to report emissions under S.B. 253's implementing regulations becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |

29

| | | Disputed to the extent that Plaintiffs are suggesting the law is overbroad by including private companies. *Evidence:* SSMF 153 (Cashion Decl. ¶ 16); SSMF 183-189 (Georgiev Decl. ¶¶ 37, 39-45, 47). |
|---|---|---|
| 29. | The requirement to estimate and report Scope 3 emissions alone will cost some companies more than $1 million per year. Hamburger Decl., Ex. 15 (Williams Companies, Inc., Comment Letter to Proposed Rule on The Enhancement and Standardization of Climate-Related Disclosures for Investors (June 17, 2022)) at 14. | Objection: Plaintiffs' assertion lacks foundation and is inadmissible hearsay. Disputed. The compliance cost estimate for the calculation of Scope 3 emissions presented in the comment letter, Hamburger Decl., Ex. 15 (ECF No. 48-18) at 14, was based on Williams Companies, Inc.'s hypothetical compliance with the Securities and Exchange Commissions' proposed rule for The Enhancement and Standardization of Climate-Related Disclosures for Investors, not the Scope 3 reporting requirements of S.B. 253. The average estimated cost for compliance with S.B. 253 Scope 3 |

30

| | | reporting requirements "is less than $250,000." |
|---|---|---|
| | | *Evidence:* SSMF 170 (Hamburger Decl., Ex. 6 (ECF 48-9) at 8:14–18); SSMF 172-175 (Burton Decl. ¶¶ 13-16, 19–25, 29–30, 31(h), 34(c), 37; Georgiev Decl. ¶¶ 46, 48-49, 50(e)). |
| 30. | In an April 11, 2022, explanation related to its proposed rule that would require publicly traded companies to report climate-related information, the Securities and Exchange Commission "recognize[d] that, in many instances, direct measurement of GHG emissions at the source, which would provide the most accurate measurement, may not be possible."<br><br>Hamburger Decl., Ex. 16 (The Enhancement and Standardization of Climate-Related Disclosures for Investors, 87 Fed. Reg. 21,334 | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiffs intend to state more than that. The quoted text does not establish that the "SEC acknowledges, the estimate in many instances may be inaccurate." MSJ 5:6–7 (citing this fact). The statement that "direct measurement of GHG emissions at the source, which would provide the most accurate measurement, may not be possible" does not establish that other GHG emissions measurement "may be" inaccurate. ECF No. 48-19 at 21,387. |

31

| | | |
|---|---|---|
| | (proposed Apr. 11, 2022)) at 21,387. | *Evidence*: Hamburger Decl., Ex. 16 (ECF No. 48-19) at 21,387; SSMF 134 (Georgiev Decl. ¶ 26). |
| 31. | The Greenhouse Gas Protocol, which S.B. 253 uses as the basis for its emissions-disclosure regime, states that Scope 3 emissions do not factor in "avoided emissions or [greenhouse-gas] reductions from actions taken to compensate for or offset emissions."<br><br>Hamburger Decl., Ex. 17 (Greenhouse Gas Protocol, Corporate Value Chain (Scope 3) Accounting and Reporting Standard (Sept. 2011)) at 6. | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiffs seek to establish more, including by taking the quotation out of context to establish that S.B. 253's disclosures are misleading. MSJ 18:16–18 (citing this fact). The document speaks for itself. Moreover, disputed because the exclusion of "Scope 4" emissions is not misleading.<br><br>*Evidence*: SSMF 142 (Lyon Decl., ¶ 39) ("In fact, any projects that succeed in avoiding emissions will by definition reduce emissions from the first 3 scopes of a reporting entity, and hence will automatically be reflected in an accurate reporting of Scopes 1, 2 and 3 emissions. |

32

| | | |
|---|---|---|
| | | There is no need to report so-called "Scope 4" emissions separately.") |
| 32. | The Greenhouse Gas Protocol, which S.B. 253 uses as the basis for its emissions-disclosure regime, states that "Scope 3 includes all other indirect emissions that occur in a company's value chain. The 15 categories in scope 3 are intended to provide companies with a systematic framework to measure, manage, and reduce emissions across a corporate value chain." <br><br> Hamburger Decl., Ex. 18 ((Greenhouse Gas Protocol, Technical Guidance for Calculating Scope 3 Emissions (version 1.0) (2013)) at 6. | Undisputed that S.B. 253 contemplates use of the Greenhouse Gas Protocol as an initial basis for emission-disclosures. Undisputed that the quoted text appears in the cited document. <br><br> Disputed to the extent Plaintiffs seek to establish more, including by taking the quotation out of context. Plaintiffs mischaracterize this statement as tending to prove that "estimations an entity reports as its Scope 3 emissions are those of other reporting entities altogether. . . ." MSJ at 4:28–5:1. The document speaks for itself. To the extent they are relevant, the Court should review the Greenhouse Gas Protocol's statements in their complete form and in the context in which they were made. |

33

| | | |
|---|---|---|
| | | *Evidence*: Hamburger Decl., Ex. 18; SSMF 180 (Cashion Decl. ¶ 14; Lyon Decl. ¶ 36); SSMF 181 (Burton Decl. ¶ 31). |
| 33. | The Greenhouse Gas Protocol, which S.B. 253 uses as the basis for its emissions-disclosure regime, states that calculation of Scope 3 emissions includes a "require[ment] to calculate emissions of all the [greenhouse gases] required by the United Nations Framework Convention on Climate Change (UNFCCC)/Kyoto Protocol," including "carbon dioxide (CO2), methane (CH4), nitrous oxide (N2O), hydrofluorocarbons (HFCs), perfluorocarbons (PFCs), sulphur hexafluoride (SF6) . . . [and] nitrogen trifluoride (NF3)." <br><br> Hamburger Decl., Ex. 18 at 14. | Undisputed that the quoted text appears in the cited document. The document speaks for itself. <br><br> Disputed to the extent Plaintiffs seek to establish more. The statute/document speaks for itself. |
| 34. | The Greenhouse Gas Protocol, which S.B. 253 uses as the basis for its emissions-disclosure regime, | Disputed. The cited document does not state that there are advantages or disadvantages of methods of |

34

| | |
|---|---|
| states that there are "advantages and disadvantages" for different methods of collecting information about greenhouse-gas emissions.<br><br>Hamburger Decl., Ex. 18 at 18. | collecting information about greenhouse gas emissions. The full cited text from Technical Guidance for Calculating Scope 3 Emissions (version 1.0) (2013) states, "Section 7.5 of the Scope 3 Standard 'Guidance for collecting secondary data and filling data gaps' provides more information on the use of proxy data and its advantages and disadvantages." Hamburger Decl., Ex. 18 (ECF No. 48-18) at 18. The cited evidence does not establish or identify any advantage or disadvantage for any particular method of "collecting information" about greenhouse-gas emissions.<br><br>Also disputed that "[e]missions calculations necessarily turn on subjective judgments." MSJ 4:26 (citing this fact). Neither the quoted text nor the surrounding text supports that claim. Emissions calculations based on the Greenhouse Gas Protocol are objective measurements. |

35

App.415

| | | |
|---|---|---|
| | | *Evidence*: SSMF 132-135, 140-141 (Burton Decl. ¶¶ 23–25, 28–33; Georgiev Decl. ¶¶ 18–21, 23–27, 29–33). |
| 35. | Studies show that publicly available information about a company's operations, including industry membership, size, sales growth, earnings growth, property value, capital expenditures, and profitability, can explain 90% of greenhouse-gas emissions.<br><br>Hamburger Decl., Ex. 19 (Daniel J. Taylor, Comment Letter to Proposed Rule on The Enhancement and Standardization of Climate-Related Disclosures for Investors (June 16, 2022)) at 7. | Objection: The statement is compound in that it sets forth multiple facts. The statement is inadmissible hearsay and lacks foundation.<br><br>Disputed. There are significant accuracy limitations to using outside estimates; these inaccuracies are eliminated by the disclosure of internal numbers. SSMF 171 (Lyon Decl. ¶ 10, 14).<br><br>Also disputed to the extent that Plaintiffs mischaracterize the cited evidence as establishing more than one study finding "that 90% of GHG emissions are explained by observable aspects of a company's operations including industry membership; company size; sales |

36

| | | | |
|---|---|---|---|
| | | | growth; earnings growth; the value of plant, property, and equipment; capital expenditures; and profitability." Hamburger Decl., Ex. 19 (ECF 48-22), at 7. Further disputed that the study stands for the proposition as stated; that document, which was not submitted as evidence here, speaks for itself.<br><br>To the extent that Plaintiffs' assertion is relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion.<br><br>*Evidence*: SSMF 171 (Decl. Lyon ¶¶ 10, 14). |
| 36. | There are gaps in emissions methodologies, making reliable and accurate calculations of emissions difficult.<br><br>Hamburger Decl., Ex. 20 (Task Force on Climate-Related Financial Disclosures, Recommendations of the Tasks Force on Climate-related | | Objection: The statement contains a legal conclusion; the phrase "gaps in emissions methodologies" is vague and ambiguous.<br><br>Disputed. The cited evidence does not establish that there are gaps in emissions methodologies that make reliable and accurate calculations of |

37

| | | |
|---|---|---|
| | Financial Disclosures (June 2017)) at 36; Hamburger Decl. Ex. 21 (Pilot Climate Scenario Analysis Exercise, Board of Governors of the Federal Reserve System (May 2024)) at 11. | emissions difficult. The cited document states only that "several organizations" raised "concerns" that, "[t]he gaps in emissions measurement methodologies, including Scope 3 emissions and product life-cycle emissions methodologies, make reliable and accurate estimates difficult." Hamburger Decl., Ex. 20 (ECF No. 48-23) at 35-36. The Task Force on Climate Related Disclosures goes on to say that in response to these concerns it "clarified the links between the metrics." *Id.* Moreover, in making this assertion, Plaintiffs rely on an assessment of a pilot climate scenario analysis conducted by the Federal Reserve, which was not based on the requirements of S.B. 253 or S.B. 261, and does not support the statement made. Hamburger Decl., Ex. 21 (ECF No. 48-24) at 11. Emissions calculations made pursuant to the Greenhouse Gas |

| | | |
|---|---|---|
| | | Protocol are considered accurate, thorough, and complete.<br><br>*Evidence*: SSMF 132-135, 140-141 (Burton Decl. ¶¶ 23–25, 28–33; Georgiev Decl. ¶¶ 18–21, 23–27, 29–33). |
| 37. | The California Senate Rules Committee September 12, 2023 analysis of S.B. 261 states that "[u]ltimately, the reporting requirements contemplated under SB 261 will indeed create additional work for covered entities" and concern "how their future operations may affect—and be affected by—global climate change."<br><br>Hamburger Decl., Ex. 22 (California Senate Rules Committee Analysis of S.B. 261, 2023-2024 Reg. Session (Sept. 12 2023) at 5-6. | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiffs seek to establish more, including by taking the quotation out of context. The document speaks for itself. Disputed that "the reporting requirements contemplated under SB 261 will indeed create additional work for covered entities," to the extent that many entities already make disclosures pursuant to the TCFD.<br><br>Further, disputed to the extent Plaintiffs are arguing the SB 261 concerns a controversial topic. Senate Bill 261 requires the |

39

| | | disclosure of only factual statements about reporting entities' own activities.<br><br>*Evidence*: SSMF 101-105 (Burton Decl. ¶¶ 11, 13–16; Cashion Decl. ¶ 17; Lyon Decl. ¶¶ 43–46; Georgiev Decl. ¶ 30; McLoon Decl., Ex. 3-4); SSMF 118 (Cashion Decl. ¶ 17); SSMF 119-122 (Burton Decl. ¶¶ 35, 38–39; Georgiev Decl. ¶¶ 19-21, 29-33); SSMF 143 (Georgiev Decl. ¶¶ 19(a), (d)), 21); SSMF 172 (Burton Decl. ¶¶ 13-16, 19–25, 29–30, 31(h), 34(c), 37; Georgiev Decl. ¶¶ 46, 48-49, 50(e)); SSMF 176-178 (Burton Decl. ¶ 34; Georgiev Decl. ¶ 46). |
| 38. | The California Senate Judiciary Committee April 10, 2023 analysis of S.B. 261 provides that the "information" required by S.B. 261 "is important to provide more transparency to policy makers, investors, and shareholders as it will result in improved decision | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiffs seek to establish more, including by taking the quotation out of context. The document speaks for itself. To the extent they are relevant, the |

40

| | | | |
|---|---|---|---|
| | | making on where to invest private and public dollars."<br><br>Hamburger Decl., Ex. 23 (California Senate Judiciary Committee Analysis of S.B. 261, 2023-2024 Reg. Session (Apr. 14, 2023) at 5. | Court should review the Senate Rules Committee's statements in their complete form and in the context in which they were made. |
| 39. | | The California Assembly Committee on Natural Resources July 10, 2023 analysis of S.B. 261 provides that S.B. 261 "[d]efines 'climate-related financial risk' as risk that may include material financial risk posed by the effects of the changing climate, such as intense storms, rising sea levels, higher global temperatures, economic damages from carbon emissions, and other financial risks due to public policies to address climate change, shifting consumer attitudes, changing economics of traditional carbon-intense industries." | Disputed. Plaintiff misstates the definition of "climate-related financial risk" in S.B. 261 as provided in the cited material. The definition Plaintiffs' cite is found in Government Code section 7510.5(a)(2). Hamburger Decl., Ex. 24 (ECF No. 48-27) at 1–2. The Assembly Committee on Natural Resources July 10, 2023 analysis of S.B. 261 defines "Climate-related financial risk" for purposes of S.B. 261 as "material risk of harm to immediate and long-term financial outcomes due to physical and transition risks, including, but not limited to, risks to corporate operations, provision of goods and |

41

| | | |
|---|---|---|
| | Hamburger Decl., Ex. 24 (California Assembly Natural Resources Committee Analysis of S.B. 261, 2023-2024 Reg. Session (July 7, 2023) at 1-2. | services, supply chains, employee health and safety, capital and financial investments, institutional investments, financial standing of loan recipients and borrowers, shareholder value, consumer demand, and financial markets and economic health." *Id.*, at 2.

*Evidence*: Hamburger Decl., Ex. 24 (ECF No. 48-27) at 2. |
| 40. | In his October 7, 2023, signing statement for S.B. 261, Governor Newsom states that "the implementation deadlines fall short in providing the California Air Resources Board (CARB) with sufficient time to adequately carry out the requirements in this bill.  I am directing my Administration to work with the bill's author and the Legislature next year to address this issue." | Undisputed that the quoted text appears in the cited document.

Disputed to the extent Plaintiffs rely on this statement for more, including to argue that the implementation deadlines in S.B. 253 are insufficient for companies. The document speaks for itself. |

42

| | | |
|---|---|---|
| | Hamburger Decl., Ex. 25 (Signing Statement of Governor Newsom for S.B. 261 (Oct. 7, 2023)) at 1. | |
| 41. | In his October 7, 2023, signing statement for S.B. 261, Governor Newsom states that "I am concerned about the overall financial impact of this bill on businesses, so I am instructing CARB to closely monitor the cost impacts as it implements this new bill and to make recommendations to streamline the program." Hamburger Decl., Ex. 25 at 1. | Undisputed that the quoted text appears in the cited document. Disputed to the extent Plaintiffs rely on this statement for anything other than its existence. Specifically, disputed to the extent Plaintiffs rely on this statement to argue that S.B. 261 will have a negative "financial impact . . . on businesses," as the statement suggests only a "concern," and the evidence suggests this concern is unwarranted. For one, many companies subject to the disclosure requirements already voluntarily disclose some or all of the required data, or are subject to other reporting requirements, reducing the marginal increase in cost for these companies to report under SB 261. Moreover, because the laws only apply to the largest companies, the |

43

| | | |
|---|---|---|
| | | vast majority of covered companies already have the reporting infrastructure and data necessary to prepare the required information with minimal burden.<br><br>*Evidence*: Cal. Health and Safety Code § 38533(b)(4) (avoiding duplication of reporting); SSMF 101-110 (Burton Decl. ¶¶ 10–11, 13–16, 36, 37(c); Cashion Decl. ¶ 17; Lyon Decl. ¶¶ 6, fn 1, 43–46; Georgiev Decl. ¶ 30; McLoon Decl., Ex. 3-4); SSMF 170 (Hamburger Decl., Ex. 6 (ECF 48-9) at 8:14-18); SSMF 172 (Burton Decl. ¶¶ 13-16, 19–25, 29–30, 31(h), 34(c), 37; Georgiev Decl. ¶¶ 46, 48-49, 50(e)); SSMF 176-179 (Burton Decl. ¶ 34; Georgiev Decl. ¶ 46; ECF 48-6 at 22:3–6). |
| 42. | The California Legislature's legislative findings for S.B. 261 include the following: "Global economic and climate policy leaders have conclusively | Undisputed that the legislative findings for S.B. 261 include the quoted text. |

| | |
|---|---|
| established that the long-term strength of global and local economies will depend on their ability to withstand climate-related risks, including physical impacts, economic transitions, and policy and legal responses." | Disputed to the extent Plaintiffs seek to establish more, including by taking the quotation out of context, that, "The California Legislature itself recognizes that climate change is a high-profile political issue subject to robust debate among '[g]lobal economic and climate policy leaders.'"  MSJ 8:16–18 (citing this fact).  The document speaks for itself, and the cited statement does not establish a "robust debate" among policy leaders.  Nor does it suggest that complying with S.B. 261 requires taking a position on any policy debate. |
| Hamburger Decl., Ex. 26 (Senate Bill No. 261), § 1(b) | |
| | *Evidence:* SSMF 119 (Burton Decl. ¶¶ 35, 38–39; Georgiev Decl. ¶¶ 19-21, 29-33); SSMF 120 (Burton Decl. ¶¶ 35, 38–39); SSMF 121 (Burton Decl. ¶¶ 35, 38–39); SSMF 122 (Georgiev Decl. ¶ 32). |

45

| | 43. | The California Legislature's legislative findings for S.B. 261 include the following: "Failure of economic actors to adequately plan for and adapt to climate-related risks to their businesses and to the economy will result in significant harm to California, residents, and investors, in particular to financially vulnerable Californians who are employed by, live in communities reliant on, or have invested in or obtained financing from these institutions." <br><br> Hamburger Decl., Ex. 26 (Senate Bill No. 261), § 1(c). | Undisputed that the legislative findings for S.B. 261 include the quoted text. <br><br> Disputed to the extent Plaintiffs seek to establish more, including by taking the quotation out of context, that, "The California Legislature itself recognizes that climate change is a high-profile political issue . . . that raises many contested questions, including . . . corporations' responsibility to "plan for and adapt to' it." MSJ 8:16–18 (citing this fact). The document speaks for itself, and the cited statement does not establish any disputed "political issue" with "contested questions." Nor does it suggest that complying with S.B. 261 requires taking a position on any policy debate. <br><br> *Evidence:* SSMF 119 (Burton Decl. ¶¶ 35, 38–39; Georgiev Decl. ¶¶ 19-21, 29-33); SSMF 120 (Burton Decl. ¶¶ 35, 38–39); SSMF 121 |

| | | (Burton Decl. ¶¶ 35, 38–39); SSMF 122 (Georgiev Decl. ¶ 32). |
|---|---|---|
| 44. | The California Legislature's legislative findings for S.B. 261 include the following: "Though a precedent has been set to address climate risk to businesses, corporations, and financial institutions nationwide, current disclosure standards are voluntary, and thus inadequate, for meeting rapidly accelerating climate risks. In order to begin to address the climate crisis, consistent, higher level, and mandatory disclosures are needed from all major economic actors, and California has an opportunity to set mandatory and comprehensive risk disclosure requirements for public and private entities to ensure a sustainable, resilient, and prosperous future for our state."<br><br>Hamburger Decl., Ex. 26 (Senate Bill No. 261), § 1(j). | Undisputed that the legislative findings for S.B. 261 include the quoted text.<br><br>Disputed to the extent Plaintiffs seek to establish more. The statute/document speaks for itself. |

47

| 45. | The June 2017 Recommendations of the Task Force on Climate-Related Financial Disclosures states that "Organizations' financial performance may also be affected by changes in water availability, sourcing, and quality; food security; and extreme temperature changes affecting organizations' premises, operations, supply chain, transport needs, and employee safety."<br><br>Hamburger Decl., Ex. 20 at 6. | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiffs seek to establish more, including by taking the quotation out of context, that the TCFD requires companies to take a position on a political or contentious issue.<br><br>*Evidence:* SSMF 119 (Burton Decl. ¶¶ 35, 38–39; Georgiev Decl. ¶¶ 19-21, 29-33); SSMF 120 (Burton Decl. ¶¶ 35, 38–39); SSMF 121 (Burton Decl. ¶¶ 35, 38–39); SSMF 122 (Georgiev Decl. ¶ 32); SSMF 143 (Georgiev Decl. ¶¶ 19(a), (d), 21). |
| --- | --- | --- |
| 46. | There is high degree of uncertainty about the timing and magnitude of climate-related risks, and it is difficult to estimate how those risks impact company operations.<br><br>Hamburger Decl., Ex. 20 at 36; Hamburger Decl., Ex. 21 at 11. | Objection: The statement contains a legal conclusion; the statement is vague or ambiguous; the statement is compound in that it sets forth multiple facts.<br><br>Disputed. The cited evidence does not establish that there is a "high |

48

degree of uncertainty about timing and magnitude of climate-related risks" or that "it is difficult to estimate how [climate-related] risks impact company operations." The cited document states only that "several organizations" raised this as a "concern." Hamburger Decl., Ex. 20 (ECF No. 48-23) at 36. The Task Force on Climate Related Disclosures goes on to say that it responded to these concerns in the design of the metrics. *Id.* Moreover, in making this assertion, Plaintiffs rely on an assessment of a pilot climate scenario analysis conducted by the Federal Reserve, which was not based on the requirements of S.B. 261, and does not support the statement made. Hamburger Decl., Ex. 21 (ECF No. 48-24) at 11.

The TCFD protocol is a globally accepted reporting framework, aligned with traditional financial reporting principles.

49

| | | |
|---|---|---|
| | | *Evidence*: SSMF 97 (Burton Decl. ¶¶ 11, 14, 36, 37(c); Cashion Decl. ¶¶ 17, 21; Hamburger Decl., Ex. 23 (ECF 48-26) at 5–6; Georgiev Decl. ¶ 33); SSMF 98 (Burton Decl. ¶¶ 11, 17, 19, 21–25, 37); SSMF 120 (Burton Decl. ¶¶ 35, 38–39); SSMF 121 (Burton Decl. ¶¶ 35, 38–39); SSMF 122 (Georgiev Decl. ¶ 32); SSMF 143 (Georgiev Decl. ¶¶ 19(a), (d), 21). |
| 47. | A company's subjective judgment is required make disclosures about climate change risks for future company operations.<br><br>Hamburger Decl., Ex. 20 at 53. | Objection: The statement contains a legal conclusion; the statement is vague or ambiguous.<br><br>Disputed. The cited evidence does not establish that a company must engage in "subjective judgment" to make disclosures about climate change risks for future company operations. The cited evidence states, "Future-oriented disclosures will inherently involve the organization's judgment (which should be adequately explained). To |

50

| | | |
|---|---|---|
| | | the extent possible, disclosures should be based on objective data and use best-in-class measurement methodologies, which would include common industry practice as it evolves." Hamburger Decl., Ex. 20 (ECF 48-23) at 53. Indeed that section of the TCFD guidance in which the cited statement is found reads, "Disclosures should be reliable, verifiable, and objective." *Id.* The disclosure of business judgments are factual in nature.<br><br>*Evidence*: Hamburger Decl., Ex. 20 (ECF 48-23) at 53; SSMF 119 (Burton Decl. ¶¶ 35, 38–39; Georgiev Decl. ¶¶ 19-21, 29-33); SSMF 120 (Burton Decl. ¶¶ 35, 38–39); SSMF 121 (Burton Decl. ¶¶ 35, 38–39); SSMF 122 (Georgiev Decl. ¶ 32); SSMF 143 (Georgiev Decl. ¶¶ 19(a), (d), 21). |
| 48. | Over 10,000 companies do business in California and have revenues of greater than | Objection: The phrases "do business in California" and "are subject to S.B. 261" are legal conclusions. |

51

| | | |
|---|---|---|
| | $500,000,000 and thus are subject to S.B. 261.<br><br>Hamburger Decl., Ex. 22 at 5. | Undisputed that the California Senate Rules Committee Analysis of S.B. 261 stated that "over 10,000 companies … do business in California and exceed the $500,000,000 revenue threshold. . . ."  Hamburger Decl., Ex. 22 (ECF No. 48-25), at 5.<br><br>Disputed to the extent Plaintiffs intend to state more than that. Defendants do not know precisely how many companies doing business in California exceed the $500,000,000 revenue threshold and the cited evidence does not establish that any particular company or number of companies are subject to the S.B. 261 reporting requirements. To the extent that the number of U.S. corporations that would have to report emissions under S.B. 261 becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |

52

| | | | |
|---|---|---|---|
| 49. | Of the more than 10,000 companies that are subject to S.B. 261, only 20% are publicly traded.<br><br>Hamburger Decl., Ex. 22 at 5. | | Objection: The phrase "are subject to S.B. 261" is a legal conclusion.<br><br>Undisputed that the California Senate Rules Committee Analysis of S.B. 261 stated that "over 10,000 companies … do business in California and exceed the $500,000,000 revenue threshold. . . ." Hamburger Decl., Ex. 22 (ECF No. 48-25), at 5. Undisputed that this same Analysis states that of those 10,000 companies, "only 20% of them are publicly traded." *Id.*<br><br>Disputed to the extent Plaintiffs intend to state more than that. Defendants do not know precisely how many companies doing business in California exceed the $500,000,000 revenue threshold and the cited evidence does not establish that any particular company or number of companies are subject to the S.B. 261 reporting requirements. To the extent that the number of publicly traded U.S. corporations |

53

| | | that would have to report emissions under S.B. 261 becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion.<br><br>Disputed to the extent Plaintiffs suggest the inclusion of privately held companies renders S.B. 261 overbroad.  As the Analysis states, "there are clear advantages in the completeness and scope of the data that could be gathered by California" in enacting a law that covers private companies.<br><br>*Evidence*: Hamburger Decl., Ex. 22 (ECF No. 48-25), at 5; SSMF 153 (Cashion Decl. ¶ 16); SSMF 183-189 (Georgiev Decl. ¶¶ 37, 39-45, 47). |
| 50. | U-Haul Holding Company ("UHHC"), a Nevada corporation, is a member of the United States Chamber of Commerce. | Defendants lack sufficient knowledge or information to respond to U-Haul's representations. |

| | | Declaration of Edward J. Shoen ("Shoen Decl.") ¶¶ 2-3. | Disputed to the extent that Defendants have not had an opportunity to cross-examine U-Haul regarding its testimony.  To the extent this fact becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
|---|---|---|---|
| | 51. | UHHC has an annual total revenue exceeding $1 billion USD.<br><br>Shoen Decl. ¶ 3. | Defendants lack sufficient knowledge or information to respond to U-Haul's representations.<br><br>Disputed to the extent that Defendants have not had an opportunity to cross-examine U-Haul's testimony.  To the extent this fact becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
| | 52. | UHHC's subsidiary, U-Haul Co. of California ("UHCA"), does business in California.<br><br>Shoen Decl. ¶ 4. | Defendants lack sufficient knowledge or information to respond to U-Haul's representations.<br><br>Disputed to the extent that Defendants have not had an |

| | | |
|---|---|---|
| | | opportunity to cross-examine U-Haul's testimony.  To the extent this fact becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
| 53. | If UHCA's activities in California are attributable to UHHC, then UHHC would be subject to the requirements of SB 253 and 261.  Shoen Decl. ¶ 5. | Objection: The statement requires a legal conclusion; the statement is compound in that it sets forth multiple facts.  Disputed. The cited evidence does not establish that UHHC (or U-Haul) is subject to the requirements of S.B. 253 or S.B. 261. Shoen Decl. (ECF 48-30) ¶¶ 3–5.  Defendants lack sufficient knowledge or information to respond to U-Haul's representations. Defendants dispute U-Haul's claim that it is a regulated entity under S.B. 253 and/or S.B. 261. |
| 54. | UHHC and its subsidiaries that do business throughout the United States and Canada make up the U-Haul System ("U-Haul"). | Disputed to the extent that Defendants have not had an opportunity to cross-examine U-Haul's testimony.  To the extent this |

56

| | | |
|---|---|---|
| | Shoen Decl. ¶ 6. | fact becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
| 55. | Complying with SB 261 would require U-Haul to opine on climate-related risks.<br><br>Shoen Decl. ¶ 32. | Objection: The statement is a legal conclusion; the phrase "opine on climate-related risks" is vague and ambiguous.<br><br>Disputed. The cited evidence does not establish that UHHC (or U-Haul) is subject to the requirements of S.B. 253 and/or S.B. 261. Shoen Decl. (ECF 48-30) ¶¶ 3–5.<br><br>Disputed to the extent that Plaintiffs claim that S.B. 261 would require U-Haul to take a position on climate-related risks that is not factual.<br><br>*Evidence*: SSMF 119 (Burton Decl. ¶¶ 35, 38–39; Georgiev Decl. ¶¶ 19-21, 29-33); SSMF 120 (Burton Decl. ¶¶ 35, 38–39); SSMF 121 (Burton Decl. ¶¶ 35, 38–39); SSMF 122 (Georgiev Decl. ¶ 32); SSMF |

| | | 143 (Georgiev Decl. ¶¶ 19(a), (d), 21). |
|---|---|---|
| 56. | Complying with SB 261 would require U-Haul to post opinions about climate risks to its website.<br><br>Shoen Decl. ¶ 32. | Objection: The statement is a legal conclusion.<br><br>Disputed. The cited evidence does not establish that UHHC (or U-Haul) is subject to the requirements of S.B. 253 or S.B. 261. Shoen Decl. (ECF 48-30) ¶¶ 3–5.<br><br>Disputed to the extent that Plaintiffs claim that S.B. 261 would require U-Haul to "post opinions" about climate risk. S.B. 261 requires the disclosure of only factual statements about reporting entities' own activities. Companies must disclose their actual policies and actual planning pertaining to climate-related financial risks as assessed by the company.<br><br>*Evidence*: SSMF 119 (Burton Decl. ¶¶ 35, 38–39; Georgiev Decl. ¶¶ 19-21, 29-33); SSMF 120 (Burton |

App.438

| | | Decl. ¶¶ 35, 38–39); SSMF 121 (Burton Decl. ¶¶ 35, 38–39); SSMF 122 (Georgiev Decl. ¶ 32); SSMF 143 (Georgiev Decl. ¶¶ 19(a), (d), 21). |
|---|---|---|
| 57. | Complying with SB 253 would require U-Haul to calculate Scope 1, 2, and 3 emissions.<br><br>Shoen Decl. ¶ 13. | Objection: The statement requires a legal conclusion.<br><br>Disputed. The cited evidence does not establish that UHHC (or U-Haul) is subject to the requirements of S.B. 253 or S.B. 261. Shoen Decl. (ECF 48-30) ¶¶ 3–5. Defendants lack sufficient knowledge or information to respond to U-Haul's representations. Defendants dispute U-Haul's stated determinations regarding its status as a regulated entity under S.B. 253. To the extent this fact becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
| 58. | U-Haul will need to exercise subjective judgment in calculating greenhouse-gas emissions. | Objection: The statement is a legal conclusion; the phrase "exercise |

| | | |
|---|---|---|
| | Shoen Decl. ¶¶ 11,17, 39. | subjective judgment" is vague and ambiguous.<br><br>Disputed. The cited evidence does not establish that UHHC (or U-Haul) is subject to the requirements of S.B. 253 or S.B. 261. Shoen Decl. (ECF 48-30) ¶¶ 3–5.<br><br>Further disputed to the extent that Plaintiffs claim that S.B. 253 would require U-Haul to "exercise subjective judgment" to calculate GHG emissions.  S.B. 253 requires companies to disclose objective, factual information: the quantity of their greenhouse gas emissions. Cal. Health & Safety Code § 38532(c)(1)(A)(ii).  Entities must measure and report their emissions "in conformance" with the "Greenhouse Gas Protocol standards and guidance," *id*. § 38532(c)(1)(A)(ii), which is a "globally accepted reporting framework" and "aligned with |

| | | |
|---|---|---|
| | | traditional financial reporting principles."<br><br>*Evidence*: SSMF 95-96 (Burton Decl. ¶¶ 10, 14, 17, 19–25, 28; Hamburger Decl., ECF 48-5, Ex. 2 at 26:10–25; Hamburger Decl., Ex. 4 (ECF 48-7) at 3:8–11; Hamburger Decl., Ex. 7 (ECF 48-10) at 8–10; Hamburger Decl., Ex. 3 (ECF 48-6) at 2:14-15; Georgiev Decl. ¶¶ 29–30); SSMF 132-140 (Burton Decl. ¶¶ 23–25, 28–33; Georgiev Decl. ¶¶ 18-19, 23-27). |
| 59. | Scope 1, 2, and 3 emissions alone do not accurately reflect U-Haul's total emissions because the calculation does not include Scope 4 emissions—i.e., those emissions that a company avoids that should be deducted from its Scope 1, 2, and 3 emission levels.<br><br>Shoen Decl. ¶¶ 28, 31. | Objection: The statement is compound in that it sets forth multiple facts; the statement requires a legal conclusion.<br><br>Disputed. The cited evidence does not establish that UHHC (or U-Haul) is subject to the requirements of S.B. 253 or S.B. 261. Shoen Decl. (ECF 48-30) ¶¶ 3–5. |

| | | | |
|---|---|---|---|
| | | | Disputed because the exclusion of "Scope 4" emissions is not misleading. |
| | | | *Evidence*: SSMF 142 (Lyon Decl., ¶ 39) ("In fact, any projects that succeed in avoiding emissions will by definition reduce emissions from the first 3 scopes of a reporting entity, and hence will automatically be reflected in an accurate reporting of Scopes 1, 2 and 3 emissions. There is no need to report so-called "Scope 4" emissions separately.") |
| 60. | U-Haul's commercial transactions with its customers do not involve disclosure of greenhouse-gas emissions or climate-related risks.<br><br>Shoen Decl. ¶ 36. | | Defendants lack sufficient knowledge or information to respond to U-Haul's representations.<br><br>To the extent it is relevant whether or not U-Haul's commercial transactions with customers involve the disclosure of GHG emissions or climate-related risks, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |

| | | |
|---|---|---|
| 61. | U-Haul's advertising does not highlight greenhouse-gas emissions or climate-related risks.<br><br>Shoen Decl. ¶ 36. | Disputed. U-Haul states on its public-facing website that it "believe[s] the primary responsibility of U-Haul is to develop products and services to help people move and store their household and commercial goods in an economically, environmentally and socially responsible manner," including by "[d]evelop[ing] and implement[ing] comprehensive climate-change strategies to manage and mitigate [U-Haul's] greenhouse gas (GHG) emissions."<br><br>To the extent it is relevant whether or not U-Haul's advertising highlights GHG emissions or climate-related risks, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion.<br><br>*Evidence*: SSMF 129 (McLoon Decl., Ex. 7). |
| 62. | S.B. 253 and 261 are burdensome. For example, with respect to IT | Objection: The statement is compound in that it sets forth |

| | |
|---|---|
| alone, U-Haul preliminarily estimates that complying with S.B. 261 would require approximately 30 additional dedicated team members to build and then support processes on an ongoing basis at an estimated cost exceeding $3,000,000 per year, which would rise as personnel costs increase over time. This cost estimate does not include costs outside of U-Haul's IT team and does not include costs for complying with S.B. 253, which would involve additional burdensome steps.<br><br>Shoen Decl. ¶¶ 12-15, 35, 39. | multiple facts; the statement relies on self-serving testimony that should not be credited without an opportunity for cross examination. The term "burdensome" is vague and ambiguous.<br><br>Disputed. The evidence presented is limited to U-Haul alone. The cited evidence does not establish that U-Haul is subject to the requirements of S.B. 253 or S.B. 261. Shoen Decl. (ECF 48-30) ¶¶ 3–5. Plaintiffs state that the cited evidence does not cover S.B. 253. It therefore cannot establish that compliance with either law is "burdensome" for U-Haul, much less for other companies (MSJ 5:3-5). In any event, evidence indicates the burdens of disclosure under S.B. 253 and 261 are lower than Plaintiffs suggest.<br><br>Moreover, Plaintiffs rely on the cited evidence to establish a preliminary estimation of U-haul's |

| | | |
|---|---|---|
| 1 | | |
| 2 | | IT costs for complying with S.B. |
| 3 | | 261. But the cited evidence does |
| 4 | | not attribute the preliminary |
| 5 | | estimation of IT costs to comply |
| 6 | | with S.B. 261, alone. Shoen Decl. |
| 7 | | (ECF 48-30) ¶¶ 10–12. |
| 8 | | |
| 9 | | Disputed that financial and |
| 10 | | administrative burden are material |
| 11 | | to Plaintiffs' First Amendment |
| 12 | | claim. *Am. Hosp. Ass'n v. Azar*, 983 |
| 13 | | F.3d 528, 541 (D.C. Cir. 2020). |
| 14 | | However, if the question of financial |
| 15 | | and administrative burden becomes |
| 16 | | relevant, then Defendants would |
| 17 | | require discovery to genuinely |
| 18 | | dispute these allegations. *See* |
| 19 | | Defendants' Rule 56(d) Motion. |
| 20 | | |
| 21 | | *Evidence:* Cal. Health and Safety |
| 22 | | Code §§ 38532(c)(1)(D)(i) |
| 23 | | (avoiding duplication of reporting), |
| 24 | | 38533(b)(4) (same); SSMF 101-110 |
| 25 | | (Burton Decl. ¶¶ 10–11, 13–16, 36, |
| 26 | | 37(c); Cashion Decl. ¶ 17; Lyon |
| 27 | | Decl. ¶¶ 6, fn 1, 43–46; Georgiev |
| 28 | | Decl. ¶ 30; McLoon Decl., Ex. 3-4); |

| | | |
|---|---|---|
| | | SSMF 170 (Hamburger Decl., Ex. 6 (ECF 48-9) at 8:14-18); SSMF 172 (Burton Decl. ¶¶ 13-16, 19–25, 29–30, 31(h), 34(c), 37; Georgiev Decl. ¶¶ 46, 48-49, 50(e)); SSMF 173-175 (Burton Decl. ¶¶ 29(b), 30(b)-(d), 31(h)); SSMF 176-179 (Burton Decl. ¶ 34; Georgiev Decl. ¶ 46; ECF 48-6 at 22:3–6). |
| 63. | S.B. 261's requirement to discuss risks "including, but not limited to, risks to corporate operations, provision of goods and services, supply chains, employee health and safety, capital and financial investments, institutional investments, financial standing of loan recipients and borrowers, shareholder value, consumer demand, and financial markets and economic health" would require investments of significant time and money that U-Haul would not otherwise make.<br><br>Shoen Decl. ¶¶ 32-38. | Objection: The phrase "S.B. 261's requirement to discuss risks . . . would require investments of significant time and money that U-Haul would not otherwise make" calls for a legal conclusion, and is vague or ambiguous.  The statement relies on self-serving testimony that should not be credited without an opportunity for cross examination. The statement is compound in that it sets forth multiple facts.<br><br>Disputed because the cited evidence does not establish that U-Haul is subject to the requirements of S.B. |

261. Shoen Decl. (ECF 48-30) ¶¶ 3–5.

Disputed that financial and administrative burden are material to Plaintiffs' First Amendment claim. *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020). However, if the question of financial and administrative burden becomes relevant, then Defendants would require discovery to genuinely dispute these allegations. *See* Defendants' Rule 56(d) Motion.

Further disputed to the extent Plaintiffs rely on U-Haul's statement to claim that other companies would face a similar burden.  MSJ 5:3-5.  The evidence presented is limited to U-Haul alone. In any event, evidence indicates the financial and administrative burdens of disclosure under S.B. 261 are lower than Plaintiffs suggest.

| | | |
|---|---|---|
| | | *Evidence:* Cal. Health and Safety Code § 38533(b)(4) (avoiding duplication of reporting); SSMF 101-110 (Burton Decl. ¶¶ 10–11, 13–16, 36, 37(c); Cashion Decl. ¶ 17; Lyon Decl. ¶¶ 6, fn 1, 43–46; Georgiev Decl. ¶ 30; McLoon Decl., Ex. 3-4); SSMF 170 (Hamburger Decl., Ex. 6 (ECF 48-9) at 8:14-18); SSMF 172 (Burton Decl. ¶¶ 13-16, 19–25, 29–30, 31(h), 34(c), 37; Georgiev Decl. ¶¶ 46, 48-49, 50(e)); SSMF 176-179 (Burton Decl. ¶ 34; Georgiev Decl. ¶ 46; ECF 48-6 at 22:3–6). |
| 64. | S.B. 253's requirement to calculate Scope 3 emissions would impose significant costs on U-Haul that U-Haul would not otherwise incur.<br><br>Shoen Decl. ¶¶ 15-27. | Objection: The statement calls for a legal conclusion. The statement relies on self-serving testimony that should not be credited without an opportunity for cross examination.<br><br>Disputed because the cited evidence does not establish that U-Haul is subject to the requirements of S.B. 253. Shoen Decl. (ECF 48-30) ¶¶ 3–5. |

Disputed that financial and administrative burden are material to Plaintiffs' First Amendment claim. *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020). However, if the question of financial and administrative burden becomes relevant, then Defendants would require discovery to genuinely dispute these allegations. *See* Defendants' Rule 56(d) Motion.

Further disputed to the extent Plaintiffs rely on U-Haul's statement to claim that other companies would face a similar burden. MSJ 5:3-5. The evidence presented is limited to U-Haul alone. In any event, evidence indicates the burdens of Scope 3 disclosure under S.B. 253 are lower than Plaintiffs suggest.

*Evidence:* Cal. Health and Safety Code §§ 38532(c)(1)(D)(i) (avoiding duplication of reporting);

|  |  |  | SSMF 101-110 (Burton Decl. ¶¶ 10–11, 13–16, 36, 37(c); Cashion Decl. ¶ 17; Lyon Decl. ¶¶ 6, fn 1, 43–46; Georgiev Decl. ¶ 30; McLoon Decl., Ex. 3-4); SSMF 170 (Hamburger Decl., Ex. 6 (ECF 48-9) at 8:14-18); SSMF 172 (Burton Decl. ¶¶ 13-16, 19–25, 29–30, 31(h), 34(c), 37; Georgiev Decl. ¶¶ 46, 48-49, 50(e)); SSMF 175 (Burton Decl. ¶ 31(h)). |
|  | 65. | S.B. 253's requirement to calculate Scope 1 and 2 emissions would impose significant costs on U-Haul that U-Haul would not otherwise incur.<br><br>Shoen Decl. ¶¶ 13-14. | Objection: The statement calls for a legal conclusion. The statement relies on self-serving testimony that should not be credited without an opportunity for cross examination.<br><br>Disputed because the cited evidence does not establish that U-Haul is subject to the requirements of S.B. 253. Shoen Decl. (ECF 48-30) ¶¶ 3–5.<br><br>Disputed that financial and administrative burden are material to Plaintiffs' First Amendment |

70

claim. *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020). However, if the question of financial and administrative burden becomes relevant, then Defendants would require discovery to genuinely dispute these allegations. *See* Defendants' Rule 56(d) Motion.

Further disputed to the extent Plaintiffs rely on U-Haul's statement to claim that other companies would face a similar burden. MSJ 5:3-5. The evidence presented is limited to U-Haul alone. In any event, evidence suggests the burdens of disclosure under S.B. 253 is lower than Plaintiffs suggest.

*Evidence:* Cal. Health and Safety Code §§ 38532(c)(1)(D)(i) (avoiding duplication of reporting); SSMF 101-110 (Burton Decl. ¶¶ 10–11, 13–16, 36, 37(c); Cashion Decl. ¶ 17; Lyon Decl. ¶¶ 6, fn 1, 43–46; Georgiev Decl. ¶ 30;

|  |  | McLoon Decl., Ex. 3-4); SSMF 170 (Hamburger Decl., Ex. 6 (ECF 48-9) at 8:14-18); SSMF 172 (Burton Decl. ¶¶ 13-16, 19–25, 29–30, 31(h), 34(c), 37; Georgiev Decl. ¶¶ 46, 48-49, 50(e)); SSMF 173-174 (Burton Decl. ¶¶ 29(b), 30(b)-(d)). |
| 66. | Triple H Farm is a family farm that raises beef cattle and markets them in local family-owned livestock auctions.<br><br>Declaration of Garrett Hawkins ("Hawkins Decl.") ¶¶ 1-2. | Defendants lack sufficient knowledge or information to respond to these representations, and on that basis disputes them. Moreover, this fact is not material to the matter at issue. |
| 67. | Triple H Farm is a member of the American Farm Bureau Federation.<br><br>Hawkins Decl. ¶ 1. | Defendants lack sufficient knowledge or information to respond to these representations, and on that basis disputes them. Moreover, this fact is not material to the matter at issue. |
| 68. | Triple H Farm does not operate in California or sell directly to California companies.<br><br>Hawkins Decl. ¶ 2. | Defendants lack sufficient knowledge or information to respond to these representations, and on that basis disputes them. Moreover, this fact is not material to the matter at issue. |

| 69. | Triple H Farm's cattle is in the supply chain of companies that will be required to report their Scope 3 emissions under S.B. 253.<br><br>Hawkins Decl. ¶¶ 2-3. | Objection: The statement calls for a legal conclusion. The statement relies on self-serving testimony that should not be credited without an opportunity for cross examination.<br><br>Disputed.  The cited evidence does not establish that Triple H Farms' cattle are "in the supply chain of companies that will be required to report their Scope 3 emissions under S.B. 253."  Hawkins Decl. (ECF No. 48-31) ¶ 2.  This assertion is speculative.<br><br>Moreover, this fact is not material to the matter at issue.  To the extent it becomes relevant whether or not Triple H Farms' cattle are "in the supply chain of companies that will be required to report their Scope 3 emissions under S.B. 253," Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |

| | | |
|---|---|---|
| | | *Evidence:* Cal. Health & Safety Code § 38532(c)(1)(A)(ii) (providing that Scope 3 emissions can be determined through the use of "secondary data sources," including "industry average data, proxy data, and other generic data" rather than directly from suppliers). |
| 70. | Companies that are subject to S.B. 253 and that purchase Triple H Farm's cattle will be required to include in their Scope 3 emissions reports information about Triple H Farm's emissions.<br><br>Hawkins Decl. ¶¶ 2-3. | Objection: The statement calls for a legal conclusion. The statement relies on self-serving testimony that should not be credited without an opportunity for cross-examination.<br><br>Disputed because the cited evidence does not establish that any company doing business with Triple H Farm is subject to S.B. 253. Hawkins Decl. (ECF No. 48-31) ¶¶ 2–3. Thus, disputed that any company subject to S.B. 253 will be required to include in their Scope 3 emissions reports information about Triple H Farm's emissions. |

74

| | | |
|---|---|---|
| | | Moreover, this fact is not material to the matter at issue. To the extent that it becomes relevant whether or not a company doing business with Triple H Farm is subject to S.B. 253 and will be required to report information about Triple H Farms' emissions in Scope 3 reporting, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion.<br><br>*Evidence:* Cal. Health & Safety Code § 38532(c)(1)(A)(ii) (providing that Scope 3 emissions can be determined through the use of "secondary data sources," including "industry average data, proxy data, and other generic data" rather than directly from suppliers). |
| 71. | Triple H Farm does not track its greenhouse-gas emissions and does not have policies, procedures, or systems in place to do so.<br><br>Hawkins Decl. ¶ 4. | Objection: The statement relies on self-serving testimony that should not be credited without an opportunity for cross examination. |

Defendants lack sufficient knowledge or information to respond to these representations, and on that basis disputes them. Moreover, this fact is not material to the matter at issue, as Plaintiffs have not shown that any company subject to S.B. 253 will be required to include in their Scope 3 emissions reports information about Triple H Farm's emissions and cannot show that any company would need to ask Triple H Farm to track this information itself. Cal. Health & Saf. Code § 38532(c)(1)(A)(ii) (providing that Scope 3 emissions calculations can be determined through "secondary data sources" rather than from the upstream entity itself).

To the extent that it becomes relevant whether or not Triple H Farm tracks its greenhouse-gas emissions or has any policies, procedures, or systems in place to do so, Defendants would require

App.456

| | | |
|---|---|---|
| | | discovery. *See* Defendants' Rule 56(d) Motion. |
| 72. | Developing an emissions tracking process would be enormously burdensome for Triple H Farm. For example, day to day, Triple H Farm requires varying levels of water, fertilizer, and other inputs. Tracking the emissions associated with these and other inputs would be a significant undertaking, for which Triple H Farm's employees have no experience.<br><br>Hawkins Decl. ¶¶ 4-5. | Objection: The statement relies on self-serving testimony that should not be credited without an opportunity for cross examination. The statement is compound in that it sets forth multiple facts. The statement lacks foundation.<br><br>Disputed that financial and administrative burden are material to Plaintiffs' First Amendment claim. *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020). Moreover, Plaintiffs have not shown that any company subject to S.B. 253 will be required to include in their Scope 3 emissions reports information about Triple H Farm's emissions and cannot show that any company would need to ask Triple H Farm to track this information itself. Cal. Health & Saf. Code § 38532(c)(1)(A)(ii) (providing that Scope 3 emissions calculations can |

| | | |
|---|---|---|
| | | be determined through "secondary data sources" rather than from the upstream entity itself).<br><br>Further disputed because the cited evidence does not establish that tracking emissions associated with Triple H Farms' operation "would be enormously burdensome." Hawkins Decl. (ECF No. 48-31) ¶¶ 4.<br><br>To the extent Triple H Farm's alleged burden becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
| 73. | As a family farm, Triple H Farm would be at a significant competitive disadvantage to large farms who could spread the fixed costs of tracking greenhouse-gas emissions over much greater output.<br><br>Hawkins Decl. ¶¶ 5-6. | Objection: The statement relies on self-serving testimony that should not be credited without an opportunity for cross examination; the statement lacks foundation.<br><br>Disputed that financial and administrative burden are material to Plaintiffs' First Amendment |

claim. *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020). Moreover, Plaintiffs have not shown that any company subject to S.B. 253 will be required to include in their Scope 3 emissions reports information about Triple H Farm's emissions and cannot show that any company would need to ask Triple H Farm to track this information itself. Cal. Health & Saf. Code § 38532(c)(1)(A)(ii) (providing that Scope 3 emissions calculations can be determined through "secondary data sources" rather than from the upstream entity itself).

Disputed. The cited evidence does not establish that Triple H Farm is at any competitive disadvantage for "tracking greenhouse-gas emissions," as this statement is conclusory and unsupported. Hawkins Decl. (ECF No. 48-31) ¶ 5.

To the extent the impact of S.B. 253 on Triple H Farm becomes relevant,

| | | Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
|---|---|---|
| 74. | By requiring the firms who purchase Triple H Farm's beef to report their emissions, S.B. 253 may, in turn, require Triple H Farm to state its emissions, including to purchasers.  Triple H Farm would not otherwise make those statements.<br><br>Hawkins Decl. ¶ 7. | Objection: The statement calls for a legal conclusion. The statement relies on self-serving testimony that should not be credited without an opportunity for cross examination. The statement is compound, in that it sets forth multiple facts.<br><br>Disputed.  Plaintiffs have not established that any company subject to S.B. 253 is required to include in their Scope 3 emissions reports information about Triple H Farm's emissions.  And far from "require[ing] Triple H Farm to state its emissions," S.B. 253 provides for Scope 3 emissions to be determined without such emissions data. Cal. Health & Saf. Code § 38532(c)(1)(A)(ii) (providing that Scope 3 emissions calculations can be determined through "secondary |

App.460

| | | |
|---|---|---|
| | | data sources" rather than from the upstream entity itself).<br><br>Further, disputed because the cited evidence does not establish that S.B. 253 will "require" Triple H Farm to state its greenhouse-gas emissions and that it "would otherwise not make these statements," as both statements are speculative and/or conclusory. Hawkins Decl. (ECF No. 48-31) ¶ 7.<br><br>To the extent this statement is relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
| 75. | Triple H Farm does not believe that required emissions reports would be a fair representation of its emissions.<br><br>Hawkins Decl. ¶ 7. | Objection: The statement calls for a legal conclusion. The statement relies on self-serving testimony that should not be credited without an opportunity for cross examination. The statement lacks foundation. The phrase "fair representation of its emissions" is vague and ambiguous. |

| | | |
|---|---|---|
| | | Disputed.  Plaintiffs have not established that any company subject to S.B. 253 is required to include in their Scope 3 emissions reports information about Triple H Farm's emissions.  And the cited evidence does not establish that S.B. 253 requires Triple H Farm to state its greenhouse-gas emissions. Hawkins Decl. (ECF No. 48-31) ¶¶ 2–3, 7. Disputed that any "required emissions reports" would not be a "fair representation" of triple H Farms' emissions. *Id.* ¶ 7.  Triple H has no basis to dispute the accuracy of hypothetical emissions reports prepared by an unknown entity using unknown data.<br><br>To the extent the Court finds this statement relevant, Defendants would require discovery to dispute it. *See* Defendants' Rule 56(d) Motion. |
| 76. | White Farms and Cattle is a family farm, which has been in operation | Defendants lack sufficient knowledge or information to |

| | | |
|---|---|---|
| | for over 100 years and raises wheat, cotton, hay, and cattle.<br><br>Declaration of Michael White ("White Decl.") ¶ 1. | respond to these representations, and on that basis disputes them. Moreover, this fact is not material to the matter at issue. |
| 77. | White Farms and Cattle is a member of the American Farm Bureau Federation.<br><br>White Decl. ¶ 1. | Defendants lack sufficient knowledge or information to respond to these representations, and on that basis disputes them. Moreover, this fact is not material to the matter at issue. |
| 78. | White Farms and Cattle does not operate in California and does not sell directly to California companies.<br><br>White Decl. ¶ 2. | Defendants lack sufficient knowledge or information to respond to these representations, and on that basis disputes them. Moreover, this fact is not material to the matter at issue. |
| 79. | White Farms and Cattle's cattle is in the supply chain of companies that will be subject to Scope 3 reporting requirements under S.B. 253.<br><br>White Decl. ¶ 2. | Objection: The statement calls for a legal conclusion. The statement relies on self-serving testimony that should not be credited without an opportunity for cross examination.<br><br>Disputed.  The cited evidence does not establish that White Farms and |

| | | |
|---|---|---|
| | | Cattle's cattle are "in the supply chain of any company that will be subject to the reporting requirements under S.B. 253." White Decl. (ECF No. 48-32) ¶ 2.<br><br>To the extent that whether White Farms and Cattle's cattle are "in the supply chain of companies that will be subject to the reporting requirements under S.B. 253 becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
| 80. | Companies that are subject to S.B. 253 and that purchase White Farms and Cattle's cattle will be required to include in their Scope 3 emissions reports information about White Farms and Cattle's emissions.<br><br>White Decl. ¶ 3. | Objection: The statement calls for a legal conclusion. The statement relies on self-serving testimony that should not be credited without an opportunity for cross-examination.<br><br>Disputed that any company subject to S.B. 253 "will be required to include in their Scope 3 emissions reports information about White Farms and Cattle's emissions." *Id.* ¶ 3 (citing no evidence). |

Disputed. The cited evidence does not establish that any company that purchases White Farms and Cattle's is subject to S.B. 253. White Decl. (ECF No. 48-32) ¶¶ 2–3. Disputed further that any company subject to S.B. 253 that purchases White Farms and Cattle's cattle "will be required to include in their emissions reports under S.B. 253 information about [White Farms and Cattle's] emissions." White Decl. (ECF No. 48-32) ¶ 3.

Defendants lack sufficient knowledge or information to respond to White Farms and Cattle's representations. To the extent that it becomes relevant whether or not a company doing business with White Farms and Cattle is subject to S.B. 253 and would be required to report information about White Farms and Cattle's emissions in Scope 3 reporting, Defendants would require

| | | discovery. *See* Defendants' Rule 56(d) Motion. |
|---|---|---|
| 81. | White Farms and Cattle does not currently track greenhouse-gas emissions, does not have experience tracking greenhouse-gas emissions, and does not have policies, procedures, or systems in place for tracking, recording, or reporting greenhouse-gas emissions.<br><br>White Decl. ¶ 4. | Objection: The statement relies on self-serving testimony that should not be credited without an opportunity for cross-examination.<br><br>Defendants lack sufficient knowledge or information to respond to these representations, and on that basis disputes them. Moreover, this fact is not material to the matter at issue, as Plaintiffs cannot show that any company subject to S.B. 253 will be required to include in their Scope 3 emissions reports information about White Farms and Cattle's emissions, nor that they would ask White Farms and Cattle to track this information itself. Cal. Health & Saf. Code § 38532(c)(1)(A)(ii) (providing that Scope 3 emissions calculations can be determined through "secondary data sources" rather than from the upstream entity itself). |

86

| | | |
|---|---|---|
| | | To the extent that it becomes relevant whether or not White Farms and Cattle tracks its greenhouse-gas emissions or has any policies, procedures, or systems in place to do so, Defendants would require discovery. See Defendants' Rule 56(d) Motion. |
| 82. | Developing the policies, procedures, or systems for tracking greenhouse-gas emissions would be enormously burdensome for White Farms and Cattle.  For example, on any given day, White Farms and Cattle requires varying levels of water, fertilizer, and crop protection products.  Tracking these fluctuations in the context of measuring greenhouse-gas emissions would be an enormous undertaking, for which White Farms and Cattle has no pre-existing procedures, policies, or systems in place. | Objection: The statement relies on self-serving testimony that should not be credited without an opportunity for cross examination. The statement is compound in that it sets forth multiple facts. The statement lacks foundation.<br><br>Disputed that financial and administrative burden are material to Plaintiffs' First Amendment claim.  *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020). Moreover, Plaintiffs cannot show that any company subject to S.B. 253 will be required to include in their Scope 3 emissions reports |

| | | |
|---|---|---|
| | White Decl. ¶¶ 4-5. | information about White Farms and Cattle's emissions, or that they would ask White Farms and Cattle to track this information itself. Cal. Health & Saf. Code § 38532(c)(1)(A)(ii) (providing that Scope 3 emissions calculations can be determined through "secondary data sources" rather than from the upstream entity itself).<br><br>Further disputed because the cited evidence does not establish that tracking emissions associated with White Farms and Cattle's operation "would be enormously burdensome." White Decl. (ECF No. 48-32) ¶ 4.<br><br>To the extent White Farms and Cattle's alleged burden becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
| 83. | As a family farm, White Farms and Cattle would be at a significant | Objection: The statement relies on self-serving testimony that should |

App.468

| | |
|---|---|
| competitive disadvantage to larger farms who could spread the fixed costs of tracking greenhouse-gas emissions over more units of output.<br><br>White Decl. ¶ 5. | not be credited without an opportunity for cross examination; the statement lacks foundation.<br><br>Disputed that financial and administrative burden are material to Plaintiffs' First Amendment claim. *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020). Moreover, Plaintiffs cannot show that any company subject to S.B. 253 will be required to include in their Scope 3 emissions reports information about White Farms and Cattle's emissions, or that they would ask White Farms and Cattle to track this information itself. Cal. Health & Saf. Code § 38532(c)(1)(A)(ii) (providing that Scope 3 emissions calculations can be determined through "secondary data sources" rather than from the upstream entity itself).<br><br>Disputed because the cited evidence does not establish that White Farms and Cattle is at any competitive |

App.469

| | | |
|---|---|---|
| | | disadvantage for "tracking greenhouse-gas emissions," as this statement is conclusory and unsupported. White Decl. (ECF No. 48-32) ¶ 5.<br><br>To the extent the impact of S.B. 253 on White Farms and Cattle becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
| 84. | If White Farms and Cattle's purchasers are required to report their Scope 3 emissions, White Farms and Cattle, in turn, could be required to make statements about its emissions.<br><br>White Decl. ¶ 7. | Objection: The statement calls for a legal conclusion. The statement relies on self-serving testimony that should not be credited without an opportunity for cross examination. The statement is compound, in that it sets forth multiple facts.<br><br>Disputed that Plaintiffs have established that any company subject to S.B. 253 is required to include in their Scope 3 emissions reports information about White Farms and Cattle's emissions. Further disputed that any entity |

90

| | | |
|---|---|---|
| | | subject to S.B. 253 would ask White Farms and Cattle's to prepare and state its emissions itself. Cal. Health & Saf. Code § 38532(c)(1)(A)(ii) (providing that Scope 3 emissions calculations can be determined through "secondary data sources" rather than from the upstream entity itself).<br><br>Disputed because the cited evidence does not establish that S.B. 253 could require White Farms and Cattle to "make statements about [its] emissions." White Decl. (ECF No. 48-32) ¶ 7.<br><br>To the extent that it becomes relevant that White Farms and Cattle would be required to "make statements about [its] emissions", Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
| 85. | White Farms and Cattle does not believe the statements that it would | Objection: The statement calls for a legal conclusion. The statement |

| | | |
|---|---|---|
| | be required to make about greenhouse-gas emissions would accurately portray White Farms and Cattle's emissions.<br><br>White Decl. ¶ 7. | relies on self-serving testimony that should not be credited without an opportunity for cross examination. The statement lacks foundation. The phrase "accurately portray" is vague and ambiguous.<br><br>Disputed that Plaintiffs have established that any company subject to S.B. 253 is required to include in their Scope 3 emissions reports information about White Farms and Cattle's emissions. Further disputed because the cited evidence does not establish that S.B. 253 requires White Farms and Cattle to state its greenhouse-gas emissions. White Decl. (ECF No. 48-32) ¶¶ 2–3, 7.  Further disputed that any entity subject to S.B. 253 would ask White Farms and Cattle's to prepare and state its emissions itself. Cal. Health & Saf. Code § 38532(c)(1)(A)(ii) (providing that Scope 3 emissions calculations can be determined through "secondary |

92

| | | data sources" rather than from the upstream entity itself). Disputed that any statements that it would be required to make about greenhouse-gas emissions would not "accurately portray" of White Farms and Cattle's emissions. *Id.* ¶ 7. White Farms and Cattle's has no basis to dispute the accuracy of hypothetical emissions reports prepared by an unknown entity using unknown data. To the extent the Court finds this statement relevant, Defendants would require discovery to further dispute it. *See* Defendants' Rule 56(d) Motion. |

| No. | Defendants' Uncontroverted Facts | Supporting Evidence |
|---|---|---|
| 86. | In the Assembly Committee on Natural Resources' May 23, 2023, Analysis of S.B. 253, Senator Scott Weiner identified the purposes of | Declaration of Caitlan McLoon (McLoon Decl.) Ex. 1 at 6–7. |

93

| | | |
|---|---|---|
| | SB 253, including that "SB 253 would bolster California's position as a leader on climate change, will allow for consumers to make informed decisions regarding their patronage of these corporations, and will give policymakers the specific data required to significantly decrease corporate emissions." | |
| 87. | During a May 30, 2023 California Senate Floor Session debate on S.B. 253, Senator Weiner explained that, "SB 253 will allow for much-needed transparency and consistency by requiring full disclosure of the three scopes of emission from all covered corporations." | Hamburger Decl., Ex. 4 (ECF 48-7) at p 3:2–5. |
| 88. | During a March 15, 2023 California Senate Environmental Quality Committee Hearing on S.B. 253, Senator Weiner stated, "Just looking big picture, this [bill] is about information and transparency.  This bill does not | Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25–33:9. |

94

| | | |
|---|---|---|
| | regulate these companies.  It does not require them to do anything to change their missions [sic]. . . . All this does is tell us what your carbon footprint is just like all these other corporations here and around the world are already doing.” | |
| 89. | The California Senate Judiciary Committee April 14, 2023 analysis of S.B. 253 stated, “According to the National Oceanic and Atmospheric Administration (NOAA), global temperatures rose 1.8 degrees Fahrenheit between 1901 and 2020.  While that might not sound like much, global warming to date has caused dramatic global climate change, including increasingly rapid sea level rise, shrinking glaciers, and more erratic weather (such as floods and droughts).” | Hamburger Decl., Ex. 7 (ECF 48-10) at 8. |
| 90. | The California Senate Judiciary Committee April 14, 2023 analysis of S.B. 253 included a statement by bill author Senator Weiner, stating, | Hamburger Decl., Ex. 7 (ECF 48-10) at 7. |

95

| | | |
|---|---|---|
| | "Without [emission reporting] requirements for these corporate entities, California is left without proper information and will not be able to accurately regulate and reduce these emissions." | |
| 91. | The California Senate Judiciary Committee April 14, 2023 analysis of S.B. 253 stated, "requiring very large companies to report scope 1, 2, and 3 emissions serves a legitimate local interest" in part, because "so many companies make unverified climate 'pledges' that may help sell products without making a meaningful difference." | Hamburger Decl., Ex. 7 (ECF 48-10) at 12. |
| 92. | At a March 15, 2023 California Senate Environmental Quality Committee Hearing, Sarah Sachs from Ceres said the following regarding S.B. 253: "The current voluntary climate emissions reporting landscape is fragmented, incomplete, and often unverified . . .creat[ing] a massive blind spot for | Hamburger Decl., Ex. 2 (ECF No. 48-5) at 9:19 – 10:1. |

96

| | | |
|---|---|---|
| | consumers, investors, and policy makers who are seeking to derive meaningful insights across the entire economy." | |
| 93. | Climate risk reporting is increasingly important to underwriters in making risk assessments. | Burton Decl. ¶ 15. |
| 94. | The information disclosed under S.B. 253 and 261 is material to insurance providers. | Burton Decl. ¶ 15; Georgiev Decl. ¶¶ 33, 50(c). |
| 95. | The Greenhouse Gas Protocol is a globally accepted reporting framework. | Burton Decl. ¶¶ 10, 14; Hamburger Decl., ECF 48-5, Ex. 2 at 26:10–25; Hamburger Decl., Ex. 4 (ECF 48-7) at 3:8–11; Hamburger Decl., Ex. 7 (ECF 48-10) at 8–10; Hamburger Decl., Ex. 3 (ECF 48-6) at 2:14-15; Georgiev Decl. ¶¶ 29-30. |
| 96. | The Greenhouse Gas Protocol is aligned with traditional financial reporting principles. | Burton Decl. ¶¶ 10, 17, 19–25, 28. |
| 97. | The TCFD is a globally accepted reporting framework. | Burton Decl. ¶¶ 11, 14, 36, 37(c); Cashion Decl. ¶¶ 17, 21; Hamburger Decl., Ex. 23 (ECF 48-26) at 5–6; Georgiev Decl. ¶ 33. |

97

| 98. | The TCFD is aligned with traditional financial reporting principles. | Burton Decl. ¶¶ 11, 17, 19, 21–25, 37. |
|---|---|---|
| 99. | The TCFD's working groups included representatives of large investors (including BlackRock and UBS Asset Management), banks (JP Morgan, Citibanamex), insurance companies (Aviva, Swiss Re, Axa), giant industrial firms (BHP, Eni, Tata Steel, Unilever), rating agencies (Moody's, S&P), accounting firms (Deloitte, E&Y), and others. | Georgiev Decl. ¶ 33. |
| 100. | The National Association of Insurance Commissioners (NAIC) has endorsed the TCFD reporting framework for use in its annual Climate Risk Disclosure Survey. | Georgiev Decl. ¶ 50(c). |
| 101. | Thousands of companies have for years publicly reported their climate risks and other climate metrics under voluntary frameworks. | Burton Decl. ¶¶ 13–16; Lyon Decl. ¶¶ 43–46; Georgiev Decl. ¶ 30; McLoon Decl., Ex. 3-4. |
| 102. | Under one such voluntary program, known as the CDP (formerly the Carbon Disclosure Project), over 23,000 firms disclosed emissions | Burton Decl. ¶ 14, Ex. 7; Lyon Decl. ¶ 45; McLoon Decl., Ex. 3-4. |

| | | |
|---|---|---|
| | and climate-related risk information in 2023, including 86% of companies in the S&P 500. | |
| 103. | The TCFD is already being used by a significant portion of companies subject to S.B. 261, many of whom voluntarily report this information or are subject to similar reporting requirements from other jurisdictions. | Burton Decl. ¶¶ 11, 14, 36, 37(c); Cashion Decl. ¶ 17. |
| 104. | 58% of public companies surveyed by the Financial Stability Board (FSB) disclosed at least five of the TCFD's 11 recommended climate-risk disclosures. | Burton Decl. ¶ 14, Ex. 9 at iv. |
| 105. | 71% of companies surveyed by the AICPA in 2022 used the TCFD framework for their climate-risk reporting. | Burton Decl. ¶ 14, Ex. 8 at 11. |
| 106. | The GHG Protocols are being used by a significant portion of the companies subject to S.B. 253, many of whom voluntarily report this information or are subject to similar reporting requirements from other jurisdictions. | Burton Decl. ¶¶ 10, 14; Lyon Decl. ¶ 6, fn 1. |
| 107. | Approximately 82% of S&P 500 | Georgiev Decl. ¶ 30. |

99

| | | |
|---|---|---|
| | companies already report Scope 1 and Scope 2 emissions under GHG Protocol methodologies. | |
| 108. | Disclosures of Scope 1 and Scope 2 GHG emissions are frequently included in SEC-filed reports subject to securities law liability and, in many cases, subject to CEO and CFO certifications as to the veracity of the information. | Georgiev Decl. ¶ 30. |
| 109. | 92% of Fortune 500 companies that responded to CDP in 2016 were reported to have utilized the GHG Protocol as the basis for calculating reported emissions. | Burton Decl. ¶ 14, Ex. 3. |
| 110. | Many companies disclose the same or similar information as required under S.B. 253 and 261 because it is relevant to contract formation, insurance coverage, merger and acquisition activity, investor engagement, and consumer outreach. | Burton Decl. ¶¶ 13, 15; Cashion Decl. ¶ 17; Georgiev Decl. ¶ 50(e). |
| 111. | Companies subject to federal securities laws and regulations must disclose information on a variety of topics, all of which are made public, | Georgiev Decl. ¶ 17. |

| | | including corporate governance arrangements, risks faced by the company or associated with investing in its securities; management's assessment of the factors it believes have affected past performance as well as known trends or uncertainties that are reasonably expected to impact future results in the near and long term; and even more esoteric topics, like "golden parachutes," the use of conflict minerals in the supply chain, mine safety, activities in breach of U.S. sanctions on Iran, and more. | |
| 112. | SEC-regulated companies had to report on the impacts to their companies of the "Year 2000" (Y2K) problem, the Covid-19 pandemic, high rates of inflation, and Russia's war on Ukraine. | Georgiev Decl. ¶¶ 19(b), 19(c). |
| 113. | The SEC required companies to make predictive statements about Y2K's impact on their operations, including disclosure both by companies that had not completed | Georgiev Decl. ¶ 19(c). |

101

| | | |
|---|---|---|
| | an assessment of their Y2K issues, and by companies that had completed their assessment and had determined that "the consequences of [their] Year 2000 issues would have a material effect on the company's business, results of operations, or financial condition, without taking into account the company's efforts to avoid those consequences." | |
| 114. | Many multinational companies or U.S.-based companies with international subsidiaries are required—depending on size—to provide emissions and climate risk reporting to the EU's Corporate Sustainability Reporting Directive, and/or the International Sustainability Standards Board's IFRS Sustainability Disclosure Standards. | Hamburger Decl., Ex. 7 (ECF 48-10) at 10; Georgiev Decl. ¶¶ 50(a), 50(b). |
| 115. | During a May 30, 2023 California Senate Floor Session debate on S.B. 253, Senator Wiener stated, "reporting requirements are limited to large point source emitters like | Hamburger Decl., Ex. 4 (ECF 48-7) at 2:7–3:1. |

102

| | | |
|---|---|---|
| | refineries leaving out vast swaths of corporate emissions. Some companies voluntarily report their emissions, but without uniformity around these reports, it's impossible to be certain if emissions are being reported in their entirety . . .[or] at all." | |
| 116. | During a September 11, 2023 California Assembly Floor Session debate on S.B. 253, Assembly member Christopher Ward stated: "Many corporations offer partial reports to the public or they section off parts of their operations to display to the public. So the lack of verification and uniformity allows for manipulations and misrepresentation of the data." | Hamburger Decl., Ex. 6 (ECF 48-9) at 3:10–15. |
| 117. | The GHG Protocol does not require companies to obtain data from suppliers. | Burton Decl. ¶ 31(g); Hamburger Decl., Ex. 8 (ECF 48-11) at 6:19-25. |
| 118. | Over 90% of the 170 companies targeted by the Climate Action 100+ have taken steps to align their climate-related reporting with the TCFD recommendations. | Cashion Decl. ¶ 17. |

103

| 119. | S.B. 261 does not require companies to take any policy position on climate change. | Burton Decl. ¶¶ 35, 38–39; Georgiev Decl. ¶¶ 19-21, 29-33. |
|---|---|---|
| 120. | S.B. 261 allows companies to determine what climate risks, if any, they anticipate will impact their business. | Burton Decl. ¶¶ 35, 38–39. |
| 121. | S.B. 261 does not require companies to take any particular action in regards to climate-related financial risk or adopt any particular business strategy. | Burton Decl. ¶¶ 35, 38–39. |
| 122. | The TCFD framework leaves decisions about the presentation of the underlying information to the reporting entity. | Georgiev Decl. ¶ 32. |
| 123. | The Legislature passed S.B. 253 and 261 in response to the expressed desire of several major companies and investor groups. | Hamburger Decl., Ex. 3 (ECF 48-6) at 7:10–13; Hamburger Decl., Ex. 24 (ECF 48-27) at 6. |
| 124. | Lawmakers were aware of the benefits S.B. 253 disclosures could have for the interests of consumers. | Hamburger Decl., Ex. 2 (ECF No. 48-5) at 10:11-14; Hamburger Decl., Ex. 6 (ECF No. 48-9) at 5:3–13; Hamburger Decl., Ex. 7 (ECF No. 48-10) at 12. |
| 125. | Lawmakers were aware of the benefits S.B. 253 and S.B. 261 | Hamburger Decl., Ex. 5 (ECF 48-8) at 7:4–11; Decl. McLoon Ex. 2 |

| | | |
|---|---|---|
| | disclosures could have for the interests of investors. | (Senate Committee on Environmental Quality Analysis for January 15, 2023 hearing) at 2–3. |
| 126. | Many companies, including economically-significant private companies, already face requests for climate-related information from their contractual counterparties who need to comply with various specialized climate-related reporting requirements of their own. | Georgiev Decl. ¶ 50(e). |
| 127. | Companies are already providing climate-related information to banks and other financial institutions, which are encouraged by prudential regulators to focus on the management of climate-related risk within their portfolios. | Georgiev Decl. ¶ 50(e). |
| 128. | Many companies advertise their business as "green" or emissions conscious. | Hamburger Decl., Ex. 2 (ECF No. 48-5) at 2:25-3:11; Lyon Decl. ¶¶ 19–23. |
| 129. | Many of Plaintiffs' own member companies have advertised themselves as adhering to "net zero" emissions goals and other climate-related adaptation goals. | McLoon Decl., Ex. 5 (Amazon), Ex. 6 (ATT), Ex. 7 (U-Haul). |
| 130. | The Legislature designed Senate | Hamburger Decl., Ex. 2 (ECF No. |

| | | |
|---|---|---|
| | Bills 253 and 261 to, in part, prevent companies from making potentially misleading statements. | 48-5) at 3:3-11, 6:24-25, 33:10-25. |
| 131. | S.B. 253 and 261 provide consumers and investors with information that is accurate, transparent, and comparable. | Lyon Decl. ¶ 28; Burton Decl. ¶ 21. |
| 132. | Traditional financial accounting principles accept the reliance on estimates for calculations. | Burton Decl. ¶¶ 23–25, 28–33; Georgiev Decl. ¶¶ 18-19, 23-27. |
| 133. | The accuracy of federal securities disclosure requirements is underwritten through the use of methodologies that involve sampling techniques, statistical methods, machine learning, informed estimates, and expert judgments. | Georgiev Decl. ¶ 24. |
| 134. | The use of estimates in disclosure requirements promotes accuracy because estimates allow for companies to present a more complete picture of their business and financial condition than would be possible if they were required to limit disclosure to non-estimates. | Georgiev Decl. ¶ 25. |

106

| | | |
|---|---|---|
| 135. | Companies routinely rely on information involving estimates and methodological discretion in making investment and business decisions that involve large financial outlays. | Georgiev Decl. ¶ 26. |
| 136. | Since 1978, public companies have been required to disclose information about the volume, value, and attributes of their oil and gas reserves and related matters as part of federal securities disclosure requirements. | Georgiev Decl. ¶ 23(a). |
| 137. | Information disclosed regarding oil and gas reserves is an essential aspect of the valuation of any company in the extractive industries and firms routinely have to make estimates and assumptions in order to calculate and report it. | Georgiev Decl. ¶ 23(a). |
| 138. | In the context of acquisitions, the volume and valuation of a potential target's oil and gas reserves are of paramount importance. Indeed, the oil and gas M&A boom that occurred during the 1980s has been attributed directly to the disclosure | Georgiev Decl. ¶ 26(a). |

107

| | | |
|---|---|---|
| | of reserve information that resulted from the adoption of an SEC disclosure rule in 1978. | |
| 139. | In the area of financial accounting, companies routinely rely on critical accounting policies and practices that require management to make judgments about the effects of matters that are inherently uncertain, which, in turn, invariably entail critical accounting estimates. | Georgiev Decl. ¶ 23(c). |
| 140. | The use of critical accounting estimates and the development (and disclosure) of critical accounting policies promote accuracy and verifiability and are generally welcomed by the users of the information. | Georgiev Decl. ¶ 23(c). |
| 141. | Traditional financial accounting principles often require companies to choose between equally acceptable accounting policies for various reporting obligations. | Burton Decl. ¶ 31(e). Georgiev Decl. ¶ 25. |
| 142. | Allowing firms to report partial emissions, or to discount their emissions reduction projects (i.e. "avoided emissions"), in lieu of | Lyon Decl. ¶¶ 18–26, 39. |

108

| | | disclosing their total emissions, is highly misleading. | |
|---|---|---|---|
| | 143. | When firms make disclosures relating to anticipated risks in compliance with applicable federal securities requirements, they are reporting their business judgments about the matters in question. The required disclosures are factual to the extent that they accurately report the firm's business judgments. | Georgiev Decl. ¶ 21; Georgiev Decl. ¶¶ 19(a), (d). |
| | 144. | The reality of climate change is uncontroversial in the scientific community. | Scheehle Decl. ¶¶ 7–14; *id.*, Exs. 1–29. |
| | 145. | Consistent with the scientific consensus, studies show that the effects of rising greenhouse gas emissions and temperatures on global climate and weather patterns include rising sea levels, ocean acidification, increasingly intense wildfires, higher risk of flooding, and less reliable snowpack. | Scheehle Decl. ¶¶ 14–17; *id.*, Exs. 15–29. |
| | 146. | The consideration of climate-related risk is uncontroversial in the business community. | Burton Decl. ¶¶ 13–17, 37; Cashion Decl. ¶¶ 9–17. |
| | 147. | The information disclosed under | Burton Decl. ¶ 15; Cashion Decl. ¶¶ |

| | | |
|---|---|---|
| | S.B. 253 and 261 is material to investors. | 10–22; Lyon Decl. ¶¶ 32–40. |
| 148. | CalPERS is the largest public defined benefit pension fund in the United States, with approximately $500 billion in assets. | Cashion Decl. ¶ 5. |
| 149. | CalPERS must discharge its responsibilities for the exclusive purpose of providing benefits to participants and beneficiaries. | Cashion Decl. ¶ 7. |
| 150. | CalPERS supports the disclosure of Scope 1, 2, and 3 emissions because it is material for making its investment decisions. | Cashion Decl. ¶¶ 13–14. |
| 151. | CalPERS supports requiring all companies to disclose their climate-related financial risks, and any measures adopted to reduce and/or adapt to that risk to better understand the financial implications to investments. | Cashion Decl. ¶ 15. |
| 152. | CalPERS has expressed that "[t]he consideration of climate-related financial risk and other factors is a necessary component of being an informed and responsible investor." | Cashion Decl. ¶ 12. |
| 153. | CalPERS has stated that it "sees the | Cashion Decl. ¶ 16. |

110

| | | |
|---|---|---|
| | same risks and would benefit from the same climate related disclosures from private companies" as it does from public companies. | |
| 154. | The value of emissions and climate-risk information to California investors is not limited to the effects within the State, but rather, the performance of the company as a whole and whether the firm is an appropriate recipient of their money. | Cashion Decl. ¶¶ 9–22. |
| 155. | California's public pension funds need to employ active investment strategies that depend on adequate information, because they rely on a defined benefit model. | Georgiev Decl. ¶ 55. |
| 156. | The California state government has a compelling interest in maintaining the health and solvency of California's public pension funds because it functions as the guarantor of the funds' obligations | Georgiev Decl. ¶ 57. |
| 157. | Of the 100 public pension funds nationally that have defined-benefit assets under management over $5 billion, 18 are California-based. | Georgiev Decl. ¶ 56. |

111

| 158. | The total assets represented by those 18 pension funds amount to $1.07 trillion. The share of California's total assets as a percentage of U.S. total assets was 23%. | Georgiev Decl. ¶ 56. |
|---|---|---|
| 159. | The information disclosed under S.B. 253 and 261 is material to consumers. | Lyon Decl. ¶ 41. |
| 160. | The information disclosed under S.B. 253 and 261 is material to employees. | Lyon Decl. ¶ 42. |
| 161. | Greenwashing has increased in prevalence in recent years. | Lyon Decl. ¶ 21. |
| 162. | Voluntary disclosure leads to selective disclosure, which is highly misleading. | Lyon Decl. ¶ 18-26. |
| 163. | The purpose of advertising as green is to increase investor confidence, influence investor and consumer behavior. | Lyon Decl. ¶¶ 6, 18–20. |
| 164. | S.B. 253 and 261 will prevent the prevalence of misleading information on emissions and other metrics by companies doing business in the state. | Lyon Decl. ¶¶ 26–28. |
| 165. | Scope 1, 2, and 3 emissions reporting and climate risk reporting | Lyon Decl. ¶ 10, 17, 26, 36. |

112

| | | |
|---|---|---|
| | are necessary to combat greenwashing. | |
| 166. | There is a concrete connection between implementation of reporting frameworks and improved environmental performance, including in particular between carbon disclosure and GHG emissions reductions | Hamburger Decl., Ex. 1 (ECF No. 48-4) at p 1; Lyon Decl. ¶¶ 47–51. |
| 167. | By closing the informational gap between polluters and their stakeholders, the simple disclosure of environmental performance tends to lead facilities to reduce their emissions of pollutants. | Lyon Decl. ¶¶ 47-51. |
| 168. | The California Legislature considered that, by requiring greater transparency about emissions and climate risks, S.B. 253 and 261 may encourage—through the market forces of third parties' independent economic decisions and actions—companies doing business in California to reduce their emissions and thereby mitigate the risks California and its residents face from climate change | Hamburger Decl., Ex. 1 (ECF No. 48-4) at p 1; Hamburger Decl., Ex. 6 (ECF No. 48-9) at 7:3-8. |

| 169. | The emissions reductions associated with disclosure regimes are a product of independent action by non-governmental stakeholders who use the information. | Burton Decl. ¶¶ 13, 15; Cashion Decl. ¶¶ 11–12, 17, 22. |
|---|---|---|
| 170. | The vast majority of companies with disclosure obligations under S.B. 253 and 261 need expend only 0.025 percent of their annual revenue in preparing the data. | Hamburger Decl., Ex. 6 (ECF 48-9 at 8:14–18). |
| 171. | Companies possess more detailed and accurate data about their own internal operations and impacts than do external observers. | Lyon Decl. ¶ 10, 14. |
| 172. | The vast majority of companies with disclosure obligations under S.B. 253 and 261 already have the reporting infrastructure and data necessary to prepare the required information with minimal burden | Burton Decl. ¶¶ 13-16, 19–25, 29–30, 31(h), 34(c), 37; Georgiev Decl. ¶¶ 46, 48-49, 50(e). |
| 173. | The data sources for scope 1 emissions are common business records available to any organization. | Burton Decl. ¶ 29(b). |
| 174. | The data sources for scope 2 emissions are common business records available to any | Burton Decl. ¶ 30(b)-(d). |

114

| | | organization. | |
|---|---|---|---|
| 175. | The data sources for scope 3 emissions can be calculated using primary data from specific activities within a company's value chain, which in some cases is readily available from third parties or internal company records. | Burton Decl. ¶ 31(h). |
| 176. | The governance disclosure requirements of the TCFD are not challenging to capture as they are similar to governance and oversight disclosures found in financial reporting, simply applied to climate risk. | Burton Decl. ¶ 34(a). |
| 177. | It would be unusual for companies within the scope of S.B. 261 to not have existing strategic and financial planning programs akin to those required by the strategy disclosure under TCFD. | Burton Decl. ¶ 34(b); Georgiev Decl. ¶ 46. |
| 178. | It would be commonplace for entities subject to S.B. 261 to have existing and active risk management practices akin to those required by the risk management disclosure under TCFD. | Burton Decl. ¶ 34(c); Georgiev Decl. ¶ 46. |

| 179. | At an April 18, 2023 California Senate Judiciary Committee Hearing, Senator Scott Weiner, author of S.B. 253 stated, "This is a simple disclosure. We required other disclosures of corporations. This is completely reasonable. Huge corporations are already doing this." | ECF 48-6 at 22:3–6. |
|---|---|---|
| 180. | Scope 3 emissions data is material to investors, consumers, and other stakeholders. | Cashion Decl. ¶ 14; Lyon Decl. ¶ 35–40. |
| 181. | Because of the process undertaken for the reporting of scope 3 emissions information, there is general market consensus that the methods allowed within each category produce meaningful, accurate information. | Burton Decl. ¶ 31(f) |
| 182. | CalPERS has stated that it "supports requiring disclosure of Scope 3 emissions because it is material in all companies." | Cashion Decl. ¶ 14. |
| 183. | Conditioning the Disclosure Laws' applicability on public company status would be ineffective because it would be both underbroad and overbroad. | Georgiev Decl. ¶¶ 39-45. |

116

1 of 779), Page 500 of 779

| 184. | Conditioning the Disclosure Laws' applicability on public company status would be underbroad because it would fail to capture economically significant entities, i.e., private companies that meet the revenue thresholds. | Georgiev Decl. ¶ 41. |
|---|---|---|
| 185. | Conditioning the Disclosure Laws' applicability on public company status alone would be overbroad too, because it would capture at least 1,704 public companies that do not meet S.B. 253's revenue threshold. | Georgiev Decl. ¶¶ 44-45. |
| 186. | The "public company" category increasingly fails to capture economically-significant entities due to a series of recent deregulatory and market developments. | Georgiev Decl. ¶ 37. |
| 187. | No overarching rationale exists for confining the applicability of disclosure obligations to public companies. | Georgiev Decl. ¶ 40. |
| 188. | Multiple existing and recently-proposed disclosure requirements, including from California, from the | Georgiev Decl. ¶ 40. |

117

| | | |
|---|---|---|
| | federal government, and from non-U.S. jurisdictions, rely on the same objective annual revenue metric for applicability as the Disclosure Laws, without regard to public or private status of the company. | |
| 189. | It is unclear whether there any companies doing business in California with over $500 million in annual revenue that lack outside investors, whether public or private. | Georgiev Decl. ¶ 47. |

Dated:  July 24, 2024

Respectfully submitted,

ROB BONTA
Attorney General of California
GARY E. TAVETIAN
MYUNG J. PARK
Supervising Deputy Attorneys General
M. ELAINE MECKENSTOCK
CAITLAN MCLOON
EMILY HAJARIZADEH
DYLAN REDOR
KATHERINE GAUMOND
Deputy Attorneys General

*/s/ Caitlan McLoon*

CAITLAN MCLOON
Deputy Attorney General
*Attorneys for Defendants Liane M. Randolph, Steven S. Cliff, and Robert A. Bonta*

SA2024300503
66957261.docx

# CERTIFICATE OF SERVICE

Case Name:    **Chamber of Commerce of the United States of America, et al.**
**v. Liane M. Randolph, et al.**

Case No.:    **2:24-cv-00801-ODW-PVC**

I hereby certify that on July 24, 2024, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANTS' SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on July 24, 2024, at Los Angeles, California.

| Beatriz Davalos | /s/ Beatriz Davalos |
|---|---|
| Declarant | Signature |

1   ROB BONTA
    Attorney General of California
2   GARY E. TAVETIAN (SBN 117135)
    MYUNG J. PARK (SBN 210866)
3   Supervising Deputy Attorneys General
    M. ELAINE MECKENSTOCK (SBN 268861)
4   CAITLAN MCLOON (SBN 302798)
    EMILY HAJARIZADEH (SBN 325246)
5   DYLAN REDOR (SBN 338136)
    KATHERINE GAUMOND (SBN 349453)
6   Deputy Attorneys General
     300 South Spring Street, Suite 1702
7    Los Angeles, CA  90013-1230
     Telephone:  (213) 269-6438
8    Fax:  (916) 731-2128
     E-mail:  Caitlan.McLoon@doj.ca.gov
9   *Attorneys for Defendants Liane M. Randolph,*
    *Steven S. Cliff, and Robert A. Bonta*

11          IN THE UNITED STATES DISTRICT COURT

12       FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION,**<br><br>Plaintiffs,<br><br>v.<br><br>**LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, and STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California,**<br><br>Defendants. | 2:24-cv-00801-ODW-PVC<br><br>**DECLARATION OF THOMAS P. LYON IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON CLAIM I**<br><br>Date:          September 9, 2024<br>Time:         1:30 p.m.<br>Courtroom:  5D<br>Judge:        The Honorable Otis D. Wright, II<br>Trial Date:  Not Set<br>Action Filed: 1/30/2024 |

1

## DECLARATION OF THOMAS P. LYON

I, Thomas P. Lyon, hereby declare:

1.      I have been retained by counsel for Defendants Liane M. Randolph, Steven S. Cliff, and Robert A. Bonta, in their official capacities, (Defendants) in connection with the above captioned litigation.  I have actual knowledge of the matters stated in this declaration and can truthfully testify to the matters contained herein.

2.      I am the Dow Chair of Sustainable Science, Technology, and Commerce at the University of Michigan, with appointments in both the Ross School of Business and the School for Environment and Sustainability (SEAS).  I received my Bachelor's of Science in engineering from Princeton University and my Masters and PhD degrees in Engineering-Economic Systems from Stanford University.  I am the author of five books and over 70 journal articles, which have been cited over 12,000 times.  I have served for 8 years as Faculty Director of the Erb Institute for Global Sustainable Enterprise at University of Michigan, and for 5 years as President of the Alliance for Research on Corporate Sustainability (ARCS).  I have been a visiting scholar at the University of Chicago, Stanford University, the University of Paris, Resources for the Future, and the US Department of Justice.  I received the Distinguished Scholar Award from the Organizations and the Natural Environment Division of the Academy of Management in 2022, and the World Sustainability Award from the MDPI Sustainability Foundation in 2023.  A true and correct copy of my CV is attached hereto as Exhibit (Ex.) 1.

3.      My research focuses on the drivers and the impacts of corporate sustainability initiatives.  I have written articles on government regulation, industry self-regulation, voluntary environmental programs, environmental information disclosure, greenwashing, and corporate political responsibility.  My 2011 paper

2

with John Maxwell, *Greenwash: Corporate Environmental Disclosure under Threat of Audit*, in the *Journal of Economics and Management Strategy*, launched the serious scholarly study of greenwash, i.e. misleading corporate sustainability claims. I have since written five additional papers on the subject, and this corpus of work has been cited nearly 3,500 times.

4.     Greenwashing appeared to be in decline by 2016, but it has since surged as investment firms proliferated portfolios designed around environmental, social and governance (ESG) criteria and companies scrambled to produce "net zero" plans for decarbonization. Media are paying close attention: my work on greenwash has been profiled by the *Princeton Alumni Weekly*, the *San Francisco Chronicle*, the *Financial Times*, and the *American Association for the Advancement of Science*, and it featured prominently in my winning the World Sustainability Award in 2023.

5.     Methodology:

a.     I have been asked by the California Department of Justice to submit this declaration, based on my independent opinions and expertise, regarding the importance of information in markets, the roles of mandatory and voluntary disclosure, the relevance of environmental disclosure to investors and other stakeholders, the impacts of disclosure on environmental performance, and the dangers of greenwashing.

b.     I have read and am familiar with California Senate Bills 253 and 261 (S.B. 253 and S.B. 261).

c.     I have read and am familiar with the Motion for Summary Judgment filed by Plaintiffs United States Chamber of Commerce, et al. in the above captioned matter, and the supporting materials attached thereto.

d.     In developing my expert opinions for this declaration, I consulted a wide range of scholarly literature on the topics I am discussing, drawing from fields that include economics, management, accounting and finance. The key

3

1  research papers on which I rely are cited below and copies of them will be made
2  available.  I also reviewed work by consultants such as KPMG and non-profits such
3  as InfluenceMap for their insights on these matters.

4        e.    I have relied on information that is customarily reviewed and
5  relied upon by experts in my field of corporate sustainability, which studies the
6  causes and consequences of environmentally-friendly corporate actions.  This is a
7  field that has grown rapidly since I helped to found the Alliance for Research on
8  Corporate Sustainability (ARCS), and hosted the first ARCS conference at the
9  University of Michigan in 2009.  There is now a large body of research on the
10 factors driving corporate sustainability initiatives, as well as their environmental
11 impact, and disclosure has been a major theme in this body of work.

12       f.    I have also relied on my own personal knowledge, training, and
13 experience in the field of economics, and in corporate sustainability in particular.
14 As can be seen from my C.V., I have written numerous papers on the impacts of
15 disclosure on financial and environmental performance, theoretical and empirical
16 analyses of greenwashing, and the factors driving carbon emissions reductions at
17 the facility level.

18 **<u>Summary</u>**

19     6.    In this declaration, I will provide support for the following
20 conclusions: Markets cannot function efficiently without full information.
21 Voluntary disclosure alone is generally insufficient to ensure that stakeholders
22 receive full information and tends to lead to misleading environmental claims, or
23 "greenwashing."  Greenwashing harms a firm's stakeholders and undermines trust
24 in markets more broadly.  Disclosure of environmental performance (including a
25 firm's carbon footprint[1]) is considered material by investors, consumers and

---

26     [1] A firm's carbon footprint is the sum total of greenhouse gas emissions for which the
27 firm is responsible.  I use the term in the way that life-cycle analysts use it, that is, to refer to all
    emissions associated with the production of the firm's products, from "cradle to grave," meaning
28 the emissions associated with all inputs, the production process itself, distribution, use of the

4

1   employees, and hence is "closely tethered" to market transactions.  Carbon

2   disclosure is already widely practiced by firms around the world.  Requiring the

3   disclosure of emissions does not mandate any reduction in emissions, so it is very

4   different from traditional regulatory approaches to emissions reduction.

5   Nevertheless, by closing the informational gap between polluters and their

6   stakeholders, the simple disclosure of environmental performance tends to lead

7   facilities to significantly reduce their emissions of pollutants.

8   **Markets cannot function efficiently without full information**

9       7.    One of the greatest accomplishments of the field of economics was to

10  show that under certain conditions competitive markets deliver efficient outcomes

11  in which it is impossible to make anyone better off without making someone else

12  worse off.  The 1983 Nobel Prize in Economics was awarded to Gerard Debreu for

13  his work establishing the conditions for general equilibrium.  Markets are

14  extraordinarily valuable social institutions, to which we in capitalist countries owe

15  much of our economic well-being.

16      8.    However, if the requisite conditions fail, then markets may perform

17  poorly.  One of the critical requirements is that of full information.  Over the last 50

18  years, economic research has shown that if some individuals hold private

19  information about key aspects of products and services, then market outcomes may

20  be severely degraded.  The 2001 Nobel Prize in Economics was awarded to George

21  Akerlof, Michael Spence, and Joseph Stiglitz for their work on markets with

22  asymmetric information.  When sellers possess private information about the

23  quality of the products on offer, high-quality goods may be driven out of the

24  market, leaving only a "market for lemons."  George A. Akerlof, *The Market for*

25  *'Lemons': Quality Uncertainty and the Market Mechanism*, 84(3) Q. J. of Econ.

26  488, 488–500 (1970), attached hereto as Exhibit (Ex.) 2.  When employees possess

27  product, and disposal of the product at end of life.   The Greenhouse Gas Protocol is the most
    widely accepted methodology for measuring a firm's carbon footprint.  See further, Greenhouse
28  Gas Protocol, https://ghgprotocol.org/ (last visited July 19, 2024).

1    private information about their own capabilities, employers may be unable to

2    separate high-quality from low-quality employees, thereby driving down their

3    productivity.  Michael Spence, *Job Market Signaling*, 87(3) Q. J. of Econ. 355,

4    355–374 (1973), attached hereto as Ex. 3.  When borrowers possess private

5    information about their credit-worthiness, banks may be forced to ration credit,

6    thereby reducing the productivity of capital markets.  Joseph E. Stiglitz & and

7    Andrew Weiss, *Credit Rationing in Markets with Imperfect Information*, 71(3) The

8    Am. Econ. Rev. 393, 393–410 (1981), attached hereto as Ex. 4.  In all of these

9    cases, asymmetric information undermines market performance.

10        9.    Even that great apostle of "free markets," Milton Friedman, who

11   argued in his famous New York Times Magazine opinion piece that, "there is one

12   and only one social responsibility of business—to use its resources and engage in

13   activities designed to increase its profits," recognized that this only works if

14   business "*engages in open and free competition without deception or fraud.*"

15   Milton Friedman, *A Friedman Doctrine: The Social Responsibility of Business is to*

16   *Increase Its Profits*, N.Y. Times, Sept. 13, 1970,

17   https://www.nytimes.com/1970/09/13/archives/a-friedman-doctrine-the-social-

18   responsibility-of-business-is-to.html, attached hereto as Ex. 5 (emphasis added).

19   When some market participants are deprived of information about material facts

20   relevant to business performance, then there is no longer any presumption that free

21   markets produce efficient or desirable outcomes for society.

22        10.   Companies typically possess more detailed and accurate data about

23   their own internal operations, the risks and opportunities they face, and the

24   environmental impacts they create than do external observers.  This private

25   information might be termed "subjective" since it is only known truly by the firm,

26   especially when it comes to assessing the risks and opportunities to which the

27   company is exposed.  Nevertheless, this private information is critically important

28   for investors and other stakeholders.  In fact, without this information, investors can

be taken advantage of by insiders, which is why the Securities Exchange Act of 1934 (the "Act") places strict rules on insider trading and requires publicly traded companies to disclose material information to present and potential shareholders. Because companies guard closely their private information, it is extremely difficult for government or external ratings organizations to estimate a firm's financial risks and opportunities as accurately as can the company itself. Hence the Act requires the companies to prepare the disclosures themselves. In similar fashion, S.B. 261 requires companies to disclose their climate-related financial risk and present the measures, if any, they have taken to reduce and adapt to it. In addition, because companies are closer to their own internal operations and their supply chains than anyone else, S.B. 253 requires companies to measure and disclose their carbon emissions.

**Voluntary disclosure is generally insufficient to provide full information**

11. One might hope that companies with strong performance records and rosy prospects would have incentives to voluntarily disclose all relevant information to their investors and other stakeholders. Some of them do so. But the world of finance offers a long, sad litany of examples of financial chicanery and shenanigans, including such familiar examples as Enron, Tyco and WorldCom, companies that robbed many people of their life savings. This is why business school courses in financial accounting teach budding investors all the many ways companies can mislead them by manipulating earnings statements.

12. In theory, and under certain special conditions, voluntary disclosure may be sufficient to provide full information to a market. To begin with, the receiver of information must be highly rational, sophisticated and utterly skeptical about corporate statements. She must assume the worst about any firms that fail to fully disclose all relevant information. And she must be able to costlessly verify the claims made by the company. If these conditions hold, then in theory voluntary disclosure can be sufficient to produce a so-called "unraveling" effect, whereby all

7

1    firms fully disclose in order that investors not assume the worst about them.  Paul

2    Milgrom & John Roberts, *Relying on the Information of Interested Parties*, 17(1)

3    The RAND J. of Econ. 18, 18–32 (1986), attached hereto as Ex. 6.

4        13.    In practice, however, the conditions for voluntary disclosure to create

5    full information seldom hold.  It is typically costly for receivers of information to

6    verify corporate claims, especially claims about environmental and social

7    performance.  In fact, for many environmental claims, it is essentially impossible

8    for most external stakeholders to verify a corporate claim.  How should an investor

9    verify claims about a firm's toxic chemical emissions?  How should a consumer

10   verify a firm's claims about its treatment of its employees in other countries?  How

11   should an employee verify a firm's claims about the safety of its workforce?

12   Moreover, there is a substantial body of research showing that in the real world,

13   investors are not always the paragons of steely, hard-headed rationality that they are

14   sometimes depicted as, and are in fact often easily misled.  James D. Westphal &

15   Edward J. Zajac, *The Symbolic Management of Stockholders: Corporate

16   Governance Reforms and Shareholder Reactions*, 43(1) Admin. Sci. Q. 127, 127–

17   153 (1998), attached hereto as Ex. 7.  Even though one might suppose that investors

18   fully and instantly make use of all publicly available information (this is the so-

19   called "efficient market hypothesis"), research shows that investors respond to

20   ratings and rankings that process publicly available information in new and more

21   convenient forms, something that would not happen if markets were already fully

22   efficient.  Thomas P. Lyon & Jay P. Shimshack, *Environmental Disclosure:

23   Evidence from Newsweek's Green Companies Rankings*, 54(5) Bus. & Soc'y 632,

24   632–675 (2015), attached hereto as Ex. 8.

25       14.    As voluntary disclosure grows more common, it becomes increasingly

26   possible for analysts to use data disclosed to the CDP to estimate the emissions of

27   non-disclosing firms using statistical models based on observable data, such as

28   industry, size, revenues, purchasing spend and similar measures.  Although it can

8

seem tempting to just rely on these estimates and not require the disclosure of actual data, there are a number of problems with such an approach. To begin with, outside estimates can never be as accurate as actual reports. One recent study found that even for the relatively well-understood Scope 1 and Scope 2 emissions, the correlations between estimates from different data providers were only between 0.63 and 0.79. Patrick Bolton & Marcin Kacperczyk, *Do Investors Care About Carbon Risk?*, 142 J. of Fin. Econ. 517, 521 (2021), attached hereto as Ex. 9. Thus, there are significant accuracy limitations to using estimated data instead of actual reported data.

15.    In addition, it is important to recognize that all analyst estimates extrapolate from data that either must be disclosed by law already (Scope 1 emissions disclosed to the EPA's GHG Reporting Program) or voluntarily disclosed (which may include Scopes 1, 2, and 3), usually to CDP, by firms that do their own internal homework to measure their emissions. There is no guarantee that the firms that choose to disclose are representative of the firms that refuse to do so. Moreover, recent research shows that individual facilities are gradually cutting their emissions over time, but at rates that vary depending upon local conditions. Glen Dowell & Thomas Lyon, *Beliefs Matter: Local Climate Concerns and Industrial Greenhouse Gas Emissions in the United States*, J. of Bus. Ethics 1, 1–24 (2024), attached hereto as Ex. 10. Estimates will inevitably fail to capture this potentially growing source of disparity across firms.

16.    Moreover, the old adage "you can't manage what you don't measure" applies here. Only by becoming conversant with the real emissions of their own facilities and of their individual suppliers can businesses learn to manage their emissions. Leaving the job of estimation to external analysts shifts the responsibility for measurement to third parties who cannot manage company emissions. Requiring disclosure incentivizes companies to develop capabilities for both measuring and managing their emissions. There is a substantial amount of

9

1  research that shows disclosure leads to emissions reductions, as I discuss in detail
2  below.

3      17.    In short, voluntary disclosure is generally insufficient to provide full
4  information in markets, especially for performance attributes that are difficult for
5  external observers to verify, such as environmental and social performance or
6  future business risks and opportunities.  Although the emissions of non-disclosers
7  can be estimated by outsiders, this process will always be imperfect and reliance on
8  external estimates will fail to incentivize companies to build the capabilities needed
9  to reduce emissions.

10  **Voluntary disclosure tends to lead to greenwashing**

11      18.    Not only is voluntary disclosure insufficient to ensure that markets
12  have full information, it can systematically distort market information in ways that
13  are highly misleading, a practice known as "greenwashing" when it involves
14  environmental information.  Thomas P. Lyon & John W. Maxwell, *Greenwash:*
15  *Corporate Environmental Disclosure under Threat of Audit*, 20(1) J. of Econ. &
16  Mgmt. Strategy 3, 3–41 (2011), attached hereto as Ex. 11; Eun-Hee Kim & Thomas
17  P. Lyon, *Strategic Environmental Disclosure: Evidence from the DOE's Voluntary*
18  *Greenhouse Gas Registry*, 61(3) J. of Env't Econ. & Mgmt. 311, 311–326 (2011),
19  attached hereto as Ex. 12.  Firms—like individuals---often have incentives to
20  disclose information that is favorable to them and to withhold information that is
21  damaging.  At best, this leads to an incomplete picture of the firm's overall
22  performance.  In practice, however, it is likely to lead to a misleadingly positive
23  view of firm performance, by creating a "halo effect" that leads stakeholders to
24  believe that unreported dimensions of performance are also likely to be positive.
25  (Declaration of Thomas P. Lyon in support of Defendants' Opposition to Plaintiffs'
26  Motion to Dismiss (Lyon Decl.), Ex. 11 at 5.)  This is especially likely for firms
27  with middling reputations.  Firms with flawless reputations have little negative
28  information to disclose, and firms with terrible reputations have little to lose by

exposing their dirty laundry, since they are already expected to be bad.  Firms with middling reputations, however, may be able to improve their image through the selective disclosure of good performance on certain dimensions of behavior.  *Id*. at 23–24.

19.     Empirical evidence supports the existence of a halo effect.  In 2010, the Federal Trade Commission (FTC) contracted with Harris Interactive, a leading market research firm, to conduct large-scale survey experiments of 3,777 respondents to study the extent of the halo effect.  They found that an unqualified claim that a product is "green" led 27% of respondents to believe the product had no environmental impacts at all, something that it literally impossible.  Even carefully delimited and narrow claims led 17% of respondents to believe that the product in question had no environmental impacts whatsoever.  Guides for the Use of Environmental Marketing Claims, 75 Fed. Reg. 63552, 63562 (proposed Oct. 15, 2010) (to be codified at 16 CFR Part 260).  Even respondents who did not take such an extreme view tended to believe that a narrow claim also implied a broader set of green credentials.  With halo effects this strong, greenwashing is easy for firms with an interest in misleading their consumers.

20.     Selective disclosure is among the most common ways in which firms greenwash, but it is far from the only one.  Thomas P. Lyon & A. Wren Montgomery, *The Means and End of Greenwash*, 28(2) Org. & Env't 223, 223–249 (2015), attached hereto as Ex. 13; Noémi Nemes et al., *An Integrated Framework to Assess Greenwashing*, 14(8) Sustainability 4431 (2022), attached hereto as Ex. 14.  Other ways include the use of vague claims ("this product is green", "this product is natural"), failing to provide substantiation for claims, making irrelevant claims ("our farm is fish friendly" even though there are no streams running through it), liberally using the color green in advertising or promotions to suggest that a company is environmentally friendly even when it is not, and making small operational improvements while using political clout to block climate policy.  Lyon

11

1 Decl., Ex. 14; Thomas P. Lyon, et al., *CSR needs CPR: Corporate sustainability*
2 *and politics*, 60(4) Cal. Mgmt. Rev. 5, 5–24 (2018), attached hereto as Ex. 15.

3     21.    Although greenwashing once seemed to be in decline, perhaps due to
4 growing consumer awareness and sophistication, it has re-emerged with a
5 vengeance in recent years. A. Wren Montgomery, Thomas P. Lyon, & Julian Barg,
6 *No End in Sight? A Greenwash Review and Research Agenda*, Org. & Env't 1, 1–3
7 (2023), DOI:10860266231168905, attached hereto as Ex. 16. Figure 1, from
8 Montgomery et al. (2023) (Ex. 16), shows a sharp increase in news stories about
9 greenwashing since 2016, which the authors find is largely driven by unverifiable
10 environmental, social and governance (ESG) claims and questionable corporate net
11 zero plans.



Figure 1: News articles mentioning greenwash. Lyon Decl., Ex. 16 at 2.

22     22.    Although much of the concern about greenwashing focuses on direct
corporate claims, even "intermediated" voluntary disclosures (i.e., those made
through an intermediary that collects and presents the information) can involve
greenwashing. For example, the US Department of Energy's Voluntary
Greenhouse Gas Registry, created by section 1605b of the Energy Policy Act of
1992, allowed firms great latitude in how to report their emissions reductions.
Lyon Decl., Ex. 12 at 3. The vast majority of firms reporting to the Registry (85%)

1    chose to report only the actions they had taken to reduce emissions (what plaintiffs

2    dub "Scope 4" emissions) and chose not to disclose their actual carbon footprint.

3    *Id*. at 10–11. In fact, as shown in Figure 2 below, participants in the 1605b

4    program reported substantial emissions reductions while their actual reductions

5    were negative, i.e. their carbon footprints were growing rapidly.



Figure 2: Reported vs. Actual Reductions in the DOE's 1605b Program. Lyon Decl. Ex. 12 at 11.

17        23.    In addition, as shown in Figure 3, the firms that chose to report to the

18   Registry at all were increasing their emissions over time, i.e., they had negative

19   actual reductions, while those that did not report were decreasing their emissions

20   over time, i.e. they had positive actual reductions. Lyon Decl. Ex. 12 at 12.

13



Figure 3: Actual Reductions by Non-Participants and Participants in the 1605b Program.  Lyon Decl. Ex. 12 at 12.

24.   Overall, the voluntary nature of the DOE's 1605b program allowed firms to selectively disclose and thereby produce highly misleading reports.  In other words, the program itself facilitated greenwashing.  The experience with this program offers important insights for how to design future disclosure programs to prevent the possibility of greenwashing, and shows the dangers of focusing on corporate projects to reduce emissions (dubbed "Scope 4" emissions in plaintiffs' filing).

25.   Similar problems exist with other voluntary programs of intermediated disclosure.  For example, some firms reporting to CDP (formerly called the Carbon Disclosure Project) claim a reduction in emissions from one year to the next that is inconsistent with the difference in the firm's total emissions between the two years, apparently hoping that readers of the reports will not notice.  Patrick Callery & Jessica Perkins, *Detecting False Accounts in Intermediated Voluntary Disclosure*, 7(1) Acad. Of Mgmt. Discoveries 40, 40–56 (2021), attached hereto as Ex. 17. Moreover, the firms that engage in this practice tend to do so on a regular basis, suggesting it is a strategic rather than an inadvertent effort at misleading the investors who rely on CDP reports.  *Id*. at 52–54.

14

26.    It is important to recognize that greenwashing can occur either through a failure to fully disclose a firm's actual carbon footprint (as occurred in the DOE's 1605b program), or through a failure to disclose the physical and transition risks to which a firm is exposed.  For example, a firm may discuss its "net zero plan" with great fanfare, implying that it is well prepared to deal with carbon-related financial risks.  However, if that plan is marred by greenwash, which recent research suggests is a common problem, then investors may be misled regarding the actual level of risk to which the firm is exposed.  Melissa Aronczyk, Patrick McCurdy, & Chris Russill, *Greenwashing, Net-Zero, and the Oil Sands in Canada: The Case of Pathways Alliance*, (112) Energy Res. & Soc. Sci. 103502, at 1–2 (2024), attached hereto as Ex. 18; Lyon Decl., Ex. 13 at 223–224 .

**Mandatory rules for disclosure are necessary to prevent greenwash**

27.    As explained above, experience with voluntary disclosure—either unmediated corporate claims or intermediated disclosure---shows that allowing firms to choose whether or how to report can be highly misleading.  In order to prevent misleading selective disclosure, it is necessary to prescribe certain aspects of disclosure.  Michael J. Fishman, & Kathleen M. Hagerty, *The Optimal Amount of Discretion to Allow in Disclosure*, (105)(2) The Q. J.of Econ. 427, 427–444 (1990), attached hereto as Ex. 19.  In the case of the DOE's Voluntary Greenhouse Registry, for example, this could have taken the form of requiring disclosure of a firm's overall carbon footprint.  Lyon Decl. Ex. 12, at 2.  Simply allowing firms to report their emissions reduction projects (what plaintiffs dub "Scope 4 emissions") without disclosing their overall footprint, was highly misleading.  In order to prevent this sort of greenwashing, mandatory rules that explicitly lay out required disclosures are needed to protect stakeholders.

28.    Mandatory disclosure on a consistent basis prevents greenwashing, ensures that stakeholders have comparable information about all the firms in their consideration set, enables stakeholders to make better decisions, and enables

15

1    markets to function efficiently.

2    **Greenwashing harms a firm's stakeholders, and the market more**

3    **broadly**

4        29.    Greenwashing harms consumers, employees, investors, and citizens by

5    depriving them of accurate information about the environmental impacts of

6    products and companies. This makes it impossible for these stakeholders to make

7    informed choices that best satisfy their own preferences. Consumers who are

8    seeking to buy greener products end up buying products they did not prefer. Ravi

9    Dutta-Powell, Joshua J. Rhee, & Saul Wodak, *Two Interventions for Mitigating the*

10   *Harms of Greenwashing on Consumer Perceptions*, 33 (2) Bus. Strategy & the

11   Env't 882, 882–903 (2024), attached hereto as Ex. 20. Employees who prefer to

12   work for an environmentally friendly company end up working for companies

13   whose practices do not align with their own values. Jennifer L. Robertson, A. Wren

14   Montgomery, & Timur Ozbilir, *Employees' Response to Corporate Greenwashing*,

15   32(7) Bus. Strategy & the Env't 4015, 4015–4027 (2023), attached hereto as Ex.

16   21. Investors seeking to build a green portfolio inadvertently end up putting their

17   money into brown investments. Ellen Pei-yi Yu, Bac Van Luu, & Catherine

18   Huirong Chen, *Greenwashing in Environmental, Social and Governance*

19   *Disclosures*, (52) Res. in Int'l Bus.& Fin. 101192 (2020), attached hereto as Ex. 22.

20   Citizens who want to see their country make progress on environmental protection

21   are lulled into complacency by the belief that business is "taking care of things" on

22   its own, and end up without the public policies that would ensure that even laggard

23   firms make real progress. Neil Malhotra, Benoît Monin, & Michael Tomz, *Does*

24   *Private Regulation Preempt Public Regulation?*, 113(1) Am. Pol. Sci. Rev., 19, 19–

25   37 (2019), attached hereto as Ex. 23.

26       30.    In addition to the harms that greenwashing imposes on consumers,

27   employees, investors and citizens, it also harms rival firms that are authentically

28   green. These firms make the investments needed to reduce their environmental

1   impacts, but they are put at an unfair competitive disadvantage when they must

2   compete with firms that make strong environmental claims but do not incur the

3   costs of actually being green.  Stephen F. Hamilton & David Zilberman, *Green*

4   *Markets, Eco-Certification, and Equilibrium Fraud*, 52(3) J. of Env'l Econ. and

5   Mgmt. 627, 627–644 (2006), attached hereto as Ex. 24.  Moreover, greenwashing

6   causes systemic damage because it undermines consumer trust in green markets

7   more generally.  As consumers are exposed to more and more greenwash, they

8   become increasingly skeptical of any green claims, making it more difficult for

9   authentically green firms to deliver their messages in a convincing manner.

10  KPMG, *Avoiding the Greenwash Peril: Best Practices for the Asset Management*

11  *Sector* (2023), https://assets.kpmg.com/content/dam/kpmg/ie/pdf/2023/01/ie-

12  getting-ahead-of-greenwashing.pdf, attached hereto as Ex. 25.

13      **Environmental disclosure is considered material by investors, consumers**

14  **and employees, and hence is "closely tethered" to market transactions**

15      31.    A large body of research shows that environmental performance is

16  material to stakeholders, and hence disclosure is closely tethered to market

17  transactions.

18      *Investors*

19      32.    With regard to investors, there is a large body of literature examining a

20  range of different disclosure settings, which consistently find disclosure material to

21  investors, in the sense that information about environmental performance influences

22  share prices.  One of the most widely studied disclosure programs is the Toxic

23  Release Inventory (TRI), which was created by the Emergency Planning and

24  Community Right-to-Know Act of 1986 (42 USC §§ 11001 et seq.), authorized by

25  Title III of the Superfund Amendments and Reauthorization Act and administered

26  by the Environmental Protection Agency (EPA).  The Act requires that all facilities

27  that produce more than a threshold level of a group of potentially toxic chemicals

28  must disclose how much of each they emitted, and whether they released those

17

1  chemicals into air, land or water.  42 USC § 11002.  The first reporting year for the

2  TRI was 1988, and research found that firms that emitted more TRI chemicals

3  suffered larger reductions in share value in June 1989 when initial disclosures were

4  made.  James T. Hamilton, *Pollution as News: Media and Stock Market Reactions*

5  *to the Toxics Release Inventory Data*, 28(1) J.of Env't Econ.& Mgmt. 98, 98–113

6  (1995), attached hereto as Ex. 26; Shameek Konar & Mark A. Cohen, *Information*

7  *as Regulation: The Effect of Community Right to Know Laws on Toxic Emissions*,

8  32(1) J. of Env't Econ. & Mgmt. 109, 109–1274 (1997), attached hereto as Ex. 27.

9  The average firm with toxic emissions lost $4 million in share value on the day

10  releases were first made public.  Lyon Decl., Ex. 26.  Subsequent work found that

11  toxic emissions led to an intangible liability of roughly $380 million for the average

12  firm in the S&P 500. Shameek Konar & Mark A. Cohen, *Does the Market Value*

13  *Environmental Performance?*, 83(2) The Rev. of Econ. &Stat. 281, 281-289

14  (2001), attached hereto as Ex. 28.

15      33.      More general information about corporate environmental performance

16  also moves share prices.  For the period from 1985 to 1991, and for all publicly

17  traded firms on the New York Stock Exchange and the American Stock Exchange,

18  firms winning environmental awards enjoyed share price increases of 0.63% on

19  average, while firms experiencing environmental crises suffered share price drops

20  of 1.5% on average.  Robert D. Klassen & Curtis P. McLaughlin, *The Impact of*

21  *Environmental Management on Firm Performance*, 42(8) Mgmt. Sci. 1199, 1207–

22  1209 (1996), attached hereto as Ex. 29.  Similarly, for all publicly traded firms in

23  the United States over the period from 1980 to 2009, positive news stories about

24  corporate environmental performance raised share prices while negative stories

25  lowered them.  Caroline Flammer, *Corporate Social Responsibility and*

26  *Shareholder Reaction: The Environmental Awareness of Investors*, 56(3) Acad. of

27  Mgmt. J. 758, 758–781 (2013), attached hereto as Ex. 30.  When Newsweek issued

28  its first Green Ratings for the 500 largest U.S. companies in 2009, firms in the top

1    100 experienced gains of between 0.6 – 1.0% compared to firms in the bottom 400.

2    Lyon Decl., Ex. 8 at 666.

3         34.    Investors definitely find climate information, in particular, to be

4    material.  In fact, the reason institutional investors created the Carbon Disclosure

5    Project (now called simply CDP) was because they considered climate information

6    material but were unable to get as much of it as they wanted.  Research clearly

7    shows that markets penalize firms for their carbon emissions.  Patrick Bolton &

8    Marcin Kacperczyk, *Do investors care about carbon risk?*, J. of Fin. Econ. 517,

9    517–549 (2021), attached hereto as Ex. 31; Ella Mae Matsumura, Rachna Prakash,

10   & Sandra C. Vera-Muñoz., *Firm-value effects of carbon emissions and carbon*

11   *disclosures*, 89(2) The Acct. Rev. 695, 695– 724, attached hereto as Ex. 32.

12   However, there is also evidence that voluntary disclosers are treated less harshly by

13   the financial markets than non-disclosers.  Ex. 32.  Moreover, earning higher CDP

14   scores can raise share prices (Yevheniia Antoniuk, *The Effect of Climate Disclosure*

15   *on Stock Market Performance: Evidence from Norway*, 31(2) Sustainable Dev.

16   1008, 1008–26 (2023), attached hereto as Ex. 33), and that simply being a discloser

17   to CDP can signal resilience to climate transition risks, raising share value when

18   shocks occur that increase the likelihood of climate regulation.  Eun-Hee Kim &

19   Thomas Lyon, *When Does Institutional Investor Activism Increase Shareholder*

20   *Value?: The Carbon Disclosure Project*, 11(1) The BE J. of Econ. Analysis &

21   Pol'y (2011), attached hereto as Ex. 34.  External ratings of firms' preparation to

22   deal with climate risks has been found to move share prices (Timothy Beatty & Jay

23   P. Shimshack, *The Impact of Climate Change Information: New Evidence from the*

24   *Stock Market*, 10(1) The BE J. of Econ. Analysis & Pol'y 10, no. 1 (2010), attached

25   hereto as Ex. 35), and a number of papers have found that greater exposure to

26   climate risk can raise a firm's financing costs.  Ex. 31; Patrick Bolton & Marcin

27   Kacperczyk, *Global Pricing of Carbon-Transition Risk*, 78(6) The J. of Fin. 3677,

28   3677–3754 (2023), attached hereto as Ex. 36; Gerhard Kling, et al., *The Impact of*

19

*Climate Vulnerability on Firms' Cost of Capital and Access to Finance*, 137 World Dev. 105131 (2021), attached hereto as Ex. 37.  At the same time, there is some evidence that participation in the U.S. government-sponsored Climate Leaders program during the period 1993-2008 harmed share prices.  Karen Fisher-Vanden & Karin S. Thorburn, *Voluntary Corporate Environmental Initiatives and Shareholder Wealth*, 62(3) J. of Env't Econ. & Mgmt 430, 430–445 (2011), attached hereto as Ex. 38.  This suggests that firms may only be rewarded for taking climate action when climate risk is considered by investors to be material, something that may not have been true 15 to 30 years ago.  Moreover, there is some evidence that markets do not fully and efficiently factor climate issues into valuation, with the implication that "[m]andatory and standardised information on carbon performance would consequently not only increase market efficiency but result in better allocation of capital within the real economy."  Andrea Liesen, et al., *Climate Change and Asset Prices: Are Corporate Carbon Disclosure and Performance Priced Appropriately?*, 44(1-2) J. of Bus. Fin. & Acct. 35, 35 (2017), attached hereto as Ex. 39.

35.    It is important to note that Scope 3 emissions are highly relevant for investors, even though they are not "direct" emissions from a firm's own facilities.  Ex. 31.  Firms may protest that Scope 3 emissions are not "their" emissions because they occur upstream in the supply chain, or downstream in the use phase of the product.  Protestations that firms cannot control their supply chains ring hollow to stakeholders, however.  For example, Nike famously protested that sweatshop labor in its supply chain was not its responsibility, but stakeholders disagreed and held Nike responsible for labor violations in its supply chain.  Ann Harrison & Jason Scorse, *Multinationals and Anti-Sweatshop Activism*, 100(1) Am. Econ. Rev. 247, 247–273 (2010), attached hereto as Ex. 40.  Nike eventually realized that it was smarter to take action to reduce sweatshop labor in its suppliers' facilities than to simply complain that it had no responsibility for its supply chain.

36.    When it comes to their climate footprint, companies face very real risks from their Scope 3 emissions.  Suppose future climate policy requires upstream suppliers to make costly investments to cut their emissions; those costs will be partially passed through to downstream firms, whose sales and margins will shrink as a result.  Alternatively, suppose future climate policy requires that downstream users shoulder more responsibility for their carbon emissions, e.g. by requiring that more energy efficient appliances be produced and used; those changes will reduce the demand for energy (e.g. natural gas and electricity), and thereby affect the sales and profits of (upstream) energy companies.  Either way, investors naturally want to know the extent of such transition risks in the supply chains of firms in which they invest.

37.    It is also worth addressing directly the notion of "Scope 4" emissions and their relevance to investors and other stakeholders.  To begin with, it is important to recognize that there are multiple definitions of "Scope 4" emissions. InfluenceMap, a UK-based non-governmental organization, defines Scope 4 emissions as a firm's "carbon policy footprint," that is, the extent to which the firm's political influence has been used to block or delay climate policy and thereby to indirectly increase global carbon emissions.  InfluenceMap, *Corporate Climate Policy Footprint: The 25 Most Influential Companies Blocking Climate Policy Action Globally*, Nov. 2022, https://influencemap.org/briefing/Corporate-Climate-Policy-Footprint-20137, attached hereto as Ex. 41.  InfluenceMap conducts extensive research to identify the full set of channels through which companies use their political clout to block climate policy, and provides letter grades to companies. An example of their ratings is presented below in Figure 4.

21



Figure 4: InfluenceMap Ratings of Scope 4 Emissions from Companies and the
U.S. Chamber of Commerce from Thomas P. Lyon & William Mandelkorn,
*Measuring Corporate Political Responsibility*, *in Corporate Political
Responsibility*, 78 (T.P. Lyon ed., 2023), attached hereto as Ex. 42 at 78.

38.     Plaintiffs offer a very different definition of "Scope 4" emissions,
referring to them as "emissions that companies avoid, and which should therefore
be deducted from Scope 1, 2, and/or 3 emissions, as appropriate." Pls.' Mem.
Supp. Summ. J 14 (ECF 48-2). As mentioned earlier in my declaration when
discussing the DOE's 1605b Voluntary Greenhouse Gas Registry, this definition of
Scope 4 emissions focuses on a company's energy efficiency investments and other
emissions reduction projects. Such projects are worthy, and companies have every
right and every incentive to share information about those projects with
stakeholders in the appropriate forum. In fact, experience with the DOE's
Voluntary Greenhouse Gas Registry shows that companies are much more likely to
disclose these projects than to disclose their full carbon footprints.

39.     However, even if one accepts this alternative definition, it is important
to recognize that the assertion that "Scope 4" emissions should be deducted from
Scope 1, 2 and/or 3 emissions is fallacious, as doing so would lead to inaccurate

22

emissions data. In fact, any projects that succeed in avoiding emissions will by definition reduce emissions from the first 3 scopes of a reporting entity, and hence will automatically be reflected in an accurate reporting of Scopes 1, 2 and 3 emissions. There is no need to report so-called "Scope 4" emissions separately. Moreover, reporting and subtracting "Scope 4" emissions from the total of Scopes 1, 2 and 3 emissions would be a misleading exercise in double counting and, in effect, a new form of greenwash.

40.    To make this point concrete, consider the example of a firm that emitted 1 million metric tons of $CO_2$ equivalent (MMTCO2e) in 2020, with 500,000 tons of Scope 1 emissions, 250,000 tons of Scope 2 emissions, and 250,000 tons of Scope 3 emissions. Now suppose that on January 1, 2021, it invests in more efficient equipment that brings its Scope 1 emissions down to 400,000 MMTCO2e. Thus, for 2021 it reports Scope 1 emissions of 400,000 tons, Scope 2 emissions of 250,000 tons and Scope 3 emissions of 250,000 tons. The efficiency improvement that reduced its Scope 1 emissions is already fully reflected in the firm's 2021 report. Moreover, if the firm now reported 100,000 tons as a "Scope 4" emission in 2021, and proposed to subtract that amount from its total of 900,000 MMTCO2e, that would imply it was emitting only 800,000 tons, a misleading underestimate and a new form of greenwash. The true carbon footprint is already disclosed through Scopes 1, 2 and 3. There is no need to report on reduction efforts separately, although the firm is of course free to discuss these in its annual report, 10k, website, or other appropriate forum.

### Consumers

41.    Although investor views of environmental performance information have received more study, perhaps because share price information is readily available, research shows that consumers also consider environmental information to be material. Markets have been growing rapidly for green products such as organic produce (Syed Badruddoza, Andrea C. Carlson, & Jill J. McCluskey, *Long-*

23

1   *Term Dynamics of US Organic Milk, Eggs, and Yogurt Premiums*, 38(1)

2   Agribusiness 45, 45–72 (2022), attached hereto as Ex. 43), sustainable seafood

3   (Frank Wijen & Mireille Chiroleu-Assouline, *Controversy Over Voluntary*

4   *Environmental Standards: A Socioeconomic Analysis of the Marine Stewardship*

5   *Council*, 32(2) Org. & Env't 98, 98–124 (2019), attached hereto as Ex. 44), and

6   sustainable coffee. Juliane Reinecke, Stephan Manning, & Oliver Von Hagen, *The*

7   *Emergence of a Standards Market: Multiplicity of Sustainability Standards in the*

8   *Global Coffee Industry*, 33(5-6) Org. Stud. 791, 791–814 (2012), attached hereto as

9   Ex. 45. Moreover, customers have also been shown to respond to carbon labeling

10  of groceries. Jerome K. Vanclay, et al., *Customer Response to Carbon Labelling of*

11  *Groceries*, 34 J. of Consumer Pol'y 153, 153–160 (2011), attached hereto as Ex.

12  46.

13      ***Employees***

14      42.    A growing body of research shows that employees prefer to work for

15  environmentally friendly firms, so disclosure is material to them as well. It is

16  increasingly understood that green firms can attract employees at lower salary

17  levels and be less likely to lose them to competitors. Kjell Arne Brekke & Karine

18  Nyborg, *Attracting Responsible Employees: Green Production as Labor Market*

19  *Screening*, 30(4) Resource & Energy Econ. 509, 509–526 (2008), attached hereto as

20  Ex. 47. Moreover, recent survey research shows that employees are aware of their

21  firms' greenwashing behaviors, which they view as corporate hypocrisy and which

22  can increase their turnover intentions. Lyon Decl., Ex. 21.

23      **Carbon Disclosure is Already Widely Practiced.**

24      43.    Carbon disclosure is already provided by thousands of firms around

25  the world. Carbon emissions are commonly classified into three groups. Scope 1

26  emissions are those that are emitted directly by a facility, typically by the

27  combustion of fossil fuels on site. Scope 2 emissions are indirect emissions that

28  arise from the generation of electricity purchased from an electric utility. Scope 3

24

1    emissions are indirect emissions that arise from either the upstream supply chain of
2    a production process or the downstream "use phase" of the product.

3        44.    The U.S. Greenhouse Gas Reporting Program (USGHGRP) is a
4    mandatory disclosure program that began collecting data in 2010.  It requires all
5    facilities that emit over 25,000 tons CO2e (including upstream suppliers whose
6    emissions would exceed this amount during the use phase) to disclose their
7    emissions.  The focus is on Scope 1 emissions, and roughly 8,000 facilities report
8    through the program, which is now in its fifteenth year of operation.

9        45.    The CDP (formerly the Carbon Disclosure Program) is a voluntary
10   disclosure program founded in 2000 by institutional investors seeking more
11   information about corporate climate risks and performance.  Today, over 800
12   institutional investors with $100 trillion in assets under management participate.
13   Over 23,000 firms disclose climate information to CDP, including 86% of the S&P
14   500, and 40% of CDP disclosers already report Scope 3 emissions, as shown in
15   Figure 5 below.



16
17
18
19
20
21
22
23
24

25   Figure 5: Share of CDP Participants Disclosing Scope 1, 2 and 3 Emissions.CDP,
26                    *CDP 2023 Disclosure Data Factsheet* (2023),
27   https://www.cdp.net/en/companies/cdp-2023-disclosure-data-factsheet, attached
28                           hereto as Ex. 48 at 11.

25

46.    The fact that thousands of firms worldwide already disclose their emissions to CDP, and that all facilities with large Scope 1 emissions in the U.S. have been required to disclose those emissions for the past 15 years suggests strongly that disclosure is not as costly, burdensome or politicized as some observers suggest.  For the vast majority of S&P 500 firms, carbon disclosure is just a normal part of doing business, just like issuing an annual report and a 10k financial report.

**Although disclosure of environmental performance does not mandate any changes in company operations, it tends to lead companies to reduce their emissions of pollutants**

47.    Disclosure does not mandate any changes in company operations or environmental performance.  Thus, it is a very "light handed" approach that differs sharply from traditional regulatory approaches such as emissions standards, which mandate that emissions be reduced to a certain level, or market-based mechanisms such as carbon taxes, which mandate that polluters pay a fee for their emissions. Tom Tietenberg, *Disclosure Strategies for Pollution Control*, 11 Env't & Resource Econ. 587, 587–602 (1998), attached hereto as Ex. 49.  Disclosure merely closes the informational gap between polluters and their stakeholders.  Nevertheless, by informing stakeholders, who are empowered to act on their new information, disclosure may indirectly affect corporate environmental performance.  For example, consumers may choose to purchase greener products, employees may change jobs to work at greener companies, and investors may reallocate their investments towards greener companies.

48.    Research shows that disclosure does indeed lead to reductions in emissions.  As mentioned earlier in this declaration, TRI data are considered material by investors, and companies with greater toxic emissions suffer greater losses in shareholder value.  Research shows that the release of toxic emissions data also leads facilities to reduce their emissions.  Indeed, the firms that suffered the

26

App.525

1  largest drops in share price after the release of the TRI subsequently cut their

2  emissions the most, suggesting that shareholder pressure motivated companies to

3  change their environmental behavior.  Lyon Decl., Ex. 27.  Similar effects have

4  been found in other settings, as well.  For example, state laws mandating disclosure

5  of chemicals used in hydraulic fracking have led to improvements in surface water

6  quality by 9-14%.  Pietro Bonetti, Christian Leuz, & Giovanna Michelon,

7  *Internalizing externalities: Disclosure regulation for hydraulic fracturing, drilling*

8  *activity and water quality*, No. w30842. Nat'l Bureau of Econ. Res., 2023, attached

9  hereto as Ex. 50.

10    49.   Intriguingly, although disclosure of raw emissions levels has been

11  shown to lead to reductions in overall toxic emissions, reports that weighted

12  emissions by their impacts on human health were more successful in driving

13  reductions of the most harmful toxic emissions.  Hyunhoe Bae, Peter Wilcoxen, &

14  David Popp, *Information Disclosure Policy: Do State Data Processing Efforts Help*

15  *More Than the Information Disclosure Itself?*, 29(1) J. of Pol'y Analysis & Mgmt.

16  163, 163–182 (2010), attached hereto as Ex. 51.  Other research has also found that

17  ratings and rankings can lead to emissions reductions.  For example, India's Green

18  Ratings Program led poor performers to reduce their emissions of pollutants into

19  waterways.  Nicholas Powers, et al., *Does Disclosure Reduce Pollution? Evidence*

20  *from India's Green Rating Project*, 50 Env't and Res. Econ. 131, 131–155 (2011),

21  attached hereto as Ex. 52.

22    50.   Disclosure of greenhouse gas emissions is of particular interest in the

23  present proceeding, and a number of research studies have found that disclosure

24  leads to GHG emissions reductions.  Greater institutional ownership of a firm by

25  investors that are CDP signatories increases the likelihood that a firm will disclose

26  its carbon emissions to CDP, and that disclosure in turn leads to an estimated

27  reduction in greenhouse gas emissions of 7 to 10%.  Shira Cohen, Igor Kadach, &

28  Gaizka Ormazabal, *Institutional Investors, Climate Disclosure, and Carbon*

27

*Emissions*, 76(2-3) Journal of Accounting and Economics 101640 (2023), attached hereto as Ex. 53.  Disclosure requirements in the UK led to an estimated 8% reduction in greenhouse gas emissions.  Benedikt Downar, et al., *The Impact of Carbon Disclosure Mandates on Emissions and Financial Operating Performance*, 26(3) Rev.of Acct. Stud. 1137, 1137–1175 (2021), attached hereto as Ex. 54.  The creation of the USGHGRP had similar effects.  One study that focused strictly on power plants found that the USGHGRP led to a 7% reduction in emissions. Lavender Yang, Nicholas Z. Muller, & Pierre Jinghong Liang, *The Real Effects of Mandatory CSR Disclosure on Emissions: Evidence from the Greenhouse Gas Reporting Program*, No. w28984. National Bureau of Economic Research, 2021, attached hereto as Ex. 55.  Another study, which studied the full range of facilities required to disclose to the USGHGRP, found an average reduction in emissions of 7% across all reporting sectors.  Sorabh Tomar, *Greenhouse Gas Disclosure and Emissions Benchmarking*, 61(2) J. of Acct. Res. 451, 451–492 (2023), attached hereto as Ex. 56.

51.    In short, although disclosure of greenhouse gas emissions does not mandate any reduction in emissions, simply closing the informational gap between polluting facilities and their stakeholders tends to lead those facilities to make significant reductions in their greenhouse gas emissions.

I declare under penalty of perjury that the foregoing are true and correct. Executed on this day, the 22nd of July, 2024, in Ann Arbor, Michigan.

THOMAS P. LYON

Professor, U. of Michigan

SA2024300503

28

1  EUGENE SCALIA, SBN 151540
2     escalia@gibsondunn.com
   GIBSON, DUNN & CRUTCHER LLP
3  1050 Connecticut Avenue, N.W.
   Washington, D.C. 20036-5306
4  Telephone: 202.955.8500
   Facsimile: 202.467.0539
5

6  *Attorneys for Plaintiffs Chamber of*
   *Commerce of the United States of*
7  *America, California Chamber of*
   *Commerce, American Farm Bureau*
8  *Federation, Los Angeles County*
   *Business Federation, Central Valley*
9  *Business Federation, and*
   *Western Growers Association*
10

11  (*Additional counsel listed on next page*)

12              IN THE UNITED STATES DISTRICT COURT

13          FOR THE CENTRAL DISTRICT OF CALIFORNIA,

14                      WESTERN DIVISION

15 | CHAMBER OF COMMERCE OF THE | CASE NO. 2:24-cv-00801-ODW-PVC
16 | UNITED STATES OF AMERICA, |
   | CALIFORNIA CHAMBER OF | **DECLARATION OF EDWARD J.**
17 | COMMERCE, AMERICAN FARM | **SHOEN**
   | BUREAU FEDERATION, LOS |
18 | ANGELES COUNTY BUSINESS |
   | FEDERATION, CENTRAL VALLEY |
19 | BUSINESS FEDERATION, and |
   | WESTERN GROWERS ASSOCIATION, |
20 |                Plaintiffs, |
21 |        v. |
22 | LIANE M. RANDOLPH, in her official |
   | capacity as Chair of the California Air |
23 | Resources Board, STEVEN S. CLIFF, in |
   | his official capacity as the Executive |
24 | Officer of the California Air Resources |
   | Board, and ROBERT A. BONTA, in his |
25 | official capacity as Attorney General of |
   | California. |
26 |                Defendants. |

27

28

1  BRADLEY J. HAMBURGER,
      SBN 266916
2      bhamburger@gibsondunn.com
3  SAMUEL ECKMAN, SBN 308923
      seckman@gibsondunn.com
4  ELIZABETH STRASSNER,
      SBN 342838
5      estrassner@gibsondunn.com
6  GIBSON, DUNN & CRUTCHER LLP
   333 South Grand Ave.
7  Los Angeles, CA 90071-3197
   Telephone:  213.229.7000
8  Facsimile:  213.229.7520

9  BRIAN A. RICHMAN
   (*pro hac vice*)
10     DC Bar No. 230071
       brichman@gibsondunn.com
11 GIBSON, DUNN & CRUTCHER LLP
12 2001 Ross Ave., Suite 2100
   Dallas, TX 75201-2923
13 Telephone:  214.698.3100
   Facsimile:  214.571.2900
14

15 *Attorneys for Plaintiffs Chamber of Commerce of the United States of America,*
   *California Chamber of Commerce, American Farm Bureau Federation, Los Angeles*
16 *County Business Federation, Central Valley Business Federation, and*
   *Western Growers Association*

17 STEPHANIE A. MALONEY
   (*pro hac vice* forthcoming)
18     DC Bar No. 104427
       smaloney@uschamber.com
19 KEVIN PALMER
   (*pro hac vice*)
20     DC Bar No. 90014967
       kpalmer@uschamber.com
21 CHAMBER OF COMMERCE OF THE
   UNITED STATES OF AMERICA
22 1615 H Street, NW
   Washington, D.C. 20062-2000
23 Telephone:  202.659.6000
   Facsimile:  202.463.5302
24

25 *Attorneys for Plaintiff Chamber of Commerce of the United States of America*

26

27

28

Gibson, Dunn &
Crutcher LLP

DECLARATION OF EDWARD J. SHOEN
CASE NO. 2:24-CV-00801-ODW-PVC

1    I, Edward J. Shoen, hereby declare as follows:

2       1.    I am over the age of eighteen, of sound mind, and capable of making this

3    declaration. The facts stated in this declaration are within my personal knowledge and

4    are true and correct.

5       2.    I am the President and Chairman of U-Haul Holding Company, a Nevada

6    corporation (NYSE- UHAL and UHAL.B) (hereinafter "UHHC").

7       3.    UHHC is a member of the United States Chamber of Commerce and has

8    annual total revenue exceeding $1 billion USD. UHHC does not do business in

9    California.

10      4.    UHHC's subsidiary, U-Haul Co. of California ("UHCA"), does business in

11   California.

12      5.    If UHCA's activities in California are attributable to UHHC such that

13   UHHC "does business" in California as a "Reporting Entity" under S.B. 253 and

14   "Covered Entity" under S.B. 261, then UHHC would be subject to the requirements of

15   S.B. 253 and 261.

16      6.    UHHC and its subsidiaries that do business throughout the United States

17   and Canada make up the U-Haul System ("U-Haul").

18      7.    U-Haul was started in 1945 by my mother and father as they returned from

19   military service. U-Haul remains family managed today, and we view the communities

20   in which we operate as partners. U-Haul's community partnership model enables it to

21   collaborate to reduce vehicle registrations and greenhouse gas ("GHG") emissions.

22      8.    Small independent businesses that partner with U-Haul, also known as

23   Dealers, are critical to U-Haul's shared-use model and its commitment to sustainability

24   and the environment. The number of locations that U-Haul itself owns and operates is

25   dwarfed by small independent businesses who contract with U-Haul to be in U-Haul's

26   Dealer network. U-Haul itself owns and operates over 2,200 locations. This is compared

27   to 22,066 independent Dealers in the U-Haul network—5,759 of which are sole

28

Gibson, Dunn &
Crutcher LLP

1

DECLARATION OF EDWARD J. SHOEN
CASE NO. 2:24-CV-00801-ODW-PVC

1  proprietorships. Such independent Dealers account for nearly half of U-Haul's entire
2  rental business.

3       9.    U-Haul's independent Dealers often do not solely (or even primarily) rent
4  or sell U-Haul products. Instead, they take the form of a variety of small businesses for
5  whom U-Haul rentals and sales are just a component of their business. To get a sense of
6  the size and variety of businesses who are Dealers, Dealers include: self-storage
7  facilities, auto repair garages, gas stations, convenience stores, used car dealerships,
8  hardware stores, tire shops, furniture stores, grocery stores, repair shops, car washes,
9  auto parts stores, motels, hotels, restaurants, wireless phone stores, appliance stores,
10  nurseries, and office supply stores—just to name a few.

11       10.    Building the apparatus necessary to comply with the requirements of S.B.
12  253 and S.B. 261 will take years, not months.

13       11.    To be in a position to begin tracking the required climate-related
14  information, U-Haul will need to determine where the required information is located,
15  both within its own operations and those of its independent Dealers; it will need to
16  develop systems and processes to collect, store, and analyze this information; it will need
17  to hire additional employees and retain external consultants; it will need to develop
18  policies and internal controls to analyze the vast quantity of data collected; and it will
19  need time to test its internal processes before they go live. All of this comes at a great
20  cost and commitment of personnel hours, and U-Haul must begin compliance work now,
21  *see* CARB Notice (Dec. 5, 2024).

22       12.    With respect to IT alone, U-Haul preliminarily estimates that this would
23  require approximately 30 additional dedicated team members to build and then support
24  these processes on an ongoing basis at an estimated cost exceeding $3,000,000 per year,
25  which would rise as personnel costs increase over time. This cost estimate does not
26  include costs outside of U-Haul's IT team.

27
28

Gibson, Dunn &
Crutcher LLP

2

DECLARATION OF EDWARD J. SHOEN
CASE NO. 2:24-CV-00801-ODW-PVC

1  **Impact of S.B. 253**

2      13.    Complying with S.B. 253 would require U-Haul to calculate Scope 1, 2,

3  and 3 emissions. Doing so involves several burdensome steps. And these disclosures

4  would go far beyond U-Haul's disclosure requirements under existing state and federal

5  law and regulations. Moreover, complying with S.B. 253 would require U-Haul to pay

6  fees to support the State's implementation of its requirements.

7      14.    Complying with S.B. 253 would require U-Haul to take several

8  burdensome steps to calculate Scope 1 and Scope 2 emissions.

9      15.    U-Haul will have to begin building the systems and compile data, not only

10  from its own operations, but from its 800 individual utility providers (some of which

11  don't even accept electronic payment and are unlikely to be able to provide U-Haul the

12  required information) immediately and at great cost and commitment of personnel hours.

13      16.    Where the required data is unavailable from U-Haul's operations or its

14  utility providers, U-Haul will be forced to engage in high-priced guesswork

15  (assumptions and prognostications multiplied by industry-wide average emissions

16  factors or average emission factors for energy generation) to generate inherently

17  inaccurate data.

18      17.    Complying with S.B. 253 would also require U-Haul to calculate Scope 3

19  emissions. This will necessitate several highly burdensome and costly steps.

20      18.    *First*, to calculate Scope 3 emissions, U-Haul would have to determine the

21  emissions of various third parties upstream and downstream from its activities.

22      19.    *Second*, because the emissions data for these activities is largely not in U-

23  Haul's custody, it would have to rely on third parties to provide that data to calculate its

24  Scope 3 emissions. U-Haul would have to ask its suppliers, including vehicle

25  manufacturers, component part manufacturers, and raw material providers, to

26  disaggregate the portion of their Scope 1 and Scope 2 emissions (assuming those

27  suppliers calculate that data) attributable to the production of goods and services

28  purchased by U-Haul. It would have to ask its third-party transportation providers,

3

DECLARATION OF EDWARD J. SHOEN
CASE NO. 2:24-CV-00801-ODW-PVC

1    including freight companies, to disaggregate the portion of their vehicle emissions

2    attributable to the transportation of U-Haul's inputs and outputs. And U-Haul would

3    have to ask these third parties to provide not only their total Scope 1 and Scope 2

4    emissions attributable to U-Haul, but also break down those emissions by constituent

5    gases. U-Haul would likely have to renegotiate its contracts with many of these various

6    third parties to ensure that they collect and provide U-Haul with all this detailed data,

7    which alone would require substantial employee hours and additional consultant and

8    expert costs. To the extent information is unavailable from particular third parties in its

9    value chain, U-Haul would have to speculate at those parties' emissions as best it can

10   using industry or national averages (assuming such data is available).

11       20.    *Third*, U-Haul would have to create a system for recording and compiling

12   all the third-party emissions data it receives. Such a system does not currently exist. U-

13   Haul will have to develop the IT infrastructure, databases, and computer systems from

14   scratch.

15       21.    *Fourth*, once the data is recorded in the new system, management would

16   have to review the raw data collected and compile it into the format required for

17   disclosure to the emissions reporting organization.

18       22.    *Fifth*, U-Haul would have to retain a third-party assurance provider to

19   review its Scope 3 emissions and prepare an assurance engagement in compliance with

20   the law's requirements.

21       23.    U-Haul will have to begin building the systems and contracts to comply

22   with this new regime immediately and at great cost and commitment of personnel hours.

23       24.    Reporting Scope 3 emissions is enormously burdensome for an entity like

24   U-Haul. S.B. 253's provisions requiring the calculation not only for U-Haul's own

25   emissions but also the emissions of entities that it does business with would be

26   particularly burdensome on U-Haul in light of its dealer-network model.

27       25.    As noted above, the number of locations that U-Haul itself owns and

28   operates is dwarfed by small independent businesses who contract with U-Haul to be in

Gibson, Dunn &
Crutcher LLP

4

DECLARATION OF EDWARD J. SHOEN
CASE NO. 2:24-CV-00801-ODW-PVC

1   U-Haul's Dealer network. Such independent Dealers account for nearly half of U-Haul's
2   entire rental business. Dealers are critical to U-Haul's shared-use model and its
3   commitment to sustainability and the environment.

4       26.    Under S.B. 253, U-Haul would likely be responsible for reporting
5   emissions and climate risks from all U-Haul Dealers. This is a practical impossibility. It
6   does not reflect the reality of business models such as U-Haul's that rely on a network
7   of independent small businesses as dealers.

8       27.    The costs of obtaining this data from U-Haul's Dealer network would be
9   immense. As an initial matter, many of these small businesses, which include things like
10  individually owned convenience stores, are simply unable to collect this data. And, if U-
11  Haul included a requirement to collect this data in its contracts, it would risk losing a
12  very substantial portion of its Dealer network. Dealers might cease working with U-Haul
13  either because they are unable to collect the data required by the law, or because the cost
14  of such collection would outweigh the revenue of the U-Haul portion of their businesses.
15  As noted above, 5,759 of U-Haul's Dealer network are small sole proprietorships. Many,
16  likely most, of these small businesses cannot collect, or it is financially infeasible for
17  them to collect, the data required by the law. Compliance with S.B. 253 threatens the
18  very essence of U-Haul's business model. And, it strikes at the core of any dealership-
19  based model utilizing small, independent dealers.

20      28.    S.B. 253 is irreconcilable with business models such as U-Haul's. Each of
21  U-Haul's Dealers does not solely rent or sell U-Haul products. Rather, they are multi-
22  service businesses. A common example is a gas station. A gas station sells gas, it sells a
23  variety of goods in the convenience store, it sometimes provides car washes and auto
24  services. And it sometimes provides U-Haul truck rentals. It is impractical if not
25  impossible for a sole proprietor of such a business to separate out the U-Haul component
26  of the business from the non-U-Haul components of the business. Under S.B. 253, only
27  the U-Haul component of the gas station can be attributed to U-Haul. The business
28  owner likely has no way of tracking climate impacts from the U-Haul rental side of the

5

DECLARATION OF EDWARD J. SHOEN
CASE NO. 2:24-CV-00801-ODW-PVC

1  business as opposed to the emissions from selling gasoline or keeping the lights on in
2  the store, nor would the business owner otherwise be required to do so under the law for
3  its own business purposes. The costs to calculate and provide the required data would
4  likely have a negative impact on the business's bottom line and the small business
5  owner's livelihood.

6       29.    Given the large number of U-Haul Dealers, U-Haul is constantly entering
7  into new contracts and renewing existing ones. If U-Haul has to include contractual
8  terms mandating the sharing of the information required by S.B. 253, it has to begin
9  revising contracts and otherwise collecting this information immediately. How many
10  Dealers U-Haul loses due to these requirements is not specifically calculable at this time,
11  but U-Haul anticipates massive damage to its Dealer network from S.B. 253.

12         Failure to consider Scope 4 emissions

13      30.    If U-Haul was inclined to speak on its GHG emissions in the first place—
14  which it is not, S.B. 253 only factors in Scopes 1, 2, and 3 emissions into its reporting
15  requirement. It does not allow for consideration of Scope 4 emissions—i.e., those
16  emissions that are avoided by the company providing its service or product and that
17  should be deducted from its Scope 1, 2, and 3 emission levels.

18      31.    In light of its business model, U-Haul would have substantial Scope 4
19  emissions, which would go a long way in offsetting Scope 1, 2, and 3 emissions. For
20  example, the nature of U-Haul's shared-use model reduces the total number of
21  registrations and vehicles on the road by allowing more people to utilize fewer, more
22  efficient shared vehicles to meet their mobility needs.

23      32.    U-Haul's vast Dealer network in particular offsets massive amounts of
24  emissions. By partnering with small independent businesses, U-Haul's Dealer network
25  reduces GHG emissions by providing rental equipment within a short distance of its
26  customers rather than requiring customers to travel long distances to rent and return
27  rental equipment from U-Haul owned locations. This is especially true in rural areas.
28

Gibson, Dunn &
Crutcher LLP

6

DECLARATION OF EDWARD J. SHOEN
CASE NO. 2:24-CV-00801-ODW-PVC

1    Placing equipment close to customers reduces miles driven and the attendant GHG
2    emissions.

3    33.    In short, U-Haul's Scope 4 emissions represent a positive in terms of GHG
4    emissions. Yet S.B. 253 does not allow U-Haul to offset its Scope 1, 2, and 3 emissions
5    to present a more accurate measure of U-Haul's emissions footprint.

6    **Impact of S.B. 261**

7    34.    Complying with S.B. 261 would require U-Haul to opine on climate-related
8    risks and post its government-compelled opinion to its website that it would not
9    otherwise choose to do.

10    35.    Complying with S.B. 261 would force U-Haul to state its opinion on
11    "material risk of harm to immediate and long-term financial outcomes due to physical
12    and transition risks, including, but not limited to, risks to corporate operations, provision
13    of goods and services, supply chains, employee health and safety, capital and financial
14    investments, institutional investments, financial standing of loan recipients and
15    borrowers, shareholder value, consumer demand, and financial markets and economic
16    health."

17    36.    S.B. 261's requirements go far beyond U-Haul's disclosure requirements
18    under existing state and federal law and regulations. Compliance with S.B. 261 would
19    require U-Haul to pay fees to support the State's implementation of it. Compliance
20    would force U-Haul to place its climate-related risk report on its website.

21    37.    S.B. 261's requirements would force U-Haul to expend considerable time
22    and resources.

23    38.    U-Haul will have to begin building the systems and contracts to comply
24    with S.B. 261 immediately and at great cost and commitment of personnel hours.

25    39.    The content that S.B. 261 would require U-Haul to post on its website also
26    has nothing to do with U-Haul's commercial transactions. And U-Haul does not disclose
27    GHG emissions in its commercial interactions with customers. Moreover, U-Haul's
28    advertising does not highlight GHG emissions or climate-related risks.

Gibson, Dunn &
Crutcher LLP

7

DECLARATION OF EDWARD J. SHOEN
CASE NO. 2:24-CV-00801-ODW-PVC

40.    U-Haul considers the information that S.B. 261 requires to be controversial and disagrees with including this type of information on its public website—as indicated by such opinions' absence on its website.

41.    Complying with S.B. 261 thus would force U-Haul to convey to the public a philosophy of environmental sustainability that it does not believe and is incompatible with the philosophy U-Haul currently expresses in the public square.

**Potential Impact on Certification of Disclosures made in Documents Filed with the Securities and Exchange Commission**

42.    Complying with these new laws would require U-Haul to make disclosures that, while based on a good faith effort and great expense, will be based on high-priced guesswork (assumptions and prognostications multiplied by industry-wide average emissions factors or average emission factors for energy generation) which ultimately yield inaccurate data compared to reality. Due to the inherent inaccuracies in calculating the data required for reporting, disclosures will require updates as methodologies and calculations become more advanced and accurate. These inaccuracies and updates will undoubtedly lead to litigation.

43.    Furthermore, complying with these laws may confuse investors or securities regulators regarding whether S.B. 253 and S.B. 261 disclosures are "material" to an investor in UHHC's equity and debt securities. I believe the disclosure required by S.B. 253 and S.B. 261 will be inaccurate and not material to investors. I am required to certify UHHC's periodic reports and registration statements filed with the SEC, and I would not certify the disclosures in those documents if I were not confident in their accuracy and reliability. UHHC should not be forced to create market confusion by compelling it to disclose information under S.B. 253 and S.B. 261 that it does not believe to be material to investors, that it would not disclose anywhere if not forced to do so by S.B. 253 and S.B. 261, and which may well be inaccurate for the reasons described in this declaration.

**Conclusion**

44.    S.B. 253 and S.B. 261 threaten U-Haul with serious and imminent harm. Those laws will compel U-Haul to speak about highly political and controversial matters when it would not otherwise speak. To make matters worse, this unconstitutionally compelled speech will result in high-priced guesswork and speculation that will yield inaccurate climate-related financial risk or emissions information. This inaccurate information will undoubtedly lead to litigation.

45.    The Court should enjoin S.B. 253 and S.B. 261 during the pendency of this litigation to prevent these imminent and irreversible harms.


Pursuant to 28 U.S.C. §1746, I, Edward J. Shoen, declare under penalty of perjury that the foregoing is true and correct.


EXECUTED on this 24th day of February, 2025.

Edward J. Shoen

Edward J. Shoen

DECLARATION OF EDWARD J. SHOEN
CASE NO. 2:24-CV-00801-ODW-PVC

Gibson, Dunn &
Crutcher LLP

1  EUGENE SCALIA, SBN 151540
       escalia@gibsondunn.com
2  GIBSON, DUNN & CRUTCHER LLP
   1050 Connecticut Avenue, N.W.
3  Washington, D.C.  20036-5306
   Telephone:  202.955.8500
4  Facsimile:   202.467.0539
5
6  *Attorneys for Plaintiffs Chamber of
   Commerce of the United States of*
7  *America, California Chamber of
   Commerce, American Farm Bureau*
8  *Federation, Los Angeles County
   Business Federation, Central Valley*
9  *Business Federation, and
   Western Growers Association*
10
11 (*Additional counsel listed on next page*)

12          IN THE UNITED STATES DISTRICT COURT

13       FOR THE CENTRAL DISTRICT OF CALIFORNIA,

14                  WESTERN DIVISION

15 | CHAMBER OF COMMERCE OF THE | CASE NO. 2:24-cv-00801-ODW-PVC |
16 | UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF | **DECLARATION OF THOMAS** |
17 | COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS | **QUAADMAN** |
18 | ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY | |
19 | BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION, | |
20 |                 Plaintiffs, | |
21 |           v. | |
22 | LIANE M. RANDOLPH, in her official capacity as Chair of the California Air | |
23 | Resources Board, STEVEN S. CLIFF, in his official capacity as the Executive | |
24 | Officer of the California Air Resources Board, and ROBERT A. BONTA, in his | |
25 | official capacity as Attorney General of California. | |
26 |                 Defendants. | |

27

28

Gibson, Dunn &
Crutcher LLP

BRADLEY J. HAMBURGER,
    SBN 266916
    bhamburger@gibsondunn.com
SAMUEL ECKMAN, SBN 308923
    seckman@gibsondunn.com
ELIZABETH STRASSNER,
    SBN 342838
    estrassner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile:  213.229.7520

BRIAN A. RICHMAN
(*pro hac vice*)
    DC Bar No. 230071
    brichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Ave., Suite 2100
Dallas, TX 75201-2923
Telephone: 214.698.3100
Facsimile:  214.571.2900

*Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association*

STEPHANIE A. MALONEY
(*pro hac vice*)
    DC Bar No. 104427
    smaloney@uschamber.com
KEVIN PALMER
(*pro hac vice*)
    DC Bar No. 90014967
    kpalmer@uschamber.com
CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA
1615 H Street, NW
Washington, D.C. 20062-2000
Telephone: 202.659.6000
Facsimile:  202.463.5302

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF THOMAS QUAADMAN
CASE NO. 2:24-CV-00801-ODW-PVC

1.    My name is Thomas Quaadman. I am the Senior Vice President for Economic Policy at the Chamber of Commerce of the United States of America. In that capacity, I oversee all of the operations of the Center for Capital Markets Competitiveness (CCMC). CCMC works to advance America's global leadership in capital formation by supporting diverse capital markets that are the most fair, transparent, efficient, and innovative in the world. CCMC advocates on behalf of American businesses to ensure that legislation and regulation strengthen our capital markets, thus allowing businesses—from the local flower shop to a multinational manufacturer—to mitigate risks, manage liquidity, access credit, and raise capital. I direct the Chamber's work on corporate governance, and I have also testified on several occasions before congressional committees on issues covering capital formation, financial reporting, and corporate governance.

2.    I am over 18 years old. This Declaration is based upon my personal knowledge and belief and/or upon my review of business records of the Chamber. If called as a witness, I could and would testify competently thereto.

### The Chamber and Its Mission

3.    The Chamber is the world's largest business federation, representing approximately 300,000 direct members. The U.S. Chamber represents the interests of its members nationwide, who, in turn, represent more than three million U.S. businesses and professional organizations of every size and in every economic sector and geographic region of the country.

4.    The Chamber's mission, which it has advanced for more than 100 years, is to advocate for policies designed to help businesses create jobs and grow the national economy. The Chamber furthers this mission through leading pro-business initiatives on legislation and regulation, and to this end, regularly brings litigation against federal, state, and local governments to challenge government action that harms its members.

Gibson, Dunn & Crutcher LLP

1

DECLARATION OF THOMAS QUAADMAN
CASE NO. 2:24-CV-00801-ODW-PVC

## S.B. 253 and 261's Effects on the Chamber's Members

5.      A number of the Chambers's direct members will fall within the scope of S.B. 253 and 261 based on their annual revenues. This includes the U-Haul Holding Company ("UHHC"), whose annual revenues exceed $1 billion and whose operations in California include "do-it-yourself" moving and storage.

6.      S.B. 253 and S.B. 261 will require a number of the Chamber's members, including UHHC, to speak in 2026. Specifically, S.B. 261 will require companies to make certain climate-related-risk disclosures "[o]n or before January 1, 2026." § 2(c)(1). S.B. 253, likewise, will require companies to disclose certain information regarding greenhouse-gas emissions in 2026. *See* CARB Enforcement Notice (Dec. 5, 2024) (noting that the "first reports by reporting entities will still be due in 2026"), *available at* https://ww2.arb.ca.gov/sites/default/files/2024-12/The%20Climate%20Corporate%20Data%20Accountability%20Act%20Enforcement%20Notice%20Dec%202024.pdf.

7.      Unless S.B. 253 and 261 are enjoined, a number of the Chamber's members, including UHHC, will be forced to incur significant costs in the next several months and overcome substantial implementation challenges.

8.      I understand that to make the disclosures required in 2026, companies must begin tracking and recording a vast amount of climate-related information now. I understand that a report dated June 2017 and entitled Recommendations of the Task Force on Climate-Related Financial Disclosures has been filed in this action at Dkt. 48-23. That report acknowledges that "significant effort" goes into "developing processes and collecting information needed for disclosing" climate-related information. Dkt. 48-23 at 41. For example, to collect the information necessary to comply with S.B. 253 and 261, companies will need to determine where the relevant required information is located across their companies; adopt policies and procedures to collect and analyze that information; develop IT systems to track and aggregate the data; hire additional employees and train current ones; retain external consultants; and

test their internal infrastructure. But as the Recommendations of the Task Force on Climate-Related Financial Disclosures acknowledge, there are many "broader challenges related to data availability and quality," including:

    a.  "The lack of robust and cost-effective tools to quantify the potential impact of climate-related risks and opportunities at the asset and project level makes aggregation across an organization's activities or investment portfolios problematic and costly."

    b.  "The need to consider the variability of climate-related impacts across and within different sectors and markets further complicates the process (and magnifies the cost) of assessing potential climate-related financial impacts."

    c.  "The high degree of uncertainty around the timing and magnitude of climate-related risks makes it difficult to determine and disclose the potential impacts with precision." *Id.* at 36.

    9.  Given these challenges, in order to begin reporting in 2026, Chamber members who are subject to S.B. 253 and 261 will likely need to begin work and incur compliance costs now or in the near future.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on February 25th, 2025, at Washington, DC.

_____
Thomas Quaadman

3

DECLARATION OF THOMAS QUAADMAN
CASE NO. 2:24-CV-00801-ODW-PVC

# Exhibit A

## California Air Resources Board's December 5, 2024 Enforcement Notice

Declaration of Bradley J. Hamburger In Support Of
Plaintiffs' Motion for Preliminary Injunction
February 25, 2025

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.*,
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)

4



CALIFORNIA
AIR RESOURCES BOARD

Gavin Newsom, Governor
Yana Garcia, CalEPA Secretary
Liane M. Randolph, Chair

**The Climate Corporate Data Accountability Act**

**ENFORCEMENT NOTICE**
**December 5, 2024**

The Climate Corporate Data Accountability Act Background

The Climate Corporate Data Accountability Act Senate Bill (SB) 253 (Wiener, Statutes of 2023, Chapter 382) requires entities formed under the laws of California, the laws of any other state of the United States or the District of Columbia, or under an act of the Congress of the United States, with total annual revenues in excess of one billion dollars ($1,000,000,000) that do business in California ("reporting entities") to annually report all of their Scope 1, Scope 2, and Scope 3 greenhouse gas emissions, as defined in the statute. This legislation aims to promote transparency from companies regarding their greenhouse gas emissions. The California Air Resources Board (CARB) is required to promulgate regulations implementing SB 253, including establishing a date in 2026 when the first emission reports will be due.

On September 27, 2024, SB 219 (Wiener, Statutes of 2024, Chapter 766) amended state law to extend the date for CARB to adopt the regulations specified in SB 253 from January 1, 2025, to July 1, 2025. The first reports by reporting entities will still be due in 2026 on a date to be established by CARB in its rulemaking. Those first reports will cover scope 1 and scope 2 emissions during the reporting entity's prior fiscal year.

Update Regarding Enforcement of Good Faith Compliance Measures

The purpose of this Enforcement Notice is to notify reporting entities that CARB has decided to exercise its enforcement discretion under Health and Safety Code section 38532, subdivision (f)((2)(A), as follows.

SB 253 requires reporting entities, "starting in 2026 on or by a date to be determined by the state board" to "publicly disclose . . . all of the reporting entity's scope 1 and scope 2 emissions for the reporting entity's prior fiscal year." (Health and Safety Code, § 38532, subd. (c)(2)(A)(i)(I).) CARB recognizes that companies may need some lead time to implement new data collection processes to allow for fully complete scope 1 and scope 2 emissions reporting, to the extent they do not currently possess or collect the relevant information.

Accordingly, CARB will exercise its enforcement discretion such that, for the first report due in 2026, reporting entities may submit scope 1 and scope 2 emissions from "the reporting entity's prior fiscal year" that can be determined from information the reporting entity already possesses or is already collecting at the time this Notice was issued. CARB will exercise enforcement discretion for the first reporting cycle, on the condition that entities demonstrate good faith efforts to comply with the requirements of the law. This enforcement discretion is aimed at supporting entities actively working toward full compliance. Thus, for the first reporting cycle, CARB will not take enforcement action for incomplete reporting against entities, as long as the companies make a good faith effort to

arb.ca.gov          1001 I Street • P.O. Box 2815 • Sacramento, California 95812          helpline@arb.ca.gov

App.545

The Climate Corporate Data Accountability Act Enforcement Notice
December 5, 2024
Page 2

retain all data relevant to emissions reporting for the entity's prior fiscal year. CARB will provide details on reporting for subsequent year reporting cycles as part of CARB's rulemaking process.

This notice reflects CARB's discretion in enforcing compliance during the transition period and does not constitute an interpretation of statutory reporting requirements. CARB encourages regulated entities to use this period to move toward full compliance as quickly as possible.

<u>Further Information</u>

For further information regarding this Notice, please contact *climatedisclosure@arb.ca.gov*.

6

App.546

1  ROB BONTA
   Attorney General of California
2  MYUNG J. PARK (SBN 210866)
   LAURA J. ZUCKERMAN (SBN 161896)
3  Supervising Deputy Attorneys General
   KATHERINE GAUMOND (SBN 349453)
4  EMILY HAJARIZADEH (SBN 325246)
   M. ELAINE MECKENSTOCK (SBN 268861)
5  DYLAN REDOR (SBN 338136)
   DAVID ZAFT (SBN 237365)
6  CAITLAN MCLOON (SBN 302798)
   Deputy Attorneys General
7    300 South Spring Street, Suite 1702
     Los Angeles, CA  90013-1230
8    Telephone:  (213) 269-6438
     Fax:  (916) 731-2128
9    E-mail:  Caitlan.McLoon@doj.ca.gov
   *Attorneys for Defendants Liane M. Randolph,*
10 *Steven S. Cliff, and Robert A. Bonta*

11           IN THE UNITED STATES DISTRICT COURT

12           FOR THE CENTRAL DISTRICT OF CALIFORNIA

13

14

| | |
|---|---|
| **CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION,** | 2:24-cv-00801-ODW-PVC **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| Plaintiffs, | Date:        May 5, 2025<br>Time:        1:30 PM<br>Courtroom:   5D<br>Judge:       The Honorable Otis D. Wright, II<br>Trial Date:  Not Set<br>Action Filed: 1/30/2024 |
| v. | |
| **LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California,** | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................... 1

Background ............................................................................................................ 3

   I.    Corporate Reporting Obligations Involving Estimation and Prediction Are Routine ............................................................................ 3

   II.   The California Legislature Enacted S.B. 253 and 261 in Part to Respond to Widespread Inaccuracies in Statements by the Largest Companies Doing Business in California ................................ 4

       A.    S.B. 253 ......................................................................................... 5

       B.    S.B. 261 ......................................................................................... 6

   III.  Procedural History .............................................................................. 7

Legal Standard ...................................................................................................... 7

Argument ............................................................................................................... 8

   I.    Plaintiffs' Challenge to S.B. 253 is Unripe ..................................... 8

   II.   Plaintiffs Are Unlikely to Prevail on the Merits ............................. 9

       A.    Plaintiffs Fail to Show that S.B. 253 and 261 Implicate the First Amendment ................................................................. 10

       B.    S.B. 253 and 261 Are Not Subject to Strict Scrutiny .............. 11

       C.    SB 253 and 261 Satisfy Any Level of Scrutiny ....................... 16

       D.    S.B. 261 is Not Unconstitutionally Vague .............................. 19

   III.  All Remaining Injunction Factors Weigh Against Plaintiffs............ 19

       A.    Plaintiffs Have Not Established Irreparable Harm ................... 19

       B.    The Balance of the Equities and the Public Interest Militate Against Granting an Injunction ................................... 22

   IV.  Scope of Any Injunction ..................................................................... 22

Conclusion .......................................................................................................... 22

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*303 Creative LLC v. Elenis*
   600 U.S. 570 (2023) ...................................................................15

*Am. Hosp. Ass'n v. Azar*
   983 F.3d 528 (D.C. Cir. 2020) ...............................12, 15, 17

*Am. Meat Inst. v. USDA*
   760 F.3d 18 (D.C. Cir. 2014)...................................14, 17

*Arce v. Douglas*
   793 F.3d 968 (9th Cir. 2015) ...................................19

*Ariix, LLC v. NutriSearch Corp.*
   985 F.3d 1107 (9th Cir. 2021) .................................12

*Askins v. U.S. Dep't of Homeland Sec.*
   899 F.3d 1035 (9th Cir. 2018) .................................10

*Baird v. Bonta*
   81 F.4th 1036 (9th Cir. 2023) .................................19

*Bolger v. Youngs Drug Prod. Corp.*
   463 U.S. 60 (1983) ...................................................11, 12

*Caribbean Marine Servs. Co. v. Baldrige*
   844 F.2d 668 (9th Cir. 1988) ...................................19, 20

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*
   447 U.S. 557 (1980) .................................................11, 16

*CTIA - The Wireless Ass'n v. City of Berkeley, California*
   928 F.3d 832 (9th Cir. 2019).........................1, 11, 13, 16

*Doe v. Harris*
   772 F.3d 563 (9th Cir. 2014).....................................9

*Drakes Bay Oyster Co. v. Jewell*
   747 F.3d 1073 (9th Cir. 2014)...................................22

ii

1

2

## TABLE OF AUTHORITIES
### (continued)

Page

3

*Env't Def. Ctr. v. EPA*

4

344 F.3d 832 (9th Cir. 2003) .............................................................. 11

5

*Exxon Corp. v. Heinze*

6

32 F.3d 1399 (9th Cir. 1994) ............................................................... 8

7

*Glickman v. Wileman Bros. & Elliott, Inc.*

521 U.S. 457 (1997) ........................................................................... 11

8

9

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*

515 U.S. 557 (1995) ........................................................................... 15

10

11

*Maryland v. King*

567 U.S. 1301 (2012) (Roberts, C.J., in chambers) ........................... 22

12

13

*Moody v. NetChoice, LLC*

603 U.S. 707 (2024) ........................................................................2, 8

14

15

*Nat'l Ass'n of Wheat Growers v. Becerra*

468 F. Supp. 3d 1247 (E.D. Cal. 2020) .............................................. 16

16

17

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*

272 F.3d 104 (2d Cir. 2001) ..........................................................1, 17

18

19

*Nat'l Inst. of Family & Life Advocates v. Becerra*

585 U.S. 755 (2018) ......................................................................15, 16

20

21

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*

538 U.S. 803 (2003) ............................................................................. 8

22

*National Ass'n of Manufacturers v. SEC*

800 F.3d 518 (D.C. Cir. 2015) ........................................................... 14

23

24

*NetChoice v. Bonta*

113 F.4th 1101 (9th Cir. 2024) ...................................................2, 10, 15

25

26

*NetChoice v. Bonta*

No. 5:24-CV-07885-EJD, 2024 WL 5264045 (N.D. Cal. Dec. 31, 2024) ...................................................................................................... 8

27

28

iii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES
### (continued)

Page

*NetChoice, LLC v. Bonta*
No. 22-CV-08861-BLF, 2025 WL 807961 (N.D. Cal. Mar. 13, 2025) ......................................................................................... 19

*Nken v. Holder*
556 U.S. 418 (2009) ........................................................................... 22

*Ohralik v. Ohio State Bar Ass'n*
436 U.S. 447 (1978) ........................................................................... 10

*Oklevueha Native Am. Church of Haw., Inc. v. Holder*
676 F.3d 829 (9th Cir. 2012) ............................................................. 8

*Reed v. Town of Gilbert, Ariz.*
576 U.S. 155 (2015) (Breyer, J., concurring in judgment) ............ 1, 11

*S.E.C. v. Wall St. Publ'g Inst., Inc.*
851 F.2d 365 (D.C. Cir. 1988) .......................................................... 10

*Smith v. Helzer*
95 F.4th 1207 (9th Cir. 2024) ........................................................... 19

*Sorrell v. IMS Health Inc.*
564 U.S. 552 (2011) ........................................................................... 11

*Stutzman v. Armstrong*
No. 2:13-CV-00116-MCE-KJN, 2013 WL 4853333 (E.D. Cal. Sept. 10, 2013) ................................................................................ 12

*Turner Broad. Sys., Inc. v. FCC*
512 U.S. 622 (1994) ........................................................................... 16

*Turner Broad. Sys., Inc. v. FCC*
520 U.S. 180 (1997) ........................................................................... 16

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*
425 U.S. 748 (1976) ............................................................................. 2

*Video Software Dealers Ass'n*, 556 F.3d at 961-62 .............................. 17

iv

# TABLE OF AUTHORITIES
## (continued)

Page

*Wash. State Grange v. Wash. State Republican Party*
   552 U.S. 442 (2008) ................................................................... 2

*Winter v. Nat. Res. Def. Council, Inc.*
   555 U.S. 7 (2008) ............................................................ 2, 7, 20

*Wooley v. Maynard*
   430 U.S. 705 (1977) ................................................................ 15

*X Corp. v. Bonta*
   116 F.4th 888 (9th Cir. 2024) ............................................ *passim*

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*
   471 U.S. 626 (1985) ...................................... 1, 11, 16, 18

**STATUTES**

15 United States Code
   § 77aa ................................................................................... 3
   § 78l ..................................................................................... 3

Cal. Stat., Chapter 382
   § 1 ....................................................................................... 4

Cal. Stat., Chapter 383
   § 1 ....................................................................................... 4

California Corporation Code
   § 1502.1 (2019) .................................................................... 3
   § 1502 (2020) ...................................................................... 3
   § 2117.1 (2019) .................................................................... 3
   § 2117 (2020) ...................................................................... 3

California Health and Safety Code
   § 38532 ......................................................................... *passim*
   § 38533 ......................................................................... *passim*
   § 38562 ............................................................................. 18
   § 38562.2 .......................................................................... 18
   § 38566 ............................................................................. 18

v

# TABLE OF AUTHORITIES
## (continued)

Page

**CONSTITUTIONAL PROVISIONS**

First Amendment ...............................................................................*passim*

**COURT RULES**

Rule 26(f) ............................................................................................ 7

Rule 56(d) ........................................................................................... 7

**OTHER AUTHORITIES**

17 Code of Federal Regulations
    pt. 210 (2024) ................................................................................. 3
    pt. 229 (2024) ................................................................................. 3
    pt. 229.105(a) .............................................................................. 10

36 Federal Register, 13989, 13989 (July 29, 1971) ............................. 10

75 Federal Register 6290, 6290-91 (Feb. 8, 2010) ............................. 10

vi

### INTRODUCTION

Courts have long examined laws compelling factual commercial speech with a lower level of scrutiny than those compelling political or ideological speech. *See Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626 (1985). This is because a speaker has only "minimal" First Amendment interest in the disclosure of uncontroversial commercial information, as compared to the "value … of the information such speech provides." *Id.* at 651; *see also Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 114 (2d Cir. 2001) ("Such disclosure furthers, rather than hinders, the First Amendment goal of the discovery of truth and contributes to the efficiency of the 'marketplace of ideas.'"). Attempting to evade application of this precedent, Plaintiffs contend that the laws at issue here compel the disclosure of "policy opinion about contentious issues." Dkt. 78-1 at 2-3 (citing *X Corp. v. Bonta*, 116 F.4th 888, 899 (9th Cir. 2024)). These laws do nothing of the kind.

The Corporate Data Accountability Act (Senate Bill 253) requires covered entities to provide the government with greenhouse gas (GHG) emissions data produced via widely accepted accounting protocols. The Climate-Related Financial Risk Act (Senate Bill 261) requires the disclosure of industry standard business-risk assessments. This type of information—like that contained in securities registration statements or income tax statements—has historically merited minimal, if any, First Amendment concern. *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 177 (2015) (Breyer, J., concurring in judgment). Plaintiffs contend that these disclosures are "controversial" merely because they relate to climate change. Dkt. 78-1 at 12. But a statement of fact does not become a contentious policy opinion simply because it "can be tied in some way to a controversial issue." *CTIA - The Wireless Ass'n v. City of Berkeley, California*, 928 F.3d 832, 845 (9th Cir. 2019). The distinction between disclosures requiring a company to articulate *its position* on a contentious policy issue, and those providing factual information (from which a third party could form an opinion about that policy issue), is legally significant, and separates

1

1    the present disclosures from those at issue in both *X Corp.*, 116 F.4th at 888, 902-

2    03, and *NetChoice v. Bonta*, 113 F.4th 1101, 1119-21 (9th Cir. 2024).

3        Moreover, the disclosures required here serve compelling government

4    interests.  A majority of large companies are making climate reduction pledges,

5    Decl. of Angela Hsu ¶ 8 (87% of sample), or disclosing their GHG emissions, Dkt.

6    53-8 at 402 (98% of sample); *see also* Decl. of Thomas P. Lyon ¶¶ 20-21.  And

7    96% of these statements are misleading.  Hsu Decl. ¶ 10.  The disclosures required

8    here address this problem.  Lyon Decl. ¶¶ 57-61; Hsu Decl. ¶¶ 15-16; *see also* Dkt.

9    78-1 at 14 (conceding that combatting fraud is a compelling interest).  These

10    disclosures will also correct "a massive blind spot for consumers, investors, and

11    policymakers," Dkt. 48-5 at 10:23-24, who need this information to make

12    "intelligent and well informed" economic decisions.  *See Va. State Bd. of Pharmacy

13    v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976).

14        Plaintiffs cannot show a likelihood of success on the merits.  They chose to

15    bring this suit through the "disfavored" mechanism of a facial challenge.  *Wash.

16    State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008); *Moody v.

17    NetChoice, LLC*, 603 U.S. 707, 723 (2024) (noting that "facial challenges [are] hard

18    to win").  And they now seek the "extraordinary remedy" of a preliminary

19    injunction, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), without

20    any further factual development from when this Court denied their motion for

21    summary judgment on this same claim, Dkt. 73 at 10-11.  As noted above,

22    Defendants' evidence shows that, under any level of scrutiny, the plainly

23    constitutional applications of these laws—e.g., to entities making misleading

24    environmental claims—outweigh any arguably unconstitutional ones.

25        Plaintiffs also fail to present any plausible claim of imminent irreparable harm,

26    or even a ripe claim as to Senate Bill (S.B.) 253.  The implementing agency has not

27    adopted the regulations that are a condition precedent to any obligation on the

28    reporting entities under that statute, *see* Dkt. 77 at 11-12, much less identified a date

1    by which covered entities must speak.  This case may well be resolved first.  Dkt.

2    87 at 6-7 (joint request for summary judgment hearing in July 2026).  As to S.B.

3    261, disclosures are not due for nearly eight months.  *Id.* § 38533(b)(1)(A) (2024).

4    Moreover, Plaintiffs' *single* declaration from a company that will be subject to

5    these disclosure requirements lacks foundation and is riddled with errors and

6    speculation.  Plaintiffs' evidence does not support the extraordinary relief they seek.

7                                    **BACKGROUND**

8    **I.    CORPORATE REPORTING OBLIGATIONS INVOLVING ESTIMATION AND
9            PREDICTION ARE ROUTINE**

10          All companies doing business in California, both public and private, are

11   subject to state reporting obligations.  *See, e.g.*, Cal. Corp. Code §§ 1502 (2020),

12   1502.1 (2019), 2117 (2020), 2117.1 (2019).  Federal law also requires public

13   companies to make a variety of disclosures to various regulatory agencies, such as

14   the Securities and Exchange Commission (SEC).  *See, e.g.*, 15 U.S.C. §§ 77aa, 78*l*;

15   17 C.F.R. pt. 229 (2024); 17 C.F.R. pt. 210 (2024).  These mandatory disclosures

16   include information about a company's operations and financial condition; factors

17   that increase the risk of investing in the company; factors management believes

18   affected past company performance and will affect future performance; etc.  *See*

19   Dkt. 54 ¶ 17.[1]  Among the risks that SEC-regulated companies have had to report

20   are the impacts of the "Year 2000" (Y2K) problem, the Covid-19 pandemic, high

21   rates of inflation, and Russia's war on Ukraine.  *Id.* ¶¶ 19(b), 19(c).

22          To prepare such disclosures, companies are routinely required to make

23   estimates and predictions and to assess and disclose perceived risks.  Decl. of James

24   P. Burton ¶ 32 (noting U-Haul's use of estimates and assumptions in financial

25   disclosures).  Disclosures pertaining to the potential impacts of a global conflict on

26

27          [1] Defendants hereby incorporate by reference the evidence, including declarations, that
     was submitted with the briefing on Plaintiffs' motion for summary judgment (*e.g.* Dkt. Nos. 48,
28   52-57).

                                            3

1  a company's supply chain, the projected impact of high rates of inflation, or the

2  impact of pending or threatened litigation necessarily involve uncertainty.  Dkt. 54

3  ¶ 19.  Nonetheless, these disclosures are understood to be "factual information"

4  reflecting the reporting entities' well-reasoned "business judgments" on the relevant

5  metrics.  *Id.* ¶¶ 20-22.  This is particularly so when the disclosed information is

6  developed pursuant to established "accounting policies and practices."  *Id.* ¶¶ 23-

7  25.  Indeed, "both investors and companies *routinely rely* on such information in

8  making investment and business decisions that involve large financial outlays."  *Id.*

9  ¶¶ 26-27 (emphasis in original).

10 **II.   THE CALIFORNIA LEGISLATURE ENACTED S.B. 253 AND 261 IN PART TO
11        RESPOND TO WIDESPREAD INACCURACIES IN STATEMENTS BY THE
         LARGEST COMPANIES DOING BUSINESS IN CALIFORNIA**

12         S.B. 253 and 261 were enacted in late 2023 to, among other things, respond to

13 concerns that California investors and consumers lacked accurate, verifiable data

14 about GHG emissions and climate-risk assessment—information needed to make

15 prudent financial decisions—from the largest companies doing business in the state.

16 2023 Cal. Stat., ch. 382 § 1 (S.B. 253); 2023 Cal. Stat., ch. 383 § 1 (S.B. 261); *see*

17 *also* Dkt. 48-7 at 2:7-3:1; Dkt. 48-9 at 3:10-15.  While a significant portion of the

18 largest companies already prepare climate-related disclosures or statements of some

19 form, Dkt. 53 ¶ 14, the lack of reliable and assured data has made it easy for

20 companies to provide misleading or fraudulent information, Lyon Decl. ¶¶ 53-61.

21 Indeed, a recent study of 4,131 companies found that 87% of them made emissions

22 claims, and of these, 96% of them were misleading or inaccurate.  Hsu Decl. ¶¶ 8-

23 10.  CalPERS, California's largest public-defined-benefit pension fund, considers

24 "[c]limate risk [to be] investment risk," and finds that "the current disclosure

25 regime for corporate reporting falls short of [investors'] expectations … ."  Dkt. 52-

26 5 ¶¶ 13, 19.  Because investors have "extensive exposure to private sector

27 companies"—in the case of CalPERS, "more than $150 billion" worth—investors

28

4

1  "see[] the same risks and would benefit from the same climate related disclosures"

2  from both public and private companies. *Id.* ¶ 16.

3     **A.  S.B. 253**

4      S.B. 253 does not directly require companies to disclose anything.  Instead, it

5  directs the California Air Resources Board (CARB) to "develop and adopt

6  regulations" that *will* require "reporting entit[ies]" to disclose their GHG emissions

7  to CARB or a designated emissions reporting organization.  Cal. Health & Safety

8  Code § 38532(c)(1).  CARB has not yet proposed these implementing regulations.

9  Decl. of Caitlan McLoon ¶ 2.

10      "Reporting entit[ies]" will be those that "do[] business in California" and have

11  total annual revenues in excess of $1 billion.  *Id.* § 38532(b)(2).  A recent analysis

12  estimated that 1,971 companies could be covered by the law, 75% of them public

13  companies.  McLoon Decl. Ex. 2 at 11.

14      Once CARB's implementing regulations are in place, reporting entities will

15  report three categories of GHG emissions: Scope 1, Scope 2, and Scope 3.  Scope 1

16  emissions are those from sources owned or directly controlled by the reporting

17  entity.  *Id.* § 38532(b)(3).  Scope 2 encompasses indirect emissions associated with

18  the reporting entity's use of electricity, heating, and cooling.  *Id.* § 38532(b)(4).

19  Scope 3 includes all other indirect emissions, such as those from "purchased goods

20  and services, business travel, employee commutes, and processing and use of sold

21  products."  *Id.* § 38532(b)(5).  Scope 3 emissions can be determined through

22  collection of relevant data (e.g., from suppliers), *or* estimated using "secondary data

23  sources," including "industry average data, proxy data, and other generic data."  *Id.*

24  § 38532(c)(2)(A)(ii).  Entities must measure and report all three categories of

25  emissions "in conformance" with the "Greenhouse Gas Protocol standards and

26  guidance," *id.*, a globally accepted protocol for emissions accounting, Dkt. 53

27  ¶¶ 10, 14, 17, 19-25, 28.

28

5

1    S.B. 253 "minimizes duplication of effort" by allowing reporting entities to

2    submit emissions data prepared to meet other national and international reporting

3    requirements. Cal. Health & Safety Code § 38532(c)(1)(D)(i). The law requires

4    third-party assurances to ensure the quality and accuracy of the data, *id.*

5    § 38532(c)(2)(F)(i), and makes the data accessible to the public, *id.* § 38532(d)(1),

6    (e)(1).

7    Scope 1 and Scope 2 emissions reports are not due until 2026 "on or by a date

8    to be determined by the state board." *Id.* § 38532(c)(2)(A)(i)(I). In December

9    2024, CARB issued an Enforcement Notice stating that "for the first report due in

10   2026," covered entities may submit reports based solely on emissions data "that can

11   be determined from information the reporting entity already possesses or is already

12   collecting at the time" the Notice issued. Dkt. 78-6 at 2. Scope 3 reporting will not

13   begin until 2027. Cal. Health & Safety Code § 38532(c)(2)(A)(i)(II).

14   **B.    S.B. 261**

15   S.B. 261 requires U.S. entities with total annual revenues in excess of $500

16   million that "do[] business in California" to prepare a biennial report disclosing

17   climate-related financial risks they have identified and any measures they have

18   adopted to reduce and adapt to those risks. *Id.* § 38533(a)(4)–(b)(1)(A). A recent

19   analysis projects that 2,675 companies will be covered by the law, 73% of them

20   public companies. McLoon Decl. Ex. 2 at 11.

21   The bill defines "[c]limate-related financial risk" as the "material risk of harm

22   to immediate and long-term financial outcomes due to physical and transition

23   risks … ," such as disruptions to operations or impacts on employee health and

24   safety. Cal. Health & Safety Code § 38533(a)(2). The law directs entities to

25   prepare their disclosures in alignment with "the Final Report of Recommendations

26   of the Task Force on Climate-related Financial Disclosures" ("TCFD"), *id.*

27   § 38533(b)(1)(A)(i), a widely adopted investor-driven protocol. Dkt. 53 ¶¶ 11, 14,

28   17, 19, 21-25, 36, 37(c). Each reporting company must publish a copy of the report

6

1   "on its own internet website."  Cal. Health & Safety Code § 38533(c)(1).  These

2   disclosures are first due on January 1, 2026.  *Id.* at § 38533(b)(1)(A).

3       Under the TCFD, "risks" and "financial impacts" subject to disclosure include

4   "[i]ncreased operating costs," "[r]educed demand for products and services,"

5   "change in revenue mix and sources," "[i]ncreased production costs due to

6   changing input prices," and "[i]ncreased insurance premiums."  Dkt. 48-23 at 19-

7   20.  Entities need not adopt any particular climate-related risk management strategy

8   or take any particular climate-risk mitigation actions.  Dkt. 53 ¶¶ 35, 38-39; Dkt. 54

9   ¶¶ 19-21, 29-33.

10   **III.  PROCEDURAL HISTORY**

11       Plaintiffs sought summary judgment on their First Amendment claim on May

12   24, 2024, before discovery opened.  Dkt. 48.  In November 2024, this Court denied

13   that motion and granted Defendant's Rule 56(d) motion on the ground "that further

14   development of the facts are needed for [the Court] to evaluate" Plaintiffs' claim.

15   Dkt. 73 at 12.  Before the parties had held their Rule 26(f) Conference, Plaintiffs

16   brought this Motion for Preliminary Injunction on the same claim.  Dkt. 78.

17       Separately, on February 3, 2025, this Court issued an order granting

18   Defendants' motion to dismiss Plaintiffs' second and third claims under the

19   Supremacy and dormant Commerce Clauses.  Dkt. 77.  In that order, the Court

20   concluded that those claims were not ripe as to S.B. 253, and that Plaintiffs had

21   failed to state those claims as to S.B. 261.  *Id.* at 11-24.

22                       **LEGAL STANDARD**

23       "A preliminary injunction is an extraordinary remedy never awarded as of

24   right."  *Winter*, 555 U.S. at 24.  The moving party must establish that (1) it is likely

25   to succeed on the merits; (2) it is likely to suffer irreparable harm absent relief; (3)

26   the balance of equities tips in its favor; and (4) an injunction is in the public

27   interest.  *Id.* at 20.

28

1   A party bringing a facial challenge to invalidate a law under the First

2   Amendment must show that "the law's unconstitutional applications substantially

3   outweigh its constitutional ones." *X Corp.*, 116 F.4th at 898 (quoting *Moody*, 603

4   U.S. at 724).  Facial challenges are "hard to win" because they "threaten to short

5   circuit the democratic process" by "preventing duly enacted laws from being

6   implemented in constitutional ways." *Moody*, 603 U.S. at 723 (cleaned up).

7                                   **ARGUMENT**

8   **I.    PLAINTIFFS' CHALLENGE TO S.B. 253 IS UNRIPE**

9   As a preliminary matter, Plaintiffs' challenge to S.B. 253, and especially the

10  provisions pertaining to Scope 3 emissions reporting, is prudentially unripe.  As this

11  Court previously explained, "SB 253, on its own, does not mandate any action from

12  any of Plaintiffs' members or any other reporting entity," and CARB has not yet

13  adopted the implementing regulations for S.B. 253 that are a prerequisite to any

14  obligation to act.  Dkt. 77 at 11.  Plaintiffs' request for extraordinary relief thus

15  seeks premature adjudication of claims that do not yet have a concrete impact on

16  the parties.  *Exxon Corp. v. Heinze*, 32 F.3d 1399, 1404 (9th Cir. 1994); *see*

17  *NetChoice v. Bonta*, No. 5:24-CV-07885-EJD, 2024 WL 5264045, at *4 (N.D. Cal.

18  Dec. 31, 2024) (finding First Amendment challenge unripe).

19  Prudential ripeness requires the Court "to first consider the fitness of the issues

20  for judicial review, followed by the hardship to the parties of withholding court

21  consideration." *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d

22  829, 837 (9th Cir. 2012).  Plaintiffs' challenge to S.B. 253 is not fit for review

23  because "further factual development"—namely, the implementing regulations—

24  "would significantly advance [the Court's] ability to deal with the legal issues

25  presented." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003)

26  (cleaned up); *see* McLoon Decl. Ex. 1 (identifying topics for regulatory

27  development).  And Plaintiffs cannot show they or their members will suffer any

28  hardship if the Court withholds its consideration of this challenge, as the

8

1    requirements are not in effect until some unspecified date in 2026 for Scopes 1 and

2    2, and 2027 for Scope 3.  Health and Safety Code § 38532(c)(1), (2)(A)(i).

3    Moreover, CARB issued an Enforcement Notice stating that entities need not

4    collect any new data "for the first report due in 2026."  Dkt. 78-6 at 2-3.

5    **II.**    **PLAINTIFFS ARE UNLIKELY TO PREVAIL ON THE MERITS**

6    On the merits, the central question before this Court is what level of First

7    Amendment scrutiny to apply.  Plaintiffs contend that the challenged laws merit

8    strict scrutiny because they compel the disclosure of policy opinions on contentious

9    issues.  But Plaintiffs fail to demonstrate that the laws compel a single company to

10    state a political opinion, much less that a substantial number of reporting entities

11    must do so.  This contrasts with *X Corp.*, 116 F.4th at 899, where the facial

12    challenge succeeded because "every covered social media company" had to "reveal

13    its policy opinion about contentious issues," thereby implicating heightened First

14    Amendment concerns "in every application" of the law.  Rather, the disclosures that

15    will be required under these laws closely resemble those that fall into a "long …

16    tradition" of reduced constitutional concern.  *Id.* at 901; *see also* Dkt. 52 at 20:13-

17    21:3.  In fact, these laws are best understood either as governing an area of

18    economic regulation that merits no First Amendment concern, or as compelling the

19    disclosure of commercial data and business information that merits a form of

20    rational basis or intermediate review.

21    In any event, as addressed below, S.B. 253 and 261 satisfy any level of

22    scrutiny.  *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014) (noting the plaintiff has

23    the initial burden of showing that a challenged law implicates the First Amendment,

24    while the government has the subsequent burden of showing that the challenged

25    law satisfies the appropriate level of scrutiny).  Thus, Plaintiffs cannot establish a

26    likelihood of success on the merits.

27

28

9

### A.  Plaintiffs Fail to Show that S.B. 253 and 261 Implicate the First Amendment

This Court is free to reexamine its previous conclusion that these laws implicate the First Amendment.  *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018) ("The law of the case doctrine does not preclude a court from reassessing its own legal rulings in the same case.").  And it should, as the Court's earlier reliance on *NetChoice*, 113 F.4th at 1118, was misplaced.  Dkt. 73 at 7-8.  In *NetChoice* the Court concluded the First Amendment applied because the laws in question compelled companies to make speech imbued with political opinion and also to "serv[e] as censors for the State."  113 F.4th at 1118.  Here, however, the laws require a type of speech—disclosure of commercial data and financial risks—that has not traditionally garnered constitutional concern.

Most of the entities regulated by S.B. 253 and 261 are subject to SEC rules requiring the disclosure of factors that may "make an investment … speculative or risky," 17 C.F.R. pt. 229.105(a), including environmental-related risks, 36 Fed. Reg. 13899, 13989 (July 29, 1971); 75 Fed. Reg. 6290, 6290-91 (Feb. 8, 2010).  Securities filings of this kind, like tax returns or census data, contain speech that has historically fallen outside the boundaries of First Amendment coverage entirely, or has merited minimal judicial scrutiny.  *See, e.g., S.E.C. v. Wall St. Publ'g Inst., Inc.*, 851 F.2d 365, 373 (D.C. Cir. 1988) ("If speech employed directly or indirectly to sell securities were totally protected, any regulation of the securities market would be infeasible—and that result has long since been rejected."); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 457 (1978) (explaining that "the exchange of information about securities" and "corporate proxy statements" may be regulated without offending the First Amendment).  There is no rational reason the present laws should be treated differently.

Additionally, the laws here are directed at a "broader regulatory apparatus" governing the disclosure of commercial data, and thus regulate conduct, not speech.

10

1    *Env't Def. Ctr. v. EPA*, 344 F.3d 832, 850 n.26 (9th Cir. 2003); *see also Glickman*

2    *v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 469 (1997).  Accordingly, the First

3    Amendment does not apply.

**B.    S.B. 253 and 261 Are Not Subject to Strict Scrutiny**

5    To the extent the Court finds that the First Amendment applies, at the very

6    least the "strong presumption against constitutionality" urged by Plaintiffs "has no

7    place" here.  *Reed*, 576 U.S. at 177 (Breyer, J., concurring in judgment).

8    Courts have long examined regulations affecting commercial speech

9    differently from those impacting other speech (e.g., political speech)—applying a

10   lower level of scrutiny to the former.  *Zauderer*, 471 U.S. at 637; *Cent. Hudson Gas*

11   *& Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561-63 (1980).

12   The need to afford the government greater room to regulate is especially

13   pronounced when the government action is intended to increase, rather than restrict,

14   the free flow of accurate information to the public.  *Zauderer*, 471 U.S. at 646; *see*

15   *also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011).

16   Under *Zauderer*, "compelled disclosure of commercial speech complies with

17   the First Amendment if the information in the disclosure is reasonably related to a

18   substantial governmental interest[,] … is purely factual and uncontroversial," and is

19   not unduly burdensome.  *CTIA*, 928 F.3d at 845, 848-49.  Plaintiffs argue the

20   disclosures at issue here are not commercial, uncontroversial, or factual.  These

21   arguments fail.

22   ***Commercial speech.***  There are no "bright line[]" rules for determining what

23   constitutes "commercial speech."  *X Corp.*, 116 F.4th at 900.  Rather, courts

24   employ a "common-sense" and "fact-driven" analysis, *id.*, focused on "the *nature*

25   of the speech," *id.* at 901 n.9.  Three characteristics, when present, lend "strong

26   support" to the conclusion that speech is commercial: (1) the speech is an

27   advertisement, (2) the speech refers to a particular product, and (3) the speaker has

28   an economic motivation.  *Id.* at 900 (citing *Bolger v. Youngs Drug Prod. Corp.*, 463

11

1    U.S. 60, 66-67 (1983)).  However, the absence of these factors is "not dispositive."

2    *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1116 (9th Cir. 2021).

3        Plaintiffs argue that the speech involved here lacks the "indicia of commercial

4    speech" because it "d[oes] not *itself* appear in advertisements" or "*merely* disclose

5    existing commercial speech."  Dkt. 78-1 at 13 (emphasis in original).  But Plaintiffs

6    take too narrow a view.  A formal "advertisement" is not required; rather "[c]ourts

7    have found commercial speech even when it involves indirect benefits, such as …

8    improvements to a brand's image."  *Ariix*, 985 F.3d at 1117; *see also Am. Hosp.*

9    *Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020) (noting commercial speech is not

10   "limited to restrictions on advertising and point-of-sale labeling").

11       Companies speak publicly about their emissions and sustainability practices to

12   attract business.  Lyon Decl. ¶¶ 11-27.  At least 82% of the largest companies in

13   North America make such statements.  Hsu Decl. ¶ 8; Dkt. 53-8 at 402; Lyon Decl.

14   ¶ 21 (noting increasing attention given to climate risk in corporate earnings calls).

15   Even U-Haul, Plaintiffs' sole covered entity declarant, is doing so.  Burton Decl.

16   ¶ 36-37, Ex. 1, Ex. 6.  This speech is advertising—even if it is advertising the

17   company, rather than a product—and has a clear economic motive.  Thus, the

18   disclosures required under S.B. 253 and 261 satisfy two of the three *Bolger* factors.

19   That suffices to establish commercial speech.  *See* Dkt. 73 at 11 (citing *Stutzman v.*

20   *Armstrong*, No. 2:13-CV-00116-MCE-KJN, 2013 WL 4853333, at *18 (E.D. Cal.

21   Sept. 10, 2013)).  But in any event, the *Bolger* factors are not dispositive, and these

22   disclosures plainly concern only firm-level operational information—such as that

23   found in SEC disclosures—that is commercial in nature.  *X Corp.*, 116 F.4th at 900

24   (explaining courts ultimately "try to give effect to a common-sense distinction

25   between commercial speech and other varieties of speech") (cleaned up).

26       ***Uncontroversial speech.***  Plaintiffs argue that the compelled speech here

27   cannot be "commercial" in nature because it "conveys companies' views on

28   intensely debated and politically fraught topics."  Dkt. 78-1 at 13 (cleaned up).  But

12

1  neither law requires a company to express its policy views on *any* topic, much less

2  one that is politically fraught. *See* Dkt. 53 ¶¶ 35, 38-39; *see also* Dkt. 53-20 at

3  1199-1201, Dkt. 53-21 at 1251-1255, and Dkt. 53-22 at 1262-1383 (example

4  disclosures). Far from requiring companies to opine on whether and how certain

5  categories of controversial content "should be defined and proscribed," *X Corp.*,

6  116 F.4th at 901, these laws require companies to follow widely accepted protocols

7  and definitions to disclose uncontroversial data and information.

8      The distinction between a policy position and a business fact is well

9  understood in the field of corporate disclosure. A company asked to disclose its

10  business risks related to the war in Ukraine, for example, is not expected to state its

11  policy view on the war or how the government should respond to the conflict;

12  rather, the company is expected to disclose facts pertaining to potential disruptions

13  in its supply chain or increased costs which in its reasonable estimation might result

14  from the conflict. Similarly, under S.B. 261, companies need not opine on whether

15  a government should adopt "carbon-pricing" policies; rather, companies need only

16  disclose costs and risks they have determined may flow from such policies,

17  including "[i]ncreased operating costs." Dkt. 48-23 at 10. Similarly, under S.B.

18  253 a company need not opine on whether its emissions contribute to climate

19  change; rather, it need only provide the numerical accounting of emissions

20  associated with its operations. And indeed, many companies already do so in

21  service of business objectives. Dkt. 53 ¶ 14.

22      Plaintiffs claim that these disclosures are "controversial" because they touch

23  on climate change and because the information disclosed could be used to

24  "stigmatize" companies. Dkt. 78-1 at 12. A factual statement does not, however,

25  become controversial simply because it "can be tied in some way to a controversial

26  issue," *CTIA*, 928 F.3d at 845, or because a listener may use the fact to form an

27

28

13

1   opinion.[2]  Plaintiffs cite *National Ass'n of Manufacturers v. SEC*, 800 F.3d 518,

2   530 (D.C. Cir. 2015), but there, companies engaged in diamond sales were required

3   to state whether their diamonds were "conflict free" or "not conflict free," a

4   statement the court found to be both ideological and intertwined with moral

5   responsibility.  *Id.*  But whereas those labels forced companies to communicate

6   whether their product was "ethically tainted," *id.*, irrespective of the companies'

7   own views of their moral responsibility, the S.B. 253 and 261 disclosures do not

8   require speech that conveys a political message, Dkt. 53 ¶¶ 35, 38-39.  These laws

9   provide data; they do not label companies as "good for the climate" or "bad for the

10  climate."  That third parties could take a further step and use the disclosed

11  information to inform commercial choices does not make the compelled speech

12  controversial.  *See Am. Meat Inst. v. USDA*, 760 F.3d 18, 21-25 (D.C. Cir. 2014).

13  Rather, it underscores the role that disclosure plays in furthering First Amendment

14  interests, such as ensuring access to robust, accurate information, unencumbered by

15  the government's own policy views.

16      ***Factual speech.***  Finally, Plaintiffs argue that lower scrutiny does not apply to

17  either law, because the information provided is not "rote, 'pure' fact."  Dkt. 78-1 at

18  10-11.  But emissions calculations arrived at using standardized accounting

19  methodologies—like the Greenhouse Gas Protocol—are purely factual in nature,

20  even if reliant on estimation.  Dkt. 53 ¶¶ 23-28.  And Plaintiffs are incorrect that the

21  disclosures under S.B. 253 are "misleading" because they contain the "upstream

22  and downstream" emissions of suppliers and do not include a company's "avoided

23  emissions."  Dkt. 78-1 at 11-12.  To the contrary, the freedom to selectively report

24  just Scope 1 and 2 emissions, or to subtract out their alleged "avoided emissions,"

25  has resulted in the current marketplace of highly misleading disclosures.  Lyon

26

27  _____

28      [2] In any event, Plaintiffs concede elsewhere that climate change as a scientific reality is
    uncontroversial. Dkt. 59 at 6:24-25.

14

1   Decl. ¶¶ 33-42; Dkt. 56 ¶¶ 18-26, 39; Dkt. 52-5 ¶ 14; *see Am. Hosp. Assoc.*, 983

2   F.3d at 541.

3        S.B. 261's disclosures are similarly factual.  Companies need only disclose

4   their existing risk-assessments and mitigation strategies concerning climate-related

5   financial risks.  Dkt. 53 ¶¶ 35, 38-39; Dkt. 54 ¶¶ 19-22, 31-33.  Companies are not

6   required to adopt any particular policy or express their views regarding climate

7   change.  Dkt. 53 ¶¶ 35, 38-39.  If an entity does not currently evaluate climate-

8   related risks, its disclosure can simply state that.  *Id*.  The business judgments

9   regarding risk disclosed under S.B. 261 are not meaningfully distinct from other

10  financial risks routinely disclosed by large companies.  And they bear no

11  resemblance to the "political opinion[s]" at issue in *NetChoice*, 113 F.4th at 1120,

12  which involved a law requiring companies to *weigh in* on highly divisive national

13  debate about what type of speech is harmful to children, and then act to censor that

14  speech.

15       Because S.B. 253 and 261 do not require the affirmation of a government-

16  favored viewpoint, the cases Plaintiffs cite are inapposite.  *See 303 Creative LLC v.*

17  *Elenis*, 600 U.S. 570 (2023) (requirement that companies convey anti-

18  discrimination statement); *Wooley v. Maynard*, 430 U.S. 705 (1977) (required

19  dissemination of ideological message on license plate); *Hurley v. Irish-Am. Gay,*

20  *Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995) (requirement to present

21  alternative viewpoints in organization's parade); *Nat'l Inst. of Family & Life*

22  *Advocates v. Becerra*, 585 U.S. 755 (2018) (regulation requiring clinics opposed to

23  abortion to disseminate notice of abortion services).  Plaintiffs have not adequately

24  demonstrated how requiring disclosure of emissions data and corporate risks

25  burdens constitutionally protected speech at all, much less in a substantial number

26  of its applications.  Plaintiffs' argument that the laws trigger strict scrutiny fails.

27

28

15

**C.    SB 253 and 261 Satisfy Any Level of Scrutiny**

Applying *Zauderer* review, the government need only show that "the information in the disclosure is reasonably related to a substantial governmental interest," *CTIA*, 928 F.3d at 845, is neither unjustified nor unduly burdensome on speech, and "remed[ies] a harm that is 'potentially real, not purely hypothetical,'" *NIFLA*, 585 U.S. at 776.  Alternatively, if this Court finds the speech compelled under S.B. 253 or 261 is not factual or uncontroversial, "the court should then proceed to examine the [laws] under *Central Hudson*'s intermediate scrutiny."  *See Nat'l Ass'n of Wheat Growers v. Becerra*, 468 F. Supp. 3d 1247, 1258 (E.D. Cal. 2020).  Under *Central Hudson*, government regulation of commercial speech must directly advance a substantial government interest and be no more restrictive than necessary to serve that interest.  447 U.S. at 564.

Defendants can meet either standard here.  In fact, these laws would survive even strict scrutiny, as they "are narrowly tailored to serve compelling state interests."  *NIFLA*, 585 U.S. at 766.  California's Legislature identified three interests served by the laws, which are supported by the legislative history and evidence.  *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665-66 (1994); *see also Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 196 (1997).

*First*, California has an interest in protecting its investors, consumers, and other stakeholders from fraud or misrepresentation.  *See Zauderer*, 471 U.S. at 638 ("The States . . . are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading[.]").  Plaintiffs concede this is a compelling state interest; they dispute only that the State has demonstrated that any such misleading speech exists.  Dkt. 78-1 at 21.  But Defendants' evidence shows that 96% of companies with emissions targets engage in misleading speech, Hsu Decl. ¶ 10, of a kind that standardized disclosures of the type required by SB 253 and 261 will prevent.  Lyon Decl. ¶¶ 56-61; *see also* Hsu Decl. ¶¶ 15-16.  As Defendants show that "the recited harms are real, not merely conjectural, and that the regulation will

16

1   in fact alleviate these harms in a direct and material way," Defendants have

2   satisfied their burden.  *Video Software Dealers Ass'n*, 556 F.3d at 961-62 (cleaned

3   up).

4   Plaintiffs argue that existing state laws criminalizing fraud are "sufficient" to

5   address this interest.  Dkt. 78-1 at 14.  But the prevalence of misleading

6   environmental claims demonstrates the insufficiency of existing law to address the

7   problem.  Hsu Decl. ¶ 10; Lyon Decl. ¶¶ 30-55.  Nor is the problem limited to

8   *actionable* fraud, Lyon Decl. ¶ 28; investors and consumers rely on the data

9   disclosed through S.B. 253 and 261 to make sound market decisions, and the

10  inaccuracies and inconsistencies in the existing data undercuts these purposes.  Dkt.

11  52-5 ¶¶ 18-22.  In order to identify companies that may be vulnerable, or profitable,

12  based on their emissions exposure, firm-wide data about emissions and climate

13  risks is necessary.  *Id.*; Lyon Decl. ¶¶ 6-10.  Moreover, given the pervasiveness of

14  the misleading speech, and the varying forms in which it appears, Lyon Decl.

15  ¶¶ 29-32, it is unworkable to limit the laws' application only to those firms making

16  such claims in formal advertising.  Nor do Plaintiffs explain how a company would

17  attach a complete report to the "climate-related advertisements themselves," other

18  than posting it to their own website.  Dkt. 78-1 at 15.

19  *Second*, California has a compelling interest in reliable information that

20  enables investors and consumers to make informed judgments about the impact of

21  climate-related risks on their economic choices.  *See Am. Meat Inst.*, 760 F.3d at 23

22  (government has "substantial" interest in labeling products to serve consumer

23  interest); *Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 115 (government interest supported

24  by "better inform[ing] consumers about the products they purchase"); *Am. Hosp.*

25  *Ass'n*, 983 F.3d at 540 (government has "legitimate" interest in "promoting price

26  transparency and lowering healthcare costs").  Studies confirm consumers' interest

27  in this information.  Lyon Decl. ¶¶ 23-26.  Moreover, these laws serve investors'

28  critical needs: "[b]oth the physical impacts and the transition risks have the power

17

1  to affect our fixed assets, disrupt supply chains and increase volatility in the

2  financial markets." Dkt. 52-5 ¶¶ 11-12. Indeed, investors "demand a premium

3  from firms that are saddled with climate risk." Lyon Decl. ¶ 14; *see also id.* ¶¶ 13-

4  16.

5      These laws are narrowly tailored to the interests of investors and consumers:

6  they apply investor-driven accounting protocols to those firms most likely to be

7  subject to outside investment. Dkt. 54 ¶¶ 34-52. Plaintiffs' assertion that "the State

8  could [] have compiled its own reports" with this information is unavailing. Dkt.

9  78-1 at 15-16. The very problem the State seeks to address is the *lack* of complete

10 and reliably assured data in existing voluntary disclosures and databases. Dkt. 52-5

11 ¶ 19; Dkt. 48-5 at 9:19-10:1. High-level, industry-wide reports utilizing existing

12 publicly available data would not fill these gaps.

13     *Third*, by requiring greater transparency about emissions data and business

14 forecasts of climate risks, S.B. 253 and 261 may encourage companies doing

15 business in California to reduce their emissions and thereby mitigate the risks

16 California and its residents face from climate change. Dkt. 48-4 at 1; Dkt. 48-9 at

17 7:3-8. This, too, is a compelling state interest, both because California has

18 committed to meeting certain emissions reduction goals over time and because of

19 the severity of the climate risks the state faces. Health & Safety Code, §§ 38562,

20 38562.2, 38566. Plaintiffs do not challenge the adequacy of this interest, but rather

21 argue that "[t]he State here has cited *no* evidence" that these disclosures would

22 make any material impact on emissions. Dkt. 78-1 at 14-15. To the contrary,

23 Defendants have presented evidence demonstrating that disclosures of this type lead

24 to a reduction in emissions of 7 to 10%. Dkt. 56 ¶ 50; Lyon Decl. ¶ 62; *see also*

25 Dkt. 48-4 at 1.

26     Thus, S.B. 253 and 261 would survive strict scrutiny, intermediate scrutiny,

27 and certainly, the lesser standard of review under *Zauderer*. And Plaintiffs clearly

28 cannot show "that the applications of the statute that fail [the applicable level of]

18

1    scrutiny are substantial in comparison to any applications of the statute that do not,"

2    as required in a facial challenge.  *NetChoice, LLC v. Bonta*, No. 22-CV-08861-

3    BLF, 2025 WL 807961, at *13 (N.D. Cal. Mar. 13, 2025).  Defendants have

4    demonstrated that a "substantial number" of companies subject to the laws engage

5    in misleading speech which these disclosures would prevent.

6        **D.    S.B. 261 is Not Unconstitutionally Vague**

7        Plaintiffs claim that the definition of "climate-related financial risk" in S.B.

8    261 is unconstitutionally vague.  A statute is impermissibly vague if it "fails to

9    provide a reasonable opportunity to know what conduct is prohibited, or is so

10   indefinite as to allow arbitrary and discriminatory enforcement."  *Arce v. Douglas*,

11   793 F.3d 968, 988 (9th Cir. 2015).  This standard "does not require 'impossible

12   standards of clarity.'"  *Id.*

13       S.B. 261 defines "climate-related financial risk" with reference to the TCFD,

14   Cal. Health & Safety Code § 38533(b)(1)(A)(i), a globally accepted reporting

15   framework well aligned with traditional financial reporting principles, which

16   provides ample guidance to reporting entities, Dkt. 53 ¶ 11.  Large, sophisticated

17   companies like those covered by this statute already have risk management

18   departments performing this type of work.  Dkt. 53 ¶¶ 19, 22, 34(c), 37; Lyon Decl.

19   ¶ 37.  Indeed, a majority of companies are already disclosing these very risks under

20   this very protocol.  Dkt. 53 ¶ 14.

21   **III.  ALL REMAINING INJUNCTION FACTORS WEIGH AGAINST PLAINTIFFS**

22       Given that Plaintiffs cannot show a likelihood of success on the merits, this

23   Court's analysis can end there.  *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023);

24   *Smith v. Helzer*, 95 F.4th 1207, 1215 (9th Cir. 2024).  But Plaintiffs also fail to

25   satisfy the remaining preliminary injunction factors.

26       **A.    Plaintiffs Have Not Established Irreparable Harm**

27       Plaintiffs fail to establish an "immediate threatened injury," that entitles them

28   to provisional relief.  *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674

                                    19

1    (9th Cir. 1988); *see also Winter*, 555 U.S. at 22 (plaintiffs must demonstrate that the

2    claimed harms are both "likely" to occur and are imminent).  Their claims amount

3    to no more than "mere allegations" of "[s]peculative" harm and are therefore

4    insufficient.  *Caribbean Marine Servs.*, 844 F.2d at 674, 676.

5    ***S.B. 253***.  Plaintiffs claim that S.B. 253 will require their members to suffer

6    constitutional harm before this case is resolved.  Dkt. 78-1 at 18:15-17.  But, as

7    discussed above, Plaintiffs cannot establish that they will suffer any constitutional

8    harm, as Plaintiffs' challenge to S.B. 253 is not ripe and is unlikely to succeed on

9    the merits.  In any event, Plaintiffs cannot establish that any alleged harm is

10   imminent.  CARB has not yet issued the regulations that will implement S.B. 253,

11   nor established reporting deadlines.  McLoon Decl. ¶ 2; Health and Safety Code

12   § 38532(c)(2)(A)(i)(I) (Scope 1 and 2 emissions not due until 2026), (2)(A)(i)(II)

13   (Scope 3 emissions not due until 2027).  This case will likely be resolved before

14   Plaintiffs must speak.  Dkt. 87 at 3-4 (noting case will likely be resolved by

15   dispositive motions filed in April 2026).

16   Plaintiffs claim the compliance costs associated with S.B. 253 constitute

17   immediate irreparable harm.  But CARB issued an Enforcement Notice stating that

18   entities need not collect any new data "for the first report due in 2026."  Dkt. 78-6

19   at 2-3.  In any event, Plaintiffs' evidence is conclusory and insufficient to support

20   their claim.  The President and Chairman of U-Haul, Edward J. Shoen—Plaintiffs'

21   sole covered-entity declarant—claims that compliance with S.B. 253 and S.B. 261

22   will "require approximately 30 additional dedicated team members … at an

23   estimated cost exceeding $3,000,000 per year."  Dkt. 78-3 ¶ 12.  But most

24   companies subject to S.B. 253 perform similar reporting with just 3-5 team

25   members, Burton Decl. ¶ 13, and Mr. Shoen's conclusory statements do not explain

26   why U-Haul's efforts would be orders of magnitude higher, especially in light of U-

27   Haul's existing reporting infrastructure, *id.* ¶¶ 14, 23-29, 38.  Moreover, the bulk of

28

20

1    the costs Mr. Shoen purports to identify are for data collection that the law likely

2    will not require. *Id.* ¶¶ 14-29.

3         Moreover, Mr. Shoen does not distinguish between costs attributable to S.B.

4    253 and S.B. 261, nor those associated with Scope 1 and 2 reporting from those

5    associated with Scope 3.  As each law—and each part—must be considered

6    separately for purposes of resolving Plaintiffs' Motion, U-Haul's single,

7    undifferentiated estimate of purported compliance costs is insufficient.  Indeed, the

8    majority of U-Haul's estimated costs appear to be associated with Scope 3

9    emissions reporting, *see* Dkt. 78-3 ¶¶ 17-29, which is not due until 2027 and thus

10   irrelevant to Plaintiffs' request for provisional relief.

11        And the Quadmaan declaration fares no better.  Mr. Quadmaan claims only

12   that "[u]nless S.B. 253 and 261 are enjoined, a number of the Chamber's members

13   … will be forced to incur significant costs in the next several months and overcome

14   substantial implementation challenges." Dkt. 78-4 ¶ 7.  This conclusory, vague,

15   and speculative statement is insufficient to obtain an extraordinary remedy.

16        ***S.B. 261***.  Plaintiffs cannot establish irreparable harm here simply by claiming

17   their members' First Amendment rights will be violated; as shown above, Plaintiffs

18   have not established that is so.

19        And Plaintiffs' allegations of economic harm similarly fail, as they have not

20   offered any evidence regarding the specific costs attributable to compliance with

21   S.B. 261.  Instead, Mr. Shoen simply claims—without foundation or detail—that U-

22   Haul will "have to begin building the systems and contracts to comply with S.B.

23   261 immediately and at great cost and commitment of personnel hours." Dkt 78-3

24   ¶¶ 37-38.  But U-Haul already makes TCFD aligned disclosures, and therefore

25   almost certainly has a risk-management department equipped to do the assessment

26   and reporting required by S.B. 261.  Burton Decl., ¶¶ 34-40.  Thus, U-Haul may not

27   need to incur additional costs of any significance, and its declaration does not

28   establish otherwise.

21

**B.    The Balance of the Equities and the Public Interest Militate Against Granting an Injunction**

"Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest," but these factors "merge" when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Enjoining these laws would prevent the State from pursuing the vital public interests served here. *See supra* at 16-18. Moreover, an injunction would inflict irreparable harm on California by preventing enforcement of statutes enacted by the people's representatives. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

**IV.    SCOPE OF ANY INJUNCTION**

Finally, to the extent the Court concludes Plaintiffs are entitled to a preliminary injunction of either law, or any part thereof, it should enjoin only that law or that part. And it should do so only as to U-Haul, as Plaintiffs have not established that any other member company is similarly situated.

## CONCLUSION

For the reasons stated above, Plaintiffs' motion for preliminary injunction should be denied.

Dated:  April 7, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General

*/s/ Caitlan McLoon*

CAITLAN MCLOON
Deputy Attorney General
*Attorneys for Defendants Liane M. Randolph, Steven S. Cliff, and Robert A. Bonta*

22

1

**CERTIFICATE OF COMPLIANCE**

2      The undersigned, counsel of record for Defendants Liane M. Randolph,

3 Steven S. Cliff, and Robert A. Bonta, certifies that this brief contains 6,996 words,

4 which complies with the word limit of L.R. 11-6.1.

5

6 Dated:  April 7, 2025                                      Respectfully submitted,

7                                                            ROB BONTA
                                                             Attorney General of California
8

9                                                            */s/ Caitlan McLoon*

10                                                           CAITLAN MCLOON
                                                             Deputy Attorney General
11                                                           *Attorneys for Defendants Liane M.*
                                                             *Randolph, Steven S. Cliff, and Robert*
12                                                           *A. Bonta*

13

14

15   SA2024300503

16   67548006.docx

17

18

19

20

21

22

23

24

25

26

27

28

23

## CERTIFICATE OF SERVICE

Case Name:    **Chamber of Commerce of the United States of America, et al. v. Liane M. Randolph, et al.**

Case No.:    **2:24-cv-00801-ODW-PVCx**

I hereby certify that on <u>April 7, 2025</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

### DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>April 7, 2025</u>, at Los Angeles, California.

<table>
<tr><td>Beatriz Davalos</td><td>*/s/ Beatriz Davalos*</td></tr>
<tr><td>Declarant</td><td>Signature</td></tr>
</table>

SA2024300503
66591334.docx

24

# Exhibit 2
# to Declaration of Caitlan McLoon

# Ceres's March 2025 report entitled "Companies Covered by the California Climate Disclosure Laws: An Updated Estimate," submitted to CARB in response to the agency's "Information Solicitation"

Exhibit 2 to Decl. of Caitlan McLoon

9

App.578



## Background

In October 2023, California Governor Gavin Newsom signed into law two key pieces of legislation that will provide investors, consumers, and other stakeholders with information about how companies are managing their climate change-related financial risks. The first-in-the-nation legislation will require companies to provide standardized and consistent climate-related disclosures.

- The **Climate Corporate Data Accountability Act (SB 253)** requires large companies doing business in California to publicly disclose their greenhouse gas (GHG) emissions across their value chains (scopes 1, 2, and 3). The new law applies to U.S. and multinational companies—including publicly and privately held corporations, LLCs, and partnerships—with revenues of more than $1 billion. These revenues need not be generated in California. If a company does business in California— a test that will be defined by the California Air Resources Board (CARB) in its regulatory implementation—and generates more than $1 billion of revenue as a corporate entity, it will be required to report under SB 253.

- The **Climate-Related Risk Disclosure Act (SB 261)** will also apply to companies doing business in California with revenues exceeding a lower threshold, $500 million. It will require these companies to biennially detail how climate change poses risks to their operations not just in California, but around the world, in alignment with the recommendations of the Task Force on Climate-related Financial Disclosures.

Now that clean-up legislation has been enacted in the form of SB 219 and CARB has begun implementing these landmark disclosure laws, an updated accounting of the number of companies covered by SB 253 and SB 261 is necessary to more accurately inform the public conversation about the reach of the two laws.

Ceres contracted with S&P Global to produce an updated analysis of the public and private companies that will likely be covered by SB 253 and SB 261. It should be noted that private company revenue data is inherently challenging to source, as private companies are not required to disclose financial information to the public. Estimates of the number of companies covered by these laws vary

Exhibit 2 to Decl. of Caitlan McLoon
10
App.579

widely depending on the source of the data. Ceres also independently surveyed various databases to see how the results compared to S&P Global's findings (See Methodology, below).

**The S&P analysis[1] of fiscal year (FY) 2022 data finds that:**

- **1,971 companies have revenues over $1 billion and are likely covered by SB 253, more than three-quarters of them public companies** (figure 1, left). Among these companies, revenue distribution is skewed towards the largest companies, with 47% of covered public companies and 42% of covered private companies generating more than $4 billion in revenue.

- **2,675 companies have revenues over $500 million and are likely covered by SB 261, 73% of them public companies** (figure 1, right). As one might expect, when accounting for companies with revenues between $500 million and $1 billion (those covered by SB 261 but not by SB 253), private companies are more well represented.

These estimates do not include nonprofit entities. The definition of impacted entities in the legislative text will depend on CARB's interpretation of "doing business in California."

**Figure 1  ·  S&P Analysis of Fiscal Year 2022**

Revenues over $1 billion USD

Revenues over $500 million USD



23% private
(459 companies)

77% public
(1,512 companies)

27% private
(716 companies)

73% public
(1,959 companies)

1. Copyright © 2025 by S&P Global Market Intelligence

**Notice:** Reproduction of any information, data or material, including ratings ("Content") in any form is prohibited except with the prior written permission of the relevant party. Such party, its affiliates and suppliers ("Content Providers") do not guarantee the accuracy, adequacy, completeness, timeliness or availability of any Content and are not responsible for any errors or omissions (negligent or otherwise), regardless of the cause, or for the results obtained from the use of such Content. In no event shall Content Providers be liable for any damages, costs, expenses, legal fees, or losses (including lost income or lost profit and opportunity costs) in connection with any use of the Content. A reference to a particular investment or security, a rating or any observation concerning an investment that is part of the Content is not a recommendation to buy, sell or hold such investment or security, does not address the suitability of an investment or security and should not be relied on as investment advice. Credit ratings are statements of opinions and are not statements of fact.

Exhibit 2 to Decl. of Caitlan McLoon
11

These estimates from S&P differ from preliminary estimates that Ceres conducted, which found that over 5,000 companies would likely be covered by SB 253 and over 10,000 by SB 261. Those preliminary estimates, based on D&B Hoovers data, likely overstated the number of companies covered by the laws. This was due in large part to methodological differences: searches of some databases for all company names over a certain revenue threshold will list multiple separate subsidiary entities and branches under a controlling parent company, which does not accurately reflect the fact that most companies subject to the California laws will opt to report at the consolidated parent company level. This double-counting of subsidiaries and branches leads to a significantly inflated count of private companies covered by the laws. Searching for a list of unique names among ultimate parent companies, rather than a count of all companies, would have yielded a more realistic estimate.

Given S&P's standing as a leading provider of financial information, we are choosing to present the S&P findings as one plausible estimate of the number of companies covered by these laws. These results are subject to change, since this report does not attempt to identify which companies "do business in California." CARB has not yet defined that term, so we did not attempt to screen for companies that do business in the state. These findings are also based on fiscal year 2022 revenue alone, under the assumption that an overwhelming portion (but not all) of the companies that meet the laws' revenue thresholds will likely do some amount of business in California (see, for example, the California Franchise Tax Board's definition of doing business in the state).

These findings were derived from S&P's Capital IQ Pro screening tool. S&P Global did not provide Ceres with direct company-specific information due to licensing considerations; all information was provided in the aggregate.

Exhibit 2 to Decl. of Caitlan McLoon

12

App.581

## Detailed SB 253 Findings

Some 1,971 companies have revenues over $1 billion and are likely covered by SB 253, more than three-quarters of them public companies. Revenue distribution is skewed towards the largest companies, with 47% of covered public companies and 42% of covered private companies making more than $4 billion in revenue. The distribution of revenue among covered companies is very similar for public and private companies, although covered private companies are slightly more likely to be relatively smaller in size, with 43% of private companies generating less than $2.5 billion in revenue (vs. 37% of public companies).

**Figure 2 · Distribution by Revenue (in USD)**



| Revenue | Public companies | Private companies |
|---|---|---|
| > $4.0B | 711 | 193 |
| $3.5–4.0B | 77 | 25 |
| $3.0–3.5B | 73 | 20 |
| $2.5–3.0B | 97 | 24 |
| $2.0–2.5B | 123 | 49 |
| $1.5–2.0B | 171 | 71 |
| $1.0–1.5B | 260 | 77 |

● Public companies   ● Private companies

Exhibit 2 to Decl. of Caitlan McLoon

13

App.582

Utilities are the most heavily represented private companies above $1 billion in revenue, and the least represented among covered public companies. Since utilities tend to have concentrated geographic footprints, the "doing business in California" test will be an important factor in determining which of those companies are actually covered by the laws (reminder: this report does not attempt to filter for companies doing business in California, since that test has not yet been spelled out in regulation). Financial firms are well represented among both public and private companies.

**Figure 3 · Industry Representation, Public vs. Private Companies**



Exhibit 2 to Decl. of Caitlan McLoon
14

App.583

Although SB 253 and SB 261 are state laws, they will apply to companies across the United States that do business in California. Although California-headquartered firms comprise 11% of companies with revenues over $1 billion that are likely to be covered by SB 253, many other states are home to dozens or hundreds of companies that are expected to be subject to the law. Texas alone nearly matches California's leading total of 216. Figure 4, below, is a breakdown of the top 15 states that host headquarters of companies with revenues over $1 billion. Collectively, these 15 states represent 72% of all companies expected to be covered by SB 253.

**Figure 4 · States in Which Companies Are Headquartered (SB 253)**



Exhibit 2 to Decl. of Caitlan McLoon

15

App.584

## Detailed SB 261 Findings

The counts for revenue bands between $1 billion and >$4 billion are identical to Figure 2 on page 4; the addition of the lowest revenue band, $0.5–$1.0B, reflects the number of public and private companies covered by SB 261 but *not* by SB 253.

**Figure 5 · Distribution by Revenue (in USD)**



Exhibit 2 to Decl. of Caitlan McLoon

16

App.585

Like SB 253, industry representation under SB 261 among public companies is again dominated by the industrial, consumer discretionary, and financial sectors. Among private companies covered by SB 261, the most notable distinction is the outsize share of health care companies represented: 25% of private companies covered by SB 261, compared to 17% of private companies covered by SB 253.

**Figure 6 · Industry Representation, Public vs. Private Companies**



Exhibit 2 to Decl. of Caitlan McLoon

17

App.586

California-headquartered firms again rank highest among companies likely to be covered by SB 261 and represent a slightly higher proportion of total companies (12% vs. 11% under SB 253). The results for SB 261 are otherwise largely identical as those for SB 253: the top 15 states represent 71% of all companies expected to be covered, and the top five states are the same as those covered by SB 253 (California, Texas, New York, Illinois, and Ohio).

**Figure 7 · States in Which Companies Are Headquartered (SB 261)**



| State | Count |
|-------|-------|
| CA | 319 |
| TX | 284 |
| NY | 213 |
| IL | 137 |
| OH | 126 |
| FL | 112 |
| MA | 102 |
| PA | 101 |
| GA | 87 |
| VA | 80 |
| CO | 74 |
| NJ | 69 |
| NC | 65 |
| WI | 65 |
| CT | 60 |

Exhibit 2 to Decl. of Caitlan McLoon
18

App.587

## Methodology

This report looks at FY 2022 revenue figures pulled from the S&P Capital IQ Pro Screening Tool. The list of companies is refined to look only at public and private companies, defined as follows:

- **Public company:**  A legal entity whose common stock is actively trading on any public stock exchange.

- **Private company:**  A legal entity, which is not an investment firm, whose equity does not trade on any public stock exchange. This includes companies listed on a stock exchange where Capital IQ does not receive pricing for the company.

To clean the data, S&P Global removed all companies that were tagged as "Out of Business," "Acquired," "Reorganizing," "No Longer Investing," or "Liquidating." This leaves only companies that are considered "Operating" and "Operating Subsidiaries." Those terms are defined as follows:

- **Operating:**  Indicates the company is not controlled, such as companies where no majority stake is held, by any single company. Includes companies where M&A deals are pending. It is non-strategically controlled with a majority stake held by a financial buyer, such as a portfolio company of a PIF.

- **Operating Subsidiary:**  Control with a majority stake of 50% or more lies with any other company AND the stake is held for strategic reasons as opposed to being held for investment purposes.

- **Out of Business:**  Any company that has completely liquidated or ceased operations without any acquisition transaction.

- **Acquired:**  An entity that has sold all of its assets to a single buyer. After the sale's completion, the acquired entity is completely folded into its purchaser. Does *not* apply to any company that has sold substantially all of its assets.

- **Reorganizing:**  Entities that are reorganizing or going into administration under a formal plan. The plan might be Chapter 11 or a non-U.S. filing type. It is a process designed to revive a financially troubled or bankrupt firm.

- **No Longer Investing:**  Firms that are not purchasing additional portfolio companies but are still managing current investments. This status could reflect that either the firm is taking a pause on funding new investments, or the firm is making follow-on investments and not making new investments, or that this status is a precursor to the firm going out of business.

- **Liquidating:**  Any companies that have obtained United States Bankruptcy Court approval for their Plan of Liquidation under a Chapter 11 bankruptcy petition or their assets have been transferred to a liquidating trust under a Chapter 7 bankruptcy petition.

Sources used to collect financial data include:

- Regulatory agency filings

- Annual and interim reports

- News and press releases

Exhibit 2 to Decl. of Caitlan McLoon
19

App.588

For North American private companies, S&P[2] sources revenue data from third-party providers, including Equifax, D&B, and Crunchbase, or captures it from the sources used to collect fundamental financial data mentioned above. S&P's third-party providers can source this data in several ways, such as from local government and commercial sources, including national business registries, chambers of commerce, news services, press releases, direct marketing campaigns, phone interviews, certified public accountants, and federal and regional courts.

It is still unclear whether (and which) nonprofit entities might be subject to the two disclosure laws; the definition of impacted entities will depend on CARB's interpretation of "doing business in California." Most nonprofit entities are tax-exempt, and the most widely referenced definition of "doing business" comes from the California Franchise Tax Board. CARB will have to determine the eligibility of nonprofit entities through its regulatory implementation process, with appropriate consideration of input from interested stakeholders.

Ceres independently surveyed various databases to see how the results compared to S&P Global's findings. We looked at Bloomberg, PitchBook, D&B Hoovers, and Data Axle. These data sources deliver different conclusions about the number of companies over the specified revenue thresholds. Estimates of covered public companies are generally closely aligned across the data sets, and the proximity of S&P Global's public company figures to Bloomberg's results is especially encouraging, since Bloomberg is generally viewed as a highly reputable source for public company financial data. However, there is significant variance in the estimates of covered private companies, which reflects the difficulty of accurately sourcing private company financial data. The discrepancies across these various data sources range from hundreds of companies to thousands. The largest figures are likely inflated by intra-company double counting, as discussed earlier in this report under the "Background" section. A search that filters for ultimate parent companies, rather than all companies above a revenue threshold, yields closer estimates.

The U.S. Securities and Exchange Commission also provided an estimate of the number of registrants covered by the California disclosure laws in the agency's adopting release for its own climate risk disclosure rule (March 6, 2024): "We estimate that approximately 1,980 Commission registrants meet the $1 billion revenue threshold for Climate Corporate Data Accountability Act and approximately 2,520 Commission registrants meet the $500 million revenue threshold for the Climate-Related Financial Risk Act." These figures differ considerably from the S&P Global and Bloomberg estimates of public companies covered by the California laws. The discrepancy may be explained by the fact that some SEC registrants are not public companies. Although "SEC registrant" and "public company" are sometimes used interchangeably, there are private companies subject to SEC jurisdiction. These may, for instance, be companies that are not listed on an exchange and do not have registered securities, but under section 15(d) of the Securities Exchange Act of 1934 are required to file reports because they have more than 300 shareholders. We do not have access to the data that informed the SEC's estimates and can only speculate that this is one possible reason for the difference.

2. Copyright © 2025 by S&P Global Market Intelligence

Exhibit 2 to Decl. of Caitlan McLoon

20

App.589

This report was authored by Ceres based on data analysis by S&P Global. The authors would also like to thank Charles Gibbons and Heather Green, our valued colleagues at Ceres, who contributed their expertise to this report.

For questions or comments, please contact:

Jake Rascoff
Director, Climate Financial Regulation
Ceres Accelerator for Sustainable Capital Markets
jrascoff@ceres.org

**About Ceres**

Ceres is a nonprofit advocacy organization working to accelerate the transition to a cleaner, more just, and sustainable world. United under a shared vision, our powerful networks of investors and companies are proving sustainability is the bottom line—changing markets and sectors from the inside out. For more information, visit ceres.org.

**About Ceres Accelerator for Sustainable Capital Markets**

The Ceres Accelerator for Sustainable Capital Markets is a center within Ceres that aims to transform the practices and policies that govern capital markets by engaging federal and state regulators, financial institutions, investors, and corporate boards to act on climate change as a systemic financial risk. For more information, visit ceres.org/accelerator.

Exhibit 2 to Decl. of Caitlan McLoon
21

App.590

1   ROB BONTA
    Attorney General of California
2   MYUNG J. PARK (SBN 210866)
    LAURA J. ZUCKERMAN (SBN 161896)
3   Supervising Deputy Attorneys General
    KATHERINE GAUMOND (SBN 349453)
4   EMILY HAJARIZADEH (SBN 325246)
    M. ELAINE MECKENSTOCK (SBN 268861)
5   DYLAN REDOR (SBN 338136)
    DAVID ZAFT (SBN 237365)
6   CAITLAN MCLOON (SBN 302798)
    Deputy Attorneys General
7    300 South Spring Street, Suite 1702
     Los Angeles, CA  90013-1230
8    Telephone:  (213) 269-6438
     Fax:  (916) 731-2128
9    E-mail:  Caitlan.McLoon@doj.ca.gov
    *Attorneys for Defendants Liane M. Randolph,*
10  *Steven S. Cliff, and Robert A. Bonta*

11              IN THE UNITED STATES DISTRICT COURT

12            FOR THE CENTRAL DISTRICT OF CALIFORNIA

13

| | |
|---|---|
| 14  **CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION,** | 2:24-cv-00801-ODW-PVCx **DECLARATION OF ANGEL HSU, PH.D. IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

                                    Plaintiffs,

        v.

LIANE M. RANDOLPH, in her official
capacity as Chair of the California Air
Resources Board, and STEVEN S.
CLIFF, in his official capacity as the
Executive Officer of the California Air
Resources Board, and ROBERT A.
BONTA, in his official capacity as
Attorney General of California,

                                    Defendants.

Date:         May 5, 2025
Time:         1:30 PM
Courtroom:    5D
Judge:        The Honorable Otis
              D. Wright, II
Trial Date:   Not Set
Action Filed: 1/30/2024

1

# DECLARATION OF ANGEL HSU

I, Angel Hsu, hereby declare:

1.    I have been retained by counsel for Defendants Liane M. Randolph, Steven S. Cliff, and Robert A. Bonta, in their official capacities (Defendants), in connection with the above captioned litigation.  I have actual knowledge of the matters stated in this declaration and can truthfully testify to the matters contained herein.

2.    I am the Director of the Data-Driven EnviroLab at the Institute of the Environment and an Associate Professor of Public Policy and Environment, Ecology and Energy at the University of North Carolina at Chapel Hill.  I received my Bachelor of Arts in Political Science and Bachelor of Science in Biology from Wake Forest University, my Master of Philosophy in Environmental Policy from the University of Cambridge, and my PhD degree in Environmental Policy from the Yale School of the Environment.  Since 2015, I have published 49 peer-reviewed articles, four book chapters, one edited volume, seven editorials and commentaries, ten referred scientific committee reports and 23 products of interdisciplinary scholarship, which have been cited nearly 7,000 times.[1]  In the domain of climate change specifically, I have contributed as a leading or contributing author to a number of leading global scientific assessments related to climate change, including the Intergovernmental Panel on Climate Change's (IPCC) Sixth Assessment Report and the 2018 United Nations Environment Programme's (UNEP) Emissions Gap Report special chapter on non-state and subnational actors. I was also one of 11 nominated expert authors of a 2022 report released by the National Academy of Sciences on greenhouse gas emissions information necessary for decision making. I have been an assistant professor at Yale-NUS College, an adjunct at the Yale School of Environment, where I was Director and Principal Investigator for the Environmental Performance Measurement Program and Environmental Performance Index at the Yale Center for Environmental Law and Policy for nearly five years. Previously, I

---

[1] Google Scholar citation report for Angel Hsu, attached hereto as Exhibit (Ex.) 1.

2

worked as a Research Analyst for the Greenhouse Gas Protocol Initiative (GHG Protocol) at the World Resources Institute, where I trained companies and organizations to use the GHG Protocol Corporate Accounting and Reporting Standard.[2]

3.     My research explores the intersection of science and policy and the use of data-driven approaches—including AI, satellite remote sensing, and other spatially explicit sources—to understand and advance environmental sustainability. I focus particularly on climate change and energy, urbanization, and air quality. Much of my work evaluates the performance and credibility of environmental policies and actors, especially at the subnational and non-state levels. My research group, the Data-Driven EnviroLab is one of four principal organizations that have created and maintain the Net Zero Tracker, the most comprehensive source and independent evaluation of decarbonization pledges made by more than 4,000 entities, from national and subnational governments to the Forbes 2000 publicly-listed companies.

4.     To facilitate understanding and comparison of corporate net-zero pledges, my team and I developed *ChatNetZero.ai* -- a question and answer chatbot that utilizes a large language model to interrogate the credibility of corporate decarbonization efforts. In my 2024 paper with Mason Laney, et al. *Evaluating ChatNetZero, an LLM-Chatbot to Demystifying Climate Pledges,* I reviewed the accuracy of large language model chatbots, including ChatNetZero but also of generic AI platforms like ChatGPT and Gemini, to produce accurate responses regarding the legitimacy of net-zero pledges made by public and private entities.[3]

5.     Decarbonizing pledges cover approximately 76% of global emissions,[4] but very few pledges are considered credible. The 2024 Net Zero Tracker Stocktake

---

[2] A true and correct copy of my current CV is attached hereto as Ex. 2.
[3] Mason Laney, et al., *Evaluating ChatNetZero, an LLM-Chatbot to Demystifying Climate Pledges* (2024), attached hereto as Ex. 3.
[4] Data pulled from Net Zero Tracker, located at http://zerotracker.net (last visited April 4, 2025). A of the landing page is attached hereto as Ex. 4.

Report[5] found that only 5% (61 out of 1,145 of the Forbes Global 2000 companies) met the United Nations' 'Starting Line' criteria[6] of the Five 'Ps' (pledge, plan, proceed, publish, and persuade) that sets a "minimum floor" for robust net zero commitments. Similarly, the NewClimate Institute's 2024 Corporate Climate Responsibility Monitor[7] find when examining 51 large global companies that most present 2030 and net-zero targets that are ambiguous or only commit to limited emission reductions, despite broader claims of decarbonization and carbon neutrality.

6.    Methodology:

a. I have been asked by the California Department of Justice to submit this declaration, based on my independent opinions and expertise, regarding the prevalence of misleading statements in corporate decarbonizing pledges and reporting.

b. I have read and am familiar with California Senate Bills 253 and 261 (S.B. 253 and S.B. 261).

c. I have read and am familiar with the Motion for Preliminary Injunction filed by Plaintiffs United States Chamber of Commerce, et al. in the above captioned matter, and the supporting materials attached thereto.

d. In developing my expert opinions for this declaration, I consulted a wide range of scholarly literature on the topics I am discussing, drawing from fields that include environmental policy and management, climate science, and large-scale data analysis. The key

---

[5] Net Zero Tracker, *Net Zero Stocktake 2024: NewClimate Institute*, Oxford Net Zero, Energy and Climate Intelligence Unit and Data-Driven EnviroLab (2025), available at https://ca1-nzt.edcdn.com/Reports/Net_Zero_Stocktake_2024.pdf?v=1732639610 (last visited April 4, 2025), attached hereto as Ex. 5.

[6] United Nations Framework Convention on Climate Change Race to Zero Campaign, *Race to Zero Criteria 3.0* (2022), available at https://www.climatechampions.net/media/f2nkeckp/race-to-zero-criteria-30-4.pdf (last visited April 4, 2025), attached hereto as Ex. 6.

[7] NewClimate Institute, *Corporate Climate Responsibility Monitor* (2024), available at https://newclimate.org/sites/default/files/2024-08/NewClimate_CCRM2024.pdf (last visited April 4, 2025), attached hereto as Ex. 7.

4

research papers on which I rely are cited below and copies of them will be made available.

e. I have relied on information that is customarily reviewed and relied upon by experts in my field of climate policy, which includes studying the response and effectiveness of climate change-related policy and regulation.  This is a field that is growing significantly since I founded the Data-Driven EnviroLab at Yale University in 2016, which I've since moved to the University of North Carolina at Chapel Hill in 2021.  There is now a growing body of research on the factors driving decarbonization disclosures, as well as their accuracy and environmental impacts therein, and the prevalence of greenwashing has been a major theme in this body of work.

f. I have also relied on my own personal knowledge, training, and experience in the field of public policy, climate change and data science in particular.  As can be seen from my C.V., I have written numerous papers on the impacts of climate change on regulatory frameworks and performance, empirical analyses of greenwashing, and the factors driving carbon emissions reductions at multiple levels.

**Summary**

7.    In this declaration, I will provide support for the following conclusions: (1) 87% or 3,578 companies in our dataset are making emissions reduction pledges or statements; (2) 96% of the companies with climate reduction pledges show signs of greenwashing; (3) Disclosing emission reduction progress reduces the risk of corporate greenwashing, and evidence from other contexts suggests regulation helps drive this relationship.

///

///

5

**82% of North American companies in our dataset are making emissions reduction pledges or statements**

8.    Our analysis on corporate emissions disclosures show that 87% or 3,578 of the companies in our dataset made a climate pledge related to emission reduction targets. The dataset was produced through a harmonization of the Net Zero Tracker database, which includes all of the Forbes 2000 publicly-listed companies and the world's 100 largest privately-owned companies, and responses to the 2022 CDP Climate Change Questionnaire, a voluntary reporting mechanism. The companies with green pledges have an average annual revenue of $25.4 billion USD, and while the percentage of companies that made green pledges varies by sector, we observe that over 70% of the companies in each of the sectors of our database, have made a green claim. Geographically, around 82% of the North American companies in our sample have made green pledges.

9.    In our dataset, a company is considered to have made a "green claim" if it: (i) appears on the Net Zero Tracker with any form of emissions reduction pledge— such as commitments to achieve "Carbon Neutrality," "Net Zero," "Zero Emissions," specific percentage reductions for emissions, or sector-specific targets—and (ii) reports at least one emissions target to CDP for any emissions scope.

**96% of corporate climate reduction pledges show signs of greenwashing**

10.    Despite the proliferation of corporate net-zero pledges, serious concerns persist regarding their credibility and the potential for greenwashing—where companies mislead stakeholders about the environmental integrity of their actions.[8] In a forthcoming paper,[9] I developed a replicable framework to detect net-zero

---

[8] de Freitas Netto, S. V., Sobral, M. F. F., Ribeiro, A. R. B., & Soares, G. R. D. L., *Concepts and forms of greenwashing: A systematic review,* 32 Environmental Sciences Europe, 1-12 (2020), attached hereto as Ex. 8. Gorovaia, N., & Makrominas, M., *Identifying greenwashing in corporate-social responsibility reports using natural-language processing,* 31(1) European Financial Management, 427-462 (2025), attached hereto as Ex. 9.

[9] Brown, B., Hsu, A., and Manya, D., *Red Flags in Green Promises: A Framework for Identifying Greenwashing Risk in Corporate Climate Pledges,* Working Paper (April 5, 2025 version), attached hereto as Ex. 10.

greenwashing by identifying seven dimensions of credibility risk, including the absence of interim targets, limited emissions coverage, reliance on questionable offsets, anti-climate lobbying, and lack of implementation progress. Building on existing framework [10] and large-scale datasets (CDP, Net Zero Tracker, InfluenceMap), we built a database of 4,131 companies across 81 countries with an average annual revenue of $21 billion USD.[11] Of those identified companies, 3,578 companies made some form of emission reduction pledge, with 1,371 (38%) making a net-zero or carbon neutrality pledge. We find that 96% of companies with emissions targets exhibit at least one indicator of greenwashing. Our analysis reveals systematic gaps between corporate climate claims and actual practices, and provides one of the first large-scale empirical assessments on the prevalence and determinants of greenwashing in net-zero commitments. These findings contribute to growing efforts to strengthen the accountability and integrity of private climate governance.[12]

11.    Our framework identifies seven dimensions most directly tied to net-zero greenwashing:

a.    No interim target – a company has no reported near or short-term interim emission targets that would indicate near-term action.

b.    No Scope 3 emissions coverage – a firm's emissions reduction targets exclude scope 3 or value chain emissions, which in the case of most companies represent substantial contributions to their overall emissions impact.

---

[10] Nemes, N., Scanlan, S. J., Smith, P., Smith, T., Aronczyk, M., Hill, S., ... & Stabinsky, D., *An integrated framework to assess greenwashing. Sustainability*, 14(8) UN High Level Expert Group 4431 (2022), attached hereto as Ex. 11. United Nations' High Level Expert Group on the Net Zero Emissions Commitments of Non State Entities, *Integrity Matters: Net Zero Commitments by Businesses, Financial Institutions, Cities and Regions* (2022), attached hereto as Ex. 12. ISO, *Net zero guidelines* (2022), attached hereto at Ex. 13.

[11] Revenue data was only available for 70 percent of the companies in our sample, since some companies are not publicly listed or do not report annual revenue data.

[12] Trencher, G., Nick, S., Carlson, J., & Johnson, M., *Demand for low-quality offsets by major companies undermines climate integrity of the voluntary carbon market*, 15(1) Nature communications 6863 (2024), attached hereto as Ex. 14. Green, J. F., & Reyes, R. S., *The history of net zero: can we move from concepts to practice?*, 23(7) Climate policy 901-915 (2023), attached hereto as Ex. 15.

7

c. No plan to achieve targets – a firm lacks a publicly available plan detailing the steps it will take to meet its stated emissions reduction goals.

d. Questionable use of carbon credits and offsets – an entity plans to rely on offsets without specifying conditions or fails to disclose whether offsets will be used.

e. Incomplete emissions coverage – a company claims a "net zero," or "GHG neutrality," or other emission targets but limits its emissions inventory to only carbon dioxide ($CO_2$) or does not specify which gases are covered for any mitigation target.

f. Anti-climate lobbying – a company actively engages in lobbying activity that undermines climate action.

g. Not on track to meet targets – a company is failing to make meaningful progress towards their own stated emission reduction target, suggesting it is not implementing measures that would indicate credible efforts taken to achieve its net-zero pledge.

Using this framework, we define greenwashing as (1) a company's claim of environmentally friendly action—such as an emissions reduction or net-zero pledge—and (2) evidence of actions that contradict or undermine that claim. We evaluated these claims using the seven dimensions of net-zero greenwashing outlined above, which assess the presence of interim targets, scope 3 coverage, concrete plans, reliance on offsets, emissions inventory completeness, lobbying efforts, and actual progress toward achieving targets.

12. Of the 3,578 companies in our dataset that made a climate target or net-zero pledge, 96% exhibited at least one indicator of potential greenwashing based on our seven-dimension framework. The most common shortcoming was lack of Scope 3 emissions coverage, present in 70% of pledging companies. Other prevalent gaps included questionable use of carbon offsets (41%), no interim targets (20%), no implementation plan (18%), and lack of progress toward targets based on 2021 data

8

1   (20%). Additionally, 12% showed a disconnect between claiming to pledge net zero
2   or carbon neutrality but failing to comprehensively address all emission scopes.
3   Examining multiple greenwashing indicators, we observe that while 41% of
4   companies evidence only one form of greenwashing, 11% of the companies in our
5   database are at risk by at least 4 of the metrics. These findings highlight a widespread
6   misalignment between public climate claims and concrete action.

7   13.   While greenwashing indicators are widespread across all global regions in
8   our analysis, we found 97% of North American companies are at risk of
9   greenwashing. These firms had the highest rate of missing interim targets (33%) and
10  the highest reliance on questionable offsets (55%).

11  14.   Overall, while there is variance on the percentages of specific
12  greenwashing indicators, there is strong evidence of the extensive prevalence of signs
13  of greenwashing across North America, evidenced by the fact that more than 90% of
14  companies in any specific region or industrial sector shows at least one of the seven
15  signs of greenwashing previously mentioned.

16  **<u>Disclosing emissions reduction progress reduces odds of greenwashing.</u>**

17  15.   There is evidence to suggest that mandatory disclosure and climate data
18  reporting improves firm performance on emissions reduction. In my own research,
19  I've found that subnational entities in Europe who disclose their greenhouse gas
20  emissions tend to show greater emission reductions than those who fail to report their
21  emissions data.[13] Other studies examining firms subject to mandatory climate
22  disclosure and reporting have likewise found that they perform better at reducing
23  emissions than unregulated firms.[14] In the UK, researchers also found that mandatory

24

25  [13] Hsu, A., Wang, X., Tan, J., Toh, W., & Goyal, N., *Predicting European cities' climate mitigation performance using machine learning*, 13(1) Nature Communications 7487 (2022), attached hereto as Ex. 16.
26  [14] Bauckloh, T., Klein, C., Pioch, T., & Schiemann, F., *Under pressure? The link between mandatory climate reporting and firms' carbon performance*, 36(1) Organization & Environment
27  126-149 (2023), attached hereto as Ex. 17; Downar, B., Ernstberger, J., Rettenbacher, H., Schwenen, S., & Zaklan, A., *Fighting climate change with disclosure? The real effects of*
28  *mandatory greenhouse gas emission disclosure* (2019), attached hereto as Ex. 18.

9

1  reporting not only improved firms' climate mitigation performance, but also curbed

2  greenwashing -- reducing the embellishment, over-optimism, and ambiguity in

3  disclosures.[15]

4  16.  When we combine all of our greenwashing indicators in a single

5  multivariable logistic regression (i.e., statistical model), we also find that firms that

6  disclose progress towards their emission reduction goals are also at a lower odds of

7  greenwashing. The model provides empirical support to suggest that companies with

8  both credible ambition in their climate mitigation efforts and measurable progress are

9  less likely to engage in greenwashing.

10

11  I declare under penalty of perjury that the foregoing are true and correct.

12  Executed on this day, the 4th of April, 2025, in Chapel Hill, North Carolina.

13

14

15

16  ANGEL HSU, Ph.D

17  Associate Professor of Public
   Policy and Environment,

18  Ecology and Energy

19  Director, Data-Driven
   EnviroLab

20  University of North Carolina at
   Chapel Hill

21

22

23

24

25

26

27

28  [15] Grewal, J., Richardson, G. D., & Wang, J., *Effects of mandatory carbon reporting on unrepresentative environmental disclosures* (2022), attached hereto as Ex. 19.

10

1  ROB BONTA
   Attorney General of California
2  MYUNG J. PARK (SBN 210866)
   LAURA J. ZUCKERMAN (SBN 161896)
3  Supervising Deputy Attorneys General
   DAVID ZAFT (SBN 237365)
4  M. ELAINE MECKENSTOCK (SBN 268861)
   CAITLAN MCLOON (SBN 302798)
5  EMILY HAJARIZADEH (SBN 325246)
   DYLAN REDOR (SBN 338136)
6  KATHERINE GAUMOND (SBN 349453)
   Deputy Attorneys General
7    300 South Spring Street, Suite 1702
     Los Angeles, CA  90013-1230
8    Telephone:  (213) 269-6438
     Fax:  (916) 731-2128
9    E-mail:  Caitlan.McLoon@doj.ca.gov
   *Attorneys for Defendants Liane M. Randolph,*
10 *Steven S. Cliff, and Robert A. Bonta*

11              IN THE UNITED STATES DISTRICT COURT

12              FOR THE CENTRAL DISTRICT OF CALIFORNIA

13

14 | | |
   |---|---|
15 **CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION,**

                                    Plaintiffs,

                    v.

   **LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California,**

                                    Defendants.

   2:24-cv-00801-ODW-PVC

   **DECLARATION OF THOMAS P. LYON IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

   Date:         May 5, 2025
   Time:         1:30 PM
   Courtroom:    5D
   Judge:        The Honorable Otis D. Wright, II
   Trial Date:   Not Set
   Action Filed: 1/30/2024

### DECLARATION OF THOMAS P. LYON

I, Thomas P. Lyon, hereby declare:

1.    I have been retained by counsel for Defendants Liane M. Randolph, Steven S. Cliff, and Robert A. Bonta, in their official capacities (Defendants), in connection with the above captioned litigation. I have actual knowledge of the matters stated in this declaration and can truthfully testify to the matters contained herein.

2.    I am the Dow Chair of Sustainable Science, Technology, and Commerce at the University of Michigan, with appointments in both the Ross School of Business and the School for Environment and Sustainability (SEAS). I received my Bachelor of Science in engineering from Princeton University and my Masters and PhD degrees in Engineering-Economic Systems from Stanford University. I am the author of five books and over 70 journal articles, which have been cited over 13,000 times. I have served for 8 years as Faculty Director of the Erb Institute for Global Sustainable Enterprise at University of Michigan, and for 5 years as President of the Alliance for Research on Corporate Sustainability (ARCS). I have been a visiting scholar at the University of Chicago, Stanford University, the University of Paris, Resources for the Future, and the US Department of Justice. I received the Distinguished Scholar Award from the Organizations and the Natural Environment Division of the Academy of Management in 2022, and the World Sustainability Award from the MDPI Sustainability Foundation in 2023. A true and correct copy of my CV can be found at Docket No. 56-1.

3.    My research focuses on the drivers and the impacts of corporate sustainability initiatives. I have written articles on government regulation, industry self-regulation, voluntary environmental programs, environmental information disclosure, greenwashing, and corporate political responsibility. My 2011 paper with John Maxwell, *Greenwash: Corporate Environmental Disclosure under*

*Threat of Audit*, in the Journal of Economics and Management Strategy, launched the serious scholarly study of greenwash, i.e. misleading corporate sustainability claims. A true and correct copy of this paper can be found at Docket No. 56-11. I have since written five additional papers on the subject, and this corpus of work has been cited over 5,000 times.

4.    Methodology:

a.    I have been asked by attorneys for Defendants to submit this declaration, based on my independent opinions and expertise, regarding the importance of information in markets, the relevance of environmental disclosure to investors and other stakeholders, and the forms and dangers of greenwashing.

b.    I have read and am familiar with California Senate Bills 253 and 261 (S.B. 253 and S.B. 261).

c.    I have read and am familiar with the Motion for Preliminary Injunction filed by Plaintiffs United States Chamber of Commerce, et al. in the above captioned matter, and the supporting materials attached thereto.

d.    In developing my expert opinions for this declaration, I consulted a wide range of scholarly literature on the topics I am discussing, drawing from fields that include economics, management, accounting and finance. The key research papers on which I rely are cited below and copies of them are attached hereto.

e.    I have relied on information that is customarily reviewed and relied upon by experts in my field of corporate sustainability, which studies the causes and consequences of environmentally sustainable corporate actions.

f.    I have also relied on my own personal knowledge, training, and experience in the field of economics, and in corporate sustainability in particular. As can be seen from my C.V., I have written numerous papers on the impacts of disclosure on financial and environmental performance, theoretical and empirical analyses of greenwashing, and the factors driving carbon emissions reductions at

3

1    the facility level.

2    **Summary**

3         5.    In this declaration, I will provide support for the following

4    conclusions.  Ensuring accurate climate disclosure is important in order to avoid

5    market failures that are harmful to the public interest.  Climate disclosures provide

6    information that assists investors, consumers and employees in making economic

7    decisions.  However, there are many ways in which this information can be

8    presented in a misleading fashion, thereby leading to greenwashing.  There are

9    many examples of misleading language in Corporate Social Responsibility (CSR)

10   Reports and on corporate websites.  Greenwashing is common in current GHG

11   emissions disclosures, primarily in the form of selective disclosure.  Greenwashing

12   is common in corporate decarbonization plans, primarily in the form of empty

13   statements and lack of proof.  Standardized, mandatory disclosure can correct much

14   of the misleading nature of current voluntary climate disclosures.

15   **Ensuring Accurate Climate Disclosure is Important In Order to Avoid Market**

16   **Failures that are Harmful to the Public Interest.**

17        6.    Economists have long understood that when companies possess and

18   exploit inside information, this can cause markets to fail and harm investors,

19   employees, consumers and the public.  The 2001 Nobel Prize in Economics was

20   awarded to George Akerlof, Michael Spence, and Joseph Stiglitz for their work on

21   markets with asymmetric information.  Financial markets are rife with crises that

22   impose heavy costs on ordinary investors and citizens.  For example, the Great

23   Recession of 2008-2009 began as a relatively limited crisis in the U.S. market for

24   residential subprime loans, but spread widely, leading to massive public bailouts of

25   firms such as AIG at the expense of many ordinary homeowners and the U.S.

26   taxpayer (Mishkin, 2011).  Frederic S. Mishkin, *Over the Cliff: From the Subprime*

27   *to the Global Financial Crisis*, 25 J. Econ. Perspectives 49 (2011), attached hereto

28   as Exhibit (Ex.) 1.  A failure to recognize systemic risks in the system played a key

1 role in exacerbating the crisis.  Financial regulation is designed to help prevent such
2 crises.

3      7.     Economists have also long understood that when market transactions
4 impose harm on third-party bystanders, as in the case of environmental pollution,
5 this can cause markets to fail and lead to massive harm to the public.  Harms like
6 these are known as externalities because of their impact on bystanders who are
7 external to the transaction itself.  Because of the importance of this topic, the Nobel
8 Prize in Economics was awarded to William Nordhaus in 2018 for his work on the
9 largest externality of all, global warming.  The costs of climate change are already
10 estimated to be trillions of dollars and will continue to grow in the future.
11 Environmental regulation is designed to prevent or mitigate such harms.

12      8.     Climate disclosures are a response to the combination of inside
13 information and externalities that exists with regard to greenhouse gas emissions
14 and corporate climate risk.  However, current disclosure practices are inadequate to
15 enable investors and consumers to make informed decisions.  In particular, the
16 discretion allowed under voluntary disclosure practices allows for a variety of
17 forms of greenwashing to enter the market, thereby distorting decisions.

18      9.     A wide range of investors make use of climate-related financial
19 information.  Two such types of investors are "impact investors" and "ESG
20 investors." Impact investors seek social and environmental, as well as financial,
21 returns, and may be willing to sacrifice some level of financial return in order to
22 contribute to important social issues such as climate change.  ESG investors, in
23 contrast, seek to maximize financial returns by making use of environmental, social
24 and governance (ESG) information to identify risks and opportunities.  Although
25 these groups of investors have different goals, both benefit from better quality
26 information about greenhouse gas emissions and climate-related financial risks.
27 Impact investors will use the information to shift their portfolios towards firms with
28 lower carbon footprints in order to help in some small way to address the climate

5

crisis.  ESG investors will use the information to shift their portfolios towards firms with lower climate-related risk and better strategies for mitigating those risks, and away from firms with high climate-related risk and poor strategies for mitigating it. Under either strategy, investors need accurate information in order to optimize their own portfolios.

10.    Although discussions of climate-related disclosures typically focus on investors, it is important to recognize that other stakeholders also value the information.  A growing number of consumers base their purchases in part on companies' sustainability performance.  Similarly, a growing number of employees, especially younger ones, base their choice of employer in part on the company's social responsibility performance.  Vanessa C. Burbano, *Social Responsibility Messages and Worker Wage Requirements: Field Experimental Evidence from Online Labor Marketplaces*, 27 Organization Science 1010 (2016), attached hereto as Ex. 2.  Both consumers and employees need accurate information about corporate performance in order to optimize their purchase and employment decisions.

### Climate Disclosures are Positive Inducements to Investors.

11.    Corporate communications about climate performance date back at least to 2002, when the Carbon Disclosure Project (now CDP), a group of large institutional investors, began asking companies to disclose their greenhouse gas emissions data to investors.  Today, more than 700 financial institutions with over $142 trillion in assets work with CDP, and over 23,000 companies worldwide from 130 countries and representing two-thirds of global market capitalization disclose to CDP.[1]

12.    Corporate climate communications typically address either a firm's carbon emissions and efforts to reduce them, or a firm's exposure to climate-related

---

[1] A true and correct copy of a CDP press release discussing these figures is attached hereto as Ex. 3.

6

financial risk, or both.  Corporate communications of the first type often reference three "scopes" of emissions.  Scope 1 emissions are those that are emitted directly by the firm's operations.  Scope 2 are indirect emissions that come from the firm's use of electricity.  Scope 3 emissions are indirect emissions embedded in the firm's value chain.

13.    Firms communicate their planned emissions reductions because investors penalize firms for carbon risk.  Firms typically raise capital by offering a mix of debt (bonds) and equity (shares of stock).  For either financing instrument, the cost of capital for a particular firm reflects the extent to which investors view the firm as risky: investors demand higher returns to compensate them for taking on additional risk.  Because of the risk premium that investors demand, firms seek to minimize the riskiness of their operations, all other things equal, in order to minimize their cost of capital.  Higher carbon emissions expose firms to greater levels of risk, because, among other things, governments may regulate emissions, impose carbon taxes on emissions, create a system of marketable emissions permits, or take other actions to reduce global warming.

14.    Indeed, Bolton and Kacperczyk (2021) show that investors demand a premium from stocks with carbon risk.  They measure the premium in terms of "basis points," which are a common unit of measurement in finance to describe a 1/100th of a percent change and are often abbreviated as "bps." Dkt. 56-9. This premium—referred to as the "carbon premium"—is the additional return from a company's stock that investors require to compensate for the company's exposure to climate risk. "The carbon premium is economically significant: A one standard-deviation increase in respectively the level and change of scope 1 emissions leads to a 15-bps and 26-bps increase in stock returns, or respectively a 1.8% and 3.1% annualized increase. In addition, a one-standard-deviation increase in the level and change of scope 2 emissions leads to respectively a 24-bps and 18-bps increase in stock returns, or a 2.9% and 2.2% annualized increase. Finally, a corresponding

7

one-standard-deviation increase in the level and change of scope 3 emissions increases stock returns by 33 bps and 31 bps per month, or 4.0% and 3.8% on an annual basis." *Id.* at 4.  At first glance, this may seem like good news for high emitters: their stocks pay higher returns than do those of low emitters. However, investors appear to be penalizing such companies by demanding higher returns in order to purchase and hold such companies' shares. Moreover, the analysis of Bolton and Kacperczyk (2021) controls for many other dimensions of firm performance, including returns over the past twelve months, leverage, the firm's industry, its market-to-book ratio, and many other factors.  They find that holding all these things equal, higher emissions raise the firm's cost of capital, which means a higher cost of doing business, which is not a positive thing for the firm.  Thus, corporate decarbonization plans can be seen as a form of advertising to investors that a firm is managing its climate risk and therefore deserves to be granted a lower carbon premium and hence a lower cost of capital.

15.    Additionally, Bolton et al. (2024) find that "energy price significantly increases the carbon premium, after controlling for firm characteristics, industry-time, and firm fixed effects. Bolton et al., *Inflation and the Carbon Premium* 3 (2024), a true and correct copy of which is attached hereto as Ex. 4.  When energy CPI is at the sample average, a one-standard deviation change in direct emissions (scope 1 and 2 emissions) is associated with a 2.05 percentage point higher annual return premium (the carbon premium). And when energy CPI is higher by one standard deviation, the return premium increases by 44% to 2.97%. We find a similar effect of energy price on the carbon premium associated with indirect emissions (scope 3 upstream and downstream emissions). Thus, when looking at within-sector variations in carbon emissions across firms, we find that energy price inflation, far from dampening firm-level carbon transition risk exposures, actually exacerbates them."

16.    Given that investors penalize high-emitting firms, it is not surprising

8

that in recent years, a growing number of companies have made public commitments to decarbonize their operations or even to achieve "net zero" emissions by a given year.  According to the Conference Board, a non-profit think tank, just over half of the Russell 3000 have set a target year for carbon reductions, as shown in Figure 1.[2]



**Figure 1: Percentage of Firms in the Russell 3000 Disclosing a Climate Target Year**

17.    Prevalence of target setting is even higher when looking just at the largest companies.  S&Should Global finds that 434 of the S&P 500 have set targets to reduce their emissions.[3]

18.    As shown in Figure 2 below, the average reduction pledge is roughly a 51% reduction in Scope 1 and Scope 2 emissions; and 11% reduction for Scope 3 emissions.  Targets vary modestly by industry, with utilities seeking a 59% reduction in Scope 1 and 2 emissions while real estate firms aim for a 41% reduction.

---

[2] A true and correct copy of the Conference Board webpage from which I obtained Figure 1 is attached hereto as Ex. 5.
[3] A true and correct copy of an article written by Matt MacFarland and published on the S&P Global website is attached hereto as Ex. 6.



**Figure 2: Average Percentage Reduction Targets by Industry**

19.     Many firms have set targets that go far beyond the targets in Figure 2 and instead aim to achieve net-zero carbon emissions by a certain date.  "Net-zero emissions" does not mean the firm emits zero greenhouse gases (GHGs).  Rather, the firm promises to offset any remaining emissions through some form of carbon capture and sequestration, most commonly some form of afforestation but also potentially including direct capture of carbon from the firm's manufacturing emissions and sequestration of the captured carbon.  Thus, these companies may still be emitting some GHGs in the target year, but they commit to counter-balance them with some combination of carbon removal and carbon offsets.

20.     The U.K. based non-profit group Net Zero Tracker compiles the net-zero commitments of the roughly 2,000 largest publicly-traded companies in the world by revenue, as well as the roughly 200 largest privately-held companies, and

makes the data freely available for download.[4]  In 2024, of 2,074 companies in the Net Zero Tracker database, 1,481 (roughly 75%) had some sort of target, as shown in Figure 3 below.   Net-zero targets were set by 40% of the firms, and carbon/climate neutral targets by another 17%, meaning that well over half the companies in this group had effectively committed on a set schedule to stop adding to global net climate emissions.  The pattern for U.S. firms alone is very similar, with 73% committing to some sort of reduction target.[5]



**Figure 3: GHG Reduction Commitments for the 2,200 Largest Global Firms**

21.    Empirical evidence demonstrates that firms are increasingly discussing climate-related information with investors.  Dzielinski et al. (2022) document a sharp increase in the amount of attention to climate in corporate earnings calls beginning in 2019.  Dzielinski, Michal, Florian Eugster, Emma Sjöström, and Alexander F. Wagner. *Climate Talk in Corporate Earnings Calls*, Mistra Center for Sustainable Markets (2022), attached hereto as Ex. 7.  Aldy et al. (2025, p. 85) document a similar increase: "Climate topics are increasingly discussed, as the 2018–2020 average frequency in the management update section [of an earnings call] is 67% greater than the corresponding 2011–2013 average, and similarly, the

---

[4] https://zerotracker.net/
[5] Author's calculations.

11

1   2018–2020 average frequency of climate topic discussion in the Q&A section is
2   75% greater than the corresponding 2011–2013 average." Aldy, Joseph E., Patrick
3   Bolton, Zachery M. Halem, and Marcin T. Kacperczyk, *Show & Tell: An Analysis*
4   *of Corporate Climate Messaging and Its Financial Impacts*, Financial Analysts
5   Journal 1-20 (2025), a true and correct copy of which is attached hereto as Ex. 8.

6          22.     Two conclusions can be drawn from the foregoing data. First, that
7   companies have incentives to communicate information about their carbon
8   emissions to investors because investors are concerned about climate risk and
9   demand a premium from firms that are saddled with climate risk.  And second, that
10  many firms seek to convince investors that their emissions will decrease in the
11  future.  These communications are a form of advertising to investors intended to
12  attract more capital and lower the firm's carbon premium.

13  **Carbon Disclosures are Positive Inducements to Consumers and Employees.**

14         23.     In addition to communicating carbon disclosures to investors,
15  companies also seek to influence consumer behavior with their emissions
16  disclosures.  Product-level climate communications began as early as 2007, when
17  the UK began encouraging firms to label the emissions associated with their
18  products.  A growing number of firms obtain certification by the Carbon Neutral
19  Protocol[6] in order to signal their performance to customers.  A true and correct
20  copy of Carbon Neutral Protocol's webpage listing examples of certified companies
21  is attached hereto as Ex. 9.  Among them are Lime scooters, Bulldog Skincare,
22  Microsoft Xbox consoles, and Logitech products.  Sloan,[7] the maker of fixtures and
23  appliances for kitchens and bathrooms, offsets the carbon for a whole array of
24  carbon-neutral products.  A true and correct copy of Sloan's webpage describing its
25  "carbon-neutral products" is attached hereto as Ex. 10.  Mars, the candy company,

26

27  _____
    [6] https://www.carbonneutral.com/examples.
28  [7] https://www.sloan.com/sustainability-and-wellness/products/carbon-neutral-
    products.

12

1   has committed to Net Zero by 2050.[8]  A true and correct copy of Mars' webpage

2   describing its Net Zero commitment is attached hereto as Ex. 11.

3          24.     One of the most widely touted carbon-neutral products is the new

4   Apple Watch,[9] released on September 12, 2023.  A true and correct copy of a press

5   release from Apple's website discussing the Apple Watch is attached hereto as Ex.

6   12.  Apple, based in Cupertino, California, aims to have all of its products be

7   carbon-neutral by 2030.  And Allbirds, based in San Francisco, California, has

8   launched the world's first zero carbon shoe, the M0.0SHOT Zero.[10]  A true and

9   correct copy of Allbirds' webpage discussing the M0.0nSHOT Zero is attached

10  hereto as Ex. 13.

11         25.     Several studies demonstrate the impact of carbon neutrality claims on

12  consumer demand.  Birkenberg et al. (2021) study the potential for low-carbon

13  labels to influence coffee demand, finding that German consumers on average are

14  willing to pay more for a carbon-neutral label on coffee.  Birkenberg, Narjes,

15  Weinmann, & Birner, *The Potential of Carbon Neutral Labeling to Engage Coffee*

16  *Consumers in Climate Change Mitigation*, Journal of Cleaner Production 278

17  (2021), attached hereto as Ex. 14.  Li et al. (2017) find that consumers are willing to

18  pay more for low-carbon products, even in a middle-income developing country

19  such as China.  Li, Long, & Chen, *Empirical Study of the Willingness of Consumers*

20  *to Purchase Low-Carbon Products by Considering Carbon Labels: A Case Study*,

21  Journal of Cleaner Production 161 (2017), attached hereto as Ex. 15.

22         26.     The growing market for information about a company's climate

23  emissions means that there is also the potential for greenwashing of such claims, as

24  Dreist et al. (2025) point out.  Dreist et al., *Greenwashing in Food Labeling:*

25

_____

26  [8] https://www.mars.com/about/policies-and-practices/mars-carbon-neutral-brands.
    [9] https://www.apple.com/newsroom/2023/09/apple-unveils-its-first-carbon-neutral-

27  products/.
    [10] https://www.allbirds.com/pages/moonshot-zero-carbon-

28  shoes?srsltid=AfmBOopIenMJ7GP1x-
    6eRk4Dya1PnJPb7UgH7B0TCCDhCUGz1ZrcauXg.

13

*Consumer Deception by Claims of Climate Neutrality and the Importance of an Interpretative Labelling Approach*, Food Quality & Preference 122 (2025), attached hereto as Ex. 16. For example, their research found that product labels saying "climate neutral" without any substantiation were viewed just as favorably by consumers as were labels making the claim that included substantiation. *Id.* at 6. Rondoni and Grasso (2021) provide a survey of 38 research studies of consumer demand for carbon-labeled products, concluding that it is important to move towards a more harmonized system of carbon labeling to reduce consumer confusion. Rondoni & Grasso, *Consumers Behaviour Towards Carbon Footprint Labels on Food: A Review of the Literature and Discussion of Industry Implications*, Journal of Cleaner Production 301 (2021), attached hereto as Ex. 17.

27. Less research has been conducted on employee responses to corporate climate communications. Nevertheless, there is extensive evidence that employees prefer to work for socially responsible companies (Brekke and Nyborg, 2008), are willing to accept lower wages in order to do so (Burbano, 2016), and are willing to work harder for them (Burbano, 2021). Kjell Arne Brekke & Karine Nyborg, *Attracting Responsible Employees: Green Production as Labor Market Screening*, 30(4) Resource & Energy Econ. 509, 509–526 (2008), located at Dkt. 56-47; Burbano, *Social Responsibility Messages and Worker Wage Requirements: Field Experimental Evidence from Online Labor Marketplaces*, 27 Organization Science 1010 (2016), attached hereto as Ex. 18; Burbano, *Getting Gig Workers to Do More by Doing Good: Field Experimental Evidence from Online Platform Labor Marketplaces*, 34(3) Org. & Env't 387 (2021), attached hereto as Ex. 19. In addition, research shows that employees are well aware of corporate greenwashing, and that a portion of them increase their turnover intentions as a result (Robertson et al., 2023). Jennifer L. Robertson, A. Wren Montgomery, & Timur Ozbilir, *Employees' Response to Corporate Greenwashing*, 32(7) Bus. Strategy & the Env't 4015, 4015–4027 (2023), located at Dkt. 56-21.

14

**There Are Many Ways in which Factual Information Can be Presented in a
Misleading Fashion, Thereby Leading to Greenwashing.**

28.    My definition of greenwashing (which has been widely adopted by others in the field) characterizes it as "any communication that misleads people into adopting overly positive beliefs about an organization's environmental performance, practices, or products."  Thomas P. Lyon & A. Wren Montgomery, *The Means and End of Greenwash*, 28(2) Org. & Env't 223, 226 (2015), located at Dkt. 56-13.  Note that this does not require that the communication is false (although some communications are), nor that the communicator intended the information to be misleading.  It merely needs to induce the receiver of the information to adopt an overly favorable impression of the entity doing the communicating.

29.    I, my co-authors, and others have identified a wide range of ways in which corporate environmental communications can be misleading.  Lyon & Maxwell, *Greenwash: Corporate Environmental Disclosure under Threat of Audit*, J. of Econ. & Mgmt. Strategy 3, 3–41 (2011), located at Dkt. 56-11; Eun-Hee Kim & Thomas Lyon, *When Does Institutional Investor Activism Increase Shareholder Value?: The Carbon Disclosure Project*, 11(1) The BE J. of Econ. Analysis & Pol'y (2011), located at Dkt. 56-31; Dkt. 56-13; Dkt. 56-21;A. Wren Montgomery, Thomas P. Lyon, & Julian Barg, *No End in Sight? A Greenwash Review and Research Agenda*, Org. & Env't 1, 1–3 (2023), DOI:10860266231168905, located at Dkt. 56-16.  A comprehensive review of these many mechanisms of greenwashing is provided by Nemes et al. (2022), and summarized in Figure 4 below.  Noémi Nemes et al., *An Integrated Framework to Assess Greenwashing*, 14(8) Sustainability 4431 (2022), located at Dkt. 56-14.  A true and correct copy of the publication from which I pulled Figure 4 is attached hereto as Ex. 20.  Below, I will refer back to Figure 4 in identifying the main types of greenwashing that occur in current voluntary climate disclosures, first in the context of disclosures of

15

1  greenhouse gas emissions and second in the context of disclosures of climate-

2  related financial risk and firms' strategies to mitigate that risk through net-zero

3  commitments and decarbonization transition plans.

4  ///

5  ///

6  ///

7  ///

8  ///

9  ///

10  ///

11  ///

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

**Network for Business Sustainability**

This figure is developed from the Network for Business Sustainability article "How to Avoid Greenwashing" by Noémi Nemes, Maya Fischhoff, and Abby Litchfield, originally published in September 2022.[15]

| GREENWASHING ELEMENTS | | HOW TO AVOID GREENWASHING |
|---|---|---|
| VAGUENESS | Making broad or poorly defined claims. | • Avoid unclear terms ("green," "eco-friendly") and support claims with evidence, e.g., sources or 3rd party review.<br>• State whether claims refer to part or all of product. |
| MISLEADING SYMBOLS | Visuals exaggerate organization's greenness. | • Ensure visuals and symbols represent degree of sustainability impact.<br>• Consider combined effect of colors, pictures, icons, sounds, and layout; be sure it doesn't exaggerate your claims. |
| JARGON | Information can't be understood by customers. | • Explain claims or actions using language that consumers can easily understand. |
| NO PROOF | Supporting information is hard to find. | • Verify claims with strong, independent, easily accessible evidence. |
| POLITICAL SPIN | Boasting green commitments while lobbying against environmental laws. | • Avoid lobbying to weaken or block environmental laws.<br>• Don't affiliate with thinktanks, trade associations and other groups that spread sustainability disinformation. |
| SELECTIVE DISCLOSURE | Emphasizing a few points instead of full sustainability impact | • Assess sustainability footprint using all life cycle stages (including material production and end-of-life disposal).<br>• Share all information about social and environmental performance claimed, including limits or negative impacts; Transparency improves trust and helps you get ahead of public criticism. |
| EMPTY STATEMENTS | Exaggerating achievements and policies. | • Only promise improvements you plan to achieve.<br>• Don't overstate commitments or spotlight minor actions.<br>• Spend more on achieving a goal than on marketing it. |
| INCONSISTENT ORGANIZATIONAL PRACTICE | Acting environmentally in some arenas but not others. | • Make sure green claims reflect sustainability focus across the entire organization (products; practices; vision). |
| DUBIOUS CERTIFICATIONS & LABELS | Using voluntary or internal certifications that don't genuinely drive action. | • Only apply seals/labels verified by an independent body.<br>• Only use certifications that are transparent about their scope and inspections; ensure rigorous enforcement of standards and adequate complaint and objection procedures.<br>• Conduct regular due diligence to make sure claims are genuine. |
| LIES AND IRRELEVANCIES | Misleading and missing the big picture. | • Make sure messaging represents scientific consensus (e.g., on climate change).<br>• Clearly communicate whether action is voluntary vs. required.<br>• Avoid making the public feel "green" about a choice that's dangerous (e.g., "greener" cigarettes) or highly controversial (e.g., natural gas). |

**Figure 4: Types of Greenwashing**

**There Are Many Examples of Misleading Language in CSR Reports or Corporate Websites**

30.     Even a cursory review of corporate websites and sustainability reports offers plenty of examples of misleading language.  Selective disclosure regarding carbon emissions is extremely common.  The Koch Industries website exhibits an extreme form of selective disclosure, saying nothing about climate except that the company reduced Scope 1 emissions over time (information that the company was required by law to disclose).[11]  A true and correct copy of the Koch Industries webpage discussing the company's environmental efforts is attached hereto as Ex. 22.  Bechtel Corporation, founded in San Francisco in 1989, says on its website that "Our approach prioritizes decarbonization while maximizing cost-efficiency, enabling us to deliver greater value and contribute to a more sustainable future."  A true and correct copy of Bechtel's webpage regarding "sustainability" is attached hereto as Ex. 23.  Yet according to Net Zero Tracker, Bechtel has a net zero target of 2050 with no interim targets, an example of "empty statements" in Figure 4.  Meta's 2024 Sustainability Report reports that 99% of the company's emissions are from Scope 3.  A true and correct copy of Meta's Sustainability Report is attached hereto as Ex. 24.  It also states that "We have also set a goal to achieve net zero emissions across our value chain in 2030."  Ex. 22 at 20.  Yet upon closer reading one finds that their target for Scope 3 emissions is merely "Not exceeding our 2021 baseline Scope 3 emissions by the end of 2031."  *Id.* at 23.This means that by 2030, Meta's Scope 3 emissions, which are 99% of the total, could be just as high as they were in 2021 at the same time that the company is claiming it will achieve net zero by 2030.  Reading between the lines, the only way the company can meet its corporate target is through an almost complete reliance on carbon offsets, but it

---

[11] Koch Industries operates four companies in California: John Zink Company, Koch Carbon, Koch Engineering Company Ltd., and Koch Membrane Systems. A true and correct copy of Koch Industries' EDGAR profile from the SEC's website is attached hereto as Ex. 21.

18

1    fails to state this clearly and provides no proof that this is even achievable.

2    Similarly, Publix Supermarkets discloses nothing except that they have reduced

3    emissions/ft$^2$ by 33% since 2007. A true and correct copy of Publix's webpage

4    discussing its greenhouse gas reduction is attached hereto as Ex. 25.

5        31.    Voluntary disclosures do not prevent the use of misleading language

6    and greenwashing.  For example, ExxonMobil's 2024 Advancing Climate Solutions

7    report engages in greenwashing through selective disclosure.  A true and correct

8    copy of Exxon's 2024 Advancing Climate Solutions report is attached hereto as Ex.

9    26.  It states that "With advancements in technology and clear and consistent

10   government policies that support needed investments and the development of

11   market-driven mechanisms, we aim to achieve net-zero Scope 1 and 2 greenhouse

12   gas emissions in our operated assets by 2050." Ex. 24 at 2. This ignores the fact

13   that Scope 3 emissions are far and away the most important climate impact of oil

14   and gas production.

15       32.    These examples of greenwashing in corporate climate disclosures give

16   a flavor of how greenwashing occurs in practice.

17   **Greenwashing in GHG Emissions Disclosures is Common, Primarily in the**

18   **Form of Selective Disclosure and a Lack of Proof.**

19       33.    Academic work recognizes selective disclosure as one of the most

20   frequent forms of greenwash.  Lyon and Maxwell's (2011) theory of greenwash as

21   selective disclosure has been cited 1,936 times. Dkt. 56-11.  Kim and Lyon (2011,

22   2015) show empirically that electric utilities have long greenwashed their carbon

23   claims through selective disclosure.  Dkt. 56-12.  Marquis et al. (2016) find

24   rampant greenwashing globally, in the form of selective disclosure, but find it is

25   reduced in countries with more scrutiny of corporate claims.  Marquis et al.,

26   *Scrutiny, Norms, and Selective Disclosure: A Global Study of Greenwashing* 27

27   Org. Science 483 (2016), attached hereto as Ex. 27.

28       34.    When it comes to disclosure of greenhouse gas emissions, which is the

19

subject of S.B. 253, selective disclosure is common.  There are two main ways in which this occurs.  First, companies may fail to fully disclose their Scope 1, 2 and 3 emissions.  Second, companies may fail to report on the full set of greenhouse gases they emit, disclosing emissions of carbon dioxide ($CO_2$) while failing to disclose emissions of methane ($CH_4$), nitrous oxide ($N_2O$), hydrofluorocarbons (HFCs), perfluorocarbons (PFCs), sulfur hexafluoride ($SF_6$) or nitrogen trifluoride ($NF_3$).

35.    In the United States, full disclosure of Scopes 1, 2 and 3 is not mandatory.  Only Scope 1 emissions (those emitted directly from combustion of fossil fuels) from plants emitting more than 25,000 pounds of $CO_2$-equivalent per year must be reported to the US greenhouse gas reporting program (USGHGRP).  Plants below the threshold need not report.  Scope 2 emissions (those that occur indirectly through the purchase of electricity) are not required to be reported.  Scope 3 emissions (those that occur upstream or downstream in a company's value chain) also are not required to be reported.

36.    In the absence of mandatory disclosure of GHG emissions, stakeholders have had to rely on voluntary disclosures.  CDP is the oldest investor-driven disclosure project, and recently celebrated its 25th anniversary.  The number of investors backing CDP's annual request for climate-related information has ballooned to more than 700, representing a quarter of all global institutional financial assets.  A true and correct copy of CDP's webpage containing information about the organization is attached hereto as Ex. 40.

37.    Companies representing two-thirds of global market capitalization – from 130 countries – disclose critical environmental data through CDP. Over the period from 2018-2023, 15,594 firms reported to CDP.  The depth and breadth of reporting has increased significantly over time, as is shown in Figure 5.[12]  Even with these increases, however, by 2023 only 49% of reporting entities disclosed Scope 3 GHG emissions.  The selective disclosure of greenhouse emissions is a

---

[12] Calculations performed by author using CDP's 2025 data set.

classic example of greenwashing.



**Figure 5. Trends in assurance, financial risk and Scope 3 disclosure.**

38.     Another classic example of greenwashing is the lack of proof for corporate claims about emissions.  One important way that firms provide substantiation of their emissions disclosures is to obtain third-party verification (also known as assurance) of their claims from professional firms with expertise in carbon accounting and emissions disclosure.  Firms obtain assurance of GHG emissions across scopes in order to communicate transparency and accuracy in emissions levels to stakeholders. Figure 5 above shows that a growing number of firms are obtaining external assurance for their Scope 1, 2 and 3 emissions, although assurance for Scope 3 emissions lags behind assurance of Scope 1 and 2 emissions.  From 2018-2023, out of 15,594 firms, 31% obtained external assurance for Scope 1 (direct) emissions, 30% for Scope 2 (indirect emissions via purchased electricity) and 23% for Scope 3 (supply chain/purchase-embedded emissions). Needless to say, that still leaves a large share of firms with a lack of assurance regarding their emissions disclosures.

39.     Figure 6 below shows variation by industry of external assurance across scopes for CDP reporters in 2023.[13]   External assurance frequency tends to be within a similar range across all scopes within a given industry, though Scope 3

---
[13] Author's calculations.

assurance tends to be the least frequent. Further, industries with higher scope 1
assurance also tend to have higher assurance across scopes 2 and 3, and vice versa
for industries with low assurance.  Industries vary widely, with semiconductors
providing the most assurance (85% for Scopes 1 and 2, and 65% for Scope 3) and
consumer durables providing the least (18% for Scopes 1 and 2, and 11% for Scope
3).

|  | External verification of GHGs by scope (mean) | | |
|---|---|---|---|
| Industry | Scope 1 | Scope 2 | Scope 3 |
| Aerospace & Defense | 0.69 | 0.67 | 0.56 |
| Air Freight Transport & Logistics | 0.42 | 0.4 | 0.35 |
| Air Transportation - Airlines | 0.71 | 0.64 | 0.51 |
| Automobiles & Components | 0.36 | 0.35 | 0.24 |
| Banks, Financials & Insurance | 0.74 | 0.74 | 0.7 |
| Building Products | 0.65 | 0.65 | 0.47 |
| Chemicals | 0.45 | 0.44 | 0.31 |
| Construction & Engineering | 0.35 | 0.36 | 0.33 |
| Construction Materials | 0.58 | 0.57 | 0.47 |
| Consumer Durables | 0.18 | 0.18 | 0.11 |
| Containers & Packaging | 0.28 | 0.26 | 0.2 |
| Electric Utilities | 0.73 | 0.67 | 0.58 |
| Electrical Equipment and Machinery | 0.29 | 0.29 | 0.2 |
| Food & Beverage Processing | 0.39 | 0.36 | 0.26 |
| Food & Staples Retailing | 0.6 | 0.6 | 0.49 |
| Forest and Paper Products | 0.35 | 0.31 | 0.22 |
| Ground Transportation - Trucking | 0.21 | 0.18 | 0.14 |
| Healthcare Providers & Services | 0.35 | 0.36 | 0.29 |
| Hotels, Restaurants & Leisure | 0.52 | 0.51 | 0.39 |
| Media | 0.35 | 0.35 | 0.31 |
| Mining | 0.54 | 0.54 | 0.36 |
| Oil & Gas | 0.4 | 0.39 | 0.25 |
| Pharmaceuticals | 0.46 | 0.46 | 0.34 |
| Real Estate | 0.74 | 0.75 | 0.67 |

22

| | | | |
|---|---|---|---|
| Retailing | 0.52 | 0.53 | 0.43 |
| Semiconductors | 0.85 | 0.85 | 0.65 |
| Software & Services | 0.29 | 0.31 | 0.27 |
| Technology Hardware | 0.26 | 0.27 | 0.2 |
| Telecommunication Services | 0.41 | 0.4 | 0.33 |
| Textiles | 0.31 | 0.29 | 0.2 |
| Trading Companies | 0.26 | 0.26 | 0.2 |
| **Average** | 0.46 | 0.45 | 0.36 |

**Figure 6. External assurance across scopes by industry.**

40.    Plaintiffs erroneously claim that Scope 3 emissions reporting is itself misleading, because carbon emissions from a company's supply chain are not the reporting entity's emissions.  This suggests that a failure in a company's supply chain can be excused because the company has no responsibility for its own supply chain and no ability to manage it.  This is simply false.  Business schools around the world have well-developed supply chain management programs, precisely because companies have great ability to manage their supply chains and doing so in a competent fashion is highly profitable.  Indeed, hundreds of papers have been written on sustainable supply chain management (Seuring and Muller, 2008). Seuring & Müller, *From a Literature Review to a Conceptual Framework for Sustainable Supply Chain Management*, J. of Cleaner Prod. 1699 (2008), attached hereto as Ex. 28.

41.    Moreover, companies that make sweeping emission commitments are making claims about their supply chain that must be substantiated to prevent greenwashing (that is, unless they are ignoring their Scope 3 emissions, which is itself a form of greenwashing). Walmart, for example, announced sweeping environmental goals for the company in 2005: "to be supplied 100% by renewable energy; to create zero waste; and to sell products that sustain people and the environment." Since roughly 90% of Walmart's greenhouse gas emissions and other environmental impacts occur in its extended supply chain, the firm must work with suppliers and customers to achieve these goals, and it has done so very

23

1    effectively (Plambeck, 2012). Plambeck, *Reducing Greenhouse Gas Emissions*

2    *Through Operations and Supply Chain Management*, Energy Econ. 34 (2012),

3    attached hereto as Ex. 29. As explained above, however, in the absence of reporting

4    and assurance, investors, consumers, and employees have no means to verify such

5    claims or compare different companies' performances. In particular, Scope 3

6    reporting and assurance serves to substantiate claims of this type.

7         42.    Plaintiffs also claim that GHG reporting is inaccurate because it omits

8    Scope 4 emissions. Scope 4 emissions are said to be emissions that "would have

9    happened" were it not for the company's efforts to reduce them. This is not a

10    category of emissions that is recognized in academic research, and for good reason.

11    There is no objective measure for a given company of what emissions "would have

12    been," and such claims are therefore incredibly susceptible to greenwashing. What

13    investors and other stakeholders want to know is what are actual emissions levels.

14    Carbon risk premia are calculated based on a company's actual emissions, and

15    investors can easily check whether a firm's emissions are lower today than they

16    were last year. Bolton and Kacperczyk (2021) find that when firms reduce their

17    emissions from one year to the next, this does reduce their carbon premium.

18    Bolton, Patrick, and Marcin Kacperczyk, *Do investors care about carbon risk?*,

19    Journal of Fin. Econ. 142, no. 2 517-49 (2021), located at Dkt. 56-9. In short,

20    "Scope 4" emissions are not generally considered legitimate, are unnecessary for

21    stakeholder decision-making, and open up opportunities for greenwashing.

22    **Many Firms Fail to Disclose their Climate-Related Financial Risks.**

23         43.    As mentioned earlier, investors are aware that greenhouse emissions

24    constitute a financial risk and that decarbonization reduces risks. As shown in

25    Figure 7, 74% of firms in the S&P 500 disclose information about the climate risks

26    to which they are exposed, leaving 26% that do not disclose their climate risks.[14]

27            [14] The figure comes from the Conference Board, a non-profit business membership

28    and research organization. Tonello, Matt. "2023 Climate Disclosures in the Russell

(continued…)

24



**Figure 7: Percentage of Firms Disclosing Climate Risks.**

44.    Disclosure of climate risks varies widely by industry sector, as shown in Figure 8 below.[15]   Of utilities, a full 93% disclose climate risks, while only 15% of health care firms do so.



**Figure 8: Frequency of Climate Risk Disclosure by Industry.**

45.    Within this reporting, climate risks are not disclosed fully, consistently, or adequately and thus do not enable investors and consumers to make informed decisions.

**Greenwashing in Corporate Decarbonization Plans Primarily Takes the Form of Empty Statements and Lack of Proof.**

46.    Among firms that seek to reduce their carbon risks through creating decarbonization transition plans or setting "net-zero" targets, the quality of many

---

3000 and S&P 500," *Harvard Law School Forum on Corporate Governance*, December 5, 2023, attached hereto as Ex. 30.
[15] *Id.*

25

1   plans is poor. Misleading claims about future emissions reduction have been

2   dubbed "future washing" by Montgomery et al. (2024).

3       47.    Evidence demonstrates several forms of greenwashing in net zero and

4   decarbonization transition plans. One is what Nemes et al. (2022) refer to as

5   "Empty Statements." Dkt. 56-14; Ex. 20. These can take many forms, such as

6   setting a long-term target but without any interim targets or without a clear strategy

7   to achieve the long-term goal. Alternatively, the company may have a target, but

8   not be on track to reach the target.

9       48.    Another form of greenwashing in carbon reduction plans is a lack of

10   substantiation, or what Nemes et al. (2022) refer to as "No Proof." Dkt. 56-14.

11   This is particularly common when companies rely on carbon offsets rather than

12   reducing the company's own Scope 1, 2 or 3 emissions. As an example of the

13   problems that can occur, Romm (2023) describes a scandal that emerged around

14   Microsoft's purchase of offsets from the Danish government's carbon capture and

15   sequestration program, in which Microsoft essentially claimed to be buying offsets

16   the Danish government had already bought and paid for. Romm, *Are Carbon*

17   *Offsets Unscalable, Unjust, and Unfixable—and a Threat to the Paris Climate*

18   *Agreement?* (2023), attached hereto as Ex. 31. This double-counting of offsets is

19   one of the reasons many observers have become highly skeptical of them. When a

20   company relies on carbon offsets to meet its decarbonization goals but provides no

21   evidence that the offsets are legitimate, that is an example of having "No Proof."[16]

22       49.    Similar concerns frequently arise as to many corporate decarbonization

23   plans. Green et al. (2022, p. 2037) report that although oil majors claim to have

24   plans for decarbonization, "we do not find any evidence of meaningful

---

25   [16] Another example is Delta Airlines, which was the first airline to pledge to go

26   carbon neutral and the first to buy carbon offsets for all of its flights. Attached
    hereto as Ex. 32 is a true and correct copy of a news article published in *The*

27   *Guardian* describing Delta's pledge to go carbon neutral. Delta has since been sued
    for the misleading nature of their plans, which allegedly rely on low-quality carbon

28   offsets. Attached hereto as Ex. 33 is a true and correct copy of a news article
    published in *The Guardian* discussing the lawsuit.

26

1   decarbonization efforts among the top 10 oil and gas firms (oil majors)."  Green et

2   al., *Transition, Hedge, or Resist? Understanding Political and Economic Behavior*

3   *Toward Decarbonization in the Oil and Gas Industry* 29 Review of Int'l Political

4   Econ. 2036, 2037 (2022), attached hereto as Ex. 34.  One oil and gas company

5   employee said "Our last annual report says absolutely nothing that you could use

6   intelligently as an investor to understand whether the company was doing the right

7   things for an energy transition." Kaplan & Levy, *The Rise of Investor-Driven*

8   *Climate Governance: From Myth to Institution?* Reg. & Gov. 1, 9 (2025), attached

9   hereto as Ex. 35.

10       50.   Many corporate decarbonization commitments have been assessed

11   either by the New Climate Institute (an independent non-profit), the CDP (formerly

12   the Carbon Disclosure Project) or Net Zero Tracker (an independent non-profit).

13   These independent analyses suggest that many corporate commitments lack

14   credibility because they consist of empty statements, fail to substantiate their

15   claims, and/or undermine their purported commitment to climate progress by

16   engaging in political spin.

17       51.   For example, in 2023 the New Climate Institute evaluated in detail the

18   net-zero plans of 25 major multinationals and found most of them deeply

19   misleading:

20            All of the 25 companies assessed in this report pledge
21            some form of zero emission, net-zero or carbon-neutral
              target. But just 3 of the 25 companies – Maersk, Vodafone
22            and Deutsche Telekom – clearly commit to deep
              decarbonisation of over 90% of their full value chain
23            emissions by their respective net-zero and zero emission
              target years. At least 5 of the companies only commit to
24            reduce their emissions by less than 15%, often by
              excluding upstream or downstream emissions. The 13
25            companies that provide specific details on what their
              headline net zero pledges mean, commit to reduce their
26            full value chain emissions from 2019 by only 40% on
              average. The other 12 companies do not accompany their
27            headline pledges with any specific emission reduction
              commitment for their that [*sic*] target year. Collectively,
28            the 25 companies specifically commit to reducing only
              less than 20% of their 2.7 GtCO2e emission footprint, by

27

their respective headline target years.

A true and correct copy of the New Climate Institute's webpage discussing its evaluation is attached hereto as Ex. 36. This finding underlines the point that many net zero plans make empty statements and offer no proof of the quality of the carbon offsets on which they implicitly rely.

52. One of the clearest indicators of empty statements in decarbonization plans is a lack of interim targets. Of firms tracked by Net Zero Tracker that have carbon reduction targets, 1,150 or 80% had intermediate targets. Among privately-held firms, however, only 63% of those with targets had set interim targets (Net Zero Tracker, 2024). In other words, 20% of the firms with targets failed to present interim targets, and 37% of the privately-held firms failed to present interim targets. Even amongst the closely monitored members of the Climate Action 100+ (which numbered 165 firms as of October 2024), only 37 had set strong mid-term reduction targets, and none had strong short-term targets. A true and correct copy of the Climate Action 100+ website discussing its member firms is attached hereto as Ex. 37.

53. One of the clearest indicators of a lack of proof is a failure to obtain external third-party assurance of climate claims. Figure 9, from the Conference Board, shows that when reporting on their progress towards meeting their targets, relatively few firms obtain external assurance of their reporting.[17] Although 54% of the S&P 500 obtain external assurance, only 14% of the Russell 3000 do so. Thus, the problem of no proof extends beyond disclosure of emissions to disclosure of progress on meeting interim targets.

---

[17] Ex. 27.

28



**Figure 9: Percentage of Firms Obtaining External Assurance for their Climate Progress.**

54.    The CDP analyzes thousands of organizations that report that they have a climate transition plan aligned with a future level of warming limited to 1.5 degrees Celsius.[18]  CDP is not attempting to evaluate the quality of the plans themselves.  It is simply assessing whether the plans provided enough detail to enable an outside stakeholder to reliably evaluate it.  In 2022, 4,100 firms out of over 18,000 reporting to CDP claimed to have such a plan.  However, only 81 of them reported sufficient detail on all 21 key indicators needed to assess the credibility of the transition plan.   These 81 organizations represented only 0.4% of the entire disclosure sample, and 1.98% of the companies claiming transition plans in 2022.  According to a report by CDP, in 2023, the number claiming to have a Paris-aligned transition plan increased by 50% to 5,900, and the number that disclosed on all 21 key indicators increased to 140.  CDP, *The State of Play: 2023 Climate Transition Plan Disclosure* 8, 11 (June 2024), a true and correct copy of which is attached hereto as Ex. 39.  This left the percentage of firms with sufficient disclosure in the total disclosure sample well below 1%, although the percentage of firms with transition plans that disclosed on all indicators rose modestly to 2.37%.  *Id.*  Although this represents a move in the right direction, overall, voluntary disclosure around climate transition plans remained deeply inadequate, and

[18] A true and correct copy of the CDP webpage discussing climate transition plans is attached hereto as Ex. 38.

29

1  exhibited a massive case of lack of proof.

2      55.    In summary, greenwashing is common in corporate decarbonization

3  and net-zero plans.  Many plans make empty statements such as setting a target for

4  decades in the future without even bothering to lay out interim targets.  Many plans

5  fail to provide proof of their claims, and do not obtain external assurance for their

6  reporting.  In addition, the problem of "no proof" extends to the way many plans

7  rely on carbon offsets of questionable quality to achieve their targets.

8  **Standardized, Mandatory Disclosure Can Correct Much of the Misleading**

9  **Nature of Current Voluntary Climate Disclosures.**

10      56.    I have shown above that existing voluntary climate disclosure practices

11  allow for misleading speech, i.e., greenwashing, and that such speech is

12  widespread.  This can happen in a variety of ways, but the ones that appear most

13  prevalent in climate disclosures are selective disclosure, empty statements, lack of

14  proof, and political spin.

15      57.    It is well established in economics that limiting the discretion of

16  voluntary disclosures can make them more informative (Fishman and Hagerty,

17  1990).  This is especially easy to see with regard to disclosure of greenhouse gas

18  emissions.  In the current voluntary disclosure environment, companies can choose

19  not to disclose emissions of the full range of their different greenhouse gases, and

20  focus solely on carbon dioxide, as many do.  Or they can choose not to report on

21  Scope 3 emissions, which is also a common practice.  They can avoid reporting

22  their total corporate emissions by choosing not to report on sources of Scope 1

23  emissions that fall below the mandatory reporting threshold of 25,000 tons of

24  $CO2$/year.  These are classic forms of selective disclosure and allow companies to

25  engage in greenwash.  California's Senate Bill 253 would mandate consistent and

26  complete disclosure of greenhouse gas emissions, eliminating this form of

27  greenwashing.

28      58.    California's Senate Bill 261 would also result in more consistent and

30

1  complete disclosure of a company's identified climate-related financial risks and

2  any corporate plans for mitigation of those risks.  A number of international bodies

3  have worked hard in recent years to develop standardized frameworks for reporting

4  that will make corporate reports more complete, consistent, and useful to investors.

5  These include the Task Force on Climate-related Financial Disclosures (TCFD) and

6  the International Sustainable Standards Board (ISSB).  Senate Bill 261 provides

7  that reporting entities align their disclosures with the "recommended framework

8  and disclosures contained in the Final Report of Recommendations of the Task

9  Force on Climate-related Financial Disclosures (June 2017) published by the Task

10  Force on Climate-related Financial Disclosures, or any successor thereto, or

11  pursuant to an equivalent reporting requirement as described in paragraph (4)."

12  Under this framework, reporting entities are tasked with identifying both their

13  "physical risks" (such as those resulting from increased severity of extreme

14  weather) and "transition risks" (such as those associated with policy action and

15  changes in technology that can affect how a company can run its business).[19]

16       59.    As especially relevant here, a report prepared in accordance with the

17  TCFD would address any emission reducing targets set by the company, and its

18  performance against these targets.[20]  The TCFD guidelines provide that, "In

19  describing their targets, organizations should consider including the following:

20  whether the target is absolute or intensity based; time frames over which the target

21  applies; base year from which progress is measured; and key performance

22  indicators used to assess progress against targets."[21]

23       60.    These disclosures thus respond to greenwashing in corporate carbon

24  disclosures and decarbonization plans.  With regards to empty statements, for

25  example, they shine a spotlight on the firm's actual strategy, if any, for setting

26

27  [19] A copy of the Final Report of Recommendations of the TCFD is available at Dkt. 53-5.

28  [20] *Id.* at 24.
    [21] *Id.*

1  targets, its development of interim targets and its progress towards achieving them.

2  This helps to eliminate several of the problematic aspects of empty statements that I

3  described earlier.

4       61.    By substantially reducing opportunities for greenwashing in corporate

5  decarbonization and net zero commitments, the disclosures under SB 253 and SB

6  261 will in turn reduce investor uncertainty with regards to the climate-related risks

7  firms face and the steps they are taking to manage them. When investors have

8  greater certainty regarding these factors, they can be expected to use this

9  information to restructure their portfolios in ways that allow them to align their

10  investments with their own risk tolerances and preferences for investment types. In

11  particular, insurance companies, pension funds, and mutual funds are likely to shift

12  away from firms with higher-than-expected levels of Scope 1 emissions, and those

13  firms are likely to see their carbon premia increase (Bolton and Kacperczyk, 2021).

14  At the same time, the market as a whole is likely to reduce the carbon premium

15  demanded from firms with lower-than-expected emissions (Bolton and Kacperczyk,

16  2021). Dkt. 56-9. Both types of adjustments will be beneficial for investors.

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

62.     Not only will these changes reduce uncertainty for investors, but as I stated in my prior declaration empirical evidence shows that mandatory disclosure of climate emissions is also associated with reductions of between 7-8% in carbon emissions themselves (Downar et al., 2021; Yang et al., 2021).  Dkt. 56-54; Dkt. 56-55.  Thus, both investors and the public more broadly stand to benefit from improved disclosure rules.

I declare under penalty of perjury that the foregoing are true and correct. Executed this day, the 7th of April, 2025, in Stanford, California.

THOMAS P. LYON
Professor, U. of Michigan

33

O

# United States District Court
# Central District of California

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA et al., | Case № 2:24-cv-00801-ODW (PVCx) |
| Plaintiffs, | **ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [78]** |
| v. | |
| CALIFORNIA AIR RESOURCES BOARD et al., | |
| Defendants. | |

## I.    INTRODUCTION

Plaintiffs Chamber of Commerce of the United States of America ("U.S. Chamber"), California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association bring this action challenging California Senate Bills ("SB" or "SBs") 253 and 261 for violation of the First Amendment.  (*See* First Am. Compl. ("FAC")  ¶¶ 92–112, ECF No. 28.)   Plaintiffs move for a preliminary injunction to enjoin both laws.  (Mot. Prelim Inj., ECF No. 78; Mem. P. & A. ISO Mot. Prelim. Inj. ("Motion" or "Mot."), ECF No. 78-1).  For the reasons below, the Court **DENIES** Plaintiffs' Motion.

## II.    BACKGROUND

**A.    Factual Background**

On October 7, 2023, Governor Gavin Newsom signed SBs 253 and 261 into law. (FAC ¶ 3.) A brief description of each law follows.

*1.    Senate Bill 253*

SB 253 applies to any entity with total annual revenues over $1 billion "that does business in California." Cal. Health & Safety Code §§ 38532(b)(2), (c)(1). SB 253 originally directed that, by January 1, 2025, the California Air Resources Board ("CARB") "shall develop and adopt regulations" for these entities. Cal. Health & Safety Code §§ 38532(b)(2), (c)(1). After the FAC was filed, California delayed this deadline to July 1, 2025. (Notice Amends. SBs 253 & 261 ("Not. Amends."), ECF No. 72.) A recent report estimated that SB 253 would apply to 1,971 companies. (Decl. Caitlan McLoon ISO Opp'n ("McLoon Decl.") Ex. 2 ("Ceres Report") at 11, ECF Nos. 89-3, 89-5.)[1]

SB 253 requires CARB to develop regulations that require reporting entities to annually disclose their "Scope 1," "Scope 2," and "Scope 3" emissions. (FAC ¶ 47); Cal. Health & Safety Code § 38532(c)(1).

- Scope 1 emissions are "all direct greenhouse gas emissions that stem from sources that a reporting entity owns or directly controls, regardless of location, including, but not limited to, fuel combustion activities." (FAC ¶ 47a); Cal. Health & Safety Code § 38532(b)(3).

- Scope 2 emissions are "indirect greenhouse gas emissions from consumed electricity, steam, heating, or cooling purchased or acquired by a reporting entity, regardless of location." (FAC ¶ 47b); Cal. Health & Safety Code § 38532(b)(4).

- Scope 3 emissions are "indirect upstream and downstream greenhouse gas emissions, other than scope 2 emissions, from sources that the reporting entity does not own or directly control and may include, but are not limited to, purchased goods and services, business travel, employee

---

[1] This report reduced the prior estimate of 5,300 companies. (*See* Ceres Report 3; FAC ¶ 44.)

commutes, and processing and use of sold products." (FAC ¶ 47c); Cal. Health & Safety Code § 38532(b)(5).

SB 253 does not mandate entities to report avoided emissions, or so-called "Scope 4 emissions." (FAC ¶¶ 50–51, 69.)

SB 253 requires CARB to ensure that its regulations mandate entities to measure and report Scope 1, Scope 2, and Scope 3 emissions "in conformance with the Greenhouse Gas protocol standards and guidance." (*Id.* ¶ 48); Cal. Health & Safety Code § 38532(c)(2)(A)(ii); (*see* Decl. Bradley J. Hamburger ISO Mot. Summ. J. ("Hamburger SJ Decl.") Ex. 18 ("Greenhouse Gas Protocol"), ECF Nos. 48-3, 48-21.) The law further directs CARB to develop and adopt regulations to "minimize[] duplication of effort" by allowing entities "to submit to the emissions reporting organization . . . reports prepared to meet other national and international reporting requirements." Cal. Health & Safety Code § 38532(c)(2)(D)(i). CARB must also develop and adopt regulations that ensure reporting entities obtain third-party assurances as to the quality and accuracy of the reported emissions. *Id.* § 38532(c)(2)(F). These emissions data will be publicly available, and CARB will ensure the creation of a public report on the disclosures. (FAC ¶ 61); Cal. Health & Safety Code §§ 38532(d)(1), (e).

While CARB has yet to issue the specified regulations, it has sent an enforcement notice stating that it "has decided to exercise its enforcement discretion" under SB 253. (Decl. Bradley J. Hamburger ISO Mot. Ex. A ("Enforcement Notice") 5, ECF No. 78-6.) For the first reporting period in 2026, CARB will require reporting entities to "submit scope 1 and scope 2 emissions from the reporting entity's prior fiscal year that can be determined from information the reporting entity already possesses or is already collecting at the time" of the Enforcement Notice. (*Id.* (internal quotation marks omitted).) During the first reporting cycle, CARB "will not take enforcement action for incomplete reporting against entities, as long as the companies make a good faith effort to retain all data relevant to emissions reporting

for the entity's prior fiscal year."  (*Id.* at 5–6.)  Reporting Scope 3 emissions will come later, as SB 253 requires CARB to issue regulations regarding disclosure of these emissions for the 2027 reporting year.  Cal. Health & Safety Code § 38532(c)(2)(A)(i)(II).

### 2.  Senate Bill 261

SB 261 applies to any entity with total annual revenues over $500 million "that does business in California."  (FAC ¶ 34); Cal. Health & Safety Code § 38533(a)(4).  A recent report estimated that SB 261 would apply to 2,675 companies.[2]  (Ceres Report.)

Starting on January 1, 2026, SB 261 will mandate each applicable entity to biennially disclose on its website two categories of "climate-related financial risk information."  "Climate-related financial risk information" is defined as information related to "material risk of harm to . . . financial outcomes due to physical and transition risks" to the business.  (*Id.* ¶¶ 36, 39); Cal. Health & Safety Code § 38533(a)(2).[3]  These two categories are:

- The entity's climate-related financial risk, in accordance with the recommended framework and disclosures contained in the Final Report of Recommendations of the Task Force on Climate-related Financial Disclosures (June 2017), (Hamburger SJ Decl. Ex. 20 ("TCFD Framework"), ECF No. 48-23; FAC ¶ 36), Cal. Health & Safety Code § 38533(b)(1)(A)(i); and

- The entity's measures adopted to reduce and adapt to climate-related financial risk disclosed in its biennial report, (FAC ¶ 37), Cal. Health & Safety Code § 38533(b)(1)(A)(ii).

---

[2] This report reduced the prior estimate of over 10,000 companies.  (*See* Ceres Report 3; FAC ¶ 34.)

[3] The legislation's full definition of "climate-related financial risk" is as follows: "material risk of harm to immediate and long-term financial outcomes due to physical and transition risks, including, but not limited to, risks to corporate operations, provision of goods and services, supply chains, employee health and safety, capital and financial investments, institutional investments, financial standing of loan recipients and borrowers, shareholder value, consumer demand, and financial markets and economic health."  Cal. Health & Safety Code § 38533(a)(2).

4

1    The TCFD Framework is structured around four areas of disclosure—
2    governance, strategy, risk management, and metrics and targets. (TCFD
3    Framework 14; *see also* Decl. James P. Burton Opp'n Mot. Summ J. ("Burton SJ
4    Decl.") Ex. 5 ("Implementing the TCFD Framework"), ECF Nos. 53, 53-5.) For
5    governance, the TCFD Framework asks each company to disclose its "governance
6    around climate-related risks and opportunities." (TCFD Framework 14 fig. 4.) For
7    strategy, the TCFD Framework asks each company to disclose "the actual and
8    potential impacts of climate-related risks and opportunities on the organization's
9    businesses, strategy, and financial planning where such information is material." (*Id.*)
10   For risk management, the TCFD Framework asks each company to disclose how it
11   "identifies, assesses, and manages climate-related risk." (*Id.*) And, for metrics and
12   targets, the TCFD Framework asks each company to disclose the metrics and targets it
13   uses "to assess and manage relevant climate-related risks and opportunities where
14   such information is material." (*Id.*)

15   **B.    Procedural Background**

16   Plaintiffs initiated this action against Defendants CARB Chair Liane M.
17   Randolph, CARB Executive Officer Steven S. Cliff, and California Attorney General
18   Robert A. Bonta (the "State"). (FAC ¶¶ 15–17.) Plaintiffs bring a facial challenge to
19   both laws on First Amendment grounds. (*Id.* ¶¶ 92–99).

20   In its FAC, Plaintiffs assert four causes of action under 42 U.S.C. § 1983. In
21   Count I, Plaintiffs allege that SBs 253 and 261 violate the First Amendment. (FAC
22   ¶¶ 92–99.) In Count II, Plaintiffs assert that the Constitution and federal law preempt
23   SBs 253 and 261. (*Id.* ¶¶ 100–06.) In Count III, Plaintiffs claim that the laws violate
24   the Constitution's limits on extraterritorial regulation, including the dormant
25   Commerce Clause. (*Id.* ¶¶ 107–12.) Lastly, in Count IV, Plaintiffs seek payment of
26   attorneys' and expert fees. (*Id.* ¶¶ 113–15.) As relief, Plaintiffs seek judicial
27   declarations that SBs 253 and 261 are "null, void, and with no force or effect," and an
28

injunction enjoining the State from "implementing, applying, or taking any action whatsoever to enforce" SBs 253 and 261. (*Id.*, Prayer for Relief ¶ 116.)

Before discovery began, Plaintiffs moved for summary judgment on their First Amendment claim, (Mot. Summ. J., ECF No. 48), and the State moved to deny or defer the motion under Federal Rule of Civil Procedure ("Rule" or "Rules") 56(d), (Mot. Den. Defer Mot. Summ. J., ECF No. 57). The Court granted the State's motion to defer Plaintiff's motion for summary judgment and provided Plaintiffs leave to re-file their motion after the close of discovery. (*See* Order Summ. J., ECF No. 73.)

The State separately moved to dismiss Plaintiffs' Supremacy Clause and extraterritoriality claims under Rules 12(b)(1) and 12(b)(6). (Mot. Dismiss, ECF No. 38.) The Court granted the motion and dismissed those claims as to SB 253 under Rule 12(b)(1) and as to SB 261 under Rule 12(b)(6). (Order Mot. Dismiss, ECF No. 77.) Although given the opportunity to amend some of these claims, (*id.* at 23–24), Plaintiffs declined to do so. On March 17, 2025, the State filed an Answer. (Answer, ECF No. 85.)

On April 8, 2025, the Court issued a scheduling order setting the deadline to file renewed motions for summary judgment for March 23, 2026, the pretrial conference for September 21, 2026, and trial for October 20, 2026. (Scheduling & Case Mgmt. Order 2, ECF No. 93.)

Plaintiffs now bring a Motion for Preliminary Injunction, asking the Court to preliminary enjoin SBs 253 and 261 on First Amendment grounds. (Mot.) The Motion is fully briefed. (Opp'n Mot., ECF No. 89; Reply, ECF No. 97.) On July 1, 2025, the Court held a hearing on the Motion. (Hr'g Mins., ECF No. 102; Hr'g Tr., ECF No. 106.)

### III.   LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, a movant must establish that they are likely to succeed on the

6

merits, they are likely to suffer irreparable harm absent an injunction, the balance of equities tips in their favor, and an injunction is in the public interest. *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1115 (9th Cir. 2024) (citing *Winter*, 555 U.S. at 20). "Because 'the party opposing injunctive relief is a government entity' here, the third and fourth factors 'merge.'" *X Corp. v. Bonta*, 116 F.4th 888, 898 (9th Cir. 2024) (quoting *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023)). "[I]n the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction on speech." *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022) (internal quotation marks omitted).

## IV.    DISCUSSION

### A.    Whether Plaintiffs' SB 253 Challenge Is Ripe

As a threshold matter, the State argues that Plaintiffs' challenge to SB 253 is prudentially unripe because SB 253, without CARB regulations, does not impose any requirements on Plaintiffs' members. (Opp'n 8–9.) The State contends that further factual development, including CARB's implementing regulations, are needed for the Court to rule on the constitutionality of SB 253. (*Id.*; *see* McLoon Decl. Ex. 1 ("CARB Letter"), ECF No. 89-4 (listing topics of potential regulation).) Additionally, the State argues that Plaintiffs cannot show their members will face hardship, as covered companies will not be required to report Scope 1 and Scope 2 emissions until 2026 and Scope 3 emissions until 2027. (Opp'n 8–9); *see* Cal. Health & Safety Code § 38532(c)(1), (2)(A)(i).

In analyzing the prudential components of ripeness, courts consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1141 (9th Cir. 2000).

Earlier in this case, when considering the State's motion to dismiss Plaintiffs' Supremacy Clause and extraterritoriality claims, the Court found those challenges to SB 253 were not justiciable. (Order Mot. Dismiss 13.) However, the Court's reasoning there does not apply to Plaintiffs' First Amendment claim. First, courts apply "the requirements of ripeness and standing less stringently in the context of First Amendment claims." *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010). Second, since the Court's prior ruling, the parties have offered CARB's Enforcement Notice, stating that CARB "has decided to exercise its enforcement discretion" under SB 253, including that CARB will require covered companies to submit Scope 1 and 2 emissions in 2026. (Enforcement Notice 5.)

Here, Plaintiffs' First Amendment challenge is fit for judicial decision. Courts find an issue is fit for review when "the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Tingley v. Ferguson*, 47 F.4th 1055, 1070 (9th Cir. 2022). While CARB has yet to issue implementing regulations for SB 253, the Court finds that SB 253 is clear that covered companies will be required to report Scope 1, 2, and 3 emissions. This positions the Court to rule on the Motion without further factual development by the State. *See* Cal. Health & Safety Code § 38532(c)(2)(A)(i)(I)–(II). To the extent further factual development is needed in this case, (*see* Order Mot. Summ. J. 11–12), it is the type of development accomplished through typical discovery, not through CARB's issuance of regulations.

Additionally, Plaintiffs have demonstrated hardship to their members if the Court declines to review their First Amendment challenge now. It appears that U-Haul Co. of California ("UHCA"), a subsidiary of U-Haul Holding Company ("UHHC") and member of Plaintiff U.S. Chamber, will be subject to SB 253's requirements. (*See* Decl. Edward J. Shoen ISO Mot. ("Shoen Decl.") ¶ 3, ECF

8

No. 78-3 (declaring that UHHC has an annual total revenue exceeding $1 billion).)[4] UHHC's president and chairman has declared that it will take years for it to build systems to comply with SB 253, for example, by developing systems and processes to collect, store, and analyze climate-related information.  (*Id.* ¶ 11.)  He estimates that it will cost at least $3 million per year to comply with SBs 253 and 261, demonstrating that UHCA would suffer hardship if the Court does not consider the Motion.  (*Id.* ¶ 12; *see id.* ¶¶ 13–29 (detailing cost and burdens of complying with SB 253).)

Accordingly, Court finds that Plaintiffs' challenge to SB 253 is ripe for review and declines to dismiss it on prudential ripeness ground.  *See Anchorage Equal Rts. Comm'n*, 220 F.3d at 1142 ("Prudential considerations of ripeness are discretionary . . . .").

## B.    Application of the First Amendment

Before analyzing whether SBs 253 and 261 violate the First Amendment, the Court must first decide whether the First Amendment even applies.

In its summary judgment order, the Court considered—and rejected—the State's argument "that the laws escape First Amendment scrutiny because they are 'part of a broader regulatory apparatus.'"  (Order Summ. J. 7–8.)  In ruling that the First Amendment applies to the laws, the Court concluded that the laws' primary effect and purpose is to compel speech.  (*Id.*)  In opposing the instant Motion, the State asks the court to revisit this conclusion.  (Opp'n 10–11.)

The State argues that the Court erred because the laws here "require a type of speech—disclosure of commercial data and financial risks—that has not traditionally garnered constitutional concern."  (Opp'n 10.)  The State notes that securities filings

---

[4] The State objects to Shoen's declaration that "[i]f UHCA's activities in California are attributable to UHHC such that UHHC 'does business' in California as a 'Reporting Entity' under S.B. 253 . . , then UHHC would be subject to the requirements of S.B. 253."  (Def's Obj. Pls.' Evid ¶ 3, ECF No. 89-1.)  The State contends that this statement is a legal conclusion.  (*Id.*)  Even if it is, and even if it cannot be confirmed whether UHCA will be subject to SB 253's requirements until CARB issues implementing regulations, CARB has stated that it will begin enforcing SB 253 in 2026 and UHCA has demonstrated that it will need to begin preparing to comply with the law before CARB issues any clarification as to its applicability to UHCA.

requiring disclosure of investment-related risks "ha[ve] historically fallen outside the boundaries of First Amendment coverage entirely, or ha[ve] merited minimal judicial scrutiny." (*Id.*)  Relatedly, the State again argues that because the laws are directed at a "broader regulatory apparatus" governing disclosure of commercial data, the laws regulate conduct, not speech. (*Id.*)

The Supreme Court has identified "[n]umerous examples" of types of "communications that are regulated without offending the First Amendment," including "the exchange of information about securities" and "corporate proxy statements." *Ohralik v. Ohio St. Bar Ass'n*, 436 U.S. 447, 456 (1978).  But to the extent this means that such communications are not subject to First Amendment review, this principle does not extend to SBs 253 and 261.  The State's mere assertion that a regulation is like a securities filing or directed at a "broader regulatory apparatus" does not automatically end a court's First Amendment inquiry.  To read these exceptions "broadly would allow [the government] to easily regulate otherwise protected speech using the guise of securities laws." *Nat'l Ass'n of Mfrs. v. S.E.C. (NAMF I)*, 748 F.3d 359, 372 (D.C. Cir. 2014), *subsequent opinion after reh'g*, 800 F.3d 518 (D.C. Cir. 2015); *cf. Nat'l Ass'n of Mfrs. v. S.E.C. (NAMF II)*, 800 F.3d 518, 521 (D.C. Cir. 2015) (rejecting argument that an SEC rule requiring companies to disclose whether its products are "conflict-free" "is valid because the United States is thick with laws forcing '[i]ssuers of securities' to 'make all sorts of disclosures about their products'").

Here, the State asserts that the legislature enacted SBs 253 and 261 "to, among other things, respond to concerns that California investors and consumers lacked accurate, verifiable data about [greenhouse gas] emissions and climate-risk assessment . . . from the largest companies doing business in the state." (Opp'n 4.) The State also offers that CalPERS, California's largest public-defined-benefit pension fund, believes "[c]limate risk is investment risk" and finds the information the laws' require companies to disclose to be valuable to its investment decisions. (Decl.

1   Peter Cashion ISO Opp'n Mot. Summ. J. ("Cashion Decl.") ¶¶ 13–16, 22, ECF
2   No. 52-5; Opp'n 4.)   Therefore, per the State, these laws are like typical securities
3   disclosure regimes geared toward consumer protection that escape First Amendment
4   review. (*See* Opp'n 4.)

5         The problem with the State's comparison is twofold.   First, at the same time it
6   argues the purpose of these laws are to correct misleading data and provide investors
7   with accurate information to evaluate climate risks, (*id.*), the State also proffers that
8   the laws further its interest for "companies doing business in California to reduce their
9   emissions" so that California can "meet[] certain emissions reduction goals over
10  time," (*id.* at 18).   While certainly a compelling state interest, this is more akin to the
11  conflict-mineral disclosures in *NAMF* than traditional securities disclosures.

12        Second, and more fundamentally, the scope of SBs 253 and 261 is broader than
13  typical securities disclosures.   The laws apply to any company that hits certain annual
14  revenue thresholds and "does business in California."   Cal. Health & Safety Code
15  §§ 38532(b)(2), 38533(a)(4).   The laws do not differentiate between private and public
16  companies or from those offering the sale of securities and those that do not.   (*See*
17  Ceres Report 11 (estimating that of the companies covered by SBs 253 and 261, 23%
18  and 27% are private companies, respectively).)   This is not to say that the State's
19  proffered interests in SBs 253 and 261 are ingenuine or not compelling, or that they
20  violate the First Amendment.   Rather, the laws' application to public and private
21  companies and those with and without investors, not just those typically subject to
22  securities-based rules, invites First Amendment review.   Otherwise, the State would
23  be permitted to "to easily regulate otherwise protected speech using the guise of
24  securities laws," *NAMF I*, 748 F.3d at 372, even if the law's purpose goes beyond the
25  reasons for traditional securities disclosure requirements and the types of companies
26  to which such requirements usually apply.

27        At bottom, "the forced disclosure of information, even purely commercial
28  information, triggers First Amendment scrutiny."   *NetChoice*, 113 F.4th at 1117.

1   While there may be exceptions for certain types of disclosures, *see Ohralik*, 436 U.S.

2   at 456, none of those exceptions apply to the laws at issue here in their current form.

3   Therefore, the Court declines to alter its prior conclusion that SBs 253 and 261 are

4   subject to First Amendment review. (*See* Order Summ. J. 7–8.)

5   **C.    Plaintiffs' Facial Challenge**

6       Plaintiffs assert a First Amendment facial challenge to SBs 253 and 261.

7   "[C]ourts usually handle constitutional claims case by case, not en masse." *X Corp.*,

8   116 F.4th at 898 (quoting *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024)).

9   Because facial challenges "often rest on speculation about the law's coverage and its

10  future enforcement" and "threaten to short circuit the democratic process," the

11  Supreme Court "has therefore made facial challenges hard to win." *Moody*, 603 U.S.

12  at 723 (internal quotation marks omitted).

13      However, in First Amendment cases, the Supreme Court has "lowered th[e]

14  very high bar" of a typical facial challenge. *X Corp.*, 116 F.4th at 898 (quoting

15  *Moody*, 603 U.S. at 723). "'[I]f the law's unconstitutional applications substantially

16  outweigh its constitutional ones,' then a court may sustain a facial challenge to the law

17  and strike it down." *Id.* at 898–99 (alteration in original) (quoting *Moody*, 603 U.S.

18  at 724). As such, "a First Amendment facial challenge has two parts: first, the courts

19  must 'assess the state laws' scope'; and second, the courts must 'decide which of the

20  laws' applications violate the First Amendment, and . . . measure them against the

21  rest." *Id.* at 899 (alteration in original) (quoting *Moody*, 603 U.S. at 725). The

22  Supreme Court recently admonished that courts cannot treat facial challenges "more

23  like as-applied claims than like facial ones." *Moody*, 603 U.S. at 724.

24      The scope of SBs 253 and 261 appears straightforward for purposes of the

25  Motion. SB 253 requires CARB to adopt regulations that will require all domestic

26  companies with total annual revenues more than $1 billion and that "do[] business in

27  California" to annually report the company's Scope 1, Scope 2, and Scope 3

28  emissions, in conformance with the Greenhouse Gas Protocol and guidance. Cal.

Health & Safety Code § 38532(a)(2), (c).  CARB must require covered entities to "publicly disclose" these figures to CARB or a contracted third party.  *Id.* § 38532(c).  Meanwhile, SB 261 requires all domestic companies with total annual revenues more than $500 million and that "do[] business in California" to "prepare a climate-related financial risk report disclosing" the company's "climate-related financial risk," in accordance with the TCFD Framework and "[i]ts measures adopted to reduce and adapt to [this] climate-related financial risk."  *Id.* § 38533(a)(4), (b).  Covered companies must make the biennial report available on its website.  *Id.* § 38533(c)(1).  In short, all covered companies—those with total annual revenues over a certain threshold and that do business in California—must report the same information.  *See NetChoice*, 113 F.4th at 1116 (finding that "all" covered companies "are under the same statutory obligation"); *X Corp.*, 116 F.4th at 899 (finding that the relevant provisions "compel every covered social media company to reveal" the same information).

"The next order of business is to decide which of the laws' applications violate the First Amendment, and to measure them against the rest."  *Project Veritas v. Schmidt*, 125 F.4th 929, 961 (9th Cir. 2025) (quoting *Moody*, 603 U.S. at 725).  This analysis is less complicated where the legislation "raise[s] the same First Amendment issues" as to every covered company.  *X Corp.*, 116 F.4th at 899.  That is not the case here.  While the laws apply equally to all covered companies, the parties reveal differences among the covered companies that may impact the First Amendment analysis.

The State asserts "an interest in protecting its investors, consumers, and other stakeholders from fraud or misrepresentation."  (Opp'n 16.)  At the same time, the State's evidence suggests that neither SB 253 nor SB 261 applies only to companies engaged in green advertising or accepting investment.  (*See* Decl. Angel Hsu ISO Opp'n ("Hsu Decl.") ¶¶ 8–9, ECF No. 89-18 (finding that 82% of North American companies in a dataset have made "green pledges" to reduce emissions); Ceres Report

1    at 11 (estimating that of the companies covered by SBs 253 and 261, 23% and 27%

2    are private companies, respectively).)   Plaintiffs attack the laws on this very basis,

3    arguing that because the laws are not limited to covered companies that engage in

4    green advertisement or are open for investment, they are not sufficiently tailored to

5    protect this government interest.   (*See* Reply 7.)   The distinction between covered

6    companies—those who engage in green advertising (and those who do not) and those

7    who have investors (and those who do not)—may result in differing analyses to

8    determine whether specific applications of SBs 253 and 261 violate the First

9    Amendment.

10    *NetChoice* is instructive as to how the difference in covered companies

11    implicates the Court's analysis of Plaintiffs' First Amendment facial challenge.   In

12    that case, the Ninth Circuit evaluated whether the California Age-Appropriate Design

13    Code Act ("CAADCA") should be preliminary enjoined on First Amendment

14    grounds.  *NetChoice*, 113 F.4th at 1108.   Among the provisions the court considered

15    was one that required online businesses to create a "report identifying, for each

16    offered online service, product, or feature likely to be accessed by children, any risk of

17    material detriment to children that arise from the data management practices of the

18    business."  *Id.* at 1109 (internal quotation marks omitted).   In affirming the district

19    court's enjoinment of this provision based on a facial challenge, the Ninth Circuit held

20    that this "report requirement, in every application to a covered business, raises the

21    same First Amendment issues," namely, whether the State can require covered

22    businesses to "ask whether the new service may lead to children viewing or receiving

23    harmful or potentially harmful materials."  *Id.* at 1116.   However, in evaluating other

24    of the CAADCA's provisions, the court found it "less certain" whether NetChoice

25    was likely to succeed on its facial challenge. *Id.* at 1122.

26    For example, as to some provisions, the Ninth Circuit found that the district

27    court erred in its facial analysis because it "focused on possible applications of these

28    provisions to social media companies—a subset of the businesses covered by the

CAADCA—and speculated about how that subset of applications could ultimately have a substantial effect on those companies' editorial discretion or the expression of their third-party users." *Id.* at 1123.  And as to a provision requiring online businesses to provide "privacy information, terms of service, policies, and community standards concisely, prominently, and using clear language suited to the age of children," the Ninth Circuit found it "unclear from the record below whether a substantial majority of those applications are likely to fail First Amendment scrutiny," because "all or most of the speech compelled by this provision is likely to be purely factual and non-controversial." *Id.* at 1123–24.

Consistent with *NetChoice*, to entertain Plaintiffs' facial challenge here, the Court must analyze all the laws' applications.  Thus, the Court must analyze whether the applications to green-advertising companies survive First Amendment scrutiny, whether applications to non-advertising companies survive First Amendment scrutiny, and then determine whether a substantial majority of the laws' applications likely fail First Amendment scrutiny.  *See Moody*, 603 U.S. at 725 (explaining that the court must "ask, . . . as to each thing covered, whether the required disclosures" survive First Amendment scrutiny and "it is not hard to see how the answers might differ as between regulation of Facebook's News Feed (considered in the courts below) and, say, its direct messaging service (not so considered)"); *Ariz. Att'ys for Crim Just. v. Mayes*, 127 F.4th 105, 110–12 (9th Cir. 2025) (rejecting facial challenge where plaintiffs challenged the prohibition on contacting victims in only one of the law's various applications).  Similarly, the Court must analyze whether the laws' applications to companies with investors survive First Amendment scrutiny, whether applications to companies without investors survive First Amendment scrutiny, and then determine whether a substantial majority of the laws' applications likely fail First Amendment scrutiny.  *See Moody*, 603 U.S. at 725.  However, before the Court can consider these questions, it must first determine what level of scrutiny applies.

15

**D.    Level of Scrutiny**

The parties disagree about which level of scrutiny applies to SBs 253 and 261. Plaintiffs argue that the laws must survive strict scrutiny to survive their First Amendment challenge.  (Mot. 10–13.)  Conversely, the State argues that, if the laws compel speech, they are subject to the lowest standard of review.  (Opp'n 11–12.)

When the First Amendment applies, compelled speech must typically be reviewed under strict scrutiny.  However, "[l]aws regulating commercial speech are generally subject to a lesser standard than strict scrutiny." *NetChoice*, 113 F.4th at 1119.  "Commercial speech is generally subject to intermediate scrutiny." *X Corp.*, 116 F.4th at 900; *see also Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980) (articulating standard).  However, if commercial speech requires disclosure of "purely factual and uncontroversial information," then it is subject to the lowest standard of review as set forth in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985). *Nat'l Inst. of Fam. & Life Advocs. v. Becerra (NIFLA)*, 585 U.S. 755, 768 (2018).

Accordingly, to determine which level of review applies to SBs 253 and 261, the Court must decide whether the laws compel commercial speech of purely factual and uncontroversial information.

*1.    Commercial Speech*

"Commercial speech is 'usually defined as speech that does no more than propose a commercial transaction.'" *X Corp.*, 116 F.4th at 900 (quoting *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001)).  But this is "just a starting point." *Id.*  Indeed, "speech that does not propose a commercial transaction on its face can still be commercial speech." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021).  Courts "try to give effect to a common-sense distinction between commercial speech and other varieties of speech." *X Corp.*, 116 F.4th at 900 (internal quotation marks omitted).  This is a "fact-driven" analysis, "due to the inherent

16

1   difficulty of drawing bright lines that will clearly cabin commercial speech in a

2   distinct category." *Id.*

3       Given this difficulty, "in close cases," courts consider three factors outlined by

4   the Supreme Court in *Bolger v. Youngs Drug Products Corporation*, 463 U.S. 60

5   (1983). *NetChoice, LLC*, 113 F.4th at 1119. The *Bolger* factors consider whether

6   (1) "the speech is an advertisement," (2) "the speech refers to a particular product,"

7   and (3) "the speaker has an economic motivation." *Hunt v. City of Los Angeles*,

8   638 F.3d 703, 715 (9th Cir. 2011). Courts have found that, if the speech meets two of

9   the three *Bolger* factors, then it "weighs in favor of finding" the "speech is

10  commercial." *Stutzman v. Armstrong*, No. 2:13-cv-00116-MCE-KJN, 2013 WL

11  4853333, at *18 (E.D. Cal. Sept. 10, 2013); *cf. Dex Media W., Inc. v. City of Seattle*,

12  696 F.3d 952, 959 (9th Cir. 2012) (not commercial speech where "does not fulfill two

13  of the three *Bolger* factors"); *X Corp.*, 116 F.4th at 901 (same). However, while these

14  factors are "important guideposts, . . . they are not necessarily dispositive." *X Corp.*,

15  116 F.4th at 900; *see Ariix,* 985 F.3d at 1116 (concluding that two of the factors "do[]

16  not shed much light" on whether the publication in question was commercial speech).

17      The State argues that the required disclosures are commercial speech.

18  (Opp'n 11–12.) While the State does not contend that the disclosures refer to a

19  particular product, it does argue that the compelled disclosures satisfy the remaining

20  *Bolger* factors. (*Id.* at 12.) In support, the State offers expert declarations. (*Id.*; Decl.

21  Thomas P. Lyon ISO Opp'n ("Lyon PI Decl."), ECF No. 90; Hsu Decl.) First, Angel

22  Hsu, a professor of environmental policy, reports that 82% of North American

23  companies in her dataset, which includes the Forbes 200 publicly listed companies

24  and the one hundred largest privately-owned companies, have made "green pledges,"

25  meaning a pledge to reduce emissions with a report of at least one emissions target.

26  (Hsu Decl. ¶¶ 8–9.) Next, Thomas Lyon, a professor of engineering-economic

27  systems, opines "that companies have incentives to communicate information about

28  their carbon emissions to investors because investors are concerned about climate risk

and demand a premium from firms that are saddled with climate risk." (Lyon PI Decl. ¶¶ 2, 22.)  He further declares that companies make climate pledges to "influence consumer behavior." (*Id.* ¶ 23.)  Based on this, the State contends that the speech the laws compel—even if referring to a company as a whole—is advertising. (Opp'n 12.)  Also, the State asserts that the advertising has an economic motive, as companies engage in this speech to appear more attractive to consumers and investors. (*Id.*)

Plaintiffs see the speech differently.  First, they argue that the Court should not even look to the *Bolger* factors because the "usual definition of commercial speech is speech that does no more than propose a commercial transaction," (Reply 4 (quoting *X Corp.*, 116 F.4th at 901) (cleaned up)), and the State does not argue that the speech here meets that definition, (*id.*).  Second, Plaintiffs argue that, even considering the *Bolger* factors, they are not met: the compelled disclosures are not themselves advertisements, do not refer to a particular product, and the companies have no economic motivation to provide these compelled disclosures. (*Id.*)

The Court rejects these arguments and finds that SBs 253 and 261 regulate commercial speech.  First, the Ninth Circuit has held that "speech that does not propose a commercial transaction on its face can still be commercial speech." *Ariix*, 985 F.3d at 1115.  Accordingly, in this case, the State is not conceding that the speech here is non-commercial simply because it does not explicitly state that the speech "does no more than propose a commercial transaction." *See, e.g.*, *Zauderer*, 471 U.S. at 637 (acknowledging that "the precise bounds of . . . commercial speech" are "subject to doubt"); *Cent. Hudson*, 447 U.S. at 561 (defining "commercial speech" as "expression related solely to the economic interests of the speaker and its audience"); *cf. X Corp.*, 116 F.4th at 901 (recognizing exceptions to the "usual definition" of commercial speech (alterations omitted)).

Second, the *Bolger* factors weigh in favor of finding the speech here commercial.  This is so even though the State does not argue the disclosures refer to a particular product. (*See* Opp'n 12.)  Plaintiffs are also correct that SBs 253 and 261

do not compel speech in the form of advertisements, in the sense that the required disclosures will not be included in targeted advertisements. However, these disclosures regarding a company's emissions and climate-related risk function as advertisements in the sense that SBs 253 and 261 compel disclosure of the same type of information that a substantial number of companies use to advertise their brands, which they have an economic motive to provide. (*See* Lyon PI Decl. ¶¶ 11–26.)

For example, some "[f]irms communicate their planned emissions reductions because investors penalize firms for carbon risk." (*Id.* ¶ 13.) Of the S&P 500, more than 400 companies have set emissions reduction targets. (*Id.* ¶ 17.) Thousands of other companies, including a substantial number of the Forbes 2000 publicly listed companies, have done the same. (*See* Hsu Decl. ¶ 8.) Firms are increasingly discussing climate-related information with investors. (Lyon PI Decl. ¶ 21.) Also, from 2018 to 2023, nearly 16,000 companies disclosed environmental data, including emissions data and climate-related risks, to CDP (formerly, the Carbon Disclosure Project), an investor-driven disclosure project. (*Id.* ¶¶ 36–37.) Of those companies, 49% disclosed Scope 3 emissions. (*Id.*) In 2022, more than 71% of companies surveyed by the American Institute of Certified Public Accountants used the TCFD Framework for climate-related reporting, and 58% of public companies surveyed by the Financial Stability Board disclosed at least five of the TCFD's recommended climate-risk disclosures. (*See* Burton SJ Decl. ¶ 14.) Indeed, in the "Sustainability" section of its website, UHHC—the only member company offering a declaration in support of the Motion—lists as one of its goals to "[d]evelop and implement comprehensive climate-change strategies to manage and mitigate our greenhouse gas (GHG) emissions." (Decl. James P. Burton ISO Opp'n ("Burton PI Decl.") Ex. 6 ("UHHC Website") at 381, ECF Nos. 89-6, 89-12.) UHHC continues that "[s]hort-term gains may result in long-term losses, both in terms of profitability and in terms of future generations being able to meet their needs." (*Id.*)

While it is true that, on their face, SBs 253 and 261 are not limited to only those companies that advertise greenhouse gas emissions and low climate-related risk, this is more appropriately addressed when applying the appropriate standard of review—e.g., whether the legislation is appropriately tailored to the state's interest—not when determining what standard to apply—e.g., whether the regulated speech is commercial.

Ultimately, in this "fact-driven" analysis considering SBs 253 and 261 and the *Bolger* factors, the "'common-sense distinction' between commercial speech and other varieties of speech," *X Corp.*, 116 F.4th at 900, supports a finding that SBs 253 and 261 compel disclosure of commercial speech. Specifically, SB 253 mandates disclosure of commercial data—a company's direct and indirect greenhouse gas emissions—that many companies routinely disclose and stakeholders consider relevant to the long-term success of the business. And SB 261 requires companies to disclose information related to climate-related risks to a company's own business. Even if companies are not already required to report these precise risks, many companies already report certain risks to their business through SEC disclosures and other requirements. With respect to the type of information many companies already report, SB 261's requirements, while perhaps different in degree, are not different in kind.

For these reasons, the Court finds that SBs 253 and 261 regulate commercial speech.[5]

---

[5] Plaintiffs' reliance on *X Corp.* is misplaced. (*See* Mot. 12–13.) That opinion focused extensively on the Ninth Circuit's conclusion that the legislation at issue required "a company to recast its content-moderation practices in language prescribed by the State." *X Corp.*, 116 F.4th at 901. For example, the court held that a company's "opinions about and reasons for" its content moderations policies "would require a social media company to convey the company's policy views on intensely debated and politically fraught topics, including hate speech, racism, misinformation, and radicalization, and also convey how the company has applied its policies." *Id.* at 901–02 (footnote omitted). At the same time, the court distinguished compelled disclosures in the case from a "platform's existing [Terms of Service] and content moderation policies" and laws that require platforms to disclose "how they moderate and promote content" and content-moderation "standards"

Having found the laws regulate commercial speech, the Court must determine whether SBs 253 and 261 are subject to intermediate scrutiny or the less searching standard of review under *Zauderer*. "Commercial speech is generally subject to intermediate scrutiny." *X Corp.*, 116 F.4th at 900. However, such speech can qualify for the lower-level *Zauderer* review if the compelled commercial speech at issue discloses "purely factual and uncontroversial information." *NIFLA*, 585 U.S. at 768.

### 2.    *Factual Information*

As a first step, courts consider whether information is "factually accurate." *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1276 (9th Cir. 2023). "[B]ut that alone is not enough to qualify for the *Zauderer* exception." *Id.* A statement that is "literally true but nonetheless misleading" is not factual. *Id.* In *National Association of Wheat Growers*, the Ninth Circuit considered a requirement that a business must provide a warning before it "knowingly and intentionally exposes any individual in California to a chemical known to the state to cause cancer." *Id.* at 1268 (cleaned up). While glyphosate was "known" to the state to cause cancer according to the statutory definition, there was substantial scientific debate on whether it actually caused cancer. *Id.* at 1278. Accordingly, the Ninth Circuit concluded that the glyphosate warning was not purely factual because "the technical meaning of the word 'known' in the warning is different from the meaning an average consumer would give the word 'known.'" *Id.* at 1279.

### a.    SB 253—Factual Information

As to SB 253, Plaintiffs argue that the disclosures required are not factual, but are in fact misleading, for two reasons. First, companies must report "their" greenhouse-gas emissions, SB 253 §§ 1(e), (f), but Scope 2 emissions are emissions of electricity providers and Scope 3 emissions are emissions of upstream and downstream sources that the reporting entity does not directly control. (Mot. 11).

---

and "rule changes," without mention of controversial topics. *Id.* at 901, 903. Here, SBs 253 and 261 do not require companies to recast their practices in language prescribed by the State.

Second, SB 253 does not factor in a company's Scope 4 (avoided) emissions, so any reported emissions will provide a misleading picture of a company's total emissions. (*Id.* at 11–12.)

SB 253's Scope 1 emissions disclosure requirement is undisputedly factual and not misleading; Plaintiffs do not challenge this conclusion. (*See* Mot.; Reply.)  The Scope 2 and Scope 3 emissions disclosures are also factual in nature, in that they are both are defined and have recognized methods of computation.  *See* Cal. Health & Safety Code § 38532(c)(1)(A)(ii) (adopting Greenhouse Gas Protocol standards); (Lyon PI Decl. ¶ 37 & fig.5 (reporting that more than 5,500 entities disclose Scope 3 emissions using these standards)).  The question then is whether it is misleading to require companies to report Scope 2 and Scope 3 emissions when the emissions being reported are not the company's own direct omissions and do not include Scope 4 avoided emissions.  (*See* Mot. 11.)

The Court concludes that these requirements are not misleading.  SB 253 simply mandates that covered entities report Scope 1, Scope 2, and Scope 3 emissions using recognized methodology.  SB 253 does not require companies to take responsibility, as Plaintiffs argue, for Scope 2 and Scope 3 emissions.  Nor does it prohibit covered entities from separately calculating and publicizing its Scope 4 avoided emissions, or from taking the position that their Scope 4 emissions can offset their Scope 1, Scope 2, and Scope 3 emissions.  *See* Cal. Health & Safety Code § 38532; (Burton PI Decl. ¶ 20 (identifying one company that already publicizes its Scope 4 avoided emissions).)  This is not like *National Association of Wheat Growers*; SB 253 does not require companies to state that they are causing the emissions, and there is no evidence that the definitions of Scope 2 and Scope 3 emissions include misleading language like the word "known," where the technical meaning of the word is different from the meaning the average consumer would give the word.  *See* 85 F.4th at 1278–79.  SB 253 does not even require companies to report a "total" number of emissions.

22

Accordingly, the Court finds that SB 253 requires reporting of only factual—and not misleading—information.  As discussed further below, because SB 253's disclosures are factual, the Court must analyze whether they are also uncontroversial to determine whether SB 253 qualifies for review under *Zauderer*.

### b. SB 261—Factual Information

As to SB 261, Plaintiffs argue that company's climate-related financial risk is not factual, because it comprises a company's assessment of the risk of harm to immediate and long-term financial outcomes, which requires companies to speculate as to future technological and policy developments.  (Mot. 11.)  The State counters that companies that "do[] not currently evaluate climate-related risks . . . can simply state that."  (Opp'n 15.)  The State describes the required disclosures under SB 261 as "not meaningfully distinct from other financial risks routinely disclosed by large companies."  (*Id.*)

The Court finds that SB 261's compelled disclosures are not factual.  Although the State refers to the disclosure as a company's "assessment[]," (Opp'n 15), by definition, an assessment about the effect of current *and future* events on a company cannot be factual.  *See Assessment*, Black's Law Dictionary (12th ed. 2024) ("The process by which, after careful thought, one makes a judgment about a person or situation.").  The State argues that SB 261's disclosures are not like the disclosures in *NetChoice*, which required companies to "weigh in on [a] highly divisive national debate about what type of speech is harmful to children" and thus did not qualify for *Zauderer* review.  (Opp'n 15 (emphasis omitted).)  But that distinction relates to the analysis of the controversial nature of the compelled *NetChoice* speech, not its *factual* character.  *See NetChoice*, 113 F.4th at 1120 ("[A] business's opinion about how its services might expose children to harmful content online is not 'purely factual and uncontroversial.'").  The State argues that SB 261 only requires companies that evaluate climate-related risks to speak and does not require companies that do not evaluate those risks to begin to do so.  (Opp'n 15.)  But this does not transform the

23

otherwise subjective and predictive opinion into a factual disclosure.  *See X Corp.*, 116 F.4th at 902 (rejecting California's argument that a "transparency measure" warrants lower scrutiny).

Accordingly, the Court finds that SB 261 compels disclosure of more than factual information, and thus is not subject to *Zauderer* review.

### 3.    Uncontroversial Information

As the Court finds that SB 253 compels disclosure of factual information, it is subject to *Zauderer* review so long as SB 253 also compels disclosure of "uncontroversial information." *NIFLA*, 585 U.S. at 768.[6]  To qualify for *Zauderer* review, the compelled disclosure must be "uncontroversial information." *Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1275.  If the required disclosure is of controversial information, intermediate scrutiny applies. *See id.*

Plaintiffs contend that SBs 253's compelled disclosures are controversial because "a company's climate-related risks and emissions 'are anything but an "uncontroversial" topic.'"  (Mot. 12 (quoting *NIFLA*, 585 U.S. at 769).)  In support, they cite the State's prior acknowledgement that "policy responses to climate change are the subject of vigorous political debate." (*Id.* (quoting Opp'n Mot. Summ. J. 21).) Plaintiffs also argue that the laws' compelled disclosures are like the conflict-mineral disclosures—which required companies to report whether their products are "conflict-free"—that the D.C. Circuit struck down in *NAMF*, because both would be used to "stigmatize companies" and "shape their behavior." (*Id.* (cleaned up).)

In response, the State contends that merely because a disclosure concerns a controversial issue or may lead consumers to form an opinion about a company does not make a factual statement controversial. (Opp'n 13.)  The State also distinguishes the conflict-mineral disclosures, highlighting that those disclosures required companies to categorize their diamonds as "conflict free" or "not conflict free," which

---

[6] As SB 261's disclosures are not factual, and thus not subject to *Zauderer* review, the Court need not consider whether those compelled disclosures are controversial.

1  is an ideological and moral statement, regardless of the companies' views about their
2  own moral responsibility.  (*Id.* at 14.)  Conversely, the State asserts, SBs 253 and 261
3  require companies to report data and climate-related risks without labeling
4  themselves, the companies, as "good" or "bad" for the climate.  (*Id.*)

5       In *NIFLA*, upon which Plaintiffs rely, (*see* Mot. 12), the Supreme Court found
6  that a law requiring clinics that oppose abortion to provide information about
7  state-sponsored services, including abortion, compelled controversial speech for
8  purposes of First Amendment review.  585 U.S. at 769.  However, as the Ninth Circuit
9  has commented, the Supreme Court did not "broadly [say] that any purely factual
10  statement that can be tied in some way to a controversial issue is, for that reason
11  alone, controversial."  *CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832,
12  845 (9th Cir. 2019).  Rather, the Ninth Circuit characterized *NIFLA* as concerning
13  "compelled speech [that] took sides in a heated political controversy, forcing the clinic
14  to convey a message fundamentally at odds with its mission."  *Id.*

15       Here, companies subject to SB 253 are not required "to take sides in a heated
16  political controversy," *id.* at 848, no matter the amount of debate surrounding the
17  existence of and policy responses to climate change.  SB 253 merely requires
18  companies to report data on emissions.  It does not require companies to say whether
19  they are "responsible" for those emissions or advocate for any (or no) policy response
20  to climate change.  This distinguishes SB 253 from the conflict-minerals disclosures,
21  where companies were required to characterize their products as "conflict free" or
22  otherwise.  *See NAMF II*, 800 F.3d at 529–30.  While the State may take the position
23  that companies are "responsible" for Scope 1, Scope 2, and Scope 3 emissions, (*see*
24  Lyon PI Decl. ¶ 40; SB 253 § 1(g)), companies are not required to agree or even
25  comment on that debate.  And SB 253 does not require companies to label themselves
26  or their products as "environmentally sustainable."  *NAMF II*,  800 F.3d  at 530
27  (indicating that such compelled disclosure would be impermissible).

28

That some may look favorably or unfavorably on a company based on its emissions report does not transform an otherwise non-controversial disclosure into a controversial one.  Indeed, courts have upheld regulations that were intended to shape consumer behavior.  *See Am. Meat Inst. v. U.S. Dep't of Agriculture (AMI)*, 760 F.3d 18, 27 (D.C. Cir. 2014) (requiring country-of-origin labels "to enable consumers to choose American-made products").  If disclosures that provide consumers with information that makes a product undesirable to them qualified a disclosure requirement as controversial, then an untold number of disclosure requirements would be subject to a higher standard of review.  *See, e.g.*, *CTIA*, 928 F.3d at 845 ("requiring cell phone retailers to disclose information to prospective cell phone purchasers about the federal government's radio-frequency radiation exposure guidelines relevant to cell phone use"); *Am. Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749, 753 (9th Cir. 2019) (requiring that certain sugar-sweetened beverages contain a disclosure about potential health risks).  Therefore, the Court finds that SB 253 does not mandate disclosure of controversial information.

Accordingly, SB 253's requirement that companies disclose data about Scope 1, Scope 2, and Scope 3 emissions is "factual and uncontroversial," and therefore subject to *Zauderer* review.  Conversely, because SB 261 concerns non-factual disclosures, that law is subject to intermediate scrutiny.

**E.    Application of Scrutiny**

Having determined that SB 253 is subject to *Zauderer* review, and SB 261 is subject to intermediate scrutiny, the Court must consider whether the laws survive the applicable review.  This is where the implications of Plaintiffs' decision to raise a facial challenge become material.  As discussed, to determine whether Plaintiffs' facial challenge against each law succeeds, the Court must evaluate SB 253's and SB 261's applications separately, considering the State's asserted purposes concerning both companies with green-advertising and companies with investors.

26

First, the Court must analyze whether each law's applications to green-advertising companies survive First Amendment scrutiny, then analyze whether the laws' applications to non-advertising companies survive First Amendment scrutiny, and finally determine whether a substantial majority of those applications likely fail First Amendment scrutiny. *See Moody*, 603 U.S. at 725. Second, the Court must similarly analyze whether the laws' applications to companies with investors survive First Amendment scrutiny, whether the laws' applications to companies without investors survive First Amendment scrutiny, and finally determine whether a substantial majority of those applications likely fail First Amendment scrutiny. *See id.*

> 1.    SB 253

As SB 253 is subject to *Zauderer* review, the required disclosures "compl[y] with the First Amendment if the information in the disclosure is reasonably related to a substantial government interest." *CTIA*, 928 F.3d at 845. The "disclosure requirement cannot be 'unjustified or unduly burdensome.'" *NIFLA*, 585 U.S. at 776 (quoting *Zauderer*, 471 U.S. at 651). The disclosures also must "remedy a harm that is 'potentially real, not purely hypothetical'" and "extend 'no broader than reasonably necessary.'" *Id.* (first quoting *Ibanez v. Fl. Dept. of Bus. & Prof. Regul., Bd. of Accountancy*, 512 U.S. 136, 146 (1994); and then quoting *In re R.M. J.*, 455 U.S. 191, 203 (1982)).

The State offers three interests to support SB 253's compelled disclosure of Scope 1, Scope 2, and Scope 3 emissions.

> a.    Reliable Information

The State asserts an interest "in reliable information that enables investors and consumers to make informed judgments about the impact of climate-related risks on their economic choices." (Opp'n 17.) This interest implicates both investors and consumers and thus warrants discussing both.

27

As to consumers, the State asserts that "[s]tudies confirm consumers' interest in this information." (*Id.*) The State offers that "to signal their performance to customers," a "growing number of firms" obtain third-party certifications that show their products are carbon neutral and market their products as carbon neutral. (Lyon PI Decl. ¶ 23–24 (providing examples, including "Lime scooters, Bulldog Skincare, Microsoft Xbox consoles, and Logitech products")).) The State also cites studies to support that consumers are willing to pay more for low-carbon products. (*Id.* ¶ 25.) Plaintiffs counter that investors and consumers' mere desire for information does not support a substantial government interest. (Reply 8.)

As the State demonstrates, courts have found that consumers' desire for information can support a substantial government interest. (Opp'n 17 (citing cases).) In *National Electrical Manufacturers Association v. Sorrell*, the Second Circuit held that Vermont had a substantial interest in requiring manufacturers to label certain products as containing mercury that, "on disposal, should be recycled or disposed of as hazardous waste." 272 F.3d 104, 107, 115 (2d Cir. 2001). This is because Vermont had an interest in "increasing consumer awareness of the presence of mercury in a variety of products" "to reduce the amount of mercury released into the environment." *Id.* at 115. The court found it "probable that some" purchasers "will properly dispose of [the products] and thereby reduce mercury pollution." *Id.* Similarly, in *AMI*, the D.C. Circuit found a substantial government interest in requiring county-of-origin disclosures because of "the demonstrated consumer interest in extending country-of-origin labeling to food products." 760 F.3d at 23. And in *American Hospital Association v. Azar*, the D.C. Circuit found the government had a substantial interest in requiring hospitals to make public a list of "standard charges" to "promot[e] price transparency and lower[] healthcare costs. 983 F.3d 528, 530, 540 (D.C. Cir. 2020).

Like in those cases, investors and consumers' purported interest in emissions is not simply for the sake of gaining information, but so that they can "make informed judgments about the impact of climate-related risks on their economic choices."

1  (Opp'n 17); *see Sorrell*, 272 F.3d at 115 (consumer interest tied to goal of reducing
2  amount of mercury in environment); *AMI*, 760 F.3d at 23 (consumer interest
3  considered in "the context and long history of country-of-original disclosures to
4  enable consumers to choose American-made products" and "the individual health
5  concerns and market impacts that can arise in the event of a food-borne illness
6  outbreak"); *Am. Hosp. Assoc.*, 983 F.3d at 540 (consumer interest in promoting price
7  transparency to lower healthcare costs).

8      Nevertheless, the State has not met its burden to show that SB 253 is reasonably
9  related to consumers' interest in this information.  The State's evidence of consumer
10  interest in company-wide emissions for purposes of determining whether to purchase
11  products or services is based on companies marketing products as green and studies
12  describing consumer behavior in Germany and China.  (*See* Lyon PI Decl. ¶¶ 23–26.)
13  Even assuming this shows a consumer interest, the State has not demonstrated that
14  SB 253 is rationally related to this interest.  The State's evidence relates to product
15  carbon labels, not a company's total emissions.  (*See id.*)  SB 253 does not require
16  companies to label products, nor does it provide consumers with information to
17  determine their purchasing impact on the environment.  For example, a company may
18  have large total emissions, but smaller emissions on a product-by-product basis.

19      However, a different conclusion results with respect to the State's interest "in
20  reliable information that enables investors . . . to make informed judgments about the
21  impact of climate-related risks on their economic choices." (Opp'n 17.)  The State has
22  provided sufficient evidence that investors have this interest.  For example, CalPERS
23  "has long been a proponent" of "Scope 1 and Scope 2 emissions, because it is crucial
24  in making investment[]" decisions.  (Cashion Decl. ¶ 13.)  "CalPERS also supports
25  requiring disclosure of Scope 3 emissions because it is material in all companies," as
26  "[o]mitting Scope 3 emissions . . . would not allow an investor like CalPERS to assess
27  the total emissions profile" of companies.  (*Id.* ¶ 14.)  As one of the State's experts
28  explains, "[h]igher carbon emissions expose firms to greater levels of risk, because,

among other things, governments may regulate emissions, impose carbon taxes on emissions, create a system of marketable emissions permits, or take other actions to reduce global warming." (Lyon PI Decl. ¶ 13.) The State's authorities also demonstrate that investors demand a premium from stocks with carbon risks. (*Id.* at 14–15 (citing studies).)

Plaintiffs argue that SB 253 is not appropriately tailored to this "investor" interest because "the laws are not limited to companies seeking investments." (Reply 7.) If the legislation was tailored to providing investors with information about climate-related financial risk, Plaintiffs argue, then California "might have applied the laws only to companies seeking investors or to those engaging in transactions for which consumers need the information the laws require." (*Id.*) The State contends that SB 253 is appropriately tailored because conditioning the law on public company status would be "both underbroad (failing to capture certain economically-significant entities) and overbroad (imposing compliance obligations on entities that are not economically significant)." (Decl. George S. Georgiev ISO Mot. Summ. J. ("Georgiev Decl.") ¶ 39, ECF No. 54 (emphasis omitted).)

SB 253 is not tailored to the State's interest in providing investors with climate-related risk information *to the extent the law compels disclosure from companies that have no California investors*. (*Cf.* Reply 7 (complaining that "the laws are not limited to companies seeking investments").) Therefore, the State's interest in providing investors with reliable information may not support SB 253 surviving a First Amendment challenge to the extent a company has no investors. If Plaintiffs were companies with no California investors and brought an as-applied challenge, then the fact that the law does not apply only to companies with investors may have proved fatal to SB 253. But Plaintiffs "chose to litigate th[is] case[] as [a] facial challenge[], and that decision comes at a cost." *Moody*, 603 U.S. at 723. As explained, "'[I]f the law's unconstitutional applications substantially outweigh its constitutional ones,' then a court may sustain a facial challenge to the law and strike it

1  down." *X Corp.*, 116 F.4th at 898–99 (alteration in original) (quoting *Moody*,
2  603 U.S. at 724).    This means that the Court must weigh the constitutional
3  applications of SB 253 (as applied to companies with California investors) against the
4  potentially unconstitutional applications (as applied to companies without California
5  investors) and determine whether the unconstitutional applications substantially
6  outweigh its constitutional ones.

7      As a starting point, over 75% of companies covered by SB 253 are estimated to
8  be public companies. (*See* Ceres Report 11.)  The State offers an expert declaration
9  that any private company covered by SB 253 "can be expected to have multiple
10 outside investors (likely both shareholders and bondholders)" because "[t]he
11 competitive business environment in the United States makes it unlikely that
12 entrepreneurs can attain scale without capital outlays that are beyond the self-
13 financing capabilities of the average entrepreneur."  (Georgiev Decl. ¶ 47; *see*
14 Cashion Decl. ¶ 16 (declaring that CalPERS has more than $150 billion exposure to
15 private companies).)  Additionally, "[e]ven if it were possible to self-finance, it would
16 be imprudent because raising capital from outside investors provides a desirable
17 mechanism for risk-sharing and attracting additional expertise to the enterprise."
18 (Georgiev Decl. ¶ 47.)  Given that a large percentage of SB 253's covered companies
19 are public and the likelihood that most, if not all, of the private companies have
20 California investors, the Court concludes, "on this record, that a substantial majority
21 of its applications" are not likely to "fail First Amendment scrutiny."  *NetChoice*,
22 113 F.4th at 1123 (reversing preliminary injunction as to facial attack where district
23 court "focused on possible applications" of provisions to only "a subset of the
24 businesses covered by the" legislation "and speculated about how that subset of
25 applications could" violate the First Amendment).

26     Accordingly, on this basis, the Court finds that Plaintiffs are unlikely to succeed
27 in their facial challenge to SB 253 and the State's "investor" interest.

28

### b. Emissions Reductions

Separately, the State asserts a second substantial interest in the disclosures: in companies "reduc[ing] their emissions and thereby mitigat[ing] the risks California and its residents face from climate change . . . . because California has committed to meeting certain emissions reduction goals over time and because of the severity of the climate risks the state faces." (Opp'n 17.)  Plaintiffs do not contest that this interest is substantial.  (Mot. 14–16; Reply); *see CTIA*, 928 F.3d at 844 (holding that *Zauderer* review is not limited to "the prevention of consumer deception," but that "the governmental interest in furthering public health and safety is sufficient under *Zauderer* so long as it is substantial").  Instead, Plaintiffs argue that "[t]he State here has cited *no* evidence . . . that consumers would change their purchasing habits based on a company's emissions or climate-change risks, that any such consumer sentiment would result in material changes in companies' emissions, or . . . that any such changes would have a material impact on climate change." (Mot.15.)

For the reasons discussed, the State has not shown that SB 253's required disclosures would alter consumer behavior such that it would lead to a material decrease in covered companies' emissions.  However, companies lower emissions for reasons other than altering consumer behavior.  The State cites four studies to support its claim that SB 253's mandatory disclosures may lead to a reduction in emissions.

In one study, the authors found a statistically significant relationship between voluntary disclosure of climate-related information—including disclosure of Scope 1, Scope 2, and Scope 3 emissions—and decrease in corporate $CO_2$ emissions.  (Decl. Thomas Lyon ISO Opp'n Mot. Summ. J. ("Lyon SJ Decl.") Ex. 53 at 1347, 1355–56, ECF Nos. 56, 56-53.)  For example, the study found a drop of between 7% and 10% of a company's Scope 1 emissions within three years of disclosure, and a drop in Scope 2 and 3 emissions by year 3 of 4% and 2%, respectively.  (*Id.* at 1355–57, tbl. 5, 1373, tbl. OD.9.)  While this study only concerns voluntary disclosures, (*id.* at 1348), the State cites three other studies regarding mandatory reporting requirements.

In two studies, authors investigated the effect of disclosures required by the U.S. Greenhouse Gas Reporting Program ("GHGRP") on emissions. (*See* Lyon SJ Decl. Ex. 55 at 1422–24, ECF No. 56-55; Lyon SJ Decl. Ex. 56 at 1466–68, ECF No. 56-56.) The GHGRP requires certain facilities in the United States that emit more than 25,000 tons of $CO_2$ per year to report emissions, including Scope 1 and Scope 2 emissions, to the Environmental Protection Agency. *See, e.g.*, 40 C.F.R. §§ 98.2, 98.3, 98.6, 98.33 (2009). The studies found that power plants subject to the GHGRP decreased emissions between 7% and 7.9% after reporting. (*See* Lyon SJ Ex. 55 at 1438, 1448; Lyon SJ Ex. 56 at 1482.) In one final study, the authors examined the effects of a United Kingdom requirement that public companies report Scope 1 and Scope 2 emissions. (*See* Lyon SJ Decl. Ex. 54 at 1382, ECF No. 56-54.) The authors found that companies subject to the mandatory disclosures reduced Scope 1 emissions by about 8% compared to companies not subject to the reporting requirement. (*Id.* at 1390, 1399.)

These studies do not support that SB 253's disclosure requirement will definitively lead to a reduction in emissions. But the State need not provide definitive results to survive *Zauderer* review. Even under a more searching review, the Supreme Court has accepted "reference to studies and anecdotes" and justifications "based solely on history, consensus, and simple common sense." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) (internal quotation marks omitted); *cf. Edenfield v. Fane*, 507 U.S. 761, 771 (1993) (holding that government did not demonstrate that a ban on solicitations advanced government's asserted interests of preventing fraud where it "present[ed] no studies" and did not "disclose any anecdotal evidence" demonstrating such dangers existed). Thus, the State provides sufficient evidence to support a finding that SB 253's disclosure requirements are reasonably related to the State's substantial government interest in reducing emissions and that Plaintiffs have not shown a likelihood that they will succeed on their First Amendment challenge.

c.  Underline{Misleading Speech}

The State raises a third interest: that "California has an interest in protecting its investors, consumers, and other stakeholders from fraud or misrepresentation." (Opp'n 16.)  Plaintiffs do not dispute that this is a substantial state interest.  (*See* Mot.; Reply); *Zauderer*, 471 U.S. at 638 (explaining that the government may "prevent the dissemination of commercial speech that is false, deceptive, or misleading").  Instead, Plaintiffs challenge whether the disclosures required by SB 253 are reasonably related to this interest and argue that these requirements are unduly burdensome.  (Mot. 13–17; Reply 7.)

The State contends that the required disclosures are reasonably related to the interest because they will help correct companies' misleading speech.  (Opp'n 16–17.)  In support, the States cites to the declaration of one of its experts, Hsu, who presents evidence that "96% of companies with emissions targets exhibit at least one indicator of greenwashing."  (Hsu Decl. ¶ 10.)  Hsu defines "greenwashing" as a company's emissions reduction pledge or statement that "mislead[s] stakeholders about the environmental integrity of their actions."  (*Id.* ¶¶ 7, 10; *see* Lyon PI Decl. ¶ 29 fig. 4 (listing ten indicators of greenwashing).)  She identifies seven indicators of greenwashing, including when a company reports no near or short-term emissions targets "that would indicate near-term action" or fails to make meaningful progress toward their stated emissions reduction target.  (Hsu Decl. ¶ 11.)[7]

Plaintiffs argue that Hsu's indicators of "greenwashing" do not equate to false or misleading speech.  (Opp'n 8.)  For example, Plaintiffs argue that whether a company engaged in lobbying activity does not affect whether their emissions targets

---

[7] The seven indicators are: a company that (1) reports no near or short-term emissions targets "that would indicate near-term action"; (2) excludes Scope 3 emissions from reduction targets; (3) does not provide a publicly available plan detailing the steps the company will take to meet its stated emissions reduction goals; (4) relies on offsets to achieve its pledge without specifying conditions or that fails to disclose whether offsets will be used; (5) pledges "net zero" or "GHG neutrality," but limits its target to only carbon dioxide emissions; (6) actively engages in lobbying activity that undermines climate action; and (7) fails to make meaningful progress toward their stated emissions reduction target.  (Hsu Decl. ¶ 11.)

1    are misleading.  (*Id.* at 8–9.)  Further, Plaintiffs contend the laws are broader than
2    reasonably necessary because they apply to all companies over the revenue threshold
3    that do business in California, not to those making climate pledges or engaging in
4    misleading speech. (*Id.* at 7.)

5        Plaintiffs are correct.  In its summary judgment order, the Court explained that
6    it "needs a record on whether SBs 253 and 261 regulate a substantial number of
7    companies that do not make potentially misleading environmental claims." (Order
8    Mot. Summ. J. 11.)  By way of example, the Court stated that "if ninety-nine percent
9    of the regulated companies have made advertisements relevant to SBs 253's and 261's
10   required disclosures, that may support a finding that SBs 253 and 261 are
11   appropriately tailored to the State's aims under at least rational basis review." (*Id.*
12   at 11–12.)  The State has not come close to this mark.

13       On the record before the Court, it is likely that a substantial majority of covered
14   companies do not make potentially misleading environmental claims. (*See* Ceres
15   Report 11 (estimating SB 253 would apply to 1,971 companies and SB 261 would
16   apply to 2,675 companies).)

17       The State estimates that "around 82% of North American companies in [its]
18   sample have made green pledges." (Hsu Decl. ¶ 8; *see* Lyon PI Decl. ¶ 20 (citing
19   study that around 73% of companies in a sample had an emissions target).)  Beyond
20   that, as Plaintiffs correctly note, the State has failed to show how Hsu's definition of
21   greenwashing equates to misleading speech that it has an interest in correcting.  Some
22   of her indicators may represent potentially misleading speech that the State has a
23   substantial interest in correcting.  For example, if a company says it will be "net zero,"
24   but then does not disclose that this pledge relates only to carbon dioxide emissions,
25   the company's pledge could mislead consumers into thinking the company is doing
26   more than it has said. (*See* Hsu Decl. ¶ 10; Lyon PI Decl. ¶ 30 (providing example of
27   company that discloses it reduced emissions but does not define its measure of
28   emissions).)  Or a company that fails to make meaningful progress towards a stated

emissions reduction target and does not retract the target when it knows it will not reach that target may mislead consumers and investors into thinking the company is doing what it said it would do.  (*See* Hsu Decl. ¶ 10.)  But other of Hsu's indicators have little to do with whether a company's announced emissions target is misleading.  Failing to provide a publicly available plan, (*see id.*), is not necessarily misleading, if the company has a private plan to reach its emissions targets.  Most concerning is the labelling of speech as misleading if a company engages in lobbying that undermines climate action.  (*See* Hsu Decl. ¶ 10; *see also* Lyon PI Decl. ¶ 29 fig. 4 (considering "[b]oasting green commitments while lobbying against environmental laws" as greenwashing).)  Ignoring the subjectivity of this measure, Hsu does not show how such activities even correlate to whether a company is meeting its target pledge.

Also, it is unclear how some of the real-world examples the State provides as misleading speech are actually misleading.  In arguing that "[v]oluntary disclosures do not prevent the use of misleading language and greenwashing," the State provides an example of a company that "aim[s] to achieve net-zero Scope 1 and 2 greenhouse gas emissions in our operated assets by 2050."  (Lyon PI Decl. ¶ 31.)  The State characterizes this commitment as misleading because the company "ignores the fact that Scope 3 emissions are far and away the most important climate impact of oil and gas production."  (*Id.* ¶ 31.)  Perhaps, if the company only committed to net-zero emissions, the speech would be misleading.  But it strains credulity to call a claim misleading when the company explicitly identifies the very metric it is using, even if it is not the State's preferred metric.

In sum, based on the record before the Court, SB 253 requires a substantial number of companies that have decided not to speak about climate impact to do so.  Even of those companies that have chosen to speak, the State's evidence does not show the prevalence of those companies engaging in misleading speech.  Taken together, with respect to the State's interest in correcting misleading information, SBs 253 is overbroad, unduly burdensome, and not reasonably related to this interest.

36

1   The State "may reasonably decide to require disclosure for a class of solicitations that

2   it determines pose a risk of deception." *Nationwide Biweekly Admin., Inc. v. Owen*,

3   873 F.3d 716, 735 (9th Cir. 2017).  But SB 253 mandates disclosures from companies

4   outside this "class" of speech.  It does not, for example, require only companies that

5   pledge to reduce emissions to define their metrics and report emissions according to

6   those metrics.  On this record, the laws extend broader than reasonably necessary to

7   correct potentially misleading speech.  *NIFLA*, 585 U.S. at 777 (finding notice

8   requirement fails rational basis review where California required disclosures "wholly

9   disconnected from California's informational interest" by requiring "covered facilities

10  to post California's precise notice, no matter what the facilities say on site or in their

11  advertisements").

12      As to whether a facial challenge succeeds, if the asserted interest of addressing

13  misleading speech was the State's sole interest supporting SB 253, the Court would

14  conclude "that a substantial majority of its applications are likely to fail First

15  Amendment scrutiny." *NetChoice*, 113 F.4th at 1123.  But, as discussed, the State's

16  other proffered other interests support denial of the Motion.  Accordingly, based on

17  the above analysis, the Court finds that Plaintiffs do not show a likelihood of success

18  on the merits as to their facial challenge to SB 253 based on the State's dual interests

19  in providing investors with reliable information on which to make investment

20  decisions and in reducing emissions.

21      *2.    SB 261*

22      SB 261 is subject to intermediate scrutiny, so "the government may compel a

23  disclosure of commercial speech only if (1) it directly advances a substantial

24  governmental interest, and (2) the restriction is not more extensive than necessary to

25  serve that interest." *Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1282–83.  The State

26  asserts the same three interests in SB 261's disclosures as it raises for SB 253's

27  disclosures.  (*See* Opp'n 16–19.)

28

As with SB 253, the State asserts "a compelling interest in reliable information that enables investors and consumers to make informed judgments about the impact of climate-related risks on their economic choices." (Opp'n 17.) Peter Cashion is Managing Investment Director for Sustainable Investments of CalPERS, California's public defined pensions benefit fund with roughly $500 billion in assets. (Cashion Decl. ¶¶ 1, 5.) In a declaration, he expresses the importance of SB 261's disclosure requirements to CalPERS's investments. (*Id.*) Cashion declares that "physical impacts and . . . transition risks have the power to affect our fixed assets, disrupt supply chains and increase volatility in the financial markets." (*Id.* ¶ 11.) He further explains that "consideration of climate-related financial risk and other factors is a necessary component of being an informed and responsible investor." (*Id.* ¶ 12.) Ultimately, SB 261 will enable CalPERS and other investors to "better understand the financial implications" of its investments. (*Id.* ¶ 15; *see* Lyon PI Decl. ¶ 9 (describing types of investors who benefit from disclosure of climate-related financial risks).)

Plaintiffs make the same argument to challenge SB 261 on this interest as they do with SB 253—that the law is not tailored to this interest because "the laws are not limited to companies seeking investments." (Reply 7.) While the State's burden under intermediate review is higher than the rational basis review applied to SB 253, the reasons for denying Plaintiffs' Motion to enjoin SB 253 equally apply to their challenge to SB 263. Ultimately, under intermediate review, "[t]he fit" between the legislature's ends and its means "need not be perfect nor the single best to achieve those ends, but one whose scope is narrowly tailored to achieve the legislative objective." *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1111 (9th Cir. 2004). At this stage, the State has made a sufficient showing as to the benefits of investors' desire for the specific disclosures required by SB 261 to achieve the legislature's objective in reliable information that enables investors to make informed judgments about the impact of climate-related risks on their economic choices. Therefore, as with SB 253, Court concludes that SB 261's potentially unconstitutional applications

(as applied to companies without California investors) do not "substantially outweigh" the constitutional applications (as applied to companies with California investors). *X Corp.*, 116 F.4th at 898; (*see* Ceres Report 11 (estimating 73% of covered companies are public).) Accordingly, Plaintiffs have not shown a likelihood of success on the merits as to their facial challenge to enjoin SB 261.

For completeness, the Court addresses the State's remaining articulated interests and finds that Plaintiffs have shown a likelihood of success of the merits that State's two other asserted interests do not survive First Amendment scrutiny. First, as discussed with respect to SB 253, Plaintiffs are likely to succeed in showing that SB 261's required disclosures do not directly advance the State's stated interest "in protecting its investors, consumers, and other stakeholders from fraud or misrepresentation." (Opp'n 16.)

Second, unlike with SB 253, the State's interest in reducing emissions does not support SB 261 surviving First Amendment review. As with SB 253, Plaintiffs do not dispute that this a substantial state interest but argue that the State has offered "no evidence" that SB 261 will result in fewer emissions. (Mot. 14–15 (emphasis omitted).) In response, the State contends it has "presented evidence demonstrating that disclosures of this type lead to a reduction in emissions of 7 to 10%." (Opp'n 18 (citing Lyon SJ Decl. ¶ 50).) The State cites the same four studies previously discussed for this proposition; however, none of them have studied whether the disclosures required by SB 261—climate-related risks—lead to a reduction in emissions. In three studies, the authors only considered the effect of reporting of greenhouse gas emissions, not climate-related risks, on future emissions. (*See* Lyon SJ Decl. Ex. 54 at 1382; Lyon SJ Decl. Ex. 55 at 1422–24; Lyon SJ Decl. Ex. 56 at 1466–68.) Without considering the effect of climate-related disclosures like those required by SB 261, these studies cannot show that SB 261's disclosures would reduce emissions. The final study—while considering some climate risk disclosures—only concerned voluntary disclosure, and the State provided no evidence to suggest that the

studied disclosures are like the ones required by SB 261.  Therefore, Plaintiffs show a likelihood that the State's interest in reducing emissions does not support SB 261 surviving First Amendment review.

However, as discussed, Plaintiffs do not show a likelihood that the State's interest in providing reliable information to investors fails intermediate scrutiny in a substantial majority of SB 261's applications.  Accordingly, the Court find that Plaintiffs have not shown a likelihood that SB 261's compelled disclosures violate the First Amendment.[8]

In sum, the Court concludes that Plaintiffs have not shown a likelihood of success on the merits with respect to either of its facial First Amendment challenges to SBs 253 and 261.

**F.     The Remaining *Winter* Factors**

Plaintiffs argue they will be irreparably harmed by SBs 253 and 261 because the laws compel speech in violation of the First Amendment.  (Mot. 18–20; Reply 9–10.)  As Plaintiffs have not demonstrated that the laws violate the First Amendment, they have also not shown irreparable harm.  *See CTIA*, 928 F.3d at 851 (concluding challengers did not show irreparable harm where the court concluded that the city's "ordinance complies with the First Amendment").

Moreover, the balance of equities favors denial of Plaintiffs' Motion.  *See id.* at 852 (finding challengers failed to demonstrate any hardship tipping the balance in their favor where their "First Amendment claim is unlikely to succeed").  This is especially true because enjoining SBs 253 and 261 would delay the State from advancing the public interests for which it adopted the laws.  *See id.* (finding "that an

---

[8] Plaintiffs also argue that SB 261 violates the First Amendment because "the definition of 'climate-related financial risk' is so broad and vague that California could almost certainly find fault in the disclosure (or lack of disclosure) of *any* company the State disfavors."  (Mot. 16.)  In defining "climate-related financial risk," SB 261 references a reporting framework that provides sufficiently clear guidance to covered entities how to comply with the law.  *See* Cal. Health & Safety Code § 38533(b)(1)(A)(i); (*see* Lyon SJ Decl. ¶ 14 (reporting that a large number of companies make disclosures using the TCFD Framework).)

injunction would injure the public interest in having a free flow of accurate information").

## V.    CONCLUSION

For the reasons discussed above, the Court **DENIES** Plaintiffs' Motion for Preliminary Injunction.  (ECF No. 78.)


**IT IS SO ORDERED.**


August 13, 2025


_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**

41

1  ROB BONTA
   Attorney General of California
2  MYUNG J. PARK (SBN 210866)
   LAURA J. ZUCKERMAN (SBN 161896)
3  Supervising Deputy Attorneys General
   KATHERINE GAUMOND (SBN 349453)
4  EMILY HAJARIZADEH (SBN 325246)
   M. ELAINE MECKENSTOCK (SBN 268861)
5  DYLAN REDOR (SBN 338136)
   DAVID ZAFT (SBN 237365)
6  CAITLAN MCLOON (SBN 302798)
   Deputy Attorneys General
7   300 South Spring Street, Suite 1702
    Los Angeles, CA  90013-1230
8   Telephone:  (213) 269-6438
    Fax:  (916) 731-2128
9   E-mail:  Caitlan.McLoon@doj.ca.gov
   *Attorneys for Defendants Liane M. Randolph,*
10 *Steven S. Cliff, and Robert A. Bonta*

11              IN THE UNITED STATES DISTRICT COURT

12            FOR THE CENTRAL DISTRICT OF CALIFORNIA

13

14
   **CHAMBER OF COMMERCE OF**          2:24-cv-00801-ODW-PVC
15 **THE UNITED STATES OF**
   **AMERICA, CALIFORNIA**             **DEFENDANTS' OPPOSITION TO**
16 **CHAMBER OF COMMERCE,**            **PLAINTIFFS' MOTION FOR**
   **AMERICAN FARM BUREAU**            **INJUNCTION PENDING APPEAL**
17 **FEDERATION, LOS ANGELES**
   **COUNTY BUSINESS**                 Date:        September 15, 2025
18 **FEDERATION, CENTRAL**             Time:        1:30 PM
   **VALLEY BUSINESS**                 Courtroom:   5D
19 **FEDERATION, and WESTERN**         Judge:       The Honorable Otis D.
   **GROWERS ASSOCIATION,**                         Wright, II
20                                     Trial Date:  Not Set
                        Plaintiffs,    Action Filed: 1/30/2024
21
          v.
22
   **LIANE M. RANDOLPH, in her**
23 **official capacity as Chair of the**
   **California Air Resources Board,**
24 **STEVEN S. CLIFF, in his official**
   **capacity as the Executive Officer of**
25 **the California Air Resources Board,**
   **and ROBERT A. BONTA, in his**
26 **official capacity as Attorney General**
   **of California,**
27
                        Defendants.
28

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................. 1

Background .................................................................................................. 3

    I.     SB 253 ............................................................................................ 4

    II.    SB 261 ............................................................................................ 5

    III.   Procedural History ......................................................................... 6

Argument ..................................................................................................... 7

    I.     Plaintiffs' Motion Should Be Denied For The Same Reasons This Court Denied The Preliminary Injunction Motion ............... 7

    II.    Plaintiffs Have Not Raised "Serious Questions" About Their Likelihood Of Success On The Merits ............................................ 8

          A.   SB 253 and SB 261 Regulate Commercial Speech ............ 10

          B.   *Zauderer* Applies to SB 253 ............................................... 12

          C.   SB 253 and SB 261 Satisfy the Appropriate Levels of Scrutiny ............................................................................... 13

               1.   Investor interest in reliable information ....................... 13

               2.   Additional government interests ................................... 16

    III.   Plaintiffs Cannot Establish that the Balance of the Equities Tips Sharply in their Favor ................................................................. 18

          A.   Plaintiffs Have Not Established Irreparable Harm ............. 18

          B.   The Balance of the Equities and the Public Interest Militate Against Granting an Injunction ............................ 19

Conclusion ................................................................................................. 20

Certificate of Compliance .......................................................................... 21

i

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011)............................................................. 1, 7

*Am. Acad. of Pain Mgmt. v. Joseph*
  353 F.3d 1099 (9th Cir. 2004)............................................................2, 17

*Am. Beverage Ass'n v. City of San Francisco*
  2016 WL 9184999 (N.D. Cal. June 7, 2016) ....................................... 8

*Am. Beverage Ass'n v. City & County of San Francisco*
  916 F.3d 749 (9th Cir. 2019) .............................................................. 15

*Am. Hosp. Ass'n*, 983 F.3d 528, 540 (D.C. Cir. 2020) ......................... 14

*Am. Meat Inst. v. USDA*
  760 F.3d 18 (D.C. Cir. 2014)............................................................... 14

*Ariix, LLC v. NutriSearch Corp.*
  985 F.3d 1107 (9th Cir. 2021)............................................................. 10

*Baird v. Bonta*
  81 F.4th 1036 (9th Cir. 2023).............................................................. 18

*Bolger v. Youngs Drug Prods. Corp.*
  463 U.S. 60 (1983) ..........................................................................9, 10

*California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*
  29 F.4th 468 (9th Cir. 2022)................................................................. 8

*Caribbean Marine Servs. Co., Inc. v. Baldrige*
  844 F.2d 668 (9th Cir. 1988)............................................................... 18

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*
  447 U.S. 557 (1980) ..........................................................................9, 13

*Chamber of Com. of United States v. SEC*
  85 F.4th 760 (5th Cir. 2023)................................................................ 14

ii

# TABLE OF AUTHORITIES
### (continued)

Page

*CTIA – The Wireless Ass'n v. City of Berkeley*
   928 F.3d 832 (9th Cir. 2019) ........................................................ 12, 13, 19

*Destination Ventures, Ltd. v. FCC*
   46 F.3d 54 (9th Cir. 1995) ........................................................................ 17

*Drakes Bay Oyster Co. v. Jewell*
   747 F.3d 1073 (9th Cir. 2014) ................................................................. 19

*Edenfield v. Fane*
   507 U.S. 761 (1993) ................................................................................. 14

*Feldman v. Ariz. Sec'y of State's Off.*
   843 F.3d 366 (9th Cir. 2016) ..................................................................... 7

*Gluth v. Kangas*
   951 F.2d 1504 (9th Cir. 1991) .................................................................... 7

*Hurley v. Irish–Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*
   515 U.S. 557 (1995) ................................................................................. 13

*Int'l Fruit Genetics, LLC v. P.E.R. Asset Mgmt. Tr.*
   2016 WL 5922715 (C.D. Cal. Oct. 4, 2016) ............................................. 8

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*
   941 F.2d 970 (9th Cir. 1991) ...................................................................... 7

*Maryland v. King*
   567 U.S. 1301 (2012) ............................................................................... 19

*Moody v. NetChoice, LLC*
   603 U.S. 707 (2024) ......................................................................... 2, 9, 13

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*
   272 F.3d 104 (2d Cir. 2001) .................................................................... 14

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*
   585 U.S. 755 (2018) ....................................................................... 12, 13, 15

*NetChoice v. Bonta*
   113 F.4th 1101 (9th Cir. 2024) ......................................................... 6, 9, 10

iii

# TABLE OF AUTHORITIES
## (continued)

Page

*Nken v. Holder*
556 U.S. 418 (2009) ................................................................. 19

*Pharm. Rsch. & Mfrs. of Am. v. Stolfi*
No. 24-1570, 2025 WL 2448851 (9th Cir. Aug. 26, 2025)............... 9, 10, 11, 14

*Smith v. Helzer*
95 F.4th 1207 (9th Cir. 2024) ................................................ 18

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*
425 U.S. 748 (1976) ................................................................. 3

*Winter v. Natural Res. Defense Council, Inc.*
555 U.S. 7 (2008) ................................................................. 7, 18

*X Corp. v. Bonta*
116 F.4th 888 (9th Cir. 2024)................................................ 1, 9, 10, 13

*Zauderer v. Off. of Disciplinary Couns.*
471 U.S. 626 (1985) .........................................................*passim*

**STATUTES**

California Health and Safety Code
§ 38501(d)........................................................................... 17
§ 38532(b)............................................................................. 4
§ 38532(c)......................................................................... 4, 5, 18
§ 38533(a)............................................................................. 5
§ 38533(b)............................................................................. 5
§ 38533(c)............................................................................. 5
California Health and Safety Code
§ 38562 .............................................................................. 17
§ 38562.2 ............................................................................ 17
§ 38566 .............................................................................. 17

**CONSTITUTIONAL PROVISIONS**

First Amendment .........................................................*passim*

iv

# INTRODUCTION

Plaintiffs cannot meet the high burden for the extraordinary relief they seek. Plaintiffs are asking this Court to grant during the pendency of their appeal the very relief this Court just denied as to the pendency of litigation. The same four factors apply to this motion as to Plaintiffs' preliminary injunction motion, and nothing in their current motion should change the reasoning underlying the Court's previous denial. That ruling should preclude the relief sought now.

Recognizing that they cannot reasonably rebut this Court's conclusion that they are unlikely to succeed on the merits, Plaintiffs attempt to sidestep this prior holding by urging the Court to analyze the issues on a "sliding scale"—i.e., asserting they need only raise "serious questions" as to the merits of their claim to the extent they can establish that "the balance of the hardships tips sharply in their favor." Dkt. 116-1 at 2 (citing *Alliance for the Wild Rockies v. Cottrell¸* 632 F.3d 1127, 1134-35 (9th Cir. 2011)). But Plaintiffs establish neither.

On the merits, this Court correctly concluded that the laws at issue—the Climate Corporate Data Accountability Act (Senate Bill 253 or SB 253), and the Climate-Related Financial Risk Act (Senate Bill 261 or SB 261)—compel the disclosure of commercial speech. Plaintiffs do not dispute the Court's factual findings, namely that a majority of companies affected by SB 253 and SB 261 already speak on the topics implicated by these laws, and do so in order to induce business. *See* Dkt. 112 at 18-20. Yet Plaintiffs nonetheless challenge this Court's conclusion that such firm-level advertising renders the speech commercial in nature—urging instead a formulaic, narrow, bright-line test for commercial speech that the Ninth Circuit has definitively rejected. *See X Corp. v. Bonta*, 116 F.4th 888, 900 (9th Cir. 2024) (courts employ a "common-sense" and "fact-driven" analysis to the question of commercial speech). And while Plaintiffs purport "serious First Amendment questions about whether [the laws] compel non-commercial speech on matters of public controversy," Mot. at 13, they fail to

1

1    identify a single controversial statement required under either law that would rebut

2    this Court's conclusions.

3         Plaintiffs' renewed tailoring arguments fare no better.  Under intermediate (or

4    lower) scrutiny, "'[t]he fit' between the legislature's ends and its means 'need not

5    be perfect nor the single best to achieve those ends, but one whose scope is

6    narrowly tailored to achieve the legislative objective.'"  Dkt. 112 at 38 (quoting

7    *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1111 (9th Cir. 2004)).  Here,

8    the laws are appropriately tailored to address the harms the government identified.

9    Looking just at the needs of investors, for example, the laws compel only the

10   information that independent industry groups have identified as necessary to

11   provide accurate and decision-useful information.  And while Plaintiffs purport the

12   laws are overbroad because of the inclusion of private companies, the evidence

13   refutes this—as a result of the high revenue threshold, "any private company that

14   falls within the scope of the Disclosure Laws can be expected to have multiple

15   outside investors…."  Dkt. 54 ¶ 47.  Plaintiffs present no evidence to the contrary.

16        The fact that the Court did not adopt all of Defendants' arguments does not

17   demonstrate "serious questions" as to the conclusions it did reach.  Mot. at 2.

18   Facial challenges "threaten to short circuit the democratic process" by "preventing

19   duly enacted laws from being implemented in constitutional ways," and thus such

20   challenges are "hard to win."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024)

21   (cleaned up).  It is no surprise that Plaintiffs have failed to meet their burden in

22   establishing a likelihood of success on the merits here.

23        In any event, Plaintiffs cannot establish imminent irreparable harm, much less

24   that the balance of the equities *tips sharply* in their favor.  Even if they could

25   establish a likelihood of constitutional harm, that harm is far from imminent as to

26   SB 253.  The implementing agency has not yet proposed the regulations that are a

27   condition precedent to any obligation on the reporting entities under that statute,

28   and has indicated that reporting will not begin until June 30, 2026.  Decl. of Caitlan

2

1    McLoon iso Opp. to Mot. ("McLoon Decl.") ¶¶ 2-3.  And even as to SB 261, this

2    appeal may be resolved before any obligation to speak.  Dkt. 118 at 3-4 (Case No.

3    25-5327 (9th Cir. 2025), Dkt. 2.1 (setting briefing schedule)).  "[B]ecause enjoining

4    SBs 253 and 261 would delay the State from advancing the public interests for

5    which it adopted the laws," the equities favor Defendants.  Dkt. 112 at 40.

6    Plaintiffs fail to establish their entitlement to the extraordinary relief they seek.

7                                **BACKGROUND**[1]

8         SBs 253 and 261 were enacted in late 2023 to, among other things, respond to

9    concerns that California investors and other stakeholders lacked accurate data about

10   greenhouse gas (GHG) emissions and climate-risk assessment from the largest

11   companies doing business in the state.  2023 Cal. Stat., ch. 382 § 1 (SB 253); 2023

12   Cal. Stat., ch. 383 § 1 (SB 261); *see also* Dkt. 48-7 at 3:7-4:1; Dkt. 48-9 at 4:10-24.

13   A significant portion of the largest companies already prepare climate-related

14   disclosures or statements of some form.  Dkt. 53 ¶ 14.  However, the lack of

15   comparable, verifiable, assured data has left "a massive blind spot for consumers,

16   investors, and policymakers," Dkt. 48-5 at 10:23-24, who need this information to

17   make "intelligent and well informed" economic decisions.  *See Va. State Bd. of*

18   *Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976).  For

19   example, CalPERS, California's largest public-defined-benefit pension fund,

20   considers "[c]limate risk [to be] investment risk," and finds that "the current

21   disclosure regime for corporate reporting falls short of [investors']

22   expectations … ."  Dkt. 52-5 ¶¶ 12-13, 19; *see also* Dkt. 48-8 at 8:4-11; Dkt. 48-6

23   at 7:10-8:13; Dkt. 48-16 at 3-4; Dkt. 48-26; Dkt. 48-27 at 7; Dkt. 52-8 at 3-4; Dkt.

24   53 ¶¶ 15, 21; Dkt. 56 ¶¶ 28, 32-40; Dkt. 90 ¶¶ 9, 11-22.

25        Because investors have "extensive exposure to private sector companies"—in

26   the case of CalPERS, "more than $150 billion" worth—investors "see[] the same

27   ――――――――――――――
     [1] Defendants hereby incorporate by reference the evidence, including declarations, that
28   was submitted with the briefing on Plaintiffs' motion for summary judgment (*e.g.* Dkt. Nos. 48,
     52-57) and Plaintiffs motion for preliminary injunction (*e.g.* Dkt. Nos. 89-90).

                                         3

1    risks and would benefit from the same climate related disclosures" from both public

2    and private companies.  Dkt. 52-5 ¶¶ 15-16.  The evidence reflects that, as a result

3    of the high revenue thresholds under both laws, "any private company that falls

4    within the scope of the Disclosure Laws can be expected to have multiple outside

5    investors (likely both shareholders and bondholders), as well as bank creditors and

6    other contractual counterparties."  Dkt. 54 ¶ 47.

7    **I.    SB 253**

8         SB 253 does not directly require companies to disclose anything.  Instead, it

9    directs the California Air Resources Board (CARB) to "develop and adopt

10   regulations" that *will* require "reporting entit[ies]" to disclose their GHG emissions

11   to CARB or a designated emissions reporting organization.  Cal. Health & Safety

12   Code § 38532(c)(1).  CARB has not yet proposed these implementing regulations.

13   McLoon Decl. ¶ 2.

14        "Reporting entit[ies]" will be those that "do[] business in California" and have

15   total annual revenues in excess of $1 billion.  Cal. Health & Safety Code

16   § 38532(b)(2).  Once CARB's implementing regulations are in place, reporting

17   entities will report three categories of GHG emissions: Scope 1 (those from sources

18   owned or directly controlled by the business entity); Scope 2 (those associated with

19   the reporting entity's use of electricity, heating, and cooling); and Scope 3 (all other

20   indirect emissions, such as those from "purchased goods and services, business

21   travel, employee commutes, and processing and use of sold products").  *Id.*

22   § 38532(b)(3)-(5).  Entities must quantify and report all three categories of

23   emissions "in conformance" with the "Greenhouse Gas Protocol standards and

24   guidance," *id.* § 38532(c)(1)(A)(ii), a globally accepted protocol for emissions

25   accounting, Dkt. 53 ¶¶ 10, 14, 17, 19-25, 28.

26        Scope 1 and Scope 2 emissions reports are not due until 2026 "on or by a date

27   to be determined by the state board."  *Id.* § 38532(c)(2)(A)(i)(I).  CARB has

28   proposed that reporting will begin on June 30, 2026.  McLoon Decl. ¶ 3.  In

4

1    December 2024, CARB issued an Enforcement Notice stating that "for the first
2    report due," covered entities may maintain the status quo by submitting reports
3    based solely on emissions data "that can be determined from information the
4    reporting entity already possesses or is already collecting at the time" the Notice
5    issued.  Dkt. 78-6 at 2.  Moreover, during the first reporting cycle, CARB "will not
6    take enforcement action for incomplete reporting against entities, as long as the
7    companies make a good faith effort to retain all data relevant to emissions reporting
8    for the entity's prior fiscal year." *Id.* at 2-3.  Scope 3 reporting will not begin until
9    2027.  Cal. Health & Safety Code § 38532(c)(2)(A)(i)(II).

10   **II.   SB 261**

11        SB 261 requires U.S. entities with total annual revenues in excess of $500
12   million that "do[] business in California" to prepare a biennial report disclosing
13   climate-related financial risks they have identified and any measures they have
14   adopted to reduce and adapt to those risks.  *Id.* § 38533(a)(4)–(b)(1)(A).

15        The bill defines "[c]limate-related financial risk" as the "material risk of harm
16   to immediate and long-term financial outcomes due to physical and transition
17   risks … ," such as disruptions to operations or impacts on employee health and
18   safety.  Cal. Health & Safety Code § 38533(a)(2).  The law directs entities to
19   prepare their disclosures in alignment with "the Final Report of Recommendations
20   of the Task Force on Climate-related Financial Disclosures" ("TCFD"), *id.*
21   § 38533(b)(1)(A)(i), a widely adopted investor- and industry-created protocol.  Dkt.
22   53 ¶¶ 11, 14, 17, 19, 21-25, 36, 37(c).  Each reporting company must publish a
23   copy of the report "on its own internet website."  Cal. Health & Safety Code
24   § 38533(c)(1).  These disclosures are first due on January 1, 2026.  *Id.* at
25   § 38533(b)(1)(A).

26        Under the TCFD, "risks" and "financial impacts" subject to disclosure include
27   purely commercial projections, such as the likelihood of "[i]ncreased operating
28   costs," "[r]educed demand for products and services," "[c]hange in revenue mix

5

1 and sources," "[i]ncreased production costs due to changing input prices," and

2 "[i]ncreased insurance premiums." Dkt. 48-23 at 19-20. Entities need not adopt

3 any particular climate-related risk management strategy or take any particular

4 climate-risk mitigation actions. Dkt. 53 ¶¶ 35, 38-39; Dkt. 54 ¶¶ 19-21, 29-33.

5 **III. PROCEDURAL HISTORY**

6  On August 13, 2025, this Court denied Plaintiffs' motion for a preliminary

7 injunction on the same First Amendment claim at issue in the present motion. Dkt.

8 112. The Court held that both SB 253 and SB 261 invite First Amendment

9 scrutiny. Dkt. 112 at 11-12. It then concluded that the laws "regulat[e] commercial

10 speech," and thus are "subject to a lesser standard than strict scrutiny." *Id.* at 16

11 (quoting *NetChoice v. Bonta*, 113 F.4th 1101, 1119 (9th Cir. 2024)). Finding "that

12 SB 253 requires reporting of only factual—and not misleading—information," Dkt.

13 112 at 23, and that such emissions data is not controversial, *id.* at 25-26, it

14 concluded that the law is subject to *Zauderer* review, *id.* at 26. Finding on the other

15 hand that "assessment[s] about the effect of current *and future* events on a company

16 cannot be factual," it applied intermediate scrutiny to SB 261. *Id.* at 23-24.

17 Applying these respective levels of review, the Court concluded that both laws

18 likely survive First Amendment review, and thus that Plaintiffs had not shown a

19 likelihood of success on the merits of their facial challenge. *Id.* at 27–40. Because

20 the Plaintiffs failed to demonstrate that the laws violate the First Amendment, the

21 Court concluded they had not shown irreparable harm. *Id.* at 40. Moreover, the

22 Court concluded that "because enjoining SBs 253 and 261 would delay the State

23 from advancing the public interests for which it adopted the laws," the equities

24 favored Defendants. *Id.* at 40-41.

25  Plaintiffs have filed a notice of appeal. Dkt. 114. The Court of Appeals has

26 set a briefing schedule, under which the case will be fully briefed by November 6,

27 2025. Case No. 25-5327 (9th Cir. 2025), Dkt. 2.1 (setting briefing schedule).

28

## ARGUMENT

**I.  PLAINTIFFS' MOTION SHOULD BE DENIED FOR THE SAME REASONS THIS COURT DENIED THE PRELIMINARY INJUNCTION MOTION**

Plaintiffs seek an affirmative (and overbroad) injunction against Defendants pending appeal—asking that the Court enjoin them from "*implementing*, applying, or taking any action to enforce the laws against Plaintiffs' members." Mot. at 19 (emphasis added).[2]  An injunction is an "extraordinary remedy"; thus, Plaintiffs must make a "clear showing that [they are] entitled to such relief." *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008).  Generally, a party seeking to establish their entitlement to an injunction pending appeal must rely on the same factors on which this Court denied Plaintiffs' preliminary injunction motion, namely that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm absent relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.  *See Feldman v. Ariz. Sec'y of State's Off.*, 843 F.3d 366, 367 (9th Cir. 2016) (standard for injunction pending appeal is "similar" to preliminary injunction).

Notably, Plaintiffs do not even attempt to make the requisite showing of likelihood of success on the merits.  Instead, they argue they need only show the existence of "serious questions" going to the merits, as long as the balance of hardships "tips sharply in [their] favor." Mot. at 9-10.  But under this "sliding scale" approach, Plaintiffs must make "a stronger showing of irreparable harm." *All. for the Wild Rockies*, 632 F.3d at 1131 (explaining "a stronger showing of one

---

[2] If this Court concludes Plaintiffs are entitled to an injunction pending appeal of either law, or any part thereof, it should enjoin only that law or that part, and such injunction should extend only to enforcement of that law or part.  It is improper to enjoin Defendants from taking administrative steps to implement the laws during the pendency of appeal, where such action does not cause any of Plaintiffs' alleged harms.  *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (injunctive relief "must be tailored to remedy the specific harm alleged"); *Gluth v. Kangas*, 951 F.2d 1504, 1509 (9th Cir. 1991) (an injunction against state actors must not "require more of state officials than is necessary to assure their compliance with the constitution").

7

1    element may offset a weaker showing of another"). The only "imminent harm"

2    Plaintiffs identify, however, is the purported constitutional harm from disclosing

3    the information required under SB 253 and SB 261. Mot. at 18. As this Court has

4    already concluded that Plaintiffs are unlikely to succeed on the merits of their facial

5    challenge, the shift in standard makes no difference here; Plaintiffs cannot satisfy

6    any formulation.

7        The cases Plaintiffs cite do not support a different conclusion. In *California*

8    *Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 475 (9th

9    Cir. 2022), the Court did not apply a "sliding scale" approach; it conducted the

10   same analysis on which Plaintiffs lost on their preliminary injunction motion, albeit

11   reaching a different conclusion on the questions and facts before it. And in *Int'l*

12   *Fruit Genetics, LLC v. P.E.R. Asset Mgmt. Tr.*, 2016 WL 5922715, at *1 (C.D. Cal.

13   Oct. 4, 2016), the Court in fact *denied* the requested motion to suspend, explaining

14   that "[t]he Ninth Circuit has [] rejected the idea of maintaining the status quo for its

15   own sake pending appeal." While the court did issue an injunction pending appeal

16   in *Am. Beverage Ass'n v. City of San Francisco*, 2016 WL 9184999, at *2 (N.D.

17   Cal. June 7, 2016), it had already "acknowledged in its order denying preliminary

18   injunctive relief" that there "is at least a close question as to whether Plaintiffs have

19   raised serious questions on the merits." There is no such "close question" here.

## II. PLAINTIFFS HAVE NOT RAISED "SERIOUS QUESTIONS" ABOUT THEIR LIKELIHOOD OF SUCCESS ON THE MERITS

22       Even if this were the correct standard, nothing in the present motion raises

23   "serious questions" about this Court's conclusion that "Plaintiffs have not shown a

24   likelihood of success on the merits with respect to either of its facial First

25   Amendment challenges to SBs 253 and 261." Dkt. 112 at 40. While Plaintiffs

26   reiterate their claim that SB 253 and SB 261 "compel[] speech on matters of public

27   controversy with significant legal and reputational consequences," Mot. at 10, they

28   have yet to demonstrate that the laws compel even a single company to state a

8

1  political or ideological opinion, much less that a substantial number of reporting

2  entities must do so. *Cf. X Corp.*, 116 F.4th at 899 (concluding "every covered

3  social media company" had to "reveal its policy opinion about contentious issues");

4  *NetChoice*, 113 F.4th at 1120 (requiring covered companies to *weigh in* on highly

5  divisive national debate about what type of speech is harmful to children, and then

6  act to censor that speech); *see also Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, No. 24-

7  1570, 2025 WL 2448851, at *12 (9th Cir. Aug. 26, 2025) ("In both *NetChoice* and

8  *X Corp.*, our application of strict scrutiny ultimately turned on the subjective and

9  political or ideological nature of the information that the regulations required.").

10      Indeed, rather than establish that the disclosures required under SB 253 and

11  261 regulate political speech that merits heightened scrutiny, Plaintiffs argue that

12  commercial speech should be cabined to narrow, formulaic categories that would

13  exclude the type of speech required here, and thereby invite strict scrutiny by

14  default. This turns precedent on its head. *See Zauderer v. Off. of Disciplinary*

15  *Couns.*, 471 U.S. 626, 651 (1985) (a speaker has only "minimal" First Amendment

16  interest in the disclosure of uncontroversial commercial information, as compared

17  to the "value … of the information such speech provides"); *Cent. Hudson Gas &*

18  *Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561-63 (1980) (noting the

19  Constitution accords the government greater latitude to regulate commercial

20  speech, relative to other safeguarded forms of expression, because such speech

21  "occurs in an area traditionally subject to government regulation"); *Bolger v.*

22  *Youngs Drug Prods. Corp.*, 463 U.S. 60, 64–65 (1983) (discussing recognition and

23  evolution of commercial speech doctrine). The Ninth Circuit, in fact, just recently

24  opined on this, clarifying that "applying [the *Bolger* factors] strictly" to government

25  reporting requirements would "produce[] counterintuitive results." *Pharm. Rsch. &*

26  *Mfrs. of Am.*, 2025 WL 2448851, at *10. "It would be odd to subject speech in a

27  consumer-facing advertisement to less scrutiny than speech in an annual report filed

28

9

1   with a state regulatory body simply because it better fits the doctrinal tests for

2   defining commercial speech." *Id.*

3       Ultimately, as to each of the issues Plaintiffs revisit in their motion—whether

4   the disclosures regulate commercial speech, whether SB 253 triggers limited

5   scrutiny under *Zauderer*, and whether the laws are appropriately tailored—

6   precedent, the undisputed factual record, and this Court's decision definitively

7   control.

8       **A.   SB 253 and SB 261 Regulate Commercial Speech**

9       Plaintiffs argue that they have raised "serious questions" that the regulated

10  speech here is not commercial, because it "does not satisfy the 'usual definition' of

11  commercial speech—speech that does no more than propose a commercial

12  transaction," Mot. at 11 (quoting *X Corp.*, 116 F.4th at 901) (cleaned up), or at least

13  satisfy the *Bolger* factors, Mot. at 11-12 (citing *NetChoice*, 113 F.4th at 1120).

14  Plaintiffs' assertion is both legally and factually flawed.

15      As this Court explained, the Ninth Circuit (and indeed the cases Plaintiffs

16  cite), has made clear that there are no "bright line[]" rules for determining what

17  constitutes commercial speech. *X Corp.*, 116 F.4th at 900.  Rather, courts employ a

18  "common-sense" and "fact-driven" analysis, "due to the inherent difficulty of

19  drawing bright lines that will clearly cabin commercial speech in a distinct

20  category." *Id.*  "[S]peech that does not propose a commercial transaction on its face

21  can still be commercial speech." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107,

22  1115 (9th Cir. 2021).  And while the *Bolger* factors, when present, lend "strong

23  support" to the conclusion that speech is commercial, the absence of these factors is

24  "not dispositive." *Id.* at 1116.  This Court already rejected Plaintiffs' reading of *X*

25  *Corp.*, Mot. at 7, noting that the Ninth Circuit there did not object to the application

26  of *Zauderer* to the disclosure of "'platform's existing [Terms of Service] and

27  content moderation policies' and laws that require platforms to disclose 'how they

28  moderate and promote content.'" Dkt. 112 at 20 n.5.  Plaintiffs' attempt to cabin

commercial speech to formulaic categories thus fails out of the gate. And indeed, in its recent *Pharm. Rsch. & Mfrs. of Am.* decision, the Ninth Circuit clarified that "the commercial speech doctrine" appropriately applies to disclosures that "provide[] parties to 'actual or potential' commercial transactions with information about those transactions." 2025 WL 2448851, at *14.

In any event, the speech regulated by SB 253 and SB 261 *do meet* the traditional definition of commercial speech. As this Court found, "these disclosures regarding a company's emissions and climate-related risk function as advertisements in the sense that SBs 253 and 261 compel disclosure of the same type of information that a substantial number of companies use to advertise their brands, which they have an economic motive to provide." Dkt. 112 at 19 (citing Dkt. 90 ¶¶ 11-26). Plaintiffs do not dispute this Court's detailed findings that a majority of the largest companies already speak publicly about their emissions and sustainability practices in order to induce business. *See id.* (citing record evidence). Rather, they dispute the Court's conclusion that the disclosures "function as advertisements," arguing that the Court "misapprehends the nature and purpose of the laws." Mot. at 12. Yet Plaintiffs support their argument with evidence from the legislative history that in fact *bolsters* the Court's conclusion that the laws regulate firm-level advertising. That legislative history explains that the disclosures are intended to provide "[i]nformation for the public," that allows them to discern which of the many companies "market[ing] themselves as green" are being truthful. Dkt. 48-5 at 2:25-3:11. This legislative purpose lies at the very heart of *Zauderer*— requiring companies to provide additional information to the public "in order to dissipate the possibility of consumer confusion" from existing marketing. 471 U.S. at 651.

There is no "serious question" on this subject, much less a likelihood of success, that could merit the extraordinary relief Plaintiffs seek.

11

### B.   *Zauderer* Applies to SB 253

This Court has already concluded that the disclosures required under SB 253 are both factual and uncontroversial.  The "emissions disclosures are … factual in nature, in that [all three Scopes] are defined and have recognized methods of computation."  Dkt. 112 at 22.  And the emission calculations are not misleading because they apply "recognized methodology," which does not require the disclosing company "to take responsibility" for the emissions disclosed.  *Id.* Moreover, the Court concluded that "SB 253 merely requires companies to report data on emissions," and not "to take sides in a heated political controversy."  *Id.* at 25.  Plaintiffs' argument that the disclosures are controversial because they relate generally to climate change—an argument made and rejected by the Court on the motion for preliminary injunction—does not present a close question.  *See CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019) ("that any purely factual statement … can be tied in some way to a controversial issue" is not, "for that reason alone, controversial").  Nothing in Plaintiffs' motion creates a "serious question" regarding the foundation of these conclusions.

Plaintiffs then argue, for the first time, that "*Zauderer* does not apply— regardless of whether the speech is factual or uncontroversial," because the compelled disclosures do not meet the additional "threshold requirement" that they be "related to the 'terms under which' the product or 'services will be available.'" Mot. at 13-14 (quoting *Nat'l Inst. of Fam. & Life Advocs. v. Becerra (NIFLA)*, 585 U.S. 755, 768 (2018)).  But Plaintiffs confuse the Court's articulation of the facts in *Zauderer* with an additional "threshold requirement."  The passage of *Zauderer* in question compares laws attempting to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion," which would merit constitutional concern, with the law actually at issue, which "t[ook] the form of a requirement that appellant include in his advertising purely factual and uncontroversial information about the terms under which his services will be

1   available." *Zauderer*, 471 U.S. at 651.  *NIFLA*, cited by Plaintiffs, makes a similar

2   distinction—noting that the law in question, which "requires these clinics to

3   disclose information about *state*-sponsored [abortion] services," is a far cry from

4   the "purely factual and uncontroversial information about the terms under which …

5   services will be available" that merited lower scrutiny in *Zauderer*.  *NIFLA*, 585

6   U.S. at 768-69.  And contrary to Plaintiffs' argument, courts have consistently

7   confirmed that in the commercial speech context, "regulations provid[ing] for the

8   disclosure of 'purely factual and uncontroversial information []' … must be

9   reviewed under *Zauderer*'s framework."  *Moody*, 603 U.S. at 796 (Alito, J.,

10  concurring); *see also Hurley v. Irish–Am. Gay, Lesbian & Bisexual Grp. of Boston,
    Inc.*, 515 U.S. 557, 573 (1995).  There is no additional threshold requirement.[3]

12  **C.   SB 253 and SB 261 Satisfy the Appropriate Levels of Scrutiny**

13          Applying *Zauderer* review, the government need only show that "the

14  information in the disclosure is reasonably related to a substantial governmental

15  interest," *CTIA*, 928 F.3d at 845, is neither unjustified nor unduly burdensome on

16  speech, and "remed[ies] a harm that is 'potentially real, not purely hypothetical,'"

17  *NIFLA*, 585 U.S. at 776.  Alternatively, under intermediate scrutiny, the

18  government need only show that regulation directly advances a substantial

19  government interest and is no more restrictive than necessary to serve that interest.

20  *Central Hudson*, 447 U.S. at 564.  Plaintiffs do not dispute that, to the extent

21  *Zauderer* does not apply, "[c]ommercial speech is generally subject to intermediate

22  scrutiny."  *X Corp.*, 116 F.4th at 900; *see also Cent. Hudson*, 447 U.S. at 562-63.

23          **1.   Investor interest in reliable information**

24          This Court concluded that the States' interest in providing "reliable

25  information that enables investors … to make informed judgments about the impact

26  of climate-related risks on their economic choices" was sufficient to satisfy both

---

27          [3] In any event, the disclosures at issue *do* relate to the "terms under which" the
28  corporations' products or services are available.  The information disclosed pertains to the
    operations of the business, and its relevant supply chains.

1    *Zauderer* scrutiny (for SB 253) and intermediate scrutiny (for SB 261).  Dkt. 112 at

2    29-31, 38-40.  Plaintiffs' current challenges fail to meaningfully rebut that

3    conclusion.

4         First, they argue that "satisfying public demand for information is not, by

5    itself, a substantial government interest."  Mot. at 16.[4]  To the contrary, many

6    courts have found that the "State has substantial interest in reducing [informational]

7    asymmetries, facilitating informed commercial transactions, and improving the

8    efficiency of the [relevant] market."  *Pharm. Rsch. & Manufacturers of Am.*, 2025

9    WL 2448851, at *18; *see also Edenfield v. Fane*, 507 U.S. 761, 769 (1993) ("For

10   purposes of [the *Central Hudson*] test, there is no question that [the State's] interest

11   in ensuring the accuracy of commercial information in the marketplace is

12   substantial.").  In *Chamber of Com. of United States v. SEC*, 85 F.4th 760, 771 (5th

13   Cir. 2023), for example, the Fifth Circuit upheld an SEC disclosure requirement

14   applying *Zauderer* scrutiny, concluding that "[t]he SEC has a legitimate interest in

15   promoting the free flow of commercial information."  The disclosure requirement

16   in that case was intended "to allow investors to separate out and assess the different

17   motivations behind, and impacts of, share repurchases," and the regulation passed

18   constitutional muster because "the only speech it compels relates directly to

19   alleviating the information asymmetry" currently "surrounding [such] share

20   repurchases."  *Id.*  And this Court already cited numerous other examples.  *See

21   Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 107, 115 (2d Cir. 2001)

22   (government had a substantial interest in "increasing consumer awareness of the

23   presence of mercury in a variety of products"); *Am. Meat Inst.*, 760 F.3d at 23

24   (government has "substantial" interest in labeling products to serve consumer

25   interest); *Am. Hosp. Ass'n*, 983 F.3d 528, 540 (D.C. Cir. 2020) (government has

26

27

28   _____

     [4] Notably, Plaintiffs' main support for this argument is a *concurring* opinion in *Am. Meat
     Inst. v. USDA*, 760 F.3d 18, 31 (D.C. Cir. 2014), which was not the prevailing view.

14

1    "legitimate" interest in "promoting price transparency and lowering healthcare

2    costs").

3          Plaintiffs make a distinct, but related, argument that investor interest cannot

4    justify the application of *Zauderer* scrutiny.  Mot. at 14-15 (arguing that the Court's

5    rejection of Defendants' interest in preventing misleading speech "forecloses

6    reliance on the core rationale of *Zauderer*").  This argument is quickly dispatched.

7    In *American Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749,

8    755-56 (9th Cir. 2019), the Ninth Circuit explicitly "rejected the argument that

9    *Zauderer* applies only to situations in which the government requires disclosures to

10    prevent consumer deception."

11          Second, they suggest that even if investor interest *could* constitute a

12    substantial government interest, the record here is insufficient to establish that

13    interest is substantial.  Mot. at 17.  They base this argument on the mistaken claim

14    that Defendants rely solely on the declaration of a "single government-linked

15    investor."  *Id.*  To be clear, the "single" investor Plaintiffs are referring to is

16    CalPERS, "the largest public defined benefit pension fund in the United States,

17    with approximately $500 billion in assets," which "provides retirement benefits to

18    more than 2.2 million California public employees."  Dkt. 52-5 at ¶ 5.  Its interests

19    are not only hugely significant throughout the State, but representative of the

20    interests of many other investors.  *See, e.g.*, Dkt. 54 at ¶¶ 53-57 (identifying 18

21    defined-benefit pensions in California who stand to benefit from the disclosures,

22    with collectively $1.07 trillion in assets).  But in any event, Plaintiffs provide ample

23    evidence of broad investor demands for this information.  *E.g.*, Dkt. 90 ¶¶ 13-16;

24    Dkt. 53 ¶¶ 15, 21; Dkt. 56 ¶¶ 28, 32-40.

25          Third, Plaintiffs argue that the Court "failed to assess whether the speech

26    compulsion was 'broader than reasonably necessary.'"  Mot. at 17 (citing *NIFLA*,

27    585 U.S. at 776).  Specifically, they argue that SB 253 and SB 261 are not tailored

28    to investor interest "to the extent the law compels disclosure from companies that

15

1   have no California investors." Mot. at 17. But there is no evidence on the record

2   that the laws sweep in *any* companies that do not have, or could not seek, California

3   investors. To the contrary, the only evidence presented on this topic concludes that,

4   as a result of the high revenue threshold for both laws, "any private company that

5   falls within the scope of the Disclosure Laws can be expected to have multiple

6   outside investors (likely both shareholders and bondholders), as well as bank

7   creditors and other contractual counterparties." Dkt. 54 ¶ 47.

8        And Plaintiffs' argument that the laws are poorly tailored because they lack a

9   materiality standard is similarly inapposite, as the disclosures under both SB 253

10   and SB 261 are to be made pursuant to industry-accepted and widely-used

11   accounting protocols, which contain a materiality threshold where deemed

12   appropriate by the industry experts who developed them. *See, e.g.*, Dkt. 48-23 at 27

13   Fig. 6 (discussing principles for effective disclosure); Dkt. 48-23 at 42-43, 58

14   (discussing "which recommended disclosures depend on materiality assessment and

15   providing flexibility for organizations to provide some or all disclosures in reports

16   other than financial filings"); Dkt. 53-2 at 11 (discussing materiality and explaining

17   that "[a]ll *relevant* emissions sources within the chosen inventory boundary need to

18   be accounted for so that a comprehensive and meaningful inventory is compiled");

19   Dkt. 53-2 at 72-73; *see also* Dkt. 48-27 at 2.

### 2.   Additional government interests

21        The Court further concluded that "the State provides sufficient evidence to

22   support a finding that SB 253's disclosure requirements are reasonably related to

23   the State's substantial government interest in reducing emissions." Dkt. 112 at 33.

24   By requiring greater transparency about emissions data, SB 253 may encourage

25   companies doing business in California to reduce their emissions. Dkt. 48-4 at 2;

26   Dkt. 48-9 at 7:3-8. Plaintiffs claim that this interest is insufficient to withstand First

27   Amendment scrutiny because "the State presented no evidence that the modest

28   reductions it anticipates would have any meaningful impact on climate change."

16

1  Mot. at 15.  But California has a compelling state interest in any emissions
2  reductions, whether or not it alleviates climate change on its own.  California, while
3  recognizing that other actions "are necessary to fully address the issue of global
4  warming," Health & Safety Code, § 38501(d), has committed to meeting certain
5  emissions reduction goals over time.  Health & Safety Code, §§ 38562, 38562.2,
6  38566.  And in any event, "[t]he First Amendment does not require Congress to
7  forgo addressing the problem at all unless it completely eliminates [the problem]."
8  *Destination Ventures, Ltd. v. FCC*, 46 F.3d 54, 56 (9th Cir. 1995).

9      Plaintiffs purport that the "State could have calculated its own estimates of
10  companies' [GHG] emissions using publicly available information," and thus the
11  disclosure requirements are insufficiently tailored.  Mot. at 16.  But Defendants'
12  evidence demonstrates that any such estimate would be inaccurate.  Dkt. 56 at
13  ¶¶ 14-17 ("[T]here are significant accuracy limitations to using estimated data
14  instead of actual reported data.").  In any event, even under intermediate scrutiny,
15  "'[t]he fit' between the legislature's ends and its means 'need not be perfect nor the
16  single best to achieve those ends….'"  Dkt. 112 at 38 (quoting *Am. Acad. of Pain*
17  *Mgmt.*, 353 F.3d at 1111).

18      Notably, here, the Legislature identified multiple additional interests served by
19  the laws, including those of the public in discerning the truthfulness of corporate
20  emissions claims, of consumers in getting reliable information, and, as to SB 261,
21  the benefit of lowered emissions.  While this Court concluded the evidence, at this
22  preliminary stage, was insufficient to support some of these interests, the Ninth
23  Circuit could well reach a different conclusion.  After all, under *Zauderer*, the
24  government need only show that its interests are real and not "speculative."  471
25  U.S. at 652-53 (noting that where "the possibility of deception is … self-evident,"
26  courts do "not require the State to 'conduct a survey … before it [may] determine
27  that the [advertisement] had a tendency to mislead'" (last alteration in original)).
28  The availability of alternative bases for affirmance on appeal underscores the

1    Court's conclusion here that Plaintiffs are unlikely to succeed on the merits of their

2    facial challenge.

3    **III.  PLAINTIFFS CANNOT ESTABLISH THAT THE BALANCE OF THE EQUITIES
     TIPS SHARPLY IN THEIR FAVOR**

4

5    Given that Plaintiffs cannot show a likelihood of success on the merits, this

6    Court's analysis can end there. *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023);

7    *Smith v. Helzer*, 95 F.4th 1207, 1215 (9th Cir. 2024).  But Plaintiffs also fail to

8    satisfy the remaining preliminary injunction factors.

9    **A.    Plaintiffs Have Not Established Irreparable Harm**

10   Plaintiffs fail to establish an "immediate threatened injury" that entitles them

11   to provisional relief, and certainly not harm that tips the equities *sharply* in their

12   favor. *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir.

13   1988); *see also Winter*, 555 U.S. at 22 (plaintiffs must demonstrate that the claimed

14   harms are both "likely" to occur and are imminent).

15   Plaintiffs' sole harm argument stems from the compelled speech itself.  Mot.

16   at 18.  But Plaintiffs cannot establish irreparable harm as to either SB 253 or SB

17   261 simply by claiming their members' First Amendment rights will be violated; as

18   shown above, Plaintiffs have not established that is so.

19   Moreover, any such harm is not imminent.  Plaintiffs assert that both statutes

20   "go into effect January 1, 2026," Dkt. 116-1 at 6, but in fact, only SB 261 does.

21   The implementing agency has not yet issued the regulations that will implement SB

22   253, and has proposed that reporting will not begin until June 30, 2026.  McLoon

23   Decl. ¶¶ 2-3; Health and Safety Code § 38532(c)(2)(A)(i)(I) (Scope 1 and 2

24   emissions not due until date set by CARB), (c)(2)(A)(i)(II) (Scope 3 emissions not

25   due until 2027).  Thus, even if Plaintiffs could establish a likelihood of

26   constitutional injury from the disclosures required under SB 253, they cannot

27   establish that any such alleged harm is imminent.  And even as to SB 261,

28   Plaintiffs' appeal may be resolved before Plaintiffs must speak.  Case No. 25-5327

18

1    (9th Cir. 2025), Dkt. 2.1 (setting briefing schedule by which briefing will be

2    complete by November 6, 2025).

3         Moreover, Plaintiffs have dropped their prior claim that the compliance costs

4    associated with the laws constitute immediate irreparable harm, Mot. at 18, and for

5    good reason.  As to SB 253, CARB issued an Enforcement Notice stating that

6    entities need not collect any new data "for the first report due," and entities will not

7    be penalized for incomplete reporting, as long as they are acting in good faith.  Dkt.

8    78-6 at 2-3.  Moreover, an injunction pending appeal would not absolve covered

9    entities from their obligation to collect information, given the regulatory uncertainty

10   on appeal.

### B. The Balance of the Equities and the Public Interest Militate Against Granting an Injunction

13         "Once an applicant satisfies the first two factors, the traditional stay inquiry

14   calls for assessing the harm to the opposing party and weighing the public interest,"

15   but these factors "merge" when the government is a party.  *Nken v. Holder*, 556

16   U.S. 418, 435 (2009); *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th

17   Cir. 2014).  This Court previously concluded that the balance of equities favors

18   denial of Plaintiffs' Motion.  *See* Dkt. 112 at 40 (citing *CTIA*, 928 F.3d at 852

19   (finding challengers failed to demonstrate any hardship tipping the balance in their

20   favor where their "First Amendment claim is unlikely to succeed")).  As this Court

21   observed, "[t]his is especially true because enjoining SBs 253 and 261 would delay

22   the State from advancing the public interests for which it adopted the laws.  *See*

23   Dkt. 112 at 40-41 (finding "that an injunction would injure the public interest in

24   having a free flow of accurate information").  Moreover, an injunction would inflict

25   harm on California by preventing enforcement of statutes enacted by the people's

26   representatives.  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in

27   chambers).

28

1

**CONCLUSION**

2    For the reasons stated above, Plaintiffs' motion for injunction pending appeal

3 should be denied.

4

5

6 Dated:  August 29, 2025                          Respectfully submitted,

7                                                 ROB BONTA
                                                  Attorney General of California
8                                                 MYUNG J. PARK
                                                  Supervising Deputy Attorney General
9                                                 KATHERINE GAUMOND
                                                  EMILY HAJARIZADEH
10                                                M. ELAINE MECKENSTOCK
                                                  DYLAN REDOR
11                                                DAVID ZAFT
                                                  Deputy Attorneys General
12

13

14                                               */s/ Caitlan McLoon*

15                                               CAITLAN MCLOON
                                                 Deputy Attorney General
16                                               *Attorneys for Defendants Liane M.*
                                                 *Randolph, Steven S. Cliff, and Robert*
17                                               *A. Bonta*

18

19

20

21

22

23

24

25

26

27

28

20

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendants Liane M. Randolph, Steven S. Cliff, and Robert A. Bonta, certifies that this brief contains 6,366 words, which complies with the word limit of this Court's Rule VII.A.3.

Dated:  August 29, 2025                    Respectfully submitted,

                                            ROB BONTA
                                            Attorney General of California


                                            */s/ Caitlan McLoon*


                                            CAITLAN MCLOON
                                            Deputy Attorney General
                                            *Attorneys for Defendants Liane M.*
                                            *Randolph, Steven S. Cliff, and Robert*
                                            *A. Bonta*

SA2024300503
67903367

21

## CERTIFICATE OF SERVICE

Case Name:    **Chamber of Commerce of the United States of America, et al.
v. Liane M. Randolph, et al.**

Case No.:    **2:24-cv-00801-ODW-PVC**

I hereby certify that on <u>August 29, 2025,</u> I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>August 29, 2025,</u> at Los Angeles, California.

| Beatriz Davalos | */s/ Beatriz Davalos* |
|---|---|
| Declarant | Signature |

SA2024300503
66591334.docx

22

EUGENE SCALIA, SBN 151540
  escalia@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Plaintiffs Chamber of
Commerce of the United States of
America, California Chamber of
Commerce, American Farm Bureau
Federation, Los Angeles County
Business Federation, Central Valley
Business Federation, and
Western Growers Association*

(*Additional counsel listed on next page*)

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA,

## WESTERN DIVISION

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION, <br><br> Plaintiffs, <br><br> v. <br><br> LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California. <br><br> Defendants. | CASE NO. 2:24-cv-00801-ODW-PVC <br><br> **DECLARATION OF MARTIN DURBIN** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

DECLARATION OF MARTIN DURBIN
CASE NO. 2:24-CV-00801-ODW-PVC

BRADLEY J. HAMBURGER,
    SBN 266916
    bhamburger@gibsondunn.com
SAMUEL ECKMAN, SBN 308923
    seckman@gibsondunn.com
ELIZABETH STRASSNER,
    SBN 342838
    estrassner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile:  213.229.7520

BRIAN A. RICHMAN
(*pro hac vice*)
    DC Bar No. 230071
    brichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Ave., Suite 2100
Dallas, TX 75201-2923
Telephone: 214.698.3100
Facsimile:  214.571.2900

*Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association*

STEPHANIE A. MALONEY
(*pro hac vice*)
    DC Bar No. 104427
    smaloney@uschamber.com
KEVIN PALMER
(*pro hac vice*)
    DC Bar No. 90014967
    kpalmer@uschamber.com
CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA
1615 H Street, NW
Washington, D.C. 20062-2000
Telephone: 202.659.6000
Facsimile:  202.463.5302

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*

Gibson, Dunn &
Crutcher LLP

DECLARATION OF MARTIN DURBIN
CASE NO. 2:24-CV-00801-ODW-PVC

1      1.    My name is Martin Durbin. I am the Senior Vice President for Policy at

2   the Chamber of Commerce of the United States of America. In that capacity, I oversee

3   the entirety of the Chamber's Policy Division.

4      2.    I am also President of the Chamber's Global Energy Institute (GEI), and

5   in that capacity, I lead strategic development and implementation of the Chamber's

6   climate, energy, and sustainability policy.

7      3.    My leadership of the Policy Division also includes oversight of the

8   operations of the Center for Capital Markets Competitiveness (CCMC). CCMC works

9   to advance America's global leadership in capital formation by supporting diverse

10   capital markets that are the most fair, transparent, efficient, and innovative in the

11   world. This work includes advocating for responsible corporate governance and

12   financial reporting measures at the state, federal, and international levels.

13      4.    I am over 18 years old. This Declaration is based upon my personal

14   knowledge and belief and/or upon my review of business records of the Chamber. If

15   called as a witness, I could and would testify competently thereto.

16      5.    My former Chamber colleague, Thomas Quaadman, submitted a

17   declaration in this matter on February 25, 2025. At that time, Mr. Quaadman led

18   CCMC. [*See* Quaadman Dec., Dkt. 78-4.]

19      6.    I have reviewed Mr. Quaadman's declaration, and here restate and

20   incorporate paragraphs 3 through 9 of that declaration in their entirety.

21      7.    I submit this further declaration in my role overseeing both the Chamber's

22   corporate governance and sustainability initiatives to address intervening

23   developments.

24   **CARB's August 21 Workshop**

25      8.    On August 21, 2025, the California Air Resources Board (CARB) held a

26   workshop regarding the implementation of S.B. 253 and S.B. 261. At this workshop,

27   CARB officials provided regulated entities with more precise information on when and

28   how the agency will enforce the two laws.

1

DECLARATION OF MARTIN DURBIN
CASE NO. 2:24-CV-00801-ODW-PVC

9.    CARB officials' presentation at this workshop included a slideshow. I have reviewed these slides, which are available on CARB's public website. SB 253/261/219 Public Workshop: Regulation Development and Additional Guidance, *available at* https://ww2.arb.ca.gov/sites/default/files/2025-08/SB%20253%20261%20workshop%20slides%208-21.pdf. A true and correct copy of the slides is attached here as **Exhibit A**.

10.    The August 21 workshop reinforced the concerns of Chamber members about CARB's plans to begin enforcing S.B. 261 on January 1, 2026, and the burdensome steps regulated entities must take well before that date to prepare to issue the required reports. Further, S.B. 253 also compels speech, and CARB has proposed enforcing penalties for non-compliance as soon as June 30, 2026. [Ex. A at 34.]

11.    Many of the Chambers's members will fall within the scope of S.B. 253 and 261 based on their annual revenues and business in California.

**S.B. 261's Effects on the Chamber's Members**

12.    At the August 21 workshop, CARB confirmed it will require companies to be in full compliance with S.B. 261 by January 1, 2026. [Ex. A at 27.] CARB also stated that it will open a portal on December 1, 2025 for the purpose of collecting companies' required climate-related risk disclosures. [*Id.*]

13.    At the workshop, CARB provided additional detail, consistent with the provisions of S.B. 261, on the statements the Chamber's members will be compelled to make by January 1, 2026. As presented at the workshop, the CARB slides highlight the various disclosures that a company must provide, including:

- its "governance structure for identifying, assessing, and managing climate-related financial risks";
- how its governing "Board [oversees] those climate-related risks";
- "the actual and potential impacts of climate-related risks and opportunities on the company's operations, strategy, and financial planning";

Gibson, Dunn &
Crutcher LLP

1  •  "the resilience of the organization's strategy, taking into account the future

2     impacts of climate change under various climate scenarios";

3  •  its qualitative process for "identifying, managing and assessing climate-related

4     risks, and how those considerations and processes are integrated into the

5     organization's overall risk management"; and

6  •  its "metrics and targets used to assess and manage relevant climate-related

7     risks."

8  [Ex. A at 30-33.]

9      14.  As the CARB slides make clear, the speech compelled by S.B. 261 is

10 subjective and concerns a topic of significant controversy and public policy debate.

11 S.B. 261 requires members of the Chamber to publish qualitative assessments as to

12 their climate-related financial risks, conveying a specific philosophy of environmental

13 sustainability.

14     15.  Some Chamber members have not spoken on these matters of public

15 controversy and do not wish to do so.

16     16.  S.B. 261 applies to companies regardless of whether they voluntarily

17 make statements about their climate-related risks, emissions, or sustainability

18 initiatives. It compels speech that is not tethered to their advertisements or to any

19 product or service they offer, in California or elsewhere.

20     17.  If not enjoined, Chamber members will be compelled to speak against

21 their will to ensure compliance with S.B. 261 as of January 1, 2026. Such speech

22 cannot be unsaid if S.B. 261 is eventually declared unlawful. The reports that they

23 issue will live on in the public square.

24     18.  Compliance with S.B. 261 will also require Chamber members to pay fees

25 to support the State's implementation of it. At the August 21 workshop, CARB

26 estimated that each Covered Entity will be required to pay a $1,403 annual

27 implementation fee for S.B. 261. [Ex. A at 24.]

28

Gibson, Dunn &
Crutcher LLP

3

DECLARATION OF MARTIN DURBIN
CASE NO. 2:24-CV-00801-ODW-PVC

19.     Chamber members are continuing to incur unrecoverable costs to create the reports required by S.B. 261 in advance of the January 1, 2026 compliance deadline.

**S.B. 253's Effects on the Chamber's Members**

20.     At the August 21 workshop, CARB officials announced that CARB "[s]taff are proposing a June 30, 2026 implementation date" for Scope 1 and Scope 2 emissions under S.B. 253. [Ex. A at 34.] S.B. 253's Scope 3 reporting requirements are scheduled to take effect in 2027.

21.     Compliance with S.B. 253's requirements to report Scope 1, 2, and 3 emissions will impose several costly and burdensome steps on the Chamber's members. These disclosures go far beyond many members' voluntary disclosures, or disclosure requirements under existing state, federal, and international laws and regulations.

22.     Proper attribution of a company's emissions, particularly Scope 3 emissions, is a controversial matter of public debate. Some Chamber members do not agree with California's definition of what constitutes a company's reportable emissions and believe that compliance with S.B. 253 would compel them to make misleading or inaccurate statements.

23.     Some Chamber members fear that being compelled to make these statements could damage their business.

24.     Because the calculation and attribution of emissions defined in S.B. 253 is itself a matter of debate, some Chamber members choose not to voluntarily disclose emissions data. These members refrain from participating in the public square on this topic.

25.     Like S.B. 261, S.B. 253 applies to companies regardless of whether they voluntarily make statements about their emissions, climate-related risks, or sustainability initiatives.

Gibson, Dunn &
Crutcher LLP

4

DECLARATION OF MARTIN DURBIN
CASE NO. 2:24-CV-00801-ODW-PVC

26.    Moreover, complying with S.B. 253 will require Chamber members to pay fees to support the State's implementation of its requirements. At the August 21 workshop, CARB calculated these fees at $3,106 per year. [Ex. A at 24.]

27.    If not enjoined, Chamber members will be forced to make these public statements that they would not otherwise make. And those statements cannot be undone. Nor can any effects they have on the members' relationships or customer goodwill be undone.

Pursuant to 28 U.S.C. §1746, I, Martin Durbin, declare under penalty of perjury that the foregoing is true and correct.

Executed on September ⎽⎽2⎽⎽, 2025, at Washington, D.C.

Martin Durbin

Gibson, Dunn & Crutcher LLP

5

DECLARATION OF MARTIN DURBIN
CASE NO. 2:24-CV-00801-ODW-PVC

App.708

# Exhibit A

California Air Resources Board

August 21, 2025 Workshop Presentation

Declaration of Martin Durbin in Support of
Plaintiffs' Reply in Support of Motion for Injunction Pending Appeal
September 2, 2025

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.*,
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)

# SB 253/261/219 Public Workshop:
## Regulation Development and Additional Guidance

AUGUST 21, 2025

CALIFORNIA AIR RESOURCES BOARD

# Workshop Logistics

- Workshop Materials link: https://ww2.arb.ca.gov/our-work/programs/california-corporate-greenhouse-gas-ghg-reporting-and-climate-related-financial

- Zoom Orientation:
  - Raise Hand
  - Zoom phone participants may dial #2 to "Raise your Hand"
  - The facilitator will inform Zoom phone participants when they are unmuted during Public Comment
  - Dial *6 to mute or unmute



CALIFORNIA AIR RESOURCES BOARD

2

# Agenda

1. **Welcome** – Program Background

2. **Regulation Development and Implementation** (SB 253/261)
   - "Who": Covered Entities and Exemptions
   - "What": Fee Regulation Concept
   - "How": Further Guidance on Reporting
   - "When": Timelines for Reporting Requirements

3. **Scope 3 Emissions and Assurance Criteria** (SB 253)

4. **Public Feedback**

App.713

Case 2:24-cv-00801-ODW-PVC    Document 122-2    Filed 09/02/25    Page 5 of 47   Page ID #:10624

# CARB's Enduring Commitment to Clean Air and Climate Leadership

For more than **50 years**, CARB has led the nation in protecting public health and reducing air pollution

CARB's work is grounded in science, supported by different governors and legislative bodies, and strengthened by partnerships with communities, industries, and public health advocates

Through regulatory innovation and collaboration, CARB has helped catalyze progress on smog, greenhouse gases, and clean transportation

**"We have a legal–and moral–obligation to continue to pursue clean air."**
— *CARB Chair Liane Randolph, May 2025 Press Conference*

App.714

# Climate Disclosures Build on Two Decades of State Climate Action

- Landmark Climate Legislation - Assembly Bill 32 (2006)
- 2030 target: At least 40% GHG reduction below 1990 levels (SB 32)
- 2045 target: Carbon neutrality and at least 85% GHG reduction below 1990 levels (AB 1279)
- Existing CARB efforts to reduce GHG emissions include Cap-and-Trade, Low Carbon Fuel Standard (LCFS), and mobile source regulations
- Mandatory Greenhouse Gas Reporting Regulation (MRR) requires reporting of scope 1 emissions from large emitters
- LCFS requires scope 1 and 2 emissions reporting

CALIFORNIA AIR RESOURCES BOARD                                                                          5

App.715

# Overview of Relevant Legislation

- California Climate Disclosure Laws: SB 253, 261, 219 (Health & Safety Code § 38532-38533) – "the 200s"
- Aim to improve transparency on corporate climate-related risks and emissions
- Help inform consumers and investors of climate-related business considerations

App.716

# SB 253: The Climate Corporate Data Accountability Act

- Affected entities – "doing business in California" and >$1 billion in annual revenues
- Scope 1, 2, disclosure beginning 2026
- Scope 3 in 2027
- Assurance milestones – starting with limited assurance
- Allows for use of existing reporting standards such as the GHG Protocol

# SB 261: Climate-Related Financial Risk Disclosure

- Affected entities – "doing business in California" and >$500 million in annual revenues
- Biennial disclosure requirement
- Encourages alignment with existing frameworks
- Allows for the use of existing voluntary reporting frameworks, like the ISSB standards (evolved from the TCFD framework)
- Contract with a non-profit organization

# SB 219: Timeline Extensions, Flexibility and Reporting Adjustments

- How SB 219 amends and adjusts SB 253 & 261:
  - Clarifies that CARB will set the schedule for scope 3 disclosures (beginning in 2027)
  - Adds parent-level consolidation option

App.719

# Regulatory Process to Implement the 200s

Pre-rulemaking recap

- Enforcement notice (December 2024)
- Information solicitation (December 2024)
- Public workshop (May 2025)
- FAQ release (July 2025)
- Public workshop (August 2025)
- All regulations must meet the APA's rulemaking standards, including the clarity standard.

App.720

# Regulation Development and Implementation

SB 253/261

# Identifying the "Who": Updates on Definitions

Definitions from the 200s:

**SB 253**: "Reporting entity" means a partnership, corporation, limited liability company, or other business entity formed under the laws of this state, the laws of any other state of the United States or the District of Columbia, or under an act of the Congress of the United States with total annual revenues in excess of one billion dollars ($1,000,000,000) and that does business in California. Applicability shall be determined based on the reporting entity's revenue for the prior fiscal year.

**SB 261**: "Covered entity" means a corporation, partnership, limited liability company, or other business entity formed under the laws of the state, the laws of any other state of the United States or the District of Columbia, or under an act of the Congress of the United States with total annual revenues in excess of five hundred million United States dollars ($500,000,000) and that does business in California. Applicability shall be determined based on the business entity's revenue for the prior fiscal year. "Covered entity" does not include a business entity that is subject to regulation by the Department of Insurance in this state, or that is in the business of insurance in any other state.

# Identifying the "Who"
# Update on Definitions: "Revenue"

- At the May workshop, staff considered defining total annual revenue as gross receipts as set forth in California Revenue and Taxation Code (RTC) § 25120(f)(2)

- Examples of feedback:
  - Gross receipts are not a suitable metric for gauging revenue due to data confidentiality limitations and lack of verification
  - Definition is too expansive

App.723

# Identifying the "Who"
# Update on Definitions: "Revenue"

**Alternative option:** "Revenue is the total global amount of money or sales a company receives from its business activities, such as selling products or providing services."

- This definition does not deduct operating costs or other business expenses
- This definition is consistent with metrics used by major data tracking and reporting industries, such as Dunn & Bradstreet, Standard & Poor, and Data Axle

CALIFORNIA AIR RESOURCES BOARD

14

# Identifying the "Who"
## Update on Definitions: "Doing Business in CA"

At the May workshop, staff considered pointing to the Revenue & Tax Code definition provided in Section 23101:

§ 23101(a): "Doing business" means actively engaging in any transaction for the purpose of financial or pecuniary gain or profit.

AND

§ 23101(b): An entity is considered to be "doing business in California" for purposes of the reporting regulation if the entity is doing business (as defined in section 23101(a)), and any of the following conditions is met during any part of a reporting year:

(1) The entity is organized or commercially domiciled in this state.

(2) Sales, as defined in The Revenue and Taxation Code subdivision (e) or (f) of Section 25120 as applicable for the reporting year, of the entity in this state exceed the inflation adjusted thresholds of seven hundred thirty-five thousand and nineteen ($735,019) (2024). For purposes of this paragraph, sales of the entity include sales by an agent or independent contractor of the entity. For purposes of this paragraph, sales in this state shall be determined using the rules for assigning sales under Sections 25135 and 25136, and the regulations thereunder, as modified by regulations under Section 25137.

# Identifying the "Who"
## Update on Definitions: "Doing Business in CA"

- Staff are exploring existing databases of US-based companies that could be used to establish "doing business in CA"
- Limitations exist for using Franchise Tax Board data
- CA Secretary of State Business Entity database is publicly available and lists any entity with a designated agent for service of process in California
- Note: companies subject to the regulation will be responsible for compliance, even if not initially included on staff's list or outreach

App.726

# Identifying the "Who"
## Update on Definitions: Parent and subsidiary

- Based on the existing Cap-and-Trade regulation:

  "Subsidiary is a business in which another company (the parent or holding company) owns more than 50% of its voting stock. A subsidiary has a different legal business name than its parent company. This corporate relationship implies that the parent company has a controlling interest and can influence the subsidiary's operations, management, and financial decisions, even though the subsidiary operates as a separate legal entity."

- Staff's proposal is to identify subsidiaries through evaluation of commercial databases, cross-referenced with the Secretary of State database and/or the Franchise Tax Board database.
- Staff is seeking input on a process where companies may choose to self-report on parent-subsidiary relationships to avoid reporting for multiple entities under the same parent company.

App.727

# Identifying the "Who" Exempted entities

**Based on stakeholder comments, staff proposes the following exemptions and invites public input:**

- Non-profits
- A company whose only business in California is the presence of teleworking employees
- Government entities would not be covered and do not need an exemption because they are not formed under business entity laws as defined in HSC 38532 and 38533.
- CA Independent System Operator (CAISO) or a business entity whose only activity within California consists of wholesale electricity transactions that occur in interstate commerce.

App.728

# Identifying the "Who": Preliminary analysis of covered entities



US-based companies w/global annual sales ≥ $500 million

**8,817**

*Source:* Dunn & Bradstreet

Businesses registered with CA Secretary of State with "Active" status

**816,845**

*Source:* CA Sec. of State

**Entity or parent company name match**

**SB 261**

4,160*

2,596*

**SB 253**

# Fee Regulation Concept

# SB 253/261 Implementation Fees: Background

- The 200s authorize CARB to assess an annual fee for the implementation and administration of the new reporting programs. Companies subject to regulation will be assessed the fee.
- CARB has experience with this kind of structure through its AB 32 Cost of Implementation (COI) Fee Regulation.
- COI Fee Regulation was adopted to support implementation of AB 32 and subsequently amended to support MRR, C&T, and LCFS.
- The COI fee is assessed per metric ton of $CO_2e$ emitted.

# SB 253/261 Implementation Fees: Concept

- For SB 253/261 implementation fees, Staff recommend issuing a "flat" fee per regulated entity

- Flat annual fee for each program calculated as:   $$\frac{Annual\ Program\ Cost}{Number\ of\ Covered\ Entities}$$

- Companies with more than $500M in revenue would annually pay the Climate-Related Financial Risk Disclosure Fund Fee (SB 261)

- Companies with more than $1B in revenue would also annually pay the Climate Accountability and Emissions Disclosure Fund Fee (SB 253)

- Subsidiaries filing parent company reports still represent separate entities subject to fee

- Fee amounts will be determined based on how many entities are covered by the program and the annual cost of the program

CALIFORNIA AIR RESOURCES BOARD

22

App.732

# SB 253/261 Implementation Fees: Covering the Cost of the Program

- CARB's program administration costs include a one-time cost to set up the program: $20.7M, temporarily funded through Greenhouse Gas Reduction Fund (GGRF) Fiscal Year (FY) 23/24 and 24/25)

- Ongoing costs of implementing 253/261 programs: $13.9M (not counting GGRF loan repayment)

- Fee will be adjusted annually for inflation

App.733

# SB 253/261 Implementation Fees: Estimated Fee Per Covered Entity

**Assumptions**

- **Annual cost of implementation**: $13.9M
- **Entities subject to SB 253**: 2,596*
- **Entities subject to SB 261**: 4,160*
- 58% of overall implementation costs attributed to SB 253
- **Annual fee for SB 253 entities**: $3,106
- **Annual fee for SB 261 entities**: $1,403
- Reporting entities with more than $1B in revenue are subject to both fees
- Annual fees to be adjusted for inflation and fund deficit/surplus in future years

*Based on staff analysis of CA Secretary of State and Dunn & Bradstreet data. CARB will initiate a process to validate the preliminary list of covered entities

CALIFORNIA AIR RESOURCES BOARD                                                                      24

# SB 253/261 Implementation Fees: Draft Timeline

- **Aug 21**: Public Workshop

- **Aug 21—Sep 11**: Public comment period for feedback on workshop concepts

- **Oct 14**: Notice of Proposed Rulemaking

- **Oct 17—Nov 30**: 45-day APA comment period begins

- **Dec 11—Dec 12**: Board consideration of proposed rulemaking

  (public Board Hearing)

App.735

# Further Guidance on The 200s Implementation

# Guidance on "How"
# SB 261: Climate Risk Reporting

- Reports must be posted to entity's website by January 1, 2026 and every two years thereafter
- CARB will post a public docket on December 1, 2025 for entities to post the public link to their reports
  - Docket scheduled to close July 1, 2026
- A number of resources exist for guidance on climate-related financial reporting:
  - Recommendations of the Task Force on Climate-related Financial Disclosures
  - TCFD's Reporting Climate-Related Financial Information: Critical Introductory Materials
  - IFRS S2 Climate-Related Disclosures
  - IFRS Comparison of IFRS S2 and TCFD Recommendations
- CARB will provide guidance on minimum requirements for compliance with HSC § 38533

App.737

# Guidance on "How"
# SB 261: Minimum Reporting Requirements

- Entity may use one of several frameworks to meet disclosure requirements:
  - Final Report of Recommendations of TCFD (2017)
  - IFRS Disclosure Standards
  - A report developed in accordance with any regulated exchange, national government, or other governmental entity
- Each report submitted to CARB should contain a statement on:
  - Which reporting framework is being applied
  - Discuss which recommendations and disclosures have been compiled and which have not
  - Provide a short summary of the reasons why recommendations/disclosures have not been included as well as discussion of any plans for future disclosures

App.738

# Guidance on "How"
# Climate-related Risk: Principles

- Four overriding principles underpin the climate related risk disclosures, informed by TCFD (2017) and IFRS S2
  - Governance
  - Strategy
  - Risk Management
  - Metrics and Targets

App.739

# Guidance on "How"
# Climate-related Risk: Governance

- Describe your organization's governance structure for identifying, assessing, and managing climate-related financial risks. Details should include:
  - Management oversight of climate-related risks and opportunities and should provide a description pertaining to Board oversight of those climate-related risks and opportunities (if the reporting entity has a Board)

App.740

# Guidance on "How"
# Climate-related Risk: Strategy

- Describe the actual and potential impacts of climate-related risks and opportunities on the company's operations, strategy and financial planning. This includes describing:
  - The climate-related risks and opportunities the organization has identified over the short, medium, and long term
  - The impact of climate-related risks and opportunities on the organization's operations, strategy, and financial planning
  - The resilience of the organization's strategy, taking into consideration the future impacts of climate change under various climate scenarios.

App.741

# Guidance on "How"
# Climate-related Risk: Risk Management

- Describe how the reporting entity identifies, assesses, and manages climate-related risks including a qualitative description of:
  - The process the reporting entity uses for identifying, managing and assessing climate-related risks, and how those considerations and processes are integrated into the organization's overall risk management

# Guidance on "How"
# Climate-related Risk: Metrics + Targets

- Disclose the metrics and targets used to assess and manage relevant climate-related risks and opportunities where such information is material
  - For a discussion of material relevance as used in this context, see TCFD 2017. If using a different framework, refer to that framework's guidance

# "When"
## SB 253: Timing of Scope 1 and 2 Reporting in 2026

- Staff are proposing a June 30, 2026 implementation deadline for SB 253 Scope 1 and 2 reporting, which will be included in the fee regulation
  - We welcome public feedback
- Staff will post draft reporting templates for Scope 1 and 2 reporting by the end of September 2025 for public feedback
  - Option to include other actions that reduce greenhouse gases, such as investments in renewable electricity and gas, among others

App.744

# SB 253: Scope 3 Emissions from Major Emitting Sectors

- We are on track with Scope 1 and 2, and already looking ahead to Scope 3 emissions
- AB 32 GHG Inventory: Transportation is one of the largest-emitting sectors in California (~50% with fuels included)

- Many transportation-related companies are already reporting Scope 3 emissions, which may guide covered entities in developing their own reports
- As part of CARB's public sessions on the Governor's ZEV EO (N-27-25), stakeholders requested stronger disclosures of GHG emissions from transportation-related companies



23% · Industrial
11% · Electricity IN STATE
5% · Electricity IMPORTS
8% · Agriculture
6% · Commercial
8% · Residential
39% · Transportation

371.1 MMT CO$_2$e
2022 TOTAL CA EMISSIONS

CALIFORNIA AIR RESOURCES BOARD　　　　　　35

App.745

# SB 253 Assurance Criteria

# Existing Mandatory GHG Reporting Regulation Definition of Verification

A <u>systematic</u>, <u>independent</u> and <u>documented</u> process for evaluating a reporting entity's emissions data report against CARB's reporting procedures and methods for calculation and reporting of GHG emissions and product data.

- Systematic: organized, rigorous and thorough
- Independent: based on fact, unbiased, objective
- Documented: process, records, findings
- Judged against a set standard and to a given level of assurance
- Findings based on examination of objective evidence

CALIFORNIA AIR RESOURCES BOARD                                                                                37

App.747

# Skills and Responsibilities of an Effective CARB-Accredited Verifier

- Do not advise and then review your own work
- Maintain independence and objectivity
- Act with integrity and honesty
- Review emissions data reports on behalf of CARB
- Focus on rigor and efficiency as required for the level of assurance

App.748

# The Importance of Impartiality

- Conflict between self-interest and ability to maintain independence and objectivity
- Conflict of interest can be real or perceived
- Perceived COI can undermine public support and confidence in the quality of the reported data
- CARB already includes conflict of interest disclosures and rotation of verification bodies in other regulatory programs

App.749

# Background: Assurance

Intended to increase user confidence in data and information

Three types of assurance: absolute, reasonable and limited
- Reasonable assurance for existing CARB regulations

Financial audits have high level of rigor

App.750

# Limited Assurance Framework

- Limited review of data and controls
- Impartiality
- Assurance is given in the negative: "nothing has come to our attention that causes us to believe that the emissions data report is not materially correct"
- Lower confidence in completeness and accuracy
- Could include qualifiers around findings

App.751

# Draft Implementation of Limited Assurance

- Sampling plans
- Reviews of data management systems
- Limited data checks
- Limited conformance checks
- Process documentation
- Log of any found and corrected errors by the reporting company
- Report and statement at the conclusion

CALIFORNIA AIR RESOURCES BOARD

42

# Initial Staff Concept for Assurance

- SB 253 requires entities to seek third-party assurance of their GHG reporting
- Potential standards
  - ISSA 5000 (IAASB)
  - AA1000
  - ISO 14060 family
  - AICPA
- We welcome public feedback

App.753

# CARB Oversight

- CARB may opt to audit assurance and reporting activities
- CARB retains all authority to review information submitted by reporting entities and assurance providers, and take enforcement action as appropriate

App.754

# Feedback / Questions

1. Questions will be taken virtually through Zoom

2. Raise Hand

3. Zoom phone participants may dial #2 to "Raise your Hand"

4. The facilitator will inform Zoom phone participants when they are unmuted during Public Comment.

5. Dial *6 to mute or unmute.

6. Staff will make every effort to call on attendees in the order they raise the hand on Zoom



App.755

# Next Steps

We want your feedback – stakeholder input is critical to shaping this program

Public docket will be open for three weeks for written feedback

Sign up with the listserv to stay engaged and be notified of future public workshops and updates:

https://ww2.arb.ca.gov/our-work/programs/california-corporate-greenhouse-gas-ghg-reporting-and-climate-related-financial

Questions or Comments? Contact us at: ClimateDisclosure@arb.ca.gov

 Note: Input received via email will be posted to the public docket

1    EUGENE SCALIA, SBN 151540
       escalia@gibsondunn.com
2    GIBSON, DUNN & CRUTCHER LLP
3    1050 Connecticut Avenue, N.W.
     Washington, D.C. 20036-5306
4    Telephone: 202.955.8500
     Facsimile:  202.467.0539
5
6    *Attorneys for Plaintiffs Chamber of*
     *Commerce of the United States of*
7    *America, California Chamber of*
     *Commerce, American Farm Bureau*
8    *Federation, Los Angeles County*
     *Business Federation, Central Valley*
9    *Business Federation, and*
     *Western Growers Association*
10
11   (*Additional counsel listed on next page*)

12               IN THE UNITED STATES DISTRICT COURT

13            FOR THE CENTRAL DISTRICT OF CALIFORNIA,

14                        WESTERN DIVISION

15   CHAMBER OF COMMERCE OF THE              CASE NO. 2:24-cv-00801-ODW-PVC
     UNITED STATES OF AMERICA,
16   CALIFORNIA CHAMBER OF                   **SUPPLEMENTAL**
     COMMERCE, AMERICAN FARM                 **DECLARATION OF EDWARD J.**
17   BUREAU FEDERATION, LOS                  **SHOEN**
     ANGELES COUNTY BUSINESS
18   FEDERATION, CENTRAL VALLEY
     BUSINESS FEDERATION, and
19   WESTERN GROWERS ASSOCIATION,

20                    Plaintiffs,

21           v.

22   LIANE M. RANDOLPH, in her official
     capacity as Chair of the California Air
23   Resources Board, STEVEN S. CLIFF, in
     his official capacity as the Executive
24   Officer of the California Air Resources
     Board, and ROBERT A. BONTA, in his
25   official capacity as Attorney General of
     ·California.
26                   Defendants.

27

28

Gibson, Dunn &
Crutcher LLP
_____
                 DECLARATION OF EDWARD J. SHOEN
                 CASE NO. 2:24-CV-00801-ODW-PVC

1    BRADLEY J. HAMBURGER,
        SBN 266916
2        bhamburger@gibsondunn.com
     SAMUEL ECKMAN, SBN 308923
3        seckman@gibsondunn.com
     ELIZABETH STRASSNER,
4        SBN 342838
5        estrassner@gibsondunn.com
     GIBSON, DUNN & CRUTCHER LLP
6    333 South Grand Ave.
     Los Angeles, CA 90071-3197
7    Telephone: 213.229.7000
     Facsimile:  213.229.7520
8

9    BRIAN A. RICHMAN
     (*pro hac vice*)
10       DC Bar No. 230071
11       brichman@gibsondunn.com
     GIBSON, DUNN & CRUTCHER LLP
12   2001 Ross Ave., Suite 2100
     Dallas, TX 75201-2923
13   Telephone: 214.698.3100
     Facsimile:  214.571.2900
14

15   *Attorneys for Plaintiffs Chamber of Commerce of the United States of America,
     California Chamber of Commerce, American Farm Bureau Federation, Los Angeles
16   County Business Federation, Central Valley Business Federation, and
     Western Growers Association*

17   STEPHANIE A. MALONEY
     (*pro hac vice*)
18       DC Bar No. 104427
19       smaloney@uschamber.com
     KEVIN PALMER
     (*pro hac vice*)
20       DC Bar No. 90014967
21       kpalmer@uschamber.com
     CHAMBER OF COMMERCE OF THE
     UNITED STATES OF AMERICA
22   1615 H Street, NW
     Washington, D.C. 20062-2000
23   Telephone: 202.659.6000
     Facsimile:  202.463.5302
24

25   *Attorneys for Plaintiff Chamber of Commerce of the United States of America*

26

27

28

1  I, Edward J. Shoen, hereby declare as follows:

2    1.    I am over the age of eighteen, of sound mind, and capable of making this
3  declaration. The facts stated in this declaration are within my personal knowledge and
4  are true and correct.

5    2.    I previously filed declarations in this matter on May 24, 2024, and February
6  24, 2025. [*See* Dkt. 48-30; Dkt. 78-3].

7    3.    In light of intervening developments, I now supplement the information
8  contained in those declarations with the following.

9  **Compliance with S.B. 261**

10    4.    The California Air Resources Board ("CARB") held a public workshop on
11  implementation of S.B 253 and S.B 261, on August 21, 2025.  Representatives of U-
12  Haul attended that workshop.

13    5.    At the meeting, CARB stated that on December 1, 2025, it will post a public
14  docket to which Covered Entities must post a public link to the reports S.B. 261 requires.
15  [Slideshow at 27, S.B. 253/261/219 Public Workshop: Regulation Development and
16  Additional    Guidance    (hereinafter    "August    21    Slides"),    *available    at*
17  https://ww2.arb.ca.gov/sites/default/files/2025-
18  08/SB%20253%20261%20workshop%20slides%208-21.pdf].  This is to effectuate the
19  law's requirement that all Covered Entities be in compliance on or before January 1,
20  2026.

21    6.    Consistent with the provisions of S.B. 261, CARB has identified several
22  complex frameworks through which Covered Entities may satisfy the disclosure
23  requirements of S.B. 261, including the Final Report of Recommendations of the Task
24  Force on Climate-Related Financial Disclosures (TCFD), the IFRS Disclosure
25  Requirements, and other reports developed in accordance with any regulated exchange,
26  national government, or other governmental entity.  [August 21 Slides at 28].

27    7.    At the meeting, CARB highlighted key reporting requirements under S.B.
28  261. CARB will require Covered Entities' reports to address principles of governance,

1
DECLARATION OF EDWARD J. SHOEN
CASE NO. 2:24-CV-00801-ODW-PVC

strategy, risk management, and metrics and targets, and has outlined how Covered Entities should address each principle in turn. For example, Covered Entities' reports should describe their governance structure for identifying, assessing, and managing climate-related financial risks and specify management oversight of climate-related risks and opportunities. They should also identify climate-related risks and opportunities that the entity has identified over the short, medium, and long term; the impact of climate-related risks and opportunities on the organization's operations, strategy, and financial planning; and the resilience of this strategy taking into consideration various future climate scenarios.   And Covered Entities have to provide not only a qualitative description of the process they use for identifying, managing, and assessing related risks, but metrics and targets used for such assessment where such information is material. [August 21 Slides at 29-33].

8.    Compliance with S.B. 261 would require U-Haul to pay fees to support the State's implementation of it.  At the August 21 workshop, CARB estimated that each Covered Entity will be required to pay a $1,403 annual implementation fee for S.B. 261. [August 21 Slides at 24.]

9.    This process is already burdensome and will become only more so as the January 1, 2026 deadline approaches in the absence of injunctive relief.

10.   Complying with S.B. 261 would require U-Haul to opine on climate-related risks and post its government-compelled opinion to its website. It would *not* otherwise choose to make such statements of opinion, on matters of considerable public controversy.

11.   Complying with S.B. 261 would force U-Haul to state its opinion on "material risk of harm to immediate and long-term financial outcomes due to physical and transition risks, including, but not limited to, risks to corporate operations, provision of goods and services, supply chains, employee health and safety, capital and financial investments, institutional investments, financial standing of loan recipients and

1    borrowers, shareholder value, consumer demand, and financial markets and economic

2    health." S.B. 261 § 2(a)(2).

3        12.    Following the August 21 workshop, it is clear to U-Haul that these

4    obligations extend to describing its "governance structure for identifying, assessing, and

5    managing climate-related financial risks"; how its governing "Board [oversees] those

6    climate-related risks"; "the actual and potential impacts of climate-related risks and

7    opportunities on the company's operations, strategy, and financial planning"; "the

8    resilience of the organization's strategy, taking into account the future impacts of climate

9    change under various climate scenarios," its qualitative process for "identifying,

10   managing and assessing climate-related risks, and how those considerations and

11   processes are integrated into the organization's overall risk management"; and its

12   "metrics and targets used to assess and manage relevant climate-related risks." [August

13   21 Slides at 30-33.]

14       13.    CARB's guidance makes clear that complying with S.B. 261 would force

15   U-Haul to make subjective assessments on a matter of significant public debate: the

16   precise nature and degree of risk that global climate change poses to individual

17   American businesses' operations. The guidance's own reference to the existence of

18   "various climate scenarios" underscores the uncertain and speculative nature of the

19   matter to which U-Haul will be compelled to speak. [August 21 Slides at 31.]

20       14.    U-Haul considers the information that S.B. 261 requires to be controversial

21   and disagrees with including this type of information on its public website. It has thus

22   far chosen not to participate in this matter of public controversy.

23       15.    Complying with S.B. 261 will thus soon force U-Haul to speak in great

24   detail where it has chosen not to speak and to convey to the public a philosophy of

25   environmental sustainability that it does not believe and is incompatible with the

26   philosophy U-Haul currently expresses in the public square.

27

28

Gibson, Dunn & Crutcher LLP

3

DECLARATION OF EDWARD J. SHOEN
CASE NO. 2:24-CV-00801-ODW-PVC

16.    If U-Haul is required to comply with S.B. 261 on January 1, 2026, the statements that the law compels it to make will be public, and U-Haul will not be able to retract them if the law is later struck down.

17.    Injunctive relief would prevent U-Haul from being forced to speak on these controversial topics while Plaintiffs' appeal from the denial of a preliminary injunction is considered.

18.    In the absence of an injunction pending appeal, U-Haul will suffer an irreparable intrusion upon its First Amendment rights when it is forced to comply with S.B. 261 on or before January 1, 2026.

**Compliance with S.B. 253**

19.    U-Haul is preparing to comply with S.B. 253, and in the absence of an injunction pending appeal, will suffer an irreparable intrusion upon its First Amendment rights when it is forced to comply with S.B. 253 in 2026.

20.    At the August 21 workshop, CARB staff proposed that all Reporting Entities should be in compliance with the Scope 1 and Scope 2 emissions reporting requirements of S.B. 253 by June 30, 2026. [August 21 Slides at 34.] S.B. 253 provides that Scope 3 emissions reporting requirements will take effect in 2027.

21.    Complying with S.B. 253 would require U-Haul to calculate Scope 1, 2, and 3 emissions. Doing so involves several burdensome steps, which only increase as the proposed June 30, 2026 enforcement deadline approaches. These disclosures would go far beyond U-Haul's disclosure requirements under existing state and federal law and regulations.

22.    U-Haul has chosen not to speak on the controversial topic of emissions and not to claim the emissions of other companies as its own. If now forced to do so, U-Haul will not be able to unring that bell. And U-Haul can only speculate on how such speech would affect its relationship with its Dealers and its customers. Such effects could not be undone if S.B. 253 is later declared unlawful.

Gibson, Dunn &
Crutcher LLP

4

23. Moreover, complying with S.B. 253 would require U-Haul to pay fees to support the State's implementation of its requirements. At the August 21 workshop, CARB calculated these fees at $3,106 per year. [August 21 Slides at 24.]

24. Injunctive relief would prevent U-Haul from being forced to speak on these controversial topics while Plaintiffs' appeal from the denial of a preliminary injunction is considered.

**Conclusion**

25. CARB's recent workshop confirms that S.B. 253 and S.B. 261 threaten U-Haul with serious and imminent harm in the coming weeks and months. Those laws will compel U-Haul to speak about highly controversial matters of public policy when it would not otherwise speak.

26. If Plaintiffs do not obtain injunctive relief on behalf of their members, U-Haul will be irreparably injured through the compulsion of its speech no later than January 1, 2026.

27. The Court should enjoin S.B. 253 and S.B. 261 during the pendency of this appeal to prevent these imminent and irreversible harms.

Pursuant to 28 U.S.C. §1746, I, Edward J. Shoen, declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on this 2nd day of September, 2025.

Edward J. Shoen

5
DECLARATION OF EDWARD J. SHOEN
CASE NO. 2:24-CV-00801-ODW-PVC

1   ROB BONTA
    Attorney General of California
2   MYUNG J. PARK (SBN 210866)
    LAURA J. ZUCKERMAN (SBN 161896)
3   Supervising Deputy Attorneys General
    KATHERINE GAUMOND (SBN 349453)
4   EMILY HAJARIZADEH (SBN 325246)
    M. ELAINE MECKENSTOCK (SBN 268861)
5   DYLAN REDOR (SBN 338136)
    DAVID ZAFT (SBN 237365)
6   CAITLAN MCLOON (SBN 302798)
    Deputy General
7    300 South Spring Street, Suite 1702
     Los Angeles, CA  90013-1230
8    Telephone:  (213) 269-6438
     Fax:  (916) 731-2128
9    E-mail:  Caitlan.McLoon@doj.ca.gov
    *Attorneys for Defendants Liane M. Randolph,*
10  *Steven S. Cliff, and Robert A. Bonta*

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE CENTRAL DISTRICT OF CALIFORNIA

13

14  **CHAMBER OF COMMERCE OF**              2:24-cv-00801-ODW-PVC
    **THE UNITED STATES OF**
15  **AMERICA, CALIFORNIA**                 **DEFENDANTS' OBJECTION TO**
    **CHAMBER OF COMMERCE,**                **PLAINTIFFS' EVIDENCE**
16  **AMERICAN FARM BUREAU**                **SUBMITTED IN REPLY IN**
    **FEDERATION, LOS ANGELES**             **SUPPORT OF MOTION FOR**
17  **COUNTY BUSINESS**                     **INJUNCTION PENDING APPEAL**
    **FEDERATION, CENTRAL**
18  **VALLEY BUSINESS**                     Date:          September 15, 2025
    **FEDERATION, and WESTERN**             Time:          1:30 PM
19  **GROWERS ASSOCIATION,**                Courtroom:     5D
                                            Judge:         The Honorable Otis D.
20                     Plaintiffs,                         Wright, II
                                            Trial Date:    Not Set
21          v.                              Action Filed: 1/30/2024

22  **LIANE M. RANDOLPH, in her**
    **official capacity as Chair of the**
23  **California Air Resources Board,**
    **STEVEN S. CLIFF, in his official**
24  **capacity as the Executive Officer of**
    **the California Air Resources Board,**
25  **and ROBERT A. BONTA, in his**
    **official capacity as Attorney General**
26  **of California,**

27                     Defendants.

28

1    Plaintiff filed a Motion for Injunction Pending Appeal on August 20, 2025.

2    Dkt. No. 116. Defendants submitted their Opposition to the Motion on August 29,

3    2025. Dkt. No. 120. Plaintiff filed a Reply in Support of their Motion on September

4    2, 2025, Dkt. No. 122, attaching several pieces of new evidence: the Declaration of

5    Martin Durbin, Dkt. No. 122-1, and accompanying exhibit, Dkt. No. 122-2, and the

6    Supplemental Declaration of Edward J. Shoen, Dkt No. 122-3.

7    It is well settled that the submission of new issues and facts in a reply brief is

8    improper. *Crandall v. Starbucks Corp.*, 249 F. Supp. 3d 1087, 1104 (N.D. Cal.

9    2017) (citing *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996)) ("[C]ourts

10    typically do not consider new evidence first submitted in a reply brief because the

11    opposing party has no opportunity to respond to it."); *see also Tovar v. U.S. Postal

12    Serv.*, 3 F.3d 1271, 1273 n.3 (9th Cir. 1993) (striking portions of reply brief that

13    presented new information).  The testimony and evidence submitted in conjunction

14    with Plaintiffs' reply violates this well-settled prohibition.

15    Both declarations present testimony regarding the alleged compliance burden

16    of reporting under SB 253 and SB 261—testimony that could have been, but was

17    not, submitted with Plaintiffs' motion. Both declarations also purport to

18    characterize information presented by the California Air Resources Board (CARB)

19    at a public workshop updating the public and seeking input regarding the status of

20    regulatory development for SB 253 and SB 261—information which neither

21    reflects the final position of the agency, nor carries any force of law, and

22    characterizations with which CARB disagrees.

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///

2

1    Defendants object to Plaintiffs' attempt to introduce new evidence in support

2  of their motion for an injunction pending appeal by attaching it to their reply brief.

3  Accordingly, Defendants object to the admission and/or consideration of the

4  Declaration of Martin Durbin, Dkt. 122-1, and accompanying exhibit, Dkt. No.

5  122-2, and the Supplemental Declaration of Edward J. Shoen, Dkt. 122-3.

6

7  Dated:  September 4, 2025                    Respectfully submitted,

8                                              ROB BONTA
                                               Attorney General of California
9                                              MYUNG J. PARK
                                               Supervising Deputy Attorney General
10                                             KATHERINE GAUMOND
                                               EMILY HAJARIZADEH
11                                             M. ELAINE MECKENSTOCK
                                               DYLAN REDOR
12                                             DAVID ZAFT
                                               Deputy Attorneys General

13

14                                             /s/ Caitlan McLoon
                                               CAITLAN MCLOON
15                                             Deputy Attorney General
                                               *Attorneys for Defendants Liane M.*
16                                             *Randolph, Steven S. Cliff, and Robert*
                                               *A. Bonta*
17

18  SA2024300503
    67914192
19

20

21

22

23

24

25

26

27

28

3

<u>**CERTIFICATE OF SERVICE**</u>

Case Name:   **Chamber of Commerce of the United States of America, et al.**
             **v. Liane M. Randolph, et al.**

Case No.:    **2:24-cv-00801-ODW-PVC** _____

I hereby certify that on <u>September 4, 2025</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANTS' OBJECTION TO PLAINTIFFS' EVIDENCE SUBMITTED IN REPLY IN SUPPORT OF MOTION FOR INJUNCTION PENDING APPEAL**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>September 4, 2025</u>, at Los Angeles, California.

_____           _____
        Beatriz Davalos                    */s/ Beatriz Davalos*
          Declarant                            Signature

SA2024300503
66591334.docx

4

1  EUGENE SCALIA, SBN 151540
2      escalia@gibsondunn.com
   GIBSON, DUNN & CRUTCHER LLP
3  1700 M St. N.W.
   Washington, D.C.  20036
4  Telephone:  202.955.8500
   Facsimile:   202.467.0539
5

6  *Attorneys for Plaintiffs Chamber of
   Commerce of the United States of Amer-*
7  *ica, California Chamber of Commerce,
   American Farm Bureau Federation, Los*
8  *Angeles County Business Federation,
   Central Valley Business Federation,*
9  *and Western Growers Association*

10 (*Additional counsel listed on next page*)

11           IN THE UNITED STATES DISTRICT COURT

12         FOR THE CENTRAL DISTRICT OF CALIFORNIA,

13                   WESTERN DIVISION

14

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION, | CASE NO. 2:24-cv-00801-ODW-PVC **PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTION TO EVIDENCE SUBMITTED IN REPLY** **HEARING:** Date:      September 15, 2025 Time:      1:30 pm Location:  Courtroom 5D Judge:     Otis D. Wright II |

15
16
17
18
19
20                     Plaintiffs,
21          v.
22 LIANE M. RANDOLPH, in her official
23 capacity as Chair of the California Air
   Resources Board, STEVEN S. CLIFF, in
24 his official capacity as the Executive
   Officer of the California Air Resources
25 Board, and ROBERT A. BONTA, in his
   official capacity as Attorney General of
26 California.
27                     Defendants.
28

Gibson, Dunn &
Crutcher LLP

1  BRADLEY J. HAMBURGER
2     SBN 266916
      bhamburger@gibsondunn.com
3  SAMUEL ECKMAN
      SBN 308923
4     seckman@gibsondunn.com
5  ELIZABETH STRASSNER
      SBN 342838
6     estrassner@gibsondunn.com
7  GIBSON, DUNN & CRUTCHER LLP
   333 South Grand Ave.
8  Los Angeles, CA  90071-3197
   Telephone:  213.229.7000
9  Facsimile:   213.229.7520

10 BRIAN A. RICHMAN
   (*pro hac vice*)
11    DC Bar No. 230071
      brichman@gibsondunn.com
12 GIBSON, DUNN & CRUTCHER LLP
   2001 Ross Ave., Suite 2100
13 Dallas, TX  75201-2923
   Telephone:  214.698.3100
14 Facsimile:   214.571.2900

15 *Attorneys for Plaintiffs Chamber of Commerce of the United States of America, Cali-*
16 *fornia Chamber of Commerce, American Farm Bureau Federation, Los Angeles*
   *County Business Federation, Central Valley Business Federation, and*
17 *Western Growers Association*

18 STEPHANIE A. MALONEY
   (*pro hac vice*)
19    DC Bar No. 104427
      smaloney@uschamber.com
20 KEVIN PALMER
21 (*pro hac vice*)
      DC Bar No. 90014967
22    kpalmer@uschamber.com
23 CHAMBER OF COMMERCE OF THE
   UNITED STATES OF AMERICA
24 1615 H Street, NW
   Washington, D.C.  20062-2000
25 Telephone:  202.659.6000
   Facsimile:   202.463.5302
26
27 *Attorneys for Plaintiff Chamber of Commerce of the United States of America*

28

Gibson, Dunn &
Crutcher LLP

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTION TO EVIDENCE SUBMITTED IN REPLY
CASE NO. 2:24-CV-00801-ODW-PVC

1    The State's evidentiary objection (Dkt. 123) should be overruled. The challenged

2    declarations respond to issues first raised in the State's opposition and reflect develop-

3    ments after Plaintiffs filed their motion for injunction pending appeal on August 20,

4    2025 (Dkt. 116). In opposing that motion, the State argued there is no imminent harm

5    because SB 253's implementing regulations are delayed, citing an August 21 CARB

6    "Public Workshop" on "regulation development." Dkt. 120 at 2–3, 4, 18; Dkt. 120-1 at

7    2. The Durbin and Shoen declarations (Dkts. 122-1, 122-3) provide the Court with cur-

8    rent, material facts from that very workshop—facts Plaintiffs could not have presented

9    earlier. The State cannot have it both ways: it cannot rely on the workshop to argue

10   there is no urgency, then disown it now that Plaintiffs have provided the full context.

11   *See Terrell v. Contra Costa Cnty.*, 232 F. App'x 626, 628–29 & n.2 (9th Cir. 2007)

12   (allowing reply material that addressed the same facts as the opposition but provided

13   "the full context").

14       Reply declarations are permissible when offered to rebut opposition arguments or

15   address changed circumstances. *See, e.g., Farmer v. Barkbox, Inc.*, 2023 WL 3149278,

16   at *1 (C.D. Cal. Apr. 11, 2023) ("'[E]vidence submitted with a reply brief is not new

17   evidence when it is submitted to rebut arguments raised in the opposition brief.'"); *ac-*

18   *cord United States v. Topkov*, 2015 WL 12683792, at *4 (C.D. Cal. Feb. 5, 2015); *Ad-*

19   *vanced Media Networks LLC v. Row 44, Inc.*, 2014 WL 5760545, at *1 (C.D. Cal. Nov.

20   4, 2014); *Burke v. City of Santa Monica*, 2010 WL 11549357, at *3 (C.D. Cal. Nov. 2,

21   2010); *see also* C.D. Cal. L.R. 7-10 ("A moving party may . . . serve and file a reply

22   memorandum, *and declarations or other rebuttal evidence*." (emphasis added)). The

23   declarations here do both, and their consideration would provide an informed equitable

24   analysis. Striking them would deprive the Court of the most current evidence—evidence

25   the State itself put at issue.

26

27

28

Gibson, Dunn &
Crutcher LLP

1

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTION TO EVIDENCE SUBMITTED IN REPLY
CASE NO. 2:24-CV-00801-ODW-PVC

DATED:  September 8, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:  */s/ Bradley J. Hamburger*

Eugene Scalia, SBN 151540
Bradley J. Hamburger, SBN 266916
Samuel Eckman, SBN 308923
Brian A. Richman (*pro hac vice*)
Elizabeth Strassner, SBN 342838

*Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation and Western Growers Association*

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA

Stephanie A. Maloney (*pro hac vice*)
Kevin Palmer (*pro hac vice*)

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*

2

**O**

# United States District Court
# Central District of California

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA et al., | Case № 2:24-cv-00801-ODW (PVCx) |
| Plaintiffs, | **ORDER DENYING PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL [116]** |
| v. | |
| CALIFORNIA AIR RESOURCES BOARD et al., | |
| Defendants. | |

## I.    INTRODUCTION

Plaintiffs bring this action challenging California Senate Bills ("SB" or "SBs") 253 and 261 for violations of the First Amendment.  (*See* First Am. Compl. ("FAC") ¶¶ 92–112, ECF No. 28.)   Plaintiffs moved for a preliminary injunction seeking to enjoin both laws, (Mot. Prelim Inj., ECF No. 78), and the Court denied the motion, (Order Den. Prelim. Inj. ("Order PI"), ECF No. 112).  Plaintiffs now move for an injunction pending appeal.  (Mot. Inj. Pending Appeal ("Motion" or "Mot."), ECF No. 116.)  For the reasons below, the Court **DENIES** Plaintiffs' Motion.[1]

---

[1] Having carefully considering the papers filed in support of the Motion, the Court deems the matter appropriate for decision without oral argument.   Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15. Accordingly, the Court **VACATES** the September 15, 2025 hearing.

## II.  BACKGROUND

The Court incorporates by reference the background in the Court's Order denying Plaintiffs' motion for preliminary injunction. (Order PI 2–6.)

On February 25, 2025, Plaintiffs moved for a preliminary injunction, asking the Court to enjoin SBs 253 and 261 on First Amendment grounds. (*See generally* Mot. Prelim. Inj.)  The Court denied Plaintiffs' motion. (Order PI).  Plaintiffs appealed the Court's Order to the Ninth Circuit. (Notice Appeal, ECF No. 114.)  Plaintiffs now ask the Court to enjoin the enforcement of SBs 253 and 261 during the pendency of the appeal. (Mot. 1.)  The Motion is fully briefed. (Opp'n, ECF No. 120; Reply, ECF No. 122.)[2]

## III.  LEGAL STANDARD

The standard for issuing an injunction pending appeal is similar to that governing a motion for a preliminary injunction. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Feldman v. Ariz. Sec'y of State's Off.*, 843 F.3d 366, 367 (9th Cir. 2016). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  It "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20; *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1115 (9th Cir. 2024).  The first two factors are "the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009).  Where, as here, the party opposing injunctive relief is a government entity, "the third and fourth factors 'merge.'" *X Corp. v. Bonta*, 116 F.4th 888, 898

---

[2] The Court declines to consider Plaintiffs' arguments and accompanying evidence submitted for the first time in their reply brief pertaining to the burden of compliance with SBs 253 and 261. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."); *see also Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (noting that courts will not consider new evidence first submitted in a reply brief because the opposing party has no opportunity to respond to it).

2

1   (9th Cir. 2024) (quoting *Fellowship of Christian Athletes v. San Jose Unified Sch.*
2   *Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023)).

3        In the Ninth Circuit, the *Winter* factors may be evaluated on a sliding scale:
4   "serious questions going to the merits and a balance of hardships that tips sharply
5   towards the plaintiff can support issuance of a preliminary injunction, so long as the
6   plaintiff also shows that there is a likelihood of irreparable injury and that the
7   injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d
8   1127, 1135 (9th Cir. 2011) (internal quotation marks omitted).

9        Plaintiffs seeking a preliminary injunction bear a "heavy burden." *Earth Island*
10  *Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (discussing that plaintiffs "face a
11  difficult task in proving that they are entitled to this 'extraordinary remedy'").

12                    **IV.    DISCUSSION**

13       Plaintiffs argue that they are entitled to injunctive relief under the "sliding
14  scale" approach to the *Winter* standard.  (Mot. 2.)   Accordingly, the Court first
15  determines if there are "serious questions going to the merits," before examining
16  whether the "balance of hardships tips sharply in the plaintiff's favor." *All. for the*
17  *Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017).

18  **A.    Serious Questions Going to the Merits**

19       Plaintiffs have not shown that they raise "serious questions going to the merits."
20  *Id.*  As an initial matter, the "serious questions" approach does not require a "separate
21  and independent analysis from the court's assessment of [a plaintiff's] likelihood of
22  success on the merits." *Lopez v. Brewer*, 680 F.3d 1068, 1073 (9th Cir. 2012).  When
23  a plaintiff fails to demonstrate a likelihood of success on the merits, the plaintiff
24  necessarily cannot establish that there are serious questions going to the merits. *Id.*;
25  *see Cottrell*, 632 F.3d at 1135–36 (assessing the plaintiffs' likelihood of success on
26  the merits under the "serious questions" approach).

27       The Court previously considered—and rejected—Plaintiffs' argument that they
28  show a likelihood of success on the merits.  (Order PI 26–40.)  It held that "Plaintiffs

have not shown a likelihood of success on the merits with respect to either of its facial First Amendment challenges to SBs 253 and 261." (*Id.* at 40.)  Plaintiffs now ask the Court to revisit its conclusion but fail to show any material changes warranting the Court's reconsideration.  (*Id.* at 26–40; *see* Mot. 5–14.)  It follows that Plaintiffs also fail to show that they raise serious questions going to the merits.  *See Lopez*, 680 F.3d at 1073 ("Because the district court did not err in determining that [the plaintiff] failed to demonstrate a likelihood of success on the merits, it follows that [the plaintiff] also failed to raise serious questions going to the merits.").

Accordingly, Plaintiffs' Motion is denied on this basis alone.  *See Ravalli Cnty. Republican Cent. Comm. v. McCulloch*, No. 15-35967, 2016 WL 1161301, at *1 (9th Cir. Mar. 3, 2016) ("Because appellants have made an insufficient showing of either likelihood of success on the merits or the likelihood of irreparable harm, the motion [for injunction pending appeal] is denied." (citation omitted)).

**B.    Balance of Hardships**

For the same reasons, Plaintiffs also fail to demonstrate that the balance of hardships tips sharply in their favor.  The Court previously held that because Plaintiffs "have not demonstrated that the laws violate the First Amendment, they have also not shown irreparable harm."  (Order PI 40.)  As above, Plaintiffs offer nothing to disturb this conclusion.  Thus, Plaintiffs fail to show that the balance of hardships tips sharply in their favor.  *CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 852 (9th Cir. 2019) (finding challengers failed to demonstrate any hardship tipping the balance in their favor where their "First Amendment claim is unlikely to succeed").

As Plaintiffs have not satisfied the first two, and most critical, factors under the "sliding scale" approach to the *Winter* test, the Court need not address the remaining factors.  Accordingly, the Court finds that Plaintiffs have failed to meet their burden required to obtain injunctive relief and declines to issue the injunction pending appeal.

4

## V.   CONCLUSION

For the reasons discussed above, the Court **DENIES** Plaintiffs' Motion for Injunction Pending Appeal.  (ECF No. 116.)

**IT IS SO ORDERED.**

September 11, 2025

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**

App.776