No. 25-5327

# United States Court of Appeals
# for the Ninth Circuit

_____

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION,

*Plaintiffs-Appellants*,

v.

LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California,

*Defendants-Appellees.*

_____

On Appeal from an order of the
United States District Court for the Central District of California,
Case No. 2:24-cv-801, Judge Otis D. Wright, II

## BRIEF OF PLAINTIFFS-APPELLANTS

Stephanie A. Maloney
Kevin Palmer
CHAMBER OF COMMERCE OF THE
  UNITED STATES OF AMERICA
1615 H St., N.W.
Washington, DC 20062
(202) 659-6000

*Counsel for Plaintiff-Appellant
Chamber of Commerce of the
United States of America*

Eugene Scalia
Jonathan C. Bond
Brian A. Richman
GIBSON, DUNN & CRUTCHER LLP
1700 M St., N.W.
Washington, DC 20036
(202) 955-8500
EScalia@gibsondunn.com

Bradley J. Hamburger
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071
(213) 229-7000

*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, undersigned counsel certifies that Plaintiffs-Appellants the U.S. Chamber of Commerce, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association have no parent corporations and no publicly held corporation owns 10% or more of their stock.

Dated: September 18, 2025

*s/ Eugene Scalia*
Eugene Scalia

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................... i

TABLE OF CONTENTS ............................................................ ii

TABLE OF AUTHORITIES ......................................................... v

INTRODUCTION ................................................................. 1

STATEMENT OF JURISDICTION ................................................... 4

ISSUE PRESENTED .............................................................. 4

PERTINENT CONSTITUTIONAL  AND STATUTORY
    PROVISIONS ............................................................. 4

STATEMENT OF THE CASE ........................................................ 5

    A.    Statutory Background ................................................. 5

        1.    SB 261 Forces Companies To Publish Reports
            Assessing Climate Issues On Their Own Websites ...... 5

        2.    SB 253 Forces Companies To Report Greenhouse-
            Gas Emissions, Including Those Of Their
            Suppliers, Customers, And Employees ................... 8

        3.    The Legislature Openly States Its Goal Of Using
            Compelled Speech To Shame And Pressure
            Corporations ...................................................... 13

    B.    Procedural History .................................................... 14

SUMMARY OF THE ARGUMENT .................................................... 21

STANDARD OF REVIEW .......................................................... 24

ARGUMENT .................................................................... 25

I.    Plaintiffs Are Likely To Prevail Because SB 253 And SB 261
    Compel Speech In Violation Of The First Amendment ................ 26

    A.    SB 253 And SB 261 Compel Speech And Fail Strict
        Scrutiny ............................................................... 26

    B.    The District Court Erred In Applying Lesser Scrutiny ...... 31

        1.    The Laws Do Not Regulate Commercial Speech ........ 31

2.    SB 253 Is Not Subject To *Zauderer* ............................. 38

    a)    SB 253 Is Not Limited Supplementation .......... 40

    b)    SB 253 Disclosures Do Not Concern A Product Or Service On Offer ............................. 41

    c)    SB 253 Compels Speech That Is Neither Purely Factual Nor Uncontroversial ................. 43

C.    The Laws Fail Under Any Level Of Scrutiny ....................... 47

    1.    Neither Statute Is Tailored To Preventing Fraud ..... 49

        a)    There Is No Record Of Actual Deception........... 49

        b)    The Mandates Are Grossly Overbroad And Untethered to Any Evidence of Deception ........ 51

    2.    The State's Emissions-Reduction Rationale Also Collapses Under Scrutiny.......................................... 54

        a)    The State Previously Disclaimed An Emissions-Reduction Justification For The Compelled Speech ................................................ 55

        b)    The State Ignored Less Speech-Restrictive Alternatives To Reduce Emissions ................... 59

    3.    The State's Claimed Interest In Transparency To Consumers And Investors Cannot Justify Compelled Speech ......................................................... 61

        a)    Merely Providing Information Is Not A Substantial Government Interest...................... 62

        b)    The Laws Are Not Tailored To Any Legitimate Informational Interest..................... 64

II.    The Equities Overwhelmingly Favor An Injunction ................... 69

A.    Plaintiffs Face Irreparable First Amendment Harm and Compliance Costs They Cannot Recover ...................... 70

B.    The Balance Of Equities And Public Interest Tip Sharply in Plaintiffs' Favor .................................................. 73

CONCLUSION ....................................................................... 75

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS................ 76

ADDENDUM OF PERTINENT CONSTITUTIONAL
PROVISIONS AND STATUTES.............................................77

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*44 Liquormart, Inc v. Rhode Island.*,
  517 U.S. 484 (1996)..........................................................58, 59, 60, 61

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023)..............................................................27

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011)..............................................24

*Am. Beverage Ass'n v. City of San Francisco*,
  916 F.3d 749 (9th Cir. 2019).....................................3, 42, 53

*Am. Meat Inst. v. USDA*,
  760 F.3d 18 (D.C. Cir. 2014).......................39, 40, 42, 62, 63

*Ams. for Prosperity Found. v. Bonta*,
  594 U.S. 595 (2021)..............................................................30

*Assurance Wireless USA, L.P. v. Reynolds*,
  100 F.4th 1024 (9th Cir. 2024)............................................69

*Bates v. State Bar of Ariz.*,
  433 U.S. 350 (1977)..............................................................40

*Bolger v. Youngs Drug Products Corp.*,
  463 U.S. 60 (1983).......................................17, 33, 34, 35, 37

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
  29 F.4th 468 (9th Cir. 2022)............................................3, 70

*Cal. Democratic Party v. Jones*,
  530 U.S. 567 (2000)..............................................................56

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
  447 U.S. 557 (1980) .................................................... 22, 31, 48, 61, 64

*City of Cincinnati v. Discovery Network, Inc.*,
  507 U.S. 410 (1993) ................................................................... 32

*City of Ladue v. Gilleo*,
  512 U.S. 43 (1994) ..................................................................... 67

*City of New York v. Chevron Corp.*,
  993 F.3d 81 (2d Cir. 2021) ........................................................ 55

*City of San Francisco v. U.S. Customs & Immigration Serv.*,
  981 F.3d 742 (9th Cir. 2020) ................................................ 72, 74

*CTIA—The Wireless Ass'n v. City of Berkeley*,
  928 F.3d 832 (9th Cir. 2019) ........................... 35, 40, 41, 42, 61, 62, 63

*Dex Media W., Inc. v. City of Seattle*,
  696 F.3d 952 (9th Cir. 2012) ...................................................... 34

*Diamond Alternative Energy, LLC v. EPA*,
  145 S. Ct. 2121 (2025) .............................................................. 56

*Edenfield v. Fane*,
  507 U.S. 761 (1993) .................................................................. 56

*Ent. Software Ass'n v. Blagojevich*,
  469 F.3d 641 (7th Cir. 2006) ...................................................... 43

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*,
  82 F.4th 664 (9th Cir. 2023) ...................................................... 73

*Florida Star v. B.J.F.*,
  491 U.S. 524 (1989) .................................................................. 61

*Green v. Miss U.S. of Am., LLC*,
  52 F.4th 773 (9th Cir. 2022) ...................................................... 56

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
  515 U.S. 557 (1995) .............................................................. 27

*IMDb.com Inc. v. Becerra*,
  962 F.3d 1111 (9th Cir. 2020) .......................... 32, 33, 34, 38

*Int'l Dairy Foods Ass'n v. Amestoy*,
  92 F.3d 67 (2d Cir. 1996) .............................................. 62, 67

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council
  31*,
  585 U.S. 878 (2018) .............................................................. 25

*Junior Sports Magazines Inc. v. Bonta*,
  80 F.4th 1109 (9th Cir. 2023) ........................... 49, 50, 51, 58

*Matsumoto v. Labrador*,
  122 F.4th 787 (9th Cir. 2024) ............................................. 73

*McCullen v. Coakley*,
  573 U.S. 464 (2014) ........................................................ 30, 54

*Meinecke v. City of Seattle*,
  99 F.4th 514 (9th Cir. 2024) .............................. 24, 25, 28, 31

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) .............................................................. 30

*NAM v. SEC*,
  748 F.3d 359 (D.C. Cir. 2014) ............................................. 60

*NAM v. SEC*,
  800 F.3d 518 (D.C. Cir. 2015) ............................................. 44

*Nat'l Ass'n of Wheat Growers v. Bonta*,
  85 F.4th 1263 (9th Cir. 2023) ........................ 3, 29, 30, 43, 48, 54, 60

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
  272 F.3d 104 (2d Cir. 2001) .......................................... 63, 64

*Nat'l Inst. of Family Life Advocs. v. Becerra* (*NIFLA*),
  585 U.S. 755 (2018)...... 23, 25, 27, 28, 38, 41, 42, 49, 51, 52, 53, 65, 68

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
  606 U.S. —, 2025 WL 2415669 (2025) ................................................ 71

*Nationwide Biweekly Admin., Inc. v. Owen*,
  873 F.3d 716 (9th Cir. 2017)................................................................ 35

*NetChoice, LLC v. Bonta*,
  113 F.4th 1101 (9th Cir. 2024) .......................... 3, 29, 30, 31, 33, 36, 37

*Nken v. Holder*,
  556 U.S. 418 (2009).............................................................................. 73

*NRA v. Vullo*,
  602 U.S. 175 (2024).............................................................................. 60

*Pharm. Rsch. & Mfrs. of Am. v. Stolfi*,
  — F.4th —, 2025 WL 2448851 (9th Cir. Aug. 26, 2025) ....... 32, 35, 36,
                                                                                    37, 47

*Reed* v. *Town of Gilbert*,
  576 U.S. 155 (2015)........................................................................ 28, 31

*Retail Digital Network, LLC v. Prieto*,
  861 F.3d 839 (9th Cir. 2017) (en banc)................................................ 59

*Riley v. Nat'l Fed'n of the Blind*,
  487 U.S. 781 (1988).............................................................................. 27

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020)................................................................................ 70

*Rubin v. Coors Brewing Co.*,
  514 U.S. 476 (1995)........................................................................ 57, 60

*Ruckelshaus v. Monsanto Co.*,
  463 U.S. 1315 (1983)............................................................................ 74

viii

*S.F. Apartment Ass'n v. San Francisco*,
    881 F.3d 1169 (9th Cir. 2018)................................................................. 35

*Vill. of Schaumburg v. Citizens for a Better Env't*,
    444 U.S. 620 (1980)........................................................................... 54

*W. States Med. Ctr. v. Shalala*,
    238 F.3d 1090 (9th Cir. 2001)............................................................. 58

*Washington v. Trump*,
    145 F.4th 1013 (9th Cir. 2025) .......................................................... 72

*Watts v. United States*,
    394 U.S. 705 (1969)........................................................................... 44

*Winter v. NRDC*,
    555 U.S. 7 (2008)............................................................................... 24

*Wooley v. Maynard*,
    430 U.S. 705 (1977)........................................................................... 28

*X Corp. v. Bonta*,
    116 F.4th 888 (9th Cir. 2024) ...................... 3, 30, 31, 34, 35, 37, 62, 63

*Zauderer v. Office of Disciplinary Counsel*,
    471 U.S. 626 (1985)......................... 2, 17, 18, 19, 31, 38, 39, 40, 41, 42,
                                            43, 48, 52, 53, 54, 61, 63, 64, 65

## Statutes

28 U.S.C.
    §1292 ................................................................................................. 4
    §1331 ................................................................................................. 4

42 U.S.C. §1983 ..................................................................................... 4

Act of Sept. 27, 2024, ch. 766 (Cal.) ....................................................... 74

Cal. Health & Safety Code
    § 38532 ............................................................................................... 4
    § 38533 ............................................................................................... 4

**Rules**

Fed. R. App. P. 4(a)(1)(A) ................................................................ 4

**Other Authorities**

89 Fed. Reg. 21,668 (SEC Mar. 28, 2024)..........................................10, 67

89 Fed. Reg. 25,804 (SEC Apr. 12, 2024) .........................................11, 12

## INTRODUCTION

California seeks to skew public debate on climate change by forcing companies across the country to convey the State's preferred messages on that controversial topic. Beginning January 1, one law (SB 261) will compel thousands of businesses to engage in speculative, judgment-laden, and politically-charged speech about what California has deemed their "climate-related risks." Six months later, another law (SB 253) will force companies to attribute greenhouse-gas emissions, including those of third parties, to themselves. All of this requires extensive work today, and will shortly force companies to engage against their will in speech with which they strongly disagree. Indeed, the State's admitted aim is to "embarras[s]" companies and to "make sure the public actually knows who's green and who isn't," in California's judgment. 8-ER-1985, 8-ER-2012.

Conscripting private speakers to one side of a divisive issue, on pain of civil penalties, is anathema to the First Amendment. And the harm caused by compelling speech that can never be unsaid is obvious and ir-reparable. Because Plaintiffs are likely to succeed on the merits, face irreparable harm absent relief, and because the balance of equities and

1

the public interest favor interim relief, they are entitled to a preliminary injunction against SB 261 and SB 253 while this suit challenging the statutes proceeds.

The district court denied a preliminary injunction, but its decision is irreconcilable with core First Amendment principles. The court acknowledged that both SB 261 and SB 253 compel speech—which typically triggers strict scrutiny, a standard the State did not attempt to meet and could not plausibly satisfy. But the court applied only intermediate scrutiny to SB 261, deeming mandatory publication of state-defined "climate risks" mere *commercial* speech. And it evaluated SB 253's emissions-reporting edict under the standard in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985)—for warnings to clients or consumers about products or services for sale.

Applying those less stringent standards was legal error, but neither law could survive any form of First Amendment review. The speech compelled does not propose a commercial transaction and does not relate to any particular product or service. These mandates require all companies over a certain size to publish uniform, state-defined narratives, regard-

2

less of the accuracy and relevance to them and regardless of what, if anything, a particular company has said about climate change. Both laws also thrust massive compliance burdens on companies that far outweigh any cognizable benefit California claims.

The remaining preliminary-injunction factors—which the district court barely considered—also strongly support relief. The harm of being forced to convey the State's preferred narrative can never be undone. And to meet these compelled-speech deadlines, companies already are incurring unrecoverable compliance burdens—the State is instructing them to take steps now to meet its deadlines. For its part, California cannot identify any urgent need for companies to satisfy these novel mandates before their constitutionality is determined by the courts.

