No. 25-5327

# United States Court of Appeals
# for the Ninth Circuit

---

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION,

*Plaintiffs-Appellants*,

v.

LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California,

*Defendants-Appellees.*

---

On Appeal from an order of the
United States District Court for the Central District of California,
Case No. 2:24-cv-801, Judge Otis D. Wright, II

## EXCERPTS OF RECORD – VOLUME 2 OF 9

| | |
|---|---|
| Stephanie A. Maloney | Eugene Scalia |
| Kevin Palmer | Jonathan C. Bond |
| CHAMBER OF COMMERCE OF THE | Brian A. Richman |
| UNITED STATES OF AMERICA | GIBSON, DUNN & CRUTCHER LLP |
| 1615 H St., N.W. | 1700 M St., N.W. |
| Washington, DC 20062 | Washington, DC 20036 |
| (202) 659-6000 | (202) 955-8500 |
| | EScalia@gibsondunn.com |
| *Counsel for Plaintiff-Appellant* | |
| *Chamber of Commerce of the* | Bradley J. Hamburger |
| *United States of America* | GIBSON, DUNN & CRUTCHER LLP |
| | 333 South Grand Ave. |
| | Los Angeles, CA 90071 |
| | (213) 229-7000 |
| | |
| | *Counsel for Plaintiffs-Appellants* |

O

# United States District Court
# Central District of California

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA et al., | Case № 2:24-cv-00801-ODW (PVCx) |
| Plaintiffs, | **ORDER DENYING PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL [116]** |
| v. | |
| CALIFORNIA AIR RESOURCES BOARD et al., | |
| Defendants. | |

## I.     INTRODUCTION

Plaintiffs bring this action challenging California Senate Bills ("SB" or "SBs") 253 and 261 for violations of the First Amendment. (*See* First Am. Compl. ("FAC") ¶¶ 92–112, ECF No. 28.) Plaintiffs moved for a preliminary injunction seeking to enjoin both laws, (Mot. Prelim Inj., ECF No. 78), and the Court denied the motion, (Order Den. Prelim. Inj. ("Order PI"), ECF No. 112). Plaintiffs now move for an injunction pending appeal. (Mot. Inj. Pending Appeal ("Motion" or "Mot."), ECF No. 116.) For the reasons below, the Court **DENIES** Plaintiffs' Motion.[1]

---

[1] Having carefully considering the papers filed in support of the Motion, the Court deems the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15. Accordingly, the Court **VACATES** the September 15, 2025 hearing.

## II.    BACKGROUND

The Court incorporates by reference the background in the Court's Order denying Plaintiffs' motion for preliminary injunction.  (Order PI 2–6.)

On February 25, 2025, Plaintiffs moved for a preliminary injunction, asking the Court to enjoin SBs 253 and 261 on First Amendment grounds.  (*See generally* Mot. Prelim. Inj.)  The Court denied Plaintiffs' motion.  (Order PI)  Plaintiffs appealed the Court's Order to the Ninth Circuit.  (Notice Appeal, ECF No. 114.)  Plaintiffs now ask the Court to enjoin the enforcement of SBs 253 and 261 during the pendency of the appeal.  (Mot. 1.)  The Motion is fully briefed.  (Opp'n, ECF No. 120; Reply, ECF No. 122.)[2]

## III.    LEGAL STANDARD

The standard for issuing an injunction pending appeal is similar to that governing a motion for a preliminary injunction.  *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Feldman v. Ariz. Sec'y of State's Off.*, 843 F.3d 366, 367 (9th Cir. 2016).  "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  It "may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Id.* at 22.  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id.* at 20; *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1115 (9th Cir. 2024).  The first two factors are "the most critical."  *Nken v. Holder*, 556 U.S. 418, 434 (2009).  Where, as here, the party opposing injunctive relief is a government entity, "the third and fourth factors 'merge.'"  *X Corp. v. Bonta*, 116 F.4th 888, 898

---

[2] The Court declines to consider Plaintiffs' arguments and accompanying evidence submitted for the first time in their reply brief pertaining to the burden of compliance with SBs 253 and 261.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."); *see also Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (noting that courts will not consider new evidence first submitted in a reply brief because the opposing party has no opportunity to respond to it).

**ER-45**

(4 of 297), Page 4 of 297     Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 4 of 297
Case 2:24-cv-00801-ODW-PVC    Document 125    Filed 09/11/25    Page 3 of 5    Page ID
#:10684

1   (9th Cir. 2024) (quoting *Fellowship of Christian Athletes v. San Jose Unified Sch.*
2   *Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023)).

3        In the Ninth Circuit, the *Winter* factors may be evaluated on a sliding scale:
4   "serious questions going to the merits and a balance of hardships that tips sharply
5   towards the plaintiff can support issuance of a preliminary injunction, so long as the
6   plaintiff also shows that there is a likelihood of irreparable injury and that the
7   injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d
8   1127, 1135 (9th Cir. 2011) (internal quotation marks omitted).

9        Plaintiffs seeking a preliminary injunction bear a "heavy burden." *Earth Island*
10  *Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (discussing that plaintiffs "face a
11  difficult task in proving that they are entitled to this 'extraordinary remedy'").

12               **IV.        DISCUSSION**

13       Plaintiffs argue that they are entitled to injunctive relief under the "sliding
14  scale" approach to the *Winter* standard.   (Mot. 2.)   Accordingly, the Court first
15  determines if there are "serious questions going to the merits," before examining
16  whether the "balance of hardships tips sharply in the plaintiff's favor." *All. for the*
17  *Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017).

18  **A.    Serious Questions Going to the Merits**

19       Plaintiffs have not shown that they raise "serious questions going to the merits."
20  *Id.*  As an initial matter, the "serious questions" approach does not require a "separate
21  and independent analysis from the court's assessment of [a plaintiff's] likelihood of
22  success on the merits." *Lopez v. Brewer*, 680 F.3d 1068, 1073 (9th Cir. 2012).  When
23  a plaintiff fails to demonstrate a likelihood of success on the merits, the plaintiff
24  necessarily cannot establish that there are serious questions going to the merits. *Id.*;
25  *see Cottrell*, 632 F.3d at 1135–36 (assessing the plaintiffs' likelihood of success on
26  the merits under the "serious questions" approach).

27       The Court previously considered—and rejected—Plaintiffs' argument that they
28  show a likelihood of success on the merits.  (Order PI 26–40.)  It held that "Plaintiffs

**ER-46**

3

have not shown a likelihood of success on the merits with respect to either of its facial First Amendment challenges to SBs 253 and 261." (*Id.* at 40.)  Plaintiffs now ask the Court to revisit its conclusion but fail to show any material changes warranting the Court's reconsideration.  (*Id.* at 26–40; *see* Mot. 5–14.)  It follows that Plaintiffs also fail to show that they raise serious questions going to the merits.  *See Lopez*, 680 F.3d at 1073 ("Because the district court did not err in determining that [the plaintiff] failed to demonstrate a likelihood of success on the merits, it follows that [the plaintiff] also failed to raise serious questions going to the merits.").

Accordingly, Plaintiffs' Motion is denied on this basis alone.  *See Ravalli Cnty. Republican Cent. Comm. v. McCulloch*, No. 15-35967, 2016 WL 1161301, at *1 (9th Cir. Mar. 3, 2016) ("Because appellants have made an insufficient showing of either likelihood of success on the merits or the likelihood of irreparable harm, the motion [for injunction pending appeal] is denied." (citation omitted)).

**B.    Balance of Hardships**

For the same reasons, Plaintiffs also fail to demonstrate that the balance of hardships tips sharply in their favor.  The Court previously held that because Plaintiffs "have not demonstrated that the laws violate the First Amendment, they have also not shown irreparable harm."  (Order PI 40.)  As above, Plaintiffs offer nothing to disturb this conclusion.  Thus, Plaintiffs fail to show that the balance of hardships tips sharply in their favor.  *CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 852 (9th Cir. 2019) (finding challengers failed to demonstrate any hardship tipping the balance in their favor where their "First Amendment claim is unlikely to succeed").

As Plaintiffs have not satisfied the first two, and most critical, factors under the "sliding scale" approach to the *Winter* test, the Court need not address the remaining factors.  Accordingly, the Court finds that Plaintiffs have failed to meet their burden required to obtain injunctive relief and declines to issue the injunction pending appeal.

**ER-47**

## V.    CONCLUSION

For the reasons discussed above, the Court **DENIES** Plaintiffs' Motion for Injunction Pending Appeal.  (ECF No. 116.)

**IT IS SO ORDERED.**

September 11, 2025

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**

**ER-48**

(7 of 297), Page 7 of 297   Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 7 of 297
Case 2:24-cv-00801-ODW-PVC   Document 122-3   Filed 09/02/25   Page 1 of 7   Page
ID #:10667

1   EUGENE SCALIA, SBN 151540
2       escalia@gibsondunn.com
    GIBSON, DUNN & CRUTCHER LLP
3   1050 Connecticut Avenue, N.W.
    Washington, D.C. 20036-5306
4   Telephone: 202.955.8500
    Facsimile:  202.467.0539
5

6   *Attorneys for Plaintiffs Chamber of
    Commerce of the United States of*
7   *America, California Chamber of
    Commerce, American Farm Bureau*
8   *Federation, Los Angeles County
    Business Federation, Central Valley*
9   *Business Federation, and
    Western Growers Association*
10

11  (*Additional counsel listed on next page*)

12              IN THE UNITED STATES DISTRICT COURT

13          FOR THE CENTRAL DISTRICT OF CALIFORNIA,

14                      WESTERN DIVISION

15  | CHAMBER OF COMMERCE OF THE | CASE NO. 2:24-cv-00801-ODW-PVC |
16  | UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF | |
    | COMMERCE, AMERICAN FARM | **SUPPLEMENTAL** |
17  | BUREAU FEDERATION, LOS | **DECLARATION OF EDWARD J.** |
    | ANGELES COUNTY BUSINESS | **SHOEN** |
18  | FEDERATION, CENTRAL VALLEY | |
    | BUSINESS FEDERATION, and | |
19  | WESTERN GROWERS ASSOCIATION, | |

20              Plaintiffs,

21          v.

22  LIANE M. RANDOLPH, in her official
    capacity as Chair of the California Air
23  Resources Board, STEVEN S. CLIFF, in
    his official capacity as the Executive
24  Officer of the California Air Resources
    Board, and ROBERT A. BONTA, in his
25  official capacity as Attorney General of
    ·California.

26              Defendants.

27

28

(8 of 297), Page 8 of 297    Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 8 of 297
Case 2:24-cv-00801-ODW-PVC    Document 122-3    Filed 09/02/25    Page 2 of 7    Page
ID #:10668

1    BRADLEY J. HAMBURGER,
       SBN 266916
2      bhamburger@gibsondunn.com
3    SAMUEL ECKMAN, SBN 308923
       seckman@gibsondunn.com
4    ELIZABETH STRASSNER,
       SBN 342838
5      estrassner@gibsondunn.com
     GIBSON, DUNN & CRUTCHER LLP
6    333 South Grand Ave.
7    Los Angeles, CA 90071-3197
     Telephone: 213.229.7000
8    Facsimile:  213.229.7520

9    BRIAN A. RICHMAN
     (*pro hac vice*)
10      DC Bar No. 230071
11      brichman@gibsondunn.com
     GIBSON, DUNN & CRUTCHER LLP
12   2001 Ross Ave., Suite 2100
     Dallas, TX 75201-2923
13   Telephone: 214.698.3100
     Facsimile:  214.571.2900
14

15   *Attorneys for Plaintiffs Chamber of Commerce of the United States of America,*
     *California Chamber of Commerce, American Farm Bureau Federation, Los Angeles*
16   *County Business Federation, Central Valley Business Federation, and*
     *Western Growers Association*

17   STEPHANIE A. MALONEY
     (*pro hac vice*)
18      DC Bar No. 104427
        smaloney@uschamber.com
19   KEVIN PALMER
     (*pro hac vice*)
20      DC Bar No. 90014967
        kpalmer@uschamber.com
21   CHAMBER OF COMMERCE OF THE
     UNITED STATES OF AMERICA
22   1615 H Street, NW
     Washington, D.C. 20062-2000
23   Telephone: 202.659.6000
     Facsimile:  202.463.5302
24

25   *Attorneys for Plaintiff Chamber of Commerce of the United States of America*

26

27

28

Gibson, Dunn &
Crutcher LLP

DECLARATION OF EDWARD J. SHOEN
CASE NO. 2:24-CV-00801-ODW-PVC                    **ER-50**

(9 of 297), Page 9 of 297   Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 9 of 297
Case 2:24-cv-00801-ODW-PVC   Document 122-3   Filed 09/02/25   Page 3 of 7   Page
ID #:10669

I, Edward J. Shoen, hereby declare as follows:

    1.    I am over the age of eighteen, of sound mind, and capable of making this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct.

    2.    I previously filed declarations in this matter on May 24, 2024, and February 24, 2025. [*See* Dkt. 48-30; Dkt. 78-3].

    3.    In light of intervening developments, I now supplement the information contained in those declarations with the following.

**Compliance with S.B. 261**

    4.    The California Air Resources Board ("CARB") held a public workshop on implementation of S.B 253 and S.B 261, on August 21, 2025. Representatives of U-Haul attended that workshop.

    5.    At the meeting, CARB stated that on December 1, 2025, it will post a public docket to which Covered Entities must post a public link to the reports S.B. 261 requires. [Slideshow at 27, S.B. 253/261/219 Public Workshop: Regulation Development and Additional Guidance (hereinafter "August 21 Slides"), *available at* https://ww2.arb.ca.gov/sites/default/files/2025-08/SB%20253%20261%20workshop%20slides%208-21.pdf]. This is to effectuate the law's requirement that all Covered Entities be in compliance on or before January 1, 2026.

    6.    Consistent with the provisions of S.B. 261, CARB has identified several complex frameworks through which Covered Entities may satisfy the disclosure requirements of S.B. 261, including the Final Report of Recommendations of the Task Force on Climate-Related Financial Disclosures (TCFD), the IFRS Disclosure Requirements, and other reports developed in accordance with any regulated exchange, national government, or other governmental entity. [August 21 Slides at 28].

    7.    At the meeting, CARB highlighted key reporting requirements under S.B. 261. CARB will require Covered Entities' reports to address principles of governance,

(10 of 297), Page 10 of 297   Case: 25-5327   09/18/2025, DktEntry: 8.3, Page 10 of 297
Case 2:24-cv-00801-ODW-PVC   Document 122-3   Filed 09/02/25   Page 4 of 7   Page
ID #:10670

1   strategy, risk management, and metrics and targets, and has outlined how Covered
2   Entities should address each principle in turn. For example, Covered Entities' reports
3   should describe their governance structure for identifying, assessing, and managing
4   climate-related financial risks and specify management oversight of climate-related risks
5   and opportunities. They should also identify climate-related risks and opportunities that
6   the entity has identified over the short, medium, and long term; the impact of climate-
7   related risks and opportunities on the organization's operations, strategy, and financial
8   planning; and the resilience of this strategy taking into consideration various future
9   climate scenarios. And Covered Entities have to provide not only a qualitative
10  description of the process they use for identifying, managing, and assessing related risks,
11  but metrics and targets used for such assessment where such information is material.
12  [August 21 Slides at 29-33].

13      8.    Compliance with S.B. 261 would require U-Haul to pay fees to support the
14  State's implementation of it. At the August 21 workshop, CARB estimated that each
15  Covered Entity will be required to pay a $1,403 annual implementation fee for S.B. 261.
16  [August 21 Slides at 24.]

17      9.    This process is already burdensome and will become only more so as the
18  January 1, 2026 deadline approaches in the absence of injunctive relief.

19      10.   Complying with S.B. 261 would require U-Haul to opine on climate-related
20  risks and post its government-compelled opinion to its website. It would *not* otherwise
21  choose to make such statements of opinion, on matters of considerable public
22  controversy.

23      11.   Complying with S.B. 261 would force U-Haul to state its opinion on
24  "material risk of harm to immediate and long-term financial outcomes due to physical
25  and transition risks, including, but not limited to, risks to corporate operations, provision
26  of goods and services, supply chains, employee health and safety, capital and financial
27  investments, institutional investments, financial standing of loan recipients and
28

2

DECLARATION OF EDWARD J. SHOEN
CASE NO. 2:24-CV-00801-ODW-PVC          **ER-52**

(11 of 297), Page 11 of 297  Case: 25-5327  09/18/2025, DktEntry: 8.3, Page 11 of 297
Case 2:24-cv-00801-ODW-PVC   Document 122-3   Filed 09/02/25   Page 5 of 7   Page
ID #:10671

1  borrowers, shareholder value, consumer demand, and financial markets and economic

2  health." S.B. 261 § 2(a)(2).

3      12.   Following the August 21 workshop, it is clear to U-Haul that these

4  obligations extend to describing its "governance structure for identifying, assessing, and

5  managing climate-related financial risks"; how its governing "Board [oversees] those

6  climate-related risks"; "the actual and potential impacts of climate-related risks and

7  opportunities on the company's operations, strategy, and financial planning"; "the

8  resilience of the organization's strategy, taking into account the future impacts of climate

9  change under various climate scenarios," its qualitative process for "identifying,

10  managing and assessing climate-related risks, and how those considerations and

11  processes are integrated into the organization's overall risk management"; and its

12  "metrics and targets used to assess and manage relevant climate-related risks." [August

13  21 Slides at 30-33.]

14      13.   CARB's guidance makes clear that complying with S.B. 261 would force

15  U-Haul to make subjective assessments on a matter of significant public debate: the

16  precise nature and degree of risk that global climate change poses to individual

17  American businesses' operations. The guidance's own reference to the existence of

18  "various climate scenarios" underscores the uncertain and speculative nature of the

19  matter to which U-Haul will be compelled to speak. [August 21 Slides at 31.]

20      14.   U-Haul considers the information that S.B. 261 requires to be controversial

21  and disagrees with including this type of information on its public website. It has thus

22  far chosen not to participate in this matter of public controversy.

23      15.   Complying with S.B. 261 will thus soon force U-Haul to speak in great

24  detail where it has chosen not to speak and to convey to the public a philosophy of

25  environmental sustainability that it does not believe and is incompatible with the

26  philosophy U-Haul currently expresses in the public square.

27

28

(12 of 297), Page 12 of 297  Case: 25-5327  09/18/2025, DktEntry: 8.3, Page 12 of 297
Case 2:24-cv-00801-ODW-PVC  Document 122-3  Filed 09/02/25  Page 6 of 7  Page
ID #:10672

1      16.    If U-Haul is required to comply with S.B. 261 on January 1, 2026, the

2   statements that the law compels it to make will be public, and U-Haul will not be able

3   to retract them if the law is later struck down.

4      17.    Injunctive relief would prevent U-Haul from being forced to speak on these

5   controversial topics while Plaintiffs' appeal from the denial of a preliminary injunction

6   is considered.

7      18.    In the absence of an injunction pending appeal, U-Haul will suffer an

8   irreparable intrusion upon its First Amendment rights when it is forced to comply with

9   S.B. 261 on or before January 1, 2026.

10  **Compliance with S.B. 253**

11     19.    U-Haul is preparing to comply with S.B. 253, and in the absence of an

12  injunction pending appeal, will suffer an irreparable intrusion upon its First

13  Amendment rights when it is forced to comply with S.B. 253 in 2026.

14     20.    At the August 21 workshop, CARB staff proposed that all Reporting

15  Entities should be in compliance with the Scope 1 and Scope 2 emissions reporting

16  requirements of S.B. 253 by June 30, 2026. [August 21 Slides at 34.] S.B. 253 provides

17  that Scope 3 emissions reporting requirements will take effect in 2027.

18     21.    Complying with S.B. 253 would require U-Haul to calculate Scope 1, 2,

19  and 3 emissions. Doing so involves several burdensome steps, which only increase as

20  the proposed June 30, 2026 enforcement deadline approaches. These disclosures would

21  go far beyond U-Haul's disclosure requirements under existing state and federal law and

22  regulations.

23     22.    U-Haul has chosen not to speak on the controversial topic of emissions and

24  not to claim the emissions of other companies as its own. If now forced to do so, U-

25  Haul will not be able to unring that bell. And U-Haul can only speculate on how such

26  speech would affect its relationship with its Dealers and its customers. Such effects

27  could not be undone if S.B. 253 is later declared unlawful.

28

(13 of 297), Page 13 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 13 of 297
Case 2:24-cv-00801-ODW-PVC Document 122-3 Filed 09/02/25 Page 7 of 7 Page
ID #:10673

23. Moreover, complying with S.B. 253 would require U-Haul to pay fees to support the State's implementation of its requirements. At the August 21 workshop, CARB calculated these fees at $3,106 per year. [August 21 Slides at 24.]

24. Injunctive relief would prevent U-Haul from being forced to speak on these controversial topics while Plaintiffs' appeal from the denial of a preliminary injunction is considered.

**Conclusion**

25. CARB's recent workshop confirms that S.B. 253 and S.B. 261 threaten U-Haul with serious and imminent harm in the coming weeks and months. Those laws will compel U-Haul to speak about highly controversial matters of public policy when it would not otherwise speak.

26. If Plaintiffs do not obtain injunctive relief on behalf of their members, U-Haul will be irreparably injured through the compulsion of its speech no later than January 1, 2026.

27. The Court should enjoin S.B. 253 and S.B. 261 during the pendency of this appeal to prevent these imminent and irreversible harms.

Pursuant to 28 U.S.C. §1746, I, Edward J. Shoen, declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on this 2nd day of September, 2025.

Edward J. Shoen

5

DECLARATION OF EDWARD J. SHOEN
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-55**

# Exhibit A

California Air Resources Board

August 21, 2025 Workshop Presentation

Declaration of Martin Durbin in Support of
Plaintiffs' Reply in Support of Motion for Injunction Pending Appeal
September 2, 2025

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.*,
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)

Case 2:24-cv-00801-ODW-PVC   Document 122-2   Filed 09/02/25   Page 2 of 47   Page ID #:10621

# SB 253/261/219 Public Workshop: Regulation Development and Additional Guidance

AUGUST 21, 2025

# Workshop Logistics

- Workshop Materials link: [https://ww2.arb.ca.gov/our-work/programs/california-corporate-greenhouse-gas-ghg-reporting-and-climate-related-financial](https://ww2.arb.ca.gov/our-work/programs/california-corporate-greenhouse-gas-ghg-reporting-and-climate-related-financial)

- Zoom Orientation:

  - Raise Hand

  - Zoom phone participants may dial #2 to "Raise your Hand"

  - The facilitator will inform Zoom phone participants when they are unmuted during Public Comment

  - Dial *6 to mute or unmute



ER-58
2

# Agenda

**1.** **Welcome** – Program Background

**2.** **Regulation Development and Implementation** (SB 253/261)
- "Who": Covered Entities and Exemptions
- "What": Fee Regulation Concept
- "How": Further Guidance on Reporting
- "When": Timelines for Reporting Requirements

**3.** **Scope 3 Emissions and Assurance Criteria** (SB 253)

**4.** **Public Feedback**

# CARB's Enduring Commitment to Clean Air and Climate Leadership

For more than **50 years**, CARB has led the nation in protecting public health and reducing air pollution

CARB's work is grounded in science, supported by different governors and legislative bodies, and strengthened by partnerships with communities, industries, and public health advocates

Through regulatory innovation and collaboration, CARB has helped catalyze progress on smog, greenhouse gases, and clean transportation

**"We have a legal—and moral—obligation to continue to pursue clean air."**
**—** *CARB Chair Liane Randolph, May 2025 Press Conference*

# Climate Disclosures Build on Two Decades of State Climate Action

- Landmark Climate Legislation - Assembly Bill 32 (2006)
- 2030 target: At least 40% GHG reduction below 1990 levels (SB 32)
- 2045 target: Carbon neutrality and at least 85% GHG reduction below 1990 levels (AB 1279)
- Existing CARB efforts to reduce GHG emissions include Cap-and-Trade, Low Carbon Fuel Standard (LCFS), and mobile source regulations
- Mandatory Greenhouse Gas Reporting Regulation (MRR) requires reporting of scope 1 emissions from large emitters
- LCFS requires scope 1 and 2 emissions reporting

CALIFORNIA AIR RESOURCES BOARD

# Overview of Relevant Legislation

- California Climate Disclosure Laws: SB 253, 261, 219 (Health & Safety Code § 38532-38533) – "the 200s"
- Aim to improve transparency on corporate climate-related risks and emissions
- Help inform consumers and investors of climate-related business considerations

ER-62

6

# SB 253: The Climate Corporate Data Accountability Act

- Affected entities – "doing business in California" and >$1 billion in annual revenues
- Scope 1, 2, disclosure beginning 2026
- Scope 3 in 2027
- Assurance milestones – starting with limited assurance
- Allows for use of existing reporting standards such as the GHG Protocol

ER-63

7

# SB 261: Climate-Related Financial Risk Disclosure

- Affected entities – "doing business in California" and >$500 million in annual revenues
- Biennial disclosure requirement
- Encourages alignment with existing frameworks
- Allows for the use of existing voluntary reporting frameworks, like the ISSB standards (evolved from the TCFD framework)
- Contract with a non-profit organization

Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 23 of 297
Case 2:24-cv-00801-ODW-PVC    Document 122-2    Filed 09/02/25    Page 10 of 47    Page ID #:10629

# SB 219: Timeline Extensions, Flexibility and Reporting Adjustments

- How SB 219 amends and adjusts SB 253 & 261:
  - Clarifies that CARB will set the schedule for scope 3 disclosures (beginning in 2027)
  - Adds parent-level consolidation option

# Regulatory Process to Implement the 200s

Pre-rulemaking recap

- Enforcement notice (December 2024)
- Information solicitation (December 2024)
- Public workshop (May 2025)
- FAQ release (July 2025)
- Public workshop (August 2025)
- All regulations must meet the APA's rulemaking standards, including the clarity standard.

# Regulation Development and Implementation

SB 253/261

# Identifying the "Who": Updates on Definitions

Definitions from the 200s:

**SB 253**: "Reporting entity" means a partnership, corporation, limited liability company, or other business entity formed under the laws of this state, the laws of any other state of the United States or the District of Columbia, or under an act of the Congress of the United States with total annual revenues in excess of one billion dollars ($1,000,000,000) and that does business in California. Applicability shall be determined based on the reporting entity's revenue for the prior fiscal year.

**SB 261**: "Covered entity" means a corporation, partnership, limited liability company, or other business entity formed under the laws of the state, the laws of any other state of the United States or the District of Columbia, or under an act of the Congress of the United States with total annual revenues in excess of five hundred million United States dollars ($500,000,000) and that does business in California. Applicability shall be determined based on the business entity's revenue for the prior fiscal year. "Covered entity" does not include a business entity that is subject to regulation by the Department of Insurance in this state, or that is in the business of insurance in any other state.

# Identifying the "Who"
# Update on Definitions: "Revenue"

- At the May workshop, staff considered defining total annual revenue as gross receipts as set forth in California Revenue and Taxation Code (RTC) § 25120(f)(2)

- Examples of feedback:
  - Gross receipts are not a suitable metric for gauging revenue due to data confidentiality limitations and lack of verification
  - Definition is too expansive

ER-69

13

# Identifying the "Who"
# Update on Definitions: "Revenue"

**Alternative option:** "Revenue is the total global amount of money or sales a company receives from its business activities, such as selling products or providing services."

- This definition does not deduct operating costs or other business expenses
- This definition is consistent with metrics used by major data tracking and reporting industries, such as Dunn & Bradstreet, Standard & Poor, and Data Axle

ER-70

# Identifying the "Who"
# Update on Definitions: "Doing Business in CA"

At the May workshop, staff considered pointing to the Revenue & Tax Code definition provided in Section 23101:

§ 23101(a): "Doing business" means actively engaging in any transaction for the purpose of financial or pecuniary gain or profit.

AND

§ 23101(b): An entity is considered to be "doing business in California" for purposes of the reporting regulation if the entity is doing business (as defined in section 23101(a)), and any of the following conditions is met during any part of a reporting year:

(1) The entity is organized or commercially domiciled in this state.

(2) Sales, as defined in The Revenue and Taxation Code subdivision (e) or (f) of Section 25120 as applicable for the reporting year, of the entity in this state exceed the inflation adjusted thresholds of seven hundred thirty-five thousand and nineteen ($735,019) (2024). For purposes of this paragraph, sales of the entity include sales by an agent or independent contractor of the entity. For purposes of this paragraph, sales in this state shall be determined using the rules for assigning sales under Sections 25135 and 25136, and the regulations thereunder, as modified by regulations under Section 25137.

# Identifying the "Who"
# Update on Definitions: "Doing Business in CA"

- Staff are exploring existing databases of US-based companies that could be used to establish "doing business in CA"

- Limitations exist for using Franchise Tax Board data

- CA Secretary of State Business Entity database is publicly available and lists any entity with a designated agent for service of process in California

- Note: companies subject to the regulation will be responsible for compliance, even if not initially included on staff's list or outreach

# Identifying the "Who"
# Update on Definitions: Parent and subsidiary

- Based on the existing Cap-and-Trade regulation:

  "Subsidiary is a business in which another company (the parent or holding company) owns more than 50% of its voting stock. A subsidiary has a different legal business name than its parent company. This corporate relationship implies that the parent company has a controlling interest and can influence the subsidiary's operations, management, and financial decisions, even though the subsidiary operates as a separate legal entity."

- Staff's proposal is to identify subsidiaries through evaluation of commercial databases, cross-referenced with the Secretary of State database and/or the Franchise Tax Board database.
- Staff is seeking input on a process where companies may choose to self-report on parent-subsidiary relationships to avoid reporting for multiple entities under the same parent company.

ER-73
17

# Identifying the "Who"
# Exempted entities

**Based on stakeholder comments, staff proposes the following exemptions and invites public input:**

- Non-profits
- A company whose only business in California is the presence of teleworking employees
- Government entities would not be covered and do not need an exemption because they are not formed under business entity laws as defined in HSC 38532 and 38533.
- CA Independent System Operator (CAISO) or a business entity whose only activity within California consists of wholesale electricity transactions that occur in interstate commerce.

ER-74

# Identifying the "Who": Preliminary analysis of covered entities



US-based companies w/global annual sales ≥ $500 million

8,817

*Source:* Dunn & Bradstreet

Businesses registered with CA Secretary of State with "Active" status

816,845

*Source:* CA Sec. of State

**Entity or parent company name match**

**SB 261**

4,160*

2,596*

**SB 253**

# Fee Regulation Concept

# SB 253/261 Implementation Fees: Background

- The 200s authorize CARB to assess an annual fee for the implementation and administration of the new reporting programs. Companies subject to regulation will be assessed the fee.

- CARB has experience with this kind of structure through its AB 32 Cost of Implementation (COI) Fee Regulation.

- COI Fee Regulation was adopted to support implementation of AB 32 and subsequently amended to support MRR, C&T, and LCFS.

- The COI fee is assessed per metric ton of $CO_2e$ emitted.

# SB 253/261 Implementation Fees: Concept

- For SB 253/261 implementation fees, Staff recommend issuing a "flat" fee per regulated entity

- Flat annual fee for each program calculated as: $\dfrac{Annual\ Program\ Cost}{Number\ of\ Covered\ Entities}$

- Companies with more than $500M in revenue would annually pay the Climate-Related Financial Risk Disclosure Fund Fee (SB 261)
- Companies with more than $1B in revenue would also annually pay the Climate Accountability and Emissions Disclosure Fund Fee (SB 253)
- Subsidiaries filing parent company reports still represent separate entities subject to fee
- Fee amounts will be determined based on how many entities are covered by the program and the annual cost of the program

# SB 253/261 Implementation Fees: Covering the Cost of the Program

- CARB's program administration costs include a one-time cost to set up the program: $20.7M, temporarily funded through  Greenhouse Gas Reduction Fund (GGRF) Fiscal Year (FY) 23/24 and 24/25)

- Ongoing costs of implementing 253/261 programs: $13.9M (not counting GGRF loan repayment)

- Fee will be adjusted annually for inflation

**ER-79**

(38 of 297), Page 38 of 297
Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 38 of 297
Case 2:24-cv-00801-ODW-PVC    Document 122-2    Filed 09/02/25    Page 25 of 47    Page ID #:10644

# SB 253/261 Implementation Fees: Estimated Fee Per Covered Entity

**Assumptions**

- **Annual cost of implementation**: $13.9M
- **Entities subject to SB 253**: 2,596*
- **Entities subject to SB 261**: 4,160*
- 58% of overall implementation costs attributed to SB 253
- **Annual fee for SB 253 entities**: $3,106
- **Annual fee for SB 261 entities**: $1,403
- Reporting entities with more than $1B in revenue are subject to both fees
- Annual fees to be adjusted for inflation and fund deficit/surplus in future years

*Based on staff analysis of CA Secretary of State and Dunn & Bradstreet data. CARB will initiate a process to validate the preliminary list of covered entities

ER-80
24

# SB 253/261 Implementation Fees: Draft Timeline

- **Aug 21**: Public Workshop

- **Aug 21—Sep 11**: Public comment period for feedback on workshop concepts

- **Oct 14**: Notice of Proposed Rulemaking

- **Oct 17—Nov 30**: 45-day APA comment period begins

- **Dec 11—Dec 12**: Board consideration of proposed rulemaking

    (public Board Hearing)

ER-81

# Further Guidance on The 200s Implementation

# Guidance on "How"
# SB 261: Climate Risk Reporting

- Reports must be posted to entity's website by January 1, 2026 and every two years thereafter
- CARB will post a public docket on December 1, 2025 for entities to post the public link to their reports
  - Docket scheduled to close July 1, 2026
- A number of resources exist for guidance on climate-related financial reporting:
  - Recommendations of the Task Force on Climate-related Financial Disclosures
  - TCFD's Reporting Climate-Related Financial Information: Critical Introductory Materials
  - IFRS S2 Climate-Related Disclosures
  - IFRS Comparison of IFRS S2 and TCFD Recommendations
- CARB will provide guidance on minimum requirements for compliance with HSC § 38533

# Guidance on "How"
# SB 261: Minimum Reporting Requirements

- Entity may use one of several frameworks to meet disclosure requirements:
  - Final Report of Recommendations of TCFD (2017)
  - IFRS Disclosure Standards
  - A report developed in accordance with any regulated exchange, national government, or other governmental entity
- Each report submitted to CARB should contain a statement on:
  - Which reporting framework is being applied
  - Discuss which recommendations and disclosures have been compiled and which have not
  - Provide a short summary of the reasons why recommendations/disclosures have not been included as well as discussion of any plans for future disclosures

ER-84

# Guidance on "How"
# Climate-related Risk: Principles

- Four overriding principles underpin the climate related risk disclosures, informed by TCFD (2017) and IFRS S2
  - Governance
  - Strategy
  - Risk Management
  - Metrics and Targets

ER-85

# Guidance on "How"
# Climate-related Risk: Governance

- Describe your organization's governance structure for identifying, assessing, and managing climate-related financial risks. Details should include:
  - Management oversight of climate-related risks and opportunities and should provide a description pertaining to Board oversight of those climate-related risks and opportunities (if the reporting entity has a Board)

**ER-86**

# Guidance on "How"
# Climate-related Risk: Strategy

- Describe the actual and potential impacts of climate-related risks and opportunities on the company's operations, strategy and financial planning. This includes describing:
  - The climate-related risks and opportunities the organization has identified over the short, medium, and long term
  - The impact of climate-related risks and opportunities on the organization's operations, strategy, and financial planning
  - The resilience of the organization's strategy, taking into consideration the future impacts of climate change under various climate scenarios.

**ER-87**
31

# Guidance on "How"
# Climate-related Risk: Risk Management

- Describe how the reporting entity identifies, assesses, and manages climate-related risks including a qualitative description of:
  - The process the reporting entity uses for identifying, managing and assessing climate-related risks, and how those considerations and processes are integrated into the organization's overall risk management

(47 of 297), Page 47 of 297
Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 47 of 297
Case 2:24-cv-00801-ODW-PVC    Document 122-2    Filed 09/02/25    Page 34 of 47    Page ID #:10653

# Guidance on "How"
# Climate-related Risk: Metrics + Targets

- Disclose the metrics and targets used to assess and manage relevant climate-related risks and opportunities where such information is material
  - For a discussion of material relevance as used in this context, see TCFD 2017. If using a different framework, refer to that framework's guidance

# "When"
## SB 253: Timing of Scope 1 and 2 Reporting in 2026

- Staff are proposing a June 30, 2026 implementation deadline for SB 253 Scope 1 and 2 reporting, which will be included in the fee regulation
  - We welcome public feedback
- Staff will post draft reporting templates for Scope 1 and 2 reporting by the end of September 2025 for public feedback
  - Option to include other actions that reduce greenhouse gases, such as investments in renewable electricity and gas, among others

(49 of 297), Page 49 of 297
Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 49 of 297
Case 2:24-cv-00801-ODW-PVC    Document 122-2    Filed 09/02/25    Page 36 of 47    Page ID #:10655

# SB 253: Scope 3 Emissions from Major Emitting Sectors

- We are on track with Scope 1 and 2, and already looking ahead to Scope 3 emissions
- AB 32 GHG Inventory: Transportation is one of the largest-emitting sectors in California (~50% with fuels included)



23% · Industrial
11% · Electricity IN STATE
5% · Electricity IMPORTS
8% · Agriculture
6% · Commercial
8% · Residential
39% · Transportation

371.1 MMT CO$_2$e
2022 TOTAL CA EMISSIONS

- Many transportation-related companies are already reporting Scope 3 emissions, which may guide covered entities in developing their own reports
- As part of CARB's public sessions on the Governor's ZEV EO (N-27-25), stakeholders requested stronger disclosures of GHG emissions from transportation-related companies

# SB 253 Assurance Criteria

(51 of 297), Page 51 of 297
Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 51 of 297
Case 2:24-cv-00801-ODW-PVC    Document 122-2    Filed 09/02/25    Page 38 of 47    Page ID #:10657

# Existing Mandatory GHG Reporting Regulation Definition of Verification

A <u>systematic</u>, <u>independent</u> and <u>documented</u> process for evaluating a reporting entity's emissions data report against CARB's reporting procedures and methods for calculation and reporting of GHG emissions and product data.

- Systematic: organized, rigorous and thorough
- Independent: based on fact, unbiased, objective
- Documented: process, records, findings
- Judged against a set standard and to a given level of assurance
- Findings based on examination of objective evidence

# Skills and Responsibilities of an Effective CARB-Accredited Verifier

- Do not advise and then review your own work
- Maintain independence and objectivity
- Act with integrity and honesty
- Review emissions data reports on behalf of CARB
- Focus on rigor and efficiency as required for the level of assurance

# The Importance of Impartiality

- Conflict between self-interest and ability to maintain independence and objectivity
- Conflict of interest can be real or perceived
- Perceived COI can undermine public support and confidence in the quality of the reported data
- CARB already includes conflict of interest disclosures and rotation of verification bodies in other regulatory programs

# Background: Assurance

Intended to increase user confidence in data and information

Three types of assurance: absolute, reasonable and limited
- Reasonable assurance for existing CARB regulations

Financial audits have high level of rigor

# Limited Assurance Framework

- Limited review of data and controls
- Impartiality
- Assurance is given in the negative:  "nothing has come to our attention that causes us to believe that the emissions data report is not materially correct"
- Lower confidence in completeness and accuracy
- Could include qualifiers around findings

**ER-97**
41

# Draft Implementation of Limited Assurance

- Sampling plans
- Reviews of data management systems
- Limited data checks
- Limited conformance checks
- Process documentation
- Log of any found and corrected errors by the reporting company
- Report and statement at the conclusion

ER-98

# Initial Staff Concept for Assurance

- SB 253 requires entities to seek third-party assurance of their GHG reporting
- Potential standards
  - ISSA 5000 (IAASB)
  - AA1000
  - ISO 14060 family
  - AICPA
- We welcome public feedback

ER-99
43

# CARB Oversight

- CARB may opt to audit assurance and reporting activities
- CARB retains all authority to review information submitted by reporting entities and assurance providers, and take enforcement action as appropriate

# Feedback / Questions

1. Questions will be taken virtually through Zoom

2. Raise Hand

3. Zoom phone participants may dial #2 to "Raise your Hand"

4. The facilitator will inform Zoom phone participants when they are unmuted during Public Comment.

5. Dial *6 to mute or unmute.

6. Staff will make every effort to call on attendees in the order they raise the hand on Zoom



CALIFORNIA AIR RESOURCES BOARD

ER-101
45

# Next Steps

We want your feedback – stakeholder input is critical to shaping this program

Public docket will be open for three weeks for written feedback

Sign up with the listserv to stay engaged and be notified of future public workshops and updates:

https://ww2.arb.ca.gov/our-work/programs/california-corporate-greenhouse-gas-ghg-reporting-and-climate-related-financial

Questions or Comments? Contact us at: ClimateDisclosure@arb.ca.gov

Note: Input received via email will be posted to the public docket

(61 of 297), Page 61 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 61 of 297
Case 2:24-cv-00801-ODW-PVC Document 122-1 Filed 09/02/25 Page 1 of 8 Page
ID #:10612

1  EUGENE SCALIA, SBN 151540
2     escalia@gibsondunn.com
   GIBSON, DUNN & CRUTCHER LLP
3  1050 Connecticut Avenue, N.W.
   Washington, D.C. 20036-5306
4  Telephone: 202.955.8500
   Facsimile: 202.467.0539
5

6  *Attorneys for Plaintiffs Chamber of*
*Commerce of the United States of*
7  *America, California Chamber of*
*Commerce, American Farm Bureau*
8  *Federation, Los Angeles County*
*Business Federation, Central Valley*
9  *Business Federation, and*
*Western Growers Association*
10

11  (*Additional counsel listed on next page*)

12        IN THE UNITED STATES DISTRICT COURT

13      FOR THE CENTRAL DISTRICT OF CALIFORNIA,

14            WESTERN DIVISION

| | |
|---|---|
| 15 CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, | CASE NO. 2:24-cv-00801-ODW-PVC |
| 16 CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM | **DECLARATION OF MARTIN DURBIN** |
| 17 BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS | |
| 18 FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and | |
| 19 WESTERN GROWERS ASSOCIATION, | |
| 20       Plaintiffs, | |
| 21      v. | |
| 22 LIANE M. RANDOLPH, in her official capacity as Chair of the California Air | |
| 23 Resources Board, STEVEN S. CLIFF, in his official capacity as the Executive | |
| 24 Officer of the California Air Resources Board, and ROBERT A. BONTA, in his | |
| 25 official capacity as Attorney General of California. | |
| 26       Defendants. | |

27

28

Gibson, Dunn &
Crutcher LLP

**ER-103**

(62 of 297), Page 62 of 297  Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 62 of 297
Case 2:24-cv-00801-ODW-PVC    Document 122-1    Filed 09/02/25    Page 2 of 8    Page
ID #:10613

1   BRADLEY J. HAMBURGER,
       SBN 266916
2       bhamburger@gibsondunn.com
3   SAMUEL ECKMAN, SBN 308923
       seckman@gibsondunn.com
4   ELIZABETH STRASSNER,
       SBN 342838
5       estrassner@gibsondunn.com
6   GIBSON, DUNN & CRUTCHER LLP
    333 South Grand Ave.
7   Los Angeles, CA 90071-3197
    Telephone:  213.229.7000
8   Facsimile:   213.229.7520

9   BRIAN A. RICHMAN
    (*pro hac vice*)
10      DC Bar No. 230071
        brichman@gibsondunn.com
11  GIBSON, DUNN & CRUTCHER LLP
12  2001 Ross Ave., Suite 2100
    Dallas, TX 75201-2923
13  Telephone:  214.698.3100
    Facsimile:   214.571.2900
14
    *Attorneys for Plaintiffs Chamber of Commerce of the United States of America,*
15  *California Chamber of Commerce, American Farm Bureau Federation, Los Angeles*
    *County Business Federation, Central Valley Business Federation, and*
16  *Western Growers Association*

17  STEPHANIE A. MALONEY
    (*pro hac vice*)
18      DC Bar No. 104427
        smaloney@uschamber.com
19  KEVIN PALMER
    (*pro hac vice*)
20      DC Bar No. 90014967
        kpalmer@uschamber.com
21  CHAMBER OF COMMERCE OF THE
    UNITED STATES OF AMERICA
22  1615 H Street, NW
    Washington, D.C. 20062-2000
23  Telephone:  202.659.6000
    Facsimile:   202.463.5302
24
25  *Attorneys for Plaintiff Chamber of Commerce of the United States of America*

26

27

28

Gibson, Dunn &
Crutcher LLP

---

DECLARATION OF MARTIN DURBIN
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-104**

1. My name is Martin Durbin.  I am the Senior Vice President for Policy at the Chamber of Commerce of the United States of America.  In that capacity, I oversee the entirety of the Chamber's Policy Division.

2. I am also President of the Chamber's Global Energy Institute (GEI), and in that capacity, I lead strategic development and implementation of the Chamber's climate, energy, and sustainability policy.

3. My leadership of the Policy Division also includes oversight of the operations of the Center for Capital Markets Competitiveness (CCMC).  CCMC works to advance America's global leadership in capital formation by supporting diverse capital markets that are the most fair, transparent, efficient, and innovative in the world. This work includes advocating for responsible corporate governance and financial reporting measures at the state, federal, and international levels.

4. I am over 18 years old.  This Declaration is based upon my personal knowledge and belief and/or upon my review of business records of the Chamber.  If called as a witness, I could and would testify competently thereto.

5. My former Chamber colleague, Thomas Quaadman, submitted a declaration in this matter on February 25, 2025. At that time, Mr. Quaadman led CCMC.  [*See* Quaadman Dec., Dkt. 78-4.]

6. I have reviewed Mr. Quaadman's declaration, and here restate and incorporate paragraphs 3 through 9 of that declaration in their entirety.

7. I submit this further declaration in my role overseeing both the Chamber's corporate governance and sustainability initiatives to address intervening developments.

**CARB's August 21 Workshop**

8. On August 21, 2025, the California Air Resources Board (CARB) held a workshop regarding the implementation of S.B. 253 and S.B. 261.  At this workshop, CARB officials provided regulated entities with more precise information on when and how the agency will enforce the two laws.

**ER-105**

(64 of 297), Page 64 of 297, Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 64 of 297
Case 2:24-cv-00801-ODW-PVC    Document 122-1    Filed 09/02/25    Page 4 of 8    Page
ID #:10615

9.     CARB officials' presentation at this workshop included a slideshow. I have reviewed these slides, which are available on CARB's public website. SB 253/261/219 Public Workshop: Regulation Development and Additional Guidance, *available at* https://ww2.arb.ca.gov/sites/default/files/2025-08/SB%20253%20261%20workshop%20slides%208-21.pdf. A true and correct copy of the slides is attached here as **Exhibit A**.

10.     The August 21 workshop reinforced the concerns of Chamber members about CARB's plans to begin enforcing S.B. 261 on January 1, 2026, and the burdensome steps regulated entities must take well before that date to prepare to issue the required reports. Further, S.B. 253 also compels speech, and CARB has proposed enforcing penalties for non-compliance as soon as June 30, 2026. [Ex. A at 34.]

11.     Many of the Chambers's members will fall within the scope of S.B. 253 and 261 based on their annual revenues and business in California.

**S.B. 261's Effects on the Chamber's Members**

12.     At the August 21 workshop, CARB confirmed it will require companies to be in full compliance with S.B. 261 by January 1, 2026. [Ex. A at 27.] CARB also stated that it will open a portal on December 1, 2025 for the purpose of collecting companies' required climate-related risk disclosures. [*Id.*]

13.     At the workshop, CARB provided additional detail, consistent with the provisions of S.B. 261, on the statements the Chamber's members will be compelled to make by January 1, 2026. As presented at the workshop, the CARB slides highlight the various disclosures that a company must provide, including:

- its "governance structure for identifying, assessing, and managing climate-related financial risks";
- how its governing "Board [oversees] those climate-related risks";
- "the actual and potential impacts of climate-related risks and opportunities on the company's operations, strategy, and financial planning";

1    • "the resilience of the organization's strategy, taking into account the future

2        impacts of climate change under various climate scenarios";

3    • its qualitative process for "identifying, managing and assessing climate-related

4        risks, and how those considerations and processes are integrated into the

5        organization's overall risk management"; and

6    • its "metrics and targets used to assess and manage relevant climate-related

7        risks."

8    [Ex. A at 30-33.]

9        14.    As the CARB slides make clear, the speech compelled by S.B. 261 is

10   subjective and concerns a topic of significant controversy and public policy debate.

11   S.B. 261 requires members of the Chamber to publish qualitative assessments as to

12   their climate-related financial risks, conveying a specific philosophy of environmental

13   sustainability.

14       15.    Some Chamber members have not spoken on these matters of public

15   controversy and do not wish to do so.

16       16.    S.B. 261 applies to companies regardless of whether they voluntarily

17   make statements about their climate-related risks, emissions, or sustainability

18   initiatives.  It compels speech that is not tethered to their advertisements or to any

19   product or service they offer, in California or elsewhere.

20       17.    If not enjoined, Chamber members will be compelled to speak against

21   their will to ensure compliance with S.B. 261 as of January 1, 2026.  Such speech

22   cannot be unsaid if S.B. 261 is eventually declared unlawful.  The reports that they

23   issue will live on in the public square.

24       18.    Compliance with S.B. 261 will also require Chamber members to pay fees

25   to support the State's implementation of it.  At the August 21 workshop, CARB

26   estimated that each Covered Entity will be required to pay a $1,403 annual

27   implementation fee for S.B. 261. [Ex. A at 24.]

28

3

DECLARATION OF MARTIN DURBIN
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-107**

19.    Chamber members are continuing to incur unrecoverable costs to create the reports required by S.B. 261 in advance of the January 1, 2026 compliance deadline.

**S.B. 253's Effects on the Chamber's Members**

20.    At the August 21 workshop, CARB officials announced that CARB "[s]taff are proposing a June 30, 2026 implementation date" for Scope 1 and Scope 2 emissions under S.B. 253. [Ex. A at 34.] S.B. 253's Scope 3 reporting requirements are scheduled to take effect in 2027.

21.    Compliance with S.B. 253's requirements to report Scope 1, 2, and 3 emissions will impose several costly and burdensome steps on the Chamber's members. These disclosures go far beyond many members' voluntary disclosures, or disclosure requirements under existing state, federal, and international laws and regulations.

22.    Proper attribution of a company's emissions, particularly Scope 3 emissions, is a controversial matter of public debate. Some Chamber members do not agree with California's definition of what constitutes a company's reportable emissions and believe that compliance with S.B. 253 would compel them to make misleading or inaccurate statements.

23.    Some Chamber members fear that being compelled to make these statements could damage their business.

24.    Because the calculation and attribution of emissions defined in S.B. 253 is itself a matter of debate, some Chamber members choose not to voluntarily disclose emissions data. These members refrain from participating in the public square on this topic.

25.    Like S.B. 261, S.B. 253 applies to companies regardless of whether they voluntarily make statements about their emissions, climate-related risks, or sustainability initiatives.

Gibson, Dunn & Crutcher LLP

4

**ER-108**

(67 of 297), Page 67 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 67 of 297
Case 2:24-cv-00801-ODW-PVC    Document 122-1    Filed 09/02/25    Page 7 of 8    Page
ID #:10618

26.    Moreover, complying with S.B. 253 will require Chamber members to pay fees to support the State's implementation of its requirements. At the August 21 workshop, CARB calculated these fees at $3,106 per year.  [Ex. A at 24.]

27.    If not enjoined, Chamber members will be forced to make these public statements that they would not otherwise make.  And those statements cannot be undone.  Nor can any effects they have on the members' relationships or customer goodwill be undone.

Pursuant to 28 U.S.C. §1746, I, Martin Durbin, declare under penalty of perjury that the foregoing is true and correct.

Executed on September ___, 2025, at Washington, D.C.

Martin Durbin

DECLARATION OF MARTIN DURBIN
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-109**

Gibson, Dunn &
Crutcher LLP

1
2
3
4
5

EUGENE SCALIA, SBN 151540
    escalia@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1700 M St. N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

6
7
8
9

*Attorneys for Plaintiffs Chamber of
Commerce of the United States of Amer-
ica, California Chamber of Commerce,
American Farm Bureau Federation, Los
Angeles County Business Federation,
Central Valley Business Federation,
and Western Growers Association*

10
11

(*Additional counsel listed on next page*)

12
13

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA,

WESTERN DIVISION

14
15
16
17
18
19
20
21

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA,
CALIFORNIA CHAMBER OF
COMMERCE, AMERICAN FARM
BUREAU FEDERATION, LOS
ANGELES COUNTY BUSINESS
FEDERATION, CENTRAL VALLEY
BUSINESS FEDERATION, and
WESTERN GROWERS ASSOCIATION,

Plaintiffs,

v.

22
23
24
25
26
27

LIANE M. RANDOLPH, in her official
capacity as Chair of the California Air
Resources Board, STEVEN S. CLIFF, in
his official capacity as the Executive
Officer of the California Air Resources
Board, and ROBERT A. BONTA, in his
official capacity as Attorney General of
California.

Defendants.

CASE NO. 2:24-cv-00801-ODW-PVC

**PLAINTIFFS' REPLY IN
SUPPORT OF MOTION FOR
INJUNCTION PENDING APPEAL**

**HEARING:**
Date:       September 15, 2025
Time:       1:30 pm
Location:   Courtroom 5D
Judge:      Otis D. Wright II

28

(70 of 297)  Page 70 of 297  Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 70 of 297
Case 2:24-cv-00801-ODW-PVC    Document 122    Filed 09/02/25    Page 2 of 17    Page ID
#:10596

1  BRADLEY J. HAMBURGER
     SBN 266916
2      bhamburger@gibsondunn.com
   SAMUEL ECKMAN
3      SBN 308923
4      seckman@gibsondunn.com
   ELIZABETH STRASSNER
5      SBN 342838
     estrassner@gibsondunn.com
6  GIBSON, DUNN & CRUTCHER LLP
7  333 South Grand Ave.
   Los Angeles, CA  90071-3197
8  Telephone:  213.229.7000
   Facsimile:   213.229.7520
9
   BRIAN A. RICHMAN
10 (*pro hac vice*)
     DC Bar No. 230071
11     brichman@gibsondunn.com
12 GIBSON, DUNN & CRUTCHER LLP
   2001 Ross Ave., Suite 2100
13 Dallas, TX  75201-2923
   Telephone:  214.698.3100
14 Facsimile:   214.571.2900

15 *Attorneys for Plaintiffs Chamber of Commerce of the United States of America, Cali-*
16 *fornia Chamber of Commerce, American Farm Bureau Federation, Los Angeles*
   *County Business Federation, Central Valley Business Federation, and*
17 *Western Growers Association*

18 STEPHANIE A. MALONEY
   (*pro hac vice*)
19     DC Bar No. 104427
20      smaloney@uschamber.com
   KEVIN PALMER
21 (*pro hac vice*)
     DC Bar No. 90014967
22     kpalmer@uschamber.com
23 CHAMBER OF COMMERCE OF THE
   UNITED STATES OF AMERICA
24 1615 H Street, NW
   Washington, D.C.  20062-2000
25 Telephone:  202.659.6000
   Facsimile:   202.463.5302
26
   *Attorneys for Plaintiff Chamber of Commerce of the United States of America*
27
28

Gibson, Dunn &
Crutcher LLP

(71 of 297) Page 71 of 297  Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 71 of 297
Case 2:24-cv-00801-ODW-PVC    Document 122    Filed 09/02/25    Page 3 of 17    Page ID
#:2997

# TABLE OF CONTENTS

Page

I. INTRODUCTION ....................................................................................... 1

II. ARGUMENT ............................................................................................ 3

    A.    Plaintiffs' Appeal Raises Serious Questions on the Merits ....................... 3

        1.    The State ducks the threshold question: what test makes the speech compelled by SB 253 and SB 261 "commercial speech." ............................................................................... 3

        2.    *Zauderer* does not apply—and the State cannot rewrite its limits. ................................................................................ 5

        3.    The lack of tailoring independently raises serious questions. ......... 6

    B.    The Equities Strongly Favor Plaintiffs ..................................................... 8

    C.    Plaintiffs Seek Narrow Relief .................................................................. 10

III. CONCLUSION ........................................................................................ 10

(72 of 297) Page 72 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 72 of 297
Case 2:24-cv-00801-ODW-PVC Document 122 Filed 09/02/25 Page 4 of 17 Page ID
#:1698

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*44 Liquormart, Inc. v. Rhode Island*,
   517 U.S. 484 (1996)..................................................................................7

*All. for Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) .................................................................1

*Am. Beverage Ass'n v. City & County of San Francisco*,
   2016 WL 9184999 (N.D. Cal. June 7, 2016)......................................1, 2

*Am. Beverage Ass'n v. City & County of San Francisco*,
   916 F.3d 749 (9th Cir. 2019) ...................................................................9

*Am. Meat Inst. v. USDA*,
   760 F.3d 18 (D.C. Cir. 2014) ..................................................................7

*Am. Trucking Ass'ns v. City of Los Angeles*,
   2010 WL 4313973 (C.D. Cal. Oct. 25, 2020) .........................................1

*Bolger v. Youngs Drug Prods. Corp.*,
   463 U.S. 60 (1983)...................................................................................4

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
   29 F.4th 468 (9th Cir. 2022) ...................................................................1

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
   447 U.S. 557 (1980).................................................................................7

*CTIA – The Wireless Ass'n v. City of Berkeley*,
   928 F.3d 832 (9th Cir. 2019) ...................................................................5

*Green v. Miss U.S. of Am., LLC*,
   52 F.4th 773 (9th Cir. 2022) ...................................................................7

*IMDb.com Inc. v. Becerra*,
   962 F.3d 1111 (9th Cir. 2020) .............................................................4, 6

*Meinecke v. City of Seattle*,
   99 F.4th 514 (9th Cir. 2024) ...................................................................2

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
   585 U.S. 755 (2018)........................................................................5, 6, 8

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
   606 U.S. —, 2025 WL 2415669 (2025) .................................................9

*NetChoice, LLC v. Bonta*,
   113 F.4th 1101 (9th Cir. 2024) .............................................................6, 9

*Pharm. Rsch. & Mfrs. of Am. v. Stolfi*,
   — F.4th —, 2025 WL 2448851 (9th Cir. 2025)...................................4, 6

Gibson, Dunn &
Crutcher LLP

(73 of 297) Page 73 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 73 of 297
Case 2:24-cv-00801-ODW-PVC Document 82 Filed 07/23/25 Page 5 of 17 Page ID #:1693
(continued)

Page(s)

*X Corp. v. Bonta*,
116 F.4th 888 (9th Cir. 2024) ................................................................ 4, 9

*Youth 71Five Ministries v. Williams*,
2024 WL 3749842 (9th Cir. Aug. 8, 2024) ............................................. 3, 8

*Zauderer v. Office of Disciplinary Counsel*,
471 U.S. 626 (1985) ..................................................................................... 5

**Statutes**

SB 253 ................................................................................................................ 6

SB 261 ............................................................................................................. 2, 8

**Other Authorities**

*Judicial Business of the United States Courts 2024*, tbl. B-4A (2024),
https://tinyurl.com/mv44a32z ...................................................................... 9

Press Release, (Jan. 26, 2022), https://sd11.senate.ca.gov/news/senator-
wieners-climate-corporate-accountability-act-passes-senate .................... 2

Gibson, Dunn &
Crutcher LLP

iii

PLAINTIFFS' REPLY ISO MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 2:24-CV-00801-ODW-PVC

ER-115

# I. INTRODUCTION

The State's opposition is based on a false premise: that this motion is a second bite at the preliminary-injunction apple. It is not. Federal Rule of Civil Procedure 62(d) and Federal Rule of Appellate Procedure 8(a)(1)(C) expressly "contemplat[e] the possibility that the district court may grant an injunction pending appeal from an interlocutory order denying preliminary injunction." *Am. Beverage Ass'n v. City of San Francisco*, 2016 WL 9184999, at *2 (N.D. Cal. June 7, 2016). These rules exist to preserve the status quo and provide the opportunity for robust, considered appellate review. As other courts have recognized, an injunction pending appeal "may be appropriate, even if the Court believed its analysis in denying preliminary injunctive relief is correct." *Id.* at *2. And the governing standard for an appeal-only injunction is flexible: Plaintiffs need only show "serious questions" and that the balance of hardships tips sharply in their favor. *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011); *see Am. Trucking Ass'ns v. City of Los Angeles*, 2010 WL 4313973, at *1 & n.3 (C.D. Cal. Oct. 25, 2020) (granting injunction pending appeal following denial of injunctive relief); *Am. Beverage*, 2016 WL 9184999, at *2 (same). That standard applies with particular force in First Amendment cases, like this one, where irreparable harm is "relatively easy to establish." *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022).[1]

Plaintiffs' members will be compelled to speak on or before January 1, 2026, and this speech cannot be undone if the Ninth Circuit later reverses on appeal. Because this injury is irreparable and a decision on the pending appeal before January 1 is improbable, this Court should grant an injunction pending appeal to avoid forcing the Ninth Circuit to expedite consideration of the serious issues the case presents.

---

[1]    Plaintiffs respectfully request a ruling by September 15, 2025, so Plaintiffs may promptly seek relief from the Ninth Circuit if this Court declines to grant an injunction pending appeal. Plaintiffs intend to seek an injunction pending appeal from the Ninth Circuit by September 19, absent relief from this Court.

Gibson, Dunn & Crutcher LLP

**ER-116**

(75 of 297)  Page 75 of 297  Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 75 of 297
Case 2:24-cv-00801-ODW-PVC    Document 122    Filed 09/02/25    Page 7 of 17    Page ID
#:10601

The seriousness of those issues is underscored by a striking omission in the State's opposition: It never squarely tells the Court what test should govern whether the disclosures compelled by SB 253 and SB 261 are commercial speech, nor explains how the laws satisfy that test. That omission is not a minor oversight—it concerns an issue at the heart of the First Amendment analysis. The State bears the burden of justifying its speech-restrictive laws. *See Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024). Yet the State hedges and equivocates, waving away established tests as too "narrow" or "formulaic" (Opp. 9), without ever committing to a specific standard and then explaining how that standard applies and justifies the two laws. The State's failure to address this crucial threshold issue is proof by itself that this Court should let the Ninth Circuit decide Plaintiffs' appeal before these mandates take effect.

The appropriateness of an injunction is reinforced by the unprecedented nature of these laws. An injunction pending appeal is "'frequently issued where the trial court is charting a new and unexplored ground.'" *Am. Beverage*, 2016 WL 9184999, at *2. SB 253 and SB 261 are first-of-their-kind laws, by every account. The Legislature touted SB 253 as "groundbreaking legislation" to "reach far beyond California's borders." Dkt. 48-9, at 5. Senator Wiener called it "the first of its kind." Press Release (Jan. 26, 2022), https://sd11.senate.ca.gov/news/senator-wieners-climate-corporate-accountability-act-passes-senate. The parties' briefs also make clear these statutes compel speech in a way no court has previously upheld. *See* Opp. 12 (citing no case upholding speech compulsions untethered to terms of a transaction).

The balance of equities tips heavily in Plaintiffs' favor. Absent relief, Plaintiffs' members will be compelled to speak "[o]n or before January 1, 2026" and must devote scarce resources now to prepare for compliance with both statutes. This speech is compelled *so that* companies will be exposed to public criticism and pressure on a politically-fraught topic. Meanwhile, the State cannot plausibly claim harm from a short pause, having missed its own deadlines for issuing regulatory guidance. The State dismisses the imminent injury here as "only" "constitutional." Opp. 8. Yet constitutional injury is

(76 of 297) Page 76 of 297  Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 76 of 297
Case 2:24-cv-00801-ODW-PVC   Document 122   Filed 09/02/25   Page 8 of 17   Page ID
#:10602

1   no technicality to be summarily brushed aside; it is the paradigmatic irreparable harm.

2   *See, e.g.*, *Youth 71Five Ministries v. Williams*, 2024 WL 3749842, at *4 (9th Cir. Aug.

3   8, 2024) (granting injunction pending appeal).

4       This Court should preserve the status quo so the Ninth Circuit can decide these

5   novel First Amendment issues before the harm becomes irreversible, and without the

6   necessity of emergency proceedings.

7   **II. ARGUMENT**

8       The State's opposition reinforces why interim relief is warranted.  On the merits,

9   it never articulates a coherent answer to the crucial threshold question of this case:  why,

10   as the State maintains, the speech these laws regulate is "commercial."  Opp. 10–11.

11   The State's fallback rationales—truth-in-marketing, investor interest, and emissions re-

12   duction—are either already rejected by this Court or unprecedented in compelled-speech

13   doctrine.  The laws are not tailored to those interests, in any event.

14       On the equities, the State fares no better.  It dismisses imminent First Amendment

15   harm as "only" "constitutional," ignores this Court's finding that compliance steps must

16   begin now, and implausibly suggests that the Ninth Circuit will resolve the appeal on

17   the merits before January 1.  Opp. 3, 8.

18   **A.   Plaintiffs' Appeal Raises Serious Questions on the Merits**

19       Plaintiffs' appeal raises serious questions regarding the constitutionality of novel

20   statutes that compel speech.  Fighting that conclusion, the State either sidesteps control-

21   ling precedent or offers arguments that confirm that the issues here remain unsettled and

22   substantial—precisely the circumstances that warrant interim relief pending appeal.

23          **1.   The State ducks the threshold question: what test makes the speech**

24                   **compelled by SB 253 and SB 261 "commercial speech."**

25       The most striking feature of the State's opposition is what's absent: a test for com-

26   mercial speech that the State contends applies in this case and which it then illustrates is

27   met by the laws at issue.  The State acknowledges the three *Bolger* factors: (1) whether

28   the speech is an advertisement, (2) whether it refers to a specific product, and (3) whether

(77 of 297)   Page 77 of 297   Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 77 of 297
Case 2:24-cv-00801-ODW-PVC   Document 122   Filed 09/02/25   Page 9 of 17   Page ID
#:10603

the speaker has an economic motivation for engaging in the speech. *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67 (1983). Yet the State waves away all these standards as too "narrow" or "formulaic," without ever forthrightly saying what test applies and how the speech at issue meets it. Opp. 9. The State simply asserts that, "[i]n any event," the disclosures meet "the traditional definition" of commercial speech. *Id.* at 11. But it never recites that definition nor shows how publishing emissions information and lengthy narratives does "*no more* than propose a commercial transaction." *X Corp. v. Bonta*, 116 F.4th 888, 901 (9th Cir. 2024) (emphasis added). In fact, those voluminous disclosures propose no commercial transaction *at all*.

This gap in the State's argument is especially telling given this Court's preliminary-injunction order. The Court recognized that two *Bolger* factors are not met here: the laws "do not compel speech in the form of advertisements" (Dkt. 112 (Order) at 19) or "refer to a particular product" (*id.* at 17). The State does not grapple with that conclusion, nor identify a single case finding speech to be commercial when two of the three *Bolger* factors were absent. Indeed, in *IMDb.com Inc. v. Becerra*, 962 F.3d 1111 (9th Cir. 2020), the Ninth Circuit held that the absence of the first two factors (advertising and product reference) *precludes* a finding of commercial speech, regardless of economic motivation.

The State relies on a generalized "economic motive" (Opp. 11), but the laws fail that (insufficient) factor too. As the Ninth Circuit confirmed, it is the compelled disclosures themselves that must be tested under the First Amendment, and companies produce compelled reports "out of legal obligation, *not economic motivation*." *Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, — F.4th —, 2025 WL 2448851, at *10 (9th Cir. 2025) (emphasis added); *see also* Order 23 (applying First Amendment test to "compelled disclosures" themselves, not other speech). Whether certain companies already voluntarily "speak publicly about their emissions and sustainability practices" (Opp. 11) is irrelevant.

The State deepens its quandary by citing *Stolfi* for the proposition that commercial-speech disclosures are those that "provid[e] parties to 'actual or potential'

(78 of 297), Page 78 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 78 of 297
Case 2:24-cv-00801-ODW-PVC    Document 122    Filed 09/02/25    Page 10 of 17    Page
ID #:10604

1  commercial transactions with information about those transactions." Opp. 11. SB 253

2  and SB 261 do not meet that test, either. They do not provide information about any

3  *transaction*, but rather compel disclosures of company-wide emissions and for-

4  ward-looking risk narratives "disconnected from any economic transaction." *Stolfi*,

5  2025 WL 2448851, at *11. And the State has no support for arguing that speech man-

6  dates "pertain[ing] to the operations of the business" in general, untethered to specific

7  products or services (Opp. 13 n.3), qualify as commercial speech.

8        **2.    *Zauderer* does not apply—and the State cannot rewrite its limits.**

9        The State's opposition underscores why *Zauderer v. Office of Disciplinary Coun-*

10  *sel*, 471 U.S. 626 (1985), cannot save these laws, and why, at a minimum, whether *Zau-*

11  *derer* applies is a serious question.

12       *First*, the State denies that *Zauderer* has any threshold limitation to disclosures

13  tied to a product or service, characterizing courts' statements in that regard as mere de-

14  scriptions of the facts of the case rather than the laws' requirements. Opp. 12–13. The

15  State is wrong. The Supreme Court and the Ninth Circuit have both stated that *Zauderer*

16  applies only to compelled disclosures of "purely factual and uncontroversial information

17  about the terms under which [a] . . . servic[e] will be available." *Nat'l Inst. of Family &*

18  *Life Advocates v. Becerra* (*NIFLA*), 585 U.S. 755, 768 (2018). In *NIFLA,* the absence

19  of a connection to the terms of service was a principal reason the ordinance was struck

20  down. *Id.* at 769 (*Zauderer* "does not apply here"; the disclosure "in no way relates to

21  the services that licensed clinics provide"). The Ninth Circuit also has been explicit on

22  this point: *Zauderer* "require[s] that the compelled speech relate to the product or service

23  that is provided." *CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845 (9th

24  Cir. 2019). As Plaintiffs have shown, every law upheld under *Zauderer* fits that descrip-

25  tion. Dkt. 97 at 4–5.

26       SB 253 and SB 261 do not meet this test. The laws compel company-wide state-

27  ments—aggregated emissions data and climate-risk narratives—not information about

28  the terms, price, or characteristics of any transaction, product, or service. As in

*NetChoice, LLC v. Bonta*, these disclosures are "disconnected from any economic transaction." 113 F.4th 1101, 1119 (9th Cir. 2024).

*Second*, even if this threshold were met, the State cannot dispute a serious question exists as to whether these laws compel speech that is purely factual and uncontroversial. This Court already concluded SB 261 falls outside *Zauderer* because it forces companies to publish forward-looking risk assessments, not verifiable facts. Order 23–24. As for SB 253, the State denies it forces companies "'to take responsibility' for the emissions disclosed." Opp. 12. But the statute does exactly that, declaring companies must take "responsibility for . . . their contributions to global [greenhouse-gas] emissions." § 1(f). Its very name—the Climate Corporate Data *Accountability* Act—signals its aim to hold companies "accountable." Legislative findings and floor statements confirm that purpose, boasting the law will "create accountability for those that aren't . . . doing their part." Dkt. 48-4 at 1. Far from uncontroversial, the disclosures forced by SB 253 are intended as fuel for the debate over corporate responsibility for climate change. *See Stolfi*, 2025 WL 2448851, at *15 (distinguishing "the economic-focused reports at issue" from the law in *X Corp.*, which compelled "value-laden, state-prescribed language").

*Finally*, the State ignores the Supreme Court's repeated admonition not to "mark off new categories" of speech for diminished First Amendment protection, and specifically to look for a "long" historical tradition before expanding compelled-disclosure regimes. *NIFLA*, 585 U.S. at 767; *see IMDb*, 962 F.3d at 1124 (declining to "cordon off" new category of speech "for reduced protection"). These laws have no such anchor, and can be upheld only by expanding the types of speech subject to lessened First Amendment scrutiny. This expansion presents another serious question.

### 3. The lack of tailoring independently raises serious questions.

The State's opposition does nothing to cure the fundamental tailoring defects this Court already identified—and those unanswered gaps independently confirm that serious constitutional questions remain. The Court rejected the State's anti-deception rationale for the laws because the State had no evidence of misleading speech. Order 35–

(80 of 297), Page 80 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 80 of 297
Case 2:24-cv-00801-ODW-PVC   Document 122   Filed 09/02/25   Page 12 of 17   Page
ID #:10606

37.  Yet the State pivots back to the same "truth-in-marketing" theory.  Opp. 11, 14.
Even under the tailoring rationales the Court previously accepted, the State cannot deny
the serious questions that Plaintiffs identify.  The State's reliance on investor "interest"
(Opp. 14–15) has no limiting principle; if generalized interest were enough, states could
compel disclosure of any fact some investor might be curious to know—such as the
percentage of a workforce who are immigrants, or the charities a company supports.  *See
Am. Meat Inst. v. USDA*, 760 F.3d 18, 31–32 (D.C. Cir. 2014) (Kavanaugh, J., concur-
ring).  The State also has no credible response to Plaintiffs' showing that the laws are
"more extensive than . . . necessary" to further investors' interest, which *Central Hudson*
precludes.  *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S.
557, 572 (1980).  Unlike the securities laws, which limit mandatory disclosures to infor-
mation a reasonable investor would deem important, SB 253 compels disclosures *with-
out any materiality threshold whatsoever*.  By definition, that compulsion is broader than
reasonably necessary.

The State claims as a fallback an interest in reducing "any" emissions (Opp. 17).
But that is boundless.  The First Amendment requires a "substantial government inter-
est" stated with precision, not an abstract aspiration.  *See Green v. Miss U.S. of Am.,
LLC*, 52 F.4th 773, 790 (9th Cir. 2022).  If "any reduction" were enough, the State could
conscript speakers for symbolic gestures that have no measurable effect on climate out-
comes.  That is not tailoring.  And the Supreme Court has struck down a speech re-
striction where the State showed only that it would "somewhat lower" alcohol consump-
tion; the Constitution required proof that the regulation would "*significantly* reduce mar-
ketwide consumption."  *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505–06
(1996) (plurality op.).  So too here.  The State offers no evidence that these mandates
will materially reduce emissions, let alone to the degree necessary to mitigate climate
change.

Nor does the State substantiate why less speech-restrictive alternatives—such as
publishing its own estimates—would not suffice.  The State offers no rebuttal to

(81 of 297), Page 81 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 81 of 297
Case 2:24-cv-00801-ODW-PVC    Document 122    Filed 09/02/25    Page 13 of 17    Page
ID #:10607

1   undisputed evidence that 90% of a company's emissions are explained by readily ob-
2   servable criteria, such as industry, size, and sales growth.  Dkt. 48-22 at 7.  Its only
3   excuse—that State-generated estimates would be "inaccurate" (Opp. 17)—collapses.
4   The State never explains why investors need pinpoint accuracy on a company's emis-
5   sions of, for example, sulphur hexafluoride (Dkt. 48-20 at 6).  The First Amendment
6   does not allow the government to conscript private speakers for "efficiency."  Opp. 14;
7   *see NIFLA*, 585 U.S. at 775 (State cannot "sacrifice speech for efficiency").

8   **B.    The Equities Strongly Favor Plaintiffs**

9        The equities here are not close.  This Court has already held that SB 253 and
10  SB 261 compel speech, that First Amendment scrutiny applies, and that companies face
11  immediate obligations to prepare to make statements these statutes compel.  *See* Order
12  7–12 & n.4.  Both injuries—compelled speech and the substantial compliance costs—
13  are imminent and unrecoverable.  The State is incorrect that the "only" imminent injury
14  here is "constitutional."  Opp. 8.  After Plaintiffs moved for an injunction pending ap-
15  peal, CARB held a "workshop" (McLoon Decl. ¶ 3 (Dkt. 120-1)) confirming that the
16  agency expects companies to begin compliance work immediately, investing time and
17  resources that cannot be recouped if these laws are struck down.  *See* Durbin Decl. ¶¶ 8–
18  27; Shoen Supp. Decl. ¶¶ 4–27.

19       That reality underscores the urgency of these harms and the need for interim relief.
20  Plaintiffs have not "dropped" (Opp. 19) their claim regarding compliance costs—those
21  costs have been a core component of irreparable harm from the outset.  Regardless, con-
22  stitutional injury is not a technicality; it is paradigmatic irreparable harm.  That is why,
23  contrary to the State's suggestion, Plaintiffs need not "*establish* a likelihood of consti-
24  tutional injury" (Opp. 18 (emphasis added)); "a colorable First Amendment claim" is
25  enough to tilt the equities in Plaintiffs' favor.  *Youth 71Five*, 2024 WL 3749842, at *4.
26       SB 261 underscores the immediacy.  The first biennial report is due "[o]n or be-
27  fore January 1, 2026," SB 261 § 2(b)(1)(A), and the Court has already recognized that
28  companies must undertake pre-publication steps now—including creating data systems,

(82 of 297), Page 82 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 82 of 297
Case 2:24-cv-00801-ODW-PVC    Document 122    Filed 09/02/25    Page 14 of 17    Page
ID #:10608

1    risk assessments, scenario analyses, assurance planning, and web-publication work-
2    flows.  Order 3–4, 8–9 & n.4, 23–24.  The State expects companies to begin making
3    submissions as early as December 1, 2025, as it indicated in its recent workshop.  *See*
4    Durbin Decl. ¶ 12; Shoen Supp. Decl. ¶ 5.

5        The State's representation that it will not enforce compliance with SB 253 until
6    June 2026 does not change the analysis.  Opp. 18.  This Court has already found that
7    covered companies must begin preparing now in light of the agency's enforcement no-
8    tice and the effective date of the statute.  Order 3–4, 8–9 & n.4.  Preparations for
9    SB 253—scoping inventories, supplier/customer data requests, and internal controls—
10   are substantial, must begin months in advance, and "cannot be recouped" if the Ninth
11   Circuit agrees the laws are unconstitutional.  *Nat'l Insts. of Health v. Am. Pub. Health*
12   *Ass'n*, 606 U.S. —, 2025 WL 2415669, at *1 (2025); *see* Shoen Supp. Decl. ¶¶ 19–24.
13   The State's provision of temporary forbearance, and its lengthy delay in issuing SB 253
14   regulations, both confirm it will not be prejudiced by a short pause for appellate review.

15       The State also suggests no injunction is necessary because Plaintiffs' appeal "may
16   be resolved" before January 1, since briefing will be complete by November 6, 2025.
17   Opp. 3.  That is contradicted by practice.  The median time from notice of appeal to
18   decision is over 13 months.  *Judicial Business of the United States Courts 2024*, tbl. B-
19   4A (2024), https://tinyurl.com/mv44a32z.  In both *X Corp.* and *NetChoice*, the Ninth
20   Circuit took five months from the close of briefing to issue a decision, and both cases
21   were expedited.  That is why Rule 62(d) and FRAP 8 exist—to avoid forcing compelled
22   speech before full appellate review can occur.  And the point cuts both ways.  If the
23   Ninth Circuit does decide by January 1, the State will have suffered no prejudice what-
24   soever from a short injunction in the interim.

25       Finally, the public interest strongly favors an injunction.  The public interest "al-
26   ways" favors protection of constitutional rights.  *Am. Beverage Ass'n v. City of San*
27   *Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (en banc).  A brief, tailored pause here
28

(83 of 297), Page 83 of 297  Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 83 of 297
Case 2:24-cv-00801-ODW-PVC    Document 122    Filed 09/02/25    Page 15 of 17    Page
ID #:10609

1    advances the public interest by ensuring that novel compelled-speech mandates are not

2    enforced until the Court of Appeals can review them.

3    **C.    Plaintiffs Seek Narrow Relief**

4    The State's "overbreadth" objection (Opp. 7 & n.2) is immaterial.  Plaintiffs do

5    not seek to halt CARB's internal planning; if the agency wants to continue those steps,

6    it may.  What it cannot do is enforce these laws against Plaintiffs' members while the

7    Ninth Circuit considers their constitutionality.  That narrow injunction preserves the sta-

8    tus quo, avoids any claimed administrative disruption, and ensures Plaintiffs are not

9    forced to speak before appellate review—exactly what Rule 62(d) and FRAP 8 are de-

10   signed to accomplish.

11                              **III.  CONCLUSION**

12   The Court should enter a limited injunction that preserves the status quo by en-

13   joining Defendants from implementing, applying, or taking any action to enforce the

14   laws against Plaintiffs' members pending appeal.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

(84 of 297), Page 84 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 84 of 297
Case 2:24-cv-00801-ODW-PVC    Document 122    Filed 09/02/25    Page 16 of 17    Page
ID #:10610

DATED: September 2, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Bradley J. Hamburger*
Eugene Scalia, SBN 151540
Bradley J. Hamburger, SBN 266916
Samuel Eckman, SBN 308923
Brian A. Richman (*pro hac vice*)
Elizabeth Strassner, SBN 342838

*Attorneys for Plaintiffs Chamber of Commerce
of the United States of America, California
Chamber of Commerce, American Farm Bureau
Federation, Los Angeles County Business Fed-
eration, Central Valley Business Federation
and Western Growers Association*

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA

Stephanie A. Maloney (*pro hac vice*)
Kevin Palmer (*pro hac vice*)

*Attorneys for Plaintiff Chamber of Commerce
of the United States of America*

Gibson, Dunn &
Crutcher LLP

PLAINTIFFS' REPLY ISO MOT. FOR INJUNCTION PENDING APPEAL
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-126**

(85 of 297), Page 85 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 85 of 297
Case 2:24-cv-00801-ODW-PVC    Document 122    Filed 09/02/25    Page 17 of 17    Page
ID #:10611

1

## CERTIFICATE OF COMPLIANCE

2       The undersigned, counsel of record for Plaintiffs Chamber of Commerce of the

3  United States of America, California Chamber of Commerce, American Farm Bureau

4  Federation, Los Angeles County Business Federation, Central Valley Business Federa-

5  tion and Western Growers Association, certifies that this brief contains 3,298 words,

6  which complies with the word limit of this Court's Rule VII.A.3.

7  DATED: September 2, 2025          Respectfully submitted,

8                                    GIBSON, DUNN & CRUTCHER LLP

9

10                                   By:  */s/ Bradley J. Hamburger*
                                     Eugene Scalia, SBN 151540

11                                   Bradley J. Hamburger, SBN 266916
                                     Samuel Eckman, SBN 308923

12                                   Brian A. Richman (*pro hac vice*)
                                     Elizabeth Strassner, SBN 342838

13

14                                   *Attorneys for Plaintiffs Chamber of Commerce*
                                     *of the United States of America, California*

15                                   *Chamber of Commerce, American Farm Bureau*
                                     *Federation, Los Angeles County Business Fed-*

16                                   *eration, Central Valley Business Federation,*
                                     *and Western Growers Association*

17

18                                   CHAMBER OF COMMERCE OF THE
                                     UNITED STATES OF AMERICA

19

20                                   Stephanie A. Maloney (*pro hac vice*)
                                     Kevin Palmer (*pro hac vice*)

21

22                                   *Attorneys for Plaintiff Chamber of Commerce*
                                     *of the United States of America*

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

PLAINTIFFS' REPLY ISO MOT. FOR INJUNCTION PENDING APPEAL
CASE NO. 2:24-CV-00801-ODW-PVC                    **ER-127**

(86 of 297) Page 86 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 86 of 297
Case 2:24-cv-00801-ODW-PVC   Document 120   Filed 08/29/25   Page 1 of 27   Page ID
#:10564

1  ROB BONTA
   Attorney General of California
2  MYUNG J. PARK (SBN 210866)
   LAURA J. ZUCKERMAN (SBN 161896)
3  Supervising Deputy Attorneys General
   KATHERINE GAUMOND (SBN 349453)
4  EMILY HAJARIZADEH (SBN 325246)
   M. ELAINE MECKENSTOCK (SBN 268861)
5  DYLAN REDOR (SBN 338136)
   DAVID ZAFT (SBN 237365)
6  CAITLAN MCLOON (SBN 302798)
   Deputy Attorneys General
7    300 South Spring Street, Suite 1702
     Los Angeles, CA  90013-1230
8    Telephone:  (213) 269-6438
     Fax:  (916) 731-2128
9    E-mail:  Caitlan.McLoon@doj.ca.gov
   *Attorneys for Defendants Liane M. Randolph,*
10 *Steven S. Cliff, and Robert A. Bonta*

11              IN THE UNITED STATES DISTRICT COURT

12            FOR THE CENTRAL DISTRICT OF CALIFORNIA

13

| | |
|---|---|
| 14 | |
| 15 **CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA** | 2:24-cv-00801-ODW-PVC |
| 16 **CHAMBER OF COMMERCE, AMERICAN FARM BUREAU** | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL** |
| 17 **FEDERATION, LOS ANGELES COUNTY BUSINESS** | |
| 18 **FEDERATION, CENTRAL VALLEY BUSINESS** | Date:           September 15, 2025 |
| 19 **FEDERATION, and WESTERN GROWERS ASSOCIATION,** | Time:           1:30 PM Courtroom:  5D Judge:         The Honorable Otis D. |
| 20 Plaintiffs, | Wright, II Trial Date:   Not Set Action Filed: 1/30/2024 |
| 21 | |
| 22 v. | |
| 23 **LIANE M. RANDOLPH, in her official capacity as Chair of the** | |
| 24 **California Air Resources Board, STEVEN S. CLIFF, in his official** | |
| 25 **capacity as the Executive Officer of the California Air Resources Board,** | |
| 26 **and ROBERT A. BONTA, in his official capacity as Attorney General** | |
| 27 **of California,** | |
| 28 Defendants. | |

(87 of 297) Page 87 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 87 of 297
Case 2:24-cv-00801-ODW-PVC    Document 120    Filed 08/29/25    Page 2 of 27    Page ID
#:10565

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................ 1

Background ......................................................................................................... 3

    I.     SB 253 ................................................................................................ 4

    II.    SB 261 ................................................................................................ 5

    III.   Procedural History .......................................................................... 6

Argument ........................................................................................................... 7

    I.     Plaintiffs' Motion Should Be Denied For The Same Reasons
          This Court Denied The Preliminary Injunction Motion ................. 7

    II.    Plaintiffs Have Not Raised "Serious Questions" About Their
          Likelihood Of Success On The Merits ........................................... 8

         A.    SB 253 and SB 261 Regulate Commercial Speech ................ 10

         B.    *Zauderer* Applies to SB 253 ................................................ 12

         C.    SB 253 and SB 261 Satisfy the Appropriate Levels of
             Scrutiny ................................................................................. 13

             1.    Investor interest in reliable information ......................... 13

             2.    Additional government interests .................................... 16

    III.   Plaintiffs Cannot Establish that the Balance of the Equities Tips
          Sharply in their Favor ................................................................... 18

         A.    Plaintiffs Have Not Established Irreparable Harm .................. 18

         B.    The Balance of the Equities and the Public Interest
             Militate Against Granting an Injunction ................................ 19

Conclusion ....................................................................................................... 20

Certificate of Compliance ................................................................................ 21

i

(88 of 297) Page 88 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 88 of 297
Case 2:24-cv-00801-ODW-PVC Document 120 Filed 08/29/25 Page 3 of 27 Page ID
#:10566

# TABLE OF AUTHORITIES

**Page**

**C**ASES

*Alliance for the Wild Rockies v. Cottrell*¸
    632 F.3d 1127 (9th Cir. 2011) ................................................................. 1, 7

*Am. Acad. of Pain Mgmt. v. Joseph*
    353 F.3d 1099 (9th Cir. 2004) ................................................................ 2, 17

*Am. Beverage Ass'n v. City of San Francisco*
    2016 WL 9184999 (N.D. Cal. June 7, 2016) ...................................... 8

*Am. Beverage Ass'n v. City & County of San Francisco*
    916 F.3d 749 (9th Cir. 2019) ...................................................... 15

*Am. Hosp. Ass'n*, 983 F.3d 528, 540 (D.C. Cir. 2020) ........................... 14

*Am. Meat Inst. v. USDA*
    760 F.3d 18 (D.C. Cir. 2014) ................................................... 14

*Ariix, LLC v. NutriSearch Corp.*
    985 F.3d 1107 (9th Cir. 2021) ..................................................... 10

*Baird v. Bonta*
    81 F.4th 1036 (9th Cir. 2023) ................................................. 18

*Bolger v. Youngs Drug Prods. Corp.*
    463 U.S. 60 (1983) ...................................................... 9, 10

*California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*
    29 F.4th 468 (9th Cir. 2022) .......................................................... 8

*Caribbean Marine Servs. Co., Inc. v. Baldrige*
    844 F.2d 668 (9th Cir. 1988) ................................................ 18

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*
    447 U.S. 557 (1980) ...................................................... 9, 13

*Chamber of Com. of United States v. SEC*
    85 F.4th 760 (5th Cir. 2023) .................................................. 14

ii

(89 of 297) Page 89 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 89 of 297
Case 2:24-cv-00801-ODW-PVC Document 120 Filed 08/29/25 Page 4 of 27 Page ID
#:10567

1
2

## TABLE OF AUTHORITIES
### (continued)

Page

3
4

*CTIA – The Wireless Ass'n v. City of Berkeley*
    928 F.3d 832 (9th Cir. 2019) ................................................. 12, 13, 19

5
6

*Destination Ventures, Ltd. v. FCC*
    46 F.3d 54 (9th Cir. 1995) ............................................................. 17

7
8

*Drakes Bay Oyster Co. v. Jewell*
    747 F.3d 1073 (9th Cir. 2014) ....................................................... 19

9

*Edenfield v. Fane*
    507 U.S. 761 (1993) ..................................................................... 14

10
11

*Feldman v. Ariz. Sec'y of State's Off.*
    843 F.3d 366 (9th Cir. 2016) ........................................................... 7

12
13

*Gluth v. Kangas*
    951 F.2d 1504 (9th Cir. 1991) .......................................................... 7

14
15

*Hurley v. Irish–Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*
    515 U.S. 557 (1995) ....................................................................... 13

16
17

*Int'l Fruit Genetics, LLC v. P.E.R. Asset Mgmt. Tr.*
    2016 WL 5922715 (C.D. Cal. Oct. 4, 2016) ........................................ 8

18
19

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*
    941 F.2d 970 (9th Cir. 1991) ............................................................ 7

20
21

*Maryland v. King*
    567 U.S. 1301 (2012) ..................................................................... 19

22

*Moody v. NetChoice, LLC*
    603 U.S. 707 (2024) .............................................................. 2, 9, 13

23
24

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*
    272 F.3d 104 (2d Cir. 2001) ............................................................ 14

25
26

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*
    585 U.S. 755 (2018) ............................................................ 12, 13, 15

27
28

*NetChoice v. Bonta*
    113 F.4th 1101 (9th Cir. 2024) ............................................... 6, 9, 10

iii

# TABLE OF AUTHORITIES
## (continued)

Page

*Nken v. Holder*
    556 U.S. 418 (2009) ................................................................... 19

*Pharm. Rsch. & Mfrs. of Am. v. Stolfi*
    No. 24-1570, 2025 WL 2448851 (9th Cir. Aug. 26, 2025)................9, 10, 11, 14

*Smith v. Helzer*
    95 F.4th 1207 (9th Cir. 2024) ................................................. 18

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*
    425 U.S. 748 (1976) ................................................................... 3

*Winter v. Natural Res. Defense Council, Inc.*
    555 U.S. 7 (2008) ............................................................... 7, 18

*X Corp. v. Bonta*
    116 F.4th 888 (9th Cir. 2024) ........................................ 1, 9, 10, 13

*Zauderer v. Off. of Disciplinary Couns.*
    471 U.S. 626 (1985) .........................................................*passim*

STATUTES

California Health and Safety Code
    § 38501(d)................................................................................ 17
    § 38532(b)................................................................................. 4
    § 38532(c)....................................................................... 4, 5, 18
    § 38533(a)................................................................................. 5
    § 38533(b)................................................................................. 5
    § 38533(c)................................................................................. 5
California Health and Safety Code
    § 38562 .................................................................................. 17
    § 38562.2 ............................................................................... 17
    § 38566 .................................................................................. 17

CONSTITUTIONAL PROVISIONS

First Amendment .........................................................*passim*

iv

ER-132

(91 of 297) Page 91 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 91 of 297
Case 2:24-cv-00801-ODW-PVC    Document 120    Filed 08/29/25    Page 6 of 27    Page ID
#:10569

**INTRODUCTION**

Plaintiffs cannot meet the high burden for the extraordinary relief they seek. Plaintiffs are asking this Court to grant during the pendency of their appeal the very relief this Court just denied as to the pendency of litigation.  The same four factors apply to this motion as to Plaintiffs' preliminary injunction motion, and nothing in their current motion should change the reasoning underlying the Court's previous denial.  That ruling should preclude the relief sought now.

Recognizing that they cannot reasonably rebut this Court's conclusion that they are unlikely to succeed on the merits, Plaintiffs attempt to sidestep this prior holding by urging the Court to analyze the issues on a "sliding scale"—i.e., asserting they need only raise "serious questions" as to the merits of their claim to the extent they can establish that "the balance of the hardships tips sharply in their favor."  Dkt. 116-1 at 2 (citing *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011)).  But Plaintiffs establish neither.

On the merits, this Court correctly concluded that the laws at issue—the Climate Corporate Data Accountability Act (Senate Bill 253 or SB 253), and the Climate-Related Financial Risk Act (Senate Bill 261 or SB 261)—compel the disclosure of commercial speech.  Plaintiffs do not dispute the Court's factual findings, namely that a majority of companies affected by SB 253 and SB 261 already speak on the topics implicated by these laws, and do so in order to induce business.  *See* Dkt. 112 at 18-20.  Yet Plaintiffs nonetheless challenge this Court's conclusion that such firm-level advertising renders the speech commercial in nature—urging instead a formulaic, narrow, bright-line test for commercial speech that the Ninth Circuit has definitively rejected.  *See X Corp. v. Bonta*, 116 F.4th 888, 900 (9th Cir. 2024) (courts employ a "common-sense" and "fact-driven" analysis to the question of commercial speech).  And while Plaintiffs purport "serious First Amendment questions about whether [the laws] compel non-commercial speech on matters of public controversy," Mot. at 13, they fail to

1

(92 of 297)  Page 92 of 297  Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 92 of 297
Case 2:24-cv-00801-ODW-PVC   Document 120   Filed 08/29/25   Page 7 of 27   Page ID
#:10570

1    identify a single controversial statement required under either law that would rebut
2    this Court's conclusions.

3    　　Plaintiffs' renewed tailoring arguments fare no better. Under intermediate (or
4    lower) scrutiny, "'[t]he fit' between the legislature's ends and its means 'need not
5    be perfect nor the single best to achieve those ends, but one whose scope is
6    narrowly tailored to achieve the legislative objective.'" Dkt. 112 at 38 (quoting
7    *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1111 (9th Cir. 2004)). Here,
8    the laws are appropriately tailored to address the harms the government identified.
9    Looking just at the needs of investors, for example, the laws compel only the
10   information that independent industry groups have identified as necessary to
11   provide accurate and decision-useful information. And while Plaintiffs purport the
12   laws are overbroad because of the inclusion of private companies, the evidence
13   refutes this—as a result of the high revenue threshold, "any private company that
14   falls within the scope of the Disclosure Laws can be expected to have multiple
15   outside investors…." Dkt. 54 ¶ 47. Plaintiffs present no evidence to the contrary.

16   　　The fact that the Court did not adopt all of Defendants' arguments does not
17   demonstrate "serious questions" as to the conclusions it did reach. Mot. at 2.
18   Facial challenges "threaten to short circuit the democratic process" by "preventing
19   duly enacted laws from being implemented in constitutional ways," and thus such
20   challenges are "hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024)
21   (cleaned up). It is no surprise that Plaintiffs have failed to meet their burden in
22   establishing a likelihood of success on the merits here.

23   　　In any event, Plaintiffs cannot establish imminent irreparable harm, much less
24   that the balance of the equities *tips sharply* in their favor. Even if they could
25   establish a likelihood of constitutional harm, that harm is far from imminent as to
26   SB 253. The implementing agency has not yet proposed the regulations that are a
27   condition precedent to any obligation on the reporting entities under that statute,
28   and has indicated that reporting will not begin until June 30, 2026. Decl. of Caitlan

**ER-134**

(93 of 297) Page 93 of 297  Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 93 of 297
Case 2:24-cv-00801-ODW-PVC    Document 120    Filed 08/29/25    Page 8 of 27    Page ID
#:10571

McLoon iso Opp. to Mot. ("McLoon Decl.") ¶¶ 2-3.  And even as to SB 261, this appeal may be resolved before any obligation to speak.  Dkt. 118 at 3-4 (Case No. 25-5327 (9th Cir. 2025), Dkt. 2.1 (setting briefing schedule)).  "[B]ecause enjoining SBs 253 and 261 would delay the State from advancing the public interests for which it adopted the laws," the equities favor Defendants.  Dkt. 112 at 40. Plaintiffs fail to establish their entitlement to the extraordinary relief they seek.

## BACKGROUND[1]

SBs 253 and 261 were enacted in late 2023 to, among other things, respond to concerns that California investors and other stakeholders lacked accurate data about greenhouse gas (GHG) emissions and climate-risk assessment from the largest companies doing business in the state.  2023 Cal. Stat., ch. 382 § 1 (SB 253); 2023 Cal. Stat., ch. 383 § 1 (SB 261); *see also* Dkt. 48-7 at 3:7-4:1; Dkt. 48-9 at 4:10-24. A significant portion of the largest companies already prepare climate-related disclosures or statements of some form.  Dkt. 53 ¶ 14.  However, the lack of comparable, verifiable, assured data has left "a massive blind spot for consumers, investors, and policymakers," Dkt. 48-5 at 10:23-24, who need this information to make "intelligent and well informed" economic decisions.  *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976).  For example, CalPERS, California's largest public-defined-benefit pension fund, considers "[c]limate risk [to be] investment risk," and finds that "the current disclosure regime for corporate reporting falls short of [investors'] expectations … ."  Dkt. 52-5 ¶¶ 12-13, 19; *see also* Dkt. 48-8 at 8:4-11; Dkt. 48-6 at 7:10-8:13; Dkt. 48-16 at 3-4; Dkt. 48-26; Dkt. 48-27 at 7; Dkt. 52-8 at 3-4; Dkt. 53 ¶¶ 15, 21; Dkt. 56 ¶¶ 28, 32-40; Dkt. 90 ¶¶ 9, 11-22.

Because investors have "extensive exposure to private sector companies"—in the case of CalPERS, "more than $150 billion" worth—investors "see[] the same

---

[1] Defendants hereby incorporate by reference the evidence, including declarations, that was submitted with the briefing on Plaintiffs' motion for summary judgment (*e.g.* Dkt. Nos. 48, 52-57) and Plaintiffs motion for preliminary injunction (*e.g.* Dkt. Nos. 89-90).

3

**ER-135**

(94 of 297) Page 94 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 94 of 297
Case 2:24-cv-00801-ODW-PVC  Document 120  Filed 08/29/25  Page 9 of 27  Page ID
#:10572

1    risks and would benefit from the same climate related disclosures" from both public

2    and private companies.  Dkt. 52-5 ¶¶ 15-16.  The evidence reflects that, as a result

3    of the high revenue thresholds under both laws, "any private company that falls

4    within the scope of the Disclosure Laws can be expected to have multiple outside

5    investors (likely both shareholders and bondholders), as well as bank creditors and

6    other contractual counterparties."  Dkt. 54 ¶ 47.

7    **I.    SB 253**

8         SB 253 does not directly require companies to disclose anything.  Instead, it

9    directs the California Air Resources Board (CARB) to "develop and adopt

10   regulations" that *will* require "reporting entit[ies]" to disclose their GHG emissions

11   to CARB or a designated emissions reporting organization.  Cal. Health & Safety

12   Code § 38532(c)(1).  CARB has not yet proposed these implementing regulations.

13   McLoon Decl. ¶ 2.

14        "Reporting entit[ies]" will be those that "do[] business in California" and have

15   total annual revenues in excess of $1 billion.  Cal. Health & Safety Code

16   § 38532(b)(2).  Once CARB's implementing regulations are in place, reporting

17   entities will report three categories of GHG emissions: Scope 1 (those from sources

18   owned or directly controlled by the business entity); Scope 2 (those associated with

19   the reporting entity's use of electricity, heating, and cooling); and Scope 3 (all other

20   indirect emissions, such as those from "purchased goods and services, business

21   travel, employee commutes, and processing and use of sold products").  *Id.*

22   § 38532(b)(3)-(5).  Entities must quantify and report all three categories of

23   emissions "in conformance" with the "Greenhouse Gas Protocol standards and

24   guidance," *id*. § 38532(c)(1)(A)(ii), a globally accepted protocol for emissions

25   accounting, Dkt. 53 ¶¶ 10, 14, 17, 19-25, 28.

26        Scope 1 and Scope 2 emissions reports are not due until 2026 "on or by a date

27   to be determined by the state board."  *Id.* § 38532(c)(2)(A)(i)(I).  CARB has

28   proposed that reporting will begin on June 30, 2026.  McLoon Decl. ¶ 3.  In

4

**ER-136**

(95 of 297), Page 95 of 297  Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 95 of 297
Case 2:24-cv-00801-ODW-PVC    Document 120    Filed 08/29/25    Page 10 of 27    Page
ID #:10573

1    December 2024, CARB issued an Enforcement Notice stating that "for the first

2    report due," covered entities may maintain the status quo by submitting reports

3    based solely on emissions data "that can be determined from information the

4    reporting entity already possesses or is already collecting at the time" the Notice

5    issued. Dkt. 78-6 at 2. Moreover, during the first reporting cycle, CARB "will not

6    take enforcement action for incomplete reporting against entities, as long as the

7    companies make a good faith effort to retain all data relevant to emissions reporting

8    for the entity's prior fiscal year." *Id.* at 2-3. Scope 3 reporting will not begin until

9    2027. Cal. Health & Safety Code § 38532(c)(2)(A)(i)(II).

10   **II.    SB 261**

11        SB 261 requires U.S. entities with total annual revenues in excess of $500

12   million that "do[] business in California" to prepare a biennial report disclosing

13   climate-related financial risks they have identified and any measures they have

14   adopted to reduce and adapt to those risks. *Id.* § 38533(a)(4)–(b)(1)(A).

15        The bill defines "[c]limate-related financial risk" as the "material risk of harm

16   to immediate and long-term financial outcomes due to physical and transition

17   risks … ," such as disruptions to operations or impacts on employee health and

18   safety. Cal. Health & Safety Code § 38533(a)(2). The law directs entities to

19   prepare their disclosures in alignment with "the Final Report of Recommendations

20   of the Task Force on Climate-related Financial Disclosures" ("TCFD"), *id.*

21   § 38533(b)(1)(A)(i), a widely adopted investor- and industry-created protocol. Dkt.

22   53 ¶¶ 11, 14, 17, 19, 21-25, 36, 37(c). Each reporting company must publish a

23   copy of the report "on its own internet website." Cal. Health & Safety Code

24   § 38533(c)(1). These disclosures are first due on January 1, 2026. *Id.* at

25   § 38533(b)(1)(A).

26        Under the TCFD, "risks" and "financial impacts" subject to disclosure include

27   purely commercial projections, such as the likelihood of "[i]ncreased operating

28   costs," "[r]educed demand for products and services," "[c]hange in revenue mix

**ER-137**

(96 of 297), Page 96 of 297  Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 96 of 297
Case 2:24-cv-00801-ODW-PVC    Document 120    Filed 08/29/25    Page 11 of 27    Page
ID #:10574

and sources," "[i]ncreased production costs due to changing input prices," and "[i]ncreased insurance premiums." Dkt. 48-23 at 19-20. Entities need not adopt any particular climate-related risk management strategy or take any particular climate-risk mitigation actions. Dkt. 53 ¶¶ 35, 38-39; Dkt. 54 ¶¶ 19-21, 29-33.

### III. PROCEDURAL HISTORY

On August 13, 2025, this Court denied Plaintiffs' motion for a preliminary injunction on the same First Amendment claim at issue in the present motion. Dkt. 112. The Court held that both SB 253 and SB 261 invite First Amendment scrutiny. Dkt. 112 at 11-12. It then concluded that the laws "regulat[e] commercial speech," and thus are "subject to a lesser standard than strict scrutiny." *Id.* at 16 (quoting *NetChoice v. Bonta*, 113 F.4th 1101, 1119 (9th Cir. 2024)). Finding "that SB 253 requires reporting of only factual—and not misleading—information," Dkt. 112 at 23, and that such emissions data is not controversial, *id.* at 25-26, it concluded that the law is subject to *Zauderer* review, *id.* at 26. Finding on the other hand that "assessment[s] about the effect of current *and future* events on a company cannot be factual," it applied intermediate scrutiny to SB 261. *Id.* at 23-24. Applying these respective levels of review, the Court concluded that both laws likely survive First Amendment review, and thus that Plaintiffs had not shown a likelihood of success on the merits of their facial challenge. *Id.* at 27–40. Because the Plaintiffs failed to demonstrate that the laws violate the First Amendment, the Court concluded they had not shown irreparable harm. *Id.* at 40. Moreover, the Court concluded that "because enjoining SBs 253 and 261 would delay the State from advancing the public interests for which it adopted the laws," the equities favored Defendants. *Id.* at 40-41.

Plaintiffs have filed a notice of appeal. Dkt. 114. The Court of Appeals has set a briefing schedule, under which the case will be fully briefed by November 6, 2025. Case No. 25-5327 (9th Cir. 2025), Dkt. 2.1 (setting briefing schedule).

**ER-138**

(97 of 297), Page 97 of 297  Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 97 of 297
Case 2:24-cv-00801-ODW-PVC   Document 120   Filed 08/29/25   Page 12 of 27   Page
ID #:10575

**ARGUMENT**

**I.    PLAINTIFFS' MOTION SHOULD BE DENIED FOR THE SAME REASONS THIS COURT DENIED THE PRELIMINARY INJUNCTION MOTION**

Plaintiffs seek an affirmative (and overbroad) injunction against Defendants pending appeal—asking that the Court enjoin them from "*implementing*, applying, or taking any action to enforce the laws against Plaintiffs' members." Mot. at 19 (emphasis added).[2]  An injunction is an "extraordinary remedy"; thus, Plaintiffs must make a "clear showing that [they are] entitled to such relief." *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008).  Generally, a party seeking to establish their entitlement to an injunction pending appeal must rely on the same factors on which this Court denied Plaintiffs' preliminary injunction motion, namely that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm absent relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *See Feldman v. Ariz. Sec'y of State's Off.*, 843 F.3d 366, 367 (9th Cir. 2016) (standard for injunction pending appeal is "similar" to preliminary injunction).

Notably, Plaintiffs do not even attempt to make the requisite showing of likelihood of success on the merits.  Instead, they argue they need only show the existence of "serious questions" going to the merits, as long as the balance of hardships "tips sharply in [their] favor."  Mot. at 9-10.  But under this "sliding scale" approach, Plaintiffs must make "a stronger showing of irreparable harm." *All. for the Wild Rockies*, 632 F.3d at 1131 (explaining "a stronger showing of one

---

[2] If this Court concludes Plaintiffs are entitled to an injunction pending appeal of either law, or any part thereof, it should enjoin only that law or that part, and such injunction should extend only to enforcement of that law or part.  It is improper to enjoin Defendants from taking administrative steps to implement the laws during the pendency of appeal, where such action does not cause any of Plaintiffs' alleged harms. *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (injunctive relief "must be tailored to remedy the specific harm alleged"); *Gluth v. Kangas*, 951 F.2d 1504, 1509 (9th Cir. 1991) (an injunction against state actors must not "require more of state officials than is necessary to assure their compliance with the constitution").

**ER-139**

(98 of 297), Page 98 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 98 of 297
Case 2:24-cv-00801-ODW-PVC   Document 120   Filed 08/29/25   Page 13 of 27   Page
ID #:10576

1    element may offset a weaker showing of another").  The only "imminent harm"

2    Plaintiffs identify, however, is the purported constitutional harm from disclosing

3    the information required under SB 253 and SB 261.  Mot. at 18.  As this Court has

4    already concluded that Plaintiffs are unlikely to succeed on the merits of their facial

5    challenge, the shift in standard makes no difference here; Plaintiffs cannot satisfy

6    any formulation.

7           The cases Plaintiffs cite do not support a different conclusion.  In *California*

8    *Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 475 (9th

9    Cir. 2022), the Court did not apply a "sliding scale" approach; it conducted the

10   same analysis on which Plaintiffs lost on their preliminary injunction motion, albeit

11   reaching a different conclusion on the questions and facts before it.  And in *Int'l*

12   *Fruit Genetics, LLC v. P.E.R. Asset Mgmt. Tr.*, 2016 WL 5922715, at *1 (C.D. Cal.

13   Oct. 4, 2016), the Court in fact *denied* the requested motion to suspend, explaining

14   that "[t]he Ninth Circuit has [] rejected the idea of maintaining the status quo for its

15   own sake pending appeal."  While the court did issue an injunction pending appeal

16   in *Am. Beverage Ass'n v. City of San Francisco*, 2016 WL 9184999, at *2 (N.D.

17   Cal. June 7, 2016), it had already "acknowledged in its order denying preliminary

18   injunctive relief" that there "is at least a close question as to whether Plaintiffs have

19   raised serious questions on the merits."  There is no such "close question" here.

20   **II.   PLAINTIFFS HAVE NOT RAISED "SERIOUS QUESTIONS" ABOUT THEIR**
     **LIKELIHOOD OF SUCCESS ON THE MERITS**
21

22          Even if this were the correct standard, nothing in the present motion raises

23   "serious questions" about this Court's conclusion that "Plaintiffs have not shown a

24   likelihood of success on the merits with respect to either of its facial First

25   Amendment challenges to SBs 253 and 261."  Dkt. 112 at 40.  While Plaintiffs

26   reiterate their claim that SB 253 and SB 261 "compel[] speech on matters of public

27   controversy with significant legal and reputational consequences," Mot. at 10, they

28   have yet to demonstrate that the laws compel even a single company to state a

(99 of 297), Page 99 of 297  Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 99 of 297
Case 2:24-cv-00801-ODW-PVC   Document 120   Filed 08/29/25   Page 14 of 27   Page
ID #:10577

1  political or ideological opinion, much less that a substantial number of reporting

2  entities must do so.  *Cf. X Corp.*, 116 F.4th at 899 (concluding "every covered

3  social media company" had to "reveal its policy opinion about contentious issues");

4  *NetChoice*, 113 F.4th at 1120 (requiring covered companies to *weigh in* on highly

5  divisive national debate about what type of speech is harmful to children, and then

6  act to censor that speech); *see also Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, No. 24-

7  1570, 2025 WL 2448851, at *12 (9th Cir. Aug. 26, 2025) ("In both *NetChoice* and

8  *X Corp.*, our application of strict scrutiny ultimately turned on the subjective and

9  political or ideological nature of the information that the regulations required.").

10       Indeed, rather than establish that the disclosures required under SB 253 and

11  261 regulate political speech that merits heightened scrutiny, Plaintiffs argue that

12  commercial speech should be cabined to narrow, formulaic categories that would

13  exclude the type of speech required here, and thereby invite strict scrutiny by

14  default.  This turns precedent on its head.  *See Zauderer v. Off. of Disciplinary*

15  *Couns.*, 471 U.S. 626, 651 (1985) (a speaker has only "minimal" First Amendment

16  interest in the disclosure of uncontroversial commercial information, as compared

17  to the "value … of the information such speech provides"); *Cent. Hudson Gas &*

18  *Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561-63 (1980) (noting the

19  Constitution accords the government greater latitude to regulate commercial

20  speech, relative to other safeguarded forms of expression, because such speech

21  "occurs in an area traditionally subject to government regulation"); *Bolger v.*

22  *Youngs Drug Prods. Corp.*, 463 U.S. 60, 64–65 (1983) (discussing recognition and

23  evolution of commercial speech doctrine).  The Ninth Circuit, in fact, just recently

24  opined on this, clarifying that "applying [the *Bolger* factors] strictly" to government

25  reporting requirements would "produce[] counterintuitive results." *Pharm. Rsch. &*

26  *Mfrs. of Am.*, 2025 WL 2448851, at *10.  "It would be odd to subject speech in a

27  consumer-facing advertisement to less scrutiny than speech in an annual report filed

28

9

**ER-141**

1    with a state regulatory body simply because it better fits the doctrinal tests for

2    defining commercial speech." *Id.*

3         Ultimately, as to each of the issues Plaintiffs revisit in their motion—whether

4    the disclosures regulate commercial speech, whether SB 253 triggers limited

5    scrutiny under *Zauderer*, and whether the laws are appropriately tailored—

6    precedent, the undisputed factual record, and this Court's decision definitively

7    control.

8    **A.    SB 253 and SB 261 Regulate Commercial Speech**

9         Plaintiffs argue that they have raised "serious questions" that the regulated

10   speech here is not commercial, because it "does not satisfy the 'usual definition' of

11   commercial speech—speech that does no more than propose a commercial

12   transaction," Mot. at 11 (quoting *X Corp.*, 116 F.4th at 901) (cleaned up), or at least

13   satisfy the *Bolger* factors, Mot. at 11-12 (citing *NetChoice*, 113 F.4th at 1120).

14   Plaintiffs' assertion is both legally and factually flawed.

15        As this Court explained, the Ninth Circuit (and indeed the cases Plaintiffs

16   cite), has made clear that there are no "bright line[]" rules for determining what

17   constitutes commercial speech. *X Corp.*, 116 F.4th at 900.  Rather, courts employ a

18   "common-sense" and "fact-driven" analysis, "due to the inherent difficulty of

19   drawing bright lines that will clearly cabin commercial speech in a distinct

20   category." *Id.*  "[S]peech that does not propose a commercial transaction on its face

21   can still be commercial speech." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107,

22   1115 (9th Cir. 2021).  And while the *Bolger* factors, when present, lend "strong

23   support" to the conclusion that speech is commercial, the absence of these factors is

24   "not dispositive." *Id.* at 1116.  This Court already rejected Plaintiffs' reading of *X

25   Corp.*, Mot. at 7, noting that the Ninth Circuit there did not object to the application

26   of *Zauderer* to the disclosure of "'platform's existing [Terms of Service] and

27   content moderation policies' and laws that require platforms to disclose 'how they

28   moderate and promote content.'"  Dkt. 112 at 20 n.5.  Plaintiffs' attempt to cabin

1  commercial speech to formulaic categories thus fails out of the gate.  And indeed,

2  in its recent *Pharm. Rsch. & Mfrs. of Am.* decision, the Ninth Circuit clarified that

3  "the commercial speech doctrine" appropriately applies to disclosures that

4  "provide[] parties to 'actual or potential' commercial transactions with information

5  about those transactions."  2025 WL 2448851, at *14.

6       In any event, the speech regulated by SB 253 and SB 261 *do meet* the

7  traditional definition of commercial speech.  As this Court found, "these disclosures

8  regarding a company's emissions and climate-related risk function as

9  advertisements in the sense that SBs 253 and 261 compel disclosure of the same

10  type of information that a substantial number of companies use to advertise their

11  brands, which they have an economic motive to provide."  Dkt. 112 at 19 (citing

12  Dkt. 90 ¶¶ 11-26).  Plaintiffs do not dispute this Court's detailed findings that a

13  majority of the largest companies already speak publicly about their emissions and

14  sustainability practices in order to induce business.  *See id.* (citing record evidence).

15  Rather, they dispute the Court's conclusion that the disclosures "function as

16  advertisements," arguing that the Court "misapprehends the nature and purpose of

17  the laws."  Mot. at 12.  Yet Plaintiffs support their argument with evidence from the

18  legislative history that in fact *bolsters* the Court's conclusion that the laws regulate

19  firm-level advertising.  That legislative history explains that the disclosures are

20  intended to provide "[i]nformation for the public," that allows them to discern

21  which of the many companies "market[ing] themselves as green" are being truthful.

22  Dkt. 48-5 at 2:25-3:11.  This legislative purpose lies at the very heart of *Zauderer*—

23  requiring companies to provide additional information to the public "in order to

24  dissipate the possibility of consumer confusion" from existing marketing.  471 U.S.

25  at 651.

26       There is no "serious question" on this subject, much less a likelihood of

27  success, that could merit the extraordinary relief Plaintiffs seek.

28

(102 of 297) Page 102 of 297Case: 25-5327 09/18/2025, DktEntry: 8.3, Page 102 of 297
Case 2:24-cv-00801-ODW-PVC    Document 120    Filed 08/29/25    Page 17 of 27    Page
ID #:10580

**B.**   *Zauderer* **Applies to SB 253**

This Court has already concluded that the disclosures required under SB 253 are both factual and uncontroversial.  The "emissions disclosures are … factual in nature, in that [all three Scopes] are defined and have recognized methods of computation."  Dkt. 112 at 22.  And the emission calculations are not misleading because they apply "recognized methodology," which does not require the disclosing company "to take responsibility" for the emissions disclosed.  *Id.* Moreover, the Court concluded that "SB 253 merely requires companies to report data on emissions," and not "to take sides in a heated political controversy."  *Id.* at 25.  Plaintiffs' argument that the disclosures are controversial because they relate generally to climate change—an argument made and rejected by the Court on the motion for preliminary injunction—does not present a close question.  *See CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019) ("that any purely factual statement … can be tied in some way to a controversial issue" is not, "for that reason alone, controversial").  Nothing in Plaintiffs' motion creates a "serious question" regarding the foundation of these conclusions.

Plaintiffs then argue, for the first time, that "*Zauderer* does not apply— regardless of whether the speech is factual or uncontroversial," because the compelled disclosures do not meet the additional "threshold requirement" that they be "related to the 'terms under which' the product or 'services will be available.'" Mot. at 13-14 (quoting *Nat'l Inst. of Fam. & Life Advocs. v. Becerra (NIFLA)*, 585 U.S. 755, 768 (2018)).  But Plaintiffs confuse the Court's articulation of the facts in *Zauderer* with an additional "threshold requirement."  The passage of *Zauderer* in question compares laws attempting to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion," which would merit constitutional concern, with the law actually at issue, which "t[ook] the form of a requirement that appellant include in his advertising purely factual and uncontroversial information about the terms under which his services will be

12

(103 of 297) Page 103 of 297 Case: 25-5327 09/18/2025, DktEntry: 8.3, Page 103 of 297
Case 2:24-cv-00801-ODW-PVC   Document 120   Filed 08/29/25   Page 18 of 27   Page
ID #:10581

1    available." *Zauderer*, 471 U.S. at 651.  *NIFLA*, cited by Plaintiffs, makes a similar

2    distinction—noting that the law in question, which "requires these clinics to

3    disclose information about *state*-sponsored [abortion] services," is a far cry from

4    the "purely factual and uncontroversial information about the terms under which …

5    services will be available" that merited lower scrutiny in *Zauderer*.  *NIFLA*, 585

6    U.S. at 768-69.  And contrary to Plaintiffs' argument, courts have consistently

7    confirmed that in the commercial speech context, "regulations provid[ing] for the

8    disclosure of 'purely factual and uncontroversial information []' … must be

9    reviewed under *Zauderer*'s framework."  *Moody*, 603 U.S. at 796 (Alito, J.,

10   concurring); *see also Hurley v. Irish–Am. Gay, Lesbian & Bisexual Grp. of Boston,*

11   *Inc.*, 515 U.S. 557, 573 (1995).  There is no additional threshold requirement.[3]

12   **C.    SB 253 and SB 261 Satisfy the Appropriate Levels of Scrutiny**

13        Applying *Zauderer* review, the government need only show that "the

14   information in the disclosure is reasonably related to a substantial governmental

15   interest," *CTIA*, 928 F.3d at 845, is neither unjustified nor unduly burdensome on

16   speech, and "remed[ies] a harm that is 'potentially real, not purely hypothetical,'"

17   *NIFLA*, 585 U.S. at 776.  Alternatively, under intermediate scrutiny, the

18   government need only show that regulation directly advances a substantial

19   government interest and is no more restrictive than necessary to serve that interest.

20   *Central Hudson*, 447 U.S. at 564.  Plaintiffs do not dispute that, to the extent

21   *Zauderer* does not apply, "[c]ommercial speech is generally subject to intermediate

22   scrutiny."  *X Corp.*, 116 F.4th at 900; *see also Cent. Hudson*, 447 U.S. at 562-63.

23        **1.    Investor interest in reliable information**

24        This Court concluded that the States' interest in providing "reliable

25   information that enables investors … to make informed judgments about the impact

26   of climate-related risks on their economic choices" was sufficient to satisfy both

27   ──────────────
      [3] In any event, the disclosures at issue *do* relate to the "terms under which" the
28   corporations' products or services are available.  The information disclosed pertains to the
      operations of the business, and its relevant supply chains.

1    *Zauderer* scrutiny (for SB 253) and intermediate scrutiny (for SB 261).  Dkt. 112 at

2    29-31, 38-40.  Plaintiffs' current challenges fail to meaningfully rebut that

3    conclusion.

4         First, they argue that "satisfying public demand for information is not, by

5    itself, a substantial government interest."  Mot. at 16.[4]  To the contrary, many

6    courts have found that the "State has substantial interest in reducing [informational]

7    asymmetries, facilitating informed commercial transactions, and improving the

8    efficiency of the [relevant] market."  *Pharm. Rsch. & Manufacturers of Am.*, 2025

9    WL 2448851, at *18; *see also Edenfield v. Fane*, 507 U.S. 761, 769 (1993) ("For

10   purposes of [the *Central Hudson*] test, there is no question that [the State's] interest

11   in ensuring the accuracy of commercial information in the marketplace is

12   substantial.").  In *Chamber of Com. of United States v. SEC*, 85 F.4th 760, 771 (5th

13   Cir. 2023), for example, the Fifth Circuit upheld an SEC disclosure requirement

14   applying *Zauderer* scrutiny, concluding that "[t]he SEC has a legitimate interest in

15   promoting the free flow of commercial information."  The disclosure requirement

16   in that case was intended "to allow investors to separate out and assess the different

17   motivations behind, and impacts of, share repurchases," and the regulation passed

18   constitutional muster because "the only speech it compels relates directly to

19   alleviating the information asymmetry" currently "surrounding [such] share

20   repurchases."  *Id.*  And this Court already cited numerous other examples.  *See*

21   *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 107, 115 (2d Cir. 2001)

22   (government had a substantial interest in "increasing consumer awareness of the

23   presence of mercury in a variety of products"); *Am. Meat Inst.*, 760 F.3d at 23

24   (government has "substantial" interest in labeling products to serve consumer

25   interest); *Am. Hosp. Ass'n*, 983 F.3d 528, 540 (D.C. Cir. 2020) (government has

26

27   _____

28       [4] Notably, Plaintiffs' main support for this argument is a *concurring* opinion in *Am. Meat Inst. v. USDA*, 760 F.3d 18, 31 (D.C. Cir. 2014), which was not the prevailing view.

14

**ER-146**

1    "legitimate" interest in "promoting price transparency and lowering healthcare

2    costs").

3           Plaintiffs make a distinct, but related, argument that investor interest cannot

4    justify the application of *Zauderer* scrutiny. Mot. at 14-15 (arguing that the Court's

5    rejection of Defendants' interest in preventing misleading speech "forecloses

6    reliance on the core rationale of *Zauderer*"). This argument is quickly dispatched.

7    In *American Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749,

8    755-56 (9th Cir. 2019), the Ninth Circuit explicitly "rejected the argument that

9    *Zauderer* applies only to situations in which the government requires disclosures to

10   prevent consumer deception."

11          Second, they suggest that even if investor interest *could* constitute a

12   substantial government interest, the record here is insufficient to establish that

13   interest is substantial. Mot. at 17. They base this argument on the mistaken claim

14   that Defendants rely solely on the declaration of a "single government-linked

15   investor." *Id.* To be clear, the "single" investor Plaintiffs are referring to is

16   CalPERS, "the largest public defined benefit pension fund in the United States,

17   with approximately $500 billion in assets," which "provides retirement benefits to

18   more than 2.2 million California public employees." Dkt. 52-5 at ¶ 5. Its interests

19   are not only hugely significant throughout the State, but representative of the

20   interests of many other investors. *See, e.g.*, Dkt. 54 at ¶¶ 53-57 (identifying 18

21   defined-benefit pensions in California who stand to benefit from the disclosures,

22   with collectively $1.07 trillion in assets). But in any event, Plaintiffs provide ample

23   evidence of broad investor demands for this information. *E.g.*, Dkt. 90 ¶¶ 13-16;

24   Dkt. 53 ¶¶ 15, 21; Dkt. 56 ¶¶ 28, 32-40.

25          Third, Plaintiffs argue that the Court "failed to assess whether the speech

26   compulsion was 'broader than reasonably necessary.'" Mot. at 17 (citing *NIFLA*,

27   585 U.S. at 776). Specifically, they argue that SB 253 and SB 261 are not tailored

28   to investor interest "to the extent the law compels disclosure from companies that

(106 of 297)   Page 106 of 297
Case: 25-5327   09/18/2025   DktEntry: 8.3   Page 106 of 297
Case 2:24-cv-00801-ODW-PVC   Document 120   Filed 08/29/25   Page 21 of 27   Page
ID #:10584

1   have no California investors." Mot. at 17. But there is no evidence on the record

2   that the laws sweep in *any* companies that do not have, or could not seek, California

3   investors. To the contrary, the only evidence presented on this topic concludes that,

4   as a result of the high revenue threshold for both laws, "any private company that

5   falls within the scope of the Disclosure Laws can be expected to have multiple

6   outside investors (likely both shareholders and bondholders), as well as bank

7   creditors and other contractual counterparties." Dkt. 54 ¶ 47.

8          And Plaintiffs' argument that the laws are poorly tailored because they lack a

9   materiality standard is similarly inapposite, as the disclosures under both SB 253

10  and SB 261 are to be made pursuant to industry-accepted and widely-used

11  accounting protocols, which contain a materiality threshold where deemed

12  appropriate by the industry experts who developed them. *See, e.g.*, Dkt. 48-23 at 27

13  Fig. 6 (discussing principles for effective disclosure); Dkt. 48-23 at 42-43, 58

14  (discussing "which recommended disclosures depend on materiality assessment and

15  providing flexibility for organizations to provide some or all disclosures in reports

16  other than financial filings"); Dkt. 53-2 at 11 (discussing materiality and explaining

17  that "[a]ll *relevant* emissions sources within the chosen inventory boundary need to

18  be accounted for so that a comprehensive and meaningful inventory is compiled");

19  Dkt. 53-2 at 72-73; *see also* Dkt. 48-27 at 2.

20                    **2.  Additional government interests**

21         The Court further concluded that "the State provides sufficient evidence to

22  support a finding that SB 253's disclosure requirements are reasonably related to

23  the State's substantial government interest in reducing emissions." Dkt. 112 at 33.

24  By requiring greater transparency about emissions data, SB 253 may encourage

25  companies doing business in California to reduce their emissions. Dkt. 48-4 at 2;

26  Dkt. 48-9 at 7:3-8. Plaintiffs claim that this interest is insufficient to withstand First

27  Amendment scrutiny because "the State presented no evidence that the modest

28  reductions it anticipates would have any meaningful impact on climate change."

**ER-148**

1   Mot. at 15.  But California has a compelling state interest in any emissions

2   reductions, whether or not it alleviates climate change on its own.  California, while

3   recognizing that other actions "are necessary to fully address the issue of global

4   warming," Health & Safety Code, § 38501(d), has committed to meeting certain

5   emissions reduction goals over time.  Health & Safety Code, §§ 38562, 38562.2,

6   38566.  And in any event, "[t]he First Amendment does not require Congress to

7   forgo addressing the problem at all unless it completely eliminates [the problem]."

8   *Destination Ventures, Ltd. v. FCC*, 46 F.3d 54, 56 (9th Cir. 1995).

9       Plaintiffs purport that the "State could have calculated its own estimates of

10  companies' [GHG] emissions using publicly available information," and thus the

11  disclosure requirements are insufficiently tailored.  Mot. at 16.  But Defendants'

12  evidence demonstrates that any such estimate would be inaccurate.  Dkt. 56 at

13  ¶¶ 14-17 ("[T]here are significant accuracy limitations to using estimated data

14  instead of actual reported data.").  In any event, even under intermediate scrutiny,

15  "'[t]he fit' between the legislature's ends and its means 'need not be perfect nor the

16  single best to achieve those ends….'"  Dkt. 112 at 38 (quoting *Am. Acad. of Pain*

17  *Mgmt.*, 353 F.3d at 1111).

18      Notably, here, the Legislature identified multiple additional interests served by

19  the laws, including those of the public in discerning the truthfulness of corporate

20  emissions claims, of consumers in getting reliable information, and, as to SB 261,

21  the benefit of lowered emissions.  While this Court concluded the evidence, at this

22  preliminary stage, was insufficient to support some of these interests, the Ninth

23  Circuit could well reach a different conclusion.  After all, under *Zauderer*, the

24  government need only show that its interests are real and not "speculative."  471

25  U.S. at 652-53 (noting that where "the possibility of deception is … self-evident,"

26  courts do "not require the State to 'conduct a survey … before it [may] determine

27  that the [advertisement] had a tendency to mislead'" (last alteration in original)).

28  The availability of alternative bases for affirmance on appeal underscores the

Court's conclusion here that Plaintiffs are unlikely to succeed on the merits of their facial challenge.

### III.  PLAINTIFFS CANNOT ESTABLISH THAT THE BALANCE OF THE EQUITIES TIPS SHARPLY IN THEIR FAVOR

Given that Plaintiffs cannot show a likelihood of success on the merits, this Court's analysis can end there. *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023); *Smith v. Helzer*, 95 F.4th 1207, 1215 (9th Cir. 2024). But Plaintiffs also fail to satisfy the remaining preliminary injunction factors.

#### A.    Plaintiffs Have Not Established Irreparable Harm

Plaintiffs fail to establish an "immediate threatened injury" that entitles them to provisional relief, and certainly not harm that tips the equities *sharply* in their favor. *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *see also Winter*, 555 U.S. at 22 (plaintiffs must demonstrate that the claimed harms are both "likely" to occur and are imminent).

Plaintiffs' sole harm argument stems from the compelled speech itself. Mot. at 18. But Plaintiffs cannot establish irreparable harm as to either SB 253 or SB 261 simply by claiming their members' First Amendment rights will be violated; as shown above, Plaintiffs have not established that is so.

Moreover, any such harm is not imminent. Plaintiffs assert that both statutes "go into effect January 1, 2026," Dkt. 116-1 at 6, but in fact, only SB 261 does. The implementing agency has not yet issued the regulations that will implement SB 253, and has proposed that reporting will not begin until June 30, 2026. McLoon Decl. ¶¶ 2-3; Health and Safety Code § 38532(c)(2)(A)(i)(I) (Scope 1 and 2 emissions not due until date set by CARB), (c)(2)(A)(i)(II) (Scope 3 emissions not due until 2027). Thus, even if Plaintiffs could establish a likelihood of constitutional injury from the disclosures required under SB 253, they cannot establish that any such alleged harm is imminent. And even as to SB 261, Plaintiffs' appeal may be resolved before Plaintiffs must speak. Case No. 25-5327

(109 of 297) Page 109 of 297
Case 2:24-cv-00801-ODW-PVC   Document 120   Filed 08/29/25   Page 24 of 27   Page
ID #:10587

1    (9th Cir. 2025), Dkt. 2.1 (setting briefing schedule by which briefing will be

2    complete by November 6, 2025).

3            Moreover, Plaintiffs have dropped their prior claim that the compliance costs

4    associated with the laws constitute immediate irreparable harm, Mot. at 18, and for

5    good reason.  As to SB 253, CARB issued an Enforcement Notice stating that

6    entities need not collect any new data "for the first report due," and entities will not

7    be penalized for incomplete reporting, as long as they are acting in good faith.  Dkt.

8    78-6 at 2-3.  Moreover, an injunction pending appeal would not absolve covered

9    entities from their obligation to collect information, given the regulatory uncertainty

10   on appeal.

11   **B.    The Balance of the Equities and the Public Interest Militate
         Against Granting an Injunction**

12

13           "Once an applicant satisfies the first two factors, the traditional stay inquiry

14   calls for assessing the harm to the opposing party and weighing the public interest,"

15   but these factors "merge" when the government is a party.  *Nken v. Holder*, 556

16   U.S. 418, 435 (2009); *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th

17   Cir. 2014).  This Court previously concluded that the balance of equities favors

18   denial of Plaintiffs' Motion.  *See* Dkt. 112 at 40 (citing *CTIA*, 928 F.3d at 852

19   (finding challengers failed to demonstrate any hardship tipping the balance in their

20   favor where their "First Amendment claim is unlikely to succeed")).  As this Court

21   observed, "[t]his is especially true because enjoining SBs 253 and 261 would delay

22   the State from advancing the public interests for which it adopted the laws.  *See*

23   Dkt. 112 at 40-41 (finding "that an injunction would injure the public interest in

24   having a free flow of accurate information").  Moreover, an injunction would inflict

25   harm on California by preventing enforcement of statutes enacted by the people's

26   representatives.  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in

27   chambers).

28

ER-151

(110 of 297)  Page 110 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 110 of 297
Case 2:24-cv-00801-ODW-PVC   Document 120   Filed 08/29/25   Page 25 of 27   Page
ID #:10588

1

## CONCLUSION

2          For the reasons stated above, Plaintiffs' motion for injunction pending appeal

3    should be denied.

4

5

6    Dated:  August 29, 2025                    Respectfully submitted,

7                                               ROB BONTA
                                                Attorney General of California
8                                               MYUNG J. PARK
                                                Supervising Deputy Attorney General
9                                               KATHERINE GAUMOND
                                                EMILY HAJARIZADEH
10                                              M. ELAINE MECKENSTOCK
                                                DYLAN REDOR
11                                              DAVID ZAFT
                                                Deputy Attorneys General
12

13                                              */s/ Caitlan McLoon*

14

15                                              CAITLAN MCLOON
                                                Deputy Attorney General
16                                              *Attorneys for Defendants Liane M.*
                                                *Randolph, Steven S. Cliff, and Robert*
17                                              *A. Bonta*

18

19

20

21

22

23

24

25

26

27

28

**ER-152**

(111 of 297) Page 111 of 297Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 111 of 297
Case 2:24-cv-00801-ODW-PVC   Document 120   Filed 08/29/25   Page 26 of 27   Page
ID #:10589

1 | **CERTIFICATE OF COMPLIANCE**

2 | The undersigned, counsel of record for Defendants Liane M. Randolph,

3 | Steven S. Cliff, and Robert A. Bonta, certifies that this brief contains 6,366 words,

4 | which complies with the word limit of this Court's Rule VII.A.3.

5

6 | Dated:  August 29, 2025                    Respectfully submitted,

7 |                                           ROB BONTA
                                              Attorney General of California
8

9

10 |                                          */s/ Caitlan McLoon*

11 |                                          CAITLAN MCLOON
                                              Deputy Attorney General
12 |                                          *Attorneys for Defendants Liane M.
                                              Randolph, Steven S. Cliff, and Robert
13 |                                          A. Bonta*

14

15 | SA2024300503
     67903367
16

17

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

Case Name:     **Chamber of Commerce of the United States of America, et al.
v. Liane M. Randolph, et al.**

Case No.:      **2:24-cv-00801-ODW-PVC**

I hereby certify that on <u>August 29, 2025</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>August 29, 2025</u>, at Los Angeles, California.

| Beatriz Davalos | */s/ Beatriz Davalos* |
|---|---|
| Declarant | Signature |

SA2024300503
66591334.docx

**ER-154**

(113 of 297)

Case 2:24-cv-00801-ODW-PVC   Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 113 of 297
Document 116-1   Filed 08/20/25   Page 1 of 21   Page
ID #:10526

1  EUGENE SCALIA, SBN 151540
      escalia@gibsondunn.com
2  GIBSON, DUNN & CRUTCHER LLP
   1700 M St. N.W.
3  Washington, D.C. 20036
   Telephone: 202.955.8500
4  Facsimile: 202.467.0539
5
6  *Attorneys for Plaintiffs Chamber of*
   *Commerce of the United States of Amer-*
7  *ica, California Chamber of Commerce,*
   *American Farm Bureau Federation, Los*
8  *Angeles County Business Federation,*
   *Central Valley Business Federation,*
9  *and Western Growers Association*
10
   (*Additional counsel listed on next page*)
11
12          IN THE UNITED STATES DISTRICT COURT
13          FOR THE CENTRAL DISTRICT OF CALIFORNIA,
14                    WESTERN DIVISION
15 CHAMBER OF COMMERCE OF THE          | CASE NO. 2:24-cv-00801-ODW-PVC
   UNITED STATES OF AMERICA,           |
16 CALIFORNIA CHAMBER OF               | **MEMORANDUM OF POINTS**
   COMMERCE, AMERICAN FARM             | **AND AUTHORITIES IN SUPPORT**
17 BUREAU FEDERATION, LOS              | **OF PLAINTIFFS' MOTION FOR**
   ANGELES COUNTY BUSINESS             | **INJUNCTION PENDING APPEAL**
18 FEDERATION, CENTRAL VALLEY          |
   BUSINESS FEDERATION, and            | **HEARING:**
19 WESTERN GROWERS ASSOCIATION,        | Date:      September 8, 2025
20            Plaintiffs,              | Time:      1:30 pm
                                       | Location:  Courtroom 5D
21       v.                            | Judge:     Otis D. Wright II
22 LIANE M. RANDOLPH, in her official  |
   capacity as Chair of the California Air |
23 Resources Board, STEVEN S. CLIFF, in |
   his official capacity as the Executive |
24 Officer of the California Air Resources |
   Board, and ROBERT A. BONTA, in his  |
25 official capacity as Attorney General of |
   California.                         |
26           Defendants.               |
27
28

Gibson, Dunn &
Crutcher LLP

BRADLEY J. HAMBURGER
  SBN 266916
  bhamburger@gibsondunn.com
SAMUEL ECKMAN
  SBN 308923
  seckman@gibsondunn.com
ELIZABETH STRASSNER
  SBN 342838
  estrassner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

BRIAN A. RICHMAN
(*pro hac vice*)
  DC Bar No. 230071
  brichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Ave., Suite 2100
Dallas, TX 75201-2923
Telephone: 214.698.3100
Facsimile: 214.571.2900

*Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association*

KEVIN PALMER
(*pro hac vice*)
  DC Bar No. 90014967
  kpalmer@uschamber.com
CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA
1615 H Street, NW
Washington, D.C. 20062-2000
Telephone: 202.659.6000
Facsimile: 202.463.5302

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*

PLAINTIFFS' MEMO. ISO MOT. FOR INJUNCTION PENDING APPEAL
CASE NO. 2:24-CV-00801-ODW-PVC

ER-156

(115 of 297) Page 115 of 297Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 115 of 297
Case 2:24-cv-00801-ODW-PVC   Document 116-1   Filed 08/20/25   Page 3 of 21   Page
ID #:10528

1

# TABLE OF CONTENTS

2

Page

3
I. INTRODUCTION ..................................................................................................... 1

4
II. BACKGROUND.................................................................................................... 3

5
III. LEGAL STANDARD........................................................................................... 4

6
IV. ARGUMENT........................................................................................................ 5

7
    A.      Plaintiffs Have Raised Serious First Amendment Questions ................... 5

8
          1.     Heightened Scrutiny Applies ........................................................... 6

9

10
          2.     The Laws Are Not Narrowly Tailored to Any Legitimate
                  Government Interest ........................................................................ 9

11
    B.      Plaintiffs Face Imminent and Irreparable Harm ................................... 13

12
    C.      The Balance of Equities Tips Sharply in Plaintiffs' Favor.................... 13

13
V. CONCLUSION................................................................................................... 14

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ......................................................... 2, 4

*Am. Beverage Ass'n v. City of San Francisco*,
    2016 WL 9184999 (N.D. Cal. June 7, 2016) ............................. 2, 4, 13, 14

*Am. Beverage Ass'n v. City of San Francisco*,
    916 F.3d 749 (9th Cir. 2019) (en banc) ................................. 1, 3, 5, 11, 14

*Am. Fed'n of Lab. v. Chertoff*,
    552 F. Supp. 2d 999 (N.D. Cal. 2007) ............................................... 13

*Am. Meat Inst. v. USDA*,
    760 F.3d 18 (D.C. Cir. 2014) ............................................................ 11

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
    2010 WL 4313973 (C.D. Cal. Oct. 25, 2010) ...................................... 2

*Bolger v. Youngs Drug Products Corp.*,
    463 U.S. 60 (1983) ........................................................................ 6, 7

*Cal. Chamber of Com. v. Council for Educ. & Research on Toxics*,
    29 F.4th 468 (9th Cir. 2022) ..................................................... 2, 5, 13

*City of Cincinnati v. Discovery Network, Inc.*,
    507 U.S. 410 (1993) ............................................................................ 6

*Elrod v. Burns*,
    427 U.S. 347 (1976) .......................................................................... 13

*Green v. Miss U.S. of Am., LLC*,
    52 F.4th 773 (9th Cir. 2022) .............................................................. 6

*Int'l Dairy Foods Ass'n v. Amestoy*,
    92 F.3d 67 (2d Cir. 1996) ................................................................. 11

*Int'l Fruit Genetics, LLC v. P.E.R. Asset Mgmt. Tr.*,
    2016 WL 5922715 (C.D. Cal. Oct. 4, 2016) ....................................... 5

(117 of 297) Page 117 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 117 of 297
Case 2:24-cv-00801-ODW-PVC   Document 116-1   Filed 08/20/25   Page 5 of 21   Page
ID #:10530

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
585 U.S. 878 (2018)......................................................................................9

*Nat'l Inst. of Family & Life Advocates v. Becerra* (*NIFLA*),
585 U.S. 755 (2018).................................................6, 8, 10, 11, 12

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024) .................................................5, 6, 9, 13

*Warsoldier v. Woodford*,
418 F.3d 989 (9th Cir. 2005) .........................................................3

*X Corp. v. Bonta*,
116 F.4th 888 (9th Cir. 2024) .......................................................6, 7

*Youth 71Five Ministries v. Williams*,
2024 WL 3749842 (9th Cir. Aug. 8, 2024) ............................................2

*Zauderer v. Office of Disciplinary Counsel*,
471 U.S. 626 (1985)...............................................4, 5, 6, 8, 9, 11, 12

**STATUTES**

FAST Act, Pub. L. No. 114-94,
129 Stat. 1312 (2015) .................................................................12

**OTHER AUTHORITIES**

89 Fed. Reg. 21,668 (SEC Mar. 28, 2024) ..................................................12

**RULES**

Ninth Circuit Rule 3-3 ..................................................................14

Fed. R. App. P. 8(a)(1)(C) ...........................................................1, 4

Fed. R. Civ. P. 62(d) ....................................................................4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

# I. INTRODUCTION

Plaintiffs have appealed this Court's order denying their motion for a preliminary injunction barring defendants from implementing, applying, or taking any action to enforce Senate Bills 253 and 261—statutes that go into effect January 1, 2026. *See* Dkt. 112 ("Order"); Dkt. 114. In accordance with Federal Rule of Appellate Procedure 8(a)(1)(C), Plaintiffs now respectfully seek an injunction pending that appeal. Rule 8 requires that a request for an injunction pending appeal be made first in the district court, and Plaintiffs do so here. The Court should grant an injunction pending appeal because Plaintiffs face imminent, irreversible First Amendment harm from compelled speech, and the constitutional questions they raise merit appellate review before the laws take effect.

SB 253 and SB 261 require Plaintiffs' members to publicly speak on climate-related topics in mere months; steps to prepare those compelled statements must begin even sooner. *See* Order 4, 8–9 & n.4. And if Plaintiffs are correct that these speech compulsions violate the First Amendment, the resulting harm will be irreparable absent an injunction pending appeal. *See, e.g.*, *Am. Beverage Ass'n v. City of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (en banc). To avoid such irreparable harm while the Ninth Circuit considers Plaintiffs' appeal of the order denying their motion for a preliminary injunction, Plaintiffs respectfully move for a limited injunction pending the conclusion of the Ninth Circuit's review (rather than for the entirety of this action). Plaintiffs also respectfully request a ruling on this motion by **September 15, 2025**, so that Plaintiffs may promptly seek relief from the Ninth Circuit if this Court declines to grant an injunction pending appeal.

Absent this interim relief, Plaintiffs' members will be forced to engage in speech that cannot be undone, even if the laws ultimately are held unconstitutional. An injunction pending appeal is warranted to ensure that these First Amendment rights are not harmed by compelled compliance, and so the Ninth Circuit has a meaningful opportunity to review the serious constitutional questions this case presents.

1    The standard for obtaining an injunction pending appeal is not demanding, and is

2    satisfied here.  Courts routinely grant such relief even where they previously denied a

3    preliminary injunction, recognizing that "the success on the merits factor cannot be rig-

4    idly applied" and that "[a]n injunction is frequently issued where the trial court is chart-

5    ing a new and unexplored ground."  *Am. Beverage Ass'n v. City of San Francisco*,

6    2016 WL 9184999, at \*2 (N.D. Cal. June 7, 2016); *see also Am. Trucking Ass'ns, Inc.*

7    *v. City of Los Angeles*, 2010 WL 4313973, at \*1 n.3 (C.D. Cal. Oct. 25, 2010).  As the

8    court explained in granting an injunction pending appeal in *American Beverage Associ-*

9    *ation*, such relief "may be appropriate, even if the Court believe[s] its analysis [previ-

10   ously] denying preliminary injunctive relief [was] correct."  2016 WL 9184999, at \*2.

11   Under Ninth Circuit precedent, Plaintiffs need not show a likelihood of success

12   on the merits.  Instead, an injunction may issue where Plaintiffs raise "serious questions"

13   going to the merits and the balance of hardships tips sharply in their favor.  *Alliance for*

14   *the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011); *see, e.g.*, *Am.*

15   *Beverage Ass'n*, 2016 WL 9184999, at \*1–2 (finding "a plausible argument that there

16   are serious questions on the merits").  It is beyond dispute that the issues Plaintiffs have

17   raised are, at a minimum, "serious questions"—a fact that is apparent from the Court's

18   rejection of many of the State's defenses of the laws.

19   The standard for an injunction pending appeal is especially forgiving in First

20   Amendment cases.  The Ninth Circuit has held that the irreparable harm requirement is

21   "relatively easy to establish" where constitutional rights are at stake.  *Cal. Chamber of*

22   *Com. v. Council for Educ. & Research on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022).

23   Plaintiffs "'need only demonstrate the existence of a colorable First Amendment

24   claim.'"  *Youth 71Five Ministries v. Williams*, 2024 WL 3749842, at \*4 (9th Cir. Aug.

25   8, 2024) (quoting *Cal. Chamber*, 29 F.4th at 482) (granting injunction pending appeal).

26   Plaintiffs easily meet this standard.  This Court has already concluded that SB 253

27   and SB 261 "compel speech," triggering First Amendment scrutiny.  Order 9, 12.  While

28   the Court ultimately concluded that these laws satisfied that scrutiny, Plaintiffs raise

(120 of 297) Page 120 of 297Case: 25-5327 09/18/2025, DktEntry: 8.3, Page 120 of 297
Case 2:24-cv-00801-ODW-PVC   Document 116-1   Filed 08/20/25   Page 8 of 21   Page
ID #:10533

1  serious constitutional questions about whether the compelled disclosures are commercial

2  speech, whether they are purely factual and uncontroversial, and whether they are tai-

3  lored to any legitimate government interest.  The balance of hardships also tips sharply

4  in Plaintiffs' favor: absent relief, they will be forced to speak in violation of the First

5  Amendment, while the State will suffer no comparable harm from a temporary pause in

6  enforcement. *See Warsoldier v. Woodford*, 418 F.3d 989, 1002 (9th Cir. 2005) (explain-

7  ing that "this case raises serious First Amendment questions and compels a finding that

8  the potential for irreparable injury exists, or at the very least, that 'the balance of hard-

9  ships tips sharply in [plaintiff's] favor'").  Finally, the public interest "always" favors

10 protecting constitutional rights from governmental overreach. *Am. Beverage Ass'n*,

11 916 F.3d at 758.

12     The Court should enjoin defendants from implementing, applying, or taking any

13 action to enforce SB 253 or SB 261 against Plaintiffs' members pending the Ninth Cir-

14 cuit's resolution of Plaintiffs' appeal.

## II. BACKGROUND

16     Senate Bills 253 and 261 impose sweeping climate-related speech mandates on

17 thousands of companies nationwide. *See* Order 2–5.  SB 253 requires entities with over

18 $1 billion in annual revenue that "d[o] business in California" to publicly report Scope

19 1, 2, and 3 greenhouse gas emissions—defined to include emissions from third parties

20 such as utilities, suppliers, and customers. *Id.* at 2.  SB 261 requires entities with over

21 $500 million in annual revenue to publish biennial reports assessing "climate-related

22 financial risk," including speculative judgments about future policy responses and global

23 market impacts. *Id.* at 4.

24     Although regulations to implement SB 253 are still forthcoming, the California

25 Air Resources Board ("CARB") has issued an enforcement notice confirming that com-

26 panies must begin reporting Scope 1 and 2 emissions in 2026 and must take action now

27 to demonstrate good-faith compliance.   *See*  Order 3.   SB 261  likewise  requires

28

Gibson, Dunn &
Crutcher LLP

3
PLAINTIFFS' MEMO. ISO MOT. FOR INJUNCTION PENDING APPEAL
CASE NO. 2:24-CV-00801-ODW-PVC    **ER-162**

(121 of 297) Page 121 of 297Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 121 of 297
Case 2:24-cv-00801-ODW-PVC   Document 116-1   Filed 08/20/25   Page 9 of 21   Page
ID #:10534

1  disclosures beginning January 1, 2026. *Id.* at 4. Plaintiffs' members are already incur-

2  ring substantial costs to prepare for compliance. *See id.* at 8–9.

3      On August 13, 2025, the Court denied Plaintiffs' motion for a preliminary injunc-

4  tion. The Court held that SB 253 and SB 261 "compel speech," that their "primary

5  effect—and purpose—is to compel speech," and that the First Amendment applies. Or-

6  der 9, 12. It also ruled that SB 261's compelled disclosures are not purely factual and

7  thus subject to intermediate scrutiny. *See id.* at 23–24. But the Court ultimately con-

8  cluded that both laws likely survive First Amendment review—applying *Zauderer* to SB

9  253 and intermediate scrutiny to SB 261—and held that Plaintiffs had not shown a like-

10  lihood of success on the merits of their facial challenge. *See id.* at 27–40. The Court

11  did not dispute that Plaintiffs' members have an imminent obligation to speak under

12  these laws, nor did it question that unconstitutionally compelled speech is irreparable

13  harm. *See id.* at 8–9, 40.

14      Plaintiffs have filed a notice of appeal, Dkt. 114, and given the laws' effective

15  dates, respectfully request a decision on this motion by **September 15, 2025**.

16                          **III. LEGAL STANDARD**

17      A district court may grant an injunction pending appeal under Federal Rule of

18  Civil Procedure 62(d) and Federal Rule of Appellate Procedure 8(a)(1)(C). The standard

19  is less exacting than that for a preliminary injunction, and is applied with flexibility in

20  recognition of the need to preserve appellate rights. See *Am. Beverage Ass'n*, 2016 WL

21  9184999, at *2 (N.D. Cal. June 7, 2016) ("an injunction pending appeal may be appro-

22  priate, even if the Court believed its analysis in denying preliminary injunctive relief is

23  correct").

24      Under Ninth Circuit precedent, a party seeking an injunction pending appeal need

25  not show a likelihood of success on the merits. Instead, relief is appropriate where the

26  party raises "serious questions" going to the merits and the balance of hardships tips

27  sharply in its favor. *Alliance for the Wild Rockies*, 632 F.3d at 1134–35. This sliding-

28

scale approach applies with particular force in First Amendment cases, where the irreparable harm requirement is "relatively easy to establish." *Cal. Chamber*, 29 F.4th at 482.

Courts also consider the public interest and whether interim relief would preserve the status quo pending appeal. Where constitutional rights are at stake, the public interest "always" favors protection. *Am. Beverage Ass'n*, 916 F.3d at 758.

## IV. ARGUMENT

The Court should not allow thousands of American businesses (*see* Order 2, 4) to be compelled to speak before the Ninth Circuit has an opportunity to review the serious constitutional questions presented in this case. *Cf. Int'l Fruit Genetics, LLC v. P.E.R. Asset Mgmt. Tr.*, 2016 WL 5922715, at *2 (C.D. Cal. Oct. 4, 2016) (Wright, J.) (temporarily suspending injunction "to allow Defendants time to seek a suspension from the Ninth Circuit"). The disclosures mandated by SB 253 and SB 261 are not minor regulatory requirements—they will impose immediate and substantial burdens on numerous businesses in a matter of months, compelling speech on matters of public controversy with significant legal and reputational consequences. *See* Order 8–9.

### A.    Plaintiffs Have Raised Serious First Amendment Questions

This Court has already held that SB 253 and SB 261 "compel speech," and that their "primary effect—and purpose—is to compel speech." Order 9, 12. That finding alone satisfies the threshold for First Amendment scrutiny and confirms that Plaintiffs' claims are not only colorable but substantial. *See NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1117 (9th Cir. 2024) ("[T]he forced disclosure of information, even purely commercial information, triggers First Amendment scrutiny.").

The constitutional questions presented here are serious. Plaintiffs challenge whether the compelled disclosures are properly classified as commercial speech, whether they trigger limited scrutiny under *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), and whether they compel speech that is purely factual and uncontroversial. Plaintiffs also raise serious questions about whether the laws are appropriately tailored to any legitimate government interest—particularly given their breadth,

(123 of 297) Page 123 of 297Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 123 of 297
Case 2:24-cv-00801-ODW-PVC   Document 116-1   Filed 08/20/25   Page 11 of 21   Page
ID #:10536

controversial content, and lack of a materiality requirement.  Each of these issues impli-
cates foundational First Amendment questions.  While this Court has concluded that
SB 253 and SB 261 are likely constitutional, the Ninth Circuit should have the oppor-
tunity to address these issues before the laws take effect.

### 1.  Heightened Scrutiny Applies

The compelled speech mandated by SB 253 and SB 261 raises foundational First
Amendment concerns.  At the heart of the constitutional analysis is whether the speech
these laws require is commercial.  If it is not, then strict scrutiny applies—a standard
that is rarely satisfied.  *See Nat'l Inst. of Family & Life Advocates v. Becerra* (*NIFLA*),
585 U.S. 755, 766 (2018); *NetChoice*, 11 F.4th at 1121.  Strict scrutiny requires the gov-
ernment to prove that the law is narrowly tailored to serve a compelling interest, and that
no less restrictive alternative would suffice.  *See NIFLA*, 585 U.S. at 766; *NetChoice*,
11 F.4th at 1121.  That is a "daunting" standard, *Green v. Miss U.S. of Am., LLC*,
52 F.4th 773, 791 (9th Cir. 2022), and the State has not come close to meeting it here.

Plaintiffs have raised serious questions that the compelled speech here is not com-
mercial, and that even if it were, the laws still fall outside the bounds of *Zauderer* review,
which applies only to certain factual, uncontroversial disclosures related to specific com-
mercial transactions.

### a.  The Compelled Speech Is Not Commercial, and Strict Scrutiny Is Required

The speech compelled here does "not satisfy the 'usual definition'" of commercial
speech—"speech that does no more than propose a commercial transaction." *X Corp. v.
Bonta*, 116 F.4th 888, 901 (9th Cir. 2024) (cleaned up); *see also City of Cincinnati v.
Discovery Network, Inc.*, 507 U.S. 410, 423 (1993).  And there is a serious question
whether it has the three characteristics typically found in commercial speech under *Bol-
ger v. Youngs Drug Products Corp.*, 463 U.S. 60, 66–67 (1983): it is not an advertise-
ment, it does not refer to a particular product or service, and it is not economically mo-
tivated.  *See NetChoice*, 113 F.4th at 1120.  This Court expressly stated that the

(124 of 297), Page 124 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 124 of 297
Case 2:24-cv-00801-ODW-PVC    Document 116-1    Filed 08/20/25    Page 12 of 21    Page
ID #:10537

compelled speech here is not an advertisement, and noted that the State itself does not claim the disclosures refer to a particular product. *See* Order 18-19. Thus, according to this Court's Order, two of the three *Bolger* factors are not met.

This Court nevertheless deemed the speech commercial, reasoning that because some companies voluntarily disclose *some* climate-related information, the laws' compelled disclosures of *other* information could "function as advertisements," even though none "refer to a particular product." Order 18–19. Plaintiffs respectfully submit that Ninth Circuit precedent raises a serious question as to that conclusion. Specifically, in *X Corp.*, the Ninth Circuit stated that there are only "limited" exceptions to the "general rule" that commercial speech must "propose a commercial transaction." 116 F.4th at 901. And it made clear that in "all" of those exceptions, the speech must "communicat[e] the terms of an actual or potential transaction." *Id.* The Ninth Circuit cited examples such as "targeted, individualized solicitations," "contract negotiations," and "retail product warnings"—each of which involved speech that was transactional in nature. *Id.*

Here, as in *X Corp.*, there is a serious question whether that standard is met. The speech mandated by SB 253 and SB 261 does not communicate the terms of any transaction, and it is not tied to any product or service. Nor does it serve any promotional function. The Court's suggestion that the disclosures "function as advertisements" at least arguably misapprehends the nature and purpose of the laws. Order 19. The laws' intent is precisely the opposite of promotional: the laws aim to impose public accountability by compelling disclosures that many companies would prefer not to make. *See* Dkt. 48-5 at 2:25-3:11. The mandated speech is designed to expose, not to promote. It is not economically motivated, it does not advance any commercial interest of the speaker, and it does not merely compel disclosures in product labels or advertisements. It is miles apart from what the Supreme Court and Ninth Circuit have recognized as commercial speech.

Gibson, Dunn & Crutcher LLP

(125 of 297), Page 125 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 125 of 297
Case 2:24-cv-00801-ODW-PVC   Document 116-1   Filed 08/20/25   Page 13 of 21   Page
ID #:10538

These constitutional issues underscore why an injunction pending appeal is war-ranted. Plaintiffs have raised serious First Amendment questions about whether SB 253 and SB 261 compel non-commercial speech on matters of public controversy—speech that is entitled to the highest constitutional protection. These questions go to the heart of the compelled speech doctrine and merit full appellate review before the laws take effect. Because the balance of hardships tips sharply in Plaintiffs' favor and the risk of irreparable harm is imminent, interim relief is necessary to preserve the status quo and prevent constitutional injury.

### b.    *Zauderer* Does Not Apply

Even assuming the compelled disclosures mandated by SB 253 and SB 261 were commercial speech, there is a serious question whether the laws qualify for the more deferential review available under *Zauderer*.

With respect to SB 261, this Court correctly concluded that *Zauderer* does not apply. Order 23. The Court ruled that SB 261 compels disclosures that are not purely factual, but instead require companies to make subjective assessments about future risks and policy developments—such as the potential financial impact of climate change on their operations. These forward-looking judgments, the Court held, are not factual in nature and therefore fall outside the scope of *Zauderer*. Order 24.

Plaintiffs respectfully submit that serious questions exist as to whether *Zauderer* applies to SB 253, either. *Zauderer* applies only in narrow circumstances, and one threshold requirement is that the compelled disclosure be related to the "terms under which" the product or "services will be available." *NIFLA*, 585 U.S. at 768. If that requirement is not satisfied, *Zauderer* does not apply—regardless of whether the speech is factual or uncontroversial. *See id.*

There are serious arguments that that threshold is not met here. SB 253 does not require companies to disclose information about any specific product or service. Instead, it compels broad public statements about the attribution of emissions to certain compa-nies—topics that are untethered from any particular transaction. The disclosures are not

(126 of 297) Page 126 of 297ase: 25-5327, 09/18/2025, DktEntry: 8.3, Page 126 of 297
Case 2:24-cv-00801-ODW-PVC    Document 116-1    Filed 08/20/25    Page 14 of 21    Page
ID #:10539

designed to inform consumers about the terms of a sale, the nature of a service, or any other commercial offering. And they are "disconnected from any economic transaction." *NetChoice*, 113 F.4th at 1119. Because the disclosures are not related to the terms of any product or service, *Zauderer* at least arguably does not apply to SB 253.

SB 253 also at least arguably falls outside *Zauderer*'s reach for an additional reason: it compels speech that is neither purely factual nor uncontroversial. "[C]limate change" is the paradigmatic example of a "controversial subject." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 913 (2018). And there is a serious question as to whether SB 253 requires a reporting company to claim as its own the emissions of third parties whom it does not control—including electricity suppliers, customers, and vendors. That is not a neutral factual disclosure; it is a compelled ideological statement, as it forces companies to adopt the State's normative judgment about responsibility for climate change.

If *Zauderer* does not apply to either SB 253 or SB 261, the laws must satisfy heightened scrutiny. And Plaintiffs have raised serious questions about whether the laws can survive such scrutiny.

## 2.    The Laws Are Not Narrowly Tailored to Any Legitimate Government Interest

Regardless of the level of scrutiny, Plaintiffs have raised serious questions about whether the laws are appropriately tailored to any legitimate government interest. The State has identified three interests—none of which satisfy those standards.

***Deception.*** The Court has already rejected the State's argument that SB 253 and SB 261 are justified by an interest in correcting misleading speech. *See* Order 34–37. That finding forecloses reliance on the core rationale of *Zauderer*, which permits compelled disclosures when they are "reasonably related to the State's interest in preventing deception." *Zauderer*, 471 U.S. at 651. The Supreme Court has made clear that it is "reluctant to mark off new categories of speech for diminished constitutional protection," and "especially reluctant to exempt a category of speech from the normal

Line numbers: 1–28

(127 of 297), Page 127 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 127 of 297
Case 2:24-cv-00801-ODW-PVC    Document 116-1    Filed 08/20/25    Page 15 of 21    Page
ID #:10540

prohibition on content-based restrictions." *NIFLA*, 585 U.S. at 767. Yet the alternative justifications the State offers for its restrictions are unprecedented—just as the disclosures themselves are unprecedented in their breadth and burdensomeness.

**Reducing Emissions.** The State has asserted that SB 253 and SB 261 would help reduce emissions and mitigate climate risks. For SB 261, the Court rejected the argument, finding that the State's emissions-reduction interest could not justify the law under intermediate scrutiny. *See* Order 39–40.

As for SB 253, while the Court accepted emissions reduction as a substantial interest, it found the supporting evidence equivocal. *See* Order 32–33. The State relied on studies showing modest emissions reductions following voluntary or mandatory disclosures, but the Court noted that these studies do not definitively establish that SB 253's requirements will lead to emissions reductions. *See id.* Nonetheless, the Court held that the State had provided "sufficient evidence" that SB 253's mandates were "reasonably related to the State's substantial government interest in reducing emissions." *Id.* at 33.

Plaintiffs respectfully submit that there are serious questions as to whether this conclusion was correct. First, the Court failed to define the asserted interest with the requisite precision. *See NIFLA*, 585 U.S. at 775 ("precision" is "the touchstone" of "regulations of speech" (brackets omitted)). The State does not have a substantial interest in reducing emissions in the abstract; its asserted interest lies in reducing emissions to a level that would materially mitigate "the severity of the climate risks the state faces." Dkt. 89 at 18. Yet the State presented no evidence that the modest reductions it anticipates would have any meaningful impact on climate change. As the State itself acknowledges, climate change is a "global" phenomenon, Dkt. 48-10 at 2, and addressing it requires a "*global* reduction of [emissions]," Dkt. 48-11 at 5 (emphasis added). There is no "long (if heretofore unrecognized) tradition" of using compelled speech to achieve environmental outcomes, *NIFLA*, 585 U.S. at 767, and certainly none to justify compelling thousands of companies to speak in service of a policy goal that will yield only marginal effects.

(128 of 297), Page 128 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 128 of 297
Case 2:24-cv-00801-ODW-PVC  Document 116-1  Filed 08/20/25  Page 16 of 21  Page
ID #:10541

Second, the Court failed to evaluate whether the speech compulsion, even if it served a government interest, was "broader than reasonably necessary" under *Zauderer*. *NIFLA*, 585 U.S. at 776. As Plaintiffs demonstrated, the State could have calculated its own estimates of companies' greenhouse-gas emissions using publicly available information, such as industry, size, and earnings growth. *See* Dkt. 48-22 at 7. Yet the State offered no evidence to show that this alternative would not satisfy its purported interest. *Cf. Am. Beverage Ass'n*, 916 F.3d at 757 (*Zauderer* not met where less burdensome alternatives "would accomplish [the government's] stated goals").

**Consumer and Investor Interests.** The State also claimed an interest in providing reliable information to investors and consumers "so that they can 'make informed judgments about the impact of climate-related risks on their economic choices.'" Order 28. The Court rejected this rationale with regard to consumers. *See id.* at 29. And while the Court credited the interest with regard to investors (*see id.*), there is at minimum a substantial question whether that conclusion was correct.

Plaintiffs will argue on appeal that courts have consistently held that satisfying public demand for information is not, by itself, a substantial government interest. *See, e.g.*, *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 73 (2d Cir. 1996); *Am. Meat Inst. v. USDA*, 760 F.3d 18, 31 (D.C. Cir. 2014) (Kavanaugh, J., concurring). As then-Judge Kavanaugh explained, "it is plainly not enough for the Government to say simply that it has a substantial interest in giving consumers information. After all, that would be true of any and all disclosure requirements." *Id.* at 31. If public demand alone were sufficient, "there is no end to the information that states could require manufacturers to disclose about their production methods." *Id.* at 31–32. "Some consumers might want to know whether their U.S.-made product was made by U.S. citizens and not by illegal immigrants. Some consumers might want to know whether a doctor has ever performed an abortion. Some consumers might want to know the political affiliation of a business's owners." *Id.* at 32. The First Amendment does not permit compelled speech merely to satisfy curiosity or promote policy preferences untethered to a substantial interest.

(129 of 297), Page 129 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 129 of 297
Case 2:24-cv-00801-ODW-PVC Document 116-1 Filed 08/20/25 Page 17 of 21 Page
ID #:10542

That concern is especially acute here, where the only investor the State identified to support its asserted interest was CALPERS—a state-affiliated investment entity. *See* Order 29. A disclosure mandate affecting thousands of private businesses nationwide cannot be justified by the preferences of a single government-linked investor.

The Court also failed to assess whether the speech compulsion was "broader than reasonably necessary." *NIFLA*, 585 U.S. at 776. The Court acknowledged that SB 253 and SB 261 are not tailored to investor interest "to the extent the law compels disclosure from companies that have no California investors." Order 30; *see also id.* at 38–39. The Court dismissed this as a facial-challenge issue, *see id.* at 30–31, 38–39, but the over-breadth of SB 253 and SB 261 goes to the tailoring requirement; a law that reaches entities with no plausible connection to the asserted interest cannot survive even defer-ential scrutiny. *See Zauderer*, 471 U.S. at 649 (rejecting "broad prophylactic rules" in this area).

The mismatch between the laws' scope and the State's asserted interest is illus-trated even more starkly by the absence of a requirement that the mandated information be *material* to investors, rather than merely of "interest." Under the securities laws, materiality is crucial to determining investors' need for disclosure. *See, e.g.*, FAST Act, Pub. L. No. 114-94, § 72003, 129 Stat. 1312, 1785 (2015). Indeed, the SEC's climate disclosure rule—which presents serious legal problems of its own—at least purports to limit Scope 1, 2, and 3 reporting to circumstances where it would be material. *See* 89 Fed. Reg. 21,668, 21,916/3 (SEC Mar. 28, 2024). The laws at issue here, which purport to serve investors but omit a central determinant of information's importance to investors, are plainly broader than reasonably necessary.

These tailoring flaws reinforce why interim relief is necessary. Plaintiffs have raised serious questions whether SB 253 and SB 261 are appropriately tailored to any legitimate government interest—questions that go to the heart of First Amendment scru-tiny. The laws compel speech from entities with no connection to the asserted interests, rely on speculative benefits, and ignore less burdensome alternatives. That overbreadth,

1  coupled with the absence of a materiality requirement and reliance on a single state-

2  affiliated investor, underscores the constitutional stakes.  California has imposed novel

3  and sweeping compelled speech requirements that raise serious constitutional questions

4  and thus warrant appellate scrutiny before those requirements go into effect.

5  **B.    Plaintiffs Face Imminent and Irreparable Harm**

6          The speech mandated by SB 253 and SB 261 must begin imminently—as early as

7  January 1, 2026.  *See* Order 4, 8–9 & n.4.  Plaintiffs' members will then be required to

8  publicly speak on climate-related topics in ways this Court has already ruled "trigge[r]

9  First Amendment scrutiny."  *Id.* at 11 (quoting *NetChoice*, 113 F.4th 1117).  If Plaintiffs

10  are correct that the laws violate the First Amendment—and they raise "plausible argu-

11  ment[s]" that they do—the resulting harm will be irreparable.  *Am. Beverage Ass'n*,

12  2016 WL 9184999, at *2.  As the Ninth Circuit has repeatedly held, "[t]he loss of First

13  Amendment freedoms, for even minimal periods of time, unquestionably constitutes ir-

14  reparable injury."  *Cal. Chamber*, 29 F.4th at 477 (quoting *Elrod v. Burns*, 427 U.S. 347,

15  373 (1976)).

16  **C.    The Balance of Equities Tips Sharply in Plaintiffs' Favor**

17          This imminent constitutional harm not only satisfies the irreparable injury require-

18  ment—it also tips the equities sharply in Plaintiffs' favor.  Absent interim relief, Plain-

19  tiffs' members will be forced to speak in violation of the First Amendment, incurring

20  expressive and reputational harms that cannot be undone.  By contrast, the State will

21  suffer no comparable injury from a temporary pause in enforcement.  The State cannot

22  claim urgency, having already failed to issue implementing regulations within the stat-

23  utorily required timeline.  *See Am. Fed'n of Lab. v. Chertoff*, 552 F. Supp. 2d 999, 1007

24  (N.D. Cal. 2007) ("the agency's delay does undercut the assertion that it will be irrepa-

25  rably harmed if the Court maintains the status quo").  A limited injunction pending ap-

26  peal would simply preserve the status quo and ensure that the Ninth Circuit has a mean-

27  ingful opportunity to review the serious constitutional questions presented before any

28  constitutional harm is inflicted.  Moreover, any hardship to the State will be minimal, as

(131 of 297), Page 131 of 297
Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 131 of 297
Case 2:24-cv-00801-ODW-PVC    Document 116-1    Filed 08/20/25    Page 19 of 21    Page
ID #:10544

the appeal will proceed on an expedited basis. *See Am. Beverage Ass'n*, 2016 WL 9184999, at *2 (granting injunction pending appeal because "the appeal will likely be resolved on an expedited basis (given Ninth Circuit Rule 3-3)").

The public interest likewise favors an injunction. The public interest "always" favors protecting constitutional rights. *Am. Beverage Ass'n*, 916 F.3d at 758. Enjoining enforcement of SB 253 and SB 261 during the pendency of the appeal would not prevent the State from pursuing its climate goals through other means, including voluntary disclosures and investor engagement. But it would prevent irreversible constitutional harm and ensure that appellate review is not undercut by compelled compliance.

## V. CONCLUSION

To preserve the status quo and prevent irreparable harm while the Ninth Circuit considers the serious constitutional questions presented by Senate Bills 253 and 261, the Court should enjoin defendants from implementing, applying, or taking any action to enforce the laws against Plaintiffs' members pending appeal.

PLAINTIFFS' MEMO. ISO MOT. FOR INJUNCTION PENDING APPEAL
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-173**

1

2     DATED: August 20, 2025     Respectfully submitted,

3                            GIBSON, DUNN & CRUTCHER LLP

4

5                          By: */s/ Bradley J. Hamburger*
                         Eugene Scalia, SBN 151540

6                          Bradley J. Hamburger, SBN 266916
                         Samuel Eckman, SBN 308923

7                          Brian A. Richman (*pro hac vice*)
                         Elizabeth Strassner, SBN 342838

8

9                          *Attorneys for Plaintiffs Chamber of Commerce*
                         *of the United States of America, California*

10                          *Chamber of Commerce, American Farm Bureau*
                         *Federation, Los Angeles County Business Fed-*

11                          *eration, Central Valley Business Federation*
                         *and Western Growers Association*

12

13                          CHAMBER OF COMMERCE OF THE
                         UNITED STATES OF AMERICA

14

15                          Kevin Palmer (*pro hac vice*)

16                          *Attorneys for Plaintiff Chamber of Commerce*
                         *of the United States of America*

17

18

19

20

21

22

23

24

25

26

27

28

(133 of 297), Page 133 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 133 of 297
Case 2:24-cv-00801-ODW-PVC    Document 116-1    Filed 08/20/25    Page 21 of 21    Page
ID #:10546

# CERTIFICATE OF COMPLIANCE

1

2     The undersigned, counsel of record for Plaintiffs Chamber of Commerce of the

3 United States of America, California Chamber of Commerce, American Farm Bureau

4 Federation, Los Angeles County Business Federation, Central Valley Business Federa-

5 tion and Western Growers Association, certifies that this brief contains 4,620 words,

6 which complies with the word limit of this Court's Rule VII.A.3.

7 DATED: August 20, 2025          Respectfully submitted,

8                                 GIBSON, DUNN & CRUTCHER LLP

9
                                  By: */s/ Bradley J. Hamburger*
10                                Eugene Scalia, SBN 151540
11                                Bradley J. Hamburger, SBN 266916
                                  Samuel Eckman, SBN 308923
12                                Brian A. Richman (*pro hac vice*)
                                  Elizabeth Strassner, SBN 342838
13

14                                *Attorneys for Plaintiffs Chamber of Commerce*
                                  *of the United States of America, California*
15                                *Chamber of Commerce, American Farm Bureau*
                                  *Federation, Los Angeles County Business Fed-*
16                                *eration, Central Valley Business Federation,*
                                  *and Western Growers Association*
17

18                                CHAMBER OF COMMERCE OF THE
                                  UNITED STATES OF AMERICA
19

20                                Kevin Palmer (*pro hac vice*)

21                                *Attorneys for Plaintiff Chamber of Commerce*
                                  *of the United States of America*

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

PLAINTIFFS' MEMO. ISO MOT. FOR INJUNCTION PENDING APPEAL
CASE NO. 2:24-CV-00801-ODW-PVC          **ER-175**

1   EUGENE SCALIA, SBN 151540
2       escalia@gibsondunn.com
    GIBSON, DUNN & CRUTCHER LLP
3   1700 M. St. N.W.
    Washington, D.C.  20036
4   Telephone:  202.955.8500
    Facsimile:   202.467.0539
5

6   *Attorneys for Plaintiffs Chamber of*
    *Commerce of the United States of Amer-*
7   *ica, California Chamber of Commerce,*
    *American Farm Bureau Federation, Los*
8   *Angeles County Business Federation,*
    *Central Valley Business Federation,*
9   *and Western Growers Association*

10  (*Additional counsel listed on next page*)

11              IN THE UNITED STATES DISTRICT COURT
12          FOR THE CENTRAL DISTRICT OF CALIFORNIA,
13                      WESTERN DIVISION
14

15  CHAMBER OF COMMERCE OF THE          CASE NO. 2:24-cv-00801-ODW-PVC
    UNITED STATES OF AMERICA,
16  CALIFORNIA CHAMBER OF               **PLAINTIFFS' NOTICE OF**
    COMMERCE, AMERICAN FARM             **MOTION AND MOTION FOR**
17  BUREAU FEDERATION, LOS              **INJUNCTION PENDING APPEAL**
    ANGELES COUNTY BUSINESS
18  FEDERATION, CENTRAL VALLEY          **Ruling Requested by**
    BUSINESS FEDERATION, and            **September 15, 2025**
19  WESTERN GROWERS ASSOCIATION,
20              Plaintiffs,
21       v.                            **HEARING:**
                                        Date:       September 8, 2025
22  LIANE M. RANDOLPH, in her official  Time:       1:30 PM
    capacity as Chair of the California Air  Location:   Courtroom 5D
23  Resources Board, STEVEN S. CLIFF, in  Judge:      Otis D. Wright II
    his official capacity as the Executive
24  Officer of the California Air Resources
    Board, and ROBERT A. BONTA, in his
25  official capacity as Attorney General of
    California.
26
27              Defendants.
28

Gibson, Dunn &
Crutcher LLP

---
PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR INJUNCTION PENDING APPEAL
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-176**

1  BRADLEY J. HAMBURGER,
2      SBN 266916
       bhamburger@gibsondunn.com
3  SAMUEL ECKMAN, SBN 308923
       seckman@gibsondunn.com
4  ELIZABETH STRASSNER,
5      SBN 342838
       estrassner@gibsondunn.com
6  GIBSON, DUNN & CRUTCHER LLP
   333 South Grand Ave.
7  Los Angeles, CA  90071-3197
   Telephone:  213.229.7000
8  Facsimile:  213.229.7520

9  BRIAN A. RICHMAN
   (*pro hac vice*)
10     DC Bar No. 230071
       brichman@gibsondunn.com
11 GIBSON, DUNN & CRUTCHER LLP
12 2001 Ross Ave., Suite 2100
   Dallas, TX  75201-2923
13 Telephone:  214.698.3100
   Facsimile:   214.571.2900
14

15 *Attorneys for Plaintiffs Chamber of Commerce of the United States of America, Cali-*
   *fornia Chamber of Commerce, American Farm Bureau Federation, Los Angeles*
16 *County Business Federation, Central Valley Business Federation, and*
   *Western Growers Association*
17

18 KEVIN PALMER
   (*pro hac vice*)
19     DC Bar No. 90014967
       kpalmer@uschamber.com
20 CHAMBER OF COMMERCE OF THE
   UNITED STATES OF AMERICA
21 1615 H Street, NW
   Washington, D.C.  20062-2000
22 Telephone:  202.659.6000
   Facsimile:   202.463.5302
23

24 *Attorneys for Plaintiff Chamber of Commerce of the United States of America*

25

26

27

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR INJUNCTION PENDING APPEAL
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-177**

(136 of 297) Page 136 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 136 of 297
Case 2:24-cv-00801-ODW-PVC   Document 116   Filed 08/20/25   Page 3 of 4   Page ID
#:10524

1  **TO THE HONORABLE OTIS D. WRIGHT II, UNITED STATES DISTRICT**
2  **JUDGE, AND TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

3  **PLEASE TAKE NOTICE** that on September 8, 2025 at 1:30 PM, or as soon
4  thereafter as may be heard by the Court, before the Honorable Otis D. Wright II, United
5  States District Judge, in Courtroom 5D of the First Street Courthouse, 350 W. 1st Street,
6  Los Angeles, California 90012, Plaintiffs Chamber of Commerce of the United States
7  of America, California Chamber of Commerce, American Farm Bureau Federation, Los
8  Angeles County Business Federation, Central Valley Business Federation, and Western
9  Growers Association will, and hereby do, move pursuant to Federal Rule of Civil Pro-
10  cedure 62(d) and Federal Rule of Appellate Procedure 8(a)(1)(C) for an injunction pend-
11  ing appeal of the Court's order denying their motion for a preliminary injunction barring
12  defendants from implementing, applying, or taking any action to enforce Senate Bills
13  253 and 261.  Plaintiffs are entitled to interim relief because they face imminent and
14  irreparable First Amendment harm from compelled speech under SB 253 and SB 261,
15  and have raised serious constitutional questions warranting appellate review before the
16  laws take effect.  Plaintiffs respectfully request a ruling on this motion by **September**
17  **15, 2025**, so that Plaintiffs may promptly seek relief from the Ninth Circuit if this Court
18  declines to grant an injunction pending appeal.

19  This Motion is based on this Notice of Motion and Motion for Injunction Pending
20  Appeal; the accompanying Memorandum of Points and Authorities; all pleadings, rec-
21  ords, and files in this action; all matters of which judicial notice may or shall be taken;
22  and any other oral or written evidence or argument that the Court may consider.

23  This Motion is made following the conference between counsel for Plaintiffs and
24  Defendants, pursuant to Central District Local Rule 7-3, which took place on August 15,
25  2025.

26
27
28

Gibson, Dunn &
Crutcher LLP

1

(137 of 297)    Page 137 of 297Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 137 of 297
Case 2:24-cv-00801-ODW-PVC    Document 116    Filed 08/20/25    Page 4 of 4    Page ID
#:10525

DATED: August 20, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Bradley J. Hamburger*
Eugene Scalia, SBN 151540
Bradley J. Hamburger, SBN 266916
Samuel Eckman, SBN 308923
Brian A. Richman (*pro hac vice*)
Elizabeth Strassner, SBN 342838

*Attorneys for Plaintiffs Chamber of Commerce*
*of the United States of America, California*
*Chamber of Commerce, American Farm Bureau*
*Federation, Los Angeles County Business Fed-*
*eration, Central Valley Business Federation*
*and Western Growers Association*

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA

Kevin Palmer (*pro hac vice*)

*Attorneys for Plaintiff Chamber of Commerce*
*of the United States of America*

2
PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR INJUNCTION PENDING APPEAL
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-179**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

CHAMBER OF COMMERCE OF THE ) CASE NO: 2:24-cv-00801-ODW-PVC
UNITED STATES OF AMERICA, )
ET AL, ) CIVIL
)
            Plaintiffs, ) Los Angeles, California
)
   vs. ) Tuesday, July 1, 2025
)
CALIFORNIA AIR RESOURCES ) (10:23 a.m. to 11:28 a.m.)
BOARD, ET AL, )
)
          Defendants. )

HEARING RE:

MOTION FOR PRELIMINARY INJUNCTION [DKT.NO.78]

BEFORE THE HONORABLE OTIS D. WRIGHT, II,
UNITED STATES DISTRICT JUDGE

APPEARANCES: SEE PGE 2

Court Reporter: Recorded; CourtSmart

Courtroom Deputy: Maria Lindaya

Transcribed by: Exceptional Reporting Services, Inc.
P.O. Box 8365
Corpus Christi, TX 78468
361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

ER-180

2

**APPEARANCES**:


For Plaintiffs:            BRIAN A. RICHMAN, ESQ.
                           EUGENE SCALIA, ESQ.
                           Gibson Dunn & Crutcher
                           1700 M Street NW
                           Washington, DC 20036
                           202-955-8500

For Defendants:            CAITLAN L. MCLOON, ESQ.
                           DYLAN C. REDOR, ESQ.
                           Office of the CA Attorney General
                           300 S. Spring Street
                           Suite 1702
                           Los Angeles, CA 90013
                           213-269-6706

3

1    <u>Los Angeles, California; Tuesday, July 1, 2025; 10:23 a.m.</u>

2                        **(Call to Order)**

3         **THE CLERK:**  Calling item number one, 24-cv-00801,

4    *Chamber of Commerce of the United States of America, et al.*

5    *versus California Air Resources Board, et al.*

6         Counsel, please take your appearances, starting with

7    the Plaintiff.

8         **MR. SCALIA:**  Good morning, Your Honor.  I'm Eugene

9    Scalia representing the Plaintiffs.  With me is my colleague

10   Brian Richman.

11        **THE COURT:**  Mr. Scalia, Mr. Richman, good morning,

12   sirs.

13        **MR. RICHMAN:**  Good morning.

14        **MR. SCALIA:**  Good morning.

15        **MS. MCLOON:**  Good morning, Your Honor.  Caitlan

16   McLoon for Defendants.

17        **THE COURT:**  Ms. McLoon.

18        **MS. MCLOON:**  With me is my colleague Dylan Redor.

19        **THE COURT:**  Redor?

20        **MR. REDOR:**  Redor.

21        **THE COURT:**  Redor.  Good morning to you both.

22        **MS. MCLOON:**  Morning.

23        **MR. REDOR:**  Morning, Your Honor.

24        **THE COURT:**  All right.  Gentlemen, I just want you to

25   be comfortable, okay.  We're not going to worry about

4

 1    formalities.  Just be comfortable.

 2            You're going to lead off.  You have the floor.

 3            **MR. SCALIA:**  Good morning again, Your Honor.  And

 4    thank you.

 5            Your Honor, my clients contend that the laws at issue

 6    here unconstitutionally compel speech in violation of the First

 7    Amendment.

 8            And in the motion before the Court, they contend, as

 9    you know, Your Honor, that they are likely to succeed on the

10    merits of that claim.

11            And, additionally, that their members will suffer

12    irreparable injury without a preliminary injunction from this

13    Court.  That will come in the form of that unconstitutionally

14    compelled speech, in addition to the compliance burdens

15    currently being incurred.

16            Your Honor, this morning I'd like to emphasize four

17    points, if I could:  two about the merits; third, irreparable

18    injury and why it's important for this Court to rule and

19    intervene now; and then fourth and finally, Your Honor, why

20    these cases are appropriate and in fact prime candidates for

21    facial review.

22            Your Honor, to start with the merits, the burden is

23    on the State to show these laws' constitutionality.  These laws

24    compel speech.  As this Court has recognized, this Court said

25    that the primary effect and purpose of these laws is to compel

5

1    speech.

2            Compelled speech is content regulation.  Compelled

3    speech is presumptively unconstitutional.  That alone puts the

4    burden on the State to justify these laws.

5            Our burden is just to show that these laws implicate

6    the First Amendment, they plainly do, and then the burden is on

7    them.

8            So, Your Honor, to address their shortfall on the

9    burden, I want to focus on two issues.

10           The first is what the State has told you is the

11   central issue in the case, and that's the appropriate standard

12   of review.

13           Just as these laws are presumptively

14   unconstitutional, they're also presumptively subject to strict

15   scrutiny.

16           If this Court's going to apply any lesser standard,

17   it's the State's burden to demonstrate why it should do so.

18   And they have embraced the so-called *Zauderer* test.  They're

19   saying that is the test to be applied.  It's their burden to

20   persuade you of that, Your Honor.

21           Your Honor, *Zauderer* is completely unsuited to

22   statutes of this nature.  The State has not identified a case

23   where *Zauderer* was applied involving speech compulsions

24   remotely like the ones involved here.

25           In fact, when the State has its opportunity to speak

6

1    with you this morning, Your Honor, I hope they will tell you

2    what their best case is under *Zauderer*.  What's their best

3    case?

4            *Zauderer* itself, as you know, was a Supreme Court

5    decision where a lawyer in Ohio told prospective clients they

6    wouldn't have to pay his fees.

7            And the Ohio Bar said, wait a minute, you need to

8    tell them they might have to pay your costs.  That was the

9    speech compulsion there.

10           In the *CTIA* case, Ninth Circuit case cited by both

11   the parties here, the speech compulsion was three sentences.

12   It was on companies selling cellphones, and they had to tell

13   prospective purchasers that those phones might exceed the radio

14   frequency emissions identified in FCC guidelines.

15           And then, finally, another case that both parties

16   have cited, then Judge Cavanaugh had an important concurring

17   opinion, *American Meat Institute*.  Simple disclosure

18   requirement.  If you're selling meat, you've got to say where

19   it came from.  Made in the USA, made in Canada.

20           Your Honor, we're talking about very, very short

21   disclosures about the terms on which a product or service is

22   being provided.  And I want to emphasize that element of it,

23   Your Honor.

24           You see that in *NIFLA*, which is the Supreme Court's

25   most recent decision applying *Zauderer*.  It found one of the

7

1    laws in issue there unconstitutional simply because it didn't

2    relate to the terms on which a service was being provided.

3            These laws, typically what they're saying is if you

4    are selling something, then you need to say something

5    particular about it.

6            If you're selling something particular, say something

7    particular.  Or if you say something particular about something

8    you're selling, you need to disclose something additional.

9    Very limited disclosure requirements.

10           And as you know, Your Honor, they must also be

11   factual and noncontroversial.

12           And the disclosures here are also not factual or

13   noncontroversial.  They're not about the product being offered

14   or the service being offered in the least.

15           Whatever you sell, whatever you say about it, you

16   have the same, very passive costly speech obligations, far

17   lengthier than anything in any of the cases we've cited.

18           Your Honor, one of the documents that the State cites

19   that sets forth the disclosure obligations applicable here, the

20   so-called TCFD, it's the report of the task force on climate

21   financial disclosures.

22           It's a 65-page document just telling you what you're

23   supposed to be disclosing.  That's how different in kind these

24   disclosures are.

25           They're not purely factual.  They involve

8

1    speculation, conjecture.  And they're not noncontroversial.

2    They're about climate change.

3         The Supreme Court has said that climate change in the

4    First Amendment context is controversial, and it warrants

5    review under the First Amendment at the highest rung of

6    scrutiny.  That applies here as well, Your Honor.

7         So, Your Honor, that's my first point on the merits.

8    Burden's on them.  They're relying on *Zauderer*.  There's not a

9    *Zauderer* case where the law was upheld remotely like what we're

10   talking about here.

11        Second, I want to talk about an important development

12   since summary judgment, which is we're now a year and a half

13   into this case, and we still don't have a purportedly false or

14   misleading statement before the Court that justifies these

15   expansive laws.

16        The State fund leader took that, Your Honor, I think

17   maybe partly in response to your summary judgment ruling.  They

18   tried to put in evidence of false and misleading statements,

19   and they relied very heavily on the declaration of a Dr. Hsu,

20   their expert.

21        And they cite that throughout their brief.  They tell

22   this Court time and time and page and page again that 96

23   percent of companies making climate-related statements are

24   engaged in false and misleading speech.  And they rely on that

25   declaration.

9

1          So we turn to that declaration.  What do we see?

2   What Dr. Hsu did was she identified seven different what she

3   called indicators of greenwashing, statements that suggested,

4   said it was possible that companies were making positive

5   statements about climate, but that those were misleading.

6          What were those indicators?  One, Your Honor, we

7   mention in our brief.  If you're a company with an exemplary

8   environmental record, you've got emissions reduction targets,

9   you're hitting them, you're beating them.

10         But you lobby against a bill that you think goes too

11  far in regulating the environment.  The expert says that's an

12  indicator of greenwashing.

13         And the State says because you lobbied a First

14  Amendment protected right, you've engaged in false and

15  misleading speech about the climate.

16         I want to mention two other examples that are very

17  important because they're not false and misleading, but also

18  because they show the complete lack of tailoring in these laws,

19  which is another plain weakness.

20         Dr. Hsu says that if you have a target for climate

21  reduction -- I'm sorry, emissions reduction, and even if you're

22  hitting that target, if you don't have an interim target,

23  that's an indicator of greenwashing.

24         So, again, you're doing an exemplary job in reducing

25  emissions, hitting your target.  You don't happen to have an

10

1   interim target.  That's an indicator of greenwashing, which the

2   State turns around and says something that Dr. Hsu doesn't,

3   that it's false or misleading.

4           And then, finally, again, your company, you've got an

5   emission target, you're hitting it, but you don't have a

6   published plan on how you're going to hit it.  That's another

7   indicator of greenwashing by Dr. Hsu.  She says that's an

8   indicator.  They say it's false and misleading speech.

9           It's not.  None of those examples, Your Honor, is

10  false speech or misleading speech, as understood at the law.

11          But I want to emphasize the following, too.  Even

12  supposing that that speech is the problem -- and this is the

13  only speech the State has said justifies these statutes.  If

14  that's the problem, my gosh, how broad the solution is.

15          If the problem is an indicator of greenwashing

16  because you had an emissions reduction target but no interim

17  target, then a tailored law would say disclose that you don't

18  have an interim target, or disclose your interim target.

19          Now, I'm not saying that would be constitutional.

20  But at least it would be far better tailored than what we have

21  here.

22          Again, if you have an emissions reduction target and

23  don't have a plan, then disclose you don't have a plan or --

24  and this I think would also be unconstitutional but, again, not

25  nearly as overbroad -- disclose your plan.  This statute,

11

1    neither one does any of that.

2          Regardless what you say, regardless what you do,

3    regardless of your business, the same raft of costly

4    disclosures are required.

5          So again, Your Honor, there's never been a statute

6    like it that's been upheld.  And when you focus on the

7    tailoring in particular, you see how overbroad these are.

8          With respect to irreparable injury, Your Honor, as I

9    think the parties agree, unconstitutionally compelled speech is

10   irreparable injury.

11         That alone is irreparable injury, and we contend that

12   that alone justifies the preliminary injunction that we've

13   sought here.

14         My clients' members will have to begin speaking

15   pursuant to these laws on or before the first of the year.

16   That's six months from now, Your Honor.

17         And something that -- a development since this

18   Court's summary judgment ruling that we think is very important

19   now is we know the schedule this case is on in the merits.

20         This Court's not going to hear argument on summary

21   judgment for more than a year.  I believe the date is July

22   13th, next year.  It presumably will take the Court some time

23   to rule after that.  And there are likely to be appeals.

24         And so my clients, without a preliminary injunction

25   from this Court under SB 261, will in fact be compelled to

12

1    speak in six months from now, in violation of their

2    constitutional rights.

3            With respect to SB 253, we know that speech under

4    that law is also compelled next year.  We don't know the exact

5    date yet.  But, again, we know that this Court won't even hear

6    summary judgment argument until the middle of July next year.

7            Our clients, if they're not compelled to speech

8    before -- speak before then, will be making enormous

9    investments and almost surely will have to speak before the end

10   of 2026.

11           You know, Your Honor, in thinking about this, there's

12   a balance you have to strike when you're asking a court for

13   emergency relief.

14           You don't want to come too soon.  You don't want to

15   scream the sky is falling in when there's time.  And so we

16   didn't come to this Court right away for a preliminary

17   injunction.  We hoped that we could dispose of these statutes

18   on summary judgment.  We tried and failed, Your Honor.

19           But now we're looking at sort of the other end of

20   that timeline.

21           Just as nobody wants to come too soon and courts

22   don't want that, what courts really don't want is for us to

23   file what would be a renewed motion for preliminary injunction

24   at the end of October, briefing through Thanksgiving, maybe

25   Christmas, oral argument, I don't know, right before Christmas,

13

1  to get a ruling on or before January 1st.

2          Your Honor, we think the timing is just right here.

3          When I looked at the *NetChoice* decided by the Ninth

4  Circuit, which both parties rely on, the plaintiff there moved

5  for a PI 17 months before the law's effective date.

6          The court heard the case, the Ninth Circuit heard the

7  case, and the preliminary injunction was affirmed.  But, Your

8  Honor, that actually took an extra month.

9          So by the time the Ninth Circuit actually ruled on

10  those PI motions, it was a year -- it was a month after the

11  effective date.

12          So the motion here, Your Honor, we didn't want to

13  rush it.  But if we didn't file this now, we'd be rushing the

14  Court at the end of this year.

15          And my clients would continue to incur compliance

16  costs which, by the way, the district court in that *NetChoice*

17  case was focused on that as well, just the cost of having to

18  get ready to comply with something that's unconstitutional.

19          Your Honor, I appreciate your time.  I just want to

20  conclude by talking about facial review and reserve whatever

21  time you think is appropriate for -- to respond to the State's

22  argument this morning.

23          We think this case is paragmatic (phonetic) example

24  of the law that's very, very well-suited to facial review.

25          As you know, that process is where the Court first

14

1    asks what the scope of the law's applications is, and then asks

2    whether a substantial number of those are unconstitutional.

3            So can you determine what the law requires?  And then

4    can you reach at least a likely judgment in a PI posture on

5    those -- the constitutionality of those requirements?

6            Here, just like in the *X Corp.* case, just like in the

7    *NetChoice* case, both last summer, Ninth Circuit, it's clear on

8    the face of the statute what's required.

9            The same speech is required of everybody.  On the

10    face of the statute, as the court said in *X Corp.*, we can judge

11    it based on the statute.

12            And we know that these laws compel speech.  We

13    therefore know they're presumptively unconstitutional.  We know

14    what that speech is.

15            And then the burden's on the State, and we know we

16    can't carry it -- or they can't carry it.

17            So for these reasons, Your Honor, we think that

18    facial review is entirely appropriate here.

19            And I want to emphasize the following about how this

20    kind of review is conducted.  The State has attempted at times,

21    Your Honor, to suggest that when you assess compelled speech,

22    you need to ask whether the speech that supposedly gives rise

23    to the need for legislation is commercial speech.

24            That's wrong.  What this Court looks at is whether

25    the speech being compelled is compelled speech -- or, I'm

15

1   sorry, is commercial speech or relates to the terms on which a

2   product or service is being provided.

3           If I could direct you to a single case, Your Honor,

4   it would be that *X Corp.* case from the Ninth Circuit last

5   summer.  And at page 901, this is exactly what Ninth Circuit

6   does.

7           It doesn't look at what speech these companies are

8   making that supposedly justifies the law.  It looks at the

9   speech being compelled, these reports.

10          And it looks at those so-called Bulger factors.  And

11  every time it does so, it looks at the compelled speech, at the

12  compelled reports, and it says, these are not being made for

13  economic reasons, this doesn't relate to a product or service

14  that's being provided, and it's not an advertisement.

15          Your honor, we would say here it's so crystal clear

16  that strict scrutiny is applicable here that you don't need to

17  reach those Bulger factors.

18          But even if this Court begins evaluating the

19  commercial speech factors, they are to be applied to the law

20  being compelled.

21          And once this Court focuses on that, Your Honor, we

22  think it's very clear this law can be assessed on a facial

23  basis, just as in *X Corp.*, just as in *NetChoice*, just in many

24  other D.C. -- I'm sorry, Ninth circuit cases that have been

25  cited by both parties.

16

1          So, Your Honor, thank you.  For all of these reasons,

2   we believe that these laws are unconstitutional, and that we

3   are at least likely to prevail in our challenge.

4          And without intervention, irreparable harm is also

5   very likely, in fact certain.

6          **THE COURT:**  Thank you, Mr. Scalia.

7          **MR. SCALIA:**  Thank you, Your Honor.

8      **(Pause)**

9          **MS. MCLOON:**  Good morning, Your Honor.

10         **THE COURT:**  Ms. McLoon.

11         **MS. MCLOON:**  Caitlan McLoon for Defendants.

12         Responding to information asymmetry and economic

13  transactions lies at the core of *Zauderer* which, as Plaintiffs

14  point out, is the key case that we're looking at this morning.

15         The legislature -- in *Zauderer*, the legislature has

16  leeway in regulations aimed at dissipating the possibility of

17  consumer confusion or deception.

18         Plaintiffs do not dispute here that some 97 percent

19  of the largest companies that this law sweeps in are making --

20  are currently making statements about either a climate

21  reduction pledge, about sustainability practices, in order to

22  induce business.

23         Commercial speech includes the inducement for

24  commercial transaction.  Here, it's corporate branding,

25  building of goodwill.

17

1          And a majority of companies are using these

2   statements in order to induce investors, consumers, and

3   potential employees to be with that business.  That in and of

4   itself is commercial speech.

5          The Plaintiffs ask, you know, whether or not any case

6   has been applied in this context.  I would say that both *X*

7   *Corp.* and *NetChoice* explicitly mention that *Zauderer* can be

8   applied to disclosures.

9          In this case, again hitting at the heart of what

10  *Zauderer* was trying to do, which was fill an information gap

11  that already exists in the market as a result of commercial

12  speech that these corporations are choosing to make.

13         In *NetChoice*, the court denied -- or the lower court

14  denied a preliminary injunction against the provision that

15  required online businesses to disclose privacy information,

16  terms of service, policies, and community standards concisely.

17         It found that in many circumstances all or most of

18  the speech compelled by this provision is likely to be purely

19  factual and noncontroversial.

20         Similarly, in *X Corp.*, the court didn't address the

21  district court's conclusion that *Zauderer* applied to the terms

22  of service posting requirements.

23         And it distinguished two decisions from other

24  circuits, in the Fifth and in the Eleventh, both of which

25  applied *Zauderer* to laws requiring social media platforms to

18

1    disclose how they moderate and promote content and provide

2    high-level statistics about their moderation efforts.

3         These cases suggest that the Ninth Circuit

4    contemplated that *Zauderer* could apply in circumstances

5    involving disclosures such as these.

6         And in those instances, it missed an element -- so

7    *Zauderer* applied in a circumstance that is less of a clean fit

8    as *Zauderer* is here where there's already this gap in

9    information introduced by existing commercial speech that's

10   inducing confusion in the market.

11        The Plaintiff here -- unlike in *NetChoice* and *X Corp.*

12   where the key issue was that it wasn't commercial speech

13   because it was political opinion, Plaintiffs here haven't

14   identified any policy opinion about a contentious issue which

15   the laws require them to make.

16        Their argument truly relies on hypotheticals or

17   suggesting that this might create some sort of First Amendment

18   problem.

19        But they haven't pointed to it, which is noticeable

20   here where I think the record is undisputed that a lot of

21   companies are already making these types of disclosure.

22        They could point to one out there that demonstrates

23   the type of contentious policy issue that they suggest might be

24   included, and that would take it sort of outside the realm of

25   *Zauderer*.  And they failed to do so.

**ER-197**

19

1          I encourage the Court to look at example statements

2    that have been submitted to the record at docket 5320, 5321,

3    and 5322.  We can see the type of statements that companies are

4    currently making in TCFD-compliant reports.

5          And at least one of those examples also includes the

6    type of emissions disclosures that would be required under 253.

7          And I'll give you some examples.  Governance

8    disclosures.  Our executive management team sets our

9    sustainability and business strategies, approves goals,

10   provides resources to meet performance targets, and has

11   oversight of our sustainability practices.

12          Under the strategy category of disclosure, we do not

13   believe climate change poses a material business risk.  We do

14   not currently view climate change as a significant business

15   risk.

16          Diamondback closely follows emerging and proposed

17   regulations.

18          There's nothing in the laws that integrate these

19   widely accepted protocols that requires a company to make a

20   policy position.

21          I would compare that with what happened in *X Corp.*

22   and *NetChoice* where the question was should a child be able to

23   read about suicide or eating disorders.

24          That in and of itself is a contentious policy

25   decision, and the corporation was being asked to step in.

20

1          Another distinguishing factor with those cases is

2     that there was no inducement or branding that the companies

3     were already engaged in that required the disclosures to fill

4     that information gap.

5          So they weren't out there inducing business on the

6     basis of statements that consumers could not adequately

7     understand without the required -- or the speech that the

8     regulations were requiring.

9          I'll say in terms of the factual or noncontroversial

10    aspects, neither law requires anything misleading or

11    nonfactual.

12         SB 253 disclosures are performed under industry-

13    accepted accounting protocols.

14         The GHG protocol which is integrated into the law was

15    not created by the legislature.  It was created in 2001 by a

16    collection of businesses and rating agencies such as BP,

17    General Motors, Ford, KPMG, Shell, PricewaterhouseCoopers,

18    etcetera.

19         And those businesses came together to determine what

20    would be an accurate method for reporting emissions.

21         And they did so both because as I've talked about

22    several times, businesses were already out there making the

23    disclosures, and they recognized that they weren't uniform,

24    they weren't being done in a way that was not -- that could be

25    accurate.  And so it was a business or an industry-generated

21

1    protocol.

2           Similarly for SB 261, the disclosures are

3    standardized corporate disclosure made pursuant to commonly

4    accepted accounting metrics.

5           The TCFD framework which is integrated into the

6    disclosures was established in 2015 by the Financial Stability

7    Board, an organization whose mandate is to promote

8    international financial stability and prevent a repeat of the

9    global financial crisis.

10          And the TCFD framework is already integrated into

11   existing mandated disclosures for insurance companies in 21

12   states.  And that has not been challenged in the Court.

13          Which brings me to another point when they say, you

14   know, what is your best case for why this type of disclosure

15   fits under *Zauderer*, I think it's important to point out that

16   in many instances disclosures of this type, of this kind of

17   economic risk assessment and factual business information

18   aren't challenged because they fall outside of the coverage of

19   the First Amendment.

20          So there's many instances in which this type of

21   disclosure goes on all the time in 10-Ks that are already

22   submitted to the SEC.

23          In fact, U-Haul, the sole entity here who has come

24   forward with any claim that these laws violate their

25   constitutional rights, is currently making statements that

22

1    would be TCFD-aligned disclosures in its 10-K.  And you can see

2    that in docket -- at docket 89-6.

3              The interest here, so turning to the Government's

4    burden, they emphasize that, you know, the burden shifts to us

5    if they can establish that their First Amendment rights are

6    infringed.

7              I would argue that they haven't met that burden

8    because they have not identified any constitutional right that

9    has been violated by these statements.

10             But when the burden shifts, we have to show our

11   interest.  Here, there's at least two that I'd like to talk

12   about this morning.

13             One is the prevention of misleading speech.  Here,

14   investors and consumers receiving these inducements, some 98

15   percent of companies that are out there making statements, are

16   not able to assess their truthfulness.

17             We know from *Zauderer* that this is where the

18   legislature has leeway to require disclosure aimed at

19   dissipating the possibility of consumer confusion or deception.

20   That lies at the heart of *Zauderer*.

21             And when we know that there is an information

22   asymmetry that's real and not purely hypothetical, that's

23   sufficient under the *Zauderer* tailoring analysis.

24             The legislature here identified that this is one of

25   their interests.  They wrote, many corporations offer only

23

1    partial reports to the public or they section off parts of

2    their operations to display to the public.  So the lack of

3    verification and uniformity allows for manipulation and

4    misrepresentation of the data.

5            So this is what's at the core of the misleading

6    claim, that companies are out there making inducements for

7    business, and that consumers and investors can't appropriately

8    assess the truthfulness of that, and that we have indication

9    from the declaration of Professor Hsu but certainly from others

10   as well that these statements lack the elements that -- from

11   which the consumer could determine whether or not they can

12   trust the statement that is being made.

13           Turning to the other interest, these laws provide

14   investors and consumers with consistent, comparable, and

15   reliable information.

16           This is a separate and sufficient government interest

17   which is to provide investors with the information they need to

18   make sure that their investments are less risky or that they're

19   sound investments when they're making difficult decisions.

20           We have on the record a declaration from CalPERS, for

21   example, a California investor, that says that the current I

22   guess environment of disclosures fall short of getting the

23   information that they need, both for investment decision-making

24   or complying with our own reporting requirements.

25           The tailoring here does not need to be a perfect fit.

24

1    When we are under *Zauderer*, the question is whether or not the

2    regulations are reasonably or the laws are reasonably related

3    to a legitimate state interest such that it remedies a harm

4    that is potentially real and not purely hypothetical.

5            There is ample evidence submitted to the record, Your

6    Honor, that corporations are making these statements at very

7    high volumes, that the legislature identified that those

8    statements did not permit the consumer or the investor

9    interested in that information to determine the truth or

10   falsity, and to tailor the laws to fill that gap.

11           The laws remedy the harms identified.  The required

12   reports alleviate that information asymmetry and dissipate the

13   confusion.

14           I'll note also that the laws are not overbroad.

15   Plaintiffs have not identified a single covered company that

16   has not made an advertisement of this kind, or that does not

17   have California investors or consumers.

18           Again, they play on hypotheticals.  And the Supreme

19   Court in *Moody* warned us that bringing a facial challenge is a

20   disfavored mechanism because it often relies on hypotheticals

21   as opposed to allowing the Court to evaluate the real world

22   facts.

23           We don't have any indication that any plaintiff --

24   any of the covered entities or any of Plaintiffs' members have

25   been swept in that aren't currently making a statement for

25

1    which this information gap filling is necessary.

2            In fact, even U-Haul has on its website a statement

3    that they are developing and implementing comprehensive climate

4    change strategies to manage and mitigation our GHG emissions.

5            The reports do not drowned out companies' own

6    messages, and they do not require them to convey a message

7    fundamentally at odds with their mission.  And there's nothing

8    in the records to suggest as much.

9            These laws provide access to robust, accurate

10   information unencumbered by the Government's own policy views.

11           The Plaintiffs here are seeking an extraordinary

12   remedy on the basis of a disfavored mechanism of a facial

13   challenge on the basis of a single declaration of a covered

14   entity without any further evidence to support their claim.

15           I'll note on the irreparable harm the Court need not

16   get to that question if it finds that there is no likelihood of

17   success on the merits for their First Amendment question.

18           But here I would draw the Court's attention to the

19   difference between SB 253 and SB 261.

20           For SB 253, we have argued and this Court has

21   previously found that their challenge to that law is not ripe

22   because the Government has not issued the regulations that are

23   required before any entity is required to speak.

24           So if the Government -- if there is no requirement to

25   speak, there can be no First Amendment harm.  And that is the

26

1    case here.

2         For 261, the Plaintiffs have submitted no evidence

3    specific to that law to indicate that there's any obligation on

4    companies currently.

5         They allege certain compliance costs that companies

6    such as U-Haul have to start implementing now.  But that --

7    those statements are joint for all -- with all -- viewing all

8    of the laws together, 253 and 261.  They don't just aggregate

9    when you just look at 261.

10        And, in fact, when you look closely at the U-Haul

11   declaration, the costs are all attributed to disclosure under

12   one element of SB 253, the scope three requirement, which is

13   not due until -- even under the law until 2027.

14        For all of those reasons, Your Honor, we argue that

15   it is inappropriate or would be inappropriate for the Court to

16   grant preliminary injunction on this record.  Thank you.

17        **(Pause)**

18        **MR. SCALIA:**  Your Honor, a few points.

19        First, the State did not dispute the burden shifting

20   which I have described.  Under the Ninth Circuit's *Meineke*

21   decision, once we establish a "colorable" First Amendment

22   claim, the burden shifts to them to justify these laws.  And

23   they simply can't do that.

24        Now, on the question of *Zauderer*, my point when I

25   spoke earlier was that the State would be unable to identify

27

1    the speech requirements remotely like the speech requirements

2    at issue here that were upheld under *Zauderer*.  And I said,

3    what is their best case, I want to know.

4         And it's remarkable that they came back with *X Corp.*

5    and *NetChoice*.  Now, I suppose it's appropriate that they focus

6    on those two cases because those are the Ninth Circuit's most

7    recent compelled speech cases.

8         And they follow immediately on *NIFLA*, which was the

9    Supreme Court's most recent application of *Zauderer*.

10        The speech being required there was of course the

11   speech principally disputed was unconstitutional.  And it was

12   similar to what's being done here, which is file reports on a

13   controversial topic.  The topic's different.  This is one the

14   Supreme Court has said is controversial.

15        Even more importantly, Your Honor, as I emphasized

16   throughout my remarks earlier this morning, the Supreme Court

17   and the Ninth Circuit in the commercial speech context always

18   asks whether the speech being compelled relates to the terms on

19   which a product or service is being offered.

20        That's in *NIFLA*, that's in *X Corp.*, that's in

21   *NetChoice*.

22        And, again, the speech being compelled here simply

23   does not relate.  The same speech is required no matter what

24   you have said about your products, no matter what your products

25   are.  It's not speech about the terms on which products or

28

1    service being offered.

2            Counsel for the State mentioned short sections of *X*

3    *Corp.* and *NetChoice* where the court suggested that certain

4    portions of the law might not be unconstitutional.

5            What's so interesting, Your Honor, is when I listen

6    to the State, the State itself pointed out that those

7    provisions of the law actually were about -- and the State

8    actually used these words: "the terms of service."

9            Or one of the other things that the court addressed

10   was how you moderate content.  That again is what is the

11   service that you're being provided, what are the terms of

12   service.  The disclosures here are not like that at all.

13           So when we step back and ask the question, when has

14   the Ninth Circuit or Supreme Court ever upheld compelled speech

15   remotely like this here, they simply don't have a case to give

16   you, Your Honor.

17           The State in framing their argument spoke repeatedly

18   about the need to fill an information gap, about how there was

19   informational asymmetry.

20           Your Honor, those high-flung phases -- phrases, to my

21   knowledge, aren't in any of the cases that the State itself

22   said were the best cases.

23           They are trying to frame their *Zauderer* argument at a

24   very abstract level where instead the *Zauderer* cases look at

25   what you sell and what in particular you might need to say

29

1    about it, or what you say about what you sell and what in

2    particular you might need to say about it.

3              It was very, very striking that the State has changed

4    its position about why these laws are needed.  Even in their

5    brief, the State said repeatedly there is false and misleading

6    speech.

7              And as I mentioned this morning, they had their

8    chance to identify the false and misleading speech to carry

9    their burden.  They failed to.

10             They relied on a declaration by an expert who herself

11   doesn't say that the speech is false or misleading in a legal

12   sense.  And when you look at the speech, it's clearly not false

13   or misleading in a legal sense.

14             And what we heard from the State and said was that

15   companies are making statements and consumers are "not able to

16   assess their truthfulness."  In other words, the State is

17   saying, well, we don't know.

18             Well, wow, how do you justify compelled speech

19   presumptively unconstitutional on the ground that, well, people

20   are saying stuff, and we can't really tell whether it's true or

21   false so we're going to require the most onerous compelled

22   speech obligations that have ever come -- to my knowledge that

23   have ever come before a court.

24             So the State's rational as it presented its -- before

25   you this morning, Your Honor, has substantially eroded.

30

1          The State also says, well, because companies are

2  making these various statements, that I think that the State

3  was applying that it's not burdensome, companies are already

4  doing things sort of like what 261 requires, or sort of like

5  what 253 requires.

6          But, Your Honor, although they are making certain

7  statements, they are not making these broad statements.

8          And they are not doing so under legal compulsion of

9  $500,000 annual fine under one statute, a $50,000 fine in

10  another.  That changes everything when those statements become

11  the subject of enforcement actions.

12          On top of that, the State can't have it both ways.

13  In their brief, they said, we have to have these laws, there's

14  a "massive blind spot."  And in fact, the informational

15  asymmetry argument I just told you was a massive blind spot

16  argument.

17          So their argument on the one hand, no, it's not a big

18  deal, states -- companies are already saying this.  And then

19  they turn around and say, oh, there's a massive blind spot, we

20  got to have all of this information forced out there.

21          They're simply wrong on this.

22          And then, Your Honor, with regard to tailoring, if

23  the problem, as Dr. Hsu said, is that companies don't have

24  interim targets, then a tailored solution is, tell the public

25  you don't have an interim target or, perhaps, tell the public

31

1    your interim target.

2              If you don't have a plan, then tell the public you

3    don't have a published plan.  Or perhaps, although this raises

4    separate constitutional problems, publish the plan.

5              There's no attempt to tailor the compelled speech to

6    the allegedly problematic company conduct that this is supposed

7    to address.

8              And the State is also erring, Your Honor, in

9    suggesting that tailoring under *Zauderer* is actually pretty

10   easy.

11             What the Supreme Court said in *NIFLA*, is that even

12   under *Zauderer*, compelled speech should be "no broader than

13   reasonably necessary" to effectuate the stated purpose.

14             I've just explained if the speech problem, the

15   disclosure problem that Dr. Hsu identified is what they're

16   trying to address, this is infinitely broader than reasonably

17   necessary to address those so-called indicators of

18   greenwashing.

19             The Supreme Court in *NIFLA* also said that in the

20   First Amendment context, precision is essential, precision when

21   you're compelling speech or restricting speech.  And, again,

22   that's totally absent here.

23             Finally, Your Honor, with respect to irreparable

24   harm, Ms. McLoon simply hasn't addressed my basic point, which

25   is that speech is required under SB 261 in six months.  We

32

1    won't get relief on the merits for more than a year.  That is

2    irreparable harm that's going to be occurring.

3          With respect to 253, the State issued an enforcement

4    notice.  This was issued after briefing was completed regarding

5    the motion to dismiss, Your Honor, saying that companies must

6    be taking steps now to achieve "full compliance as quickly as

7    possible."

8          They are under an obligation to speak next year.  We

9    don't know exactly when.  There's no point in deferring this

10   any further.

11         Your Honor, obviously if there are any questions, I'd

12   be welcome to answer them.

13         But at bottom, these are laws that compel speech.

14   They're presumptively unconstitutional.

15         The burden this morning has been on the State.  And

16   we respectfully submit they are not able to carry it.

17         **THE COURT:**  I appreciate the fact that you addressed

18   the issue of whether or not at least 253 is ripe for

19   adjudication at this point.

20         Might it also be the case that investors are

21   currently interested in whatever information some of these

22   covered companies can provide to them in order to ascertain

23   their financial risk?

24         **MR. SCALIA:**  Well, Your Honor, with respect to the

25   latter part of your question, companies that have investors,

33

1   public companies are already under an obligation under the

2   securities laws to disclose material risks.

3           So if this were just a law to protect investors in

4   public companies, the SEC already has obligations of that

5   nature.  And companies at time do disclose climate-related

6   risks that they see.

7           But, again, this law sweeps much more broadly than

8   that.

9           Also, the State hasn't carried that burden, Your

10  Honor.  The problem is -- you know, you pose a question, but

11  the burden's on the State once we show this is compelled

12  speech.

13          And the State has not come forward with any investor

14  who's ever been harmed because they don't have access to this

15  information.

16          All they've told you now, backing away from their

17  brief because I think they're uncomfortable with the

18  declaration they relied on so heavily, all they're telling you

19  now is that, well, we don't really know whether or not

20  statements are accurate.

21          And then, Your Honor, with respect to ripeness, there

22  will be speech required next year.  The State has been very

23  clear that you need to take steps now to achieve full

24  compliance ASAP.

25          And nothing the State will do in the rules that it

34

1  needs to issue will change the content of the speech being

2  compelled.

3       And we cited in our reply brief a couple of different

4  cases where the Ninth Circuit, the Seventh Circuit have said,

5  well, it's true there's a mandate and there's an implementing

6  rule.  We don't have the implementing rule yet.

7       Well, we know what's required.  And we shouldn't wait

8  and force people to bear the brunt of an illegal rule and

9  impose that hardship.

10      Ripeness is in part about hardship.  And as I

11  explained when I -- earlier, what are we going to do, brief

12  this over Christmas?  It doesn't make any sense, Your Honor.

13      We waited a reasonable time.  But now my clients'

14  members are incurring costs and on the cusp of being -- having

15  to engage in unconstitutional speech.

16      It is believed ripe for review.

17      Without it, there will be both unwarranted costs but,

18  more importantly, there will be unconstitutionally compelled

19  speech unless we rush around again toward the end of the year

20  with another round of briefing where the issues will be no more

21  crystalized than they are today.

22      **THE COURT:**  Thank you, Mr. Scalia.

23      **MR. SCALIA:**  Thank you, Your Honor.

24   **(Pause)**

25      **THE COURT:**  Okay.  And, Ms. McLoon, I'm going to

35

1    assume that you don't believe that an injunction is called for

2    in any event, correct?

3              **MS. MCLOON:**  That's right, Your Honor.

4              I'll start on the sort of ripeness questions that you

5    were asking Plaintiffs' counsel.

6              For SB 253, there is no obligation for a company to

7    speak until the agency has finalized the implementing

8    regulations.  And that has not yet happened, so there's no

9    obligation to speak.  From the --

10             **THE COURT:**  But there is going to be an obligation to

11   begin collecting data.

12             **MS. MCLOON:**  Under SB 253 and the enforcement notice

13   that Plaintiffs' counsel referenced, CARB made clear two

14   entities.

15             It would maintain status quo for the first year of

16   reporting, which means that companies need not collect any

17   additional information above what they are currently

18   collecting.

19             **THE COURT:**  Okay.

20             **MS. MCLOON:**  And so the current status quo under SB

21   253 is no additional obligation to collect data, and no

22   obligation to speak until CARB has finalized the regs.

23             And here, the agency has not even proposed

24   implementing regulations.  And so, you know, when you look at

25   the ripeness assessment where, you know, the Court must ask is

36

1    it, you know, premature adjudication of claims that do not yet

2    have a concrete impact on the parties, this is kind of a

3    quintessential example of that.

4           And for SB 261, I do think the analysis is different

5    there.  We don't have the same ripeness issues.  There's no

6    regulations that need to be implemented before companies must

7    speak.

8           But there, again, you know, you asked our position.

9    It's certainly that there's no likelihood of success on the

10   merits for SB 261.

11          And Plaintiffs have not established for -- in terms

12   of burden-shifting -- for the irreparable harm, the burden is

13   certainly on Plaintiffs to come forward and demonstrate what

14   their irreparable harm would be.  And they simply have not done

15   so.

16          They only have one declaration that they've submitted

17   on behalf of a entity that's obligated to speak under the laws.

18   And that entity doesn't identify any specific cost associated

19   with SB 261 in particular.  It speaks generally about the cost

20   of implementing the laws, but they combine it.

21          And then when you sort of dig deeper into what

22   they're saying, their focus is on the scope three aspect of SB

23   253, which is not only not ripe but scope three in particular,

24   disclosures relating to that information wouldn't be due until

25   2027 under the law because there's sort of a phased-in approach

37

1    here.

2              And if I may, Your Honor, I also wanted to respond on

3    the sort of misleading aspect here.

4              I do maintain the argument that I made earlier, which

5    is that we know under *Zauderer* that we don't require the fit to

6    be exactly perfect and that, you know, the question is just

7    whether or not the consumer is able to understand whether or

8    not they're being misled.  So it's that sort of information

9    gap.

10             But I dispute that we haven't presented any evidence

11   that there is actual misleading speech in the marketplace right

12   now.  I have in docket 90, paragraph 30, there's a description

13   of how Meta has made a net zero goal by 2030.

14             But in that case, we have enough information from

15   voluntary disclosure to see that the policy is really to

16   maintain 2020 levels of emissions by 2030.

17             And so it demonstrates this instance where if we

18   don't have the additional data, if a corporation isn't

19   voluntarily presenting it, there's a mismatch between what

20   they're saying, we will be net zero as a corporation by 2030 in

21   order to induce business, and the reality of what's going on.

22             I'll note that the Professor Hsu study is a existing

23   study from a professor that's -- that looks at sort of meta

24   analysis of what companies are saying and whether or not what

25   they're saying can be understood and believed by those who are

38

1  receiving the information.

2          And she identifies a number of metrics.  This Court

3  need not, you know, adopt all of them.  I'll note, you know,

4  Plaintiffs highlight the fact that she includes lobbying

5  against climate policies as one metric that what the company is

6  saying about their commitment to net zero is misleading.

7          But even if we take that out of her data, it's still

8  the vast majority of companies are not backing up their

9  statement with enough information to verify the truthfulness of

10  what they're saying.

11          And her -- the focus of her scholarship, which is

12  peer-reviewed, and how sort of academics think about this

13  question of how do we understand the truthfulness of corporate

14  statements of this type, she defines it as a company's claim of

15  environmentally friendly action combined with evidence of

16  actions but contradict or undermine that claim.

17          And that was the basis of what she was looking at,

18  sort of indicia that contradict what they are trying to portray

19  themselves as in the market.

20          But even if we sort of set aside the Hsu study for

21  the reasons that Plaintiffs suggest, we also have at docket 56,

22  paragraph 25, a study showing that firms reporting to the CDP

23  claim a reduction in emissions inconsistent with the difference

24  in total emissions from the year.

25          We have a study at docket 5617.  We have a study at

39

1    docket 5618 which showed misleading net zero claims among six

2    studied companies involved in oil sands production.

3            And we have another study at docket 8918 at page five

4    that was an analysis of companies making net zero commitments

5    that found only five percent of companies that were out there

6    inducing business by claiming that they were going to be net

7    zero.

8            Only five percent of those companies were meeting the

9    minimum floor of, again, using the analysis that they were

10   applying in that study, the UN's criteria for determining

11   whether or not there were indicia that what they were doing was

12   accurate.

13           And I think that's important here because it's sort

14   of the peer-reviewed analysis of whether or not corporate

15   speech is misleading the consumer who's receiving it that

16   doesn't have the information that the corporation has.

17           For companies of this size swept in by these laws,

18   we're talking about billion-dollar companies, $500 million

19   companies.

20           In order for them to achieve a pretty significant

21   goal of net zero by let's say 2030, you would see a plan.  The

22   corporation would have a plan to implement it.

23           So the lack of a plan indicates something that the

24   scholarship has identified as a way to indicate that the

25   company might not actually be on track to meet the goal that

40

1  they are inducing business on the back of.

2          And any further questions from Your Honor?

3          **THE COURT:**  No, thank you, counsel.

4          **MR. SCALIA:**  Just a few points that I feel that I

5  ought to respond to, Your Honor.

6          First, in its brief, the State relied extraordinarily

7  heavily on the Hsu report, time and again, page after page.  We

8  have addressed that in our brief, now at argument.

9          Suddenly the State is shifting away from it.  It's

10 saying, well, you can disregard one of the things that Dr. Hsu

11 said was -- or we characterized as false and misleading when

12 you're engaged in lobbying.

13         And it cited a raft of other studies that, to my

14 knowledge, were not discussed in any manner in the brief.  We

15 don't know what they say.

16         But I'm confident that if you drill into them, you

17 will find the same kinds of problems that were identified in

18 the Hsu report when they put that forward as their evidence.

19         They had an obligation to put forward cite -- present

20 to the Court evidence to carry their burden.  They didn't do

21 it.

22         Now, on sur rebuttal, all of a sudden they're

23 shifting and identifying a bunch of additional things.

24         I did want to respond to the point that the State

25 made about Meta.  This is in one of the expert reports that

41

1    they have.  It's at document 90 at ECF page 18.  It discusses

2    this Meta report.

3            But actually, Your Honor, it proves our point because

4    Meta did disclose how it was approaching its net zero goals.

5    The report says that Meta said -- this is on page 18 -- that we

6    have set a goal to achieve net zero emissions across our value

7    chain in 2030.

8            And then the declaration they're relying upon says,

9    yet upon closer reading, one finds that their target for scope

10   three emissions is merely not exceeding our 2020 baseline scope

11   three emissions.  And then they proceed to critique Meta's

12   plan.

13           So Meta had actually disclosed what its target was

14   and what it didn't include.  And this expert is able to say,

15   oh, you know, that's not good enough.

16           And that's a lot of what the Hsu declaration I expect

17   all those other reports you heard about concern, the companies

18   are saying things but they're not proving it.

19           Ms. McLoon complained that without a -- how can you

20   hit a target without a plan.  I didn't say these companies

21   didn't have a plan.

22           What Dr. Hsu says, if you don't have a published

23   plan, then you're engaged in greenwashing.  Well, that's not

24   true.  It's just -- it's not false and misleading speech.

25           With respect to 253, Your Honor, that statute is

42

1  extraordinarily costly.  These disclosures are very burdensome.

2  I think that's why the threshold for coverage for 253 is

3  actually a billion dollars, not 500,000.  The State knows how

4  onerous SB 253 is.

5          And, Your Honor, you asked about data.  The State

6  said, well, you don't have to -- you just have to keep what you

7  have.  But that itself requires effort.  But there's more than

8  that.

9          You need a system to produce this data.  And so the

10  declaration of Mr. Shoen, the U-Haul declaration, he talks

11  about how not just we have to collect data, but at page two, at

12  page three of his declaration he talks about how we have to

13  begin building systems.

14          He says the same thing on page two.  We have to

15  develop systems and processes.

16          So the burden is not just collecting the data.  It's

17  creating the infrastructure for this reporting regime.

18          I come back again to the point I made at the outset,

19  Your Honor, compelled speech is irreparable harm.  These laws

20  compel speech in 2026.

21          We waited to avoid an unnecessary PI.  There is no

22  value in waiting any further, Your Honor.  It's the time to

23  rule to avoid a rush at the end of the year.

24          The State has no response to those cases which say

25  once you know what the laws' requirements are and the fact you

43

1  don't implementing regulations is not a reason not to act when

2  the obligations are imminent.

3      And the State has not identified a single compelled

4  statement that we say is unconstitutional which their

5  regulations would relieve the burden of. We know it's

6  required. Their regulations are not going to relieve the scope

7  of unconstitutionally compelled speech. Thank you, Your Honor.

8      **MS. MCLOON:** If I may, Your Honor.

9      I'd like to make two points just in response.

10      I want to return to *Zauderer* because I think we're

11  drifting a little bit away from what *Zauderer* requires when

12  we're looking at whether or not the State's interest in

13  preventing misleading speech is real and meets the burden.

14      So in *Zauderer*, the court did two things. It made a

15  legislative determination that the public was not capable of

16  determining whether the advertising language was true.

17      And then, second, it found that the assumption that

18  the public would be misled is hardly speculative. When the

19  possibility of deception is as self-evidence as it is in this

20  case, we need not require the State to conduct a survey of the

21  public before it may determine that the advertisement has a

22  tendency to mislead.

23      I think we have met that burden here. The State has

24  identified that 98 percent or some large majority of the

25  companies that are required to prepare the disclosures under

44

1    these laws are currently making statements, and that the

2    consumers cannot on their own -- or the investors cannot

3    determine the truthfulness.

4            So we have a information gap.  So the legislative

5    determination is that the public's not capable of determining

6    whether the advertising language in their corporate branding on

7    their website inducing business is true.

8            And, further, we have presented significant evidence

9    that it's not a speculative concern that includes the Hsu

10   declaration, which is sort of a peer -- subject to peer review

11   study indicating whether or not corporations can -- their

12   statements are misleading currently based on this information

13   gap in the market.

14           The other thing I point out is that when Plaintiffs

15   are talking about burden, I just want to make clear that the

16   burden is only relevant for their irreparable harm assessment.

17           Under the First Amendment when we talk about sort of

18   the burdensomeness of the laws, the only question is whether or

19   not they burden speech.

20           And Plaintiffs have not articulated any argument that

21   the laws would drown out a corporation's message or would

22   require them to state anything contrary to -- so their business

23   message, which is what prior law from the Supreme Court and the

24   Ninth Circuit has looked to.

25           So under those circumstances, preliminary injunction

45

1   is not appropriate here.

2        **THE COURT:**  Did I understand you correctly that 90

3   some odd percent of companies that are reporting now are

4   reporting false or misleading information?

5        **MS. MCLOON:**  Your Honor, the 98 percent figure has to

6   do with how many companies are making some sort of climate

7   reduction pledge or other sustainability pledge voluntarily in

8   order to induce business.  That's different than preparing

9   disclosures of the type required under these laws.

10       There are companies -- and I think it's actually

11  quite prevalent process that companies are preparing reports

12  somewhat aligned with what these laws require.  But those are

13  not sufficient.

14       The current voluntary market of reports is piecemeal.

15  Companies choose what elements of the protocols that they are

16  using and, therefore, it creates this gap of information from

17  which they can mislead.  And that was the sort of misleading

18  aspect that the legislature identified.

19       **THE COURT:**  But the publicly traded companies are

20  making these reports, I assume that they are truthful.

21       **MS. MCLOON:**  Your Honor, publicly traded companies do

22  not have to -- are currently not obligated to make reports

23  under either the GHG protocol or the TCFD.

24       Some companies like I pointed out earlier in my

25  argument are currently in their 10-Ks to the SEC including

46

1   information that would be responsive to the TCFD-required

2   protocol or framework.

3          But it's not a current sort of mandatory aspect, and

4   so companies are not currently under an obligation to prepare

5   the information that California has determined currently

6   California investors and consumers lack.

7          **THE COURT:**  Okay.  Thank you.  All right.  The matter

8   stands submitted.  Thank you both, appreciate it.

9      **(This proceeding was adjourned at 11:28 a.m.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

47

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          July 3, 2025

    Signed             Dated

*TONI HUDSON, TRANSCRIBER*

ER-226

(185 of 297) Page 185 of 297Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 185 of 297
Case 2:24-cv-00801-ODW-PVC    Document 97-1    Filed 04/21/25    Page 1 of 28    Page
ID #:10175

1   EUGENE SCALIA, SBN 151540
2       escalia@gibsondunn.com
    GIBSON, DUNN & CRUTCHER LLP
3   1700 M. St. N.W.
    Washington, D.C.  20036
4   Telephone:  202.955.8500
    Facsimile:   202.467.0539
5

6   *Attorneys for Plaintiffs Chamber of
    Commerce of the United States of Amer-*
7   *ica, California Chamber of Commerce,*
    *American Farm Bureau Federation, Los*
8   *Angeles County Business Federation,*
    *Central Valley Business Federation,*
9   *and Western Growers Association*

10  (*Additional counsel listed on next page*)

11                IN THE UNITED STATES DISTRICT COURT

12            FOR THE CENTRAL DISTRICT OF CALIFORNIA,

13                        WESTERN DIVISION

14

15  CHAMBER OF COMMERCE OF THE          CASE NO. 2:24-cv-00801-ODW-PVC
    UNITED STATES OF AMERICA,
16  CALIFORNIA CHAMBER OF               **PLAINTIFFS' RESPONSE TO**
    COMMERCE, AMERICAN FARM             **DEFENDANTS' OBJECTIONS TO**
17  BUREAU FEDERATION, LOS              **EVIDENCE SUBMITTED IN**
    ANGELES COUNTY BUSINESS             **SUPPORT OF MOTION FOR**
18  FEDERATION, CENTRAL VALLEY          **PRELIMINARY INJUNCTION**
    BUSINESS FEDERATION, and
19  WESTERN GROWERS ASSOCIATION,        **HEARING:**
20          Plaintiffs,                 Date:      May 27, 2025
                                        Time:      11:00 AM
21      v.                              Location:  Courtroom 5D
                                        Judge:     Otis D. Wright II
22  LIANE M. RANDOLPH, in her official
    capacity as Chair of the California Air
23  Resources Board, STEVEN S. CLIFF, in
    his official capacity as the Executive
24  Officer of the California Air Resources
    Board, and ROBERT A. BONTA, in his
25  official capacity as Attorney General of
    California.
26
27          Defendants.
28

Gibson, Dunn &
Crutcher LLP

1    BRADLEY J. HAMBURGER
          SBN 266916
2          bhamburger@gibsondunn.com
3    SAMUEL ECKMAN, SBN 308923
          seckman@gibsondunn.com
4    ELIZABETH STRASSNER
          SBN 342838
5          estrassner@gibsondunn.com
6    GIBSON, DUNN & CRUTCHER LLP
     333 South Grand Ave.
7    Los Angeles, CA  90071-3197
     Telephone:  213.229.7000
8    Facsimile:   213.229.7520

9    BRIAN A. RICHMAN
     (*pro hac vice*)
10         DC Bar No. 230071
           brichman@gibsondunn.com
11   GIBSON, DUNN & CRUTCHER LLP
     2001 Ross Ave., Suite 2100
12   Dallas, TX  75201-2923
     Telephone:  214.698.3100
13   Facsimile:   214.571.2900
14
15   *Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association*
16
17
18   STEPHANIE A. MALONEY
     (*pro hac vice*)
19         DC Bar No. 104427
           smaloney@uschamber.com
20   KEVIN PALMER
     (*pro hac vice*)
21         DC Bar No. 90014967
           kpalmer@uschamber.com
22   CHAMBER OF COMMERCE OF THE
     UNITED STATES OF AMERICA
23   1615 H Street, NW
24   Washington, D.C.  20062-2000
     Telephone:  202.659.6000
25   Facsimile:   202.463.5302

26   *Attorneys for Plaintiff Chamber of Commerce of the United States of America*

27

28

PLAINTIFFS' RESPONSE TO EVIDENTIARY OBJECTIONS
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-228**

1  Plaintiffs respectfully respond to Defendants' Objections to Plaintiffs' Evidence

2  Submitted in Support of their Motion for Preliminary Injunction (Dkt. 89-1).

3  As an initial matter, given the nature of the proceedings, Defendants' objections

4  are wholly unwarranted.  As this Court has held, "courts may consider evidence in ruling

5  on an application for preliminary injunction that may otherwise be inadmissible."  *C.R.*

6  *v. PLB Mgmt., LLC*, 2023 WL 1420371, at *2 n.3 (C.D. Cal. Jan. 31, 2023) (Wright, J.)

7  (citing *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009)).  "Accordingly, evi-

8  dentiary objections to evidence submitted in connection with a motion for a preliminary

9  injunction 'properly go to weight, rather than admissibility.'"  *Hope Med. Enters., Inc.*

10  *v. Fagron Compounding Servs., LLC*, 2020 WL 3803029, at *5 (C.D. Cal. July 7, 2020);

11  *cf. Perrin Bernard Supowitz, LLC v. Morales*, 2023 WL 1415572, at *4 (C.D. Cal. Jan.

12  31, 2023) (Wright, J.) ("Defendants' objections regarding lack of foundation, lack of

13  personal knowledge, and speculation may go to the weight of a given piece of evidence,

14  but none of these objections provide a basis for altogether disregarding the proffered

15  evidence at the summary judgment stage.").  Thus, as this Court and others have done

16  on numerous occasions while considering motions for preliminary injunction, the Court

17  should overrule Defendants' objections en masse.  *See, e.g.*, *PLB Mgmt.*, 2023 WL

18  1420371, at *2 n.3 (Wright, J.); *Small ex rel. NLRB v. Avanti Health Sys., LLC*, 2011 WL

19  13209169, at *1 n.1 (C.D. Cal. Mar. 28, 2011) (Wright, J.); *Vital Pharms. v. PhD Mktg.,*

20  *Inc.*, 2021 WL 6881866, at *3 (C.D. Cal. Mar. 12, 2021); *Contender Partners, LLC v.*

21  *Azteca Int'l Corp.*, 2008 WL 11334492, at *4 n.41 (C.D. Cal. May 19, 2008); *James v.*

22  *City of Costa Mesa*, 2010 WL 1848157, at *2 (C.D. Cal. Apr. 30, 2010).

23  The objections are meritless anyway, and for the most part, irrelevant.  Only 7 of

24  the 39 paragraphs or exhibits objected to are specifically cited in Plaintiffs' motion for

25  preliminary injunction, and only 9 are discussed in Defendants' opposition.

26

27

28

Gibson, Dunn &
Crutcher LLP

PLAINTIFFS' RESPONSE TO EVIDENTIARY OBJECTIONS
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-229**

(188 of 297) Page 188 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 188 of 297
Case 2:24-cv-00801-ODW-PVC   Document 97-1   Filed 04/21/25   Page 4 of 28   Page
ID #:10178

## I. DECLARATION OF EDWARD J. SHOEN (ECF NO. 78-3)

| | Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|---|
| 1. | "UHHC does not do business in California." Shoen Decl., ¶ 3. | This is a legal conclusion. The assertion regarding what companies do business in California and/or are subject to Senate Bill ("S.B.") 253 and S.B. 261 is a disputed legal conclusion about how the laws operate, which has no evidentiary value and is irrelevant. Fed R. Evid. 401, 402; *see Silver v. Exec. Car Leasing Long Term Disability Plan*, 466 F.3d 727, 731 n.2 (9th Cir. 2006) (holding district court correctly excluded declaration containing improper legal argument). | This is not a legal conclusion; it is a statement of fact. Shoen is the President and Chairman of U-Haul Holding Company. He can testify, from personal knowledge, to where UHHC does or does not do business.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | Sustained<br><br>———<br><br>Overruled<br><br>——— |
| 2. | "UHHC's subsidiary, U- Haul of California ('UHCA'), does business in California." Shoen Decl., ¶ 4. | This is a legal conclusion. The assertion regarding what companies do business in California and/or are subject to S.B. 253 and S.B. 261 is a disputed legal conclusion about how the laws operate, which has no evidentiary value and is irrelevant. Fed R. Evid. 401, 402; *See Silver* 466 F.3d at 731 n.2. | This is not a legal conclusion; it is a statement of fact. Shoen is the President and Chairman of U-Haul Holding Company. He can testify, from personal knowledge, to where UHCA does or does not do business.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th | Sustained<br><br>———<br><br>Overruled<br><br>——— |

PLAINTIFFS' RESPONSE TO EVIDENTIARY OBJECTIONS
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-230**

| | Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|---|
| | | | 1180, 1189 (9th Cir. 2024). | |
| 3. | "If UHCA's activities in California are attributable to UHHC such that UHHC 'does business' in California as a 'Reporting Entity' under S.B. 253 and 'Covered Entity' under S.B. 261, then UHHC would be subject to the requirements of S.B. 253 and 261." Shoen Decl., ¶ 5. | This is a legal conclusion.  The assertion regarding what companies do business in California and/or are subject to S.B. 253 and S.B. 261 is a disputed legal conclusion about how the laws operate, which has no evidentiary value and is irrelevant.  Fed R. Evid. 401, 402; *See Silver* 466 F.3d at 731 n.2. | This is not a legal conclusion.  The statement reflects the witness's understanding and, moreover, follows directly from the plain text of the statutes.  In addition, there is no "disputed legal conclusion"; if a company does business in California and exceeds the relevant revenue threshold, then the company undisputedly *is* subject to the laws.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | Sustained<br><br>_____<br><br>Overruled<br><br>_____ |
| 4. | "Building the apparatus necessary to comply with the requirements of S.B. 253 and S.B. 261 will take years, not months." Shoen Decl., ¶ 10. | Lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701. Mr. Shoen offers no evidence or basis for this assertion. | Shoen is the President and Chairman of U-Haul Holding Company.  He can testify, from personal knowledge, to the complexity of the compliance process for UHHC.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction | Sustained<br><br>_____<br><br>Overruled<br><br>_____ |

| | Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|---|
| | | | context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | |
| 5. | "With respect to IT alone, U-Haul preliminarily estimates that this would require approximately 30 additional dedicated team members to build and then support these processes on an ongoing basis at an estimated cost exceeding $3,000,000 per year, which would rise as personnel costs increase over time." Shoen Decl., ¶ 12. | Lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701. Mr. Shoen provides no evidence, basis for this estimate. To the extent the estimate was not made by Mr. Shoen personally (which is not clear), it also is hearsay. Fed. R. Evid. 802. | Shoen is the President and Chairman of U-Haul Holding Company. He can testify, from personal knowledge, to UHHC's personnel and cost estimates for compliance.<br><br>Even if this statement were hearsay, a district court may "consider hearsay in deciding whether to issue a preliminary injunction." *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009). | Sustained<br><br>———<br><br>Overruled<br><br>——— |
| 6. | "Where the required data is unavailable from U-Haul's operations or its utility providers, U-Haul will be forced to engage in high-priced guesswork | Lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701. Mr. Shoen offers no explanation, foundation, or support for his statement that estimating emissions where data is unavailable from U-Haul's operations or its utility providers would be "high- | Shoen is the President and Chairman of U-Haul Holding Company. He can testify, from personal knowledge, to UHHC's compliance process.<br><br>Moreover, Shoen does offer support and explanation for why data would be unavailable, Shoen Decl. ¶¶ 8–12, 15–29, | Sustained<br><br>———<br><br>Overruled<br><br>——— |

PLAINTIFFS' RESPONSE TO EVIDENTIARY OBJECTIONS
CASE NO. 2:24-CV-00801-ODW-PVC

| | Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|---|
| | (assumptions and prognostications multiplied by industry-wide average emissions factors or average emission factors for energy generation) to generate inherently inaccurate data." Shoen Decl., ¶ 16. | priced" or "guess-work." Nor does he offer any foundation, explanation, or support for why such estimations would be "inherently inaccurate." | why it would be expensive to comply, *id.* ¶¶ 10–12, 16–24, and why reporting would result in guesswork and inaccuracy, *id.* ¶¶ 16, 42–44.  Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | |
| 7. | "U-Haul will have to begin building the systems and contracts to comply with this new regime immediately and at great cost and commitment of personnel hours." Shoen Decl., ¶ 23. | Lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701. Mr. Shoen does not provide any explanation, foundation, or support for his assertion that U-Haul will have to begin building "the systems and contracts to comply with this new regime immediately and at great cost and commitment of personnel hours." | Shoen is the President and Chairman of U-Haul Holding Company. He can testify, from personal knowledge, to UHHC's compliance process.  Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | Sustained  _____  Overruled  _____ |
| 8. | "Under S.B. 253, U-Haul would likely be responsible for reporting | Lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 402, 602, 701. S.B. 253 | Shoen's statement is based on the plain text of S.B. 253 and 261. S.B. 253 requires reporting entities to report "Scope 3 emissions," which include | Sustained  _____ |

PLAINTIFFS' RESPONSE TO EVIDENTIARY OBJECTIONS
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-233**

Gibson, Dunn & Crutcher LLP

(192 of 297)    Page 192 of 297    Case: 25-5327    09/18/2025    DktEntry: 8.3    Page 192 of 297
Case 2:24-cv-00801-ODW-PVC    Document 97-1    Filed 04/21/25    Page 8 of 28    Page
ID #:10182

| | Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|---|
| | emissions and climate risks from all U- Haul Dealers. This is a practical impossibility." Shoen Decl., ¶ 26. | does not require covered entities to disclose their climate risk.  To the extent Mr. Shoen is referring to the requirements under S.B. 261, that law requires covered entities to report their own climate risk; not the climate risk of "all U- Haul Dealers." To the extent Mr. Shoen's statement is purporting that U-Haul will have to collect data from "all U-Haul Dealers" to comply with the requirements of S.B. 253 and 261, he offers no explanation, support, or foundation for the claim that doing so would be a "practical impossibility." | "sources that the reporting entity does not own or directly control," including "purchased goods and services" and "processing and use of sold products." § 38532(b)(5).  S.B. 261 requires covered entities to report "climate-related financial risk" due to "physical and transition risk" including "corporate operations, provision of goods and services," and "supply chains." § 38533(a)(2).<br><br>Shoen offers a detailed explanation, support, and foundation for his statement that collecting data from dealers would be a practical impossibility. *See* Shoen Decl., ¶¶ 24–29.  This is a statement based on Shoen's personal knowledge.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | Overruled<br><br>_____ |
| 9. | "[M]any of these small businesses, which include things like individually owned | Lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701. Mr. Shoen does not provide any evidence | Shoen is the President and Chairman of U-Haul Holding Company.  He can testify, from personal knowledge, to the | Sustained<br><br>_____ |

6

Gibson, Dunn & Crutcher LLP

(193 of 297) Page 193 of 297
Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 193 of 297
Case 2:24-cv-00801-ODW-PVC   Document 97-1   Filed 04/21/25   Page 9 of 28   Page
ID #:10183

| | Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|---|
| | convenience stores, are simply unable to collect this data." Shoen Decl., ¶ 27. | or basis for this assertion. | complexity of the compliance process.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | Overruled<br><br>_____ |
| 10. | "[I]f U-Haul included a requirement to collect this data in its contracts, it would risk losing a very substantial portion of its Dealer network." Shoen Decl., ¶ 27. | Lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701. Mr. Shoen does not provide any evidence or basis for this claim. | Shoen is the President and Chairman of U-Haul Holding Company. He can testify, from personal knowledge, to UHHC's compliance process and relationships with dealers.<br><br>Moreover, Shoen's Declaration provides the basis for his claim by describing how cumbersome and inconvenient data gathering and reporting would be for the many small individual dealers with which U-Haul operates. *See* Shoen Decl. ¶¶ 24–29.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th | Sustained<br><br>_____<br><br>Overruled<br><br>_____ |

PLAINTIFFS' RESPONSE TO EVIDENTIARY OBJECTIONS
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-235**

| | Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|---|
| | | | 1180, 1189 (9th Cir. 2024). | |
| 11. | "Many, likely most, of these small businesses cannot collect, or it is financially infeasible for them to collect, the data required by the law." Shoen Decl., ¶ 27. | Lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701. Mr. Shoen does not explain or provide any foundation for this assertion. | Shoen is the President and Chairman of U-Haul Holding Company. He can testify, from personal knowledge, to UHHC's dealers.<br><br>Moreover, Shoen does explain why he believes that the small businesses that make up U-Haul's dealer network would be unable to collect the data. Shoen Decl., ¶¶ 24–29.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | Sustained<br><br>_____<br><br>Overruled<br><br>_____ |
| 12. | "It is impractical if not impossible for a sole proprietor of such a business to separate out the U-Haul component of the business from the non-U-Haul components of the | Lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701. Mr. Shoen provides no basis or evidence for this claim. He also does not provide any explanation or basis for his assumption that this is required by S.B. 253 or S.B. 261. | Shoen is the President and Chairman of U-Haul Holding Company. He can testify, from personal knowledge, to UHHC's compliance process.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction | Sustained<br><br>_____<br><br>Overruled<br><br>_____ |

Gibson, Dunn & Crutcher LLP

PLAINTIFFS' RESPONSE TO EVIDENTIARY OBJECTIONS
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-236**

(195 of 297) Page 195 of 297 Case: 25-5327 09/18/2025 DktEntry: 8.3 Page 195 of 297
Case 2:24-cv-00801-ODW-PVC   Document 97-1   Filed 04/21/25   Page 11 of 28   Page
ID #:10185

| | Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|---|
| | business." Shoen Decl., ¶ 28. | | context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | |
| 13. | "The business owner likely has no way of tracking climate impacts from the U- Haul rental side of the business as opposed to the emissions from selling gasoline or keeping the lights on in the store[.]" Shoen Decl., ¶ 28. | Lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701. Mr. Shoen provides no basis or evidence for this claim.  He also does not provide any explanation or basis for his assumption this is required by S.B. 253. | Shoen is the President and Chairman of U-Haul Holding Company.  He can testify, from personal knowledge, to UHHC's compliance process.  Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | Sustained _____ Overruled _____ |
| 14. | "The costs to calculate and provide the required data would likely have a negative impact on the business's bottom line and the small business owner's livelihood." Shoen Decl., ¶ 28. | Lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701. Mr. Shoen provides no basis or evidence for this claim. | Shoen is the President and Chairman of U-Haul Holding Company.  He can testify, from personal knowledge, to UHHC's compliance process.  Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th | Sustained _____ Overruled _____ |

PLAINTIFFS' RESPONSE TO EVIDENTIARY OBJECTIONS
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-237**

(196 of 297) Page 196 of 297 Case: 25-5327 09/18/2025, DktEntry: 8.3, Page 196 of 297
Case 2:24-cv-00801-ODW-PVC    Document 97-1    Filed 04/21/25    Page 12 of 28    Page
ID #:10186

| | Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|---|
| | | | 1180, 1189 (9th Cir. 2024). | |
| 15. | "U-Haul anticipates massive damage to its Dealer network from S.B. 253." Shoen Decl., ¶ 29. | Vague, ambiguous, lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701. | Shoen is the President and Chairman of U-Haul Holding Company. He can testify, from personal knowledge, to UHHC's dealer network and compliance process.<br><br>The statement is also not vague or ambiguous because Shoen's Declaration explains why U-Haul anticipates this damage to its dealer network. *See* Shoen Decl., ¶¶ 25-29.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | Sustained<br><br>———<br><br>Overruled<br><br>——— |
| 16. | Entirety of Mr. Shoen's discussion of "Scope 4" emissions in Paragraphs 30- 33. | Irrelevant. Fed. R. Evid. 402. Neither S.B. 253 nor S.B. 261 prohibits covered entities from disclosing any so-called "Scope 4 emissions" should they wish. Lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701. Mr. Shoen does not provide any foundation or | The State's attempt to force companies to adopt the State's contested, misleading calculation of emissions is relevant to the claims in this action. S.B. 253 requires covered entities to report a specific calculation of greenhouse gases that does not include Scope 4 emissions. As a result, covered entities like UHHC who believe that an emissions figure | Sustained<br><br>———<br><br>Overruled<br><br>——— |

PLAINTIFFS' RESPONSE TO EVIDENTIARY OBJECTIONS
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-238**

Gibson, Dunn & Crutcher LLP

(197 of 297) Page 197 of 297
Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 197 of 297
Case 2:24-cv-00801-ODW-PVC   Document 97-1   Filed 04/21/25   Page 13 of 28   Page
ID #:10187

| | Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|---|
| | | evidence for his claims that the products and services provided by U-Haul "avoid" greenhouse gas emissions. Mr. Shoen does not explain how any of these purported avoidances in emissions were calculated or what expertise he has, if any, to opine on avoided emissions of U-Haul. | without Scope 4 is inaccurate will be forced to report what they believe to be inaccurate, misleading information. Shoen Decl., ¶¶ 30–33.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | |
| 17. | "S.B. 261's requirements would force U-Haul to expend considerable time and resources." Shoen Decl., ¶ 37. | Lacks lack foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701. Mr. Shoen provides no basis or foundation for this assertion. | Shoen is the President and Chairman of U-Haul Holding Company. He can testify, from personal knowledge, to UHHC's compliance process.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | Sustained<br><br>_____<br><br>Overruled<br><br>_____ |
| 18. | "U-Haul will have to begin building the systems and contracts to | Lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701. Mr. Shoen provides no | Shoen is the President and Chairman of U-Haul Holding Company. He can testify, from personal | Sustained<br><br>_____ |

Gibson, Dunn & Crutcher LLP

PLAINTIFFS' RESPONSE TO EVIDENTIARY OBJECTIONS
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-239**

(198 of 297) Page 198 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 198 of 297
Case 2:24-cv-00801-ODW-PVC   Document 97-1   Filed 04/21/25   Page 14 of 28   Page
ID #:10188

| | Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|---|
| | comply with S.B. 261 immediately and at great cost and commitment of personnel hours." Shoen Decl., ¶ 38. | basis or foundation for this assertion. | knowledge, to UHHC's compliance process.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | Overruled<br><br>_____ |
| 19. | "Complying with these new laws would require U-Haul to make disclosures that, while based on a good faith effort and great expense, will be based on high-priced guesswork (assumptions and prognostications multiplied by industry-wide average emissions factors or average emission factors for energy generation) which ultimately yield inaccurate data | Lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701. Mr. Shoen does not provide any foundation or basis for his assertions that the disclosures required by S.B. 253 or S.B. 261 will produce data or results that are inaccurate; that disclosures will "require updates," or that the disclosures will "undoubtedly lead to litigation." | Shoen is the President and Chairman of U-Haul Holding Company. He can testify, from personal knowledge, to UHHC's compliance process.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | Sustained<br><br>_____<br><br>Overruled<br><br>_____ |

PLAINTIFFS' RESPONSE TO EVIDENTIARY OBJECTIONS
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-240**

Gibson, Dunn &
Crutcher LLP

(199 of 297) Page 199 of 297 Case: 25-5327 09/18/2025, DktEntry: 8.3 Page 199 of 297
Case 2:24-cv-00801-ODW-PVC   Document 97-1   Filed 04/21/25   Page 15 of 28   Page
ID #:10189

| | Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|---|
| | compared to reality." Shoen Decl., ¶ 42. | | | |
| 20. | "These inaccuracies and updates will undoubtedly lead to litigation." Shoen Decl. ¶ 42. | Lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701. Mr. Shoen does not provide any foundation or basis for this assertion. | Shoen is the President and Chairman of U-Haul Holding Company. He can testify, from personal knowledge, to UHHC's reporting process and concerns about litigation.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | Sustained<br><br>_____<br><br>Overruled<br><br>_____ |
| 21. | "Furthermore, complying with these laws may confuse investors or securities regulators regarding whether S.B. 253 and S.B. 261 disclosures are 'material' to an investor in UHHC's equity and debt securities." Shoen Decl., ¶ 43. | Lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701. Mr. Shoen does not provide any foundation or evidence for this claim. | Shoen is the President and Chairman of U-Haul Holding Company. He can testify, from personal knowledge, to UHHC's compliance process and potential confusion resulting therefrom.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th | Sustained<br><br>_____<br><br>Overruled<br><br>_____ |

| | Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|---|
| | | | 1180, 1189 (9th Cir. 2024). | |
| 22. | "I believe the disclosure required by S.B. 253 and S.B. 261 will be inaccurate and not material to investors." Shoen Decl., ¶ 43. | Lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701. Irrelevant. Fed. R. Evid. 402. Mr. Shoen's personal opinion regarding whether the disclosures may confuse investors is not relevant. | Shoen is the President and Chairman of U-Haul Holding Company. He can testify, from personal knowledge, to his opinions about the required disclosures.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | Sustained<br><br>_____<br><br>Overruled<br><br>_____ |
| 23. | "UHHC should not be forced to create market confusion by compelling it to disclose information under S.B. 253 and S.B. 261 that it does not believe to be material to investors" Shoen Decl., ¶ 43. | Lack foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701. Mr. Shoen does not provide any foundation or evidence for the claim that the disclosures would "create market confusion" or that the disclosures would not be material to investors. | Shoen is the President and Chairman of U-Haul Holding Company. He can testify, from personal knowledge, to UHHC's speech preferences and beliefs about the required disclosures.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th | Sustained<br><br>_____<br><br>Overruled<br><br>_____ |

Gibson, Dunn & Crutcher LLP

PLAINTIFFS' RESPONSE TO EVIDENTIARY OBJECTIONS
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-242**

| | Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|---|
| | | | 1180, 1189 (9th Cir. 2024). | |
| 24. | "To make matters worse, this unconstitutionally compelled speech will result in high-priced guesswork and speculation that will yield inaccurate climate-related financial risk or emissions information." Shoen Decl., ¶ 44. | Lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701. Mr. Shoen does not provide any foundation or basis for his claims that the disclosures "will result in high-priced guesswork" or that they "will yield inaccurate" information. | Shoen is the President and Chairman of U-Haul Holding Company. He can testify, from personal knowledge, to the cost and complexity of UHHC's compliance process, as well as its belief that the disclosures will be inaccurate.<br><br>Shoen explains in his declaration why he believes the required reporting must result in guesswork and inaccurate information. *See, e.g.*, Shoen Decl. ¶¶ 16, 42–44.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | Sustained<br><br>_____<br><br>Overruled<br><br>_____ |
| 25. | "This inaccurate information will undoubtedly lead to litigation." Shoen Decl., ¶ 44. | Lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701. Mr. Shoen does not provide any foundation or basis for this assertion. | Shoen is the President and Chairman of U-Haul Holding Company. He can testify, from personal knowledge, to his beliefs about the risk of litigation.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of | Sustained<br><br>_____<br><br>Overruled |

Gibson, Dunn & Crutcher LLP

**ER-243**

(202 of 297) Page 202 of 297Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 202 of 297
Case 2:24-cv-00801-ODW-PVC   Document 97-1   Filed 04/21/25   Page 18 of 28   Page
ID #:10192

| | Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|---|
| | | | Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | _____ |

## II.   DECLARATION OF THOMAS QUAADMAN (ECF NO. 78-4)

| | Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|---|
| 1. | "Unless S.B. 253 and 261 are enjoined, a number of the Chamber's members … will be forced to incur significant costs in the next several months and overcome substantial implementation challenges." Quaadman Decl., ¶ 7. | Speculative, and lacks foundation or personal knowledge.  Fed. R. Evid. 602, 701.  Mr. Quaadman does not specify whether any of the Chamber's direct members will need to take any of these actions or adopt any of these processes.  And even if they do, Mr. Quaadman does not specify or explain how he has personal knowledge of the actions they would need to take or processes they would need to adopt; how much taking those actions or adopting those processes would cost; or when those companies would need to begin doing so. | Thomas Quaadman is the Senior Vice President for Economic Policy at the Chamber of Commerce of the United States of America.  He can testify from personal knowledge to whether a number of the Chamber's members are subject to S.B. 253 and S.B. 261.<br><br>Quaadman's statement is also based on the plain text of S.B. 253 and S.B. 261, each of which by their terms require covered entities to make complex reports about their companies.  Quaadman Decl., ¶¶ 5–8.  For example, S.B. 253 and S.B. 261 each require disclosures beginning in 2026. *Id.* ¶ 6.<br><br>Quaadman mentions UHHC as one specific member that will be forced to incur costs. | Sustained<br><br>_____<br><br>Overruled<br><br>_____ |

16

Gibson, Dunn &
Crutcher LLP

| | Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|---|
| | | | Quaadman Decl., ¶ 7. This is confirmed by the Shoen Declaration, ¶¶ 3, 44.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | |
| 2. | "I understand that to make the disclosures required in 2026, companies must begin tracking and recording a vast amount of climate-related information now." Quaadman Decl., ¶ 8. | Speculative, and lacks foundation or personal knowledge. Fed. R. Evid. 602, 701. | Quaadman's statement is based on the plain text of S.B. 253 and S.B. 261, each of which by their terms require covered entities to make complex reports about their companies.<br><br>The California Air Resources Board issued a December 5, 2024 Enforcement Notice reaffirming that S.B. 253 reports would be due beginning in 2026 and must "cover scope 1 and scope 2 emissions during the reporting entity's prior fiscal year." Dkt. 78-6 at 5.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-* | Sustained<br><br>_____<br><br>Overruled<br><br>_____ |

| Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|
| | | *Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | |

## III.   DECLARATION OF BRADLEY HAMBURGER (ECF NOS. 78-5, 78-7, & 78-8)

| | Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|---|
| 1. | Hamburger Decl., Ex. B [January 14, 2025 *Law360* Article by Loyti Cheng & David Zilberberg, entitled "Climate Disclosure Spotlight Shifts to 2 Calif. Laws"] | The entire exhibit and every statement therein is hearsay. Fed. R. Evid. 802. | The article is cited for the notion that "[c]ommentators . . . are recommending that companies 'begin to put the right measures in place to comply now.'" Dkt. 78-1 at 6.  The exhibit is not cited for the truth of that statement but rather for the fact that industry experts view immediate compliance as mandatory.  This is not hearsay under Federal Rule of Evidence 801(c)(1).<br><br>Even if this statement were hearsay, a district court may "consider hearsay in deciding whether to issue a preliminary injunction." *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009). | Sustained<br><br>_____<br><br>Overruled<br><br>_____ |
| 2. | "As a practical matter, under this definition, companies with minimal California connections, such as | Lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701.  CARB has not yet issued the regulations that will define | Defendants' objection that "CARB has not yet issued the regulations that will define 'doing business in California'" rests on a contested premise—that CARB is empowered, authorized, or instructed to define | Sustained<br><br>_____ |

(205 of 297) Page 205 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 205 of 297
Case 2:24-cv-00801-ODW-PVC   Document 97-1   Filed 04/21/25   Page 21 of 28   Page
ID #:10195

| | Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|---|
| | having one employee, could be considered in scope." Hamburger Decl., Ex. B. | "doing business in California." | "doing business in California."<br><br>Even if this exhibit were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | Overruled<br><br>_____ |
| 3. | "Without further guidance from California, it is not possible to definitively resolve this ambiguity. However, one practical approach might be to look at a company's accounting policies in determining whether aggregation is appropriate." Hamburger Decl., Ex. B. | Irrelevant.  The author's characterization of the contents of S.B. 253 and S.B. 261 is not relevant to the constitutionality of the laws under the First Amendment. | This sentence from Exhibit B to the Hamburger Declaration is not cited in Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction. | Sustained<br><br>_____<br><br>Overruled<br><br>_____ |
| 4. | "Under this reading, in-scope companies would merely be required to report what they actually do to assess climate risk, and would | Irrelevant.  The author's characterization of the contents of S.B. 253 and S.B. 261 is not relevant to the constitutionality of the laws under the First Amendment. | This sentence from Exhibit B to the Hamburger Declaration is not cited in Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction. | Sustained<br><br>_____<br><br>Overruled<br><br>_____ |

Gibson, Dunn &
Crutcher LLP

**ER-247**

(206 of 297) Page 206 of 297
Case 2:24-cv-00801-ODW-PVC  Document 97-1  Filed 04/21/25  Page 22 of 28  Page ID #:10196
Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 206 of 297

| | Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|---|
| | not have to conduct any assessment — such as a scenario analysis — that goes beyond their existing practices. Whether California adopts this interpretation in administering or enforcing the law remains to be seen, but this interpretation would appear to be inconsistent with the statutory text of S.B. 261." Hamburger Decl., Ex. B. | | | |
| 5. | "However, in-scope companies that currently do not collect any Scope 1 and 2 greenhouse gas emissions data are advised to begin the process of doing so starting in 2025. CARB is unlikely to consider not collecting any data to constitute good faith efforts under the | Lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701. The author does not provide any evidence or basis for the claims as to what CARB's regulations will require. | This sentence from Exhibit B to the Hamburger Declaration is not cited in Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction. | Sustained _____ Overruled _____ |

20

(207 of 297) Page 207 of 297Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 207 of 297
Case 2:24-cv-00801-ODW-PVC    Document 97-1    Filed 04/21/25    Page 23 of 28    Page
ID #:10197

| | Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|---|
| | enforcement notice." Hamburger Decl., Ex. B. | | | |
| 6. | Hamburger Decl., Ex. C. [December 27, 2024 *Daily Journal* Article by David R. Singh, et al., entitled "SB 253 puts companies on the climate clock"] | The entire exhibit and every statement therein is hearsay. Fed. R. Evid. 402. | The article is cited for the notion that "[c]ommentators . . . are recommending that companies 'begin to put the right measures in place to comply now.'" Dkt. 78-1 at 6. The exhibit is not cited for the truth of that statement but rather for the fact that industry experts view immediate compliance as mandatory. This is not hearsay under Federal Rule of Evidence 801(c)(1).  Even if this exhibit were hearsay, a district court may "consider hearsay in deciding whether to issue a preliminary injunction." *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009). | Sustained _____ Overruled _____ |
| 7. | "In October 2023, California enacted Senate Bill 253 (SB 253) to increase regulatory pressure on companies to reduce their environmental impact." Hamburger Decl., Ex. C. | Irrelevant. Fed. R. Evid. 402. The author's characterization of the purpose behind enacting S.B. 253 and S.B. 261 is not relevant to the constitutionality of the laws under the First Amendment. | This sentence from Exhibit C to the Hamburger Declaration is not cited in Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction.  In any event, this statement demonstrates that legal analysts view S.B. 253 and S.B. 261 as designed to compel speech in order to create pressure on companies to adopt certain practices – | Sustained _____ Overruled _____ |

PLAINTIFFS' RESPONSE TO EVIDENTIARY OBJECTIONS
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-249**

(208 of 297) Page 208 of 297
Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 208 of 297
Case 2:24-cv-00801-ODW-PVC    Document 97-1    Filed 04/21/25    Page 24 of 28    Page ID #:10198

| Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|
| | | which counsels in favor of a preliminary injunction.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | |
| 8. | "Also referred to as the Corporate Climate Data Accountability Act and amended in September 2024 by Senate Bill 219, SB 253 represents a seismic shift in corporate climate accountability as it implements new annual reporting requirements for Scope 3 greenhouse gas emissions starting in 2027." Hamburger Decl., Ex. C. | Irrelevant, lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 402, 602, 701. The author does not provide any evidence or basis for the claim that the enactment of S.B. 253 or 261 represented a "seismic shift" in corporate climate accountability. The author's opinion on this topic is not relevant to the constitutionality of either law under the First Amendment. | This sentence from Exhibit C to the Hamburger Declaration is not cited in Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction.<br><br>In any event, this statement demonstrates that legal analysts view S.B. 253 and S.B. 261 as radical and difficult to comply with – both of which counsel in favor of a preliminary injunction.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, | Sustained<br><br>_____<br><br>Overruled<br><br>_____ |

| | Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|---|
| | | | 98 F.4th 1180, 1189 (9th Cir. 2024). | |
| 9. | "The indirect nature of Scope 3 emissions gives rise to challenges in tracking emissions, and accurate reporting will require careful coordination across a company's own operations and with suppliers." Hamburger Decl., Ex. C. | Lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701. The author does not provide any evidence or basis for the claim that the "indirect nature" of Scope 3 emissions "gives rise to challenges" in tracking them. | This sentence from Exhibit C to the Hamburger Declaration is not cited in Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction.<br><br>In any event, this statement demonstrates that legal analysts view S.B. 253 and S.B. 261 as ambiguous and difficult to comply with – both of which counsel in favor of a preliminary injunction.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | Sustained<br><br>_____<br><br>Overruled<br><br>_____ |
| 10. | "Accurately reporting Scope 3 emissions will be difficult due to dependence on data from third parties." Hamburger Decl., Ex. C. | Lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701. The author does not provide any evidence or basis for the claim that accurately reporting Scope 3 emissions "will be difficult due to | This sentence from Exhibit C to the Hamburger Declaration is not cited in Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction.<br><br>In any event, this statement demonstrates that | Sustained<br><br>_____<br><br>Overruled<br><br>_____ |

PLAINTIFFS' RESPONSE TO EVIDENTIARY OBJECTIONS
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-251**

Gibson, Dunn & Crutcher LLP

(210 of 297) Page 210 of 297
Case: 25-5327 09/18/2025, DktEntry: 8.3, Page 210 of 297
Case 2:24-cv-00801-ODW-PVC    Document 97-1    Filed 04/21/25    Page 26 of 28    Page ID #:10200

| | Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|---|
| | | dependence on data from third parties." | legal analysts view S.B. 253 and S.B. 261 as ambiguous and difficult to comply with – both of which counsel in favor of a preliminary injunction.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | |
| 11. | "SB 253 acknowledges this difficulty with reporting Scope 3 emissions." Hamburger Decl., Ex. C. | Irrelevant.  Fed. R. Evid. 402.  The author's characterization of the contents of S.B. 253 and S.B. 261 is not relevant to the constitutionality of the laws under the First Amendment. | This sentence from Exhibit C to the Hamburger Declaration is not cited in Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction.<br><br>In any event, this statement demonstrates that legal analysts view S.B. 253 and S.B. 261 as ambiguous and difficult to comply with – both of which counsel in favor of a preliminary injunction.<br><br>Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-* | Sustained<br><br>—————<br><br>Overruled<br><br>————— |

PLAINTIFFS' RESPONSE TO EVIDENTIARY OBJECTIONS
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-252**

Gibson, Dunn & Crutcher LLP

(211 of 297)   Page 211 of 297
Case: 25-5327  09/18/2025, DktEntry: 8.3  Page 211 of 297
Case 2:24-cv-00801-ODW-PVC   Document 97-1   Filed 04/21/25   Page 27 of 28   Page
ID #:10201

| | Statement Objected To | Basis of Objection | Response to Objection | Ruling |
|---|---|---|---|---|
| | | | *Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | |
| 12. | "However, these safe harbors will not protect companies from reputational risk around violations or litigation by the plaintiff bar, including for violations of consumer protection statutes or securities laws, or breach of fiduciary duties." Hamburger Decl., Ex. C. | Lacks foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701.  The author does not provide any evidence or basis for the claim that S.B. 253 or 261 will not "protect companies from reputational risk or litigation by the plaintiff bar." | This sentence from Exhibit C to the Hamburger Declaration is not cited in Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction.  In any event, this statement demonstrates that legal analysts view S.B. 253 and S.B. 261 as ambiguous and difficult to comply with – both of which counsel in favor of a preliminary injunction.  Even if this statement were inadmissible at trial under the Federal Rules of Evidence, "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). | Sustained _____ Overruled _____ |

Gibson, Dunn & Crutcher LLP

PLAINTIFFS' RESPONSE TO EVIDENTIARY OBJECTIONS
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-253**

(212 of 297) Page 212 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 212 of 297
Case 2:24-cv-00801-ODW-PVC   Document 97-1   Filed 04/21/25   Page 28 of 28   Page
ID #:10202

DATED: April 21, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Bradley J. Hamburger*
Eugene Scalia, SBN 151540
Bradley J. Hamburger, SBN 266916
Samuel Eckman, SBN 308923
Brian A. Richman (*pro hac vice*)
Elizabeth Strassner, SBN 342838

*Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation and Western Growers Association*

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA

Stephanie Maloney (*pro hac vice*)
Kevin Palmer (*pro hac vice*)

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*

1    EUGENE SCALIA, SBN 151540
         escalia@gibsondunn.com
2    GIBSON, DUNN & CRUTCHER LLP
3    1700 M St. N.W.
     Washington, D.C.  20036
4    Telephone:  202.955.8500
     Facsimile:   202.467.0539
5

6    *Attorneys for Plaintiffs Chamber of*
     *Commerce of the United States of Amer-*
7    *ica, California Chamber of Commerce,*
     *American Farm Bureau Federation, Los*
8    *Angeles County Business Federation,*
     *Central Valley Business Federation,*
9    *and Western Growers Association*

10
     (*Additional counsel listed on next page*)
11
                IN THE UNITED STATES DISTRICT COURT
12
            FOR THE CENTRAL DISTRICT OF CALIFORNIA,
13
                        WESTERN DIVISION
14

15   | CHAMBER OF COMMERCE OF THE | CASE NO. 2:24-cv-00801-ODW-PVC |
     | UNITED STATES OF AMERICA, | |
16   | CALIFORNIA CHAMBER OF | **REPLY IN SUPPORT OF** |
     | COMMERCE, AMERICAN FARM | **PLAINTIFFS' MOTION FOR** |
17   | BUREAU FEDERATION, LOS | **PRELIMINARY INJUNCTION** |
     | ANGELES COUNTY BUSINESS | |
18   | FEDERATION, CENTRAL VALLEY | **HEARING:** |
     | BUSINESS FEDERATION, and | Date:        May 27, 2025 |
19   | WESTERN GROWERS ASSOCIATION, | Time:        11:00 AM |
     | | Location:   Courtroom 5D |
20   | Plaintiffs, | Judge:       Otis D. Wright II |
21   | v. | |
22   | LIANE M. RANDOLPH, in her official | |
     | capacity as Chair of the California Air | |
23   | Resources Board, STEVEN S. CLIFF, in | |
     | his official capacity as the Executive | |
24   | Officer of the California Air Resources | |
     | Board, and ROBERT A. BONTA, in his | |
25   | official capacity as Attorney General of | |
     | California. | |
26   | | |
27   | Defendants. | |

28

Gibson, Dunn &
Crutcher LLP

BRADLEY J. HAMBURGER
    SBN 266916
    bhamburger@gibsondunn.com
SAMUEL ECKMAN
    SBN 308923
    seckman@gibsondunn.com
ELIZABETH STRASSNER
    SBN 342838
    estrassner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

BRIAN A. RICHMAN
(*pro hac vice*)
    DC Bar No. 230071
    brichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Ave., Suite 2100
Dallas, TX  75201-2923
Telephone:  214.698.3100
Facsimile:   214.571.2900

*Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association*

STEPHANIE A. MALONEY
(*pro hac vice*)
    DC Bar No. 104427
    smaloney@uschamber.com
KEVIN PALMER
(*pro hac vice*)
    DC Bar No. 90014967
    kpalmer@uschamber.com
CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA
1615 H Street, NW
Washington, D.C.  20062-2000
Telephone:  202.659.6000
Facsimile:   202.463.5302

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

<u>Page</u>

I. INTRODUCTION ............................................................................................. 1

II. ARGUMENT ................................................................................................... 2

    A.      Plaintiffs Are Likely to Prevail on the Merits............................................ 2

            1.      The State Cannot Escape First Amendment Scrutiny ..................... 3

            2.      S.B. 253 and 261 Fail Under Any Level of Scrutiny ..................... 7

    B.      A Preliminary Injunction Is Warranted........................................................ 9

III. CONCLUSION ............................................................................................. 10

Gibson, Dunn &
Crutcher LLP

i

**ER-257**

(216 of 297) Page 216 of 297 Case: 25-5327 09/18/2025, DktEntry: 8.3, Page 216 of 297
Case 2:24-cv-00801-ODW-PVC   Document 97   Filed 04/21/25   Page 4 of 17   Page ID
#:10161

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Am. Beverage Ass'n v. City of San Francisco*,
   916 F.3d 749 (9th Cir. 2019) ................................................................. 8, 9

*Am. Hosp. Ass'n v. Azar*,
   983 F.3d 528 (D.C. Cir. 2020) ................................................................. 5

*Am. Meat Inst. v. U.S. Dep't of Agric.*,
   760 F.3d 18 (D.C. Cir. 2014) (en banc) ................................................... 8

*Ariix, LLC v. NutriSearch Corp.*,
   985 F.3d 1107 (9th Cir. 2021) ................................................................. 4

*Doe v. Harris*,
   772 F.3d 563 (9th Cir. 2014) ................................................................... 2

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
   82 F.4th 664 (9th Cir. 2023) (en banc) ................................................. 1, 9

*First Nat'l Bank of Boston v. Bellotti*,
   435 U.S. 765 (1978) ............................................................................. 4, 7

*Gov't Suppliers Consolidating Servs., Inc. v. Bayh*,
   975 F.2d 1267 (7th Cir. 1992) ............................................................... 10

*IMDb.com Inc. v. Becerra*,
   962 F.3d 1111 (9th Cir. 2020) ................................................................. 4

*McCullen v. Coakley*,
   573 U.S. 464 (2014) ................................................................................ 8

*Meinecke v. City of Seattle*,
   99 F.4th 514 (9th Cir. 2024) ................................................................. 2, 3

*National Association of Manufacturers v. SEC*,
   800 F.3d 518 (D.C. Cir. 2015) ................................................................. 6

*National Institute of Family & Life Advocates v. Becerra* (*NIFLA*),
   585 U.S. 755 (2018) ................................................................. 2, 3, 4, 6, 7

PLAINTIFFS' REPLY ISO MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-258**

## TABLE OF AUTHORITIES
(continued)

Page(s)

*NetChoice, LLC v. Bonta*,
    113 F.4th 1101 (9th Cir. 2024) ................................................................. 2, 3, 4, 5, 10

*NetChoice, LLC v. Bonta*,
    692 F. Supp. 3d 924 (N.D. Cal. 2023) ...................................................... 10

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ..................................................................................... 3

*Union Pac. R.R. Co. v. Cal. Pub. Utils. Comm'n*,
    346 F.3d 851 (9th Cir. 2003) ..................................................................... 10

*X Corp. v. Bonta*,
    116 F.4th 888 (9th Cir. 2024) ............................................................. 4, 5, 6

*Zauderer v. Office of Disciplinary Counsel*,
    471 U.S. 626 (1985) ........................................................................... 2, 4, 7

(218 of 297) Page 218 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 218 of 297
Case 2:24-cv-00801-ODW-PVC    Document 97    Filed 04/21/25    Page 6 of 17    Page ID
#:10163

# I.  INTRODUCTION

The State asks this Court to allow enforcement of two laws that it admits "compe[l] . . . speech." Opp. 1.  The Court should decline that request and maintain the status quo, pending resolution of this litigation.

It is beyond dispute that "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 694 (9th Cir. 2023) (en banc).  Absent a preliminary injunction, that injury will occur.  Companies must begin speaking in mere months—on January 1, 2026—and must prepare now, including by retaining data necessary to comply with the laws.  The laws are ripe for review:  Even CARB concedes that S.B. 253's compelled speech "will still be due in 2026."  Notice of Enforcement, Dkt. 78-6 at 5.

The State claims immediate enforcement of the laws—*i.e.*, forcing companies to speak on a controversial issue—is needed to counter "misleading or inaccurate" speech.  Opp. 4.  But it provides no evidence of actual misleading or inaccurate speech, and its assertion—repeated throughout its brief (*see* Opp. 2, 4, 16)—that "96%" of emissions-related claims are "misleading or inaccurate" is entirely unsupported.  The State cites only its retained expert, Angel Hsu, who attests that certain corporate statements have supposed "indicator[s]" of "greenwashing."  Dkt. 89-18 ¶ 10-11.  But Hsu does not go so far as to assert that those statements were misleading or inaccurate, as the State claims in its brief.  In fact, Hsu's analysis is divorced from any actual assessment of falsity—for example, she deems it a sign of greenwashing when a company engages in "[a]nti-climate lobbying." *Id.* ¶ 11(f).  The State is thus arguing that a company's entirely true statements become "misleading or inaccurate" when the company engages in First-Amendment protected activity the State disfavors.  The Court should reject this circular attempt to justify the speech compulsions of S.B. 253 and 261.

The State's Opposition falls short in other respects.  As a threshold matter, Plaintiffs have made a "colorable claim" that their First Amendment rights "are threatened"

(219 of 297) Page 219 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 219 of 297
Case 2:24-cv-00801-ODW-PVC    Document 97    Filed 04/21/25    Page 7 of 17    Page ID
#:10164

by the mandates of S.B. 253 and 261, and the burden therefore has "shift[ed] to the [State] to justify" the laws. *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024). It has failed to do so, in at least two respects.

First, the State's attempt to avoid strict scrutiny is meritless. The State concedes that S.B. 253 and 261 "compe[l] . . . speech." Opp. 1. And this Court has already held that "'First Amendment scrutiny'" applies, and "that the primary effect—and purpose—of the laws is to compel speech" (not conduct). Dkt. 73 at 7 (quoting *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1117 (9th Cir. 2024)). The State cannot show that the limited exception from *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), applies. The laws are subject to strict scrutiny.

Second, the State fails to show the requisite tailoring or government interest to withstand any level of scrutiny. The State professes to "protec[t] its investors, consumers, and other stakeholders from fraud or misrepresentation." Opp. 16. But even under *Zauderer*, the State must show that the laws are "no broader than reasonably necessary." *National Institute of Family & Life Advocates v. Becerra* (*NIFLA*), 585 U.S. 755, 776 (2018). It cannot make that showing. S.B. 253 and 261 require *every* covered company to speak on *every* required topic, regardless of what the company has or has not said, whether it does business with consumers, or whether it solicits investments from the public. That is because the true purpose of these laws is not consumer or investor protection, but to compel speech.

The Court should preliminarily enjoin S.B. 253 and 261.

## II. ARGUMENT

### A.    Plaintiffs Are Likely to Prevail on the Merits

The parties agree on the legal standard: Plaintiffs must make a "colorable claim" that their First Amendment rights "are threatened with infringement." *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014); *see* Opp. 9 (citing *Doe*). Because both S.B. 253 and 261 "compe[l] . . . speech," as the State admits, Plaintiffs easily clear that bar. Opp. 1.

The burden shifts to the State to justify the laws. *Meinecke*, 99 F.4th at 521. It has not (and cannot).

## 1. The State Cannot Escape First Amendment Scrutiny

This Court correctly rejected the State's counterintuitive assertion that laws that "compe[l] . . . speech" (Opp. 1) do not "implicate the First Amendment" (Opp. 10). As the Court explained, "'the forced disclosure of information, even purely commercial information, triggers First Amendment scrutiny,'" because the First Amendment "protects 'the right to refrain from speaking at all.'" Dkt. 73 at 7 (quoting *NetChoice*, 113 F.4th at 1117).

Laws that compel speech are "presumptively unconstitutional" and strict scrutiny applies. *NIFLA*, 585 U.S. at 766. The State cites Justice Breyer's concurrence in *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), to argue for lesser scrutiny. Opp. 11. But the majority in *Reed*, unlike Justice Breyer, applied strict scrutiny to strike down a content-based restriction on speech. *See id.* at 172. Later, in *NIFLA*, the Court rejected Justice Breyer's view that "disclosure law[s]" are subject to lesser scrutiny. 585 U.S. at 782 (Breyer, J., dissenting) (citing *Reed*, 576 U.S. at 177-78 (Breyer, J., concurring in judgment)). The State's reliance on a minority view confirms that its attempt to avoid strict scrutiny is flawed.

There are two contexts in which courts have applied a lower level of scrutiny to compelled disclosures. *NIFLA*, 585 U.S. at 768. Neither is applicable.

**a. The laws do not regulate conduct.** The first exception to strict scrutiny applies to "regulatio[n] of professional conduct that incidentally burden[s] speech." *NIFLA*, 585 U.S. at 769. This Court has already held this exception inapplicable, as "[t]here can be no dispute that the primary effect—and purpose—of SBs 253 and 261 is to compel speech." Dkt. 73 at 7. The State does not contest that finding. It says only that the laws are "directed at a 'broader regulatory apparatus' governing the disclosure of commercial data." Opp. 10. But as in *NetChoice*, none of this changes the fact that the "primary"—indeed, *only*—"effect of" the laws "is to compel speech." 113 F.4th at

(221 of 297) Page 221 of 297
Case: 25-5327 09/18/2025, DktEntry: 8.3, Page 221 of 297
Case 2:24-cv-00801-ODW-PVC    Document 97    Filed 04/21/25    Page 9 of 17    Page ID #:10166

1117.  This, in and of itself, "distinguish[es]" the laws "from statutes where the com-

pelled speech was 'plainly incidental'" to regulation of conduct.  *Id.*

**b.  *Zauderer* is inapplicable.**  The second exception to strict scrutiny, articulated

in *Zauderer*, also does not apply.  To invoke *Zauderer*, the State must prove the com-

pelled speech is (1) commercial; (2) purely factual; *and* (3) uncontroversial.  *NIFLA*,

585 U.S. at 768.  The State makes none of these showings—for obvious reasons.  *Zau-*

*derer* applies to rote factual statements (*e.g.*, "the product contains X"); no court has

applied it to justify the full-blown reports or forced speech on vague topics like "climate-

related financial risk," as required here.

*First*, the speech is not commercial.  The "'usual definition' of commercial

speech" is "speech that does no more than propose a commercial transaction."  *X Corp.*

*v. Bonta*, 116 F.4th 888, 901 (9th Cir. 2024).  The State does not argue that the compelled

speech here satisfies this definition, which has been dispositive elsewhere.  *E.g.*,

*IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1122 (9th Cir. 2020) ("Because IMDb's pub-

lic profiles do not 'propose a commercial transaction,' we need not reach the *Bolger*

factors.").

Beyond failing the "usual definition," none of the "[t]hree characteristics"

(Opp. 11) typically found in commercial speech are present.  The compelled disclosures

"are not advertisements."  *X Corp.*, 116 F.4th at 901; *cf.* Opp. 12 ("formal 'advertise-

ment' is not required").  Nor do companies have an economic motivation to provide

them.  *X Corp.*, 116 F.4th at 901.  And they do not "refer to a particular product."

*IMDb.com*, 962 F.3d at 1122; *cf.* Opp. 12 (they concern "the company, rather than a

product").  The State offers no case finding speech to be commercial when it falls outside

the usual definition *and* is missing each of these three characteristics.  Indeed, the Ninth

Circuit cases that held speech to be commercial outside proposing a commercial trans-

action "all" involved speech "communicat[ing] the terms of an actual or potential trans-

action."  *X Corp.*, 116 F.4th at 901.  The same is true of *every* case the State cites.

Opp. 12.  *E.g.*, *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1116-17 (9th Cir. 2021)

(222 of 297), Page 222 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 222 of 297
Case 2:24-cv-00801-ODW-PVC    Document 97    Filed 04/21/25    Page 10 of 17    Page ID
#:10167

("refers to specific products," designed to "ratchet up sales"); *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 542 (D.C. Cir. 2020) ("disclose prices before rendering services"). The compelled speech here, by contrast, is "disconnected from any economic transaction." *NetChoice*, 113 F.4th at 1119 (applying strict scrutiny and affirming preliminary injunction of California compelled-speech law).

The State also claims that some covered companies already make statements about "emissions and sustainability practices." Opp. 12. Whether they do is irrelevant to the First Amendment analysis, which concerns whether the "compelled disclosures" are commercial speech, not prior company statements. *X Corp.*, 116 F.4th at 901 (holding state-mandated reports are not commercial speech, even if the speech they are "*about*" "may be commercial speech").

*Second*, the compelled speech here is not purely factual. The State incorrectly contends that companies "need only" disclose "existing" climate policies. Opp. 15. In truth, S.B. 261 mandates that companies "shall" determine their "climate-related financial risk, in accordance with the recommended framework." *Id.* § 38533(b)(1)(A)(i). The law, by incorporating the TCFD framework (§ (b)(1)(A)(i)), then *requires* companies to "asses[s] potential impacts" of "climate-related issues," even when those impacts are "not . . . clear." Dkt. 48-23 at 8. For example, S.B. 261 compels companies to discuss the effects of "[t]echnological improvements" that "support the transition to a lower-carbon" "economic system," even though the nature and timing of those improvements is "uncertai[n]." *Id.* at 6. The law further requires companies to discuss the effects of "[p]olicy actions around climate change"—*e.g.*, hypothetical carbon taxes—even though (again) the "nature and timing of [those] policy change[s]" is uncertain. *Id.* at 5. None of this is "purely factual."

S.B. 253 similarly compels non-factual speech. The State asserts that the law is consistent with "widely accepted" protocols for emissions data. Opp. 1. But as the State's evidence reveals, virtually no company calculates emissions the way S.B. 253 demands. *See* Lyon Decl. (Dkt. 90) ¶¶ 34, 37-38 (complaining about what companies

5

(223 of 297) Page 223 of 297Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 223 of 297
Case 2:24-cv-00801-ODW-PVC    Document 97    Filed 04/21/25    Page 11 of 17    Page ID
#:10168

supposedly "fail to report").  Moreover, the law requires companies to claim as "their" own the emissions of *others*—a "normative" judgment (Lyon Ex. 28 (Dkt. 90-28) at 615) about who should or should not be "excused" (Lyon Decl. (Dkt. 90) ¶ 40) for climate change.  That is not merely factual.

*Third*, the compelled disclosures of climate-related risks and emissions calculations are "anything but an 'uncontroversial' topic." *NIFLA*, 585 U.S. at 769.  The State does not deny the "policy responses to climate change are the subject of vigorous political debate." Dkt. 52 at 21.  Instead, it claims neither law requires a company to express "its policy views." Opp. 13.  But to comply with S.B. 261 and its implementing instructions, companies must opine on, *e.g.*, the "third order effects" of government "carbon-pricing mechanisms" on supply chains (Dkt. 48-23 at 5 & n.21) and "financial markets and economic health" (S.B. 261 § 38533(a)(2)).  And as noted, S.B. 253 requires companies to claim as "their" own the emissions of others—all "sensitive, constitutionally protected speech." *X Corp.*, 116 F.4th at 902.

The State attempts to distinguish *National Association of Manufacturers v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) by arguing its laws are not "ideological and intertwined with moral responsibility." Opp. 14.  But S.B. 253's very title—"Climate Corporate Data Accountability Act"—demands "[a]ccountability," and the law is designed to hold companies "responsib[le]" for others' emissions.  Lyon Decl. (Dkt. 90) ¶ 40. The State's purpose is to compel companies to accept blame for "increas[ing] the state's climate risk" through "supply chain activities" (S.B. 253 § 1(g)) for which the State thinks companies bear moral responsibility, *see* Lyon Decl. (Dkt. 90) ¶ 40; and to attract protests, *see* Dkt. 48-5 at 3:7-9 (Sen. Wiener) ("[w]e need to make sure that the public actually knows who's green and who isn't").  The compelled speech here is anything but "uncontroversial."

Strict scrutiny applies.

Gibson, Dunn & Crutcher LLP
PLAINTIFFS' REPLY ISO MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 2:24-CV-00801-ODW-PVC                    **ER-265**

(224 of 297) Page 224 of 297ase: 25-5327, 09/18/2025, DktEntry: 8.3, Page 224 of 297
Case 2:24-cv-00801-ODW-PVC    Document 97    Filed 04/21/25    Page 12 of 17    Page ID
#:10169

### 2.    S.B. 253 and 261 Fail Under Any Level of Scrutiny

The State cannot show the requisite tailoring or government interest to withstand any level of scrutiny.

**Tailoring.**  Even under *Zauderer*, the State fails to show the laws are "no broader than reasonably necessary." *NIFLA*, 585 U.S. at 776.  A tailored law might require companies to disclose material information related to, and in conjunction with, statements the State has identified as misleading, or specific transactions for which "investors and consumers" need "to make informed judgments." Opp. 16-17.  There is no such tailoring here.  Even if "96% of companies with emissions targets" were "engag[ing] in misleading speech" (Opp. 16), the State's response would still be "wholly disconnected" from its asserted interest.  *NIFLA*, 585 U.S. at 777.  The laws require *every* covered company to speak on *every* covered topic "no matter what" the company said (or did not say) about the unrelated topic of emissions targets. *NIFLA*, 585 U.S. at 777; *see* Dkt. 48-23 at 5 (requiring companies to opine on whether future, hypothetical government regulation of "water efficiency measures" will have a detrimental effect on global supply chains).  This is not tailoring.

The State incorrectly claims (Opp. 18) the laws "are narrowly tailored" to "those firms most likely to be subject to outside investment."  But the laws are not limited to companies seeking investments, and if the State had truly been seeking to protect investors (Opp. 18), or to "infor[m]" "consumers" about specific "economic choices" (Opp. 17), it might have applied the laws only to companies seeking investors or to those engaging in transactions for which consumers need the information the laws require.  *Cf. First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 794 (1978) (statute is overinclusive because it covers all corporations).  Instead, the laws require *every* company to speak, even if it has *no* investors, and even if *no* consumer has a need for compelled speech on whether, *e.g.*, "emerging technologies" in "battery storage" will change the company's future "distribution costs."  Dkt. 48-23 at 6.

It is the State's burden to demonstrate that alternative measures "would fail to achieve the [State's] interests." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014). Yet the State does not cogently explain why it could neither provide relevant information itself nor rely on existing anti-fraud laws. It says it could not compile its own reports due to a "lack" of information. Opp. 18. As Plaintiffs showed, however, 90% of a company's emissions can be estimated using readily available, public information, Dkt. 48-22 at 7; the State cites no evidence to the contrary, *cf. Am. Beverage Ass'n v. City of San Francisco*, 916 F.3d 749, 757 (9th Cir. 2019) ("on this record, Defendant has not carried its burden"). And while it tries to downplay the effectiveness of existing antifraud laws (Opp. 17), the State cannot carry its burden because it presents no evidence that it has *used* those existing laws. *See McCullen*, 573 U.S. at 494.

***Governmental Interest.*** The State cites (Opp. 18) "interests of investors and consumers." But it is "not enough for the Government to say simply that it has a substantial interest in giving [individuals] information." *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 31 (D.C. Cir. 2014) (en banc) (Kavanaugh, J., concurring). Notably, the SEC has abandoned its defense of a related rule, SEC Letter, *Iowa v. SEC*, No. 24-1522 (8th Cir. Mar. 27, 2025), partly because the compelled disclosures were not material to investors, SEC Letter (Feb. 11, 2025).

The State relies heavily on its assertion that "96% of companies with emissions targets engage in misleading speech." Opp. 16 (citing Hsu Decl. (Dkt. 89-18) ¶ 10); *see also id.* at 2, 4. But its own evidence fails to support that claim. Hsu says only that 96% of companies with emissions targets "show signs of greenwashing"—not that they have made false or misleading speech. Dkt. 89-18 ¶ 7. Hsu does not identify a single false or misleading statement. And her methodology lays bare the State's true, censorious motivations. She says a company "show[s] signs" of greenwashing if it, among other things, "*engages in lobbying activity that undermines climate action*." *Id.* ¶¶ 7, 11(f) (emphasis added). That leads to an indefensible conclusion: The State deems "misleading or inaccurate" (Opp. 4) statements that are completely true, so long as the company

PLAINTIFFS' REPLY ISO MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 2:24-CV-00801-ODW-PVC
**ER-267**

(226 of 297), Page 226 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 226 of 297
Case 2:24-cv-00801-ODW-PVC    Document 97    Filed 04/21/25    Page 14 of 17    Page ID
#:10171

separately engages in "lobbying activity" (Dkt. 89-18 ¶ 11(f)) that the State deems prob-
lematic—presumably including lobbying against the legislation at issue here.[1]  Deterring
companies from engaging in First Amendment-protected petitioning that the State dis-
likes is hardly a valid governmental interest.

**B.    A Preliminary Injunction Is Warranted**

The remaining preliminary-injunction factors also support immediate relief.  The
State concedes (Opp. 22) that where the government is a party, the balance of equities
and public interest "merge."  Both support relief:  "'[T]hat [Plaintiffs] have raised seri-
ous First Amendment questions compels a finding that . . . the balance of hardships tips
sharply in [Plaintiffs'] favor.'"  *Am. Beverage Ass'n*, 916 F.3d at 758.  Further, the State
makes no argument that the public would be harmed if the laws' requirements were
stayed pending judgment on the merits.  The equities thus fully favor a preliminary in-
junction.

Moreover, without an injunction, Plaintiffs will be irreparably injured.  The State
nowhere disputes that "'[t]he loss of First Amendment freedoms, for even minimal pe-
riods of time, unquestionably constitutes irreparable injury.'"  *Fellowship of Christian
Athletes*, 82 F.4th at 694.  Instead, the State suggests (Opp. 20) that Plaintiffs are not
facing impending harm, because this "case will likely be resolved before Plaintiffs must
speak."  That is wrong.  Briefing on summary judgment will not be completed until June
2026 (Dkt. 87 at 4), but under S.B. 261, companies must begin to speak six months ear-
lier, "[o]n or before January 1, 2026."  And CARB has confirmed that reports under
S.B. 253 "will still be due in 2026" (Notice of Enforcement, Dkt. 78-6 at 5), as the law
requires CARB's regulations to be finalized by July 2025, *see* S.B. 219 § 1 (2024), a
year before summary-judgment briefing concludes.

---

[1]    Hsu identifies several other supposed signs of "greenwashing," including that a
company does not disclose Scope 3 emissions or "limits its emissions inventory to only
carbon dioxide."  Dkt. 89-18 ¶ 11.  The State would have this Court conclude that such
companies have made misleading or inaccurate speech, even though Hsu's indicators do
not address the truth or falsity of any statements.

(227 of 297), Page 227 of 297ase: 25-5327, 09/18/2025, DktEntry: 8.3, Page 227 of 297
Case 2:24-cv-00801-ODW-PVC    Document 97    Filed 04/21/25    Page 15 of 17    Page ID
#:10172

1    "One does not have to await the consummation of threatened injury to obtain pre-

2    ventive relief. If the injury is certainly impending, that is enough." *NetChoice, LLC v.*

3    *Bonta*, 692 F. Supp. 3d 924, 964 (N.D. Cal. 2023), *aff'd in relevant part*, 113 F.4th 1101

4    (9th Cir. 2024).

5    Here, the injury *is* certainly impending, even if CARB "has not yet issued" the

6    regulations for S.B. 253. Opp. 20. It must—soon. S.B. 219 § 1 (2024). Companies are

7    *already* incurring compliance costs (Mot. 19-20), as the State is telling them to do "as

8    quickly as possible" (Notice of Enforcement, Dkt. 78-6 at 6). And CARB has no dis-

9    cretion as to what the regulations "shall" say, anyway. *E.g.*, S.B. 253 § 38352(c)(1).

10    There is "no need to wait for regulations"; "what the statutes authorize is clear"—and

11    unconstitutional. *Gov't Suppliers Consolidating Servs., Inc. v. Bayh*, 975 F.2d 1267,

12    1276 (7th Cir. 1992); *see Union Pac. R.R. Co. v. Cal. Pub. Utils. Comm'n*, 346 F.3d 851,

13    872 n.22 (9th Cir. 2003).

14                  **III.  CONCLUSION**

15    The Court should preliminarily enjoin Defendants from implementing, applying,

16    or taking any action to enforce S.B. 253 or 261.

17

18

19

20

21

22

23

24

25

26

27

28

1

2   DATED: April 21, 2025         Respectfully submitted,

3                                 GIBSON, DUNN & CRUTCHER LLP

4
                                  By: */s/ Bradley J. Hamburger*
5                                 Eugene Scalia, SBN 151540
                                  Bradley J. Hamburger, SBN 266916
6                                 Samuel Eckman, SBN 308923
                                  Brian A. Richman (*pro hac vice*)
7                                 Elizabeth Strassner, SBN 342838

8
9                                 *Attorneys for Plaintiffs Chamber of Commerce*
                                  *of the United States of America, California*
10                                *Chamber of Commerce, American Farm Bureau*
                                  *Federation, Los Angeles County Business Fed-*
11                                *eration, Central Valley Business Federation*
                                  *and Western Growers Association*
12
13                                CHAMBER OF COMMERCE OF THE
                                  UNITED STATES OF AMERICA
14
15                                Stephanie Maloney (*pro hac vice*)
                                  Kevin Palmer (*pro hac vice*)
16
                                  *Attorneys for Plaintiff Chamber of Commerce*
17                                *of the United States of America*

18

19

20

21

22

23

24

25

26

27

28

---

11

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation and Western Growers Association, certifies that this brief contains 3,297 words, which complies with the word limit of this Court's Rule VII.A.3.

DATED: April 21, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Bradley J. Hamburger*
Eugene Scalia, SBN 151540
Bradley J. Hamburger, SBN 266916
Samuel Eckman, SBN 308923
Brian A. Richman (*pro hac vice*)
Elizabeth Strassner, SBN 342838

*Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association*

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA

Stephanie Maloney (*pro hac vice*)
Kevin Palmer (*pro hac vice*)

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*

# Exhibit 29
# to Declaration of Thomas Lyon

# Plambeck, *Reducing Greenhouse Gas Emissions Through Operations and Supply Chain Management*, Energy Econ. 34 (2012)

Exhibit 29 to Decl. of Thomas Lyon
623

**ER-272**

Energy Economics 34 (2012) S64–S74



Contents lists available at SciVerse ScienceDirect

# Energy Economics

journal homepage: www.elsevier.com/locate/eneco



# Reducing greenhouse gas emissions through operations and supply chain management

Erica L. Plambeck

*Stanford Graduate School of Business, Knight Way, Stanford, CA 94305, USA*

## ARTICLE INFO

*Article history:*
Received 22 January 2012
Received in revised form 19 July 2012
Accepted 30 August 2012
Available online 5 October 2012

*Keywords:*
Supply chain
Manufacturing
Operations management
Climate change

## ABSTRACT

The experiences of the largest corporation in the world and those of a start-up company show how companies can profitably reduce greenhouse gas emissions in their supply chains. The operations management literature suggests additional opportunities to profitably reduce emissions in existing supply chains, and provides guidance for expanding the capacity of new "zero emission" supply chains. The potential for companies to profitably reduce emissions is substantial but (without effective climate policy) likely insufficient to avert dangerous climate change.

© 2012 Elsevier B.V. All rights reserved.

## 1. Introduction

In December 2011, at the climate change negotiations in Durban, South Africa, representatives of 190 countries agreed upon the need to limit the increase in global average temperature to 1.5 or 2 °C above pre-industrial levels, to avert dangerous climate change. Global anthropogenic greenhouse gas emissions must fall by at least 50% below 1990 levels before 2050 to have even a 50% probability of holding the global temperature increase to 2 °C. Cutting emissions sooner rather than later will reduce temperature and associated climate change impacts (Meinshausen et al., 2009). However, emissions of the primary greenhouse gas $CO_2$ from fossil fuels are now over 50% *higher* than 1990 levels (the reference year for the Kyoto Protocol) and growing rapidly, particularly in the emerging economies of China and India (Peters et al., 2012). The production and transportation of goods causes approximately 45% of those emissions, and the energy consumed when people use those goods accounts for much of the remainder; energy use in buildings alone accounts for approximately 25% (IPCC, 2007).

Therefore, to avert dangerous climate change will require tremendous changes in the design and operation of *supply chains*, defined here as encompassing the multi-stage production, transportation, use, and eventual disposal of goods, and the energy generation and transmission that supports all of those activities. This article sheds light on how companies can profitably reduce greenhouse gas emissions in their supply chains. Section 2 below describes how the world's largest corporation and a start-up in the building industry have already profited from doing so. Those examples suggest that

the potential for profitable emissions reduction is substantial but (without effective climate policy) likely insufficient to avert dangerous climate change. Section 3 reviews academic literature on operations and supply chain management that provides further insights into ways to reduce emissions, and begins to quantify the potential impacts of climate change on supply chain performance.

## 2. Profitable reductions in greenhouse gas emissions: company experiences

Companies seeking to reduce their greenhouse gas emissions often find that their direct emissions are dwarfed by the emissions in their supply chains. In fact, Matthews et al. (2008) found that across all industries, companies' direct emissions average only 14% of their supply chain emissions prior to use and disposal; accounting for the emissions in use and disposal of goods would make that percentage even lower.

Therefore, companies must take a global supply chain perspective in order to identify the most profitable means to reduce overall "Scope 3" emissions. [1] They must find ways not only to reduce emissions under their direct control but also to influence emissions caused

---

[1] Under the Greenhouse Gas Protocol, "direct" emissions are emissions from sources that are owned or controlled by the reporting entity. "Indirect" GHG emissions are emissions that are a consequence of the activities of the reporting entity, but occur at sources owned or controlled by another entity. Emissions are categorized into Scope 1 (direct emissions), Scope 2 (indirect emissions from consumption of purchased electricity, heat or steam), and Scope 3 (all other indirect emissions). Guidelines for accounting for Scope 3 emissions are at http://www.ghgprotocol.org/standards/scope-3-standard; though extensive, these guidelines allow flexibility that may lead to widely varying estimates of Scope 3 emissions, and they may be improved over time, as discussed in Section 3.5 below.

E-mail address: elp@stanford.edu.

0140-9883/$ – see front matter © 2012 Elsevier B.V. All rights reserved.
http://dx.doi.org/10.1016/j.eneco.2012.08.031

Exhibit 29 to Decl. of Thomas Lyon
624

ER-273

*E.L. Plambeck / Energy Economics 34 (2012) S64–S74*    S65

by their suppliers and customers—by providing them information and incentives, and collaborating or even vertically integrating with them. The experience of two companies suggests how these steps can be taken. For contrast, we consider a well-established corporation (the largest in the world, as measured by revenue) and a start-up.

### 2.1. Walmart: increasing profits by reducing GHG emissions

Walmart is the largest corporation in the world in terms of revenues, and is widely recognized as a leader in supply chain management. In the last several years it has embraced its responsibility to protect the environment and has sought to reduce emissions in ways that improve its bottom line. In 2005, CEO Lee Scott announced that "Being a good steward of the environment and being profitable are not mutually exclusive. They are one and the same." He set sweeping environmental goals for the company: "to be supplied 100% by renewable energy; to create zero waste; and to sell products that sustain people and the environment." Since roughly 90% of Walmart's greenhouse gas emissions and other environmental impacts occur in its extended supply chain, the firm must work with suppliers and customers to achieve these goals.

In a case study I wrote in 2007 and updated in 2010 (Plambeck and Denend, 2007a, 2007b), I found that Walmart is profiting from its actions to reduce greenhouse gas emissions in its own operations and its supply chain. Emission reduction is associated with cost reduction, new sources of revenue, improved employee motivation, enhanced public relations, and increased voice with policy makers. The summary below of how Walmart has tapped each of these five sources of value provides a template for other companies seeking to do the same.

#### 2.1.1. Reducing costs

Cost reduction through energy efficiency is the most obvious source of business value associated with emissions reduction. Anderson and Newell (2004) have documented that small and medium-sized firms in the U.S. commonly overlook energy-efficiency projects that have a high net present value. Walmart, though famous for the efficiency of its operations, found "quick wins" in profitable energy efficiency as soon as it looked. In just the first year of its sustainability program, for example, Walmart improved the average fuel efficiency in its logistics network by 25%, which translates into annual savings of $75 million and 400,000 tons of $CO_2$, with relatively little investment.

Nonprofit environmental organizations, including the Rocky Mountain Institute, contributed substantially to Walmart's success in reducing emissions and costs in its logistics network, by identifying energy-efficient technologies and ambitious-but-achievable goals for emission reduction. Walmart is also relying on various other nonprofit organizations to help its suppliers identify and implement energy efficiency projects (see Sectio2.1.8.8), which will ultimately reduce Walmart's cost of goods.

Not surprisingly, cost reduction is a primary reason for seeking to measure and reduce supply chain emissions, for many of 57 multinational corporations (as various as Dell, Ford, EADS, and Vivendi) participating in the Carbon Disclosure Project (CDP) Supply Chain Program (Carbon Disclosure Project, 2011).

#### 2.1.2. Increasing revenues

Walmart's efforts to reduce emissions have opened up many sources of new revenue. For example, improved public relations stemming from its environmental stewardship initiatives may help the company to add stores in communities where they would otherwise face greater resistance, and may also help the company to attract more customers to its existing stores (see 2.1.3).

Consumers are more inclined to pay a premium for "green" products when "green" is associated with some private benefit. Walmart charges a higher price per unit for organic cotton clothing, for example. The company was surprised to see, in point-of-sale data, that customers who historically would shop only for toiletries began to "cross the aisle" to buy organic cotton clothing and other organic products. Many consumers perceive a health benefit with organic apparel and food. Walmart also informs customers of electricity-cost savings with some energy-efficient products.

Greenhouse gas emissions may decrease substantially as Walmart sells organic instead of conventional products. The first reason is that organic farmers do not use synthetic nitrogen fertilizer, which tends to reduce emissions of nitrous oxide, a potent greenhouse gas, as well as $CO_2$; fertilizer manufacturing consumes a huge amount of natural gas. The second reason is that nonprofit organizations monitor and certify each stage in the supply chain for an organic product. That gives Walmart (and other buyers) unprecedented visibility of the entire supply chain, which enables rationalization of the supply chain to reduce emissions and production costs (see Section 2.1.6). Walmart is pursuing local sourcing of organic produce, and transports local produce in the same trucks used for other goods, to avoid adding trips (Ata et al., 2012). However, out-of-season produce must be transported over long distances or grown in energy-intensive hothouses (Rosenthal, 2011), which tends to increase emissions.

Walmart can earn higher revenue by selling products that are more energy-efficient, even without charging a higher price for energy-efficient products. Many of its customers have little disposable income and shop almost exclusively at Walmart. When they save money on their electricity bills, they spend that money at Walmart. The potential for emissions reduction with energy-efficient products is huge. For example, in its first year of promoting compact fluorescent (CFL) lights, Walmart achieved sales of over 100 million bulbs, which would reduce customers' electricity use and hence $CO_2$ emissions by 20 million metric tons, approximately equal to Walmart's total corporate emissions (Scope 1 and Scope 2) in 2010. (That figure presumably does not account for any increase in emissions when customers used money saved on electricity bills for additional consumption.) A second example arises in apparel, the product category wherein Walmart has the highest associated supply chain greenhouse gas emissions. Approximately half of those emissions occur in the customer use phase—i.e., washing and drying. The company is working with suppliers to change labeling on clothes to "cold water wash" instead of "hot water wash," which will substantially reduce electricity use. The company also gives prominent shelf space to detergents that are designed for cold-water washing and are triple-concentrated, which reduce cost and emissions in transport.

Even in product categories where Walmart cannot charge a premium for "green," it may gain market share by labeling products with environmental impact information. Laboratory experiments suggest that when a firm voluntarily reveals the environmental impacts associated with its product—even when those emissions are very high—it gains market share and the trust of consumers (Kalkanci et al., 2012). Indeed, of 57 prominent firms participating in the CDP's supply chain program, 73% cite brand improvement and 60% cite product differentiation as objectives for their climate strategy (Carbon Disclosure Project, 2011). Walmart took a leadership role in launching the Sustainability Consortium to develop industry standards for labeling consumer products with environmental impact information (including greenhouse gas emissions). Especially for Walmart's privately branded products, an eco-label indicating that a product performs as well or better than alternatives with prominent brands could boost sales. However, developing appropriate metrics and labels for the environmental impacts of consumer products and gathering the requisite data is difficult and contentious and will take time. Labels may eventually be used in only a limited number of product categories.

Conceivably, in future, Walmart or its suppliers or customers might be allowed to sell offset credits for emissions reductions that are measurable and additional (not profitable without the offset

Exhibit 29 to Decl. of Thomas Lyon
625

S66                                                E.L. Plambeck / Energy Economics 34 (2012) S64–S74

credit). Some critics of offset systems argue that emissions reduction and additionality are not measurable and verifiable. Conceivably, Walmart might be able to respond to those critics by holding up its promotion of CFLs as an example of a project for which emissions reduction and additionality could be measured and verified. The company has already obtained third-party verification of the emission reduction from the sale of CFLs, based on detailed sales data, the distance driven by Walmart customers, and the carbon-intensity of electricity generation in the vicinity of various Walmart stores. Perhaps Walmart's detailed sales, inventory, and cost data could also be used to verify additionality. Indeed, in promoting CFLs, Walmart gave up substantial profits on incandescent bulbs. In contrast, CFLs were more costly and difficult to source. Demand was uncertain (unlike that for incandescents) leading to stockouts. A caveat is that the determination of additionality and amount of reduction in emissions should perhaps account for customers purchasing more goods from Walmart due to their electricity-cost savings. That phenomenon is presumably difficult to measure and verify, and would tend to increase emissions and the profitability of the project for Walmart.

### 2.1.3. Enhancing public relations

Before adopting its sustainability strategy in 2005, Walmart was entangled in controversy over employee wages, health care benefits, diversity, and working conditions in suppliers' factories. According to a study conducted by McKinsey and leaked to the public by the watchdog organization Walmart Watch, between 2% and 8% of consumers said they had stopped shopping at Walmart because of the company's practices (Plambeck and Denend, 2007a, 2007b). Moreover, the company was having difficulty gaining permission to open new stores in the U.S. According to Covalence, an organization that measures the ethical reputation of companies by quantifying their positive and negative news coverage, Walmart's reputation was negative and steadily declining; by 2007 it was in last place. In 2009, just 2 years later, Walmart's reputation was ranked third among 35 multinational retailers. The company is now the subject of more positive than negative coverage, thanks in large part to coverage about its activities to reduce greenhouse gas emissions. The positive public image may help the company to grow by weakening the resistance to its opening of new stores, and may help the company to attract more customers (or at least to avoid continuing to lose customers) at existing stores.

### 2.1.4. Attracting and motivating employees and gaining voice with policy makers

A positive public image and the opportunity to do work that is good for the environment help Walmart and other companies motivate employees and attract talented new ones. Of the 57 prominent firms participating in the CDP's supply chain program, 47% cite improvements in employee motivation from emission reduction (Carbon Disclosure Project, 2011).

Firms recognized as leaders in environmental performance may also gain voice with policy makers. For example, Walmart executives have testified before congress on climate policy. The company has many other opportunities for emissions reduction which are not currently profitable but could become so under climate policy, as noted in Section 2.1.2 above; its leadership in environmental performance may enable it to promote climate policy that will be good for the company as well as the environment.

Walmart's own operations are now relatively efficient and, as mentioned above, account for only approximately 10% of its total supply chain greenhouse gas emissions. Therefore, to most profitably reduce greenhouse gas emissions, the company must pursue global supply chain optimization—i.e., influence its suppliers and customers to reduce their direct emissions. This is obviously more complicated than directing changes within Walmart's own operations, but the company has found ways to do this, as described below.

### 2.1.5. Measuring emissions in the supply chain

A primary tenet of operations management (largely developed through the pioneering work of Taylor, Shewhart and Deming) is that *measurement leads to improvement*. Walmart now asks tier-1 suppliers to measure and report their corporate GHG emissions and their targets to reduce those emissions. According to Walmart executives, this simple request for information draws managerial attention and thus improves suppliers' environmental performance. It has also engaged academics to identify its product categories with highest associated emissions and the processes within the supply chain that generate most of those emissions. (Oshita (2011) and references therein show how to use input–output analysis to identify processes with highest associated emissions.)

Prior to its 2005 commitment to sustainability, Walmart interacted with tier-1 suppliers and rarely looked deeper into its supply chain. However, the company has learned that many of the highest-impact processes are far upstream in the supply chain. Indeed, approximately 85% of all industrial energy use occurs in basic material manufacturing (IPCC, 2007). To substantially reduce emissions, Walmart must engage with upstream suppliers or motivate its tier-1 suppliers to do so.

### 2.1.6. Scrutinizing and rationalizing the supply chains

Just to identify upstream suppliers is a challenge. Walmart is working to identify the ingredients and suppliers' suppliers for all of its 6000 private brand products, and for other high-impact products. Fortuitously, for some high-impact products, third parties have developed chain-of-custody certification systems, which offer unprecedented insight into supply chain structure. For example, Walmart is obtaining detailed information about its supply chain for organic cotton apparel and organic food products from the third-party organizations that certify organic practices at each link in the supply chain, from farm to factory to store shelves. Chain-of-custody certification is intended to provide assurance to buyers that a product labeled organic is truly organic. A serendipitous benefit is that Walmart and other retailers now have unprecedented visibility into their entire supply chains for organic products.

By scrutinizing the entire supply chain, Walmart can identify opportunities to rationalize the supply chain to reduce costs and emissions. For example, in the past, cotton would be grown in Turkey, shipped to China for spinning and knitting, and then shipped to Guatemala to be cut and sewn. Seeing the cost and emissions associated with all that transport, Walmart intervened to eliminate the shipment to China and instead have all the processing done in Guatemala. That has saved both time and money, and reduced the greenhouse gas emissions associated with transportation. In supply chains for certified fish, Walmart intervened to eliminate brokers, so that fish now flow more directly from boats to Walmart stores. This has reduced emissions from transportation and energy use in freezer storage. It has improved quality and eliminated waste by avoiding the partial thawing and refreezing that commonly occurred when fish were transferred from one party to another. Eliminating margins for brokers may also have reduced the ultimate cost to Walmart.

### 2.1.7. Making quantity and other commitments to motivate suppliers to reduce emissions

Historically, Walmart has had a reputation for squeezing its suppliers and for transacting with whoever offers the lowest price at any given time. A supplier that invests in process improvement or capital equipment to improve energy efficiency will see a reduction in variable production costs. If the supplier anticipates, however, that Walmart will negotiate a corresponding low purchase price which barely covers the production cost, the supplier is unlikely to make such investments. Similarly, a supplier has little incentive to develop innovative, energy-efficient products, without a guarantee that Walmart will purchase and promote those products. Therefore, to

Exhibit 29 to Decl. of Thomas Lyon                    **ER-275**
626

*E.L. Plambeck / Energy Economics 34 (2012) S64–S74*                                                                S67

motivate suppliers to improve environmental performance, Walmart is beginning to make long-term purchasing commitments.

Walmart will typically commit to purchase a *larger quantity* over a longer period of time, as opposed to paying a higher price per unit. In addition to making explicit quantity commitments with some suppliers, Walmart is changing its overall procurement practices to shift quantity to suppliers with better environmental performance. For example, in its private-brands operations, the company uses information on emissions and emission–reduction efforts in allocating business among tier-1 suppliers. The company has also announced that it will, in certain product categories, seek long-term collaborative relationships with a smaller number of suppliers that pursue environmental innovation. The prospect of a winning a higher volume of business with Walmart is a strong motivator for suppliers to improve environmental performance.

Prior to 2005, Walmart would typically interact only with direct, tier-1 suppliers. However, environmental considerations have motivated the company to make quantity commitments to some high-impact suppliers further upstream. For example, after several failed attempts to purchase organic garments from tier-1 suppliers at reasonable rates by Walmart's standards, the company began in 2006 to engage directly with cotton farmers. Management verbally committed to buy cotton and co-products over a 5-year period if the farmers would pursue organic certification. (A farm must be free of non-organic pesticides and fertilizers for 3 years prior to the harvest of a certified-organic crop, and organic farmers must alternate the planting of cotton with nitrogen-fixing legumes and other crops to rejuvenate the soil. Demand for organic cotton is variable, so a farmer risks being forced to sell organic cotton at low prices, as conventional.) These quantity commitments would help to expand the supply of organic cotton to an economic scale for downstream manufacturing operations, and thus significantly reduce manufacturing costs.[2]

### 2.1.8. Collaborating with third parties to support sound environmental practices among suppliers and customers

The success of Walmart's sustainability strategy stems largely from collaboration, not only with its suppliers but also with third parties with an interest and expertise in reducing greenhouse gas emissions. Starting in 2005, the company has invited environmental nonprofit organizations, academics, suppliers and other stakeholders to scrutinize the environmental impacts of its extended supply chain and offer suggestions for performance improvement. The Environmental Defense Fund and Business for Social Responsibility, for example, are working with 200 of Walmart's highest-impact suppliers in China to reduce their energy intensity by 20% by 2012 (relative to a 2007 baseline). These nonprofit organizations primarily provide information—helping suppliers to see how to improve energy efficiency.

A major barrier to the pursuit of profitable energy-efficiency projects is a shortage of sustainability professionals—i.e., people with the information and expertise necessary to undertake those projects—particularly in China. To address this problem, Adidas, GE, Nike, Timberland, Walmart and other multinational buyers are collaborating with the Chinese government and the Institute for Sustainable Communities, a U.S.-based nonprofit organization, to develop an academy for training 4000 sustainability professionals per year in Jiangsu and Guangdong (Plambeck et al., 2012).

Walmart is also beginning to collaborate with other multinational buyers to jointly motivate suppliers to improve performance. For example, in the apparel supply chain, substantial environmental impacts occur in the dying process, at tier 2 or tier 3 from the

perspective of Walmart. Even dominant buyers such as Walmart, Nike, and Levi-Strauss typically account for only a small fraction of the business for a dye house. Therefore these firms and other multinational buyers are by necessity beginning to work together to motivate and assist their common suppliers to improve environmental performance (Plambeck et al., 2012) Walmart is also partnering with Unilever and other large multinationals to attempt to source "sustainable" palm oil and reduce the burning of peatland rainforest for conversion to palm plantations, which results in enormous $CO_2$ emissions.

Although this article focuses on climate change, humanity faces other environmental challenges that are of commensurate importance. Examples include the widespread use of toxic and persistent chemicals, water pollution and scarcity, and loss of biodiversity. Walmart is addressing many environmental challenges using the same approaches as described in this article for greenhouse gas emission reduction. More information about Walmart's environmental efforts is in Humes (2011) and Plambeck and Denend (2007a, 2007b, 2011).

Walmart's approaches to greenhouse gas emissions reduction are suited to its industry, its business model, and its size and influence. While other companies may be able to emulate some of its approaches, they are not the only ways to reduce GHG emissions, nor are they the best for all companies. Let is turn to a very different company in a very different industry and see how it has taken a different and creative approach to reduce emissions arising from the supply chain.

### 2.2. ZETA Communities: reducing emissions in the building industry by changing the product and reforming the supply chain

ZETA Communities is a start-up company in the building industry, which offers tremendous and largely untapped opportunities for profitable emissions reductions. Buildings account for half of U.S. energy use and associated $CO_2$ emissions (Randolph and Masters, 2008) and a similarly large fraction worldwide. Proven technologies could profitably eliminate 30% of $CO_2$ emissions from buildings worldwide by 2030, but are not being widely adopted (McKinsey and Company, 2009). Supply chain fragmentation and poor coordination limit the adoption of energy-efficient technologies and processes and invention of new ones. Work tends to be allocated based on low-cost competitive bidding for each functional component of a building project. As a result, a new team forms for each project—thereby interrupting the transfer to future projects the lessons learned—and each building component is designed largely in isolation (Sheffer and Levitt, 2010). In contrast, optimal energy efficiency requires integrated design. For example, using high-performance windows, doors and insulation to prevent heat loss can eliminate the need for expensive heating and cooling systems. The marginal benefit of thermal efficiency in one component of a building depends on the efficiency of all the other components (Randolph and Masters, 2008).

In a case study I co-authored in 2011 (Levitt et al., 2011), I found that ZETA Communities is, in fact, radically reducing GHG emissions by pioneering a business model that integrates architecture, engineering, green material procurement expertise, and the various functional construction specialties. They do this by producing buildings in their factory in Sacramento, CA, rather than on the customer's site. While other factory builders make only simple homes with minimal variation, essentially holding the design constant, ZETA produces a wide variety of residential, commercial, and educational buildings. It is able to do so because of its innovative, flexible production line, and the presence of an in-house architect and in-house building engineers who intimately understand that production line. ZETA's co-founders targeted factory construction (as opposed to on-site construction) in order to promote integrated design for energy efficiency. Whereas on-site construction is a sequential and adaptive

---

[2] In late 2010, Walmart ceased to make new long-term purchasing commitments to organic cotton farmers, and instead delegated that responsibility to its tier-1 cotton apparel suppliers. However, the company continued to make long-term commitments to motivate other suppliers to improve environmental performance, notably in its private brands business.

Exhibit 29 to Decl. of Thomas Lyon                    **ER-276**
627

S68                                    E.L. Plambeck / Energy Economics 34 (2012) S64–S74

process, factory construction requires advance planning of every aspect of a building's design.

ZETA manufactures buildings that can generate (from solar photovoltaics) as much energy as they consume (Marshall, 2012), at a cost that is roughly 15% to 20% lower than with conventional on-site construction. With its advanced design and the highly accurate equipment housed in the factory, ZETA minimizes materials requirements. The factory also shields materials from rain damage and vandalism, and enables ZETA to sort, store and reuse scrap. Thus, even though the materials required for a highly energy-efficient building may be more costly than conventional materials, ZETA keeps overall material costs low by using less. Using less materials also reduces the emissions associated with manufacturing and transport of building materials.

Factory construction also enables the company to use less labor and pay lower wages. According to CEO Naomi Porat: "ZETA is about 15% lower priced [than traditional builders] in urban markets. Part of that differentiation is that any project that has public financing (city, state, or federal) requires prevailing union wages. Offsite construction is exempt from prevailing wages, which gives us an immediate 15 to 20% discount. But in addition to that, labor hours are just less." Advanced design, ergonomically optimized equipment, and in-factory coordination of the functional specialties maximizes labor productivity.

According to Porat, ZETA's factory approach requires less than half of the vehicle travel required to transport materials and equipment to a construction site, resulting in lower transport costs and roughly 70% fewer $CO_2$ emissions from transport. The company targets projects within a 300-mile radius of the factory in order to limit the costs and emissions associated with trucking the finished modules to a site.

ZETA is growing, despite the current severe downturn in the construction industry, by offering its green buildings at prices competitive with conventional ones.

In addition, factory construction enables ZETA to offer a short lead time and minimal neighborhood disruption. Compared with the many months of work that on-site construction demands, ZETA's manufacturing process takes just weeks, and can occur while the site is being prepared. (A potential disadvantage is that design, which must occur prior to manufacturing, takes longer. ZETA is developing IT systems to better learn and reuse design elements from prior projects, in order to shorten future design costs and lead times.) ZETA utilizes a crane to stack its modules into a finished building, and can do so on urban sites with zero lot lines. ZETA has a particular competitive advantage in urban infill construction, because it eliminates the neighborhood disturbance and health issues caused by the noise, dust, and vehicle emissions of on-site construction. Indeed, ZETA's founders aim to help rejuvenate cities and pull populations in from the suburbs, which would further reduce emissions from transportation.

Perhaps ZETA and similar entrants can overturn the conventional, emission-intensive building industry. However, ZETA's buildings will truly produce as much energy as they consume only if occupants behave in a responsible manner. ZETA has developed an IT system to monitor temperature, light, and electricity use in finished buildings, which should enable the company to provide feedback to building occupants and improve its design of future buildings. Like Walmart trying to motivate its customers to wash clothes in cold water, ZETA relies on behavioral change by consumers to achieve its goals for environmental performance.

### 2.3. Conclusions from company experiences

The companies considered in this article are leaders in pursuing greenhouse gas emission reduction. Their experiences suggest that other companies can profit *now* from taking steps to reduce emissions. However, the magnitude and pace of profitable emission reduction may be insufficient to address the threat of climate change. As population and consumption continue to grow, even if firms "do everything right" (i.e., reduce the carbon-intensity and energy-intensity of their

operations to the maximum extent possible without competitive disadvantage) overall emissions are likely to remain high.

For example, between 2005 and 2010, Walmart improved the fuel efficiency of its fleet by 60% (Duke, 2010) and reduced GHG emissions from new stores by 30% and from existing stores by 5%. Nevertheless, the company's overall emissions increased, due to new store openings and other growth-related factors. In 2010, under great pressure from its environmental nonprofit partners, Walmart announced a goal to eliminate 20 million metric tons of $CO_2$ (or equivalent) from its global supply chain by the end of 2015. That is equal to one and a half times the expected growth in emissions from the global supply chain over the same 5-year period. Thus Walmart may slightly reduce its global supply chain emissions by 2015, relative to 2010. However, that is far lower than the approximately 80% overall emission reduction needed soon to avert dangerous climate change, and additional emissions reductions may be more costly and difficult, insofar as the "lowest hanging fruit" have already been harvested.

In our second example, whereas ZETA designs buildings to produce as much energy as they consume *after installation*, substantial energy use and emissions occur in manufacturing and transportation prior to installation. Such "embodied energy" could account for up to 20% of the life-cycle energy requirements of a conventional building (Randolph and Masters, 2008). This suggests that ZETA's business model may eliminate roughly 80% of the emissions associated with buildings. ZETA's business model does require additional energy for construction and operation of a factory. However, most of its supply chain emissions likely occur in the manufacturing of building materials, notably cement. The cement industry accounts for approximately 6% of anthropogenic greenhouse gas emissions. Another start-up, Calera, converts $CO_2$ emissions from a power plant into a substitute for cement, with overall net negative emissions of $CO_2$ to the atmosphere. However, in the absence of effective climate policy, I think that Calera is unlikely to substantially displace conventional cement production (Plambeck, 2011).

A second concern is that ZETA operates in Northern California, where air conditioning and heating requirements are minimal, photovoltaics are highly effective, and its initial customers are eager to participate in reducing energy consumption. In other regions, even with ZETA's innovative business model, making buildings that produce as much energy as they consume (after installation) may be prohibitively costly. Thirdly, emissions from the stock of existing buildings are likely to remain high for decades. Therefore, despite the substantial emission reductions achieved with ZETA's business model, I have difficulty imagining an 80% reduction in all emissions associated with buildings worldwide in the near future—without effective climate policy.

These examples suggest that policies that cause companies to internalize the social cost of carbon are needed to avert dangerous climate change.

## 3. Other opportunities to reduce greenhouse gas emissions: lessons from the academic literature

Surveys of the academic literature on "green" operations and supply chain management can be found in Corbett and Klassen (2006); Kleindorfer et al. (2005); Srivastava (2007); and Seuring and Müller (2008). However, remarkably few of the papers they survey focus explicitly on energy or greenhouse gas emissions. Some of the most fundamental papers in operations management, on the other hand, have important implications for energy use and greenhouse gas emissions. In the following sections, I will draw out some of those implications. Then I will survey the nascent literature in operations management that explicitly addresses greenhouse gas emissions.

Exhibit 29 to Decl. of Thomas Lyon                          ER-277
628

*E.L. Plambeck / Energy Economics 34 (2012) S64–S74*   S69

## 3.1. The bullwhip effect: avoiding energy inefficiencies from variability in demand

In arguably the most influential paper in the field of operations management, Lee et al. (1997) explain how small fluctuations in consumer demand translate into increasingly large fluctuations in demand for upstream manufacturers. This amplification of variability in demand throughout a supply chain, known as the "bullwhip effect," can lead to excessive greenhouse gas emissions, particularly in basic material manufacturing.

The bullwhip effect arises when a retailer interprets a surge in consumer demand as a signal of high future demand, which in turn causes the retailer to increase its order to the manufacturer by more than the surge in consumer demand. Similarly, a drop in consumer demand may cause the retailer not to order at all. Thus, variation in consumer demand is amplified in the retailer's orders to the manufacturer. The amplification is greater to the extent that consumer demand is positively correlated over time, when transportation and other fixed costs associated with placing an order are high, or when the order-fulfillment lead time is long.

For similar reasons, Lee et al. argue that the manufacturer's orders to a component supplier will be even more variable than its demand from the retailer, and the component supplier's orders to its material supplier will be yet more variable. Thus, variability in demand will be maximized upstream, at the level of raw material extraction and fabrication.

On the contrary, manufacturers typically have limited capacity and incur fixed costs associated with starting and stopping production, so they should ideally smooth production over time (i.e., produce at a constant rate). To meet variable demand while maintaining a constant (or nearly so) production rate, a firm must hold inventory. Production smoothing would tend to make a firm's orders to suppliers less variable than its own demand, in opposition to the bullwhip effect.

Empirically, economists have observed that production and orders are more variable than demand in most industries (see the survey in Blinder and Maccini (1991)). Most of those early studies relied on seasonally adjusted data, and therefore failed to account for the production smoothing that optimally occurs in response to predictable, seasonal variation in demand (Cachon et al., 2007; Chen and Lee, 2011; Ghali, 1987). Nevertheless, even with data *not* adjusted for seasonality, Cachon et al. (2007) find that in wholesale industries and many manufacturing industries (though not retail industries), aggregate orders and production are more variable than aggregate sales. In particular, wholesalers of chemicals, petroleum products, and construction materials including cement, as well as manufacturers of primary metals, fabricated metals, petroleum products, and paper, exhibit greater industry-level variance in orders and production than variance in demand.

Using firm-level data for 4689 public U.S. companies in a variety of industries, Bray and Mendelson (2012) find that a majority of the firms have greater variance in production and orders than in demand. The mean percentage increase in the variance of production relative to the variance of demand is remarkably high in the energy-intensive chemicals (15%), pulp and paper (11%), primary metal (30%) and fabricated metal (17%) manufacturing industries. Bray and Mendelson separate the variation into a seasonal, predictable component and uncertain component, and observe that firms tend to smooth production in response to seasonal variations but that they amplify uncertainty. Last-minute shocks in demand, in particular, are amplified in the corresponding variation in production and orders, in 97% of their sample. In related theoretical work, Chen and Lee (2011) show how demand information is distorted through supply chains, amplifying uncertainty and causing inefficiency and excess costs in upstream production.

The bullwhip effect has dramatic implications for energy use and greenhouse gas emissions because over a quarter of global energy use, and approximately 85% of all energy use in manufacturing, occurs

in the manufacturing of basic materials: metals, chemicals, fertilizers, paper, minerals, cement and petroleum products (IPCC, 2007). Basic material manufacturing is farthest upstream in the supply chain and presumably therefore subjected to the maximum bullwhip amplification of variability and uncertainty in demand. Basic material manufacturers would ideally have a smooth and predictable production schedule to minimize energy use. Demand variability and uncertainty drives variability and inefficiency in production, and hence will tend to increase greenhouse gas emissions, though empirical research is needed to quantify the magnitude of the increase in emissions associated with an increase in variability in production, particularly in energy-intensive basic material industries.

The bullwhip effect likely also exacerbates emissions from freight transport, which accounts for approximately 8% of energy-related $CO_2$ emissions (IPCC, 2007; McKinnon, 2008; Schipper et al., 2011). The reason is that an unanticipated spike in demand often causes a manufacturer to expedite shipment of input materials from suppliers, using a more rapid, emission-intensive form of transportation (e.g., air rather than container shipping) and/or a partially loaded vehicle.

Lee et al. (1997) suggest several remedies for the bullwhip effect. Some will reduce emissions, but others might increase them. The first remedy is to share real-time information about inventory levels and end consumer demand data throughout the supply chain. The second is to reduce transportation lead times. A third is to order in smaller quantities, more frequently.

Having detailed, real-time information about downstream inventory levels and consumer demand, as recommended by Lee et al. (1997), would enable manufacturers to better forecast demand for their intermediate products, and thus better smooth their production and orders to suppliers. Reducing the uncertainty and variability in demand throughout the supply chain would increase efficiency and reduce emissions in production. It would also enable firms to plan transportation in advance and therefore use slower, less emission-intensive modes of transport (Caro et al., 2011). Unfortunately, despite the potential to increase profitability and reduce emissions throughout the supply chain, many retailers do not yet share point-of-sale data with their suppliers (Cooke, 2011).

Some of Lee et al.'s (1997) other remedies for the bullwhip effect—reducing transportation lead times and ordering in smaller quantities, more frequently—might *backfire* by increasing greenhouse gas emissions from transport. Increasing the speed of a container ship by 25%, for example, increases energy intensity and hence emissions by approximately 40% (IEA, 2011, Table 8.7). Transporting goods by airplane rather than container ship increases energy intensity by a factor of 10 to 100, depending on physical and operational characteristics of the airplane and ship (Gucwa and Schafer, 2011).

In an empirical analysis of the energy intensity of major freight transportation modes, Gucwa and Schafer (2011) find that most of the variation in energy intensity within a transportation mode is explained by load carried per vehicle and vehicle size. The key variable affecting energy efficiency for ships, trucks, and rail (and the second most important factor for air, and blade stage length) is the amount of cargo transported per vehicle: energy efficiency increases as that load increases. It also increases with the size of a truck, ship, or airplane, or the number of cars per train (holding the carried load, as a percentage of vehicle capacity, constant). This suggests that just-in-time operations management (narrowly defined as ordering more frequently, in smaller quantities) will increase emissions, unless firms can batch multiple types of products or components for transport to achieve large shipment sizes and full vehicles.

Third-party logistics providers, highlighted by (Lee et al., 1997), achieve fuller loads and can potentially use larger vehicles, by pooling shipments from multiple firms. Hence by using third-party logistics providers, firms may be able order more frequently in smaller quantities (to mitigate the bullwhip effect) while reducing the costs and emissions associated with transport.

Exhibit 29 to Decl. of Thomas Lyon   **ER-278**
629

S70                                    E.L. Plambeck / Energy Economics 34 (2012) S64–S74

In the famous Toyota production system, just-in-time operations management is facilitated by having suppliers located nearby a production facility. Workers strive to immediately identify quality problems and eliminate waste, which is synergistic with the just-in-time operations and supplier proximity. Eliminating waste and designing products to require less material (exemplified by ZETA as well as Toyota) can reduce emissions from material manufacturing and transport; effective practices for eliminating waste are described in Lapre et al. (2000); Lee (forthcoming) and references therein. A caveat is that when a firm converts waste into product, it is motivated to increase production, which tends to increase its emissions (Lee, forthcoming).

### 3.2. Global optimization of supply chains: incorporating the cost of emissions

As discussed in the case of Walmart in Section 2, reducing global emissions from supply chains in the most cost-effective manner requires a global optimization perspective. Graves and Willems (2005) provide a method for designing a multi-stage supply chain which optimizes transport modes, production facilities, processes, and materials to minimize the total cost of meeting demand from multiple regions within a target maximum service time. The method could easily incorporate a cost associated with greenhouse gas emissions to suggest how best to reconfigure global supply chains to account for climate concerns.

Graves and Willems (2005) observe that the benefits from applying their method to optimize the supply chain increase with longer transportation lead times and with variability in demands. Hence their method could be highly valuable as climate concerns motivate a change from rapid, emission-intensive modes of transport (air or truck) to ones that are slower and less emission-intensive (ship or rail). It could also be highly valuable for designing new supply chains for "zero"-emission[3] sources of energy, such as photovoltaics or wind. Variability and uncertainty in demand are particularly high in supply chains for renewables due in large part to uncertainty and lack of continuity in government policy and incentives. For example, a lapse in the U.S. federal production tax credit caused wind power installations to drop by more than 70%, relative to prior years, in 2000, 2002, and again in 2004 (Wiser et al., 2007).

According to Porter and Rivkin (2012), firms may off-shore production because they overlook complex, dynamic factors that are difficult to model (e.g. corruption, lack of intellectual property protection, and rising labor costs in emerging economies, shortening product life cycles, and rising transport costs). One could add the bullwhip effect to their list of factors. Careful consideration of those factors would favor local production and reduce emissions associated with transport.

### 3.3. Demand pooling: debunking conventional wisdom about the environmental friendliness of local production

Conventional wisdom suggests that local production is best for the environment, but this conventional wisdom is not always correct. Building many local production facilities tends to increase the aggregate emissions from construction. Moreover, to meet variable local demand, local facilities need to have excess production capacity and/or hold substantial inventories of finished goods. Facilities incur fixed emissions (e.g., to keep the lights on) even when underutilized. Emissions also occur in warehousing inventory, especially at a controlled temperature.

A fundamental concept in operations and supply chain management is that *demand pooling*—for example, by having a single production

facility serve multiple geographical regions—helps smooth production and reduce inventory requirements. Negative correlation in demands from various locales reduces the variance in aggregate demand and makes pooling more beneficial. When a spike in demand in one region is balanced by a drop in demand elsewhere, pooling allows the firm to meet aggregate demand with a constant rate of production. Hence it need not build excess production capacity or a "safety stock" of inventory. Van Mieghem (2007) provides an entry point to the extensive literature on pooling.

Advocates might counter that local production reduces the emissions associated with transportation. However, even that might be false. Transport by light commercial truck could increase energy intensity in MJ/tkm by a factor of 100 compared to transport by container ship, and by a factor of 50 compared to transport by rail (Gucwa and Schafer, 2011). Hence transport by truck from local production facilities to consumers might result in higher aggregate transport emissions than transport by ship and/or rail from a single production facility, even if trucks must be used for the "last mile" of distribution.

Production at a single facility might facilitate large shipments, particularly if that facility is located in an industrial center, so that multiple products from that center can be transported together to the regions of demand. As shown by Gucwa and Schafer (2011) and discussed above, such large shipments can dramatically reduce energy-intensity.

Finally, pooling production at a single facility may increase energy efficiency through scale. Energy efficiency commonly improves with scale in basic material manufacturing industries. As mentioned above, basic material manufacturing industries account for 85% of all industrial energy use.

### 3.4. Motivating suppliers to build capacity: creating supply chains for "zero"-emission energy sources and other products

A fundamental issue in supply chain management is to ensure that suppliers have adequate capacity. This is particularly difficult in nascent supply chains for "zero"-emission sources of energy and other "cleantech" products, because demand is potentially large but uncertain; reputations, relationships, and sources of capital are not yet established; and contracts may be difficult to enter and even more difficult to enforce.

Successful new entrants in "cleantech" manufacturing often rely for material supply on the waste, by-products or excess capacity of existing industries. For example, as described in Plambeck (2011), Calera uses industrial waste streams of $CO_2$ and CaCl to make cement. Tesla Motors builds the batteries for electric vehicles out of the tiny, form factor 18650 lithium ion batteries commonly used in the electronics industry. Solar photovoltaic manufacturers have historically relied on the scrap and excess production of crystalline silicon in the supply chain for semiconductors and electronics.

To grow, however, cleantech manufacturers eventually need to motivate suppliers to build new capacity. One approach is to contract for minimum purchase quantities, at specified prices, over a long period of time. Solar photovoltaic manufacturer First Solar used this sort of contract to motivate its supplier to build a new facility to recycle its critical semiconductor material, adjacent to First Solar's own production facility in Germany. The contract also stipulated that First Solar could buy the supplier's new facility at a specified price if the supplier were to default on the specified timing, minimum quantity, or quality. First Solar is continuing to make the contractually-specified purchases, even though the company has closed its own German production facility due to drastic cuts in government subsidies for solar in the EU (Plambeck, 2011). In general, however, unforeseen contingencies may result in costly disputes and difficulties with contract enforcement, especially in a new sourcing relationship or as a supplier is developing an innovative or complex process (Tirole, 1999).

---

[3] Although wind turbines and photovoltaics generate electricity without producing greenhouse gas emissions, significant emissions occur in their manufacturing, notably in the production of steel and polycrystalline silicon.

Exhibit 29 to Decl. of Thomas Lyon                    ER-279
630

E.L. Plambeck / Energy Economics 34 (2012) S64–S74

S71

These impediments to contracting are exacerbated in jurisdictions with weak court systems— e.g., China as opposed to Germany (Master and Tung, 2010; Peerenboom, 2002).

Rather than rely on the courts to enforce a contract, firms may adopt a *relational contract*—an informal agreement regarding actions and payments, enforced by reputational concerns between parties that interact repeatedly (Baker et al., 2002). The optimal structure of a relational contract is different from that of a court-enforced contract. For example, when demand for the manufacturer's product is uncertain and the supplier's capacity is costly, a court-enforced contract would specify a minimum quantity and the unit price, whereas a relational contract would specify only the unit price; the reason is that the manufacturer would renege on a relational quantity commitment when realized demand is low (Taylor and Plambeck, 2007b).

In order to sustain effective relational contracts, firms may need sophisticated information systems or to consolidate business with a single supplier. Information systems that allow both manufacturer and supplier to commonly observe detailed process data play a critical role in sustaining relational contracts, by enabling the firms to determine which party is at fault when quality problems arise. For example, in fermentation of biomass into pharmaceuticals, fuels, or specialty chemicals, detailed information about the maintenance schedule and process variables like temperature, Ph, and feed rate may help to determine whether the manufacturer or feedstock supplier is responsible for a microbial contamination problem that reduces the process yield (Plambeck and Taylor, 2006). Consolidating business with a single supplier also helps to sustain a relational contract. As in the example of Walmart discussed in Section 2, consolidating business with a single supplier is a form of quantity commitment that helps to motivate a supplier to make investments to better serve the buyer. It increases the future value of the relationship to the buyer and to the supplier, which increases the motivation to adhere to the terms of the relational contract.

Sociologists and organizational scholars point out that trust and collaboration between a manufacturer and supplier take time to develop, and they emphasize the importance of personal relationships, social sanctions (Granovetter, 1985; Powell;, 1990; Uzzi, 1996, 1997), and institutional routines for reciprocity in sustaining agreements between trading partners (Powell et al., 1996; Zaheer et al., 1998). Locating a new production facility in proximity to a material supplier may help to build a constructive relationship. For example, First Solar chose to site its first commercial production facility adjacent to glass manufacturers in Perrysburg, Ohio. Despite its initially small purchase volume and uncertain potential for growth, First Solar was thus able to motivate those glass manufacturers to design and produce highly transparent glass for photovoltaics, instead of focusing on their large existing business with automotive and building glass customers. An innovative firm that transforms sugar into fuels, fragrances, and specialty chemicals, Amyris built its first commercial production facility adjacent to a sugar cane mill in Brazil, in a joint venture with the mill operator, which provides capital and a reliable supply of sugar (Plambeck, 2011).

An alternative or complement to a relational contract is *capacity leadership*, in which a manufacturer expands its own capacity earlier than needed and thus motivates suppliers to build more complementary capacity. Capacity expansion by a manufacturer is a credible signal of rising demand and will enable a supplier to negotiate a higher price for its future output, both of which tend to motivate a supplier to build more capacity (Islegen and Plambeck, 2009). Having already built its own capacity, a manufacturer will have less incentive to renege on a relational contract that promises a high price and/or minimum order quantity from the supplier. Thus, capacity leadership may enable the manufacturer to offer a credible relational contract with more generous terms for the supplier, and thus induce higher capacity investment. Anecdotal evidence of capacity leadership by solar photovoltaic and wind turbine manufacturers is in Islegen and Plambeck (2009).

An impediment to using capacity leadership or a relational contract to spur capacity expansion by a supplier is the threat of bankruptcy. Indeed, for a manufacturing firm to survive, its suppliers, capital providers and customers must all believe that it will do so. A manufacturer's risk of bankruptcy reduces the future expected value of a collaborative relationship between a manufacturer and supplier, which reduces the amount of complementary capacity that a supplier will build under a relational contract (Taylor and Plambeck, 2007a). Risk of bankruptcy increases the cost of capital for capacity expansion (Boyabatli and Toktay, 2011). Risk of bankruptcy reduces customers' willingness to pay for products because in bankruptcy, a manufacturer may fail to meet its warrantee, service, and recycling commitments to customers (Hortacsu et al., 2011). In a positive equilibrium, capital providers give money, suppliers build capacity, and customers buy the product. In exactly the same business environment, however, a negative equilibrium could arise in which those parties doubt the viability of the manufacturing firm, and bankruptcy becomes a self-fulfilling prophecy (Hortacsu et al., 2011).

Hortacsu et al. suggest that the existence of multiple equilibria justifies government intervention to improve social welfare by stepping in and guaranteeing warrantees or providing capital to promote a favorable equilibrium. However, a government loan (or private debt financing) for capacity expansion may cause a firm to under-invest in process improvement, which increases the risk of bankruptcy (Plambeck and Taylor, 2012).

### 3.5. Literature on operations and supply chain management that explicitly addresses climate change

This section reviews the nascent academic literature from the field of operations and supply chain management that explicitly addresses climate change. The number of papers is small—much research remains to be done. A few begin to quantify the potential for climate change to disrupt manufacturing and supply chain operations management. Most address the extent to which a tax (or alternative mechanism that causes firms to internalize some of the social costs of their greenhouse gas emissions) will reduce emissions by motivating changes in manufacturing and supply chain operations management. Their results are mixed, suggesting that firms will change some aspects of their operations in response to even a small carbon tax, but will not change others that seem to be obvious candidates for emission reduction.

According to Chen et al. (2011), imposing even a small tax on greenhouse gas emissions will motivate changes in procurement, inventory management, and the size and location of production facilities that significantly reduce emissions. They consider three classic models of operations management. First, in the "economic order quantity" model, a firm has a constant rate of demand and chooses an order quantity and frequency. Its objective is to minimize the average cost rate, including a fixed cost per order, a cost per unit ordered, and a holding cost per unit inventory per unit time. In the second, "newsvendor" model, a firm chooses a quantity (which may represent manufacturing capacity or an inventory level) to meet uncertain demand. The objective is to minimize expected cost, assuming a constant per unit cost for both overage (when the chosen quantity exceeds demand) and underage (when demand exceeds the chosen quantity). In the third, "facility location" model, the firm chooses the number of production facilities to serve demands that are uniformly distributed over some geographical region. The firm incurs a fixed cost to open a production facility, and a transport cost per unit of product per unit distance from the nearest facility to the demand. In all three models, the objective function (cost) is remarkably flat for a wide range of the decision variables around the optimal solution. However, emissions are sensitive to the decision variable, which

Exhibit 29 to Decl. of Thomas Lyon

*E.L. Plambeck / Energy Economics 34 (2012) S64–S74*

implies that emissions can be substantially reduced at little cost. Hence even a small carbon tax should substantially reduce emissions associated with such operations.

One might think that imposing a high carbon tax would motivate a retailer to have many small stores, rather than a few large outlets, to enable people to shop without driving a long distance. However, according to Cachon (2011), the optimal number of stores in a given area is insensitive to a carbon tax. In Cachon's model, a retailer chooses the number of stores in a given area to minimize its cost of trucking items to the stores (which increases with the number of stores) plus the cost to consumers of driving to the nearest store (which decreases with the number of stores). Cachon proves that if the retailer assigns zero cost to emissions, the resulting social cost (all the costs associated with the retailer's trucking, the consumers driving, and the climate change impacts caused by their emissions) will be less than 0.1% above the socially optimal level, assuming U.S. average fuel efficiencies. Furthermore, a carbon tax could motivate the retailer to reduce emissions by improving the fuel efficiency of its trucks, but that would have surprisingly little effect on the retailer's optimal number of stores. A caveat is that Cachon (2011) does not consider the potential for online retailing. The impact of on-line retailing on emissions depends on details of implementation, such as management of returns (Matthews et al., 2001).

Hoen et al. (2011a) argue that a small tax on emissions will fail to motivate most firms to shift to a slower, more energy-efficient mode of freight transport. The drawback is that using a slower mode of transport forces firms to carry more inventory and degrades their service to customers. Hoen et al. use the emission-intensity estimates of the European Network for Transport and the Environment for various modes of transport and assume that emissions from storage are negligible. For a variety of different products, they find that a tax above 30 Euros/tonne $CO_2e$ would be necessary to motivate a shift to a more efficient mode of transport. Some firms might, however, shift at a lower tax level. Hoen et al. (2011b) provide one example of a major European manufacturing firm that could, by switching modes, reduce its emissions from transportation by 10% with only an 0.7% increase in transportation and inventory costs.

A carbon tax might have the counterintuitive effect of reducing energy-efficiency in manufacturing. In a stylized model of a manufacturer of a commodity basic material, Plambeck and Taylor (2012) show that when the manufacturer has thin margins, the expected increase in expected profit from an improvement in energy efficiency *decreases* with the carbon tax. The intuition is that as the tax increases, the manufacturer becomes more likely to idle its facility (because the contribution margin is negative) so any investment and effort sunk into improving energy efficiency becomes worthless. Variability in the cost of emissions (as in a cap-and-trade system) further reduces the incentive to improve energy efficiency. This suggests that to substantially improve the emission-intensity of basic material manufacturing, a carbon tax must be set sufficiently high to spur investment in new "cleantech" facilities that rely on renewable energy or carbon-capture-and-sequestration (as in the example of Calera given in Section 2.3) to produce basic materials with minimal emissions.

A tax might also fail to spur investments in energy efficiency if firms lack information about the potential for energy efficiency, lack capital, or face agency problems of the sort described in Section 2.1.5. Anderson and Newell (2004) find empirically that U.S. manufacturers commonly fail to make investments in energy efficiency that would have a positive net present value at market interest rates. The authors draw upon data from the U.S. Department of Energy's Industrial Assessment Center (IAC) program, which provides energy-efficiency assessments and recommendations to small and medium-sized manufacturing firms, primarily regarding operational process improvements. Roughly half of the projects are adopted, which suggests that providing information spurs energy-efficiency. (This mirrors the case, described in Section 2.1.7, of

Walmart engaging environmental nonprofit organizations to help its suppliers in China to identify and implement energy-saving process improvements.) However, as the manufacturers tend not to adopt projects with a payback period greater than a year or in some cases 2 years (implying a hurdle rate of 50%–100%), the primary barrier to adoption might be capital constraints, agency problems of the sort described in Section 2.1.5 or managerial error. Using the same IAC data, Muthulingam et al. (forthcoming) observe that adoption rates are higher for the energy-saving projects that appear early in the list of recommendations, regardless of their financial characteristics.

Fortunately, small manufacturers often have supply chain partners with a lower cost of capital and motivation to reduce their supply chain carbon footprint. Those partners can design long-term contracts and provide capital or technical assistance to spur the small manufacturers to invest in energy-efficiency projects, and then share in the resulting long-term increase in profitability. A carbon tax would lead to more of such engagement. Even without climate policy, as seen in Section 2.1.6, the recent experience of Walmart suggests that even simply asking suppliers to share information about their greenhouse gas emissions and efforts to reduce those emissions draws managerial attention and thus improves performance. Empirically, suppliers are more likely to agree to share such information when more of their buyers request such information and when those buyers appear committed to using the information (Jira and Toffel, 2011).

As an example of using the information, in Walmart's private brands operations, the scorecard for suppliers gives points for transparency and management of greenhouse gas emissions, in addition to traditional considerations like financial performance, quality, and on-time delivery; the scorecard is used to allocate business, as well as to determine which suppliers could benefit from assistance (Plambeck and Denend, 2011). Jira and Toffel (2011) survey the literature on how firms motivate their suppliers to adopt specific practices intended to improve labor conditions or environmental performance. Firms should proceed gradually and cautiously, however, because increasing auditing and payments for labor and environmental performance can backfire by motivating suppliers to practice deception rather than improve performance (Jiang, 2009; Plambeck et al., 2012; Plambeck et al., 2011).

If one country or region unilaterally adopts climate policy, the corresponding increase in production costs may cause manufacturers to relocate to a region without such policy. Hence, perversely, the climate policy might increase overall greenhouse gas emissions, due to increased freight transport and higher emission-intensity of production in the region with no climate policy. Drake (2011) finds that a border adjustment—taxing imports in proportion to the greenhouse gas emissions that occur in their production to "level the playing field" for domestic and foreign manufacturers—will reduce overall emissions. Furthermore, the volume of imports may increase with the level of the tax because foreign firms adopt the low-emission technology at a lower tax level than do domestic firms.

To implement a border adjustment will require the development of rules for accounting for the supply chain emissions associated with a product. One issue is how to allocate emissions from a production facility among the various products (or industrial buyers of products) of that facility. Current accounting schemes allow buyers the flexibility to choose from among several allocation rules. Emissions may be allocated in proportion to the economic value of the products or in proportion to their masses, for example. This has some surprising effects on emissions. Keskin and Plambeck (2011) show that value-based allocation provides an incentive for a supplier to cut its price on products that are subject to a border adjustment, in order to reduce the effective tax on those products and sell more units. As a result, production and hence total emissions may *increase* with the level of the tax per unit $CO_2e$. For similar reasons, eliminating a buyer's flexibility to choose an allocation rule also may strictly

Exhibit 29 to Decl. of Thomas Lyon

632

ER-281

E.L. Plambeck / Energy Economics 34 (2012) S64–S74                    S73

increase imports and total emissions—unless policymakers specify the allocation rule correctly. Requiring firms to use the rule that allocates the most emissions to the subset of products that are exported into a region with a border adjustment may, counterintuitively, fail to minimize total emissions. Keskin and Plambeck advocate specifying an allocation rule for each industry, and suggest how to choose it. In the example of the energy-intensive mining and separation of rare earth oxides (which yields iron ore as a co-product), correct specification of the allocation rule may reduce total emissions by over a third, even at plausibly low levels of a carbon tax.

To date, schemes proposed to account for supply chain emissions have the axiomatic property that the sum of emissions allocated to the firms in a supply chain must equal the total emissions from the supply chain. Instead, Caro et al. (2011) advocate double-counting. For a seemingly ideal scenario in which a supply chain bears the full social cost associated with its greenhouse gas emissions, Caro et al. prove that the firms in the supply chain invest strictly less in emissions reduction than would be socially optimal (assuming the firms cannot contract to make payments contingent on emissions reduction). The reason for underinvestment is that optimal emissions reduction requires cooperative actions by multiple members of the supply chain (as in the example of retailers sharing point-of-sales data, to enable suppliers to better forecast demand and therefore use slower modes of transport with lower emission-intensity, described in Section 3.1) and therefore suffers from the classic problem of moral hazard in teams (Holmstrom, 1982). Currently, the underinvestment is worse because supply chains do not bear the full social cost associated with their greenhouse gas emissions. Caro et al. point out that this makes double-counting of emissions, to increase the incentive for emissions reduction, even more important.

Adverse weather disrupts supply chains. In a survey of supply chain managers in 59 companies, 14 different industries and 62 countries, weather was the most commonly cited reason for a supply chain disruption in 2011 (CSCMP, 2011). Based on a decade of production data for 64 U.S. automobile plants, Cachon et al. (2011) find that extreme weather is associated with substantial losses in productivity. Climate change is likely to worsen losses in manufacturing productivity due to extreme heat and heavy precipitation, at least in some regions. Inland, climate change might reduce wind speeds (Pryor et al., 2009) and thus benefit manufacturing. In vulnerable coastal areas, climate change might increase the frequency of the severe tropical cyclones, which would disrupt production and freight transport through airports and seaports, and/or require substantial adaptation. For example, Esteban et al. (2010) estimate a cost of between Y 31 billion and Y 128 billion to increase the capacity of Japanese sea ports to make up for the downtime (days on which the ports cannot operate) caused by the increases in tropical cyclone intensities by 2085 under plausible climate change scenarios. Even with such expansion of transportation infrastructure, the potential for disruption associated with climate change may cause companies to require more manufacturing capacity and inventory. Expanding inventories and the capacity of manufacturing facilities, sea ports and other transportation infrastructure will increase emissions unless, perhaps, it provides an opportunity for carbon sequestration in cement.

## 4. Conclusion

This article has provided examples of how companies can profitably reduce greenhouse gas emissions under their direct and indirect control. It also directs readers to operations and supply chain management literature that provides insights on additional means for companies to reduce greenhouse gas emissions and to establish new supply chains for renewable energy and other "zero"-emission products, and potential impacts of climate change on supply chains. By acting immediately to reduce greenhouse gas emissions, companies can lessen the impacts

of climate change. However, the magnitude of profitable emissions reduction seems likely to be insufficient. I conclude that effective climate policy is needed to spur transformative supply chain coordination and innovation.

## References

Anderson, S.T., Newell, R.G., 2004. Information programs for technology adoption: the case of energy-efficiency audits. Resour. Energy Econ. 26 (1), 27–50.
Ata, B., Lee, D., Tongarlak, M., 2012. Got local food? Harvard Business School Working Paper. http://www.hbs.edu/research/pdf/12-058.pdf.
Baker, G., Gibbons, R., Murphy, K.J., 2002. Relational contracts and the theory of the firm. Q. J. Econ. 117 (1), 39–83.
Blinder, A.S., Maccini, L.J., 1991. Taking stock: a critical assessment of recent research on inventories. J. Econ. Perspect. 5 (1), 73–96.
Boyabatli, O., Toktay, L.B., 2011. Stochastic capacity investment and technology choice in imperfect capital markets. Manag. Sci. 57 (12), 2163–2179.
Bray, R.L., Mendelson, H., 2012. Information transmission and the bullwhip effect: an empirical investigation. Manag. Sci. 58 (5), 860–875.
Cachon, G., 2011. Supply chain design and the cost of greenhouse gas emissions. Working paper Wharton School of Business, University of Pennsylvania. http://opim.wharton.upenn.edu/~cachon/pdf/scarbon_v1.pdf.
Cachon, G.P., Randall, T., Schmidt, G.M., 2007. In search of the bullwhip effect. Manuf. Serv. Oper. Manag. 9 (4), 457–479.
Cachon, G., Gallino, S., Olivares, M., 2011. Severe weather and automobile assembly productivity. Working Paper Wharton School of Business, University of Pennsylvania. http://opim.wharton.upenn.edu/~cachon/pdf/weather_1015.pdf.
Carbon Disclosure Project, 2011. Supply Chain Report. iii and 5.
Caro, F., Corbett, C., Tan, T., Zuidwijk, R., 2011. Carbon-optimal supply chains. Working paper UCLA. http://www.anderson.ucla.edu/x9362.xml.
Chen, L., Lee, H.L., 2011. Bullwhip effect measurement and its implications. Working Paper Duke University. http://faculty.fuqua.duke.edu/~lc91/More/papers/Chen_Lee_Bullwhip_Mar2012f.pdf.
Chen, X., Benjaafar, S., El Omri, A., 2011. The carbon-constrained EOQ. Working Paper University of Minnesota. http://www.isye.umn.edu/faculty/pdf/cbe-2011.pdf.
Cooke, J.A., 2011. Time to reconsider VMI? CSCMP's Supply Chain Quarterly. November 22, 2011.
Corbett, C.J., Klassen, R.D., 2006. Extending the horizons: environmental excellence as key to improving operations. Manuf. Serv. Oper. Manag. 8 (1), 5–22.
CSCMP, 2011. Weather is the leading culprit for supply chain disruptions. CSCMP's Supply Chain Quarterly. November 22, 2011.
Drake, D.F., 2011. Carbon tariffs: impacts on technology choice, regional competitiveness, and global emissions. Working Paper Harvard Business School. http://www.hbs.edu/research/pdf/12-029.pdf.
Duke, M., 2010. Message from CEO Mike Duke in Walmart's Global Sustainability Report: 2010 Progress Update (October 5, 2010). http://walmartstores.com/sites/sustainabilityreport/2010/message_from_mike_duke.aspx.
Esteban, M., Webersik, C., Shibayama, T., 2010. Methodology for the estimation for the increase in time loss due to future increase in tropical cyclone intensity in Japan. Clim. Chang. 102, 555–578.
Ghali, M.A., 1987. Seasonality, aggregation and the testing of the production smoothing hypothesis. Am. Econ. Rev. 77 (3), 464–469.
Granovetter, M., 1985. Economic action and social structure: the problem of embeddedness. Am. J. Sociol. 91 (3), 481–510.
Graves, S.C., Willems, S.P., 2005. Optimizing the supply chain configuration for new products. Manag. Sci. 51 (8), 1165–1180.
Gucwa, M., Schafer, A., 2011. The impact of scale on energy intensity in freight transportation. Working Paper Precourt Energy Efficiency Center, Stanford University . One may request a copy by sending email to mgucwa@stanford.edu.
Hoen, K.M.R., Tan, T., Fransoo, J.C., van Houtum, G.J., 2011a. Switching Transport Modes to Meet Voluntary Carbon Emissions Targets. Technical University of Eindhoven, Netherlands.
Hoen, K.M.R., Tan, T., Fransoo, J.C., van Houtum, G.J., 2011b. Effect of carbon emission regulations on transport mode selection in supply chains. Working Paper Technical University of Eindhoven, Netherlands.
Holmstrom, B., 1982. Moral hazards in teams. Bell J. Econ. 13 (2), 324–340.
Hortacsu, A., et al., 2011. Is an automaker's road to bankruptcy paved with customers' beliefs? Am. Econ. Rev. 101 (3), 93–97.
Humes, E., 2011. Force of Nature: The Unlikely Story of Wal-mart's Green Revolution. Harper-Collins, New York, NY.
International Energy Agency (IEA), 2009. Transport, energy and CO₂: moving toward sustainability. http://www.iea.org/publications/free_new_Desc.asp?PUBS_ID=2133.
IPCC, 2007. In: Metz, B., Davidson, O.R., Bosch, P.R., Dave, R., Meyer, L.A. (Eds.), Contribution of Working Group III to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change. Cambridge University Press, Cambridge, UK.
Islegen, O., Plambeck, E.L., 2009. Capacity leadership. Working Paper Stanford Graduate School of Business. http://faculty-gsb.stanford.edu/plambeck/research.html.
Jiang, B., 2009. The effects of interorganizational governance on supplier's compliance with SCC: an empirical examination of compliant and non-compliant suppliers. J. Oper. Manag. 27, 267–280.
Jira, C., Toffel, M., 2011. Engaging supply chains in climate change. Working Paper 12-026 Harvard Business School. http://www.hbs.edu/research/pdf/12-026.pdf.
Kalkanci, B., Ang, E., Plambeck, E.L., 2012. Measurement and improvement of social & environmental performance under voluntary versus mandatory disclosure.

Exhibit 29 to Decl. of Thomas Lyon          ER-282
633

(241 of 297) Page 241 of 297 Case 2:24-cv-00801-ODW-PVC · Document 90-29 · Filed 04/07/25 · Page 12 of 12 Page ID #:9925

Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 241 of 297

*E.L. Plambeck / Energy Economics 34 (2012) S64–S74*

Working Paper Stanford Graduate School of Business. http://faculty-gsb.stanford.edu/plambeck/research.html.

Keskin, N., Plambeck, E.L., 2011. Greenhouse gas emissions accounting: allocating emissions from processes to co-products. Working Paper Stanford Graduate School of Business. http://faculty-gsb.stanford.edu/plambeck/research.html.

Kleindorfer, P.R., Singhal, K., Van Wassenhove, L.N., 2005. Sustainable operations management. Prod. Oper. Manag. 14 (4), 482–492.

Lapre, M.A., Mukherjee, A.S., van Wassenhove, L.N., 2000. Behind the learning curve: linking learning activities to waste reduction. Manag. Sci. 46 (2), 265–288.

Lee, D., 2011. Turning waste into by-product. Manuf. Serv. Oper Manag 13 (1) (winter 2011).

Lee, H., Padmanabhan, V., Whang, S., 1997. Information distortion in a supply chain: the bullwhip effect. Manag. Sci. 43 (4), 546–558.

Levitt, R., Rosenthal, S., Larson, A., Plambeck, E.L., 2011. Zeta Communities, Parts A and B. Case study E404. May 2011 Stanford Graduate School of Business.

Marshall, J., 2012. Zero net energy: the future of green building. Currents: News and Perspectives from Pacific Gas and Electric Company. January 27.

Master, G.L., Tung, R.T., 2010. Effective enforcement of contract rights in Chinese sourcing contracts. http://www.mayerbrown.com/publications/article.asp?id=8569&nid=6.

Matthews, H.S., Hendrickson, C.T., Soh, D.L., 2001. Environmental and Economic Effect of E-Commerce: A Case Study of Book Publishing and Retail Logistics. Transportation Research Record No. 1763, pp. 6–12.

McKinsey & Company, 2009. Pathways to a low carbon economy: version 2 of the global greenhouse gas abatement cost curve.

Matthews, H.S., Hendrickson, C.T., Weber, C.L., 2008. The importance of carbon footprint estimation boundaries. Environ. Sci. Technol. 42, 5839–5842.

McKinnon, A., 2008. The potential of economic incentives to reduce $CO_2$ emissions from goods transport. Paper prepared for the first International Transport Forum on Transport and Energy: The Challenge of Climate Change. Leipzig, 28–30, May 2008.

Meinshausen, M., Meinshausen, N., Hare, W., Raper, C.B., Frieler, K., Knutti, R., Frame, D.J., Allen, M.R., 2009. Greenhouse-gas emission targets for limiting global warming to 2 °C. Nature 458, 1158–1162.

Muthulingam, S., Corbett, C., Benartzi, S., Oppenheim, B., 2009. Investment in energy efficiency by small and medium-sized firms: an empirical analysis of the adoption of process improvement recommendations. Cornell University Working Paper. http://www.johnson.cornell.edu/Faculty-And-Research/Profile.aspx?id=sm875.

Oshita, Y., 2011. Identifying critical supply chain paths that drive changes in $CO_2$ emissions. Energy Econ. 34 (4), 1041–1050.

Peerenboom, R., 2002. China's Long March Toward Rule of Law. Cambridge University Press, Cambridge, UK, pp. 463–464.

Peters, G., Marland, G., Le Quéré, C., Boden, T., Canadell, J.G., Raupach, M.R., 2012. Rapid growth in $CO_2$ emissions after the 2008–2009 global financial crisis. Nat. Clim. Change 2, 2–4.

Plambeck, E.L., 2011. Operations management challenges for some "cleantech" firms http://faculty-gsb.stanford.edu/plambeck/research.html.

Plambeck, E.L., Denend, L., 2007a. Walmart's Sustainability Strategy. OIT-71A and B Stanford Graduate School of Business Case Study . Updated 2010.

Plambeck, E.L., Denend, L., 2007b. The greening of Wal-Mart's supply chain. Supply Chain Manag. Rev. 11 (5), 18–25.

Plambeck, E.L., Denend, L., 2011. The greening of Walmart's supply chain—revisited. Supply Chain Manag. Rev. 15 (5), 16–23.

Plambeck, E.L., Taylor, T.A., 2006. Partnership in a dynamic production system with unobservable actions and noncontractible output. Manag. Sci. 52, 1509–1527.

Plambeck, E.L., Taylor, T.A., 2012. On the value of input-efficiency, capacity-efficiency, and the flexibility to rebalance them. Working Paper Stanford Graduate School of Business . http://faculty-gsb.stanford.edu/plambeck/research.html.

Plambeck, E.L., Taylor, T., Zhang, Q., 2011. A supplier's response to auditing and incentives for social and environmental performance: deception versus improvement. Stanford Graduate School of Business Working Paper. http://faculty-gsb.stanford.edu/plambeck/research.html.

Plambeck, E.L., Lee, H.L., Yatsko, P., 2012. Is your Chinese supply chain green? MIT Sloan Manag. Rev. 53 (2), 43–52.

Porter, M.E., Rivkin, J.W., 2012. Choosing the United States. Harv. Bus. Rev. 90 (3), 80–91.

Powell, W.W., 1990. Neither market nor hierarchy: network forms of organization. Res. Organ. Behav. 12, 295–336.

Powell, W.W., et al., 1996. Interorganizational collaboration and the locus of innovation: networks of learning in biotechnology. Adm. Sci. Q. 41 (1), 116–145.

Pryor, S.C., Barthelmie, R.J., Young, D.T., Takle, E.S., Arritt, R.W., Flory, D., Gutowski Jr., W.J., Nunes, A., Roads, J., 2009. Wind speed trends over the contiguous United States. J. Geophys. Res. 114, D14105.

Randolph, J., Masters, G.M., 2008. Energy for Sustainability: Technology, Policy, Planning. Island Press, Washington, D.C.

Rosenthal, E., 2011. Organic Agriculture May Be Outgrowing Its Ideals. New York Times. December 30, 2011.

Schipper, L., Saenger, C., Sudardshan, A., 2011. Transport and carbon emissions in the United States: the long view. Energies 4, 563–581.

Seuring, S., Müller, M., 2008. From a literature review to a conceptual framework for sustainable supply chain management. J. Clean. Prod. 16 (15), 1699–1710.

Sheffer, D.A., Levitt, R., 2010. How industry structure retards diffusion of innovations in construction: challenges and opportunities. Working Paper #59 Stanford Collaboratory for Research on Global Projects. Stanford University, Stanford, California. http://crgp.stanford.edu/publications/working_papers/Sheffer_Levitt_how_industry_retards_diffusion_of_innovation_WP0059.pdf.

Srivastava, S.K., 2007. Green supply-chain management: a state-of-the-art literature review. Int. J. Manag. Rev. 9 (1), 53–80.

Taylor, T.A., Plambeck, E.L., 2007a. Supply chain relationships and contracts: the impact of repeated interaction on capacity investment and procurement. Manag. Sci. 53, 1577–1593.

Taylor, T.A., Plambeck, E.L., 2007b. Simple relational contracts for capacity investment: price-only vs. quantity-commitment. Manuf. Serv. Oper. Manag. 9, 94–113.

Tirole, J., 1999. Incomplete contracts: where do we stand? Econometrica 67 (4), 741–781.

Uzzi, B., 1996. The sources and consequences of embeddedness for the economic performance of organizations: the network effect. Am. Sociol. Rev. 61 (4), 674–698.

Uzzi, B., 1997. Social structure and competition in interfirm networks: the paradox of embeddedness. Adm. Sci. Q. 42, 35–67.

Van Mieghem, J.A., 2007. Risk mitigation in Newsvendor networks: resource diversification, flexibility, sharing, and hedging. Manag. Sci. 53 (8), 1269–1288.

Wiser, R., Bolinger, M., Barbose, G., 2007. Using the federal production tax credit to build a durable market for wind power in the United States. Electr. J. 20 (9), 77–88 (November).

Zaheer, A., McEvily, B., Perrone, V., 1998. Does trust matter? exploring the effects of interorganizational and interpersonal trust on performance. Organ. Sci. 9 (2), 141–159.

Exhibit 29 to Decl. of Thomas Lyon

634

**ER-283**

# Exhibit 28
# to Declaration of Thomas Lyon

## Seuring & Muller, *From a Literature Review to a Conceptual Framework for Sustainable Supply Chain Management*, J. of Cleaner Prod. 1699 (2008)

Exhibit 28 to Decl. of Thomas Lyon
610

**ER-284**

Journal of Cleaner Production 16 (2008) 1699–1710



Contents lists available at ScienceDirect

## Journal of Cleaner Production

journal homepage: www.elsevier.com/locate/jclepro



# From a literature review to a conceptual framework for sustainable supply chain management

Stefan Seuring [a,*], Martin Müller [b]

[a] Department of International Management, Faculty of Organic Agricultural Sciences, University of Kassel, 37213 Witzenhausen, Germany
[b] Department of Business Administration, Carl von Ossietzky-University of Oldenburg, 26129 Oldenburg, Germany

### ARTICLE INFO

*Article history:*
Available online 12 June 2008

*Keywords:*
Supply chain management
Sustainability
Sustainable supply chains
Literature review
Conceptual framework
Environmental and social standards

### ABSTRACT

Academic and corporate interest in sustainable supply chain management has risen considerably in recent years. This can be seen by the number of papers published and in particular by journal special issues. To establish the field further, the purpose of this paper is twofold. First, it offers a literature review on sustainable supply chain management taking 191 papers published from 1994 to 2007 into account. Second, it offers a conceptual framework to summarize the research in this field comprising three parts. As starting point related triggers are identified. This allows putting forward two distinct strategies: (1) supplier management for risks and performance, and (2) supply chain management for sustainable products. It is evident that research is still dominated by green/environmental issues. Social aspects and also the integration of the three dimensions of sustainability are still rare.

Both practitioners in companies and academics might find the review useful, as it outlines major lines of research in the field. Further, it discusses specific features of sustainable supply chains as well as limitations of existing research; this should stimulate further research.

© 2008 Elsevier Ltd. All rights reserved.

## 1. Introduction

Production processes are often dispersed around the globe. Suppliers, focal companies and customers are linked by information, material and capital flows. In line with the value of the product comes the environmental and social burden incurred during different stages of production. With regard to this, focal companies of supply chains might be held responsible for the environmental and social performance of their suppliers. Focal companies are those companies that usually (1) rule or govern the supply chain, (2) provide the direct contact to the customer, and (3) design the product or service offered [208,220]. This is especially the case for brand-owning companies, as they are likely to come under pressure from stakeholders, e.g., non-governmental organizations (NGOs) [22,96]. These companies are asked to consider the environmental and social problems present in their entire supply chain. For example, apparel distributors such as Nike, Disney, Levi Strauss, Benetton, Adidas or C&A have been blamed in recent years for problems occurring during the production of their clothing. Inhumane working conditions [127,64] or contaminations of the (local) environment [140] were frequently mentioned as problems.

Based on this, operations, purchasing and supply chain managers have seen the integration of environmental and social issues, including those embedded in related standards (e.g., ISO 14001) into their daily tasks [200]. Such triggers have increased interest in green/environmental or sustainable supply chain management. The literature is still limited in quantity, and no major reviews of the field have been presented. Among the papers identified in the related search, only eight papers that attempt to review part of the literature were found [45,191,6,1,91,144,150]. De Burgos and Lorente [45] deal with environmental performance as an operation's objective, where supply chain issues are only secondarily addressed. In a similarly specialized perspective with only limited coverage of supply chain issues, Baumann et al. [6] centre their review on green product development. Zisdisin and Siferd [191] provide a review on environmental purchasing which is based on only 38 publications, i.e., they do not aim to cover all related publications. Abukhader and Jönson [1] look at the intersection of environmental issues with logistics. Their review has two major limitations: first, they only focus on logistics management journals. Second, supply chain issues are treated as a subset of logistics management. The recent paper by Kleindorfer et al. [91] comes closest to what is attempted here. In their contribution they review papers in the field of "Sustainable Operations Management" published in the first 50 issues of "Production and Operations Management". While they title their paper as operations, they cover related supply chain issues. The emphasis of their

---

* Corresponding author.
  *E-mail addresses:* seuring@uni-kassel.de (S. Seuring), martin.mueller@uni-oldenburg.de (M. Müller).

0959-6526/$ – see front matter © 2008 Elsevier Ltd. All rights reserved.
doi:10.1016/j.jclepro.2008.04.020

Exhibit 28 to Decl. of Thomas Lyon
611
ER-285

1700    S. Seuring, M. Müller / Journal of Cleaner Production 16 (2008) 1699–1710

paper is more on discussing individual issues, but they only provide limited insights into the overall development and status of the field. Seuring and Müller [144] also provide a specific literature review only. They address the emergence and development of integrated chain management (Stoffstrommanagement) in Germany. While this has close links to sustainable supply chain management, the different schools also identified incorporate close links to industrial ecology and closed-loop supply chain management. A much wider attempt is made in the paper of Srivastava [150], but, as the author already states in the introduction "primarily taking a reverse logistics angle". This perspective, as will be discussed in more detail below, is excluded here.

Hence, a literature review was conducted aiming to collect and analyze all relevant papers in the field by means of a structured search for literature. The last search for papers was conducted in January 2008. Based on this, the major aim of this paper is to outline the results of a literature review on the field of sustainability and supply chain management as well as to provide a conceptual framework capturing related research. (1) The research methodology is described while (2) some of the major results are portrayed. Moving beyond the analysis of specific issue, (3) a conceptual framework for the research field will be offered and discussed. Here, distinctive features of sustainable supply chain management will be outlined and limitations of the research will be addressed. Some suggestions for future research conclude the paper.

### 1.1. Basic terminology

To prepare the groundwork for the subsequent literature review, key terms are defined: "The supply chain encompasses all activities associated with the flow and transformation of goods from raw materials stage (extraction), through to the end user, as well as the associated information flows. Material and information flow both up and down the supply chain. Supply chain management (SCM) is the integration of these activities through improved supply chain relationships to achieve a sustainable competitive advantage" [208]. In line with this definition, but extending to related terms, *purchasing*, *sourcing*, *supply* and *supply chain* were all used for identifying related publications. This is justified as the review in particular wanted to address inter-organisational issues. Hence, papers on purchasing were also included.

Sustainable development is defined as "a development that meets the needs of the present without compromising the ability of future generations to meet their own needs" [225]. While diverse comprehensions of sustainability exist, one central concept helping to operationalize sustainability is the triple bottom line approach, where a minimum performance is to be achieved in the environmental, economic and social dimensions [203]. This can be comprehended as being in line with the notion of order qualifiers a company has to fulfil before it is able to even compete for orders [210]. Still, this is only one particular comprehension of sustainability. Dyllick and Hockerts [202] have framed the three dimensions of sustainability as the business case (economic), the natural case (environmental), and the societal case (social). Related keywords are sustainable/sustainability, sustainable development, environment(al), ecology/ecological, green, social and ethics/ethical. Keywords from the supply chain management side and from the sustainability side were combined for the search.

As it forms the major theme of this paper, we define sustainable supply chain management as the management of material, information and capital flows as well as cooperation among companies along the supply chain while taking goals from all three dimensions of sustainable development, i.e., economic, environmental and social, into account which are derived from customer and stakeholder requirements. In sustainable supply chains, environmental and social criteria need to be fulfilled by the members to

remain within the supply chain, while it is expected that competitiveness would be maintained through meeting customer needs and related economic criteria. This definition is rather wide and combines those given for sustainability and supply chain management. It is also able to integrate green/environmental supply chain management as one part of the wider field.

## 2. Research methodology

Fink [205] provides the following definition: "A literature review is a systematic, explicit, and reproducible design for identifying, evaluating, and interpreting the existing body of recorded documents". The analysis of documents pursues the aim of opening up material that does not have to be created on the basis of a data collection by the researcher. Literature reviews usually aim at two objectives: first, they summarize existing research by identifying patterns, themes and issues. Second, this helps to identify the conceptual content of the field [215] and can contribute to theory development (see the related discussion in [209]). One problem derives from the challenge that it is impractical to read everything. Only for emerging or narrowly defined issues might it be possible to provide complete reviews.

From a methodological point of view, literature reviews can be comprehended as content analysis, where quantitative and qualitative aspects are mixed to assess structural (descriptive) as well as content criteria [201]. A process model proposed by Mayring [214] contains four steps:

1. Material collection: The material to be collected is defined and delimitated. Furthermore, the unit of analysis (i.e., the single paper) is defined.
2. Descriptive analysis: Formal aspects of the material are assessed, e.g., the number of publications per year, providing the background for subsequent theoretical analysis.
3. Category selection: Structural dimensions and related analytic categories are selected, which are to be applied to the collected material. Structural dimensions form the major topics of analysis, which are constituted by single analytic categories.
4. Material evaluation: The material is analyzed according to the structural dimensions. This should allow identification of relevant issues and interpretation of results.

For the material analysis (steps 3 and 4), Fig. 1 provides a detailed description of the process. While it includes a feedback loop for the analysis of the collected material only, such a loop might be needed for the overall process.



**Fig. 1.** Research process of a structuring content analysis [213].

Exhibit 28 to Decl. of Thomas Lyon
612

S. Seuring, M. Müller / Journal of Cleaner Production 16 (2008) 1699–1710

Structural dimensions and related analytic categories which allow classification of the reviewed literature can be derived deductively or inductively. In a deductive approach they are selected before the material is analyzed; when using an inductive method, they are developed from the material by means of generalization [214]. In either case, they should have a clear relation to existing theory.

In content analysis the analyst makes various decisions about how the paper is to be comprehended. Such risk can be reduced by involving two or more researchers when searching for and analyzing the data. It might be necessary to redo steps 3 and 4, as the dimensions and underlying categories need to be revised [213]. In the particular approach chosen, we started with a number of dimensions and categories. Papers were classified accordingly, where the dimensions and categories were revised during the early analysis. This method forms the background for the literature review presented in this paper.

### 2.1. Delimitations and the search for literature

For a literature review it is particularly important to define clear boundaries to delimitate the research. In this context four important notes are made:

1. This analysis aimed only at papers in peer-reviewed scientific journals in English with a management focus. This excludes papers in other languages as well as those with, e.g., a technical or political science focus.
2. Publications with the main topic of public purchasing were not considered. This debate includes vital public law aspects and differs from the discussion of supply (chain) management in companies.
3. Articles which focused only on ethical demands placed on purchasing staff (e.g., acceptance of gifts) were excluded. Respective papers mainly focus on codes of conduct for purchasers, so there is no direct link to sustainable development.
4. Papers focusing on reverse logistics and remanufacturing were not included. In this field the focus of the discussion is on the end of the product life-cycle with an emphasis on reverse logistics and remanufacturing [206,150], while the research presented centres on the forward supply chain.

The search for related publications was mainly conducted as a structured keyword search. Major databases were used to search for related articles, such as those provided by major publishers, Elsevier (www.sciencedirect.com), Emerald (www.emeraldinsight.com), Springer (www.springerlink.com), Wiley (www.wiley.com) or library services (e.g., Ebsco www.ebsco.com; Scopus www.scopus.com, Metapress www.metapress.com, or Subito www.subito-doc.de). After a first quick content check, identified articles were in- or excluded from the analysis. To increase the reliability of the research, databanks and journals as well as the individual papers were checked by a second researcher. Reading the papers, cited references were used as a secondary source, but did not yield many additional papers, which can be taken as an indication of the validity of the research. Taking the stated delimitations into account, a total of 191 papers were identified.

### 2.2. Content analysis

In a first step of the evaluation, descriptive dimensions were used to classify the papers. The content of the papers was further assessed by means of a descriptive analysis: (1) how is the distribution of publications across the time period? (2) In which journals are such articles published? (3) What research methodologies are applied? (4) Which dimensions of sustainability are addressed? For these classifications, each paper was assigned to exactly one category. The selection of these categories is rather straight forward, as such descriptions are "normal" for literature reviews. These dimensions will be used for the subsequent analysis.

We will give a brief example on how we conducted the process, taking Bowen et al. [14] as an example. This paper presents a survey, so it clearly falls into the category regarding the research methodology. As it does not cover social issues, it is placed into the environmental category regarding sustainability. Further, it talks about competitive advantage as a trigger for sustainable supply chain management, and mentions, e.g., company-overlapping communication and training of purchasing staff as supporting factors, where additional coordination needed with suppliers is seen as a barrier. For the subsequent discussion, we will first present a (qualitative) conceptualization of the field and then supplement some topics with a more detailed (quantitative) analysis.

### 2.3. Rigor of the research process

The research process and related methodology also have their limitations. The structured process and systematic approach ensures the objectivity of the research process. Validity was aimed for by following the guidelines [212]. Constructs were compared to other research both from within as well as from outside of the particular field. As already briefly mentioned, a further means to ensure validity was presenting this research work at various conferences, so that other researchers and practitioners could comment on it.

Reliability was addressed by having all steps of the formal analysis conducted by two researchers. This is the minimum requirement, but given the time consuming process, it is somehow unrealistic to include more than this. While inter-rater reliability was quite high (which can be attributed to the fact that the two investigators have been cooperating for years), different judgments were individually accessed and resolved.

## 3. Descriptive analysis

### 3.1. Distribution across the time period and main journals

The basic body of literature identified comprises 191 papers. The allocation of the publications in the researched period (1994–2007) is shown in Fig. 2. While 1990 is the first year of publication where works were sought, the first published papers found were from the year 1994. The start of the time period covered was chosen allowing the Brundtland-Report [225] to be taken as a starting point. High numbers of publications are found for the time period between 2001 and 2003, but remain on a substantial level since. In 2001



**Fig. 2.** Distribution of publications per year across the period studied.

Exhibit 28 to Decl. of Thomas Lyon

613

**ER-287**

S. Seuring, M. Müller / Journal of Cleaner Production 16 (2008) 1699–1710

[136] and in 2003 [228], special issues of *Greener Management International* containing seven articles each were published. It is interesting to note that recently a number of other special issues have appeared or are in print, also capturing more traditional operations management journals, such as: *Journal of Operations Management* [211], *International Journal of Production Research* [219], *International Journal of Production Economics* [218], and *Journal of Cleaner Production* [223]. This shows the wide acceptance of the topic among research, where the two special issues appearing in 2007 explain the record number of publications in this year. Still, it should be noted that many of the papers published in these special issues focus on closed-loop supply chain management and related issues and are, therefore, not taken into account in this review (see the note on this above).

There is an equal distribution among environmental and sustainability management related journals (81 papers), and traditional operations and supply chain management journals capture (surprisingly) almost the same number (83 papers), while journals dealing with social and ethical topics remain (11 papers) in the minority. There is a final group of 16 papers published in journals which are mainly of a technical nature, but also contain natural resource or policy related ones. Most were published in the *Journal of Business Ethics* (six papers) and *Business Ethics: A European Review* (four papers). The environmental literature has three journals offering most of the papers. The leading role is now held by the *Journal of Cleaner Production* with 23 papers, followed *Greener Management International* accounts for 22 papers, mainly due to the two special issues already mentioned. *Business Strategy and the Environment* (13 papers) holds the third place. Hence, these three journals capture almost three quarters (59 out of 81) of the papers published in environmental and sustainability related journals.

Within the operations literature, a greater number of journals provide publication outlets: *International Journal of Operations & Production Management* (10), *Supply Chain Management – An International Journal* (10), *Journal of Operations Management* (7), *Production and Operations Management* (6), *International Journal of Production Research* (5), and *The Journal of Supply Chain Management* (formerly International Journal of Purchasing and Materials Management) (5) indicating a distribution across a wider range of journals.

### 3.2. Research methodologies applied

Five research methodologies were differentiated: (1) theoretical and conceptual papers; (2) case studies; (3) surveys; (4) modelling papers; and (5) literature reviews. Fig. 3 shows the assignments of the papers to the research methodologies.

In order to make our classification of papers transparent to the reader, for each analyzed paper listed in the bibliography the categorisation according to the research methodology, and treatment of sustainability issues is provided at the end of the references given. As example given, [case, social] summarizes that the paper deals predominantly with social issues and offers a case study or case example.

Forty papers do not present empirical research, and instead are of a rather theoretical or conceptual nature. For a new, unexplored field, this is not surprising, and continues into the large portion of case study papers (70). This method allows the field to be researched and provides illustrative evidence [229]. Several papers classified as case studies are often rather case *examples*, where descriptions of an industry practice are given without aiming at theory development or testing. Still, we did not assess the methodological rigor of the papers, so this neither disqualifies the case papers nor assumes that the papers placed in the other categories are somehow "better." Surveys account for 53 of the paper, while 21 mathematical models and finally seven literature reviews (see their summary in the introduction) have been published.

### 3.3. Dimensions of sustainable development

The articles were differentiated into three categories in relation to sustainable development. It should first be mentioned that the economic dimension was assumed as being covered by all papers, as only management related publications and journals form part of the assessment. Hence, three categories were formed, i.e., does the content address (1) environmental or (2) social issues, or (3) have both dimensions (environmental and social) been considered? Papers falling into the last category were classified as sustainable. Table 1 shows the results of this differentiation, while Table 2 additionally shows the distribution across the time period studied. Most of the articles (140) deal with environmental problems. This can be explained, as related issues have been on the agenda for a longer period of time. The high number of papers in 2001 is explained by a journal special issue of *Greener Management International*, which particularly looked at green topics.

Still, it should be mentioned that the first paper included in the literature review by Drumwright (1994) [49] deals with social issues. Only 20 papers focused on the social dimension, and a further 31 papers were classified as sustainable, as they integrate environmental and social issues. For the sustainable ones, it is interesting that this integration only appears about 2002, from which year on a considerable number of papers is published. Figures on social aspect are more erratic in publication numbers. There are five each in 2002 and 2003, which account for half of all related papers. Carter and co-authors [17–23] account for seven of the papers on the social aspects. New (1997) [120], Kärnä and Heiskanen (1998) [86] and Sarkis (2001) [136] are the first papers to integrate all three dimensions.

This reveals a clear deficit in supply chain management and purchasing literature on social issues as well as on the amalgamation of all three dimensions of sustainable development. Future research on these topics would be one of the clear recommendations towards researchers in the field. The relatively high number of eight paper incorporating sustainability issues might point into this direction [15,47,95,99,103,119,154,179].



**Fig. 3.** Research methodologies employed.

**Table 1**
Dimensions of sustainable development addressed in the papers

| Dimension(s) | Number of papers ($N = 191$) |
| --- | --- |
| Environmental | 140 |
| Social | 20 |
| Sustainable | 31 |

Exhibit 28 to Decl. of Thomas Lyon    **ER-288**
614

S. Seuring, M. Müller / Journal of Cleaner Production 16 (2008) 1699–1710        1703

**Table 2**
Distribution of the papers according to the three dimensions of sustainability and time

|        | Environmental (140) | Social (20) | Sustainable (31) |
|--------|--------------------|-------------|------------------|
| 1994   | 1                  | 1           |                  |
| 1995   | 3                  |             |                  |
| 1996   | 5                  |             |                  |
| 1997   | 8                  | 1           | 1                |
| 1998   | 10                 | 1           | 1                |
| 1999   | 4                  |             |                  |
| 2000   | 11                 | 3           |                  |
| 2001   | 20                 |             | 1                |
| 2002   | 7                  | 5           | 4                |
| 2003   | 10                 | 5           | 5                |
| 2004   | 12                 | 2           | 3                |
| 2005   | 19                 | 2           | 4                |
| 2006   | 8                  |             | 4                |
| 2007   | 22                 |             | 8                |

## 4. Towards a conceptual framework

The overall starting point was mentioned in Section 1 of this paper. Both sustainability management and supply chain management form the background against which the review is conducted. Now, we are aiming to conceptualize the field, which can be seen as a first step towards theory building [226]. Meredith [215] calls this a philosophical conceptualization, which here is based on reading the papers over and over again. Further, earlier versions of the literature review and some aspects of the conceptualization were presented at conferences and, therefore, discussed with a large number of researchers in the field. The framework will be presented in three parts, which are called:

- Triggers for sustainable supply chain management,
- supplier management for risks and performance, and
- supply chain management for sustainable products.

### 4.1. Triggers for sustainable supply chain management

As an initial step, the triggers for the field and related action are identified. This is presented in Fig. 4, which will be outlined in full before detailed aspects are subsequently discussed. Kleindorfer et al. [91] propose a similar figure, although they argue more on the individual elements constituting it. There is no equivalent to the further two parts of the framework presented here.

The starting points are external pressure and incentives set by different groups. While stakeholders form the widest possible description, two groups are of particular relevance. On the one hand, customers are of great importance, as operating the supply

chain is only justified if the products and services are finally "accepted" by customers. On the other hand, all modes of governmental control, be it from local municipalities, national or multi-national governments, are of great relevance. An early paper pointing towards this normative level is New [120]. He "advocates an expanded scope for supply chain management research which accounts for the social function and the political and economic implications of supply chain developments". Cramer [40] proposes an approach which "monitors new developments and trends in the environmental debate and changes in pressure exerted by external stakeholders". Roberts [134] emphasizes that action from NGOs, which hold focal companies responsible for environmental and social problems at earlier stages of their supply chain, can lead to a reputation loss for the focal company. The following criteria are frequently listed: legal demands/regulation, response to stake-holders, competitive advantage, customer demands, reputation loss, and environmental and social pressure groups (see e.g. [13,75,127,130,134,136,185,174,165,99,186]).

When the focal company is pressured, it usually passes this pressure on to suppliers. Here, one distinctive feature of sustainable supply chain management emerges. Looking at the overall supply chain (or life-cycle) of the product, the focal company quite often has to take a longer part of the supply chain into account than needed for "pure" economic reasons (see e.g. [75,93,141,128]). Related to this, barriers and supporting factors are mentioned, which support or hinder the cooperation with suppliers (see e.g. [98,26,14,22,68]). This holds true for having information on the environmental and social performance at the single production stages, as well as on improving the performance of main suppliers.

Based on these factors, a range of strategies can be identified regarding how companies deal with such issues. To put it more simply, two different strategies can be used to summarize them. Bowen et al. [14] distinguish between "greening the supply process" and "product based green supply" (see also [75]). Building on this, the two strategies are labelled as "supplier management for risks and performance" and "supply chain management for sustainable products". While upon first glance these strategies seem to oppose each other, they nevertheless complement each other, as will also be outlined in Sections 4.2 and 4.3. Before this, a closer (quantitative) look is taken at pressure and incentives.

In Table 3 the barrier and incentive categories are listed according to the number of papers that refer to them, and where several or all categories could have been addressed. Legal demands (99 entries) are the most frequently mentioned, closely followed by response to stakeholders (90), where environmental and social pressure groups (38) form a subgroup. Interesting is the high level of competitive advantage (96) and the low level of reputation loss (30). This is in line with other studies, e.g., on the implementation of environmental management systems, which is often not due to the direct demand enforced by a legal act, but instead because the companies aim to reduce related risks (see e.g. [109,38,131,95]). This, however, might partly be due to the dominance of case related papers where "success stories" are presented. Similarly, in a survey, desired behavior might be reported, but not actually displayed. Several publications call pressure groups a "central trigger," but



**Fig. 4.** Triggers for sustainable supply chain management.

**Table 3**
Pressures and incentives for sustainability in supply chains

| Pressures and incentives | Number of papers ($N = 191$) |
|--------------------------|------------------------------|
| Legal demands/regulation | 99 |
| Customer demands | 96 |
| Response to stakeholders | 90 |
| Competitive advantage | 71 |
| Environmental and social pressure groups | 38 |
| Reputation loss | 30 |

Exhibit 28 to Decl. of Thomas Lyon        **ER-289**

615

S. Seuring, M. Müller / Journal of Cleaner Production 16 (2008) 1699–1710

companies might more often fear that (private) customers would boycott their products if environmental or social problems in their supply chain were reported. This would also lead to a loss in reputation.

There is a second aspect of customer demands: Focal companies increasingly ask their suppliers to perform according to the guidelines set by environmental and social standards, which might be documented by implementing related management systems for environmental (e.g., ISO 14001) and social (SA 8000) issues. Using the example of ISO 14001, Corbett and Kirsch [36] provide evidence that this is an important model for the spread of such management systems. In some industries, such as the textile and apparel industry, they are increasingly implemented [64,102]. The brief example shows how much the mentioned issues are interrelated, so boundaries between them are often hard to ascertain.

### 4.2. Supplier management for risks and performance

While the previous dimension looks more at the factors that are external to the supply chain, there is also the internal perspective. To achieve set goals, it is important to know which factors act as barriers and which ones support such developments (see Tables 4 and 5). Three aspects were frequently mentioned as barriers for implementing sustainable supply chains: (1) higher costs, (2) coordination effort and complexity, and (3) insufficient or missing communication in the supply chain. It is interesting to note that the supporting factors clearly relate to this, as communication is again mentioned, while monitoring, evaluation, reporting and sanctions are the ones most often alluded to (see e.g. [26,38,75,124,129,136,141,82]). This causes higher costs, although joint efforts of all supply chain partners can help to control costs (see e.g. [140,61]).

Management systems play an important role in this regard, and can be related to the minimum performance required. They mainly centre on environmental management systems, namely ISO 14001 [36,37,28]. Socially related approaches, such as SA 8000 (Social Accountability 8000, see [64,37]) or codes of conduct [42,43] have not come to the forefront so far. This corresponds to the result that social aspects in the discussion are much less developed than environmental ones. The second category is also in line with this, as monitoring, evaluation, reporting, and implementation of enforcing sanctions (that can include the delisting of suppliers) is the second most often pointed out category. Company-overlapping communication and training of purchasing staff and supplier staff are more proactive measures which should allow an improvement in the supply relations as well as performance on both sides. Surprisingly, the integration of related goals into corporate policy receives much less attention. In some cases, extending goals for purchasing staff to environmental and social issues are seen as a valid measure, as these are usually evaluated and paid on the basis of hard, economic figures only. Following this discussion on triggers, we will discuss the two strategies in greater detail.

Increased global development and competition have pushed many industries to operate on a much more global level. Together with increased outsourcing, the number of companies involved in a typical supply chain has greatly increased. As a response to the above-mentioned pressures and incentives, a number of companies

### Table 5
Supporting factors for sustainable supply chain management

| Supporting factors | Number of papers (N = 191) |
|---|---|
| Company-overlapping communication | 89 |
| Management systems (e.g., ISO 14001, SA 8000) | 69 |
| Monitoring, evaluation, reporting, sanctions | 68 |
| Training education of purchasing employees and suppliers | 40 |
| Integration into the corporate policy | 38 |

have introduced supplier evaluation schemes which integrate environmental and social criteria [158,95,200]. Related measures include supplier self evaluation [158] where suppliers have to declare how they deal with environmental and social issues. An important means for implementing this are environmental and social standards which set minimum requirements. This often captures a kind of double aim: the first objective is to avoid related risk, which can be related to all three dimensions of sustainability [108,38,156]. Risks can derive from environmental or social performance, but also from disruptions of operational processes as discussed in "conventional" supply chain risk management [217].

The second one is to improve the overall supply chain performance, where frequently the focus is on the relation between environmental and economic performance [66,89,131,185,76,162,161,179]. Often, a positive correlation between these two dimensions is observed, although this might be a bit too simple: currently, long term studies are not yet available, and the social dimension has been rarely addressed. Thereby, a second distinctive feature of sustainable supply chains can be identified. Performance has been mentioned in the context of the "usual" operations objectives such as quality, speed, dependability, flexibility and cost [227]. Additionally, the quest for reaching the performance frontier [221] has to include the environmental and social dimension as well (also [91]), taking the trade-off debate to a further, broader level.

Further insights are offered on how these dimensions relate to each other. This is assessed via the goal relations. Three categories were formed in this dimension, which are not mutually exclusive, so a paper can address more than one of these categories (see Table 6): 124 papers, and thereby the majority, point at win-win-(win-) situation(s), which are frequently observed in environmental and sustainability management literature. Newton and Harte [216] have criticized much of the related publications for pointing out only the "easy wins," and feel that these should not be mistaken as long term results. Still, trade-offs between the three dimensions are brought up 72 times.

A third category was identified in this dimension. In 37 papers, the environmental and social performances were seen as the prerequisites for suppliers that allowed them to provide materials or service(s) to operate as part of the supply chain. From the focal company's perspective, this implies that environmental and social criteria for supplier evaluation guarantee that the supplier acts according to set standards [98,110,38,143]. Therefore, they can be comprehended as order qualifiers [210], while orders are won based on economic performance, i.e., the third dimension of sustainability.

Building on the issue mentioned in the previous sections, related standards both for management systems (i.e., ISO 14000, SA

### Table 4
Barriers for sustainable supply chain management

| Barriers | Number of papers (N = 191) |
|---|---|
| Higher costs | 59 |
| Coordination complexity/effort | 48 |
| Insufficient/missing communication in the supply chain | 29 |

### Table 6
Goal relations

| Goal relation | Number of papers (N = 191) |
|---|---|
| Win-win-situations | 124 |
| Trade-offs | 72 |
| Minimum performance | 37 |

Exhibit 28 to Decl. of Thomas Lyon
616                                    ER-290

S. Seuring, M. Müller / Journal of Cleaner Production 16 (2008) 1699–1710

8000, codes of conducts), which suppliers have to implement upon focal company/customer request, or specific products (e.g., coffee: [10,37,42]) play a central role. In one recently published example, Mamic [102] collected data from 22 multi-national companies and 74 of their suppliers to gain insights how such standards (i.e., codes of conduct) are implemented in the footwear, apparel and retail industry. Relating this to the idea of greening the supply process [14], comprehensive supplier audits are required [110,64,129,102, 185]. This might even trigger further partnering where joint process improvements are conducted [75].

### 4.3. Supply chain management for sustainable products

The second strategy is labelled as "supply chain management for sustainable products". *Sustainable products* is the term used to comprehend all kinds of products that have or aim at an improved environmental and social quality, which can be related back to the already mentioned implementation of environmental and social standards. The ultimate aim is to satisfy customers and gain a competitive advantage in the market [106,14,63,96,131].

For specifying product related requirements, life-cycle assessment is the method to be relied on most often [98,29,124,53,70,107]. In a line of research paralleling sustainable supply chain management, this has led to the establishment of life-cycle management [142]. Again, the focal company is in charge of addressing this and requesting it from suppliers, but joint initiatives would help to implement this product based green supply ([13]; also [75]).

In line with this, the cooperation with suppliers increases in importance. This does not just extend to first-tier suppliers, who are often the focus of conventional supply chain management [207]. In supply chain management for "sustainable" products, ensuring the quality of the product and the performance of the operational process might be as much of an issue as building partnerships for new product introductions, so the complete supply chain from raw materials to final customers has to be integrated [106,140,93,63,141,128].

Criteria for improvement do not only relate to the final products. Environmental criteria, e.g., being free of contaminants, can be tested. This is possible neither for the processing technologies applied which might cause environmental harm, nor for social impacts such as child labor that occur. This links the issue back to the use of environmental and social standards, and extends beyond this. As several cases report, supplier developments were required before focal companies were even able to offer "sustainable" products to their customers. Several authors report that textile and apparel producers/retailers had to make sure they had an organic cotton supplier before they were able to offer such products [30,106,93,63]. This triggered considerable investments at partner locations to develop this supply structure and to help improve their production facilities and processes, and was required before they could meet the set environmental standards for the production processes as well as the final product. What is implied is that suppliers are trained and their overall performance is improved even though the focal company usually buys less than 10% of the total output [172,79,128]. King and Lenox [89] characterize these as "lean and green" suppliers (also [144]). This demands much "deeper" information flows along the supply chain, where suppliers have to gain detailed insights into the subsequent stages of the life-cycle and supply chain as a way to comprehend why such improvements are required [124]. DeBakker and Nijhof [44] offer a framework on how internal (i.e., inside the focal company) as well as external (i.e., along the supply chain) capabilities have to be developed to reach such goals. Overall, there seems to be a need for cooperation among a wider range of companies along the supply chain than is usually discussed in conventional supply chain management literature. This has established a third specific feature

of sustainable supply chains: Handfield et al. [74] outline how related strategies might be formulated and implemented along the supply chain.

### 4.4. Complementing issues among the two strategies

As already mentioned in the previous sections, the two strategies are not mutually exclusive. While they emerge as two different, distinguishable approaches, their relation to each other might be called ambivalent, thereby opposing but also supporting each other at the same time. In the above-mentioned example of organic cotton production, some of the companies aimed for environmentally improved and socially sound products. When they started to offer them in their product line, they experienced the need to monitor the environmental and social performance of the suppliers [74]. Conversely, companies starting with supplier development initiatives for risk minimization [110,38,102] might then see opportunities for further win-win-win situations, and look at product performance as well.

## 5. Discussion

### 5.1. Distinctive features of sustainable supply chain management

This concluding section will point out some of the most important findings of the research and point out some directions for future research. The major contribution of this paper is to provide a comprehensive review of peer-reviewed journal publication on sustainable supply chain management. In our view three major topics need to be emphasized in this respect.

- Sustainable supply chain management has to take into account a wider range of issues and, therefore, look at a longer part of the supply chain.

This statement emerges as one of the most distinctive features of sustainable supply chain management, which also requires a different approach in conducting empirical research. Several case studies have collected data from several or even all stages of the supply chain [140,37,93] which, although rarely done in conventional supply chain management literature, has been identified as an urgent need in research on supply chain management [222]. This might also trigger consequences for supply chain management on a wider scale. When avoiding the risks associated with sourcing in global supply chain, focal companies might find themselves in a situation, where the must spend more attention on the sourcing of minor components. Here, the intersection among sustainable supply chain management with risk management starts to emerge. So far only two papers [38,156] carry the word risk in their title. Yet, this imposes a major challenge as it would ask for a major effort in purchasing transactions for minor products. This might return to the argument about the value of standards for reducing related transactions costs.

- Sustainable supply chain management deals with a wider set of performance objectives, thereby taking into account the environmental and social dimension of sustainability.

One implication of sustainability for companies and, therefore, for supply chains is the wider set of criteria that have to be met, often called the *triple bottom line approach* [203,91]. Environmental and social issues are increasingly on the public agenda, which provides triggers as well as opportunities to include them in managing the supply chain. The debate on the interrelation of the three dimensions has continued for some time for single companies [216,224], although the implications for supply chain management have not been fully explored. As mentioned already, several surveys

Exhibit 28 to Decl. of Thomas Lyon
617

ER-291

S. Seuring, M. Müller / Journal of Cleaner Production 16 (2008) 1699–1710

report a positive correlation for environmental and economic performance [185,131,163]. Still, the underlying question offers a major avenue for future research. Again, the interrelation with more traditional supply chain performance management proposes a full range of research issues.

- There is a much increased need for cooperation among partnering companies in sustainable supply chain management.

While supply chain integration can be considered a hot topic, much of the academic discussion as well as findings from empirical research point towards the limited integration that can be observed [207,204]. Several case studies have outlined how far the co-operation has to reach and how much effort focal companies have to invest before they can make the supply chains operational. Linking this back to the performance issue, this imposes the question, how companies might use supply chain integration to reach a sustainable performance?

These three distinctive features together place sustainable supply chain management well within the overall area of research, and offer evidence on which additional issues have to be addressed. This might also feedback into conventional supply chain literature.

### 5.2. Shortcomings of existing research

As a second issue, the limitations of present research are addressed. Here, two major points are highlighted.

- Sustainable development is often reduced to environmental improvements.

The comprehension of sustainable development is often rather simplistic. Mostly the Brundtland definition cited above [225] is referred to. It is, however, not discussed whether a more technical, positivist comprehension or a social science-based approach is taken, i.e., where sustainability is comprehended as a regulative idea. Consequently, the understanding of sustainable development is fragmented and mostly one-dimensional, i.e., environmentally based. An integrated perspective is required for future research where social issues in particular and the interrelation of the three dimensions need to be investigated much further.

- A theoretical background is often missing.

From a general perspective, there is a deficit in the take-up of theoretical background, both from within supply chain or operations management, as well as from a wider perspective, such as new institutional economics or strategic management. This conclusion is mainly derived from working with the material for a considerable time. Future research should take this into account.



**Fig. 6.** Supply chain management for "sustainable" products.

In particular, empirical research, as carried out in case studies and surveys, needs to build on a stronger theoretical basis. Yet, this should also be seen as an opportunity to develop theory. The framework presented in this paper is one such step towards theorizing [226].

Two thoughts should be taken into account. First, related developments also continue in traditional supply chain management. Second, academic papers have to say what they are trying to say within a certain word count, so authors might often choose to focus on empirical findings which are unique to their research rather then those relating to well-known theories.

## 6. Conclusion

This study has taken a broad look at sustainable supply chain management and the issues emerging in this field. It offers a conceptualization (embedded in Figs. 4–6) based on a literature review. Frequently, external triggers are put forward which are placed on focal companies by governing agencies, customers and stakeholders. Such pressure as well as incentives might lead to action by focal companies. In their relation to suppliers, several barriers and incentives are observable which hinder or further sustainable supply chain management. Based on these triggers, two strategies are identified. The first one is labelled as "supplier management for risks and performance". One major fear of companies following such a strategy is a loss of reputation if related problems are raised. Hence, additional environmental and social criteria are taken up to complement economically based supplier evaluation. Environmental and social standards play a central role in enabling this.

The second strategy is called "supply chain management for sustainable products". This usually demands the definition of life-cycle based standards for the environmental and social performance of products, which are then implemented throughout the supply chain. As mentioned already, several measures have been taken to ensure the quality of research conducted. However, in conceptual research, the knowledge, experience, and mindset of the researcher or research group have a strong impact on the results.

Future work might improve this framework by taking a closer look at particular sub-bodies of publications, i.e., from a research methodology perspective. This might allow specific features to be identified in greater detail.

### References Papers contained in the literature review[1]

[1] Abukhader SM, Jönson G. Logistics and the environment: is it an established subject? International Journal of Logistics: Research and Applications 2004; 7(2):137–49 [review, environment].



**Fig. 5.** Supplier management for risks and performance.

---

[1] The references for this paper are given in two parts: nos. [1] to [191] present the papers contained in the literature review. To make it easier to distinguish referenced papers not contained in the review, they are listed from [200] onwards.

Exhibit 28 to Decl. of Thomas Lyon        **ER-292**
618

[6] Baumann H, Boons F, Bragd A. Mapping the green product development field: engineering, policy and business perspectives. Journal of Cleaner Production 2002;10(5):409–25 [review, environment].

[10] Blowfield M. Ethical supply chains in the cocoa, coffee and tea industries. Greener Management International 2003;Issue 43:15–24 [case, social].

[13] Bowen FE, Cousins PD, Lamming RC, Faruk AC. Horses for courses: explaining the gap between the theory and practice of green supply. Greener Management International 2001;Issue 35:41–60 [survey, environment].

[14] Bowen FE, Cousins PD, Lamming RC, Faruk AC. The role of supply management capabilities in green supply. Production and Operations Management 2001;10(2):174–89 [survey, environment].

[15] Boyd DE, Spekman RE, Kamauff JW, Werhane P. Corporate social responsibility in global supply chains: a procedural justice perspective. Long Range Planning 2007;40(3):341–56 [theory, sustainable].

[17] Carter CR, Jennings MM. Logistics social responsibility – an integrative framework. Journal of Business Logistics 2002;23(1):145–80 [case, social].

[18] Carter CR. Ethical issues in international buyer–supplier relationships: a dyadic examination. Journal of Operations Management 2000;18(2):191–208 [survey, social].

[19] Carter CR. Precursors of unethical behavior in global supplier management. The Journal of Supply Chain Management 2000;36(1):45–56 [survey, social].

[20] Carter CR. Purchasing and social responsibility: a replication and extension. The Journal of Supply Chain Management 2004;40(4):4–16 [survey, social].

[21] Carter CR. Purchasing social responsibility and firm performance: the key mediating roles of organizational learning and supplier performance. International Journal of Physical Distribution & Logistics Management 2005; 35(3):177–94 [survey, social].

[22] Carter CR, Jennings MM. Social responsibility and supply chain relationships. Transportation Research Part E: Logistics and Transportation Review 2002; 38(1):37–52 [survey, social].

[23] Carter CR, Jennings MM. The role of purchasing in corporate social responsibility: a structural equation analysis. Journal of Business Logistics 2004;25(1):145–86 [survey, social].

[26] Carter CR, Dresner M. Purchasing's role in environmental management: cross-functional development of grounded theory. The Journal of Supply Chain Management 2001;37(3):12–27 [theory, environment].

[27] Chen C-C. Incorporating green purchasing into the frame of ISO 14000. Journal of Cleaner Production 2005;13(9):927–33 [theory, environment].

[29] Chien MK, Shih LH. An empirical study of the implementation of green supply chain management practices in the electrical and electronic industry and their relation to organizational performances. International Journal of Environmental Science and Technology 2007;4(3):383–94 [survey, environment].

[30] Chouinard Y, Brown MS. Going organic – converting Patagonia's cotton product line. Journal of Industrial Ecology 1997;1(1):117–29 [case, environment].

[36] Corbett CJ, Kirsch DA. International diffusion of ISO 14000 certification. Production and Operations Management 2001;10(3):327–42 [survey, environment].

[37] Courville S. Use of indicators to compare supply chains in the coffee industry. Greener Management International 2003;Issue 43:93–105 [case, sustainable].

[38] Cousins PD, Lamming RC, Bowen F. The role of risk in environment-related supplier initiatives. International Journal of Operations & Production Management 2004;24(6):554–65 [theory, environment].

[40] Cramer J. Responsiveness of industry to eco-efficiency improvements in the product chain: the case of Akzo Nobel. Business Strategy and the Environment 2000;9(1):36–48 [case, environment].

[42] Danse M, Wolters T. Sustainable coffee in the mainstream: the case of the SUSCOF consortium in Costa Rica. Greener Management International 2003; Issue 43:37–51 [case, environment].

[44] Davies IA, Crane A. Ethical decision making in fair trade companies. Journal of Business Ethics 2003;45(1–2):79–92 [case, social].

[44] De Bakker F, Nijhof A. Responsible chain management: a capability assessment framework. Business Strategy and the Environment 2002;11(1):63–75 [theory, sustainable].

[45] de Burgos Jiménez J, Céspedes Lorente JJ. Environmental performance as an operations objective. International Journal of Operations & Production Management 2001;21(12):1553–72 [review, environment].

[47] Diniz JDAS, Fabbe-Costes N. Supply chain management and supply chain orientation: key factors for sustainable development projects in developing countries? International Journal of Logistics: Research and Applications 2007;10(3):235–50 [case, sustainable].

[49] Drumwright ME. Socially responsible organizational buying: environmental concern as a noneconomic buying criterion. Journal of Marketing 1994;58(3): 1–19 [case, environment].

[53] Faruk AC, Lamming RC, Cousins PD, Bowen FE. Analyzing, mapping, managing environmental impacts along supply chains. Journal of Industrial Ecology 2002;5(2):13–36 [theory, environment].

[61] Geffen CA, Rothenberg S. Suppliers and environmental innovation: the automotive paint process. International Journal of Operations & Production Management 2000;20(2):166–86 [case, environment].

[63] Goldbach M, Seuring S, Back S. Coordinating sustainable cotton chains for the mass market – the case of the German mail order business OTTO. Greener Management International 2003;Issue 43:65–78 [case, sustainable].

[64] Graafland JJ. Sourcing ethics in the textile sector: the case of C&A. Business Ethics: A European Review 2002;11(3):282–94 [case, social].

[66] Green K, Morten B, New S. Green purchasing and supply policies: do they improve companies' environmental performance? Supply Chain Management: An International Journal 1998;3(2):89–95 [case, environment].

[68] Günther E, Scheibe L. The hurdles analysis as an instrument for improving environmental value chain management. Progress in Industrial Ecology: An International Journal 2005;2(1):107–31 [survey, environment].

[70] Hagelaar GJLF, van der Vorst JGAJ, Marcelis WJ. Organizing life cycles in supply chains – linking environmental performance to managerial designs. Greener Management International 2004;Issue 45:27–42 [theory, environment].

[74] Handfield R, Sroufe R, Walton S. Integrating environmental management and supply chain strategies. Business Strategy and the Environment 2005;14(1): 1–19 [case, environment].

[75] Handfield RB, Walton SV, Seegers LK, Melnyk SA. 'Green' value chain practices in the furniture industry. Journal of Operations Management 1997; 15(4):293–315 [case, environment].

[76] Hervani AA, Helms MM, Sarkis J. Performance measurement for green supply chain management. Benchmarking: An International Journal 2005;12(4): 330–53 [theory, environment].

[79] Holt D. Managing the interface between suppliers and organisations for environmental responsibility – an exploration of current practices in the UK. Corporate Social Responsibility and Environmental Management 2004;1(2): 71–84 [survey, environment].

[82] Irland LC. Developing markets for certified wood products: greening the supply chain for construction materials. Journal of Industrial Ecology 2007; 11(1):201–16 [case, environment].

[86] Kärnä A, Heiskanen E. The challenge of 'product chain' thinking for product development and design – the example of electrical and electronic products. The Journal of Sustainable Product Design 1998;4:26–36 [theory, environment].

[89] King AA, Lenox MJ. Lean and green? An empirical examination of the relationship between lean production and environmental performance. Production and Operations Management 2001;10(3):244–56 [survey, environment].

[91] Kleindorfer PR, Singhal K, Van Wassenhove LN. Sustainable operations management. Production and Operations Management 2005;14(4):482–92 [review, sustainable].

[93] Kogg B. Greening a cotton-textile supply chain: a case study of the transition towards organic production without a powerful focal company. Greener Management International 2003;Issue 43:53–64 [case, environment].

[95] Koplin J, Seuring S, Mesterharm M. Incorporating sustainability into supply management in the automotive industry: the case of the Volkswagen AG. Journal of Cleaner Production 2007;15(11–12):1053–62 [case, sustainable].

[96] Kovács G. Framing a demand network for sustainability. Progress in Industrial Ecology: An International Journal 2004;1(4):397–410 [theory, sustainable].

[98] Lamming RC, Hampson JP. The environment as a supply chain management issue. British Journal of Management 1996;7(Special Issue):45–62 [case, environment].

[99] Linton JD, Klassen RB, Jayaraman V. Sustainable supply chains: an introduction. Journal of Operations Management 2007;25(6):1075–82 [theory, sustainable].

[102] Mamic I. Managing global supply chain: the sports footwear, apparel and retail sectors. Journal of Business Ethics 2005;59(1):81–100 [case, social].

[103] Matos S, Hall J. Integrating sustainable development in the supply chain: the case of life cycle assessment in oil and gas and agricultural biotechnology. Journal of Operations Management 2007;25(6):1083–102 [case, sustainable].

[106] Meyer A, Hohmann P. Other thoughts; other results? – Remei's bioRe organic cotton on its way to the mass market. Greener Management International 2000;Issue 31:59–70.

[107] Michelsen O. Investigation of relationships in a supply chain in order to improve environmental performance. Cleaner Technology and Environmental Policy 2007;9(2):115–23 [case, environment].

[108] Michelsen O, Fet AM, Dahlsrud A. Eco-efficiency in extended supply chains: a case study of furniture production. Journal of Environmental Management 2005;79(3):290–7 [case, environment].

[109] Min H, Galle WP. Green purchasing strategies: trends and implications. The Journal of Supply Chain Management 1997;33(3):10–7 [survey, environment].

[110] Min H, Galle WP. Green purchasing practices of US firms. International Journal of Operations & Production Management 2001;21(9):1222–38 [survey, environment].

[119] Neilson J, Pritchard B. Green coffee? The contradictions of global sustainability initiatives from an Indian perspective. Development Policy Review 2007;25(3):311–31 [case, sustainable].

[120] New SJ. The scope of supply chain management research. Supply Chain Management: An International Journal 1997;2(1):15–22 [theory, sustainable].

[124] Pesonen H-L. Environmental management of value chains. Greener Management International 2001;Issue 33:45–58 [case, environment].

[127] Preuss L. In dirty chains? Purchasing and greener manufacturing. Journal of Business Ethics 2001;34(3–4):345–59 [case, environment].

[128] Preuss L. Rhetoric and reality of corporate greening: a view from the supply chain management function. Business Strategy and the Environment 2005; 14(2):123–39 [case, environment].

Exhibit 28 to Decl. of Thomas Lyon
619

ER-293

(252 of 297) Page 252 of 297
Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 252 of 297
Case 2:24-cv-00801-ODW-PVC Document 90-28 Filed 04/07/25 Page 11 of 13 Page ID #:9911

S. Seuring, M. Müller / Journal of Cleaner Production 16 (2008) 1699–1710

[129] Rao P. Greening the supply chain: a new initiative in South East Asia. International Journal of Operations & Production Management 2002;22(6): 632–55 [survey, environment].

[130] Rao P. The greening of supplies in the South East Asian context. Journal of Cleaner Production 2005;13(9):935–45 [survey, environment].

[131] Rao P, Holt D. Do green supply chains lead to competitiveness and economic performance? International Journal of Operations & Production Management 2005;25(9):898–916 [survey, environment].

[134] Roberts S. Supply chain specific? Understanding the patchy success of ethical sourcing initiatives. Journal of Business Ethics 2003;44(2):159–70 [case, sustainable].

[136] Sarkis J. Manufacturing's role in corporate environmental sustainability – concerns for the new millennium. International Journal of Operations & Production Management 2001;21(5–6):666–86 [theory, sustainable].

[140] Seuring S. Green supply chain costing – joint cost management in the polyester linings supply chain. Greener Management International 2001;Issue 33:71–80 [case, environment].

[141] Seuring S. Integrated chain management and supply chain management – comparative analysis and illustrative cases. Journal of Cleaner Production 2004;12(8–10):1059–71 [case, environment].

[142] Seuring S. Industrial ecology, life cycles, supply chains – differences and interrelations. Business Strategy and the Environment 2004;3(5):306–19 [theory, environment].

[143] Seuring S, Goldbach M, Koplin J. Managing time and complexity in supply chains: two cases from the textile industry. International Journal of Integrated Supply Management 2004;1(2):180–98.

[144] Seuring S, Müller M. Integrated chain management in Germany – identifying schools of thought based on a literature review. Journal of Cleaner Production 2007;15(7):699–710 [review, environment].

[150] Srivastava SK. Green supply chain management: a state-of-the-art literature review. International Journal of Management Reviews 2007;9(1):53–80 [review, environment].

[154] Svensson G. Aspects of sustainable supply chain management (SSCM): conceptual framework and empirical example. Supply Chain Management: An International Journal 2007;12(4):262–6 [theory, sustainable].

[156] Teuscher P, Grüninger B, Ferdinand N. Risk Management in sustainable supply chain management (SSCM): lessons learnt from the case of GMO-free soybeans. Corporate Social Responsibility and Environmental Management 2006;13(1):1–10 [case, sustainable].

[158] Trowbridge P. A case study of green supply-chain management at advanced micro devices. Greener Management International 2001;Issue 35:121–35 [case, environment].

[161] Vachon S. Green supply chain practices and the selection of environmental technologies. International Journal of Production Research 2007;45(18): 4357–79 [survey, environment].

[162] Vachon S, Klassen RD. Extending green practices across the supply chain. The impact of upstream and downstream integration. International Journal of Operations & Production Management 2006;26(7):795–821 [survey, environment].

[163] Vachon S, Klassen RD. Green project partnership in the supply chain: the case of the package printing industry. Journal of Cleaner Production 2006;14(6–7):661–71 [survey, environment].

[165] Vasileiou K, Morris J. The sustainability of the supply chain for fresh potatoes in Britain. Supply Chain Management: An International Journal 2006;11(4): 317–27 [survey, environment].

[172] Walton SV, Handfield RB, Melnyk SA. The green supply chain: integrating suppliers into environmental management processes. International Journal of Purchasing and Materials Management 1998;34(2):2–11 [case, environment].

[174] Welford R, Frost S. Corporate social responsibility in Asian supply chains. Corporate Social Responsibility and Environmental Management 2006;13(3): 166–76 [survey, sustainable].

[179] Yakoleva N. Measuring the sustainability of the food supply chain: a case study of the UK. Journal of Environmental Policy & Planning 2007;9(1):75–100 [case, sustainable].

[185] Zhu Q, Sarkis J, Geng Y. Green supply chain management in China: pressures, practices and performance. International Journal of Operations & Production Management 2005;25(5):449–68 [survey, environment].

[186] Zhu Q, Sarkis J, Lai KH. Green supply chain management: pressures, practices and performance within the Chinese automobile industry. Journal of Cleaner Production 2007;15(11):1041–52 [survey, environment].

[191] Zsidisin GA, Siferd SP. Environmental purchasing: a framework for theory development. European Journal of Purchasing & Supply Management 2001; 7(1):61–73 [review, environment].

[200] Beske P, Koplin J, Seuring S. The use of environmental and social standards by German first-tier suppliers of the Volkswagen AG. Corporate Social Responsibility & Environmental Management 2008;15(2):63–75.

[201] Brewerton P, Millward L. Organisational research methods. London: Sage; 2001.

[202] Dyllick T, Hockerts K. Beyond the business case for corporate sustainability. Business Strategy and the Environment 2002;11(2):130–41.

[203] Elkington J. Cannibals with forks: the triple bottom line of 21st century business [reprint]. Oxford: Capstone; 2002.

[204] Fawcett SE, Magnan GM. The rhetoric and reality of supply chain integration. International Journal of Physical Distribution & Logistics Management 2002; 32(5):339–61.

[205] Fink A. Conducting research literature reviews: from paper to the internet. Thousand Oaks: Sage; 1998.

[206] Fleischmann M, Bloemhof-Ruwaard JM, Dekker R, van der Laan E, van Nunen JAEE, Van Wassenhove LN. Quantitative models for reverse logistics: a review. European Journal of Operational Research 1997;103:1–17.

[207] Frohlich M, Westbrook R. Arcs of integration: an international study of supply chain strategies. Journal of Operations Management 2001;19(2):185–200.

[208] Handfield RB, Nichols EL. Introduction to supply chain management. New Jersey: Prentice-Hall; 1999.

[209] Harland CM, Lamming RC, Walker H, Philips WE, Caldwell ND, Johnson TE, et al. Supply management: is it a discipline? International Journal of Operations & Production Management 2006;26(7):730–53.

[210] Hill T. Manufacturing strategy, text and cases. 3rd ed. Boston: McGraw-Hill; 2000.

[211] Jayaram V, Klassen R, Linton JD. Supply chain management in a sustainable environment. Journal of Operations Management 2007;25(6):1071–4.

[212] Kassarjan HH. Content analysis in consumer research. The Journal of Consumer Research 1977;4(1):8–18.

[213] Mayring P. Einführung in die qualitative Sozialforschung – eine Anleitung zum qualitativen Denken. [Introduction to qualitative social research]. Weinheim, Germany: Beltz Verlag; 2002.

[214] Mayring P. (, Qualitative Inhaltanalyse – Grundlagen und Techniken. [Qualitative content analysis]. 8th ed. Weinheim, Germany: Beltz Verlag; 2003.

[215] Meredith J. Theory building through conceptual methods. International Journal of Operations & Production Management 1993;13(5):3–11.

[216] Newton T, Harte G. Green business: technicist kitsch? Journal of Management Studies 1997;34(1):75–98.

[217] Norrman A, Jansson U. Ericsson's proactive supply chain risk management approach after a serious subsupplier accident. International Journal of Physical Distribution and Logistics Management 2004;34(5):434–56.

[218] Piplani R, Pujawan N, Ray S. Sustainable supply chain management. International Journal of Production Economics 2007;111(2):193–4.

[219] Rahimifard S, Clegg AJ. Aspects of sustainable design and manufacture. International Journal of Production Economics 2007;45(18–19):4013–9.

[220] Schary P, Skjøtt-Larsen T. Managing the global supply chain. 2nd ed. Copenhagen: Copenhagen Business School Press; 2001.

[221] Schmenner RW, Swink ML. On theory in operations management. Journal of Operations Management 1998;17(1):97–113.

[222] Seuring S. The rigor of case study research in supply chain management. Supply Chain Management: An International Journal 2008;13(2):128–37.

[223] Seuring S, Sarkis J, Müller M, Rao P. Sustainability and supply chain management – an introduction to the special issue. Journal of Cleaner Production 2008;16(15):1545–51.

[224] Wagner M, Schaltegger S. The effect of corporate environmental strategy choice and environmental performance on competitiveness and economic performance: an empirical study of EU manufacturing. European Management Journal 2004;22(5):557–72.

[225] WCED (World Commission on Environment and Development). Our common future. Oxford: Oxford University Press; 1987.

[226] Weick KE. What theory is not, theorizing is. Administrative Science Quarterly 1995;40(3):385–90.

[227] White GP. A survey and taxonomy of strategy-related performance measures for manufacturing. International Journal of Operations & Production Management 1996;16(3):42–61.

[228] Wolters T. Transforming international product chains into channels of sustainable production – the imperative of sustainable chain management. Greener Management International 2003;Issue 43:6–13.

[229] Yin R. Case study research – design and methods. 3rd ed. Thousand Oaks: Sage; 2003.

## Further references[2]

[2] Angell LC, Klassen RD. Integrating environmental issues into the mainstream: an agenda for research in operations management. Journal of Operations Management 1999;17(5):575–98 [theory, environment].

[3] Apaiah RK, Hendrix EMT, Meerdink G, Linnemann AR. Qualitative methodology for efficient food chain design. Trends in Food Science & Technology 2005;16(5):204–14 [case, environment].

[4] Aronsson H, Brodin MH. The environmental impact of changing logistics structures. The International Journal of Logistics Management 2006;17(3): 394–415 [case, environment].

[5] Auroi C. Improving sustainable chain management through fair trade. Greener Management International 2003;Issue 43:25–35 [theory, social].

[6] Beamon BM. Designing the green supply chain. Logistics Information Management 1999;12(4):332–42 [theory, environment].

[8] Beamon BM. Environmental and sustainability ethics in supply chain management. Science and Engineering Ethics 2005;11(2):221–34 [theory, environment].

───────────
[2] Paper titles that suggest the paper should be part of the literature review are in most cases guest-editorial introductions to special issues. Hence, they are not peer-reviewed papers.

Exhibit 28 to Decl. of Thomas Lyon
620

**ER-294**

S. Seuring, M. Müller / Journal of Cleaner Production 16 (2008) 1699–1710          1709

[9] Bergström K, Solér C, Shanahan H. Professional food purchasers' practice in using environmental information. British Food Journal 2005;107(5):306–19 [case, environment].

[11] Boons F. Eco-design and integrated chain management: dealing with networks of stakeholders. The Journal of Sustainable Product Design 1998;5: 22–35 [case, environment].

[12] Boons F. Greening products: a framework for product chain management. Journal of Cleaner Production 2002;10(5):495–506 [theory, sustainable].

[16] Canning L, Hanmer-Lloyd S. Managing the environmental adaptation process in supplier–customer relationships. Business Strategy and the Environment 2001;10(4):225–37 [case, environment].

[24] Carter CR, Kale R, Grimm CM. Environmental purchasing and firm performance: an empirical investigation. Transportation Research Part E: Logistics and Transportation Review 2000;36(3):219–28 [survey, environment].

[25] Carter CR, Carter JR. Interorganizational determinants of environmental purchasing: initial evidence from the consumer products industries. Decision Sciences Journal 1998;29(3):659–84 [survey, environment].

[27] Carter CR, Ellram LM, Ready KJ. Environmental purchasing: benchmarking our German counterparts. International Journal of Purchasing and Materials Management 1998;34(4):28–38 [survey, environment].

[31] Clift R. Metrics for supply chain sustainability. Cleaner Technology and Environmental Policy 2003;5(3–4):240–7 [model, sustainable].

[32] Clift R, Wright L. Relationships between environmental impacts and added value along the supply chain. Technological Forecasting and Social Change 2000;65(3):281–95 [model, environment].

[33] Cooper RW, Frank GL, Kemp RA. A multinational comparison of key ethical issues, helps and challenges in the purchasing and supply management profession: the key implications for business and the professions. Journal of Business Ethics 2000;23(1):83–100 [survey, social].

[34] Cooper RW, Frank GL, Kemp RA. Ethical issues, helps and challenges: perceptions of members of The Chartered Institute of Purchasing and Supply. European Journal of Purchasing & Supply Management 1997;3(4):189–98 [survey, social].

[35] Corbett CJ, DeCroix GA. Shared-savings contracts for indirect materials in supply chains: channel profits and environmental impacts. Management Science 2001;47(7):881–93 [model, environment].

[39] Cramer J. Experiences with implementing integrated chain management in Dutch Industry. Business Strategy and the Environment 1996;5(1):38–47 [theory, environment].

[41] Cramer JM, van Lenders C. The process of chain-oriented environmental improvement at Van Hecke Catering. Greener Management International 2000;Issue 31:51–7 [case, environment].

[44] de Groene A, Hermans M. Economic and other implications of integrated chain management: a case study. Journal of Cleaner Production 1998;6(3–4): 199–211 [case, environment].

[48] Dobilas G, MacPherson A. Environmental regulation and international sourcing policies of multinational firms. Growth and Change 1997;28(1):7–23 [survey, environment].

[50] Elwood H, Case S. Private sector pioneers: how companies are incorporating environmentally preferable purchasing. Greener Management International 2000;Issue 29:70–94 [case, environment].

[51] Emiliani ML, Stec DJ. Squaring online reverse auctions with the Caux Round Table Principles for business. Supply Chain Management: An International Journal 2002;7(2):92–100 [theory, social].

[52] Euclides Filho K. Supply chain approach to sustainable beef production from a Brazilian perspective. Livestock Production Science 2004;90(1):53–61 [theory, sustainable].

[54] Ferretti I, Zanoni S, Zavanella L, Diana A. Greening the aluminium supply chain. International Journal of Production Economics 2007;108(1–2):236–45 [model, environment].

[55] Fichtner W, Frank M, Rentz O. Inter-firm energy supply concepts: an option for cleaner energy production. Journal of Cleaner Production 2004;12(8–10): 891–9 [model, environment].

[56] Fiskel J, Lambert DM, Artman LB, Harris JA, Share HM. Environmental excellence – the new supply chain edge. Supply Chain Management Review 2004;8(4):50–7 [theory, environment].

[57] Foran B, Lenzen M, Deyb C, Bilek M. Integrating sustainable chain management with triple bottom line accounting. Ecological Economics 2005;52(2): 143–57 [model, sustainable].

[58] Forman M, Jørgensen MS. Organising environmental supply chain management – experience from a sector with frequent product shifts and complex product chains: the case of the Danish textile sector. Greener Management International 2004;Issue 45:43–62 [case, environment].

[59] Fossgard-Moser T. Promoting sustainable development through the enhancement of local employment and supply chain opportunities generated by energy companies: the case of the Shell group. Greener Management International 2003;Issue 43:79–92 [case, environment].

[60] Freeman D. Homeworkers in global supply chains. Greener Management International 2003;Issue 43:107–18 [case, social].

[62] Geldermann J, Treitz M, Rentz O. Towards sustainable production networks. International Journal of Production Research 2007;45(18):4207–424 [model, environment].

[65] Grankvist G, Biel A. The impact of environmental information on professional purchasers' choice of products. Business Strategy and the Environment 2007; 16(6):421–9 [survey, environment].

[67] Green K, Morten B, New S. Purchasing and environmental management: interactions, policies and opportunities. Business Strategy and the Environment 1996;5(3):188–97 [case, environment].

[69] Hagelaar GJLF, van der Vorst JGAJ. Environmental supply chain management: using life cycle assessment to structure supply chains. International Food and Agribusiness Review 2002;4(4):399–412 [case, environment].

[71] Hall J. Environmental supply-chain innovation. Greener Management International 2001;Issue 35:105–19 [case, environment].

[72] Hall J. Environmental supply chain dynamics. Journal of Cleaner Production 2000;8(6):455–71 [case, environment].

[73] Hamprecht J, Corsten C, Noll M, Meier E. Controlling the sustainability of food supply chains. Supply Chain Management: An International Journal 2005; 10(1):7–10 [case, sustainable].

[77] Hill KE. Supply-chain dynamics, environmental issues, manufacturing firms. Environment and Planning 1997;29(7):1257–74 [survey, environment].

[78] H'Mida S, Lakhal SY. A model for assessing the greenness effort in a product supply chain. International Journal of Global Environmental Issues 2007;1:4–24 [model, environment].

[80] Hugo A, Pistikopoulos EN. Environmentally conscious long-range planning and design of supply chain networks. Journal of Cleaner Production 2005; 13(15):1471–91 [model, environment].

[81] Ilbery B, Maye D. Food supply chains and sustainability: evidence from specialist food producers in the Scottish/English borders. Land Use Policy 2005;22(4):331–4 [case, sustainable].

[83] Jones A. An environmental assessment of food supply chains: a case study on dessert apples. Environmental Management 2002;30(4):560–76 [case, environment].

[84] Jorgensen AL, Knudsen JS. Sustainable competitiveness in global value chains: how do small Danish firms behave? Corporate Governance 2006; 6(4):449–62 [survey, sustainable].

[86] Kainuma Y, Tawara N. A multiple attribute utility theory approach to lean and green supply chain management. International Journal of Production Economics 2006;101(1):99–108 [model, environment].

[87] Kassinis GI, Soteriou AC. Greening the service profit chain: the impact of environmental management practices. Production and Operations Management 2003;12(3):386–403 [survey, environment].

[88] Khoo HH, Spedding TA, Bainbridge I, Taplin DMR. Creating a green supply chain. Greener Management International 2001;Issue 35:71–88 [model, environment].

[90] Klassen RD, Vachon S. Collaboration and evaluation in the supply chain: the impact on plant-level environmental investment. Production and Operations Management 2003;12(3):336–52 [survey, environment].

[92] Kocabasoglu C, Prahinski C, Klassen RD. Linking forward and reverse supply chain investments: the role of business uncertainty. Journal of Operations Management 2007;25(6):1141–60 [survey, environment].

[94] Koh SCL, Birkin F, Lewis L, Cashman A. Current issues of sustainable production, eco-supply chains and eco-logistics for sustainable development. International Journal of Global Environmental Issues 2007;7(1):88–101 [theory, environment].

[97] Lakhal SY, H'Mida S, Islam MR. Green supply chain parameters for a Canadian petroleum refinery company. International Journal of Environmental Technology and Management 2007;7(1–2):56–67 [case, environment].

[100] Lu LYY, Wu CH, Kuo T-C. Environmental principles applicable to green supplier evaluation by using multi-objective decision analysis. International Journal of Production Research 2007;45(18):4317–31 [model, environment].

[101] Maloni MJ, Brown ME. Corporate social responsibility in the supply chain: an application in the food industry. Journal of Business Ethics 2006;68(1):35–52 [theory, sustainable].

[104] McIntyre K, Smith H, Henham A, Pretlove J. Environmental performance indicators for integrated supply chains: the case of Xerox Ltd. Supply Chain Management: An International Journal 1998;3(3):149–56.

[105] Meisner Rosen C, Bercovitz J, Beckman S. Environmental supply-chain management in the computer industry. Journal of Industrial Ecology 2001; 4(4):83–104 [theory, environment].

[111] Mintcheva V. Indicators for environmental policy integration in the food supply chain (the case of the tomato ketchup supply chain and the integrated product policy). Journal of Cleaner Production 2005;13(7):717–31 [case, environment].

[112] Murphy PR, Poist RF. Socially responsible logistics: an exploratory study. Transportation Journal 2002;41(4):23–35 [survey, social].

[113] Murphy PR, Poist RF. Green perspectives and practices: a "comparative logistics" study. Supply Chain Management: An International Journal 2003; 8(2):122–31 [survey, environment].

[114] Murphy PR, Poist RF, Braunschweig CD. Management of environmental issues in logistics: current status and future potential. Transportation Journal 1994; 34(1):48–56 [survey, environment].

[115] Murphy PR, Poist RF, Braunschweig CD. Role and relevance of logistics to corporate environmentalism – an empirical assessment. International Journal of Physical Distribution & Logistics Management 1995;25(2):5–19 [survey, environment].

[116] Murphy PR, Poist RF, Braunschweig CD. Green logistics: comparative views of environtal progressives, moderates and conservatives. Journal of Business Logistics 1996;17(1):191–211 [survey, environment].

[117] Nagurney A, Toyasaki F. Supply chain supernetworks and environmental criteria. Transportation: Part D 2003;8(3):185–213 [model, environment].

Exhibit 28 to Decl. of Thomas Lyon          ER-295

621

[118] Narayanaswamy V, Scott JA, Ness JN, Lochhead M. Resource flow and product chain analysis as practical tools to promote cleaner production initiatives. Journal of Cleaner Production 2003;11(4):375–87 [case, environment].

[121] Noci G. Designing 'green' vendor rating systems for the assessment of a supplier's environmental performance. European Journal of Purchasing & Supply Management 1997;3(2):103–14 [model, environment].

[122] Ofori G. Greening the construction supply chain in Singapore. European Journal of Purchasing & Supply Management 2000;6(3–4):195–206 [theory, environment].

[123] Partidario PJ, Vergragt PJ. Planning of strategic innovation aimed at environmental sustainability: actor-networks, scenario acceptance and backcasting analysis within a polymeric coating chain. Futures 2002;34(9–10):841–61 [case, sustainable].

[125] Polgreen K. Social and environmental supply-chain management: an overview. Small Enterprise Development: An International Journal 2002;13(3):25–33 [theory, sustainable].

[126] Preuss L. Green light for greener supply. Business Ethics: A European Review 2002;11(4):308–17 [theory, environment].

[132] Ras PJ, Vermeulen W, Saalmink SL. Greening global product chains: bridging barriers in the north-south cooperation. An exploratory study of possibilities for improvement in the product chains of table grape and wine connecting South Africa and the Netherlands. Progress in Industrial Ecology: An International Journal 2007;4(6):401–17 [case, environment].

[133] Reiskin ED, White AL, Kauffmann Johnson J, Votta TJ. Servicizing the chemical supply chain. Journal of Industrial Ecology 2000;3(2–3):9–31 [theory, environment].

[135] Sarkis J. Evaluating environmentally conscious business practices. European Journal of Operational Research 1998;107(1):159–74 [model, environment].

[137] Sarkis J. A strategic decision framework for green supply chain management. Journal of Cleaner Production 2003;11(4):397–409 [model, environment].

[138] Sarkis J. Supply chain management and environmentally conscious design and manufacturing. International Journal of Environmental Conscious Design 1995;4(2):43–52 [theory, environment].

[139] Schiefer G. Environmental control for process improvement and process efficiency in supply chain management – the case of the meat chain. International Journal of Production Economics 2002;78(2):197–206 [theory, environment].

[145] Sheu J-B, Chou Y-H, Hu C-C. An integrated logistics operational model for green-supply chain management. Transportation Research: Part E 2005;41(4):287–313 [model, environment].

[146] Simpson D, Power DJ. Use the supply relationship to develop lean and green suppliers. Supply Chain Management: An International Journal 2005;10(1):60–8.

[147] Simpson D, Power DJ, Samson D. Greening the automotive supply chain: a relationship perspective. International Journal of Operations & Production Management 2007;27(1):28–48 [survey, environment].

[148] Sinding K. Environmental management beyond the boundaries of the firm: definitions and constraints. Business Strategy and the Environment 2000;9(2):79–91 [theory, environment].

[149] Sonesson U, Berlin J. Environmental impact of future milk supply chains in Sweden: a scenario study. Journal of Cleaner Production 2003;11(3):253–66 [model, environment].

[151] Stainer L, Gully A, Stainer A. The UK food supply chain – an ethical perspective. Business Ethics: A European Review 1998;7(4):205–11 [case, social].

[152] Steger U. Managerial issues in closing the loop. Business Strategy and the Environment 1996;5(4):252–68 [theory, environment].

[153] Stoughton M, Votta T. Implementing service-based chemical procurement: lessons and results. Journal of Cleaner Production 2003;11(8):839–49 [case, environment].

[155] Tan RBH, Khoo HH. An LCA study of a primary aluminum supply chain. Journal of Cleaner Production 2005;13(6):607–18 [model, environment].

[157] Theyel G. Customer and supplier relations for environmental performance. Greener Management International 2001;Issue 35:61–9 [survey, environment].

[159] Tsoulfas GT, Pappis CP. Environmental principles applicable to supply chain design and operation. Journal of Cleaner Production 2006;14(18):1593–602 [theory, environment].

[160] Ukidwe NU, Bakshi BR. Flow of natural versus economic capital in industrial supply networks and its implications to sustainability. Environmental Science and Technology 2005;39(24):9759–69 [model, environment].

[164] van Hoek RI. From reversed logistics to green supply chains. Supply Chain Management: An International Journal 1999;4(3):129–34 [theory, environment].

[166] Verghese K, Lewis H. Environmental innovation in industrial packaging: a supply chain approach. International Journal of Production Research 2007;45(18):4381–401 [case, environment].

[167] Vermeulen WJV, Ras PJ. The challenge of greening global product chains: meeting both ends. Sustainable Development 2006;14(4):245–56 [case, environment].

[168] Verschoor AH, Reijnders L. How the purchasing department can contribute to toxics reduction. Journal of Cleaner Production 1997;5(3):187–91 [case, environment].

[169] Vidal N, Kozak R, Cohen D. Chain of custody certification: an assessment of the North American solid wood sector. Forest Policy and Economics 2005;7(3):345–55 [survey, environment].

[170] Vinodh S, Devadasan SR, Rajanayagam D. Roadmap for lucrative greening of supply chains: theoretical and practical perspectives. International Journal of Process Management and Benchmarking 2007;2(1):29–44 [model, environment].

[171] Votta T, Broe R, Kauffman Johnson J, White AL. Using environmental accounting to green chemical supplier contracts. Pollution Prevention Review 1998;8(22):67–78 [theory, environment].

[173] Warren JP, Rhodes E, Carter R. A total product system concept – a case study of the Smart™ automobile. Greener Management International 2001;Issue 35:89–104 [case, environment].

[175] Winstanley D, Clark J, Leeson H. Approaches to child labour in the supply chain. Business Ethics: A European Review 2003;11(3):210–33 [case, social].

[176] Wolters T, James P, Bouman M. Stepping-stones for integrated chain management in the firm. Business Strategy and the Environment 1997;6(3):121–32 [theory, environment].

[177] Wu H-J, Dunn SC. Environmentally responsible logistics systems. International Journal of Physical Distribution & Logistics Management 1995;25(2):20–38 [theory, environment].

[178] Wycherly IM. Greening supply chains: the case of the Body Shop International. Business Strategy and the Environment 1999;8(2):120–7 [case, environment].

[180] Yang C-L, Sheu C. Achieving supply chain environment management: an exploratory study. International Journal of Technology Management 2007;40(1–3):131–56 [case, environment].

[181] Zhu Q, Cote RP. Integrating green supply chain management into an embryonic eco-industrial development: a case study of the Guitang Group. Journal of Cleaner Production 2004;12(8–10):1025–35 [case, environment].

[182] Zhu Q, Sarkis J. Relationships between operational practices and performance among early adopters of green supply chain management practices in Chinese manufacturing enterprises. Journal of Operations Management 2004;22(3):265–89 [survey, environment].

[183] Zhu Q, Sarkis J. The link between quality management and environmental management in firms of differing size: an analysis of organizations in China. Environmental Quality Management 2004;13(3):53–66 [survey, environment].

[184] Zhu Q, Sarkis J. An inter-sectoral comparison of green supply chain management in China: drivers and practices. Journal of Cleaner Production 2006;14(5):472–86 [survey, environment].

[187] Zhu Q, Sarkis J, Lai KH. Initiatives and outcomes of green supply chain management implementation by Chinese manufacturers. Journal of Environmental Management 2007;25(6):179–89 [survey, environment].

[188] Zhu Q, Geng Y. Integrating environmental issues into supplier selection and management: a study of large and medium-sized state-owned enterprises in China. Greener Management International 2001;Issue 35:27–40 [survey, environment].

[189] Zhu Q, Sarkis J. The moderating effects of institutional pressures on emergent green supply chain practices and performance. International Journal of Production Research 2007;45(18):4333–55 [survey, environment].

[190] Zsidisin GA, Hendrick TE. Purchasing's involvement in environmental issues: a multi-country perspective. Industrial Management & Data Systems 1998;98(7–8):313–20 [survey, environment].

Exhibit 28 to Decl. of Thomas Lyon

**ER-296**

622

1   ROB BONTA
    Attorney General of California
2   MYUNG J. PARK (SBN 210866)
    LAURA J. ZUCKERMAN (SBN 161896)
3   Supervising Deputy Attorneys General
    DAVID ZAFT (SBN 237365)
4   M. ELAINE MECKENSTOCK (SBN 268861)
    CAITLAN MCLOON (SBN 302798)
5   EMILY HAJARIZADEH (SBN 325246)
    DYLAN REDOR (SBN 338136)
6   KATHERINE GAUMOND (SBN 349453)
    Deputy Attorneys General
7     300 South Spring Street, Suite 1702
      Los Angeles, CA  90013-1230
8     Telephone:  (213) 269-6438
      Fax:  (916) 731-2128
9     E-mail:  Caitlan.McLoon@doj.ca.gov
    *Attorneys for Defendants Liane M. Randolph,*
10  *Steven S. Cliff, and Robert A. Bonta*

11          IN THE UNITED STATES DISTRICT COURT

12          FOR THE CENTRAL DISTRICT OF CALIFORNIA

13

14

15   **CHAMBER OF COMMERCE OF**          2:24-cv-00801-ODW-PVC
     **THE UNITED STATES OF**
16   **AMERICA, CALIFORNIA**             **DECLARATION OF THOMAS P.**
     **CHAMBER OF COMMERCE,**            **LYON IN SUPPORT OF**
17   **AMERICAN FARM BUREAU**            **DEFENDANTS' OPPOSITION TO**
     **FEDERATION, LOS ANGELES**         **PLAINTIFFS' MOTION FOR**
18   **COUNTY BUSINESS**                 **PRELIMINARY INJUNCTION**
     **FEDERATION, CENTRAL**
19   **VALLEY BUSINESS**                 Date:        May 5, 2025
     **FEDERATION, and WESTERN**        Time:        1:30 PM
20   **GROWERS ASSOCIATION,**           Courtroom:   5D
                                         Judge:       The Honorable Otis D.
21                        Plaintiffs,                 Wright, II
                                         Trial Date:  Not Set
22      v.                               Action Filed: 1/30/2024

23   **LIANE M. RANDOLPH, in her**
     **official capacity as Chair of the**
24   **California Air Resources Board,**
     **STEVEN S. CLIFF, in his official**
25   **capacity as the Executive Officer of**
     **the California Air Resources Board,**
26   **and ROBERT A. BONTA, in his**
     **official capacity as Attorney General**
27   **of California,**

28                        Defendants.

## DECLARATION OF THOMAS P. LYON

I, Thomas P. Lyon, hereby declare:

1.     I have been retained by counsel for Defendants Liane M. Randolph, Steven S. Cliff, and Robert A. Bonta, in their official capacities (Defendants), in connection with the above captioned litigation. I have actual knowledge of the matters stated in this declaration and can truthfully testify to the matters contained herein.

2.     I am the Dow Chair of Sustainable Science, Technology, and Commerce at the University of Michigan, with appointments in both the Ross School of Business and the School for Environment and Sustainability (SEAS). I received my Bachelor of Science in engineering from Princeton University and my Masters and PhD degrees in Engineering-Economic Systems from Stanford University. I am the author of five books and over 70 journal articles, which have been cited over 13,000 times. I have served for 8 years as Faculty Director of the Erb Institute for Global Sustainable Enterprise at University of Michigan, and for 5 years as President of the Alliance for Research on Corporate Sustainability (ARCS). I have been a visiting scholar at the University of Chicago, Stanford University, the University of Paris, Resources for the Future, and the US Department of Justice. I received the Distinguished Scholar Award from the Organizations and the Natural Environment Division of the Academy of Management in 2022, and the World Sustainability Award from the MDPI Sustainability Foundation in 2023. A true and correct copy of my CV can be found at Docket No. 56-1.

3.     My research focuses on the drivers and the impacts of corporate sustainability initiatives. I have written articles on government regulation, industry self-regulation, voluntary environmental programs, environmental information disclosure, greenwashing, and corporate political responsibility. My 2011 paper with John Maxwell, *Greenwash: Corporate Environmental Disclosure under*

**ER-298**

(257 of 297) Page 257 of 297
Case 2:24-cv-00801-ODW-PVC    Document 90    Filed 04/07/25    Page 3 of 33    Page ID
#:9293

1    *Threat of Audit*, in the Journal of Economics and Management Strategy, launched

2    the serious scholarly study of greenwash, i.e. misleading corporate sustainability

3    claims. A true and correct copy of this paper can be found at Docket No. 56-11.  I

4    have since written five additional papers on the subject, and this corpus of work has

5    been cited over 5,000 times.

6        4.    Methodology:

7            a.    I have been asked by attorneys for Defendants to submit this

8    declaration, based on my independent opinions and expertise, regarding the

9    importance of information in markets, the relevance of environmental disclosure to

10   investors and other stakeholders, and the forms and dangers of greenwashing.

11           b.    I have read and am familiar with California Senate Bills 253 and

12   261 (S.B. 253 and S.B. 261).

13           c.    I have read and am familiar with the Motion for Preliminary

14   Injunction filed by Plaintiffs United States Chamber of Commerce, et al. in the

15   above captioned matter, and the supporting materials attached thereto.

16           d.    In developing my expert opinions for this declaration, I

17   consulted a wide range of scholarly literature on the topics I am discussing, drawing

18   from fields that include economics, management, accounting and finance. The key

19   research papers on which I rely are cited below and copies of them are attached

20   hereto.

21           e.    I have relied on information that is customarily reviewed and

22   relied upon by experts in my field of corporate sustainability, which studies the

23   causes and consequences of environmentally sustainable corporate actions.

24           f.    I have also relied on my own personal knowledge, training, and

25   experience in the field of economics, and in corporate sustainability in particular.

26   As can be seen from my C.V., I have written numerous papers on the impacts of

27   disclosure on financial and environmental performance, theoretical and empirical

28   analyses of greenwashing, and the factors driving carbon emissions reductions at

**ER-299**

(258 of 297) Page 258 of 297 Case: 25-5327 09/18/2025 DktEntry: 8.3 Page 258 of 297
Case 2:24-cv-00801-ODW-PVC Document 90 Filed 04/07/25 Page 4 of 33 Page ID
#:9294

1   the facility level.

2   **Summary**

3       5.    In this declaration, I will provide support for the following

4   conclusions.  Ensuring accurate climate disclosure is important in order to avoid

5   market failures that are harmful to the public interest.  Climate disclosures provide

6   information that assists investors, consumers and employees in making economic

7   decisions.  However, there are many ways in which this information can be

8   presented in a misleading fashion, thereby leading to greenwashing.  There are

9   many examples of misleading language in Corporate Social Responsibility (CSR)

10   Reports and on corporate websites.  Greenwashing is common in current GHG

11   emissions disclosures, primarily in the form of selective disclosure.  Greenwashing

12   is common in corporate decarbonization plans, primarily in the form of empty

13   statements and lack of proof.  Standardized, mandatory disclosure can correct much

14   of the misleading nature of current voluntary climate disclosures.

15   **Ensuring Accurate Climate Disclosure is Important In Order to Avoid Market**

16   **Failures that are Harmful to the Public Interest.**

17       6.    Economists have long understood that when companies possess and

18   exploit inside information, this can cause markets to fail and harm investors,

19   employees, consumers and the public.  The 2001 Nobel Prize in Economics was

20   awarded to George Akerlof, Michael Spence, and Joseph Stiglitz for their work on

21   markets with asymmetric information.  Financial markets are rife with crises that

22   impose heavy costs on ordinary investors and citizens.  For example, the Great

23   Recession of 2008-2009 began as a relatively limited crisis in the U.S. market for

24   residential subprime loans, but spread widely, leading to massive public bailouts of

25   firms such as AIG at the expense of many ordinary homeowners and the U.S.

26   taxpayer (Mishkin, 2011).  Frederic S. Mishkin, *Over the Cliff: From the Subprime*

27   *to the Global Financial Crisis*, 25 J. Econ. Perspectives 49 (2011), attached hereto

28   as Exhibit (Ex.) 1.  A failure to recognize systemic risks in the system played a key

**ER-300**

(259 of 297) Page 259 of 297 Case: 25-5327 09/18/2025, DktEntry: 8.3, Page 259 of 297
Case 2:24-cv-00801-ODW-PVC    Document 90    Filed 04/07/25    Page 5 of 33    Page ID
#:9295

1   role in exacerbating the crisis.  Financial regulation is designed to help prevent such

2   crises.

3       7.     Economists have also long understood that when market transactions

4   impose harm on third-party bystanders, as in the case of environmental pollution,

5   this can cause markets to fail and lead to massive harm to the public.  Harms like

6   these are known as externalities because of their impact on bystanders who are

7   external to the transaction itself.  Because of the importance of this topic, the Nobel

8   Prize in Economics was awarded to William Nordhaus in 2018 for his work on the

9   largest externality of all, global warming.  The costs of climate change are already

10  estimated to be trillions of dollars and will continue to grow in the future.

11  Environmental regulation is designed to prevent or mitigate such harms.

12      8.     Climate disclosures are a response to the combination of inside

13  information and externalities that exists with regard to greenhouse gas emissions

14  and corporate climate risk.  However, current disclosure practices are inadequate to

15  enable investors and consumers to make informed decisions.  In particular, the

16  discretion allowed under voluntary disclosure practices allows for a variety of

17  forms of greenwashing to enter the market, thereby distorting decisions.

18      9.     A wide range of investors make use of climate-related financial

19  information.  Two such types of investors are "impact investors" and "ESG

20  investors." Impact investors seek social and environmental, as well as financial,

21  returns, and may be willing to sacrifice some level of financial return in order to

22  contribute to important social issues such as climate change.  ESG investors, in

23  contrast, seek to maximize financial returns by making use of environmental, social

24  and governance (ESG) information to identify risks and opportunities.  Although

25  these groups of investors have different goals, both benefit from better quality

26  information about greenhouse gas emissions and climate-related financial risks.

27  Impact investors will use the information to shift their portfolios towards firms with

28  lower carbon footprints in order to help in some small way to address the climate

5

**ER-301**

(260 of 297) Page 260 of 297Case: 25-5327 09/18/2025, DktEntry: 8.3, Page 260 of 297
Case 2:24-cv-00801-ODW-PVC    Document 90    Filed 04/07/25    Page 6 of 33    Page ID
#:9296

1   crisis.  ESG investors will use the information to shift their portfolios towards firms

2   with lower climate-related risk and better strategies for mitigating those risks, and

3   away from firms with high climate-related risk and poor strategies for mitigating it.

4   Under either strategy, investors need accurate information in order to optimize their

5   own portfolios.

6        10.    Although discussions of climate-related disclosures typically focus on

7   investors, it is important to recognize that other stakeholders also value the

8   information.  A growing number of consumers base their purchases in part on

9   companies' sustainability performance.  Similarly, a growing number of employees,

10  especially younger ones, base their choice of employer in part on the company's

11  social responsibility performance.  Vanessa C. Burbano, *Social Responsibility*

12  *Messages and Worker Wage Requirements: Field Experimental Evidence from*

13  *Online Labor Marketplaces*, 27 Organization Science 1010 (2016), attached hereto

14  as Ex. 2.  Both consumers and employees need accurate information about

15  corporate performance in order to optimize their purchase and employment

16  decisions.

17             **Climate Disclosures are Positive Inducements to Investors.**

18       11.    Corporate communications about climate performance date back at

19  least to 2002, when the Carbon Disclosure Project (now CDP), a group of large

20  institutional investors, began asking companies to disclose their greenhouse gas

21  emissions data to investors.  Today, more than 700 financial institutions with over

22  $142 trillion in assets work with CDP, and over 23,000 companies worldwide from

23  130 countries and representing two-thirds of global market capitalization disclose to

24  CDP.[1]

25       12.    Corporate climate communications typically address either a firm's

26  carbon emissions and efforts to reduce them, or a firm's exposure to climate-related

27  ───────────────

28  [1] A true and correct copy of a CDP press release discussing these figures is attached
    hereto as Ex. 3.

6

**ER-302**

financial risk, or both.  Corporate communications of the first type often reference

three "scopes" of emissions.  Scope 1 emissions are those that are emitted directly

by the firm's operations.  Scope 2 are indirect emissions that come from the firm's

use of electricity.  Scope 3 emissions are indirect emissions embedded in the firm's

value chain.

13.    Firms communicate their planned emissions reductions because

investors penalize firms for carbon risk.  Firms typically raise capital by offering a

mix of debt (bonds) and equity (shares of stock).  For either financing instrument,

the cost of capital for a particular firm reflects the extent to which investors view

the firm as risky: investors demand higher returns to compensate them for taking on

additional risk.  Because of the risk premium that investors demand, firms seek to

minimize the riskiness of their operations, all other things equal, in order to

minimize their cost of capital.  Higher carbon emissions expose firms to greater

levels of risk, because, among other things, governments may regulate emissions,

impose carbon taxes on emissions, create a system of marketable emissions

permits, or take other actions to reduce global warming.

14.    Indeed, Bolton and Kacperczyk (2021) show that investors demand a

premium from stocks with carbon risk.  They measure the premium in terms of

"basis points," which are a common unit of measurement in finance to describe a

1/100th of a percent change and are often abbreviated as "bps."  Dkt. 56-9. This

premium—referred to as the "carbon premium"—is the additional return from a

company's stock that investors require to compensate for the company's exposure

to climate risk. "The carbon premium is economically significant: A one standard-

deviation increase in respectively the level and change of scope 1 emissions leads to

a 15-bps and 26-bps increase in stock returns, or respectively a 1.8% and 3.1%

annualized increase. In addition, a one-standard-deviation increase in the level and

change of scope 2 emissions leads to respectively a 24-bps and 18-bps increase in

stock returns, or a 2.9% and 2.2% annualized increase. Finally, a corresponding

(262 of 297) Page 262 of 297 Case: 25-5327 09/18/2025, DktEntry: 8.3, Page 262 of 297
Case 2:24-cv-00801-ODW-PVC   Document 90   Filed 04/07/25   Page 8 of 33   Page ID
#:9298

one-standard-deviation increase in the level and change of scope 3 emissions
increases stock returns by 33 bps and 31 bps per month, or 4.0% and 3.8% on an
annual basis." *Id.* at 4. At first glance, this may seem like good news for high
emitters: their stocks pay higher returns than do those of low emitters. However,
investors appear to be penalizing such companies by demanding higher returns in
order to purchase and hold such companies' shares. Moreover, the analysis of
Bolton and Kacperczyk (2021) controls for many other dimensions of firm
performance, including returns over the past twelve months, leverage, the firm's
industry, its market-to-book ratio, and many other factors. They find that holding
all these things equal, higher emissions raise the firm's cost of capital, which means
a higher cost of doing business, which is not a positive thing for the firm. Thus,
corporate decarbonization plans can be seen as a form of advertising to investors
that a firm is managing its climate risk and therefore deserves to be granted a lower
carbon premium and hence a lower cost of capital.

15.     Additionally, Bolton et al. (2024) find that "energy price significantly
increases the carbon premium, after controlling for firm characteristics, industry-
time, and firm fixed effects. Bolton et al., *Inflation and the Carbon Premium* 3
(2024), a true and correct copy of which is attached hereto as Ex. 4. When energy
CPI is at the sample average, a one-standard deviation change in direct emissions
(scope 1 and 2 emissions) is associated with a 2.05 percentage point higher annual
return premium (the carbon premium). And when energy CPI is higher by one
standard deviation, the return premium increases by 44% to 2.97%. We find a
similar effect of energy price on the carbon premium associated with indirect
emissions (scope 3 upstream and downstream emissions). Thus, when looking at
within-sector variations in carbon emissions across firms, we find that energy price
inflation, far from dampening firm-level carbon transition risk exposures, actually
exacerbates them."

16.     Given that investors penalize high-emitting firms, it is not surprising

8

**ER-304**

Case: 25-5327  09/18/2025, DktEntry: 8.3, Page 263 of 297

that in recent years, a growing number of companies have made public commitments to decarbonize their operations or even to achieve "net zero" emissions by a given year.  According to the Conference Board, a non-profit think tank, just over half of the Russell 3000 have set a target year for carbon reductions, as shown in Figure 1.[2]



**Figure 1: Percentage of Firms in the Russell 3000 Disclosing a Climate Target Year**

17.    Prevalence of target setting is even higher when looking just at the largest companies.  S&Should Global finds that 434 of the S&P 500 have set targets to reduce their emissions.[3]

18.    As shown in Figure 2 below, the average reduction pledge is roughly a 51% reduction in Scope 1 and Scope 2 emissions; and 11% reduction for Scope 3 emissions.  Targets vary modestly by industry, with utilities seeking a 59% reduction in Scope 1 and 2 emissions while real estate firms aim for a 41% reduction.

---

[2] A true and correct copy of the Conference Board webpage from which I obtained Figure 1 is attached hereto as Ex. 5.
[3] A true and correct copy of an article written by Matt MacFarland and published on the S&P Global website is attached hereto as Ex. 6.

**ER-305**

(264 of 297) Page 264 of 297ase: 25-5327, 09/18/2025, DktEntry: 8.3, Page 264 of 297
Case 2:24-cv-00801-ODW-PVC    Document 90    Filed 04/07/25    Page 10 of 33    Page ID
#:9300



**Figure 2: Average Percentage Reduction Targets by Industry**

19.     Many firms have set targets that go far beyond the targets in Figure 2 and instead aim to achieve net-zero carbon emissions by a certain date.  "Net-zero emissions" does not mean the firm emits zero greenhouse gases (GHGs).  Rather, the firm promises to offset any remaining emissions through some form of carbon capture and sequestration, most commonly some form of afforestation but also potentially including direct capture of carbon from the firm's manufacturing emissions and sequestration of the captured carbon.  Thus, these companies may still be emitting some GHGs in the target year, but they commit to counter-balance them with some combination of carbon removal and carbon offsets.

20.     The U.K. based non-profit group Net Zero Tracker compiles the net-zero commitments of the roughly 2,000 largest publicly-traded companies in the world by revenue, as well as the roughly 200 largest privately-held companies, and

(265 of 297), Page 265 of 297Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 265 of 297
Case 2:24-cv-00801-ODW-PVC    Document 90    Filed 04/07/25    Page 11 of 33    Page ID
#:9301

1   makes the data freely available for download.[4]  In 2024, of 2,074 companies in the

2   Net Zero Tracker database, 1,481 (roughly 75%) had some sort of target, as shown

3   in Figure 3 below.   Net-zero targets were set by 40% of the firms, and

4   carbon/climate neutral targets by another 17%, meaning that well over half the

5   companies in this group had effectively committed on a set schedule to stop adding

6   to global net climate emissions.  The pattern for U.S. firms alone is very similar,

7   with 73% committing to some sort of reduction target.[5]



**Figure 3: GHG Reduction Commitments for the 2,200 Largest Global Firms**

18          21.     Empirical evidence demonstrates that firms are increasingly discussing

19  climate-related information with investors.  Dzielinski et al. (2022) document a

20  sharp increase in the amount of attention to climate in corporate earnings calls

21  beginning in 2019.  Dzielinski, Michal, Florian Eugster, Emma Sjöström, and

22  Alexander F. Wagner. *Climate Talk in Corporate Earnings Calls*, Mistra Center for

23  Sustainable Markets (2022), attached hereto as Ex. 7.  Aldy et al. (2025, p. 85)

24  document a similar increase: "Climate topics are increasingly discussed, as the

25  2018–2020 average frequency in the management update section [of an earnings

26  call] is 67% greater than the corresponding 2011–2013 average, and similarly, the

27  _____

28  [4] https://zerotracker.net/
    [5] Author's calculations.

11

(266 of 297), Page 266 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 266 of 297
Case 2:24-cv-00801-ODW-PVC   Document 90   Filed 04/07/25   Page 12 of 33   Page ID
#:9302

1  2018–2020 average frequency of climate topic discussion in the Q&A section is
2  75% greater than the corresponding 2011–2013 average." Aldy, Joseph E., Patrick
3  Bolton, Zachery M. Halem, and Marcin T. Kacperczyk, *Show & Tell: An Analysis*
4  *of Corporate Climate Messaging and Its Financial Impacts*, Financial Analysts
5  Journal 1-20 (2025), a true and correct copy of which is attached hereto as Ex. 8.

6      22.    Two conclusions can be drawn from the foregoing data. First, that
7  companies have incentives to communicate information about their carbon
8  emissions to investors because investors are concerned about climate risk and
9  demand a premium from firms that are saddled with climate risk. And second, that
10 many firms seek to convince investors that their emissions will decrease in the
11 future. These communications are a form of advertising to investors intended to
12 attract more capital and lower the firm's carbon premium.

13 **Carbon Disclosures are Positive Inducements to Consumers and Employees.**

14     23.    In addition to communicating carbon disclosures to investors,
15 companies also seek to influence consumer behavior with their emissions
16 disclosures. Product-level climate communications began as early as 2007, when
17 the UK began encouraging firms to label the emissions associated with their
18 products. A growing number of firms obtain certification by the Carbon Neutral
19 Protocol[6] in order to signal their performance to customers. A true and correct
20 copy of Carbon Neutral Protocol's webpage listing examples of certified companies
21 is attached hereto as Ex. 9. Among them are Lime scooters, Bulldog Skincare,
22 Microsoft Xbox consoles, and Logitech products. Sloan,[7] the maker of fixtures and
23 appliances for kitchens and bathrooms, offsets the carbon for a whole array of
24 carbon-neutral products. A true and correct copy of Sloan's webpage describing its
25 "carbon-neutral products" is attached hereto as Ex. 10. Mars, the candy company,
26

27 [6] https://www.carbonneutral.com/examples.
28 [7] https://www.sloan.com/sustainability-and-wellness/products/carbon-neutral-products.

12

**ER-308**

(267 of 297) Page 267 of 297Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 267 of 297
Case 2:24-cv-00801-ODW-PVC    Document 90    Filed 04/07/25    Page 13 of 33    Page ID
#:9303

1  has committed to Net Zero by 2050.[8]  A true and correct copy of Mars' webpage

2  describing its Net Zero commitment is attached hereto as Ex. 11.

3      24.  One of the most widely touted carbon-neutral products is the new

4  Apple Watch,[9] released on September 12, 2023.  A true and correct copy of a press

5  release from Apple's website discussing the Apple Watch is attached hereto as Ex.

6  12.  Apple, based in Cupertino, California, aims to have all of its products be

7  carbon-neutral by 2030.  And Allbirds, based in San Francisco, California, has

8  launched the world's first zero carbon shoe, the M0.0SHOT Zero.[10]  A true and

9  correct copy of Allbirds' webpage discussing the M0.0nSHOT Zero is attached

10  hereto as Ex. 13.

11      25.  Several studies demonstrate the impact of carbon neutrality claims on

12  consumer demand.  Birkenberg et al. (2021) study the potential for low-carbon

13  labels to influence coffee demand, finding that German consumers on average are

14  willing to pay more for a carbon-neutral label on coffee.  Birkenberg, Narjes,

15  Weinmann, & Birner, *The Potential of Carbon Neutral Labeling to Engage Coffee*

16  *Consumers in Climate Change Mitigation*, Journal of Cleaner Production 278

17  (2021), attached hereto as Ex. 14.  Li et al. (2017) find that consumers are willing to

18  pay more for low-carbon products, even in a middle-income developing country

19  such as China.  Li, Long, & Chen, *Empirical Study of the Willingness of Consumers*

20  *to Purchase Low-Carbon Products by Considering Carbon Labels: A Case Study*,

21  Journal of Cleaner Production 161 (2017), attached hereto as Ex. 15.

22      26.  The growing market for information about a company's climate

23  emissions means that there is also the potential for greenwashing of such claims, as

24  Dreist et al. (2025) point out.  Dreist et al., *Greenwashing in Food Labeling:*

25  

26  [8] https://www.mars.com/about/policies-and-practices/mars-carbon-neutral-brands.
[9] https://www.apple.com/newsroom/2023/09/apple-unveils-its-first-carbon-neutral-products/.

27  [10] https://www.allbirds.com/pages/moonshot-zero-carbon-shoes?srsltid=AfmBOopIenMJ7GP1x-
6eRk4Dya1PnJPb7UgH7B0TCCDhCUGz1ZrcauXg.

28

(268 of 297) Page 268 of 297ase: 25-5327, 09/18/2025, DktEntry: 8.3, Page 268 of 297
Case 2:24-cv-00801-ODW-PVC   Document 90   Filed 04/07/25   Page 14 of 33   Page ID
#:9304

1   *Consumer Deception by Claims of Climate Neutrality and the Importance of an*

2   *Interpretative Labelling Approach*, Food Quality & Preference 122 (2025), attached

3   hereto as Ex. 16.  For example, their research found that product labels saying

4   "climate neutral" without any substantiation were viewed just as favorably by

5   consumers as were labels making the claim that included substantiation.  *Id.* at 6.

6   Rondoni and Grasso (2021) provide a survey of 38 research studies of consumer

7   demand for carbon-labeled products, concluding that it is important to move

8   towards a more harmonized system of carbon labeling to reduce consumer

9   confusion.  Rondoni & Grasso, *Consumers Behaviour Towards Carbon Footprint*

10  *Labels on Food: A Review of the Literature and Discussion of Industry*

11  *Implications*, Journal of Cleaner Production 301 (2021), attached hereto as Ex. 17.

12          27.     Less research has been conducted on employee responses to corporate

13  climate communications.  Nevertheless, there is extensive evidence that employees

14  prefer to work for socially responsible companies (Brekke and Nyborg, 2008), are

15  willing to accept lower wages in order to do so (Burbano, 2016), and are willing to

16  work harder for them (Burbano, 2021).  Kjell Arne Brekke & Karine Nyborg,

17  *Attracting Responsible Employees: Green Production as Labor Market Screening*,

18  30(4) Resource & Energy Econ. 509, 509–526 (2008), located at Dkt. 56-47;

19  Burbano, *Social Responsibility Messages and Worker Wage Requirements: Field*

20  *Experimental Evidence from Online Labor Marketplaces*, 27 Organization Science

21  1010 (2016), attached hereto as Ex. 18; Burbano, *Getting Gig Workers to Do More*

22  *by Doing Good: Field Experimental Evidence from Online Platform Labor*

23  *Marketplaces*, 34(3) Org. & Env't 387 (2021), attached hereto as Ex. 19.  In

24  addition, research shows that employees are well aware of corporate greenwashing,

25  and that a portion of them increase their turnover intentions as a result (Robertson

26  et al., 2023). Jennifer L. Robertson, A. Wren Montgomery, & Timur Ozbilir,

27  *Employees' Response to Corporate Greenwashing*, 32(7) Bus. Strategy & the Env't

28  4015, 4015–4027 (2023), located at Dkt. 56-21.

14

**ER-310**

**There Are Many Ways in which Factual Information Can be Presented in a**
**Misleading Fashion, Thereby Leading to Greenwashing.**

28.     My definition of greenwashing (which has been widely adopted by others in the field) characterizes it as "any communication that misleads people into adopting overly positive beliefs about an organization's environmental performance, practices, or products." Thomas P. Lyon & A. Wren Montgomery, *The Means and End of Greenwash*, 28(2) Org. & Env't 223, 226 (2015), located at Dkt. 56-13. Note that this does not require that the communication is false (although some communications are), nor that the communicator intended the information to be misleading. It merely needs to induce the receiver of the information to adopt an overly favorable impression of the entity doing the communicating.

29.     I, my co-authors, and others have identified a wide range of ways in which corporate environmental communications can be misleading. Lyon & Maxwell, *Greenwash: Corporate Environmental Disclosure under Threat of Audit*, J. of Econ. & Mgmt. Strategy 3, 3–41 (2011), located at Dkt. 56-11; Eun-Hee Kim & Thomas Lyon, *When Does Institutional Investor Activism Increase Shareholder Value?: The Carbon Disclosure Project*, 11(1) The BE J. of Econ. Analysis & Pol'y (2011), located at Dkt. 56-31; Dkt. 56-13; Dkt. 56-21; A. Wren Montgomery, Thomas P. Lyon, & Julian Barg, *No End in Sight? A Greenwash Review and Research Agenda*, Org. & Env't 1, 1–3 (2023), DOI:10860266231168905, located at Dkt. 56-16. A comprehensive review of these many mechanisms of greenwashing is provided by Nemes et al. (2022), and summarized in Figure 4 below. Noémi Nemes et al., *An Integrated Framework to Assess Greenwashing*, 14(8) Sustainability 4431 (2022), located at Dkt. 56-14. A true and correct copy of the publication from which I pulled Figure 4 is attached hereto as Ex. 20. Below, I will refer back to Figure 4 in identifying the main types of greenwashing that occur in current voluntary climate disclosures, first in the context of disclosures of

15

**ER-311**

1    greenhouse gas emissions and second in the context of disclosures of climate-

2    related financial risk and firms' strategies to mitigate that risk through net-zero

3    commitments and decarbonization transition plans.

4    / / /

5    / / /

6    / / /

7    / / /

8    / / /

9    / / /

10   / / /

11   / / /

12   / / /

13   / / /

14   / / /

15   / / /

16   / / /

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

ER-312

(271 of 297) Page 271 of 297
Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 271 of 297
Case 2:24-cv-00801-ODW-PVC   Document 90   Filed 04/07/25   Page 17 of 33   Page ID #:9307

**Network for Business Sustainability**

This figure is developed from the Network for Business Sustainability article "How to Avoid Greenwashing" by Noémi Nemes, Maya Fischhoff, and Abby Litchfield, originally published in September 2022.[15]

| GREENWASHING ELEMENTS | | HOW TO AVOID GREENWASHING |
|---|---|---|
| VAGUENESS | Making broad or poorly defined claims. | • Avoid unclear terms ("green," "eco-friendly") and support claims with evidence, e.g., sources or 3rd party review.<br>• State whether claims refer to part or all of product. |
| MISLEADING SYMBOLS | Visuals exaggerate organization's greenness. | • Ensure visuals and symbols represent degree of sustainability impact.<br>• Consider combined effect of colors, pictures, icons, sounds, and layout; be sure it doesn't exaggerate your claims. |
| JARGON | Information can't be understood by customers. | • Explain claims or actions using language that consumers can easily understand. |
| NO PROOF | Supporting information is hard to find. | • Verify claims with strong, independent, easily accessible evidence. |
| POLITICAL SPIN | Boasting green commitments while lobbying against environmental laws. | • Avoid lobbying to weaken or block environmental laws.<br>• Don't affiliate with thinktanks, trade associations and other groups that spread sustainability disinformation. |
| SELECTIVE DISCLOSURE | Emphasizing a few points instead of full sustainability impact | • Assess sustainability footprint using all life cycle stages (including material production and end-of-life disposal).<br>• Share all information about social and environmental performance claimed, including limits or negative impacts: Transparency improves trust and helps you get ahead of public criticism. |
| EMPTY STATEMENTS | Exaggerating achievements and policies. | • Only promise improvements you plan to achieve.<br>• Don't overstate commitments or spotlight minor actions.<br>• Spend more on achieving a goal than on marketing it. |
| INCONSISTENT ORGANIZATIONAL PRACTICE | Acting environmentally in some arenas but not others. | • Make sure green claims reflect sustainability focus across the entire organization (products; practices; vision). |
| DUBIOUS CERTIFICATIONS & LABELS | Using voluntary or internal certifications that don't genuinely drive action. | • Only apply seals/labels verified by an independent body.<br>• Only use certifications that are transparent about their scope and inspections; ensure rigorous enforcement of standards and adequate complaint and objection procedures.<br>• Conduct regular due diligence to make sure claims are genuine. |
| LIES AND IRRELEVANCIES | Misleading and missing the big picture. | • Make sure messaging represents scientific consensus (e.g., on climate change).<br>• Clearly communicate whether action is voluntary vs. required.<br>• Avoid making the public feel "green" about a choice that's dangerous (e.g., "greener" cigarettes) or highly controversial (e.g., natural gas). |

**Figure 4: Types of Greenwashing**

17

ER-313

(272 of 297) Page 272 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 272 of 297
Case 2:24-cv-00801-ODW-PVC    Document 90    Filed 04/07/25    Page 18 of 33    Page ID
#:9308

**There Are Many Examples of Misleading Language in CSR Reports or Corporate Websites**

30. Even a cursory review of corporate websites and sustainability reports offers plenty of examples of misleading language. Selective disclosure regarding carbon emissions is extremely common. The Koch Industries website exhibits an extreme form of selective disclosure, saying nothing about climate except that the company reduced Scope 1 emissions over time (information that the company was required by law to disclose).[11] A true and correct copy of the Koch Industries webpage discussing the company's environmental efforts is attached hereto as Ex. 22. Bechtel Corporation, founded in San Francisco in 1989, says on its website that "Our approach prioritizes decarbonization while maximizing cost-efficiency, enabling us to deliver greater value and contribute to a more sustainable future." A true and correct copy of Bechtel's webpage regarding "sustainability" is attached hereto as Ex. 23. Yet according to Net Zero Tracker, Bechtel has a net zero target of 2050 with no interim targets, an example of "empty statements" in Figure 4. Meta's 2024 Sustainability Report reports that 99% of the company's emissions are from Scope 3. A true and correct copy of Meta's Sustainability Report is attached hereto as Ex. 24. It also states that "We have also set a goal to achieve net zero emissions across our value chain in 2030." Ex. 22 at 20. Yet upon closer reading one finds that their target for Scope 3 emissions is merely "Not exceeding our 2021 baseline Scope 3 emissions by the end of 2031." *Id.* at 23.This means that by 2030, Meta's Scope 3 emissions, which are 99% of the total, could be just as high as they were in 2021 at the same time that the company is claiming it will achieve net zero by 2030. Reading between the lines, the only way the company can meet its corporate target is through an almost complete reliance on carbon offsets, but it

---

[11] Koch Industries operates four companies in California: John Zink Company, Koch Carbon, Koch Engineering Company Ltd., and Koch Membrane Systems. A true and correct copy of Koch Industries' EDGAR profile from the SEC's website is attached hereto as Ex. 21.

(273 of 297) Page 273 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 273 of 297
Case 2:24-cv-00801-ODW-PVC   Document 90   Filed 04/07/25   Page 19 of 33   Page ID
#:9309

1  fails to state this clearly and provides no proof that this is even achievable.

2  Similarly, Publix Supermarkets discloses nothing except that they have reduced

3  emissions/ft$^2$ by 33% since 2007. A true and correct copy of Publix's webpage

4  discussing its greenhouse gas reduction is attached hereto as Ex. 25.

5        31.    Voluntary disclosures do not prevent the use of misleading language

6  and greenwashing.  For example, ExxonMobil's 2024 Advancing Climate Solutions

7  report engages in greenwashing through selective disclosure.  A true and correct

8  copy of Exxon's 2024 Advancing Climate Solutions report is attached hereto as Ex.

9  26.  It states that "With advancements in technology and clear and consistent

10  government policies that support needed investments and the development of

11  market-driven mechanisms, we aim to achieve net-zero Scope 1 and 2 greenhouse

12  gas emissions in our operated assets by 2050." Ex. 24 at 2. This ignores the fact

13  that Scope 3 emissions are far and away the most important climate impact of oil

14  and gas production.

15        32.    These examples of greenwashing in corporate climate disclosures give

16  a flavor of how greenwashing occurs in practice.

17  **Greenwashing in GHG Emissions Disclosures is Common, Primarily in the**

18  **Form of Selective Disclosure and a Lack of Proof.**

19        33.    Academic work recognizes selective disclosure as one of the most

20  frequent forms of greenwash.  Lyon and Maxwell's (2011) theory of greenwash as

21  selective disclosure has been cited 1,936 times. Dkt. 56-11.  Kim and Lyon (2011,

22  2015) show empirically that electric utilities have long greenwashed their carbon

23  claims through selective disclosure.  Dkt. 56-12.  Marquis et al. (2016) find

24  rampant greenwashing globally, in the form of selective disclosure, but find it is

25  reduced in countries with more scrutiny of corporate claims.  Marquis et al.,

26  *Scrutiny, Norms, and Selective Disclosure: A Global Study of Greenwashing* 27

27  Org. Science 483 (2016), attached hereto as Ex. 27.

28        34.    When it comes to disclosure of greenhouse gas emissions, which is the

**ER-315**

1   subject of S.B. 253, selective disclosure is common.  There are two main ways in

2   which this occurs.  First, companies may fail to fully disclose their Scope 1, 2 and 3

3   emissions.  Second, companies may fail to report on the full set of greenhouse gases

4   they emit, disclosing emissions of carbon dioxide ($CO_2$) while failing to disclose

5   emissions of methane ($CH_4$), nitrous oxide ($N_2O$), hydrofluorocarbons (HFCs),

6   perfluorocarbons (PFCs), sulfur hexafluoride ($SF_6$) or nitrogen trifluoride ($NF_3$).

7        35.    In the United States, full disclosure of Scopes 1, 2 and 3 is not

8   mandatory.  Only Scope 1 emissions (those emitted directly from combustion of

9   fossil fuels) from plants emitting more than 25,000 pounds of $CO_2$-equivalent per

10  year must be reported to the US greenhouse gas reporting program (USGHGRP).

11  Plants below the threshold need not report.  Scope 2 emissions (those that occur

12  indirectly through the purchase of electricity) are not required to be reported.

13  Scope 3 emissions (those that occur upstream or downstream in a company's value

14  chain) also are not required to be reported.

15       36.    In the absence of mandatory disclosure of GHG emissions,

16  stakeholders have had to rely on voluntary disclosures.  CDP is the oldest investor-

17  driven disclosure project, and recently celebrated its 25th anniversary.  The number

18  of investors backing CDP's annual request for climate-related information has

19  ballooned to more than 700, representing a quarter of all global institutional

20  financial assets.  A true and correct copy of CDP's webpage containing information

21  about the organization is attached hereto as Ex. 40.

22       37.    Companies representing two-thirds of global market capitalization –

23  from 130 countries – disclose critical environmental data through CDP. Over the

24  period from 2018-2023, 15,594 firms reported to CDP.  The depth and breadth of

25  reporting has increased significantly over time, as is shown in Figure 5.[12]  Even

26  with these increases, however, by 2023 only 49% of reporting entities disclosed

27  Scope 3 GHG emissions.  The selective disclosure of greenhouse emissions is a

28  ---
[12] Calculations performed by author using CDP's 2025 data set.

1  classic example of greenwashing.



**Figure 5. Trends in assurance, financial risk and Scope 3 disclosure.**

38.    Another classic example of greenwashing is the lack of proof for corporate claims about emissions.  One important way that firms provide substantiation of their emissions disclosures is to obtain third-party verification (also known as assurance) of their claims from professional firms with expertise in carbon accounting and emissions disclosure.  Firms obtain assurance of GHG emissions across scopes in order to communicate transparency and accuracy in emissions levels to stakeholders. Figure 5 above shows that a growing number of firms are obtaining external assurance for their Scope 1, 2 and 3 emissions, although assurance for Scope 3 emissions lags behind assurance of Scope 1 and 2 emissions.  From 2018-2023, out of 15,594 firms, 31% obtained external assurance for Scope 1 (direct) emissions, 30% for Scope 2 (indirect emissions via purchased electricity) and 23% for Scope 3 (supply chain/purchase-embedded emissions). Needless to say, that still leaves a large share of firms with a lack of assurance regarding their emissions disclosures.

39.    Figure 6 below shows variation by industry of external assurance across scopes for CDP reporters in 2023.[13]   External assurance frequency tends to be within a similar range across all scopes within a given industry, though Scope 3

---

[13] Author's calculations.

ER-317

1 assurance tends to be the least frequent. Further, industries with higher scope 1
2 assurance also tend to have higher assurance across scopes 2 and 3, and vice versa
3 for industries with low assurance.  Industries vary widely, with semiconductors
4 providing the most assurance (85% for Scopes 1 and 2, and 65% for Scope 3) and
5 consumer durables providing the least (18% for Scopes 1 and 2, and 11% for Scope
6 3).

7
8
9
10

External verification of GHGs by scope (mean)

| Industry | Scope 1 | Scope 2 | Scope 3 |
|---|---|---|---|
| Aerospace & Defense | 0.69 | 0.67 | 0.56 |
| Air Freight Transport & Logistics | 0.42 | 0.4 | 0.35 |
| Air Transportation - Airlines | 0.71 | 0.64 | 0.51 |
| Automobiles & Components | 0.36 | 0.35 | 0.24 |
| Banks, Financials & Insurance | 0.74 | 0.74 | 0.7 |
| Building Products | 0.65 | 0.65 | 0.47 |
| Chemicals | 0.45 | 0.44 | 0.31 |
| Construction & Engineering | 0.35 | 0.36 | 0.33 |
| Construction Materials | 0.58 | 0.57 | 0.47 |
| Consumer Durables | 0.18 | 0.18 | 0.11 |
| Containers & Packaging | 0.28 | 0.26 | 0.2 |
| Electric Utilities | 0.73 | 0.67 | 0.58 |
| Electrical Equipment and Machinery | 0.29 | 0.29 | 0.2 |
| Food & Beverage Processing | 0.39 | 0.36 | 0.26 |
| Food & Staples Retailing | 0.6 | 0.6 | 0.49 |
| Forest and Paper Products | 0.35 | 0.31 | 0.22 |
| Ground Transportation - Trucking | 0.21 | 0.18 | 0.14 |
| Healthcare Providers & Services | 0.35 | 0.36 | 0.29 |
| Hotels, Restaurants & Leisure | 0.52 | 0.51 | 0.39 |
| Media | 0.35 | 0.35 | 0.31 |
| Mining | 0.54 | 0.54 | 0.36 |
| Oil & Gas | 0.4 | 0.39 | 0.25 |
| Pharmaceuticals | 0.46 | 0.46 | 0.34 |
| Real Estate | 0.74 | 0.75 | 0.67 |

**ER-318**

| | | | |
|---|---|---|---|
| Retailing | 0.52 | 0.53 | 0.43 |
| Semiconductors | 0.85 | 0.85 | 0.65 |
| Software & Services | 0.29 | 0.31 | 0.27 |
| Technology Hardware | 0.26 | 0.27 | 0.2 |
| Telecommunication Services | 0.41 | 0.4 | 0.33 |
| Textiles | 0.31 | 0.29 | 0.2 |
| Trading Companies | 0.26 | 0.26 | 0.2 |
| **Average** | 0.46 | 0.45 | 0.36 |

**Figure 6. External assurance across scopes by industry.**

40.     Plaintiffs erroneously claim that Scope 3 emissions reporting is itself misleading, because carbon emissions from a company's supply chain are not the reporting entity's emissions.  This suggests that a failure in a company's supply chain can be excused because the company has no responsibility for its own supply chain and no ability to manage it.  This is simply false.  Business schools around the world have well-developed supply chain management programs, precisely because companies have great ability to manage their supply chains and doing so in a competent fashion is highly profitable.  Indeed, hundreds of papers have been written on sustainable supply chain management (Seuring and Muller, 2008). Seuring & Müller, *From a Literature Review to a Conceptual Framework for Sustainable Supply Chain Management*, J. of Cleaner Prod. 1699 (2008), attached hereto as Ex. 28.

41.     Moreover, companies that make sweeping emission commitments are making claims about their supply chain that must be substantiated to prevent greenwashing (that is, unless they are ignoring their Scope 3 emissions, which is itself a form of greenwashing). Walmart, for example, announced sweeping environmental goals for the company in 2005: "to be supplied 100% by renewable energy; to create zero waste; and to sell products that sustain people and the environment." Since roughly 90% of Walmart's greenhouse gas emissions and other environmental impacts occur in its extended supply chain, the firm must work with suppliers and customers to achieve these goals, and it has done so very

23

**ER-319**

(278 of 297) Page 278 of 297ase: 25-5327, 09/18/2025, DktEntry: 8.3, Page 278 of 297
Case 2:24-cv-00801-ODW-PVC   Document 90   Filed 04/07/25   Page 24 of 33   Page ID
#:9314

1  effectively (Plambeck, 2012). Plambeck, *Reducing Greenhouse Gas Emissions*

2  *Through Operations and Supply Chain Management*, Energy Econ. 34 (2012),

3  attached hereto as Ex. 29. As explained above, however, in the absence of reporting

4  and assurance, investors, consumers, and employees have no means to verify such

5  claims or compare different companies' performances. In particular, Scope 3

6  reporting and assurance serves to substantiate claims of this type.

7       42.    Plaintiffs also claim that GHG reporting is inaccurate because it omits

8  Scope 4 emissions.  Scope 4 emissions are said to be emissions that "would have

9  happened" were it not for the company's efforts to reduce them.  This is not a

10  category of emissions that is recognized in academic research, and for good reason.

11  There is no objective measure for a given company of what emissions "would have

12  been," and such claims are therefore incredibly susceptible to greenwashing.  What

13  investors and other stakeholders want to know is what are actual emissions levels.

14  Carbon risk premia are calculated based on a company's actual emissions, and

15  investors can easily check whether a firm's emissions are lower today than they

16  were last year.  Bolton and Kacperczyk (2021) find that when firms reduce their

17  emissions from one year to the next, this does reduce their carbon premium.

18  Bolton, Patrick, and Marcin Kacperczyk, *Do investors care about carbon risk?*,

19  Journal of Fin. Econ. 142, no. 2 517-49 (2021), located at Dkt. 56-9.  In short,

20  "Scope  4" emissions are not generally considered legitimate, are unnecessary for

21  stakeholder decision-making, and open up opportunities for greenwashing.

22  **Many Firms Fail to Disclose their Climate-Related Financial Risks.**

23       43.    As mentioned earlier, investors are aware that greenhouse emissions

24  constitute a financial risk and that decarbonization reduces risks.  As shown in

25  Figure 7, 74% of firms in the S&P 500 disclose information about the climate risks

26  to which they are exposed, leaving 26% that do not disclose their climate risks.[14]

27  [14] The figure comes from the Conference Board, a non-profit business membership
28  and research organization.  Tonello, Matt. "2023 Climate Disclosures in the Russell
(continued…)

24

**ER-320**

(279 of 297) Page 279 of 297ase: 25-5327, 09/18/2025, DktEntry: 8.3, Page 279 of 297
Case 2:24-cv-00801-ODW-PVC    Document 90    Filed 04/07/25    Page 25 of 33    Page ID
#:9315



**Figure 7: Percentage of Firms Disclosing Climate Risks.**

44.     Disclosure of climate risks varies widely by industry sector, as shown in Figure 8 below.[15]   Of utilities, a full 93% disclose climate risks, while only 15% of health care firms do so.



**Figure 8: Frequency of Climate Risk Disclosure by Industry.**

45.     Within this reporting, climate risks are not disclosed fully, consistently, or adequately and thus do not enable investors and consumers to make informed decisions.

**Greenwashing in Corporate Decarbonization Plans Primarily Takes the Form of Empty Statements and Lack of Proof.**

46.     Among firms that seek to reduce their carbon risks through creating decarbonization transition plans or setting "net-zero" targets, the quality of many

---

3000 and S&P 500," *Harvard Law School Forum on Corporate Governance*, December 5, 2023, attached hereto as Ex. 30.
[15] *Id.*

(280 of 297) Page 280 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 280 of 297
Case 2:24-cv-00801-ODW-PVC   Document 90   Filed 04/07/25   Page 26 of 33   Page ID
#:9316

1  plans is poor.  Misleading claims about future emissions reduction have been

2  dubbed "future washing" by Montgomery et al. (2024).

3      47.    Evidence demonstrates several forms of greenwashing in net zero and

4  decarbonization transition plans.  One is what Nemes et al. (2022) refer to as

5  "Empty Statements."  Dkt. 56-14; Ex. 20.  These can take many forms, such as

6  setting a long-term target but without any interim targets or without a clear strategy

7  to achieve the long-term goal.  Alternatively, the company may have a target, but

8  not be on track to reach the target.

9      48.    Another form of greenwashing in carbon reduction plans is a lack of

10  substantiation, or what Nemes et al. (2022) refer to as "No Proof."  Dkt. 56-14.

11  This is particularly common when companies rely on carbon offsets rather than

12  reducing the company's own Scope 1, 2 or 3 emissions.  As an example of the

13  problems that can occur, Romm (2023) describes a scandal that emerged around

14  Microsoft's purchase of offsets from the Danish government's carbon capture and

15  sequestration program, in which Microsoft essentially claimed to be buying offsets

16  the Danish government had already bought and paid for.  Romm, *Are Carbon*

17  *Offsets Unscalable, Unjust, and Unfixable—and a Threat to the Paris Climate*

18  *Agreement?* (2023), attached hereto as Ex. 31.  This double-counting of offsets is

19  one of the reasons many observers have become highly skeptical of them.  When a

20  company relies on carbon offsets to meet its decarbonization goals but provides no

21  evidence that the offsets are legitimate, that is an example of having "No Proof."[16]

22      49.    Similar concerns frequently arise as to many corporate decarbonization

23  plans.  Green et al. (2022, p. 2037) report that although oil majors claim to have

24  plans for decarbonization, "we do not find any evidence of meaningful

---

25  [16] Another example is Delta Airlines, which was the first airline to pledge to go
26  carbon neutral and the first to buy carbon offsets for all of its flights. Attached
   hereto as Ex. 32 is a true and correct copy of a news article published in *The*
27  *Guardian* describing Delta's pledge to go carbon neutral.  Delta has since been sued
   for the misleading nature of their plans, which allegedly rely on low-quality carbon
28  offsets.  Attached hereto as Ex. 33 is a true and correct copy of a news article
   published in *The Guardian* discussing the lawsuit.

**ER-322**

(281 of 297) Page 281 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 281 of 297
Case 2:24-cv-00801-ODW-PVC    Document 90    Filed 04/07/25    Page 27 of 33    Page ID
#:9317

decarbonization efforts among the top 10 oil and gas firms (oil majors)." Green et al., *Transition, Hedge, or Resist? Understanding Political and Economic Behavior Toward Decarbonization in the Oil and Gas Industry* 29 Review of Int'l Political Econ. 2036, 2037 (2022), attached hereto as Ex. 34. One oil and gas company employee said "Our last annual report says absolutely nothing that you could use intelligently as an investor to understand whether the company was doing the right things for an energy transition." Kaplan & Levy, *The Rise of Investor-Driven Climate Governance: From Myth to Institution?* Reg. & Gov. 1, 9 (2025), attached hereto as Ex. 35.

50. Many corporate decarbonization commitments have been assessed either by the New Climate Institute (an independent non-profit), the CDP (formerly the Carbon Disclosure Project) or Net Zero Tracker (an independent non-profit). These independent analyses suggest that many corporate commitments lack credibility because they consist of empty statements, fail to substantiate their claims, and/or undermine their purported commitment to climate progress by engaging in political spin.

51. For example, in 2023 the New Climate Institute evaluated in detail the net-zero plans of 25 major multinationals and found most of them deeply misleading:

> All of the 25 companies assessed in this report pledge some form of zero emission, net-zero or carbon-neutral target. But just 3 of the 25 companies – Maersk, Vodafone and Deutsche Telekom – clearly commit to deep decarbonisation of over 90% of their full value chain emissions by their respective net-zero and zero emission target years. At least 5 of the companies only commit to reduce their emissions by less than 15%, often by excluding upstream or downstream emissions. The 13 companies that provide specific details on what their headline net zero pledges mean, commit to reduce their full value chain emissions from 2019 by only 40% on average. The other 12 companies do not accompany their headline pledges with any specific emission reduction commitment for their that [*sic*] target year. Collectively, the 25 companies specifically commit to reducing only less than 20% of their 2.7 GtCO2e emission footprint, by

**ER-323**

(282 of 297) Page 282 of 297ase: 25-5327, 09/18/2025, DktEntry: 8.3, Page 282 of 297
Case 2:24-cv-00801-ODW-PVC    Document 90    Filed 04/07/25    Page 28 of 33    Page ID
#:9318

their respective headline target years.

A true and correct copy of the New Climate Institute's webpage discussing its evaluation is attached hereto as Ex. 36. This finding underlines the point that many net zero plans make empty statements and offer no proof of the quality of the carbon offsets on which they implicitly rely.

52.    One of the clearest indicators of empty statements in decarbonization plans is a lack of interim targets. Of firms tracked by Net Zero Tracker that have carbon reduction targets, 1,150 or 80% had intermediate targets. Among privately-held firms, however, only 63% of those with targets had set interim targets (Net Zero Tracker, 2024). In other words, 20% of the firms with targets failed to present interim targets, and 37% of the privately-held firms failed to present interim targets. Even amongst the closely monitored members of the Climate Action 100+ (which numbered 165 firms as of October 2024), only 37 had set strong mid-term reduction targets, and none had strong short-term targets. A true and correct copy of the Climate Action 100+ website discussing its member firms is attached hereto as Ex. 37.

53.    One of the clearest indicators of a lack of proof is a failure to obtain external third-party assurance of climate claims. Figure 9, from the Conference Board, shows that when reporting on their progress towards meeting their targets, relatively few firms obtain external assurance of their reporting.[17] Although 54% of the S&P 500 obtain external assurance, only 14% of the Russell 3000 do so. Thus, the problem of no proof extends beyond disclosure of emissions to disclosure of progress on meeting interim targets.

_____

[17] Ex. 27.

**ER-324**

(283 of 297) Page 283 of 297ase: 25-5327, 09/18/2025, DktEntry: 8.3, Page 283 of 297
Case 2:24-cv-00801-ODW-PVC    Document 90    Filed 04/07/25    Page 29 of 33    Page ID
#:9319



**Figure 9: Percentage of Firms Obtaining External Assurance for their Climate Progress.**

54.     The CDP analyzes thousands of organizations that report that they have a climate transition plan aligned with a future level of warming limited to 1.5 degrees Celsius.[18]  CDP is not attempting to evaluate the quality of the plans themselves.  It is simply assessing whether the plans provided enough detail to enable an outside stakeholder to reliably evaluate it.  In 2022, 4,100 firms out of over 18,000 reporting to CDP claimed to have such a plan.  However, only 81 of them reported sufficient detail on all 21 key indicators needed to assess the credibility of the transition plan.   These 81 organizations represented only 0.4% of the entire disclosure sample, and 1.98% of the companies claiming transition plans in 2022.  According to a report by CDP, in 2023, the number claiming to have a Paris-aligned transition plan increased by 50% to 5,900, and the number that disclosed on all 21 key indicators increased to 140.  CDP, *The State of Play: 2023 Climate Transition Plan Disclosure* 8, 11 (June 2024), a true and correct copy of which is attached hereto as Ex. 39.  This left the percentage of firms with sufficient disclosure in the total disclosure sample well below 1%, although the percentage of firms with transition plans that disclosed on all indicators rose modestly to 2.37%.  *Id.*  Although this represents a move in the right direction, overall, voluntary disclosure around climate transition plans remained deeply inadequate, and

---

[18] A true and correct copy of the CDP webpage discussing climate transition plans is attached hereto as Ex. 38.

ER-325

1    exhibited a massive case of lack of proof.

2       55.    In summary, greenwashing is common in corporate decarbonization

3    and net-zero plans.  Many plans make empty statements such as setting a target for

4    decades in the future without even bothering to lay out interim targets.  Many plans

5    fail to provide proof of their claims, and do not obtain external assurance for their

6    reporting.  In addition, the problem of "no proof" extends to the way many plans

7    rely on carbon offsets of questionable quality to achieve their targets.

8    **Standardized, Mandatory Disclosure Can Correct Much of the Misleading**

9    **Nature of Current Voluntary Climate Disclosures.**

10      56.    I have shown above that existing voluntary climate disclosure practices

11   allow for misleading speech, i.e., greenwashing, and that such speech is

12   widespread.  This can happen in a variety of ways, but the ones that appear most

13   prevalent in climate disclosures are selective disclosure, empty statements, lack of

14   proof, and political spin.

15      57.    It is well established in economics that limiting the discretion of

16   voluntary disclosures can make them more informative (Fishman and Hagerty,

17   1990).  This is especially easy to see with regard to disclosure of greenhouse gas

18   emissions.  In the current voluntary disclosure environment, companies can choose

19   not to disclose emissions of the full range of their different greenhouse gases, and

20   focus solely on carbon dioxide, as many do.  Or they can choose not to report on

21   Scope 3 emissions, which is also a common practice.  They can avoid reporting

22   their total corporate emissions by choosing not to report on sources of Scope 1

23   emissions that fall below the mandatory reporting threshold of 25,000 tons of

24   CO2/year.  These are classic forms of selective disclosure and allow companies to

25   engage in greenwash.  California's Senate Bill 253 would mandate consistent and

26   complete disclosure of greenhouse gas emissions, eliminating this form of

27   greenwashing.

28      58.    California's Senate Bill 261 would also result in more consistent and

30

**ER-326**

(285 of 297) Page 285 of 297Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 285 of 297
Case 2:24-cv-00801-ODW-PVC    Document 90    Filed 04/07/25    Page 31 of 33    Page ID
#:9321

1   complete disclosure of a company's identified climate-related financial risks and

2   any corporate plans for mitigation of those risks.  A number of international bodies

3   have worked hard in recent years to develop standardized frameworks for reporting

4   that will make corporate reports more complete, consistent, and useful to investors.

5   These include the Task Force on Climate-related Financial Disclosures (TCFD) and

6   the International Sustainable Standards Board (ISSB).  Senate Bill 261 provides

7   that reporting entities align their disclosures with the "recommended framework

8   and disclosures contained in the Final Report of Recommendations of the Task

9   Force on Climate-related Financial Disclosures (June 2017) published by the Task

10  Force on Climate-related Financial Disclosures, or any successor thereto, or

11  pursuant to an equivalent reporting requirement as described in paragraph (4)."

12  Under this framework, reporting entities are tasked with identifying both their

13  "physical risks" (such as those resulting from increased severity of extreme

14  weather) and "transition risks" (such as those associated with policy action and

15  changes in technology that can affect how a company can run its business).[19]

16      59.    As especially relevant here, a report prepared in accordance with the

17  TCFD would address any emission reducing targets set by the company, and its

18  performance against these targets.[20]  The TCFD guidelines provide that, "In

19  describing their targets, organizations should consider including the following:

20  whether the target is absolute or intensity based; time frames over which the target

21  applies; base year from which progress is measured; and key performance

22  indicators used to assess progress against targets."[21]

23      60.    These disclosures thus respond to greenwashing in corporate carbon

24  disclosures and decarbonization plans.  With regards to empty statements, for

25  example, they shine a spotlight on the firm's actual strategy, if any, for setting

26  _____

27  [19] A copy of the Final Report of Recommendations of the TCFD is available at Dkt.
    53-5.

28  [20] *Id.* at 24.
    [21] *Id.*

31

**ER-327**

1    targets, its development of interim targets and its progress towards achieving them.

2    This helps to eliminate several of the problematic aspects of empty statements that I

3    described earlier.

4         61.    By substantially reducing opportunities for greenwashing in corporate

5    decarbonization and net zero commitments, the disclosures under SB 253 and SB

6    261 will in turn reduce investor uncertainty with regards to the climate-related risks

7    firms face and the steps they are taking to manage them.  When investors have

8    greater certainty regarding these factors, they can be expected to use this

9    information to restructure their portfolios in ways that allow them to align their

10   investments with their own risk tolerances and preferences for investment types.  In

11   particular, insurance companies, pension funds, and mutual funds are likely to shift

12   away from firms with higher-than-expected levels of Scope 1 emissions, and those

13   firms are likely to see their carbon premia increase (Bolton and Kacperczyk, 2021).

14   At the same time, the market as a whole is likely to reduce the carbon premium

15   demanded from firms with lower-than-expected emissions (Bolton and Kacperczyk,

16   2021).  Dkt. 56-9.  Both types of adjustments will be beneficial for investors.

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

ER-328

62.   Not only will these changes reduce uncertainty for investors, but as I stated in my prior declaration empirical evidence shows that mandatory disclosure of climate emissions is also associated with reductions of between 7-8% in carbon emissions themselves (Downar et al., 2021; Yang et al., 2021).  Dkt. 56-54; Dkt. 56-55.  Thus, both investors and the public more broadly stand to benefit from improved disclosure rules.

I declare under penalty of perjury that the foregoing are true and correct. Executed this day, the 7th of April, 2025, in Stanford, California.

THOMAS P. LYON
Professor, U. of Michigan

ER-329

(288 of 297) Page 288 of 297
Case: 25-5327 09/18/2025, DktEntry: 8.3, Page 288 of 297
Case 2:24-cv-00801-ODW-PVC Document 89-18 Filed 04/07/25 Page 1 of 10 Page ID #:8633

ROB BONTA
Attorney General of California
MYUNG J. PARK (SBN 210866)
LAURA J. ZUCKERMAN (SBN 161896)
Supervising Deputy Attorneys General
KATHERINE GAUMOND (SBN 349453)
EMILY HAJARIZADEH (SBN 325246)
M. ELAINE MECKENSTOCK (SBN 268861)
DYLAN REDOR (SBN 338136)
DAVID ZAFT (SBN 237365)
CAITLAN MCLOON (SBN 302798)
Deputy Attorneys General
 300 South Spring Street, Suite 1702
 Los Angeles, CA 90013-1230
 Telephone: (213) 269-6438
 Fax: (916) 731-2128
 E-mail: Caitlan.McLoon@doj.ca.gov
*Attorneys for Defendants Liane M. Randolph,
Steven S. Cliff, and Robert A. Bonta*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION,**<br><br>Plaintiffs,<br><br>v.<br><br>**LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, and STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California,**<br><br>Defendants. | 2:24-cv-00801-ODW-PVCx<br><br>**DECLARATION OF ANGEL HSU, PH.D. IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: May 5, 2025<br>Time: 1:30 PM<br>Courtroom: 5D<br>Judge: The Honorable Otis D. Wright, II<br>Trial Date: Not Set<br>Action Filed: 1/30/2024 |

1    **DECLARATION OF ANGEL HSU**

2    I, Angel Hsu, hereby declare:

3    1.      I have been retained by counsel for Defendants Liane M. Randolph, Steven

4    S. Cliff, and Robert A. Bonta, in their official capacities (Defendants), in connection

5    with the above captioned litigation.  I have actual knowledge of the matters stated in

6    this declaration and can truthfully testify to the matters contained herein.

7    2.      I am the Director of the Data-Driven EnviroLab at the Institute of the

8    Environment and an Associate Professor of Public Policy and Environment, Ecology

9    and Energy at the University of North Carolina at Chapel Hill. I received my

10   Bachelor of Arts in Political Science and Bachelor of Science in Biology from Wake

11   Forest University, my Master of Philosophy in Environmental Policy from the

12   University of Cambridge, and my PhD degree in Environmental Policy from the Yale

13   School of the Environment.  Since 2015, I have published 49 peer-reviewed articles,

14   four book chapters, one edited volume, seven editorials and commentaries, ten

15   referred scientific committee reports and 23 products of interdisciplinary scholarship,

16   which have been cited nearly 7,000 times. [1] In the domain of climate change

17   specifically, I have contributed as a leading or contributing author to a number of

18   leading global scientific assessments related to climate change, including the

19   Intergovernmental Panel on Climate Change's (IPCC) Sixth Assessment Report and

20   the 2018 United Nations Environment Programme's (UNEP) Emissions Gap Report

21   special chapter on non-state and subnational actors. I was also one of 11 nominated

22   expert authors of a 2022 report released by the National Academy of Sciences on

23   greenhouse gas emissions information necessary for decision making. I have been an

24   assistant professor at Yale-NUS College, an adjunct at the Yale School of

25   Environment, where I was Director and Principal Investigator for the Environmental

26   Performance Measurement Program and Environmental Performance Index at the

27   Yale Center for Environmental Law and Policy for nearly five years. Previously, I

28   _____

[1] Google Scholar citation report for Angel Hsu, attached hereto as Exhibit (Ex.) 1.

**ER-331**

worked as a Research Analyst for the Greenhouse Gas Protocol Initiative (GHG Protocol) at the World Resources Institute, where I trained companies and organizations to use the GHG Protocol Corporate Accounting and Reporting Standard.[2]

3.      My research explores the intersection of science and policy and the use of data-driven approaches—including AI, satellite remote sensing, and other spatially explicit sources—to understand and advance environmental sustainability. I focus particularly on climate change and energy, urbanization, and air quality. Much of my work evaluates the performance and credibility of environmental policies and actors, especially at the subnational and non-state levels. My research group, the Data-Driven EnviroLab is one of four principal organizations that have created and maintain the Net Zero Tracker, the most comprehensive source and independent evaluation of decarbonization pledges made by more than 4,000 entities, from national and subnational governments to the Forbes 2000 publicly-listed companies.

4.      To facilitate understanding and comparison of corporate net-zero pledges, my team and I developed *ChatNetZero.ai* -- a question and answer chatbot that utilizes a large language model to interrogate the credibility of corporate decarbonization efforts. In my 2024 paper with Mason Laney, et al. *Evaluating ChatNetZero, an LLM-Chatbot to Demystifying Climate Pledges,* I reviewed the accuracy of large language model chatbots, including ChatNetZero but also of generic AI platforms like ChatGPT and Gemini, to produce accurate responses regarding the legitimacy of net-zero pledges made by public and private entities.[3]

5.      Decarbonizing pledges cover approximately 76% of global emissions,[4] but very few pledges are considered credible. The 2024 Net Zero Tracker Stocktake

---

[2] A true and correct copy of my current CV is attached hereto as Ex. 2.

[3] Mason Laney, et al., *Evaluating ChatNetZero, an LLM-Chatbot to Demystifying Climate Pledges* (2024), attached hereto as Ex. 3.

[4] Data pulled from Net Zero Tracker, located at http://zerotracker.net (last visited April 4, 2025). A of the landing page is attached hereto as Ex. 4.

3

**ER-332**

Report[5] found that only 5% (61 out of 1,145 of the Forbes Global 2000 companies) met the United Nations' 'Starting Line' criteria[6] of the Five 'Ps' (pledge, plan, proceed, publish, and persuade) that sets a "minimum floor" for robust net zero commitments. Similarly, the NewClimate Institute's 2024 Corporate Climate Responsibility Monitor[7] find when examining 51 large global companies that most present 2030 and net-zero targets that are ambiguous or only commit to limited emission reductions, despite broader claims of decarbonization and carbon neutrality.

6. Methodology:

a. I have been asked by the California Department of Justice to submit this declaration, based on my independent opinions and expertise, regarding the prevalence of misleading statements in corporate decarbonizing pledges and reporting.

b. I have read and am familiar with California Senate Bills 253 and 261 (S.B. 253 and S.B. 261).

c. I have read and am familiar with the Motion for Preliminary Injunction filed by Plaintiffs United States Chamber of Commerce, et al. in the above captioned matter, and the supporting materials attached thereto.

d. In developing my expert opinions for this declaration, I consulted a wide range of scholarly literature on the topics I am discussing, drawing from fields that include environmental policy and management, climate science, and large-scale data analysis. The key

---

[5] Net Zero Tracker, *Net Zero Stocktake 2024: NewClimate Institute*, Oxford Net Zero, Energy and Climate Intelligence Unit and Data-Driven EnviroLab (2025), available at https://ca1-nzt.edcdn.com/Reports/Net_Zero_Stocktake_2024.pdf?v=1732639610 (last visited April 4, 2025), attached hereto as Ex. 5.
[6] United Nations Framework Convention on Climate Change Race to Zero Campaign, *Race to Zero Criteria 3.0* (2022), available at https://www.climatechampions.net/media/f2nkeckp/race-to-zero-criteria-30-4.pdf (last visited April 4, 2025), attached hereto as Ex. 6.
[7] NewClimate Institute, *Corporate Climate Responsibility Monitor* (2024), available at https://newclimate.org/sites/default/files/2024-08/NewClimate_CCRM2024.pdf (last visited April 4, 2025), attached hereto as Ex. 7.

4

**ER-333**

1    research papers on which I rely are cited below and copies of them will
2    be made available.

3            e.  I have relied on information that is customarily reviewed and
4    relied upon by experts in my field of climate policy, which includes
5    studying the response and effectiveness of climate change-related policy
6    and regulation.  This is a field that is growing significantly since I
7    founded the Data-Driven EnviroLab at Yale University in 2016, which
8    I've since moved to the University of North Carolina at Chapel Hill in
9    2021.  There is now a growing body of research on the factors driving
10   decarbonization    disclosures,    as    well    as    their    accuracy    and
11   environmental impacts therein, and the prevalence of greenwashing has
12   been a major theme in this body of work.

13           f.  I have also relied on my own personal knowledge, training, and
14   experience in the field of public policy, climate change and data science
15   in particular.  As can be seen from my C.V., I have written numerous
16   papers on the impacts of climate change on regulatory frameworks and
17   performance, empirical analyses of greenwashing, and the factors
18   driving carbon emissions reductions at multiple levels.

19   **Summary**

20   7.    In this declaration, I will provide support for the following conclusions:
21   (1) 87% or 3,578 companies in our dataset are making emissions reduction pledges
22   or statements; (2) 96% of the companies with climate reduction pledges show signs
23   of greenwashing; (3) Disclosing emission reduction progress reduces the risk of
24   corporate greenwashing, and evidence from other contexts suggests regulation helps
25   drive this relationship.

26   ///
27   ///
28

5

**ER-334**

(293 of 297) Page 293 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 293 of 297
Case 2:24-cv-00801-ODW-PVC    Document 89-18    Filed 04/07/25    Page 6 of 10    Page
ID #:8638

1 **82% of North American companies in our dataset are making emissions**
2 **reduction pledges or statements**

3    8.    Our analysis on corporate emissions disclosures show that 87% or 3,578
4 of the companies in our dataset made a climate pledge related to emission reduction
5 targets. The dataset was produced through a harmonization of the Net Zero Tracker
6 database, which includes all of the Forbes 2000 publicly-listed companies and the
7 world's 100 largest privately-owned companies, and responses to the 2022 CDP
8 Climate Change Questionnaire, a voluntary reporting mechanism. The companies
9 with green pledges have an average annual revenue of $25.4 billion USD, and while
10 the percentage of companies that made green pledges varies by sector, we observe
11 that over 70% of the companies in each of the sectors of our database, have made a
12 green claim. Geographically, around 82% of the North American companies in our
13 sample have made green pledges.

14    9.    In our dataset, a company is considered to have made a "green claim" if it:
15 (i) appears on the Net Zero Tracker with any form of emissions reduction pledge—
16 such as commitments to achieve "Carbon Neutrality," "Net Zero," "Zero Emissions,"
17 specific percentage reductions for emissions, or sector-specific targets—and (ii)
18 reports at least one emissions target to CDP for any emissions scope.

19    **96% of corporate climate reduction pledges show signs of greenwashing**

20    10.    Despite the proliferation of corporate net-zero pledges, serious concerns
21 persist regarding their credibility and the potential for greenwashing—where
22 companies mislead stakeholders about the environmental integrity of their actions.[8]
23 In a forthcoming paper,[9] I developed a replicable framework to detect net-zero

24 _____

25    [8] de Freitas Netto, S. V., Sobral, M. F. F., Ribeiro, A. R. B., & Soares, G. R. D. L.,
*Concepts and forms of greenwashing: A systematic review,* 32 Environmental Sciences Europe,
26 1-12 (2020), attached hereto as Ex. 8. Gorovaia, N., & Makrominas, M., *Identifying
greenwashing in corporate-social responsibility reports using natural-language processing,*
27 31(1) European Financial Management, 427-462 (2025), attached hereto as Ex. 9.
   [9] Brown, B., Hsu, A., and Manya, D., *Red Flags in Green Promises: A Framework for
28 Identifying Greenwashing Risk in Corporate Climate Pledges,* Working Paper (April 5, 2025
version), attached hereto as Ex. 10.

ER-335

greenwashing by identifying seven dimensions of credibility risk, including the absence of interim targets, limited emissions coverage, reliance on questionable offsets, anti-climate lobbying, and lack of implementation progress. Building on existing framework [10] and large-scale datasets (CDP, Net Zero Tracker, InfluenceMap), we built a database of 4,131 companies across 81 countries with an average annual revenue of $21 billion USD.[11] Of those identified companies, 3,578 companies made some form of emission reduction pledge, with 1,371 (38%) making a net-zero or carbon neutrality pledge. We find that 96% of companies with emissions targets exhibit at least one indicator of greenwashing. Our analysis reveals systematic gaps between corporate climate claims and actual practices, and provides one of the first large-scale empirical assessments on the prevalence and determinants of greenwashing in net-zero commitments. These findings contribute to growing efforts to strengthen the accountability and integrity of private climate governance.[12]

11.   Our framework identifies seven dimensions most directly tied to net-zero greenwashing:

a.   No interim target – a company has no reported near or short-term interim emission targets that would indicate near-term action.

b.   No Scope 3 emissions coverage – a firm's emissions reduction targets exclude scope 3 or value chain emissions, which in the case of most companies represent substantial contributions to their overall emissions impact.

---

[10] Nemes, N., Scanlan, S. J., Smith, P., Smith, T., Aronczyk, M., Hill, S., ... & Stabinsky, D., *An integrated framework to assess greenwashing. Sustainability*, 14(8) UN High Level Expert Group 4431 (2022), attached hereto as Ex. 11. United Nations' High Level Expert Group on the Net Zero Emissions Commitments of Non State Entities, *Integrity Matters: Net Zero Commitments by Businesses, Financial Institutions, Cities and Regions* (2022), attached hereto as Ex. 12.  ISO, *Net zero guidelines* (2022), attached hereto at Ex. 13.
[11] Revenue data was only available for 70 percent of the companies in our sample, since some companies are not publicly listed or do not report annual revenue data.
[12] Trencher, G., Nick, S., Carlson, J., & Johnson, M., *Demand for low-quality offsets by major companies undermines climate integrity of the voluntary carbon market*, 15(1) Nature communications 6863 (2024), attached hereto as Ex. 14. Green, J. F., & Reyes, R. S., *The history of net zero: can we move from concepts to practice?*, 23(7) Climate policy 901-915 (2023), attached hereto as Ex. 15.

7

**ER-336**

c.   No plan to achieve targets – a firm lacks a publicly available plan detailing the steps it will take to meet its stated emissions reduction goals.

d.   Questionable use of carbon credits and offsets – an entity plans to rely on offsets without specifying conditions or fails to disclose whether offsets will be used.

e.   Incomplete emissions coverage – a company claims a "net zero," or "GHG neutrality," or other emission targets but limits its emissions inventory to only carbon dioxide ($CO_2$) or does not specify which gases are covered for any mitigation target.

f. Anti-climate lobbying – a company actively engages in lobbying activity that undermines climate action.

g.   Not on track to meet targets – a company is failing to make meaningful progress towards their own stated emission reduction target, suggesting it is not implementing measures that would indicate credible efforts taken to achieve its net-zero pledge.

Using this framework, we define greenwashing as (1) a company's claim of environmentally friendly action—such as an emissions reduction or net-zero pledge—and (2) evidence of actions that contradict or undermine that claim. We evaluated these claims using the seven dimensions of net-zero greenwashing outlined above, which assess the presence of interim targets, scope 3 coverage, concrete plans, reliance on offsets, emissions inventory completeness, lobbying efforts, and actual progress toward achieving targets.

12.   Of the 3,578 companies in our dataset that made a climate target or net-zero pledge, 96% exhibited at least one indicator of potential greenwashing based on our seven-dimension framework. The most common shortcoming was lack of Scope 3 emissions coverage, present in 70% of pledging companies. Other prevalent gaps included questionable use of carbon offsets (41%), no interim targets (20%), no implementation plan (18%), and lack of progress toward targets based on 2021 data

8

**ER-337**

(296 of 297) Page 296 of 297
Case: 25-5327 09/18/2025, DktEntry: 8.3, Page 296 of 297
Case 2:24-cv-00801-ODW-PVC   Document 89-18   Filed 04/07/25   Page 9 of 10   Page ID #:8641

(20%). Additionally, 12% showed a disconnect between claiming to pledge net zero or carbon neutrality but failing to comprehensively address all emission scopes. Examining multiple greenwashing indicators, we observe that while 41% of companies evidence only one form of greenwashing, 11% of the companies in our database are at risk by at least 4 of the metrics. These findings highlight a widespread misalignment between public climate claims and concrete action.

13.    While greenwashing indicators are widespread across all global regions in our analysis, we found 97% of North American companies are at risk of greenwashing. These firms had the highest rate of missing interim targets (33%) and the highest reliance on questionable offsets (55%).

14.    Overall, while there is variance on the percentages of specific greenwashing indicators, there is strong evidence of the extensive prevalence of signs of greenwashing across North America, evidenced by the fact that more than 90% of companies in any specific region or industrial sector shows at least one of the seven signs of greenwashing previously mentioned.

**Disclosing emissions reduction progress reduces odds of greenwashing.**

15.    There is evidence to suggest that mandatory disclosure and climate data reporting improves firm performance on emissions reduction. In my own research, I've found that subnational entities in Europe who disclose their greenhouse gas emissions tend to show greater emission reductions than those who fail to report their emissions data.[13] Other studies examining firms subject to mandatory climate disclosure and reporting have likewise found that they perform better at reducing emissions than unregulated firms.[14] In the UK, researchers also found that mandatory

---

[13] Hsu, A., Wang, X., Tan, J., Toh, W., & Goyal, N., *Predicting European cities' climate mitigation performance using machine learning*, 13(1) Nature Communications 7487 (2022), attached hereto as Ex. 16.

[14] Bauckloh, T., Klein, C., Pioch, T., & Schiemann, F., *Under pressure? The link between mandatory climate reporting and firms' carbon performance*, 36(1) Organization & Environment 126-149 (2023), attached hereto as Ex. 17; Downar, B., Ernstberger, J., Rettenbacher, H., Schwenen, S., & Zaklan, A., *Fighting climate change with disclosure? The real effects of mandatory greenhouse gas emission disclosure* (2019), attached hereto as Ex. 18.

9

(297 of 297)  Page 297 of 297 Case: 25-5327, 09/18/2025, DktEntry: 8.3, Page 297 of 297
Case 2:24-cv-00801-ODW-PVC   Document 89-18   Filed 04/07/25   Page 10 of 10   Page
ID #:8642

1  reporting not only improved firms' climate mitigation performance, but also curbed

2  greenwashing -- reducing the embellishment, over-optimism, and ambiguity in

3  disclosures.[15]

4     16.  When we combine all of our greenwashing indicators in a single

5  multivariable logistic regression (i.e., statistical model), we also find that firms that

6  disclose progress towards their emission reduction goals are also at a lower odds of

7  greenwashing. The model provides empirical support to suggest that companies with

8  both credible ambition in their climate mitigation efforts and measurable progress are

9  less likely to engage in greenwashing.

10

11     I declare under penalty of perjury that the foregoing are true and correct.

12  Executed on this day, the 4th of April, 2025, in Chapel Hill, North Carolina.

13

14

15

16  ANGEL HSU, Ph.D

17  Associate Professor of Public
   Policy and Environment,

18  Ecology and Energy

19  Director, Data-Driven
   EnviroLab

20  University of North Carolina at
   Chapel Hill

21

22

23

24

25

26

27

---

28  [15] Grewal, J., Richardson, G. D., & Wang, J., *Effects of mandatory carbon reporting on unrepresentative environmental disclosures* (2022), attached hereto as Ex. 19.

ER-339