No. 25-5327

# United States Court of Appeals
# for the Ninth Circuit

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION,

*Plaintiffs-Appellants,*

v.

LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California,

*Defendants-Appellees.*

On Appeal from an order of the
United States District Court for the Central District of California,
Case No. 2:24-cv-801, Judge Otis D. Wright, II

## EXCERPTS OF RECORD – VOLUME 7 OF 9

Stephanie A. Maloney
Kevin Palmer
CHAMBER OF COMMERCE OF THE
    UNITED STATES OF AMERICA
1615 H St., N.W.
Washington, DC 20062
(202) 659-6000

*Counsel for Plaintiff-Appellant
Chamber of Commerce of the
United States of America*

Eugene Scalia
Jonathan C. Bond
Brian A. Richman
GIBSON, DUNN & CRUTCHER LLP
1700 M St., N.W.
Washington, DC 20036
(202) 955-8500
EScalia@gibsondunn.com

Bradley J. Hamburger
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071
(213) 229-7000

*Counsel for Plaintiffs-Appellants*

(2 of 296), Page 2 of 296    Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 2 of 296
Case 2:24-cv-00801-ODW-PVC    Document 55-18    Filed 07/24/24    Page 599 of 632
Page ID #:5810

**BARRETT, Ko**
National Oceanographic and
Atmospheric Administration
USA

**BASTOS, Ana**
Laboratoire des sciences du climat
et de l'environnement
France

**BATAILLE, Christopher**
Institute for Sustainable Development
and International Relations
Simon Fraser University
Canada

**BAUER, Nico**
Potsdam Institut for Climate Impact Research
Germany

**BAYAS, Dilipsing**
International Consultant (Roster)
UN Global Pulse Lab
India

**BELLAMY, Rob**
University of Oxford
UK

**BENNACEUR, Kamel**
Abu Dhabi National Oil Company
United Arab Emirates

**BENNETT, Simon**
International Energy Agency
France

**BENTO, Nuno**
ISCTE-Instituto Universitário de Lisboa
Portugal

**BENVENISTE, Hélène**
Woodrow Wilson School of Public
and International Affairs
Princeton University
USA

**BERDALET, Elisa**
Consejo Superior de Investigaciones Científicas
Spain

**BERTOLDI, Paolo**
European Commission
Italy

**BISHOP, Justin**
University of Cambridge
UK

**BLOK, Kornelis**
Delft University of Technology
The Netherlands

**BLUM, Mareike**
University of Freiburg
Germany

**BOBIN, Jean Louis**
Université Pierre et Marie Curie
France

**BODMAN, Roger**
The University of Melbourne
Australia

**BONDUELLE, Antoine**
E&E Consultant
France

**BOONEEADY, Prithiviraj**
Mauritius Meteorological Services
Mauritius

**BOOTH, Mary**
Partnership for Policy Integrity
USA

**BORGES LANDAEZ, Pedro Alfredo**
Venezuelan Institute for Scientific Research
UNFCCC Technology Executive Committee
Venezuela

**BORGFORD-PARNELL, Nathan**
Climate and Clean Air Coalition
Switzerland

**BOSETTI, Valentina**
Bocconi University
Fondazione Eni Enrico Mattei
Italy

**BOUCHER, Olivier**
Institut Pierre Simon Laplace
France

**BOYER-VILLEMAIRE, Ursule**
Université du Québec à Montréal
Canada

**BRANDÃO, Miguel**
Royal Institute of Technology (KTH)
Sweden

**BRANDER, Keith**
DTU Aqua
Denmark

**BREGMAN, Bram**
Radboud University
The Netherlands

**BREON, Francois-Marie**
Laboratoire des sciences du climat
et de l'environnement
France

**BREYER, Christian**
Lappeenranta University of Technology
Finland

**BRICEÑO-ELIZONDO, Elemer**
Instituto Tecnológico de Costa Rica
Costa Rica

**BROWN, Louis**
Manchester Business School
UK

**BROWN, Sally**
University of Southampton
UK

**BRUCKNER, Thomas**
University of Leipzig
Germany

**BRUNNER, Beat**
Lightning MultiCom SA
Switzerland

**BUDINIS, Sara**
Imperial College London
Sustainable Gas Institute
UK

**BULLOCK, Simon**
Friends of the Earth, England,
Wales and Northern Ireland
UK

**BUZÁSI, Attila**
Budapest University of
Technology and Economics
Hungary

**BYERS, Edward**
International Institute for
Applied Systems Analysis
Austria

**BUTT, Nathalie**
The University of Queensland
Australia

**CAESAR, John**
Met Office Hadley Centre
UK

**CAI, Rongshuo**
Third Institute of Oceanography
State Oceanic Administration of China
China

**CALLEN, Jessica**
International Institute for
Applied Systems Analysis
Austria

AIV

Exhibit 18 to Decl. of Scheehle
1797

(3 of 296), Page 3 of 296    Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 3 of 296
Case 2:24-cv-00801-ODW-PVC    Document 55-18    Filed 07/24/24    Page 600 of 632
Page ID #:5811

Annex IV                                          Expert Reviewers of the IPCC Special Report on Global Warming of 1.5°C

**CAMES, Martin**
Öko-Institut
Germany

**CAMPBELL, Donovan**
Jamaica

**CAMPBELL, Kristin**
Institute for Governance and
Sustainable Development
USA

**CAMPBELL-DURFLÉ, Christopher**
Center for International Sustainable
Development Law
Canada

**CANEILL, Jean-Yves**
IETA non-profit business organisation
France

**CANEY, Simon**
University of Warwick
UK

**CAPSTICK, Stuart**
Cardiff University
UK

**CARAZO ORTIZ, Maria Pia**
University for Peace
Germany

**CARNICER, Jofre**
University of Barcelona
Spain

**CARPENTER, Mike**
Gassnova
Norway

**CARRASCO, Jorge**
Universidad de Magallanes
Chile

**CARTER, Peter**
Climate Emergency Institute
Canada

**CARTER, Timothy**
Finnish Environment Institute (SYKE)
Finland

**CARTWRIGHT, Anton**
African Centre for Cities
University of Cape Town
South Africa

**CASSOTTA, Sandra**
Denmark

**CASTANEDA, Fátima**
Konrad Adenauer S.
Guatemala

**CAZZOLA, Pierpaolo**
International Energy Agency
France

**CEARRETA, Alejandro**
Universidad del Pais Vasco/EHU
Spain

**CENTELLA, Abel**
Instituto de Meteorologia
Cuba

**CERDÁ, Emilio**
University Compluntense of Madrid
Spain

**CHACÓN, Noemi**
Instituto Venezolano de
Investigaciones Científicas
Venezuela

**CHADBURN, Sarah**
University of Leeds
UK

**CHAN, Yi-Chieh**
Delta Electronics Foundation
China

**CHARPENTIER LJUNGQVIST, Fredrik**
Stockholm University
Sweden

**CHEN, Wenting**
Norwegian Institute for Water Research
Norway

**CHEN, Wenying**
Tsinghua University
China

**CHEN, Ying**
Chinese Academy of Social Sciences
China

**CHERKAOUI, Ayman Bel Hassan**
Center for International Sustainable
Development Law
Morocco

**CHERNOKULSKY, Alexander**
A.M. Obukhov Institute of Atmospheric Physics
Russian Academy of Sciences
Russian Federation

**CHINWEZE, Chizoba**
Chemtek Associates Limited
Nigeria

**CHOI, Woonsup**
University of Wisconsin-Milwaukee
USA

**CHOW, Winston**
National University of Singapore
Singapore

**CHRISTOPHER, Barrington-Leigh**
McGill University
Canada

**CHUST, Guillem**
AZTI Marine Research Division
Spain

**CIOT, Marco**
Italian Peace Civil Corps FOCSIV
Italy

**CLARK, Christopher**
US Government
USA

**CLARKE, David**
Canada

**CLARKE, Jamie**
Climate Outreach
UK

**CLAYTON, Susan**
The College of Wooster
USA

**CLEMMER, Steve**
Union of Concerned Scientists
USA

**COLLINS, Mat**
University of Exeter
UK

**COLLINS, William**
University of Reading
UK

**CONNORS, Sarah**
IPCC WGI Technical Support Unit
Université Paris-Saclay
France/UK

**CONVERSI, Alessandra**
Consiglio Nazionale delle Ricerche
Italy

**COOK, Lindsey**
Friends World Committee for Consultation
Germany

AIV

Exhibit 18 to Decl. of Scheehle
1798

**ER-1458**

(4 of 296), Page 4 of 296    Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 4 of 296
Case 2:24-cv-00801-ODW-PVC    Document 55-18    Filed 07/24/24    Page 601 of 632
Page ID #:5812

Expert Reviewers of the IPCC Special Report on Global Warming of 1.5°C

Annex IV

**COOPER, David**
Convention on Biological Diversity
Canada

**CORFEE-MORLOT, Jan**
New Climate Economy
France

**CORNELIUS, Stephen**
World Wildlife Fund
UK

**COROBOV, Roman**
Eco-Tiras International Association
of River Keepers
Republic of Moldova

**COULTER, Liese**
Griffith University
Australia

**COURAULT, Romain**
Sorbonne-Universités Paris IV
France

**CREMADES, Roger**
Climate Service Center Germany (GERICS)
Germany

**CREUTZIG, Felix**
Mercator Research Institute on Global
Commons and Climate Change
Technical University Berlin
Germany

**CURRIE-ALDER, Bruce**
International Development Research Centre
Canada

**CUSACK, Geraldine Ann**
Siemens Ltd
Ireland

**CUTTING, Hunter**
Cimate Nexus/Climate Signals
USA

**CZERNICHOWSKI-LAURIOL, Isabelle**
Bureau de recherches géologiques et minières
France

**DAALDER, Henk**
Pak de Wind
Netherlands

**DAGNET, Yamide**
World Resources Institute
USA

**DAI, Zhen**
Harvard University
USA/China

**DAIOGLOU, Vassilis**
PBL Netherlands Environmental
Assessment Agency
Netherlands

**DALIAKOPOULOS, Ioannis**
Technical University of Crete
Greece

**DAMASSA, Thomas**
Oxfam America
USA

**DAÑO, Elenita**
Action Group on Erosion
Technology and Concentration
Philippines

**DAVIES, Elizabeth Penelope**
Ford Foundation
USA

**DE BEAUVILLE-SCOTT, Susanna**
Sustainable Development Department
Government of Saint Lucia
Saint Lucia

**DE CONINCK, Heleen**
Radboud University
Netherlands

**DE FRENNE, Pieter**
Ghent University
Belgium

**DE OLIVEIRA, Gabriel**
University of Kansas
Brazil

**DEISSENBERG, Christophe**
Aix-Marseille University
Groupement de recherche en
économie quantitative
Luxembourg

**DELUSCA, Kenel**
Institut des sciences, des technologies
et des études avancées d'Haïti
University of Montreal
Haiti

**DEMKINE, Volodymyr**
Kenya

**DEN ELZEN, Michel**
PBL Netherlands Environmental
Assessment Agency
Netherlands

**DENG, Xiangzheng**
Institute of Geographic Sciences
and Natural Resources Research
Chinese Academy of Sciences
China

**DENIS-RYAN, Amandine**
Monash University
Australia

**DESCONSI, Cristiano**
Federal University of Goiás
Brazil

**DI BELLA, Jose**
ParlAmericas
Canada

**DIAZ, Julio**
National School of Public Health
Carlos III Institute of Health
Spain

**DIOP, Cherif**
Agence nationale de l'aviation
civile et de la météorologie
Senegal

**DIOSEY RAMON, Lugo-Morin**
Universidad Intercultural del Estado de Puebla
Mexico

**DIXON, Tim**
IEA Greenhouse Gas
UK

**DOCQUIER, David**
Université catholique de Louvain
Belgium

**DOELLE, Meinhard**
Dalhousie University
Canada

**DONEV, Jason**
University of Calgary
Canada

**DONNELLY, Chantal**
Bureau of Meteorology
Australia

**DOOLEY, Kate**
University of Melbourne
Australia

**DOYLE, Paul**
BC Rivers Consulting Ltd
Canada

AIV

Exhibit 18 to Decl. of Scheehle
1799

**ER-1459**

(5 of 296), Page 5 of 296    Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 5 of 296
Case 2:24-cv-00801-ODW-PVC    Document 55-18    Filed 07/24/24    Page 602 of 632
Page ID #:5813

Annex IV                                                    Expert Reviewers of the IPCC Special Report on Global Warming of 1.5°C

**DRIOUECH, Fatima**
Direction de la météorologie nationale
Morocco

**DROEGE, Susanne**
German Institute for International
and Security Affairs (SWP)
Germany

**DUBE, Lokesh Chandra**
Ministry of Environment, Forest
and Climate Change
India

**DUNPHY, Brendon**
The University of Auckland
New Zealand

**DURAND, Frédéric**
Toulouse II University
France

**DYKEMA, John**
Paulson School
Harvard University
USA

**EASTHAM, Sebastian**
Massachusetts Institute of Technology
USA/UK

**EGBENDEWE, Aklesso**
University of Lome
Togo

**EHARA, Makoto**
Forestry and Forest Products Research Institute
Japan

**EHSANI, Nima**
Saint Louis University
USA

**EISEN, Olaf**
Alfred-Wegener-Institut
Helmholtz-Zentrum für Polar-
und Meeresforschung
Germany

**EKHOLM, Tommi**
Aalto University
Finland

**EL ZEREY, Wael**
Djillali Liabes University
Algeria

**ELBASIOUNY, Heba**
Al-Azhar University
Egypt

**ELBEHIRY, Fathy**
Central laboratory for Environmental Studies
Kafrelsheikh University
Egypt

**ELBEHRI, Aziz**
Italy

**ELSHAROUNY, Mohamed**
Cairo University
Egypt

**EMORI, Seita**
National Institute for Environmental Studies
Japan

**ENOMOTO, Hiroyuki**
Japan

**ERB, Karlheinz**
Austria

**ERIKSSON, Flintull Annica**
Statistics Denmark
Sweden

**ERLANIA, Erlania**
Center for Fisheries Research
Indonesia

**ESPARTA, Adelino Ricardo Jacintho**
Universidade de São Paulo
Brazil

**FÆHN, Taran**
Statistics Norway Research Department
Norway

**FANG, Kai**
Zhejiang University
China

**FARAGO, Tibor**
Eötvös L. University (ELTE)
Hungary

**FARIA, Sergio Henrique**
Basque Centre for Climate Change (BC3)
Spain

**FAST, Stewart**
Institute for Science, Society and Policy
University of Ottawa
Canada

**FAUSET, Sophie**
University of Leeds
UK

**FICHERA, Alberto**
University of Catania
Italy

**FINNVEDEN, Göran**
Royal Institute of Technology (KTH)
Fortum Värme
Sweden

**FISCHLIN, Andreas**
ETH Zurich
Switzerland

**FLATO, Greg**
Canadian Centre for Climate
Modelling and Analysis
Environment Canada
Canada

**FLEMING, John**
Center for Biological Diversity
USA

**FLEMING, Sean**
University of British Columbia
USA

**FODA, Rabiz**
Hydro One Networks Inc.
Canada

**FOLTESCU, Valentin**
United Nations Environment
France

**FORD, James**
Department of Geography
McGill University
Canada

**FORSTER, Piers**
University of Leeds
UK

**FREI, Thomas**
Research and Consulting
Switzerland

**FUGLESTVEDT, Jan**
Center for International Climate Research
Norway

**FUHR, Lili**
Heinrich Böll Foundation
Germany

**FUJIMORI, Shinichiro**
National Institute for Environmental Studies
Japan

**FUSS, Sabine**
Mercator Research Institute on Global
Commons and Climate Change
Germany

AIV

586

Exhibit 18 to Decl. of Scheehle
1800                                                    ER-1460

(6 of 296), Page 6 of 296     Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 6 of 296
Case 2:24-cv-00801-ODW-PVC    Document 55-18    Filed 07/24/24    Page 603 of 632
Page ID #:5814

**GADIAN, Alan**
National Centre for Atmospheric Sciences
University of Leeds
UK

**GAILL, Françoise**
Plateforme océan climat
France

**GAJJAR, Sumetee Pahwa**
Indian Institute for Human Settlements
India

**GALOS, Borbala**
University of Sopron
Hungary

**GALYNA, Trypolska**
Institute for Economics and Forecasting, UNAS
Ukraine

**GAN, Thian**
University of Alberta
Canada

**GARCI SOTO, Carlos**
Spanish Institute of Ocenography
Spain

**GECK, Angela**
Institute of Political Science
University of Freiburg
Germany

**GEDEN, Oliver**
German Institute for International and Security
Affairs (Stiftung Wissenschaft und Politik)
Germany

**GEORGIADIS, Teodoro**
Italian national Research Council
Instituto of Biometeorology (CNR-IBIMET)
Italy

**GIARDINO, Alessio**
Deltares
Netherlands

**GIAROLA, Sara**
Imperial College London
UK

**GILLE, Sarah**
Scripps Institution of Oceanography
University of California San Diego
USA

**GILLETT, Nathan**
Environment and Climate Change Canada
Canada

**GLENN, Aaron**
Agriculture and Agri-Food Canada
Canada

**GOLSTON, Levi**
Princeton University
USA

**GÓMEZ CANTERO, Jonathan**
Universidad de Alicante
Castilla-La Mancha Media
Spain

**GONZALEZ, Miguel**
Global Education and
Infrastructure Services Ltd
Nigeria

**GONZALEZ, Patrick**
University of California
USA

**GONZÁLEZ-EGUINO, Mikel**
Basque Centre for Climate Change
Spain

**GOODWIN, Philip**
University of Southampton
UK

**GORNER, Marine**
Organisation for Economic Co-operation and
Development, International Energy Agency
France

**GRANT, Jonathan**
PwC
UK

**GRASSI, Giacomo**
Italy

**GRAU, Marion**
MF Norwegian School of Theology
Norway

**GRILLAKIS, Manolis**
Technical University of Crete
Greece

**GROVER, Samantha**
La Trobe University
Australia

**GUIVARCH, Céline**
Centre international de recherche sur
l'environnement et le développement,
Ecole des Ponts ParisTech
France

**GUPTA, Himangana**
NATCOM Cell
Ministry of Environment, Forest
and Climate Change
India

**HABERL, Helmut**
Institute of Social Ecology
University of Natural Resources
and Life Sciences (BOKU)
Austria

**HAFEZ, Marwa**
Institute for Graduate Studies & Research
Alexandria Governor office
Egypt

**HAGEN, Achim**
Resource Economics Group
Humboldt-Universität
Germany

**HAITES, Erik**
Margaree Consultants Inc.
Canada

**HALLAM, Samantha**
University of Southampton
UK

**HALSNAES, Kirsten**
The Danish Technical University
Denmark

**HAMDI, Rafiq**
Royal Meteorological Institute of Belgium
Belgium

**HANN, Veryan**
University of Tasmania
Australia

**HARA, Masayuki**
Center for Environmental Science in Saitama
Japan

**HARE, Bill**
Climate Analytics
Germany

**HARMELING, Sven**
CARE International
Germany

**HAROLD, Jordan**
University of East Anglia
UK

**HARPER, Anna**
University of Exeter
UK

AIV

Exhibit 18 to Decl. of Scheehle
1801
**ER-1461**

(7 of 296), Page 7 of 296   Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 7 of 296
Case 2:24-cv-00801-ODW-PVC   Document 55-18   Filed 07/24/24   Page 604 of 632
Page ID #:5815

Annex IV                                          **Expert Reviewers of the IPCC Special Report on Global Warming of 1.5°C**

**HARRISON, Jonathan**
University of Southampton
UK

**HASEGAWA, Tomoko**
National Institute for Environmental Studies
Japan

**HASHIMOTO, Shoji**
Forestry and Forest Products Research Institute
Japan

**HAYMAN, Garry**
NERC
Centre for Ecology & Hydrology
UK

**HAYWOOD, Jim**
University of Exeter
UK

**HEAD, Erica**
Fisheries and Oceans Canada
Canada

**HEBBINGHAUS, Heike**
Landesamt für Natur, Umwelt und
Verbraucherschutz Nordrhein-
Westfalen (LANUV)
Germany

**HENSON, Stephanie**
National Oceanography Centre
UK

**HERBERT, Annika**
University of Sydney
Australia

**HERRALA, Risto**
International Monetary Fund
USA

**HERTWICH, Edgar**
Yale University
USA

**HEYD, Thomas**
University of Victoria
Canada

**HIDALGO, Julia**
National Center of Scientific Research
France

**HILDÉN, Mikael**
Finnish Environment Institute
Finland

**HILMI, Nathalie**
France

**HIRVONEN, Janne**
Aalto University
Finland

**HITE, Kristen**
American University
School of International Service
USA

**HOF, Andries**
PBL Netherlands Environmental
Assessment Agency
Netherlands

**HOLZ, Christian**
Climate Equity Reference Project
Canada

**HONDA, Yasushi**
Faculty of Health and Sport Sciences
University of Tsukuba
Japan

**HONEGGER, Matthias**
Research Scientist at Institute for Advanced
Sustainability Studies Potsdam
Germany

**HONG, Jinkyu**
Department of Atmospheric Sciences
Yonsei University
Republic of Korea

**HONGO, Takashi**
Mitsui Global Strategic Studies Institute
Japan

**HOREN GREENFORD, Daniel**
Concordia University
Canada

**HORTON, Joshua**
Harvard University
Havard Kennedy School
USA

**HOSSEN, Mohammad Anwar**
University of Dhaka
Bangladesh

**HOWDEN, Mark**
Australian National University
Australia

**HUANG, Yuanyuan**
Laboratoire des sciences du climat
et de l'environnement
France

**HUEBENER, Heike**
Hessian Agency for Nature Conservation,
Environment and Geology
Germany

**HURTADO ALBIR, Francisco Javier**
European Patent Office
Germany

**HUSSEIN, Amal**
National Research Centre
Egypt

**IGLESIAS BRIONES, Maria Jesus**
Universidad de Vigo
Spain

**IIZUMI, Toshichika**
Institute for Agro-Environmental Sciences
National Agriculture and Food
Research Organization
Japan

**INFIELD, David**
University of Strathclyde
UK

**INSAROV, Gregory**
Institute of Geography
Russian Academy of Sciences
Russian Federation

**INYANG, Hilary**
Global Education and
Infrastructure Services LLC
Nigeria

**IQBAL, Muhammad Mohsin**
Global Change Impact Studies Centre
Pakistan

**IRVINE, Peter**
School of Engineering and Applied Sciences
Harvard University
USA

**ISHIMOTO, Yuki**
The Institute of Applied Energy
Norway

**ISLAM, Akm Saiful**
Bangladesh University of
Engineering and Technology
Bangladesh

**ISLAM, Md. Sirajul**
North South University Bangladesh

**ITO, Akihiko**
National Institute for Environmental Studies
Japan

AIV

Exhibit 18 to Decl. of Scheehle
1802

**ER-1462**

(8 of 296), Page 8 of 296     Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 8 of 296
Case 2:24-cv-00801-ODW-PVC   Document 55-18   Filed 07/24/24   Page 605 of 632
Page ID #:5816

Expert Reviewers of the IPCC Special Report on Global Warming of 1.5°C **Annex IV**

**IZZET, Ari**
Head of Department of Sustainable
Development and Environment
Turkey

**JACOBSON, Mark**
Stanford University
USA

**JAEGER-WALDAU, Arnulf**
European Commission
Italy

**JAKOB, Grandin**
University of Bergen
Norway

**JAMES, Rachel**
University of Oxford
UK

**JEREZ, Sonia**
University of Murcia
Spain

**JERSTAD, Heid**
University of Edinburgh
UK

**JIA, Gensuo**
China

**JIM ILHAM, Jasmin Irisha**
Jeffrey Sachs Center on
Sustainable Development
Malaysia

**JINNAH, Sikina**
UC Santa Cruz
USA

**JOHANSEN, Tom Gabriel**
InfoDesignLab
Norway

**JOHNSTON, Eleanor**
Climate Interactive
USA

**JONES, Ian**
University of Sydney
Australia

**JONES, Lindsey**
London School of Economics
Overseas Development Institute
UK

**JOSEY, Simon**
National Oceanography Centre
UK

**JOUZEL, Jean**
Centre d'énergie atomique de Saclay
France

**KABIDI, Khadija**
Direction de la météorologie nationale
Morocco

**KACHI, Aki**
Carbon Market Watch
Germany

**KADITI, Eleni**
Organization of the Petroleum
Exporting Countries
Austria

**KAINUMA, Mikiko**
Institute for Global Environmental Strategies
Japan

**KALLBEKKEN, Steffen**
Center for International Climate Research
Norway

**KALLIOKOSKI, Tuomo**
University of Helsinki
Finland

**KALUGIN, Andrey**
Water Problems Institute of
Russian Academy of Sciences
Russian Federation

**KANAKO, Morita**
Forestry and Forest Products Research Institute
Japan

**KARIMIAN, Maryam**
Climatology Research Institute
National Center of Climatology
Iran

**KARMALKAR, Ambarish**
University of Massachusetts Amherst
USA

**KARTADIKARIA, Aditya**
Bandung Institute of Technology
Indonesia

**KATBEHBADER, Nedal**
Environment Quality Authority
State of Palestine
Switzerland

**KAWAMIYA, Michio**
Japan Agency for Marine-Earth
Science and Technology
Japan

**KAY, Robert**
ICF
USA

**KEENAN, Jesse**
Harvard University
USA

**KEITH, David**
Harvard University
USA/Canada/UK

**KEMPER, Jasmin**
IEA Greenhouse Gas R&D Programme
UK

**KERKHOVEN, John**
Partner Quintel Intelligence
Netherlands

**KERSTING, Diego Kurt**
Freie Universität Berlin
Germany

**KHAZAEI, Mahnaz**
Iran Meteorological Organization
Iran

**KHAZANEDARI, Leili**
Climate Research Institute
Iran

**KHENNAS, Smail**
Independent energy and climate change expert
UK

**KHESHGI, Haroon**
ExxonMobil Research and
Engineering Company
USA

**KIENDLER-SCHARR, Astrid**
IEK-8: Troposphere, Forschungszentrum
Jülich GmbH
Germany

**KILKIS, Siir**
The Scientific and Technological Research
Council of Turkey (TUBITAK)
International Centre for Sustainable
Development of Energy, Water and
Environment Systems (SDEWES Centre)
Turkey

**KIM, Hyung Ju**
Green Technology Center Korea
Republic of Korea

**KINN, Moshe**
The University of Salford
UK

**AIV**

589

Exhibit 18 to Decl. of Scheehle
1803

**ER-1463**

(9 of 296), Page 9 of 296     Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 9 of 296
Case 2:24-cv-00801-ODW-PVC     Document 55-18     Filed 07/24/24     Page 606 of 632
Page ID #:5817

Annex IV

**Expert Reviewers of the IPCC Special Report on Global Warming of 1.5°C**

**KJELLSTRÖM, Erik**
Swedish Meteorological and
Hydrological Institute
Sweden

**KNOPF, Brigitte**
Mercator Research Institute on Global
Commons and Climate Change
Germany

**KOBAYAHI, Shigeki**
Transport Institute of Central Japan
Japan

**KOCHTITZKY, William**
University of Maine
USA

**KOLL, Roxy Mathew**
India

**KONDO, Hiroaki**
National Institute of Advanced
Industrial Science and Technology
Japan

**KOPPU, Robert**
Rutgers University
USA

**KOUTROULIS, Aristeidis**
Technical University of Crete
School of Environmental Engineering
Greece

**KRAVITZ, Ben**
Pacific Northwest National Laboratory
USA

**KREUTER, Judith**
Technische Universität
Germany

**KREY, Volker**
International Institute for
Applied Systems Analysis
Austria

**KRIEGLER, Elmar**
Potsdam Institute for Climate Impact Research
Germany

**KRINNER, Gerhard**
Centre national de la recherche scientifique
France

**KRISHNASWAMY, Jagdish**
India

**KÜHNE, Kjell**
Leave it in the Ground Initiative
Mexico

**KUHNHENN, Kai**
Konzeptwerk Neue Ökonomie
Germany

**KUSCH, Sigrid**
University of Padua
Germany

**KUYLENSTIERNA, Johan Carl Ivar**
Stockholm Environment Institute
UK

**LABRIET, Maryse**
Eneris Environment Energy Consultants
Spain

**LAHA, Priyanka**
Indian Institute of the Technology Kharagur
India

**LAHIRI, Souparna**
Global Forest Coalition
India

**LAHN, Bård**
Center for International Climate Research
Norway

**LATIF, Muhammad**
Applied Systems Analysis Division
Pakistan Atomic Energy Commission
Pakistan

**LAW, Matt**
Bath Spa University
UK

**LAWRENCE, Mark**
Institute for Advanced Sustainability Studies
Germany

**LE BRIS, Nadine**
Sorbonne University
France

**LE QUÉRÉ, Corinne**
Tyndall Centre
University of East Anglia
UK

**LEAHY, Paul**
University College Cork
Ireland

**LEAL, Walter**
Hamburg University of Applied Sciences
Germany

**LECOCQ, Noé**
Inter-Environnement Wallonie
Belgium

**LEE, Arthur**
Chevron Energy Technology Company
USA

**LEE, Sai Ming**
Hong Kong Observatory
China

**LEFALE, Penehuro Fatu**
LeA International
Joint Centre for Disaster Research
Massey University
New Zealand

**LEFFERTSTRA, Harold**
Climate Consultant
Norway

**LEHOCZKY, Annamaria**
Centre for Climate Change
Universitat Rovira i Virgili
Spain

**LESLIE, Michelle**
Canadian Nuclear Association
Canada

**LEVIHN, Fabian**
Royal Institute of Technology (KTH)
Fortum Värme
Sweden

**LEVINA, Ellina**
International Energy Agency
France

**LEY, Debora**
Latinoamérica Renovable
Guatemala/Mexico

**LICKER, Rachel**
Union of Concerned Scientists
USA

**LIJUAN, Ma**
National Climate Center
China

**LINARES, Cristina**
Carlos III Institute of Health
National School of Public Health
Spain

**LITTLE, Conor**
University of Limerick
Ireland

**LLASAT, Maria-Carmen**
University of Barcelona
Spain

**AIV**

590

Exhibit 18 to Decl. of Scheehle
1804

**ER-1464**

**Expert Reviewers of the IPCC Special Report on Global Warming of 1.5°C**                                    **Annex IV**

**LLOYD, Philip**
Cape Peninsula University of Technology
Beijing Agricultural University
South Africa

**LOBELLE, Delphine**
University of Southampton
UK

**LOCKIE, Stewart**
James Cook University
Australia

**LOCKLEY, Andrew**
UK

**LOMBROSO, Luca**
University of Modena and Reggio Emilia
Italy

**LONGDEN, Thomas**
Centre for Health Economics
Research and Evaluation
University of Technology Sydney
Australia

**LOPEZ-BUSTINS, Joan A.**
University of Barcelona
Spain

**LOUGHMAN, Joshua**
Arizona State University
USA

**LOUREIRO, Carlos**
Ulster University
University of KwaZulu-Natal
UK/South Africa

**LOVERA-BILDERBEEK, Simone**
Global Forest Coalition
University of Amsterdam
Paraguay

**LOVINS, Amory**
Rocky Mountain Institute
USA

**LUCERO, Lisa**
University of Illinois at Urbana-Champaign
USA

**LUDERER, Gunnar**
Potsdam Institute for Climate Impact Research
Germany

**LUENING, Sebastian**
Institute for Hydrography, Geoecology
and Climate Sciences
Portugal

**LUPO, Anthony**
University of Missouri
USA

**LYNN, Jonathan**
IPCC Secretariat
World Meteorological Organization
Switzerland

**LYONS, Lorcan**
France

**MAAS, Wilfried**
Royal Dutch Shell
Netherlands

**MACCRACKEN, Michael**
Climate Institute
USA

**MACDOUGALL, Andrew**
St. Francis Xavier University
Canada

**MACMARTIN, Douglas**
Cornell University
USA

**MAHAL, Snaliah**
Department of Sustainable Development
Saint Lucia

**MAHOWALD, Natalie**
Cornell University
USA

**MANTYKA-PRINGLE, Chrystal**
School of Environment and Sustainability
University of Saskatchewan
Canada

**MARBAIX, Philippe**
Université catholique de Louvain
Belgium

**MARCOTULLIO, Peter**
Hunter College
City University of New York
USA

**MARTIN, Eric**
Irstea
France

**MARTINI, Catherine**
Yale Program on Climate
Change Communication
USA

**MARTYR-KOLLER, Rosanne**
University of California Berkeley
Germany

**MARX, Andreas**
Helmholtz Centre for Environmental
Research GmbH (UFZ)
Germany

**MASOOD, Amjad**
Global Change Impact Studies Centre
Pakistan

**MASSON-DELMOTTE, Valérie**
IPCC Co-Chair WGI
France

**MATA, Érika**
IVL Swedish Environmental Research Institute
Sweden

**MATSUMOTO, Katsumi**
University of Minnesota
USA

**MATSUMOTO, Ken'ichi**
Nagasaki University
Japan

**MATTHEWS, J. B. Robin**
IPCC WGI Technical Support Unit
Université Paris-Saclay
France/UK

**MAY, Wilhelm**
Lund University
Denmark

**MAZAUD, Alain**
Laboratoire des sciences du climat
et de l'environnement
France

**MAZZOTTI, Marco**
ETH Zurich
Switzerland

**MBEVA, Kennedy**
African Centre for Technology Studies
Australia

**MCCAFFREY, Mark**
National University for Public Service
Hungary

**MCKINNON, Catriona**
University of Reading
UK

**MECHLER, Reinhard**
International Institute for
Applied Systems Analysis
Austria/Germany

**AIV**

591

Exhibit 18 to Decl. of Scheehle
1805

ER-1465

Annex IV                                    Expert Reviewers of the IPCC Special Report on Global Warming of 1.5°C

**MEFTAH, Mustapha**
Centre national de la recherche scientifique
France

**MELAMED, Megan**
International Global Atmospheric Chemistry
University of Colorado
Cooperative Institute for Research
in Environmental Sciences
USA

**MELIA, Nathanael**
Scion
New Zealand

**METZ, Bert**
European Climate Foundation
Netherlands

**MEYA, Jasper**
Humboldt-Universtiät
Germany

**MICHAELIS, Laurence**
Living Witness (Quakers)
UK

**MICHAELOWA, Axel**
University of Zurich
Switzerland

**MIDGLEY, Pauline**
Independent Consultant
Germany

**MIN, Seung-Ki**
Pohang University of Science and Technology
Republic of Korea

**MINDENBECK, Katja**
IPCC WGII Technical Support Unit
Alfred-Wegener-Institut Bremen
Germany

**MITCHELL, Dann**
University of Bristol
UK

**MIZUNO, Yuji**
Institute for Global Environmental Strategies
Japan

**MKWAMBISI, David**
Lilongwe University of Agriculture
and Natural Resources
Malawi

**MODIRIAN, Rahele**
Climatological Research Institute
Iran

**MOHAMED ABULEIF, Khalid**
Sustainability Advisor to the Minister Ministry
of Petroleum and Mineral Resources
Saudi Arabia

**MOLERO, Francisco**
Centro de Investigaciones Energéticas,
Medioambientales y Tecnológicas
Spain

**MÖLLER, Ina**
Lund University
Sweden

**MÖLLERSTEN, Kenneth**
Swedish Energy Agency
Sweden

**MONFORTI-FERRARIO, Fabio**
Joint Research Centre
European Commission
Italy

**MONTT, Guillermo**
International Labour Organization
Switzerland

**MOORE, Robert Daniel**
University of British Columbia
Canada

**MORALES, Manuel**
Université Clermont Auvergne
France

**MORECROFT, Mike**
Natural England
UK

**MORELLI, Angela**
InfoDesignLab
Norway

**MORENO, Meimalin**
Venezuelan Institute for Scientific Research
Venezuela

**MORGAN, Jennifer**
Greenpeace
The Netherlands

**MORIN, Samuel**
France

**MORROW, David**
American University
George Mason University
USA

**MORTON, John**
Natural Resources Institute
University of Greenwich
UK

**MORTON, Oliver**
University College London
UK

**MOUFOUMA OKIA, Wilfran**
IPCC WGI Technical Support Unit
Université Paris-Saclay
France/Congo

**MOUSSADEK, Rachid**
National Agricultural Research Institute
Morocco

**MOVAGHARI, Alireza**
Urmia University
Iran

**MUÑOZ SOBRINO, Castor**
Universidade de Vigo
Spain

**MURI, Helene**
University of Oslo
Norway

**MUSOLIN, Dmitry L.**
Saint Petersburg State Forest
Technical University
Russian Federation

**MYCOO, Michelle**
The University of the West Indies
Trinidad and Tobago

**NALAU, Johanna**
Griffith University
Australia

**NANGOMBE, Shingirai Shepard**
University of Chinese Academy of Science
Zimbabwe

**NATALINI, Davide**
Global Sustainability Institute
Anglia Ruskin University
UK

**NAUELS, Alexander**
University of Melbourne
Australia

**NDIONE, Jacques-André**
Centre de Suivi Ecologique
Senegal

**NEDJRAOUI, Dalila**
Algeria

AIV

592

Exhibit 18 to Decl. of Scheehle
1806

ER-1466

(12 of 296), Page 12 of 296  Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 12 of 296
Case 2:24-cv-00801-ODW-PVC    Document 55-18    Filed 07/24/24    Page 609 of 632
Page ID #:5820

Expert Reviewers of the IPCC Special Report on Global Warming of 1.5°C

Annex IV

**NERILIE, Abram**
Australian National University
Australia

**NEU, Urs**
ProClim
Swiss Academy of Sciences
Switzerland

**NICHOLLS, Neville**
Monash University
Australia

**NICOLAU, Mariana**
Collaborating Centre on Sustainable
Consumption and Production
Germany

**NIEVES, Barros**
University of Santiago de Compostela
Spain

**NIFENECKER, Herve**
Global Initiative to Save Our Climate (GISOC)
France

**NISHIOKA, Shuzo**
Institute for Global Environmental Strategies
Japan

**NOGUEIRA DA SILVA, Milton**
Climate Change & Technology Consultant
Brazil

**NOH, Dong-Woon**
Korea Energy Economics Institute
Republic of Korea

**NORMAN, Barbara**
University of Canberra
Australia

**NUGRAHA, Adi**
Pacific Northwest National Laboratory
USA

**NUNES, Ana Raquel**
University of Warwick
UK

**NUNEZ-RIBONI, Ismael**
Thünen Institute of Sea Fisheries
Germany

**OGDEN, Nicholas**
Public Health Agency of Canada
Canada

**OKPALA, Denise**
The Institution of Environmental Sciences
Nigeria

**OLA, Kalen**
Swedish Meteorological and
Hydrological Institute
Sweden

**OLHOFF, Anne**
UNEP DTU Partnership
Denmark

**OLSEN, Karen**
UNEP DTU Partnership
Denmark

**O'MAHONY, Tadhg**
Finland Futures Research Centre
Finland

**ONGOMA, Victor**
South Eastern Kenya University
Kenya

**ONUOHA, Mgbeodichinma Eucharia**
TU Bergakademie Freiberg Saxony
Germany

**OOGJES, Justin**
University of Melbourne
Australia

**OPPENHEIMER, Michael**
Princeton University
USA

**OSCHLIES, Andreas**
GEOMAR
Germany

**OTTO, Friederike**
University of Oxford
UK

**OURBAK, Timothée**
Agence française de développement
France

**PAGNIEZ, Capucine**
Plateforme océan et climat
France

**PAJARES, Erick**
The Biosphere Group
Peru

**PALTER, Jaime**
University of Rhode Island
Graduate School of Oceanography
USA

**PÁNTANO, Vanesa**
Department of Atmosphere
and Ocean Sciences
University of Buenos Aires
Argentina

**PAREDES, Franklin**
Institute of Atmospheric Sciences (ICAT)
Federal University of Alagoas
Brazil

**PARK, Go Eun**
National Institute of Forest Science
Republic of Korea

**PARKER, Andrew**
University of Bristol
UK

**PASTOR, Amandine**
Institut de recherche pour le développement
France

**PATERSON, Matthew**
University of Manchester
UK

**PATT, Anthony**
ETH Zurich
Switzerland

**PATWARDHAN, Anand**
University of Maryland
USA

**PAUL ANTONY, Anish**
Massachusetts Institute of Technology
USA

**PAUW, Willem Pieter**
German Development Institute
Germany

**PEARSON, Pamela**
International Cryosphere Climate Initiative
USA

**PEBAYLE, Antoine**
Plateforme océan et climat
France

**PEDACE, Alberto**
Climate Action Network LatinoAmerica
Argentina

**PERDINAN**
Bogor Agricultural University
Indonesia

**PERLMAN, Kelsey**
Carbon Market Watch
France

**PERRIER, Quentin**
Centre international de recherche sur
l'environnement et le développement
France

**AIV**

(13 of 296), Page 13 of 296   Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 13 of 296
Case 2:24-cv-00801-ODW-PVC   Document 55-18   Filed 07/24/24   Page 610 of 632
Page ID #:5821

**Annex IV**

<div style="text-align:right">Expert Reviewers of the IPCC Special Report on Global Warming of 1.5°C</div>

**PETERS, Glen**
Center for International Climate Research
Norway

**PETRASEK MACDONALD, Joanna**
Inuit Circumpolar Council
Canada

**PETZOLD, Jan**
IPCC WGII Technical Support Unit
Alfred-Wegener-Institut Bremen
Germany

**PHILIBERT, Cedric**
International Energy Agency
France

**PIACENTINI, Rubén**
Institute of Physics Rosario
Consejo Nacional de Investigaciones
Cientificas y Técnicas
National University of Rosario
Argentina

**PIANA, Valentino**
Economics Web Institute
Italy

**PIGUET, Etienne**
University of Neuchâtel
Switzerland

**PIRLO, Giacomo**
Consiglio per la ricerca in agricotura
e l'analisi dell'economia agraria
Italy

**PISANI, Bruno**
Civil Engineering School
University of A Coruña
Spain

**PISKOZUB, Jacek**
Institute of Oceanology Polish
Academy of Sciences
Poland

**PITARI, Giovanni**
Department of Physical and Chemical Sciences
Università L'Aquila
Italy

**PLANTON, Serge**
Météo-France
France

**POITOU, Jean**
Sauvons Le Climat
France

**POLOCZANSKA, Elvira**
IPCC WGII Technical Support Unit
Alfred-Wegener-Institut Bremen
Germany

**POMPEU PAVANELLI, João Arthur**
Instituto Nacional de Pesquisas Espaciais
Brazil

**POOT-DELGADO, Carlos**
Instituto Tecnologico Superior de Champotón
Mexico

**POPKOSTOVA, Yana**
European Centre for Energy
and Geopolitical Analysis
France

**PÖRTNER, Hans-Otto**
IPCC Co-Chair WGII
Germany

**PRAG, Andrew**
International Energy Agency
France

**PRAJAL, Pradhan**
Potsdam Institute for Climate Impact Research
Germany

**PRICE, Lynn**
Lawrence Berkeley National Laboratory
USA

**PUIG, Daniel**
Technical University of Denmark
Denmark

**PUIG ARNAVAT, Maria**
Technical University of Denmark
Denmark

**PULIDO-VELAZQUEZ, David**
Instituto Geológico y Minero
Spanish Geological Survey
Spain

**PUPPIM DE OLIVEIRA, Jose Antonio**
Fondation Getúlio Vargas
Brazil

**QIAN, Budong**
Agriculture and Agri-Food Canada
Canada

**RABITZ, Florian**
Kaunas University of Technology
Lithuania

**RADUNSKY, Klaus**
Umweltbundesamt
Austria

**RAHIMI, Mohammad**
Faculty of Desert Studies
Semnan University
Iran

**RASUL, Golam**
International Centre for Integrated
Mountain Development
Nepal

**RAU, Greg**
University of California, Santa Cruz
USA

**RAWE, Tonya**
CARE
USA

**RAYMOND, Colin**
Columbia University
USA

**REAY, David**
University of Edinburgh
UK

**REES, Morien**
The International Council of Museums
Norway

**REINECKE, Sabine**
University of Freiburg
Forest and Environmental Policy
Germany

**REISINGER, Andy**
New Zealand Agricultural
GHG Research Centre
New Zealand

**RETUERTO, Rubén**
Universidade de Santiago de Compostela
Spain

**REYER, Christopher**
Potsdam Institute for Climate Impact Reserach
Germany

**REYNOLDS, Jesse**
Utrecht University
The Netherlands

**RINKEVITCH, Baruch**
Israel

**RIXEN, Tim**
Leibniz Zentrum für Marine Tropenforschung
Germany

**ROBERTS, Debra**
IPCC Co-Chair WGII
South Africa

**AIV**

<div style="text-align:center">Exhibit 18 to Decl. of Scheehle
1808</div>

<div style="text-align:right">**ER-1468**</div>

Expert Reviewers of the IPCC Special Report on Global Warming of 1.5°C

Annex IV

**ROBERTS, Erin**
King's College London
UK

**ROBIOU DU PONT, Yann**
University of Melbourne
France

**ROBLEDO ABAD, Carmenza**
USYS-TdLab
ETH Zurich
Switzerland

**ROBOCK, Alan**
Rutgers University
USA

**ROCKMAN, Marcy**
National Park Service
USA

**RODRÍGUEZ AÑÓN, José Antonio**
University of Santiago de Compostela
Spain

**ROEHM, Charlotte**
Terralimno LLC
USA

**ROGELJ, Joeri**
International Institute for
Applied Systems Analysis
Austria/Belgium

**ROMERI, Mario Valentino**
Italy

**ROSE, Steven**
Electric Power Research Institute
USA

**ROSEN, Richard**
Germany

**ROSENZWEIG, Cynthia**
National Aeronautics and
Space Administration
Goddard Institute for Space Studies
USA

**ROTLLANT, Guiomar**
Instituto de Ciencias del mar
Consell Superior d'Investigacions Científiques
Spain

**ROUDIER, Philippe**
French Development Agency
France

**ROY, Joyashree**
Jadavpur University
Institute of Technology, Bangkok
Thailand/India

**ROY, Shouraseni**
University of Miami
USA

**ROYER, Marie-Jeanne S.**
Universite de Montreal
Canada

**RUTH, Urs**
Robert Bosch GmbH
Germany

**SAGNI, Regasa**
Malole consults
Ethiopia

**SAHEB, Yamina**
OpenExp
Ecole des Mines of Paris
France

**SALA, Hernan Edgardo**
Argentine Antarctic Institute
National Antarctic Directorate
Argentina

**SALANAVE, Jean-Luc**
Ecole CENTRALE SUPELEC
France

**SALAT, Jordi**
Instituto de Ciencias del mar
Consell Superior d'Investigacions Científiques
Spain

**SALAWITCH, Ross**
University of Maryland
USA

**SALTER, Stephen**
University of Edinburgh
UK

**SALVADOR, Pedro**
Centro de Investigaciones Energéticas,
Medioambientales y Tecnológicas
Spain

**SAMSET, Bjørn**
Center for International Climate Research
Norway

**SANCHEZ, Jose Luis**
University of Leon
Spain

**SÁNCHEZ-MOREIRAS, Adela M**
University of Vigo
Spain

**SANDER, Sylvia**
Section of Marine Environmental
Studies Laboratory
Monaco

**SANTOSH KUMAR, Mishra**
S. N. D. T. Women's University
India

**SANZ SANCHEZ, Maria Jose**
Basque Centre for Climate Change
Spain

**SARGENT, Philip**
Cambridge Energy Forum
UK

**SAUNDERS, Harry**
Decision Processes Inc
USA

**SAVARESE, Stephan**
ForCES SAS
France

**SAVÉ, Robert**
Institut de Recerca i Tecnologia
Agroalimentaries
Spain

**SAVOLAINEN, Ilkka**
Technical Research Centre of Finland
Finland

**SAYGIN, Deger**
Turkey

**SCHAEFFER, Michiel**
Climate Analytics
University of Wageningen
The Netherlands

**SCHEWE, Jacob**
Potsdam Institute for Climate Impact Research
Germany

**SCHIPPER, Lisa**
Stockholm Environment Institute
Overseas Development Institute
Vietnam

**SCHISMENOS, Spyros**
National Yunlin University of
Science and Technology
Eastern Macedonia and Thrace Institute
China

**SCHLEUSSNER, Carl-Friedrich**
Climate Analytics
Germany

AIV

595

Exhibit 18 to Decl. of Scheehle
1809

**ER-1469**

Annex IV                              Expert Reviewers of the IPCC Special Report on Global Warming of 1.5°C

**SCHNEIDER, Linda**
Heinrich Boell Foundation
Germany

**SCHOEMAN, David**
University of the Sunshine Coast
Australia

**SCHULZ, Astrid**
Wissenschaftliche Beirat der Bundesregierung
Globale Umweltveränderungen
Germany

**SCOWCROFT, John**
Global Carbon Capture and Storage Institute
Belgium

**SEHATKASHANI, Saviz**
Academic member of Atmospheric Science
and Meteorological Research Center
Iran

**SEILER, Jean Marie**
Retired from Commissariat à l'énergie
atomique et aux énergies alternatives)
France

**SEITZINGER, Sybil**
University Victoria
Pacific Institute for Climate Solutions
Canada

**SEMENOV, Sergey**
Institute of Global Climate and Ecology
Russian Federation

**SEMENOVA, Inna**
Odessa State Environmental University
Ukraine

**SENEVIRATNE, Sonia I.**
ETH Zurich
Switzerland

**SENSOY, Serhat**
Turkish State Meteorological Service
Turkey

**SERRAO-NEUMANN, Silvia**
Cities Research Institute
Griffith University
Australia

**SETTELE, Josef**
Helmholtz Centre for Environmental
Research (UFZ)
Germany

**SHAH, Shipra**
Fiji National University
Fiji

**SHAPIRO, Robert**
Climate Mobilization Outer Cape
USA

**SHAWOO, Zoha**
University of Oxford
UK

**SHEPARD, Isaac**
University of Maine
USA

**SHINDELL, Drew**
Duke University
USA

**SHINE, Keith**
Department of Meteorology
University of Reading
UK

**SHINE, Tara**
Mary Robinson Foundation
Climate Justice
Ireland

**SHIOGAMA, Hideo**
National Institute for Environmental Studies
Japan

**SHOAI-TEHRANI, Bianka**
Research Institute of Innovative
Technology for the Earth
Japan

**SHUE, Henry**
University of Oxford
UK

**SIETZ, Diana**
Wageningen University
Netherlands

**SIHI, Debjani**
University of Maryland Center for
Environmental Science Appalachian Laboratory
USA

**SIKAND, Monika**
Bronx Community College
City University of New York
USA

**SIMMONS, Adrian**
European Centre for Medium-
Range Weather Forecasts
UK

**SIMS, Ralph**
Massey University
New Zealand

**SINGER, Stephan**
Climate Action Network International
Belgium

**SINGH, Chandni**
Indian Institute for Human Settlements
Myanmar/India

**SINGH, Neelam**
World Resources Institute
USA

**SKEA Jim**
IPCC Co-Chair WGIII
UK

**SKEIE, Ragnhild**
Center for International Climate Research
Norway

**SMEDLEY, Andrew**
University of Manchester
UK

**SMITH, Alison**
University of Oxford
UK

**SMITH, Sharon**
Geological Survey of Canada
Natural Resources Canada
Canada

**SMITHERS, Richard J.**
Ricardo Energy & Environment
UK

**SMOLKER, Rachel**
Biofuelwatch
USA

**SOLAYMANI OSBOOEI, Hamidreza**
Forest, Range and Watershed
Management Org.
Iran

**SOLERA UREÑA, Miriam**
Universidad Nacional de Educación
a Distancia (Spain)
Germany

**SOORA, Naresh Kumar**
Indian Agricultural Research Institute
India

**SÖRENAAON, Anna**
Centro de Investigaciones del
Mar y la Atmósfera
Argentina

AIV

596

Exhibit 18 to Decl. of Scheehle
1810

ER-1470

(16 of 296), Page 16 of 296 Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 16 of 296
Case 2:24-cv-00801-ODW-PVC    Document 55-18    Filed 07/24/24    Page 613 of 632
Page ID #:5824

**Expert Reviewers of the IPCC Special Report on Global Warming of 1.5°C**    **Annex IV**

**SREENIVAS, Ashok**
Prayas (Energy Group)
India

**STABINSKY, Doreen**
College of the Atlantic
USA

**STANGELAND, Aage**
The Research Council of Norway
Norway

**STANLEY, Janet**
University of Melbourne
Australia

**STEFANO, Caserini**
Politecnico di Milano, Dipartimento di
Ingegneria Civile ed Ambientale
Italy

**STENMARK, Aurora**
Norwegian Environment Agency
Norway

**STOCKER, Thomas**
University of Bern
Switzerland

**STONE, Kelly**
ActionAid USA
USA

**STOTT, Peter**
University of Exeter and Met Office
UK

**STRANDBERG, Gustav**
Swedish Meteorological and
Hydrological Institute
Sweden

**STRAPASSON, Alexandre**
Harvard University
Brazil

**SU, Mingshah**
National Center for Climate Change
Strategy and International Cooperation
China

**SUGIYAMA, Masahiro**
The University of Tokyo
Japan

**SULISTYAWATI, Linda Yanti**
Universitas Ahmad Dahlan
Indonesia

**SUN, Junying**
Chinese Academy of Meteorological Sciences
China

**SUN, Yongping**
Center of Hubei Cooperative Innovation
for Emissions Trading System
China

**SUSANTO, Raden Dwi**
USA

**SUSATYA, Agus**
UNIB
Indonesia

**SUTHERLAND, Michael**
Trinidad and Tobago

**SUTTER, Daniel**
ETH Zurich
Switzerland

**SWART, Rob**
Wageningen Environmental Research
The Netherlands

**SWEENEY, John**
Maynooth University
Ireland

**SYRI, Sanna**
Aalto University
Finland

**TABARA, J. David**
Autonomous University of Barcelona
Spain

**TABATABAEI, Seyed Muhammadreza**
University of Tehran
Iran

**TACHIIRI, Kaoru**
Japan Agency for Marine
Earth Science and Technology
Japan

**TAKAGI, Hiroshi**
Tokyo Institute of Technology
Japan

**TAKAGI, Masato**
Research Institute of Innovative
Technology for the Earth
Japan

**TAKAHASHI, Kiyoshi**
National Institute for Environmental Studies
Japan

**TAKANO, Kohei**
Nagano Environmental Conservation
Research Institute
Japan

**TAKAYABU, Izuru**
Japan Meteorological Agency
Meteorological Research Institute
Japan

**TAKEMURA, Toshihiko**
Kyushu University
Japan

**TAM, Chi Keung**
Newcastle University
Singapore

**TAMAKI, Tetsuya**
Kyushu University
Japan

**TAMURA, Makoot**
Ibaraki University
Japan

**TANAKA, Katsumasa**
National Institute for Environmental Studies
Japan

**TESKE, Sven**
University of Technology Sydney
Australia

**TEXTOR, Christiane**
German Aerospace Centre
Germany

**THALER, Thomas**
Institute of Mountain Risk Engineering
University of Natural Resources
and Life Sciences
Austria

**THIERY, Wim**
ETH Zurich
Switzerland

**THOBER, Stephan**
Helmholtz Centre for Environmental
Research (UFZ)
Germany

**THOMPSON, Michael**
Forum for Climate Engineering Assessment
USA

**THORNE, Peter**
Maynooth University
Ireland

**AIV**

Exhibit 18 to Decl. of Scheehle
1811

**ER-1471**

Annex IV                                    Expert Reviewers of the IPCC Special Report on Global Warming of 1.5°C

THORNTON, Thomas
Environmental Change Institute
University of Oxford
UK

THWAITES, Joe
World Resources Institute
USA

TIBIG, Lourdes
Climate Change Commission
Philippines

TILCHE, Andrea
European Union
Belgium

TINDALL, David
Department of Sociology
University of British Columbia
Canada

TOKARSKA, Katarzyna B
University of Victoria
UK

TORVANGER, Asbjørn
Center for International Climate Research
Norway

TREBER, Manfred
Germanwatch
Germany

TREGUER, Paul
Université de Bretagne Occidentale
France

TSCHAKERT, Petra
University of Western Australia
Australia/Austria

TSUTSUI, Junichi
Central Research Institute of
Electric Power Industry
Japan

TUITT, Cate
Honourable society of Inner Temple
UK

TULKKI, Ville
VTT Technical Research Centre of Finland Ltd
Finland

TURCO, Marco
University of Barcelona
Spain

TURP, Mustafa Tufan
Bogazici University Center for Climate
Change and Policy Studies
Turkey

TYLER, Emily
University of Cape Town
South Africa

UDDIN, Noim
CPMA International
Australia

UDO, Keiko
Tohoku University
Japan

URQUHART, Penny
Independent climate resilient
development specialist
South Africa

VAILLES, Charlotte
Institute for Climate Economics
France

VALDES, Luis
Instituto Español de Oceanografía
Spain

VAN DE WAL, Roderik
Netherlands

VAN DEN HURK, Bart
Koninklijk Nederlands Meteorologisch
Instituut
Netherlands

VAN MUNSTER, Birgit
Homo Sapiens Foundation
UK

VAN RUIJVEN, Bastiaan
International Institute for
Applied Systems Analysis
Austria

VAN VELTHOVEN, Peter
Koninklijk Nederlands Meteorologisch
Instituut
Netherlands

VAN YPERSELE, Jean-Pascal
Université catholique de Louvain
Earth and Life Institute
Belgium

VAUTARD, Robert
Institut Pierre Simon Laplace
France

VELDORE, Vidyunmala
DNV-GL
Norway

VENEMA, Henry David
International Institute for
Sustainable Development
Prairie Climate Centre
Canada

VERA, Carolina
Centro de Investigaciones del
Mar y la Atmosfera
University of Buenos Aires
Comision Nacional de Investigaciones
Cientifico Tecnologicas
Argentina

VERHOEF, Leendert
University of Technology Delft
Netherlands

VICTOR, David
University of California San Diego
USA

VIDALENC, Eric
Agence de l'environnement et
de la maîtrise de l'énergie
France

VINCENT, Ceri
British Geological Survey
UK

VINER, David
Mott MacDonald
UK

VIVIAN, Scott
University of Edinburgh
UK

VLADU, Iulain Florin
United Nations Framework
Convention on Climate Change
Germany

VON SCHUCKMANN, Karina
France

WACHSMUTH, Jakob
Fraunhofer Institute for Systems
and Innovation Research
Germany

WACKERNAGEL, Mathis
Global Footprint Network
USA

WADLEIGH, Michael
Closed Mass
USA

AIV

Exhibit 18 to Decl. of Scheehle
1812

ER-1472

(18 of 296), Page 18 of 296  Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 18 of 296
Case 2:24-cv-00801-ODW-PVC   Document 55-18   Filed 07/24/24   Page 615 of 632
Page ID #:5826

Expert Reviewers of the IPCC Special Report on Global Warming of 1.5°C                    Annex IV

WAGNER, Gernot
Harvard John A. Paulson School of
Engineering and Applied Sciences
Harvard Kennedy School
USA

WANG, Bin
University of Virginia
USA

WANG, Junye
Athabasca University
Canada

WANG, Xiaojun
Research Center for Climate Change,
Ministry of Water Resources
China

WANG, Zhen-Yi
Delta Electronics Foundation
China

WARNER, Koko
United Nations Framework
Convention on Climate Change
Germany

WARRILOW, David
Royal Meteorological Society
UK

WASHBOURNE, Carla-Leanne
University College London
UK

WASKOW, David
World Resources Institute
USA

WEBB, Jeremy
Department of Science, Technology
Engineering and Public Policy
University College London
UK

WEBER, Christopher
1982
USA

WEHNER, Michael
Lawrence Berkeley National Laboratory
USA

WEI, Taoyuan
Center for International Climate Research
Norway

WEISENSTEIN, Debra
School of Engineering and Applied
Science, Harvard University
USA

WEST, Thales A. P.
University of Florida
Brazil

WESTPHAL, Michael
World Resources Institute
USA

WESTRA, Seth
University of Adelaide
Australia

WHITEFORD, Ross
University of Southampton
UK

WHITLEY, Shelagh
Overseas Development Institute
UK

WICHMANN, Janine
University of Pretoria
South Africa

WIEL, Stephen
CLASP
USA

WILDENBORG, Ton
Netherlands Organisation for Applied
Scientific Research (TNO)
Netherlands

WILLIAMS, Jonny
The National Institute of Water
and Atmospheric Research
New Zealand

WILLIAMS, Richard
Liverpool University
UK

WINIGER, Patrik
Netherlands

WINKLER, Harald
University of Cape Town
Energy Research Centre
South Africa

WINROTH, Mats
Chalmers University of Technology
Sweden

WISSENBURG, Marcel
Radboud University
Netherlands

WITHANACHCHI, Sisira S.
University of Kassel
Germany

WOLF, Shaye
Center for Biological Diversity
USA

WOOLLACOTT, Jared
RTI International
USA

WRATT, David
National Institute of Water &
Atmospheric Research
New Zealand

WRIGHT, Helena
E3G
UK

WU, Jianguo
Chinese Research Academy of
Environmental Sciences
China

WURZLER, Sabine
North Rhine Westphalian State Agency for
Nature, Environment, and Consumer Protection
Germany

XENIAS, Dimitrios
Cardiff University
UK

XU, Yangyang
Texas A&M University
USA

XU, Yinlong
China

YAMAGUCHI, Mitsutsune
Research Institute of Innovative
Technology for the Earth
Japan

YANG, Hong
Swiss Federal Institute of Aquatic
Science and Technology
Switzerland

YANG, Tao
Jiangxi Normal University
China

YANG, Xiu
National Center for Climate Change
Strategy and International Cooperation
China

YOON, Soonuk
Green Technology Center
Republic of Korea

AIV

Exhibit 18 to Decl. of Scheehle
1813

ER-1473

(19 of 296), Page 19 of 296 Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 19 of 296
Case 2:24-cv-00801-ODW-PVC Document 55-18 Filed 07/24/24 Page 616 of 632
Page ID #:5827

Annex IV                                            **Expert Reviewers of the IPCC Special Report on Global Warming of 1.5°C**

**YOSEPH-PAULUS, Rahayu**
Local Government of Buton Regency
Indonesia

**YU, Rita Man Sze**
CSR Asia
China

**YU, Yau Hing**
Sovran Environment & Energy Corp.
China

**ZABOL ABBASI, Fatemeh**
Climatological Research Institute
Iran

**ZAELKE, Durwood**
Institute for Governance and
Sustainable Development
USA

**ZAFAR, Qudsia**
Global Change Impact Studies Centre
Pakistan

**ZARIN, Daniel**
Climate and Land Use Alliance
USA

**ZAVIALOV, Petr**
Shirshov Institute of Oceanology
Russian Federation

**ZEREFOS, Christos**
Academy of Athens
Greece

**ZHANG, Jingyong**
Institute of Atmospheric Physics
Chinese Academy of Sciences
China

**ZHANG, Wei**
IIHR Hydroscience and Engineering
University of Iowa
USA

**ZHANG, Xiaolin**
Florida State University
China

**ZHAO, Zong-Ci**
National Climate Center
China Meteorological Administration
China

**ZHOU, Tianjun**
Institute of Atmospheric Physics
Chinese Academy of Sciences
China

**ZICKFELD, Kirsten**
Simon Fraser University
Canada/Germany

**ZIELINSKI, Tymon**
Institute of Oceanology
Polish Academy of Sciences
Poland

**ZINKE, Jens**
Freie Universitaet Berlin
Germany

**ZOBAA, Ahmed**
Brunel University London
UK

**ZRINKA, Mendas**
University of Bolton
UK

**AIV**

Exhibit 18 to Decl. of Scheehle
1814                                                                    **ER-1474**

(20 of 296), Page 20 of 296  Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 20 of 296
Case 2:24-cv-00801-ODW-PVC    Document 55-18    Filed 07/24/24    Page 617 of 632
Page ID #:5828



# Index

**This index should be cited as:**

IPCC, 2018: Index. In: *Global Warming of 1.5°C. An IPCC Special Report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways, in the context of strengthening the global response to the threat of climate change, sustainable development, and efforts to eradicate poverty* [Masson-Delmotte, V., P. Zhai, H.-O. Pörtner, D. Roberts, J. Skea, P.R. Shukla, A. Pirani, W. Moufouma-Okia, C. Péan, R. Pidcock, S. Connors, J.B.R. Matthews, Y. Chen, X. Zhou, M.I. Gomis, E. Lonnoy, T. Maycock, M. Tignor, and T. Waterfield (eds.)]. Cambridge University Press, Cambridge, UK and New York, NY, USA, pp. 601-616.

Exhibit 18 to Decl. of Scheehle
1815
ER-1475

Index

Note: [*] indicates the term also appears in the Glossary. Italicized page numbers denote tables, figures and boxed material. Bold page numbers indicate main discussion of topics. Supplementary Material is listed by section number, for example, 1.SM.3, 2.SM.1.3.4.

**1.5°C pathways***, 12–17, 51, 59–64, **93–174**, 265–271, 278, 320, 1.SM.4, 1.SM.6
  assumptions, 95, 98, 109–112
  carbon dioxide removal (CDR)* in, 17, 21, 95, 96, 118–125, 180, 277, 316
  classification of, 99–100, 100, 113–114
  $CO_2$ emissions, 1.SM.6
  definition, 51, 53, 59–61
  demand-side mitigation and, 97, 460–461
  emissions and, 5, 6, 12, 13, 14–15, 18, 51, 95–96, 112, 1.SM.6
  emissions, benchmark indicators for sectoral changes in, 4.SM.1
  emissions evolution in, 115–118, 117, 119
  feasibility*, 18–19, 52, 56, **71–72**, 380–386
  four categories of, 59–61, 62, 63
  future emissions in, 96, 104–107
  impediments to, 93, 95, 110
  implications of, 265–271
  investments and economics, 16, 95–96, 150–151, 152–155, 264–265
  key characteristics, 112–114, 129
  knowledge gaps, 388–390
  mitigation and adaptation options*, 110–112, 316–317
  mitigation measures, 14–15, 19–21, 51–52, 110–112
  model pathways, 12, 14–15, 278
  multiple strategies for, 157, 469
  near-term action, implications of, 126–129, 128
  one-in-two to two-in-three chance (of reaching limit) in, 60, 63, 113
  overview of, 108–129, 129
  pathway archetypes, 99–100, 100, 112–113, 113
  pathways remaining below 1.5°C, 100, 113–114, 160
  pathways temporarily exceeding 1.5°C, 100, 113–114, 160
  policies, 112, 148–150
  remaining carbon budget*, 12, 96, 104–107, 108
  scenarios, 98–100, 100
  strengthening the global response, 18–23, 70–75, **313–443**
  sustainable development and, 19–23, 20–21, 98, 156–157, 156, 448–449, 463–472, 465
  sustainable development pathways, 64, 448–449, **466–472**, 469, 479–480
  synergies and trade-offs, 18–21, 20–21, 316, 391
  system/sector transitions, 14–15, 15–16, **323–349**
  time frame for mitigation, 95–96
  transformations, 129–148, 322–323, 466
  transitions, speed and scale of, 320, 320, 322–323
  See also Pathways

**1.5°C warmer worlds***, 4–6, 274–281
  commonalities in, 277
  definition, 53
  energy supply and demand in (FAQ), 161, 162
  equity and, 54–55, 451–453
  impacts in, 7–10, 177–179, 319
  importance of adaptation in (FAQ), 396–397, 397
  key questions, 274–277
  knowledge base for, 52, 53–56
  poverty, equality, and equity implications, 451–453
  projected climatic changes, 7–10, 186–188, 188, 189
  projected risks and impacts, 7–10, 11, 51, **175–311**
  risks, vs. 2°C worlds, 5, 7–9, 11, 177–181, 277
  storyline of this report, 77–78, 78
  storylines of, 277
  sustainable development and, 18–23, 55–56, 447
  temperature in, 283
  time frame for mitigation, 277, 278
  variation in, 177, 277, 278
  watershed management in, 356
  See also Global warming of 1.5°C

**2030**
  emissions gap, 358
  emissions levels in, 18, 95, 114

**2030 Agenda for Sustainable Development***, 56, 73, 469, 477
  See also Sustainable Development Goals

# A

**Acceptability of policy or system change***, 22, 368–369
**Adaptability.** See Adaptive capacity
**Adaptation***, 5, 10
  bottom-up approaches, 317, 368
  community-based, 315, **330**, 384, 458
  definition, 51, 70, 396
  ecosystem-based, 386, 457–458
  FAQ on, 396–397, 397
  feasibility, 380, 381, 385
  finance, 21–22, 379, 456
  implementing, 51, 315, 383–386
  importance of, 396–397, 397
  infrastructure investments, 21
  integration with mitigation and sustainable development, 75–76, 448, **467**
  knowledge gaps, 388–391
  levels of, 51
  local participation, 456
  maladaptation, 19, 386, 396
  in Mekong River basin, 239–240
  place-specific, 447, 458
  potential for, 247–250
  rate of temperature change and, 178
  risk reduction and, 5, 10
  sea level rise and, 10, 457
  socio-economic challenges to, 110
  specific sectors, 10
  sustainable development and, 19, 447, **456–459**
  synergies, 18–19, 391, 447, 475
  synergies with mitigation, 386–387, 475,

  4.SM.4.5.1, 4.SM.5.2
  transformational, 5, 315, 322–323, 384, 397, 456–457
**Adaptation behaviour***. See Human behaviour
**Adaptation limits***, 10, 70, **454–456**
  examples of, 455
  hard limits, 70, 455
  residual risks and, 454–455
  for Small Island Developing States, 235
  soft limits, 70, 455
**Adaptation options***, 10, 19, 316–317, 319, 336–337
  in agriculture, 70, 315, 457
  cost-effectiveness, 316
  education and learning, 337, 456
  enabling conditions*, 4.SM.2
  energy system transitions, 4.SM.4.3.1
  feasibility, 381, 384–386, 385, 4.SM.4.3.1-4.SM.4.3.5
  industrial system transitions, 4.SM.4.3.4
  land and ecosystem transitions, 4.SM.4.3.2
  overarching, 336–337, 338, 385, 389, 4.SM.4.3.5
  supporting transitions, 336–337, 338
  sustainable development and, 457–458
  synergies, 18, 19
  urban, 10, 70, 263, 340–341, 384–386, 385
  urban and infrastructure transitions, 4.SM.4.3.3
**Adaptation pathways***, 64, 70, 396, **458–459**
  place-specific, 458
**Adaptive capacity***,
  enhancing, 316, 319, 456–457
  factors affecting, 69
  limits to, 10
  sustainable development and, 447
**Adaptive governance.** See Governance
**Aerosols***, 12, 65, 118, 120, 267–268
  aerosol cooling, 96, 267–268
  knowledge gaps, 157
  precursors, 98, 102–103, 118, 157
  radiative forcing, 102–103
  See also Black carbon
**Afforestation***, 17, 21, 96, 121, 266, 270, 316, **343**
  co-benefits, 316
  constraints, 316
  FAQ, 394, 395
  incentivization of, 147
  land requirements, 125, 126, 265, 266, 269, 270, 316
  trade-offs, 269
**AFOLU.** See Agriculture, forestry and other land-use
**Africa**
  Fynbos and succulent Karoo biomes, 260, 261
  Limpopo Watercourse Commission, 356
  Sahel, 180, 236, 259, 261, 262–263
  Southern Africa, 260, 261
  tipping points*, 262–263, 264
  West Africa and the Sahel, 259, 261, 264
  West African monsoon, 262–263, 264
**Agreement***. See Confidence; Evidence; Likelihood
**Agriculture**
  adaptation options*, 70, 315, 457
  agroforestry, 328, 384

Exhibit 18 to Decl. of Scheehle
1816

ER-1476

(22 of 296), Page 22 of 296  Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 22 of 296
Case 2:24-cv-00801-ODW-PVC  Document 55-18  Filed 07/24/24  Page 619 of 632
Page ID #:5830

Index

climate-smart agriculture*, 457, 467
conservation agriculture*, 267, **327**, 384, *459*
crop yields/productivity, 9, *11*, 145, *145*, 147,
179, 236–237, 252, 259, 263, *264*, 267, 316, 327,
452, 3.SM.3.3.5
emissions, 12, *14*, 95, 96, 116–118, 147, *147*, 157,
265, 315–316
energy crops, 16, 97
intensification of, 266–267, 327
irrigation, 201, 215, 267, *267*, 315, **328**, 384, 466
land for, 16, 97, 112, *146*, **327–329**
livelihoods, 55, 315, 447
mitigation potential, 316
peri-urban, 316
risk reduction, 456
technological innovation and, 329, *370*
tipping points*, 263, *264*
transformational adaptation in, 384
transitions, 315–316
water-energy-food (WEF) nexus, 386–387
**Agriculture, forestry and other land-use (AFOLU)**,
144–148, 463
CDR and, 17, 121, 144–145
drivers of changes in, 145–146
emissions, *14–15*, 114, 118, 268
mitigation options*, 462–463
policy assumptions, 145–146
projections for, 17
**Agroforestry**, 328, 384
**Air pollution/quality\***, 157, 241, *250, 267,* 316, 464
**Albedo\***, 70, 267
**Algae, as bioenergy source**, 111–112
**Alpine regions**, 259, *261*
**Amazon**, *340*
tropical forest, 221, 263, *340*
**Ammonia (NH$_3$) emissions**, 96
**Anomalies\***
global mean surface temperature, 183, *210*
soil moisture\*, 198, *199*, 200
**Antarctic ice sheet**, 7, 178, *208–209*, 257, 258, 271,
282
**Antarctic sea ice**, 206, 225
**Anthropocene\***, 52, 53, *54*, 75
as boundary concept for 1.5°C warmer worlds, *54*
geological dimension of, *54*
**Anthropogenic emissions\***, 5, 95
recent trends, 1.SM.7
**Appliances, energy-efficient**, 316, 331, 460, 461
**Aquaculture**, 8, 9, 237–238
hypoxia and, 224
production, 237–238
risks for, *228*
**AR5.** *See* IPCC Fifth Assessment Report (AR5)
**Arctic region**, 258–259, *338–339*, 452, 3.SM.3.3.5
adaptation in, *339*
economic effects of climate change, *339*
ecosystems, 9, *11*, 53, 220
as hotspot, 258, *261*, 262, 270, 338
indigenous peoples, 9, *339*
land regions, 259, *261*
risks for, 9, 53, 251, *252*, 253, 452
tipping points\*, 262, *264*

warming in, 4
*See also* Arctic sea ice
**Arctic sea ice**, 8, **205–206**, *209*, 254
beyond end of century, 270
fisheries and, 224–225
as hotspot and tipping point, 258, *261*, 262, 270
projected changes, 205, *212*, 254
sea-ice free summers, 8, 178, 205, 206, 254
temperature overshoot and, 8, 178, 206
**Asian monsoon**, 262, *264*
**Assessment frameworks**, 75–76
climate models and simulations, 76
confidence, uncertainty, and risk, 77
cost-benefit analysis\*, 76
detection and attribution, 75–76
knowledge sources and evidence, 75–76
methodologies, 76
risk assessment\*, **183–186**
**Atlantic Meridional Overturning Circulation
(AMOC)**, 205, 223, 257
**Atlantic Multi-Decadal Oscillation (AMO)**, 201
**Atmosphere-ocean general circulation model
(AOGCM).** *See* Climate models
**Attribution.** *See* Detection and attribution
**Avoided impacts**, 18, 68, 183, **253–265**, 447
aggregated avoided impacts, 253–258
hotspots, 258–260, *261*
poverty and inequality implications, 452–453, *453*
Reasons for Concern, 253–259
reduced risks, 452–453, *453*, *455*
regional tipping points, 262–263, *264*
sustainable development
implications, 452–453, *453*

**B**

**Baseline period.** *See* Reference period
**Batteries**, 325
**Behavioural change.** *See* Human behaviour
**Beijing, peak car use**, *376*
**Bhutan, national goals**, *387*
**Bio-based feedstocks**, 315, 335–336, *335*
**Bio-technologies**, 319
**Biochar\***, 121, *268, 270*, **345**
**Biodiversity\***, 8, 256–257
adaptation limits\*, *455*
Aichi targets, 266
CDR and, 265, 266, *269*
impacts and risks at 1.5°C vs. 2°C, 8, 179, 256–257
management, 10
**Bioenergy\***, 12, 17, 97, 111–112, *124*, 131, **324–325**
carbon intensity of, 324–325
crops, 147
emissions increase with, 96
IAMs/modelling, *124*, 2.SM.1.2.4
land use for, 19, *146*, 147, 265, *269*, 343
risks of implementing, 125
sugarcane for bioethanol in Brazil, *371*
trade-offs, 97
water use and, 464–466
**Bioenergy with carbon dioxide capture and
storage (BECCS)\***, 17, 121, *268–270*, 316,

342–343, 394, 395
in IAMs, *124*
land requirements, 125, *126*, 180, 265–266
net zero emissions and, 135
pathways with, *14–15*, 17, 96, 180
risks, 125, *268–270*
uncertainties, 158
**Bioethanol**, *371*
**Biofuel\***, *269,* **324–325**
**Biomass\***, *131, 132–133, 138, 269,* 324
**Biome shifts**, 216, *217, 247, 250,* 256–257
Fynbos and succulent Karoo biomes, 260, *261*
**Bivalve molluscs**, 180, 227, 228, 237, 238, *248*,
3.SM.3.2.5, 3.SM.3.2.11
**Black carbon (BC)\***, 12, *13*, 96, 118, *120*, 316,
**341–342**
main characteristics of, *342*
reducing emissions of, 341–342
warming impact, *66*
**Blue carbon\***, 330, 462
**Bolivian Altiplano**, 458
**Boreal forests**, 8, 263, *264*
**Bottom-up approaches**, 317, *368*
**Brazil**
bioethanol in, *371*
National Adaptation Plan, *340*
*Buen Vivir*, 480
**Buildings**, 15–16, *139*, 140–142, 316
building codes, 332, *339*, 377
decarbonization of energy supply, 316
decarbonization of investments, 378
electrification, 141
energy efficiency and, 332, 339, 377, 460
energy supply/use in, *139*, 140–142, *141*, **331**
heating and cooling demand, 141–142, 331
long-lived infrastructure, 142
low-emission, 317, 460
technological innovations, *370*
transitions, speed and scale of, *320*
**Burden sharing\***, 380, 470

**C**

**Cancun Agreement**, 79, 353
**Car use**
peak car use, *376*
pricing policies and use reductions, *366*
**Carbon budget\***, 12, 96, 104–107
in 1.5°C pathways, 113–114
remaining carbon budget\*, 12, *24*, 96, 104–107, *108*
remaining carbon budget\*, assessment methods,
104–107, 2.SM.1.1.2
total, *24*
uncertainties, 12, 96, 106, *108*
**Carbon cycle\***, 96, 103, 157
inertia, 107
oceans and, 257–258
terrestrial, 219, *220*
uncertainties, *347*
**Carbon dioxide (CO$_2$)\***
cumulative emissions, *6*, 12, *62, 67*, 96, *105*, 114,
*123*, 126–127, *127*

Exhibit 18 to Decl. of Scheehle
1817

Index

(23 of 296), Page 23 of 296  Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 23 of 296
Case 2:24-cv-00801-ODW-PVC  Document 55-18  Filed 07/24/24  Page 620 of 632
Page ID #:5831

## Index

emissions reductions, 18, 95, 96
net emissions, 12–17, *13*, *14–15*, 114, 116, *119*
net zero emissions, 5, 12, *24*, 95, 107, 116
permafrost release of, 104
sector-specific emissions, *119*
time scales of warming due to, 64
**Carbon dioxide capture and storage (CCS)***, *14*, 15, 97, 134–136, *136*, *268*, *277*, 315
deployment in 1.5°C and 2°C pathways, 134–136, *136*
direct air carbon dioxide capture and storage (DACCS)*, 17, 125
fossil fuels with CCS, 97, 135
in industry sector, 335, 336
in power sector, 326–327
uncertainties, 136
*See also* Bioenergy with carbon dioxide capture and storage (BECCS)
**Carbon dioxide capture and utilisation (CCU)***, 15, *335*, 336
**Carbon dioxide capture, utilisation and storage (CCUS).** *See* Carbon dioxide capture and utilisation (CCU)
**Carbon dioxide removal (CDR)***, 17, 70, 118–125, *268–270*, *342–346*, 4.SM.4.2.5
in 1.5°C pathways*, 17, 21, 95, 96, 111, 114, 118–125, *122*, 180, 265, *277*, 316
AFOLU sector, 17, 121
co-benefits, 121, 266
comparison of removal options, *270*
costs, *344*, 4.SM.3
cross-cutting issues, *347*
definition, *24*, 70
deployment at scale, 17, 70, 96, 114, 121–124, *122*, 180, 265–266, *269–270*, 343, 4.SM.3
deployment potential, *344*
design and implementation of, 21, 448
ethical aspects, *347*
FAQ on, 394, *395*
feasibility, 17, 121, *269*, 316, 343, *383*, 4.SM.4.2.5
governance and, 17, *347*
key messages, *270*
knowledge gaps, 158, *390*
land-based, *268–270*
land footprint of, 125, *126*, 180, 265–266, *269*, *270*, 343
limitations of, 96
in model pathways, 12, *14–15*
net negative emissions, 96, 114, 118
ramp-up rates for, *119*, 123
reducing dependence on, 19, 149, 180, 277
risks of, 96, 114, 125, 265–266, *344*
role of, 17, 21, 96, 111, 114, 122–123
side effects, *344*, 4.SM.3
sustainability and, 21, 96, 114, 124–125
Sustainable Development Goals and, 448, 462
trade-offs, 21, 96, 462
types of measures employed, 17, 70, 96, 121, 125, 265, *268*, *270*, 316, 342–346, 394
uncertainties, 96, 158, 343, *347*
**Carbon intensity***, 97
of bioenergy, *324*–325

of electricity, 97, *130*
of final energy sectors, 129–130, *130*, 137–138, 139
of residual fuel mix, *130*
**Carbon leakage**, 149, 375
**Carbon neutrality***, 14, 96
timing of, 12, 96
**Carbon price***, 97, 152–153, *153*, 375–377
necessity and constraints, 375–377
policies on, 95, 317, 375–377, 460
uniform world carbon price, 375
**Carbon sequestration***, *67*, 95, 112, 114, 121–124, 147, 266
marine, 17, 121, 125, 178, 227, *228*, 229, 3.SM.3.2.8
in peatlands, 221
permanence of, 125
soil carbon sequestration (SCS)*, 17, 121, 219, *268*, *269*, *270*, **345**
terrestrial, 112, 121, 125, 146–147, 219, 265, 316
tracking progress toward, *67*
*See also* Blue carbon; Carbon dioxide capture and storage
**Carbon sink.** *See* Carbon sequestration
**Carbonate chemistry**, 178, 222, 223
**Caribbean region**, 260, *339–340*
small island developing states and territories, *339–340*
**China**
peak car use in Beijing, *376*
technology and renewables pathways, 471
**Circular economy**, 335–336
**Cities**, 330–334
impacts and risks, 180, *182*
sea level rise, impacts, 231–232
transformation* in, *472–474*
*See also* Urban areas; and specific cities
**Civil society**, 23, 317
**Clean Development Mechanism (CDM)***, 474
**Climate change commitment***
constant composition commitment, 64
geophysical warming commitment, 64–66, *65*
warming commitment from past emissions, 64–66, *65*, 1.SM.5
zero emissions commitment, 64–65, *65*
**Climate education**, 22, 317, 456
**Climate extreme (extreme weather or climate event)***, 4, *182*
in 1.5°C warmer worlds*, 7
human health and, 240–241
impacts, 7, 177–178, *182*, 240
observed changes in, 4, 7, 177, *210*, 223, 1.SM.1
precipitation extremes, 7, 178, *189*, 190–192, *197*
projected changes, 7, 177–178, *189*, 190–191, *192*
risks from, *11*, 181
temperature extremes, 7, 177, 187, *189*, 190–191, *192*, *210*, 255
**Climate feedbacks***, 5, 103
biophysical feedbacks, 266–267
Earth system feedbacks, 65, 103–104
land processes and, 268
**Climate forcers.** *See* Radiative forcing
**Climate models***, 7, 76, 177, 183–184, *274*, 3.SM.1.1

Coupled Model Intercomparison Project (CMIP)*, *62*, 76
downscaling*, 76, 186, 194
FAIR, 99, 101, *102*, 103, *103*, 158
HAPPI, 76
integrated multimodel studies, 99
knowledge gaps, 272
MAGICC, 99, 101, *102*, 103, *103*, 127, *127*, 158
reduced-complexity, 2.SM.1.1.1
regional (RCM), 185
**Climate monitoring**, 317
**Climate projections***
climate models and simulations, 76, 183–184
definition of, **184**
**Climate-resilient development pathways (CRDPs)***, 22, 52, 73, 448–449, 450–451, *451*, **468–472**, 475–476
country and community strategies, 470–471
definition, *24*, 64
development trajectories and equity, 469–470
FAQ on, 479–480, *480*
low-carbon development pathways, 471–472
regional and national factors, 22
sustainable development and, 22, 448–449
trajectories and decision-making in, *451*, *480*
transformations, equity, and well-being in, 468–469, 472, *472–474*
urban transformations* in, *472–473*
in Vanuatu, *471*
**Climate-resilient pathways***, *64*
**Climate sensitivity***
equilibrium climate sensitivity*, 103, 104
transient climate response*, 96, 184–185
uncertainties, 112
*See also* Transient climate response to cumulative CO$_2$ emissions
**Climate services***, 337, *338*, *385*
**Climate system***, 5, *208*
as a global commons, 353
assessment of changes in, 183, 186
observed changes in, 177
tipping points in, 262–263, 270
**Climate target***, 98–99, *151*
policy assumptions and, 149
stringent, 112, 126
**Climate variability***, *279–281*
**Coal**, 96–97, 132, *132–133*, *138*, 461
**Coastal communities**, 9, 181, *182*, *222*, *453*, Table 3.SM.4
adaptation, 226, 233, 457
adaptation limits*, *455*
coastal protection, 225, 226, 227–228, 3.SM.3.2.9
flooding, *11*, 181, 231, *235*, *249*, 252, *252*, 3.SM.3.3.3
groundwater, 181
infrastructure risks, 181, 226, 231, *235*, 249
livelihoods, 9, 222, 226, *249*, 447, 452
relocation of, 457
sea level rise and, 207, 225, 231–234, 243, *249*, 252, 457
tourism, 229, 253

Exhibit 18 to Decl. of Scheehle
1818

**ER-1478**

(24 of 296), Page 24 of 296  Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 24 of 296
Case 2:24-cv-00801-ODW-PVC   Document 55-18   Filed 07/24/24   Page 621 of 632
Page ID #:5832

Index

Coastal ecosystems, 8, 181, 182, *226*, *249*, 330, Table 3.SM.4
  blue carbon\*, 330, 462
  framework organisms in, 225–226, *248*
  integrated coastal zone management, 226
  protection services, 227–228, *228*, *248*
  restoration of, 330
  saltwater intrusion, 8
  sea level rise and, 207, 225, *249*
  storms/storm surge, 223, *249*
  stress management in, 330
**Co-benefits\***, 2, *67*, 157, 268, 316, 319, 323
  of sustainable development\*, 447
**Common but Differentiated Responsibilities and Respective Capabilities (CBDR-RC)\***, 318
**Community-based adaptation**, 315, **330**, *360*, 384, 458
**Conference of the Parties (COP)\***
  COP 15, 378
  COP 16 (Cancun), 353
  COP 21, *66*, 79, 372
**Confidence\***, **77**, 182
  *See also* Evidence; Likelihood; Uncertainty
**Conflict**, 245
**Conservation agriculture\***, 267, **327**, 384, *459*
**Consumption**, 53, 56
  resource-intensive, 95
  responsible, 460
**Cook stoves**, 460
**Cooperation**, 23, 461
  international, 22, 23, 95, *240*
  regional, 353–354
**Copenhagen Accord**, 353
**Coral reefs**, 8, *11*, 179, *229–230*, 3.SM.3.2.3, 3.SM.3.2.10, 3.SM.3.3.9
  adaptation limits\*, *455*
  bleaching and mortality, 70, *228*, *229*, 254
  Great Barrier Reef (Australia), *228*, 251
  heat stress, 226, *229*
  impacts, 221
  observed loss of, 8, 228–*229*
  projected losses, 8, 179
  projected risks, 53, 225–226, *228*, *228–229*, *248*, 251, 252, 254
  protection for coastal areas, 228
  storm damage, 222
**Cost-benefit analysis\***, 76, *150–151*
**Cost-effectiveness\***, *150–151*, 152–153, 316
**Costs**, 76
  adaptation, 21–22, 316
  economic damages from climate change, 243, *264–265*
  energy sector transition, 374–375
  marginal abatement costs, 16, 95, *150*
  mitigation, 16, 22, 258, *264*, 316
  regional economic benefits, 258
  social cost of carbon (SCC)\*, *150–151*, 265, 375
  *See also* Carbon price
**Coupled Model Intercomparison Project (CMIP)\***, *62*, 76
**Covenant of Mayors initiative**, 354, *355*
**Crop yields**, 9, *11*, 145, *145*, 147, 179, 236–237, *252*,

259, 263, 267, 327, 452, 3.SM.3.3.5
**Cuba, risk management in**, *339*
**Cultural practices and resilience**, 360

**D**

**Danube River Protection Convention**, *356*
**Decarbonization\***
  of electricity, 95
  of energy sector, 95, 148, *277*, 316, 461
  of industry sector, 140
  of investments, 378
  macro-level indicators, 129–130
  rate of, 12, 468
  transport sector, 333, 461
**Decision-making**, 321, 360, 365, 456, 462, *469*
  adaptation, 459
  information provision and, 367
  participatory, 386, 459
  problem-solving, 448–449
  sustainable development goals and, *451*, *480*
**Decoupling\***, 56, 372, *376*, 461
**Definitions**, *24*
  *See also* Glossary
**Deforestation\***, 263, *264*
  emissions from, 146
  of mangroves, 226, 251
  rates of, 146
  reducing emissions from (REDD+), 329–330
  tipping points\*, 263
**Deltas and estuaries**, 232–233
**Demand and supply-side measures\***, 97, 111, 161, 317
  demand-side measures\*, 97, 460–461
  investments, 153–154
  mitigation and, 97
  supply-side measures\*, 111
  *See also* Energy supply and demand
**Dengue fever**, 9, 180, 241
**Detection and attribution\***, 76, 183, *210–212*
  attribution methods, 3.SM.1.2
  human influences on climate, 4, 51, 59, 81, 82, 186–187, *210–212*, 282, 1.SM.2, 1.SM.6, 3.SM.2.1
  of impacts, 69, 213
  regional precipitation on land, 3.SM.2.2.1
  regional temperature on land, 3.SM.2.2.1
  sea level rise, 252
**Developing countries**
  adaptation finance, 21
  development trajectories, 469–470
  international cooperation and, 23
**Development pathways.** *See* Climate-resilient development pathways; Pathways
**Diet, human**, 19, 180, 316, 462, Table 3.SM.12
**Direct air carbon dioxide capture and storage (DACCS)\***, 17, 125, 316, **346**, 394
**Disaster risk management (DRM)\***, 10, 316, **336**, 338, 385
  in Jamaica, *339–340*
**Disaster\***
  early warning systems\*, *338*, *339*, *370*
  preparedness, *339–340*

reduction, technological innovations and, *370*
  Sendai Framework for Disaster Risk Reduction\*, 70
  *See also* Hazard
**Discounting\***, 152
**Disease**, 9, 452
  dengue fever, 9, 180, 241
  diarrhoea, 452
  geographic range shifts of vectors, 9, 180, 241
  malaria, 9, 180, 241
  vector-borne, 9, 180
  *See also* Human health
**Displacement\*.** *See* Migration
**Disruptive innovation\***, 22, 111, 319, **323**
**Double dividend\***, 376
**Downscaling\***, 7, 76, 186, 194, 204
**Droughts\***, *182*, 196–201, *211*, 215, *247*, *250*, 255, 3.SM.3.1.1.2
  hotspots, *199*, 200, 260
  management responses/examples, *356*
  in Mediterranean Basin and the Middle East, 200–201
  observed changes, 196, *211*
  Palmer Drought Severity Index, 199, 215
  precipitation minus evapotranspiration, 198–199, *198*, 255
  projected, for 1.5°C warming, compared with 2°C, 7, 178, 196–201, *199*, *211*, 215, *247*, *250*, 255, 3.SM.3.1.1.2
  regional changes, 198–200, *198*, *199*, 200–201
**Drylands**, *459*

**E**

**Early warning systems (EWS)\***, *338*, *339*, *370*
**Earth system**
  feedbacks, 65, 96, 103–104
  inertia of, 64
**Economic factors**, 9, *150–151*, 152–155, *264–265*
  access to finance, 21, 23, 155
  circular economy, 335–336, 335
  co-benefits ('double dividend'), 376
  depreciation of assets, 375
  'depression economics', 319
  economic damages from climate change, 243, *264–265*
  green economy, 470–471
  incentives, 317, 366, 377
  marginal abatement costs, 16, 95, *150*, 375
  pricing instruments, 317
  redistributive policies, 21
  regional economic benefits, 258
  *See also* Finance; Investments
**Economic growth**, 53, 180–181, *182*, 319
  decoupling from emissions, 56, 372, *376*, 461
  impacts on, 180–181, *182*
  mitigation costs and, 258
  regional economic benefits, 258
  risks at 1.5°C, *vs.* 2°C, 9, 180–181, *182*
  in SSPs, *110*, 149
**Economic indicators/variables**
  discounting\*, 152

Exhibit 18 to Decl. of Scheehle

1819

**ER-1479**

Index

economic diversification, 21, 71, 448
gross domestic product (GDP)*, 158, 243, 256, 258, *265, 373*
gross fixed capital formation (GFCF)*, 317, *373*
**Economic sectors**, 242–244, 256, 3.SM.3.5
energy systems, 243–244
global economic impacts, 256
impacts and risks, 180–181, 242–244, *250*, 256
tourism, 242–243
transportation, 244
**Ecosystem(s)**, 179, *182*, 216–230, 250
adaptation options*, 384, *385*, 4.SM.4.3.2
Arctic, *9, 11, 53*, 220
coastal, 8, 181, *182*, 226, *249*, 330
drylands, *153, 117*, 463
feasibility of mitigation options, *382*
freshwater, 213–216, 221, *247*
impacts and risks at 1.5°C, *vs.* 2°C, 5, 8–9, *11*, 179, *182, 250*, 453
impacts of temperature overshoot, *277*
knowledge gaps, *388*
large-scale shifts in, 69
mitigation and, 315, 4.SM.4.2.2
observed impacts, 253
ocean, 8–9, 179, 221–230, *248*
resilience, 70
restoration of, **329–330**, *459*
risks of severe impacts, 53
risks, regional and ecosystem-specific, 219–221
succession in, *69*
terrestrial, 8, *11*, 179, 216–221, *247*, 251, 3.SM.3.3.7
trade-offs, 19
transformations, 8
transitions, 315, 4.SM.4.2.2, 4.SM.4.3.2
**Ecosystem-based adaptation**, 386, 457–458
**Ecosystem restoration**, 16, 70, **329–330**, 384
**Ecosystem services***, 17, 19, 179, *247*
carbon sinks, 69, 220, 221
impacts and risks at 1.5°C, *vs.* 2°C, 8, 9, 179, *247*, 256–257
irreversible impacts, 8
marine, 179, 221–230, *248*
mitigation and, 315
observed changes, 5
terrestrial, 221
**Education (climate education)**, 22, 317, *385*, 456
**Effective climate sensitivity.** *See* Climate sensitivity
**Effective radiative forcing.** *See* Radiative forcing
**El Niño-Southern Oscillation (ENSO)***, 58, 201, 257
deforestation and, 263
La Niña events, *235*
response in Guatemala, *356*
**Electric vehicle (EV)***, 316, 332–333, *333*
costs of, 325
**Electricity generation/use**, 15, 97, *133–134, 135, 138*, 243–244, 326
carbon intensity* of, 97
decarbonization, 95
disruptions of, 326
enabling conditions, 387
energy storage, **325–326**

evolution of supply over time, 134, *135*
investments, 154
from renewables, 15, 96, 134, **324**
technological innovations, 370
**Electrification**, 15, 95, 97, 111, 134, 315, 316, 326
in industry sector, *335*, 336
in transport sector, 332–333, *333*, 460
**Emission pathways***, 12–17, *13, 14–15, 137*, 184, *274–276*
in a prospective scenario, *276*
definition and categories, *24*, 59–61, *62*
*See also* Pathways
**Emissions**
1.5°C pathways*, *6*, 12–17, *13, 14–15*, 95, 112, 113–118, *113, 117*, 463
aggregate, *67–68*, 115
anthropogenic, recent trends, 1.SM.7
in archetype pathways, 112–113, *113*
benchmark values, 115, 4.SM.1
calculating, *66–68*
carbon budget* and, 96
$CO_2$ equivalent emission*, *67, 127*
cumulative $CO_2$, *6*, 12, *62, 67*, 96, 113, *123*, 1.SM.6
cumulative $CO_2$ and temperature, 96, 104, *105*, 126–127, *127*
cumulative emissions*, *6*, 12, *62, 67, 123*
at current rate, consequences of, 5
decoupling economic growth from, 56, 372, *376*, 461
emissions gap, 126, *358*
future emissions, commitment to, 66
global, in 2030, *6*, 12, *13*, 95
long-lived climate forcers, *66–68*, 116–118, *117*
measuring progress to net-zero emissions, *66–68*
Nationally Determined Contributions (NDCs)*, 56, 95, 126–129, *127, 128*, 149
negative emissions*, 17, 51, 70, 96, 114, 118
net-zero emissions, 12, 51, 95, 107, 116
net-zero, timing of, 95, *119*
non-$CO_2$, 70, 72, *13, 16*, 105–107, 115–116, 147, 1.SM.6
past emissions, global warming and, 51, 64–65, *65*
peak, 95, 115, 129
peak, timing of, 115, 126–127, 129
reductions, *13*, 15, 18, 95, 463
reductions, behaviour change and, 317, *363*
reductions, near-term, 17, 96, 124, 126–129, *128*
reductions, rate of, 51
reductions, remaining carbon budget and, 96
reductions, technologies and, 369–370
reductions, timing of, 5, *6*, 18, 61, 95, 96, 107, 114, 116–118
sectoral pathways, *137*
short-lived climate forcers, 64, *66–68*, 118, *120*, 316
timescales and, 5, 61, 64–66
timing of, 95, *117, 119*
warming commitment from past emissions, 64–66, *65*, 1.SM.5
zero emissions commitment, 64–65, 65
**Enabling conditions***, 18–19, 52, 148–150, 317–318, *338*, 352, 386, 474–475, 4.SM.2
adaptation options*, 4.SM.2
enabling behavioural and lifestyle changes, 362–369

enabling technological innovations, 369–372, *370*
FAQ, 392–393
international cooperation, 22, 23
knowledge gaps, *390–391*
Manizales, Colombia: enabling environment in, *361*
for mitigation implementation, 381–383
**Energy efficiency***, 15, 96, 137, 140, 315, 316, **460–461**
appliances, 316, 331, 460, 461
behavioural responses and, 460–461
building codes, 332, *339*, 377
efficiency standards, 377, 378
food production systems, 315–316
improving, 377–378
in industry sector, 315, 335, *335*
mitigation options, 460–461
policies, 149, 153, 377–378
sustainable development goals (SDGs) and, 448
**Energy sector**, 15, 129–144, 243–244, 315, **324–327**
adaptation options*, 384, *385*
carbon dioxide capture and storage in, 326–327
carbon intensity, 150, *130*, 137–138, *138, 139*
decarbonization, 95, 148, *277*, 316, 461
decarbonization, macro-level indicators, 129–130
diversification of, 21, 448
electrification, 15, 95, 97, 111, 134, 315, 316, 326
emissions, 96, *137, 138*
end-use sectors, 136–144
energy security, 387
feasibility of mitigation options, *382*
final energy, 137, *138*
fuel switch, 460–461
hybrid systems, 326
infrastructure, 326, 384, *385*
investments, 16, 22, 95–96, 153, *155*, 372, *373–374*
knowledge gaps, *388*
low-carbon pathways, *462*, 464–466
low-carbon technologies, 15, 16, 96
mitigation options, 12, *14*, 460–461, 4.SM.4.2.1
renewable energy, 14, 15, 96, 111, 131, *132–133*, 316, **324**
solar energy, 96
synergies with Sustainable Development Goals, 19
transformation, 129–144, 316, 463
transitions in 1.5°C pathways*, 15, 96–97, 130, 315, 316, **324–327**, 374–375, 4.SM.4.2.1, 4.SM.4.3.1
transitions, speed and scale of, 320, *320*
water and, 326, 384, 464–466
water-energy-food (WEF) nexus, 386–387
**Energy supply and demand**, 15, 17, 96–97, 129–136, 316, 460–461, 466
in 1.5°C warmer worlds, 161, *162*, 316
access to energy, 464
air conditioning, 243
batteries, 325
bioenergy*, 12, 17, 96, 111–112, *124*, **324–325**
carbon intensity of, 129–130, *130*, 461
demand reductions, 95, 137
disruptions and vulnerabilities, 326
emissions pathways, 12, *14*, 15, 95
energy storage, 316, 325–326

Exhibit 18 to Decl. of Scheehle
1820

**ER-1480**

(26 of 296), Page 26 of 296  Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 26 of 296
Case 2:24-cv-00801-ODW-PVC  Document 55-18  Filed 07/24/24  Page 623 of 632
Page ID #:5834

**Index**

evolution of primary energy contributions, 130–132, *131*, *132–134*
final energy demand, 137, *138*
fossil fuels, 96–97
grid flexibility resources (GFR), 325
low-demand scenarios, *110*, 111, 448
mitigation options, 460–461
primary energy supply, 96–97, 130–132, *131*, *132–133*
smart grids, 316
in SSPs, 109–110, *110*
sustainable development goals (SDGs) and, 447–448
synergies and trade-offs, 19, *20–21*, 448
transformations in, 129–136, *130–135*
urban, 331
*See also* Electricity generation/use
**Enhanced weathering**\*, 17, 112, *268, 269, 270*, **345–346**, 462–463
costs, 316, 345
side effects, 345–346
**Equality**\*, 448–449, 451–453
in 1.5°C warmer worlds\*, 451–453
inequality, 456
inequality, reducing, 18–23, 445–538
**Equilibrium climate sensitivity.**
*See* Climate sensitivity
**Equity**\*, 18, 23, 51, **54–55**, 448–449, *456*, 469–470, 479
in 1.5°C warmer worlds\*, 451–453
burden sharing\*, 380, 470
climate-resilient development pathways\*, 22, 448–449, 469–470
conditions for achieving, 474–475
disproportionate impacts and, 51
fairness\* and, 449, 469, 479
gender equity\*, 23
intergenerational equity\*, 55
international equity, 55
justice and, 22, 55, *456*, 470
mitigation efforts and, 18, 55
national equity, 55, 470
policies and, 22, *456*
procedural equity\*, 55, 73
research gaps, 475–476
responsibility–capacity–need assessment, 470
in social-ecological systems\*, *338–341*
trade-offs, 19
**Ethics**\*, 51, 52
**European Union, Covenant of Mayors**, 354, *355*
**Evidence**\*, 451
**Exposure**\*
factors influencing, 53
numbers of people exposed, 178, *246, 453*
*See also* Hazard; Risk; Vulnerability
**Extinction**, 8, 179, 218, 256–257
commitment to, 218
**Extratropical cyclone**\*, 203–204, *211*
*See also* Tropical cyclone
**Extreme weather events**\*, *182*, 255
floods and droughts, 214–215, 255
frequency of, 223

heavy precipitation, 255
*See also* Climate extreme
**Extremes.** *See* Climate extreme; *and specific topics, e.g., precipitation*

## F

**Fairness**\*, 449, 469, 479
nation-level fair shares, 470
**FAQs.** *See* Frequently Asked Questions
**Farmer managed natural regeneration (FMNR)**, *459*
**Feasibility**\*, 18–19, 52, 56, **71–72**, 380–386, *381*, 392–393, *393*
adaptation options\*, *381*, 384–386, *385*, 4.SM.4.3.1-4.SM.4.3.5
assessment of, 71–72, 380, *381*, *382–383*, 4.SM.4.1
definition, 52
dimensions of, *71–72*, 380, *381, 392*
enabling conditions\*, 18–19, 52, 56
mitigation options\*, 381, *381, 382–383*, 4.SM.4.2.1-4.SM.4.2.5
**Feedback.** *See* Climate feedbacks
**Fiji, freshwater resources**, *368*
**Finance**, 21–22, 23, 148–149, 317, 361–362, 372–380, 474
access to, 21, 23, 155, 317, 456
adaptation financing, 21–22, 379, 456
challenges of, 372–375, *373–374*, 379
climate-friendly products, 378
de-risking, 317, 378–379
global and national systems for, 317–318, 380
Green Climate Fund, *74*, 379
green instruments, 378, 474
innovative, 315, 380
knowledge gaps, *391*
low-emission assets, 317
mobilization of, 19, 456
multilateral and national development banks, 317
new forms of, 374, 380, 474
policy instruments and, 317, 372–380
private sector, 21, 22
public-private partnerships, 317, 474
public sector, 21, 317
redirection of, 317, 374, 378
*See also* Investments
**Financial institutions**\*, 361–362
**Fires**, 244, 259
forest fires, 8, *247*
tundra, 262
**Fisheries**, 8, 9, *11*, 237–238, *248*, 452
adaptation measures, 238
fin fish, 180, 226–227, 237–238, 3.SM.3.2.7, 3.SM.3.3.10, 3.SM.3.2.12, 3.SM.3.2.13
foodwebs and, 226–227, *248*
hypoxia and, 224
livelihoods, 227
management, 227
productivity change, 225, *249*, 258
projected impacts, 8, 9, *11*, 178, 222, *228, 248*, 257
range shifts, 222, *248*
restoration of, 330
risks, 180, *228*, 237–238, 251, *252*, 257

**Floods**\*, *11*, *182*, 201–203, *211*, 214–215, 3.SM.3.1.2
coastal, 181, 231, *235, 249*, 252, *252*, 3.SM.3.3.3
damage from, 214, 215
Danube River Protection Convention, *356*
fluvial, 201–203, 214, *247*, 251–252, 252, 3.SM.3.3.4
management in Rotterdam, The Netherlands, *342*
numbers of people at risk, 452
observed changes, 201, *211*
Philippines, flood measures, *368*
projected changes, 179, 201–203, *202, 211*, 214, 3.SM.3.1.2
risks, with 1.5°C warming, compared with 2°C, 7, 178, 179, 181, 201–203, *202*, 214–215, *247*, 251–252, *252*
sea level rise and, 8
**Fluorinated gases**, 118, *120*
**Food**, Table 3.SM.12
GHG-intensive foods, 97, 147
healthy diets and choices, 19, 97, 147, 180, 462
land use for, 97, *145*
plant-based proteins, 112
prices, 447, 462, 464
quality/nutrition, 327, Table 3.SM.12
water-energy-food (WEF) nexus, 386–387
**Food demand**
reducing, 464, 466
in SSPs, 110, *110, 111*
**Food production systems**, 178, 236–240, *250, 252*, **327–329**, *453*, 464, Table 3.SM.5
climate-smart food production, *239*
efficiency of, 315–316, 464
genome modification, 329
land use and, 327–329
mixed crop-livestock production, 315, **328**
projected impacts, 179–180, 236–240, *250*
technological innovations, 316, **329**
tipping points\*, 263, *264*
*See also* Agriculture; Crop yields
**Food security**\*, 180, *182*, 237, *238–240, 250*
decline in, 53
enhancing, 315–316
food insecurity, 447
mitigation pathways and, 464
projected impacts, 179–180, *239, 250*, Table 3.SM.5
risks to, *238–239*
strategies for improving, *239–240*
**Food shortages**, 9
**Food wastage**\*, 316, **328–329**, 462
**Forcing.** *See* Radiative forcing
**Forest fires**, 8, *247*
**Forests**\*, 220, 316, **329–330**
agroforestry, 328, 384
Amazon tropical forest, 221, 263, *340*
Australian rainforest, 254
boreal, 8, 263, *264*
as carbon sinks, *340*
CDR options and, 316
ecosystem restoration, 329–330
emissions, *14*
impacts, 220

Index

Exhibit 18 to Decl. of Scheehle
1821

(27 of 296), Page 27 of 296 Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 27 of 296
Case 2:24-cv-00801-ODW-PVC Document 55-18 Filed 07/24/24 Page 624 of 632
Page ID #:5835

Index

land area for, 16, 97
land-use change, *146*
rainforests, 254, 263, *264*
REDD+, 329–330
responsible sourcing of products, 462
risks, 8, 220–221
tipping points*, 263, *264*
*See also* Afforestation; Deforestation; Reforestation
**Fossil fuels***
in 1.5°C pathways*, *14–15*, 15, 96–97
combined with CCS, 97, 135
countries/economies dependent on, 448, 461, *462*
energy sector use, 15, 96–97, 131, *131, 132–133, 138*
greenhouse gas emissions, 53, 114
market preference, shifting, 317
reducing investments in, 378
**Framing and context, 49–92**
assessment and methodologies, 75–76
confidence, uncertainty and risk, 77
feasibility, *71–72*
framing asymmetries, 55
global response, 70–75
impacts, 69–70
knowledge base, 53–56, 75–76
sustainable development, *73–75*
transformation and transitions, 73
understanding 1.5°C, 56–64
**Frequently Asked Questions (FAQs)**
How Close are we to 1.5°C?, 81, 82
What are Carbon Dioxide Removal and Negative Emissions?, 394, *395*
What are the Connections between Sustainable Development and Limiting Global Warming to 1.5°C above Pre-Industrial Levels?, 477–478, *478*
What are the Impacts of 1.5°C and 2°C of Warming?, 282–283, *283*
What are the Pathways to Achieving Poverty Reduction and Reducing Inequalities while Reaching a 1.5°C World?, 479–480, *480*
What do Energy Supply and Demand have to do with Limiting Warming to 1.5°C?, 161, *162*
What Kind of Pathways Limit Warming to 1.5°C and are we on Track?, 159, *160*
What Transitions Could Enable Limiting Global Warming to 1.5°C?, 392–393, *393*
Why are we Talking about 1.5°C?, 78, *80*
Why is Adaptation Important in a 1.5°C-Warmer World?, 396–397, *397*
**Freshwater systems**, *182*, 213–216, 221, *247*
adaptation initiatives, *368*
extreme events, 214–215
freshwater stress, 181
knowledge gaps, 272
water temperature, 214
*See also* Water resources
**Fuel switch**, 460–461, *481–506*
**Fynbos and succulent Karoo biomes**, 260, *261*

## G

**Gender equity***, 23, 452
**General circulation model (GCM)**. *See* Climate models
**Genome modification techniques**, 329
**Geophysical relationships, 101–107**
climate and Earth-system feedbacks, 103–104
geophysical uncertainties, 96, 101–104
knowledge gaps, 157–158
non-$CO_2$ climate forcers, 101–103, *103*
**Geophysical warming commitment**, 64–66, *65*
**Glaciers***, 206
**Global climate model (GCM)**. *See* Climate models
**Global financial systems**, 317–318
**Globalisation**, 319
**Global mean surface temperature (GMST)***,
56–57, *57*, 177, 186, *274*
1.5°C rise, factors in, 4, *274*
anomalies*, *183, 210*
definition, *24*
measurement of, 12
observed, 4, 6, 186
past emissions and, 51
**Global mean surface air temperature (GSAT)***,
12, 56
**Global response, strengthening**, 18–23, 70–75,
**313–443**
1.5°C-consistent pathways, implications of,
320–321, 320, 448
accelerating the response, 319–320
adaptation options, 321, 336–337, *338*
change, far-reaching and rapid, 352–380, 392
change, historical rates of, 322
cooperation, 22, 23
enabling change, 21–22, 315–318
feasibility assessments, 380–386, *381, 382–383*,
385
finance and investments, 317, 321, 361–362,
**372–380**
governance and policies, 23, 71, 315, 316, 317,
321, **352–355**
implementation, 23, 70, 71, 315, 317, 319,
320–323, **352–380**
implementing adaptation, 383–386, *385*
implementing mitigation, 381–383
integration and enabling transformation, **380–387**
knowledge gaps, 318, 387, *388–391*
levels of ambition, raising, 315
monitoring and evaluation (M&E)*, 386
policy instruments and finance, 372–380
response options, 19–21, 70–71, 316–317
sustainable development and, 18, 22, 316, 321
synergies and trade-offs, 316, 386–387
system transitions, and rates of change, 322–323
systemic changes, 323–349
transformation and transitions, 70, 73, 315,
**380–387**
transitions, speed and scale of, 317, 320, *320*
**Global Temperature-change Potential (GTP)**,
*66–68*
**Global warming***, 4–6
commitment to continued warming, 64–66, *65*,

1.SM.5
current level of, 4, 51, 53, 76, 106, 177, 1.SM.1
definition, *24*, 51, 56
with emissions continuing at present rate, 4
geophysical warming commitment, 64–66, *65*
human experience of present-day, 53, 1.SM.1
human-induced, 4–5, 51, 53, *53, 54,* 59, 81, *82*,
186–187, 282, 1.SM.2, 1.SM.6
level in 2017, 51, 59, 81
maximum temperature reached, 5
observed, 4, 51, 53, *53*, 58–59, 189–190,
1.SM.1, 1.SM.2, 1.SM.3, 1.SM.6
past emissions and, 51, 64–65, *65*, 72
peak in 5, 65, 96, 101, 177, *277, 278*
pre-industrial* reference period,
51, 56, 57–59, 184
projections, 4, 81, 82, 95, 187–188, *188*
reference periods, 56–59, 184
regional/seasonal variations in, 4, 59, *60*, 81
temperatures used for definition, 51, 106
timescales and persistence, 5
total warming, 59, 61
*See also* Global mean surface temperature;
Temperature
**Global warming of 1.5°C**, 4–6, **56–64**, 187, *274*
1.5°C pathways*, 12–17, 51, **93–174**
already experienced in some regions
and seasons, 4, 51, 59, 68, 81, 452
closeness to (FAQ), 81, 82
context of sustainable development
and poverty eradication, 18–23
framing and context, 4–6, **49–92**
future emissions and, *6, 13*
impacts and risks, compared with 2°C,
5, 7–10, *11*, 51, **175–311**, 261
not considered 'safe', 447, 455
projected climatic changes, 7–10, 186–188
projected timeline for reaching,
4, 95–96, Table 3.SM.7
Reasons for concern (RFCs)*, 10, *11*, 181
reference period, 56–59, 184
returning to, after overshoot, 5, 17, 61, 96
stabilization responses/scenarios, 147, 158, 182,
184–185
strengthening the global response, 18–23, 70–75,
**313–443**
synergies and trade-offs, 19
temperature range for, 51, 187, *188, 275*
*See also* 1.5°C warmer worlds*
**Global warming of 2°C**, *100*
emissions and, 116
impacts and risks, compared with 1.5°C, 5, 7–10,
*11*, **175–311**, 261
OECD scenario for, *373*
Reasons for concern (RFCs)*, 10, *11*
regions with high risks, *247–250*
runoff and floods, 178, *211*
**Global warming of 3°C**, 18, *261*
rainforests and, 263
**Global Warming Potentials (GWPs)**, *66–68*
**Governance***, 19, 71, 316, 317, **352–355**
adaptive governance*, 315

Exhibit 18 to Decl. of Scheehle
1822

ER-1482

(28 of 296), Page 28 of 296  Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 28 of 296
Case 2:24-cv-00801-ODW-PVC   Document 55-18   Filed 07/24/24   Page 625 of 632
Page ID #:5836

**Index**

challenges in 1.5°C pathways, 95
Covenant of Mayors initiative, 354, *355*
governance capacity*, 71
governance framework, 317, 359
inclusive, 475
international, 352–354, 474
knowledge gaps, *390*
linkages across sectors, 71
local and regional, 316, 354, *355*
multilevel governance*, 19, 23, 317, **352–355**,
*355, 356*, 384, 386, 474–475
national, 316, 353, *361*
partnerships among actors, 23
sub-national, 354
water-energy-food (WEF) nexus, 386–387
*See also* Policies
**Green bonds**, 378
**Green Climate Fund**, *74*, 379
**Green economy**, 470–471
**Green infrastructure***, 10, 316, 334, *334*, 384, *385*
investment in, 316
**Greenhouse gas(es) (GHGs)***,
long-lived, 64–66, *66–68*, 116–118
short-lived, 64, *66–68*, 316
*See also* Carbon dioxide; Methane; Nitrous oxide;
Ozone
**Greenhouse gas emissions**, *14–15*, 18
aggregate, 115
benchmark values, 115
cumulative emissions*, *6*, 12, 62
drivers of, 53
global, in 2030, 12, *13*
reductions in, *6*, 12, *13, 14–15*, 95
reporting of, *66*
timing of reductions, *6, 13, 95*
*See also* Emissions
**Greenhouse gas removal***. *See* Carbon dioxide
removal (CDR)
**Greenland ice sheet**, 7, 178, 206, *208–209*, 257,
271, 282
**Gross domestic product (GDP)***, 158, 243, 256,
258, *265, 373*
**Gross fixed capital formation (GFCF)***, 317, *373*
**Gross world product (GWP)**, 256
**Groundwater**, 15, 3.SM.3.1.1.3
coastal, 181
**Guatemala**
Indigenous Table for Climate Change, *360*
Maya watershed meteorological forecasts, *360*
response to drought and El-Niño, *356*
**Gulf Cooperation Council (GCC) countries**, *462*

**H**

**Happiness index (Bhutan)**, *387*
**Hazard***, 68, 186–212, *210–212*
collocated and/or concomitant, 188
*See also* Disaster; Risk; Vulnerability
**Health.** *See* Human health
**Heat-related morbidity and mortality**, 9, *11*,
180, 240–241, *250*, 252, *252*, 263, *264*, 3.SM.3.3.1
**Heat stress**, 452

coral reefs, 226, *229*
**Heatwaves***, 9, 263, *264*
in cities, 242
deadly, 263, *264*
extreme, 177
marine, 177
numbers of people exposed, 178
observed changes, 177
projected changes, 177–178
tipping points*, 263, *264*
**Holocene***, 53
Holocene Thermal Maximum (HTM), *208*
**Hotspots***, *182*, 258–260, *261*
drought*, *199*, 200
precipitation, *193*, 194
temperature, 190–191, *193*
**Human behaviour***, **362–369**
adaptation behaviour*, *363*
adaptation options*, 457
behavioural change*, 19, 21, 22, 97, 315, 317, 461
behavioural change, enabling, 362–369
behavioural change, mainstreaming, 389–391
dietary choices, 19, 97, 147, 180, 316, 462
energy efficiency* and, 460–461
factors affecting, 364–365
habits, heuristics, and biases, 365, 461
knowledge and, 364
mitigation behaviour*, *362, 363*
motivation and, 364–365
rebound effect, 460
*See also* Values
**Human health**, 9, 178, *182*, 240–241, 250, *385*
adaptation limits*, *455*
air quality and, 241, *250*, 464, Table 3.SM.9
benefits of emissions reductions, 12
co-benefits, 157
cold-related mortality, 241
heat-related morbidity and mortality, 9, *11*, 180,
240–241, *250*, 252, *252*, 263, *264*, 3.SM.3.3.1
impacts and risks at 1.5°C, *vs.* 2°C, 9, 180, *182*,
240–241, *250*, 252, *453*
occupational health, 241, 250
population health, 337, *338*, *385*, 457
risks, 180, 240–241, 252
temperature-related risks, Table 3.SM.8
tipping points*, 263, *264*
trade-offs, 19
urban areas, 180
vector-borne diseases, 9, 180, 241, Table 3.SM.10
**Human-induced warming**, 4, 51, 59, 81, *82*,
186–187, 188, 282, 1.SM.2, 1.SM.6
equal to observed warming, 51, 59
rate of, 66
**Human population**, 51, 319
current, 319
displacement/migrations of, 180, 181, **244–245**,
337, *338, 385*
growth of, 95, 319
in regions where 1.5°C already exceeded, 51
in SSPs, 109, *110*
**Human rights***, 55, 450, 460, 469–470, 475
**Human security***, 9

**Hydrofluorocarbons (HFCs)**, 12, 96, 118, 341–342,
*342*
radiative forcing from, 342
**Hydrogen**, 15, 315, 335, 336
**Hydrological cycle***, 191–196
**Hydropower**, 201, 214, 243, 466

**I**

**Ice sheets***
albedo and, 257
Antarctic ice sheet, 7, 178, *208–209*, 257, 258,
271, 282
Greenland ice sheet, 7, 178, 206, *208–209*, 257,
271, 282
marine ice sheet instability (MISI), 257, 258
sea level rise and, 7, 178, 206, *208*, 257, 271
thresholds, 257
time frame for loss of, 257
tipping points, 282
(Climate change) Impact assessment*, 76, 185–186
**Impacts***, 7–10, 68–70, **175–311**
in 1.5°C and 2°C warmer worlds*, 7–10,
177–179, *182*, 319
in 1.5°C pathways, *vs.* overshoot pathways, 51,
61, *62*
attribution for, 69, 213
avoided, 18, 68, 183, **253–265**, 447, 452–453,
*453*, 475
climate extremes and, 7, 177–178, *182*
coastal and low-lying areas, 231–234, Table 3.SM.4
definitions, *24*, 68
direct *vs.* indirect, 69
disproportionate, 11, 51, 447, 452
distribution of, 10, *11*, 18, 181, 255–256
drivers of, 69
economic sectors and services, 180–181, *182*,
242–244, *250*, 256
ecosystems, 11, 59, 177, *182*
emission pathways* and, 51, 282
FAQ on, 282–283, *283*
food systems, 179–180, *182*, 236–240, *250*,
Table 3.SM.5
global aggregate, 10, 11, 181, 182, 256–257
global and regional climate changes, 186–212,
*210–212*
human health, 9, 180, *182*, 240–241, *250*,
252, *453*
impact assessment*, 76, 185–186
impact cascades, 69, 245, 452
irreversible, 5, 61, 177, 251, *252, 254*
knowledge gaps, 272–273
land use, 179–180
livelihoods, poverty, and migration, 244–245, 447
marine ecosystems, 8–9, 179, 221–230
non-linearity, 69–70
observed, 5, 53, **212–253**
ocean, 8–9, 179, 221–230, *228*,
*248–249*, 3.SM.3.2.1-3.SM.3.2.13
projected risks, 7–10, **212–253**
regional, 9, 68, 180–181, *182*, 189–196
sea level rise, 7–8, 181, *182*, 206–207, *212*

Exhibit 18 to Decl. of Scheehle
1823

**ER-1483**

(29 of 296), Page 29 of 296  Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 29 of 296
Case 2:24-cv-00801-ODW-PVC   Document 55-18   Filed 07/24/24   Page 626 of 632
Page ID #:5837

Index

small islands and coastal areas, 181, *182*
summary of, 182–183, *182, 247–250,* 251–253
terrestrial ecosystems, 8, *11,* 179, 216–221, *252,* Table 3.SM.2
time-integrated, 61, *62*
timescales of, 61, *62*
uncertainties*, 69
uncertainty propagation, 3.SM.1.3
urban areas, 241–242
water resources, 179, 3.SM.3.1.1.2-3.SM.3.1.1.4
**Implementation.** *See* Global response, strengthening
**Inclusion/inclusive processes,** 331, 333, 353, *381,* 449, 475
cultural considerations, 384
decision-making, 456
**Incremental adaptation.** *See* Adaptation
**India, technology and renewables pathways,** 471
**Indigenous knowledge**\*, 22, 315, 337, *338, 339, 385,* 456, 480
community adaptation and, *360*
in Guatemala, *360*
Indigenous Table for Climate Change (Guatemala), *360*
in Pacific Islands and small island developing states, *360*
in Tanzania, *360*
**Indigenous peoples,** 23, 447
in Arctic, 9, *339*
cultural beliefs, 364
land tenure, 462
Maya (in Guatemala), *360*
risks and impacts, 9
**Industry sector,** 334–336, 4.SM.4.3.4
adaptation options*, *385,* 386
bio-based feedstocks, 335–336, *335*
carbon capture and storage (CCS), *335,* 336
changes in structure of, 375
decarbonization, 140
electrification and hydrogen, *335,* 336, 460
emissions, 15, 114, 140, 334
energy efficiency, 315, 335, *335,* 460
energy-intensive industry, 334
feasibility of mitigation options, *383*
final energy demand and use, 138–140, *139*
knowledge gaps, *389*
mitigation options*, *335,* 4.SM.4.2.4
substitution and circularity, 335, *335,* 460
technological innovations, *370,* 460
transitions in, 15, 334–336, 460, 4.SM.4.3.4
transitions, speed and scale of, 320, *320*
**Inequality**
in 1.5°C warmer world*, 447
adaptation pathways* and, 458–459
increased, 53, 319
persistent, 471
reducing, 18–23, 72, **445–538,** 456, 475
research gaps, 475–476
*See also* Equality
**Information and communication technology (ICT)**\*, 316, 319
**Information flow and sharing,** 377–378, 456, 457

**Infrastructure**
adaptation options*, 384–386, *385,* 4.SM.4.3.3
climate-resilient, 386
coastal, 181, 226, 231, *235, 249*
decommissioning of existing, 374
feasibility of mitigation options, *382*
floods and, 181
green infrastructure*, 10, 316, 334, *334,* 384, *385*
investments in, 21, 333, *373–374,* 374
knowledge gaps, *388–389*
lock-in of carbon-emitting, 18, 126
low-emission, 317, 374
mitigation options*, 4.SM.4.2.3
sea level rise and, 8, 231, *249*
transitions in, 15–16, 4.SM.4.3.3
urban, 331, 333
**Insects,** 254–255
phenology, 216, 218
pollination by, 216, 218, 255
range loss, 254–255, 256–257
species loss, 179, 218
**Institutional capacity**\*, 19, 71, **359–362**
cooperative institutions and social safety nets, 362
enhancing, 359–362, 384
monitoring, reporting, and review, 361
policy design and implementation, 359–360
**Institutions**\*, 359–362, 474–475
financial, 361–362
institutional capacities, 359–362
knowledge gaps, *390*
monitoring, reporting, and review, 361
reform: Manizales, Colombia, *361*
**Integrated assessment**\*, 95
**Integrated assessment models (IAMs)**\*, 99, 100–101, 108–109, 136–137
assumptions, 2.SM.1.2.2, 2.SM.1.2.3
bioenergy and BECCS deployment in, *124, 268*
CDR and, *268–269*
global economic impacts, 256
knowledge gaps, 158
land use and bioenergy modelling, 2.SM.1.2.4
multiple IAMs, 463–464
scope, use and limitations, 2.SM.1.2.1
**Integrated assessment model (IAM) scenario database**
configuration, 2.SM.1.3.1
data collected, 2.SM.1.3.4
modelling Framework Reference Cards, 2.SM.2 Part 2
overview of mitigation measures, 2.SM.1.2.6
overview of scenarios, 2.SM.1.3.2
overview of studies, 2.SM.1.3.3
scenario classification, 2.SM.1.4
summary of models, Table 2.SM.7
**Interconnectivity,** 52, *54,* 319
**International agreements,** 70, 317
**International cooperation,** 22, 23, 95
Mekong River Commission, *240*
**International governance,** 352–354, 474
**Internet of Things (IoT)**\*, 331
**Invasive species,** 8, 9, 223

**Investments,** 21, 95–96, 149, 153–155, 316, 372–380
decarbonization*, 378
energy-related, 16, 95–96, 153, *155*
green investment, 474
incentives, 317
investment needs, *373–374*
knowledge gaps, 158
low-emission, 154, 317, 378
mitigation, 21, 95–96, 466
policy instruments and, 317
speed and scale of change, 321
upscaling of, 15, 317
world investment, 317, *373*
*See also* Finance
**IPCC Fifth Assessment Report (AR5),** 51, 81
**IPCC Special Report on 1.5°C (SR1.5),** 4, 74, 79
storyline, 77–78, *78*
timeline of, *80*
**Iron fertilization.** *See* Ocean fertilization
**Irreversibility**\*, 5, 61, 177, 251, *252, 254,* 262, *277*
temperature overshoot and, 8, 61, 179
*See also* Tipping points
**Italy, Province of Foggia, multilevel governance in,** *355*

## J

**Jamaica,** *339–340*
**Justice**\*, 448–449, *456,* 469
distributive justice*, 55
justice-centered pathways, 470
procedural justice*, 55
social justice*, 22, 448–449
*See also* Equity; Ethics; Fairness; Human rights

## K

**Kampala, Uganda, Climate Change Action Strategy,** *340*
**Kigali Amendment,** 118
**Kiribati, adaptation in,** *368,* 471
**Knowledge gaps,** 157–158, *388–391*
impacts and risks, 272–273
*See also specific topics*
**Knowledge sources,** 52, 53–56, 75–76
grey literature, 76, 451
indigenous knowledge*, 22, 315, 337, *338, 339, 385,* 456, 480
local knowledge*, 22, *339,* 457
scientific literature, 75, 451
**Krill,** 227, *228,* 3.SM.3.2.6
**Kyoto Protocol**\*, *80,* 353
Kyoto GHG-emissions, *14,* 115–116, *117, 119,* 126

## L

**Land management,** 17, 19, 180
carbon dioxide removal and, 121, 180
**Land surface air temperature**\*, 56
**Land use**\*, 144–148, 180, **327–329**
adaptation options*, 384, *385,* 4.SM.4.3.2

Exhibit 18 to Decl. of Scheehle 1824

ER-1484

(30 of 296), Page 30 of 296  Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 30 of 296
Case 2:24-cv-00801-ODW-PVC    Document 55-18    Filed 07/24/24    Page 627 of 632
Page ID #:5838

**Index**

for agriculture and food, 16, 97, 112, *146*, **327–329**
carbon dioxide removal (CDR)* and, 125, *126*,
    265–266, *268–270*, 343
    climate-resilient, 333
    feasibility of mitigation options, *382*
    governance and, 17
    intensification of, 16
    knowledge gaps, *388*
    mitigation options, 148, 265–266, *382*, 462–463,
        4.SM.4.2.2
    mitigation potential, 315
    modelling, 2.SM.1.2.4
    planning: Manizales, Columbia example, *361*
    risks of carbon release, 221
    sustainability of, 16, 97
    synergies and trade-offs, 19, *20–21*
    transitions in, 16, 17, 96, 97, 144–148, 315,
        **327–329**, 4.SM.4.3.2
    urban, 316, 333
**Land-use change (LUC)***, 112, *126*, 144–148,
    179, 180
    in agricultural sector, 98, 144–148
    bioenergy production and, 69
    biophysical feedbacks, 266–267
    CDR and, *268–269*
    overview of, *145*
    pace of, 145, *146*
    risks in mitigation pathways, 69, 97, 265–266
    in SSPs, *145*
**Large scale singular events**, 10, *11*, 181, *254*,
    257–258
**Last Glacial Maximum (LGM)**, *208*
**Lifestyles**, 315
    choices, 97, 180
    consumption and, 53, 56, 95, 97
    emissions reduction through, 317
    lifestyle change, enabling, **362–369**
    lifestyle change, knowledge gaps, *390–391*
    low energy demand, 97
    low resource use, 97
    mitigation and adaptation behaviour, *362–363*
    in SSPs, *110*
    sustainable, *276*
    *See also* Food; Human behaviour
**Likelihood***, *77*, 182
**Limpopo Watercourse Commission**, *356*
**Livelihoods***, 73, *182*, 244
    agricultural, 55, 315, 447
    coastal, 9, 222, 226, *249*, 447, 452, *455*
    impacts and risks of 1.5°C warmer worlds*, 452
    poverty and, 244
    security, promoting, 456–457
**Livestock**, 9, 180, *264*, **327–328**
    animal feed, 112
    emissions, 147, 327
    land use, 97
    mixed crop-livestock production, 315, **328**
    production, 237
    in the tropics and subtropics, 263, *264*
**Local communities**, 23
**Local knowledge***, 22, *339*, 457
**Local participation**, 456

**Lock-in***, 18, 126, 129
**London, U.K.**
    adaptation and disaster risk management, 458
    car use/policies, *366*
**Long-lived climate forcers (LLCF)***, *66–68*,
    116–118, *117*
    time scales, 64–66
**Loss and Damage***, *454–456*
**Low-carbon pathways**, 471–472

**M**

**Maharashtra, India, water resources**, *368*
**Maladaptive actions (Maladaptation)***, 19,
    386, 396
**Malaria**, 9, 180, 241, 452
**Mangroves**, 225, 226, 228, *228*, 248, *252*, 462,
    3.SM.3.2.1, 3.SM.3.3.8
    replanting, 330, 457
**Manizales, Colombia**, *361*
**Marginal abatement costs**, 16, 95, *150*, 375
**Marine ecosystems**. *See* Ocean ecosystems
**Mayan K'iché population in Guatemala**, *360*
**Mediterranean region**, 259, *261*
    droughts, *200–201*
    threatened systems, 254
**Mekong River basin**, *239–240*
**Methane (CH₄)***, 268, 316, 341, *342*
    AFOLU sector, 118, 147, *147*
    agricultural, 96
    emissions, *13*, 118, *120*
    emissions, evolution of, 96
    emissions reduction, 12, 95, 102, 157, 268, 316
    mitigation potential, 118
    release from permafrost*, 12, 104
    release from wetlands, 12
    zero emissions commitment (ZEC), 65
**Migration***, 180, 181, 232, **244–245**, 337, *338*, 385
    as adaptation, 457
    (internal) displacement*, 245
    sea level change* and, 232
**Millennium Development Goals (MDGs)***, *74*,
    450, 477
**Mitigation***, 19–21, 70, **93–174**
    in 1.5°C pathways*, 12–17, 51–52, 93–174, *465*
    adaptation and, 19, 386–387, 4.SM.4.5.1
    classification of, 99–100, *100*
    costs, 16, 22, 258, *264*, 316
    decisions after 2030, 56
    definition, 70
    demand-side measures*, 97
    equity considerations, 55
    feasibility, 15, 380, *381*
    global response, strengthening, 19–21, 70–75,
        **313–443**
    implementing, 381–383
    integrated mitigation studies, 95
    investments, 21, 95–96, 466
    knowledge gaps, *388–391*
    non-CO₂ mitigation, 95, 96, 105–106, 108,
        115–116, *120*, 265, 268
    risks and risk reduction, 5, 179, 448

socio-economic challenges to, *110*
    sustainable development and, 12, 19–21, 97,
        156–157, 447–448, **459–466**, *465*, *481–509*
    synergies and trade-offs, 18–21, *20–21*, 72, 97,
        157, 316, 386–387, *391*, 459–463, 465,
        4.SM.4.5.1
    synergies with adaptation, 386–387, 475,
        4.SM.4.5.1, 4.SM.5.2
    time frames for, *277*, 278, *279–281*
    *See also* 1.5°C pathways; Pathways
**Mitigation behaviour**. *See* Human behaviour
**Mitigation options***, 19–21, 316–317, 319, 323,
    **324–347**, *463*, *481–509*
    1.5°C pathways*, *100*, 110–112, 316–317, *465*
    CDR, 4.SM.4.2.5
    emissions reduction with, 12, *13*, *14–15*
    enabling conditions, 381–383
    energy supply and demand, 460–462, 4.SM.4.2.1
    feasibility assessment, 381, *381*, *382–383*,
        4.SM.4.2.1–4.SM.4.2.5
    industrial system, 4.SM.4.2.4
    land-based, 16, 462–463, 4.SM.4.2.2
    mitigation–SDG table, *481–509*
    overview, 2.SM.1.2.6
    SDGs and, 19–21, *20–21*, 448
    synergies and trade-offs, 459–463, *463*, *465*,
        4.SM.4.5.1
    urban and infrastructure, 4.SM.4.2.3
**Mitigation pathways***, **93–174**, 265–271
    1.5°C pathways*, 12–17, *13*, *14–15*, 60–61, 98,
        101, *102*, 108–129, *110*, 2.SM.1.5
    2°C pathways, 96, *100*, 101, *102*
    adaptive mitigation pathway, 60–61
    carbon dioxide removal (CDR) in, 118–125, 180
    challenges, opportunities, and
        co-impacts, 147–157
    emissions and, 12, *14–15*
    four model pathways, 12, *14–15*, 61, *62*
    geophysical characteristics, 101–104
    groups/classification, 61, 62, 113–114, *113*
    land-use change, 265–266
    overview, 108–129, *129*
    prospective, 60, *63*
    scenarios in, 98–100, *100*, *277*, *279–281*
    sustainable development and, 463–472, *465*,
        2.SM.1.5
    synergies and trade-offs, *465*
    transformations, 129–157, 466
    *See also* 1.5°C pathways; Pathways
**Mitigation potential**, 118, 315, *363*
**Mitigation scenarios***. *See* Mitigation pathways
**Models**. *See* Climate models; Integrated assessment
    models (IAMs)
**Monitoring and evaluation (M&E)***, 386
**Monitoring, reporting, and review institutions**,
    361
**Monsoon**, 194, 262–263, *264*
**Montreal Protocol**, 118, 353
**Mosquitoes**, 241
**Motivation***, 364–365
**Mountain ecosystems**, 254

**Index**

Exhibit 18 to Decl. of Scheehle
1825

**ER-1485**

Index

## N

Narratives*, 52, 109
Nationally Determined Contributions (NDCs)*,
  56, 95, 126–129, 127, 128, 149, 159, 357–359
  adaptation and, 359
  consistency of, 357–359
  remaining carbon budget and, 113–114
  uncertainties and, 358
Natural gas, 97
NDCs. See Nationally Determined Contributions
  (NDCs)
Negative emissions*, 17, 51, 70, 118–121, 394, 395
  474
  CDR, role in, 70, 114, 118
  FAQ on, 394, 395
  See also Net-zero emissions;
  Net-zero $CO_2$ emissions
Net-zero emissions*, 5, 24
Net-zero $CO_2$ emissions*, 12, 51, 95, 116
  definition, 24
  measuring progress to, 66–68
  necessary to stabilize GMST, 116, 161
  timing of, 5, 12, 13, 61, 95, 107, 116, 119
New York, United States, adaptation initiatives, 340
Nitrogen fertilizer, 116
Nitrous oxide ($N_2O$)*, 13, 66
  agricultural, 96, 116–118, 147
  bioenergy and, 12
  emission increases, 96
  emission reductions, 116–1118
Non-$CO_2$ climate forcers, 96, 120, 341–342
  geographical variation in, 103
  reductions in, 95
  uncertainties, 101–103, 103, 106, 108
Non-$CO_2$ emissions*, 12, 13, 96, 106, 115–116,
  265, 1.SM.6
  agricultural, 147, 147
  reducing, 341
  remaining carbon budget* and, 105–107, 108
Non-governmental organizations, 22
Non-overshoot pathways. See Overshoot; Pathways
Nuclear energy, 14, 15, 325, 461
  costs of, 325
  role in primary energy supply, 130–131, 132,
  132–133
  safety of, 325
  water use and, 466

## O

Ocean(s), 8–9, 178, 182, 221–230, 248–249,
  3.SM.3.2, Table 3.SM.3
  adaptation options, 225
  biodiversity, 8
  carbon sequestration, 17, 121, 178, 222, 227, 228,
  248, 257–258
  carbon uptake, 17, 121, 178, 227, 228, 229,
  3.SM.3.2.8
  circulation, 204–205, 212, 223, 248
  foodwebs, 226–227, 228, 248

heatwaves*, 177
hypoxia and dead zones, 179, 210, 224, 248
impacts and risks at 1.5°C, vs. 2°C, 5, 8–9, 178,
  179, 180, 182, 221–230, 228, 248–249,
  3.SM.3.2.1-3.SM.3.2.13
irreversible impacts, 8
knowledge gaps, 272–273
productivity/fisheries, 8, 179, 249
projected changes, 8–9
pteropods, 224, 226–227, 3.SM.3.2.4
Reasons for Concern, 3.SM.3., Table 3.SM.6
salinity, 209
Southern Ocean, 257–258
storms, 222–223, 249
stratification, 222, 224, 248
temperature, 8, 177, 204–205, 212, 222, 223–224,
  248
thermal inertia/expansion of, 64–65, 107, 282
warming over, 4, 51
See also Coastal communities; Coral reefs;
  Fisheries; Sea level change
Ocean acidification (OA)*, 8, 209–210, 212,
  223–224, 248, 282
  pH*, 212, 222, 223
  reversal of, 5, 67
  risks from, 180, 223–224, 227
Ocean alkalinization, 17, 121, 345–346
Ocean chemistry, 209–210, 223–224
  carbonate chemistry, 178, 222, 223
Ocean ecosystems, 8–9, 179, 221–230, 248
  blue carbon*, 330, 462
  critical thresholds, 179
  ecosystem services, 227–229, 228
  foodwebs, 226–227, 228, 248
  framework organisms, 225–226, 248
  impacts, 8, 9, 178, 179, 221–230, 228, 248
  ocean circulation and, 223, 248
  species range shifts, 222, 248
Ocean fertilization*, 346, 462–463
Organization for Economic Co-operation and
  Development (OECD), 373
Overshoot*, 12, 14–15, 18, 51, 100, 179, 265
  CDR and, 17, 95
  definition, 24
  emission reductions and, 13, 14–15, 18, 95, 116
  impacts of, 60
  irreversible impacts, 61, 179
  low-OS vs. high-OS, 100
  magnitude and duration of, 179, 265
  no or limited overshoot, 12–17, 13, 14–15,
  60–61, 62
  returning to 1.5°C after overshoot, 5, 17, 61, 96
  risks of, 5, 177, 179, 277
Ozone ($O_3$)*, 268
  ozone-related mortality, 9, 180, 250
  precursors, 98, 118, 241
  tropospheric, 236

## P

Pacific decadal variability (PDV), 201
Paris Agreement*, 4, 18, 77, 79, 353

aim and context, 54–55, 66, 74, 77, 79, 359
equity principle, 51, 54, 479
goal of adaptation, 359
goal of limiting warming, 51
time horizon for, 74
transparency framework, 361
Pathway archetypes, 99–100, 100, 112–113, 113, 147
  cumulative $CO_2$ emissions, 123
  electricity generation, 135
  land-use change (LUC)*, 126, 145
  land use/footprint, 147
  primary energy contributions, 130–131, 131
Pathways, 12–17, 49–64, 62–64, 93–174
  1.5°C pathways*, 12–17, 14–15, 52, 59–64,
  93–174, 100, 160, 265–271, 274–276, 320,
  1.SM.4, 1.SM.6
  2°C pathways, 96, 100, 101, 102
  adaptation pathways*, 64, 70, 396, 458–459
  assumptions, 95, 109–112
  bioenergy with carbon dioxide capture
  and storage (BECCS)*, 17, 96
  carbon dioxide removal (CDR)* in, 17, 21, 95, 96,
  111, 118–125, 180, 265–266
  classification of, 61, 62, 99–100, 100, 113–114, 113
  climate-resilient development pathways, 22, 52,
  64, 73, 448–449, 450–451, 451, 468–472,
  475–476, 479–480, 480
  definitions of, 59–61, 63–64
  emissions in, 12–17, 13, 14–15, 24, 95, 96
  four categories/model pathways, 12, 14–15,
  59–61, 62, 63, 265–271
  geophysical characteristics, 101–104
  implications beyond end of century, 270–271, 278
  net-zero $CO_2$ emissions*, 12, 61, 66–68, 116
  nexus approaches, 467
  no or limited overshoot, 12–17, 13, 14–15, 60–61,
  62, 100
  non-$CO_2$ mitigation, 265, 268
  overshoot pathways, 12, 14–15, 18, 24, 51, 60–61,
  62, 100, 277
  overview, 108–129
  portfolio of measures, 12, 15
  prospective mitigation pathways, 60, 63
  Representative Concentration Pathways (RCPs)*, 62
  scenarios used, 98–100, 100
  sector and system transitions, 14–15, 15–16
  Shared Socio-economic Pathways (SSPs)*, 62–63,
  109–110, 110, 111, 448, 467–468
  sustainable development and, 18–23, 98–101
  156–157, 156, 463–466, 465
  Sustainable Development Pathways, 64, 448–449,
  466–472, 469, 479–480
  temperature pathways, 59–61, 62, 63
  time frame for, 95–96
  transformation pathways*, 70, 148–157
  transformations, whole-system, 148–148
  transitions, speed and scale of, 15, 320, 320, 392
  uncertainty, 60, 98
  used in this report, 59–61, 62, 63
  See also 1.5°C pathways; Climate-resilient
  development pathways; Pathway archetypes;
  Scenarios

Exhibit 18 to Decl. of Scheehle
1826

ER-1486

Peatlands, 221
Permafrost*, *182*, 262, 271
   beyond end of century, 271
   feedbacks, 103–104, 262
   irreversible loss of carbon from, 262, *264*
   remaining carbon budget and, 12
   thawing, 8, 12, 104, 220, 259, 262
   tipping points*, 262, *264*
**pH*.** *See* Ocean acidification
**Phenology,** 216–218
**Philippines, flood measures,** *368*
**Phytoplankton,** 224, 226
**Policies*,** 19, 21–22, 71, 148–150, 317, **372–380**
   acceptability* of, 22, 368–369
   assumptions in 1.5° pathways, 112, 149
   car/transport pricing policies, *366*
   carbon pricing, 95, 317, 375–377, 460
   coordination and monitoring of, 449
   design and implementation,
   71, 321, 359–360, 460
   enabling climate finance, 372–380
   equity in, 22
   innovation, 22
   integrated policy packages, 379–380, 383
   international agreements, 70, 317
   internationally cooperative, 22, 23, 95
   investment, 22
   knowledge gaps, *391*
   for low-emission transition, 372–375
   mobilization and integration of, 150, 317
   national, 316
   promoting climate action, 366–368
   redistributive, 21, 448
   regulatory measures, 377–378
   for residual risk and loss and damage, *456*
   Sustainable Development Goals and, 448
   technology, 95, 148, 370–371
   *See also* Governance
**Population.** *See* Human population
**Poverty*,** 9, 53, 180, *182*, 244
   in 1.5°C warmer worlds*, 447, 451–453
   adaptation limits*, *455*
   avoided impacts of 1.5°C *vs.* 2°C, 452–453
   climate change influence on, 55, 282, 447, 450, 452
   disproportionate impacts, 9, 51
   energy poverty, 464
   increase in, 180
   livelihoods* and, 244
   multidimensional, 55, 450, 457
   Multidimensional Poverty Index, 55
   numbers of people at risk, 447, 452
   'poverty scenario' (SSP4), 452
   projections for, 9, 10, 180
**Poverty eradication*,** 18–23, **55,** 72, **445–538**
   conditions for achieving, 474–475
   mitigation pathways and, 22
   research gaps, 475–476
   sustainable development and, 450
**Power asymmetries,** 449, 459, 462, *471*, 475
**Prairie pothole ecosystems,** 221, 254
**Precipitation,** *182*, 191–196
   extremes, observed, 191–192, *197*

extremes, projected, *189*, *197*, 214–215
extremes, Sub-Saharan Africa, *197*
heavy precipitation, 7, 177, 178, 194–196, *195*,
*211*, *255*
hotspots, *193*, 194
monsoon, 194, 262–263, *264*
observed changes, 177, 191–194, *211*
projected changes, 7, 178, 187–188, *188*, *211*
regional, 191–196, *196*, 3.SM.2.3.1, 3.SM.2.3.2
runoff*, 201–203, *211*
*See also* Droughts; Floods
**Precursors*,** 64, *65*, 98, 102–103, 118
**Pre-industrial*,** *24*
   reference period, 51, 56, 57–59, 81, 184
**Procedural equity.** *See* Equity
**Pteropods,** 224, 226–227, 3.SM.3.2.4
**Public acceptability,** 22, 317, 368–369

## R

**Radiative forcing*,** 59, *66–67*, 188
   aerosols*, 102–103
   long-lived climate forcers (LLCF)*, 64–66, *66–68*,
   116–118
   natural forcings, 59, *66–67*
   non-$CO_2$ forcers, 5, *6*, 95, 96, 101–103, *103*
   recent trends, 1.SM.7
   short-lived climate forcers (SLCF)*, 64, *66–68*, 118,
   *120*, 316
   uncertainties in, 96, 101–104, *103*
**Rainfall.** *See* Precipitation
**Reasons for concern (RFCs)*,** 10, *11*, 181, *182*,
   251–258, 3.SM.3.3.1-3.SM.3.3.7
   RFC1 (Unique and threatened systems), 10, *11*,
   181, 251, 253–255, *254*
   RFC2 (Extreme weather events), 10, *11*, 181,
   251–252, *254*, 255
   RFC3 (Distribution of impacts), 10, *11*, 181,
   251–253, *254*, 255–256
   RFC4 (Global aggregate impacts), 10, *11*, 181,
   251–254, *254*, 256–257
   RFC5 (Large scale singular events), 10, *11*, 181,
   *254*, 257–258
**Recycling,** 335, 335, 460
**Reducing Emissions from Deforestation and
Forest Degradation (REDD+)*,** *329–330*
**Reference period*,** 56–59, 81, 184
   periods shorter than 30 years, 51
   pre-industrial* temperatures, 51, 56, 57–59
   30-year period used, 51, 56
**Reforestation*,** 17, 70, 121, 265, 266, *270*, 316,
   **343,** 394, *395*
   constraints, 316
   incentivization of, 147
   trade-offs, *269*
**Region(s)*,** *187*
   climate differences in, 177–178
   cooperation and governance, 353–354
   with high risks at 2°C, *247–250*
   hotspots, 258–260, *261*
   regions used in this report, *187*
   tipping points, 262–263, *264*

warming of >1.5°C already experienced, 4, 51,
68, 81, 452
*See also specific regions and countries*
**Regional climate change,** 68, 177, 188–191
   drought*, 198–200, *198*, *199*, *200–201*, 260
   runoff*, 201–202, *202*, 211
   temperatures on land, 188–191, *189*, *192*, *193*,
   *196*, *197*
   *See also* Regional impacts; Regional precipitation;
   Regional temperatures
**Regional impacts,** 9, 68, 177–178, *182*
   crop production, 9, 259, 263
   economic growth, 9, 180–181
   variation in, 450
**Regional precipitation,** 191–196, *196*
   observed changes, 191–194, 3.SM.2.3.1
   projected changes, *193*, 194–196, *195*, *196*
   3.SM.2.3.2
   Sub-Saharan Africa, *197*
**Regional temperatures,** 59, *60*, 189–191, *196*, *283*
   observed changes, 189–190, *197*, 1.SM.1, 1.SM.3,
   3.SM.2.2.1
   projected changes, *189*, 190–191, *192*, *193*, *196*,
   *197*, *283*, 3.SM.2.2
**Regulatory measures,** 377–378
**Remaining carbon budget*,** 12, 96, **104–107,**
   2.SM.1.1.2
   1.5°C pathways*, 113–114
   agricultural emissions and, 147
   assessment of, 104–107, *108*
   $CO_2$ and non-$CO_2$ contributions, 105–107, *108*
   definition, *24*, 96
   overshoot minimization and, 177
   permafrost thawing and, 105, 107
   uncertainties, 12, 96, *108*
**Remedial measures,** 70–71
**Renewable energy,** *14*, 15, 96, 111, 131, *132–133*,
   316, **324**
   acceptability of, 368–369
   deployment and scaling up, 461, 464–466
   feasibility of, 324
   hybrid systems, 326
   water demands for, 464
**Representative Concentration Pathways (RCPs)*,**
   *62*
**Resilience*,** 316, 456
   climate-resilient land use, 333
   cultural practices and, *360*
   *See also* Climate-resilient development pathways
   (CRDPs); Vulnerability
**Risk(s)*,** 5, 7–10, 177–181, **186–253,** *210–212,*
   ***247–250***
   confidence and likelihood qualifiers, 77, 182
   de-risking policies and investments, 317, 378–379
   definition, *24*, 68
   ecosystems*, 8–9, *11*
   factors influencing, 5, *277*
   with global warming of 1.5°C, compared with
   2°C, 5, 7–10, *11*, 177–181, 186–253, *210–212,*
   *247–250*, 453
   human health, 180, 182, *250*
   interacting and cascading, 245, 452

Index

Exhibit 18 to Decl. of Scheehle
1827

**ER-1487**

(33 of 296), Page 33 of 296  Case: 25-5327  09/18/2025, DktEntry: 8.8, Page 33 of 296
Case 2:24-cv-00801-ODW-PVC   Document 55-18   Filed 07/24/24   Page 630 of 632
Page ID #:5841

Index

key elements of, 251–253, *252*
multi-sector, *246*
multiple and compound, 10, 178, 181
to natural and human systems, 178, 179–181, **212–253**, *247–250*
Reasons for concern (RFCs)*, 10, *11*, 181
residual, *454–456*
social-ecological systems, *338–341*
summary of, *247–250*, 251–253
of temperature overshoot, 5, 177, 179
of unavoidable impacts, *455*
uncertainty, 77
urban areas, 183
to vulnerable populations, 53
**Risk assessment***, 55, **183–186**
**Risk management***, 336
adaptation* and, 5, 10
Sendai Framework*, 70
*See also* Disaster risk management
**Risk sharing**, 316, 336–337, *338*, *385*
**Rotterdam, The Netherlands, adaptation strategy,** *341*
**Runoff***, 178, 201–203, *211*
observed changes, 201, *211*
projected changes, 201–203, *202*, *211*

**S**

**Sahel, Africa, projected risks and impacts in,** 180, 236, 259, *261*, 262–263
**Scenarios***, 52, *62–64*, **98–100**, *276*, 277, 279–281
1.5°C- and 2°C scenarios, 98–100, *100*, 184
comparison of, *279–281*
database of, 99
definition of, *63*
emission scenarios*, 184, *276*
faster transition scenario, *131*, 135
inclusion of CDR in, *277*
OECD scenario for 2°C, *373*
primary energy supply in, *132–133*
socio-economic scenario*, *62–63*
SRES, *62*
used in this report, *63*
*See also* Narratives; Pathways
**Scientific evidence**, 52
**Scientific institutions**, 23, 317, 451
**Sea ice***, *182*, 205–206, *212*, 224–225, *249*, 270
Antarctic, 206, 225
Arctic, 8, 178, 205–206, *209*, *212*, 224, 254, 258, *261*, 262
beyond end of century, 270
irreversible changes, 257, 262
temperature overshoot and, 8
as tipping point, *261*, 262, 270
**Sea level change***, 7–8, *182*, 206–207, *212*, 225, 231–234, *248*, *249*
adaptation and, 10
beyond end of century, 271
coastal areas and, 207, 231–234, 243, *248*, *249*, 252
commitment to continued rise, 7, 51, *67*, 207, 257, 271, 282
deltas and estuaries, 232–233

detection and attribution, 252
emissions and, 5, 7, 51
glaciers and, 206
global mean sea level rise, 178, 206–207, *212*
ice sheets* and, 7, 178, 206, *208*, 257, 271
impacts, 178, 181, *182*
migration due to, 232
multi-metre rise, 7, 178, 271
numbers of people at risk, 178, 231, 232, *234*, 256
past climate episodes and, 208
projected, for 1.5°C, *vs.* 2°C, 7–8, 178, 206–207, *207*, *212*, 231–234, *234*
regional, 178, 207, *234*
sea level rise, 7–8, *67*, 178, 206–207, 225, 231–234, *248*, *249*, 252
small islands and, 7, 8, 232
time-integrated impacts, 61, 62
UNESCO World Heritage sites at risk, 243
**Sea surface temperature (SST)***, 204, 223–224, *248*
in definition of 1.5°C, 51
**Seagrasses**, 225–226, *228*, 248, 3.SM.3.2.1
**Seasonal warming**, 4, 51, 59, *60*, 68
**Sendai Framework for Disaster Risk Reduction***, 70
**Sequestration.** *See* Carbon sequestration
**Shared Socio-economic Pathways (SSPs)***, *62–63*, 109–110, *110*, *111*, 448, 467–468
land-use change and, 145
policy assumptions, 149
SDGs and, 321, 448, 467–468
**Shipping**, 333
**Short-lived climate forcers (SLCF)***, 64, *66–68*, 118, *120*, 316, **341–342**
co-benefits of reducing, 342, *342*
emission reductions, *67*, 316, 341–342
knowledge gaps, *389*
main characteristics of, *342*
mitigation options*, 341
projected emissions, 96, 157
SDGs and, 157
**Singapore, road pricing and car use,** 366
**Sink***. *See* Carbon sequestration
**Small Island Developing States (SIDS)***, 9, *234–235*, 255, 260, *261*
adaptation approaches, *339–340*
adaptation limits, *340*
in Caribbean, *339–340*
climate hazards for, *234–235*, *471*
climate-resilient development pathways* in, *471*, *471*
disproportionate impacts/risks, 9, 53, 447
flooding, *235*
freshwater resources, 9, 213, *234*, 235
Kiribati, adaptation in, *368*, 471
livelihoods, 232, *235*
migration and, 181
multiple, compounded risks, 10, 178, 181, 260, *261*
Pacific Islands, indigenous knowledge in, *360*
risks, 9, 181, 232, 255
sea level rise and, 7, 8, 232, *234–235*
storm damage, *235*

tourism, 229
Vanuatu, planning for climate-resilient development, 449, *471*
**Snow**, *182*
**Social cost of carbon (SCC)***, *150–151*, *265*, 375
**Social costs***, *67*, *265*, 317, 365, 375
**Social-ecological systems***, 338–341
**Social learning***, 449, 475
**Social safety nets**, 362, *385*
**Societal choices**, 98, 99
**Societal (social) transformation.**
*See* Transformation
**Socio-economic drivers**, 109–110, *110*
**Socio-economic scenario***, *62–63*
**Soil carbon sequestration (SCS)***. *See* Carbon sequestration
**Soil erosion**, 216
**Soil moisture***, 190, 191, 196
anomalies, 198, *199*, 200
**Solar energy**, 96, 131, *131*, *132–133*
water use and, 464–466
**Solar radiation modification (SRM)***, 12–13, 70–71, **347–349**, *349–352*
carbon budget and, 351
in context of 1.5°C pathways*, *349–352*
feasibility, 347–349, *351–352*
governance, 347–348
impacts and ethical issues, 71, 317, 349, *351*
knowledge gaps, 390
overview/main characteristics, 348
risks of, 13, 347
social acceptability of, 349
sustainable development and, *351*
timing and magnitude, *349–351*
uncertainties and limitations, 12–13, 316–317
**Southeast Asia, vulnerability and risks in,** 259, *261*
**Southern Ocean, role in global carbon cycle,** 257–258
**Special Report on 1.5°C.** *See* IPCC Special Report on 1.5°C (SR1.5)
**Species**
interactions, phenology and, 216–218
invasive, 8, 9, 223
loss and extinction, 8, 179, 218
range loss/shifts, 8, 179, 218, 222, *247*, 248, 256–257
**SSPs.** *See* Shared Socio-economic Pathways (SSPs)
**Stabilisation (of GHG or CO₂-equivalent concentration)***, 116, 122, 147, 158, 184–185
**Stockholm, congestion charge and car use,** 366
**Storms**, 181, 222–223, *249*
extratropical, 203–204
storm surge, 223
tropical cyclones, 203–204, *211*
**Stranded assets***, 18
**Structured Expert Dialogue (SED)***, 79
**Sub-national actors***, 23
**Sub-Saharan Africa, changes in climate extremes,** 197
**Sulphur dioxide (SO₂)**, 96, 118, *120*
**Supply-side measures.** *See* Demand and supply-side measures

Exhibit 18 to Decl. of Scheehle
1828

**ER-1488**

(34 of 296), Page 34 of 296 Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 34 of 296
Case 2:24-cv-00801-ODW-PVC    Document 55-18    Filed 07/24/24    Page 631 of 632
Page ID #:5842

Surface air temperature (SAT)
  in definition of 1.5°C, 51, 56
  global average temperature and, 56–57
Sustainable development (SD)*, 18–23, 72, *73–75*, **445–538**
  and 1.5°C pathways*, 93, 97, 98, 156–157, 253, 450–451, 463–466, *465*
  and 1.5°C warmer worlds*, 55–56, 447, 451–453
  adaptation and, 19, 447, **456–459**
  avoided impacts and, 452–453, *453*, 475
  climate-resilient development pathways (CRDPs)* and, 22, 52, *64*, 448–449, 450–451, *451*, **468–472**, 475–476, 479–480
  co-benefits, 447
  conditions for achieving, 474–475
  definition, *73*
  equity and, 55–56, 448–449
  integration with adaptation and mitigation, 75–76, 448, **467**
  mitigation and, 12, 18, 19–21, 97, 156–157, *156*, 447–448, **459–466**, *481–509*
  mitigation pathways and, 463–466, *465*
  overview, 450, 475–476
  pathways to 1.5°C, 466–472, *469*, 479–480
  research gaps, 475–476
  risks to, 253
  in social-ecological systems*, *338–341*
  synergies and trade-offs, 457–458, 459–463, *463*, 475
  trajectories, *451*, 469–470, *480*
  transformation* and, 22, 56, 73, 448, 456, 466
Sustainable Development Goals (SDGs)*, 18, 19–21, *73–75*, 156–157, *156*
  adaptation options* and, 457–458
  avoided impacts and, 18, 68, 183, **253–265**, 447, *453*, 475
  CDR and, 448, 462
  climate change and, 73, 74, *75*, 157, 158, 252
  energy efficiency and, 448
  equity and, 51
  food security and nutrition, *238*
  mitigation options and, 19–21, *20–21*, 448, **459–463**
  mitigation pathways, interactions with, 2.SM.1.5
  mitigation-SDG table, *481–509*
  overview, 450
  policy instruments and, 448
  prioritizing, 447
  risks from 1.5°C, *vs.* 2°C, 453
  SDG Global Index Scores, *53*
  SDG-interaction scores*, *481–509*
  Shared Socio-economic Pathways* and, 321, 448, 467–468
  synergies and trade-offs, 19–21, *21–22*, 319, 447, *463*, 475
  system transitions and, 317
Sustainable Development Pathways, *64*, 448–449, **466–472**, *469*, 479–480
Synergies, 18–19, *20–21*, 72, *269*, 316, 477, 4.SM.4.5.1, 4.SM.5.2
  adaptation and SDGs, 447
  knowledge gaps, *391*

mitigation and SDGs, 19–21, 20–21, 157, 459–463, *463, 465*
mitigation and sustainable development, 459–463, *463*, 475
uneven distribution of, 466
Synfuels, 333
Systemic changes/transitions, *14–15*, 15–16, 21–22, 315, **323–349**, 449, 476
  enabling, 315–318
  rates of change, 322–323
  *See also* Transitions

**T**

Tanzania, indigenous knowledge used in, *360*
Technology, 22
  access to, 23
  biotechnology/genome modification, 319, 329
  deployment of, 72
  disruptive, 22, 111, 319, 323
  general purpose technologies (GPT)*, 369–370, 383
  information and communication technology (ICT)*, 316, 319
  innovation in, 19, 21, 22, 316, 369–370
  innovation, enabling, 369–372
  innovation, examples of, *370*
  innovation, knowledge gaps, *391*
  low-carbon, 15, 16, 96, 153, 331
  new, 15, 22, 319
  policies, 95, 148, 370–371
  Power-2-X, 111
  smart technology/IoT, 331
  standards, 332, 378
Technology transfer*, 19, 23, 371–372, *371*, 449, 474
Temperature, *182*
  carbon budget, emissions, and, 96
  datasets, *53*, 56, 57, *58*, 59, 1.SM.1
  fluctuations in, natural, 56, 59
  global average, defined, 56–57, 81
  global mean surface temperature (GMST)*, 56–57, *57*, 177, 186
  heat-related morbidity and mortality, 9, 11, 180, 240–241, *250*, 252, *252*, 263, *264*, 3.SM.3.3.1
  heatwaves*, 9, 177–178, 263, *264*
  land-sea contrast in warming, 8, 51, 59, 187, 190, 205
  land surface air temperature*, 56
  number of hot days, 190, *193*, 210
  observed warming, *6*, 51, 53, *53, 58*, 106, 189–191, 1.SM.1, 1.SM.2, 1.SM.3, 1.SM.6
  peak in, 5, 96, 101, 104, 177, *277*
  peak, reducing after, 17, 18, *278*
  projections, 4, 7, 177, 187–188, *188*, 190–191, *192, 193*
  rate of change, *54*, 177, 178
  regional variation in, 177, *283*
  sea surface temperature (SST)*, 51, 204, 223–224, *248*
  temperatures used in definition of 1.5°C, 51, 187, *188*
  *See also* Global warming
Temperature extremes, 255, 263
  hotspots (key risks), 190–191, *193*

and human health, 263, *264*
observed, *210*
probability ratio of, *192*
projected, 7, 177, *189*, 190–191, *192, 210*, 255
Sub-Saharan Africa, *197*
Temperature overshoot*. *See* Overshoot
Temperature threshold, *65*, 66
Terrestrial ecosystems, 8, 179, 216–221, *247, 252*, 3.SM.3.3.7
  biomass and carbon stocks, 219, *220*
  biome shifts, 216, *217, 247, 250*
  ecosystem function, 219
  impacts and risks at 1.5°C, *vs.* 2°C, *8, 11*, 179, 216–221, *247*, 251, *252*, 3.SM.3.3.7, Table 3.SM.2
  knowledge gaps, 272
  phenology, 216–218
  productivity, *220*
  regional and ecosystem-specific risks, 219–221
  respiration, 219
  severe ecosystem changes, *217*
Thermohaline circulation. *See* Atlantic Meridional Overturning Circulation (AMOC)
Tipping points*, *182*, 262–263, *264*, 270, 282
  identifying, 458
  *See also* Irreversibility
Tourism, *11*, 178, 181, **242–243**, 253, 3.SM.3.3.2
  coastal areas, 229, 253
  observed impacts, 181
  projected impacts, 181, 242–243, 253
  risks, 181, 253
  seasonal, 181, 243
Trade-offs, 18–19, 72, 73, *269*, 4.SM.4.5.1, 4.SM.5.2
  example of, 477
  knowledge gaps, *391*
  mitigation options and sustainable development, 459–463, *465*
  reconciling, 467
  with SDGs, 19, 73
  specific mitigation options, 97
  uneven distribution of, 466
Transformation*, 22, 52, 70, 73, 112, 129–157, 315, 468–469
  1.5°C pathways*, 95, 112–113, 129–148, 448, 452
  1.5°C warmer worlds*, 73
  challenges, opportunities, and co-impacts, 148–157
  cities/urban areas, *472–474*
  in climate-resilient development pathways, 468–469
  context-specific, 469
  energy system, 129–144, 463
  FAQ on, 392–393, *393*
  feasibility of, 52, 72
  fundamental elements of, 73
  implementing, *276*
  societal (social) transformation*, 22, 52, 73, 448–449, 466
  sustainable development and, 22, 448, 456
  trade-offs, 73
  upscaling and accelerating, 314
  whole systems approach, 392
  *See also* Transitions
Transformation pathways*. *See* Pathways

Exhibit 18 to Decl. of Scheehle
1829

Index

Index

Transformational adaptation. *See* Adaptation
Transient climate response*, 184–185
   *See also* Climate sensitivity
Transient climate response to cumulative $CO_2$ emissions (TCRE)*, 96, 104, 106
Transition Movement, 480
Transition Towns (TTs), *473–474*
Transitions*, *14–15*, 15–16, 21–22, 73, 315–318, **323–349**, 4.SM.4.2.1-4.SM.4.2.5, 4.SM.4.3.1-4.SM.4.3.5
   adaptation options* supporting, 321, 336–337, *338*
   enabling, 19, 21–22, 315–318
   in energy sector, 15, 96–97, 315, **324–327**, 374–375, 4.SM.4.2.1, 4.SM.4.3.1
   equity* in, 22
   FAQ on, 392–393, *393*
   in land use, 16, 17, 96, 97, 315, **327–329**, 4.SM.4.3.2
   policies supporting, 22
   risks and ethics, 319
   speed and scale of, 15, 314, 317, 320, 320, 322–323, 392, 394
   sustainable development and, 22
   synergies, 316, 4.SM.5.2
   system/sector transitions, *14–15*, 15–16, 21–22, 96–97, 315–318, **323–349**
   *See also* specific sectors
Transnational emission reduction initiatives (TERIs), 149
Transport sector, 244, 316, 332–333
   biofuels, 325
   car/transport pricing policies, *366*
   decarbonization* of, 316, 461
   demotorization, 316, *366, 376*
   electric vehicle (EV)*, 316, 332–333, *333*
   electrification of, 332–333, *333*, 460
   emissions, 96, 114, 142–144, *143*
   emissions reduction, *366*
   final energy demand and use, *139*, 142–144, *143*, 332
   impacts of weather and climate on, 244
   international transport, 333
   investments in, *373–374*
   road safety for pedestrians, 461
   road transport, 142–143, 461
   strategies to reduce energy consumption, 142
   sustainable transport, 332
   technological innovations, *370*
   transitions, 15–16, 316
   transitions, speed and scale of, 320, *320*
   urban environments, 316, **332**
Tropical cyclone*, 203–204, *211*
   Cyclone Pam, 471
Tundra, 8, 179, 216, 220
   tipping points*, 262, *264*

U

Uncertainty*, 69, **77**
   of climate response to mitigation, 60, 63
   geophysical, 96, 101–104
   in mitigation pathways, 60, 63

   propagation of, 3.SM.1.3
Unique and threatened systems, 10, *11*, 181, 251, 253–255, *254*
United Kingdom Overseas Territories (UKOT), *339*
United Nations Framework Convention on Climate Change (UNFCCC)*, 79, *80*, 353
   adaptation financing, 21
   Conference of the Parties (COP)*, 79
   Green Climate Fund, *74*, 379
Uptake*. *See* Carbon sequestration
Urban areas, 180, 241–242, **330–334**
   adaptation examples, *340–341*
   adaptation options*, 10, 70, 263, 384–386, *385*, 4.SM.4.3.3
   agriculture in, 316
   demotorization, 316, *366, 376*
   energy systems, 331
   feasibility of adaptation options, 384–386, *385*
   feasibility of mitigation options, *382*
   global urbanization, *472*
   governance, *473*
   green infrastructure*, 10, 334, *334, 385*
   heat island effect, 9, 180, 242
   heat-related extreme events, 241–242
   impacts and risks, 180, *182*, 183, 241–242
   informal urban settlements, *473*
   infrastructure, 331, 333
   knowledge gaps, *388–389*
   land use, 316, 333
   low-carbon cities, 331
   mitigation options*, 4.SM.4.2.3
   numbers of people in, 330, *340*
   peri-urban agriculture, 316
   poverty and, 242
   risks and risk reduction, 331, 456
   sea level rise and, 231–232, 241
   transformation* in, *472–474*
   transformational adaptation, 386
   Transition Towns (TTs), *473–474*
   transitions, 15–16, 316, 330–334, 4.SM.4.2.3, 4.SM.4.3.3
   transport, 316, 331, 332–333
   urban planning, 148
   water services, 316, 334
   *See also* specific cities
Urban heat islands, 9, 180, 242

V

Values, 22, 71, 317, 364–365
   re-examination of, 449, 469, 475
   societal, 448, 476
   value judgements, 55
Vanuatu, planning for climate-resilience, 449, *471*
Vector-borne disease, 9, 180, 241
   *Aedes* mosquitoes, 241
Vulnerability*, 69, 447
   disproportionate impacts and, 9, 51, 447
   factors influencing, 53
   international cooperation and, 23
   multiple, interrelated climate risks, 10
   new vulnerabilities, 10

   redistributive policies and, 21
   reducing, 19, 447, 457
   risks and, 53, 452
   sustainable development and, 447
   systemic, 22, 447, 457

W

Warm Spell Duration Index (WSDI), 190
Water availability, 178, 213–214
Water cycle. *See* Hydrological cycle
Water management, 10
Water resources, 179, *182*, 213–216, 464–466
   bottom-up initiatives, *368*
   demand for, 464–466
   groundwater, 181, 215, 3.SM.3.1.1.3
   impacts and risks, 213–216, *247*
   irrigation, 201, 215, 267, *267*, 315, **328**, 384, 466
   projections, 179
   regional, 179, *247*
   in urban areas, 316, 334
   water-energy-food (WEF) nexus, 386–387
   water quality, 215–216, 3.SM.3.1.1.4
   water temperature, 214
   watershed management, *356*
   *See also* Precipitation
Water scarcity, 179, 213, 452, *453*, 466
Water security, 464–466
Water stress, 9, 181, *247*, 452, 466
Well-being*, 18, 180
   Bhutan's happiness index, *387*
   place-specific adaptation and, 447
   well-being for all, 469
Wetlands, 179, 225, 254, 330, Table 3.SM.2
   management, 330
   methane release from, 12
   salinization of, 233
   sea level rise and, 233
Wind energy, 96, 131, *131, 132–133*

Z

Zero emissions commitment (ZEC), 64–65, *65*

Index

Exhibit 18 to Decl. of Scheehle
1830

ER-1490

(36 of 296), Page 36 of 296 Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 36 of 296
Case 2:24-cv-00801-ODW-PVC Document 53-2 Filed 07/24/24 Page 1 of 117 Page ID
#:1677

# Exhibit 2

## to Declaration of James P. Burton

**World Resources Institute & World Business Council for Sustainable Development,** ***The GHG Protocol Corporate Accounting and Reporting Standard*** **(2004),**

https://ghgprotocol.org/sites/default/files/standards/ghg-protocol-revised.pdf

Exhibit 2 to Decl. of Burton
32

ER-1491

# The Greenhouse Gas Protocol



## A Corporate Accounting and Reporting Standard

REVISED EDITION



World Business Council for
Sustainable Development



WORLD
RESOURCES
INSTITUTE

Exhibit 2 to Decl. of Burton
33

ER-1492

## GHG Protocol Initiative Team

| | |
|---|---|
| Janet Ranganathan | World Resources Institute |
| Laurent Corbier | World Business Council for Sustainable Development |
| Pankaj Bhatia | World Resources Institute |
| Simon Schmitz | World Business Council for Sustainable Development |
| Peter Gage | World Resources Institute |
| Kjell Oren | World Business Council for Sustainable Development |

## Revision Working Group

| | |
|---|---|
| Brian Dawson & Matt Spannagle | Australian Greenhouse Office |
| Mike McMahon | BP |
| Pierre Boileau | Environment Canada |
| Rob Frederick | Ford Motor Company |
| Bruno Vanderborght | Holcim |
| Fraser Thomson | International Aluminum Institute |
| Koichi Kitamura | Kansai Electric Power Company |
| Chi Mun Woo & Naseem Pankhida | KPMG |
| Reid Miner | National Council for Air and Stream Improvement |
| Laurent Segalen | PricewaterhouseCoopers |
| Jasper Koch | Shell Global Solutions International B.V. |
| Somnath Bhattacharjee | The Energy Research Institute |
| Cynthia Cummis | US Environmental Protection Agency |
| Clare Breidenich | UNFCCC |
| Rebecca Eaton | World Wildlife Fund |

## Core Advisors

| | |
|---|---|
| Michael Gillenwater | Independent Expert |
| Melanie Eddis | KPMG |
| Marie Marache | PricewaterhouseCoopers |
| Roberto Acosta | UNFCCC |
| Vincent Camobreco | US Environmental Protection Agency |
| Elizabeth Cook | World Resources Institute |

Exhibit 2 to Decl. of Burton 34

ER-1493

# Table of Contents

| Introduction | The Greenhouse Gas Protocol Initiative | | 2 |
|---|---|---|---|
| Chapter 1 | GHG Accounting and Reporting Principles | STANDARD GUIDANCE | 6 |
| Chapter 2 | Business Goals and Inventory Design | GUIDANCE | 10 |
| Chapter 3 | Setting Organizational Boundaries | STANDARD GUIDANCE | 16 |
| Chapter 4 | Setting Operational Boundaries | STANDARD GUIDANCE | 24 |
| Chapter 5 | Tracking Emissions Over Time | STANDARD GUIDANCE | 34 |
| Chapter 6 | Identifying and Calculating GHG Emissions | GUIDANCE | 40 |
| Chapter 7 | Managing Inventory Quality | GUIDANCE | 48 |
| Chapter 8 | Accounting for GHG Reductions | GUIDANCE | 58 |
| Chapter 9 | Reporting GHG Emissions | STANDARD GUIDANCE | 62 |
| Chapter 10 | Verification of GHG Emissions | GUIDANCE | 68 |
| Chapter 11 | Setting GHG Targets | GUIDANCE | 74 |
| Appendix A | Accounting for Indirect Emissions from Electricity | | 86 |
| Appendix B | Accounting for Sequestered Atmospheric Carbon | | 88 |
| Appendix C | Overview of GHG Programs | | 90 |
| Appendix D | Industry Sectors and Scopes | | 92 |
| Acronyms | | | 95 |
| Glossary | | | 96 |
| References | | | 103 |
| Contributors | | | 104 |



Exhibit 2 to Decl. of Burton 35

**ER-1494**

# Introduction



The Greenhouse Gas Protocol Initiative is a multi-stakeholder partnership of businesses, non-governmental organizations (NGOs), governments, and others convened by the World Resources Institute (WRI), a U.S.-based environmental NGO, and the World Business Council for Sustainable Development (WBCSD), a Geneva-based coalition of 170 international companies. Launched in 1998, the Initiative's mission is to develop internationally accepted greenhouse gas (GHG) accounting and reporting standards for business and to promote their broad adoption.

The GHG Protocol Initiative comprises two separate but linked standards:

- *GHG Protocol Corporate Accounting and Reporting Standard* (this document, which provides a step-by-step guide for companies to use in quantifying and reporting their GHG emissions)

- *GHG Protocol Project Quantification Standard* (forthcoming: a guide for quantifying reductions from GHG mitigation projects)

2

Exhibit 2 to Decl. of Burton 36

ER-1495

INTRODUCTION                                                                                          3

The first edition of the *GHG Protocol Corporate Accounting and Reporting Standard (GHG Protocol Corporate Standard),* published in September 2001, enjoyed broad adoption and acceptance around the globe by businesses, NGOs, and governments. Many industry, NGO, and government GHG programs[1] used the standard as a basis for their accounting and reporting systems. Industry groups, such as the International Aluminum Institute, the International Council of Forest and Paper Associations, and the WBCSD Cement Sustainability Initiative, partnered with the GHG Protocol Initiative to develop complementary industry-specific calculation tools. Widespread adoption of the standard can be attributed to the inclusion of many stakeholders in its development and to the fact that it is robust, practical, and builds on the experience and expertise of numerous experts and practitioners.

This revised edition of the *GHG Protocol Corporate Standard* is the culmination of a two-year multi-stakeholder dialogue, designed to build on experience gained from using the first edition. It includes additional guidance, case studies, appendices, and a new chapter on setting a GHG target. For the most part, however, the first edition of the Corporate Standard has stood the test of time, and the changes in this revised edition will not affect the results of most GHG inventories.

This *GHG Protocol Corporate Standard* provides standards and guidance for companies and other types of organizations[2] preparing a GHG emissions inventory. It covers the accounting and reporting of the six greenhouse gases covered by the Kyoto Protocol — carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$), hydrofluorocarbons (HFCs), perfluorocarbons (PFCs), and sulphur hexafluoride ($SF_6$). The standard and guidance were designed with the following objectives in mind:

- To help companies prepare a GHG inventory that represents a true and fair account of their emissions, through the use of standardized approaches and principles

- To simplify and reduce the costs of compiling a GHG inventory

- To provide business with information that can be used to build an effective strategy to manage and reduce GHG emissions

- To provide information that facilitates participation in voluntary and mandatory GHG programs

- To increase consistency and transparency in GHG accounting and reporting among various companies and GHG programs.

Both business and other stakeholders benefit from converging on a common standard. For business, it reduces costs if their GHG inventory is capable of meeting different internal and external information requirements. For others, it improves the consistency, transparency, and understandability of reported information, making it easier to track and compare progress over time.

## The business value of a GHG inventory

Global warming and climate change have come to the fore as a key sustainable development issue. Many governments are taking steps to reduce GHG emissions through national policies that include the introduction of emissions trading programs, voluntary programs, carbon or energy taxes, and regulations and standards on energy efficiency and emissions. As a result, companies must be able to understand and manage their GHG risks if they are to ensure long-term success in a competitive business environment, and to be prepared for future national or regional climate policies.

A well-designed and maintained corporate GHG inventory can serve several business goals, including:

- Managing GHG risks and identifying reduction opportunities

- Public reporting and participation in voluntary GHG programs

- Participating in mandatory reporting programs

- Participating in GHG markets

- Recognition for early voluntary action.

## Who should use this standard?

This standard is written primarily from the perspective of a business developing a GHG inventory. However, it applies equally to other types of organizations with operations that give rise to GHG emissions, e.g., NGOs, government agencies, and universities.[3] It should not be used to quantify the reductions associated with GHG mitigation projects for use as offsets or credits—the forthcoming *GHG Protocol Project Quantification Standard* will provide standards and guidance for this purpose.

Policy makers and architects of GHG programs can also use relevant parts of this standard as a basis for their own accounting and reporting requirements.



Exhibit 2 to Decl. of Burton
37                                                                          ER-1496

(42 of 296) Page 42 of 296 Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 42 of 296
Case 2:24-cv-00801-ODW-PVC   Document 53-2   Filed 07/24/24   Page 7 of 117   Page ID
#:1683

# Introduction

## Relationship to other GHG programs

It is important to distinguish between the GHG Protocol Initiative and other GHG programs. The *GHG Protocol Corporate Standard* focuses only on the accounting and reporting of emissions. It does not require emissions information to be reported to WRI or WBCSD. In addition, while this standard is designed to develop a verifiable inventory, it does not provide a standard for how the verification process should be conducted.

The *GHG Protocol Corporate Standard* has been designed to be program or policy neutral. However, many existing GHG programs use it for their own accounting and reporting requirements and it is compatible with most of them, including:

- Voluntary GHG reduction programs, e.g., the World Wildlife Fund (WWF) Climate Savers, the U.S. Environmental Protection Agency (EPA) Climate Leaders, the Climate Neutral Network, and the Business Leaders Initiative on Climate Change (BLICC)

- GHG registries, e.g., California Climate Action Registry (CCAR), World Economic Forum Global GHG Registry

- National and regional industry initiatives, e.g., New Zealand Business Council for Sustainable Development, Taiwan Business Council for Sustainable Development, Association des entreprises pour la réduction des gaz à effet de serre (AERES)

- GHG trading programs,[4] e.g., UK Emissions Trading Scheme (UK ETS), Chicago Climate Exchange (CCX), and the European Union Greenhouse Gas Emissions Allowance Trading Scheme (EU ETS)

- Sector-specific protocols developed by a number of industry associations, e.g., International Aluminum Institute, International Council of Forest and Paper Associations, International Iron and Steel Institute, the WBCSD Cement Sustainability Initiative, and the International Petroleum Industry Environmental Conservation Association (IPIECA).

Since GHG programs often have specific accounting and reporting requirements, companies should always check with any relevant programs for any additional requirements before developing their inventory.

## GHG calculation tools

To complement the standard and guidance provided here, a number of cross-sector and sector-specific calculation tools are available on the GHG Protocol Initiative website (www.ghgprotocol.org), including a guide for small office-based organizations (see chapter 6 for full list). These tools provide step-by-step guidance and electronic worksheets to help users calculate GHG emissions from specific sources or industries. The tools are consistent with those proposed by the Intergovernmental Panel on Climate Change (IPCC) for compilation of emissions at the national level (IPCC, 1996). They have been refined to be user-friendly for non-technical company staff and to increase the accuracy of emissions data at a company level. Thanks to help from many companies, organizations, and individual experts through an intensive review of the tools, they are believed to represent current "best practice."

## Reporting in accordance with the *GHG Protocol Corporate Standard*

The GHG Protocol Initiative encourages the use of the *GHG Protocol Corporate Standard* by all companies regardless of their experience in preparing a GHG inventory. The term "shall" is used in the chapters containing standards to clarify what is required to prepare and report a GHG inventory in accordance with the *GHG Protocol Corporate Standard*. This is intended to improve the consistency with which the standard is applied and the resulting information that is publicly reported, without departing from the initial intent of the first edition. It also has the advantage of providing a verifiable standard for companies interested in taking this additional step.

## Overview of main changes to the first edition

This revised edition contains additional guidance, case studies, and annexes. A new guidance chapter on setting GHG targets has been added in response to many requests from companies that, having developed an inventory, wanted to take the next step of setting a target. Appendices have been added on accounting for indirect emissions from electricity and on accounting for sequestered atmospheric carbon.

Exhibit 2 to Decl. of Burton 38

**ER-1497**

(43 of 296) Page 43 of 296Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 43 of 296
Case 2:24-cv-00801-ODW-PVC Document 53-2 Filed 07/24/24 Page 8 of 117 Page ID
#:1684

INTRODUCTION                                                                    5

Changes to specific chapters include:

- **CHAPTER 1:** Minor rewording of principles.

- **CHAPTER 2:** Goal-related information on operational boundaries has been updated and consolidated.

- **CHAPTER 3:** Although still encouraged to account for emissions using both the equity and control approaches, companies may now report using one approach. This change reflects the fact that not all companies need both types of information to achieve their business goals. New guidance has been provided on establishing control. The minimum equity threshold for reporting purposes has been removed to enable emissions to be reported when significant.

- **CHAPTER 4:** The definition of scope 2 has been revised to exclude emissions from electricity purchased for resale—these are now included in scope 3. This prevents two or more companies from double counting the same emissions in the same scope. New guidance has been added on accounting for GHG emissions associated with electricity transmission and distribution losses. Additional guidance provided on Scope 3 categories and leasing.

- **CHAPTER 5:** The recommendation of pro-rata adjustments was deleted to avoid the need for two adjustments. More guidance has been added on adjusting base year emissions for changes in calculation methodologies.

- **CHAPTER 6:** The guidance on choosing emission factors has been improved.

- **CHAPTER 7:** The guidance on establishing an inventory quality management system and on the applications and limitations of uncertainty assessment has been expanded.

- **CHAPTER 8:** Guidance has been added on accounting for and reporting project reductions and offsets in order to clarify the relationship between the *GHG Protocol Corporate* and *Project Standards*.

- **CHAPTER 9:** The required and optional reporting categories have been clarified.

- **CHAPTER 10:** Guidance on the concepts of materiality and material discrepancy has been expanded.

- **CHAPTER 11:** New chapter added on steps in setting a target and tracking and reporting progress.

## Frequently asked questions...

Below is a list of frequently asked questions, with directions to the relevant chapters.

- What should I consider when setting out to account for and report emissions? **CHAPTER 2**

- How do I deal with complex company structures and shared ownership? **CHAPTER 3**

- What is the difference between direct and indirect emissions and what is their relevance? **CHAPTER 4**

- Which indirect emissions should I report? **CHAPTER 4**

- How do I account for and report outsourced and leased operations? **CHAPTER 4**

- What is a base year and why do I need one? **CHAPTER 5**

- My emissions change with acquisitions and divestitures. How do I account for these? **CHAPTER 5**

- How do I identify my company's emission sources? **CHAPTER 6**

- What kinds of tools are there to help me calculate emissions? **CHAPTER 6**

- What data collection activities and data management issues do my facilities have to deal with? **CHAPTER 6**

- What determines the quality and credibility of my emissions information? **CHAPTER 7**

- How should I account for and report GHG offsets that I sell or purchase? **CHAPTER 8**

- What information should be included in a GHG public emissions report? **CHAPTER 9**

- What data must be available to obtain external verification of the inventory data? **CHAPTER 10**

- What is involved in setting an emissions target and how do I report performance in relation to my target? **CHAPTER 11**

**NOTES**

[1] GHG program is a generic term used to refer to any voluntary or mandatory international, national, sub-national government or non-governmental authority that registers, certifies, or regulates GHG emissions or removals.

[2] Throughout the rest of this document, the term "company" or "business" is used as shorthand for companies, businesses and other types of organizations.

[3] For example, WRI uses the *GHG Protocol Corporate Standard* to publicly report its own emissions on an annual basis and to participate in the Chicago Climate Exchange.

[4] Trading programs that operate at the level of facilities primarily use the GHG Protocol Initiative calculation tools.

Exhibit 2 to Decl. of Burton
39

ER-1498

# 1 GHG Accounting and Reporting Principles



**A**s with financial accounting and reporting, generally accepted GHG accounting principles are intended to underpin and guide GHG accounting and reporting to ensure that the reported information represents a faithful, true, and fair account of a company's GHG emissions.



6

Exhibit 2 to Decl. of Burton
40

ER-1499

GHG accounting and reporting practices are evolving and are new to many businesses; however, the principles listed below are derived in part from generally accepted financial accounting and reporting principles. They also reflect the outcome of a collaborative process involving stakeholders from a wide range of technical, environmental, and accounting disciplines.

GHG accounting and reporting shall be based on the following principles:

**RELEVANCE**        Ensure the GHG inventory appropriately reflects the GHG emissions of the company and serves the decision-making needs of users – both internal and external to the company.

**COMPLETENESS**        Account for and report on all GHG emission sources and activities within the chosen inventory boundary. Disclose and justify any specific exclusions.

**CONSISTENCY**        Use consistent methodologies to allow for meaningful comparisons of emissions over time. Transparently document any changes to the data, inventory boundary, methods, or any other relevant factors in the time series.

**TRANSPARENCY**        Address all relevant issues in a factual and coherent manner, based on a clear audit trail. Disclose any relevant assumptions and make appropriate references to the accounting and calculation methodologies and data sources used.

**ACCURACY**        Ensure that the quantification of GHG emissions is systematically neither over nor under actual emissions, as far as can be judged, and that uncertainties are reduced as far as practicable. Achieve sufficient accuracy to enable users to make decisions with reasonable assurance as to the integrity of the reported information.

S T A N D A R D



Exhibit 2 to Decl. of Burton 41

**ER-1500**

# GHG Accounting and Reporting Principles

**G U I D A N C E**

These principles are intended to underpin all aspects of GHG accounting and reporting. Their application will ensure that the GHG inventory constitutes a true and fair representation of the company's GHG emissions. Their primary function is to guide the implementation of the GHG Protocol Corporate Standard, particularly when the application of the standards to specific issues or situations is ambiguous.

## Relevance

For an organization's GHG report to be relevant means that it contains the information that users—both internal and external to the company—need for their decision making. An important aspect of relevance is the selection of an appropriate inventory boundary that reflects the substance and economic reality of the company's business relationships, not merely its legal form. The choice of the inventory boundary is dependent on the characteristics of the company, the intended purpose of information, and the needs of the users. When choosing the inventory boundary, a number of factors should be considered, such as:

- Organizational structures: control (operational and financial), ownership, legal agreements, joint ventures, etc.

- Operational boundaries: on-site and off-site activities, processes, services, and impacts

- Business context: nature of activities, geographic locations, industry sector(s), purposes of information, and users of information

More information on defining an appropriate inventory boundary is provided in chapters 2, 3, and 4.

## Completeness

All relevant emissions sources within the chosen inventory boundary need to be accounted for so that a comprehensive and meaningful inventory is compiled. In practice, a lack of data or the cost of gathering data may be a limiting factor. Sometimes it is tempting to define a minimum emissions accounting threshold (often referred to as a materiality threshold) stating that a source not exceeding a certain size can be omitted from the inventory. Technically, such a threshold is simply a predefined and accepted negative bias in estimates (i.e., an underestimate). Although it appears useful in theory, the practical implementation of such a threshold is not compatible with the completeness principle of the GHG Protocol Corporate Standard. In order to utilize a materiality specification, the emissions from a particular source or activity would have to be quantified to ensure they were under the threshold. However, once emissions are quantified, most of the benefit of having a threshold is lost.

A threshold is often used to determine whether an error or omission is a material discrepancy or not. This is not the same as a de minimis for defining a complete inventory. Instead companies need to make a good faith effort to provide a complete, accurate, and consistent accounting of their GHG emissions. For cases where emissions have not been estimated, or estimated at an insufficient level of quality, it is important that this is transparently documented and justified. Verifiers can determine the potential impact and relevance of the exclusion, or lack of quality, on the overall inventory report.

More information on completeness is provided in chapters 7 and 10.

## Consistency

Users of GHG information will want to track and compare GHG emissions information over time in order to identify trends and to assess the performance of the reporting company. The consistent application of accounting approaches, inventory boundary, and calculation methodologies is essential to producing comparable GHG emissions data over time. The GHG information for all operations within an organization's inventory boundary needs to be compiled in a manner that ensures that the aggregate information is internally consistent and comparable over time. If there are changes in the inventory boundary, methods, data or any other factors affecting emission estimates, they need to be transparently documented and justified.

More information on consistency is provided in chapters 5 and 9.

8    CHAPTER 1

Exhibit 2 to Decl. of Burton
42

**ER-1501**

CHAPTER 1   GHG Accounting and Reporting Principles     9

**Volkswagen:**
**Maintaining completeness over time**

Volkswagen is a global auto manufacturer and the largest automaker in Europe. While working on its GHG inventory, Volkswagen realized that the structure of its emission sources had undergone considerable changes over the last seven years. Emissions from production processes, which were considered to be irrelevant at a corporate level in 1996, today constitute almost 20 percent of aggregated GHG emissions at the relevant plant sites. Examples of growing emissions sources are new sites for engine testing or the investment into magnesium die-casting equipment at certain production sites. This example shows that emissions sources have to be regularly re-assessed to maintain a complete inventory over time.

### Accuracy

Data should be sufficiently precise to enable intended users to make decisions with reasonable assurance that the reported information is credible. GHG measurements, estimates, or calculations should be systemically neither over nor under the actual emissions value, as far as can be judged, and that uncertainties are reduced as far as practicable. The quantification process should be conducted in a manner that minimizes uncertainty. Reporting on measures taken to ensure accuracy in the accounting of emissions can help promote credibility while enhancing transparency.

More information on accuracy is provided in chapter 7.

### Transparency

Transparency relates to the degree to which information on the processes, procedures, assumptions, and limitations of the GHG inventory are disclosed in a clear, factual, neutral, and understandable manner based on clear documentation and archives (i.e., an audit trail). Information needs to be recorded, compiled, and analyzed in a way that enables internal reviewers and external verifiers to attest to its credibility. Specific exclusions or inclusions need to be clearly identified and justified, assumptions disclosed, and appropriate references provided for the methodologies applied and the data sources used. The information should be sufficient to enable a third party to derive the same results if provided with the same source data. A "transparent" report will provide a clear understanding of the issues in the context of the reporting company and a meaningful assessment of performance. An independent external verification is a good way of ensuring transparency and determining that an appropriate audit trail has been established and documentation provided.

More information on transparency is provided in chapters 9 and 10.

**The Body Shop: Solving the trade-off**
**between accuracy and completeness**

As an international, values-driven retailer of skin, hair, body care, and make-up products, the Body Shop operates nearly 2,000 locations, serving 51 countries in 29 languages. Achieving both accuracy and completeness in the GHG inventory process for such a large, disaggregated organization, is a challenge. Unavailable data and costly measurement processes present significant obstacles to improving emission data accuracy. For example, it is difficult to disaggregate energy consumption information for shops located within shopping centers. Estimates for these shops are often inaccurate, but excluding sources due to inaccuracy creates an incomplete inventory.

The Body Shop, with help from the Business Leaders Initiative on Climate Change (BLICC) program, approached this problem with a two-tiered solution. First, stores were encouraged to actively pursue direct consumption data through disaggregated data or direct monitoring. Second, if unable to obtain direct consumption data, stores were given standardized guidelines for estimating emissions based on factors such as square footage, equipment type, and usage hours. This system replaced the prior fragmentary approach, provided greater accuracy, and provided a more complete account of emissions by including facilities that previously were unable to calculate emissions. If such limitations in the measurement processes are made transparent, users of the information will understand the basis of the data and the trade-off that has taken place.

G
U
I
D
A
N
C
E

Exhibit 2 to Decl. of Burton
43

ER-1502

(48 of 296) Page 48 of 296 Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 48 of 296
Case 2:24-cv-00801-ODW-PVC Document 53-2 Filed 07/24/24 Page 13 of 117 Page ID
#:1689

# 2 Business Goals and Inventory Design



GUIDANCE

Improving your understanding of your company's GHG emissions by compiling a GHG inventory makes good business sense. Companies frequently cite the following five business goals as reasons for compiling a GHG inventory:

· Managing GHG risks and identifying reduction opportunities

· Public reporting and participation in voluntary GHG programs

· Participating in mandatory reporting programs

· Participating in GHG markets

· Recognition for early voluntary action

GUIDANCE

Exhibit 2 to Decl. of Burton
44

**ER-1503**

CHAPTER 2  Business Goals and Inventory Design          11

Companies generally want their GHG inventory to be capable of serving multiple goals. It therefore makes sense to design the process from the outset to provide information for a variety of different users and uses—both current and future. The GHG Protocol Corporate Standard has been designed as a comprehensive GHG accounting and reporting framework to provide the information building blocks capable of serving most business goals (see Box 1). Thus the inventory data collected according to the GHG Protocol Corporate Standard can be aggregated and disaggregated for various organizational and operational boundaries and for different business geographic scales (state, country, Annex 1 countries, non-Annex 1 countries, facility, business unit, company, etc.).

Appendix C provides an overview of various GHG programs—many of which are based on the GHG Protocol Corporate Standard. The guidance sections of chapters 3 and 4 provide additional information on how to design an inventory for different goals and uses.

## Managing GHG risks and identifying reduction opportunities

Compiling a comprehensive GHG inventory improves a company's understanding of its emissions profile and any potential GHG liability or "exposure." A company's GHG exposure is increasingly becoming a management issue in light of heightened scrutiny by the insurance industry, shareholders, and the emergence of environmental regulations/policies designed to reduce GHG emissions.

In the context of future GHG regulations, significant GHG emissions in a company's value chain may result in increased costs (upstream) or reduced sales (down-stream), even if the company itself is not directly subject to regulations. Thus investors may view significant indi-rect emissions upstream or downstream of a company's operations as potential liabilities that need to be managed and reduced. A limited focus on direct emis-sions from a company's own operations may miss major GHG risks and opportunities, while leading to a misin-terpretation of the company's actual GHG exposure.

On a more positive note, what gets measured gets managed. Accounting for emissions can help identify the most effective reduction opportunities. This can drive increased materials and energy efficiency as well as the development of new products and services that reduce the GHG impacts of customers or suppliers. This in turn can reduce production costs and help differen-tiate the company in an increasingly environmentally conscious marketplace. Conducting a rigorous GHG inventory is also a prerequisite for setting an internal or public GHG target and for subsequently measuring and reporting progress.

---

**BOX 1.  Business goals served by GHG inventories**

**Managing GHG risks and identifying reduction opportunities**
- Identifying risks associated with GHG constraints in the future
- Identifying cost effective reduction opportunities
- Setting GHG targets, measuring and reporting progress

**Public reporting and participation in voluntary GHG programs**
- Voluntary stakeholder reporting of GHG emissions and progress towards GHG targets
- Reporting to government and NGO reporting programs, including GHG registries
- Eco-labelling and GHG certification

**Participating in mandatory reporting programs**
- Participating in government reporting programs at the national, regional, or local level

**Participating in GHG markets**
- Supporting internal GHG trading programs
- Participating in external cap and trade allowance trading programs
- Calculating carbon/GHG taxes

**Recognition for early voluntary action**
- Providing information to support "baseline protection" and/or credit for early action

GUIDANCE

Exhibit 2 to Decl. of Burton
45

ER-1504

(50 of 296) Page 50 of 296Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 50 of 296
Case 2:24-cv-00801-ODW-PVC Document 53-2 Filed 07/24/24 Page 15 of 117 Page ID
#:1691

# Business Goals and Inventory Design

## IBM: The role of renewable energy in reducing GHG emissions

Indirect emissions associated with the consumption of purchased electricity are a required element of any company's accounting and reporting under the *GHG Protocol Corporate Standard*. Because purchased electricity is a major source of GHG emissions for companies, it presents a significant reduction opportunity. IBM, a major information technology company and a member of the WRI's Green Power Market Development Group, has systematically accounted for these indirect emissions and thus identified the significant potential to reduce them. The company has implemented a variety of strategies that would reduce either their demand for purchased energy or the GHG intensity of that purchased energy. One strategy has been to pursue the renewable energy market to reduce the GHG intensity of its purchased electricity.

IBM succeeded in reducing its GHG emissions at its facility in Austin, Texas, even as energy use stayed relatively constant, through a contract for renewable electricity with the local utility company, Austin Energy. Starting in 2001, this five-year contract is for 5.25 million kWhs of wind-power per year. This zero emission power lowered the facility's inventory by more than 4,100 tonnes of $CO_2$ compared to the previous year and represents nearly 5% of the facility's total electricity consumption. Company-wide, IBM's 2002 total renewable energy procurement was 66.2 million kWh, which represented 1.3% of its electricity consumption worldwide and 31,550 tonnes of $CO_2$ compared to the previous year. Worldwide, IBM purchased a variety of sources of renewable energy including wind, biomass and solar.

By accounting for these indirect emissions and looking for associated reduction opportunities, IBM has successfully reduced an important source of its overall GHG emissions.

## Public reporting and participation in voluntary GHG programs

As concerns over climate change grow, NGOs, investors, and other stakeholders are increasingly calling for greater corporate disclosure of GHG information. They are interested in the actions companies are taking and in how the companies are positioned relative to their competitors in the face of emerging regulations. In response, a growing number of companies are preparing stakeholder reports containing information on GHG emissions. These may be stand-alone reports on GHG emissions or broader environmental or sustainability reports. For example, companies preparing sustainability reports using the Global Reporting Initiative guidelines should include information on GHG emissions in accordance with the GHG Protocol Corporate Standard (GRI, 2002). Public reporting can also strengthen relationships with other stakeholders. For instance, companies can improve their standing with customers and with the public by being recognized for participating in voluntary GHG programs.

Some countries and states have established GHG registries where companies can report GHG emissions in a public database. Registries may be administered by governments (e.g., U.S. Department of Energy 1605b Voluntary Reporting Program), NGOs (e.g., California Climate Action Registry), or industry groups (e.g., World Economic Forum Global GHG Registry). Many GHG programs also provide help to companies setting voluntary GHG targets.

Most voluntary GHG programs permit or require the reporting of direct emissions from operations (including all six GHGs), as well as indirect GHG emissions from purchased electricity. A GHG inventory prepared in accordance with the GHG Protocol Corporate Standard will usually be compatible with most requirements (Appendix C provides an overview of the reporting requirements of some GHG programs). However, since the accounting guidelines of many voluntary programs are periodically updated, companies planning to participate are advised to contact the program administrator to check the current requirements.

Exhibit 2 to Decl. of Burton 46



## Participating in mandatory reporting programs

Some governments require GHG emitters to report their emissions annually. These typically focus on direct emissions from operations at operated or controlled facilities in specific geographic jurisdictions. In Europe, facilities falling under the requirements of the Integrated Pollution Prevention and Control (IPPC) Directive must report emissions exceeding a specified threshold for each of the six GHGs. The reported emissions are included in a European Pollutant Emissions Register (EPER), a publicly accessible internet-based database that permits comparisons of emissions from individual facilities or industrial sectors in different countries (EC-DGE, 2000). In Ontario, Ontario Regulation 127 requires the reporting of GHG emissions (Ontario MOE, 2001).

## Participating in GHG markets

Market-based approaches to reducing GHG emissions are emerging in some parts of the world. In most places, they take the form of emissions trading programs, although there are a number of other approaches adopted by countries, such as the taxation approach used in Norway. Trading programs can be implemented on a mandatory (e.g., the forthcoming EU ETS) or voluntary basis (e.g., CCX).

Although trading programs, which determine compliance by comparing emissions with an emissions reduction target or cap, typically require accounting only for direct emissions, there are exceptions. The UK ETS, for example, requires direct entry participants to account for GHG emissions from the generation of purchased electricity (DEFRA, 2003). The CCX allows its members the option of counting indirect emissions associated with electricity purchases as a supplemental reduction commitment. Other types of indirect emissions can be more difficult to verify and may present challenges in terms of avoiding double counting. To facilitate independent verification, emissions trading

G U I D A N C E

Exhibit 2 to Decl. of Burton
47
                                        ER-1506

(52 of 296)  Page 52 of 296Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 52 of 296
Case 2:24-cv-00801-ODW-PVC   Document 53-2   Filed 07/24/24   Page 17 of 117   Page ID
#:1693

# Business Goals and Inventory Design

G U I D A N C E

may require participating companies to establish an audit trail for GHG information (see chapter 10).

GHG trading programs are likely to impose additional layers of accounting specificity relating to which approach is used for setting organizational boundaries; which GHGs and sources are addressed; how base years are established; the type of calculation methodology used; the choice of emission factors; and the monitoring and verification approaches employed. The broad participation and best practices incorporated into the GHG Protocol Corporate Standard are likely to inform the accounting requirements of emerging programs, and have indeed done so in the past.

## Recognition for early voluntary action

A credible inventory may help ensure that a corporation's early, voluntary emissions reductions are recognized in future regulatory programs. To illustrate, suppose that in 2000 a company started reducing its GHG emissions by shifting its on-site powerhouse boiler fuel from coal to landfill gas. If a mandatory GHG reduction program is later established in 2005 and it sets 2003 as the base against which reductions are to be measured, the program might not allow the emissions reductions achieved by the green power project prior to 2003 to count toward its target.

However, if a company's voluntary emissions reductions have been accounted for and registered, they are more likely to be recognized and taken into account when regulations requiring reductions go into effect. For instance, the state of California has stated that it will use its best efforts to ensure that organizations that register certified emission results with the California Climate Action Registry receive appropriate consideration under any future international, federal, or state regulatory program relating to GHG emissions.

### Tata Steel: Development of institutional capacity in GHG accounting and reporting

For Tata Steel, Asia's first and India's largest integrated private sector steel company, reducing its GHG emissions through energy efficiency is a key element of its primary business goal: the acceptability of its product in international markets. Each year, in pursuit of this goal, the company launches several energy efficiency projects and introduces less-GHG-intensive processes. The company is also actively pursuing GHG trading markets as a means of further improving its GHG performance. To succeed in these efforts and be eligible for emerging trading schemes, Tata Steel must have an accurate GHG inventory that includes all processes and activities, allows for meaningful benchmarking, measures improvements, and promotes credible reporting.

Tata Steel has developed the capacity to measure its progress in reducing GHG emissions. Tata Steel's managers have access to on-line information on energy usage, material usage, waste and byproduct generation, and other material streams. Using this data and the GHG Protocol calculation tools, Tata Steel generates two key long-term, strategic performance indicators: specific energy consumption (Giga calorie / tonne of crude steel) and GHG intensity (tonne of $CO_2$ equivalent / tonne of crude steel). These indicators are key sustainability metrics in the steel sector worldwide, and help ensure market acceptability and competitiveness. Since the company adopted the *GHG Protocol Corporate Standard*, tracking performance has become more structured and streamlined. This system allows Tata Steel quick and easy access to its GHG inventory and helps the company maximize process and material flow efficiencies.

14    CHAPTER 2

Exhibit 2 to Decl. of Burton
48

ER-1507

(53 of 296) Page 53 of 296Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 53 of 296
Case 2:24-cv-00801-ODW-PVC   Document 53-2   Filed 07/24/24   Page 18 of 117   Page ID
#:1694

CHAPTER 2   Business Goals and Inventory Design          15

## Ford Motor Company: Experiences using the *GHG Protocol Corporate Standard*

When Ford Motor Company, a global automaker, embarked on an effort to understand and reduce its GHG impacts, it wanted to track emissions with enough accuracy and detail to manage them effectively. An internal cross-functional GHG inventory team was formed to accomplish this goal. Although the company was already reporting basic energy and carbon dioxide data at the corporate level, a more detailed understanding of these emissions was essential to set and measure progress against performance targets and evaluate potential participation in external trading schemes.

For several weeks, the team worked on creating a more comprehensive inventory for stationary combustion sources, and quickly found a pattern emerging. All too often team members left meetings with as many questions as answers, and the same questions kept coming up from one week to the next. How should they draw boundaries? How do they account for acquisitions and divestitures? What emission factors should be used? And perhaps most importantly, how could their methodology be deemed credible with stakeholders? Although the team had no shortage of opinions, there also seemed to be no clearly right or wrong answers.

The *GHG Protocol Corporate Standard* helped answer many of these questions and the Ford Motor Company now has a more robust GHG inventory that can be continually improved to fulfill its rapidly emerging GHG management needs. Since adopting the *GHG Protocol Corporate Standard*, Ford has expanded the coverage of its public reporting to all of its brands globally; it now includes direct emissions from sources it owns or controls and indirect emissions resulting from the generation of purchased electricity, heat, or steam. In addition, Ford is a founding member of the Chicago Climate Exchange, which uses some of the *GHG Protocol* calculation tools for emissions reporting purposes.



GUIDANCE

Exhibit 2 to Decl. of Burton
49                                    ER-1508

# 3 Setting Organizational Boundaries



**S T A N D A R D**

**B**usiness operations vary in their legal and organizational structures; they include wholly owned operations, incorporated and non-incorporated joint ventures, subsidiaries, and others. For the purposes of financial accounting, they are treated according to established rules that depend on the structure of the organization and the relationships among the parties involved. In setting organizational boundaries, a company selects an approach for consolidating GHG emissions and then consistently applies the selected approach to define those businesses and operations that constitute the company for the purpose of accounting and reporting GHG emissions.



**S T A N D A R D**
**G U I D A N C E**

16

Exhibit 2 to Decl. of Burton 50

**ER-1509**

For corporate reporting, two distinct approaches can be used to consolidate GHG emissions: the equity share and the control approaches. Companies shall account for and report their consolidated GHG data according to either the equity share or control approach as presented below. If the reporting company wholly owns all its operations, its organizational boundary will be the same whichever approach is used.[1] For companies with joint operations, the organizational boundary and the resulting emissions may differ depending on the approach used. In both wholly owned and joint operations, the choice of approach may change how emissions are categorized when operational boundaries are set (see chapter 4).

## Equity share approach

Under the equity share approach, a company accounts for GHG emissions from operations according to its share of equity in the operation. The equity share reflects economic interest, which is the extent of rights a company has to the risks and rewards flowing from an operation. Typically, the share of economic risks and rewards in an operation is aligned with the company's percentage ownership of that operation, and equity share will normally be the same as the ownership percentage. Where this is not the case, the economic substance of the relationship the company has with the operation always overrides the legal ownership form to ensure that equity share reflects the percentage of economic interest. The principle of economic substance taking precedent over legal form is consistent with international financial reporting standards. The staff preparing the inventory may therefore need to consult with the company's accounting or legal staff to ensure that the appropriate equity share percentage is applied for each joint operation (see Table 1 for definitions of financial accounting categories).



## Control approach

Under the control approach, a company accounts for 100 percent of the GHG emissions from operations over which it has control. It does not account for GHG emissions from operations in which it owns an interest but has no control. Control can be defined in either financial or operational terms. When using the control approach to consolidate GHG emissions, companies shall choose between either the operational control or financial control criteria.

In most cases, whether an operation is controlled by the company or not does not vary based on whether the financial control or operational control criterion is used. A notable exception is the oil and gas industry, which often has complex ownership / operatorship structures. Thus, the choice of control criterion in the oil and gas industry can have substantial consequences for a company's GHG inventory. In making this choice, companies should take into account how GHG emissions accounting and reporting can best be geared to the requirements of emissions reporting and trading schemes, how it can be aligned with financial and environmental reporting, and which criterion best reflects the company's actual power of control.

- Financial Control. The company has financial control over the operation if the former has the ability to direct the financial and operating policies of the latter with a view to gaining economic benefits from its activities.[2] For example, financial control usually exists if the company has the right to the majority of benefits of the operation, however these rights are conveyed. Similarly, a company is considered to financially control an operation if it retains the majority risks and rewards of ownership of the operation's assets.

Under this criterion, the economic substance of the relationship between the company and the operation takes precedence over the legal ownership status, so that the company may have financial control over the operation even if it has less than a 50 percent interest in that operation. In assessing the economic substance of the relationship, the impact of potential voting rights, including both those held by the company and those held by other parties, is also taken into account. This criterion is consistent with international financial accounting standards; therefore, a company has financial control over an operation for GHG accounting purposes if the operation is considered as a group company or subsidiary for the purpose of financial

S
T
A
N
D
A
R
D

Exhibit 2 to Decl. of Burton
51

ER-1510

(56 of 296) Page 56 of 296Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 56 of 296
Case 2:24-cv-00801-ODW-PVC · Document 53-2 · Filed 07/24/24 · Page 21 of 117 · Page ID
#:1697

# Setting Organizational Boundaries

STANDARD

consolidation, i.e., if the operation is fully consolidated in financial accounts. If this criterion is chosen to determine control, emissions from joint ventures where partners have joint financial control are accounted for based on the equity share approach (see Table 1 for definitions of financial accounting categories).

- Operational Control. A company has operational control over an operation if the former or one of its subsidiaries (see Table 1 for definitions of financial accounting categories) has the full authority to introduce and implement its operating policies at the operation. This criterion is consistent with the current accounting and reporting practice of many companies that report on emissions from facilities, which they operate (i.e., for which they hold the operating license). It is expected that except in very rare circumstances, if the company or one of its subsidiaries is the operator of a facility, it will have the full authority to introduce and implement its operating policies and thus has operational control.

Under the operational control approach, a company accounts for 100% of emissions from operations over which it or one of its subsidiaries has operational control.

It should be emphasized that having operational control does not mean that a company necessarily has authority to make all decisions concerning an operation. For example, big capital investments will likely require the approval of all the partners that have joint financial control. Operational control does mean that a company has the authority to introduce and implement its operating policies.

More information on the relevance and application of the operational control criterion is provided in petroleum industry guidelines for reporting GHG emissions (IPIECA, 2003).

Sometimes a company can have joint financial control over an operation, but not operational control. In such cases, the company would need to look at the contractual arrangements to determine whether any one of the partners has the authority to introduce and implement its operating policies at the operation and thus has the responsibility to report emissions under operational control. If the operation itself will introduce and implement its own operating policies, the partners with joint financial control over the operation will not report any emissions under operational control.

Table 2 in the guidance section of this chapter illustrates the selection of a consolidation approach at the corporate level and the identification of which joint operations will be in the organizational boundary depending on the choice of the consolidation approach.

## Consolidation at multiple levels

The consolidation of GHG emissions data will only result in consistent data if all levels of the organization follow the same consolidation policy. In the first step, the management of the parent company has to decide on a consolidation approach (i.e., either the equity share or the financial or operational control approach). Once a corporate consolidation policy has been selected, it shall be applied to all levels of the organization.

## State-ownership

The rules provided in this chapter shall also be applied to account for GHG emissions from industry joint operations that involve state ownership or a mix of private/state ownership.

### BP: Reporting on the basis of equity share

BP reports GHG emissions on an equity share basis, including those operations where BP has an interest, but where BP is not the operator. In determining the extent of the equity share reporting boundary BP seeks to achieve close alignment with financial accounting procedures. BP's equity share boundary includes all operations undertaken by BP and its subsidiaries, joint ventures and associated undertakings as determined by their treatment in the financial accounts. Fixed asset investments, i.e., where BP has limited influence, are not included.

GHG emissions from facilities in which BP has an equity share are estimated according to the requirements of the BP Group Reporting Guidelines for Environmental Performance (BP 2000). In those facilities where BP has an equity share but is not the operator, GHG emissions data may be obtained directly from the operating company using a methodology consistent with the BP Guidelines, or is calculated by BP using activity data provided by the operator.

BP reports its equity share GHG emissions every year. Since 2000, independent external auditors have expressed the opinion that the reported total has been found to be free from material misstatement when audited against the BP Guidelines.

18    CHAPTER 3

Exhibit 2 to Decl. of Burton 52

ER-1511

(57 of 296)  Page 57 of 296 Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 57 of 296
Case 2:24-cv-00801-ODW-PVC   Document 53-2   Filed 07/24/24   Page 22 of 117   Page ID
#:1698

CHAPTER 3  Setting Organizational Boundaries          19

TABLE 1. **Financial accounting categories**

| ACCOUNTING CATEGORY | FINANCIAL ACCOUNTING DEFINITION | ACCOUNTING FOR GHG EMISSIONS ACCORDING TO *GHG PROTOCOL CORPORATE STANDARD* | |
|---|---|---|---|
| | | **BASED ON EQUITY SHARE** | **BASED ON FINANCIAL CONTROL** |
| Group companies / subsidiaries | The parent company has the ability to direct the financial and operating policies of the company with a view to gaining economic benefits from its activities. Normally, this category also includes incorporated and non-incorporated joint ventures and partnerships over which the parent company has financial control. Group companies/subsidiaries are fully consolidated, which implies that 100 percent of the subsidiary's income, expenses, assets, and liabilities are taken into the parent company's profit and loss account and balance sheet, respectively. Where the parent's interest does not equal 100 percent, the consolidated profit and loss account and balance sheet shows a deduction for the profits and net assets belonging to minority owners. | Equity share of GHG emissions | 100% of GHG emissions |
| Associated / affiliated companies | The parent company has significant influence over the operating and financial policies of the company, but does not have financial control. Normally, this category also includes incorporated and non-incorporated joint ventures and partnerships over which the parent company has significant influence, but not financial control. Financial accounting applies the equity share method to associated/affiliated companies, which recognizes the parent company's share of the associate's profits and net assets. | Equity share of GHG emissions | 0% of GHG emissions |
| Non-incorporated joint ventures / partnerships / operations where partners have joint financial control | Joint ventures/partnerships/operations are proportionally consolidated, i.e., each partner accounts for their proportionate interest of the joint venture's income, expenses, assets, and liabilities. | Equity share of GHG emissions | Equity share of GHG emissions |
| Fixed asset investments | The parent company has neither significant influence nor financial control. This category also includes incorporated and non-incorporated joint ventures and partnerships over which the parent company has neither significant influence nor financial control. Financial accounting applies the cost/dividend method to fixed asset investments. This implies that only dividends received are recognized as income and the investment is carried at cost. | 0% | 0% |
| Franchises | Franchises are separate legal entities. In most cases, the franchiser will not have equity rights or control over the franchise. Therefore, franchises should not be included in consolidation of GHG emissions data. However, if the franchiser does have equity rights or operational/financial control, then the same rules for consolidation under the equity or control approaches apply. | Equity share of GHG emissions | 100% of GHG emissions |

NOTE: Table 1 is based on a comparison of UK, US, Netherlands and International Financial Reporting Standards (KPMG, 2000).

S T A N D A R D

Exhibit 2 to Decl. of Burton
53                                                          ER-1512

(58 of 296) Page 58 of 296Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 58 of 296
Case 2:24-cv-00801-ODW-PVC Document 53-2 Filed 07/24/24 Page 23 of 117 Page ID
#:1699

# Setting Organizational Boundaries

When planning the consolidation of GHG data, it is important to distinguish between GHG accounting and GHG reporting. GHG accounting concerns the recognition and consolidation of GHG emissions from operations in which a parent company holds an interest (either control or equity) and linking the data to specific operations, sites, geographic locations, business processes, and owners. GHG reporting, on the other hand, concerns the presentation of GHG data in formats tailored to the needs of various reporting uses and users.

Most companies have several goals for GHG reporting, e.g., official government reporting requirements, emissions trading programs, or public reporting (see chapter 2). In developing a GHG accounting system, a fundamental consideration is to ensure that the system is capable of meeting a range of reporting requirements. Ensuring that data are collected and recorded at a sufficiently disaggregated level, and capable of being consolidated in various forms, will provide companies with maximum flexibility to meet a range of reporting requirements.

## Double counting
When two or more companies hold interests in the same joint operation and use different consolidation approaches (e.g., Company A follows the equity share approach while Company B uses the financial control approach), emissions from that joint operation could be double counted. This may not matter for voluntary corporate public reporting as long as there is adequate disclosure from the company on its consolidation approach. However, double counting of emissions needs to be avoided in trading schemes and certain mandatory government reporting programs.

## Reporting goals and level of consolidation
Reporting requirements for GHG data exist at various levels, from a specific local facility level to a more aggregated corporate level. Examples of drivers for various levels of reporting include:

- Official government reporting programs or certain emissions trading programs may require GHG data to be reported at a facility level. In these cases, consolidation of GHG data at a corporate level is not relevant

- Government reporting and trading programs may require that data be consolidated within certain geographic and operational boundaries (e.g., the U.K. Emissions Trading Scheme)

- To demonstrate the company's account to wider stakeholders, companies may engage in voluntary public reporting, consolidating GHG data at a corporate level in order to show the GHG emissions of their entire business activities.

## Contracts that cover GHG emissions
To clarify ownership (rights) and responsibility (obligations) issues, companies involved in joint operations may draw up contracts that specify how the ownership of emissions or the responsibility for managing emissions and associated risk is distributed between the parties. Where such arrangements exist, companies may optionally provide a description of the contractual arrangement and include information on allocation of $CO_2$ related risks and obligations (see Chapter 9).

## Using the equity share or control approach
Different inventory reporting goals may require different data sets. Thus companies may need to account for their GHG emissions using both the equity share and the control approaches. The GHG Protocol Corporate Standard makes no recommendation as to whether voluntary public GHG emissions reporting should be based on the equity share or any of the two control approaches, but encourages companies to account for their emissions applying the equity share and a control approach separately. Companies need to decide on the approach best suited to their business activities and GHG accounting and reporting requirements. Examples of how these may drive the choice of approach include the following:

- Reflection of commercial reality. It can be argued that a company that derives an economic profit from a certain activity should take ownership for any GHG emissions generated by the activity. This is achieved by using the equity share approach, since this approach assigns ownership for GHG emissions on the basis of economic interest in a business activity. The control approaches do not always reflect the full GHG emissions portfolio of a company's business activities, but have the advantage that a company takes full ownership of all GHG emissions that it can directly influence and reduce.

20     CHAPTER 3

Exhibit 2 to Decl. of Burton
54

**ER-1513**

- Government reporting and emissions trading programs. Government regulatory programs will always need to monitor and enforce compliance. Since compliance responsibility generally falls to the operator (not equity holders or the group company that has financial control), governments will usually require reporting on the basis of operational control, either through a facility level-based system or involving the consolidation of data within certain geographical boundaries (e.g. the EU ETS will allocate emission permits to the operators of certain installations).

- Liability and risk management. While reporting and compliance with regulations will most likely continue to be based directly on operational control, the ultimate financial liability will often rest with the group company that holds an equity share in the operation or has financial control over it. Hence, for assessing risk, GHG reporting on the basis of the equity share and financial control approaches provides a more complete picture. The equity share approach is likely to result in the most comprehensive coverage of liability and risks. In the future, companies might incur liabilities for GHG emissions produced by joint operations in which they have an interest, but over which they do not have financial control. For example, a company that is an equity shareholder in an operation but has no financial control over it might face demands by the companies with a controlling share to cover its requisite share of GHG compliance costs.

- Alignment with financial accounting. Future financial accounting standards may treat GHG emissions as liabilities and emissions allowances/credits as assets. To assess the assets and liabilities a company creates by its joint operations, the same consolidation rules that are used in financial accounting should be applied in GHG accounting. The equity share and financial control approaches result in closer alignment between GHG accounting and financial accounting.

- Management information and performance tracking. For the purpose of performance tracking, the control approaches seem to be more appropriate since managers can only be held accountable for activities under their control.

- Cost of administration and data access. The equity share approach can result in higher administrative costs than the control approach, since it can be difficult and time consuming to collect GHG emissions data from joint operations not under the control of the reporting company. Companies are likely to have better access to operational data and therefore greater ability to ensure that it meets minimum quality standards when reporting on the basis of control.

- Completeness of reporting. Companies might find it difficult to demonstrate completeness of reporting when the operational control criterion is adopted, since there are unlikely to be any matching records or lists of financial assets to verify the operations that are included in the organizational boundary.

**Royal Dutch/Shell:
Reporting on the basis of operational control**

In the oil and gas industry, ownership and control structures are often complex. A group may own less than 50 percent of a venture's equity capital but have operational control over the venture. On the other hand, in some situations, a group may hold a majority interest in a venture without being able to exert operational control, for example, when a minority partner has a veto vote at the board level. Because of these complex ownership and control structures, Royal Dutch/Shell, a global group of energy and petrochemical companies, has chosen to report its GHG emissions on the basis of operational control. By reporting 100 percent of GHG emissions from all ventures under its operational control, irrespective of its share in the ventures' equity capital, Royal Dutch/Shell can ensure that GHG emissions reporting is in line with its operational policy including its Health, Safety and Environmental Performance Monitoring and Reporting Guidelines. Using the operational control approach, the group generates data that is consistent, reliable, and meets its quality standards.

GUIDANCE

Exhibit 2 to Decl. of Burton
55

ER-1514

(60 of 296) Page 60 of 296Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 60 of 296
Case 2:24-cv-00801-ODW-PVC  Document 53-2  Filed 07/24/24  Page 25 of 117  Page ID
#:1701

# Setting Organizational Boundaries

G U I D A N C E

FIGURE 1.  Defining the organizational boundary of Holland Industries



AN ILLUSTRATION:

THE EQUITY SHARE AND CONTROL APPROACHES

Holland Industries is a chemicals group comprising a number of companies/joint ventures active in the production and marketing of chemicals. Table 2 outlines the organizational structure of Holland Industries and shows how GHG emissions from the various wholly owned and joint operations are accounted for under both the equity share and control approaches.

In setting its organizational boundary, Holland Industries first decides whether to use the equity or control approach for consolidating GHG data at the corporate level. It then determines which operations at the corporate level meet its selected consolidation approach. Based on the selected consolidation approach, the consolidation process is repeated for each lower operational level. In this process, GHG emissions are first apportioned at the lower operational level (subsidiaries, associate, joint ventures, etc.) before they are consolidated at the corporate level. Figure 1 presents the organizational boundary of Holland Industries based on the equity share and control approaches.

22  CHAPTER 3

Exhibit 2 to Decl. of Burton
56

**ER-1515**

CHAPTER 3   Setting Organizational Boundaries       23

**TABLE 2.** Holland Industries - organizational structure and GHG emissions accounting

| WHOLLY OWNED AND JOINT OPERATIONS OF HOLLAND | LEGAL STRUCTURE AND PARTNERS | ECONOMIC INTEREST HELD BY HOLLAND INDUSTRIES | CONTROL OF OPERATING POLICIES | TREATMENT IN HOLLAND INDUSTRIES' FINANCIAL ACCOUNTS (SEE TABLE 1) | EMISSIONS ACCOUNTED FOR AND REPORTED BY HOLLAND INDUSTRIES | |
|---|---|---|---|---|---|---|
| | | | | | EQUITY SHARE APPROACH | CONTROL APPROACH |
| Holland Switzerland | Incorporated company | 100% | Holland Industries | Wholly owned subsidiary | 100% | 100% for operational control / 100% for financial control |
| Holland America | Incorporated company | 83% | Holland Industries | Subsidiary | 83% | 100% for operational control / 100% for financial control |
| BGB | Joint venture, partners have joint financial control other partner Rearden | 50% by Holland America | Rearden | via Holland America | 41.5% (83% x 50%) | 0% for operational control / 50% for financial control (50% x 100%) |
| IRW | Subsidiary of Holland America | 75% by Holland America | Holland America | via Holland America | 62.25% (83% x 75%) | 100% for operational control / 100% for financial control |
| Kahuna Chemicals | Non-incorporated joint venture; partners have joint financial control: two other partners: ICT and BCSF | 33.3% | Holland Industries | Proportionally consolidated joint venture | 33.3% | 100% for operational control / 33.3% for financial control |
| QuickFix | Incorporated joint venture, other partner Majox | 43% | Holland Industries | Subsidiary (Holland Industries has financial control since it treats Quick Fix as a subsidiary in its financial accounts) | 43% | 100% for operational control / 100% for financial control |
| Nallo | Incorporated joint venture, other partner Nagua Co. | 56% | Nallo | Associated company (Holland Industries does not have financial control since it treats Nallo as an Associated company in its financial accounts) | 56% | 0% for operational control / 0% for financial control |
| Syntal | Incorporated company, subsidiary of Erewhon Co. | 1% | Erewhon Co. | Fixed asset investment | 0% | 0% for operational control / 0% for financial control |

In this example, Holland America (not Holland Industries) holds a 50 percent interest in BGB and a 75 percent interest in IRW. If the activities of Holland Industries itself produce GHG emissions (e.g., emissions associated with electricity use at the head office), then these emissions should also be included in the consolidation at 100 percent.

**NOTES**

[1] The term "operations" is used here as a generic term to denote any kind of business activity, irrespective of its organizational, governance, or legal structures.

[2] Financial accounting standards use the generic term "control" for what is denoted as "financial control" in this chapter.

G U I D A N C E

Exhibit 2 to Decl. of Burton
57                                    ER-1516

(62 of 296) Page 62 of 296Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 62 of 296
Case 2:24-cv-00801-ODW-PVC Document 53-2 Filed 07/24/24 Page 27 of 117 Page ID
#:1703

# 4 Setting Operational Boundaries



STANDARD

**A**fter a company has determined its organizational boundaries in terms of the operations that it owns or controls, it then sets its operational boundaries. This involves identifying emissions associated with its operations, categorizing them as direct and indirect emissions, and choosing the scope of accounting and reporting for indirect emissions.

S T A N D A R D
G U I D A N C E

24

Exhibit 2 to Decl. of Burton 58


ER-1517

(63 of 296) Page 63 of 296Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 63 of 296
Case 2:24-cv-00801-ODW-PVC   Document 53-2   Filed 07/24/24   Page 28 of 117   Page ID
#:1704

For effective and innovative GHG management, setting operational boundaries that are comprehensive with respect to direct and indirect emissions will help a company better manage the full spectrum of GHG risks and opportunities that exist along its value chain.

Direct GHG emissions are emissions from sources that are owned or controlled by the company.[1]

Indirect GHG emissions are emissions that are a consequence of the activities of the company but occur at sources owned or controlled by another company.

What is classified as direct and indirect emissions is dependent on the consolidation approach (equity share or control) selected for setting the organizational boundary (see chapter 3). Figure 2 below shows the relationship between the organizational and operational boundaries of a company.

## Introducing the concept of "scope"

To help delineate direct and indirect emission sources, improve transparency, and provide utility for different types of organizations and different types of climate policies and business goals, three "scopes" (scope 1, scope 2, and scope 3) are defined for GHG accounting and reporting purposes. Scopes 1 and 2 are carefully defined in this standard to ensure that two or more companies will not account for emissions in the same scope. This makes the scopes amenable for use in GHG programs where double counting matters.

Companies shall separately account for and report on scopes 1 and 2 at a minimum.

## Scope 1: Direct GHG emissions

Direct GHG emissions occur from sources that are owned or controlled by the company, for example, emissions from combustion in owned or controlled boilers, furnaces, vehicles, etc.; emissions from chemical production in owned or controlled process equipment.

Direct $CO_2$ emissions from the combustion of biomass shall not be included in scope 1 but reported separately (see chapter 9).

GHG emissions not covered by the Kyoto Protocol, e.g. CFCs, NOx, etc. shall not be included in scope 1 but may be reported separately (see chapter 9).

## Scope 2: Electricity indirect GHG emissions

Scope 2 accounts for GHG emissions from the generation of purchased electricity[2] consumed by the company. Purchased electricity is defined as electricity that is purchased or otherwise brought into the organizational boundary of the company. Scope 2 emissions physically occur at the facility where electricity is generated.

## Scope 3: Other indirect GHG emissions

Scope 3 is an optional reporting category that allows for the treatment of all other indirect emissions. Scope 3 emissions are a consequence of the activities of the company, but occur from sources not owned or controlled by the company. Some examples of scope 3 activities are extraction and production of purchased materials; transportation of purchased fuels; and use of sold products and services.

FIGURE 2. **Organizational and operational boundaries of a company**



Exhibit 2 to Decl. of Burton
59

ER-1518

# Setting Operational Boundaries

An operational boundary defines the scope of direct and indirect emissions for operations that fall within a company's established organizational boundary. The operational boundary (scope 1, scope 2, scope 3) is decided at the corporate level after setting the organizational boundary. The selected operational boundary is then uniformly applied to identify and categorize direct and indirect emissions at each operational level (see Box 2). The established organizational and operational boundaries together constitute a company's inventory boundary.

---

### BOX 2. Organizational and operational boundaries

Organization X is a parent company that has full ownership and financial control of operations A and B, but only a 30% non-operated interest and no financial control in operation C.

**Setting Organizational Boundary:** X would decide whether to account for GHG emissions by equity share or financial control. If the choice is equity share, X would include A and B, as well as 30% of C's emissions. If the approach chosen is financial control, X would count only A and B's emissions as relevant and subject to consolidation. Once this has been decided, the organizational boundary has been defined.

**Setting Operational Boundary:** Once the organizational boundary is set, X then needs to decide, on the basis of its business goals, whether to account only for scope 1 and scope 2, or whether to include relevant scope 3 categories for its operations.

Operations A, B and C (if the equity approach is selected) account for the GHG emissions in the scopes chosen by X, i.e., they apply the corporate policy in drawing up their operational boundaries.

---

## Accounting and reporting on scopes

Companies account for and report emissions from scope 1 and 2 separately. Companies may further subdivide emissions data within scopes where this aids transparency or facilitates comparability over time. For example, they may subdivide data by business unit/facility, country, source type (stationary combustion, process, fugitive, etc.), and activity type (production of electricity, consumption of electricity, generation or purchased electricity that is sold to end users, etc.).

In addition to the six Kyoto gases, companies may also provide emissions data for other GHGs (e.g., Montreal Protocol gases) to give context to changes in emission levels of Kyoto Protocol gases. Switching from a CFC to HFC, for example, will increase emissions of Kyoto Protocol gases. Information on emissions of GHGs other than the six Kyoto gases may be reported separately from the scopes in a GHG public report.

Together the three scopes provide a comprehensive accounting framework for managing and reducing direct and indirect emissions. Figure 3 provides an overview of the relationship between the scopes and the activities that generate direct and indirect emissions along a company's value chain.

A company can benefit from efficiency gains throughout the value chain. Even without any policy drivers, accounting for GHG emissions along the value chain may reveal potential for greater efficiency and lower costs (e.g., the use of fly ash as a clinker substitute in the manufacture of cement that reduces downstream emissions from processing of waste fly ash, and upstream

---

### FIGURE 3. Overview of scopes and emissions across a value chain



Exhibit 2 to Decl. of Burton 60

**ER-1519**

(65 of 296) Page 65 of 296Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 65 of 296
Case 2:24-cv-00801-ODW-PVC   Document 53-2   Filed 07/24/24   Page 30 of 117   Page ID
#:1706

CHAPTER 4  Setting Operational Boundaries                                     27

emissions from producing clinker). Even if such "win-win" options are not available, indirect emissions reductions may still be more cost effective to accomplish than scope 1 reductions. Thus accounting for indirect emissions can help identify where to allocate limited resources in a way that maximizes GHG reduction and return on investment.

Appendix D lists GHG sources and activities along the value chain by scopes for various industry sectors.

## Scope 1: Direct GHG emissions

Companies report GHG emissions from sources they own or control as scope 1. Direct GHG emissions are principally the result of the following types of activities undertaken by the company:

- Generation of electricity, heat, or steam. These emissions result from combustion of fuels in stationary sources, e.g., boilers, furnaces, turbines

- Physical or chemical processing.[3] Most of these emissions result from manufacture or processing of chemicals and materials, e.g., cement, aluminum, adipic acid, ammonia manufacture, and waste processing

- Transportation of materials, products, waste, and employees. These emissions result from the combustion of fuels in company owned/controlled mobile combustion sources (e.g., trucks, trains, ships, airplanes, buses, and cars)

- Fugitive emissions. These emissions result from intentional or unintentional releases, e.g., equipment leaks from joints, seals, packing, and gaskets; methane emissions from coal mines and venting; hydrofluorocarbon (HFC) emissions during the use of refrigeration and air conditioning equipment; and methane leakages from gas transport.

### SALE OF OWN-GENERATED ELECTRICITY

Emissions associated with the sale of own-generated electricity to another company are not deducted/netted from scope 1. This treatment of sold electricity is consistent with how other sold GHG intensive products are accounted, e.g., emissions from the production of sold clinker by a cement company or the production of scrap steel by an iron and steel company are not subtracted from their scope 1 emissions. Emissions associated with the sale/transfer of own-generated electricity may be reported in optional information (see chapter 9).

## Scope 2: Electricity indirect GHG emissions

Companies report the emissions from the generation of purchased electricity that is consumed in its owned or controlled equipment or operations as scope 2. Scope 2 emissions are a special category of indirect emissions. For many companies, purchased electricity represents one of the largest sources of GHG emissions and the most significant opportunity to reduce these emissions. Accounting for scope 2 emissions allows companies to assess the risks and opportunities associated with changing electricity and GHG emissions costs. Another important reason for companies to track these emissions is that the information may be needed for some GHG programs.

Companies can reduce their use of electricity by investing in energy efficient technologies and energy conservation. Additionally, emerging green power markets[4] provide opportunities for some companies to switch to less GHG intensive sources of electricity. Companies can also install an efficient on site co-generation plant, particularly if it replaces the purchase of more GHG intensive electricity from the grid or electricity supplier. Reporting of scope 2 emissions allows transparent accounting of GHG emissions and reductions associated with such opportunities.

### INDIRECT EMISSIONS
### ASSOCIATED WITH TRANSMISSION AND DISTRIBUTION

Electric utility companies often purchase electricity from independent power generators or the grid and resell it to end-consumers through a transmission and distribution (T&D) system.[5] A portion of the electricity purchased by a utility company is consumed (T&D loss) during its transmission and distribution to end-consumers (see Box 3).

Consistent with the scope 2 definition, emissions from the generation of purchased electricity that is consumed during transmission and distribution are reported in scope 2 by the company that owns or controls the T&D operation. End consumers of the purchased electricity do not report indirect emissions associated with T&D losses in scope 2 because they do not own or control the T&D operation where the electricity is consumed (T&D loss).

BOX 3.  **Electricity balance**

$$ \text{GENERATED ELECTRICITY} = \begin{array}{c} \text{Purchased electricity consumed} \\ \text{by the utility company during T\&D} \\ + \\ \text{Purchased electricity consumed} \\ \text{by end consumers} \end{array} $$

G U I D A N C E

Exhibit 2 to Decl. of Burton
61                                                   ER-1520

This approach ensures that there is no double counting within scope 2 since only the T&D utility company will account for indirect emissions associated with T&D losses in scope 2. Another advantage of this approach is that it adds simplicity to the reporting of scope 2 emissions by allowing the use of commonly available emission factors that in most cases do not include T&D losses. End consumers may, however, report their indirect emissions associated with T&D losses in scope 3 under the category "generation of electricity consumed in a T&D system." Appendix A provides more guidance on accounting for emissions associated with T&D losses.

### OTHER ELECTRICITY-RELATED INDIRECT EMISSIONS

Indirect emissions from activities upstream of a company's electricity provider (e.g., exploration, drilling, flaring, transportation) are reported under scope 3. Emissions from the generation of electricity that has been purchased for resale to end-users are reported in scope 3 under the category "generation of electricity that is purchased and then resold to end users." Emissions from the generation of purchased electricity for resale to non-end-users (e.g., electricity traders) may be reported separately from scope 3 in "optional information."

The following two examples illustrate how GHG emissions are accounted for from the generation, sale, and purchase of electricity.

Example one (Figure 4): Company A is an independent power generator that owns a power generation plant. The power plant produces 100 MWh of electricity and releases 20 tonnes of emissions per year. Company B is an electricity trader and has a supply contract with company A to purchase all its electricity. Company B resells the purchased electricity (100 MWh) to company C, a utility company that owns / controls the T&D system. Company C consumes 5 MWh of electricity in its T&D system and sells the remaining 95 MWh to company D. Company D is an end user who consumes the purchased electricity (95 MWh) in its own operations. Company A reports its direct emissions from power generation under scope 1. Company B reports emissions from the purchased electricity sold to a non-end-user as optional information separately from scope 3. Company C reports the indirect emissions from the generation of the part of the purchased electricity that is sold to the end-user under scope 3 and the part of the purchased electricity that it consumes in its T&D system under scope 2. End-user D reports the indirect emissions associated with its own consumption of purchased electricity under scope 2 and can optionally report emissions associated with upstream T&D losses in scope 3. Figure 4 shows the accounting of emissions associated with these transactions.

Example two: Company D installs a co-generation unit and sells surplus electricity to a neighboring company E for its consumption. Company D reports all direct emissions from the co-generation unit under scope 1. Indirect emissions from the generation of electricity for export to E are reported by D under optional information separately

### Seattle City Light: Accounting for the purchase of electricity sold to end users

Seattle City Light (SCL), Seattle's municipal utility company, sells electricity to its end-use customers that is either produced at its own hydropower facilities, purchased through long-term contracts, or purchased on the short-term market. SCL used the first edition of the *GHG Protocol Corporate Standard* to estimate its year 2000 and year 2002 GHG emissions, and emissions associated with generation of net purchased electricity sold to end-users was an important component of that inventory. SCL tracks and reports the amount of electricity sold to end-users on a monthly and annual basis.

SCL calculates net purchases from the market (brokers and other utility companies) by subtracting sales to the market from purchases from the market, measured in MWh. This allows a complete accounting of all emissions impacts from its entire operation, including interactions with the market and end-users. On an annual basis, SCL produces more electricity than there is end-use demand, but the production does not match load in all months. So SCL accounts for both purchases from the market and sales into the market. SCL also includes the scope 3 upstream emissions from natural gas production and delivery, operation of SCL facilities, vehicle fuel use, and airline travel.

SCL believes that sales to end-users are a critical part of the emissions profile for an electric utility company. Utility companies need to provide information on their emissions profile to educate end-users and adequately represent the impact of their business, the providing of electricity. End-use customers need to rely on their utility company to provide electricity, and except in some instances (green power programs), do not have a choice in where their electricity is purchased. SCL meets a customer need by providing emissions information to customers who are doing their own emissions inventory.

CHAPTER 4   Setting Operational Boundaries                 29

from scope 3. Company E reports indirect emissions associated with the consumption of electricity purchased from the company D's co-generation unit under scope 2.

For more guidance, see Appendix A on accounting for indirect emissions from purchased electricity.

## Scope 3: Other indirect GHG emissions

Scope 3 is optional, but it provides an opportunity to be innovative in GHG management. Companies may want to focus on accounting for and reporting those activities that are relevant to their business and goals, and for which they have reliable information. Since companies have discretion over which categories they choose to report, scope 3 may not lend itself well to comparisons across companies. This section provides an indicative list of scope 3 categories and includes case studies on some of the categories.

Some of these activities will be included under scope 1 if the pertinent emission sources are owned or controlled by the company (e.g., if the transportation of products is done in vehicles owned or controlled by the company). To determine if an activity falls within scope 1 or scope 3, the company should refer to the selected consolidation approach (equity or control) used in setting its organizational boundaries.

- Extraction and production of purchased materials and fuels[6]

- Transport-related activities
  - Transportation of purchased materials or goods
  - Transportation of purchased fuels
  - Employee business travel
  - Employees commuting to and from work
  - Transportation of sold products
  - Transportation of waste

- Electricity-related activities not included in scope 2 (see Appendix A)
  - Extraction, production, and transportation of fuels consumed in the generation of electricity (either purchased or own generated by the reporting company)
  - Purchase of electricity that is sold to an end user (reported by utility company)
  - Generation of electricity that is consumed in a T&D system (reported by end-user)

- Leased assets, franchises, and outsourced activities— emissions from such contractual arrangements are only classified as scope 3 if the selected consolidation approach (equity or control) does not apply to them. Clarification on the classification of leased assets should be obtained from the company accountant (see section on leases below).

- Use of sold products and services

- Waste disposal
  - Disposal of waste generated in operations
  - Disposal of waste generated in the production of purchased materials and fuels
  - Disposal of sold products at the end of their life

### ACCOUNTING FOR SCOPE 3 EMISSIONS

Accounting for scope 3 emissions need not involve a full-blown GHG life cycle analysis of all products and operations. Usually it is valuable to focus on one or two major GHG-generating activities. Although it is difficult to provide generic guidance on which scope 3 emissions to include in an inventory, some general steps can be articulated:

FIGURE 4. GHG accounting from the sale and purchase of electricity



Exhibit 2 to Decl. of Burton
63

ER-1522

(68 of 296)  Page 68 of 296 Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 68 of 296
Case 2:24-cv-00801-ODW-PVC   Document 53-2   Filed 07/24/24   Page 33 of 117   Page ID
#:1709

# Setting Operational Boundaries

**G U I D A N C E**

1. Describe the value chain. Because the assessment of scope 3 emissions does not require a full life cycle assessment, it is important, for the sake of transparency, to provide a general description of the value chain and the associated GHG sources. For this step, the scope 3 categories listed can be used as a checklist. Companies usually face choices on how many levels up- and down-stream to include in scope 3. Consideration of the company's inventory or business goals and relevance of the various scope 3 categories will guide these choices.

2. Determine which scope 3 categories are relevant. Only some types of upstream or downstream emissions categories might be relevant to the company. They may be relevant for several reasons:

- They are large (or believed to be large) relative to the company's scope 1 and scope 2 emissions

- They contribute to the company's GHG risk exposure

- They are deemed critical by key stakeholders (e.g., feedback from customers, suppliers, investors, or civil society)

- There are potential emissions reductions that could be undertaken or influenced by the company.

The following examples may help decide which scope 3 categories are relevant to the company.

- If fossil fuel or electricity is required to use the company's products, product use phase emissions may be a relevant category to report. This may be especially important if the company can influence product design attributes (e.g., energy efficiency) or customer behavior in ways that reduce GHG emissions during the use of the products.

---

**DHL Nordic Express: The business case for accounting for outsourced transportation services**

As a major transportation and logistics company in northern Europe, DHL Express Nordic serves large loads and special transport needs as well as world wide express package and document deliveries and offers courier, express, parcel, systemized and specialty business services. Through participation in the Business Leaders Initiative on Climate Change, the company found that 98 percent of its emissions in Sweden originate from the transport of goods via outsourced partner transportation firms. Each partner is required, as an element of the subcontract payment scheme, to enter data on vehicles used, distance traveled, fuel efficiency, and background data. This data is used to calculate total emissions via a tailored calculation tool for outsourced transportation which gives a detailed picture of its scope 3 emissions. Linking data to specific carriers allows the company to screen individual carriers for environmental performance and affect decisions based on each carrier's emissions performance, which is seen through scope 3 as DHL's own performance.

By including scope 3 and promoting GHG reductions throughout the value chain, DHL Express Nordic increased the relevance of its emissions footprint, expanded opportunities for reducing its impacts and improved its ability to recognize cost saving opportunities. Without scope 3, DHL Express Nordic would have lacked much of the information needed to be able to understand and effectively manage its emissions.

| SCOPE | EMISSIONS (tCO$_2$) |
|---|---|
| Scope 1 | 7,265 |
| Scope 2 | 52 |
| Scope 3 | 327,634 |
| Total | 334,951 |

---

FIGURE 5. **Accounting of emissions from leased assets**



CHAPTER 4

Exhibit 2 to Decl. of Burton
64

**ER-1523**

(69 of 296)  Page 69 of 296 Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 69 of 296
Case 2:24-cv-00801-ODW-PVC   Document 53-2   Filed 07/24/24   Page 34 of 117   Page ID
#:1710

CHAPTER 4  Setting Operational Boundaries                    31

- Outsourced activities are often candidates for scope 3 emissions assessments. It may be particularly important to include these when a previously outsourced activity contributed significantly to a company's scope 1 or scope 2 emissions.

- If GHG-intensive materials represent a significant fraction of the weight or composition of a product used or manufactured (e.g., cement, aluminum), companies may want to examine whether there are opportunities to reduce their consumption of the product or to substitute less GHG-intensive materials.

- Large manufacturing companies may have significant emissions related to transporting purchased materials to centralized production facilities.

- Commodity and consumer product companies may want to account for GHGs from transporting raw materials, products, and waste.

- Service sector companies may want to report on emissions from employee business travel; this emissions source is not as likely to be significant for other kinds of companies (e.g., manufacturing companies).

3. Identify partners along the value chain.
Identify any partners that contribute potentially significant amounts of GHGs along the value chain (e.g., customers/users, product designers/manufacturers, energy providers, etc.). This is important when trying to identify sources, obtain relevant data, and calculate emissions.

4. Quantify scope 3 emissions. While data availability and reliability may influence which scope 3 activities are included in the inventory, it is accepted that data accuracy may be lower. It may be more important to understand the relative magnitude of and possible changes to scope 3 activities. Emission estimates are acceptable as long as there is transparency with regard to the estimation approach, and the data used for the analysis are adequate to support the objectives of the inventory. Verification of scope 3 emissions will often be difficult and may only be considered if data is of reliable quality.

### IKEA: Customer transportation to and from its retail stores

IKEA, an international home furniture and furnishings retailer, decided to include scope 3 emissions from customer travel when it became clear, through participation in the Business Leaders Initiative on Climate Change (BLICC) program, that these emissions were large relative its scope 1 and scope 2 emissions. Furthermore, these emissions are particularly relevant to IKEA's store business model. Customer travel to its stores, often from long distances, is directly affected by IKEA's choice of store location and the warehouse shopping concept.

Customer transportation emission calculations were based on customer surveys at selected stores. Customers were asked for the distance they traveled to the store (based on home postal code), the number of customers in their car, the number of other stores they intended to visit at that shopping center that day, and whether they had access to public transportation to the store. Extrapolating this data to all IKEA stores and multiplying distance by average vehicle efficiencies for each country, the company calculated that 66 percent of its emissions inventory was from scope 3 customer travel. Based on this information, IKEA will have significant influence over future scope 3 emissions by considering GHG emissions when developing public transportation options and home delivery services for its existing and new stores.

### Leased assets, outsourcing, and franchises
The selected consolidation approach (equity share or one of the control approaches) is also applied to account for and categorize direct and indirect GHG emissions from contractual arrangements such as leased assets, outsourcing, and franchises. If the selected equity or control approach does not apply, then the company may account for emissions from the leased assets, outsourcing, and franchises under scope 3. Specific guidance on leased assets is provided below:

- USING EQUITY SHARE OR FINANCIAL CONTROL: The lessee only accounts for emissions from leased assets that are treated as wholly owned assets in financial accounting and are recorded as such on the balance sheet (i.e., finance or capital leases).

GUIDANCE

Exhibit 2 to Decl. of Burton
65

ER-1524

<div style="background: #6b7a1e; color: white; padding: 10px;">

# Setting Operational Boundaries

</div>

**G U I D A N C E**

- **USING OPERATIONAL CONTROL:** The lessee only accounts for emissions from leased assets that it operates (i.e., if the operational control criterion applies).

Guidance on which leased assets are operating and which are finance leases should be obtained from the company accountant. In general, in a finance lease, an organization assumes all rewards and risks from the leased asset, and the asset is treated as wholly owned and is recorded as such on the balance sheet. All leased assets that do not meet those criteria are operating leases. Figure 5 illustrates the application of consolidation criteria to account for emissions from leased assets.

## Double counting

Concern is often expressed that accounting for indirect emissions will lead to double counting when two different companies include the same emissions in their respective inventories. Whether or not double counting occurs depends on how consistently companies with shared ownership or trading program administrators choose the same approach (equity or control) to set the organizational boundaries. Whether or not double counting matters, depends on how the reported information is used.

Double counting needs to be avoided when compiling national (country) inventories under the Kyoto Protocol, but these are usually compiled via a top-down exercise using national economic data, rather than aggregation of bottom-up company data. Compliance regimes are more likely to focus on the "point of release" of emissions (i.e., direct emissions) and/or indirect emissions from use of electricity. For GHG risk management and voluntary reporting, double counting is less important.

<div style="background: #6b7a1e; color: white; padding: 8px;">

### World Resources Institute:
### Innovations in estimating employee commuting emissions

</div>

The World Resources Institute has a long-standing commitment to reduce its annual GHG emissions to net zero through a combination of internal reduction efforts and external offset purchases. WRI's emissions inventory includes scope 2 indirect emissions associated with the consumption of purchased electricity and scope 3 indirect emissions associated with business air travel, employee commuting, and paper use. WRI has no scope 1 direct emissions.

Collecting employee commuting activity data from WRI's 140 staff can be challenging. The method used is to survey employees once each year about their average commuting habits. In the first two years of the initiative, WRI used an Excel spreadsheet accessible to all employees on a shared internal network, but only achieved a 48 percent participation rate. A simplified, web-based survey that downloaded into a spreadsheet improved participation to 65 percent in the third year. Using feedback on the survey design, WRI further simplified and refined survey questions, improved user friendliness, and reduced the time needed to complete the survey to less than a minute. Employee participation rate rose to 88 percent.

Designing a survey that was easily navigable and had clearly articulated questions significantly improved the completeness and accuracy of the employee commuting activity data. An added benefit was that employees felt a certain amount of pride at having contributed to the inventory development process. The experience also provided a positive internal communications opportunity.

WRI has developed a guide consistent with *GHG Protocol Corporate Standard* to help office-based organizations understand how to track and manage their emissions. *Working 9 to 5 on Climate Change: An Office Guide* is accompanied by a suite of calculation tools, including one for using a survey method to estimate employee commuting emissions. The Guide and tools can be downloaded from the GHG Protocol Initiative website (www.ghgprotocol.org).

Transportation-related emissions are the fastest growing GHG emissions category in the United States. This includes commercial, business, and personal travel as well as commuting. By accounting for commuting emissions, companies may find that several practical opportunities exist for reducing them. For example, when WRI moved to new office space, it selected a building located close to public transportation, reducing the need for employees to drive to work. In its lease, WRI also negotiated access to a locked bike room for those employees who cycle to work. Finally, telework programs significantly reduce commuting emissions by avoiding or decreasing the need to travel.

32    CHAPTER 4

Exhibit 2 to Decl. of Burton
66

**ER-1525**

CHAPTER 4  Setting Operational Boundaries          33

For participating in GHG markets or obtaining GHG credits, it would be unacceptable for two organizations to claim ownership of the same emissions commodity and it is therefore necessary to make sufficient provisions to ensure that this does not occur between participating companies (see chapter 11).

### SCOPES AND DOUBLE COUNTING

The GHG Protocol Corporate Standard is designed to prevent double counting of emissions between different companies within scope 1 and 2. For example, the scope 1 emissions of company A (generator of electricity) can be counted as the scope 2 emissions of company B (end-user of electricity) but company A's scope 1 emissions cannot be counted as scope 1 emissions by company C (a partner organization of company A) as long as company A and company C consistently apply the same control or equity share approach when consolidating emissions.

Similarly, the definition of scope 2 does not allow double counting of emissions within scope 2, i.e., two different companies cannot both count scope 2 emissions from the purchase of the same electricity. Avoiding this type of double counting within scope 2 emissions makes it a useful accounting category for GHG trading programs that regulate end users of electricity.

When used in external initiatives such as GHG trading, the robustness of the scope 1 and 2 definitions combined with the consistent application of either the control or equity share approach for defining organizational boundaries allows only one company to exercise ownership of scope 1 or scope 2 emissions.



> ## ABB: Calculating product use phase emissions associated with electrical appliances
>
> ABB, an energy and automation technology company based in Switzerland, produces a variety of appliances and equipment, such as circuit breakers and electrical drives, for industrial applications. ABB has a stated goal to issue Environmental Product Declarations (EPDs) for all its core products based on life cycle assessment. As a part of its committment, ABB reports both manufacturing and product use phase GHG emissions for a variety of its products using a standardized calculation method and set of assumptions. For example, product use phase calculations for ABB's 4 kW DriveIT Low Voltage AC drive are based on a 15-year expected lifetime and an average of 5,000 annual operating hours. This activity data is multiplied by the average electricity emission factor for OECD countries to produce total lifetime product use emissions.
>
> Compared with manufacturing emissions, product use phase emissions account for about 99 percent of total life cycle emissions for this type of drive. The magnitude of these emissions and ABB's control of the design and performance of this equipment clearly give the company significant leverage on its customers' emissions by improving product efficiency or helping customers design better overall systems in which ABB's products are involved. By clearly defining and quantifying significant value chain emissions, ABB has gained insight into and influence over its emissions footprint.

### NOTES

[1] The terms "direct" and "indirect" as used in this document should not be confused with their use in national GHG inventories where 'direct' refers to the six Kyoto gases and 'indirect' refers to the precursors NOx, NMVOC, and CO.

[2] The term "electricity" is used in this chapter as shorthand for electricity, steam, and heating/cooling.

[3] For some integrated manufacturing processes, such as ammonia manufacture, it may not be possible to distinguish between GHG emissions from the process and those from the production of electricity, heat, or steam.

[4] Green power includes renewable energy sources and specific clean energy technologies that reduce GHG emissions relative to other sources of energy that supply the electric grid, e.g., solar photovoltaic panels, geothermal energy, landfill gas, and wind turbines.

[5] A T&D system includes T&D lines and other T&D equipment (e.g., transformers).

[6] "Purchased materials and fuels" is defined as material or fuel that is purchased or otherwise brought into the organizational boundary of the company.

G U I D A N C E

Exhibit 2 to Decl. of Burton
67

ER-1526

# 5 Tracking Emissions Over Time

**STANDARD**



**C**ompanies often undergo significant structural changes such as acquisitions, divestments, and mergers. These changes will alter a company's historical emission profile, making meaningful comparisons over time difficult. In order to maintain consistency over time, or in other words, to keep comparing "like with like", historic emission data will have to be recalculated.



STANDARD
GUIDANCE

34

Exhibit 2 to Decl. of Burton 68

ER-1527

Companies may need to track emissions over time in response to a variety of business goals, including:

- Public reporting

- Establishing GHG targets

- Managing risks and opportunities

- Addressing the needs of investors and other stakeholders

A meaningful and consistent comparison of emissions over time requires that companies set a performance datum with which to compare current emissions. This performance datum is referred to as the base year[1] emissions. For consistent tracking of emissions over time, the base year emissions may need to be recalculated as companies undergo significant structural changes such as acquisitions, divestments, and mergers.

The first step in tracking emissions, however, is the selection of a base year.

## Choosing a base year

Companies shall choose and report a base year for which verifiable emissions data are available and specify their reasons for choosing that particular year.

Most companies select a single year as their base year. However, it is also possible to choose an average of annual emissions over several consecutive years. For example, the U.K. ETS specifies an average of 1998–2000 emissions as the reference point for tracking reductions. A multi-year average may help smooth out unusual fluctuations in GHG emissions that would make a single year's data unrepresentative of the company's typical emissions profile.

The inventory base year can also be used as a basis for setting and tracking progress towards a GHG target in which case it is referred to as a target base year (see chapter 11).

## Recalculating base year emissions

Companies shall develop a base year emissions recalculation policy, and clearly articulate the basis and context for any recalculations. If applicable, the policy shall state any "significance threshold" applied for deciding on historic emissions recalculation. "Significance threshold" is a qualitative and/or quantitative criterion used to define any significant change to the data, inventory boundary, methods, or any other relevant factors. It is the responsibility of the company to determine the "significance threshold" that triggers base year emissions recalculation and to disclose it. It is the responsibility of the verifier to confirm the company's adherence to its threshold policy. The following cases shall trigger recalculation of base year emissions:

- Structural changes in the reporting organization that have a significant impact on the company's base year emissions. A structural change involves the transfer of ownership or control of emissions-generating activities or operations from one company to another. While a single structural change might not have a significant impact on the base year emissions, the cumulative effect of a number of minor structural changes can result in a significant impact. Structural changes include:

  - Mergers, acquisitions, and divestments

  - Outsourcing and insourcing of emitting activities

- Changes in calculation methodology or improvements in the accuracy of emission factors or activity data that result in a significant impact on the base year emissions data

- Discovery of significant errors, or a number of cumulative errors, that are collectively significant.

In summary, base year emissions shall be retroactively recalculated to reflect changes in the company that would otherwise compromise the consistency and relevance of the reported GHG emissions information. Once a company has determined its policy on how it will recalculate base year emissions, it shall apply this policy in a consistent manner. For example, it shall recalculate for both GHG emissions increases and decreases.

Exhibit 2 to Decl. of Burton 69                    ER-1528

(74 of 296) Page 74 of 296 Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 74 of 296
Case 2:24-cv-00801-ODW-PVC   Document 53-2   Filed 07/24/24   Page 39 of 117   Page ID
#:1715

# Tracking Emissions Over Time

G U I D A N C E

Selection and recalculation of a base year should relate to the business goals and the particular context of the company:

- For the purpose of reporting progress towards voluntary public GHG targets, companies may follow the standards and guidance in this chapter

- A company subject to an external GHG program may face external rules governing the choice and recalculation of base year emissions

- For internal management goals, the company may follow the rules and guidelines recommended in this document, or it may develop its own approach, which should be followed consistently.

## Choosing a base year

Companies should choose as a base year the earliest relevant point in time for which they have reliable data. Some organizations have adopted 1990 as a base year in order to be consistent with the Kyoto Protocol. However, obtaining reliable and verifiable data for historical base years such as 1990 can be very challenging.

If a company continues to grow through acquisitions, it may adopt a policy that shifts or "rolls" the base year forward by a number of years at regular intervals. Chapter 11 contains a description of such a "rolling base year," including a comparison with the fixed base year approach described in this chapter. A fixed base year has the advantage of allowing emissions data to be compared on a like-with-like basis over a longer time period than a rolling base year approach. Most emissions trading and registry programs require a fixed base year policy to be implemented.

FIGURE 6. **Base year emissions recalculation for an acquisition**



Company Gamma consists of two business units (A and B). In its base year (year one), each business unit emits 25 tonnes $CO_2$. In year two, the company undergoes "organic growth," leading to an increase in emissions to 30 tonnes $CO_2$ per business unit, i.e., 60 tonnes $CO_2$ in total. The base year emissions are not recalculated in this case. At the beginning of year three, the company acquires production facility C from another company. The annual emissions of facility C in year one were 15 tonnes $CO_2$, and 20 tonnes $CO_2$ in years two and three. The total emission of company Gamma in year three, including facility C, are therefore 80 tonnes $CO_2$. To maintain consistency over time, the company recalculates its base year emissions to take into account the acquisition of facility C. The base year emissions increase by 15 tonnes $CO_2$—the quantity of emissions produced by facility C in Gamma's base year. The recalculated base year emissions are 65 tonnes $CO_2$. Gamma also (optionally) reports 80 tonnes $CO_2$ as the recalculated emissions for year two.

Exhibit 2 to Decl. of Burton
70

**ER-1529**

(75 of 296)  Page 75 of 296Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 75 of 296
Case 2:24-cv-00801-ODW-PVC   Document 53-2   Filed 07/24/24   Page 40 of 117   Page ID
#:1716

CHAPTER 5   Tracking Emissions Over Time          37

**FIGURE 7.** Base year emissions recalculation for a divestment



Company Beta consists of three business units (A, B, and C). Each business unit emits 25 tonnes $CO_2$ and the total emissions for the company are 75 tonnes $CO_2$ in the base year (year one). In year two, the output of the company grows, leading to an increase in emissions to 30 tonnes $CO_2$ per business unit, i.e., 90 tonnes $CO_2$ in total. At the beginning of year three, Beta divests business unit C and its annual emissions are now 60 tonnes, representing an apparent reduction of 15 tonnes relative to the base year emissions. However, to maintain consistency over time, the company recalculates its base year emissions to take into account the divestment of business unit C. The base year emissions are lowered by 25 tonnes $CO_2$—the quantity of emissions produced by the business unit C in the base year. The recalculated base year emissions are 50 tonnes $CO_2$, and the emissions of company Beta are seen to have risen by 10 tonnes $CO_2$ over the three years. Beta (optionally) reports 60 tonnes $CO_2$ as the recalculated emissions for year two.

### Significance thresholds for recalculations

Whether base year emissions are recalculated depends on the significance of the changes. The determination of a significant change may require taking into account the cumulative effect on base year emissions of a number of small acquisitions or divestments. The GHG Protocol Corporate Standard makes no specific recommendations as to what constitutes "significant." However, some GHG programs do specify numerical significance thresholds, e.g., the California Climate Action Registry, where the change threshold is 10 percent of the base year emissions, determined on a cumulative basis from the time the base year is established.

### Base year emissions recalculation for structural changes

Structural changes trigger recalculation because they merely transfer emissions from one company to another without any change of emissions released to the atmos-

phere, for example, an acquisition or divestment only transfers existing GHG emissions from one company's inventory to another.

Figures 6 and 7 illustrate the effect of structural changes and the application of this standard on recalculation of base year emissions.

### Timing of recalculations for structural changes

When significant structural changes occur during the middle of the year, the base year emissions should be recalculated for the entire year, rather than only for the remainder of the reporting period after the structural change occurred. This avoids having to recalculate base year emissions again in the succeeding year. Similarly, current year emissions should be recalculated for the entire year to maintain consistency with the base year recalculation. If it is not possible to make a recalculation in the year of the structural change (e.g., due to

GUIDANCE

Exhibit 2 to Decl. of Burton
71                                    **ER-1530**

(76 of 296) Page 76 of 296 Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 76 of 296
Case 2:24-cv-00801-ODW-PVC   Document 53-2   Filed 07/24/24   Page 41 of 117   Page ID
#:1717

## Tracking Emissions Over Time

lack of data for an acquired company), the recalculation may be carried out in the following year.[2]

### Recalculations for changes in calculation methodology or improvements in data accuracy

A company might report the same sources of GHG emissions as in previous years, but measure or calculate them differently. For example, a company might have used a national electric power generation emissions factor to estimate scope 2 emissions in year one of reporting. In later years, it may obtain more accurate utility-specific emission factors (for the current as well as past years) that better reflect the GHG emissions associated with the electricity that it has purchased. If the differences in emissions resulting from such a change are significant, historic data is recalculated applying the new data and/or methodology.

Sometimes the more accurate data input may not reasonably be applied to all past years or new data points may not be available for past years. The company may then have to backcast these data points, or the change in data source may simply be acknowledged without recalculation. This acknowledgement should be made in the report each year in order to enhance transparency; otherwise, new users of the report in the two or three years after the change may make incorrect assumptions about the performance of the company.

Any changes in emission factor or activity data that reflect real changes in emissions (i.e., changes in fuel type or technology) do not trigger a recalculation.

### Optional reporting for recalculations

Optional information that companies may report on recalculations includes:

- The recalculated GHG emissions data for all years between the base year and the reporting year

- All actual emissions as reported in respective years in the past, i.e., the figures that have not been recalculated. Reporting the original figures in addition to the recalculated figures contributes to transparency since it illustrates the evolution of the company's structure over time.

### No base year emissions recalculations for facilities that did not exist in the base year

Base year emissions are not recalculated if the company makes an acquisition of (or insources) operations that did not exist in its base year. There may only be a recalculation of historic data back to the year in which the acquired company came into existence. The same applies to cases where the company makes a divestment of (or outsources) operations that did not exist in the base year.

Figure 8 illustrates a situation where no recalculation of base year emissions is required, since the acquired facility came into existence after the base year was set.

### No recalculation for "outsourcing/insourcing" if reported under scope 2 and/or scope 3

Structural changes due to "outsourcing" or "insourcing" do not trigger base year emissions recalculation if the company is reporting its indirect emissions from relevant outsourced or insourced activities. For example, outsourcing production of electricity, heat, or steam does not trigger base year emissions recalculation, since the GHG Protocol Corporate Standard requires scope 2 reporting. However, outsourcing/insourcing that shifts significant emissions between scope 1 and scope 3 when scope 3 is not reported does trigger a base year emissions recalculation (e.g., when a company outsources the transportation of products).

In case a company decides to track emissions over time separately for different scopes, and has separate base years for each scope, base year emissions recalculation for outsourcing or insourcing is made.

### ENDESA: Recalculation of base year emissions because of structural changes

The *GHG Protocol Corporate Standard* requires setting a base year for comparing emissions over time. To be able to compare over time, the base year emissions must be recalculated if any structural changes occur in the company. In a deal completed January 2002, the ENDESA Group, a power generation company based in Spain, sold its 87.5 percent holding in Viesgo, a part of its Spanish power generation business, to ENEL, an Italian power company. To account for this structural change, historical emissions from the six power plants included in the sale were no longer accounted for in the Endesa GHG inventory and therefore removed from its base year emissions. This recalculation provides ENDESA with a complete and comparable picture of its historical emissions.

Exhibit 2 to Decl. of Burton
72

CHAPTER 5  Tracking Emissions Over Time          39

FIGURE 8. **Acquisition of a facility that came into existence after the base year was set**



Company Teta consists of two business units (A and B). In its base year (year one), the company emits 50 tonnes $CO_2$. In year two, the company undergoes organic growth, leading to an increase in emissions to 30 tonnes $CO_2$ per business unit, i.e., 60 tonnes $CO_2$ in total. The base year emissions are not recalculated in this case. At the beginning of year three, Teta acquires a production facility C from another company. Facility C came into existence in year two, its emissions being 15 tonnes $CO_2$ in year two and 20 tonnes $CO_2$ in year three. The total emissions of company Teta in year three, including facility C, are therefore 80 tonnes $CO_2$. In this acquisition case, the base year emissions of company Teta do not change because the acquired facility C did not exist in year one when the base year of Teta was set. The base year emissions of Teta therefore remain at 50 tonnes $CO_2$. Teta (optionally) reports 75 tonnes as the recalculated figure for year two emissions.

## No recalculation for organic growth or decline

Base year emissions and any historic data are not recalculated for organic growth or decline. Organic growth/decline refers to increases or decreases in production output, changes in product mix, and closures and openings of operating units that are owned or controlled by the company. The rationale for this is that organic growth or decline results in a change of emissions to the atmosphere and therefore needs to be counted as an increase or decrease in the company's emissions profile over time.



NOTES

[1]  Terminology on this topic can be confusing. Base year emissions should be differentiated from the term "baseline," which is mostly used in the context of project-based accounting. The term base year focuses on a comparison of emissions over time, while a baseline is a hypothetical scenario for what GHG emissions would have been in the absence of a GHG reduction project or activity.

[2]  For more information on the timing of base year emissions recalculations, see the guidance document "Base year recalculation methodologies for structural changes" on the GHG Protocol website (www.ghgprotocol.org).

GUIDANCE

Exhibit 2 to Decl. of Burton 73          ER-1532



# 6  Identifying and Calculating GHG Emissions

**G U I D A N C E**

Once the inventory boundary has been established, companies generally calculate GHG emissions using the following steps:

1. Identify GHG emissions sources

2. Select a GHG emissions calculation approach

3. Collect activity data and choose emission factors

4. Apply calculation tools

5. Roll-up GHG emissions data to corporate level.

This chapter describes these steps and the calculation tools developed by the GHG Protocol. The calculation tools are available on the GHG Protocol Initiative website at www.ghgprotocol.org.

**G U I D A N C E**

40

Exhibit 2 to Decl. of Burton 74

**ER-1533**

CHAPTER 6 Identifying and Calculating GHG Emissions 41

To create an accurate account of their emissions, companies have found it useful to divide overall emissions into specific categories. This allows a company to use specifically developed methodologies to accurately calculate the emissions from each sector and source category.

## Identify GHG emissions sources

The first of the five steps in identifying and calculating a company's emissions as outlined in Figure 9 is to categorize the GHG sources within that company's boundaries. GHG emissions typically occur from the following source categories:

- Stationary combustion: combustion of fuels in stationary equipment such as boilers, furnaces, burners, turbines, heaters, incinerators, engines, flares, etc.

- Mobile combustion: combustion of fuels in transportation devices such as automobiles, trucks, buses, trains, airplanes, boats, ships, barges, vessels, etc.

- Process emissions: emissions from physical or chemical processes such as $CO_2$ from the calcination step in cement manufacturing, $CO_2$ from catalytic cracking in petrochemical processing, PFC emissions from aluminum smelting, etc.

- Fugitive emissions: intentional and unintentional releases such as equipment leaks from joints, seals, packing, gaskets, as well as fugitive emissions from coal piles, wastewater treatment, pits, cooling towers, gas processing facilities, etc.

Every business has processes, products, or services that generate direct and/or indirect emissions from one or more of the above broad source categories. The GHG Protocol calculation tools are organized based on these categories. Appendix D provides an overview of direct and indirect GHG emission sources organized by scopes and industry sectors that may be used as an initial guide to identify major GHG emission sources.

### IDENTIFY SCOPE 1 EMISSIONS

As a first step, a company should undertake an exercise to identify its direct emission sources in each of the four source categories listed above. Process emissions are usually only relevant to certain industry sectors like oil and gas, aluminum, cement, etc. Manufacturing companies that generate process emis-



FIGURE 9.
**Steps in identifying and calculating GHG emissions**

Identify Sources

Select Calculation Approach

Collect Data and Choose Emission Factors

Apply Calculation Tools

Roll-up Data to Corporate Level

sions and own or control a power production facility will likely have direct emissions from all the main source categories. Office-based organizations may not have any direct GHG emissions except in cases where they own or operate a vehicle, combustion device, or refrigeration and air-conditioning equipment. Often companies are surprised to realize that significant emissions come from sources that are not initially obvious (see United Technologies case study).

### IDENTIFY SCOPE 2 EMISSIONS

The next step is to identify indirect emission sources from the consumption of purchased electricity, heat, or steam. Almost all businesses generate indirect emissions due to the purchase of electricity for use in their processes or services.

### IDENTIFY SCOPE 3 EMISSIONS

This optional step involves identification of other indirect emissions from a company's upstream and downstream activities as well as emissions associated with outsourced/contract manufacturing, leases, or franchises not included in scope 1 or scope 2.

The inclusion of scope 3 emissions allows businesses to expand their inventory boundary along their value chain and to identify all relevant GHG emissions. This provides a broad overview of various business linkages and possible opportunities for significant GHG emission reductions that may exist upstream or downstream of a company's immediate operations (see chapter 4 for an overview of activities that can generate GHG emissions along a company's value chain).

G U I D A N C E

Exhibit 2 to Decl. of Burton
75

**ER-1534**

# Identifying and Calculating GHG Emissions

G U I D A N C E

## Select a calculation approach

Direct measurement of GHG emissions by monitoring concentration and flow rate is not common. More often, emissions may be calculated based on a mass balance or stoichiometric basis specific to a facility or process. However, the most common approach for calculating GHG emissions is through the application of documented emission factors. These factors are calculated ratios relating GHG emissions to a proxy measure of activity at an emissions source. The IPCC guidelines (IPCC, 1996) refer to a hierarchy of calculation approaches and techniques ranging from the application of generic emission factors to direct monitoring.

In many cases, particularly when direct monitoring is either unavailable or prohibitively expensive, accurate emission data can be calculated from fuel use data. Even small users usually know both the amount of fuel consumed and have access to data on the carbon content of the fuel through default carbon content coefficients or through more accurate periodic fuel sampling. Companies should use the most accurate calculation approach available to them and that is appropriate for their reporting context.

## Collect activity data and choose emission factors

For most small to medium-sized companies and for many larger companies, scope 1 GHG emissions will be calculated based on the purchased quantities of commercial fuels (such as natural gas and heating oil) using published emission factors. Scope 2 GHG emissions will primarily be calculated from metered electricity consumption and supplier-specific, local grid, or other published emission factors. Scope 3 GHG emissions will primarily be calculated from activity data such as fuel use or passenger miles and published or third-party emission factors. In most cases, if source- or facility-specific emission factors are available, they are preferable to more generic or general emission factors.

Industrial companies may be faced with a wider range of approaches and methodologies. They should seek guidance from the sector-specific guidelines on the GHG Protocol website (if available) or from their industry associations (e.g., International Aluminum Institute, International Iron and Steel Institute, American Petroleum Institute, WBCSD Sustainable Cement Initiative, International Petroleum Industry Environmental Conservation Association).

### United Technologies Corporation: More than meets the eye

In 1996, United Technologies Corporation (UTC), a global aerospace and building systems technology corporation, appointed a team to set boundaries for the company's new Natural Resource Conservation, Energy and Water Use Reporting Program. The team focused on what sources of energy should be included in the program's annual report of energy consumption. The team decided jet fuel needed to be reported in the annual report; jet fuel was used by a number of UTC divisions for engine and flight hardware testing and for test firing. Although the amount of jet fuel used in any given year was subject to wide variation due to changing test schedules, the total amount consumed in an average year was believed to be large and potentially small enough to be specifically excluded. However, jet fuel consumption reports proved that initial belief incorrect. Jet fuel has accounted for between 9 and 13 percent of the corporation's total annual use of energy since the program commenced. Had UTC not included the use of jet fuel in annual data collection efforts, a significant emissions source would have been overlooked.

## Apply calculation tools

This section provides an overview of the GHG calculation tools and guidance available on the GHG Protocol Initiative website (www.ghgprotocol.org). Use of these tools is encouraged as they have been peer reviewed by experts and industry leaders, are regularly updated, and are believed to be the best available. The tools, however, are optional. Companies may substitute their own GHG calculation methods, provided they are more accurate than or are at least consistent with GHG Protocol Corporate Standards approaches.

There are two main categories of calculation tools:

- Cross-sector tools that can be applied to different sectors. These include stationary combustion, mobile combustion, HFC use in refrigeration and air conditioning, and measurement and estimation uncertainty.

- Sector-specific tools that are designed to calculate emissions in specific sectors such as aluminum, iron and steel, cement, oil and gas, pulp and paper, office-based organizations.

42    CHAPTER 6

Exhibit 2 to Decl. of Burton 76

ER-1535

Most companies will need to use more than one calculation tool to cover all their GHG emission sources. For example, to calculate GHG emissions from an aluminum production facility, the company would use the calculation tools for aluminum production, stationary combustion (for any consumption of purchased electricity, generation of energy on-site, etc), mobile combustion (for transportation of materials and products by train, vehicles employed on-site, employee business travel, etc), and HFC use (for refrigeration, etc). See Table 3 for the full list of tools.

**STRUCTURE OF GHG PROTOCOL CALCULATION TOOLS**

Each of the cross-sector and sector-specific calculation tools on the website share a common format and include step-by-step guidance on measuring and calculating emissions data. Each tool consists of a guidance section and automated worksheets with explanations on how to use them.

The guidance for each calculation tool includes the following sections:

- Overview: provides an overview of the purpose and content of the tool, the calculation method used in the tool, and a process description

- Choosing activity data and emission factors: provides sector-specific good practice guidance and references for default emission factors

- Calculation methods: describes different calculation methods depending on the availability of site-specific activity data and emission factors

- Quality control: provides good practice guidance

- Internal reporting and documentation: provides guidance on internal documentation to support emissions calculations.

## ChevronTexaco: The SANGEA™ accounting and reporting system

ChevronTexaco, a global energy company, has developed and implemented energy utilization and GHG estimation and reporting software consistent with the *GHG Protocol Corporate Standard*. This software is available free of charge and makes it easier, more accurate, and less costly to institute a corporate-wide GHG accounting and reporting system in the oil and gas sector. Called the SANGEA™ Energy and Greenhouse Gas Emissions Estimating System, it is currently in use at all ChevronTexaco facilities worldwide, comprising more than 70 reporting entities.

The system is an auditable, Excel-and-Visual-Basic-based tool for estimating GHG emissions and energy utilization. It streamlines corporate-level data consolidation by allowing the inventory coordinator at each facility to configure a spreadsheet, enter monthly data, and send quarterly reports to a centralized database.

In practice, the SANGEA™ system employs a variety of strategies to ensure consistent calculation methods and ease company-wide standardization:

- Spreadsheet configuration and material input information for specific facilities can be carried over from year to year. Inventory specialists can easily modify configurations as a facility changes (due to new construction, retirement of units, etc).

- Updates are efficient. Methodologies for estimating emissions, emission factors, and calculation equations are stored centrally in

the software, easing updates when methodologies or default factors change. Updates to this central reference are automatically applied to the existing configuration and input data. Updates will mirror the timing and content of updates to the American Petroleum Institute Compendium of GHG emission estimating methodologies.

- The system is auditable. The software requires detailed audit trail information on data inputs and system users. There is documented accountability of who made any change to the system.

- Using one system saves money. Significant cost savings are achieved by using the same system in all facilities, as compared to conventional, disparate systems.

ChevronTexaco's one-off investment in developing the SANGEA™ system has already shown results: A rough cost estimate for ChevronTexaco's Richmond, California, refinery indicates savings of more than 70 percent over a five-year period compared with the conventional approaches based on locally developed reporting systems. SANGEA™ is expected to reduce the long term expenses of maintaining a legacy system and hiring independent consultants. Employing a combination of the *GHG Protocol Corporate Standard*s and SANGEA™ calculation software to replace a diverse and confusing set of accounting and reporting templates yields significant efficiency and accuracy gains, and allows the company to more accurately manage GHG emissions and institute specific emissions improvements.

GUIDANCE

Exhibit 2 to Decl. of Burton 77      ER-1536

# Identifying and Calculating GHG Emissions

TABLE 3. Overview of GHG calculation tools available on the GHG Protocol website

| CALCULATION TOOLS | MAIN FEATURES |
|---|---|
| **CROSS-SECTOR TOOLS** | |
| Stationary Combustion | • Calculates direct and indirect $CO_2$ emissions from fuel combustion in stationary equipment<br>• Provides two options for allocating GHG emissions from a co-generation facility<br>• Provides default fuel and national average electricity emission factors |
| Mobile Combustion | • Calculates direct and indirect $CO_2$ emissions from fuel combustion in mobile sources<br>• Provides calculations and emission factors for road, air, water, and rail transport |
| HFC from Air Conditioning and Refrigeration Use | • Calculates direct HFC emissions during manufacture, use and disposal of refrigeration and air-conditioning equipment in commercial applications<br>• Provides three calculation methodologies: a sales-based approach, a life cycle stage based approach, and an emission factor based approach |
| Measurement and Estimation Uncertainty for GHG Emissions | • Introduces the fundamentals of uncertainty analysis and quantification<br>• Calculates statistical parameter uncertainties due to random errors related to calculation of GHG emissions<br>• Automates the aggregation steps involved in developing a basic uncertainty assessment for GHG inventory data |
| **SECTOR-SPECIFIC TOOLS** | |
| Aluminum and other non-Ferrous Metals Production | • Calculates direct GHG emissions from aluminum production ($CO_2$ from anode oxidation, PFC emissions from the "anode effect," and $SF_6$ used in non-ferrous metals production as a cover gas) |
| Iron and Steel | • Calculates direct GHG emissions ($CO_2$) from oxidation of the reducing agent, from the calcination of the flux used in steel production, and from the removal of carbon from the iron ore and scrap steel used |
| Nitric Acid Manufacture | • Calculates direct GHG emissions ($N_2O$) from the production of nitric acid |
| Ammonia Manufacture | • Calculates direct GHG emissions ($CO_2$) from ammonia production. This is for the removal of carbon from the feedstock stream only; combustion emissions are calculated with the stationary combustion module |
| Adipic Acid Manufacture | • Calculates direct GHG emissions ($N_2O$) from adipic acid production |
| Cement | • Calculates direct $CO_2$ emissions from the calcination process in cement manufacturing (WBCSD tool also calculates combustion emissions)<br>• Provides two calculation methodologies: the cement-based approach and the clinker-based approach |
| Lime | • Calculates direct GHG emissions from lime manufacturing ($CO_2$ from the calcination process) |
| HFC-23 from HCFC-22 Production | • Calculates direct HFC-23 emissions from production of HCFC-22 |
| Pulp and Paper | • Calculates direct $CO_2$, $CH_4$, and $N_2O$ emissions from production of pulp and paper. This includes calculation of direct and indirect $CO_2$ emissions from combustion of fossil fuels, bio-fuels, and waste products in stationary equipment |
| Semi-Conductor Wafer Production | • Calculates PFC emission from the production of semi-conductor wafers |
| Guide for Small Office-Based Organizations | • Calculates direct $CO_2$ emissions from fuel use, indirect $CO_2$ emissions from electricity consumption, and other indirect $CO_2$ emissions from business travel and commuting |

44 CHAPTER 6

Exhibit 2 to Decl. of Burton 78    ER-1537

In the automated worksheet section, it is only necessary to insert activity data into the worksheets and to select an appropriate emission factor or factors. Default emission factors are provided for the sectors covered, but it is also possible to insert customized emission factors that are more representative of the reporting company's operations. The emissions of each GHG ($CO_2$, $CH_4$, $N_2O$, etc.) are calculated separately and then converted to $CO_2$ equivalents on the basis of their global warming potential.

Some tools, such as the iron and steel sector tool and the HFC cross-sector tool, take a tiered approach, offering a choice between a simple and a more advanced calculation methodology. The more advanced methods are expected to produce more accurate emissions estimates but usually require collection of more detailed data and a more thorough understanding of a company's technologies.

### Roll-up GHG emissions data to corporate level

To report a corporation's total GHG emissions, companies will usually need to gather and summarize data from multiple facilities, possibly in different countries and business divisions. It is important to plan this process carefully to minimize the reporting burden, reduce the risk of errors that might occur while compiling data, and ensure that all facilities are collecting information on an approved, consistent basis. Ideally, corporations will integrate GHG reporting with their existing reporting tools and processes, and take advantage of any relevant data already collected and reported by facilities to division or corporate offices, regulators or other stakeholders.

The tools and processes chosen to report data will depend upon the information and communication infrastructure already in place (i.e., how easy is it to include new data categories in corporate databases). It will also depend upon the amount of detail that corporate headquarters wishes to be reported from facilities. Data collection and management tools could include:

- Secure databases available over the company intranet or internet, for direct data entry by facilities

- Spreadsheet templates filled out and e-mailed to a corporate or division office, where data is processed further

- Paper reporting forms faxed to a corporate or division office where data is re-entered in a corporate database. However, this method may increase the likelihood of errors if there are not sufficient checks in place to ensure the accurate transfer of the data.

### BP: A standardized system for internal reporting of GHGs

BP, a global energy company, has been collecting GHG data from the different parts of its operations since 1997 and has consolidated its internal reporting processes into one central database system. The responsibility for reporting environmental emissions lies with about 320 individual BP facilities and business departments, which are termed "reporting units." All reporting units have to complete a standard Excel pro-forma spreadsheet every quarter, stating actual emissions for the preceding three months and updates to forecasts for the current year and the next two years. In addition, reporting units are asked to account for all significant variances, including sustainable reductions. The reporting units all use the same BP GHG Reporting Guidelines "Protocol" (BP, 2000) for quantifying their emissions of carbon dioxide and methane.

All pro-forma spreadsheets are e-mailed automatically by the central database to the reporting units, and the completed e-mail returns are uploaded into the database by a corporate team, who check the quality of the incoming data. The data are then compiled, by the end of the month following each quarter end, to provide the total emission inventory and forecasts for analysis against BP's GHG target. Finally, the inventory is reviewed by a team of independent external auditors to provide assurance on the quality and accuracy of the data.

For internal reporting up to the corporate level, it is recommended that standardized reporting formats be used to ensure that data received from different business units and facilities is comparable, and that internal reporting rules are observed (see BP case study). Standardized formats can significantly reduce the risk of errors.



GUIDANCE

Exhibit 2 to Decl. of Burton 79

**ER-1538**

# Identifying and Calculating GHG Emissions

## Approaches for rolling up GHG emissions data to corporate level

There are two basic approaches for gathering data on GHG emissions from a corporation's facilities (Figure 10):

- **Centralized:** individual facilities report activity/fuel use data (such as quantity of fuel used) to the corporate level, where GHG emissions are calculated.

- **Decentralized:** individual facilities collect activity/fuel use data, directly calculate their GHG emissions using approved methods, and report this data to the corporate level.

FIGURE 10. **Approaches to gathering data**

| | SITE LEVEL | CORPORATE LEVEL |
|---|---|---|
| CENTRALIZED | Activity data | Sites report activity data (GHG emissions calculated at corporate level: activity data x emissions factor = GHG emissions) |
| DECENTRALIZED | Activity data x emission factor = GHG emissions | Sites report GHG emissions |

The difference between these two approaches is in where the emissions calculations occur (i.e., where activity data is multiplied by the appropriate emission factors) and in what type of quality management procedures must be put in place at each level of the corporation. Facility-level staff is generally responsible for initial data collection under both approaches.

Under both approaches, staff at corporate and lower levels of consolidation should take care to identify and exclude any scope 2 or 3 emissions that are also accounted for as scope 1 emissions by other facilities, business units, or companies included in the emissions inventory consolidation.

### CENTRALIZED APPROACH:
#### INDIVIDUAL FACILITIES REPORT ACTIVITY/FUEL USE DATA

This approach may be particularly suitable for office-based organizations. Requesting that facilities report their activity/fuel use data may be the preferred option if:

- The staff at the corporate or division level can calculate emissions data in a straightforward manner on the basis of activity/fuel use data; and

- Emissions calculations are standard across a number of facilities.

### DECENTRALIZED APPROACH:
#### INDIVIDUAL FACILITIES CALCULATE GHG EMISSIONS DATA

Asking facilities to calculate GHG emissions themselves will help to increase their awareness and understanding of the issue. However, it may also lead to resistance, increased training needs, an increase in calculation errors, and a greater need for auditing of calculations. Requesting that facilities calculate GHG emissions themselves may be the preferred option if:

- GHG emission calculations require detailed knowledge of the kind of equipment being used at facilities;

- GHG emission calculation methods vary across a number of facilities;

- Process emissions (in contrast to emissions from burning fossil fuels) make up an important share of total GHG emissions;

- Resources are available to train facility staff to conduct these calculations and to audit them;

- A user-friendly tool is available to simplify the calculation and reporting task for facility-level staff; or

- Local regulations require reporting of GHG emissions at a facility level.

The choice of collection approach depends on the needs and characteristics of the reporting company. For example, United Technologies Corporation uses the centralized approach, leaving the choice of emission factors and calculations to corporate staff, while BP uses the decentralized approach and follows up with audits to ensure calculations are correct, documented, and follow approved methods. To maximize accuracy and minimize reporting burdens, some companies use a combination of the two approaches. Complex facilities with process emissions calculate their emissions at the facility level, while facilities with uniform emissions from standard sources only report fuel use, electricity consumption, and travel activity. The corporate database or reporting tool then calculates total GHG emissions for each of these standard activities.

The two approaches are not mutually exclusive and should produce the same result. Thus companies desiring a consistency check on facility-level calculations can follow both approaches and compare the results. Even when facilities calculate their own GHG emissions, corporate staff may still wish to gather activity/fuel use data to double-check calculations and explore opportunities for emissions reductions. These

46   CHAPTER 6

Exhibit 2 to Decl. of Burton 80

ER-1539

CHAPTER 6   Identifying and Calculating GHG Emissions   47

data should be available and transparent to staff at all corporate levels. Corporate staff should also verify that facility-reported data are based on well defined, consistent, and approved inventory boundaries, reporting periods, calculation methodologies, etc.

## Common guidance on reporting to corporate level

Reports from facility level to corporate or division offices should include all relevant information as specified in chapter 9. Some reporting categories are common to both the centralized and decentralized approaches and should be reported by facilities to their corporate offices. These include:

- A brief description of the emission sources

- A list and justification of specific exclusion or inclusion of sources

- Comparative information from previous years

- The reporting period covered

- Any trends evident in the data

- Progress towards any business targets

- A discussion of uncertainties in activity/fuel use or emissions data reported, their likely cause, and recommendations for how data can be improved

- A description of events and changes that have an impact on reported data (acquisitions, divestitures, closures, technology upgrades, changes of reporting boundaries or calculation methodologies applied, etc.).



### REPORTING FOR THE CENTRALIZED APPROACH

In addition to the activity/fuel use data and aforementioned common categories of reporting data, facilities following the centralized approach by reporting activity/fuel use data to the corporate level should also report the following:

- Activity data for freight and passenger transport activities (e.g., freight transport in tonne-kilometers)

- Activity data for process emissions (e.g., tonnes of fertilizer produced, tonnes of waste in landfills)

- Clear records of any calculations undertaken to derive activity/fuel use data

- Local emission factors necessary to translate fuel use and/or electricity consumption into $CO_2$ emissions.

### REPORTING FOR THE DECENTRALIZED APPROACH

In addition to the GHG emissions data and aforementioned common categories of reporting data, individual facilities following the decentralized approach by reporting calculated GHG emissions to the corporate level should also report the following:

- A description of GHG calculation methodologies and any changes made to those methodologies relative to previous reporting periods

- Ratio indicators (see chapter 9)

- Details on any data references used for the calculations, in particular information on emission factors used.

Clear records of calculations undertaken to derive emissions data should be kept for any future internal or external verification.

G U I D A N C E

Exhibit 2 to Decl. of Burton
81

ER-1540

# 7  Managing Inventory Quality

GUIDANCE



**C**ompanies have different reasons for managing the quality of their GHG emissions inventory, ranging from identifying opportunities for improvement to stakeholder demand to preparation for regulation. The *GHG Protocol Corporate Standard* recognizes that these reasons are a function of a company's goals and its expectations for the future. A company's goals for and vision of the evolution of the GHG emissions issue should guide the design of its corporate inventory, the implementation of a quality management system, and the treatment of uncertainty within its inventory.

GUIDANCE

48

Exhibit 2 to Decl. of Burton
82

ER-1541

(87 of 296)  Page 87 of 296Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 87 of 296
Case 2:24-cv-00801-ODW-PVC   Document 53-2   Filed 07/24/24   Page 52 of 117   Page ID
#:1728

A corporate GHG inventory program includes all institutional, managerial, and technical arrangements made for the collection of data, preparation of the inventory, and implementation of steps to manage the quality of the inventory.[1] The guidance in this chapter is intended to help companies develop and implement a quality management system for their inventory.

Given an uncertain future, high quality information will have greater value and more uses, while low quality information may have little or no value or use and may even incur penalties. For example, a company may currently be focusing on a voluntary GHG program but also want its inventory data to meet the anticipated requirements of a future when emissions may have monetary value. A quality management system is essential to ensuring that an inventory continues to meet the principles of the GHG Protocol Corporate Standard and anticipates the requirements of future GHG emissions programs.

Even if a company is not anticipating a future regulatory mechanism, internal and external stakeholders will demand high quality inventory information. Therefore, the implementation of some type of quality management system is important. However, the GHG Protocol Corporate Standard recognizes that companies do not have unlimited resources, and, unlike financial accounting, corporate GHG inventories involve a level of scientific and engineering complexity. Therefore, companies should develop their inventory program and quality management system as a cumulative effort in keeping with their resources, the broader evolution of policy, and their own corporate vision.

A quality management system provides a systematic process for preventing and correcting errors, and identifies areas where investments will likely lead to the greatest improvement in overall inventory quality. However, the primary objective of quality management is ensuring the credibility of a company's GHG inventory information. The first step towards achieving this objective is defining inventory quality.

## Defining inventory quality

The GHG Protocol Corporate Standard outlines five accounting principles that set an implicit standard for the faithful representation of a company's GHG emission through its technical, accounting, and reporting efforts (see chapter 1). Putting these principles into practice will result in a credible and unbiased treatment and presentation of issues and data. For a company to follow these principles, quality management needs to be an integral part of its corporate inventory program. The goal of a quality management system is to ensure that these principles are put into practice.

### KPMG: The value of integrating GHG management with existing systems

KPMG, a global services company, found that a key factor in the derivation of reliable, verifiable GHG data is the integration of GHG data management and reporting mechanisms with companies' core operational management and assurance processes. This is because:

• It is more efficient to widen the scope of existing embedded management and assurance processes than to develop a separate function responsible for generating and reporting GHG information.

• As GHG information becomes increasingly monetized, it will attract the same attention as other key performance indicators of businesses. Therefore, management will need to ensure adequate procedures are in place to report reliable data. These procedures can most effectively be implemented by functions within the organization that oversee corporate governance, internal audit, IT, and company reporting.

Another factor that is often not given sufficient emphasis is training of personnel and communication of GHG objectives. Data generation and reporting systems are only as reliable as the people who operate them. Many well-designed systems fail because the precise reporting needs of the company are not adequately explained to the people who have to interpret a reporting standard and calculation tools. Given the complexity of accounting boundaries and an element of subjectivity that must accompany source inclusion and equity share, inconsistent interpretation of reporting requirements is a real risk. It is also important that those responsible for supplying input data are aware of its use. The only way to minimize this risk is through clear communication, adequate training and knowledge sharing.

GUIDANCE

Exhibit 2 to Decl. of Burton
83                                                    ER-1542

# Managing Inventory Quality

GUIDANCE

## An inventory program framework

A practical framework is needed to help companies conceptualize and design a quality management system and to help plan for future improvements. This framework focuses on the following institutional, managerial, and technical components of an inventory (Figure 11):

METHODS: These are the technical aspects of inventory preparation. Companies should select or develop methodologies for estimating emissions that accurately represent the characteristics of their source categories. The GHG Protocol provides many default methods and calculation tools to help with this effort. The design of an inventory program and quality management system should provide for the selection, application, and updating of inventory methodologies as new research becomes available, changes are made to business operations, or the importance of inventory reporting is elevated.

DATA: This is the basic information on activity levels, emission factors, processes, and operations. Although methodologies need to be appropriately rigorous and detailed, data quality is more important. No methodology can compensate for poor quality input data. The design of a corporate inventory program should facilitate the collection of high quality inventory data and the maintenance and improvement of collection procedures.

INVENTORY PROCESSES AND SYSTEMS: These are the institutional, managerial, and technical procedures for preparing GHG inventories. They include the team and processes charged with the goal of producing a high quality inventory. To streamline GHG inventory quality

management, these processes and systems may be integrated, where appropriate, with other corporate processes related to quality.

DOCUMENTATION: This is the record of methods, data, processes, systems, assumptions, and estimates used to prepare an inventory. It includes everything employees need to prepare and improve a company's inventory. Since estimating GHG emissions is inherently technical (involving engineering and science), high quality, transparent documentation is particularly important to credibility. If information is not credible, or fails to be effectively communicated to either internal or external stakeholders, it will not have value.

Companies should seek to ensure the quality of these components at every level of their inventory design.

## Implementing an inventory quality management system

A quality management system for a company's inventory program should address all four of the inventory components described above. To implement the system, a company should take the following steps:

1. Establish an inventory quality team. This team should be responsible for implementing a quality management system, and continually improving inventory quality. The team or manager should coordinate interactions between relevant business units, facilities and external entities such as government agency programs, research institutions, verifiers, or consulting firms.

FIGURE 11: **Inventory quality management system**



50  CHAPTER 7

Exhibit 2 to Decl. of Burton
84

**ER-1543**

CHAPTER 7  Managing Inventory Quality                                    51

2. Develop a quality management plan. This plan describes the steps a company is taking to implement its quality management system, which should be incorporated into the design of its inventory program from the beginning, although further rigor and coverage of certain procedures may be phased in over multiple years. The plan should include procedures for all organizational levels and inventory development processes—from initial data collection to final reporting of accounts. For efficiency and comprehensiveness, companies should integrate (and extend as appropriate) existing quality systems to cover GHG management and reporting, such as any ISO procedures. To ensure accuracy, the bulk of the plan should focus on practical measures for implementing the quality management system, as described in steps three and four.

3. Perform generic quality checks. These apply to data and processes across the entire inventory, focusing on appropriately rigorous quality checks on data handling, documentation, and emission calculation activities (e.g., ensuring that correct unit conversions are used). Guidance on quality checking procedures is provided in the section on implementation below (see table 4).

**TABLE 4.  Generic quality management measures**

| DATA GATHERING, INPUT, AND HANDLING ACTIVITIES |
|---|
| • Check a sample of input data for transcription errors |
| • Identify spreadsheet modifications that could provide additional controls or checks on quality |
| • Ensure that adequate version control procedures for electronic files have been implemented |
| • Others |

| DATA DOCUMENTATION |
|---|
| • Confirm that bibliographical data references are included in spreadsheets for all primary data |
| • Check that copies of cited references have been archived |
| • Check that assumptions and criteria for selection of boundaries, base years, methods, activity data, emission factors, and other parameters are documented |
| • Check that changes in data or methodology are documented |
| • Others |

| CALCULATING EMISSIONS AND CHECKING CALCULATIONS |
|---|
| • Check whether emission units, parameters, and conversion factors are appropriately labeled |
| • Check if units are properly labeled and correctly carried through from beginning to end of calculations |
| • Check that conversion factors are correct |
| • Check the data processing steps (e.g., equations) in the spreadsheets |
| • Check that spreadsheet input data and calculated data are clearly differentiated |
| • Check a representative sample of calculations, by hand or electronically |
| • Check some calculations with abbreviated calculations (i.e., back of the envelope calculations) |
| • Check the aggregation of data across source categories, business units, etc. |
| • Check consistency of time series inputs and calculations |
| • Others |

G U I D A N C E

Exhibit 2 to Decl. of Burton
85                                                                    ER-1544

# Managing Inventory Quality

**GUIDANCE**

4. Perform source-category-specific quality checks. This includes more rigorous investigations into the appropriate application of boundaries, recalculation procedures, and adherence to accounting and reporting principles for specific source categories, as well as the quality of the data input used (e.g., whether electricity bills or meter readings are the best source of consumption data) and a qualitative description of the major causes of uncertainty in the data. The information from these investigations can also be used to support a quantitative assessment of uncertainty. Guidance on these investigations is provided in the section on implementation below.

5. Review final inventory estimates and reports. After the inventory is completed, an internal technical review should focus on its engineering, scientific, and other technical aspects. Subsequently, an internal managerial review should focus on securing official corporate approval of and support for the inventory. A third type of review involving experts external to the company's inventory program is addressed in chapter 10.

6. Institutionalize formal feedback loops. The results of the reviews in step five, as well as the results of every other component of a company's quality management system, should be fed back via formal feedback procedures to the person or team identified in step one. Errors should be corrected and improvements implemented based on this feedback.

7. Establish reporting, documentation, and archiving procedures. The system should contain record keeping procedures that specify what information will be documented for internal purposes, how that information should be archived, and what information is to be reported for external stakeholders. Like internal and external reviews, these record keeping procedures include formal feedback mechanisms.

A company's quality management system and overall inventory program should be treated as evolving, in keeping with a company's reasons for preparing an inventory. The plan should address the company's strategy for a multi-year implementation (i.e., recognize that inventories are a long-term effort), including steps to ensure that all quality control findings from previous years are adequately addressed.

## Practical measures for implementation

Although principles and broad program design guidelines are important, any guidance on quality management would be incomplete without a discussion of practical inventory quality measures. A company should implement these measures at multiple levels within the company, from the point of primary data collection to the final corporate inventory approval process. It is important to implement these measures at points in the inventory program where errors are mostly likely to occur, such as the initial data collection phase and during calculation and data aggregation. While corporate level inventory quality may initially be emphasized, it is important to ensure quality measures are implemented at all levels of disaggregation (e.g., facility, process, geographical, according to a particular scope, etc) to be better prepared for GHG markets or regulatory rules in the future.

Companies also need to ensure the quality of their historical emission estimates and trend data. They can achieve this by employing inventory quality measures to minimize biases that can arise from changes in the characteristics of the data or methods used to calculate historical emission estimates, and by following the standards and guidance of chapter 5.

The third step of a quality management system, as described above, is to implement generic quality checking measures. These measures apply to all source categories and all levels of inventory preparation. Table 4 provides a sample list of such measures.

The fourth step of a quality management system is source category-specific data quality investigations. The information gathered from these investigations can also be used for the quantitative and qualitative assessment of data uncertainty (see section on uncertainty). Addressed below are the types of source-specific quality measures that can be employed for emission factors, activity data, and emission estimates.



52    CHAPTER 7

Exhibit 2 to Decl. of Burton
86

ER-1545

(91 of 296), Page 91 of 296 Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 91 of 296
Case 2:24-cv-00801-ODW-PVC  Document 53-2  Filed 07/24/24  Page 56 of 117  Page ID
#:1732

CHAPTER 7 Managing Inventory Quality                                    53

## EMISSION FACTORS AND OTHER PARAMETERS

For a particular source category, emissions calculations will generally rely on emission factors and other parameters (e.g., utilization factors, oxidation rates, methane conversion factors).[2] These factors and parameters may be published or default factors, based on company-specific data, site-specific data, or direct emission or other measurements. For fuel consumption, published emission factors based on fuel energy content are generally more accurate than those based on mass or volume, except when mass or volume based factors have been measured at the company- or site-specific level. Quality investigations need to assess the representativeness and applicability of emission factors and other parameters to the specific characteristics of a company. Differences between measured and default values need to be qualitatively explained and justified based upon the company's operational characteristics.

## ACTIVITY DATA

The collection of high quality activity data will often be the most significant limitation for corporate GHG inventories. Therefore, establishing robust data collection procedures needs to be a priority in the design of any company's inventory program. The following are useful measures for ensuring the quality of activity data:

- Develop data collection procedures that allow the same data to be efficiently collected in future years.

- Convert fuel consumption data to energy units before applying carbon content emission factors, which may be better correlated to a fuel's energy content than its mass.

- Compare current year data with historical trends. If data do not exhibit relatively consistent changes from year to year then the causes for these patterns should be investigated (e.g., changes of over 10 percent from year to year may warrant further investigation).

- Compare activity data from multiple reference sources (e.g., government survey data or data compiled by trade associations) with corporate data when possible. Such checks can ensure that consistent data is being reported to all parties. Data can also be compared among facilities within a company.

> ## Interface: Integration of emissions and business data systems
>
> Interface, Inc., is the world's largest manufacturer of carpet tiles and upholstery fabrics for commercial interiors. The company has established an environmental data system that mirrors its corporate financial data reporting. The Interface EcoMetrics system is designed to provide activity and material flow data from business units in a number of countries (the United States, Canada, Australia, the United Kingdom, Thailand and throughout Europe) and provides metrics for measuring progress on environmental issues such as GHG emissions. Using company-wide accounting guidelines and standards, energy and material input data are reported to a central database each quarter and made available to sustainability personnel. These data are the foundation of Interface's annual inventory and enable data comparison over time in the pursuit of improved quality.
>
> Basing emissions data systems on financial reporting helps Interface improve its data quality. Just as financial data need to be documented and defensible, Interface's emissions data are held to standards that promote an increasingly transparent, accurate, and high-quality inventory. Integrating its financial and emissions data systems has made Interface's GHG accounting and reporting more useful as it strives to be a "completely sustainable company" by 2020.

- Investigate activity data that is generated for purposes other than preparing a GHG inventory. In doing so, companies will need to check the applicability of this data to inventory purposes, including completeness, consistency with the source category definition, and consistency with the emission factors used. For example, data from different facilities may be examined for inconsistent measurement techniques, operating conditions, or technologies. Quality control measures (e.g., ISO) may have already been conducted during the data's original preparation. These measures can be integrated with the company's inventory quality management system.

- Check that base year recalculation procedures have been followed consistently and correctly (see chapter 5).

- Check that operational and organizational boundary decisions have been applied correctly and consistently to the collection of activity data (see chapters 3 and 4).

G
U
I
D
A
N
C
E

Exhibit 2 to Decl. of Burton
87                                                          ER-1546

# Managing Inventory Quality

**GUIDANCE**

- Investigate whether biases or other characteristics that could affect data quality have been previously identified (e.g., by communicating with experts at a particular facility or elsewhere). For example, a bias could be the unintentional exclusion of operations at smaller facilities or data that do not correspond exactly with the company's organizational boundaries.

- Extend quality management measures to cover any additional data (sales, production, etc.) used to estimate emission intensities or other ratios.

## EMISSION ESTIMATES

Estimated emissions for a source category can be compared with historical data or other estimates to ensure they fall within a reasonable range. Potentially unreasonable estimates provide cause for checking emission factors or activity data and determining whether changes in methodology, market forces, or other events are sufficient reasons for the change. In situations where actual emission monitoring occurs (e.g., power plant $CO_2$ emissions), the data from monitors can be compared with calculated emissions using activity data and emission factors.

If any of the above emission factor, activity data, emission estimate, or other parameter checks indicate a problem, more detailed investigations into the accuracy of the data or appropriateness of the methods may be required. These more detailed investigations can also be utilized to better assess the quality of data. One potential measure of data quality is a quantitative and qualitative assessment of their uncertainty.

### Vauxhall Motors:
### The importance of accuracy checks

The experience of the U.K. automotive manufacturer Vauxhal Motors illustrates the importance of attention to detail in setting up GHG information collection systems. The company wished to calculate GHG emissions from staff air travel. However, when determining the impact of flight travel, it is important to make sure that the round trip distance is used when calculating emissions. Fortunately, Vauxhall's review of its assumptions and calculation methodologies revealed this fact and avoided reporting emissions that were 50 percent lower than the actual value.

## Inventory quality and inventory uncertainty

Preparing a GHG inventory is inherently both an accounting and a scientific exercise. Most applications for company-level emissions and removal estimates require that these data be reported in a format similar to financial accounting data. In financial accounting, it is standard practice to report individual point estimates (i.e., single value versus a range of possible values). In contrast, the standard practice for most scientific studies of GHG and other emissions is to report quantitative data with estimated error bounds (i.e., uncertainty). Just like financial figures in a profit and loss or bank account statement, point estimates in a corporate emission inventory have obvious uses. However, how would or should the addition of some quantitative measure of uncertainty to an inventory be used?

In an ideal situation, in which a company had perfect quantitative information on the uncertainty of its emission estimates at all levels, the primary use of this information would almost certainly be comparative. Such comparisons might be made across companies, across business units, across source categories, or through time. In this situation, inventory estimates could even be rated or discounted based on their quality before they were used, with uncertainty being the objective quantitative metric for quality. Unfortunately, such objective uncertainty estimates rarely exist.

### TYPES OF UNCERTAINTIES

Uncertainties associated with GHG inventories can be broadly categorized into scientific uncertainty and estimation uncertainty. Scientific uncertainty arises when the science of the actual emission and/or removal process is not completely understood. For example, many direct and indirect factors associated with global warming potential (GWP) values that are used to combine emission estimates for various GHGs involve significant scientific uncertainty. Analyzing and quantifying such scientific uncertainty is extremely problematic and is likely to be beyond the capacity of most company inventory programs.

54    CHAPTER 7

Exhibit 2 to Decl. of Burton
88

**ER-1547**

Estimation uncertainty arises any time GHG emissions are quantified. Therefore all emissions or removal estimates are associated with estimation uncertainty. Estimation uncertainty can be further classified into two types: model uncertainty and parameter uncertainty.[3]

Model uncertainty refers to the uncertainty associated with the mathematical equations (i.e., models) used to characterize the relationships between various parameters and emission processes. For example, model uncertainty may arise either due to the use of an incorrect mathematical model or inappropriate input into the model. As with scientific uncertainty, estimating model uncertainty is likely to be beyond most company's inventory efforts; however, some companies may wish to utilize their unique scientific and engineering expertise to evaluate the uncertainty in their emission estimation models.

Parameter uncertainty refers to the uncertainty associated with quantifying the parameters used as inputs (e.g., activity data and emission factors) into estimation models. Parameter uncertainties can be evaluated through statistical analysis, measurement equipment precision determinations, and expert judgment. Quantifying parameter uncertainties and then estimating source category uncertainties based on these parameter uncertainties will be the primary focus of companies that choose to investigate the uncertainty in their emission inventories.

### LIMITATIONS OF UNCERTAINTY ESTIMATES

Given that only parameter uncertainties are within the feasible scope of most companies, uncertainty estimates for corporate GHG inventories will, of necessity, be imperfect. Complete and robust sample data will not always be available to assess the statistical uncertainty[4] in every parameter. For most parameters (e.g., liters of gasoline purchased or tonnes of limestone consumed), only a single data point may be available. In some cases, companies can utilize instrument precision or calibration information to inform their assessment of statistical uncertainty. However, to quantify some of the systematic uncertainties[5] associated with parameters and to supplement statistical



uncertainty estimates, companies will usually have to rely on expert judgment.[6] The problem with expert judgment, though, is that it is difficult to obtain in a comparable (i.e., unbiased) and consistent manner across parameters, source categories, or companies.

Exhibit 2 to Decl. of Burton
89

ER-1548

# Managing Inventory Quality

For these reasons, almost all comprehensive estimates of uncertainty for GHG inventories will be not only imperfect but also have a subjective component and, despite the most thorough efforts, are themselves considered highly uncertain. In most cases, uncertainty estimates cannot be interpreted as an objective measure of quality. Nor can they be used to compare the quality of emission estimates between source categories or companies.

Exceptions to this include the following cases in which it is assumed that either statistical or instrument precision data are available to objectively estimate each parameter's statistical uncertainty (i.e., expert judgment is not needed):

- When two operationally similar facilities use identical emission estimation methodologies, the differences in scientific or model uncertainties can, for the most part, be ignored. Then quantified estimates of statistical uncertainty can be treated as being comparable between facilities. This type of comparability is what is aimed for in some trading programs that prescribe specific monitoring, estimation, and measurement requirements. However, even in this situation, the degree of comparability depends on the flexibility that participants are given for estimating emissions, the homogeneity across facilities, as well as the level of enforcement and review of the methodologies used.

- Similarly, when a single facility uses the same estimation methodology each year, the systematic parameter uncertainties—in addition to scientific and model uncertainties—in a source's emission estimates for two years are, for the most part, identical.[7] Because the systematic parameter uncertainties then cancel out, the uncertainty in an emission trend (e.g., the difference between the estimates for two years) is generally less than the uncertainty in total emissions for a single year. In such a situation, quantified uncertainty estimates can be treated as being comparable over time and used to track relative changes in the quality of a facility's emission estimates for that source category. Such estimates of uncertainty in emission trends can also be used as a guide to setting a facility's emissions reduction target. Trend uncertainty estimates are likely to be less useful for setting broader (e.g., company-wide) targets (see chapter 11) because of the general problems with comparability between uncertainty estimates across gases, sources, and facilities.

Given these limitations, the role of qualitative and quantitative uncertainty assessments in developing GHG inventories include:

- Promoting a broader learning and quality feedback process.

- Supporting efforts to qualitatively understand and document the causes of uncertainty and help identify ways of improving inventory quality. For example, collecting the information needed to determine the statistical properties of activity data and emission factors forces one to ask hard questions and to carefully and systematically investigate data quality.

- Establishing lines of communication and feedback with data suppliers to identify specific opportunities to improve quality of the data and methods used.

- Providing valuable information to reviewers, verifiers, and managers for setting priorities for investments into improving data sources and methodologies.

The GHG Protocol Corporate Standard has developed a supplementary guidance document on uncertainty assessments ("Guidance on uncertainty assessment in GHG inventories and calculating statistical parameter uncertainty") along with an uncertainty calculation tool, both of which are available on the GHG Protocol website. The guidance document describes how to use the calculation tool in aggregating uncertainties. It also discusses in more depth different types of uncertainties, the limitations of quantitative uncertainty assessment, and how uncertainty estimates should be properly interpreted.

Additional guidance and information on assessing uncertainty—including optional approaches to developing quantitative uncertainty estimates and eliciting judgments from experts—can also be found in EPA's Emissions Inventory Improvement Program, Volume VI: Quality Assurance/Quality Control (1999) and in chapter 6 of the IPCC's Good Practice Guidance (2000a).

Exhibit 2 to Decl. of Burton
90

CHAPTER 7   Managing Inventory Quality                   57



G U I D A N C E

### NOTES

[1] Although the term "emissions inventory" is used throughout this chapter, the guidance equally applies to estimates of removals due to sink categories (e.g., forest carbon sequestration).

[2] Some emission estimates may be derived using mass or energy balances, engineering calculations, or computer simulation models. In addition to investigating the input data to these models, companies should also consider whether the internal assumptions (including assumed parameters in the model) are appropriate to the nature of the company's operations.

[3] Emissions estimated from direct emissions monitoring will generally only involve parameter uncertainty (e.g., equipment measurement error).

[4] Statistical uncertainty results from natural variations (e.g., random human errors in the measurement process and fluctuations in measurement equipment). Statistical uncertainty can be detected through repeated experiments or sampling of data.

[5] Systematic parameter uncertainty occurs if data are systematically biased. In other words, the average of the measured or estimated value is always less or greater than the true value. Biases arise, for example, because emission factors are constructed from non-representative samples, all relevant source activities or categories have not been identified, or incorrect or incomplete estimation methods or faulty measurement equipment have been used. Because the true value is unknown, such systematic biases cannot be detected through repeated experiments and, therefore, cannot be quantified through statistical analysis. However, it is possible to identify biases and, sometimes, to quantify them through data quality investigations and expert judgments.

[6] The role of expert judgment can be twofold: First, it can provide the data necessary to estimate the parameter. Second, it can help (in combination with data quality investigations) identify, explain, and quantify both statistical and systematic uncertainties.

[7] It should be recognized, however, that biases may not be constant from year to year but instead may exhibit a pattern over time (e.g., may be growing or falling). For example, a company that continues to disinvest in collecting high quality data may create a situation in which the biases in its data get worse each year. These types of data quality issues are extremely problematic because of the effect they can have on calculated emission trends. In such cases, systematic parameter uncertainties cannot be ignored.

Exhibit 2 to Decl. of Burton
91

ER-1550

# 8 Accounting for GHG Reductions

GUIDANCE



**A**s voluntary reporting, external GHG programs, and emission trading systems evolve, it is becoming more and more essential for companies to understand the implications of accounting for GHG emissions changes over time on the one hand, and, on the other hand, accounting for offsets or credits that result from GHG reduction projects. This chapter elaborates on the different issues associated with the term "GHG reductions."

GUIDANCE

58

Exhibit 2 to Decl. of Burton
92

**ER-1551**

CHAPTER 8  Accounting for GHG Reductions                    59

The GHG Protocol Corporate Standard focuses on accounting and reporting for GHG emissions at the company or organizational level. Reductions in corporate emissions are calculated by comparing changes in the company's actual emissions inventory over time relative to a base year. Focusing on overall corporate or organizational level emissions has the advantage of helping companies manage their aggregate GHG risks and opportunities more effectively. It also helps focus resources on activities that result in the most cost-effective GHG reductions.

In contrast to corporate accounting, the forthcoming GHG Protocol Project Quantification Standard focuses on the quantification of GHG reductions from GHG mitigation projects that will be used as offsets. Offsets are discrete GHG reductions used to compensate for (i.e., offset) GHG emissions elsewhere, for example to meet a voluntary or mandatory GHG target or cap. Offsets are calculated relative to a baseline that represents a hypothetical scenario for what emissions would have been in the absence of the project.

## Corporate GHG reductions at facility or country level

From the perspective of the earth's atmosphere, it does not matter where GHG emissions or reductions occur. From the perspective of national and international policymakers addressing global warming, the location where GHG reductions are achieved is relevant, since policies usually focus on achieving reductions within specific countries or regions, as spelled out, for example, in the Kyoto Protocol. Thus companies with global operations will have to respond to an array of state, national, or regional regulations and requirements that address GHGs from operations or facilities within a specific geographic area.

The GHG Protocol Corporate Standard calculates GHG emissions using a bottom-up approach. This involves calculating emissions at the level of an individual source or facility and then rolling this up to the corporate level. Thus a company's overall emissions may decrease, even if increases occur at specific sources, facilities, or operations and vice-versa. This bottom-up approach enables companies to report GHG emissions information at different scales, e.g., by individual sources or facilities, or by a collection of facilities within a given country. Companies can meet an array of government requirements or voluntary commitments by comparing actual emissions over time for the relevant scale. On a corpo-

rate-wide scale, this information can also be used when setting and reporting progress towards a corporate-wide GHG target (see chapter 11).

In order to track and explain changes in GHG emissions over time, companies may find it useful to provide information on the nature of these changes. For example, BP asks each of its reporting units to provide such information in an accounting movement format using the following categories (BP 2000):

· Acquisitions and divestments

· Closure

· Real reductions (e.g., efficiency improvements, material or fuel substitution)

· Change in production level

· Changes in estimation methodology

· Other

This type of information can be summarized at the corporate level to provide an overview of the company's performance over time.

## Reductions in indirect emissions

Reductions in indirect emissions (changes in scope 2 or 3 emissions over time) may not always capture the actual emissions reduction accurately. This is because there is not a direct cause-effect relationship between the activity of the reporting company and the resulting GHG emissions. For example, a reduction in air travel would reduce a company's scope 3 emissions. This reduction is usually quantified based on an average emission factor of fuel use per passenger. However, how this reduction actually translates into a change in GHG emissions to the atmosphere would depend on a number of factors, including whether another person takes the "empty seat" or whether this unused seat contributes to reduced air traffic over the longer term. Similarly, reductions in scope 2 emissions calculated with an average grid emissions factor may over- or underestimate the actual reduction depending on the nature of the grid.

Generally, as long as the accounting of indirect emissions over time recognizes activities that in aggregate change global emissions, any such concerns over accuracy should not inhibit companies from reporting their indirect emissions. In cases where accuracy is more important, it may be appropriate to undertake a more

G
U
I
D
A
N
C
E

Exhibit 2 to Decl. of Burton
93                                              ER-1552

## Accounting for GHG Reductions

detailed assessment of the actual reduction using a project quantification methodology.

### Project based reductions and offsets/credits

Project reductions that are to be used as offsets should be quantified using a project quantification method, such as the forthcoming GHG Protocol Project Quantification Standard, that addresses the following accounting issues:

- SELECTION OF A BASELINE SCENARIO AND EMISSION. The baseline scenario represents what would have happened in the absence of the project. Baseline emissions are the hypothetical emissions associated with this scenario. The selection of a baseline scenario always involves uncertainty because it represents a hypothetical scenario for what would have happened without the project. The project reduction is calculated as the difference between the baseline and project emissions. This differs from the way corporate or organizational reductions are measured in this document, i.e., in relation to an actual historical base year.

- DEMONSTRATION OF ADDITIONALITY. This relates to whether the project has resulted in emission reductions or removals in addition to what would have happened in the absence of the project. If the project reduction is used as an offset, the quantification procedure should address additionality and demonstrate that the project itself is not the baseline and that project emissions are less than baseline emissions. Additionality ensures the integrity of the fixed cap or target for which the offset is used. Each reduction unit from a project used as an offset allows the organization or facility with a cap or target one additional unit of emissions. If the project were going to happen anyway (i.e., is non-additional), global emissions will be higher by the number of reduction units issued to the project.

- IDENTIFICATION AND QUANTIFICATION OF RELEVANT SECONDARY EFFECTS. These are GHG emissions changes resulting from the project not captured by the primary effect(s).[1] Secondary effects are typically the small, unintended GHG consequences of a project and include leakage (changes in the availability or quantity of a product or service that results in changes in GHG emissions elsewhere) as well as changes in GHG emissions up- and downstream of the project. If relevant, secondary effects should be incorporated into the calculation of the project reduction.

- CONSIDERATION OF REVERSIBILITY. Some projects achieve reductions in atmospheric carbon dioxide levels by capturing, removing and/or storing carbon or GHGs in biological or non-biological sinks (e.g., forestry, land use management, underground reservoirs). These reductions may be temporary in that the removed carbon dioxide may be returned to the atmosphere at some point in the future through intentional activities or accidental occurrences— such as harvesting of forestland or forest fires, etc.[2] The risk of reversibility should be assessed, together with any mitigation or compensation measures included in the project design.

- AVOIDANCE OF DOUBLE COUNTING. To avoid double counting, the reductions giving rise to the offset must occur at sources or sinks not included in the target or cap for which the offset is used. Also, if the reductions occur at sources or sinks owned or controlled by someone other than the parties to the project (i.e., they are indirect), the ownership of the reduction should be clarified to avoid double counting.

Offsets may be converted into credits when used to meet an externally imposed target. Credits are convertible and transferable instruments usually bestowed by an external GHG program. They are typically generated from an activity such as an emissions reduction project and then used to meet a target in an otherwise closed system, such as a group of facilities with an absolute emissions cap placed across them. Although a credit is usually based on the underlying reduction calculation, the conversion of an offset into a credit is usually subject to strict rules, which may differ from program to program. For example, a Certified Emission Reduction (CER) is a credit issued by the Kyoto Protocol Clean Development Mechanism. Once issued, this credit can be traded and ultimately used to meet Kyoto Protocol targets. Experience from the "pre-compliance" market in GHG credits highlights the importance of delineating project reductions that are to be used as offsets with a credible quantification method capable of providing verifiable data.

### Reporting project based reductions

It is important for companies to report their physical inventory emissions for their chosen inventory boundaries separately and independently of any GHG trades they undertake. GHG trades[3] should be reported in its public GHG report under optional information—either in relation to a target (see chapter 11) or corporate

60    CHAPTER 8

Exhibit 2 to Decl. of Burton 94

ER-1553

CHAPTER 8 Accounting for GHG Reductions          61

inventory (see chapter 9). Appropriate information addressing the credibility of purchased or sold offsets or credits should be included.

When companies implement internal projects that reduce GHGs from their operations, the resulting reductions are usually captured in their inventory's boundaries. These reductions need not be reported separately unless they are sold, traded externally, or otherwise used as an offset or credit. However, some companies may be able to make changes to their own operations that result in GHG emissions changes at sources not included in their own inventory boundary, or not captured by comparing emissions changes over time. For example:

- Substituting fossil fuel with waste-derived fuel that might otherwise be used as landfill or incinerated without energy recovery. Such substitution may have no direct effect on (or may even increase) a company's own GHG emissions. However, it could result in emissions reductions elsewhere by another organization, e.g., through avoiding landfill gas and fossil fuel use.

- Installing an on-site power generation plant (e.g., a combined heat and power, or CHP, plant) that provides surplus electricity to other companies may increase a company's direct emissions, while displacing the consumption of grid electricity by the companies supplied. Any resulting emissions reductions at the plants where this electricity would have otherwise been produced will not be captured in the inventory of the company installing the on-site plant.

- Substituting purchased grid electricity with an on-site power generation plant (e.g., CHP) may increase a company's direct GHG emissions, while reducing the GHG emissions associated with the generation of grid electricity. Depending on the GHG intensity and the supply structure of the electricity grid, this reduction may be over- or underestimated when merely comparing scope 2 emissions over time, if the latter are quantified using an average grid emission factor.

## Alcoa: Taking advantage of renewable energy certificates

Alcoa, a global manufacturer of aluminum, is implementing a variety of strategies to reduce its GHG emissions. One approach has been to purchase renewable energy certificates, or RECs, to offset some of the company's GHG emissions. RECs, which represent the environmental benefits of renewable energy unbundled from the actual flow of electrons, are an innovative method of providing renewable energy to individual customers. RECs represent the unbundled environmental benefits, such as avoided $CO_2$ emissions, generated by producing electricity from renewable rather than fossil sources. RECs can be sold bundled with the electricity (as green power) or separately to customers interested in supporting renewable energy.

Alcoa found that RECs offer a variety of advantages, including direct access to the benefits of renewable energy for facilities that may have limited renewable energy procurement options. In October 2003, Alcoa began purchasing RECs equivalent to 100% of the electricity used annually at four corporate offices in Tennessee, Pennsylvania, and New York. The RECs Alcoa is purchasing effectively mean that the four corporate centers are now operating on electricity generated by projects that produce electricity from landfill gas, avoiding the emission of more than 6.3 million kilograms (13.9 million pounds) of carbon dioxide annually. Alcoa chose RECs in part because the supplier was able to provide RECs to all four facilities through one contract. This flexibility lowered the administrative cost of purchasing renewable energy for multiple facilities that are served by different utilities.

For more information on RECs, see the Green Power Market Development Group's Corporate Guide to Green Power Markets: Installment #5 (WRI, 2003).

These reductions may be separately quantified, for example using the GHG Protocol Project Quantification Standard, and reported in a company's public GHG report under optional information in the same way as GHG trades described above.



## NOTES

[1] Primary effects are the specific GHG reducing elements or activities (reducing GHG emissions, carbon storage, or enhancing GHG removals) that the project is intended to achieve.

[2] This problem with the temporary nature of GHG reductions is sometimes referred to as the "permanence" issue.

[3] The term "GHG trades" refers to all purchases or sales of allowances, offsets, and credits.

G U I D A N C E

Exhibit 2 to Decl. of Burton
95

ER-1554

# 9 Reporting GHG Emissions

**S T A N D A R D**



A credible GHG emissions report presents relevant information that is complete, consistent, accurate and transparent. While it takes time to develop a rigorous and complete corporate inventory of GHG emissions, knowledge will improve with experience in calculating and reporting data. It is therefore recommended that a public GHG report:

· Be based on the best data available at the time of publication, while being transparent about its limitations

· Communicate any material discrepancies identified in previous years

· Include the company's gross emissions for its chosen inventory boundary separate from and independent of any GHG trades it might engage in.



S T A N D A R D
G U I D A N C E

62

Exhibit 2 to Decl. of Burton 96

ER-1555

Reported information shall be "relevant, complete, consistent, transparent and accurate." The GHG Protocol Corporate Standard requires reporting a minimum of scope 1 and scope 2 emissions.

## Required information

A public GHG emissions report that is in accordance with the GHG Protocol Corporate Standard shall include the following information:

#### DESCRIPTION OF THE COMPANY AND INVENTORY BOUNDARY

- An outline of the organizational boundaries chosen, including the chosen consolidation approach.

- An outline of the operational boundaries chosen, and if scope 3 is included, a list specifying which types of activities are covered.

- The reporting period covered.

#### INFORMATION ON EMISSIONS

- Total scope 1 and 2 emissions independent of any GHG trades such as sales, purchases, transfers, or banking of allowances.

- Emissions data separately for each scope.

- Emissions data for all six GHGs separately ($CO_2$, $CH_4$, $N_2O$, HFCs, PFCs, $SF_6$) in metric tonnes and in tonnes of $CO_2$ equivalent.

- Year chosen as base year, and an emissions profile over time that is consistent with and clarifies the chosen policy for making base year emissions recalculations.

- Appropriate context for any significant emissions changes that trigger base year emissions recalculation (acquisitions/divestitures, outsourcing/insourcing, changes in reporting boundaries or calculation methodologies, etc.).

- Emissions data for direct $CO_2$ emissions from biologically sequestered carbon (e.g., $CO_2$ from burning biomass/biofuels), reported separately from the scopes.

- Methodologies used to calculate or measure emissions, providing a reference or link to any calculation tools used.

- Any specific exclusions of sources, facilities, and/or operations.

## Optional information

A public GHG emissions report should include, when applicable, the following additional information:

#### INFORMATION ON EMISSIONS AND PERFORMANCE

- Emissions data from relevant scope 3 emissions activities for which reliable data can be obtained.

- Emissions data further subdivided, where this aids transparency, by business units/facilities, country, source types (stationary combustion, process, fugitive, etc.), and activity types (production of electricity, transportation, generation of purchased electricity that is sold to end users, etc.).

- Emissions attributable to own generation of electricity, heat, or steam that is sold or transferred to another organization (see chapter 4).

- Emissions attributable to the generation of electricity, heat or steam that is purchased for re-sale to non-end users (see chapter 4).

- A description of performance measured against internal and external benchmarks.

- Emissions from GHGs not covered by the Kyoto Protocol (e.g., CFCs, $NO_x$,), reported separately from scopes.

- Relevant ratio performance indicators (e.g. emissions per kilowatt-hour generated, tonne of material production, or sales).

- An outline of any GHG management/reduction programs or strategies.

- Information on any contractual provisions addressing GHG-related risks and obligations.

- An outline of any external assurance provided and a copy of any verification statement, if applicable, of the reported emissions data.

S T A N D A R D

Exhibit 2 to Decl. of Burton
97

**ER-1556**

# Reporting GHG Emissions

STANDARD

- Information on the causes of emissions changes that did not trigger a base year emissions recalculation (e.g., process changes, efficiency improvements, plant closures).

- GHG emissions data for all years between the base year and the reporting year (including details of and reasons for recalculations, if appropriate)

- Information on the quality of the inventory (e.g., information on the causes and magnitude of uncertainties in emission estimates) and an outline of policies in place to improve inventory quality. (see chapter 7).

- Information on any GHG sequestration.

- A list of facilities included in the inventory.

- A contact person.

### INFORMATION ON OFFSETS

- Information on offsets that have been purchased or developed outside the inventory boundary, subdivided by GHG storage/removals and emissions reduction projects. Specify if the offsets are verified/certified (see chapter 8) and/or approved by an external GHG program (e.g., the Clean Development Mechanism, Joint Implementation).

- Information on reductions at sources inside the inventory boundary that have been sold/transferred as offsets to a third party. Specify if the reduction has been verified/certified and/or approved by an external GHG program (see chapter 8).



64    CHAPTER 9

Exhibit 2 to Decl. of Burton 98

**ER-1557**

(103 of 296) Page 103 of 296 Case: 25-5327 09/18/2025 DktEntry: 8.8 Page 103 of 296
Case 2:24-cv-00801-ODW-PVC Document 53-2 Filed 07/24/24 Page 68 of 117 Page ID #:1744

CHAPTER 9  Reporting GHG Emissions                           65

By following the GHG Protocol Corporate Standard reporting requirements, users adopt a comprehensive standard with the necessary detail and transparency for credible public reporting. The appropriate level of reporting of optional information categories can be determined by the objectives and intended audience for the report. For national or voluntary GHG programs, or for internal management purposes, reporting requirements may vary (Appendix C summarizes the requirements of various GHG programs).

For public reporting, it is important to differentiate between a summary of a public report that is, for example, published on the Internet or in Sustainability/Corporate Social Responsibility reporting (e.g., Global Reporting Initiative) and a full public report that contains all the necessary data as specified by the reporting standard spelled out in this volume. Not every circulated report must contain all information as specified by this standard, but a link or reference needs to be made to a publicly available full report where all information is available.

For some companies, providing emissions data for specific GHGs or facilities/business units, or reporting ratio indicators, may compromise business confidentiality. If this is the case, the data need not be publicly reported, but can be made available to those auditing the GHG emissions data, assuming confidentiality is secured.

Companies should strive to create a report that is as transparent, accurate, consistent and complete as possible. Structurally, this may be achieved by adopting the reporting categories of the standard (e.g., required description of the company and inventory boundary, required information on corporate emissions, optional information on emissions and performance, and optional information on offsets) as a basis of the report. Qualitatively, including a discussion of the reporting company's strategy and goals for GHG accounting, any particular challenges or tradeoffs faced, the context of decisions on boundaries and other accounting parameters, and an analysis of emissions trends may help provide a complete picture of the company's inventory efforts.

## Double Counting

Companies should take care to identify and exclude from reporting any scope 2 or scope 3 emissions that are also reported as scope 1 emissions by other facilities, business units, or companies included in the emissions inventory consolidation (see chapter 6).

## Use of ratio indicators

Two principal aspects of GHG performance are of interest to management and stakeholders. One concerns the overall GHG impact of a company—that is the absolute quantity of GHG emissions released to the atmosphere. The other concerns the company's GHG emissions normalized by some business metric that results in a ratio indicator. The GHG Protocol Corporate Standard requires reporting of absolute emissions; reporting of ratio indicators is optional.

Ratio indicators provide information on performance relative to a business type and can facilitate comparisons between similar products and processes over time. Companies may choose to report GHG ratio indicators in order to:

· Evaluate performance over time (e.g., relate figures from different years, identify trends in the data, and show performance in relation to targets and base years (see chapter 11).

· Establish a relationship between data from different categories. For example, a company may want to establish a relationship between the value that an action provides (e.g., price of a tonne of product) and its impact on society or on the environment (e.g., emissions from product manufacturing).

· Improve comparability between different sizes of business and operations by normalizing figures (e.g., by assessing the impact of different sized businesses on the same scale).

It is important to recognize that the inherent diversity of businesses and the circumstances of individual companies can result in misleading indicators. Apparently minor differences in process, product, or location can be significant in terms of environmental effect. Therefore, it is necessary to know the business context in order to be able to design and interpret ratio indicators correctly.

G
U
I
D
A
N
C
E

Exhibit 2 to Decl. of Burton
99                                    ER-1558

# Reporting GHG Emissions

GUIDANCE

Companies may develop ratios that make most sense for their business and are relevant to their decision-making needs. They may select ratios for external reporting that improve the understanding and clarify the interpretation of their performance for their stakeholders. It is important to provide some perspective on issues such as scale and limitations of indicators in a way that users understand the nature of the information provided. Companies should consider what ratio indicators best capture the benefits and impacts of their business, i.e., its operations, its products, and its effects on the marketplace and on the entire economy. Some examples of different ratio indicators are provided here.

**PRODUCTIVITY/EFFICIENCY RATIOS.**
Productivity/efficiency ratios express the value or achievement of a business divided by its GHG impact. Increasing efficiency ratios reflect a positive performance improvement. Examples of productivity/efficiency ratios include resource productivity (e.g., sales per GHG) and process eco-efficiency (e.g., production volume per amount of GHG).

## MidAmerican:
## Setting ratio indicators for a utility company

MidAmerican Energy Holdings Company, an energy company based in Iowa, wanted a method to track a power plant's GHG intensity, while also being able to roll individual plant results into a corporate "generation portfolio" GHG intensity indicator. MidAmerican also wanted to be able to take into account the GHG benefits from planned renewable generation, as well as measure the impacts of other changes to its generation portfolio over time (e.g., unit retirements or new construction). The company adopted a GHG intensity indicator that specifically measures pounds of direct emissions over total megawatt hours generated (lbs/MWh).

To measure its direct emissions, the company leverages data currently gathered to satisfy existing regulatory requirements and, where gaps might exist, uses fuel calculations. For coal-fired units, that means mainly using continuous emissions monitoring (CEM) data and the U.S. Environmental Protection Agency's emission factors for natural gas- and fuel oil-fired units. Using the *GHG Protocol Corporate Standard*, the company completes an annual emission inventory for each of its fossil-fired plants, gathering together a) fuel volume and heat input data, b) megawatt production data, c) CEMs data, and d) fuel calculations using appropriate emission factors.

For example, in 2001, using CEM data and fuel calculations, the company's Iowa utility business emitted roughly 23 million tonnes of $CO_2$, while generating approximately 21 million megawatt hours. Its 2001 GHG intensity indicator calculates to approximately 2,177 lbs/MWh of $CO_2$, reflecting the Iowa utility company's reliance on traditional coal-fired generation.

By 2008, the Iowa utility company will have constructed a new 790 MW coal-fueled plant, a 540 MW combined-cycle natural gas plant, and a 310 MW wind-turbine farm and added them to its generation portfolio. The utility company's overall $CO_2$ emissions will increase, but so will its megawatt production. The combined emissions from the new coal- and gas-fired plants will be added to the GHG intensity indicator's numerator, while the megawatt production data from all three facilities will be added to the indicator's denominator. More importantly, and the ratio indicator illustrates this, over time MidAmerican's GHG intensity will decline as more efficient generation is brought online and older power plants are used less or retired altogether.

Exhibit 2 to Decl. of Burton
100

**ER-1559**

CHAPTER 9  Reporting GHG Emissions                    67

**INTENSITY RATIOS.**  Intensity ratios express GHG impact per unit of physical activity or unit of economic output.  A physical intensity ratio is suitable when aggregating or comparing across businesses that have similar products. An economic intensity ratio is suitable when aggregating or comparing across businesses that produce different products.  A declining intensity ratio reflects a positive performance improvement. Many companies historically tracked environmental performance with intensity ratios. Intensity ratios are often called "normalized" environmental impact data. Examples of intensity ratios include product emission intensity (e.g., tonnes of $CO_2$ emissions per electricity generated); service intensity (e.g., GHG emissions per function or per service); and sales intensity (e.g., emissions per sales).

**PERCENTAGES.**  A percentage indicator is a ratio between two similar issues (with the same physical unit in the numerator and the denominator). Examples of percentages that can be meaningful in performance reports include current GHG emissions expressed as a percentage of base year GHG emissions.

For further guidance on ratio indicators refer to CCAR, 2003; GRI, 2002; Verfaillie and Bidwell, 2000.



G
U
I
D
A
N
C
E

Exhibit 2 to Decl. of Burton
101                                      ER-1560

# 10 Verification of GHG Emissions

G U I D A N C E



**V**erification is an objective assessment of the accuracy and completeness of reported GHG information and the conformity of this information to pre-established GHG accounting and reporting principles. Although the practice of verifying corporate GHG inventories is still evolving the emergence of widely accepted standards, such as the *GHG Protocol Corporate Standard* and the forth-coming *GHG Protocol Project Quantification Standard,* should help GHG verification become more uniform, credible, and widely accepted.

G U I D A N C E

68

Exhibit 2 to Decl. of Burton 102

ER-1561

(107 of 296), Page 107 of 296 Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 107 of 296
Case 2:24-cv-00801-ODW-PVC   Document 53-2   Filed 07/24/24   Page 72 of 117   Page ID
#:1748

This chapter provides an overview of the key elements of a GHG verification process. It is relevant to companies who are developing GHG inventories and have planned for, or are considering, obtaining an independent verification of their results and systems. Furthermore, as the process of developing a verifiable inventory is largely the same as that for obtaining reliable and defensible data, this chapter is also relevant to all companies regardless of any intention to commission a GHG verification.

Verification involves an assessment of the risks of material discrepancies in reported data. Discrepancies relate to differences between reported data and data generated from the proper application of the relevant standards and methodologies. In practice, verification involves the prioritization of effort by the verifier towards the data and associated systems that have the greatest impact on overall data quality.

## Relevance of GHG principles

The primary aim of verification is to provide confidence to users that the reported information and associated statements represent a faithful, true, and fair account of a company's GHG emissions. Ensuring transparency and verifiability of the inventory data is crucial for verification. The more transparent, well controlled and well documented a company's emissions data and systems are, the more efficient it will be to verify. As outlined in chapter 1, there are a number of GHG accounting and reporting principles that need to be adhered to when compiling a GHG inventory. Adherence to these principles and the presence of a transparent, well-documented system (sometimes referred to as an audit trail) is the basis of a successful verification.

## Goals

Before commissioning an independent verification, a company should clearly define its goals and decide whether they are best met by an external verification. Common reasons for undertaking a verification include:

- Increased credibility of publicly reported emissions information and progress towards GHG targets, leading to enhanced stakeholder trust

- Increased senior management confidence in reported information on which to base investment and target-setting decisions

- Improvement of internal accounting and reporting practices (e.g., calculation, recording and internal reporting systems, and the application of GHG accounting and reporting principles), and facilitating learning and knowledge transfer within the company

- Preparation for mandatory verification requirements of GHG programs.

## Internal assurance

While verification is often undertaken by an independent, external third party, this may not always be the case. Many companies interested in improving their GHG inventories may subject their information to internal verification by personnel who are independent of the GHG accounting and reporting process. Both internal and external verification should follow similar procedures and processes. For external stakeholders, external third part verification is likely to significantly increase the credibility of the GHG inventory. However, independent internal verifications can also provide valuable assurance over the reliability of information.

Internal verification can be a worthwhile learning experience for a company prior to commissioning an external verification by a third party. It can also provide external verifiers with useful information to begin their work.

## The concept of materiality

The concept of "materiality" is essential to understanding the process of verification. Chapter 1 provides a useful interpretation of the relationship between the principle of completeness and the concept of materiality. Information is considered to be material if, by its inclusion or exclusion, it can be seen to influence any decisions or actions taken by users of it. A material discrepancy is an error (for example, from an oversight, omission or miscalculation) that results in a reported quantity or statement being significantly different to the true value or meaning. In order to express an opinion on data or information, a verifier would need to form a view on the materiality of all identified errors or uncertainties.

While the concept of materiality involves a value judgment, the point at which a discrepancy becomes material (materiality threshold) is usually pre-defined. As a rule of thumb, an error is considered to be materially misleading

Exhibit 2 to Decl. of Burton
103                                                    ER-1562

## Verification of GHG Emissions

if its value exceeds 5% of the total inventory for the part of the organization being verified.

The verifier needs to assess an error or omission in the full context within which information is presented. For example, if a 2% error prevents a company from achieving its corporate target then this would most likely be considered material. Understanding how verifiers apply a materiality threshold will enable companies to more readily establish whether the omissions of an individual source or activity from their inventory is likely to raise questions of materiality.

Materiality thresholds may also be outlined in the requirements of a specific GHG program or determined by a national verification standard, depending on who is requiring the verification and for what reasons. A materiality threshold provides guidance to verifiers on what may be an immaterial discrepancy so that they can concentrate their work on areas that are more likely to lead to materially misleading errors. A materiality threshold is not the same as de minimis emissions, or a permissible quantity of emissions that a company can leave out of its inventory.

### Assessing the risk of material discrepancy

Verifiers need to assess the risk of material discrepancy of each component of the GHG information collection and reporting process. This assessment is used to plan and direct the verification process. In assessing this risk, they will consider a number of factors, including:

- The structure of the organization and the approach used to assign responsibility for monitoring and reporting GHG emissions

- The approach and commitment of management to GHG monitoring and reporting

- Development and implementation of policies and processes for monitoring and reporting (including documented methods explaining how data is generated and evaluated)

- Processes used to check and review calculation methodologies

- Complexity and nature of operations

- Complexity of the computer information system used to process the information

- The state of calibration and maintenance of meters used, and the types of meters used

- Reliability and availability of input data

- Assumptions and estimations applied

- Aggregation of data from different sources

- Other assurance processes to which the systems and data are subjected (e.g., internal audit, external reviews and certifications).

### Establishing the verification parameters

The scope of an independent verification and the level of assurance it provides will be influenced by the company's goals and/or any specific jurisdictional requirements. It is possible to verify the entire GHG inventory or specific parts of it. Discrete parts may be specified in terms of geographic location, business units, facilities, and type of emissions. The verification process may also examine more general managerial issues, such as quality management procedures, managerial awareness, availability of resources, clearly defined responsibilities, segregation of duties, and internal review procedures.

The company and verifier should reach an agreement upfront on the scope, level and objective of the verification. This agreement (often referred to as the scope of work) will address issues such as which information is to be included in the verification (e.g., head office consolidation only or information from all sites), the level of scrutiny to which selected data will be subjected (e.g., desk top review or on-site review), and the intended use of the results of the verification). The materiality threshold is another item to be considered in the scope of work. It will be of key consideration for both the verifier and the company, and is linked to the objectives of the verification.

The scope of work is influenced by what the verifier actually finds once the verification commences and, as a result, the scope of work must remain sufficiently flexible to enable the verifier to adequately complete the verification.

A clearly defined scope of work is not only important to the company and verifier, but also for external stakeholders to be able to make informed and appropriate decisions. Verifiers will ensure that specific exclusions have not been made solely to improve the company's performance. To enhance transparency and credibility companies should make the scope of work publicly available.

70   CHAPTER 10

Exhibit 2 to Decl. of Burton
104

ER-1563

CHAPTER 10   Verification of GHG Emissions          71

## Site visits

Depending on the level of assurance required from verification, verifiers may need to visit a number of sites to enable them to obtain sufficient, appropriate evidence over the completeness, accuracy and reliability of reported information. The sites visited should be representative of the organization as a whole. The selection of sites to be visited will be based on consideration of a number of factors, including:

· Nature of the operations and GHG sources at each site

· Complexity of the emissions data collection and calculation process

· Percentage contribution to total GHG emissions from each site

· The risk that the data from sites will be materially misstated

· Competencies and training of key personnel

· Results of previous reviews, verifications, and uncertainty analyses.

## Timing of the verification

The engagement of a verifier can occur at various points during the GHG preparation and reporting process. Some companies may establish a semi-permanent internal verification team to ensure that GHG data standards are being met and improved on an on-going basis.

Verification that occurs during a reporting period allows for any reporting deficiencies or data issues to be addressed before the final report is prepared. This may be particularly useful for companies preparing high profile public reports. However, some GHG programs may require, often on a random selection basis, an independent verification of the GHG inventory following the submission of a report (e.g., World Economic Forum Global GHG Registry, Greenhouse Challenge program in Australia, EU ETS). In both cases the verification cannot be closed out until the final data for the period has been submitted.

### PricewaterhouseCoopers: GHG inventory verification– lessons from the field

PricewaterhouseCoopers (PwC), a global services company, has been conducting GHG emissions verifications for the past 10 years in various sectors, including energy, chemicals, metals, semiconductors, and pulp and paper. PwC's verification process involves two key steps:

1. An evaluation of whether the GHG accounting and reporting methodology (e.g., *GHG Protocol Corporate Standard*) has been correctly implemented

2. Identification of any material discrepancies.

The *GHG Protocol Corporate Standard* has been crucial in helping PwC to design an effective GHG verification methodology. Since the publication of the first edition, PwC has witnessed rapid improvements in the quality and verifiability of GHG data reported. In particular the quantification on non-$CO_2$ GHGs and combustion emissions has dramatically improved. Cement sector emissions verification has been made easier by the release of the WBCSD cement sector tool. GHG emissions from purchased electricity are also easy to verify since most companies have reliable data on MWh consumed and emission factors are publicly available.

However, experience has shown that for most companies, GHG data for 1990 is too unreliable to provide a verifiable base year for the purposes of tracking emissions over time or setting a GHG target. Challenges also remain in auditing GHG emissions embedded in waste fuels, co-generation, passenger travel, and shipping.

Over the past 3 years PwC has noticed a gradual evolution of GHG verification practices from "customized" and "voluntary" to "standardized" and "mandatory." The California Climate Action Registry, World Economic Forum Global GHG Registry and the forthcoming EU ETS (covering 12,000 industrial sites in Europe) require some form of emissions verification. In the EU ETS GHG verifiers will likely have to be accredited by a national body. GHG verifier accreditation processes have already been established in the UK for its domestic trading scheme, and in California for registering emissions in the CCAR.

GUIDANCE

Exhibit 2 to Decl. of Burton 105          ER-1564

# Verification of GHG Emissions

GUIDANCE

## Selecting a verifier

Some factors to consider when selecting a verifier include their:

- previous experience and competence in undertaking GHG verifications

- understanding of GHG issues including calculation methodologies

- understanding of the company's operations and industry

- objectivity, credibility, and independence.

It is important to recognize that the knowledge and qual-ifications of the individual(s) conducting the verification can be more important than those of the organization(s) they come from. Companies should select organizations based on the knowledge and qualifications of their actual verifiers and ensure that the lead verifier assigned to them is appropriately experienced. Effective verification of GHG inventories often requires a mix of specialized skills, not only at a technical level (e.g., engineering experience, industry specialists) but also at a business level (e.g., verification and industry specialists).

## Preparing for a GHG verification

The internal processes described in chapter 7 are likely to be similar to those followed by an independent veri-fier. Therefore, the materials that the verifiers need are similar. Information required by an external verifier is likely to include the following:

- Information about the company's main activities and GHG emissions (types of GHG produced, description of activity that causes GHG emissions)

- Information about the company/groups/organiza-tion (list of subsidiaries and their geographic location, ownership structure, financial entities within the organization)

- Details of any changes to the company's organiza-tional boundaries or processes during the period, including justification for the effects of these changes on emissions data

- Details of joint venture agreements, outsourcing and contractor agreements, production sharing agree-ments, emissions rights and other legal or contractual documents that determine the organizational and operational boundaries

- Documented procedures for identifying sources of emissions within the organizational and operational boundaries

- Information on other assurance processes to which the systems and data are subjected (e.g. internal audit, external reviews and certifications)

- Data used for calculating GHG emissions. This might, for example, include:

  - Energy consumption data (invoices, delivery notes, weigh-bridge tickets, meter readings: electricity, gas pipes, steam, and hot water, etc.)

  - Production data (tonnes of material produced, kWh of electricity produced, etc.)

  - Raw material consumption data for mass balance calculations (invoices, delivery notes, weighbridge tickets, etc.)

  - Emission factors (laboratory analysis etc.).

- Description of how GHG emissions data have been calculated:

  - Emission factors and other parameters used and their justification

  - Assumptions on which estimations are based

  - Information on the measurement accuracy of meters and weigh-bridges (e.g., calibration records), and other measurement techniques

  - Equity share allocations and their alignment with financial reporting

  - Documentation on what, if any, GHG sources or activities are excluded due to, for example, tech-nical or cost reasons.

- Information gathering process:

  - Description of the procedures and systems used to collect, document and process GHG emissions data at the facility and corporate level

  - Description of quality control procedures applied (internal audits, comparison with last year's data, recalculation by second person, etc.).

72    CHAPTER 10

Exhibit 2 to Decl. of Burton
106

ER-1565

CHAPTER 10  Verification of GHG Emissions          73

- Other information:

  · Selected consolidation approach as defined in chapter 3

  · list of (and access to) persons responsible for collecting GHG emissions data at each site and at the corporate level (name, title, e-mail, and telephone numbers)

  · information on uncertainties, qualitative and if available, quantitative.

Appropriate documentation needs to be available to support the GHG inventory being subjected to external verification. Statements made by management for which there is no available supporting documentation cannot be verified. Where a reporting company has not yet implemented systems for routinely accounting and recording GHG emissions data, an external verification will be difficult and may result in the verifier being unable to issue an opinion. Under these circumstances, the verifiers may make recommendations on how current data collection and collation process should be improved so that an opinion can be obtained in future years.

Companies are responsible for ensuring the existence, quality and retention of documentation so as to create an audit trail of how the inventory was compiled. If a company issues a specific base year against which it assesses its GHG performance, it should retain all relevant historical records to support the base year data. These issues should be born in mind when designing and implementing GHG data processes and procedures.

### Using the verification findings

Before the verifiers will verify that an inventory has met the relevant quality standard, they may require the company to adjust any material errors that they identified during the course of the verification. If the verifiers and the company cannot come to an agreement regarding adjustments, then the verifier may not be able to provide the company with an unqualified opinion. All material errors (individually or in aggregate) need to be amended prior to the final verification sign off.

As well as issuing an opinion on whether the reported information is free from material discrepancy, the verifiers may, depending on the agreed scope of work, also issue a verification report containing a number of recommendations for future improvements. The process of verification should be viewed as a valuable input to the process of continual improvement. Whether verification is undertaken for the purposes of internal review, public reporting or to certify compliance with a particular GHG program, it will likely contain useful information and guidance on how to improve and enhance a company's GHG accounting and reporting system.

Similar to the process of selecting a verifier, those selected to be responsible for assessing and implementing responses to the verification findings should also have the appropriate skills and understanding of GHG accounting and reporting issues.



G U I D A N C E

Exhibit 2 to Decl. of Burton
107                          ER-1566

# 11    Setting a GHG Target

G U I D A N C E



Setting targets is a routine business practice that helps ensure that an issue is kept on senior management's "radar screen" and factored into relevant decisions about what products and services to provide and what materials and technologies to use. Often, a corporate GHG emission reduction target is the logical follow-up to developing a GHG inventory.

G U I D A N C E

74

Exhibit 2 to Decl. of Burton
108

**ER-1567**

CHAPTER 11   Setting a GHG Target                        75

This chapter provides guidance on the process of setting and reporting on a corporate GHG target. Although the chapter focuses on emissions, many of the considerations equally apply to GHG sequestration (see Appendix B). It is not the purpose of this chapter to prescribe what a company's target should be, rather the focus is on the steps involved, the choices to be made, and the implications of those choices.

## Why Set a GHG Target?

Any robust business strategy requires setting targets for revenues, sales, and other core business indicators, as well as tracking performance against those targets. Likewise, effective GHG management involves setting a GHG target. As companies develop strategies to reduce the GHG emissions of their products and operations, corporate-wide GHG targets are often key elements of these efforts, even if some parts of the company are or will be subject to mandatory GHG limits. Common drivers for setting a GHG target include:

- **MINIMIZING AND MANAGING GHG RISKS**
  While developing a GHG inventory is an important step towards identifying GHG risks and opportunities, a GHG target is a planning tool that can actually drive GHG reductions. A GHG target will help raise internal awareness about the risks and opportunities presented by climate change and ensure the issue is on the business agenda. This can serve to minimize and more effectively manage the business risks associated with climate change.

- **ACHIEVING COST SAVINGS AND STIMULATING INNOVATION**
  Implementing a GHG target can result in cost savings by driving improvements in process innovation and resource efficiency. Targets that apply to products can drive R&D, which in turn creates products and services that can increase market share and reduce emissions associated with the use of products.

- **PREPARING FOR FUTURE REGULATIONS**
  Internal accountability and incentive mechanisms that are established to support a target's implementation can also equip companies to respond more effectively to future GHG regulations. For example, some companies have found that experimenting with internal GHG trading programs has allowed them to better understand the possible impacts of future trading programs on the company.

FIGURE 12.  **Steps in setting a GHG target**



1. Obtain senior management commitment

2. Decide on the target type
Set an absolute or intensity target?

3. Decide on the target boundary
Which GHGs to include?
Which direct and indirect emissions?
Which geographical operations?
Treat business types separately?

4. Choose the target base year
Use a fixed or rolling approach?
Use a single or multi-year approach?

5. Define the target completion date
Set a long- or short-term target?

6. Define the length of the target commitment period
Set a one-year or multi-year commitment period?

7. Decide on the use of offsets or credits

8. Establish a target double counting policy
How to deal with double counting of reductions across companies?
How does GHG trading affect target performance?

9. Decide on the target level
What is business-as-usual? How far to go beyond that?
How do all the above steps influence the decision?

10. Track and report progress
Make regular performance checks
Report information in relation to the target

GUIDANCE

Exhibit 2 to Decl. of Burton 109

ER-1568

# Setting a GHG Target

**G U I D A N C E**

- **DEMONSTRATING LEADERSHIP AND CORPORATE RESPONSIBILITY**
  With the emergence of GHG regulations in many parts of the world, as well as growing concern about the effects of climate change, a commitment such as setting a public corporate GHG target demonstrates leadership and corporate responsibility. This can improve a company's standing with customers, employees, investors, business partners, and the public, and enhance brand reputation.

- **PARTICIPATING IN VOLUNTARY PROGRAMS**
  A growing number of voluntary GHG programs are emerging to encourage and assist companies in setting, implementing, and tracking progress toward GHG targets. Participation in voluntary programs can result in public recognition, may facilitate recognition of early action by future regulations, and enhance a company's GHG accounting and reporting capacity and understanding.

## Steps in Setting a Target

Setting a GHG target involves making choices among various strategies for defining and achieving a GHG reduction. The business goals, any relevant policy context, and stakeholder discussions should inform these choices.

The following sections outline the ten steps involved. Although presented sequentially, in practice target setting involves cycling back and forth between the steps. It is assumed that the company has developed a GHG inventory before implementing these steps. Figure 12 summarizes the steps.

## 1. Obtain senior management commitment

As with any corporate wide target, senior management buy-in and commitment particularly at the board/CEO level is a prerequisite for a successful GHG reduction program. Implementing a reduction target is likely to necessitate changes in behavior and decision-making throughout the organization. It also requires establishing an internal accountability and incentive system and providing adequate resources to achieve the target. This will be difficult, if not impossible, without senior management commitment.

---

**BOX 4.  Comparing absolute and intensity targets**

**ABSOLUTE TARGETS** reduce absolute emissions over time (Example: reduce $CO_2$ by 25 percent below 1994 levels by 2010)

**Advantages**
- Designed to achieve a reduction in a specified quantity of GHGs emitted to the atmosphere
- Environmentally robust as it entails a commitment to reduce GHGs by a specified amount
- Transparently addresses potential stakeholder concerns about the need to manage absolute emissions

**Disadvantages**
- Target base year recalculations for significant structural changes to the organization add complexity to tracking progress over time
- Does not allow comparisons of GHG intensity/efficiency
- Recognizes a company for reducing GHGs by decreasing production or output (organic decline, see chapter 5)
- May be difficult to achieve if the company grows unexpectedly and growth is linked to GHG emissions

**INTENSITY TARGETS** reduce the ratio of emissions relative to a business metric over time (Example: reduce $CO_2$ by 12 percent per tonne of clinker between 2000 and 2008)

**Advantages**
- Reflects GHG performance improvements independent of organic growth or decline
- Target base year recalculations for structural changes are usually not required (see step 4)
- May increase the comparability of GHG performance among companies

**Disadvantages**
- No guarantee that GHG emissions to the atmosphere will be reduced—absolute emissions may rise even if intensity goes down and output increases
- Companies with diverse operations may find it difficult to define a single common business metric
- If a monetary variable is used for the business metric, such as dollar of revenue or sales, it must be recalculated for changes in product prices and product mix, as well as inflation, adding complexity to the tracking process

---

76    CHAPTER 11

Exhibit 2 to Decl. of Burton 110

**ER-1569**

CHAPTER 11   Setting a GHG Target                                    77

### Royal Dutch/Shell: The target cascade

The Royal Dutch/Shell Group, a global energy corporation, discovered when implementing its voluntary GHG reduction target that one of the biggest challenges was to cascade the target down to the actions of all employees who influence target performance. It was concluded that successful implementation required different targets at different levels of the company. This is because each of the components that underlie absolute GHG emissions is influenced by decision-making at various management levels (from the corporate level down to individual businesses and facilities).

Absolute GHG emissions at a plant (tonnes of $CO_2$-e.) = Function (MP x BPE x PE)

MP      Quantity of product manufactured by a facility. This is fundamental to the need to grow and is therefore controlled at corporate level. GHG emissions are typically not managed by limiting this component.

BPE     Best process energy use per tonne. The optimal (or theoretical) energy consumed (translates to emissions) by a particular design of plant. The type of plant built is a business-level decision. Significant capital decisions may be involved in building a new plant incorporating new technology. For existing plants, BPE is improved by significant design change and retrofitting. This could also involve large capital expenditure.

PE      Plant efficiency index. An index that indicates how the plant is actually performing relative to BPE. PE is a result of day-to-day decisions taken by plant operators and technicians. It is improved also by the Shell Global Solutions Energise™ programme, which typically requires low capital expenditure to implement.

Royal Dutch/Shell found that while this model is probably an oversimplification when it comes to exploration and production facilities, it is suitable for manufacturing facilities (e.g., refineries and chemical plants). It illustrates that an absolute target could only be set at the corporate level, while lower levels require intensity or efficiency targets.

| TYPE OF TARGET | | | ACTIONS THAT REDUCE EMISSIONS | LEVEL OF DECISION-MAKING (IN GENERAL AND ON TARGET) |
|---|---|---|---|---|
| Reduce absolute emissions | | | See below | Corporate |
| | MP: not normally constrained | | -------- | All levels depending on scale (e.g. new venture, new plant, operational) |
| | Reduce GHG intensity | | See below | Business in consultation with corporate |
| | | Improve BPE (efficiency) | Building new plants with new technology | Business |
| | | | Retrofitting and changing design of plants | Business |
| | | Improve PE (efficiency) | Increase plant operating efficiency | Facility, supported by Shell Global Solutions Energise™ |

## 2. Decide on the target type

There are two broad types of GHG targets: absolute and intensity-based. An absolute target is usually expressed in terms of a reduction over time in a specified quantity of GHG emissions to the atmosphere, the unit typically being tonnes of $CO_2$-e. An intensity target is usually expressed as a reduction in the ratio of GHG emissions relative to another business metric.[1] The comparative metric should be carefully selected. It can be the output of the company (e.g. tonne $CO_2$-e per tonne product, per kWh, per tonne mileage) or some other metric such as sales, revenues or office space. To facilitate transparency, companies using an intensity target should also report the absolute emissions from sources covered by the target.

Box 4 summarizes the advantages and disadvantages of each type of target. Some companies have both an absolute and an intensity target. Box 5 provides examples of corporate GHG targets. The Royal Dutch/Shell case study illustrates how a corporate wide absolute target can be implemented by formulating a combination of intensity targets at lower levels of decision-making within the company.

## 3. Decide on the target boundary

The target boundary defines which GHGs, geographic operations, sources, and activities are covered by the target. The target and inventory boundary can be identical, or

Exhibit 2 to Decl. of Burton 111                                    ER-1570

GUIDANCE

# Setting a GHG Target

the target may address a specified subset of the sources included in the company inventory. The quality of the GHG inventory should be a key factor informing this choice. The questions to be addressed in this step include the following:

- **WHICH GHGS?** Targets usually include one or more of the six major GHGs covered by the Kyoto Protocol. For companies with significant non-$CO_2$ GHG sources it usually makes sense to include these to increase the range of reduction opportunities. However, practical monitoring limitations may apply to smaller sources.

- **WHICH GEOGRAPHICAL OPERATIONS?** Only country or regional operations with reliable GHG inventory data should be included in the target. For companies with global operations, it makes sense to limit the target's geographical scope until a robust and reliable inventory has been developed for all operations. Companies that participate in GHG programs involving trading[2] will need to decide whether or not to include the emissions sources covered in the trading program in their corporate target. If common sources are included, i.e., if there is overlap in sources covered between the corporate target and the trading program, companies should consider how they will address any double counting resulting from the trading of GHG reductions in the trading program (see step 8).

- **WHICH DIRECT AND INDIRECT EMISSION SOURCES?** Including indirect GHG emissions in a target will facilitate more cost-effective reductions by increasing the reduction opportunities available. However, indirect emissions are generally harder to measure accurately and verify than direct emissions although some categories, such as scope 2 emissions from purchased electricity, may be amenable to accurate measurement and verification. Including indirect emissions can raise issues with regard to ownership and double counting of reductions, as indirect emissions are by definition someone else's direct emissions (see step 8).

- **SEPARATE TARGETS FOR DIFFERENT TYPES OF BUSINESSES?** For companies with diverse operations it may make more sense to define separate GHG targets for different core businesses, especially when using an intensity target, where the most meaningful business metric for defining the target varies across business units (e.g., GHGs per tonne of cement produced or barrel of oil refined).

---

**BOX 5.  Selected corporate GHG targets**

**ABSOLUTE TARGETS**

- **ABB** Reduce GHGs by 1 percent each year from 1998 through 2005

- **Alcoa** Reduce GHGs by 25 percent from 1990 levels by 2010, and 50 percent from 1990 levels over same period, if inert anode technology succeeds

- **BP** Hold net GHGs stable at 1990 levels through 2012

- **Dupont** Reduce GHGs by 65 percent from 1990 levels by 2010

- **Entergy** Stabilize $CO_2$ from U.S. generating facilities at 2000 levels through 2005

- **Ford** Reduce $CO_2$ by 4 percent over 2003-2006 timeframe based upon average 1998-2001 baseline as part of Chicago Climate Exchange

- **Intel** Reduce PFCs by 10 percent from 1995 levels by 2010

- **Johnson & Johnson** Reduce GHGs by 7 percent from 1990 levels by 2010, with interim goal of 4 percent below 1990 levels by 2005

- **Polaroid** Reduce $CO_2$ emissions 20 percent below its 1994 emissions by year-end 2005; 25 percent by 2010

- **Royal Dutch/Shell** Manage GHG emissions so that they are still 5 percent or more below the 1990 baseline by 2010, even while growing the business

- **Transalta** Reduce GHGs to 1990 levels by 2000. Achieve zero net GHGs from Canadian operations by 2024

**INTENSITY TARGETS**

- **Holcim Ltd.** Reduce by the year 2010 the Group average specific[3] net $CO_2$ emissions by 20 percent from the reference year 1990

- **Kansai Electric Power Company** Reduce $CO_2$ emissions per kWh sold in fiscal 2010 to approx. 0.34 kg-$CO_2$/kWh

- **Miller Brewing Company** Reduce GHGs by 18 percent per barrel of production from 2001 to 2006

- **National Renewable Energy Laboratory** Reduce GHGs by 10 percent per square foot from 2000 to 2005

**COMBINED ABSOLUTE & INTENSITY TARGETS**

- **SC Johnson** GHG emissions intensity reduction of 23 percent by 2005, which represents an absolute or actual GHG reduction of 8 percent

- **Lafarge** Reduce absolute gross $CO_2$ emissions in Annex I countries 10 percent below 1990 levels by the year 2010. Reduce worldwide average specific net $CO_2$ emissions 20 percent below 1990 levels by the year 2010[3]

---

Exhibit 2 to Decl. of Burton 112

CHAPTER 11   Setting a GHG Target                                    79

## 4. Choose the target base year

For a target to be credible, it has to be transparent how target emissions are defined in relation to past emissions. Two general approaches are available: a fixed target base year or a rolling target base year.

· USING A FIXED TARGET BASE YEAR. Most GHG targets are defined as a percentage reduction in emissions below a fixed target base year (e.g., reduce $CO_2$ emissions 25 percent below 1994 levels by 2010). Chapter 5 describes how companies should track emissions in their inventory over time in reference to a fixed base year. Although it is possible to use different years for the inventory base year and the target base year, to streamline the inventory and target reporting process, it usually makes sense to use the same year for both. As with the inventory base year, it is important to ensure that the emissions data for the target base year are reliable and verifiable. It is possible to use a multi-year average target base year. The same

considerations as described for multi-year average base years in chapter 5 apply.

Chapter 5 provides standards on when and how to recalculate base year emissions in order to ensure like-with-like comparisons over time when structural changes (e.g., acquisitions/divestitures) or changes in measurement and calculation methodologies alter the emissions profile over time. In most cases, this will also be an appropriate approach for recalculating data for a fixed target base year.

· USING A ROLLING TARGET BASE YEAR. Companies may consider using a rolling target base year if obtaining and maintaining reliable and verifiable data for a fixed target base year is likely to be challenging (for example, due to frequent acquisitions). With a rolling target base year, the base year rolls forward at regular time intervals, usually one year, so that emissions are always compared against the previous year.[4] However, emission reductions can still be collectively

TABLE 5. **Comparing targets with rolling and fixed base years**

| | FIXED TARGET BASE YEAR | ROLLING TARGET BASE YEAR |
|---|---|---|
| How might the target be stated? | A target might take the form "we will emit X% less in year B than in year A" | A target might take the form of "over the next X years we will reduce emissions every year by Y% compared to the previous year"[5] |
| What is the target base year? | A fixed reference year in the past | The previous year |
| How far back is like-with-like comparison possible? | The time series of absolute emissions will compare like with like | If there have been significant structural changes the time series of absolute emissions will not compare like with like over more than two years at a time |
| What is the basis for comparing emissions between the target base year and completion year? (see also Figure 14) | The comparison over time is based on what is owned/controlled by the company in the target completion year. | The comparison over time is based on what was owned/controlled by the company in the years the information was reported[6] |
| How far back are recalculations made? | Emissions are recalculated for all years back to the fixed target base year | Emissions are recalculated only for the year prior to the structural change, or ex-post for the year of the structural change which then becomes the base year. |
| How reliable are the target base year emissions? | If a company with a target acquires a company that did not have reliable GHG data in the target base year: back-casting of emissions becomes necessary, reducing the reliability of the base year | Data from an acquired company's GHG emissions are only necessary for the year before the acquisition (or even only from the acquisition onwards), reducing or eliminating the need for back-casting |
| When are recalculations made? | The circumstances which trigger recalculations for structural changes etc. (see chapter 5) are the same under both approaches | |

G U I D A N C E

Exhibit 2 to Decl. of Burton
113

ER-1572

# Setting a GHG Target

**GUIDANCE**

stated over several years. An example would be "from 2001 through 2012, emissions will be reduced by one percent every year, compared to the previous year." When structural or methodological changes occur, recalculations only need to be made to the previous year.[7] As a result, like-with-like comparisons of emissions in the "target starting year" (2001 in the example) and "target completion year" (2012) cannot be made because emissions are not recalculated for all years back to the target starting year.

The definition of what triggers a base-year emissions recalculation is the same as under the fixed base year approach. The difference lies in how far back emissions are recalculated. Table 5 compares targets using the rolling and fixed base year approaches while Figure 14 illustrates one of the key differences.

**RECALCULATIONS UNDER INTENSITY TARGETS**
While the standard in chapter 5 applies to absolute inventory emissions of companies using intensity targets, recalculations for structural changes for the purposes of the target are not usually needed unless the structural change results in a significant change in the GHG intensity. However, if recalculations for structural changes are made for the purposes of the target, they should be made for both the absolute emissions and the business metric. If the target business metric becomes irrelevant through a structural change, a reformulation of the target might be needed (e.g., when a company refocuses on a different industry but had used an industry-specific business metric before).

## 5. Define the target completion date
The target completion date determines whether the target is relatively short- or long-term. Long-term targets (e.g., with a completion year ten years from the time the target is set) facilitate long-term planning for large capital investments with GHG benefits. However, they might encourage later phase-outs of less efficient equipment. Generally, long-term targets depend on uncertain future developments, which can have opportunities as well as risks, which is illustrated in Figure 13. A five-year target period may be more practical for organizations with shorter planning cycles.

## 6. Define the length of the commitment period
The target commitment period is the period of time during which emissions performance is actually measured against the target. It ends with the target completion date. Many companies use single-year commitment periods, whereas the Kyoto Protocol, for example, specifies a multi-year "first commitment period" of five years (2008–2012). The length of the target commitment period is an important factor in determining a company's level of commitment. Generally, the longer the target commitment period, the longer the period during which emissions performance counts towards the target.

- **EXAMPLE OF A SINGLE YEAR COMMITMENT PERIOD.** Company Beta has a target of reducing emissions by 10 percent compared to its target base year 2000, by the commitment year 2010. For Beta to meet its target, it is sufficient for its emissions to be, in the year 2010, no more than 90 percent of year 2000 emissions.

- **EXAMPLE OF A MULTI-YEAR COMMITMENT PERIOD.** Company Gamma has a target of reducing emissions by 10 percent, compared to its target base year 2000, by the commitment period 2008–2012. For Gamma to meet its target, its sum total emissions from 2008–2012 must not exceed 90 percent of year 2000 emissions times five (number of years in the

FIGURE 13. **Defining the target completion date**



Exhibit 2 to Decl. of Burton
114

**ER-1573**

FIGURE 14. **Comparing a stabilization target under the fixed and rolling target base year approach**



A stabilization target is one that aims to keep emissions constant over time. In this example, company A acquires company B, which has experienced organic GHG growth since the target base year (or "starting" year). Under the rolling approach, emissions growth in the acquired company (B) from year 1 to year 2 does not appear as an emissions increase in relation to the target of the acquiring company (A). Thus company A would meet its stabilization target when using the rolling approach but not when using the fixed approach. In parallel to the example in chapter 5, past GHG growth or decline in divested facilities (GHG changes before the divestment) would affect the target performance under the rolling approach, while it would not be counted under the fixed approach.

commitment period). In other words, its average emissions over those five years must not exceed 90 percent of year 2000 emissions.

Target commitment periods longer than one year can be used to mitigate the risk of unpredictable events in one particular year influencing performance against the target. Figure 15 shows that the length of the target commitment period determines how many emissions are actually relevant for target performance.

For a target using a rolling base year, the commitment period applies throughout: emission performance is continuously being measured against the target every year from when the target is set until the target completion date.

## 7. Decide on the use of GHG offsets or credits[8]

A GHG target can be met entirely from internal reductions at sources included in the target boundary or through additionally using offsets that are generated from GHG reduction projects that reduce emissions at sources (or enhance sinks) external to the target boundary.[9] The use of offsets may be appropriate when

FIGURE 15. **Short vs. long commitment periods**



Exhibit 2 to Decl. of Burton      ER-1574
115

# Setting a GHG Target

the cost of internal reductions is high, opportunities for reductions limited, or the company is unable to meet its target because of unexpected circumstances. When reporting on the target, it should be specified whether offsets are used and how much of the target reduction was achieved using them.

### CREDIBILITY OF OFFSETS AND TRANSPARENCY

There are currently no generally accepted methodologies for quantifying GHG offsets. The uncertainties that surround GHG project accounting make it difficult to establish that an offset is equivalent in magnitude to the internal emissions it is offsetting.[10] This is why companies should always report their own internal emissions in separate accounts from offsets used to meet the target, rather than providing a net figure (see step 10). It is also important to carefully assess the credibility of offsets used to meet a target and to specify the origin and nature of the offsets when reporting. Information needed includes:

• the type of project

• geographic and organizational origin

• how offsets have been quantified

• whether they have been recognized by external programs (CDM, JI, etc.)

One important way to ensure the credibility of offsets is to demonstrate that the quantification methodology adequately addresses all of the key project accounting challenges in chapter 8. Taking these challenges into account, the forthcoming GHG Protocol Project Quantification Standard aims to improve the consistency, credibility, and rigor of project accounting.

Additionally, it is important to check that offsets have not also been counted towards another organization's GHG target. This might involve a contract between the buyer and seller that transfers ownership of the offset. Step 8 provides more information on accounting for GHG trades in relation to a corporate target, including establishing a policy on double counting.

### OFFSETS AND INTENSITY TARGETS

When using offsets under intensity targets, all the above considerations apply. In order to determine compliance with the target, the offsets can be subtracted from the figure used for absolute emissions (the numerator); the

resulting difference is then divided by the corresponding metric. It is important, however, that absolute emissions are still reported separately both from offsets and the business metric (see step 9 below).

## 8. Establish a target double counting policy

This step addresses double counting of GHG reductions and offsets, as well as allowances issued by external trading programs. It applies only to companies that engage in trading (sale or purchase) of GHG offsets or whose corporate target boundaries interface with other companies' targets or external programs.

Given that there is currently no consensus on how such double counting issues should be addressed, companies should develop their own "Target Double Counting Policy." This should specify how reductions and trades related to other targets and programs will be reconciled with their corporate target, and accordingly which types of double counting situations are regarded as relevant. Listed here are some examples of double counting that might need to be addressed in the policy.

• **DOUBLE COUNTING OF OFFSETS.** This can occur when a GHG offset is counted towards the target by both the selling and purchasing organizations. For example, company A undertakes an internal reduction project that reduces GHGs at sources included in its own target. Company A then sells this project reduction to company B to use as an offset towards its target, while still counting it toward its own target. In this case, reductions are counted by two different organizations against targets that cover different emissions sources. Trading programs address this by using registries that allocate a serial number to all traded offsets or credits and ensuring the serial numbers are retired once they are used. In the absence of registries this could be addressed by a contract between seller and buyer.

• **DOUBLE COUNTING DUE TO TARGET OVERLAP.**[11] This can occur when sources included under a company's corporate target are also subject to limits by an external program or another company's target. Two examples:

  • Company A has a corporate target that includes GHG sources that are also regulated under a trading program. In this case, reductions at the common sources are used by company A to meet both its corporate target and the trading program target.

82    CHAPTER 11

Exhibit 2 to Decl. of Burton 116

ER-1575

CHAPTER 11   Setting a GHG Target                    83

- Company B has a corporate target to reduce its
  direct emissions from the generation of electricity.[12]
  Company C who purchases electricity directly from
  company B also has a corporate target that
  includes indirect emissions from the purchase of
  electricity (scope 2). Company C undertakes energy
  efficiency measures to reduce its indirect emissions
  from the use of the electricity. These will usually
  show up as reductions in both companies' targets.[13]

These two examples illustrate that double counting is
inherent when the GHG sources where the reductions occur
are included in more than one target of the same or
different organizations. Without limiting the scope of
targets it may be difficult to avoid this type of double
counting and it probably does not matter if the double
counting is restricted to the organizations sharing the same
sources in their targets (i.e., when the two targets overlap).

- **DOUBLE COUNTING OF ALLOWANCES TRADED IN
  EXTERNAL PROGRAMS.** This occurs when a corporate
  target overlaps with an external trading program and
  allowances that cover the common sources are sold in
  the trading program for use by another organization
  and reconciled with the regulatory target, but not
  reconciled with the corporate target. This example
  differs from the previous example in that double
  counting occurs across two targets that are not over-
  lapping (i.e., they do not cover the same sources).
  This type of double counting could be avoided if the
  company selling the allowances reconciles the trade
  with its corporate target (see Holcim case study).
  Whatever the company decides to do in this situation,
  in order to maintain credibility, it should address
  buying and selling of allowances in trading programs
  in a consistent way. For example, if it decides not to
  reconcile allowances that it sells in a trading program
  with its corporate target, it should also not count any
  allowances of the same type that it purchases to meet
  its corporate target.

Ideally a company should try to avoid double counting in
its corporate target if this undermines the environmental
integrity of the target. Also, any prevented double
counting between two organizations provides an addi-
tional incentive for one of these companies to further
reduce emissions. However, in practice the avoidance of
double counting can be quite challenging, particularly
for companies subject to multiple external programs and
when indirect GHG emissions are included in the target.
Companies should therefore be transparent about their



double counting policy and state any reasons for
choosing not to address some double counting situations.

The Holcim case study describes how one company has
chosen to track performance towards its target and
address double counting issues.

## 9. Decide on the target level
The decision on setting the target level should be
informed by all the previous steps. Other considerations
to take into account include:

- Understanding the key drivers affecting GHG emis-
  sions by examining the relationship between GHG
  emissions and other business metrics, such as produc-
  tion, square footage of manufacturing space, number
  of employees, sales, revenue, etc.

- Developing different reduction strategies based on the
  major reduction opportunities available and examining
  their effects on total GHG emissions. Investigate how
  emissions projections change with different mitigation
  strategies.

- Looking at the future of the company as it relates to
  GHG emissions.

- Factoring in relevant growth factors such as production
  plans, revenue or sales targets, and Return on Investment
  (ROI) of other criteria that drive investment strategy.

G U I D A N C E

Exhibit 2 to Decl. of Burton
117

ER-1576

# Setting a GHG Target

**G U I D A N C E**

## Holcim: Using a GHG balance sheet to track performance towards the target

Holcim, a global cement producer, tracks its performance in relation to its voluntary corporate target using a GHG balance sheet. This balance sheet shows, for each commitment period and for each country business, on one side the actual GHG emissions and on the other the GHG "assets" and "instruments." These assets and instruments consist of the voluntary GHG target itself (the "voluntary cap"; in other words, the allowances that Holcim provides for itself), a regulatory target ("cap") if applicable, plus the CDM credits purchased (added) or sold (subtracted), and any regulatory emissions trading allowances purchased (added) or sold (subtracted). Thus if any country business sells CDM credits (generated at sources inside the voluntary target boundary), it is ensured that only the buying organization counts the credit (see first example of double counting in step 8).

At the end of the commitment period, every country business must demonstrate a neutral or positive balance towards Holcim's

target. Those companies whose voluntary cap overlaps with a regulatory cap (e.g., in Europe) must also demonstrate a neutral or positive balance towards the regulatory cap. GHG reductions in Europe are thus reported towards both targets (see second example of double counting in step 8).

Both sides of the country business balance sheets are consolidated to group level. Credits and allowances traded within the group simply cancel out in the asset column of the consolidated corporate level GHG balance sheet. Any credits or allowances traded externally are reconciled with both the voluntary and regulatory caps at the bottom line of the asset column of the balance sheet. This ensures that any sold allowance is only counted by the buying organization (when Holcim's target and that of the buying organization do not overlap). A purchased allowance or credit is counted towards both the voluntary and regulatory targets of the European business (these two targets overlap).

| GHG balance sheet (All values in tonnes $CO_2$-e/year) | |
|---|---|
| GHG ASSETS & INSTRUMENTS | GHG EMISSIONS |
| **Holcim (country A in Europe)** | |
| | |
| Voluntary cap (direct emissions) | Emissions, direct, indirect + biomass |
| Regulatory cap (direct emissions) | |
| Reg. allowances purchased (+) or sold (-) | |
| CDM credits purchased (+) or sold (-) | |
| Sum of voluntary cap, reg. allowances & credits | Sum of direct emissions |
| Sum of regulatory cap, reg. allowances & credits | Sum of direct emissions, according to EU ETS |
| | |
| **Holcim (country X in Latin America)** | |
| Voluntary cap | Emissions, direct, indirect + biomass |
| CDM credits purchased (+) or sold (-) | |
| Sum of voluntary cap & credits | Sum of direct emissions |
| | |
| **Holcim Group** | |
| Sum of voluntary cap, reg. allowances & credits | Sum of direct emissions |

84    CHAPTER 11

Exhibit 2 to Decl. of Burton 118

**ER-1577**

CHAPTER 11   Setting a GHG Target                                    85

- Considering whether there are any existing environmental or energy plans, capital investments, product/service changes, or targets that will affect GHG emissions. Are there plans already in place for fuel switching, on site power generation, and/or renewable energy investments that affect the future GHG trajectory?

- Benchmarking GHG emissions with similar organizations. Generally, organizations that have not previously invested in energy and other GHG reductions should be capable of meeting more aggressive reduction levels because they would have more cost-effective reduction opportunities.

## 10. Track and report progress

Once the target has been set, it is necessary to track performance against it in order to check compliance, and also—in order to maintain credibility—to report emissions and any external reductions in a consistent, complete and transparent manner.

- CARRY OUT REGULAR PERFORMANCE CHECKS.  In order to track performance against a target, it is important to link the target to the annual GHG inventory process and make regular checks of emissions in relation to the target. Some companies use interim targets for this purpose (a target using a rolling target base year automatically includes interim targets every year).

- REPORT INFORMATION IN RELATION TO THE TARGET. Companies should include the following information when setting and reporting progress in relation to a target:

  1. Description of the target
     - Provide an outline of the target boundaries chosen
     - Specify target type, target base year, target completion date, and length of commitment period
     - Specify whether offsets can be used to meet the target; if yes, specify the type and amount
     - Describe the target double counting policy
     - Specify target level.

  2. Information on emissions and performance in relation to the target
     - Report emissions from sources inside the target boundary separately from any GHG trades
     - If using an intensity target, report absolute emissions from within the target boundary separately, both from any GHG trades and the business metric
     - Report GHG trades that are relevant to compliance with the target (including how many offsets were used to meet the target)
     - Report any internal project reductions sold or transferred to another organization for use as an offset
     - Report overall performance in relation to the target.

### NOTES

1  Some companies may formulate GHG efficiency targets by formulating this ratio the other way around.

2  Examples include the U.K. ETS, the CCX, and the EU ETS.

3  Holcim's and Lafarge's target have been formulated using the terminology of the WBCSD Cement $CO_2$ Protocol (WBCSD, 2001), which uses "specific" to denote emissions per tonne of cement produced.

4  It is possible to use an interval other than one year. However, the longer the interval at which the base year rolls forward, the more this approach becomes like a fixed target base year. This discussion is based on a rolling target base year that moves forward at annual intervals.

5  Note that simply adding the yearly emissions changes under the rolling base year yields a different result from the comparison over time made with a fixed base year, even without structural changes. In absolute terms, an X% reduction every year over 5 years (compared to the previous year) is not the same as an (X times 5) reduction in year 5 compared to year 1.

6  Depending on which recalculation methodology is used when applying the rolling base year, the comparison over time can include emissions that occurred when the company did not own or control the emission sources. However, the inclusion of this type of information is minimized. See also the guidance document "Base year recalculation methodologies for structural changes" on the GHG Protocol website (www.ghgprotocol.org).

7  For further details on different recalculation methodologies, see the guidance document "Base year recalculation methodologies for structural changes" on the GHG Protocol website (www.ghgprotocol.org).

8  As noted in chapter 8, offsets can be converted to credits. Credits are thus understood to be a subset of offsets. This chapter uses the term offsets as a generic term.

9  For the purposes of this chapter, the terms "internal" and "external" refer to whether the reductions occur at sources inside (internal) or outside (external) the target boundary.

10  This equivalence is sometimes referred to as "fungibility." However, "fungibility" can also refer to equivalence in terms of the value in meeting a target (two fungible offsets have the same value in meeting a target, i.e., they can both be applied to the same target).

11  Overlap here refers to a situation when two or more targets include the same sources in their target boundaries.

12  Similarly, company A in this example could be subject to a mandatory cap on its direct emissions under a trading program and engage in trading allowances covering the common sources it shares with company B.  In this case, the example in the section "Double counting of allowances traded in external programs" is more relevant.

13  The energy efficiency measures implemented by company C may not always result in an actual reduction of company B's emissions. See chapter 8 for further details on reductions in indirect emissions.

G U I D A N C E

Exhibit 2 to Decl. of Burton
119                                                              ER-1578

(124 of 296) Page 124 of 296 Case: 25-5327 09/18/2025 DktEntry: 8.8 Page 124 of 296
Case 2:24-cv-00801-ODW-PVC Document 53-2 Filed 07/24/24 Page 89 of 117 Page ID #:1765

# A  Accounting for Indirect Emissions from Purchased Electricity

This appendix provides guidance on how to account for and report indirect emissions associated with the purchase of electricity. Figure A–1 provides an overview of the transactions associated with purchased electricity and the corresponding emissions.

## Purchased electricity for own consumption

Emissions associated with the generation of purchased electricity that is consumed by the reporting company are reported in scope 2. Scope 2 only accounts for the portion of the direct emissions from generating electricity that is actually consumed by the company. A company that purchases electricity and transports it in a transmission and distribution (T&D) system that it owns or controls reports the emissions associated with T&D losses under scope 2. However, if the reporting company owns or controls the T&D system but generates (rather than purchases) the electricity transmitted through its wires, the emissions associated with T&D losses are not reported under scope 2, as they would already be accounted for under scope 1. This is the case when generation, transmission, and distribution systems are vertically integrated and owned or controlled by the same company.

## Purchased electricity for resale to end-users

Emissions from the generation of purchased electricity for resale to end-users, for example purchases by a utility company, may be reported under scope 3 in the category "generation of purchased electricity that is sold to end-users." This reporting category is particularly relevant for utility companies that purchase wholesale electricity supplied by independent power producers for resale to their customers. Since utility

companies and electricity suppliers often exercise choice over where they purchase electricity, this provides them with an important

GHG reduction opportunity (see Seattle City Light case study in chapter 4). Since scope 3 is optional, companies that are unable to track their electricity sales in terms of end users and non-end users can choose not to report these emissions in scope 3. Instead, they can report the total emissions associated with purchased electricity that is sold to both end- and non-end-users under optional information in the category "generation of purchased electricity, heat, or steam for re-sale to non-end users."

## Purchased electricity for resale to intermediaries

Emissions associated with the generation of purchased electricity that is resold to an intermediary (e.g., trading transactions) may be reported under optional information under the category "Generation of purchased electricity, heat, or steam for re-sale to non-end users." Examples of trading transactions include brokerage/trading room transactions involving purchased electricity or any other transaction in which electricity is purchased directly from one source or the spot market and then resold to an intermediary (e.g., a non-end user). These emissions are reported under optional information separately from scope 3 because there could be a number of trading transactions before the electricity finally reaches the end-user. This may cause duplicative reporting of indirect emissions from a series of electricity trading transactions for the same electricity.




FIGURE A-1. Accounting for the indirect GHG emissions associated with purchased electricity

86

Exhibit 2 to Decl. of Burton 120    ER-1579

APPENDIX A                                                                87

## GHG emissions upstream of the generation of electricity

Emissions associated with the extraction and production of fuels consumed in the generation of purchased electricity may be reported in scope 3 under the category "extraction, production, and transportation of fuels consumed in the generation of electricity." These emissions occur upstream of the generation of electricity. Examples include emissions from mining of coal, refining of gasoline, extraction of natural gas, and production of hydrogen (if used as a fuel).

## Choosing electricity emission factors

To quantify scope 2 emissions, the *GHG Protocol Corporate Standard* recommends that companies obtain source/supplier specific emission factors for the electricity purchased. If these are not available, regional or grid emission factors should be used. For more information on choosing emission factors, see the relevant GHG Protocol calculation tools available on the GHG Protocol website (www.ghgprotocol.org).

## GHG emissions associated with the consumption of electricity in T&D

Emissions from the generation of electricity that is consumed in a T&D system may be reported in scope 3 under the category "generation of electricity that is consumed in a T&D system" by end-users. Published electricity grid emission factors do not usually include T&D losses. To calculate these emissions, it may be necessary to apply supplier or location specific T&D loss factors. Companies that purchase electricity and transport it in their own T&D systems would report the portion of electricity consumed in T&D under scope 2.

## Accounting for indirect emissions associated with T&D losses

There are two types of electricity emission factors: Emission factor at generation (EFG) and Emissions factor at consumption (EFC). EFG is calculated from $CO_2$ emissions from generation of electricity divided by amount of electricity generated. EFC is calculated from $CO_2$ emissions from generation divided by amount of electricity consumed.

$$EFG = \frac{\text{TOTAL } CO_2 \text{ EMISSIONS FROM GENERATION}}{\text{ELECTRICITY GENERATED}}$$

$$EFC = \frac{\text{TOTAL } CO_2 \text{ EMISSIONS FROM GENERATION}}{\text{ELECTRICITY CONSUMED}}$$

EFC and EFG are related as shown below.

$$\frac{EFC \times \text{ELECTRICITY CONSUMED}}{EFG \times (\text{ELECTRICITY CONSUMED} + \text{T\&D LOSSES})} = $$

$$EFC = EFG \times \left( 1 + \frac{\text{T\&D LOSSES}}{\text{ELECTRICITY CONSUMED}} \right)$$

As these equations indicate, EFC multiplied by the amount of consumed electricity yields the sum of emissions attributable to electricity consumed during end use and transmission and distribution. In contrast, EFG multiplied by the amount of consumed electricity yields emissions attributable to electricity consumed during end use only.

Consistent with the scope 2 definition (see chapter 4), the *GHG Protocol Corporate Standard* requires the use of EFG to calculate scope 2 emissions. The use of EFG ensures internal consistency in the treatment of electricity related upstream emissions categories and avoids double counting in scope 2. Additionally, there are several other advantages in using EFG:

1) It is simpler to calculate and widely available in published regional, national, and international sources.

2) It is based on a commonly used approach to calculate emissions intensity, i.e., emissions per unit of production output.

3) It ensures transparency in reporting of indirect emissions from T&D losses.

The formula to account for emissions associated with T&D losses is the following:

$$EFG \times \text{ELECTRICITY CONSUMED DURING T\&D} = \text{INDIRECT EMISSIONS FROM CONSUMPTION OF ELECTRICITY DURING T\&D}$$

In some countries such as Japan, local regulations may require utility companies to provide both EFG and EFC to its consumers, and consumers may be required to use EFC to calculate indirect emissions from the consumption of purchased electricity. In this case, a company still needs to use EFG to report its scope 2 emissions for a GHG report prepared in accordance with *GHG Protocol Corporate Standard*.

A P P E N D I X A

Exhibit 2 to Decl. of Burton
121                                    ER-1580

# B Accounting for Sequestered Atmospheric Carbon

A key purpose of the GHG Protocol Corporate Standard is to provide companies with guidance on how to develop inventories that provide an accurate and complete picture of their GHG emissions both from their direct operations as well as those along the value chain.[1] For some types of companies, this is not possible without addressing the company's impacts on sequestered atmospheric carbon.[2]

## Sequestered atmospheric carbon

During photosynthesis, plants remove carbon (as $CO_2$) from the atmosphere and store it in plant tissue. Until this carbon is cycled back into the atmosphere, it resides in one of a number of "carbon pools." These pools include (a) above ground biomass (e.g., vegetation) in forests, farmland, and other terrestrial environments, (b) below ground biomass (e.g., roots), and (c) biomass-based products (e.g., wood products) both while in use and when stored in a landfill.

Carbon can remain in some of these pools for long periods of time, sometimes for centuries. An increase in the stock of sequestered carbon stored in these pools represents a net removal of carbon from the atmosphere; a decrease in the stock represents a net addition of carbon to the atmosphere.

## Why include impacts on sequestered carbon in corporate GHG inventories?

It is generally recognized that changes in stocks of sequestered carbon and the associated exchanges of carbon with the atmosphere are important to national level GHG emissions inventories, and consequently, these impacts on sequestered carbon are commonly addressed in national inventories (UNFCCC, 2000). Similarly, for companies in biomass-based industries, such as the forest products industry, some of the most significant aspects of a company's overall impact on atmospheric $CO_2$ levels will occur as a result of impacts on sequestered carbon in their direct operations as well as along their value chain. Some forest product companies have begun to address this aspect of their GHG footprint within their corporate GHG inventories (Georgia Pacific, 2002). Moreover, WBCSD's Sustainable Forest Products Industry Working Group—which represents a significant cluster of integrated forestry companies operating internationally—is developing a project that will further investigate carbon measurement, accounting, reporting, and ownership issues associated with the forest products value chain.

Information on a company's impacts on sequestered atmospheric carbon can be used for strategic planning, for educating stakeholders, and for identifying opportunities for improving the company's GHG profile. Opportunities may also exist to create value from reductions created along the value chain by companies acting alone or in partnership with raw material providers or customers.

## Accounting for sequestered carbon in the context of the *GHG Protocol Corporate Standard*

Consensus methods have yet to be developed under the GHG Protocol Corporate Standard for accounting of sequestered atmospheric carbon as it moves through the value chain of biomass-based industries. Nonetheless, some issues that would need to be addressed when addressing impacts on sequestered carbon in corporate inventories can be examined in the context of existing guidance provided by the GHG Protocol Corporate Standard as highlighted below.

### SETTING ORGANIZATIONAL BOUNDARIES

The GHG Protocol Corporate Standard outlines two approaches for consolidating GHG data—the equity share approach and the control approach. In some cases, it may be possible to apply these approaches directly to emissions/removals associated with sequestered atmospheric carbon. Among the issues that may need to be examined is the ownership of sequestered carbon under the different types of contractual arrangements involving land and wood ownership, harvesting rights, and control of land management and harvesting decisions. The transfer of ownership as carbon moves through the value chain may also need to be addressed. In some cases, as part of a risk management program for instance, companies may be interested in performing value chain assessments of sequestered carbon without regard to ownership or control just as they might do for scope 2 and 3 emissions.

### SETTING OPERATIONAL BOUNDARIES

As with GHG emissions accounting, setting operational boundaries for sequestered carbon inventories would help companies transparently report their impacts on sequestered carbon along their value chain. Companies may, for example, provide a description of the value chain capturing impacts that are material to the results of the analysis. This should include which pools are

88

Exhibit 2 to Decl. of Burton
122

ER-1581

included in the analysis, which are not, and the rationale for the selections. Until consensus methods are developed for characterizing impacts on sequestered atmospheric carbon along the value chain, this information can be included in the "optional information" section of a GHG inventory compiled using the GHG Protocol Corporate Standard.

### TRACKING REMOVALS OVER TIME

As is sometimes the case with accounting for GHG emissions, base year data for impacts on sequestered carbon may need to be averaged over multiple years to accommodate the year-to-year variability expected of these systems. The temporal scale used in sequestered carbon accounting will often be closely tied to the spatial scale over which the accounting is done. The question of how to recalculate base years to account for land acquisition and divestment, land use changes, and other activities also needs to be addressed.

### IDENTIFYING AND CALCULATING GHG REMOVALS

The GHG Protocol Corporate Standard does not include consensus methods for sequestered carbon quantification. Companies should, therefore, explain the methods used. In some instances, quantification methods used in national inventories can be adapted for corporate-level quantification of sequestered carbon. IPCC (1997: 2000b) provides useful information on how to do this. In 2004, IPCC is expected to issue Good Practice Guidance for Land Use, Land Use Change and Forestry, with information on methods for quantification of sequestered carbon in forests and forest products. Companies may also find it useful to consult the methods used to prepare national inventories for those countries where significant parts of their company's value chain reside.

In addition, although corporate inventory accounting differs from project-based accounting (as discussed below), it may be possible to use some of the calculation and monitoring methods derived from project level accounting of sequestration projects.

### ACCOUNTING FOR REMOVAL ENHANCEMENTS

A corporate inventory can be used to account for yearly removals within the corporate inventory boundary. In contrast, the forthcoming GHG Protocol Project

Quantification Standard is designed to calculate project reductions that will be used as offsets, relative to a hypothetical baseline scenario for what would have happened without the project. In the forestry sector, projects take the form of removal enhancements.

Chapter 8 in this document addresses some of the issues that must be addressed when accounting for offsets from GHG reduction projects. Much of this guidance is also applicable to removal enhancement projects. One example is the issue of reversibility of removals — also briefly described in chapter 8.

### REPORTING GHG REMOVALS

Until consensus methods are developed for characterizing impacts on sequestered atmospheric carbon along the value chain, this information can be included in the "optional information" section of the inventory (See chapter 9). Information on sequestered carbon in the company's inventory boundary should be kept separate from project-based reductions at sources that are not in the inventory boundary. Where removal enhancement projects take place within a company's inventory boundary they would normally show up as an increase in carbon removals over time, but can also be reported in optional information. However, they should also be identified separately to ensure that they are not double counted. This is especially important when they are sold as offsets or credits to a third party.

As companies develop experience using various methods for characterizing impacts on sequestered carbon, more information will become available on the level of accuracy to expect from these methods. In the early stages of developing this experience, however, companies may find it difficult to assess the uncertainty associated with the estimates and therefore may need to give special care to how the estimates are represented to stakeholders.

### NOTES

[1] In this Appendix, "value chain" means a series of operations and entities, starting with the forest and extending through end-of-life management, that (a) supply or add value to raw materials and intermediate products to produce final products for the marketplace and (b) are involved in the use and end-of-life management of these products.

[2] In this Appendix the term "sequestered atmospheric carbon" refers exclusively to sequestration by biological sinks.

Exhibit 2 to Decl. of Burton
123

# C   Overview of GHG Programs

| NAME OF PROGRAM | TYPE OF PROGRAM | FOCUS (Organization, project, facility) | GASES COVERED | ORGANIZATIONAL PROJECT BOUNDARIES |
|---|---|---|---|---|
| California Climate Action Registry www.climateregisty.org | Voluntary registry | Organization (Projects possible in 2004) | Organizations report $CO_2$ for first three years of participation, all six GHGs thereafter. | Equity share or control for California or US operations |
| US EPA Climate Leaders www.epa.gov/climateleaders | Voluntary reduction program | Organization | Six | Equity share or control for US operations at a minimum |
| WWF Climate Savers www.worldwildlife.org/climatesavers | Voluntary registry | Organization | $CO_2$ | Equity share or control for worldwide operations |
| World Economic Forum Global GHG Register www.weforum.org | Voluntary registry | Organization | Six | Equity share or control for worldwide operations |
| EU GHG Emissions Allowance Trading Scheme www.europa.eu.int/comm/environment/ | Mandatory allowance trading scheme | Facility | Six | Facilities in selected sectors |
| European Pollutant Emission Registry www.europa.eu.int/comm/environment/ippc/eper/index.htm | Mandatory registry for large industrial facilities | Facility | Six Kyoto gases as well as other pollutants | Facilities that fall under EU IPPC directive |
| Chicago Climate Exchange www.chicagoclimateexchange.com | Voluntary allowance trading scheme | Organization and project | Six | Equity share |
| Respect Europe BLICC www.respecteurope.com/rt2/blicc/ | Voluntary reduction program | Organization | Six | Equity share or control for worldwide operations |

90

Exhibit 2 to Decl. of Burton 124

**ER-1583**

(129 of 296), Page 129 of 296  Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 129 of 296
Case 2:24-cv-00801-ODW-PVC  Document 53-2  Filed 07/24/24  Page 94 of 117  Page ID
#:1770

APPENDIX C                                                        91

| OPERATIONAL BOUNDARIES | NATURE/PURPOSE OF PROGRAM | BASE YEAR | TARGET | VERIFICATION |
|---|---|---|---|---|
| Scope 1 and 2 required, scope 3 to be decided | Baseline protection, public reporting, possible future targets | Specific to each organization, recalculation consistent with *GHG Protocol Corporate Standard* required | Encouraged but optional | Required through certified third party verifier |
| Scope 1 and 2 required, scope 3 optional | Public recognition, assistance setting targets and achieving reductions | Year that organization joins program, recalculation consistent with *GHG Protocol Corporate Standard* required | Required, specific to each organization | Optional, provides guidance and checklist of components that should be included if undertaken |
| Scope 1 and 2 required, scope 3 optional | Achieve targets, public recognition, expert assistance | Chosen year since 1990, specific to each organization, recalculation consistent with *GHG Protocol Corporate Standard* required | Required, specific to each organization | Third party verifier |
| Scope 1 and 2 required, scope 3 optional | Baseline protection, public reporting, targets encouraged but optional | Chosen year since 1990, specific to each organization, recalculation consistent with *GHG Protocol Corporate Standard* required | Encouraged but optional | Third party verifier or spot checks by WEF |
| Scope 1 | Achieve annual caps through tradable allowance market, initial period from 2005 to 2007 | Determined by member country for allowance allocation | Annual compliance with allocated and traded allowances, EU committed to 8% overall reduction below 1990 | Third party verifier |
| Scope 1 required | Permit individual industrial facilities | Not applicable | Not applicable | Local permitting authority |
| Direct combustion and process emission sources and indirect emissions optional. | Achieve annual targets through tradable allowance market | Average of 1998 through 2001 | 1% below its baseline in 2003, 2% below baseline in 2004, 3% below baseline in 2005 and 4% below baseline in 2006 | Third party verifier |
| Scope 1 and 2 required, scope 3 strongly encouraged | Achieve targets, public recognition, expert assistance | Specific to each organization, recalculation consistent with *GHG Protocol Corporate Standard* required | Mandatory, specific to each organization | Third party verifier |

Exhibit 2 to Decl. of Burton
125

**ER-1584**

# D    Industry Sectors and Scopes

A P P E N D I X

| SECTOR | SCOPE 1 EMISSION SOURCES | SCOPE 2 EMISSION SOURCES | SCOPE 3 EMISSION SOURCES[1] |
|---|---|---|---|
| **ENERGY** | | | |
| Energy Generation | • Stationary combustion (boilers and turbines used in the production of electricity, heat or steam, fuel pumps, fuel cells, flaring)<br><br>• Mobile combustion (trucks, barges and trains for transportation of fuels)<br><br>• Fugitive emissions ($CH_4$ leakage from transmission and storage facilities, HFC emissions from LPG storage facilities, $SF_6$ emissions from transmission and distribution equipment) | • Stationary combustion (consumption of purchased electricity, heat or steam) | • Stationary combustion (mining and extraction of fuels, energy for refining or processing fuels)<br><br>• Process emissions (production of fuels, $SF_6$ emissions[2])<br><br>• Mobile combustion (transportation of fuels/waste, employee business travel, employee commuting)<br><br>• Fugitive emissions ($CH_4$ and $CO_2$ from waste landfills, pipelines, $SF_6$ emissions) |
| Oil and Gas[3] | • Stationary combustion (process heaters, engines, turbines, flares, incinerators, oxidizers, production of electricity, heat and steam)<br><br>• Process emissions (process vents, equipment vents, maintenance/turnaround activities, non-routine activities)<br><br>• Mobile combustion (transportation of raw materials/products/waste: company owned vehicles)<br><br>• Fugitive emissions (leaks from pressurized equipment, wastewater treatment, surface impoundments) | • Stationary combustion (consumption of purchased electricity, heat or steam) | • Stationary combustion (product use as fuel or combustion for the production of purchased materials)<br><br>• Mobile combustion (transportation of raw materials/products/waste, employee business travel, employee commuting, product use as fuel)<br><br>• Process emissions (product use as feedstock or emissions from the production of purchased materials)<br><br>• Fugitive emissions ($CH_4$ and $CO_2$ from waste landfills or from the production of purchased materials) |
| Coal Mining | • Stationary combustion (methane flaring and use, use of explosives, mine fires)<br><br>• Mobile combustion (mining equipment, transportation of coal)<br><br>• Fugitive emissions ($CH_4$ emissions from coal mines and coal piles) | • Stationary combustion (consumption of purchased electricity, heat or steam) | • Stationary combustion (product use as fuel)<br><br>• Mobile combustion (transportation of coal/waste, employee business travel, employee commuting)<br><br>• Process emissions (gasification) |
| **METALS** | | | |
| Aluminum[4] | • Stationary combustion (bauxite to aluminum processing, coke baking, lime, soda ash and fuel use, on-site CHP)<br><br>• Process emissions (carbon anode oxidation, electrolysis, PFC)<br><br>• Mobile combustion (pre- and post-smelting transportation, ore haulers)<br><br>• Fugitive emissions (fuel line $CH_4$, HFC and PFC, $SF_6$ cover gas) | • Stationary combustion (consumption of purchased electricity, heat or steam) | • Stationary combustion (raw material processing and coke production by second party suppliers, manufacture of production line machinery)<br><br>• Mobile combustion (transportation services, business travel, employee commuting)<br><br>• Process emissions (during production of purchased materials)<br><br>• Fugitive emissions (mining and landfill $CH_4$ and $CO_2$, outsourced process emissions) |
| Iron and Steel[5] | • Stationary combustion (coke, coal and carbonate fluxes, boilers, flares)<br><br>• Process emissions (crude iron oxidation, consumption of reducing agent, carbon content of crude iron/ferroalloys)<br><br>• Mobile combustion (on-site transportation)<br><br>• Fugitive emission ($CH_4$, $N_2O$) | • Stationary combustion (consumption of purchased electricity, heat or steam) | • Stationary combustion (mining equipment, production of purchased materials)<br><br>• Process emissions (production of ferroalloys)<br><br>• Mobile combustion (transportation of raw materials/products/waste and intermediate products)<br><br>• Fugitive emissions ($CH_4$ and $CO_2$ from waste landfills) |
| **CHEMICALS** | | | |
| Nitric acid, Ammonia, Adipic acid, Urea, and Petrochemicals | • Stationary combustion (boilers, flaring, reductive furnaces, flame reactors, steam reformers)<br><br>• Process emissions (oxidation/reduction of substrates, impurity removal, $N_2O$ byproducts, catalytic cracking, myriad other emissions individual to each process)<br><br>• Mobile combustion (transportation of raw materials/products/waste)<br><br>• Fugitive emissions (HFC use, storage tank leakage) | • Stationary combustion (consumption of purchased electricity, heat or steam) | • Stationary combustion (production of purchased materials, waste combustion)<br><br>• Process emissions (production of purchased materials)<br><br>• Mobile combustion (transportation of raw materials/products/waste, employee business travel, employee commuting)<br><br>• Fugitive emissions ($CH_4$ and $CO_2$ from waste landfills and pipelines) |

92

Exhibit 2 to Decl. of Burton 126

ER-1585

APPENDIX D                                                                                      93

| SECTOR | SCOPE 1 EMISSION SOURCES | SCOPE 2 EMISSION SOURCES | SCOPE 3 EMISSION SOURCES |
|---|---|---|---|
| **MINERALS** | | | |
| Cement and Lime[6] | • Process emissions (calcination of limestone)<br><br>• Stationary combustion (clinker kiln, drying of raw materials, production of electricity)<br><br>• Mobile combustion (quarry operations, on-site transportation) | • Stationary combustion (consumption of purchased electricity, heat or steam) | • Stationary combustion (production of purchased materials, waste combustion)<br><br>• Process emissions (production of purchased clinker and lime)<br><br>• Mobile combustion (transportation of raw materials/products/waste, employee business travel, employee commuting)<br><br>• Fugitive emissions (mining and landfill $CH_4$ and $CO_2$, outsourced process emissions) |
| **WASTE** [7] | | | |
| Landfills, Waste combustion, Water services | • Stationary combustion (incinerators, boilers, flaring)<br><br>• Process emissions (sewage treatment, nitrogen loading)<br><br>• Fugitive emissions ($CH_4$ and $CO_2$ emissions from waste and animal product decomposition)<br><br>• Mobile combustion (transportation of waste/products) | • Stationary combustion (consumption of purchased electricity, heat or steam) | • Stationary combustion(recycled waste used as a fuel)<br><br>• Process emissions (recycled waste used as a feedstock)<br><br>• Mobile combustion (transportation of waste/products, employee business travel, employee commuting) |
| **PULP & PAPER** | | | |
| Pulp and Paper[8] | • Stationary combustion (production of steam and electricity, fossil fuel-derived emissions from calcination of calcium carbonate in lime kilns, drying products with infrared driers fired with fossil fuels)<br><br>• Mobile combustion (transportation of raw materials, products, and wastes, operation of harvesting equipment)<br><br>• Fugitive emissions ($CH_4$ and $CO_2$ from waste) | • Stationary combustion (consumption of purchased electricity, heat or steam) | • Stationary combustion (production of purchased materials, waste combustion)<br><br>• Process emissions (production of purchased materials)<br><br>• Mobile combustion (transportation of raw materials/products/waste, employee business travel, employee commuting)<br><br>• Fugitive emissions (landfill $CH_4$ and $CO_2$ emissions) |
| **HFC, PFC, SF$_6$ & HCFC 22 PRODUCTION** [9] | | | |
| HCFC 22 production | • Stationary combustion(production of electricity, heat or steam)<br><br>• Process emissions (HFC venting)<br><br>• Mobile combustion (transportation of raw materials/products/waste) | • Stationary combustion (consumption of purchased electricity, heat or steam) | • Stationary combustion (production of purchased materials)<br><br>• Process emissions (production of purchased materials)<br><br>• Mobile combustion (transportation of raw materials/products/waste, employee business travel, employee commuting)<br><br>• Fugitive emissions(fugitive leaks in product use, $CH_4$ and $CO_2$ from waste landfills) |
| **SEMICONDUCTOR PRODUCTION** | | | |
| Semiconductor production | • Process emissions ($C_2F_6$, $CH_4$, $CHF_3$, $SF_6$, $NF_3$, $C_3F_8$, $C_4F_8$, $N_2O$ used in wafer fabrication, $CF_4$ created from $C_2F_6$ and $C_3F_8$ processing)<br><br>• Stationary combustion (oxidation of volatile organic waste, production of electricity, heat or steam)<br><br>• Fugitive emissions (process gas storage leaks, container remainders/heel leakage)<br><br>• Mobile combustion (transportation of raw materials/products/waste) | • Stationary combustion (consumption of purchased electricity, heat or steam) | • Stationary combustion (production of imported materials, waste combustion, upstream T&D losses of purchased electricity)<br><br>• Process emissions (production of purchased materials, outsourced disposal of returned process gases and container remainder/heel)<br><br>• Mobile combustion (transportation of raw materials/products/waste, employee business travel, employee commuting)<br><br>• Fugitive emissions (landfill $CH_4$ and $CO_2$ emissions, downstream process gas container remainder /heel leakage) |
| **OTHER SECTORS** [10] | | | |
| Service sector/ Office based organizations[10] | • Stationary combustion (production of electricity, heat or steam)<br><br>• Mobile combustion (transportation of raw materials/waste)<br><br>• Fugitive emissions (mainly HFC emissions during use of refrigeration and air-conditioning equipment) | • Stationary combustion (consumption of purchased electricity, heat or steam) | • Stationary combustion (production of purchased materials)<br><br>• Process emissions (production of purchased materials)<br><br>• Mobile combustion (transportation of raw materials/products/waste, employee business travel, employee commuting) |

Exhibit 2 to Decl. of Burton 127                                              ER-1586

# Appendix D



## NOTES

[1] Scope 3 activities of outsourcing, contract manufacturing, and franchises are not addressed in this table because the inclusion of specific GHG sources will depend on the nature of the outsourcing.

[2] Guidelines on unintentional $SF_6$ process emissions are to be developed.

[3] The American Petroleum Institute's Compendium of Greenhouse Gas Emissions Methodologies for the Oil and Gas Industry (2004) provides guidelines and calculation methodology for calculating GHG emissions from the oil and gas sector.

[4] The International Aluminum Institute's Aluminum Sector Greenhouse Gas Protocol (2003), in cooperation with WRI and WBCSD, provides guidelines and tools for calculating GHG emissions from the aluminum sector.

[5] The International Iron and Steel Institute's Iron and Steel sector guidelines, in cooperation with WRI and WBCSD, are under development.

[6] The WBCSD Working Group Cement: Toward a Sustainable Cement Industry has developed The Cement $CO_2$ Protocol: $CO_2$ Emissions Monitoring and Reporting Protocol for the Cement Industry (2002), which includes guidelines and tools to calculate GHG emissions from the cement sector.

[7] Guidelines for waste sector are to be developed.

[8] The Climate Change Working Group of the International Council of Forest and Paper Associations has developed Calculation Tools for Estimating Greenhouse Gas Emissions from Pulp and Paper Mills (2002), which includes guidelines and tools to calculate GHG emissions from the pulp and paper sector.

[9] Guidelines for PFC and $SF_6$ production are to be developed.

[10] Businesses in "other sectors" can estimate GHG emissions using cross-sectoral estimation tools—stationary combustion, mobile (transportation) combustion, HFC use, measurement and estimation uncertainty, and waste.

[11] WRI has developed Working 9 to 5 on Climate Change: An Office Guide (2002) and www.Safeclimate.net, which include guidelines and calculation tools for calculating GHG emissions from office-based organizations.

94

Exhibit 2 to Decl. of Burton 128

**ER-1587**

# Acronyms

95

| | |
|---|---|
| CDM | Clean Development Mechanism |
| CEM | Continuous Emission Monitoring |
| $CH_4$ | Methane |
| CER | Certified Emission Reduction |
| CCAR | California Climate Action Registry |
| CCX | Chicago Climate Exchange |
| $CO_2$ | Carbon Dioxide |
| $CO_2\text{-e}$ | Carbon Dioxide Equivalent |
| EPER | European Pollutant Emission Register |
| EU ETS | European Union Emissions Allowance Trading Scheme |
| GHG | Greenhouse Gas |
| GAAP | Generally Accepted Accounting Principles |
| HFCs | Hydrofluorocarbons |
| IPCC | Intergovernmental Panel on Climate Change |
| IPIECA | International Petroleum Industry Environmental Conservation Association |
| ISO | International Standards Organization |
| JI | Joint Implementation |
| $N_4O$ | Nitrous Oxide |
| NGO | Non-Governmental Organization |
| PFCs | Perfluorocarbons |
| $SF_6$ | Sulfur Hexafluoride |
| T&D | Transmission and Distribution |
| UK ETS | United Kingdom Emission Trading Scheme |
| WBCSD | World Business Council for Sustainable Development |
| WRI | World Resources Institute |



Exhibit 2 to Decl. of Burton 129          ER-1588

# Glossary

| | |
|---|---|
| Absolute target | A target defined by reduction in absolute emissions over time e.g., reduces $CO_2$ emissions by 25% below 1994 levels by 2010. (Chapter 11) |
| Additionality | A criterion for assessing whether a project has resulted in GHG emission reductions or removals in addition to what would have occurred in its absence. This is an important criterion when the goal of the project is to offset emissions elsewhere. (Chapter 8) |
| Allowance | A commodity giving its holder the right to emit a certain quantity of GHG. (Chapter 11) |
| Annex 1 countries | Defined in the International Climate Change Convention as those countries taking on emissions reduction obligations: Australia; Austria; Belgium; Belarus; Bulgaria; Canada; Croatia; Czech Republic; Denmark; Estonia; Finland; France; Germany; Greece; Hungary; Iceland; Ireland; Italy; Japan; Latvia; Liechtenstein; Lithuania; Luxembourg; Monaco; Netherlands; New Zealand; Norway; Poland; Portugal; Romania; Russian Federation; Slovakia; Slovenia; Spain; Sweden; Switzerland; Ukraine; United Kingdom; USA. |
| Associated/affiliated company | The parent company has significant influence over the operating and financial policies of the associated/affiliated company, but not financial control. (Chapter 3) |
| Audit Trail | Well organized and transparent historical records documenting how an inventory was compiled. |
| Baseline | A hypothetical scenario for what GHG emissions, removals or storage would have been in the absence of the GHG project or project activity. (Chapter 8) |
| Base year | A historic datum (a specific year or an average over multiple years) against which a company's emissions are tracked over time. (Chapter 5) |
| Base year emissions | GHG emissions in the base year. (Chapter 5) |
| Base year emissions recalculation | Recalculation of emissions in the base year to reflect a change in the structure of the company, or to reflect a change in the accounting methodology used. This ensures data consistency over time, i.e., comparisons of like with like over time. (Chapter 5, 11) |
| Biofuels | Fuel made from plant material, e.g. wood, straw and ethanol from plant matter (Chapter 4, 9, Appendix B) |
| Boundaries | GHG accounting and reporting boundaries can have several dimensions, i.e. organizational, operational, geographic, business unit, and target boundaries. The inventory boundary determines which emissions are accounted and reported by the company. (Chapter 3, 4, 11) |
| Cap and trade system | A system that sets an overall emissions limit, allocates emissions allowances to participants, and allows them to trade allowances and emission credits with each other. (Chapter 2, 8, 11) |
| Capital Lease | A lease which transfers substantially all the risks and rewards of ownership to the lessee and is accounted for as an asset on the balance sheet of the lessee. Also known as a Financial or Finance Lease. Leases other than Capital/Financial/Finance leases are Operating leases. Consult an accountant for further detail as definitions of lease types differ between various accepted financial standards. (Chapter 4) |
| Carbon sequestration | The uptake of $CO_2$ and storage of carbon in biological sinks. |
| Clean Development Mechanism (CDM) | A mechanism established by Article 12 of the Kyoto Protocol for project-based emission reduction activities in developing countries. The CDM is designed to meet two main objectives: to address the sustainability needs of the host country and to increase the opportunities available to Annex 1 Parties to meet their GHG reduction commitments. The CDM allows for the creation, acquisition and transfer of CERs from climate change mitigation projects undertaken in non-Annex 1 countries. |

96

Exhibit 2 to Decl. of Burton 130

**ER-1589**

(135 of 296), Page 135 of 296 Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 135 of 296
Case 2:24-cv-00801-ODW-PVC  Document 53-2  Filed 07/24/24  Page 100 of 117  Page ID
#:1776

GLOSSARY                                                                    97

| | |
|---|---|
| **Certified Emission Reductions (CERs)** | A unit of emission reduction generated by a CDM project. CERs are tradable commodities that can be used by Annex 1 countries to meet their commitments under the Kyoto Protocol. |
| **Co-generation unit/Combined heat and power (CHP)** | A facility producing both electricity and steam/heat using the same fuel supply. (Chapter 3) |
| **Consolidation** | Combination of GHG emissions data from separate operations that form part of one company or group of companies. (Chapter 3, 4) |
| **Control** | The ability of a company to direct the policies of another operation. More specifically, it is defined as either operational control (the organization or one of its subsidiaries has the full authority to introduce and implement its operating policies at the operation) or financial control (the organization has the ability to direct the financial and operating policies of the operation with a view to gaining economic benefits from its activities). (Chapter 3) |
| **Corporate inventory program** | A program to produce annual corporate inventories that are in keeping with the principles, standards, and guidance of the *GHG Protocol Corporate Standard*. This includes all institutional, managerial and technical arrangements made for the collection of data, preparation of a GHG inventory, and implementation of the steps taken to manage the quality of their emission inventory. |
| **CO$_2$ equivalent (CO$_2$-e)** | The universal unit of measurement to indicate the global warming potential (GWP) of each of the six greenhouse gases, expressed in terms of the GWP of one unit of carbon dioxide. It is used to evaluate releasing (or avoiding releasing) different greenhouse gases against a common basis. |
| **Cross-sector calculation tool** | A GHG Protocol calculation tool that addresses GHG sources common to various sectors, e.g. emissions from stationary or mobile combustion. See also GHG Protocol calculation tools (www.ghgprotocol.org). |
| **Direct GHG emissions** | Emissions from sources that are owned or controlled by the reporting company. (Chapter 4) |
| **Direct monitoring** | Direct monitoring of exhaust stream contents in the form of continuous emissions monitoring (CEM) or periodic sampling. (Chapter 6) |
| **Double counting** | Two or more reporting companies take ownership of the same emissions or reductions. (Chapter 3, 4, 8, 11) |
| **Emissions** | The release of GHG into the atmosphere. |
| **Emission factor** | A factor allowing GHG emissions to be estimated from a unit of available activity data (e.g. tonnes of fuel consumed, tonnes of product produced) and absolute GHG emissions. (Chapter 6) |
| **Emission Reduction Unit (ERU)** | A unit of emission reduction generated by a Joint Implementation (JI) project. ERUs are tradable commodities which can be used by Annex 1 countries to help them meet their commitment under the Kyoto Protocol. |
| **Equity share** | The equity share reflects economic interest, which is the extent of rights a company has to the risks and rewards flowing from an operation. Typically, the share of economic risks and rewards in an operation is aligned with the company's percentage ownership of that operation, and equity share will normally be the same as the ownership percentage. (Chapter 3) |
| **Estimation uncertainty** | Uncertainty that arises whenever GHG emissions are quantified, due to uncertainty in data inputs and calculation methodologies used to quantify GHG emissions. (Chapter 7) |
| **Finance lease** | A lease which transfers substantially all the risks and rewards of ownership to the lessee and is accounted for as an asset on the balance sheet of the lessee. Also known as a Capital or Financial Lease. Leases other than Capital/Financial/Finance leases are Operating leases. Consult an accountant for further detail as definitions of lease types differ between various accepted accounting principles. (Chapter 4) |

Exhibit 2 to Decl. of Burton
131

ER-1590

# Glossary

| | |
|---|---|
| Fixed asset investment | Equipment, land, stocks, property, incorporated and non-incorporated joint ventures, and partnerships over which the parent company has neither significant influence nor control. (Chapter 3) |
| Fugitive emissions | Emissions that are not physically controlled but result from the intentional or unintentional releases of GHGs. They commonly arise from the production, processing transmission storage and use of fuels and other chemicals, often through joints, seals, packing, gaskets, etc. (Chapter 4, 6) |
| Green power | A generic term for renewable energy sources and specific clean energy technologies that emit fewer GHG emissions relative to other sources of energy that supply the electric grid. Includes solar photovoltaic panels, solar thermal energy, geothermal energy, landfill gas, low-impact hydropower, and wind turbines. (Chapter 4) |
| Greenhouse gases (GHG) | For the purposes of this standard, GHGs are the six gases listed in the Kyoto Protocol: carbon dioxide ($CO_2$); methane ($CH_4$); nitrous oxide ($N_2O$); hydrofluorocarbons (HFCs); perfluorocarbons (PFCs); and sulphur hexafluoride ($SF_6$). |
| GHG capture | Collection of GHG emissions from a GHG source for storage in a sink. |
| GHG credit | GHG offsets can be converted into GHG credits when used to meet an externally imposed target. A GHG credit is a convertible and transferable instrument usually bestowed by a GHG program. (Chapter 8, 11) |
| GHG offset | Offsets are discrete GHG reductions used to compensate for (i.e., offset) GHG emissions elsewhere, for example to meet a voluntary or mandatory GHG target or cap. Offsets are calculated relative to a baseline that represents a hypothetical scenario for what emissions would have been in the absence of the mitigation project that generates the offsets. To avoid double counting, the reduction giving rise to the offset must occur at sources or sinks not included in the target or cap for which it is used. |
| GHG program | A generic term used to refer to any voluntary or mandatory international, national, sub-national, government or non-governmental authority that registers, certifies, or regulates GHG emissions or removals outside the company. e.g. CDM, EU ETS, CCX, and CCAR. |
| GHG project | A specific project or activity designed to achieve GHG emission reductions, storage of carbon, or enhancement of GHG removals from the atmosphere. GHG projects may be stand-alone projects, or specific activities or elements within a larger non-GHG related project. (Chapter 8, 11) |
| GHG Protocol calculation tools | A number of cross-sector and sector-specific tools that calculate GHG emissions on the basis of activity data and emission factors (available at www.ghgprotocol.org). |
| GHG Protocol Initiative | A multi-stakeholder collaboration convened by the World Resources Institute and World Business Council for Sustainable Development to design, develop and promote the use of accounting and reporting standards for business. It comprises of two separate but linked standards — the *GHG Protocol Corporate Accounting and Reporting Standard* and the *GHG Protocol Project Quantification Standard*. |
| GHG Protocol Project Quantification Standard | An additional module of the GHG Protocol Initiative addressing the quantification of GHG reduction projects. This includes projects that will be used to offset emissions elsewhere and/or generate credits. More information available at www.ghgprotocol.org. (Chapter 8, 11) |
| GHG Protocol sector specific calculation tools | A GHG calculation tool that addresses GHG sources that are unique to certain sectors, e.g., process emissions from aluminium production. (see also GHG Protocol Calculation tools) |
| GHG public report | Provides, among other details, the reporting company's physical emissions for its chosen inventory boundary. (Chapter 9) |

Exhibit 2 to Decl. of Burton
132

**ER-1591**

GLOSSARY                                                                                                99

| | |
|---|---|
| GHG registry | A public database of organizational GHG emissions and/or project reductions. For example, the US Department of Energy 1605b Voluntary GHG Reporting Program, CCAR, World Economic Forum's Global GHG Registry. Each registry has its own rules regarding what and how information is reported. (Introduction, Chapter 2, 5, 8, 10) |
| GHG removal | Absorbtion or sequestration of GHGs from the atmosphere. |
| GHG sink | Any physical unit or process that stores GHGs: usually refers to forests and underground/deep sea reservoirs of $CO_2$. |
| GHG source | Any physical unit or process which releases GHG into the atmosphere. |
| GHG trades | All purchases or sales of GHG emission allowances, offsets, and credits. |
| Global Warming Potential (GWP) | A factor describing the radiative forcing impact (degree of harm to the atmosphere) of one unit of a given GHG relative to one unit of $CO_2$. |
| Group company / subsidiary | The parent company has the ability to direct the financial and operating policies of a group company/subsidiary with a view to gaining economic benefits from its activities. (Chapter 3) |
| Heating value | The amount of energy released when a fuel is burned completely. Care must be taken not to confuse higher heating values (HHVs), used in the US and Canada, and lower heating values, used in all other countries (for further details refer to the calculation tool for stationary combustion available at www.ghgprotocol.org). |
| Indirect GHG emissions | Emissions that are a consequence of the operations of the reporting company, but occur at sources owned or controlled by another company. (Chapter 4) |
| Insourcing | The administration of ancillary business activities, formally performed outside of the company, using resources within a company. (Chapter 3, 4, 5, 9) |
| Intensity ratios | Ratios that express GHG impact per unit of physical activity or unit of economic value (e.g. tonnes of $CO_2$ emissions per unit of electricity generated). Intensity ratios are the inverse of productivity/efficiency ratios. (Chapter 9, 11) |
| Intensity target | A target defined by reduction in the ratio of emissions and a business metric over time e.g., reduce $CO_2$ per tonne of cement by 12% between 2000 and 2008. (Chapter 11) |
| Intergovernmental Panel on Climate Change (IPCC) | International body of climate change scientists. The role of the IPCC is to assess the scientific, technical and socio-economic information relevant to the understanding of the risk of human-induced climate change (www.ipcc.ch). |
| Inventory | A quantified list of an organization's GHG emissions and sources. |
| Inventory boundary | An imaginary line that encompasses the direct and indirect emissions that are included in the inventory. It results from the chosen organizational and operational boundaries. (Chapter 3, 4) |
| Inventory quality | The extent to which an inventory provides a faithful, true and fair account of an organization's GHG emissions. (Chapter 7) |
| Joint Implementation (JI) | The JI mechanism was established in Article 6 of the Kyoto Protocol and refers to climate change mitigation projects implemented between two Annex 1 countries. JI allows for the creation, acquisition and transfer of "emission reduction units" (ERUs). |
| Kyoto Protocol | A protocol to the United Nations Framework Convention on Climate Change (UNFCCC). Once entered into force it will require countries listed in its Annex B (developed nations) to meet reduction targets of GHG emissions relative to their 1990 levels during the period of 2008–12. |

Exhibit 2 to Decl. of Burton 133

ER-1592

# Glossary

| | |
|---|---|
| Leakage (Secondary effect) | Leakage occurs when a project changes the availability or quantity of a product or service that results in changes in GHG emissions elsewhere. (Chapter 8) |
| Life Cycle Analysis | Assessment of the sum of a product's effects (e.g. GHG emissions) at each step in its life cycle, including resource extraction, production, use and waste disposal. (Chapter 4) |
| Material discrepancy | An error (for example from an oversight, omission, or miscalculation) that results in the reported quantity being significantly different to the true value to an extent that will influence performance or decisions. Also known as material misstatement.(Chapter 10) |
| Materiality threshold | A concept employed in the process of verification. It is often used to determine whether an error or omission is a material discrepancy or not. It should not be viewed as a de minimus for defining a complete inventory. (Chapter 10) |
| Mobile combustion | Burning of fuels by transportation devices such as cars, trucks, trains, airplanes, ships etc. (Chapter 6) |
| Model uncertainty | GHG quantification uncertainty associated with mathematical equations used to characterize the relationship between various parameters and emission processes. (Chapter 7) |
| Non-Annex 1 countries | Countries that have ratified or acceded to the UNFCC but are not listed under Annex 1 and are therefore not under any emission reduction obligation (see also Annex 1 countries). |
| Operation | A generic term used to denote any kind of business, irrespective of its organizational, governance, or legal structures. An operation can be a facility, subsidiary, affiliated company or other form of joint venture. (Chapter 3, 4) |
| Operating lease | A lease which does not transfer the risks and rewards of ownership to the lessee and is not recorded as an asset in the balance sheet of the lessee. Leases other than Operating leases are Capital/Financial/Finance leases. Consult an accountant for further detail as definitions of lease types differ between various accepted financial standards. (Chapter 4) |
| Operational boundaries | The boundaries that determine the direct and indirect emissions associated with operations owned or controlled by the reporting company. This assessment allows a company to establish which operations and sources cause direct and indirect emissions, and to decide which indirect emissions to include that are a consequence of its operations. (Chapter 4) |
| Organic growth/decline | Increases or decreases in GHG emissions as a result of changes in production output, product mix, plant closures and the opening of new plants. (Chapter 5) |
| Organizational boundaries | The boundaries that determine the operations owned or controlled by the reporting company, depending on the consolidation approach taken (equity or control approach). (Chapter 3) |
| Outsourcing | The contracting out of activities to other businesses. (Chapter 3, 4, 5) |
| Parameter uncertainty | GHG quantification uncertainty associated with quantifying the parameters used as inputs to estimation models. (Chapter 7) |
| Primary effects | The specific GHG reducing elements or activities (reducing GHG emissions, carbon storage, or enhancing GHG removals) that the project is intended to achieve. (Chapter 8) |
| Process emissions | Emissions generated from manufacturing processes, such as the $CO_2$ that is arises from the breakdown of calcium carbonate ($CaCO_3$) during cement manufacture. (Chapter 4, Appendix D) |
| Productivity/efficiency ratios | Ratios that express the value or achievement of a business divided by its GHG impact. Increasing efficiency ratios reflect a positive performance improvement. e.g. resource productivity(sales per tonne GHG). Productivity/efficiency ratios are the inverse of intensity ratios. (Chapter 9) |
| Ratio indicator | Indicators providing information on relative performance such as intensity ratios or productivity/efficiency ratios. (Chapter 9) |

100

Exhibit 2 to Decl. of Burton
134

ER-1593

| | |
|---|---|
| Renewable energy | Energy taken from sources that are inexhaustible, e.g. wind, water, solar, geothermal energy, and biofuels. |
| Reporting | Presenting data to internal management and external users such as regulators, shareholders, the general public or specific stakeholder groups. (Chapter 9) |
| Reversibility of reductions | This occurs when reductions are temporary, or where removed or stored carbon may be returned to the atmosphere at some point in the future. (Chapter 8) |
| Rolling base year | The process of shifting or rolling the base year forward by a certain number of years at regular intervals of time. (Chapter 5, 11) |
| Scientific Uncertainty | Uncertainty that arises when the science of the actual emission and/or removal process is not completely understood. (Chapter 7) |
| Scope | Defines the operational boundaries in relation to indirect and direct GHG emissions. (Chapter 4) |
| Scope 1 inventory | A reporting organization's direct GHG emissions. (Chapter 4) |
| Scope 2 inventory | A reporting organization's emissions associated with the generation of electricity, heating/cooling, or steam purchased for own consumption. (Chapter 4) |
| Scope 3 inventory | A reporting organization's indirect emissions other than those covered in scope 2. (Chapter 4) |
| Scope of works | An up-front specification that indicates the type of verification to be undertaken and the level of assurance to be provided between the reporting company and the verifier during the verification process. (Chapter 10) |
| Secondary effects (Leakage) | GHG emissions changes resulting from the project not captured by the primary effect(s). These are typically the small, unintended GHG consequences of a project. (Chapter 8) |
| Sequestered atmospheric carbon | Carbon removed from the atmosphere by biological sinks and stored in plant tissue. Sequestered atmospheric carbon does not include GHGs captured through carbon capture and storage. |
| Significance threshold | A qualitative or quantitative criteria used to define a significant structural change. It is the responsibility of the company/verifier to determine the "significance threshold" for considering base year emissions recalculation. In most cases the "significance threshold" depends on the use of the information, the characteristics of the company, and the features of structural changes. (Chapter 5) |
| Stationary Combustion | Burning of fuels to generate electricity, steam, heat, or power in stationary equipment such as boilers, furnaces etc. |
| Structural change | A change in the organizational or operational boundaries of a company that result in the transfer of ownership or control of emissions from one company to another. Structural changes usually result from a transfer of ownership of emissions, such as mergers, acquisitions, divestitures, but can also include outsourcing/insourcing. (Chapter 5) |
| Target base year | The base year used for defining a GHG target, e.g. to reduce $CO_2$ emissions 25% below the target base year levels by the target base year 2000 by the year 2010. (Chapter 11) |
| Target boundary | The boundary that defines which GHG's, geographic operations, sources and activities are covered by the target. (Chapter 11) |
| Target commitment period | The period of time during which emissions performance is actually measured against the target. It ends with the target completion date. (Chapter 11) |
| Target completion date | The date that defines the end of the target commitment period and determines whether the target is relatively short- or long-term. (Chapter 11) |

Exhibit 2 to Decl. of Burton 135

**ER-1594**

# Glossary

| | |
|---|---|
| **Target double counting policy** | A policy that determines how double counting of GHG reductions or other instruments, such as allowances issued by external trading programs, is dealt with under a GHG target. It applies only to companies that engage in trading (sale or purchase) of offsets or whose corporate target boundaries interface with other companies' targets or external programs. (Chapter 11) |
| **Uncertainty** | 1. Statistical definition: A parameter associated with the result of a measurement that characterizes the dispersion of the values that could be reasonably attributed to the measured quantity. (e.g., the sample variance or coefficient of variation). (Chapter 7) |
| | 2. Inventory definition: A general and imprecise term which refers to the lack of certainty in emissions-related data resulting from any causal factor, such as the application of non-representative factors or methods, incomplete data on sources and sinks, lack of transparency etc. Reported uncertainty information typically specifies a quantitative estimates of the likely or perceived difference between a reported value and a qualitative description of the likely causes of the difference. (Chapter 7). |
| **United Nations Framework Convention on Climate Change (UNFCCC)** | Signed in 1992 at the Rio Earth Summit, the UNFCCC is a milestone Convention on Climate Change treaty that provides an overall framework for international efforts to (UNFCCC) mitigate climate change. The Kyoto Protocol is a protocol to the UNFCCC. |
| **Value chain emissions** | Emissions from the upstream and downstream activities associated with the operations of the reporting company. (Chapter 4) |
| **Verification** | An independent assessment of the reliability (considering completeness and accuracy) of a GHG inventory. (Chapter 10) |



102

Exhibit 2 to Decl. of Burton 136

**ER-1595**

# References

**API** (2004), *Compendium of Greenhouse Gas Emissions Methodologies for the Oil and Gas Industry,* Final Draft, American Petroleum Institute

**BP** (2000), *Environmental Performance: Group Reporting Guidelines,* Version 2.2

**CCAR** (2003), *General Reporting Guidelines,* California Climate Action Registry

**DEFRA** (2003), *Guidelines for the Measurement and Reporting of Emissions by direct participants in the UK Emissions Trading Scheme,* UK Department for Environment, Food and Rural Affairs, London, UK ETS(01)05rev2

**EC-DGE** (2000), *Guidance Document for EPER Implementation,* European Commission Directorate-General for Environment

**EPA** (1999), *Emission Inventory Improvement Program, Volume VI: Quality Assurance/Quality Control,* U.S. Environmental Protection Agency

**Georgia Pacific** (2002), *Protocol for the Inventory of Greenhouse Gases in Georgia-Pacific Corporation,* Georgia-Pacific Corporation, Atlanta

**GRI** (2002), *Global Reporting Initiative, Sustainability Reporting Guidelines,* Global Reporting Initiative

**IAI** (2003), *Aluminum Sector Greenhouse Gas Protocol,* International Aluminum Institute

**ICFPA** (2002), *Calculation Tools and for Estimating Greenhouse Gas Emissions from Pulp and Paper Mills,* Climate Change Working Group of the International Council of Forest and Paper Associations

**IPCC** (1996), *Revised IPCC Guidelines for National GHG Inventories: Reference Manual,* Intergovernmental Panel on Climate Change

**IPCC** (1997), *Revised 1996 IPCC Guidelines for National Greenhouse Gas Inventories,* Intergovernmental Panel on Climate Change

**IPCC** (1998), *Evaluating Approaches for Estimating Net Emissions of Carbon Dioxide from Forest Harvesting and Wood Products,* by S. **Brown**, B. **Lim**, and B. **Schlamadinger**, Intergovernmental Panel on Climate Change

**IPCC** (2000a), *Good Practice Guidance and Uncertainty Management in National Greenhouse Gas Inventories,* Intergovernmental Panel on Climate Change

**IPCC** (2000b), *Land Use, Land Use Change, and Forestry: A Special Report of the IPCC,* Intergovernmental Panel on Climate Change. Cambridge University Press, Cambridge, UK

**IPIECA** (2003), *Petroleum Industry Guidelines for Reporting Greenhouse Gas Emissions,* International Petroleum Industry Environmental Conservation Association, London

**ISO** (1999), *International Standard on Environmental Performance Evaluation,* (ISO 14031), International Standard Organization, Geneva

**KPMG** (2000), *Global Accounting: UK, US, IAS and Netherlands Compared,* 2nd Edition, KPMG Accountants NV

**NZBCSD** (2002), *The Challenge of GHG Emissions: the "why" and "how" of accounting and reporting for GHG emissions: An Industry Guide,* New Zealand Business Council for Sustainable Development, Auckland

**Ontario MOE** (2001), *Airborne Contaminant Discharge Monitoring and Reporting,* Ontario Ministry of the Environment, Toronto, Ontario Regulation 127/01

**UNFCCC** (2000), *Synthesis Report on National Greenhouse Gas Information Reported by Annex I Parties for the Land-Use Change and Forestry Sector and Agricultural Soils Category,* FCCC/TP/1997/5, United Nations Framework Convention on Climate Change

**Verfaillie, H.**, and **R. Bidwell** (2000), *Measuring Eco-efficiency: A Guide to Reporting Company Performance,* World Business Council for Sustainable Development, Geneva

**WBCSD** (2001), *The Cement $CO_2$ Protocol: $CO_2$ Emissions Monitoring and Reporting Protocol for the Cement Industry,* World Business Council for Sustainable Development: Working Group Cement, Geneva

**WRI** (2002), *Working 9 to 5 on Climate Change: An Office Guide,* World Resources Institute, Washington, DC

**WRI** (2003), *Renewable Energy Certificates: An Attractive Means for Corporate Customers to Purchase Renewable Energy,* World Resources Institute, Washington, DC

Exhibit 2 to Decl. of Burton
137

**ER-1596**

# Contributors

## Structured Feedback Companies (REVISED EDITION)

AstraZeneca

Birka Energi

Eastman Kodak Co.

ENDESA

IKEA International A/S

Interface, Inc.

Kansai Electric Power Company

Nike, Inc.

Norsk Hydro

N.V. Nuon Renewable Energy

Philips & Yaming Co., Ltd.

Seattle City Light

Simplex Mills Co. Ltd.

Sony Corporation

STMicroelectronics

Tata Iron & Steel Company Ltd.

Tokyo Electric Power Company

Tokyo Gas Co. Ltd.

We Energies

## Road Testers (FIRST EDITION)

Baxter International

BP

CODELCO

Duncans Industries

Dupont Company

Ford Motor Company

Fortum Power and Heat

General Motors Corporation

Hindalco Industries

IBM Corporation

Maihar Cement

Nike, Inc.

Norsk Hydro

Ontario Power Generation

Petro-Canada

PricewaterhouseCoopers road tested with European companies in the non-ferrous metal sector

Public Service Electric and Gas

Shree Cement

Shell Canada

Suncor Energy

Tokyo Electric Power Company

Volkswagen

World Business Council for Sustainable Development

World Resources Institute

500 PPM road tested with several small and medium companies in Germany

## WRI & WBCSD GHG Protocol Initiative Team (FIRST EDITION)

| | | | |
|---|---|---|---|
| Janet Ranganathan | World Resources Institute | David Moorcroft | World Business Council for Sustainable Development |
| Pankaj Bhatia | World Resources Institute | Jasper Koch | World Business Council for Sustainable Development |

## Project Management Team (FIRST EDITION)

| | | | |
|---|---|---|---|
| Brian Smith | Innovation Associates | Sujata Gupta | The Energy Research Institute |
| Hans Aksel Haugen | Norsk Hydro | Yasuo Hosoya | Tokyo Electric Power Company |
| Vicki Arroyo | Pew Center on Climate Change | Rebecca Eaton | World Wildlife Fund |
| Aidan J. Murphy | Royal Dutch/Shell | | |

Exhibit 2 to Decl. of Burton
138

ER-1597

## Contributors

| | | | |
|---|---|---|---|
| Heather Tansey | 3M Corporation | Britt Sahlestrom | Birka Energi |
| Ingo Puhl | 500 PPM | David Evans | BP |
| Dawn Fenton | ABB | Nick Hughes | BP |
| Christian Kornevall | ABB | Tasmin Lishman | BP |
| Paul-Antoine Lacour | AFOCEL | Mark Barthel | British Standards Institution |
| Kenneth Martchek | Alcoa | JoAnna Bullock | Business for Social Responsibility |
| Vince Van Son | Alcoa | Robyn Camp | California Climate Action Registry |
| Ron Nielsen | Alcan | Jill Gravender | California Climate Action Registry |
| Steve Pomper | Alcan | Dianne Wittenberg | California Climate Action Registry |
| Pat Quinn | Allegheny Energy | David Cahn | California Portland Cement |
| Joe Cascio Booz | Allen & Hamilton Inc. | Paul Blacklock | Calor Gas Limited |
| David Jaber | Alliance to Save Energy | Julie Chiaravalli | Cameron-Cole |
| Alain Bill | Alstom Power Environment | Connie Sasala | Cameron-Cole |
| Robert Greco | American Petroleum Institute | Evan Jones | Canada's Climate Change Voluntary Challenge and Registry Inc. |
| Walter C. Retzsch | American Petroleum Institute | | |
| Karen Ritter | American Petroleum Institute | Alan D. Willis | Canadian Institute of Chartered Accountants |
| Tom Carter | American Portland Cement Alliance | | |
| Dale Louda | American Portland Cement Alliance | Miguel A Gonzalez | CEMEX |
| Ted Gullison | Anova | Carlos Manuel Duarte Oliveira | CEMEX |
| J Douglas Akerson | Aon Risk Services of Texas Inc | | |
| John Molburg | Argonne National Laboratory | Inna Gritsevich | CENEf (Center for Energy Efficiency) |
| Sophie Jabonski | Arthur Andersen | | |
| Fiona Gadd | Arthur Andersen | Ellina Levina | Center for Clean Air Policy |
| Christophe Scheitzky | Arthur Andersen | Steve Winkelman | Center for Clean Air Policy |
| Scot Foster | Arthur D. Little | Aleg Cherp | Central European University (Hungary) and ECOLOGIA |
| Mike Isenberg | Arthur D. Little | | |
| Bill Wescott | Arthur D. Little | Mark Fallon | CH2M Hill |
| Keith Moore | AstraZeneca | Lisa Nelowet Grice | CH2M Hill |
| Birgita Thorsin | AstraZeneca | Arthur Lee | ChevronTexaco |
| Thomas E. Werkem | Atofina Chemicals | William C. McLeod | ChevronTexaco |
| Jean-Bernard Carrasco | Australian Greenhouse Office | Susann Nordrum | ChevronTexaco |
| David Harrison | Australian Greenhouse Office | Alice LeBlanc | Chicago Climate Exchange |
| Bronwyn Pollock | Australian Greenhouse Office | Charlene R. Garland | Clean Air-Cool Planet |
| Linda Powell | Australian Greenhouse Office | Donna Boysen | Clean Energy Group |
| James Shevlin | Australian Greenhouse Office | Jennifer DuBose | Climate Neutral Network |
| Chris Loreti | Battelle Memorial Institute | Sue Hall | Climate Neutral Network |
| Ronald E. Meissen | Baxter International | Karen Meadows | Climate Neutral Network |
| Göran Andersson | Birka Energi | Michael Burnett | Climate Trust |
| Sofi Harms-Ringdahl | Birka Energi | David Olsen | Clipper Windpower |
| | | Marco Bedoya | Cimpor |
| | | Jose Guimaraes | Cimpor |

Exhibit 2 to Decl. of Burton 139                                    ER-1598

# Contributors

| | | | | |
|---|---|---|---|---|
| Elizabeth Arner | CO2e.com/Cantor Fitzgerald | | Paul Tebo | DuPont Company |
| Fernando E. Toledo | CODELCO | | Fred Whiting | DuPont Company |
| Bruce Steiner | Collier Shannon Scott | | Roy Wood | Eastman Kodak Co. |
| Lynn Preston | Collins & Aikman | | Jochen Harnisch | ECOFYS |
| Annick Carpentier | Confederation of European Paper Industries | | Alan Tate | Ecos Corporation |
| K.P. Nyati | Confederation of Indian Industry | | Pedro Moura Costa | EcoSecurities |
| Sonal Pandya | Conservation International | | Justin Guest | EcoSecurities |
| Michael Totten | Conservation International | | D. Gary Madden | Emission Credit LLC |
| Dominick J. Mormile | Consolidated Edison Company | | Kyle L. Davis | Edison Mission Energy/ MidAmerican Energy Holdings Co. |
| John Kessels | CRL Energy Ltd. | | Maria Antonia Abad Puértolas | ENDESA |
| Ian Lewis | Cumming Cockburn Limited | | David Corregidor Sanz | ENDESA |
| Raymond P. Cote | Dalhousie University | | Elvira Elso Torralba | ENDESA |
| Olivia Hartridge | DEFRA/European Commission | | Joel Bluestein | Energy & Environmental Analysis, Inc. |
| Robert Casamento | Deloitte & Touche | | Y P Abbi | The Energy Research Institute |
| Markus Lehni | Deloitte & Touche | | Girish Sethi | The Energy Research Institute |
| Flemming Tost | Deloitte & Touche | | Vivek Sharma | The Energy Research Institute |
| Philip Comer | Det Norske Veritas | | Crosbie Baluch | Energetics Pty. Ltd. |
| Simon Dawes | Det Norske Veritas | | Marcus Schneider | Energy Foundation |
| Trygve Roed Larsen | Det Norske Veritas | | David Crossley | Energy Futures Australia Pty Ltd |
| Einar Telnes | Det Norske Veritas | | Patrick Nollet | Entreprises pour l'Environnement |
| Kalipada Chatterjee | Development Alternatives | | James L. Wolf | Envinta |
| Vivek Kumar | Development Alternatives | | Kenneth Olsen | Environment Canada |
| Samrat Sengupta | Development Alternatives | | Adrian Steenkamer | Environment Canada |
| Francesco Balocco | The Dow Chemical Company | | Millie Chu Baird | Environmental Defense |
| Paul Cicio | The Dow Chemical Company | | Sarah Wade | Environmental Defense |
| Frank Farfone | The Dow Chemical Company | | Satish Kumar | Environmental Energy Technologies |
| Peter Molinaro | The Dow Chemical Company | | John Cowan | Environmental Interface |
| Scott Noesen | The Dow Chemical Company | | Edward W. Repa | Environmental Research and Education Foundation |
| Stephen Rose | The Dow Chemical Company | | Tatiana Bosteels | Environmental Resources Management |
| Jorma Salmikivi | The Dow Chemical Company | | William B. Weil | Environmental Resources Management |
| Don Hames | The Dow Chemical Company | | Wiley Barbour | Environmental Resources Trust |
| R. Swarup | Duncans Industries | | Barney Brannen | Environmental Resources Trust |
| John B. Carberry | DuPont Company | | Ben Feldman | Environmental Resources Trust |
| David Childs | DuPont Company | | Al Daily | Environmental Synergy |
| John C. DeRuyter | Dupont Company | | Anita M. Celdran | Environmental Technology Evaluation Center |
| Tom Jacob | DuPont Company | | William E. Kirksey | Environmental Technology Evaluation Center |
| Mack McFarland | DuPont Company | | | |
| Ed Mongan | DuPont Company | | | |
| Ron Reimer | DuPont Company | | | |

106

Exhibit 2 to Decl. of Burton 140

ER-1599

| | |
|---|---|
| James Bradbury | EPOTEC |
| Alan B. Reed | EPOTEC |
| Daniele Agostini | Ernst & Young |
| Juerg Fuessler | Ernst Basler & Partners |
| Stefan Larsson | ESAB |
| Lutz Blank | European Bank for Reconstruction and Development |
| Alke Schmidt | European Bank for Reconstruction and Development |
| Peter Vis | European Commission |
| Chris Evers | European Commission |
| Yun Yang | ExxonMobil Research & Engineering Company |
| Urs Brodmann | Factor Consulting and Management |
| M.A. J. Jeyaseelan | Federation of Indian Chambers of Commerce & Industry |
| Anu Karessuo | Finnish Forest Industries Federation |
| Tod Delaney | First Environment |
| Brian Glazebrook | First Environment |
| James D. Heeren | First Environment |
| James T. Wintergreen | First Environment |
| Kevin Brady | Five Winds International |
| Duncan Noble | Five Winds International |
| Steven Young | Five Winds International |
| Larry Merritt | Ford Motor Company |
| Chad McIntosh | Ford Motor Company |
| John Sullivan | Ford Motor Company |
| Debbie Zemke | Ford Motor Company |
| Dan Blomster | Fortum Power and Heat |
| Arto Heikkinen | Fortum Power and Heat |
| Jussi Nykanen | Fortum Power and Heat |
| Steven Hellem | Global Environment Management Initiative |
| Judith M. Mullins | General Motors Corporation |
| Terry Pritchett | General Motors Corporation |
| Richard Schneider | General Motors Corporation |
| Robert Stephens | General Motors Corporation |
| Kristin Zimmerman | General Motors Corporation |
| Mark Starik | George Washington University |
| Michael Rumberg | Gerling Group of Insurances |
| Jeffrey C. Frost | GHG Spaces |
| T. Imai | Global Environment and Energy Group |

| | |
|---|---|
| Joseph Romm | Global Environment and Technology Foundation |
| Arthur H Rosenfeld | Global Environment and Technology Foundation |
| Dilip Biswas | Government of India Ministry of Environment & Forests |
| Matthew DeLuca | Green Mountain Energy |
| Richard Tipper | Greenergy ECCM |
| Ralph Taylor | Greenleaf Composting Company |
| Glenna Ford | GreenWare Environmental Systems |
| Nickolai Denisov | GRID-Arendal / Hindalco Industries |
| Y.K. Saxena | Gujarat Ambuja Cement |
| Mihir Moitra | Hindalco Industries Ltd. |
| Claude Culem | Holcim |
| Adrienne Williams | Holcim |
| Mo Loya | Honeywell Allied Signal |
| Edan Dionne | IBM Corporation |
| Ravi Kuchibhotla | IBM Corporation |
| Thomas A. Cortina | ICCP |
| Paul E. Bailey | ICF Consulting |
| Anne Choate | ICF Consulting |
| Craig Ebert | ICF Consulting |
| Marcia M. Gowen | ICF Consulting |
| Kamala R. Jayaraman | ICF Consulting |
| Richard Lee | ICF Consulting |
| Diana Paper | ICF Consulting |
| Frances Sussman | ICF Consulting |
| Molly Tirpak | ICF Consulting |
| Thomas Bergmark | IKEA International A / S |
| Eva May Lawson | IKEA International A / S |
| Mona Nilsson | IKEA International A / S |
| Othmar Schwank | INFRAS |
| Roel Hammerschlag | Institute for Lifecycle Energy Analysis |
| Shannon Cox | Interface Inc. |
| Buddy Hay | Interface Inc. |
| Alyssa Tippens | Interface Inc. |
| Melissa Vernon | Interface Inc. |
| Willy Bjerke | International Aluminum Institute |
| Jerry Marks | International Aluminum Institute |
| Robert Dornau | International Emissions Trading Association |

Exhibit 2 to Decl. of Burton
141

ER-1600

# Contributors

| | |
|---|---|
| Andrei Marcu | International Emissions Trading Association |
| Akira Tanabe | International Finance Corporation |
| George Thomas | International Finance Corporation |
| Danny L. Adams | International Paper Company |
| Julie C. Brautigam | International Paper Company |
| Carl Gagliardi | International Paper Company |
| Thomas C. Jorling | International Paper Company |
| Mark E. Bateman | Investor Responsibility Research Center |
| S.K. Bezbaroa | ITC Ltd. |
| H.D. Kulkami | ITC Ltd. |
| Michael Nesbit | JAN Consultants |
| Chris Hunter | Johnson & Johnson International |
| Harry Kaufman | Johnson & Johnson International |
| Daniel Usas | Johnson & Johnson Worldwide Engineering Services |
| Shintaro Yokokawa | Kansai Electric Power Co. |
| Iain Alexander | KPMG |
| Giulia Galluccio | KPMG |
| Lisa Gibson | KPMG |
| Jed Jones | KPMG |
| Sophie Punte | KPMG |
| Michele Sanders | KPMG |
| Chris Boyd | Lafarge Corporation |
| David W. Carroll | Lafarge Corporation |
| Ed Vine | Lawrence Berkeley National Laboratory |
| Richard Kahle | Lincoln Electric Service |
| Michael E. Canes | Logistics Management Institute |
| Erik Brejla | The Louis Berger Group |
| Michael J. Bradley | M.J. Bradley & Associates |
| Brian Jones | M.J. Bradley & Associates |
| Craig McBernie | McBernie QERL |
| Tracy Dyson | Meridian Energy Limited |
| Tim Mealey | Meridian Institute |
| Maria Wellisch | MWA Consultants |
| Margriet Kuijper | NAM |
| Sukumar Devotta | National Chemical Laboratory |
| Neil B. Cohn | Natsource |
| Garth Edward | Natsource |
| Robert Youngman | Natsource |
| Dale S. Bryk | Natural Resources Defense Council |

| | |
|---|---|
| Jeff Fiedler | Natural Resources Defense Council |
| Brad Upton | NCASI |
| Timothy J. Roskelley | NESCAUM |
| Matthew W. Addison | Nexant |
| Atulya Dhungana | Nexant |
| David H. King | Niagara Mohawk Power Corporation |
| Martin A. Smith | Niagara Mohawk Power Corporation |
| Jim Goddard | Nike Inc. |
| Leta Winston | Nike Inc. |
| Amit Meridor | NILIT |
| Karina Aas | Norsk Hydro |
| Jos van Danne | Norsk Hydro |
| Hans Goosens | Norsk Hydro |
| Jon Rytter Hasle | Norsk Hydro |
| Tore K. Jenssen | Norsk Hydro |
| Halvor Kvande | Norsk Hydro |
| Bernt Malme | Norsk Hydro |
| Lillian Skogen | Norsk Hydro |
| Jostein Soreide | Norsk Hydro |
| Lasse Nord | Norsk Hydro |
| Thor Lobben | Norske Skogindustrier ASA |
| Morton A. Barlaz | North Carolina State University |
| Geir Husdal | Novatech |
| Gard Pedersen | Novatech |
| Ron Oei | Nuon N.V. |
| Jan Corfee-Morlot | OECD |
| Stephane Willems | OECD |
| Anda Kalvins | Ontario Power Generation |
| Mikako Kokitsu | Osaka Gas Co. |
| Greg San Martin | Pacific Gas and Electric Company |
| Ken Humphreys | Pacific Northwest National Laboratory |
| Michael Betz | PE Europe GmbH |
| Kathy Scales | Petro-Canada |
| Judith Greenwald | Pew Center |
| Naomi Pena | Pew Center |
| Daniel L. Chartier | PG&E Generating |
| Zhang Fan | Philips & Yaming Co. Ltd. |
| Xue Gongren | Philips & Yaming Co. Ltd. |
| Orestes R. Anastasia | Planning and Development Collaborative International |

Exhibit 2 to Decl. of Burton 142

CONTRIBUTORS                                                                      109

| | | | |
|---|---|---|---|
| Robert Hall | Platts Research and Consulting | Gareth Phillips | SGS |
| Neil Kolwey | Platts Research and Consulting | Antoine de La Rochefordière | SGS |
| David B. Sussman | Poubelle Associates | Murray G. Jones | Shell Canada |
| Bill Kyte | Powergen | Sean Kollee | Shell Canada |
| Surojit Bose | PricewaterhouseCoopers | Rick Weidel | Shell Canada |
| Melissa Carrington | PricewaterhouseCoopers | Pipope Siripatananon | Siam Cement |
| Rachel Cummins | PricewaterhouseCoopers | J.P. Semwal | Simplex Mills Co. Ltd. |
| Len Eddy | PricewaterhouseCoopers | Ros Taplin | SMEC Environment |
| Dennis Jennings | PricewaterhouseCoopers | Robert K. Ham | Solid & Hazardous Waste Engineering |
| Terje Kronen | PricewaterhouseCoopers | Jeremy K. O'Brien | Solid Waste Association of North America |
| Craig McBurnie | PricewaterhouseCoopers | Hidemi Tomita | Sony Corporation |
| Olivier Muller | PricewaterhouseCoopers | Gwen Parker | Stanford University |
| Dorje Mundle | PricewaterhouseCoopers | Georges Auguste | STMicroelectronics |
| Thierry Raes | PricewaterhouseCoopers | Ivonne Bertoncini | STMicroelectronics |
| Alain Schilli | PricewaterhouseCoopers | Giuliano Boccalletti | STMicroelectronics |
| Hans Warmenhoven | PricewaterhouseCoopers | Eugenio Ferro | STMicroelectronics |
| Pedro Maldonado | PRIEN | Philippe Levavasseur | STMicroelectronics |
| Alfredo Munoz | PRIEN | Geoffrey Johns | Suncor Energy |
| Mark S. Brownstein | PSEG | Manuele de Gennaro | Swiss Federal Institute of Technology, ETH Zurich |
| James Hough | PSEG | Markus Ohndorf | Swiss Federal Institute of Technology, ETH Zurich |
| Samuel Wolfe | PSEG | Matthias Gysler | Swiss Federal Office for Energy |
| Vinayak Khanolkar | Pudumjee Pulp & Paper Mills Ltd. | Christopher T. Walker | Swiss Reinsurance Co. |
| Federica Ranghieri | Ranghieri & Associates | Gregory A. Norris | Sylvatica |
| Jennifer Lee | Resources for the Future | GS Basu | Tata Iron & Steel Company Ltd. |
| Kaj Embren | Respect Europe | RP Sharma | Tata Iron & Steel Company Ltd. |
| Mei Li Han | Respect Europe | Robert Graff | Tellus Institute |
| David W. Cross | The RETEC Group | Sivan Kartha | Tellus Institute |
| Alan Steinbeck | Rio Tinto | Michael Lazarus | Tellus Institute |
| Katie Smith | RMC Group | Allen L. White | Tellus Institute |
| Rick Heede | Rocky Mountain Institute | Will Gibson | Tetra Tech Em Incorporated |
| Chris Lotspeich | Rocky Mountain Institute | Satish Malik | Tetra Tech Em Incorporated |
| Anita M. Burke | Royal Dutch / Shell | Fred Zobrist | Tetra Tech Em Incorporated |
| David Hone | Royal Dutch / Shell | Sonal Agrawal | Tetra Tech India |
| Thomas Ruddy | Ruddy Consultants | Ranjana Ganguly | Tetra Tech India |
| Julie Doherty | Science Applications Intl. Corp. | Ashwani Zutshi | Tetra Tech India |
| Richard Y. Richards | Science Applications Intl. Corp. | Mark D. Crowdis | Think Energy |
| Corinne Grande | Seattle City Light | | |
| Doug Howell | Seattle City Light | | |
| Edwin Aalders | SGS | | |
| Irma Lubrecht | SGS | | |

Exhibit 2 to Decl. of Burton 143                                   ER-1602

# Contributors

| | | | |
|---|---|---|---|
| Tinus Pulles | TNO MEP | Dina Kruger | U.S. Environmental Protection Agency |
| Yasushi Hieda | Tokyo Electric Power Co. Ltd | Skip Laitner | U.S. Environmental Protection Agency |
| Midori Sasaki | Tokyo Electric Power Co. Ltd. | Joseph Mangino | U.S. Environmental Protection Agency |
| Tsuji Yoshiyuki | Tokyo Electric Power Co. Ltd. | Pam Herman Milmoe | U.S. Environmental Protection Agency |
| Hiroshi Hashimoto | Tokyo Gas Co. Ltd. | Beth Murray | U.S. Environmental Protection Agency |
| Takahiro Nagata | Tokyo Gas Co. Ltd | Deborah Ottinger | U.S. Environmental Protection Agency |
| Kentaro Suzawa | Tokyo Gas Co. Ltd. | Paul Stolpman | U.S. Environmental Protection Agency |
| Satoshi Yoshida | Tokyo Gas Co. Ltd. | Susan Thorneloe | U.S. Environmental Protection Agency |
| Ralph Torrie | Torrie Smith Associates | Chloe Weil | U.S. Environmental Protection Agency |
| Manuela Ojan | Toyota Motor Company | Phil J. Wirdzek | U.S. Environmental Protection Agency |
| Eugene Smithart | Trane Company | Tom Wirth | U.S. Environmental Protection Agency |
| Laura Kosloff | Trexler & Associates | Michael Savonis | U.S. Federal Highway Administration |
| Mark Trexler | Trexler & Associates | M. Michael Miller | U.S. Geological Survey |
| Walter Greer | Trinity Consultants | Hendrik G. van Oss | U.S. Geological Survey |
| Jochen Mundinger | University of Cambridge | Valentin V. Tepordei | U.S. Geological Survey |
| Hannu Nilsen | UPM-Kymmene Corporation | Marguerite Downey | U.S. Postal Service |
| Nao Ikemoto | U.S. Asia Environmental Partnership | Hussein Abaza | UNEP |
| Stephen Calopedis | U.S. Department of Energy | Lambert Kuijpers | UNEP |
| Gregory H. Kats | U.S. Department of Energy | Gary Nakarado | UNEP |
| Dick Richards | U.S. Department of Energy | Mark Radka | UNEP |
| Arthur Rosenfeld | U.S. Department of Energy | Stelios Pesmajoglou | UNFCCC |
| Arthur Rypinski | U.S. Department of Energy | Alden Meyer | Union of Concerned Scientists |
| Monisha Shah | U.S. Department of Energy | Judith Bayer | United Technologies Corporation |
| Tatiana Strajnic | U.S. Department of Energy | Fred Keller | United Technologies Corporation |
| Kenneth Andrasko | U.S. Environmental Protection Agency | Paul Patlis | United Technologies Corporation |
| Jan Canterbury | U.S. Environmental Protection Agency | Ellen J. Quinn | United Technologies Corporation |
| Ed Coe | U.S. Environmental Protection Agency | Bill Walters | United Technologies Corporation |
| Lisa H. Chang | U.S. Environmental Protection Agency | Gary Bull | University of British Colombia |
| Andrea Denny | U.S. Environmental Protection Agency | Zoe Harkin | University of British Columbia |
| Bob Doyle | U.S. Environmental Protection Agency | Gerard Alleng | University of Delaware |
| Henry Ferland | U.S. Environmental Protection Agency | Jacob Park | University of Maryland |
| Dave Godwin | U.S. Environmental Protection Agency | Terri Shires | URS Corporation |
| Katherine Grover | U.S. Environmental Protection Agency | Angela Crooks | USAID |
| John Hall | U.S. Environmental Protection Agency | Virginia Gorsevski | USAID |
| Lisa Hanle | U.S. Environmental Protection Agency | Carrie Stokes | USAID |
| Reid Harvey | U.S. Environmental Protection Agency | Sandeep Tandon | USAID |
| Kathleen Hogan | U.S. Environmental Protection Agency | A.K. Ghose | Vam Organosys Ltd. |
| Roy Huntley | U.S. Environmental Protection Agency | Cyril Coillot | Vivendi Environment |
| Bill N. Irving | U.S. Environmental Protection Agency | Eric Lesueur | Vivendi Environment |

110

Exhibit 2 to Decl. of Burton 144

ER-1603

CONTRIBUTORS                                                                111

| | | | |
|---|---|---|---|
| Michael Dillman | Volkswagen | Anand Rao | World Resources Institute |
| Stephan Herbst | Volkswagen | Lee Schipper | World Resources Institute |
| Herbert Forster | Votorantim | Jason Snyder | World Resources Institute |
| Claude Grinfeder | Votorantim | Jennifer Morgan | World Wildlife Fund |

| | |
|---|---|
| Mahua Acharya | World Business Council for Sustainable Development |
| Christine Elleboode | World Business Council for Sustainable Development |
| Margaret Flaherty | World Business Council for Sustainable Development |
| Al Fry | World Business Council for Sustainable Development |
| Susanne Haefeli | World Business Council for Sustainable Development |
| Kija Kummer | World Business Council for Sustainable Development |
| Heidi Sundin | World Business Council for Sustainable Development |
| Donna Danihel | We Energies |
| Gary Risner | Weyerhauser |
| Thomas F. Catania | Whirlpool Corporation |
| Eric Olafson | Williams Company |
| Johannes Heister | World Bank |
| Ajay Mathur | World Bank |
| Richard Samans | World Economic Forum |
| Andrew Aulisi | World Resources Institute |
| Kevin Baumert | World Resources Institute |
| Carey Bylin | World Resources Institute |
| Florence Daviet | World Resources Institute |
| Manmita Dutta | World Resources Institute |
| Suzie Greenhalgh | World Resources Institute |
| Craig Hanson | World Resources Institute |
| Fran Irwin | World Resources Institute |
| David Jhirad | World Resources Institute |
| Nancy Kete | World Resources Institute |
| Bill LaRocque | World Resources Institute |
| Jim MacKenzie | World Resources Institute |
| Emily Matthews | World Resources Institute |
| Sridevi Nanjundaram | World Resources Institute |
| Jim Perkaus | World Resources Institute |
| Jonathan Pershing | World Resources Institute |
| Samantha Putt del Pino | World Resources Institute |

WRI and WBCSD would also like to thank the following individuals and organizations for their generous financial support: Energy Foundation, Spencer T. and Ann W. Olin Foundation, John D. and Catherine T. MacArthur Foundation, Charles Stewart Mott Foundation, the US Agency for International Development, the US Environmental Protection Agency, Arthur Lee, Anglo American, Baxter International, BP, Det Norske Veritas, DuPont, Ford, General Motors, Lafarge, International Paper, Norsk Hydro, Ontario Power Generation, Petro-Canada, PowerGen, S.C.Johnson, SGS, Shell, Statoil, STMicroelectronics, Sulzer, Suncor, Swiss Re, Texaco, The Dow Chemical Company, Tokyo Electric Power Company, Toyota, TransAlta and Volkswagen.



Design: Alston Taggart, Barbieri and Green

Exhibit 2 to Decl. of Burton 145

**ER-1604**

## Ordering publications

WBCSD
WBCSD, c/o Earthprint Limited
Tel: (44 1438) 748 111
Fax: (44 1438) 748 844
wbcsd@earthprint.com

Publications are available at:
www.wbcsd.org
www.earthprint.com

WRI
Hopkins Fulfillment Service
Tel: (1 410) 516 6956
Fax: (1 410) 516 6998
e-mail: hfscustserv@mail.press.jhu.edu

Publications can be ordered from WRI's secure online store: http://www.wristore.com

## Disclaimer

This document, designed to promote best practice GHG accounting and reporting, has been developed through a unique multi-stakeholder consultative process involving representatives of reporters and report-users from around the world. While WBCSD and WRI encourage use of the GHG Protocol Corporate Standard by all corporations and organizations, the preparation and publication of reports based fully or partially on the GHG Protocol is the full responsibility of those producing them. Neither the WBCSD and WRI, nor other individuals who contributed to this standard assume responsibility for any consequences or damages resulting directly or indirectly from its use in the preparation of reports or the use of reports based on the GHG Protocol Corporate Standard.



Copyright © World Resources Institute and World Business Council for Sustainable Development, March 2004
ISBN 1-56973-568-9
Printed in USA

Printed on Phoeno Star (20% post consumer waste, chlorine-free pulp processed paper) with soy-based inks.   

112

Exhibit 2 to Decl. of Burton
146

ER-1605



**About WBCSD**

The World Business Council for Sustainable Development (WBCSD) is a coalition of 170 international companies united by a shared commitment to sustainable development via the three pillars of economic growth, ecological balance and social progress. Our members are drawn from more than 35 countries and 20 major industrial sectors. We also benefit from a global network of 48 national and regional business councils and partner organizations involving some 1,000 business leaders globally.

**About WRI**

World Resources Institute is an independent nonprofit organization with a staff of more than 100 scientists, economists, policy experts, business analysts, statistical analysts, mapmakers, and communicators working to protect the Earth and improve people's lives. The GHG Protocol Initiative is managed by WRI's Sustainable Enterprise Program which for more than a decade, has harnessed the power of business to create profitable solutions to environment and development challenges. WRI is the only organization that brings together four influential forces to accelerate change in business practice: corporations, entrepreneurs, investors, and business schools.

Exhibit 2 to Decl. of Burton
147

**ER-1606**

(152 of 296), Page 152 of 296  Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 152 of 296
Case 2:24-cv-00801-ODW-PVC   Document 53-2   Filed 07/24/24   Page 117 of 117   Page ID
#:1793





**World Business Council for
Sustainable Development**



**WORLD
RESOURCES
INSTITUTE**

4, chemin de Conches
1231 Conches-Geneva
Switzerland

Tel: (41 22) 839 31 00
Fax: (41 22) 839 31 31
E-mail: info@wbcsd.org
Internet: www.wbcsd.org

10 G Street, NE (Suite 800)
Washington, DC 20002
USA

Tel: (1 202) 729 76 00
Fax: (1 202) 729 76 10
E-mail: sepinfo@wri.org
Internet: www.wri.org



ISBN 1-56973-568-9

Exhibit 2 to Decl. of Burton
148

**ER-1607**

1  ROB BONTA
   Attorney General of California
2  GARY E. TAVETIAN (SBN 117135)
   MYUNG J. PARK (SBN 210866)
3  Supervising Deputy Attorneys General
   M. ELAINE MECKENSTOCK (SBN 268861)
4  CAITLAN MCLOON (SBN 302798)
   EMILY HAJARIZADEH (SBN 325246)
5  DYLAN REDOR (SBN 338136)
   KATHERINE GAUMOND (SBN 349453)
6  Deputy Attorneys General
    300 South Spring Street, Suite 1702
7   Los Angeles, CA  90013-1230
    Telephone:  (213) 269-6438
8   Fax:  (916) 731-2128
    E-mail:  Caitlan.McLoon@doj.ca.gov
9  *Attorneys for Defendants Liane M. Randolph,
   Steven S. Cliff, and Robert A. Bonta*

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE CENTRAL DISTRICT OF CALIFORNIA

12

13

| | |
|---|---|
| 14 **CHAMBER OF COMMERCE OF THE UNITED STATES OF** | 2:24-cv-00801-FMO-PVCx |
| 15 **AMERICA, CALIFORNIA CHAMBER OF COMMERCE,** | **DECLARATION OF PETER CASHION IN SUPPORT OF** |
| 16 **AMERICAN FARM BUREAU FEDERATION, LOS ANGELES** | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR** |
| 17 **COUNTY BUSINESS FEDERATION, CENTRAL** | **SUMMARY JUDGMENT ON CLAIM I** |
| 18 **VALLEY BUSINESS FEDERATION, and WESTERN** | |
| 19 **GROWERS ASSOCIATION,** | Date:         September 9, 2024 |
| 20                       Plaintiffs, | Time:         1:30 PM |
| | Courtroom:   5D |
| 21           v. | Judge:        The Honorable Otis D. Wright, II |
| 22 **LIANE M. RANDOLPH, in her** | Trial Date:   Not Set |
| **official capacity as Chair of the** | Action Filed: 1/30/2024 |
| 23 **California Air Resources Board,** | |
| **STEVEN S. CLIFF, in his official** | |
| 24 **capacity as the Executive Officer of** | |
| **the California Air Resources Board,** | |
| 25 **and ROBERT A. BONTA, in his** | |
| **official capacity as Attorney General** | |
| 26 **of California,** | |
| 27                       Defendants. | |
| 28 | |

(154 of 296) Page 154 of 296 Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 154 of 296
Case 2:24-cv-00801-ODW-PVC   Document 52-5   Filed 07/24/24   Page 2 of 10   Page ID
#:1580

## DECLARATION OF PETER CASHION

I, Peter Cashion, hereby declare:

1. I submit this declaration in support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment in the above captioned matter. I have personal knowledge of the matters stated herein, and if asked to testify thereto, I could and would do so competently.

### Introduction

2. I serve as the Managing Investment Director for Sustainable Investments. My position duties include setting the vision, strategy, and governance for CalPERS' sustainability work. I am also responsible for leading all aspects of the fund's efforts to develop and implement a financially driven sustainability-based research and data framework to support sustainable investment integration throughout the investment decision-making process across the CalPERS portfolio.

3. I previously worked at the World Bank's International Finance Corporation (IFC) spanning back to 1995, where I most recently served as the global head of climate finance & chief investment officer in the Financial Institutions Group (FIG), in addition to other prior senior roles, including global equity head, principal investment officer, and principal financial officer.

4. I have read and am familiar with California Senate Bills 253 and 261 (S.B. 253 and S.B. 261).

2

ER-1609

## CalPERS Background

5. CalPERS is the largest public defined benefit pension fund in the United States, with approximately $500 billion in assets. We are a fiduciary who provides retirement benefits to more than 2.2 million California public employees, including state and school employees and public servants of cities, counties, and special districts across California.

6. Last year, CalPERS paid more than $31 billion in retirement benefits. Delivering investment returns is our number one job. In the first nine months of this fiscal year, our investments have returned 7.8 percent. Over the long term, nearly 56 cents of every dollar paid in benefits comes from investment returns. The remainder comes from members and their employers. Achieving strong investment returns helps to reduce the cost to our employers and ultimately to taxpayers.

7. CalPERS is guided by our fiduciary duties of prudence and loyalty and our duty to diversify investments. Under the California Constitution and the state's Public Employees' Retirement Law, we must discharge our responsibilities for the exclusive purpose of providing benefits to participants and beneficiaries. This duty takes precedence over any other duty.

8. Our views are reflected in a set of Investment Beliefs adopted by the CalPERS Board of Administration that, among other statements, reflect that long-term value creation requires effective management of three forms of

capital (financial, physical, and human) and a focus on multi-faceted risks. CalPERS's Investment Beliefs also reflect several other considerations, including ensuring that cash requirements are accounted for, managing costs, having a strategic asset allocation, and taking risk only when there is a strong belief that a reward will ensue.

### CalPERS Interest in Climate Risk as an Investor

9. CalPERS believes companies' long-term value creation requires effective identification, monitoring, and management of risks and opportunities. CalPERS has a long history of focusing on these risk areas because of their potential impacts on our returns, and it is investors like CalPERS who ultimately bear the costs when these risks are not managed adequately.

10. Climate change presents an existential threat to the planet—one we cannot afford to ignore as long-term investors. The consequences of inaction will be measured not just by the impact on Californians and their communities, but also on the bottom line of the many companies we rely upon to generate the investment returns that pay benefits. As a long-term investor in the global economy, the scale and multi-faceted nature of climate change presents a systemic risk to our investment portfolio in two ways. First, physical impacts, such as wildfires, extreme weather, and droughts, can affect our fixed assets and disrupt portfolio companies' supply chains and operations. Climate

4

change's acute and chronic physical impacts can also drastically impact people's health, food security, migration, water supply, and other ecosystem services in ways that could bring heightened volatility to financial markets and harm economic growth. Second, transition risks, or shifts in policies, technologies, industries, and customers due to changed climate or movement toward a lower-carbon economy, can affect the financial success of existing business models and industries. The long-term success of the companies in which we invest is dependent upon the degree to which they can successfully navigate these transitions.

11. Both the physical impacts and the transition risks have the power to affect our fixed assets, disrupt supply chains and increase volatility in the financial markets. We seek to minimize this risk through, among other things, engaging the management and corporate boards of companies we own to encourage them to give due consideration to their greenhouse gas emissions and to how they will navigate the energy transition.

12. CalPERS has consistently advocated for well regulated capital markets and corporate transparency sufficient to adequately inform investment decisions. Today, investors are increasingly looking for enhanced disclosures on financially material risks for both short- and long-term systemic challenges, such as the risks presented by climate change. The consideration of climate-related financial risk and other factors is a necessary component of being an

5

informed and responsible investor, and it is largely an investor-driven effort to keep up with the ever-evolving landscape of our global economy.

### CalPERS Climate Disclosure Goals

13. Climate risk is investment risk. CalPERS has long been a proponent of enhanced disclosure, particularly in regards to Scope 1 and Scope 2 emissions, because it is crucial in making investments on behalf of our 2 million members.

14. CalPERS also supports requiring disclosure of Scope 3 emissions because it is material in all companies. Scope 3 emissions represent the largest share of greenhouse gas emissions and the majority of emissions for most sectors as shown by S&P Global. Omitting Scope 3 emissions from any sector or individual company would be omitting a significant portion of emissions and would not allow an investor like CalPERS to assess the total emissions profile of such company, or a portfolio or index that the company is included in.

15. CalPERS similarly supports requiring all companies to disclose their climate-related financial risks, and any measures adopted to reduce and/or adapt to that risk so that we can better understand the financial implications to our investments.

16. CalPERS has extensive exposure to private sector companies (more than $150 billion). The availability of climate-related disclosures for private

6

companies is even less than for public companies. CalPERS sees the same risks and would benefit from the same climate related disclosures from private companies. CalPERS was a founding member of the ESG Data Convergence Initiative, which encourages increased emissions disclosure from such companies (along with other metrics). This initiative has been successful, but a much more comprehensive disclosure process is required.

**CalPERS Engagement on Climate Disclosure**

17. CalPERS cofounded Climate Action 100+ in 2017. Climate Action 100+ is an investor-led initiative directed at focused engagement with systemically important greenhouse gas emitters and other companies across the global economy. The objective of Climate Action 100+ is to engage each focus company to seek improved governance oversight of climate-related risks and opportunities, curb emissions across the value chain, and strengthen climate-related financial disclosures in line with the Taskforce on Climate-Related Financial Disclosures (TCFD). The initiative has more than 700 investor signatories, representing trillions of dollars of assets under management. These efforts have produced real results that substantially benefit the long-term outlook for our members. As a result of our work, more than 90 percent of Climate Action 100+'s 170 focus companies have taken steps to align reporting with the TCFD recommendations.

**CalPERS Support of S.B. 253 and 261**

7

ER-1614

18. CalPERS has seen special gains with private efforts such as Climate Action 100+, but we note that voluntary efforts fall short of getting the information we desire for investment decision-making or complying with our own reporting requirements. Therefore, guided by extensive research, we advocate for sound public policy and corresponding high quality standards for mandatory climate risk reporting, which is consistent, comparable, and reliably assured.

19. CalPERS expects the public companies in which we invest to provide integrated representations of operational, financial, environmental, social, and governance performance in terms of both financial statement and non-financial statement results and prospects. However, the current disclosure regime for corporate reporting falls short of our expectations as investors. We believe that companies should disclose consistent, comparable, and reliable information in regulatory reports so that shareowners can more easily identify, assess, and manage climate risk and opportunity.

20. S.B. 253 and 261 align with the enhanced disclosures we have been seeking in order to make more informed investment decisions and comply with the requirements of California State Law.

21. We support S.B. 253 and 261 and the incorporation of the TCFD framework in developing these rules. The benefits include widespread adoption of the framework across financial markets, usefulness for investors, and consistency

8

**ER-1615**

1   and comparability of disclosures globally. Currently, companies report in line

2   with a number of private frameworks, including TCFD, GRI, CDP and

3

4   SASB/VRF. On top of that there are numerous data providers and rating

5   agencies, including ISS, Sustainalytics, Bloomberg, MSCI, and S&P. Each of

6
    these has different templates and requirements, thereby placing additional
7

8   burdens on both companies to produce information and on investors to

9   review and process the information. S.B. 253 and 261 will streamline the

10
    processes even more than what some of the recent mergers and agreements
11

12  among the frameworks and ratings agencies could provide. S.B. 253 and 261

13  will provide relevant information in known locations which has great value.

14
    22. Some of our internally managed strategies as well as many of our external
15

16     investment managers utilize a bottom-up fundamental approach. This

17     approach incorporates the risks and opportunities that individual companies

18
       face, including physical and transition climate risk. Having the necessary
19

20     climate disclosures and consistent information across companies are vital to

21     properly assessing how these risks affect companies' financial drivers and

22
       ways in which they could impair companies' valuations. Information that
23

24     comes out of S.B. 253 and 261 will be used during due diligence and security

25     selection as it will help ensure our ability to compare one company's climate-

26
       risk to its peers. For quantitative and factor-based strategies, S.B. 253 and
27

28     261 addresses data disclosure and data integrity issues. Information that

ER-1616

comes out of S.B. 253 and 261 could help strengthen the methodology of such strategies. Some of these strategies use methodologies that are dependent upon assessing the emissions of companies, the transition pathway of companies, or the climate-related value at risk of companies. We need better information to make more informed decisions. S.B. 253 and 261 moves us in the right direction.

I declare under penalty of perjury that the foregoing are true and correct. Executed on this day, the 18th of July, in SACRAMENTO, CALIFORNIA.

PETER CASHION
Managing Investment Director,
Sustainable Investments

10

1   ROB BONTA
    Attorney General of California
2   GARY E. TAVETIAN (SBN 117135)
    MYUNG J. PARK (SBN 210866)
3   Supervising Deputy Attorneys General
    M. ELAINE MECKENSTOCK (SBN 268861)
4   CAITLAN McLOON (SBN 302798)
    EMILY HAJARIZADEH (SBN 325246)
5   DYLAN REDOR (SBN 338136)
    Deputy Attorneys General
6     300 South Spring Street, Suite 1702
      Los Angeles, CA  90013-1230
7     Telephone:  (213) 269-6438
      Fax:  (916) 731-2128
8     E-mail:  Caitlan.McLoon@doj.ca.gov
    *Attorneys for Defendants Liane M. Randolph,*
9   *Steven S. Cliff, and Robert A. Bonta*

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE CENTRAL DISTRICT OF CALIFORNIA

12

13

14   **CHAMBER OF COMMERCE OF**          2:24-cv-00801-ODW-PVC
     **THE UNITED STATES OF**
15   **AMERICA, CALIFORNIA**             **DEFENDANTS' OBJECTIONS TO**
     **CHAMBER OF COMMERCE,**            **PLAINTIFFS' STATEMENT OF**
16   **AMERICAN FARM BUREAU**            **UNCONTROVERTED FACTS**
     **FEDERATION, LOS ANGELES**
17   **COUNTY BUSINESS**                 Date:        September 9, 2024
     **FEDERATION, CENTRAL**             Time:        1:30 p.m.
18   **VALLEY BUSINESS**                 Courtroom:   5D
     **FEDERATION, and WESTERN**        Judge:       Hon. Otis D. Wright, II
19   **GROWERS ASSOCIATION,**
                                         Trial Date:  Not Set
20                          Plaintiffs,  Action Filed: 1/30/2024

21   v.

22   **CALIFORNIA AIR RESOURCES**
     **BOARD, LIANE M. RANDOLPH, in**
23   **her official capacity as Chair of the**
     **California Air Resources Board, and**
24   **STEVEN S. CLIFF, in his official**
     **capacity as the Executive Officer of**
25   **the California Air Resources Board,**

26                          Defendants.

27

28

                                     1

1    Pursuant to Federal Rule of Civil Procedure 56(c)(2) and this Court's

2  Standing Order, Defendants Liane M. Randolph, in her official capacity as Chair of

3  CARB, Steven S. Cliff, in his official capacity as the Executive Director of CARB,

4  and Robert A. Bonta, in his official capacity as Attorney General of California

5  (collectively, "Defendants") object to Plaintiffs Chamber of Commerce of the

6  United States of America, California Chamber of Commerce, American Farm

7  Bureau Federation, Los Angeles County Business Federation, Central Valley

8  Business Federation, and Western Growers Association's (collectively, "Plaintiffs")

9  evidence in support of their Motion for Summary Judgment on Claim I (ECF No.

10  48-2) as follows:

11    Separate Statement paragraph 3: Defendants object that the statement lacks

12  foundation or personal knowledge, and is speculative. Fed. R. Evid. 602, 701.

13  Senator Wiener states that he "think[s]" companies are nervous about S.B. 253, but

14  he does not state the basis of that belief or provide any evidence to support that

15  conclusion.

16    Separate Statement paragraph 12:

17    This statement is hearsay. Assemblymember Rick Zbur was quoting an

18  unsubstantiated statement made by the Los Angeles Times. Thus, when introduced

19  to prove the truth of the matter asserted, that the laws are "groundbreaking

20  legislation with the potential to reach far beyond California's borders by forcing

21  some of the world's biggest businesses to be honest about the damage they might

22  be causing," the objectionable statement relies upon hearsay not within any

23  exception.  Fed. R. Evid. 801, 802, 803, 804.

24    Separate Statement paragraph 20:

25    This statement is hearsay. It quotes a press release from Ceres, quoting the

26  statements of Assemblymember Tasha Boerner. Thus, when introduced to prove the

27  truth of the matter asserted, that Assemblymember Tasha Boerner stated that "SB

28  253 and 261 is a bold action that helps us combat the climate crisis by providing

**ER-1619**

1   transparency and ensuring accountability for those emitting greenhouse gasses," the
2   objectionable statement relies upon hearsay not within any exception.  Fed. R. Evid.
3   801, 802, 803, 804.

4   <u>Separate Statement paragraph 21</u>:

5   This statement is hearsay. It quotes an article from Reuters quoting the
6   statements of a protester. Thus, when introduced to prove the truth of the matter
7   asserted, that at a May 2022 shareholder meeting of Shell plc, demonstrators
8   interrupted the proceedings, with one supporter stating: "We're here to embarrass
9   them and hold them to account," the objectionable statement relies upon hearsay
10  not within any exception.  Fed. R. Evid. 801, 802, 803, 804.

11  <u>Separate Statement paragraph 27</u>:

12  The statement calls for a legal conclusion. The assertion regarding what
13  companies are subject to S.B. 253 is a disputed legal conclusion about how the laws
14  operate, which has no evidentiary value and is irrelevant. Fed R. Evid. 401, 402;
15  Fed. R. Civ. P. 56(e); *Silver v. Exec. Car Leasing Long Term Disability Plan*, 466
16  F.3d 727, 731 n.2 (9th Cir. 2006) (holding district court correctly excluded
17  declaration containing improper legal argument).

18  If it is not a legal conclusion, then the phrase "S.B. 253 will require" is vague
19  and ambiguous.

20  <u>Separate Statement paragraph 28</u>:

21  The statement calls for a legal conclusion. The assertion regarding what
22  companies are subject to S.B. 253 is a disputed legal conclusion about how the laws
23  operate, which has no evidentiary value and is irrelevant. Fed R. Evid. 401, 402;
24  Fed. R. Civ. P. 56(e); *Silver*, 466 F.3d at 731 n.2.

25  If it is not a legal conclusion, then the phrase "will be required to report their
26  emissions under S.B. 253" is vague and ambiguous.

27

28

3

**ER-1620**

1    <u>Separate Statement paragraph 29</u>:

2         This statement is hearsay. It quotes the Williams Companies, Inc.'s

3    Comment Letter submitted in connection with the SEC's Proposed Rule on The

4    Enhancement and Standardization of Climate-Related Disclosures for Investors.

5    Thus, when introduced to prove the truth of the matter asserted, that "[t]he

6    requirement to estimate and report Scope 3 emissions alone will cost some

7    companies more than $1 million per year," the objectionable statement relies upon

8    hearsay not within any exception.  Fed. R. Evid. 801, 802, 803, 804.

9         Moreover, the statement contains self-serving testimony that should not be

10   credited without an opportunity for cross examination, and thus it is inadmissible.

11        <u>Separate Statement paragraph 35</u>:

12        This statement is hearsay. It describes the Comment Letter of Daniel J.

13   Taylor submitted in connection with the SEC's Proposed Rule on The

14   Enhancement and Standardization of Climate-Related Disclosures for Investors.

15   Thus, when introduced to prove the truth of the matter asserted, that "[s]tudies show

16   that publicly available information about a company's operations, including

17   industry membership, size, sales growth, earnings growth, property value, capital

18   expenditures, and profitability, can explain 90% of greenhouse-gas emissions," the

19   objectionable statement relies upon hearsay not within any exception.  Fed. R. Evid.

20   801, 802, 803, 804.

21         Moreover, the statement contains testimony, made in connection with a

22   federal administrative rulemaking, that should not be credited without an

23   opportunity for cross examination, and thus it is inadmissible.

24        <u>Separate Statement paragraph 36</u>:

25        The statement calls for a legal conclusion. The assertion regarding what

26   makes reliable and accurate calculations of emissions is a disputed legal conclusion

27   about how the laws operate, which has no evidentiary value and is irrelevant. Fed

28   R. Evid. 401, 402; Fed. R. Civ. P. 56(e); *Silver*, 466 F.3d at 731 n.2.

**ER-1621**

If it is not a legal conclusion, the phrases "gaps in emissions methodologies" and "reliable and accurate calculations of emissions" are vague and ambiguous.

Separate Statement paragraph 46:

The statement calls for a legal conclusion. The assertion regarding the meaning of climate-related risks and the process of estimating those risks under S.B. 261 is a disputed legal conclusion about how the laws operate, which has no evidentiary value and is irrelevant. Fed R. Evid. 401, 402; Fed. R. Civ. P. 56(e); *Silver*, 466 F.3d at 731 n.2.

If not legal conclusions, the meaning of the phrases "high degree of uncertainty" and "climate-related risks" is vague and ambiguous.

The statement is compound in that it sets forth multiple facts regarding the uncertainty about the timing of climate-related risk, the magnitude of climate-related risks, and the difficulty to estimate those risks.

Separate Statement paragraph 47:

The statement calls for a legal conclusion. The assertion regarding the meaning of climate change risks and the process of assessing those risks under S.B. 261 is a disputed legal conclusion about how the laws operate, which has no evidentiary value and is irrelevant. Fed R. Evid. 401, 402; Fed. R. Civ. P. 56(e); *Silver*, 466 F.3d at 731 n.2.

If not legal conclusions, the meaning of the phrases "subjective judgment" and "climate change risks" is vague and ambiguous.

Separate Statement paragraph 48:

The statement calls for a legal conclusion. The assertion regarding what constitutes "doing business in California" and being subject to S.B. 261 is a disputed legal conclusion about how the laws operate, which has no evidentiary value and is irrelevant. Fed R. Evid. 401, 402; Fed. R. Civ. P. 56(e); *Silver*, 466 F.3d at 731 n.2.

5

<u>Separate Statement paragraph 49</u>:

The statement calls for a legal conclusion. The assertion regarding what companies are subject to S.B. 261 is a disputed legal conclusion about how the laws operate, which has no evidentiary value and is irrelevant. Fed R. Evid. 401, 402; Fed. R. Civ. P. 56(e); *Silver*, 466 F.3d at 731 n.2.

<u>Separate Statement paragraph 53</u>:

The statement calls for a legal conclusion. The assertion regarding what companies are subject to S.B. 253 and 261 is a disputed legal conclusion about how the laws operate, which has no evidentiary value and is irrelevant. Fed R. Evid. 401, 402; Fed. R. Civ. P. 56(e); *Silver*, 466 F.3d at 731 n.2.

The statement is compound in that it sets forth multiple facts regarding UHHA's activities in California, how those activities relate to UHHC, and whether UHHC would be subject to the requirements of S.B. 253 and 261.

<u>Separate Statement paragraph 55</u>:

The statement calls for a legal conclusion. The assertion regarding what U-Haul would have to disclose under S.B. 261 is a disputed legal conclusion about how the laws operate, which has evidentiary value and is irrelevant. Fed R. Evid. 401, 402; Fed. R. Civ. P. 56(e); *Silver*, 466 F.3d at 731 n.2.

The meaning of the phrase "opine on climate-related risks" is vague and ambiguous.

<u>Separate Statement paragraph 56</u>: The statement calls for a legal conclusion. The assertion regarding what U-Haul would have to disclose under S.B. 261 is a disputed legal conclusion about how the laws operate, which has no evidentiary value and is irrelevant. Fed R. Evid. 401, 402; Fed. R. Civ. P. 56(e); *Silver*, 466 F.3d at 731 n.2.

<u>Separate Statement paragraph 57</u>: The statement calls for a legal conclusion. The assertion regarding what U-Haul would have to calculate under S.B. 253, and how, is a disputed legal conclusion about how the laws operate, which has no

**ER-1623**

(169 of 296) Page 169 of 296 Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 169 of 296
Case 2:24-cv-00801-ODW-PVC   Document 52-2   Filed 07/24/24   Page 7 of 15   Page ID
#:1554

1    evidentiary value and is irrelevant. Fed R. Evid. 401, 402; Fed. R. Civ. P. 56(e);

2    *Silver*, 466 F.3d at 731 n.2.

3         Separate Statement paragraph 58:

4         The statement calls for a legal conclusion. The assertion regarding what U-

5    Haul would have to calculate under S.B. 253 is a disputed legal conclusion about

6    how the laws operate, which has no evidentiary value and is irrelevant. Fed R. Evid.

7    401, 402; Fed. R. Civ. P. 56(e); *Silver*, 466 F.3d at 731 n.2.

8         The meaning of the phrase "exercise subjective judgment" is vague and

9    ambiguous.

10        Separate Statement paragraph 59:

11        The statement calls for a legal conclusion. The assertion regarding how to

12   accurately reflect a company's total emissions is a disputed legal conclusion about

13   how the laws operate, which has no evidentiary value and is irrelevant. Fed R. Evid.

14   401, 402; Fed. R. Civ. P. 56(e); *Silver*, 466 F.3d at 731 n.2.

15        The statement is compound in that it sets forth multiple facts regarding how

16   to accurately reflect U-Hauls total emissions and the definition of Scope 4

17   emissions.

18        Separate Statement paragraph 62:

19        The statement is compound in that it sets forth multiple facts regarding the

20   burden of compliance with S.B. 253 and 261.

21        The statement relies on self-serving testimony that should not be credited

22   without an opportunity for cross examination.

23        Separate Statement paragraph 63:

24        The statement calls for a legal conclusion. The assertion regarding the

25   disclosure requirements of S.B. 261 is a disputed legal conclusion about how the

26   laws operate, which has no evidentiary value and is irrelevant. Fed R. Evid. 401,

27   402; Fed. R. Civ. P. 56(e); *Silver*, 466 F.3d at 731 n.2.

28

**ER-1624**

1  The statement is compound in that it sets forth multiple facts regarding the
2  disclosure requirements of S.B. 261, the burden of compliance with S.B. 253 and
3  261, and U-Hauls expenditure decisions.

4  The statement relies on self-serving testimony that should not be credited
5  without an opportunity for cross examination.

6  The phrases "S.B. 261's requirement to discuss risks" and "investments of
7  significant time and money" are vague and ambiguous.

8  <u>Separate Statement paragraph 64</u>: The statement calls for a legal conclusion.
9  The assertion regarding the calculation requirements of S.B. 253 is a disputed legal
10  conclusion about how the laws operate, which has no evidentiary value and is
11  irrelevant. Fed R. Evid. 401, 402; Fed. R. Civ. P. 56(e); *Silver*, 466 F.3d at 731 n.2.

12  The statement relies on self-serving testimony that should not be credited
13  without an opportunity for cross examination.

14  <u>Separate Statement paragraph 65</u>: The statement calls for a legal conclusion.
15  The assertion regarding the calculation requirements of S.B. 253 is a disputed legal
16  conclusion about how the laws operate, which has no evidentiary value and is
17  irrelevant. Fed R. Evid. 401, 402; Fed. R. Civ. P. 56(e); *Silver*, 466 F.3d at 731 n.2.

18  The statement relies on self-serving testimony that should not be credited
19  without an opportunity for cross examination.

20  <u>Separate Statement paragraphs 69</u>:

21  The statement calls for a legal conclusion. The assertion regarding what
22  companies are subject to S.B. 253 and what they will have to report is a disputed
23  legal conclusion about how the laws operate, which has no evidentiary value and is
24  irrelevant. Fed R. Evid. 401, 402; Fed. R. Civ. P. 56(e); *Silver*, 466 F.3d at 731 n.2

25  The statement relies on self-serving testimony that should not be credited
26  without an opportunity for cross examination. This is particularly so given the
27  unusual similarity between statements made in the Hawkins Declaration and the
28  White Declaration.

8

**ER-1625**

1    The statement also lacks foundation. The declaration fails to demonstrate a

2    basis for the declarant's personal knowledge regarding that their cattle are in the

3    supply chain of an entity with reporting obligations under S.B. 253. *See Shakur v.*

4    *Schiro*, 514 F.3d 878, 890 (9th Cir. 2008) (holding "insufficient" for summary

5    judgment purposes "conclusory affidavits that do not affirmatively show personal

6    knowledge of specific facts" (cleaned up)).

7    <u>Separate Statement paragraphs 70:</u>

8    The statement calls for a legal conclusion. The assertion regarding what

9    companies are subject to S.B. 253 and what they will have to report is a disputed

10   legal conclusion about how the laws operate, which has no evidentiary value and is

11   irrelevant. Fed R. Evid. 401, 402; Fed. R. Civ. P. 56(e); *Silver*, 466 F.3d at 731 n.2.

12   The statement relies on self-serving testimony that should not be credited

13   without an opportunity for cross examination. This is particularly so given the

14   unusual similarity between statements made in the Hawkins Declaration and the

15   White Declaration.

16   <u>Separate Statement paragraphs 71:</u>

17   The statement relies on self-serving testimony that should not be credited

18   without an opportunity for cross examination. This is particularly so given the

19   unusual similarity between statements made in the Hawkins Declaration and the

20   White Declaration.

21   <u>Separate Statement paragraphs 72:</u>

22   The statement relies on self-serving testimony that should not be credited

23   without an opportunity for cross examination. This is particularly so given the

24   unusual similarity between statements made in the Hawkins Declaration and the

25   White Declaration.

26   The statement is compound in that it sets forth multiple facts regarding the

27   burden for Triple H Farm to track greenhouse gas emissions, Triple H Farm's use

28

**ER-1626**

1   of water, fertilizer, and crop protection products, and Triple H Farm's existing

2   procedures for tracking its use of such commodities.

3        The statement lacks foundation. The declaration fails to demonstrate a basis

4   for the declarant's personal knowledge regarding the burden of tracking greenhouse

5   gas emissions. *See Shakur*, 514 F.3d at 890.

6        <u>Separate Statement paragraphs 73:</u>

7        The statement relies on self-serving testimony that should not be credited

8   without an opportunity for cross examination. This is particularly so given the

9   unusual similarity between statements made in the Hawkins Declaration and the

10  White Declaration.

11       The statement lacks foundation. The declaration fails to demonstrate a basis

12  for the declarant's personal knowledge regarding whether Triple H Farm's would

13  be at a significant competitive disadvantage than larger farms if it had to track its

14  greenhouse-gas emissions. *Shakur*, 514 F.3d at 890.

15       <u>Separate Statement paragraphs 74:</u>

16       The statement calls for a legal conclusion. The assertion regarding if Triple H

17  Fars's purchasers are required to report their Scope 3 emissions, and what

18  statements Triple H Farms would be required to make if so, is a disputed legal

19  conclusion about how the laws operate, which has no evidentiary value and is

20  irrelevant. Fed. R. Evid. 401, 402; Fed. R. Civ. P. 56(e); *Silver*, 466 F.3d at 731 n.2.

21       The statement relies on self-serving testimony that should not be credited

22  without an opportunity for cross examination. This is particularly so given the

23  unusual similarity between statements made in the Hawkins Declaration and the

24  White Declaration.

25       The statement lacks foundation. The declaration fails to demonstrate a basis

26  for the declarant's personal knowledge regarding whether Triple H Farm's

27  purchases are required to report their Scope 3 emissions, and what statements Triple

28  H Farms would be required to make if so. *Shakur*, 514 F.3d at 890.

**ER-1627**

1   The statement is compound, in that it sets forth multiple facts regarding

2   whether White Farms and Cattle's purchasers would be required to report Scope 3

3   emissions, and whether that would lead to Triple H Farms making statements about

4   its emissions.

5    Separate Statement paragraphs 75:

6   The statement calls for a legal conclusion. The assertion regarding what

7   emissions reports Triple H Farm would be required to make is a disputed legal

8   conclusion about how the laws operate, which has no evidentiary value and is

9   irrelevant. Fed R. Evid. 401, 402; Fed. R. Civ. P. 56(e); *Silver*, 466 F.3d at 731 n.2.

10   The statement relies on self-serving testimony that should not be credited

11   without an opportunity for cross examination. This is particularly so given the

12   unusual similarity between statements made in the Hawkins Declaration and the

13   White Declaration.

14   The statement lacks foundation. The declaration fails to demonstrate a basis

15   for the declarant's personal knowledge regarding what statements Triple H Farms

16   would be required to make under the laws, and what is a fair representation of its

17   emissions. *Shakur*, 514 F.3d at 890.

18   The meaning of the phrase "fair representation of its emissions" is vague and

19   ambiguous.

20    Separate Statement paragraphs 79:

21   The statement calls for a legal conclusion. The assertion regarding what

22   companies are subject to S.B. 253 and what they will have to report is a disputed

23   legal conclusion about how the laws operate, which has no evidentiary value and is

24   irrelevant. Fed R. Evid. 401, 402; Fed. R. Civ. P. 56(e); *Silver*, 466 F.3d at 731 n.2

25   The statement relies on self-serving testimony that should not be credited

26   without an opportunity for cross examination. This is particularly so given the

27   unusual similarity between statements made in the Hawkins Declaration and the

28   White Declaration.

1    The statement also lacks foundation. The declaration fails to demonstrate a

2    basis for the declarant's personal knowledge regarding that their cattle are in the

3    supply chain of an entity with reporting obligations under S.B. 253. *See Shakur*,

4    514 F.3d at 890.

5    Separate Statement paragraphs 80:

6    The statement calls for a legal conclusion. The assertion regarding what

7    companies are subject to S.B. 253 and what they will have to report is a disputed

8    legal conclusion about how the laws operate, which has no evidentiary value and is

9    irrelevant. Fed R. Evid. 401, 402; Fed. R. Civ. P. 56(e); *Silver*, 466 F.3d at 731 n.2.

10    The statement relies on self-serving testimony that should not be credited

11    without an opportunity for cross examination. This is particularly so given the

12    unusual similarity between statements made in the Hawkins Declaration and the

13    White Declaration.

14    Separate Statement paragraphs 81:

15    The statement relies on self-serving testimony that should not be credited

16    without an opportunity for cross-examination. This is particularly so given the

17    unusual similarity between statements made in the Hawkins Declaration and the

18    White Declaration.

19    Separate Statement paragraphs 82:

20    The statement relies on self-serving testimony that should not be credited

21    without an opportunity for cross examination. This is particularly so given the

22    unusual similarity between statements made in the Hawkins Declaration and the

23    White Declaration.

24    The statement is compound in that it sets forth multiple facts regarding the

25    burden for White Farms and Cattle to track greenhouse gas emissions, White Farms

26    and Cattle's use of water, fertilizer, and crop protection products, and White Farms

27    and Cattle's existing procedures for tracking its use of such commodities.

28

**ER-1629**

(175 of 296) Page 175 of 296Case: 25-5327  09/18/2025, DktEntry: 8.8  Page 175 of 296
Case 2:24-cv-00801-ODW-PVC   Document 52-2   Filed 07/24/24   Page 13 of 15   Page ID
#:1560

1   The statement lacks foundation. The declaration fails to demonstrate a basis

2   for the declarant's personal knowledge regarding the burden of tracking greenhouse

3   gas emissions. *Shakur*, 514 F.3d at 890.

4   Separate Statement paragraphs 83:

5   The statement relies on self-serving testimony that should not be credited

6   without an opportunity for cross examination. This is particularly so given the

7   unusual similarity between statements made in the Hawkins Declaration and the

8   White Declaration.

9   The statement lacks foundation. The declaration fails to demonstrate a basis

10   for the declarant's personal knowledge regarding whether White Farms and Cattle's

11   would be at a significant competitive disadvantage than larger farms if it had to

12   track its greenhouse-gas emissions. *Shakur*, 514 F.3d at 890.

13   Separate Statement paragraphs 84:

14   The statement calls for a legal conclusion. The assertion regarding if White

15   Farms and Cattle's purchasers are required to report their Scope 3 emissions, and

16   what statements White Farms and Cattle would be required to make if so, is a

17   disputed legal conclusion about how the laws operate, which has no evidentiary

18   value and is irrelevant. Fed R. Evid. 401, 402; Fed. R. Civ. P. 56(e); *Silver*, 466

19   F.3d at 731 n.2.

20   The statement relies on self-serving testimony that should not be credited

21   without an opportunity for cross examination. This is particularly so given the

22   unusual similarity between statements made in the Hawkins Declaration and the

23   White Declaration.

24   The statement lacks foundation. The declaration fails to demonstrate a basis

25   for the declarant's personal knowledge regarding whether White Farms and Cattle's

26   purchases are required to report their Scope 3 emissions, and what statements White

27   Farms and Cattle would be required to make if so. *Shakur*, 514 F.3d at 890.

28

13

ER-1630

1    The statement is compound, in that it sets forth multiple facts regarding

2    whether White Farms and Cattle's purchasers would be required to report Scope 3

3    emissions, and whether that would lead to White Farms and Cattle making

4    statements about its emissions.

5        Separate Statement paragraphs 85:

6    The statement calls for a legal conclusion. The assertion regarding what

7    statements White Farms and Cattle would be required to make is a disputed legal

8    conclusion about how the laws operate, which has no evidentiary value and is

9    irrelevant. Fed R. Evid. 401, 402; Fed. R. Civ. P. 56(e); *Silver*, 466 F.3d at 731 n.2.

10    The statement relies on self-serving testimony that should not be credited

11    without an opportunity for cross examination. This is particularly so given the

12    unusual similarity between statements made in the Hawkins Declaration and the

13    White Declaration.

14    The statement lacks foundation. The declaration fails to demonstrate a basis

15    for the declarant's personal knowledge regarding what statements White Farms and

16    Cattle would be required to make under the laws, and what is an accurate portrayal

17    of its emissions. *Shakur*, 514 F.3d at 890.

18    The meaning of the phrase "accurately portray" is vague and ambiguous.

19    Dated:  July 24, 2024                    Respectfully submitted,

20                                             ROB BONTA
                                               Attorney General of California
21                                             GARY E. TAVETIAN
                                               MYUNG J. PARK
22                                             Supervising Deputy Attorney General

23

24                                             */s/ Caitlan McLoon*

25                                             CAITLAN MCLOON
                                               Deputy Attorney General
26                                             *Attorneys for Defendants Liane M.*
                                               *Randolph, Steven S. Cliff, and Robert*
27   SA2024300503                              *A. Bonta*
     66957621.docx
28

**ER-1631**

# CERTIFICATE OF SERVICE

Case Name:    **Chamber of Commerce of the United States of America, et al. v. Liane M. Randolph, et al.**

Case No.:      **2:24-cv-00801-ODW-PVC**

I hereby certify that on <u>July 24, 2024</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANTS' OBJECTIONS TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>July 24, 2024</u>, at Los Angeles, California.

| Beatriz Davalos | /s/ Beatriz Davalos |
|---|---|
| Declarant | Signature |

**ER-1632**

1  ROB BONTA
   Attorney General of California
2  GARY E. TAVETIAN (SBN 117135)
   MYUNG J. PARK (SBN 210866)
3  Supervising Deputy Attorneys General
   M. ELAINE MECKENSTOCK (SBN 268861)
4  CAITLAN McLOON (SBN 302798)
   EMILY HAJARIZADEH (SBN 325246)
5  DYLAN REDOR (SBN 338136)
   KATHERINE GAUMOND (SBN 349453)
6  Deputy Attorneys General
     300 South Spring Street, Suite 1702
7    Los Angeles, CA  90013-1230
     Telephone:  (213) 269-6438
8    Fax:  (916) 731-2128
     E-mail:  Caitlan.McLoon@doj.ca.gov
9  Attorneys for Defendants Liane M. Randolph,
   Steven S. Cliff, and Robert A. Bonta

10

11              IN THE UNITED STATES DISTRICT COURT

12           FOR THE CENTRAL DISTRICT OF CALIFORNIA

13

| | |
|---|---|
| 14 **CHAMBER OF COMMERCE OF** | 2:24-cv-00801-ODW-PVC |
| 15 **THE UNITED STATES OF AMERICA, CALIFORNIA** | **DEFENDANTS' SEPARATE** |
| 16 **CHAMBER OF COMMERCE, AMERICAN FARM BUREAU** | **STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS** |
| 17 **FEDERATION, LOS ANGELES COUNTY BUSINESS** | Date:         September 9, 2024 |
| 18 **FEDERATION, CENTRAL VALLEY BUSINESS** | Time:         1:30 p.m. Courtroom:   5D |
| 19 **FEDERATION, and WESTERN GROWERS ASSOCIATION,** | Judge:        Hon. Otis D. Wright, II |
| 20                    Plaintiffs, | Trial Date:   Not Set Action Filed: 1/30/2024 |
| 21           v. | |
| 22 **LIANE M. RANDOLPH, in her** | |
| 23 **official capacity as Chair of the California Air Resources Board, and** | |
| 24 **STEVEN S. CLIFF, in his official capacity as the Executive Officer of** | |
| 25 **the California Air Resources Board, and ROBERT A. BONTA, in his** | |
| 26 **official capacity as Attorney General of California,** | |
| 27                    Defendants. | |
| 28 | |

1

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

Pursuant to Local Rule 56-2, Defendants Liane M. Randolph, in her official capacity as Chair of CARB, Steven S. Cliff, in his official capacity as the Executive Director of CARB, and Robert A. Bonta, in his official capacity as Attorney General of California (collectively, "Defendants") hereby respond to Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association's (collectively, "Plaintiffs") Separate Statement of Uncontroverted Facts in Support of Plaintiffs' Motion for Summary Judgment on Claim I (ECF No. 48-2).

| No. | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 1. | Senator Scott Wiener, the author of S.B. 253, has stated that the purpose of S.B. 253 is to "support those companies doing their part to tackle the climate crisis and create accountability for those that aren't."<br><br>Declaration of Bradley J. Hamburger ("Hamburger Decl."), Ex. 1 (Statement of Senator Wiener, Sept. 17, 2023) at 1. | Undisputed that the quoted text appears in the cited document.<br><br>Disputed that the quoted text establishes "the purpose of S.B. 253." Disputed to the extent Plaintiffs seek to establish, by taking the quotation out of context, that S.B. 253 and 261 "attempt, through compelled speech, to 'create accountability for those that aren't' 'doing their part to tackle the climate crisis.'" Plaintiffs' Motion for Summary Judgment (MSJ) (ECF No. |

2

| | | 48-1) at 2:16–17.  The document speaks for itself. To the extent Senator Wiener's statements are relevant, the Court should review them in their complete form and in the context in which they were made. |
|---|---|---|
| | | *Evidence*: SSMF 86 (Declaration of Caitlan McLoon (McLoon Decl.) Ex. 1 at 5–6) ("Purpose of bill"); SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 –33:9). |
| 2. | At a March 15, 2023 California Senate Environmental Quality Committee Hearing, Senator Wiener said the following regarding S.B. 253: "We know that there are large corporations that work very hard to be green to reduce their carbon footprint.  There are others that do not.  Unfortunately, among the ones that really don't do a great job lowering their carbon footprint, they will at times market themselves as green, what we call green-washing.  Marketing yourself as green when you're not.  We need to | Undisputed that the quoted text appears in the cited document.<br><br>Undisputed that there are companies doing business in California that engage in "greenwashing," or "[m]arket[ing] yourself as green when you're not."  Undisputed that S.B. 253 seeks to improve corporate "transparency" and provide "[i]nformation for the public."<br><br>Disputed to the extent Plaintiffs seek to establish, by taking the quotation out of context, that S.B. 253 and 261 |

3

**ER-1635**

| | | |
|---|---|---|
| | make sure that the public actually knows who's green and who isn't and to make sure we have that transparency.  That's all this bill does, transparency.  Information for the public."<br><br>Hamburger Decl., Ex. 2 (Transcript of Senate Environmental Quality Committee Hearing, 01:53:42-02:30:34 (Cal. Mar. 15, 2023)) at pp 2:25-3:11. | "attempt, through compelled speech, to 'create accountability for those that aren't' 'doing their part to tackle the climate crisis.'"  MSJ at 2:16–17.  The document speaks for itself.  To the extent Senator Weiner's statements are relevant, the Court should review them in their complete form and in the context in which they were made.<br><br>*Evidence:* SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 – 33:9). |
| 3. | At a March 15, 2023 California Senate Environmental Quality Committee Hearing, Senator Wiener said the following regard S.B. 253: "[S]ome of the nervousness by large corporations is because they don't want to do the disclosure and they don't want to say what their carbon footprint is because they think they're going to be embarrassed by it.  I'm just being totally blunt.  I think that's what the nervousness is." | Objection: The statement lacks foundation or personal knowledge, and is speculative.<br><br>Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiffs seek to establish, by taking the quotation out of context, that "the goal of S.B. 253 is to compel companies to release information even though 'they don't want to do the |

4

**ER-1636**

| | | | |
|---|---|---|---|
| | | Hamburger Decl., Ex. 2 at p 30:1-7. | disclosure' because (in the State's view) 'they think they're going to be embarrassed by it.'" MSJ at 2:24–27. The document speaks for itself and does not support that statement.  To the extent they are relevant, the Court should review Senator Weiner's statements in their complete form and in the context in which they were made.<br><br>*Evidence:* SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 – 33:9). |
| 4. | | At a March 15, 2023 California Senate Environmental Quality Committee Hearing, Alvaro Sanchez from the Greenlining Institute said the following regarding S.B. 253: "In order to meet the challenges posed by climate change, it is imperative to recognize the right of communities to know how and if corporations are working to reduce their emissions and to verify corporate claims of sustainable leadership." | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiffs seek to establish, by taking the quotation out of context, that S.B. 253 and 261 "attempt, through compelled speech, to 'create accountability for those that aren't' 'doing their part to tackle the climate crisis.'"  MSJ at 2:16–17.  Neither the quoted text nor the surrounding text supports that claim.  The document speaks for itself.  To |

**ER-1637**

| | | the extent they are relevant, the Court should review Alvaro Sanchez' statements in their complete form and in the context in which they were made. |
|---|---|---|
| | Hamburger Decl., Ex. 2 at p 6:20-25. | *Evidence:* SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 – 33:9). |
| 5. | At an April 18, 2023 California Senate Judiciary Committee Hearing, Senator Wiener said the following regarding S.B. 253: The law "will require these large corporations doing business in California to, in a standardized way, report this data so the consumers, investors, and others can know which corporations are actually engaging in climate action and which aren't."<br><br>Hamburger Decl., Ex. 3 at pp 2:21-3:1. | Undisputed that the quoted text appears in the cited document.<br><br>Undisputed that S.B. 253 will require certain "large corporations doing business in California to, in a standardized way, report [GHG emissions] data."<br><br>Disputed to the extent Plaintiffs suggest there is one particular way that consumers, investors, and others will use this data.<br><br>Disputed to the extent Plaintiffs seek to establish, by taking the quotation out of context, that S.B. 253 "will empower participants in the climate |

6

**ER-1638**

| | | | debate to use companies' disclosures about emissions, and about their plans to address them, as a basis to criticize the companies or to call for increased regulation or other concerted action, whether by regulators or by the companies themselves." MSJ 12:15–18. Neither the quoted text nor the surrounding text supports that claim. The document speaks for itself. To the extent they are relevant, the Court should review Senator Weiner's statements in their complete form and in the context in which they were made. |
| | | | |
| | | | *Evidence*: *E.g.* SSMF 124 (Hamburger Decl., Ex. 2 (ECF No. 48-5) at 10:11-14; Hamburger Decl., Ex. 6 (ECF No. 48-9) at 5:3–13; Hamburger Decl., Ex. 7 (ECF No. 48-10) at 12) (explaining benefits of disclosures for consumers); SSMF 125 (Hamburger Decl., Ex. 5 (ECF 48-8) at 7:4–11; Decl. McLoon Ex. 2 (Senate Committee on |

7

ER-1639

(185 of 296) Page 185 of 296 Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 185 of 296
Case 2:24-cv-00801-ODW-PVC   Document 52-1   Filed 07/24/24   Page 8 of 119   Page ID
#:1436

| | | |
|---|---|---|
| | | Environmental Quality Analysis for January 15, 2023 hearing) at 2–3) (explaining benefits of disclosures for investors); SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 – 33:9). |
| 6. | At an April 18, 2023 California Senate Judiciary Committee Hearing, Catherine Atkin from Carbondale Accountable said the following regarding S.B. 253: "Many of our California companies are already leading and reporting, and SB 253 will level the playing field for our in-state companies by ensuring that public and private companies from outside of California disclose as well."<br><br>Hamburger Decl., Ex. 3 at p 5:11-16. | Undisputed that the quoted text appears in the cited document. Undisputed that many California companies "are already … reporting."<br><br>Disputed to the extent Plaintiffs seek to establish, by taking the quotation out of context, that S.B. 253 "will empower participants in the climate debate to use companies' disclosures about emissions, and about their plans to address them, as a basis to criticize the companies or to call for increased regulation or other concerted action, whether by regulators or by the companies themselves."  MSJ 12:15–18. Neither the quoted text nor the surrounding text supports that claim. The document speaks for itself.  To |

**ER-1640**

| | | |
|---|---|---|
| | | the extent they are relevant, the Court should review Catherine Atkin's statements in their complete form and in the context in which they were made.<br><br>*Evidence:* SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 – 33:9). |
| 7. | During a May 30, 2023 California Senate Floor Session debate on S.B. 253, Senator Wiener said that "SB 253 will allow for much-needed transparency," and that "SB 253 is the next step California must take in climate action to ensure that corporate actors in our state are aligned with our goals and are working as diligently as we need them to be.  And we can't do that unless we have transparency."<br><br>Hamburger Decl., Ex. 4 (Transcript of Senate Floor Session Debate, 04:21:02-04:25:00 (Cal. May 30, 2023)) at p 3:2-3, 3:12-17. | Disputed to the extent that Plaintiffs' omit both text and context from Senator Weiner's statement.<br><br>Disputed to the extent Plaintiffs rely on these statements, by taking them out of context, to support their allegation that S.B. 253 will "'check the climate crisis' by letting the public 'hold [companies] accountable,' . . . for 'emitting greenhouse gasses.'" MSJ at 2:20–19. And disputed to the extent Plaintiffs take the quotation out of context in an effort to establish that S.B. 253 "will empower participants in the climate debate to use companies' disclosures about |

| | | |
|---|---|---|
| | | emissions, and about their plans to address them, as a basis to criticize the companies. . . ."  MSJ 12:15–18. Neither the quoted text nor the surrounding text supports these claims.  To the extent they are relevant, the Court should review the Senator Wiener's statements in their complete form and in the context in which they were made. |
| | | *Evidence:* Hamburger Decl., Ex. 4 (ECF 48-7) at p 3:2–11 (full context of statement); SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 – 33:9). |
| 8. | During a July 10, 2023 California Assembly Natural Resources Committee Hearing, Melanie Morales from the Greenlining Institute said the following regarding S.B. 253: "Creating solutions to climate change for low-income communities and communities of color requires unlocking the potential of the private sector to drive meaningful | Undisputed that the quoted text appears in the cited document. Disputed to the extent Plaintiffs seek to take the quoted text out of context; the document speaks for itself. To the extent they are relevant, the Court should review Melanie Morales' statements in their complete form and in the context in which they were made. |

| | | |
|---|---|---|
| | change as well as holding businesses accountable for their impact on the climate." | *Evidence:* SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 – 33:9). |
| | Hamburger Decl., Ex. 5 (Transcript of Assembly Natural Resources Committee Hearing, 04:06:16-04:33:07 (Cal. July 10, 2023)) at p 6:13-18. | |
| 9. | During a September 11, 2023 California Assembly Floor Session debate on S.B. 253, Assemblymember Christopher Ward said the following: "This data, along with the accompanying report, will then be published on a public facing website for all Californians to see.  Now, you can't regulate what you don't know, and as the State continues to curb its emissions across public sectors, we have a clear idea of what work is remaining and what action needs to be taken to continue progress. However, the same can't be said today for the private sector." | Undisputed that the quoted text appears in the cited document.<br><br>Undisputed that the data collected under S.B. 253 will be published on a public facing website. Cal. Health & Saf. Code § 38532(e)(1)<br><br>Disputed to the extent Plaintiffs seek to establish, by taking the quotation out of context, that S.B. 253 "will empower participants in the climate debate to use companies' disclosures about emissions, and about their plans to address them, as a basis to criticize the companies. . . ."  MSJ 12:15–18 (citing this fact).  The document speaks for itself. To the |

| | | |
|---|---|---|
| | Hamburger Decl., Ex. 6 (Transcript of Assembly Floor Session Debate, 05:13:50-05:32:50 (Cal. Sept. 11, 2023)) at pp 2:18-3:2. | extent they are relevant, the Court should review the Senate Judiciary Committee's statements in their complete form and in the context in which they were made.<br><br>*Evidence*: SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 – 33:9). |
| 10. | During a September 11, 2023 California Assembly Floor Session debate on S.B. 253, Assemblymember Ward said the following: "But to not even know, to not even understand what company X is producing in the terms of a million tons of carbon dioxide emissions in a year, that's a standard which would then challenge themselves to say, okay, if I'm at a million this year, how do I get down to 800,000 next year? How do I get down to 600,000 the year after that?"<br><br>Hamburger Decl., Ex. 6 at p 17:5-12. | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiffs seek to establish, by taking the quotation out of context, that SB 253 will "'check the climate crisis' by letting the public 'hold [companies] accountable,' [] for "emitting greenhouse gasses[.]'" MSJ 2:19–21 (citing this fact); *see, contra*, SSMF 88. The document speaks for itself. To the extent they are relevant, the Court should review Assemblymember Ward's statements in their complete form and in the context in which they were made. |

**ER-1644**

| | | *Evidence:* SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 – 33:9). |
|---|---|---|
| 11. | During a September 11, 2023 California Assembly Floor Session debate on S.B. 253, Assemblymember Ward said the following: "[I]n California, our policy should be to not look the other way when there are bad actors out there miscalculating what their impact is and not holding themselves accountable, not allowing the public to hold themselves accountable."<br><br>Hamburger Decl., Ex. 6 at p 18:16-21. | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiffs seek to establish, by taking the quotation out of context, that SB 253 will "'check the climate crisis' by letting the public 'hold [companies] accountable,' [] for "emitting greenhouse gasses[.]'" MSJ 2:19–21 (citing this fact); *see, contra*, SSMF 88.  The document speaks for itself. To the extent they are relevant, the Court should review the Assemblymember Ward's statements in their complete form and in the context in which they were made.<br><br>*Evidence:* SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 – 33:9). |
| 12. | During a September 11, 2023 California Assembly Floor Session debate on S.B. 253, | Objection: The statement is inadmissible hearsay. |

13

**ER-1645**

| | | |
|---|---|---|
| | Assemblymember Rick Zbur characterized S.B. 253 as follows: "[A] bill that the 'Los Angeles Times' described as 'groundbreaking legislation with the potential to reach far beyond California's borders by forcing some of the world's biggest businesses to be honest about the damage they might be causing.'" Hamburger Decl., Ex. 6 at pp 5:22-6:2. | Undisputed that the quoted text appears in the cited document. Disputed to the extent Plaintiffs seek to take the quotation out of context. The document speaks for itself. To the extent they are relevant, the Court should review Assemblymember Zbur's statements in their complete form and in the context in which they were made. |
| 13. | During a September 11, 2023 California Assembly Floor Session debate on S.B. 253, Assemblymember Rick Zbur characterized S.B. 253 as follows: "This bill standardizes the measurements of these emissions, makes them transparent, and gives companies a huge incentive to take steps to reduce their entire life cycle carbon footprints." Hamburger Decl., Ex. 6 at p 7:11-15. | Undisputed that the quoted text appears in the cited document. Disputed to the extent Plaintiffs seek to establish, by taking the quotation out of context, that S.B. 253 "will empower participants in the climate debate to use companies' disclosures about emissions, and about their plans to address them, as a basis to criticize the companies. . . ."  MSJ 12:15–18 (citing this fact).  The document speaks for itself. To the extent they are relevant, the Court |

14

ER-1646

| | | | |
|---|---|---|---|
| | | | should review the Assemblymember Zbur's statements in their complete form and in the context in which they were made.<br><br>*Evidence*: SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 – 33:9). |
| 14. | The California Senate Judiciary Committee April 14, 2023 analysis of S.B. 253 attributes climate change to "global warming."<br><br>Hamburger Decl., Ex. 7 (California Senate Judiciary Committee Analysis of S.B. 253, 2023-2024 Reg. Session (Apr. 14, 2023)) at 2. | | Undisputed that the quoted text "global warming" appears in the cited document at the pincite provided by Plaintiffs.<br><br>Disputed that the statement "attributes climate change to 'global warming'" occurs at that pincite. *Contra*, SSMF 89.<br><br>Also disputed to the extent Plaintiffs seek to establish more, including by taking the quotation out of context. The document speaks for itself. To the extent they are relevant, the Court should review the California Senate Judiciary Committee's statements in their complete form |

**ER-1647**

| | | and in the context in which they were made. |
|---|---|---|
| | | *Evidence:* SSMF 89 (Hamburger Decl., Ex. 7 (ECF 48-10) at 8). |
| 15. | The California Senate Judiciary Committee April 14, 2023, analysis of S.B. 253 states that greenhouse-gases "are destroying our planet" and that "Californians are watching their state get irrevocably harmed by climate change, and they have a right to know who is at the forefront of the pollution causing this." <br><br> Hamburger Decl., Ex. 7 at 7 | Undisputed that the quoted text appears in the cited document. <br><br> Disputed that the California Senate Judiciary Committee April 14, 2023 analysis of S.B. 253 made the statement as quoted because Plaintiffs omit both text and context. *Contra*, SSMF 90. The document speaks for itself. To the extent they are relevant, the Court should review the Senate Judiciary Committee's statements in their complete form and in the context in which they were made. <br><br> *Evidence:* SSMF 90 (Hamburger Decl., Ex. 7 (ECF 48-10) at 7). |
| 16. | The California Senate Judiciary Committee April 14, 2023 analysis of S.B. 253 states that the "requirements" of S.B. 253 "will | Undisputed that the quoted text appears in the cited document. |

| | | | |
|---|---|---|---|
| | | provide . . . policymakers with" information.<br><br>Hamburger Decl., Ex. 7 at 11. | Disputed to the extent Plaintiffs seek to establish, by taking the quotation out of context, that the "laws' sponsors" admitted "that the speech compelled will only fuel the policy debate."  MSJ 8:21–22 (citing this fact). Plaintiffs omit both text and context. The document speaks for itself. To the extent they are relevant, the Court should review the Senate Judiciary Committee's statements in their complete form and in the context in which they were made.<br><br>*Evidence:* SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25–33:9). |
| | 17. | The California Senate Judiciary Committee April 14, 2023 analysis of S.B. 253 states that "For companies, the knowledge that their emissions will be publicly available might encourage them to take meaningful steps to reduce their [greenhouse-gas] emissions." | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiffs seek to establish more, including by taking the quotation out of context. Plaintiffs mischaracterize this statement as tending to prove that |

ER-1649

| | | |
|---|---|---|
| | Hamburger Decl., Ex. 7 at 12. | "the State is attempting to force companies to make controversial disclosures that invite public opprobrium . . . ." MSJ at 1:13–14; *contra*, SSMF 91. The document speaks for itself. To the extent they are relevant, the Court should review the California Senate Judiciary Committee's statements in their complete form and in the context in which they were made. |
| | | *Evidence:* SSMF 91 (Hamburger Decl., Ex. 7 (ECF 48-10) at 12). |
| 18. | The California Senate Rules Committee September 11, 2023 analysis of S.B. 253 states that "Reducing scope 1 and 2 emissions by outsourcing polluting processes does not lead to a real, global reduction of GHG emissions and underscores the need for scope 3 reporting to capture the climate impacts of a business's full supply chain." | Undisputed that the quoted text appears in the cited document. Disputed to the extent Plaintiffs seek to establish more, including by taking the quotation out of context. The document speaks for itself. To the extent they are relevant, the Court should review the Senate Rules Committee's statements in their complete form and in the context in which they were made. |

18

| | | | |
|---|---|---|---|
| | | Hamburger Decl., Ex. 8 (California Senate Rules Committee Analysis of S.B. 253, 2023-2024 Reg. Session (Sept. 11, 2023)) at 5. | |
| | 19. | In a September 12, 2023, press release regarding S.B. 253, Clara Vondrich, senior policy council with Public Citizen's Climate Program, states: "For the nation to check the climate crisis, the first step is transparency on how our biggest emitters are navigating the energy transition: Are emissions going up, down, or staying the same? This legislation will let the public and regulators track companies' decarbonization progress and hold them accountable to their climate promises."<br><br>Hamburger Decl., Ex. 9 (California Lawmakers Approve Groundbreaking Climate Disclosure Bill, Public Citizen (Sept. 12, 2023)) at 1. | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiffs seek to establish more, including by taking the quotation out of context. *See, e.g.*, SSMF 88.  To the extent they are relevant, the Court should review Clara Vondrich's statements in their complete form and in the context in which they were made.<br><br>*Evidence:* SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 –33:9). |

ER-1651

| | | |
|---|---|---|
| 20. | In an August 22, 2023 press release from Ceres, a nonprofit organization, Assemblymember Tasha Boerner states "SB 253 and 261 is a bold action that helps us combat the climate crisis by providing transparency and ensuring accountability for those emitting greenhouse gasses." | Objection: The statement is inadmissible hearsay. |
| | Hamburger Decl., Ex. 10 (Sacramento Rally to Unite for Climate Transparency & Passage of SB 253 & SB 261, CERES (Aug. 22, 2023)) at 4. | Undisputed that the quoted text appears in the cited document. |
| | | Disputed to the extent Plaintiffs seek to establish, by misstating the text, that "supporters have said [S.B. 253 and 261] will 'check the climate crisis' by letting the public 'hold [companies] accountable,' for 'emitting greenhouse gasses.'"  MSJ 2:19-21 (citing this fact). The document speaks for itself. To the extent they are relevant, the Court should review the Senate Judiciary Committee's statements in their complete form and in the context in which they were made. |
| | | *Evidence:* SSMF 88 (Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25 –33:9). |
| 21. | At a May 2022 shareholder meeting of Shell plc, demonstrators | Objection: The statement is inadmissible hearsay. |

20

**ER-1652**

| | |
|---|---|
| interrupted the proceedings, with one supporter stating: "We're here to embarrass them and hold them to account."<br><br>Hamburger Decl., Ex. 11 (Shareholders Back Shell's Climate Strategy After Raucous Meeting, Reuters (May 24, 2022)) at 4. | Undisputed that the quoted text appears in the cited document.<br><br>Disputed because this fact is not a material fact relevant to the matter at issue, which concerns only whether the climate disclosure laws result in a facial violation of the First Amendment. This statement has no connection to S.B. 253 or 261, nor to the First Amendment issues raised by Plaintiffs in this case.<br><br>Disputed further because Plaintiffs mischaracterize the quoted material as establishing that "Activist groups will use information from the disclosures to . . . 'embarrass' companies and try to 'hold them to account.'" MSJ 18:27–19:1 (citing this fact). Nothing in this document connects the actions of these protestors with S.B. 253 or 261 in any way. |

ER-1653

| | | | |
|---|---|---|---|
| 22. | In his October 7, 2023 signing statement for S.B. 253, Governor Newsom states that "the implementation deadlines in this bill are likely infeasible, and the reporting protocol specified could result in inconsistent reporting across businesses subject to the measure. I am directing my Administration to work with the bill's author and the Legislature next year to address these issues."<br><br>Hamburger Decl., Ex. 12 (Signing Statement of Governor Newsom for S.B. 253 (Oct. 7, 2023)) at 1. | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiffs rely on this statement for anything other than its existence. Specifically, disputed to the extent Plaintiffs rely on this statement to argue that the implementation deadlines in S.B. 253 for companies *are* infeasible. The referenced implementation deadlines might well be those for the agency rulemaking. Moreover, the statement merely posits the possibility of timing challenges, without support, and evidence indicates that the law's timelines are feasible for companies. Many companies subject to the laws already disclose the required information, or can draw upon existing capabilities within the company to comply with minimal burden.<br><br>Further disputed that this statement establishes that the Greenhouse Gas |

22

**ER-1654**

| | | |
|---|---|---|
| | | Protocol "could result in inconsistent reporting across businesses subject to the measure." Again, that statement is not specific or supported.  In any event, the Greenhouse Gas Protocol provides widely-accepted methodologies for calculating accurate, transparent, and comparable emissions information.<br><br>*Evidence:* SSMF 131 (Lyon Decl. ¶ 28; Burton Decl. ¶ 21); SSMF 132 (Burton Decl. ¶¶ 23–25, 28–33; Georgiev Decl. ¶¶ 18-19, 23-27); SSMF 170 (Hamburger Decl., Ex. 6 (ECF 48-9) at 8:14-18); SSMF 172-175 (Burton Decl. ¶¶ 13–16, 19–25, 29–30, 31(h), 34(c), 37; Georgiev Decl. ¶¶ 46, 48-49, 50(e)). |
| 23. | In his October 7, 2023, signing statement for S.B. 253, Governor Newsom states that "I am concerned about the overall financial impact of this bill on businesses, so I am instructing | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiffs rely on this statement to argue that S.B. 253 will have a negative "financial |

ER-1655

| | |
|---|---|
| CARB to closely monitor the cost impact as it implements this new bill and to make recommendations to streamline the program." Hamburger Decl., Ex. 12 at 1. | impact . . . on businesses," as the statement suggests only a "concern," and evidence indicates the financial impact will be minimal.  For one, the statement recognizes that the governing regulations had yet to be designed and could potentially mitigate concerns about cost.  For another, a large percentage of companies subject to the disclosure requirements already voluntarily disclose some or all of this data, or are subject to other reporting requirements, reducing the marginal increase in cost for these companies. Moreover, because the laws only apply to the largest companies, the vast majority of covered companies already have the reporting infrastructure and data necessary to prepare the required information with minimal burden, and estimates suggest that companies need expend only 0.025 percent of their annual revenue in preparing the data. |

24

**ER-1656**

| | | |
|---|---|---|
| | | *Evidence:* Cal. Health and Safety Code §§ 38532(c)(1)(D)(i) (avoiding duplication of reporting); SSMF 101-110 (Burton Decl. ¶¶ 10–11, 13–16, 36, 37(c); Cashion Decl. ¶ 17; Lyon Decl. ¶¶ 6, fn 1, 43–46; Georgiev Decl. ¶ 30; McLoon Decl., Ex. 3-4); SSMF 170 (Hamburger Decl., Ex. 6 (ECF 48-9) at 8:14-18); SSMF 172-175 (Burton Decl. ¶¶ 13-16, 19–25, 29–30, 31(h), 34(c), 37; Georgiev Decl. ¶¶ 46, 48-49, 50(e)). |
| 24. | The California Legislature's legislative findings for S.B. 253 include the following: "California investors, consumers, and other stakeholders deserve transparency from companies regarding their greenhouse gas (GHG) emissions to inform their decisionmaking."  Hamburger Decl., Ex. 13 (Senate Bill No. 253), § 1(e). | Undisputed that the legislative findings for S.B. 253 include the quoted text.  Disputed to the extent Plaintiffs seek to establish more.  The statute/document speaks for itself. |

| 25. | The California Legislature's legislative findings for S.B. 253 include the following: "The people, communities, and other stakeholders in California, facing the existential threat of climate change, have a right to know about the sources of carbon pollution, as measured by the comprehensive GHG emissions data of those companies benefiting from doing business in the state, in order to make informed decisions."<br><br>Hamburger Decl., Ex. 13 (Senate Bill No. 253), § 1(j). | Undisputed that the legislative findings for S.B. 253 include the quoted text.<br><br>Disputed to the extent Plaintiffs seek to establish more.  The statute/document speaks for itself. |
| --- | --- | --- |
| 26. | The California Legislature's legislative findings for S.B. 253 include the following: "Mandating annual, full-scope GHG emissions data reporting to the emissions reporting organization for all United States companies with total annual revenues in excess of $1,000,000,000 that do business in California, as well as ensuring | Undisputed that the legislative findings for S.B. 253 include the quoted text.<br><br>Disputed to the extent Plaintiffs seek to establish more.  The statute/document speaks for itself. |

ER-1658

(204 of 296) Page 204 of 296Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 204 of 296
Case 2:24-cv-00801-ODW-PVC   Document 52-1   Filed 07/24/24   Page 27 of 119   Page ID
#:1455

| | | | |
|---|---|---|---|
| | | public access to the data in a manner that is easily understandable and accessible, will inform investors, empower consumers, and activate companies to improve risk management in order to move towards a net-zero carbon economy and is a critical next step that California must take to protect the state and its residents."<br><br>Hamburger Decl., Ex. 13 (Senate Bill No. 253), § 1(*l*). | |
| | 27. | S.B. 253 will require approximately 5,300 U.S. businesses to report their emissions.<br><br>Hamburger Decl., Ex. 14 (California Assembly Floor Analysis of S.B. 253, 2023-2024 Reg. Session (Sept. 7, 2023)) at 2. | Objection: The phrase "S.B. 253 will require" is either a legal conclusion or ambiguous.<br><br>Undisputed that the California Assembly Floor Analysis of S.B. 253 stated that "According to Ceres, one of the sponsors of the bill, of the 5,300 U.S. corporations that would have to report their emissions. . . ." |

**ER-1659**

| | | |
|---|---|---|
| | | Hamburger Decl., Ex. 14 (ECF No. 48-17) at 2.<br><br>Disputed to the extent Plaintiffs intend to state more than that. Defendants do not know precisely how many U.S. businesses will be required to disclose under the regulations that will be adopted pursuant to S.B. 253 and the cited evidence does not establish that any particular company or number of companies are subject to these disclosure requirements.<br><br>To the extent that the number of U.S. corporations that would have to report emissions under S.B. 253's implementing regulations becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
| 28. | Of the approximately 5,300 business that will be required to report their emissions under S.B. | Objection: The phrase "will be required to report their emissions under S.B. 253" is either a legal conclusion or ambiguous. |

ER-1660

(206 of 296) Page 206 of 296 Case: 25-5327 09/18/2025 DktEntry: 8.8 Page 206 of 296
Case 2:24-cv-00801-ODW-PVC Document 52-1 Filed 07/24/24 Page 29 of 119 Page ID
#:1457

| | |
|---|---|
| 253, 73% are estimated to be private companies.<br><br>Hamburger Decl., Ex. 14 at 2. | Undisputed that the California Assembly Floor Analysis of S.B. 253 stated that "According to Ceres, one of the sponsors of the bill, of the 5,300 U.S. corporations that would have to report their emissions about 73% are private companies."<br><br>Disputed to the extent Plaintiffs intend to state more than that. Defendants do not know precisely how many or which U.S. businesses will be required to disclose under S.B. 253's implementing regulations once those regulations are adopted, and the cited evidence does not establish these facts. To the extent that the number of public and private U.S. corporations that would have to report emissions under S.B. 253's implementing regulations becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |

**ER-1661**

| | | |
|---|---|---|
| | | Disputed to the extent that Plaintiffs are suggesting the law is overbroad by including private companies.<br><br>*Evidence:* SSMF 153 (Cashion Decl. ¶ 16); SSMF 183-189 (Georgiev Decl. ¶¶ 37, 39-45, 47). |
| 29. | The requirement to estimate and report Scope 3 emissions alone will cost some companies more than $1 million per year.<br><br>Hamburger Decl., Ex. 15 (Williams Companies, Inc., Comment Letter to Proposed Rule on The Enhancement and Standardization of Climate-Related Disclosures for Investors (June 17, 2022)) at 14. | Objection: Plaintiffs' assertion lacks foundation and is inadmissible hearsay.<br><br>Disputed. The compliance cost estimate for the calculation of Scope 3 emissions presented in the comment letter, Hamburger Decl., Ex. 15 (ECF No. 48-18) at 14, was based on Williams Companies, Inc.'s hypothetical compliance with the Securities and Exchange Commissions' proposed rule for The Enhancement and Standardization of Climate-Related Disclosures for Investors, not the Scope 3 reporting requirements of S.B. 253. The average estimated cost for compliance with S.B. 253 Scope 3 |

ER-1662

| | | reporting requirements "is less than $250,000." |
|---|---|---|
| | | *Evidence:* SSMF 170 (Hamburger Decl., Ex. 6 (ECF 48-9) at 8:14–18); SSMF 172-175 (Burton Decl. ¶¶ 13-16, 19–25, 29–30, 31(h), 34(c), 37; Georgiev Decl. ¶¶ 46, 48-49, 50(e)). |
| 30. | In an April 11, 2022, explanation related to its proposed rule that would require publicly traded companies to report climate-related information, the Securities and Exchange Commission "recognize[d] that, in many instances, direct measurement of GHG emissions at the source, which would provide the most accurate measurement, may not be possible." | Undisputed that the quoted text appears in the cited document. |
| | Hamburger Decl., Ex. 16 (The Enhancement and Standardization of Climate-Related Disclosures for Investors, 87 Fed. Reg. 21,334 | Disputed to the extent Plaintiffs intend to state more than that. The quoted text does not establish that the "SEC acknowledges, the estimate in many instances may be inaccurate." MSJ 5:6–7 (citing this fact). The statement that "direct measurement of GHG emissions at the source, which would provide the most accurate measurement, may not be possible" does not establish that other GHG emissions measurement "may be" inaccurate. ECF No. 48-19 at 21,387. |

ER-1663

| | | | |
|---|---|---|---|
| | | (proposed Apr. 11, 2022)) at 21,387. | *Evidence*: Hamburger Decl., Ex. 16 (ECF No. 48-19) at 21,387; SSMF 134 (Georgiev Decl. ¶ 26). |
| 31. | | The Greenhouse Gas Protocol, which S.B. 253 uses as the basis for its emissions-disclosure regime, states that Scope 3 emissions do not factor in "avoided emissions or [greenhouse-gas] reductions from actions taken to compensate for or offset emissions." | Undisputed that the quoted text appears in the cited document. |
| | | Hamburger Decl., Ex. 17 (Greenhouse Gas Protocol, Corporate Value Chain (Scope 3) Accounting and Reporting Standard (Sept. 2011)) at 6. | Disputed to the extent Plaintiffs seek to establish more, including by taking the quotation out of context to establish that S.B. 253's disclosures are misleading. MSJ 18:16–18 (citing this fact). The document speaks for itself. Moreover, disputed because the exclusion of "Scope 4" emissions is not misleading. |
| | | | *Evidence*: SSMF 142 (Lyon Decl., ¶ 39) ("In fact, any projects that succeed in avoiding emissions will by definition reduce emissions from the first 3 scopes of a reporting entity, and hence will automatically be reflected in an accurate reporting of Scopes 1, 2 and 3 emissions. |

ER-1664

(210 of 296) Page 210 of 296
Case: 25-5327 09/18/2025 DktEntry: 8.8 Page 210 of 296
Case 2:24-cv-00801-ODW-PVC Document 52-1 Filed 07/24/24 Page 33 of 119 Page ID
#:1461

| | | There is no need to report so-called "Scope 4" emissions separately.") |
|---|---|---|
| 32. | The Greenhouse Gas Protocol, which S.B. 253 uses as the basis for its emissions-disclosure regime, states that "Scope 3 includes all other indirect emissions that occur in a company's value chain. The 15 categories in scope 3 are intended to provide companies with a systematic framework to measure, manage, and reduce emissions across a corporate value chain."<br><br>Hamburger Decl., Ex. 18 ((Greenhouse Gas Protocol, Technical Guidance for Calculating Scope 3 Emissions (version 1.0) (2013)) at 6. | Undisputed that S.B. 253 contemplates use of the Greenhouse Gas Protocol as an initial basis for emission-disclosures. Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiffs seek to establish more, including by taking the quotation out of context. Plaintiffs mischaracterize this statement as tending to prove that "estimations an entity reports as its Scope 3 emissions are those of other reporting entities altogether. . . ." MSJ at 4:28–5:1. The document speaks for itself. To the extent they are relevant, the Court should review the Greenhouse Gas Protocol's statements in their complete form and in the context in which they were made. |

ER-1665

| | | |
|---|---|---|
| | | *Evidence*: Hamburger Decl., Ex. 18; SSMF 180 (Cashion Decl. ¶ 14; Lyon Decl. ¶ 36); SSMF 181 (Burton Decl. ¶ 31). |
| 33. | The Greenhouse Gas Protocol, which S.B. 253 uses as the basis for its emissions-disclosure regime, states that calculation of Scope 3 emissions includes a "require[ment] to calculate emissions of all the [greenhouse gases] required by the United Nations Framework Convention on Climate Change (UNFCCC)/Kyoto Protocol," including "carbon dioxide (CO2), methane (CH4), nitrous oxide (N2O), hydrofluorocarbons (HFCs), perfluorocarbons (PFCs), sulphur hexafluoride (SF6) . . . [and] nitrogen trifluoride (NF3)." <br><br> Hamburger Decl., Ex. 18 at 14. | Undisputed that the quoted text appears in the cited document. The document speaks for itself. <br><br> Disputed to the extent Plaintiffs seek to establish more.  The statute/document speaks for itself. |
| 34. | The Greenhouse Gas Protocol, which S.B. 253 uses as the basis for its emissions-disclosure regime, | Disputed. The cited document does not state that there are advantages or disadvantages of methods of |

| | | |
|---|---|---|
| 1 | | |
| 2 | states that there are "advantages | collecting information about |
| 3 | and disadvantages" for different | greenhouse gas emissions. The full |
| 4 | methods of collecting information | cited text from Technical Guidance |
| 5 | about greenhouse-gas emissions. | for Calculating Scope 3 Emissions |
| 6 | | (version 1.0) (2013) states, "Section |
| 7 | Hamburger Decl., Ex. 18 at 18. | 7.5 of the Scope 3 Standard |
| 8 | | 'Guidance for collecting secondary |
| 9 | | data and filling data gaps' provides |
| 10 | | more information on the use of |
| 11 | | proxy data and its advantages and |
| 12 | | disadvantages." Hamburger Decl., |
| 13 | | Ex. 18 (ECF No. 48-18) at 18. The |
| 14 | | cited evidence does not establish or |
| 15 | | identify any advantage or |
| 16 | | disadvantage for any particular |
| 17 | | method of "collecting information" |
| 18 | | about greenhouse-gas emissions. |
| 19 | | |
| 20 | | Also disputed that "[e]missions |
| 21 | | calculations necessarily turn on |
| 22 | | subjective judgments." MSJ 4:26 |
| 23 | | (citing this fact). Neither the quoted |
| 24 | | text nor the surrounding text |
| 25 | | supports that claim. Emissions |
| 26 | | calculations based on the |
| 27 | | Greenhouse Gas Protocol are |
| 28 | | objective measurements. |

35

ER-1667

| | | |
|---|---|---|
| | | *Evidence*: SSMF 132-135, 140-141 (Burton Decl. ¶¶ 23–25, 28–33; Georgiev Decl. ¶¶ 18–21, 23–27, 29–33). |
| 35. | Studies show that publicly available information about a company's operations, including industry membership, size, sales growth, earnings growth, property value, capital expenditures, and profitability, can explain 90% of greenhouse-gas emissions.<br><br>Hamburger Decl., Ex. 19 (Daniel J. Taylor, Comment Letter to Proposed Rule on The Enhancement and Standardization of Climate-Related Disclosures for Investors (June 16, 2022)) at 7. | Objection: The statement is compound in that it sets forth multiple facts. The statement is inadmissible hearsay and lacks foundation.<br><br>Disputed. There are significant accuracy limitations to using outside estimates; these inaccuracies are eliminated by the disclosure of internal numbers. SSMF 171 (Lyon Decl. ¶ 10, 14).<br><br>Also disputed to the extent that Plaintiffs mischaracterize the cited evidence as establishing more than one study finding "that 90% of GHG emissions are explained by observable aspects of a company's operations including industry membership; company size; sales |

ER-1668

| | | | |
|---|---|---|---|
| | | | growth; earnings growth; the value of plant, property, and equipment; capital expenditures; and profitability." Hamburger Decl., Ex. 19 (ECF 48-22), at 7. Further disputed that the study stands for the proposition as stated; that document, which was not submitted as evidence here, speaks for itself.<br><br>To the extent that Plaintiffs' assertion is relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion.<br><br>*Evidence*: SSMF 171 (Decl. Lyon ¶¶ 10, 14). |
| 36. | There are gaps in emissions methodologies, making reliable and accurate calculations of emissions difficult.<br><br>Hamburger Decl., Ex. 20 (Task Force on Climate-Related Financial Disclosures, Recommendations of the Tasks Force on Climate-related | | Objection: The statement contains a legal conclusion; the phrase "gaps in emissions methodologies" is vague and ambiguous.<br><br>Disputed. The cited evidence does not establish that there are gaps in emissions methodologies that make reliable and accurate calculations of |

ER-1669

| | | |
|---|---|---|
| 1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 | Financial Disclosures (June 2017)) at 36; Hamburger Decl. Ex. 21 (Pilot Climate Scenario Analysis Exercise, Board of Governors of the Federal Reserve System (May 2024)) at 11. | emissions difficult. The cited document states only that "several organizations" raised "concerns" that, "[t]he gaps in emissions measurement methodologies, including Scope 3 emissions and product life-cycle emissions methodologies, make reliable and accurate estimates difficult." Hamburger Decl., Ex. 20 (ECF No. 48-23) at 35-36. The Task Force on Climate Related Disclosures goes on to say that in response to these concerns it "clarified the links between the metrics." *Id.* Moreover, in making this assertion, Plaintiffs rely on an assessment of a pilot climate scenario analysis conducted by the Federal Reserve, which was not based on the requirements of S.B. 253 or S.B. 261, and does not support the statement made. Hamburger Decl., Ex. 21 (ECF No. 48-24) at 11.  Emissions calculations made pursuant to the Greenhouse Gas |

38

ER-1670

| | | | |
|---|---|---|---|
| | | | Protocol are considered accurate, thorough, and complete.<br><br>*Evidence*: SSMF 132-135, 140-141 (Burton Decl. ¶¶ 23–25, 28–33; Georgiev Decl. ¶¶ 18–21, 23–27, 29–33). |
| 37. | | The California Senate Rules Committee September 12, 2023 analysis of S.B. 261 states that "[u]ltimately, the reporting requirements contemplated under SB 261 will indeed create additional work for covered entities" and concern "how their future operations may affect—and be affected by—global climate change."<br><br>Hamburger Decl., Ex. 22 (California Senate Rules Committee Analysis of S.B. 261, 2023-2024 Reg. Session (Sept. 12 2023) at 5-6. | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiffs seek to establish more, including by taking the quotation out of context. The document speaks for itself. Disputed that "the reporting requirements contemplated under SB 261 will indeed create additional work for covered entities," to the extent that many entities already make disclosures pursuant to the TCFD.<br><br>Further, disputed to the extent Plaintiffs are arguing the SB 261 concerns a controversial topic. Senate Bill 261 requires the |

ER-1671

(217 of 296) Page 217 of 296 Case: 25-5327 09/18/2025 DktEntry: 8.8 Page 217 of 296
Case 2:24-cv-00801-ODW-PVC Document 52-1 Filed 07/24/24 Page 40 of 119 Page ID
#:1468

| | | |
|---|---|---|
| | | disclosure of only factual statements about reporting entities' own activities.<br><br>*Evidence*: SSMF 101-105 (Burton Decl. ¶¶ 11, 13–16; Cashion Decl. ¶ 17; Lyon Decl. ¶¶ 43–46; Georgiev Decl. ¶ 30; McLoon Decl., Ex. 3-4); SSMF 118 (Cashion Decl. ¶ 17); SSMF 119-122 (Burton Decl. ¶¶ 35, 38–39; Georgiev Decl. ¶¶ 19-21, 29-33); SSMF 143 (Georgiev Decl. ¶¶ 19(a), (d)), 21); SSMF 172 (Burton Decl. ¶¶ 13-16, 19–25, 29–30, 31(h), 34(c), 37; Georgiev Decl. ¶¶ 46, 48-49, 50(e)); SSMF 176-178 (Burton Decl. ¶ 34; Georgiev Decl. ¶ 46). |
| 38. | The California Senate Judiciary Committee April 10, 2023 analysis of S.B. 261 provides that the "information" required by S.B. 261 "is important to provide more transparency to policy makers, investors, and shareholders as it will result in improved decision | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiffs seek to establish more, including by taking the quotation out of context. The document speaks for itself. To the extent they are relevant, the |

ER-1672

| | | |
|---|---|---|
| | making on where to invest private and public dollars." <br><br> Hamburger Decl., Ex. 23 (California Senate Judiciary Committee Analysis of S.B. 261, 2023-2024 Reg. Session (Apr. 14, 2023) at 5. | Court should review the Senate Rules Committee's statements in their complete form and in the context in which they were made. |
| 39. | The California Assembly Committee on Natural Resources July 10, 2023 analysis of S.B. 261 provides that S.B. 261 "[d]efines 'climate-related financial risk' as risk that may include material financial risk posed by the effects of the changing climate, such as intense storms, rising sea levels, higher global temperatures, economic damages from carbon emissions, and other financial risks due to public policies to address climate change, shifting consumer attitudes, changing economics of traditional carbon-intense industries." | Disputed. Plaintiff misstates the definition of "climate-related financial risk" in S.B. 261 as provided in the cited material. The definition Plaintiffs' cite is found in Government Code section 7510.5(a)(2). Hamburger Decl., Ex. 24 (ECF No. 48-27) at 1–2. The Assembly Committee on Natural Resources July 10, 2023 analysis of S.B. 261 defines "Climate-related financial risk" for purposes of S.B. 261 as "material risk of harm to immediate and long-term financial outcomes due to physical and transition risks, including, but not limited to, risks to corporate operations, provision of goods and |

**ER-1673**

(219 of 296) Page 219 of 296
Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 219 of 296
Case 2:24-cv-00801-ODW-PVC Document 52-1 Filed 07/24/24 Page 42 of 119 Page ID #:1470

| | | |
|---|---|---|
| | Hamburger Decl., Ex. 24 (California Assembly Natural Resources Committee Analysis of S.B. 261, 2023-2024 Reg. Session (July 7, 2023) at 1-2. | services, supply chains, employee health and safety, capital and financial investments, institutional investments, financial standing of loan recipients and borrowers, shareholder value, consumer demand, and financial markets and economic health." *Id.*, at 2.  *Evidence*: Hamburger Decl., Ex. 24 (ECF No. 48-27) at 2. |
| 40. | In his October 7, 2023, signing statement for S.B. 261, Governor Newsom states that "the implementation deadlines fall short in providing the California Air Resources Board (CARB) with sufficient time to adequately carry out the requirements in this bill. I am directing my Administration to work with the bill's author and the Legislature next year to address this issue." | Undisputed that the quoted text appears in the cited document.  Disputed to the extent Plaintiffs rely on this statement for more, including to argue that the implementation deadlines in S.B. 253 are insufficient for companies. The document speaks for itself. |

ER-1674

| 1 | | Hamburger Decl., Ex. 25 (Signing | |
| 2 | | Statement of Governor Newsom for | |
| 3 | | S.B. 261 (Oct. 7, 2023)) at 1. | |
| 4 | | | |
| 5 | 41. | In his October 7, 2023, signing | Undisputed that the quoted text |
| 6 | | statement for S.B. 261, Governor | appears in the cited document. |
| 7 | | Newsom states that "I am | |
| 8 | | concerned about the overall | Disputed to the extent Plaintiffs rely |
| 9 | | financial impact of this bill on | on this statement for anything other |
| 10 | | businesses, so I am instructing | than its existence. Specifically, |
| 11 | | CARB to closely monitor the cost | disputed to the extent Plaintiffs rely |
| 12 | | impacts as it implements this new | on this statement to argue that S.B. |
| 13 | | bill and to make recommendations | 261 will have a negative "financial |
| 14 | | to streamline the program." | impact . . . on businesses," as the |
| 15 | | Hamburger Decl., Ex. 25 at 1. | statement suggests only a |
| 16 | | | "concern," and the evidence |
| 17 | | | suggests this concern is |
| 18 | | | unwarranted. For one, many |
| 19 | | | companies subject to the disclosure |
| 20 | | | requirements already voluntarily |
| 21 | | | disclose some or all of the required |
| 22 | | | data, or are subject to other |
| 23 | | | reporting requirements, reducing the |
| 24 | | | marginal increase in cost for these |
| 25 | | | companies to report under SB 261. |
| 26 | | | Moreover, because the laws only |
| 27 | | | apply to the largest companies, the |
| 28 | | | |

(221 of 296) Page 221 of 296 Case: 25-5327 09/18/2025 DktEntry: 8.8 Page 221 of 296
Case 2:24-cv-00801-ODW-PVC Document 52-1 Filed 07/24/24 Page 44 of 119 Page ID
#:1472

| | | |
|---|---|---|
| | | vast majority of covered companies already have the reporting infrastructure and data necessary to prepare the required information with minimal burden. *Evidence*: Cal. Health and Safety Code § 38533(b)(4) (avoiding duplication of reporting); SSMF 101-110 (Burton Decl. ¶¶ 10–11, 13–16, 36, 37(c); Cashion Decl. ¶ 17; Lyon Decl. ¶¶ 6, fn 1, 43–46; Georgiev Decl. ¶ 30; McLoon Decl., Ex. 3-4); SSMF 170 (Hamburger Decl., Ex. 6 (ECF 48-9) at 8:14-18); SSMF 172 (Burton Decl. ¶¶ 13-16, 19–25, 29–30, 31(h), 34(c), 37; Georgiev Decl. ¶¶ 46, 48-49, 50(e)); SSMF 176-179 (Burton Decl. ¶ 34; Georgiev Decl. ¶ 46; ECF 48-6 at 22:3–6). |
| 42. | The California Legislature's legislative findings for S.B. 261 include the following: "Global economic and climate policy leaders have conclusively | Undisputed that the legislative findings for S.B. 261 include the quoted text. |

| | |
|---|---|
| established that the long-term strength of global and local economies will depend on their ability to withstand climate-related risks, including physical impacts, economic transitions, and policy and legal responses." <br><br> Hamburger Decl., Ex. 26 (Senate Bill No. 261), § 1(b) | Disputed to the extent Plaintiffs seek to establish more, including by taking the quotation out of context, that, "The California Legislature itself recognizes that climate change is a high-profile political issue subject to robust debate among '[g]lobal economic and climate policy leaders.'" MSJ 8:16–18 (citing this fact). The document speaks for itself, and the cited statement does not establish a "robust debate" among policy leaders. Nor does it suggest that complying with S.B. 261 requires taking a position on any policy debate. <br><br> *Evidence:* SSMF 119 (Burton Decl. ¶¶ 35, 38–39; Georgiev Decl. ¶¶ 19-21, 29-33); SSMF 120 (Burton Decl. ¶¶ 35, 38–39); SSMF 121 (Burton Decl. ¶¶ 35, 38–39); SSMF 122 (Georgiev Decl. ¶ 32). |

| | | |
|---|---|---|
| 43. | The California Legislature's legislative findings for S.B. 261 include the following: "Failure of economic actors to adequately plan for and adapt to climate-related risks to their businesses and to the economy will result in significant harm to California, residents, and investors, in particular to financially vulnerable Californians who are employed by, live in communities reliant on, or have invested in or obtained financing from these institutions." <br><br> Hamburger Decl., Ex. 26 (Senate Bill No. 261), § 1(c). | Undisputed that the legislative findings for S.B. 261 include the quoted text. <br><br> Disputed to the extent Plaintiffs seek to establish more, including by taking the quotation out of context, that, "The California Legislature itself recognizes that climate change is a high-profile political issue . . . that raises many contested questions, including . . . corporations' responsibility to 'plan for and adapt to' it." MSJ 8:16–18 (citing this fact). The document speaks for itself, and the cited statement does not establish any disputed "political issue" with "contested questions." Nor does it suggest that complying with S.B. 261 requires taking a position on any policy debate. <br><br> *Evidence:* SSMF 119 (Burton Decl. ¶¶ 35, 38–39; Georgiev Decl. ¶¶ 19-21, 29-33); SSMF 120 (Burton Decl. ¶¶ 35, 38–39); SSMF 121 |

ER-1678

| | | |
|---|---|---|
| | | (Burton Decl. ¶¶ 35, 38–39); SSMF 122 (Georgiev Decl. ¶ 32). |
| 44. | The California Legislature's legislative findings for S.B. 261 include the following: "Though a precedent has been set to address climate risk to businesses, corporations, and financial institutions nationwide, current disclosure standards are voluntary, and thus inadequate, for meeting rapidly accelerating climate risks. In order to begin to address the climate crisis, consistent, higher level, and mandatory disclosures are needed from all major economic actors, and California has an opportunity to set mandatory and comprehensive risk disclosure requirements for public and private entities to ensure a sustainable, resilient, and prosperous future for our state."<br><br>Hamburger Decl., Ex. 26 (Senate Bill No. 261), § 1(j). | Undisputed that the legislative findings for S.B. 261 include the quoted text.<br><br>Disputed to the extent Plaintiffs seek to establish more.  The statute/document speaks for itself. |

**ER-1679**

| 45. | The June 2017 Recommendations of the Task Force on Climate-Related Financial Disclosures states that "Organizations' financial performance may also be affected by changes in water availability, sourcing, and quality; food security; and extreme temperature changes affecting organizations' premises, operations, supply chain, transport needs, and employee safety." Hamburger Decl., Ex. 20 at 6. | Undisputed that the quoted text appears in the cited document. Disputed to the extent Plaintiffs seek to establish more, including by taking the quotation out of context, that the TCFD requires companies to take a position on a political or contentious issue. *Evidence:* SSMF 119 (Burton Decl. ¶¶ 35, 38–39; Georgiev Decl. ¶¶ 19-21, 29-33); SSMF 120 (Burton Decl. ¶¶ 35, 38–39); SSMF 121 (Burton Decl. ¶¶ 35, 38–39); SSMF 122 (Georgiev Decl. ¶ 32); SSMF 143 (Georgiev Decl. ¶¶ 19(a), (d), 21). |
|-----|-----|-----|
| 46. | There is high degree of uncertainty about the timing and magnitude of climate-related risks, and it is difficult to estimate how those risks impact company operations. Hamburger Decl., Ex. 20 at 36; Hamburger Decl., Ex. 21 at 11. | Objection: The statement contains a legal conclusion; the statement is vague or ambiguous; the statement is compound in that it sets forth multiple facts. Disputed. The cited evidence does not establish that there is a "high |

48

**ER-1680**

(226 of 296) Page 226 of 296 Case: 25-5327 09/18/2025 DktEntry: 8.8 Page 226 of 296
Case 2:24-cv-00801-ODW-PVC Document 52-1 Filed 07/24/24 Page 49 of 119 Page ID
#:1477

| | | | degree of uncertainty about timing and magnitude of climate-related risks" or that "it is difficult to estimate how [climate-related] risks impact company operations." The cited document states only that "several organizations" raised this as a "concern." Hamburger Decl., Ex. 20 (ECF No. 48-23) at 36. The Task Force on Climate Related Disclosures goes on to say that it responded to these concerns in the design of the metrics. *Id.* Moreover, in making this assertion, Plaintiffs rely on an assessment of a pilot climate scenario analysis conducted by the Federal Reserve, which was not based on the requirements of S.B. 261, and does not support the statement made. Hamburger Decl., Ex. 21 (ECF No. 48-24) at 11.

The TCFD protocol is a globally accepted reporting framework, aligned with traditional financial reporting principles. |

ER-1681

(227 of 296) Page 227 of 296
Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 227 of 296
Case 2:24-cv-00801-ODW-PVC Document 52-1 Filed 07/24/24 Page 50 of 119 Page ID #:1478

| | | | |
|---|---|---|---|
| | | | *Evidence*: SSMF 97 (Burton Decl. ¶¶ 11, 14, 36, 37(c); Cashion Decl. ¶¶ 17, 21; Hamburger Decl., Ex. 23 (ECF 48-26) at 5–6; Georgiev Decl. ¶ 33); SSMF 98 (Burton Decl. ¶¶ 11, 17, 19, 21–25, 37); SSMF 120 (Burton Decl. ¶¶ 35, 38–39); SSMF 121 (Burton Decl. ¶¶ 35, 38–39); SSMF 122 (Georgiev Decl. ¶ 32); SSMF 143 (Georgiev Decl. ¶¶ 19(a), (d), 21). |
| | 47. | A company's subjective judgment is required make disclosures about climate change risks for future company operations.

Hamburger Decl., Ex. 20 at 53. | Objection: The statement contains a legal conclusion; the statement is vague or ambiguous.

Disputed. The cited evidence does not establish that a company must engage in "subjective judgment" to make disclosures about climate change risks for future company operations. The cited evidence states, "Future-oriented disclosures will inherently involve the organization's judgment (which should be adequately explained). To |

ER-1682

(228 of 296) Page 228 of 296 Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 228 of 296
Case 2:24-cv-00801-ODW-PVC  Document 52-1  Filed 07/24/24  Page 51 of 119  Page ID
#:1479

| | | |
|---|---|---|
| | | the extent possible, disclosures should be based on objective data and use best-in-class measurement methodologies, which would include common industry practice as it evolves." Hamburger Decl., Ex. 20 (ECF 48-23) at 53. Indeed that section of the TCFD guidance in which the cited statement is found reads, "Disclosures should be reliable, verifiable, and objective." *Id.* The disclosure of business judgments are factual in nature.<br><br>*Evidence*: Hamburger Decl., Ex. 20 (ECF 48-23) at 53; SSMF 119 (Burton Decl. ¶¶ 35, 38–39; Georgiev Decl. ¶¶ 19-21, 29-33); SSMF 120 (Burton Decl. ¶¶ 35, 38–39); SSMF 121 (Burton Decl. ¶¶ 35, 38–39); SSMF 122 (Georgiev Decl. ¶ 32); SSMF 143 (Georgiev Decl. ¶¶ 19(a), (d), 21). |
| 48. | Over 10,000 companies do business in California and have revenues of greater than | Objection: The phrases "do business in California" and "are subject to S.B. 261" are legal conclusions. |

51

ER-1683

| | |
|---|---|
| $500,000,000 and thus are subject to S.B. 261.<br><br>Hamburger Decl., Ex. 22 at 5. | Undisputed that the California Senate Rules Committee Analysis of S.B. 261 stated that "over 10,000 companies … do business in California and exceed the $500,000,000 revenue threshold. . . ." Hamburger Decl., Ex. 22 (ECF No. 48-25), at 5.<br><br>Disputed to the extent Plaintiffs intend to state more than that. Defendants do not know precisely how many companies doing business in California exceed the $500,000,000 revenue threshold and the cited evidence does not establish that any particular company or number of companies are subject to the S.B. 261 reporting requirements. To the extent that the number of U.S. corporations that would have to report emissions under S.B. 261 becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |

ER-1684

| 49. | Of the more than 10,000 companies that are subject to S.B. 261, only 20% are publicly traded.<br><br>Hamburger Decl., Ex. 22 at 5. | Objection: The phrase "are subject to S.B. 261" is a legal conclusion.<br><br>Undisputed that the California Senate Rules Committee Analysis of S.B. 261 stated that "over 10,000 companies … do business in California and exceed the $500,000,000 revenue threshold. . . ." Hamburger Decl., Ex. 22 (ECF No. 48-25), at 5. Undisputed that this same Analysis states that of those 10,000 companies, "only 20% of them are publicly traded." *Id.*<br><br>Disputed to the extent Plaintiffs intend to state more than that. Defendants do not know precisely how many companies doing business in California exceed the $500,000,000 revenue threshold and the cited evidence does not establish that any particular company or number of companies are subject to the S.B. 261 reporting requirements. To the extent that the number of publicly traded U.S. corporations |
|---|---|---|

| | | | |
|---|---|---|---|
| | | | that would have to report emissions under S.B. 261 becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion.<br><br>Disputed to the extent Plaintiffs suggest the inclusion of privately held companies renders S.B. 261 overbroad. As the Analysis states, "there are clear advantages in the completeness and scope of the data that could be gathered by California" in enacting a law that covers private companies.<br><br>*Evidence*: Hamburger Decl., Ex. 22 (ECF No. 48-25), at 5; SSMF 153 (Cashion Decl. ¶ 16); SSMF 183-189 (Georgiev Decl. ¶¶ 37, 39-45, 47). |
| 50. | | U-Haul Holding Company ("UHHC"), a Nevada corporation, is a member of the United States Chamber of Commerce. | Defendants lack sufficient knowledge or information to respond to U-Haul's representations. |

| | | |
|---|---|---|
| | Declaration of Edward J. Shoen ("Shoen Decl.") ¶¶ 2-3. | Disputed to the extent that Defendants have not had an opportunity to cross-examine U-Haul regarding its testimony. To the extent this fact becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
| 51. | UHHC has an annual total revenue exceeding $1 billion USD.<br><br>Shoen Decl. ¶ 3. | Defendants lack sufficient knowledge or information to respond to U-Haul's representations.<br><br>Disputed to the extent that Defendants have not had an opportunity to cross-examine U-Haul's testimony. To the extent this fact becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
| 52. | UHHC's subsidiary, U-Haul Co. of California ("UHCA"), does business in California.<br><br>Shoen Decl. ¶ 4. | Defendants lack sufficient knowledge or information to respond to U-Haul's representations.<br><br>Disputed to the extent that Defendants have not had an |

ER-1687

| | | | |
|---|---|---|---|
| | | | opportunity to cross-examine U-Haul's testimony. To the extent this fact becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
| 53. | If UHCA's activities in California are attributable to UHHC, then UHHC would be subject to the requirements of SB 253 and 261.<br><br>Shoen Decl. ¶ 5. | Objection: The statement requires a legal conclusion; the statement is compound in that it sets forth multiple facts.<br><br>Disputed. The cited evidence does not establish that UHHC (or U-Haul) is subject to the requirements of S.B. 253 or S.B. 261. Shoen Decl. (ECF 48-30) ¶¶ 3–5.<br><br>Defendants lack sufficient knowledge or information to respond to U-Haul's representations. Defendants dispute U-Haul's claim that it is a regulated entity under S.B. 253 and/or S.B. 261. | |
| 54. | UHHC and its subsidiaries that do business throughout the United States and Canada make up the U-Haul System ("U-Haul"). | Disputed to the extent that Defendants have not had an opportunity to cross-examine U-Haul's testimony. To the extent this | |

ER-1688

(234 of 296) Page 234 of 296Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 234 of 296
Case 2:24-cv-00801-ODW-PVC   Document 52-1   Filed 07/24/24   Page 57 of 119   Page ID
#:1485

| | | | |
|---|---|---|---|
| | | Shoen Decl. ¶ 6. | fact becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
| | 55. | Complying with SB 261 would require U-Haul to opine on climate-related risks.<br><br>Shoen Decl. ¶ 32. | Objection: The statement is a legal conclusion; the phrase "opine on climate-related risks" is vague and ambiguous.<br><br>Disputed. The cited evidence does not establish that UHHC (or U-Haul) is subject to the requirements of S.B. 253 and/or S.B. 261. Shoen Decl. (ECF 48-30) ¶¶ 3–5.<br><br>Disputed to the extent that Plaintiffs claim that S.B. 261 would require U-Haul to take a position on climate-related risks that is not factual.<br><br>*Evidence*: SSMF 119 (Burton Decl. ¶¶ 35, 38–39; Georgiev Decl. ¶¶ 19-21, 29-33); SSMF 120 (Burton Decl. ¶¶ 35, 38–39); SSMF 121 (Burton Decl. ¶¶ 35, 38–39); SSMF 122 (Georgiev Decl. ¶ 32); SSMF |

ER-1689

| | | |
|---|---|---|
| | | 143 (Georgiev Decl. ¶¶ 19(a), (d), 21). |
| 56. | Complying with SB 261 would require U-Haul to post opinions about climate risks to its website.<br><br>Shoen Decl. ¶ 32. | Objection: The statement is a legal conclusion.<br><br>Disputed. The cited evidence does not establish that UHHC (or U-Haul) is subject to the requirements of S.B. 253 or S.B. 261. Shoen Decl. (ECF 48-30) ¶¶ 3–5.<br><br>Disputed to the extent that Plaintiffs claim that S.B. 261 would require U-Haul to "post opinions" about climate risk.  S.B. 261 requires the disclosure of only factual statements about reporting entities' own activities.  Companies must disclose their actual policies and actual planning pertaining to climate-related financial risks as assessed by the company.<br><br>*Evidence*: SSMF 119 (Burton Decl. ¶¶ 35, 38–39; Georgiev Decl. ¶¶ 19-21, 29-33); SSMF 120 (Burton |

**ER-1690**

| | | | |
|---|---|---|---|
| | | | Decl. ¶¶ 35, 38–39); SSMF 121 (Burton Decl. ¶¶ 35, 38–39); SSMF 122 (Georgiev Decl. ¶ 32); SSMF 143 (Georgiev Decl. ¶¶ 19(a), (d), 21). |
| 57. | | Complying with SB 253 would require U-Haul to calculate Scope 1, 2, and 3 emissions.<br><br>Shoen Decl. ¶ 13. | Objection: The statement requires a legal conclusion.<br><br>Disputed. The cited evidence does not establish that UHHC (or U-Haul) is subject to the requirements of S.B. 253 or S.B. 261. Shoen Decl. (ECF 48-30) ¶¶ 3–5. Defendants lack sufficient knowledge or information to respond to U-Haul's representations. Defendants dispute U-Haul's stated determinations regarding its status as a regulated entity under S.B. 253. To the extent this fact becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
| 58. | | U-Haul will need to exercise subjective judgment in calculating greenhouse-gas emissions. | Objection: The statement is a legal conclusion; the phrase "exercise |

| | | |
|---|---|---|
| | Shoen Decl. ¶¶ 11,17, 39. | subjective judgment" is vague and ambiguous. |
| | | Disputed. The cited evidence does not establish that UHHC (or U-Haul) is subject to the requirements of S.B. 253 or S.B. 261. Shoen Decl. (ECF 48-30) ¶¶ 3–5. |
| | | Further disputed to the extent that Plaintiffs claim that S.B. 253 would require U-Haul to "exercise subjective judgment" to calculate GHG emissions.  S.B. 253 requires companies to disclose objective, factual information: the quantity of their greenhouse gas emissions. Cal. Health & Safety Code § 38532(c)(1)(A)(ii).  Entities must measure and report their emissions "in conformance" with the "Greenhouse Gas Protocol standards and guidance," *id.* § 38532(c)(1)(A)(ii), which is a "globally accepted reporting framework" and "aligned with |

ER-1692

(238 of 296) Page 238 of 296 Case: 25-5327 09/18/2025 DktEntry: 8.8 Page 238 of 296
Case 2:24-cv-00801-ODW-PVC Document 52-1 Filed 07/24/24 Page 61 of 119 Page ID
#:1489

| | | |
|---|---|---|
| | | traditional financial reporting principles."<br><br>*Evidence*: SSMF 95-96 (Burton Decl. ¶¶ 10, 14, 17, 19–25, 28; Hamburger Decl., ECF 48-5, Ex. 2 at 26:10–25; Hamburger Decl., Ex. 4 (ECF 48-7) at 3:8–11; Hamburger Decl., Ex. 7 (ECF 48-10) at 8–10; Hamburger Decl., Ex. 3 (ECF 48-6) at 2:14-15; Georgiev Decl. ¶¶ 29–30); SSMF 132-140 (Burton Decl. ¶¶ 23–25, 28–33; Georgiev Decl. ¶¶ 18-19, 23-27). |
| 59. | Scope 1, 2, and 3 emissions alone do not accurately reflect U-Haul's total emissions because the calculation does not include Scope 4 emissions—i.e., those emissions that a company avoids that should be deducted from its Scope 1, 2, and 3 emission levels.<br><br>Shoen Decl. ¶¶ 28, 31. | Objection: The statement is compound in that it sets forth multiple facts; the statement requires a legal conclusion.<br><br>Disputed. The cited evidence does not establish that UHHC (or U-Haul) is subject to the requirements of S.B. 253 or S.B. 261. Shoen Decl. (ECF 48-30) ¶¶ 3–5. |

ER-1693

(239 of 296) Page 239 of 296
Case: 25-5327 09/18/2025 DktEntry: 8.8 Page 239 of 296
Case 2:24-cv-00801-ODW-PVC Document 52-1 Filed 07/24/24 Page 62 of 119 Page ID #:1490

| | | |
|---|---|---|
| | | Disputed because the exclusion of "Scope 4" emissions is not misleading.

*Evidence*: SSMF 142 (Lyon Decl., ¶ 39) ("In fact, any projects that succeed in avoiding emissions will by definition reduce emissions from the first 3 scopes of a reporting entity, and hence will automatically be reflected in an accurate reporting of Scopes 1, 2 and 3 emissions. There is no need to report so-called "Scope 4" emissions separately.") |
| 60. | U-Haul's commercial transactions with its customers do not involve disclosure of greenhouse-gas emissions or climate-related risks.

Shoen Decl. ¶ 36. | Defendants lack sufficient knowledge or information to respond to U-Haul's representations.

To the extent it is relevant whether or not U-Haul's commercial transactions with customers involve the disclosure of GHG emissions or climate-related risks, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |

ER-1694

| | | | |
|---|---|---|---|
| 61. | U-Haul's advertising does not highlight greenhouse-gas emissions or climate-related risks.<br><br>Shoen Decl. ¶ 36. | Disputed. U-Haul states on its public-facing website that it "believe[s] the primary responsibility of U-Haul is to develop products and services to help people move and store their household and commercial goods in an economically, environmentally and socially responsible manner," including by "[d]evelop[ing] and implement[ing] comprehensive climate-change strategies to manage and mitigate [U-Haul's] greenhouse gas (GHG) emissions."<br><br>To the extent it is relevant whether or not U-Haul's advertising highlights GHG emissions or climate-related risks, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion.<br><br>*Evidence*: SSMF 129 (McLoon Decl., Ex. 7). |
| 62. | S.B. 253 and 261 are burdensome. For example, with respect to IT | Objection: The statement is compound in that it sets forth |

ER-1695

| | |
|---|---|
| alone, U-Haul preliminarily estimates that complying with S.B. 261 would require approximately 30 additional dedicated team members to build and then support processes on an ongoing basis at an estimated cost exceeding $3,000,000 per year, which would rise as personnel costs increase over time. This cost estimate does not include costs outside of U-Haul's IT team and does not include costs for complying with S.B. 253, which would involve additional burdensome steps.<br><br>Shoen Decl. ¶¶ 12-15, 35, 39. | multiple facts; the statement relies on self-serving testimony that should not be credited without an opportunity for cross examination. The term "burdensome" is vague and ambiguous.<br><br>Disputed. The evidence presented is limited to U-Haul alone. The cited evidence does not establish that U-Haul is subject to the requirements of S.B. 253 or S.B. 261. Shoen Decl. (ECF 48-30) ¶¶ 3–5. Plaintiffs state that the cited evidence does not cover S.B. 253. It therefore cannot establish that compliance with either law is "burdensome" for U-Haul, much less for other companies (MSJ 5:3-5). In any event, evidence indicates the burdens of disclosure under S.B. 253 and 261 are lower than Plaintiffs suggest.<br><br>Moreover, Plaintiffs rely on the cited evidence to establish a preliminary estimation of U-haul's |

ER-1696

(242 of 296) Page 242 of 296
Case: 25-5327  09/18/2025  DktEntry: 8.8  Page 242 of 296
Case 2:24-cv-00801-ODW-PVC  Document 52-1  Filed 07/24/24  Page 65 of 119  Page ID
#:1493

IT costs for complying with S.B. 261.  But the cited evidence does not attribute the preliminary estimation of IT costs to comply with S.B. 261, alone. Shoen Decl. (ECF 48-30) ¶¶ 10–12.

Disputed that financial and administrative burden are material to Plaintiffs' First Amendment claim. *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020). However, if the question of financial and administrative burden becomes relevant, then Defendants would require discovery to genuinely dispute these allegations. *See* Defendants' Rule 56(d) Motion.

*Evidence:* Cal. Health and Safety Code §§ 38532(c)(1)(D)(i) (avoiding duplication of reporting), 38533(b)(4) (same); SSMF 101-110 (Burton Decl. ¶¶ 10–11, 13–16, 36, 37(c); Cashion Decl. ¶ 17; Lyon Decl. ¶¶ 6, fn 1, 43–46; Georgiev Decl. ¶ 30; McLoon Decl., Ex. 3-4);

ER-1697

| | | |
|---|---|---|
| | | SSMF 170 (Hamburger Decl., Ex. 6 (ECF 48-9) at 8:14-18); SSMF 172 (Burton Decl. ¶¶ 13-16, 19–25, 29–30, 31(h), 34(c), 37; Georgiev Decl. ¶¶ 46, 48-49, 50(e)); SSMF 173-175 (Burton Decl. ¶¶ 29(b), 30(b)-(d), 31(h)); SSMF 176-179 (Burton Decl. ¶ 34; Georgiev Decl. ¶ 46; ECF 48-6 at 22:3–6). |
| 63. | S.B. 261's requirement to discuss risks "including, but not limited to, risks to corporate operations, provision of goods and services, supply chains, employee health and safety, capital and financial investments, institutional investments, financial standing of loan recipients and borrowers, shareholder value, consumer demand, and financial markets and economic health" would require investments of significant time and money that U-Haul would not otherwise make.<br><br>Shoen Decl. ¶¶ 32-38. | Objection: The phrase "S.B. 261's requirement to discuss risks . . . would require investments of significant time and money that U-Haul would not otherwise make" calls for a legal conclusion, and is vague or ambiguous.  The statement relies on self-serving testimony that should not be credited without an opportunity for cross examination. The statement is compound in that it sets forth multiple facts.<br><br>Disputed because the cited evidence does not establish that U-Haul is subject to the requirements of S.B. |

ER-1698

261. Shoen Decl. (ECF 48-30) ¶¶ 3–5.

Disputed that financial and administrative burden are material to Plaintiffs' First Amendment claim. *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020). However, if the question of financial and administrative burden becomes relevant, then Defendants would require discovery to genuinely dispute these allegations. *See* Defendants' Rule 56(d) Motion.

Further disputed to the extent Plaintiffs rely on U-Haul's statement to claim that other companies would face a similar burden. MSJ 5:3-5. The evidence presented is limited to U-Haul alone. In any event, evidence indicates the financial and administrative burdens of disclosure under S.B. 261 are lower than Plaintiffs suggest.

ER-1699

| | | | |
|---|---|---|---|
| | | | *Evidence:* Cal. Health and Safety Code § 38533(b)(4) (avoiding duplication of reporting); SSMF 101-110 (Burton Decl. ¶¶ 10–11, 13–16, 36, 37(c); Cashion Decl. ¶ 17; Lyon Decl. ¶¶ 6, fn 1, 43–46; Georgiev Decl. ¶ 30; McLoon Decl., Ex. 3-4); SSMF 170 (Hamburger Decl., Ex. 6 (ECF 48-9) at 8:14-18); SSMF 172 (Burton Decl. ¶¶ 13-16, 19–25, 29–30, 31(h), 34(c), 37; Georgiev Decl. ¶¶ 46, 48-49, 50(e)); SSMF 176-179 (Burton Decl. ¶ 34; Georgiev Decl. ¶ 46; ECF 48-6 at 22:3–6). |
| 64. | | S.B. 253's requirement to calculate Scope 3 emissions would impose significant costs on U-Haul that U-Haul would not otherwise incur. Shoen Decl. ¶¶ 15-27. | Objection: The statement calls for a legal conclusion. The statement relies on self-serving testimony that should not be credited without an opportunity for cross examination. Disputed because the cited evidence does not establish that U-Haul is subject to the requirements of S.B. 253. Shoen Decl. (ECF 48-30) ¶¶ 3–5. |

68

ER-1700

(246 of 296) Page 246 of 296 Case: 25-5327 09/18/2025 DktEntry: 8.8 Page 246 of 296
Case 2:24-cv-00801-ODW-PVC Document 52-1 Filed 07/24/24 Page 69 of 119 Page ID
#:1497

| 1 | | | |
|---|---|---|---|
| 2 | | | |
| 3 | | | Disputed that financial and |

Disputed that financial and administrative burden are material to Plaintiffs' First Amendment claim. *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020). However, if the question of financial and administrative burden becomes relevant, then Defendants would require discovery to genuinely dispute these allegations. *See* Defendants' Rule 56(d) Motion.

Further disputed to the extent Plaintiffs rely on U-Haul's statement to claim that other companies would face a similar burden. MSJ 5:3-5. The evidence presented is limited to U-Haul alone. In any event, evidence indicates the burdens of Scope 3 disclosure under S.B. 253 are lower than Plaintiffs suggest.

*Evidence:* Cal. Health and Safety Code §§ 38532(c)(1)(D)(i) (avoiding duplication of reporting);

**ER-1701**

| | | | |
|---|---|---|---|
| | | | SSMF 101-110 (Burton Decl. ¶¶ 10–11, 13–16, 36, 37(c); Cashion Decl. ¶ 17; Lyon Decl. ¶¶ 6, fn 1, 43–46; Georgiev Decl. ¶ 30; McLoon Decl., Ex. 3-4); SSMF 170 (Hamburger Decl., Ex. 6 (ECF 48-9) at 8:14-18); SSMF 172 (Burton Decl. ¶¶ 13-16, 19–25, 29–30, 31(h), 34(c), 37; Georgiev Decl. ¶¶ 46, 48-49, 50(e)); SSMF 175 (Burton Decl. ¶ 31(h)). |
| 65. | | S.B. 253's requirement to calculate Scope 1 and 2 emissions would impose significant costs on U-Haul that U-Haul would not otherwise incur.<br><br>Shoen Decl. ¶¶ 13-14. | Objection: The statement calls for a legal conclusion. The statement relies on self-serving testimony that should not be credited without an opportunity for cross examination.<br><br>Disputed because the cited evidence does not establish that U-Haul is subject to the requirements of S.B. 253. Shoen Decl. (ECF 48-30) ¶¶ 3–5.<br><br>Disputed that financial and administrative burden are material to Plaintiffs' First Amendment |

70

ER-1702

claim. *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020). However, if the question of financial and administrative burden becomes relevant, then Defendants would require discovery to genuinely dispute these allegations. *See* Defendants' Rule 56(d) Motion.

Further disputed to the extent Plaintiffs rely on U-Haul's statement to claim that other companies would face a similar burden. MSJ 5:3-5. The evidence presented is limited to U-Haul alone. In any event, evidence suggests the burdens of disclosure under S.B. 253 is lower than Plaintiffs suggest.

*Evidence:* Cal. Health and Safety Code §§ 38532(c)(1)(D)(i) (avoiding duplication of reporting); SSMF 101-110 (Burton Decl. ¶¶ 10–11, 13–16, 36, 37(c); Cashion Decl. ¶ 17; Lyon Decl. ¶¶ 6, fn 1, 43–46; Georgiev Decl. ¶ 30;

ER-1703

| | | |
|---|---|---|
| | | McLoon Decl., Ex. 3-4); SSMF 170 (Hamburger Decl., Ex. 6 (ECF 48-9) at 8:14-18); SSMF 172 (Burton Decl. ¶¶ 13-16, 19–25, 29–30, 31(h), 34(c), 37; Georgiev Decl. ¶¶ 46, 48-49, 50(e)); SSMF 173-174 (Burton Decl. ¶¶ 29(b), 30(b)-(d)). |
| 66. | Triple H Farm is a family farm that raises beef cattle and markets them in local family-owned livestock auctions.<br><br>Declaration of Garrett Hawkins ("Hawkins Decl.") ¶¶ 1-2. | Defendants lack sufficient knowledge or information to respond to these representations, and on that basis disputes them. Moreover, this fact is not material to the matter at issue. |
| 67. | Triple H Farm is a member of the American Farm Bureau Federation.<br><br>Hawkins Decl. ¶ 1. | Defendants lack sufficient knowledge or information to respond to these representations, and on that basis disputes them. Moreover, this fact is not material to the matter at issue. |
| 68. | Triple H Farm does not operate in California or sell directly to California companies.<br><br>Hawkins Decl. ¶ 2. | Defendants lack sufficient knowledge or information to respond to these representations, and on that basis disputes them. Moreover, this fact is not material to the matter at issue. |

ER-1704

(250 of 296)  Page 250 of 296Case: 25-5327  09/18/2025  DktEntry: 8.8  Page 250 of 296
Case 2:24-cv-00801-ODW-PVC  Document 52-1  Filed 07/24/24  Page 73 of 119  Page ID
#:1501

| 69. | Triple H Farm's cattle is in the supply chain of companies that will be required to report their Scope 3 emissions under S.B. 253.<br><br>Hawkins Decl. ¶¶ 2-3. | Objection: The statement calls for a legal conclusion. The statement relies on self-serving testimony that should not be credited without an opportunity for cross examination.<br><br>Disputed.  The cited evidence does not establish that Triple H Farms' cattle are "in the supply chain of companies that will be required to report their Scope 3 emissions under S.B. 253."  Hawkins Decl. (ECF No. 48-31) ¶ 2.  This assertion is speculative.<br><br>Moreover, this fact is not material to the matter at issue.  To the extent it becomes relevant whether or not Triple H Farms' cattle are "in the supply chain of companies that will be required to report their Scope 3 emissions under S.B. 253," Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |

ER-1705

| | | |
|---|---|---|
| | | *Evidence:* Cal. Health & Safety Code § 38532(c)(1)(A)(ii) (providing that Scope 3 emissions can be determined through the use of "secondary data sources," including "industry average data, proxy data, and other generic data" rather than directly from suppliers). |
| 70. | Companies that are subject to S.B. 253 and that purchase Triple H Farm's cattle will be required to include in their Scope 3 emissions reports information about Triple H Farm's emissions.<br><br>Hawkins Decl. ¶¶ 2-3. | Objection: The statement calls for a legal conclusion. The statement relies on self-serving testimony that should not be credited without an opportunity for cross-examination.<br><br>Disputed because the cited evidence does not establish that any company doing business with Triple H Farm is subject to S.B. 253. Hawkins Decl. (ECF No. 48-31) ¶¶ 2–3. Thus, disputed that any company subject to S.B. 253 will be required to include in their Scope 3 emissions reports information about Triple H Farm's emissions. |

ER-1706

| | | Moreover, this fact is not material to the matter at issue. To the extent that it becomes relevant whether or not a company doing business with Triple H Farm is subject to S.B. 253 and will be required to report information about Triple H Farms' emissions in Scope 3 reporting, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
| | | *Evidence:* Cal. Health & Safety Code § 38532(c)(1)(A)(ii) (providing that Scope 3 emissions can be determined through the use of "secondary data sources," including "industry average data, proxy data, and other generic data" rather than directly from suppliers). |
| 71. | Triple H Farm does not track its greenhouse-gas emissions and does not have policies, procedures, or systems in place to do so.<br><br>Hawkins Decl. ¶ 4. | Objection: The statement relies on self-serving testimony that should not be credited without an opportunity for cross examination. |

**ER-1707**

| | | |
|---|---|---|
| 1 | | |
| 2 | | Defendants lack sufficient |
| 3 | | knowledge or information to |
| 4 | | respond to these representations, |
| 5 | | and on that basis disputes them. |
| 6 | | Moreover, this fact is not material to |
| 7 | | the matter at issue, as Plaintiffs have |
| 8 | | not shown that any company subject |
| 9 | | to S.B. 253 will be required to |
| 10 | | include in their Scope 3 emissions |
| 11 | | reports information about Triple H |
| 12 | | Farm's emissions and cannot show |
| 13 | | that any company would need to ask |
| 14 | | Triple H Farm to track this |
| 15 | | information itself. Cal. Health & |
| 16 | | Saf. Code § 38532(c)(1)(A)(ii) |
| 17 | | (providing that Scope 3 emissions |
| 18 | | calculations can be determined |
| 19 | | through "secondary data sources" |
| 20 | | rather than from the upstream entity |
| 21 | | itself). |
| 22 | | |
| 23 | | To the extent that it becomes |
| 24 | | relevant whether or not Triple H |
| 25 | | Farm tracks its greenhouse-gas |
| 26 | | emissions or has any policies, |
| 27 | | procedures, or systems in place to |
| 28 | | do so, Defendants would require |

ER-1708

| | | |
|---|---|---|
| | | discovery. *See* Defendants' Rule 56(d) Motion. |
| 72. | Developing an emissions tracking process would be enormously burdensome for Triple H Farm. For example, day to day, Triple H Farm requires varying levels of water, fertilizer, and other inputs. Tracking the emissions associated with these and other inputs would be a significant undertaking, for which Triple H Farm's employees have no experience.<br><br>Hawkins Decl. ¶¶ 4-5. | Objection: The statement relies on self-serving testimony that should not be credited without an opportunity for cross examination. The statement is compound in that it sets forth multiple facts. The statement lacks foundation.<br><br>Disputed that financial and administrative burden are material to Plaintiffs' First Amendment claim. *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020). Moreover, Plaintiffs have not shown that any company subject to S.B. 253 will be required to include in their Scope 3 emissions reports information about Triple H Farm's emissions and cannot show that any company would need to ask Triple H Farm to track this information itself. Cal. Health & Saf. Code § 38532(c)(1)(A)(ii) (providing that Scope 3 emissions calculations can |

| | | be determined through "secondary data sources" rather than from the upstream entity itself).

Further disputed because the cited evidence does not establish that tracking emissions associated with Triple H Farms' operation "would be enormously burdensome." Hawkins Decl. (ECF No. 48-31) ¶¶ 4.

To the extent Triple H Farm's alleged burden becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
| 73. | As a family farm, Triple H Farm would be at a significant competitive disadvantage to large farms who could spread the fixed costs of tracking greenhouse-gas emissions over much greater output.

Hawkins Decl. ¶¶ 5-6. | Objection: The statement relies on self-serving testimony that should not be credited without an opportunity for cross examination; the statement lacks foundation.

Disputed that financial and administrative burden are material to Plaintiffs' First Amendment |

ER-1710

claim. *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020). Moreover, Plaintiffs have not shown that any company subject to S.B. 253 will be required to include in their Scope 3 emissions reports information about Triple H Farm's emissions and cannot show that any company would need to ask Triple H Farm to track this information itself. Cal. Health & Saf. Code § 38532(c)(1)(A)(ii) (providing that Scope 3 emissions calculations can be determined through "secondary data sources" rather than from the upstream entity itself).

Disputed. The cited evidence does not establish that Triple H Farm is at any competitive disadvantage for "tracking greenhouse-gas emissions," as this statement is conclusory and unsupported. Hawkins Decl. (ECF No. 48-31) ¶ 5.

To the extent the impact of S.B. 253 on Triple H Farm becomes relevant,

ER-1711

| | | Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
|---|---|---|
| 74. | By requiring the firms who purchase Triple H Farm's beef to report their emissions, S.B. 253 may, in turn, require Triple H Farm to state its emissions, including to purchasers.  Triple H Farm would not otherwise make those statements.<br><br>Hawkins Decl. ¶ 7. | Objection: The statement calls for a legal conclusion. The statement relies on self-serving testimony that should not be credited without an opportunity for cross examination. The statement is compound, in that it sets forth multiple facts.<br><br>Disputed.  Plaintiffs have not established that any company subject to S.B. 253 is required to include in their Scope 3 emissions reports information about Triple H Farm's emissions.  And far from "require[ing] Triple H Farm to state its emissions," S.B. 253 provides for Scope 3 emissions to be determined without such emissions data. Cal. Health & Saf. Code § 38532(c)(1)(A)(ii) (providing that Scope 3 emissions calculations can be determined through "secondary |

**ER-1712**

| | | |
|---|---|---|
| | | data sources" rather than from the upstream entity itself).<br><br>Further, disputed because the cited evidence does not establish that S.B. 253 will "require" Triple H Farm to state its greenhouse-gas emissions and that it "would otherwise not make these statements," as both statements are speculative and/or conclusory. Hawkins Decl. (ECF No. 48-31) ¶ 7.<br><br>To the extent this statement is relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
| 75. | Triple H Farm does not believe that required emissions reports would be a fair representation of its emissions.<br><br>Hawkins Decl. ¶ 7. | Objection: The statement calls for a legal conclusion. The statement relies on self-serving testimony that should not be credited without an opportunity for cross examination. The statement lacks foundation. The phrase "fair representation of its emissions" is vague and ambiguous. |

ER-1713

| | | | |
|---|---|---|---|
| | | | Disputed. Plaintiffs have not established that any company subject to S.B. 253 is required to include in their Scope 3 emissions reports information about Triple H Farm's emissions. And the cited evidence does not establish that S.B. 253 requires Triple H Farm to state its greenhouse-gas emissions. Hawkins Decl. (ECF No. 48-31) ¶¶ 2–3, 7. Disputed that any "required emissions reports" would not be a "fair representation" of triple H Farms' emissions. *Id.* ¶ 7. Triple H has no basis to dispute the accuracy of hypothetical emissions reports prepared by an unknown entity using unknown data.<br><br>To the extent the Court finds this statement relevant, Defendants would require discovery to dispute it. *See* Defendants' Rule 56(d) Motion. |
| 76. | | White Farms and Cattle is a family farm, which has been in operation | Defendants lack sufficient knowledge or information to |

| | | |
|---|---|---|
| | for over 100 years and raises wheat, cotton, hay, and cattle.<br><br>Declaration of Michael White ("White Decl.") ¶ 1. | respond to these representations, and on that basis disputes them. Moreover, this fact is not material to the matter at issue. |
| 77. | White Farms and Cattle is a member of the American Farm Bureau Federation.<br><br>White Decl. ¶ 1. | Defendants lack sufficient knowledge or information to respond to these representations, and on that basis disputes them. Moreover, this fact is not material to the matter at issue. |
| 78. | White Farms and Cattle does not operate in California and does not sell directly to California companies.<br><br>White Decl. ¶ 2. | Defendants lack sufficient knowledge or information to respond to these representations, and on that basis disputes them. Moreover, this fact is not material to the matter at issue. |
| 79. | White Farms and Cattle's cattle is in the supply chain of companies that will be subject to Scope 3 reporting requirements under S.B. 253.<br><br>White Decl. ¶ 2. | Objection: The statement calls for a legal conclusion. The statement relies on self-serving testimony that should not be credited without an opportunity for cross examination.<br><br>Disputed. The cited evidence does not establish that White Farms and |

**ER-1715**

| | | |
|---|---|---|
| | | Cattle's cattle are "in the supply chain of any company that will be subject to the reporting requirements under S.B. 253." White Decl. (ECF No. 48-32) ¶ 2.<br><br>To the extent that whether White Farms and Cattle's cattle are "in the supply chain of companies that will be subject to the reporting requirements under S.B. 253 becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
| 80. | Companies that are subject to S.B. 253 and that purchase White Farms and Cattle's cattle will be required to include in their Scope 3 emissions reports information about White Farms and Cattle's emissions.<br><br>White Decl. ¶ 3. | Objection: The statement calls for a legal conclusion. The statement relies on self-serving testimony that should not be credited without an opportunity for cross-examination.<br><br>Disputed that any company subject to S.B. 253 "will be required to include in their Scope 3 emissions reports information about White Farms and Cattle's emissions." *Id.* ¶ 3 (citing no evidence). |

ER-1716

(262 of 296)  Page 262 of 296
Case: 25-5327  09/18/2025  DktEntry: 8.8  Page 262 of 296
Case 2:24-cv-00801-ODW-PVC  Document 52-1  Filed 07/24/24  Page 85 of 119  Page ID
#:1513

| | | |
|---|---|---|
| | | Disputed. The cited evidence does not establish that any company that purchases White Farms and Cattle's is subject to S.B. 253. White Decl. (ECF No. 48-32) ¶¶ 2–3. Disputed further that any company subject to S.B. 253 that purchases White Farms and Cattle's cattle "will be required to include in their emissions reports under S.B. 253 information about [White Farms and Cattle's] emissions." White Decl. (ECF No. 48-32) ¶ 3.

Defendants lack sufficient knowledge or information to respond to White Farms and Cattle's representations. To the extent that it becomes relevant whether or not a company doing business with White Farms and Cattle is subject to S.B. 253 and would be required to report information about White Farms and Cattle's emissions in Scope 3 reporting, Defendants would require |

**ER-1717**

| | | | |
|---|---|---|---|
| | | | discovery. *See* Defendants' Rule 56(d) Motion. |
| 81. | | White Farms and Cattle does not currently track greenhouse-gas emissions, does not have experience tracking greenhouse-gas emissions, and does not have policies, procedures, or systems in place for tracking, recording, or reporting greenhouse-gas emissions.<br><br>White Decl. ¶ 4. | Objection: The statement relies on self-serving testimony that should not be credited without an opportunity for cross-examination.<br><br>Defendants lack sufficient knowledge or information to respond to these representations, and on that basis disputes them. Moreover, this fact is not material to the matter at issue, as Plaintiffs cannot show that any company subject to S.B. 253 will be required to include in their Scope 3 emissions reports information about White Farms and Cattle's emissions, nor that they would ask White Farms and Cattle to track this information itself. Cal. Health & Saf. Code § 38532(c)(1)(A)(ii) (providing that Scope 3 emissions calculations can be determined through "secondary data sources" rather than from the upstream entity itself). |

ER-1718

| | | |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | To the extent that it becomes |
| 4 | | relevant whether or not White |
| 5 | | Farms and Cattle tracks its |
| 6 | | greenhouse-gas emissions or has |
| 7 | | any policies, procedures, or systems |
| 8 | | in place to do so, Defendants would |
| 9 | | require discovery. See Defendants' |
| 10 | | Rule 56(d) Motion. |
| 11 | 82. | Developing the policies, | Objection: The statement relies on |
| 12 | | procedures, or systems for tracking | self-serving testimony that should |
| 13 | | greenhouse-gas emissions would be | not be credited without an |
| 14 | | enormously burdensome for White | opportunity for cross examination. |
| 15 | | Farms and Cattle.  For example, on | The statement is compound in that it |
| 16 | | any given day, White Farms and | sets forth multiple facts. The |
| 17 | | Cattle requires varying levels of | statement lacks foundation. |
| 18 | | water, fertilizer, and crop | |
| 19 | | protection products.  Tracking | Disputed that financial and |
| 20 | | these fluctuations in the context of | administrative burden are material |
| 21 | | measuring greenhouse-gas | to Plaintiffs' First Amendment |
| 22 | | emissions would be an enormous | claim. *Am. Hosp. Ass'n v. Azar*, 983 |
| 23 | | undertaking, for which White | F.3d 528, 541 (D.C. Cir. 2020). |
| 24 | | Farms and Cattle has no pre- | Moreover, Plaintiffs cannot show |
| 25 | | existing procedures, policies, or | that any company subject to S.B. |
| 26 | | systems in place. | 253 will be required to include in |
| 27 | | | their Scope 3 emissions reports |
| 28 | | | |

ER-1719

| | | |
|---|---|---|
| | White Decl. ¶¶ 4-5. | information about White Farms and Cattle's emissions, or that they would ask White Farms and Cattle to track this information itself. Cal. Health & Saf. Code § 38532(c)(1)(A)(ii) (providing that Scope 3 emissions calculations can be determined through "secondary data sources" rather than from the upstream entity itself).<br><br>Further disputed because the cited evidence does not establish that tracking emissions associated with White Farms and Cattle's operation "would be enormously burdensome." White Decl. (ECF No. 48-32) ¶ 4.<br><br>To the extent White Farms and Cattle's alleged burden becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
| 83. | As a family farm, White Farms and Cattle would be at a significant | Objection: The statement relies on self-serving testimony that should |

| | |
|---|---|
| competitive disadvantage to larger farms who could spread the fixed costs of tracking greenhouse-gas emissions over more units of output.<br><br>White Decl. ¶ 5. | not be credited without an opportunity for cross examination; the statement lacks foundation.<br><br>Disputed that financial and administrative burden are material to Plaintiffs' First Amendment claim. *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020). Moreover, Plaintiffs cannot show that any company subject to S.B. 253 will be required to include in their Scope 3 emissions reports information about White Farms and Cattle's emissions, or that they would ask White Farms and Cattle to track this information itself. Cal. Health & Saf. Code § 38532(c)(1)(A)(ii) (providing that Scope 3 emissions calculations can be determined through "secondary data sources" rather than from the upstream entity itself).<br><br>Disputed because the cited evidence does not establish that White Farms and Cattle is at any competitive |

**ER-1721**

| | | |
|---|---|---|
| | | disadvantage for "tracking greenhouse-gas emissions," as this statement is conclusory and unsupported. White Decl. (ECF No. 48-32) ¶ 5.<br><br>To the extent the impact of S.B. 253 on White Farms and Cattle becomes relevant, Defendants would require discovery. *See* Defendants' Rule 56(d) Motion. |
| 84. | If White Farms and Cattle's purchasers are required to report their Scope 3 emissions, White Farms and Cattle, in turn, could be required to make statements about its emissions.<br><br>White Decl. ¶ 7. | Objection: The statement calls for a legal conclusion. The statement relies on self-serving testimony that should not be credited without an opportunity for cross examination. The statement is compound, in that it sets forth multiple facts.<br><br>Disputed that Plaintiffs have established that any company subject to S.B. 253 is required to include in their Scope 3 emissions reports information about White Farms and Cattle's emissions. Further disputed that any entity |

| | | |
|---|---|---|
| 1 | | |
| 2 | | subject to S.B. 253 would ask White |
| 3 | | Farms and Cattle's to prepare and |
| 4 | | state its emissions itself. Cal. Health |
| 5 | | & Saf. Code § 38532(c)(1)(A)(ii) |
| 6 | | (providing that Scope 3 emissions |
| 7 | | calculations can be determined |
| 8 | | through "secondary data sources" |
| 9 | | rather than from the upstream entity |
| 10 | | itself). |
| 11 | | |
| 12 | | Disputed because the cited evidence |
| 13 | | does not establish that S.B. 253 |
| 14 | | could require White Farms and |
| 15 | | Cattle to "make statements about |
| 16 | | [its] emissions." White Decl. (ECF |
| 17 | | No. 48-32) ¶ 7. |
| 18 | | |
| 19 | | To the extent that it becomes |
| 20 | | relevant that White Farms and |
| 21 | | Cattle would be required to "make |
| 22 | | statements about [its] emissions", |
| 23 | | Defendants would require |
| 24 | | discovery. *See* Defendants' Rule |
| 25 | | 56(d) Motion. |
| 26 | 85. | White Farms and Cattle does not | Objection: The statement calls for a |
| 27 | | believe the statements that it would | legal conclusion. The statement |
| 28 | | | |

**ER-1723**

| | |
|---|---|
| be required to make about greenhouse-gas emissions would accurately portray White Farms and Cattle's emissions.

White Decl. ¶ 7. | relies on self-serving testimony that should not be credited without an opportunity for cross examination. The statement lacks foundation. The phrase "accurately portray" is vague and ambiguous.

Disputed that Plaintiffs have established that any company subject to S.B. 253 is required to include in their Scope 3 emissions reports information about White Farms and Cattle's emissions. Further disputed because the cited evidence does not establish that S.B. 253 requires White Farms and Cattle to state its greenhouse-gas emissions. White Decl. (ECF No. 48-32) ¶¶ 2–3, 7. Further disputed that any entity subject to S.B. 253 would ask White Farms and Cattle's to prepare and state its emissions itself. Cal. Health & Saf. Code § 38532(c)(1)(A)(ii) (providing that Scope 3 emissions calculations can be determined through "secondary |

ER-1724

| | | | |
|---|---|---|---|
| | | data sources" rather than from the upstream entity itself). | |
| | | Disputed that any statements that it would be required to make about greenhouse-gas emissions would not "accurately portray" of White Farms and Cattle's emissions. *Id.* ¶ 7. White Farms and Cattle's has no basis to dispute the accuracy of hypothetical emissions reports prepared by an unknown entity using unknown data. | |
| | | To the extent the Court finds this statement relevant, Defendants would require discovery to further dispute it. *See* Defendants' Rule 56(d) Motion. | |

| No. | Defendants' Uncontroverted Facts | Supporting Evidence |
|---|---|---|
| 86. | In the Assembly Committee on Natural Resources' May 23, 2023, Analysis of S.B. 253, Senator Scott Weiner identified the purposes of | Declaration of Caitlan McLoon (McLoon Decl.) Ex. 1 at 6–7. |

93

| | | |
|---|---|---|
| | SB 253, including that "SB 253 would bolster California's position as a leader on climate change, will allow for consumers to make informed decisions regarding their patronage of these corporations, and will give policymakers the specific data required to significantly decrease corporate emissions." | |
| 87. | During a May 30, 2023 California Senate Floor Session debate on S.B. 253, Senator Weiner explained that, "SB 253 will allow for much-needed transparency and consistency by requiring full disclosure of the three scopes of emission from all covered corporations." | Hamburger Decl., Ex. 4 (ECF 48-7) at p 3:2–5. |
| 88. | During a March 15, 2023 California Senate Environmental Quality Committee Hearing on S.B. 253, Senator Weiner stated, "Just looking big picture, this [bill] is about information and transparency.  This bill does not | Hamburger Decl., Ex. 2 (ECF 48-5) at p. 32:25–33:9. |

94

ER-1726

| | | |
|---|---|---|
| | regulate these companies.  It does not require them to do anything to change their missions [sic]. . . . All this does is tell us what your carbon footprint is just like all these other corporations here and around the world are already doing." | |
| 89. | The California Senate Judiciary Committee April 14, 2023 analysis of S.B. 253 stated, "According to the National Oceanic and Atmospheric Administration (NOAA), global temperatures rose 1.8 degrees Fahrenheit between 1901 and 2020.  While that might not sound like much, global warming to date has caused dramatic global climate change, including increasingly rapid sea level rise, shrinking glaciers, and more erratic weather (such as floods and droughts)." | Hamburger Decl., Ex. 7 (ECF 48-10) at 8. |
| 90. | The California Senate Judiciary Committee April 14, 2023 analysis of S.B. 253 included a statement by bill author Senator Weiner, stating, | Hamburger Decl., Ex. 7 (ECF 48-10) at 7. |

ER-1727

(273 of 296) Page 273 of 296
Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 273 of 296
Case 2:24-cv-00801-ODW-PVC Document 52-1 Filed 07/24/24 Page 96 of 119 Page ID #:1524

| | | |
|---|---|---|
| | "Without [emission reporting] requirements for these corporate entities, California is left without proper information and will not be able to accurately regulate and reduce these emissions." | |
| 91. | The California Senate Judiciary Committee April 14, 2023 analysis of S.B. 253 stated, "requiring very large companies to report scope 1, 2, and 3 emissions serves a legitimate local interest" in part, because "so many companies make unverified climate 'pledges' that may help sell products without making a meaningful difference." | Hamburger Decl., Ex. 7 (ECF 48-10) at 12. |
| 92. | At a March 15, 2023 California Senate Environmental Quality Committee Hearing, Sarah Sachs from Ceres said the following regarding S.B. 253: "The current voluntary climate emissions reporting landscape is fragmented, incomplete, and often unverified . . .creat[ing] a massive blind spot for | Hamburger Decl., Ex. 2 (ECF No. 48-5) at 9:19 – 10:1. |

96

ER-1728

| | | |
|---|---|---|
| | consumers, investors, and policy makers who are seeking to derive meaningful insights across the entire economy." | |
| 93. | Climate risk reporting is increasingly important to underwriters in making risk assessments. | Burton Decl. ¶ 15. |
| 94. | The information disclosed under S.B. 253 and 261 is material to insurance providers. | Burton Decl. ¶ 15; Georgiev Decl. ¶¶ 33, 50(c). |
| 95. | The Greenhouse Gas Protocol is a globally accepted reporting framework. | Burton Decl. ¶¶ 10, 14; Hamburger Decl., ECF 48-5, Ex. 2 at 26:10–25; Hamburger Decl., Ex. 4 (ECF 48-7) at 3:8–11; Hamburger Decl., Ex. 7 (ECF 48-10) at 8–10; Hamburger Decl., Ex. 3 (ECF 48-6) at 2:14-15; Georgiev Decl. ¶¶ 29-30. |
| 96. | The Greenhouse Gas Protocol is aligned with traditional financial reporting principles. | Burton Decl. ¶¶ 10, 17, 19–25, 28. |
| 97. | The TCFD is a globally accepted reporting framework. | Burton Decl. ¶¶ 11, 14, 36, 37(c); Cashion Decl. ¶¶ 17, 21; Hamburger Decl., Ex. 23 (ECF 48-26) at 5–6; Georgiev Decl. ¶ 33. |

ER-1729

| 98. | The TCFD is aligned with traditional financial reporting principles. | Burton Decl. ¶¶ 11, 17, 19, 21–25, 37. |
|---|---|---|
| 99. | The TCFD's working groups included representatives of large investors (including BlackRock and UBS Asset Management), banks (JP Morgan, Citibanamex), insurance companies (Aviva, Swiss Re, Axa), giant industrial firms (BHP, Eni, Tata Steel, Unilever), rating agencies (Moody's, S&P), accounting firms (Deloitte, E&Y), and others. | Georgiev Decl. ¶ 33. |
| 100. | The National Association of Insurance Commissioners (NAIC) has endorsed the TCFD reporting framework for use in its annual Climate Risk Disclosure Survey. | Georgiev Decl. ¶ 50(c). |
| 101. | Thousands of companies have for years publicly reported their climate risks and other climate metrics under voluntary frameworks. | Burton Decl. ¶¶ 13–16; Lyon Decl. ¶¶ 43–46; Georgiev Decl. ¶ 30; McLoon Decl., Ex. 3-4. |
| 102. | Under one such voluntary program, known as the CDP (formerly the Carbon Disclosure Project), over 23,000 firms disclosed emissions | Burton Decl. ¶ 14, Ex. 7; Lyon Decl. ¶ 45; McLoon Decl., Ex. 3-4. |

ER-1730

| | | |
|---|---|---|
| | and climate-related risk information in 2023, including 86% of companies in the S&P 500. | |
| 103. | The TCFD is already being used by a significant portion of companies subject to S.B. 261, many of whom voluntarily report this information or are subject to similar reporting requirements from other jurisdictions. | Burton Decl. ¶¶ 11, 14, 36, 37(c); Cashion Decl. ¶ 17. |
| 104. | 58% of public companies surveyed by the Financial Stability Board (FSB) disclosed at least five of the TCFD's 11 recommended climate-risk disclosures. | Burton Decl. ¶ 14, Ex. 9 at iv. |
| 105. | 71% of companies surveyed by the AICPA in 2022 used the TCFD framework for their climate-risk reporting. | Burton Decl. ¶ 14, Ex. 8 at 11. |
| 106. | The GHG Protocols are being used by a significant portion of the companies subject to S.B. 253, many of whom voluntarily report this information or are subject to similar reporting requirements from other jurisdictions. | Burton Decl. ¶¶ 10, 14; Lyon Decl. ¶ 6, fn 1. |
| 107. | Approximately 82% of S&P 500 | Georgiev Decl. ¶ 30. |

ER-1731

| | | |
|---|---|---|
| | companies already report Scope 1 and Scope 2 emissions under GHG Protocol methodologies. | |
| 108. | Disclosures of Scope 1 and Scope 2 GHG emissions are frequently included in SEC-filed reports subject to securities law liability and, in many cases, subject to CEO and CFO certifications as to the veracity of the information. | Georgiev Decl. ¶ 30. |
| 109. | 92% of Fortune 500 companies that responded to CDP in 2016 were reported to have utilized the GHG Protocol as the basis for calculating reported emissions. | Burton Decl. ¶ 14, Ex. 3. |
| 110. | Many companies disclose the same or similar information as required under S.B. 253 and 261 because it is relevant to contract formation, insurance coverage, merger and acquisition activity, investor engagement, and consumer outreach. | Burton Decl. ¶¶ 13, 15; Cashion Decl. ¶ 17; Georgiev Decl. ¶ 50(e). |
| 111. | Companies subject to federal securities laws and regulations must disclose information on a variety of topics, all of which are made public, | Georgiev Decl. ¶ 17. |

100

ER-1732

| | | |
|---|---|---|
| | including corporate governance arrangements, risks faced by the company or associated with investing in its securities; management's assessment of the factors it believes have affected past performance as well as known trends or uncertainties that are reasonably expected to impact future results in the near and long term; and even more esoteric topics, like "golden parachutes," the use of conflict minerals in the supply chain, mine safety, activities in breach of U.S. sanctions on Iran, and more. | |
| 112. | SEC-regulated companies had to report on the impacts to their companies of the "Year 2000" (Y2K) problem, the Covid-19 pandemic, high rates of inflation, and Russia's war on Ukraine. | Georgiev Decl. ¶¶ 19(b), 19(c). |
| 113. | The SEC required companies to make predictive statements about Y2K's impact on their operations, including disclosure both by companies that had not completed | Georgiev Decl. ¶ 19(c). |

101

ER-1733

| | | |
|---|---|---|
| | an assessment of their Y2K issues, and by companies that had completed their assessment and had determined that "the consequences of [their] Year 2000 issues would have a material effect on the company's business, results of operations, or financial condition, without taking into account the company's efforts to avoid those consequences." | |
| 114. | Many multinational companies or U.S.-based companies with international subsidiaries are required—depending on size—to provide emissions and climate risk reporting to the EU's Corporate Sustainability Reporting Directive, and/or the International Sustainability Standards Board's IFRS Sustainability Disclosure Standards. | Hamburger Decl., Ex. 7 (ECF 48-10) at 10; Georgiev Decl. ¶¶ 50(a), 50(b). |
| 115. | During a May 30, 2023 California Senate Floor Session debate on S.B. 253, Senator Wiener stated, "reporting requirements are limited to large point source emitters like | Hamburger Decl., Ex. 4 (ECF 48-7) at 2:7–3:1. |

| | | |
|---|---|---|
| | refineries leaving out vast swaths of corporate emissions. Some companies voluntarily report their emissions, but without uniformity around these reports, it's impossible to be certain if emissions are being reported in their entirety . . .[or] at all." | |
| 116. | During a September 11, 2023 California Assembly Floor Session debate on S.B. 253, Assembly member Christopher Ward stated: "Many corporations offer partial reports to the public or they section off parts of their operations to display to the public. So the lack of verification and uniformity allows for manipulations and misrepresentation of the data." | Hamburger Decl., Ex. 6 (ECF 48-9) at 3:10–15. |
| 117. | The GHG Protocol does not require companies to obtain data from suppliers. | Burton Decl. ¶ 31(g); Hamburger Decl., Ex. 8 (ECF 48-11) at 6:19-25. |
| 118. | Over 90% of the 170 companies targeted by the Climate Action 100+ have taken steps to align their climate-related reporting with the TCFD recommendations. | Cashion Decl. ¶ 17. |

ER-1735

| 119. | S.B. 261 does not require companies to take any policy position on climate change. | Burton Decl. ¶¶ 35, 38–39; Georgiev Decl. ¶¶ 19-21, 29-33. |
|---|---|---|
| 120. | S.B. 261 allows companies to determine what climate risks, if any, they anticipate will impact their business. | Burton Decl. ¶¶ 35, 38–39. |
| 121. | S.B. 261 does not require companies to take any particular action in regards to climate-related financial risk or adopt any particular business strategy. | Burton Decl. ¶¶ 35, 38–39. |
| 122. | The TCFD framework leaves decisions about the presentation of the underlying information to the reporting entity. | Georgiev Decl. ¶ 32. |
| 123. | The Legislature passed S.B. 253 and 261 in response to the expressed desire of several major companies and investor groups. | Hamburger Decl., Ex. 3 (ECF 48-6) at 7:10–13; Hamburger Decl., Ex. 24 (ECF 48-27) at 6. |
| 124. | Lawmakers were aware of the benefits S.B. 253 disclosures could have for the interests of consumers. | Hamburger Decl., Ex. 2 (ECF No. 48-5) at 10:11-14; Hamburger Decl., Ex. 6 (ECF No. 48-9) at 5:3–13; Hamburger Decl., Ex. 7 (ECF No. 48-10) at 12. |
| 125. | Lawmakers were aware of the benefits S.B. 253 and S.B. 261 | Hamburger Decl., Ex. 5 (ECF 48-8) at 7:4–11; Decl. McLoon Ex. 2 |

104

**ER-1736**

| | | |
|---|---|---|
| | disclosures could have for the interests of investors. | (Senate Committee on Environmental Quality Analysis for January 15, 2023 hearing) at 2–3. |
| 126. | Many companies, including economically-significant private companies, already face requests for climate-related information from their contractual counterparties who need to comply with various specialized climate-related reporting requirements of their own. | Georgiev Decl. ¶ 50(e). |
| 127. | Companies are already providing climate-related information to banks and other financial institutions, which are encouraged by prudential regulators to focus on the management of climate-related risk within their portfolios. | Georgiev Decl. ¶ 50(e). |
| 128. | Many companies advertise their business as "green" or emissions conscious. | Hamburger Decl., Ex. 2 (ECF No. 48-5) at 2:25-3:11; Lyon Decl. ¶¶ 19–23. |
| 129. | Many of Plaintiffs' own member companies have advertised themselves as adhering to "net zero" emissions goals and other climate-related adaptation goals. | McLoon Decl., Ex. 5 (Amazon), Ex. 6 (ATT), Ex. 7 (U-Haul). |
| 130. | The Legislature designed Senate | Hamburger Decl., Ex. 2 (ECF No. |

**ER-1737**

| | | |
|---|---|---|
| | Bills 253 and 261 to, in part, prevent companies from making potentially misleading statements. | 48-5) at 3:3-11, 6:24-25, 33:10-25. |
| 131. | S.B. 253 and 261 provide consumers and investors with information that is accurate, transparent, and comparable. | Lyon Decl. ¶ 28; Burton Decl. ¶ 21. |
| 132. | Traditional financial accounting principles accept the reliance on estimates for calculations. | Burton Decl. ¶¶ 23–25, 28–33; Georgiev Decl. ¶¶ 18-19, 23-27. |
| 133. | The accuracy of federal securities disclosure requirements is underwritten through the use of methodologies that involve sampling techniques, statistical methods, machine learning, informed estimates, and expert judgments. | Georgiev Decl. ¶ 24. |
| 134. | The use of estimates in disclosure requirements promotes accuracy because estimates allow for companies to present a more complete picture of their business and financial condition than would be possible if they were required to limit disclosure to non-estimates. | Georgiev Decl. ¶ 25. |

ER-1738

| 135. | Companies routinely rely on information involving estimates and methodological discretion in making investment and business decisions that involve large financial outlays. | Georgiev Decl. ¶ 26. |
| --- | --- | --- |
| 136. | Since 1978, public companies have been required to disclose information about the volume, value, and attributes of their oil and gas reserves and related matters as part of federal securities disclosure requirements. | Georgiev Decl. ¶ 23(a). |
| 137. | Information disclosed regarding oil and gas reserves is an essential aspect of the valuation of any company in the extractive industries and firms routinely have to make estimates and assumptions in order to calculate and report it. | Georgiev Decl. ¶ 23(a). |
| 138. | In the context of acquisitions, the volume and valuation of a potential target's oil and gas reserves are of paramount importance. Indeed, the oil and gas M&A boom that occurred during the 1980s has been attributed directly to the disclosure | Georgiev Decl. ¶ 26(a). |

107

**ER-1739**

| | | |
|---|---|---|
| | of reserve information that resulted from the adoption of an SEC disclosure rule in 1978. | |
| 139. | In the area of financial accounting, companies routinely rely on critical accounting policies and practices that require management to make judgments about the effects of matters that are inherently uncertain, which, in turn, invariably entail critical accounting estimates. | Georgiev Decl. ¶ 23(c). |
| 140. | The use of critical accounting estimates and the development (and disclosure) of critical accounting policies promote accuracy and verifiability and are generally welcomed by the users of the information. | Georgiev Decl. ¶ 23(c). |
| 141. | Traditional financial accounting principles often require companies to choose between equally acceptable accounting policies for various reporting obligations. | Burton Decl. ¶ 31(e).<br>Georgiev Decl. ¶ 25. |
| 142. | Allowing firms to report partial emissions, or to discount their emissions reduction projects (i.e. "avoided emissions"), in lieu of | Lyon Decl. ¶¶ 18–26, 39. |

**ER-1740**

| | | |
|---|---|---|
| | disclosing their total emissions, is highly misleading. | |
| 143. | When firms make disclosures relating to anticipated risks in compliance with applicable federal securities requirements, they are reporting their business judgments about the matters in question. The required disclosures are factual to the extent that they accurately report the firm's business judgments. | Georgiev Decl. ¶ 21; Georgiev Decl. ¶¶ 19(a), (d). |
| 144. | The reality of climate change is uncontroversial in the scientific community. | Scheehle Decl. ¶¶ 7–14; *id.*, Exs. 1–29. |
| 145. | Consistent with the scientific consensus, studies show that the effects of rising greenhouse gas emissions and temperatures on global climate and weather patterns include rising sea levels, ocean acidification, increasingly intense wildfires, higher risk of flooding, and less reliable snowpack. | Scheehle Decl. ¶¶ 14–17; *id.*, Exs. 15–29. |
| 146. | The consideration of climate-related risk is uncontroversial in the business community. | Burton Decl. ¶¶ 13–17, 37; Cashion Decl. ¶¶ 9–17. |
| 147. | The information disclosed under | Burton Decl. ¶ 15; Cashion Decl. ¶¶ |

109

(287 of 296), Page 287 of 296 Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 287 of 296
Case 2:24-cv-00801-ODW-PVC Document 52-1 Filed 07/24/24 Page 110 of 119 Page ID
#:1538

| | | S.B. 253 and 261 is material to investors. | 10–22; Lyon Decl. ¶¶ 32–40. |
|---|---|---|---|
| | 148. | CalPERS is the largest public defined benefit pension fund in the United States, with approximately $500 billion in assets. | Cashion Decl. ¶ 5. |
| | 149. | CalPERS must discharge its responsibilities for the exclusive purpose of providing benefits to participants and beneficiaries. | Cashion Decl. ¶ 7. |
| | 150. | CalPERS supports the disclosure of Scope 1, 2, and 3 emissions because it is material for making its investment decisions. | Cashion Decl. ¶¶ 13–14. |
| | 151. | CalPERS supports requiring all companies to disclose their climate-related financial risks, and any measures adopted to reduce and/or adapt to that risk to better understand the financial implications to investments. | Cashion Decl. ¶ 15. |
| | 152. | CalPERS has expressed that "[t]he consideration of climate-related financial risk and other factors is a necessary component of being an informed and responsible investor." | Cashion Decl. ¶ 12. |
| | 153. | CalPERS has stated that it "sees the | Cashion Decl. ¶ 16. |

ER-1742

| | | |
|---|---|---|
| | same risks and would benefit from the same climate related disclosures from private companies" as it does from public companies. | |
| 154. | The value of emissions and climate-risk information to California investors is not limited to the effects within the State, but rather, the performance of the company as a whole and whether the firm is an appropriate recipient of their money. | Cashion Decl. ¶¶ 9–22. |
| 155. | California's public pension funds need to employ active investment strategies that depend on adequate information, because they rely on a defined benefit model. | Georgiev Decl. ¶ 55. |
| 156. | The California state government has a compelling interest in maintaining the health and solvency of California's public pension funds because it functions as the guarantor of the funds' obligations | Georgiev Decl. ¶ 57. |
| 157. | Of the 100 public pension funds nationally that have defined-benefit assets under management over $5 billion, 18 are California-based. | Georgiev Decl. ¶ 56. |

111

ER-1743

| 158. | The total assets represented by those 18 pension funds amount to $1.07 trillion. The share of California's total assets as a percentage of U.S. total assets was 23%. | Georgiev Decl. ¶ 56. |
|---|---|---|
| 159. | The information disclosed under S.B. 253 and 261 is material to consumers. | Lyon Decl. ¶ 41. |
| 160. | The information disclosed under S.B. 253 and 261 is material to employees. | Lyon Decl. ¶ 42. |
| 161. | Greenwashing has increased in prevalence in recent years. | Lyon Decl. ¶ 21. |
| 162. | Voluntary disclosure leads to selective disclosure, which is highly misleading. | Lyon Decl. ¶ 18-26. |
| 163. | The purpose of advertising as green is to increase investor confidence, influence investor and consumer behavior. | Lyon Decl. ¶¶ 6, 18–20. |
| 164. | S.B. 253 and 261 will prevent the prevalence of misleading information on emissions and other metrics by companies doing business in the state. | Lyon Decl. ¶¶ 26–28. |
| 165. | Scope 1, 2, and 3 emissions reporting and climate risk reporting | Lyon Decl. ¶ 10, 17, 26, 36. |

ER-1744

| | | |
|---|---|---|
| | are necessary to combat greenwashing. | |
| 166. | There is a concrete connection between implementation of reporting frameworks and improved environmental performance, including in particular between carbon disclosure and GHG emissions reductions | Hamburger Decl., Ex. 1 (ECF No. 48-4) at p 1; Lyon Decl. ¶¶ 47–51. |
| 167. | By closing the informational gap between polluters and their stakeholders, the simple disclosure of environmental performance tends to lead facilities to reduce their emissions of pollutants. | Lyon Decl. ¶¶ 47-51. |
| 168. | The California Legislature considered that, by requiring greater transparency about emissions and climate risks, S.B. 253 and 261 may encourage—through the market forces of third parties' independent economic decisions and actions— companies doing business in California to reduce their emissions and thereby mitigate the risks California and its residents face from climate change | Hamburger Decl., Ex. 1 (ECF No. 48-4) at p 1; Hamburger Decl., Ex. 6 (ECF No. 48-9) at 7:3-8. |

ER-1745

| 169. | The emissions reductions associated with disclosure regimes are a product of independent action by non-governmental stakeholders who use the information. | Burton Decl. ¶¶ 13, 15; Cashion Decl. ¶¶ 11–12, 17, 22. |
|---|---|---|
| 170. | The vast majority of companies with disclosure obligations under S.B. 253 and 261 need expend only 0.025 percent of their annual revenue in preparing the data. | Hamburger Decl., Ex. 6 (ECF 48-9 at 8:14–18). |
| 171. | Companies possess more detailed and accurate data about their own internal operations and impacts than do external observers. | Lyon Decl. ¶ 10, 14. |
| 172. | The vast majority of companies with disclosure obligations under S.B. 253 and 261 already have the reporting infrastructure and data necessary to prepare the required information with minimal burden | Burton Decl. ¶¶ 13-16, 19–25, 29–30, 31(h), 34(c), 37; Georgiev Decl. ¶¶ 46, 48-49, 50(e). |
| 173. | The data sources for scope 1 emissions are common business records available to any organization. | Burton Decl. ¶ 29(b). |
| 174. | The data sources for scope 2 emissions are common business records available to any | Burton Decl. ¶ 30(b)-(d). |

114

| | | |
|---|---|---|
| | organization. | |
| 175. | The data sources for scope 3 emissions can be calculated using primary data from specific activities within a company's value chain, which in some cases is readily available from third parties or internal company records. | Burton Decl. ¶ 31(h). |
| 176. | The governance disclosure requirements of the TCFD are not challenging to capture as they are similar to governance and oversight disclosures found in financial reporting, simply applied to climate risk. | Burton Decl. ¶ 34(a). |
| 177. | It would be unusual for companies within the scope of S.B. 261 to not have existing strategic and financial planning programs akin to those required by the strategy disclosure under TCFD. | Burton Decl. ¶ 34(b); Georgiev Decl. ¶ 46. |
| 178. | It would be commonplace for entities subject to S.B. 261 to have existing and active risk management practices akin to those required by the risk management disclosure under TCFD. | Burton Decl. ¶ 34(c); Georgiev Decl. ¶ 46. |

115

| | | |
|---|---|---|
| 179. | At an April 18, 2023 California Senate Judiciary Committee Hearing, Senator Scott Weiner, author of S.B. 253 stated, "This is a simple disclosure. We required other disclosures of corporations. This is completely reasonable. Huge corporations are already doing this." | ECF 48-6 at 22:3–6. |
| 180. | Scope 3 emissions data is material to investors, consumers, and other stakeholders. | Cashion Decl. ¶ 14; Lyon Decl. ¶ 35–40. |
| 181. | Because of the process undertaken for the reporting of scope 3 emissions information, there is general market consensus that the methods allowed within each category produce meaningful, accurate information. | Burton Decl. ¶ 31(f) |
| 182. | CalPERS has stated that it "supports requiring disclosure of Scope 3 emissions because it is material in all companies." | Cashion Decl. ¶ 14. |
| 183. | Conditioning the Disclosure Laws' applicability on public company status would be ineffective because it would be both underbroad and overbroad. | Georgiev Decl. ¶¶ 39-45. |

ER-1748

| | | |
|---|---|---|
| 184. | Conditioning the Disclosure Laws' applicability on public company status would be underbroad because it would fail to capture economically significant entities, i.e., private companies that meet the revenue thresholds. | Georgiev Decl. ¶ 41. |
| 185. | Conditioning the Disclosure Laws' applicability on public company status alone would be overbroad too, because it would capture at least 1,704 public companies that do not meet S.B. 253's revenue threshold. | Georgiev Decl. ¶¶ 44-45. |
| 186. | The "public company" category increasingly fails to capture economically-significant entities due to a series of recent deregulatory and market developments. | Georgiev Decl. ¶ 37. |
| 187. | No overarching rationale exists for confining the applicability of disclosure obligations to public companies. | Georgiev Decl. ¶ 40. |
| 188. | Multiple existing and recently-proposed disclosure requirements, including from California, from the | Georgiev Decl. ¶ 40. |

ER-1749

| | | |
|---|---|---|
| | federal government, and from non-U.S. jurisdictions, rely on the same objective annual revenue metric for applicability as the Disclosure Laws, without regard to public or private status of the company. | |
| 189. | It is unclear whether there any companies doing business in California with over $500 million in annual revenue that lack outside investors, whether public or private. | Georgiev Decl. ¶ 47. |

Dated:  July 24, 2024

Respectfully submitted,

ROB BONTA
Attorney General of California
GARY E. TAVETIAN
MYUNG J. PARK
Supervising Deputy Attorneys General
M. ELAINE MECKENSTOCK
CAITLAN MCLOON
EMILY HAJARIZADEH
DYLAN REDOR
KATHERINE GAUMOND
Deputy Attorneys General

*/s/ Caitlan McLoon*

CAITLAN MCLOON
Deputy Attorney General
*Attorneys for Defendants Liane M. Randolph, Steven S. Cliff, and Robert A. Bonta*

SA2024300503
66957261.docx

ER-1750

(296 of 296), Page 296 of 296 Case: 25-5327, 09/18/2025, DktEntry: 8.8, Page 296 of 296
Case 2:24-cv-00801-ODW-PVC   Document 52-1   Filed 07/24/24   Page 119 of 119   Page ID
#:1547

# CERTIFICATE OF SERVICE

Case Name:    **Chamber of Commerce of the United States of America, et al.**
              **v. Liane M. Randolph, et al.**

Case No.:     __**2:24-cv-00801-ODW-PVC**_____

I hereby certify that on July 24, 2024, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## DEFENDANTS' SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on July 24, 2024, at Los Angeles, California.

| Beatriz Davalos | /s/ Beatriz Davalos |
|:---:|:---:|
| Declarant | Signature |

**ER-1751**