No. 25-5327

# United States Court of Appeals
# for the Ninth Circuit

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION,

*Plaintiffs-Appellants,*

v.

LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California,

*Defendants-Appellees.*

On Appeal from an order of the
United States District Court for the Central District of California,
Case No. 2:24-cv-801, Judge Otis D. Wright, II

## EXCERPTS OF RECORD – VOLUME 8 OF 9

Stephanie A. Maloney
Kevin Palmer
CHAMBER OF COMMERCE OF THE
  UNITED STATES OF AMERICA
1615 H St., N.W.
Washington, DC 20062
(202) 659-6000

*Counsel for Plaintiff-Appellant Chamber of Commerce of the United States of America*

Eugene Scalia
Jonathan C. Bond
Brian A. Richman
GIBSON, DUNN & CRUTCHER LLP
1700 M St., N.W.
Washington, DC 20036
(202) 955-8500
EScalia@gibsondunn.com

Bradley J. Hamburger
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071
(213) 229-7000

*Counsel for Plaintiffs-Appellants*

ROB BONTA
Attorney General of California
GARY E. TAVETIAN (SBN 117135)
MYUNG J. PARK (SBN 210866)
Supervising Deputy Attorneys General
M. ELAINE MECKENSTOCK (SBN 268861)
CAITLAN MCLOON (SBN 302798)
EMILY HAJARIZADEH (SBN 325246)
DYLAN REDOR (SBN 338136)
KATHERINE GAUMOND (SBN 349453)
Deputy Attorneys General
  300 South Spring Street, Suite 1702
  Los Angeles, CA 90013-1230
  Telephone: (213) 269-6438
  Fax: (916) 731-2128
  E-mail: Caitlan.McLoon@doj.ca.gov
*Attorneys for Defendants Liane M. Randolph,
Steven S. Cliff, and Robert A. Bonta*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION,**<br><br>Plaintiffs,<br><br>v.<br><br>**LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California,**<br><br>Defendants. | 2:24-cv-00801-ODW-PVC<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON CLAIM I**<br><br>Date: September 9, 2024<br>Time: 1:30 PM<br>Courtroom: 5D<br>Judge: The Honorable Otis D. Wright, II<br><br>Trial Date: Not Set<br>Action Filed: 1/30/2024 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ............................................................................................................. 1

Background ............................................................................................................. 2

I.    Senate Bills 253 and 261 ........................................................................ 2

    A.    Reporting Obligations Are An Ordinary and Expected Part of Doing Business ................................................. 2

    B.    Senate Bills 253 and 261 Build on Existing Corporate Climate-Related Reporting and Disclosure Practices in Wide Use .................................................................................. 3

    C.    Senate Bill 253 Requires the Largest Companies Doing Business in California to Report GHG Emissions in Accordance with Widely Accepted Protocols ..................... 4

    D.    Senate Bill 261 Requires the Largest Companies Doing Business in California to Disclose Climate-Related Financial Risk in Accordance with Widely Accepted Protocols .................................................................................. 5

II.    Procedural History ................................................................................... 6

Legal Standard ....................................................................................................... 6

Argument ............................................................................................................... 7

I.    Senate Bills 253 and 261 Compel Commercial Speech and Thus Are Subject to Review Under a Lower Level of Scrutiny ................... 7

II.    The Disclosure Laws Are Constitutional Under *Zauderer* ............... 10

    A.    The required disclosures are "Purely Factual and Uncontroversial" ..................................................................... 11

    B.    The Laws are Reasonably Related to a Substantial State Interest ...................................................................................... 14

    C.    The Laws are Neither Unjustified nor Unduly Burdensome ............................................................................ 17

III.    Alternatively The Disclosure Laws Are Constitutional Under *Central Hudson* ..................................................................................... 18

IV.    The Regulatory Disclosure Requirements of Senate Bills 253 and 261 Are Not Subject to Strict Scrutiny ........................................ 20

V.    Senate Bills 253 and 261 Would Survive Review Under Strict Scrutiny .................................................................................................. 22

Conclusion ............................................................................................................ 23

Certificate of Compliance ................................................................................... 24

**ER-1754**

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Am. Hosp. Ass'n v. Azar*
   983 F.3d 528 (D.C. Cir. 2020) ..........................................................8, 11, 15, 17

*Am. Meat Inst. v. U.S. Dep't of Ag.*
   760 F.3d 18 (D.C. Cir. 2014).....................................................................14, 15

*Ambat v. City & County of San Francisco*
   757 F.3d 1017 (9th Cir. 2014)..........................................................................6

*Americans for Prosperity Found. v. Bonta*
   594 U.S. 595 (2021) ...................................................................................6, 18

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986) ..........................................................................................6

*Ariix, LLC v. NutriSearch Corp.*
   985 F.3d 1107 (9th Cir. 2021)........................................................................8, 9

*Bd. of Trs. of State Univ. of N.Y. v. Fox*
   492 U.S. 469 (1989) ........................................................................................19

*Bolger v. Youngs Drug Prod. Corp.*
   463 U.S. 60 (1983) ............................................................................................9

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*
   447 U.S. 557 (1980) ................................................................................7, 8, 19

*City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*
   596 U.S. 61 (2022) (Breyer, J., concurring)...................................................20

*City of Cincinnati v. Discovery Network, Inc.*
   507 U.S. 410 (1993) ..........................................................................................8

*CTIA – The Wireless Assoc. v. City of Berkeley*
   928 F.3d 832 (9th Cir. 2019)..............................................................10, 12, 14

*Envtl. Def. Ctr. v. U.S. E.P.A.*
   344 F.3d 832 (9th Cir. 2003).............................................................11, 20, 21

ii

**ER-1755**

# TABLE OF AUTHORITIES
### (continued)

Page

*First Resort, Inc. v. Herrera*
   860 F.3d 1263 (9th Cir. 2017) ............................................................... 8

*Glickman v. Wileman Bros. & Elliott, Inc.*
   521 U.S. 457 (1997) ........................................................................... 20

*Iancu v. Brunetti*
   588 U.S. 388 (2019) .......................................................................... 22

*Ibanez v. Fla. Dep't of Bus. & Prof. Regul., Bd. of Acct.*
   512 U.S. 136 (1994) ........................................................................... 17

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*
   585 U.S. 878 (2018) ........................................................................... 13

*Jordan v. Jewel Food Stores, Inc.*
   743 F.3d 509 (7th Cir. 2014) ................................................................ 9

*Mass v. EPA*
   549 U.S. 497 (2007) ........................................................................... 13

*McSherry v. City of Long Beach*
   584 F.3d 1129 (9th Cir. 2009) .............................................................. 6

*Moody v. NetChoice*
   144 S. Ct. 2383 (2024) ............................................................. 6, 18, 20

*Nat'l Ass'n of Wheat Growers v. Becerra*
   468 F. Supp. 3d 1247 (E.D. Cal. 2020) ................................................ 18

*Nat'l Ass'n of Wheat Growers v. Bonta*
   85 F.4th 1263 (9th Cir. 2023) ............................................................. 14

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*
   272 F.3d 104 (2d Cir. 2001) ............................................................... 15

*Nat'l Inst. of Fam. and Life Advocs. v. Becerra*
   585 U.S. 755 (2018) ................................................................. 12, 20, 22

*National Ass'n of Manufacturers v. SEC*
   800 F.3d 518 (D.C. Cir. 2015) ..................................................... 12, 21

iii

**ER-1756**

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Nationwide Biweekly Admin. v. Owen*
  873 F.3d 716 (9th Cir. 2017) ................................................................ 10

*Ohralik v. Ohio State Bar Ass'n*
  436 U.S. 447 (1978) ............................................................................. 21

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*
  475 U.S. 1 (1986) ................................................................................ 12

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*
  487 U.S. 781 (1988) ............................................................................ 16

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*
  547 U.S. 47 (2006) .............................................................................. 21

*S.E.C. v. Wall St. Publ'g Inst., Inc.*
  851 F.2d 365 (D.C. Cir. 1988) ............................................................ 21

*Sorrell v. IMS Health Inc.*
  564 U.S. 552 (2011) .............................................................................. 8

*State of Iowa, et al. v. SEC*
  24-1522 (8th Cir. Apr. 4, 2024) ............................................................ 3

*Turner Broad. Sys., Inc. v. FCC*
  512 U.S. 622 (1994) ............................................................................ 15

*Turner Broad. Sys., Inc. v. FCC*
  520 U.S. 180 (1997) ............................................................................ 15

*United States v. Edge Broad. Co.*
  509 U.S. 418 (1993) ............................................................................ 15

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*
  425 U.S. 748 (1976) .......................................................................... 1, 8

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*
  471 U.S. 626 (1985) .....................................................................*passim*

iv

**ER-1757**

# TABLE OF AUTHORITIES
## (continued)

**Page**

**STATUTES**

Cal. Stat., Chapter 383
    § 1 .................................................................................................. 3, 4

California Corporations Code
    § 1502 .................................................................................................. 2
    § 1502.1 .............................................................................................. 2
    § 2117 .................................................................................................. 2
    § 2117.1 .............................................................................................. 2
    § 25000 .............................................................................................. 20

Health and Safety Code
    § 38530 .............................................................................................. 20
    § 38532(b)(2) ...................................................................................... 4
    § 38532(b)(3)–(5) ............................................................................... 4
    § 38532(b)(4) ...................................................................................... 4
    § 38532(b)(5) ...................................................................................... 4
    § 38532(c)(1) ...................................................................................... 4
    § 38532(c)(1)(A)(ii) ....................................................................... 4, 11
    § 38532(c)(1)(D)(i) ........................................................................ 5, 18
    § 38532(c)(1)(F) ............................................................................ 5, 11
    § 38532(d)(1) ...................................................................................... 5
    § 38532(e)(1) ...................................................................................... 5
    § 38533(a)(2) .................................................................................. 5, 16
    § 38533(a)(4)–(b)(1)(A) ...................................................................... 5
    § 38533(b)(1)(A)(i) ............................................................................. 5
    § 38533(b)(4) ...................................................................................... 5
    § 38533(c)(1)–(2) ................................................................................ 6
    § 38533(e)(2) ...................................................................................... 5
    § 38562 .............................................................................................. 16
    § 38562.2 ........................................................................................... 16
    § 38566 .............................................................................................. 16

**COURT RULES**

Federal Rules of Civil Procedure
    Rule 56(d) ................................................................. 7, 14, 18, 20

v

**ER-1758**

# TABLE OF AUTHORITIES
### (continued)

**Page**

**OTHER AUTHORITIES**

89 Federal Register 21,668, 21,736 (Mar. 28, 2024) ................................................. 3

Senate Bill
   253 ................................................................................................................ 1, 4
   261 ................................................................................................................ 1, 5

**ER-1759**

**INTRODUCTION**

Information forms the backbone of our political and economic system. Indeed, ensuring "the free flow of information" in an open marketplace of ideas serves core First Amendment goals: "enlighten[ing] public decisionmaking in a democracy," and allowing for "intelligent and well informed" economic decisions in a "predominantly free enterprise economy." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976). Accordingly, the Constitution gives the government greater latitude when it acts to increase, rather than restrict, the free flow of information to the marketplace. *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 650-52 (1985).

The Climate Corporate Data Accountability Act (Senate Bill 253) and the Climate-Related Financial Risk Act (Senate Bill 261) are designed to serve this very interest: "Information for the public." SSMF 2. The laws increase transparency and improve access to consistent, standardized information about the greenhouse gas (GHG) emissions and climate-related financial risks of the largest companies doing business in California. They do so to protect consumers and investors from fraudulent and misleading environmental claims and omissions, promote efficiency in the markets, SSMF 2, and correct "a massive blind spot for consumers, investors, and policymakers who are seeking to derive meaningful insights across the entire economy" in order to make informed decisions about where to spend their money, how to protect their investments from risk, and what to regulate in regards to one of the most pressing issues of our time. SSMF 92.

Neither law requires a reporting entity to take a position on any "politically salient" or "controversial" issue. MSJ 1. Indeed, they do not require statements on political or ideological issues at all. Rather, Senate Bill 253 simply asks companies to mathematically calculate their total GHG emissions and make that data public. And Senate Bill 261 asks companies to disclose corporate governance practices and risk management strategies—factual information increasingly requested by

1

**ER-1760**

insurance companies and underwriters, SSMF 93-94—so as to make data available about whether and to what extent those companies are planning for climate change. These disclosures require the application of traditional financial accounting principles that are widely accepted. SSMF 95-100. Indeed, many companies subject to the challenged laws already voluntarily report the required information using these same principles. SSMF 101-110.

Here, where the laws compel only factual and noncontroversial information about commercial operations, and do not dictate the language of the disclosures or hamper companies' ability to present their own messages on climate change, settled precedent requires a lower level of First Amendment scrutiny. *Zauderer*, 471 U.S. at 651-52. But Senate Bills 253 and 261 would survive under any level of scrutiny. Plaintiffs' motion for summary judgment should be denied.

## BACKGROUND

### I. SENATE BILLS 253 AND 261

#### A. Reporting Obligations Are An Ordinary and Expected Part of Doing Business

All companies doing business in California are subject to reporting obligations. Under the California Corporate Disclosure Act, every corporation qualified to do business in California must make annual disclosures to the California Secretary of State regarding the corporation's board of directors, officers and operations. Cal. Corp. Code §§ 1502, 1502.1, 2117, 2117.1. And publicly traded companies have to provide additional information regarding independent auditors, audit reports, annual compensation to directors and officers, loans made to members of the board at preferential loan rates, etc. *Id.*

Under federal law, public companies are required to make a variety of disclosures to the SEC, all of which are made publicly available to investors. These required disclosures include information about the company's operations, financial condition, and risk factors; factors that increase the risk of investing in the

**ER-1761**

1  company; the company's securities performance; management's discussion of the

2  factors it believes have affected past performance and will affect future

3  performance; etc. *See* SSMF 111. Among the risks that SEC-regulated companies

4  have had to report are the impacts of the "Year 2000" (Y2K) problem, the Covid-19

5  pandemic, high rates of inflation, and Russia's war on Ukraine. SSMF 112-113.

### B. Senate Bills 253 and 261 Build on Existing Corporate Climate-Related Reporting and Disclosure Practices in Wide Use

8  Senate Bills 253 and 261 were enacted in late 2023 against the backdrop of

9  an increasing number of voluntary and required climate-related disclosures.

10  Multinational companies or U.S.-based companies with international subsidiaries

11  are required—depending on size—to prepare emissions and climate risk reports

12  pursuant to the EU's Corporate Sustainability Reporting Directive, and/or the

13  International Sustainability Standards Board's IFRS Sustainability Disclosure

14  Standards. SSMF 114. The SEC recently finalized a rule governing the reporting,

15  by publicly traded companies, of climate-related financial risks and certain

16  categories of GHG emissions. 89 Fed. Reg. 21,668 (Mar. 28, 2024).[1] And

17  thousands of companies have for years publicly reported their climate risks and

18  other climate metrics under voluntary frameworks. SSMF 101-110. Under one

19  such voluntary program, the CDP (formerly the Carbon Disclosure Project), over

20  23,000 firms—including 86% of companies in the S&P 500—disclosed GHG

21  emissions and climate-related risk information in 2023. SSMF 102.

22  In passing Senate Bills 253 and 261, the California Legislature built on these

23  existing frameworks to create "the full transparency and consistency" needed by

24  California residents, consumers, and investors "to fully understand [] climate risks."

25  2023 Cal. Stat., ch. 382 § 1 (S.B. 253); *see also* 2023 Cal. Stat., ch. 383 § 1 (S.B.

26  261). The Legislature sought to solve the problem of inconsistent and misleading

27

---

28  [1] The SEC voluntarily stayed its rule pending judicial review. *See* Dkt. ID 5380534, *State of Iowa, et al. v. SEC*, 24-1522 (8th Cir. Apr. 4, 2024).

3

**ER-1762**

1    reporting among companies doing business in the State, 2023 Cal. Stat., ch. 382 §

2    1, and "set mandatory and comprehensive risk disclosure requirements for public

3    and private entities to ensure a sustainable, resilient, and prosperous future for our

4    state," 2023 Cal. Stat., ch. 383 § 1.  *See also* SSMF 115-116.

**C.   Senate Bill 253 Requires the Largest Companies Doing Business in California to Report GHG Emissions in Accordance with Widely Accepted Protocols**

7    S.B. 253 directs the California Air Resources Board (CARB) to "develop and

8    adopt regulations" that will require "reporting entit[ies]" to disclose their GHG

9    emissions.  Cal. Health & Safety Code § 38532(c)(1).  "Reporting entit[ies]" are

10   those "do[ing] business in California" with total annual revenues in excess of one

11   billion dollars.  *Id.* § 38532(b)(2).  CARB has not adopted the implementing

12   regulations required by the statute.

13   Once CARB's implementing regulations are in place, reporting entities will

14   report three categories of GHG emissions: Scope 1, Scope 2, and Scope 3.  *Id.*

15   § 38532(b)(3)–(5).  Scope 1 emissions are GHG gas emissions from sources owned

16   or directly controlled by the reporting entity.  *Id.* § 38532(b)(3).  Scope 2 emissions

17   are indirect emissions associated with the company's use of electricity, steam,

18   heating, and cooling.  *Id.* § 38532(b)(4).  Scope 3 emissions include all other

19   indirect emissions, such as emissions from "purchased goods and services, business

20   travel, employee commutes, and processing and use of sold products."  *Id.*

21   § 38532(b)(5).

22   The law provides that entities measure and report all three categories of

23   emissions "in conformance" with the "Greenhouse Gas Protocol standards and

24   guidance," *id.* § 38532(c)(1)(A)(ii), a globally accepted protocol for emissions

25   accounting.  SSMF 95-96.  This Protocol provides that Scope 3 emissions can be

26   determined through collection of relevant data (e.g., directly from suppliers), *or*

27   estimated using "secondary data sources," including "industry average data, proxy

28   data, and other generic data." Cal. Health & Safety Code § 38532(c)(1)(A)(ii);

4

1    SSMF 117.[2]  The law "minimizes duplication of effort" by allowing reporting

2    entities to submit emissions data prepared to meet other national and international

3    reporting requirements.  Cal. Health & Safety Code § 38532(c)(1)(D)(i).

4        The law requires third-party assurances to ensure the quality and accuracy of

5    the data.  *Id.* § 38532(c)(1)(F).  To ensure the usefulness of the data for investors

6    and consumers, the law directs an outside organization to create a publicly

7    accessible digital platform featuring the emissions data, *id.* § 38532(e)(1), and

8    prepare a report summarizing the data, *id.* § 38532(d)(1).

9        **D.    Senate Bill 261 Requires the Largest Companies Doing Business
            in California to Disclose Climate-Related Financial Risk in
10           Accordance with Widely Accepted Protocols**

11        S.B. 261 requires U.S. entities with total annual revenues in excess of $500

12   million dollars that do business in California to prepare a biennial report disclosing

13   their climate-related financial risk and any measures adopted to reduce and adapt to

14   that risk.  Cal. Health & Safety Code § 38533(a)(4)–(b)(1)(A).  The bill defines

15   "[c]limate-related financial risk" as the "material risk of harm to immediate and

16   long-term financial outcomes due to physical and transition risks … ," such as

17   disruptions to operations, the provision of goods and services, and employee health

18   and safety.  *Id.* § 38533(a)(2).  The law directs entities to prepare their disclosures

19   in alignment with "the Final Report of Recommendations of the Task Force on

20   Climate-related Financial Disclosures," *id.* § 38533(b)(1)(A)(i), an widely adopted

21   investor-driven protocol.  SSMF 97-98, 118.  Entities must take "good faith

22   measures" to comply but need not adopt any particular climate-related risk

23   management strategy or take any particular climate-risk mitigation actions.  Cal.

24   Health & Safety Code § 38533(e)(2); SSMF 119-122.  Disclosures prepared under

25   another framework with consistent requirements can be used to fulfill these

26   requirements.  Cal. Health & Safety Code § 38533(b)(4).  Each reporting company

27   

28       [2] Thus, Plaintiffs are incorrect that compliance costs would "flow up" the supply chain to
     family farmers or other small businesses.  *Cf.* MSJ 5.

1  must publish a copy of the report "on its own internet website." *Id.* at

2  § 38533(c)(1).

3  **II.  PROCEDURAL HISTORY**

4      Plaintiffs bring a facial challenge against Senate Bills 253 and 261 under the

5  First Amendment (Claim I), the "federal Constitution's Supremacy Clause" (Claim

6  II), and the "Constitution's limitations on extraterritorial regulation, including the

7  dormant commerce clause" (Claim III).  ECF No. 28.  Defendants moved to dismiss

8  Claims II and III.  ECF No. 38.  That motion remains undecided, and no discovery

9  has occurred.

10                              **LEGAL STANDARD**

11      The party moving for summary judgment bears the "burden of showing that

12  there are no genuine issues of material fact . . . ."  *Ambat v. City & County of San*

13  *Francisco*, 757 F.3d 1017, 1031 (9th Cir. 2014).  The Court must determine

14  "whether the evidence presents a sufficient disagreement to require submission to a

15  jury or whether it is so one-sided that one party must prevail as a matter of law."

16  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  "In making this

17  determination, [courts] view the evidence in the light most favorable to [the non-

18  movant].  All justifiable inferences are to be drawn in his favor and his evidence is

19  to be believed."  *McSherry v. City of Long Beach*, 584 F.3d 1129, 1135 (9th Cir.

20  2009).

21      A party bringing a facial challenge to invalidate a law under the First

22  Amendment must show that "a substantial number of [a law's] applications are

23  unconstitutional, judged in relation to the statute's plainly legitimate sweep."

24  *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (cleaned up).

25  The Supreme Court has "made facial challenges hard to win" because such

26  challenges "threaten to short circuit the democratic process" by "preventing duly

27  enacted laws from being implemented in constitutional ways."  *Moody v.*

28  *NetChoice*, 144 S. Ct. 2383, 2397 (2024) (cleaned up).

ER-1765

**ARGUMENT**

Senate Bills 253 and 261 require disclosure of only factual and noncontroversial information about commercial operations and do not dictate the language of the disclosures or hamper companies' ability to present their own messages on climate change. Thus, Plaintiffs' argument that the laws trigger strict scrutiny fails. *See Zauderer*, 471 U.S. at 637. But in light of the compelling government interest in ensuring the free flow of material information to market participants, preventing fraud, and lowering GHG emissions, the laws would survive First Amendment review under any level of scrutiny. Thus, Plaintiffs' motion for summary judgment must be denied.[3]

**I. SENATE BILLS 253 AND 261 COMPEL COMMERCIAL SPEECH AND THUS ARE SUBJECT TO REVIEW UNDER A LOWER LEVEL OF SCRUTINY**

In urging strict scrutiny here, Plaintiffs attempt to minimize the fact that Senate Bills 253 and 261 regulate only commercial speech. Courts have long examined regulations affecting commercial speech differently from those impacting other speech (e.g., political speech)—applying a lower level of scrutiny or declining to apply First Amendment protections entirely. *Zauderer*, 471 U.S. at 637; *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561-63 (1980). The Constitution accords the government greater latitude to regulate commercial speech, relative to other safeguarded forms of expression, because such speech "occurs in an area traditionally subject to government regulation." *Cent. Hudson*, 447 U.S. at 562.

The need to afford the government greater room to regulate is especially pronounced when the government action is intended to increase, rather than restrict, the free flow of accurate information to consumers. *See Zauderer*, 471 U.S. at 646.

---

[3] If this Court does not deny summary judgment outright, then alternatively, it should grant Defendants' concurrently filed Motion to Deny or Defer Plaintiffs' Motion for Summary Judgment on Claim I Under Federal Rule of Civil Procedure 56(d), to provide Defendants the opportunity to conduct the identified discovery.

7

For that reason, although *restrictions* on commercial speech are generally subject to intermediate scrutiny, *Cent. Hudson*, 447 U.S. at 563-66, the Supreme Court has applied a lower level of review where the challenged law requires the *disclosure* of factual and noncontroversial information, *Zauderer*, 471 U.S. at 651.  Because "the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides," *Zauderer*, 471 U.S. at 651, and the government has a "legitimate interest in protecting consumers from 'commercial harms,'" commercial speech "can be subject to greater governmental regulation than noncommercial speech," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 426 (1993)); *see also Va. State Bd. of Pharmacy*, 425 U.S. at 763 (noting consumers' "keen" interest in the free flow of commercial information).

Plaintiffs acknowledge that commercial speech is subject to a lower level of scrutiny, but they suggest it is limited to speech proposing a "commercial transaction."  MSJ 15 (citing *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021)).  Commercial speech, however, is not so narrowly circumscribed. *See Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020) (*Zauderer* scrutiny is not "limited to restrictions on advertising and point-of-sale labeling"). Rather, the Supreme Court defines commercial speech to include "expression related solely to the economic interests of the speaker and its audience."  *Cent. Hudson*, 447 U.S. at 561.  This determination "is fact-driven, due to the inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category."  *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1272 (9th Cir. 2017) (cleaned up).

Here, the Legislature passed both laws specifically in response to the expressed desires of commercial audiences—consumers and investors—to inform investment and purchasing decisions and prevent misrepresentations.  SSMF 123-

ER-1767

125.  Indeed, many businesses voluntarily disclose the same or similar metrics precisely for such commercial purposes: driving contract formation, obtaining insurance coverage, effectuating mergers and acquisitions, and responding to investors and consumers.  SSMF 110, 126-127.  The disclosures involved here require only factual information about (1) the emissions connected with an entity's business operations, and (2) the company's governance practices and business and financial plans pertaining to climate risk.  *See supra* Parts I.C, I.D.  This information is commercial speech.  *See Ariix*, 985 F.3d at 1116 (explaining that courts should "try to give effect to a common-sense distinction between commercial speech and other varieties of speech").

And even if Plaintiffs were correct that *Zauderer* applies only where the speech has a nexus to "commercial advertising," MSJ 16, there is such a connection here.  A vast swath of companies doing business in California are advertising their business as "green" or emissions-conscious.  SSMF 128.  Indeed, many of Plaintiffs' own member companies have advertised themselves as adhering to "net zero" emissions or other climate-related goals.  SSMF 129; *see Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 518 (7th Cir. 2014) ("An advertisement is no less 'commercial' because it promotes brand awareness or loyalty rather than explicitly proposing a transaction in a specific product or service.").  The disclosures required under Senate Bills 253 and 261 are, at least in part, a response to these potentially misleading statements, SSMF 2, and thus align with two of the "important guideposts" courts examine in identifying commercial speech: connection to advertisements and the "economic motivation" of the speaker.  *See Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66-67 (1983); *see also Ariix*, 985 F.3d at 1116 ("Courts have found commercial speech even when it involves indirect benefits, such as . . . improvements to a brand's image"); *Jordan*, 743 F.3d at 518 ("Modern commercial advertising is enormously varied in form and style.").

9

## II.   THE DISCLOSURE LAWS ARE CONSTITUTIONAL UNDER *ZAUDERER*

The test for analyzing the constitutionality of compelled commercial disclosures—as opposed to "outright prohibitions on speech"—is established in *Zauderer*.  471 U.S. at 650.  In that case, the Court found an attorney advertisement that claimed, "if there is no recovery, no legal fees are owed by our clients," had a "self-evident" capacity to mislead a layperson unaware of the distinction between legal fees and litigation costs.  *Id.* at 652.  Although "unjustified or unduly burdensome disclosure requirements might offend the First Amendment," there is only a "minimal" constitutionally protected interest in not providing "factual and uncontroversial information" about one's business or services.  *Id.* at 651.  "Under *Zauderer*, compelled disclosure of commercial speech complies with the First Amendment if the information in the disclosure is reasonably related to a substantial governmental interest[,] … is purely factual and uncontroversial," and is not unduly burdensome.  *CTIA – The Wireless Assoc. v. City of Berkeley*, 928 F.3d 832, 845, 848-49 (9th Cir. 2019).

*Zauderer* and its progeny thus reflect the principle that "[t]he First Amendment does not generally protect corporations from being required to tell prospective customers the truth."  *Nationwide Biweekly Admin. v. Owen*, 873 F.3d 716, 721 (9th Cir. 2017).  Here*,* the compelled disclosures provide consumers and investors with more accurate and comparable data from companies choosing to do business in the state, facilitating informed market decisions.  SSMF 86, 131-132.  These disclosures do not require companies to act in a way that is inconsistent with their views about, or, indeed, to take any position on, climate change, SSMF 119; rather, these laws simply require the largest companies doing business in the state to disclose (1) quantitative data on emissions and (2) descriptive accounts of their internal risk planning.  These laws pass constitutional muster.

## A.   The Required Disclosures are "Purely Factual and Uncontroversial"

**1.** S.B. 253 requires companies to disclose objective, factual information: the quantity of their greenhouse gas emissions.  Cal. Health & Safety Code § 38532(c)(1)(A)(ii).  Entities must measure and report their emissions "in conformance" with the "Greenhouse Gas Protocol standards and guidance," *id.* § 38532(c)(1)(A)(ii), which is a "globally accepted reporting framework" and "aligned with traditional financial reporting principles."  SSMF 95-96.  Third-party firms review such data to ensure its quality and accuracy, further underscoring the factual nature of this information.  Cal. Health & Safety Code § 38532(c)(1)(F).

Plaintiffs argue that the emissions disclosures are "more conjecture than fact," because alleged "gaps in emissions measurement methodologies" and the need to make "judgment calls" renders the calculation anything but "purely factual."  MSJ 17-18.  But the use of estimates under longstanding financial accounting principles does not render the disclosures "matters of opinion."  SSMF 132-135, 141; *see Envtl. Def. Ctr. v. U.S. E.P.A.*, 344 F.3d 832, 849 (9th Cir. 2003) (citations omitted).  To conclude otherwise would call into question a host of financial disclosure requirements and other commercial documents, many of which similarly rely on judgment calls and estimates.  SSMF 136-140.

Nor are the disclosures "misleading" because companies must disclose the emissions of "upstream and downstream" suppliers, among others, or because the Greenhouse Gas Protocol standards do not cover "avoided emissions."  MSJ 18.  To the contrary, allowing firms to report just partial emissions, or their emissions reduction projects (i.e., "avoided emissions"), in lieu of disclosing their total emissions, would be highly misleading.  SSMF 142; *see Am. Hosp. Assoc.*, 983 F.3d at 541.  The Greenhouse Gas Protocol provides industry-standard methodologies for calculating accurate and transparent factual information.  SSMF 95-96, 132.

ER-1770

S.B. 261 similarly requires the disclosure of only factual statements about the reporting entities' own activities. Companies must disclose their actual policies and actual planning pertaining to climate-related financial risks as assessed by the company. SSMF 119-122, 143. The law does not compel companies to address matters of opinion, or to take a particular policy position in regards to climate change—if an entity does not currently evaluate climate-related risks, its disclosure could state merely that (i.e., that it has no climate-related governance, strategy, risk management plans, or metrics and targets), and still comply with S.B. 261's disclosure requirements. SSMF 119-121. A company's decision whether and how to plan for climate-risks affecting its business is a subject of legitimate interest to investors. SSMF 123-126.

**2.** Nor are the disclosures at issue "controversial." A statement of fact does not become controversial simply because it "can be tied in some way to a controversial issue," *CTIA*, 928 F.3d at 845, or because a listener may use the fact to form an opinion. By contrast, courts have declined to apply *Zauderer* where the speaker was forced to convey a message to which they are morally, religiously, or ideologically opposed. *See Nat'l Inst. of Fam. and Life Advocs. v. Becerra*, 585 U.S. 755, 768-69 (2018) (*NIFLA)*; *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 15 n.12 (1986) (explaining states have "substantial leeway" to impose "appropriate information disclosure requirements" on companies, but may not "require corporations to carry the messages of third parties, where the messages themselves are biased against or are expressly contrary to the [business]'s views"). For example, in *NIFLA*, California required clinics whose purpose was to oppose abortion to provide information about state-sponsored abortion services—a message "fundamentally at odds with [their] mission." *CTIA*, 928 F.3d at 845. And in *National Ass'n of Manufacturers v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) (*NAM)*, the rule required companies to post a statement about whether its

**ER-1771**

1    diamonds are "conflict free," an ideological statement intertwined with moral

2    responsibility.

3    Plaintiffs claim that "climate change is undisputedly a 'controversial topic,'"

4    and thus *Zauderer* does not apply. MSJ 18 (cleaned up). But even crediting

5    Plaintiffs' claim that aspects of climate change are controversial, neither law

6    requires a company to take sides on any such topic. The disclosure of emissions

7    data does not implicate any particular view about climate change. Nor does it

8    require a company to take any steps inconsistent with its view (i.e. reducing

9    emissions). Similarly, the disclosure of risk planning (or the lack thereof) does not

10   require companies to conclude that they have any particular climate risks. *See* MSJ

11   19. Companies remain free to determine what—if any—"climate risks" may

12   materially impact their business. SSMF 120.

13   For those reasons, the Court need not reach the question of whether climate

14   change is a controversial topic. If it does, however, the Court should find that

15   neither law implicates a controversial issue, because there is no legitimate debate in

16   the scientific community regarding the reality of climate change. SSMF 144-145;

17   *see also Mass v. EPA*, 549 U.S. 497, 521 (2007) (concluding that "[t]he harms

18   associated with climate change are serious and well recognized"). Notably,

19   Plaintiffs have provided no evidence to the contrary. *See* MSJ 18 (relying

20   exclusively on dicta from *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.,*

21   *Council 31*, 585 U.S. 878, 913 (2018)). Nor is there any legitimate debate in the

22   business community that climate-risk is a factual metric relevant to companies'

23   business planning and risk management activities. SSMF 146. Indeed, Plaintiffs

24   provide only a single declaration from a company subject to the laws, and that

25   company does not deny the reality of climate change or the relevance of climate

26   change risks to its business planning. It states only that S.B. 261 "would force U-

27   Haul to convey to the public a philosophy of environmental sustainability that it

28   does not believe." ECF No. 48-30, ¶ 30. That is inaccurate, as S.B. 261 only

13

**ER-1772**

1   requires the disclosure of the company's own assessment of risks, it does not force

2   companies to adopt *any* particular positions, much less on "environmental

3   sustainability" at all.  The fact that Plaintiffs can present no evidence that climate

4   change is a "hotly disputed" subject, MSJ 2, in either the scientific or business

5   communities, is fatal to this aspect of their argument.[4]  *Nat'l Ass'n of Wheat*

6   *Growers v. Bonta*, 85 F.4th 1263, 1279 (9th Cir. 2023) (looking for a "strong

7   scientific consensus" and indicating that "'uncontroversial' does not mean

8   'unanimous'").

9       Finally, relying on *NAM*, Plaintiffs claim that because "[a]ctivist groups" may

10   use the disclosed data to "embarrass" companies and "hold them to account," the

11   laws run afoul of the First Amendment.  MSJ 18-19.  But in *NAM*, the government

12   required companies to apply to their products specific language that carried a

13   political message.  Here, in contrast, there is no political message and, in fact, each

14   company effectively dictates its own message.  SSMF 119-122.  That third parties

15   could use the disclosed information to inform commercial choices or political

16   actions does not make the compelled speech controversial.  *See Am. Meat Inst. v.*

17   *U.S. Dep't of Ag.*, 760 F.3d 18, 21-22 (D.C. Cir. 2014).  Rather, it merely

18   underscores the role that disclosure plays in furthering First Amendment goals by

19   allowing consumers and investors to make decisions on the basis of accurate,

20   factual information, unencumbered by the government's own policy views.

21       **B.   The Laws are Reasonably Related to a Substantial State Interest**

22       S.B. 253 and 261 easily survive *Zauderer* scrutiny because they are

23   "reasonably related to a substantial governmental interest."  *CTIA*, 928 F.3d at 845.

24   Under *Zauderer*, the government need only show that its interest is "more than

25   trivial."  *Id.* at 844.

26

27   _____

28       [4] To the extent this Court disagrees, Defendants are entitled to discovery into Plaintiffs'
     claims.  *See* Rule 56(d) Motion.

14

**ER-1773**

1    In evaluating the government's interest, courts must give "substantial

2    deference to the predictive judgments of [the legislature]." *Turner Broad. Sys., Inc.*

3    *v. FCC*, 520 U.S. 180, 195 (1997) (cleaned up); *see also United States v. Edge*

4    *Broad. Co.*, 509 U.S. 418, 434 (1993) ("Within the bounds of the general protection

5    provided by the Constitution to commercial speech, we allow room for legislative

6    judgments"). Moreover, this Court can consider materials outside of the legislative

7    history, "to assure [itself] that, in formulating its judgments, [the Legislature] has

8    drawn reasonable inferences." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666

9    (1994); *see also Turner Broad. Sys.*, 520 U.S. at 196 (examining the government

10   interest based on "the evidence before Congress and . . . the further evidence

11   presented to the District Court on remand to supplement the congressional

12   determination").

13   The California Legislature identified at least three interests served by the laws.

14   *First*, California has a substantial interest in providing consistent, comparable,

15   and reliable information to investors, consumers, and employees, to enable them to

16   make informed judgments about the impact of climate-related risks on their

17   investment, consumer, and other economic choices. SSMF 86-87, 92, 123-124,

18   155-158. *See Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 115 (2d Cir. 2001)

19   (describing as "significant" the government's interest in "better inform[ing]

20   consumers about the products they purchase"); *Am. Hosp. Ass'n*, 983 F.3d at 540

21   (describing as "legitimate" the government's interest in "promoting price

22   transparency and lowering healthcare costs"); *Am. Meat Inst.*, 760 F.3d at 23

23   (finding "substantial" the government's interest in country-of-origin labeling

24   because the labels "enable[d] consumers to choose American-made products" and

25   responded to consumer interest in such labeling). S.B. 253 and 261 clearly advance

26   this interest by requiring companies to disclose information that is considered

27   material by investors, consumers, and employees, and hence is "closely tethered" to

28   market transactions. SSMB 147,150,159-160. Investors have expressed that

15

"consideration of climate-related financial risk and other factors is a necessary component of being an informed and responsible investor," SSMB 152. And the Legislature was well aware of the value of this information to each of these stakeholders when passing the law. SSMF 86-87; Cal. Health & Safety Code § 38533(a)(2).

*Second*, California has a substantial interest in protecting its investors, consumers, and other stakeholders from fraud or misrepresentation. *See, e.g.*, *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 792 (1988) ("interest in protecting charities (and the public) from fraud is, of course, a sufficiently substantial interest"). Lawmakers were aware of the prevalence of misleading information on emissions and other metrics by companies doing business in the state, and crafted SB 253 and 261 to prevent this behavior. SSMF 2. This problem is not mere "conjecture," MSJ 9; evidence shows that voluntary disclosure leads to selective disclosure, which is highly misleading, SSMF 162, and the volume of misleading statements has exploded in recent years. SSMF 161. To prevent these practices lawmakers appropriately required comprehensive disclosure of a firm's overall carbon emissions—i.e. Scopes 1, 2, and 3—and climate risk reporting. SSMF 164-165.

*Third*, the California Legislature considered that, by requiring greater transparency about emissions and climate risks, S.B. 253 and 261 may encourage—through the market forces of third parties' independent economic decisions and actions—companies doing business in California to reduce their emissions and thereby mitigate the risks California and its residents face from climate change. SSMF 168. This, too, is a substantial state interest, both because California has committed to meeting certain emissions reduction goals over time and because of the severity of the risks the state faces. Health & Safety Code, §§ 38562, 38562.2, 38566. Research demonstrates a connection between reporting frameworks and improved environmental performance, including in particular between carbon

16

**ER-1775**

1  disclosure and GHG emissions reductions.  SSMF 166-167.  Importantly, these

2  reductions come not through any *government* regulation of emissions at all,[5] or

3  *government* pressure to align with particular policy views, but through the provision

4  of material information to third-parties, who may then take intervening actions that

5  lead to reduced emissions.  SSMF 169.

6  ### C.  The Laws are Neither Unjustified nor Unduly Burdensome

7  A disclosure requirement could violate the First Amendment if it was so

8  "unjustified or unduly burdensome" that it chills or restricts constitutionally

9  protected commercial speech.  *Zauderer*, 471 U.S. at 651.  But neither is true here.

10  As discussed in Section II.B, the effectiveness of emission and climate-risk

11  disclosure laws at materially alleviating the harms identified by the government was

12  considered by the Legislature, and is supported by evidence.  *Ibanez v. Fla. Dep't*

13  *of Bus. & Prof. Regul., Bd. of Acct.*, 512 U.S. 136, 146 (1994).  Moreover, Plaintiffs

14  have not provided any evidence to suggest that their *speech* would be burdened by

15  either law.  Nor can they, as the laws do not interfere with any message companies

16  may wish to convey.  *Am. Hosp. Ass'n*, 983 F.3d at 541 (examining whether law

17  requires speaker "to endorse a particular viewpoint" or "prevents them from adding

18  their own message"); *cf. Ibanez*, 512 U.S. at 146 (holding that a disclosure was

19  "unduly burdensome" when it "effectively rule[d] out" the regulated entity's ability

20  to speak).

21  The only burden that Plaintiffs allege is a "financial" one.  But Plaintiffs "must

22  demonstrate a burden on *speech*," *Am. Hosp. Ass'n*, 983 F.3d at 541.  In any event,

23  any administrative and financial burden here is not "undue."  For one, a large

24  percentage of companies subject to the disclosure requirements already voluntarily

25  disclose some or all of this data, or are subject to other reporting requirements,

26  SSMF 101-109, reducing the marginal increase in cost for these companies to

---

[5] "[C]ourts routinely distinguish between pressure created by state laws and actual regulation by the State, and recognize only the latter as an actionable injury."  MTD 13 (ECF 38-1); *see also* Reply iso MTD 7-8.

**ER-1776**

1  report under SB 253 and 261.  Cal. Health and Safety Code §§ 38532(c)(1)(D)(i)

2  (avoiding duplication of reporting); 38533(b)(4) (same).  Moreover, because the

3  laws only apply to the largest companies, the vast majority of covered companies

4  already have the reporting infrastructure and data necessary to prepare the required

5  information with minimal burden, SSMF 172-179, and need expend only 0.025

6  percent of their annual revenue in preparing the data.  SSMF 170.  Indeed, the

7  frequency of voluntary reporting suggests that disclosures materially benefit many

8  companies.

9       Thus, even if financial burden were a relevant consideration, Plaintiffs fail to

10  establish that the laws will impose such burdens in "a substantial number of [their]

11  applications."  *Americans for Prosperity Foundation*, 594 U.S. at 615; *Moody*, 144

12  S. Ct. at 2398 (to evaluate a facial challenge to a law compelling speech a court

13  must ask "as to each thing covered, whether the required disclosures unduly burden

14  expression").  Plaintiffs' evidence of the financial burden of compliance is limited

15  to a statement by the Governor that expresses concern over the *possibility* that the

16  laws will have a negative "financial impact" on affected businesses and thus directs

17  CARB to "closely monitor the cost impact as it implements" the new laws, SSMF

18  23, 41, and anecdotal statements from only two companies purportedly covered by

19  the laws, SSMF 29, 62-65.  This is insufficient to satisfy Plaintiffs' burden on a

20  facial challenge.[6]

21  **III. ALTERNATIVELY THE DISCLOSURE LAWS ARE CONSTITUTIONAL**
22       **UNDER *CENTRAL HUDSON***

23       If this Court does not apply *Zauderer* scrutiny because it finds the speech

24  compelled under S.B. 253 or 261 is not factual or uncontroversial, then "the court

25  should … proceed to examine the [laws] under *Central Hudson*'s intermediate

26  scrutiny."  *See Nat'l Ass'n of Wheat Growers v. Becerra*, 468 F. Supp. 3d 1247,

27
28       [6] If this Court disagrees and finds such evidence relevant, Defendants are entitled to discovery into Plaintiffs' claims.  *See* Rule 56(d) Motion.

1258 (E.D. Cal. 2020).  Under *Central Hudson*, courts uphold government regulation of commercial speech where it directly advances a substantial government interest, and the regulation is no more restrictive than necessary to serve that interest.  447 U.S. at 564.  *Central Hudson* merely requires a "fit" between the government end and the means chosen to accomplish that end; that means need not be the "best disposition" of the government's interest, "but one whose scope is 'in proportion to the interest served.'"  *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 476-80 (1989).

S.B. 253 and 261 directly advance the government's substantial interests.  *See supra*, Argument Section II.B-C.  And the scope of these laws is appropriate for the interests served.  Plaintiffs argue that the laws are overbroad because they are not tied to "whether [a] company has investors," "whether climate change is likely to have a material impact on any product or service sold within the State," or whether the law will have an impact on climate change.  MSJ 20.  These criticisms are misplaced.  For one, the government's interest is not solely tied to investors, but also to protecting consumers and other stakeholders.  SSMF 5, 24, 26.  Moreover, the value of emissions and climate-risk information to California market participants concerns the financial performance of the company as a whole and whether the firm is an appropriate recipient of their money.  SSMF 154.  And evidence indeed supports that disclosure requirements can reduce emissions, with minimal burden compared to emission regulations.  SSMF 166-167.

While Plaintiffs argue the state can have no legitimate interest in information from a company that "engages in a single transaction within the State," MSJ 20, this concern appears to be purely hypothetical.  Plaintiffs offer no evidence that this concern applies to any entity covered by the laws—those with annual revenues of $500 million and $1 billion.  In any event, this concern is insufficient to demonstrate "facial" invalidity of the laws, as Plaintiffs can point to no evidence

19

1  that this phenomenon is significant enough to burden constitutional rights in "a

2  substantial number of [its] applications." *Moody*, 144 S. Ct. at 2397.[7]

3  **IV.  THE REGULATORY DISCLOSURE REQUIREMENTS OF SENATE BILLS 253
       AND 261 ARE NOT SUBJECT TO STRICT SCRUTINY**

4

5  Plaintiffs argue that S.B. 253 and 261 "trigger[] strict scrutiny" because,

6  Plaintiffs claim, these are "content-based" laws that "burden" political speech.  MSJ

7  7-8.  Plaintiffs' argument, however, depends on this Court first concluding that the

8  laws cover something other than commercial speech, as in the commercial speech

9  context even a content-based restriction on speech is subject to lesser scrutiny.

10  *NIFLA*, 585 U.S. at 768-69 (citing *Zauderer*, 471 U.S. at 651).  But even outside

11  the commercial speech context, the application of strict scrutiny is inappropriate

12  here.

13  *First*, the laws are part of a "broader regulatory apparatus" governing the

14  disclosure of commercial data.[8]  *Env't Def. Ctr.*, 344 F.3d at 850 n.26; *see also*

15  *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 469 (1997) (evaluating

16  assessment "under the standard appropriate for the review of economic regulation"

17  rather than "under a heightened standard appropriate for the review of First

18  Amendment issues," because it was part of a broader "regulatory scheme").  While

19  courts "strictly scrutiniz[e] certain categories of laws that threaten to 'drive certain

20  ideas or viewpoints from the marketplace,'" "not all laws that distinguish between

21  speech based on its content fall into a category of this kind." *City of Austin, Texas*

22  *v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 78-79 (2022) (Breyer, J.,

23  concurring).  Census reporting requirements, securities-related disclosures,

24  copyright infringement, tax disclosures, etc., arguably touch on the content of

25  speech, *id.*, but have been found not to implicate First Amendment concerns at all,

26

27  [7] To the extent this Court disagrees, Defendants are entitled to discovery into Plaintiffs' claims.  *See* Rule 56(d) Motion.

28  [8] *See, e.g.*, Health & Safety Code, § 38530; Cal. Corp. Code § 25000, et seq. (California Corporate Securities Law of 1968).

**ER-1779**

1  much less implicate strict scrutiny.  *See, e.g., S.E.C. v. Wall St. Publ'g Inst., Inc.*,

2  851 F.2d 365, 373 (D.C. Cir. 1988); *see also Ohralik v. Ohio State Bar Ass'n*, 436

3  U.S. 447, 457 (1978).

4      *Second*, the laws do not attempt to "prescribe what shall be orthodox in

5  politics, nationalism, religion, or other matters of opinion or force [companies] to

6  confess by word or act their faith therein," and thus do not burden political speech.

7  *Env't Def. Ctr.*, 344 F.3d at 849.  California's laws require no affirmation, express

8  or implied, of private agreement with a government-favored viewpoint or position.

9  To be sure, certain policy responses to climate change are the subject of vigorous

10  political debate; but these disclosures do not implicate these debates.  And Plaintiffs

11  cite to no case suggesting that third parties' later use of this information to make

12  economic or policy decisions necessitates strict scrutiny in the disclosure of the

13  underlying facts themselves.  *See* MSJ 8.

14      Plaintiffs' other arguments for the application of strict scrutiny are equally

15  unavailing.  There is a long history of compelled commercial speech, in general,

16  and corporate disclosures, in particular, that supports the measures California

17  adopts here.  MSJ 13; *see supra* Background I.A, I.B.  Neither S.B. 253 or 261

18  compel companies to speak on California's terms, the concern expressed in *NAM*,

19  800 F.3d at 530.  MSJ 13.  Indeed, the laws leave the content of the disclosures to

20  the speaker, which militates against the application of strict scrutiny.  *See Rumsfeld*

21  *v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006) (only

22  compelled speech that "dictate[s] the content" of the speaker's message or involves

23  a "Government-mandated pledge or motto that the [speaker] must endorse" triggers

24  constitutional scrutiny); *see also Env't Def. Ctr.*, 344 F.3d at 848 (regulations

25  requiring distribution of educational materials did "not offend the First

26  Amendment" because the "broad requirements" of the regulations did "not dictate a

27  specific message").  And the laws are not vague—they integrate widely used and

28  accepted metrics for preparing disclosures of a kind that are already in frequent use

1  across the market.  SSMF 95-98.  As such, implementation of the laws is

2  straightforward, and Plaintiffs' concerns are misplaced.

3  **V.     SENATE BILLS 253 AND 261 WOULD SURVIVE REVIEW UNDER STRICT
4          SCRUTINY**

5       Ultimately, S.B. 253 and 261 survive review even under strict scrutiny, if

6  applied.  *Iancu v. Brunetti*, 588 U.S. 388, 402-03 (2019) (Breyer, J., concurring in

7  part and dissenting in part).  Both laws are "narrowly tailored" to serve the

8  government's "compelling state interests," including the prevention of fraud and

9  misrepresentation, and the correction of market inefficiencies.  *NIFLA*, 585 U.S. at

10 766.

11      The only means of alleviating the climate-related information asymmetries

12 that exist in the current market is by requiring companies to disclose complete and

13 accurate information. Without mandatory, comprehensive disclosures, companies

14 are incentivized to selectively disclose information, causing gaps in data that

15 prevent the markets from obtaining information necessary for investors, consumers,

16 and employees to make rational decisions.  The information obtained through S.B.

17 253 and 261 is (1) material to investors, SSMF 147, consumers, SSMF 159, and

18 employees, SSMF 160; (2) effective at reducing fraud, SSMF 164-165; and (3)

19 effective at reducing GHG emissions, SSMF 166-167.  And the usefulness of this

20 data is significantly improved by the inclusion of Scope 3 emissions, SSMF 180-

21 182, for which the burdens of disclosure are significantly less than Plaintiffs

22 suggest, MSJ 5, SSMF 170, 175.

23      Plaintiffs argue that the government could collect the information itself.  MSJ

24 12.  But "companies possess more detailed and accurate data about their own

25 internal operations and impacts than do external observations."  SSMF 171.

26 Plaintiffs suggest that the application of the law to any business entity satisfying the

27 revenue threshold regardless of investment status or connection to a product is too

28 broad; but Plaintiffs ignore that the revenue threshold *is* a significant limitation on

**ER-1781**

1  the application of the laws.  SSUF 183-188.  There is a genuine issue of material
2  fact as to whether any business in California with over *$500 million* in annual
3  revenue lacks outside investors, whether public or private.  SSUF 189.  And the
4  application to companies that have low GHG emissions or face negligible financial
5  risk does not render the laws overbroad, MSJ 12; rather, their data serves the
6  government's interests in allowing stakeholders to consider this information in
7  making financial decisions.

8                                    **CONCLUSION**

9         For the reasons stated above, Plaintiffs' motion for summary judgment should

10  be denied.

11

12

13  Dated:  July 24, 2024                    Respectfully submitted,

14                                           ROB BONTA
                                             Attorney General of California
15                                           GARY E. TAVETIAN
                                             MYUNG J. PARK
16                                           Supervising Deputy Attorneys General
                                             M. ELAINE MECKENSTOCK
17                                           EMILY HAJARIZADEH
                                             DYLAN REDOR
18                                           KATHERINE GAUMOND
                                             Deputy Attorneys General

19

20                                           */s/ Caitlan McLoon*

21

22                                           CAITLAN MCLOON
                                             Deputy Attorney General
23                                           *Attorneys for Defendants Liane M.*
                                             *Randolph, Steven S. Cliff, and Robert*
24                                           *A. Bonta*

25  SA2024300503
    66956020.docx

26

27

28

                                       23

                                                              **ER-1782**

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for *Defendants Liane M. Randolph, Steven S. Cliff, and Robert A. Bonta*, certifies that this brief contains 6,999 words, which complies with the word limit of L.R. 11-6.1.

Dated:  July 24, 2024

Respectfully submitted,

ROB BONTA
Attorney General of California
GARY E. TAVETIAN
MYUNG J. PARK
Supervising Deputy Attorneys General
M. ELAINE MECKENSTOCK
EMILY HAJARIZADEH
DYLAN REDOR
KATHERINE GAUMOND
Deputy Attorneys General


*/s/ Caitlan McLoon*

CAITLAN MCLOON
Deputy Attorney General
*Attorneys for Defendants Liane M. Randolph, Steven S. Cliff, and Robert A. Bonta*

24

**ER-1783**

## CERTIFICATE OF SERVICE

Case Name:    **Chamber of Commerce of the United States of America, et al.
v. Liane M. Randolph, et al.**

Case No.:     **2:24-cv-00801-ODW-PVC**

I hereby certify that on July 24, 2024, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

### DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON CLAIM I

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on July 24, 2024, at Los Angeles, California.

|  Beatriz Davalos  |  /s/ Beatriz Davalos  |
| :---: | :---: |
| Declarant | Signature |

**ER-1784**

ROB BONTA
Attorney General of California
GARY E. TAVETIAN (SBN 117135)
MYUNG J. PARK (SBN 210866)
Supervising Deputy Attorneys General
M. ELAINE MECKENSTOCK (SBN 268861)
CAITLAN McLOON (SBN 302798)
EMILY HAJARIZADEH (SBN 325246)
DYLAN REDOR (SBN 338136)
Deputy Attorneys General
 300 South Spring Street, Suite 1702
 Los Angeles, CA  90013-1230
 Telephone:  (213) 269-6438
 Fax:  (916) 731-2128
 E-mail:  Caitlan.McLoon@doj.ca.gov
*Attorneys for Defendants Liane M. Randolph,
Steven S. Cliff, and Robert A. Bonta*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION,**<br><br>Plaintiffs,<br><br>v.<br><br>**CALIFORNIA AIR RESOURCES BOARD, LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, and STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board,**<br><br>Defendants. | 2:24-cv-00801-ODW-PVC<br><br>**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Date:        September 9, 2024<br>Time:        1:30 p.m.<br>Courtroom:   5D<br>Judge:       The Honorable Otis D. Wright, II<br>Trial Date:  Not Set<br>Action Filed: 1/30/2024 |

# TABLE OF CONTENTS

**Page**

ARGUMENT ................................................................................................ 1

I.    Plaintiffs' Supremacy Clause and Extraterritoriality Claims Challenging Senate Bill 253 Are Not Ripe ............................................ 1

II.    Plaintiffs Fail to Allege an Injury-in-Fact Sufficient to Establish Standing to Bring their Supremacy Clause and Extraterritoriality Claims as to SB 261 and Scope 1 and 2 of Senate Bill 253 ................. 3

III.    Plaintiffs Fail to State a Supremacy Clause Claim ............................... 4

    A.    The Constitution Provides No Basis for This Claim .................. 5

    B.    The Clean Air Act Does Not Preempt These Laws Either ......... 6

    C.    Senate Bills 253 and 261 Do Not Regulate Emissions ............. 6

IV.    Plaintiffs Fail to State a Dormant Commerce Clause Claim ............... 8

CERTIFICATE OF COMPLIANCE ......................................................... 12

ER-1786

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Am. Auto. Mfrs. Ass'n v. Cahill*
152 F.3d 196 (2d Cir. 1998) .................................................................. 7

*American Electric Power Company, Inc. v. Connecticut* (*AEP*)
564 U.S. 410 (2011) ............................................................................. 5

*Ass'n of Am. Railroads v. Randolph*
No. 22-3-CV-01154, 2024 WL 664359 (E.D. Cal. Feb. 16, 2024) ..................... 4

*Banco Nacional de Cuba v. Sabbatino*
376 U.S. 398 (1964) ............................................................................. 6

*Bohmker v. Oregon*
903 F.3d 1029 (9th Cir. 2018) ............................................................. 7

*California Sea Urchin Comm'n v. Bean*
883 F.3d 1173 (9th Cir. 2018) ............................................................. 4

*California Trucking Ass'n v. Bonta*
996 F.3d 644 (9th Cir. 2021) ............................................................... 3

*City of New York v. Chevron Corp.*
993 F.3d 81 (2d Cir. 2021) .................................................................. 7

*Clapper v. Amnesty Int'l USA*
568 U.S. 398 (2013) ............................................................................. 4

*Dep't of Revenue of Ky. v. Davis*
553 U.S. 328 (2008) ............................................................................. 9

*Energy & Env't Legal Inst. v. Epel*
793 F.3d 1169 (10th Cir. 2015) ........................................................... 5

*Exxon Corp. v. Maryland*
437 U.S. 117 (1978) ............................................................................. 9

*Gov't Suppliers Consolidating Servs., Inc. v. Bayh*
975 F.2d 1267 (7th Cir. 1992) ............................................................. 2

**ER-1787**

1
2

## TABLE OF AUTHORITIES
### (continued)

Page

3
4

*Illinois v. City of Milwaukee*
    406 U.S. 91 (1972) ............................................................... 6

5
6

*International Paper Company v. Ouellette*
    479 U.S. 481 (1987) ............................................................ 5

7
8

*Italian Colors Rest. v. Becerra*
    878 F.3d 1165 (9th Cir. 2018) ............................................ 3

9
10

*Jensen Fam. Farms, Inc. v. Monterey Bay Unified Air Pollution*
    *Control Dist.*
    644 F.3d 934 (9th Cir. 2011) ........................................ 7, 10

11
12

*Kurns v. R.R. Friction Prod. Corp.*
    565 U.S. 625 (2012) ............................................................ 8

13
14

*L.A. Haven Hospice, Inc. v. Sebelius*
    638 F.3d 644 (9th Cir. 2011) .............................................. 4

15
16

*Los Altos Boots v. Bonta*
    562 F. Supp. 3d 1036 (E.D. Cal. 2021) ............................. 2

17
18

*Maine v. Taylor*
    477 U.S. 131 (1986) ............................................................ 9

19

*Metro. Taxicab Bd. of Trade v. City of New York*
    633 F. Supp. 2d 83 (S.D.N.Y. 2009) .................................. 7

20
21

*Nat'l Pork Producers Council v. Ross*
    598 U.S. 356 (2023) .......................................................... 10

22
23

*Neighborhood Mkt. Ass'n, Inc. v. Cnty. of San Diego*
    529 F. Supp. 3d 1123 (S.D. Cal. 2021) .............................. 7

24
25

*Puente Arizona v. Arpaio*
    821 F.3d 1098 (9th Cir. 2016) ............................................ 2

26
27

*Puerto Rico Dep't of Consumer Affs. v. Isla Petroleum Corp.*
    485 U.S. 495 (1988) ............................................................ 4

28

**ER-1788**

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Retail Indus. Leaders Ass'n v. Fielder*
  475 F.3d 180 (4th Cir. 2007) ................................................................ 2

*Rocky Mountain Farmers Union v. Corey*
  730 F.3d 1070 (9th Cir. 2013) ........................................................ 5, 10

*Rosenblatt v. City of Santa Monica*
  940 F.3d 439 (9th Cir. 2019) ................................................................ 9

*San Diego Bldg. Trades Council v. Garmon*
  359 U.S. 236 (1959) ............................................................................. 8

*Union Pac. R. Co. v. California Pub. Utilities Comm'n*
  346 F.3d 851 (9th Cir. 2003) ................................................................ 2

*United States v. California*
  444 F. Supp. 3d 1181 (E.D. Cal. 2020) ............................................... 5

*Valeria G. v. Wilson*
  12 F. Supp. 2d 1007 (N.D. Cal. 1998) ................................................. 1

*VIZIO, Inc. v. Klee*
  886 F.3d 249 (2d Cir. 2018) ........................................................... 5, 10

*Ward v. United Airlines, Inc.*
  986 F.3d 1234 (9th Cir. 2021) .............................................................. 9

*Zschernig v. Miller*
  389 U.S. 429 (1968) ............................................................................. 6

**STATUTES**

California Health and Safety Code
  § 38532(b)(1)(B)(2) .............................................................................. 1
  § 38532(c)(1) ........................................................................................ 2
  § 38532(c)(1)(D)(i) ............................................................................... 1
  § 38532(c)(1)(F)(ii) .............................................................................. 2
  § 38532(c)(4) ........................................................................................ 2
  § 38532(f)(2)(A) ................................................................................... 8
  § 38533(e)(2) ........................................................................................ 8

iv

**TABLE OF AUTHORITIES**
**(continued)**

Page

**CONSTITUTIONAL PROVISIONS**

First Amendment ............................................................................... 3

**OTHER AUTHORITIES**

Senate Bill 253, 2022-2023 Reg. Sess. § 1(c) (2023) ............................... 9

Senate Bill 261, 2022-2023 Reg. Sess. § 1(j) (2023) ............................... 9

**ARGUMENT**

Plaintiffs argue that Senate Bills 253 and 261 are both preempted by federal law and invalid "under the Constitution's limitations on extraterritorial regulation" because, Plaintiffs assert, those statutes regulate emissions and discriminate against out-of-state commerce in the process. But the laws do neither. Instead, they require the largest companies doing business in California to prepare factual disclosures regarding the sources and volumes of greenhouse gas emissions associated with their business operations and the climate-related financial risks those companies face. Plaintiffs' preemption and extraterritoriality claims have no basis in law. Additionally, Plaintiffs brought suit before these claims are ripe, and failed to plead the facts necessary to establish an injury-in-fact. Accordingly, Plaintiffs' second and third causes of action should be dismissed.[1]

**I. PLAINTIFFS' SUPREMACY CLAUSE AND EXTRATERRITORIALITY CLAIMS CHALLENGING SENATE BILL 253 ARE NOT RIPE**

Because CARB has not yet adopted the regulations necessary to implement Senate Bill 253, challenges to that law are not yet ripe. Plaintiffs argue that "nothing CARB has the power to do" will impact resolution of the issues raised in this litigation. Opp. 9:22. To the contrary, "further development by [CARB] may . . . change the nature of the issues presented." *Valeria G. v. Wilson*, 12 F. Supp. 2d 1007, 1026 (N.D. Cal. 1998). For example, the statute does not define the term "does business in California," Cal. Health & Safety Code § 38532(b)(1)(B)(2), and CARB may decide to define it to exclude a company that does no more than sell "a pack of gum" in the State, removing one of Plaintiffs' concerns. Opp. 19:16-18. Through its regulations, CARB must also "minimize[] duplication of effort" in light of other emission reporting regimes. Cal. Health & Safety Code

---

[1] In the interest of the efficient adjudication of this case, Defendants are dropping the portion of their motion that sought to dismiss the Attorney General, in his official capacity, from this suit. In doing so, Defendants do not concede that any of Plaintiffs' arguments regarding sovereign immunity have merit.

§ 38532(c)(1)(D)(i). The ways in which CARB considers compliance with different reporting regimes may bear directly on Plaintiffs' facial challenges, which require Plaintiffs to show that *all* applications of the future regulations are preempted or violate the dormant Commerce Clause. *See* MTD 16 n.7; *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir. 2016). Moreover, CARB must clarify reporting procedures in consultation with accounting experts, investors, and reporting entities, Cal. Health & Safety Code § 38532(c)(4), which could resolve alleged issues with inconsistent disclosures and alleviate the financial burdens Plaintiffs allege. *See* Opp. 4:24-27.

Moreover, examination of these laws is premature because Plaintiffs have not pleaded an immediate harm to any of their members' businesses, *cf. Gov't Suppliers Consolidating Servs., Inc. v. Bayh*, 975 F.2d 1267, 1275-76 (7th Cir. 1992) (finding challenge ripe before the adoption of implementing regulations when record demonstrated the statute's "immediate damaging effect on [plaintiffs'] businesses"), nor the need to make an immediate adjustment of internal business practices to comply with the law. *Cf. Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 186-88 (4th Cir. 2007) (plaintiff's member company "face[d] the imminent injury" of "alter[ing] its internal accounting procedures and [] spending *now* to comply with the Act"); *see also Los Altos Boots v. Bonta*, 562 F. Supp. 3d 1036, 1042-43 (E.D. Cal. 2021) (statute was *self-effectuating* and the statue *had already begun* to have an impact on business).[2] In fact, Senate Bill 253, on its own, imposes no obligations on Plaintiffs' members, Cal. Health & Safety Code § 38532(c)(1), and cannot be enforced until 2026, a full year after CARB is directed to promulgate its regulations. *Id.* § 38532(c)(1)(F)(ii).

---

[2] Plaintiffs' citation of *Union Pac. R. Co. v. California Pub. Utilities Comm'n*, 346 F.3d 851, 871 (9th Cir. 2003) is further misplaced, as that court found a challenge was ripe where the parties agreed that *any* standard issued would burden the instrumentalities of interstate commerce.

2

1      Nor does the Complaint identify any "conflict" between the statute and the

2  ways Plaintiffs' members' currently conduct their operations. *California Trucking*

3  *Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021); Opp. 10. While the future

4  regulations may require some of Plaintiffs' members to take additional actions, the

5  statute itself does not require action now. Moreover, Plaintiffs' members may

6  change their practices, or not even be covered by the laws, by the time the statute is

7  enforceable or requires them to do anything. *See Italian Colors Rest. v. Becerra*,

8  878 F.3d 1165, 1171 (9th Cir. 2018) (looking to whether there "is a credible threat

9  that the challenged provision will be invoked against [plaintiffs]") (cleaned up).

10      At minimum, this Court should decline to exercise jurisdiction on prudential

11  grounds. CARB's regulations may clarify which companies are covered and the

12  nature of the required disclosures. And Plaintiffs point to no hardship to their

13  members, apart from conclusory assertions, if the Court were to withhold

14  consideration. The only harm Plaintiffs identify is a hypothetical harm *to the Court*

15  if "forced to rule on an emergency basis," Opp. 10, which is not the relevant

16  inquiry. In any event, that eventuality is unlikely to arise given that covered entities

17  do not have compliance obligations until 2026. There will be ample time for

18  litigation before then, and that litigation can proceed on a more concrete set of facts

19  and issues once regulations are adopted.

**II.   PLAINTIFFS FAIL TO ALLEGE AN INJURY-IN-FACT SUFFICIENT TO ESTABLISH STANDING TO BRING THEIR SUPREMACY CLAUSE AND EXTRATERRITORIALITY CLAIMS AS TO SB 261 AND SCOPE 1 AND 2 OF SENATE BILL 253[3]**

23      Plaintiffs do not meaningfully dispute that their injury-in-fact allegations are

24  both sparse and conclusory. Plaintiffs identify only two member companies by

---

[3] Defendants do not "concede" that Plaintiffs have standing regarding either their First Amendment claim or the Scope 3 emissions requirement. Opp. at 5. Rather, Defendants acknowledge only that Plaintiffs have pleaded facts that, if taken as true, could be seen to establish standing for these components of their complaint.

**ER-1793**

1   name that are purportedly subject to the laws, and they allege facts sufficient only

2   to establish that these two companies would be regulated—not that they will or are

3   likely to suffer any injury that could be characterized as "concrete, particularized,

4   and actual or imminent."  FAC ¶ 20; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398,

5   409 (2013).

6        Plaintiffs attempt to excuse these pleading deficiencies by arguing that they

7   can be "presumed to have constitutional standing" because their members are "the

8   direct object of regulatory action challenged as unlawful."  Opp. 6 (quoting *L.A.*

9   *Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 655 (9th Cir. 2011)).  But "*L.A.*

10  *Haven* . . . do[es] not create an exception to the requirement that a party for

11  standing must show a concrete and particularized injury."  *California Sea Urchin*

12  *Comm'n v. Bean*, 883 F.3d 1173, 1181 (9th Cir. 2018), as amended (Apr. 18, 2018).

13  Plaintiffs must still allege facts that could establish their named members face

14  "concrete and particular burdensome requirements."  *Id.*  Here, where many

15  companies already disclose their climate-change risks and scope 1 and 2 emissions,

16  Plaintiffs must allege facts that establish "*additional* costs" or other injuries the

17  identified members will bear.  *Ass'n of Am. Railroads v. Randolph*, No. 22-3-CV-

18  01154, 2024 WL 664359, at *7 (E.D. Cal. Feb. 16, 2024).  But the Complaint

19  contains no allegations about disclosures the two identified companies already

20  make; nor does it even identify a member company with concrete plans to comply.

21  Consequently, this Court cannot presume that these members face any additional

22  injury-in-fact—financial, stigmatic, or otherwise.

### III.  PLAINTIFFS FAIL TO STATE A SUPREMACY CLAUSE CLAIM

24       Plaintiffs' second claim supposedly sounds in preemption.  FAC 26:21.  There

25  is, however, "no federal pre-emption *in vacuo,* without a constitutional text or a

26  federal statute to assert it."  *Puerto Rico Dep't of Consumer Affs. v. Isla Petroleum*

27  *Corp.*, 485 U.S. 495, 503 (1988); *see also* MTD 14:17-15:6.  Plaintiffs do not

28  identify any constitutional or statutory provision that preempts these state

**ER-1794**

1  disclosure requirements.  Plaintiffs' claim also relies on a false premise—that these

2  disclosure requirements regulate emissions.

3  **A.  The Constitution Provides No Basis for This Claim**

4  Plaintiffs first attempt to ground their preemption claim in "federalism and

5  comity principles embodied in the Constitution."  Opp. 12:22-23.  But they fail to

6  identify any constitutional principle (much less text) that precludes States from

7  requiring that corporations doing business in the State disclose information about

8  their national or global operations.  In fact, States can and do require such

9  information.  *See VIZIO, Inc. v. Klee*, 886 F.3d 249, 253 (2d Cir. 2018) (affirming

10  State's use of *national* market-share to determine manufacturers' mandatory

11  contributions to costs of state recycling program).

12  Plaintiffs appear to believe that the Constitution precludes States from

13  concerning themselves with greenhouse gas emissions because "[c]limate change is

14  by its very nature global."  Opp. 12:24.  But courts have consistently upheld states'

15  authority to *regulate* greenhouse gas emissions.  *E.g., Rocky Mountain Farmers*

16  *Union v. Corey*, 730 F.3d 1070, 1077 (9th Cir. 2013) (rejecting constitutional

17  challenges to "one such regulatory scheme"); *Energy & Env't Legal Inst. v. Epel*,

18  793 F.3d 1169 (10th Cir. 2015) (Gorsuch, J.) (same); *United States v. California*,

19  444 F. Supp. 3d 1181 (E.D. Cal. 2020) (same).  Plaintiffs neither acknowledge this

20  nor explain why States cannot require the simple *disclosure* of greenhouse gas

21  emissions.  Plaintiffs lean on *American Electric Power Company, Inc. v.*

22  *Connecticut* (*AEP*), 564 U.S. 410, 415 (2011), but that case held only that the Clean

23  Air Act displaced federal common law.  *Id.* at 415, 425.  It said nothing about state

24  statutes or regulations, generally, or disclosure requirements, specifically.[4]

25  _____

[4] Plaintiffs' water pollution cases fare no better.  While *International Paper*
26  *Company v. Ouellette*, 479 U.S. 481, 483, 497 (1987), provides that Vermont
nuisance law may not be used to require a New York facility to install particular
27  equipment to reduce its polluting discharges, it says nothing about a State's
authority *to request information* from companies that choose to do business in the
28  State.  Similarly, the "control[]" of pollution in "interstate or navigable waters,"

Plaintiffs' feint at foreign affairs preemption is equally unavailing.  Opp. 13:8-20.  None of Plaintiffs' cases involve informational disclosures of the kind at issue here.  *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 424-25 (1964) (validity of foreign nation's expropriation decree); *Zschernig v. Miller*, 389 U.S. 429, 433-34 (1968) (ability of State probate courts to inquire into the credibility of "consuls, ambassadors, and other representatives of foreign nations").  While Senate Bills 253 and 261 apply to some multi-national *companies* doing business in California, neither law involves "this country's relations with other *nations*."  *Sabbatino*, 376 U.S. at 408 (emphasis added).  And Plaintiffs point to no factual allegations that could support a contrary conclusion.  Opp. 13:8-20.

**B.    The Clean Air Act Does Not Preempt These Laws Either**

With respect to their statutory claim, Plaintiffs tellingly identify no text of the Clean Air Act that preempts state disclosure requirements or, indeed, *any* state regulation at all.  Plaintiffs purport to rely on "the structure of the Clean Air Act."  Opp. 17:1.  But Plaintiffs' description of several ways in which EPA regulates greenhouse gas emissions under the Act, *id.* at 15:14-16:12, does nothing to establish that "[t]his comprehensive statutory system precludes supplemental state regulation" of any kind, much less of the kind at issue here, *id.* at 16:13-14.  To the extent Plaintiffs mean to suggest that Congress intended EPA alone to regulate greenhouse gas emissions, *id.* at 17:16-18, that is both incorrect, *supra* at III.A, and irrelevant.  Likewise, Plaintiffs' narrower proposition—that the Act "does not license California to regulate emissions around the world," *id.* at 17:21-22 (cleaned up)—is irrelevant because neither California statute regulates emissions anywhere.

**C.    Senate Bills 253 and 261 Do Not Regulate Emissions**

Ultimately both of Plaintiffs' preemption theories fail because they rest on the erroneous premise that by requiring large companies to disclose their emissions,

---

*Illinois v. City of Milwaukee*, 406 U.S. 91, 102 (1972), is not related to the requirement to make informational disclosures.

ER-1796

1   California is *regulating* those emissions.[5]  *E.g.,* Opp. 12:26-27, 18:10.  Plaintiffs do

2   not, and cannot, identify any authority that remotely supports this premise.  To the

3   contrary, the Ninth Circuit has rejected the argument that an air pollution agency's

4   requirement that owners of certain diesel engines "provide information" about those

5   engines equated to regulating the emissions of those engines.  *Jensen Fam. Farms,*

6   *Inc. v. Monterey Bay Unified Air Pollution Control Dist.*, 644 F.3d 934, 939 (9th

7   Cir. 2011).  Other courts have similarly recognized that emission regulations

8   contain some form of "command having a direct effect on the level of emissions."

9   *Metro. Taxicab Bd. of Trade v. City of New York*, 633 F. Supp. 2d 83, 104

10  (S.D.N.Y. 2009) (quoting *Am. Auto. Mfrs. Ass'n v. Cahill*, 152 F.3d 196, 200 (2d

11  Cir. 1998)).[6]

12      Plaintiffs concede that these statutes "do not directly require reductions in

13  greenhouse-gas emissions."  FAC ¶ 88.  So, they now argue that California may not

14  impose such requirements *indirectly*.  Opp. 13:21-27.[7]  But Plaintiffs fail to identify

15  factual allegations that could support a conclusion that either statute does so.

16  Plaintiffs argue that imposing liability for damages caused by emissions constitutes

17  regulation, but there is no need to engage that argument because neither of these

18  statutes imposes any liability for emissions-related harms.  *Cf. City of New York v.*

19

20      [5] Notably, Plaintiffs cannot maintain a Supremacy Clause claim against
    Senate Bill 261 because they do not even attempt to connect the mandatory risk
21  disclosures to the control of emissions that constitutes the entire basis of their
    preemption claim.

22      [6] Still more courts have likewise rejected arguments that a regulation
    requiring or prohibiting one action (e.g., a disclosure) is a *de facto* regulation of
23  other conduct (e.g., emissions).  *E.g., Neighborhood Mkt. Ass'n, Inc. v. Cnty. of San
    Diego*, 529 F. Supp. 3d 1123, 1133-34 (S.D. Cal. 2021) (noting holding that "sales
24  ban on flavored tobacco products is not a *de facto* manufacturing regulation");
    *Bohmker v. Oregon*, 903 F.3d 1029, 1044 (9th Cir. 2018) (rejecting characterization
25  of regulation that did not prohibit or require certain uses of land as *de facto* land-use
    regulation).

26      [7] Plaintiffs imply *Defendants* suggested indirect regulation might be present.
    Opp. 13:21-22.  But they base that on Defendants' quotation of *Plaintiffs'*
27  Complaint; Defendants have never suggested that Senate Bills 253 and 261 regulate
    emissions.  MTD 13:3-14:4.

28

7

**ER-1797**

1 | *Chevron Corp.*, 993 F.3d 81, 93 (2d Cir. 2021); *Kurns v. R.R. Friction Prod. Corp.*,

2 | 565 U.S. 625, 637 (2012) (quoting *San Diego Bldg. Trades Council v. Garmon*, 359

3 | U.S. 236, 247 (1959)).[8]  A company that accurately reported more emissions and

4 | climate costs than any of its peers would have complied with its obligations under

5 | the statutes; the statutes impose no follow-on duty to reduce.  The only penalties

6 | regulated entities may face under the bills are for failure to disclose.  Cal. Health &

7 | Safety Code §§ 38532(f)(2)(A), 38533(e)(2).

8 |      Plaintiffs argue that third-parties—investors, consumers, and/or others—may

9 | make use of the disclosed information to pressure companies to reduce their

10 | emissions.  Opp. 14:1-23.  But Plaintiffs cite no authority for the proposition that

11 | whether a State is regulating particular conduct turns on the actions of private third-

12 | parties that the State does not control.  The proper inquiry is whether these

13 | particular laws actually mandate emission limitations or controls.  The plain text of

14 | both statutes clearly does no such thing.  Senate Bills 253 and 261 require the

15 | disclosure of information but do not require regulated entities to alter their emission

16 | levels *at all*.

## IV. PLAINTIFFS FAIL TO STATE A DORMANT COMMERCE CLAUSE CLAIM

18 |      Plaintiffs purport to bring their third claim under "the Constitution's

19 | limitations on extraterritorial regulation, including the Dormant Commerce

20 | Clause."  FAC ¶ 112; *see also id.* at 27:19-21.  However, as Defendants showed in

21 | their motion, there is no such freestanding claim under the dormant Commerce

22 | Clause.  MTD 16:19-17:23.  Plaintiffs do not dispute the point.  Instead, Plaintiffs

23 | now assert a different claim: one of "purposeful discrimination against out-of-state

24 | economic interests."  Opp. 19:1-2 (cleaned up).  But Plaintiffs cannot amend their

---

[8] Plaintiffs' reliance on *Kurns* for an undeveloped point about extraterritorial regulation is odd, Opp. 13:16-18, because the case does not address the issue; here Plaintiffs pleaded a separate claim for "extraterritorial regulation," *see* MTD 15:27-28.

8

1   Complaint through their opposition brief, and in any event, have failed to state any

2   discrimination claim.  MTD 18:3-19:25.[9]  This claim should be dismissed with

3   prejudice.[10]

4        Plaintiffs have not alleged, and cannot allege, facts sufficient to establish the

5   "fundamental element" of a dormant Commerce Clause discrimination claim—that

6   the state statutes apply "differential treatment favoring local entities over

7   substantially similar out-of-state interests." *Dep't of Revenue of Ky. v. Davis*, 553

8   U.S. 328, 342-43 (2008).  Plaintiffs have not identified any in-state entities that are

9   favored over substantially similar out-of-state competitors.  *Rosenblatt v. City of*

10  *Santa Monica*, 940 F.3d 439, 451 (9th Cir. 2019); *Ward v. United Airlines, Inc.*,

11  986 F.3d 1234, 1239 (9th Cir. 2021).  Nor can they do so.  These statutes require

12  the same disclosures of all similarly situated businesses.  These are simply not

13  "regulatory measures designed to benefit in-state economic interests by burdening

14  out-of-state competitors." *Id.* at 337-38 (cleaned up).

15       Plaintiffs argue that the laws will deprive out-of-state interests of "the

16  competitive advantages they would possess" if California regulated only in-state

17  businesses.  Opp. 19:10-13 (cleaned up).  But the Constitution does not require

18  States to grant an *affirmative advantage* to out-of-state companies who choose to do

19  business in the State by *excusing* them from regulations that apply generally to

20  anyone else choosing to do business in the State.  *E.g., Exxon Corp. v. Maryland*,

21  437 U.S. 117, 125 (1978) (affirming state law that regulated *only* out-of-state

22  companies).  Plaintiffs also point to no factual allegations in the Complaint that

23

24       [9] Plaintiffs cite to a conclusory allegation that the State has not identified the
benefits of these disclosures.  Opp. 19:23.  That allegation cannot be credited.  *See*
25  S.B. 253, 2022-2023 Reg. Sess. § 1(c) (2023); *see also*, S.B. 261, 2022-2023 Reg.
Sess. § 1(j) (2023).  In any event, Plaintiffs have not met their threshold burdens to
26  demand a showing of the statute's benefits.  *Maine v. Taylor*, 477 U.S. 131, 138
(1986) (requiring benefit showing "since Maine's import ban discriminates on its
27  face against interstate trade"); MTD 20:2-10.

28       [10] Plaintiffs have no response to Defendants' showing that, at a minimum,
any facial challenge must be dismissed with prejudice.  *See* MTD 16:24-28.

ER-1799

1    could establish a cognizable competitive advantage—like "the opportunity to

2    charge lower prices"—that is stripped away from out-of-state companies by either

3    California statute. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 372

4    (2023); *see also* Opp. 19:27-20:4.

5           Plaintiffs' hypothetical of an out-of-state company that sells a single pack of

6    gum in California likewise cannot save their claim. Opp. 19:15-22. As an initial

7    matter, the implausibility that a company meeting the threshold revenue

8    requirements ($500 million (Senate Bill 261) or $1 billion (Senate Bill 253)) would

9    seek to sell a single pack of gum, and no more, in California—and the speculation

10   that CARB's eventual regulations would view such sales as "doing business" in

11   California for purposes of the law—simply underscore that plaintiffs' challenge is

12   not ripe. *See supra* at I. In any event, courts have consistently rejected dormant

13   Commerce Clause challenges to state laws that "do[] nothing to *control* interstate

14   commerce, but rather merely *consider[]* out-of-state activity." *VIZIO, Inc.*, 886

15   F.3d at 256; *see also e.g.*, *Rocky Mountain Farmers Union*, 730 F.3d at 1081

16   (upholding California regulation "designed … to account for emissions associated

17   with all aspects of the production, refining, and transportation of a fuel" regardless

18   of location). Nothing in either California statute "compel[s]" a company to control

19   its emissions "outside of [California] on the state's proscribed terms," *VIZIO*, 886

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28

10

**ER-1800**

1    F.3d at 256, or, indeed, on any terms at all.  The statutes merely require qualifying

2    companies to disclose information.  Plaintiffs provide no authority for the

3    proposition that such requirements violate the dormant Commerce Clause.

4

5

6              Dated:  June 7, 2024                          Respectfully submitted,

7                                                            ROB BONTA
                                                             Attorney General of California
8                                                            GARY E. TAVETIAN
                                                             MYUNG J. PARK
9                                                            Supervising Deputy Attorneys General

10                                                           /s/ Caitlan McLoon

11

12                                                           CAITLAN MCLOON
                                                             Deputy Attorney General
13                                                           *Attorneys for Defendants Liane M.*
                                                             *Randolph, Steven S. Cliff, and Robert*
14                                                           *A. Bonta*

     SA2024300503
15   66845998.docx

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                    11

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendants Liane M. Randolph, Steven S. Cliff, and Robert A. Bonta, certifies that this brief contains 3,296 words, which complies with the word limit set by the court's standing order.

Dated:  June 7, 2024                          Respectfully submitted,

                                              ROB BONTA
                                              Attorney General of California


                                              */s/ Caitlan McLoon*

                                              CAITLAN MCLOON
                                              Deputy Attorney General
                                              *Attorneys for Defendants Liane M.*
                                              *Randolph, Steven S. Cliff, and Robert*
                                              *A. Bonta*

12

# CERTIFICATE OF SERVICE

Case Name: **Chamber of Commerce of the United States of America, et al.**
**v. Liane M. Randolph, et al.**

Case No.: **2:24-cv-00801-ODW-PVC**

I hereby certify that on June 7, 2024, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on June 7, 2024, at Los Angeles, California.

| Beatriz Davalos | /s/ Beatriz Davalos |
|:---:|:---:|
| Declarant | Signature |

SA2024300503
66591334.docx

13

**ER-1803**

(53 of 292), Page 53 of 292  Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 53 of 292
Case 2:24-cv-00801-ODW-PVC   Document 48-32   Filed 05/24/24   Page 1 of 4   Page ID
#:1359

1

2

3

4

5

6

7

8

9

10

11  IN THE UNITED STATES DISTRICT COURT

12  FOR THE CENTRAL DISTRICT OF CALIFORNIA,

13  WESTERN DIVISION

| | |
|---|---|
| 14  CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION, | CASE NO. 2:24-cv-00801-ODW-PVC **DECLARATION OF MICHAEL WHITE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON CLAIM I** |

Plaintiffs,

v.

LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California.

Defendants.

26

27

28

i

DECLARATION OF MICHAEL WHITE IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON CLAIM I
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-1804**

1.    My name is Michael White, and I am a fourth-generation farmer based in Wilbarger County, Texas. My brother, nephew, and I raise wheat, cotton, hay, and cattle on our family farm, White Farms and Cattle, which has been in operation for over 100 years. I am a member of the American Farm Bureau Federation.

2.    Although I do not operate in California and do not sell directly to California companies, my cattle is in the supply chain of companies that will be subject to Scope 3 reporting requirements under S.B. 253. I retain ownership of my cattle until they are sold to packers (slaughter-houses), who, in turn, sell beef to grocery stores. For example, I understand that Tyson Foods has purchased my cattle and, in turn, has sold beef to California customers, including grocery stores. I understand that Tyson Foods and many of their customers have revenue exceeding $1 billion and conduct business in California, and are accordingly subject to S.B. 253.

3.    I further understand that S.B. 253 will require companies subject to the law to report their "Scope 3 emissions," which includes "indirect upstream and downstream greenhouse gas emissions, other than scope 2 emissions, from sources that the reporting entity does not own or directly control and may include, but are not limited to, purchased goods and services, business travel, employee commutes, and processing and use of sold products." I am an "upstream" source for Tyson Foods. Accordingly, Tyson Foods will be required to include in their emissions reports under S.B. 253 information about my emissions. These businesses would thus likely require me to report to them, and verify, information about my greenhouse-gas emissions.

4.    I am concerned, however, that the procedures, documentation, and recordkeeping required to supply and verify information about my greenhouse-gas emissions to purchasers of my cattle will be incredibly onerous and burdensome for my operation and farms like mine. For example, I do not currently track my greenhouse-gas emissions. I do not have experience tracking greenhouse-gas emissions. And I do not have any policies, procedures, or systems in place for tracking, recording, or reporting greenhouse-gas emissions. Developing these policies, procedures, or systems

1

DECLARATION OF MICHAEL WHITE IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON CLAIM I
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-1805**

1   would be enormously burdensome.  A farm is not a power plant where a known quantity
2   of fuel produces a known quantity of energy.  To the contrary, on any given day, my
3   farm requires varying levels of water, fertilizer, and crop protection products.  Tracking
4   these fluctuations in the context of measuring greenhouse-gas emissions would be an
5   enormous undertaking, for which my farm has no pre-existing procedures, policies, or
6   systems in place.

7        5.     And as a family farm, I would be at a significant competitive disadvantage
8   to larger farms who could spread the fixed costs of tracking greenhouse-gas emissions
9   over more units of output.  As a result of this competitive dynamic, only very large farm
10  operations are likely to remain competitively viable.

11       6.     Further, I face significant risk that anomalous weather events or other acts
12  of nature can cause the greenhouse-gas emissions I will need to report to my purchasers
13  to spike per unit of output, through no fault of my own, endangering my business.  For
14  example, if drought or disease were to destroy part of my livestock, my greenhouse-gas
15  emissions *per unit of output* would substantially increase, which could cause purchasers
16  required to report their Scope 3 emissions (which would include my emissions) to refuse
17  to purchase my livestock (or demand a steep discount).  Again, as a result of this risk
18  and the competitive dynamics of the market, only the largest farms, who are able to
19  spread costs and emissions over much larger volumes of output, are likely to remain
20  competitively viable.

21       7.     In addition, in connection with my business, I make statements to potential
22  purchasers and others concerning the quality and other characteristics of my livestock.
23  If my purchasers are required to report their Scope 3 emissions, I, in turn, could be
24  required to make statements about my emissions.  However, I do not believe the
25  statements that I would be required to make would accurately portray my emissions.  For
26  instance, I do not believe that I bear responsibility for potential spikes in my emissions
27  per unit of output attributable to anomalous weather or other natural events, as discussed
28  above.

2

Gibson, Dunn &
Crutcher LLP

DECLARATION OF MICHAEL WHITE IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON CLAIM I
CASE NO. 2:24-CV-00801-ODW-PVC

ER-1806

(56 of 292), Page 56 of 292 Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 56 of 292
Case 2:24-cv-00801-ODW-PVC   Document 48-32   Filed 05/24/24   Page 4 of 4   Page ID
#:1362

1

2          Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the

3    foregoing is true and correct.  Executed this 21st day of May 2024 at Vernon, Texas.

4

5                        Michael White

6                    On behalf of White Farms and Cattle

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

DECLARATION OF MICHAEL WHITE IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON CLAIM I
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-1807**

1

2

3

4

5

6

7

8

9

10

11

IN THE UNITED STATES DISTRICT COURT

12

FOR THE CENTRAL DISTRICT OF CALIFORNIA,

13

WESTERN DIVISION

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION, <br><br> Plaintiffs, <br><br> v. <br><br> LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California. <br><br> Defendants. | CASE NO. 2:24-cv-00801-ODW-PVC <br><br> **DECLARATION OF GARRETT HAWKINS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON CLAIM I** |

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn & Crutcher LLP

i

DECLARATION OF GARRETT HAWKINS IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON CLAIM I
CASE NO. 2:24-CV-00801-ODW-PVC

ER-1808

(58 of 292), Page 58 of 292  Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 58 of 292
Case 2:24-cv-00801-ODW-PVC   Document 48-31   Filed 05/24/24   Page 2 of 3   Page ID
#:1357

1.     My name is Garrett Hawkins. I am a fifth-generation farmer based in Appleton City, Missouri. I operate Triple H Farm with my father and brother. I am also the President of the Missouri Farm Bureau Federation and a member of the American Farm Bureau Federation.

2.     Triple H Farm raises beef cattle and markets them in local family-owned livestock auctions. I do not operate in California or sell directly to California companies. But my cattle are in the supply chain of companies that will be required to report their Scope 3 emissions under S.B. 253. I understand that my cattle are ultimately bought by meat packers, including Tyson, JBS, Cargill, and Marfrig, who, I understand, purchase about 85% of U.S. beef. I understand that beef purchased by Tyson, JBS, Cargill, and Marfrig is sold in California and that each company has revenue exceeding $1 billion. Accordingly, I understand that these companies are subject to reporting requirements, including Scope 3 emissions reporting requirements, under S.B. 253.

3.     S.B. 253 defines "Scope 3" emissions as "indirect upstream and downstream greenhouse gas emissions, other than scope 2 emissions, from sources that the reporting entity does not own or directly control and may include, but are not limited to, purchased goods and services, business travel, employee commutes, and processing and use of sold products." I understand that I am an "upstream" source for Tyson, JBS, Cargill, and Marfrig, among others. As a result, these companies will be required to include in their Scope 3 emissions reports information about my emissions.

4.     However, I do not track my emissions. And I do not have policies, procedures, or systems in place to do so. Developing an emissions tracking process would be enormously burdensome. For example, day to day, my farm requires varying levels of water, fertilizer, and other inputs. Tracking the emissions associated with these and other inputs would be a significant undertaking, for which neither myself nor any of my employees have experience.

5.     As a family farm, I would be at a significant competitive disadvantage to large farms who could spread the fixed costs of tracking greenhouse-gas emissions over

1

DECLARATION OF GARRETT HAWKINS IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON CLAIM I
CASE NO. 2:24-CV-00801-ODW-PVC    **ER-1809**

1   much greater output.  As a result of this competitive dynamic, only large farm operations

2   are likely to remain competitively viable.

3        6.    In addition, unlike large farms, I face a significant risk that anomalous

4   natural events, over which I have no control, will cause artificial spikes in my

5   greenhouse-gas emissions per unit of output.  For example, suppose a natural event, such

6   as drought, disease, or flooding, were to destroy part of my livestock.  That would spread

7   my total greenhouse-gas emissions over a smaller output, which would increase my per-

8   unit emissions.   In these circumstances, buyers who need to report their Scope 3

9   emissions, which would include my emissions, could refuse to purchase my livestock or

10  demand a steep discount.  Larger farms with much higher output are much less likely to

11  experience significant variation in their greenhouse-gas emissions per unit of output,

12  another disadvantage S.B. 253 will impose on family farms like mine.

13       7.    Finally, by requiring the firms who purchase my beef to report their

14  emissions, S.B. 253 may, in turn, require me to state my emissions, including to

15  purchasers.  I would not otherwise make these statements.  And I do not believe that

16  required emissions reports would be a fair representation of my emissions.  For instance,

17  I do not believe that I bear responsibility for potential spikes in my per-unit emissions

18  due to anomalous weather events.

19

20       Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

21  is true and correct.  Executed this 23 day of May 2024 at Jefferson City, Missouri.

22

23  *Garrett Hawkins*

24  Garrett Hawkins

25  On behalf of Triple H Farm

26

27

28

Gibson, Dunn &
Crutcher LLP

2

**ER-1810**

# Exhibit 25

## Governor Gavin Newsom's October 7, 2023 Signing Statement for S.B. 261

Declaration of Bradley J. Hamburger In Support Of
Plaintiffs' Motion for Summary Judgment on Claim I
May 24, 2024

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.*,
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)



## OFFICE OF THE GOVERNOR

OCT **0 7** 2023

To the Members of the California Senate:

I am signing Senate Bill 261 which would require, among other things, businesses with total annual revenues over $500 million and operating in California, beginning January 1, 2026, and biennially thereafter, to develop a report on its climate-related financial risks.

This policy will illustrate the real risks of climate change for businesses operating in California and will encourage them to adopt practices that seek to minimize and avoid these risks. However, the implementation deadlines fall short in providing the California Air Resources Board (CARB) with sufficient time to adequately carry out the requirements in this bill. I am directing my Administration to work with the bill's author and the Legislature next year to address this issue.

Additionally, I am concerned about the overall financial impact of this bill on businesses, so I am instructing CARB to closely monitor the cost impacts as it implements this new bill and to make recommendations to streamline the program. I look forward to working with the Legislature on these outstanding items to ensure that the bill's intent is achieved.

Sincerely,

Gavin Newsom

GOVERNOR GAVIN NEWSOM • SACRAMENTO, CA 95814 • (916) 445-2841

**ER-1812**

(62 of 292), Page 62 of 292  Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 62 of 292
Case 2:24-cv-00801-ODW-PVC  Document 48-23  Filed 05/24/24  Page 1 of 75  Page ID
#:1178

# Exhibit 20

## June 2017 Recommendations of the Task Force on Climate-Related Financial Disclosures

Declaration of Bradley J. Hamburger In Support Of
Plaintiffs' Motion for Summary Judgment on Claim I
May 24, 2024

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.*,
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)

**ER-1813**

**Final Report**

# Recommendations of the Task Force on Climate-related Financial Disclosures



TASK FORCE ON CLIMATE-RELATED
FINANCIAL DISCLOSURES

June 2017

ER-1814

(64 of 292), Page 64 of 292   Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 64 of 292
Case 2:24-cv-00801-ODW-PVC   Document 48-23   Filed 05/24/24   Page 3 of 75   Page ID
#:1180

June 15, 2017

Mr. Mark Carney
Chairman
Financial Stability Board
Bank for International Settlements
Centralbahnplatz 2
CH-4002 Basel
Switzerland

Dear Chairman Carney,

On behalf of the Task Force on Climate-related Financial Disclosures, I am pleased to present this final report setting out our recommendations for helping businesses disclose climate-related financial information.

As you know, warming of the planet caused by greenhouse gas emissions poses serious risks to the global economy and will have an impact across many economic sectors. It is difficult for investors to know which companies are most at risk from climate change, which are best prepared, and which are taking action.

The Task Force's report establishes recommendations for disclosing clear, comparable and consistent information about the risks and opportunities presented by climate change. Their widespread adoption will ensure that the effects of climate change become routinely considered in business and investment decisions. Adoption of these recommendations will also help companies better demonstrate responsibility and foresight in their consideration of climate issues. That will lead to smarter, more efficient allocation of capital, and help smooth the transition to a more sustainable, low-carbon economy.

The industry Task Force spent 18 months consulting with a wide range of business and financial leaders to hone its recommendations and consider how to help companies better communicate key climate-related information. The feedback we received in response to the Task Force's draft report confirmed broad support from industry and others, and involved productive dialogue among companies and banks, insurers, and investors. This was and remains a collaborative process, and as these recommendations are implemented, we hope that this dialogue and feedback continues.

Since the Task Force began its work, we have also seen a significant increase in demand from investors for improved climate-related financial disclosures. This comes amid unprecedented support among companies for action to tackle climate change.

I want to thank the Financial Stability Board for its leadership in promoting better disclosure of climate-related financial risks, and for its support of the Task Force's work. I am also grateful to the Task Force members and Secretariat for their extensive contributions and dedication to this effort.

The risk climate change poses to businesses and financial markets is real and already present. It is more important than ever that businesses lead in understanding and responding to these risks—and seizing the opportunities—to build a stronger, more resilient, and sustainable global economy.

Sincerely,

*Michael R. Bloomberg*

Michael R. Bloomberg

---

Case 2:24-cv-00801-ODW-PVC   Document 48-23   Filed 05/24/24   Page 4 of 75   Page ID #:1181

## Executive Summary

### Financial Markets and Transparency

One of the essential functions of financial markets is to price risk to support informed, efficient capital-allocation decisions. Accurate and timely disclosure of current and past operating and financial results is fundamental to this function, but it is increasingly important to understand the governance and risk management context in which financial results are achieved. The financial crisis of 2007-2008 was an important reminder of the repercussions that weak corporate governance and risk management practices can have on asset values. This has resulted in increased demand for transparency from organizations on their governance structures, strategies, and risk management practices. Without the right information, investors and others may incorrectly price or value assets, leading to a misallocation of capital.

> Increasing transparency makes markets more efficient and economies more stable and resilient.
> —Michael R. Bloomberg

### Financial Implications of Climate Change

One of the most significant, and perhaps most misunderstood, risks that organizations face today relates to climate change. While it is widely recognized that continued emission of greenhouse gases will cause further warming of the planet and this warming could lead to damaging economic and social consequences, the exact timing and severity of physical effects are difficult to estimate. The large-scale and long-term nature of the problem makes it uniquely challenging, especially in the context of economic decision making. Accordingly, many organizations incorrectly perceive the implications of climate change to be long term and, therefore, not necessarily relevant to decisions made today.

The potential impacts of climate change on organizations, however, are not only physical and do not manifest only in the long term. To stem the disastrous effects of climate change within this century, nearly 200 countries agreed in December 2015 to reduce greenhouse gas emissions and accelerate the transition to a lower-carbon economy. The reduction in greenhouse gas emissions implies movement away from fossil fuel energy and related physical assets. This coupled with rapidly declining costs and increased deployment of clean and energy-efficient technologies could have significant, near-term financial implications for organizations dependent on extracting, producing, and using coal, oil, and natural gas. While such organizations may face significant climate-related risks, they are not alone. In fact, climate-related risks and the expected transition to a lower-carbon economy affect most economic sectors and industries. While changes associated with a transition to a lower-carbon economy present significant risk, they also create significant opportunities for organizations focused on climate change mitigation and adaptation solutions.

For many investors, climate change poses significant financial challenges and opportunities, now and in the future. The expected transition to a lower-carbon economy is estimated to require around $1 trillion of investments a year for the foreseeable future, generating new investment opportunities.[1] At the same time, the risk-return profile of organizations exposed to climate-related risks may change significantly as such organizations may be more affected by physical impacts of climate change, climate policy, and new technologies. In fact, a 2015 study estimated the value at risk, as a result of climate change, to the total global stock of manageable assets as

---

[1] International Energy Agency, *World Energy Outlook Special Briefing for COP21*, 2015.

**ER-1816**

ranging from $4.2 trillion to $43 trillion between now and the end of the century.[2] The study highlights that "much of the impact on future assets will come through weaker growth and lower asset returns across the board." This suggests investors may not be able to avoid climate-related risks by moving out of certain asset classes as a wide range of asset types could be affected. Both investors and the organizations in which they invest, therefore, should consider their longer-term strategies and most efficient allocation of capital. Organizations that invest in activities that may not be viable in the longer term may be less resilient to the transition to a lower-carbon economy; and their investors will likely experience lower returns. Compounding the effect on longer-term returns is the risk that present valuations do not adequately factor in climate-related risks because of insufficient information. As such, long-term investors need adequate information on how organizations are preparing for a lower-carbon economy.

Furthermore, because the transition to a lower-carbon economy requires significant and, in some cases, disruptive changes across economic sectors and industries in the near term, financial policymakers are interested in the implications for the global financial system, especially in terms of avoiding financial dislocations and sudden losses in asset values. Given such concerns and the potential impact on financial intermediaries and investors, the G20 Finance Ministers and Central Bank Governors asked the Financial Stability Board to review how the financial sector can take account of climate-related issues. As part of its review, the Financial Stability Board identified the need for better information to support informed investment, lending, and insurance underwriting decisions and improve understanding and analysis of climate-related risks and opportunities. Better information will also help investors engage with companies on the resilience of their strategies and capital spending, which should help promote a smooth rather than an abrupt transition to a lower-carbon economy.

## Task Force on Climate-related Financial Disclosures

To help identify the information needed by investors, lenders, and insurance underwriters to appropriately assess and price climate-related risks and opportunities, the Financial Stability Board established an industry-led task force: the Task Force on Climate-related Financial Disclosures (Task Force). The Task Force was asked to develop voluntary, consistent climate-related financial disclosures that would be useful to investors, lenders, and insurance underwriters in understanding material risks. The 32-member Task Force is global; its members were selected by the Financial Stability Board and come from various organizations, including large banks, insurance companies, asset managers, pension funds, large non-financial companies, accounting and consulting firms, and credit rating agencies. In its work, the Task Force drew on member expertise, stakeholder engagement, and existing climate-related disclosure regimes to develop a singular, accessible framework for climate-related financial disclosure.

The Task Force developed four widely adoptable recommendations on climate-related financial disclosures that are applicable to organizations across sectors and jurisdictions (Figure 1). Importantly, the Task Force's recommendations apply to financial-sector organizations, including banks, insurance companies, asset managers, and asset owners. Large asset owners and asset managers sit at the top of the investment chain and, therefore, have an

Figure 1

### Key Features of Recommendations

– Adoptable by all organizations

– Included in financial filings

– Designed to solicit decision-useful, forward-looking information on financial impacts

– Strong focus on risks and opportunities related to transition to lower-carbon economy

---

[2] The Economist Intelligence Unit, "The Cost of Inaction: Recognising the Value at Risk from Climate Change," 2015. Value at risk measures the loss a portfolio may experience, within a given time horizon, at a particular probability, and the stock of manageable assets is defined as the total stock of assets held by non-bank financial institutions. Bank assets were excluded as they are largely managed by banks themselves.

important role to play in influencing the organizations in which they invest to provide better climate-related financial disclosures.

In developing and finalizing its recommendations, the Task Force solicited input throughout the process.[3] First, in April 2016, the Task Force sought public comment on the scope and high-level objectives of its work. As the Task Force developed its disclosure recommendations, it continued to solicit feedback through hundreds of industry interviews, meetings, and other touchpoints. Then, in December 2016, the Task Force issued its draft recommendations and sought public comment on the recommendations as well as certain key issues, receiving over 300 responses. This final report reflects the Task Force's consideration of industry and other public feedback received throughout 2016 and 2017. Section E contains a summary of key issues raised by the industry as well as substantive changes to the report since December.

### Disclosure in Mainstream Financial Filings

The Task Force recommends that preparers of climate-related financial disclosures provide such disclosures in their mainstream (i.e., public) annual financial filings. In most G20 jurisdictions, companies with public debt or equity have a legal obligation to disclose material information in their financial filings—including material climate-related information. The Task Force believes climate-related issues are or could be material for many organizations, and its recommendations should be useful to organizations in complying more effectively with existing disclosure obligations.[4] In addition, disclosure in mainstream financial filings should foster shareholder engagement and broader use of climate-related financial disclosures, thus promoting a more informed understanding of climate-related risks and opportunities by investors and others. The Task Force also believes that publication of climate-related financial information in mainstream annual financial filings will help ensure that appropriate controls govern the production and disclosure of the required information. More specifically, the Task Force expects the governance processes for these disclosures would be similar to those used for existing public financial disclosures and would likely involve review by the chief financial officer and audit committee, as appropriate.

Importantly, organizations should make financial disclosures in accordance with their national disclosure requirements. If certain elements of the recommendations are incompatible with national disclosure requirements for financial filings, the Task Force encourages organizations to disclose those elements in other official company reports that are issued at least annually, widely distributed and available to investors and others, and subject to internal governance processes that are the same or substantially similar to those used for financial reporting.

### Core Elements of Climate-Related Financial Disclosures

The Task Force structured its recommendations around four thematic areas that represent core elements of how organizations operate: governance, strategy, risk management, and metrics and targets (Figure 2, p. v). The four overarching recommendations are supported by recommended disclosures that build out the framework with information that will help investors and others understand how reporting organizations assess climate-related risks and opportunities.[5] In addition, there is guidance to support all organizations in developing climate-related financial disclosures consistent with the recommendations and recommended disclosures. The guidance assists preparers by providing context and suggestions for implementing the recommended disclosures. For the financial sector and certain non-financial sectors, *supplemental* guidance was developed to highlight important sector-specific considerations and provide a fuller picture of potential climate-related financial impacts in those sectors.

---

[3] See Appendix 2: Task Force Objectives and Approach for more information.

[4] The Task Force encourages organizations where climate-related issues could be material in the future to begin disclosing climate-related financial information outside financial filings to facilitate the incorporation of such information into financial filings once climate-related issues are determined to be material.

[5] See Figure 4 on p. 14 for the Task Force's recommendations and recommended disclosures.

**ER-1818**

Figure 2

## Core Elements of Recommended Climate-Related Financial Disclosures



**Governance**
The organization's governance around climate-related risks and opportunities

**Strategy**
The actual and potential impacts of climate-related risks and opportunities on the organization's businesses, strategy, and financial planning

**Risk Management**
The processes used by the organization to identify, assess, and manage climate-related risks

**Metrics and Targets**
The metrics and targets used to assess and manage relevant climate-related risks and opportunities

**Climate-Related Scenarios**

One of the Task Force's key recommended disclosures focuses on the resilience of an organization's strategy, taking into consideration different climate-related scenarios, including a 2° Celsius or lower scenario.[6] An organization's disclosure of how its strategies might change to address potential climate-related risks and opportunities is a key step to better understanding the potential implications of climate change on the organization. The Task Force recognizes the use of scenarios in assessing climate-related issues and their potential financial implications is relatively recent and practices will evolve over time, but believes such analysis is important for improving the disclosure of decision-useful, climate-related financial information.


## Conclusion

Recognizing that climate-related financial reporting is still evolving, the Task Force's recommendations provide a foundation to improve investors' and others' ability to appropriately assess and price climate-related risk and opportunities. The Task Force's recommendations aim to be ambitious, but also practical for near-term adoption. The Task Force expects to advance the quality of mainstream financial disclosures related to the potential effects of climate change on organizations today and in the future and to increase investor engagement with boards and senior management on climate-related issues.

Improving the quality of climate-related financial disclosures begins with organizations' willingness to adopt the Task Force's recommendations. Organizations already reporting climate-related information under other frameworks may be able to disclose under this framework immediately and are strongly encouraged to do so. Those organizations in early stages of evaluating the impact of climate change on their businesses and strategies can begin by disclosing climate-related issues as they relate to governance, strategy, and risk management practices. The Task Force recognizes the challenges associated with measuring the impact of climate change, but believes that by moving climate-related issues into mainstream annual financial filings, practices and techniques will evolve more rapidly. Improved practices and techniques, including data analytics, should further improve the quality of climate-related financial disclosures and, ultimately, support more appropriate pricing of risks and allocation of capital in the global economy.

---

[6] A 2° Celsius (2°C) scenario lays out an energy system deployment pathway and an emissions trajectory consistent with limiting the global average temperature increase to 2°C above the pre-industrial average. The Task Force is not recommending organizations use a specific 2°C scenario.

# Contents

Letter from Michael R. Bloomberg ........................................................................................................... i

Executive Summary ................................................................................................................................... ii

A  Introduction ........................................................................................................................................ 1
   1. Background ....................................................................................................................................... 1
   2. The Task Force's Remit .................................................................................................................... 2

B  Climate-Related Risks, Opportunities, and Financial Impacts ....................................................... 5
   1. Climate-Related Risks ...................................................................................................................... 5
   2. Climate-Related Opportunities ....................................................................................................... 6
   3. Financial Impacts ............................................................................................................................. 8

C  Recommendations and Guidance ................................................................................................... 13
   1. Overview of Recommendations and Guidance ............................................................................. 13
   2. Implementing the Recommendations .......................................................................................... 17
   3. Guidance for All Sectors ............................................................................................................... 19

D  Scenario Analysis and Climate-Related Issues ............................................................................. 25
   1. Overview of Scenario Analysis ...................................................................................................... 25
   2. Exposure to Climate-Related Risks ............................................................................................... 26
   3. Recommended Approach to Scenario Analysis ............................................................................. 27
   4. Applying Scenario Analysis ........................................................................................................... 29
   5. Challenges and Benefits of Conducting Scenario Analysis .......................................................... 30

E  Key Issues Considered and Areas for Further Work ...................................................................... 32
   1. Relationship to Other Reporting Initiatives ................................................................................. 33
   2. Location of Disclosures and Materiality ........................................................................................ 33
   3. Scenario Analysis .......................................................................................................................... 35
   4. Data Availability and Quality and Financial Impact ...................................................................... 35
   5. GHG Emissions Associated with Investments .............................................................................. 36
   6. Remuneration ............................................................................................................................... 37
   7. Accounting Considerations ........................................................................................................... 37
   8. Time Frames for Short, Medium, and Long Term ......................................................................... 38
   9. Scope of Coverage ........................................................................................................................ 38
   10. Organizational Ownership ........................................................................................................... 39

F  Conclusion ........................................................................................................................................ 41

Appendix 1: Task Force Members ........................................................................................................... 44

Appendix 2: Task Force Objectives and Approach ................................................................................. 46

Appendix 3: Fundamental Principles for Effective Disclosure .............................................................. 51

Appendix 4: Select Disclosure Frameworks ........................................................................................... 54

Appendix 5: Glossary and Abbreviations ............................................................................................... 62

Appendix 6: References .......................................................................................................................... 65

Case 2:24-cv-00801-ODW-PVC   Document 48-23   Filed 05/24/24   Page 9 of 75   Page ID #:1186

# A Introduction

ER-1821

(71 of 292)  Page 71 of 292  Case: 25-5327  09/18/2025  DktEntry: 8.9  Page 71 of 292
Case 2:24-cv-00801-ODW-PVC   Document 48-23   Filed 05/24/24   Page 10 of 75   Page ID
#:1187

## A  Introduction

### 1. Background

It is widely recognized that continued emission of greenhouse gases will cause further warming of the Earth and that warming above 2° Celsius (2°C), relative to the pre-industrial period, could lead to catastrophic economic and social consequences.[7] As evidence of the growing recognition of the risks posed by climate change, in December 2015, nearly 200 governments agreed to strengthen the global response to the threat of climate change by "holding the increase in the global average temperature to well below 2°C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5°C above pre-industrial levels," referred to as the Paris Agreement.[8] The large-scale and long-term nature of the problem makes it uniquely challenging, especially in the context of economic decision making. Moreover, the current understanding of the potential financial risks posed by climate change—to companies, investors, and the financial system as a whole—is still at an early stage.

There is a growing demand for decision-useful, climate-related information by a range of participants in the financial markets.[9] Creditors and investors are increasingly demanding access to risk information that is consistent, comparable, reliable, and clear. There has also been increased focus, especially since the financial crisis of 2007-2008, on the negative impact that weak corporate governance can have on shareholder value, resulting in increased demand for transparency from organizations on their risks and risk management practices, including those related to climate change.

The growing demand for decision-useful, climate-related information has resulted in the development of several climate-related disclosure standards. Many of the existing standards, however, focus on disclosure of climate-related information, such as greenhouse gas (GHG) emissions and other sustainability metrics. Users of such climate-related disclosures commonly cite the lack of information on the financial implications around the climate-related aspects of an organization's business as a key gap. Users also cite inconsistencies in disclosure practices, a lack of context for information, use of boilerplate, and non-comparable reporting as major obstacles to incorporating climate-related risks and opportunities (collectively referred to as climate-related issues) as considerations in their investment, lending, and insurance underwriting decisions over the medium and long term.[10] In addition, evidence suggests that the lack of consistent information hinders investors and others from considering climate-related issues in their asset valuation and allocation processes.[11]

In general, inadequate information about risks can lead to a mispricing of assets and misallocation of capital and can potentially give rise to concerns about financial stability since markets can be vulnerable to abrupt corrections.[12] Recognizing these concerns, the G20 (Group of 20) Finance Ministers and Central Bank Governors requested that the Financial Stability Board (FSB) "convene public- and private-sector participants to review how the financial sector can take account of climate-related issues."[13] In response to the G20's request, the FSB held a meeting of public- and private-sector representatives in September 2015 to consider the implications of climate-related issues for the financial sector. "Participants exchanged views on the existing work of the financial sector, authorities, and standard setters in this area and the challenges they face,

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

---

[7] Intergovernmental Panel on Climate Change, *Fifth Assessment Report*, Cambridge University Press, 2014.
[8] United Nations Framework Convention on Climate Change, "The Paris Agreement," December 2015.
[9] Avery Fellow, "Investors Demand Climate Risk Disclosure," Bloomberg, February 2013.
[10] Sustainability Accounting Standards Board (SASB), *SASB Climate Risk Technical Bulletin#: TB001-10182016*, October 2016.
[11] Mercer LLC, *Investing in a Time of Climate Change*, 2015.
[12] Mark Carney, "Breaking the tragedy of the horizon—climate change and financial stability," September 29, 2015.
[13] "Communiqué from the G20 Finance Ministers and Central Bank Governors Meeting in Washington, D.C. April 16-17, 2015," April 2015.

areas for possible further work, and the possible roles the FSB and others could play in taking that work forward. The discussions continually returned to a common theme: the need for better information."[14]

In most G20 jurisdictions, companies with public debt or equity have a legal obligation to disclose material risks in their financial reports—including material climate-related risks. However, the absence of a standardized framework for disclosing climate-related financial risks makes it difficult for organizations to determine what information should be included in their filings and how it should be presented. Even when reporting similar climate-related information, disclosures are often difficult to compare due to variances in mandatory and voluntary frameworks. The resulting fragmentation in reporting practices and lack of focus on financial impacts have prevented investors, lenders, insurance underwriters, and other users of disclosures from accessing complete information that can inform their economic decisions. Furthermore, because financial-sector organizations' disclosures depend, in part, on those from the companies in which they invest or lend, regulators face challenges in using financial-sector organizations' existing disclosures to determine system-wide exposures to climate-related risks.

In response, the FSB established the industry-led Task Force on Climate-related Financial Disclosures (TCFD or Task Force) in December 2015 to design a set of recommendations for consistent "disclosures that will help financial market participants understand their climate-related risks."[15] See Box 1 (p. 3) for more information on the Task Force.

## 2. The Task Force's Remit

The FSB called on the Task Force to develop climate-related disclosures that "could promote more informed investment, credit [or lending], and insurance underwriting decisions" and, in turn, "would enable stakeholders to understand better the concentrations of carbon-related assets in the financial sector and the financial system's exposures to climate-related risks."[16,17] The FSB noted that disclosures by the financial sector in particular would "foster an early assessment of these risks" and "facilitate market discipline." Such disclosures would also "provide a source of data that can be analyzed at a systemic level, to facilitate authorities' assessments of the materiality of any risks posed by climate change to the financial sector, and the channels through which this is most likely to be transmitted."[18]

The FSB also emphasized that "any disclosure recommendations by the Task Force would be voluntary, would need to incorporate the principle of materiality and would need to weigh the balance of costs and benefits."[19] As a result, in devising a principle-based framework for voluntary disclosure, the Task Force sought to balance the needs of the users of disclosures with the challenges faced by the preparers. The FSB further stated that the Task Force's climate-related financial disclosure recommendations should not "add to the already well developed body of existing disclosure schemes."[20] In response, the Task Force drew from existing disclosure frameworks where possible and appropriate.

The FSB also noted the Task Force should determine whether the target audience of users of climate-related financial disclosures should extend beyond investors, lenders, and insurance underwriters. Investors, lenders, and insurance underwriters ("primary users") are the appropriate target audience. These primary users assume the financial risk and reward of the

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

---

[14] FSB, "FSB to establish Task Force on Climate-related Financial Disclosures," December 4, 2015.
[15] Ibid.
[16] FSB, "Proposal for a Disclosure Task Force on Climate-Related Risks," November 9, 2015.
[17] The term carbon-related assets is not well defined, but is generally considered to refer to assets or organizations with relatively high direct or indirect GHG emissions. The Task Force believes further work is needed on defining carbon-related assets and potential financial impacts.
[18] FSB, "Proposal for a Disclosure Task Force on Climate-Related Risks," November 9, 2015.
[19] Ibid.
[20] Ibid.

**ER-1823**

decisions they make. The Task Force recognizes that many other organizations, including credit rating agencies, equity analysts, stock exchanges, investment consultants, and proxy advisors also use climate-related financial disclosures, allowing them to push information through the credit and investment chain and contribute to the better pricing of risks by investors, lenders, and insurance underwriters. These organizations, in principle, depend on the same types of information as primary users.

This report presents the Task Force's recommendations for climate-related financial disclosures and includes supporting information on climate-related risks and opportunities, scenario analysis, and industry feedback that the Task Force considered in developing and then finalizing its recommendations. In addition, the Task Force developed a "stand-alone" document—Implementing the Recommendations of the Task Force on Climate-related Financial Disclosures (Annex)—for organizations to use when preparing disclosures consistent with the recommendations. The Annex provides supplemental guidance for the financial sector as well as for non-financial groups potentially most affected by climate change and the transition to a lower-carbon economy. The supplemental guidance assists preparers by providing additional context and suggestions for implementing the recommended disclosures.

The Task Force's recommendations provide a foundation for climate-related financial disclosures and aim to be ambitious, but also practical for near-term adoption. The Task Force expects that reporting of climate-related risks and opportunities will evolve over time as organizations, investors, and others contribute to the quality and consistency of the information disclosed.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

Box 1

## Task Force on Climate-related Financial Disclosures

The Task Force membership, first announced on January 21, 2016, has international representation and spans various types of organizations, including banks, insurance companies, asset managers, pension funds, large non-financial companies, accounting and consulting firms, and credit rating agencies—a unique collaborative partnership between the users and preparers of financial reports.

In its work, the Task Force drew on its members' expertise, stakeholder engagement, and existing climate-related disclosure regimes to develop a singular, accessible framework for climate-related financial disclosure. See Appendix 1 for a list of the Task Force members and Appendix 2 for more information on the Task Force's approach.

The Task Force is comprised of 32 global members representing a broad range of economic sectors and financial markets and a careful balance of users and preparers of climate-related financial disclosures.



| 16 | 8 | 8 |
|---|---|---|
| Experts from the Financial Sector | Experts from Non-Financial Sectors | Other Experts |

# B Climate-Related Risks, Opportunities, and Financial Impacts

ER-1825

## B  Climate-Related Risks, Opportunities, and Financial Impacts

Through its work, the Task Force identified a growing demand by investors, lenders, insurance underwriters, and other stakeholders for decision-useful, climate-related financial information. Improved disclosure of climate-related risks and opportunities will provide investors, lenders, insurance underwriters, and other stakeholders with the metrics and information needed to undertake robust and consistent analyses of the potential financial impacts of climate change.

The Task Force found that while several climate-related disclosure frameworks have emerged across different jurisdictions in an effort to meet the growing demand for such information, there is a need for a standardized framework to promote alignment across existing regimes and G20 jurisdictions and to provide a common framework for climate-related financial disclosures. An important element of such a framework is the consistent categorization of climate-related risks and opportunities. As a result, the Task Force defined categories for climate-related risks and climate-related opportunities. The Task Force's recommendations serve to encourage organizations to evaluate and disclose, as part of their annual financial filing preparation and reporting processes, the climate-related risks and opportunities that are most pertinent to their business activities. The main climate-related risks and opportunities that organizations should consider are described below and in Tables 1 and 2 (pp. 10-11).

A
Introduction

B
Climate-Related Risks,
Opportunities, and
Financial Impacts

C
Recommendations and
Guidance

D
Scenario Analysis and
Climate-Related Issues

E
Key Issues Considered and
Areas for Further Work

F
Conclusion

Appendices

## 1. Climate-Related Risks

The Task Force divided climate-related risks into two major categories: (1) risks related to the *transition* to a lower-carbon economy and (2) risks related to the *physical* impacts of climate change.

### a. Transition Risks

Transitioning to a lower-carbon economy may entail extensive policy, legal, technology, and market changes to address mitigation and adaptation requirements related to climate change. Depending on the nature, speed, and focus of these changes, transition risks may pose varying levels of financial and reputational risk to organizations.

#### Policy and Legal Risks

Policy actions around climate change continue to evolve. Their objectives generally fall into two categories—policy actions that attempt to constrain actions that contribute to the adverse effects of climate change or policy actions that seek to promote adaptation to climate change. Some examples include implementing carbon-pricing mechanisms to reduce GHG emissions, shifting energy use toward lower emission sources, adopting energy-efficiency solutions, encouraging greater water efficiency measures, and promoting more sustainable land-use practices. The risk associated with and financial impact of policy changes depend on the nature and timing of the policy change.[21]

Another important risk is litigation or legal risk. Recent years have seen an increase in climate-related litigation claims being brought before the courts by property owners, municipalities, states, insurers, shareholders, and public interest organizations.[22] Reasons for such litigation include the failure of organizations to mitigate impacts of climate change, failure to adapt to climate change, and the insufficiency of disclosure around material financial risks. As the value of loss and damage arising from climate change grows, litigation risk is also likely to increase.

---

[21] Organizations should assess not only the potential direct effects of policy actions on their operations, but also the potential second and third order effects on their supply and distribution chains.

[22] Peter Seley, "Emerging Trends in Climate Change Litigation," *Law 360*, March 7, 2016.

### Technology Risk

Technological improvements or innovations that support the transition to a lower-carbon, energy-efficient economic system can have a significant impact on organizations. For example, the development and use of emerging technologies such as renewable energy, battery storage, energy efficiency, and carbon capture and storage will affect the competitiveness of certain organizations, their production and distribution costs, and ultimately the demand for their products and services from end users. To the extent that new technology displaces old systems and disrupts some parts of the existing economic system, winners and losers will emerge from this "creative destruction" process. The timing of technology development and deployment, however, is a key uncertainty in assessing technology risk.

### Market Risk

While the ways in which markets could be affected by climate change are varied and complex, one of the major ways is through shifts in supply and demand for certain commodities, products, and services as climate-related risks and opportunities are increasingly taken into account.

### Reputation Risk

Climate change has been identified as a potential source of reputational risk tied to changing customer or community perceptions of an organization's contribution to or detraction from the transition to a lower-carbon economy.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

### b. Physical Risks

Physical risks resulting from climate change can be event driven (acute) or longer-term shifts (chronic) in climate patterns. Physical risks may have financial implications for organizations, such as direct damage to assets and indirect impacts from supply chain disruption. Organizations' financial performance may also be affected by changes in water availability, sourcing, and quality; food security; and extreme temperature changes affecting organizations' premises, operations, supply chain, transport needs, and employee safety.

### Acute Risk

Acute physical risks refer to those that are event-driven, including increased severity of extreme weather events, such as cyclones, hurricanes, or floods.

### Chronic Risk

Chronic physical risks refer to longer-term shifts in climate patterns (e.g., sustained higher temperatures) that may cause sea level rise or chronic heat waves.

## 2. Climate-Related Opportunities

Efforts to mitigate and adapt to climate change also produce opportunities for organizations, for example, through resource efficiency and cost savings, the adoption of low-emission energy sources, the development of new products and services, access to new markets, and building resilience along the supply chain. Climate-related opportunities will vary depending on the region, market, and industry in which an organization operates. The Task Force identified several areas of opportunity as described below.

### a. Resource Efficiency

There is growing evidence and examples of organizations that have successfully reduced operating costs by improving efficiency across their production and distribution processes, buildings, machinery/appliances, and transport/mobility—in particular in relation to energy efficiency but also including broader materials, water, and waste management.[23] Such actions can

---

[23] UNEP and Copenhagen Centre for Energy Efficiency, *Best Practices and Case Studies for Industrial Energy Efficiency Improvement*, February 16, 2016.

result in direct cost savings to organizations' operations over the medium to long term and contribute to the global efforts to curb emissions.[24] Innovation in technology is assisting this transition; such innovation includes developing efficient heating solutions and circular economy solutions, making advances in LED lighting technology and industrial motor technology, retrofitting buildings, employing geothermal power, offering water usage and treatment solutions, and developing electric vehicles.[25]

### b. Energy Source

According to the International Energy Agency (IEA), to meet global emission-reduction goals, countries will need to transition a major percentage of their energy generation to low emission alternatives such as wind, solar, wave, tidal, hydro, geothermal, nuclear, biofuels, and carbon capture and storage.[26] For the fifth year in a row, investments in renewable energy capacity have exceeded investments in fossil fuel generation.[27] The trend toward decentralized clean energy sources, rapidly declining costs, improved storage capabilities, and subsequent global adoption of these technologies are significant. Organizations that shift their energy usage toward low emission energy sources could potentially save on annual energy costs.[28]

### c. Products and Services

Organizations that innovate and develop new low-emission products and services may improve their competitive position and capitalize on shifting consumer and producer preferences. Some examples include consumer goods and services that place greater emphasis on a product's carbon footprint in its marketing and labeling (e.g., travel, food, beverage and consumer staples, mobility, printing, fashion, and recycling services) and producer goods that place emphasis on reducing emissions (e.g., adoption of energy-efficiency measures along the supply chain).

### d. Markets

Organizations that pro-actively seek opportunities in new markets or types of assets may be able to diversify their activities and better position themselves for the transition to a lower-carbon economy. In particular, opportunities exist for organizations to access new markets through collaborating with governments, development banks, small-scale local entrepreneurs, and community groups in developed and developing countries as they work to shift to a lower-carbon economy.[29] New opportunities can also be captured through underwriting or financing green bonds and infrastructure (e.g., low-emission energy production, energy efficiency, grid connectivity, or transport networks).

### e. Resilience

The concept of climate resilience involves organizations developing adaptive capacity to respond to climate change to better manage the associated risks and seize opportunities, including the ability to respond to transition risks and physical risks. Opportunities include improving efficiency, designing new production processes, and developing new products. Opportunities related to resilience may be especially relevant for organizations with long-lived fixed assets or extensive supply or distribution networks; those that depend critically on utility and infrastructure networks or natural resources in their value chain; and those that may require longer-term financing and investment.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

---

[24] Environmental Protection Agency Victoria (EPA Victoria), "Resource Efficiency Case Studies: Lower your Impact."

[25] As described by Pearce and Turner, circular economy refers to a system in which resource input and waste, emission, and energy leakage are minimized. This can be achieved through long-lasting design, maintenance, repair, reuse, remanufacturing, refurbishing, and recycling. This is in contrast to a linear economy which is a "take, make, dispose" model of production.

[26] IEA, "Global energy investment down 8% in 2015 with flows signaling move towards cleaner energy," September 14, 2016.

[27] Frankfurt School-United Nations Environmental Programme Centre and Bloomberg New Energy Finance, "Global Trends in Renewable Energy Investment 2017," 2017.

[28] Ceres, "Power Forward 3.0: How the largest US companies are capturing business value while addressing climate change," 2017.

[29] G20 Green Finance Study Group. *G20 Green Finance Synthesis Report.* 2016. The proposal to launch the Green Finance Study Group was adopted by the G20 Finance Ministers and Central Bank Deputies in December 2015.

## 3. Financial Impacts

Better disclosure of the financial impacts of climate-related risks and opportunities on an organization is a key goal of the Task Force's work. In order to make more informed financial decisions, investors, lenders, and insurance underwriters need to understand how climate-related risks and opportunities are likely to impact an organization's future financial position as reflected in its income statement, cash flow statement, and balance sheet as outlined in Figure 1. While climate change affects nearly all economic sectors, the level and type of exposure and the impact of climate-related risks differs by sector, industry, geography, and organization.[30]

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices



Figure 1

**Climate-Related Risks, Opportunities, and Financial Impact**

Fundamentally, the financial impacts of climate-related issues on an organization are driven by the specific climate-related risks and opportunities to which the organization is exposed and its strategic and risk management decisions on managing those risks (i.e., mitigate, transfer, accept, or control) and seizing those opportunities. The Task Force has identified four major categories, described in Figure 2 (p. 9), through which climate-related risks and opportunities may affect an organization's current and future financial positions.

The financial impacts of climate-related issues on organizations are not always clear or direct, and, for many organizations, identifying the issues, assessing potential impacts, and ensuring material issues are reflected in financial filings may be challenging. Key reasons for this are likely because of (1) limited knowledge of climate-related issues within organizations; (2) the tendency to focus mainly on near-term risks without paying adequate attention to risks that may arise in the longer term; and (3) the difficulty in quantifying the financial effects of climate-related issues.[31] To assist organizations in identifying climate-related issues and their impacts, the Task Force developed Table 1 (p. 10), which provides examples of climate-related risks and their potential financial impacts, and Table 2 (p. 11), which provides examples of climate-related opportunities and their potential financial impacts. In addition, Section A.4 in the Annex provides more information on the major categories of financial impacts—revenues, expenditures, assets and liabilities, and capital and financing—that are likely to be most relevant for specific industries.

---

[30] SASB research demonstrates that 72 out of 79 Sustainable Industry Classification System (SICS™) industries are significantly affected in some way by climate-related risk.

[31] World Business Council for Sustainable Development, "Sustainability and enterprise risk management: The first step towards integration." January 18, 2017.

(79 of 292) Page 79 of 292 Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 79 of 292
Case 2:24-cv-00801-ODW-PVC Document 48-23 Filed 05/24/24 Page 18 of 75 Page ID
#:1195

Figure 2

## Major Categories of Financial Impact

| Income Statement | Balance Sheet |
|---|---|
| **Revenues.** Transition and physical risks may affect demand for products and services. Organizations should consider the potential impact on revenues and identify potential opportunities for enhancing or developing new revenues. In particular, given the emergence and likely growth of carbon pricing as a mechanism to regulate emissions, it is important for affected industries to consider the potential impacts of such pricing on business revenues. | **Assets and Liabilities.** Supply and demand changes from changes in policies, technology, and market dynamics related to climate change could affect the valuation of organizations' assets and liabilities. Use of long-lived assets and, where relevant, reserves may be particularly affected by climate-related issues. It is important for organizations to provide an indication of the potential climate-related impact on their assets and liabilities, particularly long-lived assets. This should focus on existing and committed future activities and decisions requiring new investment, restructuring, write-downs, or impairment. |
| **Expenditures.** An organization's response to climate-related risks and opportunities may depend, in part, on the organization's cost structure. Lower-cost suppliers may be more resilient to changes in cost resulting from climate-related issues and more flexible in their ability to address such issues. By providing an indication of their cost structure and flexibility to adapt, organizations can better inform investors about their investment potential. | **Capital and Financing.** Climate-related risks and opportunities may change the profile of an organization's debt and equity structure, either by increasing debt levels to compensate for reduced operating cash flows or for new capital expenditures or R&D. It may also affect the ability to raise new debt or refinance existing debt, or reduce the tenor of borrowing available to the organization. There could also be changes to capital and reserves from operating losses, asset write-downs, or the need to raise new equity to meet investment. |
| It is also helpful for investors to understand capital expenditure plans and the level of debt or equity needed to fund these plans. The resilience of such plans should be considered bearing in mind organizations' flexibility to shift capital and the willingness of capital markets to fund organizations exposed to significant levels of climate-related risks. Transparency of these plans may provide greater access to capital markets or improved financing terms. | |

The Task Force encourages organizations to undertake both historical and forward-looking analyses when considering the potential financial impacts of climate change, with greater focus on forward-looking analyses as the efforts to mitigate and adapt to climate change are without historical precedent. This is one of the reasons the Task Force believes scenario analysis is important for organizations to consider incorporating into their strategic planning or risk management practices.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

Table 1

## Examples of Climate-Related Risks and Potential Financial Impacts

A
Introduction

**B**
**Climate-Related Risks,**
**Opportunities, and**
**Financial Impacts**

C
Recommendations and
Guidance

D
Scenario Analysis and
Climate-Related Issues

E
Key Issues Considered and
Areas for Further Work

F
Conclusion

Appendices

| Type | Climate-Related Risks[32] | Potential Financial Impacts |
|---|---|---|
| **Transition Risks** | **Policy and Legal** | |
| | – Increased pricing of GHG emissions | – Increased operating costs (e.g., higher compliance costs, increased insurance premiums) |
| | – Enhanced emissions-reporting obligations | – Write-offs, asset impairment, and early retirement of existing assets due to policy changes |
| | – Mandates on and regulation of existing products and services | – Increased costs and/or reduced demand for products and services resulting from fines and judgments |
| | – Exposure to litigation | |
| | **Technology** | |
| | – Substitution of existing products and services with lower emissions options | – Write-offs and early retirement of existing assets |
| | | – Reduced demand for products and services |
| | – Unsuccessful investment in new technologies | – Research and development (R&D) expenditures in new and alternative technologies |
| | – Costs to transition to lower emissions technology | – Capital investments in technology development |
| | | – Costs to adopt/deploy new practices and processes |
| | **Market** | |
| | – Changing customer behavior | – Reduced demand for goods and services due to shift in consumer preferences |
| | – Uncertainty in market signals | – Increased production costs due to changing input prices (e.g., energy, water) and output requirements (e.g., waste treatment) |
| | – Increased cost of raw materials | – Abrupt and unexpected shifts in energy costs |
| | | – Change in revenue mix and sources, resulting in decreased revenues |
| | | – Re-pricing of assets (e.g., fossil fuel reserves, land valuations, securities valuations) |
| | **Reputation** | |
| | – Shifts in consumer preferences | – Reduced revenue from decreased demand for goods/services |
| | – Stigmatization of sector | – Reduced revenue from decreased production capacity (e.g., delayed planning approvals, supply chain interruptions) |
| | – Increased stakeholder concern or negative stakeholder feedback | – Reduced revenue from negative impacts on workforce management and planning (e.g., employee attraction and retention) |
| | | – Reduction in capital availability |
| **Physical Risks** | **Acute** | – Reduced revenue from decreased production capacity (e.g., transport difficulties, supply chain interruptions) |
| | – Increased severity of extreme weather events such as cyclones and floods | – Reduced revenue and higher costs from negative impacts on workforce (e.g., health, safety, absenteeism) |
| | | – Write-offs and early retirement of existing assets (e.g., damage to property and assets in "high-risk" locations) |
| | **Chronic** | |
| | – Changes in precipitation patterns and extreme variability in weather patterns | – Increased operating costs (e.g., inadequate water supply for hydroelectric plants or to cool nuclear and fossil fuel plants) |
| | | – Increased capital costs (e.g., damage to facilities) |
| | – Rising mean temperatures | – Reduced revenues from lower sales/output |
| | – Rising sea levels | – Increased insurance premiums and potential for reduced availability of insurance on assets in "high-risk" locations |

---

[32] The sub-category risks described under each major category are not mutually exclusive, and some overlap exists.

(81 of 292), Page 81 of 292  Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 81 of 292
Case 2:24-cv-00801-ODW-PVC   Document 48-23   Filed 05/24/24   Page 20 of 75   Page ID
#:1197

Table 2

## Examples of Climate-Related Opportunities and Potential Financial Impacts

| Type | Climate-Related Opportunities[33] | Potential Financial Impacts |
|---|---|---|
| Resource Efficiency | – Use of more efficient modes of transport<br>– Use of more efficient production and distribution processes<br>– Use of recycling<br>– Move to more efficient buildings<br>– Reduced water usage and consumption | – Reduced operating costs (e.g., through efficiency gains and cost reductions)<br>– Increased production capacity, resulting in increased revenues<br>– Increased value of fixed assets (e.g., highly rated energy-efficient buildings)<br>– Benefits to workforce management and planning (e.g., improved health and safety, employee satisfaction) resulting in lower costs |
| Energy Source | – Use of lower-emission sources of energy<br>– Use of supportive policy incentives<br>– Use of new technologies<br>– Participation in carbon market<br>– Shift toward decentralized energy generation | – Reduced operational costs (e.g., through use of lowest cost abatement)<br>– Reduced exposure to future fossil fuel price increases<br>– Reduced exposure to GHG emissions and therefore less sensitivity to changes in cost of carbon<br>– Returns on investment in low-emission technology<br>– Increased capital availability (e.g., as more investors favor lower-emissions producers)<br>– Reputational benefits resulting in increased demand for goods/services |
| Products and Services | – Development and/or expansion of low emission goods and services<br>– Development of climate adaptation and insurance risk solutions<br>– Development of new products or services through R&D and innovation<br>– Ability to diversify business activities<br>– Shift in consumer preferences | – Increased revenue through demand for lower emissions products and services<br>– Increased revenue through new solutions to adaptation needs (e.g., insurance risk transfer products and services)<br>– Better competitive position to reflect shifting consumer preferences, resulting in increased revenues |
| Markets | – Access to new markets<br>– Use of public-sector incentives<br>– Access to new assets and locations needing insurance coverage | – Increased revenues through access to new and emerging markets (e.g., partnerships with governments, development banks)<br>– Increased diversification of financial assets (e.g., green bonds and infrastructure) |
| Resilience | – Participation in renewable energy programs and adoption of energy-efficiency measures<br>– Resource substitutes/diversification | – Increased market valuation through resilience planning (e.g., infrastructure, land, buildings)<br>– Increased reliability of supply chain and ability to operate under various conditions<br>– Increased revenue through new products and services related to ensuring resiliency |

A
Introduction

B
Climate-Related Risks,
Opportunities, and
Financial Impacts

C
Recommendations and
Guidance

D
Scenario Analysis and
Climate-Related Issues

E
Key Issues Considered and
Areas for Further Work

F
Conclusion

Appendices

[33] The opportunity categories are not mutually exclusive, and some overlap exists.

# C Recommendations and Guidance

(83 of 292)  Page 83 of 292  Case: 25-5327  09/18/2025  DktEntry: 8.9  Page 83 of 292
Case 2:24-cv-00801-ODW-PVC   Document 48-23   Filed 05/24/24   Page 22 of 75   Page ID
#:1199

# C  Recommendations and Guidance

## 1. Overview of Recommendations and Guidance

To fulfill its remit, the Task Force developed four widely adoptable recommendations on climate-related financial disclosures applicable to organizations across sectors and jurisdictions. In developing its recommendations, the Task Force considered the challenges for preparers of disclosures as well as the benefits of such disclosures to investors, lenders, and insurance underwriters. To achieve this balance, the Task Force engaged in significant outreach and consultation with users and preparers of disclosures and drew upon existing climate-related disclosure regimes. The insights gained from the outreach and consultations directly informed the development of the recommendations.

The Task Force structured its recommendations around four thematic areas that represent core elements of how organizations operate—governance, strategy, risk management, and metrics and targets. The four overarching recommendations are supported by key climate-related financial disclosures—referred to as recommended disclosures—that build out the framework with information that will help investors and others understand how reporting organizations think about and assess climate-related risks and opportunities. In addition, there is guidance to support all organizations in developing climate-related financial disclosures consistent with the recommendations and recommended disclosures as well as *supplemental* guidance for specific sectors. The structure is depicted in Figure 3 below, and the Task Force's recommendations and supporting recommended disclosures are presented in Figure 4 (p. 14).

A
Introduction

B
Climate-Related Risks,
Opportunities, and
Financial Impacts

C
Recommendations and
Guidance

D
Scenario Analysis and
Climate-Related Issues

E
Key Issues Considered and
Areas for Further Work

F
Conclusion

Appendices



Figure 3

### Recommendations and Guidance

**Recommendations**

**Recommendations**
Four widely adoptable recommendations tied to: governance, strategy, risk management, and metrics and targets

**Recommended Disclosures**
Specific recommended disclosures organizations should include in their financial filings to provide decision-useful information

**Recommended Disclosures**

**Guidance for All Sectors**

**Guidance for All Sectors**
Guidance providing context and suggestions for implementing the recommended disclosures for all organizations

**Supplemental Guidance for Certain Sectors**

**Supplemental Guidance for Certain Sectors**
Guidance that highlights important considerations for certain sectors and provides a fuller picture of potential climate-related financial impacts in those sectors

Supplemental guidance is provided for the financial sector and for non-financial sectors potentially most affected by climate change

The Task Force's supplemental guidance is included in the Annex and covers the financial sector as well as non-financial industries potentially most affected by climate change and the transition to a lower-carbon economy (referred to as non-financial groups). The supplemental guidance provides these preparers with additional context and suggestions for implementing the recommended disclosures and should be used in conjunction with the guidance for all sectors.

(84 of 292), Page 84 of 292   Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 84 of 292
Case 2:24-cv-00801-ODW-PVC   Document 48-23   Filed 05/24/24   Page 23 of 75   Page ID
#:1200

Figure 4

## Recommendations and Supporting Recommended Disclosures

| Governance | Strategy | Risk Management | Metrics and Targets |
|---|---|---|---|
| Disclose the organization's governance around climate-related risks and opportunities. | Disclose the actual and potential impacts of climate-related risks and opportunities on the organization's businesses, strategy, and financial planning where such information is material. | Disclose how the organization identifies, assesses, and manages climate-related risks. | Disclose the metrics and targets used to assess and manage relevant climate-related risks and opportunities where such information is material. |
| **Recommended Disclosures** | **Recommended Disclosures** | **Recommended Disclosures** | **Recommended Disclosures** |
| a) Describe the board's oversight of climate-related risks and opportunities. | a) Describe the climate-related risks and opportunities the organization has identified over the short, medium, and long term. | a) Describe the organization's processes for identifying and assessing climate-related risks. | a) Disclose the metrics used by the organization to assess climate-related risks and opportunities in line with its strategy and risk management process. |
| b) Describe management's role in assessing and managing climate-related risks and opportunities. | b) Describe the impact of climate-related risks and opportunities on the organization's businesses, strategy, and financial planning. | b) Describe the organization's processes for managing climate-related risks. | b) Disclose Scope 1, Scope 2, and, if appropriate, Scope 3 greenhouse gas (GHG) emissions, and the related risks. |
| | c) Describe the resilience of the organization's strategy, taking into consideration different climate-related scenarios, including a 2°C or lower scenario. | c) Describe how processes for identifying, assessing, and managing climate-related risks are integrated into the organization's overall risk management. | c) Describe the targets used by the organization to manage climate-related risks and opportunities and performance against targets. |

**ER-1835**

Figure 5 provides a mapping of the recommendations (governance, strategy, risk management, and metrics and targets) and recommended disclosures (a, b, c) for which supplemental guidance was developed for the financial sector and non-financial groups.

- **Financial Sector.** The Task Force developed supplemental guidance for the financial sector, which it organized into four major industries largely based on activities performed. The four industries are banks (lending), insurance companies (underwriting), asset managers (asset management), and asset owners, which include public- and private-sector pension plans, endowments, and foundations (investing).[34] The Task Force believes that disclosures by the financial sector could foster an early assessment of climate-related risks and opportunities, improve pricing of climate-related risks, and lead to more informed capital allocation decisions.

- **Non-Financial Groups.** The Task Force developed supplemental guidance for non-financial industries that account for the largest proportion of GHG emissions, energy usage, and water usage. These industries were organized into four groups (i.e., non-financial groups)—Energy; Materials and Buildings; Transportation; and Agriculture, Food, and Forest Products—based on similarities in climate-related risks as shown in Box 2 (p. 16). While this supplemental guidance focuses on a subset of non-financial industries, organizations in other industries with similar business activities may wish to review and consider the issues and topics contained in the supplemental guidance.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

Figure 5

## Supplemental Guidance for Financial Sector and Non-Financial Groups

| Industries and Groups | Governance a) | Governance b) | Strategy a) | Strategy b) | Strategy c) | Risk Management a) | Risk Management b) | Risk Management c) | Metrics and Targets a) | Metrics and Targets b) | Metrics and Targets c) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Financial** — Banks | | | ■ | | | ■ | | | ■ | | |
| **Financial** — Insurance Companies | | | | ■ | ■ | ■ | ■ | | ■ | | |
| **Financial** — Asset Owners | | | ■ | ■ | | ■ | ■ | | ■ | ■ | |
| **Financial** — Asset Managers | | | | ■ | | ■ | ■ | | ■ | ■ | |
| **Non-Financial** — Energy | | | ■ | ■ | | | | | ■ | | |
| **Non-Financial** — Transportation | | | ■ | ■ | | | | | ■ | | |
| **Non-Financial** — Materials and Buildings | | | ■ | | | | | | ■ | | |
| **Non-Financial** — Agriculture, Food, and Forest Products | | | ■ | ■ | | | | | ■ | | |

---

[34] The use of the term "insurance companies" in this report includes re-insurers.

Box 2

## Determination of Non-Financial Groups

In an effort to focus supplemental guidance on those non-financial sectors and industries with the highest likelihood of climate-related financial impacts, the Task Force assessed three factors most likely to be affected by both transition risk (policy and legal, technology, market, and reputation) and physical risk (acute and chronic)—GHG emissions, energy usage, and water usage.

The underlying premise in using these three factors is that climate-related physical and transition risks will likely manifest themselves primarily and broadly in the form of constraints on GHG emissions, effects on energy production and usage, and effects on water availability, usage, and quality. Other factors, such as waste management and land use, are also important, but may not be as determinative across a wide range of industries or may be captured in one of the primary categories.

In taking this approach, the Task Force consulted a number of sources regarding the ranking of various sectors and industries according to these three factors. The various rankings were used to determine an overall set of sectors and industries that have significant exposure to transition or physical risks related to GHG emissions, energy, or water. The sectors and industries were grouped into four categories of industries that have similar economic activities and climate-related exposures.

These four groups and their associated industries are intended to be indicative of the economic activities associated with these industries rather than definitive industry categories. Other industries with similar activities and climate-related exposures should consider the supplemental guidance as well.

The Task Force validated its approach using a variety of sources, including:

| 1 | The TCFD Phase I report public consultation, soliciting more than 200 responses which ranked Energy, Utilities, Materials, Industrials and Consumer Staples/Discretionary, in that order, as the Global Industry Classification Standard (GICS) sectors most important for disclosure guidelines to cover. |
| --- | --- |
| 2 | Numerous sector-specific disclosure guidance documents to understand various breakdowns by economic activity, sector, and industries, including from the following sources: CDP, GHG Protocol, Global Real Estate Sustainability Benchmark (GRESB), Global Reporting Initiative (GRI), Institutional Investors Group on Climate Change (IIGCC), IPIECA (the global oil and gas industry association for environmental and social issues), and the Sustainability Accounting Standards Board (SASB). |
| 3 | The Intergovernmental Panel on Climate Change (IPCC) report "Climate Change 2014 – Mitigation of Climate Change" that provides an analysis of global direct and indirect emissions by economic sector. The IPCC analysis highlights the dominant emissions-producing sectors as Energy; Industry; Agriculture, Forestry, and Other Land Use; and Transportation and Buildings (Commercial and Residential). |
| 4 | Research and documentation from non-governmental organizations (NGOs) and industry organizations that provide information on which industries have the highest exposures to climate change, including those from Cambridge Institute of Sustainability Leadership, China's National Development and Reform Commission (NDRC), Environmental Resources Management (ERM), IEA, Moody's, S&P Global Ratings, and WRI/UNEPFI. |

Based on its assessment, the Task Force identified the four groups and their associated industries, listed in the table below, as those that would most benefit from supplemental guidance.

| Energy | Transportation | Materials and Buildings | Agriculture, Food, and Forest Products |
| --- | --- | --- | --- |
| – Oil and Gas<br>– Coal<br>– Electric Utilities | – Air Freight<br>– Passenger Air Transportation<br>– Maritime Transportation<br>– Rail Transportation<br>– Trucking Services<br>– Automobiles and Components | – Metals and Mining<br>– Chemicals<br>– Construction Materials<br>– Capital Goods<br>– Real Estate Management and Development | – Beverages<br>– Agriculture<br>– Packaged Foods and Meats<br>– Paper and Forest Products |

(87 of 292) Page 87 of 292 Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 87 of 292
Case 2:24-cv-00801-ODW-PVC Document 48-23 Filed 05/24/24 Page 26 of 75 Page ID
#:1203

## 2. Implementing the Recommendations

### a. Scope of Coverage

To promote more informed investing, lending, and insurance underwriting decisions, the Task Force recommends all organizations with public debt or equity implement its recommendations. Because climate-related issues are relevant for other types of organizations as well, the Task Force encourages all organizations to implement these recommendations. In particular, the Task Force believes that asset managers and asset owners, including public- and private-sector pension plans, endowments, and foundations, should implement its recommendations so that their clients and beneficiaries may better understand the performance of their assets, consider the risks of their investments, and make more informed investment choices.

### b. Location of Disclosures and Materiality

The Task Force recommends that organizations provide climate-related financial disclosures in their mainstream (i.e., public) annual financial filings.[35] In most G20 jurisdictions, public companies have a legal obligation to disclose material information in their financial filings—including material climate-related information; and the Task Force's recommendations are intended to help organizations meet existing disclosure obligations more effectively.[36] The Task Force's recommendations were developed to apply broadly across sectors and jurisdictions and should not be seen as superseding national disclosure requirements. Importantly, organizations should make financial disclosures in accordance with their national disclosure requirements. If certain elements of the recommendations are incompatible with national disclosure requirements for financial filings, the Task Force encourages organizations to disclose those elements in other official company reports that are issued at least annually, widely distributed and available to investors and others, and subject to internal governance processes that are the same or substantially similar to those used for financial reporting.

The Task Force recognizes that most information included in financial filings is subject to a materiality assessment. However, because climate-related risk is a non-diversifiable risk that affects nearly all industries, many investors believe it requires special attention. For example, in assessing organizations' financial and operating results, many investors want insight into the governance and risk management context in which such results are achieved. The Task Force believes disclosures related to its Governance and Risk Management recommendations directly address this need for context and should be included in annual financial filings.

For disclosures related to the Strategy and Metrics and Targets recommendations, the Task Force believes organizations should provide such information in annual financial filings when the information is deemed material. Certain organizations—those in the four non-financial groups that have more than one billion U.S. dollar equivalent (USDE) in annual revenue—should consider disclosing such information in other reports when the information is not deemed material and not included in financial filings.[37] Because these organizations are more likely than others to be financially impacted over time, investors are interested in monitoring how these organizations' strategies evolve.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

---

[35] Financial filings refer to the annual reporting packages in which organizations are required to deliver their audited financial results under the corporate, compliance, or securities laws of the jurisdictions in which they operate. While reporting requirements differ internationally, financial filings generally contain financial statements and other information such as governance statements and management commentary.

[36] The Task Force encourages organizations where climate-related issues could be material in the future to begin disclosing climate-related financial information outside financial filings to facilitate the incorporation of such information into financial filings once climate-related issues are determined to be material.

[37] The Task Force chose a one billion USDE annual revenue threshold because it captures organizations responsible for over 90 percent of Scope 1 and 2 GHG emissions in the industries represented by the four non-financial groups (about 2,250 organizations out of roughly 15,000).

**ER-1838**

(88 of 292), Page 88 of 292  Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 88 of 292
Case 2:24-cv-00801-ODW-PVC  Document 48-23  Filed 05/24/24  Page 27 of 75  Page ID
#:1204

The Task Force recognizes reporting by asset managers and asset owners is intended to satisfy the needs of clients, beneficiaries, regulators, and oversight bodies and follows a format that is generally different from corporate financial reporting. For purposes of adopting the Task Force's recommendations, asset managers and asset owners should use their existing means of financial reporting to their clients and beneficiaries where relevant and where feasible. Likewise, asset managers and asset owners should consider materiality in the context of their respective mandates and investment performance for clients and beneficiaries.[38]

The Task Force believes that climate-related financial disclosures should be subject to appropriate internal governance processes. Since these disclosures should be included in annual financial filings, the governance processes should be similar to those used for existing financial reporting and would likely involve review by the chief financial officer and audit committee, as appropriate. The Task Force recognizes that some organizations may provide some or all of their climate-related financial disclosures in reports other than financial filings. This may occur because the organizations are not required to issue public financial reports (e.g., some asset managers and asset owners). In such situations, organizations should follow internal governance processes that are the same or substantially similar to those used for financial reporting.

A
Introduction

B
Climate-Related Risks,
Opportunities, and
Financial Impacts

C
Recommendations and
Guidance

D
Scenario Analysis and
Climate-Related Issues

E
Key Issues Considered and
Areas for Further Work

F
Conclusion

Appendices

**c. Principles for Effective Disclosures**
To underpin its recommendations and help guide current and future developments in climate-related financial reporting, the Task Force developed seven principles for effective disclosure (Figure 6), which are described more fully in Appendix 3. When used by organizations in preparing their climate-related financial disclosures, these principles can help achieve high-quality and decision-useful disclosures that enable users to understand the impact of climate change on organizations. The Task Force encourages organizations to consider these principles as they develop climate-related financial disclosures.

The Task Force's disclosure principles are largely consistent with internationally accepted frameworks for financial reporting and are generally applicable to most providers of financial disclosures. The principles are designed to assist organizations in making clear the linkages between climate-related issues and their governance, strategy, risk management, and metrics and targets.



Figure 6

**Principles for Effective Disclosures**

1 Disclosures should represent relevant information

2 Disclosures should be specific and complete

3 Disclosures should be clear, balanced, and understandable

4 Disclosures should be consistent over time

5 Disclosures should be comparable among companies within a sector, industry, or portfolio

6 Disclosures should be reliable, verifiable, and objective

7 Disclosures should be provided on a timely basis

---

[38] The Task Force recommends asset managers and asset owners include carbon footprinting information in their reporting to clients and beneficiaries, as described in Section D of the Annex, to support the assessment and management of climate-related risks.

## 3. Guidance for All Sectors

The Task Force has developed guidance to support all organizations in developing climate-related financial disclosures consistent with its recommendations and recommended disclosures. The guidance assists preparers by providing context and suggestions for implementing the recommended disclosures. Recognizing organizations have differing levels of capacity to disclose under the recommendations, the guidance provides descriptions of the types of information that should be disclosed or considered.

### a. Governance

Investors, lenders, insurance underwriters, and other users of climate-related financial disclosures (collectively referred to as "investors and other stakeholders") are interested in understanding the role an organization's board plays in overseeing climate-related issues as well as management's role in assessing and managing those issues. Such information supports evaluations of whether climate-related issues receive appropriate board and management attention.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

## Governance
Disclose the organization's governance around climate-related risks and opportunities.

| Recommended Disclosure a) Describe the board's oversight of climate-related risks and opportunities. | Guidance for All Sectors In describing the board's oversight of climate-related issues, organizations should consider including a discussion of the following: <br> – processes and frequency by which the board and/or board committees (e.g., audit, risk, or other committees) are informed about climate-related issues, <br> – whether the board and/or board committees consider climate-related issues when reviewing and guiding strategy, major plans of action, risk management policies, annual budgets, and business plans as well as setting the organization's performance objectives, monitoring implementation and performance, and overseeing major capital expenditures, acquisitions, and divestitures, and <br> – how the board monitors and oversees progress against goals and targets for addressing climate-related issues. |
|---|---|
| Recommended Disclosure b) Describe management's role in assessing and managing climate-related risks and opportunities. | Guidance for All Sectors In describing management's role related to the assessment and management of climate-related issues, organizations should consider including the following information: <br> – whether the organization has assigned climate-related responsibilities to management-level positions or committees; and, if so, whether such management positions or committees report to the board or a committee of the board and whether those responsibilities include assessing and/or managing climate-related issues, <br> – a description of the associated organizational structure(s), <br> – processes by which management is informed about climate-related issues, and <br> – how management (through specific positions and/or management committees) monitors climate-related issues. |

ER-1840

**b. Strategy**

Investors and other stakeholders need to understand how climate-related issues may affect an organization's businesses, strategy, and financial planning over the short, medium, and long term. Such information is used to inform expectations about the future performance of an organization.

## Strategy

Disclose the actual and potential impacts of climate-related risks and opportunities on the organization's businesses, strategy, and financial planning where such information is material.

| Recommended Disclosure a) Describe the climate-related risks and opportunities the organization has identified over the short, medium, and long term. | Guidance for All Sectors Organizations should provide the following information: <br><br>– a description of what they consider to be the relevant short-, medium-, and long-term time horizons, taking into consideration the useful life of the organization's assets or infrastructure and the fact that climate-related issues often manifest themselves over the medium and longer terms, <br><br>– a description of the specific climate-related issues for each time horizon (short, medium, and long term) that could have a material financial impact on the organization, and <br><br>– a description of the process(es) used to determine which risks and opportunities could have a material financial impact on the organization. <br><br>Organizations should consider providing a description of their risks and opportunities by sector and/or geography, as appropriate. In describing climate-related issues, organizations should refer to Tables 1 and 2 (pp. 10-11). |
|---|---|
| Recommended Disclosure b) Describe the impact of climate-related risks and opportunities on the organization's businesses, strategy, and financial planning. | Guidance for All Sectors Building on recommended disclosure (a), organizations should discuss how identified climate-related issues have affected their businesses, strategy, and financial planning. <br><br>Organizations should consider including the impact on their businesses and strategy in the following areas: <br><br>– Products and services <br>– Supply chain and/or value chain <br>– Adaptation and mitigation activities <br>– Investment in research and development <br>– Operations (including types of operations and location of facilities) <br><br>Organizations should describe how climate-related issues serve as an input to their financial planning process, the time period(s) used, and how these risks and opportunities are prioritized. Organizations' disclosures should reflect a holistic picture of the interdependencies among the factors that affect their ability to create value over time. Organizations should also consider including in their disclosures the impact on financial planning in the following areas: <br><br>– Operating costs and revenues <br>– Capital expenditures and capital allocation <br>– Acquisitions or divestments <br>– Access to capital <br><br>If climate-related scenarios were used to inform the organization's strategy and financial planning, such scenarios should be described. |

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

*The Task Force updated its guidance for all sectors for its Strategy and Metrics and Targets recommendations in October 2021. Please refer to the Task Force's 2021 Annex for the latest guidance.*

## Strategy

**Disclose the actual and potential impacts of climate-related risks and opportunities on the organization's businesses, strategy, and financial planning where such information is material.**

| | |
|---|---|
| **Recommended Disclosure c)**<br>Describe the resilience of the organization's strategy, taking into consideration different climate-related scenarios, including a 2°C or lower scenario. | **Guidance for All Sectors**<br>Organizations should describe how resilient their strategies are to climate-related risks and opportunities, taking into consideration a transition to a lower-carbon economy consistent with a 2°C or lower scenario and, where relevant to the organization, scenarios consistent with increased physical climate-related risks.<br><br>Organizations should consider discussing:<br><br>– where they believe their strategies may be affected by climate-related risks and opportunities;<br><br>– how their strategies might change to address such potential risks and opportunities; and<br><br>– the climate-related scenarios and associated time horizon(s) considered.<br><br>Refer to Section D for information on applying scenarios to forward-looking analysis. |

*The Task Force updated its guidance for all sectors for its Strategy and Metrics and Targets recommendations in October 2021. Please refer to the Task Force's 2021 Annex for the latest guidance.*

### c. Risk Management

Investors and other stakeholders need to understand how an organization's climate-related risks are identified, assessed, and managed and whether those processes are integrated into existing risk management processes. Such information supports users of climate-related financial disclosures in evaluating the organization's overall risk profile and risk management activities.

## Risk Management

**Disclose how the organization identifies, assesses, and manages climate-related risks.**

| | |
|---|---|
| **Recommended Disclosure a)**<br>Describe the organization's processes for identifying and assessing climate-related risks. | **Guidance for All Sectors**<br>Organizations should describe their risk management processes for identifying and assessing climate-related risks. An important aspect of this description is how organizations determine the relative significance of climate-related risks in relation to other risks.<br><br>Organizations should describe whether they consider existing and emerging regulatory requirements related to climate change (e.g., limits on emissions) as well as other relevant factors considered.<br><br>Organizations should also consider disclosing the following:<br><br>– processes for assessing the potential size and scope of identified climate-related risks and<br><br>– definitions of risk terminology used or references to existing risk classification frameworks used. |
| **Recommended Disclosure b)**<br>Describe the organization's processes for managing climate-related risks. | **Guidance for All Sectors**<br>Organizations should describe their processes for managing climate-related risks, including how they make decisions to mitigate, transfer, accept, or control those risks. In addition, organizations should describe their processes for prioritizing climate-related risks, including how materiality determinations are made within their organizations.<br><br>In describing their processes for managing climate-related risks, organizations should address the risks included in Tables 1 and 2 (pp. 10-11), as appropriate. |

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

**ER-1842**

## Risk Management

Disclose how the organization identifies, assesses, and manages climate-related risks.

| Recommended Disclosure c) | Guidance for All Sectors |
|---|---|
| Describe how processes for identifying, assessing, and managing climate-related risks are integrated into the organization's overall risk management. | Organizations should describe how their processes for identifying, assessing, and managing climate-related risks are integrated into their overall risk management. |

**d. Metrics and Targets**

Investors and other stakeholders need to understand how an organization measures and monitors its climate-related risks and opportunities. Access to the metrics and targets used by an organization allows investors and other stakeholders to better assess the organization's potential risk-adjusted returns, ability to meet financial obligations, general exposure to climate-related issues, and progress in managing or adapting to those issues. They also provide a basis upon which investors and other stakeholders can compare organizations within a sector or industry.

## Metrics and Targets

Disclose the metrics and targets used to assess and manage relevant climate-related risks and opportunities where such information is material.

| Recommended Disclosure a) | Guidance for All Sectors |
|---|---|
| Disclose the metrics used by the organization to assess climate-related risks and opportunities in line with its strategy and risk management process. | Organizations should provide the key metrics used to measure and manage climate-related risks and opportunities, as described in Tables 1 and 2 (pp. 10-11). Organizations should consider including metrics on climate-related risks associated with water, energy, land use, and waste management where relevant and applicable. |
| | Where climate-related issues are material, organizations should consider describing whether and how related performance metrics are incorporated into remuneration policies. |
| | Where relevant, organizations should provide their internal carbon prices as well as climate-related opportunity metrics such as revenue from products and services designed for a lower-carbon economy. |
| | Metrics should be provided for historical periods to allow for trend analysis. In addition, where not apparent, organizations should provide a description of the methodologies used to calculate or estimate climate-related metrics. |
| Recommended Disclosure b) | Guidance for All Sectors |
| Disclose Scope 1, Scope 2, and, if appropriate, Scope 3 greenhouse gas (GHG) emissions, and the related risks. | Organizations should provide their Scope 1 and Scope 2 GHG emissions and, if appropriate, Scope 3 GHG emissions and the related risks.[39] |
| | GHG emissions should be calculated in line with the GHG Protocol methodology to allow for aggregation and comparability across organizations and jurisdictions.[40] As appropriate, organizations should consider providing related, generally accepted industry-specific GHG efficiency ratios.[41] |
| | GHG emissions and associated metrics should be provided for historical |

*[Watermark text: The Task Force updated its guidance for all sectors for its Strategy and Metrics and Targets recommendations in October 2021. Please refer to the Task Force's 2021 Annex for the latest guidance.]*

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

---

[39] Emissions are a prime driver of rising global temperatures and, as such, are a key focal point of policy, regulatory, market, and technology responses to limit climate change. As a result, organizations with significant emissions are likely to be impacted more significantly by transition risk than other organizations. In addition, current or future constraints on emissions, either directly by emission restrictions or indirectly through carbon budgets, may impact organizations financially.

[40] While challenges remain, the GHG Protocol methodology is the most widely recognized and used international standard for calculating GHG emissions. Organizations may use national reporting methodologies if they are consistent with the GHG Protocol methodology.

[41] For industries with high energy consumption, metrics related to emission intensity are important to provide. For example, emissions per unit of economic output (e.g., unit of production, number of employees, or value-added) is widely used. See the Annex for examples of metrics.

| Metrics and Targets | |
|---|---|
| Disclose the metrics and targets used to assess and manage relevant climate-related risks and opportunities where such information is material. | |

|  | periods to allow for trend analysis. In addition, where not apparent, organizations should provide a description of the methodologies used to calculate or estimate the metrics. |
|---|---|
| **Recommended Disclosure c)** Describe the targets used by the organization to manage climate-related risks and opportunities and performance against targets. | **Guidance for All Sectors** Organizations should describe their key climate-related targets such as those related to GHG emissions, water usage, energy usage, etc., in line with anticipated regulatory requirements or market constraints or other goals. Other goals may include efficiency or financial goals, financial loss tolerances, avoided GHG emissions through the entire product life cycle, or net revenue goals for products and services designed for a lower-carbon economy. In describing their targets, organizations should consider including the following: <br><br> – whether the target is absolute or intensity based, <br> – time frames over which the target applies, <br> – base year from which progress is measured, and <br> – key performance indicators used to assess progress against targets. <br><br> Where not apparent, organizations should provide a description of the methodologies used to calculate targets and measures. |

*The Task Force updated its guidance for all sectors for its Strategy and Metrics and Targets recommendations in October 2021. Please refer to the Task Force's 2021 Annex for the latest guidance.*

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

**C
Recommendations and Guidance**

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

**ER-1844**

# D Scenario Analysis and Climate-Related Issues

ER-1845

(95 of 292) Page 95 of 292 Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 95 of 292
Case 2:24-cv-00801-ODW-PVC  Document 48-23  Filed 05/24/24  Page 34 of 75  Page ID
#:1211

# D  Scenario Analysis and Climate-Related Issues

Some organizations are affected by risks associated with climate change today. However, for many organizations, the most significant effects of climate change are likely to emerge over the medium to longer term and their timing and magnitude are uncertain. This uncertainty presents challenges for individual organizations in understanding the potential effects of climate change on their businesses, strategies, and financial performance. To appropriately incorporate the potential effects in their planning processes, organizations need to consider how their climate-related risks and opportunities may evolve and the potential implications under different conditions. One way to do this is through scenario analysis.

Scenario analysis is a well-established method for developing strategic plans that are more flexible or robust to a range of plausible future states. The use of scenario analysis for assessing the potential business implications of climate-related risks and opportunities, however, is relatively recent. While several organizations use scenario analysis to assess the potential impact of climate change on their businesses, only a subset have disclosed their assessment of forward-looking implications publicly, either in sustainability reports or financial filings.[42]

A
Introduction

B
Climate-Related Risks,
Opportunities, and
Financial Impacts

C
Recommendations and
Guidance

**D
Scenario Analysis and
Climate-Related Issues**

E
Key Issues Considered and
Areas for Further Work

F
Conclusion

Appendices

The disclosure of organizations' forward-looking assessments of climate-related issues is important for investors and other stakeholders in understanding how vulnerable individual organizations are to transition and physical risks and how such vulnerabilities are or would be addressed. As a result, the Task Force believes that organizations should use scenario analysis to assess potential business, strategic, and financial implications of climate-related risks and opportunities and disclose those, as appropriate, in their annual financial filings.

> *Scenario analysis is an important and useful tool for understanding the strategic implications of climate-related risks and opportunities.*

This section provides additional information on using scenario analysis as a tool to assess potential implications of climate-related risks and opportunities. In addition, a technical supplement, *The Use of Scenario Analysis in Disclosure of Climate-Related Risks and Opportunities*, on the Task Force's website provides further information on the types of climate-related scenarios, the application of scenario analysis, and the key challenges in implementing scenario analysis.

## 1. Overview of Scenario Analysis

Scenario analysis is a process for identifying and assessing the potential implications of a range of plausible future states under conditions of uncertainty. Scenarios are hypothetical constructs and not designed to deliver precise outcomes or forecasts. Instead, scenarios provide a way for organizations to consider how the future might look if certain trends continue or certain conditions are met. In the case of climate change, for example, scenarios allow an organization to explore and develop an understanding of how various combinations of climate-related risks, both transition and physical risks, may affect its businesses, strategies, and financial performance over time.

Scenario analysis can be qualitative, relying on descriptive, written narratives, or quantitative, relying on numerical data and models, or some combination of both. Qualitative scenario analysis

---

[42] Some organizations in the energy sector and some large investors have made public disclosures describing the results of their climate-related scenario analysis, including discussing how the transition might affect their current portfolios. In some instances, this information was published in financial filings.

explores relationships and trends for which little or no numerical data is available, while quantitative scenario analysis can be used to assess measurable trends and relationships using models and other analytical techniques.[43] Both rely on scenarios that are internally consistent, logical, and based on explicit assumptions and constraints that result in plausible future development paths.

As summarized in Figure 7, there are several reasons why scenario analysis is a useful tool for organizations in assessing the potential implications of climate-related risks and opportunities.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

Figure 7

**Reasons to Consider Using Scenario Analysis for Climate Change**

1   Scenario analysis can help organizations consider issues, like climate change, that have the following characteristics:

  – Possible outcomes that are highly uncertain (e.g., the **physical** response of the climate and ecosystems to higher levels of GHG emissions in the atmosphere)

  – Outcomes that will play out over the medium to longer term (e.g., timing, distribution, and mechanisms of the **transition** to a lower-carbon economy)

  – Potential disruptive effects that, due to uncertainty and complexity, are substantial

2   Scenario analysis can enhance organizations' strategic conversations about the future by considering, in a more structured manner, what may unfold that is different from business-as-usual. Importantly, it broadens decision makers' thinking across a range of plausible scenarios, including scenarios where climate-related impacts can be significant.

3   Scenario analysis can help organizations frame and assess the potential range of plausible business, strategic, and financial impacts from climate change and the associated management actions that may need to be considered in strategic and financial plans. This may lead to more robust strategies under a wider range of uncertain future conditions.

4   Scenario analysis can help organizations identify indicators to monitor the external environment and better recognize when the environment is moving toward a different scenario state (or to a different stage along a scenario path). This allows organizations the opportunity to reassess and adjust their strategies and financial plans accordingly.[44]

5   Scenario analysis can assist investors in understanding the robustness of organizations' strategies and financial plans and in comparing risks and opportunities across organizations.

## 2. Exposure to Climate-Related Risks

The effects of climate change on specific sectors, industries, and individual organizations are highly variable. It is important, therefore, that all organizations consider applying a basic level of scenario analysis in their strategic planning and risk management processes. Organizations more significantly affected by transition risk (e.g., fossil fuel-based industries, energy-intensive manufacturers, and transportation activities) and/or physical risk (e.g., agriculture, transportation

---

[43] For example, see Mark D. A. Rounsevell, Marc J. Metzger, *Developing qualitative scenario storylines for environmental change assessment*, WIREs Climate Change 2010, 1: 606-619. doi: 10.1002/wcc.63, 2010 and Oliver Fricko, et. al., *Energy sector water use implications of a 2° C climate policy*, Environmental Research Letters, 11: 1-10, 2016.

[44] J.N. Maack, *Scenario analysis: a tool for task managers*, Social Analysis: selected tools and techniques, Social Development Papers, Number 36, the World Bank, June 2001, Washington, DC.

and building infrastructure, insurance, and tourism) should consider a more in-depth application of scenario analysis.

### a. Exposure to Transition Risks

Transition risk scenarios are particularly relevant for resource-intensive organizations with high GHG emissions within their value chains, where policy actions, technology, or market changes aimed at emissions reductions, energy efficiency, subsidies or taxes, or other constraints or incentives may have a particularly direct effect.

A key type of transition risk scenario is a so-called 2°C scenario, which lays out a pathway and an emissions trajectory consistent with holding the increase in the global average temperature to 2°C above pre-industrial levels. In December 2015, nearly 200 governments agreed to strengthen the global response to the threat of climate change by "holding the increase in the global average temperature to well below 2°C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5°C above pre-industrial levels," referred to as the Paris Agreement.[45] As a result, a 2°C scenario provides a common reference point that is generally aligned with the objectives of the Paris Agreement and will support investors' evaluation of the potential magnitude and timing of transition-related implications for individual organizations; across different organizations within a sector; and across different sectors.

### b. Exposure to Physical Risks

A wide range of organizations are exposed to climate-related physical risks. Physical climate-related scenarios are particularly relevant for organizations exposed to acute or chronic climate change, such as those with:

- long-lived, fixed assets;
- locations or operations in climate-sensitive regions (e.g., coastal and flood zones);
- reliance on availability of water; and
- value chains exposed to the above.

Physical risk scenarios generally identify extreme weather threats of moderate or higher risk before 2030 and a larger number and range of physical threats between 2030 and 2050. Although most climate models deliver scenario results for physical impacts beyond 2050, organizations typically focus on the consequences of physical risk scenarios over shorter time frames that reflect the lifetimes of their respective assets or liabilities, which vary across sectors and organizations.

## 3. Recommended Approach to Scenario Analysis

The Task Force believes that all organizations exposed to climate-related risks should consider (1) using scenario analysis to help inform their strategic and financial planning processes and (2) disclosing how resilient their strategies are to a range of plausible climate-related scenarios. The Task Force recognizes that, for many organizations, scenario analysis is or would be a largely qualitative exercise. However, organizations with more significant exposure to transition risk and/or physical risk should undertake more rigorous qualitative and, if relevant, quantitative scenario analysis with respect to key drivers and trends that affect their operations.

A critical aspect of scenario analysis is the selection of a set of scenarios (not just one) that covers a reasonable variety of future outcomes, both favorable and unfavorable. In this regard, the Task Force recommends organizations use a 2°C or lower scenario in addition to two or three other

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

---

[45] United Nations Framework Convention on Climate Change. "The Paris Agreement," December 2015.

---

scenarios most relevant to their circumstances, such as scenarios related to Nationally Determined Contributions (NDCs), physical climate-related scenarios, or other challenging scenarios.[46] In jurisdictions where NDCs are a commonly accepted guide for an energy and/or emissions pathway, NDCs may constitute particularly useful scenarios to include in an organization's suite of scenarios for conducting climate-related scenario analysis.

For an organization in the initial stages of implementing scenario analysis or with limited exposure to climate-related issues, the Task Force recommends disclosing how resilient, qualitatively or directionally, the organization's strategy and financial plans may be to a range of relevant climate change scenarios. This information helps investors, lenders, insurance underwriters, and other stakeholders understand the robustness of an organization's forward-looking strategy and financial plans across a range of possible future states.

Organizations with more significant exposure to climate-related issues should consider disclosing key assumptions and pathways related to the scenarios they use to allow users to understand the analytical process and its limitations. In particular, it is important to understand the critical parameters and assumptions that materially affect the conclusions drawn. As a result, the Task Force believes that organizations with significant climate-related exposures should *strive* to disclose the elements described in Figure 8.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

Figure 8

**Disclosure Considerations for Non-Financial Organizations**

Organizations with more significant exposure to climate-related issues should consider disclosing key aspects of their scenario analysis, such as the ones described below.

1 The scenarios used, including the 2°C or lower scenario[47]

2 Critical input parameters, assumptions, and analytical choices for the scenarios used, including such factors as:
  – Assumptions about possible technology responses and timing (e.g., evolution of products/services, the technology used to produce them, and costs to implement)
  – Assumptions made around potential differences in input parameters across regions, countries, asset locations, and/or markets
  – Approximate sensitivities to key assumptions

3 Time frames used for scenarios, including short-, medium-, and long-term milestones (e.g., how organizations consider timing of potential future implications under the scenarios used)

4 Information about the resiliency of the organization's strategy, including strategic performance implications under the various scenarios considered, potential qualitative or directional implications for the organization's value chain, capital allocation decisions, research and development focus, and potential material financial implications for the organization's operating results and/or financial position

---

[46] The Task Force's technical supplement, The Use of Scenario Analysis in Disclosure of Climate-Related Risks and Opportunities provides more information on scenario inputs, analytical assumptions and choices, and assessment and presentation of potential impacts.
[47] The objective of the Paris Agreement is to hold the increase in the global average temperature to well below 2°C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5°C. The IEA is developing a 1.5°C scenario that organizations may find useful.

## 4. Applying Scenario Analysis

While the Task Force recognizes the complexities of scenario analysis and the potential resources needed to conduct it, organizations are encouraged to use scenario analysis to assess climate-related risks and opportunities. For organizations just beginning to use scenario analysis, a qualitative approach that progresses and deepens over time may be appropriate.[48] Greater rigor and sophistication in the use of data and quantitative models and analysis may be warranted for organizations with more extensive experience in conducting scenario analysis. Organizations may decide to use existing external scenarios and models (e.g., those provided by third-party vendors) or develop their own, in-house modeling capabilities. The choice of approach will depend on an organization's needs, resources, and capabilities.

In conducting scenario analysis, organizations should *strive* to achieve:

- transparency around parameters, assumptions, analytical approaches, and time frames;

- comparability of results across different scenarios and analytical approaches;

- adequate documentation for the methodology, assumptions, data sources, and analytics;

- consistency of methodology year over year;

- sound governance over scenario analysis conduct, validation, approval, and application; and

- effective disclosure of scenario analysis that will inform and promote a constructive dialogue between investors and organizations on the range of potential impacts and resilience of the organization's strategy under various plausible climate-related scenarios.

In applying scenario analysis, organizations should consider general implications for their strategies, capital allocation, and costs and revenues, both at an enterprise-wide level and at the level of specific regions and markets where specific implications of climate change for the organization are likely to arise. Financial-sector organizations should consider using scenario analysis to evaluate the potential impact of climate-related scenarios on individual assets or investments, investments or assets in a particular sector or region, or underwriting activities.

The Task Force's supplemental guidance recognizes that organizations will be at different levels of experience in using scenario analysis. However, it is important for organizations to use scenario analysis and develop the necessary organizational skills and capabilities to assess climate-related risks and opportunities, with the expectation that organizations will evolve and deepen their use of scenario analysis over time. The objective is to assist investors and other stakeholders in better understanding:

- the degree of robustness of the organization's strategy and financial plans under different plausible future states of the world;

- how the organization may be positioning itself to take advantage of opportunities and plans to mitigate or adapt to climate-related risks; and

- how the organization is challenging itself to think strategically about longer-term climate-related risks and opportunities.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

---

[48] Organizations considering undertaking scenario analysis may wish to conduct various sensitivity analyses around key climate factors as a precursor to scenario analysis, recognizing that sensitivity analysis and scenario analysis are different, but complementary, processes.

(100 of 292) Page 100 of 292Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 100 of 292
Case 2:24-cv-00801-ODW-PVC   Document 48-23   Filed 05/24/24   Page 39 of 75   Page ID
#:1216

### 5. Challenges and Benefits of Conducting Scenario Analysis

Scenario analysis is a well-established method for developing strategic plans that are more flexible and robust to a range of plausible future states. As previously discussed (Figure 7, p. 26) it is particularly useful for assessing issues with possible outcomes that are highly uncertain, that play out over the medium to longer term, and that are potentially disruptive. Scenario analysis can help to better frame strategic issues, assess the range of potential management actions that may be needed, engage more productively in strategic conversations, and identify indicators to monitor the external environment. Importantly, climate-related scenario analysis can provide the foundation for more effective engagement with investors on an organization's strategic and business resiliency.

Conducting climate-related scenario analysis, however, is not without challenges. First, most scenarios have been developed for global and macro assessments of potential climate-related impacts that can inform policy makers. These climate-related scenarios do not always provide the ideal level of transparency, range of data outputs, and functionality of tools that would facilitate their use in a business or investment context.

Second, the availability and granularity of data can be a challenge for organizations attempting to assess various energy and technology pathways or carbon constraints in different jurisdictions and geographic locations.

Third, the use of climate-related scenario analysis to assess potential business implications is still at an early stage. Although a handful of the largest organizations and investors are using climate-related scenario analysis as part of their strategic planning and risk management processes, many organizations are just beginning to explore its use. Sharing experiences and approaches to climate-related scenario analysis across organizations, therefore, is critical to advancing the use of climate-related scenario analysis. Organizations may be able to play an important role in this regard by facilitating information and experience exchanges among themselves; collectively developing tools, data sets, and methodologies; and working to set standards. Organizations across many different sectors will inevitably need to learn by doing. Some may seek guidance from other industry participants and experts on how to apply climate-related scenarios to make forward-looking analyses of climate-related risks and opportunities.

Addressing these challenges and advancing the use of climate-related scenario analysis will require further work. These challenges, however, are not insurmountable and can be addressed. Organizations should undertake scenario analysis in the near term to capture the important benefits for assessing climate-related risks and opportunities and improve their capabilities as tools and data progress over time.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

**D
Scenario Analysis and Climate-Related Issues**

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

# E Key Issues Considered and Areas for Further Work

ER-1852

## E  Key Issues Considered and Areas for Further Work

The diverse perspectives of Task Force members as well as outreach efforts, including two public consultations, resulting in over 500 responses, hundreds of industry interviews, several focus groups, and multiple webinars, provided valuable insight into the challenges that different organizations—both financial and non-financial—may encounter in preparing disclosures consistent with the Task Force's recommendations. The Task Force considered these issues and others in developing and then finalizing its recommendations and sought to balance the burden of disclosure on preparers with the need for consistent and decision-useful information for users (i.e., investors, lenders, and insurance underwriters). This section describes the key issues considered by the Task Force, significant public feedback received by the Task Force related to those issues, the ultimate disposition of the issues, and, in some cases, areas where further work may be warranted. Figure 9 summarizes areas the Task Force identified, through its own analysis as well as through public feedback, as warranting further research and analysis or the development of methodologies and standards.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

### Figure 9
### Key Areas for Further Work

| | |
|---|---|
| **Relationship to Other Reporting Initiatives** | Encourage standard setting organizations and others to actively work toward greater alignment of frameworks and to support adoption |
| **Scenario Analysis** | Further develop applicable 2°C or lower transition scenarios and supporting outputs, tools, and user interfaces |
| | Develop broadly accepted methodologies, datasets, and tools for scenario-based evaluation of physical risk by organizations |
| | Make datasets and tools publicly available and provide commonly available platforms for scenario analysis |
| **Data Availability and Quality and Financial Impact** | Undertake further research and analysis to better understand and measure how climate-related issues translate into potential financial impacts for organizations in financial and non-financial sectors |
| | Improve data quality and further develop standardized metrics for the financial sector, including better defining carbon-related assets and developing metrics that address a broader range of climate-related risks and opportunities |
| | Increase organizations' understanding of climate-related risks and opportunities |
| **Example Disclosures**[49] | Provide example disclosures to assist preparers in developing disclosures consistent with the Task Force's recommendations |

[49] In response to the second consultation, organizations asked for example disclosures to gain a better understanding of how the recommended information may be disclosed. The Task Force acknowledges the development of these examples as an area of further work.

## 1. Relationship to Other Reporting Initiatives

Through the Task Force's outreach efforts, some organizations expressed concern that multiple disclosure frameworks and mandatory reporting requirements increase the administrative burden of disclosure efforts. Specifically, the additional time, cost, and effort required to analyze and disclose new climate-related information could penalize those with less capacity to respond.

The Task Force considered existing voluntary and mandatory climate-related reporting frameworks in developing its recommendations and provides information in the Annex on the alignment of existing frameworks, including those developed by the CDP (formerly the Carbon Disclosure Project), Climate Disclosure Standards Board (CDSB), the Global Reporting Initiative (GRI), the International Integrated Reporting Council (IIRC), and the Sustainability Accounting Standards Board (SASB), with the Task Force's recommended disclosures. The Task Force expects preparers disclosing climate-related information under other regimes will be able to use existing processes and content when developing disclosures based on the Task Force's recommendations.

The Task Force's recommendations provide a common set of principles that should help existing disclosure regimes come into closer alignment over time. Preparers, users, and other stakeholders share a common interest in encouraging such alignment as it relieves a burden for reporting entities, reduces fragmented disclosure, and provides greater comparability for users. The Task Force also encourages standard setting bodies to support adoption of the recommendations and alignment with the recommended disclosures.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

## 2. Location of Disclosures and Materiality

In considering possible reporting venues, the Task Force reviewed existing regimes for climate-related disclosures across G20 countries. While many G20 countries have rules or regulatory guidance that require climate-related disclosure for organizations, most are *not* explicitly focused on climate-related *financial* information.[50] In addition, the locations of these disclosures vary significantly and range from surveys sent to regulators to sustainability reports to annual financial filings (see Appendix 4).

The Task Force also reviewed financial filing requirements applicable to public companies across G20 countries and found that in most G20 countries, issuers have a legal obligation to disclose material information in their financial reports—which includes material, climate-related information. Such reporting may take the form of a general disclosure of material information, but many jurisdictions require disclosure of material information in specific sections of the financial filing (e.g., in a discussion on risk factors).[51]

Based on its review, the Task Force determined that preparers of climate-related financial disclosures should provide such disclosures in their mainstream (i.e., public) annual financial filings.[52] The Task Force believes publication of climate-related financial information in mainstream financial filings will foster broader utilization of such disclosures, promoting an informed understanding of climate-related issues by investors and others, and support shareholder engagement. Importantly, in determining whether information is material, the Task Force believes organizations should determine materiality for climate-related issues consistent with how they determine the materiality of other information included in their financial filings. In addition, the Task Force cautions organizations against prematurely concluding that climate-

---

[50] Organization for Economic Co-operation and Development (OECD) and CDSB, *Climate Change Disclosure in G20 Countries: Stocktaking of Corporate Reporting Schemes,* November 18, 2015.

[51] N. Ganci, S. Hammer, T. Reilly, and P. Rodel, *Environmental and Climate Change Disclosure under the Securities Laws: A Multijurisdictional Survey,* Debevoise & Plimpton, March 2016.

[52] To the extent climate-related disclosures are provided outside of financial filings, organizations are encouraged to align the release of such reports with their financial filings.

**ER-1854**

related risks and opportunities are not material based on perceptions of the longer-term nature of some climate-related risks.

As part of the Task Force's second public consultation, some organizations expressed concern about disclosing information in financial filings that is not clearly tied to an assessment of materiality. The Task Force recognizes organizations' concerns about disclosing information in annual financial filings that is not clearly tied to an assessment of materiality. However, the Task Force believes disclosures related to the Governance and Risk Management recommendations should be provided in annual financial filings. Because climate-related risk is a non-diversifiable risk that affects nearly all sectors, many investors believe it requires special attention. For example, in assessing organizations' financial and operating results, many investors want insight into the governance and risk management context in which such results are achieved. The Task Force believes disclosures related to its Governance and Risk Management recommendations directly address this need for context and should be included in annual financial filings.

For disclosures related to the Strategy and Metrics and Targets recommendations, the Task Force believes organizations should provide such information in annual financial filings when the information is deemed material. Certain organizations—those in the four non-financial groups that have more than one billion USDE in annual revenue—should consider disclosing information related to these recommendations in other reports when the information is not deemed material and not included in financial filings.[53],[54] Because these organizations are more likely than others to be affected financially over time due to their significant GHG emissions or energy or water dependencies, investors are interested in monitoring how the organizations' strategies evolve.

In addition, the Task Force recognizes reporting by asset managers and asset owners to their clients and beneficiaries, respectively, generally occurs outside mainstream financial filings (Figure 10). For purposes of adopting the Task Force's recommendations, asset managers and asset owners should use their existing channels of financial reporting to their clients and beneficiaries where relevant and feasible. Likewise, asset managers and asset owners should consider materiality in the context of their respective mandates and investment performance for clients and beneficiaries.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

**Figure 10**

## Reporting by Asset Owners

The financial reporting requirements and practices of asset owners vary widely and differ from what is required of organizations with public debt or equity. Some asset owners have no public reporting, while others provide extensive public reporting. For purposes of adopting the Task Force's recommendations, asset owners should use their existing channels of financial reporting to their beneficiaries and others where relevant and feasible.

## Reporting by Asset Managers

Reporting to clients by asset managers also takes different forms, depending on the requirements of the client and the types of investments made. For example, an investor in a mutual fund might receive quarterly, or download from the asset manager's website, a "fund fact sheet" that reports, among other information, the top holdings by value, the top performers by returns, and the carbon footprint of the portfolio against a stated benchmark. An investor in a segregated account might receive more detailed reporting, including items such as the aggregate carbon intensity of the portfolio compared with a benchmark, the portfolio's exposure to green revenue (and how this changes over time), or insight into portfolio positioning under different climate scenarios. The Task Force appreciates that climate-related risk reporting by asset managers is in the very early stages and encourages progress and innovation by the industry.

---

[53] The Task Force chose a one billion USDE annual revenue threshold because it captures organizations responsible for over 90% of Scope 1 and 2 GHG emissions in the industries represented by the four non-financial groups (about 2,250 organizations out of roughly 15,000).

[54] "Other reports" should be official company reports that are issued at least annually, widely distributed and available to investors and others, and subject to internal governance processes that are substantially similar to those used for financial reporting.

## 3. Scenario Analysis

As part of the Task Force's second public consultation, many organizations said scenario analysis is a useful tool to help assess risks and understand potential implications of climate change; however, they also identified areas where the Task Force's recommendations and guidance could be improved. In particular, organizations asked the Task Force to identify standardized climate-related scenarios for organizations to use and clarify the information related to scenarios that should be disclosed. They also noted expectations around disclosures and climate-related scenario analysis should be proportionate to the size of the reporting entity and not onerous for smaller organizations. In addition, some organizations noted that the disclosures related to strategy could put organizations at greater risk of litigation given the high degree of uncertainty around the future timing and magnitude of climate-related impacts.

In finalizing its recommendations and guidance, the Task Force clarified organizations should describe how resilient their strategies are to climate-related risks and opportunities, taking into consideration a transition to a lower-carbon economy consistent with a 2°C or lower scenario and, where relevant, scenarios consistent with more extreme physical risks. To address concerns about proportionality, the Task Force established a threshold for organizations in the four non-financial groups that should perform more robust scenario analysis and disclose additional information on the resiliency of their strategies.

On the issue of recommending specific standardized or reference climate-related scenarios for organizations to use, Task Force members agreed that while such an approach is intuitively appealing, it is not a practical solution at this time. Existing, publicly available climate-related scenarios are not structured or defined in such a way that they can be easily applied consistently across different industries or across organizations within an industry.

The Task Force recognizes that incorporating scenario analysis into strategic planning processes will improve over time as organizations "learn by doing." To facilitate progress in this area, the Task Force encourages further work as follows:

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

- further developing 2°C or lower transition scenarios that can be applied to specific industries and geographies along with supporting outputs, tools, and user interfaces;

- developing broadly accepted methodologies, data sets, and tools for scenario-based evaluation of physical risk by organizations;

- making these data sets and tools publicly available to facilitate use by organizations, reduce organizational transaction costs, minimize gaps between jurisdictions in terms of technical expertise, enhance comparability of climate-related risk assessments by organizations, and help ensure comparability for investors; and

- creating more industry specific (financial and non-financial) guidance for preparers and users of climate-related scenarios.

## 4. Data Availability and Quality and Financial Impact

The Task Force developed supplemental guidance for the four non-financial groups that account for the largest proportion of GHG emissions, energy usage, and water usage; and, as part of that supplemental guidance, the Task Force included several illustrative metrics around factors that may be indicative of potential financial implications for climate-related risks and opportunities. As part of the second public consultation, several organizations provided feedback on the illustrative metrics, and common themes included (1) improving the comparability and consistency of the metrics, (2) clarifying the links among the metrics, climate-related risks and opportunities, and potential financial implications, (3) simplifying the metrics, and (4) providing additional guidance on the metrics, including how to calculate key metrics. Organizations also raised concerns about

the lack of standardized data and metrics in the financial sector, which complicates preparers' ability to develop decision-useful metrics and users' ability to compare metrics across organizations.

The Task Force recognizes these concerns as well as broader challenges related to data availability and quality, as described below.

- The gaps in emissions measurement methodologies, including Scope 3 emissions and product life-cycle emissions methodologies, make reliable and accurate estimates difficult. [55,56]

- The lack of robust and cost-effective tools to quantify the potential impact of climate-related risks and opportunities at the asset and project level makes aggregation across an organization's activities or investment portfolios problematic and costly.

- The need to consider the variability of climate-related impacts across and within different sectors and markets further complicates the process (and magnifies the cost) of assessing potential climate-related financial impacts.

- The high degree of uncertainty around the timing and magnitude of climate-related risks makes it difficult to determine and disclose the potential impacts with precision.

In finalizing its supplemental guidance, the Task Force addressed the redundancy of the metrics; simplified the non-financial illustrative metrics tables; ensured consistent terminology was used; and clarified the links between the metrics, climate-related risks and opportunities, and potential financial implications. In addition, the Task Force encourages further research and analysis by sector and industry experts to (1) better understand and measure how climate-related issues translate into potential financial impacts; (2) develop standardized metrics for the financial sector, including better defining carbon-related assets; and (3) increase organizations' understanding of climate-related risks and opportunities. As it relates to the broader challenges with data quality and availability, the Task Force encourages preparers to include in their disclosures a description of gaps, limitations, and assumptions made as part of their assessment of climate-related issues.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

## 5. GHG Emissions Associated with Investments

In its supplemental guidance for asset owners and asset managers issued on December 14, 2016, the Task Force asked such organizations to provide GHG emissions associated with each fund, product, or investment strategy normalized for every million of the reporting currency invested. As part of the Task Force's public consultation as well as in discussions with preparers, some asset owners and asset managers expressed concern about reporting on GHG emissions related to their own or their clients' investments given the current data challenges and existing accounting guidance on how to measure and report GHG emissions associated with investments. In particular, they voiced concerns about the accuracy and completeness of the reported data and limited application of the metric to asset classes beyond public equities. Organizations also highlighted that GHG emissions associated with investments cannot be used as a sole indicator for investment decisions (i.e., additional metrics are needed) and that the metric can fluctuate with share price movements since it uses investors' proportional share of total equity.[57]

In consideration of the feedback received, the Task Force has replaced the GHG emissions associated with investments metric in the supplemental guidance for asset owners and asset managers with a weighted average carbon intensity metric. The Task Force believes the weighted

---

[55] Scope 3 emissions are all indirect emissions that occur in the value chain of the reporting company, including both upstream and downstream emissions. See Greenhouse Gas Protocol, "Calculation Tools, FAQ."

[56] Product life cycle emissions are all the emissions associated with the production and use of a specific product, including emissions from raw materials, manufacture, transport, storage, sale, use, and disposal. See Greenhouse Gas Protocol, "Calculation Tools, FAQ."

[57] Because the metric uses investors' proportional share of total equity, increases in the underlying companies' share prices, *all else equal*, will result in a decrease in the carbon footprinting number even though GHG emissions are unchanged.

average carbon intensity metric, which measures exposure to carbon-intensive companies, addresses many of the concerns raised. For example, the metric can be applied across asset classes, is fairly simple to calculate, and does not use investors' proportional share of total equity and, therefore, is not sensitive to share price movements.

The Task Force acknowledges the challenges and limitations of current carbon footprinting metrics, including that such metrics should not necessarily be interpreted as risk metrics. Nevertheless, the Task Force views the reporting of weighted average carbon intensity as a first step and expects disclosure of this information to prompt important advancements in the development of decision-useful, climate-related risk metrics. In this regard, the Task Force encourages asset owners and asset managers to provide other metrics they believe are useful for decision making along with a description of the methodology used. The Task Force recognizes that some asset owners and asset managers may be able to report the weighted average carbon intensity and other metrics on only a portion of their investments given data availability and methodological issues. Nonetheless, increasing the number of organizations reporting this type of information should help speed the development of better climate-related risk metrics.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
**Key Issues Considered and Areas for Further Work**

F
Conclusion

Appendices

## 6. Remuneration

In the supplemental guidance for the Energy Group, the Task Force asked such organizations to consider disclosing whether and how performance metrics, including links to remuneration policies, take into consideration climate-related risks and opportunities. As part of its second public consultation, the Task Force asked whether the guidance should extend to organizations beyond those in the Energy group and, if so, to which types of organizations. The majority of organizations that commented on this issue responded that the guidance should be extended to other organizations; and many suggested that the guidance should apply to organizations more likely to be affected by climate-related risks. In consideration of the feedback received, the Task Force revised its guidance to ask organizations, where climate-related risks are material, to consider describing whether and how related performance metrics are incorporated into remuneration policies.

## 7. Accounting Considerations

As part of its work, the Task Force considered the interconnectivity of its recommendations with existing financial statement and disclosure requirements. The Task Force determined that the two primary accounting standard setting bodies, the International Accounting Standards Board (IASB) and the Financial Accounting Standards Board (FASB), have issued standards to address risks and uncertainties affecting companies. Both International Accounting Standard (IAS) 37 "Provisions, Contingent Liabilities and Contingent Assets" and Accounting Standards Codification (ASC) 450 "Contingencies" provide guidance on how to account for and disclose contingencies. Additionally, IAS 36 "Impairment of Assets" and ASC 360 "Long-lived Asset Impairment" provide guidance on assessing the impairment of long-lived assets. The disclosures of both contingencies and management's assessment and evaluation of long-lived assets for potential impairment are critically important in assisting stakeholders in understanding an organization's ability to meet future reported earnings and cash flow goals.

In most G20 countries, financial executives will likely recognize that the Task Force's disclosure recommendations should result in more quantitative financial disclosures, particularly disclosure of metrics, about the financial impact that climate-related risks have or could have on an organization. Specifically, asset impairments may result from assets adversely impacted by the effects of climate change and/or additional liabilities may need to be recorded to account for regulatory fines and penalties resulting from enhanced regulatory standards. Additionally, cash flows from operations, net income, and access to capital could all be impacted by the effects of

climate-related risks (and opportunities). Therefore, financial executives (e.g., chief financial officers, chief accounting officers, and controllers) should be involved in the organization's evaluation of climate-related risks and opportunities and the efforts undertaken to manage the risks and maximize the opportunities. Finally, careful consideration should be given to the linkage between scenario analyses performed to assess the resilience of an organization's strategy to climate-related risks and opportunities (as suggested in the Task Force's recommendations) and assumptions underlying cash flow analyses used to assess asset (e.g., goodwill, intangibles, and fixed assets) impairments.

## 8. Time Frames for Short, Medium, and Long Term

As part of the Task Force's second public consultation, some organizations asked the Task Force to define specific ranges for short, medium, and long term. Because the timing of climate-related impacts on organizations will vary, the Task Force believes specifying time frames across sectors for short, medium, and long term could hinder organizations' consideration of climate-related risks and opportunities specific to their businesses. The Task Force is, therefore, not defining time frames and encourages preparers to decide how to define their own time frames according to the life of their assets, the profile of the climate-related risks they face, and the sectors and geographies in which they operate.

In assessing climate-related issues, organizations should be sensitive to the time frames used to conduct their assessments. While many organizations conduct operational and financial planning over a 1-2 year time frame and strategic and capital planning over a 2-5 year time frame, climate-related risks may have implications for an organization over a longer period. It is, therefore, important for organizations to consider the appropriate time frames when assessing climate-related risks.

## 9. Scope of Coverage

A
Introduction

B
Climate-Related Risks,
Opportunities, and
Financial Impacts

C
Recommendations and
Guidance

D
Scenario Analysis and
Climate-Related Issues

E
Key Issues Considered
and Areas for Further
Work

F
Conclusion

Appendices

To promote more informed investing, lending, and insurance underwriting decisions, the Task Force recommends all financial and non-financial organizations with public debt and/or equity adopt its recommendations.[58] Because climate-related risks and opportunities are relevant for organizations across all sectors, the Task Force encourages all organizations to adopt these recommendations. In addition, the Task Force believes that asset managers and asset owners, including public- and private-sector pension plans, endowments, and foundations, should implement its recommendations. The Task Force believes climate-related financial information should be provided to asset managers' clients and asset owners' beneficiaries so that they may better understand the performance of their assets, consider the risks of their investments, and make more informed investment choices.

Consistent with existing global stewardship frameworks, asset owners should engage with the organizations in which they invest to encourage adoption of these recommendations. They should also ask their asset managers to adopt these recommendations. Asset owners' expectations in relation to climate-related risk reporting from organizations and asset managers are likely to evolve as data availability and quality improves, understanding of climate-related risk increases, and risk measurement methodologies are further developed.

The Task Force recognizes that several asset owners expressed concern about being identified as the potential "policing body" charged with ensuring adoption of the Task Force's recommendations by asset managers and underlying organizations. The Task Force appreciates that expectations must be reasonable and that asset owners have many competing priorities, but

---

[58] Thresholds for climate-related financial disclosures should be aligned to the financial disclosure requirements more broadly in the jurisdictions where a preparer is incorporated and/or operates and is required to make financial disclosures.

**ER-1859**

encourages them to help drive adoption of the recommendations. Because asset owners and asset managers sit at the top of the investment chain, they have an important role to play in influencing the organizations in which they invest to provide better climate-related financial disclosures.

## 10. Organizational Ownership

Some organizations have not formalized responsibility for climate-related risk assessment and management. Even for organizations with clearly assigned responsibilities for climate-related issues, the relationship between those responsible for climate-related risk (e.g., "environmental, social and governance" experts, chief investment officers) and those in the finance function can range from regularly scheduled interactions and exchanges of information to minimal or no interaction. According to some preparers, lack of clarity around responsibility for climate-related risk assessments and management, compounded by a lack of integration into organizations' financial reporting processes, could adversely affect implementation of the recommendations.

The Task Force believes that by encouraging disclosure of climate-related financial information in public financial filings, coordination between organizations' climate-related risk experts and the finance function will improve. Similar to the way organizations are evolving to include cyber security issues in their strategic and financial planning efforts, so too should they evolve for climate-related issues.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

# F Conclusion

ER-1861

## F Conclusion

The Task Force's recommendations are a foundation for improved reporting of climate-related issues in mainstream financial filings with several resulting benefits (outlined in Figure 11). The recommendations aim to be ambitious, but also practical for near-term adoption. The Task Force expects that reporting of climate-related risks and opportunities will evolve over time as organizations, investors, and others contribute to the quality and consistency of the information disclosed.

Figure 11
**Benefits of Recommendations**

– Foundation for immediate adoption and flexible enough to accommodate evolving practices

– Promote board and senior management engagement on climate-related issues

– Bring the "future" nature of issues into the present through scenario analysis

– Support understanding of financial sector's exposure to climate-related risks

– Designed to solicit decision-useful, forward-looking information on financial impacts

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

### 1. Evolution of Climate-Related Financial Disclosures

The Task Force recognizes that challenges exist, but all types of organizations can develop disclosures consistent with its recommendations. The recommendations provide a foundation for immediate adoption and are flexible enough to accommodate evolving practices. As understanding, data analytics, and modeling of climate-related issues become more widespread, disclosures can mature accordingly.

Organizations already reporting climate-related financial information under other frameworks may be well positioned to disclose under this framework immediately and are encouraged to do so. For such organizations, significant effort has gone into developing processes and collecting information needed for disclosing under these regimes. The Task Force expects these organizations will be able to use existing processes when providing disclosures in annual financial filings based on the Task Force's recommendations.[59,60] Those with less experience can begin by considering and disclosing how climate-related issues may be relevant in their current governance, strategy, and risk management practices. This initial level of disclosure will allow investors to review, recognize, and understand how organizations consider climate-related issues and their potential financial impact.

Importantly, the Task Force recognizes organizations need to make financial disclosures in accordance with their national disclosure requirements. To the extent certain elements of the recommendations are incompatible with national disclosure requirements for financial filings, the Task Force encourages organizations to disclose those elements through other reports. Such other reports should be official company reports that are issued at least annually, widely distributed and available to investors and others, and subject to internal governance processes that are the same or substantially similar to those used for financial reporting.

### 2. Widespread Adoption Critical

In the Task Force's view, the success of its recommendations depends on near-term, widespread adoption by organizations in the financial and non-financial sectors. Through widespread adoption, financial risks and opportunities related to climate change will become a natural part of

---

[59] The Task Force recognizes the structure and content of financial filings differs across jurisdictions and, therefore, believes organizations are in the best position to determine where and how the recommended disclosures should be incorporated in financial filings.

[60] The Task Force encourages organizations where climate-related issues could be material in the future to begin disclosing climate-related financial information outside financial filings to facilitate the incorporation of such information into financial filings once climate-related issues are determined to be material.

ER-1862

organizations' risk management and strategic planning processes. As this occurs, organizations' and investors' understanding of the potential financial implications associated with transitioning to a lower-carbon economy and physical risks will grow, information will become more decision-useful, and risks and opportunities will be more accurately priced, allowing for the more efficient allocation of capital. Figure 12 outlines a possible path for implementation.

Widespread adoption of the recommendations will require ongoing leadership by the G20 and its member countries. Such leadership is essential to continue to make the link between these recommendations and the achievements of global climate objectives. Leadership from the FSB is also critical to underscore the importance of better climate-related financial disclosures for the functioning of the financial system.



Figure 12

**Implementation Path** *(Illustrative)*

*(y-axis)* Adoption Volume

*(x-axis)* Five Year Time Frame

Broad understanding of the concentration of carbon-related assets in the financial system and the financial system's exposure to climate-related risks

Greater adoption, further development of information provided (e.g., metrics and scenario analysis), and greater maturity in using information

More complete, consistent, and comparable information for market participants, increased transparency, and appropriate pricing of climate-related risks and opportunities

Organizations begin to disclose in financial filings

Climate-related issues viewed as mainstream business and investment considerations by both users and preparers

Final TCFD Report Released

Companies already reporting under other frameworks implement the Task Force's recommendations. Others consider climate-related issues within their businesses

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

The Task Force is not alone in its work. A variety of stakeholders, including stock exchanges, investment consultants, credit rating agencies, and others can provide valuable contributions toward adoption of the recommendations. The Task Force believes that advocacy for these standards will be necessary for widespread adoption, including educating organizations that will disclose climate-related financial information and those that will use those disclosures to make financial decisions. To this end, the Task Force notes that strong support by the FSB and G20 authorities would have a positive impact on implementation. With the FSB's extension of the Task Force through September 2018, the Task Force will work to encourage adoption of the recommendations and support the FSB and G20 authorities in promoting the advancement of climate-related financial disclosures.

# Appendices

# Appendix 1: Task Force Members

## Chairman and Vice Chairs

**Michael Bloomberg**
Chair
Founder
Bloomberg LP and Bloomberg Philanthropies

**Denise Pavarina**
Vice Chair
Executive Director
Banco Bradesco

**Graeme Pitkethly**
Vice Chair
Chief Financial Officer
Unilever

**Christian Thimann**
Vice Chair
Group Head of Regulation, Sustainability, and
Insurance Foresight
AXA

**Yeo Lian Sim**
Vice Chair
Special Adviser, Diversity
Singapore Exchange

## Members

**Jane Ambachtsheer**
Partner, Chair – Responsible Investment
Mercer

**Matt Arnold**
Managing Director and Global Head of Sustainable
Finance
JPMorgan Chase & Co.

**Wim Bartels**
Partner Corporate Reporting
KPMG

**Bruno Bertocci**
Managing Director, Head of Sustainable Investors
UBS Asset Management

**David Blood**
Senior Partner
Generation Investment Management

**Richard Cantor**
Chief Risk Officer, Moody's Corporation
Chief Credit Officer, Moody's Investor Service

**Koushik Chatterjee**
Group Executive Director, Finance and Corporate
Tata Group

**Eric Dugelay**
Global Leader, Sustainability Services
Deloitte

**Liliana Franco**
Director, Accounting Organization and Methods
Air Liquide Group

**Udo Hartmann**
Senior Manager, Group Environmental Protection
& Energy Management
Daimler

**Neil Hawkins**
Corporate Vice President and Chief Sustainability
Officer
The Dow Chemical Company

**Thomas Kusterer**
Chief Financial Officer
EnBW Energie Baden-Württemberg AG

**Diane Larsen**
Audit Partner, Global Professional Practice
EY

**Stephanie Leaist**
Managing Director, Head of Sustainable Investing
Canada Pension Plan Investment Board

**Mark Lewis**
Managing Director, Head of European Utilities
Equity Research
Barclays

**Eloy Lindeijer**
Chief, Investment Management, member
Executive Committee
PGGM

A
Introduction

B
Climate-Related Risks,
Opportunities, and
Financial Impacts

C
Recommendations and
Guidance

D
Scenario Analysis and
Climate-Related Issues

E
Key Issues Considered and
Areas for Further Work

F
Conclusion

**Appendices**

## Members *(continued)*

**Ruixia Liu**
General Manager, Risk Department
Industrial and Commercial Bank of China

**Masaaki Nagamura**
Head, Corporate Social Responsibility
Tokio Marine Holdings

**Giuseppe Ricci**
Chief Refining and Marketing Officer
ENI

**Martin Skancke**
Chair, Risk Committee
Storebrand

**Andreas Spiegel**
Head Group Sustainability Risk
Swiss Re

**Steve Waygood**
Chief Responsible Investment Officer
Aviva Investors

**Fiona Wild**
Vice President, Sustainability and Climate Change
BHP Billiton

**Michael Wilkins**
Managing Director, Environmental & Climate Risk Research
S&P Global Ratings

**Jon Williams**
Partner, Sustainability and Climate Change
PwC

**Deborah Winshel**
Managing Director, Global Head of Impact Investing
BlackRock

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

**Appendices**

## Special Adviser

**Russell Picot**
Chair, Audit and Risk Committee, LifeSight
Board Chair, HSBC Bank (UK) Pension Scheme Trustee
Former Group Chief Accounting Officer, HSBC

## Secretariat

**Mary Schapiro**
Special Advisor to the Chair
Former Chair, U.S. Securities and Exchange Commission

**Curtis Ravenel**
Global Head, Sustainable Business & Finance
Bloomberg LP

**Didem Nisanci**
Managing Director
Promontory Financial Group, an IBM Company

**Stacy Coleman**
Managing Director
Promontory Financial Group, an IBM Company

**Jeff Stehm**
Director
Promontory Financial Group, an IBM Company

**Mara Childress**
Principal
Promontory Financial Group, an IBM Company

**Veronika Henze**
Head of Communications
Bloomberg New Energy Finance

## Observers

**Susan Nash**
Member of Secretariat
Financial Stability Board

**Joe Perry**
Member of Secretariat
Financial Stability Board

**Rupert Thorne**
Deputy to the Secretary General
Financial Stability Board

## Appendix 2: Task Force Objectives and Approach

### 1. Objectives

The Task Force engaged with key stakeholders throughout the development of its recommendations to ensure that its work would (1) promote alignment across existing disclosure regimes, (2) consider the perspectives of users and the concerns of preparers of climate-related financial disclosures, and (3) be efficiently implemented by organizations in their financial reporting.

### 2. Approach

In addition to the expertise of its members, a broad range of external resources informed the Task Force's recommendations, including existing voluntary and mandatory climate-related reporting frameworks, governance and risk management standards, government reports and research, expert resources, and various other stakeholders such as industry participants, trade associations, and non-governmental organizations (NGOs).

A
Introduction

B
Climate-Related Risks,
Opportunities, and
Financial Impacts

C
Recommendations and
Guidance

D
Scenario Analysis and
Climate-Related Issues

E
Key Issues Considered and
Areas for Further Work

F
Conclusion

**Appendices**

#### a. Leveraging Expertise

Task Force members come from a range of companies, including large financial companies, large non-financial companies, accounting and consulting firms, and credit rating agencies, and brought a range of practical experience, expertise, and global perspectives on preparing and using climate-related financial disclosures. Through eight plenary meetings, Task Force members contributed significantly to developing a consensus-based, industry-led approach to climate-related financial disclosure.

Due to the technically challenging and broad focus of its work, the Task Force also sought input from experts in the field of climate change, particularly in relation to scenario analysis. The Task Force engaged Environmental Resources Management (ERM) to inform its work by developing a technical paper on scenario analysis—The Use of Scenario Analysis in Disclosure of Climate-Related Risks and Opportunities. Several members of the Task Force, joined by representatives from 2° Investing Initiative (2°ii), Bloomberg New Energy Finance (BNEF), Bloomberg Quantitative Risk Experts, Carbon Tracker, CDP, and the London School of Economics and Political Science led a working group to oversee ERM's technical considerations. A workshop was also held with experts from Oxford Martin School. Additionally, the International Energy Agency (IEA) provided input regarding how scenario analysis can be conducted and used.

#### b. Research and Information Gathering

The Task Force's work drew on publications and research conducted by governments, NGOs, industry participants, as well as disclosure regimes with a focus on climate-related issues. The Task Force reviewed existing mandatory and voluntary reporting regimes for climate-related disclosure to identify commonalities and gaps across existing regimes and to determine areas meriting further research and analysis by the Task Force. The work of organizations regarded as standard setters, as well as several organizations active in developing reporting mechanisms for climate-related issues, served as the primary references for the Task Force in developing its recommendations and supporting guidance. The Task Force also considered resources related to sector-specific climate issues in the development of the supplemental guidance.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

**Appendices**

### c. Outreach and Engagement

Engagement with users, preparers, and other stakeholders in relevant industries and sectors across G20 countries and other countries was important in developing the Task Force's recommendations. The Task Force conducted five types of engagement to support this effort: public consultation, industry interviews, focus groups, outreach events, and webinars.

Such engagement served two primary purposes: (1) to raise the level of awareness and educate stakeholders on the Task Force's work and (2) to solicit feedback from stakeholders on the Task Force's proposed recommended disclosures and supplemental guidance for specific sectors. In total, more than 2,700 individuals in 43 countries were included in the Task Force's outreach and engagement (Figure A2.1).

### Public Consultations

The Task Force conducted two public consultations. The first followed the April 1, 2016 publication of the Task Force's Phase I Report, which set out the scope and high-level objectives for the Task Force's work. The Task Force solicited input to guide the development of its recommendations for voluntary climate-related financial disclosures. In total, 203 participants from 24 countries responded to the first public consultation. Respondents represented the financial sector, non-financial sectors, NGOs, and other organizations. Public consultation comments indicated support for disclosures on scenario analysis as well as disclosures tailored for specific sectors. Key themes from the first public consultation, which informed the Task Force's recommendations and guidance, are included in Table A2.1 (p. 48).



Figure A2.1

## Outreach and Engagement

Table A2.1

## Key Themes of First Public Consultation (Scope of Work)

| Key Themes | Survey Response | |
|---|---|---|
| **Components of Disclosures** | The majority of respondents were in agreement that disclosures should:<br>– be forward-looking,<br>– address the ability to achieve targets, with strategies for achievement, and<br>– align with material risks. | |
| **Sector-Specific Disclosures** | Respondents were in favor of disclosures for specific sectors | 62% |
| **Scenario Analysis** | Respondents see scenario analysis as a key component of disclosure | 96% |

A second public consultation followed the release of the Task Force's report in December 2016. The Task Force conducted the second consultation through an online questionnaire designed to gather feedback on the recommendations, guidance, and key issues identified by the Task Force. The Task Force received 306 responses to its online questionnaire and 59 comment letters on the recommendations and guidance from a variety of organizations in 30 countries.[61] The majority of responses came from Europe (57 percent), followed by North America (20 percent), Asia Pacific (19 percent), South America (four percent), and the Middle East/Africa (less than one percent). Fourty-five percent of respondents provided perspective as users of disclosure, 44 percent as preparers of disclosure, and 11 percent as "other." Respondents came from the financial sector (43 percent), non-financial sectors (18 percent), or other types of organizations (39 percent).[62]

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

**Appendices**

Table A2.2

## Responses to Second Public Consultation Questions

| Questions | Respondent | Percent Responding "Useful" |
|---|---|---|
| How useful are the recommendations and guidance for all sectors in preparing disclosures? | Preparers | 75% |
| How useful is the supplemental guidance in preparing disclosures? | Preparers | 66% |
| If organizations disclose the recommended information, how useful would it be for decision making? | Users | 77% |
| How useful is a description of potential performance across a range of scenarios to understanding climate-related impacts on an organization's businesses, strategy, and financial planning? | Financial | 74% |
|  | Non-Financial | 17% |
|  | Other | 86% |
| How useful are the illustrative examples of metrics and targets? | Financial | 74% |
|  | Non-Financial | 33% |
|  | Other | 72% |
| How useful would the disclosure of GHG emissions associated with investments be for economic decision-making? | Financial | 68% |
|  | Other | 74% |

---

[61] Of the 59 respondents that submitted comment letters, 45 also completed the online questionnaire, resulting in a total of 320 unique responses.
[62] The other types of organizations included research and advocacy NGOs; standard setting NGOs; data analytics, consulting, and research organizations; academia; and accounting associations.

Overall, respondents were generally supportive of the Task Force's recommendations as shown in Table A2.2 (p. 48); however, several provided specific and constructive feedback on the report. The key themes from this feedback are included in Table A2.3. For additional information regarding the results of the second public consultation, please view the TCFD Public Consultation Summary 2017 on the Task Force's website.

Table A2.3

### Key Themes of Second Public Consultation (Recommendations)

| Key Themes | |
|---|---|
| **Materiality and Location of Disclosures** | Clarifying which recommended disclosures depend on materiality assessment and providing flexibility for organizations to provide some or all disclosures in reports other than financial filings. |
| **Scenario Analysis** | Improving ease of implementation, and comparability of scenario analysis by specifying standard scenario(s) and providing additional guidance and tools. |
| **Metrics for the Financial Sector** | Encouraging further development and standardization of metrics for the financial sector. |
| **Metrics for Non-Financial Sectors** | Improving comparability and consistency of the illustrative metrics for non-financial sectors, clarifying the links to financial impact and climate-related risks and opportunities. |
| **Implementation** | Providing disclosure examples to support preparers in developing relevant climate-related financial disclosures. |

### Industry Interviews and Focus Groups

Prior to the December 2016 release of the Task Force's report for public consultation, the Task Force conducted 128 industry interviews with users and preparers of financial statements to gather feedback regarding the Task Force's draft recommendations, supplemental guidance for certain sectors, and other considerations. Industry interview participants included chief financial officers, investment officers, other finance and accounting officers, risk officers, sustainability officers, and others. Forty-three percent of the participants held finance, legal, or risk positions and 39 percent held environmental or sustainability roles.

Task Force representatives conducted two rounds of industry interviews. The initial round of interviews focused on the recommendations and guidance; the second round emphasized specific recommendations and sector-specific guidance. Organizations invited to participate in the interviews met two primary criteria: (1) represented industry and sector leaders likely to be impacted by climate-related risks and opportunities and (2) provided geographic diversity to ensure coverage from each G20 and Financial Stability Board (FSB) represented country.

The interviews provided valuable information that informed the Task Force's recommendations and guidance as reflected in the report issued for public consultation in December 2016. Industry interview themes were consistent with those identified in the second public consultation. Preparers raised concerns about the relationship of the Task Force's recommendations to other reporting initiatives and the accuracy and reliability of information requested. Users commented that establishing consistency in metrics would be beneficial, acknowledged data quality challenges, and provided thoughts on scenario analysis (e.g., would like preparers to use of a range of scenarios, interested in knowing how scenario analysis is used in the organization).

Subsequent to the December 2016 release of the Task Force's report for public consultation, the Task Force conducted five focus groups with 32 individuals from six countries representing organizations in specific sectors and industries to solicit feedback on scenario analysis and carbon footprinting metrics. In the two focus groups for the financial sector, participants expressed support for the Task Force's work, noting current challenges related to quality and consistency in

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

**Appendices**

reported climate-related information. Asset owners and asset managers also provided feedback on the benefits and limitations of different carbon footprinting metrics. In the three focus groups for non-financial sectors, participants in oil and gas and utilities industries provided specific feedback on their use of scenario analysis and challenges related to disclosing certain information in financial filings.

### Outreach Events

The Task Force sponsored 18 public outreach events in 13 countries, and Task Force members presented the recommendations at 91 other events including conferences, forums, and meetings sponsored by industry associations, NGOs, government agencies, corporations, and other organizations. The 18 Task Force-sponsored events informed stakeholders of the Task Force's work and recommendations and included panel discussions and keynote speeches by prominent climate-risk and financial experts. Attendees included representatives of financial and non-financial organizations who spanned a variety of corporate functions, including strategy, risk, accounting, portfolio and investment management, corporate sustainability, as well as representatives from industry associations, NGOs, government agencies, research providers, academia, accounting and consulting firms, and media.

### Webinars

Prior to the release of the report in December 2016 for public consultation, the Task Force offered seven webinars to educate and increase awareness of the Task Force's efforts as well as to collect additional feedback. Of the seven webinars, the Task Force hosted four webinars and participated in three additional webinars by partnering with the following organizations: Business for Social Responsibility, Global Financial Markets Association, and the National Association of Corporate Directors. These webinars served to supplement the in-person outreach events and offered global stakeholders, regardless of location, an opportunity to engage with the Task Force. The webinars included 538 attendees representing 365 organizations across 23 countries. After the release of the report, the Task Force held three webinars to present its recommendations and to solicit additional feedback. The three webinars included 255 attendees representing 209 organizations across 25 countries. In total, the Task Force offered ten webinars, reaching 793 attendees across 30 countries.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

## Appendix 3: Fundamental Principles for Effective Disclosure

To underpin its recommendations and help guide current and future developments in climate-related financial reporting, the Task Force developed a set of principles for effective disclosure.[63] As understanding of, and approaches to, climate-related issues evolve over time, so too will climate-related financial reporting. These principles can help achieve high-quality and decision-useful disclosures that enable users to understand the impact of climate change on organizations. The Task Force encourages organizations adopting its recommendations to consider these principles as they develop climate-related financial disclosures.

The Task Force's disclosure principles are largely consistent with other mainstream, internationally accepted frameworks for financial reporting and are generally applicable to most providers of financial disclosures. They are informed by the qualitative and quantitative characteristics of financial information and further the overall goals of producing disclosures that are consistent, comparable, reliable, clear, and efficient, as highlighted by the FSB in establishing the Task Force. The principles, taken together, are designed to assist organizations in making clear the linkages and connections between climate-related issues and their governance, strategy, risk management, and metrics and targets.

**Principle 1: Disclosures should present relevant information**

The organization should provide information specific to the potential impact of climate-related risks and opportunities on its markets, businesses, corporate or investment strategy, financial statements, and future cash flows.

- Disclosures should be eliminated if they are immaterial or redundant to avoid obscuring relevant information. However, when a particular risk or issue attracts investor and market interest or attention, it may be helpful for the organization to include a statement that the risk or issue is not significant. This shows that the risk or issue has been considered and has not been overlooked.

- Disclosures should be presented in sufficient detail to enable users to assess the organization's exposure and approach to addressing climate-related issues, while understanding that the type of information, the way in which it is presented, and the accompanying notes will differ between organizations and will be subject to change over time.

- Climate-related impacts can occur over the short, medium, and long term. Organizations can experience chronic, gradual impacts (such as impacts due to shifting temperature patterns), as well as acute, abrupt disruptive impacts (such as impacts from flooding, drought, or sudden regulatory actions). An organization should provide information from the perspective of the potential impact of climate-related issues on value creation, taking into account and addressing the different time frames and types of impacts.

- Organizations should avoid generic or boilerplate disclosures that do not add value to users' understanding of issues. Furthermore, any proposed metrics should adequately describe or serve as a proxy for risk or performance and reflect how an organization manages the risk and opportunities.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

**Appendices**

---

[63] These principles are adapted from those included in the Enhanced Disclosure Task Force's "Enhancing the Risk Disclosures of Banks."

**ER-1872**

**Principle 2: Disclosures should be specific and complete**

- An organization's reporting should provide a thorough overview of its exposure to potential climate-related impacts; the potential nature and size of such impacts; the organization's governance, strategy, processes for managing climate-related risks, and performance with respect to managing climate-related risks and opportunities.

- To be sufficiently comprehensive, disclosures should contain historical and future-oriented information in order to allow users to evaluate their previous expectations relative to actual performance and assess possible future financial implications.

- For quantitative information, the disclosure should include an explanation of the definition and scope applied. For future-oriented data, this includes clarification of the key assumptions used. Forward-looking quantitative disclosure should align with data used by the organization for investment decision making and risk management.

- Any scenario analyses should be based on data or other information used by the organization for investment decision making and risk management. Where appropriate, the organization should also demonstrate the effect on selected risk metrics or exposures to changes in the key underlying methodologies and assumptions, both in qualitative and quantitative terms.

**Principle 3: Disclosures should be clear, balanced, and understandable**

- Disclosures should be written with the objective of communicating financial information that serves the needs of a range of financial sector users (e.g., investors, lenders, insurers, and others). This requires reporting at a level beyond compliance with minimum requirements. The disclosures should be sufficiently granular to inform sophisticated users, but should also provide concise information for those who are less specialized. Clear communication will allow users to identify key information efficiently.

- Disclosures should show an appropriate balance between qualitative and quantitative information and use text, numbers, and graphical presentations as appropriate.

- Fair and balanced narrative explanations should provide insight into the meaning of quantitative disclosures, including the changes or developments they portray over time. Furthermore, balanced narrative explanations require that risks as well as opportunities be portrayed in a manner that is free from bias.

- Disclosures should provide straightforward explanations of issues. Terms used in the disclosures should be explained or defined for a proper understanding by the users.

**Principle 4: Disclosures should be consistent over time**

- Disclosures should be consistent over time to enable users to understand the development and/or evolution of the impact of climate-related issues on the organization's business. Disclosures should be presented using consistent formats, language, and metrics from period to period to allow for inter-period comparisons. Presenting comparative information is preferred; however, in some situations it may be preferable to include a new disclosure even if comparative information cannot be prepared or restated.

- Changes in disclosures and related approaches or formats (e.g., due to shifting climate-related issues and evolution of risk practices, governance, measurement methodologies, or accounting practices) can be expected due to the relative immaturity of climate-related disclosures. Any such changes should be explained.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

**Appendices**

**ER-1873**

(123 of 292) Page 123 of 292 Case: 25-5327 09/18/2025, DktEntry: 8.9, Page 123 of 292
Case 2:24-cv-00801-ODW-PVC Document 48-23 Filed 05/24/24 Page 62 of 75 Page ID
#:1239

**Principle 5: Disclosures should be comparable among organizations within a sector,
industry, or portfolio**

- Disclosures should allow for meaningful comparisons of strategy, business activities, risks, and performance across organizations and within sectors and jurisdictions.

- The level of detail provided in disclosures should enable comparison and benchmarking of risks across sectors and at the portfolio level, where appropriate.

- The placement of reporting would ideally be consistent across organizations—i.e., in financial filings—in order to facilitate easy access to the relevant information.

**Principle 6: Disclosures should be reliable, verifiable, and objective**

- Disclosures should provide high-quality reliable information. They should be accurate and neutral—i.e., free from bias.

- Future-oriented disclosures will inherently involve the organization's judgment (which should be adequately explained). To the extent possible, disclosures should be based on objective data and use best-in-class measurement methodologies, which would include common industry practice as it evolves.

- Disclosures should be defined, collected, recorded, and analyzed in such a way that the information reported is verifiable to ensure it is high quality. For future-oriented information, this means assumptions used can be traced back to their sources. This does not imply a requirement for independent external assurance; however, disclosures should be subject to internal governance processes that are the same or substantially similar to those used for financial reporting.

**Principle 7: Disclosures should be provided on a timely basis**

- Information should be delivered to users or updated in a timely manner using appropriate media on, at least, an annual basis within the mainstream financial report.

- Climate-related risks can result in disruptive events. In case of such events with a material financial impact, the organization should provide a timely update of climate-related disclosures as appropriate.

Reporters may encounter tension in the application of the fundamental principles set out above. For example, an organization may update a methodology to meet the comparability principle, which could then result in a conflict with the principle of consistency. Tension can also arise within a single principle. For example, Principle 6 states that disclosures should be verifiable, but assumptions made about future-oriented disclosures often require significant judgment by management that is difficult to verify. Such tensions are inevitable given the wide-ranging and sometimes competing needs of users and preparers of disclosures. Organizations should aim to find an appropriate balance of disclosures that reasonably satisfy the recommendations and principles while avoiding overwhelming users with unnecessary information.

A
Introduction

B
Climate-Related Risks,
Opportunities, and
Financial Impacts

C
Recommendations and
Guidance

D
Scenario Analysis and
Climate-Related Issues

E
Key Issues Considered and
Areas for Further Work

F
Conclusion

**Appendices**

## Appendix 4: Select Disclosure Frameworks

To the extent there is corporate reporting of climate-related issues, it happens through a multitude of mandatory and voluntary schemes. Although a complete and comprehensive survey of existing schemes is beyond the scope of this report, the Task Force on Climate-related Financial Disclosures (TCFD or Task Force) considered a broad range of existing frameworks, both voluntary and mandatory. The tables in Appendix 4 outline select disclosure frameworks considered by the Task Force and describe a few key characteristics of each framework, including whether disclosures are mandatory or voluntary, what type of information is reported, who the target reporters and target audiences are, where the disclosed information is placed, and whether there are specified materiality standards.[64] These disclosure frameworks were chosen to illustrate the broad range of disclosure regimes around the world; the tables are broken out into disclosure frameworks sponsored by governments, stock exchanges, and non-governmental organizations (NGOs).

The information presented in the tables below (A4.1, A4.2, and A4.3) is based on information released by governments, stock exchanges, and standard setters and is supplemented by the United Nations Environment Programme (UNEP), "The Financial System We Need: Aligning the Financial System with Sustainable Development," October 2015, and the Organization for Economic Co-operation and Development (OECD), "Report to G20 Finance Ministers and Central Bank Governors," September 2015.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

---

[64] These tables were originally included in the Task Force's Phase I Report and have been updated where appropriate.

Table A4.1

## Select Disclosure Frameworks: Governments

| Region: Framework | Target Reporter | Target Audience | Mandatory or Voluntary | Materiality Standard | Types of Climate-Related Information | Disclosure Location | External Assurance Required |
|---|---|---|---|---|---|---|---|
| **Australia:** National Greenhouse and Energy Reporting Act (2007) | Financial and non-financial firms that meet emissions or energy production or consumption thresholds | General public | Mandatory if thresholds are met | Based on emissions above a certain threshold | GHG emissions, energy consumption, and energy production | Report to government | Regulator may, by written notice to corporation, require an audit of its disclosures |
| **European Union (EU):** EU Directive 2014/95 regarding disclosure of non-financial and diversity information (2014) | Financial and non-financial firms that meet size criteria (i.e., have more than 500 employees) | Investors, consumers, and other stakeholders | Mandatory; applicable for the financial year starting on Jan. 1, 2017 or during the 2017 calendar year | None specified | Land use, water use, GHG emissions, use of materials, and energy use | Corporate financial report or separate report (published with financial report or on website six months after the balance sheet date and referenced in financial report) | Member States must require that statutory auditor checks whether the non-financial statement has been provided

Member States may require independent assurance for information in non-financial statement |
| **France:** Article 173, Energy Transition Law (2015) | Listed financial and non-financial firms

Additional requirements for institutional investors | Investors, general public | Mandatory | None specified | Risks related to climate change, consequences of climate change on the company's activities and use of goods and services it produces. Institutional investors: GHG emissions and contribution to goal of limiting global warming | Annual report and website | Mandatory review on the consistency of the disclosure by an independent third party, such as a statutory auditor |
| **India:** National Voluntary Guidelines on Social, Environmental, and Economic Responsibilities of Business (2011) | Financial and non-financial firms | Investors, general public | Voluntary | None specified | Significant risk, goals and targets for improving performance, materials, energy consumption, water, discharge of effluents, GHG emissions, and biodiversity | Not specified; companies may furnish a report or letter from owner/chief executive officer | Guidelines include third-party assurance as a "leadership indicator" of company's progress in implementing the principles |

Table A4.1

## Select Disclosure Frameworks: Governments *(continued)*

| Region: Framework | Target Reporter | Target Audience | Mandatory or Voluntary | Materiality Standard | Types of Climate-Related Information | Disclosure Location | External Assurance Required |
|---|---|---|---|---|---|---|---|
| **United Kingdom:** Companies Act 2006 (Strategic Report and Directors' Report) Regulations 2013 | Financial and non-financial firms that are "Quoted Companies," as defined by the Companies Act 2006 | Investors / shareholders ("members of the company") | Mandatory | Information is material if its omission or misrepresentation could influence the economic decisions shareholders take on the basis of the annual report as a whole (section 5 of the UK FRC June 2014 Guidance on the Strategic Report) | The main trends and factors likely to affect the future development, performance, and position of the company's business, environmental matters (including the impact of the company's business on the environment), and GHG emissions | Strategic Report and Directors' Report | Not required, but statutory auditor must state in report on the company's annual accounts whether in the auditor's opinion the information given in the Strategic Report and the Directors' Report for the financial year for which the accounts are prepared is consistent with those accounts |
| **United States:** NAICS, 2010 Insurer Climate Risk Disclosure Survey | Insurers meeting certain premium thresholds - $100M in 2015 | Regulators | Mandatory if thresholds are met | None specified | General disclosures about climate change-related risk management and investment management | Survey sent to state regulators | Not specified |
| **United States:** SEC Guidance Regarding Disclosure Related to Climate Change | Financial and non-financial firms subject to Securities and Exchange Commission (SEC) reporting requirements | Investors | Mandatory | US securities law definition | Climate-related material risks and factors that can affect or have affected the company's financial condition, such as regulations, treaties and agreements, business trends, and physical impacts | Annual and other reports required to be filed with SEC | Depends on assurance requirements for information disclosed |

Case 2:24-cv-00801-ODW-PVC   Document 48-23   Filed 05/24/24   Page 66 of 75   Page ID #:1243

Table A4.2

## Select Disclosure Frameworks: Exchange Listing Requirements and Indices

| Region: Framework | Target Reporter | Target Audience | Mandatory or Voluntary | Materiality Standard | Types of Climate-Related Information | Disclosure Location | External Assurance Required |
|---|---|---|---|---|---|---|---|
| **Australia:** Australia Securities Exchange Listing Requirement 4.10.3; Corporate Governance Principles and Recommendations (2014) | Listed financial and non-financial firms | Investors | Mandatory (comply or explain) | A real possibility that the risk in question could substantially impact the listed entity's ability to create or preserve value for security holders over the short, medium or long term | General disclosure of material environmental risks | Annual report must include either the corporate governance statement or company website link to the corporate governance statement on company's website | Not specified, may depend on assurance requirements for annual report |
| **Brazil:** Stock Exchange (BM&FBovespa) Recommendation of report or explain (2012) | Listed financial and non-financial firms | Investors, regulator | Voluntary (comply or explain) | Criteria explained in Reference Form (Annex 24) of the Instruction CVM nº 480/09 | Social and environmental information including methodology used, if audited/reviewed by an independent entity, and link to information (i.e., webpage) | Discretion of company | Not specified |
| **China:** Shenzhen Stock Exchange Social Responsibility Instructions to Listed Companies (2006) | Listed financial and non-financial firms | Investors | Voluntary: social responsibilities Mandatory: pollutant discharge | None specified | Waste generation, resource consumption, and pollutants | Not specified | Not specified; companies shall allocate dedicated human resources for regular inspection of implementation of environmental protection policies |
| **Singapore:** Singapore Exchange Listing Rules  711A & 711B and Sustainability Reporting Guide (2016) ("Guide") | Listed financial and non-financial firms | Investors | Mandatory (comply or explain) | Guidance provided in the Guide, paragraphs 4.7-4.11 | Material environmental, social, and governance factors, performance, targets, and related information specified in the Guide | Annual report or standalone report, disclosed through SGXNet reporting platform and company website | Not required |

**ER-1878**

Table A4.2

## Select Disclosure Frameworks: Exchange Listing Requirements and Indices *(continued)*

| Region: Framework | Target Reporter | Target Audience | Mandatory or Voluntary | Materiality Standard | Types of Climate-Related Information | Disclosure Location | External Assurance Required |
|---|---|---|---|---|---|---|---|
| **South Africa:** Johannesburg Stock Exchange Listing Requirement Paragraph 8.63; King Code of Governance Principles (2009) | Listed financial and non-financial firms | Investors | Mandatory; (comply or explain) | None specified | General disclosure regarding sustainability performance | Annual report | Required |
| **World, regional, and country-specific indices:** S&P Dow Jones Indices Sustainability Index, Sample Questionnaires | Financial and non-financial firms | Investors | Voluntary | None specified | GHG emissions, SOx emissions, energy consumption, water, waste generation, environmental violations, electricity purchased, biodiversity, and mineral waste management | Nonpublic | Disclose whether external assurance was provided and whether it was pursuant to a recognized standard |

Table A4.3

## Select Disclosure Frameworks: Non-Governmental Organizations

*Click for November 2018 Update*

| Framework | Target Reporter | Target Audience | Mandatory or Voluntary | Materiality Standard | Types of Climate-Related Information | Disclosure Location | External Assurance Required |
|---|---|---|---|---|---|---|---|
| **Global:**<br><br>Asset Owners Disclosure Project<br><br>2017 Global Climate Risk Survey | Pension funds, insurers, sovereign wealth funds ≥$2bn AUM | Asset managers, investment industry, government | Voluntary | None specified | Information on whether climate change issues are integrated in investment policies, engagement efforts, portfolio emissions intensity for scope 1 emissions, climate change-related portfolio risk mitigation actions | Survey responses; respondents are asked whether responses may be made public | Disclose whether external assurance was provided |
| **Global:**<br><br>CDP<br><br>Annual Questionnaire (2016) | Financial and non-financial firms | Investors | Voluntary | None specified | Information on risk management procedures related to climate change risks and opportunities, energy use, and GHG emissions (Scope 1-3) | CDP database | Encouraged; information requested about verification and third party certification |
| **Global:**<br><br>CDSB<br><br>CDSB Framework for Reporting Environmental Information & Natural Capital | Financial and non-financial firms | Investors | Voluntary | Environmental information is material if (1) the environmental impacts or results it describes are, due to their size and nature, expected to have a significant positive or negative effect on the organization's current, past or future financial condition and operational results and its ability to execute its strategy or (2) omitting, misstating, or mis-interpreting it could influence decisions that users of mainstream reports make about the organization | Environmental policies, strategy, and targets, including the indicators, plans, and timelines used to assess performance; material environmental risks and opportunities affecting the organization; governance of environmental policies, strategy, and information; and quantitative and qualitative results on material sources of environmental impact | Annual reporting packages in which organizations are required to deliver their audited financial results under the corporate, compliance or securities laws of the country in which they operate | Not required, but disclose if assurance has been provided over whether reported environmental information is in conformance with the CDSB Framework |

Table A4.3

## Select Disclosure Frameworks: Non-Governmental Organizations *(continued)*          *Click for November 2018 Update*

| Framework | Target Reporter | Target Audience | Mandatory or Voluntary | Materiality Standard | Types of Climate-Related Information | Disclosure Location | External Assurance Required |
|---|---|---|---|---|---|---|---|
| **Global:** CDSB Climate Change Reporting Framework, Ed. 1.1 (2012) | Financial and non-financial firms | Investors | Voluntary | Allow "investors to see major trends and significant events related to climate change that affect or have the potential to affect the company's financial condition and/or its ability to achieve its strategy" | The extent to which performance is affected by climate-related risks and opportunities; governance processes for addressing those effects; exposure to significant climate-related issues; strategy or plan to address the issues; and GHG emissions | Annual reporting packages in which organizations are required to deliver their audited financial results under the corporate, compliance or securities laws of the territory or territories in which they operate | Not required unless International Standards on Auditing 720 requires the auditor of financial statements to read information accompanying them to identify material inconsistencies between the audited financial statements and accompanying information |
| **Global:** GRESB Infrastructure Asset Assessment & Real Estate Assessment | Real estate asset/portfolio owners | Investors and industry stakeholders | Voluntary | None specified | Real estate sector-specific requirements related to fuel, energy, and water consumption and efficiencies as well as low-carbon products | Data collected through the GRESB Real Estate Assessment disclosed to participants themselves and: • for non-listed property funds and companies, to those of that company or fund's investors that are GRESB Investor Members; • for listed real estate companies, to all GRESB Investor Members that invest in listed real estate securities. | Not required, but disclose whether external assurance was provided |
| **Global:** GRI Sustainability Reporting Standards (2016) | Organizations of any size, type, sector, or geographic location | All stakeholders | Voluntary | Topics that reflect the reporting organization's significant economic, environmental, and social impacts or substantively influence the decisions of stakeholders | Materials, energy, water, biodiversity, emissions, effluents and waste, environmental compliance, and supplier environmental assessment | Stand-alone sustainability reports or annual reports or other published materials that include sustainability information | Not required, but advised |

Table A4.3

## Select Disclosure Frameworks: Non-Governmental Organizations *(continued)*     *Click for November 2018 Update*

| Framework | Target Reporter | Target Audience | Mandatory or Voluntary | Materiality Standard | Types of Climate-Related Information | Disclosure Location | External Assurance Required |
|---|---|---|---|---|---|---|---|
| **Global:** IIGCC Oil & Gas (2010) Automotive (2009) Electric Utilities (2008) | Oil and gas industries | Investors | Voluntary | None specified | GHG emissions and clean technologies data | Not specified | Not specified |
|  | Automotive industry | Investors | Voluntary | None specified | GHG emissions and clean technologies data | Company's discretion | Not specified |
|  | Electrical utilities | Investors | Voluntary | None specified | GHG emissions and electricity production | Company's discretion | Disclose how GHG emissions information was verified |
| **Global:** IIRC International Integrated Reporting Framework (2013) | Public companies traded on international exchanges | Investors | Voluntary | Substantively affect the company's ability to create value over the short, medium, and long term | General challenges related to climate change, loss of ecosystems, and resource shortages | Standalone sustainability or integrated report | Not specified; discussion paper released on issues relating to assurance |
| **Global:** IPIECA Oil and gas industry guidance on voluntary sustainability reporting | Oil and gas industries | All stakeholders | Voluntary | Material sustainability issues are those that, in the view of company management and its external stakeholders, affect the company's performance or strategy and/or assessments or decisions about the company | Energy consumption | Sustainability reporting | Not required, but encouraged |
| **Global:** PRI Reporting Framework (2016) | Investors | Investors | Voluntary | None specified | Investor practices | Transparency report | Not specified |
| **United States:** SASB Conceptual Framework (2013) and SASB Standards (Various) | Public companies traded on US exchanges | Investors | Voluntary | A substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of the information made available | Information on sustainability topics that are deemed material, standardized metrics tailored by industry | SEC filings | Depends on assurance requirements for information disclosed |

## Appendix 5: Glossary and Abbreviations

### Glossary

**BOARD OF DIRECTORS (or BOARD)** refers to a body of elected or appointed members who jointly oversee the activities of a company or organization. Some countries use a two-tiered system where "board" refers to the "supervisory board" while "key executives" refers to the "management board."[65]

**CLIMATE-RELATED OPPORTUNITY** refers to the potential positive impacts related to climate change on an organization. Efforts to mitigate and adapt to climate change can produce opportunities for organizations, such as through resource efficiency and cost savings, the adoption and utilization of low-emission energy sources, the development of new products and services, and building resilience along the supply chain. Climate-related opportunities will vary depending on the region, market, and industry in which an organization operates.

**CLIMATE-RELATED RISK** refers to the potential negative impacts of climate change on an organization. Physical risks emanating from climate change can be event-driven (acute) such as increased severity of extreme weather events (e.g., cyclones, droughts, floods, and fires). They can also relate to longer-term shifts (chronic) in precipitation and temperature and increased variability in weather patterns (e.g., sea level rise). Climate-related risks can also be associated with the transition to a lower-carbon global economy, the most common of which relate to policy and legal actions, technology changes, market responses, and reputational considerations.

**FINANCIAL FILINGS** refer to the annual reporting packages in which organizations are required to deliver their audited financial results under the corporate, compliance, or securities laws of the jurisdictions in which they operate. While reporting requirements differ internationally, financial filings generally contain financial statements and other information such as governance statements and management commentary.[66]

**FINANCIAL PLANNING** refers to an organization's consideration of how it will achieve and fund its objectives and strategic goals. The process of financial planning allows organizations to assess future financial positions and determine how resources can be utilized in pursuit of short- and long-term objectives. As part of financial planning, organizations often create "financial plans" that outline the specific actions, assets, and resources (including capital) necessary to achieve these objectives over a 1-5 year period. However, financial planning is broader than the development of a financial plan as it includes long-term capital allocation and other considerations that may extend beyond the typical 3-5 year financial plan (e.g., investment, research and development, manufacturing, and markets).

**GOVERNANCE** refers to "the system by which an organization is directed and controlled in the interests of shareholders and other stakeholders."[67] "Governance involves a set of relationships between an organization's management, its board, its shareholders, and other stakeholders. Governance provides the structure and processes through which the objectives of the organization are set, progress against performance is monitored, and results are evaluated."[68]

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

**Appendices**

---

65 OECD, *G20/OECD Principles of Corporate Governance,* OECD Publishing, Paris, 2015.
66 Based on Climate Disclosure Standards Board, "CDSB Framework for Reporting Environmental Information and Natural Capital," June 2015.
67 A. Cadbury, *Report of the Committee on the Financial Aspects of Corporate Governance,* London, 1992.
68 OECD, *G20/OECD Principles of Corporate Governance,* OECD Publishing, Paris, 2015.

**ER-1883**

### GREENHOUSE GAS (GHG) EMISSIONS SCOPE LEVELS[69]

- **Scope 1** refers to all direct GHG emissions.

- **Scope 2** refers to indirect GHG emissions from consumption of purchased electricity, heat, or steam.

- **Scope 3** refers to other indirect emissions not covered in Scope 2 that occur in the value chain of the reporting company, including both upstream and downstream emissions. Scope 3 emissions could include: the extraction and production of purchased materials and fuels, transport-related activities in vehicles not owned or controlled by the reporting entity, electricity-related activities (e.g., transmission and distribution losses), outsourced activities, and waste disposal. [70]

**INTERNAL CARBON PRICE** is an internally developed estimated cost of carbon emissions. Internal carbon pricing can be used as a planning tool to help identify revenue opportunities and risks, as an incentive to drive energy efficiencies to reduce costs, and to guide capital investment decisions.

**MANAGEMENT** refers to those positions an organization views as executive or senior management positions and that are generally separate from the board.

**NATIONALLY DETERMINED CONTRIBUTION (NDC)** refers to the post-2020 actions that a country intends to take under the international climate agreement adopted in Paris.

**ORGANIZATION** refers to the group, company, or companies, and other entities for which consolidated financial statements are prepared, including subsidiaries and jointly controlled entities.

**PUBLICLY AVAILABLE 2°C SCENARIO** refers to a 2°C scenario that is (1) used/referenced and issued by an independent body; (2) wherever possible, supported by publicly available datasets; (3) updated on a regular basis; and (4) linked to functional tools (e.g., visualizers, calculators, and mapping tools) that can be applied by organizations. 2°C scenarios that presently meet these criteria include: IEA 2DS, IEA 450, Deep Decarbonization Pathways Project, and International Renewable Energy Agency.

**RISK MANAGEMENT** refers to a set of processes that are carried out by an organization's board and management to support the achievement of the organization's objectives by addressing its risks and managing the combined potential impact of those risks.

**SCENARIO ANALYSIS** is a process for identifying and assessing a potential range of outcomes of future events under conditions of uncertainty. In the case of climate change, for example, scenarios allow an organization to explore and develop an understanding of how the physical and transition risks of climate change may impact its businesses, strategies, and financial performance over time.

**SECTOR** refers to a segment of organizations performing similar business activities in an economy. A sector generally refers to a large segment of the economy or grouping of business types, while "industry" is used to describe more specific groupings of organizations within a sector.

**STRATEGY** refers to an organization's desired future state. An organization's strategy establishes a foundation against which it can monitor and measure its progress in reaching that desired state. Strategy formulation generally involves establishing the purpose and scope of the

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

---

[69] World Resources Institute and World Business Council for Sustainable Development, *The Greenhouse Gas Protocol: A Corporate Accounting and Reporting Standard (Revised Edition),* March 2004.
[70] IPCC, *Climate Change 2014 Mitigation of Climate Change,* Cambridge University Press, 2014.

organization's activities and the nature of its businesses, taking into account the risks and opportunities it faces and the environment in which it operates.

**SUSTAINABILITY REPORT** is an organizational report that gives information about economic, environmental, social, and governance performance and impacts. For companies and organizations, sustainability —the ability to be long-lasting or permanent—is based on performance and impacts in these four key areas.

**VALUE CHAIN** refers to the upstream and downstream life cycle of a product, process, or service, including material sourcing, production, consumption, and disposal/recycling. Upstream activities include operations that relate to the initial stages of producing a good or service (e.g., material sourcing, material processing, supplier activities). Downstream activities include operations that relate to processing the materials into a finished product and delivering it to the end user (e.g., transportation, distribution, and consumption).

## Abbreviations

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

**2°C** —2° Celsius

**ASC**—Accounting Standards Codification

**BNEF**—Bloomberg New Energy Finance

**CDSB**—Climate Disclosure Standards Board

**ERM**—Environmental Resources Management

**EU**—European Union

**FASB**—Financial Accounting Standards Board

**FSB**—Financial Stability Board

**G20**—Group of 20

**GHG**—Greenhouse gas

**GICS**—Global Industry Classification Standard

**GRI**—Global Reporting Initiative

**IAS**—International Accounting Standard

**IASB**—International Accounting Standards Board

**IEA**—International Energy Agency

**IIGCC**—Institutional Investors Group on Climate Change

**IIRC**—International Integrated Reporting Council

**IPCC**—Intergovernmental Panel on Climate Change

**NGO**—Non-governmental organization

**OECD**—Organization for Economic Co-operation and Development

**R&D**—Research and development

**SASB**—Sustainability Accounting Standards Board

**TCFD**—Task Force on Climate-related Financial Disclosures

**UN**—United Nations

**UNEP**—United Nations Environment Programme

**USDE**—U.S. Dollar Equivalent

**WRI**—World Resources Institute

## Appendix 6: References

"Communiqué from the G20 Finance Ministers and Central Bank Governors Meeting in Washington, D.C. April 16-17, 2015." April 2015.
www.g20.org.tr/wp-content/uploads/2015/04/April-G20-FMCBG-Communique-Final.pdf.

Cadbury, A. *Report of the Committee on the Financial Aspects of Corporate Governance.* London, 1992.
www.ecgi.org/codes/documents/cadbury.pdf.

Carney, Mark. "Breaking the tragedy of the horizon—climate change and financial stability." September 29, 2015. www.bankofengland.co.uk/publications/Pages/speeches/2015/844.aspx.

Ceres. "Power Forward 3.0: How the largest US companies are capturing business value while addressing climate change." 2017. https://www.worldwildlife.org/publications/power-forward-3-0-how-the-largest-us-companies-are-capturing-business-value-while-addressing-climate-change.

Climate Disclosure Standards Board (CDSB). "CDSB Framework for Reporting Environmental Information and Natural Capital." June 2015. www.cdsb.net/sites/cdsbnet/files/cdsb_framework_for_reporting_environmental_information_natural_capital.pdf.

Economist Intelligence Unit. "The Cost of Inaction: Recognising the Value at Risk from Climate Change." 2015. https://www.eiuperspectives.economist.com/sustainability/cost-inaction.

Enhanced Disclosure Task Force. *Enhancing the Risk Disclosures of Banks.* October 2012.
www.fsb.org/wp-content/uploads/r_121029.pdf.

Environmental Protection Agency Victoria (EPA Victoria). "Resource Efficiency Case Studies, Lower your impact." www.epa.vic.gov.au/business-and-industry/lower-your-impact/resource-efficiency/case-studies.

Fellow, Avery. "Investors Demand Climate Risk Disclosure." *Bloomberg,* February 2013.
www.bloomberg.com/news/2013-02-25/investors-demand-climate-risk-disclosure-in-2013-proxies.html.

Frankfurt School-United Nations Environmental Programme Centre and Bloomberg New Energy Finance. "Global Trends in Renewable Energy Investment 2017." 2017. fs-unep-centre.org/sites/default/files/publications/globaltrendsinrenewableenergyinvestment2017.pdf.

Fricko, Oliver et. al. *Energy sector water use implications of a 2° C climate policy.* Environmental Research Letters, 11: 1-10, 2016. www.cd-links.org/wp-content/uploads/2016/06/Fricko-et-al-2016.pdf.

FSB. "FSB to establish Task Force on Climate-related Financial Disclosures." December 4, 2015. www.fsb-tcfd.org/wp-content/uploads/2016/01/12-4-2015-Climate-change-task-force-press-release.pdf.

FSB. "Proposal for a Disclosure Task Force on Climate-Related Risks." November 9, 2015. www.fsb.org/wp-content/uploads/Disclosure-task-force-on-climate-related-risk.pdf.

G20 Green Finance Study Group. *G20 Green Finance Synthesis Report.* 2016. unepinquiry.org/wp-content/uploads/2016/09/Synthesis_Report_Full_EN.pdf.

Ganci, N., S. Hammer, T. Reilly, and P. Rodel. *Environmental and Climate Change Disclosure under the Securities Laws: A Multijurisdictional Survey.* Debevoise & Plimpton, March 2016.
www.debevoise.com/insights/publications/2016/03/environmental-and-climate-change-disclosure.

Greenhouse Gas Protocol. "Calculation Tools, FAQ." ghgprotocol.org/calculationg-tools-faq.

Intergovernmental Panel on Climate Change (IPCC). *Fifth Assessment Report (AR5),* Cambridge University Press, 2014. http://www.ipcc.ch/report/ar5/.

IPCC. *Climate Change 2014 Mitigation of Climate Change.* Cambridge University Press, 2014.

International Energy Agency (IEA). "Global energy investment down 8% in 2015 with flows signaling move towards cleaner energy." September 14, 2016. www.iea.org/newsroom/news/2016/september/global-energy-investment-down-8-in-2015-with-flows-signalling-move-towards-clean.html.

IEA. *World Energy Outlook Special Briefing for COP21.* 2015.
www.iea.org/media/news/WEO_INDC_Paper_Final_WEB.PDF.

Maack, J. *Scenario Analysis: A Tool for Task Managers.* Social Analysis: selected tools and techniques, Social Development Papers, Number 36, the World Bank, June 2001, Washington, DC.
siteresources.worldbank.org/INTPSIA/Resources/ 490023-1121114603600/13053_scenarioanalysis.pdf.

A
Introduction

B
Climate-Related Risks, Opportunities, and Financial Impacts

C
Recommendations and Guidance

D
Scenario Analysis and Climate-Related Issues

E
Key Issues Considered and Areas for Further Work

F
Conclusion

Appendices

Mercer LLC. *Investing in a Time of Climate Change.* 2015.
www.mercer.com/our-thinking/investing-in-a-time-of-climate-change.html.

Organization for Economic Co-operation and Development (OECD) and Climate Disclosure Standards Board (CDSB). *Climate Change Disclosure in G20 Countries: Stocktaking of Corporate Reporting Schemes.* November 18, 2015. www.oecd.org/investment/corporate-climate-change-disclosure-report.htm.

OECD. *G20/OECD Principles of Corporate Governance*. OECD Publishing, Paris, 2015.
dx.doi.org/10.1787/9789264236882-en.

Pearce, David W. and R. Kerry Turner. "Economics of Natural Resources and the Environment." Johns Hopkins University Press. 1989. ISBN 978-0801839870.

Rounsevell, Martin D. A. and Marc J Metzger. *Developing qualitative scenario storylines for environmental change assessment.* WIREs Climate Change 2010, 1: 606-619. doi: 10.1002/wcc.63, 2010.
wires.wiley.com/WileyCDA/WiresArticle/wisId-WCC63.html.

Seley, Peter. "Emerging Trends in Climate Change Litigation." *Law 360.* March 7, 2016.
www.law360.com/articles/766214/emerging-trends-in-climate-change-litigation.

Sustainability Accounting Standards Board (SASB). *SASB Climate Risk Technical Bulletin#: TB001-10182016.* October, 2016. library.sasb.org/climate-risk-technical-bulletin.

Task Force on Climate-related Financial Disclosures. *Phase I Report of the Task Force on Climate-related Financial Disclosures.* March 31, 2016.
www.fsb-tcfd.org/wp-content/uploads/2016/03/Phase_I_Report_v15.pdf.

United Nations Environment Programme (UNEP). *The Financial System We Need: Aligning the Financial System with Sustainable Development.* 2015.
http://unepinquiry.org/wp-content/uploads/2015/11/The_Financial_System_We_Need_EN.pdf.

UNEP and Copenhagen Centre for Energy Efficiency. *Best Practices and Case Studies for Industrial Energy Efficiency Improvement.* February 16, 2016.
www.energyefficiencycentre.org/Nyheder/Nyhed?id=b2bedb2b-05a3-444f-ae5e-55ee3c8f1a68.

United Nations Framework Convention on Climate Change. "The Paris Agreement," December 2015.
unfccc.int/files/essential_background/convention/application/pdf/english_paris_agreement.pdf.

World Business Council for Sustainable Development. "Sustainability and enterprise risk management: The first step towards integration." January 18, 2017.
www.wbcsd.org/contentwbc/download/2548/31131.

World Resources Institute and World Business Council for Sustainable Development. *The Greenhouse Gas Protocol:  A Corporate Accounting and Reporting Standard,* (Revised Edition). March 2004.
www.ghgprotocol.org/standards/corporate-standard.

A
Introduction

B
Climate-Related Risks,
Opportunities, and
Financial Impacts

C
Recommendations and
Guidance

D
Scenario Analysis and
Climate-Related Issues

E
Key Issues Considered and
Areas for Further Work

F
Conclusion

Appendices

# Exhibit 19

Professor Daniel J. Taylor's June 16, 2022 Comment Letter to the SEC's Proposed Rule on The Enhancement and Standardization of Climate-Related Disclosures for Investors

Declaration of Bradley J. Hamburger In Support Of
Plaintiffs' Motion for Summary Judgment on Claim I
May 24, 2024

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.*,
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)

Via E-mail: rule-comments@sec.gov
Securities and Exchange Commission,
100 F Street, N.E., Washington, DC 20549-1090.
Attention: Vanessa Countryman, Secretary

June 16, 2022

Re: Proposal on The Enhancement and Standardization of Climate-Related Disclosures for Investors - File No. S7-10-22

Ladies and Gentlemen:

The Securities and Exchange Commission's (the "Commission") proposal The Enhancement and Standardization of Climate-Related Disclosures for Investors ("Proposal") is a watershed moment for the Commission. It expands considerably the scope of corporate disclosure and raises challenging questions of interest to academics and practitioners. I appreciate the opportunity to comment.

I have read the Proposal, the associated comment file for the Proposal (as of May 5), and attended many academic and practitioner seminars on various aspects of the Proposal. While there is an important debate about the rationales for the Proposal—including to facilitate policy objectives (e.g., achieve a "net zero economy") and compel companies to internalize externalities (e.g., externalities of pollution)—I will not discuss these. Instead, my comments seek to emphasize important issues that have either gone underappreciated or are lacking from the discussion.

My area of expertise is in corporate disclosure and enforcement-related matters. I have published extensively on these topics in leading academic journals; led seminars at dozens of top business schools across the globe; won numerous academic and industry awards; and regularly consult with practitioners on concerns about materiality (my vita appears at the end of this letter). As part of my expertise, I routinely conduct statistical analysis of price and trading data to assess the materiality of disclosures. Given my background, my comments will tend to focus on issues regarding materiality and enforcement/investor protection.

Part I of this letter introduces what it means for a risk to be "material" and provides comments and discussion on the broad concept of the risks posed by climate change ("climate-related risks"). It discusses how climate-related risks can be material, and when they are, they already fit within the scope of existing disclosure rules. Current rules require all material risks to be disclosed regardless of whether they are climate-related or non-climate-related. Thus, unless companies are withholding information on material risks, it seems unlikely that the additional climate disclosures required by the Proposal would reveal new material risks.

Part II of this letter discusses the academic evidence referenced in the Proposal, with a specific focus on the evidence surrounding the disclosure of greenhouse gas emissions (GHG disclosure). Most of the academic papers referenced by the Proposal do not study the implications of a company's GHG disclosures for that company's share price or other capital market outcomes. Indeed, the Proposal does not provide (or reference) any evidence on the materiality of GHG

i

(139 of 292) Page 139 of 292ase: 25-5327, 09/18/2025, DktEntry: 8.9, Page 139 of 292
Case 2:24-cv-00801-ODW-PVC   Document 48-22   Filed 05/24/24   Page 3 of 26   Page ID
#:1154

disclosures using standard "event study" tests for materiality commonly employed and accepted by academics, legal practitioners, and US courts. Instead, the cited papers tend to focus on the relation between share prices and thirty-party Environmental, Social, and Governance (ESG) ratings (e.g., MSCI, Sustainalytics). I caution against extrapolating evidence from third-party ESG ratings to disclosure of GHG emissions.

Part III of this letter provides initial evidence on the materiality of GHG disclosures using standard event study tests commonly employed by academics and practitioners to assess materiality of a given disclosure. For the average company in the sample, I find no evidence of a statistically significant change in stock price or trading volume in response to GHG disclosures. The evidence suggests that—on average—the market behaves as if GHG disclosures are not material to the valuation of the company. Part III also discusses explanations for why this is the case, discusses related academic literature, and corroborates the evidence by discussing company's disclosure practices—many of which are at odds with the notion that GHG disclosures are material.

Part IV of this letter discusses the effect of the Proposal on investor protection. Unfortunately, the Commission's budget is inadequate to keep pace with changes in US capital markets. As a result, the substantial resources needed to implement and police the Proposal will necessarily come at the cost of other (non-climate) priorities. The Commissions' cost-benefit analysis should account for the effect of diminished resources in other (non-climate-related) areas on investors and markets. Depending on the source of resources used to fund the Proposal, individual investors could be harmed. Every dollar the Commission spends on the Proposal is a dollar that could be spent protecting individual investors from accounting fraud, rogue investment advisors, crypto scams, greenwashing, market manipulation, and other illicit activities that directly affect the day-to-day lives of individual investors.

Please feel free to contact me (███████████████) if you have any questions about this letter or associated analysis.

Sincerely,

Daniel Taylor
Arthur Andersen Professor
Director, Wharton Forensic Analytics Lab
The Wharton School


*A consulting client compensated me for the time it took to write this letter, but did not have input into its findings or conclusions.

*Part I. Climate-Related Risks in the Context of Traditional Notions of Materiality*

In financial economics, a piece of information is traditionally considered material if knowledge of that information would alter a reasonable investors' valuation of the company or their proxy voting decision.[1] Material risks (and changes to these risks) must be disclosed as "risk factors" in a company's quarterly and annual filings with the SEC (i.e., 10-Qs and 10-Ks).

The Proposal states (p. 63): "*The proposed rules would require a registrant to disclose whether any climate-related risk is reasonably likely to have a material impact on a registrant, including its business or consolidated financial statements, which may manifest over the short, medium, and long term*."

Climate-related risks can be material; if and when they are, existing rules require these risks to be disclosed. Depending on the circumstances, the following hypothetical examples could theoretically be material:

(1) Despite more extreme weather in a particular region, a power company chooses to cut costs and not weatherize its equipment. In the event of extreme weather, this choice might cost the company significant damages either because the equipment freezes or contributes to forest fires. In this example, the choice not to weatherize could be material.

(2) A company operates offshore drilling equipment in an area that faces extreme weather events, and such events make work stoppages more frequent and increase the risk of catastrophic damage to the company's equipment. If climate change significantly increases the likelihood of extreme weather events, climate change could pose a material risk.

(3) A company anticipates very significant regulatory costs in the future because of its high levels of greenhouse gas emissions. If the expected value of these costs are sufficiently large, the company's emissions could pose a material risk.

(4) A company sells a single consumer product that runs on fossil fuels, and observes that significant trends in consumer purchasing of that product now prioritize products that use "green energy." Its competitors offer such products, but the company does not. These changes in consumer spending and competitive advantages could pose a material risk.

These examples illustrate several different scenarios that could give rise to material climate-related risks. When these risks are material (i.e., would alter a reasonable investor's valuation of the company), these risks are required to be disclosed under *existing* disclosure rules. In this regard, current SEC rules speak to material risks, and do not treat climate-related and non-climate-related risks differently.

Indeed, the Commission acknowledges that the determination of material climate-risk is similar to that for required risk factor disclosure (p. 65):

---

[1] Proposal, footnote 29.

**ER-1891**

> *"The materiality determination that a registrant would be required to make regarding climate-related risks under the proposed rules is similar to what is required when preparing the MD&A section in a registration statement or annual report. The Commission's rules require a registrant to disclose material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. As the Commission has stated, MD&A should include descriptions and amounts of matters that have had a material impact on reported operations as well as matters that are reasonably likely to have a material impact on future operations."*

This makes me wonder whether the Commission believes some firms are not disclosing climate-related risks that are in fact material. If the Commission feels material climate-related risks are not being disclosed—such an omission violates existing rules—this suggests the need for additional guidance. Indeed, the Division of Corporation Finance's sample letter dated September 2021, demonstrates that climate-related risks fit into the existing disclosure rules and how additional guidance can sharpen disclosures under existing rules.[2] Tellingly, Bloomberg reports that 25 of 26 companies that received inquiries from the SEC reported that "climate risk wasn't a material issue...".[3] Thus, unless companies are withholding information on material risks, it seems unlikely that the additional climate disclosures required by the Proposal would reveal new material risks.

*Part II. Academic Evidence on Materiality of GHG Disclosures*

A core aspect of the Proposal is that it would require companies to report Scope 1, 2, and/or 3 GHG emissions, provide auditor attestation of the emissions, and disclose disaggregated emissions by constituent gas (e.g., methane, carbon dioxide, etc.). While the Proposal cites many academic studies, few (if any) papers provide an analysis of the relation between GHG disclosures and share price—the sort of analysis that is commonly used to assess materiality. Indeed, the section of the Commission's economic analysis that discusses the benefits to disclosing GHG emissions metrics (Section IV.C.1.e) does not reference any academic papers studying corporate disclosures of such metrics.[4] Nor does the Proposal provide or cite any evidence that investors use disaggregated emissions data in their valuation or voting decisions.

In many places the Proposal cites evidence from studies that examine the relation between third-party ESG ratings (e.g., MSCI, Bloomberg, etc.) and share prices or mutual fund flows to support the notion that disclosures of climate-related risks are material.[5] Third party ESG ratings—and by extension, the academic papers studying them—do not speak to GHG emissions. ESG ratings are a hodgepodge of various environmental, social, and governance factors. As a result, the Commission should exercise extreme caution in extrapolating inferences using research relying on

---

[2] "Sample Letter to Companies Regarding Climate Change Disclosures," *U.S. Securities and Exchange Commission*, September 22, 2021, available at https://www.sec.gov/corpfin/sample-letter-climate-change-disclosures.

[3] Nicola M. White, "SEC Drops Hints About ESG Rule in Retorts to Vague Disclosures," *Bloomberg*, March 18, 2022, available at https://news.bloomberglaw.com/financial-accounting/sec-scrutiny-of-big-companies-sheds-light-on-climate-priorities.

[4] For example, footnote 877 of the Proposal references a paper studying mine safety disclosures; footnotes 886 and 887 reference academic papers studying where multinationals emit: onshore or offshore; and footnote 888 references two papers that suggest long-run risks generally affect asset prices.

[5] See papers referenced in Proposal footnotes 802, 804, 839, and 987.

**ER-1892**

third-party ESG ratings to justify the materiality of GHG disclosures. Indeed, the Proposal does not provide (or reference) any evidence on the materiality of GHG disclosures using standard "event study" tests for materiality commonly employed and accepted by academics, legal practitioners, and US courts. This is an important oversight, as the market reaction to a given disclosure—specifically whether and how prices and trading volume change in response to the disclosure—is critical to inferring the materiality of the disclosure.

## Part III. Market Reaction to GHG Disclosures

In this section, I provide initial evidence of the market reaction to GHG disclosures. In particular, I use standard event study tests commonly employed in the academic literature to examine whether there was a statistically significant change in the level of trading volume and/or stock prices in response to a disclosure.[6] If so, it suggests the disclosure was material (i.e., altered a reasonable investor's valuation of the company).

I begin by collecting the set of GHG disclosures posted on the SEC's EDGAR system. I focus on GHG disclosures posted on EDGAR because EDGAR provides machine-readable information on the precise date the disclosure was made public. This date is necessary to estimate the event study tests. By focusing only on GHG disclosures posted on EDGAR, the sample is weighted toward highly visible disclosures of GHG emissions. If anything, I expect disclosure of GHG emissions on EDGAR to have a greater economic impact on markets than GHG emissions disclosed via other less visible channels. By focusing on GHG disclosures on EDGAR, the sample is arguably biased *in favor* of finding such disclosures are material.

In conducting this analysis, I found two alternative disclosure strategies that are not considered in my analysis but are nonetheless worth discussing.

(1) Some companies provide GHG emissions in an "ESG report" provided on their corporate website, but do not file the ESG report as an exhibit to an EDGAR filing.[7] Only ESG reports explicitly included as an exhibit in an EDGAR filing are included in my analysis.

(2) Many companies appear to be privately disclosing detailed information on GHG emissions, mitigation strategies, and risks to the Carbon Disclosure Project (CDP) but *not* disclosing this information to shareholders. The CDP then makes this information accessible to accountholders and paid subscribers. For example, NetApp discusses data on GHG emissions in a single sentence in their 2020 ESG Report (p. 20): *"We continue to measure, monitor, and report our GHG emissions (Scopes 1, 2, and 3) and we voluntarily report*

---

[6] The tests used in this section are standard and have been repurposed from prior academic studies I have previously conducted. I refer interested readers to Taylor, Daniel, et al. (2022), "Audit Process, Private Information, and Insider Trading," available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3264424; Taylor, Daniel et al. (2020), "Undisclosed SEC Investigations," *Management Science*, 67(6), available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3507083; and Lynch, Bradford and Taylor, Daniel (2021), "The Information Content of Corporate Websites," available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3791474.

[7] See for example IBM's 2021 ESG report, located on IBM's investor relation website but never filed as an exhibit to an EDGAR filing. See, "Reports & Policies," *IBM*, available at https://www.ibm.com/impact/reports-and-policies.

3

*annually to CDP."*[8] However, neither their 2020 ESG report, nor any document filed on EDGAR, discusses their 2020 Scope 1, 2, or 3 emissions, how they compare to 2011 base levels the company recorded, or provide disaggregated emissions data by facility. Nevertheless, NetApp disclosed all of this information in their 2020 report filed with the CDP.[9] This disclosure practice to CDP is commonplace. For example, one academic study estimated that 12.75% of the S&P 500 responded to the CDP's survey on climate-risks and GHG emissions but did not authorize CDP to make their responses publicly available.[10]

These two disclosure practices are not consistent with a view that GHG disclosures are material. For example, if information on GHG emissions is material—useful for valuation and voting decisions—then it would seem the widespread practice of selectively disclosing this information to a third-party (e.g., CDP) would violate Reg FD (which is supposed to prevent the selective disclosure of material non-public information). Thus, I infer from the prevalence of this disclosure strategy that companies and their counsel do not believe data on GHG emissions is material, otherwise they would not be selectively disclosing it. Regardless, I do not include GHG disclosures to the CDP in my analysis because (i) these disclosures are available only to CDP accountholders and paid subscribers; and (ii) the CDP does not have precise information on the date at which the company publicly disclosed their emissions data.

To compile the sample used in my analysis, I use the SEC's website to search EDGAR for all Form 8-Ks filed between January 2021 and March 2022 that include the keywords: "Scope 1," "Scope 2," or "Scope 3."[11] The search includes all Form 8-K exhibits and hyperlinked materials. I focus on keywords related to the various emission levels because I seek to identify disclosure related to emissions levels, not disclosures related to climate risk more broadly. I focus on Form 8-Ks, because alternative forms such as 10-Qs and 10-Ks include a wealth of financial statement information that would confound attributing changes in volume and price to the GHG disclosure itself.

This results in a sample of 371 Form 8-Ks. I then read each 8-K to determine whether the disclosure relates to emissions. I eliminate 46 that are parsing errors (e.g., a table of contents to a contract where the "Scope" is discussed on page 2), 115 that reference emissions but do not provide information about emissions levels (e.g., covenants on "green bonds"), and 94 that are duplicate disclosures of the same information (e.g., three different investor day presentations that all provide the same emissions levels). This suggests many companies either: (1) provide GHG emission data on their website as an ESG report without a corresponding 8-K, (2) disclose the information only to CDP, or (3) do not disclose GHG emission data. I interpret these findings as *prima facie* evidence that companies do not view the information as material for investors' valuation decisions.

I merge the sample of the remaining 116 8-Ks to price data from the Center for Research in Security Prices (CRSP), and focus on common stocks listed on the three major exchanges (e.g.,

---

[8] "NetApp 2020 ESG Report," *NetApp*, available at https://www.netapp.com/pdf.html?item=/media/11875-netapp-2020-esg-report.pdf.

[9] "NetApp Inc. - Climate Change 2020," *CDP*. See https://www.dropbox.com/s/iq4wopk7yms4uz2/CDP.pdf.

[10] Matsumura, Ella M., et al. (2015), "Firm-Value Effects of Carbon Emissions and Carbon Disclosures," The Accounting Review, (89)2, available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1921809.

[11] "EDGAR Advanced Search," *U.S. Securities and Exchange Commission*, available at https://www.sec.gov/edgar/search/#.

(144 of 292) Page 144 of 292ase: 25-5327, 09/18/2025, DktEntry: 8.9, Page 144 of 292
Case 2:24-cv-00801-ODW-PVC   Document 48-22   Filed 05/24/24   Page 8 of 26   Page ID
#:1159

excluding Real-Estate Investment Trusts and Limited Partnerships).[12] This leaves a sample of 87 GHG disclosures. Of these, 52 are bundled with an earnings announcement (or merger announcement). Trading volume and shares prices respond to earnings announcements even in the absence of any GHG disclosures. Thus, without a more rigorous and deeper investigation, one cannot disentangle whether the change in trading volume and prices are attributable to the GHG disclosure or the quarterly financials. I remove these observations from the sample.

For each of the remaining 8-Ks, I calculate the first date at which the market could have traded on the information in the 8-K.[13] I refer to this as "day 0." I then collect data on stock returns and trading volume over the thirty calendar days before and after this date, i.e., the [-30, +30] window around day 0, and test for statistically abnormal changes in trading volume and stock price on day 0. The final sample consists of 1,493 daily observations.

I compute trading volume as a percentage of shares outstanding (*Volume*), and price change as the absolute value of stock return in excess of the respective industry benchmark (|*Return*|).[14] I use absolute value of returns, because these tests seek to estimate whether the price changed once the 8-K was disclosed—which could be a positive price change (i.e., good news), or a negative price change (i.e., bad news).[15]

Table 1 presents mean and median absolute price change and trading volume on the day the disclosure is made public (i.e., "Day 0") and on all other days in the [-30, +30] window excluding Day 0 (i.e., "[-30, +30] ex Day 0"). Table 1 shows that the average (median) return is slightly elevated (or depressed) on day 0, and both average and median trading volumes are elevated.

### Table 1. Difference in Mean and Median Price Change and Trading Volume

| | Day 0 | | [-30, +30] ex Day 0 | | Diff in Means | Diff in Medians |
|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | | |
| \|*Return*\| | 2.43 | 1.00 | 1.83 | 1.20 | 0.60 | -0.20 |
| *Volume* | 1.63 | 0.92 | 1.42 | 0.79 | 0.21 | 0.13 |

Table 2 presents statistical tests for whether the change in price and trading volume on day 0 is statistically abnormal (i.e., statistically different from all other days in the [-30, +30] window).

---

[12] I restrict the sample to CRSP share code 10 or 11.

[13] For 8-Ks filed during market hours, this is the date of the filing. For 8-Ks filed after hours, this is the next trading date.

[14] I use the 48 industry portfolios available from Ken French as the industry benchmark. Kenneth R. French, "Detail for 48 Industry Portfolios," 2022, available at
https://mba.tuck.dartmouth.edu/pages/faculty/ken french/Data_Library/det_48_ind_port.html.

[15] Focusing on whether price changed, not the direction of the change, is common in the literature that seeks to examine whether a disclosure provides the market with information. See e.g., Lynch, Bradford and Taylor, Daniel (2021), "The Information Content of Corporate Websites," available at SSRN:
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3791474.

(145 of 292) Page 145 of 292Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 145 of 292
Case 2:24-cv-00801-ODW-PVC   Document 48-22   Filed 05/24/24   Page 9 of 26   Page ID
#:1160

| | Dependent Variable: $\|Return\|$ | | Dependent Variable: *Volume* | |
|---|---|---|---|---|
| | (1) Coeff. | (2) Coeff. | (3) Coeff. | (4) Coeff. |
| *Day 0* | 0.60 | 0.46 | 0.21 | 0.05 |
| *p*-value | (0.20) | (0.33) | (0.47) | (0.77) |
| Date FE | No | Yes | No | Yes |
| Company-Year-Qtr FE | No | Yes | No | Yes |
| S.E. Cluster | Date | Date | Date | Date |
| *N* | 1,493 | 1,493 | 1,493 | 1,493 |

**Table 2. Statistical Tests for Changes in Price and Trading Volume**

Column 1 presents results from a regression of the price change on an indicator variable for whether a given observation is day 0. Column 2 includes date and company-year-quarter fixed effects which adjust for the average price change on the respective date and during the respective company-fiscal quarter (e.g., average price change in Intel's Q1-2021). Columns 3 and 4 present analogous results using trading volume. The *p*-values (two-tailed) that indicate whether a given regression coefficient is statistically different from zero appear in parentheses. In the academic literature, *p*-values of 0.05 and below are traditionally considered "statistically significant." Across all tests, *p*-values are routinely above 0.05. Thus, there is no statistical evidence of a price or trading volume response to the GHG disclosures. In the academic literature, this would be interpreted as evidence that the average GHG disclosure did not contain material information.

Taken at face value, the evidence from this analysis suggests that—on average—investors do not update their beliefs about value (upward or downward) in light of the GHG emissions data. These findings are consistent with two other academic studies that use a similar event study design, and find no evidence of a price or volume response to the disclosure of corporate sustainability reports and no evidence of a price response to corporate press releases related to ESG.[16] The Proposal does not reference these studies, nor does it provide (or reference) any evidence on the materiality of GHG disclosures using standard "event study" tests for materiality.

I caution that this evidence does *not* suggest climate risk is immaterial, but rather it suggests that GHG emissions are not material. To highlight this distinction, consider the following. Suppose GHG emissions are relevant to investors because it helps them assess the risk the company will incur substantial regulatory costs in the future. If this risk is already adequately disclosed as a material risk factor in the company's 10-K, then GHG emissions data will not cause shareholders to update their beliefs about that risk. To trigger a market reaction, GHG emissions have to contain new information that is not already reflected elsewhere in the company's many disclosures (e.g., the risk factors in annual filings). If GHG emissions measure climate risks, and a company is

---

[16] For evidence on lack of price or volume response to corporate sustainability reports, see Burzillo, Suzanne, et al. (2022), "Who Uses Corporate Sustainability Reports?" available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3976550. For evidence on lack of price response to corporate press releases related to ESG, see Moss, Austin, et al. (2020), "The Irrelevance of ESG Disclosure to Retail Investors: Evidence from Robinhood," available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3604847.

ER-1896

(146 of 292) Page 146 of 292
Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 146 of 292
Case 2:24-cv-00801-ODW-PVC   Document 48-22   Filed 05/24/24   Page 10 of 26   Page ID
#:1161

already (appropriately) disclosing these climate risks elsewhere in their annual filings, then I would not expect GHG disclosures to be material.

One potential explanation for the above findings is that GHG emissions are highly correlated with other observable aspects of a company's operations that are already reflected in stock prices. For example, one academic study estimates that GHG emissions are extremely highly correlated over time (e.g., autocorrelation coefficient of 0.977).[17] This means that, on average, next year's GHG emissions will be almost the same as this year. This study also finds that 90% of GHG emissions are explained by observable aspects of a company's operations including industry membership; company size; sales growth; earnings growth; the value of plant, property, and equipment; capital expenditures; and profitability. Thus, 90% of the variation in GHG emissions can be inferred from information that is already publicly available. This information will already be reflected in stock prices, such that the level of GHG emissions itself (and potentially other climate-related information) may provide little *new* information beyond what can be inferred from observable aspects of the company's operations. This could explain why GHG disclosures examined above are not material to a company's valuation. It could also explain why two academic studies find no evidence of a price or volume response to the disclosure of corporate sustainability reports and no evidence of a price response to corporate press releases related to ESG.[18] Another academic study compares the market's valuation of actual GHG emissions and GHG emissions inferred from information on the company's balance sheet and income statement. This study finds no evidence of a difference in valuation between GHG emissions voluntarily disclosed by the company (to the CDP) and the valuation of GHG emissions inferred from publicly-observable information.[19]

The preceding analysis and discussion is subject to the caveat that the event study analysis is based on traditional notions of materiality embraced by academics and legal scholars. These tests are shareholder-centric and consider whether prices or trading volume in the company's stock changed as a result of the company's disclosure. The tests do not consider other stakeholders or other non-valuation uses of the information.

*Part IV. Investor Protections*

The Commission has recently made tremendous strides on investor protections. I commend the Commission for this progress and the Commission's renewed focus on robust enforcement. The Commission's budget has grown on average at 4% over the past five years (2017-2021).[20] This growth has not kept pace with the explosive growth in trading volume and recent capital markets developments (e.g., special purpose acquisition companies, high frequency trading, crypto, and non-fungible tokens). As a result, the Commission is being asked to regulate and police increasingly large portions of the economy with relatively less resources.

---

[17] Bolton, Patrick and Kacperczyk, Marcin T. (2019), "Do Investors Care about Carbon Risk?" *Journal of Financial Economics*, 142(2), available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3398441.
[18] See footnote 17 for references.
[19] Griffin, Paul A., et al. (2015), "The Relevance to Investors of Greenhouse Gas Emission Disclosures," *Contemporary Accounting Research*, 34(2), available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1735555.
[20] "Budget History – BA vs. Actual Obligations ($ in 000s)," *U.S. Securities and Exchange Commission*, November 13, 2019, available at https://www.sec.gov/foia/docs/budgetact htm.

ER-1897

(147 of 292) Page 147 of 292Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 147 of 292
Case 2:24-cv-00801-ODW-PVC Document 48-22 Filed 05/24/24 Page 11 of 26 Page ID
#:1162

Given its resource constraints, the Commission is already incapable of policing every violation of federal securities laws that it learns about. It routinely disregards enforcement of some violations of securities laws in favor of enforcing others. Against this backdrop, the Proposal dramatically expands the amount of resources the Commission would need to invest in implementing and policing disclosures of GHG emissions. The Commission's scarce resources dictate that this investment would necessarily come at the cost of other priorities. I am particularly concerned about the consequences for enforcement, and investor protections. Stretched resources imply less effectively policing of markets. Less effective policing implies reduced compliance with securities laws. Reduced compliance with laws erodes Americans' trust in markets and institutions.[21]

Mandatory GHG disclosures will undoubtedly benefit Blackrock, Ceres, and those niche funds that invest based on GHG levels. Rather than spend considerable effort and money researching what a company's GHG emissions are, they will be able to get such data directly from the company's mandatory SEC disclosures. Indeed, the Proposal will transfer the burden of calculating GHG emissions from the funds to the companies themselves. To the extent that such calculations are costly, even investors in the company who do not use such information will effectively be paying for the information to be produced. Indeed, research suggests most individual investors generally ignore such factors in their investment decisions.[22] It is this latter group that may suffer from the reallocation of Commission resources. In this regard, the Proposal nicely illustrates the distinction between the interests of the average dollar (e.g., those of certain high-profile institutional investors) and the interests of the average investor (e.g., those of the individual investors). In prioritizing the interests of the average dollar, the Commission may be acting against the interest of the average investor. Every dollar the Commission spends on the Proposal is a dollar that could be spent protecting individual investors from accounting fraud, rogue investment advisors, crypto scams, greenwashing, market manipulation, and other illicit activities that directly affect the day-to-day lives of individual investors.

Currently the Proposal's cost-benefit analysis does not speak to where the resources to implement the Proposal will come from, and what priorities might face fewer resources as a result of implementing the Proposal. The Commission's cost-benefit analysis should articulate what specific functions will be diminished as a result of the resources needed to implement the Proposal, and should account for the effect of diminished resources in other (non-climate-related) areas on investors and markets. This is a potential hidden cost of the Proposal that does not feature in the economic analysis.

---

[21] Gurbir S. Grewal, "PLI Broker/Dealer Regulation and Enforcement 2021," *U.S. Securities and Exchange Commission*, October 6, 2021, available at https://www.sec.gov/news/speech/grewal-pli-broker-dealer-regulation-and-enforcement-100621.

[22] For academic evidence see Moss, Austin, et al. (2020), "The Irrelevance of ESG Disclosure to Retail Investors: Evidence from Robinhood," available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3604847; and for survey evidence see Gary Mottola et al., "Consumer Insights: Money & Investing," FINRA Investor Education and NORC at the University of Chicago, March 2022, available at https://www.finrafoundation.org/sites/finrafoundation/files/Consumer-Insights-Money-and-Investing.pdf.

**Professional Profile for Dr. Daniel Taylor:**

Daniel Taylor is the Arthur Andersen Chaired Professor at The Wharton School, and is director of the Wharton Forensic Analytics Lab. He is an award-winning researcher and teacher with extensive expertise on corporate disclosures, insider trading, fraud prediction, and corporate governance. He has published extensively on these topics in leading academic journals; led seminars at dozens of top business schools across the globe; and won numerous academic and industry awards.

Professor Taylor's research targets practitioners and regulators, and aims to have direct relevance to current issues facing boards, shareholders, and enforcement agencies. His research frequently appears in the business media and has been cited in rules and regulations promulgated by the SEC. Most recently, his research on insider trading was the impetus behind proposed rule changes to 10B5-1 trading plans; Form 144 filings; the Holding Foreign Insiders Accountable Act; and multiple investigations by the SEC, FBI, Treasury, and DoJ.

Professor Taylor enjoys putting his research into practice and has provided expert and consulting services related to best practices in corporate disclosure, 10B5-1 trading plans, statistical analysis of trading activity, and fraud prediction, and has co-developed and licensed intellectual property related to parsing SEC filings. His consulting clients include the DoJ, hedge funds, plaintiff and defense firms, and a Big 4 auditor.

Professor Taylor teaches a cutting-edge undergraduate course—Forensic Analytics—that applies state-of-the-art analytics to corporate disclosures, and teaches a doctoral seminar on data analysis. His doctoral students have gone on to become faculty at a variety of leading business schools, including Stanford, MIT, and Chicago. Professor Taylor received his bachelor's degree from University of Delaware, his master's from Duke University, and his PhD from Stanford University.

June 2022

**ER-1899**

# Daniel J. Taylor

www.danieltayloranalytics.com

Arthur Andersen Professor
The Wharton School
University of Pennsylvania

dtayl@wharton.upenn.edu
Cell: 302.897.0644
Fax: 215.573.2054

## EDUCATION

**Stanford University**
*Ph.D. Business, 2010*

**Duke University**
*M.A. Economics*, 2005

**University of Delaware**
*B.S. Economics*, 2003
*Minor: Information Systems; Cum Laude*

## ACADEMIC POSITIONS

The Wharton School of the University of Pennsylvania

| | |
|---|---|
| *Professor* | 2022 – present |

Arthur Andersen Chair, 2020 – present
Founder & Director, Wharton Forensic Analytics Lab, 2021 – present
Wharton Teaching Excellence Award, 2019, 2020, 2021
Analytics @Wharton Teaching Grant, 2020, 2021
Analytics @Wharton Fellow, 2020 – present
Wharton Faculty Fellow, 2019
Dean's Research Grant, 2011-2013, 2019-2021
Harold C. Stott Chair, 2013-2017

| | |
|---|---|
| *Associate Professor* | 2017 – 2022 |
| *Assistant Professor* | 2011 – 2017 |
| *Lecturer* | 2010 – 2011 |

## RESEARCH INTERESTS

insider trading, financial misreporting, corporate disclosure, corporate governance

**ER-1900**

## ACADEMIC PUBLICATIONS

**Causality Redux: The Evolution of Empirical Methods in Accounting Research**
(with C. Armstrong, J. Kepler, and D. Samuels) Journal of Accounting and Economics, forthcoming [invited, not peer reviewed]

**Disclosure Substitution**
(with M. Heinle and D. Samuels) Management Science, forthcoming

**Audit Process, Private Information, and Insider Trading**
(with S. Arif, J. Kepler, and J. Schroeder) Review of Accounting Studies, September 2022

- Winner, *Best Academic Paper Award,* Weinberg Corporate Governance Symposium (Mar 2019)

- Featured in *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Nov 2018); *Marketwatch* (Mar 2019); *Council of Institutional Investors, The Voice of Corporate Governance* (May, 2019); *Marketwatch* (Jun 2019);

**Voluntary Disclosure when Private Information and Disclosure Costs are Jointly Determined**
(with J.M. Kim and R. Verrecchia) Review of Accounting Studies, June 2021

**Undisclosed SEC Investigations**
(with T. Blackburne, J. Kepler, and P. Quinn) Management Science, June 2021

- Winner, *Outstanding Research Paper Award*, Jacobs Levy Center for Quantitative Financial Research (2020)

- Cited in the SEC's final ruling on exemptions to 404(b) of SOX "Amendments to the Accelerated Filer and Large Accelerated Filer Definitions" *SEC Release No. 34–88365*

- Featured in Columbia Law School Blue Sky Blog (Feb 2020); *Bloomberg Money Stuff* (Feb 2020), *Securities Regulation Daily* (Feb 2020); *Corporate Counsel* (Mar 2020); *Wall Street Journal* (Sept 2021)

**The Economics of Misreporting and the Role of Public Scrutiny**
(with D. Samuels and R. Verrecchia) Journal of Accounting and Economics, February 2021

- Featured in *CFO* (May 2018); *Barron's* (Jun 2018)

**Political Connections and the Informativeness of Insider Trades**
(with A. Jagolinzer, D. Larcker, and G. Ormazabal) Journal of Finance, August 2020

**ER-1901**

- Winner, *Outstanding Research Paper Award*, Jacobs Levy Center for Quantitative Financial Research (2019)

- Synopsis printed in *CATO Institute Research Briefs in Economic Policy* (Jan 2018)

- Featured in *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Sept 2016); *The Economist* (Feb 2018); *CNBC* (Feb 2018); *Apple News* (Mar 2020); *Bloomberg Law* (Mar 2020); *Bloomberg Money Stuff* (Mar 2020), *DailyMail* (Mar 2020); *Fox Business* (Mar 2020); *Law.com* (Mar 2020); *Reuters* (Mar 2020); *Securities Docket* (Mar 2020); *Yahoo Finance* (Mar 2020); *Yahoo News* (Mar 2020); *The Week* (Mar 2020); *US News and World Report* (Mar 2020), *Reuters* (Apr 2020), *New York Times* (Apr 2020); *US News and World Report* (Apr 2020); lead story on news aggregator *Drudgereport* (Mar 26-27, 2020)

- Almetrics media influence score in the top 5% of all academic research, ranked in top 0.5% within Journal of Finance.

### Economics of Managerial Taxes and Corporate Risk-Taking
(with C. Armstrong, S. Glaeser, and S. Huang) <u>The Accounting Review</u>, January 2019

- Featured in *Columbia Law School Blue Sky Blog* (Dec 2017)

### Linguistic Complexity in Firm Disclosures: Obfuscation or Information
(with B. Bushee and I. Gow) <u>Journal of Accounting Research</u>, March 2018

- Top five most highly-cited papers published in the journal since 2018

- A widely-used Perl command to calculate Fog Index, *Lingua:EN:Fathom*, was revised as a direct result of the computational errors identified in this paper (see v1.22 of this command)

- Synopsis printed in *CFA Digest* (December 2018)

### JOBS Act and Information Uncertainty in IPO Firms
(with M. Barth and W. Landsman) <u>The Accounting Review</u>, Nov 2017

- Winner, *AICPA Notable Contribution to Accounting Literature Award* (2020)

- Cited in the SEC's final ruling on amendments to Regulation A of the Securities Act, "Amendments for Small and Additional Issues Exemptions Under the Securities Act" *SEC Release No. 33–9741, 34–74578, 39–2501*

- Featured in *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Aug 2014); speech by SEC Commissioner Kara Stein (Dec 2016); *CFO* (Oct 2017); *CPA Practice Advisor* (Oct 2017); *MarketWatch* (Oct 2017); *The Intercept* (Feb 2018); speech by SEC Commissioner Kara Stein (Jun 2018); *Xconomy* (Apr 2019); *Accounting Today* (Aug 2020) *CPA Practice Advisor* (2020)

ER-1902

- Almetrics media influence score in the top 25% of all academic research, ranked in top 10% within The Accounting Review.

**Guiding Through the Fog: Financial Statement Complexity and Voluntary Disclosure**
(with W. Guay and D. Samuels) <u>Journal of Accounting and Economics</u>, Nov 2016

- Top five most highly-cited papers published in the journal since 2016
- Featured in *Columbia Law School Blue Sky Blog* (Mar 2015)

**Thoughts on the Divide Between Theoretical and Empirical Research in Accounting**
(with Q. Chen, J. Gerakos, and V. Glode) <u>Journal of Financial Reporting</u>, Fall 2016 [invited, not peer reviewed]

**From Casual to Causal Inference in Accounting Research: The Need for Theoretical Foundations**
(with J. Bertomeu and A. Beyer) <u>Foundations and Trends in Accounting</u>, Fall 2016

**Abnormal Accruals in Newly Public Companies: Misreporting or Economic Activity?**
(with C. Armstrong and G. Foster) <u>Management Science</u>, May 2016

**Asymmetric Reporting**
(with C. Armstrong and R. Verrecchia) <u>Journal of Financial Reporting</u>, Spring 2016

**Delegated Trade and the Pricing of Public and Private Information**
(with R. Verrecchia) <u>Journal of Accounting and Economics</u>, Dec 2015

**The Relation Between Equity Incentives and Misreporting: The Role of Risk-Taking Incentives**
(with C. Armstrong, D. Larcker, and G. Ormazabal) <u>Journal of Financial Economics</u>, Aug 2013

- Featured in Keynote Address by PCAOB Chair James Doty at *AICPA National Conference on Current SEC and PCAOB Developments* (Dec 2012); *Wall Street Journal* (May 2013); *Harvard Law School Forum on Corporate Governance and Financial Regulation* (May 2013)

**Why Do Pro Forma and Street Earnings Not Reflect Changes in GAAP?**
(with M. Barth and I. Gow) <u>Review of Accounting Studies</u>, Sep 2012

**ER-1903**

- Featured in *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Nov 2010); *Wall Street Journal* (May 2015)

### Asset Securitizations and Credit Risk
(with M. Barth and G. Ormazabal) <u>The Accounting Review,</u> Mar 2012

### Frictions in the CEO Labor Market: The Role of Talent Agents in CEO Compensation
(with S. Rajgopal and M. Venkatachalam) <u>Contemporary Accounting Research,</u> Spring 2012

### Corporate Governance and the Information Content of Insider Trades
(with A. Jagolinzer and D. Larcker) <u>Journal of Accounting Research,</u> Dec 2011

- Featured in *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Oct 2011); *Marketwatch* (Mar 2019);

### The Market Reaction to Corporate Governance Regulation
(with D. Larcker and G. Ormazabal) <u>Journal of Financial Economics,</u> Aug 2011

- Cited in the SEC's final ruling on proxy access (SEC Rules 14a-8 and 14a-11), "Facilitating Shareholder Director Nominations" *SEC Release No. 33-9136*

- Synopses printed in *CFA Digest* (Aug 2011)

- Featured in *Wall Street Journal* (Jul 2010); *New York Times* (Nov 2010); *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Sep 2010); *CFA Institute* (Aug 2014)

### When Does Information Asymmetry Affect the Cost of Capital?
(with C. Armstrong, J. Core, and R. Verrecchia) <u>Journal of Accounting Research,</u> Mar 2011

- Cited in the SEC's proposed rule regarding mandatory clawbacks  "Listing Standards for Recovery of Erroneously Awarded Compensation" *SEC Release No. 33-9861, 34-75342*

- Cited in the SEC's proposed exemptions to Section 404(b) of SOX "Amendments to the Accelerated Filer and Large Accelerated Filer Definitions" *SEC Release No. 34–85814*

### Correcting for Cross-Sectional and Time-Series Dependence in Accounting Research
(with I. Gow and G. Ormazabal) <u>The Accounting Review,</u> Mar 2010

- Top 5 most highly-cited paper published in the journal since 2010

**ER-1904**

**In Defense of Fair Value: Weighing the Evidence on Earnings Management and Asset Securitizations**
     (with M. Barth) Journal of Accounting and Economics, Feb 2010 [invited, not peer reviewed]

**The Stock Market's Pricing of Customer Satisfaction**
     (with C. Ittner and D. Larcker) Marketing Science, Oct 2009 [invited, not peer reviewed]

## CURRENT ACADEMIC WORKING PAPERS

**Dark Side of Investor Conferences: Evidence of Managerial Opportunism**
     (with B. Bushee and C. Zhu)

   - Featured in Columbia Law School Blue Sky Blog (Jan 2021); *Bloomberg Money Stuff* (Jan 2021)

**Long-Term Information in the Decision to Provide a Short-Term Forecast**
     (with M. Heinle, C. Kim, and F. Zhou)

**Measurement Error, Fixed Effects, and False Positives in Accounting Research**
     (with J. Jennings, J.M. Kim, and J. Lee)

**The Information Content of Corporate Websites**
     (with B. Lynch)

   - Featured in 2021 NBER Big Data and Securities Markets Conference

**Holding Foreign Insiders Accountable**
     (with R. Jackson and B. Lynch)

   - Featured in *Wall Street Journal* (April 2022); *Bloomberg Money Stuff* (April 2022); congressional testimony before the Senate Banking Committee (April 2022); *Council of Institutional Investors, The Voice of Corporate Governance* (June 2022); Harvard Law School Forum on Corporate Governance and Financial Regulation (June 2022)

   - Based on this paper, Sen. Kennedy introduced the "Holding Foreign Insiders Accountable Act" into the US Senate in May 2022

## PRACTITIONER PUBLICATIONS AND REGULATORY COMMENT LETTERS

ER-1905

**Amicus Curiae in Support of Claims that Engineered Short Squeezes are a Form of Market Manipulation** (co-authored with six other academics authoring in support) US Court of Appeals, Tenth Circuit, Case 21-4126, Feb 2022.

**Amicus Curiae in Support of Claims that SPACs are Not Valued as Operating Companies** (lead author; 30 academics authoring in support) US District Court for the Southern District of New York, Case 1:21-cv-07072-JPO, Nov 2021.

**Amicus Curiae in Support of Claims that 10B5-1 Trading Plans Can Be Probative of Scienter** (lead coauthor with Joshua Mitts, 7 academics authoring in support) US Court of Appeals for the 10th Circuit, Case 21-4058, Sept 2021.

**OpEd: Insider Trading Loopholes Need to be Closed** (with SEC Commissioner Caroline Crenshaw) Bloomberg, Mar 2021.

**Comment Letter on the SEC's Proposed Rule 144 Holding Period and Form 144 Filings** (with David Larcker and Bradford Lynch), Mar 2021

- Featured in Harvard Law School Forum on Corporate Governance and Financial Regulation (Mar 2021); Council of Institutional Investor's Comment Letter to the SEC (Mar 2021)

- Cited in the SEC's Proposed Rule Changes on Rule 10B5-1 "Rule 10B5-1 and Insider Trading" *SEC Release No. 34-93782*, Dec 2021

- Cited in the SEC's Final Rule "EDGAR Filing Requirements and Form 144 Filings" *SEC Release No. 33-11070*, June 2022

**Gaming the System: Three Red Flags of Potential 10B5-1 Abuse** (with D. Larcker, B. Lynch, P. Quinn, and B. Tayan) Stanford Closer Look Series, Jan 2021: 1-17. Stanford University Press.

- Presented to the *SEC's Investor Advisory Committee* (June 2021); presentation covered in *Law360* (June 2021)

- Featured in Harvard Law School Forum on Corporate Governance and Financial Regulation (Jan 2021); *Cooley PubCo* (Feb 2021); Council of Institutional Investor's Comment Letter to the SEC (Mar 2021); speech by Chairman Gensler at WSJ-CFO Summit (June 2021); speech by SEC Commissioner Allison Herren Lee (Dec 2021); *Reuters* (June 2021, Dec 2021); *Bloomberg* (June 2021, Dec 2021); *Bloomberg Money Stuff* (June 2021, Sept 2021); *Financial Times* (June 2021, July 2021, Dec 2021); *Law360* (June 2021 x4; July 2021); *Wall Street Journal* (June 2021, Aug 2021, Dec 2021 x2); *Forbes* (Aug 2021); and letters to the SEC by the AFL-CIO (April 2022),

Council of Institutional Investor's (April 2022), and New York City Employee Retirement System (April 2022);

- Cited extensively in the SEC's Proposed Rule Changes on Rule 10B5-1 "Rule 10B5-1 and Insider Trading" *SEC Release No. 34-93782*, Dec 2021

- Cited in New York City Comptroller's proxy challenge to Abbott Labs on 10b5-1 plans, supported by ISS and GlassLewis with 49% of the vote

### OpEd: How the SEC Can and Should Fix Insider Trading Rules
(with A. Jagolinzer and D. Larcker) <u>The Hill</u>, Dec 2020.

- Our policy recommendations were adopted by Senators Brown, Van Hollen, and Warren in their Feb 10, 2021 letter to the SEC urging changes in insider trading rules

- Cited in the SEC's Proposed Rule Changes on Rule 10B5-1 "Rule 10B5-1 and Insider Trading" *SEC Release No. 34-93782*, Dec 2021

### Comment Letter on the SEC's Proposed Reporting Threshold for Institutional Investment Managers
(with M. Barth, T. Dyer, and W. Landsman), Sept 2020

- Featured in *IR Magazine* (Sept 2020); *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Oct 2020); *Council of Institutional Investor's Comment Letter to the SEC* (Oct 2020)

### OpEd: The Covid-19 Economic War: Congress Must Open a Second Front
(with Y. Gopalan and T. Lys) <u>The Hill</u>, July 2020.

### The Spread of Covid-19 Disclosures
(with D. Larcker, B. Lynch, and B. Tayan) in <u>Stanford Closer Look Series</u>, June 2020: 1-5. Stanford University Press.

- Featured in *Bloomberg Money Stuff* (June 2020); *Cooley PubCo* (June 2020); *Harvard Law School Forum on Corporate Governance and Financial Regulation* (July 2020); included in NIRI's Covid-19 Crisis Response Library (July 2020)

- Private staff briefing to *House Financial Services Committee* (July 2020)

- Presented to the *SEC's Investor Advisory Committee* (Dec 2020); presentation covered in *Law360* (Dec 2020)

### OpEd: Are You Angry with the Fed? You Should Be
(with T. Lys) <u>The Hill</u>, June 22, 2020.

ER-1907

- Fed President Mary Daly responded to our arguments regarding Fed-fueled income inequality in "The Fed Isn't Fueling US Inequality," (*Reuters* June 23, 2020).

### Governance of Corporate Insiders' Equity Trades

(with D. Larcker, J.Kepler, and B. Tayan) in <u>Stanford Closer Look Series</u>, Jan 2020: 1-5. Stanford University Press.

- Featured in *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Jan 2020)

### Comment Letter on the SEC's Proposed Exemption to Internal Control Audits under SOX 404(b)

(with M. Barth, W. Landsman, and J. Schroeder), Jul 2019

- Featured in *Wall Street Journal* (Jul 2019); *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Jul 2019); *Council of Institutional Investor's Comment Letter to the SEC* (Jul 2019); *Better Market's Comment Letter to the SEC*; *Wall Street Journal* (Aug 2019); *CFA Institute's Comment Letter to the SEC*; *Corporate Secretary* (Aug 2019); *Internal Audit 360* (Aug 2019); *Wall Street Journal* (Mar 2020)

- Cited in the SEC's final ruling on exemptions to 404(b) of SOX "Amendments to the Accelerated Filer and Large Accelerated Filer Definitions" *SEC Release No. 34–88365*

- Cited in SEC Commissioner Allison Herren Lee's "Statement on the Rollback of Auditor Attestation Requirements"

### Follow the Money: Compensation, Risk, and the Financial Crisis

(with D. Larcker, G. Ormazabal, and B. Tayan) in <u>Stanford Closer Look Series</u>, Sept 2014: 1-5. Stanford University Press.

**Post-Earnings Announcement Drift and Related Anomalies**

in <u>Handbook of Equity Market Anomalies</u> (2011): 91-115. Wiley Publishing. Ed. Len Zacks.

## CONFERENCE DISCUSSIONS AND PANELS

"Research on Forensic Finance and Accounting" *2021 UT Symposium on Financial Market Policy Development & Research*

"How policy-makers use academic research on disclosure and governance," *2020 UT Symposium on Financial Market Policy Development & Research*

"Theory and Inference in Accounting Research," *2019 Stanford Theory & Inference Conference*

**ER-1908**

"Surviving and Thriving in the Profession," *2019, 2020, 2021 AAA Doctoral Consortium*

"Change in Capitol: How a 60 Minutes Expose and the STOCK Act Affected the Investment Activity of U.S. Senators," *2017 FEA Conference*

"When and Why do IPO Firms Manage Earnings," *2017 Review of Accounting Studies Conference*
- Winner, Morgan-Stanley Best Discussant Prize *2017 Review of Accounting Studies Conference*

"Pre-IPO Communication and Analyst Research: Evidence Surrounding the JOBS Act," *2017 NYU/SEC Changing Role of Stock Markets in Capital Formation*

"Increased Creditor Rights, Institutional Investors, and Corporate Myopia," *2016 Harvard IMO Conference*

"Payoffs to Aggressiveness," *2015 AAA Annual Meeting*

"The Unification of Theory and Empirical Research and the Path toward Knowledge," *2015 Junior Accounting Theory Conference*

"Corporate Governance and Securitization Quality: The Impact of Shareholder Rights in the Banking Industry," *2014 AAA Annual Meeting*

"Earnings Co-Movement and Earnings Manipulation in Different Economic States," *2014 FARS Mid-year Conference*

"Managerial Incentives to Increase Firm Volatility Provided by Debt, Stock, and Options," *2013 Washington University St. Louis Nick Dopuch Conference*

"The Association Between Audit Committee Characteristics and Information Asymmetry," *2013 AAA Annual Meeting*

"Accounting Experts, Information Cost, and Implied Cost of Equity Capital," *2013 AAA Annual Meeting*

"Management Team Incentive Alignment and Firm Value," *2013 FARS Mid-year Conference*

## INVITED PRESENTATIONS

2022:   UT-Austin Law; Yale; Stanford

**ER-1909**

2021:   SEC Investor Advisory Committee; UT Symposium on Financial Market Policy Development & Research; Michigan State; Chinese Univ of Hong Kong; University of Maryland; SEC Enforcement; DoJ Fraud Unit; Northwestern; Minnesota; Baruch; Tilburg; UT-Dallas; SEC Division of Economic and Risk Analysis; Journal of Accounting and Economics Conference; Florida State; SEC Chair's Office

2020:   SEC Commission-wide seminar; Accounting Theory Group; Univ of Miami; staff of House Financial Services Committee; UT Symposium on Financial Market Policy Development & Research; NYU; Georgia; SEC Investor Advisory Committee; Iowa; Review of Accounting Studies Conference

2019:   Stanford; Michigan; PCAOB; SEC Commissioner's Office (x2); Washington Univ; Weinberg Corporate Governance Symposium; Florida; Carnegie-Mellon; Miami; Stanford Theory and Inference; Notre Dame Conference; Columbia; Indiana; Hawaii

2018:   MIT; Toronto

2017:   UC-Davis; Minnesota Spring Conference; NYU/SEC Changing Role of Stock Markets in Capital Formation; Review of Accounting Studies conference; FEA conference

2016:   Temple; Utah; Chicago; Cornell; Harvard IMO Conference; Securities & Exchange Commission; Texas A&M; Treasury; Southern District of New York; FBI

2015:   Rochester; AAA Mid-Atlantic Doctoral Consortium; Delaware; Penn State Accounting Research Conference; Colorado Summer Camp; Junior Accounting Theory Conference; AAA Annual Meeting

2014:   FARS Mid-year Meeting; University of Texas Corporate Governance conference; Junior Accounting Theory Conference; AAA Annual Meeting; Stanford Summer Camp; USC; SUNY-Binghamton; Northwestern

2013:   FARS Mid-year Meeting; Duke; AAA Annual Meeting; Duke/UNC Fall Camp; LBS; Washington University St. Louis Nick Dopuch Conference

## INVITED CONFERENCES

2021:   UT Symposium on Financial Market Policy Development & Research (panelist); JAE conference (presenter); RAST conference (invited participant)

2020:   UT Symposium on Financial Market Policy Development & Research (panelist); Stanford Virtual Summer Camp (invited participant); JAR conference (invited participant); NYU Institute for Corporate Governance (invited participant); JAE conference (invited participant); RAST conference (presenter)

2019:   Weinberg Corporate Governance Symposium (presenter); Theory and Inference in Accounting Research (moderator); Notre Dame Accounting Conference (presenter); Miami Winter Warm-Up Conference (invited participant)

**ER-1910**

2018: JAR conference (invited participant); NYU Summer Camp (invited participant); Harvard IMO conference (invited participant); Wharton Spring Conference (invited participant); Harvard IMO conference (invited participant); NYU Summer Camp (invited participant); Stanford Summer Camp (invited participant); Junior Accounting Theory Conference (invited participant); Toronto Summer Camp (presenter); JAR/PCAOB conference (invited participant); JAE conference (invited participant)

2017: Minnesota Empirical Conference (presenter); NYU/SEC Changing Role of Stock Markets in Capital Formation (discussant); JAR conference (invited participant); Wharton Spring Conference (invited participant); Review of Accounting Studies conference (discussant); JAR/PCAOB conference (invited participant); JAE conference (invited participant); FEA conference (discussant);

2016: JAR conference (invited participant); Harvard IMO conference (discussant); Wharton Spring Conference (invited participant); Colorado Summer Camp (invited participant); Stanford Summer Camp (invited participant); RAST conference (invited participant); JAR/PCAOB conference (invited participant); JAE conference (invited participant);

2015: AAA Mid-Atlantic Doctoral Consortium (presenter); Penn State Accounting Research Conference (presenter); JAR conference (invited participant); Colorado Summer Camp (presenter); Junior Accounting Theory Conference (moderator); AAA Annual Meeting (discussant); JAE conference (presenter); JAR/PCAOB conference (invited participant); Washington University Nick Dopuch Conference (invited participant);

2014: FARS Mid-year Meeting (presenter, discussant); University of Texas Corporate Governance conference (presenter); JAR conference (invited participant); Junior Accounting Theory Conference (presenter); AAA Annual Meeting (discussant); Stanford Summer Camp (presenter); JAE conference (presenter); Causality Conference (invited participant)

2013: FARS Mid-year Meeting (discussant); JAE/HBS Social Responsibility conference (invited participant); Colorado Summer Camp (invited participant); Stanford Summer Camp (invited participant); UNC Global Issues in Accounting conference (invited participant); NYU-Stern Summer Camp (invited participant); AAA Annual Meeting (discussant); Duke/UNC Fall Camp (presenter); Washington University Nick Dopuch Conference (discussant); JAE conference (invited participant)

## INTERNAL AND EXTERNAL SERVICE

Editorial Positions

| | | |
|---|---|---|
| Management Science | *Associate Editor* | 2018 – present |
| The Accounting Review | *Editor* | 2018 – present |
| The Accounting Review | *Editorial Board* | 2017 – 2018 |
| Review of Accounting Studies | *Editorial Board* | 2018 – present |

ER-1911

| | | |
|---|---|---|
| SSRN Accounting Theory eJournal | *Editorial Board* | 2018 – present |
| Journal of Financial Reporting | *Editorial Board* | 2016 – present |
| Journal of Accounting and Economics | *Editorial Board* | 2015 – present |
| Journal of Accounting Research | *Editorial Board* | 2016 – 2021 |
| | *Reviewer of the Year* | 2019 |

### DISSERTATION COMMITTEES & PLACEMENTS

| | | |
|---|---|---|
| Bradford Lynch | (on the market, 2022-2023) | 2023 |
| Jung Min Kim | (Northwestern) | 2022 |
| John Kepler | (Stanford) | 2019 |
| Delphine Samuels | (MIT) | 2017 |
| Michael Carniol | (Rutgers) | 2017 |
| Jason Xiao | (University of Rochester) | 2016 |
| David Tsui | (USC) | 2015 |
| Terrence Blackburne | (University of Washington) | 2013 |

### PROFESSIONAL SERVICE

| | |
|---|---|
| Member, WRDS Advisory Board, | 2020 – present |
| Member, Wharton IT Steering Committee | 2017 – present |
| Member, Wharton Rookie Recruiting Committee | 2015 – present |
| Member, Wharton PhD Qualifying Exam Committee | 2012 – present |
| Member, Wharton Curriculum Innovation & Review Committee | 2020 – 2021 |
| Leader, AAA/Deloitte Doctoral Consortium | 2019 – 2021 |
| Organizer & Founder, Wharton Theory Boot Camp for Empiricists | 2018 – 2020 |
| Leader, AAA New Faculty Consortium | 2019 |
| Member, FARS Meeting Editorial Committee | 2017 |
| Member, FARS Best Dissertation Award Committee | 2016 |
| Member, Wharton PhD Curriculum Committee | 2016 |
| Organizer, Wharton Seminar Series | 2013 – 2015 |
| Member, AAA Meeting Editorial Committee | 2013 |

## COURSE DEVELOPMENT

### FORENSIC ANALYTICS (Spring 2019 – present)

Created this experiential course for undergraduates interested in learning how to manipulate Big Data and mine SEC filings to predict earnings, detect fraud, and flag suspicious trading behavior. The course draws on cutting-edge academic research in each topic; features industry guest speakers; introduces basic SQL coding skills; and leverages the computing power of AWS and the datasets at Wharton Research Data Services.

**ER-1912**

EMPIRICAL DESIGN IN ACCOUNTING RESEARCH (Spring 2014 – present)

Created this course for Ph.D. students looking for an advanced course on empirical methodology and research design with application to the accounting literature. The course emphasizes applied econometrics and research design rather than topical coverage of the literature [mini-versions taught at Northwestern, Stanford, and Washington University].

INTRODUCTION TO FINANCIAL ACCOUNTING (Fall 2010 – Fall 2017)

Designed a custom course pack for ~800 students.

## ADDITIONAL INFORMATION

Citizenship: United States
Hobbies/Other: hiking, home renovations, landscaping, Eagle Scout

**ER-1913**

# Exhibit 12

## Governor Gavin Newsom's October 7, 2023 Signing Statement for S.B. 253

Declaration of Bradley J. Hamburger In Support Of
Plaintiffs' Motion for Summary Judgment on Claim I
May 24, 2024

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.*,
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)

**ER-1914**



# OFFICE OF THE GOVERNOR

OCT **0 7** 2023

To the Members of the California State Senate:

I am signing Senate Bill 253 which would require, among other things, the California Air resources Board (CARB), by January 1, 2025, to develop and adopt regulations requiring businesses with total annual revenues over $1 billion and operating in California to disclose their greenhouse gas emissions to an emissions reporting organization.

This important policy, once again, demonstrates California's continued leadership with bold responses to the climate crisis, turning information transparency into climate action. However, the implementation deadlines in this bill are likely infeasible, and the reporting protocol specified could result in inconsistent reporting across businesses subject to the measure. I am directing my Administration to work with the bill's author and the Legislature next year to address these issues.

Additionally, I am concerned about the overall financial impact of this bill on businesses, so I am instructing CARB to closely monitor the cost impact as it implements this new bill and to make recommendations to streamline the program. I look forward to working with the Legislature on these modifications to ensure we achieve this bill's goals of "full transparency and consistency".

Sincerely,

Gavin Newsom

GOVERNOR GAVIN NEWSOM • SACRAMENTO, CA 95814 • (916) 445-2841



**ER-1915**

# Exhibit 9

Public Citizen's September 12, 2023 press release "California Lawmakers Approve Groundbreaking Climate Disclosure Bill

Declaration of Bradley J. Hamburger In Support Of
Plaintiffs' Motion for Summary Judgment on Claim I
May 24, 2024

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.*,
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)

(166 of 292), Page 166 of 292

Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 166 of 292

5/20/24, 2:12 PM    Case 2:24-cv-00801-ODW-PVC    California Lawmakers Approve Groundbreaking Climate Disclosure Bill - Public Citizen    Page ID #:617



GET UPDATES    ACT    DONATE ⌄    DONATE ⌄

**SEPTEMBER 12, 2023**

# California Lawmakers Approve Groundbreaking Climate Disclosure Bill

WASHINGTON, D.C. — The California State Assembly voted last night to require public and private companies with more than $1 billion in revenue to disclose greenhouse gas emissions up and down their value chain. Senate Bill 253 was one of two pending before the Assembly addressing climate risk disclosure obligations for companies doing business in the state. The second bill is expected to be voted on later this week. Both bills passed the state senate earlier this year. **Clara Vondrich, senior policy council with Public Citizen's Climate Program,** issued the following statement:

"For the nation to check the climate crisis, the first step is transparency on how our biggest emitters are navigating the energy transition: Are emissions going up, down, or staying the same? This legislation will let the public and regulators track companies' decarbonization progress and hold them accountable to their climate promises. And it will let investors safeguard their savings against climate-related risks and invest in ways that align with their values. We look forward to the Assembly's swift passage of companion bill SB 261 over the next few days, and the Governor signing both bills into law. Together, these bills will represent the most significant climate-related financial risk disclosure in the world – outpacing Europe's standards finalized in July.

"California's legislation includes disclosure of emissions associated with its upstream and downstream activities, known as Scope 3 emissions. When it becomes law, consumers will have access to vital background on the impact a company's supply chain has on the climate crisis. For the first time, Big Oil will be required to disclose publicly the deep and ongoing impact it has on global warming.

"As the U.S. Securities and Exchange Commission (SEC) prepares to finalize its long-awaited climate risk disclosure rule, it must not back away from its commitment to require Scope 3 disclosures. Perhaps no other piece of

**ER-1917**

5/20/24, 2:02 PM

information is more important to fulfill its core mandate to protect investors and maintain fair and orderly markets. The California law will cover a sizable percentage of the public market, but the SEC proposal is critical to covering other large companies."

# # #

## Topics

**Climate & Energy:** Fighting Climate Change

Cover Climate  Curbing Fossil Finance

## RELEVANT NEWS

**Insurance, get with the climate program**
December 2, 2021

**Citizen Groups Deliver 27,000 Petitions Calling on Insurance Giant AIG to Halt Support for Fossil Fuel Projects**
December 7, 2021

**Biden Nominates Sarah Bloom Raskin, Lisa Cook, and Philip Jefferson to Join Federal Reserve**
January 14, 2022

**Net-Zero Transition Plans: Advancing Abroad, With a Path in the U.S.**
January 26, 2022

## STAY UPDATED ON PUBLIC CITIZEN

**ER-1918**

5/20/24, 11:04 PM    California Lawmakers Approve Groundbreaking Climate Disclosure - Public Citizen

mail Address *

GET UPDATES

## Follow Public Citizen





## Support Our Work

DONATE ^

DONATE ^

Privacy Policy     Careers     Contact

Copyright © 2023 Public Citizen. Some rights reserved. Non-commercial use of text and images in which Public Citizen
holds the copyright is permitted, with attribution, under the terms and conditions of a Creative Commons License.
This website is shared by Public Citizen Inc. and Public Citizen Foundation.
Learn More about the distinction between these two components of Public Citizen.

**ER-1919**

# Exhibit 7

## California Senate Judiciary Committee's April 14, 2023 Analysis of S.B. 253

Declaration of Bradley J. Hamburger In Support Of
Plaintiffs' Motion for Summary Judgment on Claim I
May 24, 2024

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.*,
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)

(170 of 292) Page 170 of 292Case: 25-5327 09/18/2025, DktEntry: 8.9, Page 170 of 292
Case 2:24-cv-00801-ODW-PVC Document 48-10 Filed 05/24/24 Page 2 of 21 Page ID
#:583

**SENATE JUDICIARY COMMITTEE**
**Senator Thomas Umberg, Chair**
**2023-2024 Regular Session**

SB 253 (Wiener)
Version: January 30, 2023
Hearing Date: April 18, 2023
Fiscal: Yes
Urgency: No
AWM

## SUBJECT

Climate Corporate Data Accountability Act

## DIGEST

This bill requires any partnership, corporation, limited liability company, or other U.S. business entity with total annual revenues in excess of one billion dollars and that does business in California to publicly report their annual greenhouse gas (GHG) emissions, as specified by the California Air Resources Board (CARB).

## EXECUTIVE SUMMARY

The window to prevent the most catastrophic effects of climate change is rapidly closing. Current law, however, does not give the state or its consumers significant insight into what steps, if any, large companies are taking to reduce GHG emissions, which is imperative to avoid the worst effects of climate change.

This bill requires the CARB to adopt regulations to partner with a nonprofit emissions registry and to require U.S.-based companies with annual revenues over $1 billion and that do business in California to annually report their scope 1, scope 2, and scope 3 GHG emissions—which encompass emissions from a company's direct operations as well as from its supply chain—to that registry. CARB must adopt the regulations for the reports by January 1, 2025, and the covered entities would be required to make their disclosures beginning in 2026 or a date to be determined by the CARB. The bill also requires the CARB, by January 1, 2027, to contract with an academic institution to prepare a publicly available report on the disclosures made by the reporting entities.

This bill is substantially similar to SB 260 (Wiener, 2021), which this Committee passed in an early version that required companies to report their emissions directly to the CARB. Following its passage in this Committee, the author continued to work with stakeholders and amended the bill to, among other things, require CARB to work with a third-party entity to create an emissions registry. SB 260 died on the Assembly Floor.

**ER-1921**

SB 253 (Wiener)
Page 2 of 20

This bill picks up where SB 260 left off, with additional changes made in response to stakeholder concerns.

This bill is sponsored by Carbon Accountable, CA Enviro Voters, Ceres, Sunrise Bay Area, and The Greenlining Institute, and is supported by over 60 environmental organizations, labor groups, businesses, and community groups. This bill is opposed by over 60 organizations including Chambers of Commerce, agricultural and manufacturing groups, and businesses. This bill was passed out of the Senate Environmental Quality Committee with a vote of 4-2.

## PROPOSED CHANGES TO THE LAW

Existing state law:

1) Establishes the CARB as the air pollution control agency in California and requires the CARB, among other things, to control emissions from a wide array of mobile sources and coordinate, encourage, and review the efforts of all levels of government as they affect air quality. (Health and Saf. Code, div. 26, part 2, §§ 39500 et seq.)

2) Establishes the California Global Warming Solutions Act of 2006 (AB 32 (Nunez, Ch. 488, Stats. 2006)), which declares that global warming poses a serious threat to the economic well-being, public health, natural resources, and the environment of California, and that action taken by California to reduce emissions of greenhouse gases will have far-reaching effects by encouraging other states, the federal government, and other countries to act. (Health & Saf. Code, div. 25.5, §§ 38500 et seq.)

3) Requires, as part of the California Global Warming Solutions Act of 2006, the CARB to determine the 1990 statewide GHG emissions level and approve a statewide GHG emissions limit that is equivalent to that level to be achieved by 2020. (Health & Saf. Code, § 38550.)

4) Requires the CARB to ensure that statewide GHG emissions are reduced to at least 40 percent below the 1990 level by December 31, 2030, and allows the CARB, until December 31, 2030, to adopt regulations that utilize market-based compliance mechanisms (i.e., the cap-and-trade program) to reduce GHG emissions. (Health & Saf. Code, §§ 38562, 38566.)

5) Requires the CARB to adopt regulations that, among other things, require monitoring and annual reporting of GHG emissions from GHG emission sources within the state, beginning with the sources or categories of sources that contribute the most to statewide emissions; and provides that, for the cap-and-trade program, entities that voluntarily participated in the California Climate Action Registry prior

**ER-1922**

SB 253 (Wiener)
Page 3 of 20

to December 31, 2006, and had developed a GHG emission reporting program would not be required to significantly alter their reporting or verification program except as necessary for compliance. (Health & Saf. Code, § 38530.)

6) Requires the CARB to make available, and update annually, the emissions of GHGs, criteria pollutants, and toxic air contaminants from each facility that reports to the statute pursuant to AB 32. (Health & Saf. Code, § 38531.)

7) Requires the CARB to monitor compliance with and enforce the requirements of the California Global Warming Solutions Act of 2006, and deems any violation to result in an emission of an air contaminant that may result in criminal and civil penalties. (Health & Saf. Code, § 38580.)

8) Defines "doing business" in California as engaging in any transaction for the purpose of financial gain within California, being organized or commercially domiciled in California, or having California sales, property, or payroll exceed $610,395, $61,040, and $61,040, respectively, as of 2020. (Rev. & Tax. Code, §§17041, 23101.)

Existing federal law:

1) Gives Congress the authority to regulate commerce with foreign nations and between states. (U.S. Const. art. I, § 8.)

2) Establishes the Clean Air Act, which declares as a primary goal encouraging or otherwise promoting reasonable federal, state, and local governmental actions, consistent with the provisions of this Act, for pollution prevention. (42 U.S.C. § 7401.)

This bill:

1) Establishes the Climate Corporate Data Accountability Act (the Act) within the California Global Warming Solutions Act of 2006.

2) Makes findings and declarations regarding, among other things, the impacts of climate change, the strength of California's economy, and the importance of accurate emissions data in informing investors, consumers, and companies.

3) Defines relevant terms, including:
   a) "Emissions registry" is a nonprofit emissions registry organization, contracted by the CARB pursuant to 7), that (1) currently operates a voluntary greenhouse gas emission registry for organizations operating in the United States and (2) has experience with voluntary greenhouse gas emissions disclosure by entities operating in California.

SB 253 (Wiener)
Page 4 of 20

b) "Reporting entity" is a partnership, corporation, limited liability company, or other business entity formed under the laws of the state, any other state in the United States, the District of Columbia, or under an act of Congress of the United States with total annual revenues in excess of $1 billion, and that does business in California.

c) "Scope 1 emissions" is all direct GHG emissions that stem from sources that a reporting entity owns or directly controls, regardless of location, including, but not limited to, fuel combustion activities.

d) "Scope 2 emissions" is indirect GHG emissions from electricity purchased and used by a reporting entity, regardless of location.

e) "Scope 3 emissions" is indirect GHG emissions, other than scope 2 emissions, from activities of a reporting entity that stem from sources that the reporting entity does not own or directly control and may include emissions associated with the reporting entity's supply chain, business travel, employee commutes, procurement, waste, and water usage, regardless of location.

4) Requires the CARB, on or before January 1, 2025, to develop and adopt regulations to require a reporting entity to annually disclose to the emissions registry, and verify, all of the entity's scope 1, 2, and 3 emissions.

5) Requires the CARB to ensure that the regulations adopted pursuant to 4) require, at a minimum, all of the following:

a) That a reporting entity, starting in 2026 or a date to be determined by the CARB, and annually thereafter, publicly disclose to the emissions registry all of its scope 1 and scope 2 emissions for the prior calendar year, and its scope 3 emissions for that same calendar year no later than 180 days after that date, using the Greenhouse Gas Protocol Corporate Accounting and Reporting Standard and the Greenhouse Gas Protocol Corporate Value Chain (Scope 3) Accounting and Reporting Standard developed by the World Resources Institute and the World Business Council for Sustainable Development, including guidance for scope 3 emissions calculations that detail acceptable use of both primary and secondary data sources, including the use of industry average data, proxy data, and other generic data in its scope 3 emissions calculations.

b) That CARB, on or before January 1, 2030, shall review and update as necessary the public disclosure guidelines developed in 5)(a) to evaluate trends in scope 3 emissions reporting and consider changes to the disclosure deadlines to ensure that scope 3 emissions data are disclosed to the emissions registry as close in time as practicable to the deadline for disclosing scope 1 and 2 emissions data.

c) The reporting timelines shall consider industry stakeholder input and shall take into account the timelines by which reporting entities typically receive scope 1, 2, and 3 emissions data, as well as the capacity for independent

SB 253 (Wiener)
Page 5 of 20

> verification to be performed by a third-party auditor, as approved by the CARB.
>
> d) That a reporting entity's public disclosure is made in a manner that is easily understandable to residents, investors, and other stakeholders of the state.
>
> e) That a reporting entity's public disclosure includes the name of the reporting entity and any fictitious names, trade names, assumed names, and logos used by the reporting entity.
>
> f) That a reporting entity's public disclosure is structured in ways that streamline and maximize reporting entities' ability to use reports used in meeting requirements of other leading climate disclosure programs and standards. The CARB shall determine leading program standards based on industry stakeholder and disclosure expert input.
>
> g) That a reporting entity's public disclosure is independently verified by the emissions registry or a third-party auditor approved by the CARB and with expertise in greenhouse gas emissions accounting. The reporting entity shall ensure that a copy of the complete, audited greenhouse gas emissions inventory, including the name of the approved third-party auditor, is provided to the emissions registry as part of or in connection with the reporting entity's public disclosure. The CARB shall establish auditor qualifications and a process for approval of auditors that ensures sufficient auditor capacity and timely reporting implementation for this purpose.

6) Requires the CARB, in developing the regulations in 5), to consult with all of the following:
   a) The Attorney General.
   b) Other government stakeholders, including, but not limited to, experts in climate science and corporate carbon emissions accounting.
   c) Investors.
   d) Stakeholders representing consumer and environmental justice interests.
   e) Reporting entities that have demonstrated leadership in full-scope greenhouse gas emissions accounting and public disclosure and greenhouse gas emissions reductions.

7) Requires the CARB to contract with an emissions registry to develop a reporting and registry program to receive and make publicly available disclosures required by this section pursuant to 4)(a).

8) Authorizes the CARB to adopt or develop any other regulations that it deems necessary and appropriate to implement the requirements of 4)-7).

9) Requires CARB, on or before July 1, 2027, to contract with the University of California, the California State University, a national laboratory, or another equivalent academic institution to prepare a report on the public disclosures made

**ER-1925**

SB 253 (Wiener)
Page 6 of 20

by reporting entities to the emissions registry pursuant to 4) and the regulations adopted by the CARB.

    a) In preparing the report, consideration shall be given to, at a minimum, greenhouse gas emissions from reporting entities in the context of state greenhouse gas emissions reduction and climate goals.

    b) The entity preparing the report shall not require reporting entities to report any information beyond what is required pursuant to 5) or the regulations adopted by the CARB pursuant to 8).

10) Requires the CARB to submit the report required by 9) to the emissions registry to be made publicly available on the digital platform required to be created pursuant to 10). The emissions registry must submit the report to the Legislature within 30 days of receipt to the relevant policy committees of the Legislature.

11) Requires the emissions registry contracted with pursuant to 7), on or before a date determined by the CARB, to create a publicly accessible digital platform to house all disclosures submitted by reporting entities to the emissions registry and the report prepared pursuant to 10).

    a) The emissions registry shall make the reporting entities' disclosures and the state board's report available on the digital platform within 30 days of receipt.

    b) The digital platform shall be capable of featuring individual reporting entity disclosures and shall allow consumers view to reported data elements aggregated in a variety of ways, including multiyear data, in a manner that is easily understandable and accessible to residents of the state. All data sets and customized views shall be available in electronic format for access and use by the public.

12) Provides that the criminal and civil penalties for violations of the California Global Warming Solutions Act of 2006 (Health & Saf. Code, div. 25.5) set forth in Health & Safety Code section 38580 do not apply to violations of this bill.

13) Authorizes the Attorney General, if the Attorney General finds that a reporting entity has violated or is violating this section or receives a complaint of noncompliance from the CARB, to bring a civil action against that reporting entity in the name of the State of California seeking civil penalties for the violations of the bill's requirements.

14) Includes a severability clause.

15) Provides that the bill's implementation is contingent upon an appropriation by the Legislature in the annual Budget Act or another statute for its purposes.

**ER-1926**

SB 253 (Wiener)
Page 7 of 20

# **COMMENTS**

1.  Author's comment

According to the author:

> SB 253, the Climate Corporate Data Accountability Act, requires public and private US-based corporations who do business in California and which have over $1 billion in annual revenue to report their greenhouse gas emissions from their direct activities, the activities of their supply chain, and other major emission sources by 2025. This emissions data will be published publicly and accessible via an online platform.

> California has been at the forefront of climate policy in recent decades, establishing a successful cap and trade program, committing to preserve 30% of California's lands in their natural state, and setting and achieving ambitious emission reduction targets. These reductions were partially met, and continue to be bolstered by the emission reporting requirements as laid out in the California Global Warming Solutions Act. These requirements, however, only apply to electricity generators, industrial facilities, fuel suppliers, and other major emitters, missing many sources of corporate pollution. Without the same requirements for these corporate entities, California is left without proper information and will not be able to accurately regulate and reduce these emissions. Filling this gap with detailed data regarding corporate activities is a crucial next step for the state to ensure that we continue to decrease the rampant GHGs that are destroying our planet.

> California, like the rest of the world, is already deeply impacted by climate change, with worsening droughts, floods, and the unforgettable devastation brought on by an influx of massive wildfires – the top five largest wildfires in the state's history have all occurred in 2018 or later. We no longer have the time to rely on massive corporations to voluntarily report their emissions, and cannot afford any possibility that the emissions we are being told about have been altered or manipulated to ensure a positive public-facing appearance for a particular company. Rather, these corporations must be required to transparently report their activities and the emissions associated with them. Californians are watching their state get irrevocably harmed by climate change, and they have a right to know who is at the forefront of the pollution causing this. SB 253 would bolster California's position as a leader on climate change, will allow for consumers to make informed decisions regarding their patronage of these corporations, and will give policymakers the specific data required to significantly decrease corporate emissions.

**ER-1927**

SB 253 (Wiener)
Page 8 of 20

2.  <u>Background: the threat of climate change and California's mitigation efforts</u>

According to the National Oceanic and Atmospheric Administration (NOAA), global temperatures rose 1.8 degrees Fahrenheit between 1901 and 2020.[1] While that might not sound like much, global warming to date has caused dramatic global climate change, including increasingly rapid sea level rise, shrinking glaciers, and more erratic weather (such as floods and droughts).[2] The NOAA reports that "[g]reenhouse gases from human activities are the most significant driver of observed climate change since the mid-20th century."[3]

"California is one of the most 'climate-challenged' regions of North America."[4] Climate change will "have effects on all parts of California's society,"[5] with the effects disproportionately felt by "the State's most vulnerable citizens and communities."[6] While California has already taken steps to impose limits on GHG emissions and other causes of climate change—such as reducing GHG emissions to such 1990 levels by 2020 (which the state accomplished early, in 2016);[7] implementing a cap-and-trade program;[8] and requiring the state to be carbon neutral by 2045[9]—research indicates that, without "[g]lobal warming of 1.5°C and 2°C will be exceeded during the 21st century unless deep reductions in $CO_2$ and other greenhouse gas emissions occur in the coming decades."[10]

3.  <u>The "scope" framework for GHG emissions and existing reporting requirements</u>

The Senate Environmental Quality Committee's analysis of this bill, which is incorporated here by reference, explains the three-scope emissions framework employed in this bill as follows:

> The "scope" framework was introduced in 2001 by the World Resources Institute (WRI) and World Business Council for Sustainable Development as part of their

---

[1] NOAA, Climate change impacts (last updated Aug. 13, 2021), https://www.noaa.gov/education/resource-collections/climate/climate-change-impacts. All links in this analysis are current as of April 14, 2023.

[2] *Ibid.*

[3] NOAA, Climate Change Indicators: Greenhouse Gases (last updated Aug. 1, 2022), https://www.epa.gov/climate-indicators/greenhouse-gases.

[4] California's Fourth Climate Change Assessment (Fourth Assessment), Statewide Summary Report (Jan. 16, 2019), p. 13.

[5] *Ibid.*

[6] *Id.* at p. 16.

[7] AB 32 (Nunez, Ch. 488, Stats. 2006); Kasler, *California beats its 2020 goals for cutting greenhouse gases*, Sacramento Bee (Jul. 11, 2018), *available at* https://www.sacbee.com/article214717585.html.

[8] Cal. Code Regs., tit. 17, div. 3, ch. 1, subchapter 10, art. 5, §§ 95801 et seq.

[9] Governor's Exec. Order No. B-55-18 (Sept. 10, 2018).

[10] Intergovernmental Panel on Climate Change, Report, *Climate Change 2021: The Physical Science Basis: Contribution of Working Group I to the Sixth Assessment Report of the Intergovernmental Palen on Climate Change* (2021), p. 14.

**ER-1928**

(178 of 292) Page 178 of 292Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 178 of 292
Case 2:24-cv-00801-ODW-PVC Document 48-10 Filed 05/24/24 Page 10 of 21 Page ID
#:591

SB 253 (Wiener)
Page 9 of 20

Greenhouse Gas Protocol Corporate Accounting and Reporting Standard. The goal was to create a universal method for companies to measure and report the emissions associated with their business. The three scopes allow companies to differentiate between the emissions they emit directly into the air, which they have the most control over, and the emissions they contribute to indirectly.

Scope 1 covers direct emissions from owned or controlled sources, such as fuel combustion, company vehicles, or fugitive emissions. Scope 2 covers indirect emissions from the generation of purchased electricity, steam, heating and cooling consumed by the reporting company. Scope 3 includes all other indirect emissions that occur in a company's value chain. Recent research from CDP (formerly the Carbon Disclosure Project) found that among full-scope (i.e. 1, 2, and 3) reports, scope 3 supply chain emissions are on average 11.4 times higher than combined scope 1 and 2 emissions.

Scope 3 emissions are divided into fifteen categories: Purchased goods and services; capital goods; fuel-and energy-related activities; upstream transportation and distribution; waste generated in operations; business travel; employee commuting; upstream leased assets; downstream transportation and distribution; processing of sold products; end-of-life treatment of sold products; downstream leased assets; franchises; and investments.

While the range of categories is daunting, the U.S. Environmental Protection Agency (EPA) provides an extensive list of accepted emission factor (EF) values for common items. For instance, a business would not need to measure and calculate the GHG emissions associated with each and every vehicle its employees used to calculate "employee commuting," they could instead determine the total vehicle-miles traveled by their employees via different modes, then multiply those miles by the provided EF to get an acceptable estimation of the $CO2$ associated with that travel.

The "scope" framework is not currently employed in federal law; federal GHG emissions reporting requirements are limited to certain large GHG emissions sources, fuel and industrial gas suppliers, and carbon dioxide injection sites in the United States.[11] The United States Securities and Exchange Commission (SEC), however, is considering a proposed rule that would require all publicly traded companies in the U.S. to disclose, as part of their initial offering materials and annually thereafter, information about their scope 1 and 2 emissions, and their scope 3 emissions if they are material or if the company has made a commitment that included reference to scope 3 emissions.[12] The SEC propounded the proposed rule after concluding that the existing

[11] 40 C.F.R. pt.98, §§ 98.1-98.478.
[12] See SEC Proposed Rules, The Enhancement and Standardization of Climate-Related Disclosures for Investors, 87 Fed.Reg. 21334-01, 21345 (Apr. 11, 2022).

SB 253 (Wiener)
Page 10 of 20

framework for emissions disclosures—much of it voluntary "has failed to produce the consistent, comparable, and reliable information that investors need. Instead, the proliferation of third-party reporting frameworks has contributed to reporting fragmentation, which can hinder investors' ability to understand and compare registrants' climate-related disclosures."[13]

Scope-based reporting requirements are being adopted internationally as well. At the beginning of 2023, the European Union finalized and implemented the Corporate Sustainability Reporting Directive (CSRD), which requires certain EU-based and non-EU companies to file sustainability disclosures that include, among other things, the company's scope 1 and 2 emissions and their scope 3 emissions if they are "material."[14] The CSRD's reporting requirement applies to EU-based companies, non-EU companies with a net annual turnover of €150 million or more, and companies with securities listed on a qualified EU market.[15] The United Kingdom has adopted a similar climate disclosure requirement for UK-incorporated companies with 500 or more employees and is (1) traded on a UK-regulated market, (2) a banking company, (3) an authorized insurance company, or (4) has a turnover of more than £500 million.[16] Specifically, companies must disclose scope 1 and scope 2 emissions, and disclose scope 3 emissions if they are "material" or if the company has set an emissions target or other climate-related goal.[17]

According to the sponsors of the bill, the EU's CSRD will cover approximately 50,000 companies, and the SEC rules, if adopted, would cover between 5,000 and 7,000 publicly traded companies.

4. This bill requires the most profitable U.S.-based companies to disclose their enterprise-wide GHG emissions

This bill implements an annual three-scope GHG emissions reporting requirement for companies with annual gross revenues in excess of $1 billion and that do business in California. Specifically, the bill requires the CARB to contract with an existing emissions registry for the receipt of the disclosure reports; beginning in 2026 or on a date later determined by the CARB, companies will be required to provide to the registry disclosures of their scope 1, 2, and 3 emissions, which must be either verified by the emissions registry or a third-party auditor with expertise in GHG emissions accounting. The CARB must consult with stakeholders including the Attorney General, investors,

---

[13] *Id.* at p. 21342.

[14] *See* Directive (EU) 2022/2464 of Eur. Parliament and the Council of 14 Dec. 2022, amending Regulation (EU) No 537/2014, Directive 2004/109/EC, Directive 2006/43/EC and Directive 2013/34/EU, as regards corporate sustainability reporting (OJ L. 322 (12/16/2022), pp. 15-80).

[15] *Ibid.*

[16] The Companies (Strategic Report) (Climate-related Financial Disclosure) Regulations 2022 (Jan. 17. 2022).

[17] *Ibid.*

(180 of 292) Page 180 of 292 Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 180 of 292
Case 2:24-cv-00801-ODW-PVC   Document 48-10   Filed 05/24/24   Page 12 of 21   Page ID
#:593

SB 253 (Wiener)
Page 11 of 20

and representatives of consumer and environmental interest groups in developing regulations pursuant to this bill.

Company reports provided under this bill will be public. The bill also requires the emissions registry to create a public online portal that will allow the information provided to be viewed in a variety of ways, such as comparing companies' emissions year-to-year and presenting data by industry. Additionally, in 2027, the CARB must contract with an academic institution to develop a report on the disclosures that will consider the reported emissions in the context of the state's GHG reduction and climate goals. Collectively, these requirements will provide the public and policymakers with valuable information about companies' emissions and what further steps can be taken to decrease GHG emissions.

This bill is similar to SB 260 (Wiener, 2021), which this Committee heard and passed two years ago. SB 260 made it through the policy and fiscal committees in both houses but failed passage on the Assembly floor. For purposes of this Committee's jurisdiction, the relevant changes are: (1) unlike SB 260, this bill explicitly permits industry average, proxy, and other data to be used in scope 3 emissions calculations, and (2) the enforcement mechanism has changed from a penalty regime to be determined by the CARB to allowing the Attorney General to seek civil penalties for violations.

The environmental impact of this bill, including the debate over the value of disclosing scope 3 emissions, is discussed more thoroughly in the Senate Environmental Quality Committee's analysis of this bill. Relevant to this Committee's jurisdiction are the civil penalty provision and the potential constitutional issues raised by the bill. These are discussed below in Parts 5 and 6.

5.   This bill authorizes the Attorney General to seek civil penalties from an entity that fails to comply with the disclosure requirements; the author is continuing to work with stakeholders to craft a more specific penalty framework

As currently in print, this bill provides that the Attorney General can seek a civil penalty in a civil action against an entity that violates the bill's disclosure requirements. The lack of specificity of the penalty poses concerns about whether a covered entity has adequate notice about the consequences of a violation and whether a court would have adequate guidance in how to assess a penalty. The author, however, is committed to continuing to work with stakeholders as the bill works its way through the legislative process to develop a more specific penalty framework that implements proportional penalties in light of the harm caused by the failure to report and the size of the companies covered by this bill.

SB 253 (Wiener)
Page 12 of 20

6.  <u>The bill does not present clear dormant interstate commerce clause issues</u>

Section 8 of Article I of the United States Constitution grants the United States Congress the power to regulate interstate commerce.[18] Since the early nineteenth century, the Supreme Court has held that obverse proposition—that states may not usurp Congress's express power to regulate interstate commerce—must also be true.[19] This rule against state interference in interstate commerce, sometimes known as the dormant Commerce Clause, serves as an absolute bar to regulations that discriminate against interstate commerce, i.e., by favoring in-state businesses or excluding out-of-state businesses.[20] But when a state passes a law that " 'regulat[es] even-handedly [across all in-state and out-of-state businesses] to effectuate a legitimate local public interest,' " that law " 'will be upheld unless the burden imposed upon such commerce is clearly excessive in relation to the putative local benefits.' "[21]

There is no facial dormant Commerce Clause issue here. This bill grants no favoritism for in-state companies—all U.S.-based companies doing business in California with annual gross revenues in excess of $1 billion are subject to the bill's reporting requirement. That leaves only the questions of whether the bill's reporting requirement serves a legitimate local interest, and whether the burden imposed by the reporting requirement is clearly excessive in relation to the benefits conferred.

With respect to the first prong—whether requiring very large companies to report scope 1, 2, and 3 emissions serves a legitimate local interest—the answer must be yes. As discussed above in Part 2, serious efforts are needed to prevent catastrophic levels of global warming. California thus has a clear interest in ensuring its residents can make informed, environmentally sound consumer decisions about companies that do business in the state, particularly when so many companies make unverified climate "pledges" that may help sell products without making a meaningful difference. This bill's reporting requirement and resulting academic assessment of the reported emissions will inform California and its residents with about the full scope of GHG emissions from the country's largest companies that profit from California's substantial market power, as well as whether those companies are reducing emissions on a year-to-year basis. For companies, the knowledge that their emissions will be publicly available might encourage them to take meaningful steps to reduce GHG emissions.

For the second prong—whether the burden imposed by the reporting requirement is clearly excessive in relation to the benefit—the answer is likely no. The bill does not impose any new *restrictions* on GHG emissions—covered companies are required only to tabulate and report on what is already there, i.e., their enterprise-wide GHG emissions. Moreover, the bill limits its application to only the most profitable

---

[18] U.S. Const., art. I, § 8, cl. 3.
[19] *See Gibbons v. Ogden* (1824) 22 U.S. 1.
[20] *E.g.*, *Dean Milk Co. v. Madison* (1951) 340 U.S. 349, 354.
[21] *South Dakota v. Wayfair, Inc.* (2018) 138 S.Ct. 2080, 2091.

(182 of 292) Page 182 of 292Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 182 of 292
Case 2:24-cv-00801-ODW-PVC   Document 48-10   Filed 05/24/24   Page 14 of 21   Page ID
#:595

SB 253 (Wiener)
Page 13 of 20

companies in the country and which do business in California, so the added economic
cost of tabulating and auditing scope 1, 2, and 3 GHG emissions is unlikely to impose a
significant burden on the affected companies.[22] By comparison, California reaches out
and requires out-of-state companies to pay state sales taxes when their revenues exceed
$610,395 in California;[23] imposing a GHG reporting requirement only on companies
with annual revenues in excess of $1 billion appears to be a proportional burden.[24]

This bill, unlike SB 260, also explicitly allows scope 3 emissions to be calculated using
approved indirect methods, such as using industry average data, proxy data, and other
generic data. As the Senate Environmental Quality Committee's analysis notes, this
mode of calculation is still a nontrivial endeavor, but this bill's express allowance of
indirect calculation methods significantly simplifies the reporting requirement as
compared to SB 260.

The bill's opponents argue that the economic impact of GHG reporting will be felt by
smaller companies to the extent those companies' emissions will have to be counted as
part of the reporting companies' scope 3 emissions. As an initial matter, as discussed in
Part 3, many of the companies covered by this bill are already required, or may soon be
required, to report material scope 3 emissions, so it is unclear how many new burdens
this bill will impose. It is also unclear to what extent smaller companies will need to be
involved in reporting companies' calculations of scope 3 emissions, because the bill
authorizes a reporting entity to use industry data and other generic data in its scope 3
calculations. The use of indirect scope 3 calculation methods should significantly reduce
the bill's burden on small and medium companies and, in turn, decrease the likelihood
that the burden imposed by the bill is clearly excessive in relation to the benefits
conferred. The author and stakeholders are continuing to discuss possible amendments
that could provide additional clarity with respect to how scope 3 emissions may be
calculated.

6.   Arguments in support

According to a coalition of over 50 organizations, including the bill's sponsors:

> Many communities in California are on the front lines of the climate crisis, facing
> the human impacts head-on…And while all of California is impacted, we know

---

[22] Research conducted on 14,400 publicly listed companies in 77 countries between 2005 and 2018 shows
that voluntarily disclosing emissions actually reduces the cost of capital for the companies that do so, and
provides greater market efficiency overall. (Bolton & Kacperczyk, *Signaling Through Carbon Disclosure*,
Harvard Law School Forum on Corporate Governance (Mar. 30, 2021),
https://corpgov.law.harvard.edu/2021/03/30/signaling-through-carbon-disclosure/).
[23] Rev. & Tax. Code, §§17041,  23101, 23151.
[24] California also already imposes extra-territorial reporting requirements, including requiring
manufacturers and retail sellers with $100 million in gross revenue that do business in the state to
disclose on their websites their efforts, if any, to prevent slavery and human trafficking within their
supply chains. (Civ. Code, § 1714.43.)

SB 253 (Wiener)
Page 14 of 20

that climate impacts fall disproportionately on low-income communities and on Black people, Indigenous people, and People of Color. Yet the very corporations who are most responsible for the pollution which has caused the climate crisis ask individuals to make changes in their own lives to solve the problem, rather than own the responsibility to change their own practices.

This crisis is the direct result of the cumulative and growing emissions of [GHG] into our atmosphere and the private sector continues to play an outsized role in contributing to the crisis. For example, we know that 100 active fossil fuel producers are linked to 71% of global industrial GHG emissions since 1988. But the full picture of corporate climate emissions remains fragmented, complete, and unverified. When we do get corporate disclosures, they are often limited to a corporation's operations and other direct emissions, but supply chain emissions are now estimated to be 11.4 times more than a company's direct emissions from their direct operations on average. Without specific and comprehensive data detailing the sources and levels of corporate pollution, and whether emissions are increasing or decreasing, we will remain unable to effectively regulate, reduce, and restrict these sources of climate pollution that are threatening California and its residents.

By requiring reporting of both direct emissions from these corporations, and any emissions produced from their supply chains and other indirect emissions, SB 253 creates the data infrastructure to drive down corporate carbon emissions. This mandate of comprehensive climate pollution transparency would be the first in the nation and would establish a public right to know which companies are polluting our environmental commons, how much they are emitting, and if they are decreasing—or increasing—their climate emissions, offering a transparent and public way of verifying corporate claims of climate leadership.

7. <u>Arguments in opposition</u>

According to a coalition of over 60 organizations writing in opposition:

Requiring reporting and limiting emissions associated with a company's entire supply chain will necessarily require that large businesses stop doing business with small and medium businesses that will struggle to accurately measure their greenhouse gas emissions let alone meet ambitious carbon emission requirements, leaving these companies without the contracts that enable them to grow and employ more workers. Further, the inability to meet the emission objectives may fall outside of the sphere of influence of small and medium businesses as the technology to transition to carbon neutrality may not yet even exist for their line of business. Yet, they will be subject to increasing costs and the potential loss of market opportunity. Forcing companies to make these decisions

(184 of 292) Page 184 of 292
Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 184 of 292
Case 2:24-cv-00801-ODW-PVC   Document 48-10   Filed 05/24/24   Page 16 of 21   Page ID
#:597

SB 253 (Wiener)
Page 15 of 20

would have the effect of consolidating market share in the largest of companies rather than fostering competition and growth of smaller industries…

At this juncture, Scope 3 emissions reporting is more of an art than it is a science. Due to the likelihood of double counting, assessing Scope 3 emissions data with any degree of accuracy is not yet possible. For example, the guidelines were updated last fall to focus on Scope 3 emissions associated with land use and biogenic carbon and thus will impact Scope 3 emissions data for any materials derived from bio-based sources such as food/agricultural materials, etc. These updated guidelines not only underscore that Scope 3 emissions data reporting is still in its infancy stage, but it also raises compliance issues in terms of what guidance reporting entities must follow in the event the guidance, or portions thereof, are in the process of being updated in the future. Further, the State of California itself via CalPERS has requested at the Securities and Exchange Commission's (SEC) ongoing rulemaking process relating to climate-related disclosures that the information disclosed should be "material" to a financial investment.

Finally, we are not aware of any statutory authority that would provide the [CARB] the authority to regulate foreign and out-of-state companies delivering goods to California. It seems likely that out-of-state or non-California companies would challenge such authority. Because of this uncertainty, the burden will fall on California-based companies, giving out-of-state and foreign companies a market advantage, driving production out-of-state and increasing the cost of goods for California residents…California should continue to implement and build upon existing programs and policies to regulate in-state emissions rather than seek to obtain emissions data throughout the international supply chain, especially seeing how it would have no authority to regulate emissions beyond the California border.

### **SUPPORT**

California Environmental Voters (co-sponsor)
Carbon Accountable (co-sponsor
Ceres (co-sponsor)
Sunrise Movement Bay Area (co-sponsor)
The Greenlining Institute (co-sponsor)
350 Bay Area Action
350 Conejo/San Fernando Valley
350 Sacramento
350Marin.org
1000 Grandmothers for Future Generations
Active San Gabriel Valley
Alameda County Democratic Party

(185 of 292)  Page 185 of 292 Case: 25-5327  09/18/2025  DktEntry: 8.9  Page 185 of 292
Case 2:24-cv-00801-ODW-PVC  Document 48-10  Filed 05/24/24  Page 17 of 21  Page ID
#:598

SB 253 (Wiener)
Page 16 of 20

Arcadia
Asian Pacific Environmental Network
Avocado Green Brands
California Alliance for Retired Americans
California Interfaith Power & Light
California Nurses for Environmental Health and Justice
California Public Interest Research Group
California Reinvestment Coalition
Californians Against Waste
Californians for Energy Choice
Center for Biological Diversity
Center for Climate Change and Health
Citizens' Climate Lobby Santa Cruz
CleanEarth4Kids.org
Climate Action California
Climate Action Campaign
Climate Equity Policy Center
Climate Hawks Vote
ClimatePlan
Coalition for Clean Air
Dignity Health
Elders Climate Action
Environmental Defense Fund
Environmental Working Group
Everlane
Fossil Free California
Friends Committee on Legislation of California
Friends of the Earth
Green New Deal at UC San Diego
Greenbelt Alliance
Grove Collaborative
Hammond Climate Solutions Foundation
Human Impact Partners
IKEA USA
Los Angeles County Democratic Party
Mono Lake Committee
Move LA
Natural Resources Defense Council
Patagonia
Pesticide Action Network
Planning and Conservation League
Sacramento Area Congregations Together
San Diego 350
San Fernando Valley Climate Reality Project

(186 of 292) Page 186 of 292
Case: 25-5327 09/18/2025 DktEntry: 8.9 Page 186 of 292
Case 2:24-cv-00801-ODW-PVC Document 48-10 Filed 05/24/24 Page 18 of 21 Page ID #:599

SB 253 (Wiener)
Page 17 of 20

San Francisco Baykeeper
SEIU California
Sierra Club California
Sierra Nevada Brewing Co.
Sunflower Alliance
Sunrise Movement San Diego
The Climate Center
Transformative Wealth Management, LLC
University Professional & Technical Employees
Voices for Progress
One individual

## OPPOSITION

Advanced Medical Technology Association
African American Farmers of California
Agricultural Council of California
Agricultural Energy Consumers Association
American Beverage Association
American Chemistry Council
American Composites Manufacturers Association
American Pistachio Growers
American Property Casualty Insurance Corporation
Antelope Valley Chambers of Commerce
Association of California Life and Health Insurance Companies
Association of General Contractors
B. Braun Medical Inc.
Building Owners and Managers Association
Cal Asian Chamber of Commerce
California Apartment Association
California Apple Commission
California Bankers Association
California Blueberry Association
California Blueberry Commission
California Building Industry Association
California Business Properties Association
California Cattlemen's Association
California Cement Manufacturers Environmental Coalition
California Chamber of Commerce
California Construction and Industrial Materials Association
California Cotton Ginners and Growers Association
California Date Commission
California Food Producers
California Fresh Fruit Association

**ER-1937**

SB 253 (Wiener)
Page 18 of 20

California Fuels and Convenience Alliance
California Hispanic Chamber of Commerce
California Independent Petroleum Assocation
California Life Sciences
California Manufacturers and Technology Association
California Poultry Federation
California Restaurant Association
California Retailers Association
California Trucking Association
California Walnut Commission
California Water Association
CalCIMA
CalTax
Carlsbad Chamber of Commerce
Chemical Industry Council of California
Chino Valley Chamber of Commerce
Citrus Heights Chamber
Costa Mesa Chamber of Commerce
Danville Area Chamber of Commerce
Far West Equipment Dealers Association
Financial Services Institute
Greater High Desert Chamber of Commerce
La Cañada Flintridge Chamber of Commerce
Long Beach Area Chamber of Commerce
Los Angeles Area Chamber of Commerce
National Association of Industrial and Office Properties
National Association of Mutual Insurance Companies
Nisei Farmers League
North San Diego Business Chamber of Commerce
Oceanside Chamber of Commerce
Olive Growers Council of California
Orange County Business Council
Pacific Merchant Shipping Association
Palos Verdes Peninsula Chamber of Commerce
Personal Insurance Federation of California
Plumbing Manufacturers International
Rancho Cordova Chamber of Commerce
Santa Barbara South Coast Chamber of Commerce
Santee Chamber of Commerce
Securities Industry and Financial markets Association
Specialty Equipment Market Association
Tenaska
TechNet
Torrance Area Chamber of Commerce

SB 253 (Wiener)
Page 19 of 20

Truck and Engine Manufacturers Association
Walnut Creek Chamber
West Precast Prestressed Concrete Institute
West Ventura County Business Alliance
Western Agricultural Processors Association
Western Growers Association
Western Plant Health Association
Western States Petroleum Association
Wine Institute

## <u>RELATED LEGISLATION</u>

<u>Pending Legislation:</u>

SB 390 (Limón, 2023) makes it unlawful for a person to certify or issue a voluntary carbon offset, to maintain on a registry a voluntary carbon offset, or to market, make available or offer for sale, or sell a voluntary carbon offset if the person knows or should know that the greenhouse gas reductions or greenhouse gas removal enhancements of the offset project related to the voluntary carbon offset are unlikely to be quantifiable, real, additional, and permanent. SB 390 is pending before the Senate Environmental Quality Committee.

SB 261 (Stern, 2023) requires businesses with total annual revenues over $500,000,000 and doing business in California to report the institution's climate-related financial risk and the measures it has taken to reduce and adapt to those risks; and requires the Climate-Related Risk Disclosure Advisory Group to review the information submitted by the covered businesses and annually report to the public on the data received and proposals for regulatory actions or reforms needed to mitigate climate-related financial risks. SB 261 is pending before this Committee.

SB 252 (Gonzalez, 2023) prohibits the boards of the Public Employees' Retirement System and the State Teachers' Retirement System from making new investments or renewing existing investments of public employee retirement funds in a fossil fuel company, as defined, and would require the boards to liquidate investments in a fossil fuel company on or before July 1, 2030. SB 252 is pending before the Senate Labor, Public Employment, and Retirement Committee.

<u>Prior Legislation:</u>

SB 449 (Stern, 2021) would have required certain California-based financial institutions to prepare and disclose climate-related financial risk reports disclosing the institution's climate-related financial risk and its measures to reduce and adapt to those risks; and established the Climate Change Financial Risk Task Force require certain California-based financial institutions to review the institutions' reports and prepare analysis of

**ER-1939**

(189 of 292)  Page 189 of 292 Case: 25-5327  09/18/2025  DktEntry: 8.9  Page 189 of 292
Case 2:24-cv-00801-ODW-PVC  Document 48-10  Filed 05/24/24  Page 21 of 21  Page ID
#:602

SB 253 (Wiener)
Page 20 of 20

the systemic and sector-wide climate-related financial risk. SB 449 died in the Senate Appropriations Committee.

SB 260 (Wiener, 2021) would have required the CARB to develop regulations to require a reporting entity—defined as a business entity with total annual revenues over one billion dollars that does business in California—to report to an emissions registry, as defined, their Scope 1, Scope 2, and Scope 3 emissions, as defined. The bill also would have required the ARB to prepare a report by January 1, 2026, on those disclosures, and it requires the emissions registry to establish a public data platform to view the disclosures. SB 260 died on the Assembly Floor.

SB 775 (Wieckowski, 2017) would have imposed legislatively mandated requirements for the State's emissions cap-and-trade program adopted by the CARB under the California Global Warming Solutions Act of 2006 and created several funds to accomplish climate-change-related goals. SB 775 was held in the Senate Environmental Quality Committee.

AB 1516 (Cunningham, Ch. 561, Stats. 2017) required the CARB to adopt regulations requiring the monitoring and reporting of GHG emissions within the state, including accounting for GHG emissions from all electricity sources within the state.

AB 617 (Cristina Garcia, Ch. 136, Stats. 2017) required the CARB to establish a uniform, statewide system for stationary sources to report their emissions of pollutants and toxic air contaminants; created an expedited schedule for certain facilities covered under the state's cap-and-trade program to implement best achievable retrofit control technology for criteria pollutants and toxic air contaminants; required CARB to establish a clearinghouse of information on best achievable control technology and best achievable retrofit control technology; increased civil and criminal penalties for certain types of emissions; and created community emissions reduction programs for communities with a heavy exposure to criteria pollutants and toxic air contaminants.

AB 398 (Eduardo Garcia, Ch. 135, Stats. 2017) set legislatively mandated requirements for the State's emissions cap-and-trade program adopted by the CARB under the California Global Warming Solutions Act of 2006 and extended certain tax relief to businesses to help offset the costs of complying with reduced emissions requirements.

### PRIOR VOTES:

Senate Environmental Quality Committee (Ayes 4, Noes 2)

***************

# Exhibit 6

Transcript of September 11, 2023
California Assembly Floor Session,
05:13:50-05:32:50

Declaration of Bradley J. Hamburger In Support Of
Plaintiffs' Motion for Summary Judgment on Claim I
May 24, 2024

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.*,
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)

Page 1

1

2

3

4

5

6

7

8

9

10

11    9/11/2023 Assembly Floor Session

12

13    https://www.assembly.ca.gov/media/assembly-floor-

14    session-20230911

15    05:13:50 - 05:32:50

16

17

18

19

20

21

22

23

24

25

(192 of 292) Page 192 of 292
Case: 25-5327  09/18/2025  DktEntry: 8.9  Page 192 of 292
Case 2:24-cv-00801-ODW-PVC  Document 48-9  Filed 05/24/24  Page 3 of 30  Page ID #:554

Page 2

1          SPEAKER PRO TEMPORE CECILIA M. AGUIAR-

2     CURRY:  Moving to File Number 198, SB 253.

3     Clerk will read.

4          CLERK:  Senate Bill 253, by Senator

5     Wiener and others, (indiscernible) greenhouse

6     gasses and making an appropriation, therefore.

7          SPEAKER PRO TEMPORE CECILIA M. AGUIAR-

8     CURRY:  Assembly Member Ward, you have been

9     recognized.

10         ASSEMBLY MEMBER CHRISTOPHER WARD:

11    Thank you, Madam Speaker and Members.  SB 253 is

12    introduced, the Climate Corporate Data

13    Accountability Act, which would require all U.S.

14    based companies with over $1 billion in annual

15    revenue who do business in California to report

16    their full greenhouse gas footprint to the

17    California Air Resources Board.  That's what it

18    does.  This data, along with the accompanying

19    report, will then be published on a public facing

20    website for all Californians to see.

21         Now, you can't regulate what you don't

22    know, and as the State continues to curb its

23    emissions across public sectors, we have a clear

24    idea of what work is remaining and what action

25    needs to be taken to continue progress.  However,

Page 3

1   the same can't be said today for the private

2   sector.

3           Currently, emissions reporting

4   requirements are limited to large point source

5   emitters, leaving out vast swaths of private

6   emitters.  Some companies do voluntarily report

7   certain emissions, and we are grateful for that,

8   but it's difficult to be certain of a report's

9   validity.

10          Many corporations offer only partial

11  reports to the public or they section off parts

12  of their operations to display to the public.  So

13  the lack of verification and uniformity allows

14  for manipulation and misrepresentation of the

15  data.

16          Customers and policymakers are left

17  with no further information beyond the public

18  facade put on by a company-backed emissions

19  disclosure.  Companies continue to set and

20  achieve ambitious climate goals for themselves,

21  but without full transparency, without full

22  verification of their data, and without public

23  documentation of their missions, how can we be

24  sure that their claims are accurate?

25          So, SB 253 will allow for that much

Page 4

1  needed transparency by requiring full disclosure

2  of emissions from all covered entities.  This

3  means that companies must disclose direct

4  emissions from their activities and indirect

5  emissions from their supply chain and other

6  sources.

7      Shining a light onto the world of

8  corporate emissions reporting will ensure that

9  those who are correctly reporting will have

10  minimal work to be aligned with SB 253, but will

11  expose some of the actors using unregulated

12  emissions disclosures in bad faith.

13      Although SB 253 will certainly push

14  some companies into new territory, this bill will

15  not reinvent the wheel.  We are directing CARB to

16  consult and consider the guidelines and protocols

17  that are already established and recognized as

18  the international standard.

19      Additionally, the author has made

20  explicit in the bill that secondary data and

21  estimates can be used for the Scope 3.  This is

22  in line with other emissions disclosure

23  requirements and ensures that a company can

24  comply with SB 253 without ever speaking to or

25  engaging a member of their supply chain.  The

Page 5

1   burden is entirely on the billion dollar company

2   to do the reporting.

3           SB 253 will allow for consumers to have

4   a better understanding of the impact of household

5   brands and big companies that they know.  It will

6   provide the ability to make a decision between

7   one product and another, as manufacturers'

8   emissions will be displayed and easily

9   understandable online.  And most of all, it will

10  allow consumers to see which corporations are

11  making progress and which are causing California

12  to potentially lie behind in emissions reductions

13  in our climate goals.

14          With that, I respectfully request your

15  aye vote on SB 253.

16          SPEAKER PRO TEMPORE CECILIA M. AGUIAR-

17  CURRY:  Assembly Member Zbur, you are recognized.

18          ASSEMBLY MEMBER RICK CHAVEZ ZBUR:

19  Madam Speaker, Members, today I rise in strong

20  support of SB 253, the Climate Corporate Data

21  Accountability Act, the top priority of

22  California environmental voters, and a bill that

23  the "Los Angeles Times" described as

24  "groundbreaking legislation with the potential to

25  reach far beyond California's borders by forcing

(196 of 292) Page 196 of 292
Case: 25-5327 09/18/2025 DktEntry: 8.9 Page 196 of 292
Case 2:24-cv-00801-ODW-PVC Document 48-9 Filed 05/24/24 Page 7 of 30 Page ID #:558

Page 6

1   some of the world's biggest businesses to be

2   honest about the damage they might be causing."

3            SB 253 will once again demonstrate

4   California's historic leadership in confronting

5   the crisis that is before us and move the nation

6   and the world to save our planet for our kids

7   before it's too late.

8            I want to focus my comments on the

9   issue of why this bill is so important and why

10  it's so important to include Scope 3 emissions in

11  the required climate reporting.  The bill sets up

12  a standard reporting regime that requires the

13  largest companies operating in our state with

14  over $1 billion in sales to publicly report their

15  annual greenhouse gas emissions to the California

16  Air Resources Board.

17           These are the companies that are making

18  the real decisions that will determine whether we

19  are successful in saving our planet.  A lot of

20  talk has been around what are called Scope 3

21  emissions.  These are the emissions that result

22  from the decisions these large companies make

23  regarding the raw materials, components and

24  supplies upstream, which they purchase and use to

25  make their products or supply their services, and

Page 7

1    the downstream emissions that result from the

2    goods and services that they sell.

3            These companies are the drivers of what

4    their suppliers do upstream and they can drive

5    change by asking their suppliers to take steps to

6    reduce their carbon footprints.  Or they could

7    decide to source supplies and components with

8    lower carbon footprints.

9            On the downstream side, these companies

10   could devise ways to invest, manufacture and

11   market lower carbon products.  This bill

12   standardizes the measurements of these emissions,

13   makes them transparent, and gives companies a

14   huge incentive to take steps to reduce their

15   entire life cycle carbon footprints.

16           When I was talking with my kids about

17   this this weekend, they asked me how these

18   companies can reduce emissions of their products

19   if they aren't keeping track of what they are,

20   and said that they want to know which companies

21   are taking steps to protect our planet and which

22   aren't.

23           This bill is hugely supported by the

24   public, with 82 percent of Americans supporting

25   this kind of reporting.  And because people

(198 of 292) Page 198 of 292
Case: 25-5327 09/18/2025 DktEntry: 8.9 Page 198 of 292
Case 2:24-cv-00801-ODW-PVC Document 48-9 Filed 05/24/24 Page 9 of 30 Page ID #:560

Page 8

1    understand that if we are not measuring

2    emissions, we don't have the tools to do better.

3            Some opponents have characterized this

4    bill as merely paper pushing that won't reduce

5    carbon.  That claim could not be further from the

6    truth.  This bill may be the most important thing

7    we can do since AB 32 in the fight to address the

8    crisis of climate change.

9            A number of folks have expressed

10   concern that including the Scope 3 emissions is

11   too difficult or raises too much enforcement risk

12   for companies because it's a new program.  To

13   that, I'd say that this only applies to companies

14   with $1 billion in revenue, and the average

15   estimated cost of this work is less than

16   $250,000, or .025 percent of their annual

17   revenue, nothing more than a blip in their

18   accounting sheets.

19           I have great confidence in the

20   ingenuity of American business to solve our

21   toughest challenges, just like they did in World

22   War II.  And we now need them to be a part of

23   this fight to save our planet.

24           Second, the bill builds on decades of

25   work in developing protocols to estimate

(199 of 292)  Page 199 of 292
Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 199 of 292
Case 2:24-cv-00801-ODW-PVC  Document 48-9  Filed 05/24/24  Page 10 of 30  Page ID
#:561

Page 9

1   emissions.  There are today already detailed

2   emissions reporting protocols for almost every

3   industry on how to estimate and report Scope 3

4   emissions.  For the areas in which there are

5   gaps, the bill delegates to carve the

6   responsibility to develop regulations that will

7   fill in the gaps.  That regulatory direction also

8   requires them to avoid duplication with other

9   reporting laws that may be developed in the EU

10  and elsewhere.

11          On top of that, the author and sponsor

12  last Thursday took significant amendments to

13  respond to the concerns of businesses and many of

14  our colleagues today that essentially remove the

15  risk of penalties out into the future by eight

16  years until the 2030 reporting year.

17          And beyond 2030, the bill provides --

18  and I quote -- "A reporting entity shall not be

19  subject to an administrative penalty under this

20  section for any misstatements with regard to

21  Scope 3 emissions disclosures made with a

22  reasonable basis and disclosed in good faith."

23  And that applies even after 2030.

24          SPEAKER PRO TEMPORE CECILIA M. AGUIAR-

25  CURRY:  Thirty seconds.

Page 10

1           ASSEMBLY MEMBER RICK CHAVEZ ZBUR:  On

2    top of that, CARB has a regulatory safety valve

3    that they have.  To sum it up, this bill is

4    hugely important.  Our Federal government is

5    mired in dysfunction, and we know that Congress

6    can't fix this.  Once again, as we've done before

7    on climate, civil rights, and LGBTQ rights,

8    California can lead the way.

9           As you make this decision, I ask you to

10   think about your kids, our kids, and the planet

11   that we are leaving them.  I ask you to think

12   about whether our business community --

13           SPEAKER PRO TEMPORE CECILIA M. AGUIAR-

14   CURRY:  Time.

15           ASSEMBLY MEMBER RICK CHAVEZ ZBUR:  --

16   the most innovative in the world, is asking too

17   much to be partners in this fight.  I

18   respectfully ask for your aye vote.

19           SPEAKER PRO TEMPORE CECILIA M. AGUIAR-

20   CURRY:  Assembly Member Kalra, you are

21   recognized.

22           ASSEMBLY MEMBER ASH KALRA:  Thank you,

23   Madam Speaker.  I'm proud to stand in support of

24   the SB 253, the Climate Corporate Data

25   Accountability Act.  It's no secret that the

Page 11

```
 1    corporate sector is responsible for an enormous

 2    portion of total greenhouse gas emissions.  What

 3    we don't know is exactly how much they generate

 4    and where this generation is occurring in their

 5    supply chains.  SB 253 will shine a light on this

 6    mystery, giving us a better idea of the true

 7    scope of corporate greenhouse gas emissions.

 8            Unfortunately, this bill has been

 9    smeared by misinformation, including claims that

10    its reporting requirements will hurt businesses.

11    And this is simply not true.  The bill only

12    imposes reporting requirements on the businesses

13    earning over a billion dollars annually, and many

14    of them are already partially reporting their

15    greenhouse gas emissions.

16            In fact, a number of them have come out

17    in support of the bill, including Patagonia,

18    Microsoft, Apple, IKEA and many companies,

19    including California-based companies, already

20    have goals for zero emissions.

21            Furthermore, this bill offers

22    corporations flexibility in reporting emissions

23    derived from indirect, upstream and downstream

24    sources.  They will not have to rely on data

25    sourced from the smaller businesses they work
```

Page 12

```
 1   with.

 2            You know, an extensive study has shown

 3   that over the last 35 years, 100 companies have

 4   been responsible for 71 percent of global

 5   emissions.  We can't -- not only can we not hide

 6   from the issue of climate change, it's actually

 7   we've created so much damage that some of it's

 8   irreversible.  The question is when are we going

 9   to get this urgency that it deserves?

10            Our children and grandchildren are

11   going to face the world that we give them and

12   they're going to ask what did we do?  The next

13   generation of legislators will be standing on

14   this floor.  Either they're going to be dealing

15   with a mess that is beyond repair, or they're

16   going to be given today a path; a path towards a

17   future that has them continuing on a journey to

18   combat climate change and to ensure that our

19   companies are the most innovative in the world.

20            Let's not forget the opportunities that

21   exist when our companies are taking the lead

22   towards zero emissions, or at least taking the

23   lead to reducing their carbon footprint.

24   Consumers deserve to know.  We know how much we

25   spend and how much energy we use every month.  We
```

(203 of 292) Page 203 of 292Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 203 of 292
Case 2:24-cv-00801-ODW-PVC   Document 48-9   Filed 05/24/24   Page 14 of 30   Page ID
#:565

Page 13

```
 1   deserve to know what decisions we're making with

 2   our purchasing power, and we want our companies

 3   to be the best in the world in terms of combating

 4   the climate change.  And it's not an existential

 5   threat.  It's a current threat, as we see around

 6   the world the catastrophes are happening in every

 7   single corner of this world.

 8            California can lead.  California should

 9   lead.  SB 253 is a common sense bill that gives

10   us another tool to wield in our fight against

11   climate change.  Clear and accessible

12   information.

13            I ask you to support this bill today

14   and look forward to standing in support of the

15   future climate solutions that it inspires.

16            SPEAKER PRO TEMPORE CECILIA M. AGUIAR-

17   CURRY:  Assembly Member Wicks, you are

18   recognized.

19            ASSEMBLY MEMBER BUFFY WICKS:  Thank

20   you, Madam Speaker, Members.  I wasn't going to

21   speak today, but I wanted to rise in support of

22   SB 253 as a mom.  I have a six-year-old and a

23   three-year-old.  And when I think about the world

24   that they are inheriting, that we did, it is time

25   that we fix this problem.  And that starts with
```

Page 14

1    transparency.  Basic sunlight on issues.  That's

2    what we're talking about.  Data, so we understand

3    what is happening, what our corporate partners

4    are doing to our communities.  And many of them

5    want to lead the way.

6              You know, when we think about these

7    tough challenges, climate change, it's our

8    individual responsibility to take action.  I

9    thought about this.  I just bought an EV for the

10   first time and I was talking to my six-year-old

11   about it.  And she said, oh, I'm so excited that

12   we're not going to have a car that puts pollution

13   into the air, because she said, mommy, you know,

14   the polar bears don't have any ice blocks to rest

15   on and the ice caps are melting, and so are they

16   going to rest when they're trying to hunt?  And

17   she's six years old, right?  And those are the

18   conversations she's having with me.

19             So it's incumbent upon us to have those

20   individual conversations and take individual

21   action.  It's incumbent upon our government to

22   take action to force regulation.  And it's

23   incumbent upon our corporations and our business

24   community and our private sector to lead the way.

25             And many of these companies want to do

Page 15

1   that.  That's why we have Google, Salesforce,

2   Microsoft supporting.  But not just tech

3   companies.  Levis, they have complicated supply

4   chain issues.  IKEA, Apple, Patagonia.  These are

5   companies that want to lead the way.  They are

6   supporting this bill.

7             So I know the argument is, oh, business

8   doesn't want it.  Well, guess what?  These

9   companies want it.  They're signing up.  They're

10  saying, yes, California can and should lead the

11  way.  We have led the way.  Remember, emission

12  standards in the 70s?  It's obvious that

13  California should lead the way.  We always lead

14  the way on the environment.

15            So, if you care about the future that

16  we're leaving for our children, and I do

17  selfishly as a mom, then you will vote to support

18  this bill.  We should continue to lead the way.

19  We should be global leaders.  We go to COP.  We

20  go to these international conferences and what do

21  we brag about?  All the good work that we're

22  doing here in California?

23            This is the most consequential

24  environmental piece of legislation you're going

25  to vote on this year in the Assembly.  The most

Page 16

1    consequential.  So I respectfully ask for an aye

2    vote.

3                SPEAKER PRO TEMPORE CECILIA M. AGUIAR-

4    CURRY:  Assembly Member Ward, would you like to?

5                ASSEMBLY MEMBER CHRISTOPHER WARD:

6    Thank you, Madam Speaker.  I want to thank

7    comments from my colleagues as well, and I

8    probably could not under score it better than

9    they already have about why it is so critical

10   that this bill passes.

11               And there's been a lot of

12   misinformation out there, and I know this is the

13   author's, I think, second attempt working out a

14   variation of this bill.  But it's so critical

15   that we pass this.

16               It's really straightforward when you

17   cut through a lot of the noise and a lot of the

18   disinformation.  This is a reporting bill and it

19   helps us to standardize measurements that are

20   already available on the international stage.

21               And why is that critical?  Well, we

22   here in California have been trying to hold

23   ourselves, our governments, from the State down

24   to the local governmental level, accountable for

25   measuring and then challenging ourselves to

Page 17

1    reduce some of those emissions.  But of course, a

2    lot of this activity is born from private sector

3    activities.  And that's okay.  That builds a

4    great economy and we're very proud of that.

5             But to not even know, to not even

6    understand what company X is producing in the

7    terms of a million tons of carbon dioxide

8    emissions in a year, that's a standard which

9    would then challenge themselves to say, okay, if

10   I'm at a million this year, how do I get down to

11   800,000 next year?  How do I get down to 600,000

12   the year after that?  And that really systemizes

13   as the measurements that they take a huge

14   responsibility in the totality of carbon

15   emissions that we're seeing in -- that we see

16   coming through activities in our state. That's

17   them doing their part.

18            So we can't even begin to start to

19   measure that until we have SB 253 in place.  That

20   really sets the standard.  Again, many companies

21   are supporting this bill and many companies are

22   already doing the right thing to be able to try

23   to accurately measure and then challenge

24   themselves to reduce that, reduce their

25   emissions.

Page 18

1           And so this would create that
2     systemized approach that would allow, not small
3     mom and pops, but million to billion dollar
4     corporations across our state to be able to
5     adhere to some of those very same standards as
6     well.
7           The author has dug in deep to really
8     make sure that amendments are addressing the
9     concerns that are out there, amendments on what
10    it looks like for CARB's regulations, what the
11    phase-in requirements are going to look like.
12    That there would be a cap on penalties.  And more
13    importantly, that there's a safe harbor
14    provision.
15          We know that honest mistakes can be
16    made.  But we do not -- in California, our policy
17    should be to not look the other way when there
18    are bad actors out there miscalculating what
19    their impact is and not holding themselves
20    accountable, not allowing the public to hold
21    themselves accountable.
22          So I ask you to think about again how
23    simple this bill actually is on its face and what
24    a difference it will make for us to be able to
25    meet our climate goals, because we are out of

Page 19

1    time.  And so we have to be able to -- I hope

2    that we can almost universally agree on that,

3    that we are out of time on addressing the climate

4    crisis.  This will absolutely help us take a leap

5    forward to be able to hold ourselves accountable

6    and start to begin to meet those reductions that

7    we are seeking over the coming decade.  I

8    respectfully ask for your I vote.

9              SPEAKER PRO TEMPORE CECILIA M. AGUIAR-

10   CURRY:  Clerk, open the roll.  All those vote who

11   desire to vote.  All those vote who desire to

12   vote.  All those vote who desire to vote.

13   Members, it's a 41 vote.

14              All those vote who desire to vote.  All

15   those vote who desire to vote.  All those vote

16   who desire to vote.  Clerk, close the roll.

17              Ayes 41, noes 20.  Measure passes.

18

19

20

21

22

23

24

25

Page 20

1              C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certify that the

4    foregoing transcript is a true and accurate

5    record of the proceedings.

6

7

8    _Sonya M. Ledanski Hyde_

9    _____

10

11   Veritext Legal Solutions

12   330 Old Country Road

13   Suite 300

14   Mineola, NY 11501

15

16   Date: May 21, 2024

17

18

19

20

21

22

23

24

25

[025 - aye]                                                          Page 1

| 0 | 6 | | |
|---|---|---|---|
| **025**  8:16 | **600,000**  17:11 | **achieve**  3:20 | **american**  8:20 |
| **05:13:50**  1:15 | **7** | **act**  2:13 5:21 | **americans**  7:24 |
| **1** | **70s**  15:12 | 10:25 | **angeles**  5:23 |
| **1**  2:14 6:14 | **71**  12:4 | **action**  2:24 | **annual**  2:14 |
| 8:14 | **8** | 14:8,21,22 | 6:15 8:16 |
| **100**  12:3 | **800,000**  17:11 | **activities**  4:4 | **annually**  11:13 |
| **11501**  20:14 | **82**  7:24 | 17:3,16 | **apple**  11:18 |
| **12151**  20:8 | **9** | **activity**  17:2 | 15:4 |
| **198**  2:2 | **9/11/2023**  1:11 | **actors**  4:11 | **applies**  8:13 |
| **2** | **a** | 18:18 | 9:23 |
| **20**  19:17 | **ab**  8:7 | **actually**  12:6 | **approach**  18:2 |
| **20230911**  1:14 | **ability**  5:6 | 18:23 | **appropriation** |
| **2024**  20:16 | **able**  17:22 18:4 | **additionally** | 2:6 |
| **2030**  9:16,17,23 | 18:24 19:1,5 | 4:19 | **areas**  9:4 |
| **21**  20:16 | **absolutely**  19:4 | **address**  8:7 | **argument**  15:7 |
| **250,000**  8:16 | **accessible** | **addressing** | **ash**  10:22 |
| **253**  2:2,4,11 | 13:11 | 18:8 19:3 | **asked**  7:17 |
| 3:25 4:10,13 | **accompanying** | **adhere**  18:5 | **asking**  7:5 |
| 4:24 5:3,15,20 | 2:18 | **administrative** | 10:16 |
| 6:3 10:24 11:5 | **accountability** | 9:19 | **assembly**  1:11 |
| 13:9,22 17:19 | 2:13 5:21 | **agree**  19:2 | 1:13 2:8,10 |
| **3** | 10:25 | **aguiar**  2:1,7 | 5:17,18 10:1 |
| **3**  4:21 6:10,20 | **accountable** | 5:16 9:24 | 10:15,20,22 |
| 8:10 9:3,21 | 16:24 18:20,21 | 10:13,19 13:16 | 13:17,19 15:25 |
| **300**  20:13 | 19:5 | 16:3 19:9 | 16:4,5 |
| **32**  8:7 | **accounting** | **air**  2:17 6:16 | **attempt**  16:13 |
| **330**  20:12 | 8:18 | 14:13 | **author**  4:19 |
| **35**  12:3 | **accurate**  3:24 | **aligned**  4:10 | 9:11 18:7 |
| **4** | 20:4 | **allow**  3:25 5:3 | **author's**  16:13 |
| **41**  19:13,17 | **accurately** | 5:10 18:2 | **available**  16:20 |
| | 17:23 | **allowing**  18:20 | **average**  8:14 |
| | | **allows**  3:13 | **avoid**  9:8 |
| | | **ambitious**  3:20 | **aye**  5:15 10:18 |
| | | **amendments** | 16:1 |
| | | 9:12 18:8,9 | |

[ayes - companies]                                                                                  Page 2

**ayes**  19:17

**b**

**backed**  3:18
**bad**  4:12 18:18
**based**  2:14
  11:19
**basic**  14:1
**basis**  9:22
**bears**  14:14
**best**  13:3
**better**  5:4 8:2
  11:6 16:8
**beyond**  3:17
  5:25 9:17
  12:15
**big**  5:5
**biggest**  6:1
**bill**  2:4 4:14,20
  5:22 6:9,11
  7:11,23 8:4,6
  8:24 9:5,17
  10:3 11:8,11
  11:17,21 13:9
  13:13 15:6,18
  16:10,14,18
  17:21 18:23
**billion**  2:14 5:1
  6:14 8:14
  11:13 18:3
**blip**  8:17
**blocks**  14:14
**board**  2:17
  6:16
**borders**  5:25

**born**  17:2
**bought**  14:9
**brag**  15:21
**brands**  5:5
**buffy**  13:19
**builds**  8:24
  17:3
**burden**  5:1
**business**  2:15
  8:20 10:12
  14:23 15:7
**businesses**  6:1
  9:13 11:10,12
  11:25

**c**

**c**  20:1,1
**california**  2:15
  2:17 5:11,22
  6:15 10:8
  11:19 13:8,8
  15:10,13,22
  16:22 18:16
**california's**
  5:25 6:4
**californians**
  2:20
**called**  6:20
**cap**  18:12
**caps**  14:15
**car**  14:12
**carb**  4:15 10:2
**carb's**  18:10
**carbon**  7:6,8,11
  7:15 8:5 12:23
  17:7,14

**care**  15:15
**carve**  9:5
**catastrophes**
  13:6
**causing**  5:11
  6:2
**cecilia**  2:1,7
  5:16 9:24
  10:13,19 13:16
  16:3 19:9
**certain**  3:7,8
**certainly**  4:13
**certify**  20:3
**chain**  4:5,25
  15:4
**chains**  11:5
**challenge**  17:9
  17:23
**challenges**  8:21
  14:7
**challenging**
  16:25
**change**  7:5 8:8
  12:6,18 13:4
  13:11 14:7
**characterized**
  8:3
**chavez**  5:18
  10:1,15
**children**  12:10
  15:16
**christopher**
  2:10 16:5
**civil**  10:7

**claim**  8:5
**claims**  3:24
  11:9
**clear**  2:23
  13:11
**clerk**  2:3,4
  19:10,16
**climate**  2:12
  3:20 5:13,20
  6:11 8:8 10:7
  10:24 12:6,18
  13:4,11,15
  14:7 18:25
  19:3
**close**  19:16
**colleagues**  9:14
  16:7
**combat**  12:18
**combating**  13:3
**come**  11:16
**coming**  17:16
  19:7
**comments**  6:8
  16:7
**common**  13:9
**communities**
  14:4
**community**
  10:12 14:24
**companies**  2:14
  3:6,19 4:3,14
  5:5 6:13,17,22
  7:3,9,13,18,20
  8:12,13 11:18
  11:19 12:3,19

[companies - emissions]                                    Page 3

12:21 13:2
14:25 15:3,5,9
17:20,21
**company** 3:18
4:23 5:1 17:6
**complicated**
15:3
**comply** 4:24
**components**
6:23 7:7
**concern** 8:10
**concerns** 9:13
18:9
**conferences**
15:20
**confidence**
8:19
**confronting** 6:4
**congress** 10:5
**consequential**
15:23 16:1
**consider** 4:16
**consult** 4:16
**consumers** 5:3
5:10 12:24
**continue** 2:25
3:19 15:18
**continues** 2:22
**continuing**
12:17
**conversations**
14:18,20
**cop** 15:19
**corner** 13:7

**corporate** 2:12
4:8 5:20 10:24
11:1,7 14:3
**corporations**
3:10 5:10
11:22 14:23
18:4
**correctly** 4:9
**cost** 8:15
**country** 20:12
**course** 17:1
**covered** 4:2
**create** 18:1
**created** 12:7
**crisis** 6:5 8:8
19:4
**critical** 16:9,14
16:21
**curb** 2:22
**current** 13:5
**currently** 3:3
**curry** 2:2,8
5:17 9:25
10:14,20 13:17
16:4 19:10
**customers** 3:16
**cut** 16:17
**cycle** 7:15

**d**

**damage** 6:2
12:7
**data** 2:12,18
3:15,22 4:20
5:20 10:24
11:24 14:2

**date** 20:16
**dealing** 12:14
**decade** 19:7
**decades** 8:24
**decide** 7:7
**decision** 5:6
10:9
**decisions** 6:18
6:22 13:1
**deep** 18:7
**delegates** 9:5
**demonstrate**
6:3
**derived** 11:23
**described** 5:23
**deserve** 12:24
13:1
**deserves** 12:9
**desire** 19:11,11
19:12,14,15,16
**detailed** 9:1
**determine** 6:18
**develop** 9:6
**developed** 9:9
**developing**
8:25
**devise** 7:10
**difference**
18:24
**difficult** 3:8
8:11
**dioxide** 17:7
**direct** 4:3
**directing** 4:15

**direction** 9:7
**disclose** 4:3
**disclosed** 9:22
**disclosure** 3:19
4:1,22
**disclosures**
4:12 9:21
**disinformation**
16:18
**display** 3:12
**displayed** 5:8
**documentation**
3:23
**doing** 14:4
15:22 17:17,22
**dollar** 5:1 18:3
**dollars** 11:13
**downstream**
7:1,9 11:23
**drive** 7:4
**drivers** 7:3
**dug** 18:7
**duplication** 9:8
**dysfunction**
10:5

**e**

**e** 20:1
**earning** 11:13
**easily** 5:8
**economy** 17:4
**eight** 9:15
**either** 12:14
**emission** 15:11
**emissions** 2:23
3:3,7,18 4:2,4,5

[emissions - honest]

Page 4

4:8,12,22 5:8
5:12 6:10,15
6:21,21 7:1,12
7:18 8:2,10 9:1
9:2,4,21 11:2,7
11:15,20,22
12:5,22 17:1,8
17:15,25
**emitters** 3:5,6
**energy** 12:25
**enforcement**
8:11
**engaging** 4:25
**enormous** 11:1
**ensure** 4:8
12:18
**ensures** 4:23
**entire** 7:15
**entirely** 5:1
**entities** 4:2
**entity** 9:18
**environment**
15:14
**environmental**
5:22 15:24
**essentially** 9:14
**established**
4:17
**estimate** 8:25
9:3
**estimated** 8:15
**estimates** 4:21
**eu** 9:9
**ev** 14:9

**exactly** 11:3
**excited** 14:11
**exist** 12:21
**existential** 13:4
**explicit** 4:20
**expose** 4:11
**expressed** 8:9
**extensive** 12:2

**f**

**f** 20:1
**facade** 3:18
**face** 12:11
18:23
**facing** 2:19
**fact** 11:16
**faith** 4:12 9:22
**far** 5:25
**federal** 10:4
**fight** 8:7,23
10:17 13:10
**file** 2:2
**fill** 9:7
**first** 14:10
**fix** 10:6 13:25
**flexibility**
11:22
**floor** 1:11,13
12:14
**focus** 6:8
**folks** 8:9
**footprint** 2:16
12:23
**footprints** 7:6,8
7:15

**force** 14:22
**forcing** 5:25
**foregoing** 20:4
**forget** 12:20
**forward** 13:14
19:5
**full** 2:16 3:21
3:21 4:1
**further** 3:17
8:5
**furthermore**
11:21
**future** 9:15
12:17 13:15
15:15

**g**

**gaps** 9:5,7
**gas** 2:16 6:15
11:2,7,15
**gasses** 2:6
**generate** 11:3
**generation**
11:4 12:13
**give** 12:11
**given** 12:16
**gives** 7:13 13:9
**giving** 11:6
**global** 12:4
15:19
**go** 15:19,20
**goals** 3:20 5:13
11:20 18:25
**going** 12:8,11
12:12,14,16
13:20 14:12,16

15:24 18:11
**good** 9:22
15:21
**goods** 7:2
**google** 15:1
**government**
10:4 14:21
**governmental**
16:24
**governments**
16:23
**grandchildren**
12:10
**grateful** 3:7
**great** 8:19 17:4
**greenhouse** 2:5
2:16 6:15 11:2
11:7,15
**groundbreaki...**
5:24
**guess** 15:8
**guidelines** 4:16

**h**

**happening** 13:6
14:3
**harbor** 18:13
**help** 19:4
**helps** 16:19
**hide** 12:5
**historic** 6:4
**hold** 16:22
18:20 19:5
**holding** 18:19
**honest** 6:2
18:15

**[hope - measurements]**

**hope** 19:1
**household** 5:4
**https** 1:13
**huge** 7:14 17:13
**hugely** 7:23 10:4
**hunt** 14:16
**hurt** 11:10
**hyde** 20:3

**i**

**ice** 14:14,15
**idea** 2:24 11:6
**ii** 8:22
**ikea** 11:18 15:4
**impact** 5:4 18:19
**important** 6:9 6:10 8:6 10:4
**importantly** 18:13
**imposes** 11:12
**incentive** 7:14
**include** 6:10
**including** 8:10 11:9,17,19
**incumbent** 14:19,21,23
**indirect** 4:4 11:23
**indiscernible** 2:5
**individual** 14:8 14:20,20

**industry** 9:3
**information** 3:17 13:12
**ingenuity** 8:20
**inheriting** 13:24
**innovative** 10:16 12:19
**inspires** 13:15
**international** 4:18 15:20 16:20
**introduced** 2:12
**invest** 7:10
**irreversible** 12:8
**issue** 6:9 12:6
**issues** 14:1 15:4

**j**

**journey** 12:17

**k**

**kalra** 10:20,22
**keeping** 7:19
**kids** 6:6 7:16 10:10,10
**kind** 7:25
**know** 2:22 5:5 7:20 10:5 11:3 12:2,24,24 13:1 14:6,13 15:7 16:12 17:5 18:15

**l**

**lack** 3:13
**large** 3:4 6:22
**largest** 6:13
**late** 6:7
**laws** 9:9
**lead** 10:8 12:21 12:23 13:8,9 14:5,24 15:5 15:10,13,13,18
**leaders** 15:19
**leadership** 6:4
**leap** 19:4
**leaving** 3:5 10:11 15:16
**led** 15:11
**ledanski** 20:3
**left** 3:16
**legal** 20:11
**legislation** 5:24 15:24
**legislators** 12:13
**level** 16:24
**levis** 15:3
**lgbtq** 10:7
**lie** 5:12
**life** 7:15
**light** 4:7 11:5
**limited** 3:4
**line** 4:22
**local** 16:24
**look** 13:14 18:11,17

**looks** 18:10
**los** 5:23
**lot** 6:19 16:11 16:17,17 17:2
**lower** 7:8,11

**m**

**m** 2:1,7 5:16 9:24 10:13,19 13:16 16:3 19:9
**madam** 2:11 5:19 10:23 13:20 16:6
**made** 4:19 9:21 18:16
**make** 5:6 6:22 6:25 10:9 18:8 18:24
**makes** 7:13
**making** 2:6 5:11 6:17 13:1
**manipulation** 3:14
**manufacture** 7:10
**manufacturers** 5:7
**market** 7:11
**materials** 6:23
**means** 4:3
**measure** 17:19 17:23 19:17
**measurements** 7:12 16:19 17:13

[measuring - public]                                                    Page 6

**measuring** 8:1
  16:25
**media** 1:13
**meet** 18:25
  19:6
**melting** 14:15
**member** 2:8,10
  4:25 5:17,18
  10:1,15,20,22
  13:17,19 16:4
  16:5
**members** 2:11
  5:19 13:20
  19:13
**merely** 8:4
**mess** 12:15
**microsoft**
  11:18 15:2
**million** 17:7,10
  18:3
**mineola** 20:14
**minimal** 4:10
**mired** 10:5
**miscalculating**
  18:18
**misinformation**
  11:9 16:12
**misrepresent...**
  3:14
**missions** 3:23
**misstatements**
  9:20
**mistakes** 18:15
**mom** 13:22
  15:17 18:3

**mommy** 14:13
**month** 12:25
**move** 6:5
**moving** 2:2
**mystery** 11:6

### n

**n** 20:1
**nation** 6:5
**need** 8:22
**needed** 4:1
**needs** 2:25
**new** 4:14 8:12
**noes** 19:17
**noise** 16:17
**number** 2:2 8:9
  11:16
**ny** 20:14

### o

**o** 20:1
**obvious** 15:12
**occurring** 11:4
**offer** 3:10
**offers** 11:21
**oh** 14:11 15:7
**okay** 17:3,9
**old** 13:22,23
  14:10,17 20:12
**once** 6:3 10:6
**online** 5:9
**open** 19:10
**operating** 6:13
**operations** 3:12
**opponents** 8:3

**opportunities**
  12:20

### p

**paper** 8:4
**part** 8:22 17:17
**partial** 3:10
**partially** 11:14
**partners** 10:17
  14:3
**parts** 3:11
**pass** 16:15
**passes** 16:10
  19:17
**patagonia**
  11:17 15:4
**path** 12:16,16
**penalties** 9:15
  18:12
**penalty** 9:19
**people** 7:25
**percent** 7:24
  8:16 12:4
**phase** 18:11
**piece** 15:24
**place** 17:19
**planet** 6:6,19
  7:21 8:23
  10:10
**point** 3:4
**polar** 14:14
**policy** 18:16
**policymakers**
  3:16
**pollution** 14:12

**pops** 18:3
**portion** 11:2
**potential** 5:24
**potentially**
  5:12
**power** 13:2
**priority** 5:21
**private** 3:1,5
  14:24 17:2
**pro** 2:1,7 5:16
  9:24 10:13,19
  13:16 16:3
  19:9
**probably** 16:8
**problem** 13:25
**proceedings**
  20:5
**producing** 17:6
**product** 5:7
**products** 6:25
  7:11,18
**program** 8:12
**progress** 2:25
  5:11
**protect** 7:21
**protocols** 4:16
  8:25 9:2
**proud** 10:23
  17:4
**provide** 5:6
**provides** 9:17
**provision** 18:14
**public** 2:19,23
  3:11,12,17,22
  7:24 18:20

**[publicly - shown]**

| | | | |
|---|---|---|---|
| **publicly** 6:14 | **regard** 9:20 | **requiring** 4:1 | 10:24 11:5 |
| **published** 2:19 | **regarding** 6:23 | **resources** 2:17 | 13:9,22 17:19 |
| **purchase** 6:24 | **regime** 6:12 | 6:16 | **scope** 4:21 6:10 |
| **purchasing** | **regulate** 2:21 | **respectfully** | 6:20 8:10 9:3 |
| 13:2 | **regulation** | 5:14 10:18 | 9:21 11:7 |
| **push** 4:13 | 14:22 | 16:1 19:8 | **score** 16:8 |
| **pushing** 8:4 | **regulations** 9:6 | **respond** 9:13 | **second** 8:24 |
| **put** 3:18 | 18:10 | **responsibility** | 16:13 |
| **puts** 14:12 | **regulatory** 9:7 | 9:6 14:8 17:14 | **secondary** 4:20 |
| **q** | 10:2 | **responsible** | **seconds** 9:25 |
| **question** 12:8 | **reinvent** 4:15 | 11:1 12:4 | **secret** 10:25 |
| **quote** 9:18 | **rely** 11:24 | **rest** 14:14,16 | **section** 3:11 |
| **r** | **remaining** 2:24 | **result** 6:21 7:1 | 9:20 |
| **r** 20:1 | **remember** | **revenue** 2:15 | **sector** 3:2 11:1 |
| **raises** 8:11 | 15:11 | 8:14,17 | 14:24 17:2 |
| **raw** 6:23 | **remove** 9:14 | **rick** 5:18 10:1 | **sectors** 2:23 |
| **reach** 5:25 | **repair** 12:15 | 10:15 | **see** 2:20 5:10 |
| **read** 2:3 | **report** 2:15,19 | **right** 14:17 | 13:5 17:15 |
| **real** 6:18 | 3:6 6:14 9:3 | 17:22 | **seeing** 17:15 |
| **really** 16:16 | **report's** 3:8 | **rights** 10:7,7 | **seeking** 19:7 |
| 17:12,20 18:7 | **reporting** 3:3 | **rise** 5:19 13:21 | **selfishly** 15:17 |
| **reasonable** | 4:8,9 5:2 6:11 | **risk** 8:11 9:15 | **sell** 7:2 |
| 9:22 | 6:12 7:25 9:2,9 | **road** 20:12 | **senate** 2:4 |
| **recognized** 2:9 | 9:16,18 11:10 | **roll** 19:10,16 | **senator** 2:4 |
| 4:17 5:17 | 11:12,14,22 | **s** | **sense** 13:9 |
| 10:21 13:18 | 16:18 | **safe** 18:13 | **services** 6:25 |
| **record** 20:5 | **reports** 3:11 | **safety** 10:2 | 7:2 |
| **reduce** 7:6,14 | **request** 5:14 | **sales** 6:14 | **session** 1:11,14 |
| 7:18 8:4 17:1 | **require** 2:13 | **salesforce** 15:1 | **set** 3:19 |
| 17:24,24 | **required** 6:11 | **save** 6:6 8:23 | **sets** 6:11 17:20 |
| **reducing** 12:23 | **requirements** | **saving** 6:19 | **sheets** 8:18 |
| **reductions** 5:12 | 3:4 4:23 11:10 | **saying** 15:10 | **shine** 11:5 |
| 19:6 | 11:12 18:11 | **sb** 2:2,11 3:25 | **shining** 4:7 |
| | **requires** 6:12 | 4:10,13,24 5:3 | **shown** 12:2 |
| | 9:8 | 5:15,20 6:3 | |

**[side - under]** Page 8

side  7:9
signature  20:8
significant  9:12
signing  15:9
simple  18:23
simply  11:11
single  13:7
six  13:22 14:10
  14:17
small  18:2
smaller  11:25
smeared  11:9
solutions  13:15
  20:11
solve  8:20
sonya  20:3
source  3:4 7:7
sourced  11:25
sources  4:6
  11:24
speak  13:21
speaker  2:1,7
  2:11 5:16,19
  9:24 10:13,19
  10:23 13:16,20
  16:3,6 19:9
speaking  4:24
spend  12:25
sponsor  9:11
stage  16:20
stand  10:23
standard  4:18
  6:12 17:8,20
standardize
  16:19

standardizes
  7:12
standards
  15:12 18:5
standing  12:13
  13:14
start  17:18
  19:6
starts  13:25
state  2:22 6:13
  16:23 17:16
  18:4
steps  7:5,14,21
straightforward
  16:16
strong  5:19
study  12:2
subject  9:19
successful  6:19
suite  20:13
sum  10:3
sunlight  14:1
suppliers  7:4,5
supplies  6:24
  7:7
supply  4:5,25
  6:25 11:5 15:3
support  5:20
  10:23 11:17
  13:13,14,21
  15:17
supported  7:23
supporting
  7:24 15:2,6
  17:21

sure  3:24 18:8
swaths  3:5
systemized
  18:2
systemizes
  17:12

**t**

t  20:1,1
take  7:5,14
  14:8,20,22
  17:13 19:4
taken  2:25
talk  6:20
talking  7:16
  14:2,10
tech  15:2
tempore  2:1,7
  5:16 9:24
  10:13,19 13:16
  16:3 19:9
terms  13:3 17:7
territory  4:14
thank  2:11
  10:22 13:19
  16:6,6
thing  8:6 17:22
think  10:10,11
  13:23 14:6
  16:13 18:22
thirty  9:25
thought  14:9
threat  13:5,5
three  13:23
thursday  9:12

time  10:14
  13:24 14:10
  19:1,3
times  5:23
today  3:1 5:19
  9:1,14 12:16
  13:13,21
tons  17:7
took  9:12
tool  13:10
tools  8:2
top  5:21 9:11
  10:2
total  11:2
totality  17:14
tough  14:7
toughest  8:21
towards  12:16
  12:22
track  7:19
transcript  20:4
transparency
  3:21 4:1 14:1
transparent
  7:13
true  11:6,11
  20:4
truth  8:6
try  17:22
trying  14:16
  16:22

**u**

u.s.  2:13
under  9:19
  16:8

[understand - zero]                                                    Page 9

| | | x |
|---|---|---|
| **understand**  8:1 14:2 17:6 | **voters**  5:22 | **x**  17:6 |
| **understandable** 5:9 | **w** | **y** |
| **understanding** 5:4 | **want**  6:8 7:20 13:2 14:5,25 15:5,8,9 16:6 | **year**  9:16 13:22 13:23 14:10 15:25 17:8,10 17:11,12 |
| **unfortunately** 11:8 | **wanted**  13:21 | **years**  9:16 12:3 14:17 |
| **uniformity** 3:13 | **war**  8:22 | **z** |
| **universally** 19:2 | **ward**  2:8,10 16:4,5 | **zbur**  5:17,18 10:1,15 |
| **unregulated** 4:11 | **way**  10:8 14:5 14:24 15:5,11 15:11,13,14,18 18:17 | **zero**  11:20 12:22 |
| **upstream**  6:24 7:4 11:23 | **ways**  7:10 | |
| **urgency**  12:9 | **we've**  10:6 12:7 | |
| **use**  6:24 12:25 | **website**  2:20 | |
| **used**  4:21 | **weekend**  7:17 | |
| **using**  4:11 | **wheel**  4:15 | |
| **v** | **wicks**  13:17,19 | |
| **validity**  3:9 | **wield**  13:10 | |
| **valve**  10:2 | **wiener**  2:5 | |
| **variation**  16:14 | **work**  2:24 4:10 8:15,25 11:25 15:21 | |
| **vast**  3:5 | **working**  16:13 | |
| **verification** 3:13,22 | **world**  4:7 6:6 8:21 10:16 12:11,19 13:3 13:6,7,23 | |
| **veritext**  20:11 | **world's**  6:1 | |
| **voluntarily**  3:6 | **www.assemb...** 1:13 | |
| **vote**  5:15 10:18 15:17,25 16:2 19:8,10,11,11 19:12,12,12,13 19:14,14,15,15 19:15,16 | | |

# Exhibit 4

Transcript of May 30, 2023 California
Senate Floor Session, 04:21:02-04:25:00

Declaration of Bradley J. Hamburger In Support Of
Plaintiffs' Motion for Summary Judgment on Claim I
May 24, 2024

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.*,
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)

Page 1

5/30/2023 Senate Floor Session

https://www.senate.ca.gov/media/senate-floor-session-20230530/video
04:21:02 - 04:25:00

(222 of 292) Page 222 of 292
Case: 25-5327 09/18/2025 DktEntry: 8.9 Page 222 of 292
Case 2:24-cv-00801-ODW-PVC Document 48-7 Filed 05/24/24 Page 3 of 11 Page ID #:502

Page 2

1          MAN 1:  Now moving onto File Item 71,
2     Senator Wiener.  Secretary, please read.
3          SECRETARY:  Senate Bill 253 by Senator
4     Wiener, an act relating to greenhouse gases.
5          MAN 1:  Senator Wiener.
6          SENATOR SCOTT WIENER:  Thank you, Mr.
7     President, colleagues.  SB 253 is the Climate
8     Corporate Data Accountability Act.  It will
9     require all U.S.-based companies with over $1
10    billion in annual revenue who do business in
11    California to report their full greenhouse gas
12    emissions to the California Air Resources Board.
13    The emissions registry that will actually compile
14    and disclose this information will take the
15    report and publish it on a public-facing website
16    for all to see.
17          Currently, emissions reporting
18    requirements are limited to large point source
19    emitters like refineries leaving out vast swaths
20    of corporate emissions.  Some companies
21    voluntarily report their emissions, but without
22    uniformity around these reports, it's impossible
23    to be certain if emissions are being reported in
24    their entirety.  And of course for many
25    companies, they are simply not reporting

Page 3

1    anything.

2             SB 253 will allow for much-needed

3    transparency and consistency by requiring full

4    disclosure of the three scopes of emission from

5    all covered corporations.  Although SB 253 will

6    certain push some companies in the new territory,

7    this bill does not in any way reinvent the wheel.

8    These protocols and disclosures have been around

9    for a long time.  These are very established, and

10   there are many companies that are already making

11   these disclosures.

12             SB 253 is the next step California must

13   take in climate action to ensure that corporate

14   actors in our state are aligned with our goals

15   and are working as diligently as we need them to

16   be.  And we can't do that unless we have

17   transparency.  I respectfully ask for an aye

18   vote.

19             MAN 1:  Thank you.  Any further

20   discussion or debate on this item?  Seeing none,

21   secretary, please call the roll on File Item 71.

22             SECRETARY:  Allen?  Aye.

23             SENATOR BENJAMIN ALLEN:  Aye.

24             SECRETARY:  Alvarado-Gil?  Archuleta?

25   Ashby?  Atkins?

Page 4

1            SENATOR TONI ATKINS:  Aye.

2            SECRETARY:  Aye.  Becker?

3            SENATOR JOSH BECKER:  Aye.

4            SECRETARY:  Aye.  Blakespear?

5            SENATOR CATHERINE BLAKESPEAR:  Aye.

6            SECRETARY:  Aye.  Bradford?

7            SENATOR STEVEN BRADFORD:  Aye.

8            SECRETARY:  Aye.  Caballero?  Cortese?

9            SENATOR DAVE CORTESE:  Aye.

10           SECRETARY:  Aye.  Dahle?

11           SENATOR BRIAN DAHLE:  No.

12           SECRETARY:  No.  Dodd?  Durazo?

13           MARIA ELENA DURAZO:  Aye.

14           SECRETARY:  Aye.  Eggman?

15           SENATOR SUSAN EGGMAN:  Aye.

16           SECRETARY:  Aye.  Glazer?  Gonzalez?

17           SENATOR LENA GONZALEZ:  Aye.

18           SECRETARY:  Aye.  Grove?

19           SENATOR SHANNON GROVE:  No.

20           SECRETARY:  No.  Hurtado?

21           SENATOR MELISSA HURTADO:  Aye.

22           SECRETARY:  Aye.  Jones?

23           SENATOR BRIAN JONES:  No.

24           SECRETARY:  No.  Laird?

25           SENATOR JOHN LAIRD:  Aye.

Page 5

```
 1              SECRETARY:  Aye.  Limon?

 2              SENATOR MONIQUE LIMON:  Aye.

 3              SECRETARY:  Aye.  McGuire?

 4              SENATOR MIKE MCGUIRE:  Aye.

 5              SECRETARY:  Aye.  Menjivar?

 6              SENATOR CAROLINE MENJIVAR:  Aye.

 7              SECRETARY:  Aye.  Min?

 8              SENATOR DAVE MIN:  Aye.

 9              SECRETARY:  Aye.  Newman?  Nguyen?

10              SENATOR JANET NGUYEN:  No.

11              SECRETARY:  No.  Niello?

12              SENATOR ROGER NIELLO:  No.

13              SECRETARY:  No.  Ochoa Bogh?

14              SENATOR ROSILICIE OCHOA BOGH:  No.

15              SECRETARY:  No.  Padilla?

16              SENATOR STEVE PADILLA:  Aye.

17              SECRETARY:  Aye.  Portantino?

18              SENATOR ANTHONY PORTANTINO:  Aye.

19              SECRETARY:  Aye.  Roth?  Rubio?

20  Seyarto?

21              SENATOR KELLY SEYARTO:  No.

22              SECRETARY:  No.  Skinner?

23              SENATOR NANCY SKINNER:  Aye.

24              SECRETARY:  Aye.  Smallwood-Cuevas?

25              SENATOR LOLA SMALLWOOD-CUEVAS:  Aye.
```

Page 6

1             SECRETARY:  Aye.  Stern?

2             SENATOR HENRY STERN:  Aye.

3             SECRETARY:  Aye.  Umberg?  Wahab?

4             SENATOR AISHA WAHAB:  Aye.

5             SECRETARY:  Aye.  Wiener?

6             SENATOR SCOTT WIENER:  Aye.

7             SECRETARY:  Aye.  Wilk?

8             SENATOR SCOTT WILK:  No.

9             SECRETARY:  No.

10            MAN 1:  Please call the absent members.

11            SECRETARY:  Alvarado-Gil?

12            SENATOR MARIE ALVARADO-GIL:  No.

13            SECRETARY:  No.  Archuleta?

14            SENATOR BOB ARCHULETA:  Aye.

15            SECRETARY:  Aye.  Ashby?  Caballero?

16   Dodd?  Glaser?  Newman?  Roth?  Rubio?  Umberg?

17            SENATOR THOMAS UMBERG:  Aye.

18            SECRETARY:  Aye.

19            MAN 1:  Ayes 24, no's 9.  The measure

20   passes.

21            (End of requested portion)

22

23

24

25

Page 7

1                C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certify that the

4    foregoing transcript is a true and accurate

5    record of the proceedings.

6

7

8    *Sonya M. Ledanski Hyde*

9    _____

10

11   Veritext Legal Solutions

12   330 Old Country Road

13   Suite 300

14   Mineola, NY 11501

15

16   Date: May 21, 2024

17

18

19

20

21

22

23

24

25

**[04:21:02 - foregoing]**                                               Page 1

| **0** |
| --- |
| **04:21:02**  1:15 |

| **1** |
| --- |
| **1**  2:1,5,9 3:19 |
| 6:10,19 |
| **11501**  7:14 |
| **12151**  7:8 |

| **2** |
| --- |
| **20230530**  1:14 |
| **2024**  7:16 |
| **21**  7:16 |
| **24**  6:19 |
| **253**  2:3,7 3:2,5 |
| 3:12 |

| **3** |
| --- |
| **300**  7:13 |
| **330**  7:12 |

| **5** |
| --- |
| **5/30/2023**  1:11 |

| **7** |
| --- |
| **71**  2:1 3:21 |

| **9** |
| --- |
| **9**  6:19 |

| **a** |
| --- |
| **absent**  6:10 |
| **accountability** |
| 2:8 |
| **accurate**  7:4 |
| **act**  2:4,8 |
| **action**  3:13 |
| **actors**  3:14 |

**actually**  2:13
**air**  2:12
**aisha**  6:4
**aligned**  3:14
**allen**  3:22,23
**allow**  3:2
**alvarado**  3:24
 6:11,12
**annual**  2:10
**anthony**  5:18
**archuleta**  3:24
 6:13,14
**ashby**  3:25
 6:15
**atkins**  3:25 4:1
**aye**  3:17,22,23
 4:1,2,3,4,5,6,7
 4:8,9,10,13,14
 4:15,16,17,18
 4:21,22,25 5:1
 5:2,3,4,5,6,7,8
 5:9,16,17,18,19
 5:23,24,25 6:1
 6:2,3,4,5,6,7,14
 6:15,17,18
**ayes**  6:19

| **b** |
| --- |
| **based**  2:9 |
| **becker**  4:2,3 |
| **benjamin**  3:23 |
| **bill**  2:3 3:7 |
| **billion**  2:10 |
| **blakespear**  4:4 |
| 4:5 |

**board**  2:12
**bob**  6:14
**bogh**  5:13,14
**bradford**  4:6,7
**brian**  4:11,23
**business**  2:10

| **c** |
| --- |
| **c**  7:1,1 |
| **caballero**  4:8 |
| 6:15 |
| **california**  2:11 |
| 2:12 3:12 |
| **call**  3:21 6:10 |
| **caroline**  5:6 |
| **catherine**  4:5 |
| **certain**  2:23 3:6 |
| **certify**  7:3 |
| **climate**  2:7 |
| 3:13 |
| **colleagues**  2:7 |
| **companies**  2:9 |
| 2:20,25 3:6,10 |
| **compile**  2:13 |
| **consistency**  3:3 |
| **corporate**  2:8 |
| 2:20 3:13 |
| **corporations** |
| 3:5 |
| **cortese**  4:8,9 |
| **country**  7:12 |
| **course**  2:24 |
| **covered**  3:5 |
| **cuevas**  5:24,25 |
| **currently**  2:17 |

| **d** |
| --- |
| **dahle**  4:10,11 |
| **data**  2:8 |
| **date**  7:16 |
| **dave**  4:9 5:8 |
| **debate**  3:20 |
| **diligently**  3:15 |
| **disclose**  2:14 |
| **disclosure**  3:4 |
| **disclosures**  3:8 |
| 3:11 |
| **discussion**  3:20 |
| **dodd**  4:12 6:16 |
| **durazo**  4:12,13 |

| **e** |
| --- |
| **e**  7:1 |
| **eggman**  4:14 |
| 4:15 |
| **elena**  4:13 |
| **emission**  3:4 |
| **emissions**  2:12 |
| 2:13,17,20,21 |
| 2:23 |
| **emitters**  2:19 |
| **ensure**  3:13 |
| **entirety**  2:24 |
| **established**  3:9 |

| **f** |
| --- |
| **f**  7:1 |
| **facing**  2:15 |
| **file**  2:1 3:21 |
| **floor**  1:11,13 |
| **foregoing**  7:4 |

**[full - secretary]** Page 2

| | | | |
|---|---|---|---|
| **full** 2:11 3:3 | **k** | **need** 3:15 | **refineries** 2:19 |
| **further** 3:19 | **kelly** 5:21 | **needed** 3:2 | **registry** 2:13 |
| **g** | **l** | **new** 3:6 | **reinvent** 3:7 |
| **gas** 2:11 | **laird** 4:24,25 | **newman** 5:9 6:16 | **relating** 2:4 |
| **gases** 2:4 | **large** 2:18 | **nguyen** 5:9,10 | **report** 2:11,15 2:21 |
| **gil** 3:24 6:11,12 | **leaving** 2:19 | **niello** 5:11,12 | **reported** 2:23 |
| **glaser** 6:16 | **ledanski** 7:3 | **no's** 6:19 | **reporting** 2:17 2:25 |
| **glazer** 4:16 | **legal** 7:11 | **ny** 7:14 | **reports** 2:22 |
| **goals** 3:14 | **lena** 4:17 | **o** | **requested** 6:21 |
| **gonzalez** 4:16 4:17 | **limited** 2:18 | **o** 7:1 | **require** 2:9 |
| **greenhouse** 2:4 2:11 | **limon** 5:1,2 | **ochoa** 5:13,14 | **requirements** 2:18 |
| **grove** 4:18,19 | **lola** 5:25 | **old** 7:12 | **requiring** 3:3 |
| **h** | **long** 3:9 | **p** | **resources** 2:12 |
| **henry** 6:2 | **m** | **padilla** 5:15,16 | **respectfully** 3:17 |
| **https** 1:13 | **making** 3:10 | **passes** 6:20 | **revenue** 2:10 |
| **hurtado** 4:20 4:21 | **man** 2:1,5 3:19 6:10,19 | **please** 2:2 3:21 6:10 | **road** 7:12 |
| **hyde** 7:3 | **maria** 4:13 | **point** 2:18 | **roger** 5:12 |
| **i** | **marie** 6:12 | **portantino** 5:17,18 | **roll** 3:21 |
| **impossible** 2:22 | **mcguire** 5:3,4 | **portion** 6:21 | **rosilicie** 5:14 |
| **information** 2:14 | **measure** 6:19 | **president** 2:7 | **roth** 5:19 6:16 |
| **item** 2:1 3:20 3:21 | **media** 1:13 | **proceedings** 7:5 | **rubio** 5:19 6:16 |
| **j** | **melissa** 4:21 | **protocols** 3:8 | **s** |
| **janet** 5:10 | **members** 6:10 | **public** 2:15 | **sb** 2:7 3:2,5,12 |
| **john** 4:25 | **menjivar** 5:5,6 | **publish** 2:15 | **scopes** 3:4 |
| **jones** 4:22,23 | **mike** 5:4 | **push** 3:6 | **scott** 2:6 6:6,8 |
| **josh** 4:3 | **min** 5:7,8 | **r** | **secretary** 2:2,3 3:21,22,24 4:2 4:4,6,8,10,12 4:14,16,18,20 4:22,24 5:1,3,5 5:7,9,11,13,15 |
| | **mineola** 7:14 | **r** 7:1 | |
| | **monique** 5:2 | **read** 2:2 | |
| | **moving** 2:1 | **record** 7:5 | |
| | **n** | | |
| | **n** 7:1 | | |
| | **nancy** 5:23 | | |

[secretary - www.senate.ca.gov]                                    Page 3

| | | |
|---|---|---|
| 5:17,19,22,24 | **swaths**  2:19 | **wilk**  6:7,8 |
| 6:1,3,5,7,9,11 | | **working**  3:15 |
| 6:13,15,18 | **t** | **www.senate....** |
| **see**  2:16 | **t**  7:1,1 | 1:13 |
| **seeing**  3:20 | **take**  2:14 3:13 | |
| **senate**  1:11,13 | **territory**  3:6 | |
| 2:3 | **thank**  2:6 3:19 | |
| **senator**  2:2,3,5 | **thomas**  6:17 | |
| 2:6 3:23 4:1,3 | **three**  3:4 | |
| 4:5,7,9,11,15 | **time**  3:9 | |
| 4:17,19,21,23 | **toni**  4:1 | |
| 4:25 5:2,4,6,8 | **transcript**  7:4 | |
| 5:10,12,14,16 | **transparency** | |
| 5:18,21,23,25 | 3:3,17 | |
| 6:2,4,6,8,12,14 | **true**  7:4 | |
| 6:17 | | |
| **session**  1:11,14 | **u** | |
| **seyarto**  5:20,21 | **u.s.**  2:9 | |
| **shannon**  4:19 | **umberg**  6:3,16 | |
| **signature**  7:8 | 6:17 | |
| **simply**  2:25 | **uniformity** | |
| **skinner**  5:22,23 | 2:22 | |
| **smallwood** | **v** | |
| 5:24,25 | **vast**  2:19 | |
| **solutions**  7:11 | **veritext**  7:11 | |
| **sonya**  7:3 | **video**  1:14 | |
| **source**  2:18 | **voluntarily** | |
| **state**  3:14 | 2:21 | |
| **step**  3:12 | **vote**  3:18 | |
| **stern**  6:1,2 | **w** | |
| **steve**  5:16 | | |
| **steven**  4:7 | **wahab**  6:3,4 | |
| **suite**  7:13 | **way**  3:7 | |
| **susan**  4:15 | **website**  2:15 | |
| | **wheel**  3:7 | |
| | **wiener**  2:2,4,5 | |
| | 2:6 6:5,6 | |

# Exhibit 2

Transcript of March 15 2023 California
Senate Environmental Quality
Committee Hearing, 01:53:42-02:30:34

Declaration of Bradley J. Hamburger In Support Of
Plaintiffs' Motion for Summary Judgment on Claim I
May 24, 2024

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.*,
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)

(232 of 292) Page 232 of 292
Case 2:24-cv-00801-ODW-PVC Document 48-5 Filed 05/24/24 Page 2 of 52 Page ID #:393
Case: 25-5327 09/18/2025 DktEntry: 8.9 Page 232 of 292



Page 1

11    3/15/2023 Senate Environmental Quality Committee

12    Hearing

13    https://www.senate.ca.gov/media/senate-

14    environmental-quality-committee-20230315/video

15    01:53:42 - 02:30:34

Page 2

1              CHAIR BENJAMIN ALLEN:  All right.  I

2    see Senator Wiener here to present our last bill

3    of the morning.  That's Item 6, SB 253.  You may

4    proceed when ready, Senator.

5              SENATOR SCOTT WIENER:  Thank you, Mr.

6    Chair.  It's good to see you on this bill after

7    we were in this committee two years ago on SB

8    260, which was the predecessor bill.  But we got

9    up to 40 votes on the assembly floor, but we

10   could not get vote number 41.  So we are back at

11   it.  And as noted in the analysis, this is a

12   narrower bill than what was before this committee

13   two years ago.

14             So colleagues, SB 253 is the Climate

15   Corporate Data Accountability Act, and it will

16   require all U.S.-based companies, both public and

17   privately held, with a billion dollars or more in

18   annual revenue, if they do business in California

19   to disclose their entire carbon footprint.  After

20   this disclosure, the state will be required to

21   basically contract out with a registry that will

22   then host this data on a website so that the

23   public, policymakers, investors will know which

24   corporations have what carbon footprint.

25             We know that there are large

Page 3

1    corporations that work very hard to be green to

2    reduce their carbon footprint.  There are others

3    that do not.  Unfortunately, among the ones that

4    really don't do a great job lowering their carbon

5    footprint, they will at times market themselves

6    as green, what we call green-washing.  Marketing

7    yourself as green when you're not.  We need to

8    make sure that the public actually knows who's

9    green and who isn't and to make sure we have that

10   transparency.  That's all this bill does,

11   transparency.  Information for the public.

12           So right now we do require carbon

13   disclosures for a limited set of companies,

14   basically large point source emitters through the

15   Cap-and-Trade Program, but the vast majority of

16   corporate California, corporate market is not

17   required to do this.

18           Some corporations do a great job

19   compiling this data.  Walmart is one of those

20   examples.  So anyone who tells you, including

21   some of the opponents, that this is somehow not

22   doable or a problem, some of the largest

23   corporations in the U.S. already do this.  In

24   fact, Walmart goes beyond what we're requiring in

25   this bill.  So that opposition claiming that this

Page 4

1   is not doable or a terrible burden is simply

2   inaccurate because we know that companies are

3   already doing this.

4           The EU is already requiring this.  The

5   SEC is trying to require a more limited version

6   of this.  There's been a lot of back-and-forth,

7   and I hope that the SEC succeeds, but we don't

8   know yet.  And so this is absolutely an idea

9   whose time has come, and California should do

10  this.

11          So colleagues, I just want to stress

12  that we have worked very hard over the last few

13  years with the opposition led by the chamber of

14  commerce.  We have -- we took amendments in the

15  last version of the bill, which we have all

16  honored in this bill.  For example, Scope 3,

17  which is probably the most contentious part, and

18  we know Scope 3 includes supply chain.

19          Scope 3 for many companies is about 90

20  percent of their carbon emissions that are

21  effectively contracting out their carbon

22  emissions, and Scope 3 is incredibly important.

23  We -- in the last version of the bill, the

24  opposition came to us and said this is going to

25  effectively sweep in small suppliers and also

Page 5

 1    create a burden by having to track down suppliers
 2    in different parts of the world.
 3              And so we worked out an amendment to
 4    allow, at their option, to use formulas and
 5    estimates, which are very well established in
 6    this methodology.  There's software for it.  It's
 7    an established thing.  We're not creating
 8    anything new.  And we did that to respond to this
 9    issue of sweeping in small suppliers in the
10    global supply chain.
11              The main opposition letter once again
12    says we're going to sweep in small suppliers.
13    Respectfully, with all respect to the opposition,
14    that is absolutely untrue, and that was the
15    amendment that we took last year and that we have
16    honored.  We take -- we took other amendments
17    last year to make sure that implementation could
18    be as smooth as possible.
19              We took several amendments on the
20    enforcement structure in response to critiques
21    from the opposition.  We've honored all of those
22    amendments in this bill.  So I would be honored
23    to have your support, and I respectfully ask for
24    your aye vote.
25              With me today to testify are two lead

Page 6

1    witnesses, Sarah Sachs, who is Senior Associate

2    of State Policy at Series, which is a business

3    coalition that is a co-sponsor of this bill, and

4    Alvaro Sanchez, the Vice President of Policy at

5    the Greenlining Institute.  We also have, if

6    questions arise, Catherine Atkin, the Director of

7    Carbon Accountable, who has enormous technical

8    expertise in this area if there are questions

9    that we need to ask her to answer.

10             CHAIR BENJAMIN ALLEN:  Thank you.  All

11   right.

12             ALVARO SANCHEZ:  Hi.  Good morning,

13   Chair Allen and other members of the committee.

14   My name is Alvaro Sanchez.  I'm the Vice

15   President of Policy at the Greenlining Institute.

16   We work towards a future where communities of

17   color can build wealth, live in healthy places

18   filled with economic opportunity, and are ready

19   to meet the challenges posed by climate change.

20             In order to meet the challenges posed

21   by climate change, it is imperative to recognize

22   the right of communities to know how and if

23   corporations are working to reduce their

24   emissions and to verify corporate claims of

25   sustainable leadership.  The transparency

Page 7

1    required by SB 253 provides Californians with the

2    necessary information to make informed decisions

3    about how to manage the emissions from

4    corporations.

5            By requiring reporting of direct

6    emissions from these corporations and any

7    emissions produced from their supply chains or

8    indirect emissions, SB 253 creates the data

9    infrastructure to drag down corporate carbon

10   emissions.  This mandate of comprehensive climate

11   pollution transparency would set the gold

12   standard for the rest of the nation and

13   establishes the right to know which companies are

14   polluting our environment, how much they are

15   emitting, and if they are decreasing or

16   increasing their climate emissions offering a

17   transparent and public way of verifying corporate

18   claims of climate leadership.

19           Now we know that California, thanks to

20   the hard work of many of you, is a global leader

21   in fighting climate change and reducing

22   emissions.  And we know that not only because of

23   the goals that we've set for ourselves, but more

24   importantly because of the climate actions, the

25   reporting, and the transparency that the state

Page 8

1   has for achieving our climate goals.

2           SB 253 is requiring that corporate

3   sector follow GHG emission reporting practices

4   that are the norm in other sectors and for the

5   state.  This reporting ensures accurate and

6   truthful reporting of corporate corporations'

7   climate carbon footprint.  Corporate emissions

8   contribute to over-pollute communities and deadly

9   climate outcomes from harsher wildfires, seasons,

10  and historic storms and floods.

11          The worst of these impacts

12  disproportionately fall on communities of color

13  and low-income communities.  And for all the

14  reasons above, the Greenlining Institute requests

15  your aye vote towards this measure.  Thank you.

16          CHAIR BENJAMIN ALLEN:  Thank you.  Next

17  we have Sarah.  And Sarah, I thought Series was

18  the goddess of agriculture.  Is that not true?

19          SARAH SACHS:  It's also a move I

20  believe for Saturn.  So no, there is --

21          CHAIR BENJAMIN ALLEN:  It's a moon of

22  Saturn.  Okay.

23          SARAH SACHS:  Very common.

24          CHAIR BENJAMIN ALLEN:  How did you guys

25  end up with that name?

Page 9

 1                SARAH SACHS:  We initially started as

 2      an acronym.  So you'll --

 3                CHAIR BENJAMIN ALLEN:  Oh.

 4                SARAH SACHS: -- sometimes see it in all

 5      caps.

 6                CHAIR BENJAMIN ALLEN:  Okay.

 7                SARAH SACHS:  We got started in 1989

 8      after the Exxon Valdez oil spill and very much

 9      focused on ESG values, which leads us here today.

10                CHAIR BENJAMIN ALLEN:  Okay.

11                SARAH SACHS:  Well, good morning again,

12      Chair Allen and committee members.  Again, Sarah

13      Sachs on behalf of Series.  And in parallel with

14      Senator Stern's SB 261, we also believe that the

15      state has an opportunity to set a gold standard

16      on requiring corporate emissions data disclosure

17      with SB 263 and are pleased to support and serve

18      as a co-sponsor for this bill.

19                Some other climate risk reporting.  The

20      current voluntary climate emissions reporting

21      landscape is fragmented, incomplete, and often

22      unverified.  And this gap in publicly available

23      emissions data creates a massive blind spot for

24      consumers, investors, and policymakers who are

25      seeking to derive meaningful insights across the

(241 of 292) Page 241 of 292 Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 241 of 292
Case 2:24-cv-00801-ODW-PVC  Document 48-5  Filed 05/24/24  Page 11 of 52  Page ID
#:402

Page 10

1    entire economy.

2              In recent years we have begun to see

3    more and more action on emissions data reporting

4    from leading companies.  These businesses and

5    many of their peers understand that climate

6    change poses a significant risk to their long-

7    term economic success, impacts the health and

8    livelihood of the communities in which they

9    operate and live, and disrupts the value chains

10   on which they rely.

11             Reporting emissions data in a

12   consistent standardized format that all companies

13   must follow will provide a competitive edge for

14   leading businesses with investors and consumers.

15   As a result, many companies are already

16   voluntarily reporting some form of their

17   emissions data, including over 80 percent of S&P

18   500 companies.

19             However, mandatory emissions

20   disclosure, including Scopes 1, 2, and 3, is

21   necessary to access the full picture across

22   companies' value chains.  This will level the

23   playing field by ensuring that all major public

24   and private companies disclose their full

25   emissions inventory.  And this bill will also

(242 of 292) Page 242 of 292Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 242 of 292
Case 2:24-cv-00801-ODW-PVC  Document 48-5  Filed 05/24/24  Page 12 of 52  Page ID
#:403

                                                          Page 11

 1   complement the SEC's proposed climate disclosure
 2   rule as well as the European Corporate
 3   Sustainability Reporting Directive that took
 4   effect in January, and global standards that are
 5   expected to be finalized this year by the IFRS --
 6   so many acronyms in the sustainability world --
 7   International Sustainability Standards Board.
 8             We'd also like to note that several
 9   major companies and institutions already support
10   this bill, including Patagonia, Ikea USA, Dignity
11   Health, Sierra Nevada Brewing Company, Avocado
12   Green Brands Growth Collaborative, and Everlane.
13   For all the reasons stated above, Series
14   respectfully requests your aye vote on this
15   measure.  Thank you for your time and
16   consideration.
17             CHAIR BENJAMIN ALLEN:  Thank you.
18   Other folks who want to voice support for the
19   bill who are here in person?  Just come on up to
20   the mic.
21             KATE CONNELLY:  Kate Connelly on behalf
22   of the SEIU in support.
23             CHAIR BENJAMIN ALLEN:  Thank you.
24             JANET COX:  Janet Cox for Climate
25   Action California in support.  Thank you for your

Page 12

1    perseverance.

2              CHRISTINA SCARINGE:  Christina Scaringe

3    with the Center for Biological Diversity in

4    support.

5              LIV BUTLER:  Liv Butler, Californians

6    Against Waste in support.

7              MELISSA ROMERO:  Melissa Romero,

8    California Environmental Voters proud co-sponsor

9    of SB 253.  Thank you.

10             CHAIR BENJAMIN ALLEN:  All right.  Yes.

11   Sorry.

12             MELISSA ROMERO:  Who was also asked to

13   voice the support of Community Water Center for

14   the bill.

15             CHAIR BENJAMIN ALLEN:  Great.  Thank

16   you.  All right.  Witnesses in opposition to the

17   bill who want to come up to the mic.

18             BRADY VAN ENGELEN:  Good morning.

19   Brady Van Engelen here on behalf of the

20   California Chamber of Commerce.  First I'd just

21   like to take a moment and thank Senator Wiener

22   for the work that he's done with us previously on

23   this bill.  He's really kind of served as a model

24   author of, you know, the kind of, you know,

25   collaboration that we'd like to see from members

Page 13

1    moving, you know, throughout this process.  So

2    just wanted to take a moment and acknowledge that

3    he has been very accommodating.

4              However, there are still some concerns

5    that we have, primarily the transition isn't

6    exactly happening, you know, through one sector.

7    The economic impact varies depending on which

8    sector, and which sector -- and which is why you

9    see companies in various stages of analysis

10   tracking and goal setting.  We respectfully

11   oppose this bill primarily because the outsize

12   impact it would on medium and small businesses,

13   particularly those located here in California.

14             It's impossible to remove the supply

15   chain from Scope 3, so it just creates a really

16   challenging dynamic.  Giving the breadth of

17   calculating Scope 3 emissions, it's still more of

18   an art than a science.  There isn't really an

19   objective criteria for calculating Scope 3.  And

20   this fundamentally compromises the notion that SB

21   253 is a -- intended to be a transparency

22   measure.

23             Data transparency is only valuable when

24   you're comparing apples to apples.  The different

25   methodologies are going to create different kinds

(245 of 292) Page 245 of 292
Case: 25-5327  09/18/2025  DktEntry: 8.9  Page 245 of 292
Case 2:24-cv-00801-ODW-PVC  Document 48-5  Filed 05/24/24  Page 15 of 52  Page ID
#:406

Page 14

 1   of analyses, which makes things more complicated.

 2   If it were created -- if SB 253 were adopted, it

 3   would create yet another disclosure regime.  It

 4   would only further complicate climate reporting,

 5   which is happening at a national and global

 6   scale.  There isn't yet broad consensus.  We're

 7   seeing that through the SEC and through the Biden

 8   Administration, and we just encourage that to be

 9   contemplated if this bill is further revised to

10   contemplate that as well.

11          And at a minimum -- sorry.  And last --

12   but you know, another point to raise here is that

13   GHG emissions are an international issue.  This

14   bill doesn't really contemplate that either.

15   Thinking about this from a global perspective

16   rather than here in California where CARB's

17   regulatory authority really is confined really

18   complicates this issue as well.

19          For the reasons that I've noted above,

20   that's the reasons that we're opposed to this --

21   respectfully opposed to this bill.  Thank you.

22          CHAIR BENJAMIN ALLEN:  Thank you.

23   Thank you.  Other folks?  Yeah.

24          ROB SPIEGEL:  Hello again, Mr. Chair.

25   Rob Spiegel, Senior Policy Director for the

(246 of 292) Page 246 of 292Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 246 of 292
Case 2:24-cv-00801-ODW-PVC   Document 48-5   Filed 05/24/24   Page 16 of 52   Page ID
#:407

Page 15

1    California Manufacturers and Technology

2    Association.  Definitely concur with the comments

3    of my good colleague from Cal Chamber and also

4    definitely -- and deeply respect the efforts of

5    Senator Wiener in kind of bringing forward this

6    largely transparency measure.

7              But to give the committee and members a

8    little bit more of an optic as to how this

9    impacts the supply chain -- and I understand the

10   arguments surrounding, well, it doesn't impact

11   small businesses, well, the manufacturing sector,

12   not only California sector but internationally,

13   is going to be at the heart of this Scope 3

14   emission challenge.

15             We are the ones, as everybody knows,

16   manufacturing that finished product, that complex

17   product, the airplane, that vehicle, that

18   electronic device, the medical device.  And with

19   CMTA's own membership, we have members who are

20   manufacturers that rely on a supply chain

21   sometimes 10,000 or more subcontractors and

22   contractors to supply that finished product.

23             The only way in which the reportable

24   entity for Scope 3 emissions in this bill will be

25   able to comply is to go to each one of those

Page 16

1    10,000 manufacturers, those subcontractors, in

2    order to provide that emission data. Now, I do

3    respect that there were modifications made in SB

4    260 last year, including industry average, a

5    proxy data, secondary data. And those were all

6    fine and good, but the issue and the challenge

7    with primary and secondary data is it's not a

8    replacement for accuracy, and it's not a

9    replacement for completeness.

10          And that's what SB 253 is providing.

11   It relies upon average data, secondary data, not

12   the fundamental core component of what is that

13   emission target, and that's an issue. So with

14   that as well -- and I'll wrap up here very

15   quickly, CMTA, our National Association of

16   Manufacturers as well in discussing the SEC

17   modifications, this has been ongoing now for

18   almost two years. We're close to having that

19   finished.

20          But through that process, we've been

21   able to understand what the financial impact is

22   for all size businesses and manufacturers. The

23   cost of the reporting requirements can extend in

24   the tens to hundreds of thousands of dollars to

25   millions of dollars for those manufacturers of

(248 of 292) Page 248 of 292
Case: 25-5327  09/18/2025, DktEntry: 8.9, Page 248 of 292
Case 2:24-cv-00801-ODW-PVC  Document 48-5  Filed 05/24/24  Page 18 of 52  Page ID #:409

Page 17

1  products with complex supply chains.  So this is

2  going to be an expensive endeavor for California

3  businesses and others to comply.  We do respect

4  what the author is trying to do, but for these

5  reasons and others, we do have to respectfully

6  oppose.

7              CHAIR BENJAMIN ALLEN:  Before you sit

8  down --

9              ROB SPIEGEL:  Chair Allen.

10             CHAIR BENJAMIN ALLEN:  -- can I -- can

11  you just respond to the idea that major

12  businesses such as Walmart, I mean the author

13  just mentioned they're complying with the basic

14  parameters of the bill.  So why -- how is it that

15  they're able to comply but it's so onerous for

16  everybody else?

17             ROB SPIEGEL:  I think onerous is in the

18  eye of the beholder, okay?  So for a manufacturer

19  -- and we don't -- obviously we don't represent

20  Walmart.  I don't represent Walmart.  For a

21  manufacturer, though, it's broader than just the

22  retail sector for what we have to do.  It's

23  broader than transportation.  It's broader than

24  bringing that final product to a retail

25  establishment and to a consumer.  As we build and

(249 of 292) Page 249 of 292
Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 249 of 292
Case 2:24-cv-00801-ODW-PVC  Document 48-5  Filed 05/24/24  Page 19 of 52  Page ID
#:410

```
                                               Page 18

 1   construct that product --

 2             CHAIR BENJAMIN ALLEN:  You're

 3   incorporating lots of things.

 4             ROB SPIEGEL:  -- you're incorporating

 5   -- exactly.

 6             CHAIR BENJAMIN ALLEN:  But --

 7             ROB SPIEGEL:  So --

 8             CHAIR BENJAMIN ALLEN:  Yeah.

 9             ROB SPIEGEL:  -- on that level, it's --

10   again, to Brady's point, it's not an apples-to-

11   apples comparison.

12             CHAIR BENJAMIN ALLEN:  Is it any more

13   complicated than a big retailer that's bringing

14   in so many products from so many different

15   places, and has this complicated supply chain,

16   and all?  I don't know.  I'm --

17             ROB SPIEGEL:  I mean, in some ways it's

18   very similar.

19             CHAIR BENJAMIN ALLEN:  Yeah.

20             ROB SPIEGEL:  You take that final

21   product, the T-shirt, the television from

22   Walmart, they're requiring that manufacturer to

23   also provide that data I would assume.  Where --

24   what was the manufacturing profile of it?  What

25   were the emission targets of it?  Then from that
```

(250 of 292) Page 250 of 292Case: 25-5327  09/18/2025, DktEntry: 8.9, Page 250 of 292
Case 2:24-cv-00801-ODW-PVC  Document 48-5  Filed 05/24/24  Page 20 of 52  Page ID
#:411

Page 19

1   supplier, Samsung or whoever the TV manufacturer

2   is, they're going to each one of those internal

3   components to provide that additional data,

4   whether it's the LCD screen with wiring or what

5   have you.  That is how we conceptually understand

6   this bill and how it conceptually works.

7           CHAIR BENJAMIN ALLEN:  All right.

8   Well, we can discuss it further, and obviously

9   stay here and I'm sure we'll have some

10  discussions but appreciate that.  Okay.  other

11  folks who want to just weigh in, in opposition,

12  make sure their opposition is recorded?

13          BRET GLADFELTY:  Good morning.  Bret

14  Gladfelty with Apex Group on behalf of the

15  Association of General Contractors and Financial

16  Services Institute, and unfortunately in

17  opposition.  Again, Scope 3 is the big issue

18  here.  I think we could find a middle ground if

19  we just resolve Scope 3.  Thank you.

20          CHAIR BENJAMIN ALLEN:  Thank you.

21          MATTHEW ALLEN:  Hi, Mr. Chair and

22  members of the committee.  Matthew Allen with

23  Western Growers also opposed.

24          CHAIR BENJAMIN ALLEN:  Thank you.

25          ZACH LEARY:  Hi there.  Zach Leary with

Page 20

1    the Western States Petroleum Association.  We're

2    opposed.

3                JOANNE BETTENCOURT:  Joanne Bettencourt

4    representing SIFMA, the Securities Industry and

5    Financial Markets Association in opposition.

6                NICK CHAFFEE:  Good morning.  Nick

7    Chaffee with the California Trucking Association

8    in respectful opposition.  Thank you.

9                CHAIR BENJAMIN ALLEN:  Thank you.

10               MELANIE CUEVAS:  Good morning.  Melanie

11   Cuevas with the California Bankers Association

12   also in respectful opposition.  Thank you.

13               CHAIR BENJAMIN ALLEN:  Thank you very

14   much.

15               DAN KREKELBERG:  Dan Krekelberg with

16   the Climate Registry.  We have concerns about

17   this bill, about some of the language in there.

18   We're not in opposition to the bill, but we do

19   have concerns.  Specifically we'd like to see

20   standards and protocols included in there that

21   ensure the integrity of the greenhouse gas

22   emissions that are being disclosed, including --

23               CHAIR BENJAMIN ALLEN:  The integrity of

24   the data, right?

25               DAN KREKELBERG:  The data.

(252 of 292) Page 252 of 292Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 252 of 292
Case 2:24-cv-00801-ODW-PVC   Document 48-5   Filed 05/24/24   Page 22 of 52   Page ID
#:413

```
                                          Page 21

 1             CHAIR BENJAMIN ALLEN:  Right.

 2             DAN KREKELBERG:  The data.

 3             CHAIR BENJAMIN ALLEN:  Yeah.

 4             DAN KREKELBERG:  If the intent to

 5    prevent greenwashing, then we want to make sure

 6    that verification is done correctly, measurement

 7    and reporting as well.  And that includes

 8    inclusion of the protocols that were developed by

 9    the voluntary registry created by the state of

10    California 20 years ago.  Thank you.

11             CHAIR BENJAMIN ALLEN:  Okay.  Okay.

12    Folks on the phone lines.  Folks on the phone

13    lines, do you want to raise concerns or support

14    for the bill?

15             WOMAN 1:  Thank you.  If you're in

16    support or opposition, you may press 1 and then

17    0.  Again, that is 1 and then 0 for support or

18    opposition.  We'll go to line 44.  Your line is

19    open.

20             MADDIE MUNSON:  Maddie Munson on behalf

21    of the Agricultural Energy Consumers Association

22    and California Poultry Federation in opposition.

23             WOMAN 1:  Thank you.  Next we'll go

24    Line 25.  Your line is open.  Line 25, your line

25    is open.
```

Page 22

```
 1              JIM LINDBERG:  Jim Lindberg on behalf
 2    of the Friends Committee on Legislation of
 3    California in support.  Thank you.
 4              WOMAN 1:  Thank you.  Next we'll go to
 5    line 50.  Your line is open.
 6              ANDREA CORREIA:  Andrea Correia on
 7    behalf of the California Life Sciences in
 8    opposition.
 9              WOMAN 1:  Thank you.  Next we'll go to
10    line 49.  Your line is open.
11              MEGAN CLEVELAND:  Good morning.  Megan
12    Cleveland with the Nature Conservancy in support.
13              WOMAN 1:  Thank you.  Next we'll go to
14    line 24.  Your line is open.
15              VALERIE VENTRE-HUTTON:  Valerie Ventry-
16    Hutton with 350 Bay Area Action in support.
17              WOMAN 1:  Thank you.  Next we'll go to
18    line 35.  Your line is open.
19              WOMAN 2:  (Indiscernible) on behalf of
20    the American Pistachio Growers, California Apple,
21    Blueberry, Date, and Walnut Commission, Western
22    Plant Health Association, California All-Growers
23    Council, (Indiscernible) Farmers League,
24    (Indiscernible) Equipment Dealers, Cotton Ginners
25    and Growers Association, Fresh Fruit Association,
```

(254 of 292) Page 254 of 292
Case: 25-5327 09/18/2025, DktEntry: 8.9, Page 254 of 292
Case 2:24-cv-00801-ODW-PVC  Document 48-5  Filed 05/24/24  Page 24 of 52  Page ID
#:415

Page 23

1    and Western Ag Processors in opposition.  Thank

2    you.

3              WOMAN 1:  Thank you.  Next we'll go to

4    line 43.  Your line is open.

5              VICTORIA RODRIGUEZ:  Good morning.

6    Victoria Rodriguez with Nielsen Merksamer on

7    behalf of the Alliance for Automotive Innovation

8    in opposition.

9              WOMAN 1:  Thank you.  Next we'll go to

10   line 51.  Your line is open.

11             NATALIE BOUST:  Natalie Boust, the

12   California Business Roundtable respectfully

13   opposed.

14             WOMAN 1:  Thank you.  Line 48, your

15   line is open.

16             DARRYL LITTLE, JR.:  Darryl Little, Jr.

17   with the Natural Resources Defense Council in

18   support.  Thank you.

19             WOMAN 1:  Thank you.  Line 39, your

20   line is open.

21             STEVEN KING:  Hi, this is Steven King

22   with Environment California and CALPIRG, the

23   California Public Interest Research Group.  Both

24   groups are in support of SB 253.

25             WOMAN 1:  Thank you.  Next we'll go to

Page 24

1   line 45.  Your line is open.

2           RYAN ALLAIN:  Good morning.  This is

3   Ryan Allain with the California Retailers

4   Association in opposition.  Thank you.

5           WOMAN 1:  Thank you.  And next we'll go

6   to line 47.  Your line is open.

7           KATHY SCHAEFER:  Kathy Schaefer on

8   behalf of the San Fernando Valley Climate Reality

9   Project in support.  Thank you.

10          WOMAN 1:  Thank you.  We do have one

11  more in queue.  We're just waiting for their line

12  number.  It'll be just a moment.  Thank you.  And

13  next we'll go to line 52.  Your line is open.

14          JOHN WINGER:  Thanks, chair members.

15  John Winger on behalf of the California Fuels and

16  Convenience Alliance and the Advanced Medical

17  Technology Association in opposition.  Thanks.

18          WOMAN 1:  Thank you.  And we have no

19  further supporting or opposition in queue.

20          CHAIR BENJAMIN ALLEN:  All right.

21  Thank you.  We'll bring the bill back to the

22  committee for questions, discussion, concerns,

23  support.  Senator Hurtado.

24          SENATOR MELISSA HURTADO:  Thank you,

25  Mr. Chair.  And thank you, Senator Wiener.  I

ER-2006

(256 of 292) Page 256 of 292 Case: 25-5327  09/18/2025, DktEntry: 8.9, Page 256 of 292
Case 2:24-cv-00801-ODW-PVC  Document 48-5  Filed 05/24/24  Page 26 of 52  Page ID
#:417

Page 25

```
 1    know that last year I supported a similar bill
 2    that you had.  It was probably the exact same
 3    thing.  And I know that you made some changes to
 4    the bill.  I'm all for climate corporate data
 5    accountability, but I do have some new concerns
 6    in this area.  I mean, I like -- I love the fact
 7    that it puts the responsibility on corporations
 8    over $1 billion.  At the same time, I also have
 9    concern over those corporations having and
10    collecting information of, you know, of the
11    supply chain and what type of information they'll
12    have in their hands.
13            And I don't think that the bill is --
14    you know, clearly defines what needs to be
15    collected from those companies.  I believe that
16    it leaves the responsibility to a panel of
17    experts to advise CARB.  And I think without
18    having that information at -- you know, in my
19    hands, I can't support the bill because I just
20    don't know what will come about from it.
21            And the concern really is -- and there
22    was mention of Walmart.  Well, Walmart just picks
23    and chooses who they buy from.  And can they have
24    a competitive edge down the road because of the
25    information that is provided?  I mean, that's a
```

(257 of 292) Page 257 of 292Case: 25-5327  09/18/2025, DktEntry: 8.9, Page 257 of 292
Case 2:24-cv-00801-ODW-PVC   Document 48-5   Filed 05/24/24   Page 27 of 52   Page ID
#:418

Page 26

```
 1    concern that I have.  And I don't know if you

 2    have anything to say on those issues there.

 3              SENATOR SCOTT WIENER:  Sure.  I

 4    appreciate it, Senator Hurtado.  And thank you

 5    for your support of this bill last year.  This

 6    bill is no broader than last year.  In fact, in

 7    some ways it was somewhat narrowed in the

 8    assembly.  So it's a very similar bill to last

 9    year.

10              So first of all, Scope 3 is extremely

11    well-defined.  The GHG -- it's called the GHG

12    Protocols, which is what the bill is based on.

13    It's a well-flushed out and established

14    methodology that companies around the world are

15    using today.  And we gave Walmart as an example.

16    A lot of other companies big and small are using

17    it in the U.S., in the EU, and they're you know,

18    compiling Scope 3.

19              So this is -- we're not creating

20    anything new in this bill other than the

21    requirement to do it.  We're not creating a new

22    methodology, a new system.  This is all

23    established methodology and all very well

24    defined.  So I don't agree that this is -- it's

25    like a nebulous Scope 3.
```

Page 27

1           In addition, these companies, if they
2    want to, can already collect this -- or require
3    this data from their suppliers.  They have every
4    ability to do that, and some of them are already
5    doing it.  We -- and we're not even requiring
6    them to go to their suppliers because I know -- I
7    appreciate the opposition acknowledging that we
8    worked very hard with them in the last two years
9    to allow for Scope 3 use of formulas and
10   estimates, which is also an established
11   methodology.
12           So they do not -- so they're not
13   required to go to every single micro-supplier and
14   demand that data.  They can do that if they want,
15   and some companies are already doing it, but
16   we're not requiring them to do it.  So I think
17   that Scope 3 is very well established and we're
18   not doing anything new or out of the ordinary
19   here with that requirement.
20           SENATOR MELISSA HURTADO:  Thank you.  I
21   guess on my end I would love to learn a little
22   bit more about the formulas and the methodologies
23   --
24           SENATOR SCOTT WIENER:  Sure.
25           SENATOR MELISSA HURTADO:  -- that are

Page 28

```
 1   being used.  Because I think that's what will get
 2   me back to a position of aye on this measure.  I
 3   want to support it.  I supported it last year.  I
 4   do have, as I mentioned, new concerns.  However,
 5   I do want to learn some more about the formulas
 6   and methodologies and to be able to get myself
 7   back to an aye vote.
 8           SENATOR SCOTT WIENER:  We'll absolutely
 9   be happy to work with you on that.
10           SENATOR MELISSA HURTADO:  Thank you.
11           CHAIR BENJAMIN ALLEN:  Thank you.  All
12   right.  Yes.  Senator Dahle.
13           VICE CHAIR BRIAN DAHLE:  Thank you, Mr.
14   Chairman.  So I listened to a lot of debate, and
15   obviously -- so I'm a producer of agriculture
16   commodities in California, which is amazing I'm
17   still here.  We have AB 32.  We have Air Board.
18   We have all kinds of things to meet goals of
19   reducing carbon in California and are just two
20   California businesses.
21           So I think the difference in -- you
22   know, you're talking about Walmart is doing it
23   already, and you're talking about these -- and
24   it's a billion-dollar company.  So I sell my
25   products to -- and I looked them up -- companies
```

Page 29

1    that are over -- will meet this threshold, and my

2    products go there.  And I'm not required to

3    report today, and they're not required to ask me.

4    They could use some formula I guess to try to

5    figure out what I do.

6              But when you add in the fact that they

7    can get a $50,000 fine or $100,000 penalty by the

8    AG's Office according to what I'm reading here,

9    is that there will be the ability to be able to

10   do that, and then we're going to talk later down

11   the road about, you know, how accurate they are

12   and what the ability is.  So I think that's the

13   nervousness of why people are concerned about

14   your piece of legislation.

15             So if you could address that issue and

16   give us some sort of secure answer in why it

17   would be, you know, not pushed down to those

18   smaller companies that are producing those

19   products that go to these large corporations --

20             SENATOR SCOTT WIENER:  Sure.

21             VICE CHAIR BRIAN DAHLE:  -- I think

22   that would be helpful --

23             SENATOR SCOTT WIENER:  I think the --

24             VICE CHAIR BRIAN DAHLE:  -- in this

25   debate.

Page 30

1              SENATOR SCOTT WIENER:  -- some of the

2     nervousness by large corporations is because they

3     don't want to do the disclosure and they don't

4     want to say what their carbon footprint is

5     because they think they're going to be

6     embarrassed by it.  I'm just being totally blunt.

7     I think that's what the nervousness is.  Because

8     we were -- again, we worked with -- they came

9     forward and said it's going to be really hard for

10    us to go through the entire global supply chain.

11              Those 10,000 -- the 10,000 suppliers

12    that the folks from the manufacturers talked

13    about, we don't want to go to 10,000 people.  We

14    said, okay, we'll work with you and allow you the

15    option.  You can go to all of them if you want

16    to, but you don't have to.  You can use these

17    estimates and formulas, which are well-

18    established methodology.  It's an established

19    software.  It's an established thing, and you can

20    do that if you want to.

21              And now they come back and say, well,

22    on the one hand it's still going to affect our

23    suppliers, which it doesn't.  That's just not

24    accurate.  On the other hand, you accommodated us

25    by saying we could use formulas.  Now we're

Page 31

1    saying it's not accurate enough to use formulas.

2    Well, which way is it?  You're saying it's going

3    to be too accurate and too hard to get that

4    precise accuracy, and it's going to sweep in

5    small suppliers and be too burdensome.  Okay.

6    We'll use estimates.  Well, now it's not accurate

7    enough.

8            So I understand they oppose the bill,

9    and I appreciate that they have worked with us,

10   but at some point the arguments stop making

11   sense.  I think that companies largely are going

12   to use the formulas.  That's what I -- I'm -- I

13   strongly suspect that.  If a company was bound

14   and determined to get precise data from its

15   suppliers, they would probably be doing that

16   already, right?

17           They don't like this bill.  They're not

18   going to go above and beyond what they're

19   required to do.  I'd be surprised if they did.

20   And so that -- that's my take on it.  And we did

21   this amendment, and we put a lot of work into it

22   precisely to lower the risk of smaller suppliers

23   being swept in.  That was our goal because my

24   goal has never been to require an impact on these

25   small suppliers.

Page 32

1           VICE CHAIR BRIAN DAHLE:  What about

2    out-of-country suppliers that aren't required to

3    give any information at all?

4           SENATOR SCOTT WIENER:  They can --

5    that's -- they can use the formulas and

6    estimates.  That's another -- there was -- the

7    two reasons for making the change were the small

8    suppliers, and the other one was, especially if

9    you're larger and you have a worldwide supply

10   chain, we get that it's -- you know, that micro-

11   supplier in Indonesia, you might struggle to get

12   information from them.  Different country,

13   different, you know, business atmosphere.

14          They may not be able to calculate it,

15   and that's why we gave companies the options of

16   using these established formulas to do it so that

17   they would not get caught up in that kind of

18   situation.

19          CHAIR BENJAMIN ALLEN:  Okay.  Joint

20   Author Gonzalez has moved this bill.

21          SENATOR SCOTT WIENER:  Thank you.

22          CHAIR BENJAMIN ALLEN:  We'll let you

23   close, Senator.

24          SENATOR SCOTT WIENER:  Thank you very

25   much, colleagues.  Just looking big picture, this

(264 of 292) Page 264 of 292
Case: 25-5327  09/18/2025, DktEntry: 8.9, Page 264 of 292
Case 2:24-cv-00801-ODW-PVC  Document 48-5  Filed 05/24/24  Page 34 of 52  Page ID
#:425

Page 33

1    is about information and transparency.  This bill

2    does not regulate these companies.  It does not

3    require them to do anything to change their

4    missions.  I know there are other bills that are

5    dealing with that, and that's its own debate.

6    All this does is they tell us what your carbon

7    footprint is just like all these other

8    corporations here and around the world are

9    already doing.

10           We have major corporations that are not

11   just doing this but are sponsoring this bill and

12   are submitting support letters saying this is

13   doable, we do this.  It should be standardized.

14   It is -- there's few things that are more

15   maddening when you see some like major -- I know

16   the oil companies oppose it.  The oil companies

17   that literally run around having like

18   greenwashing ads on network TV about how

19   incredibly green they are with all the green

20   imagery for oil companies that are polluting.

21           And you know, they can advertise

22   however they want, but they should at least have

23   to tell us what their carbon footprint is so that

24   members of the public don't just have to believe

25   what they see on TV.  I respectfully ask for your

(265 of 292) Page 265 of 292Case: 25-5327  09/18/2025  DktEntry: 8.9  Page 265 of 292
Case 2:24-cv-00801-ODW-PVC  Document 48-5  Filed 05/24/24  Page 35 of 52  Page ID
#:426

```
                                          Page 34

 1    aye vote.

 2              CHAIR BENJAMIN ALLEN:  All right.

 3    Thank you, Senator.  Secretary, please call the

 4    roll.

 5              SECRETARY:  All right.  This is SB 253

 6    and the motion is due passed to the Senate

 7    Judiciary Committee.  Allen?

 8              CHAIR BENJAMIN ALLEN:  Aye.

 9              SECRETARY:  Allen aye.  Dahle?

10              VICE CHAIR BRIAN DAHLE:  No.

11              SECRETARY:  Dahle no.  Gonzalez?

12              SENATOR LENA GONZALEZ:  Aye.

13              SECRETARY:  Gonzalez aye.  Hurtado?

14    Menjivar?

15              SENATOR CAROLINE MENJIVAR:  Aye.

16              SECRETARY:  Menjivar aye.  Nguyen?

17              SENATOR JANET NGUYEN:  No.

18              SECRETARY:  Nguyen no.  Skinner?

19              SENATOR NANCY SKINNER:  Aye.

20              SECRETARY:  Skinner aye.

21              CHAIR BENJAMIN ALLEN:  Okay.

22              SECRETARY:  I'm sorry, 4-2.

23              CHAIR BENJAMIN ALLEN:  That's 4-2 with

24    one abstention so we'll close the roll on that.

25    All right.  Thank you, members.  Let's -- that
```

(266 of 292) Page 266 of 292Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 266 of 292
Case 2:24-cv-00801-ODW-PVC  Document 48-5  Filed 05/24/24  Page 36 of 52  Page ID
#:427

Page 35

```
 1   concludes our agenda.  Let's just make sure we
 2   got all the votes added on for everybody.  We
 3   will start out with the SB 12, Item 1 on your
 4   agendas, members.  Item 1, SB 12.  Secretary,
 5   please call the roll.
 6             SECRETARY:  SB 12, the motion -- I'm
 7   sorry, SB 12 is File Item Number 1, and the
 8   motion is due pass to the Senate Appropriations
 9   Committee.  Current vote is 4-2, Chair voting
10   aye, Vice Chair voting no.  Hurtado?
11             CHAIR BENJAMIN ALLEN:  12, yeah.
12             SENATOR MELISSA HURTADO:  Aye.
13             SECRETARY:  Hurtado aye.  Final vote is
14   5-2.
15             CHAIR BENJAMIN ALLEN:  Okay.  That's 5-
16   2.  We'll close the roll on that item.  Oh,
17   before you go, can we take the consent calendar?
18             (End of requested portion)
19
20
21
22
23
24
25
```

(267 of 292) Page 267 of 292
Case: 25-5327 09/18/2025 DktEntry: 8.9 Page 267 of 292
Case 2:24-cv-00801-ODW-PVC Document 48-5 Filed 05/24/24 Page 37 of 52 Page ID #:428

Page 36

1                    C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certify that the

4    foregoing transcript is a true and accurate

5    record of the proceedings.

6

7

8    _Sonya M. Ledanski Hyde_

9    _____

10

11   Veritext Legal Solutions

12   330 Old Country Road

13   Suite 300

14   Mineola, NY 11501

15

16   Date: May 21, 2024

17

18

19

20

21

22

23

24

25

**[0 - ago]**                                                                    Page 1

## 0

**0**  21:17,17
**01:53:42**  1:15

## 1

**1**  10:20 21:15
  21:16,17,23
  22:4,9,13,17
  23:3,9,14,19,25
  24:5,10,18
  25:8 35:3,4,7
**10,000**  15:21
  16:1 30:11,11
  30:13
**100,000**  29:7
**11501**  36:14
**12**  35:3,4,6,7,11
**12151**  36:8
**1989**  9:7

## 2

**2**  10:20 22:19
  35:16
**20**  21:10
**20230315**  1:14
**2024**  36:16
**21**  36:16
**24**  22:14
**25**  21:24,24
**253**  2:3,14 7:1
  7:8 8:2 12:9
  13:21 14:2
  16:10 23:24
  34:5
**260**  2:8 16:4

**261**  9:14
**263**  9:17

## 3

**3**  4:16,18,19,22
  10:20 13:15,17
  13:19 15:13,24
  19:17,19 26:10
  26:18,25 27:9
  27:17
**3/15/2023**  1:11
**300**  36:13
**32**  28:17
**330**  36:12
**35**  22:18
**350**  22:16
**39**  23:19

## 4

**4-2**  34:22,23
  35:9
**40**  2:9
**41**  2:10
**43**  23:4
**44**  21:18
**45**  24:1
**47**  24:6
**48**  23:14
**49**  22:10

## 5

**5**  35:15
**5-2**  35:14
**50**  22:5
**50,000**  29:7
**500**  10:18

**51**  23:10
**52**  24:13

## 6

**6**  2:3

## 8

**80**  10:17

## 9

**90**  4:19

## a

**ab**  28:17
**ability**  27:4
  29:9,12
**able**  15:25
  16:21 17:15
  28:6 29:9
  32:14
**above**  8:14
  11:13 14:19
  31:18
**absolutely**  4:8
  5:14 28:8
**abstention**
  34:24
**access**  10:21
**accommodated**
  30:24
**accommodati...**
  13:3
**accountability**
  2:15 25:5
**accountable**
  6:7
**accuracy**  16:8
  31:4

**accurate**  8:5
  29:11 30:24
  31:1,3,6 36:4
**achieving**  8:1
**acknowledge**
  13:2
**acknowledging**
  27:7
**acronym**  9:2
**acronyms**  11:6
**act**  2:15
**action**  10:3
  11:25 22:16
**actions**  7:24
**actually**  3:8
**add**  29:6
**added**  35:2
**addition**  27:1
**additional**  19:3
**address**  29:15
**administration**
  14:8
**adopted**  14:2
**ads**  33:18
**advanced**
  24:16
**advertise**  33:21
**advise**  25:17
**affect**  30:22
**ag**  23:1
**ag's**  29:8
**agenda**  35:1
**agendas**  35:4
**ago**  2:7,13
  21:10

[agree - bill]                                            Page 2

**agree** 26:24
**agricultural** 21:21
**agriculture** 8:18 28:15
**air** 28:17
**airplane** 15:17
**allain** 24:2,3
**allen** 2:1 6:10 6:13 8:16,21 8:24 9:3,6,10 9:12 11:17,23 12:10,15 14:22 17:7,9,10 18:2 18:6,8,12,19 19:7,20,21,22 19:24 20:9,13 20:23 21:1,3 21:11 24:20 28:11 32:19,22 34:2,7,8,9,21 34:23 35:11,15
**alliance** 23:7 24:16
**allow** 5:4 27:9 30:14
**alvaro** 6:4,12 6:14
**amazing** 28:16
**amendment** 5:3 5:15 31:21
**amendments** 4:14 5:16,19 5:22

**american** 22:20
**analyses** 14:1
**analysis** 2:11 13:9
**andrea** 22:6,6
**annual** 2:18
**answer** 6:9 29:16
**apex** 19:14
**apple** 22:20
**apples** 13:24,24 18:10,11
**appreciate** 19:10 26:4 27:7 31:9
**appropriations** 35:8
**area** 6:8 22:16 25:6
**arguments** 15:10 31:10
**art** 13:18
**asked** 12:12
**assembly** 2:9 26:8
**associate** 6:1
**association** 15:2 16:15 19:15 20:1,5,7 20:11 21:21 22:22,25,25 24:4,17
**assume** 18:23
**atkin** 6:6

**atmosphere** 32:13
**author** 12:24 17:4,12 32:20
**authority** 14:17
**automotive** 23:7
**available** 9:22
**average** 16:4 16:11
**avocado** 11:11
**aye** 5:24 8:15 11:14 28:2,7 34:1,8,9,12,13 34:15,16,19,20 35:10,12,13

**b**

**back** 2:10 4:6 24:21 28:2,7 30:21
**bankers** 20:11
**based** 2:16 26:12
**basic** 17:13
**basically** 2:21 3:14
**bay** 22:16
**begun** 10:2
**behalf** 9:13 11:21 12:19 19:14 21:20 22:1,7,19 23:7 24:8,15
**beholder** 17:18

**believe** 8:20 9:14 25:15 33:24
**benjamin** 2:1 6:10 8:16,21 8:24 9:3,6,10 11:17,23 12:10 12:15 14:22 17:7,10 18:2,6 18:8,12,19 19:7,20,24 20:9,13,23 21:1,3,11 24:20 28:11 32:19,22 34:2 34:8,21,23 35:11,15
**bettencourt** 20:3,3
**beyond** 3:24 31:18
**biden** 14:7
**big** 18:13 19:17 26:16 32:25
**bill** 2:2,6,8,12 3:10,25 4:15 4:16,23 5:22 6:3 9:18 10:25 11:10,19 12:14 12:17,23 13:11 14:9,14,21 15:24 17:14 19:6 20:17,18 21:14 24:21 25:1,4,13,19

[bill - close]                                                                    Page 3

26:5,6,8,12,20
31:8,17 32:20
33:1,11
**billion** 2:17
25:8 28:24
**bills** 33:4
**biological** 12:3
**bit** 15:8 27:22
**blind** 9:23
**blueberry**
22:21
**blunt** 30:6
**board** 11:7
28:17
**bound** 31:13
**boust** 23:11,11
**brady** 12:18,19
**brady's** 18:10
**brands** 11:12
**breadth** 13:16
**bret** 19:13,13
**brewing** 11:11
**brian** 28:13
29:21,24 32:1
34:10
**bring** 24:21
**bringing** 15:5
17:24 18:13
**broad** 14:6
**broader** 17:21
17:23,23 26:6
**build** 6:17
17:25
**burden** 4:1 5:1

**burdensome**
31:5
**business** 2:18
6:2 23:12
32:13
**businesses** 10:4
10:14 13:12
15:11 16:22
17:3,12 28:20
**butler** 12:5,5
**buy** 25:23

c

**c** 36:1,1
**cal** 15:3
**calculate** 32:14
**calculating**
13:17,19
**calendar** 35:17
**california** 2:18
3:16 4:9 7:19
11:25 12:8,20
13:13 14:16
15:1,12 17:2
20:7,11 21:10
21:22 22:3,7
22:20,22 23:12
23:22,23 24:3
24:15 28:16,19
28:20
**californians**
7:1 12:5
**call** 3:6 34:3
35:5
**called** 26:11

**calpirg** 23:22
**cap** 3:15
**caps** 9:5
**carb** 25:17
**carb's** 14:16
**carbon** 2:19,24
3:2,4,12 4:20
4:21 6:7 7:9
8:7 28:19 30:4
33:6,23
**caroline** 34:15
**catherine** 6:6
**caught** 32:17
**center** 12:3,13
**certify** 36:3
**chaffee** 20:6,7
**chain** 4:18 5:10
13:15 15:9,20
18:15 25:11
30:10 32:10
**chains** 7:7 10:9
10:22 17:1
**chair** 2:1,6 6:10
6:13 8:16,21
8:24 9:3,6,10
9:12 11:17,23
12:10,15 14:22
14:24 17:7,9
17:10 18:2,6,8
18:12,19 19:7
19:20,21,24
20:9,13,23
21:1,3,11
24:14,20,25
28:11,13 29:21

29:24 32:1,19
32:22 34:2,8
34:10,21,23
35:9,10,11,15
**chairman**
28:14
**challenge** 15:14
16:6
**challenges** 6:19
6:20
**challenging**
13:16
**chamber** 4:13
12:20 15:3
**change** 6:19,21
7:21 10:6 32:7
33:3
**changes** 25:3
**chooses** 25:23
**christina** 12:2,2
**claiming** 3:25
**claims** 6:24
7:18
**clearly** 25:14
**cleveland** 22:11
22:12
**climate** 2:14
6:19,21 7:10
7:16,18,21,24
8:1,7,9 9:19,20
10:5 11:1,24
14:4 20:16
24:8 25:4
**close** 16:18
32:23 34:24

[close - council]  Page 4

35:16
cmta 16:15
cmta's 15:19
coalition 6:3
collaboration
  12:25
collaborative
  11:12
colleague 15:3
colleagues 2:14
  4:11 32:25
collect 27:2
collected 25:15
collecting
  25:10
color 6:17 8:12
come 4:9 11:19
  12:17 25:20
  30:21
comments 15:2
commerce 4:14
  12:20
commission
  22:21
committee 1:11
  1:14 2:7,12
  6:13 9:12 15:7
  19:22 22:2
  24:22 34:7
  35:9
commodities
  28:16
common 8:23
communities
  6:16,22 8:8,12

8:13 10:8
community
  12:13
companies 2:16
  3:13 4:2,19
  7:13 10:4,12
  10:15,18,22,24
  11:9 13:9
  25:15 26:14,16
  27:1,15 28:25
  29:18 31:11
  32:15 33:2,16
  33:16,20
company 11:11
  28:24 31:13
comparing
  13:24
comparison
  18:11
competitive
  10:13 25:24
compiling 3:19
  26:18
complement
  11:1
completeness
  16:9
complex 15:16
  17:1
complicate
  14:4
complicated
  14:1 18:13,15
complicates
  14:18

comply 15:25
  17:3,15
complying
  17:13
component
  16:12
components
  19:3
comprehensive
  7:10
compromises
  13:20
conceptually
  19:5,6
concern 25:9
  25:21 26:1
concerned
  29:13
concerns 13:4
  20:16,19 21:13
  24:22 25:5
  28:4
concludes 35:1
concur 15:2
confined 14:17
connelly 11:21
  11:21
consensus 14:6
consent 35:17
conservancy
  22:12
consideration
  11:16
consistent
  10:12

construct 18:1
consumer
  17:25
consumers 9:24
  10:14 21:21
contemplate
  14:10,14
contemplated
  14:9
contentious
  4:17
contract 2:21
contracting
  4:21
contractors
  15:22 19:15
contribute 8:8
convenience
  24:16
core 16:12
corporate 2:15
  3:16,16 6:24
  7:9,17 8:2,6,7
  9:16 11:2 25:4
corporations
  2:24 3:1,18,23
  6:23 7:4,6 8:6
  25:7,9 29:19
  30:2 33:8,10
correctly 21:6
correia 22:6,6
cost 16:23
cotton 22:24
council 22:23
  23:17

[country - entire]                                                    Page 5

| | | | |
|---|---|---|---|
| **country** 32:2 | **deadly** 8:8 | **disclosed** 20:22 | **effect** 11:4 |
| 32:12 36:12 | **dealers** 22:24 | **disclosure** 2:20 | **effectively** 4:21 |
| **cox** 11:24,24 | **dealing** 33:5 | 9:16 10:20 | 4:25 |
| **create** 5:1 | **debate** 28:14 | 11:1 14:3 30:3 | **efforts** 15:4 |
| 13:25 14:3 | 29:25 33:5 | **disclosures** | **either** 14:14 |
| **created** 14:2 | **decisions** 7:2 | 3:13 | **electronic** |
| 21:9 | **decreasing** | **discuss** 19:8 | 15:18 |
| **creates** 7:8 9:23 | 7:15 | **discussing** | **embarrassed** |
| 13:15 | **deeply** 15:4 | 16:16 | 30:6 |
| **creating** 5:7 | **defense** 23:17 | **discussion** | **emission** 8:3 |
| 26:19,21 | **defined** 26:11 | 24:22 | 15:14 16:2,13 |
| **criteria** 13:19 | 26:24 | **discussions** | 18:25 |
| **critiques** 5:20 | **defines** 25:14 | 19:10 | **emissions** 4:20 |
| **cuevas** 20:10 | **definitely** 15:2 | **disproportion...** | 4:22 6:24 7:3,6 |
| 20:11 | 15:4 | 8:12 | 7:7,8,10,16,22 |
| **current** 9:20 | **demand** 27:14 | **disrupts** 10:9 | 8:7 9:16,20,23 |
| 35:9 | **depending** 13:7 | **diversity** 12:3 | 10:3,11,17,19 |
| | **derive** 9:25 | **doable** 3:22 4:1 | 10:25 13:17 |
| **d** | **determined** | 33:13 | 14:13 15:24 |
| | 31:14 | **doing** 4:3 27:5 | 20:22 |
| **dahle** 28:12,13 | **developed** 21:8 | 27:15,18 28:22 | **emitters** 3:14 |
| 29:21,24 32:1 | **device** 15:18,18 | 31:15 33:9,11 | **emitting** 7:15 |
| 34:9,10,11 | **difference** | **dollar** 28:24 | **encourage** 14:8 |
| **dan** 20:15,15 | 28:21 | **dollars** 2:17 | **endeavor** 17:2 |
| 20:25 21:2,4 | **different** 5:2 | 16:24,25 | **energy** 21:21 |
| **darryl** 23:16,16 | 13:24,25 18:14 | **drag** 7:9 | **enforcement** |
| **data** 2:15,22 | 32:12,13 | **due** 34:6 35:8 | 5:20 |
| 3:19 7:8 9:16 | **dignity** 11:10 | **dynamic** 13:16 | **engelen** 12:18 |
| 9:23 10:3,11 | **direct** 7:5 | | 12:19 |
| 10:17 13:23 | **directive** 11:3 | **e** | **enormous** 6:7 |
| 16:2,5,5,7,11 | **director** 6:6 | | **ensure** 20:21 |
| 16:11 18:23 | 14:25 | **e** 36:1 | **ensures** 8:5 |
| 19:3 20:24,25 | **disclose** 2:19 | **economic** 6:18 | **ensuring** 10:23 |
| 21:2 25:4 27:3 | 10:24 | 10:7 13:7 | **entire** 2:19 10:1 |
| 27:14 31:14 | | **economy** 10:1 | 30:10 |
| **date** 22:21 | | **edge** 10:13 | |
| 36:16 | | 25:24 | |

[entity - going]                                                                    Page 6

**entity**  15:24
**environment**
  7:14 23:22
**environmental**
  1:11,14 12:8
**equipment**
  22:24
**esg**  9:9
**especially**  32:8
**established**  5:5
  5:7 26:13,23
  27:10,17 30:18
  30:18,19 32:16
**establishes**
  7:13
**establishment**
  17:25
**estimates**  5:5
  27:10 30:17
  31:6 32:6
**eu**  4:4 26:17
**european**  11:2
**everlane**  11:12
**everybody**
  15:15 17:16
  35:2
**exact**  25:2
**exactly**  13:6
  18:5
**example**  4:16
  26:15
**examples**  3:20
**expected**  11:5
**expensive**  17:2

**expertise**  6:8
**experts**  25:17
**extend**  16:23
**extremely**
  26:10
**exxon**  9:8
**eye**  17:18

**f**

**f**  36:1
**fact**  3:24 25:6
  26:6 29:6
**fall**  8:12
**farmers**  22:23
**federation**
  21:22
**fernando**  24:8
**field**  10:23
**fighting**  7:21
**figure**  29:5
**file**  35:7
**filled**  6:18
**final**  17:24
  18:20 35:13
**finalized**  11:5
**financial**  16:21
  19:15 20:5
**find**  19:18
**fine**  16:6 29:7
**finished**  15:16
  15:22 16:19
**first**  12:20
  26:10
**floods**  8:10
**floor**  2:9

**flushed**  26:13
**focused**  9:9
**folks**  11:18
  14:23 19:11
  21:12,12 30:12
**follow**  8:3
  10:13
**footprint**  2:19
  2:24 3:2,5 8:7
  30:4 33:7,23
**foregoing**  36:4
**form**  10:16
**format**  10:12
**formula**  29:4
**formulas**  5:4
  27:9,22 28:5
  30:17,25 31:1
  31:12 32:5,16
**forth**  4:6
**forward**  15:5
  30:9
**fragmented**
  9:21
**fresh**  22:25
**friends**  22:2
**fruit**  22:25
**fuels**  24:15
**full**  10:21,24
**fundamental**
  16:12
**fundamentally**
  13:20
**further**  14:4,9
  19:8 24:19

**future**  6:16

**g**

**gap**  9:22
**gas**  20:21
**general**  19:15
**ghg**  8:3 14:13
  26:11,11
**ginners**  22:24
**give**  15:7 29:16
  32:3
**giving**  13:16
**gladfelty**  19:13
  19:14
**global**  5:10
  7:20 11:4 14:5
  14:15 30:10
**go**  15:25 21:18
  21:23 22:4,9
  22:13,17 23:3
  23:9,25 24:5
  24:13 27:6,13
  29:2,19 30:10
  30:13,15 31:18
  35:17
**goal**  13:10
  31:23,24
**goals**  7:23 8:1
  28:18
**goddess**  8:18
**goes**  3:24
**going**  4:24 5:12
  13:25 15:13
  17:2 19:2
  29:10 30:5,9
  30:22 31:2,4

[going - inventory]                                                    Page 7

| | | i | indirect 7:8 |
|---|---|---|---|
| 31:11,18 | happening 13:6 | | indiscernible |
| **gold** 7:11 9:15 | 14:5 | **idea** 4:8 17:11 | 22:19,23,24 |
| **gonzalez** 32:20 | **happy** 28:9 | **ifrs** 11:5 | **indonesia** |
| 34:11,12,13 | **hard** 3:1 4:12 | **ikea** 11:10 | 32:11 |
| **good** 2:6 6:12 | 7:20 27:8 30:9 | **imagery** 33:20 | **industry** 16:4 |
| 9:11 12:18 | 31:3 | **impact** 13:7,12 | 20:4 |
| 15:3 16:6 | **harsher** 8:9 | 15:10 16:21 | **information** |
| 19:13 20:6,10 | **health** 10:7 | 31:24 | 3:11 7:2 25:10 |
| 22:11 23:5 | 11:11 22:22 | **impacts** 8:11 | 25:11,18,25 |
| 24:2 | **healthy** 6:17 | 10:7 15:9 | 32:3,12 33:1 |
| **great** 3:4,18 | **hearing** 1:12 | **imperative** | **informed** 7:2 |
| 12:15 | **heart** 15:13 | 6:21 | **infrastructure** |
| **green** 3:1,6,6,7 | **held** 2:17 | **implementati...** | 7:9 |
| 3:9 11:12 | **hello** 14:24 | 5:17 | **initially** 9:1 |
| 33:19,19 | **helpful** 29:22 | **important** 4:22 | **innovation** |
| **greenhouse** | **hi** 6:12 19:21 | **importantly** | 23:7 |
| 20:21 | 19:25 23:21 | 7:24 | **insights** 9:25 |
| **greenlining** 6:5 | **historic** 8:10 | **impossible** | **institute** 6:5,15 |
| 6:15 8:14 | **honored** 4:16 | 13:14 | 8:14 19:16 |
| **greenwashing** | 5:16,21,22 | **inaccurate** 4:2 | **institutions** |
| 21:5 33:18 | **hope** 4:7 | **included** 20:20 | 11:9 |
| **ground** 19:18 | **host** 2:22 | **includes** 4:18 | **integrity** 20:21 |
| **group** 19:14 | **https** 1:13 | 21:7 | 20:23 |
| 23:23 | **hundreds** | **including** 3:20 | **intended** 13:21 |
| **groups** 23:24 | 16:24 | 10:17,20 11:10 | **intent** 21:4 |
| **growers** 19:23 | **hurtado** 24:23 | 16:4 20:22 | **interest** 23:23 |
| 22:20,22,25 | 24:24 26:4 | **inclusion** 21:8 | **internal** 19:2 |
| **growth** 11:12 | 27:20,25 28:10 | **income** 8:13 | **international** |
| **guess** 27:21 | 34:13 35:10,12 | **incomplete** | 11:7 14:13 |
| 29:4 | 35:13 | 9:21 | **internationally** |
| **guys** 8:24 | **hutton** 22:15 | **incorporating** | 15:12 |
| | 22:16 | 18:3,4 | **inventory** |
| **h** | **hyde** 36:3 | **increasing** 7:16 | 10:25 |
| **hand** 30:22,24 | | **incredibly** 4:22 | |
| **hands** 25:12,19 | | 33:19 | |

**[investors - marketing]**

**investors** 2:23
9:24 10:14
**issue** 5:9 14:13
14:18 16:6,13
19:17 29:15
**issues** 26:2
**it'll** 24:12
**item** 2:3 35:3,4
35:7,16

**j**

**janet** 11:24,24
34:17
**january** 11:4
**jim** 22:1,1
**joanne** 20:3,3
**job** 3:4,18
**john** 24:14,15
**joint** 32:19
**jr** 23:16,16
**judiciary** 34:7

**k**

**kate** 11:21,21
**kathy** 24:7,7
**kind** 12:23,24
15:5 32:17
**kinds** 13:25
28:18
**king** 23:21,21
**know** 2:23,25
4:2,8,18 6:22
7:13,19,22
12:24,24 13:1
13:6 14:12
18:16 25:1,3

25:10,14,18,20
26:1,17 27:6
28:22 29:11,17
32:10,13 33:4
33:15,21
**knows** 3:8
15:15
**krekelberg**
20:15,15,25
21:2,4

**l**

**landscape** 9:21
**language** 20:17
**large** 2:25 3:14
29:19 30:2
**largely** 15:6
31:11
**larger** 32:9
**largest** 3:22
**lcd** 19:4
**lead** 5:25
**leader** 7:20
**leadership** 6:25
7:18
**leading** 10:4,14
**leads** 9:9
**league** 22:23
**learn** 27:1
28:5
**leary** 19:25,25
**leaves** 25:16
**led** 4:13
**ledanski** 36:3
**legal** 36:11

**legislation** 22:2
29:14
**lena** 34:12
**letter** 5:11
**letters** 33:12
**level** 10:22 18:9
**life** 22:7
**limited** 3:13 4:5
**lindberg** 22:1,1
**line** 21:18,18
21:24,24,24,24
22:5,5,10,10,14
22:14,18,18
23:4,4,10,10,14
23:15,19,20
24:1,1,6,6,11
24:13,13
**lines** 21:12,13
**listened** 28:14
**literally** 33:17
**little** 15:8 23:16
23:16 27:21
**liv** 12:5,5
**live** 6:17 10:9
**livelihood** 10:8
**located** 13:13
**long** 10:6
**looked** 28:25
**looking** 32:25
**lot** 4:6 26:16
28:14 31:21
**lots** 18:3
**love** 25:6 27:21
**low** 8:13

**lower** 31:22
**lowering** 3:4

**m**

**maddening**
33:15
**maddie** 21:20
21:20
**made** 16:3 25:3
**main** 5:11
**major** 10:23
11:9 17:11
33:10,15
**majority** 3:15
**make** 3:8,9
5:17 7:2 19:12
21:5 35:1
**makes** 14:1
**making** 31:10
32:7
**manage** 7:3
**mandate** 7:10
**mandatory**
10:19
**manufacturer**
17:18,21 18:22
19:1
**manufacturers**
15:1,20 16:1
16:16,22,25
30:12
**manufacturing**
15:11,16 18:24
**market** 3:5,16
**marketing** 3:6

ER-2026

**[markets - open]**

Page 9

**markets** 20:5
**massive** 9:23
**matthew** 19:21
  19:22
**mean** 17:12
  18:17 25:6,25
**meaningful**
  9:25
**measure** 8:15
  11:15 13:22
  15:6 28:2
**measurement**
  21:6
**media** 1:13
**medical** 15:18
  24:16
**medium** 13:12
**meet** 6:19,20
  28:18 29:1
**megan** 22:11
  22:11
**melanie** 20:10
  20:10
**melissa** 12:7,7
  12:12 24:24
  27:20,25 28:10
  35:12
**members** 6:13
  9:12 12:25
  15:7,19 19:22
  24:14 33:24
  34:25 35:4
**membership**
  15:19

**menjivar** 34:14
  34:15,16
**mention** 25:22
**mentioned**
  17:13 28:4
**merksamer**
  23:6
**methodologies**
  13:25 27:22
  28:6
**methodology**
  5:6 26:14,22
  26:23 27:11
  30:18
**mic** 11:20
  12:17
**micro** 27:13
  32:10
**middle** 19:18
**millions** 16:25
**mineola** 36:14
**minimum**
  14:11
**missions** 33:4
**model** 12:23
**modifications**
  16:3,17
**moment** 12:21
  13:2 24:12
**moon** 8:21
**morning** 2:3
  6:12 9:11
  12:18 19:13
  20:6,10 22:11
  23:5 24:2

**motion** 34:6
  35:6,8
**move** 8:19
**moved** 32:20
**moving** 13:1
**munson** 21:20
  21:20

**n**

**n** 36:1
**name** 6:14 8:25
**nancy** 34:19
**narrowed** 26:7
**narrower** 2:12
**natalie** 23:11
  23:11
**nation** 7:12
**national** 14:5
  16:15
**natural** 23:17
**nature** 22:12
**nebulous** 26:25
**necessary** 7:2
  10:21
**need** 3:7 6:9
**needs** 25:14
**nervousness**
  29:13 30:2,7
**network** 33:18
**nevada** 11:11
**never** 31:24
**new** 5:8 25:5
  26:20,21,22
  27:18 28:4
**nguyen** 34:16
  34:17,18

**nick** 20:6,6
**nielsen** 23:6
**norm** 8:4
**note** 11:8
**noted** 2:11
  14:19
**notion** 13:20
**number** 2:10
  24:12 35:7
**ny** 36:14

**o**

**o** 36:1
**objective** 13:19
**obviously**
  17:19 19:8
  28:15
**offering** 7:16
**office** 29:8
**oh** 9:3 35:16
**oil** 9:8 33:16,16
  33:20
**okay** 8:22 9:6
  9:10 17:18
  19:10 21:11,11
  30:14 31:5
  32:19 34:21
  35:15
**old** 36:12
**once** 5:11
**onerous** 17:15
  17:17
**ones** 3:3 15:15
**ongoing** 16:17
**open** 21:19,24
  21:25 22:5,10

Veritext Legal Solutions
www.veritext.com

**[open - proxy]**                                                                    Page 10

| | | | |
|---|---|---|---|
| 22:14,18 23:4 | **parameters** | **pleased**  9:17 | **probably**  4:17 |
| 23:10,15,20 | 17:14 | **point**  3:14 | 25:2 31:15 |
| 24:1,6,13 | **part**  4:17 | 14:12 18:10 | **problem**  3:22 |
| **operate**  10:9 | **particularly** | 31:10 | **proceed**  2:4 |
| **opponents**  3:21 | 13:13 | **policy**  6:2,4,15 | **proceedings** |
| **opportunity** | **parts**  5:2 | 14:25 | 36:5 |
| 6:18 9:15 | **pass**  35:8 | **policymakers** | **process**  13:1 |
| **oppose**  13:11 | **passed**  34:6 | 2:23 9:24 | 16:20 |
| 17:6 31:8 | **patagonia** | **pollute**  8:8 | **processors**  23:1 |
| 33:16 | 11:10 | **polluting**  7:14 | **produced**  7:7 |
| **opposed**  14:20 | **peers**  10:5 | 33:20 | **producer**  28:15 |
| 14:21 19:23 | **penalty**  29:7 | **pollution**  7:11 | **producing** |
| 20:2 23:13 | **people**  29:13 | **portion**  35:18 | 29:18 |
| **opposition**  3:25 | 30:13 | **posed**  6:19,20 | **product**  15:16 |
| 4:13,24 5:11 | **percent**  4:20 | **poses**  10:6 | 15:17,22 17:24 |
| 5:13,21 12:16 | 10:17 | **position**  28:2 | 18:1,21 |
| 19:11,12,17 | **perseverance** | **possible**  5:18 | **products**  17:1 |
| 20:5,8,12,18 | 12:1 | **poultry**  21:22 | 18:14 28:25 |
| 21:16,18,22 | **person**  11:19 | **practices**  8:3 | 29:2,19 |
| 22:8 23:1,8 | **perspective** | **precise**  31:4,14 | **profile**  18:24 |
| 24:4,17,19 | 14:15 | **precisely**  31:22 | **program**  3:15 |
| 27:7 | **petroleum**  20:1 | **predecessor**  2:8 | **project**  24:9 |
| **optic**  15:8 | **phone**  21:12,12 | **present**  2:2 | **proposed**  11:1 |
| **option**  5:4 | **picks**  25:22 | **president**  6:4 | **protocols**  20:20 |
| 30:15 | **picture**  10:21 | 6:15 | 21:8 26:12 |
| **options**  32:15 | 32:25 | **press**  21:16 | **proud**  12:8 |
| **order**  6:20 16:2 | **piece**  29:14 | **prevent**  21:5 | **provide**  10:13 |
| **ordinary**  27:18 | **pistachio**  22:20 | **previously** | 16:2 18:23 |
| **outcomes**  8:9 | **places**  6:17 | 12:22 | 19:3 |
| **outsize**  13:11 | 18:15 | **primarily**  13:5 | **provided**  25:25 |
| **own**  15:19 33:5 | **plant**  22:22 | 13:11 | **provides**  7:1 |
| | **playing**  10:23 | **primary**  16:7 | **providing** |
| **p** | **please**  34:3 | **private**  10:24 | 16:10 |
| **panel**  25:16 | 35:5 | **privately**  2:17 | **proxy**  16:5 |
| **parallel**  9:13 | | | |

[public - samsung]                                          Page 11

| | | | |
|---|---|---|---|
| **public** 2:16,23 3:8,11 7:17 10:23 23:23 33:24 | **reduce** 3:2 6:23 | **required** 2:20 3:17 7:1 27:13 29:2,3 31:19 32:2 | **retailers** 24:3 |
| | **reducing** 7:21 28:19 | | **revenue** 2:18 |
| | **regime** 14:3 | | **revised** 14:9 |
| | | | **right** 2:1 3:12 6:11,22 7:13 12:10,16 19:7 20:24 21:1 24:20 28:12 31:16 34:2,5 34:25 |
| **publicly** 9:22 | **registry** 2:21 20:16 21:9 | **requirement** 26:21 27:19 | |
| **pushed** 29:17 | **regulate** 33:2 | **requirements** 16:23 | |
| **put** 31:21 | **regulatory** 14:17 | **requiring** 3:24 4:4 7:5 8:2 9:16 18:22 27:5,16 | |
| **puts** 25:7 | **relies** 16:11 | | |
| **q** | **rely** 10:10 15:20 | | **risk** 9:19 10:6 31:22 |
| **quality** 1:11,14 | **remove** 13:14 | **research** 23:23 | **road** 25:24 29:11 36:12 |
| **questions** 6:6,8 24:22 | **replacement** 16:8,9 | **resolve** 19:19 | **rob** 14:24,25 17:9,17 18:4,7 18:9,17,20 |
| | | **resources** 23:17 | |
| **queue** 24:11,19 | **report** 29:3 | **respect** 5:13 15:4 16:3 17:3 | |
| **quickly** 16:15 | **reportable** 15:23 | | **rodriguez** 23:5 23:6 |
| **r** | **reporting** 7:5 7:25 8:3,5,6 9:19,20 10:3 10:11,16 11:3 14:4 16:23 21:7 | **respectful** 20:8 20:12 | **roll** 34:4,24 35:5,16 |
| **r** 36:1 | | **respectfully** 5:13,23 11:14 13:10 14:21 17:5 23:12 33:25 | |
| **raise** 14:12 21:13 | | | **romero** 12:7,7 12:12 |
| **rather** 14:16 | | | **roundtable** 23:12 |
| **reading** 29:8 | **represent** 17:19,20 | **respond** 5:8 17:11 | **rule** 11:2 |
| **ready** 2:4 6:18 | **representing** 20:4 | **response** 5:20 | **run** 33:17 |
| **reality** 24:8 | | **responsibility** 25:7,16 | **ryan** 24:2,3 |
| **really** 3:4 12:23 13:15,18 14:14 14:17,17 25:21 30:9 | **requested** 35:18 | **rest** 7:12 | **s** |
| | **requests** 8:14 11:14 | **result** 10:15 | **s&p** 10:17 |
| **reasons** 8:14 11:13 14:19,20 17:5 32:7 | **require** 2:16 3:12 4:5 27:2 31:24 33:3 | **retail** 17:22,24 | **sachs** 6:1 8:19 8:23 9:1,4,7,11 9:13 |
| | | **retailer** 18:13 | |
| **recent** 10:2 | | | **samsung** 19:1 |
| **recognize** 6:21 | | | |
| **record** 36:5 | | | |
| **recorded** 19:12 | | | |

san 24:8
sanchez 6:4,12
  6:14
sarah 6:1 8:17
  8:17,19,23 9:1
  9:4,7,11,12
saturn 8:20,22
saying 30:25
  31:1,2 33:12
says 5:12
sb 2:3,7,14 7:1
  7:8 8:2 9:14,17
  12:9 13:20
  14:2 16:3,10
  23:24 34:5
  35:3,4,6,7
scale 14:6
scaringe 12:2,2
schaefer 24:7,7
science 13:18
sciences 22:7
scope 4:16,18
  4:19,22 13:15
  13:17,19 15:13
  15:24 19:17,19
  26:10,18,25
  27:9,17
scopes 10:20
scott 2:5 26:3
  27:24 28:8
  29:20,23 30:1
  32:4,21,24
screen 19:4
seasons 8:9

sec 4:5,7 14:7
  16:16
sec's 11:1
secondary 16:5
  16:7,11
secretary 34:3
  34:5,9,11,13,16
  34:18,20,22
  35:4,6,13
sector 8:3 13:6
  13:8,8 15:11
  15:12 17:22
sectors 8:4
secure 29:16
securities 20:4
see 2:2,6 9:4
  10:2 12:25
  13:9 20:19
  33:15,25
seeing 14:7
seeking 9:25
seiu 11:22
sell 28:24
senate 1:11,13
  34:6 35:8
senator 2:2,4,5
  9:14 12:21
  15:5 24:23,24
  24:25 26:3,4
  27:20,24,25
  28:8,10,12
  29:20,23 30:1
  32:4,21,23,24
  34:3,12,15,17
  34:19 35:12

senior 6:1
  14:25
sense 31:11
series 6:2 8:17
  9:13 11:13
serve 9:17
served 12:23
services 19:16
set 3:13 7:11,23
  9:15
setting 13:10
several 5:19
  11:8
shirt 18:21
sierra 11:11
sifma 20:4
signature 36:8
significant 10:6
similar 18:18
  25:1 26:8
simply 4:1
single 27:13
sit 17:7
situation 32:18
size 16:22
skinner 34:18
  34:19,20
small 4:25 5:9
  5:12 13:12
  15:11 26:16
  31:5,25 32:7
smaller 29:18
  31:22
smooth 5:18

software 5:6
  30:19
solutions 36:11
somewhat 26:7
sonya 36:3
sorry 12:11
  14:11 34:22
  35:7
sort 29:16
source 3:14
specifically
  20:19
spiegel 14:24
  14:25 17:9,17
  18:4,7,9,17,20
spill 9:8
sponsor 6:3
  9:18 12:8
sponsoring
  33:11
spot 9:23
stages 13:9
standard 7:12
  9:15
standardized
  10:12 33:13
standards 11:4
  11:7 20:20
start 35:3
started 9:1,7
state 2:20 6:2
  7:25 8:5 9:15
  21:9
stated 11:13

(280 of 292) Page 280 of 292Case: 25-5327 09/18/2025, DktEntry: 8.9, Page 280 of 292
Case 2:24-cv-00801-ODW-PVC   Document 48-5   Filed 05/24/24   Page 50 of 52   Page ID
#:441

**[states - transportation]**                                           Page 13

states   20:1
stay   19:9
stern's   9:14
steven   23:21,21
stop   31:10
storms   8:10
stress   4:11
strongly   31:13
structure   5:20
struggle   32:11
subcontractors
   15:21 16:1
submitting
   33:12
succeeds   4:7
success   10:7
suite   36:13
supplier   19:1
   27:13 32:11
suppliers   4:25
   5:1,9,12 27:3,6
   30:11,23 31:5
   31:15,22,25
   32:2,8
supply   4:18
   5:10 7:7 13:14
   15:9,20,22
   17:1 18:15
   25:11 30:10
   32:9
support   5:23
   9:17 11:9,18
   11:22,25 12:4
   12:6,13 21:13
   21:16,17 22:3

22:12,16 23:18
23:24 24:9,23
25:19 26:5
28:3 33:12
supported   25:1
28:3
supporting
   24:19
sure   3:8,9 5:17
   19:9,12 21:5
   26:3 27:24
   29:20 35:1
surprised
   31:19
surrounding
   15:10
suspect   31:13
sustainability
   11:3,6,7
sustainable
   6:25
sweep   4:25
   5:12 31:4
sweeping   5:9
swept   31:23
system   26:22

**t**

t   18:21 36:1,1
take   5:16 12:21
   13:2 18:20
   31:20 35:17
talk   29:10
talked   30:12
talking   28:22
   28:23

target   16:13
targets   18:25
technical   6:7
technology
   15:1 24:17
television   18:21
tell   33:6,23
tells   3:20
tens   16:24
term   10:7
terrible   4:1
testify   5:25
thank   2:5 6:10
   8:15,16 11:15
   11:17,23,25
   12:9,15,21
   14:21,22,23
   19:19,20,24
   20:8,9,12,13
   21:10,15,23
   22:3,4,9,13,17
   23:1,3,9,14,18
   23:19,25 24:4
   24:5,9,10,12,18
   24:21,24,25
   26:4 27:20
   28:10,11,13
   32:21,24 34:3
   34:25
thanks   7:19
   24:14,17
thing   5:7 25:3
   30:19
things   14:1
   18:3 28:18

33:14
think   17:17
   19:18 25:13,17
   27:16 28:1,21
   29:12,21,23
   30:5,7 31:11
thinking   14:15
thought   8:17
thousands
   16:24
threshold   29:1
time   4:9 11:15
   25:8
times   3:5
today   5:25 9:9
   26:15 29:3
took   4:14 5:15
   5:16,19 11:3
totally   30:6
towards   6:16
   8:15
track   5:1
tracking   13:10
trade   3:15
transcript   36:4
transition   13:5
transparency
   3:10,11 6:25
   7:11,25 13:21
   13:23 15:6
   33:1
transparent
   7:17
transportation
   17:23

**[trucking - yeah]**

| | | | |
|---|---|---|---|
| **trucking** 20:7 | **valley** 24:8 | **voters** 12:8 | 24:25 26:3 |
| **true** 8:18 36:4 | **valuable** 13:23 | **votes** 2:9 35:2 | 27:24 28:8 |
| **truthful** 8:6 | **value** 10:9,22 | **voting** 35:9,10 | 29:20,23 30:1 |
| **try** 29:4 | **values** 9:9 | **w** | 32:4,21,24 |
| **trying** 4:5 17:4 | **van** 12:18,19 | | **wildfires** 8:9 |
| **tv** 19:1 33:18 | **varies** 13:7 | **waiting** 24:11 | **winger** 24:14 |
| 33:25 | **various** 13:9 | **walmart** 3:19 | 24:15 |
| **two** 2:7,13 5:25 | **vast** 3:15 | 3:24 17:12,20 | **wiring** 19:4 |
| 16:18 27:8 | **vehicle** 15:17 | 17:20 18:22 | **witnesses** 6:1 |
| 28:19 32:7 | **ventre** 22:15 | 25:22,22 26:15 | 12:16 |
| **type** 25:11 | **ventry** 22:15 | 28:22 | **woman** 21:15 |
| **u** | **verification** | **walnut** 22:21 | 21:23 22:4,9 |
| | 21:6 | **want** 4:11 | 22:13,17,19 |
| **u.s.** 2:16 3:23 | **verify** 6:24 | 11:18 12:17 | 23:3,9,14,19,25 |
| 26:17 | **verifying** 7:17 | 19:11 21:5,13 | 24:5,10,18 |
| **understand** | **veritext** 36:11 | 27:2,14 28:3,5 | **work** 3:1 6:16 |
| 10:5 15:9 | **version** 4:5,15 | 30:3,4,13,15,20 | 7:20 12:22 |
| 16:21 19:5 | 4:23 | 33:22 | 28:9 30:14 |
| 31:8 | **vice** 6:4,14 | **wanted** 13:2 | 31:21 |
| **unfortunately** | 28:13 29:21,24 | **washing** 3:6 | **worked** 4:12 |
| 3:3 19:16 | 32:1 34:10 | **waste** 12:6 | 5:3 27:8 30:8 |
| **untrue** 5:14 | 35:10 | **water** 12:13 | 31:9 |
| **unverified** 9:22 | **victoria** 23:5,6 | **way** 7:17 15:23 | **working** 6:23 |
| **usa** 11:10 | **video** 1:14 | 31:2 | **works** 19:6 |
| **use** 5:4 27:9 | **voice** 11:18 | **ways** 18:17 | **world** 5:2 11:6 |
| 29:4 30:16,25 | 12:13 | 26:7 | 26:14 33:8 |
| 31:1,6,12 32:5 | **voluntarily** | **we've** 5:21 7:23 | **worldwide** 32:9 |
| **used** 28:1 | 10:16 | 16:20 | **worst** 8:11 |
| **using** 26:15,16 | **voluntary** 9:20 | **wealth** 6:17 | **wrap** 16:14 |
| 32:16 | 21:9 | **website** 2:22 | **www.senate....** |
| **v** | **vote** 2:10 5:24 | **weigh** 19:11 | 1:13 |
| | 8:15 11:14 | **western** 19:23 | **y** |
| **valdez** 9:8 | 28:7 34:1 35:9 | 20:1 22:21 | |
| **valerie** 22:15 | 35:13 | 23:1 | **yeah** 14:23 |
| 22:15 | | **wiener** 2:2,5 | 18:8,19 21:3 |
| | | 12:21 15:5 | 35:11 |

(282 of 292) Page 282 of 292
Case 2:24-cv-00801-ODW-PVC Document 48-5 Filed 05/24/24 Page 52 of 52 Page ID #:443
Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 282 of 292

**[year - zach]**                                                   Page 15

**year**   5:15,17
    11:5 16:4 25:1
    26:5,6,9 28:3
**years**   2:7,13
    4:13 10:2
    16:18 21:10
    27:8

|   z   |
|-------|

**zach**   19:25,25

# Exhibit 1

Senator Scott Wiener

September 17, 2023 Statement

Declaration of Bradley J. Hamburger In Support Of
Plaintiffs' Motion for Summary Judgment on Claim I
May 24, 2024

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.*,
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)

(284 of 292), Page 284 of 292 Case: 25-5327, 09/18/2025, DktEntry: 8.9, Page 284 of 292
5/24/24, 2:17 PM Governor Newsom Announces Intention To Sign Senator Wiener's Landmark Climate Bill
Case 2:24-cv-00801-ODW-AJR Document 42-5 Filed 05/24/24 Page 284 of 299 Page ID #:390

The Wayback Machine - https://web.archive.org/web/20231127231653/https://sd11.senate.ca.gov/print/1121



Published on *Senator Scott Wiener* (https://sd11.senate.ca.gov
(https://web.archive.org/web/20231127231653/https://sd11.senate.ca.gov/))

Home (/web/20231127231653/https://sd11.senate.ca.gov/) > Governor Newsom Announces Intention To Sign Senator Wiener's Landmark Climate Bill

(https://web.archive.org/web/20231127231653/https://www.addthis.com/bookmark.php?v=300) [1]
(https://web.archive.org/web/20231127231653/https://www.addthis.com/bookmark.php?v=300) [1]
(https://web.archive.org/web/20231127231653/https://www.addthis.com/bookmark.php?v=300) [1]
September 17, 2023

SACRAMENTO – At the Opening Ceremony of Climate Week NYC, Governor Gavin Newsom announced his intention to sign Senate Bill 253, the nation's first comprehensive greenhouse gas emissions disclosure requirement, authored by Senator Scott Wiener (D-San Francisco). In response, Senator Wiener issued the following statement:

"In announcing he will sign SB 253, Governor Newsom is reaffirming California's global climate leadership. These carbon disclosures are a simple but intensely powerful driver of decarbonization. When business leaders, investors, consumers, and analysts have full visibility into large corporations' carbon emissions, they have the tools and incentives to turbocharge their decarbonization efforts. This legislation will support those companies doing their part to tackle the climate crisis and create accountability for those that aren't. I applaud the Governor's bold climate leadership — the planet needs more climate champions like Gavin Newsom."

SB 253 will require any public or private company earning over a billion dollars in annual revenue that operates in California to publicly disclose the greenhouse gas emissions released from their operations and supply chain. These disclosures are a powerful accelerant to decarbonization, providing unprecedented clarity that will unlock new approaches and drive action to reduce emissions. The New York Times called the bill "a move with national and global repercussions in governments' efforts to fight climate change."

Disclosures have a long history of driving environmental progress. When the US EPA created the Toxic Release Inventory, a corporate toxics disclosure regime, total releases of substances covered by the disclosures dropped 54.5% from 1988-2001. A recent study in Science found that mandatory disclosures could cut total corporate emissions 70% by pushing laggard companies to cut emissions to the median level of their industry.

The announcement comes one day after Governor Gavin Newsom and Attorney General Rob Bonta announced a landmark case against five Big Oil companies for misleading the public about the catastrophic dangers of climate change. The suit—the most ambitious attempt by any American official to hold fossil fuel companies accountable for climate change—alleges that this dishonest conduct continues to the present day, as Big Oil companies attempt to mislead the public about their greenhouse gas emissions.

**Read more about the Climate Accountability Package here:**

California Lawmakers Vote to Require Disclosure of Greenhouse Emissions by Coral Davenport (https://web.archive.org/web/20231127231653/https://www.nytimes.com/2023/09/13/climate/california-emissions-businesses-climate.html) [2] (New York Times, September 13)

**ER-2035**

California's Climate Disclosure Bill Could Have Nationwide Impacts (https://web.archive.org/web/20231127231653/https://insideclimatenews.org/news/15092023/todays-climate-california-climate-disclosure-bill-nationwide-impacts-scope-3-emissions/) [3](Inside Climate News, September 15)

California Legislature Passes Sweeping Emissions Bill (https://web.archive.org/web/20231127231653/https://www.wsj.com/politics/policy/california-legislature-passes-sweeping-emissions-bill-398b586c) [4](Wall Street Journal, September 12)

**Source URL:** https://sd11.senate.ca.gov/news/20230917-governor-newsom-announces-intention-sign-senator-wiener%E2%80%99s-landmark-climate-bill

**Links**

[1] https://www.addthis.com/bookmark.php?v=300

[2] https://www.nytimes.com/2023/09/13/climate/california-emissions-businesses-climate.html

[3] https://insideclimatenews.org/news/15092023/todays-climate-california-climate-disclosure-bill-nationwide-impacts-scope-3-emissions/

[4] https://www.wsj.com/politics/policy/california-legislature-passes-sweeping-emissions-bill-398b586c

**ER-2036**

1  EUGENE SCALIA, SBN 151540
2      escalia@gibsondunn.com
   KATHERINE MORAN MEEKS
3  (*pro hac vice*)
       DC Bar No. 1028302
4      kmeeks@gibsondunn.com
5  GIBSON, DUNN & CRUTCHER LLP
   1050 Connecticut Avenue, N.W.
6  Washington, D.C.  20036-5306
   Telephone:  202.955.8500
7  Facsimile:   202.467.0539

8  *Attorneys for Plaintiffs Chamber of*
9  *Commerce of the United States of*
   *America, California Chamber of*
10 *Commerce, American Farm Bureau*
   *Federation, Los Angeles County*
11 *Business Federation, Central Valley*
   *Business Federation, and*
12 *Western Growers Association*

13 (*Additional counsel listed on next page*)

14              IN THE UNITED STATES DISTRICT COURT

15           FOR THE CENTRAL DISTRICT OF CALIFORNIA,

16                       WESTERN DIVISION

17 CHAMBER OF COMMERCE OF THE          CASE NO. 2:24-cv-00801-ODW-PVC
18 UNITED STATES OF AMERICA,
   CALIFORNIA CHAMBER OF               **DECLARATION OF BRADLEY J.**
19 COMMERCE, AMERICAN FARM             **HAMBURGER IN SUPPORT OF**
   BUREAU FEDERATION, LOS              **PLAINTIFFS' MOTION FOR**
20 ANGELES COUNTY BUSINESS             **SUMMARY JUDGMENT ON**
   FEDERATION, CENTRAL VALLEY          **CLAIM I**
21 BUSINESS FEDERATION, and
   WESTERN GROWERS ASSOCIATION,        **HEARING:**
22              Plaintiffs,            Date:      September 9, 2024
                                       Time:      1:30 PM
23      v.                             Location:  Courtroom 5D
                                       Judge:     Otis D. Wright II
24 LIANE M. RANDOLPH, in her official
   capacity as Chair of the California
25 Air Resources Board, STEVEN S. CLIFF, in
   his official capacity as the Executive
26 Officer of the California Air Resources
   Board, and ROBERT A. BONTA, in his
27 official capacity as Attorney General of
   California.
28              Defendants.

Gibson, Dunn &
Crutcher LLP

1    BRADLEY J. HAMBURGER,
2       SBN 266916
         bhamburger@gibsondunn.com
3    SAMUEL ECKMAN, SBN 308923
         seckman@gibsondunn.com
4    ELIZABETH STRASSNER,
5       SBN 342838
         estrassner@gibsondunn.com
6    GIBSON, DUNN & CRUTCHER LLP
     333 South Grand Ave.
7    Los Angeles, CA 90071-3197
     Telephone:  213.229.7000
8    Facsimile:   213.229.7520

9    BRIAN A. RICHMAN
     (*pro hac vice*)
10      DC Bar No. 230071
         brichman@gibsondunn.com
11   GIBSON, DUNN & CRUTCHER LLP
12   2001 Ross Ave., Suite 2100
     Dallas, TX 75201-2923
13   Telephone:  214.698.3100
     Facsimile:   214.571.2900
14
     *Attorneys for Plaintiffs Chamber of Commerce of the United States of America,*
15   *California Chamber of Commerce, American Farm Bureau Federation, Los Angeles*
     *County Business Federation, Central Valley Business Federation, and*
16   *Western Growers Association*

17   DARYL JOSEFFER
     (*pro hac vice*)
18      DC Bar No. 457185
         djoseffer@uschamber.com
19   TYLER S. BADGLEY
     (*pro hac vice*)
20      DC Bar No. 1047899
         tbadgley@uschamber.com
21   KEVIN PALMER
     (*pro hac vice*)
22      DC Bar No. 90014967
         kpalmer@uschamber.com
23   CHAMBER OF COMMERCE OF THE
     UNITED STATES OF AMERICA
24   1615 H Street, NW
     Washington, D.C. 20062-2000
25   Telephone:  202.659.6000
     Facsimile:   202.463.5302
26
27   *Attorneys for Plaintiff Chamber of Commerce of the United States of America*
28

I, Bradley, J. Hamburger, declare as follows:

1. I am an attorney licensed to practice law before all courts of the State of California as well as the United States District Court for the Central District of California. I am a partner at the law firm of Gibson, Dunn & Crutcher LLP, counsel of record for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association in the above-titled action. I offer this declaration in support of Plaintiffs' Motion for Summary Judgment on Claim I. I have personal knowledge of the matters stated herein, and if asked to testify thereto, I could and would do so competently.

2. As required by Central District Rule 7-3, counsel for Plaintiffs and counsel for Defendants Liane M. Randolph, Steven S. Cliff, and Robert A. Bonta met and conferred regarding this motion on April 26, 2024.

3. Attached hereto as **Exhibit 1** is a true and correct copy of California State Senator Scott Wiener's September 17, 2023 statement entitled "Governor Newsom Announces Intention to Sign Senator Wiener's Landmark Climate Bill," available at https://web.archive.org/web/20240211114524/https://sd11.senate.ca.gov/news/202309 17-governor-newsom-announces-intention-sign-senator-wiener%E2%80%99s-landmark-climate-bill.

4. Attached hereto as **Exhibit 2** is a true and correct copy of a transcript, along with a Certification by Sonya Ledanski Hyde of Veritext Legal Solutions, of the March 15, 2023 hearing of the California Senate Environmental Quality Committee from 01:53:42-2:30:34, available at https://www.senate.ca.gov/media/senate-environmental-quality-committee-20230315/video.

5. Attached hereto as **Exhibit 3** is a true and correct copy of a transcript, along with a Certification by Sonya Ledanski Hyde of Veritext Legal Solutions, of the April 18, 2023 hearing of the California Senate Judiciary Committee from 04:58:07-05:32:29,

1

**ER-2039**

1  available at https://www.senate.ca.gov/media/senate-judiciary-committee-
2  20230418/video.

3        6.    Attached hereto as **Exhibit 4** is a true and correct copy of a transcript, along
4  with a Certification by Sonya Ledanski Hyde of Veritext Legal Solutions, of the May
5  30, 2023 California Senate Floor Session from 04:21:02-04:25:00, available at
6  https://www.senate.ca.gov/media/senate-floor-session-20230530/video.

7        7.    Attached hereto as **Exhibit 5** is a true and correct copy of a transcript, along
8  with a Certification by Sonya Ledanski Hyde of Veritext Legal Solutions, of the July 10,
9  2023 hearing of the California Assembly Natural Resources Committee from 04:06:16-
10  04:33:07, available at https://www.assembly.ca.gov/media/assembly-natural-resources-
11  committee-20230710.

12        8.    Attached hereto as **Exhibit 6** is a true and correct copy of a transcript, along
13  with a Certification by Sonya Ledanski Hyde of Veritext Legal Solutions, of the
14  September 11, 2023 California Assembly Floor Session from 05:13:50-05:32:50,
15  available at https://www.assembly.ca.gov/media/assembly-floor-session-20230911.

16        9.    Attached hereto as **Exhibit 7** is a true and correct copy of the California
17  Senate Judiciary Committee's April 14, 2023 Analysis of S.B. 253, available at
18  https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202320240SB
19  253.

20       10.    Attached hereto as **Exhibit 8** is a true and correct copy of the California
21  Senate Rules Committee's September 11, 2023 Analysis of S.B. 253, available at
22  https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202320240SB
23  253.

24       11.    Attached hereto as **Exhibit 9** is a true and correct copy of Public Citizen's
25  September 12, 2023 press release entitled "California Lawmakers Approve
26  Groundbreaking Climate Disclosure Bill," available at
27  https://www.citizen.org/news/cali-carbon-disclosure/.

28

12. Attached hereto as **Exhibit 10** is a true and correct copy of CERES's August 22, 2023 announcement entitled "Sacramento Rally to Unite for Climate Transparency & Passage of SB 253 & SB 261," available at https://www.ceres.org/resources/news/sacramento-rally-to-unite-for-climate-transparency-passage-of-sb-253-sb-261.

13. Attached hereto as **Exhibit 11** is a true and correct copy of a May 24, 2022 Reuters article entitled "Shareholders back Shell's climate strategy after raucous meeting," available at https://www.reuters.com/business/environment/climate-protestors-disrupt-shell-shareholder-meeting-2022-05-24/.

14. Attached hereto as **Exhibit 12** is a true and correct copy of Governor Gavin Newsom's October 7, 2023 signing statement for S.B. 253, available at https://www.gov.ca.gov/wp-content/uploads/2023/10/SB-253-Signing.pdf.

15. Attached hereto as **Exhibit 13** is a true and correct copy of the session law version of California Senate Bill No. 253, available at https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202320240SB253.

16. Attached hereto as **Exhibit 14** is a true and correct copy of the California Assembly's September 7, 2023 Floor Analysis of S.B. 253, available at https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202320240SB253.

17. Attached hereto as **Exhibit 15** is a true and correct copy of the Williams Companies, Inc.'s June 17, 2022 Comment Letter to the Securities and Exchange Commission's Proposed Rule on The Enhancement and Standardization of Climate-Related Disclosures for Investors, available at https://www.sec.gov/comments/s7-10-22/s71022-20132208-302726.pdf.

18. Attached hereto as **Exhibit 16** is a true and correct copy of the Securities and Exchange Commission's Proposed Rule on The Enhancement and Standardization of Climate-Related Disclosures for Investors, 87 Fed. Reg. 21,223, available at https://www.govinfo.gov/content/pkg/FR-2022-04-11/pdf/2022-06342.pdf.

19.    Attached hereto as **Exhibit 17** is a true and correct copy of the Greenhouse Gas Protocol's September 2011 Corporate Value Chain (Scope 3) Accounting and Reporting Standard, available at https://ghgprotocol.org/sites/default/files/standards/Corporate-Value-Chain-Accounting-Reporing-Standard_041613_2.pdf.

20.    Attached hereto as **Exhibit 18** is a true and correct copy of the Greenhouse Gas Protocol's 2013 Technical Guidance for Calculating Scope 3 Emissions (version 1.0), available at https://ghgprotocol.org/sites/default/files/standards/Scope3_Calculation_Guidance_0.pdf.

21.    Attached hereto as **Exhibit 19** is a true and correct copy of Professor Daniel J. Taylor's June 16, 2022 Comment Letter to the Securities and Exchange Commission's Proposed Rule on The Enhancement and Standardization of Climate-Related Disclosures for Investors, available at https://www.sec.gov/comments/s7-10-22/s71022-20131668-302058.pdf.

22.    Attached hereto as **Exhibit 20** is a true and correct copy of the June 2017 Recommendations of the Task Force on Climate-Related Financial Disclosures, available at https://assets.bbhub.io/company/sites/60/2021/10/FINAL-2017-TCFD-Report.pdf.

23.    Attached hereto as **Exhibit 21** is a true and correct copy of the May 2024 Board of Governors of the Federal Reserve System's Pilot Climate Scenario Analysis Exercise, available at https://www.federalreserve.gov/publications/files/csa-exercise-summary-20240509.pdf.

24.    Attached hereto as **Exhibit 22** is a true and correct copy of the California Senate Rules Committee's September 12, 2023 Analysis of S.B. 261, available at https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202320240SB261.

25.    Attached hereto as **Exhibit 23** is a true and correct copy of the California Senate Judiciary Committee's April 14, 2023 Analysis of S.B. 261, available at https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202320240SB 261.

26.    Attached hereto as **Exhibit 24** is a true and correct copy of the California Assembly Natural Resources Committee's July 7, 2023 Analysis of S.B. 261, available at

https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202320240SB 261.

27.    Attached hereto as **Exhibit 25** is a true and correct copy of Governor Gavin Newsom's October 7, 2023 signing statement for S.B. 261, available at https://www.gov.ca.gov/wp-content/uploads/2023/10/SB-261-Signing.pdf.

28.    Attached hereto as **Exhibit 26** is a true and correct copy of the session law version of California Senate Bill No. 261, available at https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202320240SB261.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Los Angeles, California, this 24th day of May, 2024.

By:  */s/ Bradley J. Hamburger*

Bradley J. Hamburger, SBN 266916