No. 25-5327

# United States Court of Appeals for the Ninth Circuit

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION,

*Plaintiffs-Appellants,*

v.

LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California,

*Defendants-Appellees.*

On Appeal from an order of the
United States District Court for the Central District of California,
Case No. 2:24-cv-801, Judge Otis D. Wright, II

## EXCERPTS OF RECORD – VOLUME 9 OF 9

Stephanie A. Maloney
Kevin Palmer
CHAMBER OF COMMERCE OF THE
    UNITED STATES OF AMERICA
1615 H St., N.W.
Washington, DC 20062
(202) 659-6000

*Counsel for Plaintiff-Appellant
Chamber of Commerce of the
United States of America*

Eugene Scalia
Jonathan C. Bond
Brian A. Richman
GIBSON, DUNN & CRUTCHER LLP
1700 M St., N.W.
Washington, DC 20036
(202) 955-8500
EScalia@gibsondunn.com

Bradley J. Hamburger
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071
(213) 229-7000

*Counsel for Plaintiffs-Appellants*

EUGENE SCALIA, SBN 151540
  escalia@gibsondunn.com
KATHERINE MORAN MEEKS
(*pro hac vice*)
  DC Bar No. 1028302
  kmeeks@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
Telephone:  202.955.8500
Facsimile:   202.467.0539

*Attorneys for Plaintiffs Chamber of
Commerce of the United States of
America, California Chamber of
Commerce, American Farm Bureau
Federation, Los Angeles County
Business Federation, Central Valley
Business Federation, and
Western Growers Association*

(*Additional counsel listed on next page*)

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA,

## WESTERN DIVISION

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION, | CASE NO. 2:24-cv-00801-ODW-PVC **PLAINTIFFS' SEPARATE STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON CLAIM I** |
| Plaintiffs, | **HEARING:** |
| v. | Date:       September 9, 2024 Time:       1:30 PM Location:   Courtroom 5D Judge:      Otis D. Wright II |
| LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California. | |
| Defendants. | |

BRADLEY J. HAMBURGER,
  SBN 266916
  bhamburger@gibsondunn.com
SAMUEL ECKMAN, SBN 308923
  seckman@gibsondunn.com
ELIZABETH STRASSNER,
  SBN 342838
  estrassner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

BRIAN A. RICHMAN
(*pro hac vice*)
  DC Bar No. 230071
  brichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Ave., Suite 2100
Dallas, TX 75201-2923
Telephone:  214.698.3100
Facsimile:   214.571.2900

*Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association*

DARYL JOSEFFER
(*pro hac vice*)
  DC Bar No. 457185
  djoseffer@uschamber.com
TYLER S. BADGLEY
(*pro hac vice*)
  DC Bar No. 1047899
  tbadgley@uschamber.com
KEVIN PALMER
(*pro hac vice*)
  DC Bar No. 90014967
  kpalmer@uschamber.com
CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA
1615 H Street, NW
Washington, D.C. 20062-2000
Telephone:  202.659.6000
Facsimile:   202.463.5302

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56-1, Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association hereby submit the following Statement of Uncontroverted Facts in Support of Plaintiffs' Motion for Summary Judgment on Claim I.

| Uncontroverted Fact | Supporting Evidence |
|---|---|
| 1.  Senator Scott Wiener, the author of S.B. 253, has stated that the purpose of S.B. 253 is to "support those companies doing their part to tackle the climate crisis and create accountability for those that aren't." | Declaration of Bradley J. Hamburger ("Hamburger Decl."), Ex. 1 (Statement of Senator Wiener, Sept. 17, 2023) at 1. |
| 2.  At a March 15, 2023 California Senate Environmental Quality Committee Hearing, Senator Wiener said the following regarding S.B. 253: "We know that there are large corporations that work very hard to be green to reduce their carbon footprint. There are others that do not.  Unfortunately, among the ones that really don't do a great job lowering their carbon footprint, they will at times market themselves as green, what we call green-washing.  Marketing | Hamburger Decl., Ex. 2 (Transcript of Senate Environmental Quality Committee Hearing, 01:53:42-02:30:34 (Cal. Mar. 15, 2023)) at pp 2:25-3:11. |

Gibson, Dunn &
Crutcher LLP

| | |
|---|---|
| yourself as green when you're not.  We need to make sure that the public actually knows who's green and who isn't and to make sure we have that transparency.  That's all this bill does, transparency.  Information for the public." | |
| 3.  At a March 15, 2023 California Senate Environmental Quality Committee Hearing, Senator Wiener said the following regard S.B. 253: "[S]ome of the nervousness by large corporations is because they don't want to do the disclosure and they don't want to say what their carbon footprint is because they think they're going to be embarrassed by it.  I'm just being totally blunt.  I think that's what the nervousness is." | Hamburger Decl., Ex. 2 at p 30:1-7. |
| 4.  At a March 15, 2023 California Senate Environmental Quality Committee Hearing, Alvaro Sanchez from the Greenlining Institute said the following regarding S.B. 253: "In order to meet the challenges posed by climate change, it is imperative to recognize the right of communities to know how and if | Hamburger Decl., Ex. 2 at p 6:20-25. |

| | |
|---|---|
| corporations are working to reduce their emissions and to verify corporate claims of sustainable leadership." | |
| 5. At an April 18, 2023 California Senate Judiciary Committee Hearing, Senator Wiener said the following regarding S.B. 253: The law "will require these large corporations doing business in California to, in a standardized way, report this data so the consumers, investors, and others can know which corporations are actually engaging in climate action and which aren't." | Hamburger Decl., Ex. 3 (Transcript of Senate Judiciary Committee Hearing, 04:58:07-05:32:29 (Cal. Apr. 18, 2023)) at pp 2:21-3:1. |
| 6. At an April 18, 2023 California Senate Judiciary Committee Hearing, Catherine Atkin from Carbondale Accountable said the following regarding S.B. 253: "Many of our California companies are already leading and reporting, and SB 253 will level the playing field for our in-state companies by ensuring that public and private companies from outside of California disclose as well." | Hamburger Decl., Ex. 3 at p 5:11-16. |

Gibson, Dunn & Crutcher LLP

STATEMENT OF UNCONTROVERTED FACTS ISO MOT. FOR SUMMARY JUDGMENT ON CLAIM I
CASE NO. 2:24-CV-00801-ODW-PVC                          **ER-2049**

| | |
|---|---|
| 7. During a May 30, 2023 California Senate Floor Session debate on S.B. 253, Senator Wiener said that "SB 253 will allow for much-needed transparency," and that "SB 253 is the next step California must take in climate action to ensure that corporate actors in our state are aligned with our goals and are working as diligently as we need them to be. And we can't do that unless we have transparency." | Hamburger Decl., Ex. 4 (Transcript of Senate Floor Session Debate, 04:21:02-04:25:00 (Cal. May 30, 2023)) at p 3:2-3, 3:12-17. |
| 8. During a July 10, 2023 California Assembly Natural Resources Committee Hearing, Melanie Morales from the Greenlining Institute said the following regarding S.B. 253: "Creating solutions to climate change for low-income communities and communities of color requires unlocking the potential of the private sector to drive meaningful change as well as holding businesses accountable for their impact on the climate." | Hamburger Decl., Ex. 5 (Transcript of Assembly Natural Resources Committee Hearing, 04:06:16-04:33:07 (Cal. July 10, 2023)) at p 6:13-18. |
| 9. During a September 11, 2023 California Assembly Floor Session debate on S.B. 253, Assemblymember Christopher Ward said the following: "This data, along | Hamburger Decl., Ex. 6 (Transcript of Assembly Floor Session Debate, |

| | |
|---|---|
| with the accompanying report, will then be published on a public facing website for all Californians to see. Now, you can't regulate what you don't know, and as the State continues to curb its emissions across public sectors, we have a clear idea of what work is remaining and what action needs to be taken to continue progress.  However, the same can't be said today for the private sector." | 05:13:50-05:32:50 (Cal. Sept. 11, 2023)) at pp 2:18-3:2. |
| 10.  During a September 11, 2023 California Assembly Floor Session debate on S.B. 253, Assemblymember Ward said the following: "But to not even know, to not even understand what company X is producing in the terms of a million tons of carbon dioxide emissions in a year, that's a standard which would then challenge themselves to say, okay, if I'm at a million this year, how do I get down to 800,000 next year?  How do I get down to 600,000 the year after that?" | Hamburger Decl., Ex. 6 at p 17:5-12. |
| 11.  During a September 11, 2023 California Assembly Floor Session debate on S.B. 253, | Hamburger Decl., Ex. 6 at p 18:16-21. |

Gibson, Dunn &
Crutcher LLP

ER-2051

| | |
|---|---|
| Assemblymember Ward said the following: "[I]n California, our policy should be to not look the other way when there are bad actors out there miscalculating what their impact is and not holding themselves accountable, not allowing the public to hold themselves accountable." | |
| 12.  During a September 11, 2023 California Assembly Floor Session debate on S.B. 253, Assemblymember Rick Zbur characterized S.B. 253 as follows: "[A] bill that the 'Los Angeles Times' described as 'groundbreaking legislation with the potential to reach far beyond California's borders by forcing some of the world's biggest businesses to be honest about the damage they might be causing.'" | Hamburger Decl., Ex. 6 at pp 5:22-6:2. |
| 13.  During a September 11, 2023 California Assembly Floor Session debate on S.B. 253, Assemblymember Rick Zbur characterized S.B. 253 as follows: "This bill standardizes the measurements of these emissions, makes them transparent, and gives | Hamburger Decl., Ex. 6 at p 7:11-15. |

Gibson, Dunn & Crutcher LLP

STATEMENT OF UNCONTROVERTED FACTS ISO MOT. FOR SUMMARY JUDGMENT ON CLAIM I
CASE NO. 2:24-CV-00801-ODW-PVC            **ER-2052**

| | |
|---|---|
| companies a huge incentive to take steps to reduce their entire life cycle carbon footprints." | |
| 14. The California Senate Judiciary Committee April 14, 2023 analysis of S.B. 253 attributes climate change to "global warming." | Hamburger Decl., Ex. 7 (California Senate Judiciary Committee Analysis of S.B. 253, 2023-2024 Reg. Session (Apr. 14, 2023)) at 2. |
| 15. The California Senate Judiciary Committee April 14, 2023, analysis of S.B. 253 states that greenhouse-gases "are destroying our planet" and that "Californians are watching their state get irrevocably harmed by climate change, and they have a right to know who is at the forefront of the pollution causing this." | Hamburger Decl., Ex. 7 at 7. |
| 16. The California Senate Judiciary Committee April 14, 2023 analysis of S.B. 253 states that the "requirements" of S.B. 253 "will provide . . . policymakers with" information. | Hamburger Decl., Ex. 7 at 11. |

| 17. The California Senate Judiciary Committee April 14, 2023 analysis of S.B. 253 states that "For companies, the knowledge that their emissions will be publicly available might encourage them to take meaningful steps to reduce their [greenhouse-gas] emissions." | Hamburger Decl., Ex. 7 at 12. |
|---|---|
| 18. The California Senate Rules Committee September 11, 2023 analysis of S.B. 253 states that "Reducing scope 1 and 2 emissions by outsourcing polluting processes does not lead to a real, global reduction of GHG emissions and underscores the need for scope 3 reporting to capture the climate impacts of a business's full supply chain." | Hamburger Decl., Ex. 8 (California Senate Rules Committee Analysis of S.B. 253, 2023-2024 Reg. Session (Sept. 11, 2023)) at 5. |
| 19. In a September 12, 2023, press release regarding S.B. 253, Clara Vondrich, senior policy council with Public Citizen's Climate Program, states: "For the nation to check the climate crisis, the first step is transparency on how our biggest emitters are navigating the energy transition: Are emissions going up, down, or staying the same? This legislation will let | Hamburger Decl., Ex. 9 (California Lawmakers Approve Groundbreaking Climate Disclosure Bill, Public Citizen (Sept. 12, 2023)) at 1. |

| | |
|---|---|
| the public and regulators track companies' decarbonization progress and hold them accountable to their climate promises." | |
| 20. In an August 22, 2023 press release from Ceres, a nonprofit organization, Assemblymember Tasha Boerner states "SB 253 and 261 is a bold action that helps us combat the climate crisis by providing transparency and ensuring accountability for those emitting greenhouse gasses." | Hamburger Decl., Ex. 10 (Sacramento Rally to Unite for Climate Transparency & Passage of SB 253 & SB 261, CERES (Aug. 22, 2023)) at 4. |
| 21. At a May 2022 shareholder meeting of Shell plc, demonstrators interrupted the proceedings, with one supporter stating: "We're here to embarrass them and hold them to account." | Hamburger Decl., Ex. 11 (Shareholders Back Shell's Climate Strategy After Raucous Meeting, Reuters (May 24, 2022)) at 4. |
| 22. In his October 7, 2023 signing statement for S.B. 253, Governor Newsom states that "the implementation deadlines in this bill are likely infeasible, and the reporting protocol specified could result in inconsistent reporting across businesses | Hamburger Decl., Ex. 12 (Signing Statement of Governor Newsom for S.B. 253 (Oct. 7, 2023)) at 1. |

(13 of 271), Page 13 of 271 Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 13 of 271
Case 2:24-cv-00801-ODW-PVC Document 48-2 Filed 05/24/24 Page 12 of 30 Page ID
#:363

| | |
|---|---|
| subject to the measure. I am directing my Administration to work with the bill's author and the Legislature next year to address these issues." | |
| 23. In his October 7, 2023, signing statement for S.B. 253, Governor Newsom states that "I am concerned about the overall financial impact of this bill on businesses, so I am instructing CARB to closely monitor the cost impact as it implements this new bill and to make recommendations to streamline the program." | Hamburger Decl., Ex. 12 at 1. |
| 24. The California Legislature's legislative findings for S.B. 253 include the following: "California investors, consumers, and other stakeholders deserve transparency from companies regarding their greenhouse gas (GHG) emissions to inform their decisionmaking." | Hamburger Decl., Ex. 13 (Senate Bill No. 253), § 1(e). |
| 25. The California Legislature's legislative findings for S.B. 253 include the following: "The people, communities, and other stakeholders in California, | Hamburger Decl., Ex. 13 (Senate Bill No. 253), § 1(j). |

| | |
|---|---|
| facing the existential threat of climate change, have a right to know about the sources of carbon pollution, as measured by the comprehensive GHG emissions data of those companies benefiting from doing business in the state, in order to make informed decisions." | |
| 26.  The California Legislature's legislative findings for S.B. 253 include the following: "Mandating annual, full-scope GHG emissions data reporting to the emissions reporting organization for all United States companies with total annual revenues in excess of $1,000,000,000 that do business in California, as well as ensuring public access to the data in a manner that is easily understandable and accessible, will inform investors, empower consumers, and activate companies to improve risk management in order to move towards a net-zero carbon economy and is a critical next step that California must take to protect the state and its residents." | Hamburger Decl., Ex. 13 (Senate Bill No. 253), § 1(*l*). |
| 27.  S.B. 253 will require approximately 5,300 U.S. businesses to report their emissions. | Hamburger Decl., Ex. 14 (California Assembly Floor |

| | Analysis of S.B. 253, 2023-2024 Reg. Session (Sept. 7, 2023)) at 2. |
|---|---|
| 28.  Of the approximately 5,300 business that will be required to report their emissions under S.B. 253, 73% are estimated to be private companies. | Hamburger Decl., Ex. 14 at 2. |
| 29.  The requirement to estimate and report Scope 3 emissions alone will cost some companies more than $1 million per year. | Hamburger Decl., Ex. 15 (Williams Companies, Inc., Comment Letter to Proposed Rule on The Enhancement and Standardization of Climate-Related Disclosures for Investors (June 17, 2022)) at 14. |
| 30.  In an April 11, 2022, explanation related to its proposed rule that would require publicly traded companies to report climate-related information, the Securities and Exchange Commission "recognize[d] | Hamburger Decl., Ex. 16 (The Enhancement and Standardization of Climate-Related Disclosures for |

(16 of 271), Page 16 of 271 Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 16 of 271
Case 2:24-cv-00801-ODW-PVC Document 48-2 Filed 05/24/24 Page 15 of 30 Page ID
#:366

| | |
|---|---|
| that, in many instances, direct measurement of GHG emissions at the source, which would provide the most accurate measurement, may not be possible." | Investors, 87 Fed. Reg. 21,334 (proposed Apr. 11, 2022)) at 21,387. |
| 31. The Greenhouse Gas Protocol, which S.B. 253 uses as the basis for its emissions-disclosure regime, states that Scope 3 emissions do not factor in "avoided emissions or [greenhouse-gas] reductions from actions taken to compensate for or offset emissions." | Hamburger Decl., Ex. 17 (Greenhouse Gas Protocol, Corporate Value Chain (Scope 3) Accounting and Reporting Standard (Sept. 2011)) at 6. |
| 32. The Greenhouse Gas Protocol, which S.B. 253 uses as the basis for its emissions-disclosure regime, states that "Scope 3 includes all other indirect emissions that occur in a company's value chain. The 15 categories in scope 3 are intended to provide companies with a systematic framework to measure, manage, and reduce emissions across a corporate value chain." | Hamburger Decl., Ex. 18 ((Greenhouse Gas Protocol, Technical Guidance for Calculating Scope 3 Emissions (version 1.0) (2013)) at 6. |
| 33. The Greenhouse Gas Protocol, which S.B. 253 uses as the basis for its emissions-disclosure regime, | Hamburger Decl., Ex. 18 at 14. |

| | |
|---|---|
| states that calculation of Scope 3 emissions includes a "require[ment] to calculate emissions of all the [greenhouse gases] required by the United Nations Framework Convention on Climate Change (UNFCCC)/Kyoto Protocol," including "carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$), hydrofluorocarbons (HFCs), perfluorocarbons (PFCs), sulphur hexafluoride ($SF_6$) . . . [and] nitrogen trifluoride ($NF_3$)." | |
| 34.  The Greenhouse Gas Protocol, which S.B. 253 uses as the basis for its emissions-disclosure regime, states that there are "advantages and disadvantages" for different methods of collecting information about greenhouse-gas emissions. | Hamburger Decl., Ex. 18 at 18. |
| 35.  Studies show that publicly available information about a company's operations, including industry membership, size, sales growth, earnings growth, property value, capital expenditures, and profitability, can explain 90% of greenhouse-gas emissions. | Hamburger Decl., Ex. 19 (Daniel J. Taylor, Comment Letter to Proposed Rule on The Enhancement and Standardization of Climate- |

| | |
|---|---|
| | Related Disclosures for Investors (June 16, 2022)) at 7. |
| 36.  There are gaps in emissions methodologies, making reliable and accurate calculations of emissions difficult. | Hamburger Decl., Ex. 20 (Task Force on Climate-Related Financial Disclosures, Recommendations of the Tasks Force on Climate-related Financial Disclosures (June 2017)) at 36; Hamburger Decl. Ex. 21 (Pilot Climate Scenario Analysis Exercise, Board of Governors of the Federal Reserve System (May 2024)) at 11. |
| 37.  The California Senate Rules Committee September 12, 2023 analysis of S.B. 261 states that "[u]ltimately, the reporting requirements contemplated | Hamburger Decl., Ex. 22 (California Senate Rules Committee Analysis of |

| | |
|---|---|
| under SB 261 will indeed create additional work for covered entities" and concern "how their future operations may affect—and be affected by—global climate change." | S.B. 261, 2023-2024 Reg. Session (Sept. 12 2023) at 5-6. |
| 38.  The California Senate Judiciary Committee April 10, 2023 analysis of S.B. 261 provides that the "information" required by S.B. 261 "is important to provide more transparency to policy makers, investors, and shareholders as it will result in improved decision making on where to invest private and public dollars." | Hamburger Decl., Ex. 23 (California Senate Judiciary Committee Analysis of S.B. 261, 2023-2024 Reg. Session (Apr. 14, 2023) at 5. |
| 39.  The California Assembly Committee on Natural Resources July 10, 2023 analysis of S.B. 261 provides that S.B. 261 "[d]efines 'climate-related financial risk' as risk that may include material financial risk posed by the effects of the changing climate, such as intense storms, rising sea levels, higher global temperatures, economic damages from carbon emissions, and other financial risks due to public policies to address climate change, shifting consumer attitudes, changing economics of traditional carbon-intense industries." | Hamburger Decl., Ex. 24 (California Assembly Natural Resources Committee Analysis of S.B. 261, 2023-2024 Reg. Session (July 7, 2023) at 1-2. |

Gibson, Dunn &
Crutcher LLP

16

| | |
|---|---|
| 40. In his October 7, 2023, signing statement for S.B. 261, Governor Newsom states that "the implementation deadlines fall short in providing the California Air Resources Board (CARB) with sufficient time to adequately carry out the requirements in this bill. I am directing my Administration to work with the bill's author and the Legislature next year to address this issue." | Hamburger Decl., Ex. 25 (Signing Statement of Governor Newsom for S.B. 261 (Oct. 7, 2023)) at 1. |
| 41. In his October 7, 2023, signing statement for S.B. 261, Governor Newsom states that "I am concerned about the overall financial impact of this bill on businesses, so I am instructing CARB to closely monitor the cost impacts as it implements this new bill and to make recommendations to streamline the program." | Hamburger Decl., Ex. 25 at 1. |
| 42. The California Legislature's legislative findings for S.B. 261 include the following: "Global economic and climate policy leaders have conclusively established that the long-term strength of global and local economies will depend on their ability to | Hamburger Decl., Ex. 26 (Senate Bill No. 261), § 1(b) |

| | |
|---|---|
| withstand climate-related risks, including physical impacts, economic transitions, and policy and legal responses." | |
| 43. The California Legislature's legislative findings for S.B. 261 include the following: "Failure of economic actors to adequately plan for and adapt to climate-related risks to their businesses and to the economy will result in significant harm to California, residents, and investors, in particular to financially vulnerable Californians who are employed by, live in communities reliant on, or have invested in or obtained financing from these institutions." | Hamburger Decl., Ex. 26 (Senate Bill No. 261), § 1(c). |
| 44. The California Legislature's legislative findings for S.B. 261 include the following: "Though a precedent has been set to address climate risk to businesses, corporations, and financial institutions nationwide, current disclosure standards are voluntary, and thus inadequate, for meeting rapidly accelerating climate risks. In order to begin to address the climate crisis, consistent, higher level, and mandatory | Hamburger Decl., Ex. 26 (Senate Bill No. 261), § 1(j). |

Gibson, Dunn & Crutcher LLP

18

**ER-2064**

| | |
|---|---|
| disclosures are needed from all major economic actors, and California has an opportunity to set mandatory and comprehensive risk disclosure requirements for public and private entities to ensure a sustainable, resilient, and prosperous future for our state." | |
| 45.  The June 2017 Recommendations of the Task Force on Climate-Related Financial Disclosures states that "Organizations' financial performance may also be affected by changes in water availability, sourcing, and quality; food security; and extreme temperature changes affecting organizations' premises, operations, supply chain, transport needs, and employee safety." | Hamburger Decl., Ex. 20 at 6. |
| 46.  There is high degree of uncertainty about the timing and magnitude of climate-related risks, and it is difficult to estimate how those risks impact company operations. | Hamburger Decl., Ex. 20 at 36; Hamburger Decl., Ex. 21 at 11. |
| 47.  A company's subjective judgment is required make disclosures about climate change risks for future company operations. | Hamburger Decl., Ex. 20 at 53. |

Gibson, Dunn &
Crutcher LLP

STATEMENT OF UNCONTROVERTED FACTS ISO MOT. FOR SUMMARY JUDGMENT ON CLAIM I
CASE NO. 2:24-CV-00801-ODW-PVC

ER-2065

(23 of 271), Page 23 of 271 Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 23 of 271
Case 2:24-cv-00801-ODW-PVC Document 48-2 Filed 05/24/24 Page 22 of 30 Page ID
#:373

| | |
|---|---|
| 48. Over 10,000 companies do business in California and have revenues of greater than $500,000,000 and thus are subject to S.B. 261. | Hamburger Decl., Ex. 22 at 5. |
| 49. Of the more than 10,000 companies that are subject to S.B. 261, only 20% are publicly traded. | Hamburger Decl., Ex. 22 at 5. |
| 50. U-Haul Holding Company ("UHHC"), a Nevada corporation, is a member of the United States Chamber of Commerce. | Declaration of Edward J. Shoen ("Shoen Decl.") ¶¶ 2-3. |
| 51. UHHC has an annual total revenue exceeding $1 billion USD. | Shoen Decl. ¶ 3. |
| 52. UHHC's subsidiary, U-Haul Co. of California ("UHCA"), does business in California. | Shoen Decl. ¶ 4. |
| 53. If UHCA's activities in California are attributable to UHHC, then UHHC would be subject to the requirements of SB 253 and 261. | Shoen Decl. ¶ 5. |
| 54. UHHC and its subsidiaries that do business throughout the United States and Canada make up the U-Haul System ("U-Haul"). | Shoen Decl. ¶ 6. |

Gibson, Dunn &
Crutcher LLP

| | |
|---|---|
| 55. Complying with SB 261 would require U-Haul to opine on climate-related risks. | Shoen Decl. ¶ 32. |
| 56. Complying with SB 261 would require U-Haul to post opinions about climate risks to its website. | Shoen Decl. ¶ 32. |
| 57. Complying with SB 253 would require U-Haul to calculate Scope 1, 2, and 3 emissions. | Shoen Decl. ¶ 13. |
| 58. U-Haul will need to exercise subjective judgment in calculating greenhouse-gas emissions. | Shoen Decl. ¶¶ 11,17, 39. |
| 59. Scope 1, 2, and 3 emissions alone do not accurately reflect U-Haul's total emissions because the calculation does not include Scope 4 emissions—i.e., those emissions that a company avoids that should be deducted from its Scope 1, 2, and 3 emission levels. | Shoen Decl. ¶¶ 28, 31. |
| 60. U-Haul's commercial transactions with its customers do not involve disclosure of greenhouse-gas emissions or climate-related risks. | Shoen Decl. ¶ 36. |
| 61. U-Haul's advertising does not highlight greenhouse-gas emissions or climate-related risks. | Shoen Decl. ¶ 36. |

Gibson, Dunn & Crutcher LLP

STATEMENT OF UNCONTROVERTED FACTS ISO MOT. FOR SUMMARY JUDGMENT ON CLAIM I
CASE NO. 2:24-CV-00801-ODW-PVC

ER-2067

| | |
|---|---|
| 62.  S.B. 253 and 261 are burdensome.  For example, with respect to IT alone, U-Haul preliminarily estimates that complying with S.B. 261 would require approximately 30 additional dedicated team members to build and then support processes on an ongoing basis at an estimated cost exceeding $3,000,000 per year, which would rise as personnel costs increase over time. This cost estimate does not include costs outside of U-Haul's IT team and does not include costs for complying with S.B. 253, which would involve additional burdensome steps. | Shoen Decl. ¶¶ 12-15, 35, 39. |
| 63.  S.B. 261's requirement to discuss risks "including, but not limited to, risks to corporate operations, provision of goods and services, supply chains, employee health and safety, capital and financial investments, institutional investments, financial standing of loan recipients and borrowers, shareholder value, consumer demand, and financial markets and economic health" would require investments of | Shoen Decl. ¶¶ 32-38. |

Gibson, Dunn & Crutcher LLP

STATEMENT OF UNCONTROVERTED FACTS ISO MOT. FOR SUMMARY JUDGMENT ON CLAIM I
CASE NO. 2:24-CV-00801-ODW-PVC

ER-2068

| | |
|---|---|
| significant time and money that U-Haul would not otherwise make. | |
| 64. S.B. 253's requirement to calculate Scope 3 emissions would impose significant costs on U-Haul that U-Haul would not otherwise incur. | Shoen Decl. ¶¶ 15-27. |
| 65. S.B. 253's requirement to calculate Scope 1 and 2 emissions would impose significant costs on U-Haul that U-Haul would not otherwise incur. | Shoen Decl. ¶¶ 13-14. |
| 66. Triple H Farm is a family farm that raises beef cattle and markets them in local family-owned livestock auctions. | Declaration of Garrett Hawkins ("Hawkins Decl.") ¶¶ 1-2. |
| 67. Triple H Farm is a member of the American Farm Bureau Federation. | Hawkins Decl. ¶ 1. |
| 68. Triple H Farm does not operate in California or sell directly to California companies. | Hawkins Decl. ¶ 2. |
| 69. Triple H Farm's cattle is in the supply chain of companies that will be required to report their Scope 3 emissions under S.B. 253. | Hawkins Decl. ¶¶ 2-3. |

(27 of 271), Page 27 of 271 Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 27 of 271
Case 2:24-cv-00801-ODW-PVC   Document 48-2   Filed 05/24/24   Page 26 of 30   Page ID
#:377

| | |
|---|---|
| 70.  Companies that are subject to S.B. 253 and that purchase Triple H Farm's cattle will be required to include in their Scope 3 emissions reports information about Triple H Farm's emissions. | Hawkins Decl. ¶¶ 2-3. |
| 71.  Triple H Farm does not track its greenhouse-gas emissions and does not have policies, procedures, or systems in place to do so. | Hawkins Decl. ¶ 4. |
| 72.  Developing an emissions tracking process would be enormously burdensome for Triple H Farm.  For example, day to day, Triple H Farm requires varying levels of water, fertilizer, and other inputs.  Tracking the emissions associated with these and other inputs would be a significant undertaking, for which Triple H Farm's employees have no experience. | Hawkins Decl. ¶¶ 4-5. |
| 73.  As a family farm, Triple H Farm would be at a significant competitive disadvantage to large farms who could spread the fixed costs of tracking greenhouse-gas emissions over much greater output. | Hawkins Decl. ¶¶ 5-6. |

Gibson, Dunn &
Crutcher LLP

STATEMENT OF UNCONTROVERTED FACTS ISO MOT. FOR SUMMARY JUDGMENT ON CLAIM I
CASE NO. 2:24-CV-00801-ODW-PVC                    ER-2070

| | |
|---|---|
| 74.  By requiring the firms who purchase Triple H Farm's beef to report their emissions, S.B. 253 may, in turn, require Triple H Farm to state its emissions, including to purchasers.  Triple H Farm would not otherwise make those statements. | Hawkins Decl. ¶ 7. |
| 75.  Triple H Farm does not believe that required emissions reports would be a fair representation of its emissions. | Hawkins Decl. ¶ 7. |
| 76.  White Farms and Cattle is a family farm, which has been in operation for over 100 years and raises wheat, cotton, hay, and cattle. | Declaration of Michael White ("White Decl.") ¶ 1. |
| 77.  White Farms and Cattle is a member of the American Farm Bureau Federation. | White Decl. ¶ 1. |
| 78.  White Farms and Cattle does not operate in California and does not sell directly to California companies. | White Decl. ¶ 2. |
| 79.  White Farms and Cattle's cattle is in the supply chain of companies that will be subject to Scope 3 reporting requirements under S.B. 253. | White Decl. ¶ 2. |

**ER-2071**

Gibson, Dunn & Crutcher LLP

| 80.  Companies that are subject to S.B. 253 and that purchase White Farms and Cattle's cattle will be required to include in their Scope 3 emissions reports information about White Farms and Cattle's emissions. | White Decl. ¶ 3. |
|---|---|
| 81.  White Farms and Cattle does not currently track greenhouse-gas emissions, does not have experience tracking greenhouse-gas emissions, and does not have policies, procedures, or systems in place for tracking, recording, or reporting greenhouse-gas emissions. | White Decl. ¶ 4. |
| 82.  Developing the policies, procedures, or systems for tracking greenhouse-gas emissions would be enormously burdensome for White Farms and Cattle. For example, on any given day, White Farms and Cattle requires varying levels of water, fertilizer, and crop protection products.  Tracking these fluctuations in the context of measuring greenhouse-gas emissions would be an enormous undertaking, for which White Farms and Cattle has no pre-existing procedures, policies, or systems in place. | White Decl. ¶¶ 4-5. |

Gibson, Dunn & Crutcher LLP

STATEMENT OF UNCONTROVERTED FACTS ISO MOT. FOR SUMMARY JUDGMENT ON CLAIM I
CASE NO. 2:24-CV-00801-ODW-PVC

ER-2072

| | |
|---|---|
| 83. As a family farm, White Farms and Cattle would be at a significant competitive disadvantage to larger farms who could spread the fixed costs of tracking greenhouse-gas emissions over more units of output. | White Decl. ¶ 5. |
| 84. If White Farms and Cattle's purchasers are required to report their Scope 3 emissions, White Farms and Cattle, in turn, could be required to make statements about its emissions. | White Decl. ¶ 7. |
| 85. White Farms and Cattle does not believe the statements that it would be required to make about greenhouse-gas emissions would accurately portray White Farms and Cattle's emissions. | White Decl. ¶ 7. |

Gibson, Dunn & Crutcher LLP

STATEMENT OF UNCONTROVERTED FACTS ISO MOT. FOR SUMMARY JUDGMENT ON CLAIM I
CASE NO. 2:24-CV-00801-ODW-PVC                    **ER-2073**

1    DATED: May 24, 2024       Respectfully submitted,

2                           GIBSON, DUNN & CRUTCHER LLP

3

4                        By:  */s/ Bradley J. Hamburger*
                       Eugene Scalia, SBN 151540

5                        Bradley J. Hamburger, SBN 266916
                       Katherine Moran Meeks (*pro hac vice*)

6                        Samuel Eckman, SBN 308923
                       Brian A. Richman (*pro hac vice*)

7                        Elizabeth Strassner, SBN 342838

8                        *Attorneys for Plaintiffs Chamber of Commerce*

9                        *of the United States of America, California*
                       *Chamber of Commerce, American Farm Bureau*

10                       *Federation, Los Angeles County Business*
                      *Federation, Central Valley Business Federation*

11                       *and Western Growers Association*

12                        CHAMBER OF COMMERCE OF THE

13                        UNITED STATES OF AMERICA

14                        Daryl Joseffer (*pro hac vice*)

15                        Tyler S. Badgley (*pro hac vice*)
                       Kevin Palmer (*pro hac vice*)

16                        *Attorneys for Plaintiff Chamber of Commerce*

17                        *of the United States of America*

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

28
STATEMENT OF UNCONTROVERTED FACTS ISO MOT. FOR SUMMARY JUDGMENT ON CLAIM I
CASE NO. 2:24-CV-00801-ODW-PVC     **ER-2074**

1  EUGENE SCALIA, SBN 151540
2      escalia@gibsondunn.com
   KATHERINE MORAN MEEKS
3  (*pro hac vice*)
       DC Bar No. 1028302
4      kmeeks@gibsondunn.com
5  GIBSON, DUNN & CRUTCHER LLP
   1050 Connecticut Avenue, N.W.
6  Washington, D.C. 20036-5306
   Telephone: 202.955.8500
7  Facsimile: 202.467.0539

8  *Attorneys for Plaintiffs Chamber of*
9  *Commerce of the United States of*
   *America, California Chamber of*
10 *Commerce, American Farm Bureau*
   *Federation, Los Angeles County*
11 *Business Federation, Central Valley*
   *Business Federation, and*
12 *Western Growers Association*

13 (*Additional counsel listed on next page*)

14          IN THE UNITED STATES DISTRICT COURT

15        FOR THE CENTRAL DISTRICT OF CALIFORNIA,

16                  WESTERN DIVISION

17
18 | CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, | CASE NO. 2:24-cv-00801-ODW-PVC |
   | CALIFORNIA CHAMBER OF | |

CHAMBER OF COMMERCE OF THE
18 UNITED STATES OF AMERICA,
   CALIFORNIA CHAMBER OF
19 COMMERCE, AMERICAN FARM
   BUREAU FEDERATION, LOS
20 ANGELES COUNTY BUSINESS
   FEDERATION, CENTRAL VALLEY
21 BUSINESS FEDERATION, and
   WESTERN GROWERS ASSOCIATION,

22              Plaintiffs,

23          v.

24 LIANE M. RANDOLPH, in her official
   capacity as Chair of the California Air
25 Resources Board, STEVEN S. CLIFF, in
   his official capacity as the Executive
26 Officer of the California Air Resources
   Board, and ROBERT A. BONTA, in his
27 official capacity as Attorney General of
   California.

28              Defendants.

CASE NO. 2:24-cv-00801-ODW-PVC

**MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT
OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT ON
CLAIM I** [F.R.C.P. 56]

**HEARING:**
Date:       Sept. 9, 2024
Time:       1:30 PM
Location:   Courtroom 5D
Judge:      Otis D. Wright II

1    BRADLEY J. HAMBURGER,
          SBN 266916
2          bhamburger@gibsondunn.com
3    SAMUEL ECKMAN, SBN 308923
          seckman@gibsondunn.com
4    ELIZABETH STRASSNER,
          SBN 342838
5          estrassner@gibsondunn.com
6    GIBSON, DUNN & CRUTCHER LLP
     333 South Grand Ave.
7    Los Angeles, CA  90071-3197
     Telephone:  213.229.7000
8    Facsimile:   213.229.7520

9    BRIAN A. RICHMAN
     (*pro hac vice*)
10         DC Bar No. 230071
           brichman@gibsondunn.com
11   GIBSON, DUNN & CRUTCHER LLP
     2001 Ross Ave., Suite 2100
12   Dallas, TX  75201-2923
     Telephone:  214.698.3100
13   Facsimile:   214.571.2900
14
     *Attorneys for Plaintiffs Chamber of Commerce of the United States of America,*
15   *California Chamber of Commerce, American Farm Bureau Federation, Los Angeles*
     *County Business Federation, Central Valley Business Federation, and*
16   *Western Growers Association*

17   DARYL JOSEFFER
     (*pro hac vice*)
18         DC Bar No. 457185
           djoseffer@uschamber.com
19   TYLER S. BADGLEY
     (*pro hac vice*)
20         DC Bar No. 1047899
           tbadgley@uschamber.com
21   KEVIN PALMER
     (*pro hac vice*)
22         DC Bar No. 90014967
           kpalmer@uschamber.com
23   CHAMBER OF COMMERCE OF THE
     UNITED STATES OF AMERICA
24   1615 H Street, NW
     Washington, D.C.  20062-2000
25   Telephone:  202.659.6000
     Facsimile:   202.463.5302
26
27   *Attorneys for Plaintiff Chamber of Commerce of the United States of America*

28

Gibson, Dunn &
Crutcher LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...........................................................................................1

II. BACKGROUND............................................................................................2

    A.    California Seeks to Hold Corporations Accountable for Climate Change Through Senate Bills 253 and 261................................................2

    B.    The New Laws Impose Substantial Costs on Business. ............................3

    C.    Plaintiffs Bring This Suit to Enjoin the Laws' Unconstitutional Mandates. ..................................................................................................5

III. LEGAL STANDARD....................................................................................6

IV. ARGUMENT..................................................................................................6

    A.    S.B. 253 and 261 Fail Strict Scrutiny.......................................................7

        1.    Strict Scrutiny Applies....................................................................7

        2.    The State Cannot Show that the Laws Survive Strict Scrutiny. ........................................................................................9

    B.    Less Stringent First Amendment Standards Have No Application and Cannot Save the Laws Anyway. ......................................................14

        1.    S.B. 253 and 261 Do Not Fall into Either Exception to Strict Scrutiny. .............................................................................14

        2.    The Laws Fail Any Degree of First Amendment Scrutiny............19

    C.    The Court Should Enjoin Application, Implementation, or Enforcement of the Laws. ........................................................................20

V. CONCLUSION.............................................................................................21

Gibson, Dunn & Crutcher LLP

i

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*303 Creative LLC v. Elenis*,
    600 U.S. 570 (2023)...................................................................................... 7

*Am. Beverage Ass'n v. City & Cnty. of San Francisco*,
    916 F.3d 749 (9th Cir. 2019) (en banc) ..................................... 8, 16, 20, 21

*Americans for Prosperity Found. v. Bonta*,
    141 S. Ct. 2373 (2021).................................................................................. 21

*AMI. v. USDA*,
    760 F.3d 18 (D.C. Cir. 2014)........................................................ 9, 13, 17

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)...................................................................................... 6

*Ariix, LLC v. NutriSearch Corp.*,
    985 F.3d 1107 (9th Cir. 2021) ................................................................... 15

*Bolger v. Youngs Drug Prods. Corp.*,
    463 U.S. 60 (1983)...................................................................................... 15

*Book People, Inc. v. Wong*,
    91 F.4th 318 (5th Cir. 2024) ...................................................................... 17

*Brown v. Entm't. Merchs. Ass'n*,
    564 U.S. 786 (2011)................................................................... 11, 18, 21

*Cal. Chamber of Commerce v. Council for Educ. & Research on Toxics*,
    29 F.4th 468 (9th Cir. 2022) ............................................................... 18, 19

*Canyon Ferry Road Baptist Church of East Helena, Inc. v. Unsworth*,
    556 F.3d 1021 (9th Cir. 2019) ................................................................... 14

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*,
    447 U.S. 557 (1980)..................................................................................... 15

*Citizens United v. FEC*,
    558 U.S. 310 (2010)................................................................. 8, 11, 15

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*CTIA - The Wireless, Ass'n v. City of Berkeley,*
    928 F.3d 832 (9th Cir. 2019) ........................................................ 9, 15, 19

*Edenfield v. Fane,*
    507 U.S. 761 (1993) .......................................................................... 9

*Elrod v. Burns,*
    427 U.S. 347 (1976) ........................................................................ 20

*Entm't Software Ass'n v. Blagojevich,*
    469 F.3d 641 (7th Cir. 2006) ......................................................... 17

*Fairbank v. Wunderman Cato Johnson,*
    212 F.3d 528 (9th Cir. 2000) ........................................................... 6

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021) ........................................................................ 10

*Green v. Miss United States of Am., LLC,*
    52 F.4th 773 (9th Cir. 2022) ................................................... 8, 9, 10

*Hill v. Colorado,*
    530 U.S. 703 (2000) ........................................................................ 14

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
    515 U.S. 557 (1995) ............................................................... 7, 16, 17

*Ibanez v. Fla. Dep't of Bus. & Prof'l Reg.,*
    512 U.S. 136 (1994) ........................................................................ 20

*IMDB.com, Inc. v. Becerra,*
    2018 WL 979031 (N.D. Cal. Feb. 20, 2018) ................................... 6

*Int'l Dairy Foods Ass'n v. Amestoy,*
    92 F.3d 67 (2d Cir. 1996) ................................................................ 9

*Italian Colors Rest. v. Becerra,*
    878 F.3d 1165 (9th Cir. 2018) ..................................................... 9, 10

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31,*
    585 U.S. 878 (2018) ................................................................... 8, 18

Gibson, Dunn &
Crutcher LLP

iii

PLAINTIFFS' OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS
CASE NO. 2:24-CV-00801-ODW-PVC

ER-2079

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Junior Sports Magazines Inc. v. Bonta*,
80 F.4th 1109 (9th Cir. 2023) ............................................................. 10, 19

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) .................................................................................... 6

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) .................................................................................... 9

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
142 S. Ct. 2111 (2022) .............................................................................. 14

*NAM v. SEC*,
748 F.3d 359 (D.C. Cir. 2014) .................................................................. 12

*NAM v. SEC*,
800 F.3d 518 (D.C. Cir. 2015) ............................................. 10, 11, 13, 16, 19

*Nat'l Ass'n of Wheat Growers v. Bonta*,
85 F.4th 1263 (9th Cir. 2023) ...................................... 7, 12, 18, 19, 21

*Nat'l Rifle Ass'n of Am. v. City of L.A.*,
441 F. Supp. 3d 915 (C.D. Cal. 2019) ....................................................... 6

*NIFLA v. Becerra*,
585 U.S. 755 (2018) ............................... 7, 8, 9, 10, 11, 13, 15, 16, 17, 18, 19, 20, 21

*O'Brien v. Welty*,
818 F.3d 920 (9th Cir. 2016) .................................................................... 13

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) ...................................................................... 6

*Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n*,
475 U.S. 1 (1986) ........................................................................................ 7

*In re R.M.J.*,
455 U.S. 191 (1982) .............................................................................. 19, 20

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 (2015) .................................................................................... 9

Gibson, Dunn &
Crutcher LLP

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
  487 U.S. 781 (1988).....................................................................................7, 8

*Small Bus. Fin. Ass'n v. Hewlett*,
  2023 WL 3551061 (C.D. Cal. Mar. 30, 2023) ......................................... 14

*Townsend Farms Inc. v. Göknur Gida Maddeleri Enerji Imalat Ithalat Ihracat Ticaret Ve Sanayi A.S.*,
  2016 WL 10570246 (C.D. Cal. Nov. 21, 2016) ....................................... 15

*Twitter, Inc. v. Garland*,
  61 F.4th 686 (9th Cir. 2023) .................................................................... 11

*United States v. Lopez*,
  514 U.S. 549 (1995)................................................................................. 10

*United States v. Playboy Entm't Grp., Inc.*,
  529 U.S. 803 (2000)................................................................................. 11

*United States v. Stevens*,
  559 U.S. 460 (2010)................................................................................... 6

*United States v. United Foods, Inc.*,
  533 U.S. 405 (2001)................................................................................. 15

*Video Software Dealers Ass'n v. Schwarzenegger*,
  556 F.3d 950 (9th Cir. 2009) .................................................................. 18

*Williams-Yulee v. Florida Bar*,
  575 U.S. 433 (2015)................................................................................... 9

*Wooley v. Maynard*,
  430 U.S. 705 (1977)...............................................................................1, 7

*Ysursa v. Pocatello Education Ass'n*,
  555 U.S. 353 (2009)................................................................................... 1

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
  471 U.S. 626 (1985).............................................................................15, 16

Gibson, Dunn & Crutcher LLP

v

**TABLE OF AUTHORITIES**
(continued)

Page(s)

STATUTES

S.B. 253..................................................................................4, 10, 11, 16, 18, 19

S.B. 261..............................................................................3, 4, 8, 11, 12, 14, 17, 19

RULES

Federal Rule of Civil Procedure 56(a)..............................................................6

REGULATIONS

89 Fed. Reg. 21,698 (Mar. 28, 2024).........................................................2, 12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I. INTRODUCTION

It is fundamental that "the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). S.B. 253 and 261 violate this First Amendment protection by compelling thousands of companies doing even minimal business in California to make controversial, opinion-laden statements on the hotly contested and politically salient issue of climate change. The laws will force every covered entity, as a consequence of merely entering the California market, to publicly state its opinions regarding the risks associated with climate change, post those opinions to its own website, and disclose an inexact, misleading calculation of the entity's greenhouse-gas emissions. Worse still, the laws do so with the express purpose of advancing the State's preferred view on emissions. The record makes clear that the State is attempting to force companies to make controversial disclosures that invite public opprobrium and thereby "encourage [companies] to take meaningful steps to reduce [greenhouse-gas] emissions." Plaintiffs' Statement of Uncontroverted Facts ("UF") No. 17.

Plaintiffs support policies that reduce greenhouse-gas emissions as much and as quickly as reasonably possible, consistent with the pace of innovation and the feasibility of implementing large-scale technical change. Nevertheless, the First Amendment does not permit California to impose speculative and—in the words of Governor Newsom— "likely infeasible" disclosures that burden speech rights and would have a substantial "financial impact," all in the hope that the scrutiny these disclosures invite will coerce companies to reduce their emissions. UF 22-23.

California's chosen path—designed to spark a public pressure campaign through compelled speech—violates the First Amendment. Because S.B. 253 and 261 compel the content of companies' speech, they "are 'presumptively invalid' and subject to strict scrutiny." *Ysursa v. Pocatello Education Ass'n*, 555 U.S. 353, 358 (2009). The laws fail that scrutiny. California cannot connect the required disclosures to any concrete,

(41 of 271), Page 41 of 271 Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 41 of 271
Case 2:24-cv-00801-ODW-PVC   Document 48-1   Filed 05/24/24   Page 10 of 31   Page ID
#:330

direct, immediate, and legitimate interests, such as avoiding fraud.  And the disclosure requirements are unusually burdensome, both in terms of cost and on free-speech rights. In fact, the mandate to report certain emissions is likely to cost some companies more than $1 million per year each, UF 29, which is why the SEC refused to adopt a similar requirement, *see* 89 Fed. Reg. 21,698, 21,736 (Mar. 28, 2024).

The Court should grant Plaintiffs' motion for summary judgment on Claim I of their Amended Complaint, declare S.B. 253 and 261 facially invalid under the First Amendment, and enjoin Defendants from implementing, applying, or taking any action whatsoever to enforce the laws.

## II.  BACKGROUND

**A.    California Seeks to Hold Corporations Accountable for Climate Change Through Senate Bills 253 and 261.**

On October 7, 2023, Governor Newsom signed two bills, S.B. 253 and 261, requiring thousands of companies doing business in California to engage in burdensome, controversial, and opinion-laden speech regarding climate change—a hotly disputed political issue.  The laws attempt, through compelled speech, to "create accountability for those that aren't" "doing their part to tackle the climate crisis."  UF 1; *accord* UF 2, 4-6.  "Californians," one legislator wrote, "have a right to know who" is "destroying [their] planet" by "causing" climate change.  UF 15.  And the laws, supporters have said, will "check the climate crisis" by letting the public "hold [companies] accountable," UF 19, for "emitting greenhouse gasses," UF 20; *accord* UF 7, 9-11.

As supporters of the bills explained, the purpose of these speech compulsions is to regulate conduct—to "encourage" companies to conform their behavior to the policy preferences of the State.  UF 17.  As one legislator explained, the goal of S.B. 253 is to compel companies to release information even though "they don't want to do the disclosure" because (in the State's view) "they think they're going to be embarrassed by it."  UF 3.

(42 of 271), Page 42 of 271 Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 42 of 271
Case 2:24-cv-00801-ODW-PVC Document 48-1 Filed 05/24/24 Page 11 of 31 Page ID
#:331

**B.     The New Laws Impose Substantial Costs on Business.**

Both laws compel a substantial amount of speech at significant expense, without a permissible compelling governmental interest.  By the Governor's own reckoning, the legislation will have a negative "financial impact" on the more than 10,000 businesses covered, will impose deadlines that are "likely infeasible," and will deluge the public with unhelpful, "inconsistent" information.  UF 22; *see also* UF 39-40.

**1.**     S.B. 261 is expected to apply to more than 10,000 businesses.  UF 48.  It reaches any company with revenues exceeding $500 million that does any business in California. S.B. 261 § 2(a).  Because there is no de minimis exception, if an entity exceeds the revenue threshold, it is subject to S.B. 261 even if it conducts an immaterial amount of business in the State and even if the business it conducts in California lacks any plausible connection to climate change.

The law requires any covered entity to publicly state its opinion regarding various "climate-related financial risk[s]" and to post that opinion to the entity's website. S.B. 261 § 2(b)(1)(A), (c)(1).  Under the law, companies must opine on any "material risk of harm to immediate and long-term financial outcomes due to physical and transition risks, including, but not limited to, risks to corporate operations, provision of goods and services, supply chains, employee health and safety, capital and financial investments, institutional investments, financial standing of loan recipients and borrowers, shareholder value, consumer demand, and financial markets and economic health." *Id.* § 2(a)(2).  Companies must then provide a report discussing any "measures adopted to reduce and adapt to" any of the above climate-related risks.  *Id.* § 2(b)(1)(A)(ii).  And unless a company certifies that it has prepared an "equivalent" report for other reasons (e.g., it was required by federal law or the law of another "government entity"), the law requires companies to conform their reports to the "recommended framework" contained in the "Final Report of Recommendations of the Task Force on Climate-Related Financial Disclosures (June 2017)."  *Id.* § 2(b)(1)(A), (4).  That framework provides detailed instructions on the "types of information that should be disclosed or

(43 of 271), Page 43 of 271 Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 43 of 271
Case 2:24-cv-00801-ODW-PVC   Document 48-1   Filed 05/24/24   Page 12 of 31   Page ID
#:332

1    considered" and how such information "should be presented."  Hamburger Decl. Ex. 20

2    at 19, 51; *see also* UF 45.

3         **2.**     S.B. 253 likewise applies to any company exceeding a certain revenue

4    threshold (in this case, $1 billion) that does any business in California.  S.B. 253

5    § 2(b)(2).  The law is expected to directly cover more than 5,300 companies, UF 27,

6    although its impact will extend to many more companies that do business with the

7    covered entities, including small businesses and businesses with no operations in

8    California.

9         S.B. 253 requires each covered entity to publicly state the "entity's" greenhouse-

10   gas emissions.  S.B. 253 § 2(c)(1).  Each entity must "measure and report" three

11   categories of greenhouse-gas emissions—Scope 1, Scope 2, and Scope 3—"in

12   conformance with the Greenhouse Gas Protocol standards and guidance."  *Id.*

13   § 2(c)(1)(A)(ii).  And although the law purports to require each company to report "its

14   emissions," *id.*, "Scope 2" and "Scope 3" emissions are defined to include the emissions

15   of *others*, including emissions from utility providers, upstream suppliers, and

16   downstream customers.  *Id.* § 2(c)(1).  Thus, S.B. 253 requires a company to

17   misleadingly represent that the emissions of other entities are its own.  Moreover, by

18   requiring reporting "in conformance with the Greenhouse Gas Protocol," the law

19   requires companies to make reports that are misleadingly high, because the Greenhouse

20   Gas Protocol does not factor in emissions that companies avoid or offset.

21        The reported emissions are not purely factual.  Besides forcing a company to

22   report others' emissions as its own, the proper calculation of a company's emissions is

23   subject to significant debate.  Even Governor Newsom expressed concerns about

24   inconsistent reporting, stating "the reporting protocol specified" in S.B. 253 "could

25   result in inconsistent reporting across businesses subject to the measure."  UF 22.

26   Emissions calculations necessarily turn on subjective judgments concerning the

27   "advantages and disadvantages" of various approaches to estimation.  UF 34.  Even

28   more so, the subjective estimations an entity reports as its Scope 3 emissions are those

(44 of 271), Page 44 of 271 Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 44 of 271
Case 2:24-cv-00801-ODW-PVC   Document 48-1   Filed 05/24/24   Page 13 of 31   Page ID
#:333

of other reporting entities altogether, both downstream and upstream in the supply chain. UF 32.

The emissions estimations S.B. 253 requires are enormously burdensome. And S.B. 253's requirements go beyond what companies, including members of Plaintiffs, would otherwise do. *See, e.g.*, UF 62-65. The Scope-3 requirement alone could cost some companies more than $1 million per year. *See, e.g.*, UF 29. And as even the SEC acknowledges, the estimate in many instances may be inaccurate. *See* UF 30 (acknowledging that, "in many instances, direct measurement of [greenhouse-gas] emissions at the sources, which would provide the most accurate measurement, may not be possible").

The burden of estimating Scope 3 emissions flows up and down the supply chain. *See, e.g.*, UF 32. Small businesses nationwide, including family farms far outside of California, UF 66-85, will incur significant costs monitoring and reporting emissions to suppliers and customers swept within the law's reach.

## C.   Plaintiffs Bring This Suit to Enjoin the Laws' Unconstitutional Mandates.

S.B. 253 and 261 forces thousands of companies, including Plaintiffs' members, to engage in controversial speech that they do not wish to make, untethered to any commercial purpose or transaction. *E.g.*, UF 50-85. And they do all this for the explicit purpose of placing political and economic pressure on companies to "encourage" them to conform their behavior to the policy goals of the State. This violates the First Amendment, as well as the Supremacy Clause and the Constitution's prohibition on extraterritorial regulation by the States.

Plaintiffs sued to enjoin the implementation or enforcement of the laws on these grounds. Dkt. 28. Defendants moved to dismiss Plaintiffs' complaint in part, but did not seek to dismiss the First Amendment claim. Dkt. 38; *see also* Dkt. 43 (opposition).

Plaintiffs now move for summary judgment on their First Amendment claim (Claim I of the amended complaint). Dkt. 46.

(45 of 271), Page 45 of 271 Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 45 of 271
Case 2:24-cv-00801-ODW-PVC    Document 48-1    Filed 05/24/24    Page 14 of 31    Page ID
#:334

### III.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), the Court may grant summary judgment on a claim "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "Once the moving party has met its initial burden, Rule 56[ ] requires the nonmoving party to go beyond the pleadings and identify facts which show a genuine issue for trial."  *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000).  The State's burden here "is not a light one."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  In deciding whether something is a "genuine issue for trial," the Court looks to "the record taken as a whole."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In the First Amendment context, a party bringing a facial challenge need show only that "a substantial number of [a law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *United States v. Stevens*, 559 U.S. 460, 473 (2010).  Unlike facial challenges in other contexts, "facial attacks under the First Amendment are given more permissive consideration" because "the First Amendment needs breathing space."  *Nat'l Rifle Ass'n of Am. v. City of L.A.*, 441 F. Supp. 3d 915, 927 (C.D. Cal. 2019); *see Stevens*, 559 U.S. at 473.  Facial challenges to state statutes are routinely resolved on motions for summary judgment.  *See, e.g.*, *IMDB.com, Inc. v. Becerra*, 2018 WL 979031 (N.D. Cal. Feb. 20, 2018), *aff'd*, 962 F.3d 1111 (9th Cir. 2020).

### IV.  ARGUMENT

The Court should permanently enjoin Defendants from enforcing or implementing S.B. 253 and 261, because they unconstitutionally compel speech.  The laws serve no compelling government interest, concern a controversial matter of

Gibson, Dunn & Crutcher LLP

6

(46 of 271), Page 46 of 271 Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 46 of 271
Case 2:24-cv-00801-ODW-PVC   Document 48-1   Filed 05/24/24   Page 15 of 31   Page ID
#:335

vehement public debate that is not purely factual, and are nothing like the government-required disclosures regarding health, safety, or other matters that courts have upheld in other contexts.

## A.   S.B. 253 and 261 Fail Strict Scrutiny.

The First Amendment prohibits "abridging the freedom of speech." U.S. Const. amend. I. This freedom "includes both the right to speak freely and the right to refrain from speaking at all," *Wooley*, 430 U.S. at 714, and it "applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid," *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995). "For corporations as for individuals, the choice to speak includes within it the choice of what not to say." *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n*, 475 U.S. 1, 16 (1986) (plurality). Laws compelling speech are thus "presumptively unconstitutional" and routinely trigger—and fail—strict scrutiny. *NIFLA v. Becerra*, 585 U.S. 755, 766 (2018); *accord Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1283 (9th Cir. 2023) ("Although commandeering speech may seem expedient, it is seldom constitutionally permissible."). S.B. 253 and 261 violate the First Amendment by compelling thousands of companies to make controversial, opinion-laden statements on the hotly contested, politically salient issue of climate change.

### 1.   Strict Scrutiny Applies.

By requiring companies to wade into a contentious political debate, S.B. 253 and 261 infringe on companies' freedom "to remain silent," triggering strict scrutiny twice over. *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023).

*First*, by "[m]andating speech that a speaker would not otherwise make," the laws "necessarily alter[ ] the content of the speech" and thus qualify as "content-based regulation[s]." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). The laws require companies to disclose an inexact, misleading calculation of greenhouse-gas emissions, and publicly pronounce subjective judgments about future risks—requiring, for example, determinations of which risks to their businesses are

"climate-related." The laws thereby force companies into public discussions about why they do or do not have certain climate-related policies or expertise. As "[c]ontent-based" rules, S.B. 253 and 261 "presumptively" trigger, and fail, "strict scrutiny." *NIFLA*, 585 U.S. at 766. As the Ninth Circuit has explained, a "government regulation compelling individuals to speak a particular message is a content-based regulation that is subject to strict scrutiny." *Green v. Miss United States of Am., LLC*, 52 F.4th 773, 791 (9th Cir. 2022) (quoting *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 759 (9th Cir. 2019) (en banc) (Ikuta, J., concurring in the result)).

*Second*, by "compelling" opinion-based discussion of climate change, the laws unavoidably "burden" political speech. *Riley*, 487 U.S. at 798. "Laws that burden political speech" are independently "'subject to strict scrutiny.'" *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). "[C]limate change" is a "sensitive political topic[ ]," and it is "undoubtedly [a] matter[ ] of profound 'value and concern to the public.'" *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 913-14 (2018). Such speech thus "'occupies the highest rung on the hierarchy of First Amendment values' and merits 'special protection.'" *Id.* at 914. The California Legislature itself recognizes that climate change is a high-profile political issue subject to robust debate among "[g]lobal economic and climate policy leaders," S.B. 261 § 1(b); UF 42, and that it raises many contested questions, including climate change's "long-term" consequences, *id.*, and corporations' responsibility to "plan for and adapt to" it, *id.* § 1(c); UF 43. The laws' sponsors, moreover, admit that the speech compelled here not only will fuel the policy debate—"provid[ing] . . . policymakers with" information they want to use in support of their policy goals, UF 16, but also will necessarily address the efficacy of "public policies to address climate change," UF 39. The First Amendment protects each person's right to speak, or not, on this crucial matter of public debate; the government can no more compel than prohibit speech on the subject of climate change or the government's response "to address" it. *Id.*

Gibson, Dunn & Crutcher LLP

**ER-2090**

(48 of 271), Page 48 of 271 Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 48 of 271
Case 2:24-cv-00801-ODW-PVC   Document 48-1   Filed 05/24/24   Page 17 of 31   Page ID
#:337

For both reasons, S.B. 253 and 261 warrant strict scrutiny, and are "presumptively unconstitutional." *NIFLA*, 585 U.S. at 766.

### 2. The State Cannot Show that the Laws Survive Strict Scrutiny.

**a.** Strict scrutiny places the burden on the government, not the plaintiff, to show that the legislation survives review, *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 171 (2015)—and "it is the rare case" when the government can meet this burden, *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015). S.B. 253 and 261 "may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *NIFLA*, 585 U.S. at 766. "These requirements are daunting," *Green*, 52 F.4th at 791, and the State here cannot meet the challenge.

*First*, the laws are not justified by a compelling state interest. The government cannot rest on "mere speculation or conjecture." *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1176 (9th Cir. 2018). It must prove that a compelling problem exists. *See, e.g.*, *Edenfield v. Fane*, 507 U.S. 761, 770-771 (1993). But there is no evidence that the rule furthers *any* "compelling" government interest. *NIFLA*, 585 U.S. at 766.

There is no compelling government interest "simply" in providing "information." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 348 (1995). "[T]he interest at stake must be more than the satisfaction of mere consumer curiosity." *CTIA - The Wireless, Ass'n v. City of Berkeley*, 928 F.3d 832, 844 (9th Cir. 2019); *see also AMI v. USDA*, 760 F.3d 18, 31 (D.C. Cir. 2014) (Kavanaugh, J., concurring) ("[I]t is plainly not enough for the Government to say simply that is has a substantial interest in giving consumers information," because "[a]fter all, that would be true of any and all disclosure requirements."); *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 73 (2d Cir. 1996) ("We are aware of no case in which consumer interest alone was sufficient[.]"). The State needs more than that—but, here, there is nothing more. The State does not, and cannot, connect the required disclosures to any concrete, direct, and immediate interest that any court has recognized, such as avoiding fraud or undisclosed materials risks. A "state may not restrict protected speech to prevent something that does not appear to occur."

1   *Junior Sports Magazines Inc. v. Bonta*, 80 F.4th 1109, 1117 (9th Cir. 2023).  Yet here,

2   the State has not shown "a *single* instance," *id.*, of anyone having been harmed by a lack

3   of climate-related disclosures—the *only* supposed problem these laws seek to remedy.

4   Thus, "California has not demonstrated any justification for . . . [the compelled speech]

5   that is more than 'purely hypothetical.'"  *NIFLA*, 585 U.S. at 776; *see also Italian*

6   *Colors*, 878 F.3d at 1177 (striking down speech restriction where California "pointed to

7   no evidence" that the cited dangers "were in fact real").

8       The State has made vague, generalized assertions of interest, but the "'First

9   Amendment demands a more precise analysis' than the 'high level of generality' offered

10  here."  *Green*, 52 F.4th at 791 (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522,

11  541 (2021)).  The State has asserted, for example, that "California investors, consumers,

12  and other stakeholders deserve transparency from companies regarding their greenhouse

13  gas (GHG) emissions to inform their decisionmaking," and that "people, communities,

14  and other stakeholders in California . . . have a right to know about the sources of carbon

15  pollution . . . in order to make informed decisions."  S.B. 253 § 1(e), (j); UF 24-25, 44.

16  But the State cannot explain what decisionmaking the required disclosures will better

17  inform, or how the *disclosures* would do that.  Why, for example, would a consumer

18  purchasing a pack of gum at a convenience store in California need to know the precise

19  level of "sulphur hexafluoride," UF 33, emitted by employees of the same convenience

20  store chain "commut[ing]" to work in Rhode Island, S.B. 253 § 2(b)(5)?  Or whether the

21  chain's future financial performance may "be affected by changes in water availability"

22  in Vermont?  UF 45.

23      At most, the State seems to believe that consumers could boycott companies with

24  significant greenhouse-gas emissions, which could help the State "move towards a net-

25  zero carbon economy" that would "protect the state and its residents," presumably by

26  ending or mitigating climate change.  S.B. 253 § 1(*l*); UF 26.  But to credit such a claim

27  would require "pil[ing] inference upon inference."  *United States v. Lopez*, 514 U.S. 549,

28  567 (1995).  In *NAM v. SEC*, the SEC had similarly, and unsuccessfully, argued that a

(50 of 271), Page 50 of 271 Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 50 of 271
Case 2:24-cv-00801-ODW-PVC   Document 48-1   Filed 05/24/24   Page 19 of 31   Page ID
#:339

compelled "conflict free" disclosure might cause consumers to "boycott mineral suppliers having any connection to [a specific] region of Africa," which would "decrease the revenue of armed groups in the DRC and their loss of revenue [would] end or at least diminish the humanitarian crisis there." 800 F.3d 518, 525 (D.C. Cir. 2015) ("*NAM II*"). But there, as here, the "major problem with this idea" is that it "is entirely unproven and rests on pure speculation." *Id.* The State cites no evidence that consumers would change their purchasing habits based on a company's greenhouse-gas emissions, that any such consumer sentiment would result in material changes in companies' emissions, or that any such changes would have a material impact on climate change. As the State admits, climate change is a "global" phenomenon, UF 14, 37, and combatting it requires a "*global* reduction of [greenhouse-gas emissions]," UF 18 (emphasis added). There is no evidence that S.B. 253 and 261 would make any discernable difference in global emissions, and thus to global climate change.

*Second*, even if the State were able to show some justification for these requirements, it has made no attempt to tailor them to that justification. "To be narrowly drawn, a 'curtailment of free speech must be actually necessary to the solution.'" *Twitter, Inc. v. Garland*, 61 F.4th 686, 698 (9th Cir. 2023) (quoting *Brown v. Entm't. Merchs. Ass'n*, 564 U.S. 786, 799 (2011)). And "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000).

The disclosures here fail tailoring because they are far "broader than reasonably necessary." *NIFLA*, 585 U.S. at 776. For example, even if California were able to show that "investors" or "consumers" need certain climate-related information, *see* S.B. 261 § 1(c); S.B. 253 § 1(e); UF 43, 24, the disclosure requirements apply far beyond that supposed justification—to *any* "business entity" satisfying the revenue threshold, *e.g.*, S.B. 261 § 2(a)(4), whether it has outside investors or not, *see* UF 28, 49, or whether the compelled climate-related speech bears any relation to a product or service sold within the State. *Cf. Citizens United*, 558 U.S. at 362 (statute to protect dissenting shareholders

11

(51 of 271), Page 51 of 271 Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 51 of 271
Case 2:24-cv-00801-ODW-PVC   Document 48-1   Filed 05/24/24   Page 20 of 31   Page ID
#:340

1  was overinclusive where it applied to nonprofit corporations and corporations with only

2  single shareholders).  The laws are overbroad, too, in that they require companies to

3  speak about climate change even if they have low [greenhouse-gas]emissions, or face

4  negligible financial risk from climate change.

5    California could try numerous alternative approaches that burden less speech.  For

6  instance, rather than compel individual companies to discuss subjective climate-related

7  financial risks themselves, California could compile its own reports disclosing the

8  "physical and transition risks," S.B. 261 § 2(a)(2), that companies in various industries

9  face.  *Cf. NAM v. SEC*, 748 F.3d 359, 372 (D.C. Cir. 2014) ("*NAM I*") (finding the SEC's

10  compelled conflict-mineral disclosures to be unduly burdensome because "the

11  government could compile its own list of products that it believes are affiliated with the

12  Congo war"), *overruled on other grounds by AMI*, 760 F.3d 18.  California could

13  similarly provide its own estimates of companies' greenhouse gas emissions.  Studies

14  show that 90% of a company's greenhouse-gas emissions could be estimated with

15  readily available information, such as industry, size, and earnings growth.  *See, e.g.*,

16  UF 35.  "California could . . . post [such] information . . . on its own website," without

17  "co-opt[ing]" the speech of anyone else.  *Wheat Growers*, 85 F.4th at 1283.  To survive

18  a First Amendment challenge, California must "provide evidence" that these and other

19  "intuitive alternatives to regulating speech would be . . . less effective" than its current

20  approach.  *NAM I*, 748 F.3d at 373.  California has not made, and cannot make, that

21  showing.

22    S.B. 253 and 261 also fail tailoring because they are incongruously burdensome.

23  S.B. 253's requirement to report Scope 3 emissions alone will cost some companies

24  more than $1 million per year, *see, e.g.*, UF 29; *see also* UF 62, which is so burdensome

25  that the SEC refused to adopt a similar requirement, *see* 89 Fed. Reg. at 21,736.  And

26  given the fundamentally speculative nature of emissions reporting and climate risks, the

27  laws, which require companies to go far beyond current practices, *see, e.g.*, UF 63-65,

28  do nothing to better inform consumers or investors.  The laws also reach far beyond

(52 of 271), Page 52 of 271 Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 52 of 271
Case 2:24-cv-00801-ODW-PVC   Document 48-1   Filed 05/24/24   Page 21 of 31   Page ID
#:341

California's borders, burdening speech and threatening small businesses even when they have no direct business in California but merely deal with other companies that do, including thousands of family-farm members of AFBF and WGA.   UF 66-85. Estimating emissions for these entities is unjustifiably burdensome.

    **b.**    Both laws also share characteristics that courts have recognized push "public disclosure" laws over the line into unconstitutional compelled speech.

    *First*, there is no historical pedigree for disclosures of this type.  *See NIFLA*, 585 U.S. at 767 (explaining that the government may not "impose content-based restrictions on speech without 'persuasive evidence . . . of a long (if heretofore unrecognized) tradition to that effect'"); *AMI*, 760 F.3d at 23 (explaining that determining whether an interest is "substantial" turns on the "historical pedigree" of that interest); *id.* at 31 (Kavanaugh, J., concurring) ("history and tradition are reliable guides" for "what interests qualify as sufficiently substantial to justify the infringement on the speaker's First Amendment autonomy").

    *Second*, the laws by design will empower participants in the climate debate to use companies' disclosures about emissions, and about their plans to address them, as a basis to criticize the companies or to call for increased regulation or other concerted action, whether by regulators or by the companies themselves.  *E.g.*, UF 1-5, 7, 9, 11, 13. Similar concerns underlaid the invalidation of the conflict mineral disclosure on First Amendment grounds, where the D.C. Circuit perceived that SEC disclosures would be used to "stigmatize" companies and attempt to "shape [their] behavior."  *NAM II*, 800 F.3d at 530.  By compelling companies to speak on California's terms, the government-mandated speech would likewise force companies into politically charged discussions about how they address certain climate-related risks, thereby "skew[ing] [the] public debate." *Id.*  These effects "make[ ] the requirement[s] more constitutionally offensive." *Id.*

    *Third*, vagueness concerns make the laws even more problematic.  Vague laws "allow arbitrary and discriminatory enforcement," *O'Brien v. Welty*, 818 F.3d 920, 930

(9th Cir. 2016), and thus may have a significant chilling effect on speech. The definition of "climate-related financial risk," in particular, is so broad and vague—any "material risk of harm to immediate and long-term financial outcomes due to physical and transition risks, including, but not limited to, risks to corporate operations, provision of goods and services, supply chains, employee health and safety, capital and financial investments, institutional investments, financial standing of loan recipients and borrowers, shareholder value, consumer demand, and financial markets and economic health," S.B. 261 § 2(a)(2)—that California could almost certainly find something to fault in the disclosure (or lack of disclosure) of *any* company the State disfavors. This creates a substantial risk that, among other things, companies whose climate-related practices do not conform to California's policy preferences will be subject to "arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *see also Canyon Ferry Road Baptist Church of East Helena, Inc. v. Unsworth*, 556 F.3d 1021, 1029 (9th Cir. 2019) (striking down "reporting requirements" that were "triggered by *any* in-kind expenditure").

## B. Less Stringent First Amendment Standards Have No Application and Cannot Save the Laws Anyway.

To avoid strict scrutiny, the State must carry "the burden of proving" that the expression compelled "falls outside of the category of [fully] protected speech." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2130 (2022); *accord Small Bus. Fin. Ass'n v. Hewlett*, 2023 WL 3551061, at *3 (C.D. Cal. Mar. 30, 2023). The State cannot make that showing and even if it could, there is no genuine dispute that S.B. 253 and 261 fail intermediate scrutiny anyway.

### 1. S.B. 253 and 261 Do Not Fall into Either Exception to Strict Scrutiny.

**a.** To start, the general test for commercial speech set forth in *Central Hudson* does not apply. "Under *Central Hudson*, the government may restrict or prohibit commercial speech that is neither misleading nor connected to unlawful activity, as long as the governmental interest in regulating the speech is substantial" and the regulation

1   "directly advance[s] the governmental interest asserted" without "be[ing] more

2   extensive than is necessary to serve that interest." *CTIA*, 928 F.3d at 842 (citing *Central*

3   *Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557

4   (1980)). But as the Ninth Circuit has explained, "*Central Hudson*'s intermediate

5   scrutiny test does not apply to *compelled*, as distinct from restricted or prohibited,

6   commercial speech." *Id.* (emphasis added) (citing *Zauderer v. Office of Disciplinary*

7   *Counsel of Supreme Court of Ohio*, 471 U.S. 626, 631 (1985)). Because S.B. 253 and

8   261 compel speech, rather than restrict or prohibit it, *Central Hudson* is inapplicable.

9   S.B. 253 and 261 also do not regulate *commercial* speech. "Commercial speech

10  is 'usually defined as speech that does no more than propose a commercial transaction.'"

11  *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021) (quoting *United*

12  *States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001)); *see also Central Hudson*, 447

13  U.S. at 562 ("[O]ur decisions have recognized 'the commonsense distinction between

14  speech proposing a commercial transaction . . . and other varieties of speech."). But the

15  speech compelled by S.B. 253 and 261 does not concern or relate to a commercial

16  transaction. In fact, unlike every example of commercial speech of which Plaintiffs are

17  aware, the speech here is not about any product or service a company offers at all. *Cf.,*

18  *e.g.*, *Central Hudson*, 447 U.S. at 561; *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S.

19  60, 66 (1983); *see also NIFLA*, 585 U.S. at 768 (explaining that a rule applicable to

20  commercial speech concerns "the terms under which . . . services will be available").

21  Like other non-commercial speech, it does "not discuss the pricing, availability, or

22  quality of any . . . product." *Townsend Farms Inc. v. Göknur Gida Maddeleri Enerji*

23  *Imalat Ithalat Ihracat Ticaret Ve Sanayi A.S.*, 2016 WL 10570246, at *3 (C.D. Cal. Nov.

24  21, 2016). Instead, the compelled speech here addresses a company's greenhouse-gas

25  emissions and climate-related financial risks *regardless* of whether those emissions or

26  risks relate to a good or service provided in California. And while the disclosures are

27  limited to businesses, not all speech that a business engages in constitutes commercial

28

(55 of 271), Page 55 of 271 Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 55 of 271
Case 2:24-cv-00801-ODW-PVC Document 48-1 Filed 05/24/24 Page 24 of 31 Page ID
#:344

1 speech. *See, e.g.*, *NIFLA*, 585 U.S. at 771; *Citizens United*, 558 U.S. at 340; *Townsend*
2 *Farms*, 2016 WL 10570246, at *3.

3      **b.**     For similar reasons, the limited exception to strict scrutiny recognized in
4 *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626
5 (1985), does not apply, either. In *Zauderer*, the Supreme Court held that the government
6 could compel the disclosure of certain "information" where "the disclosure requirement
7 governed only 'commercial advertising' and required the disclosure of 'purely factual
8 and uncontroversial information.'" *NIFLA*, 585 U.S. at 768 (quoting *Zauderer*, 471 U.S.
9 at 651); *see Am. Beverage*, 916 F.3d at 756 ("*Zauderer* provides the appropriate
10 framework to analyze a First Amendment claim involving compelled commercial
11 speech," and calls for an inquiry of whether the compelled speech is "purely factual"
12 and "noncontroversial"). The speech at issue here, however, fails both of *Zauderer*'s
13 prerequisites: It has no nexus to commercial advertising, nor is it purely factual and
14 uncontroversial.

15      The lack of a nexus to commercial advertising is by itself sufficient to distinguish
16 *Zauderer*, as "the Supreme Court has refused to apply *Zauderer* when the case before it
17 did not involve voluntary commercial *advertising*." *NAM II*, 800 F.3d at 523 (emphasis
18 added) (collecting cases). In *Hurley*, for example, the Court treated *Zauderer* as a
19 decision that "at times" permits the government to "prescribe what shall be orthodox in
20 commercial advertising." 515 U.S. at 573. But "*outside* that context," the Court
21 stressed, "the speaker has the right to tailor [its] speech." *Id.* (emphasis added); *see also*
22 *NIFLA*, 585 U.S. at 769 (declining application of *Zauderer* to a California compelled
23 disclosure requirement that "in no way relate[d] to the services" provided); *Am.*
24 *Beverage*, 916 F.3d at 755 ("*Zauderer* provides the proper analytical framework for
25 considering required warnings on commercial products."). Here, the disclosure
26 requirements have no connection to commercial advertising—or even, as discussed, to
27 commercial speech more generally. The compelled disclosures apply to any company
28 of a certain size that "does business in California," *e.g.*, S.B. 253 § 2(b)(2), whether that

(56 of 271), Page 56 of 271 Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 56 of 271
Case 2:24-cv-00801-ODW-PVC   Document 48-1   Filed 05/24/24   Page 25 of 31   Page ID
#:345

company advertises goods or services in the State or not.  In these circumstances, the State cannot reasonably argue that the legislation applies "[in]side [the] context" of "commercial advertising." *Hurley*, 515 U.S. at 573.

Even if the legislation were somehow limited to "commercial advertising," these government-mandated disclosures would be unconstitutional because they are not "purely factual and uncontroversial." *NIFLA*, 585 U.S. at 768-69.  *Zauderer* applies only to mundane factual matters not subject to reasonable dispute, such as "country-of-origin labels" on imports, *AMI*, 760 F.3d at 20, or "whether a particular chemical is within any given product," *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006).  The disclosure requirements here are much different.  A discussion of a company's "climate-related financial risk[s]," S.B. 261 § 2(b)(1)(A)(i), is not the reporting of a rote, "pure" fact; it represents a company's compelled assessment of the "risk of harm to immediate and long-term financial outcomes" from a variety of events whose connection to climate change, if any, is subject to reasonable debate, *id.* § 2(a)(2).  This exercise "inherently involve[s]" the company's subjective "judgment" about unverifiable "future-oriented" events, Hamburger Decl. Ex. 20 at 53; *see* UF 47, including future policy responses ("transition risks") and effects on global "financial markets," S.B. 261 § 2(a)(2), and requires the weighing and balancing of numerous "factors that may be indicative of potential financial implications for climate-related risks and opportunities," Hamburger Decl. Ex. 20 at 35; *see id.* (there is "high degree of uncertainty around the timing and magnitude of climate-related risks"); UF 46.  "[U]ndertak[ing] [such] contextual analyses," and "weighing and balancing many factors," is "anything but the mere disclosure of factual information." *Book People, Inc. v. Wong*, 91 F.4th 318, 340 (5th Cir. 2024).

Even emissions disclosures are also more conjecture than fact, particularly with respect to Scope 3 emissions.  Because the "gaps in emissions measurement methodologies . . . make reliable and accurate [emissions] estimates difficult," Hamburger Decl. Ex. 20 at 36; *see* UF 36, and require reporting entities to make many

(57 of 271), Page 57 of 271 Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 57 of 271
Case 2:24-cv-00801-ODW-PVC   Document 48-1   Filed 05/24/24   Page 26 of 31   Page ID
#:346

different judgment calls, with competing "advantages and disadvantages," *e.g.*, UF 34, the resulting calculation is anything but "purely factual," *NIFLA*, 585 U.S. at 768. Governor Newsom himself has recognized that the laws may "result in inconsistent reporting across businesses." UF 22.

The compelled disclosures here will be misleading, which is the opposite of purely "factual." *Cal. Chamber of Commerce v. Council for Educ. & Research on Toxics*, 29 F.4th 468, 479 n.12 (9th Cir. 2022). S.B. 253 requires companies to report "*their* greenhouse gas (GHG) emissions" (or "*their* contributions to global GHG emissions"), § 1(e), (f) (emphases added); UF 24, but the law actually requires companies to claim as "their" own the emissions of *others*, including the emissions of "electricity" providers (Scope 2) and other "upstream and downstream" suppliers and customers who "the reporting entity does not own or directly control" (Scope 3), § 2(b)(4), (b)(5). It is not accurate—and certainly not "uncontroversial"—to saddle companies with "responsibility" (S.B. 253 § 1(f)) for emissions they did not make. And by forcing companies to speak "in conformance with the Greenhouse Gas Protocol standards and guidance," S.B. 253 § 2(c)(1)(A)(ii), the law further misleads by requiring them to report emissions numbers that do not factor in "avoided emissions or [greenhouse-gas] reductions from actions taken to compensate for or offset emissions," UF 31; *see also* UF 59. The State has no legitimate interest in misleadingly slanting the debate on this contested policy issue. *See Cal. Chamber*, 29 F.4th at 479; *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 967 (9th Cir. 2009), *aff'd sub nom. Brown*, 564 U.S. 786.

In all events, climate change is undisputedly a "'[ ]controversial' topic," *NIFLA*, 585 U.S. at 769—independently taking the compelled disclosures here out of *Zauderer*'s reach. *See Janus*, 585 U.S. at 913 ("climate change" is a "controversial subject[ ]"); *Wheat Growers*, 85 F.4th at 1278 (refusing to apply *Zauderer* when assessing "a compelled statement of a hotly disputed scientific finding"). Activist groups will use information from the disclosures to (in the words of one climate-change activist)

"embarrass" companies and try to "hold them to account."  UF 21; *accord* UF 3-4.  The entire purpose of the laws is to peg companies with responsibility for climate change, to assign blame for "increas[ing] the state's climate risk," S.B. 253 § 1(g), and to in effect "compel[ ]" them to "confess blood on [their] hands," an assignment of "moral responsibility" with which many "may disagree."  *NAM II*, 800 F.3d at 530.

Climate-related financial disclosures are particularly "controversial."  Whether a particular "wildfire[ ]," "sea level rise," "extreme weather event[ ]," or "extreme drought[ ]," S.B. 261 § 1(a), for example, has anything to do with climate change, or to what extent, is a matter of significant debate and controversy.  "Given [the] robust disagreement by reputable scientific sources" on the degree to which climate change affects these events, the compelled disclosures on these issues are "controversial." *Cal. Chamber*, 29 F.4th at 478.  The *Zauderer* exception to standard First Amendment scrutiny does not apply.

### 2.    The Laws Fail Any Degree of First Amendment Scrutiny.

The laws would fail under *Central Hudson* or *Zauderer* even if those cases applied.  As noted, *Central Hudson* "applies intermediate scrutiny, which requires the government to 'directly advance' a 'substantial' governmental interest.'" *Wheat Growers*, 85 F.4th at 1275.  "To satisfy its burden, California must provide evidence establishing that the harms it recites are real and that its speech will *significantly* alleviate those harms." *Junior Sports Magazines*, 80 F.4th at 1117.  And the "[r]estrictions must be narrowly drawn." *In re R.M.J.*, 455 U.S. 191, 203 (1982).

The Ninth Circuit has interpreted *Zauderer* to apply a standard similar to *Central Hudson*: "*Zauderer* requires that the compelled disclosure further some substantial— that is, more than trivial—governmental interest." *CTIA*, 928 F.3d at 844.  "[N]othing in *Zauderer* . . . would allow a lesser interest to justify compelled commercial speech" as compared to *Central Hudson*; rather, "the interest at stake must be more than the satisfaction of mere consumer curiosity." *Id.*  And even if such an interest is shown, "a

disclosure requirement cannot be unjustified or unduly burdensome." *NIFLA*, 585 U.S. at 776.

S.B. 253 and 261 flunk these standards because the laws are "'unjustified,'" "'unduly burdensome,'" and "'broader than reasonably necessary.'" *NIFLA*, 585 U.S. at 776. As discussed, California has not shown, and cannot show, that "the harm" it seeks "to remedy" (an alleged lack of information) is "more than 'purely hypothetical,'" *id.*, or that the required disclosures "will in fact alleviate [that harm] to a material degree," *Ibanez v. Fla. Dep't of Bus. & Prof'l Reg.*, 512 U.S. 136, 146 (1994). Nor, as explained, has the State "narrowly drawn" either measure. *R.M.J.*, 455 U.S. at 203. The laws are incredibly broad. They apply to any company over a certain revenue threshold that does business in California, regardless of whether that company has investors or whether climate change is likely to have a material impact on any product or service sold within the State. The State has no evidence that the laws will materially curb climate change. And it cannot articulate a legitimate interest in forcing discussion of out-of-state, or even out-of-country, climate-related information merely because a company engages in a single transaction within the State, wholly unconnected to climate-related risks. The speech and financial burdens of the laws, moreover, are substantial, as even the Governor recognizes they will have a negative "financial impact" on covered businesses. UF 41. S.B. 253 and 261 fail any level of First Amendment scrutiny.

**C.    The Court Should Enjoin Application, Implementation, or Enforcement of the Laws.**

Because S.B. 253 and 261 violate the First Amendment, the Court should enjoin Defendants from applying, enforcing, or otherwise implementing those laws. "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Accordingly, Plaintiffs "will suffer irreparable harm if the [laws] take[ ] effect." *Am. Beverage*, 916 F.3d at 758. Further, "[t]he fact that [Plaintiffs] have raised serious First Amendment

(60 of 271), Page 60 of 271 Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 60 of 271
Case 2:24-cv-00801-ODW-PVC   Document 48-1   Filed 05/24/24   Page 29 of 31   Page ID
#:349

1    questions compels a finding that . . . the balance of hardships tips sharply in [Plaintiffs']

2    favor." *Id.*

3         The Ninth Circuit has "consistently recognized the significant public interest in

4    upholding First Amendment principles." *Id.* "Indeed, 'it is *always* in the public interest

5    to prevent the violation of a party's constitutional rights.'" *Id.* (emphasis added).  For

6    these reasons, the Court should enjoin implementation, application, or enforcement of

7    S.B. 253 or 261.  *See, e.g.*, *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373,

8    2389 (2021); *NIFLA*, 585 U.S. at 779; *Brown*, 564 U.S. at 790, 805; *Wheat Growers*, 85

9    F.4th at 1283; *Am. Beverage*, 916 F.3d at 758.

10                                  **V.  CONCLUSION**

11        The Court should grant summary judgment on Count I of Plaintiffs' Amended

12   Complaint, declare that both S.B. 253 and 261 violate the First Amendment to the U.S.

13   Constitution, and enjoin Defendants from implementing, applying, or taking any action

14   whatsoever to enforce the laws.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

1    DATED: May 24, 2024      Respectfully submitted,

2                      GIBSON, DUNN & CRUTCHER LLP

3

4                    By:  */s/ Bradley J. Hamburger*

                    Eugene Scalia, SBN 151540

5                     Bradley J. Hamburger, SBN 266916

                    Katherine Moran Meeks

6                     (*pro hac vice*)

                    Samuel Eckman, SBN 308923

7                     Brian A. Richman (*pro hac vice*)

                    Elizabeth Strassner, SBN 342838

8

9                     *Attorneys for Plaintiffs Chamber of Commerce*

                    *of the United States of America, California*

10                   *Chamber of Commerce, American Farm Bureau*

                    *Federation, Los Angeles County Business*

11                   *Federation, Central Valley Business Federation*

                    *and Western Growers Association*

12

13                   CHAMBER OF COMMERCE OF THE

                    UNITED STATES OF AMERICA

14

15                   Daryl Joseffer (*pro hac vice*)

                    Tyler S. Badgley (*pro hac vice*)

16                   Kevin Palmer (*pro hac vice*)

17                   *Attorneys for Plaintiff Chamber of Commerce*

                    *of the United States of America*

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation and Western Growers Association, certifies that this brief contains 6,991 words, which complies with the word limit of L.R. 11-6.1.

DATED: May 24, 2024                    Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:  */s/ Bradley J. Hamburger*
Eugene Scalia, SBN 151540
Bradley J. Hamburger, SBN 266916
Katherine Moran Meeks (*pro hac vice*)
Samuel Eckman, SBN 308923
Brian A. Richman (*pro hac vice*)
Elizabeth Strassner, SBN 342838

*Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation and Western Growers Association*

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA

Daryl Joseffer (*pro hac vice*)
Tyler S. Badgley (*pro hac vice*)
Kevin Palmer (*pro hac vice*)

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*

Gibson, Dunn & Crutcher LLP

PLAINTIFFS' MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT ON CLAIM I
CASE NO. 2:24-CV-00801-ODW-PVC                    ER-2105

1  EUGENE SCALIA, SBN 151540
2      escalia@gibsondunn.com
   KATHERINE MORAN MEEKS
3  (*pro hac vice*)
       DC Bar No. 1028302
4      kmeeks@gibsondunn.com
5  GIBSON, DUNN & CRUTCHER LLP
   1050 Connecticut Avenue, N.W.
6  Washington, D.C. 20036-5306
   Telephone: 202.955.8500
7  Facsimile: 202.467.0539

8  *Attorneys for Plaintiffs Chamber of*
   *Commerce of the United States of*
9  *America, California Chamber of*
   *Commerce, American Farm Bureau*
10 *Federation, Los Angeles County*
   *Business Federation, Central Valley*
11 *Business Federation, and*
   *Western Growers Association*
12

13 (*Additional counsel listed on next page*)

14          IN THE UNITED STATES DISTRICT COURT

15         FOR THE CENTRAL DISTRICT OF CALIFORNIA,

16                   WESTERN DIVISION

17

18 | CHAMBER OF COMMERCE OF THE | CASE NO. 2:24-cv-00801-ODW-PVC |
   | UNITED STATES OF AMERICA, | |
19 | CALIFORNIA CHAMBER OF | **PLAINTIFFS' NOTICE OF** |
   | COMMERCE, AMERICAN FARM | **MOTION AND MOTION FOR** |
20 | BUREAU FEDERATION, LOS | **SUMMARY JUDGMENT ON** |
   | ANGELES COUNTY BUSINESS | **CLAIM I** |
21 | FEDERATION, CENTRAL VALLEY | |
   | BUSINESS FEDERATION, and | **HEARING:** |
22 | WESTERN GROWERS ASSOCIATION, | Date:      September 9, 2024 |
   |            Plaintiffs, | Time:      1:30 PM |
23 |            v. | Location:  Courtroom 5D |
   | | Judge:     Otis D. Wright II |
24 | LIANE M. RANDOLPH, in her official | |
   | capacity as Chair of the California Air | |
25 | Resources Board, STEVEN S. CLIFF, in | |
   | his official capacity as the Executive | |
26 | Officer of the California Air Resources | |
   | Board, and ROBERT A. BONTA, in his | |
27 | official capacity as Attorney General of | |
   | California. | |
28 |            Defendants. | |

1  BRADLEY J. HAMBURGER,
      SBN 266916
2     bhamburger@gibsondunn.com
3  SAMUEL ECKMAN, SBN 308923
      seckman@gibsondunn.com
4  ELIZABETH STRASSNER,
      SBN 342838
5     estrassner@gibsondunn.com
6  GIBSON, DUNN & CRUTCHER LLP
   333 South Grand Ave.
7  Los Angeles, CA 90071-3197
   Telephone:  213.229.7000
8  Facsimile:   213.229.7520

9  BRIAN A. RICHMAN
   (*pro hac vice*)
10    DC Bar No. 230071
      brichman@gibsondunn.com
11 GIBSON, DUNN & CRUTCHER LLP
   2001 Ross Ave., Suite 2100
12 Dallas, TX 75201-2923
   Telephone:  214.698.3100
13 Facsimile:   214.571.2900

14
   *Attorneys for Plaintiffs Chamber of Commerce of the United States of America,*
15 *California Chamber of Commerce, American Farm Bureau Federation, Los Angeles*
   *County Business Federation, Central Valley Business Federation, and*
16 *Western Growers Association*

17 DARYL JOSEFFER
   (*pro hac vice*)
18    DC Bar No. 457185
      djoseffer@uschamber.com
19 TYLER S. BADGLEY
   (*pro hac vice*)
20    DC Bar No. 1047899
      tbadgley@uschamber.com
21 KEVIN PALMER
   (*pro hac vice*)
22    DC Bar No. 90014967
      kpalmer@uschamber.com
23 CHAMBER OF COMMERCE OF THE
   UNITED STATES OF AMERICA
24 1615 H Street, NW
   Washington, D.C. 20062-2000
25 Telephone:  202.659.6000
   Facsimile:   202.463.5302
26
   *Attorneys for Plaintiff Chamber of Commerce of the United States of America*
27

28

1 **TO THE HONORABLE OTIS D. WRIGHT II, UNITED STATES DISTRICT**
2 **JUDGE, AND TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

3       **PLEASE TAKE NOTICE** that on September 9, 2024 at 1:30 PM, or as soon
4 thereafter as may be heard by the Court, before the Honorable Otis D. Wright II, United
5 States District Judge, in Courtroom 5D of the First Street Courthouse, 350 W. 1st Street,
6 Los Angeles, California 90012, Plaintiffs Chamber of Commerce of the United States
7 of America, California Chamber of Commerce, American Farm Bureau Federation, Los
8 Angeles County Business Federation, Central Valley Business Federation, and Western
9 Growers Association will, and hereby do, move pursuant to Federal Rule of Civil
10 Procedure 56 for summary judgment as to Plaintiffs' Claim I (Violation of the First
11 Amendment Under 42 U.S.C. § 1983). Dkt. 28. Plaintiffs are entitled to summary
12 judgment on Claim I because there is no genuine dispute as to any material fact and
13 Plaintiffs are entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As a
14 result, the Court should enjoin Defendants Liane M. Randolph, Steven S. Cliff, and
15 Robert A. Bonta ("Defendants" or the "State") from implementing, applying, or taking
16 any action whatsoever to enforce S.B. 253, Cal. Health & Safety Code § 38532, and S.B.
17 261, Cal. Health & Safety Code § 38533.

18       With respect to Claim I, both S.B. 253 and 261 compel speech on the controversial
19 issue of climate change, a political topic; thus, strict scrutiny, the most stringent form of
20 First Amendment review, applies. *See Janus v. Am. Fed'n of State, Cnty., & Mun.*
21 *Emps., Council 31*, 585 U.S. 878, 913-14 (2018); *NIFLA v. Becerra*, 585 U.S. 755, 766
22 (2018). The State cannot meet its burden to show that either S.B. 253 or 261 survive
23 strict scrutiny. The State cannot prove that either law furthers a compelling
24 governmental interest or is narrowly tailored, *Nat'l Ass'n of Wheat Growers v. Bonta*,
25 85 F.4th 1263, 1283 (9th Cir. 2023); there are numerous less burdensome alternatives
26 the State could have adopted, and the requirements to report both greenhouse-gas
27 emissions and the future impact of climate change on corporate operations are unusually
28 burdensome for entities compelled to speak by S.B. 253 and 261. A lack of historical

pedigree and vagueness heighten the First Amendment concerns for both laws. *See NIFLA*, 585 U.S. at 767; *O'Brien v. Welty*, 818 F.3d 920, 930 (9th Cir. 2016).

Less stringent standards of review do not apply because the speech compelled by S.B. 253 and 261 is not commercial speech, is unrelated to advertising, and is not purely factual and uncontroversial. *See Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 562-63 (1980); *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985). Finally, even if a less stringent standard were to apply, the State could not meet its burden to show that the laws satisfy that standard.

A First Amendment violation "unquestionably constitutes irreparable injury," *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 828 (9th Cir. 2013), and there is a "significant public interest in upholding First Amendment principles," *Am. Beverage Ass'n v. City of San Francisco*, 916 F.3d 749, 757 (9th Cir. 2019) (en banc). Therefore, the Court should permanently enjoin Defendants from applying, enforcing, or otherwise implementing S.B. 253 and 261.

This Motion is based on this Notice of Motion and Motion for Summary Judgment; the accompanying Memorandum of Points and Authorities; the concurrently filed Statement of Uncontroverted Facts; the concurrently filed declarations of Bradley J. Hamburger, Edward J. Shoen, Garrett Hawkins, and Michael White; all pleadings, records, and files in this action; all matters of which judicial notice may or shall be taken; and any other oral or written evidence or argument that the Court may consider.

This Motion is made following the conference between counsel for Plaintiffs and Defendants, pursuant to Central District Local Rule 7-3, which took place on April 26, 2024. *See* Declaration of Bradley J. Hamburger ¶ 2.

1  DATED: May 24, 2024                Respectfully submitted,

2                                      GIBSON, DUNN & CRUTCHER LLP

3
                                       By: */s/ Bradley J. Hamburger*
4                                      Eugene Scalia, SBN 151540
                                       Bradley J. Hamburger, SBN 266916
5                                      Katherine Moran Meeks (*pro hac vice*)
                                       Samuel Eckman, SBN 308923
6                                      Brian A. Richman (*pro hac vice*)
                                       Elizabeth Strassner, SBN 342838
7

8                                      *Attorneys for Plaintiffs Chamber of Commerce*
                                       *of the United States of America, California*
9                                      *Chamber of Commerce, American Farm Bureau*
                                       *Federation, Los Angeles County Business*
10                                     *Federation, Central Valley Business Federation*
                                       *and Western Growers Association*
11

12                                     CHAMBER OF COMMERCE OF THE
                                       UNITED STATES OF AMERICA
13

14                                     Daryl Joseffer (*pro hac vice*)
                                       Tyler S. Badgley (*pro hac vice*)
15                                     Kevin Palmer (*pro hac vice*)

16                                     *Attorneys for Plaintiff Chamber of Commerce*
                                       *of the United States of America*
17

18

19

20

21

22

23

24

25

26

27

28

1   EUGENE SCALIA, SBN 151540
     escalia@gibsondunn.com

2   KATHERINE MORAN MEEKS

3   (*pro hac vice*)
     DC Bar No. 1028302

4     kmeeks@gibsondunn.com

5   GIBSON, DUNN & CRUTCHER LLP
   1050 Connecticut Avenue, N.W.

6   Washington, D.C.  20036-5306
   Telephone:  202.955.8500

7   Facsimile:   202.467.0539

8   *Attorneys for Plaintiffs Chamber of*

9   *Commerce of the United States of*
   *America, California Chamber of*

10  *Commerce, American Farm Bureau*
   *Federation, Los Angeles County*

11  *Business Federation, Central Valley*
   *Business Federation, and*

12  *Western Growers Association*

13  (*Additional counsel listed on next page*)

14        IN THE UNITED STATES DISTRICT COURT

15      FOR THE CENTRAL DISTRICT OF CALIFORNIA,

16            WESTERN DIVISION

| | |
|---|---|
| 17   CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION, | CASE NO. 2:24-cv-00801-ODW-PVC **PLAINTIFFS' OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS** **<u>HEARING:</u>** Date:     June 24, 2024 Time:    1:30 PM Location:  Courtroom 5D Judge:   Otis D. Wright II |

Plaintiffs,

    v.

LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California.

       Defendants.

BRADLEY J. HAMBURGER,
SBN 266916
bhamburger@gibsondunn.com
SAMUEL ECKMAN, SBN 308923
seckman@gibsondunn.com
ELIZABETH STRASSNER,
SBN 342838
estrassner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

BRIAN A. RICHMAN
(*pro hac vice*)
DC Bar No. 230071
brichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Ave., Suite 2100
Dallas, TX 75201-2923
Telephone: 214.698.3100
Facsimile: 214.571.2900

*Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association*

DARYL JOSEFFER
(*pro hac vice*)
DC Bar No. 457185
djoseffer@uschamber.com
TYLER BADGLEY
(*pro hac vice*)
DC Bar No. 1047899
tbadgley@uschamber.com
KEVIN PALMER
(*pro hac vice*)
DC Bar No. 90014967
kpalmer@uschamber.com
CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA
1615 H Street, NW
Washington, D.C. 20062-2000
Telephone: 202.659.6000
Facsimile: 202.463.5302

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*

1

## TABLE OF CONTENTS

2

Page

3   I. INTRODUCTION ................................................................................................ 1

4   II. BACKGROUND ............................................................................................... 3

5   III. ARGUMENT .................................................................................................. 5

6
7   A.   For Counts II and III, Article III Standing Is Clear and This Case Is
       Ripe for Adjudication................................................................................. 5

8
9       1.   Plaintiffs Have Article III Standing To Press Their
            Supremacy Clause and Extraterritoriality Arguments
            Because Their Members Will Suffer Actual Injury from S.B.
10          253 and 261 ........................................................................................ 6

11
12      2.   Plaintiffs' Supremacy Clause and Extraterritoriality
            Arguments Are Also Ripe with Respect to S.B. 253 ....................... 9

13
14  B.   California Cannot Regulate Interstate and Global Emissions, and
       Plaintiffs Stated Valid Claims Under Federal Constitutional and
15     Statutory Law. ......................................................................................... 11

16      1.   S.B. 253 and 261 are Precluded by the Constitution and the
            Clean Air Act (Count II). ............................................................... 11

17
18      2.   Plaintiffs' Extraterritoriality Claims Survive (Count III). ............. 18

19  C.   The Attorney General Cannot Escape This Court's Review. ................... 20

20  IV. CONCLUSION .............................................................................................. 21

21

22

23

24

25

26

27

28

i

PLAINTIFFS' OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-2113**

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Abbott Labs. v. Super. Ct. of Orange Cnty.*,
    467 P.3d 184 (Cal. 2020)..............................................................................20

*Am. Elec. Power Co., Inc. v. Connecticut*,
    564 U.S. 410 (2011)........................................................12, 15, 16, 17, 18

*Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*,
    724 F.3d 243 (D.C. Cir. 2013)........................................................................6

*Arellano v. Clark Cnty. Collection Serv., LLC*,
    875 F.3d 1213 (9th Cir. 2017) .....................................................................18

*Arizona v. United States*,
    567 U.S. 387 (2012)......................................................................................18

*Assurance Wireless USA, L.P. v. Reynolds*,
    2023 WL 2780365 (N.D. Cal. Mar. 31, 2023) .............................................7

*Banco Nacional de Cuba v. Sabbatino*,
    376 U.S. 398 (1964)......................................................................................13

*Bell v. Cheswick Generating Station*,
    734 F.3d 188 (3d Cir. 2013) ........................................................................17

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559 (1996)..............................................................................12, 13

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988)......................................................................................11

*Brown-Forman Distillers Corp. v. New York State Liquor Authority*,
    476 U.S. 573 (1986)......................................................................................20

*Buckman Co. v. Plaintiffs' Legal Comm.*,
    531 U.S. 341 (2001)......................................................................................11

*Cal. Med. Ass'n v. Aetna Health of Cal., Inc.*,
    532 P.3d 250 (Cal. 2023)..............................................................................20

Gibson, Dunn & Crutcher LLP

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Cal. Trucking Ass'n v. Bonta*,
996 F.3d 644 (9th Cir. 2021) ..................................................................... 10

*City of Milwaukee v. Illinois*,
451 U.S. 304 (1981) ................................................................................... 12

*City of New York v. Chevron Corp.*,
993 F.3d 81 (2d Cir. 2011) ............................................... 12, 13, 14, 17

*Comm. for Idaho's High Desert v. Collinge*,
148 F. Supp. 2d 1097 (D. Idaho 2001) ..................................................... 10

*North Carolina ex rel. Cooper v. Tenn. Valley Auth.*,
615 F.3d 291 (4th Cir. 2010) ..................................................................... 17

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ................................................................................... 17

*English v. Gen. Elec. Co.*,
496 U.S. 72 (1990) ............................................................................... 15, 17

*Franchise Tax Bd. of Cal. v. Hyatt*,
139 S. Ct. 1485 (2019) ............................................................................... 11

*Gov't Suppliers Consolidating Servs., Inc. v. Bayh*,
975 F.2d 1267 (7th Cir. 1992) ..................................................................... 9

*Illinois v. City of Milwaukee*,
406 U.S. 91 ................................................................................................. 12

*Illinois v. City of Milwaukee*,
731 F.2d 403 (7th Cir. 1984) ..................................................................... 12

*Int'l Paper Co. v. Ouellette*,
479 U.S. 481 (1987) ...................................................... 12, 15, 16, 18

*Italian Colors Rest. v. Becerra*,
878 F.3d 1165 (9th Cir. 2018) ................................................................... 10

*Kansas v. Colorado*,
206 U.S. 46 (1907) ..................................................................................... 13

Gibson, Dunn &
Crutcher LLP

PLAINTIFFS' OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-2115**

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Kong v. Trader Joe's Co.*,
2022 WL 1125667 (9th Cir. Apr. 15, 2022)................................................................ 7

*Kurns v. R.R. Friction Prods. Corp.*,
565 U.S. 625 (2012)..................................................................................... 13

*L.A. Branch NAACP v. L.A. Unified Sch. Dist.*,
714 F.2d 946 (9th Cir. 1983) ....................................................................... 20

*L.A. Haven Hospice, Inc. v. Sebelius*,
638 F.3d 644 (9th Cir. 2011) ......................................................................... 6

*Logan v. U.S. Bank Nat'l Ass'n*,
722 F.3d 1163 (9th Cir. 2013) ..................................................................... 20

*Los Altos Boots v. Bonta*,
562 F. Supp. 3d 1036 (E.D. Cal. 2021) ....................................................... 10

*Maness v. Meyers*,
419 U.S. 449 (1975)...................................................................................... 9

*Massachusetts v. EPA*,
549 U.S. 497 (2007)..................................................................................... 18

*Merrick v. Diageo Ams. Supply, Inc.*,
805 F.3d 685 (6th Cir. 2015) ....................................................................... 17

*NAACP v. Alabama ex rel. Patterson*,
357 U.S. 449 (1958)..................................................................................... 14

*Namisnak v. Uber Techs.*,
971 F.3d 1088 (9th Cir. 2020) ....................................................................... 7

*Nat'l Ass'n of Mfrs. v. SEC*,
800 F.3d 518 (D.C. Cir. 2015)..................................................................... 14

*Nat'l Lifeline Ass'n v. Batjer*,
2023 WL 1281676 (9th Cir. Jan. 31, 2023)................................................... 6

*Nat'l Pork Producers Council v. Ross*,
143 S. Ct. 1142 (2023)................................................................................. 19

Gibson, Dunn &
Crutcher LLP

PLAINTIFFS' OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS
CASE NO. 2:24-CV-00801-ODW-PVC

**ER-2116**

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Pennhurst State Sch. & Hosp. v. Halderman*,
   465 U.S. 89 (1984)................................................................21

*Pharm. Rsch. & Mfrs. of Am. v. Stolfi*,
   __ F. Supp. 3d __, 2024 WL 1177999 (D. Or. 2024).................9

*Philip Morris USA v. Williams*,
   549 U.S. 346 (2007)..............................................................13

*R.J. Reynolds Tobacco Co. v. Bonta*,
   272 F. Supp. 2d 1085 (E.D. Cal. 2003) .................................8

*Retail Indus. Leaders Ass'n v. Fielder*,
   475 F.3d 180 (4th Cir. 2007) ...............................................10

*San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*,
   359 U.S. 236 (1959)..............................................................14

*Shaw v. Delta Air Lines, Inc.*,
   463 U.S. 85 (1982)................................................................20

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
   143 S. Ct. 2141 (2023)..........................................................13

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*,
   451 U.S. 630 (1981).......................................................11, 15

*Ting v. AT&T*,
   319 F.3d 1126 (9th Cir. 2003) .............................................18

*U.S. Catholic Conference v. Abortion Rights Mobilization, Inc.*,
   487 U.S. 72 (1988)..................................................................9

*Union Pac. R.R. Co. v. Cal. Pub. Utils. Comm'n*,
   346 F.3d 851 (9th Cir. 2003) ...............................................9

*United States v. Locke*,
   529 U.S. 89 (2000)................................................................15

*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014)..............................................................16

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Van v. LLR, Inc.*,
  962 F.3d 1160 (9th Cir. 2020) ....................................................................... 8

*Verizon Md., Inc. v. Public Serv. Comm'n of Md.*,
  535 U.S. 635 (2002).......................................................................................... 20

*West Lynn Creamery, Inc. v. Healy*,
  512 U.S. 186 (1994)........................................................................................ 19

*Ex parte Young*,
  209 U.S. 123 (1908)................................................................................... 2, 20

*Zschernig v. Miller*,
  389 U.S. 429 (1968)........................................................................................ 13

STATUTES

28 U.S.C. § 1331................................................................................................. 20

42 U.S.C. § 7411................................................................................... 15, 18

42 U.S.C. § 7416................................................................................................. 17

42 U.S.C. § 7521................................................................................................. 15

42 U.S.C. § 7545................................................................................................. 16

42 U.S.C. § 7547................................................................................................. 15

42 U.S.C. § 7571................................................................................................. 15

42 U.S.C. § 7607................................................................................................. 18

Cal. Bus. & Prof. Code § 17200 ..................................................................... 20

Cal. Bus. & Prof. Code § 17206 ..................................................................... 20

Cal. Health & Safety Code § 38532 ......................................................... 5, 9, 19

Cal. Health & Safety Code § 38533 ......................................................... 3, 5, 19

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**REGULATIONS**

40 C.F.R. § 60, subpart OOOOa ................................................................................. 15

89 Fed. Reg. 21,698 (Mar. 28, 2024) .................................................................... 4, 8

Gibson, Dunn &
Crutcher LLP

## I. INTRODUCTION

Two new California laws, S.B. 253 and 261, will impermissibly compel thousands of businesses to make costly and burdensome disclosures about "their operations, not just in California, but around the world," in an attempt to stigmatize those companies and shape their behavior on the politically fraught issue of climate change.  ECF No. 28 ("Am. Compl.") ¶ 1.  Both laws unconstitutionally compel speech in violation of the First Amendment and seek to regulate an area that is outside California's jurisdiction and subject to exclusive federal control by virtue of the Clean Air Act and federalism principles embodied in the U.S. Constitution.

S.B. 253 and 261 were designed to "create accountability" for those that are not, in the California Legislature's opinion, "doing their part to tackle the climate crisis." *Id.* ¶ 4.  These laws will force every covered "entity," just by entering the California market in any respect, to publicly state its opinions regarding the risks associated with climate change, promote those opinions on its own website, and then disclose an inexact, misleading calculation of the "entity's" greenhouse-gas emissions.  *Id.*  The purpose of this compelled speech is to fuel political pressure campaigns against businesses: "For companies, the knowledge" that their compelled statements "will be publicly available might encourage them to take meaningful steps" to support the policy goals of the State. *Id.*  By Governor Newsom's own reckoning, the legislation will have a negative "financial impact" on the more than 10,000 businesses covered, will impose deadlines that are "likely infeasible," and will deluge the public with "inconsistent" information. *Id.*

The State does not contest in its motion to dismiss that the laws' compulsion of speech violates the First Amendment, that Plaintiffs have Article III standing to seek redress of those violations from this Court, or that this constitutional claim is ripe.  Instead, the State's motion raises misplaced objections—largely jurisdictional—to other aspects of the complaint.  This Court has jurisdiction over all claims here, and Plaintiffs

have stated plausible claims that S.B. 253 and 261 are both precluded by federal law and unconstitutionally extraterritorial.

Plaintiffs' Article III standing to challenge S.B. 253 and 261 on preemption and extraterritoriality grounds is clear. Plaintiffs' members are the direct objects of the laws and are injured and burdened by the laws' requirements, and the hypothetical existence of other reporting regimes does not eliminate those burdens. The State concedes that Plaintiffs' challenge to S.B. 261 is ripe; the S.B. 253 claim is also ripe for this Court's adjudication. The California Air Resources Board ("CARB") has *no discretion* whether to promulgate regulations consistent with S.B. 253. While CARB will eventually have to determine the penalty amount under S.B. 253 and certain other details, the reporting requirements themselves—the basis of Plaintiffs' objections—were set in stone by the California Legislature: Plaintiffs' members *will* face a penalty in the future if they do not report emissions in the way S.B. 253 requires. This claim is ripe for review.

On the merits, Plaintiffs' Supremacy Clause and extraterritoriality claims are sound. Because the areas of nationwide environmental protection, interstate disputes, and foreign affairs are, based on the federal structure of the Constitution, committed to the supervision of the federal government exclusively, S.B. 253 and 261 are in conflict and must fall. The Clean Air Act preempts both laws because it occupies the field of interstate-air-emissions regulation and preempts alternative remedial regimes (like California's). And Plaintiffs' extraterritoriality claim is valid because both laws compel companies to speak on emissions that occur entirely outside California's borders.

Finally, Attorney General Bonta has no valid basis to escape this case. The Attorney General has direct enforcement power for both laws under the California Unfair Competition Law. Under *Ex parte Young*, 209 U.S. 123, 160-62 (1908), this Court has authority to enjoin him from violating Plaintiffs' members' constitutional rights.

ER-2121

1    The Court should deny the State's motion to dismiss. Alternatively, at a
2    minimum, the Court should grant leave to amend if it is inclined to dismiss any aspect
3    of the Amended Complaint.

## II. BACKGROUND

5    Throughout 2023, members of the California Legislature publicly stated that they
6    intended to enact a reporting regime that would pressure companies to reduce
7    greenhouse-gas emissions. The legislators said they wanted to "create accountability
8    for those that aren't" "doing their part to tackle the climate crisis." Am. Compl. ¶ 23.
9    And they claimed that "Californians . . . have a right to know who" is "destroying [their]
10   planet" by "causing" climate change. *Id.* Companies, they explained, should be
11   "encourage[d]" to conform their behavior to the State's policy preferences. *Id.* ¶ 27. If
12   a company's opinions on emissions were "publicly available," they reasoned, then that
13   "might encourage them to take meaningful steps to reduce [greenhouse-gas] emissions,"
14   lest they be publicly "embarrassed." *Id.* ¶ 28.

15   With these goals in mind, California enacted S.B. 253 and 261. "S.B. 253 requires
16   covered entities to publicly report three categories of greenhouse-gas emissions—Scope
17   1, Scope 2 and Scope 3." *Id.* ¶ 47. S.B. 261, likewise, compels companies to opine on
18   climate-related risks and "post that opinion to the entity's website." *Id.* ¶ 36. "Under
19   the law, companies must opine on any 'material risk of harm to immediate and long-
20   term financial outcomes due to physical and transition risks, including, but not limited
21   to, risks to corporate operations, provision of goods and services, supply chains,
22   employee health and safety, capital and financial investments, institutional investments,
23   financial standing of loan recipients and borrowers, shareholder value, consumer
24   demand, and financial markets and economic health.'" *Id.* (quoting Cal. Health & Safety
25   Code § 38533(a)(2)). So long as a company exceeds the laws' revenue thresholds and
26   does even a small amount of business in California, the company becomes obligated to
27   speak about its *global* emissions and risks to global operations—to a global audience.
28   *Id.* ¶¶ 34, 44.

Although framed in terms of disclosure, S.B. 253 and 261's requirements are aimed at stigmatizing companies by compelling their speech on subjective and controversial matters, for the purpose of politically coercing them to lower their emissions nationwide and even worldwide. *Id.* ¶ 89. As activists and policymakers repeatedly stated, they intend to use the compelled reporting to identify companies whose emissions they deem to be unsuitable, and to shame those companies into alignment with the Legislature's political positions. *Id.* ¶ 90. According to one sponsor, S.B. 253 "ensure[s] that corporate actors in [California] are aligned with [the Legislature's] goals and are working as diligently as [legislators] need them to be." *Id.*; *see also* ECF No. 38-1 ("Mot.") 3 ("Legislature sought . . . to ensure a sustainable . . . future.").

While the bills were pending, business organizations noted the significant costs and difficulties with implementation. Am. Compl. ¶¶ 29-31. Reporting certain greenhouse-gas emissions with "any degree of accuracy [is] not yet possible," *Id.* ¶ 30, and necessitates subjective decisionmaking. In particular, reporting Scope 3 emissions (emissions upstream and downstream in the supply chain) is "enormously burdensome" and is estimated to "cost many companies more than $1 million per year." *Id.* ¶ 52; *see also* 89 Fed. Reg. 21,698, 21,736 (Mar. 28, 2024) (SEC declining to require Scope 3 disclosures given the "burdens such a requirement could impose"). Likewise, companies would also have to "opine on the risks that will be specifically caused by climate change," even though determination of whether particular weather events are tied to climate change "is a matter of significant debate and controversy." Am. Compl. ¶ 67. And covered entities that do even small amounts of business in California would be forced to comply with the laws' onerous requirements. *Id.* ¶¶ 34, 44. In signing these acts into law, Governor Newsom acknowledged that "the reporting protocol specified could result in inconsistent reporting across businesses subject to" S.B. 253 and that he had "concern[s] about the overall financial impact of [S.B. 261] on business." *Id.* ¶ 32.

As the complaint alleges, S.B. 253 and 261 violate the federal Constitution in three ways. First, unchallenged by the State's motion to dismiss, the laws compel speech in violation of the First Amendment. *Id.* ¶¶ 64-83, 92-99. Second, S.B. 253 and 261 violate the Supremacy Clause because the Constitution assigns the governance of interstate and international air pollution to the federal government and because the Clean Air Act preempts both laws. *Id.* ¶¶ 84-91, 100-106. And third, the statutes impose significant burdens on interstate commerce, to advantage California business, in violation of the federal Constitution. *Id.* ¶¶ 84-91, 107-112.

## III.  ARGUMENT

**A.  For Counts II and III, Article III Standing Is Clear and This Case Is Ripe for Adjudication.**

The State's limited standing and ripeness arguments do not reach all of Plaintiffs' claims. The State's motion "do[es] not address" Plaintiffs' First Amendment claims, Count I of the complaint. Mot. 12 n.5. Instead, the State makes two limited arguments with regard to Counts II and III. First, the State argues that Plaintiffs lack standing on those claims, but even then, only in part. Mot. 10-12. The State concedes that with regard to S.B. 253, Plaintiffs have standing with respect to the requirement to disclose so-called Scope 3 emissions; accordingly, the State argues that Plaintiffs lack standing *only* with respect to Scope 1 and 2 emissions. *See id.* at 12. Second, although the State concedes that Plaintiffs' Supremacy Clause and extraterritoriality claims, Counts II and III, are ripe with regard to S.B. 261, the State maintains that the S.B. 253 challenge is "premature." *Id.* at 8-10. Both arguments fail.

S.B. 253 and 261 directly regulate Plaintiffs' members. The laws apply to any company with revenue exceeding certain thresholds that does business in California. Am. Compl. ¶¶ 34, 44; Mot. 3-4, 5; *see* §§ 38532(b)(2), 38533(a)(4). There is no de minimis exception, and, as alleged, the laws require many of Plaintiffs' over 300,000 members to take concrete, burdensome steps to comply—a classic Article III injury.

Am. Compl. ¶¶ 9-10, 12-14, 20, 34, 54-59. Under traditional standing principles, Plaintiffs' standing is unassailable, and this case is ripe for adjudication.

> **1. Plaintiffs Have Article III Standing To Press Their Supremacy Clause and Extraterritoriality Arguments Because Their Members Will Suffer Actual Injury from S.B. 253 and 261.**

The State does not contest that Plaintiffs have standing to challenge S.B. 253's requirement that Plaintiffs' members report Scope 3 emissions. *See* Mot. 12. The State challenges standing only with respect to S.B. 261 and a limited part of S.B. 253. *See id.* at 10-12. But the State's arguments miss the mark.

A "plaintiff is presumed to have constitutional standing to seek injunctive relief when it is the direct object of regulatory action challenged as unlawful." *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 655 (9th Cir. 2011). Here, Plaintiffs allege that many of their members exceed the laws' revenue thresholds and do business in California, and therefore are directly regulated by S.B. 253 and 261. Am. Compl. ¶¶ 9-10, 12-13, 20. Among other mandates, the laws "require[ ]" covered entities, including Plaintiffs' members, "to prepare . . . climate-related financial risk report[s]," Mot. 5, and "measure and report [greenhouse-gas] emissions 'in conformance' with the 'Greenhouse Gas Protocol,'" *id.* at 4. *See* Am. Compl. ¶¶ 36, 46. As the State concedes, these "mandatory and comprehensive . . . requirements" go beyond "current reporting initiatives." Mot. 3. Although the State argues that the claimed injuries are "conclusory," *id.* at 11, Governor Newsom has *admitted* that the laws will likely have a negative "financial impact" on the more than 10,000 businesses covered, Am. Compl. ¶ 4. Plaintiffs, who represent the legal and economic interests of their members (*id.* ¶¶ 9-10, 12-13, 20), have "an obvious interest in challenging [laws] that directly—and negatively—impact[ their] members." *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013); *see also Nat'l Lifeline Ass'n v. Batjer*, 2023 WL 1281676, at *2 (9th Cir. Jan. 31, 2023) (finding standing where

1 association's members were "the object of" regulation); *Assurance Wireless USA, L.P.*

2 *v. Reynolds*, 2023 WL 2780365, at *5-6 (N.D. Cal. Mar. 31, 2023) (similar).

3       The State's speculation—that the laws will impose no regulatory costs

4 whatsoever, because *some of* Plaintiffs' members "may already" be making required

5 disclosures "under other reporting regimes," Mot. 11, 12—flips the legal standard on its

6 head. At the motion-to-dismiss stage, the Court "construe[s] the complaint in favor of

7 the complaining party," *Namisnak v. Uber Techs.*, 971 F.3d 1088, 1092 (9th Cir. 2020),

8 and does not make unsubstantiated, speculative leaps in favor of the State, *cf. Kong v.*

9 *Trader Joe's Co.*, 2022 WL 1125667, at *1 (9th Cir. Apr. 15, 2022). Here, Plaintiffs not

10 only allege "many" of their members are "subject to S.B. 253 and 261," Am. Compl.

11 ¶ 9; *accord id.* ¶¶ 10, 12-13; they identify particular members that are "affected and

12 injured by the challenged laws," *id.* ¶ 20; *contra* Mot. 11, and explain how the laws

13 require members to make disclosures "they otherwise would not," Am. Compl. ¶ 93.

14 This factual content "allows the [C]ourt to draw the reasonable inference" that it is S.B.

15 253 and 261, *Kong*, 2022 WL 1125667, at *1—not "other reporting regimes," Mot. 11—

16 that are driving the compliance costs of Plaintiffs' members, which is more than enough

17 to survive a motion to dismiss, regardless of the State's alternative theory. *See Kong*,

18 2022 WL 1125667, at *1 ("If there are two alternative explanations, one advanced by

19 defendant and the other advanced by plaintiff, both of which are plausible," the

20 complaint survives.).

21       In any event, the State's suggestion that "other reporting regimes" already require

22 S.B. 253 and 261's disclosures is wrong. Mot. 11. The State's motion acknowledges

23 that S.B. 253 and 261 are premised on the notion that "current reporting initiatives" are

24 inadequate; the California laws thus require *more.* *Id.* at 3; *see also id.* at 2 (S.B. 253

25 and 261 "*build* on existing . . . frameworks" (emphasis added; capitalization altered)).

26 Indeed, the legislative report cited by the State shows that no more than 10% of the

27 "10,000 companies"—including Plaintiffs' members—swept up by the California laws,

28

State's RJN, Ex. 3, at 50, have signed up for the "voluntary framework" ("Task Force on Climate-Related Disclosure") cited in the State's motion, Mot. 3.

The State turns to a recent SEC rule (which has already been stayed pending litigation), and to one European regulation, Mot. 2-3, but it is unable to say that companies are already "preparing [relevant] data" under these regimes, *id.* at 12. The most the State can say is that some unspecified subset of companies "may" be. *Id.* But even still, the State overstates any overlap. The SEC itself acknowledges that it and California "apply different . . . standards." State's RJN, Ex. 2, at 41. While the SEC rule applies only to public companies, for instance, Mot. 3, the California laws apply to public *and* private companies, Am. Compl. ¶ 110. And although the SEC rule requires the disclosure of Scope 1 and Scope 2 emissions in certain circumstances, 89 Fed. Reg. at 21,670; California requires these *for all companies* subject to S.B. 253, and also requires reporting of Scope 3 emissions, which the SEC rule does not require, and which will "cost many companies more than $1 million per year" alone, Am. Compl. ¶ 52.

The State also ignores the various aspects of S.B. 253 and 261 that impose legally cognizable injuries, independent of other reporting regimes. The laws, for example, require companies to file reports with state-approved entities and pay fees to support the State's implementation, *id.* ¶¶ 43, 62; additionally, S.B. 261 requires companies to host climate-risk reports on their websites, *id.* ¶ 26. All this costs money and is undisputedly unique to S.B. 253 and 261; those costs are independently sufficient to confer Article III standing. *See, e.g.*, *Van v. LLR, Inc.*, 962 F.3d 1160, 1162 (9th Cir. 2020) (even "a dollar or two" is sufficient).

The State, moreover, does not dispute that S.B. 253 and 261 impose an "injury from compelled speech," Mot. 12 n.5, by forcing companies to state messages and information "they otherwise would not," Am. Compl. ¶ 93. Independent of any First Amendment injury, this compelled speech imposes "stigma and reputational harm" that separately confers standing to pursue the Supremacy Clause and extraterritoriality claims. *R.J. Reynolds Tobacco Co. v. Bonta*, 272 F. Supp. 2d 1085, 1093 (E.D. Cal.

2003) ("stigma and reputation harm" are independent Article III injuries); *see* Am. Compl. ¶ 89. The compelled speech also forces companies to "reveal information" they would rather keep confidential, itself an Article III injury, *cf. Maness v. Meyers*, 419 U.S. 449, 460 (1975) (being compelled to "reveal information" causes "irreparable injury"); *U.S. Catholic Conference v. Abortion Rights Mobilization, Inc.*, 487 U.S. 72, 76 (1988) (witnesses have standing to challenge discovery orders); *see* Am. Compl. ¶ 66. And compelling speech is the method through which the State subjects companies to regulation—regulation that is preempted by federal law, *Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, __ F. Supp. 3d __, 2024 WL 1177999, at *8, 10 (D. Or. 2024); *see* Am. Compl. ¶¶ 89, 91—another independent Article III injury directly traceable to S.B. 253 and 261 and capable of being remedied by an injunction.

## 2. Plaintiffs' Supremacy Clause and Extraterritoriality Arguments Are Also Ripe with Respect to S.B. 253.

Although the State concedes that Plaintiffs' challenge to S.B. 261 is ripe, the State argues, with respect to Plaintiffs' Supremacy Clause and extraterritoriality arguments, that the challenge to S.B. 253 is "premature" because CARB has not yet adopted its implementing regulations. Mot. 8-10. That argument is a red herring.

The statute itself says exactly what the regulations "shall" provide: they "shall" require companies to disclose "scope 1 emissions, scope 2 emissions, and scope 3 emissions," and those disclosures "shall" be "in conformance with the Greenhouse Gas Protocol standards and guidance." § 38532(c)(1), (c)(1)(A)(ii). Given those statutory mandates, nothing CARB has the power to do could alleviate "Plaintiffs' current concerns." Mot. 9. Thus, there "is no need to wait for regulations" when "what the statutes authorize is clear." *Gov't Suppliers Consolidating Servs., Inc. v. Bayh*, 975 F.2d 1267, 1276 (7th Cir. 1992). Plaintiffs' challenge to S.B. 253 is ripe for adjudication. *See, e.g.*, *Union Pac. R.R. Co. v. Cal. Pub. Utils. Comm'n*, 346 F.3d 851, 872 n.22 (9th Cir. 2003) (rejecting ripeness objection "because it is clear that any standard required" by the agency "would impermissibly burden interstate commerce," even though "no

standards" had yet been "issued"); *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 188 (4th Cir. 2007) (finding claim ripe for review even though "regulations under the Act have not been promulgated" because the regulations "could not alter the Act's provisions, which clearly establish" the challenged requirements).

The State argues that Plaintiffs must "articulate[ ] a 'concrete plan' to violate the law" and that "prosecuting authorities [must] have communicated a specific warning or threat to initiate proceedings." Mot. 8. But this is not a case where Plaintiffs challenge a law that renders their conduct illegal. The State, here, is not *proscribing* conduct; it is imposing new, affirmative disclosure obligations. In any event, Plaintiffs' members' "current business practices" are "presently in conflict" with S.B. 253, *Los Altos Boots v. Bonta*, 562 F. Supp. 3d 1036, 1044 (E.D. Cal. 2021) (quoting *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021)), because the law requires disclosures Plaintiffs' members "otherwise would not" make, Am. Compl. ¶ 93. And while the State has not "communicated a specific [enforcement] warning," Mot. 8, the State "has not disavowed enforcement," either, "which is 'strong evidence' of a 'credible threat'" of enforcement, *Los Altos*, 562 F. Supp. 3d at 1045 (quoting *Cal. Trucking Ass'n*, 996 F.3d at 653); *see, e.g.*, *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1173 (9th Cir. 2018) (holding that plaintiff had standing in part because California had "not suggested" the challenged law would "not be enforced").

Lastly, if the Court were to require Plaintiffs to "wait" until S.B. 253 goes into effect, as the State suggests, "the Court [would] be forced to rule on an emergency basis," even though the issues would not be any clearer. *Comm. for Idaho's High Desert v. Collinge*, 148 F. Supp. 2d 1097, 1100 (D. Idaho 2001). These claims are fully ripe for judicial review now, and it would harm both Plaintiffs' constitutional interests and judicial economy to defer adjudication.

**B.**     **California Cannot Regulate Interstate and Global Emissions, and Plaintiffs Stated Valid Claims Under Federal Constitutional and Statutory Law.**

The State's motion fares no better on Rule 12(b)(6) grounds. The State does not contest that Plaintiffs have stated a claim under the First Amendment (Count I). The State challenges only Plaintiffs' claims under Counts II and III, but under federal constitutional and statutory law, S.B. 253 and 261 are invalid because the State cannot use state law to regulate out-of-state emissions.

    **1.**     **S.B. 253 and 261 are Precluded by the Constitution and the Clean Air Act (Count II).**

In Count II, Plaintiffs adequately allege that S.B. 253 and 261 are precluded by the Constitution and the Clean Air Act.

        **a.**     **The Structure of the Constitution Reserves the Regulation of Greenhouse-Gas Emissions to Federal Law.**

The Supreme Court has long held—based on the structure of the U.S. Constitution—that "a few areas, involving uniquely federal interests, are so committed by the Constitution . . . to federal control that state law is pre-empted." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988). In such "inherently federal" cases, "no presumption against pre-emption obtains." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347-48 (2001).

These exclusively federal areas include "interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations" and other areas "in which a federal rule of decision is 'necessary to protect uniquely federal interests'"; in such cases, "our federal system *does not permit* the controversy to be resolved under state law." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640-41 (1981) (emphasis added). "[T]he Constitution implicitly forbids that exercise of power" because the interstate nature of the issue "makes it inappropriate for state law to control." *Franchise Tax Bd. of Cal. v. Hyatt*, 139 S. Ct. 1485, 1498 (2019). This principle reflects the well-established premise that a State may not wield "its laws with

1 the intent of changing [a person's] lawful conduct in other States." *BMW of N. Am., Inc.*

2 *v. Gore*, 517 U.S. 559, 572 (1996).

3 The Supreme Court has explained that state law cannot regulate issues dealing

4 with "air and water in their ambient or *interstate* aspects"; in that context, application of

5 "the law of a particular State would be inappropriate." *Am. Elec. Power Co., Inc. v.*

6 *Connecticut*, 564 U.S. 410, 421-22 (2011) ("*AEP*") (emphasis added). The "basic

7 interests of federalism . . . demand[ ]" that the varying laws of the individual States

8 cannot govern such issues. *Illinois v. City of Milwaukee*, 406 U.S. 91, 105 n.6, 107 n.9

9 (1972); *see also Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 488 (1987) ("interstate . . .

10 pollution is a matter of federal, not state, law"); *City of Milwaukee v. Illinois*, 451 U.S.

11 304, 313 n.7 (1981) ("state law cannot be used").

12 Accordingly, "the basic scheme of the Constitution" requires that federal law

13 alone must govern issues concerning "air and water in their ambient or interstate

14 aspects" because they are not "matters of substantive law appropriately cognizable by

15 the states." *AEP*, 564 U.S. at 421. Federal common law may govern such issues absent

16 congressional legislation, but even still, a State "cannot apply its own state law to out-

17 of-state discharges" even after statutory displacement of federal common law. *Illinois*

18 *v. City of Milwaukee*, 731 F.2d 403, 409-11 (7th Cir. 1984); *see also City of New York*

19 *v. Chevron Corp.*, 993 F.3d 81, 91 (2d Cir. 2011) ("For over a century, a mostly

20 unbroken string of cases has applied federal law to disputes involving interstate air or

21 water pollution.").

22 Thus, federalism and comity principles embodied in the Constitution preclude

23 California's attempt to regulate greenhouse-gas emissions "around the world." Am.

24 Compl. ¶ 1. Climate change is by its very nature global, caused by the cumulative effect

25 of factors, including greenhouse-gas emissions, far beyond the reach of any one State's

26 borders. *See AEP*, 564 U.S. at 422. Applying state law to attempt to regulate these

27 global emissions would necessarily violate the exclusivity of federal law. While

28 "*Congress* has ample authority to enact such a policy for the entire Nation, it is clear that

no single State could do so, or even impose its own policy choice on neighboring States." *BMW*, 517 U.S. at 571 (emphasis added); *see also Philip Morris USA v. Williams*, 549 U.S. 346, 352-53 (2007) ("[O]ne State[ ]" may not "impose" its "policy choice[s] . . . upon neighboring States with different public policies."). Allowing state law to govern such areas would permit one State to "impose its own legislation on . . . the others," violating the "cardinal rule" that "[e]ach state stands on the same level with all the rest." *Kansas v. Colorado*, 206 U.S. 46, 97 (1907).

Nor may state law dictate our "relationships with other members of the international community." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 425 (1964). Yet, that is exactly what S.B. 253 and 261 would do. If those laws are allowed to stand, Plaintiffs' members will be subject to ongoing reporting obligations regarding their emissions around the globe, Am. Compl. ¶ 87, and associated international public pressure campaigns to reduce those emissions to levels approved by California. As one Senate report put it, "[f]or companies, the knowledge" that their compelled disclosures "will be publicly available might encourage them to take meaningful steps" to support the policy goals of California. *Id.* ¶ 4. This is a paradigmatic example of state law improperly attempting to "regulat[e]" an industry's extraterritorial operations. *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012); *cf. Zschernig v. Miller*, 389 U.S. 429, 440-41 (1968) (holding that state law was unconstitutional because it "affect[ed] international relations in a persistent and subtle way").

The State argues that S.B. 253 and 261 do not "*directly* require reductions in greenhouse-gas emissions," Mot. 13 (emphasis added), but "what cannot be done directly cannot be done indirectly" as "[t]he Constitution deals with substance, not shadows." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 143 S. Ct. 2141, 2176 (2023). When a state attempts to "regulate cross-border emissions in an indirect and roundabout manner, it [still] regulate[s] them nonetheless." *New York*, 993 F.3d at 93.

Here, the complaint plausibly alleges that, although S.B. 253 and 261 are "framed in terms of disclosure, these requirements are aimed at stigmatizing companies for the purpose of pressuring them to lower their emissions nation- and even world-wide." Am. Compl. ¶ 89.  As the complaint details, "activists and policymakers have repeatedly stated that they intend to use the compelled reporting to identify companies whose emissions they deem to be unsuitable, and to shame those companies into reducing their emissions." *Id.* ¶ 90.  For example, as one sponsor noted, S.B. 253 "ensure[s] that corporate actors in [California] are aligned with [the Legislature's] goals and are working as diligently as [legislators] need them to be." *Id.*  This pressure "can be, indeed is designed to be," as "potent [a] method of governing conduct and controlling policy" as direct regulation.  *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 247 (1959).

The State seeks refuge in the assertion that "any 'pressure' companies feel would come *from third parties*—investors, customers, and the like—not *from the State itself*." Mot. 13.  But the "crucial factor" here "is the interplay of governmental and private action."  *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 463 (1958).  "[I]t is only *after* the initial exertion of state power represented by the" "compulsory disclosure" mandates "that private action takes hold." *Id.* (emphasis added).  Legislators have openly admitted that the laws' purpose is to exert such state power.  *See, e.g.*, Am. Compl. ¶ 4.  That the laws "regulate *speech*," Mot. 13, moreover, does not mean that they do not *also* regulate conduct.  The use of speech compulsion "to stigmatize and shape behavior" makes the compulsion "more constitutionally offensive, not less so." *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015).

In the end, "[a]rtful" drafting of a statute "cannot transform [S.B. 253 and 261] into anything other than [regulations] over global greenhouse gas emissions." *New York*, 993 F.3d at 91.  Because S.B. 253 and 261 conflict with the federal government's responsibility for environmental protection, interstate disputes, and foreign relations, "it

1   [is] inappropriate for state law to control." *Tex. Indus.*, 451 U.S. at 641.  Plaintiffs'

2   Supremacy Clause arguments, Count II, state a valid claim for relief.

3               **b.      The Clean Air Act Preempts S.B. 253 and 261.**

4       Plaintiffs' Supremacy Clause arguments in Count II also state a valid claim

5   because S.B. 253 and 261 are independently preempted by the Clean Air Act.

6       "[I]n the absence of explicit statutory language, state law is pre-empted where

7   it regulates conduct in a field that Congress intended the Federal Government to

8   occupy exclusively." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990).  "[T]he

9   longstanding rule [is] that the enactment of a uniform federal scheme displaces state

10  law."  *United States v. Locke*, 529 U.S. 89, 103 (2000).  Preemption is "presumed

11  when the federal legislation is sufficiently comprehensive to make reasonable the

12  inference that Congress left no room for supplementary state regulation." *Ouellette*,

13  479 U.S. at 491.

14      Through the Clean Air Act, Congress evaluated and balanced the societal

15  harms and benefits associated with extraction, production, processing, transportation,

16  sale, and use of fossil fuels, and has already regulated fossil fuels and greenhouse gas

17  emissions.  For example, Title II of the Act governs greenhouse-gas emissions

18  standards for vehicles, aircraft, locomotives, motorcycles, and nonroad engines and

19  equipment.  42 U.S.C. §§ 7521(a)(1)-(2), (3)(E), 7571(a)(2)(A), 7547(a)(1), (5).

20      The statute also governs "whether and how to regulate carbon-dioxide

21  emissions from powerplants" and other stationary sources. *AEP*, 564 U.S. at 426; *see*

22  *also* 42 U.S.C. § 7411(b)(1)(A)-(B), (d).  The EPA has issued comprehensive

23  regulations to control greenhouse gas emissions up and down the oil-and-gas supply

24  chain, which include: limiting emissions of methane (the second-most prevalent

25  greenhouse gas) and emissions from crude oil and natural gas production, *see* 40

26  C.F.R. § 60, subpart OOOOa; regulating carbon dioxide emissions from fossil fuel-

27  fired power plants; and requiring many major industrial sources to employ control

28  technologies constituting the best available system of emissions reduction to limit

Gibson, Dunn &
Crutcher LLP

1    greenhouse-gas emissions.  *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 329-31
2    (2014).

3         The Clean Air Act's Renewable Fuel Standard Program also regulates the
4    consumption and use of fossil fuel products; specifically, the Program requires fuel
5    companies to reduce the quantity of petroleum-based transportation fuel, heating oil,
6    or jet fuel sold by blending in renewable fuels, resulting in lower greenhouse gas
7    emissions on a lifecycle basis.  *See* 42 U.S.C. § 7545(o).  Thus, through the Clean Air
8    Act and its implementing regulations, the federal government has balanced the
9    benefits and harms relating to activities associated with greenhouse-gas emissions
10   through an "informed assessment of competing interests," including the
11   "environmental benefit potentially achievable," and "our Nation's energy needs and
12   the possibility of economic disruption."  *AEP*, 564 U.S. at 427.

13        This comprehensive statutory system precludes supplemental state regulation
14   of alleged harms arising from interstate greenhouse-gas emissions.

15        Decades ago, the Supreme Court concluded that the Clean Water Act "pre-
16   empts state law to the extent that the state law is applied to an out-of-state point
17   source."  *Id.* at 500.  The Clean Air Act shares all of the features of the Clean Water
18   Act that led the Supreme Court to find preemption of state regulation of interstate
19   pollution.   Both laws authorize "pervasive regulation" that entail a "complex"
20   balancing of economic costs and environmental benefits, *id.* at 492, 494-95; both laws
21   provide States with a circumscribed role that is "subordinate" to the EPA's role as the
22   federal environmental regulatory agency, *id.* at 491; and both ensure that "control of
23   interstate pollution is primarily a matter of federal law," *id.* at 492.  Given these
24   statutory features, the Supreme Court held in *Ouellette* that the Clean Water Act
25   "precludes a court from applying the law of an affected State against an out-of-state
26   source" because doing so would "upset[ ] the balance of public and private interests
27   so carefully addressed by the Act."  *Id.* at 494.

28

1    Because the structure of the Clean Air Act parallels that of the Clean Water

2    Act, courts have consistently construed *Ouellette*'s interpretation of the Clean Water

3    Act's saving clause to apply equally to the Clean Air Act's saving clause, meaning

4    that the Clean Air Act preempts state law to the extent it purports to regulate air

5    pollution originating out of state. *See, e.g.*, *Merrick v. Diageo Ams. Supply, Inc.*, 805

6    F.3d 685, 692 (6th Cir. 2015); *Bell v. Cheswick Generating Station*, 734 F.3d 188,

7    194-97 & n.6 (3d Cir. 2013); *North Carolina ex rel. Cooper v. Tenn. Valley Auth.*,

8    615 F.3d 291, 301-09 (4th Cir. 2010). Here, as the complaint explained, S.B. 253 and

9    261 target emissions not only emanating from California, but from other states as

10   well. Am. Compl. ¶ 89. S.B. 253 was explicitly hailed as "groundbreaking

11   legislation with the potential to reach far beyond California's borders." *Id.* ¶ 7. And

12   both laws expressly "require companies to make sweeping reports about their

13   emissions and risks everywhere they operate, whether in California [or] in other

14   states." *Id.* ¶ 87. The "state law[s'] actual effect," therefore, is to interfere with

15   Congress's comprehensive regime of air emissions regulation. *English*, 496 U.S. at

16   84. Congress "designated an expert [federal] agency," not the State of California, "as

17   best suited to serve as primary regulator of greenhouse gas emissions." *AEP*, 564

18   U.S. at 428.

19   The State retreats to the Clean Air Act's saving clause, Mot. 15 (citing 42

20   U.S.C. § 7416), but that clause "is narrowly circumscribed" and permits application

21   of state law "only" to "in-state polluters." *New York*, 993 F.3d at 99-100. The clause

22   does not license California to regulate emissions "around the world." Am. Compl.

23   ¶ 1.

24   S.B. 253 and 261 also fail under conflict preemption because they are an "obstacle

25   to the accomplishment or execution of the full purposes and objectives of Congress."

26   *English*, 496 U.S. at 79. "What is a sufficient obstacle is a matter of judgment, to be

27   informed by examining the federal statute as a whole and identifying its purpose and

28   intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

"[T]he Act itself need not 'speak directly to the issue'" for conflict preemption to occur. *Arellano v. Clark Cnty. Collection Serv., LLC*, 875 F.3d 1213, 1218 (9th Cir. 2017) (quoting *Ouellette*, 479 U.S. at 493). A "[c]onflict in technique can be fully as disruptive to the system Congress erected as a conflict in overt policy." *Arizona v. United States*, 567 U.S. 387, 406 (2012). "Thus, obstruction preemption focuses on both the objective of the federal law and the method chosen by Congress to effectuate that objective, taking into account the law's text, application, history, and interpretation." *Ting v. AT&T*, 319 F.3d 1126, 1137 (9th Cir. 2003).

In enacting the Clean Air Act, Congress chose to empower the EPA, a *federal* agency, to regulate interstate greenhouse-gas emissions from certain sources. *See Massachusetts v. EPA*, 549 U.S. 497, 528-32 (2007); *AEP* 564 U.S. at 424. "[T]he method chosen by Congress to effectuate that objective," *Ting*, 319 F.3d at 1137, was EPA rulemaking, whereby the EPA Administrator "establish[es] standards of performance for emissions of pollutants" and then "impose[s] administrative penalties for noncompliance," or even "criminal penalties" in some circumstances, *AEP*, 564 U.S. at 424-25. The Clean Air Act also empowers private civil enforcement actions in federal court. *Id.* at 425. While "EPA may *delegate* implementation and enforcement authority to the States," *id.* at 425 (citing 42 U.S.C. § 7411(c)(1), (d)(1)) (emphasis added), that authority does not allow states to create alternative methods of interstate enforcement. S.B. 253 and 261, however, in their attempt to "reduce [greenhouse-gas] emissions," Am. Compl. ¶ 28, do exactly that.

In the end, "[i]f [the] EPA does *not set* emissions limits for a particular pollutant or source of pollution, [California] may petition for a rulemaking on the matter." *AEP*, 564 U.S. at 425 (citing 42 U.S.C. § 7607(b)(1)) (emphasis added). What California may not do is enact statutes conflicting with the Clean Air Act.

### 2. Plaintiffs' Extraterritoriality Claims Survive (Count III).

Count III, which comprises Plaintiffs' allegations regarding the State's improper extraterritorial regulation, also states a valid claim. This case presents the "familiar

Gibson, Dunn & Crutcher LLP

18

concern," addressed by the Commerce Clause, of "preventing purposeful discrimination against out-of-state economic interests." Mot. 17 (quoting *Nat'l Pork Producers Council v. Ross*, 143 S. Ct. 1142, 1154 (2023)). The State of California intended to regulate greenhouse-gas emissions and could, in certain ways, at least, have regulated emissions tied to California. But a regulation tailored in that way, to California businesses, or to California products, would have put the State at a competitive disadvantage. *See, e.g.*, *Pork Producers*, 143 S. Ct. at 1156 ("Environmental laws often prove decisive when businesses choose where to manufacture their goods."). So it tried a workaround. By incorporating into S.B. 253 and 261 an unprecedented and unwarranted extraterritorial reach, the laws impose costs on businesses nationwide, thus "depriv[ing] businesses and consumers in other States" of the "competitive advantages" they would possess otherwise freed from California's overly burdensome regulatory scheme. *Id.* at 1155.

The "practical effect[s]" of the laws confirm their "discriminatory purpose." *Id.* at 1158. Suppose a customer buys a pack of gum in California. So long as the seller otherwise meets the laws' revenue thresholds, that de minimis transaction (doing "business in California," §§ 38532(b)(2), 38533(a)(4)) would trigger the full suite of S.B. 253 and 261's requirements for all of the seller's global operations. Not only would the seller have to disclose emissions and other climate-related information related to the California transaction, the seller would have to disclose such information related to the seller's (*i.e.*, the "entity['s]," §§ 38532(c)(1), 38533(b)(1)(A)) nation- and even world-wide operations. The State does not even attempt to explain what benefits flow to the State of California from this type of disclosure requirement, *see* Am. Compl. ¶ 110, which operates differently from requirements that have survived judicial review. For example, unlike the pork regulations in *Pork Producers*, the California laws here concern not only the products sold *in* California, but products sold anywhere else (so long as there is some other, unrelated California triggering event). In this way, S.B. 253 and 261 are like the laws the Supreme Court invalidated in *West Lynn Creamery, Inc. v.*

1    *Healy*, 512 U.S. 186, 194-96 (1994), and *Brown-Forman Distillers Corp. v. New York*

2    *State Liquor Authority*, 476 U.S. 573 (1986), where the States used the existence of in-

3    state transactions to force businesses to "surrender" pricing or cost advantages enjoyed

4    in other states, *id.* at 580.  The State's motion to dismiss Count III should be denied.

5    **C.     The Attorney General Cannot Escape This Court's Review.**

6             "It is beyond dispute that federal courts have jurisdiction over suits to enjoin state

7    officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc.*, 463 U.S.

8    85, 96 n.14 (1982) (citing *Young*, 209 U.S. at 160-62).  Accordingly, a "plaintiff who

9    seeks injunctive relief from state regulation, on the ground that such regulation is pre-

10   empted by" federal law—or violates the First Amendment—"presents a federal question

11   which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." *Id.*  That

12   is true regardless whether federal law creates a private cause of action.  *Verizon Md.,*

13   *Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 641-44 (2002).

14            The Attorney General tries to evade this straightforward application of federal

15   jurisdiction by denying that he has "enforcement authority" with respect to S.B. 253 and

16   261 at all.  Mot. 22.  But unlike in the cases he cites, Mot. 21-22, in which the official

17   had *no* enforcement role, *e.g.*, *L.A. Branch NAACP v. L.A. Unified Sch. Dist.*, 714 F.2d

18   946, 953 (9th Cir. 1983), under California law, the Attorney General enforces S.B. 253

19   and 261 via the Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200, *et seq.*

20   Only he and certain other officials are permitted to collect penalties from UCL

21   violations.  *Id.* § 17206(a); *Cal. Med. Ass'n v. Aetna Health of Cal., Inc.*, 532 P.3d 250,

22   257 (Cal. 2023).  And even among other officials empowered by the UCL, the Attorney

23   General stands apart as "the ultimate locus of control and accountability for UCL

24   actions." *Abbott Labs. v. Super. Ct. of Orange Cnty.*, 467 P.3d 184, 193 (Cal. 2020).

25            The Attorney General cannot escape the Court's "virtually unflagging obligation

26   to adjudicate [the] controvers[y] properly before it," *Logan v. U.S. Bank Nat'l Ass'n*,

27   722 F.3d 1163, 1166 (9th Cir. 2013), by "hold[ing] state officials responsible to 'the

28

supreme authority of the United States,'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984).

## IV. CONCLUSION

The motion to dismiss should be denied, or, in the alternative, the Court should grant leave to amend.

DATED: May 1, 2024                    Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Bradley J. Hamburger*
Eugene Scalia, SBN 151540
Bradley J. Hamburger, SBN 266916
Katherine Moran Meeks
(*pro hac vice*)
Samuel Eckman, SBN 308923
Brian A. Richman (*pro hac vice*)
Elizabeth Strassner, SBN 342838

*Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation and Western Growers Association*

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA

Daryl Joseffer (*pro hac vice*)
Tyler Badgley (*pro hac vice*)
Kevin Palmer (*pro hac vice*)

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation and Western Growers Association, certifies that this brief contains 6,870 words, which complies with the word limit of L.R. 11-6.1.

DATED: May 1, 2024                    Respectfully submitted,

                                      GIBSON, DUNN & CRUTCHER LLP


                                      By: */s/ Bradley J. Hamburger*
                                      Eugene Scalia, SBN 151540
                                      Bradley J. Hamburger, SBN 266916
                                      Katherine Moran Meeks
                                      (*pro hac vice*)
                                      Samuel Eckman, SBN 308923
                                      Brian A. Richman (*pro hac vice*)
                                      Elizabeth Strassner, SBN 342838

                                      *Attorneys for Plaintiffs Chamber of Commerce*
                                      *of the United States of America, California*
                                      *Chamber of Commerce, American Farm Bureau*
                                      *Federation, Los Angeles County Business*
                                      *Federation, Central Valley Business Federation*
                                      *and Western Growers Association*

                                      CHAMBER OF COMMERCE OF THE
                                      UNITED STATES OF AMERICA

                                      Daryl Joseffer (*pro hac vice*)
                                      Tyler Badgley (*pro hac vice*)
                                      Kevin Palmer (*pro hac vice*)

                                      *Attorneys for Plaintiff Chamber of Commerce*
                                      *of the United States of America*

1   ROB BONTA
    Attorney General of California
2   GARY E. TAVETIAN (SBN 117135)
    MYUNG J. PARK (SBN 210866)
3   Supervising Deputy Attorneys General
    M. ELAINE MECKENSTOCK (SBN 268861)
4   CAITLAN MCLOON (SBN 302798)
    EMILY HAJARIZADEH (SBN 325246)
5   DYLAN REDOR (SBN 338136)
    Deputy Attorneys General
6    300 South Spring Street, Suite 1702
     Los Angeles, CA  90013-1230
7    Telephone:  (213) 269-6438
     Fax:  (916) 731-2128
8    E-mail:  Caitlan.McLoon@doj.ca.gov
    *Attorneys for Defendants Liane M. Randolph,*
9   *Steven S. Cliff, and Robert A. Bonta*

10

11              IN THE UNITED STATES DISTRICT COURT

12         FOR THE CENTRAL DISTRICT OF CALIFORNIA

13

14  **CHAMBER OF COMMERCE OF**        2:24-cv-00801-FMO-PVCx
    **THE UNITED STATES OF**
15  **AMERICA, CALIFORNIA**
    **CHAMBER OF COMMERCE,**          **MEMORANDUM OF POINTS**
16  **AMERICAN FARM BUREAU**          **AND AUTHORITIES IN SUPPORT**
    **FEDERATION, LOS ANGELES**       **OF DEFENDANTS' MOTION TO**
17  **COUNTY BUSINESS**               **DISMISS PLAINTIFFS'**
    **FEDERATION, CENTRAL**           **AMENDED COMPLAINT FOR**
18  **VALLEY BUSINESS**               **DECLARATORY AND**
    **FEDERATION, and WESTERN**       **INJUNCTIVE RELIEF**
19  **GROWERS ASSOCIATION,**
                                      Date:        June 20, 2024
20                    Plaintiffs,     Time:        10:00 a.m.
                                      Courtroom:   6D
21           v.                       Judge:       The Honorable Fernando
                                                   M. Olguin
22  **LIANE M. RANDOLPH, in her**     Trial Date:  Not Set
    **official capacity as Chair of the**  Action Filed: 1/30/2024
23  **California Air Resources Board, and**
    **STEVEN S. CLIFF, in his official**
24  **capacity as the Executive Officer of**
    **the California Air Resources Board,**
25  **and ROBERT A. BONTA, in his**
    **official capacity as Attorney General**
26  **of California,**

27                    Defendants.

28

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................... 1

STATEMENT OF FACTS ............................................................... 2

   I.    Senate Bills 253 and 261 ............................................. 2

         A.    California Enacts New Measures That Build on Existing Climate-Related Reporting and Disclosure Frameworks .......... 2

         B.    Senate Bill 253 Requires Companies with Over a Billion Dollars in Revenue Doing Business in California to Report GHG Emissions in Accordance with Existing Industry Protocols ............................................................. 3

         C.    Senate Bill 261 Requires Companies with Over $500 Million Dollars in Revenue Doing Business in California to Report Material Climate-Related Financial Risk in Accordance with Existing Industry Protocols ...................... 5

   II.    Procedural History ....................................................... 6

LEGAL STANDARD ..................................................................... 6

ARGUMENT .................................................................................. 7

   I.    Plaintiffs' Supremacy Clause and Extraterritoriality Claims Should Be Dismissed Under Rule 12(b)(1) on Ripeness and Standing Grounds ....................................................... 7

         A.    In the Absence of Implementing Regulations, Plaintiffs' Supremacy Clause and Extraterritoriality Claims Challenging Senate Bill 253 Are Not Ripe for Adjudication ............................................................... 8

         B.    Plaintiffs Lack Standing to Bring their Supremacy Clause and Extraterritoriality Claims as to Senate Bill 261 and Scope 1 and 2 of Senate Bill 253 Where They Have Not Alleged an Injury-in-Fact ........................................... 10

              1.    Plaintiffs' alleged injury from Senate Bill 261 is conclusory and insufficient to establish standing ......... 11

              2.    Plaintiffs do not allege any injury arising from the Scope 1 and Scope 2 reporting requirements under Senate Bill 253 ........................................................ 12

   II.    Plaintiffs' Supremacy Clause Claim Should Be Dismissed Under Rule 12(b)(6) for Failure to State A Claim ............................. 12

         A.    Plaintiffs Do Not State a Claim Under the Supremacy Clause Because these State Statutes Regulate Informational Disclosures, Not Emissions ............................. 13

         B.    Plaintiffs Fail to Identify a Cognizable Legal Theory for the Alleged Supremacy Clause Violation ............................... 14

   III.    Plaintiffs' Extraterritoriality Claim Should Be Dismissed Under Rule 12(b)(6) for Failure to State A Claim ......................................... 16

i

ER-2143

**TABLE OF CONTENTS**
**(continued)**

|  |  | Page |
|---|---|---|
| A. | There is No Freestanding "Extraterritorial Regulation" Claim under the Dormant Commerce Clause | 16 |
| B. | Plaintiffs Fail to State a Discrimination Claim under the Dormant Commerce Clause | 18 |
| C. | Plaintiffs Fail to State a Claim under the Clause's Pike Test | 19 |
| IV. | Sovereign Immunity Bars All of Plaintiffs' Claims Against Attorney General Bonta | 21 |
| CERTIFICATE OF COMPLIANCE | | 24 |

**ER-2144**

# TABLE OF AUTHORITIES

**Page**

<span style="font-variant: small-caps;">CASES</span>

*7 Bland v. Fessler*
  88 F.3d 729 (9th Cir. 1996) ...................................................................... 10

*All. of Nonprofits for Ins., Risk Retention Grp. v. Kipper*
  712 F.3d 1316 (9th Cir. 2013) ......................................................... 14, 18

*Am. Fuel & Petrochem. Mfrs. v. O'Keeffe*
  903 F.3d 903 (9th Cir. 2018) .................................................................. 16

*Ammex, Inc. v. Cox*
  351 F.3d 697 (6th Cir. 2003) .................................................................... 9

*Arizona v. Yellen*
  34 F.4th 841 (9th Cir. 2022) .................................................................... 8

*Armstrong v. Exceptional Child Ctr., Inc.*
  575 U.S. 320 (2015) .............................................................................. 14

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*
  729 F.3d 937 (9th Cir. 2013) .................................................................. 22

*Assoc. of Am. R.R. v. Cal. Office of Spill Prevention and Response*
  113 F. Supp. 3d 1052 (E.D. Cal. 2015) ............................................. 9, 11

*Associated Builders & Contractors of S. Cal., Inc. v. Nunn*
  356 F.3d 979 (9th Cir. 2004) .................................................................. 13

*Atascadero State Hosp. v. Scanlon*
  473 U.S. 234 (1985) .............................................................................. 21

*Babbitt v. United Farm Workers Nat'l Union*
  442 U.S. 289 (1979) .............................................................................. 10

*Bell Atlantic v. Twombly*
  550 U.S. 544 (2007) .............................................................................. 19

*Boating Indus. Ass'ns v. Marshall*
  601 F.2d 1376 (9th Cir. 1979) ................................................................. 8

iii

**ER-2145**

**TABLE OF AUTHORITIES**
(continued)

Page

*Bolbol v. Brown*
120 F. Supp. 3d 1010 (N.D. Cal. 2015).............................................................22

*Chamber of Commerce v. Whiting*
563 U.S. 582 (2011) ...................................................................................14, 16

*Chandler v. State Farm Mut. Auto. Ins. Co.*
598 F.3d 1115 (9th Cir. 2010).................................................................... 6, 7

*Clapper v. Amnesty Int'l USA*
568 U.S. 398 (2013) ...................................................................................... 10

*Dep't of Revenue of Ky. v. Davis*
553 U.S. 328 (2008) ...................................................................................... 18

*Exxon Corp. v. Governor of Maryland*
437 U.S. 117 (1978) ...................................................................................20, 21

*Exxon Corp. v. Heinze*
32 F.3d 1399 (9th Cir. 1994)........................................................................ 8

*General Motors Corp. v. Tracy*
519 U.S. 278 (1997) ...................................................................................... 19

*Goodyear Atomic Corp. v. Miller*
486 U.S. 174 (1988) ...................................................................................... 13

*In re Gilead Sci. Sec. Litig.*
536 F.3d. 1049 (9th Cir. 2008)..................................................................... 7

*L.A. County Bar Ass'n v. Eu*
979 F.2d 697 (9th Cir. 1992)........................................................................ 21

*Los Angeles Branch NAACP v. Los Angeles Unified School Dist.*
714 F.2d 946 (9th Cir. 1983)........................................................................ 21

*Lujan v. Defenders of Wildlife*
504 U.S. 555 (1992) ...................................................................................... 11

*Nat'l Ass'n of Optometrists & Opticians v. Harris*
682 F.3d 1144 (9th Cir. 2012)...................................................................... 20

iv

**ER-2146**

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Nat'l Pork Producers Council v. Ross*
6 F.4th 1021 (9th Cir. 2021) .................................................................. 20

*Nat'l Pork Producers Council v. Ross (NPPC)*
598 U.S. 356 (2023) ..................................................................... *passim*

*Oregon Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*
511 U.S. 93 (1994) ............................................................................ 18

*Pharm. Research & Mfrs. of Am. v. Walsh*
538 U.S. 644 (2003) ........................................................................... 13

*Pharm. Rsch. & Mfrs. of Am. v. Cnty. of Alameda* (*PhRMA*)
768 F.3d 1037 (9th Cir. 2014) ............................................................. 19

*Pike v. Bruce Church, Inc.*
397 U.S. 137 (1970) ..........................................................2, 19, 20, 21

*Quern v. Jordan*
440 U.S. 332 (1979) ........................................................................... 21

*Rattlesnake Coal. v. U.S. EPA*
509 F.3d 1095 (9th Cir. 2007) ............................................................. 10

*Rhoades v. Avon Products, Inc.*
504 F.3d 1151 (9th Cir. 2007) ............................................................... 7

*Rocky Mountain Farmers Union v. Corey*
730 F.3d 1070 (9th Cir. 2013) ............................................................. 13

*Rosenblatt v. City of Santa Monica*
940 F.3d 439 (9th Cir. 2019) ......................................................... 16, 18

*Safe Air for Everyone v. Meyer*
373 F.3d 1035 (9th Cir. 2004) ....................................................6, 7, 12

*State of Iowa, et al. v. SEC*
24-1522 (8th Cir. 2024) ........................................................................ 3

*Thomas v. Anchorage Equal Rights Com'n*
220 F.3d 1134 (9th Cir. 2000) .......................................................8, 9, 10, 11

v

**ER-2147**

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Tohono O'odham Nation v. Ducey*
130 F. Supp. 3d 1301 (D. Ariz. 2015)................................................................22

*United States v. Power Co., Inc.*
2008 WL 2626989 (D. Nev. 2008)......................................................................9

*United States v. Salerno*
481 U.S. 739 (1987) ...........................................................................................16

*Va. Uranium, Inc. v. Warren*
139 S. Ct. 1894 (2019) (lead opinion of Gorsuch, J.) .................................15, 16

*Valeria G. v. Wilson*
12 F. Supp. 2d 1007 (N.D. Cal. 1998)..................................................................9

*VIZIO, Inc. v. Klee*
886 F.3d 249 (2d Cir. 2018) ...............................................................................15

*Ward v. United Airlines, Inc.*
986 F.3d 1234 (9th Cir. 2021) ............................................................................21

*Watison v. Carter*
668 F.3d 1108 (9th Cir. 2012) ..............................................................................7

*Whole Woman's Health v. Jackson*
595 U.S. 30 (2021) ..............................................................................................22

*Woods v. U.S. Bank N.A.*
831 F.3d 1159 (9th Cir. 2016) ..............................................................................7

*Ex parte Young*
209 U.S. 123 (1908) ............................................................................................21

**STATUTES**

42 United States Code
§ 1983 .................................................................................................................21
§ 7416 .................................................................................................................15
§ 7602(k) ............................................................................................................14

vi

**ER-2148**

1

2

**TABLE OF AUTHORITIES**
(continued)

**Page**

3

2023 Cal. Stats., ch. 382, § 1 ....................................................................... 3

4

2023 Cal. Stats., ch. 383, § 1 ....................................................................... 3

5

California Health and Safety Code

6

§ 38532(b)(2) ........................................................................................ 4, 18

7

§ 38532(b)(3) ............................................................................................. 4
§ 38532(b)(3)–(5) ...................................................................................... 4

8

§ 38532(b)(4) ............................................................................................. 4

9

§ 38532(b)(5) ............................................................................................. 4
§ 38532(c)(1) ............................................................................................. 3

10

§ 38532(c)(1)(A)(i) .................................................................................... 5

11

§ 38532(c)(1)(A)(ii) ................................................................................... 4
§ 38532(c)(1)(D) ........................................................................................ 9

12

§ 38532(c)(1)(D)(i) .................................................................................... 4

13

§ 38532(c)(1)(F) ......................................................................................... 4

14

§ 38532(c)(3) ........................................................................................... 22

15

§ 38532(d)(1) ............................................................................................. 4

16

§ 38532(e)(1) ............................................................................................. 4
§ 38532(f)(2) ........................................................................................... 5, 9

17

§ 38532(f)(2)(A) ........................................................................................ 5
§ 38533(a)(2) ............................................................................................. 5

18

§ 38533(a)(4) ........................................................................................ 5, 18
§ 38533(a)(4)–(b)(1)(A) ............................................................................ 5

19

§ 38533(b)(1)(A) ....................................................................................... 5
§ 38533(b)(1)(A)(i) ................................................................................... 5

20

§ 38533(b)(4) ............................................................................................. 6

21

§ 38533(c)(1)–(2) ...................................................................................... 6
§ 38533(c)(2) ........................................................................................... 22

22

§ 38533(e)(2) ............................................................................................. 6

23

**CONSTITUTIONAL PROVISIONS**

24

25

U.S. Constitution, First Amendment ................................................... *passim*

26

U.S. Constitution, Eleventh Amendment ......................................... 21, 22

27

U.S. Constitution, Article III, § 2, cl. 1 .................................................. 7

28

vii

# TABLE OF AUTHORITIES
**(continued)**

Page

## COURT RULES

Federal Rules of Civil Procedure,
    Rule 12(b)(1) ................................................................. 6, 7
    Rule 12(b)(6) ........................................................ 7, 12, 16

ER-2150

(108 of 271) Page 108 of 271
Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 108 of 271
Case 2:24-cv-00801-FMO-PVC   Document 38-1   Filed 03/27/24   Page 10 of 34   Page ID
#:175

**INTRODUCTION**

On October 7, 2023, California's Governor signed into law Senate Bills 253 and 261—two laws seeking to increase transparency and improve access to information about the greenhouse gas (GHG) emissions and climate-related financial risks of the largest companies doing business in California.  Both laws reference existing climate change reporting protocols that provide metrics for determining the required information.  And both laws are complementary additions to an expanding suite of climate reporting regimes.  The disclosures required by these two laws are intended to help California residents, consumers, companies, and investors make decisions informed by greater understanding of the sources and volumes of GHG emissions produced by major companies doing business in California and the climate-related financial risks those companies face.

Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federal, and Western Growers Association (Plaintiffs) claim that Senate Bills 253 and 261 violate the First Amendment of the U.S. Constitution, are "precluded" by federal law under the Supremacy Clause, and are invalid "under the Constitution's limitations on extraterritorial regulation."  However, Plaintiffs' claims arising under the Supremacy Clause and the limits on extraterritorial regulation are not justiciable, as the California Air Resources Board (CARB)—the agency tasked with enforcement of the laws—has not yet proposed regulations governing their enforcement, and Plaintiffs have not pled an injury-in-fact.  Moreover, Plaintiffs have not stated a claim under the Supremacy Clause, as they failed to identify any federal law that preempts these state disclosure laws.  The only law they do identify—the Clean Air Act—is inapplicable to these reporting frameworks, and in any event, preserves state authority in the field of air pollution.  Similarly, Plaintiffs fail to state a claim for "extraterritorial regulation" or any other purported violation of the dormant

1

1  Commerce Clause.  Neither law is driven by economic protectionism, *see Nat'l*

2  *Pork Producers Council v. Ross (NPPC)*, 598 U.S. 356, 369, 371 (2023), nor

3  imposes a cognizably significant burden on interstate commerce.  *Pike v. Bruce*

4  *Church, Inc.*, 397 U.S. 137, 142 (1970).  The Court should dismiss these claims.[1]

5       Moreover, Defendant Attorney General Bonta must be dismissed as to all

6  claims.  Neither statute provides an enforcement role for Attorney General Bonta

7  that a federal court could enjoin him from exercising.

8                          **STATEMENT OF FACTS**

9  **I.    SENATE BILLS 253 AND 261**

10      **A.    California Enacts New Measures That Build on Existing**
           **Climate-Related Reporting and Disclosure Frameworks**
11

12      In late 2023, the California Legislature passed and Governor Newsom signed

13  the Climate Corporate Data Accountability Act (Senate Bill 253) and the Climate-

14  Related Financial Risk Act (Senate Bill 261).  Both climate-related disclosure bills

15  were enacted against the backdrop of other reporting frameworks under which

16  many of Plaintiffs' member companies already operate.  Multinational companies,

17  including those based in the United States, that have securities listed on a regulated

18  market in the European Union (EU) or annual revenue in the EU of more than $163

19  million are subject to the EU's Corporate Sustainability Reporting Directive

20  requiring GHG and climate-related financial risk disclosures.  Directive (EU)

21  2022/2464, 2022 O.J. (L 322) 15.  U.S.-based companies with international

22  subsidiaries may also be subject to the International Sustainability Standards

23  Board's IFRS Sustainability Disclosure Standards, which similarly provide for

24  GHG emission and climate-risk reporting.  Request for Judicial Notice (RJN), Ex.

25  1, at 6 (IFRS Sustainability Disclosure Standards, Project Summary).  Moreover,

26  the U.S. Securities and Exchange Commission (SEC) recently finalized a rule

27  _____

[1] While Plaintiffs' First Amendment challenge is also legally flawed,

28  Defendants do not seek dismissal of that claim here, except as to Attorney General
     Bonta as a Defendant.

(110 of 271)   Page 110 of 271
Case: 25-5337, 09/18/2025, DktEntry: 8.10, Page 110 of 271
Case 2:24-cv-00801-FMO-PVC   Document 38-1   Filed 03/27/24   Page 12 of 34   Page ID
#:177

1  governing the reporting of Scope 1 and Scope 2 GHG emissions and climate-related

2  risks for publicly traded companies.  RJN, Ex. 2 (The Enhancement and

3  Standardization of Climate-Related Disclosures for Investors, SEC).[2]  And

4  thousands of companies have for years publicly reported their climate risks and

5  other climate metrics under voluntary frameworks including the Task Force on

6  Climate-Related Disclosure protocols.  RJN, Ex. 3, at 50 (Assembly Comm. on

7  Appropriations Rep. on SB 261, Aug. 16, 2023).

8       In passing Senate Bills 253 and 261, the Legislature noted that the current

9  reporting initiatives "lack[] the full transparency and consistency" needed by

10  California residents, consumers, and investors "to fully understand []climate risks."

11  2023 Cal. Stats., ch. 382 § 1 (SB 253); *see also* 2023 Cal. Stats., ch. 383 § 1 (SB

12  261)  The Legislature sought to resolve the problem of inconsistent reporting

13  among companies doing business in the State by crafting laws that

14  comprehensively serve to "inform investors, empower consumers, and activate

15  companies to improve risk management in order to move towards a net-zero carbon

16  economy," 2023 Cal. Stats., ch. 382 § 1, and "set mandatory and comprehensive

17  risk disclosure requirements for public and private entities to ensure a sustainable,

18  resilient, and prosperous future."  2023 Cal. Stats., ch. 383 § 1.

19   **B.    Senate Bill 253 Requires Companies with Over a Billion Dollars
         in Revenue Doing Business in California to Report GHG**

20   **Emissions in Accordance with Existing Industry Protocols**

21       Senate Bill 253 directs CARB to "develop and adopt regulations" that will

22  require the covered "reporting entit[ies]" to report their direct and indirect GHG

23  emissions.  Cal. Health & Saf. Code § 38532(c)(1).  "Reporting entit[ies]" that must

24  comply with the law are very large U.S. companies—specifically, U.S. entities

25  "that do[] business in California" with total annual revenues in excess of one billion

26

27

28  ---

[2] Petitions for review challenging the SEC's final rule are currently pending
in the Eighth Circuit. *See State of Iowa, et al. v. SEC*, 24-1522 (8th Cir. 2024).

3

1    dollars. *Id*. § 38532(b)(2). CARB has not, to date, initiated the rulemaking process

2    to issue and adopt the implementing regulations required by the statute.

3        Once these implementing regulations are in place, reporting entities will report

4    three categories of GHG emissions: Scope 1, Scope 2, and Scope 3. *Id*.

5    § 38532(b)(3)–(5). Scope 1 emissions are direct GHG gas emissions from a

6    reporting company's owned or controlled sources. *Id*. § 38532(b)(3). Scope 2

7    emissions are the company's indirect emissions associated with the company's use

8    of electricity, steam, heating, and cooling. *Id*. § 38532(b)(4). Scope 3 emissions

9    include all other indirect emissions related to the company, for example, emissions

10   from "purchased goods and services, business travel, employee commutes, and

11   processing and use of sold products." *Id*. § 38532(b)(5). The law does not restrict

12   reporting entities from providing additional data on metrics not listed in the statute.

13       The law provides that entities measure and report emissions "in conformance"

14   with the "Greenhouse Gas Protocol standards and guidance" developed by the

15   World Resources Institute and the World Business Council for Sustainable

16   Development. *Id*. § 38532(c)(1)(A)(ii). This Protocol provides that Scope 3

17   emissions calculations can be determined through "both primary and secondary

18   data sources," including "industry average data, proxy data, and other generic data."

19   *Id*. And the law "minimizes duplication of effort" by allowing reporting entities to

20   submit emissions data prepared to meet other national and international reporting

21   requirements. *Id*. § 38532(c)(1)(D)(i).

22       The law requires third-party assurances regarding the quality and accuracy of

23   the information in their public disclosures, starting at a "limited assurance level" by

24   2026 for Scope 1 and Scope 2 emissions, and 2030 for Scope 3 emissions. *Id*.

25   § 38532(c)(1)(F). To ensure public access, Senate Bill 253 directs the emissions

26   reporting organization to create and publish a publicly accessible digital platform

27   featuring the emissions data of reporting companies, *id*. § 38532(e)(1), and provides

28   for the preparation of a report arising from the collected data. *Id*. § 38532(d)(1).

1     Senate Bill 253 provides general deadlines for compliance with the reporting

2    requirements, beginning in 2026 for Scope 1 and 2 emissions, and 2027 for Scope 3

3    emissions. *Id.* § 38532(c)(1)(A)(i). The law provides that CARB must "adopt

4    regulations that authorize it to seek administrative penalties for nonfiling, late

5    filing, or other failure to meet the requirements" of the statute. *Id.*

6    § 38532(f)(2)(A). Reporting companies that do not comply with these regulations

7    will be subject to administrative penalties determined by CARB, not to exceed

8    $500,000 in a reporting year, following an administrative hearing conducted by

9    CARB. *Id*. § 38532(f)(2). As with the implementing regulations, CARB has not

10   yet initiated the rulemaking process to issue the enforcing regulations required by

11   the statute.

12   **C.    Senate Bill 261 Requires Companies with Over $500 Million
         Dollars in Revenue Doing Business in California to Report**

13   **Material Climate-Related Financial Risk in Accordance with
         Existing Industry Protocols**

14

15    Senate Bill 261 requires U.S. entities with total annual revenues in excess of

16   $500 million dollars that do business in California to prepare a climate-related

17   financial risk report biennially.[3] Cal. Health & Saf. Code § 38533(a)(4)–(b)(1)(A).

18   The bill requires covered entities to disclose both their climate-related financial risk

19   and any measures adopted to reduce and/or adapt to that risk. *Id*. § 38533(b)(1)(A).

20   The bill defines "[c]limate-related financial risk" as the "material risk of harm to

21   immediate and long-term financial outcomes due to physical and transition

22   risks … ," such as disruptions to operations, the provision of goods and services,

23   and employee health and safety. *Id*. § 38533(a)(2). The law provides that such risk

24   can be reported in accordance with the framework contained in "the Final Report of

25   Recommendations of the Task Force on Climate-related Financial Disclosures." *Id*.

26   § 38533(b)(1)(A)(i). A covered entity fulfills the requirements of the law if

27   _____

28       [3] The law exempts business entities subject to regulation by the California
     Department of Insurance. *Id*. § 38533(a)(4).

**ER-2155**

1  reporting climate risks under another disclosure framework with consistent

2  requirements. *Id*. § 38533(b)(4).

3      Senate Bill 261 requires each reporting company, on or before January 1,

4  2026, to publish a copy of the report "on its own internet website." *Id.* at

5  § 38533(c)(1)–(2).  The law provides that CARB must "adopt regulations that

6  authorize it to seek administrative penalties" from a covered entity that fails to

7  make the required report or publishes an inadequate report. *Id.* § 38533(e)(2).

8  These administrative penalties are not to exceed $50,000 per reporting year, and

9  can be imposed only after an administrative hearing.  *Id.*  As of the date of this

10  filing, CARB has not initiated the rulemaking process to issue the regulations

11  required by the statute.

12  **II.  PROCEDURAL HISTORY**

13      Plaintiffs filed the operative Amended Complaint for Declaratory and

14  Injunctive Relief (FAC) on February 22, 2024 (ECF No. 28).  Plaintiffs allege that

15  both Senate Bills 253 and 261 violate the First Amendment, FAC ¶¶ 92–99, are

16  preempted under the "federal Constitution's Supremacy Clause," FAC ¶¶ 100–106,

17  and violate the "Constitution's limitations on extraterritorial regulations, including

18  the dormant commerce clause." FAC ¶¶ 107–112.  They sued CARB's chair and

19  executive officer, as well as the Attorney General.

20      Defendants now move to dismiss the Supremacy Clause and extraterritoriality

21  causes of action on jurisdictional grounds and for failure to state a claim.

22              **LEGAL STANDARD**

23      "The party asserting federal subject matter jurisdiction bears the burden of

24  proving its existence." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115,

25  1122 (9th Cir. 2010).  "In a facial attack" under Rule 12(b)(1), "the challenger

26  asserts that the allegations contained in a complaint are insufficient on their face to

27  invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039

28  (9th Cir. 2004).  In a "factual attack" on jurisdiction, "the district court may review

6

evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment," and "[t]he court need not presume the truthfulness of the plaintiff's allegations." *Id.*

On a motion to dismiss under Rule 12(b)(6), the Court "determines whether Plaintiffs pled enough facts to state a claim to relief that is plausible on its face." *Woods v. U.S. Bank N.A.*, 831 F.3d 1159, 1162 (9th Cir. 2016) (cleaned up). "A complaint may fail to show a right to relief either by lacking a cognizable legal theory or by lacking sufficient facts alleged under a cognizable legal theory." *Id.* While the Court must generally "accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs," the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Sci. Sec. Litig.*, 536 F.3d. 1049, 1055 (9th Cir. 2008) (cleaned up).

Dismissal without leave to amend is appropriate when deficiencies in the complaint could not possibly be cured by amendment. *See Watison v. Carter*, 668 F.3d 1108, 1117 (9th Cir. 2012).

## ARGUMENT

I. **PLAINTIFFS' SUPREMACY CLAUSE AND EXTRATERRITORIALITY CLAIMS SHOULD BE DISMISSED UNDER RULE 12(b)(1) ON RIPENESS AND STANDING GROUNDS**

Federal courts may adjudicate only cases or controversies; they may not issue advisory opinions. U.S. Const. art. III, § 2, cl. 1; *Rhoades v. Avon Products, Inc.*, 504 F.3d 1151, 1157 (9th Cir. 2007). "The Article III case or controversy requirement limits federal courts' subject matter jurisdiction by requiring, inter alia, that plaintiffs have standing and that claims be "ripe" for adjudication. […] Because standing and ripeness pertain to federal courts' subject matter jurisdiction, they are properly raised in a Rule 12(b)(1) motion to dismiss." *Chandler*, 598 F.3d at 1121.

**A.    In the Absence of Implementing Regulations, Plaintiffs' Supremacy Clause and Extraterritoriality Claims Challenging Senate Bill 253 Are Not Ripe for Adjudication**

The "ripeness" doctrine prevents premature adjudication of claims that do not yet have a concrete impact on the parties. *Exxon Corp. v. Heinze*, 32 F.3d 1399, 1404 (9th Cir. 1994). Ripeness is "'peculiarly a question of timing,' designed to 'prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Thomas v. Anchorage Equal Rights Com'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (citations omitted). There is both a constitutional component to the ripeness doctrine and a prudential component. *Id.*

Under the constitutional component, the focus is on the immediacy of enforcement. The mere existence of a statute is not sufficient. *Id.*; *see also Boating Indus. Ass'ns v. Marshall*, 601 F.2d 1376, 1384 (9th Cir. 1979). A federal court may only issue a declaratory judgment where "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Boating Industry Ass'ns*, 601 F.2d at 1384 (cleaned up). For a pre-enforcement challenge, a substantial controversy can be established by showing both that the plaintiffs have articulated a "concrete plan" to violate the law in question, and that the prosecuting authorities have communicated a specific warning or threat to initiate proceedings.[4] *Thomas*, 220 F.3d at 1139.

Plaintiffs cannot establish either element here. When Senate Bill 253 took effect on January 1, 2024, the statute itself did not impose any affirmative obligations on Plaintiffs or any other entity subject to the new reporting requirements. Nor does it now. Rather, Senate Bill 253 expressly provides that CARB must adopt regulations implementing the statute before any entity has any responsibility under the law. But CARB has not yet done so. Enforcement under

---

[4] While courts also look to the history of past prosecution or enforcement under the challenged statute, when a "statute is new the history of past enforcement carries little, if any weight." *Arizona v. Yellen*, 34 F.4th 841, 850 (9th Cir. 2022).

ER-2158

(116 of 271) Page 116 of 271 Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 116 of 271
Case 2:24-cv-00801-FMO-PVC Document 38-1 Filed 03/27/24 Page 15 of 34 Page ID
#:183

1    Senate Bill 253 cannot take place until after CARB adopts regulations establishing

2    the procedures under which reporting entities must act, and by which the agency

3    may seek administrative penalties. Cal. Health & Saf. Code

4    §§ 38532(f)(2), 38533(e)(2). Moreover, Plaintiffs cannot articulate a "concrete

5    plan" to violate the law under which they have no existing obligations. *Cf. Assoc.*

6    *of Am. R.R. v. Cal. Office of Spill Prevention and Response*, 113 F. Supp. 3d 1052,

7    1059 (E.D. Cal. 2015) (concluding case not ripe when agency had not issued

8    implementing regulations on challenged law).

9         But even if the minimum constitutional requirements were met here, the Court

10   should decline to exercise jurisdiction on prudential grounds. The prudential

11   analysis includes a two-pronged inquiry: (1) the "fitness of the issues for judicial

12   decision" and (2) "the hardship to the parties of withholding court consideration."

13   *Thomas*, 220 F.3d at 1141 (citations omitted).

14        This Court should avoid deciding a pre-enforcement challenge that does not

15   permit CARB to first propose and finalize its regulations. *Cf. Ammex, Inc. v. Cox*,

16   351 F.3d 697, 708 (6th Cir. 2003); *see also United States v. Power Co., Inc.*, 2008

17   WL 2626989, *4 (D. Nev. 2008) ("That the City of Las Vegas, as the primary

18   governmental entity charged with construing the challenged law, has not yet had an

19   opportunity to construe the ordinances at issue weighs against exercising

20   jurisdiction."). The law requires that the Board develop its regulations in

21   consultation with "experts in climate science and corporate carbon emissions

22   accounting and reporting," "[i]nvestors," and "[r]eporting entities that have

23   demonstrated leadership in full-scope greenhouse gas emissions accounting and

24   public disclosure," among others. Cal. Health & Saf. Code § 38532(c)(1)(D). It is

25   thus reasonable to conclude that the final regulations may be responsive to at least

26   some of Plaintiffs' current concerns, such as the alleged impact of Scope 3

27   reporting on upstream and downstream entities. *See Valeria G. v. Wilson*, 12 F.

28   Supp. 2d 1007, 1026 (N.D. Cal. 1998) ("Courts regularly deny anticipatory review

9

1    when further development by state officials may reduce or avoid constitutional

2    problems, or change the nature of the issues presented."). Plaintiffs' allegations are

3    based on speculation about how the disclosure requirements will be applied and

4    enforced. For example, they do not explain how this law will operate in light of

5    federal and other reporting requirements, and they propose hypothetical scenarios

6    regarding the scope and nature of the reporting obligation, especially under Scope

7    3. These allegations are insufficient to carry plaintiffs' burden of establishing the

8    court's jurisdiction. *Rattlesnake Coal. v. U.S. EPA*, 509 F.3d 1095, 1102 n.1 (9th

9    Cir. 2007)

10        The absence of regulations also means Plaintiffs will not suffer any substantial

11   hardship if the Court withholds consideration of this matter. *Thomas*, 220 F.3d at

12   1142 ("[T]he absence of any real or imminent threat of enforcement … seriously

13   undermines any claim of hardship."). There is no threat of any immediate

14   enforcement here. Accordingly, it is appropriate for the Court to withhold

15   consideration at this time.

16   **B.    Plaintiffs Lack Standing to Bring their Supremacy Clause and
            Extraterritoriality Claims as to Senate Bill 261 and Scope 1 and
17          2 of Senate Bill 253 Where They Have Not Alleged an Injury-in-
            Fact**
18

19        Plaintiffs who seek to establish standing to challenge a law or regulation that

20   is not presently enforced against them, must demonstrate "a realistic danger of

21   sustaining a direct injury as a result of the statute's operation or enforcement."

22   *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *7 Bland v.

23   Fessler*, 88 F.3d 729, 736–37 (9th Cir. 1996). The injury must be "concrete,

24   particularized, and actual or imminent," as opposed to conjectural or hypothetical.

25   *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). While Plaintiffs plead a

26   purported injury for their First Amendment claim, they fail to plead a sufficient

27   injury to support standing with respect to their preemption and extraterritoriality

28   challenges. Because injury-in-fact is one of three "irreducible constitutional

**ER-2160**

(118 of 271) Page 118 of 271 Case: 25-5337, 09/18/2025, DktEntry: 8.10, Page 118 of 271
Case 2:24-cv-00801-FMO-PVC   Document 38-1   Filed 03/27/24   Page 20 of 34   Page ID
#:185

1    minimum" showings of Article III standing, *Lujan v. Defenders of Wildlife*, 504

2    U.S. 555, 560–61 (1992), this failure is fatal to establishing the Court's jurisdiction.

3        **1.    Plaintiffs' alleged injury from Senate Bill 261 is conclusory
            and insufficient to establish standing**

4

5        Plaintiffs claim that "[w]hile the bills were pending business-organization

6    representatives noted the significant costs of the bills and the difficulties associated

7    with compliance." FAC ¶ 29.  They suggest that the Governor expressed

8    "concern[s] about the overall financial impact of this bill on business." FAC ¶ 32.

9    And they claim a vague "risk" that companies will feel pressured to conform their

10   risk assessment disclosures to speculative policy preferences of the State sometime

11   in the future, FAC ¶ 83, and the possibility of "stigma[]" from unnamed entities

12   concerned about the purely speculative contents of their disclosures.  FAC ¶¶ 83,

13   89.  Notably absent from these allegations is the identification of even a single

14   entity subject to the reporting requirements that claims an actual injury from

15   planning to comply with the law's requirements.  Nor does any entity claim that it

16   would incur costs associated with Senate Bill 261 that it would not incur as part of

17   obligations under other reporting regimes.

18       Moreover, as discussed above, any claimed injury from enforcement of the

19   statute is premature.  Whether this issue "is viewed as one of standing or ripeness,"

20   Plaintiffs' failure to allege "when, … where, or under what circumstances" their

21   members would violate the challenged law, and the current absence of regulations

22   under which the agency would enforce, leaves this Court without a case or

23   controversy.  *Thomas*, 220 F.3d at 1139; *see also Ass'n of Am. R.R.*, 113 F. Supp.

24   3d at 1058.

25

26

27

28

**ER-2161**

(119 of 271) Page 119 of 271
Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 119 of 271
Case 2:24-cv-00801-FMO-PVC   Document 38-1   Filed 03/27/24   Page 21 of 34   Page ID
#:186

Thus, setting aside the First Amendment claim,[5] Plaintiffs' pleadings alleging injury arising from Senate Bill 261 are "insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1039.

### 2. Plaintiffs do not allege any injury arising from the Scope 1 and Scope 2 reporting requirements under Senate Bill 253

Other than a purported First Amendment injury—which Defendants dispute, but do not address for purposes of this motion—Plaintiffs' amended complaint is bereft of allegations pertaining to any injury arising out of compliance with the Scope 1 and Scope 2 requirements of Senate Bill 253. Plaintiffs do not claim that any member entity has incurred costs in connection with compliance with the Scope 1 or Scope 2 requirements, or is likely to do so. *See, e.g.*, FAC ¶¶ 11 (addressing Scope 3's "burdensome compliance costs"), 52 (estimating cost of complying with the Scope 3 requirements). The absence of such allegations is notable in light of the existing voluntary and mandatory climate change reporting regimes under which many companies may already be preparing this data. *See* Statement of Facts, section I(A), *supra*. Plaintiffs' conclusory claims pertaining to "significant costs" generally associated with compliance with both bills are insufficient to establish injury-in-fact. *Safe Air for Everyone*, 373 F.3d at 1039.

## II. PLAINTIFFS' SUPREMACY CLAUSE CLAIM SHOULD BE DISMISSED UNDER RULE 12(B)(6) FOR FAILURE TO STATE A CLAIM

Should this Court find it has jurisdiction, Plaintiffs' second claim—which alleges a violation of the Supremacy Clause—should nevertheless be dismissed because it relies on an erroneous factual premise and because it lacks a cognizable legal theory.

---

[5] As to the First Amendment claim, Plaintiffs allege a purported injury from compelled speech. Defendants do not address those allegations for purposes of this motion.

**A.  Plaintiffs Do Not State a Claim Under the Supremacy Clause Because these State Statutes Regulate Informational Disclosures, Not Emissions**

Plaintiffs' second claim rests on an incorrect premise: that these statutes "regulate greenhouse-gas emissions outside of [California's] own borders."  FAC ¶ 105.  These statutes require informational disclosures; they are not laws regulating the emissions themselves.  Plaintiffs admit that "the laws do not directly require reductions in greenhouse-gas emissions."  FAC ¶ 88.  In fact, the entire basis of Plaintiffs' First Amendment claim is that these statutes regulate *speech*, not emissions.  *E.g.*, FAC ¶¶ 93–94 (alleging compelled speech).

Plaintiffs do allege that these statutes will "function[] to pressure companies to reduce their emissions of greenhouse gases."  FAC ¶ 104.  But on Plaintiffs' theory, any "pressure" companies feel would come *from third parties*—investors, customers, and the like—not *from the State itself*.  And courts routinely distinguish between pressure created by state laws and actual regulation by the State, and recognize only the latter as an actionable injury.  For example, the Supreme Court rejected the argument that Maine was regulating wholesale pharmaceutical prices when it pressured manufacturers into negotiating rebate agreements.  *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003) (rejecting "regulation" characterization); *id.* at 649 (describing pressure applied to obtain rebate agreements).  And the Ninth Circuit easily distinguished between "regulat[ion]" and "incentives" created by state law.  *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1101 (9th Cir. 2013); *see also Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 176 (1988) (distinguishing "incidental regulatory pressure" from "direct regulatory authority"); *Associated Builders & Contractors of S. Cal., Inc. v. Nunn*, 356 F.3d 979, 985 (9th Cir. 2004), *amended* 2004 WL 292128 (9th Cir. Feb. 17, 2004) (concluding state law "[a]t most, … alters the incentives" where it does not "bind [regulated entities] to anything") (cleaned up).

13

1   As these cases demonstrate, States regulate when they require or prohibit

2   conduct. Congress understands this, particularly in the context of emission

3   regulation. In fact, under the Clean Air Act, the terms "emission limitation" and

4   "emission standard" are defined to "mean a *requirement* established by the State or

5   the Administrator which limits the quantity, rate, or concentration of emissions of

6   air pollutants on a continuous basis, including any *requirement* relating to the

7   operation or maintenance of a source to assure continuous emission reduction, and

8   any design, equipment, work practice or operational standard promulgated under

9   this chapter." 42 U.S.C. § 7602(k) (emphasis added). Here, as Plaintiffs concede,

10  the statutes require *disclosure of information*; they do not regulate *emissions*. FAC

11  ¶ 105 (State "requiring extensive disclosure of information about out-of-state

12  emissions").

13  Accordingly, even if the Supremacy Clause prohibited states from regulating

14  out-of-state emissions, Plaintiffs cannot plausibly allege these statutes do so.

15  **B.  Plaintiffs Fail to Identify a Cognizable Legal Theory for the**
    **Alleged Supremacy Clause Violation**
16

17  Plaintiffs' Supremacy Clause claim also fails because no source of federal law

18  "preclude[s]" States from requiring these kinds of disclosures.

19  The Supremacy Clause "creates a rule of decision" by which courts decline to

20  "give effect to state laws that conflict with federal laws." *Armstrong v. Exceptional*

21  *Child Ctr., Inc.*, 575 U.S. 320, 324 (2015). That Clause is not, however, "the

22  source of any federal rights, and certainly does not create a cause of action." *Id.*

23  (quotation marks and citations omitted); *see also All. of Nonprofits for Ins., Risk*

24  *Retention Grp. v. Kipper*, 712 F.3d 1316, 1325 (9th Cir. 2013) ("[T]he Supremacy

25  Clause, of its own force, does not create rights enforceable under § 1983.") (cleaned

26  up). To state this claim, Plaintiffs must identify *substantive* federal law with which

27  these state statutes allegedly conflict—*i.e.*, a statutory or constitutional provision

28  that preempts these California statutes. *See Chamber of Commerce v. Whiting*, 563

14

**ER-2164**

1    U.S. 582, 607 (2011) (preemption cannot be based on "a freewheeling judicial

2    inquiry into whether a state statute is in tension with federal objectives") (quotation

3    marks and citation omitted); *see also Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894,

4    1901 (2019) (lead opinion of Gorsuch, J.) ("[A] litigant must point specifically to 'a

5    constitutional text or a federal statute' that does the displacing or conflicts with

6    state law." (citation omitted)).  Plaintiffs feint at two such sources:  "the Clean Air

7    Act and principles of federalism inherent in the structure of our federal

8    Constitution."  FAC ¶ 105.  But neither can support the weight of Plaintiffs' claim.

9        First, Congress could not have been more clear that only a very few provisions

10   of the Clean Air Act have preemptive force:  "Except as otherwise provided in [*four*

11   enumerated] sections … nothing in this chapter shall preclude or deny the right of

12   any State or political subdivision thereof to adopt or enforce (1) any standard or

13   limitation respecting emissions of air pollutants or (2) any requirement respecting

14   control or abatement of air pollution."  42 U.S.C. § 7416.  Plaintiffs have not

15   alleged that these state laws run afoul of the four sections of the Clean Air Act that

16   can preempt state law.  Nor could Plaintiffs do so, as those sections concern

17   "certain" state emission standards for "moving sources," which has no bearing on

18   these disclosure requirements.  *Id.*  Plaintiffs fail to identify any provision of the

19   Clean Air Act that even arguably conflicts with these state statutes because there is

20   no such provision.

21       Second, Plaintiffs fail to identify any provision of the Constitution—or any

22   specific "principle of federalism"—that conflicts with the challenged state statutes.

23   Courts have rejected arguments that the Constitution precludes States from

24   obtaining information about corporations' out-of-state activities.  *E.g.*, *VIZIO, Inc.

25   v. Klee*, 886 F.3d 249, 256 (2d Cir. 2018) (rejecting constitutional challenge to state

26   law that "*considers* out-of-state activity"); *see also* Argument section III(A), *infra*.[6]

27       [6] Plaintiffs nowhere explain the distinction between this claim and their
     "extraterritorial regulation" claim.  FAC ¶ 112.  Plaintiffs fail to state a claim under

28

15

1    Plaintiffs' vague invocation of unspecified constitutional principles is exactly the

2    sort of "freewheeling" appeal, *Whiting*, 563 U.S. at 607, to "brooding federal

3    interest[s]" upon which the Supreme Court has warned a claim for preemption

4    cannot successfully rely, *Va. Uranium*, 139 S. Ct. at 1901 (lead opinion of Gorsuch,

5    J.).

6    **III.  PLAINTIFFS' EXTRATERRITORIALITY CLAIM SHOULD BE DISMISSED
         UNDER RULE 12(B)(6) FOR FAILURE TO STATE A CLAIM**

7

8         Plaintiffs' third claim—for extraterritorial regulation—should also be

9    dismissed for failure to state a claim.  Plaintiffs identify only one source of

10   authority for this claim: the dormant Commerce Clause.  FAC ¶¶ 108, 109, 112.

11   Plaintiffs bear the burden of proof to establish the alleged constitutional violation.

12   *Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 448 (9th Cir. 2019).  Yet

13   Plaintiffs have not alleged, and cannot allege, facts sufficient to state such a claim

14   under any legal theory cognizable under the dormant Commerce Clause.[7]

15        **A.   There is No Freestanding "Extraterritorial Regulation" Claim
               under the Dormant Commerce Clause**

16

17        Plaintiffs primarily ground their dormant Commerce Clause claim in the

18   purported "extraterritorial" effects of Senate Bill 253 and Senate Bill 261.  FAC

19   ¶ 112; *id.* at 27:20.  But in *National Pork Producers Council v. Ross* (*NPPC*), 598

20   U.S. 356, 369, 371 (2023), the Supreme Court rejected the existence of such a

21

22   that Clause.  *See infra* at III.  And they cannot save that claim by cloaking it in
     different cloth here.  *Am. Fuel & Petrochem. Mfrs. v. O'Keeffe*, 903 F.3d 903, 917

23   (9th Cir. 2018) (rejecting claim under "principles of interstate federalism" as
     indistinct from failed dormant Commerce Clause claim).

24        [7] Plaintiffs appear to allege a facial challenge because they seek to enjoin
     Senate Bill 253 and Senate Bill 261 in full and identify no particular applications of

25   either statute that purportedly violate the dormant Commerce Clause.  *E.g.*, FAC
     ¶ 116.  At a minimum, this facial challenge must be dismissed because Plaintiffs

26   cannot "establish "'that no set of circumstances exists under which the [statutes]
     would be valid.'"  *Rosenblatt*, 940 F.3d at 444 (quoting *United States v. Salerno*,

27   481 U.S. 739, 745 (1987)).  In fact, Plaintiffs seem to suggest that some
     applications—i.e., to companies with significant revenues from California—would

28   be unobjectionable.  FAC ¶ 109.

16

**ER-2166**

freestanding claim under this Clause. Specifically, the Court rejected the existence of an "'extraterritoriality doctrine'"—a purported "rule forbidding enforcement of state laws that have the practical effect of controlling commerce outside the State, even when those laws do not purposely discriminate against out-of-state economic interests." *NPPC*, 598 U.S. at 371. Reaffirming the dormant Commerce Clause's anti-protectionism focus, *id.* at 364, the Court observed that the cases on which petitioners relied involved "*specific* impermissible 'extraterritorial effect[s]'"—*e.g.*, where the State "deliberately prevented out-of-state firms from undertaking competitive pricing or deprived businesses and consumers in other States of whatever competitive advantages they may possess." *Id.* at 374 (cleaned up). In other words, the decisions in those cases manifested "the familiar concern with preventing purposeful discrimination against out-of-state economic interests" and did not establish an extraterritoriality doctrine. *Id.* at 371.

Underscoring the point, the Court recognized that "many (maybe most) state laws have the practical effect of controlling extraterritorial behavior," without raising constitutional concerns. *NPPC*, 598 U.S. at 374 (cleaned up). As examples, the Court pointed to state "libel laws, securities requirements, charitable registration requirements, franchise laws, [and] tort laws." *Id.* (cleaned up). Plaintiffs do not allege that either Senate Bill 253 or 261 will have any particular extraterritorial effects, much less extraterritorial effects distinct from those of state libel and securities laws or charitable registration requirements. To the extent Plaintiffs attempt to allege an "extraterritorial regulation" claim here, that claim should be dismissed, just as in *NPPC*.[8]

_____

[8] Although the Court recognized that other constitutional provisions and principles are sometimes invoked to "resolve disputes about the reach of one State's power," *NPPC*, 598 U.S. at 376, Plaintiffs have not identified any provisions or principles upon which they rely other than the dormant Commerce Clause and have not alleged any facts that could sustain such a claim. Nor could they cure the latter defect, given that Senate Bills 253 and 261 only apply to companies doing business in California.

17

**ER-2167**

**B.** **Plaintiffs Fail to State a Discrimination Claim under the
Dormant Commerce Clause**

As the Court recently reaffirmed in *NPPC*, the "very core of … dormant
Commerce Clause jurisprudence" is its "antidiscrimination principle"—the
prohibition against "state laws driven [] by economic protectionism." *NPPC*, 598
U.S. at 369 (cleaned up).  Plaintiffs cannot state a claim under this actual dormant
Commerce Clause principle because they cannot allege any facts that, if proven,
could establish that either Senate Bill 253 or 261 is "'designed to benefit in-state
economic interests by burdening out-of-state competitors.'" *Id.* at 369 (quoting
*Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–38 (2008)).

Both laws apply evenhandedly to *all* companies that meet their neutral criteria,
regardless of location.  Senate Bill 261 applies to any "corporation, partnership,
limited liability company, or other business entity" formed in the U.S. that (1) has
"total annual revenues in excess of [$500 million]" and (2) "does business in
California."  Cal. Health & Saf. Code § 38533(a)(4).  Senate Bill 253's criteria are
similar except that it applies only to companies with total annual revenues over $1
billion.  *Id.* § 38532(b)(2).  Neither statute provides an exemption or other special
treatment for California companies that meet the income qualifications.  This is
simply not "'differential treatment of in-state and out-of-state economic interests
that benefits the former and burdens the latter.'" *Rosenblatt*, 940 F.3d at 448
(quoting *Oregon Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*, 511 U.S.
93, 99 (1994)).

Plaintiffs nonetheless attempt to suggest this evenhanded treatment amounts to
economic protectionism, alleging "out-of-state companies that do little business in
California will be subject to the laws, even though in-state companies that have
their entire business in California (but fall just below the revenue threshold) will
not be." FAC ¶ 109.  Far from demonstrating discrimination, however, that
allegation underscores its absence.  Plaintiffs concede that the statutes apply to all

(126 of 271) Page 126 of 271 Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 126 of 271
Case 2:24-cv-00801-FMO-PVC   Document 38-1   Filed 03/27/24   Page 28 of 34   Page ID
#:193

1   companies with certain revenues, if the companies do business in California.  That

2   is no different than a non-discriminatory ordinance that "applies to all

3   manufacturers *that make their drugs available in Alameda County*."  *Pharm. Rsch.*

4   *& Mfrs. of Am. v. Cnty. of Alameda* (*PhRMA*), 768 F.3d 1037, 1042 (9th Cir. 2014)

5   (emphasis added).  Neither distinguishes based on "the geographic location of the

6   [business]."  *Id*.  Moreover, "any notion of discrimination assumes a comparison of

7   substantially similar entities."  *General Motors Corp. v. Tracy*, 519 U.S. 278, 298

8   (1997).  And Plaintiffs concede what the statutes make plain:  that companies with

9   similar revenues will be treated equally.  Thus, companies that "fall just below the

10  revenue threshold" have no disclosure obligations—*regardless of their in-state or*

11  *out-of-state location*.  *See* FAC ¶ 109.  If anything, the other criteria—whether a

12  company does business in California—*disfavors* entities located in the State as they

13  likely cannot avoid doing some business in the State.

14      Plaintiffs' conclusory allegation that "the laws 'offend the Commerce Clause'

15  by 'build[ing] up … domestic commerce' through 'burdens upon the industry of

16  other States'" does not cure the Complaint's fatal defects.  FAC ¶ 109 (quoting

17  *NPPC*, 598 U.S. at 369) (cleaned up); *see Bell Atlantic v. Twombly*, 550 U.S. 544,

18  555 (2007) ("[A] plaintiff's obligation to provide the grounds of his entitlement to

19  relief requires more than labels and conclusions.").  Plaintiffs fail to explain how

20  statutes that apply to in-state and out-of-state businesses in exactly the same way

21  could burden the latter to the advantage of the former.  Specifically, Plaintiffs do

22  not identify a feature of either statute that "artificially encourag[es] in-state

23  production even when the same goods could be produced at lower cost in other

24  States" or otherwise "provide[s] distinct advantages to in-state entities over out-of-

25  state entities."  *PhRMA*, 768 F.3d at 1042 (cleaned up).

26   **C.    Plaintiffs Fail to State a Claim under the Clause's *Pike* Test**

27      Plaintiffs also fail to allege a violation of the dormant Commerce Clause's

28  *Pike* test under which a state law "will be upheld unless the burden imposed on

19

**ER-2169**

1    [interstate] commerce is clearly excessive in relation to the putative local benefits."

2    *Pike*, 397 U.S. at 142.  They have not alleged, and cannot allege, the "critical

3    requirement" for a *Pike* claim:  that the application of these state statutes imposes a

4    "substantial burden on interstate commerce."  *Nat'l Ass'n of Optometrists &*

5    *Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012) (emphasis omitted).

6    Thus, this Court need not even consider Plaintiffs' (unsupported) claims that these

7    statutes provide little benefit.  *See id.* at 1156 (declining to consider arguments

8    about benefits "[i]n the absence of … [a] substantial burden on interstate

9    commerce"); *see also Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127–28

10   (1978) (same).

11        A burden on interstate commerce is most frequently cognizable under *Pike*

12   when the nature of the burden suggests protectionism—*i.e.*, where the effects of the

13   challenged law "may … disclose the presence of a discriminatory purpose."  *NPPC*,

14   598 U.S. at 377.  In fact, many *Pike* cases have "turned in whole or in part on the

15   discriminatory character of the challenged state regulations."  *Id.* (internal quotation

16   marks omitted).  Thus, "the *Pike* line [of cases] serves as an important reminder that

17   a law's practical effects may also disclose the presence of a discriminatory

18   purpose," and "no clear line separates the *Pike* line of cases from [the] core

19   antidiscrimination precedents."  *Id.* (cleaned up).  Plaintiffs have alleged no such

20   burden.  And they cannot cure this defect through amendment because, as shown

21   above, both statutes apply even-handedly without regard to the location of the

22   business.

23        In the rarer case, a burden cognizable under *Pike* can arise "when a lack of

24   national uniformity would impede *the flow* of interstate goods."  *NPPC*, 598 at 380

25   n.2; *see also Nat'l Pork Producers Council v. Ross*, 6 F.4th 1021, 1032 (9th Cir.

26   2021), aff'd, 598 U.S. 356 (2023).  Plaintiffs do not and cannot allege that the

27   disclosures required by Senate Bill 253 or 261 impede the flow of goods in

28   interstate commerce.

**ER-2170**

1    To the contrary, Plaintiffs allege only that these laws will "require companies

2  to spend significant time and money" in order to comply.  FAC ¶ 109.  But courts

3  have consistently rejected mere compliance costs as substantial burdens on

4  *interstate commerce*, even when the compliance costs are purportedly sizable:

5  "[t]he mere fact that a firm engaged in interstate commerce will face increased costs

6  as a result of complying with state regulations does not, on its own, suffice to

7  establish a substantial burden on interstate commerce."  *Ward v. United Airlines,*

8  *Inc.*, 986 F.3d 1234, 1241–42 (9th Cir. 2021); *Exxon*, 437 U.S. at 127.  Indeed, the

9  Supreme Court affirmed dismissal of a *Pike* claim despite allegations that "certain

10  processing firms" would be required "to make substantial new capital investments."

11  *NPPC*, 598 U.S. at 367.  This Court should do likewise here.

## IV.  SOVEREIGN IMMUNITY BARS ALL OF PLAINTIFFS' CLAIMS AGAINST ATTORNEY GENERAL BONTA

14    The Eleventh Amendment bars a private party from suing a state and its

15  agencies unless the state consents to the suit.  *Los Angeles Branch NAACP v. Los*

16  *Angeles Unified School Dist.*, 714 F.2d 946, 952 (9th Cir. 1983).[9]  However, under

17  *Ex parte Young*, 209 U.S. 123 (1908), sovereign immunity does not bar "actions

18  seeking only prospective declaratory or injunctive relief against state officers in

19  their official capacities" who are acting unconstitutionally.  *L.A. County Bar Ass'n*

20  *v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992).  For this exception to apply, "the state

21  officer sued must have some connection with the enforcement of the [allegedly

22  unconstitutional] act."  *Id.* (cleaned up).  This connection "must be fairly direct"

23  and the state official must have more than "a generalized duty to enforce state law

24  or general supervisory power over the persons responsible for enforcing the

25  challenged provision."  *L.A. County Bar Ass'n*, 979 F.2d at 704.

---

[9] Section 1983 did not abrogate a state's Eleventh Amendment immunity, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and California has not waived that immunity with respect to claims brought under § 1983 in federal court.  *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985).

**ER-2171**

(129 of 271) Page 129 of 271Case: 25-5337, 09/18/2025, DktEntry: 8.10, Page 129 of 271
Case 2:24-cv-00801-FMO-PVC   Document 38-1   Filed 03/27/24   Page 31 of 34   Page ID
#:196

1    Plaintiffs fail to allege that Attorney General Bonta has a plausible connection

2    to enforcement of the laws at issue here.  They claim only that Attorney General

3    Bonta is "the chief law officer of the State" and has a "duty … to see that the laws

4    of [California] are uniformly and adequately enforced."  FAC ¶ 17 (alterations and

5    ellipses in original).  But alleging that Attorney General Bonta has a "'general duty

6    to enforce California law' is plainly insufficient to invoke the Ex parte Young

7    exception to Eleventh Amendment immunity."  *Bolbol v. Brown*, 120 F. Supp. 3d

8    1010, 1018 (N.D. Cal. 2015) (quoting *Ass'n des Eleveurs de Canards et d'Oies du*

9    *Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013)).  And while Plaintiffs also

10   point out that Senate Bill 253 requires CARB to "consult with" Attorney General

11   Bonta in developing its implementing regulations, FAC ¶ 17, this allegation does

12   not establish a role in enforcement of the statute.  *See Tohono O'odham Nation v.*

13   *Ducey*, 130 F. Supp. 3d 1301, 1311 (D. Ariz. 2015).[10]

14   Nor could Plaintiffs cure this deficiency.  Both laws expressly charge CARB

15   with enforcement of their substantive provisions, and provide no enforcement

16   authority to Attorney General Bonta.  Cal. Health & Saf. Code §§ 38532(c)(3),

17   38533(c)(2).  As he lacks "enforcement authority … in connection with" the laws

18   "that a federal court might enjoin him from exercising," Plaintiffs' claims against

19   him must be dismissed.  *Whole Woman's Health v. Jackson*, 595 U.S. 30, 43

20   (2021).

21

22

23

24

25

26

27

28

[10] In any event, this allegation pertains only to Senate Bill 253, and not
Senate Bill 261.

ER-2172

1     Dated:  March 27, 2024            Respectfully submitted,

2                                            ROB BONTA
                                         Attorney General of California

3                                          GARY E. TAVETIAN
                                         MYUNG J. PARK

4                                          Supervising Deputy Attorney General
                                         M. ELAINE MECKENSTOCK

5                                          EMILY HAJARIZADEH
                                         DYLAN REDOR

6                                          Deputy Attorneys General

7

8                                          /s/ Caitlan McLoon

9

10                                          CAITLAN MCLOON
                                         Deputy Attorney General
                                         *Attorneys for Defendants Liane M.*

11                                          *Randolph, Steven S. Cliff, and Robert*
                                         *A. Bonta*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF COMPLIANCE

2

The undersigned, counsel of record for Defendants Liane M. Randolph,

3

Steven S. Cliff, and Robert A. Bonta, certifies that this brief contains 6,984 words,

4

which complies with the word limit of L.R. 11-6.1.

5

6

7

Dated:  March 27, 2024                                    Respectfully submitted,

8

ROB BONTA
Attorney General of California
GARY E. TAVETIAN
MYUNG J. PARK
Supervising Deputy Attorney General
M. ELAINE MECKENSTOCK
EMILY HAJARIZADEH
DYLAN REDOR
Deputy Attorneys General

9

10

11

12

13

/s/ Caitlan McLoon

14

15

CAITLAN McLOON
Deputy Attorney General
*Attorneys for Defendants Liane M. Randolph, Steven S. Cliff, and Robert A. Bonta*

16

17

18

19

SA2024300503
66681048.docx

20

21

22

23

24

25

26

27

28

24

# CERTIFICATE OF SERVICE

Case Name:   **Chamber of Commerce of the United States of America, et al.
v. Liane M. Randolph, et al.**

Case No.:   **2:24-cv-00801-FMO-PVCx**

I hereby certify that on <u>March 27, 2024</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>March 27, 2024</u>, at Los Angeles, California.

| | |
|---|---|
| <u>Beatriz Davalos</u> | <u>/s/ Beatriz Davalos</u> |
| Declarant | Signature |

SA2024300503
66591334.docx

**ER-2175**

1　Rob Bonta
　　Attorney General of California
2　Gary E. Tavetian (SBN 117135)
　　Myung J. Park (SBN 210866)
3　Supervising Deputy Attorneys General
　　M. Elaine Meckenstock (SBN 268861)
4　Caitlan McLoon (SBN 302798)
　　Emily Hajarizadeh (SBN 325246)
5　Dylan Redor (SBN 338136)
　　Deputy Attorneys General
6　　300 South Spring Street, Suite 1702
　　　Los Angeles, CA  90013-1230
7　　Telephone:  (213) 269-6438
　　Fax:  (916) 731-2128
8　　E-mail:  Caitlan.McLoon@doj.ca.gov
　　*Attorneys for Defendants Liane M. Randolph,*
9　*Steven S. Cliff, and Robert A. Bonta*

10

11　　　　　IN THE UNITED STATES DISTRICT COURT

12　　　　FOR THE CENTRAL DISTRICT OF CALIFORNIA

13

| | |
|---|---|
| **CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION,**<br><br>　　　　　　　　　Plaintiffs,<br><br>**v.**<br><br>**LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, and STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California,**<br><br>　　　　　　　　　Defendants. | Case No. 2:24-cv-00801-FMO-PVCx<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Date:　　　　June 20, 2024<br>Time:　　　　10:00 a.m.<br>Courtroom:　6D<br>Judge:　　　The Honorable Fernando M. Olguin<br><br>Trial Date:　Not Set<br>Action Filed: 1/30/2024 |

**ER-2176**

**TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on June 20, 2024, at 10:00 a.m., or as soon thereafter as the matter may be heard, Defendants Liane M. Randolph, in her official capacity as Chair of the California Air Resources Board, Steven S. Cliff, in his official capacity as Executive Officer of the California Air Resources Board, and Robert A. Bonta, in his official capacity as Attorney General of California (Defendants), by and through their undersigned counsel, will, and hereby do, move this Court for an order dismissing the Amended Complaint of Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association, under:

1.   Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction as to the second and third claims against Defendants;

2.   Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted as to the second and third claims against Defendants; and

3.   Federal Rule of Civil Procedure 12(b)(1) for Eleventh Amendment immunity as to all claims against Defendant Robert A. Bonta, in his official capacity as Attorney General of California.

This motion will be made before the Honorable Fernando M. Olguin, United States District Judge, First Street United States Courthouse, 350 W 1st Street, Los Angeles, CA 90012, Courtroom 6D, 6th Floor.

This motion is made upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed Request for Judicial Notice and attached papers, all pleadings, records, and other documents on file with the Court in this action, and other such written and oral argument as may be presented to the Court.

2

**ER-2177**

1    This motion is made following the conference of counsel pursuant to L.R. 7-

2    3 and the Standing Order of this Court, which took place on March 19, 2024.

3

4    Dated: March 27, 2024                    Respectfully submitted,

5                                             ROB BONTA
                                             Attorney General of California
6                                             GARY E. TAVETIAN
                                             MYUNG J. PARK
7                                             Supervising Deputy Attorney General
                                             M. ELAINE MECKENSTOCK
8                                             EMILY HAJARIZADEH
                                             DYLAN REDOR
9                                             Deputy Attorneys General

10

11                                           /s/ Caitlan McLoon

12

13                                           CAITLAN MCLOON
                                             Deputy Attorney General
                                             *Attorneys for Defendants Liane M.*
14                                           *Randolph, Steven S. Cliff, and Robert*
                                             *A. Bonta*
15

16

17    SA2024300503
      66681047.docx
18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

Case Name: **Chamber of Commerce of the United States of America, et al. v. Liane M. Randolph, et al.**

Case No.: **2:24-cv-00801-FMO-PVCx**

I hereby certify that on <u>March 27, 2024</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>March 27, 2024</u>, at Los Angeles, California.

| Beatriz Davalos | /s/ Beatriz Davalos |
|---|---|
| Declarant | Signature |

SA2024300503
66591334.docx

ER-2179

(137 of 271), Page 137 of 271
Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 137 of 271
Case 2:24-cv-00801-KS   Document 28   Filed 02/22/24   Page 1 of 31   Page ID #:111

EUGENE SCALIA, SBN 151540
escalia@gibsondunn.com
KATHERINE MORAN MEEKS
(*pro hac vice*)
    DC Bar No. 1028302
    kmeeks@gibsondunn.com
BRIAN A. RICHMAN
(*pro hac vice*)
    DC Bar No. 230071
    brichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association*

(*Additional counsel listed on next page*)

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA,

WESTERN DIVISION

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION, <br><br> Plaintiffs, <br><br> v. <br><br> LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California. <br><br> Defendants. | CASE NO. 2:24-cv-00801-KS <br><br> **AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Gibson, Dunn &
Crutcher LLP

**ER-2180**

BRADLEY J. HAMBURGER,
    SBN 266916
    bhamburger@gibsondunn.com
SAMUEL ECKMAN, SBN 308923
    seckman@gibsondunn.com
ELIZABETH STRASSNER,
    SBN 342838
    estrassner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

*Attorneys for Plaintiffs Chamber of Commerce of the United States of America,
California Chamber of Commerce, American Farm Bureau Federation, Los Angeles
County Business Federation, Central Valley Business Federation, and
Western Growers Association*

DARYL JOSEFFER
(*pro hac vice*)
    DC Bar No. 457185
    djoseffer@uschamber.com
TYLER BADGLEY
(*pro hac vice*)
    DC Bar No. 1047899
    tbadgley@uschamber.com
KEVIN PALMER
(*pro hac vice*)
    DC Bar No. 90014967
    kpalmer@uschamber.com
CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA
1615 H Street, NW
Washington, D.C. 20062-2000
Telephone:  202.659.6000
Facsimile:   202.463.5302

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*

## INTRODUCTION

1.      This lawsuit challenges two novel California laws that unlawfully attempt to regulate speech related to climate change.  Senate Bills 253 and 261 impermissibly compel thousands of businesses to make costly, burdensome, and politically fraught statements about "their operations, not just in California, but around the world," Assembly Comm. on Nat'l Res., Analysis of SB. 261 (2023–2024 Reg. Sess.) July 7, 2023 at 6, in order to stigmatize those companies and shape their behavior.  Both laws unconstitutionally compel speech in violation of the First Amendment and seek to regulate an area that is outside California's jurisdiction and subject to exclusive federal control by virtue of the Clean Air Act and the federalism principles embodied in our federal Constitution.  These laws stand in conflict with existing federal law and the Constitution's delegation to Congress of the power to regulate interstate commerce. This Court should enjoin the Defendants from carrying out the State's plan.

2.      Plaintiffs support policies that reduce greenhouse-gas emissions as much and as quickly as reasonably possible, consistent with the pace of innovation and the feasibility of implementing large-scale technical change.  Plaintiffs likewise support policies that provide for the disclosure of material information, including climate-related information, as necessary to protect investors.  At the same time, policies must be informed by the best science, a careful analysis of available alternatives, and attention to legal rights and requirements.  Further, neither businesses nor consumers benefit from a patchwork of inconsistent state-by-state regulatory regimes, under which multiple states attempt to regulate emissions nationally through conflicting means.  The laws at issue here run roughshod over those considerations, in violation of the Constitution.

3.      On October 7, 2023, Governor Gavin Newsom signed into law S.B. 253 and 261.

4.      The laws were designed to "create accountability" for those that are not, in the Legislature's opinion, "doing their part to tackle the climate crisis."  Statement

Gibson, Dunn & Crutcher LLP

**ER-2182**

of Sen. Scott Wiener (Sept. 17, 2023), http://tinyurl.com/27up3ded (discussing S.B. 253). They will force every covered "entity," as a consequence of merely entering the California market, to publicly state its opinions regarding the risks associated with climate change, post those opinions to its own website, and then disclose an inexact, misleading calculation of the "entity's" greenhouse-gas emissions. *E.g.*, S.B. 253 § 2(c)(1)(A)(i)(I); S.B. 261 § 2(b)(1)(A). The purpose of this compelled speech is to fuel pressure campaigns against businesses: "For companies, the knowledge" that their compelled statements "will be publicly available might encourage them to take meaningful steps" to support the policy goals of the State. Sen. Judiciary Comm., Analysis of S.B. 253 (2023–2024 Reg. Sess.) Apr. 14, 2023 at 12. By the Governor's own reckoning, the legislation will have a negative "financial impact" on the more than 10,000 businesses covered, will impose deadlines that are "likely infeasible," and will deluge the public with "inconsistent" information. Signing Statement of Gov. Newsom, S.B. 253 (Oct. 7, 2023), http://tinyurl.com/4mz6by3p.

5.     The State's plan for compelling speech to combat climate change is unconstitutional—twice over.

6.     The plan violates the First Amendment. It forces thousands of companies to engage in controversial speech that they do not wish to make, untethered to any commercial purpose or transaction. And it does all this for the explicit purpose of placing political and economic pressure on companies to "encourage" them to conform their behavior to the political wishes of the State.

7.     To make matters worse, the State's stated objective in enacting S.B. 253 and 261 is to regulate conduct, "not just in California, but around the world." Assembly Comm. on Nat'l Res., Analysis of SB 261 (2023–2024 Reg. Sess.) July 7, 2023 at 6. For example, one legislator specifically noted that S.B. 253 had been described as "groundbreaking legislation with the potential to reach far beyond California's borders." Remarks of Assemblymember Rick Chavez Zbur, Debate on S.B. 253 (Sept. 11, 2023), http://tinyurl.com/taajvam8 (at 5:17:52–5:18:16). The State

1    does not have that authority.  While federal law may permit California to regulate

2    greenhouse-gas emissions *within* the State's own borders, California has no right to

3    regulate emissions in other states or in other parts of the world, let alone to do so

4    through a novel program of speech regulation.

5          8.      S.B. 253 and 261 violate the First Amendment.  Both laws are also

6    precluded by federal law and run headlong into the Dormant Commerce Clause and

7    broader federalism principles.  This Court should bar the Defendants from enforcing

8    the laws.

9                                **PARTIES**

10         9.      Plaintiff Chamber of Commerce of the United States of America ("the

11    U.S. Chamber") is the world's largest business federation.  The U.S. Chamber

12    represents 300,000 direct members and indirectly represents the interests of more than

13    three million businesses and organizations.  Its members include many companies

14    doing business in California that are subject to S.B. 253 and 261.  An important

15    function of the U.S. Chamber is to represent the interests of its members in matters

16    before Congress, the Executive Branch, and the courts.  To that end, the U.S. Chamber

17    regularly participates in cases that raise issues of vital concern to America's business

18    community.

19         10.     Plaintiff California Chamber of Commerce ("CalChamber") is the largest

20    broad-based business advocate to government in California.  CalChamber represents

21    more than 13,000 members that employ one quarter of the private sector workforce in

22    California.  Many of CalChamber's members are subject to S.B. 253 and 261.

23    CalChamber works at both the state and federal levels to advocate for its members, and

24    CalChamber actively tracks legislation in the California State Legislature.  Like the

25    U.S. Chamber, CalChamber regularly participates in cases that raise issues of vital

26    concern to California's business community.

27         11.     Plaintiff American Farm Bureau Federation ("AFBF") was formed in

28    1919 and is the largest non-profit general farm organization in the United States.

Gibson, Dunn &
Crutcher LLP

5

**ER-2184**

Representing about six million member families in all fifty States and Puerto Rico, AFBF's members grow and raise every type of agricultural crop and commodity produced in the United States.  Its mission is to protect, promote, and represent the business, economic, social, and educational interests of American farmers and ranchers.  To that end, AFBF regularly participates in litigation.  While AFBF's members will not be directly regulated by the challenged laws, its members will bear much of the burden.  Nearly every farmer touches the value chain of those that will be directly regulated by the laws and thus will be caught up in those companies' efforts to report Scope 3 emissions, incurring burdensome compliance costs, regardless of their contacts with California.  Moreover, some regulated companies may favor larger farms that can more easily supply the information, to the detriment of smaller operations, leading to increased consolidation and integration.

12.     Plaintiff Los Angeles County Business Federation ("BizFed") is a grassroots alliance of over 240 diverse business groups who represent 420,000 employers with over five million employees in the Los Angeles region.  As a united federation, BizFed advocates for policies and projects that strengthen the regional economy at the local, state and federal level.  A number of BizFed members are impacted by S.B. 253 and 261.

13.     Plaintiff Central Valley Business Federation ("BizFed CV") is a grassroots alliance of over 75 diverse business groups who represent 30,000 employers with over 400,000 employees in the Central Valley.  As a united federation, BizFed CV advocates for policies and projects that strengthen the regional economy at the local, state and federal level.  A number of BizFed CV members are impacted by S.B. 253 and 261.

14.     Plaintiff Western Growers Association ("WGA"), founded in 1926, represents local and regional family farmers growing fresh produce in California, Arizona, Colorado, and New Mexico.  Western Growers' members and their workers provide over half of the nation's fresh fruits, vegetables, and tree nuts, including half

of America's fresh organic produce.  S.B. 253 and 261 will impact many family farms that are members of WGA.

15.    Defendant Liane M. Randolph is sued in her official capacity as the Chair of the California Air Resources Board ("CARB").

16.    Defendant Steven S. Cliff is sued in his official capacity as the Executive Officer of CARB.

17.    Defendant Robert A. Bonta is sued in his official capacity as the Attorney General of California.  Under S.B. 253, CARB "shall consult with . . . [t]he Attorney General" "[i]n developing the regulations" under the statute.  S.B. 253 § 2(c)(4)(A).  Additionally, "the Attorney General [is] the chief law officer of the State" of California and has "the duty . . . to see that the laws of [California] are uniformly and adequately enforced."  Cal. Const. art. 5, § 13.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.  This action arises under the United States Constitution.

19.    Because Plaintiffs seek an "injunction[] to protect rights safeguarded by the Constitution," they have presented a federal question that the federal courts have jurisdiction to resolve under 28 U.S.C. § 1331.  *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489, 491 n.2 (2010) (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)).

20.    Each of the Plaintiffs has standing to bring this lawsuit because at least one of its members would have standing to sue in its own right, the interests it seeks to protect are germane to its purpose, and neither the claim asserted nor the relief requested requires an individual member to participate in this suit.  *See California Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1099–1100 (9th Cir. 2024).  For example, Plaintiffs' members that are affected and injured by the challenged laws include: Chevron Corp., a member of the U.S. Chamber, CalChamber, BizFed, and BizFed CV, whose annual

revenues exceed $1 billion and whose headquarters is located in San Ramon, California; Triple H Farm, a family-owned and operated farm that is a member of AFBF and in the supply chain of many companies that will be subject to Scope 3 reporting under S.B. 253; U-Haul Holding Company, a member of the U.S. Chamber whose annual revenues exceed $1 billion and whose operations in California include "do-it-yourself" moving and storage; and White Farms and Cattle, a family-owned and operated farm that is a member of AFBF and in the supply chain of many companies that will be subject to Scope 3 reporting under S.B. 253.

21.    Venue is proper in this District under 28 U.S.C. § 1391 because all Defendants maintain an office and conduct their official duties within this judicial district.

22.    Venue is further proper in this District under 28 U.S.C § 1391 because a substantial part of the events or omissions giving rise to this action occurred within this judicial district; to wit, Plaintiff BizFed resides within this judicial district at 1150 South Olive Street, Los Angeles, California, 90015.

## BACKGROUND

**A.    California Seeks to Hold Corporations "Accountable" for Climate Change Through Senate Bills 253 and 261.**

23.    S.B. 253 and 261 were designed to "create accountability for those that aren't" "doing their part to tackle the climate crisis."  Statement of Sen. Scott Wiener (Sept. 17, 2023), http://tinyurl.com/27up3ded.  "Californians," one of the bill's authors wrote, "have a right to know who" is "destroying [their] planet" by "causing" climate change.  Sen. Judiciary Comm., Analysis of S.B. 253 (2023–2024 Reg. Sess.) Apr. 14, 2023 at 7.

24.    These laws were supported by scores of "environmental organizations," Sen. Judiciary Comm., Analysis of S.B. 253 (2023–2024 Reg. Sess.) Apr. 14, 2023 at 2, "including groups dedicated to minimizing the effects of climate change," Sen. Judiciary Comm., Analysis of S.B. 261 (2023–2024 Reg. Sess.) Apr. 14, 2023 at 2.

25.     As one supporter explained, "[f]ighting the climate crisis requires bold, strategic regulations," and the bills offered "California regulators and communities just that." *California Passes First-in-the-Nation Bill to Expand Transparency in California Emissions*, SIERRA CLUB CALIFORNIA (Sept. 12, 2023), http://tinyurl.com/4v8z34fk.  Other supporters have claimed that the laws will help "check the climate crisis" by letting the public "hold [companies] accountable," *California Lawmakers Approve Groundbreaking Climate Disclosure Bill*, PUBLIC CITIZEN (Sept. 12, 2023), http://tinyurl.com/36svd2t3, and by "ensuring accountability for those emitting greenhouse gasses," *Sacramento Rally to Unite for Climate Transparency & Passage of SB 253 & SB 261*, CERES (Aug. 22, 2023), http://tinyurl.com/wz8tzcac.

26.     The laws seek this "accountability" through an unconstitutional mechanism: regulation of speech.  S.B. 261 requires each covered entity to prepare a detailed report opining on the risks of climate change and to post that report to its own website.  S.B. 253, in turn, requires each covered entity to estimate, and then publicly disclose, that "entity's" greenhouse-gas emissions, including the emissions of *others* that it does business with, such as customers, suppliers, and contractors.

27.     As supporters of the bills explained, the purpose of these speech compulsions is to "encourage" companies to conform their behavior to the policy preferences of the State.  Sen. Judiciary Comm., Analysis of S.B. 253 (2023–2024 Reg. Sess.) Apr. 14, 2023 at 12.

28.     As one legislative report explained, "the knowledge that" companies' compelled statements "will be publicly available might encourage them to take meaningful steps to reduce [greenhouse-gas] emissions."  *Id.*  And the goal of S.B. 253 was to compel companies to release information even though "they don't want to do the disclosure" because (in the State's view) "they think they're going to be embarrassed by it."  Remarks of Sen. Wiener, Sen. Env'l Quality Comm. Hearing on S.B. 253 (Mar. 25, 2023) http://tinyurl.com/yf66mbdn (at 2:30:33–2:23:50).

Gibson, Dunn &
Crutcher LLP

9

ER-2188

29.     While the bills were pending, numerous business-organization representatives noted the significant costs of the bills and the difficulties associated with compliance, including Plaintiffs CalChamber, BizFed, BizFed CV, and WGA.

30.     For example, a "coalition of over 60 [business] organizations" explained that estimating certain greenhouse-gas emissions with "any degree of accuracy [was] not yet possible."  Sen. Judiciary Comm., Analysis of S.B. 253 (2023–2024 Reg. Sess.) Apr. 14, 2023 at 14–15.  Estimation methods were (and are) "still in [their] infancy stage" and, for that reason, any reporting would be "more of an art" than "a science."  *Id.* at 15.

31.     Business-organization representatives further explained that the burdens of the bills would fall disproportionately on small and medium businesses.  For example, many small and medium businesses, including family farms, "struggle to accurately measure their greenhouse gas emissions."  *Id.* at 14.  These difficulties, the representatives warned, could force "large businesses [to] stop doing business with small and medium businesses" that lack the resources to comprehensively report emissions to supply chain partners.  *Id.*  If a large business must publicly report, for instance, the "emissions associated with [its] entire supply chain," including the emissions of its suppliers, that business may have no choice but to cease its relationship with any small-to-medium suppliers that struggle to measure and report their own emissions.  *Id.*

32.     Governor Newsom expressly acknowledged many of these concerns in signing the bills into law.  For S.B. 253, for instance, the Governor stated that "the implementation deadlines in this bill are likely infeasible, and the reporting protocol specified could result in inconsistent reporting across businesses subject to the measure."  Signing Statement of Gov. Newsom, S.B. 253 (Oct. 7, 2023), http://tinyurl.com/4mz6by3p.  And for S.B. 261, he noted his "concern[s] about the overall financial impact of this bill on business" and that "the implementation deadlines fall short in providing the California Air Resources Board (CARB) with

sufficient time to adequately carry out the requirements in this bill."  Signing

Statement of Gov. Newsom, S.B. 261 (Oct. 7, 2023), http://tinyurl.com/ycy7vk2w.

The Governor signed both laws anyway.

**B.    The New Laws Impose Massive Costs on Business.**

33.    Both laws compel a substantial amount of speech at significant expense.

*Senate Bill 261*

34.    S.B. 261 is expected to apply to more than 10,000 businesses.  Sen. Rules

Comm., Analysis of S.B. 261 (2023–2024 Reg. Sess.) Sept. 12, 2023 at 5.  It reaches

any company with revenues exceeding $500 million that does *any* business in

California.  S.B. 261 § 2(a).  There is no de minimis exception.  That means that if an

entity exceeds the revenue threshold, it is subject to S.B. 261 even if it conducts an

immaterial amount of business in the State and even if the business it conducts in

California lacks any plausible connection to activity related to climate change.

35.    S.B. 261 compels subjective speech on a topic, climate change, that the

Supreme Court has deemed "controversial."  *Janus v. Am. Fed'n of State, Cnty. &*

*Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 (2018).

36.    The law requires any covered entity to publicly state its opinion regarding

various "climate-related financial risk[s]" and to post that opinion to the entity's

website.  S.B. 261 § 2(b)(1)(A), (c)(1).  Under the law, companies must opine on any

"material risk of harm to immediate and long-term financial outcomes due to physical

and transition risks, including, but not limited to, risks to corporate operations,

provision of goods and services, supply chains, employee health and safety, capital and

financial investments, institutional investments, financial standing of loan recipients

and borrowers, shareholder value, consumer demand, and financial markets and

economic health."  *Id.* § 2(a)(2).

37.    Companies must then provide a report discussing any "measures adopted

to reduce and adapt to" any of the above climate-related risks.  *Id.* § 2(b)(1)(A)(ii).

**ER-2190**

38.     Unless a company certifies that it has prepared an "equivalent" report for other reasons (*e.g.*, it was required by federal law or the law of another "government entity") the law requires companies to conform their reports to the "recommended framework" contained in the "Final Report of Recommendations of the Task Force on Climate-Related Financial Disclosures (June 2017) published by the Task Force on Climate-Related Financial Disclosures, or any successor thereto." *Id.* § 2(b)(1)(A), (4).  Those recommendations provide detailed instructions on the content that reporting companies must include.

39.     Companies must publicly post their first disclosure on their "own internet website[s]" by January 1, 2026.  *Id.* § 2(c)(1).

40.     S.B. 261 expressly acknowledges the political, and thus controversial, nature of the speech it requires companies to make, as it proclaims that addressing the risks of climate change is an important political issue and the subject of robust public debate.  *See Id.* § 1(b) ("Global economic and climate policy leaders have conclusively established that the long-term strength of global and local economies will depend on their ability to withstand climate-related risks, including physical impacts, economic transitions, and policy and legal responses.").

41.     On the other hand, this speech is not commercial speech because S.B. 261 compels companies to post statements that are unconnected to proposing any commercial transaction.

42.     S.B. 261 also requires CARB to contract with a climate reporting organization to prepare its own report on disclosures.  *Id.* § 2(b)(3).  The organization must be a nonprofit that currently operates as a climate reporting organization for entities operating in the United States and must have experience with climate-related financial risk disclosure by entities operating in California.  *Id.* § 2(a)(1).  The report must include both a review of climate-related financial risk in various industries as well as an "[a]nalysis of the systemic and sectorwide climate-related financial risks facing the state based on the contents of climate-related financial risk reports,

including, but not limited to, potential impacts on economically vulnerable communities." *Id.* § 2(d)(1)(A)–(B). The climate reporting organization is also responsible for regularly gathering stakeholder input on "current best practices regarding the disclosure of financial risks." *Id.* § 2(d)(2).

43. CARB is authorized to impose administrative penalties of $50,000 per reporting year for violations of S.B. 261. *Id.* § 2(e)(2). The law requires covered entities to pay for the law themselves, with an annual fee being assessed on covered entities to defray CARB's costs in administering and implementing the law. *Id.* § 2(c)(2)(A), (e)(2). These fees will be deposited into the newly created "Climate-Related Financial Risk Disclosure Fund." *Id.* § 2(c)(2)(C).

### *Senate Bill 253*

44. As with S.B. 261, S.B. 253 applies to any company exceeding a certain revenue threshold (in this case, $1 billion) that does any business in California. S.B. 253 § 2(b)(2). The law is expected to directly cover more than 5,300 companies, Assembly Floor Analysis of S.B. 253 (2023–2024 Reg. Sess.) Sept. 7, 2023 at 2, although its impact will extend to many more companies, including small and primarily out-of-state businesses, as explained below.

45. S.B. 253 also compels noncommercial speech because the speech it requires is not connected to proposing any commercial transaction.

46. In addition to S.B. 261's requirement that companies opine on climate-related risks, S.B. 253 requires each covered entity to publicly state the "entity's" greenhouse-gas emissions. S.B. 253 § 2(c)(1).

47. S.B. 253 requires covered entities to publicly report three categories of greenhouse-gas emissions—Scope 1, Scope 2 and Scope 3:

a. ***'Scope 1 emissions'*** means all direct greenhouse gas emissions that stem from sources the reporting entity owns or directly controls, regardless of location." *Id.* § 2(b)(3).

b. **'*Scope 2 emissions*'** means indirect greenhouse gas emissions from consumed electricity, steam, heating, or cooling purchased or acquired by a reporting entity, regardless of location." *Id.* § 2(b)(4).

c. **'*Scope 3 emissions*'** means indirect upstream and downstream greenhouse gas emissions, other than Scope 2 emissions, from sources that the reporting entity does not own or directly control and may include" the emissions of upstream suppliers or downstream customers. *Id.* § 2(b)(5).

48. The law requires each covered entity to "measure and report its emissions of greenhouse gases in conformance with the Greenhouse Gas Protocol standards and guidance, including the Greenhouse Gas Protocol Corporate Accounting and Reporting Standard and the Greenhouse Gas Protocol Corporate Value Chain (Scope 3) Accounting and Reporting Standard developed by the World Resources Institute and the World Business Council for Sustainable Development." *Id.* § 2(c)(1)(A)(ii).

49. Although the law purports to require each company to report "its emissions," *id.*, the reported emissions actually include emissions from utility providers, upstream suppliers, downstream customers, and others. *Id.* § 2(c)(1). Thus, S.B. 253 requires a company to falsely state that the emissions of other entities are its own.

50. Moreover, by requiring reporting "in conformance with the Greenhouse Gas Protocol," the law requires materially misleading emissions reports because the Greenhouse Gas Protocol does not factor in "Scope 4" emissions—emissions that companies avoid, and which should therefore be deducted from Scope 1, 2, and/or 3 emissions, as appropriate. For example, a company's Scope 4 emissions may include those avoided through purchases of energy-efficient equipment or reduction of mileage driven. Thus, to the extent the law's purpose is to provide customers with clear and comprehensive information about companies' alleged contribution to global emissions,

it fails because the disclosures will exclude any evidence of steps companies have taken to avoid emissions.

51.     The reported emissions are not purely factual.  To the contrary, the proper calculation of the scope of a company's emissions—including, but not limited to, the need to include Scope 4 emissions—is subject to significant debate.  Emissions calculations necessarily turn on subjective judgments concerning the "advantages and disadvantages" of various approaches to estimation.  GREENHOUSE GAS PROTOCOL, TECHNICAL GUIDANCE FOR CALCULATING SCOPE 3 EMISSIONS 18 (version 1.0) (2013), http://tinyurl.com/2f9n52k2.  For Scope 3 emissions, moreover, those subjective judgments are not only those of the reporting entity, but also of *other* entities, both downstream and upstream in the supply chain.  *Id.* at 6.

52.     Estimating greenhouse-gas emissions is enormously burdensome.  The requirement to estimate and report Scope 3 emissions alone will cost many companies more than $1 million per year.  *See, e.g.*, Comment of the Williams Companies, Inc. 14, SEC File No. S7-10-22 (June 17, 2022), http://tinyurl.com/y99amdcd.  And as even the Securities and Exchange Commission acknowledges, the estimate in many instances may be inaccurate.  *See Enhancement and Standardization of Climate-Related Disclosures for Investors*, 87 Fed. Reg. 21,334, 21,387 (proposed Apr. 11, 2022) (acknowledging that, "in many instances, direct measurement of [greenhouse-gas] emissions at the sources, which would provide the most accurate measurement, may not be possible").

53.     The burden of estimating Scope 3 emissions flows up and down the supply chain.  Small businesses nationwide will incur significant costs monitoring and reporting emissions to suppliers and customers swept within the law's reach.  For example, scores of family farm members of AFBF will need to report emissions to business partners that do business with entities covered by S.B. 253.

54.     One small business owner so affected is Garrett Hawkins.  Mr. Hawkins is a third-generation farmer based in Appleton City, Missouri.  His farm, Triple H Farm,

Gibson, Dunn &
Crutcher LLP

**ER-2194**

which he operates with his father and brother, raises beef cattle and markets them in local family-owned livestock auctions. Mr. Hawkins is the President of the Missouri Farm Bureau Federation and is a member of AFBF.

55. While Mr. Hawkins does not operate in California and does not sell directly to California companies, his cattle is in the supply chain of many companies that will be subject to Scope 3 reporting under S.B. 253. For example, Mr. Hawkins' cattle will ultimately be bought by packers (slaughter-houses) that are subject to Scope 3 reporting under S.B. 253. And the grocery stores that the packers sell beef to similarly consist of companies that will be subject to Scope 3 reporting under S.B. 253.

56. S.B. 253 will require those companies to report on Scope 3 emissions, which include Mr. Hawkins' farm. Mr. Hawkins is concerned that the documentation and recordkeeping required to supply his greenhouse gas emissions will be incredibly onerous and burdensome for his operation and farms like his. Mr. Hawkins fears that the requirements of S.B. 253 will have the potential to force rapid consolidation across agriculture, such that only the largest operations will survive.

57. A similarly affected small business owner is Michael White. Mr. White is a fourth-generation farmer based in Wilbarger County, Texas. Mr. White and his brother and nephew raise wheat, cotton, hay and cattle on their family farm, White Farms and Cattle, which has been in operation for over one hundred years. Mr. White is a member of AFBF.

58. Mr. White's farm is in the supply chain of many companies that will be subject to Scope 3 reporting under S.B. 253. For example, Mr. White retains ownership in his cattle up to the point they are sold to packers, most or all of which will be subject to Scope 3 reporting under S.B. 253. And the grocery stores that the packers sell beef to similarly consist of companies that will be subject to Scope 3 reporting under S.B. 253. The wheat, cotton, and hay Mr. White produces will also likely end up in the Scope 3 value chain of companies subject to S.B. 253.

59.     S.B. 253 will require those companies to report on "their" Scope 3 emissions, which includes Mr. White's farm.  Like Mr. Hawkins, Mr. White is concerned that the documentation and recordkeeping required to supply his greenhouse emissions will be incredibly onerous and burdensome for his operation and farms like his.  Mr. White, like Mr. Hawkins, fears that the requirements of S.B. 253 will have the potential to force rapid consolidation across agriculture, such that only the largest operations will survive.

60.     S.B. 253 requires all covered entities not only to publicly report their emissions calculation, but also to file those reports with a newly established statewide reporting organization.  S.B. 253 § 2(c)(1).  The mandatory reports that companies are compelled to produce will be made publicly available by CARB.  *Id.* § 2(c)(2).  S.B. 253 also requires each reporting entity's disclosures to be independently verified by a third-party assurance provider, approved by CARB, that has expertise in greenhouse-gas emissions accounting.  *Id.* § 2(c)(1).  Assurance of Scope 1 and Scope 2 greenhouse-gas emissions will be required at a "limited assurance" level beginning in 2026 and at a "reasonable assurance" level beginning in 2030.  Scope 3 greenhouse-gas emissions may require assurance at a "limited assurance" level beginning in 2030.  *Id.* § 2(c)(1)(F)(iii).

61.     CARB is required to contract with an "academic institution," such as the University of California, "to prepare a report on the public disclosures made by reporting entities to the emissions reporting organization."  *Id.* § 2(d)(1).  That report will be posted to a digital platform created by the new emissions reporting organization, regardless of whether a given reporting entity wishes to have its reports shared with the public.  *Id.* § 2(d)(2), (e)(1)(A)–(B).

62.     Reporting entities are also forced to pay for their own compelled disclosures—the law requires them to pay a filing fee to cover the costs of administration and implementation of the new reporting requirements.  *Id.*

1  § 2(c)(1)(G)(i).  These fees will be deposited in the newly created "Climate

2  Accountability and Emissions Disclosure Fund."  *Id.* § 2(c)(1)(G)(iii).

3      63.    S.B. 253 authorizes CARB to assess administrative penalties of up to

4  $500,000 for noncompliance.  *Id.* § 2(f)(2)(A).  It includes a safe harbor for Scope 3

5  emissions, which provides that penalties will not apply to Scope 3 misstatements made

6  "with a reasonable basis and disclosed in good faith" and that, until 2030, Scope 3

7  penalties will be assessed only for failures to disclose.  *Id.* § 2(f)(2).

8      **C.    The Laws Violate the First Amendment.**

9      64.    The First Amendment protects "both the right to speak freely and the right

10  to refrain from speaking at all," *Wooley v. Maynard*, 430 U.S. 705, 714 (1977), and

11  "applies not only to expressions of value, opinion, or endorsement, but equally to

12  statements of fact the speaker would rather avoid," *Hurley v. Irish-Am. Gay, Lesbian &*

13  *Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).  S.B. 253 and 261 violate this right

14  by compelling companies to engage in costly speech on "climate change," an issue the

15  Supreme Court has acknowledged is "controversial."  *Janus*, 138 S. Ct. at 2476.

16      65.    Courts apply different tiers of scrutiny to different types of compelled

17  speech.  Where a state seeks to compel a business to speak *noncommercially* on

18  *controversial political matters*, strict scrutiny applies.  *See Nat'l Inst. of Family & Life*

19  *Advocates v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2372–74 (2018).  "[S]uch speech

20  occupies the highest rung of the hierarchy of First Amendment values and merits

21  special protection." *Janus*, 138 S. Ct. at 2476 (citations and quotation marks omitted).

22  Courts therefore apply "the most exacting form of review."  *IMDB.com Inc. v.*

23  *Becerra*, 962 F.3d 1111, 1121 (9th Cir. 2020).  Laws subject to strict scrutiny "are

24  presumptively unconstitutional and may be justified only if the government proves that

25  they are narrowly tailored to serve compelling state interests."  *NIFLA*, 138 S. Ct. at

26  2371 (citations and quotation marks omitted).

27      66.    Strict scrutiny applies to S.B. 253 and 261 because both laws compel

28  speech concerning the "controversial subject[]" of "climate change."  *Janus*, 138 S. Ct.

at 2476. They do not compel "purely factual and uncontroversial information" that could be subject to a lower standard than strict scrutiny. *NIFLA*, 138 S. Ct. at 2372 (quoting *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985)).

67. The compelled speech is controversial on two levels. First, the laws require companies to speak about the effects of, and proper response to, climate change, anything but uncontroversial topics. *See Janus*, 138 S. Ct. at 2476. And second, the specific speech compelled by S.B. 261 is controversial. Whether, for example, a particular "wildfire[ ]," "sea level rise," "extreme weather event[ ]," or "extreme drought[ ]," S.B. 261 § 1(a), has anything to do with climate change, or to what extent, is a matter of significant debate and controversy. Yet S.B. 261 requires companies to opine on the risks that will be specifically caused by climate change.

68. The speech compelled by S.B. 253 and 261 also is not "factual." *NIFLA*, 138 S. Ct. at 2372. A company's compelled assessment of the "risk of harm to immediate and long-term financial outcomes" from a variety of events whose connection to climate change, if any, is subject to reasonable debate, S.B. 261 § 2(a)(2), is far from the recitation of a pure, rote "fact."

69. Even the estimation of emissions is a matter of opinion. The law's requirements do not provide for a readily verifiable way to calculate a company's total net emissions. Many companies, for instance, believe that emissions that they helped avoid ("Scope 4" emissions) are relevant, and that simply disclosing Scope 1, Scope 2, and Scope 3 emissions will necessarily provide an incomplete and misleading picture about their emissions. But the laws require companies to disclose emissions without considering avoided emissions. Even within a particular scope of emissions, the calculation is anything but factual, especially for Scope 3 emissions by companies, individuals, and others who use or contribute to the provision of a good or service; any reported emissions require a subjective assessment (by the reporting entity and/or outside suppliers), based on numerous assumptions and estimations.

Gibson, Dunn &
Crutcher LLP

19

**ER-2198**

70.     Additionally, strict scrutiny applies because the speech compelled by S.B. 253 and 261 is not commercial.  Not all speech made by a business is "commercial speech."  *See, e.g.*, *NIFLA*, 138 S. Ct. at 2374.  Rather, commercial speech is "'usually defined as speech that does no more than propose a commercial transaction.'"  *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021) (quoting *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001)).

71.     The speech that S.B. 253 and 261 mandate is required regardless of whether it is connected to proposing a commercial transaction.

72.     Because the speech compelled by S.B. 253 and 261 is noncommercial, not purely factual, and concerns a controversial political matter, strict scrutiny applies three times over.  Accordingly, the burden is on the State to prove that the laws "are narrowly tailored to serve compelling state interests."  *NIFLA*, 138 S. Ct. at 2371 (citations and quotation marks omitted).

73.     Both S.B. 253 and 261 fail to satisfy strict scrutiny.

74.     The speech compelled by S.B. 253 and 261 does not further any legitimate government interest of the State of California, let alone a compelling one.  The legislation cites no evidence, for example, that the public's response to the disclosures would result in material changes in companies' emissions, or that any such changes would have a material impact on climate change, much less the climate of California.

75.     The legislation also makes no meaningful effort to restrict its scope to information that is needed to achieve any legitimate governmental purpose.  S.B. 253 and 261 apply to *any* "business entity" satisfying the revenue threshold, whether or not the entity is publicly traded or has outside investors, and regardless of the extent of its California operations.  S.B. 253 § 2(b)(2); S.B. 261 § 2(a)(4).  Nor does either law exempt companies that have low greenhouse-gas emissions or face negligible risks from climate change.

Gibson, Dunn &
Crutcher LLP

20

**ER-2199**

76.     The legislation is also not "narrowly tailored" because it "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014).  As noted above, S.B. 253's requirement to report Scope 3 emissions alone will cost many companies more than $1 million per year.  *See* Comment of the Williams Companies, Inc. 14, SEC File No. S7-10-22 (June 17, 2022) http://tinyurl.com/y99amdcd.

77.     The legislation is also not "narrowly tailored" because it unduly burdens the speech and threatens the business viability of small businesses far beyond California's borders, including Mr. Hawkins' farm, Mr. White's farm, and thousands of similarly situated members of AFBF and WGA.

78.     Even if a lower level of scrutiny were to apply, the laws are nonetheless unconstitutional.  Under any form of scrutiny, required disclosures cannot be "unjustified or "unduly burdensome."  *NIFLA*, 138 S. Ct. at 2377 (citing *Zauderer*, 471 U.S. at 651).  S.B. 253 and 261 are both unjustified and unduly burdensome.

79.     For government-mandated speech to be justified, the State must show that "the harm" it seeks "to remedy" is "more than 'purely hypothetical,'" *NIFLA*, 138 S. Ct. at 2377, and that the required disclosures "will in fact alleviate [that harm] to a material degree," *Ibanez v. Fla. Dep't of Bus. & Prof'l Reg.*, 512 U.S. 136, 146 (1994). But the State has not connected the disclosures required by S.B. 253 and 261 to any concrete, direct, and immediate interests, instead relying on vague, generalized statements, such as "stakeholders deserv[ing] transparency."  S.B. 253 § 1(e).

80.     The disclosures that S.B. 253 and 261 require are also unduly burdensome.  The requirement to disclose Scope 3 emissions will cost companies more than $1 million per year, and those disclosures are mandated for any "business entity," S.B. 261 § 2(a)(4), which is broader than the State's supposed interest in providing "investors" with certain climate-related information, *id.* § 1(c).

81.     The problems with these speech compulsions are compounded by the laws' vagueness.  Vague laws "allow arbitrary and discriminatory enforcement."

**ER-2200**

*O'Brien v. Welty*, 818 F.3d 920, 930 (9th Cir. 2016). And "[w]hen speech is involved, rigorous adherence to [the] requirement[]'" that "parties should know what is required of them" "is necessary to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations*, 567 U.S. 239, 253–54 (2012).

82. The definition of "climate-related financial risk" under S.B. 261, in particular, is broad and vague: any "material risk of harm to immediate and long-term financial outcomes due to physical and transition risks, including, but not limited to, risks to corporate operations, provision of goods and services, supply chains, employee health and safety, capital and financial investments, institutional investments, financial standing of loan recipients and borrowers, shareholder value, consumer demand, and financial markets and economic health." S.B. 261 § 2(a)(2).

83. On that expansive definition, the State is likely to be able to find something to fault in the disclosure (or lack of disclosure) of *any* company the State disfavors. This creates a risk that, among other things, companies whose climate-related practices do not conform to California's policy preferences will be subject to heightened investigation and enforcement. And because the laws authorize the imposition of substantial penalties, companies will be pressured to conform their risk assessments to the State's policy preferences.

**D. Senate Bills 253 and 261 Operate as Impermissible *De Facto* Regulations on Nationwide Greenhouse-Gas Emissions.**

84. Because the new disclosure requirements of S.B. 253 and 261 operate as *de facto* regulations of greenhouse-gas emissions nationwide, they are precluded by the Clean Air Act and are invalid under the Dormant Commerce Clause and principles of federalism. *See* Clean Air Act Amendments of 1970, Pub. L. No. 91-604, 84 Stat. 1676; *see also Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 403-10 (2023) (Kavanaugh, J., concurring). Under the Supremacy Clause, the Clean Air Act displaces state regulation of interstate greenhouse-gas emissions. Further, "[e]ach State's equal dignity and sovereignty under the Constitution implies certain

Gibson, Dunn &
Crutcher LLP

22

**ER-2201**

constitutional limitation[s] on the sovereignty of all of its sister States." *Franchise Tax Bd. of Cal. v. Hyatt*, 139 S. Ct. 1485, 1497 (2019). One such limitation, which stems from each State's equal sovereignty, is that one State cannot project its laws into another State.

85. Under the Supremacy Clause, U.S. Const., art. VI, cl. 2, "when Congress enacts a valid statute pursuant to its Article I powers, state law is naturally preempted to the extent of any conflict with a federal statute. End of story." *Haaland v. Brackeen*, 599 U.S. 255, 287 (2023) (citation and quotation marks omitted). In particular, "where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," a state law attempting to regulate the same field is preempted. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (quotation marks omitted). The Clean Air Act is "'an intricate regulatory regime intended to protect and enhance the quality of the nation's air resources so as to promote the public health and welfare and the productive capacity of its population.'" *City of N.Y. v. Chevron Corp.*, 993 F.3d 81, 87 (2d Cir. 2021) (quoting *N.Y. Pub. Int. Rsch. Grp. v. Whitman*, 321 F.3d 316, 319–20 (2d Cir. 2003)).

86. Under the Clean Air Act, the federal government is empowered to implement programs to regulate pollution, including greenhouse gases. *Chevron Corp.*, 993 F.3d at 87–88 Although the Act "envisions extensive cooperation between federal and state authorities," *id.* at 87 (citing 42 U.S.C. §§ 7401, 7411(c)(1), (d)(1)–(2)), when it comes to "regulating pollution sources beyond their borders," states are limited to "commenting on proposed [Environmental Protection Agency] rules or on another state's emission plan," *id* at 88.

87. The legislation here does not limit reporting requirements to emissions produced in California or to companies' expected climate change financial risks in California—rather, both laws require companies to make sweeping reports about their emissions and risks everywhere they operate, whether in California, in other states, or

even abroad.  States may not regulate out-of-state emissions by requiring disclosure of data about such emissions in this manner.

88.    Nor, for that matter, may states enact measures to force actual reductions in out-of-state emissions, whether by disclosure or by any other legal tools.  While the laws do not directly require reductions in greenhouse-gas emissions in other states, "'[w]hat cannot be done directly cannot be done indirectly'" because "'[t]he Constitution deals with substance, not shadows.'"  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023) (quoting *Cummings v. Missouri*, 71 U.S. 277, 325 (1867)).

89.    Although framed in terms of disclosure, these requirements are aimed at stigmatizing companies for the purpose of pressuring them to lower their emissions nation- and even world-wide.  *See, e.g.*, S.B. 253 § 1(f) ("United States companies that have access to California's tremendously valuable consumer market by virtue of exercising their corporate franchise in the state also share responsibility for disclosing their contributions to global [greenhouse-gas] emissions."); *id.* § 1(f), (h), (l) (claiming a need to encourage "investments in decarbonization strategies," to "develop means to reduce" emissions, and to "activate companies to improve risk management in order to move toward a net-zero carbon economy"); S.B. 261 § 1(j) (explaining that "mandatory and comprehensive" disclosures are needed to "address the climate crisis").

90.    In fact, activists and policymakers have repeatedly stated that they intend to use the compelled reporting to identify companies whose emissions they deem to be unsuitable, and to shame those companies into reducing their emissions.  As one sponsor noted, S.B. 253 "ensure[s] that corporate actors in [California] are aligned with [the Legislature's] goals and are working as diligently as [legislators] need them to be."  Remarks of Sen. Wiener, Debate on S.B. 253, Sen. Floor Sess. (May 30, 2023) http://tinyurl.com/225dekr5 (at 4:21:17–4:23:02).  A main function of the laws,

although framed in terms of reporting, is to facilitate public-pressure campaigns to coerce companies into reducing their emissions of greenhouse gases.

91.     It is immaterial whether such a policy is sound—under the Clean Air Act, the regulation of nationwide greenhouse-gas emissions is exclusively the domain of the federal government.  States may not engage in de facto regulation of greenhouse-gas emissions nationwide, running afoul of Congress's exclusive authority to regulate interstate commerce.  This legislation is therefore beyond the limits of what state law is allowed to do.

## FIRST CLAIM FOR RELIEF

### (Violation of the First Amendment Under 42 U.S.C. § 1983)

92.     Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 91 above.

93.     S.B. 253 and 261 compel companies to publicly express a speculative, noncommercial, controversial, and politically-charged message that they otherwise would not express, and in the case of S.B. 261, expressly requires companies to communicate that message on their own websites.

94.     S.B. 261 requires companies to make public statements estimating their future risk from climate change.  This speech is necessarily speculative because it requires companies to estimate not only their risk of damage from future events like natural disasters, but also to speculate about whether those events will occur and will do so as a result of climate change.  And it is a politically controversial topic about which significant uncertainty is inevitable.

95.     S.B. 261 also fails to describe its key term—"climate-related financial risk"—with enough specificity to enable companies to comply.  The term is so ambiguous that companies will be forced to make high-stakes, public guesses about their future—with the aim, on the part of the State, to discourage investors and consumers from doing business with the companies based on that speculation.

96.     S.B. 253 requires companies to make public statements not only about their greenhouse-gas emissions, but also about the emissions of up- and downstream entities with which they do business.  Because companies must report these Scope 3 emissions as their *own* emissions, the law necessarily requires that a company falsely and inaccurately represent the provenance of these emissions.

97.     Moreover, this compelled speech requires companies to speculate about Scope 3 emissions.  Calculating Scope 3 emissions is a subjective undertaking, requiring myriad judgment calls about how to identify and quantify another entity's emissions.  Alternatively, companies will be forced to demand information from their non-covered partners in the supply chain.  Reporting companies under S.B. 253 might disagree with how upstream and downstream entities calculated their emissions, and thus may be forced to convey speech with which they disagree.

98.     Under S.B. 253, companies risk enormous penalties and public opprobrium should they happen to guess incorrectly.  The compelled reports of Scope 3 emissions are not purely factual but rather are full of subjectivity and guesswork.

99.     The laws violate the First Amendment to the United States Constitution, which protects both the freedom from being compelled to speak and the freedom to engage in speech.

## SECOND CLAIM FOR RELIEF

### (Violation of the Supremacy Clause Under 42 U.S.C. § 1983)

100.   Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 91 above.

101.   S.B. 253 and 261 require companies to make sweeping reports about their emissions and risks everywhere they operate.

102.   The laws are not limited to companies that are headquartered or incorporated in the State of California; rather, they reach any company above a certain revenue threshold that does any business in California.

Gibson, Dunn &
Crutcher LLP

26

**ER-2205**

103.   Nor are the laws limited to reporting of emissions or risks within the State of California; rather, both S.B. 253 and 261 require companies to publicly speak about emissions and risks *wherever* they do business, and wherever their partners in the supply chain also do business—including other states or countries.

104.   By requiring companies to make speculative public statements about emissions and climate-related financial risk, the legislation enables activists and policymakers to single out companies for stigmatization, criticism, investigation, and boycotts.  It therefore functions to pressure companies to reduce their emissions of greenhouse gases, within the State of California and outside of it.

105.   Under the Clean Air Act and principles of federalism inherent in the structure of our federal Constitution, however, California lacks the authority to regulate greenhouse-gas emissions outside of its own borders.  Yet that is precisely what this legislation intentionally accomplishes, using a legal mechanism (requiring extensive disclosure of information about out-of-state emissions) that is itself precluded by the Clean Air Act and the Constitution, as part of a calculated program for mobilizing public pressure.

106.   Accordingly, this legislation violates the federal Constitution's Supremacy Clause.

### THIRD CLAIM FOR RELIEF

### (Violation of Constitutional Limits on Extraterritorial Regulation Under 42 U.S.C. § 1983)

107.   Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 91 above.

108.   The Constitution vests Congress, not each of the fifty states, with authority to regulate interstate and foreign commerce.  The laws here intrude on that congressional authority and place upon interstate commerce a burden that far outweighs any benefits to the State of California.

Gibson, Dunn &
Crutcher LLP

27

**ER-2206**

109. S.B. 253 and 261 impose significant burdens on interstate and foreign commerce. The laws require companies to spend significant time and money, up to millions of dollars per company, making public statements regarding climate change. The laws will also subject companies, including those in the supply chain that have no intention of doing business in California, to significant political and economic pressure to conform their conduct to the policy preferences of the State of California. And the laws "offend the Commerce Clause" by "'build[ing] up . . . domestic commerce' through 'burdens upon the industry of other States.'" *Pork Producers*, 598 U.S. at 369 (quoting *Guy v. Baltimore*, 100 U.S. 434, 443 (1880)). S.B. 253 and 261 apply to any company that meets their respective revenue thresholds, regardless of what proportion of that revenue stems from California. So out-of-state companies that do little business in California will be subject to the laws, even though in-state companies that have their entire business in California (but fall just below the revenue threshold) will not be.

110. The benefits to California from the laws are slim to non-existent. The State does not (and cannot reasonably) maintain that the laws will have a meaningful impact on climate change, a *global* phenomenon. Nor does the State explain, let alone demonstrate, how the compelled speech would benefit anyone. The State does not identify any risk of fraud or danger associated with any particular transaction and does not (and cannot) establish that the compelled speech (which applies to private as well as public companies) will be material to investors.

111. Even if some of the compelled speech could theoretically be useful in some instances, the laws are so overbroad that their burden on interstate and foreign commerce eclipses any benefit to the State of California. For example, so long as a company exceeds certain revenue thresholds, it, and all of its worldwide operations, is subject to S.B. 253 and 261 if it does *any* business in the State of California, even if that business is de minimis and is unlikely to have any impact in the State. The State does not explain how it has a legitimate interest in compelling speech about activities outside of California that will often have no articulable connection to the State.

Gibson, Dunn &
Crutcher LLP

**ER-2207**

112.   Because the laws so heavily intrude on Congress's authority to regulate interstate and foreign commerce, and because the benefits to California are so limited, the laws are invalid under the Constitution's limitations on extraterritorial regulation, including the Dormant Commerce Clause.

## FOURTH CLAIM FOR RELIEF

### (Attorneys' Fees and Costs Under 42 U.S.C. § 1988 and All Other Applicable Statutes)

113.   Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 91 above.

114.   Under 42 U.S.C. § 1988(b), "[i]n any proceeding to enforce" 42 U.S.C. § 1983, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of its costs."  Additionally, the court "may include expert fees as part of the attorney's fee."  42 U.S.C. § 1988(c).

115.   Plaintiffs are entitled to reasonable attorneys' fees, including expert fees and other costs, in this action and request that the Court award such fees under 42 U.S.C. § 1988 and all other applicable statutes.

## PRAYER FOR RELIEF

116.   WHEREFORE, Plaintiffs pray for an order and judgment:

a.      Declaring that S.B. 253 violates the First Amendment of the U.S. Constitution and is null, void, and with no force or effect;

b.      Declaring that S.B. 261 violates the First Amendment of the U.S. Constitution and is null, void, and with no force or effect;

c.      Declaring that S.B. 253 is precluded by federal law and is null, void, and with no force or effect;

d.      Declaring that S.B. 261 is precluded by federal law and is null, void, and with no force or effect;

Gibson, Dunn &
Crutcher LLP

29

ER-2208

e.      Declaring that S.B. 253 is invalid under the Constitution's limitations on extraterritorial regulation, including the Dormant Commerce Clause, and is null, void, and with no force or effect;

f.      Declaring that S.B. 261 is invalid under the Constitution's limitations on extraterritorial regulation, including the Dormant Commerce Clause, and is null, void, and with no force or effect;

g.      Enjoining the Defendants from implementing, applying, or taking any action whatsoever to enforce S.B. 253;

h.      Enjoining the Defendants from implementing, applying, or taking any action whatsoever to enforce S.B. 261;

i.      Awarding Plaintiffs their reasonable attorneys' and experts' fees incurred in bringing this action under 42 U.S.C. § 1988 and all other applicable statutes; and

j.      Granting such other and further relief as this Court deems just and proper.

DATED: February 22, 2024      Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Bradley J. Hamburger*
Eugene Scalia, SBN 151540
Bradley J. Hamburger, SBN 266916
Katherine Moran Meeks
(*pro hac vice*)
Samuel Eckman, SBN 308923
Brian A. Richman (*pro hac vice*)
Elizabeth Strassner, SBN 342838

*Attorneys for Plaintiffs Chamber of Commerce
of the United States of America, California
Chamber of Commerce, American Farm Bureau
Federation, Los Angeles County Business
Federation, Central Valley Business Federation
and Western Growers Association*

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA

Daryl Joseffer (*pro hac vice*)
Tyler Badgley (*pro hac vice*)
Kevin Palmer (*pro hac vice*)

*Attorneys for Plaintiff Chamber of Commerce
of the United States of America*

**ER-2210**

EUGENE SCALIA, SBN 151540
escalia@gibsondunn.com
KATHERINE MORAN MEEKS
(*pro hac vice forthcoming*)
    DC Bar No. 1028302
    kmeeks@gibsondunn.com
BRIAN A. RICHMAN
(*pro hac vice forthcoming*)
    DC Bar No. 230071
    brichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association*

(*Additional counsel listed on next page*)

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA,

## WESTERN DIVISION

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION, | CASE NO. 2:24-cv-00801 **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Plaintiffs, | |
| v. | |
| CALIFORNIA AIR RESOURCES BOARD, LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, and STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board. | |
| Defendants. | |

BRADLEY J. HAMBURGER,
   SBN 266916
   bhamburger@gibsondunn.com
SAMUEL ECKMAN, SBN 308923
   seckman@gibsondunn.com
ELIZABETH STRASSNER,
   SBN 342838
   estrassner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

*Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association*

DARYL JOSEFFER
(*pro hac vice forthcoming*)
   DC Bar No. 457185
   djoseffer@uschamber.com
TYLER BADGLEY
(*pro hac vice forthcoming*)
   DC Bar No. 1047899
   tbadgley@uschamber.com
KEVIN PALMER
(*pro hac vice forthcoming*)
   DC Bar No. 90014967
   kpalmer@uschamber.com
CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA
1615 H Street, NW
Washington, D.C. 20062-2000
Telephone: 202.659.6000
Facsimile: 202.463.5302

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*

Gibson, Dunn &
Crutcher LLP

2

**ER-2212**

**INTRODUCTION**

1.      This lawsuit challenges two novel California laws that unlawfully attempt to regulate speech related to climate change.  Senate Bills 253 and 261 impermissibly compel thousands of businesses to make costly, burdensome, and politically fraught statements about "their operations, not just in California, but around the world," Assembly Comm. on Nat'l Res., Analysis of SB 261 (2023–2024 Reg. Sess.) July 7, 2023 at 6, in order to stigmatize those companies and shape their behavior.  Both laws unconstitutionally compel speech in violation of the First Amendment and seek to regulate an area that is outside California's jurisdiction and subject to exclusive federal control by virtue of the Clean Air Act and the federalism principles embodied in our federal Constitution.  These laws stand in conflict with existing federal law and the Constitution's delegation to Congress of the power to regulate interstate commerce. This Court should enjoin the Defendants from carrying out the State's plan.

2.      Plaintiffs support policies that reduce greenhouse-gas emissions as much and as quickly as reasonably possible, consistent with the pace of innovation and the feasibility of implementing large-scale technical change.  Plaintiffs likewise support policies that provide for the disclosure of material information, including climate-related information, as necessary to protect investors.  At the same time, policies must be informed by the best science, a careful analysis of available alternatives, and attention to legal rights and requirements.  Further, neither businesses nor consumers benefit from a patchwork of inconsistent state-by-state regulatory regimes, under which multiple states attempt to regulate emissions nationally through conflicting means.  The laws at issue here run roughshod over those considerations, in violation of the Constitution.

3.      On October 7, 2023, Governor Gavin Newsom signed into law S.B. 253 and 261.

4.      The laws were designed to "create accountability" for those that are not, in the Legislature's opinion, "doing their part to tackle the climate crisis."  Statement

Gibson, Dunn &
Crutcher LLP

3

**ER-2213**

of Sen. Scott Wiener (Sept. 17, 2023), http://tinyurl.com/27up3ded (discussing S.B. 253). They will force every covered "entity," as a consequence of merely entering the California market, to publicly state its opinions regarding the risks associated with climate change, post those opinions to its own website, and then disclose an inexact, misleading calculation of the "entity's" greenhouse-gas emissions. *E.g.*, S.B. 253 § 2(c)(1)(A)(i)(I); S.B. 261 § 2(b)(1)(A). The purpose of this compelled speech is to fuel pressure campaigns against businesses: "For companies, the knowledge" that their compelled statements "will be publicly available might encourage them to take meaningful steps" to support the policy goals of the State. Sen. Judiciary Comm., Analysis of S.B. 253 (2023–2024 Reg. Sess.) Apr. 14, 2023 at 12. By the Governor's own reckoning, the legislation will have a negative "financial impact" on the more than 10,000 businesses covered, will impose deadlines that are "likely infeasible," and will deluge the public with "inconsistent" information. Signing Statement of Gov. Newsom, S.B. 253 (Oct. 7, 2023), http://tinyurl.com/4mz6by3p.

5. The State's plan for compelling speech to combat climate change is unconstitutional—twice over.

6. The plan violates the First Amendment. It forces thousands of companies to engage in controversial speech that they do not wish to make, untethered to any commercial purpose or transaction. And it does all this for the explicit purpose of placing political and economic pressure on companies to "encourage" them to conform their behavior to the political wishes of the State.

7. To make matters worse, the State's stated objective in enacting S.B. 253 and 261 is to regulate conduct, "not just in California, but around the world." Assembly Comm. on Nat'l Res., Analysis of SB 261 (2023–2024 Reg. Sess.) July 7, 2023 at 6. For example, one legislator specifically noted that S.B. 253 had been described as "groundbreaking legislation with the potential to reach far beyond California's borders." Remarks of Assemblymember Rick Chavez Zbur, Debate on S.B. 253 (Sept. 11, 2023), http://tinyurl.com/taajvam8 (at 5:17:52–5:18:16). The State

Gibson, Dunn &
Crutcher LLP

**ER-2214**

1   does not have that authority.  While federal law may permit California to regulate

2   greenhouse-gas emissions *within* the State's own borders, California has no right to

3   regulate emissions in other states or in other parts of the world, let alone to do so

4   through a novel program of speech regulation.

5         8.      S.B. 253 and 261 violate the First Amendment.  Both laws are also

6   precluded by federal law and run headlong into the Dormant Commerce Clause and

7   broader federalism principles.  This Court should bar the Defendants from enforcing

8   the laws.

## PARTIES

10        9.      Plaintiff Chamber of Commerce of the United States of America ("the

11  U.S. Chamber") is the world's largest business federation.  The U.S. Chamber

12  represents 300,000 direct members and indirectly represents the interests of more than

13  three million businesses and organizations.  Its members include many companies

14  doing business in California that are subject to S.B. 253 and 261.  An important

15  function of the U.S. Chamber is to represent the interests of its members in matters

16  before Congress, the Executive Branch, and the courts.  To that end, the U.S. Chamber

17  regularly participates in cases that raise issues of vital concern to America's business

18  community.

19        10.     Plaintiff California Chamber of Commerce ("CalChamber") is the largest

20  broad-based business advocate to government in California.  CalChamber represents

21  more than 13,000 members that employ one quarter of the private sector workforce in

22  California.  Many of CalChamber's members are subject to S.B. 253 and 261.

23  CalChamber works at both the state and federal levels to advocate for its members, and

24  CalChamber actively tracks legislation in the California State Legislature.  Like the

25  U.S. Chamber, CalChamber regularly participates in cases that raise issues of vital

26  concern to California's business community.

27        11.     Plaintiff American Farm Bureau Federation ("AFBF") was formed in

28  1919 and is the largest non-profit general farm organization in the United States.

Gibson, Dunn &
Crutcher LLP

**ER-2215**

Representing about six million member families in all fifty States and Puerto Rico, AFBF's members grow and raise every type of agricultural crop and commodity produced in the United States. Its mission is to protect, promote, and represent the business, economic, social, and educational interests of American farmers and ranchers. To that end, AFBF regularly participates in litigation. While AFBF's members will not be directly regulated by the challenged laws, its members will bear much of the burden. Nearly every farmer touches the value chain of those that will be directly regulated by the laws and thus will be caught up in those companies' efforts to report Scope 3 emissions, incurring burdensome compliance costs, regardless of their contacts with California. Moreover, some regulated companies may favor larger farms that can more easily supply the information, to the detriment of smaller operations, leading to increased consolidation and integration.

12. Plaintiff Los Angeles County Business Federation ("BizFed") is a grassroots alliance of over 240 diverse business groups who represent 420,000 employers with over five million employees in the Los Angeles region. As a united federation, BizFed advocates for policies and projects that strengthen the regional economy at the local, state and federal level. A number of BizFed members are impacted by S.B. 253 and 261.

13. Plaintiff Central Valley Business Federation ("BizFed CV") is a grassroots alliance of over 75 diverse business groups who represent 30,000 employers with over 400,000 employees in the Central Valley. As a united federation, BizFed CV advocates for policies and projects that strengthen the regional economy at the local, state and federal level. A number of BizFed CV members are impacted by S.B. 253 and 261.

14. Plaintiff Western Growers Association ("WGA"), founded in 1926, represents local and regional family farmers growing fresh produce in California, Arizona, Colorado, and New Mexico. Western Growers' members and their workers provide over half of the nation's fresh fruits, vegetables, and tree nuts, including half

**ER-2216**

of America's fresh organic produce. S.B. 253 and 261 will impact many family farms that are members of WGA.

15. Defendant California Air Resources Board ("CARB") is an agency of the State of California. CARB is responsible for enforcing S.B. 253 and 261, and for issuing regulations to implement S.B. 253.

16. Defendant Liane M. Randolph is sued in her official capacity as the Chair of CARB.

17. Defendant Steven S. Cliff is sued in his official capacity as the Executive Officer of CARB.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343. This action arises under the United States Constitution.

19. Because Plaintiffs seek an "injunction[] to protect rights safeguarded by the Constitution," they have presented a federal question that the federal courts have jurisdiction to resolve under 28 U.S.C. § 1331. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489, 491 n.2 (2010) (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)).

20. Each of the Plaintiffs has standing to bring this lawsuit because at least one of its members would have standing to sue in its own right, the interests it seeks to protect are germane to its purpose, and neither the claim asserted nor the relief requested requires an individual member to participate in this suit. *See California Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1099–1100 (9th Cir. 2024). For example, Plaintiffs' members that are affected and injured by the challenged laws include: Chevron Corp., a member of the U.S. Chamber, CalChamber, BizFed, and BizFed CV, whose annual revenues exceed $1 billion and whose headquarters is located in San Ramon, California; Triple H Farm, a family-owned and operated farm that is a member of AFBF and in the supply chain of many companies that will be subject to Scope 3 reporting under S.B. 253; U-Haul Holding Company, a member of the U.S. Chamber whose annual revenues

exceed $1 billion and whose operations in California include "do-it-yourself" moving and storage; and White Farms and Cattle, a family-owned and operated farm that is a member of AFBF and in the supply chain of many companies that will be subject to Scope 3 reporting under S.B. 253.

21.    Venue is proper in this District under 28 U.S.C. § 1391 because all Defendants maintain an office and conduct their official duties within this judicial district.

22.    Venue is further proper in this District under 28 U.S.C § 1391 because a substantial part of the events or omissions giving rise to this action occurred within this judicial district; to wit, Plaintiff BizFed resides within this judicial district at 1150 South Olive Street, Los Angeles, California, 90015.

## BACKGROUND

**A.    California Seeks to Hold Corporations "Accountable" for Climate Change Through Senate Bills 253 and 261.**

23.    S.B. 253 and 261 were designed to "create accountability for those that aren't" "doing their part to tackle the climate crisis." Statement of Sen. Scott Wiener (Sept. 17, 2023), http://tinyurl.com/27up3ded. "Californians," one of the bill's authors wrote, "have a right to know who" is "destroying [their] planet" by "causing" climate change. Sen. Judiciary Comm., Analysis of S.B. 253 (2023–2024 Reg. Sess.) Apr. 14, 2023 at 7.

24.    These laws were supported by scores of "environmental organizations," Sen. Judiciary Comm., Analysis of S.B. 253 (2023–2024 Reg. Sess.) Apr. 14, 2023 at 2, "including groups dedicated to minimizing the effects of climate change," Sen. Judiciary Comm., Analysis of S.B. 261 (2023–2024 Reg. Sess.) Apr. 14, 2023 at 2.

25.    As one supporter explained, "[f]ighting the climate crisis requires bold, strategic regulations," and the bills offered "California regulators and communities just that." *California Passes First-in-the-Nation Bill to Expand Transparency in California Emissions*, SIERRA CLUB CALIFORNIA (Sept. 12, 2023),

http://tinyurl.com/4v8z34fk. Other supporters have claimed that the laws will help "check the climate crisis" by letting the public "hold [companies] accountable," *California Lawmakers Approve Groundbreaking Climate Disclosure Bill*, PUBLIC CITIZEN (Sept. 12, 2023), http://tinyurl.com/36svd2t3, and by "ensuring accountability for those emitting greenhouse gasses," *Sacramento Rally to Unite for Climate Transparency & Passage of SB 253 & SB 261*, CERES (Aug. 22, 2023), http://tinyurl.com/wz8tzcac.

26.   The laws seek this "accountability" through an unconstitutional mechanism: regulation of speech. S.B. 261 requires each covered entity to prepare a detailed report opining on the risks of climate change and to post that report to its own website. S.B. 253, in turn, requires each covered entity to estimate, and then publicly disclose, that "entity's" greenhouse-gas emissions, including the emissions of *others* that it does business with, such as customers, suppliers, and contractors.

27.   As supporters of the bills explained, the purpose of these speech compulsions is to "encourage" companies to conform their behavior to the policy preferences of the State. Sen. Judiciary Comm., Analysis of S.B. 253 (2023–2024 Reg. Sess.) Apr. 14, 2023 at 12.

28.   As one legislative report explained, "the knowledge that" companies' compelled statements "will be publicly available might encourage them to take meaningful steps to reduce [greenhouse-gas] emissions." *Id.* And the goal of S.B. 253 was to compel companies to release information even though "they don't want to do the disclosure" because (in the State's view) "they think they're going to be embarrassed by it." Remarks of Sen. Wiener, Sen. Env'l Quality Comm. Hearing on S.B. 253 (Mar. 25, 2023) http://tinyurl.com/yf66mbdn (at 2:30:33–2:23:50).

29.   While the bills were pending, numerous business-organization representatives noted the significant costs of the bills and the difficulties associated with compliance, including Plaintiffs CalChamber, BizFed, BizFed CV, and WGA.

30.     For example, a "coalition of over 60 [business] organizations" explained that estimating certain greenhouse-gas emissions with "any degree of accuracy [was] not yet possible."  Sen. Judiciary Comm., Analysis of S.B. 253 (2023–2024 Reg. Sess.) Apr. 14, 2023 at 14–15.  Estimation methods were (and are) "still in [their] infancy stage" and, for that reason, any reporting would be "more of an art" than "a science."  *Id.* at 15.

31.     Business-organization representatives further explained that the burdens of the bills would fall disproportionately on small and medium businesses.  For example, many small and medium businesses, including family farms, "struggle to accurately measure their greenhouse gas emissions."  *Id.* at 14.  These difficulties, the representatives warned, could force "large businesses [to] stop doing business with small and medium businesses" that lack the resources to comprehensively report emissions to supply chain partners.  *Id.*  If a large business must publicly report, for instance, the "emissions associated with [its] entire supply chain," including the emissions of its suppliers, that business may have no choice but to cease its relationship with any small-to-medium suppliers that struggle to measure and report their own emissions.  *Id.*

32.     Governor Newsom expressly acknowledged many of these concerns in signing the bills into law.  For S.B. 253, for instance, the Governor stated that "the implementation deadlines in this bill are likely infeasible, and the reporting protocol specified could result in inconsistent reporting across businesses subject to the measure."  Signing Statement of Gov. Newsom, S.B. 253 (Oct. 7, 2023), http://tinyurl.com/4mz6by3p.  And for S.B. 261, he noted his "concern[s] about the overall financial impact of this bill on business" and that "the implementation deadlines fall short in providing the California Air Resources Board (CARB) with sufficient time to adequately carry out the requirements in this bill."  Signing Statement of Gov. Newsom, S.B. 261 (Oct. 7, 2023), http://tinyurl.com/ycy7vk2w.  The Governor signed both laws anyway.

Gibson, Dunn &
Crutcher LLP

**ER-2220**

**B.     The New Laws Impose Massive Costs on Business.**

33.     Both laws compel a substantial amount of speech at significant expense.

### *Senate Bill 261*

34.     S.B. 261 is expected to apply to more than 10,000 businesses.  Sen. Rules Comm., Analysis of S.B. 261 (2023–2024 Reg. Sess.) Sept. 12, 2023 at 5.  It reaches any company with revenues exceeding $500 million that does *any* business in California.  S.B. 261 § 2(a).  There is no de minimis exception.  That means that if an entity exceeds the revenue threshold, it is subject to S.B. 261 even if it conducts an immaterial amount of business in the State and even if the business it conducts in California lacks any plausible connection to activity related to climate change.

35.     S.B. 261 compels subjective speech on a topic, climate change, that the Supreme Court has deemed "controversial."  *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 (2018).

36.     The law requires any covered entity to publicly state its opinion regarding various "climate-related financial risk[s]" and to post that opinion to the entity's website.  S.B. 261 § 2(b)(1)(A), (c)(1).  Under the law, companies must opine on any "material risk of harm to immediate and long-term financial outcomes due to physical and transition risks, including, but not limited to, risks to corporate operations, provision of goods and services, supply chains, employee health and safety, capital and financial investments, institutional investments, financial standing of loan recipients and borrowers, shareholder value, consumer demand, and financial markets and economic health."  *Id.* § 2(a)(2).

37.     Companies must then provide a report discussing any "measures adopted to reduce and adapt to" any of the above climate-related risks.  *Id.* § 2(b)(1)(A)(ii).

38.     Unless a company certifies that it has prepared an "equivalent" report for other reasons (*e.g.*, it was required by federal law or the law of another "government entity") the law requires companies to conform their reports to the "recommended framework" contained in the "Final Report of Recommendations of the Task Force on

Climate-Related Financial Disclosures (June 2017) published by the Task Force on Climate-Related Financial Disclosures, or any successor thereto." *Id.* § 2(b)(1)(A), (4). Those recommendations provide detailed instructions on the content that reporting companies must include.

39. Companies must publicly post their first disclosure on their "own internet website[s]" by January 1, 2026. *Id.* § 2(c)(1).

40. S.B. 261 expressly acknowledges the political, and thus controversial, nature of the speech it requires companies to make, as it proclaims that addressing the risks of climate change is an important political issue and the subject of robust public debate. *See Id.* § 1(b) ("Global economic and climate policy leaders have conclusively established that the long-term strength of global and local economies will depend on their ability to withstand climate-related risks, including physical impacts, economic transitions, and policy and legal responses.").

41. On the other hand, this speech is not commercial speech because S.B. 261 compels companies to post statements that are unconnected to proposing any commercial transaction.

42. S.B. 261 also requires CARB to contract with a climate reporting organization to prepare its own report on disclosures. *Id.* § 2(b)(3). The organization must be a nonprofit that currently operates as a climate reporting organization for entities operating in the United States and must have experience with climate-related financial risk disclosure by entities operating in California. *Id.* § 2(a)(1). The report must include both a review of climate-related financial risk in various industries as well as an "[a]nalysis of the systemic and sectorwide climate-related financial risks facing the state based on the contents of climate-related financial risk reports, including, but not limited to, potential impacts on economically vulnerable communities." *Id.* § 2(d)(1)(A)–(B). The climate reporting organization is also responsible for regularly gathering stakeholder input on "current best practices regarding the disclosure of financial risks." *Id.* § 2(d)(2).

43.     CARB is authorized to impose administrative penalties of $50,000 per reporting year for violations of S.B. 261. *Id.* § 2(e)(2).  The law requires covered entities to pay for the law themselves, with an annual fee being assessed on covered entities to defray CARB's costs in administering and implementing the law. *Id.* § 2(c)(2)(A), (e)(2).  These fees will be deposited into the newly created "Climate-Related Financial Risk Disclosure Fund." *Id.* § 2(c)(2)(C).

### Senate Bill 253

44.     As with S.B. 261, S.B. 253 applies to any company exceeding a certain revenue threshold (in this case, $1 billion) that does any business in California. S.B. 253 § 2(b)(2).  The law is expected to directly cover more than 5,300 companies, Assembly Floor Analysis of S.B. 253 (2023–2024 Reg. Sess.) Sept. 7, 2023 at 2, although its impact will extend to many more companies, including small and primarily out-of-state businesses, as explained below.

45.     S.B. 253 also compels noncommercial speech because the speech it requires is not connected to proposing any commercial transaction.

46.     In addition to S.B. 261's requirement that companies opine on climate-related risks, S.B. 253 requires each covered entity to publicly state the "entity's" greenhouse-gas emissions.  S.B. 253 § 2(c)(1).

47.     S.B. 253 requires covered entities to publicly report three categories of greenhouse-gas emissions—Scope 1, Scope 2 and Scope 3:

        a.  ***"'Scope 1 emissions'*** means all direct greenhouse gas emissions that stem from sources the reporting entity owns or directly controls, regardless of location." *Id.* § 2(b)(3).

        b.  ***"'Scope 2 emissions'*** means indirect greenhouse gas emissions from consumed electricity, steam, heating, or cooling purchased or acquired by a reporting entity, regardless of location." *Id.* § 2(b)(4).

c.  **'*Scope 3 emissions*'** means indirect upstream and downstream greenhouse gas emissions, other than Scope 2 emissions, from sources that the reporting entity does not own or directly control and may include" the emissions of upstream suppliers or downstream customers.  *Id.* § 2(b)(5).

48.  The law requires each covered entity to "measure and report its emissions of greenhouse gases in conformance with the Greenhouse Gas Protocol standards and guidance, including the Greenhouse Gas Protocol Corporate Accounting and Reporting Standard and the Greenhouse Gas Protocol Corporate Value Chain (Scope 3) Accounting and Reporting Standard developed by the World Resources Institute and the World Business Council for Sustainable Development."  *Id.* § 2(c)(1)(A)(ii).

49.  Although the law purports to require each company to report "its emissions," *id.*, the reported emissions actually include emissions from utility providers, upstream suppliers, downstream customers, and others.  *Id.* § 2(c)(1).  Thus, S.B. 253 requires a company to falsely state that the emissions of other entities are its own.

50.  Moreover, by requiring reporting "in conformance with the Greenhouse Gas Protocol," the law requires materially misleading emissions reports because the Greenhouse Gas Protocol does not factor in "Scope 4" emissions—emissions that companies avoid, and which should therefore be deducted from Scope 1, 2, and/or 3 emissions, as appropriate.  For example, a company's Scope 4 emissions may include those avoided through purchases of energy-efficient equipment or reduction of mileage driven.  Thus, to the extent the law's purpose is to provide customers with clear and comprehensive information about companies' alleged contribution to global emissions, it fails because the disclosures will exclude any evidence of steps companies have taken to avoid emissions.

51.  The reported emissions are not purely factual.  To the contrary, the proper calculation of the scope of a company's emissions—including, but not limited to, the

need to include Scope 4 emissions—is subject to significant debate. Emissions calculations necessarily turn on subjective judgments concerning the "advantages and disadvantages" of various approaches to estimation. GREENHOUSE GAS PROTOCOL, TECHNICAL GUIDANCE FOR CALCULATING SCOPE 3 EMISSIONS 18 (version 1.0) (2013), http://tinyurl.com/2f9n52k2. For Scope 3 emissions, moreover, those subjective judgments are not only those of the reporting entity, but also of *other* entities, both downstream and upstream in the supply chain. *Id.* at 6.

52.     Estimating greenhouse-gas emissions is enormously burdensome. The requirement to estimate and report Scope 3 emissions alone will cost many companies more than $1 million per year. *See, e.g.*, Comment of the Williams Companies, Inc. 14, SEC File No. S7-10-22 (June 17, 2022), http://tinyurl.com/y99amdcd. And as even the Securities and Exchange Commission acknowledges, the estimate in many instances may be inaccurate. *See Enhancement and Standardization of Climate-Related Disclosures for Investors*, 87 Fed. Reg. 21,334, 21,387 (proposed Apr. 11, 2022) (acknowledging that, "in many instances, direct measurement of [greenhouse-gas] emissions at the sources, which would provide the most accurate measurement, may not be possible").

53.     The burden of estimating Scope 3 emissions flows up and down the supply chain. Small businesses nationwide will incur significant costs monitoring and reporting emissions to suppliers and customers swept within the law's reach. For example, scores of family farm members of AFBF will need to report emissions to business partners that do business with entities covered by S.B. 253.

54.     One small business owner so affected is Garrett Hawkins. Mr. Hawkins is a third-generation farmer based in Appleton City, Missouri. His farm, Triple H Farm, which he operates with his father and brother, raises beef cattle and markets them in local family-owned livestock auctions. Mr. Hawkins is the President of the Missouri Farm Bureau Federation and is a member of AFBF.

Gibson, Dunn &
Crutcher LLP

15

**ER-2225**

55.     While Mr. Hawkins does not operate in California and does not sell directly to California companies, his cattle is in the supply chain of many companies that will be subject to Scope 3 reporting under S.B. 253.  For example, Mr. Hawkins' cattle will ultimately be bought by packers (slaughter-houses) that are subject to Scope 3 reporting under S.B. 253.  And the grocery stores that the packers sell beef to similarly consist of companies that will be subject to Scope 3 reporting under S.B. 253.

56.     S.B. 253 will require those companies to report on Scope 3 emissions, which include Mr. Hawkins' farm.  Mr. Hawkins is concerned that the documentation and recordkeeping required to supply his greenhouse gas emissions will be incredibly onerous and burdensome for his operation and farms like his.  Mr. Hawkins fears that the requirements of S.B. 253 will have the potential to force rapid consolidation across agriculture, such that only the largest operations will survive.

57.     A similarly affected small business owner is Michael White.  Mr. White is a fourth-generation farmer based in Wilbarger County, Texas.  Mr. White and his brother and nephew raise wheat, cotton, hay and cattle on their family farm, White Farms and Cattle, which has been in operation for over one hundred years.  Mr. White is a member of AFBF.

58.     Mr. White's farm is in the supply chain of many companies that will be subject to Scope 3 reporting under S.B. 253.  For example, Mr. White retains ownership in his cattle up to the point they are sold to packers, most or all of which will be subject to Scope 3 reporting under S.B. 253.  And the grocery stores that the packers sell beef to similarly consist of companies that will be subject to Scope 3 reporting under S.B. 253.  The wheat, cotton, and hay Mr. White produces will also likely end up in the Scope 3 value chain of companies subject to S.B. 253.

59.     S.B. 253 will require those companies to report on "their" Scope 3 emissions, which includes Mr. White's farm.  Like Mr. Hawkins, Mr. White is concerned that the documentation and recordkeeping required to supply his greenhouse emissions will be incredibly onerous and burdensome for his operation and farms like

his.  Mr. White, like Mr. Hawkins, fears that the requirements of S.B. 253 will have the potential to force rapid consolidation across agriculture, such that only the largest operations will survive.

60.  S.B. 253 requires all covered entities not only to publicly report their emissions calculation, but also to file those reports with a newly established statewide reporting organization.  S.B. 253 § 2(c)(1).  The mandatory reports that companies are compelled to produce will be made publicly available by CARB.  *Id.* § 2(c)(2).  S.B. 253 also requires each reporting entity's disclosures to be independently verified by a third-party assurance provider, approved by CARB, that has expertise in greenhouse-gas emissions accounting.  *Id.* § 2(c)(1).  Assurance of Scope 1 and Scope 2 greenhouse-gas emissions will be required at a "limited assurance" level beginning in 2026 and at a "reasonable assurance" level beginning in 2030.  Scope 3 greenhouse-gas emissions may require assurance at a "limited assurance" level beginning in 2030.  *Id.* § 2(c)(1)(F)(iii).

61.  CARB is required to contract with an "academic institution," such as the University of California, "to prepare a report on the public disclosures made by reporting entities to the emissions reporting organization."  *Id.* § 2(d)(1).  That report will be posted to a digital platform created by the new emissions reporting organization, regardless of whether a given reporting entity wishes to have its reports shared with the public.  *Id.* § 2(d)(2), (e)(1)(A)–(B).

62.  Reporting entities are also forced to pay for their own compelled disclosures—the law requires them to pay a filing fee to cover the costs of administration and implementation of the new reporting requirements.  *Id.* § 2(c)(1)(G)(i).  These fees will be deposited in the newly created "Climate Accountability and Emissions Disclosure Fund."  *Id.* § 2(c)(1)(G)(iii).

63.  S.B. 253 authorizes CARB to assess administrative penalties of up to $500,000 for noncompliance.  *Id.* § 2(f)(2)(A).  It includes a safe harbor for Scope 3 emissions, which provides that penalties will not apply to Scope 3 misstatements made

"with a reasonable basis and disclosed in good faith" and that, until 2030, Scope 3 penalties will be assessed only for failures to disclose. *Id.* § 2(f)(2).

### C. The Laws Violate the First Amendment.

64. The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all," *Wooley v. Maynard*, 430 U.S. 705, 714 (1977), and "applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid," *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995). S.B. 253 and 261 violate this right by compelling companies to engage in costly speech on "climate change," an issue the Supreme Court has acknowledged is "controversial." *Janus*, 138 S. Ct. at 2476.

65. Courts apply different tiers of scrutiny to different types of compelled speech. Where a state seeks to compel a business to speak *noncommercially* on *controversial political matters*, strict scrutiny applies. *See Nat'l Inst. of Family & Life Advocates v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2372–74 (2018). "[S]uch speech occupies the highest rung of the hierarchy of First Amendment values and merits special protection." *Janus*, 138 S. Ct. at 2476 (citations and quotation marks omitted). Courts therefore apply "the most exacting form of review." *IMDB.com Inc. v. Becerra*, 962 F.3d 1111, 1121 (9th Cir. 2020). Laws subject to strict scrutiny "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *NIFLA*, 138 S. Ct. at 2371 (citations and quotation marks omitted).

66. Strict scrutiny applies to S.B. 253 and 261 because both laws compel speech concerning the "controversial subject[]" of "climate change." *Janus*, 138 S. Ct. at 2476. They do not compel "purely factual and uncontroversial information" that could be subject to a lower standard than strict scrutiny. *NIFLA*, 138 S. Ct. at 2372 (quoting *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985)).

67. The compelled speech is controversial on two levels. First, the laws require companies to speak about the effects of, and proper response to, climate

change, anything but uncontroversial topics. *See Janus*, 138 S. Ct. at 2476. And second, the specific speech compelled by S.B. 261 is controversial. Whether, for example, a particular "wildfire[ ]," "sea level rise," "extreme weather event[ ]," or "extreme drought[ ]," S.B. 261 § 1(a), has anything to do with climate change, or to what extent, is a matter of significant debate and controversy. Yet S.B. 261 requires companies to opine on the risks that will be specifically caused by climate change.

68.     The speech compelled by S.B. 253 and 261 also is not "factual." *NIFLA*, 138 S. Ct. at 2372. A company's compelled assessment of the "risk of harm to immediate and long-term financial outcomes" from a variety of events whose connection to climate change, if any, is subject to reasonable debate, S.B. 261 § 2(a)(2), is far from the recitation of a pure, rote "fact."

69.     Even the estimation of emissions is a matter of opinion. The law's requirements do not provide for a readily verifiable way to calculate a company's total net emissions. Many companies, for instance, believe that emissions that they helped avoid ("Scope 4" emissions) are relevant, and that simply disclosing Scope 1, Scope 2, and Scope 3 emissions will necessarily provide an incomplete and misleading picture about their emissions. But the laws require companies to disclose emissions without considering avoided emissions. Even within a particular scope of emissions, the calculation is anything but factual, especially for Scope 3 emissions by companies, individuals, and others who use or contribute to the provision of a good or service; any reported emissions require a subjective assessment (by the reporting entity and/or outside suppliers), based on numerous assumptions and estimations.

70.     Additionally, strict scrutiny applies because the speech compelled by S.B. 253 and 261 is not commercial. Not all speech made by a business is "commercial speech." *See, e.g.*, *NIFLA*, 138 S. Ct. at 2374. Rather, commercial speech is "'usually defined as speech that does no more than propose a commercial transaction.'" *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021) (quoting *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001)).

Gibson, Dunn &
Crutcher LLP

**ER-2229**

71.     The speech that S.B. 253 and 261 mandate is required regardless of whether it is connected to proposing a commercial transaction.

72.     Because the speech compelled by S.B. 253 and 261 is noncommercial, not purely factual, and concerns a controversial political matter, strict scrutiny applies three times over.  Accordingly, the burden is on the State to prove that the laws "are narrowly tailored to serve compelling state interests."  *NIFLA*, 138 S. Ct. at 2371 (citations and quotation marks omitted).

73.     Both S.B. 253 and 261 fail to satisfy strict scrutiny.

74.     The speech compelled by S.B. 253 and 261 does not further any legitimate government interest of the State of California, let alone a compelling one. The legislation cites no evidence, for example, that the public's response to the disclosures would result in material changes in companies' emissions, or that any such changes would have a material impact on climate change, much less the climate of California.

75.     The legislation also makes no meaningful effort to restrict its scope to information that is needed to achieve any legitimate governmental purpose.  S.B. 253 and 261 apply to *any* "business entity" satisfying the revenue threshold, whether or not the entity is publicly traded or has outside investors, and regardless of the extent of its California operations.  S.B. 253 § 2(b)(2); S.B. 261 § 2(a)(4).  Nor does either law exempt companies that have low greenhouse-gas emissions or face negligible risks from climate change.

76.     The legislation is also not "narrowly tailored" because it "burden[s] substantially more speech than is necessary to further the government's legitimate interests."  *McCullen v. Coakley*, 573 U.S. 464, 486 (2014).  As noted above, S.B. 253's requirement to report Scope 3 emissions alone will cost many companies more than $1 million per year.  *See* Comment of the Williams Companies, Inc. 14, SEC File No. S7-10-22 (June 17, 2022) http://tinyurl.com/y99amdcd.

77.     The legislation is also not "narrowly tailored" because it unduly burdens the speech and threatens the business viability of small businesses far beyond California's borders, including Mr. Hawkins' farm, Mr. White's farm, and thousands of similarly situated members of AFBF and WGA.

78.     Even if a lower level of scrutiny were to apply, the laws are nonetheless unconstitutional.  Under any form of scrutiny, required disclosures cannot be "unjustified or "unduly burdensome."  *NIFLA*, 138 S. Ct. at 2377 (citing *Zauderer*, 471 U.S. at 651).  S.B. 253 and 261 are both unjustified and unduly burdensome.

79.     For government-mandated speech to be justified, the State must show that "the harm" it seeks "to remedy" is "more than 'purely hypothetical,'" *NIFLA*, 138 S. Ct. at 2377, and that the required disclosures "will in fact alleviate [that harm] to a material degree," *Ibanez v. Fla. Dep't of Bus. & Prof'l Reg.*, 512 U.S. 136, 146 (1994). But the State has not connected the disclosures required by S.B. 253 and 261 to any concrete, direct, and immediate interests, instead relying on vague, generalized statements, such as "stakeholders deserv[ing] transparency."  S.B. 253 § 1(e).

80.     The disclosures that S.B. 253 and 261 require are also unduly burdensome.  The requirement to disclose Scope 3 emissions will cost companies more than $1 million per year, and those disclosures are mandated for any "business entity," S.B. 261 § 2(a)(4), which is broader than the State's supposed interest in providing "investors" with certain climate-related information, *id.* § 1(c).

81.     The problems with these speech compulsions are compounded by the laws' vagueness.  Vague laws "allow arbitrary and discriminatory enforcement." *O'Brien v. Welty*, 818 F.3d 920, 930 (9th Cir. 2016).  And "[w]hen speech is involved, rigorous adherence to [the] requirement[]'" that "parties should know what is required of them" "is necessary to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations*, 567 U.S. 239, 253–54 (2012).

82.     The definition of "climate-related financial risk" under S.B. 261, in particular, is broad and vague:  any "material risk of harm to immediate and long-term

**ER-2231**

financial outcomes due to physical and transition risks, including, but not limited to, risks to corporate operations, provision of goods and services, supply chains, employee health and safety, capital and financial investments, institutional investments, financial standing of loan recipients and borrowers, shareholder value, consumer demand, and financial markets and economic health."  S.B. 261 § 2(a)(2).

83.    On that expansive definition, the State is likely to be able to find something to fault in the disclosure (or lack of disclosure) of *any* company the State disfavors.  This creates a risk that, among other things, companies whose climate-related practices do not conform to California's policy preferences will be subject to heightened investigation and enforcement.  And because the laws authorize the imposition of substantial penalties, companies will be pressured to conform their risk assessments to the State's policy preferences.

**D.    Senate Bills 253 and 261 Operate as Impermissible *De Facto* Regulations on Nationwide Greenhouse-Gas Emissions.**

84.    Because the new disclosure requirements of S.B. 253 and 261 operate as *de facto* regulations of greenhouse-gas emissions nationwide, they are precluded by the Clean Air Act and are invalid under the Dormant Commerce Clause and principles of federalism.  *See* Clean Air Act Amendments of 1970, Pub. L. No. 91-604, 84 Stat. 1676; *see also Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 403-10 (2023) (Kavanaugh, J., concurring).  Under the Supremacy Clause, the Clean Air Act displaces state regulation of interstate greenhouse-gas emissions.  Further, "[e]ach State's equal dignity and sovereignty under the Constitution implies certain constitutional limitation[s] on the sovereignty of all of its sister States."  *Franchise Tax Bd. of Cal. v. Hyatt*, 139 S. Ct. 1485, 1497 (2019).  One such limitation, which stems from each State's equal sovereignty, is that one State cannot project its laws into another State.

85.    Under the Supremacy Clause, U.S. Const., art. VI, cl. 2, "when Congress enacts a valid statute pursuant to its Article I powers, state law is naturally preempted

Gibson, Dunn &
Crutcher LLP

**ER-2232**

to the extent of any conflict with a federal statute. End of story." *Haaland v. Brackeen*, 599 U.S. 255, 287 (2023) (citation and quotation marks omitted). In particular, "where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," a state law attempting to regulate the same field is preempted. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (quotation marks omitted). The Clean Air Act is "'an intricate regulatory regime intended to protect and enhance the quality of the nation's air resources so as to promote the public health and welfare and the productive capacity of its population.'" *City of N.Y. v. Chevron Corp.*, 993 F.3d 81, 87 (2d Cir. 2021) (quoting *N.Y. Pub. Int. Rsch. Grp. v. Whitman*, 321 F.3d 316, 319–20 (2d Cir. 2003)).

86. Under the Clean Air Act, the federal government is empowered to implement programs to regulate pollution, including greenhouse gases. *Chevron Corp.*, 993 F.3d at 87–88 Although the Act "envisions extensive cooperation between federal and state authorities," *id.* at 87 (citing 42 U.S.C. §§ 7401, 7411(c)(1), (d)(1)–(2)), when it comes to "regulating pollution sources beyond their borders," states are limited to "commenting on proposed [Environmental Protection Agency] rules or on another state's emission plan," *id* at 88.

87. The legislation here does not limit reporting requirements to emissions produced in California or to companies' expected climate change financial risks in California—rather, both laws require companies to make sweeping reports about their emissions and risks everywhere they operate, whether in California, in other states, or even abroad. States may not regulate out-of-state emissions by requiring disclosure of data about such emissions in this manner.

88. Nor, for that matter, may states enact measures to force actual reductions in out-of-state emissions, whether by disclosure or by any other legal tools. While the laws do not directly require reductions in greenhouse-gas emissions in other states, "'[w]hat cannot be done directly cannot be done indirectly'" because "'[t]he

Constitution deals with substance, not shadows.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023) (quoting *Cummings v. Missouri*, 71 U.S. 277, 325 (1867)).

89.     Although framed in terms of disclosure, these requirements are aimed at stigmatizing companies for the purpose of pressuring them to lower their emissions nation- and even world-wide. *See, e.g.*, S.B. 253 § 1(f) ("United States companies that have access to California's tremendously valuable consumer market by virtue of exercising their corporate franchise in the state also share responsibility for disclosing their contributions to global [greenhouse-gas] emissions."); *id.* § 1(f), (h), (l) (claiming a need to encourage "investments in decarbonization strategies," to "develop means to reduce" emissions, and to "activate companies to improve risk management in order to move toward a net-zero carbon economy"); S.B. 261 § 1(j) (explaining that "mandatory and comprehensive" disclosures are needed to "address the climate crisis").

90.     In fact, activists and policymakers have repeatedly stated that they intend to use the compelled reporting to identify companies whose emissions they deem to be unsuitable, and to shame those companies into reducing their emissions.  As one sponsor noted, S.B. 253 "ensure[s] that corporate actors in [California] are aligned with [the Legislature's] goals and are working as diligently as [legislators] need them to be."  Remarks of Sen. Wiener, Debate on S.B. 253, Sen. Floor Sess. (May 30, 2023) http://tinyurl.com/225dekr5 (at 4:21:17–4:23:02).  A main function of the laws, although framed in terms of reporting, is to facilitate public-pressure campaigns to coerce companies into reducing their emissions of greenhouse gases.

91.     It is immaterial whether such a policy is sound—under the Clean Air Act, the regulation of nationwide greenhouse-gas emissions is exclusively the domain of the federal government.  States may not engage in de facto regulation of greenhouse-gas emissions nationwide, running afoul of Congress's exclusive authority to regulate

interstate commerce. This legislation is therefore beyond the limits of what state law is allowed to do.

### **FIRST CLAIM FOR RELIEF**

#### **(First Amendment)**

92.     Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 91 above.

93.     S.B. 253 and 261 compel companies to publicly express a speculative, noncommercial, controversial, and politically-charged message that they otherwise would not express, and in the case of S.B. 261, expressly requires companies to communicate that message on their own websites.

94.     S.B. 261 requires companies to make public statements estimating their future risk from climate change. This speech is necessarily speculative because it requires companies to estimate not only their risk of damage from future events like natural disasters, but also to speculate about whether those events will occur and will do so as a result of climate change. And it is a politically controversial topic about which significant uncertainty is inevitable.

95.     S.B. 261 also fails to describe its key term—"climate-related financial risk"—with enough specificity to enable companies to comply. The term is so ambiguous that companies will be forced to make high-stakes, public guesses about their future—with the aim, on the part of the State, to discourage investors and consumers from doing business with the companies based on that speculation.

96.     S.B. 253 requires companies to make public statements not only about their greenhouse-gas emissions, but also about the emissions of up- and downstream entities with which they do business. Because companies must report these Scope 3 emissions as their *own* emissions, the law necessarily requires that a company falsely and inaccurately represent the provenance of these emissions.

97.     Moreover, this compelled speech requires companies to speculate about Scope 3 emissions. Calculating Scope 3 emissions is a subjective undertaking,

Gibson, Dunn &
Crutcher LLP

**ER-2235**

requiring myriad judgment calls about how to identify and quantify another entity's emissions. Alternatively, companies will be forced to demand information from their non-covered partners in the supply chain. Reporting companies under S.B. 253 might disagree with how upstream and downstream entities calculated their emissions, and thus may be forced to convey speech with which they disagree.

98. Under S.B. 253, companies risk enormous penalties and public opprobrium should they happen to guess incorrectly. The compelled reports of Scope 3 emissions are not purely factual but rather are full of subjectivity and guesswork.

99. The laws violate the First Amendment to the United States Constitution, which protects both the freedom from being compelled to speak and the freedom to engage in speech.

### SECOND CLAIM FOR RELIEF

### (Supremacy Clause)

100. Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 91 above.

101. S.B. 253 and 261 require companies to make sweeping reports about their emissions and risks everywhere they operate.

102. The laws are not limited to companies that are headquartered or incorporated in the State of California; rather, they reach any company above a certain revenue threshold that does any business in California.

103. Nor are the laws limited to reporting of emissions or risks within the State of California; rather, both S.B. 253 and 261 require companies to publicly speak about emissions and risks *wherever* they do business, and wherever their partners in the supply chain also do business—including other states or countries.

104. By requiring companies to make speculative public statements about emissions and climate-related financial risk, the legislation enables activists and policymakers to single out companies for stigmatization, criticism, investigation, and

boycotts.  It therefore functions to pressure companies to reduce their emissions of greenhouse gases, within the State of California and outside of it.

105.   Under the Clean Air Act and principles of federalism inherent in the structure of our federal Constitution, however, California lacks the authority to regulate greenhouse-gas emissions outside of its own borders.  Yet that is precisely what this legislation intentionally accomplishes, using a legal mechanism (requiring extensive disclosure of information about out-of-state emissions) that is itself precluded by the Clean Air Act and the Constitution, as part of a calculated program for mobilizing public pressure.

106.   Accordingly, this legislation violates the federal Constitution's Supremacy Clause.

## THIRD CLAIM FOR RELIEF

### (Constitutional Limitations on Extraterritorial Regulation)

107.   Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 91 above.

108.   The Constitution vests Congress, not each of the fifty states, with authority to regulate interstate and foreign commerce.  The laws here intrude on that congressional authority and place upon interstate commerce a burden that far outweighs any benefits to the State of California.

109.   S.B. 253 and 261 impose significant burdens on interstate and foreign commerce.  The laws require companies to spend significant time and money, up to millions of dollars per company, making public statements regarding climate change.  The laws will also subject companies, including those in the supply chain that have no intention of doing business in California, to significant political and economic pressure to conform their conduct to the policy preferences of the State of California.  And the laws "offend the Commerce Clause" by "'build[ing] up . . . domestic commerce' through 'burdens upon the industry of other States.'"  *Pork Producers*, 598 U.S. at 369 (quoting *Guy v. Baltimore*, 100 U.S. 434, 443 (1880)).  S.B. 253 and 261 apply to any

Gibson, Dunn & Crutcher LLP

**ER-2237**

company that meets their respective revenue thresholds, regardless of what proportion of that revenue stems from California. So out-of-state companies that do little business in California will be subject to the laws, even though in-state companies that have their entire business in California (but fall just below the revenue threshold) will not be.

110. The benefits to California from the laws are slim to non-existent. The State does not (and cannot reasonably) maintain that the laws will have a meaningful impact on climate change, a *global* phenomenon. Nor does the State explain, let alone demonstrate, how the compelled speech would benefit anyone. The State does not identify any risk of fraud or danger associated with any particular transaction and does not (and cannot) establish that the compelled speech (which applies to private as well as public companies) will be material to investors.

111. Even if some of the compelled speech could theoretically be useful in some instances, the laws are so overbroad that their burden on interstate and foreign commerce eclipses any benefit to the State of California. For example, so long as a company exceeds certain revenue thresholds, it, and all of its worldwide operations, is subject to S.B. 253 and 261 if it does *any* business in the State of California, even if that business is de minimis and is unlikely to have any impact in the State. The State does not explain how it has a legitimate interest in compelling speech about activities outside of California that will often have no articulable connection to the State.

112. Because the laws so heavily intrude on Congress's authority to regulate interstate and foreign commerce, and because the benefits to California are so limited, the laws are invalid under the Constitution's limitations on extraterritorial regulation, including the Dormant Commerce Clause.

## PRAYER FOR RELIEF

113. WHEREFORE, Plaintiffs pray for an order and judgment:

a. Declaring that S.B. 253 violates the First Amendment of the U.S. Constitution and is null, void, and with no force or effect;

Gibson, Dunn &
Crutcher LLP

b.     Declaring that S.B. 261 violates the First Amendment of the U.S. Constitution and is null, void, and with no force or effect;

c.     Declaring that S.B. 253 is precluded by federal law and is null, void, and with no force or effect;

d.     Declaring that S.B. 261 is precluded by federal law and is null, void, and with no force or effect;

e.     Declaring that S.B. 253 is invalid under the Constitution's limitations on extraterritorial regulation, including the Dormant Commerce Clause, and is null, void, and with no force or effect;

f.     Declaring that S.B. 261 is invalid under the Constitution's limitations on extraterritorial regulation, including the Dormant Commerce Clause, and is null, void, and with no force or effect;

g.     Enjoining the Defendants from implementing, applying, or taking any action whatsoever to enforce S.B. 253;

h.     Enjoining the Defendants from implementing, applying, or taking any action whatsoever to enforce S.B. 261;

i.     Awarding Plaintiffs their reasonable attorneys' and experts' fees incurred in bringing this action; and

j.     Granting such other and further relief as this Court deems just and proper.

Gibson, Dunn & Crutcher LLP

29

ER-2239

DATED: January 30, 2024

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Bradley J. Hamburger*

Eugene Scalia, SBN 151540
Bradley J. Hamburger, SBN 266916
Katherine Moran Meeks
(*pro hac vice forthcoming*)
Samuel Eckman, SBN 308923
Brian A. Richman (*pro hac vice forthcoming*)
Elizabeth Strassner, SBN 342838

*Attorneys for Plaintiffs Chamber of Commerce
of the United States of America, California
Chamber of Commerce, American Farm Bureau
Federation, Los Angeles County Business
Federation, Central Valley Business Federation
and Western Growers Association*

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA

Daryl Joseffer (*pro hac vice forthcoming*)
Tyler Badgley (*pro hac vice forthcoming*)
Kevin Palmer (*pro hac vice forthcoming*)

*Attorneys for Plaintiff Chamber of Commerce
of the United States of America*

1    EUGENE SCALIA, SBN 151540
         escalia@gibsondunn.com
2    GIBSON, DUNN & CRUTCHER LLP
     1700 M St. N.W.
3    Washington, D.C.  20036
     Telephone:  202.955.8500
4    Facsimile:   202.467.0539
5
6    *Attorneys for Plaintiffs Chamber of*
     *Commerce of the United States of Amer-*
7    *ica, California Chamber of Commerce,*
     *American Farm Bureau Federation, Los*
8    *Angeles County Business Federation,*
     *Central Valley Business Federation,*
9    *and Western Growers Association*
10
     (*Additional counsel listed on next page*)
11
                IN THE UNITED STATES DISTRICT COURT
12
              FOR THE CENTRAL DISTRICT OF CALIFORNIA,
13
                         WESTERN DIVISION
14

| 15  CHAMBER OF COMMERCE OF THE | **PRELIMINARY INJUNCTION** |
|---|---|
| UNITED STATES OF AMERICA, | **APPEAL** |
| 16  CALIFORNIA CHAMBER OF | |
| COMMERCE, AMERICAN FARM | CASE NO. 2:24-cv-00801-ODW-PVC |
| 17  BUREAU FEDERATION, LOS | |
| ANGELES COUNTY BUSINESS | **NOTICE OF APPEAL OF** |
| 18  FEDERATION, CENTRAL VALLEY | **PLAINTIFFS CHAMBER OF** |
| BUSINESS FEDERATION, and | **COMMERCE OF THE UNITED** |
| 19  WESTERN GROWERS ASSOCIATION, | **STATES OF AMERICA,** |
| | **CALIFORNIA CHAMBER OF** |
| 20  Plaintiffs, | **COMMERCE, AMERICAN FARM** |
| | **BUREAU FEDERATION, LOS** |
| 21  v. | **ANGELES COUNTY BUSINESS** |
| | **FEDERATION, CENTRAL** |
| 22  LIANE M. RANDOLPH, in her official | **VALLEY BUSINESS** |
| capacity as Chair of the California Air | **FEDERATION, and WESTERN** |
| 23  Resources Board, STEVEN S. CLIFF, in | **GROWERS ASSOCIATION** |
| his official capacity as the Executive | |
| 24  Officer of the California Air Resources | |
| Board, and ROBERT A. BONTA, in his | |
| 25  official capacity as Attorney General of | |
| California. | |
| 26 | |
| 27  Defendants. | |

28

Gibson, Dunn &
Crutcher LLP

1   BRADLEY J. HAMBURGER
2       SBN 266916
        bhamburger@gibsondunn.com
3   SAMUEL ECKMAN
        SBN 308923
4       seckman@gibsondunn.com
5   ELIZABETH STRASSNER
        SBN 342838
6       estrassner@gibsondunn.com
    GIBSON, DUNN & CRUTCHER LLP
7   333 South Grand Ave.
    Los Angeles, CA  90071-3197
8   Telephone:  213.229.7000
    Facsimile:   213.229.7520
9

10  BRIAN A. RICHMAN
    (*pro hac vice*)
11      DC Bar No. 230071
        brichman@gibsondunn.com
12  GIBSON, DUNN & CRUTCHER LLP
    2001 Ross Ave., Suite 2100
13  Dallas, TX  75201-2923
    Telephone:  214.698.3100
14  Facsimile:   214.571.2900

15  *Attorneys for Plaintiffs Chamber of Commerce of the United States of America, Cali-*
16  *fornia Chamber of Commerce, American Farm Bureau Federation, Los Angeles*
    *County Business Federation, Central Valley Business Federation, and*
17  *Western Growers Association*

18  KEVIN PALMER
    (*pro hac vice*)
19      DC Bar No. 90014967
        kpalmer@uschamber.com
20  CHAMBER OF COMMERCE OF THE
21  UNITED STATES OF AMERICA
    1615 H Street, NW
22  Washington, D.C.  20062-2000
    Telephone:  202.659.6000
23  Facsimile:   202.463.5302

24  *Attorney for Plaintiff Chamber of Commerce of the United States of America*

25

26

27

28

1      Plaintiffs Chamber of Commerce of the United States of America, California

2 Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Busi-

3 ness Federation, Central Valley Business Federation, and Western Growers Association

4 appeal to the United States Court of Appeals for the Ninth Circuit from the Order Deny-

5 ing Plaintiffs' Motion for Preliminary Injunction entered on August 13, 2025.  ECF

6 No. 112.  A true and correct copy of that order is attached hereto as Exhibit A.

7

8

9   DATED: August 20, 2025            GIBSON, DUNN & CRUTCHER LLP

10                                     By:  */s/ Bradley J. Hamburger*

11                                     Eugene Scalia, SBN 151540
                                       Bradley J. Hamburger, SBN 266916
12                                     Samuel Eckman, SBN 308923
                                       Brian A. Richman (*pro hac vice*)
13                                     Elizabeth Strassner, SBN 342838

14                                     *Attorneys for Plaintiffs Chamber of Commerce*
15                                     *of the United States of America, California*
                                       *Chamber of Commerce, American Farm Bureau*
16                                     *Federation, Los Angeles County Business Fed-*
                                       *eration, Central Valley Business Federation*
17                                     *and Western Growers Association*

18                                     CHAMBER OF COMMERCE OF THE
19                                     UNITED STATES OF AMERICA

20                                     Kevin Palmer (*pro hac vice*)

21                                     *Attorney for Plaintiff Chamber of Commerce of*
22                                     *the United States of America*

23

24

25

26

27

28

(201 of 271), Page 201 of 271 Case: 25-5327 09/18/2025, DktEntry: 8.10, Page 201 of 271
Case 2:24-cv-00801-ODW-PVC    Document 114    Filed 08/20/25    Page 4 of 48    Page ID
#:10475

1             **REPRESENTATION STATEMENT**

2                Ninth Circuit Rule 3-2(b)

3   **Attorneys for Plaintiffs:**

4   EUGENE SCALIA, SBN 151540
     escalia@gibsondunn.com

5   GIBSON, DUNN & CRUTCHER LLP
  1700 M St. N.W.

6   Washington, D.C. 20036
  Telephone: 202.955.8500

7   Facsimile: 202.467.0539

8   BRADLEY J. HAMBURGER, SBN 266916
     bhamburger@gibsondunn.com

9   SAMUEL ECKMAN, SBN 308923
     seckman@gibsondunn.com

10   ELIZABETH STRASSNER, SBN 342838
     estrassner@gibsondunn.com

11   GIBSON, DUNN & CRUTCHER LLP
  333 South Grand Ave.

12   Los Angeles, CA 90071-3197
  Telephone: 213.229.7000

13   Facsimile: 213.229.7520

14   BRIAN A. RICHMAN (*pro hac vice*)
     brichman@gibsondunn.com

15   GIBSON, DUNN & CRUTCHER LLP
  2001 Ross Ave., Suite 2100

16   Dallas, TX 75201-2923
  Telephone: 214.698.3100

17   Facsimile: 214.571.2900

18   ROBERT EDWARD DUNN, SBN 275600
     rdunn@eimerstahl.com

19   COLLIN JAMES VIERRA, SBN 322720
     cvierra@eimerstahl.com

20   EIMER STAHL LLP
  1999 South Bascom Avenue, Suite 1025

21   Campbell, CA 95008
  Telephone: 408-889-1668 (Vierra)

22   Telephone: 408-889-1690 (Dunn)
  Facsimile: 312-692-1718

23

24   *Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association*

25

26

27   STEPHANIE A. MALONEY (*pro hac vice*)
     smaloney@uschamber.com

28   KEVIN PALMER (*pro hac vice*)
     kpalmer@uschamber.com

**ER-2244**

(202 of 271) Page 202 of 271 Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 202 of 271
Case 2:24-cv-00801-ODW-PVC    Document 114    Filed 08/20/25    Page 5 of 48    Page ID
#:10476

1  DARYL L. JOSEFFER (*pro hac vice*)
      djoseffer@uschamber.com
2  CHAMBER OF COMMERCE OF THE
   UNITED STATES OF AMERICA
3  1615 H Street, NW
   Washington, D.C. 20062-2000
4  Telephone: 202.659.6000
   Facsimile: 202.463.5302
5

6  *Attorneys for Plaintiff Chamber of Commerce of the United States of America*

7  **Attorneys for Defendants:**

8
   CAITLAN LISETTE MCLOON, SBN 302798
9      caitlan.mcloon@doj.ca.gov
   OFFICE OF THE CALIFORNIA ATTORNEY GENERAL
10  DEPARTMENT OF JUSTICE
   300 S. Spring Street
11  Suite 1702
   Los Angeles, CA 90013
12  Telephone: 213-269-6438
   Facsimile: 916-731-2128
13

14  DYLAN CHARLES REDOR, SBN 338136
15     dylan.redor@doj.ca.gov
   OFFICE OF THE ATTORNEY GENERAL
16  300 S. Spring St.
   Ste 11th Floor
17  Los Angeles, CA 90013
   Telephone: 213-269-6706
18

19  Margaret Elaine Meckenstock, SBN 268861
       Elaine.Meckenstock@doj.ca.gov
20  CALIFORNIA DEPARTMENT OF JUSTICE
   1515 Clay Street 20th Floor
21  Oakland, CA 94612-1492
   Telephone: 510-879-0299
22  Facsimile: 510-622-2270

23
   *Attorneys for Defendants Liane M. Randolph, in her official capacity as Chair of the*
24  *California Air Resources Board, Steven S. Cliff, in his official capacity as the Executive*
   *Officer of the California Air Resources Board, Robert A. Bonta, in his official capacity*
25  *as Attorney General of California*

26

27

28

Gibson, Dunn &
Crutcher LLP

| | |
|---|---|
| 1 | DATED: August 20, 2025 |

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:  */s/ Bradley J. Hamburger*
Eugene Scalia, SBN 151540
Bradley J. Hamburger, SBN 266916
Samuel Eckman, SBN 308923
Brian A. Richman (*pro hac vice*)
Elizabeth Strassner, SBN 342838

*Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association*

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA

Kevin Palmer (*pro hac vice*)

*Attorney for Plaintiff Chamber of Commerce of the United States of America*

# Exhibit A

August 13, 2025 Order Denying Plaintiffs' Motion for
Preliminary Injunction

Notice of Appeal
August 20, 2025

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.,*
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)

(205 of 271), Page 205 of 271
Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 205 of 271
Case 2:24-cv-00801-ODW-PVC    Document 114    Filed 08/20/25    Page 1 of 48    Page ID
#:10429

O

# United States District Court
# Central District of California

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CALIFORNIA AIR RESOURCES BOARD et al.,<br><br>Defendants. | Case № 2:24-cv-00801-ODW (PVCx)<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [78]** |

## I.    INTRODUCTION

Plaintiffs Chamber of Commerce of the United States of America ("U.S. Chamber"), California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association bring this action challenging California Senate Bills ("SB" or "SBs") 253 and 261 for violation of the First Amendment.  (*See* First Am. Compl. ("FAC")  ¶¶ 92–112, ECF No. 28.)   Plaintiffs move for a preliminary injunction to enjoin both laws.  (Mot. Prelim Inj., ECF No. 78; Mem. P. & A. ISO Mot. Prelim. Inj. ("Motion" or "Mot."), ECF No. 78-1.)  For the reasons below, the Court **DENIES** Plaintiffs' Motion.

## II.      BACKGROUND

**A.    Factual Background**

On October 7, 2023, Governor Gavin Newsom signed SBs 253 and 261 into law.  (FAC ¶ 3.)  A brief description of each law follows.

*1.    Senate Bill 253*

SB 253 applies to any entity with total annual revenues over $1 billion "that does business in California."   Cal. Health & Safety Code §§ 38532(b)(2), (c)(1).  SB 253 originally directed that, by January 1, 2025, the California Air Resources Board ("CARB") "shall develop and adopt regulations" for these entities.  Cal. Health & Safety Code §§ 38532(b)(2), (c)(1).  After the FAC was filed, California delayed this deadline to July 1, 2025.  (Notice Amends. SBs 253 & 261 ("Not. Amends."), ECF No. 72.)  A recent report estimated that SB 253 would apply to 1,971 companies.  (Decl. Caitlan McLoon ISO Opp'n ("McLoon Decl.") Ex. 2 ("Ceres Report") at 11, ECF Nos. 89-3, 89-5.)[1]

SB 253 requires CARB to develop regulations that require reporting entities to annually disclose their "Scope 1," "Scope 2," and "Scope 3" emissions.  (FAC ¶ 47); Cal. Health & Safety Code § 38532(c)(1).

- Scope 1 emissions are "all direct greenhouse gas emissions that stem from sources that a reporting entity owns or directly controls, regardless of location, including, but not limited to, fuel combustion activities." (FAC ¶ 47a); Cal. Health & Safety Code § 38532(b)(3).

- Scope 2 emissions are "indirect greenhouse gas emissions from consumed electricity, steam, heating, or cooling purchased or acquired by a reporting entity, regardless of location."  (FAC ¶ 47b); Cal. Health & Safety Code § 38532(b)(4).

- Scope 3 emissions are "indirect upstream and downstream greenhouse gas emissions, other than scope 2 emissions, from sources that the reporting entity does not own or directly control and may include, but are not limited to, purchased goods and services, business travel, employee

---

[1] This report reduced the prior estimate of 5,300 companies.  (*See* Ceres Report 3; FAC ¶ 44.)

**ER-2249**

commutes, and processing and use of sold products." (FAC ¶ 47c); Cal. Health & Safety Code § 38532(b)(5).

SB 253 does not mandate entities to report avoided emissions, or so-called "Scope 4 emissions." (FAC ¶¶ 50–51, 69.)

SB 253 requires CARB to ensure that its regulations mandate entities to measure and report Scope 1, Scope 2, and Scope 3 emissions "in conformance with the Greenhouse Gas protocol standards and guidance." (*Id.* ¶ 48); Cal. Health & Safety Code § 38532(c)(2)(A)(ii); (*see* Decl. Bradley J. Hamburger ISO Mot. Summ. J. ("Hamburger SJ Decl.") Ex. 18 ("Greenhouse Gas Protocol"), ECF Nos. 48-3, 48-21.) The law further directs CARB to develop and adopt regulations to "minimize[] duplication of effort" by allowing entities "to submit to the emissions reporting organization . . . reports prepared to meet other national and international reporting requirements." Cal. Health & Safety Code § 38532(c)(2)(D)(i). CARB must also develop and adopt regulations that ensure reporting entities obtain third-party assurances as to the quality and accuracy of the reported emissions. *Id.* § 38532(c)(2)(F). These emissions data will be publicly available, and CARB will ensure the creation of a public report on the disclosures. (FAC ¶ 61); Cal. Health & Safety Code §§ 38532(d)(1), (e).

While CARB has yet to issue the specified regulations, it has sent an enforcement notice stating that it "has decided to exercise its enforcement discretion" under SB 253. (Decl. Bradley J. Hamburger ISO Mot. Ex. A ("Enforcement Notice") 5, ECF No. 78-6.) For the first reporting period in 2026, CARB will require reporting entities to "submit scope 1 and scope 2 emissions from the reporting entity's prior fiscal year that can be determined from information the reporting entity already possesses or is already collecting at the time" of the Enforcement Notice. (*Id.* (internal quotation marks omitted).) During the first reporting cycle, CARB "will not take enforcement action for incomplete reporting against entities, as long as the companies make a good faith effort to retain all data relevant to emissions reporting

**ER-2250**

3

for the entity's prior fiscal year." (*Id.* at 5–6.) Reporting Scope 3 emissions will come later, as SB 253 requires CARB to issue regulations regarding disclosure of these emissions for the 2027 reporting year. Cal. Health & Safety Code § 38532(c)(2)(A)(i)(II).

### 2. Senate Bill 261

SB 261 applies to any entity with total annual revenues over $500 million "that does business in California." (FAC ¶ 34); Cal. Health & Safety Code § 38533(a)(4). A recent report estimated that SB 261 would apply to 2,675 companies.[2] (Ceres Report.)

Starting on January 1, 2026, SB 261 will mandate each applicable entity to biennially disclose on its website two categories of "climate-related financial risk information." "Climate-related financial risk information" is defined as information related to "material risk of harm to . . . financial outcomes due to physical and transition risks" to the business. (*Id.* ¶¶ 36, 39); Cal. Health & Safety Code § 38533(a)(2).[3] These two categories are:

- The entity's climate-related financial risk, in accordance with the recommended framework and disclosures contained in the Final Report of Recommendations of the Task Force on Climate-related Financial Disclosures (June 2017), (Hamburger SJ Decl. Ex. 20 ("TCFD Framework"), ECF No. 48-23; FAC ¶ 36), Cal. Health & Safety Code § 38533(b)(1)(A)(i); and

- The entity's measures adopted to reduce and adapt to climate-related financial risk disclosed in its biennial report, (FAC ¶ 37), Cal. Health & Safety Code § 38533(b)(1)(A)(ii).

---

[2] This report reduced the prior estimate of over 10,000 companies. (*See* Ceres Report 3; FAC ¶ 34.)

[3] The legislation's full definition of "climate-related financial risk" is as follows: "material risk of harm to immediate and long-term financial outcomes due to physical and transition risks, including, but not limited to, risks to corporate operations, provision of goods and services, supply chains, employee health and safety, capital and financial investments, institutional investments, financial standing of loan recipients and borrowers, shareholder value, consumer demand, and financial markets and economic health." Cal. Health & Safety Code § 38533(a)(2).

**ER-2251**

The TCFD Framework is structured around four areas of disclosure—governance, strategy, risk management, and metrics and targets. (TCFD Framework 14; *see also* Decl. James P. Burton Opp'n Mot. Summ J. ("Burton SJ Decl.") Ex. 5 ("Implementing the TCFD Framework"), ECF Nos. 53, 53-5.) For governance, the TCFD Framework asks each company to disclose its "governance around climate-related risks and opportunities." (TCFD Framework 14 fig. 4.) For strategy, the TCFD Framework asks each company to disclose "the actual and potential impacts of climate-related risks and opportunities on the organization's businesses, strategy, and financial planning where such information is material." (*Id.*) For risk management, the TCFD Framework asks each company to disclose how it "identifies, assesses, and manages climate-related risk." (*Id.*) And, for metrics and targets, the TCFD Framework asks each company to disclose the metrics and targets it uses "to assess and manage relevant climate-related risks and opportunities where such information is material." (*Id.*)

## B. Procedural Background

Plaintiffs initiated this action against Defendants CARB Chair Liane M. Randolph, CARB Executive Officer Steven S. Cliff, and California Attorney General Robert A. Bonta (the "State"). (FAC ¶¶ 15–17.) Plaintiffs bring a facial challenge to both laws on First Amendment grounds. (*Id.* ¶¶ 92–99).

In its FAC, Plaintiffs assert four causes of action under 42 U.S.C. § 1983. In Count I, Plaintiffs allege that SBs 253 and 261 violate the First Amendment. (FAC ¶¶ 92–99.) In Count II, Plaintiffs assert that the Constitution and federal law preempt SBs 253 and 261. (*Id.* ¶¶ 100–06.) In Count III, Plaintiffs claim that the laws violate the Constitution's limits on extraterritorial regulation, including the dormant Commerce Clause. (*Id.* ¶¶ 107–12.) Lastly, in Count IV, Plaintiffs seek payment of attorneys' and expert fees. (*Id.* ¶¶ 113–15.) As relief, Plaintiffs seek judicial declarations that SBs 253 and 261 are "null, void, and with no force or effect," and an

**ER-2252**

injunction enjoining the State from "implementing, applying, or taking any action whatsoever to enforce" SBs 253 and 261. (*Id.*, Prayer for Relief ¶ 116.)

Before discovery began, Plaintiffs moved for summary judgment on their First Amendment claim, (Mot. Summ. J., ECF No. 48), and the State moved to deny or defer the motion under Federal Rule of Civil Procedure ("Rule" or "Rules") 56(d), (Mot. Den. Defer Mot. Summ. J., ECF No. 57). The Court granted the State's motion to defer Plaintiff's motion for summary judgment and provided Plaintiffs leave to re-file their motion after the close of discovery. (*See* Order Summ. J., ECF No. 73.)

The State separately moved to dismiss Plaintiffs' Supremacy Clause and extraterritoriality claims under Rules 12(b)(1) and 12(b)(6). (Mot. Dismiss, ECF No. 38.) The Court granted the motion and dismissed those claims as to SB 253 under Rule 12(b)(1) and as to SB 261 under Rule 12(b)(6). (Order Mot. Dismiss, ECF No. 77.) Although given the opportunity to amend some of these claims, (*id.* at 23–24), Plaintiffs declined to do so. On March 17, 2025, the State filed an Answer. (Answer, ECF No. 85.)

On April 8, 2025, the Court issued a scheduling order setting the deadline to file renewed motions for summary judgment for March 23, 2026, the pretrial conference for September 21, 2026, and trial for October 20, 2026. (Scheduling & Case Mgmt. Order 2, ECF No. 93.)

Plaintiffs now bring a Motion for Preliminary Injunction, asking the Court to preliminary enjoin SBs 253 and 261 on First Amendment grounds. (Mot.) The Motion is fully briefed. (Opp'n Mot., ECF No. 89; Reply, ECF No. 97.) On July 1, 2025, the Court held a hearing on the Motion. (Hr'g Mins., ECF No. 102; Hr'g Tr., ECF No. 106.)

### III.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, a movant must establish that they are likely to succeed on the

**ER-2253**

(211 of 271) Page 211 of 271 Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 211 of 271
Case 2:24-cv-00801-DWH-WC Document 114 Filed 08/23/25 Page 7 of 148 Page
ID #:10495

merits, they are likely to suffer irreparable harm absent an injunction, the balance of equities tips in their favor, and an injunction is in the public interest. *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1115 (9th Cir. 2024) (citing *Winter*, 555 U.S. at 20). "Because 'the party opposing injunctive relief is a government entity' here, the third and fourth factors 'merge.'" *X Corp. v. Bonta*, 116 F.4th 888, 898 (9th Cir. 2024) (quoting *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023)). "[I]n the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction on speech." *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022) (internal quotation marks omitted).

## IV.     DISCUSSION

### A.     Whether Plaintiffs' SB 253 Challenge Is Ripe

As a threshold matter, the State argues that Plaintiffs' challenge to SB 253 is prudentially unripe because SB 253, without CARB regulations, does not impose any requirements on Plaintiffs' members. (Opp'n 8–9.) The State contends that further factual development, including CARB's implementing regulations, are needed for the Court to rule on the constitutionality of SB 253. (*Id.*; *see* McLoon Decl. Ex. 1 ("CARB Letter"), ECF No. 89-4 (listing topics of potential regulation).) Additionally, the State argues that Plaintiffs cannot show their members will face hardship, as covered companies will not be required to report Scope 1 and Scope 2 emissions until 2026 and Scope 3 emissions until 2027. (Opp'n 8–9); *see* Cal. Health & Safety Code § 38532(c)(1), (2)(A)(i).

In analyzing the prudential components of ripeness, courts consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1141 (9th Cir. 2000).

**ER-2254**

Earlier in this case, when considering the State's motion to dismiss Plaintiffs' Supremacy Clause and extraterritoriality claims, the Court found those challenges to SB 253 were not justiciable. (Order Mot. Dismiss 13.) However, the Court's reasoning there does not apply to Plaintiffs' First Amendment claim. First, courts apply "the requirements of ripeness and standing less stringently in the context of First Amendment claims." *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010). Second, since the Court's prior ruling, the parties have offered CARB's Enforcement Notice, stating that CARB "has decided to exercise its enforcement discretion" under SB 253, including that CARB will require covered companies to submit Scope 1 and 2 emissions in 2026. (Enforcement Notice 5.)

Here, Plaintiffs' First Amendment challenge is fit for judicial decision. Courts find an issue is fit for review when "the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Tingley v. Ferguson*, 47 F.4th 1055, 1070 (9th Cir. 2022). While CARB has yet to issue implementing regulations for SB 253, the Court finds that SB 253 is clear that covered companies will be required to report Scope 1, 2, and 3 emissions. This positions the Court to rule on the Motion without further factual development by the State. *See* Cal. Health & Safety Code § 38532(c)(2)(A)(i)(I)–(II). To the extent further factual development is needed in this case, (*see* Order Mot. Summ. J. 11–12), it is the type of development accomplished through typical discovery, not through CARB's issuance of regulations.

Additionally, Plaintiffs have demonstrated hardship to their members if the Court declines to review their First Amendment challenge now. It appears that U-Haul Co. of California ("UHCA"), a subsidiary of U-Haul Holding Company ("UHHC") and member of Plaintiff U.S. Chamber, will be subject to SB 253's requirements. (*See* Decl. Edward J. Shoen ISO Mot. ("Shoen Decl.") ¶ 3, ECF

**ER-2255**

No. 78-3 (declaring that UHHC has an annual total revenue exceeding $1 billion).)[4] UHHC's president and chairman has declared that it will take years for it to build systems to comply with SB 253, for example, by developing systems and processes to collect, store, and analyze climate-related information. (*Id.* ¶ 11.) He estimates that it will cost at least $3 million per year to comply with SBs 253 and 261, demonstrating that UHCA would suffer hardship if the Court does not consider the Motion. (*Id.* ¶ 12; *see id.* ¶¶ 13–29 (detailing cost and burdens of complying with SB 253).)

Accordingly, Court finds that Plaintiffs' challenge to SB 253 is ripe for review and declines to dismiss it on prudential ripeness ground. *See Anchorage Equal Rts. Comm'n*, 220 F.3d at 1142 ("Prudential considerations of ripeness are discretionary . . . .").

**B.  Application of the First Amendment**

Before analyzing whether SBs 253 and 261 violate the First Amendment, the Court must first decide whether the First Amendment even applies.

In its summary judgment order, the Court considered—and rejected—the State's argument "that the laws escape First Amendment scrutiny because they are 'part of a broader regulatory apparatus.'" (Order Summ. J. 7–8.) In ruling that the First Amendment applies to the laws, the Court concluded that the laws' primary effect and purpose is to compel speech. (*Id.*) In opposing the instant Motion, the State asks the court to revisit this conclusion. (Opp'n 10–11.)

The State argues that the Court erred because the laws here "require a type of speech—disclosure of commercial data and financial risks—that has not traditionally garnered constitutional concern." (Opp'n 10.) The State notes that securities filings

---

[4] The State objects to Shoen's declaration that "[i]f UHCA's activities in California are attributable to UHHC such that UHHC 'does business' in California as a 'Reporting Entity' under S.B. 253 . . , then UHHC would be subject to the requirements of S.B. 253." (Def's Obj. Pls.' Evid ¶ 3, ECF No. 89-1.) The State contends that this statement is a legal conclusion. (*Id.*) Even if it is, and even if it cannot be confirmed whether UHCA will be subject to SB 253's requirements until CARB issues implementing regulations, CARB has stated that it will begin enforcing SB 253 in 2026 and UHCA has demonstrated that it will need to begin preparing to comply with the law before CARB issues any clarification as to its applicability to UHCA.

**ER-2256**

(214 of 271) Page 214 of 271 Case: 25-5337, 09/18/2025, DktEntry: 8.10, Page 214 of 271
Case 2:24-cv-00801-ODW-PVC    Document 112    Filed 08/20/25    Page 10 of 48    Page
ID #:10488

1   requiring disclosure of investment-related risks "ha[ve] historically fallen outside the

2   boundaries of First Amendment coverage entirely, or ha[ve] merited minimal judicial

3   scrutiny." (*Id.*)  Relatedly, the State again argues that because the laws are directed at

4   a "broader regulatory apparatus" governing disclosure of commercial data, the laws

5   regulate conduct, not speech.  (*Id.*)

6        The Supreme Court has identified "[n]umerous examples" of types of

7   "communications that are regulated without offending the First Amendment,"

8   including "the exchange of information about securities" and "corporate proxy

9   statements."  *Ohralik v. Ohio St. Bar Ass'n*, 436 U.S. 447, 456 (1978).  But to the

10  extent this means that such communications are not subject to First Amendment

11  review, this principle does not extend to SBs 253 and 261.  The State's mere assertion

12  that a regulation is like a securities filing or directed at a "broader regulatory

13  apparatus" does not automatically end a court's First Amendment inquiry.  To read

14  these exceptions "broadly would allow [the government] to easily regulate otherwise

15  protected speech using the guise of securities laws."  *Nat'l Ass'n of Mfrs. v. S.E.C.*

16  *(NAMF I)*, 748 F.3d 359, 372 (D.C. Cir. 2014), *subsequent opinion after reh'g*,

17  800 F.3d 518 (D.C. Cir. 2015); *cf. Nat'l Ass'n of Mfrs. v. S.E.C. (NAMF II)*, 800 F.3d

18  518, 521 (D.C. Cir. 2015) (rejecting argument that an SEC rule requiring companies

19  to disclose whether its products are "conflict-free" "is valid because the United States

20  is thick with laws forcing '[i]ssuers of securities' to 'make all sorts of disclosures

21  about their products'").

22        Here, the State asserts that the legislature enacted SBs 253 and 261 "to, among

23  other things, respond to concerns that California investors and consumers lacked

24  accurate, verifiable data about [greenhouse gas] emissions and climate-risk

25  assessment . . . from the largest companies doing business in the state."  (Opp'n 4.)

26  The State also offers that CalPERS, California's largest public-defined-benefit

27  pension fund, believes "[c]limate risk is investment risk" and finds the information the

28  laws' require companies to disclose to be valuable to its investment decisions.  (Decl.

**ER-2257**

(215 of 271) Page 215 of 271 Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 215 of 271
Case 2:24-cv-00801-ODW-PVC    Document 114    Filed 08/26/25    Page 18 of 48    Page
ID #:10489

Peter Cashion ISO Opp'n Mot. Summ. J. ("Cashion Decl.") ¶¶ 13–16, 22, ECF No. 52-5; Opp'n 4.)   Therefore, per the State, these laws are like typical securities disclosure regimes geared toward consumer protection that escape First Amendment review.  (*See* Opp'n 4.)

The problem with the State's comparison is twofold.  First, at the same time it argues the purpose of these laws are to correct misleading data and provide investors with accurate information to evaluate climate risks, (*id.*), the State also proffers that the laws further its interest for "companies doing business in California to reduce their emissions" so that California can "meet[] certain emissions reduction goals over time," (*id.* at 18).  While certainly a compelling state interest, this is more akin to the conflict-mineral disclosures in *NAMF* than traditional securities disclosures.

Second, and more fundamentally, the scope of SBs 253 and 261 is broader than typical securities disclosures.  The laws apply to any company that hits certain annual revenue thresholds and "does business in California."  Cal. Health & Safety Code §§ 38532(b)(2), 38533(a)(4).  The laws do not differentiate between private and public companies or from those offering the sale of securities and those that do not.  (*See* Ceres Report 11 (estimating that of the companies covered by SBs 253 and 261, 23% and 27% are private companies, respectively).)  This is not to say that the State's proffered interests in SBs 253 and 261 are ingenuine or not compelling, or that they violate the First Amendment.  Rather, the laws' application to public and private companies and those with and without investors, not just those typically subject to securities-based rules, invites First Amendment review.  Otherwise, the State would be permitted to "to easily regulate otherwise protected speech using the guise of securities laws," *NAMF I*, 748 F.3d at 372, even if the law's purpose goes beyond the reasons for traditional securities disclosure requirements and the types of companies to which such requirements usually apply.

At bottom, "the forced disclosure of information, even purely commercial information, triggers First Amendment scrutiny."  *NetChoice*, 113 F.4th at 1117.

**ER-2258**

(216 of 271) Page 216 of 271Case: 25-5337, 09/18/2025, DktEntry: 8.10, Page 216 of 271
Case 2:24-cv-00801-ODW-PVC   Document 112   Filed 08/26/25   Page 19 of 48   Page
ID #:10490

1   While there may be exceptions for certain types of disclosures, *see Ohralik*, 436 U.S.

2   at 456, none of those exceptions apply to the laws at issue here in their current form.

3   Therefore, the Court declines to alter its prior conclusion that SBs 253 and 261 are

4   subject to First Amendment review. (*See* Order Summ. J. 7–8.)

5   **C.   Plaintiffs' Facial Challenge**

6   Plaintiffs assert a First Amendment facial challenge to SBs 253 and 261.

7   "[C]ourts usually handle constitutional claims case by case, not en masse." *X Corp.*,

8   116 F.4th at 898 (quoting *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024)).

9   Because facial challenges "often rest on speculation about the law's coverage and its

10  future enforcement" and "threaten to short circuit the democratic process," the

11  Supreme Court "has therefore made facial challenges hard to win." *Moody*, 603 U.S.

12  at 723 (internal quotation marks omitted).

13  However, in First Amendment cases, the Supreme Court has "lowered th[e]

14  very high bar" of a typical facial challenge. *X Corp.*, 116 F.4th at 898 (quoting

15  *Moody*, 603 U.S. at 723). "'[I]f the law's unconstitutional applications substantially

16  outweigh its constitutional ones,' then a court may sustain a facial challenge to the law

17  and strike it down." *Id.* at 898–99 (alteration in original) (quoting *Moody*, 603 U.S.

18  at 724). As such, "a First Amendment facial challenge has two parts: first, the courts

19  must 'assess the state laws' scope'; and second, the courts must 'decide which of the

20  laws' applications violate the First Amendment, and . . . measure them against the

21  rest." *Id.* at 899 (alteration in original) (quoting *Moody*, 603 U.S. at 725). The

22  Supreme Court recently admonished that courts cannot treat facial challenges "more

23  like as-applied claims than like facial ones." *Moody*, 603 U.S. at 724.

24  The scope of SBs 253 and 261 appears straightforward for purposes of the

25  Motion. SB 253 requires CARB to adopt regulations that will require all domestic

26  companies with total annual revenues more than $1 billion and that "do[] business in

27  California" to annually report the company's Scope 1, Scope 2, and Scope 3

28  emissions, in conformance with the Greenhouse Gas Protocol and guidance. Cal.

**ER-2259**

(217 of 271) Page 217 of 271 Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 217 of 271
Case 2:24-cv-00801-ODW-PVC Document 112 Filed 08/28/25 Page 20 of 48 Page
ID #:10495

1   Health & Safety Code § 38532(a)(2), (c). CARB must require covered entities to

2   "publicly disclose" these figures to CARB or a contracted third party. *Id.* § 38532(c).

3   Meanwhile, SB 261 requires all domestic companies with total annual revenues more

4   than $500 million and that "do[] business in California" to "prepare a climate-related

5   financial risk report disclosing" the company's "climate-related financial risk," in

6   accordance with the TCFD Framework and "[i]ts measures adopted to reduce and

7   adapt to [this] climate-related financial risk." *Id.* § 38533(a)(4), (b). Covered

8   companies must make the biennial report available on its website. *Id.* § 38533(c)(1).

9   In short, all covered companies—those with total annual revenues over a certain

10  threshold and that do business in California—must report the same information. *See*

11  *NetChoice*, 113 F.4th at 1116 (finding that "all" covered companies "are under the

12  same statutory obligation"); *X Corp.*, 116 F.4th at 899 (finding that the relevant

13  provisions "compel every covered social media company to reveal" the same

14  information).

15        "The next order of business is to decide which of the laws' applications violate

16  the First Amendment, and to measure them against the rest." *Project Veritas v.*

17  *Schmidt*, 125 F.4th 929, 961 (9th Cir. 2025) (quoting *Moody*, 603 U.S. at 725). This

18  analysis is less complicated where the legislation "raise[s] the same First Amendment

19  issues" as to every covered company. *X Corp.*, 116 F.4th at 899. That is not the case

20  here. While the laws apply equally to all covered companies, the parties reveal

21  differences among the covered companies that may impact the First Amendment

22  analysis.

23        The State asserts "an interest in protecting its investors, consumers, and other

24  stakeholders from fraud or misrepresentation." (Opp'n 16.) At the same time, the

25  State's evidence suggests that neither SB 253 nor SB 261 applies only to companies

26  engaged in green advertising or accepting investment. (*See* Decl. Angel Hsu ISO

27  Opp'n ("Hsu Decl.") ¶¶ 8–9, ECF No. 89-18 (finding that 82% of North American

28  companies in a dataset have made "green pledges" to reduce emissions); Ceres Report

13

**ER-2260**

(218 of 271) Page 218 of 271
Case: 25-5337, 09/18/2025, DktEntry: 8.10, Page 218 of 271
Case 2:24-cv-00801-ODW-PVC    Document 114    Filed 08/26/25    Page 24 of 48    Page ID #:10490

1    at 11 (estimating that of the companies covered by SBs 253 and 261, 23% and 27%

2    are private companies, respectively).)  Plaintiffs attack the laws on this very basis,

3    arguing that because the laws are not limited to covered companies that engage in

4    green advertisement or are open for investment, they are not sufficiently tailored to

5    protect this government interest.  (*See* Reply 7.)  The distinction between covered

6    companies—those who engage in green advertising (and those who do not) and those

7    who have investors (and those who do not)—may result in differing analyses to

8    determine whether specific applications of SBs 253 and 261 violate the First

9    Amendment.

10    *NetChoice* is instructive as to how the difference in covered companies

11    implicates the Court's analysis of Plaintiffs' First Amendment facial challenge.  In

12    that case, the Ninth Circuit evaluated whether the California Age-Appropriate Design

13    Code Act ("CAADCA") should be preliminary enjoined on First Amendment

14    grounds.  *NetChoice*, 113 F.4th at 1108.  Among the provisions the court considered

15    was one that required online businesses to create a "report identifying, for each

16    offered online service, product, or feature likely to be accessed by children, any risk of

17    material detriment to children that arise from the data management practices of the

18    business."  *Id.* at 1109 (internal quotation marks omitted).  In affirming the district

19    court's enjoinment of this provision based on a facial challenge, the Ninth Circuit held

20    that this "report requirement, in every application to a covered business, raises the

21    same First Amendment issues," namely, whether the State can require covered

22    businesses to "ask whether the new service may lead to children viewing or receiving

23    harmful or potentially harmful materials."  *Id.* at 1116.  However, in evaluating other

24    of the CAADCA's provisions, the court found it "less certain" whether NetChoice

25    was likely to succeed on its facial challenge.  *Id.* at 1122.

26    For example, as to some provisions, the Ninth Circuit found that the district

27    court erred in its facial analysis because it "focused on possible applications of these

28    provisions to social media companies—a subset of the businesses covered by the

**ER-2261**

(219 of 271) Page 219 of 271Case: 25-5337, 09/18/2025, DktEntry: 8.10, Page 219 of 271
Case 2:24-cv-00801-ODW-PVC   Document 112   Filed 08/26/25   Page 23 of 48   Page
ID #:10493

CAADCA—and speculated about how that subset of applications could ultimately have a substantial effect on those companies' editorial discretion or the expression of their third-party users." *Id.* at 1123. And as to a provision requiring online businesses to provide "privacy information, terms of service, policies, and community standards concisely, prominently, and using clear language suited to the age of children," the Ninth Circuit found it "unclear from the record below whether a substantial majority of those applications are likely to fail First Amendment scrutiny," because "all or most of the speech compelled by this provision is likely to be purely factual and non-controversial." *Id.* at 1123–24.

Consistent with *NetChoice*, to entertain Plaintiffs' facial challenge here, the Court must analyze all the laws' applications. Thus, the Court must analyze whether the applications to green-advertising companies survive First Amendment scrutiny, whether applications to non-advertising companies survive First Amendment scrutiny, and then determine whether a substantial majority of the laws' applications likely fail First Amendment scrutiny. *See Moody*, 603 U.S. at 725 (explaining that the court must "ask, . . . as to each thing covered, whether the required disclosures" survive First Amendment scrutiny and "it is not hard to see how the answers might differ as between regulation of Facebook's News Feed (considered in the courts below) and, say, its direct messaging service (not so considered)"); *Ariz. Att'ys for Crim Just. v. Mayes*, 127 F.4th 105, 110–12 (9th Cir. 2025) (rejecting facial challenge where plaintiffs challenged the prohibition on contacting victims in only one of the law's various applications). Similarly, the Court must analyze whether the laws' applications to companies with investors survive First Amendment scrutiny, whether applications to companies without investors survive First Amendment scrutiny, and then determine whether a substantial majority of the laws' applications likely fail First Amendment scrutiny. *See Moody*, 603 U.S. at 725. However, before the Court can consider these questions, it must first determine what level of scrutiny applies.

**ER-2262**

(220 of 271) Page 220 of 271 Case: 25-5337, 09/18/2025, DktEntry: 8.10, Page 220 of 271
Case 2:24-cv-00801-ODW-PVC   Document 114   Filed 08/26/25   Page 26 of 48   Page
ID #:10498

**D.     Level of Scrutiny**

The parties disagree about which level of scrutiny applies to SBs 253 and 261. Plaintiffs argue that the laws must survive strict scrutiny to survive their First Amendment challenge.  (Mot. 10–13.)  Conversely, the State argues that, if the laws compel speech, they are subject to the lowest standard of review.  (Opp'n 11–12.)

When the First Amendment applies, compelled speech must typically be reviewed under strict scrutiny.  However, "[l]aws regulating commercial speech are generally subject to a lesser standard than strict scrutiny."  *NetChoice*, 113 F.4th at 1119.  "Commercial speech is generally subject to intermediate scrutiny."  *X Corp.*, 116 F.4th at 900; *see also Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980) (articulating standard).  However, if commercial speech requires disclosure of "purely factual and uncontroversial information," then it is subject to the lowest standard of review as set forth in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985).  *Nat'l Inst. of Fam. & Life Advocs. v. Becerra (NIFLA)*, 585 U.S. 755, 768 (2018).

Accordingly, to determine which level of review applies to SBs 253 and 261, the Court must decide whether the laws compel commercial speech of purely factual and uncontroversial information.

*1.     Commercial Speech*

"Commercial speech is 'usually defined as speech that does no more than propose a commercial transaction.'"  *X Corp.*, 116 F.4th at 900 (quoting *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001)).  But this is "just a starting point." *Id.*  Indeed, "speech that does not propose a commercial transaction on its face can still be commercial speech."  *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021).  Courts "try to give effect to a common-sense distinction between commercial speech and other varieties of speech."  *X Corp.*, 116 F.4th at 900 (internal quotation marks omitted).  This is a "fact-driven" analysis, "due to the inherent

**ER-2263**

(221 of 271) Page 221 of 271 Case: 25-5337, 09/18/2025, DktEntry: 8.10, Page 221 of 271
Case 2:24-cv-00801-ODW-PVC    Document 114    Filed 08/20/25    Page 17 of 48    Page
ID #:10499

difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *Id.*

Given this difficulty, "in close cases," courts consider three factors outlined by the Supreme Court in *Bolger v. Youngs Drug Products Corporation*, 463 U.S. 60 (1983). *NetChoice, LLC*, 113 F.4th at 1119. The *Bolger* factors consider whether (1) "the speech is an advertisement," (2) "the speech refers to a particular product," and (3) "the speaker has an economic motivation." *Hunt v. City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011). Courts have found that, if the speech meets two of the three *Bolger* factors, then it "weighs in favor of finding" the "speech is commercial." *Stutzman v. Armstrong*, No. 2:13-cv-00116-MCE-KJN, 2013 WL 4853333, at *18 (E.D. Cal. Sept. 10, 2013); *cf. Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 959 (9th Cir. 2012) (not commercial speech where "does not fulfill two of the three *Bolger* factors"); *X Corp.*, 116 F.4th at 901 (same). However, while these factors are "important guideposts, . . . they are not necessarily dispositive." *X Corp.*, 116 F.4th at 900; *see Ariix,* 985 F.3d at 1116 (concluding that two of the factors "do[] not shed much light" on whether the publication in question was commercial speech).

The State argues that the required disclosures are commercial speech. (Opp'n 11–12.) While the State does not contend that the disclosures refer to a particular product, it does argue that the compelled disclosures satisfy the remaining *Bolger* factors. (*Id.* at 12.) In support, the State offers expert declarations. (*Id.*; Decl. Thomas P. Lyon ISO Opp'n ("Lyon PI Decl."), ECF No. 90; Hsu Decl.) First, Angel Hsu, a professor of environmental policy, reports that 82% of North American companies in her dataset, which includes the Forbes 200 publicly listed companies and the one hundred largest privately-owned companies, have made "green pledges," meaning a pledge to reduce emissions with a report of at least one emissions target. (Hsu Decl. ¶¶ 8–9.) Next, Thomas Lyon, a professor of engineering-economic systems, opines "that companies have incentives to communicate information about their carbon emissions to investors because investors are concerned about climate risk

**ER-2264**

and demand a premium from firms that are saddled with climate risk." (Lyon PI Decl. ¶¶ 2, 22.)  He further declares that companies make climate pledges to "influence consumer behavior." (*Id.* ¶ 23.)  Based on this, the State contends that the speech the laws compel—even if referring to a company as a whole—is advertising. (Opp'n 12.) Also, the State asserts that the advertising has an economic motive, as companies engage in this speech to appear more attractive to consumers and investors. (*Id.*)

Plaintiffs see the speech differently.  First, they argue that the Court should not even look to the *Bolger* factors because the "usual definition of commercial speech is speech that does no more than propose a commercial transaction," (Reply 4 (quoting *X Corp.*, 116 F.4th at 901) (cleaned up)), and the State does not argue that the speech here meets that definition, (*id.*).  Second, Plaintiffs argue that, even considering the *Bolger* factors, they are not met: the compelled disclosures are not themselves advertisements, do not refer to a particular product, and the companies have no economic motivation to provide these compelled disclosures. (*Id.*)

The Court rejects these arguments and finds that SBs 253 and 261 regulate commercial speech.  First, the Ninth Circuit has held that "speech that does not propose a commercial transaction on its face can still be commercial speech." *Ariix*, 985 F.3d at 1115.  Accordingly, in this case, the State is not conceding that the speech here is non-commercial simply because it does not explicitly state that the speech "does no more than propose a commercial transaction." *See, e.g.*, *Zauderer*, 471 U.S. at 637 (acknowledging that "the precise bounds of . . . commercial speech" are "subject to doubt"); *Cent. Hudson*, 447 U.S. at 561 (defining "commercial speech" as "expression related solely to the economic interests of the speaker and its audience"); *cf. X Corp.*, 116 F.4th at 901 (recognizing exceptions to the "usual definition" of commercial speech (alterations omitted)).

Second, the *Bolger* factors weigh in favor of finding the speech here commercial.  This is so even though the State does not argue the disclosures refer to a particular product. (*See* Opp'n 12.)  Plaintiffs are also correct that SBs 253 and 261

**ER-2265**

(223 of 271) Page 223 of 27 Case: 25-5337, 09/18/2025, DktEntry: 8.10, Page 223 of 271
Case 2:24-cv-00801-ODW-PVC    Document 112    Filed 08/26/25    Page 20 of 48    Page
ID #:10497

do not compel speech in the form of advertisements, in the sense that the required disclosures will not be included in targeted advertisements. However, these disclosures regarding a company's emissions and climate-related risk function as advertisements in the sense that SBs 253 and 261 compel disclosure of the same type of information that a substantial number of companies use to advertise their brands, which they have an economic motive to provide. (*See* Lyon PI Decl. ¶¶ 11–26.)

For example, some "[f]irms communicate their planned emissions reductions because investors penalize firms for carbon risk." (*Id.* ¶ 13.) Of the S&P 500, more than 400 companies have set emissions reduction targets. (*Id.* ¶ 17.) Thousands of other companies, including a substantial number of the Forbes 2000 publicly listed companies, have done the same. (*See* Hsu Decl. ¶ 8.) Firms are increasingly discussing climate-related information with investors. (Lyon PI Decl. ¶ 21.) Also, from 2018 to 2023, nearly 16,000 companies disclosed environmental data, including emissions data and climate-related risks, to CDP (formerly, the Carbon Disclosure Project), an investor-driven disclosure project. (*Id.* ¶¶ 36–37.) Of those companies, 49% disclosed Scope 3 emissions. (*Id.*) In 2022, more than 71% of companies surveyed by the American Institute of Certified Public Accountants used the TCFD Framework for climate-related reporting, and 58% of public companies surveyed by the Financial Stability Board disclosed at least five of the TCFD's recommended climate-risk disclosures. (*See* Burton SJ Decl. ¶ 14.) Indeed, in the "Sustainability" section of its website, UHHC—the only member company offering a declaration in support of the Motion—lists as one of its goals to "[d]evelop and implement comprehensive climate-change strategies to manage and mitigate our greenhouse gas (GHG) emissions." (Decl. James P. Burton ISO Opp'n ("Burton PI Decl.") Ex. 6 ("UHHC Website") at 381, ECF Nos. 89-6, 89-12.) UHHC continues that "[s]hort-term gains may result in long-term losses, both in terms of profitability and in terms of future generations being able to meet their needs." (*Id.*)

ER-2266

(224 of 271) Page 224 of 271 Case: 25-5337, 09/18/2025, DktEntry: 8.10, Page 224 of 271
Case 2:24-cv-00801-ODW-PVC   Document 114   Filed 08/28/25   Page 20 of 48   Page
ID #:10498

While it is true that, on their face, SBs 253 and 261 are not limited to only those companies that advertise greenhouse gas emissions and low climate-related risk, this is more appropriately addressed when applying the appropriate standard of review—e.g., whether the legislation is appropriately tailored to the state's interest—not when determining what standard to apply—e.g., whether the regulated speech is commercial.

Ultimately, in this "fact-driven" analysis considering SBs 253 and 261 and the *Bolger* factors, the "'common-sense distinction' between commercial speech and other varieties of speech," *X Corp.*, 116 F.4th at 900, supports a finding that SBs 253 and 261 compel disclosure of commercial speech. Specifically, SB 253 mandates disclosure of commercial data—a company's direct and indirect greenhouse gas emissions—that many companies routinely disclose and stakeholders consider relevant to the long-term success of the business. And SB 261 requires companies to disclose information related to climate-related risks to a company's own business. Even if companies are not already required to report these precise risks, many companies already report certain risks to their business through SEC disclosures and other requirements. With respect to the type of information many companies already report, SB 261's requirements, while perhaps different in degree, are not different in kind.

For these reasons, the Court finds that SBs 253 and 261 regulate commercial speech.[5]

---

[5] Plaintiffs' reliance on *X Corp.* is misplaced. (*See* Mot. 12–13.) That opinion focused extensively on the Ninth Circuit's conclusion that the legislation at issue required "a company to recast its content-moderation practices in language prescribed by the State." *X Corp.*, 116 F.4th at 901. For example, the court held that a company's "opinions about and reasons for" its content moderations policies "would require a social media company to convey the company's policy views on intensely debated and politically fraught topics, including hate speech, racism, misinformation, and radicalization, and also convey how the company has applied its policies." *Id.* at 901–02 (footnote omitted). At the same time, the court distinguished compelled disclosures in the case from a "platform's existing [Terms of Service] and content moderation policies" and laws that require platforms to disclose "how they moderate and promote content" and content-moderation "standards"

**ER-2267**

Having found the laws regulate commercial speech, the Court must determine whether SBs 253 and 261 are subject to intermediate scrutiny or the less searching standard of review under *Zauderer*. "Commercial speech is generally subject to intermediate scrutiny." *X Corp.*, 116 F.4th at 900. However, such speech can qualify for the lower-level *Zauderer* review if the compelled commercial speech at issue discloses "purely factual and uncontroversial information." *NIFLA*, 585 U.S. at 768.

### 2. Factual Information

As a first step, courts consider whether information is "factually accurate." *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1276 (9th Cir. 2023). "[B]ut that alone is not enough to qualify for the *Zauderer* exception." *Id.* A statement that is "literally true but nonetheless misleading" is not factual. *Id.* In *National Association of Wheat Growers*, the Ninth Circuit considered a requirement that a business must provide a warning before it "knowingly and intentionally exposes any individual in California to a chemical known to the state to cause cancer." *Id.* at 1268 (cleaned up). While glyphosate was "known" to the state to cause cancer according to the statutory definition, there was substantial scientific debate on whether it actually caused cancer. *Id.* at 1278. Accordingly, the Ninth Circuit concluded that the glyphosate warning was not purely factual because "the technical meaning of the word 'known' in the warning is different from the meaning an average consumer would give the word 'known.'" *Id.* at 1279.

### a. SB 253—Factual Information

As to SB 253, Plaintiffs argue that the disclosures required are not factual, but are in fact misleading, for two reasons. First, companies must report "their" greenhouse-gas emissions, SB 253 §§ 1(e), (f), but Scope 2 emissions are emissions of electricity providers and Scope 3 emissions are emissions of upstream and downstream sources that the reporting entity does not directly control. (Mot. 11).

---

and "rule changes," without mention of controversial topics. *Id.* at 901, 903. Here, SBs 253 and 261 do not require companies to recast their practices in language prescribed by the State.

**ER-2268**

(226 of 271) Page 226 of 271Case: 25-5337, 09/18/2025, DktEntry: 8.10, Page 226 of 271
Case 2:24-cv-00801-ODW-PVC    Document 114    Filed 08/20/25    Page 29 of 48    Page
ID #:10500

1   Second, SB 253 does not factor in a company's Scope 4 (avoided) emissions, so any

2   reported emissions will provide a misleading picture of a company's total emissions.

3   (*Id.* at 11–12.)

4         SB 253's Scope 1 emissions disclosure requirement is undisputedly factual and

5   not misleading; Plaintiffs do not challenge this conclusion. (*See* Mot.; Reply.) The

6   Scope 2 and Scope 3 emissions disclosures are also factual in nature, in that they are

7   both are defined and have recognized methods of computation. *See* Cal. Health &

8   Safety Code § 38532(c)(1)(A)(ii) (adopting Greenhouse Gas Protocol standards);

9   (Lyon PI Decl. ¶ 37 & fig.5 (reporting that more than 5,500 entities disclose Scope 3

10  emissions using these standards)). The question then is whether it is misleading to

11  require companies to report Scope 2 and Scope 3 emissions when the emissions being

12  reported are not the company's own direct omissions and do not include Scope 4

13  avoided emissions. (*See* Mot. 11.)

14        The Court concludes that these requirements are not misleading. SB 253

15  simply mandates that covered entities report Scope 1, Scope 2, and Scope 3 emissions

16  using recognized methodology. SB 253 does not require companies to take

17  responsibility, as Plaintiffs argue, for Scope 2 and Scope 3 emissions. Nor does it

18  prohibit covered entities from separately calculating and publicizing its Scope 4

19  avoided emissions, or from taking the position that their Scope 4 emissions can offset

20  their Scope 1, Scope 2, and Scope 3 emissions. *See* Cal. Health & Safety Code

21  § 38532; (Burton PI Decl. ¶ 20 (identifying one company that already publicizes its

22  Scope 4 avoided emissions).) This is not like *National Association of Wheat*

23  *Growers*; SB 253 does not require companies to state that they are causing the

24  emissions, and there is no evidence that the definitions of Scope 2 and Scope 3

25  emissions include misleading language like the word "known," where the technical

26  meaning of the word is different from the meaning the average consumer would give

27  the word. *See* 85 F.4th at 1278–79. SB 253 does not even require companies to

28  report a "total" number of emissions.

**ER-2269**

(227 of 271) Page 227 of 271Case: 25-5337, 09/18/2025, DktEntry: 8.10, Page 227 of 271
Case 2:24-cv-00801-ODW-PVC   Document 112   Filed 08/26/25   Page 30 of 48   Page
ID #:10505

Accordingly, the Court finds that SB 253 requires reporting of only factual—and not misleading—information.  As discussed further below, because SB 253's disclosures are factual, the Court must analyze whether they are also uncontroversial to determine whether SB 253 qualifies for review under *Zauderer*.

### b. SB 261—Factual Information

As to SB 261, Plaintiffs argue that company's climate-related financial risk is not factual, because it comprises a company's assessment of the risk of harm to immediate and long-term financial outcomes, which requires companies to speculate as to future technological and policy developments.  (Mot. 11.)  The State counters that companies that "do[] not currently evaluate climate-related risks . . . can simply state that."  (Opp'n 15.)  The State describes the required disclosures under SB 261 as "not meaningfully distinct from other financial risks routinely disclosed by large companies."  (*Id.*)

The Court finds that SB 261's compelled disclosures are not factual.  Although the State refers to the disclosure as a company's "assessment[]," (Opp'n 15), by definition, an assessment about the effect of current *and future* events on a company cannot be factual.  *See Assessment*, Black's Law Dictionary (12th ed. 2024) ("The process by which, after careful thought, one makes a judgment about a person or situation.").  The State argues that SB 261's disclosures are not like the disclosures in *NetChoice*, which required companies to "weigh in on [a] highly divisive national debate about what type of speech is harmful to children" and thus did not qualify for *Zauderer* review.  (Opp'n 15 (emphasis omitted).)  But that distinction relates to the analysis of the controversial nature of the compelled *NetChoice* speech, not its *factual* character.  *See NetChoice*, 113 F.4th at 1120 ("[A] business's opinion about how its services might expose children to harmful content online is not 'purely factual and uncontroversial.'").  The State argues that SB 261 only requires companies that evaluate climate-related risks to speak and does not require companies that do not evaluate those risks to begin to do so.  (Opp'n 15.)  But this does not transform the

**ER-2270**

(228 of 271) Page 228 of 271 Case: 25-5337, 09/18/2025, DktEntry: 8.10, Page 228 of 271
Case 2:24-cv-00801-ODW-PVC    Document 112    Filed 08/26/25    Page 24 of 48    Page
ID #:10902

otherwise subjective and predictive opinion into a factual disclosure.  *See X Corp.*, 116 F.4th at 902 (rejecting California's argument that a "transparency measure" warrants lower scrutiny).

Accordingly, the Court finds that SB 261 compels disclosure of more than factual information, and thus is not subject to *Zauderer* review.

### 3.    Uncontroversial Information

As the Court finds that SB 253 compels disclosure of factual information, it is subject to *Zauderer* review so long as SB 253 also compels disclosure of "uncontroversial information."  *NIFLA*, 585 U.S. at 768.[6]  To qualify for *Zauderer* review, the compelled disclosure must be "uncontroversial information."  *Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1275.  If the required disclosure is of controversial information, intermediate scrutiny applies.  *See id.*

Plaintiffs contend that SBs 253's compelled disclosures are controversial because "a company's climate-related risks and emissions 'are anything but an "uncontroversial" topic.'"  (Mot. 12 (quoting *NIFLA*, 585 U.S. at 769).)  In support, they cite the State's prior acknowledgement that "policy responses to climate change are the subject of vigorous political debate."  (*Id.* (quoting Opp'n Mot. Summ. J. 21).)  Plaintiffs also argue that the laws' compelled disclosures are like the conflict-mineral disclosures—which required companies to report whether their products are "conflict-free"—that the D.C. Circuit struck down in *NAMF*, because both would be used to "stigmatize companies" and "shape their behavior."  (*Id.* (cleaned up).)

In response, the State contends that merely because a disclosure concerns a controversial issue or may lead consumers to form an opinion about a company does not make a factual statement controversial.  (Opp'n 13.)  The State also distinguishes the conflict-mineral disclosures, highlighting that those disclosures required companies to categorize their diamonds as "conflict free" or "not conflict free," which

---

[6] As SB 261's disclosures are not factual, and thus not subject to *Zauderer* review, the Court need not consider whether those compelled disclosures are controversial.

**ER-2271**

(229 of 271) Page 229 of 271 Case: 25-5337, 09/18/2025, DktEntry: 8.10, Page 229 of 271
Case 2:24-cv-00801-ODW-PVC    Document 114    Filed 08/26/25    Page 25 of 48    Page
ID #:10503

is an ideological and moral statement, regardless of the companies' views about their
own moral responsibility. (*Id.* at 14.)  Conversely, the State asserts, SBs 253 and 261
require companies to report data and climate-related risks without labeling
themselves, the companies, as "good" or "bad" for the climate. (*Id.*)

In *NIFLA*, upon which Plaintiffs rely, (*see* Mot. 12), the Supreme Court found
that a law requiring clinics that oppose abortion to provide information about
state-sponsored services, including abortion, compelled controversial speech for
purposes of First Amendment review.  585 U.S. at 769.  However, as the Ninth Circuit
has commented, the Supreme Court did not "broadly [say] that any purely factual
statement that can be tied in some way to a controversial issue is, for that reason
alone, controversial." *CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832,
845 (9th Cir. 2019).  Rather, the Ninth Circuit characterized *NIFLA* as concerning
"compelled speech [that] took sides in a heated political controversy, forcing the clinic
to convey a message fundamentally at odds with its mission." *Id.*

Here, companies subject to SB 253 are not required "to take sides in a heated
political controversy," *id.* at 848, no matter the amount of debate surrounding the
existence of and policy responses to climate change.  SB 253 merely requires
companies to report data on emissions.  It does not require companies to say whether
they are "responsible" for those emissions or advocate for any (or no) policy response
to climate change.  This distinguishes SB 253 from the conflict-minerals disclosures,
where companies were required to characterize their products as "conflict free" or
otherwise.  *See NAMF II*, 800 F.3d at 529–30.  While the State may take the position
that companies are "responsible" for Scope 1, Scope 2, and Scope 3 emissions, (*see*
Lyon PI Decl. ¶ 40; SB 253 § 1(g)), companies are not required to agree or even
comment on that debate.  And SB 253 does not require companies to label themselves
or their products as "environmentally sustainable." *NAMF II*, 800 F.3d at 530
(indicating that such compelled disclosure would be impermissible).

**ER-2272**

That some may look favorably or unfavorably on a company based on its emissions report does not transform an otherwise non-controversial disclosure into a controversial one. Indeed, courts have upheld regulations that were intended to shape consumer behavior. *See Am. Meat Inst. v. U.S. Dep't of Agriculture (AMI)*, 760 F.3d 18, 27 (D.C. Cir. 2014) (requiring country-of-origin labels "to enable consumers to choose American-made products"). If disclosures that provide consumers with information that makes a product undesirable to them qualified a disclosure requirement as controversial, then an untold number of disclosure requirements would be subject to a higher standard of review. *See, e.g.*, *CTIA*, 928 F.3d at 845 ("requiring cell phone retailers to disclose information to prospective cell phone purchasers about the federal government's radio-frequency radiation exposure guidelines relevant to cell phone use"); *Am. Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749, 753 (9th Cir. 2019) (requiring that certain sugar-sweetened beverages contain a disclosure about potential health risks). Therefore, the Court finds that SB 253 does not mandate disclosure of controversial information.

Accordingly, SB 253's requirement that companies disclose data about Scope 1, Scope 2, and Scope 3 emissions is "factual and uncontroversial," and therefore subject to *Zauderer* review. Conversely, because SB 261 concerns non-factual disclosures, that law is subject to intermediate scrutiny.

## E.   Application of Scrutiny

Having determined that SB 253 is subject to *Zauderer* review, and SB 261 is subject to intermediate scrutiny, the Court must consider whether the laws survive the applicable review. This is where the implications of Plaintiffs' decision to raise a facial challenge become material. As discussed, to determine whether Plaintiffs' facial challenge against each law succeeds, the Court must evaluate SB 253's and SB 261's applications separately, considering the State's asserted purposes concerning both companies with green-advertising and companies with investors.

**ER-2273**

First, the Court must analyze whether each law's applications to green-advertising companies survive First Amendment scrutiny, then analyze whether the laws' applications to non-advertising companies survive First Amendment scrutiny, and finally determine whether a substantial majority of those applications likely fail First Amendment scrutiny. *See Moody*, 603 U.S. at 725. Second, the Court must similarly analyze whether the laws' applications to companies with investors survive First Amendment scrutiny, whether the laws' applications to companies without investors survive First Amendment scrutiny, and finally determine whether a substantial majority of those applications likely fail First Amendment scrutiny. *See id.*

### 1.    SB 253

As SB 253 is subject to *Zauderer* review, the required disclosures "compl[y] with the First Amendment if the information in the disclosure is reasonably related to a substantial government interest." *CTIA*, 928 F.3d at 845. The "disclosure requirement cannot be 'unjustified or unduly burdensome.'" *NIFLA*, 585 U.S. at 776 (quoting *Zauderer*, 471 U.S. at 651). The disclosures also must "remedy a harm that is 'potentially real, not purely hypothetical'" and "extend 'no broader than reasonably necessary.'" *Id.* (first quoting *Ibanez v. Fl. Dept. of Bus. & Prof. Regul., Bd. of Accountancy*, 512 U.S. 136, 146 (1994); and then quoting *In re R.M. J.*, 455 U.S. 191, 203 (1982)).

The State offers three interests to support SB 253's compelled disclosure of Scope 1, Scope 2, and Scope 3 emissions.

### a.   Reliable Information

The State asserts an interest "in reliable information that enables investors and consumers to make informed judgments about the impact of climate-related risks on their economic choices." (Opp'n 17.) This interest implicates both investors and consumers and thus warrants discussing both.

**ER-2274**

1   As to consumers, the State asserts that "[s]tudies confirm consumers' interest in

2   this information." (*Id.*) The State offers that "to signal their performance to

3   customers," a "growing number of firms" obtain third-party certifications that show

4   their products are carbon neutral and market their products as carbon neutral. (Lyon

5   PI Decl. ¶ 23–24 (providing examples, including "Lime scooters, Bulldog Skincare,

6   Microsoft Xbox consoles, and Logitech products")).) The State also cites studies to

7   support that consumers are willing to pay more for low-carbon products. (*Id.* ¶ 25.)

8   Plaintiffs counter that investors and consumers' mere desire for information does not

9   support a substantial government interest. (Reply 8.)

10   As the State demonstrates, courts have found that consumers' desire for

11   information can support a substantial government interest. (Opp'n 17 (citing cases).)

12   In *National Electrical Manufacturers Association v. Sorrell*, the Second Circuit held

13   that Vermont had a substantial interest in requiring manufacturers to label certain

14   products as containing mercury that, "on disposal, should be recycled or disposed of

15   as hazardous waste." 272 F.3d 104, 107, 115 (2d Cir. 2001). This is because Vermont

16   had an interest in "increasing consumer awareness of the presence of mercury in a

17   variety of products" "to reduce the amount of mercury released into the environment."

18   *Id.* at 115. The court found it "probable that some" purchasers "will properly dispose

19   of [the products] and thereby reduce mercury pollution." *Id.* Similarly, in *AMI*, the

20   D.C. Circuit found a substantial government interest in requiring county-of-origin

21   disclosures because of "the demonstrated consumer interest in extending country-of-

22   origin labeling to food products." 760 F.3d at 23. And in *American Hospital

23   Association v. Azar*, the D.C. Circuit found the government had a substantial interest

24   in requiring hospitals to make public a list of "standard charges" to "promot[e] price

25   transparency and lower[] healthcare costs. 983 F.3d 528, 530, 540 (D.C. Cir. 2020).

26   Like in those cases, investors and consumers' purported interest in emissions is

27   not simply for the sake of gaining information, but so that they can "make informed

28   judgments about the impact of climate-related risks on their economic choices."

**ER-2275**

(Opp'n 17); *see Sorrell*, 272 F.3d at 115 (consumer interest tied to goal of reducing amount of mercury in environment); *AMI*, 760 F.3d at 23 (consumer interest considered in "the context and long history of country-of-original disclosures to enable consumers to choose American-made products" and "the individual health concerns and market impacts that can arise in the event of a food-borne illness outbreak"); *Am. Hosp. Assoc.*, 983 F.3d at 540 (consumer interest in promoting price transparency to lower healthcare costs).

Nevertheless, the State has not met its burden to show that SB 253 is reasonably related to consumers' interest in this information. The State's evidence of consumer interest in company-wide emissions for purposes of determining whether to purchase products or services is based on companies marketing products as green and studies describing consumer behavior in Germany and China. (*See* Lyon PI Decl. ¶¶ 23–26.) Even assuming this shows a consumer interest, the State has not demonstrated that SB 253 is rationally related to this interest. The State's evidence relates to product carbon labels, not a company's total emissions. (*See id.*) SB 253 does not require companies to label products, nor does it provide consumers with information to determine their purchasing impact on the environment. For example, a company may have large total emissions, but smaller emissions on a product-by-product basis.

However, a different conclusion results with respect to the State's interest "in reliable information that enables investors . . . to make informed judgments about the impact of climate-related risks on their economic choices." (Opp'n 17.) The State has provided sufficient evidence that investors have this interest. For example, CalPERS "has long been a proponent" of "Scope 1 and Scope 2 emissions, because it is crucial in making investment[]" decisions. (Cashion Decl. ¶ 13.) "CalPERS also supports requiring disclosure of Scope 3 emissions because it is material in all companies," as "[o]mitting Scope 3 emissions . . . would not allow an investor like CalPERS to assess the total emissions profile" of companies. (*Id.* ¶ 14.) As one of the State's experts explains, "[h]igher carbon emissions expose firms to greater levels of risk, because,

**ER-2276**

(234 of 271) Page 234 of 271 Case: 25-5337, 09/18/2025, DktEntry: 8.10, Page 234 of 271
Case 2:24-cv-00801-ODW-PVC   Document 112   Filed 08/28/25   Page 30 of 48   Page
ID #:10562

among other things, governments may regulate emissions, impose carbon taxes on emissions, create a system of marketable emissions permits, or take other actions to reduce global warming." (Lyon PI Decl. ¶ 13.) The State's authorities also demonstrate that investors demand a premium from stocks with carbon risks. (*Id.* at 14–15 (citing studies).)

Plaintiffs argue that SB 253 is not appropriately tailored to this "investor" interest because "the laws are not limited to companies seeking investments." (Reply 7.) If the legislation was tailored to providing investors with information about climate-related financial risk, Plaintiffs argue, then California "might have applied the laws only to companies seeking investors or to those engaging in transactions for which consumers need the information the laws require." (*Id.*) The State contends that SB 253 is appropriately tailored because conditioning the law on public company status would be "both underbroad (failing to capture certain economically-significant entities) and overbroad (imposing compliance obligations on entities that are not economically significant)." (Decl. George S. Georgiev ISO Mot. Summ. J. ("Georgiev Decl.") ¶ 39, ECF No. 54 (emphasis omitted).)

SB 253 is not tailored to the State's interest in providing investors with climate-related risk information *to the extent the law compels disclosure from companies that have no California investors*. (*Cf.* Reply 7 (complaining that "the laws are not limited to companies seeking investments").) Therefore, the State's interest in providing investors with reliable information may not support SB 253 surviving a First Amendment challenge to the extent a company has no investors. If Plaintiffs were companies with no California investors and brought an as-applied challenge, then the fact that the law does not apply only to companies with investors may have proved fatal to SB 253. But Plaintiffs "chose to litigate th[is] case[] as [a] facial challenge[], and that decision comes at a cost." *Moody*, 603 U.S. at 723. As explained, "'[I]f the law's unconstitutional applications substantially outweigh its constitutional ones,' then a court may sustain a facial challenge to the law and strike it

**ER-2277**

down." *X Corp.*, 116 F.4th at 898–99 (alteration in original) (quoting *Moody*, 603 U.S. at 724). This means that the Court must weigh the constitutional applications of SB 253 (as applied to companies with California investors) against the potentially unconstitutional applications (as applied to companies without California investors) and determine whether the unconstitutional applications substantially outweigh its constitutional ones.

As a starting point, over 75% of companies covered by SB 253 are estimated to be public companies. (*See* Ceres Report 11.) The State offers an expert declaration that any private company covered by SB 253 "can be expected to have multiple outside investors (likely both shareholders and bondholders)" because "[t]he competitive business environment in the United States makes it unlikely that entrepreneurs can attain scale without capital outlays that are beyond the self-financing capabilities of the average entrepreneur." (Georgiev Decl. ¶ 47; *see* Cashion Decl. ¶ 16 (declaring that CalPERS has more than $150 billion exposure to private companies).) Additionally, "[e]ven if it were possible to self-finance, it would be imprudent because raising capital from outside investors provides a desirable mechanism for risk-sharing and attracting additional expertise to the enterprise." (Georgiev Decl. ¶ 47.) Given that a large percentage of SB 253's covered companies are public and the likelihood that most, if not all, of the private companies have California investors, the Court concludes, "on this record, that a substantial majority of its applications" are not likely to "fail First Amendment scrutiny." *NetChoice*, 113 F.4th at 1123 (reversing preliminary injunction as to facial attack where district court "focused on possible applications" of provisions to only "a subset of the businesses covered by the" legislation "and speculated about how that subset of applications could" violate the First Amendment).

Accordingly, on this basis, the Court finds that Plaintiffs are unlikely to succeed in their facial challenge to SB 253 and the State's "investor" interest.

**ER-2278**

### b. Emissions Reductions

Separately, the State asserts a second substantial interest in the disclosures: in companies "reduc[ing] their emissions and thereby mitigat[ing] the risks California and its residents face from climate change . . . . because California has committed to meeting certain emissions reduction goals over time and because of the severity of the climate risks the state faces." (Opp'n 17.)  Plaintiffs do not contest that this interest is substantial.  (Mot. 14–16; Reply); *see CTIA*, 928 F.3d at 844 (holding that *Zauderer* review is not limited to "the prevention of consumer deception," but that "the governmental interest in furthering public health and safety is sufficient under *Zauderer* so long as it is substantial").  Instead, Plaintiffs argue that "[t]he State here has cited *no* evidence . . . that consumers would change their purchasing habits based on a company's emissions or climate-change risks, that any such consumer sentiment would result in material changes in companies' emissions, or . . . that any such changes would have a material impact on climate change." (Mot.15.)

For the reasons discussed, the State has not shown that SB 253's required disclosures would alter consumer behavior such that it would lead to a material decrease in covered companies' emissions.  However, companies lower emissions for reasons other than altering consumer behavior.  The State cites four studies to support its claim that SB 253's mandatory disclosures may lead to a reduction in emissions.

In one study, the authors found a statistically significant relationship between voluntary disclosure of climate-related information—including disclosure of Scope 1, Scope 2, and Scope 3 emissions—and decrease in corporate $CO_2$ emissions.  (Decl. Thomas Lyon ISO Opp'n Mot. Summ. J. ("Lyon SJ Decl.") Ex. 53 at 1347, 1355–56, ECF Nos. 56, 56-53.)  For example, the study found a drop of between 7% and 10% of a company's Scope 1 emissions within three years of disclosure, and a drop in Scope 2 and 3 emissions by year 3 of 4% and 2%, respectively.  (*Id.* at 1355–57, tbl. 5, 1373, tbl. OD.9.)  While this study only concerns voluntary disclosures, (*id.* at 1348), the State cites three other studies regarding mandatory reporting requirements.

**ER-2279**

In two studies, authors investigated the effect of disclosures required by the U.S. Greenhouse Gas Reporting Program ("GHGRP") on emissions. (*See* Lyon SJ Decl. Ex. 55 at 1422–24, ECF No. 56-55; Lyon SJ Decl. Ex. 56 at 1466–68, ECF No. 56-56.) The GHGRP requires certain facilities in the United States that emit more than 25,000 tons of $CO_2$ per year to report emissions, including Scope 1 and Scope 2 emissions, to the Environmental Protection Agency. *See, e.g.*, 40 C.F.R. §§ 98.2, 98.3, 98.6, 98.33 (2009). The studies found that power plants subject to the GHGRP decreased emissions between 7% and 7.9% after reporting. (*See* Lyon SJ Ex. 55 at 1438, 1448; Lyon SJ Ex. 56 at 1482.) In one final study, the authors examined the effects of a United Kingdom requirement that public companies report Scope 1 and Scope 2 emissions. (*See* Lyon SJ Decl. Ex. 54 at 1382, ECF No. 56-54.) The authors found that companies subject to the mandatory disclosures reduced Scope 1 emissions by about 8% compared to companies not subject to the reporting requirement. (*Id.* at 1390, 1399.)

These studies do not support that SB 253's disclosure requirement will definitively lead to a reduction in emissions. But the State need not provide definitive results to survive *Zauderer* review. Even under a more searching review, the Supreme Court has accepted "reference to studies and anecdotes" and justifications "based solely on history, consensus, and simple common sense." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) (internal quotation marks omitted); *cf. Edenfield v. Fane*, 507 U.S. 761, 771 (1993) (holding that government did not demonstrate that a ban on solicitations advanced government's asserted interests of preventing fraud where it "present[ed] no studies" and did not "disclose any anecdotal evidence" demonstrating such dangers existed). Thus, the State provides sufficient evidence to support a finding that SB 253's disclosure requirements are reasonably related to the State's substantial government interest in reducing emissions and that Plaintiffs have not shown a likelihood that they will succeed on their First Amendment challenge.

**ER-2280**

(238 of 271)   Page 238 of 271
Case 2:24-cv-00801-ODW-PVC   Document 112   Filed 08/20/25   Page 34 of 48   Page
ID #:10550

Case: 25-5337, 09/18/2025, DktEntry: 8.10, Page 238 of 271
Case 2:24-cv-00801-ODW-PVC   Document 112   Filed 08/20/25   Page 34 of 48   Page
ID #:10550

### c. Misleading Speech

The State raises a third interest: that "California has an interest in protecting its investors, consumers, and other stakeholders from fraud or misrepresentation." (Opp'n 16.)  Plaintiffs do not dispute that this is a substantial state interest.  (*See* Mot.; Reply); *Zauderer*, 471 U.S. at 638 (explaining that the government may "prevent the dissemination of commercial speech that is false, deceptive, or misleading").  Instead, Plaintiffs challenge whether the disclosures required by SB 253 are reasonably related to this interest and argue that these requirements are unduly burdensome.  (Mot. 13–17; Reply 7.)

The State contends that the required disclosures are reasonably related to the interest because they will help correct companies' misleading speech.  (Opp'n 16–17.) In support, the States cites to the declaration of one of its experts, Hsu, who presents evidence that "96% of companies with emissions targets exhibit at least one indicator of greenwashing."  (Hsu Decl. ¶ 10.)  Hsu defines "greenwashing" as a company's emissions reduction pledge or statement that "mislead[s] stakeholders about the environmental integrity of their actions."  (*Id.* ¶¶ 7, 10; *see* Lyon PI Decl. ¶ 29 fig. 4 (listing ten indicators of greenwashing).)  She identifies seven indicators of greenwashing, including when a company reports no near or short-term emissions targets "that would indicate near-term action" or fails to make meaningful progress toward their stated emissions reduction target.  (Hsu Decl. ¶ 11.)[7]

Plaintiffs argue that Hsu's indicators of "greenwashing" do not equate to false or misleading speech.  (Opp'n 8.)  For example, Plaintiffs argue that whether a company engaged in lobbying activity does not affect whether their emissions targets

---

[7] The seven indicators are: a company that (1) reports no near or short-term emissions targets "that would indicate near-term action"; (2) excludes Scope 3 emissions from reduction targets; (3) does not provide a publicly available plan detailing the steps the company will take to meet its stated emissions reduction goals; (4) relies on offsets to achieve its pledge without specifying conditions or that fails to disclose whether offsets will be used; (5) pledges "net zero" or "GHG neutrality," but limits its target to only carbon dioxide emissions; (6) actively engages in lobbying activity that undermines climate action; and (7) fails to make meaningful progress toward their stated emissions reduction target.  (Hsu Decl. ¶ 11.)

**ER-2281**

are misleading. (*Id.* at 8–9.) Further, Plaintiffs contend the laws are broader than reasonably necessary because they apply to all companies over the revenue threshold that do business in California, not to those making climate pledges or engaging in misleading speech. (*Id.* at 7.)

Plaintiffs are correct. In its summary judgment order, the Court explained that it "needs a record on whether SBs 253 and 261 regulate a substantial number of companies that do not make potentially misleading environmental claims." (Order Mot. Summ. J. 11.) By way of example, the Court stated that "if ninety-nine percent of the regulated companies have made advertisements relevant to SBs 253's and 261's required disclosures, that may support a finding that SBs 253 and 261 are appropriately tailored to the State's aims under at least rational basis review." (*Id.* at 11–12.) The State has not come close to this mark.

On the record before the Court, it is likely that a substantial majority of covered companies do not make potentially misleading environmental claims. (*See* Ceres Report 11 (estimating SB 253 would apply to 1,971 companies and SB 261 would apply to 2,675 companies).)

The State estimates that "around 82% of North American companies in [its] sample have made green pledges." (Hsu Decl. ¶ 8; *see* Lyon PI Decl. ¶ 20 (citing study that around 73% of companies in a sample had an emissions target).) Beyond that, as Plaintiffs correctly note, the State has failed to show how Hsu's definition of greenwashing equates to misleading speech that it has an interest in correcting. Some of her indicators may represent potentially misleading speech that the State has a substantial interest in correcting. For example, if a company says it will be "net zero," but then does not disclose that this pledge relates only to carbon dioxide emissions, the company's pledge could mislead consumers into thinking the company is doing more than it has said. (*See* Hsu Decl. ¶ 10; Lyon PI Decl. ¶ 30 (providing example of company that discloses it reduced emissions but does not define its measure of emissions).) Or a company that fails to make meaningful progress towards a stated

**ER-2282**

(240 of 271) Page 240 of 271Case: 25-5337, 09/18/2025, DktEntry: 8.10, Page 240 of 271
Case 2:24-cv-00801-ODW-PVC   Document 112   Filed 08/28/25   Page 40 of 48   Page
ID #:10558

1  emissions reduction target and does not retract the target when it knows it will not

2  reach that target may mislead consumers and investors into thinking the company is

3  doing what it said it would do.  (*See* Hsu Decl. ¶ 10.)  But other of Hsu's indicators

4  have little to do with whether a company's announced emissions target is misleading.

5  Failing to provide a publicly available plan, (*see id.*), is not necessarily misleading, if

6  the company has a private plan to reach its emissions targets.  Most concerning is the

7  labelling of speech as misleading if a company engages in lobbying that undermines

8  climate action.  (*See* Hsu Decl. ¶ 10; *see also* Lyon PI Decl. ¶ 29 fig. 4 (considering

9  "[b]oasting green commitments while lobbying against environmental laws" as

10  greenwashing).)  Ignoring the subjectivity of this measure, Hsu does not show how

11  such activities even correlate to whether a company is meeting its target pledge.

12      Also, it is unclear how some of the real-world examples the State provides as

13  misleading speech are actually misleading.  In arguing that "[v]oluntary disclosures do

14  not prevent the use of misleading language and greenwashing," the State provides an

15  example of a company that "aim[s] to achieve net-zero Scope 1 and 2 greenhouse gas

16  emissions in our operated assets by 2050."  (Lyon PI Decl. ¶ 31.)  The State

17  characterizes this commitment as misleading because the company "ignores the fact

18  that Scope 3 emissions are far and away the most important climate impact of oil and

19  gas production."  (*Id.* ¶ 31.)  Perhaps, if the company only committed to net-zero

20  emissions, the speech would be misleading.  But it strains credulity to call a claim

21  misleading when the company explicitly identifies the very metric it is using, even if it

22  is not the State's preferred metric.

23      In sum, based on the record before the Court, SB 253 requires a substantial

24  number of companies that have decided not to speak about climate impact to do so.

25  Even of those companies that have chosen to speak, the State's evidence does not

26  show the prevalence of those companies engaging in misleading speech.  Taken

27  together, with respect to the State's interest in correcting misleading information,

28  SBs 253 is overbroad, unduly burdensome, and not reasonably related to this interest.

**ER-2283**

The State "may reasonably decide to require disclosure for a class of solicitations that it determines pose a risk of deception." *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 735 (9th Cir. 2017). But SB 253 mandates disclosures from companies outside this "class" of speech. It does not, for example, require only companies that pledge to reduce emissions to define their metrics and report emissions according to those metrics. On this record, the laws extend broader than reasonably necessary to correct potentially misleading speech. *NIFLA*, 585 U.S. at 777 (finding notice requirement fails rational basis review where California required disclosures "wholly disconnected from California's informational interest" by requiring "covered facilities to post California's precise notice, no matter what the facilities say on site or in their advertisements").

As to whether a facial challenge succeeds, if the asserted interest of addressing misleading speech was the State's sole interest supporting SB 253, the Court would conclude "that a substantial majority of its applications are likely to fail First Amendment scrutiny." *NetChoice*, 113 F.4th at 1123. But, as discussed, the State's other proffered other interests support denial of the Motion. Accordingly, based on the above analysis, the Court finds that Plaintiffs do not show a likelihood of success on the merits as to their facial challenge to SB 253 based on the State's dual interests in providing investors with reliable information on which to make investment decisions and in reducing emissions.

### 2. SB 261

SB 261 is subject to intermediate scrutiny, so "the government may compel a disclosure of commercial speech only if (1) it directly advances a substantial governmental interest, and (2) the restriction is not more extensive than necessary to serve that interest." *Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1282–83. The State asserts the same three interests in SB 261's disclosures as it raises for SB 253's disclosures. (*See* Opp'n 16–19.)

**ER-2284**

(242 of 271) Page 242 of 271
Case: 25-5337, 09/18/2025, DktEntry: 8.10, Page 242 of 271
Case 2:24-cv-00801-ODW-PVC   Document 112   Filed 08/26/25   Page 38 of 48   Page
ID #:10560

As with SB 253, the State asserts "a compelling interest in reliable information that enables investors and consumers to make informed judgments about the impact of climate-related risks on their economic choices." (Opp'n 17.) Peter Cashion is Managing Investment Director for Sustainable Investments of CalPERS, California's public defined pensions benefit fund with roughly $500 billion in assets. (Cashion Decl. ¶¶ 1, 5.) In a declaration, he expresses the importance of SB 261's disclosure requirements to CalPERS's investments. (*Id.*) Cashion declares that "physical impacts and . . . transition risks have the power to affect our fixed assets, disrupt supply chains and increase volatility in the financial markets." (*Id.* ¶ 11.) He further explains that "consideration of climate-related financial risk and other factors is a necessary component of being an informed and responsible investor." (*Id.* ¶ 12.) Ultimately, SB 261 will enable CalPERS and other investors to "better understand the financial implications" of its investments. (*Id.* ¶ 15; *see* Lyon PI Decl. ¶ 9 (describing types of investors who benefit from disclosure of climate-related financial risks).)

Plaintiffs make the same argument to challenge SB 261 on this interest as they do with SB 253—that the law is not tailored to this interest because "the laws are not limited to companies seeking investments." (Reply 7.) While the State's burden under intermediate review is higher than the rational basis review applied to SB 253, the reasons for denying Plaintiffs' Motion to enjoin SB 253 equally apply to their challenge to SB 263. Ultimately, under intermediate review, "[t]he fit" between the legislature's ends and its means "need not be perfect nor the single best to achieve those ends, but one whose scope is narrowly tailored to achieve the legislative objective." *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1111 (9th Cir. 2004). At this stage, the State has made a sufficient showing as to the benefits of investors' desire for the specific disclosures required by SB 261 to achieve the legislature's objective in reliable information that enables investors to make informed judgments about the impact of climate-related risks on their economic choices. Therefore, as with SB 253, Court concludes that SB 261's potentially unconstitutional applications

**ER-2285**

(as applied to companies without California investors) do not "substantially outweigh" the constitutional applications (as applied to companies with California investors). *X Corp.*, 116 F.4th at 898; (*see* Ceres Report 11 (estimating 73% of covered companies are public).) Accordingly, Plaintiffs have not shown a likelihood of success on the merits as to their facial challenge to enjoin SB 261.

For completeness, the Court addresses the State's remaining articulated interests and finds that Plaintiffs have shown a likelihood of success of the merits that State's two other asserted interests do not survive First Amendment scrutiny. First, as discussed with respect to SB 253, Plaintiffs are likely to succeed in showing that SB 261's required disclosures do not directly advance the State's stated interest "in protecting its investors, consumers, and other stakeholders from fraud or misrepresentation." (Opp'n 16.)

Second, unlike with SB 253, the State's interest in reducing emissions does not support SB 261 surviving First Amendment review. As with SB 253, Plaintiffs do not dispute that this a substantial state interest but argue that the State has offered "no evidence" that SB 261 will result in fewer emissions. (Mot. 14–15 (emphasis omitted).) In response, the State contends it has "presented evidence demonstrating that disclosures of this type lead to a reduction in emissions of 7 to 10%." (Opp'n 18 (citing Lyon SJ Decl. ¶ 50).) The State cites the same four studies previously discussed for this proposition; however, none of them have studied whether the disclosures required by SB 261—climate-related risks—lead to a reduction in emissions. In three studies, the authors only considered the effect of reporting of greenhouse gas emissions, not climate-related risks, on future emissions. (*See* Lyon SJ Decl. Ex. 54 at 1382; Lyon SJ Decl. Ex. 55 at 1422–24; Lyon SJ Decl. Ex. 56 at 1466–68.) Without considering the effect of climate-related disclosures like those required by SB 261, these studies cannot show that SB 261's disclosures would reduce emissions. The final study—while considering some climate risk disclosures—only concerned voluntary disclosure, and the State provided no evidence to suggest that the

**ER-2286**

(244 of 271) Page 244 of 271 Case: 25-5337, 09/18/2025, DktEntry: 8.10, Page 244 of 271
Case 2:24-cv-00801-ODW-PVC   Document 112   Filed 08/26/25   Page 40 of 48   Page
ID #:10562

1    studied disclosures are like the ones required by SB 261. Therefore, Plaintiffs show a

2    likelihood that the State's interest in reducing emissions does not support SB 261

3    surviving First Amendment review.

4         However, as discussed, Plaintiffs do not show a likelihood that the State's

5    interest in providing reliable information to investors fails intermediate scrutiny in a

6    substantial majority of SB 261's applications. Accordingly, the Court find that

7    Plaintiffs have not shown a likelihood that SB 261's compelled disclosures violate the

8    First Amendment.[8]

9         In sum, the Court concludes that Plaintiffs have not shown a likelihood of

10   success on the merits with respect to either of its facial First Amendment challenges to

11   SBs 253 and 261.

## F.    The Remaining *Winter* Factors

13        Plaintiffs argue they will be irreparably harmed by SBs 253 and 261 because

14   the laws compel speech in violation of the First Amendment. (Mot. 18–20; Reply 9–

15   10.) As Plaintiffs have not demonstrated that the laws violate the First Amendment,

16   they have also not shown irreparable harm. *See CTIA*, 928 F.3d at 851 (concluding

17   challengers did not show irreparable harm where the court concluded that the city's

18   "ordinance complies with the First Amendment").

19        Moreover, the balance of equities favors denial of Plaintiffs' Motion. *See id.*

20   at 852 (finding challengers failed to demonstrate any hardship tipping the balance in

21   their favor where their "First Amendment claim is unlikely to succeed"). This is

22   especially true because enjoining SBs 253 and 261 would delay the State from

23   advancing the public interests for which it adopted the laws. *See id.* (finding "that an

24

---

[8] Plaintiffs also argue that SB 261 violates the First Amendment because "the definition of
'climate-related financial risk' is so broad and vague that California could almost certainly find fault
in the disclosure (or lack of disclosure) of *any* company the State disfavors." (Mot. 16.) In defining
"climate-related financial risk," SB 261 references a reporting framework that provides sufficiently
clear guidance to covered entities how to comply with the law. *See* Cal. Health & Safety Code
§ 38533(b)(1)(A)(i); (*see* Lyon SJ Decl. ¶ 14 (reporting that a large number of companies make
disclosures using the TCFD Framework).)

**ER-2287**

(245 of 271) Page 245 of 271 Case: 25-5327, 09/18/2025, DktEntry: 8.10, Page 245 of 271
Case 2:24-cv-00801-ODW-PVC   Document 114   Filed 08/26/25   Page 48 of 48   Page
ID #:10569

injunction would injure the public interest in having a free flow of accurate information").

## V.   CONCLUSION

For the reasons discussed above, the Court **DENIES** Plaintiffs' Motion for Preliminary Injunction.  (ECF No. 78.)


**IT IS SO ORDERED.**


August 13, 2025

_____
OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE

**ER-2288**

Query    Reports ▾    Utilities ▾    Help    Log Out

ACCO,(PVCx),APPEAL,DISCOVERY,MJDAP_OUT,PROTORD,STAYED

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
### CIVIL DOCKET FOR CASE #: 2:24-cv-00801-ODW-PVC

| | |
|---|---|
| Chamber of Commerce of the United States of America et al v. California Air Resources Board et al<br>Assigned to: Judge Otis D. Wright, II<br>Referred to: Magistrate Judge Pedro V. Castillo<br>Case in other court: 9th CCA, 25-05327<br>Cause: 28:2201 Constitutionality of State Statute(s) | Date Filed: 01/30/2024<br>Jury Demand: None<br>Nature of Suit: 950 Constitutional - State Statute<br>Jurisdiction: Federal Question |

**Plaintiff**

| | | |
|---|---|---|
| **Chamber of Commerce of the United States of America** | represented by | **Brian A. Richman**<br>Gibson Dunn and Crutcher, LLP<br>1050 Connecticut Avenue, NW<br>Washington, DC 20036-5306<br>202-955-8500<br>Fax: 202-467-0539<br>Email: brichman@gibsondunn.com<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Collin James Vierra**<br>Eimer Stahl LLP<br>1999 South Bascom Avenue, Suite 1025<br>Campbell, CA 95008<br>408-889-1668<br>Fax: 312-692-1718<br>Email: cvierra@eimerstahl.com *(Inactive)*<br>*ATTORNEY TO BE NOTICED* |
| | | **Daryl L. Joseffer**<br>Chamber of Commerce of the United States of America<br>1615 H Street, NW<br>Washington, DC 20062-2000<br>202-659-6000<br>Fax: 202-463-5302<br>Email: djoseffer@uschamber.com<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Elizabeth Duncan Strassner**<br>Gibson Dunn and Crutcher<br>333 South Grand Avenue<br>Los Angeles, CA 90071<br>213-229-7024 |

**ER-2289**

Fax: 213-229-6024
Email: estrassner@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Eugene Scalia**
Gibson, Dunn and Crutcher LLP
1700 M Street NW
Washington, DC 20036
202-955-8210
Email: escalia@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Katherine Moran Meeks**
Gibson, Dunn and Crutcher LLP
1050 Connecticut Ave NW
Washington, DC 20036
202-955-8258
Fax: 202-831-6023
Email: kmeeks@gibsondunn.com
*TERMINATED: 08/08/2024*
*PRO HAC VICE*

**Kevin R. Palmer**
Chamber of Commerce of the United States
of America
1615 H Street, NW
Washington, DC 20062-2000
202-659-6000
Fax: 202-463-5302
Email: kpalmer@uschamber.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert Edward Dunn**
Eimer Stahl LLP
1999 South Bascom Avenue, Suite 1025
Campbell, CA 95008
408-889-1690
Fax: 312-692-1718
Email: rdunn@eimerstahl.com
*ATTORNEY TO BE NOTICED*

**Samuel E Eckman**
Gibson Dunn and Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071
213-229-7204
Fax: 213-229-6204
Email: seckman@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Stephanie A. Maloney**
Chamber of Commerce of the USA
1615 H Street, N.W.

**ER-2290**

Washington, DC 20062
202-659-6000
Fax: 202-463-5302
Email: SMaloney@USChamber.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tyler S. Badgley**
1500 Pennsylvania Avenue
Washington, DC 20220
202-880-6993
Email: tyler.badgley@treasury.gov
*TERMINATED: 01/16/2025*
*PRO HAC VICE*

**Bradley Joseph Hamburger**
Gibson Dunn and Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071
213-229-7658
Fax: 213-229-6658
Email: bhamburger@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **California Chamber of Commerce** | represented by | **Brian A. Richman** |

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Collin James Vierra**
Eimer Stahl LLP
1999 South Bascom Avenue, Suite 1025
Campbell, CA 95008
408-889-1668
Fax: 312-692-1718
Email: cvierra@eimerstahl.com *(Inactive)*
*ATTORNEY TO BE NOTICED*

**Elizabeth Duncan Strassner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eugene Scalia**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katherine Moran Meeks**
(See above for address)
*TERMINATED: 08/08/2024*
*PRO HAC VICE*

**Robert Edward Dunn**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Samuel E Eckman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Joseph Hamburger**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**American Farm Bureau Federation**          represented by   **Brian A. Richman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Collin James Vierra**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Duncan Strassner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eugene Scalia**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katherine Moran Meeks**
(See above for address)
*TERMINATED: 08/08/2024*
*PRO HAC VICE*

**Robert Edward Dunn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel E Eckman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Joseph Hamburger**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**Los Angeles County Business Federation**   represented by   **Brian A. Richman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Collin James Vierra**
(See above for address)
*ATTORNEY TO BE NOTICED*

Elizabeth Duncan Strassner
(See above for address)
*ATTORNEY TO BE NOTICED*

Eugene Scalia
(See above for address)
*ATTORNEY TO BE NOTICED*

Katherine Moran Meeks
(See above for address)
*TERMINATED: 08/08/2024*
*PRO HAC VICE*

Robert Edward Dunn
(See above for address)
*ATTORNEY TO BE NOTICED*

Samuel E Eckman
(See above for address)
*ATTORNEY TO BE NOTICED*

Bradley Joseph Hamburger
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Central Valley Business Federation**          represented by **Brian A. Richman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Collin James Vierra
(See above for address)
*ATTORNEY TO BE NOTICED*

Elizabeth Duncan Strassner
(See above for address)
*ATTORNEY TO BE NOTICED*

Eugene Scalia
(See above for address)
*ATTORNEY TO BE NOTICED*

Katherine Moran Meeks
(See above for address)
*TERMINATED: 08/08/2024*
*PRO HAC VICE*

Robert Edward Dunn
(See above for address)
*ATTORNEY TO BE NOTICED*

Samuel E Eckman

**ER-2293**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Joseph Hamburger**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**Western Growers Association**                represented by    **Brian A. Richman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Collin James Vierra**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Duncan Strassner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eugene Scalia**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katherine Moran Meeks**
(See above for address)
*TERMINATED: 08/08/2024*
*PRO HAC VICE*

**Robert Edward Dunn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel E Eckman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Joseph Hamburger**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

<u>Defendant</u>

**California Air Resources Board**              represented by    **Caitlan Lisette McLoon**
*TERMINATED: 02/22/2024*                                         Office of the California Attorney General
Department of Justice
300 S. Spring Street
Suite 1702
Los Angeles, CA 90013
213-269-6438
Fax: 916-731-2128

**ER-2294**

Email: caitlan.mcloon@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Dylan Charles Redor**
Office of The Attorney General
300 S. Spring St.
Ste 11th Floor
Los Angeles, CA 90013
213-269-6706
Email: dylan.redor@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Margaret Elaine Meckenstock**
California Department of Justice
1515 Clay Street 20th Floor
Oakland, CA 94612-1492
510-879-0299
Fax: 510-622-2270
Email: Elaine.Meckenstock@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Liane M. Randolph**                    represented by   **Caitlan Lisette McLoon**
*in her official capacity as Chair of the*                (See above for address)
*California Air Resources Board*                          *ATTORNEY TO BE NOTICED*

                                                          **Dylan Charles Redor**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Margaret Elaine Meckenstock**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**Steven S. Cliff**                      represented by   **Caitlan Lisette McLoon**
*in his official capacity as the Executive*               (See above for address)
*Officer of the California Air Resources*                 *ATTORNEY TO BE NOTICED*
*Board*
                                                          **Dylan Charles Redor**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Margaret Elaine Meckenstock**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**Robert A. Bonta**                      represented by   **Caitlan Lisette McLoon**
*in his official capacity as Attorney General*            (See above for address)
*of California*                                           *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Dylan Charles Redor**

**ER-2295**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Margaret Elaine Meckenstock**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/30/2024 | 1 | COMPLAINT Receipt No: ACACDC-36817759 - Fee: $405, filed by Plaintiffs Western Growers Association, American Farm Bureau Federation, California Chamber of Commerce, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Central Valley Business Federation. (Attorney Bradley Joseph Hamburger added to party American Farm Bureau Federation(pty:pla), Attorney Bradley Joseph Hamburger added to party California Chamber of Commerce(pty:pla), Attorney Bradley Joseph Hamburger added to party Central Valley Business Federation(pty:pla), Attorney Bradley Joseph Hamburger added to party Chamber of Commerce of the United States of America(pty:pla), Attorney Bradley Joseph Hamburger added to party Los Angeles County Business Federation(pty:pla), Attorney Bradley Joseph Hamburger added to party Western Growers Association(pty:pla))(Hamburger, Bradley) (Entered: 01/30/2024) |
| 01/30/2024 | 2 | CIVIL COVER SHEET filed by Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association. (Hamburger, Bradley) (Entered: 01/30/2024) |
| 01/30/2024 | 3 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening),,, 1 filed by Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association. (Attachments: # 1 Summons in a Civil Action, # 2 Summons in a Civil Action) (Hamburger, Bradley) (Entered: 01/30/2024) |
| 01/30/2024 | 4 | CORPORATE DISCLOSURE STATEMENT *AND NOTICE OF INTERESTED PARTIES* filed by Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association (Hamburger, Bradley) (Entered: 01/30/2024) |
| 02/01/2024 | 5 | NOTICE TO COUNSEL re Magistrate Judge Direct Assignment Program. This case has been randomly assigned to Magistrate Judge Karen L. Stevenson. (Attachments: # 1 CV11C) (jtil) (Entered: 02/01/2024) |
| 02/01/2024 | 6 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening), 1 as to Defendants California Air Resources Board, Steven S. Cliff, Liane M. Randolph. (jtil) (Entered: 02/01/2024) |
| 02/02/2024 | 7 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Katherine Meeks. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of |

| | | record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (jtil) (Entered: 02/02/2024) |
|---|---|---|
| 02/02/2024 | 8 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Brian A. Richman. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (jtil) (Entered: 02/02/2024) |
| 02/02/2024 | 9 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Daryl Joseffer. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (jtil) (Entered: 02/02/2024) |
| 02/02/2024 | 10 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Tyler Badgley. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (jtil) (Entered: 02/02/2024) |
| 02/02/2024 | 11 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Kevin Palmer. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (jtil) (Entered: 02/02/2024) |
| 02/02/2024 | 12 | Notice of Appearance or Withdrawal of Counsel: for attorney Eugene Scalia counsel for Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association. Adding Eugene Scalia as counsel of record for Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association for the reason indicated in the G-123 Notice. Filed by Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American |

**ER-2297**

| | | Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association. (Attorney Eugene Scalia added to party American Farm Bureau Federation(pty:pla), Attorney Eugene Scalia added to party California Chamber of Commerce(pty:pla), Attorney Eugene Scalia added to party Central Valley Business Federation(pty:pla), Attorney Eugene Scalia added to party Chamber of Commerce of the United States of America(pty:pla), Attorney Eugene Scalia added to party Los Angeles County Business Federation(pty:pla), Attorney Eugene Scalia added to party Western Growers Association(pty:pla))(Scalia, Eugene) (Entered: 02/02/2024) |
|---|---|---|
| 02/06/2024 | 13 | PROOF OF SERVICE Executed by Plaintiff Western Growers Association, American Farm Bureau Federation, California Chamber of Commerce, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Central Valley Business Federation, upon Defendant California Air Resources Board served on 2/2/2024, answer due 2/23/2024. Service of the Summons and Complaint were executed upon Bee Marie, Legal, in compliance with Federal Rules of Civil Procedure by personal service (Hamburger, Bradley) (Entered: 02/06/2024) |
| 02/06/2024 | 14 | PROOF OF SERVICE Executed by Plaintiff Western Growers Association, American Farm Bureau Federation, California Chamber of Commerce, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Central Valley Business Federation, upon Defendant Liane M. Randolph served on 2/2/2024, answer due 2/23/2024. Service of the Summons and Complaint were executed upon Bee Marie, Legal, in compliance with Federal Rules of Civil Procedure by personal service (Hamburger, Bradley) (Entered: 02/06/2024) |
| 02/06/2024 | 15 | PROOF OF SERVICE Executed by Plaintiff Western Growers Association, American Farm Bureau Federation, California Chamber of Commerce, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Central Valley Business Federation, upon Defendant Steven S. Cliff served on 2/2/2024, answer due 2/23/2024. Service of the Summons and Complaint were executed upon Bee Marie, Legal, in compliance with Federal Rules of Civil Procedure by personal service (Hamburger, Bradley) (Entered: 02/06/2024) |
| 02/09/2024 | 16 | APPLICATION of Non-Resident Attorney Katherine Moran Meeks to Appear Pro Hac Vice on behalf of Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-36894843) filed by Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association. (Attachments: # 1 Proposed Order) (Hamburger, Bradley) (Entered: 02/09/2024) |
| 02/09/2024 | 17 | APPLICATION of Non-Resident Attorney Brian Alan Richman to Appear Pro Hac Vice on behalf of Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-36894927) filed by Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association. (Attachments: # 1 Proposed Order) (Hamburger, Bradley) (Entered: 02/09/2024) |
| 02/09/2024 | 18 | APPLICATION of Non-Resident Attorney Daryl L. Joseffer to Appear Pro Hac Vice on behalf of Plaintiff Chamber of Commerce of the United States of America (Pro Hac Vice |

**ER-2298**

|  |  | Fee - $500 Fee Paid, Receipt No. ACACDC-36894970) filed by Plaintiff Chamber of Commerce of the United States of America. (Attachments: # 1 Proposed Order) (Hamburger, Bradley) (Entered: 02/09/2024) |
|---|---|---|
| 02/09/2024 | 19 | APPLICATION of Non-Resident Attorney Tyler S. Badgley to Appear Pro Hac Vice on behalf of Plaintiff Chamber of Commerce of the United States of America (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-36894995) filed by Plaintiff Chamber of Commerce of the United States of America. (Attachments: # 1 Proposed Order) (Hamburger, Bradley) (Entered: 02/09/2024) |
| 02/09/2024 | 20 | APPLICATION of Non-Resident Attorney Kevin R. Palmer to Appear Pro Hac Vice on behalf of Plaintiff Chamber of Commerce of the United States of America (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-36895039) filed by Plaintiff Chamber of Commerce of the United States of America. (Attachments: # 1 Proposed Order) (Hamburger, Bradley) (Entered: 02/09/2024) |
| 02/12/2024 | 21 | ORDER by Magistrate Judge Karen L. Stevenson: Granting 16 Non-Resident Attorney Katherine Moran Meeks APPLICATION to Appear Pro Hac Vice on behalf of Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association, designating Bradley J. Hamburger as local counsel. (et) (Entered: 02/12/2024) |
| 02/12/2024 | 22 | ORDER by Magistrate Judge Karen L. Stevenson: Granting 17 Non-Resident Attorney Brian A. Richman APPLICATION to Appear Pro Hac Vice on behalf of of Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association, designating Bradley J. Hamburger as local counsel. (et) (Entered: 02/12/2024) |
| 02/12/2024 | 23 | ORDER by Magistrate Judge Karen L. Stevenson: Granting 18 Non-Resident Attorney Daryl L. Joseffer APPLICATION to Appear Pro Hac Vice on behalf of Plaintiff Chamber of Commerce of the United States of America, designating Bradley J. Hamburger as local counsel. (et) (Entered: 02/12/2024) |
| 02/12/2024 | 24 | ORDER by Magistrate Judge Karen L. Stevenson: Granting 19 Non-Resident Attorney Tyler S. Badgley APPLICATION to Appear Pro Hac Vice on behalf of Plaintiff Chamber of Commerce of the United States of America, designating Bradley J. Hamburger as local counsel. (et) (Entered: 02/12/2024) |
| 02/12/2024 | 25 | ORDER by Magistrate Judge Karen L. Stevenson: Granting 20 Non-Resident Attorney Kevin R. Palmer APPLICATION to Appear Pro Hac Vice on behalf of Plaintiff Chamber of Commerce of the United States of America, designating Bradley J. Hamburger as local counsel. (et) (Entered: 02/12/2024) |
| 02/16/2024 | 26 | REMINDER NOTICE re Magistrate Judge Direct Assignment Program. Each party must file form CV-11C within the consent deadlines pursuant to L.R. 73-2. Additionally, the parties are directed to L.R. 73-2.2 Proof of Service. In any case in which only a magistrate judge is initially assigned, plaintiff must file a proof of service within 10 days of service of the summons and complaint as to each defendant. (hr) (Entered: 02/16/2024) |
| 02/21/2024 | 27 | Joint STIPULATION for Extension of Time to File Answer to March 27, 2024 filed by Defendants California Air Resources Board, Steven S. Cliff, Liane M. Randolph. (Attachments: # 1 Proposed Order Granting Stipulation Extending Time for Defendants to File Responsive Pleading & Setting Briefing Schedule for Motion to Dismiss)(Attorney Caitlan Lisette McLoon added to party California Air Resources Board(pty:dft), Attorney Caitlan Lisette McLoon added to party Steven S. Cliff(pty:dft), Attorney Caitlan Lisette |

**ER-2299**

| | | McLoon added to party Liane M. Randolph(pty:dft))(McLoon, Caitlan) (Entered: 02/21/2024) |
|---|---|---|
| 02/22/2024 | 28 | FIRST AMENDED COMPLAINT against Defendants Steven S. Cliff, Liane M. Randolph, Robert A. Bonta amending Complaint (Attorney Civil Case Opening),,, 1 , filed by Plaintiffs Western Growers Association, American Farm Bureau Federation, California Chamber of Commerce, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Central Valley Business Federation(Hamburger, Bradley) (Entered: 02/22/2024) |
| 02/22/2024 | 29 | Request for Clerk to Issue Summons on Amended Complaint/Petition, 28 filed by Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association. (Hamburger, Bradley) (Entered: 02/22/2024) |
| 02/23/2024 | 30 | ORDER GRANTING JOINT STIPULATION EXTENDING TIME FOR DEFENDANTS TO FILE RESPONSIVE PLEADING AND SETTING BRIEFING SCHEDULE FOR DEFENDANTS' MOTION TO DISMISS by Magistrate Judge Karen L. Stevenson, re Stipulation to Extend Time to Answer 27 . 1. Defendants shall have until March 27, 2024, to file their motion to dismiss or other responsive pleading in this matter. (see document for further details) (hr) (Entered: 02/27/2024) |
| 02/27/2024 | 31 | 21 DAY Summons Issued re First Amended Complaint 28 as to Defendant Robert A. Bonta. (hr) (Entered: 02/27/2024) |
| 03/07/2024 | 32 | WAIVER OF SERVICE Returned Executed filed by Plaintiffs Western Growers Association, American Farm Bureau Federation, California Chamber of Commerce, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Central Valley Business Federation. upon Robert A. Bonta waiver sent by Plaintiff on 3/1/2024, answer due 4/30/2024. Waiver of Service signed by 03/05/2024. (Hamburger, Bradley) (Entered: 03/07/2024) |
| 03/11/2024 | 33 | STATEMENT Declining Consent to Proceed Before A United States Magistrate Judge filed by Defendants California Air Resources Board, Steven S. Cliff, Liane M. Randolph (McLoon, Caitlan) (Entered: 03/11/2024) |
| 03/12/2024 | 34 | NOTICE OF REASSIGNMENT of MJDAP case from Magistrate Judge Karen L. Stevenson to Judge Fernando M. Olguin for all further proceedings. Any discovery matters that may be referred to a Magistrate Judge are assigned to U.S. Magistrate Judge Pedro V. Castillo. The case number will now reflect the initials of the transferee Judges 2:24-cv-00801 FMO(PVCx). (rn) (Entered: 03/12/2024) |
| 03/14/2024 | 35 | TEXT ONLY ENTRY by Chambers of Judge Fernando M. Olguin. This matter has been assigned to District Judge Fernando M. Olguin. The Court refers counsel to the Court's Initial Standing Order found on the Court's Website under Judge Olguin's Procedures and Schedules. Please read this Order carefully. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (vdr) TEXT ONLY ENTRY (Entered: 03/14/2024) |
| 03/22/2024 | 36 | Joint STIPULATION to Clarify Court Ordered Briefing Schedule and Extended Period for Hearing Defendants' Motion to Dismiss, Re: Order, 30 , filed by Defendants Robert A. Bonta, Steven S. Cliff, Liane M. Randolph. (Attachments: # 1 Proposed Order Confirming Court Ordered Briefing Schedule and Extending Period for Hearing on Defendants' Motion to Dismiss)(Attorney Caitlan Lisette McLoon added to party Robert A. Bonta(pty:dft))(McLoon, Caitlan) (Entered: 03/22/2024) |
| 03/26/2024 | 37 | ORDER ON STIPULATION 36 by Judge Fernando M. Olguin. (vdr) (Entered: 03/26/2024) |

**ER-2300**

| 03/27/2024 | 38 | NOTICE OF MOTION AND MOTION to Dismiss Amended Complaint *for Declaratory and Injunctive Relief* filed by Defendants Robert A. Bonta, Steven S. Cliff, Liane M. Randolph. Motion set for hearing on 6/20/2024 at 10:00 AM before Judge Fernando M. Olguin. (Attachments: # 1 Memorandum of Points and Authorities In Support of Defendants' Motion to Dismiss Plaintiffs' Amended Complaint for Declaratory and Injunctive Relief, # 2 Proposed Order Granting Defendants Motion to Dismiss Plaintiffs' Amended Complaint for Declaratory and Injunctive Relief) (McLoon, Caitlan) (Entered: 03/27/2024) |
| --- | --- | --- |
| 03/27/2024 | 39 | REQUEST FOR JUDICIAL NOTICE re NOTICE OF MOTION AND MOTION to Dismiss Amended Complaint *for Declaratory and Injunctive Relief* 38 filed by Defendants Robert A. Bonta, Steven S. Cliff, Liane M. Randolph. (Attachments: # 1 Declaration of Caitlan McLoon in Support of Defendants' Request for Judicial Notice in Support of Motion, # 2 Exhibit 1 to Declaration of Caitlan McLoon, # 3 Exhibit 2 to Declaration of Caitlan McLoon, # 4 Exhibit 3 to Declaration of Caitlan McLoon, # 5 Proposed Order Granting Request for Judicial Notice in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Complaint for Declaratory and Injunctive Relief)(McLoon, Caitlan) (Entered: 03/27/2024) |
| 03/28/2024 | 40 | ORDER SETTING SCHEDULING CONFERENCE by Judge Fernando M. Olguin. Scheduling Conference set for 6/20/2024 at 10:00 AM before Judge Fernando M. Olguin. (vdr) (Entered: 03/28/2024) |
| 03/29/2024 | 41 | ORDER TO REASSIGN CASE due to self-recusal pursuant to this Court's General Order in the Matter of Assignment of Cases and Duties to the District Judges.by Judge Fernando M. Olguin. Case transferred from Judge Fernando M. Olguin to the calendar of Judge Otis D. Wright, II for all further proceedings. Case number now reads as 2:24-cv-00801 ODW(PVCx). (rn) (Entered: 03/29/2024) |
| 04/01/2024 | 42 | COUNSEL ARE NOTIFIED, the case was reassigned and will be heard before Judge Wright. The MOTION to Dismiss Amended Complaint for Declaratory and Injunctive Relief 38 and the Scheduling Conference are CONTINUED to 6/24/2024 at 1:30 PM before Judge Otis D. Wright II. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sce) TEXT ONLY ENTRY (Entered: 04/01/2024) |
| 05/01/2024 | 43 | OPPOSITION to NOTICE OF MOTION AND MOTION to Dismiss Amended Complaint *for Declaratory and Injunctive Relief* 38 filed by Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association. (Hamburger, Bradley) (Entered: 05/01/2024) |
| 05/14/2024 | 44 | Joint STIPULATION for Order Re Briefing Schedule and Hearing Dates for the Parties' Motions for Summary Judgment as to Claim I and Defendant's Motion to Dismiss, and Request to Defer Scheduling Conference filed by Defendants American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association. (Attachments: # 1 Proposed Order) (Hamburger, Bradley) (Entered: 05/14/2024) |
| 05/16/2024 | 45 | NOTICE OF APPEARANCE of California Attorney General Office Dylan C. Redor on behalf of Defendants California Air Resources Board. (Attorney Dylan Charles Redor added to party California Air Resources Board(pty:dft))(Redor, Dylan) (Entered: 05/16/2024) |
| 05/17/2024 | 46 | ORDER GRANTING JOINT STIPULATION REGARDING BRIEFING SCHEDULE AND HEARING DATES FOR THE PARTIES' MOTIONS FOR SUMMARY |

**ER-2301**

| | | |
|---|---|---|
| | | JUDGMENT AS TO CLAIM I AND DEFENDANT'S MOTION TO DISMISS, AND REQUEST TO DEFER SCHEDULING CONFERENCE 44 by Judge Otis D. Wright, II: 1. Plaintiffs shall have until May 24, 2024 to file their motion for summary judgment; 2. Any amicus briefs in support of Plaintiffs motion for summary judgment shall be filed by June 5, 2024; 3. The deadline for Defendants to file a reply in support of their motion to dismiss shall be continued to June 7, 2024; 4. Defendants' opposition to Plaintiffs' motion for summary judgment and potential cross-motion for summary judgment shall be filed by July 15, 2024; 5. Any amicus briefs in support of Defendants' opposition to Plaintiffs' motion for summary judgment and Defendants' potential cross-motion for summary judgment shall be filed by July 24, 2024; 6. Plaintiffs' reply in support of their motion for summary judgment and opposition to Defendants' potential cross-motion for summary judgment shall be filed by August 5, 2024; 7. Defendants' reply in support of its cross-motion for summary judgment (if filed) shall be filed by August 26, 2024; 8. Plaintiffs' motion for summary judgment and Defendants' potential cross-motion for summary judgment shall be noticed for a hearing on September 9, 2024, or as soon thereafter as the matter may heard. The hearing on Defendants' motion to dismiss 38 , is CONTINUED to September 9, 2024, at 1:30 p.m., to facilitate the Court's consideration of all pending motions at the same time; and 10. The Scheduling Conference currently set for June 24, 2024 is hereby VACATED. (lc) (Entered: 05/17/2024) |
| 05/23/2024 | 47 | First NOTICE of Appearance filed by attorney Margaret Elaine Meckenstock on behalf of Defendants Robert A. Bonta, California Air Resources Board, Steven S. Cliff, Liane M. Randolph (Attorney Margaret Elaine Meckenstock added to party Robert A. Bonta(pty:dft), Attorney Margaret Elaine Meckenstock added to party California Air Resources Board(pty:dft), Attorney Margaret Elaine Meckenstock added to party Steven S. Cliff(pty:dft), Attorney Margaret Elaine Meckenstock added to party Liane M. Randolph(pty:dft))(Meckenstock, Margaret) (Entered: 05/23/2024) |
| 05/24/2024 | 48 | NOTICE OF MOTION AND MOTION for Summary Judgment as to Claim I filed by Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association. Motion set for hearing on 9/9/2024 at 01:30 PM before Judge Otis D. Wright II. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Separate Statement of Uncontroverted Facts, # 3 Declaration of Bradley J. Hamburger, # 4 Exhibit 1 to Hamburger Decl., # 5 Exhibit 2 to Hamburger Decl., # 6 Exhibit 3 to Hamburger Decl., # 7 Exhibit 4 to Hamburger Decl., # 8 Exhibit 5 to Hamburger Decl., # 9 Exhibit 6 to Hamburger Decl., # 10 Exhibit 7 to Hamburger Decl., # 11 Exhibit 8 to Hamburger Decl., # 12 Exhibit 9 to Hamburger Decl., # 13 Exhibit 10 to Hamburger Decl., # 14 Exhibit 11 to Hamburger Decl., # 15 Exhibit 12 to Hamburger Decl., # 16 Exhibit 13 to Hamburger Decl., # 17 Exhibit 14 to Hamburger Decl., # 18 Exhibit 15 to Hamburger Decl., # 19 Exhibit 16 to Hamburger Decl., # 20 Exhibit 17 to Hamburger Decl., # 21 Exhibit 18 to Hamburger Decl., # 22 Exhibit 19 to Hamburger Decl., # 23 Exhibit 20 to Hamburger Decl., # 24 Exhibit 21 to Hamburger Decl., # 25 Exhibit 22 to Hamburger Decl., # 26 Exhibit 23 to Hamburger Decl., # 27 Exhibit 24 to Hamburger Decl., # 28 Exhibit 25 to Hamburger Decl., # 29 Exhibit 26 to Hamburger Decl., # 30 Declaration of Edward J. Shoen, # 31 Declaration of Garrett Hawkins, # 32 Declaration of Michael White, # 33 Proposed Order) (Hamburger, Bradley) (Entered: 05/24/2024) |
| 06/07/2024 | 49 | MEMORANDUM in Support of NOTICE OF MOTION AND MOTION to Dismiss Amended Complaint *for Declaratory and Injunctive Relief* 38 filed by Defendants Robert A. Bonta, Liane M. Randolph. (McLoon, Caitlan) (Entered: 06/07/2024) |

**ER-2302**

| 07/09/2024 | 50 | STIPULATION for Order an order regarding briefing schedule filed by Defendant Robert A. Bonta, Steven S. Cliff, Liane M. Randolph. (Attachments: # 1 Proposed Order)(Redor, Dylan) (Entered: 07/09/2024) |
|---|---|---|
| 07/10/2024 | 51 | ORDER UPON STIPULATON 50 by Judge Otis D. Wright, II 1. The deadline for Defendants to file their opposition to Plaintiffs' motion for summary judgment shall be continued to July 24, 2024; 2. Defendants shall file their Rule 56(d) motion no later than July 24; 3. The deadline for any amicus briefs in support of Defendants' motion for summary judgment to be filed shall be continued to August 5, 2024; 4. The deadline for Plaintiffs to file their reply brief in support of their motion for summary judgment shall be continued to August 19, 2024; 5. Plaintiffs shall file their opposition to Defendants' Rule 56(d) motionno later than August 19, 2024; 6. Defendants shall file their reply in support of their Rule 56(d) motion no later than August 26, 2024; 7. The hearing on Defendants' Rule 56(d) motion is set for September 9, 2024, at 1:30 p.m., in Courtroom 5D of the United States District Court for the Central District of California, located at 530 W. 1st St., Los Angeles, CA 90012, to facilitate the Court's consideration of all pending motions at the same time. (lc) (Entered: 07/10/2024) |
| 07/24/2024 | 52 | Defendants' Opposition to Plaintiffs' Motion for Summary Judgment on Claim I Opposition re: NOTICE OF MOTION AND MOTION for Summary Judgment as to Claim I 48 filed by Defendants Robert A. Bonta, Steven S. Cliff, Liane M. Randolph. (Attachments: # 1 Defendants' Separate Statement of Genuine Disputes of Material Facts, # 2 Defendants' Objections to Plaintiffs' Statement of Uncontroverted Facts, # 3 Table of Contents for Declaration Exhibits, # 4 Certificate of Service for Declarations and Table of Contents, # 5 Declaration of Peter Cashion ISO Opposition to Plaintiffs Motion for Summary Judgment, # 6 Declaration of Caitlan McLoon ISO Opposition to Plaintiffs Motion for Summary Judgment, # 7 Exhibit 1 to Declaration of Caitlan McLoon, # 8 Exhibit 2 to Declaration of Caitlan McLoon, # 9 Exhibit 3 to Declaration of Caitlan McLoon, # 10 Exhibit 4 to Declaration of Caitlan McLoon, # 11 Exhibit 5 to Declaration of Caitlan McLoon, # 12 Exhibit 6 to Declaration of Caitlan McLoon, # 13 Exhibit 7 to Declaration of Caitlan McLoon)(McLoon, Caitlan) (Entered: 07/24/2024) |
| 07/24/2024 | 53 | DECLARATION of James Burton in opposition to NOTICE OF MOTION AND MOTION for Summary Judgment as to Claim I 48 filed by Defendants Robert A. Bonta, Steven S. Cliff, Liane M. Randolph. (Attachments: # 1 Exhibit 1 to Declaration of James P. Burton, # 2 Exhibit 2 to Declaration of James P. Burton, # 3 Exhibit 3 to Declaration of James P. Burton, # 4 Exhibit 4 to Declaration of James P. Burton, # 5 Exhibit 5 to Declaration of James P. Burton, # 6 Exhibit 6 to Declaration of James P. Burton, # 7 Exhibit 7 to Declaration of James P. Burton, # 8 Exhibit 8 to Declaration of James P. Burton, # 9 Exhibit 9 to Declaration of James P. Burton, # 10 Exhibit 10 to Declaration of James P. Burton, # 11 Exhibit 11 to Declaration of James P. Burton, # 12 Exhibit 12 to Declaration of James P. Burton, # 13 Exhibit 13 to Declaration of James P. Burton, # 14 Exhibit 14 to Declaration of James P. Burton, # 15 Exhibit 15 to Declaration of James P. Burton, # 16 Exhibit 16 to Declaration of James P. Burton, # 17 Exhibit 17 to Declaration of James P. Burton, # 18 Exhibit 18 to Declaration of James P. Burton, # 19 Exhibit 19 to Declaration of James P. Burton, # 20 Exhibit 20 to Declaration of James P. Burton, # 21 Exhibit 21 to Declaration of James P. Burton, # 22 Exhibit 22 to Declaration of James P. Burton, # 23 Exhibit 23 to Declaration of James P. Burton)(McLoon, Caitlan) (Entered: 07/24/2024) |
| 07/24/2024 | 54 | DECLARATION of George Georgiev in opposition to NOTICE OF MOTION AND MOTION for Summary Judgment as to Claim I 48 filed by Defendants Robert A. Bonta, Steven S. Cliff, Liane M. Randolph. (Attachments: # 1 Exhibit 1 to Declaration of George Georgiev, # 2 Exhibit 2 to Declaration of George Georgiev, # 3 Exhibit 3 to Declaration of George Georgiev, # 4 Exhibit 4 to Declaration of George Georgiev, # 5 Exhibit 5 to |

| | | |
|---|---|---|
| | | Declaration of George Georgiev, # 6 Exhibit 6 to Declaration of George Georgiev, # 7 Exhibit 7 to Declaration of George Georgiev, # 8 Exhibit 8 to Declaration of George Georgiev, # 9 Exhibit 9 to Declaration of George Georgiev, # 10 Exhibit 10 to Declaration of George Georgiev, # 11 Exhibit 11 to Declaration of George Georgiev, # 12 Exhibit 12 to Declaration of George Georgiev, # 13 Exhibit 13 to Declaration of George Georgiev, # 14 Exhibit 14 to Declaration of George Georgiev, # 15 Exhibit 15 to Declaration of George Georgiev, # 16 Exhibit 16 to Declaration of George Georgiev, # 17 Exhibit 17 to Declaration of George Georgiev, # 18 Exhibit 18 to Declaration of George Georgiev, # 19 Exhibit 19 to Declaration of George Georgiev, # 20 Exhibit 20 to Declaration of George Georgiev, # 21 Exhibit 21 to Declaration of George Georgiev, # 22 Exhibit 22 to Declaration of George Georgiev, # 23 Exhibit 23 to Declaration of George Georgiev, # 24 Exhibit 24 to Declaration of George Georgiev, # 25 Exhibit 25 to Declaration of George Georgiev, # 26 Exhibit 26 to Declaration of George Georgiev, # 27 Exhibit 27 to Declaration of George Georgiev, # 28 Exhibit 28 to Declaration of George Georgiev, # 29 Exhibit 29 to Declaration of George Georgiev, # 30 Exhibit 30 to Declaration of George Georgiev, # 31 Exhibit 31 to Declaration of George Georgiev, # 32 Exhibit 32 to Declaration of George Georgiev, # 33 Exhibit 33 to Declaration of George Georgiev, # 34 Exhibit 34 to Declaration of George Georgiev, # 35 Exhibit 35 to Declaration of George Georgiev, # 36 Exhibit 36 to Declaration of George Georgiev, # 37 Exhibit 37 to Declaration of George Georgiev)(McLoon, Caitlan) (Entered: 07/24/2024) |
| 07/24/2024 | 55 | DECLARATION of Elizabeth Scheehle in opposition to NOTICE OF MOTION AND MOTION for Summary Judgment as to Claim I 48 filed by Defendants Robert A. Bonta, Steven S. Cliff, Liane M. Randolph. (Attachments: # 1 Exhibit 1 to Declaration of Elizabeth Scheehle, # 2 Exhibit 2 to Declaration of Elizabeth Scheehle, # 3 Exhibit 3 to Declaration of Elizabeth Scheehle, # 4 Exhibit 4 to Declaration of Elizabeth Scheehle, # 5 Exhibit 5 to Declaration of Elizabeth Scheehle, # 6 Exhibit 6 to Declaration of Elizabeth Scheehle, # 7 Exhibit 7 to Declaration of Elizabeth Scheehle, # 8 Exhibit 8 to Declaration of Elizabeth Scheehle, # 9 Exhibit 9 to Declaration of Elizabeth Scheehle, # 10 Exhibit 10 to Declaration of Elizabeth Scheehle, # 11 Exhibit 11 to Declaration of Elizabeth Scheehle, # 12 Exhibit 12 to Declaration of Elizabeth Scheehle, # 13 Exhibit 13 to Declaration of Elizabeth Scheehle, # 14 Exhibit 14 to Declaration of Elizabeth Scheehle, # 15 Exhibit 15 to Declaration of Elizabeth Scheehle, # 16 Exhibit 16 to Declaration of Elizabeth Scheehle, # 17 Exhibit 17 to Declaration of Elizabeth Scheehle, # 18 Exhibit 18 to Declaration of Elizabeth Scheehle, # 19 Exhibit 19 to Declaration of Elizabeth Scheehle, # 20 Exhibit 20 to Declaration of Elizabeth Scheehle, # 21 Exhibit 21 to Declaration of Elizabeth Scheehle, # 22 Exhibit 22 to Declaration of Elizabeth Scheehle, # 23 Exhibit 23 to Declaration of Elizabeth Scheehle, # 24 Exhibit 24 to Declaration of Elizabeth Scheehle, # 25 Exhibit 25 to Declaration of Elizabeth Scheehle, # 26 Exhibit 26 to Declaration of Elizabeth Scheehle, # 27 Exhibit 27 to Declaration of Elizabeth Scheehle, # 28 Exhibit 28 to Declaration of Elizabeth Scheehle, # 29 Exhibit 29 to Declaration of Elizabeth Scheehle)(McLoon, Caitlan) (Entered: 07/24/2024) |
| 07/24/2024 | 56 | DECLARATION of Thomas Lyon in opposition to NOTICE OF MOTION AND MOTION for Summary Judgment as to Claim I 48 filed by Defendants Robert A. Bonta, Steven S. Cliff, Liane M. Randolph. (Attachments: # 1 Exhibit 1 to Declaration of Thomas Lyon, # 2 Exhibit 2 to Declaration of Thomas Lyon, # 3 Exhibit 3 to Declaration of Thomas Lyon, # 4 Exhibit 4 to Declaration of Thomas Lyon, # 5 Exhibit 5 to Declaration of Thomas Lyon, # 6 Exhibit 6 to Declaration of Thomas Lyon, # 7 Exhibit 7 to Declaration of Thomas Lyon, # 8 Exhibit 8 to Declaration of Thomas Lyon, # 9 Exhibit 9 to Declaration of Thomas Lyon, # 10 Exhibit 10 to Declaration of Thomas Lyon, # 11 Exhibit 11 to Declaration of Thomas Lyon, # 12 Exhibit 12 to Declaration of Thomas Lyon, # 13 Exhibit 13 to Declaration of Thomas Lyon, # 14 Exhibit 14 to Declaration of Thomas Lyon, # 15 Exhibit 15 to Declaration of Thomas Lyon, # 16 Exhibit 16 to Declaration of Thomas Lyon, # 17 Exhibit 17 to Declaration of Thomas Lyon, # 18 |

| | | |
|---|---|---|
| | | Exhibit 18 to Declaration of Thomas Lyon, # 19 Exhibit 19 to Declaration of Thomas Lyon, # 20 Exhibit 20 to Declaration of Thomas Lyon, # 21 Exhibit 21 to Declaration of Thomas Lyon, # 22 Exhibit 22 to Declaration of Thomas Lyon, # 23 Exhibit 23 to Declaration of Thomas Lyon, # 24 Exhibit 24 to Declaration of Thomas Lyon, # 25 Exhibit 25 to Declaration of Thomas Lyon, # 26 Exhibit 26 to Declaration of Thomas Lyon, # 27 Exhibit 27 to Declaration of Thomas Lyon, # 28 Exhibit 28 to Declaration of Thomas Lyon, # 29 Exhibit 29 to Declaration of Thomas Lyon, # 30 Exhibit 30 to Declaration of Thomas Lyon, # 31 Exhibit 31 to Declaration of Thomas Lyon, # 32 Exhibit 32 to Declaration of Thomas Lyon, # 33 Exhibit 33 to Declaration of Thomas Lyon, # 34 Exhibit 34 to Declaration of Thomas Lyon, # 35 Exhibit 35 to Declaration of Thomas Lyon, # 36 Exhibit 36 to Declaration of Thomas Lyon, # 37 Exhibit 37 to Declaration of Thomas Lyon, # 38 Exhibit 38 to Declaration of Thomas Lyon, # 39 Exhibit 39 to Declaration of Thomas Lyon, # 40 Exhibit 40 to Declaration of Thomas Lyon, # 41 Exhibit 41 to Declaration of Thomas Lyon, # 42 Exhibit 42 to Declaration of Thomas Lyon, # 43 Exhibit 43 to Declaration of Thomas Lyon, # 44 Exhibit 44 to Declaration of Thomas Lyon, # 45 Exhibit 45 to Declaration of Thomas Lyon, # 46 Exhibit 46 to Declaration of Thomas Lyon, # 47 Exhibit 47 to Declaration of Thomas Lyon, # 48 Exhibit 48 to Declaration of Thomas Lyon, # 49 Exhibit 49 to Declaration of Thomas Lyon, # 50 Exhibit 50 to Declaration of Thomas Lyon, # 51 Exhibit 51 to Declaration of Thomas Lyon, # 52 Exhibit 52 to Declaration of Thomas Lyon, # 53 Exhibit 53 to Declaration of Thomas Lyon, # 54 Exhibit 54 to Declaration of Thomas Lyon, # 55 Exhibit 55 to Declaration of Thomas Lyon, # 56 Exhibit 56 to Declaration of Thomas Lyon)(McLoon, Caitlan) (Entered: 07/24/2024) |
| 07/24/2024 | 57 | NOTICE OF MOTION AND MOTION for Order for Granting Defendants Motion To Deny Or Defer Plaintiffs Motion For Summary Judgment On Claim I Under Rule 56(D) filed by Defendants Robert A. Bonta, Steven S. Cliff, Liane M. Randolph. Motion set for hearing on 9/9/2024 at 01:30 PM before Judge Otis D. Wright II. (Attachments: # 1 Defendants' 56(d) Motion to Deny or Defer Plaintiffs' Motion for Summary Judgment on Claim I, # 2 Declaration of Caitlan McLoon ISO Defendants' Motion to Deny or Defer Plaintiffs' Motion for Summary Judgment on Claim I, # 3 Exhibit 1 to Declaration of Caitlan McLoon, # 4 Exhibit 2 to Declaration of Caitlan McLoon, # 5 Proposed Order Granting Defendants Motion To Deny Or Defer Plaintiffs Motion For Summary Judgment On Claim I Under Rule 56(D)) (McLoon, Caitlan) (Entered: 07/24/2024) |
| 08/08/2024 | 58 | Notice of Appearance or Withdrawal of Counsel: for attorney Katherine Moran Meeks counsel for Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association. Katherine Moran Meeks is no longer counsel of record for the aforementioned party in this case for the reason indicated in the G-123 Notice. Filed by Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association. (Meeks, Katherine) (Entered: 08/08/2024) |
| 08/19/2024 | 59 | REPLY In Support Of NOTICE OF MOTION AND MOTION for Summary Judgment as to Claim I 48 filed by Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association. (Attachments: # 1 Reply In Support Of Statement of Uncontroverted Facts, # 2 Response to Defendants' Objections to Plaintiffs' Statement of Uncontroverted Facts) (Hamburger, Bradley) (Entered: 08/19/2024) |
| 08/19/2024 | 60 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION for Order for Granting Defendants Motion To Deny Or Defer Plaintiffs Motion For Summary Judgment |

| | | |
|---|---|---|
| | | On Claim I Under Rule 56(D) 57 filed by Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association. (Hamburger, Bradley) (Entered: 08/19/2024) |
| 08/26/2024 | 61 | REPLY in Support of NOTICE OF MOTION AND MOTION for Order for Granting Defendants Motion To Deny Or Defer Plaintiffs Motion For Summary Judgment On Claim I Under Rule 56(D) 57 filed by Defendants Robert A. Bonta, Steven S. Cliff, Liane M. Randolph. (McLoon, Caitlan) (Entered: 08/26/2024) |
| 08/29/2024 | 62 | Joint STIPULATION for Leave to File Sur-Replies to Plaintiffs' Motion for Summary Judgment on Claim I filed by Defendants Robert A. Bonta, Steven S. Cliff, Liane M. Randolph. (Attachments: # 1 Proposed Order Granting Leave to File Sur-Replies to Plaintiffs' Motion for Summary Judgment on Claim I)(McLoon, Caitlan) (Entered: 08/29/2024) |
| 08/30/2024 | 63 | ORDER GRANTING LEAVE TO FILE SUR-REPLIES TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON CLAIM I 62 by Judge Otis D. Wright, II: 1. Defendants are permitted to file a sur-reply addressing NetChoice, LLC v. Bonta,-- F.4th --, 2024 WL 3838423 (9th Cir. Aug. 16, 2024), of no more than 500 words, on or before September 3, 2024; and 2. Plaintiffs are permitted to file a response to Defendants' sur-reply addressing NetChoice, LLC v. Bonta, -- F.4th --, 2024 WL 3838423 (9th Cir. Aug. 16, 2024), of no more than 250 words, on or before September 5, 2024. (lc) (Entered: 08/30/2024) |
| 09/03/2024 | 64 | REPLY In Opposition NOTICE OF MOTION AND MOTION for Summary Judgment as to Claim I 48 *SUR-REPLY* filed by Defendants Robert A. Bonta, Steven S. Cliff, Liane M. Randolph. (McLoon, Caitlan) (Entered: 09/03/2024) |
| 09/04/2024 | 65 | ON THE COURT'S OWN MOTION, the MOTION to Dismiss Amended Complaint 38 ; MOTION for Summary Judgment 48 ; and the MOTION for Order for Granting Defendants Motion To Deny Or Defer Plaintiffs Motion For Summary Judgment 57 is CONTINUED to October 15, 2024 at 1:30 p.m.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. TEXT ONLY ENTRY (Entered: 09/04/2024) |
| 09/05/2024 | 66 | REPLY in Support of NOTICE OF MOTION AND MOTION for Summary Judgment as to Claim I 48 *(Plaintiffs' Response to Defendants' Sur-Reply)* filed by Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association. (Hamburger, Bradley) (Entered: 09/05/2024) |
| 09/13/2024 | 67 | Joint STIPULATION for Order Granting Leave to File Supplemental Briefing Re X Corp. v. Bonta filed by Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association. (Attachments: # 1 Proposed Order)(Hamburger, Bradley) (Entered: 09/13/2024) |
| 09/16/2024 | 68 | MINUTES IN CHAMBERS 67 by Judge Otis D. Wright, II. The Court ORDERS that Plaintiffs and Defendants are each permitted to file one supplemental brief addressing X Corp., of no more than 800 words on or before September 20, 2024. The parties should assume that the Court has read X Corp. (rolm) (Entered: 09/17/2024) |
| 09/20/2024 | 69 | SUPPLEMENTAL BRIEF filed by Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, |

**ER-2306**

| | | |
|---|---|---|
| | | Western Growers Association. *Regarding X Corp. v. Bonta* (Hamburger, Bradley) (Entered: 09/20/2024) |
| 09/20/2024 | 70 | SUPPLEMENT to NOTICE OF MOTION AND MOTION for Summary Judgment as to Claim I 48 *Supplemental Brief re: X Corp. v. Bonta* filed by Defendants Robert A. Bonta, Steven S. Cliff, Liane M. Randolph. (McLoon, Caitlan) (Entered: 09/20/2024) |
| 10/08/2024 | 71 | The hearing on the MOTION to Dismiss Amended Complaint 38 ; MOTION for Summary Judgment 48 ; MOTION for Order for Granting Defendants Motion To Deny Or Defer Plaintiffs Motion For Summary Judgment 57 , scheduled for October 15, 2024 at 1:30 P.M., are hereby VACATED and taken off calendar. No appearances are necessary. The matters stands submitted, and will be decided upon without oral argument. An order will issue.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sce) TEXT ONLY ENTRY (Entered: 10/08/2024) |
| 10/16/2024 | 72 | Notice filed by Defendants Robert A. Bonta, Liane M. Randolph, Steven S. Cliff. *Notice of Amendments to Senate Bills 253 and 261* (McLoon, Caitlan) (Entered: 10/16/2024) |
| 11/05/2024 | 73 | ORDER GRANTING DEFENDANTS' MOTION TO DENY OR DEFER PLAINTIFFS' MOTIONFOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT 48 57 by Judge Otis D. Wright, II: Court GRANTS the State's Motion to Defer or Deny Plaintiffs' Motion for Summary Judgment on Claim I, (ECF No. 57), and DENIES Plaintiffs' Motion for Summary Judgment on Claim I, (ECF No. 48),WITH LEAVE TO RE-FILE. (lc) (Entered: 11/05/2024) |
| 01/16/2025 | 74 | Notice of Appearance or Withdrawal of Counsel: for attorney Tyler S. Badgley counsel for Plaintiff Chamber of Commerce of the United States of America. Tyler Badgley is no longer counsel of record for the aforementioned party in this case for the reason indicated in the G-123 Notice. Filed by Plaintiff Tyler Badgley. (Badgley, Tyler) (Entered: 01/16/2025) |
| 01/28/2025 | 75 | MINUTE ORDER IN CHAMBERS by Judge Otis D Wright, II: This action has been assigned to the calendar of Judge Otis D. Wright II. EFFECTIVE IMMEDIATELY- No mandatory chambers copies required, EXCEPT FOR Motions for summary judgment and any other evidence-heavy motions. The Court's Electronic Document Submission System (EDSS) allows people without lawyers who have pending cases in the United States District Court for the Central District of California to submit documents electronically to the Clerk's Office The parties may consent to proceed before a Magistrate Judge appearing on the voluntary consent list. PLEASE refer to Local Rule 79-5 for the submission of CIVIL ONLY SEALED DOCUMENTS. CRIMINAL SEALED DOCUMENTS will remain the same. Please refer to Court's Website and Judge's procedures for information as applicable. (lc) (Entered: 01/28/2025) |
| 01/28/2025 | 76 | SCHEDULING MEETING OF COUNSEL [FRCP 16, 26(f)] ; NOTICE OF INTENT TO ISSUESCHEDULING ORDER on April 8, 2025 by Judge Otis D. Wright, II. (lc) (Entered: 01/28/2025) |
| 02/03/2025 | 77 | ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AND THIRD CAUSES OF ACTION 38 by Judge Otis D. Wright, II: Court GRANTS the States Motion toDismiss. (ECF No. 38.) The Court lacks jurisdiction over Plaintiffs SupremacyClause and extraterritoriality causes of action to the extent they challenge SB 253, and therefore DISMISSES WITHOUT PREJUDICE these claims as to SB 253 pursuant to Rule 12(b)(1). Additionally, the Court DISMISSES WITH PREJUDICEPlaintiffs Supremacy Clause cause of action to the extent it challenges SB 261 for failure to state a claim pursuant to Rule 12(b)(6). The Court also DISMISSESWITHOUT PREJUDICE Plaintiffs extraterritoriality cause of action to the extent it challenges SB 261 for failure to state a claim pursuant to Rule 12(b)(6). Thus, |

**ER-2307**

| | | |
|---|---|---|
| | | the Court dismisses both Counts II and III from the First Amended Complaint. If Plaintiffs wish to amend, they must file a Second Amended Complaint no later than twenty-one days from the date of this Order, in which case the State shall answer or otherwise respond within fourteen days of the filing. If Plaintiffs do not timely amend, the dismissal of the extraterritoriality cause of action as to SB 261 shall be deemed a dismissal with prejudice as of the lapse of the deadline to amend. (lc) (Entered: 02/03/2025) |
| 02/25/2025 | 78 | NOTICE OF MOTION AND MOTION for Preliminary Injunction filed by Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, Western Growers Association. Motion set for hearing on 5/5/2025 at 01:30 PM before Judge Otis D. Wright II. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Proposed Order, # 3 Declaration of Edward J. Shoen, # 4 Declaration of Thomas Quaadman, # 5 Declaration of Bradley J. Hamburger, # 6 Exhibit A, # 7 Exhibit B, # 8 Exhibit C, # 9 Declaration of Ben Golombeck, # 10 Declaration of Cory Lunde, # 11 Declaration of David Englin) (Hamburger, Bradley) (Entered: 02/25/2025) |
| 02/26/2025 | 79 | NOTICE TO FILER OF DEFICIENCIES in Electronic Filed Document RE: Proposed Order ONLY to the NOTICE OF MOTION AND MOTION for Preliminary Injunction [78-2]. The following error(s) was/were found: L.R. 58-10 at least 2 lines of text must accompany the Signature Line for Signature of Judge on a last page of proposed order In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (lc) (Entered: 02/26/2025) |
| 02/26/2025 | 80 | STIPULATION for Order Granting Stipulated Briefing Schedule on Plaintiffs' Motion for Preliminary Injunction and Extending Defendants' Time to Answer filed by Defendants Robert A. Bonta, Liane M. Randolph, Steven S. Cliff. (Attachments: # 1 Proposed Order Granting Stipulated Briefing Schedule on Plaintiffs' Motion for Preliminary Injunction and Extending Defendants' Time to Answer)(McLoon, Caitlan) (Entered: 02/26/2025) |
| 02/27/2025 | 81 | ORDER GRANTING STIPULATED BRIEFING SCHEDULE ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND EXTENDING DEFENDANTS' TIME TO ANSWER 80 by Judge Otis D. Wright, II. IT IS HEREBY ORDERED THAT: 1. Defendants shall file their opposition to Plaintiffs' motion for preliminary injunction on or before April 7, 2025; 2. Plaintiffs shall file their reply in support of their motion for preliminary injunction on or before April 21, 2025; and 3. Defendants' deadline to answer Plaintiffs' First Amended Complaint shall be extended from March 10, 2025, to March 17, 2025. (lom) (Entered: 02/27/2025) |
| 03/04/2025 | 82 | NOTICE of Appearance filed by attorney Robert Edward Dunn on behalf of Plaintiff Chamber of Commerce of the United States of America (Attorney Robert Edward Dunn added to party Chamber of Commerce of the United States of America(pty:pla))(Dunn, Robert) (Entered: 03/04/2025) |
| 03/04/2025 | 83 | NOTICE of Appearance filed by attorney Collin James Vierra on behalf of Plaintiff Chamber of Commerce of the United States of America (Attorney Collin James Vierra added to party Chamber of Commerce of the United States of America(pty:pla))(Vierra, Collin) (Entered: 03/04/2025) |
| 03/05/2025 | 84 | NOTICE TO FILER OF DEFICIENCIES in Electronic Filed Document RE: Notice of Appearance, 83 , Notice of Appearance, 82 . The following error(s) was/were found: Incorrect event selected. Correct event to be used is: Notice of Appearance or Withdrawal of Counsel G-123.. In response to this notice, the Court may: (1) order an amended or |

| | | |
|---|---|---|
| | | correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (ak) (Entered: 03/05/2025) |
| 03/17/2025 | 85 | ANSWER to Amended Complaint/Petition, 28 filed by Defendants Robert A. Bonta, Liane M. Randolph, Steven S. Cliff.(McLoon, Caitlan) (Entered: 03/17/2025) |
| 04/01/2025 | 86 | Notice of Appearance or Withdrawal of Counsel: for attorney Robert Edward Dunn counsel for Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Los Angeles County Business Federation, Western Growers Association. Adding Robert Edward Dunn as counsel of record for California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association for the reason indicated in the G-123 Notice. Filed by Plaintiffs California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association. (Attorney Robert Edward Dunn added to party American Farm Bureau Federation(pty:pla), Attorney Robert Edward Dunn added to party California Chamber of Commerce(pty:pla), Attorney Robert Edward Dunn added to party Central Valley Business Federation(pty:pla), Attorney Robert Edward Dunn added to party Los Angeles County Business Federation(pty:pla), Attorney Robert Edward Dunn added to party Western Growers Association(pty:pla))(Dunn, Robert) (Entered: 04/01/2025) |
| 04/01/2025 | 87 | JOINT REPORT Rule 26(f) Discovery Plan ; estimated length of trial 5 to 10 court days, filed by Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association.. (Dunn, Robert) (Entered: 04/01/2025) |
| 04/01/2025 | 88 | Notice of Appearance or Withdrawal of Counsel: for attorney Collin James Vierra counsel for Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Los Angeles County Business Federation, Western Growers Association. Adding Collin James Vierra as counsel of record for California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association for the reason indicated in the G-123 Notice. Filed by Plaintiffs California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association. (Attorney Collin James Vierra added to party American Farm Bureau Federation(pty:pla), Attorney Collin James Vierra added to party California Chamber of Commerce(pty:pla), Attorney Collin James Vierra added to party Central Valley Business Federation(pty:pla), Attorney Collin James Vierra added to party Los Angeles County Business Federation(pty:pla), Attorney Collin James Vierra added to party Western Growers Association(pty:pla))(Vierra, Collin) (Entered: 04/01/2025) |
| 04/07/2025 | 89 | Opposition opposition re: NOTICE OF MOTION AND MOTION for Preliminary Injunction 78 filed by Defendants Robert A. Bonta, Steven S. Cliff, Liane M. Randolph. (Attachments: # 1 Objections to Plaintiffs' Evidence, # 2 Table of Contents for Declaration Exhibits, # 3 Declaration of Caitlan McLoon In Support of Opposition to Motion for Preliminary Injunction, # 4 Exhibit 1 to Declaration of Caitlan McLoon, # 5 Exhibit 2 to Declaration of Caitlan McLoon, # 6 Declaration of James Burton In Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, # 7 Exhibit 1 to Declaration of James Burton, # 8 Exhibit 2 to Declaration of James Burton, # 9 Exhibit 3 to Declaration of James Burton, # 10 Exhibit 4 to Declaration of James Burton, # 11 Exhibit 5 to Declaration of James Burton, # 12 Exhibit 6 to Declaration of James Burton, # 13 Exhibit 7 to Declaration of James Burton, # 14 Exhibit 8 to Declaration of James |

CM/ECF - California Central District

| | | |
|---|---|---|
| | | Burton, # 15 Exhibit 9 to Declaration of James Burton, # 16 Exhibit 10 to Declaration of James Burton, # 17 Exhibit 11 to Declaration of James Burton, # 18 Declaration of Angel Hsu In Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, # 19 Exhibit 1 to Declaration of Angel Hsu, # 20 Exhibit 2 to Declaration of Angel Hsu, # 21 Exhibit 3 to Declaration of Angel Hsu, # 22 Exhibit 4 to Declaration of Angel Hsu, # 23 Exhibit 5 to Declaration of Angel Hsu, # 24 Exhibit 6 to Declaration of Angel Hsu, # 25 Exhibit 7 to Declaration of Angel Hsu, # 26 Exhibit 8 to Declaration of Angel Hsu, # 27 Exhibit 9 to Declaration of Angel Hsu, # 28 Exhibit 10 to Declaration of Angel Hsu, # 29 Exhibit 11 to Declaration of Angel Hsu, # 30 Exhibit 12 to Declaration of Angel Hsu, # 31 Exhibit 13 to Declaration of Angel Hsu, # 32 Exhibit 14 to Declaration of Angel Hsu, # 33 Exhibit 15 to Declaration of Angel Hsu, # 34 Exhibit 16 to Declaration of Angel Hsu, # 35 Exhibit 17 to Declaration of Angel Hsu, # 36 Exhibit 18 to Declaration of Angel Hsu, # 37 Exhibit 19 to Declaration of Angel Hsu)(McLoon, Caitlan) (Entered: 04/07/2025) |
| 04/07/2025 | 90 | DECLARATION of Thomas Lyon in opposition to NOTICE OF MOTION AND MOTION for Preliminary Injunction 78 filed by Defendants Robert A. Bonta, Steven S. Cliff, Liane M. Randolph. (Attachments: # 1 Exhibit 1 to Declaration of Thomas Lyon, # 2 Exhibit 2 to Declaration of Thomas Lyon, # 3 Exhibit 3 to Declaration of Thomas Lyon, # 4 Exhibit 4 to Declaration of Thomas Lyon, # 5 Exhibit 5 to Declaration of Thomas Lyon, # 6 Exhibit 6 to Declaration of Thomas Lyon, # 7 Exhibit 7 to Declaration of Thomas Lyon, # 8 Exhibit 8 to Declaration of Thomas Lyon, # 9 Exhibit 9 to Declaration of Thomas Lyon, # 10 Exhibit 10 to Declaration of Thomas Lyon, # 11 Exhibit 11 to Declaration of Thomas Lyon, # 12 Exhibit 12 to Declaration of Thomas Lyon, # 13 Exhibit 13 to Declaration of Thomas Lyon, # 14 Exhibit 14 to Declaration of Thomas Lyon, # 15 Exhibit 15 to Declaration of Thomas Lyon, # 16 Exhibit 16 to Declaration of Thomas Lyon, # 17 Exhibit 17 to Declaration of Thomas Lyon, # 18 Exhibit 18 to Declaration of Thomas Lyon, # 19 Exhibit 19 to Declaration of Thomas Lyon, # 20 Exhibit 20 to Declaration of Thomas Lyon, # 21 Exhibit 21 to Declaration of Thomas Lyon, # 22 Exhibit 22 to Declaration of Thomas Lyon, # 23 Exhibit 23 to Declaration of Thomas Lyon, # 24 Exhibit 24 to Declaration of Thomas Lyon, # 25 Exhibit 25 to Declaration of Thomas Lyon, # 26 Exhibit 26 to Declaration of Thomas Lyon, # 27 Exhibit 27 to Declaration of Thomas Lyon, # 28 Exhibit 28 to Declaration of Thomas Lyon, # 29 Exhibit 29 to Declaration of Thomas Lyon, # 30 Exhibit 30 to Declaration of Thomas Lyon, # 31 Exhibit 31 to Declaration of Thomas Lyon, # 32 Exhibit 32 to Declaration of Thomas Lyon, # 33 Exhibit 33 to Declaration of Thomas Lyon, # 34 Exhibit 34 to Declaration of Thomas Lyon, # 35 Exhibit 35 to Declaration of Thomas Lyon, # 36 Exhibit 36 to Declaration of Thomas Lyon, # 37 Exhibit 37 to Declaration of Thomas Lyon, # 38 Exhibit 38 to Declaration of Thomas Lyon, # 39 Exhibit 39 to Declaration of Thomas Lyon, # 40 Exhibit 40 to Declaration of Thomas Lyon)(McLoon, Caitlan) (Entered: 04/07/2025) |
| 04/07/2025 | 91 | CERTIFICATE OF SERVICE filed by Defendants Robert A. Bonta, Steven S. Cliff, Liane M. Randolph, re Declaration (Motion related),,,,,,,, 90 , Objection/Opposition (Motion related),,,,,,,,, 89 served on April 7, 2025. (McLoon, Caitlan) (Entered: 04/07/2025) |
| 04/08/2025 | 92 | COUNSEL ARE NOTIFIED, the MOTION for Preliminary Injunction 78 is CONTINUED TO 5/27/2025 at 11:00 AM before Judge Otis D. Wright II. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sce) TEXT ONLY ENTRY (Entered: 04/08/2025) |

**ER-2310**

| 04/08/2025 | 93 | SCHEDULING AND CASE MANAGEMENT ORDER (BENCH TRIAL) by Judge Otis D. Wright, II: Bench Trial set for 10/20/2026 09:00 AM ; Final Pretrial Conference set for 9/21/2026 01:30 PM ; Motion in Limine set for hearing on 10/5/2026 at 01:30 PM (SEE DOCUMENT FOR ALL SPECIFIED DEADLINES). (lc) (Entered: 04/08/2025) |
| 04/08/2025 | 94 | ORDER/REFERRAL to ADR Procedure No 1 by Judge Otis D. Wright, II. Case ordered to Magistrate Judge Pedro V. Castillo for Settlement Conference. (lc) (Entered: 04/08/2025) |
| 04/17/2025 | 95 | APPLICATION of Non-Resident Attorney Stephanie A. Maloney to Appear Pro Hac Vice on behalf of Plaintiff Chamber of Commerce of the United States of America (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-39530068) filed by Plaintiff Chamber of Commerce of the United States of America. (Attachments: # 1 Proposed Order) (Hamburger, Bradley) (Entered: 04/17/2025) |
| 04/17/2025 | 96 | ORDER by Judge Otis D. Wright, II: granting 95 Non-Resident Attorney Stephanie A. Maloney APPLICATION to Appear Pro Hac Vice on behalf of Plaintiff Chamber of Commerce of the United States of America, designating Hamburger, Bradley as local counsel. THERE IS NO PDF ASSOCIATED WITH THIS ENTRY (aus) (Entered: 04/17/2025) |
| 04/21/2025 | 97 | REPLY In Support of NOTICE OF MOTION AND MOTION for Preliminary Injunction 78 filed by Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association. (Attachments: # 1 Plaintiffs Response to Defendants Objections to Evidence Submitted in Support of Motion for Preliminary Injunction)(Hamburger, Bradley) (Entered: 04/21/2025) |
| 05/27/2025 | 98 | ON THE COURT'S OWN MOTION, the Motion for Prelim 78 is CONTINUED to 6/10/2025 at 10:30 AM before Judge Otis D. Wright II. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sce) TEXT ONLY ENTRY (Entered: 05/27/2025) |
| 06/05/2025 | 99 | ON THE COURT'S OWN MOTION, the MOTION for Preliminary Injunction 78 is CONTINUED to 6/24/2025 at 10:30 AM before Judge Otis D. Wright II. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sce) TEXT ONLY ENTRY (Entered: 06/05/2025) |
| 06/06/2025 | 100 | Joint STIPULATION to Reschedule Hearing on Motion for Preliminary Injunction filed by Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association. (Attachments: # 1 Proposed Order)(Hamburger, Bradley) (Entered: 06/06/2025) |
| 06/09/2025 | 101 | ORDER GRANTING ]JOINT STIPULATION REQUESTING RESCHEDULING OF HEARING ON MOTION FOR PRELIMINARY INJUNCTION 100 by Judge Otis D. Wright, II: The Court CONTINUES the hearing on Plaintiff's Motion for Preliminary Injunction currently scheduled for June 24, 2025 to July 1, 2025 at 10:30 AM 78 . (lc) (Entered: 06/09/2025) |
| 07/01/2025 | 102 | MINUTES OF MOTION for Preliminary Injunction 78 Hearing held before Judge Otis D. Wright, II: The Court, having carefully considered the papers and having heard oral arguments of counsel, takes the motion under submission. A final order will be issued. Court Recorder: Court Smart. (lc) (Entered: 07/01/2025) |

**ER-2311**

| 07/02/2025 | 103 | TRANSCRIPT ORDER for Court Smart (CS).Transcript preparation will not begin until payment has been satisfied with the transcription company. (ha) (Entered: 07/02/2025) |
| 07/02/2025 | 104 | TRANSCRIPT ORDER as to Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association for Court Smart (CS). Court will contact Branton Nestor at BNestor@gibsondunn.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (Hamburger, Bradley) (Entered: 07/02/2025) |
| 07/02/2025 | 105 | TRANSCRIPT ORDER as to Ginger Hervey for Court Smart (CS). Court will contact Ginger Hervey at ginger.hervey@freshfields.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (cr) (Entered: 07/02/2025) |
| 07/03/2025 | 106 | TRANSCRIPT for proceedings held on Tuesday, July 1, 2025 (10:23 a.m. to 11:28 a.m.). Electronic Court Recorder: Exceptional Reporting Services, Inc, phone number 361-949-2988. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 7/24/2025. Redacted Transcript Deadline set for 8/4/2025. Release of Transcript Restriction set for 10/1/2025. (mci) (Entered: 07/03/2025) |
| 07/03/2025 | 107 | NOTICE OF FILING TRANSCRIPT filed for proceedings Tuesday, July 1, 2025 (10:23 a.m. to 11:28 a.m.) re Transcript 106 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (mci) TEXT ONLY ENTRY (Entered: 07/03/2025) |
| 08/11/2025 | 108 | STIPULATION for Protective Order filed by Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association. (Attachments: # 1 Proposed Order)(Dunn, Robert) (Entered: 08/11/2025) |
| 08/11/2025 | 109 | STIPULATION for Order re Discovery of Electronically Stored Information filed by Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association. (Attachments: # 1 Proposed Order)(Dunn, Robert) Modified on 8/12/2025 (mr). (Entered: 08/11/2025) |
| 08/12/2025 | 110 | PROTECTIVE ORDER by Magistrate Judge Pedro V. Castillo re Stipulation for Protective Order 108 . (SEE DOCUMENT FOR DETAILS) (hr) (Entered: 08/12/2025) |
| 08/12/2025 | 111 | ORDER RE: DISCOVERY OF ELECTRONICALLY STORED INFORMATION by Magistrate Judge Pedro V. Castillo: granting 109 STIPULATION for Order re Discovery of Electronically Stored Information. (SEE DOCUMENT FOR FURTHER DETAILS) (hr) (Entered: 08/12/2025) |
| 08/13/2025 | 112 | ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION 78 by Judge Otis D. Wright, II (lc) (Entered: 08/13/2025) |
| 08/19/2025 | 113 | Joint STIPULATION for Order Regarding Briefing Schedule for Plaintiffs' Motion for Injunction Pending Appeal filed by Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association. (Attachments: # 1 Proposed Order)(Hamburger, Bradley) (Entered: 08/19/2025) |

| 08/20/2025 | 114 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Plaintiff American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association. Appeal of Order on Motion for Preliminary Injunction 112 . (Appeal Fee - $605 Fee Paid, Receipt No. ACACDC-40340314.) (Hamburger, Bradley) (Entered: 08/20/2025) |
| --- | --- | --- |
| 08/20/2025 | 115 | ORDER GRANTING STIPULATED BRIEFING SCHEDULE ON PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL 113 by Judge Otis D. Wright, II: 1. Plaintiffs shall file their motion for injunction pending appeal on or before Wednesday, August 20, 2025; 2. Defendants shall file their opposition to Plaintiffs' motion for injunction pending appeal on or before Friday, August 29, 2025; 3. Plaintiffs shall file their reply in support of their motion for injunction pending appeal on or before Tuesday, September 2, 2025; and 4. The hearing on Plaintiffs' motion for injunction pending appeal is scheduled for Monday, September 8, 2025, at 1:30 p.m. (lc) (Entered: 08/20/2025) |
| 08/20/2025 | 116 | NOTICE OF MOTION AND MOTION for Order for Injunction Pending Appeal filed by Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association. Motion set for hearing on 9/8/2025 at 01:30 PM before Judge Otis D. Wright II. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Proposed Order) (Hamburger, Bradley) (Entered: 08/20/2025) |
| 08/21/2025 | 117 | MINUTE ORDER IN CHAMBERS by Judge Otis D. Wright, II: On its own motion, the Court finds it necessary to reschedule the hearing on Plaintiffs' motion for injunction pending appeal from September 8, 2025, at 1:30 p.m. to September 15, 2025, at 1:30 PM 116 . (lc) (Entered: 08/21/2025) |
| 08/21/2025 | 118 | NOTIFICATION from Ninth Circuit Court of Appeals of case number assigned and briefing schedule. Appeal Docket No. 25-5327 assigned to Notice of Appeal to 9th Circuit Court of Appeals, 114 as to Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association. (sh) (Entered: 08/27/2025) |
| 08/29/2025 | 119 | Joint STIPULATION to Stay Case pending Appeal filed by Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association. (Attachments: # 1 Proposed Order) (Dunn, Robert) (Entered: 08/29/2025) |
| 08/29/2025 | 120 | Opposition re: NOTICE OF MOTION AND MOTION for Order for Injunction Pending Appeal 116 filed by Defendants Robert A. Bonta, Steven S. Cliff, Liane M. Randolph. (Attachments: # 1 Declaration of Caitlan McLoon In Support of Opposition to Plaintiffs' Motion for Injunction Pending Appeal)(McLoon, Caitlan) (Entered: 08/29/2025) |
| 09/02/2025 | 121 | DESIGNATION of Record on Appeal by Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association re 114 (Hamburger, Bradley) (Entered: 09/02/2025) |
| 09/02/2025 | 122 | REPLY in support of NOTICE OF MOTION AND MOTION for Order for Injunction Pending Appeal 116 filed by Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Association. (Attachments: # 1 Declaration of Martin Durbin, # 2 Exhibit A to Durbin |

| | | Declaration, # 3 Supplemental Declaration of Edward J. Shoen)(Hamburger, Bradley) (Entered: 09/02/2025) |
|---|---|---|
| 09/04/2025 | 123 | Objection to Evidence Submitted in Reply re: NOTICE OF MOTION AND MOTION for Order for Injunction Pending Appeal 116 filed by Defendants Robert A. Bonta, Steven S. Cliff, Liane M. Randolph. (McLoon, Caitlan) (Entered: 09/04/2025) |
| 09/08/2025 | 124 | RESPONSE filed by Plaintiffs American Farm Bureau Federation, California Chamber of Commerce, Central Valley Business Federation, Chamber of Commerce of the United States of America, Los Angeles County Business Federation, Western Growers Associationto Objection/Opposition (Motion related) 123 (Hamburger, Bradley) (Entered: 09/08/2025) |
| 09/11/2025 | 125 | ORDER DENYING PLAINTIFFS MOTION FOR INJUNCTION PENDING APPEAL 116 . by Judge Otis D. Wright, II: For the reasons discussed above, the Court DENIES Plaintiffs Motion for Injunction Pending Appeal. (ECF No. 116.) (pj) (Entered: 09/11/2025) |
| 09/11/2025 | 126 | ORDER GRANTING JOINT STIPULATION TO STAY PROCEEDINGS 119 by Judge Otis D. Wright, II: 1. All proceedings in this matter, including discovery, pre-trial motions (except for currently pending motions), and trial, shall be stayed until further order of this Court, pending resolution of Plaintiffs appeal of this Court's interlocutory order denying Plaintiffs' Motion for a Preliminary Injunction. 2. All current case deadlines are vacated, to be reset after resolution of Plaintiffs appeal. 3. Plaintiffs' counsel shall file with this Court a copy of the Ninth Circuits decision in Plaintiffs' appeal within ten (10) days of its issuance. 4. Following the Ninth Circuit's decision, the parties will meet and confer and, within 21 days of the Ninth Circuit's decision, file a proposed case management order setting renewed deadlines for discovery, pre-trial motions, and trial. (lc) (Entered: 09/11/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/18/2025 11:13:14 | | |
| **PACER Login:** | gi000234 | **Client Code:** 93403-00100 |
| **Description:** | Docket Report | **Search Criteria:** 2:24-cv-00801-ODW-PVC End date: 9/18/2025 |
| **Billable Pages:** | 28 | **Cost:** 2.80 |

**ER-2314**