No. 25-5327

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*,

*Plaintiffs-Appellants*,

v.

LIANE M. RANDOLPH, IN HER OFFICIAL CAPACITY AS CHAIR OF THE CALIFORNIA AIR RESOURCES BOARD, *et al.*,

*Defendants-Appellees*.

**On Appeal from the United States District Court for the Central District of California**
No. 2:24-cv-00801-ODW-PVC

# DEFENDANTS-APPELLEES' OPPOSITION TO PLAINTIFFS-APPELLANTS' MOTION FOR INJUNCTION PENDING APPEAL

ROB BONTA
*Attorney General of California*
ANNADEL A. ALMENDRAS
*Senior Assistant Attorney General*
MYUNG J. PARK
LAURA J. ZUCKERMAN
*Supervising Deputy Attorneys General*

CAITLAN MCLOON
KATHERINE GAUMOND
EMILY HAJARIZADEH
M. ELAINE MECKENSTOCK
DYLAN REDOR
ELIZABETH SONG
*Deputy Attorneys General*
CALIFORNIA DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6438
Caitlan.McLoon@doj.ca.gov
*Attorneys for Defendants-Appellees*

September 25, 2025

# TABLE OF CONTENTS

**Page**

Introduction ..... 1
Background ..... 4
I. Senate Bills 253 and 261 ..... 4
A. Legislative History ..... 4
B. SB 253 ..... 5
C. SB 261 ..... 6
II. Procedural History ..... 7
Standard of Review ..... 8
Argument ..... 9
I. Plaintiffs Are Unlikely to Succeed on the Merits ..... 9
A. SB 253 and SB 261 are Subject to *Zauderer* Review, Not Strict Scrutiny ..... 11
1. SB 253 and SB 261 Regulate Commercial Speech ..... 11
2. This Court's Review is Governed by *Zauderer* ..... 13
3. Plaintiffs' Arguments for Strict Scrutiny are Unpersuasive ..... 16
a. Neither Law Discriminates on the Basis of Viewpoint ..... 16
b. Neither Law Elicits Statements of Opinion on Contentious Issues ..... 18
B. SB 253 and SB 261 Satisfy the Appropriate Levels of Scrutiny ..... 18
1. Investor Interest in Reliable Information ..... 19
2. Prevention of Market Confusion and Misleading Speech ..... 21
3. Emissions reductions ..... 22

## TABLE OF CONTENTS
## (continued)

**Page**


II. The Remaining Injunction Factors Favor the State ................ 24

A. Plaintiffs Have Not Established Irreparable Harm ....... 24

B. The Balance of the Equities and the Public Interest Militate Against Granting an Injunction ....................... 25

Conclusion ........................................................................................ 26

Certificate of Compliance ........................................................................ 26

# TABLE OF AUTHORITIES

**Page**

**CASES**

*All. for the Wild Rockies v. Cottrell*
632 F.3d 1127 (9th Cir. 2011) .......... 9

*Am. Acad. of Pain Mgmt. v. Joseph*
353 F.3d 1099 (9th Cir. 2004) .......... 23

*Am. Meat Inst. v. USDA*
760 F.3d 18 (D.C. Cir. 2014) .......... 17

*Ariix, LLC v. NutriSearch Corp.*
985 F.3d 1107 (9th Cir. 2021) .......... 11

*Baird v. Bonta*
81 F.4th 1036 (9th Cir. 2023) .......... 24

*Bolger v. Youngs Drug Prods. Corp.*
463 U.S. 60 (1983) .......... 11

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*
447 U.S. 557 (1980) .......... 3, 19

*Chamber of Commerce of United States v. SEC*
85 F.4th 760 (5th Cir. 2023) .......... 19

*CTIA - The Wireless Ass'n v. City of Berkeley*
928 F.3d 832 (9th Cir. 2019) .......... *passim*

*Destination Ventures, Ltd. v. FCC*
46 F.3d 54 (9th Cir. 1995) .......... 23

*Doe v. San Diego Unified Sch. Dist.*
19 F.4th 1173 (9th Cir. 2021) .......... 8

*Edenfield v. Fane*
507 U.S. 761 (1993) .......... 19

## TABLE OF AUTHORITIES
## (continued)

Page

*Env't Def. Ctr. v. EPA*
344 F.3d 832 (9th Cir. 2003) .......................................................... 15

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*
515 U.S. 557 (1995) .......................................................... 17

*IMDb.com v. Becerra*
962 F.3d 1111 (9th Cir. 2020) .......................................................... 12, 13

*Loan Payment Admin. LLC v. Hubanks*
821 F. App'x 687 (9th Cir. 2020) .......................................................... 16

*Maryland v. King*
567 U.S. 1301 (2012) (Roberts, C.J., in chambers) .......................................................... 25

*Moody v. NetChoice, LLC*
603 U.S. 707 (2024) .......................................................... 9, 18

