No. 25-5327

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,
CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU
FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION,
CENTRAL VALLEY BUSINESS FEDERATION, AND
WESTERN GROWERS ASSOCIATION,
*Plaintiffs-Appellants*,

V.

LAUREN SANCHEZ, IN HER OFFICIAL CAPACITY AS CHAIR OF THE
CALIFORNIA AIR RESOURCES BOARD, STEVEN S. CLIFF, IN HIS OFFICIAL
CAPACITY AS THE EXECUTIVE OFFICER OF THE CALIFORNIA AIR RESOURCES
BOARD, AND ROBERT A. BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY
GENERAL OF CALIFORNIA,
*Defendants-Appellees*.

**On Appeal from the United States District Court**
**for the Central District of California**
No. 2:24-cv-00801-ODW-PVC

## ANSWERING BRIEF OF DEFENDANTS-APPELLEES

Rob Bonta
*Attorney General of California*
Annadel A. Almendras
*Senior Assistant Attorney General*
Myung J. Park
Laura J. Zuckerman
*Supervising Deputy Attorneys
General*

Caitlan McLoon
Katherine Gaumond
Emily Hajarizadeh
M. Elaine Meckenstock
Dylan Redor
Elizabeth Song
*Deputy Attorneys General*
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6438
Caitlan.McLoon@doj.ca.gov
*Attorneys for Defendants-Appellees*

October 16, 2025

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................. 1

Statement of Jurisdiction ............................................................. 3

Issues Presented .......................................................................... 3

Pertinent Constitutional and Statutory Provisions ...................... 4

Statement of the Case .................................................................. 4

    I.     Statutory Background ....................................................... 4

          A.    Market Participants Demand Transparency About
               Corporate GHG Emissions and Climate-Related
               Financial Risk ................................................... 4

          B.    SB 253 .............................................................. 6

          C.    SB 261 .............................................................. 9

    II.    Procedural History ......................................................... 11

Summary of the Argument .......................................................... 15

Standard of Review ..................................................................... 19

Argument ..................................................................................... 20

    I.     The District Court Did Not Abuse Its Discretion in
        Denying a Preliminary Injunction as to SB 253 ...................... 20

          A.    Plaintiffs are Unlikely to Succeed on the Merits of
               their First Amendment Challenge to SB 253 ............... 20

               1.    SB 253 is Not Subject to Strict Scrutiny ........... 20

                      a.    SB 253 regulates commercial speech,
                            which is subject at most to intermediate
                            scrutiny ................................................... 21

                      b.    SB 253's commercial disclosures are
                              factual and uncontroversial and thus
                              *Zauderer*'s lower level of scrutiny
                            applies ..................................................... 26

i

## TABLE OF CONTENTS
### (continued)

Page

        c.    Alternatively, SB 253 is a government reporting requirement that warrants lesser scrutiny ............................................. 32

        d.    Plaintiffs' argument for the application of strict scrutiny is unpersuasive .............. 34

    2.    SB 253 Satisfies the Appropriate Level of Scrutiny ................................................................ 35

        a.    Investor and other stakeholder interest in emissions data ...................................... 36

        b.    Potential for emissions reductions ........... 41

        c.    Prevention of misleading speech and provision of material information to consumers ................................................ 46

B.    The Remaining Injunction Factors Favor the State ...... 50

    1.    Plaintiffs Have Not Established Irreparable Harm ................................................................. 50

    2.    The Balance of the Equities and the Public Interest Militate Against Granting an Injunction ........................................................... 52

II.    The District Court Did Not Abuse Its Discretion in Denying a Preliminary Injunction as to SB 261 ...................... 52

A.    Plaintiffs are Unlikely to Succeed on the Merits of their First Amendment Challenge to SB 261 ................ 53

    1.    SB 261 is Subject to *Zauderer* Review or Intermediate Scrutiny, Not Strict Scrutiny ......... 53

        a.    SB 261 regulates commercial speech ....... 53

        b.    The disclosures required under SB 261 are factual and uncontroversial ............... 56

## TABLE OF CONTENTS
### (continued)

Page

c.    Plaintiffs' argument for the application of strict scrutiny is unpersuasive .............. 57

2.    SB 261 Satisfies the Appropriate Level of Scrutiny ............................................................ 58

a.    Investor and other stakeholder interest in company risk assessments .................... 59

b.    Potential for emissions reductions ........... 61

c.    Prevention of misleading speech and provision of material information to consumers ................................................. 62

B.    The Remaining Injunction Factors Favor the State ...... 63

1.    Plaintiffs Have Not Established Irreparable Harm ................................................................. 64

2.    The Balance of the Equities and the Public Interest Militate Against Granting an Injunction ........................................................ 65

Conclusion ........................................................................... 65

Certificate of Compliance ................................................... 65

Addendum ............................................................................ 65

# TABLE OF AUTHORITIES

**Page**

CASES

*A.O. Smith Corp. v. FTC*
530 F.2d 515 (3d Cir. 1976) .........................................................51

*All. for the Wild Rockies v. Cottrell*
632 F.3d 1127 (9th Cir. 2011) ...............................................19, 50

*Am. Acad. of Pain Mgmt. v. Joseph*
353 F.3d 1099 (9th Cir. 2004) ...................................................48

*Am. Auto. Mfrs. Ass'n v. Cahill*
152 F.3d 196 (2d Cir. 1998) .......................................................43

*Am. Beverage Ass'n v. City & Cnty. of San Francisco*
916 F.3d 749 (9th Cir. 2019) ...................................................49

*Am. Hosp. Ass'n v. Azar*
983 F.3d 528 (D.C. Cir. 2020) ...................................................38

*Am. Hosp. Ass'n v. Harris*
625 F.2d 1328 (7th Cir. 1980) ...................................................51

*American Meat Institute v. USDA*
760 F.3d 18, 26 (D.C. Cir. 2014) .................................32, 34, 38

*Ams. for Prosperity Found. v. Bonta*
594 U.S. 595 (2021).......................................................................48

*Ariix, LLC v. NutriSearch Corp.*
985 F.3d 1107 (9th Cir. 2021) ...............................................21, 22

*Assurance Wireless USA, L.P. v. Reynolds*
100 F.4th 1024 (9th Cir. 2024) ...................................................64

*B & L Prods., Inc. v. Newsom*
104 F.4th 108 (9th Cir. 2024) ...................................................29

iv

# TABLE OF AUTHORITIES
## (continued)

Page

*Baird v. Bonta*
　　81 F.4th 1036 (9th Cir. 2023) .............................................. 50, 63

*Bd. of Trs. v. Fox*
　　492 U.S. 469 (1989) ................................................................. 35

*Bolger v. Youngs Drug Products Corp.*
　　463 U.S. 60 (1983) ............................................................. 21, 25

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*
　　29 F.4th 468 (9th Cir. 2022) ..................................................... 50

*Cal. Democratic Party v. Jones*
　　530 U.S. 567 (2000) ................................................................. 42

*Caribbean Marine Servs. Co. v. Baldrige*
　　844 F.2d 668 (9th Cir. 1988) ............................................... 51, 64

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*
　　447 U.S. 557 (1980) ........................................................ *passim*

*Chamber of Com. v. SEC*
　　85 F.4th 760 (5th Cir. 2023) ............................................... 31, 61

*CTIA—The Wireless Ass'n v. City of Berkeley*
　　928 F.3d 832 (9th Cir. 2019) ............................................ *passim*

*Destination Ventures, Ltd. v. FCC*
　　46 F.3d 54 (9th Cir. 1995) ....................................................... 42

*Edenfield v. Fane*
　　507 U.S. 761 (1993) ................................................ 37, 39, 53, 61

*Freedom Holdings, Inc. v. Spitzer*
　　408 F.3d 112 (2d Cir. 2005) ..................................................... 51

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Full Value Advisors, LLC v. SEC*
   633 F.3d 1101 (D.C. Cir. 2011).................................18, 54, 58, 61

*Green v. Miss U.S. of Am., LLC*
   52 F.4th 773 (9th Cir. 2022) ........................................................42

*IMDb.com v. Becerra*
   962 F.3d 1111 (9th Cir. 2020) ...............................................24, 25

*Junior Sports Magazines Inc., v. Bonta*
   80 F.4th 1109, 1117 (9th Cir. 2023) ...........................................42

*Loan Payment Admin. LLC v. Hubanks*
   821 F. App'x 687 (9th Cir. 2020)................................................32

*Lorillard Tobacco Co. v. Reilly*
   533 U.S. 525 (2001)................................................................39, 41

*Maryland v. King*
   567 U.S. 1301 (2012)......................................................19, 52, 65

*Metro. Taxicab Bd. of Trade v. City of New York*
   633 F. Supp. 2d 83 (S.D.N.Y. 2009) ...........................................43

*Moody v. NetChoice, LLC*
   603 U.S. 707 (2024)................................................................20, 48

*Nat'l Ass'n of Wheat Growers v. Bonta*
   85 F.4th 1263 (9th Cir. 2023) ......................................................58

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*
   272 F.3d 104 (2d Cir. 2001) ........................................................38

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*
   585 U.S. 755 (2018)...........................................................*passim*

*National Ass'n of Manufacturers v. SEC*
   800 F.3d 518 (D.C. Cir. 2015)....................................................28

vi

# TABLE OF AUTHORITIES
## (continued)

Page

*Nationwide Biweekly Admin. v. Owen*
    873 F.3d 716 (9th Cir. 2017) ....................................................26

*NetChoice, LLC v. Bonta*
    113 F.4th 1101 (9th Cir. 2024) ....................................31, 33, 49

*NetChoice, LLC v. Paxton*
    49 F.4th 439 (5th Cir. 2022) ....................................................31

*Nken v. Holder*
    556 U.S. 418 (2009)...............................................................52

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*
    475 U.S. 1 (1986)...................................................................30

*Pharm. Care Mgmt. Ass'n v. Rowe*
    429 F.3d 294 (1st Cir. 2005)...................................................31

*Pharm. Rsch. & Mfrs. of Am. v. Stolfi*
    No. 24-1570, 2025 WL 2448851 (9th Cir. Aug. 26, 2025)................*passim*

*Roman Catholic Diocese of Brooklyn v. Cuomo*
    592 U.S. 14 (2020)................................................................50

*Roman v. Wolf*
    977 F.3d 935 (9th Cir. 2020) ..................................................20

*Smith v. Helzer*
    95 F.4th 1207 (9th Cir. 2024) .................................................50

*Turner Broad. Sys., Inc. v. FCC*
    512 U.S. 622 (1994)...................................................33, 47, 58

*Turner Broad. Sys., Inc. v. FCC*
    520 U.S. 180 (1997)...............................................................36

*United States v. Edge Broad. Co.*
    509 U.S. 418 (1993)...............................................................36

vii

## TABLE OF AUTHORITIES
### (continued)

Page

*United States v. O'Brien*
    391 U.S. 367 (1968) ...................................................................29

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council,*
    *Inc.*
    425 U.S. 748 (1976) ..............................................................2, 35

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008) ............................................................3, 19, 51

*Wooley v. Maynard*
    430 U.S. 705 (1977) ............................................................34, 58

*X Corp. v. Bonta*
    116 F.4th 888 (9th Cir. 2024) .......................................... *passim*

*Zauderer. Zauderer v. Off. of Disciplinary Couns.*
    471 U.S. 626 (1985) ....................................................... *passim*

### STATUTES

28 United States Code
    § 1292(a)(1) ...............................................................................3
    § 1331 .........................................................................................3

## TABLE OF AUTHORITIES
### (continued)

Page

California Health and Safety Code
§ 38532 ............................................................................................ 4
§ 38532(b)(2) ................................................................................... 7
§ 38532(b)(3) ................................................................................... 7
§ 38532(b)(4) ................................................................................... 7
§ 38532(b)(5) ................................................................................... 7
§ 38532(c)(1) ................................................................................... 6
§ 38532(c)(1)(A)(ii) ........................................................................ 8
§ 38532(c)(1), (d)(2) ....................................................................... 33
§ 38532(c)(2)(A)(i)(I) ..................................................................... 8
§ 38532(c)(2)(A)(i)(II) ................................................................ 9, 51
§ 38532(c)(2)(A)(ii) ........................................................................ 8
§ 38532(c)(l)(F) ............................................................................... 27
§ 38532(e)(1)(A), (B) ...................................................................... 6
§ 38532(f)(2) .................................................................................... 34
§ 38532(f)(2)(A) .............................................................................. 9
§ 38532(f)(2)(B), (C) ...................................................................... 9
§ 38533 ............................................................................................ 4
§ 38533(a)(2) ................................................................................... 10
§ 38533(a)(4) ................................................................................... 9
§§ 38533(a)(4), (b)(1)(A), (c)(1) .................................................... 9
§ 38533(b)(1)(A) ............................................................................. 9
§ 38533(b)(1)(A)(i) .................................................................. 10, 11
§ 38533(f)(2) ............................................................................ 11, 55
§ 38562.2 ......................................................................................... 42
§ 38566 ............................................................................................ 42

CONSTITUTIONAL PROVISIONS

First Amendment ...................................................................... *passim*

## TABLE OF AUTHORITIES
### (continued)

Page

COURT RULES

Federal Rule of Appellate Procedure
    Rule 4(a)(1)(B)(1) ................................................................ 3
    Rule 43(c)(2) ..................................................................... 11
    Rule 56(d) ....................................................................... 12

OTHER AUTHORITIES

Senate Bill 219 ..................................................................... 4

Senate Bill 253 ..................................................................... 1

Senate Bill 261 ..................................................................... 1

## INTRODUCTION

Corporations face all manner of business risks. Those risks are of keen interest to their investors, insurers, lenders, workers, and others whose own fortunes are tied to the company's. That is why, for decades, our Nation's securities laws have required disclosure of certain forms of material investment risk. And that is why California, recognizing the emerging economic risk to major companies from climate change, recently enacted two laws that provide transparency into these risks.

The Climate Corporate Data Accountability Act (Senate Bill 253) will, no earlier than June 30, 2026, require companies doing business in California that make $1 billion in annual revenue to provide the State with raw greenhouse gas (GHG) emissions data calculated using a standardized, independently-created and industry-supported accounting protocol. SB 253 is not yet operative, as the implementing agency has not proposed the regulations that are a condition precedent to any obligation on companies to speak under that law.

