No. 25-5327

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*,

*Plaintiffs-Appellants,*

v.

LIANE M. RANDOLPH, IN HER OFFICIAL CAPACITY AS CHAIR OF THE CALIFORNIA
AIR RESOURCES BOARD, *et al.*,

*Defendants-Appellees.*

———————————

**On Appeal from the United States District Court
for the Central District of California**
No. 2:24-cv-00801-ODW-PVC

———————————

## SUPPLEMENTAL EXCERPTS OF RECORD
## VOLUME 1 OF 10

———————————

ROB BONTA
  *Attorney General of California*
ANNADEL A. ALMENDRAS
  *Senior Assistant Attorney General*
LAURA ZUCKERMAN
MYUNG J. PARK
  *Supervising Deputy Attorneys
  General*




October 16, 2025

CAITLAN MCLOON
KATHERINE GAUMOND
EMILY HAJARIZADEH
M. ELAINE MECKENSTOCK
DYLAN REDOR
ELIZABETH SONG
*Deputy Attorneys General*
CALIFORNIA DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6438
Caitlan.McLoon@doj.ca.gov
*Attorneys for Defendants-Appellees*

1  ROB BONTA
   Attorney General of California
2  MYUNG J. PARK (SBN 210866)
   LAURA J. ZUCKERMAN (SBN 161896)
3  Supervising Deputy Attorneys General
   KATHERINE GAUMOND (SBN 349453)
4  EMILY HAJARIZADEH (SBN 325246)
   M. ELAINE MECKENSTOCK (SBN 268861)
5  DYLAN REDOR (SBN 338136)
   DAVID ZAFT (SBN 237365)
6  CAITLAN MCLOON (SBN 302798)
   Deputy Attorneys General
7    300 South Spring Street, Suite 1702
     Los Angeles, CA  90013-1230
8    Telephone:  (213) 269-6438
     Fax:  (916) 731-2128
9    E-mail:  Caitlan.McLoon@doj.ca.gov
   *Attorneys for Defendants Liane M. Randolph,*
10 *Steven S. Cliff, and Robert A. Bonta*

11             IN THE UNITED STATES DISTRICT COURT

12          FOR THE CENTRAL DISTRICT OF CALIFORNIA

13

14 **CHAMBER OF COMMERCE OF**          2:24-cv-00801-ODW-PVC
   **THE UNITED STATES OF**
15 **AMERICA, CALIFORNIA**              **DEFENDANTS' OBJECTION TO**
   **CHAMBER OF COMMERCE,**             **PLAINTIFFS' EVIDENCE**
16 **AMERICAN FARM BUREAU**             **SUBMITTED IN REPLY IN**
   **FEDERATION, LOS ANGELES**          **SUPPORT OF MOTION FOR**
17 **COUNTY BUSINESS**                  **INJUNCTION PENDING APPEAL**
   **FEDERATION, CENTRAL**
18 **VALLEY BUSINESS**                  Date:         September 15, 2025
   **FEDERATION, and WESTERN**         Time:         1:30 PM
19 **GROWERS ASSOCIATION,**             Courtroom:    5D
                                        Judge:        The Honorable Otis D.
20                  Plaintiffs,                        Wright, II
                                        Trial Date:   Not Set
21          v.                          Action Filed: 1/30/2024

22 **LIANE M. RANDOLPH, in her**
   **official capacity as Chair of the**
23 **California Air Resources Board,**
   **STEVEN S. CLIFF, in his official**
24 **capacity as the Executive Officer of**
   **the California Air Resources Board,**
25 **and ROBERT A. BONTA, in his**
   **official capacity as Attorney General**
26 **of California,**

27                  Defendants.

28

1      Plaintiff filed a Motion for Injunction Pending Appeal on August 20, 2025.

2    Dkt. No. 116. Defendants submitted their Opposition to the Motion on August 29,

3    2025. Dkt. No. 120. Plaintiff filed a Reply in Support of their Motion on September

4    2, 2025, Dkt. No. 122, attaching several pieces of new evidence: the Declaration of

5    Martin Durbin, Dkt. No. 122-1, and accompanying exhibit, Dkt. No. 122-2, and the

6    Supplemental Declaration of Edward J. Shoen, Dkt No. 122-3.

7      It is well settled that the submission of new issues and facts in a reply brief is

8    improper. *Crandall v. Starbucks Corp.*, 249 F. Supp. 3d 1087, 1104 (N.D. Cal.

9    2017) (citing *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996)) ("[C]ourts

10    typically do not consider new evidence first submitted in a reply brief because the

11    opposing party has no opportunity to respond to it."); *see also Tovar v. U.S. Postal*

12    *Serv.*, 3 F.3d 1271, 1273 n.3 (9th Cir. 1993) (striking portions of reply brief that

13    presented new information).  The testimony and evidence submitted in conjunction

14    with Plaintiffs' reply violates this well-settled prohibition.

15      Both declarations present testimony regarding the alleged compliance burden

16    of reporting under SB 253 and SB 261—testimony that could have been, but was

17    not, submitted with Plaintiffs' motion. Both declarations also purport to

18    characterize information presented by the California Air Resources Board (CARB)

19    at a public workshop updating the public and seeking input regarding the status of

20    regulatory development for SB 253 and SB 261—information which neither

21    reflects the final position of the agency, nor carries any force of law, and

22    characterizations with which CARB disagrees.

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///

2

1    Defendants object to Plaintiffs' attempt to introduce new evidence in support

2    of their motion for an injunction pending appeal by attaching it to their reply brief.

3    Accordingly, Defendants object to the admission and/or consideration of the

4    Declaration of Martin Durbin, Dkt. 122-1, and accompanying exhibit, Dkt. No.

5    122-2, and the Supplemental Declaration of Edward J. Shoen, Dkt. 122-3.

6

7    Dated:  September 4, 2025                    Respectfully submitted,

8                                               ROB BONTA
                                                Attorney General of California
9                                               MYUNG J. PARK
                                                Supervising Deputy Attorney General
10                                              KATHERINE GAUMOND
                                                EMILY HAJARIZADEH
11                                              M. ELAINE MECKENSTOCK
                                                DYLAN REDOR
12                                              DAVID ZAFT
                                                Deputy Attorneys General

13

14                                              /s/ Caitlan McLoon
                                                CAITLAN MCLOON
15                                              Deputy Attorney General
                                                *Attorneys for Defendants Liane M.*
16                                              *Randolph, Steven S. Cliff, and Robert*
                                                *A. Bonta*
17

18    SA2024300503
      67914192
19

20

21

22

23

24

25

26

27

28

3

**SER 4**

# CERTIFICATE OF SERVICE

Case Name:  **Chamber of Commerce of the United States of America, et al. v. Liane M. Randolph, et al.**

Case No.:  **2:24-cv-00801-ODW-PVC**

I hereby certify that on <u>September 4, 2025</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANTS' OBJECTION TO PLAINTIFFS' EVIDENCE SUBMITTED IN REPLY IN SUPPORT OF MOTION FOR INJUNCTION PENDING APPEAL**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>September 4, 2025</u>, at Los Angeles, California.

| Beatriz Davalos | */s/ Beatriz Davalos* |
|---|---|
| Declarant | Signature |

SA2024300503
66591334.docx

ROB BONTA
Attorney General of California
MYUNG J. PARK (SBN 210866)
LAURA J. ZUCKERMAN (SBN 161896)
Supervising Deputy Attorneys General
DAVID ZAFT (SBN 237365)
M. ELAINE MECKENSTOCK (SBN 268861)
CAITLAN MCLOON (SBN 302798)
EMILY HAJARIZADEH (SBN 325246)
DYLAN REDOR (SBN 338136)
KATHERINE GAUMOND (SBN 349453)
Deputy Attorneys General
  300 South Spring Street, Suite 1702
  Los Angeles, CA 90013-1230
  Telephone: (213) 269-6438
  Fax: (916) 731-2128
  E-mail: Caitlan.McLoon@doj.ca.gov
*Attorneys for Defendants Liane M. Randolph,
Steven S. Cliff, and Robert A. Bonta*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION,**<br><br>Plaintiffs,<br><br>v.<br><br>**LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, and STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California,**<br><br>Defendants. | 2:24-cv-00801-ODW-PVCx<br><br>**DECLARATION OF CAITLAN MCLOON IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL**<br><br>Date: Sept. 15, 2025<br>Time: 1:30 PM<br>Courtroom: 5D<br>Judge: The Honorable Otis D. Wright, II<br>Trial Date: Not Set<br>Action Filed: 1/30/2024 |

1

## DECLARATION OF CAITLAN MCLOON

I, Caitlan McLoon, hereby declare:

1.    I am a Deputy Attorney General for the California Department of Justice, a member of the bar of this Court, and an active member of the State Bar of California.  I am counsel for Defendants Liane M. Randolph, in her official capacity as Chair of the California Air Resources Board, and Steven S. Cliff, in his official capacity as the Executive Officer of the California Air Resources Board, and Robert A. Bonta, in his official capacity as Attorney General of California in this case.  All of the statements contained herein are based on my own personal knowledge and if called upon to testify I could and would competently testify thereto.

2.    Senate Bill 253 directs the California Air Resources Board (CARB) to "develop and adopt regulations to require a reporting entity to annually disclose all of the reporting entity's scope 1 emissions, scope 2 emissions, and scope 3 emissions, and obtain an assurance engagement performed by an independent third-party assurance provider."  Cal. Health & Safety Code § 38532(c)(1).  As of the date of this filing, CARB has not yet proposed or adopted these implementing regulations.

3.    On August 21, 2025, CARB held a Public Workshop on SB 253, SB 261, and SB 219, at which they discussed "regulation development" for SB 253. During that August 21 Workshop, CARB indicated that staff are proposing a June 30, 2026 implementation deadline for SB 253 Scope 1 and 2 reporting, and invited public feedback on that topic.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this day, the 29th of August, 2025, in Los Angeles, California.

_____
CAITLAN MCLOON

SA2024300503
67902526

2

**SER 7**

## CERTIFICATE OF SERVICE

Case Name:  **Chamber of Commerce of the United States of America, et al. v. Liane M. Randolph, et al.**

Case No.:  **2:24-cv-00801-ODW-PVC**

I hereby certify that on <u>August 29, 2025,</u> I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

### DECLARATION OF CAITLAN MCLOON IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>August 29, 2025,</u> at Los Angeles, California.

| Beatriz Davalos | */s/ Beatriz Davalos* |
|:---:|:---:|
| Declarant | Signature |

SA2024300503
66591334.docx

3

**SER 8**

# Exhibit 39
# to Declaration of Thomas Lyon

# CDP, *The State of Play: 2023 Climate Transition Plan Disclosure* 8, 11 (June 2024)

Exhibit 39 to Decl. of Thomas Lyon
790
**SER 9**

Case 2:24-cv-00801-ODW-PVC    Document 90-39    Filed 04/07/25    Page 2 of 37    Page ID #:10082



# The State of Play

## 2023 Climate Transition Plan Disclosure

June 2024



Exhibit 39 to Decl. of Thomas Lyon
791
**SER 10**

# Contents

**04   Key findings**

**05   Introduction**

**06   Transition Plan Elements**
**08   Climate Transition Plan Disclosure**

**12   Trends in Climate Transition Plan Disclosure**
13   Indices
15   Geographic
16   Industry
18   Element-level

**20   CDP's Climate Transition Plan Journey**

**27   Conclusion**

**28   Appendix**

**Important Notice**

The contents of this report may be used by anyone providing acknowledgment is given to CDP Worldwide (CDP). This does not represent a license to repackage or resell any of the data reported to CDP or the contributing authors and presented in this report. If you intend to repackage or resell any of the contents of this report, you need to obtain express permission from CDP before doing so. CDP has prepared the data and analysis in this report based on responses to the CDP 2022 information request. No representation or warranty (express or implied) is given by CDP as to the accuracy or completeness of the information and opinions contained in this report. You should not act upon the information contained in this publication without obtaining specific professional advice. To the extent permitted by law, CDP does not accept or assume any liability, responsibility or duty of care for any consequences of you or anyone else acting, or refraining to act, in reliance on the information contained in this report or for any decision based on it. All information and views expressed herein by CDP is based on their judgment at the time of this report and are subject to change without notice due to economic, political, industry and firm-specific factors. Guest commentaries where included in this report reflect the views of their respective authors; their inclusion is not an endorsement of them. CDP, their affiliated member firms or companies, or their respective shareholders, members, partners, principals, directors, officers and/or employees, may have a position in the securities of the companies discussed herein. The securities of the companies mentioned in this document may not be eligible for sale in some states or countries, nor suitable for all types of investors; their value and the income they produce may fluctuate and/or be adversely affected by exchange rates. 'CDP Worldwide' and 'CDP' refer to CDP Worldwide, a registered charity number 1122330 and a company limited by guarantee, registered in England number 05013650.

© 2024 CDP Worldwide. All rights reserved.

2

Exhibit 39 to Decl. of Thomas Lyon
792
**SER 11**



Exhibit 39 to Decl. of Thomas Lyon

# Key findings

 **1** Over 1 in 4 companies (5906) disclosed through CDP that they have a 1.5°C-aligned climate transition plan in place – an increase of 44% since last year.

 **2** Nearly 40% of companies that report having a climate transition plan are already disclosing against most (at least two thirds) of the climate transition plan key indicators.

 **3** In 2023, 36% of all disclosing companies (over 8,600) disclosed the intention to develop a climate transition plan in two years. Of the companies that committed to developing a plan in 2021, 44% had set one by 2023, with 25 disclosing plans credibly.

 **4** Organizations listed on the FTSEurofirst 300 and KOSPI 200 indicies are ahead of their market peers. 77% and 74% of organizations listed disclosed to at least two thirds of the indicators that make up a credible plan.

 **5** But there's still a way to go: just 2% of companies that report having a transition plan are currently disclosing to all 21 indicators to judge credibility – key barriers include complete strategy, target setting and financial planning.

 **6** Japan retained its lead position in regional assessments, with 32 organizations credibly disclosing their climate transition plans, 16 more organizations than 2022

 **7** Power generation, financial services, and infrastructure industries had the most sufficient disclosure as 32%, 30%, and 24% disclosing to 'all' or 'many' of the key indicators in 2023. Conversely, the fossil fuel industry continued to perform the worst.

4

Exhibit 39 to Decl. of Thomas Lyon
794
**SER 13**



# Introduction

**We are in the most critical decade of environmental action. Despite progress through historic pledges and commitments, rapid, ambitious, and credible action by non-state actors and governments is crucial to accelerate the transition to a 1.5°C, nature-positive global economy.**

The first test of the Paris "ratchet mechanism" culminated at COP28 with the Global Stocktake: a collective assessment of progress on the Paris Agreement goals. Despite reaching a historic agreement to transition away from fossil fuels, the Stocktake failed to provide a crystal clear, actionable roadmap for implementation by all actors, although the critical role of companies is recognized. With increased focus on clearer and tighter standards for companies to achieve global environmental goals, particularly where critical signals and evidence gaps remain, there is a pressing need to further define credible actions and support progress, particularly in transition planning.

The landscape of climate transition planning has progressed rapidly over the past twelve months. Climate transition plan disclosure is now required by several standards including the IFRS S2 developed by the International Sustainability Standards Board (ISSB) and the European Sustainability Reporting Standards (ESRS) under the European Union's Corporate Sustainability Reporting Standards (CSRD). In addition to this the UK Transition Plan Taskforce (TPT) published its final Disclosure Framework with the UK Financial Conduct Authority (FCA) exploring how this guidance can support organizations disclosing transition plans under IFRS S2. These frameworks are now converging around consistent indicators of credible climate transition plans, as shown in the mapping to CDP's Key Transition Plan Indicators in this report. In an evolving landscape with a need for continued acceleration and alignment, CDP is a crucial tool to support organizations across jurisdictions looking to develop, implement and disclose standardized credible climate transition plans in line with current and future global reporting standards.

This year's report assesses the disclosure of over 23,200 organizations from 14 industries across 129 countries against CDP's 21 key climate transition plan indicators. This assessment will establish that the current state of climate transition plan disclosure is accelerating in some areas, industries and regions. However, in analyzing these perspectives, the report will reflect the wide-reaching need for greater guidance on credible climate transition plans. In response to this, this report introduces the concept of CDP's Transition Plan Journey to support disclosers in preparing credible plans and data users in assessing progress.

5

Exhibit 39 to Decl. of Thomas Lyon
795
**SER 14**



Transition Plan Elements

2

Exhibit 39 to Decl. of Thomas Lyon
796
SER 15

# Transition Plan Elements

**There is an emerging convergence around the key disclosure indicators of a credible climate transition plan. This can support regulators in their critical role of mandating disclosure and providing effective guidance on credible climate transition plans. The table below illustrates CDP's alignment across other frameworks, standards and initiatives[1].**

**Figure 1: Mapping climate transition plan key indicators to existing frameworks, standards and initiative.**

| CDP Climate transition plan element | CDP Climate Transition Plan sub-elements | IFRS S2 | EFRAG (ESRS) | SEC | TPT | GRI | GFANZ |
|---|---|---|---|---|---|---|---|
| Governance | Board level oversight | Full | Full | Full | Full | Full | Full |
| Governance | Executive incentives linked to climate performance indicators | Full | Full | — | Full | Full | Full |
| Scenario analysis | Details of scenario analysis | Full | Full | Full | Full | — | Full |
| Risk & opportunities | Climate-related risks — risks, potential financial impact and response strategy | Full | Partial | Partial | Partial | Full | Full |
| Risk & opportunities | Climate-related opportunities — opportunities, potential financial impact and response strategy | Full | Full | Full | Full | Full | Full |
| Strategy | Link between identified (and potential) climate related risks, opportunities & company strategy | Full | Full | Full | Full | — | Full |
| Strategy | Existence of a 1.5°C world-aligned transition plan within business strategy & shareholder feedback mechanism | Full | Full | Full | Full | Partial | Full |
| Financial planning | Link between identified (and potential) climate related risks, opportunities & financial planning | Full | Full | Full | Full | Full | Full |
| Financial planning | Financial planning details associated with a 1.5°C world | Full | Full | Full | Full | Full | Full |
| Targets | Emission reduction targets — absolute and/or intensity | Full | Partial | Partial | Full | Partial | Full |
| Targets | Net-zero targets | — | Full | Full | — | Full | Full |
| Scope 1,2 & 3 accounting with verification | Comprehensive and third-party verified emissions accounting | Full | Full | Full | Full | Full | Full |
| Policy engagement | Alignment of public policy engagement with climate ambition & strategy | — | Full | — | Full | Full | Full |
| Value chain engagement | Value chain engagement | Full | Full | — | Full | Full | Full |
| Value chain engagement | Details of low-carbon products and/or service | Full | Full | Full | Full | Full | Full |

**Full coverage:** There is at least full coverage between disclosures from the CDP questionnaire included in the key indicators and the disclosure requirements set by the framework/standard - including where CDP exceeds the requirements of the standard/framework/initiative.

**Partial coverage:** The disclosure requirements of the standard/framework/initiative exceed the disclosures from the CDP questionnaire included in the key indicators.

**Standard does not cover:** The mapped standard/framework/initiative does not require the disclosure of this information - whereas CDP's questionnaire does.

1  CDP recognizes this is a rapidly evolving field with many more frameworks developed by other initiatives. This is a sample of those we consider most present in the field. For other standards, see for example: CDP-Technical-Note-FS-Transition-Plans-and-Net-Zero-Commitments.pdf

7

Exhibit 39 to Decl. of Thomas Lyon
797
SER 16



## Disclosure of climate transition plans

CDP has been collecting data on climate transition plans since 2021. The relevant questions and the response indicating the presence of a climate transition plan from 2021 to 2023 are shown in Figure 2 below.

**Figure 2. Number of climate transition plans disclosed in 2021, 2022, 2023**

| Year | Question | Response | # | % |
|------|----------|----------|---|---|
| 2021 | Have climate-related risks and opportunities influenced your organization's strategy and/or financial planning? | Yes, and we have developed a low-carbon transition plan | 4,005 | 30% |
| 2022 | Does your organization's strategy include a transition plan that aligns with a 1.5°C world? | Yes, we have a transition plan which aligns with a 1.5°C world | 4,116 | 22% |
| 2023 | Does your organization's strategy include a transition plan that aligns with a 1.5°C world? | Yes, we have a transition plan which aligns with a 1.5°C world | 5,900[2] | 26% |

The number of organizations disclosing that they have a climate transition plan has increased year-on-year since 2021. This number has not increased at the same rate as the total number of organizations disclosing through CDP, so the proportion of organizations disclosing that they have a climate transition plan in place has declined. This reflects the natural process of mainstreaming the concept of transition plans and the associated accountability within it.

**Figure 3. Number of disclosing organizations and the number of organizations disclosing a climate transition plan from 2021 to 2023.**



2  This statistic references data which was extracted from the CDP platform, as of 14 November 2023.

8

Exhibit 39 to Decl. of Thomas Lyon
798
SER 17

Several factors can account for this trend, such as CDP refining its criteria for climate transition plans from a "low-carbon" transition plan to a climate transition plan that aligns with a 1.5°C-aligned world, and varying guidance and methodologies on what constitutes credible transition plans.

Assessing the consistency of climate transition plan disclosure over three years can help establish the degree of understanding and confidence in climate transition plan disclosure. In 2021, 4,005 organizations disclosed having a climate transition plan in place, their climate transition plan disclosure from 2021 to 2023 is shown in Figure 4.

**Figure 4. Consistency of climate transition plan disclosure from 2021 to 2023**



**Although there is not yet enough data to establish multi-year trends, the data shows an increase in consistency in 2023, which suggests an emerging understanding and confidence within disclosing organizations of the requirements of climate transition plans, increasing the likelihood of their adoption and implementation.**

Despite this, the rate of change is still too slow, suggesting organizations need improved guidance supported by robust frameworks and policies. CDP's Transition Plan Journey can help establish best-practice guidance for disclosing organizations to formulate and implement credible climate transition plans. Before assessing progress along CDP's Transition Journey, it is necessary to assess the quality of transition-relevant disclosures.

9

Exhibit 39 to Decl. of Thomas Lyon
799
**SER 18**

## Disclosure to 21 key transition indicators and thresholds

This section examines how organizations have performed by climate transition plan disclosure threshold in 2022 and 2023.

**CDP Credible climate transition plan thresholds.**

| Tier | % key indicators disclosed against | # of key indicators disclosed against |
|------|-----------------------------------|---------------------------------------|
| Few  | 0%-33%  | 0 – 7   |
| Some | 34%-66% | 7 – 14  |
| Many | 67%-99% | 14 – 20 |
| All  | 100%    | 21      |

**Figure 5. 2022 & 2023 disclosure to climate transition plan indicators – by disclosure tier**



Exhibit 39 to Decl. of Thomas Lyon
800
**SER 19**

**Organizations that continually disclose through CDP year-on-year are more likely to provide sufficient details on their climate transition plan.**



**Although remaining at less than 1% of the total, the number of organizations disclosing against "all" key climate transition plan indicators increased from 81 to 140. Of these 140 organizations, 33 disclosed against all indicators in both years, 48 dropped a threshold, and 107 disclosed against all indicators in 2023 for the first time.**

Organizations disclosing against "many" key indicators decreased from 12% to 9%. However, within this group, a subset disclosing that they have a public 1.5°C-aligned climate transition plan incorporating a shareholder feedback mechanism increased from 949 (26%) of that tier to 1,379 (63%) in 2023. **This suggests a growing number of organizations that disclose to "many" of the key indicators have confidence in their transition plans due to strong accountability mechanisms**, a requirement for credible climate transition planning from CDP.

**Organizations that continually disclose through CDP year-on-year are more likely to provide sufficient details on their climate transition plan**. Figure 6 below shows that 41% of all repeat disclosers sit in either the "Some", "Many", or "All" tiers as opposed to 30% of the entire disclosure sample. In addition to this, almost all "All" tier disclosers are repeat disclosers.

**Figure 6. 2023 repeat disclosers by disclosure tier**



While key indicators of credible climate transition plans may be converging and the understanding of credible planning increasing, so too is the legal and financial significance of these plans. Therefore, the number of organizations credibly disclosing plans may plateau or decline while the quality of adoption increases. CDP plays a critical role by providing a consistent and comparable platform for plans to be disclosed. Additionally, the disparity in quality and quantity reinforces the need for a clear assessment of challenges and barriers for organizations attempting to develop and disclose credible climate transition plans.

11

Exhibit 39 to Decl. of Thomas Lyon
801
**SER 20**



Exhibit 39 to Decl. of Thomas Lyon

# Index trends

Key global indexes contain some of the most influential organizations expected to drive the climate transition. In addition to this, many of these jurisdictions are developing or have already implemented climate-related disclosure requirements that may now be impacting the level of credible climate transition plan disclosure[3]. Figure 7 how some key indexes performed by disclosure threshold in 2023[4].

**Figure 7. Credible climate transition disclosure performance, by index**



**Most organizations listed on these markets are situated within the 'some' (41%) or 'many' (42%) threshold tiers.** In contrast, the entire disclosure sample in 2023 had 20% of disclosing organizations situated within the 'some' tier and 9% in the 'many' tier. **This disparity suggests that transition plans appear to be a higher priority for organizations that are publicly listed. This is expected given the increased level of scrutiny and development of disclosure requirements that public companies are subject to.**

---

3  CDP, 2023, Shaping high-quality mandatory disclosure.
4  The mapping of disclosers to their respective index was conducted in December 2023. There may be additional organizations that disclosed via CDP in 2023 that have not been mapped in this report.

13

Exhibit 39 to Decl. of Thomas Lyon
803
**SER 22**

**Best performing indexes:**

# FTSEurofirst 300
# KOSPI 200



FTSEurofirst 300 and KOSPI 200, were the best-performing indexes **with 77% and 74% of its organizations situated within both the 'many' and 'all' tiers.**

**FTSE 100, was the third-best performing index with 70% of its organizations situated within the 'many' (65%) and 'all' (5%) tier**. This is encouraging as regulation within the United Kingdom (UK) and the European Union (EU), will require companies in these markets to disclose transition plans.

**S&P TSX60, and, CSI 300 were the poorest performing members of the G20 with 72% and 71% of organizations situated within the 'few' and 'some' tiers respectively**. Both indexes were the only indexes with zero organizations disclosing sufficient details of their climate transition plan, showing a clear lag within these regions.

While some public markets are lagging, generally global indexes stand to be well prepared for credible climate transition plan disclosure. While climate-related disclosure requirements are on the rise, as seen in the United Kingdom (UK), the European Union (EU), and the United States, some regions will require a greater steer from regulating to mandate transition plan disclosure.



14

Exhibit 39 to Decl. of Thomas Lyon
804
**SER 23**

### Geographic trends

Organizations from 129 countries disclosed through CDP in 2023.

**Figure 8. Disclosure performance, by country/region (Top 20)**





**When assessed for credible climate transition plan disclosure Japan was the leader for the third year in a row**, with 32 organizations situated within the 'all' tier – double the number of disclosures from last year. This contrasts with Japan's TOPIX index which had the 5th highest number of organizations situated within the 'all' tier.

**While a high degree of climate transition plan preparedness has been observed within publicly listed organizations in the EU and UK, this readiness is not uniform across the entire region**. The UK had 88% of its disclosers situated within the 'few' and some 'tier' and EU nations represented in the top 20 countries per disclosure numbers had on average 88% situated within these tiers also.

15

Exhibit 39 to Decl. of Thomas Lyon
805
**SER 24**

In the EU, organizations from Germany, Italy, France, Spain, the Netherlands, Sweden, and Denmark are represented in the top 20 countries per total disclosures. **Out of these, Germany and France have the largest increases in the number of organizations disclosing to the 'all' tier, with Germany going from one organization in 2022 to 10 in 2023, and France going from five to 12.**

While the lack of sufficient progress across geographies indicates that steps taken are not being implemented rapidly or widely enough, it is anticipated that disclosure mandates regionally and for publicly listed companies will begin to impact supply and value chains globally. For an effective economy-wide transition, both public and private organizations must align their ambition, collaborate, and disclose, utilizing necessary guidance and tools on transition plans to drive the transition across economies.

### Industry trends – by disclosure threshold tier

CDP has analyzed disclosure performance across various industries.

**Figure 9. Credible climate transition disclosure performance, by industry**



Exhibit 39 to Decl. of Thomas Lyon
806
**SER 25**



**Industries continuing to demonstrate high rates of disclosure across 'all' and 'many' tiers:**

# 32%

Power generation

# 30%

Financial services

# 24%

Infrastructure

While year-on-year improvements are encouraging, action on credible climate transition planning is not moving fast enough as many industries continue to lag, such as the key industry of fossil fuels.

**Industries that are prone to long term planning such as power generation, financial services, and infrastructure continue to demonstrate high rates of disclosure across 'all' and 'many' tiers with 32%, 30%, and 24% situated within these tiers respectively.**

The apparel industry has seen an increase in the number of organizations situated within the 'all' tier, rising from one in 2023 to four in 2023. However, it remains among the industries with the lowest number of organizations disclosing sufficient detail across key indicators for climate transition planning. **Alongside apparel, the hospitality and transportation services industries have minimal representation in the 'all' tier, with zero hospitality organizations (one less than 2022) and only one transportation services organization (one less than 2022) disclosing sufficient details across all key climate transition plan indicators.**

**Fossil fuel organizations continue to lag across all indicators, a stark contrast to 2021 when the industry led in credible climate transition plan disclosure.** There has been no increase in organizations situated in the 'all' tier since last year. **Fossil fuel organizations should prioritize embedding sufficient disclosure of climate-related risks and opportunities and utilize sustainable finance taxonomies to navigate and support their climate transition.** Taxonomies help align organizations with stakeholder expectations, particularly in the financial services and fossil fuel industries, potentially increasing access to capital through prioritizing sustainable activities. These actions are crucial for meeting the transition needs of a low-carbon economy and fulfilling commitments under the COP28 agreement to shift away from fossil fuels in energy systems.

17

Exhibit 39 to Decl. of Thomas Lyon
807
**SER 26**

## Element-level trends

CDP's assessment of sufficient disclosure against the elements of a credible climate transition plan helps to establish where organizations lack clarity or are facing barriers to developing and implementing a credible climate transition plan.

**Figure 10. Percentage of organizations that disclosed sufficient details to each element of a credible climate transition plan in 2022 and 2023**

■ **Group 1**: Entire 2023 disclosure group - the 23,200+ organizations who disclosed through the climate change questionnaire in 2023

■ **Group 2**: Entire 2022 disclosure group - the 18,600+ organizations who disclosed through the climate change questionnaire in 2022



**The only elements that have a proportional decrease in organizations disclosing sufficient details are policy engagement and governance.**

Changes in CDP's assessment criteria for the elements of governance[5] and policy engagement[6] have resulted in a significant drop in the number of disclosers providing sufficient details about these elements. CDP always provides information on updates to our questionnaire and would recommend that organizations consult the Guidance for Companies webpage to remain aware of increased scoring criteria.

5  In 2023 CDP increased the stringency of sufficient governance disclosure of credible climate transition plans, organizations should now demonstrate that at least one member of their senior management team is incentivized for specific transition planning actions. See appendix for more details.

6  In 2023 CDP increased the stringency of sufficient policy engagement disclosure of credible climate transition plans, organizations should now ensure that it has a public commitment or position statement to conduct their engagement activities in line with the goals of the Paris Agreement. See appendix for more details.

18

Exhibit 39 to Decl. of Thomas Lyon
808
SER 27

**Credible climate-related risk and opportunities disclosure remained at 32%.** This reflects the external pressures organizations face due to the further development of climate-related disclosures, such as those recommended by the TCFD and ISSB.

Financial planning which had the lowest proportion of organizations providing sufficient details in 2022 increased by 2% in 2023 moving above the element of targets. Still, more needs to be done concerning sufficient financial planning disclosure and utilizing taxonomies can support organizations in overcoming some of these challenges.



**Of the**
# 5%
**of organizations that disclosed sufficient details of their financial planning in 2023**

# 18%
**disclosed utilizing a taxonomy to classify their financial planning as aligned with their transition plan or a net-zero carbon economy.**

**This contrasts with the 2% of organizations outside this group who disclosed utilizing a taxonomy.** As recommended in CDP's recent report on the EU taxonomy, organizations should strive to adopt taxonomies as a tool to demonstrate and support the alignment of expenditure with transition targets and gain access to capital.

Both targets and value chain engagement have remained consistent across 2022 and 2023 with 4% and 8% of disclosing organizations providing sufficient details on each element respectively. In each case, this is an increase in just 180 organizations that are disclosing sufficient details of each element in 2023.

Climate transition plan elements where proportional growth has stagnated or decreased  suggests a lack of urgency and required speed, however, the number of organizations disclosing sufficient information for many elements has increased in line with CDP's growth of disclosures. This growth signals and reflects the increasing pressure and awareness among organizations regarding broad climate-related disclosure. However, as is the case in all societal changes which increase legal and financial significance, a plateau can be observed where the threat of legal and financial reprove balances with the benefits of being first movers. The journey CDP outlines below aims to address this and serves two purposes: to indicate the sustained efforts and directions of an organization and to help identify where wider challenges may be delaying action.

19

Exhibit 39 to Decl. of Thomas Lyon
809
**SER 28**



CDP's Climate Transition Plan Journey

Exhibit 39 to Decl. of Thomas Lyon
810
SER 29

# CDP's Climate Transition Plan Journey

**CDP's Transition Plan Journey offers a structured pathway for organizations, guiding them in developing and disclosing their climate transition plan. Each step is drawn from the experience of a huge section of organizations and outlines a series of actions and disclosures that should be taken by organizations during the development and disclosure of their climate transition plan. These actions are mapped to CDP's key climate transition plan indicators[7].**

This journey provides transition plan preparers with a suggestive procedural roadmap and data users with a useful visualization of progress.

The following section of the report will assess how organizations have progressed along CDP's Transition Plan Journey in 2022 and 2023. The sample assessed in this section is organizations that disclosed that they would develop a climate transition plan in 2021 and continued to disclose in 2022 and 2023[8].

**Figure 11. Steps of the CDP's Climate Transition Plan Journey**

| | |
|---|---|
| **1** Impact metrics & disclosure (CDP) | The transition journey begins with environmental disclosure, which is achieved using CDP's disclosure platform and responding to CDP's full Climate Change questionnaire[9]. The questionnaire serves as a guide to **what needs doing, what is considered normal, and what is considered best practice**. In the context of credible climate transition planning this is a holistic overview of impacts on the environment, which includes an inventory of validated Scopes 1, 2, and 3 GHG emissions which provides a fundamental baseline for any plan. |
| **2** Climate risk & governance (TCFD / ISSB) | The next step in the transition plan journey, once an assessment of the existing situation is completed, is implementing a rigorous protocol to assess climate-related risks and opportunities regulated by effective governance mechanisms. This assessment should feed into the wider strategy and business model. |
| **3** Set target (SBTi) | When organizations have identified their climate-related risks and opportunities and potential financial impact (materiality), they are better positioned to set long and short-term decarbonization targets and make the business case to reduce their environmental impact. |
| **4** Business strategy and action plan | Once an organization has its inventory, the governance to understand it, and a target to arrive at, it should then begin building an action plan that outlines how it intends to reduce its environmental impacts to progress towards meeting its ambition. This includes a strategic response to climate-related risks and opportunities, development of policy and value chain engagement plans, and plans to transition its products and/or services towards low-carbon products and services. |
| **5** disclosure and plan performance | Finally, organizations should support the disclosure of their plan with rigorous financial planning disclosure that also enables tracking the progress of their transition. Leadership in transition planning does not end at this final stage. Organizations should establish and disclose a publicly available 1.5°-aligned transition plan with a well-defined feedback mechanism. Organizations must continue assessing their performance to inform any necessary changes to their plan to stay in line with the ambition of that plan and credible science-based pathways. |

---

7  Refer to the appendix to see the mapping of the climate transition plan key indicators to each stage of the CDP Transition Plan Journey.

8  CDP has assessed progress along the transition plan journey in 2022 and 2023 due to the consistency in indicators between these two years, due to substantial changes to the indicators after 2021 an assessment was not possible for that year.

9  In 2023 for all CDP corporate questionnaires, there were two versions: full and minimum. The full version contains all questions relevant to a company, including sector-specific questions and data points. The minimum version contains fewer of those questions, and no sector-specific questions or data points. Find out more here: Guidance for companies - CDP

Exhibit 39 to Decl. of Thomas Lyon

811



# 44%

**of the group that disclosed that they would develop a climate transition plan in two years have delivered on their commitment by 2023.**

## CDP's Transition Plan Journey — Organizations that disclosed that they would develop a plan in two years in 2021

In 2021, 1,569 organizations disclosed they would develop a climate transition plan within two years, of these, CDP has assessed 1,343 organizations that continually in 2022 and 2023[10]. **44% of the group that disclosed that they would develop a climate transition plan in two years have delivered on their commitment by 2023**.

To assess how the 1,343 organizations have progressed toward credibly disclosing their climate transition plan, disclosures to CDP's climate transition plan key indicators at each step of the journey across 2022 and 2023 will be assessed. To progress to a step, an organization must have disclosed sufficient details to all key indicators making up the previous step.

**Figure 14. Progress along CDP's Transition Plan Journey in 2022 & 2023**

**Stayed at the same step in 2023**
**965**

**Progressed to higher step in 2023**
**165**

**Regressed to lower step in 2023**
**213**



10 There were more organizations that disclosed that they would develop a climate transition plan in 2021 and continued to disclose in 2022 and 2023. However, CDP cannot assess the disclosure of all of these organizations over the two years due to late disclosures in 2022.

22

Exhibit 39 to Decl. of Thomas Lyon
812
**SER 31**

**While there are clear challenges to progression, disclosers are mainly progressing along the transition journey at two key steps, from zero to one and from various steps to five**. Organizations at step zero decreased by 83 (4%) in 2023 and organizations at step 5 increased by 21 (a fivefold increase). It is noteworthy **out of the initial 1,343 organizations, 25 organizations have delivered on their commitment to develop a climate transition plan and aligned with best practice climate transition plan disclosure**.

The net change along the transition plan journey between 2022 and 2023 is highlighted in Figure 13.

Most organizations within this group remained at the same step between 2022 and 2023, comprising 72% of the sample. Additionally, 16% of the 1,343 organizations regressed by at least one step in 2023.

As demonstrated in Figure 12 above the step that experienced the largest increase in 2023 was Step One, partially attributable to the migration of 125 organizations from Step Two to One in 2023. This regression underscores the heightened stringency of governance criteria applied to organizations within Step 2 in 2023.

Encouragingly, despite the increased stringency of this criterion, 12% of the group progressed to a higher step in 2023. **The staggered progress in an indication of the continuing fragmentation in the field, however, it is also evident that there is a move toward convergence and mainstreaming of actions and we can expect further improvement in the future.**

**Figure 13. Net change in Transition Journey progression from 2022 to 2023**



- Progress
- Stayed the same
- Regressed



23

Exhibit 39 to Decl. of Thomas Lyon
813
SER 32

The table below summarizes the most significant challenges per climate transition plan key indicator for organizations progressing from one step to another.

**Figure 14. Progressing of organizations by key climate transition indicator disclosure along CDP's Transition Plan Journey in 2022 and 2023**

| Step | CDP 2023 question number | Key Climate Transition Plan indicator | 2022 % of organizations at step satisfying indicator criteria | 2023 % of organizations at step satisfying indicator criteria | Change |
|---|---|---|---|---|---|
| Step 0 → Step 1 | | Respond to the Full tier questionnaire | 94% | 93% | -1% |
| | C6.1 | Accounts for Scope 1 emissions | 96% | 95% | -1% |
| | C6.3 | Accounts for Scope 2 emissions | 99% | 99% | 0% |
| | C6.5 | Accounts for Scope 3 emissions | 33% | 38% | 5% |
| | C10.1 | Verification of emissions inventory | 20% | 22% | 2% |
| Step 1 → Step 2 | C1.1b | Board level oversight of climate transition plan | 97% | 53% | -44% |
| | C1.3a | Senior Management incentives linked to transition plan performance indicators | 82% | 8% | -74%* |
| | C2.3a/2.3b | Identified climate-related risks | 57% | 81% | 23% |
| | C2.4a/2.4b | Identified climate-related opportunities | 56% | 79% | 23% |
| | C3.2a | Conducted scenario analysis | 35% | 76% | 41% |
| Step 2 → Step 3 | C4.1a/4.1b | Set short-term science-based targets | 44% | 55% | 11% |
| | C4.2c | Set long-term science-based targets | 17% | 19% | 3% |
| Step 3 → Step 4 | C3.3 | Identified areas where climate-related risk & opportunities have influenced strategy | 48% | 60% | 12% |
| | C3.4 | Identified areas where climate-related risk & opportunities have influenced financial planning | 100% | 100% | 0% |
| | C12.1a | Create value chain engagement plan | 78% | 73% | -4% |
| | C4.5a | Conducts policy engagement | 19% | 27% | 8%* |
| | C12.3 | Developed low carbon products or services | 89% | 73% | -16% |
| Step 4 → Step 5 | C3.5a | Identified spending/revenue that is aligned with climate transition plan | 13% | 15% | 2% |
| | C3.1 | Has a publicly available climate transition plan | 42% | 77% | 35% |

24

Exhibit 39 to Decl. of Thomas Lyon

814

**SER 33**



**Step 0**

**1**

**Impact metrics & disclosure (CDP)**

### Step Zero to One

The transition from Step Zero to One in 2023 reveals that the most significant barrier for organizations is accounting for Scope 3 emissions and completing verifications of emissions inventory.

### Step One to Two

The primary barrier to advancement from Step One was the lack of senior management incentives linked to transition plan performance indicators, primarily due to the change in assessment criteria. **Notably, there was a 44% decline in organizations disclosing board-level oversight of their climate transition plan at Step One. Considering this indicator's consistency across frameworks and CDP's climate transition plan assessment, organizations should prioritize establishing effective governance mechanisms moving into the next CDP disclosure cycle.**



**Step 1**

**2**

**Climate risk & governance (TCFD / ISSB)**

Conversely, there were significant increases in organizations disclosing sufficient details in climate-related risk and opportunities assessment and the utilization of scenario analysis. Familiarity with TCFD and now ISSB-relevant disclosures, along with CDP's alignment with these frameworks, can aid organizations in advancing these transition-relevant disclosures.

### Step Two to Three

A consistent increase in sufficient target disclosure was observed across short-term and long-term targets, which is promising. However, 14 organizations still regressed from Step Three in 2023, indicating a failure to set and disclose sufficient details of short and long-term science-based targets.



**Step 2**

**3**

**Set target (SBTi)**

### Step Three to Four

Progression from Step Three to Four over two years exhibits a slightly more nuanced picture. **Climate-related risk and opportunities influencing financial planning and strategy remain familiar areas for organizations advancing along this journey. This, coupled with substantial progress in identifying climate-related risks and opportunities, underscores the value of these processes working in conjunction.**



**Step 3**

**4**

**Business strategy and action plan**

An essential aspect of any action plan and implementation of a credible climate transition plan is robust engagement plans and scaling of low-carbon products and/or services. These areas require significant attention from organizations progressing to Step Four, particularly in policy engagement.

25

Exhibit 39 to Decl. of Thomas Lyon
815
**SER 34**

**Step 4**

# 5

**Disclosure and plan performance**

### Step Four to Five

Although the number of organizations situated at Step Four and Five is low, as reflected in figure 12, a high degree of organizations at Step Four and Five are disclosing a publicly available climate transition plan, indicating a high level of confidence in their climate transition plans.

Organizations at Step Four must increase their disclosure of aligned spending/revenue with their climate transition plan to demonstrate that their climate transition plan is sufficiently resourced.

**Some specific indicators are presenting challenges for organization's progression. For example, for example, Scope 3 emissions accounting with verification. Organizations must prioritize this fundamental exercise, particularly as the IFRS S2 and ESRS E1 cover the disclosure of scope 3 emissions and that CDP recommends in its high-quality mandatory disclosure principles that disclosure policies should also require external verification.** Additional challenges included effective governance, setting both short and long-term science-based targets, policy engagement, and aligning spending and/or revenue with a climate transition plan.

While methodologies are still converging, the action associated with some of the barriers to progression should be supported by mandatory reporting policies, robust disclosure guidance, and tools. **It is essential that organizations on a climate transition plan development journey, utilize their CDP disclosure to reflect on their location along this journey, explore guidance associated with common barriers and relevant tools such as those provided by CDP's Accredited Solution Providers, and leverage their disclosure to provide all relevant information when disclosing details a climate transition plan.**



26

Exhibit 39 to Decl. of Thomas Lyon
816
SER 35



# Conclusion

**While the convergence of credible climate transition plan indicators is now occurring across key standards, frameworks and initiatives, the number of organizations disclosing sufficient details of their climate transition plan through CDP is not increasing at the required pace. In 2023 the percentage of organizations disclosing a credible climate transition plan increased by just 0.2% to reach a total of 0.6%.**

**However, organizations that maintain their disclosure year-on-year are better positioned to develop and disclose credible climate transition plans.** For instance, repeat disclosers are more prevalent across the 'some,' 'many,' and 'all' climate transition disclosure threshold tiers. Additionally, 44% of the group that committed to developing a climate transition plan within two years in 2021 have fulfilled their pledge by 2023 and among them, 25 organizations have credibly disclosed details of their climate transition plan. Clarity of guidance and transparency of planning will serve to support this increase.

**Public markets are beginning to lead the way in credible climate transition plan disclosure**, notably in the EU, South Korea, and the UK.

There remain significant barriers for organizations. These include but are not limited to, financial planning, targets, Scope 3 accounting with verifcation, governance, policy engagement and science-based target setting. **These issues are not uniform and will be unique for each disclosing organization. It is therefore essential that disclosers utilize their disclosure, and CDP's Transition Plan Journey to assess and identify their barriers and seek solutions.**

Despite the barriers and challenges, indicator convergence and disclosure requirements are creating a level playing field, particularly through increasing the understanding of climate-related risk disclosure. However, approaches are still patchy and there remains critical gaps. It is important to adopt an integrated perspective towards environmental issues, which are interconnected and mutually reinforcing. **CDP is committed to ensuring that current and future regulation is impactful as possible, and in line with our clarion call towards high quality mandatory disclosure, we recommend governments include expectations on transition plans in their own disclosure requirements.**

Transition planning is crucial for the global economies' pivot to a 1.5°C-aligned world. Credible transition plans are a mechanism for organizations to demonstrate how they intend to pivot their entire business model to reduce their impact on the environment. It is crucial that organizations are supported by policies and tools that enable consistent climate transition planning that is reflective of best practices.

Disclosing through CDP allows organisations to develop standardised and comparable transition plans that align with incoming regulation.

27

Exhibit 39 to Decl. of Thomas Lyon
817
**SER 36**



# Appendices

**6**

Exhibit 39 to Decl. of Thomas Lyon
818

# Appendix 1:
# Assessment methodology & key transition indicators in 2023 climate change questionnaire

| Climate transition plan element | CDP 2023 climate change question and question code | Relevance to climate transition plans | Assessment methodology |
|---|---|---|---|
| **Governance** | (C1.1b) Provide further details on the board's oversight of its climate climate transition plan. | An organization should have board-level oversight of its climate transition plan with defined governance mechanisms in place to ensure delivery of the plan. Climate issues should be a scheduled item at all or some board meetings. | Organizations disclose the frequency with which transition plan-related issues are a scheduled agenda item, such as monitoring the implementation of a transition plan, and the mechanism into which these issues are integrated and elaborate with an explanation. |
| | (C1.3a) Provide further details on the incentives provided for the management of climate-related issues. | To incentivize conscious action and commitment in realizing the plan's goals, it is recommended that executive management incentives are aligned with the organization's climate transition plan goals. | Organization discloses at least one member of the management team who is entitled to incentives that are tied to transition-related performance indicators and elaborates with a comment. |
| **Scenario analysis** | (C3.2a) Provide details of your organization's use of climate-related scenario analysis. | Robust scenario analysis is an important strategic planning tool that can be used to inform the development of a climate transition plan. | Organization discloses on its use of climate-related scenario analysis, scenario analysis coverage, temperature alignment of scenario, parameters, assumptions, and analytical choices. |
| **Financial planning** | (3.4) Describe where and how climate-related risks and opportunities have influenced your financial planning. | Financial planning is crucial when demonstrating that an organization is aligning with climate goals (as elaborated in its climate transition plan), and that it will be relevant (i.e., profitable) in a 1.5°C-aligned world. Climate transition plans should include a demonstration of how they have aligned/intend to align their financial planning with their climate transition plan in the reporting year and at milestone years '2025' and '2030'. Financial details may describe revenue, CAPEX, and/or OPEX projections which are crucial for realizing the plan's ambition. | Organization reports on at least one area of its financial planning that has been influenced by climate and describes its influences. |
| | (C3.5a) Quantify the percentage share of your spending/revenue that is aligned with your organization's climate transition. | | Organization must select at least one financial metric and disclose the percentage share of the selected financial metric which is aligned with a 1.5°C world in the reporting year, 2025, 2030 and description of methodology used to identify spending/revenue that is aligned with a 1.5°C world. |
| **Strategy** | (C3.1) Does your organization's strategy include a transition plan that aligns with a 1.5°C world? | Developing a climate transition plan provides certainty to data users that a company is aligning to long- and short-term climate goals and that its business model will continue to be relevant in a net-zero carbon economy. Collecting feedback on the transition plan allows shareholders and/or stakeholders to review and raise resolutions related to progress. | Organization discloses that it has a publicly available 1.5°C climate transition plan with a well-defined feedback mechanism in place, to track progress. |
| | (C3.3) Describe where and how climate-related risks and opportunities have influenced your strategy. | A climate transition plan should outline  how an organization will achieve its strategy to pivot its products and services, supply/value chain, investment in R&D, and operations to a 1.5°C-aligned world. | Organization describes how climate has influenced or has not influenced, or how they are considering climate's  influence to their strategy regarding products and services, investment in R&D, operations, and supply/value chain. |
| **Risks & opportunities** | (C2.3a) Provide details of risks identified with the potential to have a substantive financial or strategic impact on your business.  (2.3b) Why do you not consider your organization to be exposed to climate-related risks with the potential to have a substantive financial or strategic impact on your business? | Disclosing details of material climate risks posed to an organization, including the potential financial impact and the cost to respond to these risks, indicates a robust climate transition plan is in place. | Organization reports details of at least one climate-related risk identified, including the potential financial impact and cost to respond to the risk.  However, if an organization has not disclosed to C2.3a, it must have disclosed to C2.3b, by providing an explanation why it does not consider itself to be exposed to climate-related risks with the potential to have a substantive financial or strategic impact on its business. |
| | (C2.4a) Provide details of opportunities identified with the potential to have a substantive financial or strategic impact on your business.  (C2.4b) Why do you not consider your organization to have climate-related opportunities? | Disclosing details of material climate opportunities posed to an organization, including the potential financial impact and the cost to realize these opportunities, indicates a robust transition plan is in place. | Organization reports details of at least one climate-related opportunity identified, including the potential financial impact and cost to realize the opportunity.  However, if an organization has not  disclosed to C2.4a, it must have disclosed to C2.4b, by providing an explanation why it does not consider itself to be exposed to climate-related risks with the potential to have a substantive financial or strategic impact on its business. |

29

Exhibit 39 to Decl. of Thomas Lyon

819

**SER 38**

| Climate transition plan element | CDP 2023 climate change question and question code | Relevance to climate transition plans | Assessment methodology |
|---|---|---|---|
| **Targets** | (C4.1a) Provide details of your absolute emissions target(s) and progress made against those target(s). <br><br> (C4.1b) Provide details of your emissions intensity target(s) and progress made against those target(s). | A climate transition plan should be underpinned by ambitious near-and long-term science-based targets which are in line with the latest climate science to achieve a 1.5°C-aligned world. | The criteria for credible targets disclosure within a credible climate transition plan require an organization to disclose: <br> 1. is target to have a science-based status; <br> 2. details on intensity or absolute emissions targets; <br> 3. that it has a 1.5°C-aligned target. <br><br> For this year's assessment, we leveraged the CDP scoring methodology and resultantly, 2,429 organizations could not be assessed for several operational reasons such as: Late submissions, minimum tier responses with Investor request only, HQ in Russian Federation/Belarus, Forests only - Coal OR Metals & mining companies, Forests only - didn't respond to any commodity, Unpaid administration fees. |
| | (C4.2c) Provide details of your net-zero target(s). | A climate transition plan should aim to achieve ambitious science-based net-zero targets in line with the latest climate science to achieve a 1.5°C-aligned world by 2050 at the latest. | Organization reports on whether it is reporting a net-zero target, whether it is science based – and if so, it also reports details on its net-zero target. |
| **Scope 1,2,3 accounting with verification** | (C6.1) What were your organization's gross global Scope 1 emissions in metric tons $CO_2$e? | A climate transition plan should be accompanied by a complete, accurate, transparent, consistent, and relevant inventory of all three scopes of emissions. Organizations should calculate and disclose all material categories of Scope 3 and provide an explanation for categories that are not relevant. | Organization discloses a figure for its Scope 1 emissions. |
| | (C6.3) What were your organization's gross global Scope 2 emissions in metric tons $CO_2$e? | | Organization discloses a figure for its Scope 2 location-based or market-based emissions |
| | (C6.5) Account for your organization's gross global Scope 3 emissions, disclosing and explaining any exclusions. | | For each category of Scope 3 emissions, the organization discloses a figure for any "relevant, calculated" or "not relevant, calculated" categories, or provides an explanation for any categories "not relevant, explanation provided". |
| | (C10.1) Indicate the verification/ assurance status that applies to your reported emissions. | A climate transition plan should be accompanied by a complete annual inventory Scope 1, 2, & 3 emissions that is verified by a third party. | Organization reports verification is in place for its Scope 1, 2, and 3 emissions. |
| **Value chain engagement & low carbon initiatives** | (12.1a) Provide details of your climate-related supplier engagement strategy | Organizations are facing resiliency risks in the value chain that have material environmental and financial implications; hence, value chain engagement plays a significant role in realizing a climate transition plan. Organizations with significant emissions in their supply chain can leverage their buyer power and engage their suppliers towards a 1.5°C-aligned transition. A climate transition plan should include time-bound actions to decarbonize business processes within the value chain, including supply chain engagement that covers at least 25% of its suppliers by procurement spend or Scope 3 emissions. | Organization discloses the type of supplier engagement, details of the engagement, a description of the impact of the engagement, including measures of success, a figure in both the % of suppliers by number and % of procurement spend, and a rationale for the cover of its engagement. |
| | (C4.5a) Provide details of your products and/or services that you classify as low-carbon products. | A climate transition plan should include time-bound actions to decarbonize business processes, such as growing the revenue earned from its products and services portfolio. | Organization discloses details of its low-carbon products and services, as well as a non-zero figure for the % revenue from that product in the reporting year and elaborate with a comment. |
| **Policy engagement** | (C12.3) Does your organization engage in activities that could either directly or indirectly influence policy, law, or regulation that may impact the climate? | For many organizations, a successful climate transition will depend on an accommodative policy landscape, thus organizations should advocate for climate-positive policies that impact their relevant industry(s). A climate transition plan should demonstrate that an organization's public policy engagement aligns with its climate ambitions and strategy. | Organization should disclose whether it has a direct or indirect engagement that could influence policy, law, or regulation that may impact climate, and that it has a public commitment or position statement to conduct its engagement activities in line with the goals of the Paris Agreement, describe the process(es) it has in place to ensure that its engagement activities are consistent with its overall climate change strategy. |

30

Exhibit 39 to Decl. of Thomas Lyon

820

**SER 39**

# Appendix 2
# Total index disclosure (and threshold breakdown)

|  | Sum of bottom tier | Sum of lower mid-tier | Sum of upper mid-tier | Sum of top tier | Sum of grand total |
|---|---|---|---|---|---|
| BSE 200 | 6 | 31 | 39 | 4 | 80 |
| CSI 300 | 8 | 30 | 17 |  | 54 |
| FTSE 100 | 2 | 26 | 61 | 5 | 94 |
| FTSE Eurofirst 300 | 7 | 56 | 189 | 22 | 274 |
| Hang Seng | 5 | 19 | 12 | 1 | 37 |
| KOSPI 200 | 9 | 19 | 71 | 8 | 107 |
| MSCI ACWII | 166 | 635 | 843 | 73 | 1717 |
| MSCI small cap | 361 | 896 | 505 | 34 | 1796 |
| S&P 500 | 53 | 226 | 147 | 3 | 429 |
| S&P TSX 60 | 7 | 27 | 13 |  | 47 |
| S&P/ASX 300 | 12 | 42 | 24 | 1 | 79 |
| South Africa - FTSE JSE All - Share | 10 | 34 | 30 | 2 | 76 |
| TOPIX 500 | 26 | 121 | 267 | 27 | 441 |
| **Grand Total** | **672** | **2162** | **2218** | **180** | **5231** |



31

Exhibit 39 to Decl. of Thomas Lyon
821
**SER 40**

# Appendix 3
# Total industry disclosure (and threshold breakdown)

| Industry | | Few # | Some # | Many # | All # |
|---|---|---|---|---|---|
| Apparel | | 423 | 125 | 40 | 4 |
| Biotech, health care & pharma | | 367 | 162 | 72 | 6 |
| Financial services | | 152 | 332 | 201 | 8 |
| Food, beverage & agriculture | | 1007 | 242 | 132 | 9 |
| Fossil Fuels | | 168 | 87 | 48 | 1 |
| Hospitality | | 63 | 52 | 22 | |
| Infrastructure | | 414 | 210 | 185 | 20 |
| International bodies | | 11 | 2 | | |
| Manufacturing | | 7181 | 1554 | 554 | 33 |
| Materials | | 1181 | 495 | 284 | 21 |
| Power generation | | 115 | 68 | 78 | 8 |
| Retail | | 674 | 302 | 137 | 6 |
| Services | | 3706 | 812 | 333 | 23 |
| Transportation services | | 754 | 202 | 104 | 1 |
| #N/A | | 3 | 1 | | |
| **Grand Total** | | **16219** | **4646** | **2190** | **140** |

Exhibit 39 to Decl. of Thomas Lyon
822
**SER 41**

Case 2:24-cv-00801-ODW-PVC    Document 90-39    Filed 04/07/25    Page 34 of 37   Page ID #:10114

# Appendix 4
# Total country/region disclosure (and threshold breakdown)

| Country/Region | Few # | Some # | Many # | All # | Total # |
|---|---|---|---|---|---|
| Grand total | 16219 | 4646 | 2190 | 140 | 23195 |
| United States | 3457 | 896 | 249 | 7 | 4609 |
| China | 1999 | 500 | 90 | 0 | 2589 |
| Japan | 874 | 660 | 418 | 32 | 1984 |
| United Kingdom | 1189 | 393 | 203 | 10 | 1795 |
| Germany | 907 | 235 | 89 | 10 | 1241 |
| Brazil | 914 | 149 | 67 | 5 | 1135 |
| Republic of Korea | 687 | 85 | 104 | 9 | 885 |
| India | 500 | 130 | 64 | 5 | 699 |
| Italy | 500 | 106 | 52 | 6 | 664 |
| France | 380 | 133 | 116 | 12 | 641 |
| Taiwan, China | 344 | 147 | 112 | 7 | 610 |
| Canada | 363 | 127 | 25 | | 515 |
| Mexico | 422 | 53 | 10 | 1 | 486 |
| Spain | 344 | 48 | 60 | 7 | 459 |
| Netherlands | 211 | 72 | 33 | 4 | 320 |
| Sweden | 197 | 65 | 38 | 2 | 302 |
| Switzerland | 154 | 74 | 39 | 3 | 270 |
| Turkey | 141 | 56 | 56 | 8 | 261 |
| Denmark | 177 | 37 | 28 | | 242 |
| China, Hong Kong | 144 | 65 | 16 | | 225 |
| Finland | 143 | 36 | 31 | | 210 |
| Australia | 126 | 44 | 22 | | 192 |
| Poland | 155 | 24 | 3 | | 182 |
| Singapore | 131 | 25 | 18 | | 174 |
| Norway | 93 | 32 | 30 | 3 | 158 |
| Ireland | 75 | 42 | 32 | 1 | 150 |
| Belgium | 77 | 26 | 24 | 2 | 129 |
| Austria | 78 | 24 | 24 | 1 | 127 |
| Thailand | 86 | 19 | 18 | 2 | 125 |
| Malaysia | 96 | 23 | 4 | | 123 |
| South Africa | 58 | 34 | 25 | 1 | 118 |
| Portugal | 64 | 16 | 10 | 2 | 92 |
| Indonesia | 56 | 29 | 5 | | 90 |
| United Arab Emirates | 64 | 21 | 3 | | 88 |
| Argentina | 67 | 7 | 1 | | 75 |
| Viet Nam | 65 | 8 | | | 73 |
| Saudi Arabia | 59 | 6 | | | 65 |
| Colombia | 36 | 19 | 4 | | 59 |
| Hungary | 49 | 8 | 2 | | 59 |
| Romania | 51 | 5 | 1 | | 57 |
| Chile | 36 | 7 | 8 | | 51 |
| Czechia | 44 | 3 | 3 | | 50 |

| Country/Region | Few # | Some # | Many # | All # | Total # |
|---|---|---|---|---|---|
| Greece | 23 | 12 | 10 | | 45 |
| Philippines | 28 | 9 | 6 | | 43 |
| Israel | 26 | 14 | 2 | | 42 |
| New Zealand | 17 | 15 | 7 | | 39 |
| Luxembourg | 16 | 9 | 10 | | 35 |
| Ecuador | 30 | 3 | 1 | | 34 |
| Bangladesh | 28 | 4 | 1 | | 33 |
| Pakistan | 20 | 8 | | | 28 |
| Slovenia | 22 | 4 | 1 | | 27 |
| Kuwait | 24 | 1 | 1 | | 26 |
| Russian Federation | 11 | 12 | 1 | | 24 |
| Slovakia | 20 | 1 | 1 | | 22 |
| Costa Rica | 18 | 2 | | | 20 |
| Egypt | 15 | 4 | 1 | | 20 |
| Nigeria | 15 | 3 | | | 18 |
| Oman | 18 | | | | 18 |
| Lithuania | 10 | 3 | 2 | | 15 |
| Peru | 11 | 4 | | | 15 |
| Croatia | 14 | | | | 14 |
| Panama | 12 | 1 | | | 13 |
| Guatemala | 12 | | | | 12 |
| Iraq | 12 | | | | 12 |
| Qatar | 11 | 1 | | | 12 |
| Bermuda | 3 | 7 | 1 | | 11 |
| Cambodia | 11 | | | | 11 |
| Estonia | 8 | 3 | | | 11 |
| Serbia | 11 | | | | 11 |
| Bulgaria | 9 | 1 | | | 10 |
| China, Macao Special Administrative Region | 9 | 1 | | | 10 |
| Trinidad and Tobago | 10 | | | | 10 |
| Uruguay | 9 | 1 | | | 10 |
| Algeria | 9 | | | | 9 |
| Cayman Islands | 4 | 2 | 2 | | 8 |
| Iceland | 2 | 3 | 3 | | 8 |
| Sri Lanka | 7 | 1 | | | 8 |
| Ukraine | 6 | 2 | | | 8 |
| Kenya | 6 | | 1 | | 7 |
| Kazakhstan | 2 | 4 | | | 6 |
| Ghana | 4 | 1 | | | 5 |
| Honduras | 4 | 1 | | | 5 |
| Lebanon | 4 | 1 | | | 5 |

33

Exhibit 39 to Decl. of Thomas Lyon
823
**SER 42**

| | Few | Some | Many | All | Total |
|---|---|---|---|---|---|
| **Country/Region** | # | # | # | # | # |
| **Tunisia** | 5 | | | | 5 |
| **Bolivia (Plurinational State of)** | 4 | | | | 4 |
| **Guyana** | 3 | 1 | | | 4 |
| **Malta** | 2 | 2 | | | 4 |
| **Mauritius** | 3 | 1 | | | 4 |
| **Morocco** | 3 | | 1 | | 4 |
| **Paraguay** | 4 | | | | 4 |
| **Venezuela (Bolivarian Republic of)** | 4 | | | | 4 |
| **Angola** | 3 | | | | 3 |
| **Bosnia & Herzegovina** | 3 | | | | 3 |
| **Dominican Republic** | 2 | 1 | | | 3 |
| **El Salvador** | 3 | | | | 3 |
| **Jersey** | 1 | 2 | | | 3 |
| **Jordan** | 2 | 1 | | | 3 |
| **Monaco** | 1 | 2 | | | 3 |
| **North Macedonia** | 3 | | | | 3 |
| **Puerto Rico** | 3 | | | | 3 |
| **United States Minor Outlying Islands** | 2 | 1 | | | 3 |
| **Bahrain** | 2 | | | | 2 |
| **Cocos (Keeling) Islands** | 2 | | | | 2 |
| **Cyprus** | 1 | 1 | | | 2 |
| **Guernsey** | | 1 | 1 | | 2 |
| **Latvia** | 2 | | | | 2 |
| **Armenia** | 1 | | | | 1 |
| **Azerbaijan** | 1 | | | | 1 |
| **Barbados** | 1 | | | | 1 |
| **British Virgin Islands** | | 1 | | | 1 |
| **Brunei Darussalam** | 1 | | | | 1 |
| **Equatorial Guinea** | 1 | | | | 1 |
| **Eritrea** | 1 | | | | 1 |
| **Ethiopia** | 1 | | | | 1 |
| **Faroe Islands** | 1 | | | | 1 |
| **Fiji** | 1 | | | | 1 |
| **Georgia** | 1 | | | | 1 |
| **Greenland** | 1 | | | | 1 |
| **Jamaica** | 1 | | | | 1 |

| | Few | Some | Many | All | Total |
|---|---|---|---|---|---|
| **Country/Region** | # | # | # | # | # |
| **Libya** | 1 | | | | 1 |
| **Liechtenstein** | | 1 | | | 1 |
| **Marshall Islands** | | 1 | | | 1 |
| **Mongolia** | | 1 | | | 1 |
| **Mozambique** | 1 | | | | 1 |
| **Myanmar** | 1 | | | | 1 |
| **South Sudan** | 1 | | | | 1 |
| **Uganda** | | 1 | | | 1 |
| **United Republic of Tanzania** | 1 | | | | 1 |
| **Uzbekistan** | | 1 | | | 1 |

# Appendix 5
# CDP Transition plan journey climate transition plan key indicator mapping

|  |  | Respond to the Full tier questionnaire |
|---|---|---|
| **Step 1:**<br>**Impact metrics & disclosure** | C6.1 | What were your organization's gross global Scope 1 emissions in metric tons $CO_2e$? |
|  | C6.3 | What were your organization's gross global Scope 2 emissions in metric tons $CO_2e$? |
|  | C6.5 | Account for your organization's gross global Scope 3 emissions, disclosing and explaining any exclusions. |
|  | C10.1 | Indicate the verification/assurance status that applies to your reported emissions. |
| **Step 2:**<br>**Climate risk and governance** | C1.1b | Provide further details on the board's oversight of climate transition plan |
|  | C1.3a | Provide further details on the incentives provided for the management of climate-related issues |
|  | C2.3a/ 2.3b | (C2.3a) Provide details of risks identified with the potential to have a substantive financial or strategic impact on your business. OR (2.3b) Why do you not consider your organization to be exposed to climate-related risks with the potential to have a substantive financial or strategic impact on your business? |
|  | C2.4a/ 2.4b | (C2.4a) Provide details of opportunities  identified with the potential to have a  substantive financial or strategic impact on your business. OR (C2.4b) Why do you not consider your organization to have climate-related opportunities? |
|  | C3.2a | Provide details of your organization's use of climate-related scenario analysis |
| **Step 3:**<br>**Setting science-based targets** | C4.1a/ 4.1b | (C4.1a) Provide details of your absolute emissions target(s) and progress made against those target(s). OR (C4.2b) (C4.1b) Provide details of your emissions intensity target(s) and progress made against those target(s) |
|  | C4.2c | Provide details of your net-zero target(s) |
| **Step 4:**<br>**Business strategy and action plan** | C3.3 | Describe where and how climate-related risks and opportunities have influenced your strategy. |
|  | C3.4 | Describe where and how climate-related risks and opportunities have influenced your financial planning. |
|  | C12.1a | Provide details of your climate-related supplier engagement strategy |
|  | C4.5a | Does your organization engage in activities that could either directly or indirectly influence policy, law, or regulation that may impact the climate? |
|  | C12.3 | Provide details of your products and/or services that you classify as low-carbon products. |
| **Step 5:**<br>**Disclosure and plan performance** | C3.5a | Quantify the percentage share of your spending/revenue that is aligned with your organization's climate transition. |
|  | C3.1 | Does your organization's strategy include a transition plan that aligns with a 1.5°C world? |

35

Exhibit 39 to Decl. of Thomas Lyon
825
**SER 44**



**Authors**

**Amir Sokolowski**
Global Director, Climate Change
amir.sokolowski@cdp.net

**Scott Twigg**
Transition Plan Manager
scott.twigg@cdp.net

**Edan McHugh**
Analyst, Climate and Environment
Disclosure Frameworks.
edan.mchugh@cdp.net

**Ariella Shamir**
Deputy Facilitator – Net Zero and
Transition Plans
ariella.shamir@cdp.net

**CDP Worldwide**
4th Floor,
60 Great Tower Street,
London EC3R 5AZ
United Kingdom

Tel: +44 (0)20 3818 3900
www.cdp.net
info@cdp.net

**Data team**

**Ben Simpson**
Senior Data Analyst - Transitions
ben.simpson@cdp.net

**Maxim Sinclair**
Senior Transition Analyst
maxim.sinclair@cdp.net

**Flavia Bedicks**
Senior Manager, Transition Planning
flavia.bedicks@cdp.net

**Communications lead**

**Maddy Bravery**
Communications Manager
maddy.bravery@cdp.net

**About CDP**

CDP is a global non-profit that runs the world's environmental disclosure system for companies, cities, states, and regions. Founded in 2000 and working with over 700 financial institutions representing more than US$142 trillion in assets. CDP pioneered using capital markets and corporate procurement to motivate companies to disclose their environmental impacts, and to reduce greenhouse gas emissions, safeguard water resources and protect forests. Over 24,000 organizations around the world disclosed data through CDP in 2023, including more than 23,000 companies worth two thirds global market capitalization, and over 1,100 cities, states, and regions. Fully TCFD aligned, CDP holds the largest environmental database in the world, and CDP scores are widely used to drive investment and procurement decisions towards a zero carbon, sustainable and resilient economy. CDP is a founding member of the Science Based Targets initiative, We Mean Business Coalition, The Investor Agenda, and the Net Zero Asset Managers initiative.

Visit cdp.net or follow us @CDP to find out more.

© CDP 2024

Exhibit 39 to Decl. of Thomas Lyon
826
**SER 45**

# Exhibit 36
# to Declaration of Thomas Lyon

# New Climate Institute's
# Webpage

Exhibit 36 to Decl. of Thomas Lyon
756
**SER 46**





‹ **PUBLICATIONS**

# CORPORATE CLIMATE RESPONSIBILITY MONITOR 2022

**PUBLICATIONS**

📅 **Publication date:**  07 Feb 2022

---

**Related materials:**

**DOWNLOAD THE REPORT  →**

**DOWNLOAD THE METHODOLOGY DOCUMENTATION  →**

Exhibit 36 to Decl. of Thomas Lyon

757

**SER 47**





Exhibit 36 to Decl. of Thomas Lyon

758

**SER 48**





Exhibit 36 to Decl. of Thomas Lyon
759
SER 49





Exhibit 36 to Decl. of Thomas Lyon
760
**SER 50**



Exhibit 36 to Decl. of Thomas Lyon
761
SER 51





Carbon Market Watch, assesses the climate strategies of 25 major global companies. It critically analyses the extent to which they demonstrate corporate climate leadership.

## About the Corporate Climate Responsibility Monitor

Companies around the world are increasingly alert to the climate emergency, facing calls from a growing range of stakeholders to take responsibility for the environmental impact of their activities. Most large companies now have public climate strategies and targets, many of which include pledges that, on the face of it, appear to significantly reduce, or even eliminate, their contributions to global warming. The rapid acceleration of corporate climate pledges, combined with the fragmentation of approaches means that it is more difficult than ever to distinguish between real climate leadership and unsubstantiated greenwashing. This is compounded by a general lack of regulatory oversight at national and sectoral levels. Identifying and promoting real climate leadership is a key challenge that, where addressed, has the potential to unlock greater global climate change mitigation ambition. The Corporate Climate Responsibility Monitor evaluates the transparency and integrity of companies' climate pledges. The objectives of the Corporate Climate Responsibility Monitor are:

» Identify and highlight good practice approaches that can be replicated by other companies, recognising that companies are experimenting to work out what is constructive and credible practice.

» Reveal the extent to which major companies' climate leadership claims have integrity, and provide a structured methodology for others to replicate such an evaluation.

» Scrutinise the credibility of companies' plans for offsetting their emissions through carbon dioxide removals or emission reduction credits, recognising that voluntary carbon markets are highly fragmented and there remains a lot of uncertainty on credible good practice.

The Corporate Climate Responsibility Monitor focuses on four main areas of corporate climate action: tracking and disclosure of emissions, setting emission reduction targets, reducing own emissions and taking responsibility for unabated emissions through climate contributions or offsetting. Finally, it evaluates 25 major global companies' transparency and integrity across these four areas.

## Key Insights

Exhibit 36 to Decl. of Thomas Lyon
762
**SER 52**

 

## Headline pledges are often ambiguous and emission reduction commitments are limited

**Net-zero targets aim to reduce the analysed companies' aggregate emissions by only 40% at most, not 100% as suggested by the term "net-zero". All of the 25** companies assessed in this report pledge some form of zero-emission, net-zero or carbon-neutral target. But just 3 of the 25 companies – Maersk, Vodafone and Deutsche Telekom – clearly commit to deep decarbonisation of over 90% of their full value chain emissions by their respective net-zero and zero emission target years. At least 5 of the companies only commit to reduce their emissions by less than 15%, often by excluding upstream or downstream emissions. The 13 companies that provide specific details on what their headline net zero pledges mean, commit to reduce their full value chain emissions from 2019 by only 40% on average. The other 12 companies do not accompany their headline pledges with any specific emission reduction commitment for their that target year. Collectively, the 25 companies specifically commit to reducing only less than 20% of their 2.7 GtCO2e emission footprint, by their respective headline target years.

**Targets for 2030 fall well short of the ambition required to align with the internationally agreed goals of the Paris Agreement and avoid the most damaging effects of climate change.** Among the companies we assessed, 15 of the 25 prominently report interim climate targets. However, our analysis finds that the average emission reduction commitment of full value chain emissions between 2019 and 2030 is just 23%.

Exhibit 36 to Decl. of Thomas Lyon
763
**SER 53**



Figure 1: Integrity of corporate net-zero pledges.

## Demonstrated good practice emission reduction measures must be replicated and scaled up

**Companies' uptake of readily-available emission reduction measures shows little sense of urgency.** Good practice examples for target-setting and the implementation of emission reduction measures are demonstrated among our sample of companies for all emission scopes and can be readily replicated by ambitious peers. Yet many of the companies could significantly improve their uptake of ambitious measures to address their climate footprint, especially for their upstream and downstream emissions (scope 3). Scope 3 emissions account on average for 87% of total emissions for the 25 companies assessed in this report, but only 8 of the 25 companies disclosed a moderate level of detail on their plans to address these emissions. Companies could demonstrate their climate leadership by further prioritising climate change objectives and engaging in constructive dialogue to share knowledge on good practices.

**A few companies demonstrate leadership with higher quality and innovative approaches for sourcing renewable electricity, but the overall integrity of renewable electricity procurement remains low.**

Most companies assessed in this report use unbundled renewable energy certificates (RECs) to claim their energy use has limited, or no, climate impact, i.e. they source their electricity from the local regional or

Exhibit 36 to Decl. of Thomas Lyon

764

**SER 54**

    

the nuances of renewable electricity quality, as 6 out of the 25 analysed companies source the majority of their electricity from higher quality power purchase agreements (PPAs) and own-generation. Beyond this, some companies are innovating to find new ways to further improve the integrity of renewable energy procurement.



Figure 2: Use of offsets for carbon neutrality claims and net zero pledges. (Click here for high resolution graph)

## Offsetting plans are contentious, but climate contributions without neutralisation claims are gaining traction as an alternative approach

**Companies' plans to offset or "neutralise" their emissions are especially contentious. 19 of the 25 companies assessed already know that they will rely on offsetting for their future pledges, and only one company plans explicitly without offsets.** At least two-thirds of these companies rely on carbon dioxide removals from forestry and other biological-related carbon sequestration (nature-based solutions) to claim that their emissions in the future are offset, i.e. that the impact to the climate is the same as if the emissions were never released in the first place. But these approaches are unsuitable for individual offsetting claims, because biological carbon storage can be reversed (e.g. when forests are cut and burned) and because there

Exhibit 36 to Decl. of Thomas Lyon

765

**SER 55**

 

contributions, or a lack of transparency regarding the objectives of the programmes and potential to use the investments to support offsetting claims in the future. More good practice examples are required to facilitate replication of the climate contribution approach.

## Companies will be the innovators that find the solutions to the climate crisis, but they must be subject to scrutiny and regulation

**Mitigation of climate change depends on innovation; companies have, and will continue, to play a central role in finding and scaling up solutions for deep decarbonisation.** These efforts need urgent acceleration. The findings of this report indicate that regulators should not rely on consumer and shareholder pressure to drive corporate action. Companies must be subject to intense scrutiny to confirm whether their pledges and claims are credible, and should be made accountable in the case that they are not. Truly ambitious corporate actors can be supported by introducing stronger regulation that levels the playing field by ensuring that those ambitious actors are not at an economic disadvantage compared to their less ambitious peers. Regulators and standard-setting initiatives must find ways to distinguish and segregate climate leadership from greenwashing, to support ambitious actors to innovate and accelerate decarbonisation.

The Corporate Climate Responsibility Monitor will be an annual publication. You can find a recording of the virutal press conference on 7 February 2022 here.

# KEY CONTACTS

**MEET ALL EXPERTS →**

Exhibit 36 to Decl. of Thomas Lyon
766
**SER 56**



**THOMAS DAY**

t.day
@newclimate.org

**SILKE MOOLDIJK**

s.mooldijk
@newclimate.org

**SYBRIG SMIT**

s.smit
@newclimate.org

Exhibit 36 to Decl. of Thomas Lyon
767
**SER 57**



 

**FIND OUT MORE** →

PUBLICATIONS    PROJECTS    EVENTS    NEWS & BLOG

# Corporate Climate Responsibility Monitor 2024

**Publication date:** 09 Apr 2024

The 2024 Corporate Climate Responsibility Monitor (CCRM) analyses the climate strategies of 51 major global companies, critically...

🗎 PUBLICATION

Exhibit 36 to Decl. of Thomas Lyon
768
**SER 58**




# The corporate climate accountability loop

**Publication date:** 20 Sep 2023

Introducing key functions of an accountability system for corporate climate action, and selected spotlights on how to improve the...

↻ PUBLICATION

Exhibit 36 to Decl. of Thomas Lyon
769
**SER 59**

 

# Corporate Climate Responsibility Monitor 2023

**Publication date:** 13 Feb 2023

For the 2024 iteration of the Corporate Climate Responsibility Monitor, click here. The Corporate Climate Responsibility Monitor...

🔖 PUBLICATION

Exhibit 36 to Decl. of Thomas Lyon
770
**SER 60**

 

# Evaluating corporate target setting in the Netherlands

**Publication date:** 05 Jul 2022

An assessment of the climate action plans of 29 Dutch companies and financial institutions In this publication, we scrutinise the...

🗅 PUBLICATION

Exhibit 36 to Decl. of Thomas Lyon
771
**SER 61**



**WHAT WE DO**

Topics | Projects

**RESOURCES**

Tools | Publications | Climate Responsibility

**NEWS & EVENTS**

News | Events

**ABOUT US**

Who we are | Press | Career | Contact

**FOLLOW US**

Legal & privacy policy.
© NewClimate Institute

Exhibit 36 to Decl. of Thomas Lyon
772
**SER 62**

# Exhibit 31
# to Declaration of Thomas Lyon

# Romm, *Are Carbon Offsets Unscalable, Unjust, and Unfixable—and a Threat to the Paris Climate Agreement?* (2023)

Exhibit 31 to Decl. of Thomas Lyon
650
**SER 63**

*Penn Center for Science, Sustainability, and the Media*    1

# Are carbon offsets unscalable, unjust, and unfixable—and a threat to the Paris Climate Agreement?

A White Paper from the Penn Center for Science, Sustainability, and the Media

## Joseph Romm, Ph.D.

## EXECUTIVE SUMMARY

"If the world were graded on the historic reliability of carbon offsets, the result would be a solid F." That was the conclusion of a 2019 analysis by ProPublica of global carbon offsets of the past two decades, the scientific literature, technical reports, and new satellite imagery. Numerous investigative reports, scientific studies, and leading experts support that conclusion.

**What is new is that—absent major changes—"there is a risk that … the voluntary carbon market undermines the objectives of the Paris Climate Agreement instead of supporting the required transformational change,"** as one review article explained.

What is also new is the rapidly rising reputational—and legal—risks offsets pose to companies. As recently as November 2021, McKinsey said "net zero" was now "a core principle for business." By February 2023, a leading publisher for media and marketing companies wrote, **"Carbon offsets present an emerging risk to advertisers,"** and **"firms relying on offsetting to hit net zero targets risk greenwashing—and the law might be coming for them."** In September 2022, a law firm with over 1000 lawyers in 12 countries issued a client memo titled, "Carbon Offsets: A Coming Wave of Litigation?" In May 2023, the CEO of United Airlines said of offsets, "the majority of them are fraud," and Delta was sued in federal court over its claim to be "the world's first carbon-neutral airline."

Carbon offsets are "reductions of greenhouse gas emissions from an activity in one place to compensate for emissions elsewhere," as the U.S. Government Accountability Office (GAO) put it. In a typical transaction, a developed country or company—instead of reducing its own heat-trapping $CO_2$ emissions—pays a developing country to reduce its emissions by an equivalent amount instead. If the buyer purchases enough offsets to cover all its emissions, then it calls itself "carbon neutral" or "net zero." Typical projects are deploying clean energy, planting new trees, and paying people not to cut down trees. **But research on offsets shows "the large majority are not real or are over-credited or both,"** said Dr. Barbara Haya, Director of The Berkeley Carbon Trading Project, in 2023.

These problems pervade every major offset program. Consider the UN's Clean Development Mechanism (CDM)—the world's biggest program, launched in 2006. Over 50% of CDM offsets came

Exhibit 31 to Decl. of Thomas Lyon

651

*Penn Center for Science, Sustainability, and the Media*                                    2

from China, nearly 70% from China and India. **Studies have found the vast majority of those credits were not genuine—either the projects would have happened anyway (without the offset money) or they were credited for far more reductions than actually occurred or both**. Also since 2006, China built so many coal plants its yearly $CO_2$ emissions *increased* by nearly as much as the U.S. emits today. India's emissions doubled. So not only was there little actual clean development, but those offsets were sold to developed countries, letting them generate as much as 6 billion tons of $CO_2$ more than they would have otherwise. **Too often, offsets cause pollution and discourage genuine $CO_2$ reductions.**

This paper explores whether the carbon offset market is fixable, just, and scalable. **One finding: There is a growing consensus that companies should not be using any offsets they buy from developing countries to make claims about emissions reductions or net zero.** The Science Based Targets initiative (SBTi), which works with thousands of companies, said in 2021, **"Net-zero targets are mostly greenwash"** that focus on "offsets instead of reducing emissions."

This growing consensus is very visible in the price history since June 2022 of Nature-Based Global Emissions Offsets (NGEOs), such as forest conservation or restoration projects:



We will look at the dramatic but poorly understood changes in the offset market that the world adopted since Paris. These changes will create a new UN-run market of "authorized" offsets that, experts say, will disincentivize developing countries from participating *and* from making strong $CO_2$

Exhibit 31 to Decl. of Thomas Lyon
652
**SER 65**

*Penn Center for Science, Sustainability, and the Media*                                    3

reduction pledges. The details are not finalized, but if the current changes stick, **authorized offsets would allow developed countries to make achieving their Paris climate commitments *easier* by paying developing countries to make achieving their commitments *harder*.** In 2023, Dr. Haya said of this burden shifting, "I don't think it's fair, and I don't think it's what we should be doing."

This burden shifting is also not popular with most developing countries. So, we are unlikely to see it happen at scale—at least until those offsets are much costlier than today, perhaps by a factor of 10 or more. **In 2023, the World Bank modeled authorized offsets and found they may well exceed $100 a ton. A high price is especially likely because there are far fewer "negative emissions"—tons of carbon dioxide removal (CDR)—available than are widely expected**.

"Carbon dioxide removal is not a current climate solution," argues a 2023 *Nature* article. If we don't "drastically reduce emissions first," CDR "will be next to useless." **Bioenergy with carbon capture and storage (BECCS) is unlikely to generate significant negative emissions by 2050 and scaling it up may well increase global warming for decades.** At a June 2023 Direct Air Capture Summit hosted by industry leader Climeworks, the company's co-founder and co-CEO Jan Wurzbacher "told the crowd his company could see its prices remain as high as $300 by 2050."

So, achieving net zero for most countries in the coming decades will involve fewer purchases of carbon removal and more pursuit of domestic emissions reductions, which will likely become more expensive over time. So, **selling off your easiest emission reductions cheaply now may be a counterproductive policy for any country**.

We'll examine whether the UN should be running a major new offset effort similar to the CDM for nations party to the Paris Agreement—given its inability to fix the CDM's key problems after two decades of trying. **We will explore the issues raised by a May 2023 deal where Microsoft is buying and claiming the same carbon offsets from a BECCS project in Denmark that the Danish government is officially buying and counting in its national $CO_2$ inventory**. We will also look at the many climate justice issues offsets raise. Ultimately, we'll see why **the fact that the entire world must get emissions as close to zero as possible undercuts the rationale for carbon offsets**. The solution is to replace offsets with programs whereby the richer countries and corporations focus on 1) meeting their climate targets by reducing their own emissions and 2) helping the poorer countries reduce their emissions without offset projects.

Exhibit 31 to Decl. of Thomas Lyon

*Penn Center for Science, Sustainability, and the Media*                                            4

## INTRODUCTION

Offsets took off in the 2000s when the UN launched the Clean Development Mechanism. The CDM was created to help developed countries meet their greenhouse gas (GHG) reduction targets under the 1997 Kyoto Protocol, an international climate treaty, while helping developing countries grow more sustainably. As the UN explains, "The CDM allowed countries with emission-reduction targets to partly meet their commitments by buying Certified Emission Reductions (CERs), one tonne of CO2 equivalent each, from projects that reduced or avoided emissions in developing countries."[1]

These CERs allowed developed countries to officially offset an equivalent amount of their pledged reductions. If Germany had to reduce emissions by 100 million tons, for example, they could fund a renewable energy facility in China that was projected to save (or avoid) 10 MT, and then they would only have to reduce their own $CO_2$ emissions by 90 MT to meet their goal.

A 2016 analysis of CDM projects for the European Commission's Directorate-General for Climate Action found that **"85% of the covered projects … have a low likelihood of ensuring environmental integrity (i.e. ensuring that emission reductions are additional and not over-estimated). Only 2% of the projects … have a high likelihood."[2]** A great many offsets were awarded to clean energy projects, such as wind and hydropower, that would have happened anyway (so they were not "additional" as discussed below). By the mid-2010s, the CDM "pipeline" had more than 2000 dams in various stages of approval. Some two-thirds were in China. **Yet, these dams "are being built at a rapid rate by countries such as China, India and Brazil independent of any subsidy for supposed mitigation benefits,"** noted a 2015 study.[3] They would have been built anyway—without the CDM. "In addition, tropical dams emit greenhouse gases despite CDM regulations allowing zero emissions to be claimed by many dams."

**Recent studies have estimated the CDM may well have led to a substantial *increase* in $CO_2$ emissions—6 billion tons, in the case of one 2021 study**.[4] Why? The reductions in the developing countries would have happened anyway and were far smaller in reality than they were credited for—10 CERs were issued but, in reality, it should've been 2 or perhaps 0. Yet the extra carbon pollution that the developed countries were allowed to emit by purchasing CDM offsets was real. **One 2018 study explained the mechanism "does not reduce global emissions" by its very design**.[5]

The CDM's Certified Emission Reductions were part of a "compliance market," since they allowed a developed country to comply with a mandatory emissions reduction target. At the same time as the CDM, the *voluntary* offset market was also developing. It let companies (and others) help meet a

Exhibit 31 to Decl. of Thomas Lyon
654
**SER 67**

*Penn Center for Science, Sustainability, and the Media*                                     5

voluntary emissions reduction target by paying someone (typically in a developing country) to reduce their emissions by an equivalent amount in their place. If a company purchased enough of these unofficial offsets to cover all its emissions, then it could call itself "carbon neutral" or "net zero." The first carbon offset was in 1988, but the overall voluntary market had only about $300 million in c*umulative* sales pre-2005.[6] When the CDM launched in the mid-2000s, the voluntary market also took off and from 2005 to 2020 averaged about $350 million in *annual* sales, with many ups and downs.

Then in 2021, the market exploded to $2 billion.

Why? In the 2015 Paris Agreement, the world's leading countries—developed and developing—unanimously agreed to reduce greenhouse gas emissions to a level that would avoid dangerous climate impacts. This meant, according to the Agreement, "holding the increase in the global average temperature to well below 2°C [3.6°F] above pre-industrial levels and pursuing efforts to limit the temperature increase to 1.5°C [2.7°F]."

After Paris, momentum grew for 1.5°C as the target. The parties to the Agreement asked the world's top climate scientists of the Intergovernmental Panel on Climate Change (IPCC) to do a special report on 1.5°C warming, which was released in 2018. The IPCC found climate impacts beyond 1.5°C were much more serious than realized.[7] Thus, limiting warming to 1.5°C was imperative—but meeting the 1.5°C limit required reducing global $CO_2$ emissions 45% by 2030 compared to 2010 levels and to "net zero" around mid-century. Net zero for the world means that whatever emissions can't be mitigated must be offset by carbon removals (such as tree-planting or technologies that directly capture $CO_2$ from the air). The report further stated, "**Limiting global mean temperature increase at any level requires global $CO_2$ emissions to become net zero at some point in the future.**"[8]

Leading up to the Glasgow, Scotland climate summit (COP26) in the fall of 2021, more and more countries (and companies) began making net-zero pledges. President Xi Jinping announced in September 2020 that China would aim to "achieve carbon neutrality before 2060." At the summit, India said it would aim for net zero by 2070. By the end of Glasgow, more than 70 countries—including most of the top emitters—had made the net-zero pledge.[9]

At the same time, many companies made similar pledges. Over 450 banks, pension funds, and other firms that together manage $130 trillion pledged at Glasgow to use their money to reach net-zero by 2050.[10] During the summit, McKinsey published a piece, "COP26 made net zero a core principle for business. Here's how leaders can act."[11] It argued that now, "net-zero commitments are the norm."

Exhibit 31 to Decl. of Thomas Lyon
655
**SER 68**

*Penn Center for Science, Sustainability, and the Media*                                      6

So, business pledges for net zero soared over the course of 2021. Coupled with a growth in speculation by investors believing they could make a profit by buying offsets before the gold rush, the unregulated sale of voluntary offsets soared in 2021 to $2 billion, quadruple 2020 spending. One market research firm projected in December 2022 that offset purchases could hit $17 billion by 2027.[12] In 2023, Boston Consulting Group and Shell Group projected purchases could hit $10 to $40 billion by 2030.[13]

Yet there is a tremendous disconnect between all this activity and what the scientific literature and investigative reports on offsets have been saying for the past two decades as well as what many major practitioners—and the world as a whole—have started doing in the last few years.

## THE PROBLEMS WITH OFFSETS AND NET ZERO

In September 2022, the Gold Standard—a top certifier of carbon credits—changed its "claims guidelines" to ensure its certified projects were communicated "accurately."[14] **All credits would now be called an "impact claim" or "contribution claim"—whereby the buyer can say it is contributing to a domestic carbon target "without stating or implying" they've offset their own emissions. Moreover, the buyer cannot credibly make offsetting claims unless credits meet key criteria (which few if any can), including that they "are highly likely to be additional" and that "organisations should prioritise the avoidance and reduction of emissions, in line with science"—with a strong preference the offsets are not double claimed with the selling country's Paris Agreement commitments.[15]** At the same time, other certifiers are still calling what they sell "offsets," and many companies are still buying them and asserting they are offsetting their own emissions.

The market for "authorized" offsets in the emerging compliance market for countries to meet their climate commitments under the Paris Agreement is moving in a similar direction as the Gold Standard—following the dramatic changes in offset rules the world adopted at the last two global climate conferences. Because the underlying realities of offsets are so opaque and confusing, the full implication of these changes are not well understood, so they will be discussed at length below. But the key point for now is that—once the rules are finalized—**for an offset to become "authorized" by the UN, the selling country will have to effectively agree to make their official climate commitment harder to achieve**. If the seller does not agree to that, then the offset will likely be reclassified to something very similar to the "contribution claim" the Gold Standard has shifted to. And that means the buyer can't use it to meet their official Paris commitments.

Exhibit 31 to Decl. of Thomas Lyon

656

**SER 69**

*Penn Center for Science, Sustainability, and the Media*                                                      7

Returning to the voluntary market, the Science Based Targets initiative (SBTi) launched a new "Net-Zero Standard" in 2021, which it revised in April 2023. SBTi is the leader in setting and verifying credible voluntary targets. It works with thousands of companies, of which more than 2600 have science-based targets and over 1700 have pledged to meet its specific requirements for a genuine "net zero" commitment.

SBTi noted in October 2021 that nearly 70% of the global economy had committed to net-zero by 2050 but that **"Net-zero targets are mostly greenwash" that focus on "offsets instead of reducing emissions."**[16] SBTi explained that **now, to be net zero, the vast majority of companies working with SBTi must directly cut their emissions 90-95% before 2050.** Virtually none of the offsets available on the voluntary market play a part here: "When a company reaches its net-zero target, only a very limited amount of residual emissions can be neutralised with high quality carbon removals, this will be no more than 5-10%."

In its April 2023 *Corporate Net-Zero Standard, Version 1.1*, SBTi underscored the point that **"The use of carbon credits must not be counted as emission reductions toward the progress of companies' near-term or long-term science-based targets."**[17] SBTi does, however, allow companies to use something similar to an offset—a Renewable Energy Credit (REC)—to meet any of its targets for offsetting emissions from its electricity purchases. Yet as we will see in the next section, RECs don't represent real emissions reductions, and corporations should not be allowed to use them as such.

In terms of neutralizing residual emissions, SBTi explains, **"Companies shall remove carbon from the atmosphere and permanently store it to counterbalance the impact of any unabated emissions that remain *once* companies have achieved their long-term science-based target."**[18] The permanent storage requirement eliminates the most popular nature-based offsets used today, such as tree planting, as we'll see. Finally, SBTi explains it will take quite some time before most company can say they are net zero: **"A company cannot claim to have reached net-zero until the long-term science-based target for all scopes is achieved, and the company has neutralized residual emissions**."

The world's leading climate experts embraced a similar view for countries—"focusing on direct emission reductions within their own territory; minimal reliance on offsets"—in their 2900-page IPCC report summarizing the state of climate change mitigation knowledge in 2022.[19]

In November 2022 during the big climate conference in Egypt (COP27), the UN's High-Level Expert Group on the Net Zero Emissions Commitments of Non-State Entities" released, "Integrity Matters: Net Zero Commitments by Businesses, Financial Institutions, Cities and Regions."[20] The

Exhibit 31 to Decl. of Thomas Lyon
657
**SER 70**

*Penn Center for Science, Sustainability, and the Media*                                                      8

Group had "over 40 regional and thematic consultations" that included over 500 organizations worldwide. One of its "main recommendations" is **Non-state actors must prioritise urgent and deep reduction of emissions across their value chain. High integrity carbon credits in voluntary markets should be used for beyond value chain mitigation but cannot be counted toward a non-state actor's interim emissions reductions required by its net zero pathway."**

The Expert Group explains that to "be considered and recognised as net zero," a non-state actor (such as a company) must meet two conditions. First, its targets and pathway to net zero should be "consistent with limiting warming to 1.5°C" using a methodology verified by an independent third party like SBTi. Second, "it has achieved its long-term net zero target with any residual emissions neutralised by permanent greenhouse gas removals" as verified by "a credible, independent third party." **In short, companies should not be using any offsets they buy in the voluntary market to make any claims about emissions reductions or net zero for the foreseeable future.**

So at the same time that many experts were predicting the market for offsets would keep rising sharply, many companies and others were concluding that offsets were not a viable solution to the climate crisis, and that most net zero claims were, as SBTi says, "greenwash"—an attempt to look environmentally responsible without actually doing so. Offset expert Dr. Mark Trexler, who worked on the first offset (in 1988), said in 2023, "**I don't think corporate net-zero leads to decarbonization.**"[21] Similarly, Dr. Barbara Haya, Director of the University of California's Berkeley Carbon Trading Project, said in 2023, **"the offset market is broken, and too far gone to fix."**[22]

Let's start by looking at the challenges facing the offset market to understand why the world's nations made big changes and whether they could make offsets a viable climate solution.

## THE ADDITIONALITY AND OVER-CREDITING PROBLEMS

*Bloomberg* published a 3-part investigation in 2022, "Inside the Billion-Dollar Market for Junk Carbon Offsets."[23] They examined "more than 215,000 transactions last year" focusing on renewable-energy projects. **Renewables have become so low cost those projects almost certainly would have happened without offset revenues. But genuine offsets must be "additional"—which means the carbon reductions associated with a given project would not have occurred without the revenues from the offset sale.** Offsets that are not additional should not be used as a license to pollute by the buyer. Yet, the report notes many big corporations are using offsets to claim they are "carbon neutral."

Exhibit 31 to Decl. of Thomas Lyon
658
SER 71

*Penn Center for Science, Sustainability, and the Media*                                                            9

Years earlier, the 2016 analysis of the CDM for the European Commission had come to the same conclusion. After examining hundreds of CDM projects, the report concluded, "**Most energy-related project types (wind, hydro, waste heat recovery, fossil fuel switch and efficient lighting) are unlikely to be additional, irrespective of whether they involve the increase of renewable energy, energy efficiency improvements or fossil fuel switch**."[24] And renewables are much cheaper now.

In 2019, the two largest offset certifiers, Verra and Gold Standard, stopped issuing offsets from grid-connected renewable projects anywhere but the poorest countries. But the voluntary carbon market is unregulated—essentially anyone can participate. "It's like the Wild West, where anything goes," said Stefan Reichelstein, professor emeritus of accounting at Stanford Business School in 2022.[25] So, in 2019, in advance of the World Cup, the Qatari government launched its own offset certifier. The Doha-based Global Carbon Council (GCC) now "signs off on the kinds of projects that fail to meet minimum standards anywhere else in the world," including renewables, as *Bloomberg* explained in November 2022.[26] To become carbon neutral, "World Cup organizers have been the sole purchasers of credits verified by GCC." **The carbon market is gameable.**

But gaming the system—such as dubious claims of carbon neutrality—is coming with increasing reputational risk. Responding to complaints, the commission regulating advertising in Switzerland ruled in June 2023 that FIFA, which is based in the country, misled fans with its claims of a "carbon-neutral Qatar World Cup," the *Guardian* reported.[27] While FIFA "repeatedly hints that it will fully offset the emissions to be definitively calculated at a later date, it is unable to provide proof that the estimated emissions have been offset," the Commission said in a press release.[28] "In addition, it is unclear whether [FIFA's] offsetting measures comply with Swiss standards, eg the complete and sustainable removal of $CO_2$ from the atmosphere." Finally, the Commission "has advised FIFA to refrain from making unsubstantiated claims in the future," including carbon neutrality claims for the 2022 World Cup.

Just as most renewable energy offsets are non-additional, so too is a nearly identical product, a Renewable Energy Credit (REC)—a certificate representing the environmental value of one megawatt-hour of renewable power. In buying a REC, you are paying a renewable project owner (or broker) a little bit of money so you can claim the entire environmental benefit of the electricity produced. Corporations and others often buy RECs to claim a smaller carbon footprint from their electricity purchases, just like an offset. But as Dr. Mark Trexler explains in his 2022 online offsets course: There is "no evidence, unfortunately, the renewable energy certificate market is resulting in any more renewable energy being generated. There is no evidence of additionality."[29] Trexler calls RECS, "just an accounting shell game."

Exhibit 31 to Decl. of Thomas Lyon
659
**SER 72**

*Penn Center for Science, Sustainability, and the Media*                                        10

The projects would've happened anyway, as many studies have found, a point also made in the 2022 *Nature* article, "**Renewable energy certificates threaten the integrity of corporate science-based targets**."[30] This study looked at "the climate change disclosures of 115 companies" with science-based targets. It found two-thirds of the claimed emissions reductions from these companies' electricity usage (so-called Scope 2 emissions) came from RECs and so were "unlikely to be real reductions." In October 2022, *Bloomberg Green* found a similar reliance on RECS in what they called "the broadest investigation yet into how companies are using this accounting technique to dramatically exaggerate their emissions reductions."[31] They analyzed nearly 6,000 climate reports filed by companies in 2021.

Back in 2007, a *Nature* article explained, "There is no correct technique for determining additionality because it involves the evaluation of counterfactual circumstances. No test for additionality can provide certainty about what would have happened otherwise."[32] In 2008, the GAO similarly said of the CDM: "it is impossible to know with certainty whether any given project is additional."[33]

Consider the common case where the offset is paying a landowner or country not to cut down trees. The counterfactual is no payment. But how do you know the landowner was going to let some lumber company cut down their trees? Investigations have revealed many cases where the land was already set aside as a preserve. What if only half the trees were to be cut down? What if the trees were destined to be used not for making wood products, which store carbon a long time, but for burning to generate heat, releasing a huge amount of $CO_2$? What if the company simply cuts down the same number of trees somewhere else? And what if the preserved forest is later burned down in a wildfire?

How do you do a credible life-cycle analysis if you don't even know what will happen to the trees? You can't. And that is true of most offsets—particularly the so-called "avoided emissions" offsets, where you aren't actually funding a direct reduction in emissions but, rather, you're theoretically trying to avoid future emissions, as in the case above of paying someone not to cut down trees.

Back in 2007, the *Guardian* called this "a crisis of legitimacy in the voluntary market, as offsetters lay claim to certainties that are beyond their reach."[34] **Their "major investigation" showed "how greenhouse gas credits do little or nothing to combat global warming**." They quoted Dan Welch, a journalist who scrutinized offsets: "Offsets are an imaginary commodity created by deducting what you hope happens from what you guess would have happened."

A 2022 *New Scientist* article explained that "**California's carbon offsetting may actually be increasing emissions**."[35] A 2019 study by Dr. Haya had found most credits offered by California for forest preservation "likely do not represent true emissions reductions due to the protocol's use of lenient

Exhibit 31 to Decl. of Thomas Lyon
660
**SER 73**

*Penn Center for Science, Sustainability, and the Media*                                                  11

leakage accounting methods."[36] Leakage occurs when your effort to reduce emissions in one place leads to increased emissions in another—for instance, reducing timber harvesting in one place causes an increase in timber harvesting in another place to meet the demand for wood. Research indicates the actual leakage rate is four times higher than what California's protocol assumes. This coupled with California's lenient leakage accounting methods is why the state is greatly over-crediting forest preservation tons.[37]

Significant over-crediting is commonplace in the voluntary carbon market (VCM). As one carbon management firm wrote in 2022, "**Studies have found very high rates of over-crediting by all major offset programs** that have developed offset protocols with credits available on the VCM, including the UN's Clean Development Mechanism, California's offset program, and a range of project types developed by the voluntary market registries, including soil carbon, improved cookstoves, and improved forest management."[38] Dr. Barbara Haya said in 2023, "**everyone has not just failed, but deeply failed**."[39]

The over-crediting can be considerable, as in the case of replacing inefficient, dirty cookstoves (used by nearly 3 billion people globally) with more efficient ones. The 2023 study, "Cooking the books: Pervasive over-crediting from cookstoves offset methodologies," noted cookstoves represent more than 10% of projects on the VCM.[40] The authors analyzed the climate benefit of 36 cookstove projects, concluding, "We estimate that our project sample, on average, is over-credited by 6.3 times." That is, "**the average project generated roughly 6 times more credits than our estimated climate benefits**." Extrapolating their methodology to all cookstove offsets, **their analysis found that of the 53 million VCM-issued credits, only some 8.7 million (~16%) "likely should have been issued**."

All of these studies and exposes may be starting to discredit key carbon offsets used by companies to become carbon neutral or net net zero, thereby weakening demand. **The amount of "avoided deforestation" credits supplied to the market "shrank by a third from 2021 to 2022," explained a 2023 BloombergNEF analysis. Why the drop? "Some companies were accused of greenwashing after buying such offsets."**[41] And in the first half of 2023, the price of a great many carbon offsets declined sharply.[42] On May 26, 2023, *Quantum Commodity Intelligence* reported, nature-based offsets hit "**a new all-time low**" of $1/tCO2e.[43] In June 2023, *CarbonCredits.com* did an "in-depth analysis" of the collapse in prices of Nature-Based Global Emissions Offsets (NGEOs), which are "generated by projects that reduce, remove, or prevent carbon emissions through nature-based solutions," such as forest conservation or restoration projects (see chart).[44]

Exhibit 31 to Decl. of Thomas Lyon
661
**SER 74**

*Penn Center for Science, Sustainability, and the Media*                                    12



The analysis noted that "while **the prices of all voluntary market carbon offsets … have taken a beating**, the decline in NGEO prices stands out due to the premium they were trading at over the other offsets last year." Nature-based offsets "trade at a premium due to the additional co-benefits they bring, like biodiversity protection." They have been the most popular offsets, comprising 45% of all offsets in 2022. But this 90% drop in prices in just 12 months suggests that their myriad problems are making them much less attractive to corporate offset buyers and others.

## THE DOUBLE COUNTING PROBLEM

Double counting is, along with additionality, leakage, and over-crediting, one of the biggest problems offsets face—although it's much more confusing. But you can't understand the game-changing implications of the "authorized" offsets created by the Paris Agreement—or how voluntary offsets threaten that Agreement—without understanding the issue.

Double counting occurs when a project cuts emissions by, say, 10 million tons of $CO_2$ (10 MT), and the buyer of the offsets takes credit for the emissions reduction (by claiming its "net" emissions

Exhibit 31 to Decl. of Thomas Lyon

662

**SER 75**

*Penn Center for Science, Sustainability, and the Media*                                13

have dropped by 10 MT)—but the country selling the offset *also* takes credit for reducing its own total emissions (by 10 MT).[45] Thus one project that (may have) reduced global emissions by 10 MT gets counted as if it reduced global emissions by 20 MT. That's why, for an offset to be genuine, if a developing country uses a project to reduce its own officially-recognized emissions—as it invariably does—then that same project shouldn't be used to offset the buyer's emissions too.

One reason the double-counting problem took so long to address is that it's very counterintuitive. And that's because we are used to thinking in terms of buying and selling actual commodities, whereas offsets are a hypothetical reduction of a commodity—essentially a negative commodity, a theoretical cut in $CO_2$ emissions. Genuine commodities operate very differently, since buying a positive number of real items is completely different than buying a negative number of hypothetical ones.

If I have 10 oranges and you have 10 oranges, then when I sell you those 10 oranges, you have 20 oranges, and I have zero oranges. You the buyer would never let me sell you 10 fake plastic oranges—let alone sell you 2 fake oranges and claim that I was selling you 10 real ones, which is basically how the carbon offset market operates. **With real commodities, it's *caveat emptor*—the buyer is motivated to ensure the quantity and quality, even if the seller is not.**

But imagine you could sell negative oranges or the reduction in the number of oranges. If I eat my 10 oranges (taking me to zero) and then sell you 10 orange offsets, which you use to claim you also have zero oranges, then to the world we are each claiming we have zero oranges. But the total number of oranges between us is not zero—it is in fact clearly 10. We just double counted the reductions.

Now imagine the world is trying to reduce the number of oranges and that I, the seller, am a country, and you, the buyer, are a company that doesn't really care if you reduce your quantity of oranges—you only want to convince the public you have. The country is happy to sell you 10 fake plastic orange offsets—which is to say they don't actually have to consume their own oranges. Now whereas the buyer would normally ensure the quantity and quality of a real commodity, in this case the company doesn't really care whether they are getting genuine orange reductions. They just want to be able to publicly claim as many orange reductions as they can at the lowest possible price.

Now back to something the world is actually trying to eliminate—$CO_2$ emissions. The selling country also is not incentivized to care if the emissions reductions are real. And it genuinely benefits the country if they are overcounted—since the seller gets paid (per ton) as if they are real and counted correctly. But you, as the greenwashing company paying for the project, don't care either because you get to count all the non-genuine emissions reductions—at minimal cost. **In fact, you generally don't**

Exhibit 31 to Decl. of Thomas Lyon
663
**SER 76**

*Penn Center for Science, Sustainability, and the Media*                                                   14

**want to buy high-quality tons because those tons would each cost more (being higher quality), and the project's total tons would generally be lower (after correctly accounting for leakage, over-crediting, and the like).** This problem in the offset market is not new. Indeed, two decades ago, a 2001 study on forestry carbon projects explained, "**In the case of carbon offsets, both the host country and the project developer have an incentive to exaggerate their accomplishments.**"[46]

## HOW THE DOUBLE COUNTING SOLUTION CHANGES EVERYTHING

Fixing the double-counting problem was at the heart of the changes the world made at the big climate conferences in late 2021 (COP26 in Scotland) and 2022 (COP27 in Egypt).

For years the world could not agree on a new offset system because Brazil (and others) refused to fix the problem. At COP26, Brazil agreed to a fix—but with a twist, as we'll see. The fix is a type of double-entry bookkeeping called "corresponding adjustments." *SPGlobal* explained in 2021, **"the host country will have to issue a guarantee that it won't use the transferred credits against its own NDCs," Nationally Determined Contributions, the emissions reduction commitments it made under the Paris Agreement**.[47] These emissions reduction credits transferred from one country to another are called Internationally Transferred Mitigation Outcomes (ITMOs). To be an offset officially "authorized" under the Paris Agreement, its emissions reductions "can only be claimed once: either by the credit-generating country, or by the second country buying that credit from the international market."

As the journal *Science* explained, in practice this means "**The country selling emission reductions makes an addition to its emission level, and the country acquiring the emission reductions makes a subtraction.**"[48] To be clear, at the start of the transaction, the seller has *already counted* the offset reductions (say 10 million tons of CO2), thereby reducing its total emissions 10 MT. Then, after the sale, it must add back those 10 MT. **The seller must keep its official emissions total flat as if it never reduced its emissions in the first place.**

Japan's Ministry of the Environment has a good illustration (below).[49] Here, the seller transfers ITMOs (mitigation outcomes) of GHG (greenhouse gas) reductions in return for technology and finance and the like from the acquiring party to help it achieve its NDC, its Paris commitment.

Exhibit 31 to Decl. of Thomas Lyon
664
**SER 77**

*Penn Center for Science, Sustainability, and the Media* 15



On the right, the acquiring party starts with its current, real-world (pre-adjusted) emissions total (tall gray bar). Then it buys the ITMOs (in green) and subtracts them from its pre-adjusted total. That leaves it with an adjusted level (shorter gray bar on far right) that now represents its official emissions.

On the left, the transferring party had, with the help of the buyer, built some solar panels thereby reducing or avoiding emissions (in theory). So, its actual emissions level is reduced by the same amount of ITMOs to the pre-adjusted level (short gray bar on far left). But after selling those ITMOs, the seller must—to avoid double counting—correspondingly adjust its emissions level back to what it was before doing the project (the gray plus orange bar). **So, the buyer gets to pretend the reductions occurred in its country, while the seller must pretend their own emission reductions never occurred at all.**

This is confusing stuff. The Boston Consulting Group and Shell Group "conducted a worldwide survey of over 200 environmental and sustainability executives across sectors and interviewed over 20 executives in depth" for a January 2023 report on the carbon market. They found "**Companies have limited clarity on the impact of Article 6 and corresponding adjustments.**"[50] Article 6 is the part of the Paris Agreement dealing with the carbon credit and offset markets.

Does all this matter in the real world? Yes. "Transferred mitigation outcomes contribute to the NDC targets of the party that purchases the ITMO," as a UN Development Program explainer put it.[51] The seller "has to 'un-count' these mitigation outcomes from the emission reductions that contribute to its NDC targets." **Translation: The buyer just made achieving their Paris climate commitment easier, while the seller just made achieving theirs harder**—a key point we will return to.

The reason this is counterintuitive and confusing is that again we're used to buying (and selling) a quantity of real things, so we are used to tracking transactions by *adding* the quantity we bought to what we owned while *subtracting* the quantity from what the seller owned. We don't buy hypothetical

Exhibit 31 to Decl. of Thomas Lyon
665
**SER 78**

*Penn Center for Science, Sustainability, and the Media*                                                16

negative things like a carbon offset where you do the opposite—you, the buyer, *subtract* the quantity from your books, while the seller must *add back* the quantity to their books as if it never happened.

In the orange example, the double counting is avoided if I tell the world I am selling my reductions ("my mitigation outcome") to you—and so you get to subtract it from your total oranges, whereas I must add it back to my official orange total. That is, you can now say you have zero oranges (even though you actually have 10) because, from the perspective of official global accounting, I still have those 10 oranges (even though I don't because I ate them).

Back in the carbon world, if Brazil sells an authorized offset of 10 MT to the U.S., then the U.S. gets to reduce its total emissions by 10 MT, while Brazil must tell the world it is officially keeping its emissions flat (because it cut its emissions 10 MT but then had to add back an adjustment of 10 MT). **In other words, the richer country gets to pretend that the reductions occurred in their country, while the poorer country must pretend their own emissions reduction never occurred at all.**

The implications of all this are poorly understood—but huge. *Note: The world has not finalized offset rules yet and could even change the ones they've already agreed to, so any discussion of the implications is speculative. What follows should be seen as a scenario, though probably the most likely scenario if the changes made at COP26 and COP27 are maintained.*

*Also, because of the confusing and counterintuitive nature of the corresponding adjustment, the A.I. ChatGPT was asked to come up with an analogy to help explain it. That analogy is in the Appendix.*

## THE IMPLICATIONS OF THE DOUBLE COUNTING SOLUTION

The first implication is how this is going to look to the world—it is unfair. **If the developing countries let the developed ones skim off their easiest emissions reductions as lower-cost authorized offsets today, then those emission reductions never officially happened. So, to achieve their own emissions targets, they would have to make up those reductions another way in the future—most likely by buying expensive authorized offsets that other developing nations will also be bidding for. That is to say, the richer countries are paying to** *weaken* **their original climate targets while shifting the burden to the poorer countries who must** *strengthen* **their original targets. That is not climate justice.**

Dr. Barbara Haya said in 2023, "I think corresponding adjustments reveal what's wrong with the current system, but I don't think it's fair and I don't think it's what we should be doing."[52]

Exhibit 31 to Decl. of Thomas Lyon
666
**SER 79**

*Penn Center for Science, Sustainability, and the Media*                                              17

Chirag Gajjar, former head of subnational climate action at the global think tank World Resources Institute, India, was interviewed in 2022 on this subject: "**The developed countries will get away buying the cheap credits. They will continue to maintain the emissions they have. Whereas, the burden of emission reduction will be on vulnerable countries of the developing world, he added.**"[53] In March 2023, Gajjar said he stands by those comments and added, "a lot of people [from developing countries] shared similar concerns" after Glasgow (COP26).[54]

"The demand for corresponding adjustments is outright patronizing and fails to recognize the real needs of developing countries," wrote Sandeep Roy Choudhury, Co-Chair of the International Carbon Reduction and Offset Alliance in June 2021.[55] **"Corresponding adjustments cement existing power structures and frustrate emerging calls for climate justice." He notes, "The result is as it always has been: The developed world sets the rules, and the rest of the world is forced to accept the bent logic supporting them."**

A second implication: Developing countries may choose not to sell authorized offsets, in part because it would make the cost of abating their own emissions higher. As Pedro Moura Costa explains in a September 2022 article in *Environmental Finance*, "because of the effect of corresponding adjustments on the marginal abatement costs to the host countries, many countries may refrain to engage in emissions trading."[56] Costa is Executive Director of BVRio, a Brazil-based nonprofit with a trading platform for environmental credits.[57]

As far back as 2014, an analysis by Stockholm Environment Institute commissioned by the Swiss Federal Office for the Environment concluded that in the real world any transaction of this kind is likely to be unpopular: "Agreeing domestically on mitigation pledges is often a long and difficult political process, and any adjustments to agreed pledges in order to compensate for double counting may be politically controversial. **In our assessment, it is thus politically unlikely that countries would adjust their pledges to correct for double counting**."[58]

The nonprofit *Ecosystems Marketplace*, in a November 2021 explainer on Glasgow (COP 26), noted, "**Many developing countries, however, say they don't want to transfer emission reductions abroad.**"[59] The article also said, "In the lead-up to the signing of the Paris Agreement in 2015, **many developing countries were surprised to learn they'd have to transfer their emission reductions abroad if selling ITMOs, and few have done so.**"

A great many developing countries will probably just keep those emissions reductions for themselves, rather than selling them off. And that's the twist: Brazil insisted developing countries must

Exhibit 31 to Decl. of Thomas Lyon
667
**SER 80**

*Penn Center for Science, Sustainability, and the Media*                                    18

have a choice as to whether they keep the emissions reductions or give them to the buyer as an authorized offset. But again, why would a poorer country give up its own emissions reductions—effectively increasing its original $CO_2$ emissions reduction pledge? This seems politically unlikely—especially at current offset prices.

**So, the third implication is that if any such transactions do occur, these authorized offsets will not be low cost**. In fact, they will probably be quite expensive, as explained in a detailed 2023 World Bank analysis, "Corresponding Adjustment and Pricing of Mitigation Outcomes" (see below).[60]

In 2023, a great many voluntary carbon offsets are under $3 a ton of $CO_2$, and the weighted average is below $5.[61] By comparison, the $CO_2$ price that must be paid in perhaps the most credible regulated market—the EU's European Trading System—was $80 to $100 a ton in June 2023. That is the price Germany would pay to buy a permit (or allowance) equal to a ton of $CO_2$ emissions from France. It is essentially the marginal cost of reducing one ton of $CO_2$ emissions in the EU today.

Offsets being inexpensive is not inherent to their nature. "As a general rule, the lower the price, the lower and more dubious the quality," noted Michael Sheldrick, cofounder and policy chief at Global Citizen, in *Forbes* in November 2022.[62] In explaining "how worthless a lot of" offsets are, Stefan Reichelstein, Stanford Business professor emeritus of accounting, said in 2022, "Believe me, you can't really eliminate a ton of carbon for $3."[63] **Offsets are very low cost now because the large majority, as Dr. Haya and others have said, are not real or are significantly overcounted—or both.** That's why many actors in the voluntary market have started to move away from calling them offsets or using them to claim their own emissions cuts, as we've seen.

Indeed, at COP27 in Egypt in 2022, the world adopted "a new kind of carbon credit in the centralised carbon market for companies and governments under Article 6.4," of the Paris Agreement, as *Carbon Market Watch* explained.[64] It's called a "mitigation contribution emission reduction" (MCER), and it's similar to what the Gold Standard now calls an "impact claim" or "contribution claim." That is, "**Companies purchasing these contribution credits must not claim the emission reductions they represent to offset their own pollution because the underlying mitigation will continue to count towards the climate target of the country where the climate project(s) are based.**"

Once these rules are finalized, we could have multiple tradeable products. One is an "authorized" offset that does avoid double counting and can be used to reduce the buyer's total official emissions—whereas the MCER and voluntary credit do not and cannot. It's unclear why voluntary credits would cost much more than they do now once they become officially unauthorized. They might even be

Exhibit 31 to Decl. of Thomas Lyon
668
**SER 81**

*Penn Center for Science, Sustainability, and the Media*                                    19

cheaper once it's clearer to all they don't represent a sale of real and credible emission reductions anymore. The reputational risks to buyers of greenwashing offsets are already rising (see next section). The MCER might be higher cost since it could be perceived as higher quality than the voluntary credit— even if it is not. Also, it's not clear why the world needs another category of unauthorized offset—such as the Bezos Earth Fund, Rockefeller Foundation, and U.S. State Department proposed in 2022.

There may well be a bifurcated market as many have pointed out. The price disparity between the authorized offset and the MCER (and voluntary offset) should be significant because, if it weren't, everyone would simply buy the authorized offset.

Beyond being formally recognized by the U.N. and world, authorized offsets will have another advantage over typical offsets—higher quality and more accurately counted tons. **In the vast majority of offset programs both the buyer and the seller are incentivized to downplay issues of quality and overestimate CO$_2$ reductions,** as we've seen**.** In the authorized market, the buyer still has little reason to care about quality. They still want maximum tons at a minimum cost. But now the seller is highly motivated not to overcount the tons or sell tons that aren't additional or might leak. Every ton they sell is a ton that they don't get to count toward meeting their own climate goals and that they will probably have to make up at some point in the future when tons are much more expensive. So, they wouldn't want to overestimate emissions reductions or sell reductions that would have happened anyway.

## HOW THE VOLUNTARY MARKET THREATENS THE PARIS AGREEMENT

There is one more reason why offsets with corresponding adjustments will be in higher demand: Many corporate and other buyers in the voluntary carbon market (VCM) will be very interested in them. Indeed, for years a number of researchers and VCM participants have expressed concern that voluntary offsets without a corresponding adjustment could actually threaten the credibility of the VCM and undermine the Paris Agreement.

A 2021 synthesis article and literature review, "Caught in between: credibility and feasibility of the voluntary carbon market post-2020," has an extensive discussion of this issue.[65] The authors conclude that the VCM "has not yet found a way to align itself with the new legal architecture of the Paris Agreement in a credible and legitimate way." The article explains:

"Mitigation activities implemented within the capped environment contribute (at least in theory) automatically towards the achievement of the host Party's NDC. The mitigation outcomes generated by a mitigation activity would be claimed against the national target. **If the same mitigation outcomes are also claimed on the demand side by the investor (another country**

Exhibit 31 to Decl. of Thomas Lyon
669
**SER 82**

*Penn Center for Science, Sustainability, and the Media*                                           20

**or a private sector actor) of the mitigation activity, there would be double claiming, which is considered one form of double counting in the academic literature**."

These concerns about double claiming and its potential impact on the credibility of the voluntary market were raised by the same authors in a 2016 report just a year after the Paris Agreement was signed.[66]

As we've seen, at COP 26 in Glasgow the world agreed to put in place the "corresponding adjustment" to solve the double counting problem in the Paris compliance market for countries. Left unanswered, though, is how the VCM would solve the double claiming problem. Some involved in the VCM want to treat this as a non-problem, maintain the status quo, and allow companies to buy offsets without the corresponding adjustment—which they would use to claim they had lowered their net emissions even as the host country claimed those reductions in its official emissions inventory effectively using them to achieve its NDC. Others argue a corresponding adjustment is needed.

The authors point out the "risk" that a failure to resolve this debate consistently could create "a race to the bottom in which the voluntary carbon market undermines the objectives of the Paris Agreement instead of supporting the required transformational change." After analyzing articles and reports on the debate and on various solutions proposed, the authors conclude, "**Finally, we deem that *NDC crediting with corresponding adjustments* is the only solution that strengthens and protects the legitimacy of using carbon credits for offsetting in the context of carbon neutrality targets while ensuring a high degree of environmental integrity**."

A 2022 analysis from the University of Edinburgh Business School also examines the debate in detail and concludes, "We find that the arguments against corresponding adjustments do not address the fundamental requirement that voluntary offsets must achieve a lower level of emissions than would have happened anyway." The authors also address the issue of whether this problem should be called "double counting" or something else. They argue that what it is called is a semantic issue, but the problem itself "is whether an offset project reduces emissions below what would have happened anyway."[67]

How could double claimed offsets undermine the Paris agreement as well as the legitimacy of voluntary offsets and the VCM? *Carbon Market Watch* examines that question in a December 2022 article, "**Was COP27 the beginning of the end for corporate offsetting?**"[68] They note that this double counting/claiming "is problematic, including on the voluntary market, since it can displace or delay climate action. **A country may no longer implement emissions reductions they would have normally carried out, if they can still count them after they've been sold to someone else (who also counts**

Exhibit 31 to Decl. of Thomas Lyon

670

**SER 83**

*Penn Center for Science, Sustainability, and the Media*                                                21

**them).**" That is, countries will be in no hurry to spend their own money to reduce emissions to meet their NDCs if they can just wait long enough until some company pays them to make that reduction.

"**When double counting displaces climate action, it undermines the core promise that a carbon credit must always unlock additional mitigation,**" writes *Carbon Market Watch*. "**This means that any offset claims based on double-counted credits are unreliable and inappropriate. Not all claims will be false, but the promise that they are right is no longer strong enough.**"

Finally, for VCM buyers who don't want to pay for a corresponding adjustment, *Carbon Market Watch* endorses the solution that came out of COP27, the "mitigation contribution" discussed earlier. This new designation the world agreed to in Egypt "sends a strong reminder to companies and wider voluntary carbon market actors that an alternative to offsetting is not only possible but even better."

The Gold Standard takes a similar approach—and, as we've seen, has already been urging buyers to treat their credits as impact claims or contribution claims, which cannot be used to offset the buyers' emissions. Their 2020 report on the "Post-2020 Voluntary Carbon Market," explains that **"without Corresponding Adjustments, it is difficult to be certain there is no double claiming" because it is "challenging to be sure that the impact of a carbon credit has not inadvertently displaced an equivalent impact for which the host country has stated targets."**[69] A December 2021 post titled, "Why does Gold Standard believe that Corresponding Adjustments are needed for offsetting claims in the future?" states that if such displacement were to occur then**, "the underlying premise of the offset claim—that the atmosphere is no worse off—is no longer assured, as the underlying emission impact has replaced rather than added to abatement that would otherwise have happened."**[70]

A 2020 report for the German Environment Agency, "Future role for voluntary carbon markets in the Paris era," raises very similar concerns:

A critical focus is whether and how 'double counting' of emission reductions—using the same emission reduction for voluntary offsetting and to achieve a country's target under the Paris Agreement—is avoided. **We show that, where there is a risk that the same emission reduction outcome could be claimed more than once, the impact of voluntary engagement in carbon markets could be negligible, or even lead to an overall negative climate impact**.[71]

The "only solution" to all of these risks, according to the 2021 synthesis article, is for any offset that helps a developing country achieve its NDC to include a corresponding adjustment. "If, however, the main actors in the voluntary carbon market do not unite behind an approach based on corresponding adjustments, they risk losing ground altogether." If that happens, the authors conclude, **"the voluntary carbon market may become obsolete or worse, a threat to effective climate change mitigation**."

Exhibit 31 to Decl. of Thomas Lyon
671
**SER 84**

*Penn Center for Science, Sustainability, and the Media*                                                22

## MICROSOFT, THE DANISH GOVERNMENT, AND DOUBLE CLAIMING

A May 2023 deal involving Microsoft, the Danish government, and Ørsted Bioenergy & Thermal Power exemplifies the challenges that even the best corporations face when they do offset deals. Microsoft has "committed to one of the country's most ambitious corporate carbon-cutting programs," as *National Geographic* noted in 2022.[72] On May 15, 2023, *Bloomberg* published an article headlined, "Microsoft Inks Deal to Pay for $CO_2$ Stored Below the Sea."[73] It begins, "Microsoft Corp. is buying credits for $CO_2$ captured at two Danish power plants and then stored beneath the North Sea." The article then explains, "The tech giant's deal with Orsted A/S helped the utility in its bid to secure backing from the Danish government to trap $CO_2$ from the biomass-fired power stations."

But then the article states: "Orsted will be paid by the Danish government for every metric ton of CO2 that it stores, with a target to trap 430,000 tons a year. Additionally, Microsoft agreed to buy credits for 2.76 million tons of carbon removal over a period of 11 years." So, if everything works as planned, Microsoft will be buying 250,000 tons of carbon removal a year out of the 430,000 tons trapped. And yet the Danish government is itself going to pay for every metric ton stored.

**This story seemed to suggest that the Danish government was buying the 430,000 tons of removal a year, but Microsoft was also buying more than half of *the exact same tons*.** (The issue of whether such bioenergy with carbon capture and storage—BECCS—offsets are sustainable and scalable will be addressed in a forthcoming report.)

The Danish Energy Agency (DEA), which is part of their Ministry of Climate, Energy and Utilities, put out a press release on the project the same day.[74] The release quotes DEA Deputy Director Mogens Hagelskær: "Ørsted has offered capture and storage of 430,000 tonnes of $CO_2$ annually from 2026 and guaranteed a start-up of CCS in 2025. This brings Denmark closer to the climate goals, and it even goes a little further than the political agreement requires." The release explains the money came from a special subsidy fund: "The CCUS subsidy scheme (carbon capture, usage, and storage) with a total of DKK 16 billion was adopted with the Climate Agreement on energy and industry etc. from 2020." The release also notes, "The aid will be paid out per tonne of $CO_2$ reduced."

In other words, using a special fund designed to subsidize CCUS, the Danish government will be paying money for each of the 430,000 tonnes captured every year and claiming all those tons for itself to achieve its climate goals. **The Danish Energy Agency release makes no mention of Microsoft**.

Exhibit 31 to Decl. of Thomas Lyon
672
**SER 85**

*Penn Center for Science, Sustainability, and the Media*                                                 23

The Ørsted press release from May 15 quotes Ole Thomsen, Senior Vice President and Head of Ørsted's Bioenergy business, saying "our CCS project will contribute significantly to realising the politically decided Danish climate targets for 2025 and 2030."[75]

Since this seemed like a clear-cut case of Microsoft claiming most of the same tons the Danish government was claiming, I wrote emails to the tech giant, to Ørsted's Thomsen, and to DEA Deputy Director Hagelskær. I asked the DEA if they were paying for all 430,000 annual tonnes and claiming them all—and if so, wasn't this double claiming given that Microsoft was claiming 250,000 of those annual tons at the same time. Henrik Sulsbrück, Head of Division of the DEA's CCS Center responded, "On behalf of Mogens Hagelskær." He argued that Denmark's national greenhouse gas (GHG) registry is completely different from "the trade of voluntary $CO_2$ credits, in which the Danish government is not involved." The body of his argument is worth quoting at length:

> Hence, in the case of Ørsted deal, the reductions obtained by the CCS project will be accounted for in the Danish national GHG inventory, which has been the main purpose of the subsidy scheme.

> Neither the Danish Energy Agency nor the Danish State is involved in the deal between Microsoft and Ørsted.

> However, the claiming of the credits under the voluntary scheme will not affect the site-specific emissions from neither the seller nor the buyer of the certificates, as the specific emissions from the buying party are reported as emissions in the national GHG inventories.

> As the national GHG inventories and the voluntary $CO_2$ credit market are two separate accounting systems, we do not consider that the agreement entered by Ørsted and Microsoft lead to double claiming.

This is a position held by many, but as discussed in the previous section, whether you call it double claiming or not, if this type of approach to offsets were widely adopted it would undermine both the integrity of the voluntary market and the Paris Agreement. Also, it seems problematic on its face. **How can Microsoft acquire the same tons in the VCM that the Danish government has already legally acquired and plans to account for in its official national GHG inventory?**

I asked Auden Schendler, Senior VP for Sustainability at Aspen Skiing Company for his thoughts on this deal. Schendler, an expert on offsets who has published articles on them in *the New York Times*[76] and elsewhere, replied: "**This is complicated, yes, but it's also incredibly simple. Only one entity can claim carbon reduction. The second claimant is just practicing PR**. Microsoft's

Exhibit 31 to Decl. of Thomas Lyon
673
**SER 86**

*Penn Center for Science, Sustainability, and the Media*                                        24

contribution may well be helpful, in that they inject money into a system that cuts emissions. But that can't result in a carbon reduction claim if Denmark is officially claiming the reductions."

Ørsted confirmed in its response that the project "will capture and store approx. 430,000 tonnes of biogenic $CO_2$ every year," and that the Danish government has a 20-year contract to acquire those, while Microsoft "has agreed to buy credits for 2.76 million tons of carbon removal over a period of 11 years." Ørsted explains:

> Due to the funding pledged by the Danish state to help make this project a reality, the Danish state will include these removals in its national carbon accounting and in the Nationally Determined Contribution (NDC) of the European Union. Due to the funding pledged by Microsoft to help make this project a reality, Microsoft also plans to include these carbon removals in its own private-sector carbon accounting in support of its commitment to be carbon negative by 2030.

> Both public-sector and private-sector funding was required to realize the project, and the parallel national and private-sector, non-conflicting claims to the carbon outcome are in line with the goals of the Paris Agreement and are an important component of rapidly scaling the carbon removal industry. National and corporate greenhouse gas inventories are two separate inventory systems – just as fossil emissions count in both systems today.

It is true that there are two separate inventory systems for tracking fossil fuel emissions. But that doesn't change the fact that Orsted is selling Microsoft the exact same tons in the voluntary market system that it has already sold to the Danish government in the official national accounting system that will track the country's progress on its Paris climate targets. As Schendler says, in this scenario the Microsoft claim is just public relations.

Since Microsoft had not yet replied, I re-sent the original note but added that the Danish government did confirm that they were claiming all 430,000 tons a year for their national GHG registry, which meant the tech giant was claiming 250,000 tons a year that the Danish government was already claiming. A few days later, I sent them a draft of the previous section, which examines why many experts believe that if such deals became standard practice, it would undermine both the VCM and Paris. I pointed out that if Microsoft wanted to maintain their investment in support of the deal, then all they had to do was call it a contribution claim or an impact claim as the Gold Standard is doing, or call it a mitigation contribution, as the nations of the world agreed to do for the Paris compliance market in Egypt (COP27)—but that would mean not using this deal to offset any of the company's emissions.

Exhibit 31 to Decl. of Thomas Lyon

674

*Penn Center for Science, Sustainability, and the Media*                                    25

**Microsoft did not respond to requests for comment.**

Significantly, this type of deal—where the host country officially claims the CO2 reductions (as part of its Paris commitments) but so does a corporation (in the voluntary market)—is not expressly disallowed under the Paris Agreement, at least not yet. And essentially anything is allowed on the unregulated voluntary market as previously noted. Because of the threat double claiming poses to the Paris Agreement discussed in the previous section—and because it's not clear that the VCM can or will try to enforce any self-regulation—it will be up to the nations of the world to fix this problem, ideally at COP28 in Dubai in December 2023 or as soon as possible after that.

In the meantime, do leading companies really want to risk the reputational damage that could come from engaging in such a problematic offset deal and from being seen as embracing, endorsing, and advancing a transaction that could potentially undermine the Paris Climate Agreement? Instead, most companies whose goal is to help the world achieve the Paris goal of averting catastrophic climate change are likely to prefer offsets with corresponding adjustments.

## RISING CORPORATE REPUTATIONAL—AND LEGAL—RISKS

Once the compliance offset market for Paris is in place, purchasing a voluntary offset without a corresponding adjustment may increase the reputational risks companies are already taking using the VCM. And reputational risks from buying offsets have already started rising sharply.

**"Carbon offsets present an emerging risk to advertisers,"** explained a February 2023 article in *The Drum*, a global publisher for media and marketing companies.[77] **"Bad practice and questionable science in the voluntary carbon markets mean firms relying on offsetting to hit net zero targets risk greenwashing–and the law might be coming for them."** We've already seen the Swiss regulatory agency rebuke FIFA for claiming the 2022 World Cup was "carbon-neutral." We've seen major investigative reports call into question the integrity of large numbers of offsets purchased by companies like Disney and Shell.

In June 2022, the Dutch Advertising Code Committee "ruled for the fourth time this year that an ad campaign by Shell Plc about its efforts to reduce carbon-dioxide emissions is misleading and must be pulled from circulation," as *Bloomberg* reported that month.[78] In September 2022, the global law firm Quinn Emanuel issued a 9-page memo to its clients titled, **"Carbon Offsets: A Coming Wave of Litigation?"**[79] The firm, which has over 1000 lawyers operating in 12 countries, cited a variety of different offset-related lawsuits. It explained, "**The VCM's lack of oversight, combined with the**

Exhibit 31 to Decl. of Thomas Lyon
675
**SER 88**

*Penn Center for Science, Sustainability, and the Media*                                        26

**difficulty in accurately measuring the impact of carbon offsets, makes it ripe for litigation**." This is particularly the case because "Regulators, investors, and NGOs are increasingly scrutinizing the quality of offsets used by companies to meet 'net zero' goals."

In October 2022, *FoodNavigator*, an online news source for the food industry, posed the headline question, "**Will 'carbon neutral' claims land brands in legal hot water?**"[80] The story concerned a proposed class action lawsuit filed against Danone Waters of America in the Southern District of New York that asserted Evian bottled water "is not 'carbon neutral' based on how a reasonable consumer would understand the term." Evian, which uses offsets, had been independently certified as carbon neutral in 2020 by the Carbon Trust.

David Kwasniewski, a partner at a U.S. litigation and corporate law firm, told *FoodNavigator*, "**Even with a third-party certifier that is truly independent and objective, that is not going to be sufficient to prevent some plaintiffs' lawyers from making an argument that consumers believe neutrality means something other than what that third party body says," he stated. "So I think right now, these things are very risky and will be challenging to defend.**" He noted that lawsuits alleging greenwashing are growing in number. Perkins Coie, with 1200 lawyers in the US and Asia, reports that lawsuits challenging a company's sustainability or environmental practices have risen sharply. There were 3 in 2017, while the two-year period of 2021 to 2022 saw 61.[81]

In a 2022 *Bloomberg* piece, "This Timber Company Sold Millions of Dollars of Useless Carbon Offsets," Robert Mendelsohn, professor of forest policy and economics at Yale, said, "**There's a distinct possibility that a great deal of existing carbon offsets are effectively fake.**"[82] In May 2023, United Airlines CEO Scott Kirby told Politico that one reason he is against carbon offsets is, "the majority of them are fraud."[83]

The same month, Delta was sued in federal court over its claim to be "the world's first carbon-neutral airline," which plaintiffs say is "false and misleading." The *Guardian* notes, "The class-action lawsuit says Delta's carbon neutrality claim is demonstrably false as it heavily relies on junk offsets that do nothing to counteract the climate crisis."[84] The lawsuit alleges that "offsets purchased by and relied upon by Defendant" are "replete" with "non-additional effects on worldwide carbon levels due to the vendors crediting offsets for projects that would have occurred with or without offset market investment" and "non-immediate speculative emissions reductions that will at best occur over decades, despite crediting purchasers with the sum of those projected offsets" and "impermanent projects subject

Exhibit 31 to Decl. of Thomas Lyon
676
**SER 89**

*Penn Center for Science, Sustainability, and the Media*                                                    27

to disease, natural disasters, and human intervention."[85] The lawsuit sites scientific studies, government regulators, and investigative journalism reports to defend its claims.

A spokesperson for Delta said: "This lawsuit is without legal merit. Delta is a vigorous advocate for more sustainable aviation, adopting industry-leading climate goals as we work towards achieving net-zero carbon emissions by 2050. Delta committed to carbon neutrality in March 2020, and since 31 March 2022, has fully transitioned its focus away from carbon offsets toward decarbonisation of our operations, focusing our efforts on investing in sustainable aviation fuel, renewing our fleet for more fuel-efficient aircraft and implementing operational efficiencies."[86]

**Although Delta says that since March 31, 2022 it "has fully transitioned its focus away from carbon offsets," Delta's own *2022 ESG Report*, published April 2023, does not appear to support such a statement**.[87] For instance, Delta pledged to invest $1 billion by 2030 to become the world's first carbon neutral airline. The *2022 ESG Report* explains that Delta purchased $116 million of carbon offsets in 2022, adding "We expect much of the remaining investment to support our goal to spend $1 billion through the end of 2030 toward airline decarbonization focusing on solutions other than offsets." Why did Delta choose the word "much" here, which isn't even as strong as "most"? In any case, "all" is the word that would be consistent with the claim that Delta has "fully transitioned" away from offsets.

The report's section on offsets states, "Offsets will play a role in compliance with the global CORSIA scheme and ultimately achieving net-zero by 2050." CORSIA is the International Carbon Offsetting and Reduction Scheme for International Aviation agreement. CORSIA has been widely criticized by the European Commission[88] and others for having "major flaws in the scheme," as well as "questionable quality of offsets" and "having issues with double counting."[89] As for their value, *Quantum Commodity Intelligence* reported on May 16, 2023, "The spot Corsia-Eligible Offset (CEO) price fell below the $1/tCO2e mark for the first time since January 2021."[90]

If the risk to companies from buying traditional offsets and using phrases like "carbon neutral" continues to rise, then the price of voluntary offsets without the adjustment will most likely continue its recent decline while the price of an offset with one will likely be quite high when it becomes available.


## JUST HOW EXPENSIVE COULD AUTHORIZED OFFSETS BE?

So, what might higher quality authorized offsets cost in the coming years? The $80 to $100 price of one of the highest quality official tons today is a plausible guess. Authorized tons *should* reflect the

Exhibit 31 to Decl. of Thomas Lyon
677
**SER 90**

*Penn Center for Science, Sustainability, and the Media*                                            28

future price of the more expensive credits or offsets or permits developing countries will otherwise have to buy if they sell off their easier emissions reductions now as inexpensive offsets.

The problem, as Pedro Moura Costa explained in his 2022 *Environmental Finance* article, is that outside "investors usually look for low-cost mitigation options," when they fund projects for the purpose of reducing developing country emissions that are then sold off to a developed country as an official offset.[91] That leaves a host country with higher-cost options for reducing its own emissions. "The result is that the overall cost of meeting NDCs will increase at the national economy level."

As the 2023 World Bank report explained, **this extra burden means host countries will need to charge significant "Corresponding Adjustment fees well above US$25/tCO₂e *in addition* to the cost of the emission reduction credits."**[92] Also, the credits themselves will cost more than typical offsets because, as noted, they should be much higher quality and include fewer over-credited tons (although the UN has not yet demonstrated it can create such an improved program, as discussed below). The combined price of the fee and the unit cost of these credits could be substantial.

**The Bank report suggests that this combined price would be the minimum or floor price the host country could consider for the actual price of the Internationally Transferred Mitigation Outcomes** (ITMOs)—and that the fee would be the marginal cost to the host country of achieving its 2030 NDC pledge.[93]

Why is it the floor price? "The actual price will in practice be determined based on negotiation between the seller and buyer countries in relation to many factors including the quality of the credits, underlying category of the project (e.g., sector, technology) and so on," explains the Bank report. **The negotiated price "will also be determined by the buyer's willingness to pay which, in turn, will be influenced by the marginal costs of the buyer's NDC. This means that the price of ITMO will be determined at some level between these two."**

The report contains a list of the marginal costs for achieving the 2030 NDCs of various developed countries (buyers) and developing country regions (hosts) derived from a dynamic model used to explore climate policies. Most of the host regions have marginal costs ranging from $31 and $78 per ton of $CO_2$, but some are much lower. As expected, **the marginal cost for major developed countries of achieving their 2030 NDCs is considerably higher, $129 per ton for the EU and $155 for the United States**.

Significantly, we are in a world that must get emissions down to near zero—a world with far fewer "negative emissions" (tons of carbon removal) available than are widely expected, as discussed

Exhibit 31 to Decl. of Thomas Lyon
678
**SER 91**

*Penn Center for Science, Sustainability, and the Media*                                      29

below. This means the price of authorized offsets that are truly additional, unleaky, not over-credited, and so on should be closer to the high marginal cost of the buyer's NDC than the lower marginal cost in the host country. If it weren't, then the developed country buyers would increase their demand for authorized offsets from the developing country sellers and bid up their price until it was—or the big developing countries would form a cartel to achieve the same thing.[94]

Already, developing countries are adopting new regulations for the carbon credit market, in part so that they can get a piece of the coming demand for higher priced offsets. For instance, in May 2023, *Bloomberg* reported that "**Zimbabwe's government said it will take control of the production of carbon credits in the country, stipulating that it will be entitled to half of the revenue from the securities**."[95] Foreign investors will be limited to 30% of the revenues, while local investors will get at least 20%. The information minister said that all previous agreements signed with international agencies and groups are now "null and void." The legal consulting firm HFW has labeled this kind of "legislative upheaval" in host countries over carbon markets a "Nationalisation Risk."[96] If such new legislation becomes commonplace in host countries, that should further drive up the price of all offsets.

So, the cost of an authorized offset could well be considerably above $100 per ton. How high could it go? Consider what happens if the authorized offset market moves toward a focus on "high quality carbon removals"? That's what SBTi and others propose for the voluntary carbon market. In one of its three 2023 scenarios of a possible future market—a world where only carbon removal offsets count—BloombergNEF projects the offset price hitting $200 a ton in the early 2030s, as expensive direct air carbon capture and storage systems (DACCS) drive the price.[97]

Finally, the World Bank's analysis reveals a potentially perverse outcome from authorized offsets. Authorized offsets increase the cost to a seller of meeting its NDC. So why would developing countries sellers want to increase that burden even more by adopting an ambitious NDC to start with?[98] **As Pedro Moura Costa explained in March 2022, "in essence, host countries are disincentivised to adopt ambitious NDCs**."[99] And so this yet another threat that offsets pose to the Paris agreement.

## IF THE GOAL IS ZERO EMISSIONS, WHAT ARE OFFSETS FOR?

In today's world, much of the original rationale for offsets no longer holds. Confusion has arisen in part because emissions trading and offsets developed in a world where companies or countries did not have to go to zero.

Exhibit 31 to Decl. of Thomas Lyon
679

*Penn Center for Science, Sustainability, and the Media*        30

Corporate emissions trading was popularized in the U.S. acid rain program where sulfur dioxide (SO2) was traded under a cap that was phased in—with the final 2010 cap set at "a level of about one-half of the emissions from the power sector in 1980," the EPA explains.[100] To oversimplify, imagine every company had to reduce emissions 50%. The idea was that one company might find it much cheaper to cut its emissions 60% than it would cost another to cut its emissions beyond 40%. In this world, it is economically efficient—it reduces the total amount of money spent to comply with the program—to allow the first company to sell its excess reductions to the second one. That's a key reason economists and businesses liked trading. **But if every company had to reduce its own emissions to zero, trading would have far less purpose and perhaps none at all—after all, each company needs credit for all of its reductions to get to zero. Selling them would be self-defeating.**

Similarly, when the first big official offset program was created, the Clean Development Mechanism, it was for a climate treaty (the Kyoto Protocol) where the richer countries had to cut their emissions under a modest cap. In a world where all countries had to cut their emissions by amounts not close to 100%, offsets could theoretically bring efficiency and lower costs if they were additional and permanent and so on. In the case of CDM, however, the poorer countries did not have an emissions cap, which meant that the CDM as a whole was not likely to accomplish much. **As the Environmental Defense Fund explained in a 2018 report, "Under the current CDM design," it is "a mechanism that … does not reduce global emissions."**[101]

When the world realized in the mid-to-late 2010s that it had to take total emissions as close to zero as possible by around mid-century, suddenly offsets also didn't have as much purpose. Why wasn't that obvious at the time? Most of the offsets were artificially cheap since the large majority were significantly overcounted or not real or both. So, **it *seemed* like there was a bonanza of inexpensive offset tons that richer countries could buy from poorer ones to save themselves the effort and cost of reducing their own emissions. But there wasn't. Genuine, additional offsets that were not double counted were always going to be much pricier.** And that means on the path to global net zero, selling off your easiest emission reductions cheaply now is a counterproductive policy.

That's especially true because it is unlikely there will be an abundance of affordable negative emissions—genuine, inexpensive carbon removal tons—to purchase in the future.

Exhibit 31 to Decl. of Thomas Lyon
680
**SER 93**

*Penn Center for Science, Sustainability, and the Media*                                                31

## THE PROBLEMS WITH CARBON REMOVAL TECHNOLOGIES

As emissions kept rising over the past two decades, many climate modelers realized just how challenging getting close to zero would be for the world. So, they added in some negative emissions strategies that were not close to being commercial and scalable. Now instead of getting to zero, we only had to get to "net zero."

Many modelers added vast gigatons of negative emissions from carbon removal by bioenergy with carbon capture and storage (BECCS) and direct air carbon capture and storage (DACCS). Carbon capture and storage (CCS) by itself does not remove carbon from the atmosphere but only reduces the amount that gets into it in the first place. But over the past decade, reality set in (as discussed in forthcoming reports on the challenges facing BECCS and DACCS, briefly summarized below).

First, it became clear that simply adding a CCS system—which recovers $CO_2$ from industrial facilities and buries it underground—to a coal or gas power plant was challenging. In its 2022 assessment of climate mitigation strategies, the UN Intergovernmental Panel on Climate Change (IPCC) concluded that "Implementation of CCS currently faces technological, economic, institutional, ecological-environmental and socio-cultural barriers."[102] This conclusion was signed off on by all the nations of the world. The U.S. will be spending billions of dollars on CCS under the 2021 Bipartisan Infrastructure Law and 2022 Inflation Reduction Act (IRA) to help fossil fuel companies and others address these challenges.

Second, BECCS—using biomass to remove $CO_2$ from the air and adding a CCS system to a bioenergy plant to capture and bury the $CO_2$—is more challenging and problematic than fossil fuel CCS. **A growing number of scientists and peer-reviewed articles cast doubt on whether BECCS could truly scale.** And indeed, the IPCC scaled back its use of BECCS in its 2022 report, noting "**BECCS is not projected to be widely implemented for several decades.**"

**Many studies also make the case BECCS would not actually generate significant negative emissions by 2050 if ever—particularly compared to the increasingly low-carbon power plants it will be competing against.** Most lifecycle analyses (LCAs) of bioenergy emissions do this calculation incorrectly. They compare the biopower plant's emissions to that of a coal plant, rather than, say, the average new plant being built.[103] Also, most LCAs leave out key variables, including a full accounting of the greenhouse gas emissions related to land-use impacts of BECCS. **The true cost per ton of $CO_2$ removed by BECCS will likely be hundreds of dollars per ton.**

Exhibit 31 to Decl. of Thomas Lyon

681

**SER 94**

*Penn Center for Science, Sustainability, and the Media*                                    32

But while scaling up BECCS has little if any benefit, it has a huge opportunity cost—the tremendous amount of water and land needed for bioenergy could have been used for something better. In particular, our world is running short on unused land—land that will be needed to feed everyone in 2050, to provide the wood products they want, and to plant the vast number of trees that are currently in the emissions reduction plans of every major country and company, as discussed below. For the foreseeable future, **studies find that rather than putting CCS systems on existing (or new) biomass plants, putting them on existing (or new) fossil fuel plants would achieve far more reductions for far less money.**[104] It would also preserve large amounts of land and water for better uses.

Third, DACCS, which pulls $CO_2$ directly out of the air and then buries it, is more challenging than BECCS. Because $CO_2$ in the air is so diluted—420 parts per million—capturing it is expensive and energy intensive. The overall efficiency of this process is low, in the range of 5% to 10% according to the National Academy of Sciences.[105] To actually reduce emissions, DACCS must run on large amounts of carbon-free power (such as renewables). Studies have found that until a region's electricity system is virtually decarbonized, dedicating carbon-free power to DACCS is a costly way to reduce emissions. The opportunity cost of not using those renewables to first reduce $CO_2$ emissions instead is large.

Per ton of $CO_2$ captured and stored, current DACCS costs range from several hundreds of dollars to $1000 or more. ***Bloomberg* reports that at a June 2023 Direct Air Capture Summit hosted by industry leader Climeworks, the company's co-founder and co-CEO Jan Wurzbacher "told the crowd his company could see its prices remain as high as $300 by 2050."[106]**

**The models in the 2022 IPCC mitigation report contain little DACCS by 2050.**

Finally, consider the scale required for BECCS and DACCS to sequester just 3 billion tons (Gt) of $CO_2$ a year *combined*—only 6% of total global greenhouse gas emissions. That would require capturing, transporting, and storing a volume of compressed $CO_2$ greater than the more than 90 million barrels of oil a day extracted by the global oil industry, which took a century to develop. As one expert put it, "**Needless to say, such a technical feat could not be accomplished within a single generation**."[107] Achieving it by 2050 would be exceedingly difficult and yet still leave us 47 billion tons of $CO_2$ equivalent emissions a year to deal with. **Again, for the foreseeable future, the best use of CCS technology (including infrastructure like pipelines) is for fossil fuel plants.**

"A United Nations panel is casting doubt on the promise of using machines to remove vast amounts of carbon dioxide from the air and sea in order to fight climate change," reported *Climate Wire* in May 2023.[108] "**Engineering-based removal activities are technologically and economically**

Exhibit 31 to Decl. of Thomas Lyon
682
**SER 95**

*Penn Center for Science, Sustainability, and the Media*                                                    33

**unproven, especially at scale, and pose unknown environmental and social risks**," wrote the panel supervising the set-up of the carbon trading and offset system under Article 6.4 of the Paris Agreement.[109] The 96-page Information note also states, "**These activities do not contribute to sustainable development, are not suitable for implementation in the developing countries and do not contribute to reducing the global mitigation costs, and therefore do not serve any of the objectives of the Article 6.4 mechanism**." A letter organized by the Carbon Business Council, a trade association, signed by over a hundred executives and experts in carbon removal, took strong exception to the panel's background document.[110] This issue will be taken up in December at the COP28 climate conference in Dubai.

Negative emissions technologies remain controversial, and the ones most often found in major climate models—BECCS and DACCS—are unlikely to be major contributors to solving the climate crisis for decades and won't be providing the offset market a scalable amount of affordable and sustainable offsets anytime soon.

## THE PROBLEMS WITH NATURE-BASED CARBON REMOVAL

The major nature-based carbon removal solutions most often found in climate models and NDCs are planting trees, paying people not to cut down trees, and boosting $CO_2$ in soils. Avoided deforestation is the most popular offset today, despite being the most heavily critiqued. This "offset" is not actually a reduction in emissions but rather a hypothetical avoidance of future emissions. As discussed earlier, it is not possible to know how many if any of the trees were going to be cut down by the timber company. So, it is not possible to demonstrate with any confidence that any of these carbon offsets were additional, that they would not have happened anyway.

Also, since the original demand for the wood products hasn't changed, there is the leakage problem that the timber company can and generally will simply go someplace else and cut down trees. The leakage rate can be high as we've seen, which means this offset is being greatly over-credited in the marketplace—if a reduction of 10 million tons of $CO_2$ is claimed, the actual net reduction is far less.

A nine-month investigation by the *Guardian*, *SourceMaterial*, and *Die Zeit* published in early 2023 found **"more than 90% of rainforest carbon offsets by [the] biggest certifier are worthless."**[111] Most of these deforestation avoidance offsets—used by big companies like Shell, Disney, and Gucci—are "phantom credits" and may even "worsen global heating." The certifier, Verra, has "strongly disputed the studies' conclusions about its rainforest projects."

Exhibit 31 to Decl. of Thomas Lyon
683
**SER 96**

*Penn Center for Science, Sustainability, and the Media*                                                34

The journalists analyzed almost 100 million carbon credits.[112] They also had "dozens of interviews and on-the-ground reporting with scientists, industry insiders, and Indigenous communities." They made use of three new studies analyzing projects to avoid rainforest deforestation using different methods and did their own further analysis. "The implications of this analysis are huge," Dr. Barbara Haya told the *Guardian*. **"Companies are using credits to make claims of reducing emissions when most of these credits don't represent emissions reductions at all." She added, "But these problems are not just limited to this credit type. These problems exist with nearly every kind of credit."**

Stopping deforestation in developing countries is a crucial climate solution—it just shouldn't be turned into a license to emit heat-trapping $CO_2$ by developed countries. *That* $CO_2$ is going to be 100% real, whereas the actual emissions reduction in any specific offset project is, as we've seen, unknowable, but invariably much less than whatever the buyer and seller have agreed upon.

**That license to emit $CO_2$ has another problem—the risk of environmental injustice for the buyer.** In California's carbon trading program, the benefits of offsets have often led to more inequitable harm because they are a reprieve for so many local facilities that would otherwise be the source of emissions cuts. And while those facilities' emissions of $CO_2$ do not directly endanger the local residents, the toxic air pollution accompanying that $CO_2$ does directly harm human health. A 2018 study found "facilities regulated under California's cap-and-trade program are disproportionately located in disadvantaged neighborhoods."[113] A follow-up 2022 study found that while the majority of "Disadvantaged Communities" (DACs) saw reduced toxic pollutants from cap-and-trade facilities, "these improvements were less than those in the non-DACs, with many of the contrasts being statistically significant." Also, many facilities and neighborhoods saw a rise in greenhouse gas emissions and co-pollutants, and those "tended to have higher proportions of people of color, people living below 200 percent of the federal poverty level," and other socially vulnerable people.[114]

The great majority of nature-based solutions projects do not appear to represent high-quality carbon removal offsets. Consider Microsoft, which has pledged that by 2050 it will have removed carbon from the atmosphere equal to all its cumulative emissions since it was founded. In a 2021 article in *Nature*, Microsoft staff and outside scientists analyzed the proposals received from a 2020 solicitation for carbon removal projects—one of the first solicitations of its kind from a major company.[115] Proposals representing over 95% of total $CO_2$ volume were "nature-based storage." Yet while Microsoft **"received 189 proposals offering 154 megatonnes of $CO_2$ (Mt$CO_2$) over the coming years," only "a mere 2 Mt$CO_2$ met Microsoft's criteria for high-quality $CO_2$ removal."** Those criteria include

Exhibit 31 to Decl. of Thomas Lyon
684
**SER 97**

*Penn Center for Science, Sustainability, and the Media*                                      35

requirements to demonstrate additionality, perform a comprehensive lifecycle analysis, explain how long the carbon will be stored, address the concerns of environmental justice and local communities, and "conclusively demonstrate leakage avoidance, or robustly and conservatively account for the carbon impacts of leakage caused by the project."[116] If such criteria were enforced in the voluntary carbon market, it's likely a similarly large fraction of projects would be rejected.[117]

One general problem for all nature-based offsets—especially ones involving trees—is that "very few nature-based offsets today can promise anything like true permanence because of the fact that they are reversible at any time," as Dr. Mark Trexler explains in his 2022 online offsets course.[118] Wildfires, extreme drought, deluges, disease and pests—all of which keep getting worse because of climate change—can, for instance, wipe out part of an existing forest or a plantation of new trees. When that happens, the trees stop absorbing $CO_2$ and start emitting it—very quickly in the case of wildfires. This has already begun in California forests being preserved as offsets.

A 2022 study led by ecologist William Anderegg looked at "Future climate risks from stress, insects and fire across US forests."[119] A major finding is, "**Our results reveal that US forests are very likely to experience increasing risks from climate change that undermine their C [carbon] sequestration potential**, an important factor that should be considered in climate change mitigation policy." In an explanatory article, Anderegg described "The big picture" impact: "**As the planet warms, wildfire risk increases substantially over the current century, especially in the Western U.S. In a scenario with medium emissions, wildfire risk is projected to increase by a factor of four. Drought and insect risks increase by about 50% to 80%**."[120] He added, "climate policymakers and offset developers need to be very careful about how they count on forest offsets to deliver benefits."

The issue of permanence (or "durability") is particularly salient for offsetting carbon pollution because when humans put CO2 into the air, it stays there warming the planet for centuries. That's why, as a 2021 Congressional Research Service report on agriculture and forestry offsets noted, "**Many carbon standards require 100-year permanence**."[121]

**Nature-based solutions projects rarely promise such durability.** As the 2021 *Nature* article noted, "Nature-based storage projects sequestering carbon for less than 100 years accounted for most proposals that Microsoft received (in total, more than 95% of $CO_2$ volume)."[122] Many sequestered carbon for less than 50 years. One approach to address this problem in places like California has been an insurance program known as a buffer pool. "Landowners pay into the pool when they sell credits," explained a 2022 *New Scientist* article.[123] "When there are unintentional reversals—when wildfire burns

Exhibit 31 to Decl. of Thomas Lyon
685
**SER 98**

*Penn Center for Science, Sustainability, and the Media*                                                    36

down trees that were supposed to be storing carbon, for example—the state can withdraw credits from the buffer pool." But warming-worsened wildfires in California have become so prevalent, the article explains, "that in the last 10 years, fires have depleted a jaw-dropping 95 per cent of the buffer that was intended to manage the next century's wildfire risks."[124]

In a 2021 report by Microsoft on lessons learned from its program that funded carbon removal, the company said, "we think that a full, healthy market will require stronger protections" than just buffer pools.[125] **"Today, there's simply not a lot of really secure forest carbon projects," the company's carbon program director Elizabeth Willmott told** *National Geographic* **in 2022. "We see a problem with that across the U.S. and across the world."[126]**

## THE PROBLEMS WITH TREE-PLANTING OFFSETS

Planting trees may have the biggest long-term potential of any nature-based strategy, and it is more straightforward to quantify and verify as an offset than most other nature-based solutions, such as boosting $CO_2$ in soils. Yet tree-planting has real challenges as an offset—whether it is reforestation (replanting an area with trees) or afforestation (planting trees where there had previously been none).

First, the $CO_2$ reductions are not immediate. They could take decades to achieve their full offset potential. Meanwhile in too many cases the offset is used by the buyer to continue pouring $CO_2$ into the air right now—the period most important to slowing warming. *Technology Review* noted in 2020 that one popular travel booking app offers to plant trees to offset emissions from air travel but that, "it'll generally take about 25 years to offset the share of emissions from each flight."[127]

One longer-term study looked at carbon sequestration in degraded land "following 18 years of active tropical forest restoration."[128] The first 10 years of "above ground biomass" accumulation were extremely slow. Even after "18 years of regeneration, biomass is only 12% of that seen in old-growth forests." For restoration to hit 90%, projections suggest it would take more than another half century, and possibly a century in total. **Significantly this was "active forest restoration" with fire protection. "Restoration consisted of protection from fire (creation and maintenance of 10 m fire breaks; staffed fire towers for monitoring) and planting areas with native seedlings."**

The real world sees far less (if any) protection and far less focus on storing carbon as opposed to planting trees with commercial prospects. An analysis of 74 groups planting trees in the tropics referenced nearly 700 species, but "by far the most widely mentioned species were familiar tree crops, like cacao, coffee and mango — good for economic development, less so for storing carbon or

Exhibit 31 to Decl. of Thomas Lyon
686
**SER 99**

*Penn Center for Science, Sustainability, and the Media*                                37

supporting biodiversity," the *New York Times* reported in 2022.[129] A 2019 study of 24 national plans to help reforest vast areas of degraded and deforested land found "nearly half the land involved was slated to be turned into plantations of fast-growing commercial trees." Also, "The carbon these monocultures store is mostly released in a decade or so, when the trees are harvested, the researchers wrote."

In a 2022 article on Australia's widely-criticized[130] offset program, the *UK Guardian* reported, "Projects meant to regenerate Australia's outback forests to store carbon dioxide have been awarded millions of carbon credits—worth hundreds of millions of dollars—despite total tree and shrub cover in those areas having declined, a new analysis has found."[131] In other cases, "projects are being credited for increases in tree and shrub cover that would have happened anyway because they are mainly a product of rainfall (i.e. increased plant water availability) rather than the project activities."[132]

The 2020 *Technology Review* article noted that studies have found **"We have a terrible track record on carrying out reforestation efforts to date."**[133] For instance, the 2020 study "How feasible are global forest restoration commitments?" looked at 62 global reforestation pledges and found most countries are not good at keeping them—partly because many make unrealistic promises.[134] The study found "one-quarter of countries made commitments larger than either their current forest or agricultural areas." Noting that previous studies had found "restored forests may be ephemeral," the study reported "a quarter of countries experienced more recent forest loss and agricultural conversion (2000–2015) than their restoration commitment for the next 15 years (2015–2030)."

**Second, and relatedly, what gets planted is much more vulnerable and much less permanent than regular trees in a forest because, as the *New York Times* noted in 2020, people aren't generally planting trees, which "are famously tough."[135] They are, rather, planting seeds or seedlings, which "are not tough at all."** Seedlings can be killed by everything trees can—drought, fire, and flood—plus "they are eaten, shaded out, stepped on. Often they die of simple neglect." Again, not much monitoring is going on. One study found that "less than a fifth of the 174 tree-planting organizations they examined mentioned any monitoring of their trees after planting, and only eight companies mentioned the survival rates of their trees."

There are numerous examples in the scientific literature and media of tree-planting efforts gone awry. A 2022 study of tropical and sub-tropical forest restoration at 176 sites in Asia, for instance, found a first-year mortality rate of nearly 20% rising to nearly 50% by year 5 and beyond.[136] *Vice* describes several cases in a 2022 investigation—such as 6000 trees that were planted in Norfolk, England to be a new carbon sink.[137] Almost all of them died. Experts said the trees were planted too shallowly, at the

Exhibit 31 to Decl. of Thomas Lyon
687
**SER 100**

*Penn Center for Science, Sustainability, and the Media*                                           38

wrong time of year, and in the wrong location (in already carbon–rich grasslands). "Simply planting trees isn't the answer," said Dr Charlie Gardner, a local conservation scientist. "**If we want these trees to have a real impact, they've got to still be alive in 100 years and that means it's a 100-year commitment, not a 1-day commitment.**" Yet another reason those offsets can't be so low cost.

A third challenge is that planting or replanting trees "**in boreal zones will have a warming effect that exceeds the cooling effect of reducing GHGs,**" as the National Academy of Sciences explained in a 2019 report on negative emissions strategies.[138] Above the snow line "an increase in forest cover reduces surface reflectivity causing more surface warming." This "albedo" effect limits the benefit to the climate of planting trees in northern regions.

**Fourth, tree-planting also suffers from leakage.** As Dr. Mark Trexler explained in his online course, "How do you know when you plant trees that other landowners aren't *not* planting trees because they're anticipating that there will be a glut of trees in 30 or 40 years—and therefore your planting trees today causes them not to plant their trees today?"[139]

A related concern is that if we're going to be planting a lot of trees, we'll be displacing a lot of people or a lot of land that people were using (or planning to use) for other purposes like grazing or growing crops. "Suppose forests are established in one place to sequester carbon but lead to forest clearing elsewhere," posits a 2009 policy brief on leakage in forestry offset programs by Duke University.[140] "The induced leakage is immediate and large, while the direct sequestration benefits take time to accrue. This shifting of impacts over time has implications for the climate benefits of the project (nearer-term mitigation is generally more valuable than farther-term), which complicates leakage estimation." This may perhaps not be a big problem if you're planting a few thousand trees—but people and governments are talking today about planting tens of billions of trees and perhaps as many as a trillion. Figuring out where to put those trees may be the biggest challenge of all.

**So, fifth, demand for land will rise sharply with climate action, even as the world faces "looming global land scarcity," as one study put it.**[141] **A 2017 study noted, "The vast majority of models estimate expansion of agricultural land by 2050, including several by more than half a billion hectare**s."[142] The entirety of net U.S. cropland is about 166 million hectares.[143]

*The Land Gap Report*—a 2022 analysis by 20 international researchers—added up "the area of land required to meet projected biological carbon removal in national climate pledges and commitments."[144] They found "almost 1.2 billion hectares of land—close to the extent of current global cropland—are required to meet them." More than half this area involves reforestation and "requires a

Exhibit 31 to Decl. of Thomas Lyon
688
**SER 101**

*Penn Center for Science, Sustainability, and the Media*                                        39

land-use change to achieve the projected carbon removal, with the potential to displace food production." Are nations already counting on an unrealistic amount of tree planting in their climate pledges? What about companies? A 2021 Oxfam study concluded net-zero claims from just BP, Total Energies, Eni, and Shell would require some 70 million hectares of land by 2050 for tree planting.[145]

In its 2019 *Climate Change and Land* report, the IPCC noted that, "**Large-scale afforestation could cause increases in food prices of 80% by 2050**, and more general mitigation measures in the AFOLU [Agriculture, Forestry, and Other Land Use] sector can translate into a rise in undernourishment of 80–300 million people."[146] **Just how scalable is land-use change for carbon removal?**

This brings us to a final challenge. *The Land Gap Report* noted, "**The vast majority of lands and forests targeted by national and international pledges on climate change mitigation and forest restoration are neither unclaimed nor unused**. They constitute the customary lands and territories of indigenous peoples and local communities." And so, "**without a social justice lens, any attempt to fulfil the many land-based climate pledges is likely to perpetuate injustices**."

**How many large-scale carbon-removal offset plans are inherently unjust**?

## THE TWO-DECADE FAILURE OF CDM

Much of the discussion here has been predicated on the idea that the new UN-authorized offsets will actually be genuine, additional, durable, verifiable, accurately quantifiable, and not leaky. On the positive side, as discussed earlier, unlike regular offsets, the developing country sellers of the authorized offsets will be highly motivated to make sure that the tons are additional and not over-credited, since every authorized ton they sell is a ton that needs to be added to their Paris climate commitment.

On the negative side, the U.N. has failed in the last two decades to prove it can create or run a credible official regulated offset market—the Clean Development Mechanism. The flaws in the CDM have been detailed again and again in the literature and media, yet the UN has failed to fix them. It bears repeating that a 2016 analysis of hundreds of CDM projects for the European Commission found **"85% of the covered projects … have a low likelihood of ensuring environmental integrity (i.e. ensuring that emission reductions are additional and not over-estimated). Only 2% of the projects … have a high likelihood of ensuring environmental integrity."** The analysis found "most energy-related project types … are unlikely to be additional," in part because "the revenue from the CDM for these project types is small compared to the investment costs and other cost or revenue streams."

Exhibit 31 to Decl. of Thomas Lyon
689
**SER 102**

*Penn Center for Science, Sustainability, and the Media*                                                40

Significantly, the study found **"Compared to earlier assessments of the environmental integrity of the CDM, our analysis suggests that the CDM's performance as a whole has anything but improved." Why? "The main reason is a shift in the project portfolio towards projects with more questionable additionality." How can you run an effective offset program without a very strong focus on ensuring additionality?**

Yet just two years later, in December 2018, the UN published, *Achievements of the Clean Development Mechanism, Harnessing Incentive for Climate Action (2001-2018)*. The report asserts that "the CDM exceeded everyone's expectations." It briefly mentions major problems only to state they "have been looked at critically and addressed by the CDM's Executive Board wherever possible." In particular, "Criticism over the environmental integrity and additionality of projects ... have resulted in the CDM Board strengthening the mechanism's methodologies and procedures."[147]

These statements are at odds with many earlier scientific studies and media investigations—and many to follow. A 2020 study in the journal *Climatic Change* on CDM projects in Cambodia wrote, "Our findings support the observation that the CDM finances ecologically and socially harmful projects in the name of GHG reductions."[148] They concluded, **"We highlight the apparent lack of improvements in critical areas of the CDM despite years of criticisms and suggest that there are framing and structural issues that will make reforming the CDM difficult."**

A 2021 report noted, "Most CDM credits have been issued from projects which would probably have happened anyway, and **in some cases the mechanism even set an incentive for companies to increase their production of pollutants in order to generate credits for their destruction.**"[149] In other words, like most offset programs, the CDM was gameable. **Also, the CDM has "failed to adopt sufficiently stringent safeguards against harms to the environment or local people, especially indigenous communities."** In Uganda, "a private company blocked access to land vital for the livelihoods of local communities in order to claim credits for planting forests in that area." In India, "a waste incinerator project diverted waste from landfills, where it would get sorted by local informal workers, and burned them in a facility located close to villages." In Chile and Guatemala, "hydroelectricity projects exacerbated land right conflicts, destroyed social cohesion within villages, and damaged ecosystems and biodiversity."

A 2021 study on wind power projects in India found that at least 52% of the projects would have happened anyway and so were not additional.[150] This meant that the developed countries buying these offsets were allowed to emit much more carbon pollution than had actually been avoided. **The authors**

Exhibit 31 to Decl. of Thomas Lyon
690
**SER 103**

*Penn Center for Science, Sustainability, and the Media*                                              41

note that if this rate of non-additionality applied to all CDM projects it would mean that developed countries emitted 6 billion tons of $CO_2$ more than they otherwise were allowed to. And other studies have, as we've seen, found an even higher rate of CDM non-additionality.

**Moreover, nearly 70% of all CDM offsets have gone to China and India. Yet during the same time, China built so many coal plants that its $CO_2$ emissions *increased* by nearly as much as the U.S. emits today. India's emissions doubled.** So, in what sense were the clean energy CDM projects—which again, would've happened without CDM money—actually delivering any avoided emissions? What justification could the UN give for letting those offsets be sold to developed countries who then used them as a license to emit more carbon pollution? **In short, the coal plants China and India built increased global emissions—but so did the renewable plants.**

"I don't think the UN is set up to do this," Dr. Barbara Haya said in 2023.[151] "I don't think we'll get quality from the U.N." in their new offset effort. "If the UN-backed carbon market is built largely upon the shaky foundation of earlier offset programs, including its own, it will effectively replicate and magnify the known problems," *Technology Review* wrote after COP 26.[152] "That would threaten to overstate emissions progress, undermine the credibility of Paris agreement achievements, and slow global efforts to address climate change."

## CONCLUSION

"**In private, scientists express significant scepticism about the Paris Agreement, BECCS, offsetting, geoengineering and net zero,**" wrote three leading climate scientists, including Robert Watson, former chair of the Intergovernmental Panel on Climate Change (IPCC), in a 2021 article.[153] "The path to disastrous climate change is paved with feasibility studies and impact assessments."

**Today, every major offset program still has the same exact problems researchers and investigative reports have been identifying for more than two decades. That suggests the core problems are inherent to offsets and intractable**—the impossibility of ensuring additionality or of counting them accurately or of solving the double counting problem in a just way. Dr. Haya said in 2023, "everyone has not just failed, but deeply failed."[154] After two decades of researching offsets and working to improve them, she has concluded, "the offset market is too far gone to fix." After COP26 and COP27, the voluntary market does not align with Paris and may instead undermine it.

Thus, the answers to the questions posed in the title are that **carbon offsets are unscalable, unjust, and unfixable—and a threat to the Paris Agreement.** "Net-zero targets are mostly

Exhibit 31 to Decl. of Thomas Lyon
691
**SER 104**

*Penn Center for Science, Sustainability, and the Media*                                                    42

greenwash," as the Science Based Targets initiative (SBTi) says. When asked in May 2023 by Politico "why you're against carbon offsets," United Airlines CEO Scott Kirby answered, "There's two things that are wrong with them. **First, the majority of them are fraud," and "Even if they weren't a fraud, they are not scalable."**[155] A consensus is growing that companies whose goal is addressing climate change should not be buying voluntary offsets today and using them as a license to pollute—because that pollution will be real, but the supposedly offsetting emissions reductions won't be.

The great majority of corporate offsets that have been sold to date were not genuine—they would've happened anyway, or they were greatly overcounted, and usually both. Going forward will be another concern on top of those—that a voluntary offset without a corresponding adjustment will be double claimed, by the developing country seller who uses it to reduce emissions as part of its Paris climate target (NDC) and by the corporate buyer, who uses it to claim to be reducing its own emissions. And the result of the double claiming is that "**the impact of voluntary engagement in carbon markets could be negligible, or even lead to an overall negative climate impact,"** as a 2020 report for the German Environment Agency put it.[156]

When authorized offsets start being sold—and the seller must officially acknowledge that their emissions reductions are being sold to the buyer—that will further underscore the view that non-authorized offsets are not genuine offsets. They should be called "mitigation contributions," as the world has agreed, or "impact claims" or "contribution claims" as the Gold Standard is now doing—and not be used as a license for the buyers to pollute more.

"Carbon dioxide removal is not a current climate solution," argues CDR expert, David T. Ho, an oceanography professor, in an April 2023 *Nature* article.[157] If we don't "drastically reduce emissions first," then CDR "will be next to useless." Ho, who was a reviewer for the $100-million XPRIZE Carbon Removal competition, concludes, **"We must be prepared for CDR to be a failure."**

In a world that must get to near-zero emissions—a world that is also without an overabundance of genuine, verifiable, affordable, and scalable negative emissions—it's likely even an authorized offset program would have relatively small benefits. That's because in such a world, getting close to zero global emissions will require essentially every major country to get close to zero themselves—nobody is going to have a lot of surplus offsets to sell. Whatever they sell today they are likely to have to buy back in the future, probably at a much higher price. So, selling off your easiest emission reductions cheaply now is a counterproductive policy.

Exhibit 31 to Decl. of Thomas Lyon
692
**SER 105**

*Penn Center for Science, Sustainability, and the Media*                                                  43

**Also, authorized offsets would allow developed countries to make achieving their Paris climate commitments *easier* while shifting the burden to the developing countries who must make achieving their commitments *harder***, as discussed. Since this burden sharing does not appear to be popular among developing countries, they may well decide to keep the vast majority of their emissions reductions. So authorized offsets should become expensive—perhaps as expensive as actual large-scale emissions reductions in developed countries. Ultimately, the upside of such a program won't be large but the downside may well be, since it has a significant risk of causing net harm and proving a serious distraction from the urgent task of having every country and company rapidly reduce its own emissions.

Those aiming to avoid catastrophic warming should embrace the basic approach of SBTi and the UN's High-Level Expert Group. Companies (and developed countries, too) should first have to cut their own emissions 90-95% by 2050. Only then can they neutralize the remaining 5-10% of emissions—not with traditional offsets but with "high-quality carbon removals," which are unlikely to be low cost.

**In the end, many things that offsets are supposedly funding today, like deploying clean energy and ending deforestation in developing countries, are crucial climate solutions—they just shouldn't be turned into a license for developed countries and companies to keep polluting. The solution is to replace offsets with programs whereby the richer countries and companies focus on 1) meeting their climate targets by reducing their own emissions and 2) helping poorer countries reduce their emissions—without trying to take those emission reductions away from them.**

## ABOUT THE AUTHOR
*Dr. Joseph Romm is Senior Research Fellow at the University of Pennsylvania Center for Science, Sustainability, and the Media. His work focuses on the sustainability and scalability—and the scientific underpinnings—of the major climate solutions, as well as the media coverage of them. Romm spent 5 years in the 1990s working on climate and clean energy solutions at the US Department of Energy. For 3 years, he helped to run the Office of Energy Efficiency and Renewable Energy ultimately serving as Acting Assistant Secretary, where he oversaw a $1 billion budget for R&D, demonstration, and deployment of climate solutions. In 2008, Romm was elected a Fellow of the American Association for the Advancement of Science for "distinguished service toward a sustainable energy future." In 2009, Time magazine named him "Hero of the Environment" and "The Web's most influential climate-change blogger" for his work at Climate Progress. Rolling Stone named him one of "100 people who are changing America." Romm has 10 books in the areas of climate change, clean energy, and communications, including one NY Magazine called "the best single-source primer on the state of climate change." His 2004 book, "The Hype about Hydrogen: Fact and Fiction in the Race to Save the Climate," was named one of the best science and technology books of 2004 by Library Journal. He has written extensively on the problems with carbon offsets for more than 15 years. He holds a PhD in physics from M.I.T.*

Exhibit 31 to Decl. of Thomas Lyon
693
**SER 106**

*Penn Center for Science, Sustainability, and the Media*                                              44

## APPENDIX: CHATGPT'S "AUTHORIZED OFFSET" ANALOGY

*Because of the counterintuitive nature of an authorized offset sale and the corresponding adjustment, the A.I. ChatGPT was asked to come up with an analogy to help explain the transaction. Here it is.*

QUESTION: Can you provide an analogy that explains how the burden of emission reductions is being shifted from the developed country to the developing country?[158]

CHATGPT: Sure here's an analogy that may help illustrate how the burden of emissions reduction can be shifted from a developed country to a developing country in the context of authorized offset sales:

Imagine two people Alice and Bob who both need to lose weight for health reasons. Alice has a lot of resources at her disposal such as access to a gym a personal trainer and a nutritionist. Bob on the other hand has limited resources and cannot afford these luxuries.

Alice and Bob agree to help each other lose weight by following a joint diet and exercise plan. They set individual weight loss goals based on their starting weights and health needs. However Alice proposes a deal where she can buy "weight loss credits" from Bob for every pound of weight he loses. Alice believes that this will make it easier for her to reach her weight loss goal.

Bob agrees to the deal because he needs the money but he realizes that he is now facing a more difficult weight loss target. He must not only reach his own weight loss goal but also help Alice achieve hers by selling her weight loss credits. Meanwhile Alice can now claim credit for weight loss that she did not actually achieve through her own efforts.

In this analogy Alice represents the developed country with more resources while Bob represents the developing country with fewer resources. The weight loss credits represent authorized offsets and the weight loss goals represent emissions reduction targets under the Paris Agreement. The corresponding adjustments mechanism represents the accountability and transparency measures that prevent double-counting of emissions reductions.

The analogy is not perfect as climate change is a global problem that affects everyone and emissions reduction efforts must be undertaken by all countries regardless of their resources or capabilities. However it may help illustrate how authorized offset sales can impact the distribution of emissions reduction targets and responsibilities between developed and developing countries.

## ACKNOWLEDGEMENTS

The contents of this report, including any mistakes, are the responsibility of the author alone. The author would like to thank the following for sharing some of their time and expertise to discuss these opaque issues: Chirag Gajjar, Barbara Haya, Auden Schendler, and Mark Trexler. Special thanks to Barbara Haya, David Ho, Auden Schendler, and Mark Trexler for their comments on early drafts. Thanks go to Tan Copsey and Hunter Cutting for commenting on the executive summary and sharing their expertise on offsets. Zhao Liu's comments, copy editing, and fact checking were invaluable. And finally, the author is very grateful to Michael Mann and Heather Kostick of University of Pennsylvania's Center for Science, Sustainability, and the Media for their tremendous help in bringing this project to fruition.

Exhibit 31 to Decl. of Thomas Lyon
694
**SER 107**

*Penn Center for Science, Sustainability, and the Media* 45

CITATION: Joseph Romm, *Are carbon offsets unscalable, unjust, and unfixable—and a threat to the Paris Climate Agreement?* A University of Pennsylvania Center for Science, Sustainability, and the Media White Paper, June 2023. https://web.sas.upenn.edu/pcssm

## ENDNOTES

[1]UN Framework Convention on Climate Change (UNFCCC) Secretariat, "Achievements of the Clean Development Mechanism, 2001-2018," December 2018.

[2]Dr. Martin Cames *et al.*, "How additional is the Clean Development Mechanism?" Institute for Applied Ecology, prepared for EU's Directorate-General for Climate Action of the European Commission, March 2016.

[3]Philip M. Fearnside, "Tropical hydropower in the clean development mechanism: Brazil's Santo Antônio Dam as an example of the need for change," *Climatic Change*, April 2015. See also Barbara Haya and Payal Parekh, "Hydropower in the CDM: Examining Additionality and Criteria for Sustainability," U.C. Berkeley Energy and Resources Group Working Paper, November 25, 2011. This analysis recommended that "large hydropower be excluded from the CDM." It contains references to many studies critical of CDM-backed hydropower. See also, Ian G. Baird and W. Nathan Green, "The Clean Development Mechanism and large dam development: contradictions associated with climate financing in Cambodia," *Climatic Change*, December 2019.

[4]Raphael Calel *et al.*, "Do carbon offsets offset carbon?" Grantham Research Institute on Climate Change and the Environment, Centre for Climate Change Economics, London School of Economics, November 2021.

[5]Kristin Qui, *The Future of the Clean Development Mechanism under a New Regime of Higher Climate Ambition*, Environmental Defense Fund (EDF), 2018. See also Barbara Haya, *Carbon Offsetting: An Efficient Way to Reduce Emissions or to Avoid Reducing Emissions? An Investigation and Analysis of Offsetting Design and Practice in India and China*, a peer-reviewed dissertation for a Ph.D. in Energy and Resources, Fall 2010.

[6]Ecosystem Marketplace, "Today's VCM, Explained in Three Figures," August 2022.

[7]UN Intergovernmental Panel on Climate Change, *An IPCC Special Report: Global Warming of 1.5 °C*, 2018.

[8]IPCC, *Global Warming of 1.5 °C*, Chapter Two, 2018.

[9]Clea Schumer, "How National Net-Zero Targets Stack Up After the COP26," World Resources Institute, November 18, 2021.

[10]Lindsay Maizland, "COP26: Here's What Countries Pledged," Council on Foreign Relations, November 15, 2021.

[11]Harry Bowcott *et al.*, "COP26 made net zero a core principle for business. Here's how leaders can act," McKinsey & Company, November 12, 2021.

[12]Daedal Research, *Global Voluntary Carbon Market*, December 2022.

[13]Anders Porsborg-Smith *et al.*, "The Voluntary Carbon Market Is Thriving," Boston Consulting Group and Shell Group, January 19, 2023.

[14]Gold Standard, "Claims Guidelines," June 2022.

[15]The most straightforward way to avoid double claiming (which is a type of double counting) is to make sure the offset comes with a corresponding adjustment. When asked by email in May 2023 "whether Gold Standard is saying in its 'Claims guidance' that it does not necessarily endorse or support any offsetting claim that comes without a Corresponding Adjustment," Hugh Salway, Senior Director of Market Development and Partnerships at the Gold Standard replied "Yes, this is effectively correct." For more detail and nuance, see Gold Standard, "Claims Guidelines," June 2022.

[16]Tom Dowdall, "Science-Based Net-Zero Targets: 'Less Net, more Zero'," Science Based Targets initiative (SBTi), October 7, 2021.

[17]*SBTi Corporate Net-Zero Standard, Version 1.1*, April 2023.

[18]SBTi's long-term science-based target for net zero also requires very deep reductions in so-called Scope 3 emissions, which are generated by customers using the corporation's products or by the suppliers the corporation uses (including things like shipping and offshore manufacturing).

[19]UN IPCC, *Climate Change 2022: Mitigation of Climate Change*, Working Group III contribution to the Sixth Assessment Report, Chapter 13, 2022.

[20]U.N. High-Level Expert Group on the Net Zero Emissions Commitments of Non-State Entities, *Integrity Matters: Net Zero Commitments by Businesses, Financial Institutions, Cities and Regions*, United Nations, November 2022.

[21]Mark Trexler, personal communications, February 2023.

[22]Barbara Haya, personal communications, February 2023.

Exhibit 31 to Decl. of Thomas Lyon

*Penn Center for Science, Sustainability, and the Media*                                          46

---

[23]Akshat Rathi, "Inside the Billion-Dollar Market for Junk Carbon Offsets," Bloomberg, November 21, 2022.

[24]Dr. Martin Cames et al., "How additional is the Clean Development Mechanism?" Institute for Applied Ecology, prepared for EU's Directorate-General for Climate Action of the European Commission, March 2016.

[25]Lee Simmons, "Are Big Companies' Net-Zero Pledges a Well-Intentioned Shell Game?" *Insights by Stanford Business*, April 8, 2022.

[26]Natasha White and Verity Ratcliffe, "How the 2022 World Cup Rebuilt a Market for Dodgy Carbon Credits," *Bloomberg*, November 16, 2022.

[27]Paul MacInnes, "Fifa misled fans over 'carbon-neutral Qatar World Cup', regulator finds," *Guardian*, June 7, 2023.

[28]Allgemeine Themen, "Swiss Commission for Fairness upholds complaints against FIFA," Swiss Commission for Fairness, June 7, 2023.

[29]Mark Trexler, personal communications, February 2023.

[30]Anders Bjørn et al., "Renewable energy certificates threaten the integrity of corporate science-based targets," *Nature Climate Change*, June 2022.

[31]Ben Elgin and Sinduja Rangarajan, "What Really Happens When Emissions Vanish," *Bloomberg*, October 31, 2022.

[32]Michael Wayne Gillenwater *et al.*, "Policing the voluntary carbon market," *Nature Climate Change*, October 2007.

[33]United States General Accounting Office, "International Climate Change Programs: Lessons Learned from the European Union's Emissions Trading Scheme and the Kyoto Protocol's Clean Development Mechanism," GAO Report GAO-09-151, November 2008.

[34]Nick Davies, "The inconvenient truth about the carbon offset industry," *The Guardian*, June 16, 2007.

[35]Lois Parshley, "California's carbon offsetting may actually be increasing emissions," *New Scientist*, December 22, 2022.

[36]Barbara Haya, "The California Air Resources Board's US Forest offset protocol underestimates leakage," UC Berkeley Technical Report, May 2019.

[37]Barbara Haya, personal communications, April 2023. Haya explains that California dilutes the leakage deduction by spreading it over 100 years rather than deducting it at the beginning of a project when it is likely to occur.

[38]Carbon Direct, "2022 Commentary on the Voluntary Registry Offsets Database (VROD)," May 2022.

[39]Barbara Haya, personal communications, February 2023.

[40]Annelise Gill-Wiehl, Daniel Kammen, and Barbara Haya, "Cooking the books: Pervasive over-crediting from cookstoves offset methodologies," preprint (not yet peer-reviewed) published on *Research Square*, February 2023.

[41]BloombergNEF, "Carbon Offset Market Could Reach $1 Trillion With Right Rules," January 23, 2023.

[42]CarbonCredits.com, "Live Carbon Prices Today," accessed June 21, 2023.

[43]*Quantum Commodity Intelligence*, "Nature-based prices fall further amid poor demand," May 26, 2023. Nature-based prices have risen from the low some 30% since then as of late June.

[44]Jennifer L, "The Collapse of NGEO Carbon Prices: An In-depth Analysis," *CarbonCredits.com*, June 9, 2023

[45]See Environmental Defense Fund, "How to avoid double counting of emissions reductions," 2018, which notes, "In the absence of rules, a country of origin could reduce emissions to meet its pledged effort and transfer those to a recipient; the recipient could then claim those same reductions to meet its pledged effort. In that case, only one reduction has actually occurred, but it is being claimed twice. Analyses indicate that such double claiming could eliminate the entire climate benefit of all the Nationally Determined Contributions, or NDCs, under the Paris Agreement."

[46]Kenneth R. Richards and Krister P, Andersson, "The leaky sink: Persistent obstacles to a forest carbon sequestration program based on individual projects," *Climate Policy*, January 2001.

[47]Silvia Favasuli , "Paris accord Article 6 approval set to jump-start evolution of voluntary carbon market," *SPGlobal*, November 17, 2021.

[48]Lambert Schneider *et al.*, "Double counting and the Paris Agreement rulebook," *Science*, October 11, 2019.

[49]Japan's Joint Crediting Mechanism (JCM) Outreach Project, "Article 6 of the Paris Agreement," Ministry of the Environment, downloaded March, 2023.

[50]Anders Porsborg-Smith *et al.*, "The Voluntary Carbon Market Is Thriving," Boston Consulting Group and Shell Group, January 19, 2023.

[51]UN Development Program, "Frequently Asked Questions on Article 6 of the Paris Agreement and Internationally Transferred Mitigation Options (ITMOs)," downloaded March, 2023. See also Silvia Favasuli , "Paris accord Article 6 approval set to jump-start evolution of voluntary carbon market," *SPGlobal*, November 17, 2021, which explains "if Brazil decided to sell the US 100,000 mt of carbon credits generated by a local carbon project for the US to use against its NDCs, Brazil would need to add 100,000 mt of CO2e to its reduction target, while the US would subtract the same volume."

[52]Barbara Haya, personal communications, February 2023.

[53]Bhasker Tripathi, "Article 6: Will Corresponding Adjustments Tool Stop Double Counting?" *CarbonCopy*, January 24, 2022.

[54]Chirag Gajjar, personal communications, March 2023.

Exhibit 31 to Decl. of Thomas Lyon

*Penn Center for Science, Sustainability, and the Media*                                                    47

---

[55]Sandeep Roy Choudhury, "Corresponding Adjustments, Equity, and Climate Justice," *Ecosystem Marketplace*, June 10, 2021.

[56]Pedro Moura Costa, "Will Article 6 trading be a flop?" *Environmental Finance*, September 12, 2022.

[57]UNFCCC, "BVRio Environmental Exchange of Rio de Janeiro, Brazil," UN Global Climate Action Awards Activity Database, downloaded March 2023. See also BVRio.org.

[58]Lambert Schneider *et al.*, "Addressing the risk of double counting," Stockholm Environment Institute, Working Paper 2014-02, commissioned by the Swiss Federal Office for the Environment (FOEN).

[59]Steve Zwick, "Article 6 and its Glasgow Rulebook: the Basics," *Ecosystem Marketplace*, November 16, 2021.

[60]The World Bank, "Corresponding Adjustment and Pricing of Mitigation Outcomes," World Bank Working Paper, Washington, DC, 2023.

[61]Jean Chemnick, "Who will buy Kerry's carbon credits?" *ClimateWire,* February 2, 2023.

[62]Michael Sheldrick, "Kerry's Carbon Market Proposal Needs More Scrutiny Before It's Hailed A Climate Change Breakthrough," *Forbes*, November 11, 2022.

[63]Lee Simmons, "Are Big Companies' Net-Zero Pledges a Well-Intentioned Shell Game?" *Insights by Stanford Business*, April 8, 2022.

[64]Jonathan Crook, "Was COP27 the beginning of the end for corporate offsetting?" *Carbon Market Watch*, December 7, 2022.

[65]Nicolas Kreibich & Lukas Hermwille, "Caught in between: credibility and feasibility of the voluntary carbon market post-2020," *Climate Policy*, July 2021.

[66]Lukas Hermwille and Nicholas Kreibich, "Identity Crisis? Voluntary Carbon Crediting and the Paris Agreement," JIKO Policy Brief, Wuppertal Institute for Climate, Environment, and Energy, December 2016. The authors write: "We find that the voluntary market must prepare to become part of the Paris architecture if [it] wants to remain credible. Voluntary certification schemes will have to make sure that Parties report on the certificates transferred or set up an international registry that allows to track these transfers. Alternatively, suppliers of the voluntary markets could shift their business models from providing an offset scheme to a labelling scheme in which high-quality mitigation activities are certified including a quantification of the achieved emission reductions, but these could not be used to consolidate the emissions account of whoever purchases the certificates."

[67]Matthew Brander et al., "The Future of the Voluntary Offset Market: The Need for Corresponding Adjustments," *Edinburgh Research Explorer*, University of Edinburgh. The authors explain, "It is worth noting that the problem for the voluntary offset market and the rationale for corresponding adjustments are often expressed in terms of 'double counting', i.e. that two entities (the company purchasing the offset and the host country) are claiming the same emission reduction.... However, framing the problem in this way can be open to misinterpretation, and this appears to be the basis for some of the arguments that challenge the existence of the problem.... **the fundamental issue is whether an offset project reduces emissions below what would have happened anyway, rather than double-counting per se. Double-counting is relevant as it is the mechanism via which projects fail to reduce emissions below what would have happened anyway, i.e., because if countries count the reduction then they will not implement alternative policies, but double-counting is not the problem itself**."

[68]Jonathan Crook, "Was COP27 the beginning of the end for corporate offsetting?" *Carbon Market Watch*, December 7, 2022.

[69]Gold Standard, "Operationalising and Scaling Post-2020 Voluntary Carbon Market," June 2020.

[70]Gold Standard, "Why does Gold Standard believe that Corresponding Adjustments are needed for offsetting claims in the future?" December 2, 2021.

[71]Harry Fearnehough et al., "Future role for voluntary carbon markets in the Paris era," German Environment Agency, 2020.

[72]Craig Welch, "Polluters are using forests as 'carbon offsets.' Climate change has other plans." *National Geographic,* May 5, 2022.

[73]Will Mathis, "Microsoft Inks Deal to Pay for $CO_2$ Stored Below the Sea," *Bloomberg*, May 15, 2023.

[74]Danish Energy Agency, "The first tender of the CCUS subsidy scheme has been finalized: the Danish Energy Agency awards the contract to Ørsted's full scale CCS project," May 15, 2023.

[75]Ørsted, "Ørsted awarded contract – will capture and store 430,000 tonnes of biogenic $CO_2$," May 15, 2023.

[76]Auden Schendler, "Worrying About Your Carbon Footprint Is Exactly What Big Oil Wants You to Do," *New York Times*, August 31, 2021.

[77]Ellen Ormesher, "'There is too much impunity': carbon offsets present an emerging risk to advertisers," *The Drum*, February 20, 2023.

[78]Laura Hurst and Diederik Baazil, "Shell Is Called Out Again for Misleading Climate Ads in Holland," *Bloomberg*, June 30, 2022.

[79]Quinn Emanuel Trial Lawyers Firm Memoranda, "Carbon Offsets: A Coming Wave of Litigation?" September 2022.

Exhibit 31 to Decl. of Thomas Lyon

697

SER 110

*Penn Center for Science, Sustainability, and the Media*                                              48

---

[80]Elaine Watson, "Will 'carbon neutral' claims land brands in legal hot water? Danone sued over Evian eco claims," *FoodNavigator*, October 18, 2022. See also Elaine Watson, "Lawsuit challenging Evian's 'carbon neutral' claims 'defies science and common sense,' says Danone," *AFN*, May 8, 2023.

[81]Elaine Watson, "Will 'carbon neutral' claims land brands in legal hot water? Danone sued over Evian eco claims," *FoodNavigator*, October 18, 2022.

[82]Ben Elgin, "This Timber Company Sold Millions of Dollars of Useless Carbon Offsets," *Bloomberg*, March 17, 2022.

[83]Allison Prang, "The airline CEO who hates offsets," *Politico*, May 24, 2023.

[84]Patrick Greenfield, "Delta Air Lines faces lawsuit over $1bn carbon neutrality claim," *The Guardian*, May 30, 2023.

[85]Mayanna Berrin vs. Delta Air Lines Inc, Class Action Complaint, filed May 30, 2023, posted on *Courthousenews.com*.

[86]Patrick Greenfield, "Delta Air Lines faces lawsuit over $1bn carbon neutrality claim," *The Guardian*, May 30, 2023.

[87]Delta Air Lines, *2022 ESG Report*, April 2023. The report notes, "progress toward some of our short-, medium- and long-term strategies and initiatives during the first quarter of 2023 is included in this report as well."

[88]ICF Consulting et al., "*Assessment of ICAO's global market-based measure (CORSIA) pursuant to Article 28b and for studying cost pass-through pursuant to Article 3d of the EU ETS Directive*," European Commission, September 2020.

[89]Transport & Environment, "Corsia: worst option for the climate, Briefing on assessment of ICAO's offsetting scheme," March 2021. The quotes in the text are from this paper, which summarizes the 350-page September 2020 European Commission assessment of CORSIA cited above.

[90]*Quantum Commodity Intelligence*, "Corsia-eligible credits fall below symbolic $1/t threshold," May 16, 2023.

[91]Pedro Moura Costa, "Will Article 6 trading be a flop?" *Environmental Finance*, September 12, 2022.

[92]The World Bank, "Corresponding Adjustment and Pricing of Mitigation Outcomes," World Bank Working Paper, Washington, DC, 2023.

[93]The marginal price here is the carbon price of the lowest-cost mitigation activity needed to go beyond the NDC target. By making the corresponding adjustment, the host country is, as we've seen, increasing its NDC-pledged target. Therefore, it will have to do mitigation beyond the original NDC target—and that mitigation cost will be equal to or higher than the marginal cost of achieving the original target.

[94]In a world where the cost of authorized offsets is close to the marginal cost of developing countries meeting their NDC, most companies and countries may well choose to make the vast majority of their own emissions reductions. In this world, the offset market would be much smaller in terms of total tons traded but it could still be a big marketplace if those tons have a very high average price.

[95]Ray Ndlovu and Godfrey Marawanyika, "Zimbabwe to Take over Carbon Credit Trade, Void Past Deals," *Bloomberg*, May 16, 2023.

[96]Peter Zaman, "Nationalisation Risk: Will host countries hedge their bets between Article 6 and the voluntary carbon markets?" *Lexology*, December 5, 2022.

[97]BloombergNEF, "Carbon Offset Market Could Reach $1 Trillion With Right Rules," January 23, 2023.

[98]A developing country with very ambitious climate targets has a higher marginal cost to achieve its NDC than a country with less ambitious targets. So, the ambitious country could make considerably less money from selling authorized tons than the less ambitious country—and may well believe it will find fewer buyers.

[99]Pedro Moura Costa, "Corresponding Adjustments and their Impact on NDCs and Additionality," *Ecosystems Marketplace*, March 9, 2022.

[100]U.S. Environmental Protection Agency, "Acid Rain Program," Last Updated on June 24, 2022.

[101]Kristin Qui, *The Future of the Clean Development Mechanism under a New Regime of Higher Climate Ambition*, Environmental Defense Fund (EDF), 2018. The report states "global emissions need to go down to achieve the PA [Paris Agreement] temperature goals and PA Article 6.4(d) specifically states that the PA Article 6.4 mechanism shall aim to deliver an overall mitigation in global emissions. Under the current CDM design, BAU [business-as-usual] in non-Annex I Parties [developing countries, with no emission caps] is increasing, and a mechanism that simply shifts such BAU increases from non-Annex I to Annex I Parties [primarily developed countries, with caps] does not reduce global emissions.**"**

[102]UN IPCC, *Climate Change 2022: Mitigation of Climate Change*, Working Group III contribution to the Sixth Assessment Report, 2022.

[103]Neil Bird, "Using a Life Cycle Assessment Approach to Estimate the Net Greenhouse Gas Emissions of Bioenergy," IEA Bioenergy, January 2011. This issue is discussed at length in my forthcoming BECCS report.

[104]National Academies of Sciences (NAS), *Climate Intervention: Carbon Dioxide Removal and Reliable Sequestration*, The National Academies Press, 2015.

[105]National Academy of Sciences, *Negative Emissions Technologies and Reliable Sequestration*, 2019. The efficiency being calculated here is the "exergy efficiency" or the so-called "second-law" [of thermodynamics] efficiency. It is defined as "the ratio of minimum work to real work": Wmin/Wreal. There are two basic types of DACCS systems, ones using a liquid solvent to absorb CO2 from the air and ones using a solid sorbent. The Academy report explains that for liquid solvent DAC

Exhibit 31 to Decl. of Thomas Lyon

698

**SER 111**

*Penn Center for Science, Sustainability, and the Media*                                                49

---

systems, their calculations lead to "an exergy efficiency of 4.1-6.2 percent." For solid sorbent systems," the middle-range exergy efficiency estimate is "7.6-11.4 percent."

[106]Brian Kahn, "Removing Carbon From the Air Enters Its Awkward Teen Years," *Bloomberg*, June 12, 2023.

[107]Vaclav Smil, "Energy at the Crossroads," OECD Global Science Forum, May 17-18, 2006. For a similar calculation, see Niall Mac Dowell *et al.*, "The role of $CO_2$ capture and utilization in mitigating climate change," *Nature Climate Change*, April 2017.

[108]Corbin Hiar, "U.N. slams carbon removal as unproven and risky," *Climate Wire*, May 24, 2023.

[109]UN Framework Convention on Climate Change (UNFCCC) Article 6.4 Supervisory Body, "Removal activities under the Article 6.4 mechanism," Version 4.0, May 17, 2023.

[110]Carbon Business Council, "Meeting the Goals of the Paris Agreement: Letter from 100+ Carbon Removal Experts," May 24, 2023.

[111]Patrick Greenfield, "Revealed: more than 90% of rainforest carbon offsets by biggest certifier are worthless, analysis shows," *The Guardian*, January 18, 2023.

[112]*SourceMaterial*, "The Carbon Con," January 18, 2023.

[113]Lara Cushing et al., "Carbon trading, co-pollutants, and environmental equity: Evidence from California's cap-and-trade program (2011– 2015)," *PLoS Medicine*, July 2018. This study found that, "Since California's cap-and-trade program began, neighborhoods that experienced increases in annual average GHG and co-pollutant emissions from regulated facilities nearby had higher proportions of people of color and poor, less educated, and linguistically isolated residents, compared to neighborhoods that experienced decreases in GHGs."

[114]Manuel Pastor et al., "Up in the Air: Revisiting Equity Dimensions of California's Cap-and-Trade System," University of Southern California's Dornsife Equity Research Institute, February 2022. The study notes that California labels certain neighborhoods with a high score from CalEnviroScreen (a statewide environmental hazard and social vulnerability spatial screening tool) as "Disadvantaged Communities."

[115]Lucas Joppa et al., "Microsoft's million-tonne $CO_2$-removal purchase—lessons for net zero," *Nature*, September 29, 2021.

[116]Microsoft and Carbon Direct, "Criteria for high-quality carbon dioxide removal," 2022.

[117]See for instance, Compensate, *Reforming the voluntary carbon market*, April 2021. Compensate is a company that evaluates offsets using a stronger set of criteria. Since 2020, "it has evaluated over 100 nature-based, mostly forest conservation and afforestation/reforestation, projects. All evaluated projects are certified by international standards such as Gold Standard [and] Verra." They are "often in the top tier of projects within their relevant standards in terms of quality and co-benefits." Only 9% passed the evaluation.

[118]Mark Trexler, "Are Carbon Offsets Helping Tackle Climate Change?" The Climate Web course, 2022.

[119]William Anderegg et al., "Future climate risks from stress, insects and fire across US forests," *Ecology Letters*, May 11, 2022.

[120]William Anderegg, "Trees aren't a climate change cure-all—2 new studies on the life and death of trees in a warming world show why," *The Conversation*, May 12, 2022.

[121]Congressional Research Service, "Agriculture and Forestry Offsets in Carbon Markets: Background and Selected Issues," November 3, 2021.

[122]Lucas Joppa et al., "Microsoft's million-tonne $CO_2$-removal purchase—lessons for net zero," *Nature*, September 29, 2021.

[123]Lois Parshley, "California's carbon offsetting may actually be increasing emissions," *New Scientist*, December 22, 2022.

[124]See also Grayson Badgley et al., "California's forest carbon offsets buffer pool is severely undercapitalized," *Frontiers in Forest and Global Change*, August 5, 2022.

[125]Microsoft, *Microsoft carbon removal: Lessons from an early corporate purchase*, 2021.

[126]Craig Welch, "Polluters are using forests as 'carbon offsets.' Climate change has other plans," *National Geographic*, May 5, 2022.

[127]James Temple, "'A Trillion Trees' is a great idea—that could become a dangerous climate distraction," *Technology Review*, January 28, 2020.

[128]Charlotte E. Wheeler et al., "Carbon sequestration and biodiversity following 18 years of active tropical forest restoration," *Forest Ecology and Management*, August 2016.

[129]Zach St. George, "Can Planting a Trillion New Trees Save the World?" *New York Times*, July 13, 2022.

[130]For a discussion of the criticisms of Australia's offset program, see Polly Hemming *et al.*, *State-sponsored Greenwash*, The Australia Institute, October 2022.

[131]Adam Morton, "Forest regeneration that earned multimillion-dollar carbon credits resulted in fewer trees, analysis finds," *UK Guardian*, November 6, 2022.

[132]Andrew Macintosh *et al.*, "Trends in forest and sparse woody cover inside ERF HIR project areas relative to those in surrounding areas," The Australian National University, October 30, 2022.

Exhibit 31 to Decl. of Thomas Lyon

*Penn Center for Science, Sustainability, and the Media*                                                50

---

[133] James Temple, "'A Trillion Trees' is a great idea—that could become a dangerous climate distraction," *Technology Review,* January 28, 2020.

[134] Matthew E. Fagan et al., "How feasible are global forest restoration commitments?" *Conservation Letters,* January 16, 2020.

[135] Zach St. George, "Can Planting a Trillion New Trees Save the World?" *New York Times*, July 13, 2022.

[136] Lindsay F. Banin et al., "The road to recovery: a synthesis of outcomes from ecosystem restoration in tropical and sub-tropical Asian forests," *Philosophical Transactions of the Royal Society B*, November 14, 2022.

[137] Sophia Smith Galer, "'Greenwashing': Tree-Planting Schemes are Just Creating Tree Cemeteries," *Vice*, September 1, 2022.

[138] National Academies of Sciences, *Negative Emissions Technologies and Reliable Sequestration: A Research Agenda*, The National Academies Press, 2019.

[139] Mark Trexler, "Are Carbon Offsets Helping Tackle Climate Change?" The Climate Web course, 2022.

[140] Aaron Jenkins et al., "Addressing Leakage in a Greenhouse Gas Mitigation Offsets Program for Forestry and Agriculture," Nicholas Institute for Environmental Policy Solutions, Duke University, 2010.

[141] Eric F. Lambin et al., "Global land use change, economic globalization, and the looming land scarcity," *Proceedings of the National Academy of Sciences,* February 2011.

[142] Tim Searchinger et al., "Does the world have low-carbon bioenergy potential from the dedicated use of land?" *Energy Policy*, November 2017.

[143] The United States Geological Survey, "Map of Croplands in the United States," downloaded June 2023.

[144] Kate Dooley et al., *The Land Gap Report*, November 2022, Available at: https://www.landgap.org/.

[145] Oxfam International, "'Net zero' carbon targets are dangerous distractions from the priority of cutting emissions says new Oxfam report," August 2021.

[146] P.R. Shukla et al. (eds.), *Summary for Policymakers, Climate Change and Land: an IPCC special report on climate change, desertification, land degradation, sustainable land management, food security, and greenhouse gas fluxes in terrestrial ecosystems,* IPCC, 2019. The IPCC notes that the impact would be minimal if the tree planting were "implemented using best practices in appropriately managed landscape systems that allow for efficient and sustainable resource use and supported by appropriate governance mechanisms."

[147] UN Framework Convention on Climate Change (UNFCCC), *Achievements of the Clean Development Mechanism, Harnessing Incentive for Climate Action (2001-2018)*, August 2018. The full quote: "Criticism over the environmental integrity and additionality of projects (i.e. whether emission reductions are new and would not have occurred in the business-as-usual scenario) and lack of representation in some sectors and regions has resulted in the CDM Board strengthening the mechanism's methodologies and procedures—including its oversight of accredited, independent auditors who ensure that projects meet the mechanism's stringent requirements."

[148] Ian G. Baird and W. Nathan Green, "The Clean Development Mechanism and large dam development: contradictions associated with climate financing in Cambodia," *Climatic Change*, December 2019.

[149] *Carbon Market Watch*, "The Clean Development Mechanism: Local Impacts of a Global System," October 2017.

[150] Raphael Calel *et al.*, "Do carbon offsets offset carbon?" Grantham Research Institute on Climate Change and the Environment, Centre for Climate Change Economics, London School of Economics, November 2021.

[151] Barbara Haya, personal communications, February 2023.

[152] James Temple, "How a new global carbon market could exaggerate climate progress," *Technology Review,* November 24, 2021.

[153] James Dyke, Robert Watson, and Wolfgang Knorr, "Climate scientists: concept of net zero is a dangerous trap," *The Conversation*, April 22, 2021.

[154] Barbara Haya, personal communications, February 2023.

[155] Allison Prang, "The airline CEO who hates offsets," *Politico*, May 24, 2023.

[156] Harry Fearnehough et al., "Future role for voluntary carbon markets in the Paris era," German Environment Agency, 2020.

[157] David T. Ho, "Carbon dioxide removal is not a current climate solution— we need to change the narrative," *Nature*, April 4, 2023.

[158] *NOTE: This was not the first question asked of ChatGPT. There were two previous questions to determine the extent of the A.I.'s "understanding" of corresponding adjustments and authorized tons and the like. Also, ChatGPT does not appear to use a lot of commas. Its response to the question is reprinted verbatim here.*

Exhibit 31 to Decl. of Thomas Lyon

# Exhibit 30
# to Declaration of Thomas Lyon

# Harvard Law School Forum
# on Corporate Governance,
# December 5, 2023

Exhibit 30 to Decl. of Thomas Lyon

635

**SER 114**



# Harvard Law School Forum on Corporate Governance

## 2023 Climate Disclosures in the Russell 3000 and S&P 500

*Posted by Matteo Tonello, The Conference Board, on Tuesday, December 5, 2023*

**Tags:** **Climate change**, **Climate Risk Disclosure**, **Russell 3000**, **S&P 500**
**More from:** **Steve Newman**, **The Conference Board**

> **Editor's Note:** **Steve Newman** is a Contributing Author at The Conference Board ESG Center in New York. This post relates to a Conference Board research report authored by Mr. Newman and is based on *Corporate Environmental Practices in the Russell 3000, S&P 500, and S&P MidCap 400: Live Dashboard*, a live online dashboard published by The Conference Board and ESG data analytics firm **ESGAUGE**. Related research from the Program on Corporate Governance includes **The Illusory Promise of Stakeholder Governance** (discussed on the Forum **here**) by Lucian Bebchuk and Roberto Tallarita; **Does Enlightened Shareholder Value add Value** (discussed on the Forum **here**); and **Stakeholder Capitalism in the Time of COVID** (discussed on the Forum **here**) both by Lucian Bebchuk, Kobi Kastiel, and Roberto Tallarita; **How Twitter Pushed Stakeholders Under The Bus** (discussed on the Forum **here**) by Lucian A. Bebchuk, Kobi Kastiel, and Anna Toniolo; and **Restoration: The Role Stakeholder Governance Must Play in Recreating a Fair and Sustainable American Economy – A Reply to Professor Rock** (discussed on the Forum **here**) by Leo E. Strine, Jr.

## Climate Risk Disclosure Are on the Rise but Remain the Domain of Large Companies and Regulated Industries

Climate risk disclosures increased in 2022 from the previous year, with S&P 500 companies still the most likely to disclose; specifically, 60% of companies in the Russell 3000 Index still did not report climate risk in 2022, compared to only 26% of companies in the S&P 500.



Climate risk disclosure was most prevalent in sectors with existing regulatory and reputational risks related to climate change, including utilities (93%), real estate (77%), and energy (75%). The lowest rates of climate risk disclosure were in health care (15%), communication services (23%), and IT (24%).

Figure 2



Industries with the highest rate of climate risk disclosure typically had climate target years furthest in the future; for example, in utilities it was 2045, while in energy it was 2040. Those with the lowest disclosure had a target year closest to the present date (health care and IT in 2034, with communication services having the target year farthest in the future relative to the sector's average climate risk disclosure rate). Companies with regulatory and reputation risks associated with climate change are likely to have established governance structures and knowledge related to climate risks. They also tend to have a better understanding of what is needed to meet sustainability targets.

Figure 3



2 of 14

Exhibit 30 to Decl. of Thomas Lyon
637
SER 116

## Board Accountability on Climate Will Increase

Among the Russell 3000, it was more common to disclose climate risk policies and targets than to:

- Assign board responsibility for climate (39%, or 1,160 companies).

- Disclose board climate expertise (12%, 364 companies); or

- Link ESG performance to compensation (39%, or 1,169 companies).

This will change. The disclosure requirements in the SEC draft rule on climate-related disclosures, the California climate-related legislation, the CSRD, and CSDDD4 will all increase boards' responsibilities relating to climate (see box "Regulatory and Self-Regulatory Efforts to Standardize Climate Risk Disclosures").

Figure 4

### Climate Governance

| | Climate Policy | Climate Targets | Board Expertise | Board Responsibility | ESG Remuneration |
|---|---|---|---|---|---|
| Communication Services (116) | 34.5% | 25.0% | 3.4% | 25.0% | 34.5% |
| Consumer Discretionary (371) | 42.9% | 36.1% | 7.5% | 39.4% | 29.1% |
| Consumer Staples (121) | 62.8% | 52.9% | 15.7% | 43.0% | 32.2% |
| Energy (138) | 73.9% | 53.6% | 31.9% | 60.1% | 69.6% |
| Financials (489) | 32.9% | 16.4% | 7.2% | 37.2% | 37.0% |
| Health Care (501) | 22.4% | 13.8% | 4.0% | 19.6% | 35.9% |
| Industrials (417) | 56.8% | 43.4% | 16.8% | 47.0% | 39.8% |
| Information Technology (428) | 46.5% | 33.6% | 7.0% | 30.4% | 28.0% |
| Materials (134) | 73.1% | 67.9% | 35.1% | 63.4% | 56.7% |
| Real Estate (183) | 57.9% | 49.7% | 12.0% | 53.0% | 56.8% |
| Utilities (71) | 80.3% | 85.9% | 63.4% | 80.3% | 78.9% |

Source: ESGAUGE 2023

The sectors with the current highest rates of policy and target disclosures—utilities, materials, energy, and consumer staples—also had the highest rate of board responsibility and expertise, as well as ESG-linked management compensation. There is a strong, although not linear, correlation between board responsibility and board expertise across sectors. In most cases, companies that disclosed in 2022 were more likely to assign board responsibility for climate than to have board expertise in climate. This finding is consistent with those in prior reports by The Conference Board, which discuss the general need for clear board governance relating to environment issues, but the risks associated with recruiting directors with highly specific expertise (especially if that expertise is not accompanied by broader board and business strategy experience). As previously noted, board fluency in relevant ESG topics is likely to be more valuable than expertise.

Exhibit 30 to Decl. of Thomas Lyon
638
SER 117

Figure 5



Source: ESGAUGE 2023

The rate of disclosure of climate target years was higher in organizations that implement ESG-linked compensation structures. Companies with both board climate expertise and responsibility were considerably more likely to incorporate ESG performance metrics into their remuneration strategies.

Notably, in companies lacking any of the three forms of climate-related governance and compensation (15%), the reported target year tended to be the earliest, typically set at 2034. In contrast, organizations that checked all three boxes tended to set their target years further into the future, often around 2040.

Figure 6



Source: ESGAUGE 2023

Note: Figure shows mean climate year and percentage of companies disclosing climate year based on whether they have board experience, board responsibility and ESG-linked remuneration.

This divergence in target years likely reflects both the realities of, and the understanding of the complexities and risks associated with, achieving a net-zero transition. At companies that are responsible for high levels of greenhouse gas

Exhibit 30 to Decl. of Thomas Lyon
639
**SER 118**

(GHG emissions, climate goals are likely to be subject to greater scrutiny (including at the board level) and integrated into a broader strategy aimed at transitioning to and investing in a low-carbon economy. Additionally, industry regulations and sector-specific challenges play a role. Companies outside the utilities, energy, and materials sectors, which may have set GHG targets without the same rigorous internal processes, may wish to revisit those targets. At a minimum, boards should be aware that the increased due diligence required by upcoming SEC and EU regulations may prompt companies to reset their targets.

**Climate-related firm performance and executive compensation.** According to a review of incentive plan compensation metrics conducted in collaboration with ESG data analytics firm ESGAUGE, in 2023, 40.4% of S&P 500 companies and 22.7% of Russell 3000 companies link their executive compensation to carbon footprint and emission reduction performance metrics. Only two years ago, these percentages were 14.8% and 7.3%, respectively. Considering the new regulation, companies may be even more inclined to link compensation to climate related ESG performance.

However, integrating ESG performance goals into compensation packages presents a greater challenge compared to traditional financial metrics.[1] For this reason, The Conference Board has advised that companies proceed with caution as they redesign their incentive plans to include these new types of metrics. To the extent that the company sets specific, quantitative sustainability targets, these targets should be time bound and rooted in scientific principles, particularly in the case of climate and other environmental objectives. In all cases, companies should articulate why integrating or adjusting ESG goals within compensation programs aligns with their business strategy.

## The Biggest Companies Produced the Most Emissions but the Least Annual Relative Increase

In November 2022, officials at COP27 reiterated the need for countries to revisit and strengthen their emission reduction targets for 2030. This call-to-action places significant pressure on the world's most-emitting countries to formulate robust and ambitious climate plans, as well as to implement stronger policies aimed at curtailing GHG emissions. In 2022, companies in the S&P 500 generated the highest level of GHG emissions ever disclosed but demonstrated the smallest proportional increase in median total GHG emissions (3%), compared to S&P MidCap 400 companies (7%) and companies on the Russell 3000 Index (32%). This relatively lower year-on-year change among the larger companies on the S&P 500 was likely due to greater investment to control or reduce emission production.

The utilities, energy, and materials sectors had the highest rate of GHG emission disclosure and the highest total median GHG emissions. Energy producers were the highest GHG emitters, followed by companies in the materials sector, which

Exhibit 30 to Decl. of Thomas Lyon
640
**SER 119**

encompasses energy-intensive production to make things such as cement, steel, and aluminum. Reporting in these sectors is typically more regulated due to their environmental impact.

**Expanding scope—Scope 3 emission reporting.** The proposed SEC ruling and many securities exchanges focus on Scope 1 (direct) and Scope 2 emissions (indirect, i.e., emissions from purchased power), with Scope 3 emissions (indirect, i.e., supply chain) only reported if the company is already doing so or if it is material to the company. However, pressure is mounting to compel companies to extend their reporting to encompass emissions reporting throughout their supply chains. Notably, the EU's Corporate Sustainability Reporting Directive (CSRD) and California's Climate Corporate Data Accountability Act both require Scope 3 emission disclosure, while the proposed SEC ruling would require it if the Scope 3 emissions are material or if the company has set a GHG emissions target or goal that includes Scope 3 emissions. Furthermore, the Science-Based Target Initiative stipulates that companies account for supply chain emissions in their targets and strategies.

The importance of including Scope 3 emissions in reporting was underscored by the fact that such emissions accounted for the largest amount of GHG emissions in all sectors except energy, utilities, and materials. CEOs have identified supply chain disruptions as a top-five high-impact issue in 2023,[2] and supply chains will continue to be a key focus even as ESG concerns mount. The SEC climate disclosure rules, the California climate-related legislation, and the CSRD are expected to place greater scrutiny on companies to gain a more comprehensive understanding of emissions originating from their supply chains, in line with national efforts to reduce GHG emissions.

While most public, investor, and corporate attention is focused on carbon emissions, there are many different types of GHG emissions. Other GHGs are often industry-specific, with no correlation to company size or index but may contribute significantly to climate change:

- Information technology: This sector has emerged as a substantial emitter of ozone-depleting substances, nitrogen trifluoride, and perfluorochemicals (PFCs).

- Health care: This sector produces a considerable amount of volatile organic compounds and PFCs.

- Consumer staples: This sector produces large amounts of methane and hydrofluorocarbons.

Given that the SEC regulations speak to the full range of GHG emissions, it is important for boards and management to familiarize themselves with the full range of relevant GHG emissions at their company and supply chain.

2 of 14

Exhibit 30 to Decl. of Thomas Lyon
641
SER 120

# Regulatory and Self-Regulatory Efforts to Standardize Climate Risk Disclosure

Recently, we have seen multiple efforts by regulators in the US and Europe to standardize climate-related disclosures. However, because of the lack of effective coordination and consistency among these regulatory regimes, companies are now facing multiple layers of overlapping and inconsistent reporting obligations. Some of the more notable developments include:

- In March 2022, the SEC proposed a draft rule on Enhancement and Standardization of Climate-Related Disclosures for Investors, which would impose climate-related reporting requirements on both US and foreign public companies.

- In January 2023, the EU approved the Corporate Sustainability Reporting Directive (CSRD), which imposes reporting obligations on companies, including thousands of US-headquartered firms, relating to multiple ESG-related areas. Looking ahead, the EU is poised to adopt the Corporate Sustainability Due Diligence Directive (CSDDD). Unlike CSRD's focus on reporting, the CSDDD will aim at improving corporate compliance; if adopted, will require thousands of companies headquartered around the world to eliminate existing negative business impacts on the environment and society.

- In June 2023, the International Sustainability Standards Board (ISSB) approved two International Financial Reporting Standards (IFRS #1 and #2) relating to general sustainability reporting and to climate-related disclosures. While these standards will be voluntary in the US and Europe, they are expected to become mandatory in other jurisdictions throughout the world.

- In October 2023, California enacted two laws requiring large public and private US companies to disclose their GHG emissions (Scope 1, 2, and 3) and their climate financial risks.

The emerging regulatory regime, especially for large US-headquartered multinational companies, is characterized by the following:

1. **The EU is setting the pace.** CSRD will apply to non-EU companies with a) a net turnover of €150 million for each of the last two consecutive years; and b) either a large or listed EU subsidiary or an EU branch that generated net turnover greater than €40 million in the preceding financial year. It is estimated that CSRD will directly affect over 3,000 US firms. CSRD is sweeping in its scope (applying to 10 ESG areas), considering its requirement to disclose based on the standard of double materiality (i.e., ESG-related activities that have a material impact on the company or material external impact through the company's upstream and downstream value chain) and its expectation that companies obtain a certain degree of third-party assurance.

2. **There are no safe harbors, so companies face multiple layers of regulation.** Adhering to SEC requirements will not exempt companies from fulfilling their obligations under other regulations. For example, given the granularity of the CSRD's standards and considering that the SEC's announced regulatory approach will instead be principle-based, the SEC climate-related disclosure rules are unlikely to qualify for the CSRD's provision that accepts comparable reporting.

3. **Private companies are affected, too.** The California climate-related legislation applies directly to both public and private companies. Companies that are not directly required to report under the CSRD will, if they are upstream or downstream of a company that is covered, need to provide ESG-related information to companies that are directly covered.

Rather than aiming for minimal compliance with each of these distinct regulatory regimes, which can result in a complex hodgepodge of reporting, companies may find it more efficient and effective to aim higher for more consistent reporting around the world. Even though CSRD's reporting requirements may not come into effect for many US firms for a few years, companies should begin to build the reporting infrastructure now.

2 of 14

Exhibit 30 to Decl. of Thomas Lyon
642
**SER 121**

Exhibit 30 to Decl. of Thomas Lyon
643
**SER 122**

## Renewables Are on the Rise

The proposed SEC climate reporting requirements will compel companies to both disclose emissions and actively work toward reducing them. Renewable energy is emerging as an attractive entry point for smaller enterprises to help meet these goals, thanks to an increasingly favorable return on investment. While concerns about transition costs persist, a substantial portion of global CEOs (49%) and C-Suite executives (59%) surveyed in The Conference Board C-Suite Outlook for 2023 believe that the shift toward renewable energy will yield significant benefits for their organizations. Investing in renewables can not only lead to direct cost savings for businesses, but it also offers a more sustainable approach than relying on offsets, as the latter entails operational costs and can be viewed as a strategy for emission avoidance rather than genuine reduction.

In support of this transition, global renewable energy production is expected to jump by one-third in 2023: by 107 gigawatts (GW)—the equivalent of Germany and Spain's combined power consumption—to more than 440 GW. Two-thirds of this increase is expected to come from photovoltaics, with global photovoltaics manufacturing potential set to double in 2023–24.[3] Meanwhile, new policy measures are leading to significant increases in renewable production in the US,[4] facilitating accessibility to businesses of all sizes.

Just like emission reduction programs and other climate change risk mitigation strategies, renewable energy use is on an upward trajectory: in fact, year-on-year increases in renewable energy adoption have outpaced the corresponding growth in median GHG emissions; over 50% of companies in the S&P 500 disclosed renewable use, aligning with the observed trend of lower GHG emissions. However, just like in the emission area, only 26% of S&P MidCap 400 companies reported using renewable energy in 2022, yet they showcased the most significant year-on-year surge in renewables adoption, at 302%.

This marked uptake in renewable energy use among smaller companies could be attributed to a combination of factors, such as:

- The relative attractiveness of self-producing energy.
- Increased return on investment for renewable energy initiatives considering high global energy prices; and
- Greater access for smaller companies to power-purchase agreements (PPAs), including virtual PPAs, which eliminate the need for substantial upfront capital investment for solar installations.

Exhibit 30 to Decl. of Thomas Lyon
644
**SER 123**

There exists an inverse relationship between overall energy consumption and the percentage of renewable energy different sectors use: the sectors with the highest energy consumption— utilities, materials, and energy—demonstrated a relatively lower proportion of renewable energy adoption. This can be attributed to various factors, including their historical reliance on fossil fuels, infrastructure limitations, and challenges transitioning to renewable sources.

However, when viewed in absolute terms, utilities, materials, and energy reported the greatest renewable use. It is encouraging to note that many companies in the utilities and energy sectors are investing heavily in the transition to renewables, although clearly more substantial investment, infrastructure development, and innovation is required to facilitate the adoption of cleaner energy alternatives.

## More Robust Climate Reporting Will Require Companies to Increase External Assurance

As noted above (see the box titled "Regulatory Efforts to Standardize Climate Risk Disclosures"), there are several initiatives underway to standardize reporting on climate and other ESG topics, including SEC disclosure regulations, the EU's CSRD, and the ISSB standards.

While the SEC and EU rules will set the reporting obligations for companies under their jurisdiction, the ISSB standards may well set expectations for firms in the US and Europe, as well as being adopted by regulators to directly apply to companies outside the US and EU.

Large multinational companies can therefore expect to need to adhere to the SEC, CSRD, and ISSB standards. But even so, other voluntary reporting frameworks are likely to remain in place, including: the Taskforce for Climate-Related Financial Disclosures (TCFD), with which the SEC draft rule is aligned; the UN's Sustainable Development Goals (SDGs); and the framework established by the Global Reporting Initiative (GRI).

According to ESGAUGE data, the most common climate risk reporting frameworks to which sustainability disclosures refer are:

2 of 14

Exhibit 30 to Decl. of Thomas Lyon
645
SER 124

Given ISSB's incorporation of SASB and CDP (which will ultimately transition into IFRS Sustainability Standards using the ISSB Framework), and the SEC's alignment with TCFD, we may see an increase in adherence to the first two frameworks listed in the table above and a decline with respect to the other three. In any event, we should see an increased use of assurance services with respect to climate disclosures.

For instance, per the CSRD, non-EU companies' disclosures will need third-party assurance by a European or third-party auditor. The proposed SEC rules and the California climate-related legislation will also require independent verification, at least for Scope 1 and 2 GHG emissions.

2 of 14

Exhibit 30 to Decl. of Thomas Lyon
646
**SER 125**

## Conclusion

Climate change poses a significant but not insurmountable challenge, and history has shown the capacity of humankind to overcome formidable obstacles. Perhaps one of the most striking examples of successful climate protection legislation to date is the Montreal Protocol, an international agreement made in 1987 that effectively banned chlorofluorocarbons in a bid to reverse the damage to the ozone layer.

The trend toward climate-related disclosures is unmistakable, signaling a commitment to more comprehensive reporting and transparency. This will be strengthened by the SEC and CSRD's climate reporting standards, while the growing emphasis on external assurance will add an extra layer of accountability to climate-related reporting.

The largest corporations are leading the way in terms of climate-related disclosures and minimizing the increase in GHG emissions, despite often being among the biggest contributors to GHG emissions. This underscores their pivotal role in the transition toward renewable energy: over 50% of companies on the S&P 500 now report using renewable energy, showcasing a commitment to more sustainable practices.

Companies with robust climate governance were often found in highly regulated industries associated with significant emissions—utilities, energy, and materials—and tended to set climate goals further into the future, reflecting a realistic assessment of the time required for meaningful change. By comparison, companies with less at stake (or perhaps a more limited understanding of climate issues) tend to set short-term targets.

Substantial opportunity remains to address climate, especially among smaller and less regulated companies. While their efforts will need to be tailored to the company's specific circumstances and strategy, they can benefit from the experience of their larger counterparts, including in ensuring that their GHG policies and targets are not set in isolation, but as part of the company's broader board-approved business strategy.

Exhibit 30 to Decl. of Thomas Lyon
647
**SER 126**

## Methodology and Access to Data

This report highlights key findings from an analysis of the disclosure of climate-related and sustainability reporting metrics by 2,969 companies in the Russell 3000 Index conducted by The Conference Board and ESG data analytics firm ESGAUGE. Comparisons are made with companies in the S&P 500 Index and the S&P MidCap 400. Data analysis is complemented with insights from a series of roundtables and focus groups held by The Conference Board on the topic of climate-related disclosure in the course of 2023.

Data comprising 86 reported metrics were compiled by ESG data analytics firm ESGAUGE from companies' publicly reported sustainability information, including annual reports, proxy statements, sustainability/CSR reports, and company websites. This report analyzed and presented findings from 52 core metrics, which had additional levels such as rates of disclosure and intensity across each of the three indexes, company size (revenue and asset value), and business sector.

The full dataset for this report can be accessed and visualized through an interactive online dashboard available at **https://conferenceboard.esgauge.org/environmental**.

This report presents key findings for climate-related disclosures; greenhouse gas, CO2, CO, and other atmospheric emissions; energy and electricity use; and climate-related reporting and external assurance, with the following key assumptions:

1. Greenhouse gas emissions include Scope 1 and 2 emissions due to the varying definitions and difficulties measuring Scope 3 emissions.

2. Preference was given to the location-based approach for Scope 2 emissions as companies typically disclose their Scope 1 emissions based on location. If location-based data was not available, the study used market-based Scope 2 emissions or unspecified Scope 2 emissions.

3. Board expertise indicates whether a company identifies a board member with expertise in specific environmental, climate and sustainability matters. This is based on skill matrix disclosures provided in a proxy statement, which highlights skills possessed by each director. ESGAUGE then examines the background and experience listed of each director's biography. This process aligns with the framework established by the CDP (section C1.1d).

4. Board responsibility indicates whether a company identifies board members or board committees responsible for oversight of climate-related risks, with a focus on the board's risk assessment. This specifically refers to physical risks posed by climate change to a company's operations, supply chain and financial performance. This is sourced from proxy statements, sustainability or ESG reports, and reports from the CDP (section C1.1) and TCFD.

### Endnotes

[1] Merel Spierings, **Linking Executive Compensation to ESG Performance**, The Conference Board, October 2022 **(go back)**

[2] Chuck Mitchell et al., **C-Suite Outlook 2023: On the Edge: Driving Growth and Mitigating Risk Amid Extreme Volatility**, The Conference Board, January 2023. **(go back)**

[3] Cristen Hemingway Jaynes, **2022 Was a Record-Breaking Year for Renewable Energy in the UK**, World Economic Forum, January 6, 2023. **(go back)**

Exhibit 30 to Decl. of Thomas Lyon
648
**SER 127**

[4] International Energy Agency, **Renewable Power on Course to Shatter More Records as Countries Around the World Speed up Deployment**, IEA press release, June 1, 2023.
**(go back)**

Exhibit 30 to Decl. of Thomas Lyon
649
**SER 128**

# Exhibit 12
# to Declaration of Thomas Lyon

# Press Release from Apple's Website discussing the Apple Watch

Exhibit 12 to Decl. of Thomas Lyon

237

SER 129

**Newsroom**

Apple Services        Apple Stories        🔍 Search Newsroom

PRESS RELEASE  ·  September 12, 2023

# Apple unveils its first carbon neutral products

The new Apple Watch lineup marks major progress toward ambitious Apple 2030 climate goal







Apple's first carbon neutral products are the result of years of significant work and innovation across the company and its global supply chain, including the use of wind and solar.                    ↓

**CUPERTINO, CALIFORNIA** — Apple today announced its first-ever carbon neutral products in the all-new Apple Watch lineup. Innovations in design and clean energy have driven dramatic reductions in product emissions of over 75 percent for each carbon neutral Apple Watch.[1] This milestone marks a major step in the company's journey toward its ambitious Apple 2030 goal to make every product carbon neutral by the end of the decade, including the entire global supply chain and the lifetime use of every device Apple makes.

As part of Apple 2030 and the company's broader environmental efforts, Apple has also ended the use of leather across all of its product lines, announced its

Exhibit 12 to Decl. of Thomas Lyon

238

**SER 130**

first entirely fiber-based packaging for the new Apple Watch lineup,[2] and continued to expand the use of recycled materials in iPhone. The company also introduced a new tool in the Home app called Grid Forecast,[3] which helps inform users when their power grid has cleaner energy available, so they can decide when to use electricity.

"At Apple, we have a longstanding and proven commitment to leading the fight against climate change. Our focus on renewable energy and low-carbon design has already driven industry-leading emissions reductions, and we're not slowing down," said Lisa Jackson, Apple's vice president of Environment, Policy, and Social Initiatives. "We've achieved an important milestone in making the world's most popular watch carbon neutral — and we will keep innovating to meet the urgency of the moment."

**Every Product Carbon Neutral by 2030**

Apple has adopted a clear and rigorous approach to product decarbonization that prioritizes reducing greenhouse gas emissions from the three biggest sources across the product life cycle: electricity, materials, and transportation. Only after Apple steeply cuts product emissions, will the company apply high-quality carbon credits from nature-based projects for emissions that cannot yet be avoided or reduced with existing solutions.

Each carbon neutral Apple Watch model meets the following strict criteria: 100 percent clean electricity for manufacturing and product use, 30 percent recycled

Exhibit 12 to Decl. of Thomas Lyon

or renewable material by weight, and 50 percent of shipping without the use of air transportation.[4] These combined efforts result in at least a 75 percent reduction in product emissions for each model. The company will use high-quality carbon credits to address the small amount of remaining emissions, resulting in a carbon neutral product footprint. Every carbon neutral Apple Watch — which includes any aluminum Series 9 and SE models when paired with a new Sport Loop, and Apple Watch Ultra 2 when paired with a new Trail Loop or Alpine Loop — is certified by SCS Global Services, a leader in environmental standards and certification.

## The Path to 2030

Apple's first carbon neutral products are the result of years of significant work and innovation across the company and its global supply chain. They also represent the latest step on a journey that began over a decade ago.

In 2020, Apple achieved carbon neutrality for its global corporate operations and announced Apple 2030: a bold strategy to be carbon neutral across its entire value chain by 2030. Apple's plan centers on an aggressive 75 percent reduction in overall carbon emissions from 2015 levels. By avoiding activities that generate carbon, significantly expanding renewable energy across the company's corporate operations and supply chain, and designing with recycled and renewable materials, Apple has so far reduced total emissions by over 45 percent since 2015, while still growing revenue by over 65 percent in the same period.

As Apple accelerates efforts to decarbonize its value chain, every product represents an opportunity to reduce emissions — from the electricity used for manufacturing and charging devices, to materials and shipping.

Exhibit 12 to Decl. of Thomas Lyon

240

SER 132

## Spurring Progress in Clean Electricity

All manufacturing for the carbon neutral Apple Watch models is powered by 100 percent clean electricity through investments and sourcing by Apple and its suppliers. Additionally, every supplier that manufactures parts and components for these models has committed to 100 percent renewable electricity for all of their Apple production by the end of the decade. Apple also works with manufacturing partners around the world to advocate for policies that support wider deployment of clean energy solutions.

Apple began building and investing in large-scale solar and wind farms to power its data centers and offices over a decade ago. In 2015, the company started working with its manufacturing partners to help them create and invest in their own solar and wind projects, and source renewable energy for all Apple production. Since 2018, all of Apple's corporate offices, data centers, and retail stores worldwide have been powered by renewable electricity.

Exhibit 12 to Decl. of Thomas Lyon
241
SER 133

Thanks to these combined efforts, Apple and its global suppliers support more than 15 gigawatts of clean energy around the world today — enough to power over 5 million American homes. Across all product lines, more than 300 global suppliers — representing over 90 percent of Apple's direct manufacturing spend — have now joined Apple's Supplier Clean Energy Program, committing to 100 percent renewable electricity for all Apple production by the end of this decade.

Electricity for manufacturing and charging devices represents the largest source of Apple's emissions across all product lines. To address the latter, Apple has committed to invest in large-scale solar and wind projects around the world. For the carbon neutral Apple Watch models, the company will match 100 percent of customers' expected electricity use for charging.

### Innovating in Low-Carbon Design

Apple has pioneered the use of many key recycled materials in its products through world-class product engineering, extensive design qualification, and supply chain expertise. The new products announced today build on these achievements.

To further reduce impact on the planet, Apple is ending the use of leather across all of its product lines, including iPhone accessories and Apple Watch bands. The company will replace leather with a new textile called FineWoven, an elegant and durable twill made from 68 percent post-consumer recycled content. FineWoven offers a subtle luster and a soft, suedelike feel, and is available on iPhone MagSafe cases and wallets as well as the Magnetic Link and Modern Buckle Apple Watch bands.

Exhibit 12 to Decl. of Thomas Lyon

242

**SER 134**

As recycled and renewable materials often have a lower carbon footprint than primary materials, Apple's industry-leading progress in the use of recycled content also advances the company's Apple 2030 goal. The new FineWoven material has significantly lower emissions compared to the more carbon-intensive leather, and both the new iPhone 15 and the Apple Watch lineups advance progress toward the company's 2025 targets for the use of 100 percent recycled metals in key components. This includes 100 percent recycled rare earth magnets and the company's first use of 100 percent recycled cobalt in the battery of iPhone 15, Apple Watch Series 9, and Apple Watch Ultra 2.[5] Additionally, the popular Sport Loop has been redesigned with 82 percent recycled yarn, which includes material from discarded fishing nets. Customers looking to upgrade to the new carbon neutral Apple Watch models can take advantage of Apple Trade In, and Apple will refurbish the device for a new owner, or recycle it for free.

Exhibit 12 to Decl. of Thomas Lyon

243

**SER 135**

Apple is also accelerating progress toward plastic-free packaging by 2025. In addition to achieving the first 100 percent fiber-based packaging for the new Apple Watch and band lineup, the packaging for every iPhone 15 model is over 99 percent fiber-based.

**Reducing Transportation Emissions**

Transporting products around the world makes up about 9 percent of Apple's comprehensive carbon footprint. The company is shifting more product volume

Exhibit 12 to Decl. of Thomas Lyon
244
**SER 136**

to shipping modes that are less carbon-intensive than air transport, such as ocean or rail. Apple's carbon footprint methodology shows that shipping the same product by ocean emits 95 percent fewer emissions than by air.

For the carbon neutral Apple Watch models, including watches and bands, the company will ship at least 50 percent of the combined weight using non-air modes, cutting total transportation emissions nearly in half. Additionally, the packaging of all Apple Watch Series 9 and SE models has been redesigned for compactness, with a new, smaller shape that allows for 25 percent more devices per shipment.

At the same time, Apple is committed to supporting broader efforts to decarbonize shipping industries, such as by being a member of the First Movers Coalition, and by supporting analysis to identify pathways for developing sustainable aviation fuels. The company also seeks out technical innovations — including the use of alternative fuels and electric vehicles — and selects vendors that offer low-carbon options to help further drive decarbonization in the industry.

## Investing in High-Quality Carbon Removal

After achieving steep reductions in product emissions, Apple plans to cover residual emissions with high-quality carbon credits primarily from nature-based projects that remove carbon from the atmosphere, like restoring grasslands, wetlands, and forests. Carbon removal is critical to addressing climate change and achieving global climate goals, as leading scientific bodies like the United Nations Intergovernmental Panel on Climate Change have emphasized.

Apple defines high-quality credits as those from projects that are real, additional, measurable, and quantified, with systems in place to avoid double-counting, and that ensure permanence. Apple has helped advance natural carbon-removal solutions that meet this definition by creating the innovative Restore Fund, which currently supports projects in Latin America. The company uses credits from projects that are certified to international standards such as Verra; the Climate, Community & Biodiversity Standards; and the Forest Stewardship Council.

For the carbon neutral Apple Watch models, the high-quality carbon credits used to compensate for the remaining emissions will come from projects like the Restore Fund's investments with Arbaro Advisors and BTG Pactual Timberland Investment Group, which are helping to restore and protect high-quality working forests and native ecosystems in Paraguay and Brazil.

Exhibit 12 to Decl. of Thomas Lyon
245
SER 137

**Introducing Grid Forecast**

As Apple decarbonizes its value chain, the company is also committed to engaging with customers and creating technology that helps them understand and address their environmental impact.

Grid Forecast is a new tool in the Home app on Apple devices that shows when a user's electrical grid has relatively cleaner or less clean energy sources available. For example, there are times when wind and solar projects produce more energy than the grid can use, leading to some of it being wasted. There are also times when electricity is being generated with lower emissions. By using electricity during these cleaner times, customers may lower the climate impact of the electricity they use at home.

Exhibit 12 to Decl. of Thomas Lyon

246

SER 138

Apple uses data that combines grid, emissions, and weather information into one, easy-to-follow signal. This can help people make decisions about the best time to run large appliances and charge electric vehicles or devices throughout the day. In the contiguous United States, Grid Forecast is available in the Home app on iPhone, iPad, Mac, and Apple Watch, and can be added as an iOS widget or a watch face complication. As additional data becomes available through ongoing industry collaboration, Apple will continue refining Grid Forecast to maximize impact.

Beyond its 2030 goal, Apple is also working toward a 90 percent reduction in emissions by 2050 — which requires advocating for collective action from governments, businesses, and individuals to accelerate global progress in the fight against climate change.

For more information on Apple's 2030 climate goal and the environmental impact of Apple products, visit apple.com/2030.

**Share article**

**Aa  Text of this article**    Copy text

Exhibit 12 to Decl. of Thomas Lyon
247

**Images in this article**                    Download all images ⬇

**About Apple**

Apple revolutionized personal technology with the introduction of the Macintosh in 1984. Today, Apple leads the world in innovation with iPhone, iPad, Mac, Apple Watch, and Apple TV. Apple's five software platforms — iOS, iPadOS, macOS, watchOS, and tvOS — provide seamless experiences across all Apple devices and empower people with breakthrough services including the App Store, Apple Music, Apple Pay, and iCloud. Apple's more than 100,000 employees are dedicated to making the best products on earth, and to leaving the world better than we found it.

1. Carbon reductions are calculated against a baseline scenario: No use of clean electricity for manufacturing or product use, beyond what is already available on the grid; Apple's carbon intensity of key materials as of 2015; and Apple's average mix of transportation modes by product line across three years.

2. The breakdown of U.S. retail packaging is by weight. Adhesives, inks, and coatings are excluded from calculations of plastic content and packaging weight.

3. Grid Forecast will be available in the contiguous United States.

4. 50 percent or more of all carbon neutral products by total weight are planned, as of product launch, to be shipped using non-air modes of transportation — like ocean freight — from the factory to their next destination over the lifetime of the products.

5. All cobalt content claims are based on a mass balance allocation.

## Press Contacts

**Apple Media Helpline**

media.help@apple.com

## Latest News



⚡ QUICK READ

**Apple Intelligence features expand to new languages and regions today**

March 31, 2025



UPDATE

**Apple Intelligence comes to Apple Vision Pro today with visionOS 2.4**

March 31, 2025



APPLE STORIES

**How the mind-splitting world of *Severance* comes together on Mac**

March 26, 2025

 Newsroom

Exhibit 12 to Decl. of Thomas Lyon

248

**SER 140**

**The latest news and updates,
direct from Apple.**

Read more

 Newsroom  >  Apple unveils its first carbon neutral products

| Shop and Learn | Account | Apple Store | For Business | Apple Values |
|---|---|---|---|---|
| Store | Manage Your Apple Account | Find a Store | Apple and Business | Accessibility |
| Mac | Apple Store Account | Genius Bar | Shop for Business | Education |
| iPad | iCloud.com | Today at Apple | | Environment |
| iPhone | | Group Reservations | For Education | Inclusion and Diversity |
| Watch | Entertainment | Apple Camp | Apple and Education | Privacy |
| Vision | Apple One | Apple Store App | Shop for K-12 | Racial Equity and Justice |
| AirPods | Apple TV+ | Certified Refurbished | Shop for College | Supply Chain |
| TV & Home | Apple Music | Apple Trade In | | |
| AirTag | Apple Arcade | Financing | For Healthcare | About Apple |
| Accessories | Apple Fitness+ | Carrier Deals at Apple | Apple in Healthcare | Newsroom |
| Gift Cards | Apple News+ | Order Status | Mac in Healthcare | Apple Leadership |
| | Apple Podcasts | Shopping Help | Health on Apple Watch | Career Opportunities |
| Apple Wallet | Apple Books | | Health Records on iPhone and iPad | Investors |
| Wallet | App Store | | | Ethics & Compliance |
| Apple Card | | | For Government | Events |
| Apple Pay | | | Shop for Government | Contact Apple |
| Apple Cash | | | Shop for Veterans and Military | |

More ways to shop: Find an Apple Store or other retailer near you. Or call 1-800-MY-APPLE.

Copyright © 2025 Apple Inc. All rights reserved.    Privacy Policy | Terms of Use | Sales and Refunds | Legal | Site Map    United States (English) | Español

Exhibit 12 to Decl. of Thomas Lyon
249
**SER 141**

# Exhibit 11
# to Declaration of Thomas Lyon

# Mars' Webpage describing its
# Net Zero commitment

Exhibit 11 to Decl. of Thomas Lyon

228

**SER 142**

# MARS

Policies & Practices

# Mars Carbon Neutral Brands



# Carbon neutral brands contribute to Mars Net Zero by 2050 commitment

We use cookies to personalize content and ads, to provide social media features and to analyze our traffic. See our **cookie policy** ⬈. You can use cookie settings to change your preferences. Click "Accept cookies" to enable all cookies, or "Reject cookies" if you do not want them.

**Cookies Settings**

Reject All

Accept All Cookies

Exhibit 11 to Decl. of Thomas Lyon
229
SER 143

the UK, Ireland, and Canada and Kitten and Puppy Growth Programs from the ROYAL CANIN® brand are some of the first products to undergo this certification.

## What does it mean for a Mars product to be carbon neutral?

Carbon neutrality is a state in which human activities result in no net effect on the climate system as defined by Intergovernmental Panel on Climate Change (IPCC). For a product, this is achieved by calculating the GHG footprint through a life cycle assessment and reducing it to zero through a combination of reduction/efficiency measures within the operations and using carbon credits to offset the remaining emissions. For a product to achieve and maintain carbon neutrality in a specific time, the entire footprint of the product for that time period must be offset with carbon credits.

**Step 1: Calculate the product's GHG footprint**

Mars uses the cradle-to-grave approach to calculate the footprint of a product for carbon neutral certification:

- Cradle-to-Grave: The GHG emission for the product's entire life cycle from the extraction of its raw materials to the emissions created during its disposal. Cradle-to-grave is generally used to certify business-to-consumer (B2C) products.

**Step 2: Reduce the footprint of the product**

Emission reduction activities can occur at the company's operations, upstream in the value chain, or downstream of the production of the product. Common strategies for reduction efforts include reducing the footprint of ingredients through reformulation, stopping deforestation, or using climate-smart agriculture; reducing logistics emissions; using renewable energy; and reducing waste. Emission reduction activities often require business transformation and engagement with suppliers several tiers up the value chain and can take several years to deliver measurable emission reductions. After any reductions are achieved, a product's carbon footprint must be recalculated to demonstrate the impact of emissions reductions.

We use cookies to personalize content and ads, to provide social media features and to analyze our traffic. See our **cookie policy** ⬀. You can use cookie settings to change your preferences. Click "Accept cookies" to enable all cookies, or "Reject cookies" if you do not want them.

Exhibit 11 to Decl. of Thomas Lyon
230

# What is a carbon credit?

A carbon credit is a certified transferrable instrument that represents an emission reduction, avoidance or removal of one metric ton of greenhouse gas (GHG) emissions. After issuance of a carbon credit, the eventual owner can then later permanently retire it against a claim – meaning it cannot be reused.

In addition to GHG emission benefits, these projects can have other benefits such as protecting ecosystems, enhancing biodiversity, providing job opportunities, supporting farmers, and empowering communities.

Mars purchases removal credits only. Removal credits come from projects or activities that absorb or pull carbon from the atmosphere. The projects underlying these carbon credits are validated and verified according to internationally known standards such as the Gold Standard, Verified Carbon Standard, and American Carbon Registry, amongst others. and are retired on third-party registries such as Impact, Verra and ACR.

This assures that the carbon credits we use are real, additional (beyond business-as-usual activities), measurable and permanent. In addition to the registries, Mars has a stringent due-diligence process to measure these projects' environmental, carbon and social impact.

We use cookies to personalize content and ads, to provide social media features and to analyze our traffic. See our cookie policy ⬈. You can use cookie settings to change your preferences. Click "Accept cookies" to enable all cookies, or "Reject cookies" if you do not want them.

Exhibit 11 to Decl. of Thomas Lyon
231
**SER 145**



Image A: Illustrative example of GHG Footprint Y-o-Y reductions and carbon credits to be retired to achieve and maintain carbon neutral certification in accordance with the PAS 2060:2014 standard.

**Step 4: Carbon neutral certification**

Carbon neutral certification of a product is verified through the PAS 2060:2014 Standard for Carbon Neutrality, which is an independent, rigorous, and internationally recognized standard

We use cookies to personalize content and ads, to provide social media features and to analyze our traffic. See our **cookie policy** [↗]. You can use cookie settings to change your preferences. Click "Accept cookies" to enable all cookies, or "Reject cookies" if you do not want them.

Exhibit 11 to Decl. of Thomas Lyon
232
**SER 146**

# Net Zero Done Right: Important role carbon neutral products play towards our Net Zero 2050 commitment

The science is clear – climate change is real, and around the world people are already beginning to feel its effects. To do our part of avoiding the worst effects of climate change, Mars is committed to achieving net zero greenhouse gas (GHG) emissions in our full value chain by 2050 (including all scope 3 emissions, such as those created by suppliers and customers), aligning with the most ambitious aim of the Paris Agreement to limit global temperature rises to 1.5 °C. This commitment includes our existing science-based targets to achieve a 27% reduction in full value chain emissions by 2025, and net zero emissions in our direct operations by 2040.

The road to achieving net zero by 2050 is complex; however, we're confident in the actions we're taking and will continue to raise our ambition as science evolves and technology improves. When we achieve net zero, all our brands will be carbon neutral.

Our brands play a crucial role in driving progress, and some of them are pursuing carbon neutral certification before 2050. While we agree that the highest priority of net zero action is to reduce emissions urgently, we see several ways that carbon neutral certification for products can contribute to this goal.

1. **Carbon neutral brands help embed climate action into our business model.** We believe our brands have an important role to play in engaging consumers on critical issues, such as climate change, to help create more awareness so that consumers have a choice to support the brands they love that are taking climate action - today.

2. **Carbon neutral brands will be accountable for GHG reductions internally and externally.** This includes subjecting brands to our own internal review, implementing year-on-year reductions strategies to reduce emissions and advancing our capabilities of product-footprint accounting. Our carbon neutral brands will be accredited through the PAS 2060:2014 Specification for the demonstration of Carbon Neutrality, providing full transparency to consumers about the standard we are using to achieve this goal. This

We use cookies to personalize content and ads, to provide social media features and to analyze our traffic. See our cookie policy ↗. You can use cookie settings to change your preferences. Click "Accept cookies" to enable all cookies, or "Reject cookies" if you do not want them.

Exhibit 11 to Decl. of Thomas Lyon
233

emissions reductions. We are committed to ensuring that any residual emissions are neutralized with real, durable, and socially beneficial carbon credits based on removing carbon from the atmosphere, aligned with the SBTi Net Zero Foundations paper. We believe that using high-quality carbon removal credits will help to scale up the carbon credit market and advance nature-based and technology-based solutions in service of Net Zero.

## POLICIES

Added Sugars

Animal Consumption of Confectionery Products

Animal Research

Anti-Corruption

Artificial Colors

Beef

Biomedical and Clinical Research Involving Human Participants

CA Supply Chain Transparency Act

Cage-Free Eggs

CCPA Rights Metrics

Climate Action

We use cookies to personalize content and ads, to provide social media features and to analyze our traffic. See our cookie policy ↗. You can use cookie settings to change your preferences. Click "Accept cookies" to enable all cookies, or "Reject cookies" if you do not want them.

Exhibit 11 to Decl. of Thomas Lyon
234
SER 148

Fish

Food Nutrition Criteria

Fortification and the Use of Active Ingredients in Human Foods

Gender Equality in the Cocoa Supply Chain

Genetically Modified Organisms (GMOs)

Global Human Rights Disclosure

Guidelines And Rules For Services

Human Rights

Human Rights in the Thai Fish Supply Chain

Human Rights Policy

Land Use

Mars Carbon Neutral Brands

Mars Statement on Human Rights Defenders

Privacy

Protecting Children Action Plan

Public Policy and Advocacy

Pulp & Paper-Based Materials

We use cookies to personalize content and ads, to provide social media features and to analyze our traffic. See our cookie policy ↗. You can use cookie settings to change your preferences. Click "Accept cookies" to enable all cookies, or "Reject cookies" if you do not want them.

Exhibit 11 to Decl. of Thomas Lyon
235



Responsible Marketing and Our Marketing Code

Responsible Sourcing

Scientific Research and Engagement

Soy

Supplier Code of Conduct

Sustainability Financing Framework

Water Stewardship

Workplace Code of Conduct

Contact Us    Careers    Media    Policies & Practices    Cookies Settings

Follow Us

Privacy Policy    Cookies Notice    Legal    AdChoices    Accessibility

Mars Alumni    CA Supply Chain Transparency Act    Mars Supplier Gateway

Your Privacy Choices

© 2025 Mars, Incorporated and its Affiliates. All Rights Reserved

We use cookies to personalize content and ads, to provide social media features and to analyze our traffic. See our cookie policy. You can use cookie settings to change your preferences. Click "Accept cookies" to enable all cookies, or "Reject cookies" if you do not want them.

Exhibit 11 to Decl. of Thomas Lyon
236
**SER 150**

# Exhibit 8
# to Declaration of Thomas Lyon

# Aldy et al., *Show & Tell: An Analysis of Corporate Climate Messaging and Its Financial Impacts*, Financial Analysts Journal (2025)

Exhibit 8 to Decl. of Thomas Lyon
193
**SER 151**





**Financial Analysts Journal**

ISSN: (Print) (Online) Journal homepage: www.tandfonline.com/journals/ufaj20

# Show & Tell: An Analysis of Corporate Climate Messaging and Its Financial Impacts

Joseph E. Aldy, Patrick Bolton, Zachery M. Halem & Marcin T. Kacperczyk

**To cite this article:** Joseph E. Aldy, Patrick Bolton, Zachery M. Halem & Marcin T. Kacperczyk (2025) Show & Tell: An Analysis of Corporate Climate Messaging and Its Financial Impacts, Financial Analysts Journal, 81:1, 82-101, DOI: 10.1080/0015198X.2024.2444384

**To link to this article:** https://doi.org/10.1080/0015198X.2024.2444384

📅  Published online: 17 Jan 2025.

✏️  Submit your article to this journal ↗

📊  Article views: 607

🔍  View related articles ↗

⬤  View Crossmark data ↗

Full Terms & Conditions of access and use can be found at
https://www.tandfonline.com/action/journalInformation?journalCode=ufaj20

Exhibit 8 to Decl. of Thomas Lyon

Financial Analysts Journal | A Publication of CFA Institute
https://doi.org/10.1080/0015198X.2024.2444384

# Show & Tell: An Analysis of Corporate Climate Messaging and Its Financial Impacts

**Joseph E. Aldy**, **Patrick Bolton** , **Zachery M. Halem** and **Marcin T. Kacperczyk**

*Joseph E. Aldy is a professor of Environmental Policy Harvard Kennedy School, Cambridge, Massachusetts. Patrick Bolton is a professor of Finance, Columbia University, New York, New York, and Imperial College London, UK. Zachery M. Halem is the director of the Lazard Climate Center, New York, New York. Marcin T. Kacperczyk is a professor of finance, Imperial College London, UK. Send correspondence to Patrick Bolton at pb2208@columbia.edu*

As climate-induced physical and tran-sition risks to corporations are becoming more and more material, investors are increasingly scrutinizing a patchwork of voluntary climate-related public communications, namely emission disclosures, emis-sion reduction commitments, and soft information from earnings calls and other corporate announcements. We observe, for large-cap US firms, a rise in the usage of *all* forms of cli-mate communication from 2010 to 2020. Public communication is com-monly used by firms in emission-intensive sectors, such as industrials, materials, and utilities. We provide evidence that increased transparency from disclosure, especially of scope 1 and scope 2 emissions, can offset a significant portion of the P/E dis-count associated with carbon emis-sions, especially for firms in the energy and industrial sectors. A simi-lar offsetting effect is observed for positive climate-related sentiment during earnings calls Q&A, but not for the management update section of earnings calls. In contrast, decar-bonization commitments have a sub-sequent statistically insignificant impact on valuation.

**Keywords:** Carbon emissions; climate change; disclosure; earnings calls; financial cost of carbon; science-based and CDP targets

**Disclosure:** No potential conflict of interest was reported by the author(s).

**PL Credits:** 2.0

Volume 81, Number 1

## Introduction

Climate and environmental risks to corporations are increasingly being scrutinized by investors. The underlying sources of these risks are well understood in theory: climate change (induced by greenhouse gas emissions) imparts a physical impact on people, com-munities, capital, natural resources, and economies. This impact may materialize as acute events (e.g., wildfires, storms, heatwaves) or as longer-term climate phenomena (e.g., droughts, sea level rises). The transition to a decarbonized economy is also accompanied by changes in the regulatory and legal landscape, social norms, technological pro-gress, customer preferences, and capital markets. Businesses face a range of growing challenges related to climate change, including reduced access to key inputs or infrastructure; inventory damage; sup-ply chain disruptions; untenable insurance costs; regulatory, compli-ance, and litigation costs; shifts in product/service demand; and potential reputational damage.

Growing evidence suggests that capital markets are already attentive to these risks and already price relevant information on climate change risk exposures, where available. Investors have been shown to reward firms for better environmental performance with lower costs of capital (Friedman and Heinle 2016; Bolton and Kacperczyk 2021a, 2023; Pástor,

We thank two anonymous referees for very insightful comments, Jenny Cao and Arvind Kumar for assistance with the climate sentiment model and data processing, and Maxime Tchibozo and Ria Sen for editing assistance.
This research has been supported by the Lazard Climate Center. Aldy's research has also been supported by the Salata Institute for Climate and Sustainability. Bolton's research is supported by the European Research Council (ERC) under the ERC Advanced Grant program (grant agreement No. 885552 Investors and Climate Change).

© 2025 CFA Institute. All rights reserved.

**82**

Exhibit 8 to Decl. of Thomas Lyon

**SER 153**

Show & Tell

Stambaugh, and Taylor 2021) and higher financial valuations across economic sectors (Lazard Climate Center 2021; Bolton, Halem, and Kacperczyk 2022).

Less is known, however, on how the increased attention to, and pricing of, climate transition risk affects companies' climate communication and emission mitigation strategies. This study focuses on the three main channels of communication firms rely on to provide greater transparency about their climate risk exposures and their climate impact goals (the *show* part of our motivating title): (1) disclosure of carbon footprints from operations and supply chains; (2) commitments to reduce the future carbon footprint of operations, supply chains, or investments; and (3) soft information messaging through earnings calls or press releases. To better understand the overall communication strategy and interconnection of these three communication modes, we examine annual and sectoral trends of corporate messaging for a sample of large US companies[1] from 2010 through 2020. To assess the economic significance and resulting communication incentives, we further estimate the economic effects of the different communication modes on valuation discounts from climate risk exposures, in aggregate and across sectors (the *tell* part of our title). We conclude with a discussion of the implications of our findings for public disclosure policies around climate risks and corporate climate communication strategies.

### Measuring and Communicating Climate Risk.
In the absence of a standardized disclosure regime, investors can only view a firm's "greenness" through a glass darkly: that is, investors rely on the patchwork of voluntary climate-related communications that firms make. These include regulatory filings, public commitments, and soft information, like earnings call messaging and other forms of communication through the media. Each of these modes of communication provides incomplete assessments and present ambiguities. No single mode can deliver an informational "silver bullet" to the problems of transparency and comparability about climate and environmental impacts.

In the absence of a standardized measurement framework, firms may currently choose from a range of metrics to communicate their exposure to climate risk. These metrics include greenhouse gas (GHG) emissions; water usage; total waste; green revenue; natural capital levels; environmental, social, and governance (ESG) scores; and measurements of climate-related physical or regulatory risk

exposure. Unsurprisingly, the choice of metric is not altogether random: in a study of seven large firms' carbon emission reduction goals and reporting of their progress toward those objectives, Comello, Reichelstein, and Reichelstein (2021) found that firms' definition of certain metrics in their calculation of their carbon footprint are strategic, and their choices are typically tied to their emissions profile.

Through their efforts to promote standardized, comparable metrics of climate-related risks, the international Taskforce on Climate-Related Financial Disclosures (TCFD) has recently proposed a framework to encourage companies to more systematically communicate their climate-related risks. This framework has been influential in shaping climate-related disclosure regulation in advanced economies. The TCFD, which was launched by the Financial Stability Board at the Paris COP21 in 2015, was founded "to develop consistent climate-related financial risk disclosures for use by companies, banks, and investors in providing information to shareholders."[2] Its recommended framework requires companies to provide transparency on governance, strategy, risk management protocols, and benchmarking for climate-related risks and opportunities.[3] In June 2021, finance ministers and central bank governors from the G7 countries agreed to require climate-related financial reporting consistent with the TCFD's standards.[4] In April 2022, the UK became the first of these countries to implement TCFD-aligned requirements in a new mandatory disclosure regime for more than 1,300 of the UK's biggest registered companies and financial institutions.[5]

In March 2024, the US Securities and Exchange Commission (SEC) formally issued rule changes[6] that would require companies to make emissions- and climate risk–related disclosures in their filings. The required risk disclosures track much of the TCFD framework discussed above, requiring companies to illuminate how climate risks affect their business strategy and operations, as well as the governance and risk management protocols employed to mitigate them. The SEC disclosure rule has not been without controversy, however, and the commission voluntarily delayed implementation of the rule pending resolution of legal challenges in the federal court system.[7] Under the final rule, if implemented, companies would be required to disclose their exposure to physical climate risks that have a material impact on their operations, business strategy, or financial condition. In addition, if a

   © 2025 CFA Institute. All rights reserved.

Exhibit 8 to Decl. of Thomas Lyon
196
**SER 154**

**Financial Analysts Journal** | A Publication of **CFA** Institute

company has taken on climate-related targets or goals that could materially affect its operations, business strategy, or financial condition, then it would be required to disclose relevant information, including its scope 1 and 2 emissions.

In addition to frameworks for corporate disclosure, since the 2015 Paris Agreement, most of the world's national governments have pledged to decarbonize their economies and have set targets accordingly. For any country to make good on its pledge, the private sector must participate in these efforts as well. To that end, progress may have already begun: many of the 500 largest global corporations—which are collectively responsible for one-third of global GDP and the same proportion of global GHG emissions—have made public pledges to become carbon-neutral in so-called net-zero commitments (Bolton and Kacperczyk 2021a). The most common net-zero target programs for firms are the Carbon Disclosure Project (CDP) initiative, the Science-Based Target Initiative (SBTi), and Climate Action 100+. SBTi is considered the gold standard for climate commitments, as firms are required to develop decarbonization targets that, at a minimum, exceed the ambition of limiting the global temperature increase to 1.5 °C compared to pre-industrialized temperatures.[8] Shorter-term commitments must still maintain targets consistent with reaching net-zero emissions by 2050, and SBTi provides sector-specific guidance and requirements. Climate transition plans that are registered with CDP are not subject to the same degree of scrutiny and allow increased flexibility around targets and base emissions values. In fact, CDP asserted in March 2022 that less than 35% of company decarbonization targets are credible.[9]

Ex ante, it is unclear whether these commitments are a cause for optimism or circumspection. Viewing the net-zero glass as half full, public pledges may help businesses hold themselves accountable to their decarbonization initiatives and, by bolstering a business's reputation for "greenness," can enable businesses to unlock cheaper financing that is increasingly tied to climate-friendlier assets. Unfortunately, it is also possible that net-zero commitments are mostly shallow promises—good on PR but with little action to match. There has been minimal empirical work to answer this question, but a recent study (Bolton and Kacperczyk 2021b) offers a mixed outlook: companies that make commitments do indeed reduce their subsequent emissions, but not by much. Moreover, the firms that are most likely to

commit and make the most ambitious commitments are typically companies with lower carbon emissions in the first place. We will present findings that shed more light on this issue.

Corporate communications—in the form of quarterly earnings calls, firm announcements, or corporate sustainability reports—may also be an important channel for a firm to signal its greenness. Earnings calls are a particularly important means of communication (Brown and Zhou 2015), though views vary as to whether the earnings call is an appropriate venue to discuss sustainability or ESG performance more broadly (Eccles and Serafeim 2013; Eckerle, Whelan, and Tomlinson 2020; Setterberg and Sjöström 2021). Chava, Du, and Malakar (2021) use natural language processing to analyze earnings calls of public companies and find that discussion of climate-related subjects is linked with better sustainability performance. However, Dzieliński et al. (2022) find that the relationship is more conditional: discussions of climate are linked to decreases in $CO_2$ emissions in the year following the call, except in certain countries, including the US, where increased climate talk is correlated with ex post lower stock returns.

**Empirical Trends in Climate Communication.** In examining companies in the Russell 3000 over a 10-year period, we observe several patterns around climate communication. First, there has been a consistent and steady increase in GHG disclosure, across all scopes, from 2010 to 2020 (Table 1A). The time span is characterized by a 174% and 163% rise in scope 1 and 2 emissions disclosure, respectively. At present, about a quarter of all large-cap US firms provide some climate disclosure (scope 3 rates still sit below 10%). However, major sectoral variation exists in disclosure rates. Carbon-intensive corporates in utilities, energy, and materials disclose at much greater rates (in 2020, the rates of disclosure covering operational emissions for these sectors were 69%, 62%, and 58%, respectively) than those in less carbon-intensive sectors (Table 1B). Consumer staples firms are also among the most transparent, which is likely attributed to the heightened public visibility of consumer-facing entities.

When it comes to commitments, we consider two types of margins: the extensive margin, which relates to a firm's decision to participate in a decarbonization commitment coalition through either CDP or SBTi, and the intensive margin, which examines the different strengths of company

Exhibit 8 to Decl. of Thomas Lyon

197

**SER 155**

Show & Tell

commitments. Along this margin, we consider differences in maximum horizon of the commitment, the length of commitments in years (Max Commitment Year), and the size of emission reduction pledges associated with the commitment (Max Commitment Emission Reduction). We also prorate the total reduction to a per-year rate of abatement (Effective Commitment Annual Abatement). Firm commitments on carbon reduction targets have been on the rise in the past decade, with the number of CDP pledges more than doubling (Table 1A). At present, fewer firms have announced more stringent SBTi commitments (4%) compared to CDP pledges (15%). On a sectoral basis, utilities (46%), consumer staples (35%), and materials (31%) have the highest proportions of firm pledges (Table 1B). We should note that a large proportion of US electric utilities have assets covered by a state Renewable Portfolio Standard, a state carbon price, and other climate-oriented energy programs and, thus, it is possible that their CDP commitments may not be that ambitious, offering little in addition to what they are mandated to do under these policies.

Notably, the majority of commitments have been found to be short in length, with close to 50% of pledges stating targets of less than five years (Figure 1A). Pledges to decarbonize by 2050 were observed, consisting of 6% of the sample, as were a few outlier pledges for 2100. The pledged terminal target rates of decarbonization are fairly dispersed, with 70% of firms pledging to cut emissions by 40% or less (Figure 1B). Only 7% of firms have committed to complete decarbonization.

To identify trends in soft information, we scrape transcripts from earnings call reports for relevant climate- and environmental-related bigrams. Traditional lexicon-based approaches to the analysis of climate sentiment largely ignore the varying uses of climate-related terms and the rich contextual information contained in neighboring text. Accordingly, we apply FinBERT—an open-source BERT-based model featuring state-of-the-art performance on several financial sentiment benchmarks—to ascertain a more context-aware measure of climate sentiment. FinBERT is based on the core BERT architecture and pretrains a BERT encoder using a finance-related news corpus. A pooled representation of the input text is passed through a fully connected layer for sentiment classification into three classes (positive, neutral, and negative). We assign probabilities for each class by applying a softmax over the outputs of the classification layer. Our

sentiment score is then given by the difference between the positive and negative class probabilities and, in effect, reflects the relative likelihood that the input text sequence is on balance more positive than negative. We tokenize climate excerpts by sentence and separately aggregate scores across the presentation and Q&A sections by averaging over sentence-level sentiment. In the vein of Sautner et al. (2023), the topics analyzed can be categorized as follows: (1) physical impacts and risks, (2) regulatory risks, and (3) transition opportunities. The frequencies and contextualized sentiments (how positively or negatively the bigrams are being discussed in the sentence) of these topics are examined in both the management update section and the investor Q&A section of the call.

Climate topics are increasingly discussed, as the 2018–2020 average frequency in the management update section is 67% greater than the corresponding 2011–2013 average, and similarly, the 2018–2020 average frequency of climate topic discussion in the Q&A section is 75% greater than the corresponding 2011–2013 average (Table 1A). Still, earnings calls remain a more sporadic form of climate information signaling, with only 5% of companies using this channel, compared to disclosure (26%) and commitments (15%). A persistent exception is in the utilities sector, in which climate topics are raised in 37% of earnings calls, with an emphasis on emissions and regulation (Table 1B). Other emission-intensive sectors, like energy and industrials, have above-average rates as well. Sentiment scores, on average, remain consistent from 2010–2016 and then rise from 2017–2020, implying that firms have been more strategic in crafting and communicating their climate policies in recent years. As would be expected, sentiment from the management update section has invariably been more positive than that from the Q&A section through the 10-year sample.

While corporate climate messaging has incontrovertibly spread across disclosure, commitments, and earnings call communication, especially within the past five years, there is substantial variability in the relationships between different forms of climate messaging. Disclosure of emissions is generally the first step in firms' climate impact communication. Using a linear probability model, we assess disclosure as a predictor of later decarbonization commitments and earnings call climate-related discussions (Figure 2). Control variables include market cap, book-to-market ratio, CapEx, debt-to-equity ratio, PP&E, stock return momentum and volatility, and

Exhibit 8 to Decl. of Thomas Lyon

198

**SER 156**

Financial Analysts Journal | A Publication of CFA Institute

## Table 1. Summary Statistics and Trends in Climate Communication

### A. Year-over-year trends

| Year | Disclosure-Scope 1 | Disclosure-Scope 2 | Disclosure-Scope 3 Downstream | Disclosure-Scope 3 Upstream | CDP Initiative | SBTi Signatory | Management Count | Q&A Count | Management Average Sentiment Score | Q&A Average Sentiment Score |
|------|------|------|------|------|------|------|------|------|------|------|
| 2011 | 276 (9.5%) | 263 (9.0%) | 0 (0.0%) | 135 (4.6%) | 209 (7.2%) | 0 (0.0%) | 305 (2.6%) | 144 (1.2%) | 0.41 | 0.15 |
| 2012 | 313 (10.7%) | 297 (10.2%) | 0 (0.0%) | 148 (5.1%) | 230 (7.9%) | 0 (0.0%) | 265 (2.3%) | 117 (1.1%) | 0.38 | 0.16 |
| 2013 | 339 (11.6%) | 324 (11.1%) | 0 (0.0%) | 160 (5.5%) | 255 (8.7%) | 0 (0.0%) | 249 (2.1%) | 125 (1.1%) | 0.36 | 0.13 |
| 2014 | 362 (12.4%) | 342 (11.7%) | 0 (0.0%) | 103 (3.5%) | 267 (9.2%) | 1 (0.0%) | 245 (2.1%) | 148 (1.3%) | 0.39 | 0.19 |
| 2015 | 387 (13.3%) | 368 (12.6%) | 0 (0.0%) | 98 (3.4%) | 286 (9.8%) | 12 (0.4%) | 282 (2.4%) | 136 (1.2%) | 0.37 | 0.16 |
| 2016 | 427 (14.6%) | 409 (14.0%) | 6 (0.2%) | 169 (5.8%) | 312 (10.7%) | 22 (0.8%) | 294 (2.5%) | 160 (1.4%) | 0.40 | 0.16 |
| 2017 | 490 (16.8%) | 467 (16.0%) | 103 (3.5%) | 177 (6.1%) | 339 (11.6%) | 38 (1.3%) | 294 (2.5%) | 159 (1.4%) | 0.43 | 0.18 |
| 2018 | 555 (19.0%) | 527 (18.1%) | 149 (5.1%) | 182 (6.2%) | 370 (12.7%) | 59 (2.0%) | 345 (3.0%) | 162 (1.4%) | 0.48 | 0.19 |
| 2019 | 648 (22.2%) | 609 (20.9%) | 152 (5.2%) | 130 (4.5%) | 403 (13.8%) | 75 (2.6%) | 445 (3.8%) | 209 (1.8%) | 0.48 | 0.21 |
| 2020 | 755 (25.9%) | 714 (24.5%) | 126 (4.3%) | 196 (6.7%) | 428 (14.7%) | 106 (3.6%) | 575 (4.9%) | 305 (2.6%) | 0.49 | 0.21 |

### B. Sectoral Trends (2020)

| Sector | Disclosure-Scope 1 | Disclosure-Scope 2 | Disclosure-Scope 3 Downstream | Disclosure-Scope 3 Upstream | CDP Initiative | SBTi Signatory | Management Count | Q&A Count | Management Average Sentiment Score | Q&A Average Sentiment |
|------|------|------|------|------|------|------|------|------|------|------|
| Comm. Services | 15 (14.4%) | 15 (14.4%) | 8 (7.7%) | 4 (3.8%) | 8 (7.7%) | 3 (2.9%) | 46 (1.1%) | 20 (0.5%) | 0.33 | 0.19 |
| Consumer Discret. | 82 (23.6%) | 82 (23.6%) | 25 (7.2%) | 15 (4.3%) | 55 (15.8%) | 16 (4.6%) | 98 (0.7%) | 72 (0.5%) | 0.51 | 0.23 |
| Consumer Staples | 50 (43.1%) | 48 (41.4%) | 12 (10.3%) | 12 (10.3%) | 40 (34.5%) | 24 (20.7%) | 68 (1.5%) | 34 (0.7%) | 0.49 | 0.23 |
| Energy | 71 (62.3%) | 56 (49.1%) | 4 (3.5%) | 1 (0.9%) | 16 (14.0%) | 1 (0.9%) | 281 (6.2%) | 143 (3.1%) | 0.37 | 0.16 |
| Financials | 63 (13.5%) | 61 (13.1%) | 3 (0.6%) | 3 (0.6%) | 48 (10.3%) | 4 (0.9%) | 310 (1.7%) | 188 (1.0%) | 0.37 | 0.17 |
| Health Care | 57 (9.3%) | 55 (9.0%) | 18 (2.9%) | 13 (2.1%) | 41 (6.7%) | 7 (1.5%) | 51 (0.2%) | 31 (0.1%) | 0.38 | 0.21 |
| Industrials | 140 (34.7%) | 128 (31.7%) | 30 (7.4%) | 24 (5.9%) | 69 (17.1%) | 11 (2.7%) | 892 (5.5%) | 440 (2.7%) | 0.45 | 0.18 |
| Info. Tech. | 97 (25.4%) | 96 (25.1%) | 42 (11.0%) | 19 (5.0%) | 60 (15.7%) | 17 (4.5%) | 287 (1.9%) | 107 (0.7%) | 0.49 | 0.24 |
| Materials | 75 (58.6%) | 71 (55.5%) | 14 (10.9%) | 14 (10.9%) | 40 (31.3%) | 9 (7.0%) | 178 (3.5%) | 103 (2.0%) | 0.40 | 0.16 |
| Real Estate | 58 (33.1%) | 61 (34.9%) | 12 (6.9%) | 16 (9.1%) | 20 (11.4%) | 10 (5.7%) | 75 (1.1%) | 45 (0.6%) | 0.54 | 0.18 |
| Utilities | 47 (69.1%) | 41 (60.3%) | 6 (8.8%) | 5 (7.4%) | 31 (45.6%) | 2 (2.9%) | 1013 (37.2%) | 482 (17.7%) | 0.43 | 0.17 |

Notes: This table reports the rates of disclosure and commitments, as well as average earnings call sentiment scores for climate-related topics, for Russell 3000 companies. Panel A displays annual figures from 2011 to 2020 and Panel B shows sectoral figures from 2020. Data on disclosure are sourced from S&P Global Trucost, commitment data are sourced from CDP, and earnings calls transcripts are sourced from FactSet.

© 2025 CFA Institute. All rights reserved.

Exhibit 8 to Decl. of Thomas Lyon
199
**SER 157**

Show & Tell

**Figure 1A.** Distributions of Carbon Disclosure Project (CDP) Commitment Attributes



*Notes:* This figure displays histograms of commitment attributes from a sample of Russell 3000 companies that have made a listed CDP pledge prior to 2020. Figure 1A shows a histogram of commitment length (in years), Figure 1B shows a histogram of the terminal emissions reduction target (in % of the total), and Figure 1C shows a histogram of the assumed annual abatement rate if the company is to decarbonize linearly over time (in %). All data are sourced from CDP.

return on equity. Year-month, country, and industry-fixed effects are also applied.

Disclosure is found to be a key predictor of future decarbonization commitments, as firms that have disclosed have a 48% greater probability of making a future pledge. The subsequent effect on earnings call communications, however, is found to be largely nonexistent. Disclosing firms are only 1% more likely to discuss climate topics in future earnings call updates and less than 1% more likely to be questioned by investors during Q&A. The predictive effects of disclosure on the actual sentiment score are also minimal. Very similar results on forecasting earnings call climate topic frequency and sentiment are observed for firms making commitments.

Additionally, we examine whether the three forms of climate communication are predictors of future emissions. Firms disclosing emissions data have, on average, 21% lower emissions the following year than those that do not disclose (Figure 3). Initiating a CDP pledge has no statistically significant correlation with future emissions levels, though firms that have signed SBTi commitments have 21% lower emissions on average the following year than those that have not. These relationships most likely reflect a selection effect given that firms with lower emissions are more prone to disclose and make an SBTi commitment in the first place. We also find a positive correlation between the commitment horizon and future emissions, which suggests that firms are less likely to take near-term emission reduction actions when they make longer-term pledges (although this effect is small in magnitude).

Pricing Climate Messaging. One of the main findings of the climate finance literature is the evidence that firm-level exposure to climate-related risks is reflected in valuation ratios of companies

 © 2025 CFA Institute. All rights reserved.

Exhibit 8 to Decl. of Thomas Lyon
200
**SER 158**

**Financial Analysts Journal** | A Publication of **CFA** Institute

**Figure 1B.** Terminal Emissions Reduction Target



with different exposures to such risks (e.g., Bolton, Halem, and Kacperczyk 2022). Companies with higher exposure to such risks have lower valuation ratios, other things equal. What is less well understood, however, is how the observed valuation discounts depend on companies' climate communication strategies. The main thrust of this section is to shed light on this question, both in aggregate as well as in the cross-section of different industries.

Before we assess the valuation implications of different forms of climate communication, we briefly contextualize how disclosure, commitments, and soft-information transmission fit within a more holistic corporate strategy. Climate finance is, first and foremost, a form of risk management. Companies respond to investor concerns about the extent of the company's exposure to climate risk. They understand that a failure to allay these concerns could translate into a repricing of the company's valuation or cost or capital by investors, leading to greater pressure to mitigate climate risk. The three forms of climate communication we

analyze each reflect how investors may assess (and reprice) transition risk (or occasionally physical risk for certain earnings calls information). The absence of a standardized disclosure regime for transition risk muddies communication and sets up a complicated information revelation game between companies and investors. Firms must make strategic decisions on the methods of communication to maximize stock price and other impacts. Investors, in turn, face a complex information extraction problem from multiple, multidimensional, noisy signals to be able to assess these risks. The challenge for investors, of course, is that corporate and investor objectives are not necessarily aligned. It is expected that those companies with positive climate policies and outlooks will seek to demonstrate their stance through information transparency, while companies with negative ESG impacts will attempt to obscure potential underlying exposure. To be sure, some companies largely ignore climate-related issues altogether, making it particularly challenging for investors to extract signals of ESG impacts. By assessing the valuation changes resulting from different forms of climate communications, we can

 © 2025 CFA Institute. All rights reserved.

Exhibit 8 to Decl. of Thomas Lyon

201

**SER 159**

Show & Tell

**Figure 1C.** Committed Annual Abatement Rates Under a Linear Decarbonization Scheme



not only predict how the market will receive disclosure, commitments, and climate messaging during earnings calls but also infer the value investors ascribe to each signal as a genuine indicator of climate risk.

With this in mind, we undertake a set of controlled multivariate regressions to isolate the distinctive effects of each form of climate communication on P/E. The main variable of interest is the interaction term between firm-level emissions and various forms of climate communication. Our model also includes a set of firm-level financial controls. including the logarithm of stock market capitalization; logarithm of the net value of property, plants, and equipment; return on equity (past, present, and estimated one- and two-year future values); price momentum; and volatility. In addition, we absorb year-month, country, and industry-specific variation. Our industry classification follows that of S&P Global Trucost and covers roughly 430 different industries. Most regression specifications, except those where the sample has insufficient residual variation, include firm-fixed effects interacted with

either disclosure or commitment indicator variables. This specification allows us to estimate an aggregation of the direct valuation change firms experience after initiating a given mode of climate massaging. The advantage of using interacted fixed effects is that we can thereby allow for differential valuation treatments of firms before and after changing their mode of communication. In contrast, a regression without firm-level fixed effects would illustrate the cross-sectional variation in the estimated valuation effects, which might simply be indicative of ex ante differences across firms within their specific industries. Of course, in the absence of a fully randomized assignment of communication modes to firms, we are not able to make conclusive causal inferences about the economic magnitudes of the estimated coefficients. Nevertheless, with a fully saturated model that includes both observable characteristics and various fixed effects we can isolate some of the most obvious explanations of our findings.

In the baseline emissions regression model, we analyze the effect of disclosure of different emission

 © 2025 CFA Institute. All rights reserved.

Exhibit 8 to Decl. of Thomas Lyon

**Financial Analysts Journal** | A Publication of **CFA** Institute

**Figure 2.** Effect of Disclosure on Commitments or Earnings Calls Sentiment



*Notes:* This figure reports the additive change in probability that a disclosing firm makes a commitment or discusses a climate-related topic during an earnings call (during the management update section or investor Q&A). The sample comprises Russell 3000 companies from 2011 to 2020. Results are determined through multivariate regressions in which the dependent variables are either binary indicators of Carbon Disclosure Project (CDP) or Science-Based Target Initiative (SBTi) commitments, or binary indicators of earnings call topics. The independent variable is a binary indicator of disclosure. Control variables include the natural logarithm of market cap (in $ millions); the cumulative stock return over the past year (momentum); the book value of equity divided by market value of equity (B/M ratio); the CapEx divided by book value; the book value of debt divided by the book value of assets (leverage); the natural logarithm of plant, property, and equipment (PP&E); the monthly stock return volatility calculated over the past year; and the return on equity (ROE). Year-month, country, and industry-fixed effects are used. We note that **$p < 0.01$ and *$p < 0.05$. Emissions, financial, and disclosure data are sourced from S&P Global Trucost, commitment data are sourced from CDP, and earnings calls transcripts are sourced from FactSet.

scopes on P/E valuation discounts related to exposures to carbon transition risk (Table 2). Firm-level emissions data are sourced through S&P Global Trucost, which consists of disclosed values (when applicable) or estimated values. Across scope 1, scope 2, and upstream scope 3 emissions, we observe a statistically significant negative relationship between respective emission levels and P/E ratios, such that a firm with 10% higher emissions is expected to have, ceteris paribus, a little over a 1.5% lower P/E value. The results for downstream scope 3 emissions are weaker. When we include disclosure as an indicator variable and firm-disclosure fixed effects, we can assess the degree to which investors value the greater transparency associated with disclosure.

We find that, among various emission metrics, disclosing scope 1 emissions offsets the largest portion of the valuation discount. Increasing

transparency through scope 1 emission disclosure offsets 62% of the P/E discount tied to emissions. We estimate similar effects for scope 2 emissions, where scope 2 carbon disclosure reverses around half (52%) of the P/E emissions discount. However, we find a much a much smaller effect of scope 3 carbon disclosure on the P/E emissions discount for scope 3 emissions. The interpretation of these offsetting valuation effects is either that disclosure decreases associated firm-level climate-related financial risks or that the informational uncertainty of firm-level climate-related financial risks is reduced. In the absence of disclosure, investors attempt to analyze emissions values through estimated data (typically from third-party providers, like S&P Global Trucost). The first explanation would imply that there exists an upward bias with estimated emissions data, such that disclosed values would, on average, demonstrate a lower carbon footprint, which would induce a relative repricing of

© 2025 CFA Institute. All rights reserved.

Exhibit 8 to Decl. of Thomas Lyon
203
**SER 161**

Show & Tell

**Figure 3.** Effect of Communication Signals on Future Emissions



*Notes:* This figure reports the difference in the predicted value of next year's emissions associated with disclosure and commitments. The sample comprises Russell 3000 companies from 2011 to 2020. Results are determined through multivariate regressions in which the dependent variable is one-year-ahead carbon emission levels and the independent variables are either binary indicators of disclosure or commitments or attributes of commitments. Results for Max Commitment Year and Max Commitment Emission Reduction are based on unit changes in one year and 1%, respectively. All regression models include the controls of Figure 4. Year-month, country, and industry-fixed effects are used. We note that $**p < 0.01$ and $*p < 0.05$. Emissions, financial, and disclosure data are sourced from S&P Global Trucost, commitment data are sourced from CDP, and earnings calls transcripts are sourced from FactSet.

climate risk. The latter, and more likely, explanation is that the asymmetric distribution of climate risk exposures (and associated tail risk) causes investors to price in the uncertainty of the estimate. Removing that uncertainty through disclosure would result in the observed valuation impact. This offsetting effect would be expected to be stronger for direct measures of emissions, as these are known to be more reliable and are reported with less noise. Arguably, the P/E discounts associated with carbon emission could also reflect a lack of growth opportunities, or short equity duration (Dechow, Sloan, and Soliman 2004; Dechow et al. 2021). If disclosure of emissions is a signal of longer equity duration, then one would expect the carbon P/E discount to be lower for disclosing companies. The above results are consistent with the findings in Bolton and Kacperczyk (2023), who also observe similar effects in the context of stock returns. Notably, contrary to the evidence in Aswani, Raghunandan, and Rajgopal (2024), who argue that the entire valuation discount in emissions is due to undisclosed emissions, not all the valuation discount gets offset by firm disclosure, which means that climate risk is non-zero even for firms that

disclose either their scope 1 or their scope 2 emissions (Figure 5).

The financial effects of disclosure vary significantly across sectors. Emissions-intensive sectors (energy, industrials, materials, and utilities) all show outsized valuation boosts from disclosure relative to less carbon-intensive industries (Table 3). In the energy sector, a 3% P/E discount rate is associated with 10% higher emissions, but firms are able to fully offset the discount through disclosure and, in fact, receive a net financial benefit (under the same example, the disclosing firm would experience a 0.8% rise in P/E). Industrial firms can offset 82% of the emissions valuation discount through disclosure, while materials and utilities companies have respective 87% and 52% offsetting rates, though at a lower statistical significance.

Decarbonization commitments produce the same directional valuation effects as disclosure, but at a much smaller magnitude and with limited statistical significance. We find that participating in a CDP initiative can offset, on average, 15% of the firm's carbon valuation discount, though the lack of

   © 2025 CFA Institute. All rights reserved.

Exhibit 8 to Decl. of Thomas Lyon
204
**SER 162**

**Financial Analysts Journal** | A Publication of **CFA Institute**

Figure 4. Percentage of the Emissions Valuation Discount That Is Offset by Different Forms of Climate Communication



*Notes:* This figure reports the degree to which disclosure, commitments, and earnings call sentiment affect P/E valuations. The sample comprises Russell 3000 companies from 2011 to 2020. Results are determined through multivariate regressions in which the dependent variable is P/E. The independent variables are carbon emission levels and either binary indicators of disclosure or commitments or earnings call sentiment. Control variables include the logarithm of stock market capitalization; the logarithm of net property, plants, and equipment; cumulative stock return over the past year (momentum); the monthly stock return volatility calculated over the past year (volatility); past return on equity (ROE(t-1)); present return on equity (ROE(t)); and estimated one- and two-year future values of return of equity (ROE(t+1) and ROE(t+2)). Year-month, country, and firm-fixed effects are used. The offset percentage is the ratio of the P/E valuation discount due to greenhouse gas emissions when the firms utilize an idiosyncratic form of climate communication compared to the valuation discount when the firms do not use the communication form. We note that $**p<0.01$ and $*p<0.05$. Emissions, financial, and disclosure data are sourced from S&P Global Trucost, commitment data are sourced from CDP, and earnings calls transcripts are sourced from FactSet.

statistical significance suggests that this result is not robust (Table 4). The results are even less significant for SBTi pledges. The variation in quality of pledges (length and reduction targets) have no real impact on firm valuation either (Table 5). Sector results also display insignificant valuation effects (Table 6), with two outliers being financials and consumer staples: firms making pledges in these two sectors get a further valuation discount. This could be due to the perceived greater costs associated with the implementation of these commitments.

In theory, there are two opposing effects that underlie the financial decision-making around pledging to meet emissions targets. Making such a pledge could signal a near-term financial cost, as presumably decarbonizing operations or purchasing

carbon offsets is costly. This would, however, decrease firms' exposure to transition risk, which would be value-accretive in the medium and long run. The lack of any noticeable valuation changes from commitments could be a consequence of these effects offsetting each other. More likely, given the increased public scrutiny of greenwashing, investors may not believe that many commitments are genuine signals of future emission reductions. Investors may not interpret pledges as bearing material weight, but rather as a public relations move. In effect, investors may value the outcomes of a firm's actions—as reflected in their disclosed emissions—more than the firm's pledge to take action—as reflected in their future targets.

With respect to earnings calls, we find interesting differences in valuation effects depending on

 © 2025 CFA Institute. All rights reserved. **92**

Exhibit 8 to Decl. of Thomas Lyon
205
**SER 163**

Show & Tell

| Table 2. Emissions Disclosure and P/E by Scope | | | | |
|---|---|---|---|---|
| Dependent Variable: Log P/E | Disclosure Scope 1 Levels | Disclosure Scope 2 Levels | Disclosure Scope 3 Upstream Levels | Disclosure Scope 3 Downstream Levels |
| Log Scope 1 | −0.177** | | | |
| | (0.031) | | | |
| Disclosure Scope 1*Log Scope 1 | 0.111** | | | |
| | (0.036) | | | |
| Log Scope 2 | | −0.165** | | |
| | | (0.042) | | |
| Disclosure Scope 2*Log Scope 2 | | 0.087 | | |
| | | (0.049) | | |
| Log Scope 3 Upstream | | | −0.288** | |
| | | | (0.041) | |
| Disclosure Scope 3 Upstream*. Log Scope 3 Upstream | | | 0.037 | |
| | | | (0.066) | |
| Log Scope 3 Downstream | | | | 0.010 |
| | | | | (0.006) |
| Disclosure Scope 3 Downstream* Log Scope 3 Downstream | | | | −0.029 |
| | | | | (0.022) |
| Log (Mkt Cap) | 0.081** | 0.089** | 0.143** | 0.092** |
| | (0.025) | (0.026) | (0.027) | (0.030) |
| Log (PPE) | −0.001 | 0.001 | −0.001 | −0.004 |
| | (0.002) | (0.002) | (0.003) | (0.003) |
| Momentum | 5.414** | 5.433** | 5.677** | 5.268** |
| | (0.238) | (0.241) | (0.245) | (0.275) |
| Volatility | −0.472 | −0.402 | −0.352 | −0.415 |
| | (0.251) | (0.252) | (0.250) | (0.317) |
| ROE (t-1) | −0.005** | −0.005** | −0.006** | −0.005** |
| | (0.001) | (0.001) | (0.001) | (0.001) |
| ROE (t) | −0.003** | −0.003** | −0.002** | −0.002 |
| | (0.001) | (0.001) | (0.001) | (0.001) |
| ROE (t + 1) (Est) | 0.001 | 0.001 | 0.001 | 0.001 |
| | (0.001) | (0.001) | (0.001) | (0.001) |
| ROE (t + 2) (Est) | 0.001 | 0.001 | 0.001 | −0.001 |
| | (0.001) | (0.001) | (0.001) | (0.001) |
| Constant | 3.657** | 3.603** | 5.347** | 2.227** |
| | (0.254) | (0.293) | (0.443) | (0.267) |
| Yr/mo-fixed effects | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes |
| Industry-fixed effects | Yes | Yes | Yes | Yes |
| Firm*disclosure-fixed effects | Yes | Yes | Yes | Yes |
| Observations | 99,675 | 99,366 | 89,772 | 53,120 |
| $R^2$ | 0.733 | 0.733 | 0.737 | 0.792 |

*Notes:* The sample comprises Russell 3000 companies from 2011 to 2020. The dependent variable is P/E. The independent variables are carbon emission levels and binary indicators of disclosure. All regression models include the controls of Figure 4. We report the results of the pooled regression with standard errors (in parentheses) double-clustered at the firm and year level. Year-month, country, and firm-disclosure-fixed effects are used. We note that **$p < 0.01$ and *$p < 0.05$.

whether climate topics are discussed during the management update section or during the investor Q&A section. First, examining the extensive margin, we observe a negative P/E effect when climate topics are brought up during the management

update (Table 7), but no significant effect is found for the Q&A section. When exploring a hybrid extensive-intensive margin, in which we replace the simple binary outcomes with the sentiment scores of the outcomes (so that we can capture possible

© 2025 CFA Institute. All rights reserved.

Exhibit 8 to Decl. of Thomas Lyon

206

**SER 164**

**Financial Analysts Journal** | A Publication of **CFA Institute**

**Figure 5.** Percentage of the Emissions Valuation Discount That Is Offset by Disclosure for High-Emitting Industries



*Notes:* This figure reports the degree to which disclosure affect P/E valuations for energy, industrials, materials, and utilities companies. The sample comprises Russell 3000 companies from 2011 to 2020. Results are determined through multivariate regressions in which the dependent variable is P/E. The independent variables are carbon emission levels and either binary indicators of disclosure and commitments or earnings call sentiment. All regression models include the controls of Figure 4. Year-month, country, and firm-fixed effects are used. The offset percentage is the ratio of the P/E valuation discount due to greenhouse gas emissions when the firms disclose compared to the valuation discount when the firms do not disclose. We note that $**p < 0.01$ and $*p < 0.05$. Emissions, financial, and disclosure data are sourced from S&P Global Trucost, commitment data are sourced from CDP, and earnings calls transcripts are sourced from FactSet.

valuation effects emanating from *both* frequency and sentiment in which climate-related topics are discussed), we find that there is no significant effect from the management section. Yet, climate sentiment during the Q&A section is a significant signal and can offset (conditional on positive sentiment), on average, 66% of the emissions valuation discount. As with disclosure, carbon-intensive sectors, including energy, industrials, materials, and utilities, are subject to the largest correlations between sentiment and valuation (Tables 8 and 9). Across all industries, the findings are slightly sharper for the Q&A part of the calls. Positive climate sentiment during the Q&A section hints that either investors are asking questions about climate topics with an optimistic tilt or management has answered climate-related questions in a favorable manner. Regardless, investors view climate sentiment during Q&A to be a valuable signal, perhaps because it is the only source of information that is not entirely pre-scripted or controlled by the firm. The off-the-cuff nature of Q&A could buttress veracity.

Up until this point, we have examined each method of climate communication in isolation to assess its distinctive effect on financial valuation. However, in reality, when firms are constructing climate communication strategies, they are reviewing potential signals in tandem. When we estimate a given model with the full set of communication measures, it becomes apparent that disclosure and Q&A section sentiment are the most significant predictors of valuation (Table 10). Disclosure nullifies any valuation effect of making a commitment.

**Implications.** Over the past decade, investors have raised greater concern over the carbon footprint of the firms they invest in. In part, this reflects the heightened salience of accelerating climate

    © 2025 CFA Institute. All rights reserved.

Exhibit 8 to Decl. of Thomas Lyon
207
**SER 165**

*Show & Tell*

## Table 3. Emissions Disclosure and P/E by Sector

| Dependent Variable: Log P/E | Comm. Services | Cons. Discret. | Cons. Staples | Energy | Financial | Health Care | Industrial | Info. Tech. | Materials | Real Estate | Utilities |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Log Scope 1 | −0.003 | −0.135 | 0.058 | −0.325* | 0.007 | −0.333** | −0.316** | −0.221** | −0.134 | −1.571 | −0.151 |
| | (0.154) | (0.079) | (0.156) | (0.125) | (0.051) | (0.091) | (0.067) | (0.078) | (0.081) | (1.259) | (0.123) |
| Disclosure Scope 1*Log Scope 1 | −0.085 | 0.079 | −0.234 | 0.396* | −0.067 | 0.175 | 0.260** | 0.183* | 0.122 | 12.527** | 0.064 |
| | (0.153) | (0.077) | (0.175) | (0.188) | (0.076) | (0.096) | (0.079) | (0.089) | (0.092) | (2.350) | (0.128) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Yr/mo-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Firm-discl.-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 2,955 | 15,135 | 5,170 | 4,153 | 21,480 | 9,725 | 16,695 | 13,243 | 6,140 | 138 | 4,796 |
| $R^2$ | 0.727 | 0.726 | 0.786 | 0.540 | 0.715 | 0.795 | 0.712 | 0.848 | 0.582 | 0.940 | 0.657 |

Notes: The sample comprises Russell 3000 companies from 2011 to 2020. The dependent variable is P/E. The independent variables are carbon emission levels and binary indicators of disclosure. All regression models include the controls of Figure 4. We report the results of the pooled regression with standard errors (in parentheses) double-clustered at the firm and year level. Year-month, country, and firm-disclosure-fixed effects are used. We note that **$p < 0.01$ and *$p < 0.05$.

change and current and future climate change mitigation policy responses. It also reflects greater investor disquiet about the climate impact of their investment decisions. Both reasons would lead investors to demand better information about firms' current emissions, likely trajectory of emissions, and the actions they undertake to reduce their emissions. Voluntary disclosure of corporate emissions, voluntary commitments into the near to medium future to reduce emissions, and discussions about climate change implications in earnings calls each provide opportunities for firms to communicate information to these interested investors.

In communicating such information, firms may reduce the uncertainty investors face in terms of understanding the firms' emissions and the potential for such emissions to represent liabilities (e.g., under a carbon tax, cap-and-trade program, or conventional regulatory standard). In the absence of such information, investors may form expectations about a firm's emissions profile based on inaccurate imputations of emissions from various data sources. This noisy information may reduce their incentive to invest or at least delay their investment until they secure more information (Bernanke 1983; McDonald and Siegel 1986; Dixit and Pindyck 1994). By disclosing their emissions, firms improve the information set of investors and reduce some of the climate-policy related uncertainty about future returns.

The sectoral variation in how disclosure offsets some, and in some cases all, of the P/E discount associated with emissions may reflect the extent to which the sector is facing (or likely to face) current or near-term regulatory costs. For example, energy firms that transition to emissions disclosure fully offset the equity price discount associated with their emissions, and industrial firms offset more than 80% of the discount. The less statistically precise estimates for firms in other industries and the incomplete offsetting of equity price discounts suggests greater residual climate policy uncertainty for the firms in these industries. In other words, investors may be more uncertain about what, if any, regulatory burdens firms outside of the energy and industrial sectors may face, given that most regulatory and carbon pricing policies to date—the EU Emissions Trading System, the California carbon dioxide Cap-and-Trade Program, the Regional Greenhouse Gas Initiative, and so on—have focused on the energy, industrial, and electric utility sectors.

 © 2025 CFA Institute. All rights reserved. 95

Exhibit 8 to Decl. of Thomas Lyon
208
SER 166

**Financial Analysts Journal** | A Publication of **CFA Institute**

## Table 4.  Commitments and P/E: Extensive Margin

| Dependent Variable: Log P/E | CDP Initiative | SBTI Signatory |
|---|---|---|
| Log Scope 1 | −0.079** | −0.058** |
|  | (0.017) | (0.013) |
| Commitment (Y/N)*Log Scope 1 | 0.014 | 0.005 |
|  | (0.025) | (0.092) |
| Controls | Yes | Yes |
| Yr/mo-fixed effects | Yes | Yes |
| Country-fixed effects | Yes | Yes |
| Industry-fixed effects | Yes | Yes |
| Firm-commitment-fixed effects | Yes | Yes |
| Observations | 101,284 | 101,284 |
| $R^2$ | 0.723 | 0.720 |

*Notes:* The sample comprises Russell 3000 companies from 2011 to 2020. The dependent variable is P/E. The independent variables are carbon emission levels and binary indicators of CDP pledges. All regression models include the controls of Figure 4. We report the results of the pooled regression with standard errors (in parentheses) double-clustered at the firm and year level. Year-month, country, and firm-commitment-fixed effects are used. We note that **$p < 0.01$ and *$p < 0.05$.

## Table 5.  Commitments and P/E: Intensive Margin

| Dependent Variable: Log P/E | Max Commitment Year | Max Commitment Reduction | Effective Abatement |
|---|---|---|---|
| Max Commitment Year | −0.007 |  |  |
|  | (0.008) |  |  |
| Max Commitment Emission Reduction |  | −0.001 |  |
|  |  | (0.002) |  |
| Effective Commitment Annual Abatement |  |  | −0.001 |
|  |  |  | (0.003) |
| Log Scope 1 | −0.039 | −0.035 | −0.026 |
|  | (0.041) | (0.043) | (0.042) |
| Max Commitment Year*Log Scope 1*100 | 0.043 |  |  |
|  | (0.052) |  |  |
| Max Commitment Emission Reduction*Log Scope 1*100 |  | 0.007 |  |
|  |  | (0.016) |  |
| Effective Commitment Annual Abatement*Log Scope 1*100 |  |  | 0.003 |
|  |  |  | (0.025) |
| Controls | Yes | Yes | Yes |
| Yr/mo-fixed effects | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes |
| Industry-fixed effects | Yes | Yes | Yes |
| Firm-fixed effects | Yes | Yes | Yes |
| Observations | 12,125 | 12,053 | 10,747 |
| $R^2$ | 0.692 | 0.700 | 0.742 |

*Notes:* The sample comprises Russell 3000 companies from 2011 to 2020. The dependent variable is P/E. The independent variables are carbon emission levels and attributes of CDP pledges. All regression models include the controls of Figure 4. We report the results of the pooled regression with standard errors (in parentheses) double-clustered at the firm and year level. Year-month, country, and firm-fixed effects are used. We note that **$p < 0.01$ and *$p < 0.05$.

   © 2025 CFA Institute. All rights reserved.

Exhibit 8 to Decl. of Thomas Lyon

209

**SER 167**

Show & Tell

## Table 6. Commitments and P/E by Sector

| Dependent Variable: Log P/E | Comm. Services | Consumer Discret. | Consumer Staples | Energy | Financials | Health Care | Industrials | Info. Tech. | Materials | Real Estate | Utilities |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Log Scope 1 | 0.060 | −0.083 | 0.073** | −0.073 | 0.001 | −0.147** | −0.081** | −0.071* | −0.059 | 0.001 | −0.024 |
|  | (0.092) | (0.047) | (0.026) | (0.100) | (0.031) | (0.052) | (0.028) | (0.034) | (0.045) | (0.073) | (0.031) |
| CDP Initiative*Log Scope 1 | −0.137 | 0.022 | −0.130* | −0.269 | −0.128* | 0.017 | 0.073 | 0.048 | 0.062 | 0.107 | −0.087 |
|  | (0.127) | (0.061) | (0.060) | (0.232) | (0.059) | (0.074) | (0.057) | (0.047) | (0.079) | (0.076) | (0.045) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Yr/mo-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry fixed-effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Firm-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | No | Yes |
| Observations | 2,967 | 15,255 | 5,326 | 4,286 | 21,576 | 9,989 | 16,971 | 13,471 | 6,224 | 138 | 5,036 |
| $R^2$ | 0.721 | 0.717 | 0.775 | 0.517 | 0.715 | 0.787 | 0.698 | 0.846 | 0.572 | 0.940 | 0.710 |

Notes: The sample comprises Russell 3000 companies from 2011 to 2020. The dependent variable is P/E. The independent variables are carbon emission levels and binary indicators of CDP pledges. All regression models include the controls of Figure 4. We report the results of the pooled regression with standard errors (in parentheses) double-clustered at the firm and year level. Year-month, country, industry, and firm-commitment-fixed effects are used for all regressions. We note that **$p < 0.01$ and *$p < 0.05$.

In our empirical analyses of the valuation effects of corporate disclosure, the utility sector stands apart from the energy and industrial sectors, with no incremental value of information associated with voluntary emissions disclosure. This may reflect the fact that every fossil fuel–powered electricity generating unit in the United States since the mid-1990s has reported its carbon dioxide emissions to the Environmental Protection Agency (EPA) through a continuous emissions monitoring system requirement.[10] The EPA regularly publishes these emissions data.

While investors have fairly easy access to data on utility emissions, they may not have as clear a sense of how to attribute those emissions to corporate customers across various industries. Corporate disclosure of scope 2 emissions may therefore be informative for investors. The definition of scope 2 is clear and narrow, and the regulatory burden in the electricity sector—between carbon prices covering about one-quarter of US power (under California and the Regional Greenhouse Gas Initiative cap-and-trade programs) and virtually all European power (under the EU Emissions Trading System), as well as renewable portfolio standards applying to power in 30 US states—is well established (Aldy 2020). With relatively lower uncertainty about the costs of scope 2 emissions, disclosing the quantity of scope 2 emissions eliminates much of the uncertainty associated with this potential environmental liability for a firm. In contrast, the considerable variation in definitions of scope 3 emissions and the heterogeneity in composition of scope 3 across industries, even under a common scope 3 definition, reduces the informativeness of scope 3 disclosures for an investor managing emissions risk across a broad portfolio of companies.

Corporate commitments appear to have less information value for investors than emissions disclosure. This may reflect a key ambiguity associated with these commitments, especially for those targets that are set well in the future (e.g., 2030 and beyond). A corporate emission target for 2040 may well be trumped by future federal and state regulatory policies and carbon pricing schemes. As a result, a firm may not be able to distinguish itself from its peers in its industry if all industry participants face a common regulatory regime in the future.

Understanding what actions a firm is undertaking, as well as the potential regulatory burdens and opportunities it faces, may help address this uncertainty. Corporate management and investors have

© 2025 CFA Institute. All rights reserved.
97

Exhibit 8 to Decl. of Thomas Lyon
210
SER 168

**Financial Analysts Journal** | A Publication of **CFA** Institute

## Table 7. Earnings Calls Sentiment and P/E

| Dependent Variable: Log P/E | Management-Extensive Margin | Management-Extensive-Intensive Margin | Q&A-Hybrid Extensive Margin | Q&A-Hybrid Extensive-Intensive Margin |
|---|---|---|---|---|
| Management Climate Sentiment Hybrid Score | | −0.087 (0.128) | | |
| Q&A Climate Sentiment Hybrid Score | | | | −0.490 (0.281) |
| Log Scope 1 | −0.059** (0.013) | −0.060** (0.013) | −0.060** (0.013) | −0.061** (0.013) |
| Management Climate Sentiment (Y/N)*Log Scope 1 | −0.077** (0.028) | | | |
| Q&A Climate Sentiment (Y/N)*Log Scope 1 | | | −0.013 (0.025) | |
| Management Climate Sentiment Hybrid Score*Log Scope 1 | | 0.009 (0.009) | | |
| Q&A Climate Sentiment Hybrid Score*Log Scope 1 | | | | 0.040* (0.020) |
| Controls | Yes | Yes | Yes | Yes |
| Yr/mo-fixed effects | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes |
| Industry-fixed effects | Yes | Yes | Yes | Yes |
| Firm-sentiment-fixed effects | Yes | Yes | Yes | Yes |
| Observations | 101,137 | 101,137 | 101,154 | 101,154 |
| $R^2$ | 0.717 | 0.717 | 0.717 | 0.717 |

*Notes:* The sample comprises Russell 3000 companies from 2011 to 2020. The dependent variable is P/E. The independent variables are carbon emission levels, binary indicators of earnings call climate sentiment, and earnings call climate sentiment values. All regression models include the controls of Figure 4. We report the results of the pooled regression with standard errors (in parentheses) double-clustered at the firm and year level. Year-month, country, and firm-fixed effects are used. We note that $**p < 0.01$ and $*p < 0.05$.

demonstrated increasing interest in how climate change influences firm operations, strategy, and valuations, as reflected in quarterly earnings calls. Over 2018–2020, management raised climate change in earnings calls 67% more often than they did over 2011–2013, and investors raised climate change issues 75% more during the Q&A periods of these calls. While management has consistently been more positive in communicating about climate change during earning calls than investors have in the Q&A sessions, both management and investors have become more positive, as measured by our sentiment index, in recent years. Management of firms that disclose and/or have made emission commitments have, on average, more positive communications about climate change in earnings calls, and investors tend to frame questions more positively about climate change for firms that have disclosed emissions or adopted emission commitments. As firms face climate policy transition risks and

opportunities, communication by firms and questions from investors in earning calls complement the disclosure of emissions and the public commitment to emission reduction targets.

With about one in six of the Russell 3000 companies voluntarily disclosing their GHG emissions, the prospect of climate-related risk disclosure through an SEC regulatory mandate could substantially improve the information set for investors.[11] Moreover, implementing a mandatory climate-related disclosure regulation could clarify the information to be disclosed—and in a form to enable valuable comparisons across firms—in terms of the scope of emissions, as well as the nature of—and progress toward—corporate emission commitments. This latter information could include the disclosure of actions to mitigate emissions within the corporate footprint, as well as the acquisition of emission offsets.

 © 2025 CFA Institute. All rights reserved.

Exhibit 8 to Decl. of Thomas Lyon

211

**SER 169**

Show & Tell

## Table 8. Earnings Calls Sentiment of Management and P/E by Sector

| Dependent Variable: Log P/E | Consumer Discret. | Consumer Staples | Energy | Financials | Health Care | Industrials | Info. Tech. | Materials | Real Estate | Utilities |
|---|---|---|---|---|---|---|---|---|---|---|
| Management Climate Sentiment Hybrid Score | 0.616 | 0.605 | -0.813 | -0.353 | 1.261 | -0.576* | 1.133 | -1.283* | -1.717 | 0.014 |
| | (0.768) | (0.675) | (0.831) | (0.525) | (2.078) | (0.255) | (0.887) | (0.522) | (1.381) | (0.205) |
| Log Scope 1 | -0.095** | -0.096** | -0.117** | -0.121** | -0.164** | -0.075** | -0.078** | -0.096** | -0.052 | -0.018 |
| | (0.031) | (0.026) | (0.036) | (0.025) | (0.041) | (0.015) | (0.030) | (0.024) | (0.037) | (0.014) |
| Management Climate Sentiment Hybrid Score*Log Scope 1 | -0.085 | -0.043 | 0.060 | 0.049 | -0.108 | 0.045* | -0.117 | 0.091* | 0.204 | -0.002 |
| | (0.067) | (0.046) | (0.055) | (0.068) | (0.176) | (0.020) | (0.088) | (0.039) | (0.130) | (0.013) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Yr/mo-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Firm-fixed effects | No | No | No | No | No | No | No | No | No | No |
| Observations | 15,256 | 5,327 | 4,286 | 21,577 | 9,992 | 16,972 | 13,472 | 6,225 | 6,620 | 5,036 |
| $R^2$ | 0.382 | 0.364 | 0.330 | 0.323 | 0.353 | 0.335 | 0.510 | 0.358 | 0.335 | 0.511 |

*Notes:* The sample comprises Russell 3000 companies from 2011 to 2020. Communication services was omitted due to insufficient sample size. The dependent variable is P/E. The independent variables are carbon emission levels and earnings call climate sentiment values. All regression models include the controls of Figure 4. We report the results of the pooled regression with standard errors (in parentheses) double-clustered at the firm and year level. Year-month, country, and industry-fixed effects are used for all regressions. Firm-fixed effects are not used because of a lack of residual variation. We note that $**p < 0.01$ and $*p < 0.05$.

## Table 9. Earnings Calls Sentiment from Q&A and P/E by Sector

| Dependent Variable: Log P/E | Consumer Discret. | Consumer Staples | Energy | Financials | Health Care | Industrials | Info. Tech. | Materials | Real Estate | Utilities |
|---|---|---|---|---|---|---|---|---|---|---|
| Q&A Climate Sentiment Hybrid Score | -0.102 | 0.466 | -7.180* | -0.471 | 1.839 | -1.645** | -2.392* | -3.866** | -2.158 | -1.398 |
| | (2.557) | (1.852) | (2.862) | (0.446) | (2.144) | (0.579) | (0.937) | (1.278) | (3.816) | (0.932) |
| Log Scope 1 | -0.095** | -0.096** | -0.118** | -0.121** | -0.164** | -0.075** | -0.078** | -0.096** | -0.051 | -0.020 |
| | (0.031) | (0.026) | (0.036) | (0.025) | (0.041) | (0.015) | (0.030) | (0.024) | (0.037) | (0.015) |
| Q&A Climate Sentiment Hybrid Score*Log Scope 1 | -0.025 | -0.032 | 0.472* | 0.059 | -0.133 | 0.127** | 0.232* | 0.291** | 0.233 | 0.086 |
| | (0.217) | (0.145) | (0.197) | (0.055) | (0.178) | (0.047) | (0.101) | (0.097) | (0.378) | (0.058) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Yr/mo-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Firm-fixed effects | No | No | No | No | No | No | No | No | No | No |
| Observations | 15,256 | 5,327 | 4,286 | 21,577 | 9,992 | 16,972 | 13,472 | 6,225 | 6,620 | 5,036 |
| $R^2$ | 0.381 | 0.364 | 0.331 | 0.323 | 0.353 | 0.335 | 0.510 | 0.358 | 0.334 | 0.512 |

*Notes:* The sample comprises Russell 3000 companies from 2011 to 2020. Communication services was omitted due to insufficient sample size. The dependent variable is P/E. The independent variables are carbon emission levels and earnings call climate sentiment values. All regression models include the controls of Figure 4. We report the results of the pooled regression with standard errors (in parentheses) double-clustered at the firm and year level. Year-month, country, and industry-fixed effects are used for all regressions. Firm-fixed effects are not used because of a lack of residual variation. We note that $**p < 0.01$ and $*p < 0.05$.

 © 2025 CFA Institute. All rights reserved.

Exhibit 8 to Decl. of Thomas Lyon
212
**SER 170**

**Financial Analysts Journal** | A Publication of **CFA** Institute

| Table 10.  Disclosure, Commitments, and Earnings Calls Sentiment and P/E: Partial Regressions |
| :--- |

| Dependent Variable: Log P/E | Disclosure, CDP Initiative, SBTi Signatory, Management Sentiment Hybrid Score, Q&A Sentiment Hybrid Score |
| :--- | :---: |
| Disclosure Scope 1 (Y/N) | −0.713** |
| | (0.133) |
| CDP Initiative (Y/N) | −0.018 |
| | (0.116) |
| SBTi Initiative (Y/N) | 0.204 |
| | (0.205) |
| Management Climate Sentiment Hybrid Score | −0.091 |
| | (0.111) |
| Q&A Climate Sentiment Hybrid Score | −0.661** |
| | (0.207) |
| Log Scope 1 Levels | −0.127** |
| | (0.013) |
| Disclosure Scope 1*Log Scope 1 | 0.047** |
| | (0.011) |
| CDP Initiative (Y/N)*Log Scope 1 | −0.001 |
| | (0.009) |
| SBTi Initiative (Y/N)*Log Scope 1 | −0.019 |
| | (0.016) |
| Management Climate Sentiment Hybrid Score*Log Scope 1 | 0.006 |
| | (0.008) |
| Q&A Climate Sentiment Hybrid Score*Log Scope 1 | 0.046** |
| | (0.015) |
| Controls | Yes |
| Yr/mo-fixed effects | Yes |
| Country-fixed effects | Yes |
| Industry-fixed effects | Yes |
| Firm-fixed effects | No |
| Observations | 99,686 |
| $R^2$ | 0.394 |

*Notes:* The sample comprises Russell 3000 companies from 2011 to 2020. The dependent variable is *P/E*. The independent variables are carbon emission levels, binary indicators of disclosure, binary indicators of CDP pledges and SBTi commitments, and earnings call climate sentiment values. All regression models include the controls of Figure 4. We report the results of the pooled regression with standard errors (in parentheses) double-clustered at the firm and year level. Year-month, country, and industry-fixed effects are used for all regressions. We note that $**p < 0.01$ and $*p < 0.05$.

**Editor's Note**

Submitted 15 June 2024

Accepted 16 December 2024 by William N. Goetzmann

## Notes

1. Those that are in the Russell 3000, a market cap–weighted index of the 3000 largest US equities, as of 25 June 2021.

2. See https://www.unepfi.org/climate-change/tcfd/#:~:text=The%20Task%20Force%20on%20Climate,in%20providing%20information%20to%20stakeholders.

3. See https://www.fsb-tcfd.org/recommendations/.

4. See https://www.fsb-tcfd.org/press/statement-of-michael-r-bloomberg-on-g7-finance-ministers-announcing-mandatory-climate-disclosure/.

5. See https://www.gov.uk/government/news/uk-to-enshrine-mandatory-climate-disclosures-for-largest-companies-in-law

 © 2025 CFA Institute. All rights reserved. **100**

Exhibit 8 to Decl. of Thomas Lyon

213

**SER 171**

6. Refer to the SEC final rule, "The Enhancement and Standardization of Climate-Related Disclosures for Investors," 89 FR 21668, 28 March 2024.

7. Refer to the SEC final rule, updated action, "The Enhancement and Standardization of Climate-Related Disclosures for Investors Delay of Effective Date," 89 FR 25804, 12 April 2024.

8. See https://sciencebasedtargets.org/resources/files/SBTi-criteria.pdf.

9. See https://www.cdp.net/en/articles/companies/just-a-third-of-companies-4002-13-100-that-disclosed-through-cdp-in-2021-have-climate-transition-plans.

10. Refer to 40 CFR §75.1.

11. Refer to the SEC final rule, "The Enhancement and Standardization of Climate-Related Disclosures for Investors," 89 FR 21668, 28 March 2024.

---

## References

Aldy, Joseph E. 2020. "Pricing Pollution through Market-Based Instruments." In *Handbook of U.S. Environmental Policy*, Edward Elgar Publishing, Cheltenham, UK, 202–216.

Aswani, Jitendra, Aneesh Raghunandan, and Shivaram Rajgopal. 2024. "Are Carbon Emissions Associated with Stock Returns?" *Review of Finance* 28 (1): 75–106. doi:10.1093/rof/rfad013.

Bernanke, Ben S. 1983. "Irreversibility, Uncertainty, and Cyclical Investment." *The Quarterly Journal of Economics* 98 (1): 85–106. doi:10.2307/1885568.

Bolton, Patrick, and Marcin Kacperczyk. 2021a. "Do Investors Care about Carbon Risk?" *Journal of Financial Economics* 142 (2): 517–549. doi:10.1016/j.jfineco.2021.05.008.

Bolton, Patrick, and Marcin Kacperczyk. 2021b. "Firm Commitments." *SSRN Electronic Journal*. doi:10.2139/ssrn.3840813.

Bolton, Patrick, and Marcin Kacperczyk. 2023. "Global Pricing of Carbon-Transition Risk." *Journal of Finance* 78 (6): 3677–3754. doi:10.1111/jofi.13272.

Bolton, Patrick, Zachery Halem, and Marcin Kacperczyk. 2022. "The Financial Cost of Carbon." *Journal of Applied Corporate Finance* 34 (2): 17–29. doi:10.1111/jacf.12502.

Brown, Lawrence D., and Ling Zhou. 2015. "Interactions between Analysts' and Managers' Earnings Forecasts." *International Journal of Forecasting* 31 (2): 501–514. doi:10.1016/j.ijforecast.2014.10.002.

Chava, Sudheer, Wendi Du, and Baridhi Malakar. 2021. "Do Managers Walk the Talk on Environmental and Social Issues?" *SSRN Electronic Journal*. doi:10.2139/ssrn.3900814.

Comello, Stephen, Julia Reichelstein, and Stefan Reichelstein. 2021. "Corporate Carbon Reduction Pledges: An Effective Tool to Mitigate Climate Change?" *SSRN Electronic Journal*. doi:10.2139/ssrn.3875343.

Dechow, Patricia M., Richard G. Sloan, and Mark T. Soliman. 2004. "Implied Equity Duration: A New Measure of Equity Risk." *Review of Accounting Studies* 9 (2/3): 197–228. doi:10.1023/B:RAST.0000028186.44328.3f.

Dechow, Patricia M., Ryan D. Erhard, Richard G. Sloan, and Mark T. Soliman. 2021. "Implied Equity Duration: A Measure of Pandemic Shutdown Risk." *Journal of Accounting Research* 59 (1): 243–281. doi:10.1111/1475-679X.12348.

Dixit, Avinash K., and Robert S. Pindyck. 1994. *Investment under Uncertainty*. Princeton University Press, Princeton, NJ.

Dzieliński, Michał, Florian Eugster, Emma Sjöström, and Alexander F. Wagner. 2022. "Do Firms Walk the Climate Talk?." Swiss Finance Institute Research Paper No. 22-14. doi:10.2139/ssrn.4021061.

Eccles, Robert G., and George Serafeim. 2013. "A Tale of Two Stories: Sustainability and the Quarterly Earnings Call." *Journal of Applied Corporate Finance* 25 (3): 8–19. doi:10.1111/jacf.12023.

Eckerle, Kevin, Tensie Whelan, and Brian Tomlinson. 2020. "Embedding Sustainability Performance and Long-Term Strategy in the Earnings Call." *Journal of Applied Corporate Finance* 32 (2): 85–99. doi:10.1111/jacf.12408.

Friedman, Henry L., and Mirko S. Heinle. 2016. "Taste, Information, and Asset Prices: Implications for the Valuation of CSR." *Review of Accounting Studies* 21 (3): 740–767. doi:10.1007/s11142-016-9359-x.

Lazard Climate Center. 2021. "Inaugural Research Findings of the Lazard Climate Center." https://www.lazard.com/research-insights/inaugural-research-findings-of-the-lazard-climate-center/

McDonald, Robert, and Daniel Siegel. 1986. "The value of waiting to invest," *The Quarterly Journal of Economics* 101 (4): 707–727.

Pástor, Luboš, Robert F. Stambaugh, and Lucian A. Taylor. 2021. "Sustainable Investing in Equilibrium." *Journal of Financial Economics* 142 (2): 550–571. doi:10.1016/j.jfineco.2020.12.011.

Sautner, Zacharias, Laurence van Lent, Grigory Vilkov, and Ruishen Zhang. 2023. "Firm-Level Climate Change Exposure." *Journal of Finance* 78 (3): 1449–1498.

Setterberg, Hanna, and Emma Sjöström. 2021. "Integrated Communications on Financial and ESG Performance in the Earnings Call." Misum Working Paper Series no. 01.

Exhibit 8 to Decl. of Thomas Lyon
214
**SER 172**

# Exhibit 7
# to Declaration of Thomas Lyon

# Dzielinski, Michal, Florian Eugster, Emma Sjöström, and Alexander F. Wagner, *Climate Talk in Corporate Earnings Calls, Mistra Center for Sustainable Markets* (2022)

Exhibit 7 to Decl. of Thomas Lyon
145
**SER 173**



# MISUM

NO. 2022-06, JAN 2022

# WORKING PAPER SERIES

## CLIMATE TALK IN CORPORATE EARNINGS CALLS

---

Michał Dzieliński
  Stockholm Business School
  Stockholm University

Florian Eugster
  Mistra Center for Sustainable Markets (Misum)
  University of St. Gallen

Emma Sjöström, PhD
  Mistra Center for Sustainable Markets (Misum)
  Stockholm School of Economics

Alexander F. Wagner
  University of Zurich, CEPR, ECGI, and Swiss Finance Institute

Mistra Center for Sustainable Markets (Misum) | Sveavägen 65, floor 4, 113 59 Stockholm

Exhibit 7 to Decl. of Thomas Lyon
146
SER 174

Case 2:24-cv-00801-ODW-PVC    Document 90-7    Filed 04/07/25    Page 3 of 48    Page ID #:9438

# Climate Talk in Corporate Earnings Calls[*]

Michał Dzieliński[1], Florian Eugster[2], Emma Sjöström[3], Alexander F. Wagner[4]

[1]Stockholm Business School, Stockholm University

[2]University of St.Gallen

[3]Stockholm School of Economics

[4]University of Zurich, CEPR, ECGI, and Swiss Finance Institute.

29th January 2022

## Abstract

Climate change is a major concern for many companies, but it has not historically featured much in earnings conference calls. We find a marked increase in climate talk on these calls in recent years. We also find that climate talk is negatively related to the change in $CO_2$ emissions (especially Scope 2) in the year after the call, particularly in firms with high overall environmental and governance ratings. Conversely, investors react particularly negatively to climate talk when it comes from a firm with low levels of ESG performance or following poor earnings performance. Finally, a firm employs more climate talk when it is more material, when there is greater shareholder pressure or when it is better prepared for climate-related disclosure. Overall, these results suggest that investors and other stakeholders interested in corporate climate action should be paying attention to earnings conference calls as a source of useful information about companies' broader stance on climate-related issues.

Keywords: climate talk, earnings calls, sustainability, CO2 emissions, greenwashing

JEL codes: D83, G14, G34, G41, Q54

[*]The authors would like to thank the Mistra Center for Sustainable Markets (Misum) at the Stockholm School of Economics (SSE) for financing the research. We would also like to thank Sailee Sakhardande for her excellent research assistance. We thank Robert Eccles and Nils Vinge for good discussions, and seminar participants at Misum/SSE, the Stockholm Business School, and the Jönköping International Business School, for their valuable comments on earlier versions of the paper.

1

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
147
**SER 175**

# 1  Introduction

The interest of institutional investors in sustainability issues in general and climate change in particular has been steadily growing over the past 20 years. In 2020, almost 36 per cent of total assets under management globally were labelled sustainable investment (GSIA, 2021), including those of many public pension funds. The world's largest asset management company, BlackRock, publicly stated in 2018 that environmental, social and governance (ESG) issues are essential to long-term value creation (e.g. Sorkin, 2018). Concerns over climate change and what it might entail for long-term investment value and returns have resulted in initiatives such as Climate Action 100+, the Net-Zero Asset Owners Alliance, and most recently the Glasgow Financial Alliance for Net Zero, where many (although far from all) institutional investors have come together to put pressure on companies to take the necessary action on climate change.

The increasing focus on climate change in the investment community has been accompanied by mounting scientific evidence and political momentum, manifest not least in the Kyoto Protocol of 2009 and the Paris Agreement of 2015. According to the Sustainability Standards Accounting Board (SASB), climate change is likely to materially affect almost all industries. Today, many institutional investors believe that climate risks will have financial implications for their portfolio firms, and that these risks, particularly of the regulatory kind, are already arising (Krueger et al., 2020). Bolton & Kacperczyk (2021a) show that $CO_2$ emissions are indeed a negatively priced factor in the cross-section of stock returns.

If climate change is financially material, it arguably merits the same attention in corporate disclosure as any other issue likely to affect corporate financial performance (Eccles & Serafeim, 2013). The quarterly earnings call is rated as one of the most important interfaces between companies, investors, and financial analysts (Brown

2

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
148
**SER 176**

et al., 2015). Analysts use information from the earnings call in their fundamental analysis of the company. However, many companies seem to find it difficult to talk about sustainability in general and climate change in particular during quarterly earnings calls (Eccles & Serafeim, 2013; Eckerle et al., 2020; Setterberg et al., 2021). Anecdotally, climate issues hardly register during quarterly earnings calls, and some companies and investors argue that the earnings call's short-term focus means that it is not an appropriate forum for the discussion of sustainability issues (Setterberg et al., 2021). However, Eccles & Serafeim (2013) warn that neither companies nor investors will be seen as taking sustainability, including climate change, seriously unless these topics are integrated into the quarterly earnings call.

This paper investigates climate talk in corporate earnings calls, using an extensive, global sample of the past two decades. We ask three questions that shed light on whether it makes sense for investors and other stakeholders interested in corporate climate actions to pay attention to quarterly earnings calls: First, do firms that talk more about climate change during earnings calls in fact reduce their emissions more in the future? Second, how do investors respond to climate talk? Third, does climate talk take place more where shareholders and other stakeholders might reasonably expect them to?

To capture discussions of climate change, we compute the textual similarity between earnings call transcripts and a reference library of texts focused on climate change. We include almost 350,000 transcripts of earnings calls for 11,363 firms from around the globe in the period 2002-Q12021. As a climate-related reference library, we use the five reports issued by the Intergovernmental Panel on Climate Change (IPCC). For each transcript we create a vector of all bigrams, that is combinations of two consecutive words, and their term frequency-inverse document frequency ($tf-idf$) scores. We then calculate the cosine similarity between this vector and an analogous vector created from the IPCC reports. Our measure is inspired by Engle et al. (2020),

3

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
149
**SER 177**

who use it to capture climate news in Wall Street Journal articles.

Over the course of our 20-year sample climate talk in earnings calls gradually increase until the beginning of 2010, before partially declining in the period 2010-2018, then increasing rapidly from 2019. Our evidence is consistent with Henry et al. (2021), who show that environmental disclosure in quarterly earnings calls has increased over the past 15 years.

Our first main result concerns whether more climate talk translates into more climate action. We focus on $CO_2$ emission reductions, which will be instrumental in keeping the rise in global temperatures below dangerous levels. Since data on corporate $CO_2$ emissions are only available annually, we average the measure of climate talk across the four earnings calls in each calendar year. We find that more climate talk in one year predicts a statistically significant decrease in $CO_2$ emissions in the following year. Thus, the words of Eccles & Serafeim (2013) ring true in that discussing climate change in earnings calls signals that companies are taking climate issues seriously.

Mindful of the important findings of Bolton & Kacperczyk (2021b) that firm-level commitments to reducing $CO_2$ may not translate into meaningful reductions in aggregate emissions, we calculate the hypothetical emissions that would occur in the absence of any climate talk during earnings calls, which would signal a less serious approach to climate change. We find that aggregate hypothetical emissions would be between 1.1% and 2.3% higher than those actually reported, suggesting that firms' attitudes as signalled by climate talk also make a difference on aggregate.

Heterogeneity across emission types and across firm types provides more color on these results. We find, first, that the overall $CO_2$ reductions are mostly driven by reductions in Scope 2 emissions, which are indirect emissions linked to the purchase of electricity, steam, heat or cooling. Second, climate talk in the Q&A session is more credible and followed by a stronger reduction in $CO_2$ emissions in well-governed firms and in firms with a track record of good environmental ratings. This suggests that

4

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
150
**SER 178**

climate talk can indeed signal a serious approach to climate action, but can also be "hot air".

Our second inquiry concerns how investors respond to climate talk during earnings calls. We analyze cumulative abnormal returns ($CARs$) over two days spanning each call. On average, investors trading on earnings call information react negatively to climate talk, controlling for the earnings surprise and a range of firm characteristics. Further analysis reveals that investors are particularly critical of climate talk by firms with low ESG scores, by firms for which climate change is less material, and when climate talk follows negative earnings surprises. Given that managers take stock price feedback into account, these result suggest that financial market mechanisms alone are unlikely to encourage companies to increase climate talk in earnings calls. However, well-governed firms can reduce carbon emissions, and talk about climate policy, without penalty from investors.

Finally, we consider which factors drive climate talk in earnings calls. If climate talk is systematically related to factors that shareholders and other stakeholders might arguably consider important for the climate exposure of a company, this would provide further indications of the relevance of what firms say regarding climate change during earnings calls. First, we hypothesize that firms with more prominent exposure in terms of the materiality of climate-related issues are more likely to talk about these issues in earnings calls. We rely on the SASB Materiality Map to identify such firms. Second, we hypothesize that market discipline could be an effective driver. We investigate whether firms that are targeted by the Climate Action 100+ platform talk more about climate in earnings calls.[1] Finally, we investigate how a firm's prepared-

---

[1] Climate Action 100+ is an investor-led initiative seeking to influence the world's largest corporate greenhouse gas emitters to take appropriate action on climate change. At the end of 2021, it is backed by 545 investors with more than $52 trillion Assets under Management in over 33 markets, including the world's largest asset manager, BlackRock. The original list with 100 target companies was released in December 2017 and expanded with 61 companies in June 2018.

5

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
151
**SER 179**

ness to disclose information on climate-related issues is reflected in discussions in the earnings call. Here, we look at company adoption of the guidelines issued by the Task Force on Climate-Related Financial Disclosures (TCFD).

We find that companies are indeed more prone to talk more about climate change in earnings calls (1) if they are in a sector in which green-house gas (GHG) emissions are highly material, (2) if they have been targeted by Climate Action 100+, or (3) if they have officially endorsed the TCFD climate disclosure standards. Thus, a combination of materiality, shareholder pressure and appropriate guidelines appears effective at motivating companies to address climate change in their earnings calls.

Overall, these results suggest that it can pay off for investors and other stakeholders interested in corporate climate actions to pay careful attention to discussions about climate-related issues in earnings calls.

This paper contributes to the literature in three ways. First, we contribute empirically to the "walk the talk" versus "greenwashing" literature (e.g. Delmas & Burbano, 2011; Christensen et al., 2013; Wickert et al., 2016) by exploring the relation of climate-related disclosure with $CO_2$ emissions. Recent work specifically related to earnings calls has brought mixed results: while some studies found that climate and environmental disclosure was not followed by action (Hail et al., 2021), others claim that environmental talk is associated with better environmental performance such as greater pollution abatement and a higher number of future green patents (Chava et al., 2021). Our research sheds more light on this question by showing that, at least in the climate context, talk during earnings calls is associated with walk. We reveal important cross-sectional heterogeneity in these actions, and show that investors take these into account when assessing climate talk.

Second, we add to the earnings calls literature by expanding the nascent stream of studies that empirically explores sustainability-related talk in this setting. While much has been said about earnings calls in general, such as on market reaction to

6

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
152
**SER 180**

call tone (e.g. Price et al., 2012; Blau et al., 2015; Brockman et al., 2017; Druz et al., 2020), and manager-analyst interactions (e.g. Matsumoto et al., 2011; Mayew, 2008), it is only recently that researchers have started to pay attention to non-financial content such as environmental issues.[2]  We extend this small but growing pool of studies in several ways: We focus on climate change rather than the environment or sustainability more generally, which provides a more focused empirical setting that allows for a tighter link to the outcome variable of carbon emissions reductions. Moreover, our research identifies hitherto unexplored determinants in this context, such as shareholder pressure and reporting preparedness; focuses on all industries rather than a limited set; and provides a longer time series than previous studies.

Third, we contribute to the literature on applying textual analysis in finance. Capturing climate talk is challenging, because there are no accepted dictionaries or word lists of climate-related terms. Different authors have thus developed their own approaches. Sautner et al. (2020) apply a keyword discovery algorithm, which allows them to compile a broad set of bigrams, starting with a small hand-picked set of "initial" bigrams, related to different aspects of climate change (physical, regulatory and opportunity).  A string of related papers by Diggelmann et al. (2021), Varini et al. (2021), and Webersinke et al. (2021) apply and refine advanced natural language processing techniques such as BERT to identify climate change topics and to verify climate-related claims. In comparison, our approach, inspired by Engle et al. (2020), is relatively simple, yet it proves helpful in measuring the overall intensity of climate talk and in explaining variation in corporate actions and investor reactions.

---

[2] See for example: Henry et al. (2021); Mahdavi et al. (2021); Chava et al. (2021); Hail et al. (2021); Setterberg et al. (2021); Sautner et al. (2020); Raman et al. (2020); Eckerle et al. (2020); Eccles & Serafeim (2013); Li et al. (2020); Bochkay et al. (2021).

7

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
153
**SER 181**

# 2   Hypotheses

Clearly, just talking about climate change will have little impact on it. Thus, for our first hypothesis, we are interested in whether companies walk the talk, and if climate talk in earnings calls is followed by climate action. On the one hand, there is growing concern that company talk on climate change amounts to "greenwashing", or making environmental commitments that are not matched by actions. For instance, Reid & Toffel (2009) note that while shareholder proposals requesting greater corporate social responsibility (CSR) disclosure increase companies' propensity to publicly disclose GHG emissions, this increased disclosure does not generally result in a change in corporate activities, at least not in the short term.

On the other hand, research in organization studies suggests that talk might drive walk. According to Christensen et al. (2013, 2021), aspirational talk about CSR can stimulate CSR improvements and social change. Drawing on 12 years of experience in the CDP (formerly known as the Carbon Disclosure Project), Topping (2012) presents anecdotal evidence that climate disclosure drives behavioral change, albeit without supplying proof of decreased $CO_2$ emissions. Arguably, the special standing of earnings calls in the communication between companies and markets could motivate managers only to discuss the topics on which they intend to deliver. While Chava et al. (2021) find that environmental talk in earnings calls is reflected in improved environmental action, Hail et al. (2021) argue that even this venue is used for greenwashing.

In the light of these mixed findings, the null hypothesis is that there is no association between climate talk and subsequent $CO_2$ emissions. Alternatively, if climate talk in earnings calls signal a more serious approach to the topic, we would expect to see that:

<div align="center">8</div>

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
154
**SER 182**

*H1a: Firms with more climate talk in earnings calls reduce $CO_2$ emissions by more (or increase them by less) than companies with less climate talk.*

Finally, if climate talk on earnings calls is greenwashing, it may actually allow companies to get away with substandard climate actions, leading to the opposite prediction that:

*H1b: Firms with more climate talk in earnings calls reduce $CO_2$ emissions by less (or increase them by more) than companies with less climate talk.*

Note that we are not postulating a causal effect of climate talk on $CO_2$ emissions, even though previous studies have shown that talk can trigger action. Our more modest objective is to determine whether such talk is cheap in earnings calls or actually rooted in a more serious approach to the topic, which results in steeper reductions in $CO_2$ emissions.

Our second approach to assessing the relevance of climate talk in conference calls is to examine how climate talk affects firm valuations. If investors expect that firms initiating climate talk will have higher cash flows in the future (e.g., through innovative and climate-friendly innovations that augment their capacity to meet regulatory needs or other opportunities), then a positive effect on shareholder reactions should be expected following the earnings call. Investors could also perceive these firms to be less risky. For example, in line with the majority of the disclosure literature, increased disclosure might be expected to reduce the cost of equity capital through a

9

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
155
**SER 183**

reduction in information asymmetry, which would also increase firm value.[3]

*H2a: Climate talk is positively associated with announcement returns.*

On the other hand, it is conceivable that greater climate disclosure during earnings calls is associated with lower expected future cash flows and/or higher cost of capital, leading investors to bid down share prices of such companies. A wider discourse about climate-related issues might induce expectations that the company might invest in negative net-present value (NPV) projects. Such projects could be undertaken for agency reasons but they might also be undertaken for regulatory reasons that are seen as value-destroying by investors. Investors could thus fear that the firm no longer prioritizes maximizing financial performance. Relatedly, the climate-related talk could be seen as an attempt at greenwashing, with negative reputational or even legal consequences. Finally, discussion about climate-related issues could increase uncertainty about a firm's future cash flows due to the inherent uncertainty about climate change. Overall, these considerations suggest:

*H2b: Climate talk is negatively associated with announcement returns.*

A third, complementary approach to evaluating the merits of climate talk in earnings calls is to investigate which firm characteristics determine its extent. While climate change is relevant to most sectors and industries, some are likely to have a stronger business-relevant link to it than others. The notion of materiality is helpful

---

[3] See Plumlee et al. (2015), who finds a reduction of the cost of equity capital for sustainability disclosures. However, current research in accounting is critical towards a reduction effect based on disclosure (Eugster, 2020), proposes a non-linear relationship (Athanasakou et al., 2020), or indicates that the growth of the firm moderates the effect of disclosure on cost of equity (Ellahie et al., 2021).

10

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
156
**SER 184**

here. Materiality refers to the quality of being relevant or significant. In a sustainability context, materiality is a way to denote which of the broad set of sustainability issues is deemed key to a particular company's long-term success - by corporate stakeholders and corporate management (Eccles et al., 2012). Many companies nowadays carry out materiality assessments to identify and prioritize such issues. To aid this work, the independent Sustainability Accounting Standards Board (SASB) provides guidance on the disclosure of financially material sustainability issues for 77 industries.

Research shows that firms with good ratings on material sustainability issues significantly outperform firms with poor ratings on these issues (Consolandi et al., 2020; Kotsantonis & Bufalari, 2019; Khan et al., 2016; Van Heijningen, 2019).

Given that materiality indicates financial relevance and even seems to predict financial performance, it would arguably make sense for companies to discuss material sustainability issues with analysts and investors. We therefore propose that companies for which climate change is highly material would be more prone to talk about it and be questioned about it in an earnings call.

*H3a: Climate talk is more prevalent in firms in industries where climate change is ranked as highly material.*

The acknowledgement that sustainability and climate change are strategically important has led to a wealth of disclosure on these topics (Bolton & Kacperczyk, 2021c). Some companies have adopted the method of "integrated reporting", which combines financial and non-financial information to explain how the organization creates, preserves or erodes value over time.[4] The realization that climate change issues can

---

[4] See Barth et al. (2017) and Eugster & Wagner (2020) for the financial performance effect of Integrated Reporting and Value Reporting, respectively.

11

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
157
**SER 185**

be financially material has also spurred demand for corporate disclosure that specifically addresses the financial implications of climate-related risks and exposures. A survey among institutional investors shows that a majority believe that climate risk reporting is as important as financial reporting, and one-third believe that climate risk reporting is even more important (Krueger et al., 2020). Voices have even been raised for mandatory and enforced carbon disclosures (Bolton et al., 2021). To propel investor-useful climate disclosure, the Task Force on Climate-Related Financial Disclosures (TCFD) was launched by the Financial Stability Board in 2015. It encourages companies to supply the financial markets with reliable and relevant climate-related information. As of the end of 2021, 2,800 organizations in 89 jurisdictions were listed as "supporters" of the TCFD, and thus expected to use the framework.

Reporting on climate issues is notoriously challenging, and many companies struggle to disclose accurate and relevant data. We propose that companies that are already disclosing financially relevant climate information in other forums might be better prepared to also address the issue in the quarterly earnings call.

*H3b: Climate talk is more prevalent in firms that are committed to financially relevant climate disclosure.*

Much of the pressure on corporations to address climate issues in their strategic and operational efforts comes from the investor community. The number of climate-related shareholder proposals has increased over time (Horster & Papadopoulos, 2019; Treviño et al., 2021) but they are also now attracting increasingly higher votes (Hale, 2019). Recent research shows that firms are more likely to disclose climate-related information if they are pressured to do so by institutional shareholders via the proxy vote on environmental issues (Flammer et al., 2021). This is in line with neo-institutional theory, which posits that companies are dependent on the

12

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
158
**SER 186**

organizational legitimacy conferred by key stakeholders (Powell & DiMaggio, 1991). We therefore propose that companies under such pressure from investors are more prone to include climate issues in the quarterly earnings calls.

*H3c: Climate talk is more prevalent in firms that are targeted by shareholder pressure on climate change.*

# 3   Data

## 3.1   Conference calls transcripts and other data

We use the transcripts of the quarterly earnings calls of all publicly listed companies worldwide from 2002 until the end of the first quarter of 2021. These were obtained from Thomson Reuters Street Events. We start with a sample of 345,553 earnings calls for 11,363 unique companies. We merge this data with the available data from Thomson Eikon and require ESG data with Asset-4 coverage. These data requirements reduces the sample to 6,705 unique companies. After merging with earnings data, we are left with 118,984 firm-quarters. We also require that the control variables and some of the outcome variables should be available, ending up with 4,610 unique firms and 85,829 firm-quarters. The sample consists of firms headquartered in 65 countries worldwide. Not surprisingly, the United States contributes most firms to the sample, at 63.21% of all firms.[5] All the accounting data is converted into US dollars. We also observe that the sample is more populated in the most recent years of the sample period. For example, 2019 contains roughly 14% of all the firm-quarters, whereas 2002 contains just 0.6%. This was due to the coverage of our data providers

---

[5] Canada, Germany, Japan, and Sweden follow on ranks two through five.

13

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
159
**SER 187**

and the availability of ESG data. On average, there are 15 quarterly earnings calls per company in the sample. Our sample does not exclude any particular industry and contains the full range of listed firms.

In our real effect tests, we investigate whether there is a reduction in $CO_2$ emissions in the period following the earnings calls. However, the additional data requirements reduce the final sample size for that particular test, given that not all firms disclose this kind of information. We then transfer the quarterly measures from the quarterly earnings calls to the yearly measure by averaging the available quarterly measures in that calendar year. We also try to disentangle the real effect and look into Scope 1, Scope 2, and Scope 3 $CO_2$ emissions, reducing the sub-sample slightly due to the variable availability of data.

We use accounting, market and ESG data from Eikon. Data about which companies support TCFD and which companies are targeted by Climate Action 100+ were obtained directly from these initiatives. The materiality matrix was taken from the SASB's website.

# 4 Capturing climate-related discussions in earnings calls

We adapt the approach of Engle et al. (2020) and capture the extent to which companies discuss climate change in their earnings calls by measuring the textual similarity between the transcripts of such calls and a reference library of documents that we can be reasonably sure are devoted to climate change. We use the five assessment reports published by the IPCC at regular intervals between 1992 and 2014 as our reference library.

To operationalize textual similarity, we first remove common stopwords, such as

14

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
160
**SER 188**

"the", "and", and "or", from the transcripts. Then, for each transcript we construct a list of all bigrams - that is adjacent two-word combinations - that occur in the remaining text[6] and calculate their term frequency-inverse document frequency $(tf - idf)$ scores. Term frequency is the number of times a bigram occurs in a given transcript. Document frequency, by contrast, is the number of documents (transcripts) in which a bigram occurs. Thus, the $tf - idf$ score of bigram $b$ in transcript $t$ is given by:

$$tf - idf_{b,t,T} = f_{b,t} \cdot log \frac{T}{\#\{b \in t\}}$$

where $f_{b,t}$ is the frequency of bigram $b$ in transcript $t$, $T$ is the number of all transcripts in our dataset and $\#\{b \in t\}$ is the number of transcripts containing bigram $b$. Intuitively, bigrams receive a high $tf - idf$ score if they occur frequently in a given transcript but not across very many transcripts. Controlling for document frequency ensures that bigrams common to earnings calls, such as "this quarter," do not dominate the ranking.

Similarly, we construct a list of all bigrams (excluding stopwords) and their term frequencies in the IPCC reports, having merged all five reports into a single document. In order to arrive at $tf - idf$ scores, we multiply term frequencies with inverse document frequencies obtained for the same bigrams from the earnings call transcripts.[7]

Finally, we calculate the textual similarity of an earnings call transcript with the IPCC benchmark as the cosine similarity between the $tf - idf$ vector of that transcript and the $tf - idf$ vector obtained from the IPCC reports. Cosine similarity captures

---

[6] Studies in computational linguistics, such as Bekkerman & Allan (2004) argue that using n-grams (usually bigrams) of words as opposed to single words (unigrams) improves the results of text classification.

[7] Applying $idf$ weights from transcripts also to IPCC bigram frequencies may seem arbitrary. However, if we calculated $idf$ within the five IPCC reports, we would down weight the most informative climate change bigrams and unduly distort our measurement of textual similarity.

15

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
161
**SER 189**

the degree to which two vectors "point in the same directions" in high-dimensional space. In our case, it captures the extent to which the same bigrams appear in the same proportions in the transcripts and in the IPCC reports. In cases of perfect overlap, the similarity is equal to 1 while if there is no overlap at all, it is 0. To the extent that the IPCC reports represent the canonical way to discuss climate change, the cosine similarity we measure allows us to gauge the extent to which firms raise this topic in their earnings calls.

We calculate three variants of textual similarity (climate talk, $CT$) to the IPCC benchmark: $CT_{CALL}$, based on the entire earnings call transcript, $CT_{PRE}$, based only on the presentation part, and finally, $CT_{QA}$, based on the questions and answers (Q&A) session between managers and analysts participating in the call.[8]

## 4.1   Summary statistics

The overall summary statistics are tabulated in Table 2. Our results show that, while the level of climate-related talk in quarterly earnings calls has been fairly constant for the previous 20 years, there was a marked increase in 2019 that has been maintained since. While we might have expected a notable rise after 2015, the year in which both the Paris Agreement and the Sustainable Development Goals were adopted, and when initiatives such as Science-Based Targets and the TCFD were launched, there was apparently a lag in these developments being reflected in earnings calls. We also observe that the presentation part in the earnings call contains a greater amount of climate-related talk compared to the Q&A session. Interestingly, the amount of climate talk in the answers is greater than in the questions asked by analysts. These results are visualized in Figure 1.

---

[8] In the determinants analysis we also consider climate talk in questions ($CT_Q$) and answers ($CT_A$) separately.

16

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
162
**SER 190**

[Insert Table 2 and Figure 1 about here]

We find that firms in the (1) Reneweable Resources & Alternative Energy and (2) Resource Transformation, and the (3) Extractives & Minerals Processing industries have the highest average amount of climate discussion. These are all sectors in which one would intuitively expect firms to talk extensively about climate-related issues, given the nature of their operations. However, we find substantial heterogeneity within each sector, meaning that there are large cross-sectional differences even among similar firms in terms of climate talk. This is illustrated in Figure 2.

[Insert Figure 2 about here]

# 5   Results

## 5.1   Empirical approach

Our analysis proceeds in three steps. First, we investigate whether climate talk is related to climate action. To this end, we transform the quarterly data to yearly frequency using the average measure of climate talk and link this to annual $CO_2$ emissions data from Asset 4. Second, we analyze stock price reactions to climate talk in earnings calls. We are especially interested in whether investors respond positively to climate talk if this in turn is positively related to environmental performance. This will give a sense of whether markets can be a force for good in promoting constructive climate disclosure. Third, we examine determinants of climate talk to shed light on whether its occurrence is systematic.

17

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
163
SER 191

## 5.2   Does climate talk predict lower $CO_2$ emissions?

Reducing $CO_2$ emissions is paramount for preventing dangerous levels of climate change. Thus, to understand whether there is substance behind the climate talk in earnings calls, we investigate their relationship with subsequent $CO_2$ emission levels. As the dependent variable, we calculate the percentage change in total $CO_2$ emissions in year $t+1$ reported by company $i$:

$$\Delta CO2_{i,t+1} = \frac{CO2\_Total_{i,t+1} - CO2\_Total_{i,t}}{CO2\_Total_{i,t}} \cdot 100\%$$

We first illustrate the link between $\Delta CO_2$ using binned scatter plots, shown in Figure 3. The slopes are uniformly negative for both the entire call, Panel (a), and the presentation and Q&A sections individually, Panel (b) and (c) respectively. There do not appear to be any significant outliers driving the overall results.

[Insert Figure 3 about here]

To formalize the visual intuition, we regress $\Delta CO2_{i,t+1}$ on (average) climate talk ($CT$) in year $t$ and a range of control variables, reflecting the company's sustainability profile as well as standard firm characteristics, all of which could affect future emissions:

$$\Delta CO2_{i,t+1} = \beta_1 CT\_CALL/PRE/QA_{i,t} + \beta_j CSR_{i,t}^j + \beta_k FirmChars_{i,t}^k \\ + Industry_i + Year_t + \epsilon_{i,t} \tag{1}$$

The matrix $CSR^j$ contains the following indicator variables (see Table 1 for definitions): $POLICYEMISSIONS$, $TARGETSEMISSIONS$, $TARGETYEAR$, $CSR\_REPORTING$, $CSR\_AUDIT$, $CSR\_INCENTIVE$ and $CSR\_COMMITTEE$. These capture the extent to which sustainability in general and emissions in particular

18

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
164
**SER 192**

are incorporated into a company's policies and disclosure. The matrix $FirmChars^k$ comprises the following variables: $ln\_SIZE, ln\_BM, ROA, LEVERAGE, SCALED\_PPE$ and $SCALED\_CAPX$. Finally, we include industry- and year-fixed effects.

Table 3 summarizes the baseline results. For ease of interpretation, we standardize all continuous variables to a mean of 0 and a standard deviation of 1, which we denote with the suffix STD in the variable name. In Column (1), we show that controlling for firm characteristics an increase in $CT$ on the entire earnings call by one standard deviation is associated in a 0.8 percentage points smaller change in $CO_2$ emissions in the following year.

This result is also robust following inclusion of the various CSR variables, Column (2), and the economic magnitude also remains meaningful at a 0.6 percentage point decrease in $CO_2$ emissions for a one-standard deviation increase in climate talk. Following further analysis, we find that this effect comes mostly from climate talk during the Q&A part of the call. Overall, these results support Hypothesis 1a - that firms that talk more about climate in their earnings calls produce larger decreases (or smaller increases) in their subsequent $CO_2$ emissions.

We do not interpret our results as evidence of a causal link between climate talk and subsequent emissions. Rather, our interpretation is that climate talk in earnings calls signals a serious attitude by a company to the climate challenge.

[Insert Table 3 about here]

### 5.2.1    Aggregate impact

An important concern highlighted by Bolton & Kacperczyk (2021b) is that the firms willing to commit to reductions in CO2 emissions are primarily those with low emissions to begin with, meaning that such commitments have little impact on aggregate emissions. To get a sense of the aggregate impact of firms' attitudes revealed

19

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
165
**SER 193**

through climate talk, we conduct a simple counterfactual exercise following Eskander & Fankhauser (2020), who apply it in the context of climate legislation. Based on Equation 1, we can express the difference between estimated changes in emissions ($\Delta C\hat{O}2_{i,t+1}$) and hypothetical changes in emissions ($\Delta C\tilde{O}2_{i,t+1}$) when the value of $CT\_CALL$ is set to 0 for all $i, t$:

$$\Delta C\hat{O}2_{i,t+1} - \Delta C\tilde{O}2_{i,t+1} = \hat{\beta}_1 CT\_CALL_{i,t}$$

Consequently, we can express the hypothetical change in emissions for company $i$ in year $t+1$ as:

$$\Delta C\tilde{O}2_{i,t+1} = \Delta C\hat{O}2_{i,t+1} - \hat{\beta}_1 CT\_CALL_{i,t}$$
$$\approx \Delta CO2_{i,t+1} - \hat{\beta}_1 CT\_CALL_{i,t}$$

In the second line above, we replace estimated changes with the actual changes observed in our data.[9] To convert from changes to hypothetical levels of emissions, we multiply the reported level of $CO_2$ emissions in year $t$ by the hypothetical change for year $t+1$ calculated as above:

$$C\tilde{O}2_{i,t+1} = CO2_{i,t} \cdot (1 + \Delta C\tilde{O}2_{i,t+1})$$

Finally, we calculate hypothetical aggregate emissions for each year by summing across all companies for which we were able to calculate hypothetical emissions in that year. As the vertical bars in Figure 4 show, hypothetical aggregate emissions exceed reported aggregate emissions for the same sample of companies by between 1.1% and 2.3% in every year.

---

[9] This is an approximation, since estimated and observed changes differ by the residual factor $\epsilon_{i,t}$. However, note that $E(\epsilon_{i,t}) = 0$.

20

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
166
**SER 194**

[Insert Figure 4 about here]

At the same time, the fraction of global $CO_2$ emissions covered by our sample of reporting companies increases from 3% in 2003 to 24% in 2020, see the solid line in Figure 4.[10] Thus, especially in the later part of the sample, $CO_2$ reductions signalled by increased climate talk in earnings calls also appear to be meaningful in aggregate.

### 5.2.2   Reductions in $CO_2$ emissions by scope

Table 4 focuses on emissions of different scopes, which helps explain how exactly climate-talking firms are reducing their $CO_2$ footprint - either directly or indirectly. We find that the overall reduction is mainly driven by the change in Scope 2 emissions, which are indirect emissions that stem from the purchase of electricity, steam, heat or cooling. It is notable that nearly 40 percent of global GHG emissions stem from electricity use (Sotos, 2015). These findings hold for the call-level measure of climate talk (Panel A), and are again particularly pronounced for climate talk in the Q&A part of the earnings call (Panels B and C). We do not find significant reduction for Scope 1 emissions, which are direct emissions from sources owned or controlled by the firm, such as those associated with fuel combustion in boilers, furnaces, vehicles, and so on. Similarly we do not find a significant reduction in Scope 3 emissions, which are linked to the supply chain and customer application.

[Insert Table 4 about here]

Taken together, we observe that firms do reduce their carbon footprint, in the wake of talking about climate-related issues in a quarterly earnings call. Specifically, there seems to be a negative association between the level of talk about climate-related issues in the analyst call and the future change in $CO_2$ emission levels.

---

[10] Global $CO_2$ emissions are from the Global Carbon Project, see Friedlingstein et al. (2021) for details

21

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
167
**SER 195**

### 5.2.3   Which firms walk the talk?

In cross-sectional tests, we examine how different characteristics moderate the effect of climate talk on $CO_2$ emissions. First, we consider the Asset 4 environmental pillar score to compare firms with high and low environmental ratings. Second, we use the corporate governance score to compare well and poorly governed firms. Third, we use a combined ESG score. These results are tabulated in Table 5.

A clear picture emerges. We only find a significant effect for climate talk in the Q&A part of the earnings call for firms in the *high* environmental score or governance score sub samples. In other words, the climate talk in the Q&A session is only credible and followed by a reduction in $CO_2$ emissions in well-governed firms or firms with a track record of good environmental ratings.

[Insert Table 5 about here]

## 5.3   Stock market reactions to climate talk

Our second test of the relevance of climate talk on earnings calls is to examine stock market reaction during the announcement window on the day of the earnings call and on the following business day. To calculate abnormal returns, we subtract from each stock's return the stock market return for developed stock markets from Kenneth French's website as a proxy for the performance of the market portfolio.

Overall, we find that the announcement returns are negatively correlated with climate talks in the full cross-section of firms - see Column (1). In Column (2), we disentangle the climate talk based on the presentation and the Q&A-section and find a negative association for both parts of the call, which initially supports Hypothesis 2b.

[Insert Table 6 about here]

22

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
168
**SER 196**

However, further tests reveal that these critical shareholder reactions are driven by firms where shareholders may be reasonably sceptical about climate talk. For example, Column (3) shows that the negative response is particularly strong in firms with low ESG scores, that is, firms where climate talk is arguably less credible. This holds separately for environmental and governance quality, as seen in Columns (4) and (5). Moreover, the negative reaction is particularly pronounced in the sub-sample of firms with negative earnings surprises (Column (6)), suggesting that climate talk is seen as a luxury good by those investors who pay attention to the earnings call. (The complementary sample results, on high ESG score firms and positive earnings surprise firms, are not shown due to space constraints, but reveal that climate talk is rarely associated with market reactions for these firms.)

## 5.4   Determinants of climate talk

Given our findings in the previous section, at least in the short run stock market re-actions alone are unlikely to motivate firms to increase climate talk in their earnings calls. Consequently, this section investigates other potential determinants. Specifi-cally, we examine three different drivers: (1) being targeted by the Climate Action 100+ initiative, which we use as a proxy for pressure from climate-focused investors, (2) publicly declaring support for the TCFD as a signal of preparedness, and (3) being in an industry for which climate change-related issues are deemed highly material.

The first driver is the firm's business model and the industry in which the firm operates. For this analysis, we use the Materiality Map developed by the SASB. It ranks environmental issues on two types of evidence: (1) that investors in a particular industry are interested in the issue and (2) that these issues can have an impact on firms in that industry. We focus on the climate-related aspect of this measure: GHG emissions. Given that materiality is an industry-wide measure, we could not use firm

23

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
169
**SER 197**

fixed effects or industry fixed effects in this part of the analysis. Thus, the variable *MATERIALITY* is equal to one if the SASB considers GHG emissions material for a firms in a given industry.

The second driver is the preparedness of the firm to talk about climate-related issues. With its framework and guidance, the TCFD should help firms prepare their carbon- and climate-related disclosure. Hence, we code the variable *TCFD* as one if the company publicly supports the TCFD framework and zero if the firm has not publicly endorsed it.[11] We obtain a list direct from TCFD and merge the lists based on ISIN numbers.[12]

The third driver of climate-related disclosure entails being targeted by large institutional investors to be nudged towards more voluntary environmental disclosure. One such initiatives is the Climate Action 100+ program, which targets the largest corporate GHG emitters. Again, we obtained the list of targeted firms directly from the initiative and merged the list based on ISIN numbers. The original list, published in 2017, contained 100 firms. A further 61 companies were added to the list in June 2018. The variable *CLIMATECOMP100* is equal to one after the company has been targeted by the Climate Action 100+ program and hence there is some time variation.

In addition to the above-mentioned drivers, we also include potential explanatory variables based on standard control variables: (1) earnings surprise (*POSITIVE_SURPRISE*) measured as the difference between the actual earnings and what analyst would have expected, (2) company size *ln_SIZE*, (3) book-to-market *ln_BM* , (4) profitability (*ROA*) , (5) leverage (*LEVERAGE*), (6) intensity of property, plants and equipment *SCALED_PPE*, and (7) investments of the firms (*SCALED_CAPEX*).

---

[11] TCFD supporters are expected to apply the guidelines, according to the TCFD website. So far, 2,800 companies are listed as supporters.

[12] We acknowledge that a broader measure, such for example, if a firm applies a Sustainability report, might have been an alternative. We have decided, however, to have a more narrow focus on climate-related issues.

24

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
170
**SER 198**

We also include year fixed effects. All the variables are defined in Table 1.

We start by examining the relation between climate-related disclosure and the various determinants. Specifically, we estimate the parameters of the following regression model:

$$CT = \alpha_i + \alpha_t + \beta_1 CLIMATECOMP100_t + \beta_2 TCFD_t$$
$$+ \beta_3 MATERIALITY_t + \beta_j CSR_{i,t}^j + \beta_k FirmChars_{i,t}^k \quad (2)$$

Table 7 shows the results of our primary investigation into the different factors that might drive the disclosure of climate-related issues in the earnings calls. First, we find that materiality is positively associated with climate talk in all parts of the earnings calls - see significant coefficients in columns (1)-(4). This is in line with our Hypothesis 3a that the materiality of climate-related issues (GHG emissions) to firm value stimulates climate talk by both internal and external participants in earnings calls.

Furthermore, we find that firms that supports the TCFD framework are significantly positively associated with two out of four measures: the overall call measure and the measure based on the presentation. This supports our Hypothesis 3b to the extent that adopting general climate-related disclosure guidelines facilitates climate talk in the part of the earnings call that is under the company's control (the presentation section).

Third, we find empirical evidence that the firms targeted by the Climate Action 100+ initiative talk more about climate-related issues in their earnings calls. Climate Action 100+ has become one of the largest global investor engagement initiatives on climate change, and its influence and impact are growing. Our results are in line with Hypothesis 3c and document that shareholder pressure on businesses to address

25

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
171
**SER 199**

climate change issues is positively associated with discussion of climate-related issues throughout all parts of the earnings call.

Concentrating on managerial climate talk either in presentations or answers, we find that $POLICY\,EMISSIONS$, $TARGET\,EMISSIONS$, $CSR\_INCENTIVES$, and $CSR\_REPORTING$ enter positively and statistically significantly. Thus, managers whose firms have a policy for reducing emissions in place exhibit more climate talk, especially if it is coupled with setting specific targets for the reduction. Interestingly, firms that additionally specify the year for achieving their targets do not engage in more climate talk in the presentation part but do so in the Q&A, suggesting that analysts are more likely to ask about climate-related issues if the company commits to a deadline. When managerial incentives are linked to CSR targets, there is also more climate talk on earnings calls, both by managers and by analysts. Finally, the coefficients on the control variables are plausible. They suggest, for example, that larger companies and those with higher market-to-book ratios engage in more climate talk.

[Insert Table 7 about here]

Taken together, these results suggest that a combination of external and internal factors drives firms' propensity to talk about climate change in earnings calls. Among the factors that shareholders and other stakeholders could potentially influence, CSR incentives for management as well as setting specific emissions reduction targets appear most significant.

# 6    Conclusions

There is mounting evidence that climate change is disrupting ecosystems and societies. The transition to a climate-friendly economy will be costly for firms but also

26

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
172
**SER 200**

generate significant opportunities. In this paper, we have investigated whether publicly listed firms talk about climate issues in their quarterly earnings calls, whether the occurrence of climate talks in earnings calls has changed over time, which factors make companies more prone to talk about climate change in their quarterly earnings calls, and whether climate-related talk is associated with changes in the level of corporate $CO_2$ emissions. We have four main findings:

First, our global sample shows only a limited fluctuation in the occurrence of climate talks in earnings calls, until 2019 when there was a sharp increase. Our empirical findings indicate that three sectors are leading when it comes to climate talk: (1) Renewable Resources & Alternative Energy, (2) Resource Transformation, and (3) Extractives & Minerals Processing.

Second, we find empirical evidence that an increase in climate-related talk is positively associated with a reduction in $CO_2$ emission in the year after the earnings call. This result is consistent with the notion that executives are not just producing hot air by talking about climate-related issues but also transforming their words into action by reducing their $CO_2$ emissions. Interestingly, the climate talk in the Q&A session is more credible and followed by stronger reductions in $CO_2$ emissions in well-governed firms and in firms with a track record of good environmental ratings. This suggests that climate talk can indeed signal a serious approach to climate action, but can also be "hot air".

Third, we also find that climate-related talk is negatively associated with stock market reaction during the announcement period and that this is a potential explanation for the reluctance of managers to talk about climate-related issues during the call. Interestingly, further analysis reveals that investors are particularly critical of climate talk by firms with low ESG scores and poor governance scores or when climate talk follows negative earnings surprises. Given that managers take stock price feedback into account, these result suggest that financial market mechanisms alone

27

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
173
**SER 201**

are unlikely to encourage companies to increase the amount of climate talk in earnings calls.

Fourth, companies are more prone to talk more about climate change in the earnings call if they are in a sector for which climate change is highly material, if they are targeted by a climate-focused investor coalition (in this case Climate Action 100+), or if they have endorsed the TCFD climate disclosure standards.

Overall, these results suggest that it can pay for investors and other stakeholders interested in corporate climate actions to pay carefully attention to discussions on climate change in earnings calls.

One limitation of our study is that our sample based on $CO_2$ emissions is relatively small compared to the original sample we started with. Moreover, we were only able to study firms for which there was a transcript of the earnings call available. Therefore, we were unable to examine the predominately smaller firms with no analyst following or the non-listed firms that often make up a large fraction of the economy. Understanding those firms' climate actions should be an important topic for further research.

28

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
174
SER 202

# References

Athanasakou, V., Eugster, F., Schleicher, T., & Walker, M. (2020). Annual report narratives and the cost of equity capital: Uk evidence of a u-shaped relation. *European Accounting Review*, *29*(1), 27–54.

Barth, M. E., Cahan, S. F., Chen, L., & Venter, E. R. (2017). The economic consequences associated with integrated report quality: Capital market and real effects. *Accounting, Organizations and Society*, *62*, 43–64.

Bekkerman, R., & Allan, J. (2004). Using bigrams in text categorization. *Technical Report IR-408, Center of Intelligent Information Retrieval, UMass Amherst*. URL https://cs.brynmawr.edu/Courses/cs380/fall2006/ir-408.pdf

Blau, B. M., DeLisle, J. R., & Price, S. M. (2015). Do sophisticated investors interpret earnings conference call tone differently than investors at large? Evidence from short sales. *Journal of Corporate Finance*, *31*, 203–219.

Bochkay, K., Hales, J., & Serafeim, G. (2021). Disclosure standards and communication norms: Evidence of voluntary disclosure standards as a coordinating device for capital markets. *Working Paper*.

Bolton, P., & Kacperczyk, M. (2021a). Do investors care about carbon risk? *Journal of Financial Economics*, *142*(2), 517–549.

Bolton, P., & Kacperczyk, M. T. (2021b). Firm commitments. *Working Paper*.

Bolton, P., & Kacperczyk, M. T. (2021c). Global pricing of carbon-transition risk. *Working Paper*.

29

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
175
**SER 203**

Bolton, P., Kacperczyk, M. T., Leuz, C., Ormazabal, G., Reichelstein, S., & Schoenmaker, D. (2021). Mandatory corporate carbon disclosures and the path to net zero. *Management and Business Review, Forthcoming*.

Brockman, P., Cicon, J. E., Li, X., & Price, S. M. (2017). Words versus Deeds: Evidence from Post-Call Manager Trades. *Financial Management*, *46*(4), 965–994.

Brown, L. D., Call, A. C., Clement, M. B., & Sharp, N. Y. (2015). Inside the "black box" of sell-side financial analysts. *Journal of Accounting Research*, *53*(1), 1–47.

Chava, S., Du, W., & Malakar, B. (2021). Do managers walk the talk on environmental and social issues? *Working Paper*.

Christensen, L. T., Morsing, M., & Thyssen, O. (2013). CSR as aspirational talk. *Organization*, *20*(3), 372–393.

Christensen, L. T., Morsing, M., & Thyssen, O. (2021). Talk–action dynamics: Modalities of aspirational talk. *Organization Studies*, *42*(3), 407–427.

Consolandi, C., Eccles, R. G., & Gabbi, G. (2020). How material is a material issue? Stock returns and the financial relevance and financial intensity of ESG materiality. *Journal of Sustainable Finance & Investment*, (pp. 1–24).

Delmas, M. A., & Burbano, V. C. (2011). The drivers of greenwashing. *California Management Review*, *54*(1), 64–87.

Diggelmann, T., Boyd-Graber, J., Bulian, J., Ciaramita, M., & Leippold, M. (2021). Climate-fever: A dataset for verification of real-world climate claims.

30

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
176
**SER 204**

Druz, M., Petzev, I., Wagner, A. F., & Zeckhauser, R. J. (2020). When Managers Change Their Tone, Analysts and Investors Change Their Tune. *Financial Analysts Journal*, *76*(2), 47–69.

Eccles, R. G., Krzus, M. P., Rogers, J., & Serafeim, G. (2012). The need for sector-specific materiality and sustainability reporting standards. *Journal of Applied Corporate Finance*, *24*(2), 65–71.

Eccles, R. G., & Serafeim, G. (2013). A tale of two stories: Sustainability and the quarterly earnings call. *Journal of Applied Corporate Finance*, *25*(3), 8–19.

Eckerle, K., Whelan, T., & Tomlinson, B. (2020). Embedding sustainability performance and long-term strategy in the earnings call. *Journal of Applied Corporate Finance*, *32*(2), 85–99.

Ellahie, A., Hayes, R. M., & Plumlee, M. (2021). Growth matters: Disclosure and risk premium. *The Accounting Review, Forthcoming*.

Engle, R. F., Giglio, S., Kelly, B., Lee, H., & Stroebel, J. (2020). Hedging climate change news. *The Review of Financial Studies*, *33*(3), 1184–1216.

Eskander, S. M., & Fankhauser, S. (2020). Reduction in greenhouse gas emissions from national climate legislation. *Nature Climate Change*, *10*(8), 750–756.

Eugster, F. (2020). Endogeneity and the dynamics of voluntary disclosure quality: is there really an effect on the cost of equity capital? *Contemporary Accounting Research*, *37*(4), 2590–2614.

Eugster, F., & Wagner, A. F. (2020). Value reporting and firm performance. *Journal of International Accounting, Auditing and Taxation*, *40*, 100319.

31

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
177
**SER 205**

Flammer, C., Toffel, M. W., & Viswanathan, K. (2021). Shareholder activism and firms' voluntary disclosure of climate change risks. *Strategic Management Journal*, *42*(10), 1850–1879.

Friedlingstein, P., Jones, M. W., O'Sullivan, M., Andrew, R. M., Bakker, D. C. E., Hauck, J., Le Quéré, C., Peters, G. P., Peters, W., Pongratz, J., Sitch, S., Canadell, J. G., Ciais, P., Jackson, R. B., Alin, S. R., Anthoni, P., Bates, N. R., Becker, M., Bellouin, N., Bopp, L., Chau, T. T. T., Chevallier, F., Chini, L. P., Cronin, M., Currie, K. I., Decharme, B., Djeutchouang, L., Dou, X., Evans, W., Feely, R. A., Feng, L., Gasser, T., Gilfillan, D., Gkritzalis, T., Grassi, G., Gregor, L., Gruber, N., Gürses, O., Harris, I., Houghton, R. A., Hurtt, G. C., Iida, Y., Ilyina, T., Luijkx, I. T., Jain, A. K., Jones, S. D., Kato, E., Kennedy, D., Klein Goldewijk, K., Knauer, J., Korsbakken, J. I., Körtzinger, A., Landschützer, P., Lauvset, S. K., Lefevre, N., Lienert, S., Liu, J., Marland, G., McGuire, P. C., Melton, J. R., Munro, D. R., Nabel, J. E. M. S., Nakaoka, S.-I., Niwa, Y., Ono, T., Pierrot, D., Poulter, B., Rehder, G., Resplandy, L., Robertson, E., Rödenbeck, C., Rosan, T. M., Schwinger, J., Schwingshackl, C., Séférian, R., Sutton, A. J., Sweeney, C., Tanhua, T., Tans, P. P., Tian, H., Tilbrook, B., Tubiello, F., van der Werf, G., Vuichard, N., Wada, C., Wanninkhof, R., Watson, A., Willis, D., Wiltshire, A. J., Yuan, W., Yue, C., Yue, X., Zaehle, S., & Zeng, J. (2021). Global carbon budget 2021. *Earth System Science Data Discussions*, *2021*, 1–191. URL https://essd.copernicus.org/preprints/essd-2021-386/

Global Sustainable Investment Alliance (GSIA) (2021). Trends report 2021.

Hail, L., Shawn, K., & Zhang, R. X. (2021). How do managers greenwash? Evidence from earnings conference calls. *Working Paper*.

32

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
178
**SER 206**

Hale, J. (2019). Proxy season shows ESG concerns on shareholders' minds. *Morningstar, 22 August 2019*.

Henry, E., Jiang, X., & Rozario, A. (2021). The evolution of environmental discourse: Evidence from conference calls. *Working Paper*.

Horster, M., & Papadopoulos, K. (2019). Climate change and proxy voting in the US and Europe. *Harvard Law School Forum on Corporate Governance, Retrieved April*, *1*, 2021.

Khan, M., Serafeim, G., & Yoon, A. (2016). Corporate sustainability: First evidence on materiality. *The Accounting Review*, *91*(6), 1697–1724.

Kotsantonis, S., & Bufalari, V. (2019). Do sustainable banks outperform? Driving value creation through ESG practices. *Report of the Global Alliance for Banking on Values (GABV)*.

Krueger, P., Sautner, Z., & Starks, L. T. (2020). The importance of climate risks for institutional investors. *The Review of Financial Studies*, *33*(3), 1067–1111.

Li, Q., Shan, H., Tang, Y., & Yao, V. (2020). Corporate climate risk: Measurements and responses. *Working Paper*.

Mahdavi, P., Green, J., Hadden, J., & Hale, T. (2021). Using earnings calls to understand the political behavior of major polluters. *Global Environmental Politics*, *11*(11), 1–16.

Matsumoto, D., Pronk, M., & Roelofsen, E. (2011). What makes conference calls useful? the information content of managers' presentations and analysts' discussion sessions. *The Accounting Review*, *86*(4), 1383–1414.

33

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
179
**SER 207**

Mayew, W. J. (2008). Evidence of management discrimination among analysts during earnings conference calls. *Journal of Accounting Research*, *46*(3), 627–659.

Plumlee, M., Brown, D., Hayes, R. M., & Marshall, R. S. (2015). Voluntary environmental disclosure quality and firm value: Further evidence. *Journal of Accounting and Public Policy*, *34*(4), 336–361.

Powell, W. W., & DiMaggio, P. J. (1991). *The new institutionalism in organizational analysis*. University of Chicago Press.

Price, S. M., Doran, J. S., Peterson, D. R., & Bliss, B. (2012). Earnings conference calls and stock returns: The incremental informativeness of textual tone. *Journal of Banking and Finance*, *36*(4), 992–1011.
    URL http://dx.doi.org/10.1016/j.jbankfin.2011.10.013

Raman, N., Bang, G., & Nourbakhsh, A. (2020). Mapping ESG trends by distant supervision of neural language models. *Machine Learning and Knowledge Extraction*, *2*(4), 453–468.

Reid, E. M., & Toffel, M. W. (2009). Responding to public and private politics: Corporate disclosure of climate change strategies. *Strategic Management Journal*, *30*(11), 1157–1178.

Sautner, Z., van Lent, L., Vilkov, G., & Zhang, R. (2020). Firm-level climate change exposure. *Working Paper*.

Setterberg, H., Sjöström, E., et al. (2021). Action lab: Integrated communications on financial and ESG performance in the earnings call. Tech. rep., Stockholm School of Economics, Mistra Center for Sustainable Markets (Misum).

Sorkin, A. R. (2018). Blackrock's message: Contribute to society, or risk losing our support. *The New York Times*, *15*.

34

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
180
**SER 208**

Sotos, M. E. (2015). GHG Protocol Scope 2 Guidance. *Greenhouse Gas Protocol*.

Topping, N. (2012). How Does Sustainability Disclosure Drive Behavior Change? *Journal of Applied Corporate Finance*, *24*(2), 45–48.

Treviño, M., Hu, J. M., Levin, J. L., & Sullivan & Cromwell, L. (2021). 2021 proxy season review: Shareholder proposals on environmental matters. *Harvard Law School Forum on Corporate Governance*.

Van Heijningen, K. (2019). The impact of ESG factor materiality on stock performance of firms. *Working Paper*.

Varini, F. S., Boyd-Graber, J., Ciaramita, M., & Leippold, M. (2021). Climatext: A dataset for climate change topic detection.

Webersinke, N., Kraus, M., Bingler, J. A., & Leippold, M. (2021). Climatebert: A pretrained language model for climate-related text.

Wickert, C., Scherer, A. G., & Spence, L. J. (2016). Walking and talking corporate social responsibility: Implications of firm size and organizational cost. *Journal of Management Studies*, *53*(7), 1169–1196.

35

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
181
**SER 209**

**Figure 1: Climate Talk Over Time**



Notes: This figure shows average amounts of climate talk ($CT$) in earnings calls in each calendar quarter between 2002 and 2021Q1. $CT$ is measured as the textual similarity between call transcripts and a reference library of texts focused on climate change (IPCC reports) - see Section 4 for details. $CT$ is calculated for the entire call ($CT\_CALL$) as well as for the presentation and the Q&A sections separately ($CT\_PRE$, $CT\_QA$).

36

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
182
**SER 210**

**Figure 2: Climate Talk Across Industries**



This figure shows the distribution of climate talk ($CT$) in earnings calls across economic sectors, defined according to the Sustainable Industry Classification System. Each box in the graphs shows the interquartile range (25-75) for a given sector with the median highlighted, while the tips of the whiskers are set at 1.5 times the inter-quartile range (values outside these bounds are excluded).

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
183
**SER 211**

Figure 3: Climate Talk and Changes in $CO_2$ Emissions



(a) CT_CALL

(b) CT_PRE

(c) CT_QA

This figure presents binned scatter plots, which show the change in $CO_2$ emissions in year $t+1$ depending on the average level of climate talk ($CT$) in year $t$. Panel (a) shows the changes in $CO_2$ emissions associated with climate talk on the entire call ($CT\_CALL$) while Panels (b) and (c) focus on the presentation ($CT_PRE$) and Q&A ($CT\_QA$) sections respectively. In all Panels, $CT$ is standardized to mean 0 and a standard deviation of 1.

38

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
184
**SER 212**

**Figure 4: Aggregate Hypothetical vs. Reported $CO_2$ Emissions**



The vertical bars in this figure show, on the left axis, the percentage difference between hypothetical $CO_2$ emissions that would have occurred in the absence of any climate talk ($CT$) in earnings calls and the actual emissions reported by the same companies in a given year. Hypothetical emissions are calculated following Eskander & Fankhauser (2020) - see Section 5.2 for details. The solid line shows, on the right axis, the proportion of global $CO_2$ emissions covered by companies in our sample. Data on global $CO_2$ emissions are from the Global Carbon Budget 2021.

39

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
185
**SER 213**

**Table 1: Variable Definitions**

| Variable | Description | Source |
|---|---|---|
| $CT_{CALL}$ | The overall call measure based on the textual similarity of an earnings call transcript to the IPCC benchmark as the cosine similarity between the $tf - idf$ vector of the transcripts and the $tf - idf$ vector obtained from the IPCC reports. This measure is based on the full earnings call. | Own Calculations |
| $CT_{PRE}$ | This measure is based only on the presentation part of the call. | Own Calculations |
| $CT_Q$ | This measure is based only on the questions asked during the call. | Own Calculations |
| $CT_A$ | This measure is based only on the answers to analyst questions of the call. | Own Calculations |
| $CAR$ | Cumulative Abnormal Return over [0:1] days relative to the call, in %. | Own Calculations |
| $POLICYEMISSIONS$ | This variable is equal to 1 if the company had a policy for reducing future greenhouse-gas emissions (according to Asset4 analysts), and 0 otherwise | Asset4 |
| $TARGETEMISSIONS$ | This variable is equal to 1 if the company has set a target for reduction in greenhouse-gas emissions, and 0 otherwise | Asset4 |
| $TARGETYEAR$ | This variable is equal to 1 if the company has set a year for reaching its target for reduction in greenhouse-gas emissions, and 0 otherwise | Asset4 |
| $CLIMATECOMP100$ | This variable is equal to one for firms that are part of the Climate Action 100+ program which nudges firms to increase their climate-related disclosure; otherwise zero. | From the organisation. |
| $TCFD$ | This variable is equal to one if the company applies the Task Force on Climate-related Financial Disclosures (TCFD) framework and zero if the firm does not. | From the organisation. |
| $MATERIALITY$ | The variable is equal to one if the Sustainability Standards Accounting Board considers greenhouse-gas emissions material for companies in a given industry | SASB |
| $CSR\_INCENTIVE$ | is equal to one if the firms management has a variable incentive that is linked to CSR. | Asset4 |
| $CSR\_AUDIT$ | is equal to one if the firm has an audit of its CSR report. | Asset4 |
| $CSR\_COMMITTEE$ | is equal to one if the board of directors has a CSR committee. | Asset4 |
| $CSR\_REPORTING$ | is equal to one if the firm has a corporate sustainability report. | Asset4 |
| $POSITIVE\_SURPRISE$ | Quarterly earnings surprise, calculated as the difference in actual quarterly earnings minus the most recent mean forecasted quarter earnings. | IBES |
| $ln\_SIZE$ | Logarithm of market value of equity. | Eikon |
| $ln\_BM$ | Book-to-market-ratio. | Eikon |
| $ROA$ | Return on Assets | Eikon |
| $LEVERAGE$ | Book leverage | Eikon |
| $SCALED\_PPE$ | Property, Plants and Equipment scaled by total assets. | Eikon |
| $SCALED\_CAPEX$ | CAPEX scaled by total assets. | Eikon |

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
186
**SER 214**

## Table 2: Summary Statistics

The descriptive statistics are based on 85,829 firm-quarters in the period 2002-2021Q1. The variables are defined in Table 1. We report the number of observations, mean and standard deviation (Std.), as well as the Minimum, and Maximum and the three quartiles. All variables other than the call measures have been winsorized at the 1st and 99th percentile.

| | N | Mean | SD | Minimum | Q1 | Median | Q3 | Maximum |
|---|---|---|---|---|---|---|---|---|
| $CT_{CALL}$ | 85,829 | 15.80 | 10.29 | 4.60 | 10.45 | 13.57 | 17.87 | 88.39 |
| $CT_{PRE}$ | 85,829 | 13.54 | 10.28 | 1.09 | 8.31 | 11.38 | 15.58 | 90.79 |
| $CT_{QA}$ | 85,829 | 10.98 | 6.36 | 0.00 | 7.06 | 9.92 | 13.50 | 40.45 |
| $CAR$ | 85,829 | 0.24 | 6.92 | -21.13 | -3.25 | 0.15 | 3.71 | 21.74 |
| $\Delta CO_2$ | 15,912 | 1.78 | 24.64 | -62.53 | -8.20 | -1.18 | 6.34 | 222.32 |
| $\Delta CO_2$ Scope 1 | 12,760 | 4.36 | 35.16 | -73.41 | -8.79 | -0.61 | 8.37 | 380.33 |
| $\Delta CO_2$ Scope 2 | 12,585 | 1.24 | 29.21 | -74.88 | -10.36 | -1.96 | 6.43 | 280.44 |
| $\Delta CO_2$ Scope 3 | 7,782 | 109.06 | 708.47 | -89.90 | -10.03 | 1.07 | 17.83 | 10737.50 |
| $ENVIRONMENTAL\ SCORE$ | 15,907 | 58.00 | 22.51 | 0.03 | 42.14 | 60.23 | 76.54 | 99.11 |
| $EMISSION\ SCORE$ | 15,906 | 66.88 | 23.74 | 0.17 | 50.57 | 70.99 | 86.91 | 99.89 |
| $GOVERNANCE\ SCORE$ | 15,912 | 60.61 | 20.62 | 0.45 | 45.34 | 63.21 | 77.24 | 99.38 |
| $CLIMATECOMP100$ | 85,829 | 0.01 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 |
| $TCFD$ | 85,829 | 0.01 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 |
| $MATERIALITY$ | 85,829 | 0.47 | 0.50 | 0.00 | 0.00 | 0.00 | 1.00 | 1.00 |
| $POSITIVE\_SURPRISE$ | 85,829 | 0.64 | 0.48 | 0.00 | 0.00 | 1.00 | 1.00 | 1.00 |
| $POLICYEMISSIONS$ | 85,829 | 0.53 | 0.50 | 0.00 | 0.00 | 1.00 | 1.00 | 1.00 |
| $TARGETSEMISSIONS$ | 85,829 | 0.33 | 0.47 | 0.00 | 0.00 | 0.00 | 1.00 | 1.00 |
| $TARGETYEAR$ | 85,829 | 0.12 | 0.32 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 |
| $CSR\_INCENTIVE$ | 85,829 | 0.20 | 0.40 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 |
| $CSR\_AUDIT$ | 85,829 | 0.21 | 0.41 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 |
| $CSR\_COMMITTEE$ | 85,829 | 0.46 | 0.50 | 0.00 | 0.00 | 0.00 | 1.00 | 1.00 |
| $CSR\_REPORTING$ | 85,829 | 0.49 | 0.50 | 0.00 | 0.00 | 0.00 | 1.00 | 1.00 |
| $ln\_SIZE$ | 85,829 | 22.44 | 1.73 | 18.30 | 21.29 | 22.36 | 23.52 | 27.45 |
| $ln\_BM$ | 85,829 | 1.55 | 0.58 | 0.77 | 1.21 | 1.40 | 1.70 | 4.82 |
| $ROA$ | 85,829 | 3.07 | 11.17 | -53.09 | 0.90 | 3.79 | 7.83 | 28.70 |
| $LEVERAGE$ | 85,829 | 0.80 | 1.75 | -6.03 | 0.15 | 0.49 | 1.03 | 10.49 |
| $SCALED\_PPE$ | 85,829 | 0.50 | 0.44 | 0.00 | 0.12 | 0.35 | 0.81 | 1.90 |
| $SCALED\_CAPX$ | 85,829 | -0.05 | 0.05 | -0.25 | -0.06 | -0.03 | -0.01 | 0.00 |

41

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
187
SER 215

**Table 3: Climate Talk and Reduction in $CO_2$**

The dependent variable is the change in $CO_2$ emission. All variables are defined in Table 1. We estimate panel regressions. We include but do not tabulate year fixed effects in each model, as indicated in the table. $t$-statistics, calculated based on standard errors clustered at the firm level, are in parentheses below the coefficients. ***, **, and * denote significance at the 1%, 5%, and 10% (two-sided) levels.

|  | (1) $\Delta CO_2$ | (2) $\Delta CO_2$ | (3) $\Delta CO_2$ | (4) $\Delta CO_2$ | (5) $\Delta CO_2$ |
|---|---|---|---|---|---|
| $CT_{CALL}$ | -0.815*** | -0.610* |  |  |  |
|  | (-2.88) | (-2.00) |  |  |  |
| $CT_{PRE}$ |  |  | -0.448 |  | -0.278 |
|  |  |  | (-1.61) |  | (-1.13) |
| $CT_{QA}$ |  |  |  | -0.674** | -0.597** |
|  |  |  |  | (-2.40) | (-2.36) |
| CSR_REPORTING |  | -0.343 | -0.350 | -0.399 | -0.371 |
|  |  | (-0.35) | (-0.36) | (-0.40) | (-0.37) |
| CSR_AUDIT |  | -1.225* | -1.249* | -1.254* | -1.241* |
|  |  | (-2.04) | (-2.09) | (-2.06) | (-2.05) |
| CSR_INCENTIVE |  | -1.654*** | -1.684*** | -1.641*** | -1.604*** |
|  |  | (-3.32) | (-3.37) | (-3.25) | (-3.16) |
| CSR_COMMITTEE |  | 0.062 | 0.069 | 0.012 | 0.031 |
|  |  | (0.08) | (0.09) | (0.02) | (0.04) |
| POLICYEMISSIONS |  | -0.349 | -0.341 | -0.346 | -0.350 |
|  |  | (-0.41) | (-0.40) | (-0.41) | (-0.42) |
| TARGETSEMISSIONS |  | -2.588*** | -2.608*** | -2.605*** | -2.586*** |
|  |  | (-4.40) | (-4.46) | (-4.44) | (-4.36) |
| TARGETYEAR |  | -1.090* | -1.088* | -1.048* | -1.060* |
|  |  | (-2.05) | (-2.05) | (-1.97) | (-1.98) |
| CLIMATECOMP100 |  | 1.522 | 1.424 | 1.425 | 1.521 |
|  |  | (1.19) | (1.18) | (1.14) | (1.16) |
| ln_SIZE | -0.793** | 0.163 | 0.116 | 0.260 | 0.258 |
|  | (-2.53) | (0.44) | (0.31) | (0.67) | (0.66) |
| ln_BM | -0.752*** | -0.822*** | -0.807*** | -0.847*** | -0.856*** |
|  | (-3.27) | (-3.14) | (-3.09) | (-3.21) | (-3.24) |
| ROA | 0.628 | 0.677 | 0.658 | 0.695 | 0.695 |
|  | (1.39) | (1.37) | (1.34) | (1.39) | (1.40) |
| LEVERAGE | -0.079 | -0.087 | -0.082 | -0.082 | -0.083 |
|  | (-0.41) | (-0.47) | (-0.44) | (-0.44) | (-0.45) |
| SCALED_PPE | -1.941*** | -1.667*** | -1.674*** | -1.666*** | -1.667*** |
|  | (-4.83) | (-3.75) | (-3.79) | (-3.70) | (-3.72) |
| SCALED_CAPX | -1.772*** | -1.776*** | -1.790*** | -1.768*** | -1.760*** |
|  | (-4.20) | (-3.85) | (-3.89) | (-3.82) | (-3.80) |
| Constant | 2.454*** | 5.249*** | 5.247*** | 5.341*** | 5.312*** |
|  | (46.62) | (4.17) | (4.16) | (4.31) | (4.25) |
|  |  |  |  |  |  |
| Observations | 13,459 | 12,907 | 12,907 | 12,907 | 12,907 |
| R-squared | 0.028 | 0.032 | 0.032 | 0.032 | 0.032 |
| Fixed Effect | Industry & Year | Industry & Year | Industry & Year | Industry & Year | Industry & Year |

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
188
SER 216

**Table 4: Climate Talk and Reduction in the Scope of $CO_2$**

The dependent variables are the change in $CO_2$ emission based on Scope 1 in column (1), Scope 2 in column (2), and Scope 3 in column (3). In Panel A, we report the results for the baseline regressions (not controlling for other CSR characteristics) on the overall call level. In Panel B, we report the results from the baseline regression but include the presentation and the Q&A variables, separately. In Panel C. we also include additional CSR controls. All variables are defined in Table 1. We estimate panel regressions. We include but do not tabulate year fixed effects in each model, as indicated in the table. $t$-statistics, calculated based on standard errors clustered at the firm level, are in parentheses below the coefficients. ***, **, and * denote significance at the 1%, 5%, and 10% (two-sided) levels.

| Change in: $CO_2$ | (1) Scope 1 | (2) Scope 2 | (3) Scope 3 |
|---|---|---|---|
| *Panel A. Baseline regression: Call Level* | | | |
| $CT_{CALL}$ | -0.532 | -0.867** | 5.019 |
| | (-1.08) | (-2.29) | (0.80) |
| | | | |
| CSR Controls | No | No | No |
| Firm Characteristics | Yes | Yes | Yes |
| Observations | 10,540 | 10,232 | 6,175 |
| R-squared | 0.022 | 0.027 | 0.019 |
| *Panel B. Baseline regression: Presentation vs. Q&A* | | | |
| $CT_{PRE}$ | -0.273 | -0.359 | 3.959 |
| | (-0.51) | (-1.11) | (0.93) |
| $CT_{QA}$ | -0.488 | -0.796* | -2.022 |
| | (-1.00) | (-1.90) | (-0.22) |
| | | | |
| CSR Controls | No | No | No |
| Firm Characteristics | Yes | Yes | Yes |
| Observations | 10,540 | 10,232 | 6,175 |
| R-squared | 0.023 | 0.028 | 0.019 |
| *Panel C. Full Model controlling for CSR characteristics* | | | |
| $CT_{PRE}$ | -0.094 | -0.109 | 4.271 |
| | (-0.17) | (-0.33) | (0.67) |
| $CT_{QA}$ | -0.422 | -0.790* | -0.901 |
| | (-0.85) | (-1.74) | (-0.08) |
| | | | |
| CSR Controls | Yes | Yes | Yes |
| Firm Characteristics | Yes | Yes | Yes |
| Observations | 10,204 | 9,947 | 6,097 |
| R-squared | 0.026 | 0.031 | 0.020 |
| Fixed Effect | Industry & Year | Industry & Year | Industry & Year |

43

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
189
**SER 217**

### Table 5: Climate Talk and Reduction $CO_2$. Sample Splits

The dependent variables are the change in $CO_2$ emission. We revisit the results from Table 3 and split the sample based on the ESG score in columns (1-2). In columns (3-4) we use the environment-score and in columns (5-6) we split the sample based on the the governance scores. All variables are defined in Table 1. We estimate panel regressions. We include but do not tabulate year fixed effects in each model, as indicated in the table. $t$-statistics, calculated based on standard errors clustered at the firm level, are in parentheses below the coefficients. ***, **, and * denote significance at the 1%, 5%, and 10% (two-sided) levels.

| Split | ESG Score | | Environmental Score | | Governance Score | |
|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High |
| | (1) | (2) | (3) | (4) | (5) | (6) |
| $CT_{PRE}$ | -0.646* | 0.061 | -0.396 | -0.155 | -0.440 | -0.117 |
| | (-1.78) | (0.23) | (-0.92) | (-0.62) | (-1.13) | (-0.33) |
| $CT_{QA}$ | -0.424 | -0.708* | -0.443 | -0.677** | -0.497 | -0.728** |
| | (-1.18) | (-1.96) | (-1.20) | (-2.36) | (-1.08) | (-2.53) |
| CSR Controls | Yes | Yes | Yes | Yes | Yes | Yes |
| Firm Characteristics | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 6,216 | 6,689 | 6,239 | 6,665 | 6,387 | 6,520 |
| R-squared | 0.031 | 0.041 | 0.034 | 0.040 | 0.038 | 0.037 |
| Fixed Effect | Industry & Year | Industry & Year | Industry & Year | Industry & Year | Industry & Year | Industry & Year |

44

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
190
**SER 218**

### Table 6: Climate Talk and Cumulative Abnormal Returns

The dependent variable is the cumulative abnormal return (CAR) on the announcement day of the conference call and the day after. All variables are defined in Table 1. We estimate panel regressions. We include but do not tabulate year fixed effects in each model, as indicated in the table. $t$-statistics, calculated based on standard errors clustered at the firm level, are in parentheses below the coefficients. ***, **, and * denote significance at the 1%, 5%, and 10% (two-sided) levels.

| | (1) CAR All Firms | (2) CAR All Firms | (3) CAR Low ESG | (4) CAR Low Env | (5) CAR Low Gov | (6) CAR Surp<0 |
|---|---|---|---|---|---|---|
| $CT_{CALL}$ (STD) | -0.096*** | | | | | |
| | (-4.22) | | | | | |
| $CT_{PRE}$ (STD) | | -0.048** | -0.142** | -0.129** | -0.086* | -0.095*** |
| | | (-2.04) | (-2.57) | (-2.06) | (-1.88) | (-2.58) |
| $CT_{QA}$ (STD) | | -0.110*** | -0.168*** | -0.204*** | -0.120*** | -0.130*** |
| | | (-4.36) | (-3.40) | (-3.89) | (-2.72) | (-3.12) |
| SURPRISE | 0.262*** | 0.262*** | 0.572*** | 0.469*** | 0.372*** | 0.000 |
| | (12.21) | (12.21) | (7.60) | (6.67) | (8.03) | (0.02) |
| CLIMATECOMP100 | 0.158 | 0.186 | -0.993 | -0.460* | -0.319 | -0.159 |
| | (0.78) | (0.92) | (-0.74) | (-1.86) | (-0.62) | (-0.52) |
| TCFD | 0.086 | 0.074 | 0.417 | 0.509 | -0.048 | -0.052 |
| | (0.61) | (0.52) | (0.42) | (1.34) | (-0.13) | (-0.21) |
| MATERIALITY | 0.108* | 0.120* | 0.106 | 0.108 | 0.100 | 0.423*** |
| | (1.74) | (1.92) | (0.94) | (0.89) | (0.96) | (3.68) |
| POLICYEMISSIONS | -0.117 | -0.114 | -0.065 | -0.085 | -0.174 | -0.209 |
| | (-1.51) | (-1.48) | (-0.53) | (-0.67) | (-1.53) | (-1.43) |
| TARGETSEMISSIONS | -0.029 | -0.025 | 0.222 | 0.461* | -0.054 | -0.326** |
| | (-0.39) | (-0.35) | (1.21) | (1.84) | (-0.44) | (-2.46) |
| TARGETYEAR | -0.247** | -0.242** | -0.303 | -0.974** | -0.027 | 0.046 |
| | (-2.52) | (-2.47) | (-0.87) | (-2.41) | (-0.15) | (0.26) |
| CSR_INCENTIVE | -0.032 | -0.024 | 0.089 | -0.075 | -0.012 | -0.233** |
| | (-0.54) | (-0.41) | (0.70) | (-0.59) | (-0.10) | (-2.15) |
| CSR_AUDIT | 0.066 | 0.066 | -0.012 | -0.693** | 0.050 | 0.640*** |
| | (1.04) | (1.03) | (-0.04) | (-2.10) | (0.45) | (5.38) |
| CSR_COMMITTEE | -0.028 | -0.028 | -0.079 | -0.068 | 0.001 | 0.068 |
| | (-0.44) | (-0.44) | (-0.73) | (-0.60) | (0.01) | (0.53) |
| CSR_REPORTING | -0.143* | -0.139* | -0.049 | -0.103 | -0.166 | 0.536*** |
| | (-1.91) | (-1.85) | (-0.37) | (-0.71) | (-1.46) | (3.71) |
| $ln\_SIZE$ | -0.001 | 0.007 | -0.112* | -0.023 | -0.039 | 0.677*** |
| | (-0.04) | (0.20) | (-1.87) | (-0.39) | (-0.70) | (10.89) |
| $ln\_BM$ | -0.332*** | -0.339*** | -0.408*** | -0.432*** | -0.401*** | -0.384*** |
| | (-10.58) | (-10.73) | (-8.27) | (-8.02) | (-8.34) | (-7.43) |
| ROA | 0.360*** | 0.361*** | 0.421*** | 0.395*** | 0.379*** | -0.025 |
| | (10.40) | (10.43) | (9.90) | (9.35) | (8.94) | (-0.48) |
| LEVERAGE | -0.060** | -0.059** | -0.021 | -0.014 | -0.043 | -0.023 |
| | (-2.10) | (-2.09) | (-0.47) | (-0.30) | (-1.07) | (-0.42) |
| SCALED_PPE | -0.018 | -0.019 | -0.027 | -0.036 | 0.016 | -0.008 |
| | (-0.56) | (-0.59) | (-0.50) | (-0.61) | (0.29) | (-0.14) |
| SCALED_CAPX | 0.058* | 0.060* | 0.009 | 0.001 | 0.080 | -0.144** |
| | (1.78) | (1.86) | (0.19) | (0.03) | (1.62) | (-2.52) |
| Constant | 0.361*** | 0.353*** | 0.284*** | 0.316*** | 0.381*** | -2.275*** |
| | (8.03) | (7.83) | (4.70) | (5.26) | (6.05) | (-26.25) |
| | | | | | | |
| Observations | 82,494 | 82,494 | 38,997 | 38,419 | 39,768 | 29,074 |
| R-squared | 0.011 | 0.011 | 0.014 | 0.012 | 0.011 | 0.019 |
| Fixed Effect | Year | Year | Year | Year | Year | Year |

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon

191

**SER 219**

## Table 7: Determinants of Climate Talk

This table presents regression results for Equation 2. The dependent variables are the different call measures ($CT_{CALL}$), which is the climate-talk measure for the entire call and is shown in column (1). The results for the different subparts of the earnings call are available in column (2) for the presentation, in column (3) for the questions and in column (4) for the answers. All our variables are defined in Table 1. We estimate panel regressions. We include but do not tabulate year fixed effects in each model, as indicated in the table. $t$-statistics, calculated based on standard errors clustered at the firm level, are in parentheses below the coefficients. ***, **, and * denote significance at the 1%, 5%, and 10% (two-sided) levels.

| Climate Talk | (1) Call ($CT_{CALL}$) | (2) Presentation ($CT_{PRE}$) | (3) Questions ($CT_Q$) | (4) Answers ($CT_A$) |
|---|---|---|---|---|
| CLIMATECOMP100 | 8.325*** | 7.020*** | 3.336*** | 3.743*** |
| | (5.86) | (4.95) | (3.53) | (5.94) |
| TCFD | 2.813*** | 2.657*** | 0.218 | 0.146 |
| | (3.10) | (2.83) | (0.34) | (0.35) |
| MATERIALITY | 4.326*** | 3.910*** | 2.278*** | 1.931*** |
| | (17.50) | (15.57) | (9.60) | (12.30) |
| POSITIVE_SURPRISE | -0.070 | -0.068 | 0.423*** | 0.157*** |
| | (-0.80) | (-0.76) | (5.08) | (2.74) |
| POLICYEMISSIONS | 0.834*** | 0.830*** | -0.064 | 0.310** |
| | (3.68) | (3.55) | (-0.29) | (2.08) |
| TARGETSEMISSIONS | 1.339*** | 1.437*** | 0.444 | 0.515*** |
| | (4.31) | (4.54) | (1.54) | (2.69) |
| TARGETYEAR | 0.508 | 0.478 | 0.609** | 0.433** |
| | (1.64) | (1.52) | (2.28) | (2.33) |
| CSR_INCENTIVE | 1.619*** | 1.562*** | 0.666*** | 0.961*** |
| | (7.04) | (6.58) | (3.25) | (6.97) |
| CSR_AUDIT | -0.012 | -0.503* | -0.059 | -0.019 |
| | (-0.04) | (-1.65) | (-0.22) | (-0.10) |
| CSR_COMMITTEE | 0.140 | 0.105 | 0.164 | -0.032 |
| | (0.65) | (0.49) | (0.76) | (-0.23) |
| CSR_REPORTING | 0.866*** | 0.593** | 0.368* | 0.541*** |
| | (3.67) | (2.57) | (1.71) | (3.53) |
| ln_SIZE | 0.511*** | 0.335*** | 0.788*** | 0.444*** |
| | (6.90) | (4.56) | (11.01) | (9.66) |
| ln_BM | -0.540*** | -0.181 | -0.893*** | -0.851*** |
| | (-4.23) | (-1.39) | (-7.34) | (-10.27) |
| ROA | -0.017*** | -0.027*** | 0.035*** | -0.000 |
| | (-3.28) | (-5.04) | (6.66) | (-0.06) |
| LEVERAGE | -0.052 | -0.023 | -0.004 | -0.029 |
| | (-1.39) | (-0.56) | (-0.13) | (-1.27) |
| SCALED_PPE | -1.170*** | -1.125*** | -0.590** | -0.622*** |
| | (-3.30) | (-3.03) | (-2.36) | (-3.40) |
| SCALED_CAPX | 1.686 | -0.122 | 10.272*** | 3.604*** |
| | (0.72) | (-0.05) | (6.44) | (3.02) |
| Constant | 0.445 | 2.465 | -4.179** | -0.756 |
| | (0.22) | (1.21) | (-2.00) | (-0.60) |
| | | | | |
| Observations | 85,829 | 85,829 | 85,829 | 85,829 |
| R-squared | 0.128 | 0.096 | 0.068 | 0.102 |
| Fixed Effect | Year | Year | Year | Year |

Electronic copy available at: https://ssrn.com/abstract=4021061

Exhibit 7 to Decl. of Thomas Lyon
192
SER 220

# Exhibit 4
# to Declaration of Thomas Lyon

# Bolton et al., Inflation and the Carbon Premium (2024)

Exhibit 4 to Decl. of Thomas Lyon

83

**SER 221**

# Inflation and the Carbon Premium

Patrick Bolton[§], Marcin Kacperczyk[φ], and Tianyu Wang[σ]

June 11, 2024

**Abstract:** This paper explores the link between inflation and the carbon premium of U.S. listed companies. Prior evidence has established that investors demand a return premium for stocks of companies with higher (direct and indirect) carbon emissions. We find new evidence that this carbon premium is higher in the presence of energy price inflation. For values of energy CPI equal to the sample mean, a one-standard deviation change in direct emissions is associated with a 2 percentage-point higher annual return premium, and this return premium increases by 44% when aggregate energy prices are higher by one standard deviation of their in-sample distribution.

§ Columbia University, Imperial College, CEPR, and NBER
φ Imperial College and CEPR
σ Tsinghua University

We thank Tobias Berg, Zach Halem, Zach Sautner, and Max Tchibozo for helpful comments. Funding from the European Research Council (ERC) under the ERC Advanced Grant program (grant agreement No. 885552 *Investors and Climate Change*) for this research is gratefully acknowledged.

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon

84

**SER 222**

## 1. Introduction

A growing number of studies has found that a widespread and significant carbon premium has emerged, especially following the landmark Paris Climate Agreement of 2015. This carbon premium is generally interpreted as reflecting the compensation that investors increasingly demand for their exposure to carbon transition risk or their stronger preferences for green stocks. In the post-COVID years, however, there has been a backlash against the sustainable investment movement and ESG-related funds have seen interest by investors wane, with significant outflows from these funds in recent years.[1] Some commentators have even suggested that ESG was a fad that had run its course.[2]

This backlash has coincided with a return of inflation, as global economic activity has surged following the COVID lockdowns. There were multiple causes to this resurgence of inflation, one of which being the rise in energy prices following the Russian invasion of Ukraine. As a direct consequence of this energy price shock, profits of brown energy companies have reached record levels in 2022,[3] and the oil and gas industry has responded by postponing any planned decarbonization.[4] In contrast, the valuation of renewable energy companies (Ørsted, Enel) has declined, partly as a result of the expected rise in interest rates to combat inflation. A natural question, therefore, is whether the fading interest in ESG may be due to inflation. Is the revived interest in brown companies driven by the energy price shock? If so, then this interest could be short-lived, and could, in turn, vanish when energy prices revert to mean.

In this paper we undertake the first systematic analysis of how inflation impacts carbon transition risk by looking at how inflation is associated with the carbon premium in the cross-section of listed U.S. companies over the period 2005-2022. We distinguish between core inflation, as measured by changes in the core consumer price index (core CPI), and energy price inflation (the energy component of the CPI). One plausible hypothesis is that inflation, by boosting valuation of brown companies, negatively impacts the carbon premium. An alternative hypothesis is that energy price inflation, by raising the energy costs of brown companies, reduces their valuation, and thereby positively impacts the carbon premium. A third hypothesis is that the higher interest rates that inevitably follow the rise of inflation reduce the growth rate of green firms, increase their discount rates, and lower their valuation. As some

---

[1] Brooke Masters and Patrick Temple-West "The real impact of the ESG backlash," *Financial Times*, 4 December 2023.
[2] See for example Aswath Damodaran, "ESG is beyond redemption: may it RIP," *Financial Times* October 23, 2023.
[3] Oliver Milman 'Monster profits' for energy giants reveal a self-destructive fossil fuel resurgence, *The Guardian*, 9 February 2023
[4] Myles McCormick, Jamie Smyth and Amanda Chu "Oil executives talk down rapid shift to green energy as profits boom," *Financial Times*, 27 March 2024

1

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon
85
**SER 223**

have argued, a fourth hypothesis is that inflation raises the development costs of green companies and lowers their capital expenditures.[5] Our analysis sheds light on which of these hypotheses is more plausible.

A common observation is that stocks provide a hedge against inflation. For example, Fama (1981) has argued that earnings rise with inflation, so that stock returns are negatively correlated with inflation. More recent evidence, however, paints a more nuanced picture. Fang, Liu, and Roussanov (2022), for example, while confirming the negative relation between core inflation and stock returns, also find that stock returns are positively related with energy-price inflation. Following Fang, Liu, and Roussanov (2022), we also distinguish between core and energy-price inflation, as these are likely to have different effects on carbon-transition risk. However, the question we address is different from the macroeconomics and asset pricing literature that is concerned with the pricing and hedging of inflation risk. The question we focus on is the effect of price rises on the carbon premium, defined as the risk compensation associated with carbon-transition risk exposure proxied by the level of carbon emissions.

The standard carbon premium regression model estimates the relation between expected returns and lagged carbon emissions, controlling for key company characteristics, together with industry-time (or firm) fixed effects (see Bolton and Kacperczyk, 2021). To measure the effects of inflation on the carbon premium, we add to this specification an interaction term between carbon emissions and inflation. If the coefficient of this interaction term is positive and significant then we conclude that inflation increases the carbon premium, and if the coefficient is negative then we conclude that brown company stocks are a hedge against inflation. We look at both direct and indirect emissions, distinguishing between four different emission categories, scope 1, scope 2, upstream scope 3, and downstream scope 3 (we have comprehensive data for these latter emissions only over part of our sample period). As for our inflation variables, we consider both the core CPI and the energy component of the CPI. Note that in our main specification we interact the (demeaned) level of emissions with the price level. That is, we focus on the effects of price-level shocks (rather than inflation shocks per se) because shocks to the price level are more persistent and have a long-term impact on cash-flows.

---

[5] See Rachel Millard and Mari Novik "European utilities cut renewable targets as high costs and low power prices bite," *Financial Times* 19 May 2024

2

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon
86
**SER 224**

Our key finding is that energy price significantly increases the carbon premium, after controlling for firm characteristics, industry-time, and firm fixed effects. When energy CPI is at the sample average, a one-standard deviation change in direct emissions (scope 1 and 2 emissions) is associated with a 2.05 percentage point higher annual return premium (the carbon premium). And when energy CPI is higher by one standard deviation, the return premium increases by 44% to 2.97%. We find a similar effect of energy price on the carbon premium associated with indirect emissions (scope 3 upstream and downstream emissions). Thus, when looking at within-sector variations in carbon emissions across firms, we find that energy price inflation, far from dampening firm-level carbon transition risk exposures, actually exacerbates them. In contrast, we find no significant effect of general (or core) inflation on the carbon premium.[6]

These findings confirm the hypothesis that positive energy price shocks increase carbon-transition risk, on average. The more a company is exposed to carbon-transition risk through its emissions the more the carbon premium is affected by energy price shocks. Companies with higher emissions are obviously more dependent on fossil fuels, and therefore are more exposed to energy price shocks. Thus, the surge in energy prices following the invasion of Ukraine by Russia, far from being a bell toll for ESG, has worsened carbon-transition risk for brown companies. This effect has been overshadowed by the attention given to the rise in profits of fossil fuel energy companies. Any energy price increase, however, is a cost increase for fossil-fuel dependent companies, which exposes them to greater carbon-transition risk.

We further examine the positive relationship between energy price inflation and the carbon premium by exploring several alternative specifications. First, we find that the cross-sectional results are not due to differential responses of companies with different carbon footprint to surprises in earnings announcements. Second, we find that the conditional carbon premium cannot be explained by shocks to oil supply, monetary surprises, U.S. dollar exchange rate, and inflation innovations. Third, we show that the relationship between energy price inflation and the carbon premium is robust when we split our sample into before and after COVID subsamples. This latter finding suggests that our results are not driven by possible weakening climate concerns post COVID, as some have suggested (see e.g., Baker, Egan, and Sarkar, 2022). This interpretation is further supported by our finding that there is no significant difference in coefficients of the interaction term before and after the Paris Climate

---

[6] There is a positive impact, but it is not economically or statistically significant.

3

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon
87
SER 225

Agreement of 2015. Moreover, more directly, we show that the main effect cannot be explained by investors' flows into U.S. sustainable funds, both across all asset categories and their stock subset.

Finally, we explore what are the likely economic forces underlying the effect of energy price inflation on the carbon premium. Two natural alternative explanations are first, that higher energy prices are associated with lower cash-flows for companies with high exposures to fossil fuel energy price shocks, and second that higher energy prices are associated with higher discount rates. Our findings are consistent with the latter explanation. Indeed, we find that companies with higher emissions are on average associated with higher energy price betas, which suggests that capital markets price these companies at discount rates in response to an energy price shock. We further find that companies with higher scope 1 emissions generate lower sales and invest less in periods of high energy price inflation. The results for indirect emissions are less conclusive. Finally, we find that higher emissions (both direct and indirect) predict higher future profitability twelve months forward (but not in three months forward) when energy price inflation is higher. Following Novy-Marx (2013), when we combine this latter finding with our earlier result that firms with higher emissions are also associated with higher expected returns (following a positive energy price shock), we conclude that brown firms are, in effect, seen by investors as a form of growth stock.

*Related literature.* This paper contributes mainly to the growing literature on the asset-pricing implications of carbon-transition risk (e.g., Bolton and Kacperczyk, 2021; 2023; Bolton, Halem, Kacperczyk, 2022; Sautner et al., 2023; and Aswani, Raghunandan, and Rajgopal, 2023). Compared to the earlier studies, we show evidence that energy price inflation can exacerbate carbon premium for an average brown company. To our knowledge, this is the first paper to undertake such an analysis.

Our study also contributes to the literature on the asset-pricing implications of inflation, particularly the energy component of inflation. Most of the studies in this literature focus on aggregate, market-level returns and bond prices (for more details, see the recent survey by Cieślak and Pflueger, 2023). The literature on stock returns is somewhat small, especially taking the cross-section of returns. Here, Chen, Roll, and Ross (1986) were the first to study the unconditional inflation premium in stock returns. Boons, Duarte, de Roon, and Szymanowska (2020) stress the importance of estimating inflation betas conditionally by estimating it across various industry sectors. Fang, Liu, and Roussanov (2022) study the impact of inflation risk on returns across various broadly defined asset classes and point out to significant differences between the core inflation and energy inflation. Our study makes three significant contributions here. First, we focus on the inflation effects in the cross-section of

4

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon
88
**SER 226**

individual companies. More importantly, our study examines the interaction between core/energy prices and carbon-transition risk, thereby blending the insights from the two independently studied streams of literature. On the methodology side, our specification allows us to absorb a significantly richer variation in the data, potentially reflecting other confounding time-varying macroeconomic confounders, by utilizing both industry-time and firm fixed effects, none of which are feasible in the context of using aggregate or industry-level data.

Finally, we also contribute to the literature on the economic mechanisms driving the carbon premium/greenium, which typically distinguishes between risk-based (Bolton and Kacperczyk, 2021; 2023), and preference-based explanations (Pastor, Stambaugh, and Taylor, 2022; Zerbib, 2022). Our finding that the carbon premium increases in times of energy price inflation suggest that risk-based explanations are more consistent with the evidence. Moreover, this result is not a simple reflection of monetary shocks or supply effects in the energy markets.

The remainder of the paper is organized as follows. Section 2 describes the data and our empirical model. Section 3 discusses the main cross-sectional results. Section 4 discusses how these results change over time. Section 5 analyses corporate responses of brown companies to inflation shocks. Section 6 concludes.

## 2. Data and Panel Regression Specification

We combine two data sets for listed companies in the U.S., one by S&P Global Trucost, which provides annual data on firm-level carbon and other greenhouse gas emissions, and the other by Compustat, which assembles data on stock returns and corporate balance sheets. We follow the same matching procedure as in Cenedese, Han, and Kacperczyk (2023). We further add inflation data from the U.S. Bureau of Labor Statistics (BLS), which includes the time series for the CPI, Core CPI, and the components of CPI (in particular, energy, and its subcomponents). For our robustness analysis we also add data on monetary policy news shocks from Acosta (2023),[7] and data on oil supply news shocks from Kanzig (2021). As in other asset pricing studies, we remove observations of companies whose stock prices are below $1. The overall number of unique firms in our sample is 2898 and the total number of observations in the main sample is 227,310.

---

[7] These data are constructed following the methodology of Nakamura and Steinsson (2018).

5

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon

89

**SER 227**

Figure 1 displays the core and energy CPI time series over our sample period, from 2005 to 2022. Core inflation has been close to flat until the end of the COVID lockdown periods, when it started to accelerate as economic activity rapidly recovered in response to pent-up demand. Energy price inflation has fluctuated more over our sample period, with a major positive shock following the Russian invasion of Ukraine.



We also report summary statistics on CPI price variables in Panel A of Table 1. Panel A is divided into two subpanels, the first one covering the full sample, and the second one covering only the sample for the period 2017-2022, during which we also have data on corporate downstream scope 3 emissions. The most noteworthy statistics are the relatively high volatility in energy CPI, which is 0.3175 over the full sample, and commodity price CPI (0.5294), compared with a volatility for core CPI of 0.2475 over the same sample period.[8]  It is also worth noting the high dispersion in the level of direct (scope 1) and indirect (scope 2 and scope 3) carbon emissions across firms.

Panel B of Table 1 reports summary statistics for stock returns and the firm characteristics we use for our control variables. The dependent variable in most our cross-sectional regressions is monthly stock returns $RET_{i,t}$, the monthly return of a primary share of an individual stock $i$ in month $t$.  To calculate returns, we follow the approach outlined in Chaieb et al. (2021), with some necessary adjustments. We focus on securities categorized as common or ordinary shares (*tpci = '0'*) in Compustat. Total return indexes are created by combining variables such as prices (*prccm*), adjustment factors (*ajexdm*),

---

[8] CPI price levels are divided by 100.

6

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon
90
**SER 228**

quotation units (*qunit*), and total return factors (*trfm*). We apply -30% delisting returns when delisting is performance related (based on the delisting reasons *dlrsn*), following Shumway (1997).

The control variables we use in our cross-sectional regressions are defined as follows: 1) $LOGSIZE_{i,t}$ is the natural logarithm of firm $i$'s market capitalization at the end of month $t$. Market capitalization is computed as a product of number of shares outstanding and stock prices (*prccm*) and the shares outstanding reported on the last trading day of the month (*cshom*). 2) $LOGMB_{i,t}$ is the natural logarithm of the price-to-book ratios. We define the book value of common equity, that is, as a difference between the book value of stockholder's equity, adjusted for tax effects, and the book value of preferred stock.[9] To construct the book value per share, we follow Asness and Frazzini (2013), and adjust book value for corporate actions between fiscal year-end and the date of portfolio formation. To construct price-to-book ratios we divide current price by book value per share. 3) $LEVERAGE_{i,t}$ is the firm's book leverage; 4) $MOM_{i,t}$ is the return momentum taken to be the buy-and-hold return of the most recent 12 months of stock $i$, leading up to and including month $t$-1; 5) $INVEST/A_{i,t}$ is the ratio of the firm's capital expenditures divided by the book value of its assets; 6) $LOGPPE_{i,t}$ is the natural logarithm of the firm's property, plant, and equipment; 7) $VOLAT_{i,t}$ is the standard deviation of returns based on the past 12 months of monthly returns; 8) $AGE_{i,t}$ is given by the number of years the firm has been in operation as of year $t$;[10] 9) $SALESGR_{i,t}$ is the annual growth rate in firm sales; and, 10) $ROE_{i,t}$ is the ratio of firm i's net yearly income divided by the value of its equity. To mitigate the impact of outliers, we winsorize *LEVERAGE, MOM, INVEST/A, VOLAT, SALESGR*, and *ROE* at the 2.5% level. Over our sample period the average firm's monthly stock return is 1.07%, with a standard deviation of 12.67%. The magnitudes and distributions of other firm-level controls are consistent with other studies using U.S. data.

## 3. Cross-Sectional Results

Our cross-sectional analysis relates the level of companies' direct and indirect emissions to their corresponding stock returns, conditional on the states of U.S. inflation. This translates to the model in which firm-level emissions measures are interacted with aggregate measures of inflation. As in Bolton and Kacperczyk (2021; 2023), the level of corporate emissions reflects in broad terms the exposure of the company to carbon-transition risk when inflation is at its sample average. The higher are the company's emissions, the further it must travel to reach net zero emissions, and the bumpier

---

[9] See Bali et al. (2016), page 178.
[10] In our regressions, we use the transformation of the variable 1/(1+firmage), to control for the skewness of the distribution in the raw variable.

7

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon

91

**SER 229**

the journey is likely to be. The interaction term between emissions and inflation captures exposure to some of these bumps. In particular, the higher are the company's emissions, the higher is its reliance on fossil fuels, and therefore the higher is its exposure to energy price (and commodity price) inflation. If the company is a net seller of fossil fuel energy, then a rise in energy price inflation is expected to boost its bottom line, whereas if it is a net buyer of fossil fuels, energy price inflation ought to hurt its earnings. One of the touted benefits of renewable energy is indeed that the supply of this energy following installation of the equipment is not affected by swings in energy and commodity prices.

To operationalize this intuition, we estimate the following cross-sectional regression model:

$$RET_{i,t} = a_0 + a_1 (TOT\ Emissions)_{i,t-1} + a_2 (TOT\ Emissions)_{i,t-1} * (Inflation)_t + a_3 Controls_{i,t-1} + \mu_{j,t} + \mu_i + \varepsilon_{i,t} \tag{1}$$

where $RET_{i,t}$ measures the stock return of company $i$ in month $t$, $TOT\ Emissions$ is a generic term for respectively the level of the firm's scope 1 emissions ($LOGS1TOT$), scope 2 emissions ($LOGS2TOT$), and upstream ($LOGS3UTOT$) and downstream scope 3 emissions ($LOGS3DTOT$), all measured in log scale, and $Inflation$ is a generic term for the various inflation measures (CPI and CPI changes) we consider in turn. The vector of firm-level controls is the same as in Bolton and Kacperczyk (2023) and is listed in Table 1.[11] We also include industry-time fixed effects ($\mu_{j,t}$) and firm fixed effects ($\mu_i$) to account for time-varying industry-level unobservables,[12] and time-invariant firm-level unobservables. The former ones are particularly useful to account for many time-varying macroeconomic effects, both aggregate and sectoral. Including industry-fixed effects is also important in transition risk regressions due to significant cross-industry differences in emissions, as indicated by Bolton and Kacperczyk (2023). The latter fixed effects allow us to absorb any firm-specific effects possibly correlated with firm emissions. We double cluster standard errors at the firm and year levels, which allows us to account for any cross-firm correlation in the residuals as well as capture the fact that some control variables, and emissions, are measured at an annual frequency. Our main coefficient of interest is $a_2$.

What are the effects of inflation on the carbon premium? How are stock returns of companies that are exposed to carbon transition risk affected by price inflation? Typically, stocks are considered to be

---

[11] We center both the emissions and inflation variables to facilitate the interpretation of the regressions' level effects.

[12] Throughout our analysis we consider a granular classification of 361 Trucost industries, but the results are also robust to using coarser, 77-industry GICS-6 classification.

8

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon
92
**SER 230**

hedges against inflation, so that expected stock returns may be unaffected, or even be lower in the face of higher inflation (Modigliani and Cohn, 1979; Fama, 1981; Flannery and Protopapadakis, 2002; and Stock and Watson, 2003). This is true irrespective of whether firms have high carbon emissions or not. On that basis, one would expect that the coefficient of the interaction term, $a_2$, to be insignificant, or possibly negative, if stocks of companies with high emissions offer a better hedge against core price inflation. On the other hand, Fang, Liu, and Roussanov (2022) have shown that energy price inflation is considerably more volatile than core inflation and that it is positively related with excess returns on various risky portfolios of assets. Now, companies with high emissions are disproportionately exposed to energy and commodity price shocks. To the extent that higher energy price inflation imposes higher costs on companies with high emissions, one would therefore expect that the coefficient of the interaction term to be positive and significant. And if higher energy price inflation boosts revenues of net suppliers of fossil fuel energy, then one would expect the coefficient $a_2$ to be negative and significant.

3.1 Inflation and the Carbon Premium

We begin our analysis by exploring the effects of energy price inflation on the carbon premium, as reflected by the coefficient $a_2$ of the interaction of energy price inflation (*Energy CPI*) and carbon emissions. We report the results of our regression in Table 2. Columns 1 and 2 show the results for direct scope 1 emissions (*LOGS1TOT*). The first column includes industry-time fixed effects, and the second column further includes firm fixed effects. Columns 3 and 4 report the results for indirect scope 2 emissions (*LOGS2TOT*); columns 5 and 6 for upstream indirect emissions (*LOGS3UTOT*); and columns 7 and 8 for downstream indirect emissions (*LOGS3DTOT*). Consistent with the findings in Bolton and Kacperczyk (2021), we find a positive and statistically significant effect of carbon emissions on stock returns, for all four categories of emissions, which indicates that there is a positive carbon premium for an average firm when *Energy CPI* is at its mean value. As for our interaction coefficient of interest, we find that it is consistently positive and statistically significant for all four categories of emissions, whether we add industry-time fixed effects or firm fixed effects (we obtain slightly stronger statistical significance when we add firm fixed effects). Remarkably, the effects are strongest for companies with greater downstream Scope 3 emissions, which suggests that the energy-price risk is highest for end products that have a high carbon footprint.

The effect of energy price inflation on the carbon premium is also economically significant: A one-standard-deviation increase in the energy price index leads to an increase in the scope 1 carbon

9

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon

93

**SER 231**

premium by roughly 44%. The numbers for the scope 2, upstream scope 3, and downstream scope 3 emissions premia are 41%, 28%, and 136%, respectively. In terms of the effect of emissions on stock returns this implies that a (within) one-standard-deviation increase of scope 1 emissions is associated with a 2.86 percentage-point increase in next month's annualized returns. Again, similar numbers for the other categories of emissions are 2.87, 4.97, and 5.21. Overall, these findings suggest that energy-price shocks worsen the carbon transition risk of companies. That is to be expected based on a straightforward economic analysis. To be sure, swings in energy prices affect the bottom line of companies with greater fossil fuel energy dependence more, so that investors should be expected to seek greater compensation for holding these companies when there is a greater energy price inflation.

To better understand the source of energy-price inflation we further break down the energy price index into its two subcomponents, an energy commodities and energy services component, and include them jointly in the regression model (1). We report the results of the regression model in terms of these two energy sub-components in Table 3 for the specification with both industry*time and firm fixed effects as well as the same control variables as in Table 2. All coefficients of the control variables have been omitted for brevity here and in subsequent tables. The coefficient of the interaction variables is positive and highly significant for the commodities component for all four categories of emissions. On the other hand, the effect of services for scope1, scope 2, and upstream scope 3 emissions is much weaker and statistically insignificant. At the same time, both commodities and services contribute roughly the same to the effect of scope 3 downstream emissions and are both statistically significant.

Next, we explore the relative effects of core inflation and energy price inflation on the carbon premium. As we highlighted above, it is unclear a priori what the effects of core inflation on the carbon premium are likely to be, as they depend on whether stocks of companies with high carbon emissions offer better (or worse) inflation hedges than other stocks. There is no obvious economic reason why brown stocks should offer a better inflation hedge than green stocks. We evaluate this empirically by including jointly energy and core price index in the model (1).

Table 4 report the results for each of the four types of emissions for the specification with both industry*time and firm fixed effects. The effects of energy price index remain positive and significant as before. Remarkably, the coefficient of the interaction term with core CPI while positive is statistically insignificant, and economically much smaller, for all four categories of emissions. These findings suggest that the carbon premium is not sensitive to the component of core CPI unexplained

10

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon
94
**SER 232**

by energy prices, and that brown stocks are not significantly different from green stocks as inflation hedges. However, when it comes to the energy price component, brown firms are more exposed to this price risk than green firms, so that investors demand a greater risk compensation for holding brown stocks when energy price is high. These results broadly resonate with the findings in Fang et al. (2022) who also underscore the relatively more important role of energy prices in asset pricing.

Bolton and Kacperczyk (2021) found that the carbon premium is mirrored in corporate valuations: Companies with higher emissions other things equal have lower market to book ratios. How is this valuation discount affected by energy price inflation? We explore this question next by looking at the interaction effect for the regression specification, where the dependent variable is firms' market-to-book ratio (*MB*), winsorized at the 2.5% level. Our specification here follows Hong and Kacperczyk (2009) and includes previously used momentum and volatility measures, as well as contemporaneous values of both *ROE* and *SALESGR*, along with their values one year and two years into the future. We report the results in Table 5. The four columns of Table 5 are for each type of emissions for the specification that includes both industry*time and firm fixed effects. The results go in the expected direction, with energy price inflation negatively affecting the valuation of brown stocks, in most cases in a statistically significant way. However, the effects on the book-to-market ratio are weaker than the effects on returns, especially for the effects measured at the average energy price levels, as reflected in the estimates of the coefficients of the emission levels. We interpret these findings as reflecting the fact that energy price shocks are somewhat transitory, given that energy price inflation is a mean-reverting process.

We have estimated several additional models to help better understand our main findings. First, we assess whether our results might be due to unexpected earnings news differentially affecting brown and green stocks in different inflation regimes. To this end, we re-estimate the model in (1) by netting out returns around earnings announcement dates, defined as the one-day and three-day return around quarterly earnings announcements. The results in Table 6 indicate a negligible change relative to our baseline model in Table 4. Second, we explore whether the effect of energy price inflation can be explained by the energy inflation rate. To this end, we expand the model in (1) with a set of additional interaction terms between respective emission types and the annual rate of energy price changes. We present the results in Table A1 of the Appendix. We find that the effect of energy price cannot be explained by changes in the price; moreover, the unexplained component of the energy price is economically and statistically insignificant. Our interpretation of these results is that energy price levels are more important for the carbon premium than the rate of change *per se*, likely because the energy

11

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon
95
**SER 233**

price, rather than its change, is the key driver of profitability. Third, we examine whether our main effect is due to expected or unexpected components of energy price inflation. To this end, we expand our model with the measure of energy inflation innovations interacted with the respective measures of emissions. We report the results in Table A2 of the Appendix. We find that the expected component of energy price is a stronger predictor of the carbon premium: interaction terms between energy prices and emissions are all positive and significant, whereas the equivalent interaction terms with energy inflation innovations are positive but all statistically insignificant. Fourth, our baseline results are based on seasonally adjusted energy CPI series. We further assess the robustness of our findings to using unadjusted series. Our results, presented in Table A3 of the Appendix indicate that the results are not particularly sensitive to one or the other specification. Finally, we assess the importance of sample selection bias related to the discrete shift in coverage of companies by Trucost. Notably, Trucost has adjusted the universe of companies with estimated or reported carbon emissions by a significant margin in 2016. To establish whether the shift is not affecting our results we estimated our main regression on a sample of companies that had at least one year of emissions data in any year between 2005 and 2015. The results of this estimation, reported in Table A4 of the Appendix, indicate no material difference in the effect we document for the entire sample. Hence, we conclude that our main results cannot be solely explained by differences in the time-series composition of our sample.

3.2 The Carbon Premium, Demand Shocks, Monetary Policy, and Exchange Rates

Our analysis above inevitably raises questions about the specific macroeconomic drivers of our effects. In this section, we consider three possible channels: the role of oil supply shocks, the role of U.S. dollar as the primary mode of commodity pricing, and the implications of inflation for monetary policy and its effects on asset prices. Energy prices are affected by changes in the supply and demand for fossil fuel, and it is helpful to try and separate supply-driven from demand-driven inflation forces. In Table 7, Panel A, we present results from our regression model (1), expanded by the inclusion of an interaction effect between firm-level emissions and oil supply shocks, as defined in Kanzig (2021). As can be seen, the estimates of our main interaction term with energy prices remain positive and highly significant. At the same time, the effect of oil supply shocks is negative, as one would expect, but significantly weaker, both statistically and economically. These findings suggest that the effects of energy price inflation are more likely driven by demand rather than supply factors and are consistent with the common narrative of demand shocks affecting energy prices (see e.g., Kilian, 2009; and Cheng, and Xiong, 2014).

12

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon
96
SER 234

We further consider the role of monetary policy shocks in driving the effects of energy and core CPI shocks on the carbon premium. It is reasonable to expect that the stock return effects we document could be a reflection of (expected) changes in monetary policy in response to inflation. This is especially because firms with different carbon footprint tend to exhibit different sensitivities to interest rate changes. To separate pure cash-flow effects of inflation from effects driven by changing discount rates due to changes in interest rates and monetary policy stance, we expand the model in equation (1) to include the level of short-term Fed funds rate (*RF*) and the monetary policy (Fed funds) shock (*FF shock*) from Nakamura and Steinsson (2018), both interacted with firm-level emissions. Our results, in Table 7, Panel B and Panel C, suggest that the observed changes in carbon premium due to energy price shocks are not driven solely by changes in interest rates or monetary policy shocks. In fact, we observe that our main coefficients remain positive and significant, whether we control for the level of interest rates or monetary policy shocks. If anything, the direct effects of monetary shocks are weaker and statistically insignificant.

Finally, we examine the sensitivity of our results to fluctuations in U.S. dollar exchange rates. Various commodities may be traded using different currencies as a mode of exchange, but corporate profits of U.S. companies are reported in U.S. dollars. Thus, changes in the exchange rate may differentially affect the values and stock prices of energy-sensitive companies. We measure the U.S. dollar exchange rate, *Dollar index*, by using the exchange rate basket that measures exchange rates aggregated across several markets. To measure the impact of the index on the inflation premium, we expand the model in equation (1) to include *Dollar index* interacted with firm-level emissions. Results, reported in Panel D of Table 7, indicate that carbon premium increases on average with higher values of *Dollar index*. This is particularly true for scope 2 and upstream scope 3 emissions. However, this effect cannot explain the role of energy CPI in pricing carbon-sensitive companies. Most of the coefficients of the interaction terms between *Energy CPI* and measure of emissions remain nearly the same relative to the baseline model.

## 4. The Effects of Inflation over Time

In this section we explore how the impact of energy price on the carbon premium has evolved over time. In particular, we ask two questions: (1) to what extent are the price effects attributable to changing investor preferences for green stocks, possibly as a result of strengthening climate policy response, and (2) are the effects mostly driven by the recent large price shocks due to Covid and the war in Ukraine?

13

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon

97

**SER 235**

To address the first question, we look at the impact of energy prices before and after the Paris Climate Agreement of 2015. Several studies have argued that the Paris Climate Agreement has ushered in a new era of climate policy, which has led investors to reprice carbon transition risk. The effect of the Paris Climate Agreement shock on the carbon premium has been documented in Bolton and Kacperczyk (2021), among others. However, it is not known whether the same shock might amplify the carbon premium conditional on the state of energy prices. We explore this question by expanding our model (1) with an additional interaction effect capturing the periods pre- vs. post-Paris. We define an indicator variable, *Paris*, that takes the value one for the period 2016-2022 and zero for the period 2005-2015. We focus on the triple interaction term between energy prices, firm-level emissions, and the *Paris* indicator. The results are reported in Panel A of Table 8. Interestingly, we do not find that the Paris shock has significantly affected of the link between energy prices, emissions, and stock prices. While the interaction effect is positive, it is small both in terms of its statistical and economic significance. Hence, we conclude that the energy forces we observe are not merely a reflection of changing preferences and perceptions of climate risk by investors but are rather a reflection of changing fundamentals driven by changing energy prices.

With respect to the second question, we repeat our analysis of Table 4 by restricting our sample to observations prior to the Covid crisis. Concretely, we retain observations from 2005 until 2020.06 to allow for some delay in changing fundamentals around the onset of the global pandemic. We report the results of the analysis in Panel B of Table 8. A few notable findings emerge. First, the carbon premium measured for average energy prices remains positive and statistically significant for all four measures of emissions. More specifically, we find that the interaction effects between respective emissions and energy prices are positive, statistically and economically significant. Thus, our results are not solely driven by the extreme inflation shock post 2020.06, but also obtain for changes in energy prices in the earlier sample period. Moreover, in light of the fact that the magnitudes of both effects in Table 4 and 8 are quite similar we conclude that the carbon premium is similarly affected by inflation in the pre- and post-Covid periods. This last result is quite provoking given the common belief that climate risk has become less of an issue to U.S. investors in recent times (e.g., Baker, Egan, and Sarkar, 2022). Our interpretation is that such shift in beliefs is not the primary driver of carbon premium; rather, it is fundamentals that are responsible for changing asset prices.

In our final test, we look at the role of demand forces for sustainability-driven mutual funds. These forces could be correlated with the interaction effect between emissions and inflation levels and at the same time future stock returns. Specifically, we obtain monthly data from Morningstar on aggregate

14

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon
98
**SER 236**

net flows (*Tot Flow*) into U.S. sustainability mutual funds and ETFs and their asset-level subcategories. In the cross-sectional tests, we focus on flows to U.S. stocks (*Stock Flow*). We also measure the respective growth rates of the two flow variables. Next, we expand our model in (1) to include another interaction term between the respective flow variables and alternating measures of emissions. We report the results from estimating this model in Table 9. Our results indicate that controlling for the flow variables does not reduce much of the variation we capture in our main effects between energy prices and emissions. Our results remain similar to those we document before. Moreover, the interaction variables between the flow variables and all emission levels are positive but statistically insignificant.

### 5. Corporate Responses to Inflation

How is exposure to energy price risk related to carbon emissions, and how are companies' decisions affected by this exposure? We explore these questions in this section and begin by exploring the link between energy price and carbon emissions. Following Duarte (2013) and others we take energy price betas, which capture how stock returns are affected by energy price innovations, to be our measure of energy price risk. Because our earlier results point towards an important role of the expected component of energy inflation, we construct an equivalent measure of beta based on the expected energy price.[13] Specifically, we decompose total inflation into its expected part and an unexpected inflation shock. The inflation shock is estimated using a VAR system as in Fang et al. (2022):

$$Y_t = a + AY_{t-1} + \varepsilon_t \tag{2}$$

where, $Y_t$ includes the vector of headline, core, food, and energy inflation, plus the risk-free rate, and the price-dividend ratio of the aggregate stock market portfolio. The first elements of $\varepsilon_t$ for the inflation variables are extracted as the inflation shocks. Then, for each stock, using a 60-month rolling window of data, we estimate a time-series regression model as follows:

$$R_t = a + \beta * Inflation_t + \mu_t \tag{3}$$

where, $R_t$ is stock excess return, and $Inflation_t$ is a variable indicating expected inflation. The coefficient of *Inflation* is our beta measure, henceforth referred to as the *Energy Expected Beta*. We have

---

[13] In another, unreported test, we have estimated our models with the beta based on the unexpected energy inflation component. These estimates are unrelated to the levels of firm emissions.

15

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon

99

**SER 237**

also considered alternative measures of betas, with different windows or measures of expected inflation, with similar results, as below.

Next, we examine the link between *Energy Expected Beta* and the levels of corporate emissions, direct and indirect. Panel A of Table 10 reports our main findings. As can be seen, the higher are corporate emissions, the higher is the firm's exposure to expected energy price risk. This is true for direct (scope 1) emissions (as seen in column 1), and indirect (scope 2 and upstream scope 3) emissions (as shown in columns 2 and 3). For all three emission variables the coefficients are positive and statistically significant. As for downstream scope 3 emissions, the coefficient is also positive, but it is not statistically significant. The latter result may be due to the fact that we have a shorter time-series for downstream scope 3 emissions, even though we note that for other levels of emissions the results hold even for the restricted sample. Overall, these findings provide further insight on the association between energy price inflation and the carbon premium. To the extent that companies with higher emissions are more exposed to energy price risk, we should expect their carbon premia to be positively affected by energy price inflation.

In Panel B of Table 10 we explore how corporate profitability, measured by the return on equity (*ROE*), is affected by energy price changes, by linking *ROE* to the interaction variable between carbon emissions and the *Energy CPI*. In the odd-numbered columns, we report the effects on next quarter *ROE*, and in the even-numbered columns we report the results for next year's *ROE*. Overall, we find that short-term (next quarter) profitability is not significantly affected by shocks in the *Energy CPI*, except for the effect on scope 2 emissions, which is borderline statistically significant. This result suggests that electricity prices are not immediately and fully responding to changes in fossil fuel energy prices, so that cost shocks to firms' electricity consumption are somewhat dampened. In turn, we find a strong and positive effect of the *Energy CPI* interacted with emissions on next year's *ROE*. For all measures of emissions, the effect is positive, and it is highly statistically significant for all except for downstream scope 3 emissions. This latter result is consistent with the view that brown companies can extract rents through rising energy prices. More profitable companies also command higher expected returns, consistent with them having more sensitive growth prospects (see Novy-Marx, 2013).

In Panels C, D, and E of Table 10 we look at how firms' operations are affected by energy price shocks, again both in the short and longer run. We begin with the total level of sales (*LOGSALES*) in Panel C. Our main finding here is that sales of companies with high scope 1 emissions are negatively related to energy prices in the short run. As can be seen in column 1, the coefficient of the interaction

<div align="center">16</div>

Electronic copy available at: https://ssrn.com/abstract=4847591

<div align="center">Exhibit 4 to Decl. of Thomas Lyon</div>
<div align="center">100</div>
<div align="center">**SER 238**</div>

term between *LOGS1TOT* and the *Energy CPI* is negative and significant. However, the effect becomes insignificant in the long horizon. Moreover, firms' exposure to energy price shocks through indirect emissions does not seem to significantly relate to their sales, both in the short-term and the long-term. Notably, the challenge with interpreting the sales data is that quantities of products sold may move in the opposite direction to the products' prices and thus the dollar value of sales may be unaffected even if buyers and sellers internalize the price changes.

Panel D of Table 10 reports the results for corporate debt outcomes, measured by the logarithm of the total value of debt outstanding, *LOGDEBT*. Overall, we find that companies with a greater exposure to energy price inflation risk, as reflected by the interaction term between corporate emissions and the *Energy CPI*, tend to have less debt in the short term. This is true for scope 1, 2, and upstream scope 3 emissions. The coefficient of the interaction term is negative and statistically significant for these three categories of emissions. We obtain an insignificant coefficient for downstream scope 3 emissions, which, again, may be due to the fact that we have a much shorter time-series for this category. At the same time, the effect becomes significantly weaker in the longer horizon. Overall, these results suggest that companies with greater exposure to energy price risk adjust their debt policy following a new shock, but in the long run tend to return to their target capital structure (as predicted by the dynamic risk-management and debt policy theories of Bolton, Chen, and Wang, 2013, and Bolton, Wang, and Yang, 2021).

Finally, Panel E reports the results for corporate investment policy in terms of firms' level of capital expenditure. We find that companies with higher exposure to energy price shocks through their scope 1 emissions tend to invest less in the short run, but not in the long run. Moreover, exposure to energy price shocks through their indirect emissions does not seem to affect corporate capital expenditures, both in the short and in the long run.

Overall, the results from this section suggest that the effect of energy price inflation on the carbon premium is multifaceted and manifests itself both in terms of its effect on systematic energy beta risk as well as its effect on firm profitability and firm debt. The profitability force is stronger in the long run and the debt effect is more pronounced in the short run. Altogether, these forces lead to a higher carbon premium in stock returns.

17

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon
101
SER 239

## 6. Conclusion

Our analysis of how inflation affects the carbon premium has revealed one robust finding, namely that energy price inflation significantly increases the carbon premium. Energy price inflation isn't a bonus for brown firms. On the contrary, it is a source of greater risk, which investors demand compensation for. This finding is even more striking when contrasted with the effects of core CPI, which does not significantly affect expected returns of brown firms. We have measured the effects of energy price on the carbon premium by estimating the coefficient of an interaction term between carbon emissions and energy price inflation. We have found that this coefficient is positive and significant for all four categories of emissions.

There has been considerable discussion of a backlash in sustainable investing in recent years; of an end of ESG, that recent outflows from ESG funds seem to indicate. Yet, this prophecy may well be premature, if one takes account the context of rising energy prices in recent years. This energy price inflation may have filled the coffers of oil & gas majors, but most other brown companies have seen their carbon premia rise, reflecting a demand for greater risk compensation from investors facing higher carbon transition risks.

Importantly, we also find that the relationship between energy price and the carbon premium is broadly similar before and after COVID, suggesting that the higher carbon premia of brown firms in response to energy price shocks has not been affected by changing investor preferences post COVID.

There are two alternative broad explanations for the positive effect of energy prices on the carbon premium, a cash-flow, and a discount rate shock explanation. Our findings are generally consistent with the latter, as we found that brown companies are associated with higher energy price betas and higher long-term profitability, so that brown firms inherit similar risk pricing characteristics as growth stocks.

18

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon

102

**SER 240**

## References

Acosta, Miguel (2023) "The perceived causes of monetary policy surprises", Working Paper Federal Reserve Board.

Asness, Clifford, and Andrea Frazzini (2013) "The devil in HML's details", *The Journal of Portfolio Management* 39, 49–68.

Aswani, Jitendra, Aneesh Raghunandan, and Shiva Rajgopal (2024), "Are carbon emissions associated with stock returns?", *Review of Finance* 28(1), 75–106.

Baker, Malcolm, Mark L. Egan, and Suproteem K. Sarkar (2022) "How do investors value ESG?" NBER Working Paper 30708.

Bali, Turan G., Robert F. Engle, and Scott Murray (2016) *Empirical asset pricing: the cross section of stock returns* (John Wiley & Sons).

Bolton, Patrick and Marcin Kacperczyk (2021) "Do investors care about carbon risk?", *Journal of Financial Economics* 142(2), 517–549.

Bolton, Patrick, and Marcin Kacperczyk (2023) "Global pricing of carbon-transition risk", *Journal of Finance* 78(6): 3677–3754.

Bolton, Patrick, Zachery Halem, and Marcin Kacperczyk (2022) "The financial cost of carbon," *Journal of Applied Corporate Finance* 34(2): 17–30.

Bolton, Patrick, Hui Chen, and Neng Wang (2013) "Market timing, investment, and risk management," *Journal of Financial Economics* 109(1): 40-62.

Bolton, Patrick, Neng Wang, and Jinqiang Yang (2021) "Leverage dynamics under costly equity issuance," NBER Working Paper 26802.

Boons Martijn, Duarte Fernando, de Roon Frans, and Marta Szymanowska (2020) "Time-varying inflation risk and stock returns", *Journal of Financial Economics* 136(2), 444–470.

Cenedese, Gino, Shangqi Han, and Marcin Kacperczyk (2023) "Carbon-transition risk and net-zero portfolios", https://ssrn.com/abstract=4565220.

Chaieb, Ines, Hugues Langlois, and Olivier Scaillet (2021) "Factors and risk premia in individual international stock returns", *Journal of Financial Economics* 141, 669–692.

Chen, Nai-Fu, Richard Roll, and Steve A. Ross (1986), "Economic forces and the stock market", *Journal of Business* 59, 383–403.

Cheng, Ing-Haw and Wei Xiong (2014), "Financialization of commodity markets", *Annual Review of Financial Economics* 6, 419-441.

Cieślak, Anna and Carolin Pflueger (2023), "Inflation and asset returns", *Annual Review of Financial Economics* 15, 433-448.

Duarte, Fernando M (2013), "Inflation risk and the cross section of stock returns", Staff Report, No. 621, Federal Reserve Bank of New York

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon

Fama, Eugene F. "Stock returns, real activity, inflation, and money", *American Economic Review* 71, no. 4 (1981): 545–565.

Fang, Xiang, Yang Liu, and Nikolai Roussanov (2022), "Getting to the core: inflation risks within and across asset classes", NBER Working Paper 30169.

Flannery, Mark J. and Aris A. Protopapadakis (2002) "Macroeconomic factors do influence aggregate stock returns", *The Review of Financial Studies* 15(3), 751-782.

Kanzig, Diego (2021), "The macroeconomic effects of oil supply news: evidence from OPEC announcements", *American Economic Review* 111(4), 1092-1125.

Kilian, Lutz (2009), "Not all oil price shocks are alike: disentangling demand and supply shocks in the crude oil market" *American Economic Review* 99(3), 1053-69.

Modigliani, Franco and Richard A. Cohn (1979) "Inflation, rational valuation and the market", *Financial Analysts Journal* 35(2), 24–44.

Nakamura, Emi, and Jón Steinsson (2018), "High-frequency identification of monetary non-neutrality: the information effect", *The Quarterly Journal of Economics* 133(3), 1283–1330.

Pastor, Lubos, Robert F. Stambaugh, and Lucian A. Taylor (2022), "Dissecting green returns", *Journal of Financial Economics* 146, 403-424.

Pedersen, Lasse (2023) "Carbon pricing versus green finance," https://ssrn.com/abstract=4382360

Sautner, Zacharias, Laurence Van Lent, Grigory Vilkov, and Ruishen Zhang (2023), "Firm level climate change exposure", *The Journal of Finance* 78, 1449–1498.

Shumway, Tyler (1997) "The delisting bias in CRSP data", *The Journal of Finance* 52, 327–340.

Stock, James H. and Mark W. Watson (2003) "Forecasting output and inflation: The role of asset prices", *Journal of Economic Literature* 41(3), 788–829.

Stroebel, Johannes and Jeffrey Wurgler (2021) "What do you think about climate finance?", *Journal of Financial Economics* 142(2): 487–498.

Zerbib, Olivier David (2022), "A Sustainable Capital Asset Pricing Model (S-CAPM): Evidence from environmental integration and sin stock exclusion", *Review of Finance* 26(6), 1345-1388.

20

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon

104

**SER 242**

Table 1: Summary statistics

This table reports summary statistics (mean, standard deviation, minimum, median, and maximum) of the main variables. CPI data series include core and energy components, and sub-categories in energy index (energy commodities and services). *Energy inflation* is annual growth rate of energy CPI, and innovation of energy inflation (*Energy innovation*) is calculated using ARIMA or VAR model. *Oil supply shock* is defined as in Kanzig (2021); *Monetary shock* is defined in Acosta (2023). *Dollar index* is a U.S. dollar exchange rate index. Carbon emissions are the natural logarithm of scope 1, 2, 3 upstream/downstream total emissions. *Tot flow growth* is the growth rate of fund flows into U.S. ESG funds. *Stock flow growth* is the corresponding value for equity investments of such funds. The sample period is 2005.01-2022.12. Panel A1 reports statistics for full sample. Panel A2 shows information on the same variables for a subsample of observations with non-missing downstream emissions. Panel B summarizes information on firm-level variables that enter our regression models. *RET* is the monthly stock return; *LOGSIZE* is the natural logarithm of a firm's market capitalization; *LOGMB* is the natural logarithm of market cap divided by book value; *LEVERAGE* is the ratio of debt to book value of assets; *MOM* is the average stock returns over the previous year; *INVEST/A* is capital expenditures divided by the book value of its assets; *LOGPPE* is the natural logarithm of the property, plant, and equipment; *VOLAT* is the standard deviation of returns based on the past 12 monthly returns; *ROE* is the ratio of net yearly income divided by the value of equity; *AGE* is a standardized measure of firm age; *SALESGR* is the annual growth rate in firm sales.

| VARIABLES | Mean | p50 | SD | Min | Max |
|---|---|---|---|---|---|
| **Panel A1: Full sample** | | | | | |
| Energy CPI | 2.253 | 2.172 | 0.317 | 1.764 | 3.283 |
| Commodities | 2.560 | 2.427 | 0.529 | 1.634 | 4.225 |
| Energy services | 2.062 | 2.031 | 0.183 | 1.783 | 2.672 |
| Core CPI | 2.515 | 2.543 | 0.248 | 2.032 | 3.003 |
| Energy inflation | 0.049 | 0.043 | 0.137 | -0.326 | 0.346 |
| Energy innovation | 0.000 | 0.002 | 0.028 | -0.158 | 0.086 |
| Oil supply shock | 0.002 | -0.055 | 0.661 | -2.896 | 1.827 |
| Monetary shock | -0.001 | 0.000 | 0.021 | -0.200 | 0.096 |
| Dollar index | 91.268 | 93.230 | 8.720 | 71.800 | 112.120 |
| Tot flow growth | 0.553 | 0.300 | 1.133 | -2.870 | 4.150 |
| Stock flow growth | 0.391 | 0.140 | 1.100 | -5.070 | 4.820 |
| LOGS1TOT | 10.159 | 10.160 | 3.062 | -4.605 | 19.506 |
| LOGS2TOT | 10.240 | 10.448 | 2.502 | -1.946 | 17.165 |
| LOGS3UTOT | 12.144 | 12.374 | 2.347 | -0.941 | 19.031 |
| **Panel A2: Sample with non-missing LOGS3DTOT** | | | | | |
| Energy CPI | 2.157 | 2.150 | 0.176 | 1.793 | 2.681 |
| Commodities | 2.344 | 2.366 | 0.304 | 1.658 | 3.174 |
| Energy services | 2.071 | 2.038 | 0.074 | 1.991 | 2.294 |
| Core CPI | 2.642 | 2.640 | 0.091 | 2.505 | 2.852 |
| Energy inflation | 0.048 | 0.051 | 0.115 | -0.203 | 0.287 |
| Energy innovation | 0.001 | 0.004 | 0.023 | -0.072 | 0.045 |
| Oil supply shock | -0.001 | -0.079 | 0.634 | -1.794 | 1.567 |
| Monetary shock | 0.002 | 0.000 | 0.013 | -0.033 | 0.061 |
| Dollar index | 95.003 | 95.130 | 2.978 | 89.130 | 101.120 |
| Tot flow growth | 1.157 | 0.780 | 1.146 | -0.320 | 4.150 |
| Stock flow growth | 0.902 | 0.690 | 1.081 | -0.960 | 4.820 |
| LOGS1TOT | 9.352 | 9.430 | 3.039 | -2.431 | 18.569 |
| LOGS2TOT | 9.578 | 9.806 | 2.572 | -1.946 | 16.727 |
| LOGS3UTOT | 11.494 | 11.643 | 2.430 | -0.941 | 18.897 |
| LOGS3DTOT | 10.761 | 11.139 | 3.881 | -5.880 | 20.875 |

21

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon

105

| Panel B: Control Variables | | | | | |
|---|---|---|---|---|---|
| VARIABLES | Mean | p50 | SD | Min | Max |
| RET(%) | 1.071 | 0.926 | 12.668 | -83.480 | 1625.053 |
| LOGSIZE | 8.169 | 8.169 | 1.715 | -0.288 | 14.885 |
| LOGMB | 1.021 | 0.944 | 0.948 | -3.762 | 7.808 |
| LEVERAGE | 0.233 | 0.213 | 0.181 | 0.000 | 0.822 |
| MOM | 0.145 | 0.099 | 0.411 | -0.552 | 1.454 |
| INVEST/A | 0.038 | 0.025 | 0.043 | 0.000 | 0.244 |
| LOGPPE | 5.985 | 6.047 | 2.255 | -4.962 | 12.467 |
| VOLAT | 0.100 | 0.086 | 0.054 | 0.030 | 0.274 |
| AGE | -0.029 | -0.020 | 0.036 | -1.000 | -0.004 |
| SALESGR | 0.089 | 0.054 | 0.206 | -0.339 | 0.831 |
| ROE | 0.112 | 0.117 | 0.206 | -0.401 | 0.581 |

22

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon
106
**SER 244**

Table 2: Carbon Emissions and Stock Returns: Energy CPI

The sample period is 2005.01-2022.12. The dependent variable is *RET*. The main independent variables are carbon emission levels and interaction terms with *Energy CPI*. All variables are defined in Table 1 and Table 2. We report the results of the pooled regression with standard errors double clustered at the firm and year levels. All regressions include Trucost industry*time fixed effects. In columns (2), (4), (6), and (8), we additionally include firm-fixed effect. ***1% significance; **5% significance; *10% significance.

| VARIABLES | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|
| | | | | Dependent Variable: RET | | | | |
| LOGS1TOT | 0.144** | 0.335*** | | | | | | |
| | (0.062) | (0.110) | | | | | | |
| LOGS2TOT | | | 0.175** | 0.361*** | | | | |
| | | | (0.078) | (0.110) | | | | |
| LOGS3UTOT | | | | | 0.316** | 1.164*** | | |
| | | | | | (0.111) | (0.274) | | |
| LOGS3DTOT | | | | | | | 0.077 | 0.217** |
| | | | | | | | (0.060) | (0.082) |
| LOGS1TOT*Energy CPI | 0.352** | 0.460** | | | | | | |
| | (0.176) | (0.170) | | | | | | |
| LOGS2TOT* Energy CPI | | | 0.329* | 0.466** | | | | |
| | | | (0.179) | (0.172) | | | | |
| LOGS3UTOT* Energy CPI | | | | | 0.425* | 0.619*** | | |
| | | | | | (0.236) | (0.220) | | |
| LOGS3DTOT* Energy CPI | | | | | | | 0.856*** | 0.931*** |
| | | | | | | | (0.170) | (0.243) |
| LOGSIZE | -0.253*** | -3.924*** | -0.289*** | -3.925*** | -0.372*** | -4.269*** | -0.202*** | -6.779** |
| | (0.052) | (0.610) | (0.062) | (0.613) | (0.084) | (0.648) | (0.084) | (1.578) |
| LOGMB | -0.002 | -0.252** | 0.017 | -0.259** | 0.033 | -0.184 | -0.023 | -0.327 |
| | (0.105) | (0.138) | (0.099) | (0.140) | (0.097) | (0.137) | (0.185) | (0.249) |
| LEVERAGE | -0.151 | 0.032 | -0.187 | 0.035 | -0.292 | -0.173 | -0.001 | 1.195 |
| | (0.266) | (0.650) | (0.269) | (0.639) | (0.273) | (0.651) | (0.389) | (1.783) |
| MOM | 0.153 | 0.316 | 0.161 | 0.319 | 0.172 | 0.421 | -0.068 | 0.695 |
| | (0.262) | (0.407) | (0.262) | (0.408) | (0.258) | (0.424) | (0.183) | (0.666) |
| INVEST/A | -0.829 | -1.265 | -0.788 | -0.981 | -0.069 | -0.382 | 0.791 | -3.523 |
| | (1.140) | (1.941) | (1.135) | (1.968) | (1.312) | (2.041) | (1.924) | (3.036) |
| LOGPPE | 0.106** | 0.143 | 0.095** | 0.113 | 0.049 | -0.039 | 0.131 | 0.183 |
| | (0.042) | (0.139) | (0.042) | (0.137) | (0.041) | (0.119) | (0.068) | (0.185) |
| VOLAT | 3.458 | 1.553 | 3.374 | 1.601 | 3.573 | 1.264 | 5.813 | -0.484 |
| | (5.578) | (1.925) | (5.545) | (1.927) | (5.503) | (1.840) | (8.946) | (1.730) |
| AGE | 1.629 | -0.003 | 1.600 | -0.009 | 1.465 | -0.027 | 0.655 | 4.264 |
| | (1.640) | (1.469) | (1.668) | (1.476) | (1.644) | (1.494) | (2.770) | (2.037) |
| Firm FE | No | Yes | No | Yes | No | Yes | No | Yes |
| Industry * Time FE | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 227,329 | 227,310 | 227,197 | 227,178 | 227,329 | 227,310 | 105,990 | 105,983 |
| R-squared | 0.404 | 0.427 | 0.404 | 0.427 | 0.404 | 0.428 | 0.371 | 0.406 |

23

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon
107
**SER 245**

Table 3: Carbon Emissions and Stock Returns: Energy (Commodities and Services)

The sample period is 2005.01-2022.12. The dependent variable is *RET*. The main independent variables are carbon emission levels and interaction terms with energy CPI subcategory (commodities and services). The vector of controls includes those in Table 2. All variables are defined in Table 1 and Table 2. We report the results of the pooled regression with standard errors double clustered at the firm and year levels. All regressions include firm and Trucost industry*time fixed effects. ***1% significance; **5% significance; *10% significance.

| VARIABLES | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| | Dependent Variable: RET | | | |
| LOGS1TOT | 0.338*** | | | |
| | (0.111) | | | |
| LOGS2TOT | | 0.361*** | | |
| | | (0.110) | | |
| LOGS3UTOT | | | 1.168*** | |
| | | | (0.276) | |
| LOGS3DTOT | | | | 0.222** |
| | | | | (0.080) |
| LOGS1TOT*Commodities CPI | 0.243** | | | |
| | (0.113) | | | |
| LOGS2TOT* Commodities CPI | | 0.226** | | |
| | | (0.112) | | |
| LOGS3UTOT* Commodities CPI | | | 0.343** | |
| | | | (0.173) | |
| LOGS3DTOT* Commodities CPI | | | | 0.332*** |
| | | | | (0.093) |
| LOGS1TOT*Services CPI | 0.122 | | | |
| | (0.208) | | | |
| LOGS2TOT* Services CPI | | 0.202 | | |
| | | (0.200) | | |
| LOGS3UTOT* Services CPI | | | 0.108 | |
| | | | (0.287) | |
| LOGS3DTOT* Services CPI | | | | 1.207*** |
| | | | | (0.298) |
| Controls | Yes | Yes | Yes | Yes |
| Firm FE | Yes | Yes | Yes | Yes |
| Industry * Time FE | Yes | Yes | Yes | Yes |
| Observations | 227,310 | 227,178 | 227,310 | 105,983 |
| R-squared | 0.427 | 0.427 | 0.428 | 0.406 |

24

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon
108
**SER 246**

Table 4: Carbon Emissions and Stock Returns: Energy and Core CPI

The sample period is 2005.01-2022.12. The dependent variable is *RET*. The main independent variables are carbon emission levels and interaction terms with *Energy CPI* and *Core CPI*. The vector of controls includes those in Table 2. All variables are defined in Table 1 and Table 2. We report the results of the pooled regression with standard errors double clustered at the firm and year levels. All regressions include firm and Trucost industry*time fixed effects. ***1% significance; **5% significance; *10% significance.

| VARIABLES | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| | Dependent Variable: RET | | | |
| LOGS1TOT | 0.329*** | | | |
| | (0.112) | | | |
| LOGS2TOT | | 0.364*** | | |
| | | (0.105) | | |
| LOGS3UTOT | | | 1.157*** | |
| | | | (0.274) | |
| LOGS3DTOT | | | | 0.219** |
| | | | | (0.079) |
| LOGS1TOT*Energy CPI | 0.414** | | | |
| | (0.175) | | | |
| LOGS2TOT*Energy CPI | | 0.395** | | |
| | | (0.181) | | |
| LOGS3UTOT*Energy CPI | | | 0.535** | |
| | | | (0.248) | |
| LOGS3DTOT*Energy CPI | | | | 0.823*** |
| | | | | (0.250) |
| LOGS1TOT*Core CPI | 0.152 | | | |
| | (0.219) | | | |
| LOGS2TOT*Core CPI | | 0.241 | | |
| | | (0.207) | | |
| LOGS3UTOT*Core CPI | | | 0.277 | |
| | | | (0.308) | |
| LOGS3DTOT*Core CPI | | | | 0.435 |
| | | | | (0.555) |
| Controls | Yes | Yes | Yes | Yes |
| Firm FE | Yes | Yes | Yes | Yes |
| Industry*time FE | Yes | Yes | Yes | Yes |
| Observations | 227,310 | 227,178 | 227,310 | 105,983 |
| R-squared | 0.427 | 0.427 | 0.428 | 0.406 |

25

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon

109

Table 5: Carbon Emissions and Market-to-Book Ratio

The sample period is 2005.01-2022.12. The dependent variable is *MB*, the market-to-book ratio winsorized at 2.5%. The main independent variables are carbon emission levels and interaction terms with *Energy CPI*. The vector of controls includes those in Table 2. All variables are defined in Table 1 and Table 2. We report the results of the pooled regression with standard errors double clustered at the firm and year levels. All regressions include firm and Trucost industry*time fixed effects. ***1% significance; **5% significance; *10% significance.

| VARIABLES | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| | | Dependent Variable: MB | | |
| LOGS1TOT | -0.005 | | | |
| | (0.054) | | | |
| LOGS2TOT | | -0.054 | | |
| | | (0.046) | | |
| LOGS3UTOT | | | -0.290** | |
| | | | (0.142) | |
| LOGS3DTOT | | | | -0.025 |
| | | | | (0.023) |
| LOGS1TOT*Energy CPI | -0.107* | | | |
| | (0.062) | | | |
| LOGS2TOT*Energy CPI | | -0.126** | | |
| | | (0.055) | | |
| LOGS3UTOT*Energy CPI | | | -0.186** | |
| | | | (0.069) | |
| LOGS3DTOT*Energy CPI | | | | -0.082 |
| | | | | (0.066) |
| Controls | Yes | Yes | Yes | Yes |
| Firm FE | Yes | Yes | Yes | Yes |
| Industry*time FE | Yes | Yes | Yes | Yes |
| Observations | 131,706 | 131,599 | 131,706 | 58,597 |
| R-squared | 0.903 | 0.903 | 0.903 | 0.948 |

26

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon
110
**SER 248**

Table 6: Carbon Emissions and Stock Returns: Excluding Earnings Announcement Returns

The sample period is 2005.01-2022.12. The dependent variable is the difference between stock return and returns around earnings announcement days. The main independent variables are carbon emission levels and interaction terms with energy CPI. Panel A reports the monthly return excluding one-day earnings announcement return, Panel B reports the monthly return excluding three-day earnings announcement return. The vector of controls includes those in Table 2. All variables are defined in Table 1 and Table 2. We report the results of the pooled regression with standard errors double clustered at the firm and year levels. All regressions include firm and Trucost industry*time fixed effects. ***1% significance; **5% significance; *10% significance.

**Panel A: Excluding 1-Day Earnings Announcement Return**

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| VARIABLES | Dependent Variable: RET − ANNRET(1) | | | |
| LOGS1TOT | 0.309*** | | | |
|  | (0.107) | | | |
| LOGS2TOT | | 0.352*** | | |
|  | | (0.105) | | |
| LOGS3UTOT | | | 1.076*** | |
|  | | | (0.264) | |
| LOGS3DTOT | | | | 0.202** |
|  | | | | (0.079) |
| LOGS1TOT*Energy CPI | 0.447** | | | |
|  | (0.173) | | | |
| LOGS2TOT*Energy CPI | | 0.443** | | |
|  | | (0.175) | | |
| LOGS3UTOT*Energy CPI | | | 0.593** | |
|  | | | (0.222) | |
| LOGS3DTOT*Energy CPI | | | | 0.926*** |
|  | | | | (0.235) |
| Observations | 227,310 | 227,178 | 227,310 | 105,983 |
| R-squared | 0.430 | 0.430 | 0.431 | 0.407 |

**Panel B: Excluding 3-Day Earnings Announcement Return**

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| VARIABLES | Dependent Variable: RET − ANNRET(3) | | | |
| LOGS1TOT | 0.291*** | | | |
|  | (0.105) | | | |
| LOGS2TOT | | 0.342*** | | |
|  | | (0.104) | | |
| LOGS3UTOT | | | 1.041*** | |
|  | | | (0.267) | |
| LOGS3DTOT | | | | 0.212*** |
|  | | | | (0.077) |
| LOGS1TOT*Energy CPI | 0.442** | | | |
|  | (0.174) | | | |
| LOGS2TOT*Energy CPI | | 0.445** | | |
|  | | (0.176) | | |
| LOGS3UTOT*Energy CPI | | | 0.592** | |
|  | | | (0.223) | |
| LOGS3DTOT*Energy CPI | | | | 0.915*** |
|  | | | | (0.211) |
| Controls | Yes | Yes | Yes | Yes |
| Firm FE | Yes | Yes | Yes | Yes |
| Industry * Time FE | Yes | Yes | Yes | Yes |
| Observations | 227,310 | 227,178 | 227,310 | 105,983 |
| R-squared | 0.423 | 0.423 | 0.424 | 0.401 |

27

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon

111

Table 7: Carbon Emissions and Stock Returns: Oil Supply and Monetary Policy

The sample period is 2005.01-2022.12. The dependent variable is *RET*. The main independent variables are carbon emission levels and interaction terms with *Energy CPI*, *Oil Supply Shock* (Panel A), Fed fund interest rate (Panel B), monetary policy news shock (Panel C), and U.S. dollar exchange rate index (Panel D). The vector of controls includes those in Table 2. All variables are defined in Table 1 and Table 2. We report the results of the pooled regression with standard errors double clustered at the firm and year levels. All regressions include firm and Trucost industry*time fixed effects. ***1% significance; **5% significance; *10% significance.

| | | **Panel A: Oil supply news shock** | | |
| --- | --- | --- | --- | --- |
| | (1) | (2) | (3) | (4) |
| VARIABLES | | Dependent Variable: RET | | |
| LOGS1TOT | 0.337*** | | | |
| | (0.109) | | | |
| LOGS2TOT | | 0.362*** | | |
| | | (0.110) | | |
| LOGS3UTOT | | | 1.166*** | |
| | | | (0.273) | |
| LOGS3DTOT | | | | 0.217** |
| | | | | (0.081) |
| LOGS1TOT*Energy CPI | 0.469** | | | |
| | (0.179) | | | |
| LOGS2TOT*Energy CPI | | 0.476** | | |
| | | (0.180) | | |
| LOGS3UTOT*Energy CPI | | | 0.628*** | |
| | | | (0.231) | |
| LOGS3DTOT*Energy CPI | | | | 0.974*** |
| | | | | (0.248) |
| LOGS1TOT*Oil Supply Shock | -0.082 | | | |
| | (0.065) | | | |
| LOGS2TOT*Oil Supply Shock | | -0.085 | | |
| | | (0.067) | | |
| LOGS3UTOT*Oil Supply Shock | | | -0.088 | |
| | | | (0.088) | |
| LOGS3DTOT*Oil Supply Shock | | | | -0.102** |
| | | | | (0.039) |
| Controls | Yes | Yes | Yes | Yes |
| Firm FE | Yes | Yes | Yes | Yes |
| Industry*time FE | Yes | Yes | Yes | Yes |
| Observations | 227,310 | 227,178 | 227,310 | 105,983 |
| R-squared | 0.427 | 0.427 | 0.428 | 0.406 |

28

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon
112
**SER 250**

**Panel B: Interest rate**

| VARIABLES | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| | | Dependent Variable: RET | | |
| LOGS1TOT | 0.337*** | | | |
| | (0.110) | | | |
| LOGS2TOT | | 0.363*** | | |
| | | (0.110) | | |
| LOGS3UTOT | | | 1.157*** | |
| | | | (0.272) | |
| LOGS3DTOT | | | | 0.225** |
| | | | | (0.081) |
| LOGS1TOT*Energy CPI | 0.461** | | | |
| | (0.173) | | | |
| LOGS2TOT*Energy CPI | | 0.466** | | |
| | | (0.175) | | |
| LOGS3UTOT*Energy CPI | | | 0.618*** | |
| | | | (0.223) | |
| LOGS3DTOT*Energy CPI | | | | 0.945*** |
| | | | | (0.169) |
| LOGS1TOT*RF | 0.389 | | | |
| | (0.366) | | | |
| LOGS2TOT*RF | | 0.353 | | |
| | | (0.386) | | |
| LOGS3UTOT*RF | | | 0.448 | |
| | | | (0.462) | |
| LOGS3DTOT* RF | | | | -0.535* |
| | | | | (0.291) |
| Controls | Yes | Yes | Yes | Yes |
| Firm FE | Yes | Yes | Yes | Yes |
| Industry*time FE | Yes | Yes | Yes | Yes |
| Observations | 227,310 | 227,178 | 227,310 | 105,983 |
| R-squared | 0.427 | 0.427 | 0.428 | 0.406 |

29

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon
113
**SER 251**

| | | | | |
|---|---|---|---|---|
| **Panel C: Monetary policy news shock** | | | | |
| | (1) | (2) | (3) | (4) |
| VARIABLES | Dependent Variable: RET | | | |
| LOGS1TOT | 0.335*** | | | |
| | (0.110) | | | |
| LOGS2TOT | | 0.361*** | | |
| | | (0.110) | | |
| LOGS3UTOT | | | 1.164*** | |
| | | | (0.274) | |
| LOGS3DTOT | | | | 0.216** |
| | | | | (0.083) |
| LOGS1TOT*Energy CPI | 0.460** | | | |
| | (0.170) | | | |
| LOGS2TOT*Energy CPI | | 0.466** | | |
| | | (0.170) | | |
| LOGS3UTOT*Energy CPI | | | 0.619*** | |
| | | | (0.218) | |
| LOGS3DTOT*Energy CPI | | | | 0.920*** |
| | | | | (0.251) |
| LOGS1TOT*FF shock | 0.407 | | | |
| | (1.175) | | | |
| LOGS2TOT* FF shock | | 0.714 | | |
| | | (1.122) | | |
| LOGS3UTOT*FF shock | | | 1.039 | |
| | | | (1.425) | |
| LOGS3DTOT*FF shock | | | | 1.676 |
| | | | | (1.436) |
| Controls | Yes | Yes | Yes | Yes |
| Firm FE | Yes | Yes | Yes | Yes |
| Industry*time FE | Yes | Yes | Yes | Yes |
| Observations | 227,310 | 227,178 | 227,310 | 105,983 |
| R-squared | 0.427 | 0.427 | 0.428 | 0.406 |

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon

114

**SER 252**

| Panel D: U.S. dollar exchange rate | | | | |
|---|---|---|---|---|
| | (1) | (2) | (3) | (4) |
| VARIABLES | Dependent Variable: RET | | | |
| LOGS1TOT | 0.328*** | | | |
| | (0.106) | | | |
| LOGS2TOT | | 0.364*** | | |
| | | (0.107) | | |
| LOGS3UTOT | | | 1.156*** | |
| | | | (0.267) | |
| LOGS3DTOT | | | | 0.209** |
| | | | | (0.088) |
| LOGS1TOT*Energy CPI | 0.422** | | | |
| | (0.188) | | | |
| LOGS2TOT*Energy CPI | | 0.429** | | |
| | | (0.194) | | |
| LOGS3UTOT*Energy CPI | | | 0.555** | |
| | | | (0.250) | |
| LOGS3DTOT*Energy CPI | | | | 0.977*** |
| | | | | (0.250) |
| LOGS1TOT*Dollar index | 0.008 | | | |
| | (0.005) | | | |
| LOGS2TOT*Dollar index | | 0.008* | | |
| | | (0.004) | | |
| LOGS3UTOT*Dollar index | | | 0.012* | |
| | | | (0.006) | |
| LOGS3DTOT*Dollar index | | | | 0.020 |
| | | | | (0.011) |
| Controls | Yes | Yes | Yes | Yes |
| Firm FE | Yes | Yes | Yes | Yes |
| Industry*time FE | Yes | Yes | Yes | Yes |
| Observations | 227,310 | 227,178 | 227,310 | 105,983 |
| R-squared | 0.427 | 0.427 | 0.428 | 0.406 |

31

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon
115
**SER 253**

Table 8: Carbon Emissions and Stock Returns: the Paris Agreement and COVID

The sample period is 2005.01-2022.12. The dependent variable is RET. The main independent variables are carbon emission levels and interaction terms with energy CPI, and an indicator variable Paris (Panel A). In Panel B, we show the pre-COVID sample analysis. The vector of controls includes those in Table 2. All variables are defined in Table 1 and Table 2. We report the results of the pooled regression with standard errors double clustered at the firm and year levels. All regressions include firm and Trucost industry*time fixed effects. ***1% significance; **5% significance; *10% significance.

| | | **Panel A: Paris Agreement** | |
| --- | --- | --- | --- |
| | (1) | (2) | (3) |
| VARIABLES | | Dependent Variable: RET | |
| LOGS1TOT | 0.283** | | |
| | (0.132) | | |
| LOGS2TOT | | 0.299** | |
| | | (0.124) | |
| LOGS3UTOT | | | 1.081*** |
| | | | (0.323) |
| LOGS1TOT*Energy CPI | 0.198 | | |
| | (0.248) | | |
| LOGS2TOT*Energy CPI | | 0.213 | |
| | | (0.231) | |
| LOGS3UTOT*Energy CPI | | | 0.363 |
| | | | (0.360) |
| Paris*LOGS1TOT | 0.065 | | |
| | (0.085) | | |
| Paris*LOGS2TOT | | 0.093 | |
| | | (0.081) | |
| Paris*LOGS3UTOT | | | 0.102 |
| | | | (0.126) |
| Paris*LOGS1TOT*Energy CPI | 0.306 | | |
| | (0.324) | | |
| Paris*LOGS2TOT*Energy CPI | | 0.300 | |
| | | (0.317) | |
| Paris*LOGS3UTOT*Energy CPI | | | 0.292 |
| | | | (0.444) |
| Controls | Yes | Yes | Yes |
| Firm FE | Yes | Yes | Yes |
| Industry*time FE | Yes | Yes | Yes |
| Observations | 227,310 | 227,178 | 227,310 |
| R-squared | 0.427 | 0.427 | 0.428 |

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon
116
**SER 254**

**Panel B: Pre-COVID crisis**

| VARIABLES | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| | Dependent Variable: RET | | | |
| LOGS1TOT | 0.401*** | | | |
| | (0.129) | | | |
| LOGS2TOT | | 0.374*** | | |
| | | (0.117) | | |
| LOGS3UTOT | | | 1.309*** | |
| | | | (0.388) | |
| LOGS3DTOT | | | | 0.196** |
| | | | | (0.085) |
| LOGS1TOT*Energy CPI | 0.365* | | | |
| | (0.191) | | | |
| LOGS2TOT*Energy CPI | | 0.367** | | |
| | | (0.176) | | |
| LOGS3UTOT*Energy CPI | | | 0.597** | |
| | | | (0.275) | |
| LOGS3DTOT*Energy CPI | | | | 0.652** |
| | | | | (0.237) |
| LOGS1TOT*Core CPI | 0.244 | | | |
| | (0.298) | | | |
| LOGS2TOT*Core CPI | | 0.331 | | |
| | | (0.295) | | |
| LOGS3UTOT*Core CPI | | | 0.534 | |
| | | | (0.415) | |
| LOGS3DTOT*Core CPI | | | | -0.136 |
| | | | | (0.888) |
| Controls | Yes | Yes | Yes | Yes |
| Firm FE | Yes | Yes | Yes | Yes |
| Industry*time FE | Yes | Yes | Yes | Yes |
| Observations | 163,858 | 163,726 | 163,858 | 69,454 |
| R-squared | 0.474 | 0.474 | 0.474 | 0.455 |

33

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon

117

**SER 255**

Table 9: Carbon Emissions and Stock Returns: ESG Fund Flows

The sample period is 2005.01-2022.12. The dependent variable is *RET*. The main independent variables are carbon emission levels and interaction terms with *Energy CPI*, growth rate of *Tot flow growth* (Panel A) and *Stock flow growth* (Panel B), and also the net asset flow in dollar value, *Dollar flow*, (Panel C). The vector of controls includes those in Table 2. All variables are defined in Table 1 and Table 2. We report the results of the pooled regression with standard errors double clustered at the firm and year levels. All regressions include firm and Trucost industry*time fixed effects. ***1% significance; **5% significance; *10% significance.

| Panel A: Total ESG Fund Flow Growth Rate | | | | |
|---|---|---|---|---|
| | (1) | (2) | (3) | (4) |
| VARIABLES | | Dependent Variable: RET | | |
| LOGS1TOT | 0.334** | | | |
| | (0.120) | | | |
| LOGS2TOT | | 0.362*** | | |
| | | (0.106) | | |
| LOGS3UTOT | | | 1.163*** | |
| | | | (0.280) | |
| LOGS3DTOT | | | | 0.215** |
| | | | | (0.085) |
| LOGS1TOT*Energy CPI | 0.466** | | | |
| | (0.182) | | | |
| LOGS2TOT*Energy CPI | | 0.481** | | |
| | | (0.181) | | |
| LOGS3UTOT*Energy CPI | | | 0.630** | |
| | | | (0.231) | |
| LOGS3DTOT*Energy CPI | | | | 0.906*** |
| | | | | (0.287) |
| LOGS1TOT*Tot flow growth | 0.005 | | | |
| | (0.058) | | | |
| LOGS2TOT*Tot flow growth | | 0.013 | | |
| | | (0.056) | | |
| LOGS3UTOT*Tot flow growth | | | 0.009 | |
| | | | (0.064) | |
| LOGS3DTOT*Tot flow growth | | | | -0.031 |
| | | | | (0.036) |
| Controls | Yes | Yes | Yes | Yes |
| Firm FE | Yes | Yes | Yes | Yes |
| Industry*time FE | Yes | Yes | Yes | Yes |
| Observations | 227,310 | 227,178 | 227,310 | 105,983 |
| R-squared | 0.427 | 0.427 | 0.428 | 0.406 |

34

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon
118

**Panel B: Stock ESG Fund Flow Growth Rate**

| VARIABLES | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| | | Dependent Variable: RET | | |
| LOGS1TOT | 0.333*** | | | |
| | (0.116) | | | |
| LOGS2TOT | | 0.363*** | | |
| | | (0.106) | | |
| LOGS3UTOT | | | 1.163*** | |
| | | | (0.276) | |
| LOGS3DTOT | | | | 0.216** |
| | | | | (0.083) |
| LOGS1TOT*Energy CPI | 0.472** | | | |
| | (0.178) | | | |
| LOGS2TOT*Energy CPI | | 0.484** | | |
| | | (0.180) | | |
| LOGS3UTOT*Energy CPI | | | 0.634** | |
| | | | (0.230) | |
| LOGS3DTOT*Energy CPI | | | | 0.916*** |
| | | | | (0.279) |
| LOGS1TOT*Stock flow growth | 0.014 | | | |
| | (0.055) | | | |
| LOGS2TOT*Stock flow growth | | 0.020 | | |
| | | (0.054) | | |
| LOGS3UTOT*Stock flow growth | | | 0.017 | |
| | | | (0.065) | |
| LOGS3DTOT*Stock flow growth | | | | -0.020 |
| | | | | (0.035) |
| Controls | Yes | Yes | Yes | Yes |
| Firm FE | Yes | Yes | Yes | Yes |
| Industry*time FE | Yes | Yes | Yes | Yes |
| Observations | 227,310 | 227,178 | 227,310 | 105,983 |
| R-squared | 0.427 | 0.427 | 0.428 | 0.406 |

35

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon

119

**Panel C: Stock ESG Fund Flow Dollar Value**

| VARIABLES | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| | Dependent Variable: RET | | | |
| LOGS1TOT | 0.329*** | | | |
| | (0.119) | | | |
| LOGS2TOT | | 0.363*** | | |
| | | (0.105) | | |
| LOGS3UTOT | | | 1.159*** | |
| | | | (0.278) | |
| LOGS3DTOT | | | | 0.216** |
| | | | | (0.082) |
| LOGS1TOT*Energy CPI | 0.481** | | | |
| | (0.171) | | | |
| LOGS2TOT*Energy CPI | | 0.492** | | |
| | | (0.174) | | |
| LOGS3UTOT*Energy CPI | | | 0.645*** | |
| | | | (0.222) | |
| LOGS3DTOT*Energy CPI | | | | 0.941*** |
| | | | | (0.251) |
| LOGS1TOT*Dollar flow | 0.027 | | | |
| | (0.054) | | | |
| LOGS2TOT*Dollar flow | | 0.033 | | |
| | | (0.054) | | |
| LOGS3UTOT*Dollar flow | | | 0.032 | |
| | | | (0.061) | |
| LOGS3DTOT*Dollar flow | | | | -0.009 |
| | | | | (0.028) |
| Controls | Yes | Yes | Yes | Yes |
| Firm FE | Yes | Yes | Yes | Yes |
| Industry*time FE | Yes | Yes | Yes | Yes |
| Observations | 227,310 | 227,178 | 227,310 | 105,983 |
| R-squared | 0.427 | 0.427 | 0.428 | 0.406 |

36

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon
120
**SER 258**

Table 10: Carbon Emissions and Firm Fundamentals

The sample period is 2005.01-2022.12. The dependent variables are *Energy Expected Beta*, *ROE*, *LOGSALES*, *DEBT*, and *CAPEX*. The main independent variables are carbon emission levels and interaction terms with *Energy CPI*. The vector of controls includes those in Table 2. All variables are defined in Table 1 and Table 2. We report the results of the pooled regression with standard errors double clustered at the firm and year levels. All regressions include firm and Trucost industry*time fixed effects. ***1% significance; **5% significance; *10% significance.

**Panel A: Energy Beta**

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| VARIABLES | Dependent Variable: Energy Expected Beta | | | |
| LOGS1TOT | 0.037** | | | |
|  | (0.018) | | | |
| LOGS2TOT | | 0.042** | | |
|  | | (0.019) | | |
| LOGS3UTOT | | | 0.067** | |
|  | | | (0.031) | |
| LOGS3DTOT | | | | 0.020 |
|  | | | | (0.014) |
| Controls | Yes | Yes | Yes | Yes |
| Industry*time FE | Yes | Yes | Yes | Yes |
| Observations | 216,095 | 216,210 | 216,342 | 100,903 |
| R-squared | 0.208 | 0.209 | 0.209 | 0.190 |

**Panel B: ROE**

|  | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|
|  | ROE(t+3) | ROE(t+12) | ROE(t+3) | ROE(t+12) | ROE(t+3) | ROE(t+12) | ROE(t+3) | ROE(t+12) |
| VARIABLES | | | | | | | | |
| LOGS1TOT | -0.049 | 0.664** | | | | | | |
|  | (0.093) | (0.234) | | | | | | |
| LOGS2TOT | | | 0.032 | 0.738*** | | | | |
|  | | | (0.090) | (0.200) | | | | |
| LOGS3UTOT | | | | | 0.182 | 4.178*** | | |
|  | | | | | (0.292) | (0.626) | | |
| LOGS3DTOT | | | | | | | -0.041 | 0.353 |
|  | | | | | | | (0.102) | (0.220) |
| LOGS1TOT*Energy CPI | 0.069 | 0.523** | | | | | | |
|  | (0.070) | (0.224) | | | | | | |
| LOGS2TOT*Energy CPI | | | 0.145** | 0.651*** | | | | |
|  | | | (0.073) | (0.181) | | | | |
| LOGS3UTOT*Energy CPI | | | | | 0.137 | 0.875*** | | |
|  | | | | | (0.081) | (0.237) | | |
| LOGS3DTOT*Energy CPI | | | | | | | -0.071 | 0.194 |
|  | | | | | | | (0.105) | (0.197) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry*time FE | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 212,885 | 189,149 | 212,753 | 189,017 | 212,885 | 189,149 | 100,689 | 99,150 |
| R-squared | 0.896 | 0.784 | 0.896 | 0.784 | 0.896 | 0.786 | 0.912 | 0.812 |

37

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon

121

## Panel C: Log Sales

| VARIABLES | SALES(t+3) | SALES(t+12) | SALES(t+3) | SALES(t+12) | SALES(t+3) | SALES(t+12) | SALES(t+3) | SALES(t+12) |
|---|---|---|---|---|---|---|---|---|
| LOGS1TOT | 0.220*** | 0.083*** | | | | | | |
| | (0.024) | (0.021) | | | | | | |
| LOGS2TOT | | | 0.247*** | 0.093*** | | | | |
| | | | (0.035) | (0.023) | | | | |
| LOGS3UTOT | | | | | 0.765*** | 0.331*** | | |
| | | | | | (0.020) | (0.084) | | |
| LOGS3DTOT | | | | | | | 0.081*** | 0.017* |
| | | | | | | | (0.014) | (0.010) |
| LOGS1TOT*Energy CPI | -0.016* | -0.004 | | | | | | |
| | (0.008) | (0.013) | | | | | | |
| LOGS2TOT*Energy CPI | | | -0.012 | -0.006 | | | | |
| | | | (0.008) | (0.012) | | | | |
| LOGS3UTOT*Energy CPI | | | | | -0.002 | 0.004 | | |
| | | | | | (0.004) | (0.013) | | |
| LOGS3DTOT*Energy CPI | | | | | | | 0.007 | 0.001 |
| | | | | | | | (0.005) | (0.010) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry*time FE | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 221,549 | 196,446 | 221,417 | 196,314 | 221,549 | 196,446 | 105,577 | 103,853 |
| R-squared | 0.986 | 0.985 | 0.986 | 0.985 | 0.994 | 0.987 | 0.983 | 0.986 |

## Panel D: Log Debt

| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|
| VARIABLES | Debt(t+3) | Debt(t+12) | Debt(t+3) | Debt(t+12) | Debt(t+3) | Debt(t+12) | Debt(t+3) | Debt(t+12) |
| LOGS1TOT | 2.318*** | 5.864*** | | | | | | |
| | (0.345) | (1.170) | | | | | | |
| LOGS2TOT | | | 3.018*** | 7.006*** | | | | |
| | | | (0.453) | (1.125) | | | | |
| LOGS3UTOT | | | | | 10.781*** | 29.241*** | | |
| | | | | | (1.280) | (3.397) | | |
| LOGS3DTOT | | | | | | | 0.557 | 1.538** |
| | | | | | | | (0.317) | (0.542) |
| LOGS1TOT*Energy CPI | -0.746*** | -1.071 | | | | | | |
| | (0.227) | (1.592) | | | | | | |
| LOGS2TOT*Energy CPI | | | -0.645*** | -1.972 | | | | |
| | | | (0.203) | (1.464) | | | | |
| LOGS3UTOT*Energy CPI | | | | | -0.569** | -1.915 | | |
| | | | | | (0.286) | (1.780) | | |
| LOGS3DTOT*Energy CPI | | | | | | | -0.594 | -1.600 |
| | | | | | | | (0.891) | (1.647) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry*time FE | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 200,716 | 175,137 | 200,584 | 175,005 | 200,716 | 175,137 | 93,825 | 91,655 |
| R-squared | 0.981 | 0.950 | 0.981 | 0.950 | 0.982 | 0.951 | 0.982 | 0.957 |

38

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon
122
SER 260

**Panel E: CAPEX**

| VARIABLES | Capex(t+3) | Capex(t+12) | Capex(t+3) | Capex(t+12) | Capex(t+3) | Capex(t+12) | Capex(t+3) | Capex(t+12) |
|---|---|---|---|---|---|---|---|---|
| LOGS1TOT | 0.017*** | 0.051*** | | | | | | |
| | (0.003) | (0.007) | | | | | | |
| LOGS2TOT | | | 0.024*** | 0.069*** | | | | |
| | | | (0.004) | (0.011) | | | | |
| LOGS3UTOT | | | | | 0.064*** | 0.201*** | | |
| | | | | | (0.010) | (0.026) | | |
| LOGS3DTOT | | | | | | | 0.007*** | 0.014*** |
| | | | | | | | (0.002) | (0.005) |
| LOGS1TOT*Energy CPI | -0.006** | -0.008 | | | | | | |
| | (0.003) | (0.007) | | | | | | |
| LOGS2TOT*Energy CPI | | | -0.005 | -0.005 | | | | |
| | | | (0.003) | (0.006) | | | | |
| LOGS3UTOT*Energy CPI | | | | | -0.003 | -0.004 | | |
| | | | | | (0.004) | (0.009) | | |
| LOGS3DTOT*Energy CPI | | | | | | | 0.003 | 0.007 |
| | | | | | | | (0.006) | (0.009) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry*time FE | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 217,567 | 192,538 | 217,435 | 192,406 | 217,567 | 192,538 | 103,570 | 101,676 |
| R-squared | 0.986 | 0.970 | 0.986 | 0.970 | 0.987 | 0.970 | 0.985 | 0.965 |

39

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon

123

# Appendix Tables

### Table A1: Carbon Emissions and Stock Returns: Energy Inflation

The sample period is 2005.01-2022.12. The dependent variable is *RET*. The main independent variables are carbon emission levels and interaction terms with Energy CPI and energy price inflation. The vector of controls includes those in Table 2. All variables are defined in Table 1 and Table 2. We report the results of the pooled regression with standard errors double clustered at the firm and year levels. All regressions include firm and Trucost industry*time fixed effects. ***1% significance; **5% significance; *10% significance.

| VARIABLES | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| | Dependent Variable: RET | | | |
| LOGS1TOT | 0.332*** | | | |
| | (0.111) | | | |
| LOGS2TOT | | 0.362*** | | |
| | | (0.112) | | |
| LOGS3UTOT | | | 1.154*** | |
| | | | (0.274) | |
| LOGS3DTOT | | | | 0.213** |
| | | | | (0.084) |
| LOGS1TOT*Energy_Inflation | 0.377 | | | |
| | (0.322) | | | |
| LOGS2TOT*Energy_Inflation | | 0.360 | | |
| | | (0.351) | | |
| LOGS3UTOT*Energy_Inflation | | | 0.430 | |
| | | | (0.433) | |
| LOGS3DTOT*Energy_Inflation | | | | -0.456 |
| | | | | (0.533) |
| LOGS1TOT*Energy CPI | 0.347** | | | |
| | (0.146) | | | |
| LOGS2TOT*Energy CPI | | 0.358** | | |
| | | (0.140) | | |
| LOGS3UTOT*Energy CPI | | | 0.491*** | |
| | | | (0.164) | |
| LOGS3DTOT*Energy CPI | | | | 1.180** |
| | | | | (0.509) |
| Controls | Yes | Yes | Yes | Yes |
| Firm FE | Yes | Yes | Yes | Yes |
| Industry*time FE | Yes | Yes | Yes | Yes |
| Observations | 227,310 | 227,178 | 227,310 | 105,983 |
| R-squared | 0.427 | 0.427 | 0.428 | 0.406 |

40

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon
124
**SER 262**

Table A2: Carbon Emissions and Stock Returns: Energy Inflation Shock

The sample period is 2005.01-2022.12. The dependent variable is *RET*. The main independent variables are carbon emission levels and interaction terms with energy CPI and energy inflation shock. The vector of controls includes those in Table 2. All variables are defined in Table 1 and Table 2. We report the results of the pooled regression with standard errors double clustered at the firm and year levels. All regressions include firm and Trucost industry*time fixed effects. ***1% significance; **5% significance; *10% significance.

| VARIABLES | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
|  | Dependent Variable: RET | | | |
| LOGS1TOT | 0.334*** |  |  |  |
|  | (0.110) |  |  |  |
| LOGS2TOT |  | 0.361*** |  |  |
|  |  | (0.110) |  |  |
| LOGS3UTOT |  |  | 1.162*** |  |
|  |  |  | (0.275) |  |
| LOGS3DTOT |  |  |  | 0.217** |
|  |  |  |  | (0.082) |
| LOGS1TOT*Energy inflation shock | 1.014 |  |  |  |
|  | (0.772) |  |  |  |
| LOGS2TOT* Energy inflation shock |  | 0.823 |  |  |
|  |  | (0.835) |  |  |
| LOGS3UTOT* Energy inflation shock |  |  | 1.256 |  |
|  |  |  | (1.158) |  |
| LOGS3DTOT* Energy inflation shock |  |  |  | 1.129 |
|  |  |  |  | (1.075) |
| LOGS1TOT*Energy CPI | 0.453** |  |  |  |
|  | (0.167) |  |  |  |
| LOGS2TOT*Energy CPI |  | 0.460*** |  |  |
|  |  | (0.169) |  |  |
| LOGS3UTOT*Energy CPI |  |  | 0.609*** |  |
|  |  |  | (0.218) |  |
| LOGS3DTOT*Energy CPI |  |  |  | 0.899*** |
|  |  |  |  | (0.244) |
| Controls | Yes | Yes | Yes | Yes |
| Firm FE | Yes | Yes | Yes | Yes |
| Industry*time FE | Yes | Yes | Yes | Yes |
| Observations | 227,310 | 227,178 | 227,310 | 105,983 |
| R-squared | 0.427 | 0.427 | 0.428 | 0.406 |

41

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon
125
**SER 263**

Table A3: Carbon Emissions and Stock Returns: Legacy Sample

The sample period is 2005.01-2022.12. The (legacy) sample includes all companies with information on emissions in any period before 2016. The dependent variable is *RET*. The main independent variables are carbon emission levels and interaction terms with CPI energy. The vector of controls includes those in Table 2. All variables are defined in Table 1 and Table 2. We report the results of the pooled regression with standard errors double clustered at the firm and year levels. All regressions include firm and Trucost industry*time fixed effects. ***1% significance; **5% significance; *10% significance.

| VARIABLES | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| | | Dependent Variable: RET | | |
| LOGS1TOT | 0.165* | | | |
| | (0.097) | | | |
| LOGS2TOT | | 0.136* | | |
| | | (0.073) | | |
| LOGS3UTOT | | | 0.798* | |
| | | | (0.438) | |
| LOGS3DTOT | | | | 0.201** |
| | | | | (0.083) |
| LOGS1TOT*Energy CPI | 0.229** | | | |
| | (0.095) | | | |
| LOGS2TOT*Energy CPI | | 0.242** | | |
| | | (0.099) | | |
| LOGS3UTOT*Energy CPI | | | 0.458*** | |
| | | | (0.147) | |
| LOGS3DTOT*Energy CPI | | | | 0.418** |
| | | | | (0.157) |
| Controls | Yes | Yes | Yes | Yes |
| Firm FE | Yes | Yes | Yes | Yes |
| Industry*time FE | Yes | Yes | Yes | Yes |
| Observations | 134,263 | 134,131 | 134,263 | 36,978 |
| R-squared | 0.546 | 0.546 | 0.546 | 0.559 |

42

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon
126
**SER 264**

Table A4: Carbon Emissions and Stock Returns: Unadjusted CPI Energy

The sample period is 2005.01-2022.12. The dependent variable is *RET*. The main independent variables are carbon emission levels and interaction terms with unadjusted CPI energy. The vector of controls includes those in Table 2. All variables are defined in Table 1 and Table 2. We report the results of the pooled regression with standard errors double clustered at the firm and year levels. All regressions include firm and Trucost industry*time fixed effects. ***1% significance; **5% significance; *10% significance.

| | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| VARIABLES | Dependent Variable: RET | | | |
| LOGS1TOT | 0.336*** | | | |
| | (0.108) | | | |
| LOGS2TOT | | 0.361*** | | |
| | | (0.109) | | |
| LOGS3UTOT | | | 1.162*** | |
| | | | (0.275) | |
| LOGS3DTOT | | | | 0.217** |
| | | | | (0.086) |
| LOGS1TOT*Unadj_CPI_energy | 0.423** | | | |
| | (0.171) | | | |
| LOGS2TOT*Unadj_CPI_energy | | 0.431** | | |
| | | (0.171) | | |
| LOGS3UTOT*Unadj_CPI_energy | | | 0.565** | |
| | | | (0.220) | |
| LOGS3DTOT*Unadj_CPI_energy | | | | 0.976*** |
| | | | | (0.121) |
| Controls | Yes | Yes | Yes | Yes |
| Firm FE | Yes | Yes | Yes | Yes |
| Industry*time FE | Yes | Yes | Yes | Yes |
| Observations | 227,310 | 227,178 | 227,310 | 105,983 |
| R-squared | 0.427 | 0.427 | 0.428 | 0.406 |

43

Electronic copy available at: https://ssrn.com/abstract=4847591

Exhibit 4 to Decl. of Thomas Lyon

127

# Exhibit 19
# to Declaration of Angel Hsu

# Grewal, J., Richardson, G.D., & Wang, J., Effects of mandatory carbon reporting on unrepresentative environmental disclosures (2022)

Exhibit 19 to Decl. of Angel Hsu
602
SER 266

# Effects of Mandatory Carbon Reporting on Greenwashing

Jody Grewal

*University of Toronto – Rotman School of Management & Department of Management at UTM*
jody.grewal@rotman.utoronto.ca

Gordon Richardson

*University of Toronto – Rotman School of Management*
gordon.richardson@rotman.utoronto.ca

Jingjing Wang

*University of Calgary – Haskayne School of Business*
jingjing.wang@ucalgary.ca

November 2024

## Abstract

We study the effects of mandated ESG reporting on greenwashing. Our setting is a regulation in the United Kingdom requiring firms to report carbon emissions, or Mandatory Carbon Reporting (MCR). Measuring greenwashing as the discrepancy between companies' external carbon-related discussions and their underlying carbon performance, we find MCR leads to a decline in three types of greenwashing: excessive length, over-optimism, and vague commitments, relative to performance. MCR also curtails greenwashing of other, non-carbon disclosures, suggesting a positive spillover from MCR to firms' broader environmental reporting. Companies that reduce misleading carbon talk also decrease their carbon footprint, consistent with a substitution between greenwashing and real efforts to mitigate climate change. Our results inform recent regulatory proposals to mandate climate-related reporting.

**Keywords:** *Mandatory carbon reporting, Greenhouse gas emissions, climate change, greenwashing*

The authors gratefully acknowledge support from the Canadian Academic Accounting Association Research Grant Program, Chartered Professional Accountants (CPA) of Ontario Rotman Data Grant, CPA Canada, Rotman CPA Ontario Centre for Accounting Innovation Research Grant, and Rotman's Lee-Chin Institute. We thank Sona Agrawal (discussant), Elizabeth Demers (discussant), Paul Griffin, Darren Henderson, Mingyi Hung (discussant), Sarah McVay (discussant), Guoman She (discussant), Tatyana Sokolyk (discussant), Lisa Yao Liu (discussant), and seminar participants at the FARS Midyear Meeting, Haskayne and Fox Accounting Conference, Hawaii Accounting Research Conference, Journal of Accounting, Auditing and Finance Symposium, Sustainability, ESG, & Value Creation Conference, Laurier University, LMU Munich, Mannheim Institute for Sustainable Energy Studies, Northern Finance Association Conference, University of Calgary, University of Chicago, University of Illinois at Chicago, University of Toronto, Stanford Carbon Disclosure Conference, World Energy Business School Conference, and International Sustainability Standards Board's IFRS Sustainability Disclosure Standards workshop for helpful comments. For helpful conversations regarding Trucost data, we thank Jamie Salo, Head of Environmental Research and ESG Modeling at S&P Global Trucost.

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
603
**SER 267**

**1. Introduction**

This study examines the effects of mandated environmental, social and governance ("ESG") reporting on greenwashing. Nearly 90% of listed companies worldwide published a corporate social responsibility (CSR) or sustainability report in 2021, up from fewer than 100 companies in 1999 (Bloomberg 2022). Despite this dramatic increase, there are widespread concerns that the absence of ESG reporting requirements – particularly those that require standardized, timely, and comparable ESG metrics – permits companies to "greenwash" or provide information that "misleads people into adopting overly positive beliefs" about a firm's ESG performance (Lyon and Montgomery 2015, p.225). In light of these concerns, regulators in a number of jurisdictions have proposed mandated reporting; the idea is that firms have less ability to hide behind misrepresentations when users have underlying performance data at hand. Notably, the Securities and Exchange Commission (SEC) in the United States, along with regulators in Australia, Canada, Hong Kong, and Singapore, have proposed ESG disclosure requirements aimed at protecting investors from greenwashing (SEC 2024; Mishra 2022; Jones 2022).[1] However, to our knowledge, no study has examined the impact of mandated reporting on greenwashing. We aim to fill this gap.

In 2012 the United Kingdom (UK) adopted an act requiring listed UK-incorporated companies to disclose greenhouse gas emissions (GHG) in annual financial reports (hereafter, mandatory carbon reporting or MCR). The UK regulator's stated objective for MCR was to increase transparency on GHG. It can also be inferred from the announcement by the Deputy Prime Minister of the UK that MCR was regarded as a policy tool to mitigate greenwashing, as "…hiding your greenhouse gas emissions is a false economy" (DEFRA 2012a). We use this setting to study the effects of mandated ESG reporting on greenwashing.

---

[1] According to the SEC's proposed final rules on climate-related disclosure: "…mandatory disclosure of [carbon] emissions…may deter potential greenwashing that could occur with voluntary disclosures" (SEC 2024, p. 681).

1

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu

604

**SER 268**

UK firms affected by MCR consist of those that voluntarily disclose their GHG prior to MCR and those that do not. For the latter, we expect MCR to elicit a decrease in greenwashing: the revelation of GHG data via mandated reporting will make greenwashing attempts obvious and potentially damaging to firm reputation. This is consistent with the "confirmation hypothesis" where mandated reporting disciplines managers into truthful voluntary disclosure (e.g. Ball, Jayaraman, and Shivakumar 2012). For the former, MCR will improve the usability and reliability of firm-reported GHG data via a more credible and disseminated disclosure channel, as well as timely and standardized reporting (e.g. Downar, Ernstberger, Reichelstein, Schwenen, and Zaklan 2021). Accordingly, we expect greenwashing to become more apparent as users' reliance on GHG data increases, which will in turn reduce this behavior.

We also expect MCR to affect other, non-carbon environmental disclosures. Once MCR increases GHG transparency, firms may attempt to greenwash on other environmental factors that are unregulated and easier to obscure, in order to confuse outsiders about the overall "green-ness" of the firm. This would result in an increase in non-carbon greenwashing. On the other hand, after MCR, outsiders may become more attentive to firms' broader environmental reporting. Firms' environmental reporting will thus face more scrutiny and the disciplining effect of MCR will spill-over to non-carbon reporting, leading to less non-carbon greenwashing as well.

For our measures of greenwashing, we perform textual analysis of CSR reports and use FinBERT, a state-of-the-art large language model, to determine the length, tone and forward-looking vagueness of carbon and non-carbon (e.g. pollution and waste) disclosures.[2] We then compute the difference between the i) length, ii) optimistic tone, and iii) vagueness of a firm's

---

[2] FinBERT is a "BERT" model (Bidirectional Encoder Representations from Transformers) trained on financial communication text. It uses machine-learning natural language processing to analyze and classify sentences according to the coexistence of words around them.

2

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
605
SER 269

disclosure and its underlying performance. Our assumption is that, in expectation, firms discuss carbon and non-carbon information commensurate with underlying performance, and any excess or abnormal disclosure relative to performance suggests misrepresentations of performance. Similar measures have been used in prior research (e.g. Baker, Larcker, McClure, Saraph and Watts 2024; Yu, Luu and Chen 2020). The intuition is that a larger gap between disclosure and performance indicates greenwashing because firms do not "walk the talk".

To ascertain whether our measures reflect greenwashing, we conduct two sets of validation tests. In the first set, we show that our measures are related to poor environmental outcomes, both contemporaneously and in the future (i.e. one-year ahead). Specifically, firms with higher carbon (non-carbon) greenwashing have more carbon- (non-carbon-) intensive operations, both concurrently and in the future. In addition, the firm's overall level of greenwashing (i.e. average of carbon and non-carbon greenwashing) is positively associated with current and future environmental fines and ESG reputational risks. In the second set of tests, we consider the possibility that our measures signal longer-term commitments to cutting carbon. Instead, however, we find that our measures are related to setting *easier* carbon reduction targets and a *lower propensity* to set carbon reduction targets that are approved by the Science-Based Targets Initiative, an organization that helps firms set rigorous targets that are aligned with climate change science.

Having validated our measures, we turn to our primary research question – whether mandatory reporting curtails greenwashing. To examine this, we compare changes in carbon and non-carbon greenwashing for treatment (UK) firms from before to after MCR to those of control (EU and US) firms unaffected by MCR. We account for flexible time and static firm-level differences through the inclusion of year and firm fixed effects and time-varying controls. We

3

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu

606

**SER 270**

validate the parallel trends assumption and use entropy-balancing to minimize differences in observable firm characteristics across treatment and control firms (Hainmueller 2012).

We find that UK firms reduced carbon greenwashing after MCR took effect. Our estimates for the full sample show that carbon greenwashing fell by 37-62% for UK firms, on average, while estimates for the entropy-balanced specification are similar and range from 32% to 57%. This suggests that when firms are required to report standardized, timely, and comparable GHG data, managers are disciplined into greenwashing less on their carbon-related performance.

We then examine the effect of MCR on the greenwashing of other, non-carbon environmental information disclosed voluntarily before and after MCR (i.e. the non-carbon environmental indicators included in our non-carbon greenwashing measures are not mandated by MCR or another reporting requirement). Consistent with a positive spillover from MCR to broader environmental reporting, we find that UK firms decreased non-carbon greenwashing by 53-62% in the full sample and 62-76% in the entropy-balanced sample, on average.

Last, we document that UK firms that reduce misleading carbon talk also decrease their GHG and GHG intensity by, on average, 16.5% and 12.5%, respectively. This is consistent with firms' reduced ability to use greenwashing to tout their sustainability, in place of real efforts to cut carbon, once MCR is in effect. However, we cannot isolate these real effects from those of broader stakeholder pressures following increased transparency (e.g. Downar et al. 2021; Rauter 2020). As such, our finding should be interpreted with this caveat in mind.

Our results are robust to excluding firms without third-party verified GHG and CSR report assurance, as well as to excluding firms implicated by concurrent GHG regulations (e.g. cap-and-trade, carbon taxation, carbon reporting). Our findings also hold when using an alternate measure

4

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
607
SER 271

of greenwashing from Trucost Plc – selective disclosure – which reflects the disclosure of benign environmental impacts rather than those that are more damaging.

Our study contributes to the growing stream of research on ESG misrepresentations. Recent work in this area finds evidence of greenwashing among firms (e.g. Baker et al. 2024; Huang and Lu 2022) and mutual funds (e.g. Kim and Yoon 2022), while other research suggests genuine motives among institutional investors that publicly request corporate climate change information (Cohen, Kadach, and Ormazabal 2023). Most studies focus on documenting the presence and extent of greenwashing but do not study how this behavior can be curbed. We fill this gap and are the first (to our knowledge) to empirically document the diminishing effects of mandated reporting on greenwashing. This is an idea that has been conjectured by both academics and practitioners (e.g. Christensen, Hail, and Leuz 2021; Lee 2022) but not yet demonstrated using real-world data.

Our study also contributes to research on the spillovers of mandatory reporting to voluntary reporting. Central to this work is the theoretically-modeled confirmation hypothesis: managers are disciplined into making truthful voluntary disclosure when actual outcomes are mandatorily reported (e.g. Gigler and Hemmer 1998; Lundholm 2003). Ball et al. (2012) provide supportive empirical evidence in the context of voluntary management earnings forecasts, but question whether their results generalize to other types of voluntary disclosure. We extend this line of work by evaluating mandatory-to-voluntary spillovers in the context of nonfinancial disclosures, specifically ESG disclosures. We show that mandatory carbon emissions reporting improves the quality of voluntary carbon- and non-carbon- discussions via a decline in greenwashing.

Last, we contribute to research on the so-called "real effects" of mandated ESG reporting (see Christensen et al. 2021 for a review). These studies show that mandated reporting attracts stakeholder pressure to improve ESG and enhances benchmarking which leads to better ESG

5

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
608
SER 272

outcomes (e.g. Tomar 2023). Our evidence suggests that ESG improvements following mandated reporting also come from a substitution between greenwashing and real actions. Whereas before MCR firms used greenwashing to promote themselves as sustainable rather than making real efforts to reduce their carbon emissions, they can no longer hide behind greenwashing once full transparency is in effect.

Our findings are timely in light of the recent regulatory trend to mandate transparency on climate change issues. In response to investor demands for consistent and reliable climate-risk information, securities regulators around the world have proposed mandatory reporting of carbon emissions for public companies. However, as is the case in the US, such proposals often face legal challenges and push-back from anti-ESG groups. Policymakers could benefit from understanding the impacts of mandated reporting on greenwashing, as one potential factor in their decision-making. Our study shows that regulated transparency, in particular the provision of standardized GHG data, reduces greenwashing for carbon and broader environmental information, which has the potential to benefit stakeholders and investors that make decisions on the basis of ESG.

## 2. Institutional setting

Mandatory Carbon Reporting (MCR) was first proposed in the UK Climate Change Act of 2008 (the Act). As part of the Act, UK Parliament imposed a deadline of April 2012 on the UK government to pass regulation mandating the reporting of corporate GHG or explain why it had not done so. On June 12, 2012, Deputy Prime Minister Nick Clegg announced that UK-incorporated companies listed on a major stock exchange (i.e. the Main Market of the London Stock Exchange, the New York Stock Exchange, Nasdaq, or an exchange in a European Economic Area state) would be required to report GHG each year starting for fiscal years ending on or after September 30, 2013 in the Directors' Report (the equivalent of SEC Form 10-K). MCR mandates

6

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
609
**SER 273**

covered firms to report direct (scope 1) and indirect (scope 2) GHG in metric tons of carbon dioxide equivalent along with a ratio expressing total GHG in relation to an activity metric such as revenue or assets. Direct GHG result from the combustion of fuels (in stationary buildings and equipment, in transportation vehicles, and in industrial processes). Indirect GHG result from purchased electricity, heat, steam, or cooling.

MCR's requirements were formulated using the GHG Protocol Corporate Accounting and Reporting Standard ("GHG Protocol"), an internationally recognized framework for GHG reporting (DEFRA 2012c).[3] After MCR was announced, the UK government issued guidance specifying acceptable methodologies to measure GHG (e.g. Standard 14064-1 of the International Organization for Standardization), the reporting boundary (global GHG for the entire organization), the covered period (12 months corresponding to the firm's fiscal year), the disclosure channel (annual Directors' Reports) and external verification (recommended but not required).[4]

Two attributes in particular make MCR in the UK a desirable setting for our study. First, all listed UK firms are covered by MCR whereas other environmental regulations tend to cover specific industries (e.g. the European Union Emissions Trading Scheme; see Downar et al. 2021) or installations/facilities (e.g. the GHG reporting program in the United States; see Tomar 2023). Thus, our results are generalizable beyond particular industries and subsets of firms that have typically been the focus of prior research on mandated environmental reporting. Second, unlike ESG disclosure mandates that are vague about the information to be reported (e.g. the EU Directive on non-financial reporting; see Fiechter, Hitz, and Lehmann 2022 and Grewal, Riedl, and Serafeim

---

[3] GHG Protocol is the most widely adopted greenhouse gas accounting standard. It is used by the California Climate Action Registry, the World Economic Forum Global Greenhouse Gas Registry, and national programs such as the US Environmental Protection Agency Greenhouse Gas Reporting Program and the Tokyo Emissions Scheme. It can be accessed here: https://ghgprotocol.org/sites/default/files/standards/ghg-protocol-revised.pdf.
[4] See: Environmental Reporting Guidelines: Mandatory Greenhouse Gas Emissions Reporting from www.gov.uk/defra.

7

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu

610

**SER 274**

2019), MCR is prescriptive about what, how and where GHG data are to be disclosed. This allows us to study whether a mandate requiring standardized ESG reporting mitigates greenwashing.

## 3. Literature review

An extensive prior literature examines the motivations behind managerial disclosure decisions. Some studies find that non-GAAP earnings and qualitative information in 10-K filings are informative about core earnings and operations (e.g. Li, Lundholm, and Minnis 2013), while other studies suggest that tone and non-GAAP earnings obfuscate financial performance (e.g. Huang, Teoh, and Zhang 2014). With the rise of corporate ESG practices and reporting (see the review papers by Christensen et al. 2021 and Grewal and Serafeim 2020), accounting researchers have started to examine the credibility of ESG reporting (e.g. Matsumura, Prakash, and Vera-Muñoz 2022) and ESG reporting that misrepresents underlying performance (commonly referred to as greenwashing). This work suggests that firms with poor ESG performance provide more voluntary ESG disclosure (e.g. Huang and Lu 2022), managers use certain linguistic properties in conference calls to conceal true ESG performance (Hail, Kim, and Zhang 2021), and the manner in which ESG information is presented can influence user perceptions of ESG (Cho, Pillips, Hageman, and Patten 2009). Studies also find that firms do not "walk the talk" when it comes to employee diversity, equity and inclusion (DEI) efforts (Baker et al. 2024) or stakeholder-centric practices (Raghunandan and Rajgopal 2023). Moreover, firms appear to misreport gender pay-gap figures (Bailey, Glaeser, Omartian and Raghunandan 2024) and provide unreliable quantitative information in CSR reports (Pinnuck, Ranasinghe, Soderstrom and Zhou 2020). A related stream of work examines greenwashing among investors and finds that ESG mutual funds do not improve fund-level ESG scores (Kim and Yoon 2022) but instead hold stocks of firms with worse track records on labor and environmental laws (Raghunandan and Rajgopal 2022).

8

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
611
**SER 275**

**3.1 Greenwashing strategies**

Akin to how strategic narrative devices in financial reports have been shown to mislead investors about firm financial performance (e.g. Huang et al. 2014), prior studies have theorized and empirically examined the ways in which firms misrepresent underlying ESG performance. A broad consensus has emerged from the prior literature in defining greenwashing as the gap between "talk" and "walk" – where ESG discussions (talk) are incommensurate with actual outcomes (walk). In particular, length, positive tone and forward-looking vagueness, when excessive compared to underlying performance, have been shown to be indicative of ESG misrepresentation. We discuss each of these greenwashing strategies in turn.

**3.1.1 Length**

Excessive length in CSR reports, combined with poor CSR performance, is a form of symbolic management that the literature has termed "decoupling" because the firm's disclosures are decoupled from its actions (i.e. the firm's "talk" does not match its "walk") (e.g. Lyon and Montgomery 2015). For instance, Yu, Luu and Chen (2020) describe greenwashing as "companies which seem very transparent and publish large quantities of ESG data but perform poorly in ESG aspects" (p.2). Theory suggests that firms decouple external appearance from actual activities to achieve and maintain legitimacy in the eyes of external stakeholders (e.g. Meyer and Rowan 1977).

Baker et al. (2024) use lengthy disclosure as a basis for identifying misrepresentations of diversity, equity and inclusion (DEI) efforts. They classify a firm as a "diversity washer" if the percentile of the firm's diversity disclosure (frequency of disclosed DEI-related terms) is higher than that of its workplace diversity, and show that this measure predicts workplace discrimination-related violations. In another study, Martínez-Ferrero, Suárez-Fernández, and García-Sánchez (2019) document an inverse relation between CSR performance and the length of CSR reports. In

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
612
SER 276

addition, Hail et al. (2021) show that the over-discussion of climate change issues in earnings calls, relative to underlying climate change activities, helps firms to obtain favorable ESG ratings.

### 3.1.2 Positive tone

An overly positive tone has been theorized as an impression management strategy to influence stakeholder perceptions (Merkl-Davies and Brennan 2007). This is because a positive bias in narrative disclosures may reflect managers' attempt to conceal poor performance or misleadingly "hype" the firm's future performance (e.g. Huang et al. 2014). Consistent with this, Cho, Roberts, and Patten (2010) find that firms with poor environmental performance exhibit greater optimism in their environmental disclosures. Similarly, Martínez-Ferrero et al. (2019) show that better CSR performers are less optimistic in their CSR reports. Liang and Wu (2022) find that a positive tone in CSR reports when CSR performance is poor, contributes to analyst forecast bias. The findings in Hail et al. (2021) suggest that managers discuss climate change with excessive optimism in earnings calls when trying to detract from poor climate-related performance.

### 3.1.3 Forward-looking vagueness

Vague forward-looking information reflects the use of language about the future that is imprecise and lacking in substance (e.g. Cheng, De Franco, Jiang and Lin 2019; Loughran and McDonald 2013). Aspirational and future-oriented talk is central to ESG reporting and includes strategies, plans, commitments, and targets (Mio, Marchini, and Medioli 2020; Christensen, Morsing, and Thyssen 2013). These discussions are meant to describe current efforts to improve future outcomes. However, because they are difficult to substantiate, firms may misleadingly disclose plans that they have no intention or ability to fulfill. Prior research has found that when this forward-looking information is vague – rather than specific – it is indicative of cheap talk.

10

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
613
SER 277

Martinez-Ferrero et al. (2019) find that better CSR performers provide more quantitative information in CSR reports, which implies greater specificity. Baker et al. (2024) show that "diversity-washers" are more likely to use ambiguous language when discussing DEI plans. Greenwashing firms also have less precise sustainability commitments (Ruiz-Blanco, Romero, and Fernandez-Feijoo 2022), measured by a scale scoring sentences as most precise when they are monetary and least precise when they are narrative (Michelon, Pilonato, and Ricceri 2015). In an experiment, Orazi and Chan (2020) find that participants had a more favorable view of a company when a negative CSR incident followed vague CSR-strategy statements rather than concrete ones, suggesting that vagueness can be used by a greenwashing firm to protect its reputation.

## 4. Hypotheses

### 4.1 Carbon greenwashing

There are two groups of UK firms relevant to our research question: those that do not disclose their GHG prior to MCR (57% of firms affected by MCR) and those that do (remaining 43%). For the former, the non-disclosers, we expect MCR to constrain their greenwashing. The revelation of "hard" GHG data under mandated reporting will reduce uncertainty about a firm's carbon performance and lower the incentives to greenwash, as such attempts will be more obvious to outsiders and risky for firm reputation.[5] This is in line with the "confirmation hypothesis" (e.g. Gigler et al. 1998) where mandated reporting spills over onto voluntary reporting and disciplines managers into making truthful voluntary disclosures. This is because the reporting of actual outcomes provides outsiders with the means to assess the veracity of the voluntary information. In our setting, voluntary disclosure refers to carbon-related discussions (talk). Veracity refers to whether these discussions are commensurate with underlying carbon performance (walk).

---

[5] Section 7.5 describes how we examine the impact of MCR on greenwashing for non-disclosers given the lack of GHG data for these firms prior to MCR.

11

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
614
SER 278

Stocken (2000) theorizes that periodic reporting of accounting information constrains managers into truthful voluntary reporting and Lundholm (2003) predicts, in a cheap-talk model, that mandated accounting reports improve the value relevance of voluntary disclosure. Empirically, the evidence shows that audited financial statements improve the quality of voluntary management earnings forecasts (Ball et al. 2012). This would suggest that mandated reporting of GHG will discipline voluntary carbon discussions and lead to less carbon greenwashing.

For firms voluntarily disclosing GHG prior to MCR, the answer to our question is less clear. First, however, we note the importance of studying these firms. Voluntary ESG disclosure rates are high for listed companies, with an estimated 81% of Russell 1000 companies voluntarily issuing CSR reports in recent years (Menna 2023). This sizeable group of firms, which disclose ESG even absent regulation forcing them to do so, should be included when studying the impacts of ESG mandates. Moreover, a key reason for the regulatory push behind mandatory ESG reporting is the concern that voluntary ESG disclosures are misleading to investors (e.g. Lee 2022). Voluntary disclosers are thus important targets for transparency requirements, the intent being that regulation will clean up their reporting.

Because these firms were already disclosing their GHG, MCR may not provide new information that reveals greenwashing and disciplines firms to reduce it. On the other hand, the disciplinary mechanism proposed by the confirmation hypothesis is likely to be weak before MCR and much stronger after MCR. The first reason for this is enhanced credibility of GHG data. Prior to MCR, GHG are reported in voluntary and unregulated channels (e.g. CSR reports) but after MCR, they are provided in the annual report which is regulated and subject to more scrutiny and oversight, and, in the UK, bears criminal repercussions for the provision of knowingly false or misleading information. The second reason is the usability of GHG data which MCR improves by

12

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu

615

**SER 279**

way of standardization and timely reporting (Downar et al. 2021), lowered acquisition costs due to a more disseminated and accessible disclosure channel (Christensen, Floyd, Liu, and Maffett 2017), and improved benchmarking (Tomar 2023).[6] A necessary condition for the mandatory-to-voluntary spillover is that users *rely* on the underlying data, not simply that it is available (Ball et al. 2012). As the credibility and usefulness of GHG data increases after MCR, so too will outsiders' reliance on it. This will raise the expected costs of greenwashing, causing it to fall. We predict:

**Hypothesis 1:** *Mandatory carbon reporting reduces carbon greenwashing.*

### 4.2 Non-carbon greenwashing

We now turn to the question of whether MCR affects other forms of greenwashing. In particular, we are interested in how firms respond to MCR vis-à-vis greenwashing of other, unregulated (non-carbon) environmental information, such as waste and non-carbon pollutants.

Early research on environmental reporting shows that when firms are mandated to report an outcome considered to be "negative" by stakeholder groups such as customers, employees, and investors (e.g. toxic pollutants), firms provide more voluntary environmental disclosures to distract users from the unfavorable information (Patten 2002). This would suggest that once MCR increases transparency on carbon emissions, firms may attempt to greenwash on other environmental factors that are unregulated and thus easier to obscure.

Recent research, however, suggests that MCR will have a positive spillover onto non-carbon disclosures and result in less greenwashing. Studies find that when measurement and reporting of a mandated environmental outcome improves, ESG disclosure increases, likely due to the deployment of additional resources towards environmental tracking and reporting within the

---

[6] Benchmarking is limited before MCR because some firms disclose while others do not. With all UK firms disclosing after MCR, users can benchmark and form more accurate assessments of firm type.

13

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
616
**SER 280**

firm (Bens, Chen and Joos 2022). Thus, as firms expend additional resources to comply with MCR, there could be a spillover to broader environmental reporting that will increase in quality.

A positive spillover may also be driven by increased external attention to firms' broader environmental reporting after MCR. This will occur if, for instance, MCR leads users to revise expectations about the value relevance of environmental information. Given the research showing that mandatory GHG reporting reveals new information about firm operations (e.g. Bauckloh, Klein, Pioch, and Schiemann 2023), investors that were skeptical about environmental data may reassess this in light of MCR, and take a closer look at the other environmental disclosures that firms provide. MCR could also raise concerns about future environmental regulations (Tomar 2023) and be viewed as the first step in a wider legislative agenda to regulate firms' environmental externalities, making outsiders attentive to how firms manage their environmental issues at large.

As external attention to environmental reporting increases, firms become more susceptible to scrutiny and accusations of falsely promoting themselves as environmentally responsible (Marquis, Toffel, and Zhou 2016; Lyon and Maxwell 2011). This in turn curbs greenwashing because firms are warier of negative publicity when they are in the watchful eyes of the public (Lyon and Montgomery 2013). Thus, as MCR brings increased attention to firms' broader environmental reporting, firms will reduce greenwashing to avoid negative exposure. Therefore, while there is tension, we expect MCR to have a positive spillover to non-carbon greenwashing.

**Hypothesis 2:** *Mandatory carbon reporting reduces non-carbon greenwashing.*

### 4.3 Real effects

Hypothesis 1 predicts that MCR will disincentivize carbon greenwashing, because it will become easier to detect and expose this behavior under full transparency. Whereas before MCR firms could use greenwashing to promote themselves as sustainable and build reputation with

14

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu

617

**SER 281**

ESG-conscious stakeholders, such attempts will be hindered under MCR. We expect this to yield a substitution between greenwashing and *real efforts* to reduce carbon emissions, as such efforts will be required for firms to demonstrate their "green-ness" to external stakeholders. In sum, as firms reduce carbon talk that is indicative of greenwashing after MCR, they will instead take real actions to reduce their GHG.

> **Hypothesis 3:** *There is a substitution between misleading carbon talk and carbon emission reductions around MCR.*

## 5. Research Design

### 5.1 Greenwashing measures

We construct greenwashing measures using carbon and non-carbon discussions in CSR reports, which include all equivalent reports such as sustainability, Environment/Health/Safety (EHS), and Integrated (IR) reports. We focus on CSR reports for three main reasons. First, CSR reports are by far the dominant channel in which firms communicate CSR activities and performance (e.g. Baker et al. 2024). Second, stakeholders rely on the information contained in CSR reports for decision-making, as evidenced by the value-relevance of CSR reports (e.g. Dhaliwal, Li, Tsang, and Yang 2011) and their use by intermediaries such as financial analysts (Dhaliwal, Radhakrishnan, Tsang, and Yang 2012; Ioannou and Serafeim 2015). Third, although financial reports increasingly contain voluntary ESG information, GHG reporting was scant around the time of the adoption of MCR in 2013, as indicated by only 14% of listed companies having disclosed climate-related information in financial reports in as recently as 2022.[7]

We obtain CSR reports from Corporate Register for United Kingdom (UK), United States (US), and European Union (EU) firms between 2004 and 2019. Using FinBERT, all sentences in

---

[7] According to data from the Carbon Disclosure Project (CDP) survey, 14% of companies answered that they had published climate change information in their 2022 financial reports.

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
618
**SER 282**

the reports are categorized into nine topics (eight ESG and one non-ESG).[8] FinBERT is a state-of-the-art large language model designed for financial texts based on Google's Bidirectional Encoder Representations from Transformers (BERT) algorithm. It is more effective than the traditional dictionary approach at processing contextual information and achieves better accuracy in classifications and other commonly used machine learning algorithms (Huang, Wang, and Yang 2023). Huang et al. (2023) demonstrate that FinBERT achieves 89.5% accuracy in labeling ESG discussions, surpassing non-BERT algorithms. Moreover, the same study shows that in sentiment classification, FinBERT outperforms the Loughran-McDonald dictionary (see Loughran and McDonald 2011) and other machine learning models (e.g. naïve Bayes, random forest, etc.).

FinBERT's "Climate Change" category captures carbon-related discussions, such as initiatives to increase carbon efficiency, environmental technologies and renewable energy. This category is therefore appropriate for generating carbon greenwashing measures. FinBERT's "Pollution and Waste" category consists of discussions on pollutants, toxic emissions, materials disposal, and non-recyclable waste, which is suitable for calculating non-carbon greenwashing.

We construct three carbon greenwashing "talk" measures: length, positive tone, and forward-looking vagueness. For length, we calculate the number of carbon-related sentences identified by FinBERT and scale it by the number of sentences in the CSR report. For positive tone, we use the FinBERT sentiment classification model to generate the sentiment of each carbon sentence. Then, we subtract the number of negative carbon sentences from the number of positive carbon sentences and scale the difference by the sum of both types of sentences.[9] For forward-

---

[8] A detailed explanation of the algorithm can be found at
https://www.allenhuang.org/uploads/2/6/5/5/26555246/esg_9-class_descriptions.pdf.
[9] FinBERT is pre-trained on financial communication text (corporate filings, earnings call transcripts, and analyst reports). The FinBERT sentiment classification model is trained on 10,000 sentences from analyst reports that are manually-annotated and categorized as positive, negative, or neutral.

16

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
619
**SER 283**

looking vagueness, we use the FinBERT forward-looking disclosure algorithm and scale the number of carbon sentences classified as "specific forward-looking" (meaning firm-specific and not generalizable to other companies) by the number of carbon sentences, and then multiply it by -1 so that a higher value indicates a higher level of vagueness in the forward-looking disclosure.[10]

For each measure of carbon greenwashing "talk", we rank firms in the same country, sector, and year, and then convert the rank into a percentile using the formula (rank-1)/(number of firms-1). This ensures that the lowest ranking firm receives a value of zero, while the highest-ranking firm receives a value of one (Lang and Lundholm 1996). A higher value signifies lengthier discussion, more positive tone, and more vagueness in future-oriented carbon discussions.

For carbon greenwashing "walk" we calculate the sum of scope 1 and 2 GHG using firm-disclosed data collected by Trucost Plc.[11] We then multiply the total by -1 so that a higher value indicates a lower carbon footprint. We again rank firms in the same country, sector, and year, and convert the rank into a percentile using the formula (rank-1)/(number of firms-1). A higher value indicates a lower level of carbon emissions. We subtract this "walk" measure from each of the three "talk" measures to generate three greenwashing measures: *LENGTH_CARBON, TONE_CARBON,* and *FLVAGUE_CARBON.* A higher value for each measure indicates a larger gap between disclosure and performance, which suggests more greenwashing.[12] Finally, we

---

[10] An explanation of the FinBERT forward-looking disclosure classification algorithm can be located at: https://www.allenhuang.org/uploads/2/6/5/5/26555246/fls_description.pdf. The algorithm classifies sentences as specific forward-looking if they pertain to the future of the company as opposed to being applicable to any company.

[11] Trucost provides the data source for its GHG figures, allowing us to use GHG data disclosed by firms and exclude GHG estimates by Trucost. Specifically, we focus on firms that provide disclosures through various means, including exact values from environmental/CSR/sustainability reports, Carbon Disclosure Project (CDP) survey responses, and annual reports/10K/financial accounts disclosures.

[12] Use *LENGTH_CARBON* as an example: if two firms have a "talk" rank of 0.9 (providing a large amount of disclosure), but firm one has a "walk" rank of 0.1 (heavy polluter) and the other firm has a "walk" rank of 0.9 (not a heavy polluter), then firm one's *LENGTH_CARBON* would be 0.8 and firm two's *LENGTH_CARBON* would be 0. This means that firm one has a higher level of greenwashing than firm two. Thus, firms with worse carbon performance that "talk a lot" are more likely to be greenwashing.

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
620
**SER 284**

generate a composite measure of carbon greenwashing, *GW_CARBON*, which is the simple average of *LENGTH_CARBON*, *TONE_CARBON*, and *FLVAGUE_CARBON*.

We follow the same process to calculate non-carbon "talk" measures, except that we use sentences classified as "Pollution and Waste" by FinBERT. For "walk", we use the sum of total unrecycled waste, nitrogen oxide (NOx) emissions, ozone depleting substances, and volatile organic compounds (VOC) emissions from Refinitiv.[13] Higher values of *LENGTH_NONCARBON*, *TONE_NONCARBON*, and *FLVAGUE_NONCARBON* indicate that the firm has a larger discrepancy between, on the one hand, pollution and waste performance and, on the other hand, the length, positive tone and forward-looking vagueness of pollution and waste discussions. We again compute a composite measure of non-carbon greenwashing, *GW_NONCARBON*, by taking the simple average of the sub-measures *LENGTH_NONCARBON*, *TONE_NONCARBON*, and *FLVAGUE_NONCARBON*.

### 5.2 Empirical Models

Our objective is to measure the effect of MCR on greenwashing. Our empirical strategy relies on the institutional fact that only listed, UK-incorporated companies are subject to MCR. We use a difference-in-differences design to compare changes in greenwashing for treatment and control firms from before to after MCR, and estimate the following model over 2004-2019:

$$GREENWASHING_{it} = \alpha_i + \lambda_t + \beta_1\ TREAT_i \times POST_t + \Sigma\beta_{it}\ \text{Controls} + \varepsilon_{it} \quad (1)$$

where $GREENWASHING_{it}$ is the carbon or non-carbon greenwashing measures explained above, $\alpha_i$ refers to firm fixed effects that absorb all observed and unobserved time-invariant firm characteristics, and $\lambda_t$ refers to year fixed effects that control for common macroeconomic shocks. We include time-varying controls (assets, revenue, return-on-assets, and leverage) defined in

---

[13] Trucost also provides data on pollution and waste, but such data is only available after 2011, whereas our sample period begins in 2004. Refinitiv gets its data from firm disclosures.

18

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
621
**SER 285**

Appendix I, and cluster standard errors at the country-year level. Financial variables are from S&P Global and measured in USD.

The average treatment effect is the $\beta_1$ coefficient on the interaction *TREAT* x *POST* which captures the change in greenwashing for treatment firms from before to after MCR relative to the change for control firms. *TREAT* is an indicator equal to one if the firm is covered by MCR and *POST* is an indicator equal to one in the years that MCR is in effect. Because MCR first applies to fiscal years ending on or after September 30th 2013, *POST* equals 1 in 2013 for firms with fiscal year-ends after September 30th, but equals 0 in 2013 (and 1 in 2014) for firms with fiscal year-ends before September 30th. MCR's effect is thus staggered according to firms' fiscal year-ends and accordingly, the coefficients on *POST* can be estimated.

**5.3 Matching**

An important assumption of model (1) is that *TREAT* is uncorrelated with unobservables (the error term, $\varepsilon_{it}$). However, there could be differences across treatment and control firms that bias the estimate of $\beta_1$. To address this concern, we employ entropy balancing to minimize differences in observable characteristics across treatment and control firms (Hainmueller 2012; Ferri, Zheng, and Zou 2018). To implement entropy balancing, we match our control variables (i.e. assets, revenue, return-on-assets, and leverage) across the treatment and control samples on the first (mean), second (variance), and third (skewness) moments. Through iterations, the algorithm searches for the set of weights for control observations such that the specified distributional properties of the treatment and post-weighted control observations are identical for all covariates. Appendix III tabulates the mean, variance, and skewness of the treatment and control samples before and after this process, showing that the covariate distributions are balanced

19

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
622
**SER 286**

across the samples after reweighting. The weights generated and assigned to each control observation are incorporated in the regressions where indicated.

## 5.4 Parallel Trends

Another assumption of our difference-in-differences model is that the control sample's mean outcome changes are a valid counterfactual estimate for the treatment group's mean outcome changes, absent MCR. To validate this assumption, we plot treatment effects over time to ascertain whether the pre-period trends for *GW_CARBON* and *GW_NONCARBON* – our composite measures of greenwashing – are similar for the two groups. Across both dependent variables, Figures 1a-1d in Appendix II show that the coefficients of *TREAT* × *POST* are close to zero and statistically insignificant leading up to MCR. The evidence therefore does not indicate the existence of pre-trends that would violate the parallel trends assumption.

## 6. Sample

### 6.1 Sample construction

Table 1 provides an overview of the sample construction process. We obtain CSR reports from Corporate Register for UK, US and EU firms from 2004-2019. This gives us a starting point of 10,877 firm-year observations, from which we remove 197 that do not have carbon-related discussions identified by FinBERT. We then merge these data with Trucost and 2,242 observations are dropped due to missing GHG. We remove an additional 365 observations with missing control variables. After eliminating observations for which GHG data are estimated by Trucost rather than being from firm disclosures (3,786) and firms from countries with fewer than ten observations (10), we are left with 4,277 firm-year observations corresponding to 911 unique firms. Among these observations, 727 belong to 128 unique treatment firms (UK firms) in the treatment group,

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
623
SER 287

while 3,550 belong to 783 unique control firms (US and EU firms) in the control group.

The non-carbon greenwashing sample also begins with CSR reports from UK, US and EU firms from 2004-2019 (10,877 firm-years), and falls by 440 observations after removing firm-years without pollution and waste discussions identified by FinBERT. After merging with Refinitiv 5,192 observations are removed due to missing pollution and waste data. After removing observations with missing control variables (1,004) and observations from countries with fewer than ten observations (11), there are 4,230 firm-year observations corresponding to 906 unique firms. Out of the 4,230 observations, 563 belong to 94 unique treatment firms (UK firms), and 3,667 belong to 812 unique control firms (US and EU firms).

### 6.2 Descriptive statistics

Panel B of Table 1 presents summary statistics for the treatment and control firms in the carbon and non-carbon greenwashing samples. In the carbon sample, treatment firms have lower greenwashing compared to control firms: the mean *GW_CARBON* for the treatment sample is 0.10, compared to 0.19 for the control sample. Treatment firms also have lower *LENGTH_CARBON*, *TONE_CARBON*, and *FLVAGUE_CARBON* compared to control firms (0.12 versus 0.24, 0.09 versus 0.15, and 0.09 versus 0.18). Treatment firms are somewhat smaller than control firms, with treatment (control) firms having average total assets of $10.14 billion ($19.82 billion) and average revenues of $4.89 billion ($9.84 billion). Treatment firms are more profitable, however, with a mean ROA of 0.83 compared to that of 0.73 for control firms. Treatment firms are also less leveraged (0.24 for treatment and 0.29 for control). These differences highlight the importance of controlling for observable firm characteristics in our models, as well as matching on them in the entropy-balanced sample. For the non-carbon sample, treatment and control firms are comparable in the four greenwashing measures (*GW_NONCARBON*, *LENGTH_NONCARBON*,

21

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
624
**SER 288**

*TONE_NONCARBON*, and *FLVAGUE_NONCARBON*). Control firms are larger in size and revenue. Treatment firms have higher ROA and are less leveraged.

Panel C of Table 1 presents the industry breakdown. In the carbon sample, the industrials sector has the highest representation, accounting for 22.28% of treatment firms and 19.49% of control firms. This is followed by financials, consumer discretionary, and consumer staples, which make up 15.96% and 10.96%, 15.13% and 10.37%, and 15.13% and 8.96% of the treatment and control samples, respectively. For the other industries, no more than 15% of the sample is from any given one. In the non-carbon sample, major sector representations are also consumer staples, consumer discretionary, industrials, and financials, comprising 17.58% and 8.84%, 17.23% and 9.57%, 15.63% and 17.89%, and 14.92% and 8.04% for treatment and control firms, respectively.

Panel D of Table 1 shows the representation of countries. In both the carbon and non-carbon samples, the largest representations are the UK and the US. In the carbon sample, UK firms represent 17% and US firms represent 49.24%. In the non-carbon sample, UK firms represent 13.31% and US firms represent 48.16%. The rest of the firms in both samples are from the EU, with the largest representations being France, Germany, and Italy.

Panels E and F of Table 1 provide figures that show how carbon and non-carbon talk vary for different levels of environmental output. We divide our carbon and non-carbon samples into quartiles based on scope 1 and 2 GHG and pollution and waste (a higher quartile indicates higher GHG/pollution and waste), and then plot mean values for *LENGTH*, *TONE*, and *FL_VAGUE* at each quartile. Akin to our greenwashing measures, *LENGTH* is the fraction of carbon or non-carbon sentences in CSR reports, *TONE* is positive minus negative carbon/non-carbon sentences divided by the sum of both, and *FL_Vague* is -1 times the fraction of carbon/non-carbon sentences that are specific forward-looking. These figures show that increases in environmental output are

22

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
625
**SER 289**

accompanied by increases in carbon and non-carbon talk. In other words, as a firm pollutes more, it is more likely to greenwash.

## 7. Results

### 7.1 Validation of greenwashing measures

We conduct two sets of tests to validate our greenwashing measures. For the first set, we reason that our greenwashing measures should be related to poor environmental outcomes if they are accurate proxies for misrepresentations of environmental efforts. Accordingly, we examine the association between our greenwashing measures and environmental performance, environmental fines, and negative ESG-related media attention.

Table 2 reports the results. The first two columns show that carbon greenwashing is positively associated with GHG intensity (scope 1+2 GHG scaled by total revenue) for both the current year (*T*) and one-year ahead (*T+1*), at 1% and 5% significance levels respectively. Similarly, the third and fourth columns show that non-carbon greenwashing is significantly and positively associated with pollution and waste intensity (pollution and waste scaled by total revenue), both contemporaneously and in the year ahead. These results validate our measures by showing that firms with higher levels of greenwashing are worse emitters of GHG and pollution and waste, consistent with greenwashing being used to mask poor environmental performance.

Next, we create an overall level of greenwashing by taking the average of *GW_CARBON* and *GW_NONCARBON*. In columns five and six, using data on environmental fines from Refinitiv, we observe that this overall level of greenwashing (*GW_OVERALL)* is linked to higher fines paid for environmental infractions (*ENV_FINES*) in the current and following year. In columns seven and eight, we use data from RepRisk and find that overall greenwashing is associated with the current and following year's ESG-related reputation risk (*REP_RISK*) which measures a firm's

23

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
626
**SER 290**

exposure to ESG reputational risks and reflects the level of negative media and stakeholder attention to ESG issues.[14] Thus, greenwashing is related to higher environmental fines and ESG reputational risks, which provides additional validation for our measures.[15]

In our second set of tests, we consider the possibility that our greenwashing measures signal longer-term climate change commitments that are not yet reflected in the outcome measures used thus far. Although we have used one-year ahead outcomes, many firms set carbon reduction goals that are longer-term in nature (i.e. 5-10 years ahead). For instance, a firm may discuss carbon mitigation extensively compared to its current level of underlying carbon performance, but this could be signaling targeted improvements in carbon performance in the longer-term. Thus, it is important to distinguish whether our greenwashing measures capture such commitments or represent cheap talk intended to mislead outsiders.

For these tests, we examine the relationship between carbon greenwashing and two measures reflecting a firm's longer-term commitment to climate action, which we compute using data from the Carbon Disclosure Project (CDP). CDP is an annual survey that requests information on a wide set of environmental metrics from large companies on behalf of institutional investor signatories. The CDP database, which provides information about climate change risks, opportunities, policies, and performance based on survey responses, has been used in prior accounting research (e.g. Cohen et al. 2023).

The first measure is the ambitiousness or difficulty of a firm's carbon reduction targets, *TARGET_DIFFICULTY*, which is calculated as the targeted percent reduction in GHG divided by

---

[14] RepRisk screens media, government, NGO, and third-party sources for negative news (e.g. controversies and criticisms) about firms' ESG and calculates a proprietary Reputation Risk Index. RepRisk has been used in prior accounting research (e.g. Grewal, Mohan and Perez-Cavazos 2024).

[15] In columns 8-8 we include industry and country fixed effects, rather than firm fixed effects, to capture across-firm variation (we include year fixed effects in all specifications). This approach aligns with prior academic studies such as Baker et al. (2024) which examine how greenwashing firms differ from other firms.

24

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
627
SER 291

how many years the target horizon is set to be achieved in, multiplied by what percentage of the firm's total emissions the target covers, and averaged over all of the firm's absolute targets in a given year.[16] The second measure, *TARGET_SCIENCE*, is an indicator variable equal to 1 if any of a firm's absolute carbon reduction targets in a given year is "science-based", meaning it has been externally verified by the Science-Based Targets Initiative (SBTi), a not-for-profit organization, as being aligned with what climate science says is needed to prevent the worst effects of climate change.[17] Science-based targets are considered to be best-in-class targets that guide firms to make meaningful and significant carbon reductions. Firms must submit progress reports to SBTi and are removed from the approval list if they do not demonstrate adequate progress.

The results are reported in columns (9) and (10) of Table 2. In column 9, the relation between carbon greenwashing (*GW_CARBON*) and target difficulty (*TARGET_DIFFICULTY*) is negative and significant at the 1% level, indicating that higher levels of greenwashing are associated with less ambitious carbon reduction targets. In column 10, we also see a negative association between the propensity to set a science-based target and carbon greenwashing (the coefficient is negative and significant at the 5% level). These results are inconsistent with the notion that our greenwashing measures are signals of longer-term commitments, but rather reflect cheap-talk. Therefore, this also adds validity to our measures.

### 7.2 Effect of MCR on carbon greenwashing

The results for H1 are shown in Table 3 Panel A (full sample) and Panel B (entropy-

---

[16] We scale the targeted % reduction in GHG by the number of years because a longer target deadline reflects a less challenging target (the annualized reduction in GHG is smaller). Coverage is also important to consider because a target with a coverage of less than 100% does not apply to all a firm's emissions, decreasing the real reduction in net emissions. For example, a target with a 10% reduction and 50% coverage is comparable in net emissions reduction to a target with a 5% reduction and a coverage of 100%, all else equal.

[17] Specifically, this is the level of decarbonization needed to keep global temperature increases below 2 degrees Celsius compared to pre-industrial temperatures, according to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change (IPCC AR5). More information about the Science Based Targets Initiative can be found at: https://sciencebasedtargets.org/

25

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
628
SER 292

balanced sample). In Panel A, columns 1 to 4 use *LENGTH_CARBON*, *TONE_CARBON*, *FLVAGUE_CARBON*, and *GW_CARBON* as the dependent variables, respectively. The coefficient estimates on *TREAT×POST* reveal that MCR had a negative on-average effect on each of the four measures. The estimate in column 1 for the full sample shows that UK firms decrease *LENGTH_CARBON* by 62% of its pre-MCR mean (0.131/0.213). In column 2, the estimate shows that UK firms decrease *TONE_CARBON* by 40% of its pre-MCR mean (0.069/0.174). In column 3, UK firms decrease *FLVAGUE_CARBON* by 37% of its pre-MCR mean (0.065/0.175). Finally, column 4 reveals that UK firms decrease the composite measure, *GW_CARBON*, by 47% of its pre-MCR mean (0.089/0.188). The estimates in Panel B of Table 3 (entropy balancing) imply similar results in terms of economic significance. The evidence is consistent with H1 and points to a meaningful impact of mandatory GHG reporting on carbon greenwashing.

### 7.3 Effect of MCR on non-carbon greenwashing

Table 4 reports results for the effects of MCR on non-carbon greenwashing. In Panel A (full sample), columns 1 to 4 use *LENGTH_NONCARBON*, *TONE_NONCARBON*, *FLVAGUE_NONCARBON*, and *GW_NONCARBON* as the dependent variables. Across all columns, the negative and significant estimates on *TREAT×POST* show that MCR reduced each of the four measures. In particular, treatment firms decrease *LENGTH_NONCARBON* by 61% of its pre-MCR mean (0.13/0.213); *TONE_NONCARBON* by 62% of its pre-MCR mean (0.092/0.148); *FLVAGUE_NONCARBON* by 53% of its pre-MCR mean (0.092/0.173); and *GW_NONCARBON* by 59% of its pre-MCR mean (0.105/0.178). The economic significance of the results in Panel B (entropy balancing) are similar. The results in Table 4 are consistent with H2 and indicate positive spillovers from MCR to non-carbon disclosures.

26

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
629
**SER 293**

**7.4 Greenwashing and GHG Reductions after MCR**

H3 predicts a substitution between misleading carbon talk and GHG reductions. Prior to MCR, firms could use greenwashing to curry favor with ESG-oriented stakeholders After MCR, greenwashing is easier to detect and thus riskier for firm reputation. We expect this reduced ability to hide behind greenwashing will push firms to take real efforts to reduce their GHG.

To test H3, we create an indicator equal to 1 if a firm's mean carbon greenwashing "talk" is less (on average) in the post-period than in the pre-period, denoting that the firm reduced carbon language that is indicative of greenwashing after MCR. Analogous to our greenwashing measures, we compute the within country-sector-year percentile ranks of *Length* (fraction of carbon sentences in the CSR report), *Positive Tone* (positive minus negative carbon sentences divided by the sum of both), and *Forward-Looking Vagueness* (-1 times the fraction of carbon sentences that are specific forward-looking). The sum of these equals *CARBON_TALK*, which we average in the pre- and post- periods. Then, we calculate *CARBON_TALK_DECREASE* which equals one if the post-period average is less than the pre-period average, zero otherwise. We interact this indicator with our DID estimator and regress the triple interaction term on firms' carbon emissions.

Table 5 reports the results, where *GHG* (a firm's logged scope 1+2 GHG) and *GHG_INTEN* (a firm's logged scope 1+2 GHG divided by sales) are the dependent variables. Focusing on column 1, the triple interaction term *TREAT×POST×CARBON_TALK_DECREASE* is negative and significant at the 1% level. The estimate reveals a GHG decrease of 16.5% (1 - exp(-0.181)) for treatment firms that reduced their misleading carbon talk, relative to treatment firms that did not and benchmarked against the corresponding difference for control firms, from before to after MCR. The result for *GHG_INTEN* (column 2) shows a similar decline, specifically

27

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
630
**SER 294**

a reduction in GHG intensity of 12.5% (1-exp(-0.134)), significant at the 5% level.

These results lend support for H3: carbon reductions around MCR may stem from the reduced ability of firms to deceive external stakeholders with greenwashing once mandated reporting requirements are in place. However, we caution against a causal interpretation as these tests are cross-sectional in nature, and we cannot disentangle the effects of reduced greenwashing on GHG from that of increased GHG transparency more broadly (e.g. Downar et al. 2021). This evidence should thus be viewed as exploratory and suggestive of how mandatory reporting restricts firms' ability to use greenwashing in place of real efforts to improve environmental performance.

**7.5 Non-Disclosers**

As H1 explains, we expect non-disclosing UK firms to reduce carbon greenwashing after MCR since they are forced to reveal GHG data that they previously withheld. However, our carbon greenwashing measures require firms to disclose GHG in both pre- and post- periods, because we compute the gap between disclosure (talk) and underlying carbon performance (walk) before and after MCR. This approach enables our DID research design, but restricts the analyses to firms that voluntarily disclose GHG prior to MCR as opposed to firms that do not voluntarily disclose GHG prior to MCR (we explain in section 4.1 why voluntary disclosers are relevant to this study). Thus, to shed light on how MCR affects non-disclosers, we perform a workaround. This workaround uses a single pre-period year in which, for non-disclosing UK firms, we measure "walk" using GHG data in the *first year that it is available* (i.e. 2013, the initial year that MCR is in effect), and "talk" using carbon narratives immediately before MCR is in effect (i.e. 2012). For non-disclosers, this is a reasonable way to measure greenwashing in the pre-period because it computes the first available gap between talk and walk. In the post-period, we measure greenwashing using

28

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
631
**SER 295**

contemporaneous talk and walk, since GHG data becomes available for the non-disclosers after MCR. Contemporaneous talk and walk is used for the control sample in the pre- and post- periods.

Table 6 presents results of the DID model using non-disclosing UK firms as the treatment sample. For brevity, we tabulate results for the composite measure, *GW_CARBON,* but note that (untabulated) results are similar for the sub-measures (i.e. *LENGTH_CARBON, TONE_CARBON,* and *FLVAGUE_CARBON*). We include the same set of controls, fixed effects, and clustering of standard errors by country-year as previously. The negative and significant coefficient on *TREAT* x *POST* (coef.=-0.232, *t*-stat=3.85) is consistent with our prediction and demonstrates that non-disclosing UK firms decrease carbon greenwashing following MCR.

## 8. Robustness Tests

### 8.1 External verification of GHG data

MCR recommends, but does not require, GHG data to be independently verified or assured. It is therefore possible that UK firms' carbon data are not reliable and yet we document a decline in greenwashing for these firms. Although it is a criminal offence in the UK to knowingly disclose false or misleading information in the annual report, this may not deter misreporting. To determine whether the decline in carbon greenwashing that we document is driven by firms that misrepresent their GHG, we re-run our analyses on a subsample of firms that have third-party assured scope 1 and 2 GHG. Similarly, the decline in non-carbon greenwashing that we document may not be legitimate if firms' non-carbon environmental data are misreported. To mitigate this, we identify a subsample of firms that have an external audit of their CSR or sustainability report and re-run our analyses. This does not necessarily mean that firms' pollution and waste outcomes are audited, but it does identify firms that have increased oversight over their CSR reporting.

To identify firms with GHG assurance, we use answers to CDP survey questions *"Please*

29

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
632
**SER 296**