*　　*　　*

This Court has seen this before: California compels speech, forcing this Court to enjoin it. *See X Corp. v. Bonta*, 116 F.4th 888 (9th Cir. 2024); *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024); *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263 (9th Cir. 2023); *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468 (9th Cir. 2022); *Am. Beverage Ass'n v. City of San Francisco*, 916 F.3d 749

(9th Cir. 2019). The same course is warranted here. The Court should reverse and remand for immediate issuance of a preliminary injunction.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 because this case arises under the First Amendment and 42 U.S.C. § 1983. 9-ER-2186–87, -2204–08.

The district court denied Plaintiffs' motion for a preliminary injunction on August 13, 2025. 1-ER-1–42. Plaintiffs filed a timely notice of appeal (9-ER-2241–88) on August 20, 2025. Fed. R. App. P. 4(a)(1)(A).

This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## ISSUE PRESENTED

Whether the district court erred in denying a preliminary injunction against SB 253 and SB 261.

## PERTINENT CONSTITUTIONAL
## AND STATUTORY PROVISIONS

The First Amendment to the United States Constitution is reproduced at 79. SB 253 is codified at § 38532 of the California Health and Safety Code and reproduced at 80. SB 261 is codified at § 38533 of the California Health and Safety Code and reproduced at 97.

## STATEMENT OF THE CASE

### A.    Statutory Background

This case concerns "first in the nation" compelled-speech mandates (8-ER-1934) that are less defensible and more burdensome than prior California disclosure laws this Court has previously enjoined. SB 253 and SB 261 both impose sweeping, stand-alone reporting mandates under which companies must publish lengthy, judgment-laden statements on one of the most contested policy issues of our time. Their admitted purpose is to "embarras[s]" companies that do not fit California's notion of "who's green." 8-ER-1985, -2012. And they are not tailored to correcting misleading speech. They sweep in companies that have chosen not to state any position on climate issues, have no investors, or sell no products in California.

### 1.    SB 261 Forces Companies To Publish Reports Assessing Climate Issues On Their Own Websites

Beginning January 1, 2026, SB 261 will force thousands of companies nationwide to speak publicly about climate change, in California's terms and under threat of penalty. The statute applies to any entity with more than $500 million in annual revenue that does business in California. It has no de minimis exception, and applies regardless of whether a

5

covered company has spoken publicly on climate issues, has California investors, or even sells products in the State. § 2(a)(4), (b). The mandate is expected to cover more than 10,000 companies. 3-ER-344.

Every covered company must publish, biennially, what SB 261 labels a "climate-related financial risk" report. The report's contents are dictated by the "final report" of the "Task Force on Climate-related Financial Disclosures" (TCFD), a roughly 100-page document (8-ER-1814–87) incorporated by reference into SB 261. § 2(b)(1)(A)(i). Under the TCFD, companies must address and speculate about various climate-related issues. For example, companies must:

- Describe and assess risks posed by a vast array of climate-related matters, ranging from "cyclones" to changes in government "policy." 8-ER-1826, -1883.

- Explain the roles of their executives and directors in managing such climate risks. 8-ER-1835, -1840.

- Include "scenario analysis," which means modeling how the business would fare under hypothetical future climate conditions (*e.g.*, a world where global warming is limited to 2° C). 8-ER-1846–51.

6

- Outline risk-management processes. 8-ER-1842–43.

- Disclose metrics and targets, including how climate considerations affect capital allocation, R&D priorities, and even executive compensation. 8-ER-1818–19, -1836, -1831, -1858.

All disclosures must be "specific and complete." 8-ER-1839. A recent presentation by the State published on its website reiterates and elaborates upon these requirements. 2-ER-56–102.

The TCFD acknowledges a "high degree of uncertainty" when assessing climate risk and the need to weigh and balance many "factors." 8-ER-1856. It concedes that information is "not always clear or direct," and therefore compliance "may be challenging." 8-ER-1829. The reports require predictive judgments about uncertain future events, inevitably shaped by subjective assumptions about climate science, economics, and politics: How might global climate change affect operations decades from now? 8-ER-1831. How will regulators and markets respond? 8-ER-1826–27. How will consumers behave? 8-ER-1831. Companies must speculate—and then defend their strategies publicly (8-ER-1835)—even if, in their judgment, climate change poses no material threat to their business.

SB 261 requires companies to post this report on their own websites, regardless of whether the company speaks elsewhere about sustainability. The deadline is fast approaching. Reports must be posted by January 1, 2026, and the portal for submissions opens December 1, 2025. 2-ER-106, -51. Noncompliance can trigger civil penalties up to $50,000 per reporting year. § 2(e)(1). Covered entities also must pay annual fees into a State-controlled fund that funds the program. § 2(c)(1); 2-ER-80.

### 2. SB 253 Forces Companies To Report Greenhouse-Gas Emissions, Including Those Of Their Suppliers, Customers, And Employees

SB 253, titled the Corporate Data Accountability Act, compels thousands of companies to publish the State's preferred accounting of "their" greenhouse-gas emissions—even where those emissions are produced by *others*. § 1(e). The law applies to any entity with more than $1 billion in annual revenue that "does business in California." § 2(b)(2). It is expected to cover more than 5,000 companies. 3-ER-344. Like SB 261, SB 253 is not tailored to advertising, investors, or sales in the State, and it applies regardless of what a company has said about emissions, or whether it has spoken at all.

SB 253 requires covered companies, annually, to publicly report emissions across three categories, using the "Greenhouse Gas Protocol" (GHG Protocol). § 2(c)(1)(A)(ii). Beginning in June 2026, companies must determine and report direct emissions from sources the company owns or controls (Scope 1) and indirect emissions from purchased energy (Scope 2). Starting in 2027, companies must determine and report all other emissions across the value chain—including those from suppliers, contractors, and customers (Scope 3). § 2(c)(1)(A)(i)(II).

By design, SB 253 thus forces each covered company to claim the emissions of third parties as its own emissions. It treats as a company's "emissions" the fuel a customer burns, the electricity a utility generates, and the emissions from shipping a product to a retailer—such as the diesel burned by an independent trucking company. That attribution reflects California's viewpoint on who bears responsibility for emissions. 2-ER-319. Many companies, however, disagree. 3-ER-441–47; 3-ER-435–36.

At the same time, SB 253 precludes businesses from taking account of "avoided" or offsetting emissions, also known as "Scope 4." 3-ER-444, 2-ER-320. A company that invents a more efficient appliance or logistics

system—one that slashes downstream energy use and prevents millions of tons of emissions—gets no credit.  3-ER-444.

SB 253's emissions estimates are not hard facts.  As the federal government has explained, emissions typically cannot be "[d]irect[ly] measure[d]."  89 Fed. Reg. 21,668, 21,727/3 (SEC Mar. 28, 2024).  The Greenhouse Gas Protocol itself admits data gaps, proxying, and modeling choices that can swing results dramatically.  7-ER-1547–49.  Under SB 253, companies must cobble together estimates across sprawling supply chains—relying on industry averages and assumptions about entities they neither own nor control.  The Act then forces those inherently uncertain figures to appear as a company's official "emissions."  3-ER-441–45.

SB 253 goes much farther than a rule adopted by the Securities and Exchange Commission during the last presidential Administration.  That rule required public companies to disclose Scope 1 and Scope 2 emissions only when "material," and it declined to mandate Scope 3 disclosures altogether.  89 Fed. Reg. 21,668, 21,733/1-2 (SEC Mar. 28, 2024).  The SEC explained that such a requirement would impose significant burdens and rely on data that is not "reliabl[e]" or "robus[t]."  *Id.* at 21,736/1.  (The

SEC agreed to stay that rule, which also is under legal challenge, pending the outcome of the litigation—the same relief Plaintiffs seek here. 89 Fed. Reg. 25,804, 25,805/2-3 (SEC Apr. 12, 2024).)

SB 253 requires companies to file their reports publicly through a State-designated reporting organization, obtain third-party assurance of the data's accuracy, and make the reports publicly available in a State-run database. § 2(c)(2). The law also directs the State to prepare a synthesized, academic-style summary of the disclosures—further amplifying the compelled speech. § 2(d)(1). Companies must pay fees to fund the program—financing the apparatus that compels and amplifies their own speech—and face civil penalties up to $500,000 per year (with only a narrow, time-limited Scope 3 safe harbor). § 2(f)(2)(A).

The burdens are substantial and immediate. Scope 3 reporting alone can cost more than $1 million per year for many companies. 3-ER-440, -436. These costs include hiring consultants, building internal reporting systems, and gathering data from suppliers who may be unwilling or unable to provide reliable information. 3-ER-440, -435–36. For example, U-Haul explained it would have to obtain emissions data from its 800 utility providers—many of which lack the ability to supply such

11

information electronically—and renegotiate contracts with thousands of suppliers and freight carriers to disaggregate their emissions. 3-ER-441–42. It would also need to develop entirely new IT systems from scratch, supported by an estimated 30 new employees, and submit all of this to third-party assurance. 3-ER-440. The burden does not stop with large companies. U-Haul's declaration details how more than 22,000 independent dealers—nearly 6,000 of them sole proprietorships—would be swept into the process. 3-ER-439. Those that cannot feasibly collect the required data risk losing their contracts. 3-ER-443.

The Chamber likewise attested its members must already begin building out staff, IT systems, and compliance infrastructure at great cost, even before the first reports are due. 3-ER-435–36. The expense and data demands cascade up and down the supply chain, forcing smaller and out-of-state businesses—including family farms and mom-and-pop retailers—to build emissions-tracking systems simply because they do business with covered entities, risking loss of business when they cannot keep up. *Id.* These burdens on the contractors of reporting companies are the reason two farmers' associations are plaintiffs here. 9-ER-2184–86.

### 3.   The Legislature Openly States Its Goal Of Using Compelled Speech To Shame And Pressure Corporations

California has been explicit about the purpose of these compelled-speech mandates.  The sponsors and supporters of SB 253 and SB 261 openly and repeatedly declared that the laws exist to "create accountability for those that aren't . . . doing their part to tackle the climate crisis" and to "make sure the public actually knows who's green and who isn't." 8-ER-2035, -1985.  Senator Wiener, the author of SB 253, candidly said: "Some of the nervousness by large corporations is because they don't want to do the disclosure . . . because they think they're going to be embarrassed by it.  I'm just being totally blunt."  8-ER-2012.

Each statute confirms on its face the State's goal of stigmatizing companies for their supposed role in creating the "existential threat of climate change."  SB 253 § 1(j) ("[t]he people . . . have a right to know"); *see* SB 261 § 1(c) ("[f]ailure of economic actors to adequately plan for and adapt to climate-related risks . . . will result in significant harm to California").  Legislators championing the bills accused companies of "destroying our planet," and explicitly encouraged public pressure campaigns.  8-ER-1927.  The bills' advocates admitted that the compelled

13

speech is designed to "embarras[s]" companies, "hold them accountable," and "activate" them to change behavior.  8-ER-2012, -1917; SB 253 § 1(l).

Committee reports reiterate the laws are designed to "encourage" companies to "take meaningful steps to reduce [greenhouse-gas] emissions," spurred by "the knowledge that their emissions will be publicly available."  8-ER-1932.  The Legislature framed the laws as a tool to "giv[e] companies a huge incentive to take steps to reduce their entire life cycle carbon footprints" and to ensure that corporate actors are "aligned with our goals and are working as diligently as we need them to be."  8-ER-1948, -1974.

Governor Newsom signed both bills despite acknowledging many of their problems.  He warned that the deadlines were "likely infeasible," that the protocol could yield "inconsistent reporting," and that the overall "financial impact" on businesses would be significant.  8-ER-1915; *see* 8-ER-1812.

## B.  Procedural History

1.  On January 30, 2024, the U.S. Chamber of Commerce, California Chamber of Commerce, American Farm Bureau Federation, Los

Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association filed this action challenging SB 253 and SB 261. 9-ER-2211–40. The operative complaint asserts multiple claims against the Chair and Executive Officer of the California Air Resources Board and the California Attorney General. 9-ER-2204–09. As relevant here, Plaintiffs claim that Senate Bills 253 and 261 violate the First Amendment by compelling companies to make judgment-laden statements on the controversial subject of climate change. 9-ER-2204–05.

Plaintiffs moved for summary judgment, and the State moved to dismiss in part. 3-ER-482–518. The district court allowed the First Amendment claim to proceed (and later dismissed certain other claims). It held the compelled-speech challenge was ripe and justiciable, and that the First Amendment applies because "the forced disclosure of information, even purely commercial information, triggers First Amendment scrutiny." 3-ER-512. The court further stated "there can be no dispute that the primary effect—and purpose—of SBs 253 and 261 is to compel

speech." *Id*. It nonetheless denied Plaintiffs' motion for summary judgment with leave to refile after discovery, finding the challenge required a "fact-driven" inquiry into the laws' applications. 3-ER-516.

2. In February 2025—with the case entering discovery under a schedule that did not contemplate renewed consideration of summary judgment until summer 2026—Plaintiffs moved for a preliminary injunction against SB 253 and SB 261. The district court denied the motion on August 13. The court agreed that both statutes compel speech, that SB 261's disclosures are not purely factual, and that the State's fraud-prevention rationale lacked evidentiary support. It nevertheless denied preliminary relief.

***Commercial speech***. With respect to both laws, the district court recognized that "compelled speech must typically be reviewed under strict scrutiny," but declined to apply it, reasoning that both laws compel commercial speech. 1-ER-17. The court conceded that "[c]ommercial speech is 'usually defined as speech that does no more than propose a commercial transaction.'" *Id*. It was undisputed that neither statute's required reports fit that traditional definition.