*Nat'l Inst. of Family & Life Advocates v. Becerra*
585 U.S. 744 (2018) .......................................................... 16, 17, 19

*National Ass'n of Manufacturers v. SEC*
800 F.3d 518 (D.C. Cir. 2015) .......................................................... 17

*Nationwide Biweekly Admin. v. Owen*
873 F.3d 716 (9th Cir. 2017) .......................................................... 14

*NetChoice v. Bonta*
113 F.4th 1101 (9th Cir. 2024) .......................................................... 18

*Nken v. Holder*
556 U.S. 418 (2009) .......................................................... 25

*Pharm. Rsch. & Mfrs. of Am. v. Stolfi*
No. 24-1570, 2025 WL 2448851 (9th Cir. Aug. 26, 2025) .......................................................... *passim*

*Smith v. Helzer*
95 F.4th 1207 (9th Cir. 2024) .......................................................... 24

## TABLE OF AUTHORITIES
## (continued)


**Page**

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*
425 U.S. 748 (1976) .......... 2

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008) .......... 2, 9, 24

*Wooley v. Maynard*
430 U.S. 705 (1977) .......... 17

*X Corp. v. Bonta*
116 F.4th 888 (9th Cir. 2024) .......... *passim*

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*
471 U.S. 626 (1985) .......... *passim*

**STATUTES**

California Health and Safety Code
§ 38532 .......... 5, 6, 17
§ 38533 .......... 6, 7, 17

## INTRODUCTION

Plaintiffs-Appellants U.S. Chamber of Commerce et al.'s request for an injunction pending appeal should be denied. Their preliminary injunction appeal is already proceeding on an expedited schedule under Circuit Rule 3-3, and briefing will be completed in just six weeks. Plaintiffs have identified no immediate irreparable harm that would necessitate relief before the preliminary injunction appeal can be considered in the ordinary course. And because Plaintiffs' claims are unlikely to succeed on the merits, as the district court held in a reasoned opinion, no preliminary injunctive relief if warranted in any event.

Plaintiffs challenge the constitutionality of two corporate disclosure requirements under the First Amendment. The Corporate Data Accountability Act (Senate Bill 253) requires billion-dollar companies doing business in California to provide the State with greenhouse gas (GHG) emissions raw data calculated using a standardized, industry-supported accounting protocol. The Climate-Related Financial Risk Act (Senate Bill 261) requires $500-million companies doing business in the State to disclose their climate-related financial risk, such as their exposure to environmental harms that might disrupt their supply chains, decrease the value of their assets, or render them uninsurable, pursuant to a widely used framework established by the Financial Stability Board—an international organization whose mandate is to promote financial stability and prevent a repeat

of the 2007-2009 global financial crisis. Neither law requires a company to voice its views regarding climate change, convey a government message on any topic, nor change its business practices, e.g., by lowering emissions. And neither law penalizes a company for the positions it holds.

The underlying thrust of Plaintiffs' present motion is that these laws are presumptively unconstitutional under the First Amendment simply because the disclosures of data and facts *relate to* climate change. Mot. (Dkt. 6.1) at 1 (urging application of strict scrutiny because the Supreme Court has observed that the "topic" of climate change is "controversial"). But factual disclosures do not invite strict scrutiny simply because they "can be tied in some [theoretical] way to a controversial issue." *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019). Nor does the possibility that the public "may look favorably or unfavorably on a company based on" its reporting "transform an otherwise non-controversial disclosure into a controversial one." App. 659. By providing material information into the marketplace, these laws fundamentally *serve* a core First Amendment goal: allowing for "intelligent and well informed" economic decisions in a "predominantly free enterprise economy." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976).

Plaintiffs cannot meet the requirements for obtaining the "extraordinary remedy" of an injunction here, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7,

24 (2008)—and certainly not for immediate injunctive relief even before this preliminary injunction appeal can be considered. Laws compelling factual commercial speech are subject to a lower level of scrutiny than those compelling political or ideological speech. *See Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561-63 (1980). As the district court correctly concluded, the disclosures at issue regulate commercial speech. App. 653. "What is at stake here," is the "disclosure of economically significant information" designed to "reduc[e] [informational] asymmetries, facilitate[e] informed commercial transactions, and improv[e] the efficiency of the [California] market." *Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, No. 24-1570, 2025 WL 2448851, at *8, *18 (9th Cir. Aug. 26, 2025) ("*PhRMA*"). The laws are appropriately tailored to achieve these purposes. They compel only the information that independent industry groups have identified as necessary for the provision of accurate and decision-useful information into the marketplace, and apply a neutral metric—a revenue threshold—designed to capture the most relevant information.

In any event, Plaintiffs fail to establish imminent irreparable harm. Reporting under SB 253 will not begin until June 30, 2026, at the earliest; indeed, the implementing agency has not even proposed the regulations that are a condition precedent to any obligation on the reporting entities to speak. Supp. App. 897.