The Climate-Related Financial Risk Act (Senate Bill 261) will, on January 1, 2026, require companies doing business in the State that make $500+ million in annual revenue to disclose climate-related financial risks, similar in kind to longstanding requirements in the securities context. Disclosures under SB 261 are to be aligned with a widely used framework established by the Financial Stability

Board, an international body formed to prevent a repeat of the 2007-2009 global financial crisis.

Plaintiffs-Appellants U.S. Chamber of Commerce *et al.* facially challenge the constitutionality of these laws under the First Amendment, proposing that laws calling for the disclosure of numerical data and assessed business risk discriminate on the basis of "viewpoint" merely because third party market participants might make decisions based on that information that in turn influence corporate behavior. The district court correctly rejected this argument, finding that the operation of both laws is viewpoint-neutral. Neither law asks reporting companies to identify their political views, convey a government message, acknowledge any particularized risk, or lower their emissions. Rather, both laws govern commercial speech in which California has a substantial interest, including by ensuring investors in the State can properly price risk in making the economic decisions these third parties deem most prudent. *See Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, No. 24-1570, 2025 WL 2448851, at *6, *18 (9th Cir. Aug. 26, 2025) ("*PhRMA*").

Concluding that Plaintiffs are unlikely to succeed on the merits of their First Amendment challenge, the district court denied Plaintiffs' motion for preliminary injunction as to both laws. As the laws advance, rather than burden, a core First Amendment interest in the "free flow of commercial information," *see Va. State*

*Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976), that conclusion was correct.

And in any event Plaintiffs present insufficient evidence to establish irreparable harm specific to either law. Plaintiffs seek to facially invalidate the laws on the basis of a single declaration from a reporting company, which attributes the bulk of its costs to aspects of reporting not due until 2027. The equities favor the State in "advancing the public interests for which it adopted the laws." *CTIA—The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 852 (9th Cir. 2019). Thus, Plaintiffs are not entitled to the "extraordinary remedy" of an injunction for either law. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

## STATEMENT OF JURISDICTION

The district court has subject matter jurisdiction under 28 U.S.C. § 1331. On August 13, 2025, the district court entered an order denying Plaintiffs' motion for a preliminary injunction. 1-ER-2. Plaintiffs timely filed their notice of appeal on August 20, 2025. 9-ER-2241; *see* Fed. R. App. P. 4(a)(1)(B)(1). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

1.    Whether the district court acted within its discretion in denying a preliminary injunction against SB 253.

3

2.    Whether the district court acted within its discretion in denying a preliminary injunction against SB 261.

**PERTINENT CONSTITUTIONAL AND STATUTORY PROVISIONS**

SB 253 as amended by Senate Bill 219 (SB 219, Reg. Sess. (Cal. 2024)) and codified at § 38532 of the California Health and Safety Code is reproduced at 69-81.  SB 261 as amended by SB 219 and codified at § 38533 of the California Health and Safety Code is reproduced at 82-88.

**STATEMENT OF THE CASE**

I.    **STATUTORY BACKGROUND**

A.    **Market Participants Demand Transparency About Corporate GHG Emissions and Climate-Related Financial Risk**

Harms from climate change,[1] like ever-more-extreme wildfires, floods, and droughts, can pose significant risks to companies' supply chains, insurability, employee health, and overall financial stability.  *See* 7-ER-1611-1612; 8-ER-1827, 1831-1832.  Societal shifts "away from fossil fuel energy and related physical assets" can also be expected to "affect most economic sectors and industries," for example through reduced demand for certain goods and services.  8-ER-1816, 1831-1832; 7-ER-1612.

---

[1] "All parties here *agree* climate change is a 'reality' and emissions contribute to it."  4-ER-782; *see also* 6-SER-1504-1512.

4

"One of the essential functions of financial markets is to price risk to support informed, efficient, capital-allocation decisions." 8-ER-1816. To play this role, financial markets require complete and accurate material information. 2-ER-300-302; 4-ER-832-834. Accordingly, entities across the private sector—from insurance company CEOS, 7-SER-1944, to corporations involved in mergers and acquisitions, 7-SER-1931-1932—have long called for "clear, consistent and comparable climate information" in order to make informed decisions regarding these risks. 7-SER-1944; *see also* 2-ER-301-302, 7-ER-1501-1502, 8-ER-1817-1818.

To address these stakeholder needs and attract market share, 2-ER-302-310, 9-SER-2346-2348, the vast majority of large companies have for years been voluntarily disclosing select emissions data and climate-related risks, or otherwise making emission reduction claims, 2-ER-302-308, 2-ER-335, 4-ER-852-853, 9-SER-2346-2347. In 2023 more than 23,000 companies disclosed environmental data to the CDP (formerly the Carbon Disclosure Project), an investor-driven disclosure project. 9-SER-2193.

However, these voluntary disclosures and commitments have proven inconsistent and incomplete, creating confusion among the same stakeholders the companies seek to attract. *See, e.g.*, 2-ER-315-316, 321-323, 325, 4-ER-837-838, 841, 5-SER-1450-1451, 1464-1465, 5-SER-1390-1392. As a representative of the

5

nation's largest public pension fund explained in the district court: "the current disclosure regime for corporate reporting falls short of our expectations as investors." 7-ER-1615.

In 2023, the California Legislature enacted and the Governor signed two statutes to respond to these concerns: SB 253 and SB 261. 2023 Cal. Stat., ch. 382 (SB 253); 2023 Cal. Stat., ch. 383 (SB 261); *see also* 8-ER-1944-1946, 8-ER-1991-1992, 10-SER-2583-2588, 10-SER-2573, 10-SER-2565, 9-SER-2402, 9-SER-2388, 2391.

## B. SB 253

SB 253, as amended in 2024 by SB 219, directs the California Air Resources Board (CARB) to "develop and adopt regulations" that will require "reporting entit[ies]" to report their GHG emissions to the government. Cal. Health & Safety Code § 38532(c)(1). CARB's regulations will specify whether these emissions reports will be submitted directly to CARB, or to an "emissions reporting organization" contracted by CARB. *Id.* § 38532(c)(1).[2] CARB or its designee must create a publicly available "digital platform" that will host the "emissions data of reporting entities." *Id.* § 38532(e)(1)(A), (B). CARB has not yet proposed

_____

[2] Plaintiffs reference an earlier version of the law that required submission to a reporting organization. The operative version can be found in the State's Appendix at 69-81. *See also* 3-ER-519-531.

these implementing regulations. 1-SER-7. Until CARB does so, the statute imposes no obligations on any private entities.

When regulations are adopted, "[r]eporting entit[ies]" will be those that "do[] business in California" and have total annual revenues in excess of $1 billion. Cal. Health & Safety Code § 38532(b)(2). Reporting entities will report GHG emissions in three categories:

- "Scope 1" covers those emissions from sources owned or directly controlled by the business entity. *Id.* § 38532(b)(3).

- "Scope 2" covers those emissions associated with the reporting entity's use of electricity, heating, and cooling. *Id.* § 38532(b)(4).

- "Scope 3" covers all other indirect emissions "from sources that the reporting entity does not own or directly control," such as "purchased goods and services, business travel, employee commutes, and processing and use of sold products." *Id.* § 38532(b)(5).

The data needed to calculate Scope 1 and 2 emissions is generally "available from within [a company's] existing financial records," 4-SER-995, such as from fixed asset listings and electricity invoices, *see* 9-SER-2353-2360. Scope 3 emissions can be determined through either the collection of relevant data (e.g., from suppliers), or estimated using "secondary data sources," including "industry

7

average data, proxy data, and other generic data." Cal. Health & Safety Code
§ 38532(c)(2)(A)(ii).

To ensure accuracy, consistency, and transparency in the data, entities must
quantify and report all three categories of emissions "in conformance" with the
"GHG Protocol standards and guidance." *Id.* § 38532(c)(1)(A)(ii). This Protocol
was created in 2001 by a coalition of business and other interests, including
representatives from BP, Ford Motor Company, KPMG, and
PricewaterhouseCoopers. 7-ER-1493, 1495-1496. It has been widely adopted. 9-
SER-2335-2337 ("92% of Fortune 500 companies responding to the CDP used
[the] GHG Protocol"); *see* 9-SER-2344-2351. The Protocol specifies that
companies should provide "[e]missions data separately for each scope," and
encourages companies to provide additional explanation where helpful for
transparency. 7-ER-1556. Thus, companies are permitted to separate out their
own emissions from those of other entities within their defined boundaries.

Scope 1 and Scope 2 emissions reports are not due until 2026 "on or by a date
to be determined by the state board" in its regulations. Cal. Health & Safety Code
§ 38532(c)(2)(A)(i)(I). CARB has tentatively proposed that reporting would begin
on June 30, 2026. 1-SER-7. CARB has announced that companies need not incur
costs to collect new data for their first reports—these can be based solely on
emissions data "that can be determined from information the reporting entity

8

already possesses or is already collecting." 3-ER-430.  Moreover, during the first reporting cycle, CARB "will not take enforcement action for incomplete reporting," as long as companies make a good faith effort to retain relevant data. 3-ER-430.  By statute, Scope 3 reporting will not begin until 2027.  Cal. Health & Safety Code § 38532(c)(2)(A)(i)(II).

CARB must adopt regulations before it is "authorize[d]" to "seek administrative penalties," and when it does so, those penalties can only be assessed for "nonfiling, late filing, or other failure to meet the requirements" of the statute. *Id.* § 38532(f)(2)(A).  For the first four years of reporting on Scope 3 (from 2027 to 2030), penalties can only be assessed for "nonfiling," and even thereafter cannot be assessed "for any misstatements with regard to scope 3 emissions disclosures made with a reasonable basis and disclosed in good faith."  *Id.* §§ 38532(f)(2)(B), (C).

## C.  SB 261

SB 261, as amended in 2024 by SB 219, applies to U.S. entities with total annual revenues over $500 million that "do[] business in California."  Cal. Health & Safety Code § 38533(a)(4).  It requires them to prepare and post on their website a biennial report disclosing climate-related financial risks they have identified and any measures they have adopted to reduce and adapt to those risks.  *Id.* §§ 38533(a)(4), (b)(1)(A), (c)(1).  These disclosures are first due on January 1, 2026.  *Id.* § 38533(b)(1)(A).

9

The bill defines "[c]limate-related financial risk" as the "material risk of harm to immediate and long-term financial outcomes due to physical and transition risks…." *Id.* § 38533(a)(2). The law directs reporting entities to prepare their disclosures in alignment with a framework adopted by the Task Force on Climate-related Financial Disclosures (TCFD), *id.* § 38533(b)(1)(A)(i), which was created by a working group of large investors, banks, insurance companies, industrial firms, rating agencies, and accounting firms at the behest of the Financial Stability Board, 6-SER-1685-1686. Twenty-one states already require large insurers to complete a Climate Risk Disclosure Survey using this same TCFD framework. 6-SER-1695, 6-SER-1565, 6-SER-1519-1521.

The TCFD framework is structured around four areas of disclosure—governance, strategy, risk management, and metrics and targets. 8-ER-1819; 9-SER-2361-2365. Under the TCFD, "risks" and "financial impacts" subject to disclosure cover purely commercial projections, such as the likelihood of "[r]educed demand for products and services," "[c]hange in revenue mix and sources," "[i]ncreased production costs due to changing input prices," and "[i]ncreased insurance premiums." 8-ER-1831. Many companies, including Plaintiffs' sole testifying member company, U-Haul, already disclose information consistent with the TCFD framework in reports submitted to the U.S. Securities and Exchange Commission (SEC). 4-SER-1000-1004, 3-SER-770-771.

10

The information to be disclosed is "focused on a company's actual or planned activities." 9-SER-2367. As such, a company that "do[es] not evaluate climate-related risks could make disclosures that [it] do[es] not have any climate-related governance, strategy, risk management, or metrics and targets." *Id.* Or a company could state that it has assessed climate-related risk and determined that it faces no such risk. *Id.*; *see, e.g.*, 7-SER-1878 ("We currently do not see any chronic physical risks … affecting our business any more than normal operations.").

CARB is responsible for adopting regulations "authoriz[ing]" it to "seek administrative penalties." Cal. Health & Safety Code § 38533(f)(2). Once those regulations have been adopted, such penalties are to be assessed for failure to post a report, or for publication of an "inadequate or insufficient report." *Id.* In determining penalties, CARB will be required to take into consideration a company's "past and present compliance" and the company's "good faith measures to comply" and "when those measures were taken." *Id.*

## II.  PROCEDURAL HISTORY

Plaintiffs are several trade associations. In January 2024, they initiated this action against CARB's Chair,[3] CARB's Executive Officer, and California Attorney General Rob Bonta (collectively, the "State"), arguing, as relevant here,

---

[3] In October 2025 Lauren Sanchez succeeded Liane Randolph as CARB Chair. Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Lauren Sanchez automatically substitutes for Liane Randolph as a Defendant in this action.

that SB 253 and SB 261 are facially unconstitutional under the First Amendment. 9-ER-2180-2210. Plaintiffs sought summary judgment on this claim in May 2024, before discovery opened.[4] 9-ER-2106. In November 2024, the district court denied Plaintiffs' motion for summary judgment and granted the State's Rule 56(d) motion on the ground "that further development of the facts are needed for [the Court] to evaluate" Plaintiffs' claim. 3-ER-506-518.

In February 2025, Plaintiffs brought this motion for preliminary injunction on the same claim. 3-ER-477-481. The district court denied Plaintiffs' motion, holding that the laws concern speech, 1-ER-12-13, but concluding that because such speech is "commercial," the laws are "subject to a lesser standard than strict scrutiny," 1-ER-17 (citation omitted), and satisfied the applicable standards.

Employing a "fact-driven" analysis, the court found that "SB 253 mandates disclosure of commercial data … that many companies routinely disclose and stakeholders consider relevant to the long-term success of the business." 1-ER-21. The court determined that the required emissions disclosures are "factual in nature," because they are "defined and have recognized methods of computation," and are not "misleading" because companies neither have to state they are causing the emissions, nor are restricted from separately publicizing "avoided emissions."

---

[4] The State separately moved to dismiss Plaintiffs' non-First Amendment claims; the district court granted that motion. 3-ER-482-505.