16

The court, however, considered three additional "factors" courts have derived from *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983): "whether (1) the speech is an advertisement, (2) the speech refers to a particular product, and (3) the speaker has an economic motivation." 1-ER-18 (quotation marks omitted). It was undisputed that neither SB 253 nor SB 261 compels disclosures about specific products. *Id.* And the court agreed with Plaintiffs that "SBs 253 and 261 do not compel speech in the form of advertisements." 1-ER-19–20. But it found that the disclosures "*function* as advertisements" because the statutes "compel disclosure of the same *type* of information that a substantial number of companies use to advertise their brands" and that companies "have an economic motive" to do so. *Id.* (emphases added). The court further described "a company's direct and indirect greenhouse gas emissions" required by SB 253 as "commercial data," noting that "stakeholders consider" such information "relevant to the long-term success of the business." 1-ER-21. And it analogized SB 261's climate-risk disclosures to risks companies report in SEC and similar filings. *Id.*

**SB 253.** The court declined to apply even intermediate scrutiny to SB 253, reviewing it instead under *Zauderer v. Office of Disciplinary*

*Counsel*, 471 U.S. 626 (1985). *Zauderer*, the court recognized, is an exception that applies only to disclosures of "purely factual and uncontroversial information." 1-ER-22 (citation omitted). The court found the emissions disclosures required by SB 253 to be factual and not misleading—even Scopes 2 and 3, which require companies to report emissions of *third parties* in their own filings. 1-ER-22–24. And it found those disclosures "uncontroversial" because the statute "does not require companies to *say* whether they are 'responsible'" for the emissions (including those of third parties) they must report. 1-ER-26.

Applying *Zauderer*, the court evaluated whether SB 253's reports are "reasonably related to a substantial government interest." 1-ER-28–38. The court rejected California's claim that SB 253's disclosures are needed to combat fraud, finding no evidence of widespread deception by companies regarding climate-related matters. 1-ER-35–38. The State had relied heavily on a declaration and report by Dr. Angel Hsu, who claimed that 96 percent of companies with emissions targets exhibited at least one "indicator of greenwashing," 2-ER-336. But the court found that Dr. Hsu's so-called "indicators" of "greenwashing" did not demonstrate fraud or deception at all. 1-ER-35–38. For example, one of Dr. Hsu's

18

indicators was that a company that reported and *met* emissions-reductions targets failed to issue "interim target[s]." 1-ER-336. Another "indicator of greenwashing" was a company's opposition to climate-related legislation. 2-ER-337. These factors, the court found, are irrelevant to fraud and are "concerning" in their own right (1-ER-37)—because by treating disfavored political speech as deception, the State had exposed its viewpoint-discriminatory purpose.

The district court concluded, however, that the State has a substantial interest in reducing emissions. 1-ER-33–34. The court held that "the State ha[d] *not* shown that SB 253's required disclosures would alter consumer behavior such that it would lead to a material decreased in covered companies' emissions." 1-ER-33 (emphasis added). But the court posited that companies might "lower emissions for reasons other than altering consumer behavior," and it deemed sufficient certain studies which showed that "SB 253's mandatory disclosures *may* lead to a reduction in emissions." *Id.* (emphasis added).

The district court also found, with respect to both laws, that the State has substantial interest in providing "California investors" with climate information that may be of interest to them. 1-ER-28–32. The court

19

did not identify what specific information investors were interested in nor determine the information to be material to investors, much less that it was necessary to avert investor harm. And it relied almost entirely on a declaration from CalPERS—a state-controlled pension fund that is required by state law to consider climate factors. 1-ER-32, 7-ER-1608–17.

*SB 261*. The district court recognized that SB 261 does not fall under *Zauderer*'s exception for disclosures of "purely factual and uncontroversial information." 1-ER-25–27. Far from requiring the mere "disclosure" of basic, objective facts already known to the company, these laws require exceptionally time-consuming, burdensome, and speculative guesswork and projections, which companies must assemble for the first time and publish to the public at large.

The court therefore applied intermediate scrutiny to SB 261, assessing whether the law directly advanced a substantial government interest through a restriction no more extensive than necessary to serve that interest. As with SB 253, the court rejected California's claim that SB 261's disclosures are justified to combat fraud. And, unlike SB 253, the court concluded that SB 261 cannot be justified as a means of reducing emissions because the State offered no evidence that it would do so.

The court explained that none of the studies California cited even "studied whether," much less showed that, "the disclosures required by SB 261—climate-related risks—lead to a reduction in emissions." 1-ER-40. But the court found that California's purported interest in providing California investors with climate-related information about companies was sufficient for SB 261 to withstand intermediate scrutiny. The court nowhere addressed whether California could have achieved its informational goals through less speech-restrictive means, such as publishing its own climate-risk assessments or investor guidance.

## SUMMARY OF THE ARGUMENT

Plaintiffs are entitled to a preliminary injunction because SB 253 and SB 261 both will imminently compel companies to speak against their will on a divisive and politically charged issue, inflicting irreparable First Amendment and economic harm. These laws cannot survive any level of constitutional scrutiny, yet the State seeks to enforce them before their validity is adjudicated. The speech the laws compel—once made public—cannot be unsaid, and the substantial compliance costs companies must incur now are unrecoverable. Immediate judicial intervention

is necessary to prevent irreversible injury and protect First Amendment rights while this challenge proceeds.

I. SB 253 and SB 261 violate the First Amendment.

A. These laws are paradigmatic examples of compelled speech subject to strict scrutiny—a standard California cannot plausibly satisfy. The State has not shown a compelling interest, let alone narrow tailoring. The fraud rationale is pretextual, with no evidence of deception; the emissions-reduction rationale is speculative and rests on studies the district court described as equivocal; and the investor-information rationale is too abstract and insubstantial to justify compelling speech.

B. The district court erred in concluding that SB 253 and SB 261 should be reviewed under any lesser level of scrutiny. These laws force companies—whether or not they speak about the climate or market goods or services in California—to adopt and broadcast subjective, value-driven narratives that advance the State's climate agenda. These laws do not regulate commercial speech under *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980), because the speech they compel does not propose a commercial transaction and

does not, as the district court acknowledged, "refer to a particular product." Even if they were regulations of commercial speech, intermediate scrutiny applies because the laws cannot qualify for *Zauderer*'s narrow exception, which applies only to "purely factual and uncontroversial" disclosures that supplement existing commercial speech "about" a product (or service) to apprise consumers of specific risks or characteristics of the product historically recognized to warrant disclosure.

C.     In any event, both laws fail any standard of First Amendment review. Their sweeping mandates—requiring thousands of companies to engage in the same burdensome speech, regardless of their industry, product, investor base, and past statements about climate—extend far more broadly "than reasonably necessary," which is fatal. *Nat'l Inst. of Family Life Advocs. v. Becerra* (*NIFLA*), 585 U.S. 755, 776 (2018).

II.     The remaining injunction factors, which the district court all but ignored, strongly support interim relief. The laws impose immediate and irreparable harm by forcing companies to speak when they would prefer to remain silent on one of the most divisive policy issues of our time. That compelled speech—once made public—cannot be unsaid, and the expressive harm to companies' First Amendment rights is profound

23

and irreversible.  In addition, the statutes foist unrecoverable compliance costs on companies, requiring them to divert substantial resources now to prepare for mandates whose constitutionality is questioned.  The balance of equities and public interest overwhelmingly favor an injunction.  There is no downside to the State from a brief delay in enforcement while these laws' constitutionality is adjudicated.

## STANDARD OF REVIEW

This Court reviews the denial of a preliminary injunction for abuse of discretion, but it reviews underlying legal conclusions—including the application of the First Amendment—de novo.  *Meinecke v. City of Seattle*, 99 F.4th 514, 520 (9th Cir. 2024).

To obtain a preliminary injunction, a plaintiff must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest.  *Winter v. NRDC*, 555 U.S. 7, 20 (2008).  Under this Court's "sliding scale" approach, serious questions on the merits and a balance of hardships that tips sharply toward the plaintiff also warrant an injunction.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  And "[i]n First Amendment cases,"

24

once a plaintiff makes a "colorable claim that its First Amendment rights have been infringed, or are threatened with infringement," the burden shifts to the government to justify the law under the applicable standard. *Meinecke*, 99 F.4th at 521.

## ARGUMENT

As the State admits, SB 253 and SB 261 "compe[ll] speech." 3-ER-388. They are "groundbreaking" in their scope, burden, and lack of connection to a specific product, service, or transaction. 8-ER-1946; *see* 8-ER-1766–68. Both will force thousands of companies—regardless of whether they advertise, have investors, or sell products in California—to publish politically charged, speculative statements on climate change under threat of penalty. No State has ever gone this far, and the First Amendment does not allow California to "lea[d]" the way. 8-ER-1947.

The Supreme Court has repeatedly warned against "mark[ing] off" new categories of speech for diminished constitutional protection. *NIFLA*, 585 U.S. at 767. That admonition is especially apt in the case of speech about "climate change," which the Court already has recognized is a paradigmatic "controversial subjec[t]" entitled to "'special protection'" at the "'highest rung'" of the First-Amendment ladder. *Janus v.*

25

*Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 913–14 (2018). The Constitution does not permit the State to forcibly compel private speakers to enter the climate change debate.

SB 253 and SB 261 cannot survive strict scrutiny—or any level of First Amendment review. At an absolute minimum, Plaintiffs' suit raises very serious questions about the statutes' validity. And allowing those laws to take effect while Plaintiffs' legal challenge is ongoing would inflict irreparable First Amendment injuries. Unlike speech restrictions, speech compulsions cannot be undone; statements, once made, cannot be retracted after a law is deemed invalid. These California laws are also imposing unrecoverable economic costs on Plaintiffs' members. This Court should reverse.

## I.  Plaintiffs Are Likely To Prevail Because SB 253 And SB 261 Compel Speech In Violation Of The First Amendment

### A.  SB 253 And SB 261 Compel Speech And Fail Strict Scrutiny

1.  Strict scrutiny applies—and is fatal to SB 253 and SB 261. As the district court correctly found, both statutes compel speech by requiring covered companies to publish content prescribed by the State. 1-ER-10–12. That is a content-based regulation and subject to strict scrutiny.

26

The Supreme Court has repeatedly held compelled speech restrictions are "'presumptively unconstitutional'" and demand the most exacting review. *NIFLA*, 585 U.S. at 766; *see Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 795 (1988). These principles apply to statements of fact no less than opinion and to corporations as fully as individuals. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573–74 (1995).

SB 253 and SB 261 are paradigmatic examples of compelled speech. They force companies to speak when they would "prefer to remain silent"—and to do so on one of the most divisive policy issues of our time. *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023). They require every covered company to adopt the State's framing of climate risk and emissions, publish judgment-laden assessments, and attribute emissions—including those of third parties—to themselves. That across-the-board mandate to speak on a matter of public controversy is precisely what the First Amendment forbids.

Both statutes embody a particularly pernicious form of compelled speech, aimed at promoting the State's preferred *viewpoint*. Like another

27

California compelled-speech law invalidated in *NIFLA*, "viewpoint discrimination is inherent in the design and structure of this Act." 585 U.S. at 779 (Kennedy, J., joined by Roberts, C.J., and Alito and Gorsuch, JJ. concurring). California is not compelling neutral disclosures. Rather, the speech compelled here is designed to skew the public debate by forcing businesses to publicly address the issue of corporate responsibility for greenhouse-gas emissions and climate change on terms the State prefers. The Legislature was explicit: the laws' goal is to "embarras[s]" companies and "make sure the public knows who's green and who isn't" by California's lights. 8-ER-1985, -2012. California cannot force private entities to "be an instrument for fostering public adherence to an ideological point of view" that the State wishes to promote. *Wooley v. Maynard*, 430 U.S. 705, 715 (1977).

2. Because the laws compel speech and therefore are subject to strict scrutiny, the State bears the burden of proving that its chosen means are the least speech-restrictive way to achieve a compelling interest. *Reed* v. *Town of Gilbert*, 576 U.S. 155, 171 (2015); *Meinecke*, 99 F.4th at 521. The State did not seriously argue below that it could survive strict

scrutiny—offering only a single sentence asserting that "these laws would survive even strict scrutiny." 3-ER-392.

That is false, as reflected in California's failure even to consider less burdensome ways to achieve its goals. The State could have relied on existing fraud statutes to address allegedly misleading climate claims. *NetChoice,* 113 F.4th at 1121. It could have limited any disclosure requirements to companies that advertise on climate-related grounds and tailored the disclosure to ensuring the accuracy of the advertisement. But it did none of that. The State instead imposed blanket mandates on all companies above a revenue threshold—regardless of whether they have chosen to enter the debate, or what they have said.

The State also could have spoken for itself. It could have compiled its own reports on "physical and transition risks," SB 261 § 2(a)(2), or published its own estimates of companies' greenhouse-gas emissions. Studies show that roughly 90 percent of a company's emissions can be estimated using publicly available data—industry, size, and earnings growth. 8-ER-1897. As this Court held in *Wheat Growers*, California could "post [such] information . . . on its own website," without "co-

29

opt[ing]" private speakers.  85 F.4th at 1283.  But the State has not "seriously undert[aken]" to use any of these less-speech-restrictive alternatives.  *McCullen v. Coakley*, 573 U.S. 464, 494 (2014).  Nor has it carried its burden to show that such alternatives would be inadequate.  *See id.*

That failure is fatal.  The First Amendment does not permit the State to conscript private speakers when it could achieve its goals through its own voice or through narrower, targeted regulations.  SB 253 and SB 261 are not tailored to any compelling interest—they are sweeping mandates designed to compel controversial speech.  They are unconstitutional and should be enjoined.

3.     These glaring defects render SB 253 and SB 261 facially unconstitutional.  *See generally Moody v. NetChoice, LLC*, 603 U.S. 707, 723–24 (2024).  The district court's suggestions that the laws could survive a facial challenge and are vulnerable only as applied are mistaken.  The same fundamental defects in these statutes pervade "every case."  *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021).  Like the statutes this Court struck down in *X Corp. v. Bonta* and *NetChoice v. Bonta*, SB 253 and SB 261 impose a state-scripted reporting obligation

on "every covered business"—regardless of whether the company advertises, has investors, or engages in any speech the State claims to regulate. *NetChoice*, 113 F.4th at 1116; *accord X Corp.*, 116 F.4th at 899. That across-the-board compulsion means the constitutional flaw is structural, not situational. It is baked into the statutes themselves.

## B. The District Court Erred In Applying Lesser Scrutiny

The district court's analysis went off course at the threshold. Because SB 253 and SB 261 compel speech, strict scrutiny presumptively applies. *See, e.g.*, *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). The burden therefore shifted to the State to show that the laws fell within one of the narrow exceptions where lesser scrutiny is permitted. *Meinecke*, 99 F.4th at 521. Specifically, the State was required to prove both that the compelled disclosures are "commercial speech" and that the laws satisfy the exacting standards of *Central Hudson* or *Zauderer*. The State never carried that burden.