*Only* SB 261 has disclosures due on January 1, 2026, but Plaintiffs have presented no evidence establishing irreparable harm specific to this law. And even if they had, "enjoining SBs 253 and 261 would delay the State from advancing the public interests for which it adopted the laws," and thus, the equities favor Defendants. App. 673-674.

## BACKGROUND

### I. SENATE BILLS 253 AND 261

#### A. Legislative History

Harms from climate change, like ever-more-extreme wildfires, floods, and droughts, can pose significant risks to companies' supply chains, insurability, employee health, and overall financial stability. Accordingly, in an effort to address investor concerns and attract market share, App. 606-614, most large companies have been voluntarily disclosing emissions data and climate-related risks for years, App. 523-525, 596, 606-612, 620, Supp. App. 113-115. However, such voluntary corporate disclosures are both incomplete and inconsistent, creating confusion among the consumers and investors the companies seek to attract. *See, e.g.*, App. 506-514, 618-630; Supp. App. 102-103, 105-106. Highlighting the importance of "provid[ing] more transparency to policy makers, investors, and shareholders" in order to "improve[] decision-making on where to invest private and public dollars," App. 338, in 2023 the California Legislature enacted SB 253

and 261. 2023 Cal. Stat., ch. 382 § 1 (SB 253); 2023 Cal. Stat., ch. 383 § 1 (SB 261); *see also* App. 7, Supp. App. 3-4, 75, 115-116.

**B. SB 253**

SB 253 does not directly require companies to disclose anything. Instead, it directs the California Air Resources Board (CARB) to "develop and adopt regulations" that *will* require "reporting entit[ies]" to disclose their GHG emissions to the government. Cal. Health & Safety Code § 38532(c)(1). CARB has not yet proposed these implementing regulations. Supp. App. 897.

When regulations are adopted, "[r]eporting entit[ies]" will be those that "do[] business in California" and have total annual revenues in excess of $1 billion. Cal. Health & Safety Code § 38532(b)(2). Once regulations are in place, reporting entities will report three categories of GHG emissions: Scope 1 (those from sources owned or directly controlled by the business entity); Scope 2 (those associated with the reporting entity's use of electricity, heating, and cooling); and Scope 3 (all other indirect emissions). *Id.* § 38532(b)(3)-(5).

To ensure accuracy, consistency, and transparency in the data, entities must quantify and report all three categories of emissions "in conformance" with the "Greenhouse Gas Protocol standards and guidance." *Id.* § 38532(c)(1)(A)(ii). The GHG Protocol was created in 2001 by a coalition of business interests, Supp. App. 138, 140-141, and has been widely adopted, Supp. App. 255-256.

Scope 1 and Scope 2 emissions reports are not due until 2026 "on or by a date to be determined by the state board." *Id.* § 38532(c)(2)(A)(i)(I). CARB has proposed that reporting would begin on June 30, 2026. Supp. App. 897. To prepare for the first report, companies need not incur costs to establish new compliance mechanisms—first reports can be based solely on emissions data "that can be determined from information the reporting entity already possesses or is already collecting." App. 545. During the first reporting cycle, CARB "will not take enforcement action for incomplete reporting." *Id.*

Scope 3 reporting will not begin until 2027. Cal. Health & Safety Code § 38532(c)(2)(A)(i)(II).

**C. SB 261**

SB 261 requires U.S. entities with total annual revenues in excess of $500 million that "do[] business in California" to prepare a biennial report disclosing climate-related financial risks they have identified and any measures they have adopted to reduce and adapt to those risks. *Id.* §§ 38533(a)(4), (b)(1)(A). Reports must be posted to the company's own website. *Id.* § 38533(c)(1). These disclosures are first due on January 1, 2026. *Id.* § 38533(b)(1)(A).

The bill defines "[c]limate-related financial risk" as the "material risk of harm to immediate and long-term financial outcomes due to physical and transition risks." *Id.* § 38533(a)(2). The law directs reporting entities to prepare their

disclosures in alignment with a framework adopted by the Task Force on Climate-related Financial Disclosures (TFCD), *id.* § 38533(b)(1)(A)(i), which was created by a working group of large investors, banks, insurance companies, industrial firms, rating agencies, and accounting firms at the behest of the Financial Stability Board, an international intergovernmental organization, Supp. App. 465-466. Twenty-one states, including California, already require large insurers to complete a Climate Risk Disclosure Survey using the TCFD framework. Supp. App. 475.

Under the TCFD, "risks" and "financial impacts" subject to disclosure cover purely commercial projections, such as the likelihood of "[i]ncreased operating costs," "[r]educed demand for products and services," "[c]hange in revenue mix and sources," "[i]ncreased production costs due to changing input prices," and "[i]ncreased insurance premiums." App. 276-277.