1-ER-23.  And it found such disclosures uncontroversial because "companies subject to SB 253 are not required to take sides in a heated political controversy," but merely "report data on emissions."  1-ER-26-27 (cleaned up).  As the court explained, "[t]hat some may look favorably or unfavorably on a company based on its emissions report does not transform an otherwise non-controversial disclosure into a controversial one."  1-ER-27.

Based on these conclusions, the court applied the test for compelled speech from *Zauderer v. Office of Disciplinary Counsel*, 1-ER-27.  Highlighting the State's factual record, the district court determined California had established a substantial interest "in reliable information that enables investors … to make informed judgments about the impact of climate-related risks on their economic choices."  1-ER-30.  And "[g]iven that a large percentage of SB 253's covered companies are public and the likelihood that most, if not all, of the private companies have California investors," the district court concluded SB 253's tailoring passed constitutional muster on this facial challenge.  1-ER-32.  It further concluded that California has a "second" substantial interest in emissions reductions, as "California has committed to meeting certain emissions reduction goals over time" in light of "the severity of the climate risks the state faces."  1-ER-33.  It found that several studies supported the conclusion that mandatory disclosure of this type can lead to emissions reductions.  1-ER-33-34.  The court

deemed the evidence insufficient to support two alternative interests proffered by California—providing emissions information material to California consumers, 1-ER-29-30, and preventing misleading speech in corporate emissions claims, 1-ER-35-38.

The district court independently concluded that SB 261 governs commercial speech, because it "requires companies to disclose information related to … risks to a company's own business," similar to the type of risk information many companies already report "through SEC disclosures and other requirements." 1-ER-21. The court declined to apply *Zauderer* review because it deemed risk assessments about future events not purely factual, 1-ER-24-25, instead applying intermediate scrutiny under *Central Hudson*. 1-ER-38-40. The court concluded that California met its burden to establish that the "specific disclosures required by SB 261 achieve[d] the [L]egislature's objective" in providing California investors with the information necessary "to make informed judgments about the impact of climate-related risks on their economic choices." 1-ER-39. The court did not agree with several alternative interests discussed by the State. 1-ER-40-41.

As Plaintiffs failed to demonstrate that either law violates the First Amendment, the court concluded they had not shown irreparable harm, and that

the equities favored the State in "advancing the public interests for which it adopted the laws." 1-ER-41-42.[5]

## SUMMARY OF THE ARGUMENT

Examining SB 253 and SB 261 separately, the district court determined that both laws are constitutional. Both conclusions are supported by settled precedent and a voluminous record, and neither was an abuse of discretion.

I. The district court correctly declined to issue a preliminary injunction as to SB 253. SB 253 regulates the disclosure of "commercial speech," and thus either intermediate scrutiny or "a lower level of scrutiny" under *Zauderer* should apply. *PhRMA*, 2025 WL 2448851, at *6. The disclosures provide parties to actual or potential commercial transactions—current and prospective investors, shareholders, lenders, insurers, employees, and consumers—with numerical data pertinent to understanding the risks and opportunities associated with these transactions. *See id.* at *14. Because emissions data is factual and uncontroversial, *Zauderer*'s rational basis standard applies.

SB 253 is readily distinguishable from laws that have merited the application of strict scrutiny. This law elicits raw data free from political opinion or government coercion—it neither forces a company to identify itself as morally

---

[5] The district court subsequently denied Plaintiffs' request for an injunction pending appeal. 2-ER-44-48. Plaintiffs have sought the same relief in this Court. Dkt. 6.1.

responsible for climate change, nor present a government-crafted statement at odds with its mission, nor disclose a position on a contentious policy question. The law does not mandate changes in a company's environmental performance, nor burden a company's own message regarding its emissions reduction goals and achievements. SB 253 achieves "accountability" only through transparency—by closing the information gap between companies and their stakeholders. *E.g.,* 10-SER-2573.

As the district court recognized, California has substantial interests in ensuring the free flow of material information to investors and other stakeholders and achieving the emissions reductions that improved transparency has been shown to generate in an open market. This Court could additionally conclude that the State has a substantial interest in preventing the selective, and thereby misleading, emissions disclosures which currently flood the marketplace, and providing information necessary for consumers to evaluate corporate emissions claims. The law requires only the information that independent experts have identified as necessary for accurate and complete data. And it applies a neutral metric—a revenue threshold—designed to capture those companies that are most economically significant, all of whom are "expected to have multiple outside investors." 6-SER-1692. Thus, the law satisfies both *Zauderer* and intermediate scrutiny, and Plaintiffs cannot establish a likelihood of success on the merits.

In the absence of a constitutional violation, Plaintiffs are not entitled to a preliminary injunction. But in any event, there can be no plausible assertion of imminent irreparable harm as to SB 253—CARB has not even proposed the regulations that are a condition precedent to any obligation on the reporting entities to speak. 1-SER-7. Reporting of Scopes 1 and 2 will not begin until June 30, 2026, at the earliest, and only after CARB issues enforcing regulations that will determine the specifics of disclosure, *id.*, with Scope 3 not coming until a *year later* in 2027. Under these circumstances, the equities strongly favor the State.

II. SB 261 likewise governs "commercial speech": the disclosures provide parties to actual or potential commercial transactions with information pertinent to these transactions. *See PhRMA*, 2025 WL 2448851, at *14. "[I]nadequate information about risks" facing businesses "can lead to a mispricing of assets and misallocation of capital and can potentially give rise to concerns about financial stability…." 8-ER-1822. While the district court applied intermediate scrutiny, this Court could alternatively examine the law under *Zauderer*'s rational basis review. Under SB 261, companies need only disclose operational information regarding governance and oversight, assessed business risks (e.g., risks to supply chains or revenue streams), and emissions reduction goals and targets. Such information is not meaningfully distinct from disclosures routinely made by large companies in the context of other commercial transactions.

17

Nothing about SB 261 merits the application of strict scrutiny. The disclosures required under SB 261 are not a veiled attempt to "suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion," *Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1108 (D.C. Cir. 2011)—the companies preparing the disclosures choose the content, and face no penalty for their underlying policies and assessments. The law elicits only operational information free from political opinion or government messaging.

SB 261 satisfies both *Zauderer* and intermediate scrutiny. The State has a substantial interest in the disclosure of economically significant information designed to "reduc[e] [informational] asymmetries, facilitate[e] informed commercial transactions, and improv[e] the efficiency of the [California] market." *PhRMA*, 2025 WL 2448851, at *18. The neutral metric—a revenue threshold—is designed to capture those companies that are most economically significant to California investors and other stakeholders, and is not more restrictive than necessary to serve the State's interests. *See Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 564 (1980). Accordingly, Plaintiffs cannot establish a likelihood of success on the merits, and their challenge fails.

But Plaintiffs also fail to establish any imminent irreparable harm attributable to SB 261. The declarations pertaining to compliance burdens link costs almost

exclusively to Scope 3 reporting under the other law, which will not begin until 2027, 3-ER-441-444, and generally lack credibility, 4-SER-990-1000. Thus, there is nothing to justify the application of even "sliding scale" review. Because "enjoining … [SB] 261 would delay the State from advancing the public interests for which it adopted the laws," 1-ER-41-42, and inflict harm on California by preventing the enforcement of statutes enacted by the People's representatives, *Maryland v. King*, 567 U.S. 1301, 1303 (2012), the balance of the equities tip in the State's favor.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. The moving party must establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Id.* at 20. Plaintiffs argue they need only show the existence of "serious questions" going to the merits, as long as the balance of hardships "tips sharply in [their] favor." Plaintiffs-Appellants' Brief (Br.) 69. But to benefit from this "sliding scale" approach, "plaintiffs must establish that irreparable harm is likely, not just possible." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). This Court reviews the district court's denial of a preliminary

injunction for abuse of discretion. *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020).

Because this is a facial challenge, Plaintiffs must establish that "the law's unconstitutional applications substantially outweigh its constitutional ones." *X Corp. v. Bonta*, 116 F.4th 888, 898 (9th Cir. 2024) (quoting *Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024)). Facial challenges are "hard to win" because they "threaten to short circuit the democratic process" by "preventing duly enacted laws from being implemented in constitutional ways." *Moody*, 603 U.S. at 723.

## ARGUMENT

I. **THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING A PRELIMINARY INJUNCTION AS TO SB 253**

A. **Plaintiffs are Unlikely to Succeed on the Merits of their First Amendment Challenge to SB 253**

1. **SB 253 is Not Subject to Strict Scrutiny**

Plaintiffs contend that the challenged laws "presumptively" merit strict scrutiny because they "compel speech." Br. 31. But not all compelled speech is subject to strict scrutiny. Two independent bases justify applying less than strict scrutiny here. First, settled precedent provides that "commercial speech" is subject to either intermediate scrutiny under *Central Hudson*, or "a lower level of scrutiny akin to rational basis review" under *Zauderer*. *PhRMA*, 2025 WL 2448851, at *6. The district court correctly concluded that SB 253 addresses commercial speech and is subject to *Zauderer*'s lower standard. Second, this Court in *PhRMA* recently

20

suggested that government reporting requirements, in contrast to direct disclosure requirements, may warrant lesser scrutiny even without evaluating whether the law governs commercial speech. 2025 WL 2448851, at *6-13. Although *PhRMA* did not ultimately need to decide that question, SB 253 is a government reporting requirement and provides the Court an opportunity to confirm that its suggestion in *PhRMA* was correct.

### a. SB 253 regulates commercial speech, which is subject at most to intermediate scrutiny

In *PhRMA*, this Court clarified that "the commercial speech doctrine" applies to disclosures that "provide[] parties to 'actual or potential' commercial transactions with information about those transactions." 2025 WL 2448851, at *14. This definition reflects the longstanding connection between commercial speech and "commercial transactions," but makes explicit that courts are to employ a "common-sense" approach to commercial speech that eschews "bright line[]" rules, *X Corp.*, 116 F.4th at 900; *accord Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021) ("[S]peech that does not propose a commercial transaction on its face can still be commercial speech."). The Supreme Court has also set out several "important guideposts" that can aid the analysis in "close" cases. *X Corp.*, 116 F.4th at 900; *see Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 66-67 (1983). These factors, when present, lend "strong support" to the conclusion that the speech is commercial: (1) if the speech is an advertisement,

(2) if the speech refers to a particular product, and (3) if the speaker has an economic motivation. *Ariix*, 985 F.3d at 1116. But the absence of these factors is "not dispositive." *Id.*

Employing a "fact-driven" analysis, *X Corp.*, 116 F.4th at 900, the district court correctly concluded that SB 253 regulates commercial speech because it "mandates disclosure of commercial data—a company's direct and indirect GHG emissions—that many companies routinely disclose and stakeholders consider relevant to the long-term success of the business." 1-ER-21. This Court's subsequent *PhRMA* decision bolsters this conclusion. In *PhRMA* this Court upheld the constitutionality of a regulation requiring prescription drug manufacturers to submit to the state a detailed report addressing current and past drug prices, generic alternatives, sales revenue, and factors the company considered in setting its drug prices. 2025 WL 2448851, at *14-*16. While the reports did not themselves "propose a commercial transaction," *id.* at *14, the Court nevertheless found them commercial because "they provide market participants with information to facilitate future commercial transactions," *id.* at *15.

The disclosures required under SB 253 provide parties to actual *or potential* commercial transactions—current and prospective investors, shareholders, lenders, insurers, and consumers—with information pertinent to these transactions. *Id.* at *14. Indeed, companies disclose emissions, or make emissions reduction pledges,

22

explicitly in order to induce business and attract shareholders and contractual counterparties. 2-ER-302-310. And they do so *voluntarily* in such large numbers that there is no rational conclusion but that such statements are of significant commercial value. 2-ER-302, 305-308, 2-ER-335, 4-ER-852-853, 9-SER-2346-2347. Even U-Haul, Plaintiffs' sole testifying member company, which claims a corporate philosophy at odds with the purpose behind SB 253, publicly advertises the company's commitment to "[d]evelop[ing] and implement[ing] comprehensive climate-change strategies to manage and mitigate our [GHG] emissions." 3-SER-757-758.

That the disclosures "do not concern prices, services, or sales," and require the disclosure of information "regardless of whether the company sells any good or service in California," is irrelevant. Br. 32. Purchases of stock shares or other investment products and the issuance of debt or insurance policies, are indisputably commercial transactions. Indeed, the record is replete with evidence that investors, insurers, and other stakeholders are seeking such information to understand the risk associated with these commercial transactions. 7-ER-1611-1615, 7-ER-1528; *see also* 4-ER-844-852, 7-SER-1944, 7-SER-1932, 5-SER-1467-1480, 1-SER-221-265. And these prospective stakeholders benefit from information about the financial risks and opportunities faced by the company as a whole. 4-ER-848, 7-ER-1611-1616.

Relying on selective (and thereby misleading) quotes from a single legislator, Plaintiffs claim that the SB 253 disclosures are "intended for public accountability, not commercial engagement." Br. 32. But the highlighted remarks, in full context, actually underscore that the statute's purpose is "transparency":

> We know that there are large corporations that work very hard to be green to reduce their carbon footprint. There are others that do not. Unfortunately, among the ones that really don't do a great job lowering their carbon footprint, they will at times market themselves as green …. We need to make sure that the public actually knows who's green and who isn't and to make sure we have that transparency. That's all this bill does, transparency. Information for the public.

8-ER-1984-1985 (emphasis added). Indeed, correcting misleading commercial statements lies at the very heart of constitutional speech under *Zauderer*. *Zauderer v. Off. of Disciplinary Couns.*, 471 U.S. 626, 646 (1985). Similarly, Plaintiffs cite one of Defendants' experts to support their argument that the "[t]he mandated speech is meant to pressure and embarrass, not to promote." Br. 37. But the context makes clear that what is at issue is actual commercial transactions: "When investors have greater certainty regarding [the disclosed information], they can be expected to use this information to restructure their portfolios in ways that allow them to align their investments with their own risk tolerances and preferences for investment types." 2-ER-328.