### 1. The Laws Do Not Regulate Commercial Speech

Commercial speech is "'speech that does no more than propose a commercial transaction.'" *X Corp.*, 116 F.4th at 901. That is "'*the test*'" the Supreme Court has articulated "'for identifying commercial speech.'"

*City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423 (1993) (emphasis in original). As the district court observed, the State did not even argue that the speech compelled by SB 253 or SB 261 meets this definition (1-ER-19)—and for good reason. The laws do not concern prices, services, or sales. Nor do they "communicat[e] the terms of an actual or potential commercial transaction." *Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, — F.4th —, 2025 WL 2448851, at *14 (9th Cir. Aug. 26, 2025) (brackets omitted). They compel companies to opine on climate-related risks and report emissions from their activities and those of third parties in their value chain—untethered to any real or hypothetical transaction, and regardless of whether the company sells any good or service in California.

The content is intended for public accountability, not commercial engagement. SB 253, for example, "make[s] sure that the public actually knows who's green and who isn't . . . . That's all this bill does." 8-ER-1985 (Sen. Wiener). It is regulatory, "not transactional." *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1122 (9th Cir. 2020). "Because [the compelled

32

disclosures] do not 'propose a commercial transaction,'" they are not commercial speech. *Id.* That places these laws squarely outside the commercial speech category—and subjects them to strict scrutiny.

The district court here looked beyond that traditional definition of commercial speech to considerations courts apply "in close cases," 1-ER-18 (quoting *NetChoice*, 113 F.4th at 1119)—commonly known as the *Bolger* factors. These factors are: whether the speech is (1) an advertisement, (2) refers to a particular product or service, and (3) is economically motivated. *See id.* (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67 (1983)). But "even if the question were close" here, *IMDb.com*, 962 F.3d at 1122, the *Bolger* factors lead to the same conclusion.

*IMDb.com* is instructive. The Court held that the absence of the first two factors established the speech as non-commercial. Because "nothing in the record indicate[d]" the speech at issue "either (1) [was] an advertisement or (2) refer[red] to a particular product," the Court concluded, it was not commercial speech—regardless of any economic motivation. *Id.*

The absence of those same two factors here compels the same result. The State conceded below that the speech does not refer to a product or

service. 3-ER-388; *accord* 1-ER-18–19 (district court decision). And the district court explicitly found that the compelled speech is not "in the form of [an] advertisemen[t]." 1-ER-20. Under *IMDb.com*, that is dispositive: The compelled disclosures are not commercial speech, and strict scrutiny applies. 962 F.3d at 1122; *see Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 959 (9th Cir. 2012) (declining to conclude that speech was commercial where it failed to satisfy "two of the three *Bolger* factors"); *cf. Bolger*, 463 U.S. at 67 (finding the "combination of *all* these characteristics" supported the conclusion that speech was commercial).

The district court deemed the compelled disclosures *close enough* to advertisements, and concluded that this *Bolger* factor favored the State. That reasoning is wrong and rewrites precedent. The court posited that the compelled disclosures "*function* as advertisements"—even though none "refer[s] to a particular product"—because some companies voluntarily disclose different information of a purportedly similar type. 1-ER-18–20 (emphasis added). Intermediate scrutiny is applied to the speech compelled, however. *See X Corp.*, 116 F.4th at 901. It is not applied by proxy, with reference to different speech that occurs separately and is not even identified by the court. And distorting *Bolger*'s advertisement factor

as the court did renders it useless in answering the ultimate question at which all the *Bolger* factors aim:  whether the speech "proposes" or "communicat[es] the terms of an actual or potential transaction."  *Id.* (emphasis added).  Every category of commercial speech this Court has identified fits that description, including individualized solicitations, *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 731–32 (9th Cir. 2017); contract negotiations, *S.F. Apartment Ass'n v. San Francisco*, 881 F.3d 1169, 1177–78 (9th Cir. 2018); and retail product warnings, *CTIA—The Wireless Ass'n v. City of Berkeley*,  928 F.3d 832, 845 (9th Cir. 2019).

This Court's recent decision in *Stolfi* reinforces the point.  The compelled speech there was deemed commercial only *because* it compelled "product-specific economic information about prescription drugs that are available for purchase on the market," thereby "communicat[ing] the terms of potential commercial transactions."  2025 WL 2448851, at *14.  The Court emphasized that this connection was essential to its holding, repeatedly noting that the reports communicate "economic information that is . . . tethered to commercial transactions," *id.* at *14, and "product-specific . . . report[s]" that are "closely tethered to the sale of a product," *id.* at *15.  Addressing a partial dissent, the Court made this "'limiting

principle'" explicit: the speech was commercial only because of a "close tether between the speech compelled . . . and commercial pharmaceutical transactions." *Id.* at *15 n.18.

That "'limiting principle'" excludes SB 253 and SB 261, which are wholly "'disconnected from any economic transaction.'" *Stolfi*, 2025 WL 2448851, at *11 (quoting *NetChoice*, 113 F.4th at 1119); *id.* at *15 n.18. They do not communicate the terms of any transaction, nor are they tied to any product or service. They serve no promotional function. *See also id.* at *10 n.11 ("mandatory reports to the government . . . do not 'propose a commercial transaction'").[*]

The district court's suggestion that the compelled disclosures here "function as advertisements" thus unmoors the advertisement factor from the central inquiry. It also misapprehends the laws' nature and purpose. 1-ER-20–21. SB 253 and SB 261 compel sweeping, stand-alone

---

[*] SB 253 and SB 261 also do not compel "government reporting" as described in dicta in *Stolfi*. Companies' climate reports are not "merely" submitted to a government agency which then makes them "available to the public." 2025 WL 2448851, at *5. Rather, companies must communicate the information "directly to . . . the general public." *Id.* at *6; *see* SB 253 § 2(c)(1)(A)(i)(I) (reports must be "publicly disclose[d] to the emissions reporting organization"); SB 261 § 2(c)(1) (requiring reports "to the public," on company's "own internet website").

narratives designed to impose public accountability, not to facilitate commerce. The mandated speech is meant to pressure and embarrass, not to promote—let alone promote a specific transaction. In the State's words, it will "shift" business "*away* from firms." 2-ER-328 (emphasis added). That is not commercial speech.

Although the absence of the first two *Bolger* factors is fatal to the district court's commercial-speech conclusion, the court was wrong about the third factor as well. The court stated that companies "have an economic motive" for the *voluntary* disclosures of climate data in which some companies engage. 1-ER-20. But "*mandatory* reports to the government" about a company's business model "are not produced out of an 'economic motivation.'" *Stolfi*, 2025 WL 2448851, at *10 n.11 (emphasis added). They are produced "out of legal obligation." *Id.* at *20; *accord X Corp.*, 116 F.4th at 901 (companies have "no economic motivation in [the] content" of government-mandated reports); *NetChoice*, 113 F.4th at 1120 ("businesses do not have a clear economic motivation to provide these opinions"). Properly applied, all three *Bolger* commercial-speech factors are missing.

\*　　\*　　\*

The net effect of the district court's approach is to create a new category of compelled noncommercial speech—untethered from any transaction, product, or service—that is nevertheless subject to the diminished standards for commercial speech. But the Supreme Court has emphatically rejected efforts to curtail First Amendment freedoms by expanding commercial-speech doctrine or inventing new analogues that enjoy reduced protection. *NIFLA*, 585 U.S. at 767 (refusing to recognize category of "professional speech" subject to commercial-speech standards). This Court has heeded that message, warning against "cordon[ing] off" new categories of speech "for reduced protection." *IMDb.com*, 962 F.3d at 1124. The district court nonetheless proceeded to mark off a novel category of compelled speech divorced from any commercial transaction. This Court should reject that misguided innovation.

## 2. SB 253 Is Not Subject To *Zauderer*

The district court went further with respect to SB 253, holding that it need survive only *Zauderer* review reserved for certain compelled disclosures of "purely factual and uncontroversial information." 1-ER-22 (quoting *NIFLA*, 585 U.S. at 768). The court correctly recognized that

38

SB 261 is not subject to *Zauderer*; its mandates are not even "factual" (1-ER-25)—let alone uncontroversial. But the court erred in concluding that *Zauderer* does apply to SB 253.

*Zauderer* carves out a "very narrow" exception to strict constitutional scrutiny for compelled disclosures of purely factual, uncontroversial information that merely supplement existing commercial speech about a product or service. *Am. Meat Inst. v. USDA*, 760 F.3d 18, 34 (D.C. Cir. 2014) (Kavanaugh, J., concurring). Its rationale reflects traditional consumer-protection principles—akin to tort doctrines that require sellers to warn of hidden dangers or correct misleading impressions. In *Zauderer* itself, the Supreme Court upheld a narrow disclosure requirement for attorney advertisements that promised "no recovery, no fee," reasoning that the State could require a brief clarification that clients might still be liable for costs. 471 U.S. at 650–51. The Court emphasized that the disclosure was (1) a limited supplement to the speaker's own existing message about (2) "the terms under which" a product or service would "be available" that (3) conveyed "purely factual and uncontroversial information." *Id.* at 651. SB 253 is nothing like the disclosures approved in *Zauderer*.

### a) SB 253 Is Not Limited Supplementation

SB 253 requires sprawling, standalone reports of enterprise-wise emissions estimates—not limited supplementation. *Zauderer* permits only brief, factual clarifications appended to existing commercial speech—"somewhat more information" than the speaker would otherwise provide. *Zauderer*, 471 U.S. at 650; *see id.* at 658 (Brennan, J., concurring) ("'some *limited* supplementation'" (quoting *Bates v. State Bar of Ariz.*, 433 U.S. 350, 384 (1977)). Courts have upheld under *Zauderer* only short, easily digestible disclosures: a single sentence about litigation costs (*Zauderer*), a three-word "Made in China" label (*Am. Meat Inst.*, 760 F.3d at 30 (Kavanaugh, J., concurring)), or a three-sentence point-of-sale safety notice (*CTIA*, 928 F.3d at 838).

SB 253 is nothing like that. Instead, it requires a detailed and value-laden regulatory submission designed to advance the State's preferred climate narrative. SB 253's disclosures look nothing like the clarifying "health and safety" footnotes "long considered permissible," *id.* at 848—they are standalone regulatory manifestos, "the nation's first" (8-ER-2035 (Sen. Wiener)).

No court has ever held that *Zauderer* covers anything like this—and the State has not identified a single example. When asked at argument whether there was any case upholding a statute like SB 253 (or SB 261) under *Zauderer*, the State could identify none. 2-ER-196, -206. That silence speaks volumes. The Supreme Court has repeatedly emphasized that compelled-disclosure regimes must rest on a "long" historical tradition. *NIFLA*, 585 U.S. at 767. There is no such tradition here.

### b) SB 253 Disclosures Do Not Concern A Product Or Service On Offer

*Zauderer* also is inapplicable where "the compelled speech" does not "relate to the product or service that is provided." *CTIA*, 928 F.3d at 845. SB 253 (like SB 261) fails that requirement outright. SB 253 compels companies to report Scope 1, 2, and 3 greenhouse-gas emissions—aggregated across the company (and *other* companies), with no link to any particular good or service. It does not relate in any "way . . . to the services" or products that companies offer. *NIFLA*, 585 U.S. at 769. Every case where *Zauderer* was properly applied has concerned a tailored statement for a particular context, such as total potential legal costs or cellphone radiation risks. SB 253, by contrast, requires all companies of a given

size in all industries to publish the same information, whatever product or service they sell.

The State has downplayed this aspect of *Zauderer*, dismissing courts' repeated statements that the mandated disclosures must relate to a product or service as mere "articulation[s] of the fac[ts]" of the case, rather than a prerequisite for *Zauderer* to apply. 2-ER-144. But this limitation is critical to *Zauderer*'s rationale (as it is to the definition of commercial speech itself). In *NIFLA*—the Supreme Court's most recent application of *Zauderer*—the Court expressly said that "[t]he *Zauderer* standard d[id] not apply" to one of the laws at issue because (among other reasons) the compelled disclosure "in no way relate[d] to the services that [the compelled speakers] provide[d]." 585 U.S. at 769. The D.C. Circuit likewise explained that, "to match *Zauderer* logically, the disclosure mandated *must* relate to the good or service offered." *Am. Meat Inst.*, 760 F.3d at 26 (emphasis added); *see id.* at 33 n.1 (Kavanaugh, J., concurring) ("the compelled disclosure must be a disclosure about the product or service in question"). This Court has said the same: *Zauderer* "require[s] that the compelled speech relate to the product or service that is provided." *CTIA*, 928 F.3d at 845; *see Am. Beverage*, 916 F.3d at 761 (Ikuta, J., concurring

42

in the result) (finding *Zauderer* inapplicable where "the warning does not relate to the terms on which the advertisers provide their services").

### c) SB 253 Compels Speech That Is Neither Purely Factual Nor Uncontroversial

SB 253's compelled disclosures are neither "purely factual" nor "uncontroversial," distinct and demanding requirements of *Zauderer*. That is true for at least four reasons:

*First*, publishing emissions is not an ideologically neutral act. As this Court explained in *Wheat Growers*, "information that is purely factual is necessarily 'factually accurate,' but that alone is not enough to qualify for the *Zauderer* exception." 85 F.4th at 1276. The word "purely" is critical: it excludes speech that embeds normative framing, subjective interpretation, or predictive judgment. A compelled disclosure must communicate objective, verifiable facts—such as whether a chemical is present in a product. *See Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006). It cannot require speculation about future events, adoption of ideological framing, or implication of moral blame.

SB 253, by contrast, is built to achieve precisely that. The statute calls itself the Climate Corporate Data *Accountability* Act and declares that companies "share responsibility for disclosing their contributions to

global [greenhouse-gas] emissions." § 1(f). That framing carries an un-
mistakable moral verdict: companies are culpable for climate change.
Courts have condemned this kind of moral metaphor. *See NAM v. SEC*,
800 F.3d 518, 530 (D.C. Cir. 2015) (invalidating "conflict-free" label be-
cause it "conveys moral responsibility").

"Taken in context," SB 253's emissions reports are not purely fac-
tual—they are designed to promote the State's viewpoint that companies
are morally responsible for climate change and should be shamed into
changing their behavior. *Watts v. United States*, 394 U.S. 705, 708
(1969); *see* 4-ER-625 (Assemb. Ward) ("[I]n California, our policy should
be to not look the other way when there are bad actors out there miscal-
culating what their impact is and not holding themselves accountable,
not allowing the public to hold themselves accountable."); 4-ER-621 (Sen.
Wiener) ("SB 253 is the next step California must take in climate action
to ensure that corporate actors in our state are aligned with our goals
and are working as diligently as we need them to be.").