Under SB 261, entities need not adopt any particular climate-related risk management strategy or take any climate-risk mitigation actions. Supp. App. 133-134.

## II. PROCEDURAL HISTORY

Plaintiffs initiated this action against Defendants CARB Chair Liane M. Randolph, CARB Executive Officer Steven S. Cliff, and California Attorney General Robert A. Bonta (the "State"), arguing, as relevant here, that SB 253 and 261 are facially unconstitutional under the First Amendment. Plaintiffs moved for

a preliminary injunction on this claim. The district court denied Plaintiffs' motion, holding that the laws concern speech, App. 644-645, but concluding that because such speech is "commercial," App. 649-653, the laws are "subject to a lesser standard than strict scrutiny," App. 649 (citation omitted). The court reasoned that "SB 253 requires reporting of only factual—and not misleading—information," App. 656, and that such emissions data is not controversial, App. 658-659. As a result, the court applied the test for compelled speech in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, and upheld the law. App. 659-666. With respect to SB 261, in contrast, the court declined to apply *Zauderer* review, because "assessment[s] about the effect of current *and future* events on a company cannot be factual." App. 656. The court therefore applied intermediate scrutiny to SB 261 and concluded the law passed that test. App. 670-673. As Plaintiffs failed to demonstrate that either law violates the First Amendment, App. 673, the court concluded they had not shown irreparable harm, and the equities favored the State. App. 673-674. The district court denied Plaintiffs' request for an injunction pending appeal. App. 772-776.

## STANDARD OF REVIEW

"To determine whether to grant an injunction pending appeal, this court applies the test for preliminary injunctions." *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1176 (9th Cir. 2021). "A preliminary injunction is an extraordinary

remedy never awarded as of right." *Winter*, 555 U.S. at 24. The moving party must establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Id.* at 20. Even under this Court's "sliding scale" approach, "plaintiffs must establish that irreparable harm is *likely*, not just possible." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (emphasis in original).

Because this is a facial challenge, Plaintiffs must establish that "the law's unconstitutional applications substantially outweigh its constitutional ones." *X Corp. v. Bonta*, 116 F.4th 888, 898 (9th Cir. 2024) (quoting *Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024)).

## ARGUMENT

### I. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

Plaintiffs contend that the challenged laws "presumptively" merit strict scrutiny, merely by "compell[ing] speech." Mot. 13-14. But not all compelled speech receives strict scrutiny. A "'compelled speech' requirement [is] subject to strict scrutiny, *unless* the content of the direct disclosure requirement qualifies as 'commercial speech,'" in which case "courts apply either intermediate scrutiny"

under *Central Hudson*, or apply "a lower level of scrutiny akin to rational basis review" under *Zauderer*. *PhRMA*, 2025 WL 2448851, at *6 (emphasis added).[1]

Plaintiffs do not—and cannot—dispute that commercial speech is entitled "to less constitutional protection" under settled law. *Id.* Rather, they argue that the disclosures are not commercial in nature because the laws fail to meet this Circuit's commercial speech test, Mot. 17-22, discriminate on the basis of viewpoint, Mot. 14-15, and force companies to speak on divisive policy issues, Mot. 14. All three arguments fail. The laws elicit raw data and other business information free from political opinion or government coercion, and thus merit minimal First Amendment scrutiny. App. 653-654. *See infra* Arg. § I.A.

Regardless, the laws would survive First Amendment review under any level of scrutiny. The State has compelling interests in ensuring the free flow of material information to the marketplace, preventing misleading corporate statements and consumer and investor confusion, and achieving the emissions reductions that improved transparency can generate. *See infra* Arg. § I.B.

---

[1] Notably, in *PhRMA*, this Court explained that laws requiring disclosure of information directly to the government likely default to a lower level of scrutiny even in the absence of a finding that such speech is "commercial." 2025 WL 2448851, at *9-10. The Court explained that laws "involving only 'routine disclosure of economically significant information designed to forward ordinary regulatory purposes' … typically will not 'require an extensive First Amendment analysis.'" *Id.* at *9. SB 253 is just such a "government reporting requirement," and merits rational basis review on this independent ground as well. *Id.*

### A. SB 253 and SB 261 are Subject to *Zauderer* Review, Not Strict Scrutiny

#### 1. SB 253 and SB 261 Regulate Commercial Speech

In *PhRMA*, this Court recently clarified that "the commercial speech doctrine" appropriately applies to disclosures that "provide[] parties to 'actual or potential' commercial transactions with information about those transactions." 2025 WL 2448851, at *14. This definition reflects the historic notion of commercial speech as "speech which does no more than propose a commercial transaction," *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (cleaned up), but makes explicit that courts are to employ a "common-sense" approach to applying this definition that eschews "bright line[]" rules, *X Corp.*, 116 F.4th at 900. *Accord Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021) ("[S]peech that does not propose a commercial transaction on its face can still be commercial speech."). The three *Bolger* factors—(1) if the speech is an advertisement, (2) if the speech refers to a particular product, and (3) if the speaker has an economic motivation—when present, lend "strong support" to the conclusion that speech is commercial. *X Corp.*, 116 F.4th at 900. But the absence of these factors is "not dispositive." *Ariix*, 985 F.3d at 1116.