Plaintiffs' reliance on *IMDb.com v. Becerra*, 962 F.3d 1111 (9th Cir. 2020), is misplaced. Br. 32-33. In *IMDb.com*, the Court concluded that there was no

24

"commercial transaction" involved at all when a website posts "encyclopedic" movie and entertainment facts; thus, a law restricting the website from publishing the ages and dates of birth of entertainment industry professionals did not involve commercial speech. 962 F.3d at 1122. Here, in contrast, the companies seek shareholders or contractual counterparties, and SB 253 provides information pertinent to those financial decisions.

Contrary to Plaintiffs' assertion, the district court's analysis was not a novel expansion of the commercial speech doctrine. Br. 38. Commercial disclosure of firm-level data, disconnected from a particular product or sale, is commonplace and unexceptional. *See PhRMA*, 2025 WL 2448851, at *5-9 (listing examples). Rather, it is Plaintiffs' insistence on a narrow and formulaic definition of commercial speech that runs counter to both precedent and common sense. As explained in *PhRMA* in rejecting strict adherence to the *Bolger* factors, "[i]t would be odd to subject speech in a consumer-facing advertisement to less scrutiny than speech in an annual report filed with a state regulatory body simply because it better fits the doctrinal tests for defining commercial speech." 2025 WL 2448851, at *10.

The district court's conclusion that SB 253 regulates commercial speech is well supported and should be affirmed.

### b. SB 253's commercial disclosures are factual and uncontroversial and thus *Zauderer*'s lower level of scrutiny applies

*Zauderer* provides one avenue for affirmance. In that case, the Court found an attorney advertisement that claimed, "if there is no recovery, no legal fees are owed by our clients" had a "self-evident" capacity to mislead a layperson unaware of the distinction between legal fees and litigation costs. 471 U.S. at 652. Thus, requiring such advertisements "to state that the client may have to bear certain expenses even if he loses" merited minimal concern. *Id.* at 650-51. The Court applied "a lower level of scrutiny akin to rational basis review." *PhRMA*, 2025 WL 2448851, at *6. The Court explained: although "unjustified or unduly burdensome disclosure requirements might offend the First Amendment," there is only a "minimal" constitutionally protected interest in not providing "factual information" about one's business or services. *Zauderer*, 471 U.S. at 650-51. *Zauderer* and its progeny reflect the enduring principle that "[t]he First Amendment does not generally protect corporations from being required to tell prospective customers the truth." *Nationwide Biweekly Admin. v. Owen*, 873 F.3d 716, 721 (9th Cir. 2017).

**1.** *Zauderer* only applies to speech that is "factual and uncontroversial." *CTIA*, 928 F.3d at 845. Both elements are satisfied here.

26

The "emissions disclosures are … factual in nature," because they are numerical values, generated through standardized "methods of computation." 1-ER-23. SB 253 requires companies to measure and report the quantity of their GHG emissions in conformance with a "globally accepted standard" that is "aligned with traditional and well-established financial reporting principles." 9-SER-2344-2353; *see* 6-SER-1685, 8-ER-1974, 8-ER-2008. And third-party firms are required to review and "assure" the accuracy of the data, underscoring its factual and verifiable nature. Cal. Health & Safety Code § 38532(c)(l)(F); 9-SER-2360-2361.

Plaintiffs argue that the emissions disclosures are "approximations shaped by assumptions," and thus cannot constitute "hard facts." Br. 46. But the use of estimates under longstanding financial accounting principles does not take the data out of the world of fact and place them into the world of "opinion." 9-SER-2351, 2353-2361, 6-SER-1677-1684. By Plaintiffs' logic, many decades-old financial disclosure requirements, which similarly rely on estimates and professional analysis, are actually compelled "opinions." The GHG Protocol provides industry-standard methodologies for calculating accurate and transparent factual information on the metric stakeholders care about: total emissions levels from which they can determine the company's "[c]arbon risk premia." 2-ER-320.

27

Plaintiffs argue the emissions data is not factual because companies are asked to "own responsibility" for the emissions of others. Br. 44-45. But "SB 253 does not require companies to state that they are causing the emissions," 1-ER-23, and the statutory definitions make clear that Scope 3 emissions come from sources the disclosing company does not own or directly control. Nor does SB 253 "prohibit covered entities from separately calculating and publicizing its Scope 4 avoided emissions." *Id.* (citing 4-SER-1004-1005, 3-SER-613-619).

Plaintiffs cite *National Ass'n of Manufacturers v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015), arguing the disclosures required by SB 253 are not factual because they "carr[y] an unmistakable moral verdict." Br. 44. But in that case companies engaged in diamond sales were required to state whether their diamonds were "conflict free" or "not conflict free," labels forcing companies to self-identify their product as "ethically tainted," even if they disagreed with that assessment, 800 F.3d at 554. In contrast, SB 253's disclosures do not require speech that conveys any such message—they do not, for example, require a company to characterize itself as "part of the climate solution" or "not part of the climate solution." Plaintiffs cite isolated language from legislators and experts to suggest that forcing companies to take moral responsibility for climate change is the true purpose of the law. Br. 44. But the purpose of the law is accountability *through* transparency—providing data from which third parties can make their own

determinations. 8-ER-2015. In any event, this Court "will not invalidate a statute that is constitutional on its face, on the basis of what fewer than a handful of [legislators] said about it." *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 116-17 (9th Cir. 2024) (cleaned up) (citing *United States v. O'Brien*, 391 U.S. 367, 384 (1968)).

Requiring that companies over a certain size report Scope 2 and Scope 3 emissions data is not the equivalent of requiring them to acknowledge that they bear responsibility for the climate crisis; nor is it misleading. *Contra* Br. 45. Companies are required to provide "[e]missions data separately for each scope," preventing confusion about attribution. 7-ER-1556. In positing that this data constitutes "value-laden judgment about responsibility for third-party conduct," Br. 45, Plaintiffs ignore the straightforward business rationale for including Scope 3 emissions, not to mention Scope 2 emissions, in a company's report:

> [C]ompanies face very real risks from their Scope 3 emissions. Suppose future climate policy requires upstream suppliers to make costly investments to cut their emissions; those costs will be partially passed through to downstream firms, whose sales and margins will shrink as a result. Alternatively, suppose future climate policy requires that downstream users shoulder more responsibility for their carbon emissions, e.g. by requiring that more energy efficient appliances be produced and used; those changes will reduce the demand for energy (e.g. natural gas and electricity), and thereby affect the sales and profits of (upstream) energy companies. Either way, investors naturally want to know the extent of such transition risks in the supply chains of firms in which they invest.

29

4-ER-848. Indeed, it was large institutional investors that called for the creation of the GHG Protocol, 4-ER-852, to "increase consistency and transparency in GHG accounting and reporting," 7-ER-1496. And it has been widely adopted by businesses *voluntarily* preparing disclosures, belying any unconstitutional agenda. *E.g.*, 9-SER-2335-2336.

Finally, the SB 253 disclosures are uncontroversial. As the district court observed, "SB 253 merely requires companies to report data on emissions," and not "to take sides in a heated political controversy." 1-ER-26-27. A statement of fact does not become controversial simply because it "can be tied in some way to a controversial issue," *CTIA*, 928 F.3d at 845, or because a listener may use the fact to form an opinion. Rather, courts have declined to apply *Zauderer* where the speaker was forced to convey a message to which they are morally, religiously, or ideologically opposed. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 768-69 (2018) (*NIFLA*); *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 15 n.12 (1986) (states have "substantial leeway" to impose "appropriate information disclosure requirements" on companies, but may not "require corporations to carry the messages of third parties, where the messages themselves are biased against or are expressly contrary to the corporation's views"). The SB 253 disclosures convey no such value-laden message.

30

**2.** Plaintiffs seek to insert two additional "threshold requirements" into the application of *Zauderer*. First, they argue that *Zauderer* should apply only to "limited supplement[s]" appended to the speaker's own message. Br. 40-41. This "requirement" does not appear in any prior cases applying *Zauderer*, and in fact, is contradicted by several cases. For example, courts have upheld requirements under *Zauderer* that compel issuers of securities to report day-to-day share repurchase data once each quarter and to disclose the reason why the issuer repurchased shares of its own stock, *Chamber of Com. v. SEC*, 85 F.4th 760, 766, 771 (5th Cir. 2023); pharmacy benefit managers to disclose conflicts of interest and certain financial information to third parties with which they entered into contracts, *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 299, 310 (1st Cir. 2005); and social media platforms to publish information related to their content-moderation policies, *NetChoice, LLC v. Paxton*, 49 F.4th 439, 446, 485-86 (5th Cir. 2022), *rev'd on other grounds sub nom. Moody v. NetChoice*, 603 U.S. 707 (2024). And this Court has suggested that requiring online businesses to "[p]rovide any privacy information, terms of service, policies, and community standards concisely, prominently, and using clear language suited to the age of children," likely passes muster under *Zauderer*. *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1123–24 (9th Cir. 2024).

Second, this Court does not require a showing that compelled disclosures be related to "'the terms under which' a product or service is offered." *Contra* Br. 41-42. In *CTIA*, this Court rejected the same contention, noting that *Zauderer* has been applied outside this context, such as for "disclosures about commercial products." 928 F.3d at 848; *see also Loan Payment Admin. LLC v. Hubanks*, 821 F. App'x 687, 689–90 (9th Cir. 2020) (rejecting argument that *Zauderer* is "limited" to compelled disclosures that concern "the terms under which … services will be available"). As the D.C. Circuit noted in *American Meat Institute v. USDA*, the link between disclosure and the "good or service offered by the regulated party" was "inherent in the facts" in *Zauderer*, but no court has yet needed to "decide on the precise scope or character of that relationship." 760 F.3d 18, 26 (D.C. Cir. 2014). In any event, that "link" is sufficiently close here. Whereas in *NIFLA* the Court struck down a requirement that women's health clinics post information about abortion services those clinics *refused to provide*, here the information pertains to the operations—direct, upstream, and downstream—of the reporting entity itself. 585 U.S. at 768-69.

### c.   Alternatively, SB 253 is a government reporting requirement that warrants lesser scrutiny

Recently this Court discussed an alternative basis on which SB 253 should merit lesser scrutiny. In *PhRMA*, this Court suggested that laws requiring disclosure of information directly to the government may default to a lower level

32

of scrutiny even in the absence of a finding that such speech is "commercial." 2025 WL 2448851, at *9-10.  While such disclosures "require reporting based on categories prescribed by the state," the court noted they have historically not aroused heightened constitutional concern.  *PhRMA*, 2025 WL 2448851, at *15 n.22.  It is only where a speech requirement crosses the line from commercial information to matters of "subjective political or ideological statements," *id.* at *13 (citing *NetChoice*, 113 F.4th at 1118, *X Corp.*, 116 F.4th at 901-02), or "compel[s] speakers to utter or distribute speech bearing a particular message," *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994), that heightened scrutiny has been implicated.

Although *PhRMA* did not ultimately resolve this issue, SB 253 provides this Court with an opportunity to confirm that its observations are correct.  SB 253, as amended by SB 219, requires companies to submit their disclosures directly to CARB, or an "emissions reporting organization" contracted by CARB, then directs CARB or its designee to post the information on a webpage making it available to the public.  Cal. Health & Safety Code § 38532(c)(1), (d)(2).  The reports do not involve any political or ideological statements, only emissions data and related calculations.  Such reports thus "involve only 'routine disclosure of economically significant information designed to forward ordinary regulatory purposes.'"  2025

WL 2448851, at *9. Accordingly, SB 253 warrants lesser scrutiny *whether or not* the disclosures are deemed commercial. *Id.*

### d. Plaintiffs' argument for the application of strict scrutiny is unpersuasive

Plaintiffs assert SB 253 is designed to "skew the public debate," and thus discriminates on the basis of "viewpoint." Br. 27-28. But SB 253 simply requires companies to submit straightforward emissions data devoid of editorialization or comment. The State does not dictate any message in these disclosures. *Contra Wooley v. Maynard*, 430 U.S. 705 (1977) (requiring dissemination of ideological message on license plate); *NIFLA*, 585 U.S. 755 (requiring clinics opposed to abortion to disseminate notice of abortion services). And the operation of SB 253 is ideologically neutral—penalties are to be assessed for failure to disclose fully and accurately, not for the company's environmental performance or policies. Cal. Health & Safety Code § 38532(f)(2).

That third parties could take a further step and use the disclosed information to inform their commercial decisions does not render the laws discriminatory. 1-ER-27 (citing *Am. Meat Inst.*, 760 F.3d at 23 (rejecting First Amendment challenge to a regulation requiring country-of-origin labels "to enable consumers to choose American-made products")). Mandatory nutrition labels, for example, may influence consumer decisions, but that does not render them discriminatory. On the contrary, it underscores the role that disclosure plays in furthering First

34

Amendment interests. *See Va. State Bd. of Pharm.*, 425 U.S. at 765 ("It is a matter of public interest that [private economic] decisions … be intelligent and well informed."); *Cent. Hudson*, 447 U.S. at 561-62 ("Commercial expression … furthers the societal interest in the fullest possible dissemination of information.").

Nor does the fact that the disclosures required by SB 253 relate generally to "climate change" militate a different conclusion. *Contra* Br. 25. Settled precedent makes clear that "communications 'can constitute commercial speech notwithstanding the fact that they contain discussions of important public issues.'" *Bd. of Trs. v. Fox*, 492 U.S. 469, 475 (1989); *see also CTIA*, 928 F.3d at 845.

### 2. SB 253 Satisfies the Appropriate Level of Scrutiny

Under *Zauderer*, the government need only show that "the information in the disclosure is reasonably related to a substantial governmental interest," *CTIA*, 928 F.3d at 845, is neither unjustified nor unduly burdensome, and "remed[ies] a harm that is 'potentially real, not purely hypothetical,'" *NIFLA*, 585 U.S. at 776. When *Zauderer* does not apply, "[c]ommercial speech is generally subject to intermediate scrutiny." *X Corp.*, 116 F.4th at 900. Under intermediate scrutiny the government need only show that the regulation directly advances a substantial government interest and is no more restrictive than necessary to serve that interest. *Central Hudson*, 447 U.S. at 564.