*Second*, SB 253 forces companies to claim not only emissions they
produce, but also emissions by *others*: Scope 2 emissions from utility pro-
viders, which can swing dramatically based on factors entirely outside

44

the company's control (such as which regional power grid it happens to be on); and Scope 3 emissions—from suppliers, contractors, and end-users the company does not own or control. § 1(e). Responsibility for those emissions is not a fact. It is a contested value-laden judgment about responsibility for third-party conduct. The State's own expert defends this framing in moral terms, arguing that companies should not be "excused" from responsibility for supply-chain emissions. 2-ER-319. Holding "focal companies responsible for environmental and social problems," according to materials used by the expert, is a "normative" expectation driven by "environmental and social pressure groups," not "'pure' economic reasons." 2-ER-289. Forcing a firm to speak on that basis is compelled statement of opinion, not disclosure of an objective fact.

The district court disagreed on the ground that SB 253 "does not require companies to *say* whether they are 'responsible' for" the emissions of third parties that they must report. 1-ER-26 (emphasis added). But the whole point of mandating that a company disclose emissions produced by separate entities in its value chain is to make the company own responsibility. The Legislature left no doubt that it designed SB 253 to "create accountability for those that aren't doing their part," to "make

45

sure the public actually knows who's green and who isn't," and to identify "who is at the forefront of the pollution" "destroying our planet." 8-ER-2035; 8-ER-1985; 8-ER-1927 (legislative statements). That is not neutral disclosure.

*Third*, the emissions estimates themselves are not hard facts. Far from it. The mandated methodology—the GHG Protocol—admits to data gaps, modeling choices, and material uncertainty. 4-ER-650; *see* 7-ER-1524, -1531, -1548. These are not verifiable measurements; they are approximations shaped by assumptions. California could make the estimates itself, at a fraction of the cost, without compelling any speech. 8-ER-1897. Yet the State forces companies to assemble and present these estimates as their own, preventing them from disclaiming the figures as government speech. That maneuver transforms contested estimates into compelled corporate speech.

*Finally*, the manner in which the State requires companies to present their reports confirms the ideological character of the message. SB 253 requires companies to publicly submit emissions data to a state-curated database, run by a state-selected nonprofit, that excludes offset-

46

ting or avoided emissions (Scope 4), ensuring that every company appears as a net polluter. As this Court emphasized in *Stolfi*, compelled disclosures are less suspect when companies can rebut the message in the same forum. 2025 WL 2448851, at *16. Here, they cannot.

Ironically, the State's defense of SB 253 below shows how reports under that law will actually be used. Dr. Hsu's declaration—and a similarly worded report by another declarant—twisted companies' entirely accurate statements about their emissions into supposed "indicator[s] of greenwashing." 2-ER-336. These 'indicators of greenwashing' were defined to include entirely accurate statements coupled with other conduct disapproved by the State's experts—such as lobbying against certain climate legislation, which is core political expression protected by the First Amendment. The State then twisted these statements further into allegations of outright deception and fraud (3-ER-392). The same fate awaits companies' SB 253 reports—they are intended as fuel for the debate over corporations' responsibility for climate change.

## C.    The Laws Fail Under Any Level Of Scrutiny

Even if the State could show that lesser scrutiny applies, SB 253 and SB 261 still fail under any standard of review. The State advanced

47

three purported interests.  The district court rejected the fraud rationale outright, declined to credit emissions reduction for SB 261, and (for both laws) sustained only a narrow informational interest in providing climate data to California investors.  None of these justifications can support the statutes.  The State identified no actual deception, yet the laws compel reports from every covered company regardless of whether it has ever spoken about climate or what it has said—an exercise in forced participation rather than correction.  The emissions-reduction theory rests not on regulation but on ideological compulsion—pressuring companies into behavioral change through compelled speech.  And public curiosity about information cannot suffice: Every compelled-speech law reflects what some audience wants to hear; if popular demand were enough, the First Amendment would protect no one.

Whether the Court applies intermediate scrutiny under *Central Hudson* or *Zauderer*, these laws compel speech in ways the First Amendment forbids.  Under intermediate scrutiny, a compelled disclosure is invalid unless it "it directly advances a substantial governmental interest" and "is not more extensive than necessary to serve that interest." *Wheat Growers*, 85 F.4th at 1282–83.  And "under *Zauderer*," as the Supreme

48

Court most recently clarified, "a disclosure requirement cannot be unjustified or unduly burdensome," must "remedy a harm that is potentially real, not purely hypothetical," and must "extend no broader than reasonably necessary." *NIFLA*, 585 U.S. at 776 (quotation marks omitted). SB 253 and SB 261 flunk either test.

### 1. Neither Statute Is Tailored To Preventing Fraud

The State's principal rationale for both laws below was that they mandate corrective disclosure of purportedly "misleading" speech. The district court rightly found that neither law advances, let alone is tailored to, the prevention of fraud. 1-ER-35–38, -40.

### a) There Is No Record Of Actual Deception

As the district court correctly found, the State cannot justify SB 253 or SB 261 as anti-fraud measures because it failed to show that fraud exists. Under any standard, a speech restriction cannot stand when the government fails to show a "real, not purely hypothetical" harm. *NIFLA*, 585 U.S. at 776. "[A] state may not [burden] speech to prevent something that does not appear to occur." *Junior Sports Magazines Inc. v. Bonta*, 80 F.4th 1109, 1117 (9th Cir. 2023).

49

Here, California did not identify even "a *single* instance" of misleading climate-related speech. *Junior Sports Magazines*, 80 F.4th at 1117. The legislative record is filled with vague references to "greenwashing" and "accountability," *e.g.*, 8-ER-2015, -1984, but none is tied to specific deceptive statements.

The State's reliance on Dr. Hsu's analysis underscores the pretextual—and ideologically biased—nature of its asserted interest. *See* 3-ER-392 (citing Hsu Report, 2-ER-336). Dr. Hsu did not identify any false or misleading statements. Instead, she claimed that 96 percent of companies with emissions targets "show[ed] signs of greenwashing." 2-ER-335. She defined that term expansively (and misleadingly) to cover entirely accurate statements about a company's emissions if the company also engaged in *other* conduct that Hsu disfavored—such as lobbying against climate legislation. 2-ER-335–38. That is not evidence of deception; it is viewpoint discrimination masquerading as fraud prevention. The district court itself called Dr. Hsu's analysis "concerning"—a polite way of saying it revealed an unconstitutional intent to punish disfavored viewpoints. 1-ER-37.

When pressed at oral argument for a concrete example of deception, the State pointed to one company's voluntary disclosure of its goal for achieving net-zero emissions. 2-ER-216. The State argued that the goal was "misleading" because the company's policy "really [was] to maintain 2020 levels [of emissions] by 2030." *Id.* But the State knew that because the company explicitly said it. *See id.* In other words, the State's "example" of "misleading" speech was a truthful statement that contained clarifying context. As the district court said, "It strains credulity to call a claim misleading when the company explicitly identifies the very metric it is using, even if it is not the State's preferred metric." 1-ER-37. When further pressed, the State essentially conceded that it lacked proof of falsehood, asserting instead that its concern was with companies "not backing up their statement with enough information to verify the truthfulness of what they're saying." 2-ER-217. That is not proof of deception; it is a concession that the State lacks proof.

### b) The Mandates Are Grossly Overbroad And Untethered to Any Evidence of Deception

As the district court further found, even if deception existed, neither SB 253 nor SB 261 is tailored to combating it. 1-ER-36. Both laws instead sweep far more "broad[ly] than reasonably necessary." *NIFLA*,

585 U.S. at 776 (applying *Zauderer*). They apply to every company above a revenue threshold that does any business in California—whether or not the company has ever spoken about climate issues, and regardless of what it has said. That mismatch is fatal under any level of First Amendment review.

The Supreme Court has already rebuked California for this very tactic: In *NIFLA*, the Court struck down a law requiring clinics to post a government-scripted notice "no matter what the facilities say on site or in their advertisements." 585 U.S. at 777. The California statutes here suffer from the same defect—they conscript every covered company into speaking on a controversial issue, regardless of whether the company has ever entered the debate or what it has said.

Even on the State's own terms, the laws are indefensible. If California actually established, for example, that a net-zero pledge is misleading if unaccompanied by certain metrics (2-ER-337), an obvious and less-intrusive (though still constitutionally problematic) requirement would be to disclose that additional information if and when a company makes a net-zero claim. That is what *Zauderer* approved: Attorneys advertising "no recovery, no legal fees" could be required to disclose that

clients might still owe costs. 471 U.S. at 650–52. Such a contemporane-
ous disclosure directly addresses the risk of deception where it arises.

Both California laws, by contrast, force thousands of companies to publish the same lengthy, politically fraught reports on their websites or in a government database—while the supposedly misleading statements continue to circulate uncorrected. This mandate applies regardless of which, if any, of Dr. Hsu's "indicators of greenwashing" a company has triggered—the State's only "evidence" of misleading speech. That is, by definition, "broader than reasonably necessary." *NIFLA*, 585 U.S. at 776; *cf. Zauderer*, 471 U.S. at 649 (rejecting "broad prophylactic rules" in this area).

This Court's en banc decision in *American Beverage*, 916 F.3d 749, underscores the point. There, the Court struck down a health-warning mandate under *Zauderer* because the city did "not carr[y] its burden" to show that a *smaller* warning would not have sufficed. *Id.* at 756–57. If a two-sentence warning fails because it takes up too much space, then California's sweeping mandates to submit lengthy freestanding reports are utterly indefensible.

Less intrusive remedies already available to the State confirm the constitutional defect. California could have enforced existing fraud statutes, *cf. Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 636–37 (1980); pursued targeted enforcement against demonstrably misleading claims, *cf. McCullen v. Coakley*, 573 U.S. 464, 494 (2014); or published its own emissions estimates and climate analyses, *cf. Wheat Growers*, 85 F.4th at 1284. Any of those measures would advance California's stated goals without conscripting private speakers into a controversial policy debate. The State ignored all of these options and instead imposed blanket mandates on thousands of companies. The First Amendment does not permit that choice.

## 2. The State's Emissions-Reduction Rationale Also Collapses Under Scrutiny

As a fallback to its principal (and unsuccessful) defense of the laws below, California also claimed that SB 253 and SB 261 advance its aim of reducing emissions. The district court rejected that interest as to SB 261 because the State offered no evidence linking the disclosures it requires to reduced emissions. But the court nonetheless found the State's emissions-reduction claim sufficient to uphold SB 253—it was enough under *Zauderer*, the court reasoned, that the law *might* have that

54

effect. 1-ER-33–34. This was error. The State's emission-reduction interest is not only speculative but contradicted by the State's own evidence. Under any level of First Amendment scrutiny, that mismatch is fatal.

> a) **The State Previously Disclaimed An Emissions-Reduction Justification For The Compelled Speech**

California's emissions-reduction rationale is legally incoherent. Federal law does not permit California to regulate global greenhouse-gas emissions. *City of New York v. Chevron Corp.*, 993 F.3d 81, 91 (2d Cir. 2021). And the State has repeatedly disclaimed any intent to regulate emissions through SB 253 or SB 261, telling the district court that it has "never suggested that Senate Bills 253 and 261 regulate emissions." 8-ER-1797. Yet the State now invokes getting companies to "reduce their emissions" as a justification for compelling speech. 3-ER-394–95.

That "whipsa[w]"—"between disavowing any intent to address emissions and identifying such emissions as the singular source of the [State's] harm"—is fatal. *City of New York*, 993 F.3d at 91. California "cannot have it both ways," *id.*, *denying* that it is regulating global emissions, but then claiming that compelled disclosures are *justified* because

55

they could reduce emissions. Only last Term the Supreme Court looked askance at similar doublespeak from California. *Cf. Diamond Alternative Energy, LLC v. EPA*, 145 S. Ct. 2121, 2140 (2025) ("When as here [California] seeks to justify its regulatory actions by, on the one hand, touting the consequences . . . while, on the other, maintaining that . . . there are no consequences, courts can appropriately be skeptical."). The First Amendment requires real justifications, not litigation-driven rationales contrived after the fact. *Edenfield v. Fane*, 507 U.S. 761, 768 (1993).

The State's asserted interest in "reducing emissions" is also far too vague to support either law. That "broad formulation" "cannot suffice" to compel speech. *Green v. Miss U.S. of Am., LLC*, 52 F.4th 773, 792 (9th Cir. 2022). The government's interest must be stated with precision and evaluated in context—not "in the abstract." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 584 (2000). Here, that would require identifying a concrete aim—such as bringing emissions within California down to a level that reduces the harms of climate change in the State.

Once reframed with necessary precision, the State's rationale collapses. As the district court found, there is no evidence SB 261 will reduce emissions. 1-ER-40–41. That law requires reporting of climate-associated risks. It does not require emissions disclosures, does not target emissions-related conduct, and does not even purport to regulate emissions. The State's legislative findings emphasize financial stability and systemic risk, not emissions reduction (SB 261 § 1(b)–(e), (j)), and its filings here concede the point. 8-ER-1797 (asserting that SB 261's "mandatory risk disclosures" have no "connect[ion] . . . to the control of emissions").

SB 253 fares no better. That law requires companies to report total emissions—not emissions per product, per unit, or per transaction. 1-ER-30. This metric punishes success. Consider a company that invents a product that slashes emissions per unit and captures most of the market. Its total emissions under the disclosures mandated by SB 253 nonetheless will *rise* even as it drives down emissions economy-wide. If the State's "true aim" is to reduce emissions, SB 253 "makes no rational sense." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 488 (1995).

The State's evidence of emissions reductions collapses under scrutiny. The studies California relies on show that other reporting programs—not SB 253—might yield modest reductions, and even those are negligible in the scheme of things. As the State's own evidence puts it, any resulting emissions reductions will be "insufficient to avert dangerous climate change." 2-ER-273.