Employing a "fact-driven" analysis, the district court correctly concluded that both laws regulate commercial speech, App. 649-653 (quoting *X Corp.*, 116 F.4th at 900), a conclusion bolstered by this Court's subsequent *PhRMA* decision. The

relevant disclosures clearly provide parties to commercial transactions—current and prospective investors, shareholders, lenders, insurers, and consumers—with information pertinent to their financial decisions. *See PhRMA*, 2025 WL 2448851, at *14.

That the disclosures "do not concern prices, services, or sales," and require the disclosure of information "regardless of whether the company sells anything in California," is irrelevant. Mot. 19. Purchases of stock shares or other investment products, from public or private companies, and the issuance of debt or insurance policies, are indisputably commercial transactions.[2] Moreover, prospective investors, consumers, lenders, and insurers in California benefit from information about the financial risks and opportunities faced by the firm as a whole, not just their transactions within the State. *See, e.g.*, App. 514, 516-519, 522-523; Supp. App. 477-478.

*IMDb.com v. Becerra*, 962 F.3d 1111 (9th Cir. 2020) is inapposite. Mot. 19-20. In that case, the Court concluded that there was no "commercial transaction" proposed when a website posted movie facts; thus, a law restricting the website from publishing the ages and dates of birth of entertainment industry professionals

---

[2] Because of significant investment in privately held companies, investors "see[] the same risks and would benefit from the same climate related disclosures" from both public and private companies. Supp. App. 103-104; *see also* Supp. App. 469-472.

did not regulate commercial speech. *IMDb.com*, 962 F.3d at 1122. Here, in contrast, the regulated parties are seeking to increase their market share and attract investments through statements about their climate commitments and preparedness. App. 606-614.

Plaintiffs' insistence on a narrow and formulaic definition of commercial speech—excluding the type of comprehensive disclosures required here—runs counter to both precedent and common sense. As explained in *PhRMA*, "[i]t would be odd to subject speech in a consumer-facing advertisement to less scrutiny than speech in an annual report filed with a state regulatory body simply because it better fits the doctrinal tests for defining commercial speech." 2025 WL 2448851, at *10. But in any event, as the district court concluded, App. 652, the disclosures regulate corporate speech that *is* reasonably understood as advertising (i.e., branding), App. 7, and which has a clear economic motive, App. 606-614. Thus, by any metric, the laws regulate commercial speech.

### 2. This Court's Review is Governed by *Zauderer*

The test for analyzing the constitutionality of compelled commercial disclosures is established in *Zauderer*. 471 U.S. at 651. In that case, the Court found an attorney advertisement that claimed, "if there is no recovery, no legal fees are owed by our clients," had a "self-evident" capacity to mislead a layperson unaware of the distinction between legal fees and litigation costs. *Id.* at 652. Thus,

requiring such advertisements "to state that the client may have to bear certain expenses even if he loses" merited minimal concern: although "unjustified or unduly burdensome disclosure requirements might offend the First Amendment," there is only a "minimal" constitutionally protected interest in not providing "factual information" about one's business or services. *Id.* at 650-651. *Zauderer* and its progeny reflect the enduring principle that "[t]he First Amendment does not generally protect corporations from being required to tell prospective customers the truth." *Nationwide Biweekly Admin. v. Owen*, 873 F.3d 716, 721 (9th Cir. 2017).

*Zauderer* only applies to speech that is "factual and uncontroversial." *CTIA*, 928 F.3d at 845, 848-49. The district court readily concluded that both elements were met as to SB 253: the "emissions disclosures are … factual in nature," in that they "are defined and have recognized methods of computation," App. 655, and are not misleading because they do not require the disclosing company "to take responsibility" for the emissions disclosed, *id.* Moreover, the district court concluded that the disclosures were uncontroversial: "SB 253 merely requires companies to report data on emissions," and not "to take sides in a heated political controversy." App. 658-659.

And while the district court declined to apply *Zauderer* to SB 261, the disclosures required under that law are also properly understood as factual. Under

SB 261, companies need only disclose operational information such as: how and when the Board of Directors receives updates on climate-related risk planning; whether climate policies are expected to impact corporate supply chains or revenue streams; any corporate emissions reduction targets and interim goals towards meeting that target; etc. *See* Supp. App. 129-132. Such information is not meaningfully distinct from disclosures routinely made by large companies in the context of other commercial transactions, such as in companies' Form 10-Ks. Supp. App. 456-464, 664-668, 681-682. In this context, companies are merely asked to reveal their existing assessments, which are factual "to the extent that they accurately report the firm's business judgments." Supp. App. 460. And while the district court never reached the question of whether the disclosures required under SB 261 were uncontroversial, the answer is clear. There can be no dispute around a company's own articulation of its actual policies and assessments, which is all that the law requires. Supp. App. 132, 134-135, 457-461, 465-467.