35

Here, the Legislature identified several substantial interests—investor demand for emissions data, the potential for emissions reductions, the prevention of misleading claims, and value to consumers—any one of which could satisfy either level of scrutiny. In evaluating the government's interest, courts must give "substantial deference to the predictive judgments of [the legislature]." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997); *see also United States v. Edge Broad. Co.*, 509 U.S. 418, 434 (1993) ("Within the bounds of the general protection provided by the Constitution to commercial speech, we allow room for legislative judgments."). As the district court correctly concluded, SB 253's reporting requirement survives intermediate scrutiny to serve the needs of investors, alone, *or* to achieve the emissions reductions expected from the operation of market forces. But this Court could additionally affirm on the basis of state interests the district court did not accept, further reinforcing the conclusion that SB 253 survives constitutional scrutiny.

### a. Investor and other stakeholder interest in emissions data

The district court correctly concluded that California's interest in providing "reliable information that enables investors … to make informed judgments about the impact of climate-related risks on their economic choices" was sufficient to satisfy both *Zauderer* and *Central Hudson*. 1-ER-28-32. California has a "substantial interest in reducing [informational] asymmetries, facilitating informed

commercial transactions, and improving the efficiency of the [relevant] market."
*PhRMA*, 2025 WL 2448851, at *18; *see also Edenfield v. Fane*, 507 U.S. 761, 769
(1993) ("For purposes of [the *Central Hudson*] test, there is no question that [the
government's] interest in ensuring the accuracy of commercial information in the
marketplace is substantial.").

The evidence supporting investors' need for the information provided under
SB 253 is significant. A managing investment director at CalPERS, the largest
defined-benefit pension fund in the United States, with approximately $500 billion
in assets, and fiduciary responsibility to over 2.2 million public employees,
testified that climate change has the potential to significantly impact "the bottom
line of the many companies we rely upon to generate the investment returns that
pay benefits," 7-ER-1610-1611. He described Scope 1 and Scope 2 emissions data
as "crucial in making investments on behalf of our 2 million members," and Scope
3 as "material in all companies." 7-ER-1613. He explained that "the current
disclosure regime for corporate reporting falls short of our expectations as
investors," and that SB 253 data is needed to fill that gap. 7-ER-1615; *see also* 6-
SER-1697-1698.

This interest is not limited to CalPERS. Indeed, more than 700 financial
institutions, collectively handling over $142 trillion in assets, participate in the
CDP's voluntary disclosure marketplace, 2-ER-302, which was created precisely

because these investors "considered climate information material but were unable to get as much of it as they wanted." 4-ER-846. And "climate-related information" is increasingly addressed in corporate earnings calls. 2-ER-307, 1-SER-173, 1-SER-51.

This investor interest is not mere "curiosity." *Contra* Br. 64. Investors "demand a premium from firms that are saddled with climate risk," precisely because of the risk to their investments and financial well-being. 2-ER-308, 2-ER-303-304 ("[h]igher carbon emissions expose firms to greater levels of risk") (citing 5-SER-1466-1480); *see also* 4-ER-846. As one paper concluded, "[m]andatory and standardised information on carbon performance would … not only increase market efficiency but result in better allocation of capital within the real economy." 4-ER-847 (citing 4-SER-1171); *see also* 5-SER-1300, 5-SER-1280, 5-SER-1201. Where, as here, "the State's asserted interests [] are not limited to transparency for its own sake," but have a real commercial motivation, those interests are substantial. *PhRMA¸* 2025 WL 2448851, at *17; *see also Am. Meat Inst.*, 760 F.3d at 23 ("substantial" interest in labeling products to serve consumer interest in food safety); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 115 (2d Cir. 2001); *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 540 (D.C. Cir. 2020). The "State's role" as a market participant here further bolsters the legitimacy of its interest. *PhRMA*, 2025 WL 2448851, at *18.

The district court also correctly determined that SB 253 is appropriately tailored to serve this interest. As just discussed, the SB 253 disclosures are not "unjustified." *Zauderer*, 471 U.S. at 651. "The current voluntary climate emissions reporting landscape is fragmented, incomplete, and often unverified . . .creat[ing] a massive blind spot for … investors … seeking to derive meaningful insights across the entire economy." 8-ER-1991-1992; *see also* 8-ER-1823. SB 253 addresses that blind spot and provides investors the emissions information they seek for making investment decisions. Nor does SB 253 unduly burden the First Amendment rights of the speaker. *Zauderer*, 471 U.S. at 651. "Courts have repeatedly characterized the mechanism of disclosure here—wherein the State rather than a regulated entity makes disclosed information available to the public—as narrowly tailored." *PhRMA*, 2025 WL 2448851, at *19 (citing cases).

Alternatively, under *Central Hudson*'s "direct advancement" requirement, the State need only establish that "the harms it recites are real and that [the disclosure requirement] will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 771. This can be done "by reference to studies and anecdotes" or even "based solely on history, consensus, and simple common sense." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001). As discussed above, investors' interest is real, *contra* Br. 65, and the current marketplace has proven insufficient for them to obtain consistent and reliable data, *contra* Br. 67-68. Moreover, the disclosures—

39

made pursuant to the GHG Protocol's widely accepted methods—will provide the needed information in a consistent, transparent, and reliable manner.  7-ER-1615; 2-ER-326, 328; *contra* Br. 66.

Plaintiffs argue that the Legislature could have limited reporting to publicly traded companies.  Br. 67.  But as the district court rightly concluded, the State here used a revenue threshold as an accurate proxy for companies that have or may seek outside investors.  *See* 1-ER-32.  As a starting point, over 75% of companies covered by SB 253 are estimated to be public companies.  3-ER-343.  And the private companies covered by SB 253 "can be expected to have multiple outside investors (likely both shareholders and bondholders)" because "raising capital from outside investors provides a desirable mechanism for risk-sharing and attracting additional expertise to the enterprise."  6-SER-1692.  Indeed, CalPERS has more than $150 billion in exposure to private companies, and "sees the same risks and would benefit from the same climate related disclosures" from both public and private companies.  7-ER-1613-1614.  Notably, despite their large membership base, Plaintiffs have presented no evidence suggesting that the laws sweep in even one company that does not have California investors.

Plaintiffs argue SB 253 mandates disclosure regardless of materiality, Br. 67, but the GHG Protocol integrated into SB 253 considers materiality.  7-ER-1501-1502.  That the Legislature did not demand disclosures on other topics of interest

to investors, *see* Br. 68, is not relevant—not only does California not need to address all problems at once, but there is nothing in the record to suggest that investors do not already have the information they need on other metrics, "such as earnings." Br. 68. Plaintiffs propose these disclosures could be sent directly to investors, Br. 67, but doing so would fail to provide decision-useful information to *prospective* investors, lenders, and insurers.

### b. Potential for emissions reductions

Relying on four studies submitted by the State, the district court correctly concluded that California provided "sufficient evidence to support a finding that SB 253's disclosure requirements are reasonably related to the State's substantial government interest in reducing emissions." 1-ER-34 (citing *Lorillard*, 533 U.S. 525 (accepting "reference to studies and anecdotes")). The studies show other emissions disclosure programs resulted in total emissions reductions of between 7-10%. 4-ER-854-855 (citing 4-SER-1137-1138, 4-SER-1096-1134; 4-SER-1050-1094; 4-SER-1007-1048). This evidence supports the conclusion that SB 253, by requiring greater transparency about emissions data, may encourage companies doing business in California to reduce their emissions.

Plaintiffs now argue that "reducing emissions" is "far too vague" an interest to support the law. Br. 56. But the State articulated, and the district court credited, 1-ER-33, an interest in efforts that will result in lower emissions *in order to meet*

41

*its statutorily mandated emission reduction goals.* 3-ER-394 (citing Health & Safety Code §§ 38562.2, 38566). And the district court appropriately evaluated the interest in reducing emissions in context—whether mandatory emissions disclosure programs were tied to measurable emissions reductions. *Contra Cal. Democratic Party v. Jones*, 530 U.S. 567, 584 (2000) (explaining that while "protecting privacy" might be a value generally, specifically protecting the confidentiality of one's party affiliation was not); *Green v. Miss U.S. of Am., LLC*, 52 F.4th 773, 792 (9th Cir. 2022) (concluding that interest in eliminating discrimination against LGBTQ individuals was not sufficiently precise to justify requirement that one specific pageant accept a transgender competitor, when other pageants remained available).

That this law will not, on its own, alleviate the harms caused by climate change, Br. 56, is of no consequence, as "[t]he First Amendment does not require Congress to forgo addressing the problem at all unless it completely eliminates [the problem]." *Destination Ventures, Ltd. v. FCC*, 46 F.3d 54, 56 (9th Cir. 1995). Nor does *Junior Sports Magazines Inc. v. Bonta* compel a different conclusion—there, this Court held that the state was "restrict[ing] protected speech to prevent something that does not appear to occur" at all. 80 F.4th 1109, 1117 (9th Cir. 2023).

There is no inconsistency between the State's interest in the emissions reductions that are likely to be achieved through disclosure, and its assertion that these laws do not regulate emissions, Br. 55-56, as the expected emission reductions are not achieved through emissions *regulation*. Emission regulations contain some form of "command having a direct effect on the level of emissions." *Metro. Taxicab Bd. of Trade v. City of New York*, 633 F. Supp. 2d 83, 104 (S.D.N.Y. 2009) (quoting *Am. Auto. Mfrs. Ass'n v. Cahill*, 152 F.3d 196, 200 (2d Cir. 1998)). SB 253 requires the disclosure of information, but does not require regulated entities to alter their emission levels *at all*. Accord 8-ER-1798.[6] Indeed, a company could *increase its emissions*, and SB 253 would have nothing to say about that choice—no penalty or negative repercussions—only that the emissions be reported. *See* 4-ER-853.

Nor is the mechanism by which disclosure leads to emission reductions dependent on ideologically-motivated entities "shaming" companies, as Plaintiffs purport. *E.g.*, Br. 44. Many investors seek emissions data "to maximize financial returns." 2-ER-301-302. These investors seek emissions data only to "shift their

---

[6] The quotes Plaintiffs highlight to suggest inconsistency are taken out of context. Br. 55, 57. In its motion to dismiss briefing, the State noted (1) that *Plaintiffs* had failed to plead any facts to establish that SB 261 regulated emissions, 8-ER-1797 at n.5, and (2) that Plaintiffs had misattributed a quote taken from Plaintiffs' complaint as a position of the State. 8-ER-1797 at n.7. Neither footnote demonstrates any "doublespeak" on the part of the State.

43

portfolios towards firms with lower-climate-related risk and better strategies for mitigating those risks…." 2-ER-301-302. Companies may *choose* to respond to these market decisions by cutting emissions. 4-ER-853-854. Additionally, for companies that have independently committed to reducing emissions, disclosure aids in "develop[ing] capabilities for both measuring and managing their emissions." 4-ER-836. This is not State coercion, but the State nevertheless benefits from, and has an interest in, any emissions reductions that companies might be inspired to undertake.

The State similarly has an interest in the company Plaintiffs hypothesize that "invents a product that slashes emissions per unit," thereby capturing more market share—causing "[i]ts total emissions … [to] rise even as it drives down emissions economy-wide." Br. 57. Under SB 253, that company *could* report "[r]elevant ratio performance indicators (e.g. emissions per kilowatt-hour generated, tonne of material production, or sales)," 7-ER-1556, and would further be free to independently publicize its contributions to market-wide emissions reductions. Investors would obtain information on "actual emissions levels," allowing them to better understand the company's exposure to risk. 2-ER-320. Economy-wide emissions would go down. Br. 57. The State's interests would be served, along with the public's.

44

As to tailoring, SB 253 is not "more extensive than necessary to further the State's interest[s]." *Cent. Hudson*, 447 U.S. at 569-70. SB 253 requires disclosure of information that industry experts identified as necessary for the provision of accurate and complete information from the most economically significant companies doing business in California. 8-ER-1928-1929, 8-ER-1992. It neither restricts companies' speech, nor interferes with their message.

Plaintiffs argue that "direct regulation of emissions would be more effective at reducing emissions than compelled speech." Br. 60. But California is not seeking to regulate emissions through SB 253, *see, e.g.*, 8-ER-2015; rather, it seeks to close information gaps. There is no more effective way to close an information gap than to require the disclosure of the information. And even if true that direct emissions regulation "would be more effective at reducing emissions," Br. 60, "[a]s a general matter, governments are entitled to attack problems piecemeal, save where their policies implicate rights so fundamental that strict scrutiny must be applied." *Zauderer*, 471 U.S. at 651 n.14.

Plaintiffs argue that the State could alternatively "post" the data on "its own website," Br. 60, but that is precisely what SB 253 does. Moreover, the State cannot rely on its "own estimates." *Id.* Any such estimate would be incomplete, and would miss the benefits gained from having the entity responsible for managing emissions prepare the calculations. 4-ER-835-836.

45

c. **Prevention of misleading speech and provision of material information to consumers**

While the district court disagreed with California's alternative arguments that SB 253 serves the State's compelling interest in preventing the "dissemination of commercial speech that is false, deceptive, or misleading," *Zauderer,* 471 U.S. at 638, and providing information material to consumers, this Court could affirm on those alterative bases as well.

Under *Zauderer*, the State may "appropriately require[]" speech "in order to dissipate the *possibility* of consumer confusion or deception." 471 U.S. at 651 (emphasis added). And where "the possibility of deception is … self-evident," courts do "not require the State to 'conduct a survey'" before determining that the regulated speech "ha[s] a tendency to mislead.'" *Id.* at 652-53; *contra* Br. 49-51.

The current marketplace of unregulated emissions pledges and voluntary disclosures is rife with the potential for confusion and deception, among both investors *and consumers*. 4-ER-837-844. Companies frequently make "unverified climate 'pledges'"—aimed at consumers—"to help sell products." 8-ER-1932, 1-SER-143-150, 1-SER-130-141. Indeed, the vast majority of large companies make such statements. 2-ER-335, 9-SER-2148. And the lack of oversight over such statements leaves room for corporations to selectively disclose—creating impressions that are often not consistent with the full picture. 5-SER-1450-1465, 5-SER-1390-1406. Uniform and consistent disclosures guard against deception in

46

such pledges, creating a level playing field backed by verifiable data. 4-ER-842, 5-SER-1370-1388, 1-SER-267.

While such evidence was not necessary under *Zauderer*, the State presented expert testimony at the district court to illustrate that the problem identified was "real, not purely hypothetical." *NIFLA*, 585 U.S. at 776; *Turner Broad. Sys.*, 512 U.S. at 666. One study, for example, showed that companies participating in a voluntary disclosure program consistently reported reductions even as their emissions increased. 5-SER-1450; *see also* 5-SER-1390, 5-SER-1357.