Tellingly, before the district court, the State abandoned any pretense of showing that SB 253 would reduce emissions "'to a material degree.'" *44 Liquormart, Inc v. Rhode Island.*, 517 U.S. 484, 505 (1996) (plurality op.); *see Junior Sports*, 80 F.4th at 1117 (holding that the speech burden must "'*significantly*' alleviate" the cited harms (emphasis in original)). Instead, it claimed a "compelling state interest in *any* emissions reductions, *whether or not it alleviates climate change on its own*." 2-ER-149 (emphases added). Accepting that justification would be granting an open license to trammel First Amendment rights.

The mismatch here mirrors that in Part II.B of the Supreme Court's opinion in *44 Liquormart*, which this Court routinely applies. *See Junior Sports*, 80 F.4th at 1117; *W. States Med. Ctr. v. Shalala*, 238 F.3d 1090, 1094–95 (9th Cir. 2001). In *44 Liquormart*, Rhode Island banned price

advertising for alcohol to promote temperance. The Supreme Court acknowledged that the ban might have some marginal effect on the purchasing patterns of consumers of modest means and that higher prices might slightly reduce demand. But the Court held that the First Amendment requires more. 517 U.S. at 504–06 (plurality op.). Rhode Island had "not identified what price level would lead to a significant reduction in alcohol consumption," and any link between the ban and reduced consumption was "purely fortuitous." *Id.* at 506–07.

So too here. California has not identified what level of emissions reduction would meaningfully mitigate climate change, nor shown that SB 253 or SB 261 will achieve it. At most, the State claims the laws "might"—or "may"—"indirectly" affect emissions. 2-ER-148; 4-ER-853. The First Amendment does not permit such "indirect advancement" of the State's purported interest, *Retail Digital Network, LLC v. Prieto*, 861 F.3d 839, 851 (9th Cir. 2017) (en banc)—much less speech intrusions predicated on conjecture about what a law "may" do. 4-ER-853.

### b) The State Ignored Less Speech-Restrictive Alternatives To Reduce Emissions

Even if the State had shown that either statute would materially reduce emissions, both statutes fail because their speech compulsion

sweeps more broadly than necessary.  The State itself concedes that direct regulation of emissions would be more effective at reducing emissions than compelled speech.  *See* 4-ER-853.  If California's true aim were to reduce emissions in California, it could—as the Court emphasized in *Rubin* and *44 Liquormart*—"directly limi[t]" California emissions through regulation, to the extent permitted by federal law.  *Rubin*, 514 U.S. at 490; *accord 44 Liquormart*, 517 U.S. at 507 (plurality op.).  True, as explained above, California lacks authority to regulate *global* emissions, but the fact its sovereign authority ends at the state line does not excuse breaking the bounds of the First Amendment instead.  The State may not "do indirectly," through compelled speech and public pressure, what it "is barred from doing directly" by regulation.  *NRA v. Vullo*, 602 U.S. 175, 190 (2024).

The State ignored other options, too.  For example, it could "post" its own estimates "on its own website," without "co-opt[ing] [Plaintiffs] to deliver its message for it."  *Wheat Growers*, 85 F.4th at 1283 (second alteration original); *see NAM v. SEC*, 748 F.3d 359, 372–73 (D.C. Cir. 2014) (explaining that the SEC could publish its own estimates rather than compel speech).  But instead, the State has chosen to compel companies

to speak—at length, and on matters far beyond their own operations—without showing that this speech is necessary to achieve the stated goal.

As in *44 Liquormart*, the availability of less speech-restrictive alternatives "further highlight[s]" the constitutional defect. *Id.* at 508. And here, it does more: It exposes the State's asserted interest as a façade. *Cf. Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989). A government that truly sought to reduce emissions would use the tools that actually work—"traditional regulatory approaches such as emissions standards"—not a compelled-speech regime it admits is less effective, 4-ER-853, and built on an evidentiary foundation that is, by the State's own cited studies, "sketchy and incomplete," 4-ER-824.

### 3. The State's Claimed Interest In Transparency To Consumers And Investors Cannot Justify Compelled Speech

The district court credited California's asserted interest in providing climate-related information to investors. But that rationale cannot sustain either statute—whether analyzed under *Zauderer* or *Central Hudson*.

61

### a) Merely Providing Information Is Not A Substantial Government Interest

Both *Zauderer* and *Central Hudson* demand a substantial government interest. *CTIA*, 928 F.3d at 842. The district court's informational-interest rationale is boundless, and does not qualify. 1-ER-28–32, -39–41. As then-Judge Kavanaugh warned, "[g]overnments . . . would love to have such a free pass to spread their preferred messages on the backs of others," but "consumer curiosity alone is not a strong enough state interest" to compel speech. *Am. Meat Inst.*, 760 F.3d at 31–32 (Kavanaugh, J., concurring) (quoting *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 74 (2d Cir. 1996)). This Court has said the same: "the interest at stake must be more than the satisfaction of mere 'consumer curiosity.'" *CTIA*, 928 F.3d at 844.

The State's claim (1-ER-29) that consumers "may be willing to pay more" for low-carbon products only underscores the danger: If consumer preference were enough, "there is no end to the information that states could require manufacturers to disclose." *Am. Meat Inst.*, 760 F.3d at 31-32 (Kavanaugh, J., concurring) (quoting *Amestoy*, 92 F.3d at 74). "Some consumers might want to know whether their U.S.-made product

was made by U.S. citizens and not by illegal immigrants. . . . Some consumers might want to know the political affiliation of a business's owners." *Id.* at 32. All of that information—this Court has recognized— "could conceivably "play a role in the [potential consumer's] decision of whether to use the platform." *X Corp.*, 116 F.4th at 902 n.10. But the First Amendment forbids that kind of "free-wheeling government power to mandate compelled commercial disclosures." *Am. Meat Inst.*, 760 F.3d at 32 (Kavanaugh, J., concurring); *accord X Corp.*, 116 F.4th at 902 n.10.

The district court's contrary conclusion—that "consumers' desire for information can support a substantial government interest" (1-ER-29)—contravenes this Court's precedent. *CTIA* held that *Zauderer* requires a substantial governmental interest—"more than the satisfaction of mere 'consumer curiosity.'" 928 F.3d at 844. Historically, courts have limited that interest to preventing deception. *See Zauderer*, 471 U.S. at 651 (holding that disclosure requirements comport with the First Amendment "as long as [they] are reasonably related to the State's interest *in preventing deception of consumers*" (emphasis added)). As discussed above, no anti-fraud justification can sustain SB 253 or SB 261, as the district court correctly found.

In rare instances, courts have recognized other concrete, transaction-specific interests with deep roots—such as health and safety warnings or environmental hazards. *See CTIA*, 928 F.3d at 844 (health and safety); *Am. Meat Inst.*, 760 F.3d at 23 (country-of-origin labeling with long historical pedigree); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 115 (2d Cir. 2001) (mercury disposal warnings to prevent environmental harm). But SB 253 and SB 261 are not transaction-specific or deeply rooted. And responsiveness to investor "interest"—with no showing of need or threatened harm—is far removed from the interests historically recognized as substantial.

### b) The Laws Are Not Tailored To Any Legitimate Informational Interest

The district court's informational-interest rationale cannot sustain either law in any event—whether under *Zauderer* or *Central Hudson*—because California's asserted interest is hopelessly vague. 3-ER-393. The State framed its interest as providing "reliable information that enables investors and consumers to make informed judgments about the impact of climate-related risks on their economic choices." *Id.* The court accepted a fraction of that: only an informational interest of investors,

and only investors in California. Neither the State's claim nor the district court's narrower version is sufficient.

When courts have upheld compelled disclosures, the government identified a specific informational gap—for example, whether a product contains mercury (*Nat'l Elec. Mfrs.*, 272 F.3d at 115) or whether an advertisement omits certain costs (*Zauderer*, 471 U.S. at 650–51). The disclosure upheld filled that gap. That is appropriate in an area—speech regulation—where "[p]recision" is "the touchstone." *NIFLA*, 585 U.S. at 775 (brackets in original).

Here, by contrast, California asserted—and the district court sustained—a generalized "interest in this information" simpliciter. 3-ER-393. That loosely defined interest was then deployed to mandate not merely "disclosure" of a known fact, but sprawling, state-scripted reports on emissions, scenario analyses, and governance policies. The result is overkill: SB 261's nearly 100-page manual and SB 253's multi-scope emissions estimates—far beyond any documented informational need. Companies must, for example:

- Describe the "resilience" of their strategies under hypothetical 2°C scenarios;

65

- Disclose "critical input parameters, assumptions, and analytical choices" for those scenarios;

- Provide "approximate sensitivities to key assumptions";

- Explain how climate risks affect "capital allocation decisions," "research and development focus," and even "remuneration policies";

- Report on "internal carbon prices," "weighted average carbon intensity," and "participation in renewable energy programs."

8-ER-1832, -1835, -1849, -1858.

The district court did not identify, because the State never adduced, any evidence that anyone—investors, consumers, or otherwise—needs this level of detail. Its only proof is a declaration from CalPERS, a state-controlled entity that, by California law, is required to consider the climate in its investment decisions. 7-ER-1608–17. In other words, the State cites its own agent—one legally obligated to prioritize climate factors—as proof that "investors" want this information. That is not evidence of market demand; it is self-dealing.

If there were a genuine market need for this information, California still would not have to conscript every company into a sweeping disclosure regime. As an initial matter, the State could have limited reporting *to* investors, by public companies that *have* investors. The fact California did not shows that addressing investor interest is not its true purpose. On top of that, if the State's goal were serving investors, it would have limited the mandatory disclosures to information that is material to investment decisions, as the SEC at least purported to do in its controversial climate rule. 89 Fed. Reg. at 21,916/3. California ignores that limit entirely. Instead, the State mandates disclosure in all cases, for all companies, on all emissions, regardless of materiality. It does so whether the company has investors or not. And it requires disclosure to the world, rather than to the investors whose interests it claims to protect.

That is overbreadth by definition, particularly when the market provides a constitutional alternative: investors and consumers can "exercise the power of their purses" by refusing to deal with companies that do not provide the information. *Amestoy*, 92 F.3d at 74. California itself insists these disclosures are good for companies—that they will attract investors and improve performance. 3-ER-388. But if that is true, no

mandate is necessary; companies will voluntarily provide the information. *Cf. City of Ladue v. Gilleo*, 512 U.S. 43, 58 (1994) (self-interest "diminishe[d] the danger" the city feared). The consequences of California's theory, by contrast, are breathtaking: so long as investors or consumers want *some* climate information, the State can force companies to disclose *anything* it wants about issues relating to climate change.

The district court also overlooked another incongruity in the State's attempt to justify SB 253 and SB 261: California claims a generalized interest in investor and consumer information (3-ER-393), yet it singles out climate disclosures for extraordinary treatment—mandating exhaustive detail on hypothetical scenarios, internal carbon pricing, and executive pay policies. It ignores countless other topics investors routinely consider more material, such as earnings. That mismatch underscores what *NIFLA* condemned: a disclosure regime "wholly disconnected" from the asserted interest, targeting a favored policy issue rather than tailoring to actual informational needs. 585 U.S. at 777. California's obsession with climate disclosures—while ignoring so much else—underscores that this is policy advocacy, not investor or consumer protection.

## II. The Equities Overwhelmingly Favor An Injunction

The remaining preliminary-injunction factors—which the district court barely considered—strongly favor an injunction. SB 261 requires companies to post climate-risk reports on their websites by January 1, 2026, with the State's submission portal opening a month earlier, on December 1. SB 253 requires enterprise-wide emissions reports beginning June 2026. Those deadlines are imminent, and companies must build systems and incur compliance costs now to prepare.

Against that backdrop, the equities strongly favor interim relief. Plaintiffs face imminent, irreparable harm if these laws take effect, and the equities and public interest decisively favor preserving the status quo. The First Amendment injury alone is enough to tip the scales. Add to that compliance costs—which the State concedes will be hundreds of thousands of dollars per company, spread across thousands of businesses—and the case for interim relief becomes overwhelming. At a minimum, under this Court's sliding-scale approach, even if the Court finds only "serious questions" on the merits, a preliminary injunction is warranted if "'the balance of hardships tips sharply in [Plaintiffs'] favor.'"

*Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024). That balance tips sharply here.

The district court cursorily dismissed the other injunction factors in two paragraphs. It concluded that Plaintiffs had not shown irreparable harm based solely on its First Amendment analysis—never addressing the serious questions Plaintiffs had raised or their independent, substantial, and unrecoverable here-and-now compliance costs. 1-ER-41. And it cursorily found that the balance of equities favored the State merely because enjoining the laws "would delay the State from advancing the public interest for which it adopted them." *Id.* That was error.

## A. Plaintiffs Face Irreparable First Amendment Harm and Compliance Costs They Cannot Recover

The first and most decisive factor is irreparable harm—and here, it is certain, imminent, and severe. Plaintiffs face two injuries that no later remedy can fix: the loss of the core First Amendment freedom not to speak, and the imposition of massive, unrecoverable compliance costs.

*First*, the First Amendment injury of compelled speech is automatic and intolerable. "'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020). And

70

that injury is "'relatively easy to establish'": a plaintiff need only show a colorable claim. *Cal. Chamber*, 29 F.4th at 482. Plaintiffs easily clear that threshold. SB 253 and SB 261 conscript companies' speech into California's climate campaign, forcing them to speak when they would rather remain silent and to adopt the State's framing on one of the most divisive policy issues of our time. 3-ER-441 (explaining that company will be compelled to make statements it does not believe are accurate and does not wish to make); *see* 2-ER-52–53, -86–89, -106–07.

These First Amendment harms are imminent. SB 261 requires compliance "[o]n or before January 1, 2026," SB 261 § 2(b)(1)(A), and the State's portal for uploading disclosures opens December 1 (2-ER-51, -106). Once the compelled speech is made public, it cannot be unsaid; the harm cannot be undone. And the State has confirmed that reporting for SB 253 will be required in June 2026. On that date litigation in the district court will undoubtedly still be ongoing; the district court will not set a summary judgment schedule until the mandate issues from this Court.

*Second*, the economic harm is real, immediate, and unrecoverable. Compliance will cost millions—costs that cannot be recouped because California enjoys sovereign immunity. The Supreme Court and this

Court have repeatedly held that such compliance burdens constitute irreparable injury. *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 606 U.S. —, 2025 WL 2415669, at *1 (2025) ("[W]hile the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be recouped' and are thus 'irrevocably expended.'"); *Washington v. Trump*, 145 F.4th 1013, 1036 (9th Cir. 2025) ("economic harm [was] irreparable" because "Defendants are federal officials and federal agencies," so "money damages are unavailable"); *City of San Francisco v. U.S. Customs & Immigration Serv.*, 981 F.3d 742, 762 (9th Cir. 2020).