Plaintiffs now seek to insert two additional "threshold requirements" into the application of *Zauderer*. First, they argue that *Zauderer* should apply only to "limited supplement[s]" appended to the speaker's own message. Mot. 21. This "requirement" does not appear in this Court's prior cases applying *Zauderer*, and in fact, is contradicted by several cases. *E.g., Env't Def. Ctr. v. EPA*, 344 F.3d 832, 849-51 (9th Cir. 2003) (applying *Zauderer* to educational pamphlets

"informing the public about safe toxin disposal"); *X Corp.*, 116 F.4th at 900-01 (permitting application of *Zauderer* to required disclosure of a company's "[Terms of Service] and content moderation policies").

Second, this Court does not require a showing that compelled disclosures be related to "'the terms under which' a product or service is offered." Mot. 21. In *CTIA*, this Court rejected the same contention. 928 F.3d at 848; *see also Loan Payment Admin. LLC v. Hubanks*, 821 F. App'x 687, 689–90 (9th Cir. 2020) (rejecting argument that *Zauderer* is "limited" to compelled disclosures that concern "the terms under which … services will be available"). But in any event, these disclosures *do* pertain to the reporting entity's own services and operations. *Cf. Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 744, 768-69 (2018) (*NIFLA*) (striking down the requirement that clinics post information about abortion services *they do not provide*).

### 3. Plaintiffs' Arguments for Strict Scrutiny are Unpersuasive

#### a. Neither Law Discriminates on the Basis of Viewpoint

Plaintiffs assert the laws discriminate on the basis of "viewpoint," because the public *might* use the information disclosed to pressure some companies into taking action on climate change, thereby rendering those companies "'an instrument' of the government's message." Mot. 14-15. Not so.

The State does not dictate the message of these disclosures. *Cf. Wooley v. Maynard*, 430 U.S. 705 (1977) (requiring dissemination of ideological message on license plate); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995) (requiring parade organizers to present alternative viewpoints); *NIFLA*, 585 U.S. 755 (requiring clinics opposed to abortion to disseminate notice of abortion services). The operation of the laws is ideologically neutral—penalties are to be assessed for failure to disclose fully and accurately, not for the underlying content of those disclosures. Cal. Health & Safety Code § 38532(f)(2); *id.* § 38533(f)(2).

Plaintiffs cite *National Ass'n of Manufacturers v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015), but in that case companies engaged in diamond sales were required to state whether their diamonds were "conflict free" or "not conflict free," labels forcing companies to self-identify their product as "ethically tainted," *id*. at 554. In contrast, these disclosures do not require speech that conveys an equivalent message—they do not, for example, require a company to label itself as "good for the climate" or "bad for the climate." These laws require companies to provide raw information without editorialization.

That third parties could take a further step and use the disclosed information to inform commercial choices does not render the laws discriminatory. App. 659 (citing *Am. Meat Inst. v. USDA*, 760 F.3d 18, 23 (D.C. Cir. 2014) (rejecting First

Amendment challenge to a regulation requiring country-of-origin labels "to enable consumers to choose American-made products")). On the contrary, it underscores the role that disclosure plays in furthering First Amendment interests.

#### b. Neither Law Elicits Statements of Opinion on Contentious Issues

SB 253 requires the disclosure of quantitative data. *See, e.g.*, Supp. App. 445 (example disclosure). SB 261 requires the disclosure of operational information. *See* example disclosures at Supp. App. 389, 390, 393-450. Plaintiffs have yet to explain how the laws compel even a single company to state a political or ideological opinion. *Cf. X Corp.*, 116 F.4th at 899; *NetChoice v. Bonta*, 113 F.4th 1101, 1120 (9th Cir. 2024); *see also PhRMA*, 2025 WL 2448851, at *12 ("In both *NetChoice* and *X Corp.*, our application of strict scrutiny ultimately turned on the subjective and political or ideological nature of the information that the regulations required."). At most, Plaintiffs suggest that the laws implicate strict scrutiny because they relate generally to climate change—but a factual statement does not become controversial simply because it "can be tied in some way to a controversial issue," *CTIA*, 928 F.3d at 845.