Plaintiffs make much of their claim that Defendants' expert, Dr. Hsu, "did not identify a single false statement." Br. 50. But Plaintiffs oversell their criticism of Dr. Hsu's research. If a company fails to make meaningful progress towards its stated emission reduction target (e.g., 2-SER-427-589, 2-SER-390-425), or relies on demonstrably poor quality offsets that do not lower emissions (e.g., 2-SER-325-339, 1-SER-64-113), such an emissions reduction pledge is misleading. 2-ER-335-338. While Plaintiffs argue the segment of Dr. Hsu's data regarding corporate lobbying demonstrates *California's* discriminatory motive, Br. 50, this is a red herring: absolutely nothing in either law targets companies for their lobbying positions, or even asks for information pertaining to lobbying, *see generally* 9-SER-2352-2360.

47

Given the pervasiveness of the corporate statements at issue, and the varying forms they take, the scope of regulation is appropriate. *See Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1111 (9th Cir. 2004) ("what is required is a reasonable fit between the legislature's ends and the means chosen to accomplish those ends") (cleaned up). Plaintiffs respond that SB 253 is overbroad because it applies to every company above the revenue threshold doing business in California, "whether or not the company has even spoken about climate issues, and regardless of what it has said." Br. 52. But the record reflects that upwards of 82%, 2-ER-335, or even 98%, 9-SER-2148, of the largest companies are making some sort of emissions disclosure or climate pledge.

Plaintiffs here have chosen to bring a facial challenge. While a company making no public statements may be able to come forward with an as applied challenge, the hypothetical existence of such a company is not a basis on which to *facially* invalidate the law. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (the question is whether "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep"). This is especially true here, where any purported overbreadth on this rationale is justified in service of one of California's other compelling interests. Citing *NetChoice* and *X Corp.* Plaintiffs counter that the laws are facially invalid because they impose the same unconstitutional speech requirement on

48

"every covered business" without heed to whether the business has made relevant emissions commitments. Br. 30-31. But in both of those cases, the Court found that every covered company was required to disclose policy positions on sensitive issues, a burden for which California lacked justification in all contexts. *NetChoice*, 113 F.4th at 1116; *X Corp.*, 116 F.4th at 899. That is a far cry from this law.

Plaintiffs additionally propose narrowing application of SB 253 to those companies actually making a "net-zero" emissions claim. Br. 52. But this would be underinclusive as to entities that are soliciting business and investment through other forms of emission claims or commitments, and would potentially *disincentivize* companies from making net-zero commitments. And reliance on existing fraud statutes as an alternative to SB 253, Br. 54, fares no better, as it ignores the harms to Californians from a vast marketplace of unregulated claims.

Plaintiffs argue that, under *American Beverage*, the SB 253 disclosures are too lengthy to pass muster. Br. 53. But in that case the government required a label to be affixed to the plaintiffs' advertisements that was so physically large it effectively drowned out the speaker's own message. *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 757 (9th Cir. 2019). There is no such allegation here. Indeed, the disclosures at issue go directly to the government, thus

49

minimizing any burden on the reporting company's own speech. *PhRMA*, 2025 WL 2448851, at *19.

## B.  The Remaining Injunction Factors Favor the State

Given that Plaintiffs cannot show a likelihood of success on the merits, this Court's analysis can end there. *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023); *Smith v. Helzer*, 95 F.4th 1207, 1215 (9th Cir. 2024). But independent of that, Plaintiffs cannot establish *imminent* harm from SB 253, and thus they are not entitled to a preliminary injunction while the case proceeds.

### 1.  Plaintiffs Have Not Established Irreparable Harm

Plaintiffs' central harm argument stems from the "First Amendment injury" they claim if required to disclose under SB 253. Their harm argument thus depends on their likelihood of success and fails for the same reason. Plaintiffs urge this Court's "sliding-scale" approach. Br. 69-70. But even then, "plaintiffs must establish that irreparable harm is *likely*, not just possible," which circles right back to the question of likelihood of success on the merits. *All. for the Wild Rockies*, 632 F.3d at 1131 (emphasis in original). Moreover, the cases on which Plaintiffs rely, Br. 70, involve intrusive government action, not government reporting. *Contra Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020); *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 479 (9th Cir. 2022).

In any event, Plaintiffs fail to establish an "immediate threatened injury," that entitles them to provisional relief. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *see also Winter*, 555 U.S. at 22 (harms must be both "likely" to occur and imminent). CARB has not yet issued the regulations that will implement SB 253, nor established reporting deadlines. 1-SER-7. And reporting of Scope 3 is not due until 2027. Cal. Health & Safety Code § 38532(c)(2)(A)(i)(II).

Compliance costs do not entitle Plaintiffs to extraordinary relief. *See Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005); *A.O. Smith Corp. v. FTC*, 530 F.2d 515, 527-28 (3d Cir. 1976); *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980). But even if they could, Plaintiffs' claimed costs are specious. *Caribbean Marine Servs.*, 844 F.2d at 674, 676 ("mere allegations" of "[s]peculative" harm and are insufficient). Entities need not collect any new data "for the first report due" under SB 253, and entities will not be penalized for incomplete, but good faith, reporting. 3-ER-430. And the claimed expenses of U-Haul, Plaintiffs' sole covered-entity declarant, were largely discredited by Defendants' independent accounting expert. *See* 4-SER-990-998 (noting the bulk of U-Haul's purported compliance costs are for data collection that the law likely will not require). U-Haul attributes the bulk of its costs to Scope 3 reporting, which is not due until 2027. 3-ER-441-444. And Plaintiffs fail to

51

address whether a preliminary injunction would even prevent the expenditure of these compliance costs, given the regulatory uncertainty that remains during the pendency of litigation.

### 2. The Balance of the Equities and the Public Interest Militate Against Granting an Injunction

The remaining two factors "merge" when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here "enjoining SBs 253 and 261 would delay the State from advancing the public interests for which it adopted the laws." 1-ER-41-42. Moreover, an injunction would inflict harm on California by preventing the enforcement of statutes enacted by the People's representatives. *Maryland*, 567 U.S. at 1303. As Plaintiffs are unlikely to succeed on the merits of their claim, they fail to demonstrate any hardship tipping the balance in their favor. *See CTIA*, 928 F.3d at 852.

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING A PRELIMINARY INJUNCTION AS TO SB 261

SB 261 is also constitutional. Indeed, while the district court applied a higher level of scrutiny to SB 261's narrative disclosures about climate risk than it did to SB 253's numerical emissions disclosures, it nevertheless concluded that SB 261 satisfied that standard. As discussed below, the record establishes that SB 261 disclosures (1) govern commercial speech, and (2) "alleviate … to a material degree," a real informational asymmetry in the market that harms California

investors. *Edenfield*, 507 U.S. at 771. Moreover, alternative grounds support the lower court's conclusion.

### A. Plaintiffs are Unlikely to Succeed on the Merits of their First Amendment Challenge to SB 261

#### 1. SB 261 is Subject to *Zauderer* Review or Intermediate Scrutiny, Not Strict Scrutiny

As distinguished from the disclosures under SB 253, which are submitted to the government or its designee, the disclosures under SB 261 are to be posted directly to a company's website. "For direct disclosure requirements," like this one, "the analytical path for determining the applicable level of scrutiny is fairly well-settled." *PhRMA*, 2025 WL 2448851, at *6. Where the "'content of [a] direct disclosure requirement qualifies as 'commercial speech,'" courts will "apply either intermediate scrutiny" under *Central Hudson*, or "a lower level of scrutiny akin to rational basis review" under *Zauderer*. *Id.* Plaintiffs do not disagree with this settled law, but argue that the SB 261 disclosures are not commercial in nature. As the district court concluded, this argument fails.

#### a. SB 261 regulates commercial speech

The disclosures required under SB 261 "provide[] parties to actual or potential commercial transactions with information about those transactions." *PhRMA*, 2025 WL 2448851, at *14 (cleaned up). And they neither compel reporting companies to make "political or ideological statements," *id.* at *13, nor constitute "a veiled attempt to 'suppress unpopular ideas or information or

53

manipulate the public debate through coercion rather than persuasion,'" *Full Value Advisors*, 633 F.3d at 1108. Thus, the speech required is commercial.

"[I]nadequate information about risks" facing businesses, "can lead to a mispricing of assets and misallocation of capital and can potentially give rise to concerns about financial stability since markets can be vulnerable to abrupt corrections." 8-ER-1822. The TCFD framework, under which SB 261 disclosures are aligned, was created in response to a "growing demand for decision-useful, climate-related information" from "investors, lenders, and insurance underwriters," and among other market participants. 8-ER-1822-1823. The SB 261 disclosures provide critical information about risks that inform day-to-day investment and underwriting decisions: "physical impacts," such as "wildfires, extreme weather, and droughts," and "transition risks," resulting from "movement toward a lower-carbon economy," both "have the power to affect [] fixed assets, disrupt supply chains and increase volatility in the financial markets." 7-ER-1611-1612.

The SB 261 risk disclosures pertain "to a company's own business," and are similar "in kind" to existing commercial risk reporting. 1-ER-21. For example, U-Haul's 2024 Form 10-K submitted to the SEC included statements about transition risk "that would be responsive to the requirements for TCFD reporting." 4-SER-1000-1004 (citing 3-SER-770-771); *see also* 6-SER-1676-1677.

54

Plaintiffs argue that SB 261 requires companies to "opine on climate-related risks … untethered to any … transaction." Br. 32. But in *PhRMA* this Court rejected a similar argument—namely that disclosures requiring a company to express "opinions about and reasons for" the pricing of pharmaceuticals "goes further than communicating the terms of a potential transaction." 2025 WL 2448851, at *15. The Court examined the *nature* of the reported information, and determined that it was "economic-focused" rather than "politically fraught," and thus constituted commercial speech despite containing opinion and reasoning. *Id.* SB 261 similarly "does not compel" companies "to express any … normative view" about their risk planning, nor does it require companies "to define" their risk planning "in value-laden, state prescribed language." *Id.*

Plaintiffs argue that the law "is intended for public accountability, not commercial engagement." Br. 32. But "public accountability" in the form of transparency about risks that companies face *is* about commercial engagement with that company's investors, creditors, and underwriters. This accountability is not a pretext for a "regulatory" purpose other than information. *Contra* Br. 32. Penalties are assessed for failure to report *assessed* climate risks, not for failure to identify or address any particular climate risks. Cal. Health & Safety Code § 38533(f)(2).

### b. The disclosures required under SB 261 are factual and uncontroversial

This Court need not determine whether *Zauderer* applies to SB 261 because the district court correctly concluded that SB 261 survives even intermediate scrutiny. But upholding SB 261 is even more straightforward under the *Zauderer* standard, and is appropriate here as the disclosures are both factual and uncontroversial.

Under SB 261, companies need only disclose operational information such as: whether and how the Board of Directors receives updates on climate-related risk planning; whether climate policies are expected to impact corporate supply chains or revenue streams; and corporate emissions reduction targets and interim goals. *See generally* 9-SER-2361-2365. Thus, companies are merely asked to reveal their existing business assessments—"the relevant questions in the context of disclosure" of corporate risks and contingencies are: (1) does the company have a business judgment on the metric in question, and if so (2) what is that business judgment. 6-SER-1680-1681. Such information is not meaningfully distinct from disclosures routinely made by large companies in the context of other commercial transactions, such as in companies' Form 10-Ks. 9-SER-2350-2351, 2365-2367, 6-SER-1676-1684, 4-SER-1000-1004.

While the district court never reached the question of whether the disclosures required under SB 261 were uncontroversial, the answer is clear. There can be no

dispute around a company's own articulation of its actual policies and assessments, which is all that the law requires.  9-SER-2361-2365, 6-SER-1680-1681.

### c. Plaintiffs' argument for the application of strict scrutiny is unpersuasive

Plaintiffs argue that the SB 261 disclosures are not commercial because the information disclosed is not "neutral," but rather serves to "skew[s] the public debate" by requiring businesses to provide detailed information that may turn out to "embarrass" companies.  Br. 28 (cleaned up).  But it is impossible to square this conclusory assertion with the actual operation of the disclosures.

Under the TCFD, "risks" and "financial impacts" subject to disclosure cover purely commercial projections, such as the likelihood of "[i]ncreased operating costs," "[r]educed demand for products and services," "[c]hange in revenue mix and sources," "[i]ncreased production costs due to changing input prices," and "[i]ncreased insurance premiums."  8-ER-1831.  A review of voluntary risk disclosures reveals such statements as: "Our Board of Directors … receive updates" regarding environmental and climate related issues "at least once annually," 7-SER-1926, and "possible carbon tax or regulatory incentives to encourage the use of renewables could affect energy costs," 7-SER-1927.  Moreover, the information disclosed is "focused on a company's actual or planned activities."  9-SER-2367.  As such, a company that "do[es] not evaluate climate-related risks could make disclosures that [it] do[es] not have any climate-related

governance, strategy, risk management, or metrics and targets." *Id.* Or a company could state that it has assessed climate-related risk and determined that it faces no such risk. *Id.*; *see, e.g.,* 7-SER-1878 ("We currently do not see any chronic physical risks … affecting our business any more than normal operations."). Such an explanation does not require "'opining on' the importance of climate change." *Contra* Washington Legal Found. Am. Br. 17.

The TCFD framework provides neutral prompts on topics deemed material to investors, and does not tip the scales on policy. Thus, the disclosures neither "suppress unpopular ideas or information" nor "manipulate the public debate through coercion rather than persuasion." *Full Value Advisors*, 633 F.3d at 1108-09 (citing *Turner Broad. Sys.*, 512 U.S. at 641). And the State does not dictate the message of these disclosures. *Contra Wooley*, 430 U.S. 705; *NIFLA*, 585 U.S. 755. Strict scrutiny is not merited.

### 2. SB 261 Satisfies the Appropriate Level of Scrutiny

The disclosures required pursuant to SB 261 meet this Court's test for intermediate scrutiny: they "'directly advance' a 'substantial' governmental interest," through means that are not "'more extensive than necessary.'" *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1275 (9th Cir. 2023) (quoting *Cent. Hudson*, 447 U.S. at 564-66). If this Court alternatively applies *Zauderer*'s

58

rational basis-type review, the State's burden is even lighter. *See CTIA*, 928 F.3d at 845.