The compliance burden here is beyond dispute. U-Haul alone estimates (and showed in a declaration) that it must hire 30 new employees and spend over $3 million annually. 3-ER-440 (describing new compliance staff, data systems, and other annual costs). The Chamber likewise attested that its members are already diverting resources to build internal reporting systems, renegotiate supplier contracts, and prepare emissions data. 3-ER-435–36. These declarations confirm what the State itself concedes: compliance will impose significant financial impacts. The

State projects costs of up to 0.025% of annual revenue—hundreds of thousands of dollars for a company meeting SB 253's threshold of a billion in annual revenues.  3-ER-579.

Critically, the costs of compliance are *already* being incurred.  To make SB 261 disclosures due by January 1, 2026, and file SB 253 reports in June 2026, companies necessarily must build out staff, infrastructure, and protocols months in advance to collect and process information. 3-ER-435–36, -442, -445 (explaining that companies must begin compliance preparations well before the first reporting deadlines).  Indeed, CARB has ordered companies to "move toward full compliance as quickly as possible" and start retaining data immediately.  3-ER-431.  These are sunk costs that cannot be unwound if Plaintiffs prevail.  Much of that harm can be measured in dollars, but some cannot.  Compliance also means fundamental business changes—new systems and renegotiated contracts.  3-ER-435–36, -440–42.  Those changes cannot be undone.

## B.  The Balance Of Equities And Public Interest Tip Sharply in Plaintiffs' Favor

When the government is the opposing party, the public interest and balance of equities merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  And "'[i]t is always in the public interest to prevent the violation of a party's

73

constitutional rights.'" *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 695 (9th Cir. 2023) (en banc). Plaintiffs have shown flagrant First Amendment compelled-speech violations. At a minimum, they have raised serious First Amendment questions. That alone "'compels a finding that the balance of hardships tips sharply in [their] favor.'" *Matsumoto v. Labrador*, 122 F.4th 787, 816 (9th Cir. 2024).

The State's counterargument—that an injunction would delay enforcement—rings hollow. If California ultimately prevails, the only "harm" will amount to "no more than a temporary" return to the status quo "previously in effect for decades": the same disclosure regime California deemed adequate before enacting these laws. *City of San Francisco*, 981 F.3d at 762.

The State can hardly object to that brief delay, having caused delays itself—the Legislature extended CARB's rulemaking deadline from January to July 2025, and even then CARB has not met it. *See* Act of Sept. 27, 2024, ch. 766, § 1(c)(1) (Senate Bill No. 219). The State's "failure to act with greater dispatch" in implementing the laws "blunt[s]" any newfound "claim of urgency." *Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1318 (1983) (Blackmun, J., in chambers).

The State's claimed harms pale beside the First Amendment and economic injuries Plaintiffs face. Equity does not tolerate that imbalance.

## CONCLUSION

The Court should reverse the order denying a preliminary injunction and remand with instructions to preliminarily enjoin defendants from applying or taking any action to enforce SB 253 and SB 261 against Plaintiffs' members.

Respectfully submitted,

Dated: September 18, 2025

*s/ Eugene Scalia*

Stephanie A. Maloney
Kevin Palmer
CHAMBER OF COMMERCE OF THE
    UNITED STATES OF AMERICA
1615 H St., N.W.
Washington, DC 20062
(202) 659-6000

*Counsel for Plaintiff-Appellant*
*Chamber of Commerce of the*
*United States of America*

Eugene Scalia
Jonathan C. Bond
Brian A. Richman
GIBSON, DUNN & CRUTCHER LLP
1700 M St., N.W.
Washington, DC 20036
(202) 955-8500
EScalia@gibsondunn.com

Bradley J. Hamburger
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071
(213) 229-7000

*Counsel for*
*Plaintiffs-Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**   25-5327

I am the attorney or self-represented party.

**This brief contains**   13,989   **words,** including   0   words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**   s/Eugene Scalia   **Date**   September 18, 2025
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                *Rev. 12/01/22*

76

# ADDENDUM

Pertinent Constitutional Provisions and Statutes

# Table of Contents

**Page**

First Amendment ........................................................................79

SB 253 ................................................................................. 80

SB 261 ................................................................................. 97

**First Amendment to the United States Constitution**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

**California Senate Bill 253**

**SECTION 1.**

The Legislature finds and declares all of the following:

(a) California has demonstrated its leadership in the battle against climate change and the climate actions of the state have inspired and contributed to bold actions in other states and across the globe.

(b) Californians are already facing devastating wildfires, sea level rise, drought, and other impacts associated with climate change that threaten the health and safety of Californians, undermines the sustainability of our communities, particularly those communities most affected by the negative effects of climate change, and the economic well-being of the state and its residents, including threatening many of the state's largest industries.

(c) Climate change also poses a significant risk to companies' long-term economic success and disrupts the value chains on which they rely. Managing these risks requires investments in decarbonization strategies that unlock emissions reductions and provide economic benefits for Californians and the state economy.

(d) California has achieved record economic growth, is on track to be the fourth largest economy in the world, and is a highly desirable market for the globe's most profitable companies.

(e) California investors, consumers, and other stakeholders deserve transparency from companies regarding their greenhouse gas (GHG) emissions to inform their decisionmaking.

(f) United States companies that have access to California's tremendously valuable consumer market by virtue of exercising their corporate franchise in the state also share responsibility for disclosing their contributions to global GHG emissions.

(g) Companies can increase the state's climate risk through emissions activities that include, but are not limited to, company operations, supply chain activities, employee and consumer transportation, goods production and movement, construction, land use, and natural resource extraction.

(h) Accurate and comprehensive data that is subject to an assurance engagement performed by an independent third-party assurance provider is required to determine a company's direct and indirect GHG

81

emissions, also known as its carbon footprint, and to effectively identify the sources of the emissions and develop means to reduce the same.

(i) The current approach for disclosure of climate emissions from public and private corporate enterprises relies largely on voluntary reporting of GHG inventories, goals, commitments, and agreements, and lacks the full transparency and consistency needed by residents and financial markets to fully understand these climate risks.

(j) The people, communities, and other stakeholders in California, facing the existential threat of climate change, have a right to know about the sources of carbon pollution, as measured by the comprehensive GHG emissions data of those companies benefiting from doing business in the state, in order to make informed decisions.

(k) The Greenhouse Gas Protocol is the globally recognized GHG emissions accounting and reporting standard developed and updated by the World Resources Institute and the World Business Council for Sustainable Development and provides the framework for corporate GHG emissions accounting and reporting. The framework defines and categorizes emissions as scopes 1, 2, and 3 emissions. Many companies already partially or fully disclose their emissions data.

82

(l) Mandating annual, full-scope GHG emissions data reporting to the emissions reporting organization for all United States companies with total annual revenues in excess of $1,000,000,000 that do business in California, as well as ensuring public access to the data in a manner that is easily understandable and accessible, will inform investors, empower consumers, and activate companies to improve risk management in order to move towards a net-zero carbon economy and is a critical next step that California must take to protect the state and its residents.

**SECTION 2.**

Section 38532 is added to the Health and Safety Code, to read:

**38532.**

(a) This section shall be known, and may be cited, as the Climate Corporate Data Accountability Act.

(b) For purposes of this section, the following terms have the following definitions:

(1) "Emissions reporting organization" means a nonprofit emissions reporting organization contracted by the state board pursuant to paragraph (2) of subdivision (c) that both:

(A) Currently operates a greenhouse gas emission reporting organization for organizations operating in the United States.

(B) Has experience with greenhouse gas emissions disclosure by entities operating in California.

(2) "Reporting entity" means a partnership, corporation, limited liability company, or other business entity formed under the laws of this state, the laws of any other state of the United States or the District of Columbia, or under an act of the Congress of the United States with total annual revenues in excess of one billion dollars ($1,000,000,000) and that does business in California. Applicability shall be determined based on the reporting entity's revenue for the prior fiscal year.

(3) "Scope 1 emissions" means all direct greenhouse gas emissions that stem from sources that a reporting entity owns or directly controls, regardless of location, including, but not limited to, fuel combustion activities.

(4) "Scope 2 emissions" means indirect greenhouse gas emissions from consumed electricity, steam, heating, or cooling purchased or acquired by a reporting entity, regardless of location.

84

(5) "Scope 3 emissions" means indirect upstream and downstream greenhouse gas emissions, other than scope 2 emissions, from sources that the reporting entity does not own or directly control and may include, but are not limited to, purchased goods and services, business travel, employee commutes, and processing and use of sold products.

(c) (1) On or before January 1, 2025, the state board shall develop and adopt regulations to require a reporting entity to annually disclose to the emissions reporting organization, and obtain an assurance engagement performed by an independent third-party assurance provider on all of the reporting entity's scope 1 emissions, scope 2 emissions, and scope 3 emissions. The state board shall ensure that the regulations adopted pursuant to this subdivision require all of the following:

(A) (i) (I) That a reporting entity, starting in 2026 on or by a date to be determined by the state board, and annually thereafter on or by that date, publicly disclose to the emissions reporting organization all of the reporting entity's scope 1 emissions and scope 2 emissions for the reporting entity's prior fiscal year.

(II) That a reporting entity, starting in 2027 and annually thereafter, publicly disclose its scope 3 emissions no later than 180 days after its

85

scope 1 emissions and scope 2 emissions are publicly disclosed to the emissions reporting organization for the prior fiscal year.

(ii) A reporting entity shall, beginning in 2026, measure and report its emissions of greenhouse gases in conformance with the Greenhouse Gas Protocol standards and guidance, including the Greenhouse Gas Protocol Corporate Accounting and Reporting Standard and the Greenhouse Gas Protocol Corporate Value Chain (Scope 3) Accounting and Reporting Standard developed by the World Resources Institute and the World Business Council for Sustainable Development, including guidance for scope 3 emissions calculations that detail acceptable use of both primary and secondary data sources, including the use of industry average data, proxy data, and other generic data in its scope 3 emissions calculations.

(iii) (I) Starting in 2033 and every five years thereafter, the state board may survey and assess currently available greenhouse gas accounting and reporting standards. At the conclusion of this assessment the state board may adopt a globally recognized alternative accounting and reporting standard if it determines its use would more effectively further the goals of this section. This review process shall include consultation with the stakeholders identified in paragraph (4).

86

(II) If the state board adopts an alternative accounting and reporting standard, the state board shall develop and adopt new regulations, pursuant to paragraph (1), to ensure full conformance with the new standard and reporting of scopes 1, 2, and 3 emissions and other requirements of this section.

(iv) During 2029 the state board shall review, and on or before January 1, 2030, the state board shall update as necessary, the public disclosure deadlines established pursuant to clause (i) to evaluate trends in scope 3 emissions reporting and consider changes to the disclosure deadlines to ensure that scope 3 emissions data is disclosed to the emissions reporting organization as close in time as practicable to the deadline for reporting entities to disclose scope 1 emissions and scope 2 emissions data.

(v) The reporting timelines shall consider industry stakeholder input and shall take into account the timelines by which reporting entities typically receive scope 1, scope 2, and scope 3 emissions data, as well as the capacity for an independent assurance engagement to be performed by a third-party assurance provider.

(B) That a reporting entity's public disclosure maximizes access for consumers, investors, and other stakeholders to comprehensive and detailed greenhouse gas emissions data across scopes 1, 2, and 3 emissions, as defined by this section, and is made in a manner that is easily understandable and accessible.

(C) That a reporting entity's public disclosure includes the name of the reporting entity and any fictitious names, trade names, assumed names, and logos used by the reporting entity.

(D) (i) That the emissions reporting is structured in a way that minimizes duplication of effort and allows a reporting entity to submit to the emissions reporting organization reports prepared to meet other national and international reporting requirements, including any reports required by the federal government, as long as those reports satisfy all of the requirements of this section.

(ii) Reporting entities that are required to report mandatory industrial emissions pursuant to regulations adopted pursuant to Section 38530 may provide that data with the disclosure required pursuant to this section.

(E) That a reporting entity's disclosure takes into account acquisitions, divestments, mergers, and other structural changes that can affect the greenhouse gas emissions reporting, and is disclosed in a manner consistent with the Greenhouse Gas Protocol standards and guidance or an alternative standard, if one is adopted after 2033.

(F) (i) That a reporting entity obtains an assurance engagement, performed by an independent third-party assurance provider, of their public disclosure. The reporting entity shall ensure that a copy of the complete assurance provider's report on the greenhouse gas emissions inventory, including the name of the third-party assurance provider, is provided to the emissions reporting organization as part of or in connection with the reporting entity's public disclosure.

(ii) The assurance engagement for scope 1 emissions and scope 2 emissions shall be performed at a limited assurance level beginning in 2026 and at a reasonable assurance level beginning in 2030.

(iii) During 2026, the state board shall review and evaluate trends in third-party assurance requirements for scope 3 emissions. On or before January 1, 2027, the state board may establish an assurance requirement for third-party assurance engagements of scope 3 emissions. The

89

assurance engagement for scope 3 emissions shall be performed at a limited assurance level beginning in 2030.

(iv) A third-party assurance provider shall have significant experience in measuring, analyzing, reporting, or attesting to the emission of greenhouse gasses and sufficient competence and capabilities necessary to perform engagements in accordance with professional standards and applicable legal and regulatory requirements. The assurance provider shall be able to issue reports that are appropriate under the circumstances and independent with respect to the reporting entity, and any of the reporting entity's affiliates for which it is providing the assurance report. During 2029 the state board shall review and, on or before January 1, 2030, shall update as necessary, the qualifications for third-party assurance providers based on an evaluation of trends in education relating to the emission of greenhouse gases and the qualifications of third-party assurance providers.

(v) The state board shall ensure that the assurance process minimizes the need for reporting entities to engage multiple assurance providers and ensures sufficient assurance provider capacity, as well as

90

timely reporting implementation as required under clause (i) of subparagraph (A).

(G) (i) That a reporting entity, upon filing its disclosure, shall pay an annual fee to the state board for the administration and implementation of this section.

(ii) The state board shall set the fee established pursuant to clause (i) in an amount sufficient to cover the state board's full costs of administrating and implementing this section. The total amount of fees collected shall not exceed the state board's actual and reasonable costs to administer and implement this section.