### B. SB 253 and SB 261 Satisfy the Appropriate Levels of Scrutiny

Applying *Zauderer* review, the government need only show that "the information in the disclosure is reasonably related to a substantial governmental interest," *CTIA*, 928 F.3d at 845, is neither unjustified nor unduly burdensome on

speech, and "remed[ies] a harm that is 'potentially real, not purely hypothetical,'" *NIFLA*, 585 U.S. at 776. Plaintiffs do not dispute that, to the extent *Zauderer* does not apply, "[c]ommercial speech is generally subject to intermediate scrutiny." *X Corp.*, 116 F.4th at 900. Under intermediate scrutiny, the government need only show that the regulation directly advances a substantial government interest and is no more restrictive than necessary to serve that interest. *Central Hudson*, 447 U.S. at 564. The State identified three compelling interests, any one of which could satisfy any level of scrutiny.

### 1. Investor Interest in Reliable Information

The district court concluded that the State's interest in providing "reliable information that enables investors … to make informed judgments about the impact of climate-related risks on their economic choices" was sufficient to satisfy both *Zauderer* scrutiny (for SB 253) and intermediate scrutiny (for SB 261). App. 662-664, 671-672. This conclusion is unassailable. The State clearly has a "substantial interest in reducing [informational] asymmetries, facilitating informed commercial transactions, and improving the efficiency of the [relevant] market." *PhRMA*, 2025 WL 2448851, at *18; *see also Edenfield v. Fane*, 507 U.S. 761, 769 (1993) ("For purposes of [the *Central Hudson*] test, there is no question that [the State's] interest in ensuring the accuracy of commercial information in the marketplace is substantial."); *Chamber of Commerce of United States v. SEC*, 85

F.4th 760, 771 (5th Cir. 2023) (noting "[t]he SEC has a legitimate interest in promoting the free flow of commercial information"). The evidence supporting investors' need for this particular information is significant. Supp. App. 102-103, 477-478; App. 516-520, 605-608. And this investor interest is not mere "curiosity." Mot. 24. Investors "demand a premium from firms that are saddled with climate risk," because of the risk to their investments. App. 612; *see also* Supp. App. 102-103 ("[b]oth the physical impacts and the transition risks have the power to affect our fixed assets, disrupt supply chains and increase volatility in the financial markets").

The laws are appropriately tailored to meet these interests. Supp. App. 467-473. As a result of the high revenue threshold for both laws, the companies that fall within the scope, whether public or private, "can be expected to have multiple outside investors (likely both shareholders and bondholders), as well as bank creditors and other contractual counterparties." Supp. App. 472; *see also* Supp. App. 103-104. And the disclosures under both SB 253 and SB 261 are made pursuant to industry-accepted and widely used accounting protocols, which contain a materiality threshold where deemed appropriate by the industry experts who developed them. *See* App. 284, 299-300; Supp. App. 146-147. Disclosing the information only to existing investors would fail to provide decision-useful

information to prospective investors, lenders, and insurers, in addition to failing to serve the other interests discussed below.

### 2. Prevention of Market Confusion and Misleading Speech

While the district court did not agree with the State's alternative argument that the laws serve the State's compelling interest in preventing the "dissemination of commercial speech that is false, deceptive, or misleading," *Zauderer*, 471 U.S. at 638, this Court could affirm on that basis as well. The State need not *demonstrate* that any such misleading speech exists to meet its burden. *See* Mot. 23. Under *Zauderer* the State may "impose[] regulations to *guard against* 'the *potential* for deception and confusion' in commercial speech." 471 U.S. at 658 (Brennan, J., concurring in part) (emphasis added); *see also id.* at 651. And where "the possibility of deception is … self-evident," courts do "not require the State to 'conduct a survey'" before determining that the regulated speech "ha[s] a tendency to mislead.'" *Id.* at 652-53.

There can be no genuine dispute that the current marketplace of unregulated emissions pledges and voluntary disclosures is rife with the *potential* for confusion and deception. App. 509-516. The vast majority of large companies make such statements, App. 523-525, 596, 608-612, but the market contains insufficient information from which to discern whether companies are truly living up to those commitments, App. 509-516. Uniform and consistent disclosures guard against

deception in such pledges. App. 514. This is true for both laws. *Id.* ("greenwashing can occur … through a failure to disclose the physical and transition risks to which a firm is exposed").

Plaintiffs make much of their claim that Defendants' expert, Dr. Hsu, "did not identify a single false statement." Mot. 23. But the State needs no evidence of actual fraud. *See supra*. And Plaintiffs oversell their criticism of Dr. Hsu's research. If a company is failing to make meaningful progress towards its stated emission reduction target, App. 598, or is relying on questionable offsets to achieve that goal, *id.*, such an emissions reduction pledge is misleading. *See also* App. 509-514, 615-630. Absolutely nothing in either law "target[s]" companies for their lobbying positions, Mot. 23, or even asks for information pertaining to lobbying in any respect, *see generally* Supp. App. 119-135.

Given the pervasiveness of the corporate statements at issue, and the varying forms they take, the scope of regulation is appropriate. App. 630-632.