As the district court correctly concluded, SB 261 survives intermediate scrutiny when looking at the needs of investors alone. The additional interests the statute serves makes its constitutionality even more clear.

### a. Investor and other stakeholder interest in company risk assessments

As discussed at length above, *supra* 36-37, the State's interest in "reducing [informational] asymmetries, facilitating informed commercial transactions, and improving the efficiency of the [relevant] market" is substantial. *PhRMA*, 2025 WL 2448851, at *18.

The evidence supporting investors' need for the specific information provided under SB 261 is significant. CalPERS testified in the district court that "[t]he consideration of climate-related financial risk … is a necessary component of being an informed and responsible investor, and [] is largely an investor-driven effort to keep up with the ever-evolving landscape of our global economy." 7-ER-1612-1613. Because of the risk "physical impacts" can have on "portfolio companies' supply chains and operations," 7-ER-1611, and the impact "shifts in policies, technologies, industries, and customers due to changed climate" can have on "the financial success of existing business models and industries," 7-ER-1612, "[t]he long-term success of the companies in which [CalPERS] invest[s] is

dependent upon the degree to which they can successfully navigate these transitions." 7-ER-1612. Plaintiffs attempt to discount this testimony, arguing that CalPERS is legally required to consider climate risk in its investment decisions, Br. 66. But this in fact supports the State's interest, rather than undermines it. *PhRMA*, 2025 WL 2448851, at *17.

In any event, entities across the private sector have indicated "clear, consistent and comparable climate information," is needed to make informed economic decisions. *E.g.*, 7-SER-1944. For example, a global association of insurance and reinsurance CEOs called in 2021 for the widespread adoption of consistent "methodologies and tools for climate risk assessment and scenario analysis for both sides of the balance sheet." *Id*. And firms specializing in mergers and acquisition decisions publicly highlighted gaps in "the processes, data, and tools" needed to "capture better, more relevant data" on climate risks, as necessary to "plan[] and execut[e] transactions." 7-SER-1932. Simply put, "investors need accurate information in order to optimize their own portfolios." 2-ER-302; *see supra* 37-39. This is not mere "curiosity." *Contra* Br. 63.

Plaintiffs concede that compelled disclosures responding to "specific information gap[s]" are often upheld, Br. 65, but claim that the SB 261 disclosures are broader than necessary to fill any such gap, Br. 65-66. But the State's evidence demonstrates the need *for these particular* disclosures. According to CalPERS,

60

"SB 261 align[s] with the enhanced disclosures we have been seeking." 7-ER-1615. And the TCFD framework was formulated by industry experts to correct "fragmentation in reporting practices and lack of focus on financial impacts [that] have prevented investors, lenders, insurance underwriters, and other users of disclosures from accessing complete information that can inform their economic decisions." 8-ER-1823. Thus, the State's interest is "real" and the disclosures here will address these interests "to a material degree." *Edenfield*, 507 U.S. at 771; *cf. Chamber of Com.*, 85 F.4th at 771 (upholding similar investor-facing disclosures); *Full Value Advisors*, 633 F.3d 1101 (same).

As to tailoring, the discussion at 39-41 applies equally here. A majority of the entities covered by the laws are public, but for those that are private, the revenue threshold acts as an appropriate proxy for "economic significance" and expectation of current outside investment. *See supra* 40. Moreover, the TCFD makes clear that other entities—including insurance underwriters—are also directly served by the information. 8-ER-1824.

### b. Potential for emissions reductions

The district court determined that the State has a substantial interest in transparency measures expected to lead indirectly to lower emissions, because such emission reductions support California's obligation to meet its statutorily mandated emission reduction goals, 1-ER-34, but the court determined that the State's

61

evidence supported that interest only as to emission disclosures, 1-ER-40. This Court could, however, uphold SB 261 on this alternative ground, because the mechanism by which emissions disclosure leads to emissions reductions—transparency and direct management involvement—applies equally here. For one, it is transparency about a company's *overall climate-related risk* that leads investors to shift their portfolios, which may cause corporations to choose to change their emissions priorities. *See supra* 43-44. Moreover, the disclosure of climate-risk and corporate emissions targets may assist firms *voluntarily* seeking to reduce emissions to better identify risks and manage those reductions. *See supra* 44.

### c. Prevention of misleading speech and provision of material information to consumers

Alternatively, this Court could affirm that the State has a substantial interest in SB 261 towards preventing the "dissemination of commercial speech that is false, deceptive, or misleading," *Zauderer*, 471 U.S. at 638, or providing material information to consumers. The district court's contrary conclusion was based on a misapplication of the existing standard. *See supra* 46. To succeed on this ground, the State need only show its regulation "dissipate[s] the *possibility* of consumer confusion or deception." *Zauderer*, 471 U.S. at 651 (emphasis added).

A significant majority of large companies—for example, 74% of companies in the S&P 500—voluntarily disclose information about the climate-related risks to

which they are exposed. 2-ER-320; 9-SER-2154, 8-SER-1985. But "within this reporting, climate risks are not disclosed fully, consistently, or adequately." 2-ER-321. This leaves an information asymmetry—whereby companies disclose some of their assessed climate-related risks but withhold others—which then generates a misleading impression that the firm has not assessed any such risks. 4-ER-837; *see also supra* 46-47.

For the reasons addressed above concerning SB 253, the tailoring used here passes constitutional muster. *See supra* 48-50. Disclosures performed pursuant the TCFD framework will specifically prevent misleading emission reduction pledges, as companies must report information on a company's "metrics and targets," thereby providing needed transparency regarding "any emission reducing targets set by the company, and its performance against these targets." 2-ER-327. And complete reporting is not overbroad, Br. 65; alignment with the TCFD framework creates uniformity and comparability across the metrics outside experts deemed material for evaluating a company's climate-related risk. *E.g.*, 8-ER-1822-1823; *contra* Br. 65.

## B. The Remaining Injunction Factors Favor the State

As discussed above, Plaintiffs' failure to show a likelihood of success on the merits ends consideration of their requested preliminary injunction. *Baird*, 81

F.4th at 1040.  But turning to the other preliminary injunction factors, the equities nonetheless favor the State.

### 1.  Plaintiffs Have Not Established Irreparable Harm

Plaintiffs cannot establish irreparable harm simply by claiming their members' First Amendment rights will be violated, when they have not established that is so.  The "sliding scale" approach makes no difference here.  *See Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1039 (9th Cir. 2024) ("failure to show a likelihood of success on the merits precludes injunctive relief").

And not only can compliance costs not constitute irreparable harm, *supra* 51, but Plaintiffs fail to offer credible evidence regarding compliance costs attributable to SB 261.  As to SB 261, U-Haul merely claims—without foundation or detail—that it will "have to begin building the systems and contracts to comply with SB 261 immediately and at great cost and commitment of personnel hours."  3-ER-445.  But U-Haul already makes TCFD aligned disclosures, and therefore likely has the infrastructure needed to do the required reporting.  4-SER-1000-1002; *see also* 1-SER-2-4 (objecting to late-filed evidence).  Plaintiffs cannot obtain the extraordinary relief they seek on the basis of "mere allegations" of "[s]peculative" harm.  *Caribbean Marine Servs.*, 844 F.2d at 674, 676.

### 2. The Balance of the Equities and the Public Interest Militate Against Granting an Injunction

As the district court concluded, "enjoining … [SB] 261 would delay the State from advancing the public interests for which it adopted the laws." 1-ER-41-42. Moreover, an injunction would inflict harm on California by preventing the enforcement of statutes enacted by the People's representatives. *Maryland*, 567 U.S. at 1303. The balance of the equities thus tip in the State's favor.

## CONCLUSION

For the reasons stated above, this Court should uphold the district court's order denying a preliminary injunction as to both SB 253 and SB 261.

Dated: October 16, 2025                    Respectfully submitted,

                                          */s/ Caitlan McLoon*
                           _____

                                          Rob Bonta
                                            *Attorney General of California*
                                          Annadel A. Almendras
                                            *Senior Assistant Attorney General*
                                          Myung J. Park
                                            *Supervising Deputy Attorney General*
                                          CAITLAN MCLOON
                                            *Deputy Attorney General*

65

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** _____25-5327_____

    I am the attorney or self-represented party.

    **This brief contains** __13,994_____ **words,** including ___0_____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

    I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** _____/s/ Caitlan McLoon_____ **Date** _____October 16, 2025__
*(use "s/[typed name]" to sign electronically-filed documents)*

66

# ADDENDUM

Pertinent Constitutional Provisions and Statutes

## Table of Contents to the Addendum

**Page**

Senate Bill 253, as later amended by Senate Bill 219 (codified at Cal. Health & Safety Code § 38532)………………………………………………………………..69

Senate Bill 261, as later amended by Senate Bill 219 (codified at Cal. Health & Safety Code § 38533)……………………………………………………………….82

**California Senate Bill 253, as later amended by Senate Bill 219 (codified at Cal. Health & Safety Code § 38532)**

(a) This section shall be known, and may be cited, as the Climate Corporate Data Accountability Act.

(b) For purposes of this section, the following terms have the following definitions:

(1) "Emissions reporting organization" means a nonprofit emissions reporting organization contracted by the state board pursuant to paragraph (3) of subdivision (c) that both:

(A) Currently operates a greenhouse gas emissions reporting organization for organizations operating in the United States.

(B) Has experience with greenhouse gas emissions disclosure by entities operating in California.

(2) "Reporting entity" means a partnership, corporation, limited liability company, or other business entity formed under the laws of this state, the laws of any other state of the United States or the District of Columbia, or under an act of the Congress of the United States with total annual revenues in excess of one billion dollars ($1,000,000,000) and that does business in California. Applicability shall be determined based on the reporting entity's revenue for the prior fiscal year.

69

(3) "Scope 1 emissions" means all direct greenhouse gas emissions that stem from sources that a reporting entity owns or directly controls, regardless of location, including, but not limited to, fuel combustion activities.

(4) "Scope 2 emissions" means indirect greenhouse gas emissions from consumed electricity, steam, heating, or cooling purchased or acquired by a reporting entity, regardless of location.

(5) "Scope 3 emissions" means indirect upstream and downstream greenhouse gas emissions, other than scope 2 emissions, from sources that the reporting entity does not own or directly control and may include, but are not limited to, purchased goods and services, business travel, employee commutes, and processing and use of sold products.

(c)(1) On or before July 1, 2025, the state board shall develop and adopt regulations to require a reporting entity to annually disclose all of the reporting entity's scope 1 emissions, scope 2 emissions, and scope 3 emissions, and obtain an assurance engagement performed by an independent third-party assurance provider. Those regulations shall require the reporting entity to make the annual disclosure to either of the following:

(A) The emissions reporting organization, if contracted for services.

(B) The state board.

70

(2) The state board shall ensure that the regulations adopted pursuant to this subdivision require all of the following:

(A)(i)(I) That a reporting entity, starting in 2026 on or by a date to be determined by the state board, and annually thereafter on or by that date, publicly disclose to the emissions reporting organization, if contracted for services, or the state board, all of the reporting entity's scope 1 emissions and scope 2 emissions for the reporting entity's prior fiscal year.

(II) That a reporting entity, starting in 2027 and annually thereafter, publicly disclose its scope 3 emissions on a schedule specified by the state board as part of the regulations developed pursuant to this subdivision for the prior fiscal year.

(ii) A reporting entity shall, beginning in 2026, measure and report its emissions of greenhouse gases in conformance with the Greenhouse Gas Protocol standards and guidance, including the Greenhouse Gas Protocol Corporate Accounting and Reporting Standard and the Greenhouse Gas Protocol Corporate Value Chain (Scope 3) Accounting and Reporting Standard developed by the World Resources Institute and the World Business Council for Sustainable Development, including guidance for scope 3 emissions calculations that detail acceptable use of both primary and secondary data sources, including the use of industry average data, proxy data, and other generic data in its scope 3 emissions calculations.

71

(iii) Reports may be consolidated at the parent company level. If a subsidiary of a parent company qualifies as a reporting entity pursuant to paragraph (2) of subdivision (b), the subsidiary is not required to prepare a separate report.

(iv)(I) Starting in 2033, the state board may survey and assess currently available greenhouse gas accounting and reporting standards. At the conclusion of this assessment the state board may adopt a globally recognized alternative accounting and reporting standard if it determines its use would more effectively further the goals of this section. This review process shall include consultation with the stakeholders identified in paragraph (5).

(II) If the state board adopts an alternative accounting and reporting standard, the state board shall develop and adopt new regulations, pursuant to paragraph (1), to ensure full conformance with the new standard and reporting of scope 1 emissions, scope 2 emissions, and scope 3 emissions and other requirements of this section.

(v) During 2029 the state board shall review, and on or before January 1, 2030, the state board shall update as necessary, the public disclosure deadlines established pursuant to clause (i) to evaluate trends in scope 3 emissions reporting and consider changes to the disclosure deadlines to ensure that scope 3 emissions data is disclosed to the emissions reporting organization, if contracted for services,

or the state board, as close in time as practicable to the deadline for reporting entities to disclose scope 1 emissions and scope 2 emissions data.

(vi) The reporting timelines shall consider industry stakeholder input and shall take into account the timelines by which reporting entities typically receive scope 1 emissions, scope 2 emissions, and scope 3 emissions data, as well as the capacity for an independent assurance engagement to be performed by a third-party assurance provider.

(B) That a reporting entity's public disclosure maximizes access for consumers, investors, and other stakeholders to comprehensive and detailed greenhouse gas emissions data across scope 1 emissions, scope 2 emissions, and scope 3 emissions, as defined by this section, and is made in a manner that is easily understandable and accessible.

(C) That a reporting entity's public disclosure includes the name of the reporting entity and any fictitious names, trade names, assumed names, and logos used by the reporting entity.

(D)(i) That the emissions reporting is structured in a way that minimizes duplication of effort and allows a reporting entity to submit to the emissions reporting organization, if contracted for services, or the state board, reports prepared to meet other national and international reporting requirements, including

any reports required by the federal government, as long as those reports satisfy all of the requirements of this section.