(iii) The proceeds of the fees imposed pursuant to clause (i) shall be deposited in the Climate Accountability and Emissions Disclosure Fund, which is hereby created in the State Treasury. Notwithstanding Section 13340 of the Government Code, the money in the fund is continuously appropriated to the state board and shall be expended by the state board for the state board's activities pursuant to this section and to reimburse any outstanding loans made from other funds used to finance the initial costs of the state board's activities pursuant to this section. Moneys in

91

the fund shall not be expended for any purpose not enumerated in this section.

(iv) The state board may adjust the fee in any year to reflect changes in the California Consumer Price Index during the prior year.

(2) The state board shall contract with an emissions reporting organization to develop a reporting program to receive and make publicly available disclosures required by this section pursuant to paragraph (1).

(3) The state board may adopt or update any other regulations that it deems necessary and appropriate to implement this section.

(4) In developing the regulations required pursuant to this subdivision, the state board shall consult with all of the following:

(A) The Attorney General.

(B) Other government stakeholders, including, but not limited to, experts in climate science and corporate carbon emissions accounting and reporting.

(C) Investors.

(D) Stakeholders representing consumer and environmental justice interests.

92

(E) Reporting entities that have demonstrated leadership in full-scope greenhouse gas emissions accounting and public disclosure and greenhouse gas emissions reductions.

(5) This section does not require additional reporting of emissions of greenhouse gases beyond the reporting of scope 1 emissions, scope 2 emissions, and scope 3 emissions required pursuant to the Greenhouse Gas Protocol standards and guidance or an alternative standard, if one is adopted after 2033.

(d) (1) On or before July 1, 2027, the state board shall contract with the University of California, the California State University, a national laboratory, or another equivalent academic institution to prepare a report on the public disclosures made by reporting entities to the emissions reporting organization pursuant to subdivision (c) and the regulations adopted by the state board pursuant to that subdivision. In preparing the report, consideration shall be given to, at a minimum, greenhouse gas emissions from reporting entities in the context of state greenhouse gas emissions reduction and climate goals. The entity preparing the report shall not require reporting entities to report any information beyond

93

what is required pursuant to subdivision (c) or the regulations adopted by the state board pursuant to that subdivision.

(2) The state board shall submit the report required by this subdivision to the emissions reporting organization to be made publicly available on the digital platform required to be created by the emissions reporting organization pursuant to subdivision (e).

(e) (1) (A) The emissions reporting organization, on or before the date determined by the state board pursuant to clause (i) of subparagraph (A) of paragraph (1) of subdivision (c), shall create a digital platform, which shall be accessible to the public, that will feature the emissions data of reporting entities in conformance with the regulations adopted by the state board pursuant to subdivision (c) and the report prepared for the state board pursuant to subdivision (d). The emissions reporting organization shall make the reporting entities' disclosures and the state board's report available on the digital platform within 30 days of receipt.

(B) The digital platform shall be capable of featuring individual reporting entity disclosures, and shall allow consumers, investors, and

94

other stakeholders to view reported data elements aggregated in a variety of ways, including multiyear data, in a manner that is easily understandable and accessible to residents of the state. All data sets and customized views shall be available in electronic format for access and use by the public.

(2) The emissions reporting organization shall submit, within 30 days of receipt, the report prepared for the state board pursuant to subdivision (d) to the relevant policy committees of the Legislature.

(f) (1) Section 38580 does not apply to a violation of this section.

(2) (A) The state board shall adopt regulations that authorize it to seek administrative penalties for nonfiling, late filing, or other failure to meet the requirements of this section. The administrative penalties authorized by this section shall be imposed and recovered by the state board in administrative hearings conducted pursuant to Article 3 (commencing with Section 60065.1) and Article 4 (commencing with Section 60075.1) of Subchapter 1.25 of Chapter 1 of Division 3 of Title 17 of the California Code of Regulations. The administrative penalties imposed on a reporting entity shall not exceed five hundred thousand dollars ($500,000) in a reporting year. In imposing penalties for a violation of this section, the

95

state board shall consider all relevant circumstances, including both of the following:

(i) The violator's past and present compliance with this section.

(ii) Whether the violator took good faith measures to comply with this section and when those measures were taken.

(B) A reporting entity shall not be subject to an administrative penalty under this section for any misstatements with regard to scope 3 emissions disclosures made with a reasonable basis and disclosed in good faith.

(C) Penalties assessed on scope 3 reporting, between 2027 and 2030, shall only occur for nonfiling.

(g) This section applies to the University of California only to the extent that the Regents of the University of California, by resolution, make any of these provisions applicable to the university.

(h) The provisions of this section are severable. If any provision of this section or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.

**California Senate Bill 261**

**SECTION 1.**

 The Legislature finds and declares all of the following:

(a) Climate change is affecting California's communities and economy with impacts including wildfires, sea level rise, extreme weather events, extreme droughts, and associated impacts to the global economy.

(b) Global economic and climate policy leaders have conclusively established that the long-term strength of global and local economies will depend on their ability to withstand climate-related risks, including physical impacts, economic transitions, and policy and legal responses.

(c) Failure of economic actors to adequately plan for and adapt to climate-related risks to their businesses and to the economy will result in significant harm to California, residents, and investors, in particular to financially vulnerable Californians who are employed by, live in communities reliant on, or have invested in or obtained financing from these institutions.

(d) California is a global leader in addressing climate risk through state policy, as demonstrated by the requirement for state public pension funds to analyze and report material climate-related financial risks, as

97

required by Section 7510.5 of the Government Code, and the state climate investment framework directed by, and Climate-Related Risk Disclosure Advisory Group established in accordance with, Executive Order No. N-19-19.

(e) Leading voluntary initiatives have begun to develop frameworks for disclosure of climate change- and sustainability-related information. Thousands of companies already disclose their climate-related financial risks.

(f) Other jurisdictions have begun to require certain entities to develop and disclose sustainability policies, including public entities, as required by the State of Illinois' Sustainable Investing Act (PA 101-473), and both public and private entities, as required by France's Energy Transition Law, as set forth in Article 173-VI for institutional investors and Article 173-IV for companies.

(g) On May 20, 2021, President Joseph Biden signed Executive Order 14030, Climate-Related Financial Risk, which directs federal agencies to develop a comprehensive, governmentwide strategy regarding the measurement, assessment, mitigation, and disclosure of climate-related

98

financial risk to federal government programs, assets, and liabilities in order to increase the long-term stability of federal operations.

(h) On March 21, 2022, the United States Securities and Exchange Commission (SEC) proposed a rule that would require publicly traded United States companies to include climate-related disclosures in their registration statements and periodic reports, including information about climate-related risks that are reasonably likely to have a material impact on their business, results of operations, or financial condition, and certain climate-related financial statement metrics in a note to their audited financial statements. The required information about climate-related risks also would include disclosure of a registrant's greenhouse gas emissions, which have become a commonly used metric to assess a registrant's exposure to those risks.

(i) On April 8, 2022, the National Association of Insurance Commissioners, which includes California's Insurance Commissioner, adopted a new standard for insurance companies to report their climate-related risks, in alignment with the internationally recognized Task Force on Climate-Related Financial Disclosures (TCFD). The TCFD standard is

the international benchmark for climate risk disclosure and will help insurance regulators and the public better understand the climate-related risks to the United States insurance market, which is the largest in the world.

(j) Though a precedent has been set to address climate risk to businesses, corporations, and financial institutions nationwide, current disclosure standards are voluntary, and thus inadequate, for meeting rapidly accelerating climate risks. In order to begin to address the climate crisis, consistent, higher level, and mandatory disclosures are needed from all major economic actors, and California has an opportunity to set mandatory and comprehensive risk disclosure requirements for public and private entities to ensure a sustainable, resilient, and prosperous future for our state.

**SECTION 2.**

Section 38533 is added to the Health and Safety Code, to read:

**38533.**

(a) For purposes of this section, the following definitions apply:

(1) "Climate reporting organization" means a nonprofit climate reporting organization contracted by the state board pursuant to paragraph (2) of subdivision (b) that both:

(A) Currently operates a climate reporting organization for organizations operating in the United States.

(B) Has experience with climate-related financial risk disclosure by entities operating in California.

(2) "Climate-related financial risk" means material risk of harm to immediate and long-term financial outcomes due to physical and transition risks, including, but not limited to, risks to corporate operations, provision of goods and services, supply chains, employee health and safety, capital and financial investments, institutional investments, financial standing of loan recipients and borrowers, shareholder value, consumer demand, and financial markets and economic health.

(3) "Climate-related financial risk report" means a report required by subdivision (b).

(4) "Covered entity" means a corporation, partnership, limited liability company, or other business entity formed under the laws of the state, the laws of any other state of the United States or the District of

101

Columbia, or under an act of the Congress of the United States with total annual revenues in excess of five hundred million United States dollars ($500,000,000) and that does business in California. Applicability shall be determined based on the business entity's revenue for the prior fiscal year. "Covered entity" does not include a business entity that is subject to regulation by the Department of Insurance in this state, or that is in the business of insurance in any other state.

(b) (1) (A) On or before January 1, 2026, and biennially thereafter, a covered entity shall prepare a climate-related financial risk report disclosing both of the following:

(i) Its climate-related financial risk, in accordance with the recommended framework and disclosures contained in the Final Report of Recommendations of the Task Force on Climate-related Financial Disclosures (June 2017) published by the Task Force on Climate-related Financial Disclosures, or any successor thereto, or pursuant to an equivalent reporting requirement as described in paragraph (4).

(ii) Its measures adopted to reduce and adapt to climate-related financial risk disclosed pursuant to clause (i).

102

(B) If a covered entity does not complete a report consistent with all required disclosures pursuant to clause (i) of subparagraph (A), the covered entity shall provide the recommended disclosures to the best of its ability, provide a detailed explanation for any reporting gaps, and describe steps the covered entity will take to prepare complete disclosures.

(2) Climate-related financial risk reports may be consolidated at the parent company level. If a subsidiary of a parent company qualifies as a covered entity pursuant to paragraph (4) of subdivision (a), the subsidiary is not required to prepare a separate climate-related financial risk report.

(3) The state board shall contract with a climate reporting organization to prepare a biennial public report on the climate-related financial risk disclosures required by this section.

(4) Notwithstanding paragraph (1), a covered entity satisfies the requirements of paragraph (1) if it prepares a publicly accessible biennial report that includes climate-related financial risk disclosure information by any of the following methods:

(A) Pursuant to a law, regulation, or listing requirement issued by any regulated exchange, national government, or other governmental entity, including a law or regulation issued by the United States government, incorporating disclosure requirements consistent with clause (i) of subparagraph (A) of paragraph (1), including the International Financial Reporting Standards Sustainability Disclosure Standards, as issued by the International Sustainability Standards Board.

(B) Voluntarily using a framework that meets the requirements of clause (i) of subparagraph (A) of paragraph (1) or the International Financial Reporting Standards Sustainability Disclosure Standards, as issued by the International Sustainability Standards Board.

(5) To the extent a climate-related financial risk report contains a description of a covered entity's greenhouse gases or voluntary mitigation of greenhouse gases, the state board may consider covered entity's claims if those claims are verified by a third-party independent verifier.

(c) (1) On or before January 1, 2026, and biennially thereafter, a covered entity shall make available to the public, on its own internet website, a copy of the report required by this section.

104

(2) (A) On or before January 1, 2026, and annually thereafter, a covered entity shall pay a fee, upon filing its disclosure, to the state board for the administration and implementation of this section.

(B) (i) The state board shall set the fee described in subparagraph (A) at an amount adequate to cover the state board's full costs of administrating and implementing this section. The total amount of fees collected shall not exceed the state board's actual and reasonable costs to administer and implement this section.

(ii) The state board may adjust the fee in any year to reflect changes in the California Consumer Price Index during the prior year.

(C) The proceeds of the fees imposed pursuant to this paragraph shall be deposited in the Climate-Related Financial Risk Disclosure Fund, which is hereby created in the State Treasury. Notwithstanding Section 13340 of the Government Code, the money in the fund is continuously appropriated to the state board and shall be expended by the state board for the state board's activities pursuant to this section and to reimburse any outstanding loans made from other funds used to finance the initial costs of the state board's activities pursuant to this section. Money

in the fund shall not be expended for any other purpose not described in this subparagraph.

(d) The climate reporting organization shall be contracted to do all of the following:

(1) Biennially prepare a public report that contains all of the following elements:

(A) A review of the disclosure of climate-related financial risk contained in a subset of publicly available climate-related financial risk reports by industry.

(B) Analysis of the systemic and sectorwide climate-related financial risks facing the state based on the contents of climate-related financial risk reports, including, but not limited to, potential impacts on economically vulnerable communities.

(C) Identification of inadequate or insufficient reports.

(2) Regularly convene representatives of sectors responsible for reporting climate-related financial risks, state agencies responsible for oversight of reporting sectors, investment managers, academic experts, standard-setting organizations, climate and corporate sustainability or-

106

ganizations, labor union representatives whose members work in impacted sectors, and other stakeholders to offer input on current best practices regarding the disclosure of financial risks resulting from climate change, including, but not limited to, proposals to update the definition of "climate-related financial risk," and the framework or disclosure standard of "climate-related financial risk reports" that meets the requirements of clause (i) of subparagraph (A) of paragraph (1) of subdivision (b).

(3) Monitor federal regulatory actions among agency members of the federal Financial Stability Oversight Council, as well as nonindependent regulators overseen by the White House.

(e) (1) Section 38580 does not apply to a violation of this section.

(2) The state board shall adopt regulations that authorize it to seek administrative penalties from a covered entity that fails to make the report required by this section publicly available on its internet website or publishes an inadequate or insufficient report. The administrative penalties authorized by this section shall be imposed and recovered by the state board in administrative hearings conducted pursuant to Article 3

107

(commencing with Section 60065.1) and Article 4 (commencing with Section 60075.1) of Subchapter 1.25 of Chapter 1 of Division 3 of Title 17 of the California Code of Regulations. The administrative penalties imposed on a reporting entity shall not exceed fifty thousand dollars ($50,000) in a reporting year. In imposing penalties for a violation of this section, the state board shall consider all relevant circumstances, including both of the following:

(A) The violator's past and present compliance with this section.

(B) Whether the violator took good faith measures to comply with this section and when those measures were taken.