### 3. Emissions reductions

The district court concluded that "the State provides sufficient evidence to support a finding that SB 253's disclosure requirements are reasonably related to the State's substantial government interest in reducing emissions." App 666. By requiring greater transparency about emissions data, SB 253 may encourage companies doing business in California to reduce their emissions by, in one study,

at least 7-10%. App. 504-506, 508-509, 525-527; Supp. App. 497-498, 524, 541, 564-566, 579-580, 590, 608-610, 624. And while the district court did not extend this rationale to SB 261, the mechanism applies, not least because SB 261 includes reporting on metrics and targets.

Plaintiffs claim that this interest is insufficient to withstand First Amendment scrutiny because "there is no evidence these laws will meaningfully reduce emissions." Mot. 23. This is belied by the evidence, *supra.* California has a compelling interest in any reduction in emissions in the State, whether or not such a reduction is great enough on its own to alleviate climate change. *Destination Ventures, Ltd. v. FCC*, 46 F.3d 54, 56 (9th Cir. 1995) ("The First Amendment does not require Congress to forgo addressing the problem at all unless it completely eliminates [the problem]"). *Junior Sports Magazines Inc. v. Bonta* is inapposite—there the State was "restrict[ing] protected speech to prevent something that does not appear to occur" at all. 80 F.4th 1109, 1117 (9th Cir. 2023).

Plaintiffs argue that the "State could have calculated its own estimates of companies' [GHG] emissions using publicly available information." Mot. 17. But Defendants' evidence demonstrates that any such estimate would be inaccurate. App. 507-509. And in any event, even under intermediate scrutiny, "[t]he fit … need not be perfect." App. 671 (*quoting Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1111 (9th Cir. 2004)).

## II. THE REMAINING INJUNCTION FACTORS FAVOR THE STATE

Given that Plaintiffs cannot show a likelihood of success on the merits, this Court's analysis can end there. *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023); *Smith v. Helzer*, 95 F.4th 1207, 1215 (9th Cir. 2024). But as Plaintiffs cannot establish imminent harm, they fail to satisfy the remaining preliminary injunction factors.

### A. Plaintiffs Have Not Established Irreparable Harm

Plaintiffs cannot establish irreparable harm simply by claiming their members' First Amendment rights will be violated; as shown above, they have not established that is so. Moreover, any such harm is not *imminent*. *See Winter*, 555 U.S. at 22. Reporting of Scopes 1 and 2 will not begin until June 30, 2026, and only after CARB issues enforcing regulations, Supp. App. 897, with Scope 3 not coming until a *year later* in 2027.

And even if compliance costs could entitle Plaintiffs to extraordinary relief, Plaintiffs' claimed costs are specious. As to SB 253, CARB made clear that entities need not collect *any* new data "for the first report due," and entities will not be penalized for incomplete, but good faith, reporting. App. 545-546. And Plaintiffs have not met their burden to establish that they will incur costs specific to SB 261 in the brief window before this Court decides the preliminary injunction appeal on the fast calendar that applies to such appeals under Circuit Rule 3-3.

They fail to separate out costs specific to compliance with SB 261 from those incurred as to SB 253, *see* App. 531-536 (attributing costs to Scope 3 reporting), Supp. App. 664-668; fail to address whether the costs they claim have already been incurred; and fail to establish that an injunction pending appeal would prevent the expenditures, given the regulatory uncertainty on appeal.

### B. The Balance of the Equities and the Public Interest Militate Against Granting an Injunction

The remaining two factors "merge" when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here "enjoining SBs 253 and 261 would delay the State from advancing the public interests for which it adopted the laws." App. 673-674. Moreover, an injunction would inflict harm on California by preventing the enforcement of statutes enacted by the People's representatives. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). As Plaintiffs are unlikely to succeed on the merits of their claim, they fail to demonstrate any hardship tipping the balance in their favor. *CTIA*, 928 F.3d at 852.

## CONCLUSION

For the reasons stated above, Plaintiffs-Appellants' motion for injunction pending appeal should be denied.

Dated: September 25, 2025

Respectfully submitted,

*s/ Caitlan McLoon*

Rob Bonta
*Attorney General of California*
Annadel A. Almendras
*Senior Assistant Attorney General*
Myung J. Park
Laura J. Zuckerman
*Supervising Deputy Attorneys General*
CAITLAN MCLOON
*Deputy Attorney General*

*Attorneys for Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 27(d)(2)(a) and Ninth Circuit Rules 27-1(1)(d) and 32-3 because it contains 5,597 words, excluding the portions of the document exempted by Ninth Circuit Rule 27-1(1)(d) and Fed. R. App. P. 27(a)(2)(B) and 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) as it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: September 25, 2025

Respectfully submitted,

*s/ Caitlan McLoon*

CAITLAN MCLOON
*Deputy Attorney General*

*Attorney for Defendants-Appellees*

SF2025305052
67961123