(ii) Reporting entities that are required to report mandatory industrial emissions pursuant to regulations adopted pursuant to Section 38530 may provide that data with the disclosure required pursuant to this section.

(E) That a reporting entity's disclosure takes into account acquisitions, divestments, mergers, and other structural changes that can affect the greenhouse gas emissions reporting, and is disclosed in a manner consistent with the Greenhouse Gas Protocol standards and guidance or an alternative standard, if one is adopted after 2033.

(F)(i) That a reporting entity obtains an assurance engagement, performed by an independent third-party assurance provider, of their public disclosure. The reporting entity shall ensure that a copy of the complete assurance provider's report on the greenhouse gas emissions inventory, including the name of the third-party assurance provider, is provided to the emissions reporting organization, if contracted for services, or the state board, as part of or in connection with the reporting entity's public disclosure.

(ii) The assurance engagement for scope 1 emissions and scope 2 emissions shall be performed at a limited assurance level beginning in 2026 and at a reasonable assurance level beginning in 2030.

(iii) During 2026, the state board shall review and evaluate trends in third-party assurance requirements for scope 3 emissions. On or before January 1, 2027, the state board may establish an assurance requirement for third-party assurance engagements of scope 3 emissions. The assurance engagement for scope 3 emissions shall be performed at a limited assurance level beginning in 2030.

(iv) A third-party assurance provider shall have significant experience in measuring, analyzing, reporting, or attesting to the emission of greenhouse gasses and sufficient competence and capabilities necessary to perform engagements in accordance with professional standards and applicable legal and regulatory requirements. The assurance provider shall be able to issue reports that are appropriate under the circumstances and independent with respect to the reporting entity, and any of the reporting entity's affiliates for which it is providing the assurance report. During 2029 the state board shall review and, on or before January 1, 2030, shall update as necessary, the qualifications for third-party assurance providers based on an evaluation of trends in education relating to the emission of greenhouse gases and the qualifications of third-party assurance providers.

(v) The state board shall ensure that the assurance process minimizes the need for reporting entities to engage multiple assurance providers and ensures

sufficient assurance provider capacity, as well as timely reporting implementation as required under clause (i) of subparagraph (A).

(G)(i) That a reporting entity shall pay an annual fee to the state board for the administration and implementation of this section.

(ii) The state board shall set the fee established pursuant to clause (i) in an amount sufficient to cover the state board's full costs of administrating and implementing this section. The total amount of fees collected shall not exceed the state board's actual and reasonable costs to administer and implement this section.

(iii) The proceeds of the fees imposed pursuant to clause (i) shall be deposited in the Climate Accountability and Emissions Disclosure Fund, which is hereby created in the State Treasury. Notwithstanding Section 13340 of the Government Code, the money in the fund is continuously appropriated to the state board and shall be expended by the state board for the state board's activities pursuant to this section and to reimburse any outstanding loans made from other funds used to finance the initial costs of the state board's activities pursuant to this section. Moneys in the fund shall not be expended for any purpose not enumerated in this section.

(iv) The state board may adjust the fee in any year to reflect changes in the California Consumer Price Index during the prior year.

(3) The state board may contract with an emissions reporting organization to develop a reporting program to receive and make publicly available disclosures required by this section pursuant to paragraph (1).

(4) The state board may adopt or update any other regulations that it deems necessary and appropriate to implement this section.

(5) In developing the regulations required pursuant to this subdivision, the state board shall consult with all of the following:

(A) The Attorney General.

(B) Other government stakeholders, including, but not limited to, experts in climate science and corporate carbon emissions accounting and reporting.

(C) Investors.

(D) Stakeholders representing consumer and environmental justice interests.

(E) Reporting entities that have demonstrated leadership in full-scope greenhouse gas emissions accounting and public disclosure and greenhouse gas emissions reductions.

(6) This section does not require additional reporting of emissions of greenhouse gases beyond the reporting of scope 1 emissions, scope 2 emissions, and scope 3 emissions required pursuant to the Greenhouse Gas Protocol standards and guidance or an alternative standard, if one is adopted after 2033.

(d)(1) On or before July 1, 2027, the state board shall contract with the University of California, the California State University, a national laboratory, or another equivalent academic institution to prepare a report on the public disclosures made by reporting entities to the emissions reporting organization, if contracted for services, or the state board, pursuant to subdivision (c) and the regulations adopted by the state board pursuant to that subdivision. In preparing the report, consideration shall be given to, at a minimum, greenhouse gas emissions from reporting entities in the context of state greenhouse gas emissions reduction and climate goals. The entity preparing the report shall not require reporting entities to report any information beyond what is required pursuant to subdivision (c) or the regulations adopted by the state board pursuant to that subdivision.

(2) The state board shall ensure the report required by this subdivision is posted publicly by either of the following:

(A) The emissions reporting organization, if contracted for services, to be made publicly available on the digital platform required to be created by the emissions reporting organization pursuant to subdivision (e).

(B) The state board on its public internet website.

(e)(1)(A) The state board, or the emissions reporting organization, if contracted for services, on or before the date determined by the state board pursuant to clause (i) of subparagraph (A) of paragraph (2) of subdivision (c), shall

78

create a digital platform, which shall be accessible to the public, that will feature the emissions data of reporting entities in conformance with the regulations adopted by the state board pursuant to subdivision (c) and the report prepared for the state board pursuant to subdivision (d). The state board, or the emissions reporting organization, if contracted for services, shall make the reporting entities' disclosures and the state board's report available on the digital platform no later than 90 days after receipt.

(B) The digital platform shall be capable of featuring individual reporting entity disclosures, and shall allow consumers, investors, and other stakeholders to view reported data elements aggregated in a variety of ways, including multiyear data, in a manner that is easily understandable and accessible to residents of the state. All data sets and customized views shall be available in electronic format for access and use by the public.

(C) Any contract for services with a reporting organization shall be considered a noninformation technology services contract for procurement purposes.

(2) The emissions reporting organization, if contracted for services, or the state board, shall submit, within 30 days of receipt, the report prepared for the state board pursuant to subdivision (d) to the relevant policy committees of the Legislature.

(f)(1) Section 38580 does not apply to a violation of this section.

(2)(A) The state board shall adopt regulations that authorize it to seek administrative penalties for nonfiling, late filing, or other failure to meet the requirements of this section. The administrative penalties authorized by this section shall be imposed and recovered by the state board in administrative hearings conducted pursuant to Article 3 (commencing with Section 60065.1) and Article 4 (commencing with Section 60075.1) of Subchapter 1.25 of Chapter 1 of Division 3 of Title 17 of the California Code of Regulations. The administrative penalties imposed on a reporting entity shall not exceed five hundred thousand dollars ($500,000) in a reporting year. In imposing penalties for a violation of this section, the state board shall consider all relevant circumstances, including both of the following:

(i) The violator's past and present compliance with this section.

(ii) Whether the violator took good faith measures to comply with this section and when those measures were taken.

(B) A reporting entity shall not be subject to an administrative penalty under this section for any misstatements with regard to scope 3 emissions disclosures made with a reasonable basis and disclosed in good faith.

(C) Penalties assessed on scope 3 reporting, between 2027 and 2030, shall only occur for nonfiling.

80

(g) A regulation adopted by the state board pursuant to this section is exempt from the California Environmental Quality Act (Division 13 (commencing with Section 21000) of the Public Resources Code).

(h) This section applies to the University of California only to the extent that the Regents of the University of California, by resolution, make any of these provisions applicable to the university.

(i) The provisions of this section are severable. If any provision of this section or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.

**California Senate Bill 261, as later amended by Senate Bill 219 (codified at Cal. Health & Safety Code § 38533)**

(a) For purposes of this section, the following definitions apply:

(1) "Climate reporting organization" means a nonprofit climate reporting organization contracted by the state board pursuant to subdivision (d) that both:

(A) Currently operates a climate reporting organization for organizations operating in the United States.

(B) Has experience with climate-related financial risk disclosure by entities operating in California.

(2) "Climate-related financial risk" means material risk of harm to immediate and long-term financial outcomes due to physical and transition risks, including, but not limited to, risks to corporate operations, provision of goods and services, supply chains, employee health and safety, capital and financial investments, institutional investments, financial standing of loan recipients and borrowers, shareholder value, consumer demand, and financial markets and economic health.

(3) "Climate-related financial risk report" means a report required by subdivision (b).

(4) "Covered entity" means a corporation, partnership, limited liability company, or other business entity formed under the laws of the state, the laws of

any other state of the United States or the District of Columbia, or under an act of the Congress of the United States with total annual revenues in excess of five hundred million United States dollars ($500,000,000) and that does business in California. Applicability shall be determined based on the business entity's revenue for the prior fiscal year. "Covered entity" does not include a business entity that is subject to regulation by the Department of Insurance in this state, or that is in the business of insurance in any other state.

(b)(1)(A) On or before January 1, 2026, and biennially thereafter, a covered entity shall prepare a climate-related financial risk report disclosing both of the following:

(i) Its climate-related financial risk, in accordance with the recommended framework and disclosures contained in the Final Report of Recommendations of the Task Force on Climate-related Financial Disclosures (June 2017) published by the Task Force on Climate-related Financial Disclosures, or any successor thereto, or pursuant to an equivalent reporting requirement as described in paragraph (3).

(ii) Its measures adopted to reduce and adapt to climate-related financial risk disclosed pursuant to clause (i).

(B) If a covered entity does not complete a report consistent with all required disclosures pursuant to clause (i) of subparagraph (A), the covered entity shall provide the recommended disclosures to the best of its ability, provide a detailed

explanation for any reporting gaps, and describe steps the covered entity will take to prepare complete disclosures.

(2) Climate-related financial risk reports may be consolidated at the parent company level. If a subsidiary of a parent company qualifies as a covered entity pursuant to paragraph (4) of subdivision (a), the subsidiary is not required to prepare a separate climate-related financial risk report.

(3) Notwithstanding paragraph (1), a covered entity satisfies the requirements of paragraph (1) if it prepares a publicly accessible biennial report that includes climate-related financial risk disclosure information by any of the following methods:

(A) Pursuant to a law, regulation, or listing requirement issued by any regulated exchange, national government, or other governmental entity, including a law or regulation issued by the United States government, incorporating disclosure requirements consistent with clause (i) of subparagraph (A) of paragraph (1), including the International Financial Reporting Standards Sustainability Disclosure Standards, as issued by the International Sustainability Standards Board.

(B) Voluntarily using a framework that meets the requirements of clause (i) of subparagraph (A) of paragraph (1) or the International Financial Reporting Standards Sustainability Disclosure Standards, as issued by the International Sustainability Standards Board.

84

(4) To the extent a climate-related financial risk report contains a description of a covered entity's greenhouse gas emissions or voluntary mitigation of greenhouse gas emissions, the state board may consider the covered entity's claims if those claims are verified by a third-party independent verifier.

(c)(1) On or before January 1, 2026, and biennially thereafter, a covered entity shall make available to the public, on its own internet website, a copy of the report required by this section.

(2)(A) On or before January 1, 2026, and annually thereafter, a covered entity shall pay a fee to the state board for the administration and implementation of this section.

(B)(i) The state board shall set the fee described in subparagraph (A) at an amount adequate to cover the state board's full costs of administrating and implementing this section. The total amount of fees collected shall not exceed the state board's actual and reasonable costs to administer and implement this section.

(ii) The state board may adjust the fee in any year to reflect changes in the California Consumer Price Index during the prior year.

(C) The proceeds of the fees imposed pursuant to this paragraph shall be deposited in the Climate-Related Financial Risk Disclosure Fund, which is hereby created in the State Treasury. Notwithstanding Section 13340 of the Government Code, the money in the fund is continuously appropriated to the state board and

shall be expended by the state board for the state board's activities pursuant to this section and to reimburse any outstanding loans made from other funds used to finance the initial costs of the state board's activities pursuant to this section. Money in the fund shall not be expended for any other purpose not described in this subparagraph.

(d) The state board may contract with a climate reporting organization to do any of the following it deems appropriate:

(1) Biennially prepare a public report that contains all of the following elements:

(A) A review of the disclosure of climate-related financial risk contained in a subset of publicly available climate-related financial risk reports by industry.

(B) Analysis of the systemic and sectorwide climate-related financial risks facing the state based on the contents of climate-related financial risk reports, including, but not limited to, potential impacts on economically vulnerable communities.

(C) Identification of inadequate or insufficient reports.

(2) Regularly convene representatives of sectors responsible for reporting climate-related financial risks, state agencies responsible for oversight of reporting sectors, investment managers, academic experts, standard-setting organizations, climate and corporate sustainability organizations, labor union representatives

86

whose members work in impacted sectors, and other stakeholders to offer input on current best practices regarding the disclosure of financial risks resulting from climate change, including, but not limited to, proposals to update the definition of "climate-related financial risk," and the framework or disclosure standard of "climate-related financial risk reports" that meets the requirements of clause (i) of subparagraph (A) of paragraph (1) of subdivision (b).

(3) Monitor federal regulatory actions among agency members of the federal Financial Stability Oversight Council, as well as nonindependent regulators overseen by the White House.

(e) Any contract for services with a reporting organization shall be considered a noninformation technology services contract for procurement purposes.

(f)(1) Section 38580 does not apply to a violation of this section.

(2) The state board shall adopt regulations that authorize it to seek administrative penalties from a covered entity that fails to make the report required by this section publicly available on its internet website or publishes an inadequate or insufficient report. The administrative penalties authorized by this section shall be imposed and recovered by the state board in administrative hearings conducted pursuant to Article 3 (commencing with Section 60065.1) and Article 4 (commencing with Section 60075.1) of Subchapter 1.25 of Chapter 1 of Division 3

87

of Title 17 of the California Code of Regulations. The administrative penalties

imposed on a reporting entity shall not exceed fifty thousand dollars ($50,000) in a

reporting year. In imposing penalties for a violation of this section, the state board

shall consider all relevant circumstances, including both of the following:

(A) The violator's past and present compliance with this section.

(B) Whether the violator took good faith measures to comply with this

section and when those measures were taken.

(g) A regulation adopted by the state board pursuant to this section is exempt

from the California Environmental Quality Act (Division 13 (commencing with

Section 21000) of the Public Resources Code).

SF2025305052
68006265