No. 25-5327

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*,

*Plaintiffs-Appellants,*

v.

LIANE M. RANDOLPH, IN HER OFFICIAL CAPACITY AS CHAIR OF THE CALIFORNIA AIR RESOURCES BOARD, *et al.*,

*Defendants-Appellees.*

**On Appeal from the United States District Court
for the Central District of California**
No. 2:24-cv-00801-ODW-PVC

## SUPPLEMENTAL EXCERPTS OF RECORD
## VOLUME 2 OF 10

ROB BONTA
  *Attorney General of California*
ANNADEL A. ALMENDRAS
  *Senior Assistant Attorney General*
LAURA ZUCKERMAN
MYUNG J. PARK
  *Supervising Deputy Attorneys General*

CAITLAN MCLOON
KATHERINE GAUMOND
EMILY HAJARIZADEH
M. ELAINE MECKENSTOCK
DYLAN REDOR
ELIZABETH SONG
  *Deputy Attorneys General*
CALIFORNIA DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6438
Caitlan.McLoon@doj.ca.gov
*Attorneys for Defendants-Appellees*

October 16, 2025

*indicate the assurance status that applies to your reported scope 1 and 2 emissions"* and *"Attach
the assurance statement if applicable"*. To identify firms with CSR report assurance, we use the
variable *CsrSustainabilityExternalAudit* from Refinitiv; the variable equals one if a firm has an
external auditor of its CSR/sustainability report. Panel A of Table 7 presents the results. Across
both subsamples, we observe evidence consistent with our main inferences. The coefficients on
*TREAT×POST*, when regressed on *GW_CARBON* and *GW_NONCARBON*, are negative and
statistically significant at the 1% level or better. This suggests that our main results are not sensitive
to whether external assurance is obtained over GHG data and CSR reports.

**8.2 Removing potential confounds**

Because our analysis compares UK firms to non-UK firms (specifically, US and EU firms),
we search for concurrent regulations and events that could confound our inferences. In Appendix
V, we summarize GHG regulations that were passed during the sample period (e.g. mandated GHG
reporting, carbon taxation, cap-and-trade schemes, etc.) that implicate firms in our control sample.
It is unclear whether and how these mandates could confound our inferences; given our finding
that MCR decreased greenwashing for UK firms, it is possible that these mandates similarly
affected the firms in these countries, such that including them would bias against our results.
Nevertheless, we exclude firms from these countries to mitigate unforeseen confounding effects.

In Panel B of Table 7, we exclude the potentially confounded countries (i.e. Ireland and
the United States, as well as firms regulated under the European Union's Emissions Trading
Scheme – see Appendix V). We identify firms regulated under the European Union Emissions
Trading Scheme (EU ETS) using the CDP, which asks firms to identify their emissions trading
schemes. We continue to find a negative and significant on-average decline in *GW_CARBON* and
*GW_NONCARBON* for treated firms after MCR. Thus, our inferences do not appear to be

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
633
**SER 298**

influenced by concurrent regulations.

### 8.3 Alternative greenwashing measure

We re-run our main specification on an alternative (non-textual) greenwashing measure, *selective disclosure*, which reflects the disclosure of less harmful environmental impacts whilst not disclosing information that is more environmentally damaging (Marquis et al. 2016). The intuition is that a firm which selectively discloses many of its benign indicators, but few if any of its more harmful ones, creates an impression of transparency that is not representative of its overall environmental impact. Although our measurement of greenwashing as talk-minus-walk is consistent with the vast majority of the prior research, an alternative measure that does not rely on textual analysis can help mitigate the concern that our results are limited to a single, textual-based approach for measuring greenwashing.

Selective carbon disclosure (*SELECTIVE_CARBON_DISC*) is calculated as the *absolute carbon disclosure ratio* minus the *weighted carbon disclosure ratio* (calculated using data from Trucost). *Absolute carbon disclosure ratio* is the fraction of the two GHG scopes (i.e. scope 1 and scope 2) for which a firm discloses global quantitative figures in publicly available channels such as financial reports, regulatory filings, and websites. *Weighted carbon disclosure ratio* is the fraction of the firm's total scope 1 and 2 GHG that is disclosed by the firm. Scope 1 and 2 GHG are estimated by Trucost if no disclosure is made.[18] Therefore, *absolute carbon disclosure ratio* measures how much carbon information is disclosed, and *weighted carbon disclosure ratio*

---

[18] Trucost uses its proprietary Environmentally-Extended Input-Output (EEIO) model to estimate carbon emissions and other environmental impacts. First, a company's revenues are allocated to the subset of business activities in which it operated that year, based on segment data from the FactSet Fundamentals dataset, supply-chain data from FactSet Supply Chain Relationships, and other publicly-available information from financial reports and regulatory filings. Then, the company's total annual tonnage of emissions released (to air, land, and water) and resources consumed (such as metals, water, oil, natural gas) are estimated based on the company's revenues from each business activity. These calculations are based on resource-per-dollar factors derived from resource and pollution release and transfer registries and economic input–output models (which model trade between suppliers and customers). Trucost's estimates have been utilized in previous academic studies (e.g. Bolton and Kacperczyk 2021).

31

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
634
**SER 299**

measures how much important carbon information is disclosed. Similarly, selective non-carbon disclosure (*SELECTIVE_NONCARBON_DISC*) is the difference between the *absolute non-carbon disclosure ratio* and the *weighted non-carbon disclosure ratio*. The absolute ratio is the proportion of the number of non-carbon environmental indicators identified by Trucost as relevant to a focal company (e.g. consumption of natural resources, waste, and non-carbon pollutants) for which a firm publicly discloses global quantitative figures. The weighted ratio measures how much of the firm's total non-carbon pollution is disclosed by the firm (non-carbon pollutants are estimated if disclosure is not available). Higher values of both measures indicate that the company disclosed more trivial indicators than important ones, and lower values indicate the opposite. Hence, a higher (lower) value is indicative of more (less) selective disclosure.[19]

Panel C of Table 7 reports results of our DID model using the alternative greenwashing measure (for consistency, we continue to use firms from the UK, US and EU in the Trucost database). In column 1, the coefficient on *TREAT×POST* is negative and significant at the 1% level when regressed on *SELECTIVE_CARBON_DISC,* and in column 2, *TREAT×POST* is negative and significant (1% level) when using *SELECTIVE_NONCARBON_DISC* as the dependent variable. Thus, our main inferences hold when using an alternate, non-textual measure of greenwashing.

### 8.4 Alternative explanation for H1

H1 predicts that MCR will lead firms to reduce carbon greenwashing owing to a disciplining mechanism. Specifically, MCR will increase users' reliance on GHG data which in turn will increase the expected costs of greenwashing. However, recent research shows that UK

---

[19] As an example, for *selective carbon disclosure*, suppose one company discloses scope 2 emission only (ADR=0.5), and 90% of the carbon emissions arise from scope 1 (WDR=0.1). For this company, ADR minus WDR equals 0.4, indicating greenwashing. Alternatively, suppose another company discloses scope 1 emissions only (ADR=0.5), and 90% of the carbon emissions arise from scope 1 (WDR=0.9). For this company, ADR minus WDR equals -0.4, indicating more transparency. The same idea applies for *selective non-carbon disclosure*.

32

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
635
**SER 300**

firms reduced their GHG after MCR (Downar et al. 2021). Thus, our results may be driven by improvements in carbon "walk", which would decrease the talk-walk gap, but are unrelated to the mechanism that we propose. To investigate this, we split our sample into two groups: 1) firms that do not improve carbon performance after MCR (i.e. these firms *increase* or *do not change* their GHG from the pre- to the post- period) and, 2) firms that improve carbon performance (i.e. these firms *decrease* their GHG after MCR). If our main results are driven by carbon performance improvements, we should not observe a decline in carbon greenwashing for firms that do not reduce GHG following MCR. For these firms, a decline in greenwashing is more likely to be consistent with the disciplining effect of MCR on impression management.

The results are presented in Panel D of Table 7. We re-estimate model (1) for firms that increase or do not change their GHG (column 1), and firms that decrease their GHG (column 2). The coefficients on *TREAT* x *POST* across both columns are negative and significant at the 1% level, and an *F*-test shows that the estimates do not differ between the two groups ($p < 0.53$). This indicates that carbon greenwashing reductions around MCR occur even for firms that do not improve carbon performance, inconsistent with the alternative explanation. Furthermore, in column (3) we re-run model (1) for the full sample and show that UK firms decrease misleading carbon talk around MCR. The dependent variable, *CARBON_TALK*, is analogous to our carbon greenwashing measures: it equals the average of *Length* (fraction of carbon sentences in the CSR report), *Positive Tone* (positive minus negative carbon sentences divided by the sum of both), and *Forward-Looking Vagueness* (-1 times the fraction of carbon sentences that are specific forward-looking). This is also inconsistent with the alternative explanation.

## 9. Conclusion

We document a reduction in greenwashing following the introduction of mandated

33

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
636
**SER 301**

greenhouse gas emissions reporting. In the United Kingdom, listed companies were required to disclose scope 1 and 2 GHG starting in fiscal years ending on or after September 30, 2013 in the annual report. We measure greenwashing using textual analysis of narrative discussions in CSR reports and follow prior literature in defining greenwashing as the gap between "talk" and "walk", where narratives (talk) that are incommensurate with actual underlying performance (walk), are indicative of ESG misrepresentation.

We find that UK firms reduce carbon talk that is overly-lengthy, positive and vague, relative to underlying carbon performance, around MCR. This is the case for both UK firms that disclose GHG voluntarily before MCR, and those that do not. This shows that mandated reporting can reduce greenwashing even when the mandated information was previously reported. We conjecture that this is due to a strengthening of the reliability and usability of disclosed GHG data under mandated reporting which enhances users' reliance on it, and in turn disciplines firms' qualitative discussions.

We also find that UK firms decrease greenwashing of other, non-carbon environmental information disclosed voluntarily before and after MCR (e.g. pollution and waste). This is consistent with external stakeholders becoming more attentive to firms' broader environmental reporting after MCR, raising the expected costs of greenwashing and disciplining firms to greenwash less on other environmental factors. Last, we provide descriptive evidence of a new channel for ESG improvements following mandatory ESG reporting. Specifically, we document a substitution between misleading carbon talk and actual carbon emission reductions. This is consistent with MCR hindering firms' ability to tout their sustainability by greenwashing and instead forcing firms to take real actions to demonstrate their seriousness about climate change.

The practical implications of this study are significant. Practitioners, lawmakers and

34

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu

637

**SER 302**

academics have discussed the potential for mandated ESG reporting to discipline greenwashing, but, to our knowledge, no study has provided real-world evidence on the matter. We fill this gap and empirically document greenwashing reductions after MCR. However, it is important to note that while greenwashing reductions have the potential to benefit ESG-oriented investors and stakeholders who make decisions on the basis of ESG, we cannot speak to MCR's overall welfare effects as we do not conduct a general equilibrium analysis to examine all of its possible costs and benefits.

## References

Bailey, M., Glaeser, S., Omartian, J. D., and Raghunandan, A. 2024. Misreporting of mandatory ESG disclosures: Evidence from gender pay gap information. *Working paper.*

Baker, A. C., D. F. Larcker, C. G. McClure, D. Saraph, and E. M. Watts. 2024. Diversity washing. *Journal of Accounting Research*, 62(5): p. 1661-1709.

Ball, R., S. Jayaraman, and L. Shivakumar. 2012. Audited Financial Reporting and Voluntary Disclosure as Complements: A Test of the Confirmation Hypothesis. *Journal of Accounting and Economics* 53: 136-166.

Bauckloh, T., Klein, C., Pioch, T., and F. Schiemann. 2023. Under Pressure? The Link Between Mandatory Climate Reporting and Firms' Carbon Performance. *Organization & Environment*, 36(1): 126-149.

Bens, D. A., C. Chen, and P. R. Joos. 2022. The association between mandated environmental liability recognition and voluntary ESG disclosure quality. *Working paper.*

Bloomberg Professional Services. Global Environmental, Social & Governance – ESG Data. 2022. https://www.bloomberg.com/professional/dataset/global-environmental-social-governance-data/#:~:text=Bloomberg's%2C%20Social%20%26%20Governance%20(,for%20over%20410%2C000%20active%20securities.

Bolton, P., and M. Kacperczyk. 2021. Do investors care about carbon risk? *Journal of Financial Economics* 142 (2): 517-549.

Cheng, S.F., De Franco, G., Jiang, H., Lin, P. 2019. Riding the blockchain mania: Public firms' speculative 8-k disclosures. *Management Science* 65 (12): 5901–5913.

Cho, C. H., J. R. Phillips, A. M. Hageman, and D. M. Patten. 2009. Media richness, user trust, and perceptions of corporate social responsibility: An experimental investigation of visual web site disclosures. *Accounting, auditing & accountability journal* 22 (6): 933-952.

Cho, C. H., R. Roberts, and D. Patten. 2010. The language of US corporate environmental disclosure. *Accounting, Organizations and Society* 35 (4): 431-443.

Christensen, H. B., E. Floyd, L. Liu, and M. Maffett. 2017. The real effects of mandated information on social responsibility in financial reports: Evidence from mine-safety records. *Journal of Accounting and Economics* 64 (2-3): 284-304.

Christensen, H. B., L. Hail, and C. Leuz. 2021. Mandatory CSR and sustainability reporting: economic analysis and literature review. *Review of Accounting Studies* 26 (3): 1176–1248.

Christensen, L.T., Morsing, M., and O. Thyssen. 2013. CSR as aspirational talk. *Organization* 20(3): 372-393.

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
638
**SER 303**

Cohen, S., I. Kadach, and G. Ormazabal. 2023. Institutional investors, climate disclosure, and carbon emissions. *Journal of Accounting and Economics*, 76(2-3): 101640.

Department for Environment, Food & Rural Affairs (DEFRA). 2012a. Leading Businesses to disclose greenhouse gas emissions.https://www.gov.uk/government/news/leading-businesses-to-disclose-greenhouse-gas-emissions

Department for Environment, Food & Rural Affairs (DEFRA). 2012b. Policy paper. Company reporting of greenhouse gas emissions. https://www.gov.uk/government/publications/company-reporting-of-greenhouse-gas-emissions

Department for Environment, Food & Rural Affairs (DEFRA). 2012c. Environmental reporting guidelines: Mandatory greenhouse gas emissions reporting. www.gov.uk/defra

Dhaliwal, D. S., O. Z. Li, A. Tsang, and Y. G. Yang. 2011. Voluntary nonfinancial disclosure and the cost of equity capital: The initiation of corporate social responsibility reporting. *The Accounting Review* 86 (1): 59–100.

Dhaliwal, D. S., S. Radhakrishnan, A. Tsang, and Y. G. Yang. 2012. Nonfinancial disclosure and analyst forecast accuracy: International evidence on corporate social responsibility disclosure. *The Accounting Review* 87 (3): 723–759.

Downar, B., J. Ernstberger, S. Reichelstein, S. Schwenen, and A. Zaklan. 2021. The impact of carbon disclosure mandates on emissions and financial operating performance. *Review of Accounting Studies* 26 (3): 1137–1175.

Ferri, F., R. Zheng, and Y. Zou. 2018. Uncertainty about managers' reporting objectives and investors' response to earnings reports: Evidence from the 2006 executive compensation disclosures. *Journal of Accounting and Economics* 66 (2–3): 339–365.

Fiechter, P., Hitz, J-M., and N. Lehman. 2022. Real effects of a widespread CSR reporting mandate: Evidence from the European Union's CSR Directive. *Journal of Accounting Research* 60 (4): 1499-1549.

Gigler, F. and T. Hemmer. 1998. On the Frequency, Quality, and Informational Role of Mandatory Financial Reports. *Journal of Accounting Research* 36 (Supplement): 117-147.

Greenhouse Gas Protocol. 2022. Calculation Tools. https://ghgprotocol.org/calculationg-tools-faq

Grewal, J., A. Mohan, and G. Pérez-Cavazos. 2024. Payment Practices Transparency and Customer-Supplier Dynamics. *Journal of Accounting Research* 62 (2): 635-674.

Grewal, J., and G. Serafeim. 2020. Research on corporate sustainability: Review and directions for future research. *Foundations and Trends® in Accounting* 14 (2): 73–127.

Grewal, J., E. J. Riedl, and G. Serafeim. 2019. Market reaction to mandatory nonfinancial disclosure. *Management Science* 65 (7): 3061–3084.

Hail, L. S. Kim, and R.X. Zhang. 2021. How do managers greenwash? Evidence from earnings conference calls. *Workingpaper.*

Hainmueller, J. 2012. Entropy Balancing for Causal Effects: A multivariate reweighting method to produce balanced samples in observational studies. *Political Analysis* 20 (1): 25–46.

Huang, A. H., H. Wang, and Y. Yang. 2023. FinBERT: A large language model for extracting information from financial text. *Contemporary Accounting Research* 40 (2): 806-841.

Huang, J., and S. Lu. 2022. ESG Performance and voluntary ESG disclosure: Mind the (gender pay) gap. *SSRN Electronic Journal.*

Huang, X., S. H. Teoh, and Y. Zhang. 2014. Tone management. *The Accounting Review* 89 (3): 1083–1113.

Ioannou, I., and G. Serafeim. 2015. The impact of corporate social responsibility on investment recommendations: Analysts' perceptions and shifting institutional logics. *Strategic Management Journal* 36 (7): 1053–1081

36

Exhibit 19 to Decl. of Angel Hsu
639
**SER 304**

Jones, J. 2022. Canadian standards board created to oversee ESG reporting amid global calls for better transparency. *The Globe and Mail*. https://www.theglobeandmail.com/business/article-esg-reporting-companies-canadian-sustainability-standards-board/.

Kim, S., and A. Yoon. 2022. Analyzing active fund managers' commitment to ESG: Evidence from the United Nations Principles for Responsible Investment. *Management Science*, forthcoming.

Lang, M. H., and R. J. Lundholm. 1996. Corporate disclosure policy and analyst behavior. *The Accounting Review*: 467-492.

Lee. A. H. 2022. It's not easy being green: Bringing transparency and accountability to sustainable investing. https://www.sec.gov/news/statement/lee-statement-esg-052522#_ftn3.

Li, F., R. Lundholm, and M. Minnis. 2013. A measure of competition based on 10-K filings. *Journal of Accounting Research* 51 (2): 399-436.

Liang, X., and H. Wu. 2022. Does the tone in corporate social responsibility reports misdirect analysts' forecasts in China? *Sustainability* 14 (24): 16631.

Loughran, T., and B. McDonald. 2011. When is a liability not a liability? Textual analysis, dictionaries, and 10-Ks. *The Journal of Finance* 66 (1): 35-65.

Loughran, T., and B. McDonald. 2013. IPO first-day returns, offer price revisions, volatility, and form S-1 language. *Journal of Financial Economics* 109 (2): 307-326.

Lundholm, R. 2003. Historical Accounting and the Endogenous Credibility of Current Disclosures. *Journal of Accounting, Auditing & Finance* 18 (1): 207-229.

Lyon, T. P., and A. W. Montgomery. 2013. Tweet jacked: The impact of social media on corporate greenwash. *Journal of Business Ethics* 118: 747-757.

Lyon, T. P., and A. W. Montgomery. 2015. The means and end of greenwash. *Organization & Environment* 28 (2): 223-249.

Lyon, T. P., and J. W. Maxwell. 2011. Greenwash: Corporate environmental disclosure under threat of audit. *Journal of Economics & Management Strategy* 20 (1): 3–41.

Marquis, C., M. W. Toffel, and Y. Zhou. 2016. Scrutiny, norms, and selective disclosure: A global study of greenwashing. *Organization Science* 27 (2): 483-504.

Martínez-Ferrero, J., O. Suárez-Fernández, and I. M. García-Sánchez. 2019. Obfuscation versus enhancement as corporate social responsibility disclosure strategies. *Corporate Social Responsibility and Environmental Management* 26 (2): 468-480.

Matsumura, E.M., R. Prakash, and S.C. Vera- Muñoz. 2022. Climate-Risk Materiality and Firm Risk. *Review of Accounting Studies* Sep 21: 1-42.

Menna, H. 2023. "2022 in review: the evolution of the ESG reporting landscape." https://www.ey.com/en_us/insights/climate-change-sustainability-services/the-evolution-of-the-esg-reporting-landscape

Merkle-Davies, and N.M. Brennan. 2007. Discretionary disclosure strategies in corporate narratives: Incremental information or impression management? *Journal of Accounting Literature* 27: 116-196.

Meyer, J. W., and B. Rowan. 1977. Institutionalized organizations: Formal structure as myth and ceremony. *American Journal of Sociology* 83: 340-363.

Michelon, G., S. Pilonato, and F. Ricceri. 2015. CSR reporting practices and the quality of disclosure: An empirical analysis. *Critical Perspectives on Accounting* 33: 59-78.

Mio, C., P. L. Marchini, and A. Medioli. 2020. Forward-looking information in integrated reports: Insights from "best in class". *Corporate Social Responsibility and Environmental Management* 27 (5): 2212-2224.

Mishra, S. 2022. Regulatory Solutions: A Global Crackdown on ESG Greenwash. Harvard Law School Forum on Corporate Governance. https://corpgov.law.harvard.edu/2022/06/23/regulatory-solutions-a-global-crackdown-on-esg-greenwash/

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu

640

**SER 305**

Orazi, D.C. and E.Y. Chan. 2020. "They did not walk the green talk!:" How information specificity influences consumer evaluations of disconfirmed environmental claims. *Journal of Business Ethics* 163: 107-123.

Patten, D. M. 2002. The relation between environmental performance and environmental disclosure: a research note. *Accounting, Organizations and Society* 27 (8): 763–773.

Pinnuck, M., Ranasinghe, A. and N. Soderstrom. 2020. Restatement of CSR reports: Frequency, magnitude, and determinants. *Contemporary Accounting Research* 38 (3): 2376-2416.

Raghunandan, A., and S. Rajgopal. 2023. Do socially responsible firms walk the talk? *Forthcoming, Journal of Law and Economics*.

Rauter, T. 2020. The effect of mandatory extraction payment disclosures on corporate payment and investment policies abroad. *Journal of Accounting Research* 58(5):1075-1116.

Ruiz-Blanco, S., S. Romero, and B. Fernandez-Feijoo. 2022. Green, blue or black, but washing - What company characteristics determine greenwashing? *Environment, Development and Sustainability*, 24 (3): 4024-4045.

Securities and Exchange Commission (SEC). 2024. "The Enhancement and Standardization of Climate-Related Disclosures for Investors (final rules)". https://www.sec.gov/files/rules/final/2024/33-11275.pdf

Stocken, P. 2000. Credibility of Voluntary Disclosure. *RAND Journal of Economics* 31 (2): 359-374.

Tomar, S. 2023. Greenhouse gas disclosure and emissions benchmarking. *Journal of Accounting Research* 61 (2): 451-492.

Yu, E.P., V.B. Luu, and C.H. Chen. 2020. Greenwashing in environmental, social and governance disclosures. *Research in International Business and Finance* 52: 101-192.

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu

**SER 306**

## Appendix I: Variable Definitions

| VARIABLE | DEFINITION | SOURCE |
|---|---|---|
| LENGTH_CARBON | Percentile rank of total carbon sentences (classified by FinBERT) scaled by total number of sentences in CSR reports, minus percentile rank of scope 1+2 GHG multiplied by -1. Percentile rank is calculated at country-sector-year level: (rank-1)/(number of firms-1). | Computed |
| TONE_CARBON | Percentile rank of the positive tone of carbon sentences in CSR reports, minus percentile rank of scope 1+2 GHG multiplied by -1. Percentile rank is calculated at country-sector-year level: (rank-1)/(number of firms-1). Positive tone equals total positive minus negative carbon sentences (classified by FinBERT) divided by the sum of positive and negative carbon sentences. | Computed |
| FLVAGUE_CARBON | Percentile rank of vague forward-looking carbon sentences in CSR reports, minus percentile rank of scope 1+2 GHG multiplied by -1. Percentile rank is calculated at country-sector-year level: (rank-1)/(number of firms-1). Vague forward-looking equals -1 times total carbon sentences that are specific forward-looking (classified by FinBERT) scaled by total number of carbon sentences. | Computed |
| GW_CARBON | Average of LENGTH_CARBON, TONE_CARBON, and FLVAGUE_CARBON. | Computed |
| SELECTIVE_CARBON_DISC | Selective Carbon Disclosure equals Absolute Carbon Disclosure Ratio minus Weighted Carbon Disclosure Ratio. Absolute Carbon Disclosure Ratio is the fraction of carbon indicators that a company publicly discloses in a given year. Carbon indicators consist of scope 1 and 2 GHG. Weighted Carbon Disclosure Ratio is the proportion of the firm's total scope 1 and 2 GHG (estimated if no disclosure is made) that the firm discloses. | Trucost Plc |
| LENGTH_NONCARBON | Percentile rank of total pollution and waste sentences (classified by FinBERT) scaled by total number of sentences in CSR reports, minus percentile rank of total pollution and waste multiplied by -1. Percentile rank is at country-sector-year level: (rank-1)/(number of firms-1). Total pollution and waste equals the sum of total waste net of recycled waste, NOx emissions, ozone-depleting substances, and VOC emissions. | Computed |
| TONE_NONCARBON | Percentile rank of the positive tone of pollution and waste sentences in CSR reports, minus the percentile rank of total pollution and waste multiplied by -1. Percentile rank is at country-sector-year level: (rank-1)/(number of firms-1). Positive tone equals total positive minus negative pollution and waste sentences (classified by FinBERT) divided by the sum of positive and negative pollution and waste sentences. Total pollution and waste equals the sum of total waste net of recycled waste, NOx emissions, ozone-depleting substances, and VOC emissions. | Computed |
| FLVAGUE_NONCARBON | Percentile rank of vague forward-looking pollution and waste sentences in CSR reports, minus percentile rank of total pollution and waste multiplied by -1. Percentile rank is at country-sector-year level: (rank-1)/(number of firms-1). Vague forward-looking equals -1 times total pollution and waste sentences that are specific forward-looking (classified by FinBERT), scaled by total number of pollution and waste sentences. Total pollution and waste equals the sum of total waste net of recycled waste, NOx emissions, ozone-depleting substances, and VOC emissions. | Computed |

39

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
642

| Variable | Description | Source |
|---|---|---|
| GW_NONCARBON | Average of LENGTH_NONCARBON, TONE_NONCARBON, and FLVAGUE_NONCARBON. | Computed |
| GW_OVERALL | Average of GW_CARBON and GW_NONCARBON. | Computed |
| SELECTIVE_ NONCARBON_DISC | Selective Non-Carbon Disclosure equals Absolute Non-Carbon Disclosure Ratio minus Weighted Non-Carbon Disclosure Ratio. Absolute Non-Carbon Disclosure Ratio is the fraction of non-carbon indicators that a company publicly discloses in a given year. Non-carbon indicators consist of: consumption of various natural resources (e.g. biomass, metals, minerals, and water), waste, and non-carbon pollutants (land, water, and air). Weighted Non-Carbon Disclosure Ratio is the proportion of the firm's total non-carbon pollutants (estimated if no disclosure is made) that the firm discloses. | Computed |
| TREAT | Equals one for UK publicly-traded firms; zero otherwise. | Trucost Plc |
| POST | Equals one for financial years ending on or after September 30, 2013; zero otherwise. | Trucost Plc |
| ASSET | Natural log of total assets. | S&P Global |
| REVENUE | Natural log of total revenue. | S&P Global |
| ROA | Total revenue scaled by total assets. | S&P Global |
| LEVERAGE | Total debt scaled by total assets. | S&P Global |
| GHG | Sum of scope 1 and scope 2 carbon emissions. | Trucost Plc |
| GHG_INTEN | Natural log of GHG divided by total revenue. | Trucost Plc |
| POLLUTION_WASTE | Sum of total waste net of recycled waste, NOx emissions, ozone depleting substances, and VOC emissions. | Refinitiv |
| POLLUTION_WASTE _INTEN | Natural log of POLLUTION_WASTE divided by total revenue. | Refinitiv |
| ENV_FINES | Natural log of total environmental fines. | Refinitiv |
| REP_RISK | Reputation risk index that captures a firm's current level of exposure to negative ESG news and ranges from 0 to 100, with higher values denoting higher risk exposure. | RepRisk |
| TARGET_DIFFICULTY | Targeted % reduction in GHG / (Target year – Base year) x % of firm's total GHG covered by the target. Averaged over all of the firm's absolute targets in a given year. | CDP |
| TARGET_SCIENCE | Indicator equals one if any of a firm's absolute carbon reduction targets in a given year is approved by the Science-Based Target Initiative as being aligned with climate science, zero otherwise. | CDP |
| CARBON_TALK_ DECREASE | Indicator equal to 1 if firm's CARBON_TALK percentile rank is lower on average in the post-period than in the pre-period, zero otherwise. CARBON_TALK percentile rank is the sum of the percentile ranks of *Length* (fraction of carbon sentences in CSR reports), *Positive Tone* (positive minus negative carbon sentences divided by the sum of both), and *Forward-Looking Vagueness* (-1 times the fraction of carbon sentences that are specific forward-looking). Percentile rank is at country-sector-year level: (rank-1)/(number of firms-1). | Computed |

Electronic copy available at: https://ssrn.com/abstract=4166184

40

Exhibit 19 to Decl. of Angel Hsu

643

## Appendix II: Parallel Trends

The figures below report coefficients and 95% confidence intervals of OLS regressions estimating the effect of Mandatory Carbon Reporting on carbon greenwashing ($GW\_CARBON$) and non-carbon greenwashing ($GW\_NONCARBON$) (defined in Appendix I) for treated UK firms and control non-UK firms. We estimate model (1) but replace $TREAT \times POST$ with time dummy variables, each representing one time period relative to the year the mandate comes into effect (t=0). To account for the staggered implementation of MCR, t=0 refers to the year 2013 for firms with a fiscal year-end after September 30th, while t=0 refers to the year 2014 for firms with a fiscal year-end prior to September 30th. The indicator for year t=0 is the omitted benchmark period.

**Figure 1a - Full sample – $GW\_CARBON$**



**Figure 1b - Full sample – $GW\_NONCARBON$**



**Figure 1c - Entropy-balanced sample – $GW\_CARBON$**



**Figure 1d - Entropy-balanced sample – $GW\_NONCARBON$**



41

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
644

## APPENDIX III: Entropy Balancing

The tables below tabulate descriptive statistics (sample means, variances and skewness) for the treatment and control samples before and after employing entropy balancing. Variables are defined in Appendix I.

**Before entropy balancing** - Carbon Greenwashing Sample

|  | Treat (N = 727) | | | Control (N = 3,550) | | |
|---|---|---|---|---|---|---|
|  | Mean | Variance | Skewness | Mean | Variance | Skewness |
| ASSET | 23.04 | 3.86 | 0.71 | 23.71 | 2.63 | 0.42 |
| REVENUE | 22.31 | 2.73 | -0.16 | 23.01 | 1.87 | -0.01 |
| ROA | 0.83 | 0.45 | 0.97 | 0.73 | 0.31 | 1.53 |
| LEVARAGE | 0.24 | 0.03 | 0.48 | 0.29 | 0.02 | 0.39 |

**After entropy balancing** - Carbon Greenwashing Sample

|  | Treat (N = 727) | | | Control (N = 3,550) | | |
|---|---|---|---|---|---|---|
|  | Mean | Variance | Skewness | Mean | Variance | Skewness |
| ASSET | 23.04 | 3.86 | 0.71 | 23.05 | 3.86 | 0.71 |
| REVENUE | 22.31 | 2.73 | -0.16 | 22.31 | 2.73 | -0.16 |
| ROA | 0.83 | 0.45 | 0.97 | 0.83 | 0.45 | 0.97 |
| LEVERAGE | 0.24 | 0.03 | 0.48 | 0.24 | 0.03 | 0.48 |

**Before entropy balancing** - Non-Carbon Greenwashing Sample

|  | Treat (N = 563) | | | Control (N = 3,667) | | |
|---|---|---|---|---|---|---|
|  | Mean | Variance | Skewness | Mean | Variance | Skewness |
| ASSET | 23.29 | 3.90 | 0.63 | 23.63 | 2.49 | 0.40 |
| REVENUE | 22.61 | 2.73 | -0.27 | 23.01 | 1.85 | 0.04 |
| ROA | 0.84 | 0.42 | 0.76 | 0.75 | 0.30 | 1.61 |
| LEVERAGE | 0.23 | 0.03 | 0.54 | 0.29 | 0.02 | 0.43 |

**After entropy balancing** - Non-Carbon Greenwashing Sample

|  | Treat (N = 563) | | | Control (N = 3,667) | | |
|---|---|---|---|---|---|---|
|  | Mean | Variance | Skewness | Mean | Variance | Skewness |
| ASSET | 23.29 | 3.90 | 0.63 | 23.29 | 3.90 | 0.63 |
| REVENUE | 22.61 | 2.73 | -0.27 | 22.61 | 2.73 | -0.27 |
| ROA | 0.84 | 0.42 | 0.76 | 0.84 | 0.42 | 0.77 |
| LEVARAGE | 0.23 | 0.03 | 0.54 | 0.23 | 0.03 | 0.55 |

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu

**SER 310**

## APPENDIX IV: Description of Trucost and Refinitiv

**Trucost**

Trucost is a leading provider of carbon and environmental data. Founded in 2000 and acquired by S&P in 2016, Trucost's data (which includes greenhouse gas emissions, water, waste, pollution and natural resources) covers over 15,000 companies representing 99% of global market capitalization. We use the following data from Trucost to construct our primary carbon greenwashing measures: firm disclosed scope 1 emissions (direct emissions from sources owned by the company, e.g. emissions that result from the combustion of fuel to heat or power buildings) and firm disclosed scope 2 emissions (indirect emissions generated off-site, e.g. purchased electricity or heat).

**Refinitiv**

Refinitiv is a prominent provider of ESG data, covering over 12,500 companies worldwide. Refinitiv compiles ESG data points using firm disclosures.

We use the following data from Refinitiv to construct our primary non-carbon greenwashing measures.

| Data point from Refinitiv | Definition |
|---|---|
| Waste Total | Total amount of waste produced in tonnes, including non-hazardous waste and hazardous waste. |
| NOx Emissions | Total amount of NOx emissions emitted in tonnes. Gases relevant: NOx (nitrogen oxide), NO (nitric oxide), NO2 (nitrogen dioxide) – these emissions contribute to eutrophication, acidification and the formation of ground-level ozone. |
| Ozone-Depleting Substances | Total amount of ozone depleting (CFC-11 equivalents) substances emitted in tonnes, including chlorofluorocarbons (CFCS), hydrochlorofluorocarbons (HFCS), halons, methyl bromide, carbon tetrachloride, and methyl chloroform. |
| VOC Emissions | Total amount of volatile organic compounds (VOC) emissions in tonnes, including hydrocarbon emissions (THC), or unburned hydrocarbons (UHC) excluding methane and ethane. |
| Waste Recycled Total | Total recycled and reused waste produced in tonnes. Waste used through incineration to generate energy and waste used for composting also considered as waste recycled. Wastes recycled include both hazardous and non-hazardous waste. |

43

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu

646

## APPENDIX V: Carbon Mandates Affecting Control Sample

This table summarizes carbon regulations that passed during our sample period that affect firms in our control sample (e.g. mandated GHG disclosure, carbon taxation, cap-and-trade schemes, etc.). We identify these mandates using the database from the Grantham Research Institute on Climate Change and the Environment and the Sabin Center on Climate Change Law which includes more than 1,200 policies across 164 countries accounting for over 95% of global GHG (https://climate-laws.org/). In Section 8.2, we explain our approach to addressing these mandates in our analyses.

| Country | Year law passed | Year law came into effect | Type of mandate | Firms affected | Description |
|---------|-----------------|---------------------------|-----------------|----------------|-------------|
| Ireland | 2008 | 2010 | Carbon tax | All organizations | Ireland's carbon tax (€20/ton since 2012) covers fossil fuels consumed by homes, offices, vehicles and farms. |
| United States | 2008 | 2009 | Emissions disclosure | Large emitters | Mandatory Reporting of Greenhouse Gases Rule covers large emitters in the United States. Facilities emitting at least 25,000 metric tons of $CO_2$ equivalent/annum must disclose GHG data annually to the EPA. |
| European Union | 2001 | 2005 | Cap-and-trade | Power generators and manufacturing | European Union Emissions Trading Scheme (EU ETS) is the largest emissions trading scheme in the world. Firms are required to disclose facility-level scope 1 GHG to the regulator and submit to audits of scope 1 figures. |

44

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
647

**Table 1 Sample Selection Procedure and Descriptive Statistics**

**Panel A: Sample Selection**

**Carbon Greenwashing Sample**

| | |
|---|---|
| UK, US and EU CSR reports from 2004-2019 | 10,877 |
| Less: reports without carbon disclosure | 197 |
| Less: Trucost data not available | 2,242 |
| Less: missing values for control variables | 365 |
| Less: GHG data based on Trucost estimates | 3,786 |
| Less: countries with less than 10 observations | 10 |
| Final sample (firm-years) | 4,277 |

This panel presents the sample selection procedure for the carbon greenwashing sample.

**Non-Carbon Greenwashing**

| | |
|---|---|
| UK, US and EU CSR reports from 2004-2019 | 10,877 |
| Less: reports without pollution and waste disclosure | 440 |
| Less: Refinitiv data not available | 5,192 |
| Less: missing values for control variables | 1,004 |
| Less: countries with less than 10 observations | 11 |
| | 4,230 |

This panel presents the sample selection procedure for the non-carbon greenwashing sample. Note that Refinitiv, unlike Trucost, does not estimate pollution and waste in instances where disclosure is not available.

**Panel B: Descriptive Statistics**

**Carbon Greenwashing Sample**

| Variables | Treat | | | Control | | | Diff in mean ($t$-stat) |
|---|---|---|---|---|---|---|---|
| | Mean | Median | Std. Dev. | Mean | Median | Std. Dev. | |
| GW_CARBON | 0.10 | 0.11 | 0.35 | 0.19 | 0.20 | 0.30 | 6.92 |
| LENGTH_CARBON | 0.12 | 0.07 | 0.47 | 0.24 | 0.23 | 0.42 | 6.70 |
| TONE_CARBON | 0.09 | 0.07 | 0.45 | 0.15 | 0.11 | 0.38 | 3.50 |
| FLVAGUE_CARBON | 0.09 | 0.00 | 0.43 | 0.18 | 0.13 | 0.38 | 5.68 |
| ASSET | 23.04 | 22.86 | 1.96 | 23.71 | 23.56 | 1.62 | 9.73 |
| REVENUE | 22.31 | 22.29 | 1.65 | 23.01 | 22.97 | 1.37 | 12.09 |
| ROA | 0.83 | 0.72 | 0.67 | 0.73 | 0.64 | 0.56 | 3.94 |
| LEVERAGE | 0.24 | 0.24 | 0.16 | 0.29 | 0.28 | 0.16 | 8.04 |

This panel presents descriptive statistics of the variables (defined in Appendix I), for the treatment and control firms in the carbon greenwashing sample. Two-tailed t-tests are conducted for comparing the means of these variables between the treatment and control group.

45

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu

648

**SER 313**

**Non-Carbon Greenwashing Sample**

| Variables | Treat | | | Control | | | Diff in mean (*t*-stat) |
|---|---|---|---|---|---|---|---|
| | Mean | Median | Std. Dev. | Mean | Median | Std. Dev. | |
| GW_NONCARBON | 0.13 | 0.14 | 0.31 | 0.13 | 0.13 | 0.28 | 0.06 |
| LENGTH_NONCARBON | 0.18 | 0.13 | 0.41 | 0.18 | 0.11 | 0.40 | 0.50 |
| TONE_NONCARBON | 0.10 | 0.00 | 0.38 | 0.10 | 0.00 | 0.36 | 0.21 |
| FLVAGUE_NONCARBON | 0.13 | 0.08 | 0.43 | 0.12 | 0.03 | 0.36 | 0.61 |
| ASSET | 23.29 | 23.09 | 1.97 | 23.63 | 23.51 | 1.58 | 4.56 |
| REVENUE | 22.61 | 22.67 | 1.65 | 23.01 | 22.99 | 1.36 | 6.29 |
| ROA | 0.84 | 0.70 | 0.65 | 0.75 | 0.65 | 0.54 | 3.54 |
| LEVERAGE | 0.23 | 0.23 | 0.16 | 0.29 | 0.28 | 0.16 | 7.45 |

This panel presents descriptive statistics of the variables (defined in Appendix I), for the treatment and control firms in the non-carbon sample. Two-tailed t-tests are conducted for comparing the means of these variables between the treatment and control group.

**Panel C: Industry Distribution – Full Sample**

| | Carbon Greenwashing Sample | | | | Non-Carbon Greenwashing Sample | | | |
|---|---|---|---|---|---|---|---|---|
| | Treat | | Control | | Treat | | Control | |
| | Freq. | % | Freq. | % | Freq. | % | Freq. | % |
| Communication Services | 29 | 3.99 | 181 | 5.10 | 24 | 4.26 | 179 | 4.88 |
| Consumer Discretionary | 110 | 15.13 | 368 | 10.37 | 97 | 17.23 | 351 | 9.57 |
| Consumer Staples | 110 | 15.13 | 318 | 8.96 | 99 | 17.58 | 324 | 8.84 |
| Energy | 22 | 3.03 | 189 | 5.32 | 32 | 5.68 | 257 | 7.01 |
| Financials | 116 | 15.96 | 389 | 10.96 | 84 | 14.92 | 295 | 8.04 |
| Health Care | 33 | 4.54 | 227 | 6.39 | 39 | 6.93 | 260 | 7.09 |
| Industrials | 162 | 22.28 | 692 | 19.49 | 88 | 15.63 | 656 | 17.89 |
| Information Technology | 15 | 2.06 | 343 | 9.66 | 0 | 0.00 | 350 | 9.54 |
| Materials | 44 | 6.05 | 414 | 11.66 | 50 | 8.88 | 472 | 12.87 |
| Real Estate | 60 | 8.25 | 137 | 3.86 | 31 | 5.51 | 109 | 2.97 |
| Utilities | 26 | 3.58 | 292 | 8.23 | 19 | 3.37 | 414 | 11.29 |
| Total | 727 | 100 | 3,550 | 100 | 563 | 100 | 3,667 | 100 |

46

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu
649
**SER 314**

**Panel D: Country Distribution – Control Sample**

| Country | Carbon Greenwashing Sample | | Non-Carbon Greenwashing Sample | |
|---|---|---|---|---|
| | Freq. | % | Freq. | % |
| Austria | 49 | 1.15 | 64 | 1.51 |
| Belgium | 28 | 0.65 | 37 | 0.87 |
| Denmark | 76 | 1.78 | 77 | 1.82 |
| Finland | 99 | 2.31 | 130 | 3.07 |
| France | 264 | 6.17 | 288 | 6.81 |
| Germany | 206 | 4.82 | 269 | 6.36 |
| Greece | 25 | 0.58 | 64 | 1.51 |
| Hungary | 23 | 0.54 | 13 | 0.31 |
| Ireland | 70 | 1.64 | 44 | 1.04 |
| Italy | 202 | 4.72 | 220 | 5.20 |
| Luxembourg | 21 | 0.49 | 23 | 0.54 |
| Netherlands | 79 | 1.85 | 71 | 1.68 |
| Poland | 12 | 0.28 | 35 | 0.83 |
| Portugal | 22 | 0.51 | 29 | 0.69 |
| Spain | 120 | 2.81 | 127 | 3.00 |
| Sweden | 148 | 3.46 | 139 | 3.29 |
| USA | 2,106 | 49.24 | 2,037 | 48.16 |
| United Kingdom | 727 | 17.00 | 563 | 13.31 |
| Total | 4277 | 100 | 4230 | 100 |

47

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu

650

**SER 315**







**Panel E: Levels of Carbon Talk at Different Levels of GHG**

**Panel F: Levels of Non-carbon Talk at Different Levels of Pollution and Waste**

These figures plot mean values of carbon and non-carbon talk (y-axes) at quartile values of scope 1 and 2 GHG (*GHG*) and pollution and waste (*POLLUTION_WASTE*) (x-axes). Q1 is the lowest level of GHG (or pollution and waste) and Q4 is the highest level of GHG (or pollution and waste). *Length*, *Tone*, and *Forward-Looking Vague* mirror our greenwashing measures, i.e. *Length* is the fraction of CSR report sentences that concern carbon or pollution and waste, *Tone* is the number of positive minus negative carbon or pollution and waste sentences divided by the sum both, and *Forward-Looking Vague* is -1 times the fraction of carbon or pollution and waste sentences that are specific forward-looking. These graphs show that as the level of GHG/pollution and waste increases, so does the level of carbon/non-carbon discourse that is suggestive of greenwashing.

48

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu

651

**SER 316**

## Table 2: Validation of Carbon and Non-Carbon Greenwashing Measures

| VARIABLES | GHG_INTEN T (1) | GHG_INTEN T+1 (2) | POLLUTION_WASTE_INTEN T (3) | POLLUTION_WASTE_INTEN T+1 (4) | ENV_FINES T (5) | ENV_FINES T+1 (6) | REP_RISK T (7) | REP_RISK T+1 (8) | TARGET_DIFFICULTY T (9) | TARGET_SCIENCE T (10) |
|---|---|---|---|---|---|---|---|---|---|---|
| GW_CARBON | 0.102*** (3.155) | 0.075** (2.576) | | | | | | | | |
| GW_NONCARBON | | | 1.076*** (6.912) | 0.472*** (4.645) | | | | | | |
| GW_OVERALL | | | | | 1.061*** (3.341) | 0.865** (1.978) | 2.962*** (3.000) | 2.430** (2.048) | -0.014*** (-3.843) | -0.107** (-2.247) |
| ASSET | -0.125** (-2.324) | -0.088 (-1.541) | 0.559*** (3.756) | 0.729*** (4.026) | -0.239* (-2.484) | -0.401*** (-3.010) | 4.113*** (5.372) | 3.478*** (3.582) | 0.002 (1.264) | 0.018 (0.542) |
| REVENUE | -0.153*** (-2.912) | -0.075 (-1.290) | -0.939*** (-6.408) | -0.901*** (-5.081) | 0.671*** (5.357) | 0.853*** (5.192) | 2.036** (2.504) | 2.794*** (2.696) | 0.000 (0.240) | 0.090** (2.331) |
| ROA | -0.262*** (-2.905) | -0.252*** (-3.692) | 0.413** (2.333) | 0.533*** (2.750) | -1.756*** (-11.212) | -1.961*** (-9.883) | -0.004 (-0.003) | -0.869 (-0.646) | -0.001 (-0.300) | -0.091 (-1.556) |
| LEVERAGE | -0.184 (-1.618) | -0.262*** (-2.632) | 0.318 (1.182) | 0.192 (0.734) | -1.197*** (-2.673) | -1.344*** (-2.718) | 1.039 (0.631) | -1.374 (-0.810) | -0.000 (-0.008) | 0.052 (0.419) |
| Observations | 4,277 | 3,366 | 3,972 | 3,166 | 2,750 | 2,100 | 2,069 | 1,659 | 1,336 | 760 |
| Adjusted $R^2$ | 0.974 | 0.976 | 0.861 | 0.869 | 0.204 | 0.219 | 0.450 | 0.432 | 0.057 | 0.213 |
| Firm FE & Year FE | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry, Year, and Country FE | | | | | Yes | Yes | Yes | Yes | Yes | Yes |

This table presents results of validation tests for greenwashing measures. GW_OVERALL is the average of GW_CARBON and GW_NONCARBON. The dependent variables include current year and one-year ahead GHG intensity, pollution and waste intensity, environmental fines, and reputation risk, as well as target difficulty and science-based target setting (all defined in Appendix I). ASSET, REVENUE, ROA, and LEVERAGE are included as control variables. Robust $t$-statistics clustered by country-year in parentheses. *** p<0.01, ** p<0.05, * p<0.1.

49

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu

652

**Table 3: Effect of Mandatory Carbon Reporting on Carbon Greenwashing**

**Panel A: Full Sample**

| VARIABLES | (1) LENGTH_CARBON | (2) TONE_CARBON | (3) FLVAGUE_CARBON | (4) GW_CARBON |
|---|---|---|---|---|
| **TREAT×POST** | **-0.131*** | **-0.069** | **-0.065*** | **-0.089*** |
|  | (-4.325) | (-2.480) | (-2.754) | (-5.111) |
| POST | 0.003 | 0.011 | 0.058 | 0.024 |
|  | (0.097) | (0.268) | (1.241) | (0.717) |
| ASSET | 0.060 | 0.079* | 0.034 | 0.058** |
|  | (1.532) | (1.926) | (1.023) | (2.224) |
| REVENUE | -0.003 | -0.034 | -0.026 | -0.021 |
|  | (-0.077) | (-0.857) | (-0.749) | (-0.754) |
| ROA | -0.054 | 0.004 | 0.031 | -0.006 |
|  | (-0.969) | (0.064) | (0.545) | (-0.157) |
| LEVERAGE | 0.024 | -0.001 | -0.059 | -0.012 |
|  | (0.276) | (-0.013) | (-0.646) | (-0.172) |
| Observations | 4,277 | 4,277 | 4,277 | 4,277 |
| Adjusted $R^2$ | 0.556 | 0.375 | 0.362 | 0.538 |
| Firm FE & Year FE | Yes | Yes | Yes | Yes |

**Panel B: Entropy-Balanced Sample**

| VARIABLES | (1) LENGTH_CARBON | (2) TONE_CARBON | (3) FLVAGUE_CARBON | (4) GW_CARBON |
|---|---|---|---|---|
| **TREAT×POST** | **-0.122*** | **-0.056** | **-0.065** | **-0.081*** |
|  | (-3.968) | (-2.015) | (-2.566) | (-4.176) |
| POST | 0.023 | 0.004 | 0.115** | 0.048 |
|  | (0.587) | (0.064) | (2.443) | (1.130) |
| ASSET | 0.037 | 0.110** | 0.024 | 0.057** |
|  | (0.883) | (2.545) | (0.566) | (2.095) |
| REVENUE | -0.004 | -0.044 | -0.016 | -0.021 |
|  | (-0.080) | (-1.122) | (-0.335) | (-0.749) |
| ROA | -0.057 | 0.030 | -0.037 | -0.021 |
|  | (-0.871) | (0.416) | (-0.454) | (-0.444) |
| LEVERAGE | 0.178* | 0.164 | 0.034 | 0.125 |
|  | (1.814) | (1.404) | (0.277) | (1.473) |
| Observations | 4,277 | 4,277 | 4,277 | 4,277 |
| Adjusted $R^2$ | 0.567 | 0.406 | 0.385 | 0.578 |
| Firm FE & Year FE | Yes | Yes | Yes | Yes |

This table presents results of regressions that examine the impact of MCR on carbon greenwashing. The dependent variables include three individual measures of greenwashing – *LENGTH_CARBON*, *TONE_CARBON*, and *FLVAGUE_CARBON* – as well as the composite measure of greenwashing, *GW_CARBON*, which is an average of the three. *ASSET*, *REVENUE*, *ROA*, and *LEVERAGE* are included as control variables. Robust *t*-statistics clustered by country-year in parentheses. *** p<0.01, ** p<0.05, * p<0.1.

50

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu

653

**SER 318**

**Table 4: Effect of Mandatory Carbon Reporting on Non-Carbon Greenwashing**

**Panel A: Full Sample**

| VARIABLES | (1) LENGTH _NONCARBON | (2) TONE _NONCARBON | (3) FLVAGUE _NONCARBON | (4) GW _NONCARBON |
|---|---|---|---|---|
| **TREAT×POST** | **-0.130*** | **-0.092*** | **-0.092**** | **-0.105*** |
| | **(-3.952)** | **(-2.960)** | **(-2.277)** | **(-3.810)** |
| POST | 0.065 | 0.032 | 0.097 | 0.065 |
| | (0.713) | (0.649) | (1.190) | (0.946) |
| ASSET | 0.100* | 0.094** | 0.069 | 0.088** |
| | (1.799) | (2.001) | (1.351) | (2.387) |
| REVENUE | -0.090 | -0.104** | -0.038 | -0.078** |
| | (-1.574) | (-2.182) | (-0.814) | (-1.996) |
| ROA | 0.026 | 0.074 | 0.091 | 0.064 |
| | (0.407) | (1.166) | (1.561) | (1.405) |
| LEVERAGE | 0.093 | 0.063 | 0.076 | 0.077 |
| | (1.184) | (0.725) | (0.900) | (1.271) |
| Observations | 4,230 | 4,230 | 4,230 | 4,230 |
| Adjusted $R^2$ | 0.452 | 0.296 | 0.281 | 0.421 |
| Firm FE & Year FE | Yes | Yes | Yes | Yes |

**Panel B: Entropy-Balanced Sample**

| VARIABLES | (1) LENGTH _NONCARBON | (2) TONE _NONCARBON | (3) FLVAGUE _NONCARBON | (4) GW _NONCARBON |
|---|---|---|---|---|
| **TREAT×POST** | **-0.149*** | **-0.113*** | **-0.107*** | **-0.123*** |
| | **(-5.281)** | **(-4.119)** | **(-3.196)** | **(-5.209)** |
| POST | 0.211** | 0.082* | 0.249*** | 0.181** |
| | (2.079) | (1.652) | (2.600) | (2.404) |
| ASSET | 0.081 | 0.144** | 0.169** | 0.132*** |
| | (1.247) | (2.289) | (2.420) | (3.670) |
| REVENUE | -0.042 | -0.091 | -0.126** | -0.086* |
| | (-0.612) | (-1.561) | (-2.210) | (-1.967) |
| ROA | -0.015 | 0.132 | 0.175*** | 0.098 |
| | (-0.202) | (1.252) | (2.727) | (1.598) |
| LEVERAGE | 0.095 | 0.091 | 0.101 | 0.096 |
| | (0.917) | (0.679) | (0.929) | (1.163) |
| Observations | 4,230 | 4,230 | 4,230 | 4,230 |
| Adjusted $R^2$ | 0.424 | 0.323 | 0.284 | 0.417 |
| Firm FE & Year FE | Yes | Yes | Yes | Yes |

This table presents results of regressions that examine the impact of MCR on non-carbon greenwashing. The dependent variables include three individual measures of greenwashing– *LENGTH_NONCARBON*, *TONE_NONCARBON*, and *FLVAGUE_NONCARBON* – as well as the composite measure of greenwashing, *GW_NONCARBON*, which is an average of the three. *ASSET*, *REVENUE*, *ROA*, and *LEVERAGE* are included as control variables. Robust *t*-statistics clustered by country-year in parentheses. *** p<0.01, ** p<0.05, * p<0.1.

51

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu

654

**SER 319**

**Table 5: Real Effects**

| VARIABLES | (1)<br>GHG | (2)<br>GHG_INTEN |
|---|---|---|
| TREAT×POST×CARBON_TALK_DECREASE | -0.181*** | -0.134** |
| | (-2.697) | (-2.548) |
| TREAT×POST | 0.053 | 0.035 |
| | (1.065) | (0.707) |
| POST×CARBON_TALK_DECREASE | 0.014 | 0.007 |
| | (0.529) | (0.239) |
| POST | -0.027 | 0.004 |
| | (-0.693) | (0.114) |
| ASSET | -0.133 | 0.408*** |
| | (-1.605) | (5.033) |
| REVENUE | -0.138* | 0.193*** |
| | (-1.792) | (2.778) |
| ROA | -0.385*** | 0.069 |
| | (-4.105) | (0.810) |
| LEVERAGE | -0.264* | -0.317** |
| | (-1.661) | (-2.291) |
| Observations | 4,277 | 4,277 |
| Adjusted $R^2$ | 0.983 | 0.972 |
| Firm FE & Year FE | Yes | Yes |

This table presents results that associate declines in carbon talk with GHG. *CARBON_TALK_DECREASE* equals one if a firm's *CARBON_TALK* percentile rank is lower in the post-period than in the pre-period (see Appendix I). Robust *t*-statistics clustered by country-year in parentheses. *** p<0.01, ** p<0.05, * p<0.1.

**Table 6: Carbon Greenwashing and Non-Disclosers**

| VARIABLES | (1)<br>GW_CARBON |
|---|---|
| TREAT×POST | -0.232*** |
| | (-3.850) |
| POST | -0.023 |
| | (-0.622) |
| ASSET | 0.057 |
| | (1.622) |
| REVENUE | 0.009 |
| | (0.221) |
| ROA | -0.007 |
| | (-0.140) |
| LEVERAGE | -0.025 |
| | (-0.352) |
| Observations | 2,971 |
| Adjusted $R^2$ | 0.621 |
| Firm FE & Year FE | Yes |

This table presents results for UK firms that do not voluntarily disclose GHG prior to MCR. Pre-period consists of one period where *GW_CARBON* uses "talk" in the year right before MCR (i.e. 2012) and "walk" in the first year that MCR in in effect (i.e. 2013). Robust *t*-statistics clustered by country-year in parentheses. *** p<0.01, ** p<0.05, * p<0.1.

Electronic copy available at: https://ssrn.com/abstract=3944144

Exhibit 19 to Decl. of Angel Hsu
655
**SER 320**

**Table 7: Robustness Tests**
**Panel A: Assurance**

| VARIABLES | (1)<br>GHG Assurance<br>GW_CARBON | (2)<br>CSR Report Assurance<br>GW_CARBON |
|---|---|---|
| **TREAT×POST** | **-0.090*** | **-0.102*** |
| | **(-2.885)** | **(-2.945)** |
| POST | -0.023 | 0.083 |
| | (-0.580) | (0.912) |
| ASSET | 0.085** | 0.166*** |
| | (2.053) | (3.279) |
| REVENUE | 0.021 | -0.152*** |
| | (0.576) | (-2.913) |
| ROA | -0.041 | 0.176** |
| | (-0.684) | (2.467) |
| LEVERAGE | -0.143 | -0.014 |
| | (-1.321) | (-0.136) |
| Observations | 2,196 | 2,318 |
| Adjusted $R^2$ | 0.600 | 0.450 |
| Firm, Year FE | Yes | Yes |

This table presents results of robustness tests based on subsamples of firms with scope 1 & 2 GHG assurance (column 1) or CSR/sustainability report assurance (column 2). *ASSET*, *REVENUE*, *ROA*, and *LEVERAGE* are included as control variables. Robust *t*-statistics clustered by country-year in parentheses. *** p<0.01, ** p<0.05, * p<0.1.

**Panel B: Removing Countries with Concurrent GHG Regulations**

| VARIABLES | (1)<br>GW_CARBON | (2)<br>GW_NONCARBON |
|---|---|---|
| **TREAT×POST** | **-0.172*** | **-0.191*** |
| | **(-5.243)** | **(-5.176)** |
| POST | 0.170*** | 0.263*** |
| | (3.321) | (4.366) |
| ASSET | 0.004 | 0.134** |
| | (0.097) | (2.471) |
| REVENUE | -0.043 | -0.139** |
| | (-1.030) | (-2.220) |
| ROA | -0.078 | 0.068 |
| | (-1.043) | (0.723) |
| LEVERAGE | 0.424*** | 0.344*** |
| | (3.193) | (2.722) |
| Observations | 1,367 | 1,299 |
| Adjusted $R^2$ | 0.503 | 0.363 |
| Firm, Year FE | Yes | Yes |

This table presents results of robustness tests removing firms affected by potentially confounding GHG-related regulations (see Appendix V). *ASSET*, *REVENUE*, *ROA*, and *LEVERAGE* are included as control variables. Robust *t*-statistics clustered by country-year in parentheses. *** p<0.01, ** p<0.05, * p<0.1.

53

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu

656

**SER 321**

**Panel C: Alternative Non-Textual Greenwashing Measures**

| VARIABLES | (1) SELECTIVE_CARBON_DISC | (2) SELECTIVE_NONCARBON_DISC |
|---|---|---|
| **TREAT×POST** | **-0.030*** | **-0.080*** |
| | **(-4.674)** | **(-3.990)** |
| POST | 0.004 | 0.045 |
| | (0.666) | (0.993) |
| ASSET | 0.020** | 0.070*** |
| | (2.050) | (2.606) |
| REVENUE | -0.007 | -0.061** |
| | (-0.655) | (-2.124) |
| ROA | 0.002 | 0.059 |
| | (0.189) | (1.590) |
| LEVERAGE | -0.027 | 0.043 |
| | (-1.137) | (0.858) |
| Observations | 7,387 | 4,008 |
| Adjusted $R^2$ | 0.441 | 0.419 |
| Firm, Year FE | Yes | Yes |

This table presents the results of robustness tests using an alternate measure of greenwashing (selective disclosure) calculated using data from Trucost Plc. *ASSET, REVENUE, ROA,* and *LEVERAGE* are included as control variables. Robust *t*-statistics clustered by country-year in parentheses. *** p<0.01, ** p<0.05, * p<0.1.

**Panel D: Alternative Explanation for Carbon Greenwashing Decline**

| | (1) | (2) | (3) |
|---|---|---|---|
| *Subsample* | *GHG Increase or No Change* | *GHG Decrease* | *Full Sample* |
| VARIABLES | GW_CARBON | GW_CARBON | CARBON_TALK |
| **TREAT×POST** | **-0.078*** | **-0.088*** | **-0.487*** |
| | **(-2.608)** | **(-4.554)** | **(-4.072)** |
| POST | 0.035 | 0.015 | 0.304*** |
| | (0.866) | (0.396) | (3.258) |
| ASSET | -0.002 | 0.107** | -0.157 |
| | (-0.064) | (2.571) | (-1.174) |
| REVENUE | -0.008 | -0.066 | 0.142 |
| | (-0.244) | (-1.562) | (1.108) |
| ROA | -0.139*** | 0.139** | -0.346** |
| | (-2.687) | (2.318) | (-2.089) |
| LEVERAGE | -0.080 | 0.051 | -0.095 |
| | (-0.885) | (0.569) | (-0.397) |
| *F*-test comparing *TREAT_POST* in col (1) vs. col (2): *p < 0.53* | | | |
| Observations | 2,439 | 1,838 | 4,277 |
| Adjusted $R^2$ | 0.563 | 0.527 | 0.607 |
| Firm, Year FE | Yes | Yes | Yes |

This table presents results for subsamples of firms that reduce, and do not reduce GHG after MCR. *ASSET, REVENUE, ROA,* and *LEVERAGE* are included as control variables. Robust *t*-statistics clustered by country-year in parentheses. *** p<0.01, ** p<0.05, * p<0.1.

54

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu

657

**SER 322**

55

Electronic copy available at: https://ssrn.com/abstract=4166184

Exhibit 19 to Decl. of Angel Hsu

658

# Exhibit 14
# to Declaration of Angel Hsu

# Trencher, G., Nick, S., Carlson, J., & Johnson, M., Demand for low-quality offsets by major companies undermines climate integrity of the voluntary carbon market, 15(1) Nature communications 6863 (2024)

Exhibit 14 to Decl. of Angel Hsu
487
**SER 324**

## nature communications

Article    https://doi.org/10.1038/s41467-024-51151-w

# Demand for low-quality offsets by major companies undermines climate integrity of the voluntary carbon market

Received: 19 October 2023

Accepted: 30 July 2024

Published online: 10 August 2024

Check for updates

Gregory Trencher [1], Sascha Nick [2], Jordan Carlson [1] & Matthew Johnson[3]

Most companies include carbon offsets in their net-zero strategy. However, many offset projects are poor quality and fail to reduce emissions as claimed. Here we focus on the twenty companies retiring the most offsets from the voluntary carbon market over 2020–2023. We examine if their offsets could be considered high quality and likely to benefit the climate. We curate an original company-level dataset to examine quality and climate benefits across four dimensions: (1) use of offsets from low/high-risk project types; (2) age of projects and credits; (3) price of credits; and (4) country of implementation. We find that companies have predominantly sourced low-quality, cheap offsets: 87% carry a high risk of not providing real and additional emissions reductions, with most offsets originating from forest conservation and renewable energy projects. Further, most offsets do not meet industry standards regarding age and country of implementation. These findings provide further evidence that the voluntary carbon market is not supporting effective climate mitigation. Particularly, we show that its persisting quality issues are exacerbated by the demand for low-quality offsets by individual companies.

Increasing numbers of companies have pledged to reach net zero by 2050[1] to support climate mitigation efforts under the Paris Agreement[2]. To reach this goal with minimal changes to the underlying business, many companies are using or plan to use carbon offsets (also known as carbon credits)[3]. Offsets can be procured at low cost and are abundant on the voluntary carbon market (VCM). The appeal of offsets lies in their ability to allow companies to outsource decarbonisation efforts to external initiatives, thus avoiding the more difficult task of transforming their own operations and supply chains and phasing out fossil fuels[4,5]. The VCM has consequently grown rapidly. Valued at approximately US $2 billion in 2022, it is forecast to expand further in value and scale as companies increasingly seek to offset their emissions[6].

However, claims by companies that offsets provide a reliable tonne-for-tonne means to neutralise their greenhouse gas (GHG) emissions have lost credibility due to increasing evidence that many offset projects are of low quality and fail to deliver the emissions

reductions they promise[7]. Criticism has particularly concerned offsets from REDD+ (forest conservation)[8-11] and renewable energy projects[12-14]. Such projects issue credits based on the claim to have avoided GHG emissions, but they are prone to over-crediting and exaggerating their 'additionality' (i.e. when a project would not be implemented without the revenue generated by selling offsets)[15]. The larger concern is that if offsets do not represent real GHG reductions, global emissions will increase if companies use them to counterbalance their carbon-emitting activities[16]. Recognising this, the science-based targets initiative, seeking to align corporate decarbonisation strategies with pathways to keep global warming below 1.5 °C, requires that companies pursue net-zero targets by reducing emissions within their value chain without using offsets[17]. As terms like 'junk[18], 'worthless'[19] and 'carbon con'[20] are increasingly associated with offsets, companies relying on offsetting to accelerate decarbonisation also risk accusations of greenwashing[21-23].

[1]Graduate School of Global Environmental Studies, Kyoto University, Kyoto, Japan. [2]Laboratory of Environmental and Urban Economics (LEURE), Ecole Polytechnique Fédérale de Lausanne (EPFL), Lausanne, Switzerland. [3]Center for Earth System Research and Sustainability, Universität Hamburg, Hamburg, Germany. e-mail: trencher.gregory.2s@kyoto-u.ac.jp

Exhibit 14 to Decl. of Angel Hsu
488
SER 325

**Article**

https://doi.org/10.1038/s41467-024-51151-w

**Table 1 | Framework for assessing offset quality and climate benefits**

| Dimension | Indicator | Rule or standard illustratively used, coding framework and data source | Scientific basis in literature |
|---|---|---|---|
| 1. Relative quality risks | Do credits come from offset project types with a lower likelihood of overstating their emissions reduction or additionality? | Categorisations of offset project types with a lower, medium and higher risk using the relative quality risks framework in the *Quality Offsets Guide* by the Stockholm Environmental Institute and GHG Management Institute[9]. | 8,10,12,13,15,16 |
| 2. Age | Is the window between the offsetting activity and the time of retirement in line with industry standards? | Rule by Carbon Offsetting and Reduction Scheme for International Aviation (CORSIA) that excludes credits with a vintage year and project start year earlier than 2016. | 15,21,32,75 |
| 3. Price | Does the credit come from offset project types that typically sell for above-average prices? | Estimates of the average price paid for offsets by project category from Ecosystem Marketplace[15]. | 11,15,21 |
| 4. Country of implementation (applied to renewable energy projects) | Do credits derive from projects implemented in low-income countries where the diffusion of renewable energy is low and hampered by market or policy conditions? | (1) Rule by GS and VCS that limits eligible renewable energy projects to those located in a least developed country (LDC), and (2) Rule by GS that limits eligible renewable energy projects to those located in a low-income country or lower-middle income country where the penetration rate of the proposed energy technology is below 5%. Country classifications and data from World Bank[77] and IRENA[57]. | 12,13,58 |

Suppliers and buyers of offsets have attempted to circumvent such concerns by claiming to use 'quality' offsets[23,24]. Guidance about offset quality has also emerged from VCM governance frameworks and from best-practice principles proposed by various stakeholders[25–28]. Despite considerable heterogeneity across different conceptions of quality[29], most stress the need to ensure additionality and permanence, avoiding over-crediting and double-counting, and protecting against negative effects on society and the natural environment[7,15,26,28,30].

Such quality principles, however, do not guarantee genuine climate benefits. Consider the case of an offset from a wind farm or forest conservation project that started 15 years ago. The climate impact of claiming such an offset today may be compromised in four ways. First, renewable energy projects carry a high risk of overestimating emissions reductions and lacking additionality[12,13,15]. Second, using historical mitigation activities to offset emissions today fails to promote new decarbonisation activities beyond those already scheduled to occur[31]. Indicators of quality should therefore consider the age of offset projects and credits[32,33]. Third, quality indicators should also address price. Cheap offsets typically originate from over-credited projects with low additionality[15], diverting funds from projects with higher quality control measures that cost more[11]. Fourth, in countries where renewable energy has diffused widely and become standard practice, there is a weak argument for additionality. Thus, projects like renewable energy should be implemented in countries where such technologies have not yet mainstreamed due to technological, financial or policy hurdles[12,13]. Meanwhile, to draw down and permanently sequester historical emissions in pursuit of net-zero emissions, VCM best-practice principles[34,35] and researchers[36–38] have emphasised the importance of upscaling investments in carbon removal.

Since offset quality is strongly influenced by characteristics at the individual project level, the extant literature has focused on GHG accounting methodologies and assessing project-level climate benefits[8,11–13,30,39]. Yet there remains a need for a framework and indicators that can be applied with readily available market-level data to determine if the offsets retired by large corporate buyers correspond with key metrics of high quality and high climate benefits. However, firm-level analyses[5,40–42] are few, despite many companies depending heavily on offsets to pursue decarbonisation goals. Further, scholars have yet to exhaustively study the publicly available data on registries to examine the behaviour of large-scale corporate offset buyers.

Accordingly, we examine the characteristics and quality of the offsets used by the twenty companies responsible for retiring the largest volumes on the VCM between January 2020 and December 2023. We build an original dataset that compiles each company's offset procurements from the VCM's three largest registries: Verra's Verified Carbon Standard (VCS), the United Nation's Clean Development Mechanism (CDM) and Gold Standard (GS). After clarifying the extent to which offset retirements support emissions avoidance or removal, we set out to answer: 'To what extent could the offsets retired by these companies be considered high quality and likely to benefit the climate?'. We investigate retirement behaviour across four dimensions (Table 1): (1) use of offsets from low/high-risk project types; (2) age of projects and credits; (3) cost of credits and (4) country of implementation (applied only to renewable energy projects).

The analysis reveals that these twenty companies predominantly sourced their offsets from low-quality avoidance activities. Most offsets carry a high risk of overestimating emissions reductions and fail to meet industry standards regarding age and country of implementation. We also find that companies have actively targeted cheap credits. Our results provide further evidence that predominant practices on the VCM are not supporting effective climate mitigation. Our contribution is to demonstrate that individual companies are a major cause of persisting quality issues due to their demand for problematic and cheap offset types known to overstate emission reductions. We also provide the first publicly available dataset compiling the attributes of offsets used by the largest corporate buyers on the VCM. This complements the extant literature's focus on supply-side issues such as project characteristics and registry methodologies.

## Results
### Scale and context of offsetting activity
Collectively, the twenty companies examined retired 134 MtCO$_2$e over 2020–2023 (Fig. 1a). This volume is considerable, representing just over one-fifth of all global retirements made on the three registries (VCS, CDM and GS) during the same period (Table S1).

All companies but one in our sample have used offsets to claim carbon neutrality or pursue decarbonisation targets (Table S2). Domains of offset use extend from operational emissions (e.g. Boeing, Telstra and Norwegian CL) to various claims of 'carbon-neutral' products, such as offset-bundled LNG tankers (Shell and Chevron), parcel delivery (DPD and Yamato) and flights (Delta Airlines and easyJet).

The two largest offset buyers are Shell and Delta Airlines, each retiring around 23.5 MtCO$_2$e over 2020–2023 (Fig. 1a and Table S3a, b). Retirements by these two companies alone make up roughly 35% of all offsets in the data set. Most companies retired far less than this: mean

2

Exhibit 14 to Decl. of Angel Hsu
489
SER 326

**Article**

https://doi.org/10.1038/s41467-024-51151-w







**Fig. 1 | Volume of offset retirements and proportion of emissions avoidance and emissions removal. a** Absolute volumes of all offsets retired by each company over 2020–2023. **b** Relative shares of avoidance or removal offsets retired over 2020–2023. Both panels show aggregated yearly results for each company that appear in Table S3a, b. **c** Absolute volume of avoidance and removal offsets for all companies by year. **d** Relative share of avoidance and removal offsets for all companies by year. Classification into avoidance, removal and mixed follows the University of California Berkeley's Voluntary Registry Offsets Database[64].

and median retirement volumes in the dataset are 6.71 MtCO$_2$e and 3.84 MtCO$_2$e, respectively, over 2020–2023.

When procuring offsets, the companies have predominantly targeted VCS (Table S4), which makes up 102 MtCO$_2$e or 76% of all offsets retired by the twenty companies. This volume represents one quarter (24%) of all retirements made on VCS globally over 2020–2023 (Table S1). CDM is the next most targeted registry, accounting for 26.4 MtCO$_2$e or 20% of all retirements. This volume represents 22% of all worldwide retirements conducted through CDM during the four-year period. The third registry, GS, is the least used, making up only 5.16 MtCO$_2$e or 4% of all global retirement made on this registry. In sum, our results show that the twenty companies examined are among the largest buyers of VCS and CDM, the two largest registries globally in terms of credit issuances[21].

**Mitigation approach: retirements focus on emissions avoidance**
Offset projects fall into two broad categories: (1) avoidance, where mitigation activities like renewable energy or improved forest protection generate credits based on the claim that GHG emissions were avoided compared to a counterfactual scenario where the activity was not implemented; and (2) removals, where nature-based or engineering-based activities directly capture and sequester atmospheric CO$_2$. Stakeholders[28,35], industry guidelines[27,43], researchers[36–38,44] and the IPCC[45] underscore the importance of removals for achieving net zero, minimising emissions overshoot, and drawing down historical emissions, which could help reverse temperature rise once net zero is reached. The authoritative Oxford Principles even declare that organisations must 'shift toward carbon removals' away from avoidance[34]. Pro-removal discourse often emphasises engineering-based removal with permanent geological storage. However, such technologies are immature, in short supply, and were unavailable on the registries studied during 2020–2023. Accordingly, we consider here each company's share of offsets from nature-based removal activities (e.g. afforestation, soil enhancement).

Results show that almost all offsets retired by the twenty companies are from avoidance projects (Fig. 1b, d). Avoidance offsets account for over 97% (131 MtCO$_2$e) of all retirements in the dataset. Similarly, eighteen companies sourced 90% or more of their offsets

Exhibit 14 to Decl. of Angel Hsu
490
**SER 327**

**Article**

https://doi.org/10.1038/s41467-024-51151-w

from avoidance activities. In contrast, offsets from removal projects account for merely 2.3% of all retirements across the companies. Only three (PetroChina, easyJet and Audi) demonstrate meaningful engagement with carbon removal, each obtaining 5% or more of their offsets from removal projects.

We also do not find any evidence of a shift towards carbon removals (Fig. 1c, d and Table S3b). Indeed, the annual share of pure removal offsets rose substantially in only one year; reaching 1.1% in 2021 compared to 0.3% in 2020. This share remained stagnant in 2021, then contracted to 0.6% in 2023. Furthermore, only two companies (Audi and Takeda) visibly increased their share of removal credits over the four years. Most evident is Audi, increasing its removals share from none in 2020–2021 to 10% over 2022–2023. However, many companies *decreased* their share of removal credits over the same period: Shell, Volkswagen, Boeing, PetroChina and EY each reduced their removal share in 2022–2023 to below half of 2020–2021 levels. Thus, we find that demand for avoidance credits is substantial, persistent over time, and unaffected by VCM discourse around the need to reduce reliance on avoidance and shift towards carbon removal.

It should be emphasised that carbon removal projects are not immune to the quality issues affecting avoidance projects[46]. For instance, afforestation and soil enhancement projects have been found to overestimate carbon stockage[16] and lack additionality[47,48]. Furthermore, nature-based solutions are unable to store carbon permanently for the millennial timescales required for effective climate mitigation[44,49]. These issues motivate us to separate the above analysis of mitigation strategy from the following evaluation of offset quality.

## Relative quality risks: retirements dominated by high-risk offsets

The offset projects used by the companies are shown in Fig. 2a, d. In the first dimension of our quality assessment, we adopt a framework of relative quality risks published by the Stockholm Environmental Institute and the GHG Management Institute[15]. Although the framework does not assess quality based on individual project characteristics, it operationalises the view that some project types are, *ceteris paribus*, more likely to lack additionality, overestimate emissions reductions, or encounter leakage.

We find that companies have overwhelmingly sourced high-risk offsets (Fig. 2a). 87% of credits fall into this high-risk category, whereas those credits with a low-risk profile make up only 6.0% of all retirements.

Most high-risk offsets stem from forestry and land use projects (mainly REDD+ initiatives, which conserve tropical forests and prevent deforestation) and large-scale renewable energy projects sized >15 MWe. Medium-risk projects (e.g. household and community biodigesters, cookstoves, small-scale renewable energy projects sized ≥15 MWe) make up only 6.7% of purchased credits (Fig. 2b).

REDD+, classified as high-risk, is the most frequently used offset type by far (Fig. 2c). Comprising 58.2 MtCO₂e (43%) of all credits retired, REDD+ projects feature in the retirement portfolios of sixteen companies. Notably, Gucci obtained 100% of its offsets from REDD+ projects. The strong preference for offsetting emissions via REDD+ projects should cause significant doubt regarding firms' net-zero claims because most projects investigated in prior research have not achieved their stated climate benefits and over-issued credits. These investigations showed tendencies to exaggerate historical deforestation trends or regional baselines[8,9,11,48], failures to reduce deforestation to levels claimed by developers[8,10], and emissions leakage, where deforestation shifts to another area[11].

Renewable energy projects are the next most sourced offset type, comprising 36%. Wind projects are the most voluminous (40%) in this category, followed by solar (33%) and hydropower (16%). Most of these renewable installations are large-scale, classified by the aforementioned framework[15] as higher risk. This is due to the strong likelihood

of miscalculating emissions avoided through fossil-power displacement or their weak additionality, since revenue from renewable electricity rather than offset sales is usually the decisive factor for investments. Numerous studies confirm the high likelihood of such problems ocurring[12,13,50,51]. Furthermore, renewable electricity has become competitive relative to fossil fuels around the world due to declining costs and supportive government policies[52]. As such, installing renewable energy has become standard practice rather than additional.

In our sample, twelve companies have offset their emissions with hydropower. Norwegian CL, a global cruise operator, sourced more than half its offsets from hydropower while Banco BV and Chevron each retired 2.99 MtCO₂e and 1.38 MtCO₂e. However, hydropower projects are highly unlikely to be additional, since most receive government support as infrastructure projects and are built regardless of the opportunity to capture extra revenue through offset sales[50]. As a result, hydropower projects are no longer allowed to register on VCS and are prohibited under most of emissions trading schemes[53] and best-practice VCM frameworks[54].

## Age: heavy reliance on historical actions not meeting industry standards

The second dimension of our quality assessment addresses the age of offsets, considering both vintage years and project start years. Results indicate that companies have sourced most of their offsets from aged projects, too old to meet even lenient quality standards in the VCM.

Figure 3 indicates that three-quarters (75%) of offsets retired would fail to meet eligibility rules for the carbon offsetting and reduction scheme for international aviation (CORSIA), managed by the United Nation's International Civil Aviation Organization. To qualify in CORSIA, offset credits must derive from projects that started issuing credits in 2016 or later. Likewise, a project's vintage year, or the year a particular mitigation action occurred, must also be 2016 or later.

In applying the 2016 cut-off year to our analysis, we acknowledge that CORSIA targets airlines, sets only a soft standard[31,55], and that meeting the cut-off year does not inherently guarantee key quality attributes such as additionality. Nonetheless, the 2016 cut-off year aligns with what many industry stakeholders and offset trading platforms (e.g. CBL and ACX) have considered an acceptable age limit for offsets[32] (see "Methods"). Moreover, setting a limit on the maximum vintage and project start year addresses quality concerns in at least two ways. First, it assures that offset projects adopt newer procedures when calculating emissions avoidance or removal, as methodologies are continuously updated to correct historical faults[32]. Second, it prevents the use of older credits, where the additionality is doubtful if a project continues to operate despite not having sold all its credits[15,33].

Examining only vintages years shows that many companies have predominantly selected post-2016 credits, thereby meeting one part of the CORSIA rule. This is notably the case for Takeda, whose credits are all from 2016 or later, and for six other companies (Volkswagen, Eni, Telstra, Audi, Yamato and Skoda) sourcing 80% or more of their credits from post-2016 vintages (Fig. S1). Conversely, seven companies (Shell, Delta, Sasol, DPD, Gucci, PetroChina and Norwegian CL) have obtained the majority of their credits from pre-2016 vintages, presumably because older credits typically trade for lower prices[21]. For these seven companies, the tendency to source older vintages remains visible even when accounting for the age of the vintage year at the time of retirement (Fig. S2).

However, when considering project start years, we find that most of the offsets sourced by the twenty companies derive from old projects that began issuing credits a decade or more ago (start year ≤ 2013), (Fig. S3). This tendency is particularly pronounced for eight companies (Shell, Delta, Takeda, Sasol, DPD, Chevron, Norwegian CL and Hu-Chems), which each obtained three-quarters or more of their credits from projects started in

4

Exhibit 14 to Decl. of Angel Hsu
491
SER 328

**Article**    https://doi.org/10.1038/s41467-024-51151-w



**Fig. 2 | Types of offset projects and quality risks for offsets retired in 2020–2023. a** Relative share of offset credits organized into differing relative risk profiles defined by the Stockholm Environmental Institute and GHG Management Institute[15]. **b** Relative share of retired offset credits organised into project categories defined by the University of California Berkeley's Voluntary Registry Offsets Database[44]. **c** Breakdown of offset volumes sourced from forestry and land use projects. **d** Breakdown of offset volumes sourced from renewable energy projects. 'Solar' shows merged results for centralised and distributed solar. 'Other' shows merged results for geothermal and bundled.

Exhibit 14 to Decl. of Angel Hsu

492

**SER 329**

**Article**

https://doi.org/10.1038/s41467-024-51151-w



**Fig. 3 | Share of offset credits retired by project start year and vintage year.** The relative share (%) of offset credits retired by all twenty companies in 2020–2023, organised into project start years and vintage years. Darker shades indicate a higher relative share. Project start years reflect the first year that an offset project began issuing credits. Vintage years capture the year in which a specific climate action occurred (e.g. a wind turbine generated electricity). Credits sourced from CDM are not shown as this registry does not disclose vintage years. Years after 2016, marked in blue, are illustratively used as a lenient indicator to designate a maximum age limit for project start years and vintage years set by the CORSIA, a governance mechanism for international airlines. This maximum age limit has also been adopted by other credit trading platforms.

2013 or earlier. Overall, for all twenty companies combined, two-thirds (65%) of retired credits come from projects aged a decade or more. Our findings thus indicate that the majority of offsetting expenditures by the twenty companies have not supported the formation of new climate initiatives.

It is important to note that the Paris Agreement has established stricter rules than CORSIA for crediting periods. Specifically, offsets traded under its Article 6.4 mechanism (designed to replace the CDM) must come from mitigation activities that started in 2021 or later, a standard also advocated by the Science Based Targets initiative[3]. Although we do not expect the twenty companies in our dataset to have adhered to this rule during the period of analysis (2020–2023), it is notable that a mere 0.4% of their offsets came from projects with post-2021 start years (Fig. 3). This further illustrates how the offsets purchased by the twenty companies fall considerably short of contemporary quality standards.

**Price: preference for low-quality offsets driven by low cost**
Because low-quality offsets tend to trade cheaper than higher-quality ones[1,15,21], the third dimension of our assessment investigates buying preferences for cheaper credits. The results (Fig. 4) reveal a distinct preference for purchasing cheaper credits for most companies.

Sixteen companies have sourced a plurality of their credits from offset projects whose average estimated price falls into the two lowest price quintiles. For eleven companies in this group, low-price credits constitute the majority of offsets retired. Projects in the two lower price quintiles consist of RE, industrial/commercial and chemical processes, from which credits sold on average between $0.98 tCO$_2$e and $5.39 tCO$_2$e during 2020–2023 (Table S5). Moreover, our data show that this preference for cheaper credits is persistent for many companies (Fig. S4). Conversely, only four companies purchased the plurality of their offsets from the two higher price quintiles. Two companies featured in this group are Shell and PetroChina, each sourcing 80% and 98% of their offsets from the two upper quintiles. This result especially reflects their preference for REDD+ and afforestation offsets, which sold higher than other project types during 2020–2023, namely between $5.15 and $15.60 (Table S5).

These results correlate with earlier findings regarding the large share of offsets purchased from renewable energy projects (Fig. 2), indicating that the popularity of renewable offsets appears to reflect

| | Q1 Lowest | Q2 Mid-low | Q3 Average | Q4 Mid-high | Q5 Highest |
|---|---|---|---|---|---|
| Shell | 5.7 | | 18.0 | 20.1 | 56.2 |
| Delta | 41.3 | 22.5 | 34.0 | 1.5 | 0.7 |
| Volkswagen | 35.2 | | 21.8 | 16.4 | 26.6 |
| Banco BV | 57.0 | | 41.1 | | 1.9 |
| Eni | 12.7 | | 11.4 | 66.5 | 9.4 |
| Telstra | 100.0 | | | | <0.1 |
| Audi | 38.4 | | 34.9 | 0.6 | 26.1 |
| Takeda | 59.4 | | 8.6 | 30.9 | 1.1 |
| Sasol | 44.3 | 54.6 | 1.0 | | |
| DPD | 79.7 | | 20.3 | | |
| Boeing | 59.5 | 15.5 | 5.7 | 3.5 | 15.7 |
| Chevron | 40.5 | | 28.1 | 31.3 | 0.1 |
| Gucci | | | 27.0 | 73.0 | |
| PetroChina | 2.3 | 1.7 | 24.5 | 11.3 | 60.2 |
| easyJet | 49.1 | | 32.6 | | 18.3 |
| EY | 49.6 | | 15.2 | 25.2 | 10.0 |
| Norwegian CL | 58.5 | 41.5 | | <0.1 | <0.1 |
| Yamato | 95.0 | | 5.0 | | |
| Hu-Chems | | 100.0 | | | |
| Skoda | 68.0 | | 8.2 | 12.5 | 11.2 |
| All companies | 38.9 | 8.8 | 20.8 | 14.6 | 17.0 |
| No. of companies sourcing their largest share of credits from that quintile | 14 | 2 | 0 | 2 | 2 |

**Fig. 4 | Share of offset credits retired by price category.** The relative share (%) of credits retired by each company in 2020–2023, is organised into five quintiles. Each reflects the average estimated price of eight types of offset projects contained in our database relative to the price of other offset types (see Table S5). The bottom row shows the number of companies for whom a plurality of offsets (i.e. largest share) falls into that quintile. Pricing estimates for each project type are sourced from Ecosystem Marketplace[76]. To capture price fluctuations, we coded price categories each year. The table shows aggregated results for yearly trends, compiled in Fig. S4.

their consistently lower cost relative to other categories. Conversely, the companies choosing forestry and land-use offsets (mostly from REDD+ projects) have seemingly tolerated their price premium relative to other offset project types.

Exhibit 14 to Decl. of Angel Hsu

493

**SER 330**

Article    https://doi.org/10.1038/s41467-024-51151-w

This interpretation, however, requires caution, since two trends suggest that companies have sourced forestry and land-use offsets in a way that would reduce their price premium relative to cheaper project types. First, our analysis of vintage years (Fig. S5) shows that companies choosing nature-based projects tend to choose older credits, especially compared to renewable energy projects. Second, our analysis of retirement volumes (Table S6) shows a strong tendency to purchase forestry and land-use offsets in large quantities (defined as >82.6 ktCO$_2$e, the fifth quintile). Because selecting older vintages and purchasing in bulk are two strategies known to lower per-tonne offset costs[21,56], both trends suggest that many companies have actively sought to reduce the price premium incurred when procuring forestry and land-use credits.

## Country of implementation for renewable energy projects: few meet additionality rules

Eighteen companies have sourced 48.4 MtCO$_2$e of credits (36% of all retirements) from renewable energy projects (Fig. 2b, d). Two registries, GS and VCS, have set explicit rules regarding the minimum conditions for renewable energy projects seeking registration to demonstrate additionality. Since similarly explicit guidance is lacking for other project types, including forestry and land use, industrial and commercial, we limit the fourth dimension of our quality assessment to renewable energy projects. We apply two tests to determine a minimum degree of additionality, with passing either test being sufficient. The first test, based on criteria set by GS and VCS, requires that renewable electricity projects are implemented in a least developed country (LDC). The second test, based on criteria set by GS, requires that projects target a low-income country (LIC) or lower-middle-income country (LMIC) where the penetration of the proposed technology is below 5% of all grid-connected generation capacity. Both rules ensure that projects are implemented in developing countries where renewable energy is not yet mainstream, and where technological, market and policy barriers hinder its diffusion. While these rules apply only to cases of new project registration, both provide a meaningful test of additionality from the perspective of contemporary quality standards.

Few of the renewable energy offsets sourced by the companies satisfy either test (Fig. 5 and Fig. S7). The tightening of additionality standards by GS and VCS has not observably diverted offset demand away from low-quality renewable energy projects. For the first test, only 106 ktCO$_2$e (0.2% of total retirements) come from projects implemented in an LDC, with only offsets from Mauritania and Uganda satisfying this condition. For the second test, over one-third (38%) of offsets come from projects that started issuing credits in a year when that country simultaneously met the low-income thresholds and had penetration rates for the deployed renewable energy technologies below 5%. Furthermore, although not required by GS or VCS, no offsets satisfy both tests.

The renewable energy offsets used by the surveyed companies originate from projects implemented in 26 countries (Table S7). Most offsets, however, originate from just three countries—Brazil, China and India—that collectively supplied 84% of all renewables credits (Fig. S8). According to the second additionality test, offsets from Brazil and China especially have questionable additionality, because projects in these two countries started after Brazil and China had reached upper-middle income status and when penetration rates for the respective renewable energy technologies had exceeded 5% (Fig. S7). Moreover, Brazil and China collectively provided 4.47 MtCO$_2$e of hydropower offsets to the companies. However, the additionality of these offsets could be challenged because hydropower has long been a mainstream technology, and therefore common practice, in each country. Indeed, during 2005–2021 (the period covering all project start years in our dataset), hydropower's share of electricity generation lay between 57–77% in Brazil and around 15–22% in China[57]. Conversely, around half

(58%) of the renewables offsets from India (an LMIC) exhibit a stronger case for additionality, mainly because solar electricity did not exceed the 5% threshold until 2017.

In a complementary analysis, we examine the attractiveness of Brazil's, China's and India's policy environment for renewable energy diffusion, since research and registry principles consider a weak policy environment a critical indicator of a project's additionality[58,50]. Specifically, we compare each country's annual score from the World Bank's regulatory indicators for sustainable energy (RISE) project[59], which evaluates the effectiveness of renewable energy policies, to the average score of OECD nations. Results show that renewable energy projects implemented in Brazil, China and India have emerged in a period of high governmental support (Fig. S9). Since 2010, RISE scores for India and Brazil have remained within the range of OECD nations, which received the highest scores globally for policies supporting renewables diffusion. India's RISE score has even caught up to and closely aligned with Denmark's and Germany's since 2017, the two countries consistently attracting the highest scores globally. By demonstrating the attractive policy conditions enjoyed by renewable energy projects in Brazil, China and India, this supplementary analysis provides further grounds to doubt the additionality of offsets sourced from these three countries over the past decade.

In sum, our analyses provide multiple reasons to suspect that many renewable energy projects in Brazil, China and India lack additionality, and therefore, a genuine climate impact.

## Summary of offset quality: most credits fail to meet multiple indicators

As a final and integrated analysis, we examine the quality and likely climate benefits of the offsets retired by each company across all four dimensions discussed in the previous sections (see "Methods", Table 1), because an offset can simultaneously meet or fail multiple indicators. For non-renewable energy offsets, we assigned a score of '1' for each of the following indicators met: (1) the project or credit does not fall into a high-risk category; (2) it meets CORSIA requirements for vintage and start year (i.e. 2016 or later) and (3) it has an estimated price higher than the average of other offset types. For renewable energy offsets, we add a fourth indicator, verifying if an offset originated from a LDC or from a LIC/LMIC with a low-penetration rate (<5%) for that energy technology. If all indicators are met, a non-renewable energy credit receives the highest score of '3' while a renewable energy credit obtains '4'. Results (Fig. 6a, c) show that scores for most companies are concentrated between 0 and 2, meaning that most offsets purchased in 2020–2023 meet only half or fewer of the quality and climate benefit indicators applied here.

For non-renewable energy offsets, the average weighted score is 1.03 for all companies combined. Just under one-tenth (9.0%) of these offsets meet none of the three indicators, while 79% meet only one (Fig. 6b). This result especially reflects the tendency to source offsets from old projects started before 2016 in categories that typically sell at below average prices (Table S5). The tendency to procure low-scoring, low-quality credits is particularly pronounced for Norwegian CL and Telstra, for whom more than 99% of all non-renewable energy offsets scored '0'. Yamato stands out as the only company to meet all three criteria for all its renewables offsets. These offsets, however, represent only 5.0% (124 ktCO$_2$e) of Yamato's total retirements.

For renewable energy offsets, the average score for all companies is 0.81. This indicates even lower quality than the non-renewable energy offsets. Around half (48%) of the renewables credits fail to meet any of the four indicators, while roughly one quarter (24%) meet only one (Fig. 6c). In addition to the fact that renewables offsets typically trade for lower-than-average prices (Table S5), this outcome reveals a strong tendency to source credits from old projects located in countries not meeting contemporary additionality standards with respect to national income and renewable energy penetration rates. Further,

Exhibit 14 to Decl. of Angel Hsu
494
SER 331

**Article**

https://doi.org/10.1038/s41467-024-51151-w



**Fig. 5 | Registry additionality criteria for renewable energy projects.** The share of renewable energy (RE) offset credits retired by all twenty companies in 2020–2023 by country of origin and the share that meets additionality criteria set by registries. Test 1 (based on rules from GS and VCS) checks if a renewable energy project is located in a LDC. Test 2 (based on rules by GS) checks if the project is located in a LIC or LMIC where the penetration level of the proposed energy technology is below 5% of all grid-installed electricity capacity. The share of renewable energy offsets passing either additionality test is marked in blue. An offset credit only needs to pass one of the two tests to demonstrate a minimum degree of additionality. The period 2005–2021 for LIC/LMIC classifications covers all project start years in the dataset. Data for country classifications and renewables shares are sourced from the United Nations[80], World Bank[79] and IRENA[81]. For test 2, full results by country and renewable energy technology appear in Fig. S7. Bundled energy offsets (limited to 213,465 tCO2e from India) are excluded when conducting test 2 since these projects mix renewables technologies.

most renewable energy projects are large-scale (>15 MWe). Such projects are deemed to carry a higher quality risk[15], since profitability from selling electricity rather than offset credits is more likely the decisive factor for investment decisions.

## Discussion

This study focused on the twenty largest buyers of carbon offsets over 2020–2023 in the VCM's three major registries. Amid mounting concerns that many offsets are poor quality and fail to deliver genuine and

Exhibit 14 to Decl. of Angel Hsu
495
**SER 332**

Case 2:24-cv-00801-ODW-PVC     Document 89-32     Filed 04/07/25     Page 10 of 16     Page ID #:9128

**Article**

https://doi.org/10.1038/s41467-024-51151-w





**Fig. 6 | Simultaneous application of all quality indicators to offsets retired. a** Average scores by company for all non-renewable energy credits (tested with three indicators) and renewable energy credits (tested with four indicators) retired over 2020–2023 using indicators of quality and climate benefits explained in Table 1 and Methods. Average scores were computed by weighting the relative share of credits from each company that received a particular score, shown in bottom two panels. For example, Delta Airline's score for non-renewable credits, was calculated as 36.66 × 0 + 62.66 × 1 + 0.70 × 2 then divided by 100 to arrive at 0.64 against a maximum possible score of 3. Two companies (Gucci and Hu-Chems) marked with asterisks (*) did not retire any offsets from renewable energy projects. **b** Relative share of scores by company for all non-renewable energy credits (left) and renewable energy credits (right). For example, a share of 20% in the score category 1 indicates that 20% of the offsets retired by that company met only one criterion.

additional emission reductions, we investigated the extent to which the offsets used by the twenty companies align with four dimensions of quality and high climate benefits.

The analysis reveals prolific retirements of low-quality and cheap offsets. In fact, none of the twenty companies could claim that a substantial portion of their retired offsets adhered to VCM quality standards and indicators of high climate benefits. Specifically, we find that 87% of offsets originate from high-risk project types such as REDD+ and large-scale RE, which are prone to overstating emissions reductions and over-issuing credits. Our analysis of buying behaviour suggests that many companies have continuously sourced these low-quality offsets because of their low cost. Furthermore, we find that most offsets derive from aged projects, indicating that the bulk of company spending on offsetting has not supported new investments in climate mitigation.

Particularly, the analysis on renewable energy credits, making up 36% of all retirements, reveals practices that deviate considerably from quality standards on the VCM. Around half (48%) of the renewables credits fail to meet any of the four indicators in our framework, while roughly one quarter (24%) meet only one (Fig. 6c). Most notably, only 106 ktCO$_2$e (0.2%) of these credits come from renewables projects implemented in least-developed countries, where a strong case could be made for additionality−a condition now required by two registries, GS and VCS. Meanwhile, only 38% of renewables credits meet less stringent rules set by GS regarding country income and technology penetration levels. With 84% of renewables credits issued from projects implemented in Brazil, China and India, our analysis on the attractiveness of each country's policy environment casts further doubts on the additionality of projects in these countries. This is because weak government policy−a

9

Exhibit 14 to Decl. of Angel Hsu

496

**SER 333**

Article     https://doi.org/10.1038/s41467-024-51151-w

cornerstone argument for additionality—does not apply to these countries.

Faced with mounting pressures to 'clean up' the market, there has been no shortage of guidance in the form of principles, recommendations, rule changes and commitments on the VCM to combat its chronic quality issues and bad behaviour[27,34,54,60]. However, our results reveal a persisting problem in the adoption of this guidance. The largest corporate buyers of offsets, who collectively account for over 20% of retirements on the VCM's three largest registries, continue to source low-quality, cheap credits with minimal climate benefits. These findings support the growing body of evidence that the VCM—designed as a voluntary industry-led market operating free from government oversight and regulation—is plagued by fundamental quality issues that undermine its effectiveness in reducing global emissions[11,13,37,58]. While prior research has focused on offset projects[7,9,16], registries[58] and methodologies[61], our results underscore the significant role of purchasing decisions by individual companies in perpetuating these quality issues. They reveal that companies in our sample have actively targeted—and therefore increased demand for—cheap offsets and project types with questionable climate benefits. Our study thus shows that the VCM's unresolved quality issues arise not only from the supply side[24], but also from demand for low-quality offsets.

All companies except one in our study have pledged net-zero targets or claim to provide carbon-neutral services (Table S2). These companies operate in diverse sectors like energy (Shell, Chevron, Eni and Sasol), aviation (Delta, easyJet and Boeing), car manufacturing (Audi, Volkswagen and Skoda), telecommunications (Telstra) and fashion (Gucci). Our results show that the offsets supporting these claims neither meet indicators of quality nor provide high climate benefits. The neutralisation effect of the investigated companies' offsetting strategies is therefore highly likely to be overstated. Overstating environmental performance is an important indicator of greenwashing[62]. Our findings thus suggest that any decarbonisation claims connected to the use of these offsets lack integrity and amount to greenwashing.

Also pertinent to global efforts to reach net-zero emissions[46], we find that carbon removal makes up only 2.5% of all offsets retired by the twenty companies in 2020–2023. This amount is lower than the average share of removals for all non-CDM retirements made globally, which is 4.1% in the same period[63]. As confirmed by our analysis and prior studies[11,21], the preference for avoidance offsets can be largely explained by their low cost. Cheap offsets derive especially from RE, chemical processes, and industrial projects, which have traded between $1–5 per $tCO_2$ since 2020 (Table S6). Conversely, costlier removal credits like afforestation have hovered in the range of $8–16 per $tCO_2e$, considerably impeding their uptake[21]. Additionally, there is a severely limited supply of nature-based removal offsets compared to avoidance offsets on the VCM, with removals making up only around 5% of credits issued over 2020–2023[64]. Our findings thus highlight a pressing need for much larger investments in carbon removal[13]. As underscored by the IPCC[65], physically drawing down historical carbon emissions from the atmosphere may prove critical for addressing emissions overshoot and sustaining negative emissions after net zero is reached.

Our evaluation of offset quality (Table 1), however, does not link offset quality to a company's mitigation approach, specifically the choice of avoidance vs removal offsets. This methodological decision reflects three considerations. First, the registries examined in this study do not yet offer technology-based carbon removals with permanent storage, which some stakeholders[34,36,38] promote as a long-term goal for quality enhancement. Second, some VCM stakeholders and researchers worry that prioritising removals may distract from the urgent need to reduce emissions at the source. To use the 'rapidly filling bathtub' metaphor suggested by Ellis and colleagues[46], assuming that avoidance and removal offsets equally satisfy quality criteria,

atmospheric emissions overflow can be stopped by both 'reducing the tap's flow and pulling the plug out'. Third, upscaling nature-based removals is unlikely in itself to solve many of the VCM's inherent quality problems[37,46]. Research shows that many afforestation and soil-sequestration projects do not capture carbon as claimed[16] or would have proceeded without the extra revenue from offset sales[16,48]. Furthermore, nature-based removals are unable to store carbon on millennial time-scales[49], and stockage can easily be reversed if perturbed by wildfires, drought, disease or changed land-management practices[13,67]. These unresolved quality risks for carbon removal projects call the utility of offsets as a decarbonisation strategy into deeper question. At the same time, these risks reinforce the urgency of pursuing emissions reductions and carbon neutrality by directly phasing out fossil fuels across society.

Our findings point to a need for corrective actions to address the ongoing quality issues in the VCM. We foresee two plausible options. In the first option, governments would intervene to regulate the VCM, restricting the use of offsets solely to those sourced from government-approved schemes that adhere to stringent quality control measures. But this would be unlikely to overcome all quality issues, since even forestry-based removal projects in government-regulated regimes fail to provide genuine, additional and permanent carbon sequestration, including in California[68,69] and Australia[16]. Furthermore, renewable energy offsets generated through CDM, overseen by the United Nations, also suffer from low quality and low additionality[11]. With such abundant evidence that carbon offsets do not provide a reliable means of neutralising emissions, more fundamental change is required. In the second option, therefore, until verifiable and permanent removals become widely available, the VCM would be strictly limited to 'contribution' and no longer used for offsetting emissions[11,27,28]. In this way, companies would still support climate mitigation and co-benefits for sustainable development by buying offsets from outside their value chain, but refrain from claiming to have neutralised their emissions[13]. The shift from compensation to contribution would generate a need for companies to redirect their investments towards reducing in-house emissions and implementing transformative changes in technologies and business practices. Such a decarbonisation approach would incur higher costs than offsetting. Yet various modelling pathways, including those from the International Energy Agency[70], underscore that transitioning away from fossil fuels is the surest and quickest pathway to net zero and meeting Paris Agreement targets[71].

By revealing a demand for low-quality and cheap offsets, our analysis demonstrates that the self-regulating VCM lacks the ability to push its largest buyers towards offsets that meet even modest indicators of quality and climate benefits. Consequently, prevailing offsetting practices on the VCM cannot be seen as an effective substitute for regulatory policies that force physical changes in the energy technologies, supply chains and business models of large emitters. This view extends beyond regional or national markets to encompass international climate governance. Consider for instance Article 6 of the Paris Agreement, which allows countries to use carbon credits for domestic emission reductions, including offsets sourced from the VCM. As our study suggests, without fundamental market-level changes and greater adherence to quality principles, efforts to grow the VCM through integration with the Paris Agreement risk amplifying demand for low-quality offsets with limited or no climate benefits.

## Methods
Our study followed a design shown in Fig. 7 and outlined below.

### Sample construction
Our sample covers the world's three largest carbon offset registries: Verra's VCS the United Nation's CDM and GS. In 2022, projects listed on these three registries accounted for 85% of all voluntary carbon offsets issued globally[21].

Exhibit 14 to Decl. of Angel Hsu
497
SER 334

Article    https://doi.org/10.1038/s41467-024-51151-w



**Fig. 7 | Research design of study.**

We selected twenty companies for analysis, recognising that a small number of companies have retired a disproportionally large volume of credits from the above registries[14]. This strategy helped confine our analysis to a manageable sample size but still cover a significant portion of retirement activity across the three registries. This was achieved since the twenty companies examined are responsible for 21% of all credits retired worldwide on VCS, CDM and GS over 2020–2023 (Table S1).

To identify the twenty largest buyers over 2020–2023 on the three registries, we obtained a proprietary list from Allied Offsets (a data-analysis firm). When building our sample of companies, we excluded Toucan (a US-based blockchain start-up) due to its unique mission of purchasing and retiring low-quality offsets, thereby preventing heavy emitters from using them for emissions compensation.

**Data collection**
Data collection occurred from October 2022 to February 2024. The principal data for analysis was sourced from the publicly available information on the online databases of the three offset registries VCS, CDM and GS. We identified the retirements belonging to each of the twenty companies in our sample by manually searching for their names in fields for retirement beneficiaries or reasons. We also used variations or codes for company names, since Delta Airlines, for example, frequently records its name as 'DL'. Our analysis is limited to identifiable retirements and does not consider instances where a company retired credits but did not disclose its name on that registry.

Our analysis covers retirement activity from January 1, 2020, to December 31, 2023. Two reasons underpin our selection of this period. First, the chosen registries underwent a rapid growth of credit issuances during this period[13]. Second, the four years since the start of 2020 have seen a rapid increase in the adoption of net-zero targets by companies and the use of offsets for decarbonising operations, supply chains and various products and services[i].

We collated the data from each registry into a single database (Supplementary Data 1). This was organised by company, and offset project and then all cases of retirement transactions were identified on each registry. To verify the accuracy and replicability of our calculation of each company's retirement volumes, we purchased proprietary data from a firm (Allied Offsets) and cross-checked their results with ours. This triangulation process increases the accuracy of our dataset in two ways. First, it helped us overcome situations where a particular company discloses its name in registry records using a code name known only to those working inside the VCM (this was the case for Sasol). Second, it helped us verify the replicability of our manual procedure for searching the three registries for each company's retirements.

**Mitigation approach**
To examine the focus of mitigation activities supported by offset procurements, we coded projects as removal, avoidance or mixed following categories suggested by the University of California Berkeley's Voluntary Registry Offsets Database[e,k]. As a small difference, we use the term 'avoidance' in our study to denote what the Berkeley database terms 'reduction'. This reflects our view that avoidance better

Exhibit 14 to Decl. of Angel Hsu
498
**SER 335**

**Article**

https://doi.org/10.1038/s41467-024-51151-w

captures the speculative nature of offsetting projects that issue credits based on counterfactual claims to have avoided GHG emissions. It should also be noted that both the Berkeley database and ours consider REDD+ projects as avoidance/reduction, even though some protected forest sinks also remove atmospheric carbon. This categorisation is supported by literature[72], which demonstrates that in terms of surface area and tonnes of carbon avoided or removed, the primary function of REDD+ projects is avoidance, through preventing deforestation.

### Framework for assessing offset quality and climate benefits: construction and application

Our analysis of each company's offsetting behaviour was guided by the question: 'To what extent could the offsets retired by these companies be considered high quality and likely to benefit the climate?' To objectively assess the quality and likely climate benefits of offsets retired by each company, we adopted various indicators, standards and principles that are used on the VCM, advocated by its various stakeholder bodies, or discussed in the peer-reviewed literature. These were identified through a targeted review of the relevant grey and academic literature. This strategy avoids the integration of subjective value-based judgements in the analysis. The resulting framework consists of four dimensions and indicators (Table 1) that evaluate the quality and likely climate benefits of offsets from four key perspectives emphasised in the VCM and peer-reviewed literature: (1) use of offsets from low/high-risk project types; (2) age of projects and credits; (3) price of credits and (4) country of implementation. The main features and rationale of this framework, as well as any analytical decisions and additional data sources, are summarised below.

It is important to note that we do not include the mitigation approach (i.e. avoidance or removal) as an indicator of offset quality. Some industry frameworks like the Science Based Targets initiative and the International Standards Organization have stipulated that companies should exclusively use removals when using offsets to reach net-zero targets[25,43,73]. However, as already explained, our methodological decision reflects evidence that non-durable removal techniques like afforestation and soil enhancement also suffer from quality issues, especially with regard to carbon stockage estimation[15,16] and additionality[47,48]. Furthermore, due to technological immaturity, offsets from engineering-based removals with durable storage—promoted by some stakeholders as critical for quality enhancement[34,36,44]—were not traded on the studied registries.

**Relative quality risks.** We first coded project types in accordance with categories used by the University of California Berkeley's Voluntary Registry Offsets Database[64]. This classifies an offset project into a specific sector (e.g. industrial and commercial) and type (e.g. energy efficiency, waste gas recovery). Next, we evaluated the quality risks of each project type with a framework developed by the Stockholm Environmental Institute and GHG Management Institute[15], which defines three relative risk levels: lower risk, medium risk, and higher risk. Based on interviews with experts, the framework operationalises the view that some types of offset projects, all else being equal, involve a higher relative risk of failing basic quality criteria (additionality, accurate emissions accounting, etc.) than other types of projects. Projects falling into the higher risk category include forestry and land use (encompassing both avoidances [e.g. REDD+] and afforestation), large-scale renewables (>15 MW), and agriculture. Examples of projects in the medium risk category are small-scale renewables (≤15 MW), energy efficiency (demand-side) and household/community projects like improved cookstoves. Projects considered to involve a lower relative quality risk are fewer, key examples being methane destruction (without utilisation) and N$_2$O gas destruction. It should be noted that the framework is not intended to provide an exhaustive evaluation of project-level quality attributes, which can vary strongly from project

to project. However, many of the framework's evaluations are supported by ample literature. For instance, numerous studies show that REDD+[9,11], afforestation[16,48], renewables[12,13], agriculture[47] and cooking stove[39] projects tend to suffer from low additionality and over-crediting. Conversely, project types such as N$_2$O gas destruction may be more likely to be additional[18,74], since their investment is typically not justifiable in the absence of revenue from carbon credits, and newer methodologies address historical problems such as perverse incentives to increase N$_2$O production before issuing credits.

When placing offset projects into quality risk categories, we checked project documentation on registries to decide key factors such as capacity size for renewables installations, utilisation of methane gas (for grid-connected power) for landfill methane projects, etc. In a few cases where we were unsure about what risk categories to assign offset projects too, we contacted the authors[15] for guidance.

**Age.** Our analysis of age encompasses two perspectives. The first, project start year, measures the start of the first credit issuance period. This captures the year when an offset project started its emissions avoidance/removal activities (e.g. the year when a wind farm connected to the grid). The second, vintage, measures the year when a climate action associated with an offset credit was conducted (e.g. a particular year during which deforestation activities were prevented).

Debates continue about what should be considered a suitable maximum for offset vintages or project start years[31,32,34]. Thus, there is no definitive age limit that would guarantee quality. Recognising this, we adopt as an illustrative indicator a rule from CORSIA, which governs offsetting in the global aviation industry, and prohibits the use of offset credits with a vintage year or project start year before 2016. Although this lenient cut-off year by no means constitutes a rigorous standard, it has been adopted as a defacto yardstick by some commodity trading platforms that screen for quality (e.g. ACX's sustainable development goals tonne or global nature tonne+ and CBL's Global Emissions Offset).

There are several reasons why younger offsets may offer higher climate benefits than older ones. First, newer offset projects ensure that investments are directed towards contemporary rather than historical climate actions. This is essential for supporting the formation of new or recent climate mitigation initiatives and for minimising the use of offset credits from historical projects that cannot deliver further emissions reductions beyond what they are already scheduled to do[31,33]. Second, old projects that still issue credits for past actions (i.e. back issuing) or that have large volumes of unsold vintages are unlikely to be additional. Because such a project has continued to operate despite not having sold all of its credits, there is a strong argument to suspect that the initiative did not need revenue from offset sales to attain bankability, and therefore is not additional[32]. Third, older projects are likely to use older methodologies, which in many cases have been discredited and updated due to problems. Older projects are therefore more prone to overestimating emissions reductions and over-issuing credits[32,75]. Credit prices on the VCM reflect preferences for newer vintages, which generally fetch higher premiums from buyers[21].

**Price.** Another important indicator of credit quality is the price since cheaply priced credits are widely assumed to reflect the low quality and low additionality[15,21]. Our attention to this indicator also recognises that when companies consistently choose cheap credits, project implementers lose the incentive to supply high-quality credits, which in most cases require higher prices. Preferences for cheap credits can thus drive a race to the bottom by incentivising low-cost projects with weak measures to ensure climate integrity[31].

Because the VCM experiences sharp fluctuations in credit prices, we focused our analysis on the relative prices of different offset types—i.e. the cost of one type of offset, such as RE, compared to another

Exhibit 14 to Decl. of Angel Hsu
499
**SER 336**

**Article**

https://doi.org/10.1038/s41467-024-51151-w

type, such as chemical processes. Estimates of average annual prices were obtained from Ecosystem Marketplace, which publishes estimates based on a yearly survey distributed to its member organisations, which use offsets[76]. We then arranged these average price estimates into quintiles (Table S3), calculating for the twenty companies in our sample the volume of credits that fell into each price range each year (Fig. S4).

**Country of implementation (applied to renewable energy projects).**
The country of implementation is a critical determinant of a project's additionality, reflecting whether a project would have been financially feasible and therefore implemented without the opportunity to generate extra revenue by selling carbon credits. To ensure additionality, it is crucial that offsetting projects are implemented in countries where significant barriers (technological, financial, regulatory etc.) for that particular technology exist[12]. Conversely, if a mitigation technology or activity is standard practice in a country, it should not be considered additional[2]. Although such considerations are relevant to all kinds of offsetting projects, we limited our analysis to renewable energy projects. This is because the VCM has established explicit criteria regarding the countries where the implementation of renewable energy activities could be considered additional. Our analysis consists of two tests that apply criteria introduced by VCS and GS between 2019 and 2020.

Using a criterion from GS and VCS, the first test determines if the renewable energy project is implemented in a LDC[77,78]. The second test, using criteria from GS, checks if the project is located in a low-income or LMIC where the share of the proposed renewable electricity technology is below 5% of all installed electricity capacity[77]. To sufficiently demonstrate a minimum level of additionality, an offset project need only satisfy one test. Although these tests would only take effect in the case where a new offset project sought admission to either registry, both tests nonetheless provide an objective means to assess an offset's potential additionality (and therefore quality and climate benefit) with contemporary industry standards. Notably, both the adopted criteria emerged in response to the realisation that many early renewable energy projects issuing offset credits on the major registries were implemented in countries where attractive market, policy and technology conditions had lowered the barriers to upscaling, thereby reducing the likelihood that these projects were additional[15].

**Analysis: verification with experts**
To check the soundness of our methods, results and interpretations, we conducted six interviews during October 2022 and October 2023, presenting our analytical methodology to experts working in the VCM. All experts possess several years of experience in their current roles. We used their advice to improve our methodology and interpretations of results. The interviewed experts were composed of one researcher at a Europe-based think tank (Carbon Market Watch) and four analysts working at data firms in Europe and North America (Trove Research, Carbon Direct and Allied Offsets). This composition of experts allowed us to obtain diverse feedback on our study that reflected critical, neutral and supportive positions regarding the climate integrity of the VCM.

**Limitations**
Our study has several limitations. First, our analysis is confined to the retirements that we could identify on the three registries and does not consider instances where a company has retired offsets but has not disclosed its name in the relevant fields on the registry. Thus, the scale of actual retirements may be larger than that captured by our analysis, particularly because many companies will conceal offset retirements to escape public scrutiny or purchase offsets through intermediaries or internal means. This limitation could be overcome by using other sources of offset retirement disclosure, such as annual surveys

submitted to CDP (Climate Disclosure Project). We did not use this data as not all companies in the sample report to CDP. Besides, CPD data also lacks vintage years. Second, we did not analyse the various policies within companies that might dictate their offsetting behaviour and how they use offset credits for decarbonisation and pursuing net-zero targets. Analysing these factors, including interviews with company representatives, would deepen understanding of the many determinants of corporate offsetting behaviour. Third, our analysis of offset quality does not account for the varying conditions of individual projects, which are a key determinant of quality. Scholars have used various methods to appraise individual project quality, such as Internal Rate of Return[12,50], baseline settings and methodologies[11] and effectiveness at actually reducing emissions[8,9,58]. With around 500 projects used by the twenty companies, we consider a project-by-project quality analysis beyond the scope of this research. Although we could have used project quality ratings by private firms in the VCM (e.g. BeZero and Calyx), ratings are not available for around three-quarters of the projects in our database. This reduces their utility for our analysis. Fourth, we did not have access to actual transaction prices paid by companies, since such data is not publicly available.

## Data availability
The main dataset used for analysis, compiling the volume and characteristics of the offsets retired by each company, has been made available in Supplementary Data 1 as an electronic spreadsheet.

## References
1.  Hale, T. et al. Assessing the rapidly-emerging landscape of net zero targets. *Clim. Policy* **22**, 18–29 (2022).
2.  Rekker, S., Ives, M. C., Wade, B., Webb, L. & Greig, C. Measuring corporate Paris compliance using a strict science-based approach. *Nat. Commun.* **13**, 4441 (2022).
3.  Fankhauser, S. What next on net zero? *One Earth* **4**, 1520–1522 (2021).
4.  Trencher, G., Blondeel, M. & Asuka, J. Do all roads lead to Paris? Comparing pathways to net-zero by BP, Shell, Chevron and ExxonMobil. *Climatic Change* **176**, 83 (2023).
5.  Christiansen, K. L. et al. Our burgers eat carbon": investigating the discourses of corporate net-zero commitments. *Environ. Sci. Policy* **142**, 79–88 (2023).
6.  BloombergNEF. *Long-term carbon offsets outlook 2023* (cited 30 July 2023); https://www.bloomberg.com/professional/insights/commodities/long-term-carbon-offsets-outlook-2023/.
7.  Probst, B., Toetzke, M., Anadón, L. D., Kontelon, A. & Hoffman, V. *Systematic review of the actual emissions reductions of carbon offset projects across all major sectors* (Research Square, 2023). https://doi.org/10.21203/rs.3.rs-3149652/v1.
8.  West, T. A. P. et al. Action needed to make carbon offsets from forest conservation work for climate change mitigation. *Science* **381**, 873–877 (2023).
9.  West, T. A. P., Börner, J., Sills, E. O. & Kontoleon, A. Overstated carbon emission reductions from voluntary REDD+ projects in the Brazilian Amazon. *Proc. Natl. Acad. Sci.* **117**, 24188–24194 (2020).
10. Guizar-Coutiño, A., Jones, J. P. G., Balmford, A., Carmenta, R. & Coomes, D. A. A global evaluation of the effectiveness of voluntary REDD+ projects at reducing deforestation and degradation in the moist tropics. *Conserv. Biol.* **36**, e13970 (2022).
11. Haya, B. K. et al. Quality assessment of REDD+ carbon credit projects. *Berkeley Carbon Trading Project 2023* (cited 20 September 2023); https://gspp.berkeley.edu/research-and-impact/centers/cepp/projects/berkeley-carbon-trading-project/REDD+.
12. Lo, A. Y. Carbon offsetting and renewable energy development. *Geographical Res.* **61**, 158–163 (2023).
13. Calel, R., Colmer, J., Dechezleprêtre, A. & Glachant, M. *Do carbon offsets offset carbon? 2021* (cited 4 July 2023); https://www.lse.ac.

Exhibit 14 to Decl. of Angel Hsu
500
SER 337

Article                                                          https://doi.org/10.1038/s41467-024-51151-w

uk/granthaminstitute/publication/do-carbon-offsets-offset-carbon/.

14. Rathi, A., White, N. & Pogkas, P. *Junk Carbon Offsets Are What Make These Big Companies 'Carbon Neutral' 2022* (cited 2 December 2022); https://www.bloomberg.com/graphics/2022-carbon-offsets-renewable-energy/.

15. Broekhoff, D., Gillenwater, M., Colbert-Sangree, T. & Cage, P. *Securing Climate Benefit: A Guide to Using Carbon Offsets 2019* (cited 20 June 2023); https://www.offsetguide.org/wp-content/uploads/2020/03/Carbon-Offset-Guide_3122020.pdf.

16. Macintosh, A. et al. Australian human-induced native forest regeneration carbon offset projects have limited impact on changes in woody vegetation cover and carbon removals. *Commun. Earth Environ.* **5**, 149 (2024).

17. Science Based Targets. *SBTi Corporate Manual Version 2.1 2023* (cited 10 October 2023); https://sciencebasedtargets.org/resources/files/SBTi-Corporate-Manual.pdf.

18. White, N. *Carbon Offset Gatekeepers Are Failing to Stop Junk Credits 2023* (cited 20 August 2023); https://www.bloomberg.com/news/articles/2023-03-21/top-carbon-offset-registries-are-failing-to-stop-junk-credits

19. Greenfield, P. *Carbon credit speculators could lose billions as off-sets deemed 'worthless' 2023* (cited 25 August 2023); https://www.theguardian.com/environment/2023/aug/24/carbon-credit-speculators-could-lose-billions-as-offsets-deemed-worthless-aoe.

20. Source Material. *The Carbon Con 2023* (cited 25 August 2023); https://www.source-material.org/vercompanies-carbon-offsetting-claims-inflated-methodologies-flawed/.

21. World Bank. *State and Trends of Carbon Pricing 2023* (cited 15 August 2023); https://openknowledge.worldbank.org/items/58f2a409-9bb7-4ee6-899d-be47835c838f.

22. Trouwloon, D., Streck, C., Chagas, T. & Martinus, G. Understanding the use of carbon credits by companies: a review of the defining elements of corporate climate claims. *Glob. Chall.* **7**, 2200158 (2023).

23. UN. *Integrity Matters: Net-Zero Commitments by Businesses, Financial Institutions, Cities and Regions 2023* (cited 15 August 2023); https://www.un.org/sites/un2.un.org/files/high-level_expert_group_n7b.pdf.

24. Valiergue, A. & Ehrenstein, V. Quality offsets? A commentary on the voluntary carbon markets. *Consum. Mark. Cult.* **26**, 1–13 (2022).

25. Allen, M. et al. *The Oxford Principles for Net Zero Aligned Carbon Offsetting 2021* (cited 30 March 2021); https://www.smithschool.ox.ac.uk/publications/reports/Oxford-Offsetting-Principles-2020.pdf.

26. Integrity Council for the Voluntary Carbon Market. *Core Carbon Principles and Assessment Framework 2023* (cited 10 March 2024); https://icvcm.org/the-core-carbon-principles/.

27. VCMI. *Claims Code of Practice: Building integrity in voluntary carbon markets 2023* (cited 1 October 2023); https://vcmintegrity.org/vcmi-claims-code-of-practice/.

28. Day, T. et al. *Corporate Climate Responsibility Monitor 2023* (cited 10 February 2023); https://carbonmarketwatch.org/publications/corporate-climate-responsibility-monitor-2023/.

29. Huber, E., Bach, V. & Finkbeiner, M. A qualitative meta-analysis of carbon offset quality criteria. *J. Environ. Manag.* **352**, 119983 (2024).

30. Broekhoff, D. & Spalding-Fecher, R. Assessing crediting scheme standards and practices for ensuring unit quality under the Paris agreement. *Carbon Manag.* **12**, 635–648 (2021).

31. Warnecke, C., Schneider, L., Day, T., La Hoz Theuer, S. & Fearnehough, H. Robust eligibility criteria essential for new global scheme to offset aviation emissions. *Nat. Clim. Change* **9**, 218–221 (2019).

32. Turner, G. & Grocott, H. *The Global Voluntary Carbon Market: Dealing With the Problem of Historic Credits 2021* (cited 15 August 2022); https://trove-research.com/wp-content/uploads/2021/01/Global-Carbon-Offset-Supply_11-Jan-1.pdf.

33. Science Based Targets. *Above and Beyond: An SBTi Report on the Design and Implementation of Beyond Value Chain Mitigation (BVCM) 2024* (cited 1 May 2024); https://sciencebasedtargets.org/resources/files/Above-and-Beyond-Report-on-BVCM.pdf.

34. Axelsson, K. et al. *Oxford Principles for Net Zero Aligned Carbon Offsetting (revised 2024) 2024* (cited 14 March 2024); https://www.smithschool.ox.ac.uk/sites/default/files/2024-02/Oxford-Principles-for-Net-Zero-Aligned-Carbon-Offsetting-revised-2024.pdf.

35. World Economic Forum. *The Voluntary Carbon Market: Climate Finance at an Inflection Point 2023* (cited 25 August 2023); https://www3.weforum.org/docs/WEF_The_Voluntary_Carbon_Market_2023.pdf.

36. Boyd, P. W., Bach, L., Holden, R. & Turney, C. Carbon offsets aren't helping the planet—four ways to fix them. *Nature* **620**, 947–949 (2023).

37. Cullenward, D., Badgley, G. & Chay, F. Carbon offsets are incompatible with the Paris Agreement. *One Earth* **6**, 1085–1088 (2023).

38. Carton, W. et al. *Net Zero, Carbon Removal and the Limitations of Carbon Offsetting (CSSN Position Paper 2022:1)* (cited 20 July 2022); https://www.cssn.org/wp-content/uploads/2022/06/Net-Zero-and-Carbon-Offsetting-Position-Paper.pdf.

39. Gill-Wiehl, A., Kammen, D. M. & Haya, B. K. Pervasive over-crediting from cookstove offset methodologies. *Nat. Sustain.* **7**, 191–202 (2024).

40. Engler, D., Gutsche, G., Simixhiu, A. & Ziegler, A. On the relationship between corporate CO2 offsetting and pro-environmental activities in small- and medium-sized firms in Germany. *Energy Econ.* **118**, 106487 (2023).

41. Jaraitė, J., Kurtyka, O. & Ollivier, H. Take a ride on the (not so) green side: How do CDM projects affect Indian manufacturing firms' environmental performance? *J. Environ. Econ. Manag.* **114**, 102684 (2022).

42. Guix, M., Ollé, C. & Font, X. Trustworthy or misleading communication of voluntary carbon offsets in the aviation industry. *Tour. Manag.* **88**, 104430 (2022).

43. ISO. *International Organization for Standardization 2023* (cited August 2023); https://www.iso.org/netzero.

44. Schenuit, F. et al. Secure robust carbon dioxide removal policy through credible certification. *Commun. Earth Environ.* **4**, 349 (2023).

45. IPCC. AR6 *Climate Change 2022: Mitigation of Climate Change, the Working Group III contribution 2022* (cited 25 May 2023); www.ipcc.ch/report/sixth-assessment-report-working-group-3/.

46. Fankhauser, S. et al. The meaning of net zero and how to get it right. *Nat. Clim. Change* **12**, 15–21 (2022).

47. Barbato, C. T. & Strong, A. L. Farmer perspectives on carbon markets incentivizing agricultural soil carbon sequestration. *npj Clim. Action* **2**, 26 (2023).

48. Salo, E., Rinne, J. & Kaskeala, N. *From Crisis to Confidence: Rethinking Integrity in the Voluntary Carbon Market 2023* (cited 10 September 2023); https://www.compensate.com/articles/from-crisis-to-confidence-rethinking-integrity-in-the-voluntary-carbon.

49. UNEP. *Emissions Gap Report 2023: Broken Record 2023* (cited 10 May 2024); https://www.unep.org/resources/emissions-gap-report-2023.

50. Cames, M. et al. *How additional is the Clean Development Mechanism? Analysis of the application of current tools and proposed alternatives 2016* (cited 1 December 2022); https://climate.ec.europa.eu/system/files/2017-04/clean_dev_mechanism_en.pdf.

51. Trove Research. *The Role of "Reduction" and "Removal" Projects in the Voluntary Carbon Market* (cited 23 July 2023); https://trove-research.com/reports-and-commentary/.

52. BloombergNEF. *Global Carbon Market Outlook 2022* (cited 15 August 2023); https://www.bloomberg.com/professional/blog/global-carbon-market-outlook-2022-bulls-trump-bears/.

Exhibit 14 to Decl. of Angel Hsu

501

**SER 338**

**Article**                                                    https://doi.org/10.1038/s41467-024-51151-w

53. La Hoz Theuer, S. et al. *Offset Use Across Emissions Trading Systems* (ICAP, 2023).
54. Climate Impact Partners. *The Carbon Neutral Protocol 2023*: The global standard for carbon neutral programmes (cited 10 October 2023); https://www.carbonneutral.com/the-carbonneutral-protocol/technical-specifications-and-guidance/step-4-reduce-1/4-7-excluded-emission-reduction-project-types.
55. Nick, S. & Thalmann, P. Towards true climate neutrality for global aviation: a negative emissions fund for airlines. *J. Risk Financ. Manag.* **15**, 505 (2022)
56. Favasuli, S. & Sebastian, V. Voluntary carbon markets: how they work, how they're priced and who's involved. in *Insight*. 40–47 (S&P Global Platts, 2021).
57. IRENA. *Renewable Capacity Statistics* (cited 25 August 2023); https://www.irena.org/Data/Downloads/IRENASTAT.
58. Lo, A. Y. & Cong, R. Emission reduction targets and outcomes of the clean development mechanism (2005–2020). *PLOS Clim.* **1**, e0000046 (2022).
59. World Bank Group. *Regulatory Indicators for Sustainable Energy (RISE)* (cited 30 August 2023); https://rise.esmap.org/reports.
60. World Economic Forum. *Scaling Voluntary Carbon Markets: A Playbook for Corporate Action* (cited 20 September 2023); https://www.weforum.org/publications/scaling-voluntary-carbon-markets-a-playbook-for-corporate-action/.
61. Haya, B. K. et al. Comprehensive review of carbon quantification by improved forest management offset protocols. *Front. Forests Global Change*. https://doi.org/10.3389/ffgc.2023.958879 (2023).
62. Li, M., Trencher, G. & Asuka, J. The clean energy claims of BP, Chevron, ExxonMobil and Shell: a mismatch between discourse, actions and investments. *PLoS One* **17**, e0263596 (2022).
63. University of California Berkley. Voluntary Registry Offsets *Database (Version 10)* (2024).
64. University of California Berkley. *Voluntary Registry Offsets Database* (2023).
65. IPCC. *Climate Change 2022: Mitigation of Climate Change (Summary for Policymakers)* (cited 10 May 2022); https://www.ipcc.ch/report/sixth-assessment-report-working-group-3/.
66. Mitchard, E., Ellis, P., Cook Patton, S. & Adjei, R. F. Don't dismiss carbon credits that aim to avoid future emissions. *Nature* **628**, 36 (2024).
67. Seddon, N. et al. Getting the message right on nature-based solutions to climate change. *Glob. Change Biol.* **27**, 1518–1546 (2021).
68. Badgley, G. et al. Systematic over-crediting in California's forest carbon offsets program. *Glob. Change Biol.* **28**, 1433–1445 (2022).
69. Haya, B. et al. Managing uncertainty in carbon offsets: insights from California's standardized approach. *Clim. Policy* **20**, 1112–1126 (2020).
70. IEA. *Net Zero by 2050: A Roadmap for the Global Energy Sector* (cited 17 July 2022); https://www.iea.org/reports/net-zero-by-2050.
71. Dooley, K., Nicholls, Z. & Meinshausen, M. Carbon removals from nature restoration are no substitute for steep emission reductions. *One Earth* **5**, 812–824 (2022).
72. Atmadja, S. S. et al. How do REDD+ projects contribute to the goals of the Paris Agreement? *Environ. Res. Lett.* **17**, 044038 (2022).
73. SBTi. *Corporate Net-Zero Standard 2021* [cited 20 October 2022]; https://sciencebasedtargets.org/resources/files/Net-Zero-Standard.pdf.
74. Kuriyama, A. & Abe, N. Ex-post assessment of the Kyoto protocol—quantification of $CO_2$ mitigation impact in both Annex B and non-Annex B countries. *Appl. Energy* **220**, 286–295 (2018).
75. Hong, A., Herbert, C. & Dolginow, A. *Commentary on the Voluntary Registry Offsets Database (VROD) 2022* (cited 12 October 2022]; https://www.carbon-direct.com/insights/assessing-the-state-of-the-voluntary-carbon-market-in-2022.
76. Ecosystem Marketplace. *EM Reports and Resources on Global Carbon Markets 2023* (cited 1 August 2023); https://www.ecosystemmarketplace.com/carbon-markets/.
77. Gold Standard. *Renewable Energy Requirements Version 1.4* (cited 10 October 2023); https://globalgoals.goldstandard.org/standards/202_V1.4_AR-Renewable-Energy-Activity-Requirements.pdf.
78. Verra. *VCS Standard v4.4* (cited 20 October 2023); https://verra.org/wp-content/uploads/2022/12/VCS-Standard-v4.4-FINAL.pdf.
79. World Bank. *World Bank Country and Lending Groups* (cited 10 October 2023); https://datahelpdesk.worldbank.org/knowledgebase/articles/906519-world-bank-country-and-lending-groups.
80. UNCTAD. *UN List of Least Developed Countries* https://unctad.org/topic/least-developed-countries/list (2023).

## Acknowledgements

We express thanks to the experts who shared their insights and helped us to improve our methodology, analysis and interpretations.

## Author contributions

G.T. conceived the study, collected data and performed the analysis with contributions from S.N. and J.C. G.T. wrote the manuscript and drew all figures. S.N., J.C. and M.J. all contributed to drafting the manuscript and improving the analysis.

## Competing interests

The authors have no competing interests to declare.

## Additional information

**Supplementary information** The online version contains supplementary material available at https://doi.org/10.1038/s41467-024-51151-w.

**Correspondence** and requests for materials should be addressed to Gregory Trencher.

**Peer review information** *Nature Communications* thanks Derik Broekhoff and the other, anonymous, reviewer(s) for their contribution to the peer review of this work. A peer review file is available.

**Reprints and permissions information** is available at http://www.nature.com/reprints

**Publisher's note** Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.

**Open Access** This article is licensed under a Creative Commons Attribution-NonCommercial-NoDerivatives 4.0 International License, which permits any non-commercial use, sharing, distribution and reproduction in any medium or format, as long as you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons licence, and indicate if you modified the licensed material. You do not have permission under this licence to share adapted material derived from this article or parts of it. The images or other third party material in this article are included in the article's Creative Commons licence, unless indicated otherwise in a credit line to the material. If material is not included in the article's Creative Commons licence and your intended use is not permitted by statutory regulation or exceeds the permitted use, you will need to obtain permission directly from the copyright holder. To view a copy of this licence, visit http://creativecommons.org/licenses/by-nc-nd/4.0/.

© The Author(s) 2024

Exhibit 14 to Decl. of Angel Hsu

502

**SER 339**

# Exhibit 13
# to Declaration of Angel Hsu

# ISO, Net zero guidelines
# (2022)

Exhibit 13 to Decl. of Angel Hsu

438

**SER 340**



Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS 2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

# Net Zero Guidelines

Accelerating the transition to net zero

IWA 42:2022(E)

Please share your feedback about the standard. Scan the QR code with your phone or click the link

Customer Feedback Form

iso.org

Exhibit 13 to Decl. of Angel Hsu
439
SER 341

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

Exhibit 13 to Decl. of Angel Hsu
440

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

# INTERNATIONAL WORKSHOP AGREEMENT

**IWA 42**

First edition
2022-11

## Net zero guidelines



Reference number
IWA 42:2022(E)

© ISO 2022

Exhibit 13 to Decl. of Angel Hsu

441

**SER 343**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

 **COPYRIGHT PROTECTED DOCUMENT**

© ISO 2022

All rights reserved. Unless otherwise specified, or required in the context of its implementation, no part of this publication may be reproduced or utilized otherwise in any form or by any means, electronic or mechanical, including photocopying, or posting on the internet or an intranet, without prior written permission. Permission can be requested from either ISO at the address below or ISO's member body in the country of the requester.

ISO copyright office
CP 401 • Ch. de Blandonnet 8
CH-1214 Vernier, Geneva
Phone: +41 22 749 01 11
Email: copyright@iso.org
Website: www.iso.org

Published in Switzerland

Exhibit 13 to Decl. of Angel Hsu
442
**SER 344**

Case 2:24-cv-00801-ODW-PVC    Document 89-31    Filed 04/07/25    Page 6 of 49    Page ID #:9075

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

# Contents

Page

Foreword ................................................................................................................................................................................................ v

Introduction ..................................................................................................................................................................................... vi

1   Scope ........................................................................................................................................................................................ 1

2   Normative references ................................................................................................................................................. 2

3   Terms and definitions ............................................................................................................................................... 2
   3.1   Terms related to climate action .................................................................................................................... 2
   3.2   Terms related to greenhouse gases .............................................................................................................. 3
   3.3   Terms related to mitigation of greenhouse gas emissions ........................................................... 5
   3.4   Terms relating to organizations seeking to achieve net zero .................................................... 7

4   Abbreviated terms ......................................................................................................................................................... 8

5   Net zero guiding principles ................................................................................................................................... 8
   5.1   General ........................................................................................................................................................................... 8
   5.2   Alignment ..................................................................................................................................................................... 9
   5.3   Urgency .......................................................................................................................................................................... 9
   5.4   Ambition ........................................................................................................................................................................ 9
   5.5   Prioritization .............................................................................................................................................................. 9
   5.6   Decision-making based on scientific evidence and indigenous knowledge .................... 9
   5.7   Risk-based approach ............................................................................................................................................. 9
   5.8   Credibility ................................................................................................................................................................. 10
   5.9   Equity and justice ............................................................................................................................................... 10
   5.10  Transparency, integrity and accountability ...................................................................................... 10
   5.11  Achievement and continuation of net zero ........................................................................................ 11

6   Establishing levels and boundaries for net zero ............................................................................. 11

7   Leadership and commitment ............................................................................................................................ 12
   7.1   General ........................................................................................................................................................................ 12
   7.2   Leadership commitment ................................................................................................................................. 13
   7.3   Roles and responsibilities ............................................................................................................................. 13

8   Targets .................................................................................................................................................................................. 14
   8.1   Planning actions to be taken ....................................................................................................................... 14
   8.2   Target setting .......................................................................................................................................................... 15
       8.2.1   General ..................................................................................................................................................... 15
       8.2.2   Sectoral targets ................................................................................................................................. 16
       8.2.3   Targets for Scope 1 emissions ............................................................................................... 17
       8.2.4   Targets for Scope 2 emissions ............................................................................................... 17
       8.2.5   Targets for Scope 3 emissions ............................................................................................... 18
       8.2.6   Interim targets ................................................................................................................................... 19

9   Mitigation .......................................................................................................................................................................... 20
   9.1   Planning ..................................................................................................................................................................... 20
       9.1.1   General ..................................................................................................................................................... 20
       9.1.2   Content of mitigation plans ..................................................................................................... 20
   9.2   Prioritization of mitigation actions ....................................................................................................... 22
       9.2.1   General ..................................................................................................................................................... 22
       9.2.2   Actions to address Scope 1 and Scope 2 emissions ............................................... 22
       9.2.3   Actions to address Scope 3 and other emissions ..................................................... 23

10  Counterbalancing residual emissions ..................................................................................................... 23
   10.1  General ........................................................................................................................................................................ 23
   10.2  Credits ......................................................................................................................................................................... 25

11  Measurement and monitoring ........................................................................................................................ 26
   11.1  General ........................................................................................................................................................................ 26
   11.2  Use of indicators and tools ........................................................................................................................... 26

© ISO 2022 – All rights reserved

iii

Exhibit 13 to Decl. of Angel Hsu
443
**SER 345**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

| | | |
|---|---|---|
| **12** | **Wider impact, equity and empowerment** | **27** |
| | 12.1  Wider impact | 27 |
| | 12.2  Fair share and just transition | 28 |
| | 12.3  Empowerment | 29 |
| **13** | **Communication, reporting and transparency** | **29** |
| | 13.1  General | 29 |
| | 13.2  Scope of reporting and information to include | 30 |
| | 13.2.1  Scope of reporting | 30 |
| | 13.2.2  Reporting of net zero claims | 31 |
| | 13.2.3  Limitations of reporting | 32 |
| | 13.2.4  Credibility of reports | 33 |
| **14** | **Improvement** | **33** |
| **Annex A** (informative) **Workshop contributors** | | **34** |
| **Bibliography** | | **35** |

© ISO 2022 – All rights reserved

Exhibit 13 to Decl. of Angel Hsu
444
**SER 346**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

IWA 42:2022(E)

## Foreword

ISO (the International Organization for Standardization) is a worldwide federation of national standards bodies (ISO member bodies). The work of preparing International Standards is normally carried out through ISO technical committees. Each member body interested in a subject for which a technical committee has been established has the right to be represented on that committee. International organizations, governmental and non-governmental, in liaison with ISO, also take part in the work. ISO collaborates closely with the International Electrotechnical Commission (IEC) on all matters of electrotechnical standardization.

The procedures used to develop this document and those intended for its further maintenance are described in the ISO/IEC Directives, Part 1. In particular, the different approval criteria needed for the different types of ISO documents should be noted. This document was drafted in accordance with the editorial rules of the ISO/IEC Directives, Part 2 (see www.iso.org/directives).

Attention is drawn to the possibility that some of the elements of this document may be the subject of patent rights. ISO shall not be held responsible for identifying any or all such patent rights. Details of any patent rights identified during the development of the document will be in the Introduction and/or on the ISO list of patent declarations received (see www.iso.org/patents).

Any trade name used in this document is information given for the convenience of users and does not constitute an endorsement.

For an explanation of the voluntary nature of standards, the meaning of ISO specific terms and expressions related to conformity assessment, as well as information about ISO's adherence to the World Trade Organization (WTO) principles in the Technical Barriers to Trade (TBT), see www.iso.org/iso/foreword.html.

International Workshop Agreement IWA 42 was approved at a workshop hosted by the British Standards Institution (BSI), in association with Our 2050 World, held virtually in September 2022.

In order to respond to urgent market requirements, International Workshop Agreements are prepared through a workshop mechanism outside of ISO committee structures, following a procedure that ensures the broadest range of relevant interested parties worldwide have the opportunity to participate, and are approved by consensus amongst the individual participants in the workshops. If there is an existing ISO committee whose scope covers the topic, the published International Workshop Agreement is automatically allocated to this committee for maintenance. An International Workshop Agreement is reviewed three years after its publication and can be further processed to become a Publicly Available Specification, a Technical Specification or an International Standard, according to the market requirement. An International Workshop Agreement can exist for a maximum of six years, following which it is either withdrawn or converted into another ISO document.

Any feedback or questions on this document should be directed to the user's national standards body. A complete listing of these bodies can be found at www.iso.org/members.html.

© ISO 2022 – All rights reserved

v

Exhibit 13 to Decl. of Angel Hsu
445
SER 347

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS 2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

# Introduction

### 0.1  General

Climate change is one of the most pressing challenges that our world faces. Scientific assessments through the Intergovernmental Panel on Climate Change (IPCC) reports have shown that many of the worst consequences of climate change can be avoided by limiting global warming to 1,5 °C above pre-industrial levels. The global temperature is already over 1 °C above pre-industrial levels, and scenarios assessed by the IPCC indicate that limiting warming to 1,5 °C, with no or limited temperature overshoot, requires achieving at least net zero global carbon dioxide ($CO_2$) emissions in the early 2050s, along with deep and sustained global reductions in other greenhouse gas emissions (GHGs)[15][16]. These scenarios also show that the earlier and faster emission reductions occur, the lower peak warming and the lower the likelihood of overshooting warming limits. Peak warming depends on cumulative $CO_2$ emissions from the beginning of the industrial period up to the time they are reduced to net zero, combined with the change in non-$CO_2$ emissions on the climate system, by the time the temperature peaks.

This document provides guiding principles and recommendations to enable a common approach with a high level of ambition, to drive organizations to achieve net zero GHGs as soon as possible and by 2050 at the latest. It is intended to be a common reference for governance organizations (including voluntary initiatives, adoption of standards, policy and national and international regulation), and can help organizations taking action to contribute to achieving global net zero.

This document should be interpreted and used in line with its purpose and scope to maintain and promote the highest possible climate ambition. This document does not address legal and other obligations relating to climate action.

This document builds on progress by voluntary initiatives, campaigns and governance, supporting their purpose of progressing to a climate positive future, increasing their reach and enabling a more consistent approach for future interventions and deliverables, including ISO standards.

The 2015 Paris Agreement[17] states the importance of achieving a global balance between human-caused emissions by sources and human-led removals by sinks in the second half of the 21st century, taking into account varying capabilities in different parts of the world, on the basis of equity, and in the context of sustainable development and efforts to eradicate poverty. This document therefore includes recommendations on equity and wider impact.

The scope of this document is aligned to the objectives of the "High-Level Expert Group on the Net Zero Emissions Commitments of Non-State Entities", formed at the request of the United Nations (UN) Secretary General, and other UN developments, including the United Nations Framework Convention on Climate Change (UNFCCC).

Some initiatives and policies limit actions relating to net zero GHG emissions to those emissions and removals under the direct control of the reporting organization. This document promotes and gives guidance on taking action to address all GHG emissions, direct and indirect, in an organization's value chain.

### 0.2  Use of this document

In this document, the following verbal forms are used:

— "should" indicates a recommendation;

— "may" indicates a permission;

— "can" indicates a possibility or a capability.

Information marked as "NOTE" is intended to assist the understanding or use of the document. "Notes to entry" used in Clause 3 provide additional information that supplements the terminological data and can contain provisions relating to the use of a term.

© ISO 2022 – All rights reserved

Exhibit 13 to Decl. of Angel Hsu
446
**SER 348**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**International Workshop Agreement**                                          **IWA 42:2022(E)**

# Net zero guidelines

## 1   Scope

This document provides guiding principles and recommendations to enable a common, global approach to achieving net zero greenhouse gas emissions through alignment of voluntary initiatives and adoption of standards, policies and national and international regulation.

This document provides guidance on what governance organizations and other organizations can do to effectively contribute to global efforts to limit warming to 1,5 °C by achieving net zero no later than 2050. It provides guidance on a common and equitable contribution and recognizes the capability of individual organizations in contributing to achieving global net zero. This document, when used in combination with applicable science-based pathways, provides guidance for organizations seeking to set robust climate strategies.

This document provides common terms and definitions, guidance and specific recommendations on:

— net zero guiding principles for all organizations;

— incorporating net zero into strategies and policies;

— what net zero means at different levels and for different types of organization;

— setting and aligning interim and long-term targets based on equity, latest scientific knowledge, evidence, research and agreed good practice;

— actions to take to achieve these targets;

— greenhouse gas emission reductions within the value chain;

— nature protection and restoration;

— avoided emissions and other climate contributions beyond the value chain;

— removals;

— offsets;

— credits;

— claims;

— monitoring, measuring and use of appropriate and consistent indicators;

— equity, empowerment, fair share and wider impact;

— transparent reporting and effective communication.

This document is intended to align territorial approaches to achieving net zero (e.g. by nations, regions, cities) and value chain approaches by organizations.

This document is intended to enable and support all organizations, including governance organizations developing policies, frameworks, standards or other initiatives on net zero for use by others.

Exhibit 13 to Decl. of Angel Hsu
447
**SER 349**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

This document is intended to complement voluntary initiatives and facilitate alignment, so that any organization looking to make or support a net zero claim takes a similar approach regardless of the initiative it is associated with.

NOTE 1    A single target for organizations of net zero for all greenhouse gas emissions, as soon as possible or by 2050 at the latest, is used in this document to provide a common, understandable and ambitious target, in line with scientific consensus on the global effort needed to limit warming to 1,5 °C with no or limited temperature overshoot. This organizational target aligns with the target stated in the Race to Zero Criteria[18].

NOTE 2    Governance organizations include:

— national and sub-national (e.g. regional, local, municipal) governments, as appropriate;

— regulators;

— voluntary initiatives;

— intergovernmental bodies;

— international and national non-governmental organizations.

NOTE 3    This document does not provide guidance on carbon neutrality for organizations or for products and services. Information on carbon neutrality for organizations will be provided in ISO 14068[1)].

## 2   Normative references

There are no normative references in this document.

NOTE    The Normative references clause lists, for information, those documents which are cited in the text in such a way that some or all of their content constitutes requirements of the document.

## 3   Terms and definitions

For the purposes of this document, the following terms and definitions apply.

ISO and IEC maintain terminology databases for use in standardization at the following addresses:

— ISO Online browsing platform: available at https://www.iso.org/obp

— IEC Electropedia: available at https://www.electropedia.org/

NOTE    The Terms and definitions clause provides definitions necessary for the understanding of certain terms used in the document. Some definitions have been drafted specifically for this document, others are based on existing terminological entries from International Standards and from documents published by the Intergovernmental Panel on Climate Change (IPCC), the Greenhouse Gas Protocol (GHGP) and United Nations Framework Convention on Climate Change (UNFCCC).

### 3.1   Terms related to climate action

**3.1.1**
**net zero**
net zero GHG
condition in which human-caused *residual GHG emissions* (3.2.9) are balanced by human-led *removals* (3.3.3) over a specified period and within specified boundaries

Note 1 to entry: Human-led removals include ecosystem restoration, direct air carbon capture and storage, reforestation and afforestation, enhanced weathering, biochar and other effective methods.

Note 2 to entry: The words "human-caused" and "human-led" are intended to be understood as synonymous with the word "anthropogenic" in IPCC definitions.

---

1)   Under development.

    © ISO 2022 – All rights reserved

Exhibit 13 to Decl. of Angel Hsu
448
**SER 350**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

IWA 42:2022(E)

[SOURCE: IPCC AR6 Working Group III Annex 1, definition of "net zero greenhouse gas emissions", modified]

**3.1.2**
**science-based pathway**
trajectory to achieve global *net zero* (3.1.1) *greenhouse gas emissions* (3.2.2) based on scientific evidence

Note 1 to entry: Scientific evidence refers to evidence that has been confirmed through peer review.

Note 2 to entry: In this document, applicable science-based pathways are independent 1,5 °C aligned pathways.

**3.1.3**
**biodiversity**
biological diversity
variability among living organisms on the earth, including the variability within and between species, and within and between ecosystems

Note 1 to entry: Further information on biodiversity is provided by the Convention on Biological Diversity.

[SOURCE: ISO 14050:2020, 3.8.22, modified — Note 1 to entry has been added.]

**3.1.4**
**renewable energy**
energy collected from resources that are naturally replenished at a rate equal or faster than extracted or used

Note 1 to entry: Renewable energy includes sources such as sunlight, wind, rain, tides, waves, biomass, and geothermal heat.

[SOURCE: IPCC AR6, Working Group III, Annex 1, modified]

**3.1.5**
**adaptation**
adjustments in ecological, social or economic systems in response to actual or expected climatic stimuli and their effects or impacts

Note 1 to entry: Adaptation refers to changes in processes, practices and structures to moderate potential damages or to benefit from opportunities associated with climate change.

[SOURCE: UNFCCC Glossary of climate change acronyms and terms, modified]

## 3.2    Terms related to greenhouse gases

**3.2.1**
**greenhouse gas**
**GHG**
gaseous constituent of the atmosphere, natural or anthropogenic, that absorbs and emits radiation at specific wavelengths within the spectrum of infrared radiation emitted by the Earth's surface, the atmosphere and clouds

Note 1 to entry: Greenhouse gases caused by human activities and relevant for this document include carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$), hydrofluorocarbons (HFCs), perfluorocarbons (PFCs), sulfur hexafluoride ($SF_6$) and nitrogen trifluoride ($NF_3$).

[SOURCE: ISO 14050:2020, 3.9.1, modified — The words "both natural and anthropogenic" have been replaced with "natural or anthropogenic" in the definition and Note 1 to entry has been added.]

© ISO 2022 – All rights reserved

Exhibit 13 to Decl. of Angel Hsu
449
SER 351

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

### 3.2.2
**greenhouse gas emission**
GHG emission
emission
release of a *greenhouse gas* ([3.2.1](#)) into the atmosphere

Note 1 to entry: greenhouse gas emissions include those released from:

— natural sources (e.g. decomposition of plants);

— combustion of fossil fuels;

— other processes, including unintentional release (e.g. caused by imperfections in processing equipment or conditions).

Note 2 to entry: For GHG emissions that occur not directly into the atmosphere but into a body of water or into soil, the relevant emission is the amount by which the concentration of the gas increases in the atmosphere as a result of this emission, according to scientific evidence for chemical and biological processes that can occur in water or soil.

[SOURCE: ISO 14050:2020, 3.9.8, modified — The admitted term "emission" has been added and Notes 1 and 2 to entry have been added.]

### 3.2.3
**Scope 1 emission**
direct GHG emission
*greenhouse gas emission* ([3.2.2](#)) from *sources* ([3.2.7](#)) owned or directly controlled by the *organization* ([3.4.1](#))

Note 1 to entry: This document uses the concepts of equity share or control (territorial, financial and operational) to establish Scope 1 emission responsibility.

Note 2 to entry: Scope 1 emissions do not include those occurring from natural ecosystems owned or controlled by the organization that are not under management, or remain in a natural state and have not been modified.

Note 3 to entry: Scope 1 emissions for *governance organizations* ([3.4.2](#)) operating at a territorial level refer to GHG emissions from sources located inside the boundary of that territory. More information on Scope 1 emissions is provided in the GHG *Global Protocol for Community-Scale Greenhouse Gas Inventories, An Accounting and Reporting Standard for Cities Version 1.1.*

[SOURCE: GHG Protocol *Corporate Accounting and Reporting Standard*]

### 3.2.4
**Scope 2 emission**
indirect GHG emission from purchased energy
*greenhouse gas emission* ([3.2.2](#)) from the generation of purchased electricity, heat, cooling or steam consumed by the *organization* ([3.4.1](#))

Note 1 to entry: Scope 2 emissions for organizations operating at a territorial level refers to GHG emissions other than *Scope 1 emissions* ([3.2.3](#)), occurring as a consequence of the use of grid-supplied electricity, heat, steam and cooling within the territorial boundary.

[SOURCE: GHG Protocol *Corporate Accounting and Reporting Standard*]

### 3.2.5
**Scope 3 emission**
indirect GHG emission
*greenhouse gas emission* ([3.2.2](#)) that is a consequence of the *organization's* ([3.4.1](#)) activities but arises from *sources* ([3.2.7](#)) that are not owned or directly controlled by the organization

Note 1 to entry: Scope 3 emissions include all attributable *value chain* ([3.4.3](#)) GHG emissions not included in *Scope 1 emissions* ([3.2.3](#)) or *Scope 2 emissions* ([3.2.4](#)).

**4**                                         © ISO 2022 – All rights reserved

Exhibit 13 to Decl. of Angel Hsu
450
**SER 352**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

IWA 42:2022(E)

Note 2 to entry: For organizations operating at a territorial level, Scope 3 emissions refer to GHG emissions that occur fully or partially outside the territorial boundary as a result of activities taking place within the boundary and include transport across boundaries. More information on Scope 3 emissions is provided in the GHG *Global Protocol for Community-Scale Greenhouse Gas Inventories, An Accounting and Reporting Standard for Cities Version 1.1.*

[SOURCE: GHG Protocol *Corporate Accounting and Reporting Standard*]

**3.2.6**
**avoided emission**
avoided GHG emission
potential effect on *greenhouse gas emission* (3.2.2) that occurs outside the boundaries of the *organization* (3.4.1) but arising through the use of its products or services, outside *Scope 1 emissions* (3.2.3), *Scope 2 emissions* (3.2.4) and *Scope 3 emissions* (3.2.5)

Note 1 to entry: Avoided emissions cannot be included in claims of progress towards Scope 1, Scope 2, and Scope 3 targets.

**3.2.7**
**source**
GHG source
human-caused activity or process that releases a *greenhouse gas* (3.2.1) into the atmosphere

[SOURCE: ISO 14064-1:2018, 3.1.2, modified — The preferred term "greenhouse gas source" has been replaced with "source" and the words "human-caused activity or" have been added to the definition.]

**3.2.8**
**greenhouse gas inventory**
GHG inventory
list of GHG *sources* (3.2.7) and GHG *sinks* (3.3.5), and their quantified *greenhouse gas emissions* (3.2.2) and *removals* (3.3.3) over a specified period of time and within specified boundaries

[SOURCE: ISO 14064-1:2018, 3.2.6, modified — The words "over a specified period of time and within specified boundaries" have been added.]

**3.2.9**
**residual emission**
residual GHG emission
*greenhouse gas emission* (3.2.2) that remains after taking all possible actions to implement *emissions reductions* (3.3.2)

Note 1 to entry: Residual emissions are estimated for each year from the *net zero* (3.1.1) target date (e.g. 2050), not for interim target dates, using a 1,5 °C aligned *science-based pathway* (3.1.2) .

Note 2 to entry: All possible actions refer to what is technically and scientifically feasible.

**3.3 Terms related to mitigation of greenhouse gas emissions**

**3.3.1**
**mitigation**
GHG mitigation
human intervention to reduce *greenhouse gas emissions* (3.2.2) or enhance *sinks* (3.3.5)

[SOURCE: IPCC AR6 WGIII Annex-I Glossary]

© ISO 2022 – All rights reserved    5

Exhibit 13 to Decl. of Angel Hsu
451
**SER 353**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

### 3.3.2
**emissions reduction**
GHG emissions reduction
quantified decrease in *greenhouse gas emissions* (3.2.2) specifically related to or arising from an activity between two points in time or relative to a *baseline* (3.3.6)

[SOURCE: ISO 14050:2020, 3.9.17, modified — The preferred term "greenhouse gas emission reduction" has been replaced with "emissions reduction" and the words "between a baseline scenario and the project" have been replaced with "specifically related to or arising from an activity between two points in time or relative to a baseline" in the definition.]

### 3.3.3
**removal**
GHG removal
withdrawal of a *greenhouse gas* (3.2.1) from the atmosphere as a result of deliberate human activities

Note 1 to entry: Types of removals include afforestation, building with biomass (plant-based material used in construction), direct air carbon capture and storage, habitat restoration, soil carbon capture, enhanced weathering (mixing soil with crushed rock), bioenergy with carbon capture and storage.

Note 2 to entry: In this document, the term "removal" includes storage, including the durable storage of $CO_2$, which is referred to as "carbon dioxide removal" by the IPCC.

[SOURCE: IPCC AR6 WGIII Annex-I Glossary]

### 3.3.4
**offset**
*emissions reduction* (3.3.2) or *removal* (3.3.3) resulting from an action outside the *organization's* (3.4.1) boundaries used to counterbalance the organization's *residual emissions* (3.2.9)

Note 1 to entry: Offsets are usually represented by a *credit* (3.3.7) that has been retired or cancelled in a registry by or on behalf of the organization that is seeking to counterbalance residual GHG emissions. A registry is a platform that allows organizations to track, manage and trade GHG emissions.

Note 2 to entry: Only offsets that are removals can be used to counterbalance residual emissions to achieve *net zero* (3.1.1).

### 3.3.5
**sink**
GHG sink
process that removes a *greenhouse gas* (3.2.1) from the atmosphere

[SOURCE: ISO 14050:2020, 3.9.5, modified — The preferred term "greenhouse gas sink" has been replaced with "sink".]

### 3.3.6
**baseline**
GHG baseline
quantified *greenhouse gas emissions* (3.2.2) and *removals* (3.3.3) of an *organization* (3.4.1) at a specified time against which assessment of progress to *net zero* (3.1.1) can be performed

Note 1 to entry: Emissions and removals are separate parts of the baseline and calculation of *emissions reduction* (3.3.2) only refers to the baseline emissions.

Note 2 to entry: The GHGP provides further information on baselines, which it refers to as "base years".

6                                                                  © ISO 2022 – All rights reserved

Exhibit 13 to Decl. of Angel Hsu
452
**SER 354**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

IWA 42:2022(E)

**3.3.7**
**credit**
GHG credit
tradeable certificate representing the *mitigation* ([3.3.1](#)) of a specified amount of *greenhouse gas emissions* ([3.2.2](#))

Note 1 to entry: An *organization* ([3.4.1](#)) can retire a credit without using it as an *offset* ([3.3.4](#)).

## 3.4    Terms relating to organizations seeking to achieve net zero

**3.4.1**
**organization**
person or group of people that has its own functions with responsibilities, authorities and relationships to achieve its objectives

Note 1 to entry: The concept of organization includes, but is not limited to, sole-trader, company, corporation, firm, enterprise, authority, partnership, association, charity or institution, or part or combination thereof, whether incorporated or not, public or private.

Note 2 to entry: A group of organizations can also be considered as an organization that have, alone or collectively, their own objectives.

[SOURCE: ISO 14064-1:2018, 3.4.2, modified — Note 2 to entry has been added.]

**3.4.2**
**governance organization**
*organization* ([3.4.1](#)) that decides, manages, implements and/or monitors policies, requirements, legislation or guidelines

Note 1 to entry: Governance organizations include various levels of government (global, international, regional, sub-national and local) intergovernmental organizations, private sector and nongovernmental organizations and voluntary initiatives of all types, including community initiatives.

**3.4.3**
**value chain**
all upstream and downstream activities associated with the operations of the *organization* ([3.4.1](#))

Note 1 to entry: Value chain *greenhouse gas emissions* ([3.2.2](#)) include *Scope 1 emissions* ([3.2.3](#)), *Scope 2 emissions* ([3.2.4](#)) and *Scope 3 emissions* ([3.2.5](#)).

Note 2 to entry: The value chain includes other organizations (e.g. suppliers, retailers, service providers) as well as end-users of products and services such as customers or the public.

[SOURCE: GHGP *Corporate Value Chain (Scope 3) Accounting and Reporting Standard*]

**3.4.4**
**leadership**
top management
person or group of people who direct and control an *organization* ([3.4.1](#)) at the highest level

Note 1 to entry: Leadership has the power to delegate authority and provide resources within the organization.

Note 2 to entry: Leadership at government level refers to the leader(s) of the government and senior officials.

Note 3 to entry: Leadership is referred to as "top management" in ISO management system standards.

**3.4.5**
**competent**
able to apply knowledge and skills to achieve intended results

© ISO 2022 – All rights reserved    **7**

Exhibit 13 to Decl. of Angel Hsu
453
**SER 355**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

IWA 42:2022(E)

**3.4.6**
**documented information**
information required to be controlled and maintained by an *organization* (3.4.1) and the medium on which it is contained

Note 1 to entry: Documented information can be in any format and media and from any source.

[SOURCE: ISO 9000:2015, 3.8.6, modified — Note 2 and 3 to entry have been removed.]

**3.4.7**
**indicator**
quantitative, qualitative or binary variable that can be measured, calculated or described, representing the status of operations, management, conditions or impacts

[SOURCE: ISO 14050:2020, 3.2.24]

**3.4.8**
**verification**
conformity assessment
confirmation of a claim, through the provision of objective evidence, that specified requirements have been fulfilled

Note 1 to entry: Verification is considered to be a process for evaluating a claim based on historical data and information to determine whether the claim is materially correct and conforms with specified requirements.

Note 2 to entry: Verification is applied to claims regarding events that have already occurred or results that have already been obtained (confirmation of truthfulness).

[SOURCE: ISO/IEC 17029:2019, 3,3, modified — Note 3 to entry has been removed.]

## 4   Abbreviated terms

| | |
|---|---|
| $CO_2$ | Carbon dioxide |
| GHG | Greenhouse Gas |
| GHGP | Greenhouse Gas Protocol |
| IPCC | Intergovernmental Panel on Climate Change |
| ISO | International Organization for Standardization |
| OECD | Organization for Economic Cooperation and Development |
| SBTi | Science Based Targets Initiative |
| SDGs | Sustainable Development Goals |
| UN | United Nations |
| UNFCCC | United Nations Framework Convention on Climate Change |
| VCMI | Voluntary Carbon Markets Initiative |

## 5   Net zero guiding principles

### 5.1   General

The guiding principles in 5.2 to 5.11 are the foundation for achieving net zero GHG emissions for organizations at every level, through the use of a standard, framework or voluntary initiative. The recommendations provided in Clauses 6 to 14 give guidance on how to take action in alignment with these principles to enable a common and ambitious approach.

© ISO 2022 – All rights reserved

Exhibit 13 to Decl. of Angel Hsu
454
**SER 356**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

## 5.2    Alignment

Policies and guidance align organizations on common climate action approaches (recognizing common but differentiated responsibilities and respective capabilities) to support meeting the goals of the Paris Agreement[17] and any subsequent United Nations global agreements that supersede the Paris Agreement.

## 5.3    Urgency

Immediate and ongoing action is taken to effectively contribute to the global efforts to hold the increase in the average temperature to well below 2 °C above pre-industrial levels and pursuing efforts to limit the temperature increase to 1,5 °C, by organizations achieving net zero GHG emissions as soon as possible and by 2050 at the latest.

Organizations set long-term targets to meet net zero by or before 2050, and interim targets to achieve substantial emissions reductions of Scope 1, Scope 2 and Scope 3 emissions by 2030 or earlier. Subsequent targets are no more than five years from the preceding target and support long-term commitments for ongoing action towards and beyond 2050.

NOTE        In order to make a fair contribution towards global net zero, some organizations, such as those with high current or historical GHG emissions and/or high capacity to act, will need to achieve net zero well before 2050.

## 5.4    Ambition

Targets are set to achieve net zero GHG emissions as early as possible. Organizations with higher capacity, historical responsibility or high current emissions take additional and ambitious action to achieve net zero emissions well before the global average.

Specific interim targets are derived from long-term targets and take into account all GHG emissions to enable global achievement of net zero and to limit temperature rise to 1,5 °C above pre-industrial levels.

NOTE 1    Targets take into account all processes and activities throughout the value chain.

NOTE 2    "Pre-industrial levels" refers to the multi-century period prior to the onset of large-scale industrial activity that occurred around 1750. The period 1850 to 1900 represents the earliest period of sufficiently globally complete observations to estimate global surface temperature and is used in the IPCC Sixth Assessment Reports as an approximation for pre-industrial conditions.

## 5.5    Prioritization

Reduction of GHG emissions is prioritized for interim and long-term net zero targets, with removals used after all possible emissions reduction actions have been taken, to minimize eventual residual emissions.

## 5.6    Decision-making based on scientific evidence and indigenous knowledge

Decision-making relating to the achievement of net zero by or before 2050, limiting temperature rise and the protection and improvement of nature, is based on current scientific evidence and indigenous and local knowledge. Decisions align with the principle of equity and justice (see 5.9) and take into account fair share and just transition (see 12.2). Decisions are reviewed regularly, and targets, policies and actions are adapted as knowledge and science evolves.

## 5.7    Risk-based approach

Risks related to climate change mitigation actions are assessed and controls are put in place to address them.

© ISO 2022 – All rights reserved

9

Exhibit 13 to Decl. of Angel Hsu
455
**SER 357**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

The risk-based approach takes into account uncertainty, potential negative impacts, unintended consequences and other foreseeable risks.

The risks of each mitigation action are compared with the risks of not taking action.

There is ongoing monitoring of mitigation actions taken and a commitment to take urgent corrective action if issues arise.

NOTE 1    "Unintended consequences" relate to any direct or indirect effect that reduces or eliminates the effectiveness of a mitigation action. For example:

— reversal of a removal through non-permanent storage or leakage of GHG emissions;

— double-counting of emissions reductions, removals or offset investments made outside the organization's boundaries or influence.

Storage permanence relates to risk of reversal. Storage is generally considered at low risk of reversal if no GHG is re-released for at least 100 years after storage or within the lifespan of the GHG being counterbalanced.

NOTE 2    Further information on the risks of not taking action is provided in the IPCC Sixth Assessment Report[16].

## 5.8  Credibility

Mitigation actions can be demonstrated to be real and of high quality, prioritizing significant emissions reductions across all sectors, and are verifiable using internationally accepted accounting standards. GHG emissions removals and offsets address issues of permanence and leakage.

NOTE    Guidance on quantifying GHG emissions and third-party verification is provided in ISO 14064-1, ISO 14064-2, ISO 14064-3 and ISO 14065.

## 5.9  Equity and justice

Targets and actions align with the United Nations Sustainable Development Goals (SDGs)[22] to support equity and global transition to a net zero economy, and any subsequent UN global goals that supersede the 2030 SDGs.

Mitigation actions take a human-centred approach, safeguarding the rights of the most vulnerable people and communities. Activities take into account the burdens and benefits of climate change and ensure that responses, including responsibility for costs, are equitably shared (see Clause 12).

Mitigation actions take into account the need to preserve or enhance ecosystems and biodiversity.

NOTE    This principle is based on the IPCC definitions of equity and justice and the IPCC Intergovernmental Science-Policy Platform on Biodiversity and Ecosystem Services research on nature and climate change linkage[23].

## 5.10  Transparency, integrity and accountability

Information relating to current emissions status, baseline, targets and plans are comprehensive and publicly reported. Independent monitoring is in place to ensure commitments are supported by meaningful actions.

Relevant information relating to progress towards achievement of net zero targets by or before 2050 is disclosed to the public regularly (see Clause 13). Documented information is accurate, comprehensive and does not overstate achievements.

Progress towards interim and long-term targets and associated claims of net zero status are verified through a credible and competent third party.

NOTE    Some public sector entities monitor, evaluate and report progress through public engagement protocols rather than third-party verification.

© ISO 2022 – All rights reserved

Exhibit 13 to Decl. of Angel Hsu
456
**SER 358**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

### 5.11 Achievement and continuation of net zero

Action is taken at all levels (see Clause 6) in accordance with the principles of equity and justice (see 5.9), including fair share (see 12.2), to ensure all feasible GHG emissions reductions are made and residual emissions are balanced by permanent or sufficiently long-term removals to counterbalance the GHG emissions.

On achieving net zero, actions are taken towards reaching negative GHG emissions.

## 6   Establishing levels and boundaries for net zero

The organization should establish boundaries for determining targets, monitoring and assessment of progress towards net zero.

Scope 1, Scope 2 and Scope 3 emissions (direct and indirect emissions) should be included in net zero targets and cover the full boundary that has been established for the organization.

Boundaries at different levels can include:

a)   territorial level: a physically defined territory, such as a country, region, county, city or other administrative unit;

b)   sectoral level: a commercial or industrial sector, such as the retail or steel industry;

c)   organizational level: a legally defined entity, such as a company or non-governmental organization;

d)   portfolio level: a financial activity, such as investments made or held by a bank, pension fund or trust;

e)   asset level: related to the life-cycle emissions of a physically defined unit, such as a building.

When establishing the boundaries, the organization should consider the need to ensure all relevant GHG emissions are covered.

The organization should collaborate with other organizations to determine responsibility and actions to address GHG emissions over which no single organization exercises direct control, such as those Scope 3 emissions associated the use of purchased products and services.

An organization operating at territorial level is not solely responsible for all GHG emissions in its boundary, however, it should take responsibility for developing policies, initiatives and partnerships to address GHG emissions of products and services entering and leaving the territory.

As appropriate to its level, the organization should take into account factors such as:

— attribution of GHG emissions from activities that cross territorial or other boundaries (e.g. aviation, shipping (bunker fuels) or other transportation);

— consumption-based GHG emissions at a territorial level, to account for imported GHG emissions associated with purchased products and services;

— joint ventures, which can be accounted for on either a control or ownership basis;

— land-based GHG emissions, including those associated (positively or negatively) with land use changes;

— portfolio, financed, facilitated and insured GHG emissions for financial activities.

© ISO 2022 – All rights reserved

Exhibit 13 to Decl. of Angel Hsu
457
**SER 359**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

Where an organization operates in multiple territories, GHG emissions should be quantified using a consistent approach, applying country- or region-specific (or measured) emission factors where available.

NOTE 1    When boundaries are set by organizations, this includes organizational level (relating to a legally defined entity) and operational level (relating to the organization's activities).

NOTE 2    The GHGP *Corporate Accounting and Reporting Standard*[21] and the GHGP *Value Chain (Scope 3) Accounting and Reporting Standard*[24] provide guidance on boundary setting at the organizational level.

NOTE 3    The UNFCCC provides reporting guidelines on annual GHG inventories for countries[25].

NOTE 4    The GHGP *Global Protocol for Community-Scale Greenhouse Gas Inventories*[26] provides guidance on GHG inventories for cities.

## 7    Leadership and commitment

### 7.1    General

The organization should demonstrate a clear commitment to the achievement of its own interim and long-term net zero targets and to support global achievement of net zero. Targets should address all GHGs, including emissions with a relatively short lifetime in the atmosphere compared with $CO_2$, such as methane, ozone and aerosols.

Governance organizations setting regulations on net zero should start with larger organizations and organizations and sectors with the largest emissions. Governance organizations should set requirements for competent annual third-party verification of emissions reporting, absolute emissions reduction targets and full information about implementation plans and timelines, as well as how plans fit with applicable science-based pathways. Governance organizations should consider the capacity of smaller organizations when setting applicable requirements for auditing and verification.

The criteria provided by governance organizations in policy, regulations, guidance, standards or voluntary initiatives relating to the achievement of net zero for itself and for other organizations should:

a)    prioritize emissions reductions within the organization's boundaries and its value chain, using applicable science-based pathways (including sector pathways) to set targets;

b)    use alternatives to high GHG emitting processes, materials, practices and services, taking into account the lifecycle of products, buildings and other assets;

c)    prioritize environmental integrity and the protection and enhancement of nature (e.g. ending deforestation, supporting afforestation, protecting biodiversity) and the avoidance of adverse impacts;

d)    require the counterbalancing of residual GHG emissions through appropriate high-quality removals and storage (e.g. investment in long-term nature-based solutions to counterbalance GHG emissions with similar atmospheric lifespans; removal of carbon emissions with permanent geological storage to counterbalance fossil $CO_2$ emissions);

e)    include sector-specific science-based pathways and decarbonization trajectories;

f)    safeguard society, human settlements, communities and core human needs (see Clause 12).

The organization should consider setting and promoting additional more ambitious targets, for example:

—    going beyond its fair share of 50 % global GHG emissions reductions by 2030 (see 12.2) from a 2018 base year;

—    achieving a state of no Scope 1 or 2 GHG emissions;

**12**                                                                          © ISO 2022 – All rights reserved

Exhibit 13 to Decl. of Angel Hsu
458
**SER 360**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

— targeting residual emissions at less than 5 % of baseline Scope 3 emissions;

— working towards a state in which removals exceed GHG emissions;

— developing climate solutions that other organizations and consumers can use to reduce GHG emissions.

When setting policy, regulations, guidance, standards or voluntary initiatives, governance organizations should take into account the best available scientific evidence and knowledge as well as relevant science-based technical information.

### 7.2 Leadership commitment

The leadership of all organizations should ensure alignment between policies and actions, including public policy and advocacy. The leadership should ensure this commitment is not undermined by conflicting targets.

The leadership of the organization should demonstrate commitment to net zero and the principles provided in Clause 5 by:

a) providing strategic direction, oversight, support and sufficient resources to set and achieve targets;

b) incorporating net zero targets into core governance documented information (e.g. articles of association, charters, legislation);

c) disclosing shareholder voting records on climate-related issues, if appropriate to the organization;

d) publicly committing to achieve targets as soon as possible through communication by the highest level of leadership;

e) clearly defining leadership responsibilities;

f) appointing competent members of the organization's leadership to take responsibility for actions;

g) ensuring competent persons are appointed to relevant roles and determining the frequency of updates to leadership on climate-related issues and progress towards targets;

h) implementing incentives for delivering net zero targets;

i) ensuring consideration of actions needed to transition to net zero is prioritized throughout the organization;

j) publicly and regularly communicating transition plans and progress (see Clause 13).

NOTE    Information on what is needed to be competent in relation to GHGs is provided in ISO 14066.

### 7.3 Roles and responsibilities

The leadership of the organization should be directly accountable for ensuring it:

a) clearly defines its boundaries (see Clause 6), taking into account all activities, locations, products and services and the full value chain of the organization, including Scope 1, Scope 2, and Scope 3 emissions (see 8.2);

b) sets targets for the organization to achieve net zero in the shortest time possible, and no later than 2050, taking into account fair share (see 12.2);

c) sets interim targets (see 8.2.6) for the organization consistent with its fair share of 50 % global GHG emissions reduction by 2030 from a 2018 base year, taking into account just transition considerations (see 12.2);

© ISO 2022 – All rights reserved    **13**

Exhibit 13 to Decl. of Angel Hsu
459
**SER 361**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

d)   prioritizes the organization's own GHG emissions reductions and removals over the use of credits and offsets;

e)   determines actions for GHG emissions reductions (e.g. implementation of more energy-efficient processes and an energy management system to reduce energy consumption);

f)   determines actions for removals;

g)   determines appropriate indicators, sources of information and tools used to measure emissions reductions and removals;

h)   establishes quality criteria for the use of removals, credits or offsets (see Clause 10);

i)   establishes and develops supply chain relationships with organizations to facilitate and support net zero in the value chain and beyond;

j)   adopts best practices to reduce GHG emissions minimizing societal or environmental harm;

k)   advances the global goal of achieving net zero through the use of effective net zero strategies, including innovative business models, products, and solutions and advocacy of climate legislation;

l)   shares knowledge and experience of using new net zero business models, products and solutions with other organizations to develop cross-sector partnerships and support wider use;

m)   invests in meeting the organization's net zero target (see 8.2);

n)   commits to eliminating deforestation, preservation of biodiversity and restoration of land throughout the value chain;

o)   takes actions to support, enable and promote equity and empowerment (see Clause 12) in line with the net zero principles (see Clause 5);

p)   identifies and acts upon wider impacts at each stage of the net zero plans, minimizing adverse impacts (see 12.1);

q)   establishes, implements and maintains measuring, monitoring (see Clause 11) and reporting mechanisms (see Clause 13)

r)   establishes, implements and maintains a corrective action process to address deviation or failure to progress as expected against targets.

## 8   Targets

### 8.1   Planning actions to be taken

The organization should determine a plan of prioritized actions to be taken to achieve interim targets which support the stated long-term net zero target. Targets should take into account needs for inclusivity, fair share and just transition to global net zero (see 12.2).

The organization should ensure that all GHG emissions (Scope 1, Scope 2 and Scope 3 emissions), are taken into account and included in planned actions to achieve net zero. The organization should consider the negative climate impacts other than from GHG emissions, such as high-altitude effects due to vapour trails from aircraft, and determine appropriate actions to address these if relevant.

Governance organizations should take into account the recommendations provided in this document when taking action on its own behalf and when setting policy, regulations, guidance, standards or voluntary initiatives for implementation by other organizations.

**14**    © ISO 2022 – all rights reserved

Exhibit 13 to Decl. of Angel Hsu
460
**SER 362**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

IWA 42:2022(E)

All organizations should determine:

a) the baseline from which to measure GHG emissions reduction progress, with an explanation of why the baseline has been chosen and how changes in conditions since the baseline will be accounted for, to appropriately represent changes in GHG emissions performance;

b) the current status of the organization's GHG emissions based on its GHG inventory;

c) the degree to which the GHG inventory aligns with the applicable science-based pathway, including relevant sector-specific pathways (see 8.2.2) for each year and identify any gaps between the inventory and requirements;

d) necessary updates to the science-based pathway, taking into account any gap arising from its climate underperformance as well as global climate underperformance;

e) separate targets for emissions reductions and removals, clarifying if actions are taken inside or outside the value chain;

f) the anticipated residual emissions and need for counterbalancing these to achieve and maintain net zero;

g) progressive timelines, with interim targets to achieve each long-term target, aligned with the science-based pathway used;

h) actions to achieve each target;

i) measurement, monitoring and evaluation mechanisms (see Clause 11);

j) controls implemented to ensure quality and accuracy of data and documented information;

k) engagement plans for the workforce and other interested parties;

l) external and internal communication and reporting mechanisms (see Clause 13).

The organization should ensure that actions to address GHG emissions take into account emissions related to land use and land use change, if appropriate.

In addition to actions to achieve interim and net zero targets, the organization should consider assessing historical GHG emissions (pre-baseline GHG emissions accumulated over a specified period of time (see 12.2)). When counterbalancing historical emissions, organizations should follow the same guidance as when counterbalancing residual emissions (see Clause 10). The organization should treat historical GHG emissions separately and should not include actions to address these GHG emissions to meet interim and net zero targets (See Clause 8).

NOTE 1    Guidance on establishing a baseline varies and depends on having reliable data for a given year. Further information on determining a baseline is provided in ISO 14064-2.

NOTE 2    If the organization using this document is a government, baselines can include GHG emissions in cities, regions or other geographical areas, or for specific sectors based in those areas.

NOTE 3    Further information and guidance on identifying, assessing and managing climate risks and opportunities is given in ISO 14091 and is available from organizations such as the Task Force on Climate-related Financial Disclosures[27], the European Financial Reporting Advisory Group[28], and the International Sustainability Standards Board (ISSB)[29].

## 8.2   Target setting

### 8.2.1   General

The organization should set targets consistent with 50 % global GHG emissions reductions by 2030 (from a 2018 global baseline), achieving net zero by 2050 at the latest, and supporting global efforts to limit global warming to 1,5 °C above pre-industrial temperatures.

© ISO 2022 – All rights reserved                                                    15

Exhibit 13 to Decl. of Angel Hsu
461
SER 363

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

Net zero targets should include emissions related to all relevant GHGs and all Scope 1, Scope 2 and Scope 3 emissions, as appropriate.

The organization should ensure targets are set separately for Scope 1, Scope 2 and Scope 3.

If the organization has limited Scope 1 emissions, it may combine Scope 1 and Scope 2 targets.

Separate targets for territorial emissions should take into account all GHG emission sources within the boundary of the country, region, state or city. When setting targets, organizations operating at a territorial level should also take into account the total GHG emissions related to products and services consumed within its boundaries and aim to counterbalance these through removals and offsets.

In addition to net zero targets, the organization should set additional, separate targets to have a neutral or positive impact on nature (e.g. a biodiversity net gain target, enhanced land regeneration). The organization should apply environmental and social safeguards to ensure that net zero actions do not have adverse environmental and social impacts and should seek to enhance environmental and social benefits.

Governance organizations and other organizations with the capacity to do so should promote targets to go beyond net zero by mitigating GHG emissions beyond the value chain and removing more GHGs than they emit. Organizations operating at a territorial level should take into account that targets can be adjusted for some cities and regions and that fair share emissions reductions vary considerably (see 12.2). The organizations should set suitable alternative targets in such situations.

Governance organizations and other organizations with the capacity to do so should promote and support the innovation and availability of affordable, enabling technologies to support sectors to achieve net zero emissions no later than 2050.

NOTE 1    Scopes of GHG emissions are based on those defined in the GHGP *Corporate Accounting and Reporting Standard*[21] which provides further information on what GHG emissions fall into Scope 1, Scope 2 and Scope 3 emissions and the greenhouse gas categories. More information on categories of Scope 3 emissions is also provided in 8.2.5.

NOTE 2    ISO 14064-1 and ISO/TR 14069 provide further information on indirect emissions that are included in Scope 3 and the quantification and reporting of these GHG emissions.

### 8.2.2    Sectoral targets

The organization should set interim and long-term targets and determine residual emissions using sector-specific science-based pathways which:

— stay within the remaining carbon budget for a high likelihood of limiting global warming to 1,5 °C above pre-industrial levels;

— reduce energy and industrial process emissions, and the use of coal, oil and gas, by an amount consistent with an internationally recognized net zero emissions scenario;

— achieve net zero $CO_2$ at the global level and sufficient reductions in other GHG emissions by 2050, with low reliance on removals.

Examples of sector-specific pathways are provided in Table 1.

**16**

© ISO 2022 – All rights reserved

Exhibit 13 to Decl. of Angel Hsu
462
**SER 364**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

IWA 42:2022(E)

**Table 1 — Examples of sector-specific targets**

| Sector | 2050 emissions reduction target |
|---|---|
| | % |
| Forest, land and agriculture | 72 |
| Power | 100 |
| Cement | 95 |
| Iron and steel | 93 |
| Service buildings | 99,6 |
| Residential buildings | 97,9 |

NOTE 1    The examples in Table 1 are aligned to the SBTI *Net Zero Standard*[30], which provides a methodology and breakdown of sectoral decarbonization pathways to help determine appropriate residual emissions for organizations. This builds on the *Roadmap for the Global Energy Sector Net Zero by 2050* IEA Report (Chapter 3 *Sectoral Pathways to Net Zero Emissions by 2050*)[31].

NOTE 2    More information on sectoral targets is provided in the Race to Zero *2030 Breakthroughs*[32].

### 8.2.3    Targets for Scope 1 emissions

In setting targets for Scope 1 emissions, the organization should:

— include targets for all Scope 1 emissions within its boundary;

— specify and justify any exclusions;

— ensure interim Scope 1 emissions reduction targets align to applicable science-based pathways, including sector-specific pathways (8.2.2) where these are available.

Scope 1 emissions targets should include emissions from:

a)    physical or chemical processing (e.g. from manufacture, or processing of chemicals);

b)    transportation (e.g. of materials, products, waste, people), from the combustion of fuels in mobile combustion sources (e.g. vehicles) owned or controlled by the organization;

c)    intentional or unintentional fugitive emissions (e.g. from equipment leaks from joints, seals, packing, and gaskets; methane emissions from coal mines and venting; hydrofluorocarbon (HFC) emissions during the use of refrigeration and air conditioning equipment; methane leakages from gas transport);

d)    the generation of electricity, heat or steam as a result of combustion of fuels in stationary sources (e.g. boilers, furnaces, turbines).

NOTE    Challenges for different types and sizes of organizations or sectors vary. Interim targets can be adapted to account for specific factors if the amended targets support a science-based pathway towards global efforts to limit warming to 1,5 °C.

### 8.2.4    Targets for Scope 2 emissions

The organization should specify how Scope 2 emissions are calculated when setting targets. The organization should set targets to reduce its energy consumption through improving energy efficiency, and to switch to the use of renewable and low carbon (non-fossil) energy. The organization should specify its criteria for the procurement of renewable and low carbon (non-fossil) energy and how it supports additional renewable and low carbon energy production. The organization should, according to its capacity, set targets which take responsibility for GHG emissions beyond its boundaries, including those caused by consumption of products and services (e.g. for cities, states, and regions), especially where these are significant.

© ISO 2022 – All rights reserved                                                    17

Exhibit 13 to Decl. of Angel Hsu
463
**SER 365**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

When setting targets the organization should calculate Scope 2 emissions from energy using the average GHG emissions of the grid where the utility is based (location-based accounting) whenever possible. The organization may also calculate Scope 2 emissions on the energy purchased (market-based accounting). The organization should, if possible, use both methods of calculation and should prioritize the higher of the two values for improving energy efficiency. The organization should set targets and track progress using the same calculation method. Calculation should include all Scope 2 emissions.

The organization should set targets to significantly reduce energy consumption and increase the use of low carbon technologies and production or procurement of low carbon (non-fossil) or renewable energy by 2030 (e.g. 80 % reduction of energy consumption).

The organization should aim to use 100 % low carbon renewable energy. When sourcing renewable energy, the organization should ensure that its purchase leads to the development of further renewable energy. The organization should avoid reliance on certificates of origin that allocate the renewable portion of a supply that contains a mix of other sources, including fossil fuels.

Governance organizations, and other organizations if appropriate, should set targets to promote the availability of low carbon (non-fossil) or appropriate renewable energy for every hour of every day, to motivate a wholesale clean energy transformation.

NOTE    Information on accounting, setting targets and minimizing Scope 2 emissions is provided in ISO 14064-1, the Science Based Targets Initiative[33], the GHGP Scope 2 Guidance[34] and RE100[35].

### 8.2.5    Targets for Scope 3 emissions

The organization should include all relevant Scope 3 emissions in interim targets and long-term net zero targets and collaborate with other organizations in the value chain to achieve them. Scope 3 emission targets should be consistent with Scope 1 and Scope 2 interim and long-term targets, by using the same baseline. Scope 3 emissions include GHG emissions related to the use of products and services and those related to financed, facilitated and insured activities that cause water-based or land-based GHG emissions (e.g. deforestation, degradation, conversion of natural resources for housing or industrial use).

The organization should set a long-term net zero target for reduction and removal of all Scope 3 emissions. The organization should focus on reducing value chain emissions by considering if a product or service is necessary and by adopting a circular business model or a "build less" approach.

The organization should provide justification for the exclusion of any Scope 3 emissions from interim or long-term targets.

The organization should, if relevant, set commitments to achieve and maintain operations and supply chains free of deforestation by 2025 at the latest.

Organizations operating in value chains or sectors which have significant technological challenges in meeting net zero by 2050 through significant GHG emissions reductions should set achievable targets and should not make false claims. These organizations should use applicable science-based sector pathways (see 8.2.2) where available, to achieve the highest level of emissions reductions possible, and work with others, including across sectors, to develop or provide climate solutions for achieving the global net zero goal.

The organization should take into account GHG emissions arising from the entire sequence of activities relating to its operations and products and services throughout the value chain and consider actions that can be taken to reduce GHG emissions at each stage of use.

The categories of Scope 3 emissions include:

a)   purchased products and services;

b)   capital goods;

18                                                                      © ISO 2022 – All rights reserved

Exhibit 13 to Decl. of Angel Hsu
464
**SER 366**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

c)   fuel and energy-related activities not included in Scope 1 and Scope 2 emissions;

d)   upstream transportation and distribution;

e)   waste generated in operations;

f)   business travel (including client and visitor transport);

g)   employee commuting;

h)   upstream leased assets;

i)   downstream transportation and distribution;

j)   processing of sold products;

k)   use of sold products;

l)   end of life treatment of sold products (e.g. disposal, recycling, repurposing);

m)   downstream leased assets;

n)   franchises;

o)   investments.

NOTE 1     Guidance for the process of identifying significant indirect greenhouse gas (Scope 3) emissions are provided in ISO 14064-1:2018, Annex H.

NOTE 2     Information on Scope 3 (indirect) emissions is provided in GHGP *Corporate Value Chain (Scope 3) Accounting and Reporting Standard*[24].

### 8.2.6   Interim targets

The organization should set interim targets as milestones towards its net zero target, taking into account the specific recommendations for Scope, I, Scope 2 and Scope 3 and 1,5 °C aligned science-based pathways.

The organization should set interim targets every 2 to 5 years on the path to achieving net zero GHG emissions.

Interim targets should be based on the organization's baseline and can include:

—   a minimum target to halve all types of GHG emissions every decade, if possible (justification should be provided for GHG emissions reductions at a lower rate), with a plan provided on how net zero GHG emissions will be achieved no later than 2050;

—   sectoral targets to be achieved by 2030, if appropriate, including any international commitments to reduce GHG emissions;

—   reduction of methane emissions by at least 30 % by 2030, if the organization is responsible for methane emissions (taking into account that reducing fossil methane has higher abatement potential than reducing agricultural methane).

Interim targets should be based on scientific evidence and reflect maximum effort towards the full mitigation potential of the organization, consistent with a fair share of 50 % global GHG emissions reduction by 2030 (see 12.2) from a 2018 base year.

NOTE 1     If insufficient GHG emission reductions (including reductions in the production and use of fossil fuels) are made by 2030, it is more likely that warming will exceed 1,5 °C during the 21st century[16], necessitating accelerated action.

NOTE 2     The SBTi requires interim targets to be 5 to 10 years from date of submission following a 1,5 °C science-based pathway.

© ISO 2022 – All rights reserved                                                                                 **19**

Exhibit 13 to Decl. of Angel Hsu
465
**SER 367**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

NOTE 3    Over 100 countries joined the Glasgow Climate Agreement Global Methane Pledge[36] in November 2021 at COP26, committing to ensuring new facilities and operations are low emission by design with a goal of reducing global anthropogenic methane emissions by at least 30 % below 2020 levels by 2030. Global IPCC pathways consistent with the 1,5 °C limit of the Paris Agreement reduce methane emissions by 39 % (25 % to 53 %) in 2030 relative to 2020 levels.

NOTE 4    It is important that net zero strategies avoid increasing methane emissions at all times, including after the date of net zero, regardless of whether they are counterbalanced by $CO_2$ removals. The IPCC Sixth Assessment Reports[15][16] state that expressing GHGs as $CO_2$ equivalent using 100-year global warming potentials overstates the impact of constant methane emissions, but understates the impact of any increase in methane emissions over the 20 years following that increase.

## 9   Mitigation

### 9.1   Planning

#### 9.1.1   General

The organization should establish a mitigation plan for GHG mitigation actions that:

a)   prioritizes emissions reductions;

b)   is assessed using recognized accounting standards;

c)   is based on realistic and credible baselines;

d)   includes details of how they will be monitored and reported and how they will be verified by a competent third party;

e)   includes removals that are permanent or sufficiently long-lasting, with storage duration comparable to the lifespan of the GHG emission;

f)   takes into account and mitigates the potential risk of a consequent rise in emissions beyond its boundaries;

g)   ensures safeguards against social or environmental harm, or negative impacts that arise as a consequence of mitigation actions.

The organization should identify gaps between targets and solutions currently available and encourage and facilitate broad collaboration to share or co-develop solutions.

The organization should recognize and support public and private innovation to bring enabling technologies to market and make them cost competitive.

The organization should establish a transition plan for emissions reductions and removals as part of its transition to a net zero operational model. The plan should prioritize reducing GHG emissions and increasing removals and action through restoration, regeneration and enhancement of ecosystems. Offsets should only be used when there are no alternatives available. The organization should invest early in high-quality, long-term removals if it anticipates a need to rely on these to achieve net zero by its target date. Early investment is needed to scale and mature removal and storage capacity (e.g. through increased natural restoration or technological advancement).

#### 9.1.2   Content of mitigation plans

The organization's plans for transition to net zero should include how the organization will:

a)   meet interim and long-term targets;

b)   align broader organizational strategy, including investments and management of assets (including decommissioning) with the organization's commitment to net zero;

© ISO 2022 – All rights reserved

Exhibit 13 to Decl. of Angel Hsu
466
**SER 368**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

c)  align executive and board compensation with meeting interim and long-term targets (e.g. 20 % of long-term compensation plans);

d)  implement policies and requirements (e.g. carbon pricing) to meet net zero;

e)  advocate and support climate policy and legislation and take action to ensure it is not involved (directly or indirectly) in lobbying against climate ambition;

f)  provide sufficient financial, human, technical and other resources to meet net zero targets;

g)  contribute to the development of solutions for climate action and sustainability;

h)  implement low-carbon and renewable energy solutions;

i)  implement actions that protect biodiversity and enhance ecosystems;

j)  define and assign roles, ensuring roles include defined responsibility for delivering on different parts of the net zero strategy (e.g. a person or team clearly responsible for engaging suppliers in the supply chain);

k)  build capability and upskill the workforce;

l)  take full responsibility for reducing Scope 1, Scope 2 and Scope 3 emissions without shifting undue responsibility for GHG emissions to another organization;

m)  take actions to enable and empower organizations within the value chain to achieve net zero;

n)  reduce or eliminate reliance on offsets after achieving net zero;

o)  exclusively use removals (including removal-based offsets) to counterbalance residual emissions at net zero;

p)  ensure that removals used to counterbalance residual emissions are sufficiently long-term to maintain the net zero balance;

q)  ensure removals, credits or investments in offsets are not double counted or double claimed by multiple parties and are retired in public registries after single use;

r)  ensure removals do not lead to a rise in GHG emissions in other locations due to efforts to reduce GHG emissions in one location (avoiding leakage);

s)  engage suppliers, customers and interested parties to collaborate to reduce Scope 3 emissions;

t)  examine the potential to use alternative processes (e.g. in line with circular economy practices), equipment or facilities with lower GHG emissions;

u)  reduce significant GHG emission sources or GHG emissions "hot spots" (e.g. electric power tools instead of compressed air; public transport or electric bicycles in place of company cars);

v)  use innovative solutions to satisfy the core human needs of nutrition, health and shelter;

w)  communicate information to interested parties on expected GHG emission reductions.

The organization should commit to reporting publicly on progress against interim and long-term targets, and actions being taken, at least annually (see Clause 13).

NOTE     Recognized accounting standards include ISO 14064-1, those provided by the ISSB[29] and the GHGP *Corporate Accounting and Reporting Standard*[21].

© ISO 2022 – All rights reserved

Exhibit 13 to Decl. of Angel Hsu
467
SER 369

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

## 9.2 Prioritization of mitigation actions

### 9.2.1 General

The organization should not delay urgent mitigation actions to achieve interim or long-term targets.

The organization should prioritize emissions reductions and mitigation actions that are within its direct control (see 8.2.3 and 8.2.4) or within the value chain (see 8.2.5). The organization should use the full potential of all mitigation actions and not rely on use of a single action (e.g. removal, credits or investments in offsets) as a reason to underuse other actions.

The organization should, where possible, additionally act as a solution provider for consumers and for other value chains, to enable actions that lead to avoided emissions in society. These avoided emissions should not be counted towards the organization's interim or long-term net zero targets and should be treated separately.

### 9.2.2 Actions to address Scope 1 and Scope 2 emissions

Consistent with its mitigation plan (see 9.1), the organization should take actions such as:

a) accelerating transition to renewable energy for processes, buildings and sites, and setting a target to use only low-carbon energy and then carbon-free energy as soon as possible;

b) implementing an energy management system to improve efficiency of energy consumption and promote continual improvement;

c) prioritizing low carbon (non-fossil) and renewable energy through power purchase agreements;

d) generating own low-emission or renewable energy within the organization (e.g. heat from waste biomass);

e) align energy consumption with the availability of renewable energy, and minimize consumption when the grid is reliant on high-emission energy;

f) transitioning away from dependence on the use of fossil fuels, including phasing out the use of coal;

g) establish, apply and disclose financing policies to phase out fossil fuels (e.g. halting coal use by 2030 in OECD countries and 2040 in non-OECD countries), both by selling assets and responsibly retiring them, meeting obligations to local ecology and communities;

h) optimizing energy use of buildings (e.g. through repurposing, retrofitting, digital automation, increased use of heat pump technology);

i) minimizing or eliminating the use of emission-producing resources in all operations;

j) implementing low-carbon cooling, heating, ventilation and refrigerants;

k) minimizing waste and reducing consumption of raw materials and energy by repurposing or refitting buildings rather than building new facilities;

l) facilitating working from home to reduce GHG emissions (e.g. GHG emissions from operations or commuting) if this is likely to cause fewer overall GHG emissions;

m) supporting use of low-carbon travel and creating local office hubs to reduce commuting distance;

n) using remote technology for meetings and collaboration, to avoid unnecessary travelling;

o) choosing technology and other service providers that have committed to robust net zero targets;

p) requiring lower GHG emission modes of business travel where feasible, if travel is essential (e.g. rail rather than air);

**22**                                              © ISO 2022 – All rights reserved

Exhibit 13 to Decl. of Angel Hsu
468
**SER 370**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

q)  transitioning to very low GHG emission vehicles owned or used by the organization;

r)  ensuring new facilities and operations are at least low GHG emission by design;

s)  ensuring all buildings, equipment, machinery and vehicles are regularly maintained;

t)  integrating climate criteria into research and development and product and service design processes to improve energy performance and develop circular economy solutions;

u)  providing and promoting of low-carbon diets, such as plant-based food;

v)  supporting nature-based solutions and regenerative farming practices (e.g. soil carbon sequestration);

w)  systematically reducing energy, resource and material waste in all operations.

NOTE     ISO 50001 provides information on implementing an energy management system.

### 9.2.3   Actions to address Scope 3 and other emissions

The organization should select appropriate actions for emission reductions by improving the climate impact of products and services. Actions can include, but are not limited to:

a)  developing products and services that contribute to the emergence of alternative value chains (e.g. increase quality and decrease cost of plant-based protein);

b)  redesigning and developing products and services to reduce their life cycle emissions;

c)  promoting, supporting and facilitating the circular economy (e.g. reuse, repair, refurbishment, repurposing, recycling);

d)  requiring suppliers to commit to net zero targets, in line with the recommendations in this document;

e)  prioritizing suppliers based on their climate strategy, past performance and transparency of emission data;

f)  collaborating with other organizations and sector or industry partners to strengthen and align procurement and purchase requirements;

g)  extending collaboration with other organizations and the value chain to accelerate adoption of low carbon (non-fossil) and renewable energy and achievement of interim and long-term emissions reduction targets;

h)  investing in GHG emissions reduction and removals projects;

i)  ensuring financial investments, including assets and pension funds, are aligned with climate strategy and net zero commitments;

j)  prioritizing low-carbon mobility solutions (e.g. public transport, electric vehicles with appropriate charging infrastructure) and reducing the need for personal transportation through urban planning.

## 10  Counterbalancing residual emissions

### 10.1  General

The organization should prioritize direct reduction of all GHG emissions within its boundaries, limiting residual emissions to the minimum, in line with science-based pathways that are aligned with a high likelihood of limiting global warming to 1,5 °C above pre-industrial levels.

Exhibit 13 to Decl. of Angel Hsu
469
SER 371

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

To achieve and maintain net zero, the organization should counterbalance residual emissions only through investment in high-quality removals which can be in the value chain or through removal-based offsets (see Clause 10) and removal-based credits.

If the organization offsets emissions, only those counterbalancing residual emissions should count towards its net zero target. The organization should not use offsets towards achievement of interim targets.

When counterbalancing residual emissions, the organization should ensure that removals, including through offsets and investments in credits:

a)   are based on credible accounting standards;

b)   are additional, based on realistic and credible baselines and lead to mitigation which would not have occurred if the actions were not implemented;

c)   are monitored, reported and verified by a competent third party;

d)   are based on removals that are permanent or provide sufficiently long-term storage (especially when used to offset GHGs with long atmospheric lifespans such as carbon dioxide) and include plans to manage potential impermanence;

e)   are not double-counted (e.g. counted by more than one party, or credited under more than one offset programme);

f)   avoid or limit the risk of a consequent rise in GHG emissions in other locations;

g)   do no social or environmental harm;

h)   are from activities that provide social safeguards, promote equity and benefit both ecosystems and local communities (see Clause 12);

i)   are sourced from activities that address urgent and transformational climate priorities that are beyond the reasonable reach of unilateral action by a single country or territory.

To protect social and environmental integrity, the organization should take reasonable actions to ensure removals, offsets and credits:

— are governed inclusively, through participation and consultation of experts and the people and groups impacted by them, particularly indigenous peoples, local communities and vulnerable groups (e.g. women, children, elderly people, people with disabilities);

— balance trade-offs, particularly social trade-offs (e.g. the need to use land for subsistence farming);

— are managed in an adaptive way, using flexible decision-making to adjust to uncertainties as natural outcomes change;

— protect and manage a wide range of ecosystems (e.g. avoiding single-species tree farms or other kinds of plantations that have negative impacts on biodiversity);

— create biodiversity net gain (i.e. the variety of plant and animal life increases rather than decreases as a result of the action);

— support land regeneration rather than land degradation.

If the organization counterbalances residual emissions through investments in offsets through afforestation or reforestation, it should take into account the time necessary to achieve maximum removal and the permanence of the removal, taking environmental drivers, land-used management and governance into consideration. The organization should ensure that any claim related to afforestation or reforestation is independently verified.

**24**                                                                 © ISO 2022 – All rights reserved

Exhibit 13 to Decl. of Angel Hsu
470
**SER 372**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

If appropriate to its context, the organization should go beyond net zero. This can be achieved through additional investment in removals, and activities to reduce emissions (e.g. protecting forests), to go beyond its fair share of global GHG emissions reductions (see 12.2).

Avoided emissions should not be used to counterbalance residual emissions.

NOTE 1    This document provides recommendations for the use of offsets to meet net zero targets rather than the use of offsets for other claims. ISO 14068[2)] will provide guidance for organizations on offsets in the context of carbon neutrality.

NOTE 2    Some sector-specific science-based pathways can require that certain organizations and sectors achieve net zero with no residual emissions, and without the use of offsets. These pathways demonstrate that specific sectors and organizations need to achieve net zero earlier than 2050. Some sector-specific pathways do not include all scopes of emissions and need to be used with other pathways, so all scopes are included.

NOTE 3    Residual emissions are estimated for the net zero target year and thereafter.

NOTE 4    The IPCC report *Climate Change 2022: Impacts, Adaptation and Vulnerability*[37] outlines gaps that need to be addressed to meet climate priorities. The IPCC report *Climate change 2022: Mitigation of Climate Change*[16] provides information on the management of trade-offs associated with mitigation options that occupy land.

NOTE 5    The IUCN *Global Standard for Nature-based Solutions*[38] sets out a framework for the verification, design and scaling up of nature-based solution.

### 10.2 Credits

All of the recommendations relating to counterbalancing emissions (10.1) are also valid for credits.

The organization should follow all the recommendations in this document before it can make a claim of net zero that uses credits.

When using credits, the organization should:

— specify which type of credits are used and where the credits are held (e.g. registry used, type of project);

— specify what GHG emissions, areas and scopes are covered by the credits;

— ensure credits are comparable in durability to the GHG emission being counterbalanced;

— confirm if credits are being used for additional voluntary action or to counterbalance residual emissions.

If the organization purchases credits in the voluntary carbon market, a share of proceeds from the sale of the credits should go towards the Adaptation Fund of the UNFCCC to finance adaptation projects in developing counties that are particularly vulnerable to the adverse effects of climate change, and a share of credits should be cancelled as a contribution to an overall mitigation in global emissions.

NOTE 1    The Integrity Council Voluntary Carbon Market *Core Carbon Principles*[40] set out the basis for identifying high-quality carbon credits. The *Core Carbon Principles* form the basis of the ICVCM Assessment Framework, which provides criteria for evaluating whether carbon credits and carbon-crediting programmes reach a high-quality threshold.

NOTE 2    The trading mechanism defined in Article 6.4 of the Paris Agreement[12] requires 5 % share of proceeds to be given to the Adaptation Fund[39] and that a minimum of 2 % of credits should be cancelled.

---

2)    Under development.

© ISO 2022 – All rights reserved    **25**

Exhibit 13 to Decl. of Angel Hsu
471
**SER 373**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

## 11 Measurement and monitoring

### 11.1 General

The organization should determine indicators and tools to measure, monitor and calculate baselines and the impact of its mitigation actions. The organization should ensure that all GHG emissions within its boundaries (Scope 1, Scope 2) and the wider value chain (Scope 3); are separately measured, monitored and reported (see Clause 13).

The organization should also separately measure and monitor each of the following:

a)  GHG emissions increases within its boundaries;

b)  GHG emissions increases in the wider value chain;

c)  emissions reductions within its boundaries;

d)  emissions reductions in the wider value chain;

e)  removals within its boundaries;

f)  removals in the wider value chain;

g)  removals outside the value chain;

h)  offsets and credits outside the value chain.

The organization should select quantifiable indicators that minimize uncertainty and yield accurate, consistent and verifiable results, taking into account technical feasibility. Indicators should include those that measure and monitor offsets through investments.

The methods and the data used for all measuring and monitoring should support reproducibility of the results.

NOTE      The GHGP and ICVCM and standards such as ISO 14064-1 (for organizations) and ISO 14064-2 (for projects) provide further information and guidance on measuring and monitoring.

### 11.2 Use of indicators and tools

The organization should explain and justify the use of indicators and tools selected or developed.

When selecting indicators and tools, the organization should consider:

—  accuracy of emission and removal measurements;

—  limits of application;

—  uncertainty and rigour;

—  reproducibility of results;

—  acceptability and limitations of the tool;

—  origin and level of recognition of the tool;

—  consistency with intended use.

The organization should act immediately and not delay taking action to reduce GHG emissions due to incomplete data or measurement. The organization should take actions likely to reduce GHG emissions using estimates while it works to improve measurement.

**26**                                                          © ISO 2022 – All rights reserved

Exhibit 13 to Decl. of Angel Hsu
472
**SER 374**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

The organization should implement processes to continually improve the quality and comprehensiveness of data gathered to measure progress and estimate GHG emissions reductions. The organization should:

a) develop and report how it plans to narrow data gaps (see Clause 13);

b) collect primary data on significant GHG emissions, where possible;

c) use substitutable methodologies when primary data is not available;

d) report how it plans to account for changes in the baseline (e.g. making adjustments to reflect changes to boundaries);

e) report how it plans to account for changes in activities (e.g. production volumes, areas occupied);

f) use credible data sources for estimating GHG emissions factors (e.g. IPCC, International Energy Agency, national databases);

g) report the type of data used, data sources and methodologies and assumptions used to determine GHG emissions data (see Clause 13);

h) quantify levels of uncertainty introduced by use of estimates, where possible;

i) use tools such as lifecycle assessment to quantify value chain Scope 3 emissions.

NOTE 1    Further information on measuring and monitoring greenhouse gas removals and emissions reductions is provided by GHGP and in ISO 14064-1 and ISO 14064-2. ISO 14067 provides information on quantifying the carbon footprint of products.

NOTE 2    "Primary data" is data about the organization's own processes.

## 12  Wider impact, equity and empowerment

### 12.1  Wider impact

The organization should consider how its net zero strategy aligns with the United Nations SDGs and how it impacts:

— climate justice and equity;

— its workforce;

— indigenous peoples, local communities and minority and vulnerable groups (e.g. women, children, elderly people, people with disabilities);

— society and cultures;

— prosperity and eliminating poverty;

— biodiversity, the integrity of ecosystems and related critical services (e.g. food, water).

The organization should take action for positive wider impact, such as:

a) setting targets for societal climate action;

b) mobilizing interested parties across the value chain;

c) working with trade associations and initiatives engaging in climate issues to support and amplify emissions reduction efforts and counteract any efforts against climate action;

d) influencing local and national policymakers to enhance climate action;

e) advocating for appropriate regulation and facilitating measures to enable alignment to achieving net zero across all organizations and halving global GHG emissions by 2030;

© ISO 2022 – All rights reserved    **27**

Exhibit 13 to Decl. of Angel Hsu
473
**SER 375**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

f)  contributing to national and international events which demonstrate concrete solutions to help scale best-practice solutions;

g)  facilitating circular economy practices that reduce overall emissions;

h)  lobbying for policy to enable effective climate action;

i)  advocating for industry bodies to take clearer and stronger positions on climate policy;

j)  mitigating harm to the environment and ecosystems;

k)  supporting and enhancing biodiversity;

l)  supporting restoration and protection of natural and semi-natural ecosystems in their own right;

m)  making immediate contributions to the preservation and restoration of natural sinks (e.g. forests, wetlands);

n)  conservation and protection of water, oceans and natural resources.

NOTE     Recommendations on reporting wider impacts on nature are provided by the Task Force on Nature-related Financial Disclosures[41] and SBTN[42].

## 12.2  Fair share and just transition

The organization should take into account the principle of equity and justice (see 5.9) when determining fair share and how it should contribute to a just transition to global net zero.

Large organizations and those based in developed countries should aim to achieve net zero earlier (potentially well before 2050) than low-emitting countries to contribute to global efforts to limit warming to 1,5 °C.

In determining what a fair share is for the organization, it should consider its context and take into account:

—  resources and technology;

—  its historical GHG emissions;

—  historical GHG emissions of the territories it operates in;

—  historical and current GHG emissions of the sector(s) it operates in;

—  current socio-economic situation of the territories it operates in.

If an organization is operating at a territorial level in a territory with comparatively less resources (e.g. emerging economies), it should consider the need to balance actions towards net zero with the need to protect communities, society and the economy. To support a just transition, organizations with greater resource and greater historical responsibility should collaborate with those organizations with less capability to act.

Fair share for organizations in territories or sectors with greater historical responsibility for GHG emissions and greater current resources should make a proportionately greater contribution towards achieving global net zero.

The organization should utilize the capacity it has to the fullest extent possible to contribute with urgency towards its fair share, regardless of specific targets that are based on historic and socio-economic factors.

To support achievement of global net zero, organizations, sectors and territories with more capability can set more ambitious interim targets, for example by reducing GHG emissions by 50 % (from a 2018 base year) earlier than 2030.

**28**

© ISO 2022 – All rights reserved

Exhibit 13 to Decl. of Angel Hsu
474
**SER 376**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

If the organization has the capability to contribute beyond its fair share, it should take additional action to achieve its own targets earlier and to assist others in achieving their targets as early as possible by investing in emissions reductions and removals beyond its own boundaries. To achieve the above, the organization should take into account:

a) equitable distribution of GHG emissions reduction responsibility, including within countries or regions at different stages of development;

b) different impacts of climate change and mitigation activities on more or less vulnerable populations;

c) the need to fully inform and consult with indigenous people and vulnerable communities when formulating, adopting or implementing decisions involving their lands, territories or resources. and the need to obtain consent before taking any action which affects them;

d) the need for adaptation measures and finance to support the most affected communities, areas and vulnerable people affected by both climate impacts and the climate transition and strengthen their participation in achieving global goals;

e) the need to integrate climate action thinking and related activities into operational resilience planning across communities and societies;

f) allocation of resources to mitigate GHG emissions and to adapt to climate impacts;

g) the need to address injustices and build a more equitable future.

The organization should report information on processes to ensure equity and fair share and why they have been adopted.

### 12.3 Empowerment

Governance organizations should establish, implement and maintain processes to contribute to the global transition to net zero. Processes can include:

a) training and capacity building events;

b) transfer of resources;

c) supporting access to financial support;

d) knowledge sharing;

e) representation of member organizations and under-represented groups in decision-making.

## 13 Communication, reporting and transparency

### 13.1 General

The organization should implement processes to ensure transparent communication and reporting of progress to net zero to relevant interested parties. The organization should make information on progress publicly available.

The organization should report its progress on its mitigation plan and all applicable items in Clause 9. The organization should include the following when reporting progress towards meeting net zero targets:

a) scope of reporting (see 13.2.1);

b) published reporting requirements, including reporting frequency;

c) baseline;

© ISO 2022 – All rights reserved

Exhibit 13 to Decl. of Angel Hsu
475
**SER 377**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

d)   reporting year;

e)   reporting boundaries (see Clause 6);

f)   changes in emissions levels;

g)   data collection and calculation methods used to prepare the report;

h)   data used for reported results and where and how that data can be accessed;

i)   data limitations, including confidence intervals for indicators;

j)   reporting limitations (see 13.2.3);

k)   improvements and solutions implemented since the previous reporting period;

l)   planned new initiatives or actions;

m)   whether the mitigation actions taken have immediate or projected future impact on GHG emissions;

n)   authors of the report and whether they are internal or external to the organization;

o)   details of previously published reports and how these can be accessed.

The organization should report qualitative and quantitative progress against targets at least annually, using relevant public reporting platforms. If appropriate, the organization may report in line with accepted financial reporting timeframes, if this is equally or more frequent.

Governance organizations should recognize the need to balance reporting requirements with practical limitations (e.g. on capacity, data collection, analysis and communication) for some organizations, especially smaller organizations, when setting requirements for other organizations.

## 13.2   Scope of reporting and information to include

### 13.2.1   Scope of reporting

The organization should define the scope of each report taking into account relevant guidance from a governance organization, if applicable. The organization may choose to create separate reports to communicate different types of information.

The organization should report:

a)   climate risks and opportunities relevant to its boundaries (see Clause 6);

b)   progress against interim and long-term targets (see Clause 8), including impacts of actions taken (see 12.1);

c)   a transition plan, including information on actions planned to reduce current GHG emissions (see Clause 9) consistent with achieving interim GHG emissions targets;

d)   allocation of material and human resources to achieve interim and long-term targets;

e)   specific removals and offsets beyond the organization's boundaries;

f)   offsets used to make specific counterbalance claims (see 13.2.2);

g)   details of Scope 1, Scope 2 and Scope 3 emissions (see Clause 8), including:

   —   separate GHG emissions data by GHG gas or activity for Scope 1, Scope 2 and Scope 3;

   —   breakdown of GHG emission data for Scope 1;

   —   separate data for the different categories of GHG emissions in Scope 3;

**30**                                                          © ISO 2022 – All rights reserved

Exhibit 13 to Decl. of Angel Hsu

**SER 378**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

IWA 42:2022(E)

     — what is included in the organization's Scope 3 commitment, any exclusions and the justification for those exclusions;

h)   separate GHG emissions data for all GHGs;

i)    separate data for direct carbon dioxide emissions from biologically stored carbon (e.g. in grasslands, forests, soils, oceans), if applicable;

j)    separate progress towards emissions reduction and removal targets;

k)   information on expected residual emissions and how these have been estimated;

l)    plans for counterbalancing residual emissions through offsets and investments, including details of those offsets and how their quality has been determined;

m)  details of the liability and impermanence risk of carbon storage and actions taken to mitigate these;

n)   actions to further mitigate residual emissions after the net zero target date, including those completed and those planned (see Clause 10);

o)   land-use change GHG emissions and removals, if relevant;

     — wider impacts (see 12.1), including actions and initiatives to support fair share (see 12.2) and empowerment (see 12.3), including actions taken outside the organization's value chain (separately to actions taken within the value chain);

     — both positive and potentially negative impacts, and plans to address negative impacts;

     — advocacy activities and collaborative partnerships (e.g. lobbying, participation in voluntary initiatives, trade associations, membership networks);

     — progress in engaging initiatives and trade associations in working towards interim and long-term targets;

     — how it is engaging workers, the supply chain, the public and other interested parties on achieving net zero;

p)   case studies and lessons learned.

The organization should report qualitative and quantitative progress against targets at least annually, using relevant public reporting platforms. If appropriate, the organizations may report in line with accepted financial reporting timeframes, if this is more frequent.

### 13.2.2 Reporting of net zero claims

The organization should report the basis of its net zero claims at least annually.

The organization should specify whether claims are at a territorial, sector, organizational, operational, portfolio or asset level (see Clause 6).

The organization should publish its criteria and processes to ensure that actions taken to counterbalance residual emissions, including offsets and credits, are of high quality and verifiable (see 10.1).

To claim net zero, only residual emissions should remain, and these should be counterbalanced by removals. The organization should not make a net zero claim if it is on the path to net zero and still has GHG emissions that are not residual emissions, even if the emissions are counterbalanced.

In a situation where other emissions remain, the organization should communicate progress towards specific emissions reduction targets to provide a transparent indication for the prospects of achieving net zero. If the organization counterbalances other emissions and meets relevant criteria, it may be able to make a claim of carbon neutrality on the path to net zero.

Exhibit 13 to Decl. of Angel Hsu
477
**SER 379**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

To claim achievement of its net zero target, the organization should:

a) quantify all GHG emissions it continues to generate, or which are generated as a consequence of its products and activities (i.e. all Scope 1, 2 and 3 emissions), including GHG types and origins (e.g. fossil fuels or biological);

b) quantify all GHG emissions it is removing, the types of storage used and the level of storage permanence;

c) explain the method used to add up the GHGs (e.g. metric values used, such as global warming potential);

d) provide evidence that the full potential of Scope 1, Scope 2 and Scope 3 GHG emission reductions has been achieved within the value chain;

e) provide evidence that removals or offsets fully counterbalance residual emissions;

f) explain the method for calculating residual emissions and the justification for the use of removals or offsets to counterbalance residual emissions;

g) provide a plan to maintain the net zero balance over the long term, multiple decades at a minimum, including a plan to address any reversal of removed GHGs (e.g. by counterbalancing GHG emissions with additional removals and storage on similar lifetimes);

h) explain limitations of claims made and how the quality of the data has been determined;

i) include confidence levels (potential for error) in published values of indicators for claims, where possible;

j) ensure the data supporting claims made are independently verified;

k) provide justification if data verification is not possible, and include the justification in reports;

l) provide details of how double-counting of offsets and credits has been avoided.

The organization should be aware that if the storage of removed GHGs used towards a net zero claim expires before the end of the GHG's lifespan, then the organization ceases to be net zero until it takes additional appropriate action.

If the organization transfers credits to support another organization in meeting its targets, inventory adjustments should be made to avoid double-counting of progress. An inventory adjustment relates to transferring the results of the credit from the donor organization to the receiving organization and removing the results of the credit activity from the donor organization.

NOTE 1    Article 6 of the Paris Agreement[17] has further information on adjustments for organizations operating at national level.

NOTE 2    The Integrity Council for the Voluntary Carbon Market[43] provides guidance to improve the quality of offsets and credits on the carbon market.

NOTE 3    The Voluntary Carbon Market Integrity Initiative[44] and ISO 14021 provide information on how to make claims based on investment in credits.

NOTE 4    Residual emissions at net zero cannot generally exceed the range of 5 % to 10 % compared to baseline emissions.

### 13.2.3  Limitations of reporting

The organization should communicate the limitations of reports, including:

a) any sources of GHG emissions which are excluded and quantify their significance;

b) use of GHG emissions proxies, averages, or gaps in knowledge within value chains;

**32**                                                            © ISO 2022 – all rights reserved

Exhibit 13 to Decl. of Angel Hsu
478
**SER 380**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

c)  methods used to estimate, and proportion of total disclosed data estimated when proxies are used to cover lack of data;

d)  limitations of an achievement claim about a product or service being climate or carbon neutral.

NOTE    A GHG emissions proxy uses aggregated data from a range of sectors and sources to estimate GHG emissions from a complex process. Proxies usually relate to Scope 3 emissions.

### 13.2.4  Credibility of reports

The organization should establish processes to ensure:

a)  comprehensive data collection and review;

b)  accuracy of GHG emissions and removals data;

c)  reports are free of material discrepancies;

d)  quality of carbon credits and offsets;

e)  third-party verification of data and claims.

## 14 Improvement

The organization should use iterative and adaptive approaches on a regular basis with an increasing level of ambition to achieve interim targets and long-term targets and to address wider impacts, where feasible.

The organization should take into account emerging scientific evidence, best practice and external and internal lessons learned.

The organization should determine opportunities and take action to support and accelerate the speed or extent of:

a)  reducing GHG emissions;

b)  counterbalancing residual GHG emissions;

c)  supporting the preservation and restoration of natural sinks;

d)  achieving net zero status and striving for net-negative status.

The organization should integrate and embed climate risk management indicators, measures and controls into its normal organizational processes and core risk management processes and policies.

© ISO 2022 – All rights reserved

Exhibit 13 to Decl. of Angel Hsu
479
**SER 381**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

# Annex A
(informative)

## Workshop contributors

A list of workshop contributors is available at: https://standards.iso.org/iso/iwa/42/ed-1/en.

34

© ISO 2022 – All rights reserved

Exhibit 13 to Decl. of Angel Hsu
480
**SER 382**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

IWA 42:2022(E)

# Bibliography

[1]    ISO 9000:2015, *Quality management systems — Fundamentals and vocabulary*

[2]    ISO 14021, *Environmental labels and declarations — Self-declared environmental claims (Type II environmental labelling)*

[3]    ISO 14050:2020, *Environmental management — Vocabulary*

[4]    ISO 14064-1:2018, *Greenhouse gases — Part 1: Specification with guidance at the organization level for quantification and reporting of greenhouse gas emissions and removals*

[5]    ISO 14064-2, *Greenhouse gases — Part 2: Specification with guidance at the project level for quantification, monitoring and reporting of greenhouse gas emission reductions or removal enhancements*

[6]    ISO 14064-3, *Greenhouse gases — Part 3: Specification with guidance for the verification and validation of greenhouse gas statements*

[7]    ISO 14065, *General principles and requirements for bodies validating and verifying environmental information*

[8]    ISO 14066[3]), *Competence requirements for teams (including technical experts), and independent reviewers involved in the validation and verification of environmental information*

[9]    ISO 14067, *Greenhouse gases — Carbon footprint of products — Requirements and guidelines for quantification*

[10]   ISO 14068[4]), *Greenhouse gas management and climate change management and related activities — Carbon neutrality*

[11]   ISO/TR 14069, *Greenhouse gases — Quantification and reporting of greenhouse gas emissions for organizations — Guidance for the application of ISO 14064-1*

[12]   ISO 14091, *Adaptation to climate change — Guidelines on vulnerability, impacts and risk assessment*

[13]   ISO/IEC 17029:2019, *Conformity assessment — General principles and requirements for validation and verification bodies*

[14]   ISO 50001, *Energy management systems — Requirements with guidance for use*

[15]   IPCC, *Sixth Assessment Report, Climate Change 2021: The Physical Science Basis.* [Viewed 2022-09-17] Available at: https://www.ipcc.ch/report/ar6/wg1/

[16]   IPCC, *Sixth Assessment Report, Climate Change 2022: Mitigation of Climate Change.* [Viewed 2022-09-17] Available at: https://www.ipcc.ch/report/ar6/wg3/

[17]   The Paris Agreement. [Viewed 2022-09-17] Available at: https://unfccc.int/process-and-meetings/the-paris-agreement/the-paris-agreement

[18]   Race to Zero, *Criteria 3.0.* [Viewed 2022-09-17] Available at: https://climatechampions.unfccc.int/wp-content/uploads/2022/06/Race-to-Zero-Criteria-3.0-4.pdf

[19]   IPCC, *Sixth Assessment Report, Working Group III Annex I Glossary.* [Viewed 2022-09-17] Available at:    chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://report.ipcc.ch/ar6wg3/pdf/IPCC_AR6_WGIII_Annex-I.pdf

---

3)    Under preparation. Stage at the time of publication: ISO/DIS 14066:2022.

4)    Under development.

© ISO 2022 – All rights reserved                                                                                              35

Exhibit 13 to Decl. of Angel Hsu
481
**SER 383**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

[20]  United Nations Climate Change, *Glossary of climate change acronyms and terms.* [Viewed 2022-09-17] Available at: https://unfccc.int/process-and-meetings/the-convention/glossary-of-climate-change-acronyms-and-terms

[21]  Greenhouse Gas Protocol, *Corporate Accounting and Reporting Standard.* [Viewed 2022-09-17] Available at: https://ghgprotocol.org/corporate-standard

[22]  United Nations Sustainable Development Goals. [Viewed 2022-09-17] Available at: https://sdgs.un.org/goals

[23]  IPBES, *Global Assessment Report on Biodiversity and Ecosystem Services.* [Viewed 2022-09-17] Available at: https://ipbes.net/global-assessment

[24]  Greenhouse Gas Protocol, *The Corporate Value Chain (Scope 3) Accounting and Reporting Standard.* [Viewed 2022-09-17] Available at: https://ghgprotocol.org/standards/scope-3-standard

[25]  United Nations Climate Change Reporting guidelines. [Viewed 2022-09-17] Available at: https://unfccc.int/process-and-meetings/transparency-and-reporting/reporting-and-review-under-the-convention/greenhouse-gas-inventories-annex-i-parties/reporting-requirements

[26]  Greenhouse Gas Protocol, *Global Protocol for Community-Scale Greenhouse Gas Inventories, An Accounting and Reporting Standard for Cities Version 1.1.* [Viewed 2022-09-17] Available at: https://ghgprotocol.org/greenhouse-gas-protocol-accounting-reporting-standard-cities

[27]  Task Force on Climate-Related Financial Disclosures. [Viewed 2022-09-17] Available at: https://www.fsb-tcfd.org/

[28]  European Financial Reporting Advisory Group [Viewed 2022-09-17] Available at: https://www.efrag.org/

[29]  International Sustainability Standards Board. [Viewed 2022-09-17] Available at: https://www.ifrs.org/groups/international-sustainability-standards-board/

[30]  Science Based Targets Initiative, *Corporate Net-Zero Standard, Version1.0, October 2021.* [Viewed 2022-09-17] Available at: https://sciencebasedtargets.org/net-zero

[31]  International Energy Agency, *Roadmap for the Global Energy Sector Net Zero by 2050.* [Viewed 2022-09-17] Available at: https://www.iea.org/reports/net-zero-by-2050

[32]  Race to Zero, *2030 Breakthroughs.* [Viewed 2022-09-17] Available at: https://racetozero.unfccc.int/system/2030breakthroughs/

[33]  Science Based Targets Initiative (SBTi). [Viewed 2022-09-17] Available at: https://sciencebasedtargets.org/

[34]  Greenhouse Gas Protocol, *Scope 2 Guidance.* [Viewed 2022-09-17] Available at: https://ghgprotocol.org/scope_2_guidance#:~:text=About%20the%20Scope%202%20Guidance,other%20types%20of%20energy%20purchases

[35]  RE100. [Viewed 2022-09-17] Available at: https://www.there100.org/

[36]  Global Methane Pledge. [Viewed 2022-09-17] Available at: https://www.globalmethanepledge.org/#:~:text=About%20the%20Global%20Methane%20Pledge&text=Participants%20joining%20the%20Pledge%20agree,not%20a%20national%20reduction%20target

[37]  IPCC, *Sixth Assessment Report, Climate Change 2022: Impacts, Adaptation and Vulnerability.* [Viewed 2022-09-17] Available at: https://www.ipcc.ch/report/ar6/wg2/

[38]  IUCN, *Global Standard for Nature-based Solutions: First Edition.* [Viewed 2022-09-17] Available at: https://www.iucn.org/resources/publication/iucn-global-standard-nature-based-solutions-first-edition

[39]  Adaptation Fund. [Viewed 2022-09-17] Available at: https://www.adaptation-fund.org/

**36**   © ISO 2022 – All rights reserved

Exhibit 13 to Decl. of Angel Hsu
482
**SER 384**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

[40] ICVCM, *Core Carbon Principles*. [Viewed 2022-09-17] Available at: https://icvcm.org/the-core-carbon-principles/

[41] Task Force on Nature-Related Financial Disclosures. [Viewed 2022-09-17] Available at: https://tnfd.global/

[42] Science Based Targets Network. [Viewed 2022-09-17] Available at: https://sciencebasedtargetsnetwork.org/

[43] The Integrity Council for the Voluntary Carbon Market. [Viewed 2022-09-17] Available at: https://icvcm.org/

[44] Voluntary Carbon Markets Integrity Initiative. [Viewed 2022-09-17] Available at: https://vcmintegrity.org/

© ISO 2022 – All rights reserved

Exhibit 13 to Decl. of Angel Hsu

483

**SER 385**

Case 2:24-cv-00801-ODW-PVC    Document 89-31    Filed 04/07/25    Page 47 of 49    Page ID #:9116

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**IWA 42:2022(E)**

**ICS  13.020.40**

Price based on 37 pages

© ISO 2022 – All rights reserved

Exhibit 13 to Decl. of Angel Hsu
484
**SER 386**

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

Exhibit 13 to Decl. of Angel Hsu
485

Licensed to Angel Hsu (angel.hsu@unc.edu) from University of North Carolina-Chapel Hill by ISO/CS
2025-04-03
Sponsored by ISO to support global climate efforts. Unauthorized reproduction or distribution is prohibited.

**ISO**

**International Organization
for Standardization**

ISO Central Secretariat
Chemin de Blandonnet 8
1214 Geneva, Switzerland

© ISO, 2022
All rights reserved

**iso.org**

Exhibit 13 to Decl. of Angel Hsu
486
**SER 388**

# Exhibit 9
# to Declaration of Angel Hsu

# Gorovaia, N., & Makrominas, M., Identifying greenwashing in corporate-social responsibility reports using natural-language processing, 31(1) European Financial Management, 427-462 (2025)

Exhibit 9 to Decl. of Angel Hsu
323
**SER 389**



DOI: 10.1111/eufm.12509

**ORIGINAL ARTICLE**



# Identifying greenwashing in corporate-social responsibility reports using natural-language processing

**Nina Gorovaia[1]**  |  **Michalis Makrominas[2]**

[1]Department of Business Administration, Frederick University, Nicosia, Cyprus

[2]Department of Maritime Transport and Commerce, Frederick University, Nicosia, Cyprus

**Correspondence**
Michalis Makrominas, Department of Maritime Transport and Commerce, Frederick University, 7, Y. Frederickou Str. Pallouriotisa, Nicosia 1036, Cyprus.
Email: bus.mm@fit.ac.cy

**Abstract**
A textual analysis of corporate-social responsibility (CSR) reports reveals that companies engaged in environmental violations report differently from firms with a clean record. The violators issue longer, more positive and more frequent reports to relay environmental content that is more copious but less readable. The violator firms appear to modify their reporting practices right after committing a violation. The findings suggest that culpable firms exploit the current unregulated–unaudited state of CSR reporting as a means of greenwashing and call for institutional change. Our results are robust to a number of industry-firm characteristics, including board composition, ownership dispersion and international presence.

**KEYWORDS**
corporate-social responsibility, greenwashing, natural-language processing, sustainability reporting

**JEL CLASSIFICATION**
G30, G32, M14

We thank an anonymous referee and participants at the 2023 International Conference on Sustainability, Environment and Social Transition in Economics and Finance for useful comments and suggestions.

This is an open access article under the terms of the Creative Commons Attribution-NonCommercial-NoDerivs License, which permits use and distribution in any medium, provided the original work is properly cited, the use is non-commercial and no modifications or adaptations are made.
© 2024 The Author(s). *European Financial Management* published by John Wiley & Sons Ltd.

Exhibit 9 to Decl. of Angel Hsu
324
**SER 390**

Case 2:24-cv-00801-ODW-PVC    Document 89-27    Filed 04/07/25    Page 3 of 37    Page ID #:8957

**428** | WILEY EUROPEAN FINANCIAL MANAGEMENT                     GOROVAIA and MAKROMINAS

# 1 | INTRODUCTION

Over the past decade, public apprehension regarding the state of the environment has compelled companies to pursue ecofriendly policies. By addressing citizens' ethical concerns, companies are believed to extract a number of benefits, including customer loyalty, increased sales, lower cost of capital and enhanced employee retention.

However, a strategy that focuses on achieving beneficial outcomes for the environment, in addition to financial gains, could be costly and ultimately unsuccessful in maximizing shareholder value. This dichotomy of incentives has led to the phenomenon of "greenwashing", the practice by which corporations make spurious claims with respect to environmental actions in an effort to rip the benefits of an environmentally conscious image without incurring the costs associated with environmental practices. How widespread is greenwashing, and what are the channels of its dissemination? In this study, we show that corporate-social responsibility (CSR) reports, in their current unregulated and unaudited form, are exploited by culpable firms as a means of greenwashing. We call for greater regulation oversight of CSR reporting, including effective mechanisms for assurance.

Identifying greenwashing involves comparing environmental claims versus actual environmental performance. Both sides of the equation are hard to measure. Firms broadcast environmental claims in different formats and through diverse means of communication, which makes the aggregation and overall evaluation of such information difficult. At the same time, quantifying environmental performance, particularly on a short-term basis, is inherently ambiguous, leading to a wide divergence of experts' opinions on a firm's environmental record. We address the issues of measurability first by focusing on a single source of information, the CSR report, as the *primoris* (foremost) means of corporate communication, typically signed by the company's chief executive officer (CEO) or responsible officer. Likewise, we seek a reliable "yardstick" of actual environmental performance to juxtapose against environmental assertions. We opt for a simple, yet error-free, binary measure of environmental responsibility, that is, whether a firm has received a monetary penalty for environmental violations or not. This process allows us to classify firms to violators versus nonviolators and directly examine variation in the environmental claims between the two groups. To formulate testable hypotheses that are economically meaningful, we rely on theories of greenwashing via decoupling, selective disclosure and attention deflection.

Our investigation has two objectives: first, to assess whether the CSR reporting practices of "green" firms and "brown" firms differ, and second, to investigate whether a company changes reporting practices straight after committing a violation. Our empirical analysis focuses on a sample of US public firms for the period 2008–2022, a time in which the number of American firms releasing CSR reports rose exponentially,[1] in line with public environmental concerns. Given the voluntary, unaudited and unstructured nature of CSR reporting in the United States over this period, to what end were these reports issued, and what can they tell us about the future? We find that violator firms tend to issue longer, more positive and more frequently available reports and use these reports to broadcast stronger, but less readable, environmental content. Issuing longer reports and maintaining these reports on the public domain for longer,

---

[1]S&P 500 firms that released sustainability or corporate responsibility reports (CSR) between 2011 and 2019 have risen from 20% to 86% over the period. https://www.ga-institute.com/press-releases/article/flash-report-86-of-sp-500-indexR-companies-publish-sustainability-responsibility-reports-.

Exhibit 9 to Decl. of Angel Hsu
325
SER 391

GOROVAIA and MAKROMINAS                                    EUROPEAN FINANCIAL MANAGEMENT WILEY | **429**

suggests that violator firms are willing to divulge more information in line with selective disclosure theory. Populating the report with greater amounts of environmental content, albeit with a lower degree of readability, likewise points out to attention deflection and decoupling. Firms appear to modify their CSR reports in this direction following the year of environmental violation. From the onset, we control for firm/industry-specific differences using a propensity-score methodology (PSM) that generates a matched sample. We thereon extend our analysis to include known characteristics of CSR performance, such as board composition, ownership dispersion and international presence. Overall, we provide evidence in support of the idea that firms with poor environmental records exploit the present lack of regulatory oversight to channel false environmental claims through CSR reports.

The contributions of the paper are manifold. Using standard natural-language processing (NLP) techniques, we analyze the textual content of CSR reports to quantify their environmental content, tone (sentiment) and readability. On the basis of a pre-established Lexicon of environmental terms (DiCoEnviro), designed by linguists for NLP, we employ a dictionary approach to extract, for the first time to our knowledge, an environmental score (ES) for the textual content of unstructured CSR reports. We thereon interact the ES with each of the readability and positiveness scores, allowing us to test directly for greenwashing via decoupling and attention deflection. Looking at the size and reporting frequency of the reports, we also examine greenwashing via selective disclosure. To "cut through the noise" of environmental, social, and governance (ESG) third-party ratings, we opt for a binary, error-free proxy for environmental performance: whether a company committed a penalized environmental violation or not. We thus suggest a stricter criterion for disentangling "brown" firms from "green" firms, one which provides positive assurance for violators and/but only negative assurance for nonviolators. This criterion is used to assess the overall differences in CSR reporting between violator and nonviolator firms in univariate and multivariate tests, as well as to detect within-firm changes in CSR reporting following a transition to violator using cosine similarity and staggered difference-in-differences (DiDs) regressions.

Our study lies in the cross-section of management, corporate finance and accounting literature for sustainability reporting. More so, the paper is linked to, but remains distinct from, a relatively recent set of empirical studies that focus on the textual analysis of CSR reports to detect greenwashing. Michelon et al. (2015) examine the quality of CSR disclosure for a small sample of London Stock Exchange-listed firms between 2005 and 2007, using content analysis and manual coding. Lang and Stice-Lawrence (2015) use natural-language techniques to analyze reporting data, but their study focuses on annual reports. Clarkson et al. (2020) provide a large-scale textual analysis of CSR reports, but do not examine greenwashing. Albitar et al. (2023) likewise apply NLP to sustainability sections of annual reports, but their analysis is limited to detecting tone.

Our results have important implications for research and industry. As the practice of issuing stand-alone CSR reports and annual reports becomes established, we highlight the discrepancy between the two kinds of reports: the former is voluntary, unstructured and unaudited; the latter is statutory and subject to independent assurance.

Closing the regulation gap between financial and sustainability reporting is necessary to ensure that CSR reports are held to the same standards of accountability as annual reports. Previous efforts to regulate CSR reporting more strongly, as evidenced by European and worldwide initiatives, have been of limited success. Haji et al. (2023) find that "CSR reporting continues to be ceremonial rather than substantive after the regulations". Christensen et al. (2021) caution on potential actual costs of enforcing mandated disclosures for CSR, such as loss

14685974, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12500 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 9 to Decl. of Angel Hsu
326
SER 392

**430** | WILEY—EUROPEAN FINANCIAL MANAGEMENT                                    GOROVAIA and MAKROMINAS

of competitiveness, exposure to litigation risk and resorting to greenwashing. These concerns are somewhat alleviated by Fiechter et al. (2022), who find that the real effects of the European Union's CSR directive have been beneficial, leading to meaningful CSR activities and actual CSR outcomes. Given our present findings of greenwashing in CSR reports, we are more inclined to support the idea of a statutory CSR reporting and auditing framework for US firms despite the anticipated adjustment costs.

The rest of the paper is organized as follows. Section 2 presents the literature review. Section 3 develops testable hypotheses. Section 4 outlines the research design. Section 5 provides empirical results, while Section 6 concludes.

## 2 | LITERATURE REVIEW

### 2.1 | Societal expectations

Corporations are keen to promote an environmentally conscious image. Capitalizing on widespread concern for the state of the environment, companies that appear to be good corporate citizens enjoy preferential investment opportunities (Sen et al., 2006), lower financial risk (Orlitzky & Benjamin, 2001), increased employee retention (Greening & Turban, 2000; Turban & Greening, 1997) and greater customer loyalty (Martin et al., 2009). At the same time, continuous demand for ecofriendly assets has led to a proliferation of "green funds". According to the US SIF Foundation, approximately $8.4 trillion (SIF Annual Report, December 2023) in US-domiciled assets, or about 12.5% of total US assets, are deployed using sustainable investing strategies.

Over the last 10 years, ecofriendly investments have yielded superior returns (Edmans, 2011; Nagy et al., 2016). Pástor et al. (2022) show that the higher-than-expected returns on green assets are not in line with ex-ante estimates of required returns. Instead, they are more likely to reflect a willingness to pay an additional price—a "greenium", out of environmental considerations. Baker et al. (2022) find that on average, investors are willing to pay 20 basis points more to a fund with an ESG mandate than to an otherwise identical investment. Consumers also appear willing to accommodate higher prices for environmentally friendly products, ranging from restaurant food (Namkung & Jang, 2017) to air travel (Hinnen et al., 2017) and anything in between.

As public sentiment concerning the state of the environment continues to drive preferences, more companies attempt to harvest the "greenium" by broadcasting ecofriendly policies. The information is only sometimes accurate. A report released by the European Commission as part of its 2021 annual screening of websites ("sweep") found that 42% of the examined environmental claims were likely "exaggerated, false or deceptive". In a similar exercise performed globally, the International Consumer Protection Enforcement Network reported that 40% of the sampled websites were likely using misleading tactics to appear ecofriendlier. On November 22, 2022, Amundi, Europe's largest investment manager, downgraded most of its €45bn ($47bn) of funds ranked Article 9, the highest grade in the EU's sustainability disclosures, to Article 8, or "light green", suggesting the funds were misclassified in the first place. The practice by which companies appear to make spurious claims concerning environmental actions—"greenwashing" is the subject of research that it is both extensive and multidisciplinary. While comprehensive reviews can be found in De Freitas Netto et al.

14668016, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12509 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 9 to Decl. of Angel Hsu
327
SER 393

GOROVAIA and MAKROMINAS  **431**

(2020) and Yang et al. (2020), we summarize some key findings of the literature and, importantly, the limitations that prompt further investigation.

## 2.2 | Greenwashing

Greenwashing is multifaceted, each dimension presenting a separate identification, measurement and inference challenge. A common type of greenwashing arises through selective disclosure of: "positive information about a company's environmental or social performance, while withholding negative information on these dimensions", so as to create an overly positive corporate image (Lyon & Maxwell, 2011, p. 5). In selective disclosure, the act of greenwashing relates to how information is classified and disseminated (Font et al., 2012; Yang et al., 2020). An important implication of the selective disclosure practice is that companies with poor environmental records are likely to divulge more information (Patten, 2002) than their green peers.

A second form of greenwashing refers to decoupling, the gap between symbolic and substantive corporate-social actions (Walker & Wan, 2012). Unlike selective disclosure, decoupling is associated with corporate claims and actions, enabling companies with more negative CSR performance to project more positive communication. Attention deflection activities to conceal poor environmental performance, or outright deceptive manipulation (i.e., Siano et al., 2017), including the use of dubious ecofriendly labels and rogue third-party authorizers (De Freitas Netto et al., 2020) are common tools of decoupling. A final distinction in different types of greenwashing rests on how the message of ecofriendliness is delivered: Claim greenwashing uses textual arguments that explicitly advertise environmentally friendly products or corporate policies, while executional greenwashing (Parguel et al., 2015) uses nature-evoking images (i.e., wind turbines, green/blue images, natural landscapes, etc.) that may be irrelevant to actual products or services.

While firm incentives for being perceived as ecofriendly are numerous, the motivation to actively mislead is more complex. An incentive to cheat lies in that the pursuit of environmental or other societal goals may result in reduced profitability (Bénabou & Tirole, 2010), either by allowing suboptimal cost control or truncating the set of available investments should those not meet extended criteria. Furthermore, deviations from the management's ingrained mission to maximize shareholder value raise crucial corporate governance issues (Cespa & Cestone, 2007) that may come at a sacrifice for the shareholders. Menla Ali et al. (2023) highlight that firms may resort to "greenwashing" when the career stability of powerful CEOs and the corporate control exerted by major shareholders are at risk.

On the other hand, overcommitting to stated environmental goals and failing to deliver is costly, as the discrepancy between CSR performance and reporting draws consumer backlash and punishment by civil organizations (Lyon & Maxwell, 2011). Ioannou et al. (2022) show that perceived "greenwashing" is understood as a form of corporate hypocrisy and is negatively associated with customer satisfaction. Discovered greenwashing has an asymmetric impact in reducing corporate legitimacy (Guo et al., 2018) compared with verifiable activities that increase corporate legitimacy.

Hence, with growing scrutiny on environmental claims, it remains a subject of empirical investigation, whether companies engage in greenwashing as a profit-maximizing strategy, or are driven by nonpecuniary motives of shareholders (Hong & Shore, 2023).

Exhibit 9 to Decl. of Angel Hsu
328
**SER 394**

14680036, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12500 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**432** WILEY— EUROPEAN FINANCIAL MANAGEMENT                              GOROVAIA and MAKROMINAS

## 2.3 | CSR disclosure and environmental performance

This line of inquiry, relating advertised CSR actions with realized CSR performance, presents significant challenges to regulators and researchers. Both sides of the equation appear to be noisy, and efforts to approximate the two variables for empirical association testing are incomplete. The first issue relates to how one discerns and aggregates what is claimed. CSR information is released through various communication channels, including, but not limited to, news feeds on the corporate websites, stakeholder engagement via social media, press releases, advertising, product packaging, becoming a signatory to responsible investment frameworks[2] and issuing stand-alone CSR reports. Each outlet is associated with varying degrees of accountability, scope, format and target audience. The fragmentation in CSR reporting makes it difficult to assess the overall quality and reliability of management's environmental assertions. Furthermore, due to the heterogeneity of the information signals, it is hard to aggregate the information to construct a comprehensive picture of environmental claims.

Singling out the stand-alone CSR report as a more formal means of communication does not alleviate heterogeneity. Unlike traditional financial reporting, CSR reports are not mandated by the Securities and Exchange Commission (SEC, 2020) and are not prepared according to Generally Accepted Accounting Principles. As such, CSR reports differ substantially in the diversity of topics, objective functions, time horizon and, ultimately, users and uses. The amount of CSR disclosure, which remains voluntary, also varies across firm characteristics, such as industry membership, size and ownership dispersion. Given substantial firms' incentives to voluntarily disclose CSR/ESG information, a lack of statutory framework does not so much hinder the amount of information released as much as compromises the quality and credibility of management's assertions.

A second point of contention arises from the difficulty of measuring actual CSR performance. This is an issue arising from diverse and incomplete auditing. In the absence of SEC regulations and in line with fragmented reporting, a miscellaneous set of institutions appear to have taken the role of quasi-watchdogs. At times, these include nongovernmental organizations, activist investors, consumer protection agencies and financial institutions that provide a third-party assessment of corporations' ESG performance. Currently, ESG rating providers, KLD, Sustainalytics, Moody's ESG, London stock exchange group (Refinitiv), S&P Global and MSCI amongst the most prominent, appear to be far-reaching in influencing investment decisions and corporate policies as a growing number of investors rely on ESG ratings to form portfolio choices.

Nevertheless, these agencies appear to provide a widely divergent test of performance. Berg et al. (2022) find that ESG ratings from the six most prominent rating agencies correlate by as little as 38%, and differ in scope, weighting and measurement. By comparison, the correlation of alternative credit ratings is 99%. This level of discord invalidates third-party ratings and highlights the difficulty of environmental auditing: If experts cannot agree on two out of three ESG ratings, who is to cry "greenwashing", and to what end? Larcker et al. (2022) doubt that "we agree on the purpose of ESG" as the number one "myth" in their list of ESG grievances.

---

[2]More than 3000 institutional investors and service providers have signed onto the Principles of Responsible Investment (2020), a commitment to integrate ESG/CSR issues into their investment analysis and decision-making processes.

Exhibit 9 to Decl. of Angel Hsu
329
**SER 395**

14685036, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12509 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GOROVAIA and MAKROMINAS

EUROPEAN FINANCIAL MANAGEMENT WILEY **433**

A closer look at ESG rating divergences attributes discord to the difficulty of agreeing on what is essential to measure and the challenge of quantifying largely qualitative indicators. Chatterji et al. (2016) establish two preconditions for rating convergence. The first one, called "theorization", refers to what precisely is rated and how important it is in the composition of an overall ESG score. Hence, the theory corresponds to the scope of assessment and the weight assigned to specific ESG markers. The difficulty of adopting a single system of taxonomy concerning what categories of ESG actions are considered and how much each action is valued could be traced to differences of opinion amongst the raters and business considerations concerning product differentiation and competitiveness. The second precondition, called "commensurability", refers to the actual measurement of CSR as defined in theorization. While divergence in theorization can be alleviated by reclassifying different categories preferred by raters, the measurement problem is more complex to circumvent. This is because raters are called upon to quantify inherently qualitative indicators, such as societal externalities from an improved environment, that are only tangentially related to the core business operations. In Berg et al. (2022), 56% of ESG rating divergence is attributed to measurement, 38% to scope and 6% to weight.

The paper contributes to the ongoing debate on corporate greenwashing by circumventing the problems of noisy signaling, complex theorization and low commensurability that hinder the problem of identification. To achieve this, we employ a simple, error-free, binary measure of environmental responsibility: whether the firm has received a monetary penalty for environmental violation, or not. Compared with a composite, qualitative measure of environmental performance our proxy is reliable in the sense that it is not subject to rating divergence and can be verified objectively. While we obtain the status of a firm being a "violator" or a "non-violator" from KLD/MSCI (2008–2019) and Refinitiv (2019–2022), the environmental transgressions linked to monetary penalties are factual and not subjective to the specific raters. This is in line with Berg et al.'s (2022, p. 1342) suggestion that "... researchers can construct hypotheses around more specific sub-categories of ESG performance, such as GHG Emissions or Labor Practices. This avoids the problems of weight and scope divergence ...". Our proxy is not subject to measurement error, particularly when used as binary, without quantifying the size of penalties. Furthermore, we note that violator status is a conservative measure of environmental performance because it provides positive assurance for environmental offenders and only negative assurance for nonoffenders. This distinction provides a stiffer "yardstick" for disentangling "brown" firms from "green" firms and a more reliable one, as it counters the optimistic bias of management assertions and the difficulty of measuring the actual realization of these assertions.

In turn, we contrast the violator status of the firm directly to the information content of its stand-alone CSR report. By focusing on a single source of information, we avoid the difficulty of aggregating information signals from diverse sources (i.e., corporate websites, social media, product labels, etc.). At the same time, we view the stand-alone CSR report as the most formal means of corporate communication and one that holds the most significant amount of accountability. Typically, the CSR report is signed by the company's CEO or designated CSR officer assuming responsibility for the content of the report. CSR reports are also maintained in public view longer than other communication media, suggesting that the company remains publicly liable to environmental claims for longer periods of time. Despite these benefits, the CSR report remains an unregulated, unstructured document that differs in scope, length, language and objectives. To extract the environmental content of the reports, at scale, we employ increasingly popular (Aziz et al., 2022) NLP techniques that facilitate the "reading" of

14680036, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12509 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 9 to Decl. of Angel Hsu
330
**SER 396**

**434** | WILEY — EUROPEAN FINANCIAL MANAGEMENT GOROVAIA and MAKROMINAS

large swaths of text beyond the capacity of (reasonably applied) human labor. We then use standard machine learning (ML) algorithms to quantify the amount of environmental content, degree of readability, positiveness and length.

# 3 | HYPOTHESES

The variables extracted allow us to test for greenwashing through the following baseline hypotheses:

**H1.** The probability of being an Environmental Violator is positively associated with making more environmental claims.

Our first hypothesis tests for greenwashing by decoupling (Walker & Wan, 2012), capturing the gap between symbolic representations of CSR and substantive corporate actions. To test this hypothesis the actual environmental status of the firm is identified through the classification of the firm as a violator or not, while the symbolic representations of environmental claims are measured by the amount of environmental content identified in the CSR report.

**H2.** The probability of being an Environmental Violator is positively associated with releasing more obfuscated information.

The second hypothesis tests for greenwashing by attention deflection (Guo et al., 2018). We postulate that violator firms conceal their actual environmental performance by divulging a greater number of environmental claims, but these claims are less clearly articulated to avoid detection. As with H1, the actual environmental status of the firm is identified through the classification of the firm as a violator or not, while the degree of information obfuscation is measured by the degree of readability of the CSR report.

**H3.** The probability of being an Environmental Violator is positively associated with releasing more positive information.

While the CSR report is a firm-issued document, which, by definition, is positive, we look at cross-sectional variation in the degree of positiveness using sentiment analysis (SA). We argue that environmental violators attempt to conceal poor environmental performance by projecting a more positive image than their green peers.

**H4.** The probability of being an Environmental Violator is positively associated with voluntarily disclosing more information.

This hypothesis relates to greenwashing by selective disclosure (Yang et al., 2020) a direct implication of which is that companies with poor environmental performance are likely to volunteer more information (Patten, 2002). To this end, we relate the environmental violator status of a firm to the actual size of its CSR report, as measured by the number of pages and words. Taking a step back, we also observe the frequency of violator firms releasing a CSR report and making the report publicly available, and compare this frequency with that of nonviolator firms. We likewise conjecture that violator firms are more likely to produce

14680X6s, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12369 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 9 to Decl. of Angel Hsu
331
**SER 397**

GOROVAIA and MAKROMINAS

**WILEY** | **435**

publicly available CSR reports. Hypotheses H1–H4 are tested independently, with univariate association tests, and jointly in multivariate logistic regressions. We also test for interactive effects between environmental content and positiveness and environmental content and readability.

Furthermore, we relate the probability of being an environmental violator to corporate finance variables known to affect ESG/CSR performance. These include board size and diversity (Velte, 2022), the international aspect of operations (Cai et al., 2016) and ownership dispersion (Nofsinger et al., 2019). In particular, we test for effects of board composition via:

**H5.**  The probability of being an Environmental Violator is negatively associated with board size, the percentage of women directors on the board, and the number of outside directors on the board.

Traditionally, board size has been used as a catch-all proxy of corporate governance quality. Nevertheless, size is not unconditional as it presents a trade-off between increased monitoring (reduced agency costs) and the cost of this monitoring (Boone et al., 2007). Looking at board composition, a score of papers (Cronqvist & Yu, 2017; McGuinness et al., 2017 among others) suggests that female representation on board positively affects CSR policies and ESG performance. Board independence, as captured by the number of outside directors, is also found to be associated with better corporate governance (Knyazeva et al., 2013).

To test for international aspect effects, we formulate the following hypothesis:

**H6.**  The probability of being an Environmental Violator is negatively associated with the firm's international operations.

Firms with a significant percentage of income from foreign operations and tax paid in foreign countries are identified as having an international presence. These firms are hypothesized to be less likely to commit environmental violations in the United States. For example, Iliev and Roth (2023) find that exposure of US firms to foreign countries' sustainability reforms (which are often more substantial than those in the United States) has a positive effect in shaping local CSR policies and increasing the firm's ESG performance.

Finally, we relate the probability of being an environmental violator to ownership dispersion. Our final hypothesis states:

**H7.**  The probability of being an Environmental Violator is negatively associated with ownership dispersion.

To obtain a simple measure of ownership dispersion, we group firms identified in KLD/MSCI as "Institutions Dominant" or "Indexed Stock" or "Mixed Ownership" or "Widely Held" as higher dispersion firms, and firms classified as "Founder Firm" or "Family Firm" or having a "Principal Shareholder" or a "Controlling Shareholder" as lower dispersion firms. Evidence concerning ownership characteristics and ESG performance is mixed. For example, Borghesi et al. (2014) find a negative association between institutional ownership and CSR performance, while Chava (2014), focusing only on ESs, finds the opposite. Drobetz et al. (2024) show that institutional investor ownership is negatively related to corporate environmental costs. Nevertheless, the result is not unconditional, and it appears to be driven by long-term foreign institutional investors from advanced economies. The same ambiguity is encountered when

14683036, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12500 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 9 to Decl. of Angel Hsu
332
**SER 398**

436 | WILEY— EUROPEAN FINANCIAL MANAGEMENT

GOROVAIA and MAKROMINAS

looking at closely owned firms. While El Ghoul et al. (2016) find that family firms have worse ESG performance, Abeysekera and Fernando (2020) conclude that: "Family firms do at least as well as non-family firms in alleviating environmental concerns".

Corporate finance variables remain of interest as stand-alone determinants of the probability of a firm being an environmental violator. Nevertheless, we consider these variables more informative in multivariate regressions, controlling for confounding factors in the relationship between environmental performance and environmental claims (H1–H4). This aligns with the view that board and other firm characteristics are only measurable proxies for latent internal governance that drive CSR communication and environmental actions (Gillan et al., 2021).

## 4 | RESEARCH DESIGN

### 4.1 | Sample selection procedure

Because the public issuance of a CSR report is voluntary, the availability of CSR reports, particularly when subject to retrospective collection, is widely divergent across firms/years. Focusing, a priori, on the CSR reports that are readily available generates a skewed sample, towards larger firms, with narrow industry membership, and close environmental outlook. To avoid a sample selection bias and to construct a sample that is not based on the availability of CSR reports, we impose the following procedure:

We begin by anchoring our sample on the MSCI ESG KLD Stats data set, which provides a fair representation of firm population across industries and years, and has the highest coverage among the six most prominent rating agencies. We select all firms with nonmissing data on negative environmental indicators, whereas a zero score indicates a nonviolator firm/year instance, while a nonzero score indicates a violator firm/year instance (the exact definitions are provided in Appendix A). Furthermore, we extend the MSCI ESG KLD Stats data set, which covers the period from 2008 to 2019, with Refinitiv data set for additional 3 years from 2020 to 2022.[3] True to our direct measurement of environmental performance, we identify violator firms with the variable "Environmental Fines" (ENERDP103). Thus, the timeframe of the study is from 2008 to 2022.

Second, we apply PSM to produce a matched sample of violator/nonviolator firms in the KLD/MSCI/Refinitiv sets controlling for firm and industry/year characteristics obtained from Compustat database. It is clarified that we run the PSM routine for *each year* separately and with *annual replacement*. This is beneficial for two reasons: First, it allows for a sufficient number of correct matches, since companies tend to transition between violator status over time. In particular, after consolidating KLD/MSCI with Refinitiv and observing a wide cross-section of firms over 15 years, we find only very few companies that are perennial violators.[4] While there is a large number of always-green firms in the sample (control group), the majority of the violator firms (treatment group) got fines only occasionally, making it challenging to find satisfactory matches without annual replacement. Second, matching with replacement minimizes the propensity-score distance between the matched comparison and the treatment

---

[3]We thank an anonymous referee for suggesting to extend the data set for another 3 years.
[4]Some publicly known examples include Monsanto.

Exhibit 9 to Decl. of Angel Hsu
333
SER 399

14680b36, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12590 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GOROVAIA and MAKROMINAS  **WILEY** | **437**

14680036, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12509 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

units and is conducive in terms of bias reduction (Dehejia & Wahba, 2002). The matched data set preserves the stratification of the sample which remains representative.

Third, for the matched sample, we perform a fairly exhaustive search to retrieve publicly available CSR reports, cross-checking four sources: companies' own webpages, Sustainability Reporting, Corporate Register and GRI databases. If any additional variables are missing for any firm/year instance, the observation is dropped from the sample. We do not substitute the dropped observations, not to deviate from the sample selection methodology. The matched sample controls, from the onset, for unwanted factors underlying violator status and CSR reporting practices. The matching methodology including the selection of covarying factors is explained below.

## 4.2 | Propensity-score matching variables

The PSM routine generates a set of pairs between violator/nonviolator firms that are similar in ways that may bias the association of outcome (probability of being a violator) and treatment (explanatory variables). By looking at pairs that are "otherwise identical" the effect of confounding factors is eliminated while the stratification of the sample concerning these factors is maintained. Below, we motivate the set of control variables. The first control is firm Size, defined as the market capitalization of the firm. While larger firms are thought to extend more CSR activities and be more transparent (Chae, 2005), Udayasankar (2008) documents a U-shape relationship in which medium-sized firms are the least motivated to pursue CSR outcomes. At the same time, larger and smaller firms that appear more active in sustainable policies do so with different economic incentives. Firm Size is also a well-known determinant of board characteristics, ownership dispersion and international presence. Our second control is firm Age, defined as the number of years between the year of incorporation and the time of measurement. Withisuphakorn and Jiraporn (2016) find that more mature firms invest significantly more in CSR, and the effect is most strongly applied to diversity and environmental awareness. The finding is also confirmed by D'Amato and Falivena (2020), who argue that smaller and younger companies need more financial resources, experience, or reputation to pursue environmental policies.

The third control is intangibility, defined as 1 minus the ratio of tangible assets over the total assets of the firm. Edmans (2023) provides an exciting perspective that ESG policies are, in fact, intangible assets themselves, in line with, that is, quality of human capital or corporate culture. In Jun et al. (2022), the relationship between ESG disclosure and intangible capital is characterized by an inverted S-shaped curve in which initial ESG outlays increase intangible capital. At higher levels, the marginal effect of increasing ESG investment eventually diminishes intangibles.

We employ the following three control variables to account for differences in financial performance, valuation and leverage constraints. Return on Equity, defined as net income over last year's equity, captures immediate profitability. The relationship between firm profitability and CSR is not unidirectional. On the one hand, a company that struggles financially may be unable to invest in sustainability policies that will not directly improve its bottom line. At the same time, companies that maintain some capacity for CSR initiatives may aim at environmental outcomes to improve their brand image and ultimately increase profits (Cornett et al., 2016). The ratio of market value (market capitalization) to book value of equity is a catch-all proxy for investor confidence, expectations for future profitability, growth opportunities and

Exhibit 9 to Decl. of Angel Hsu
334
**SER 400**

438 | WILEY EUROPEAN FINANCIAL MANAGEMENT GOROVAIA and MAKROMINAS

cost of capital. Conventional wisdom suggests that companies with higher ESG activities increase their market valuation against their recorded net assets (i.e., Di Simone et al., 2022) even though the effect may exacerbate the misvaluation (Bofinger et al., 2022). Ferrell et al. (2016) also note that well-governed firms with fewer agency costs can take more full advantage of the positive valuation effects of CSR activities. Leverage, defined as the ratio of long-term debt to the book value of equity, aims at capturing financial constraints that may inhibit CSR activities. The impact of higher leverage on CSR appears to be negative, either by inhibiting directly sustainable investments (Hong et al., 2012) or by increasing the cost of debt (i.e., Goss & Roberts, 2011; Zerbib, 2019). Finally, to account for diversity in operations, firms are classified in a specific industry based on the Kenneth French 12-industry classification.

The PSM routine is implemented in two stages. First, we run a binary logit regression, where the "treatment variable" is violator status (i.e., a dummy equal to 1 for firms committing environmental violations and 0 otherwise) for each year separately. The first-stage regression produces the propensity score as the fitted probability of being a violator. Second, we use a $k$-nearest neighbor algorithm with $k = 1$ to match the firms based on the nearest propensity scores. To facilitate efficient matching, we demand that the difference in the logits of the propensity scores for pairs of individuals from the two groups be less than or equal to 0.5 times the pooled estimate of the common standard deviation of the logits of the propensity scores. The procedure is repeated for every year with annual replacement.

The ensuing sample comprises 1120 CSR reports published by 441 unique firms (see Table 1) over the period 2008–2022. This suggests, on average, 2.53 CSR reports per firm. While this number is sufficient for assessing *cross-sectional* differences between violator and nonviolator firms, in subsequent DiD analysis we require a longer time-series dimension. We, therefore, condition a subsample of 475 reports for 79 unique firms attaining, on average, six consecutive annual reports per firm, and a median number of reports before violation being 3.01. Only the companies that changed status from nonviolator to violator are included in the subsample.

## 4.3 | NLP variables

We apply standard NLP routines to quantify textual information for those firms/years in which we obtain CSR reports. Below, we describe these procedures.

### 4.3.1 | Text extraction

CSR reports are obtained as Portable Document Format (pdf) documents with various degrees of structure. To obtain useful information from the pdf, we transcribe the textual content to raw text and apply a tokenizer, splitting paragraphs and sentences into individual words or other nonwhitespace. This generates a "bag-of-words", a simplifying representation in which the linguistic information of text is represented by the set of its words without punctuation or order. Furthermore, parts of speech that are necessary for grammar but do not convey information, known as "stop words" are removed to reduce processing time. Examples of stop words include, but are not limited to, definite and indefinite articles (i.e., "the", "a" and "an"), adverbs (i.e., "because"), or prepositions (i.e., "until"). While stop words are completely eliminated, informative words are allowed multiplicity. The resulting set of words is

14680836, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12390 by University of North Carolina at Chapel Hill, Wiley Online Library on [03/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 9 to Decl. of Angel Hsu
335
SER 401

GOROVAIA and MAKROMINAS

 **WILEY** | **439**

14680036, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12509 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**TABLE 1**   Corporate-social responsibility (CSR) reporting frequency and sample selection.

This table outlines the sample selection process. Panel A gives the details of the matching procedure. For each year, for the period 2008–2022, we estimate the equation propensity-score methodology (PSM): $logit(P(Viol = 1)) = a + b_1Age + b_2Size + b_3ROE + b_4Leverage + b_5M/B + b_6D/E + b_7Intan + Sum(b_iIndustry_i) + \varepsilon$ to predict the probability of treatment (violation) and match treated units to untreated units with $k$-nearest neighbor = 1 and caliber = 0.5. The process is repeated every year with annual replacement. Panel B provides a summary of matched pairs, number of unique firms and total number of reports for Violator versus Nonviolator firms. Panel C presents the annual breakdown of CSR report availability and provides statistics for differences in the mean, median and variance of the two groups. The ***, ** and * superscripts signify statistical significance at the 1%, 5% and 10% limits, respectively. All variables are defined in Appendix A.

| Panel A: Propensity-score matching procedure | | | |
| --- | --- | --- | --- |
| Distance metric | Logit of PSM | Method | $k$-Nearest neighbors |
| Treatment variable | Environmental violation | Control ratio for *each year* | 1 ($k = 1$) |
| Matched pairs with *Annual Replacement* | 993 | Caliber | 0.5 |

| Panel B: Reporting frequency all years |*N. of unique firms*: 441| Period: 2008–2022 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Total (N.) | Nonviolators (N.) | Violators (N.) | Difference (N.) | Violators/ nonviolators |
| *All year-matched observations* | 1986 | 993 | 993 | 0 | |
| *Available CSR reports* | 1120 | 482 | 638 | 156 | |
| *N. of unique firms* | 441 | 237 | 204 | | |
| *N. of reports/firms* | 2.53 | 2.03 | 3.12 | 1.09 | 1.53 |

| Panel C: Reporting frequency for matched sample per year | | | | | |
| --- | --- | --- | --- | --- | --- |
| | | Available/collected CSR reports | | | |
| Year | Matched pairs (N.) | Nonviolators (N.) | Violators (N.) | Difference (N.) | Violators/nonviolators (%) |
| 2008 | 60 | 10 | 15 | 5 | 50.00 |
| 2009 | 58 | 14 | 16 | 2 | 14.29 |
| 2010 | 60 | 16 | 37 | 21 | 131.25 |
| 2011 | 64 | 22 | 43 | 21 | 95.45 |
| 2012 | 68 | 31 | 40 | 9 | 29.03 |
| 2013 | 68 | 32 | 48 | 16 | 50.00 |
| 2014 | 76 | 36 | 55 | 19 | 52.78 |
| 2015 | 72 | 38 | 51 | 13 | 34.21 |

(Continues)

Exhibit 9 to Decl. of Angel Hsu
336
SER 402

**440** | WILEY — EUROPEAN FINANCIAL MANAGEMENT    GOROVAIA and MAKROMINAS

**TABLE 1** (Continued)

| Panel C: Reporting frequency for matched sample per year | | | | | |
|---|---|---|---|---|---|
| | | Available/collected CSR reports | | | |
| Year | Matched pairs (N.) | Nonviolators (N.) | Violators (N.) | Difference (N.) | Violators/nonviolators (%) |
| 2016 | 68 | 37 | 54 | 17 | 45.95 |
| 2017 | 62 | 28 | 32 | 4 | 14.29 |
| 2018 | 64 | 43 | 38 | −6 | −0.11.6 |
| 2019 | 61 | 29 | 34 | 5 | 17.24 |
| 2020 | 73 | 55 | 58 | 3 | 5.45 |
| 2021 | 67 | 46 | 57 | 11 | 23.91 |
| 2022 | 72 | 45 | 60 | 15 | 33.33 |
| Mean | | 32.13 | 43.53 | 10.33** (<0.04) | ($t$ Statistics = −14.02) |
| Median | | 32.00 | 43.00 | 11.00* (0.07) | (Mann–Whitney statistics = 69.0) |
| SD | | 12.76 | 14.02 | 1.49 (0.418) | (Bartlett's $U$ statistics = 0.66) |

lemmatized, allowing the grouping of inflected forms of a word (i.e., "environmental" vs. "environmentally") to be analyzed as a single word. All words are converted to lowercase. Allowing a multiplicity of words and applying lemmatization creates a more meaningful representation of word frequency, an important input to the training classifiers.

### 4.3.2 | Environmental score

Environmental Score Analysis (ESA) aims to measure the environmental content of a CSR report in relation to other (nonidentified) themes in the text. While environmental content is expected to be a significant part of a sustainability report, the degree of emphasis given and space allocated to environmental issues remain discretionary and may reflect managerial decisions. ESA aims to gauge degrees of environmental reporting across firms and time, for violators or nonviolators, before and after a violation.

Our ESA analysis rests on the lexicon approach, in which a prearranged dictionary of environmental terms (the Lexicon) is used to score a CSR report based on the cumulative frequency of lexical entries found in the document. We obtain a Lexicon for environmental terms from DiCoEnviro (L'Homme, 2012), a multilingual technology resource that is publicly available.[5]

Unlike most terminological repositories DiCoEnviro is curated by linguists and is a priori designed for NLP. The English version of the Lexicon consists of 923 tokens. After lemmatizing and converting to lowercase, we count the number of times (if any) a lexical token appears in a

---

[5]DiCoEnviro can be accessed at the following link: https://olst.ling.umontreal.ca/dicoenviro/moteur/search-enviro.cgi?ui=en&mode=terme&lang=fr&prec=exact&equi=1&rq=

Exhibit 9 to Decl. of Angel Hsu
337
**SER 403**

14468036, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12509 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GOROVAIA and MAKROMINAS

 WILEY | **441**

CSR report. Then, we sum the counts and divide the total by the number of words in the text. The result gives a quantifiable measure of the environmental emphasis of a CSR report and is used thereon as our ES variable. ES values range from 0 to 1 and can be viewed as frequentist probabilities. The economic interpretation of ES is nevertheless tricky. For one, the plausible range of ES values is truncated: a value of 1 (or close to 1) is not attainable because such text would be illegible when reconstructed in sentences and paragraphs. An ES value of zero is theoretically possible, but unlike a report devoid of any environmental terms. Furthermore, looking at the central location of the distribution, an ES value of 0.5 does not signify environmental "neutrality": It means that half of the CSR report text consists of environmental terms, an enormous amount given that CSR reports are thematically diverse. Because we do not have a meaningful benchmark for evaluating ES values in absolute terms, we focus on assessing variation in ES values across firms and time, controlling for other factors.

### 4.3.3  |  Readability score (RS)

Our second NLP variable is an RS assigned to each CSR report. An RS measures the degree of understanding of a text and roughly corresponds to the grade levels of the US education system required to comprehend the text. When applied to CSR reports, it gauges the degree to which the report is accessible to average readers. A CSR report with relatively low RS is understood to be more difficult to read and may include technical terms or longer sentences. Obfuscating the text of corporate reports allows management to pass false claims or conceal adverse facts. The extensive use of technical jargon, including environmental terms, may suggest "greenwashing". As such, the RS score is particularly important when jointly evaluated with our ES because it helps disentangle meaningful environmental content from greenwashing. Several tools are easily applied for obtaining an RS using the Textstat library in Python software. We rely on the Flesch Reading-Ease (FRE) test, which approximates readability as a function of total words in a sentence and total syllables in a word.[6] Due to the richness and convenient application of Textstat, we obtain alternative measures of readability (including the popular Coleman-Liau Index) and correlate those with FRE scores. We find FRE to be a robust and reliable measure of readability.

### 4.3.4  |  Sentiment analysis

SA is a commonly applied ML tool that analyzes text for polarity, from positive to negative. In our case, the procedure output assigns a value between 0 and 1 to each CSR report, representing the probability of the report being positive. The economic interpretation is that the closer the score is to 1 the more positive the report will likely be. We note that CSR reports are corporate documents issued by firms to communicate their best efforts and their impact on the environment and community. While increasingly in demand, CSR reporting is optional. Firms that choose to issue a CSR report, do so to improve their outlook for external stakeholders, including providers of finance, customers, analysts and regulators. For this reason, the content

---

[6]Note that to apply the FRE test, the sentence structure of the CSR text must be maintained. Therefore, while the CSR report is reduced to text, it is not tokenized.

Exhibit 9 to Decl. of Angel Hsu
338
SER 404

14680362, 2025, 3, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12509 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

of a CSR report is expected to be, and is, almost by definition, positive. It is nevertheless valuable to assess a cross-sectional variation in positive sentiment and to compare degrees of positiveness between violators and nonviolators.

Our SA relies on the corpus approach, in which an ML algorithm (the classifier) is trained to categorize novel text into positive or negative. The classifier "learns" to distinguish a positive text from a negative text by looking at many validated examples. The set of documents representing examples of positive or negative text is called the corpus.[7] After learning is completed to a high degree of accuracy, the trained classifier is applied to predict sentiment on each CSR report. We rely on the Amazon Unlocked Mobile data set to train the classifier, a widely used SA corpus available at Kaggle. The set comprises 400,000 reviews of mobile phones; each ranked in terms of positiveness on a scale of 1–5. Using the same techniques outlined for text extraction, we tokenize the set to remove punctuation and stop words, lemmatize, and convert all words to lowercase. We remove all instances with a rating of three (3) signifying neutral reports, neither positive nor negative, and we encode the remaining set by assigning a value of 1 (positive) to ratings above three or a value of zero (negative) otherwise. In the next step, we transform the textual information into a meaningful representation of numbers in which each word, for each review, is indexed to a vocabulary, and the frequency of each word concerning this index is calculated (count vectorization). The procedure is further refined as follows: First, we remove words appearing in fewer than five separate reviews. As the reviews are completed ad hoc by online customers, they contain words with misspellings, words augmented by numbers, misnomers, or other tokens that are not intelligible to NLP for purposes of lemmatization. Because such input is idiosyncratic to the person completing a single review, demanding that a minimum of five separate reviews include a specific token alleviates the possibility of featuring meaningless information. Eliminating redundant tokens also preserves degrees of freedom. Finally, to provide a weight on how important a word is to a review, we apply the method of term frequency-inverse document frequency (tf-idf), which compares the number a word appears in a review with the number of reviews the word appears in. As the tf-idf statistic decreases by how many times a word appears in the corpus, just like stop words, it reduces the bias of assigning greater weight to commonly used words. Tf-idf values are stored in a matrix in which each row represents a review, and each column represents a word. The matrix is sparse, that is, mostly populated by zeros because there are many more words than reviews. Since we already know whether a review is positive (assigned a value of 1 for scores higher than 3) or negative (assigned a value of 0), we now run a binary logistic regression model that outputs the estimated coefficients of each word (weighted by its tf-idf value) as explanatory variables of the sentiment score. The model's accuracy is tested out-of-sample by splitting the corpus into a training set (80% of the reviews) and a test set. Finally, we apply the estimated coefficients to the vectorized representation of each CSR report to predict the probability of the report being positive.

### 4.4 | Compustat variables

We match NLP variables with additional annual Compustat variables using ticker/CUSIP and year as identifiers. According to our proposed Hypotheses H5–H7, these variables capture

---

[7]In general, a corpus is any collection of authentic text, meaning text written by a native of the language. Different corpora support different ML objectives, beyond SA.

14689036, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12509 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 9 to Decl. of Angel Hsu
339
**SER 405**

GOROVAIA and MAKROMINAS

 **WILEY** | **443**

board characteristics, ownership structure and international presence (see data description in Appendix A).

## 5 | EMPIRICAL RESULTS

### 5.1 | Descriptive statistics

Table 1, Panel A gives the details of the PSM procedure. The total number of matched pairs, extracted with annual replacement over the period 2008–2022 is 993. Panel B gives a breakdown of the total number of matched observations, collected CSR reports and the number of unique firms per violator status. We find that the public availability of CSR reports for violator firms is significantly higher than that of the nonviolator firms. For an equal number of (matched) firms throughout the same period, violator firms appear to volunteer significantly more CSR information, in terms of a number of publicly available CSR reports, by a factor of 1.53.

Panel C breaks down the number of CSR reports collected for each year of the sample for violator/nonviolator firms. Consistent with the findings of Panel B, violator firms appear to volunteer more CSR reports in (nearly) all years of the sample with the % of higher frequency ranging from 5.45% to 131.3% and an overall rate of 39.8%. The mean and median tests of differences in the reporting frequency of the violator versus nonviolator firms are statistically significant and the two samples are shown to have the same variance.

Throughout our search, we identify several ways in which companies choose to volunteer or conceal more CSR information. First, companies differ in their decision to issue a stand-alone CSR report, or not. Because the collection of CSR reports is performed retrospectively, we can only be reasonably certain that a CSR report has NOT been issued in the year of search or near past (last 2 years). Second, there is significant variation in the time-series public availability of CSR reports. While some firms maintain a public record of CSR reports stretching over several years, others maintain a more conservative outlook keeping online only the latest reports. Third, firms may choose to publicly advertise the issuance of a CSR report but only provide access to the report for their shareholders, or other insiders. Finally, some CSR reports are publicly released but they are password protected or encrypted against NLP/semantic analysis.

Given the above set of choices, our first finding suggests that violator firms may voluntarily disclose more CSR information in an effort to maintain a better public outlook in contrast to their environmental actions. This is in line with Patten (2002), who suggests that companies with poor environmental performance are likely to volunteer more information. At the same time, our findings contradict Mahoney et al. (2013), who argue that companies with better CSR performance are more likely to issue stand-alone CSR reports, and to publish a higher number of reports (Uyar et al., 2020). These studies, however, use composite ESG scores, which are more noisy and not independently verifiable.

Nevertheless, at this point, we do not know, what the content of the CSR report is and whether it relates to environmental disclosure at all. Neither can we comment on the tone or readability of the report as means of attention deflection, decoupling and greenwashing.

Table 2 gives the descriptive statistics of the variables included in the sample. Panel A shows the NLP variables extracted from the CSR reports with respect to environmental focus, readability and positiveness. The interactive terms between environmental focus times

14680609, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12509 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 9 to Decl. of Angel Hsu

340

**SER 406**

14680366, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12509 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**444** WILEY—EUROPEAN FINANCIAL MANAGEMENT                                GOROVAIA and MAKROMINAS

TABLE 2  Descriptive statistics.

This table gives descriptive statistics of the explanatory variables used in the analysis. Panel A gives descriptive statistics for natural-language processing variables. Panel B provides Board composition characteristics, including the total number of directors, the % of the board composition comprising women directors and the number of outside directors. Panel C provides a breakdown between firms based solely in the United States versus firms founded in the United States but maintaining significant international presence. For those companies having an international presence, the panel gives the % of income generated from offshore operations and the % of total tax paid in foreign jurisdictions. Panel D gives a breakdown of the Kenneth French 12-industry classification. Panel E gives the corresponding breakdown for ownership structure. All variables are defined in Appendix A.

**Panel A: Natural-language processing variables**

|                    | N    | Mean   | SD     | 5pct   | 25pct  | Median | 75pct  | 95pct  |
|--------------------|------|--------|--------|--------|--------|--------|--------|--------|
| N-pages            | 1120 | 63     | 51     | 8      | 28     | 51     | 82     | 162    |
| Total N. of Words  | 1120 | 22,536 | 21,722 | 1764   | 7924   | 16,646 | 29,834 | 60,547 |
| Readability Score  | 1120 | 50.04  | 26.34  | 24.72  | 36.10  | 47.40  | 56.40  | 82.50  |
| Positiveness Score | 1120 | 0.807  | 0.077  | 0.665  | 0.760  | 0.820  | 0.864  | 0.910  |
| Environ. Score     | 1120 | 0.179  | 0.030  | 0.138  | 0.163  | 0.179  | 0.195  | 0.220  |
| Envir. * Read      | 1120 | 8.997  | 5.463  | 4.138  | 6.350  | 8.121  | 9.945  | 16.079 |
| Envir. * Pos       | 1120 | 0.144  | 0.028  | 0.105  | 0.128  | 0.143  | 0.161  | 0.183  |

**Panel B: Board characteristics**

|                        | N    | Mean   | SD    | 5pct  | 25pct | Median | 75pct | 95pct |
|------------------------|------|--------|-------|-------|-------|--------|-------|-------|
| Total N. of Directors  | 1120 | 10.30  | 2.11  | 7.00  | 9.00  | 10.00  | 12.00 | 14.00 |
| Women Directors (N.)   | 1120 | 2.12   | 1.37  | 0     | 1.00  | 2.00   | 3.00  | 5.00  |
| (Pct.)                 |      | (20%)  | (12%) | (0%)  | (11%) | (20%)  | (27%) | (42%) |
| Outside Directors (N.) | 1120 | 8.88   | 2.12  | 5.00  | 7.00  | 9.00   | 10.00 | 12.00 |
| (Pct.)                 |      | (86%)  | (8%)  | (71%) | (82%) | (89%)  | (91%) | (92%) |

**Panel C: International representation**

|                                   | Local | Global | Total |
|-----------------------------------|-------|--------|-------|
| N. firm/year observations         | 739   | 381    | 1120  |
| %                                 | 66    | 34     | 100   |
| % Of Foreign Income to Total Income | 0   | 53     | 100   |
| % Of Foreign Tax to Total Tax     | 0     | 69     | 100   |

**Panel D: Industry classification**

|           | N.Firm/Year | (%) |
|-----------|-------------|-----|
| Energy    | 208         | 19  |
| Materials | 203         | 18  |

**Panel E: Ownership**

|                       | N   | (%) |
|-----------------------|-----|-----|
| Principal Shareholder | 395 | 35  |
| Institutions Dominant | 182 | 16  |

Exhibit 9 to Decl. of Angel Hsu
341
**SER 407**

GOROVAIA and MAKROMINAS

EUROPEAN FINANCIAL MANAGEMENT WILEY | **445**

TABLE 2    (Continued)

| Panel D: Industry classification | | | Panel E: Ownership | | |
|---|---|---|---|---|---|
| | *N.Firm/Year* | (%) | | *N* | (%) |
| *Industrials* | 167 | 15 | *Indexed Stock* | 276 | 25 |
| *Consumer Discr.* | 112 | 10 | *Founder Firm* | 73 | 7 |
| *Consumer Staples* | 69 | 6.1 | *Family Firm* | 54 | 5 |
| *Health Care* | 73 | 6.5 | *Mixed Ownership* | 38 | 3 |
| *Financials* | 50 | 4.4 | *Widely Held* | 57 | 5 |
| *IT* | 66 | 5.9 | *Controlling Shareholder* | 46 | 4 |
| *Communication* | 20 | 1.8 | | | |
| *Utilities* | 84 | 7.5 | | | |
| *Real Estate* | 37 | 3.3 | | | |
| *Other* | 32 | 2.9 | | | |
| *Total* | 1120 | 100 | | 1120 | 100 |

readability and environmental focus times positiveness are also shown. As a measure of report size, the table provides the number of pages and words within the reports.

The interpretation of NLP variables is tricky, and to some extent, not very useful when looked at in isolation. For example, there is no reference point to assess whether a mean environmental score of 0.179 is high or not, particularly given the diverse scope of a CSR report. At the same time, a CSR report is, by definition, a positive and fairly sophisticated document and these characteristics are reflected in both the positiveness score and RS we obtain. Of more interest is the cross-sectional variation of these variables and mean differences between groups of violator/nonviolator firms.

Panel B provides statistics on board representation variables, in particular, the number of directors (size), the % of women directors (diversity) and the number of outside directors (independence). The average number of directors appears to be just above 10.3 extending up to 14. Female representation is at a mean of 20% suggesting, on average, one female director versus five male directors on a typical board of 10. The range of female representation extends from 0% to 42% suggesting in some cases an "even" board, but never a majority female board. The high number of outside directors (on average 8.8 on an average total of 10) suggests strong independence, even though special cases of CEO duality may negate this. Across the entire range of board size and number of outside directors, at least one person on the board remains an insider, which is not unexpected.

Panel C gives information regarding the international presence of firms comprising the sample. We employ two measurable proxies for international operations: the first being the % of foreign income to total income and the second being the % of foreign tax to total tax. In each variable, a measurement of zero suggests no international presence. If at least one of the two is nonzero the company is classified as an international firm, otherwise domestic. The breakdown suggests that 66% of our firm/year observations are domestic firms and 34% are international. Importantly, for those international firms, approximately 53% of their income comes from

Exhibit 9 to Decl. of Angel Hsu
342
**SER 408**

overseas operations while 69% of their tax is paid to foreign jurisdictions. We acknowledge that these levels of financials may as well be the result of tax optimization practices in which taxable income is transferred to lower tax rate destinations, without reflecting the true scope of international operations. To that end, we only use "international presence" as a categorical variable, without further quantifying the international presence in accordance with foreign income or tax.

Panel D gives the industry breakdown. Approximately 52% of the firms are classified as "Energy", "Materials" or "Industrials". Looking at our initial sample selection process, we remind that our starting point is coverage for environmental violations in the KLD/MSCI database. As expected, such coverage is more heavily focused on companies in *environmentally taxing* industries. On the same note, financials, information technology firms and communications make up less than 12% of the sample combined. Even so, the sample is fairly well represented by the 12 industries proposed by Kenneth French with no missing classification. We thereon include industry fixed effects in the multivariate analysis.

Finally, Panel E provides information regarding the ownership structure of the firms. While there are eight categories of ownership, for purposes of further analysis, we group firms identified as "Institutions Dominant" or "Indexed Stock" or "Mixed Ownership" or "Widely Held" as higher dispersion firms, and firms classified as "Founder Firm" or "Family Firm" or having a "Principal Shareholder" or a "Controlling Shareholder" as lower dispersion firms. The resulting dummy variable is well balanced: aggregating the percentages of the different categories suggests that 49% of the firms fall under the classification of high dispersion, while 51% of the firms fall under the classification of low dispersion, a nearly 50–50 split.

## 5.2 | Univariate analysis

Table 3 presents group differences between violator/nonviolator firms regarding CSR textual characteristics, board composition, international status and ownership dispersion. Panel A presents mean differences of continuous variables. For each group, for each variable of interest, we calculate the mean statistic and then subtract the mean of the group of nonviolator firms from the mean of the group of the violator firms. To test for statistical significance, we apply the Mann–Whitney test assuming group independence. Panel B presents the analysis for categorical variables. For each group of violator–nonviolator status, we count the instances of international (domestic only) presence and low (high) ownership dispersion. The statistical significance for differences in frequency is assessed with the $\chi^2$ test.

We find that the violator firms populate their CSR reports with greater amounts of environmental content, and the difference is statistically significant at less than 1%. The finding is in line with the theoretical premises of greenwashing via decoupling (Walker & Wan, 2012) in which environmental offenders project a textual image of sustainability that is not in line with their environmental actions. Higher ESs for violator firms persist when these interact with positiveness and readability. The violators tend to publish longer reports (the difference is statistically significant at less than 1%) and more positive reports (the difference is significant at 1%). We find little difference, when tested on a stand-alone basis, between readability of CSR reports of violator and nonviolator firms. Looking at board composition effects, we show that violator firms tend to have smaller boards, less diversity and less independence, and the results

Exhibit 9 to Decl. of Angel Hsu

343

**SER 409**

14668036, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12500 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GOROVAIA and MAKROMINAS

EUROPEAN FINANCIAL MANAGEMENT WILEY | **447**

16888366, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12509 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

TABLE 3   Univariate analysis.

This table presents results from univariate analysis. Panel A presents differences of dependent variables between violator and nonviolator firms. The statistical significance of the differences is evaluated using the Mann–Whitney test, assuming independence. Violators are found to excel in their corporate-social responsibility reports higher Environmental Scores and the result is significant at less than 1%. Higher environmental scores for violator firms persist when those are combined (interacted) with positiveness scores and readability scores. Furthermore, violator firms have smaller boards, represented by fewer women and outside directors. In Panel B a similar analysis is performed for categorical groups. Violator firms appear to have weaker international outlook (significant at less than 1%) and more concentrated ownerships. The statistical significance of differences in categorical variables is assessed through the $\chi^2$ test. The ***, ** and * superscripts signify statistical significance at the 1%, 5% and 10% limits, respectively. All variables are defined in Appendix A.

| Panel A: Continuous variables | | | | | |
|---|---|---|---|---|---|
| | N | Violator | Nonviolator | Difference | p Value |
| *Environ. Score* | 1120 | 0.185 | 0.175 | 0.010*** | (<0.001) |
| *Readability Score* | 1120 | 47.400 | 45.950 | 1.450 | (0.114) |
| *Positiveness Score* | 1120 | 0.823 | 0.816 | −0.007** | (0.012) |
| *N-pages* | 1120 | 57 | 46 | 11*** | (<0.001) |
| *Total N. of Words* | 1120 | 20,304 | 15,091 | 5213*** | (<0.001) |
| *Environ. ∗ Pos* | 1120 | 8.651 | 7.733 | 0.919** | (0.018) |
| *Envir. ∗ Read* | 1120 | 0.147 | 0.142 | 0.005** | (<0.015) |
| *N. of Directors* | 1120 | 10.230 | 10.438 | −0.207** | (0.012) |
| *% of Women Dir.* | 1120 | 0.193 | 0.210 | −0.017*** | (<0.001) |
| *N. of Outside Dir.* | 1120 | 8.797 | 9.035 | −0.238* | (0.083) |

| Panel B: Categorical variables | | | | | |
|---|---|---|---|---|---|
| | N | Violator | Nonviolator | Odds ratio | Fisher exact p value |
| *International* | 381 | 179 (47%) | 202 (53%) | | |
| *Domestic* | 739 | 459 (62%) | 280 (38%) | 1.84*** | (<0.001) |
| *Total* | 1120 | | | | |
| *High Own. Dispersion* | 625 | 292 (47%) | 333 (53%) | | |
| *Low Own. Dispersion* | 495 | 346 (70%) | 149 (30%) | 2.64*** | (<0.001) |
| *Total* | 1120 | | | | |

are statistically significant at less than 1% for women directors, 5% for size of the board and 10% for outside directors. These findings largely confirm Hypothesis H5, which states that board characteristics affect the probability of a firm being an environmental violator. Finally, we confirm that violator firms have a more limited international outlook and have a more concentrated ownership, confirming H6 and H7 respectively.

Exhibit 9 to Decl. of Angel Hsu
344
**SER 410**

**448** | WILEY — EUROPEAN FINANCIAL MANAGEMENT    GOROVAIA and MAKROMINAS

## 5.3 | Multivariate analysis

To test for the joint effect of explanatory variables, we run a multivariate logit regression for the following specification:

$$
\begin{aligned}
p(Viol_{i,t}) = \alpha_0 &+ \beta_1 Env\text{-}Sc_{i,t} + \beta_2 Read\text{-}Sc_{i,t} + \beta_3 Pos\text{-}Sc_{i,t} + \beta_4 Length_{i,t} \\
&+ \beta_5 Env{*}Pos_{i,t} + \beta_6 Env{*}Read_{i,t} + \beta_7 NDir_{i,t} + \beta_8 \%WomD_{i,t} \\
&+ \beta_9 NDout_{i,t} + \beta_{10} IntrD_{i,t} + \beta_{11} DispD_{i,t} + f_{ind} + f_{year} + \epsilon_{i,t}.
\end{aligned}
\tag{1}
$$

The dependent variable is the likelihood of being a violator firm while all regressors are as described in Sections 4.3 and 4.4 and as defined in Appendix A. We also include industry and year fixed effects to control for confounding factors. Table 4 gives the correlation matrix in which the pairwise associations of the individual variables are measured, while Table 5 gives the regression results.

The output of the logistic regression gives the estimated coefficients, the average marginal effects and the corresponding odds ratios. For marginal effects and odds ratios, we also provide lower (2.5%) and upper (97.5%) bounds. Since the dependent variable is the log odds of a firm being an environmental violator the estimated coefficients represent the change of the log odds given the incremental increase in the given explanatory variable, all other things constant. The odds ratio equals the exponent of the estimated coefficient providing a more straightforward way of looking at how, ceteris paribus, the odds of the outcome (dependent) variable change for a one-unit increase in the corresponding predictor variable. An odds ratio of more (less) than one suggests a positive (negative) association between the dependent variable and the corresponding regressor. Finally, marginal effects directly give how the predicted probability of being an environmental violator increases (decreases) for a one-unit increase in any predictor variable, holding all other variables constant.

We find that violator firms are positively associated with higher ESs, more positive content and larger reports, and negatively associated with the interaction of environmental content and readability. These results suggest that violator firms may use the information content of their CSR reports to obfuscate (decouple) their true environmental performance. In doing so, they volunteer more information (longer reports) with stronger and more positive environmental content, which nevertheless, is less readable. This is consistent with Higgins et al. (2020), who argue that a lack of clarity and accuracy in what is being reported could indicate duplicity and hypocrisy.

Furthermore, violator firms are found to be associated with smaller boards, limited representation of female directors, fewer outside directors and no international presence. It is interesting to compare the results of the multivariate regression with the univariate tests of association, as the joint assessment of individual predictors largely corrects for common trends and latent effects. While the interaction between ES and readability appears initially higher for violator firms, when the variable is tested simultaneously with other predictors, it reverts to the predicted negative sign.

## 5.4 | Change in violator status and modified reporting

Both univariate and multivariate tests reveal that violator firms are more likely to exploit CSR reporting to project an image of ecofriendliness and sustainability, even as they commit

Exhibit 9 to Decl. of Angel Hsu
345
**SER 411**

14680036x, 2023, 3, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12309 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GOROVAIA and MAKROMINAS

EUROPEAN FINANCIAL MANAGEMENT — WILEY | **449**

14683606, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12509 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**TABLE 4** Pearson correlation matrix.

This table gives the Pearson correlation matrix. Figures in brackets are $p$ values of statistical significance. All variables are defined in Appendix A.

| | | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (1) | Env-Sc | 1 | 0.07 | −0.01 | −0.02 | −0.03 | 0.34 | 0.87 | −0.12 | −0.08 | −0.12 | −0.02 | 0.00 |
| | | | (0.01) | (0.77) | (0.42) | (0.28) | (0.00) | (0.00) | (0.00) | (0.01) | (0.00) | (0.41) | (0.88) |
| (2) | Read-Sc | | 1 | −0.02 | 0.00 | 0.01 | 0.95 | 0.05 | 0.00 | −0.05 | 0.00 | −0.06 | −0.02 |
| | | | | (0.46) | (0.89) | (0.63) | (0.00) | (0.07) | (0.89) | (0.09) | (0.89) | (0.03) | (0.57) |
| (3) | Pos-Sc | | | 1 | −0.08 | −0.12 | −0.02 | 0.48 | 0.00 | −0.04 | 0.00 | −0.02 | −0.01 |
| | | | | | (0.00) | (0.00) | (0.53) | (0.00) | (0.92) | (0.19) | (0.95) | (0.44) | (0.68) |
| (4) | N-pages | | | | 1 | 0.91 | −0.01 | −0.06 | 0.07 | 0.13 | 0.05 | 0.07 | 0.02 |
| | | | | | | (0.00) | (0.65) | (0.03) | (0.03) | (0.00) | (0.08) | (0.02) | (0.43) |
| (5) | N-words | | | | | 1 | −0.01 | −0.08 | 0.10 | 0.11 | 0.09 | 0.10 | 0.01 |
| | | | | | | | (0.77) | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) | (0.67) |
| (6) | Env × Pos | | | | | | 1 | 0.29 | −0.04 | −0.07 | −0.04 | −0.07 | 0.00 |
| | | | | | | | | (0.00) | (0.22) | (0.02) | (0.25) | (0.02) | (0.92) |
| (7) | Env × Read | | | | | | | 1 | −0.11 | −0.09 | −0.10 | −0.03 | 0.00 |
| | | | | | | | | | (0.00) | (0.00) | (0.00) | (0.32) | (0.99) |
| (8) | NDir | | | | | | | | 1 | 0.27 | 0.93 | 0.12 | 0.10 |
| | | | | | | | | | | (0.00) | (0.00) | (0.00) | (0.00) |
| (9) | %WomD | | | | | | | | | 1 | 0.23 | 0.12 | 0.12 |
| | | | | | | | | | | | (0.00) | (0.00) | (0.00) |

(Continues)

Exhibit 9 to Decl. of Angel Hsu
346
**SER 412**

**450** | WILEY—EUROPEAN FINANCIAL MANAGEMENT

GOROVAIA and MAKROMINAS



TABLE 4 (Continued)

| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (10) NDOut | | | | | | | | | | 1 | 0.12 (0.00) | 0.13 (0.00) |
| (11) IntrD | | | | | | | | | | | 1 | 0.09 (0.00) |
| (12) DispD | | | | | | | | | | | | 1 |

14680306, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12509 by University of North Carolina at Chapel Hill, Wiley Online Library on [03/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 9 to Decl. of Angel Hsu
347
**SER 413**

GOROVAIA and MAKROMINAS                                    **451**

EUROPEAN FINANCIAL MANAGEMENT ‑WILEY

**TABLE 5**  Multivariate analysis.

This table gives the results from multivariate analysis. We estimate the equation: $p(Viol_{i,t}) = \alpha_0 + \beta_1 Env\text{-}Sc_{i,t} + \beta_2 Read\text{-}Sc_{i,t} + \beta_3 Pos\text{-}Sc_{i,t} + \beta_4 Length_{i,t} + \beta_5 Env * Pos_{i,t} + \beta_{6,t} Env * Read_{i,t} + \beta_7 NDir_{i,t} + \beta_8\% WomD_{i,t} + \beta_9 NDout_{i,t} + \beta_{10} IntrD_{i,t} + \beta_{11} DispD_{i,t} + f_{ind} + f_{year} + \varepsilon_{i,t}$, where the dependent variable is the log odds of being a violator with probability $p$ versus not being a violator with probability $1 - p$. All regressors are defined in Appendix A. The table gives the estimated coefficients of the logistic regression, the average marginal effects (AMEs) and their lower/upper bounds and the average odds ratios (ORs) with corresponding lower (2.5%)/upper (97.5%) bounds. The estimated coefficients suggest the level of change in the log odds of being a violator for a unit of change on the corresponding explanatory variable. The AMEs are the mean of each individual observation's marginal effect directly measuring the change in probability of being a violator given an instantaneous change in a specific explanatory variable, with all other variables assumed constant. The ORs are obtained by exponentiating the estimated coefficients and can be interpreted as the change in the OR for an increase in one unit of the explanatory variable *relative* to no change. The ***, ** and * superscripts signify statistical significance at the 1%, 5% and 10% limits, respectively.

| | | Marginal effects | | | Odds ratios | | |
|---|---|---|---|---|---|---|---|
| | Coefficients | AME | Lower | Upper | OR | 2.5% | 97.5% |
| *Env-Sc* | 0.555*** | 0.11 | −0.06 | 0.27 | 1.74 | 1.09 | 2.77 |
| | (<0.01) | | | | | | |
| *Read-Sc* | 0.027 | 0.01 | 0.00 | 0.02 | 1.027 | 1.026 | 1.028 |
| | (0.15) | | | | | | |
| *Pos-Sc* | 0.071** | 0.01 | −0.02 | 0.05 | 1.07 | 0.95 | 1.21 |
| | (0.034) | | | | | | |
| *N-words* | 0.085*** | 0.02 | 0.00 | 0.04 | 1.09 | 1.05 | 1.13 |
| | (<0.01) | | | | | | |
| *Env × Pos* | 0.153 | 0.03 | −0.05 | 0.01 | 1.17 | 0.85 | 1.78 |
| | (0.192) | | | | | | |
| *Env × Read* | −0.404*** | −0.08 | −0.25 | 0.09 | 0.67 | 0.37 | 1.22 |
| | (<0.01) | | | | | | |
| *NDir* | −0.106*** | −0.02 | −0.03 | −0.01 | 0.90 | 0.89 | 1.04 |
| | (<0.01) | | | | | | |
| *%WomD* | −0.255*** | −0.05 | −0.08 | −0.02 | 0.77 | 0.55 | 1.09 |
| | (<0.01) | | | | | | |
| *NDOut* | −0.231*** | 0.04 | 0.01 | 0.08 | 1.26 | 0.09 | 1.38 |
| | (<0.01) | | | | | | |
| *IntrD* | −0.333*** | −0.06 | −0.12 | −0.01 | 0.72 | 0.68 | 0.76 |
| | (<0.01) | | | | | | |
| *DispD* | −0.001 | 0.00 | −0.03 | 0.02 | 0.99 | 0.88 | 1.12 |
| | (0.876) | | | | | | |

(Continues)

Exhibit 9 to Decl. of Angel Hsu
348
**SER 414**

14680036x, 2025, 3, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12509 by University of North Carolina at Chapel Hill, Wiley Online Library on [03/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

452 **WILEY** EUROPEAN FINANCIAL MANAGEMENT                    GOROVAIA and MAKROMINAS

14680x04, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12580 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

TABLE 5    (Continued)

| | Coefficients | Marginal effects | | | Odds ratios | | |
|---|---|---|---|---|---|---|---|
| | | AME | Lower | Upper | OR | 2.5% | 97.5% |
| *Industry fixed effects (FE)* | YES | YES | YES | YES | YES | YES | YES |
| *Year FE* | YES | YES | YES | YES | YES | YES | YES |
| *Maximum likelihood pseudo-R²* | 14.45% | | | | | | |
| *N. of observations* | 1120 | | | | | | |

punishable environmental offenses. The finding is largely cross-sectional which leaves room for latent factors influencing the relationship between violator status and CSR reporting, if violator firms are different from nonviolator firms in ways we do not control. To strengthen our analysis, we thereon investigate within-firm differences in CSR reporting, subject to change in violator status. The analysis answers the question of whether firms change their CSR reporting after becoming violators and provides a clearer cause-and-effect relationship between change in status and CSR reporting. The within-firm analysis helps control for unobserved heterogeneity by comparing the same firms over time and further reduces the selection bias from factors that do not vary over time within each firm.

To test for modified reporting, we seek to construct a subsample of firms with an adequate number of nonmissing consecutive CSR reports split evenly before and after the violation. After consolidating the KLD/MSCI and Refinitiv databases, we obtain 475 observations corresponding to 79 unique firms satisfying all data requirements. The mean number of reports per firm is 6 and the median number of reports before (after) the violation is 3. Table 6, Panel A provides the reports/firms breakdown.

## 5.5 | Cosine similarity

In Panel B we initially examine whether the content of a firm's CSR report is significantly altered straight after the firm's transition to the violator status. To test for the overall degree of modification, we use the cosine similarity measure, a standard NLP technique that directly compares the similarity of two documents. In cosine similarity, each document is transformed into a multidimensional vector, where each dimension represents a word in the document and the value in that dimension represents the frequency of that word in the document. In NLP, the angle between these vectors gives the degree of similarity with 1 indicating identical documents and 0 suggesting nonsimilarity (orthogonality).

To detect significant report modification, we observe whether the persistence in cosine similarity between subsequent reports of the same firm declines after change in violator status. More specifically, for all firms, we compare the median of the year-to-year cosine similarity in the period in which a firm retains its status, with the median of the cosine similarity between the report issued in the year following the change in status. We find that companies significantly modify their CSR report after the year of changing status. While the median cosine similarity for all instances of retaining violator status is approximately 12%, the cosine

Exhibit 9 to Decl. of Angel Hsu
349
**SER 415**

GOROVAIA and MAKROMINAS

EUROPEAN
FINANCIAL MANAGEMENT — WILEY | **453**

14680394, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12509 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**TABLE 6**  Change in violator status and modified reporting.

This table presents a within-firm analysis for differences in the content of corporate-social responsibility (CSR) reporting upon change of status from nonviolator to violator. Panel A describes the sample partition of firms with available CSR reports for consecutive years and the change in status transitioning from nonviolator to violator. The average number of reports per firm in the sample is 6.01 with an even split of three reports before transition and three reports after the transition. Panel B provides results regarding tests of difference in medians regarding the overall (cosine) similarity of CSR reports before violation and the CSR report following the violation. In particular, for all firms, we compare the median of the year-to-year cosine similarity in the period in which a firm retains its status, with the median of the cosine similarity between the report issued in the year following the change in status. The cosine similarity measure directly compares the similarity of two documents. Each document is transformed into a multidimensional vector where each dimension represents a word in the document and the value in that dimension represents the frequency of that word in the document. The angle between these vectors gives the degree of similarity with 1 indicating identical documents and 0 suggesting nonsimilarity (orthogonality). $\Delta S(t)$ signifies the year after change of status to violator, while $RS_{(t-n)}$ denotes $n$ prior years of retaining status of nonviolator. The results in Panel B indicate that firms modify their CSR reports more significantly upon to becoming a violator. The ***, ** and * superscripts signify statistical significance at the 1%, 5% and 10% limits, respectively.

| Panel A: Sample partition for difference-in-difference analysis | | | |
|---|---|---|---|
| | **N. of reports** | **Unique firms** | **N. of reports/firms** |
| *Initial sample* | 1120 | 441 | 2.53 |
| *Change of status from nonviolator to violator* | 475 | 79 | 6.01 |
| *Median N. of reports before violation* | | | 3.01 |

| Panel B: Within-firm differences in CSR content under alternate violator status | | | |
|---|---|---|---|
| | $\Delta S(t)$ median | $RS_{(t-n)}$ median | Difference | Mann–Whitney $p$ value |
| *Cosine similarity* $(CSR_{i,t}, CSR_{i,t-1})$ | 0.091 | 0.120 | −0.029*** | [<0.01] |

similarity following the change in status drops to 9.1% and the difference is statistically significant at 1%.

## 5.6 | DiD analysis

Having established that CSR reporting changes right after a violation, we seek to determine the direction of change. Since we already know that ex post violator firms tend to report more aggressively in terms of environmental content, positiveness and length, it is interesting to examine whether the modification is enacted after (or caused by) transitioning to violator status. For this test, we implement a two-way fixed effect staggered DiDs methodology in which the ESs, and other NLP measures, are dependent variables, and the change to violator status represents the treatment. The staggered analysis is particularly suitable for this sample because

Exhibit 9 to Decl. of Angel Hsu
350
**SER 416**

454 | WILEY — EUROPEAN FINANCIAL MANAGEMENT    GOROVAIA and MAKROMINAS

the treatment (violation) happens at different years over firms.[8] In Table 7, Panel A, we estimate the following specification:

$$y_{i,t} = \alpha_{ind} + \lambda_t + \beta^{DD}D_{i,t} + \varepsilon_{i,t}, \tag{2}$$

where $\alpha_{ind}$ and $\lambda_t$ are industry/year fixed effects and $D_{i,t}$ an interaction variable between the treated unit ($D_i$) and an indicator variable for observations following ($POST_t$) the treatment (violation). The dependent variable $y_{i,t}$ is substituted with the environmental score (Env-Sc), and in turn, readability (Read-Sc), positiveness (Pos-Sc), length (N-words), the interaction between environmental score and positiveness (Env-Pos) and the interaction between environmental score and readability (Env-Read).

The analysis confirms that companies modify their CSR reports following an environmental violation to significantly increase the amount of environmental content, positiveness and length. We are unable to confirm a within-firm negative relationship between change in violator status and readability and its interaction with ES.

We furthermore augment the DiD analysis by adding firm controls for additional robustness. While all firms included in the DiD sample are initially matched, extending their time series to include a sufficient number of reports may fall outside the matched period. Hence, we additionally estimate:

$$y_{i,t} = \alpha_{ind} + \lambda_t + \gamma'\bar{X}_{i,t} + \beta^{DD}D_{i,t} + \varepsilon_{i,t}, \tag{3}$$

where $\bar{X}_{i,t}$ is a vector of firm characteristics, including Size, Profitability and Leverage (as defined in Appendix A), and all other variables as in Equation (1). Panel B shows that the DiD results survive the inclusion of additional firm controls. Overall, this section reinforces the idea that differences in CSR reporting between violator and nonviolator firms are initiated following an environmental transgression to counterbalance, or preempt negative publicity.

# 6 | CONCLUSIONS

We revisit the issue of alleged greenwashing, the practice by which firms' benevolent environmental claims are in contrast to their actual environmental performance. Although there are various channels through which these claims are communicated, we focus on CSR reports, as the medium for corporate disclosure displaying a comparatively higher level of accountability. At the same time, we note that CSR reporting remains largely unregulated and unaudited, providing corporations with significant flexibility in regard to the level of information they choose to divulge—both in terms of reporting frequency and content. We compare the CSR disclosure for firms with documented environmental violations versus those firms with a clean environmental record. Using standard NLP techniques, we provide quantitative measures of size, readability, environmental focus and positiveness of CSR disclosure.

We find that violator firms tend to issue longer, more positive and more frequently publicly available reports, and use these reports to broadcast environmental content that is more

---

[8]We thank an anonymous referee for suggesting this line of research.

Exhibit 9 to Decl. of Angel Hsu
351
SER 417

GOROVAIA and MAKROMINAS

EUROPEAN
FINANCIAL MANAGEMENT | WILEY | **455**

14680362, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12509 by University of North Carolina at Chapel Hill, Wiley Online Library on [03/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

TABLE 7  Difference-in-difference (DiD) analysis.

This table gives the results of a staggered DiD analysis. In Panel A, we estimate $y_{i,t} = \alpha_{ind} + \lambda_t + \beta^{DD}D_{i,t} + \varepsilon_{i,t}$, where $\alpha_{ind}$ and $\lambda_t$ are industry/year fixed effects (FE) and $D_{i,t}$ an interaction variable between the treated unit ($D_i$) and an indicator variable for observations following ($POST_t$) the treatment (violation). The dependent variable $y_{i,t}$ takes the value of environmental score (*Env-Sc*) (*column* 1) and in turn, readability (*Read-Sc*), positiveness (*Pos-Sc*), length (*N-words*), the interaction between environmental score and positiveness (*Env-Pos*) and the interaction between environmental score and readability (*Env-Read*). Panel B augments the analysis with firm-specific controls. We estimate $y_{i,t} = \alpha_{ind} + \lambda_t + \gamma^i \bar{X}_{i,t} + \beta^{DD}D_{i,t} + \varepsilon_{i,t}$ where $\bar{X}_{i,t}$ is a vector of firm characteristics, including Size, Profitability and Leverage. All variables are defined in Appendix A. The ***, ** and * superscripts signify statistical significance at the 1%, 5% and 10% limits, respectively.

| Panel A: Staggered DiD with year and industry/fixed effects \|*N. of observations* = 475\| | | | | | |
|---|---|---|---|---|---|
| | Env-Sc (1) | Read-Sc (2) | Pos-Sc (3) | N-words (4) | Env * Pos (5) | Env * Read (6) |
| $\beta^{DD}$ | 0.175***<br>(<0.001) | | | | | |
| $\beta^{DD}$ | | 0.449<br>(0.750) | | | | |
| $\beta^{DD}$ | | | 0.804***<br>(<0.001) | | | |
| $\beta^{DD}$ | | | | 0.917***<br>(<0.001) | | |
| $\beta^{DD}$ | | | | | 3.328***<br>(<0.001) | |
| $\beta^{DD}$ | | | | | | 0.142***<br>(<0.001) |
| *Year FE* | YES | YES | YES | YES | YES | YES |
| *Industry FE* | YES | YES | YES | YES | YES | YES |
| *Adjusted $R^2$* | 0.23 | 0.22 | 0.28 | 0.31 | 0.79 | 0.22 |
| *N. of firms* | 79 | | | | | |
| *Reports per firm* | 6.01 | | | | | |

| Panel B: Staggered DiD with year/industry FE and firm controls \|*N. of observations* = 475\| | | | | | |
|---|---|---|---|---|---|
| | Env-Sc (7) | Read-Sc (8) | Pos-Sc (9) | N-words (10) | Env * Pos (11) | Env * Read (12) |
| $\beta^{DD}$ | 0.172***<br>(<0.001) | | | | | |
| $\beta^{DD}$ | | 0.449<br>(0.750) | | | | |
| $\beta^{DD}$ | | | 0.768***<br>(<0.001) | | | |

(Continues)

Exhibit 9 to Decl. of Angel Hsu
352
**SER 418**

456 WILEY— EUROPEAN FINANCIAL MANAGEMENT                                          GOROVAIA and MAKROMINAS

TABLE 7    (Continued)

| | Env-Sc (7) | Read-Sc (8) | Pos-Sc (9) | N-words (10) | Env * Pos (11) | Env * Read (12) |
|---|---|---|---|---|---|---|
| $\beta^{DD}$ | | | | 0.997*** (<0.001) | | |
| $\beta^{DD}$ | | | | | 3.304*** (<0.001) | |
| $\beta^{DD}$ | | | | | | 0.092*** (<0.001) |
| Firm controls | YES | YES | YES | YES | YES | YES |
| Year FE | YES | YES | YES | YES | YES | YES |
| Industry FE | YES | YES | YES | YES | YES | YES |
| Adjusted $R^2$ | 0.27 | 0.22 | 0.34 | 0.35 | 0.78 | 0.18 |
| N. of firms | 79 | | | | | |
| Reports per firm | 6.01 | | | | | |

**Panel B: Staggered DiD with year/industry FE and firm controls |N. of observations = 475|**

copious, but less readable. Issuing longer reports, more frequently, suggests that violator firms are willing to divulge more information in line with selective disclosure theory. Populating the report with greater amounts of environmental content, albeit with lower degree of readability, likewise, points out to attention deflection and decoupling. Furthermore, we show that reporting changes right after committing a violation. The cosine similarity test and differences-in-differences regressions highlight the within-firm differences in CSR reporting and provide a clearer cause-and-effect relationship between the change in status and CSR reporting controlling for all firm-specific effects.

Our study makes important contributions. First, we identify greenwashing in CSR reports using a novel methodology—NLP techniques, which allow analysis of the large body of textual data (Aziz et al., 2022). To the best of our knowledge, such analysis has not been done before to detect greenwashing. The use of NLP techniques offers significant advantages both in terms of the quantity of processed textual data as well as in the construction of original variables of interest extracted from text, such as environmental content, tone and readability. Second, in line with the literature that defines greenwashing as a gap between *verba et acta* (words and deeds), we compare what companies say with what companies do. Unlike previous studies, for example, Ioannou et al. (2022), that use direct measures of greenwashing—the difference between the constructs of policy and implementation, or the deviation between the reported and actual emissions (Kim & Lyon, 2015), we observe greenwashing "in action": the violator firms report more aggressively, more positively and volunteer more information to relay environmental content that is more copious but less readable. In this manner, while we maintain the conceptual framework of greenwashing, we contribute a novel way to detecting greenwashing in CSR reporting. Third, we catch the violators "red-handed": our study demonstrates that the CSR reporting changes straight after committing a violation.

14480394, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12590 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 9 to Decl. of Angel Hsu
353
SER 419

GOROVAIA and MAKROMINAS  **457**

Overall, we find evidence that culpable firms may exploit the lack of regulation and employ CSR reports as a means of greenwashing. This raises the question of whether a statutory framework for CSR reporting is now needed. Despite arguments against mandatory disclosure, including significant adjustment costs and/or loss of competitive advantage, we take the view that the benefits will eventually outweigh the additional regulatory burden.

## DATA AVAILABILITY STATEMENT

Financial data are obtained from financial databases described in detail in the text. The lexicon of environmental terms can be found at http://olst.ling.umontreal.ca/dicoenviro/dicoenviro-bilingue-fr.html. The corporate-social responsibility/sustainability reports used in NLP are obtained from publicly available corporate websites and stored locally due to the large size (in excess of 6 GB). They are available upon request. All data used in the study are publicly available from sources cited in the text. The list of companies in the sample is available upon request.

## ORCID

*Nina Gorovaia* http://orcid.org/0000-0002-1656-5220
*Michalis Makrominas* http://orcid.org/0000-0002-5711-4741

## REFERENCES

Abeysekera, A. P., & Fernando, C. S. (2020). Corporate social responsibility versus corporate shareholder responsibility: A family firm perspective. *Journal of Corporate Finance*, 61, 101370. https://doi.org/10.1016/j.jcorpfin.2018.05.003

Albitar, K., Abdoush, T., & Hussainey, K. (2023). Do corporate governance mechanisms and ESG disclosure drive CSR narrative tones? *International Journal of Finance & Economics*, 28(4), 3876–3890. https://doi.org/10.1002/ijfe.2625

Aziz, S., Dowling, M., Hammami, H., & Piepenbrink, A. (2022). Machine learning in finance: A topic modeling approach. *European Financial Management*, 28(3), 744–770. https://doi.org/10.1111/eufm.12326

Baker, M., Egan, M. L., & Sarkar, S. K. (2022). *How do investors value ESG?* [NBER Working Paper 30708]. https://www.nber.org/system/files/working_papers/w30708/w30708.pdf

Bénabou, R., & Tirole, J. (2010). Individual and corporate social responsibility. *Economica*, 77(305), 1–19. https://doi.org/10.1111/j.1468-0335.2009.00843.x

Berg, F., Kölbel, J. F., & Rigobon, R. (2022). Aggregate confusion: The divergence of ESG ratings. *Review of Finance*, 26(6), 1315–1344. https://doi.org/10.1093/rof/rfac033

Bofinger, Y., Heyden, K. J., & Rock, B. (2022). Corporate social responsibility and market efficiency: Evidence from ESG and misvaluation measures. *Journal of Banking & Finance*, 134, 106322. https://doi.org/10.1016/j.jbankfin.2021.106322

Boone, A. L., Casares Field, L., Karpoff, J. M., & Raheja, C. G. (2007). The determinants of corporate board size and composition: An empirical analysis. *Journal of Financial Economics*, 85(1), 66–101. https://doi.org/10.1016/j.jfineco.2006.05.004

Borghesi, R., Houston, J. F., & Naranjo, A. (2014). Corporate socially responsible investments: CEO altruism, reputation, and shareholder interests. *Journal of Corporate Finance*, 26, 164–181. https://doi.org/10.1016/j.jcorpfin.2014.03.008

Cai, Y., Pan, C. H., & Statman, M. (2016). Why do countries matter so much in corporate social performance? *Journal of Corporate Finance*, 41, 591–609. https://doi.org/10.1016/j.jcorpfin.2016.09.004

Cespa, G., & Cestone, G. (2007). Corporate social responsibility and managerial entrenchment. *Journal of Economics & Management Strategy*, 16(3), 741–771. https://doi.org/10.1111/j.1530-9134.2007.00156.x

Chae, J. (2005). Trading volume, information asymmetry, and timing information. *The Journal of Finance*, 60(1), 413–442. https://www.jstor.org/stable/3694843

Exhibit 9 to Decl. of Angel Hsu
354
**SER 420**

**458** | WILEY—**EUROPEAN FINANCIAL MANAGEMENT**                                                    GOROVAIA and MAKROMINAS

Chatterji, A. K., Durand, R., Levine, D. I., & Touboul, S. (2016). Do ratings of firms converge? Implications for managers, investors and strategy researchers. *Strategic Management Journal*, 37(8), 1597–1614. https://doi.org/10.1002/smj.2407

Chava, S. (2014). Environmental externalities and cost of capital. *Management Science*, 60(9), 2223–2247. https://doi.org/10.1287/mnsc.2013.1863

Christensen, H. B., Hail, L., & Leuz, C. (2021). Mandatory CSR and sustainability reporting: Economic analysis and literature review. *Review of Accounting Studies*, 26(3), 1176–1248. https://doi.org/10.1007/s11142-021-09609-5

Clarkson, P. M., Ponn, J., Richardson, G. D., Rudzicz, F., Tsang, A., & Wang, J. (2020). A textual analysis of US corporate social responsibility reports. *Abacus*, 56(1), 3–34. https://doi.org/10.1111/abac.12182

Cornett, M. M., Erhemjamts, O., & Tehranian, H. (2016). Greed or good deeds: An examination of the relation between corporate social responsibility and the financial performance of US commercial banks around the financial crisis. *Journal of Banking & Finance*, 70, 137–159. https://doi.org/10.1016/j.jbankfin.2016.04.024

Cronqvist, H., & Yu, F. (2017). Shaped by their daughters: Executives, female socialization, and corporate social responsibility. *Journal of Financial Economics*, 126(3), 543–562. https://doi.org/10.1016/j.jfineco.2017.09.003

D'Amato, A., & Falivena, C. (2020). Corporate social responsibility and firm value: Do firm size and age matter? Empirical evidence from European listed companies. *Corporate Social Responsibility and Environmental Management*, 27(2), 909–924. https://doi.org/10.1002/csr.1855

De Freitas Netto, S. V., Sobral, M. F. F., Ribeiro, A. R. B., & Soares, G. R. L. (2020). Concepts and forms of greenwashing: A systematic review. *Environmental Sciences Europe*, 32(1), 19. https://doi.org/10.1186/s12302-020-0300-3

Dehejia, R. H., & Wahba, S. (2002). Propensity score-matching methods for nonexperimental causal studies. *Review of Economics and Statistics*, 84(1), 151–161. https://doi.org/10.1162/003465302317331982

Di Simone, L., Petracci, B., & Piva, M. (2022). Economic sustainability, innovation, and the ESG factors: An empirical investigation. *Sustainability*, 14(4), 2270. https://doi.org/10.3390/su14042270

Drobetz, W., El Ghoul, S., Fu, Z., & Guedhami, O. (2024). Institutional investors and corporate environmental costs: The roles of investment horizon and investor origin. *European Financial Management*, 30(2), 727–769. https://doi.org/10.1111/eufm.12444

Edmans, A. (2011). Does the stock market fully value intangibles? Employee satisfaction and equity prices. *Journal of Financial Economics*, 101(3), 621–640. https://doi.org/10.1016/j.jfineco.2011.03.021

Edmans, A. (2023). The end of ESG. *Financial Management*, 52(1), 3–17. https://doi.org/10.1111/fima.12413

Ferrell, A., Liang, H., & Renneboog, L. (2016). Socially responsible firms. *Journal of Financial Economics*, 122(3), 585–606. https://doi.org/10.1016/j.jfineco.2015.12.003

Fiechter, P., Hitz, J.-M., & Lehmann, N. (2022). Real effects of a widespread CSR reporting mandate: Evidence from the European Union's CSR Directive. *Journal of Accounting Research*, 60, 1499–1549. https://doi.org/10.1111/1475-679X.12424

Font, X., Walmsley, A., Cogotti, S., McCombes, L., & Häusler, N. (2012). Corporate social responsibility: The disclosure–performance gap. *Tourism Management*, 33(6), 1544–1553. https://doi.org/10.1016/j.tourman.2012.02.012

El Ghoul, S., Guedhami, O., Wang, H., & Kwok, C. C. Y. (2016). Family control and corporate social responsibility. *Journal of Banking & Finance*, 73, 131–146. https://doi.org/10.1016/j.jbankfin.2016.08.008

Gillan, S. L., Koch, A., & Starks, L. T. (2021). Firms and social responsibility: A review of ESG and CSR research in corporate finance. *Journal of Corporate Finance*, 66, 101889. https://doi.org/10.1016/j.jcorpfin.2021.101889

Goss, A., & Roberts, G. S. (2011). The impact of corporate social responsibility on the cost of bank loans. *Journal of Banking & Finance*, 35(7), 1794–1810. https://doi.org/10.1016/j.jbankfin.2010.12.002

Greening, D. W., & Turban, D. B. (2000). Corporate social performance as a competitive advantage in attracting a quality workforce. *Business & Society*, 39(3), 254–280. https://doi.org/10.1177/000765030003900302

Guo, R., Zhang, W., Wang, T., Li, C. B., & Tao, L. (2018). Timely or considered? Brand trust repair strategies and mechanism after greenwashing in China—From a legitimacy perspective. *Industrial Marketing Management*, 72, 127–137. https://doi.org/10.1016/j.indmarman.2018.04.001

14680036x, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12509 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 9 to Decl. of Angel Hsu

355

**SER 421**

GOROVAIA and MAKROMINAS  WILEY | **459**

Haji, A. A., Coram, P., & Troshani, I. (2023). Consequences of CSR reporting regulations worldwide: A review and research agenda. *Accounting, Auditing & Accountability Journal*, 36(1), 177–208. https://doi.org/10.1108/AAAJ-05-2020-4571

Higgins, C., Tang, S., & Stubbs, W. (2020). On managing hypocrisy: The transparency of sustainability reports. *Journal of Business Research*, 114, 395–407. https://doi.org/10.1016/j.jbusres.2019.08.041

Hinnen, G., Hille, S. L., & Wittmer, A. (2017). Willingness to pay for green products in air travel: Ready for take-off? *Business Strategy and the Environment*, 26(2), 197–208. https://doi.org/10.1002/bse.1909

Hong, H., Kubik, J. D., & Scheinkman, J. A. (2012). *Financial constraints on corporate goodness* [Working Paper No. w18476]. National Bureau of Economic Research. http://www.nber.org/papers/w18476

Hong, H., & Shore, E. (2023). Corporate social responsibility. *Annual Review of Financial Economics*, 15, 327–350.

Iliev, P., & Roth, L. (2023). Director expertise and corporate sustainability. *Review of Finance*, 27(6), 2085–2123. https://doi.org/10.1093/rof/rfad012

Ioannou, I., Kassinis, G., & Papagiannakis, G. (2022). The impact of perceived greenwashing on customer satisfaction and the contingent role of capability reputation. *Journal of Business Ethics*, 185, 333–347. https://doi.org/10.1007/s10551-022-05151-9

Jun, W., Shiyong, Z., & Yi, T. (2022). Does ESG disclosure help improve intangible capital? Evidence from A-share listed companies. *Frontiers in Environmental Science*, 10, 858548. https://doi.org/10.3389/fenvs.2022.858548

Kim, E. H., & Lyon, T. P. (2015). Greenwash vs. brownwash: Exaggeration and undue modesty in corporate sustainability disclosure. *Organization Science*, 26(3), 705–723. https://doi.org/10.1287/orsc.2014.0949

Knyazeva, A., Knyazeva, D., & Masulis, R. W. (2013). The supply of corporate directors and board independence. *Review of Financial Studies*, 26(6), 1561–1605. https://doi.org/10.1093/rfs/hht020

L'Homme, M. C. (2012). Adding syntactico-semantic information to specialized dictionaries: An application of the FrameNet methodology. *Lexicographica*, 28(2012), 233–252. https://doi.org/10.1515/lexi.2012-0012

Lang, M., & Stice-Lawrence, L. (2015). Textual analysis and international financial reporting: Large sample evidence. *Journal of Accounting and Economics*, 60(2–3), 110–135. https://doi.org/10.1016/j.jacceco.2015.09.002

Larcker, D. F., Tayan, B., & Watts, E. M. (2022). Seven myths of ESG. *European Financial Management*, 28(4), 869–882. https://doi.org/10.1111/eufm.12378

Lyon, T. P., & Maxwell, J. W. (2011). Greenwash: Corporate environmental disclosure under threat of audit. *Journal of Economics & Management Strategy*, 20(1), 3–41. https://doi.org/10.1111/j.1530-9134.2010.00282.x

Mahoney, L. S., Thorne, L., Cecil, L., & LaGore, W. (2013). A research note on standalone corporate social responsibility reports: Signaling or greenwashing? *Critical Perspectives on Accounting*, 24(4–5), 350–359. https://doi.org/10.1016/j.cpa.2012.09.008

Martin, W. C., Ponder, N., & Lueg, J. E. (2009). Price fairness perceptions and customer loyalty in a retail context. *Journal of Business Research*, 62(6), 588–593. https://doi.org/10.1016/j.jbusres.2008.05.017

McGuinness, P. B., Vieito, J. P., & Wang, M. (2017). The role of board gender and foreign ownership in the CSR performance of Chinese listed firms. *Journal of Corporate Finance*, 42, 75–99. https://doi.org/10.1016/j.jcorpfin.2016.11.001

Menla Ali, F., Wu, Y., & Zhang, X. (2023). ESG disclosure, CEO power and incentives and corporate risk-taking. *European Financial Management*, 30(2), 961–1011. https://doi.org/10.1111/eufm.12447

Michelon, G., Pilonato, S., & Ricceri, F. (2015). CSR reporting practices and the quality of disclosure: An empirical analysis. *Critical Perspectives on Accounting*, 33, 59–78. https://doi.org/10.1016/j.cpa.2014.10.003

Nagy, Z., Kassam, A., & Lee, L. E. (2016). Can ESG add alpha? An analysis of ESG tilt and momentum strategies. *The Journal of Investing*, 25(2), 113–124.

Namkung, Y., & Jang, S. (2017). Are consumers willing to pay more for green practices at restaurants? *Journal of Hospitality & Tourism Research*, 41(3), 329–356. https://doi.org/10.1177/1096348014525632

Nofsinger, J. R., Sulaeman, J., & Varma, A. (2019). Institutional investors and corporate social responsibility. *Journal of Corporate Finance*, 58, 700–725. https://doi.org/10.1016/j.jcorpfin.2019.07.012

Orlitzky, M., & Benjamin, J. D. (2001). Corporate social performance and firm risk: A meta-analytic review. *Business & Society*, 40(4), 369–396. https://doi.org/10.1177/000765030104000040

14685906, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12509 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 9 to Decl. of Angel Hsu
356
**SER 422**

**460** | WILEY—EUROPEAN FINANCIAL MANAGEMENT                                    GOROVAIA and MAKROMINAS

Parguel, B., Benoit-Moreau, F., & Russell, C. A. (2015). Can evoking nature in advertising mislead consumers? the power of 'executional greenwashing'. *International Journal of Advertising*, *34*(1), 107–134. https://doi.org/10.1080/02650487.2014.996116

Pástor, Ľ., Stambaugh, R. F., & Taylor, L. A. (2022). Dissecting green returns. *Journal of Financial Economics*, *146*(2), 403–424. https://doi.org/10.1016/j.jfineco.2022.07.007

Patten, D. M. (2002). The relation between environmental performance and environmental disclosure: A research note. *Accounting, Organizations and Society*, *27*(8), 763–773. https://doi.org/10.1016/S0361-3682(02)00028-4

Principles of Responsible Investment. (2020). https://www.unpri.org/

SEC. (2020). *Recommendation from the investor-as-owner subcommittee of the SEC investor advisory committee related to ESG disclosure.* Accessed July 12, 2024 Available at: https://www.sec.gov/spotlight/investor-advisory-committee-2012/recommendation-of-the-investor-as-owner-subcommittee-on-esg-disclosure.pdf

Sen, S., Bhattacharya, C. B., & Korschun, D. (2006). The role of corporate social responsibility in strengthening multiple stakeholder relationships: A field experiment. *Journal of the Academy of Marketing science*, *34*(2), 158–166. https://doi.org/10.1177/0092070305284978

Siano, A., Vollero, A., Conte, F., & Amabile, S. (2017). "More than words": Expanding the taxonomy of greenwashing after the Volkswagen scandal. *Journal of Business Research*, *71*, 27–37. https://doi.org/10.1016/j.jbusres.2016.11.002

Turban, D. B., & Greening, D. W. (1997). Corporate social performance and organizational attractiveness to prospective employees. *The Academy of Management Journal*, *40*(3), 658–672. https://doi.org/10.2307/257057

Udayasankar, K. (2008). Corporate social responsibility and firm size. *Journal of Business Ethics*, *83*(2), 167–175. https://www.jstor.org/stable/25482364

Uyar, A., Karaman, A. S., & Kilic, M. (2020). Is corporate social responsibility reporting a tool of signaling or greenwashing? Evidence from the worldwide logistics sector. *Journal of Cleaner Production*, *253*, 119997. https://doi.org/10.1016/j.jclepro.2020.119997

Velte, P. (2022). Meta-analyses on corporate social responsibility (CSR): A literature review. *Management Review Quarterly*, *72*(3), 627–675. https://doi.org/10.1007/s11301-021-00211-2

Walker, K., & Wan, F. (2012). The harm of symbolic actions and greenwashing: Corporate actions and communications on environmental performance and their financial implications. *Journal of Business Ethics*, *109*, 227–242. https://doi.org/10.1007/s10551-011-1122-4

Withisuphakorn, P., & Jiraporn, P. (2016). The effect of firm maturity on corporate social responsibility (CSR): Do older firms invest more in CSR? *Applied Economics Letters*, *23*(4), 298–301. https://doi.org/10.1080/13504851.2015.1071464

Yang, Z., Nguyen, T. T. H., Nguyen, H. N., Nguyen, T. T. N., & Cao, T. T. (2020). Greenwashing behaviours: Causes, taxonomy and consequences based on a systematic literature review. *Journal of Business Economics and Management*, *21*(5), 1486–1507. https://doi.org/10.3846/jbem.2020.13225

Zerbib, O. D. (2019). The effect of pro-environmental preferences on bond prices: Evidence from green bonds. *Journal of Banking & Finance*, *98*, 39–60. https://doi.org/10.1016/j.jbankfin.2018.10.012

---

**How to cite this article:** Gorovaia, N., & Makrominas, M. (2025). Identifying greenwashing in corporate-social responsibility reports using natural-language processing. *European Financial Management*, *31*, 427–462. https://doi.org/10.1111/eufm.12509

Exhibit 9 to Decl. of Angel Hsu
357
**SER 423**

GOROVAIA and MAKROMINAS

 **WILEY** | **461**

## APPENDIX A
See Table A1.

16488536, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12369 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**TABLE A1**  Data definitions.

| Acronym | Definition | Description | Source |
|---|---|---|---|
| Panel A: Firm/industry characteristics | | | |
| Env. Viol. | $Dum = 1/0$ | For years 2008–2019, a firm/year instance is assigned $Dum = 1$ if it appears on the MSCI ESG KLD Stats file with a Negative Environment Performance Indicator regarding Hazardous Waste (Env-Con-A), or Regulatory Compliance (Env-Con-B), or Ozone Depleting Chemicals (Env-Con-C) or Toxic Emissions and Waste (Env-Con-D). For years 2020–2022, a firm/year instance is assigned $Dum = 1$ if it reports nonzero Environmental Fines (ENERDP103) in LSEG (Refinitiv) | KLD/ MSCI/LSEG |
| Size | $Price \times N.$ of Shrs. Outstand. | Market capitalization | CRSP |
| Age | Age of the firm | Period between the year of incorporation and the year of measurement | Compustat |
| Intangibility | $1 - (Tangible\ Assets)/(Total\ Assets)$ | % Of intangible assets of the firm | Compustat |
| ROE | $(Net\ Income_t)/(Equity_{t-1})$ | Return on equity (profitability) | Compustat |
| M/B | $(Market\ Cap)/(BV\ of\ Equity)$ | Market-to-book ratio | Compustat/ CRSP |
| D/E | $(LT\ Debt)/(BV\ of\ Equity)$ | Leverage ratio | Compustat |
| Industry D. | $Dum = 1/0$ | A firm is assigned $Dum = 1$ (0) if is classified (not classified) in a specific industry according to the Kenneth French 12-industry classification. | Compustat |
| Foreign income | Net Income | Net Income attributed to international operations | Compustat |
| Foreign tax | Tax Expensed | Amount of Tax paid outside the country of incorporation | Compustat |
| International | $Dum = 1/0$ | A firm is assigned $Dum = 1$ (0) for nonmissing (missing) Foreign Income of Foreign Tax | Compustat |
| Domestic | $Dum = 1/0$ | A firm is assigned $Dum = 1$ if it is not International, 0 otherwise | Compustat. |
| NDir | N. of Directors | Number of Directors comprising the Board | Compustat |

(Continues)

Exhibit 9 to Decl. of Angel Hsu
358
**SER 424**

462 WILEY—EUROPEAN FINANCIAL MANAGEMENT GOROVAIA and MAKROMINAS

**TABLE A1**  (Continued)

| Acronym | Definition | Description | Source |
|---|---|---|---|
| *%WomD* | *% Women Directors* | Number of Female Directors as a % of *N. of Directors* | KLD/MSCI/ EDGAR |
| *NDOut* | *N. of Outside Directors* | Number of Directors outside the Firm | KLD/MSCI/ EDGAR |
| *DispD* | *Dum = 1/0* | A Firm is assigned *Dum* = 1 (0) for High (Low) Ownership Dispersion if its ownership structure is classified as "Institutions Dominant" or "Indexed Stock" or "Mixed Ownership" or "Widely Held" ("Principal Shareholder" or "Founder Firm" or "Family Firm" or "Controlling Shareholder") | KLD/MSCI/ EDGAR |
| *Panel B: Natural-language processing variables* | | | |
| *N-pages* | Number of pages | The page count in the CSR report (Size of the Report) | CSR Reports |
| *N-words* | Number of words | The number of words contained in the CSR report | CSR reports |
| *Env-Sc* | Environmental score | The Score quantifies the degree to which environmental content appears in the text analyzed | CSR reports |
| *Read-Sc* | Readability score | The Readability Score quantifies how difficult it is to read or understand the text analyzed | CSR reports |
| *Pos-Sc* | Positiveness score | The Positiveness Score quantifies the degree to which the text analyzed is positive, negative or neutral (sentiment analysis) | CSR reports |
| *Env × Pos* | *Env-Sc × Pos-Sc* | Interactive term between Environmental and Positiveness Scores | CSR reports |
| *Env × Read* | *Env-Sc × Read-Sc* | Interactive term between Environmental and Readability Scores | CSR reports |

Abbreviations: CSR, corporate-social responsibility; CRSP, center for research in security prices; EDGAR, electronic data gathering, analysis, and retrieval; ESG, environmental, social, and governance; LSEG, London stock exchange group.

14680036, 2025, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/eufm.12509 by University of North Carolina at Chapel Hill, Wiley Online Library on [05/04/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 9 to Decl. of Angel Hsu
359
**SER 425**

# Exhibit 7
# to Declaration of Angel Hsu

# NewClimate Institute, Corporate
# Climate Responsibility Monitor (2024)

Exhibit 7 to Decl. of Angel Hsu
146
**SER 426**

Case 2:24-cv-00801-ODW-PVC    Document 89-25    Filed 04/07/25    Page 2 of 164    Page ID #:8779



Exhibit 7 to Decl. of Angel Hsu
147



**Authors**

Thomas Day, Frederic Hans, Silke Mooldijk, Sybrig Smit, Santiago Woollands, Juliette de Grandpré, Nabila Putri Salsabila, Eve Fraser, Takeshi Kuramochi, Carsten Warnecke.

**Design**

Quentin Geluyckens, Curious Cowboy SRL – www.curiouscowboy.com
Photographies by Jimmy Chang (Unsplash), Mathew Schwartz (Unsplash) and Cynthia Young (Unsplash).

**Editing**

Laeticia (Hyunju) Ock

**Communications**

Victoria Fischdick, Polina Korneeva.

**Disclaimer**

The Corporate Climate Responsibility Monitor represents the authors' views and interpretations of publicly available information that is self-reported by the companies assessed. Due to the fragmentation, inconsistency and ambiguity of some of the information provided by the assessed companies, as well as the fact that the authors did not seek to validate the public self-reported information provided by those companies, the authors cannot guarantee the factual accuracy of all information presented in this report. Therefore, neither the authors nor NewClimate Institute makes representations or warranties as to the accuracy or reliability of any information in this report. The authors and NewClimate Institute expressly assume no liability for information used or published by third parties with reference to this report.

**Acknowledgement**

This document was prepared in collaboration with Carbon Market Watch.

© NewClimate Institute 2024

This work is licensed under a Creative Commons Attribution-NonCommercial 4.0 International License for non-commercial use.

↓ **Download the report:** http://newclimate.org/publications/

Corporate Climate Responsibility Monitor 2024

2

Exhibit 7 to Decl. of Angel Hsu
148

# Table of Contents

Summary    4

About the Corporate Climate Responsibility Monitor    12

Good practice overview    13

SECTION A — TRENDS IN CORPORATE CLIMATE RESPONSIBILITY    16

1 Net-zero and 2030 targets: integrity over flexibility in the crucial decade of climate action    17

1.1 Gradual but insufficient progress in climate targets for 2030 and beyond    17

1.2 Scope 3 emissions: insufficiency and the risk of backsliding    21

1.3 Key challenges for improving science-aligned validations of corporate climate targets    25

1.4 Summary of recommendations for improving the integrity of corporate climate target setting    29

2 Mixed progress towards critical sector transitions    30

2.1 Some sectors on the right track but accelerated efforts required    30

2.2 Regulations and technology development driving energy transitions    36

3 Separating real transition pathways from false narratives    38

3.1 Fossil fuel phase-out and CCUS: limited traction for HLEG recommendations    38

3.2 Renewable electricity procurement: innovative leadership and cheap claims    41

3.3 Bioenergy: reliance on unsustainable solutions    46

3.4 Offsetting 2.0? Agrifood companies' use of land sequestration CDR in the value chain    49

3.5 Neutralising residual emissions: allocation of scarce carbon dioxide removal potential    52

4 Where next for corporate climate accountability?    56

4.1 From carbon neutrality claims to more constructive climate contributions    56

4.2 Revision of the GHG Protocol    60

4.3 Evolving from voluntary initiatives to formal accountability    62

4.4 Summary of recommendations for the evolution of the corporate climate accountability system    65

SECTION B — COMPANY ANALYSES    66

5 Automotive manufacturers    69

5.1 Sector highlights    69

5.2 Sectoral transition framework    70

5.3 Daimler Truck    74

5.4 Stellantis    76

5.5 Toyota    78

5.6 Volkswagen Group    81

5.7 Volvo Group    84

6 Electric utilities    86

6.1 Sector highlights    86

6.2 Sectoral transition framework    87

6.2 Duke Energy    90

6.3 Enel    92

6.4 ENGIE    94

6.5 Iberdrola    96

6.6 KEPCO    98

7 Fashion    100

7.1 Sector highlights    100

7.2 Sectoral transition framework    101

7.3 Adidas    104

7.4 Fast Retailing    106

7.5 H&M Group    108

7.6 Inditex    110

7.7 Nike    112

8 Food & agriculture    114

8.1 Sector highlights    114

8.2 Sectoral transition framework    115

8.3 Danone    118

8.4 Mars    120

8.5 Nestlé    122

8.6 Tesco    124

8.7 Walmart    126

Glossary and abbreviations    128

References    132

Annex I — Companies assessed in this report    140

Annex II — Target integrity assessments    142

Annex III — Additional assumptions for Part A analysis    162

Exhibit 7 to Decl. of Angel Hsu
149

# Summary

### About the Corporate Climate Responsibility Monitor

The 2024 *Corporate Climate Responsibility Monitor* (CCRM) analyses the climate strategies of 51 major global companies, critically assessing the extent to which they demonstrate corporate climate leadership. We evaluate the integrity of climate pledges against good practice criteria to identify examples for replication and highlight areas where improvement is needed.

Section A of this report includes references to different company sample sizes:

* **20 companies:** The 2024 CCRM includes in-depth analyses of 20 companies across four focus sectors: automotive manufacturers, electric utilities, fashion, and food and agriculture (Section B).

* **51 companies:** For our aggregated analysis in Section A, we have also updated our assessments of the 2030 and net-zero targets for all other 31 companies covered in the 2022 and 2023 iterations of the CCRM. The 51 companies reported combined revenues of USD 6.1 trillion in 2022. Their total self-reported GHG emission footprint in 2022, including upstream and downstream emissions (scope 3) that may include a marginal degree of overlap, amounts to approximately 8.8 GtCO$_2$e. This is equivalent to roughly 16% of global GHG emissions in 2022.

* **28 companies:** 28 of the 51 companies analysed in detail by the 2022, 2023 and 2024 iterations of the CCRM are covered by the four focus sectors of this report: automotive manufacturers, electric utilities, fashion, and food and agriculture. The 28 companies from these four sectors are sometimes considered in more detail in Section A of this report.

The first iteration of the CCRM, published in February 2022, exposed the ambiguity and insufficiency of corporate climate strategies. The report found that major companies' net-zero targets were mostly ambiguous and lacked commitments to reducing emissions. The collective ambition of companies to reduce emissions by 2030 fell far short of the requirements to be aligned with 1.5°C compatible pathways.

Since 2022, we have seen several significant developments aimed at improving the system, including the published recommendations of the UN High-Level Expert Group (HLEG), updates to International Organization for Standardization's (ISO) standards, introduction of new Science Based Targets initiative's (SBTi) standards, implementation of new regulations in some jurisdictions, and the emergence of innovative good practices for certain areas. Amid these developments, the 2024 CCRM examines what has changed in the quality of companies' climate strategies, what examples of leadership are emerging and which sticking points persist.

**Companies' climate targets are gradually improving yet still mostly insufficient and unsubstantiated, amid a looming threat of backsliding.**

4

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu
150

# Key insights

The collective ambition of companies 2030 and net-zero climate targets has gradually improved over the last two years. However, most companies continue to fall short of the economy-wide emission reductions required to limit global warming to below 1.5°C. (Section 1.1)

The 2030 climate targets of 51 major companies translate to a median absolute emission reduction commitment of just 30% of the full value chain emissions between 2019 and 2030. This may increase to 33% under the most optimistic scenario that emission intensity targets translate to equivalent absolute emission reductions (see Figure S1). This represents modest progress in companies' mitigation ambition towards 2030, with 19 out of 51 companies having made updates of varying significance to their 2030 climate pledges over the last two years.

An increasing number of companies also substantiate their long-term net-zero targets in line with guidance from HLEG, ISO and SBTi. More than half of the major companies we have assessed (29 out of 51) explicitly commit to emission reduction targets alongside their net-zero pledges. Of these 29 companies, 18 commit to deep decarbonisation along their value chain by aiming for close to a 90% reduction, partially aligning with 1.5°C-compatible decarbonisation milestones.

While this represents tangible progress compared to the widespread ambiguity of corporate net-zero targets that we identified in the 2022 CCRM, companies' targets are collectively still critically insufficient to be aligned with a 1.5°C pathway. The average commitment to 30% emission reductions by 2030 falls short of the need to decrease global GHG and CO₂ emissions by around 43% and 48% respectively between 2019 and 2030 (IPCC, 2022). Most companies continue to present 2030 and net-zero targets that are either ambiguous or only commit to limited emission reductions. Often, targets cannot be taken at face value as companies leave out certain emission sources, use non-harmonised base years, do not report updated base year emissions, or do not provide contextualising information to understand what the targets mean in absolute terms, among other issues.



**Fig S1:** The median commitment to emission reductions between 2019 and 2030 is 30-33%

This chart shows the proportion of full value chain GHG emissions that companies commit to reduce between 2019 and 2030. Data includes 51 companies. 4 companies without clear commitments for 2030 are not included.

Cross-sector global minimum requirements
48% reduction of CO₂ emissions

43% reduction of all GHG emission

Median value chain targets
30% including only absolute targets
33% including intensity targets

Unsubstantiated or unspecified 2030 target

Integrity rating: 🟢 SBTi  🟡 Reasonable  🟠 Moderate  🔴 Poor  🔴 Very poor

Data presented on a single y-axis. Placement on y-axis only relevant for sector affiliation.

Exhibit 7 to Decl. of Angel Hsu
151

**SER 431**



Proposals for introducing flexibility mechanisms for scope 3 emission reduction targets are gaining momentum, although this would entail backsliding on already insufficient commitments, in many cases nullifying companies' current targets. (Section 1.2)

In contradiction to the key recommendations of the Integrity Matters report by HLEG, which calls for no offsetting towards the achievement of interim targets (UN HLEG, 2022), the Voluntary Carbon Markets Integrity Initiative's (VCMI) beta Scope 3 Flexibility Claim would allow companies to purchase carbon credits for up to 50% of their annual scope 3 emissions to "bridge the gap" to the scope 3 target trajectory that they are not on track to meet up to 2030 (VCMI, 2023b). The VCMI's beta claim offers a 50% flexibility threshold compared to a company's actual emissions in any given year. In other words, companies can still be eligible if their emissions are double the levels that would be implied by the target trajectory in any given year. Of the 14 companies for which we could test the implications of such a flexibility mechanism, 11 would be entitled to the flexibility to even increase (8) or plateau (3) their scope 3 emissions between 2019 and 2030, rendering these targets as effectively meaningless. Figure S2 shows that this proposed flexibility mechanism would nullify the scope 3 commitments of most companies and leave them accountable only to their scope 1 and 2 targets.

Any potential link between the VCMI Scope 3 Flexibility Claim and the SBTi target setting guidance remains unclear. At COP28 in December 2023, SBTi joined with VCMI and other initiatives to announce a "framework for end-to-end integrity" aimed at aligning and complementing their guidance, and SBTi is currently in the process of evaluating evidence on the effectiveness of environmental attribute certificates (Manuel, 2023). It remains unclear whether SBTi's position on the use of offsetting towards scope 3 targets could change, and whether the VCMI Scope 3 Flexibility Claim could serve as a basis for any such changes. This would further weaken companies' SBTi scope 3 targets, which in many cases are already insufficient to align with 1.5°C pathways.

Part of the rationale for scope 3 flexibility proposals is to increase the flow of voluntary climate finance to climate change mitigation projects worldwide through carbon crediting, but climate contributions (also referred to as Beyond Value Chain Mitigation) can also increase the flow of voluntary climate finance without compromising transparency and the requirement to decarbonise a company's own emissions.

**Fig S2: The proposed scope 3 flexibility claim would effectively nullify the scope 3 commitments of most companies, reducing their 2030 commitments to cover only scope 1 and 2 emissions**

Data presented on a single y-axis. Placement on y-axis has no significance.

Integrity rating: ● High ● Moderate ● Poor ● Very poor

Proportion of companies' scope 1, 2 and 3 GHG emissions that they would be required to reduce between 2019 and 2030 (under a combination of all their targets)

*Note: Data includes 14 companies, as available to be broken down to specific scopes. The 14 companies in this figure are only used as examples; we are not aware and do not intend to imply that these companies have indicated an intention to make use of the Scope 3 Flexibility Claim. The data points in this chart represent the authors' interpretation of companies' emission reduction commitments, based on publicly available information. The data points include the following example assumptions: (1) Emission intensity targets are assumed to result in equivalent emission reductions. (2) Although most of the companies would be entitled under the VCMI proposal to increase their emissions, the data points show the scenario under which scope 3 emissions remain constant, rather than assuming that they will indeed increase.*

The colour of the data points represents our assessment of the integrity of the company's 2030 targets, based on their sufficiency compared to sector-specific 1.5°C aligned benchmarks, and the appropriateness of the terminology used in the pledge communication.

Exhibit 7 to Decl. of Angel Hsu

152

The Science Based Targets initiative (SBTi), as the largest and most influential validator of corporate targets and independent assessments, plays a critical role in validating corporate climate pledges. A comparison between the ratings of SBTi and other assessors indicates a significant degree of leniency in the current validation practices and points to multiple areas for improvements. (Section 1.3)

Founded in 2015, the SBTi has developed into the largest and most influential validator of corporate climate targets for 2030 and beyond. Of the 28 companies covered in the four key focus sectors of this analysis, SBTi has validated the 2030 targets of 22 of these companies to be aligned with a pathway to limit global temperature increase to 1.5°C, 'well-below 2°C', or 2°C. Most of these companies prominently highlight their SBTi validations in their climate-related communications to promote targets that are in many cases insufficient in the context of the latest available science.

The comparison between SBTi's validations of 2030 targets and assessments by the CCRM, the Transition Pathways Initiative (TPI), the MSCI Net-Zero Tracker, and the Planet Tracker, indicates that SBTi could implement the following improvements to substantiate and uphold the integrity of their validations:

➢ Increase the frequency of the validation cycle for 2030 corporate climate targets to align validations with the latest developments in validation methods and the latest scientific findings.

➢ Revise approach and develop methodologies to cover scope 3 emissions along to key relevant emission sources along the value chain in SBTi's target classifications.

➢ Remove outdated validations that date back multiple years since their issuance or are based on indefinitely paused methodologies such as for intensity targets for light-duty vehicles in the automotive sector.

➢ Refine the SBTi's Forest, Land and Agriculture (FLAG) guidance to specify minimum requirements for the reduction of agricultural emissions, or additional targets for specific agricultural emission sources, alongside carbon dioxide removals.

➢ Transparently disclose underlying data and methods for each validation and communicate existing limitations affecting current validations.

The SBTi might face multiple challenges to implement such timely improvements. As a voluntary initiative mostly funded by third parties, the SBTi depends on the voluntary participation of companies and needs to accommodate the perspectives of different stakeholders when developing its validation methodologies. These contextual conditions may explain some of the existing flexibility in the system and might present a bottleneck for SBTi to further develop towards fully science-aligned validations that provide the necessary insights for investors, regulators, courts, and other stakeholders on 1.5°C-aligned climate action.

Mixed progress towards critical sector transitions calls into question the credibility of companies' apparent ambition. (Section 2.1)

Only four companies' emission reduction plans embody the necessary shift from pledges to actual implementation. For instance, **Danone** commits to significantly reduce methane emissions from fresh milk until 2030 and to increase the share of plant-based products. **Enel** and **Iberdrola** have increased the installed capacity of renewables, especially solar and wind, and plan to further ramp this up in the near future. **Volvo Group** invests in zero-emission vehicles, charging infrastructure and low-carbon steel and aluminium.

Whereas we see some promising examples among the automotive manufacturers, electric utilities and food and agriculture companies, none of the five fashion companies present convincing emission reduction plans, raising concerns about the feasibility of the companies' ambitious 2030 targets. The fashion companies implement measures to increase renewable electricity use in the supply chain, but also encourage suppliers to switch to biomass or natural gas, which are not credible decarbonisation options. None of the five companies commit to reducing overproduction or moving away from the fast fashion business model.



Corporate Climate Responsibility Monitor 2024

7

Exhibit 7 to Decl. of Angel Hsu
153

Many companies continue to rely on false solutions such as Carbon Capture, Utilisation and Storage (CCUS) standalone Renewable Energy Certificates (RECs), bioenergy and carbon dioxide removals as an alternative to emission reductions. (Sections 2 and 3)

We identify over-reliance on the following contentious solutions and recommendations to mitigate them:

### ⚠ CCUS and transitional fuels' as an alternative to fossil fuel phase-out (Section 3.1)

Despite being one of the main levers to reduce emissions in the power, automotive, and fashion sectors, only a minority of the companies assessed in our analysis commit to a fossil fuel phase-out. A phase-out of coal and fossil gas is particularly crucial in the energy sector, as this is a prerequisite for the decarbonisation of other high-emitting sectors through electrification. Most electric utilities assessed in our analysis address the need to exit coal, but fossil gas is still seen as a 'transitional fuel', especially outside Europe. The automotive sector is lagging in phasing out internal combustion engines. The fashion sector has started to reduce coal from its production processes, but a full commitment is yet to be made. Overall, we find that companies' commitments to phase out fossil fuels depend largely on the regulatory environment at the national and regional level, as the phase-in of alternatives must take place in parallel and requires dedicated incentive schemes.

> We recommend that regulators, standard setters, and voluntary initiatives formulate more prescriptive guidelines on the necessity for companies to include fossil fuel phase-out requirements in their transition plans.

### ⚠ Standalone Renewable Energy Certificates (Section 3.2)

Companies are increasingly reporting renewable electricity targets and higher shares of renewable electricity consumption, but these targets and claims all mean different things, and their real impact is often far less than implied. Standalone RECs still play a large role in companies' renewable electricity procurement strategies, but companies demonstrate increasing awareness on the limitations of this approach and many plan to shift towards higher-quality procurement instruments including Power Purchase Agreements. Momentum is also building for hourly matching of renewable electricity, but support and incentives are needed for more companies to adopt this approach. We find that voluntary initiatives and standards currently provide limited incentives for companies to strive for higher-quality renewable electricity strategies. The update process for the GHG Protocol's guidance on Scope 2 emissions accounting is a promising opportunity to realign the standard with transparent and ambitious practices.

> We recommend revising the market-based emission accounting method to better differentiate between the highly significant nuances in renewable electricity strategies.

### ⚠ Bioenergy (Section 3.3)

While over half of the companies assessed consider bioenergy in their decarbonisation plans, bioenergy is not a credible solution for any of them. Particularly in the fashion sector, plans for switching coal to biomass in the supply chain may significantly undermine seemingly ambitious emission reduction targets – and in some cases render them meaningless. Contrary to popular belief, bioenergy is not an emissions-free energy source, and sourcing biomass is likely to have negative impacts on ecosystems and local communities. Companies that consider themselves climate leaders should refrain from using bioenergy and advocate for policy changes in regions where sourcing bioenergy is easier and cheaper than sourcing non-combustible sources of renewable energy.

> We recommend that accounting guidance is revised to recognise that bioenergy is not an equal alternative to non-combustible renewables.

Corporate Climate Responsibility Monitor 2024

8

Exhibit 7 to Decl. of Angel Hsu
154



### ▲ Carbon dioxide removals and 'insetting' (Section 3.4)

Carbon dioxide removals are crucial to reach net-zero emissions globally by mid-century. However, companies in the food and agriculture sector are currently counting on land sequestration carbon dioxide removals within their value chain to meet significant portions of their emission reduction targets, sometimes referred to as 'insetting'. Besides major uncertainties around the permanence and potential of land sequestration CDR, the aggregation of removals and emission reductions is hiding a lack of commitment and progress towards the necessary agricultural transitions for reducing emissions from highly challenging sources, such as methane emissions from livestock and nitrous oxide emissions from fertiliser application.

> We recommend refining the SBTi's FLAG guidance to specify minimum requirements for the reduction of agricultural emissions or additional targets for specific agricultural emission sources, alongside carbon dioxide removals.

### ▲ Neutralising residual emissions (Section 3.5)

Companies' reliance on carbon dioxide removals to fulfil their net-zero targets is high, at times reaching up to 50% of their 2019 emissions. Their plans appear to be unrealistic because they rely on excessive volumes of CDR compared to the definition of residual emissions implied by 1.5°C-aligned sector-specific pathways. Furthermore, they mostly rely on land sequestration CDR with a high probability of non-permanence. It is also highly unlikely that the scarce supply of high-quality CDR can match the high demand for CDR. This over-reliance has the potential to jeopardise global net zero, if companies use removals to delay emissions reductions.

> We recommend that regulators and corporate guidelines require companies to set three separate targets for emission reductions, land sequestration removals, and technical removals without neutralisation claims.

## Companies appear to be moving away from misleading carbon neutrality claims.

Several companies, including Nestlé, Danone, Nike, Stellantis and Volvo Group, appear to have moved away from some of the unsubstantiated carbon neutrality claims that they used to make in the past, thereby improving the transparency of their climate communications. Danone continues to make modest contributions to climate change mitigation beyond its value chain despite moving away from making carbon neutrality claims for its brands (although the company continue to make carbon neutrality claims for its production sites; see below). Google and Microsoft – both of which received a poor rating for the integrity of their carbon neutrality claims in the 2023 *Corporate Climate Responsibility Monitor* – also appear to be quietly moving away from these claims, even though both companies still appear to procure carbon credits equivalent to their scope 1 and 2 emissions.

Among the 20 companies assessed, only four – Daimler Truck, Danone, Mars, and Volkswagen Group – reported in 2022 or

2023 that certain products or aspects of their businesses were carbon neutral, using carbon credits. We have rated all these claims to be of very poor or unclear integrity; each claim applies to only a fraction of the respective company's emissions, and none of the companies provide evidence that the carbon credits they procure are of sufficiently high quality to be considered equivalent to reducing the company's own emissions.

In 2024, the EU adopted a ban on climate-neutral advertising on products and services (European Parliament, 2024). This breakthrough legislation marks the first time in the world where policymakers have banned carbon neutrality claims, potentially setting a precedent for similar developments in other countries. During 2023, a wave of European business consultancies and carbon credit sellers – including myclimate, ClimatePartner and South Pole – also announced a transition away from carbon neutrality labels.

*Exhibit 7 to Decl. of Angel Hsu*
155

The publication of guidelines in 2023 and 2024 constitute concrete steps towards operationalising and mainstreaming climate contributions, but there remains a lack of specificity on the claims that companies can and cannot make based on the contributions they provide. (Section 4.3)

A climate contribution refers to finance provided by a company to support climate change action beyond the company's own value chain, without claiming to neutralise its own emissions. Climate contributions can also increase the flow of voluntary climate finance without compromising transparency and the requirement to decarbonise a company's own emissions. Despite this, only a small number of the companies in this report are contributing to climate change mitigation beyond their value chains without claiming neutralisation of emissions, and the volumes of support from these companies remain modest.

Several developments in 2023 and 2024 have contributed to moving the climate contribution model from a theoretical concept towards an implementation-ready model. However, undefined details that require further elaboration will determine the extent to which these developments represent a significant step forward or merely a repackaging of old approaches.

• In February 2024, **SBTi** published the outcome of its consultation process on recommendations for companies to engage in beyond value chain mitigation (BVCM) (Benson et al, 2024). The outcome is an operationalisation of the climate contribution approach: companies are recommended to provide finance – based on a carbon price applied to the volume of their own emission footprint – to climate change mitigation efforts outside of the companies' value chain. However, the SBTi report does not rule out the possibility of companies making compensation claims under the BVCM approach, which is a highly relevant omission. If a decision is made to depart from the core principles of SBTi to allow offsetting toward target fulfilment, then the BVCM recommendations could have a substantially different meaning compared to the current situation.

• The **Gold Standard** also published a "Step by step guidance for organisations taking responsibility for their unabated emissions" (Gold Standard, 2024), which aligns with SBTi's best practice recommendations on BVCM and is also prescriptive on claims.

• The **Voluntary Carbon Markets Integrity Initiative's (VCMI)** "Carbon integrity" claims guidance also constitutes a form of climate contribution approach: although exclusively based on carbon credit procurement, companies are recommended not to claim the neutralisation of their emissions through this means (VCMI, 2023a). Despite this potentially positive development, it remains to be seen whether the VCMI carbon integrity claims will be picked up by companies, compared to VCMI's other separate proposed framework: the VCMI's beta Scope 3 Flexibility Claim would allow companies to offset emissions towards their scope 3 targets, posing a major risk to corporate ambition.

In 2024, details on claim terminology and finance recipients need to be clarified. Most importantly, the potential links between these frameworks and any emerging flexibility mechanisms need to be clarified. The claims that companies can make with the contributions they provide should be specified in clear terms to avoid a new generation of inconsistent and potentially misleading communications. More guidance is needed regarding where and how climate contributions could be channelled. With these details, business consultancies and project developers will be able to follow a clear framework, and more companies will be able to start using this model.

The integrity of the current corporate accountability system is impaired by inherent tensions deriving from a lack of institutional separation and direct corporate influence. We need to evolve from voluntary initiatives to formal accountability. (Section 4.3)

The findings of our analysis show that – while voluntary initiatives play a key role in the corporate climate accountability system – the current over-reliance on voluntary initiatives for many functions of the system does not result in sufficiently credible corporate climate action, despite the increasing urgency of the climate crisis. These pioneering initiatives were formed at a time when corporate climate action was in its early stages. As we have now reached a stage where most of the largest and most influential multinational corporates regularly announce targets and strategies to reduce emissions, the model of voluntary mobilisation may have outgrown its original purpose.

Prompt adjustments to the existing system are needed to establish institutional separation and independence between actors performing the functions of *standard setting, validations, and mobilisation*.

✓ **Institutional separation for key functions of the accountability system** avoids some of the most basic tensions that impair the integrity of the current system. Mobilisation and capacity-building initiatives should be able to engage as many companies as possible, while those setting science-aligned standards should not compromise between companies' interests on the one side and scientific findings on the other side.

✓ **Compliance, grievance, and whistle blowing mechanisms must be introduced within existing voluntary initiatives** to accompany this institutional separation.

10

Exhibit 7 to Decl. of Angel Hsu

156

Case 2:24-cv-00801-ODW-PVC    Document 89-25    Filed 04/07/25    Page 12 of 164    Page ID #:8789

In parallel to these adjustments of the existing system, the corporate climate accountability system should start to shift from voluntary initiatives to formal accountability including regulation, accredited verification and validation entities, and effective advocacy and litigation.

✓ The legally binding nature of regulation contributes to an enforceable accountability system in which it is no longer voluntary for companies to commit to corporate climate strategies, and in which companies and auditors can be held accountable.

✓ The introduction of regulation or international standards will enable target validations and performance verifications by accredited and legally liable entities. Like traditional financial auditing by accounting firms, entities performing validations and verifications could undergo accreditations by regulators and can be held legally liable in case of negligence. This formalisation can enhance the effectiveness of the advocacy and litigation activities.

✓ This necessary shift includes an important role for voluntary initiatives to scrutinise forthcoming regulations and promote upward convergence to high-ambition standards.

**Table 1:** Overview of companies assessed in the Corporate Climate Responsibility Monitor 2024 (companies are listed alphabetically within each integrity rating category)



| HIGH INTEGRITY | HEADLINE PLEDGE | TRANSPARENCY | INTEGRITY | PAGE |
|---|---|---|---|---|
| No companies achieved a high integrity rating | | | | |

| REASONABLE INTEGRITY | HEADLINE PLEDGE | TRANSPARENCY | INTEGRITY | PAGE |
|---|---|---|---|---|
| Enel | Zero emissions in 2040 | | | p. 92 |
| Iberdrola | Net zero emissions before 2040 | | | p. 96 |

| MODERATE INTEGRITY | HEADLINE PLEDGE | TRANSPARENCY | INTEGRITY | PAGE |
|---|---|---|---|---|
| Danone | Net zero emissions by 2050 | | | p. 118 |
| H&M Group | Net zero emissions by 2040 | | | p. 108 |
| Inditex | Net zero emissions by 2040 | | | p. 110 |
| Mars | Net zero emissions by 2050 | | | p. 120 |
| Nike | Net zero emissions by 2050 | | | p. 112 |
| Stellantis | Carbon net-zero by 2038 | | | p. 76 |
| Volvo Group | Net zero emissions by 2040 | | | p. 84 |

| LOW INTEGRITY | HEADLINE PLEDGE | TRANSPARENCY | INTEGRITY | PAGE |
|---|---|---|---|---|
| Adidas | Carbon neutral by 2050 | | | p. 104 |
| Daimler Truck | $CO_2$-neutrality by 2050 | | | p. 74 |
| ENGIE | Net zero carbon by 2045 | | | p. 94 |
| Duke Energy | Net zero carbon by 2050 | | | p. 90 |
| Fast Retailing | Carbon neutral by 2050 | | | p. 106 |
| Nestlé | Net zero emissions by 2050 | | | p. 122 |
| Tesco | Net zero emissions by 2050 | | | p. 124 |
| Volkswagen Group | Carbon neutral by 2050 | | | p. 81 |
| Walmart | Zero emissions in operations by 2040 | | | p. 126 |

| VERY LOW INTEGRITY | HEADLINE PLEDGE | TRANSPARENCY | INTEGRITY | PAGE |
|---|---|---|---|---|
| KEPCO | Carbon neutrality by 2050 | | | p. 98 |
| Toyota | Carbon neutral by 2050 | | | p. 78 |

5-point scale ● High ● Reasonable ● Moderate ● Low ● Very low    See individual company analyses.

Assessments were made based on public information identified by the authors. A poor rating may not necessarily be an indication that a company's climate strategy is weak, but could also indicate that the information was insufficient to confirm good practice. Ambitious companies can improve their ratings by ensuring that all aspects of their climate responsibility strategies are transparently and accurately disclosed, and in the public domain.

Exhibit 7 to Decl. of Angel Hsu
157

# About the Corporate Climate Responsibility Monitor

## The need for scrutiny on corporate climate action

**Many companies are putting themselves at the forefront of climate action.** Corporate climate pledge setting is becoming standard practice: by February 2024, over 10,000 companies had joined the UNFCCC's Race to Zero campaign (UNFCCC, 2023b), including many of the world's largest companies.

The increasing concern within civil society about the climate crisis is leading to increased pressure from consumers, shareholders, and regulators for companies to decarbonise. In parallel, companies realise that the trajectory towards decarbonising the global economy is firmly established, and it is increasingly attractive for them to assume a leading role in that new paradigm. Many companies are scrambling to adopt new approaches and narratives to demonstrate their climate leadership. However, the rapid acceleration of corporate climate pledge setting, combined with the fragmentation of approaches and the general lack of regulation or oversight, makes it challenging to distinguish real climate leadership from unsubstantiated greenwashing.

## The Corporate Climate Responsibility Monitor

The *Corporate Climate Responsibility Monitor* evaluates the transparency and integrity of companies' climate pledges with the following objectives:

✓ **Identify and highlight good practice approaches** that can be replicated by others, recognising that companies are experimenting to work out what constructive and credible practices are.

✓ **Evaluate the transparency and integrity of major companies' climate leadership claims** and provide a structured methodology for others to replicate such an evaluation. **Transparency** refers to the extent to which a company publicly discloses the information necessary to fully understand the integrity of that company's

**The criteria for good practice climate action by companies has shifted with the increasingly clear scientific evidence that underpins the urgency of the climate crisis.** With the objectives of the Paris Agreement, greenhouse gas emissions need to be reduced at speed across all countries and sectors. To meet the 1.5°C limit, global greenhouse gases and $CO_2$ emissions must be reduced by 43% and 48%, respectively, from 2019 levels by 2030. This trajectory aims to reach net-zero global $CO_2$ emissions by around 2050, followed by net-zero emissions of all greenhouse gases by around 2070 and net-negative emissions thereafter (IPCC, 2022).

Company actions that were considered viable only five years ago are often far from sufficient according to the current state of knowledge. For example, it is no longer sufficient for companies to only address their own direct emissions; rather, companies need to address upstream and downstream emissions as well. It is no longer good practice for a company to

approaches towards the various elements of corporate climate responsibility. **Integrity**, in this context, is a measure of the quality, credibility, and comprehensiveness of those approaches.

✓ **Highlight opportunities for enhancing the corporate climate accountability system** based on emerging good practices and issues that we observe.

The *Corporate Climate Responsibility Monitor* focuses on four main areas of corporate climate action: tracking and disclosure of emissions (methodology section 1), setting emission reduction targets (methodology section 2), reducing own emissions (methodology section 3) and taking responsibility for unabated and residual emissions (methodology section 4). Evaluations

offset emissions by reducing or removing emissions elsewhere; rather, emission reductions and removals 'elsewhere' need to be enhanced in parallel to the company's emission reductions.

**The challenge of distinguishing real climate leadership from greenwashing is significant, but addressing it has the potential to unlock more substantial global climate change mitigation efforts.** Corporate climate action is key to closing the emissions gap to align with a 1.5°C pathway. In a short space of time and in the absence of sufficient top-down regulation, consumers' and shareholders' expectations have become a major driver for enhanced corporate climate action. Companies appear to be responding to these expectations. To support this important bottom-up pressure, it is essential that the credibility of companies' strategies is transparent and can be understood by their target audiences.

for 20 major global companies are set out in Section B of this report. Section A analyses aggregate trends drawing on up to 51 detailed company assessments, which includes the companies assessed in section B of this report, as well as those covered in the 2022 and 2023 iterations of the CCRM.

The *Corporate Climate Responsibility Monitor* is prepared by NewClimate Institute, with support from **Carbon Market Watch**. The consortium partners combine years of experience with the independent critical analysis of corporate climate action and carbon market mechanisms. NewClimate Institute and Carbon Market Watch are both not-for-profit organisations. Neither institution holds private commercial interests in voluntary carbon credit markets.

Exhibit 7 to Decl. of Angel Hsu

158

**SER 438**

## Development of the Corporate Climate Responsibility Monitor

The Corporate Climate Responsibility Monitor follows the guiding principles for good practice corporate climate responsibility outlined in the accompanying methodology document: *Guidance and assessment criteria for good practice corporate emission reduction and net zero targets: Version 4.0* (NewClimate Institute, 2023a) We have drawn these guiding principles from a combination of scientific literature review, previous work by the authors, and the identification of existing good practices from company case studies. These guiding principles address issues where the state of scientific knowledge and debate are rapidly evolving. The views expressed in this document reflect the perspectives of the authors, based on our interpretation of existing research and current developments. While these views may not be universally held, we note that version 4.0 of the methodology in 2024 is very closely aligned with the converging guidance of other major initiatives including the

UN High Level Expert Group on Net Zero Targets and the ISO Net Zero Guidelines on net zero targets *(see Table 2)*.

The Corporate Climate Responsibility Monitor promotes transparency with the philosophy that consumers, shareholders, regulators, and CSOs should be able to follow and assess the integrity of companies' claims. Accordingly, the company assessments in section B are solely based on publicly available information that the authors were able to identify (see *Annex-Data Sources in the Methodology document*). Each rating represents the authors' understanding of the publicly available information. In some cases, company information was scattered across different sources (e.g., annual reports, press releases and statements, webpages, or other marketing materials); it is possible in this process that information may have been misinterpreted, or that relevant information was overlooked.

Companies should consider how to present information as transparently as possible to ensure that observers are able to access all relevant information necessary to understand their climate strategies.

We assess companies primarily based on self-reported information. We do not verify or certify the accuracy of the information provided by companies, including their GHG emission reporting. In specific cases, we supplement the self-reported information with data from other sources, but we cannot guarantee the accuracy of that information.

→ See also the assessment methodology for the Corporate Climate Responsibility Monitor. *Guidance and assessment criteria for good practice corporate emission reduction and net-zero targets: Version 4.0* (NewClimate Institute, 2024).

# Good practice overview

Corporates looking to take a position of climate leadership can learn from each other to replicate good practice approaches that are transparent, constructive and robust. The Corporate Climate Responsibility Monitor 2024 assesses 20 major global companies to identify good practices in four key areas.

* **Tracking and disclosure of emissions:** To develop a comprehensive and robust climate strategy, it is key that companies understand and are transparent about their GHG emission footprints and their trajectories.

* **Setting specific and substantiated targets:** Companies' headline climate change pledges encompass a broad range of target setting approaches. Regardless of the type of target and the terminology used, the commitments should send a clear signal for immediate action to decarbonise the value chain and avoid misleading consumers, shareholders, observers and regulators.

* **Reducing emissions:** Encompassing measures for deep emission reductions is the backbone of ambitious corporate climate targets.

* **Responsibility for unabated and residual emissions:** Corporate climate leadership extends beyond ambitious target setting to include taking responsibility for unabated emissions and avoiding misleading offsetting claims.

Figure 1 provides an overview of good practice corporate climate responsibility and our rating methodology for each of these four areas. Table 2 demonstrates the alignment of this methodology with our major standards and initiatives.

Our assessments include a rating of the transparency and integrity of companies' approaches. **Transparency** refers to the extent to which a company publicly discloses the information necessary to fully understand the integrity of its approaches towards the various elements of corporate climate responsibility. **Integrity**, in this context, measures the quality, credibility and comprehensiveness of those approaches.

Full details on our methodology for assessing good practice across these four areas can be found in the accompanying methodological document: *Guidance and assessment criteria for good practice corporate emission reduction and net-zero targets: Version 4.0* (NewClimate Institute, 2024).

13

Exhibit 7 to Decl. of Angel Hsu
159

Case 2:24-cv-00801-ODW-PVC    Document 89-25    Filed 04/07/25    Page 15 of 164
Page ID #:8792



**Figure 1:** Overview of Corporate Climate Responsibility Monitor methodology (and alignment with respective recommendations of HLEG and ISO Net Zero Guidelines)

Exhibit 7 to Decl. of Angel Hsu
160

Case 2:24-cv-00801-ODW-PVC    Document 89-25    Filed 04/07/25    Page 16 of 164
Page ID #:8793

**Table 2:** Comparison of the Corporate Climate Responsibility Monitor (v4.0) methodology (CCRM, 2024) with four other voluntary standards and guidelines. Adapted from Net Zero Tracker (2023).

| | CCRM (NewClimate Institute, v4.0) | How does the CCRM align with other standards? | UN Expert Group (UN HLEG, 2022) | ISO Net Zero Guidelines (ISO, 2022) | UN Race to Zero (Race to Zero, 2022, v3.0) | SBTi Net Zero Standard (SBTi, 2023d, v1.2) |
|---|---|---|---|---|---|---|
| **CCRM METHODOLOGY COMPONENT 2: SETTING SPECIFIC AND SUBSTANTIATED TARGETS** | | | | | | |
| Coverage of all emission scopes along the value chain (scopes 1, 2 and 3) | Yes | Fully aligned with HLEG, ISO & RtZ | Yes | Yes | Yes | Partially |
| **Net-zero target** | | | | | | |
| Minimum reduction for 'credible net zero' terminology (compared to 2019) | >90% for all sectors >72% for FLAG sector | Fully aligned | Not specified | >90% for all sectors >72% for FLAG sector | Not specified | >90% for all sectors >72% for FLAG sector |
| Requirement to comply with 1.5°C-aligned decarbonisation milestones | Yes | Aligned but going beyond | Not specified | Not specified | Not specified | Yes |
| **2030 target(s)** | | | | | | |
| Five-year intervals for interim targets | Yes | Fully aligned | Yes | Yes | Not specified | Partially |
| Requirement to comply with 1.5°C-aligned decarbonisation milestones | Yes | Aligned but going beyond | Not specified | Not specified | Not specified | Yes |
| Offsetting to achieve interim targets | Not allowed | Fully aligned | Not allowed | Not allowed | Not recommended | Not allowed |
| **CCRM METHODOLOGY COMPONENT 3: EMISSION REDUCTION MEASURES** | | | | | | |
| Specific requirements for transition plans | Yes | Fully aligned | Yes | Yes | Not specified | Not specified |
| Fossil fuel phase-out | Required | Fully aligned | Required | Required | Required | Not specified |
| Additionally & hourly matching for RE | Required | Aligned with ISO | Not specified | Recommended | Not specified | Not specified |
| **CCRM METHODOLOGY COMPONENT 4: CLIMATE CONTRIBUTIONS, OFFSETTING CLAIMS AND RESIDUAL EMISSIONS** | | | | | | |
| Climate contributions | Recommended | Aligned but going beyond | Not specified | Not specified | Not specified | Recommended |
| Carbon neutrality claims today | Not recommended | Beyond other standards | Not specified | Not specified | Not specified | Not specified |
| Approach to residual emissions | Residual emissions definition science aligned; CDR permanence required | Fully aligned | CDR permanence required | Residual emissions definition science aligned; CDR permanence required | CDR permanence required | Residual emissions definition science aligned; CDR permanence required |

Note: A more detailed version of this comparison table can be found in the accompanying methodological document (NewClimate Institute, 2024)

Corporate Climate Responsibility Monitor 2024

15

Exhibit 7 to Decl. of Angel Hsu
161

# SECTION A
# TRENDS IN CORPORATE CLIMATE RESPONSIBILITY

Section A of this report includes references to different company sample sizes:

**20 companies:** The 2024 CCRM includes in-depth analyses of 20 companies across four focus sectors: automotive manufacturers, electric utilities, fashion, and food and agriculture (Section B).

**51 companies:** For our aggregated analysis in Section A, we have also updated our assessments of the 2030 and net-zero targets for all other 31 companies covered in the 2022 and 2023 iterations of the CCRM. The 51 companies reported combined revenues of USD 6.1 trillion in 2022. Their total self-reported GHG emission footprint in 2022, including upstream and downstream emissions (scope 3) that may include a marginal degree of overlap, amounts to approximately 8.8 GtCO$_2$e. This is equivalent to roughly 16% of global GHG emissions in 2022.

**28 companies:** 28 of the 51 companies analysed in detail by the 2022, 2023 and 2024 iterations of the CCRM belong to the four focus sectors of this report: automotive manufacturers, electric utilities, fashion, and food and agriculture. The 28 companies from these four sectors are sometimes considered in more detail in Section A of this report.

16

Exhibit 7 to Decl. of Angel Hsu
162

# 1

# Net-zero and 2030 targets: integrity over flexibility in the crucial decade of climate action

## 1.1 Gradual but insufficient progress in corporate targets for 2030 and beyond

### Summary

The 2030 climate pledges of 51 of the largest multinational companies show some gradual improvements over the last two years. We estimate the median 2030 emission reduction commitment of these 51 companies to be 30–33% below 2019 levels. This gradual improvement in 2030 targets coincides with an emerging consensus across recently published voluntary standards on the meaning of credible longer-term corporate net-zero targets. Against this backdrop, an increasing number of companies substantiate their net-zero targets by explicitly committing to deep decarbonisation along their value chains, in line with 1.5°C-compatible emission reduction pathways for their respective sectors.

Despite these gradual improvements, the collective 2030 ambition continues to fall short of the economy-wide emission reductions required to stay below the 1.5°C temperature limit. While some companies set partially 1.5°C-aligned 2030 targets and measures to achieve them, many others either lack credible measures or set inadequate and outdated 2030 targets in the first place. The voluntary nature of existing standards on net-zero targets further allows almost half of the 51 companies to continue remaining vague about what exactly they intend to achieve as part of these pledges.

The world enters the fourth year of the crucial decade for climate action towards 2030 with a rapidly closing window to correct the course on what is required to limit global warming to 1.5°C. To stand a reasonable chance of limiting global warming to 1.5°C, global GHG and $CO_2$ emissions must decrease by around 43% and 48% respectively between 2019 and 2030, and by 84% and 99% by 2050 (IPCC, 2022).

Against the backdrop of recent scientific findings, the collective ambition of companies' 2030 climate pledges has gradually improved over the last two years. However, most companies continue to fall far short of the economy-wide emission reductions required to stay below the 1.5°C temperature limit until the end of the decade.

The 2030 targets of 51 major companies covered in our CCRM analyses between 2022 to 2024 translate to a median absolute emission reduction commitment of just 30% of the full value chain emissions between 2019 and 2030.[1] This may increase to 33% under the most optimistic scenario that emission intensity targets translate to equivalent absolute emission reductions (see Figure 2). This represents modest progress in companies' mitigation ambition towards 2030, with 19 out of 51 companies having updated their 2030 climate pledges over the last two years to varying degrees.[2]

Corporate targets for 2030, however, remain subject to a high level of uncertainty on what they mean in practice. Targets often cannot be taken at face value as companies, among other issues, may omit certain emission sources, use non-harmonised base years, fail to report updated base year emissions, or provide insufficient contextual information to understand what the targets mean in absolute terms.

---

1   The CCRM 24 includes in-depth analyses of 20 companies (see Section 8). We have updated all 2030 and net-zero targets for all other 31 companies included in the CCRM 22 and 23 as of April 2024 (see Annex I).

2   We identify updates 2030 targets for Accenture, BMW, Carrefour, Danone, Enel, ENGIE, Iberdrola, IKEA, Inditex, KEPCO, Maersk, Mars, Mercedes-Benz, Novartis, Tesco, Toyota, Unilever, Vodafone, and Volvo Group as of April 2024 (in alphabetical order).

Corporate Climate Responsibility Monitor 2024

17

Exhibit 7 to Decl. of Angel Hsu
163

**Several companies across different economic sectors take a leading role in setting updated and partially science-aligned targets towards 2030. However, companies need to substantiate these targets with transparent and credible plans to achieve them by the end of this decade.**

In the four focus sectors of this analysis – fashion, automotive manufacturers, food and agriculture, and electric utilities – eight of the 28 companies assessed have set 2030 targets that we rate as having high or reasonable integrity. These targets at least partially meet 1.5°C-aligned decarbonisation milestones for the major emission sources within specific sectors.

Among these companies, we observe variation in the degree to which companies substantiate these ambitious 2030 targets with relevant emission reduction measures *(see Table 3)*. Only four of the eight companies whose 2030 targets have high or reasonable integrity have emission reduction plans that may support the necessary shift from pledges to actual implementation: **Danone, Iberdrola, Mars and Volvo Group** *(see Section 2.1 for analysis on the mixed progress towards critical sector transitions)*. These companies' targets in combination with their underlying transition plans for 2030 reflect the latest developments in technology, voluntary and regulative frameworks, and scientific findings to stay below the 1.5°C temperature limit. For some other companies, in particular fashion companies like **H&M Group, Nike** and **Inditex**, we identify a significant gap between their ambitious targets and the lack of underlying measures to support them.

18



**Figure 2:** *The median commitment to emission reductions between 2019 and 2030 is 30-33%*
*This chart shows the proportion of full value chain GHG emissions that companies commit to reduce between 2019 and 2030. Data includes 51 companies. 4 companies without clear commitments for 2030 are not included.*

Data presented on a single y-axis. Placement on y-axis only relevant for sector affiliation.

Food & agriculture
Electric utilities
Fashion companies
Automotive manufacturers
Other sectors

Cross-sector global minimum requirements
48% reduction of $CO_2$ emissions
43% reduction of all GHG emissions

Median commitment –
30% including only absolute targets
33% including intensity targets

Unsubstantiated or unspecified 2030 target

Integrity rating: High | Reasonable | Moderate | Poor | Very poor

The colour of the data points represents our assessment of the integrity of company's 2030 targets, based on their sufficiency compared to sector-specific 1.5 °C aligned benchmarks, and the appropriateness of the terminology used in the pledge communication.

Note: The data in this chart represents the authors' interpretation of companies' emission reduction commitments, based on publicly available information. Targets that are reliant on offsets to an undefined extent are marked in ambiguous. See Section III and Annex III for further details and explanations on individual company cases. The median calculation that includes emission intensity targets represents the most systematic scenario that emission intensity targets result in equivalent absolute emission reductions.

Exhibit 7 to Decl. of Angel Hsu
164

**Table 3:** Gap between 2030 targets of 'reasonable' or 'high' integrity and actual emission reduction measures for companies in the fashion, automotive manufacturers, food and agriculture, and electric utilities sectors assessed in the Corporate Climate Responsibility Monitor (CCRM) 2022 to 2024.



| DEGREE OF IMPLEMENTATION GAP between 2030 targets considered (partially) aligned with the 1.5°C temperature limit and measures to implement them. | TARGETS TOWARDS 2030 (Section 2A) | REDUCTION MEASURES (Section 3) |
|---|---|---|
| **LOW DEGREE** | | |
| Danone | | |
| Iberdrola | | |
| Volvo Group | | |
| Mars | | |
| Ahold Delhaize (update of CCRM23 analysis) | | |
| Nike | | |
| H&M Group | | |
| **HIGH DEGREE** | | |
| Inditex | | |

Rating: ● High  ● Reasonable  ● Moderate  ● Poor  ● Very poor

Despite some promising developments, many companies' 2030 climate pledges are outdated and remain inadequate. These targets often cover only selected emission scopes and have not been substantially updated for five years or more.

Despite promising developments on updated 2030 targets by leading companies, many other companies' mitigation ambition towards 2030 remains inadequate. Some of these targets were initially set more than five years ago. For example, **Walmart** set its 2030 targets in 2016 and 2017 and has not significantly updated them since. As a result, these targets are outdated and do not reflect latest developments in science, technology, and validation methods.

Against this backdrop, many of these 2030 targets fail to meet key recommendations for 2030 target setting that have been published as voluntary guidance over the last two years. For example, 2030 targets remain predominantly focused on operational scope 1 and 2 emissions, while only inadequately addressing their full up- and downstream scope 3 emissions that are essential to successfully transition their business model (see Section 1.2 for further analysis on scope 3 targets). The UN HLEG recommendations and ISO Net Zero Guidelines both emphasise the need for 2030 targets to cover all emission scopes and address key relevant emission sources along their value chain (ISO, 2022, pp. 19–20; UN, 2022, p. 17).

Some companies even backpedal on their previously announced commitments instead of updating them in line with recent guidance. For example, **Volkswagen** entirely dropped its 2025 target between the reporting periods of 2021 and 2022 without any announced replacement.

The current validation practice of corporate targets by voluntary initiatives allows companies to keep promoting outdated targets. The Science Based Targets initiative (SBTi), as the largest and most influential validator of corporate targets, currently allows validations of 2030 targets to be used indefinitely. From 2025 onwards, companies will *"be required to review, and if necessary revalidate, their targets every five years from the date of the original target approval"* (SBTi, 2024b). However, a five-year review period is arguably too long for a 'science-aligned' target setting process as latest scientific findings on climate action are both fast-developing and indicating an urgent need for re-alignment with those new findings. Our analysis across more than 50 companies suggests that accelerating the revision and validation cycles of corporate climate targets — for example biannually to reflect latest developments — could help to overcome legacy issues that hinder the acceleration of climate action.

**An increasing number of companies substantiate their net-zero and carbon neutrality targets in line with recently published voluntary standards and guidance.**

More than a year has passed since the release of the recommendations by UN Secretary General's High-Level Expert Group (HLEG), the Net Zero Principles by the International Organization for Standardization, and the second version of the Science Based Targets initiative's Net Zero Standard (ISO, 2022; UN HLEG, 2022; SBTi, 2023d). Recent analysis finds that these voluntary standards, guidance, and assessment frameworks show an emerging consensus on the meaning of credible longer-term corporate net-zero targets and some of the specific criteria to operationalise them (see Chapter 4 in Net Zero Tracker, 2023). The available guidance thus provides companies with specific recommendations on how to pursue longer-term target setting with integrity.

More than half of the major companies we have assessed (29 out of 51) explicitly commit to emission reduction targets alongside their net-zero pledges (see Figure 3). Eighteen companies commit to deep decarbonisation along their value chain by aiming for close to a 90% reduction, partially aligning with 1.5°C-compatible decarbonisation milestones. Some companies have explicitly updated their net-zero pledges over the last two years. For example, **Inditex** clarified that its 2040 net-zero target implies a 90% absolute emission reduction across the entire value chain below 2018 levels, equivalent to 89% below 2019 levels. Similarly, both **Tesco** and **Mars** substantiated their net-zero pledges by committing to emission reduction targets alongside their net-zero pledges in 2023.

Corporate Climate Responsibility Monitor 2024

19

*Exhibit 7 to Decl. of Angel Hsu*

165

**Figure 3:** 18 of 51 companies commit to deep decarbonisation with their net-zero pledges.
*This chart shows the proportion of full value chain GHG emissions that companies commit to reduce within their net zero pledges. Data includes 51 companies. For 18 other companies the meaning of the net zero target is ambiguous.*



Despite specific recommendations on how to set credible net-zero targets, almost half of the existing net-zero targets remains of poor or unclear integrity due to the inadequacy or absence of explicit emission reduction commitments, scope exclusions, or ambiguous offsetting and neutralisation strategies.

Twenty-two of the 51 companies continue to remain vague on what exactly they intend to achieve as part of these net-zero pledges. Of these 22 companies, three companies at least commit to measures that implicitly substantiate their pledges by addressing a substantial share of emissions. For example, **Volvo Group** does not set an emission reduction target alongside its 2040 net-zero pledge but does commit to aspirational sales shares of heavy-duty zero-emission vehicles under an illustrative scenario for 1.5°C towards 2040. The other 19 companies neither explicitly specify the extent to which they intend to reduce emissions nor commit to other quantitative decarbonisation milestones that would imply deep emission reductions. The exclusion of relevant emission scopes like for **Walmart**, **Tesco** or **Nestlé** or the ambiguity of the role of emission reductions compared to offsetting and neutralisation strategies like for **Volkswagen** or **Toyota** represent key remaining obstacles for higher ambition across major companies.

The voluntary nature of current standards and guidance continues to leave companies with the flexibility to follow recent recommendations by HELG, ISO, or SBTi or simply continue with vaguely formulated, unsubstantiated, and potentially misleading targets.

20

Exhibit 7 to Decl. of Angel Hsu

166



21

## 1.2 Scope 3 emissions: insufficiency and the risk of backsliding

### Summary

The limited depth of emission reduction targets for companies' up- and downstream value chain emissions (scope 3) remain a key limitation for the integrity of most companies' 2030 climate pledges. These emissions are often the most significant and relevant for the sector transformations that would be necessary to align with a 1.5°C pathway. Although we see signs of gradual improvement in addressing value chain emissions by 2030 targets, proposals for introducing flexibility mechanisms in the form of offsetting for scope 3 targets are gaining momentum. This would entail backsliding on already insufficient commitments. The VCMI beta scope 3 flexibility claim could effectively nullify the scope 3 targets of most of the companies we have analysed for the period up to 2030, leaving them accountable only to their scope 1 and 2 emission targets. Any potential link between the VCMI scope 3 flexibility proposal and the SBTi target setting guidance remains unclear. Instead, of addressing the challenges of target implementation through offsetting, the GHG Protocol and SBTi Net Zero Standard revision processes are an opportunity to reconsider the categorisation of value chain emissions to focus on the most critical decarbonisation indicators for each sector which are well within companies' direct control.

A key limitation of many companies' targets for 2030 is the lack of depth in addressing up- and downstream (scope 3) emissions, which account for the majority of their footprint and are often within the direct control of companies.

Up- and downstream (scope 3) emissions account for over 90% of the emission footprints of most of the 51 companies assessed in the CCRM. Companies' 2030 targets – and voluntary initiatives that validate those targets – primarily focus on operational emissions (scope 1 and 2) for the period up to 2030. Addressing up- and downstream scope 3 emissions is essential to successfully transition companies' business models.

In some sectors, scope 3 emissions are the main emission source of relevance regarding the sector transformations that would be necessary to align with a 1.5°C pathway, and these are emissions that are within the direct control of companies because they result directly from business model decisions. Sector transformations often depend on the type of product that companies choose to produce, rather than how it is produced, as demonstrated in Table 4.

The UN HLEG recommendations and ISO Net Zero Guidelines emphasise the need for 2030 targets to cover all emission scopes (ISO, 2022, pp. 19–20; UN , 2022, p. 17).

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu
167

Table 4: Relevance of scope 3 emissions for companies covered in the 2024 CCRM

| Sector | Scope 3 | | Scope 1 & 2 | |
|---|---|---|---|---|
| **Automotive manufacturers**<br>BMW, Mercedes-Benz, Stellantis, Toyota, Volkswagen Group, Volvo Group (Daimler Truck does not disclose scope 3 emissions) | ~99% | of emissions derive from scope 3 emissions on average, mostly from the use of sold vehicles downstream. The companies' climate footprints are mostly dependent on the extent to which companies continue to produce internal combustion engine vehicles, or transition to manufacturing electric vehicles. | Just ~1% | of emissions derive from operations (scope 1 and 2) to produce these vehicles. Installing solar panels onto production facilities will not transform the emissions footprint of the businesses. |
| **Food processors and retailers**<br>Ahold Delhaize, Carrefour, Danone, JBS, Mars, Nestlé, PepsiCo, Tesco, Unilever, Walmart | ~95% | of emissions derive from scope 3 on average, mostly from activities such as rearing livestock and the use of fertilisers. The companies' climate footprints are mostly dependent on the extent to which companies shift their business models to plant-based products. | Just ~5% | of emissions derive from operations (scope 1 and 2) related to operating offices, warehouses and stores. Reducing emissions from operations will not transform the emissions footprint of the businesses. |
| **Fashion producers and retailers**<br>Adidas, Fast Retailing, H&M Group, Inditex, Nike | ~95% | of emissions derive from scope 3 emissions on average, mostly from the procurement of materials and of energy in the supply chain. The companies' climate footprints are mostly dependent on the extent to which companies transition to sustainable materials and renewable energy within the supply chain. | Just ~5% | of emissions derive from operations (scope 1 and 2) related to operating offices, warehouses and stores. Reducing emissions from operations will not transform the emissions footprint of the businesses. |
| **Electric utilities**<br>Duke Energy, EON, Enel, Engie, Iberdrola, REPCO | ~63% | of emissions derive from scope 3 emissions on average, mostly from the procurement of electricity for retail and the downstream use of sold natural gas. Many major companies transition through a retail business model, shifting their emissions from scope 1 to scope 3. Their climate footprint is dependent not only on their own generation but also the business model they pursue as a retailer of fossil or renewable energy. | ~37% | of emissions derive from Scope 1 emissions, mostly from electricity generation. This emission source is highly relevant for many electric utilities, when the business model is focused more on direct generation than retail. |

Proposals for introducing flexibility mechanisms for scope 3 targets are gaining momentum, although this would entail backsliding on already insufficient commitments, in many cases nullifying companies' current targets.

There is a clear consensus within the scientific community that companies should not be able to achieve short- and medium-term emission reduction targets through offsetting. This has been a long-standing principle of SBTi since its initiation, and was also one of the key recommendations of the Integrity Matters report by the United Nations' High-Level Expert Group on the Net-Zero Emissions Commitments of Non-State Entities (UNFCCC, 2023c).

In contradiction to these recommendations, 2024 sees an active discussion on the potential role of offsetting towards scope 3 targets.

The Voluntary Carbon Markets Integrity initiative (VCMI) Claims Code of Practice – launched in November 2023 ahead of COP28 – is intended to be a demand-side rulebook on how companies can make voluntary use of carbon credits as part of credible, science-aligned net-zero decarbonisation pathways (VCMI, 2023a). VCMI's guidelines include a framework for "carbon integrity" claims, which could be understand as a constructive approach to climate change mitigation contributions beyond a company's value chain and targets (see section 4.1), as well as a separate framework referred to as the VCMI beta scope 3 flexibility claim.

**VCMI's scope 3 flexibility proposal would allow companies to purchase carbon credits for up to 50% of their annual scope 3 emissions** to "bridge the gap" to the scope 3 target trajectory that they are not on track to meet up to 2030 (VCMI, 2023b). Whether this constitutes offsetting depends on one's interpretation of terminology, but it offers companies the possibility to use carbon credits as an alternative, rather than a complement, to cutting their own emissions, during the "critical decade" for action.

Exhibit 7 to Decl. of Angel Hsu
168

The VCMI's beta claim sets a 50% flexibility threshold compared to a company's actual emissions in any given year, rather than 50% of the emission reductions necessary to achieve the company's target. In other words, companies could still qualify to make some (currently undefined) form of claim regarding their scope 3 targets, even if their emissions are double the levels implied by the target trajectory in any given year. In most cases, companies could significantly increase their emissions between 2019 and 2030 and still remain eligible for the claim.

To illustrate the implications of the Scope 3 Flexibility Claim, we tested it for the 14 companies covered in this report with SBTi-validated 2030 targets that can be broken down to scope 3 specifically. Of the 14 companies, 11 would be entitled to the flexibility to even increase (8) or plateau (3) their scope 3 emissions between 2019 and 2030, rendering these companies' current scope 3 targets effectively meaningless. Figure 4 demonstrates the implications of this for companies' overall commitments to value chain emission reductions between 2019 and 2030 (including a combination of all their targets for scope 1, 2 and 3 emissions), showing that the proposed 50% flexibility mechanism would nullify the scope 3 commitments of most companies and leave them accountable only to their scope 1 and 2 targets.

Under VCMI's beta proposal, the role of carbon credits to "bridge the gap" should phase out by 2035 at the latest. The phase-out by 2035 is identified as a "guardrail" for the Scope 3 Flexibility Claim. However, it is questionable whether the proposed timeline for 2035 can send a meaningful signal to companies, given the high probability of further developments to the rulebooks and recommendations related to corporate accountability and claims over the next decade.

**Any potential link between the VCMI scope 3 flexibility proposal and the SBTi target setting guidance remains unclear.** In response to pressure from some stakeholders urging SBTi to reverse its long-standing position that companies' short- and medium-term targets should not be met through offsetting, SBTi announced in September 2023 an open call for evidence on the effectiveness of carbon credits and other certificates used for offsetting claims. At COP28 in December

2023, SBTi collaborated with VCMI and other initiatives to announce a "framework for end-to-end integrity" aimed at aligning and complementing their guidance (Manuel, 2023). It remains unclear whether SBTi's position on the use of offsetting towards scope 3 targets could change, and whether the VCMI Scope 3 Flexibility Claim could serve as a basis for any such changes. This would further weaken companies' SBTi scope 3 targets, which in many cases are already critically insufficient to align with 1.5°C pathways (see section 1.3).

**Figure 4: The proposed scope 3 flexibility claim would effectively nullify the scope 3 targets of most companies, reducing their 2030 commitments to cover only scope 1 and 2 emissions.**



Exhibit 7 to Decl. of Angel Hsu

169

23

Corporate Climate Responsibility Monitor 2024

Unnuanced flexibility to offset scope 3 emissions is not the right solution to address the challenges that companies understandably face in implementing targets. Instead, the GHG Protocol and SBTi Net Zero Standard revision processes are an opportunity to reconsider the categorisation of value chain emissions to focus on the most critical decarbonisation indicators for each sector which are well within companies' direct control.

Scope 3 emission reduction targets represent a serious challenge for companies. But it is far too simple to suggest that scope 3 emissions are outside of the direct influence of companies. In particular, the materials that companies choose to procure and the products that their produce are the most relevant business decisions that determine the extent to which companies' transition plans are aligned with the objectives of the Paris Agreement. On these issues, there is no room for flexibility and offsetting is not the right solution. Instead of accounting approaches that lead to ambiguous claims, transparency and constructive dialogue are necessary when companies understandably fall short of the hugely challenging level of necessary ambition.

Instead of addressing the challenge through blanket flexibility across all scope 3 emission categories, the process to revise of the GHG Protocol and SBTi Net Zero Standard throughout 2024 and 2025 offers the opportunity to reconsider the general approach to categorising and accounting for value chain emissions. GHG emission accounting for the value chain could better distinguish between those emission sources within companies' direct influence that are of utmost importance to sector transitions, and other emission sources where companies genuinely have less information and control to lead the transition. Compiling all these emission sources under the extensive umbrella of 'scope 3 emissions' and formulating overarching targets across scope 3 may not afford sufficient focus to the most critical decarbonisation indicators for each sector, and may create non-trivial challenges for companies to account and plan for truly indirect emission sources where they may understandably lack the confidence to set targets without flexibility allowances.

Part of the rationale for scope 3 flexibility proposals is to increase the flow of voluntary climate finance to climate change mitigation projects worldwide through carbon crediting, but climate contributions (also referred to as Beyond Value Chain Mitigation) can also increase the flow of voluntary climate finance without compromising transparency and the requirement to decarbonise a company's own emissions (see *contribution claims in section 4.1*).



24

Exhibit 7 to Decl. of Angel Hsu
170

## 1.3 Key challenges for improving science-aligned validations of corporate climate targets

### Summary

The voluntary Science Based Targets initiative (SBTi), as the largest and most influential validator of corporate climate targets, plays a crucial role in the current accountability system on credible corporate climate action. Our analysis comparing existing SBTi validations for 2030 targets with other analyses by independent assessors points to multiple areas for improvements of its current validation practice. These include a more stringent focus on scope 3 emissions as part of 2030 validations, addressing legacy issues stemming from outdated validations and validation methods, and the exclusion of potentially misleading 'insetting' practices.

The SBTi might face multiple challenges to implement such timely improvements. As a voluntary and mostly third-party funded initiative, the SBTi depends on the voluntary participation of companies and needs to accommodate the perspectives of different stakeholders when developing its validation methodologies. These contextual conditions may explain some of the existing flexibility in the system and might present a bottleneck for SBTi to further develop towards fully science-aligned validations that provide the necessary insights for investors, regulators, courts, and other stakeholders on 1.5°C-aligned climate action.

The Science Based Targets initiative (SBTi), as the largest and most influential validator of corporate climate targets and independent assessments, plays a critical role to validate corporate climate pledges towards 2030. A comparison between the ratings of SBTi and other assessors indicates a significant degree of leniency in current SBTi validation practices and points to multiple areas for improvements.

Founded in 2015, the Science Based Targets initiative (SBTi) has developed into the largest and most influential validator of corporate targets for 2030 and beyond. As of March 2024, the SBTi has validated more than 4,800 companies upon the voluntary request of companies (SBTi, 2024c), establishing itself as the de facto standalone validator of corporate climate targets (*see Section 4.3 for further analysis on the current corporate accountability system*). Diverse stakeholders including investors, regulators, the judiciary, and civil society use and rely on these validations to tell apart credible climate pledges that are in line with the Paris Agreement objectives, from those that are not.

Out of the 51 companies assessed between 2022 and 2024, 28 are active in the four focus sectors of this analysis: fashion, automotive manufacturers, food and agriculture, and electric utilities. SBTi has validated the 2030 targets of 22 of these 28 companies to be aligned with a pathway to limit global temperature increase to 1.5°C, 'well-below 2°C', or 2°C. Companies generally highlight these validations prominently in their climate-related communications.

The comparison between SBTi's validations of 2030 targets and assessments by the *Corporate Climate Responsibility Monitor* (CCRM), the Transition Pathways Initiative (TPI), the MSCI Net Zero Tracker, and the Planet Tracker identifies five distinct areas for improvements of its current validation practice (*see Table 5 below for detailed overview*).

× **Temperature classifications of target validations for 2030 usually do not apply to large shares of companies' value chains:** Current validations of 2030 targets – phrased as 'target classifications' that provide a temperature alignment – mostly cover operational scope 1 and 2 emissions (SBTi, 2024e). Those temperature classifications do not apply to scope 3 targets in most cases, although companies' scope 3 targets are also listed on SBTi's website. A 1.5°C validation for a given scope 1 and 2 target might in some cases only cover less than 5% of a company's total footprint. SBTi's 'expansive boundary' approach under its SBTi Net Zero Standard only requires companies to cover 67% of all scope 3

emissions for 2030 or 2035 interim targets (SBTi, 2024d, p. 25). In some cases, the expansive boundary may be a reasonable approach to allow companies to focus the most important and accessible emission sources in the short-term. However, the approach can also be used to simply reduce a company's apparent emission reduction ambition across all emission sources. For example, Tesco has SBTi-validated targets for 2032 for its non-FLAG emissions that specifically cover 67% of each scope 3 emissions category (except for use of sold products).

× **SBTi's validations across companies within respective sectors cover different emission shares along the entire value chain.** Current validations of 2030 targets for different companies within a given sector can cover different emission scopes along companies' value chains.

- **Automotive manufacturers:** The Volvo Group's temperature classification only covers scope 1 and 2, while the temperature classifications of other vehicle manufacturers cover scope 3 use phase emissions for LDVs.

- **Electric utilities:** Enel and Iberdrola's temperature classifications include all scope 3 emission categories while ENGIE's validation covers scope 3 category 1, 2, 3, 11 and 15. E.ON's temperature classification covers no scope 3 emission categories, although scope 3 emissions account for over 90% of the company's GHG emission footprint.

- **Fashion:** Adidas's temperature classification covers all scope 3 emissions while the temperature classifications of other fashion companies cover no scope 3 emission categories.

- **Food and agriculture:** Nestlé and Unilever's temperature classifications includes parts of their scope 3 emissions while the temperature classifications of all other seven food and agriculture companies that we assessed since 2022 do not cover any scope 3 emissions.

Exhibit 7 to Decl. of Angel Hsu
171

Corporate Climate Responsibility Monitor 2024

25

We could not identify an explanation of this different coverage within same sectors. These varying scope coverages make it difficult for external audiences to compare companies within any given sector. This is further complicated by the fact that many scope 3 targets listed do not receive a 'target classification' as of April 2024. Other assessors, such as the Transition Pathways Initiative (TPI), use consistent sector-specific methods covering specific emission scopes across all companies in each sector, offering a more uniform basis for comparison.

× **No disclosure of methods and underlying data used for specific validations:** SBTi neither provides information on validation methods used for specific company validations, nor on underlying data inputs such as base year emissions. On the former, it remains unclear for an external audience whether SBTi uses sector-specific or cross-sectoral methods for specific validations. This reinforces the challenge to understand and compare the validations between companies within a given sector.

× **Presentation of outdated validations dating back up to seven years and continued use of automotive manufactures validations based on methods discontinued by SBTi (legacy issues):** The SBTi continues to list outdated validations on their website, which are subsequently and continuously used by companies in their sustainability reporting. In addition, SBTi list 'well-below 2°C' validations for the scope 3 emissions intensity targets for light duty-vehicles for automobile manufacturers such as **Volkswagen, Toyota, Mercedes-Benz,** or **BMW** despite indefinitely pausing the methodology's use due to its 1.5°C-incompatibility since March 2022 (SBTi, 2022c). None of these companies have been validated under SBTi's new interim guidance for automobile manufacturers, released in March 2024. This new guidance requires a 'phase out of new ICE cars and vans by 2035 in leading markets and by 2040 globally' (SBTi, 2024f, pp. 16–17). Our analysis for Volkswagen and Toyota, for example, shows that neither of the two companies sets ICE phase-out targets in line with these requirements.

× **Use of carbon dioxide removals within the value chain – sometimes referred to as 'inserting' – by companies operating in the forest, land, and agriculture (FLAG) sector:** The SBTi FLAG guidance and the SBTi Net Zero Standard allow companies operating in the FLAG sector to use carbon dioxide removals within the value chain to meet their 2030 and net-zero targets (SBTi, 2023b, pp. 27–28, 2024d, pp. 26–27). This concept – sometimes referred to as 'inserting' – includes approaches under which emissions are offset within the value chain rather than reduced. 'Inserting' through land sequestration carbon dioxide removals is not an equivalent alternative to emission reductions, among other reasons, due to high uncertainties regarding the permanence of outcomes and lack of certification (see Section 3.4 for detailed analysis). **Nestlé** and **PepsiCo** are examples of companies that rely on inserting to achieve 2030 pledges.

Aside from the FLAG sector, the SBTi further allows for emission reduction measures that (partially) occur within a company's scope 3 value chain to count towards target achievement under the term 'inserting' (SBTi, 2023c, pp. 13–14). The SBTi allows this inserting practice on 'a case-by-case basis' despite pointing out the lack of standardised definitions and overall uncertainty around this approach (SBTi, 2023c, pp. 13–14).

The SBTi might face multiple challenges to implement these timely improvements on its validation practice for 2030 targets due the voluntary nature of the initiative and the influence of diverse stakeholders.

As a voluntary and mostly third-party funded initiative, the SBTi depends on the voluntary participation of companies and needs to accommodate the perspectives of different stakeholders when developing its validation methodologies. These contextual conditions may explain some of the existing flexibility in the current validation practice and might present a bottleneck for SBTi to further develop towards fully science-aligned validations that are timely and provide the necessary insights for investors, regulators, courts, and other stakeholders on 1.5°C-aligned climate action.

Without the initial improvement listed above, however, existing SBTi validations for 2030 targets continue to lend credibility to some companies whose targets are highly insufficient. This leads to undifferentiated validations of corporate targets, regardless of whether a company has set a 1.5°C-aligned target across the entire value chain or is lagging behind in climate action. As a result, SBTi's 2030 validations currently do not fully provide the timely information to the diverse stakeholders who use and rely on these validations to tell apart companies that embark on the necessary transitions to align their business models with the Paris Agreement objectives, from those that do not.

26

Exhibit 7 to Decl. of Angel Hsu
172

Corporate Climate Responsibility Monitor 2024

**Table 5:** Comparison between 2030 target assessments by (1) the Corporate Climate Responsibility Monitor (CCRM) 2024, (2) the Science Based Targets initiative (SBTi), (3) the Transition Pathway Initiative, (4) the MSCI Net Zero Tracker, and (5) the Planet Tracker; all as of March 2024. Companies listed in alphabetical order for each sector.

| COMPANY | CCRM 2024 INTEGRITY ASSESSMENT (Short-term targets towards 2030) | SBTi TEMPERATURE RATING (Near-term targets for specific scopes) | TPI's CARBON PERFORMANCE ASSESSMENT (2030 targets for specific scopes per sector) | MSCI NET ZERO TEMPERATURE ALIGNMENT (for reduction targets & emissions trajectories) | PLANET TRACKER 'CLIMATE ALIGNMENT' (for 2030) |
|---|---|---|---|---|---|
| **Automotive manufacturers** | | | | | |
| BMW | Poor (CCRM 2022) | 1.5°C & Well-below 2.0°C | 2.5°C | 1.9°C | n/a |
| Daimler Trucks | Unclear | Not validated | n/a | 2.3°C | n/a |
| Mercedes-Benz | Poor (CCRM 2023) | 1.5°C & Well-below 2.0°C | <2.0°C | 1.5°C | n/a |
| Stellantis | Moderate | Not validated | <2.0°C | 1.6°C | n/a |
| Toyota | Very poor | 1.5°C & Well-below 2.0°C | 2.5°C | 2.0°C | n/a |
| Volkswagen Group | Poor | 1.5°C & 2.0°C | >2.5°C | 2.3°C | n/a |
| Volvo Group | Reasonable | 1.5°C | n/a | 1.5°C | n/a |
| **Electric utilities** | | | | | |
| Duke Energy | Very poor | Not validated | >2.5°C | 3.3°C | n/a |
| Enel | Moderate | 1.5°C | <2.0°C | 1.5°C | n/a |
| Engie | Poor | 1.5°C | 1.5°C | 1.7°C | n/a |
| E.ON | Poor (CCRM 2022) | 1.5°C | 1.5°C | 1.5°C | n/a |
| Iberdrola | Reasonable | 1.5°C | 1.6°C | 1.5°C | n/a |
| KEPCO | Poor | Not validated | >2.5°C | 2.4°C | n/a |
| **Fashion** | | | | | |
| Adidas | Moderate | 1.5°C | n/a | 1.5°C | n/a |
| H&M Group | Reasonable | 1.5°C | n/a | 1.5°C | n/a |
| Inditex | Reasonable | 1.5°C | n/a | 1.5°C | n/a |
| Nike | Reasonable | 1.5°C | n/a | 1.5°C | n/a |
| Fast Retailing | Poor | 1.5°C | n/a | 3.5°C | n/a |
| **Food and agriculture** | | | | | |
| Ahold Delhaize | Reasonable (CCRM 2022) | 1.5°C | n/a | 1.4°C | n/a |
| Carrefour | Poor (CCRM 2023) | Well-below 2°C | n/a | 1.5°C | n/a |
| Danone | Reasonable | 1.5°C | Not assessed due to unsuitable disclosure | 2.4°C | >2.0°C |
| JBS | High | Commitment removed | 1.5°C | 3.2°C | n/a |
| Mars | Poor | 1.5°C | n/a | n/a | n/a |
| Nestlé | Poor | 1.5°C | 1.5°C | 1.9°C | >2.0°C |
| PepsiCo | Unclear (CCRM 2023) | 1.5°C | n/a | 2.2°C | n/a |
| Tesco (for 2032) | Poor (CCRM 2023) | 1.5°C | n/a | 2.4°C | >2.0°C |
| Unilever | Poor (CCRM 2022) | 1.5°C | n/a | 2.2°C | >2.0°C |
| Walmart | Very poor | 1.5°C | n/a | 2.2°C | >3.0°C |

**KEY ISSUES EXPLAINING THE DIFFERENCE BETWEEN SBTi TEMPERATURE RATINGS AND THE CCRM INTEGRITY ASSESSMENTS FOR CORPORATE TARGETS TOWARDS 2030** (Use of levelling / Discontinued or legacy validations / Exclusion of scope 3 emission share / Lack of disclosure on method & underlying data / Other reasons)

**Automotive manufacturers:**
- **Legacy:** The SBTi temperature ratings for intensity targets of light-duty vehicles' use-phase emissions use a method permanently paused by the SBTi since March 2022 (BMW, Mercedes-Benz, Toyota, Volkswagen Group).
- **Exclusion:** The SBTi temperature ratings do not cover upstream scope 3 emissions (all), HDV use-phase emissions (Toyota, Volkswagen Group, Volvo Group), and other downstream scope 3 emissions not related to use-phase emissions (all).
- **Other:** CCRM assessments considers a range of 1.5°C-specific decarbonisation milestones for specific geographies like the EU or US identified in the literature

**Electric utilities:**
- **Exclusion:** The SBTi temperature ratings cover different emission scopes ranging from the coverage of all emission scopes (Enel, Iberdrola), partial coverage of scope 3 emissions (Engie) to operational emissions only (E.ON).
- **Other:** CCRM assessments considers a range of 1.5°C-specific decarbonisation milestones for specific geographies like the EU or US identified in the literature.

**Fashion:**
- **Exclusion:** The SBTi temperature ratings for all companies only cover operational emissions, excluding all scope 3 emissions (>95% of total emissions).
- **Disclosure:** We cannot identify the SBTi method used for Adidas' validation covering scope 3 emissions (e.g. cross-sectoral and/or sector-specific methods).
- **Other:** CCRM assessments considers that no targets set within five-year intervals towards 2030 (H&M Group, Inditex, Nike).

**Food and agriculture:**
- **Targeting:** Several SBTi temperature ratings in the FLAG sector allow for the use of 'insetting' within the value chain (Nestlé, PepsiCo, Unilever).
- **Outdatedness:** The SBTi displays outdated temperature classifications on its webpage for targets dating back more than two years ago (Walmart).
- **Exclusion:** The majority of SBTi temperature ratings do not cover any upstream scope 3 emissions (Ahold Delhaize, Carrefour, Danone, Mars, PepsiCo, Tesco, Walmart).
- **Disclosure:** We cannot identify the SBTi method used for validations (Ahold Delhaize, PepsiCo) and/or the underlying data relevant for the validation (Carrefour).
- **Other:** CCRM assessments considers that no targets set within five-year intervals towards 2030 (Ahold Delhaize, Danone).

Exhibit 7 to Decl. of Angel Hsu
173

**SER 453**

Our analysis indicates that the SBTi's Net Zero Standard may provide a credible framework for net-zero targets that are substantiated by emission reduction commitments. However, the lack of clarity on the treatment of carbon dioxide removals *within* the value chain raises questions over validations in the forest, land, and agriculture (FLAG) sector, and compliance across sectors must be thoroughly and continuously monitored in the future.

Alongside validations for 2030 targets, SBTi has validated more than 730 companies' net-zero targets as 1.5°C-aligned as of March 2024 (SBTi, 2024c). More than 1,900 companies have officially committed to setting net-zero targets in line with the SBTi Net Zero Standard, although SBTi has not yet validated their targets.

Among the 28 companies in the four focus sectors we assessed, six have had their net-zero pledges certified by SBTi under its Net Zero Standard. We find the net-zero pledges of **Enel, Iberdrola, H&M Group, and Mars** to be of reasonable integrity. SBTi's Net Zero Standard mandates that net-zero pledges should equate to at least 90% emission reductions across the full value chain. This requirement directly addresses the key issues that undermine many other companies' net-zero pledges, which either lack clarity or fail to commit to deep decarbonisation. The validated 2050 net-zero targets by **Nestlé** and **Tesco** under the FLAG sector, however, are prone to the same issues concerning the use of carbon dioxide removals *within the value chain* as those observed in 2030 target validations.

Another four of the 28 companies from the focus sectors assessed in this report have officially committed to the Net Zero Standard through SBTi's webpage, but SBTi has not yet validated their targets. We evaluate the net-zero targets of two of those four companies to have very poor integrity (**BMW, PepsiCo**) and two others as reasonable (**Ahold Delhaize, Inditex**). In March 2024, SBTi removed previously made commitments by more than 200 companies from its target dashboard as these companies did not substantiate their net zero commitments with specific targets within the required time period (Robinson-Tillett, 2024; SBTi, 2024a). This affected five companies of the 28 companies assessed in this report (**ENGIE, Carrefour, JBS, Unilever, Walmart**), all of which we evaluated as of poor or very poor integrity.

**Table 6:** Comparison between integrity assessment of net-zero targets as part of the Corporate Climate Responsibility Monitor (CCRM) 2024 and validations of net-zero targets by the Science Based Targets initiative (SBTi) as of March 2024. Companies listed in alphabetical order.

| COMPANY | CCRM 2024 INTEGRITY ASSESSMENT (for net-zero targets in the medium- or longer-term) | SBTi VALIDATIONS (for net-zero targets) |
|---|---|---|
| Ahold Delhaize | for longer-term beyond 2041; CCRM 2023 update | Officially committed since 2021, no validation |
| BMW | for medium-term between 2031–2040; CCRM 2022 update | Officially committed since 2021, no validation |
| Carrefour | for medium-term between 2031–2040; CCRM 2023 update | Commitment removed since 2024 |
| Enel | for medium-term between 2031–2040 | 1.5°C validated in 2023 |
| Engie | for longer-term beyond 2041 | Commitment removed since 2024 |
| H&M | for medium-term between 2031–2040 | 1.5°C validated in 2022 |
| Iberdrola | for medium-term between 2031–2040 | 1.5°C validated in 2022 |
| Inditex | for medium-term between 2031–2040 | Officially committed since 2021, no validation |
| JBS | for longer-term beyond 2041; CCRM 2022 update | 1.5°C validated in 2022 |
| Mars | for longer-term beyond 2041 | 1.5°C validated in 2022 |
| Nestlé | for longer-term beyond 2041 | 1.5°C validated in 2022 |
| PepsiCo | for longer-term beyond 2041 | Commitment removed since 2021, no validation |
| Tesco | for medium-term between 2031–2040; CCRM 2022 update | 1.5°C validated in 2022 |
| Unilever | for longer-term beyond 2041 | Commitment removed since 2024 |
| Walmart | for longer-term beyond 2041 | Commitment removed since 2024 |

Integrity rating: ● High ● Reasonable ● Moderate ● Poor ● Very poor

28

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu
174

## 1.4 Summary of recommendations for improving the integrity of corporate climate target setting

### Recommendations for improving integrity of corporate climate target setting

- ✓ **Companies:** Companies should follow an **accelerated revision cycle for corporate climate targets** towards 2030 to align their targets with the latest developments in science, technology, and validation methods. This revision process should incorporate the latest recommendations on corporate target setting, such as those from the UN High-Level Expert Group (UN HLEG) or the ISO Net Zero Principles. Short-, medium- and long-term targets should, among others, cover all emission scopes along the value chain including scope 3 value chain emissions, be set at least within five-year intervals, and be aligned with 1.5°C-compatible pathways with no or limited overshoot.

- ✓ **Regulators:** Regulators should enact **mandatory regulations** to mandate companies to set legally binding targets and transition plans aligned with the 1.5°C trajectory. Such mandatory regulations — even if they encounter challenges like political lobbying themselves — could effectively address some of the existing shortcomings of a predominantly voluntary system that provides companies full flexibility on whether to follow existing voluntary guidance or not.

- ✓ **Science Based Targets initiative (SBTi):** The SBTi, as the largest and most influential validator of corporate climate targets, could implement improvements to ensure the high integrity of their 'target classifications' going forward.

  - **Increase the frequency of the validation cycle for 2030 corporate climate targets** to align validations with the latest developments in validation methods and latest scientific findings.

  - **Revise approach and develop methodologies to cover scope 3 emissions** related to key relevant emission sources along the value chain in SBTi's target classifications.

  - **Remove outdated and 'legacy' validations** issued several years ago or based on methodologies that have been paused indefinitely, such as intensity targets for light-duty vehicles in the automotive sector.

  - **Revise the SBTi's FLAG guidance** to specify minimum requirements for the reduction of agricultural emissions, alongside carbon dioxide removals.

  - **Transparently disclose underlying data and methods for each validation and communicate existing limitations affecting current validations.**

- **SBTi, GHG Protocol and Voluntary Carbon Markets Integrity (VCMI) initiative:** The consultations by SBTi on the effectiveness of environmental attribute certificates in climate targets, the revision process of the GHG Protocol, and the finalisation of VCMI claims will take place throughout 2024 and 2025.

  - These processes should reaffirm that offsetting cannot play a role towards company's inventories and the achievement of companies' emission reductions targets. This position aligns with the recommendations of the UN HLEG, ISO Net Zero Principles, and the original SBTi principles. The challenge of meeting the necessary ambition poses understandable difficulties for companies. Resolving this issue necessitates open dialogue and collaborative solutions, rather than resorting to more ambiguous accounting approaches that obscure genuine progress. The VCMI carbon integrity claims and the SBTi beyond value chain mitigation recommendations offer a more transparent and constructive approach to scaling up voluntary climate finance, compared to scope 3 'flexibility' claims.

  - Instead of addressing the challenges by allowing unnuanced flexibility in the form of offsetting across all scope 3 emission categories, the GHG Protocol and SBTi Net Zero Standard revision processes create an opportunity to reconsider the categorisation of value chain emissions to focus on the most critical decarbonisation indicators for each sector, which are well within companies' direct control.

29

Exhibit 7 to Decl. of Angel Hsu
175

Corporate Climate Responsibility Monitor 2024

## 2    Mixed progress towards critical sector transitions

### 2.1 Some sectors on the right track but accelerated efforts required

**Summary**

Only four of the 20 companies assessed present emission reduction measures that have reasonable integrity. These are Enel, Danone, Iberdrola and Volvo Group. We evaluated the measures of another four companies to have moderate integrity, while over half of the companies receive a poor or very poor integrity rating for their emission reduction plans. For some companies, we identify a strong gap between ambitious targets and the absence of underlying measures (see section 1.1).

Overall, we find that the European electric utilities are on the right track when it comes to ramping up renewable energy generation, although increased deployment is necessary to meet regional 1.5°C-aligned benchmarks for electricity generation. Enel is the only one of the electric utilities present a comprehensive plan to phase out all fossil fuels (see Section 3.1). Automotive manufacturers are also moving in the right direction – albeit at a slow pace. All automotive manufacturers we assessed in our report present plans for phasing in electric vehicles, which is critical to eliminate use-phase emissions. In the food and agriculture sector, most companies are reluctant to implement deep and comprehensive emission reduction measures, although we identified some promising exceptions. Four of the five fashion companies assessed set ambitious 2030 targets, but none present convincing plans on how to reduce emissions.

Most companies assessed in this report do not take the necessary measures to significantly reduce their GHG emissions. The sectoral transition frameworks in section B describe what measures companies active in the four focus sectors of this report should take to place themselves on a 1.5°C-aligned trajectory. Only four of the 20 companies assessed in this report present measures that have reasonable integrity (see Table 7). These are Enel, Danone, Iberdrola and Volvo Group. We evaluated the emission reduction measures of another four companies – Mars, Stellantis, Volkswagen Group, and Walmart – to have moderate integrity. The other 12 companies do not implement the measures that would be necessary for sectoral transitions.

Exhibit 7 to Decl. of Angel Hsu
176

**Table 7:** Overview of key emission reduction measures implemented by the 20 companies assessed in the CCRM 2024.

| | EVALUATION OF EMISSION REDUCTION MEASURES |
|---|---|
| **Automotive manufacturers** | **Volvo Group (HDV)** The company present targets for procurement of low-carbon steel and aluminium (upstream scope 3, 4% of 2022 emissions). Relevant measures for use-phase emissions presented, including zero-emission vehicle technologies and charging infrastructure. Plans to exit ICE's using biofuels and e-fuels in 2040, even though battery electric vehicles are technologically possible. |
| | **Stellantis (LDV)** Plans to address upstream scope 3 emissions (about 10% of 2022 emissions) lack detail. The company presents relevant measures to reduce downstream scope 3 emissions (90% of 2022 emissions), including phasing in electric vehicles. Targets for EV phase-in not aligned with sectoral benchmarks for all markets. |
| | **Volkswagen Group (LDV and HDV)** Several measures to reduce upstream scope 3 emissions (about 15% of 2022 emissions) presented, but limited details on timeline, milestones, and expected impact. The company present plans to address downstream scope 3 emissions (about 85% of 2022 emissions), but limited details on the timeline and expected impact. While the company's phase in targets for electric LDVs fall short of sectoral benchmarks, its targets for HDVs are aligned with Paris-compatible sectoral benchmarks. |
| | **Daimler Truck (HDV)** No measures to reduce key upstream scope 3 emission sources. Relevant measures for use phase emissions, including zero emission vehicle technologies and charging infrastructure. Limited details on the timeline and impact up to 2030. |
| | **Toyota (LDV and HDV)** No measures to reduce upstream scope 3 emissions (20% of 2022 emissions) identified. The company present some plans to address downstream scope 3 emissions (about 80% of 2022 emissions), but with limited details on scope and timeline. Its target for phasing in EVs in the EU and UK falls short of regional benchmarks. |
| **Electric utilities** | **Enel** Commitment to phase out coal by 2027 and gas by 2040, and to rapidly increase the share of renewables in electricity generation. Pace is not quite sufficient to fully align with EU benchmarks. |
| | **Iberdrola** Coal power plants phased out in 2020, but no comprehensive strategy to end fossil gas sales. Ambitious renewable deployment plan for 2030. |
| | **Engie** Plans to phase out coal, but not gas power plants; the company invests in CCUS development to continue using fossil gas. No clear support for large-scale electrification of end consumers. Renewable ramp up is insufficient. |
| | **Duke Energy** Commitment to phase out coal by 2035 and gas by 2050, falling short of US benchmarks. Limited investments in renewables and targets for renewable energy generation fall short of global benchmarks. |
| | **KEPCO** Inadequate targets for renewable electricity generation; the company plans for a delayed coal phase out and plans for CCUS and co-firing with hydrogen risk a lock in of fossil gas. |
| **Fashion** | **Adidas** Measures to phase out coal and increase renewable energy use in the supply chain (95% of 2022 emissions) but scale of implementation unclear. No commitment to stop overproduction. |
| | **H&M Group** Measures for upstream scope 3 (about 90% of 2022 emissions) cover all key areas but lack sufficient information to estimate impact. H&M Group is investing in renewable electricity for suppliers, but the scale of implementation is unclear. Signals that the company relies on bioenergy to decarbonise the supply chain. No commitment to reduce overproduction. Encourages suppliers to switch to bioenergy and natural gas. |
| | **Inditex** Measures for upstream scope 3 (about 95% of 2022 emissions) cover all key areas but lack sufficient information to estimate impact. Signals that Inditex may rely on bioenergy. No commitment to reduce overproduction. |
| | **Nike** Measures for upstream scope 3 (about 90% of 2022 emissions) cover all key areas but lack sufficient information to estimate impact. No commitment to reduce overproduction. |
| | **Fast Retailing** Presented measures lack sufficient information to estimate impact. No commitment to reduce overproduction. |
| **Food and agriculture** | **Danone** Several measures to reduce upstream scope 3 emissions identified (about 80% of 2022 emissions), including a plan to increase the share of plant-based protein. |
| | **Mars** The company commits to relevant measures to reduce its emission sources in the upstream value chain (around 80% of 2022 emissions) to meet its 2030 target. However, the company neither considers measures for upstream emissions post-2030 nor introduces measures of its downstream value chain (responsible for 16% of 2022 emissions). |
| | **Walmart** Supplier engagement programme presented for significant upstream scope 3 emission sources (over 90% of 2022 emissions), but information lacks detail. |
| | **Nestlé** Some measures to reduce upstream scope 3 emissions identified (about 80% of 2022 emissions), but these include uncertain measures such as regeneration. Little measures that will lead to deep decarbonisation presented. |
| | **Tesco** No measures identified that meaningfully reduce either upstream or downstream scope 3 emissions (respectively 55% and 43% of 2022 emissions). |

Rating: ● High ● Acceptable ● Inadequate ● Poor ● Very poor

31

Exhibit 7 to Decl. of Angel Hsu
177

Corporate Climate Responsibility Monitor 2024

Electric utilities are moving in the right direction, but increased efforts to generate renewable electricity are necessary.

**Decarbonising the power system requires both a significant ramp up of renewable electricity generation and a rapid phase out of fossil fuels.** Increasing renewable capacity, especially from wind and solar, is key to decarbonise the power system (CAT, 2023b, p. 16). Globally, 59–89% of electricity should be from renewables by 2030, growing to 85–99% by 2040 and 89–100% by 2050 (IEA, 2022b, p. 197, 2023c, p. 197; Teske, 2022, p. 296; Boehm et al., 2023, p. 29; CAT, 2023b, p. 16; IRENA, 2023c, pp. 72, 75). In advanced economies, however, the transition to renewable electricity generation should go at a faster pace. In the EU, renewables should account for close to 90% of electricity generation in 2030 and close to 100% by 2040 (CAT, 2023b, p. 16). While phasing in renewable capacity, electric utilities should phase out fossil fuels to avoid stranded assets and locked-in emissions that will derail us from staying in a 1.5°C trajectory (IEA, 2023c).

**In the electric utilities sector, commitments to phasing out coal for own generation are in place, but we need clearer plans for phasing out fossil gas – both in electricity generation and sales – and for the electricity purchased for resale.** All five electric utilities present plans for phasing out coal, but with strong differences on the timeline: whereas Iberdrola phased out coal in 2020, KEPCO plans to do so only in 2050 (see *Table 11 in Section 3.1*). A 1.5°C-aligned plan to phase out fossil gas is still missing for four out of five companies: Enel is the only one to commit to phasing out gas across its value chain. Section 3.1 discussed the electric utilities' fossil fuel phase-out plans in more detail.

**All electric utilities assessed plan to ramp up renewable electricity generation, but just two of the five set renewable targets that put them on a Paris-aligned trajectory.** Iberdrola, Enel and – to a lesser extent – ENGIE have scaled up their renewable generation capacity in recent years (see *Table 8 and Table 9*). Iberdrola's and Enel's 2030 targets meet the global benchmark of 59–89% of electricity generation and 68–77% of total installed capacity by 2030 (IEA, 2022b, p. 197, 2023c, p. 197; Teske, 2022, p. 296; Boehm et al., 2023, p. 29; CAT, 2023b, p. 16; IRENA, 2023c, pp. 72, 75). However, both companies may need to increase their efforts to meet European benchmarks, which show that renewables should generate close to 90% of electricity generation by the end of this decade (CAT, 2023b, p. 16). Although ENGIE is also ramping up its renewable capacity, the company's target of 58% installed capacity by 2030 falls short of global and European benchmarks.

Renewables account for a minor share of Duke Energy's and KEPCO's portfolios today (see *Table 8 and Table 9*). Although both companies aim to significantly ramp up their renewable electricity generation until 2030, their efforts are insufficient to put them on a Paris-aligned trajectory. Both companies commit to a share of about 20% renewable electricity generation by 2030, which means a doubling of Duke Energy's current renewable electricity generation and a seven-fold increase of KEPCO's. However, global benchmarks require that renewables account for at least 59% of electricity generation by 2030. In the US, where Duke Energy operates, this should be at least 68% (CAT, 2023b, p. 16).

**Table 8: Electric utilities' 2030 renewable installed capacity portfolios and targets.**

| COMPANY | RENEWABLE INSTALLED CAPACITY PORTFOLIO | | | | RENEWABLE INSTALLED CAPACITY TARGET 2030 |
|---|---|---|---|---|---|
| | 2019 | 2021 | 2022 | 2023 | |
| 1.5-compatible global benchmarks | | | | | 68-77% |
| Iberdrola | 62% | 65% | 66% | 67% | 93% |
| Enel | 50% | 58% | 63% | | 85% |
| ENGIE | 28% | 34% | 38% | 41% | 58% |
| KEPCO | No data | 9% | 9% | Data not available yet | No data |
| Duke Energy | 7% | 8% | 13% | Data not available yet | No data |

Sources: CAT (2020, p. 16); iea, 2024, p. 63); Duke Energy (2019, p. 16, 2021, p. 14, 2022, p. 37); KEPCO (2022, p. 11, 2023, p. 11); Iberdrola (2021, p. 22, 2023d, p. 19, 2024, p. 19); Enel (2020, p. 38, 2021, p. 153)

**Table 9: Electric utilities' renewable generation portfolios and targets**

| COMPANY | RENEWABLE GENERATION PORTFOLIO | | | | RENEWABLE GENERATION TARGET 2030 |
|---|---|---|---|---|---|
| | 2019 | 2021 | 2022 | 2023 | |
| 1.5-compatible global benchmarks | | | | | 59-89% |
| Iberdrola | 39% | 45% | 46% | 47% | No data |
| Enel | 34% | 49% | 49% | Data not available yet | No data |
| ENGIE | No data | No data | No data | 35% | No data |
| KEPCO | No data | 3% | 3% | Data not available yet | 22% |
| Duke Energy | 2% | 2% | 8% | Data not available yet | 18% |

Sources: ENGIE (2024, p. 92); Duke Energy (2019, p. 16, 2021, p. 14, 2022, p. 22); KEPCO (2022, p. 11, 2023, p. 11); Iberdrola (2021, p. 23, 2023d, p. 1, 2024, p. 19); Enel (2020, pp. 274–277, 2023a, p. 458)

Exhibit 7 to Decl. of Angel Hsu

178

32

Corporate Climate Responsibility Monitor 2024

Automotive manufacturers are phasing in electric vehicles, but not yet at the pace needed to place the sector on a 1.5°C-aligned trajectory.

**Phasing out internal combustion engines and replacing them with electric vehicles is crucial to transform the automotive sector.** By far the largest source of automotive manufacturers' GHG footprint is the combustion of fossil fuels when their cars, trucks or buses are used. For the companies assessed in this report, use phase emissions (scope 3, category 11) account for over 60% of all reported emissions. Electric vehicles powered by decarbonised electricity have a large potential to reduce the GHG emissions of light-duty and heavy-duty vehicles (IPCC, 2022; Jaramillo et al., 2022). Phasing out vehicles with an internal combustion engine (ICE) is the most important measure that automotive manufacturers should take to align their business with a 1.5°-compatible trajectory. Enabling measures to support the roll-out of vehicle charging infrastructure and to support demand management solutions can complement automotive manufacturers' climate strategies (Pathak et al., 2022; Boehm et al., 2023; IEA, 2023b).

**Although automotive manufacturers acknowledge the need to phase in electric light-duty vehicles (LDVs), the transition is not going fast enough.** The share of LDV sales in 2022 for Stellantis, Toyota and Volkswagen Group were 5%, 0.2%, and 7% respectively. All three companies plan to rapidly increase these shares until 2030, but the transition to EVs needs to go much faster than the pace anticipated by Stellantis, Toyota, and Volkswagen (see Table 6). Only Stellantis' target for Europe meets 1.5°C-aligned milestones, which show that by 2030, sales of electric light-duty vehicles should reach 67%–95% globally and 95–100% in the EU and US (CAT, 2020, p. 27; UNFCCC, 2021, pp. 10-11; Teske et al., 2022, p. 4; WBA, 2022; Boehm et al., 2023, pp. 77–78; IEA, 2023c, pp. 88, 93). The LDV manufacturers' targets for the European market are more ambitious than their targets for other regions. We expect this is the result of the EU and individual member states setting tentative phase-out dates for ICEs earlier than the Chinese and US governments (see section 2.2 and IEA (2023b, p. 89)).

**Two of the three heavy-duty vehicle (HDV) manufacturers assessed set Paris-aligned zero-emission vehicles sales targets for most of their brands** (see Table 10). In 2022, 4.5% of global bus sales and 1.2% of global truck sales were EVs (IEA, 2023b, p. 32). These shares need to increase by over 2,000% until the ends of this decade by 2030, 56–60% of global bus sales and 30-37% of global truck sales need to be battery electric vehicles (BEVs) and fuel cell electric vehicles (FECVs)(UNFCCC, 2021; Boehm et al., 2023; IEA, 2023c). Volvo Group and Volkswagen Group's subsidiaries MAN, Navistar, Scania, and Volkswagen Truck & Bus committed to EV phase-in targets for 2030 that could be aligned with Paris-compatible benchmarks; aiming for at least 35% and 40%, respectively. In contrast, Daimler Truck frames its target to sell "up to 60%" of zero-emission vehicles by 2030 as an aspirational goal with no minimum bound. Depending on the sales share that Daimler Truck will achieve by the end of this decade, the company could meet or massively fall short of sectoral benchmarks.

Charging infrastructure for HDVs is less developed than for LDVs. To address this issue, the three HDV manufacturers formed a joint venture to invest EUR 0.5 billion to roll out a high-performance public charging network for battery electric trucks and coaches (Volvo Group, 2023a, p. 35).

**Table 10:** Light-duty vehicle and heavy-duty vehicle manufacturers' 2030 targets for the phase-in of battery electric vehicles

| COMPANY | 2030 TARGETS |
|---|---|
| *TARGETS FOR ELECTRIC LIGHT-DUTY VEHICLES* | |
| Stellantis | • 100% sales share of battery electric passenger cars in the EU by 2030<br>• 50% sales share of battery electric passenger cars and light-duty vehicles in the USA by 2030 |
| Toyota | • 50% sales share of battery electric vehicles in EU and the UK by 2030 |
| Volkswagen Group | • At least 70% sales share of electric LDVs in Europe<br>• At least 50% sales share of electric LDVs in the US and China |
| BMW (update of CCRM22 analysis) | • No targets for phasing in EVs identified |
| Mercedes-Benz (update of CCRM23 analysis) | • 50% share of plug-in hybrid and all-electric vehicles around 2025, when market conditions allow<br>• Mercedes-Benz is "all electric" by 2030, wherever market conditions allow |
| *TARGETS FOR ELECTRIC HEAVY-DUTY VEHICLES* | |
| Daimler Trucks | • Aspirational goal of "up to 60%" sales share of zero-emission vehicles in Europe, Japan, and the US by 2030 |
| Volkswagen Group's subsidiaries MAN, Navistar, Scania and Volkswagen Truck & Bus. | • MAN, Navistar and Scania each make subsidiary-specific pledges of a minimum 40% sales share for zero-emission vehicles by 2030 |
| Volvo Group | • At least 35% sales share of electric vehicles by 2030 |
| Toyota's subsidiary Hino | • No phase-in target identified |

Exhibit 7 to Decl. of Angel Hsu
179

Large fashion brands are implementing some measures to electrify manufacturing processes and switch to renewables but not yet at the scale needed. Measures to reduce emissions from material production are questionable and may distract from real solutions.

**Fashion companies need to implement a set of measures to decarbonise their business, including electrification and switching to renewables in the supply chain, investing in innovative low-carbon materials, and stopping overproduction.** Over 95% of fashion brands' emissions occur in the supply chain, with about 75% attributable to energy-intensive manufacturing processes (Sadowski et al., 2021; Sadowski, 2023). Thermal energy to produce steam and hot water accounts for a substantial share of the total energy demand in the sector. For instance, in China, Japan, and Taiwan, thermal energy represents over half of the total energy demand in the textile industry (Hasanbeigi and Zuberi, 2022). Often, manufacturers of fabrics and other materials (tier 2) and suppliers assembling the final products (tier 1) use on-site coal-fired boilers. Electrifying heat and steam processes can substantially reduce the fashion sector's energy demand and GHG emissions, for instance, through industrial heat pumps, electric steam boilers, and electric processing equipment (Hasanbeigi and Zuberi, 2022). Raw materials production accounts for about a quarter of fashion companies' total GHG footprint (Sadowski et al., 2021; Sadowski, 2023). These emissions can be reduced by investing in the development of innovative materials, including biosynthetic fibres and hemp, which have a lower carbon footprint than fabrics commonly used in the fashion sector (Ley et al., 2021; Sadowski et al., 2021; Sadowski, 2023). In addition, stopping overproduction and moving away from the fast fashion business model are crucial to place the fashion industry on a 1.5°C-aligned trajectory.

**While all five fashion companies assessed work to increase renewable electricity in the supply chain, clear targets and a comprehensive package of measures are missing.** H&M Group is the only fashion company assessed to commit to 100% renewable electricity in the supply chain by 2030 (H&M Group, 2024b, p. 26). Inditex commits to 50% renewable electricity in manufacturing processes by 2030 (Inditex, 2024b, p. 10). However, there are caveats to these pledges, including potential reliance on renewable electricity certificates (RECs), the lack of a commitment to electrify manufacturing processes, and a switch to biomass to replace coal in the supply chain (see section 3.2 for a discussion on the limitations of RECs and section 3.3 for more details on the issues with bioenergy). Four of the five companies report measures to support suppliers with the procurement of renewable electricity. Adidas, H&M Group, Nike, and Inditex all report capacity building measures, incentive instruments and/or financial support. For instance, Nike offers suppliers in China, Vietnam, and Indonesia technical advice and assistance for on-site solar PV (Nike, 2023, p. 98). Inditex developed an online knowledge platform (Inditex, 2023a, p. 205); and Adidas incorporated renewable energy and decarbonisation performance in its supplier assessment process (Adidas, 2023b, p. 84). Despite these encouraging signals, none of the companies assessed present a comprehensive package of measures to electrify their supply chains, raising concerns about the feasibility of the companies' ambitious 2030 targets. In addition, all five fashion companies use biomass in the supply chain and some explicitly consider this as a measure to reduce coal reliance and GHG emissions. Strong reliance on biomass could undermine companies' decarbonisation efforts, as biomass is not an emissions-free energy source and has several other negative sustainability implications, including biodiversity loss (see section 3.3).

**None of the five fashion companies present concrete plants to scale up the use of innovative low-carbon materials.** Adidas, Fast Retailing, H&M Group, Inditex, and Nike all claim to use recycled materials, most notably cotton and polyester (Adidas, 2023b, p. 88; Fast Retailing, 2023b, p. 17; H&M Group, 2023d, p. 45; Inditex, 2023a, p. 189; Nike, 2023, pp. 103–104). While the term "recycled materials" has a positive connotation, it does not significantly lower GHG emissions and may distract companies from the need to search for real solutions. Less than 1% of materials used to produce clothing is recycled and used for new clothing (Morlet et al., 2017). Recycled polyester in the fast sector generally comes from PET bottles from the beverage industry (Cobbing and Vicaire, 2017; Majumdar et al., 2020). By buying large amounts of PET bottles, fashion companies drive the need for virgin plastics – made with crude oil – in other sectors. Similarly, for "recycled cotton," it is unclear whether companies recycle used and discarded clothing, or rather unsold clothes, in which case "recycling" distracts from the need to reduce overproduction. Some of the companies are investing in the development of innovative materials (e.g., H&M Group, 2023d, p. 47; Inditex, 2023b, p. 10), but these efforts need to be massively scaled up to reduce the fashion sector's climate and other sustainability impacts (see section 7.2).

**None of the five fashion companies present concrete measures to reduce overproduction and move away from their fast fashion business model, which would be critical to bring the fashion sector as a whole on a Paris-aligned trajectory.** The production of clothing doubled between 2000 and 2015 and consumers discard many items after just seven to ten years (Morlet et al., 2017). While electrification, switching to renewable energy, and investing in innovative low-carbon materials are crucial measures, they should be underpinned by a shift to a more circular fashion system. However, none of the companies assessed set targets to reduce overproduction (i.e. clothes that are never sold) or to move away from their fast fashion business model. While we found some examples of repair, reuse and resale services, the fashion companies only implement these measures only at a small scale.

34

Exhibit 7 to Decl. of Angel Hsu

180

**Most food and agriculture companies do not commit to transitioning to plant-based products, which is necessary to reduce the sector's methane emissions.**

**Increasing the share of plant-based protein is crucial to reduce methane emissions in the food and agriculture sector.** The food and agriculture sector is responsible for roughly a third of global emissions (Crippa et al., 2021; Boehm et al., 2023). Even if all sectors would phase out fossil fuels immediately, the global food and agriculture sector could prevent the achievement of the 1.5°C temperature goal (Clark et al., 2020). The most important source of emissions in the sector is livestock, which generates high amounts of methane emissions. Methane is a potent greenhouse gas and has an almost immediate effect on global temperatures, contrary to carbon dioxide, which takes several decades. Due to its short-lived nature, reducing methane emissions can have a cooling effect (Collins et al., 2018). Bringing the agricultural and food sector on a trajectory compatible with 1.5°C pathways requires a shift from animal-based to plant-based protein. Other measures that companies can take to reduce methane emissions from livestock include increasing feed quality, improved manure management, synthetic methane inhibitors, and the use of seaweed as a feed additive (Reisinger et al., 2021, p. 7). Section 8.2 provides more information on sectoral transition measures for the food and agriculture sector.

**Of the 11 agrifood companies we assessed in this and previous iterations of the CCRM,[3] Danone is the only company to indicate intent to increase the share of plant-based protein.** The company states its goal is to "increase the share of revenue from lower carbon products transitioning to a low-carbon product offer as a main source of business" (Danone, 2023b, p. 36). Plant-based dairy alternatives are a key pillar of Danone's "lower-carbon product development strategy" (Danone, 2023b, p. 36). Nestlé also mentions a shift to "low carbon products, such as plant-based foods and animals" in its Net Zero Roadmap and projects this can lead to emission reductions of 14 MtCO₂e by 2030, which equals about 1% of today's emissions (Nestle, 2023b, pp. 21,23-24). However, Nestle does not explain what the role of plant-based products vis-à-vis other products will be; the company does not commit to increase the share of plant-based products. We did not identify any reference to the need for an increased share of plant-based proteins in Mars, Tesco, and Walmart's public communications.

**Danone is also the only agrifood company to have set a target for methane emissions.** Danone commits to reduce methane emissions from fresh milk by 30% between 2020 and 2030 (Danone, 2023c, p. 3). Fresh milk accounts for about 70% of Danone's methane emissions. In its methane strategy, the company presents plans to achieve its methane target through improved herd and feed management, manure management, and innovative feed additives, among others (Danone, 2023c, pp. 7–11). The other 10 agrifood companies that we assessed do not set a target for methane emissions.

---

3   These include the CCRM 2022, 2023 and 2024, and a spin-off report assessing climate targets of companies based in the Netherlands.

Corporate Climate Responsibility Monitor 2024

35

Exhibit 7 to Decl. of Angel Hsu
181

## 2.2 Regulations and technology development driving energy transitions

### Summary

Of the five electric utilities assessed, the three European ones (Enel, ENGIE, and Iberdrola) present more ambitious renewable energy and emission reduction targets than Duke Energy and KEPCO, headquartered in the US and South Korea, respectively. Likewise, the three light-duty vehicle manufacturers in this report (Stellantis, Toyota, and Volkswagen Group) provide more ambitious targets for the European market than for other regions. While this report does not delve into the underlying reasons for these differences, it suggests that EU legislation and political commitment may play a significant role in driving more ambitious climate action among some of these companies.

### European regulations drive the shift to renewable electricity generation.

**The EU committed to increasing the share of renewable energy to at least 42.5% by 2030, which means a doubling from 2022 levels** (European Parliament and the Council of the European Union, 2023b; Eurostat, 2023). The share of renewable electricity would need to increase to 69% by 2030 (European Commission, 2022). In December 2023, seven European countries, including the EU's two largest economies, committed to decarbonise their electricity systems by 2035 (Government of the Netherlands, 2023). The EU Emissions Trading System (ETS) is the Union's key instrument to drive emission reductions in the power sector, but other measures such as subsidies and R&D support also stimulate investments in renewable energy capacity (Bölük and Kaplan, 2022). Policy changes in European member states like Denmark, Germany, and the Netherlands led to a rapid increase in renewable electricity generation in recent years (Boehm et al., 2023, pp. 33–34).

**Compared to Europe, the transition to renewables has been slower in the US and South Korea, where Duke Energy and KEPCO are headquartered. The climate strategies of these two electric utilities appear to be in line with national policies.** Although the Biden administration announced a target of a carbon free electricity system by 2035 and the share of renewables in the electricity sector is growing, existing policies do not result in penetration levels deep enough to bring the US on track to meet sectoral benchmarks (CAT, 2023d, p. 9). The slower uptake of renewables in the US compared to the EU is due to the existing contribution of nuclear power to the US grids and a lack of policies incentivising the phase-out of oil and gas (CAT, 2023d, p. 9). The US government's proposed emission standards for existing fossil gas facilities do not cover the majority of fossil plants, and the Inflation Reduction Act provides substantial concessions to the fossil fuel industry (CAT, 2023d, 2023f). Duke Energy's climate strategy aligns with national policies – the company plans for nuclear to continue playing an important role in electricity generation and co-firing of hydrogen and fossil gas (Duke Energy, 2023a, pp. 48–49). Likewise, KEPCO, which is state-run, views fossil gas as a "transitional" fuel and also plans for the co-firing of hydrogen and fossil gas, as well as an expansion of nuclear (KEPCO, 2023, p. 31). This mirrors national policies in South Korea. The South Korean government increased its nuclear power generation target in 2023 and plans to increase the use of liquified natural gas (LNG) in the power sector (CAT, 2023e). The Yoon Suk-yeol administration has dropped South Korea's 100% renewable energy target. While the share of renewables in electricity generation doubled in recent years, it remains small at about 6%, much lower than in countries like the EU, the US, and Japan (CAT, 2023e).

### Regulation and financial incentives for consumers to buy EVs may also explain why the light-duty (LDV) manufacturers assessed set more ambitious targets for the EU than for China and the US, and no targets for other markets.

**The three LDV manufacturers in this report (Stellantis, Toyota, and Volkswagen Group) set more ambitious targets for electric vehicle (EV) sales shares in the EU than in the US and China. They do not communicate EV sales targets for other regions.** As shown in Table 10 above, Volkswagen committed to selling at least 70% electric LDVs in the EU and at least 50% electric LDVs in the US and China by 2030. Stellantis set an electric LDV sales target of 100% in Europe and 50% in the US by 2050; however, the company did not set a target for the Chinese market, where it holds a minor share (<1%) of the car market. Toyota committed to a 50% sales share of battery electric vehicles in the EU and the UK by 2030 and does not present targets for the US and China.

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu
182

**As a result of enabling policies and regulatory requirements, EV sales have reached a breakthrough stage in advanced economies** (Boehm et al., 2023, p. 85). In 2022, EV sales for passenger cars reached 29% in China, 21% in the EU, and 8% in the US (IEA, 2023b, p. 16,18,20). Enabling policies, including subsidies for consumers and charging infrastructure rollout, helped accelerate the share of EVs in these three markets. The Chinese government started financial support for new energy vehicles (NEV), which include battery electric vehicles (BEV), plug-in hybrid vehicles (PHEV), and fuel cell electric vehicles (FCEV), in the 1990s, and subsidy schemes boosted sales shares (CAT, 2023a). While NEV subsidies for producers ended in 2022, consumers can still benefit from tax exemptions until the end of 2027 (CAT, 2023a; Xinhuanet, 2023). Many European governments set up subsidy schemes to incentivise the purchase of electric LDV, but as the market for EVs has matured, they are reducing or changing the nature of purchase incentives (IEA, 2023b, p. 77). Both in China and several European countries, governments are now shifting their financial support from vehicles to charging infrastructure (IEA, 2023b, p. 83). In the US, the Inflation Reduction Act (IRA) incentivises investments in EVs and charging infrastructure (CAT, 2023f; IEA, 2023b).

**The European Union pledged more ambitious targets for reducing $CO_2$ emissions from new cars and vans than the US and China.** The EU adopted targets to reduce $CO_2$ emissions from new cars and vans by 55% and 50% by 2030 and 100% by 2035, compared to 2021 (European Parliament and the Council of the European Union, 2023a). This implies that the overwhelming majority of new light-duty vehicles sold by 2035 will likely be battery electric vehicles, with perhaps a small share of other zero-emission cars. The Biden administration set a goal of a 50% sales share of zero emissions vehicles by 2030 (The White House, 2021), but the US government estimates that LDV EV sales will reach only 22% by 2030 (CAT, 2023f). Some federal states, which together account for about 25% of car sales in the US, go beyond this national target. California was the first to adopt legislation that requires a minimum sales share of EVs of 35% in 2026 and 100% in 2035 (IEA, 2023b, pp. 74–75). China targets a 50% sales share of NEV in "key air pollution control regions" which account for almost 80% of China's LDV market (IEA, 2023b, p. 77). Several regions within China committed to targets that surpass the national level. For instance, Shanghai aims for a 50% of BEVs by 2025.

Section 2.1 showed that the five automotive manufacturers assessed set more ambitious targets for the EU than for other markets. This is likely the consequence of more stringent regulation in the EU compared to the US and China and IEA (2023b, p. 89). To support the increase of EV sales shares in other markets, especially less mature ones, regulators could adopt legislation on tailpipe emissions or EV sales shares, implement subsidy schemes for consumers buying EVs, and providing financial incentives for investments in charging infrastructure roll-out, among others.

Exhibit 7 to Decl. of Angel Hsu
183

# 3

# Separating real transition pathways from false narratives

## 3.1 Fossil fuel phase-out and CCUS: limited traction for HLEG recommendations

### Summary

Despite being one of the main levers to reduce emissions in the power, automotive, and fashion sectors, only a minority of the companies assessed in our analysis commit to a fossil fuel phase-out. A phase-out of coal and fossil gas is particularly crucial in the energy sector as this is a prerequisite for decarbonising other high-emitting sectors through electrification. Most electric utilities in our analysis address the need to exit coal, but fossil gas is still seen as transitional fuels, especially outside Europe. The automotive sector lags in phasing out internal combustion engines. The fashion sector has started to reduce coal from its production processes, but a full commitment is yet to be made. Overall, we find that companies' commitments to phase out fossil fuels largely depend on the regulatory environment at the national and regional levels, as transitioning to alternatives must take place in parallel and requires dedicated incentive schemes.

International consensus on the need to move away from fossil fuels is facing strong resistance and is being countered by powerful vested interests.

The majority of companies with net-zero targets have not committed to fossil fuel phase-out despite the international agreement on transitioning away from fossil fuels in energy systems. Although climate policies focused on the energy sector from the outset, it took several decades for the international community to reach an agreement — albeit weak — on phasing out fossil fuels. At COP27, parties agreed on the necessity to accelerate efforts towards the phase-down of unabated coal power (UNFCCC, 2023a, p. 5). Recommendations on fossil phase-out commitments in corporate climate guidelines are

also recent and have not yet become widely adopted. An explicit reference to the phase-out of fossil fuels is integrated in the HLEG recommendations (UN HLEG, 2022, p. 24). HLEG recommends phasing out coal for power generation across the entire value chain by 2030 in OECD countries and by 2040 in the rest of the world, as well as ending oil and gas exploration, expansion, and production. However, the explicit requirements for fossil fuel phase-out have sparked controversy due to concerns that they might violate anti-competition regulations, especially in the US (Hearn et al., 2023, p. 33). Therefore, we understand that some corporate initiatives are reluctant to incorporate the HLEG recommendations into their guidelines. The Net Zero Tracker found that the majority of companies with net-zero targets have not committed to phasing out fossil fuels (Lutz, 2023, p. 6).

In the electric utilities sector, commitments to phasing out coal for own generation are in place, but we need clearer plans for phasing out fossil gas — both in electricity generation and sales — and for the electricity purchased for resale.

All electric utilities assessed have planned to phase out coal; however, there are stark differences in their timelines. Iberdrola has already shut down its last coal-powered plants as early as 2020, while Enel and ENGIE have committed to do so by 2027, and Duke Energy by 2035 (although this is contingent on regulatory approvals), with KEPCO committing to phase out coal only by 2050 (see Table 11). European power companies appear to be outperforming their non-European peers for several reasons. Among them, coal is no longer profitable in the EU. Since 2013, European electric utilities have been required to auction their allowances in the EU emissions trading scheme. The recent reform of the scheme as part of the EU Fit for 55 Package has resulted in a rising carbon price, which exceeded €80/tCO$_2$ in December 2023 (Montel and Ember, 2024).

Furthermore, to meet the stricter EU Air Quality Directive in 2021, coal plants owners were faced with the costly decision to either retrofit their facilities with expensive technologies or close their facilities (Wynn and Coghe, 2017). Pressure from investors and NGOs, as well as political will, are also considered significant drivers of change in Europe (Czyżak et al., 2022; Beyond Fossil Fuels, 2024).

Despite the positive steps taken by these companies to phase out coal, a 1.5°C-aligned plan to phase out fossil gas is still missing for four out of five companies. Fossil gas accounts for 36% of Duke Energy's installed capacity, 49% of ENGIE's installed capacity, 21% of KEPCO's installed capacity, and 15% of Iberdrola's own installed capacity (KEPCO, 2022, p. 11; Duke Energy, 2023b, p. 37; ENGIE, 2023, p. 3; Iberdrola, 2023b, p. 101, 2023d, p. 19). Duke Energy and KEPCO will only phase out gas by 2050 (KEPCO, 2022, p. 59,68; Duke Energy, 2023a, pp. 48–49), which is 15 years beyond the advised timeline for developed countries (CAT, 2023b, p. 1). Iberdrola has not publicly announced a comprehensive strategy for complete fossil gas phase-out in its electricity generation and sales. Duke Energy, KEPCO, and ENGIE do not plan to decommission gas-fired power plants after 2030, but instead view gas as "transitional fuels". They also rely on hydrogen blending in gas turbines, view gas as a suitable flexibility option in the decarbonisation of the energy sector and support the use of CCS to extend the life of gas-fired power plants (Duke Energy, 2022, pp. 18, 67, 2023a, p. 43; KEPCO, 2022, p. 64; ENGIE, 2023, p. 66). Only Enel pledges to completely phase out gas in its electricity generation and retail gas sales by 2040, which meets global benchmarks (Enel, 2023a, p.86). While gas phase-out is a major concern, oil phase-out is less critical for most companies in our analysis since it only accounts for an insignificant share of the companies' power generation capacity (KEPCO, 2022, p. 11; Duke Energy, 2023b, p. 37; ENGIE, 2023, p. 3).

Exhibit 7 to Decl. of Angel Hsu
184

**Three out of the five companies assessed in our analysis – Duke Energy, ENGIE, and KEPCO – consider resorting to false solutions like CCUS or bioenergy** (KEPCO, 2022, p. 59, 69, 76; Duke Energy, 2023a, p. 37, 44; ENGIE, 2023, p. 66, 98). The reliance on CCUS in electricity generation faces severe risks due to the unproven efficacy and potential environmental impacts of these technologies. Furthermore, CCUS is not yet available at scale and may come at a high cost compared to switching to renewables (Grant et al., 2021). Duke Energy is also exploring decarbonising its scope 3 downstream by tapping into renewable natural gas (RNG) from waste-based feedstocks (Duke Energy, 2023b, p. 31). Similarly, ENGIE considers the role of (decarbonised) gas like biomethane from non-recyclable waste crucial for its transformation. However, their approach to heavy bioenergy reliance potentially overlooks the fuel's negative sustainability implications and distracts the company from investing in renewable generation and supporting electrification in end-use sectors, while prolonging the use of existing fossil gas infrastructure (Saadat et al., 2020).

**Table 11: Fossil fuel phase out commitments for electric utilities**

| COMPANY | NET ZERO OR CARBON NEUTRALITY TARGET | COAL PHASE-OUT IN ELECTRICITY GENERATION | GAS PHASE-OUT IN ELECTRICITY GENERATION | FALSE SOLUTIONS |
|---|---|---|---|---|
| Paris-aligned 'deadline' *(electric utilities in advanced economies)* | 2035 | 2030 | 2035 | None |
| Iberdrola | 2039 | 2020 | Not identified | None identified |
| Enel | 2040 | 2027 | 2040 | None identified |
| ENGIE | 2045 | 2025 (EU) 2027 (global) | Not identified | CCS, bioenergy (biomethane) |
| Duke Energy | 2050 | 2035 | 2050 | CCUS, bioenergy (RNG) |
| KEPCO | 2050 | 2050 | 2050 | CCUS |

Sources: KEPCO (2022, pp. 59, 64, 69, 76); Duke Energy (2023a, pp. 29, 37, 43, 44, 2023b, p. 31); ENGIE (2023, pp. 66, 98); Iberdrola (2023b, pp. 1, 87); Enel (2023a, p.86)

In the automotive and fashion sectors, commitments on phasing out fossil fuel are mostly missing or insufficient.

**Four of the five automotive manufacturers assessed do not set phase-out dates for internal combustion engines (ICE), which the automotive sector sees as a critical transitional measure.** Daimler Trucks is the only company assessed that commits to 100% zero-emissions vehicles worldwide: the heavy-duty vehicle manufacturer aims to reach this milestone in the EU, Japan, and US by 2039, and in the rest of the world by 2050 (Daimler Truck, 2023a, pp. 78, 81). While the other four companies set carbon neutrality or net-zero targets, they do not communicate phase-out dates for ICEs on all of their markets (see section 2.1). However, the global sales share for zero-emission light-duty vehicles must reach 100% between 2035–2040 and earlier in advanced economies (CAT, 2020, p. 27; Boehm et al., 2023, pp. 77–78; IEA, 2023c, pp. 88, 93), meaning that ICE sales must be completely phased out by the end of next decade (COP26 Presidency, 2021; SBTi, 2023a, pp. 4–6). A complete phase-out of ICE trucks would need to be achieved between 2045–2050 globally (Boehm et al., 2023; IEA, 2023c).

**The fashion companies in our assessment are taking measures to decrease the use of coal in their supply chain but only three committed to a coal phase-out in the production process.** Adidas, Nike, and Inditex committed to eliminate coal from the production processes of their materials (tier 2) and finished goods (tier 1) suppliers. Adidas' claims that its suppliers have not installed any new coal-fired boilers, heaters, or power generation system since 2022 and commits to phasing out coal-fired boilers at all finished goods and materials suppliers by 2025 (Adidas, 2024, p. 86). Nike supported its finished goods suppliers in replacing coal-fired steam boilers with electric alternatives in recent years and pledged to eliminate the use of coal in their supply chain (tier 1 and tier 2) and to avoid installing new coal-fired equipment from 2023 (Inditex, 2023a). The two other companies – H&M Group and Fast Retailing – do not commit to phase out coal in the production processes within their supply chains. H&M Group states that it will no longer onboard new suppliers that have on-site coal boilers but has not yet presented a timeline for completely phasing out coal in their supply chain (H&M Group, 2023d, p. 26). Fast Retailing merely commits to "leverage our long-standing partnerships to promote measures that will [...] phase out coal and introduce renewable energy at major partner factories" (Fast Retailing, 2023b, p. 56).

**Fashion companies' plans to expand biomass use in the supply chain could undermine their commitments to decrease or phase out coal.** All five fashion companies assessed use biomass in their supply chain (see section 3.3). Notably, H&M Group presents biomass as a solution to reduce emissions in the supply chain. The Swedish fashion company states that "certain types of biomass can act as a stop-gap solution" for suppliers who have no access to non-combustible renewable energy sources and are connected to unreliable electricity grids (H&M Group, 2023a). However, biomass has severe sustainability implications and is therefore not a credible solution for reducing coal reliance. Section 3.3 discusses this issue in more detail.

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu
185

**SER 465**

## Recommendations for scaling up the rate of corporate fossil fuel phase-out commitments

> **Regulators** should enact policies that accelerate the fossil fuel phase-out in the power, fashion, and automotive sectors.

> **Companies** should considerably scale up commitments and present a clear timeline on fossil fuel phase-out. These should systematically be included in companies' transition plans and published in the sustainability report.

> **Standard setters and voluntary initiatives** should formulate more prescriptive corporate guidelines requiring companies to include fossil fuel phase-out requirements in their transition plans. For instance, fashion companies should be mandated to present a timeline for phasing out coal in their supply chain, while car manufacturers should be mandated to present a timeline for phasing out internal combustion engines.



40

Exhibit 7 to Decl. of Angel Hsu

186

SER 466

## 3.2 Renewable electricity procurement: innovative leadership and cheap claims

*Some extracts of this section are adapted from a special edition of the Corporate Climate Responsibility Monitor focused on renewable electricity strategies (Moeldijk et al., 2024). The companies assessed in that report are included in the analysis within this section.*

### Summary

While corporate claims and targets for renewable electricity are increasing, the meaning and impact of these claims vary significantly. Standalone Renewable Energy Certificates (RECs) still play a large role in companies' renewable electricity procurement strategies, but we see that companies are increasingly aware of the limitations of this approach and shifting towards higher quality procurement instruments. There is a rising momentum for hourly matching of renewable electricity, although more support and incentives are needed for companies to adopt this approach. We find that voluntary initiatives and standards currently offer limited incentives for companies to pursue higher quality renewable electricity strategies. The update process for the GHG Protocol's guidance on Scope 2 emissions accounting presents a promising opportunity to realign the standards with transparent and ambitious practices.

Corporate renewable electricity claims and targets are increasing, but all mean different things and their real impact is often far less than implied.

Of the 22 companies[1] included in Table 12, seven companies made some form of 100% renewable electricity claims in 2022, while around half claimed to procure most of their electricity from renewable sources. The RE100 initiative found that its members consumed 50% renewable electricity in 2022 (RE100, 2024), up from 45% in 2020 (RE100, 2023).

While renewable electricity claims are increasing among companies, it is not easy to understand what these claims mean. The landscape of renewable electricity procurement constructs from these companies is highly nuanced due to the differences in the coverage of targets, procurement constructs and the methods for matching renewable generation with consumption (Figure 5), making it difficult to compare the claims directly. Companies investing in higher-quality strategies such as PPAs or utility tariffs with hourly matching are often grouped with those pursuing more accessible claims with limited impact, such as the procurement of standalone RECs with annual matching. Because of the limitations of all these approaches, GHG emissions associated with companies' electricity consumption are often significantly misrepresented.

Despite their limitations, standalone RECs still play a large role in companies' strategies for procuring renewable electricity today.

Of the 22 companies included in Table 12, at least 16 use standalone RECs to account for a significant proportion of their renewable electricity claims. For at least 11 of these companies, standalone RECs constitute the main method for claiming to procure renewable electricity.

In many cases, this involves the purchase of RECs that may not originate from the same region as where the companies operate. For instance, lululemon procured RECs from Germany to cover its electricity consumption across all EU countries where the company operates (lululemon, 2023). Similarly, H&M Group bought RECs from Norway to cover electricity consumption in its stores in Bulgaria, Cyprus, Greece, and Spain, among others (H&M Group, 2023b). Although the European grid is interconnected, the physical flow of electricity from one country to another is much smaller than the number of RECs traded between countries (Hamburger, 2023). Purchasing Norwegian RECs does not signal real demand to the Bulgarian electricity market and carries the risk of implicit double counting, where both the REC buyer and Norwegian grid consumers believe they are using renewable electricity.

---

4   Our analysis of renewable electricity procurement excludes electric utilities, but includes the companies covered by the report Navigating the nuances of corporate renewable electricity procurement (Moeldijk et al., 2024).

Corporate Climate Responsibility Monitor 2024

## Exhibit 7 to Decl. of Angel Hsu
## 187

**Figure 5:** Diverse landscape of renewable electricity procurement constructs and matching methods



Exhibit 7 to Decl. of Angel Hsu
188

**Table 12:** Comparison between companies' renewable electricity claims, RE100 membership, and our CCRM integrity assessments.

| COMPANY | SCOPE 2 EMISSIONS REPORTED UNDER GHG PROTOCOL GUIDELINES (MtCO2_e 2022) | | RENEWABLE ELECTRICITY SHARE CLAIMED IN 2022 | RE100 MEMBERSHIP** | CCRM INTEGRITY ASSESSMENT For renewable electricity procurement | MAIN RENEWABLE ELECTRICITY PROCUREMENT CONSTRUCTS |
|---|---|---|---|---|---|---|
| | Location-based | Market-based | | | | |
| **Food and agriculture** | | | | | | |
| Danone | 0.76 | 0.28 | 71% | Gold ⭐ | Poor | Mostly standalone RECs. |
| Mars | 0.97 | 0.42 | 58% | – | Moderate | PPAs and standalone RECs |
| Nestlé | 2.61 | 0.76 | 77% | ⊘ | Moderate | PPAs and standalone RECs |
| Tesco | 0.58 | 0.01 | 100% | ⊘ | Very poor | Mostly standalone RECs. |
| Walmart | 9.98 | 6.74 | 47% | ⊘ | Moderate | Mostly PPAs, also standalone RECs. |
| **Fashion** | | | | | | |
| Adidas | ? | 0.14 | no claim | – | Very poor | Mostly standalone RECs. |
| H&M | 0.46 | 0.05 | 92% | ⊘ | Moderate | Standalone RECs plans for more PPAs |
| Inditex | 0.45 | Zero | 100% | – | Moderate | Standalone RECs plans for more PPAs |
| Nike | 0.22 | 0.02 | 93% | Gold ⭐ | Moderate | Local PPAs with annual matching. |
| Fast Retailing | 0.29 | 0.16 | 42% | – | Poor | Mostly standalone RECs. |
| Lululemon ** | 0.02 | Zero | 100% | ⊘ | Poor | Standalone RECs plans for more PPAs |
| Gap ** | 1.1 | 0.003 | 36-57% | – | Moderate | Local PPAs with annual matching. |
| **Automobile manufacturers** | | | | | | |
| Daimler Trucks | 0.59 | 0.33 | no claim | – | ? | Not disclosed. |
| Stellantis | 2.55 | 1.90 | 27% | – | Very poor | Mostly standalone RECs, plans for PPAs. |
| Toyota | 3.81 | 2.87 | 20% | – | Very poor | Not disclosed. |
| Volkswagen | 4.65 | 2.11 | no claim | – | Very poor | Standalone RECs plans for more PPAs. |
| Volvo Group | 0.18 | 0.08 | 48% | – | ? | Not disclosed. |
| **Tech and electronics ** | | | | | | |
| Apple | 1.1 | 0.003 | 100% | Gold ⭐ | Moderate | Local PPAs with annual matching |
| Google | 8.5 | 2.5 | 100% | Gold ⭐ | Reasonable | PPAs & utility tariffs with 24/7 matching |
| Microsoft | 6.4 | 0.3 | 100% | Gold ⭐ | Moderate | PPAs and RECs with 24/7 matching |
| Samsung Elect. | 19.9 | 9.1 | 31% | Gold ⭐ | Very poor | Mostly standalone RECs |
| TSMC | 10.9 | 9.5 | 10% | ⊘ | Poor | Standalone RECs, shift to more PPAs |

\* Gold memberships for RE100 are available to companies for a premium fee. Companies paying for gold status receive preferential placement and profiling on the RE100 website and at events (Climate Group, 2021). We could not identify any specific technical criteria that companies must fulfil to qualify for this label (aside from criteria for energy producers and financial institutions).

\*\* Lululemon, Gap and the Tech and electronics companies were not assessed in this 2024 Corporate Climate Responsibility Monitor report, but were included in a special edition of the CCRM focused on renewable electricity procurement in January 2024 (Mos49jk et al., 2024)

Exhibit 7 to Decl. of Angel Hsu
189

Corporate Climate Responsibility Monitor 2024

Companies demonstrate an increasing awareness of the limitations of standalone RECs, and many are planning to shift to higher-quality procurement instruments.

Several companies, including H&M Group, Inditex, lululemon, TSMC and Volkswagen, indicate their intention to transition to Power Purchase Agreements (PPAs) in the coming years, although all these companies currently purchase standalone RECs to cover most of their renewable electricity claims. H&M Group has recently signed PPAs in Spain, Sweden and the United Kingdom, which may account for about a third of the company's current electricity demand once operational (H&M Group, 2023a).

We also see signs that PPAs overtaking standalone RECs as the preferred procurement method in emerging renewable electricity markets. For example, while Samsung and TSMC could have purchased standalone RECs for their operations in South Korea and Taiwan, respectively, neither company has pursued this option; now that PPAs are possible in these countries, Samsung and TSMC show signs of starting to procure renewable electricity through this approach (Mooldijk et al., 2024).

There are also promising signs that some companies are looking for more innovative solutions to overcome the burdens and complexities associated with directly engaging in PPAs, which could increase access to high-quality procurement constructs for other companies with more limited resources. For example, Google and Apple have collaborated with several regional utilities to establish utility-scale programmes through which companies can sign long-term contracts with the utility to manage a portfolio of PPA-style constructs. Gap and TSMC have pursued aggregated PPA constructs, which allows companies to pool their resources and expertise to develop high-quality plans (Mooldijk et al., 2024).

There is growing momentum for matching renewable electricity generation with consumption on an hourly basis, but replication requires support and incentives.

Some companies – including Google and Microsoft – have recognised the limitations of annual matching and are moving to hourly (24/7) matching (Day, Mooldijk, Hans, et al., 2023; Mooldijk et al., 2024). Emerging scientific literature on hourly matching clearly demonstrates that its potential to address the challenges of the electricity system and ultimately decrease emissions is significantly greater compared to annual matching. Annual renewable electricity matching hides a significant embedded reliance on fossil fuel generation. Companies that commit to match their electricity consumption on an hourly basis provide a critical demand pull for additional and novel renewable energy generation and storage technologies that will be necessary to completely decarbonise power systems in the most challenging times and locations.

Across the companies discussed in section B of this report, only Daimler Truck claims to be procuring electricity using a 24/7 accounting method for its production sites in Europe (Daimler Truck, 2023a, p. 94). However, the company provides very little information on what this approach entails, making it difficult for us to assess the integrity of this claim. As of March 2024, the 24/7 Carbon-Free Energy Compact had 147 (24/7 Carbon-Free Energy Compact, 2024), but most of these entities were either tech companies, power companies, research groups, or consultancies. This indicates that systems for 24/7 procurement are still in a phase of development and may not yet be accessible for every company to implement.

While it might not be realistic for companies to switch to 24/7 accounting overnight, major companies could already commit to transitioning towards this accounting metric in the coming years. To this end, it is critical that major initiatives responsible for accounting guidelines and seeking to mobilise corporate renewable electricity targets – such as the GHG Protocol and the RE100 initiative – integrate 24/7 accounting into their guidance. Companies that currently strive to replicate this good practice approach may find themselves outside the guidelines of these initiatives, potentially without support and recognition.

Voluntary initiatives and standards currently provide limited guidance incentives for companies to strive for emerging best practice in high-quality renewable electricity procurement.

Companies' climate strategies – and the integrity of their leadership credentials – are dependent on high-quality guidelines, standards, and criteria from major international cooperative initiatives and certification schemes. But the most relevant and influential initiatives largely fail to distinguish between the nuanced aspects of renewable electricity accounting (Mooldijk et al., 2024). While the tools developed by the GHG Protocol, RE100, SBTi, and the CDP may have promoted awareness of corporate renewable electricity procurement at the point of their design, the level of detail and differentiation no longer adequately reflect the complexity of corporate renewable electricity strategies that we see from major companies today:

✕ Neither the GHG Protocol Scope 2 Standard, the RE100 technical criteria, nor the SBTi Net Zero Standard distinguish between procurement constructs such as standalone RECs, PPAs, and utility-scale tariffs.

✕ None of the major initiatives distinguish between annual and hourly approaches for matching renewable electricity.

✕ None of the major initiatives provide guidance or specific criteria for accounting for the procurement of renewable electricity in the supply chain, which is the most relevant source of electricity demand for many companies.

Table 12 indicates that – for the companies covered by our analysis – neither the GHG Protocol accounting methodologies nor the RE100 membership criteria offer clear and consistent differentiation between companies that demonstrate real leadership for high-quality renewable electricity strategies and those pursuing much lower-quality approaches.

Our assessments of Google and Microsoft in our separate renewable electricity focus report (Mooldijk et al., 2024) explain how the undifferentiated standards of these initiatives may even pose a barrier for companies to adopt emerging

44

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu
190

best practices, due to comparative disadvantages. Some companies like Inditex, lululemon, Tesco and Samsung in some regions, are reporting 100% renewable electricity under the minimum criteria of the mainstreamed standards, using annual matching and mostly standalone RECs. Companies that strive for higher-quality PPAs like Gap, Nike or Walmart, and companies who pursue 24/7 matching like Google and Microsoft, are only able to report comparatively lower shares of renewable electricity, although their renewable electricity strategies are more constructive and likely to have a greater impact in reducing emissions. Given the significant influence of these initiatives, the revision of their guidelines and criteria to facilitate such a differentiation may represent one of the most promising and necessary levers for raising the ambition of companies' renewable electricity strategies.

The update process for the GHG Protocol's guidance on Scope 2 emissions accounting presents a promising opportunity to realign the standard with transparent and ambitious practices.

The GHG Protocol began a major revision period in 2023, aiming to publish updated standards to be published in 2026 (GHG Protocol, 2023). After initial consultations, the GHG Protocol published its Summary of Proposal Submissions Related to Scope 2 Guidance in December 2023 (WRI and WBCSD, 2023), to be reviewed by a technical working group throughout 2024 and 2025.

This summary of proposals includes some promising elements; in particular, the **following proposals would be of key importance:**

⟩ **Increasing granularity of renewable electricity matching in time and location, including a switch to hourly matching** instead of annual matching.

⟩ **Increasing the stringency of additionality requirements for renewable electricity procurement constructs.** Options explicitly mentioned for consideration include **restrictions on the use of unbundled electricity products,** which would include standalone RECs.

However, the summary of proposals also includes some elements that could represent a considerable step back for transparency and integrity.

✕ The proposal to introduce a new accounting method – labelled 'project-based accounting' – would allow companies to claim reductions in their scope 2 emissions based on emissions avoided from renewable energy projects implemented anywhere in the world, whether inside or outside of the local grid region or market. This proposal appears closely aligned with the Emissions First Partnership, initiated by Amazon and with a small group of corporate signatories that includes Meta, Intel, and General Motors. In practice, this would effectively be the same as offsetting with carbon credits, which is a highly contentious proposal for improving the Scope 2 Guidance.

The extent to which GHG Protocol and other major initiatives can foster and accelerate the implementation of higher-quality corporate renewable electricity strategies will largely depend on the decisions made on these three key proposals. Until the publication of the updated standards in 2026, other influential initiatives for corporate renewable electricity procurement, such as RE100, should not wait to align their own guidance and criteria with emerging good practices, recognising the urgency for accelerated action on renewable electricity deployment.

## Recommendations for the revision of guidelines and criteria of major initiatives to distinguish between highly significant nuances in corporate renewable electricity strategies

**GHG Protocol & RE100:** We recommend that the major initiatives adopt a common standard for renewable electricity claims and revise the market-based emission accounting method to differentiate between highly significant nuances in renewable electricity strategies. This means:

⟩ Count only meaningful renewable electricity procurement constructs; RECs should be understood only as a supplementary accounting tool unless evidence is provided to demonstrate its effectiveness as a standalone procurement construct.

✓ Count only renewable electricity generated on the same grid as the electricity consumption it is matched to.

✓ Distinguish between annual and hourly accounting methods, with a transition towards hourly matching as the standard approach as soon as practically possible.

⟩ Provide guidance and criteria on setting supply chain targets and strategies.

45

Exhibit 7 to Decl. of Angel Hsu
191

Corporate Climate Responsibility Monitor 2024

## 3.3 Bioenergy: reliance on unsustainable solutions

### Summary

While over half of the companies assessed consider bioenergy in their decarbonisation plans, it is not a credible solution for any of them. Particularly in the fashion sector, plans for switching coal to biomass in the supply chain may significantly undermine seemingly ambitious emission reduction targets – and in some cases render them meaningless. Contrary to popular belief, bioenergy is not an emissions-free energy source, and sourcing biomass is likely to have negative impacts on ecosystems and local communities. Companies that consider themselves climate leaders should refrain from using bioenergy and instead advocate for policy changes in regions where sourcing bioenergy is easier and cheaper than sourcing non-combustible sources of renewable energy.

**Companies present bioenergy as part of their emission reduction plans, but in most cases, it is not a credible measure, given that bioenergy is likely to have a range of negative sustainability implications.** Over half of the 20 companies assessed use bioenergy in their own operations or their value chain, including all five fashion companies, Stellantis, Toyota, Volvo, and Duke Energy. However, bioenergy is very likely to have negative sustainability implications. These include, but are not limited to, deforestation, biodiversity loss and food insecurity (Kline et al, 2015; Hof et al, 2018; Searchinger et al, 2018; Calvin et al, 2020; Ahmed et al, 2021; Clarke et al, 2022; Hanssen et al, 2022).

**Bioenergy is not an emissions-free energy source.** Cutting down trees or other plants and burning them to generate energy leads to the release of sequestered carbon. It can take several to hundreds of years to balance out this release of $CO_2$, depending on the type of trees used (Holsmark, 2012; Mitchell et al, 2012; Ter-Mikaelian et al, 2015; Searchinger et al, 2018). Land used to grow bioenergy crops cannot be used for other purposes, such as directly sequestering

carbon (Searchinger et al, 2022). This carbon opportunity cost of land should be factored in when calculating the net impact of bioenergy. While advanced bioenergy may play a minor role in decarbonising hard-to-electrify sectors, such as aviation, the sectors assessed in this report have sufficient alternatives to decarbonise their value chains (Calvin et al, 2020; Clarke et al, 2022).

**Bioenergy is a scarce resource, which means companies using truly sustainable bioenergy push others to use non-sustainable bioenergy.** Most of the companies assessed in this report claim to use "sustainable" bioenergy. Although it is commendable that companies set sustainability criteria for the bioenergy that they source, using any type of bioenergy pushes other companies to use non-sustainable biomass.

### Companies in the power, automotive and fashion sector use biomass to replace fossil fuels, but these sectors can achieve full decarbonisation using non-combustible renewable energy sources.

**Biomass to replace fossil fuels remains a common measure among electric utilities, but is not a credible alternative to ramping up renewable deployment.** Of the five electric utilities assessed, Duke Energy and ENGIE have plans for significant biogas sales (Duke Energy, 2023a, p. 56; ENGIE, 2023, p. 11). Duke Energy plans to replace its fossil gas sales with "renewable natural gas" (RNG) and a relatively small share of hydrogen (Duke Energy, 2023a, p. 56). While RNG is mainly sourced from landfills, wastewater, food waste, and animal manure, Duke Energy expects energy crops to become the key resource to produce RNG by 2050 (Duke Energy, 2023a, pp. 53–54). We did not identify further details on where and how these energy crops would be produced, but they are very likely to compete with food production or ecosystem preservation (Kline et al, 2015; Hof et al, 2018; Calvin et al, 2020; Ahmed et al, 2021; Clarke et al, 2022; Hanssen et al, 2022). ENGIE considers biomethane from agricultural and food waste a key

solution to decarbonise its gas sales, alongside renewable hydrogen and fossil gas with CCUS (ENGIE, 2023, p. 33). The French utility plans to produce 10 TWh of biomethane per year in Europe by 2030, up from its current capacity of 8.3 TWh (ENGIE, 2023, p. 11.30). While there may be some scope for producing biomethane from agricultural waste for sectors that are hard to electrify, most end-consumers can electrify or switch to green hydrogen (Calvin et al, 2020; Clarke et al, 2022). Marketing biomethane as an emissions-free option risks exacerbating sustainability issues and delaying investments in non-combustible sources of renewable energy.

Although the five companies assessed in this report do not significantly invest in biomass for electricity and heat generation, various other electricity utilities pursue this option, including EON, RWE, Uniper, and Vattenfall for their European operations (Mooldijk et al, 2022; RWE, 2024; Vattenfall, 2024). For instance, RWE co-fires biomass in its Dutch power plants, and Vattenfall operates a combined heat and power plant exclusively fuelled by biomass. However, as discussed above, bioenergy is not an emissions-free source. Electric utilities that pursue bioenergy for electricity and heat generation contribute – directly or indirectly – to a range of sustainability problems. As Iberdrola and Enel show, non-combustible sources of renewable energy, like solar, wind, and geothermal, are economically attractive (see section 2.1). Further investments in these sources are necessary to decarbonise the energy system within the next decades.

**Fashion companies are supporting suppliers to switch to biomass, but this is not a credible alternative to electrification and renewable electricity.** All five fashion companies in this assessment work with suppliers who use biomass to generate on-site heat and steam (Zhang, 2023). For example, H&M Group pursues biomass as a key decarbonisation measure in the short term. In its sustainability disclosure in 2021, the company aimed for Cambodia to become the first production country to use 100% biomass boilers (H&M Group, 2022, p. 24). While such targets are missing from its latest sustainability disclosure, supporting

Corporate Climate Responsibility Monitor 2024

46

Exhibit 7 to Decl. of Angel Hsu
192

suppliers to transition to "thermal energy from agriculture residues" (i.e. biomass) is still listed as a key reduction measure (H&M Group, 2023d, p. 28). On its Climate webpage, H&M Group states that "certain types of biomass can act as a stop-gap solution" for suppliers who have no access to non-combustible renewable energy sources and are connected to unreliable electricity grids (H&M Group, 2023a). Adidas and Inditex also state that they encourage their suppliers to switch to biomass (Inditex, 2023a, p. 205; Adidas, 2024, p. 87). We could not identify any information on the use of biomass in the supply chain in Nike's and Fast Retailing's sustainability reports, but research by Stand.earth has shown that several of these companies' suppliers use biomass for generating heat and steam (Zhang, 2023).

While fashion brands need to phase out coal in their supply chains, replacing it with biomass may distract from energy efficiency improvements and investments in electrification and novel technologies for generating heat and steam, such as green hydrogen and concentrated solar (Ley et al. 2021, p. 21). As those options are not yet viable at commercial scale, large investments are needed to unlock their decarbonisation potential. In addition, a key emission reduction measure that companies can take in the short term is switching to dry processing (tier 2) (Ley et al., 2021, p. 6) This can decrease energy use by around 80%.

It is critical that fashion brands lobby with national governments for a policy environment that is conducive to renewable energy generation and consumption. In many key manufacturing countries, regulatory policies hinder the transition to non-combustible renewable energy sources and incentivise the use of wood for heat and steam production. In Cambodia, for instance, factories are not allowed to generate more than 50% of their electricity demand on site (Flynn and Ball, 2023). Also, wood is cheaper than (renewable) electricity in Cambodia, which makes it economically attractive to use biomass instead of investing in electrification.

**Biofuels remain a focal point in the automotive industry but are not a credible alternative to electrification.** Three of the five automotive manufacturers assessed – Stellantis, Toyota and Volvo Group – invest in biofuels alongside their electrification efforts. For instance, Stellantis deploys bioethanol-compatible vehicles in the Brazilian market and is set to launch an electric-bioethanol hybrid vehicle model in 2024 (Lara, 2023; Stellantis, 2023a, p. 87). Volvo Group states its intention to produce ICE trucks with "sustainable fuels", including biofuels (Volvo Group, 2023a, pp. 16, 155, 2023b). However, road transport - including heavy duty vehicles - can fully electrify, using battery electric vehicles (BEVs) and fuel cell electric vehicles (FCEVs) (Mollière, 2022; Tol et al. 2022; T&E, 2023). BEVs and FCECs are proven technologies and rapidly improving, which means that negative side effects associated with the mining of critical minerals can be mitigated. Automotive manufacturers that continue to invest in biofuels or synthetic fuels risk delaying the phase-out of vehicles with internal combustion engines.

**Despite scientific evidence indicating that bioenergy is not carbon neutral and poses a range of other sustainable issues, the IEA and national governments classify bioenergy as a renewable energy source, placing it on par with wind and solar.** The International Energy Agency (IEA) considers "modern bioenergy", which excludes biomass used for cooking and heating with open fires or simple stoves, as an import source of renewable energy (IEA, 2024). The IEA Net Zero scenario forecasts an annual increase of 8% in the use of modern bioenergy for energy generation between 2022 and 2030 and a doubling of biomass use for electricity generation in the same period (IEA, 2023c, 2024). The IPCC guidelines state that countries should report emissions from bioenergy in the Agriculture, Forestry and Other Land Uses (AFOLU) sector rather than in the energy sector (IPCC, 2019). This creates a perverse incentive for countries to import and burn biomass for energy generation because they are allowed to report zero emissions from energy generation. It may explain why certain countries provide substantial subsidies for bioenergy generation. The European Renewable Energy Directive considers bioenergy a renewable energy source and various member states encourage electric utilities to co-fire woody biomass in power installations (European Parliament and the

Council of the European Union, 2023b). Bioenergy accounts for over half of the renewable electricity generation in the EU (European Commission, 2023), which implies that the actual reduction of $CO_2$ emissions from energy generation is less than what the EU claims it to be. Biomass also plays a key role in the UK Government's energy policy and aspirations to achieve net zero emissions by 2050 (Department for Energy Security & Net Zero, 2023). The Drax power plant in North Yorkshire is the UK's largest power plant and the world's largest biomass installation, with an annual generation of 14 terawatt-hours (TWh) (Drax, 2024).

47

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu
193

## Recommendations for avoiding an unsustainable reliance on biomass in corporate climate strategies

**Companies:** Companies should take the following measures to avoid negative sustainability implications from the use of bioenergy:

- Phase out bioenergy if alternatives exist or will likely become available in the near future.
- For sectors that will rely on bioenergy to some extent (e.g. aviation), present a very clear plan of criteria to source bioenergy and ensure that negative impacts are minimised.
- Advocate for policy changes to ensure that (renewable) electricity is more economically attractive than biomass.

**Voluntary initiatives:** To provide companies with better guidance on the use and avoidance of bioenergy, voluntary initiatives should:

- Develop corporate guidance to account for emissions from bioenergy.
- Explicitly exclude bioenergy from the list of "renewable energy" sources.
- Require companies to commit to switching to non-combustible renewable energy sources (e.g. wind, solar, geothermal).

**Regulators:** Due to existing regulations, companies get a perverse incentive to switch to bioenergy instead of non-combustible sources of renewable energy. Regulators should:

- Not label bioenergy as a sustainable renewable energy source on par with non-combustible renewable energy sources energy (e.g. wind, solar, geothermal).
- Remove regulatory hurdles to the procurement of non-combustible sources of renewable energy (e.g. wind, solar, geothermal).

**IEA and IPCC:** Should reconsider the labelling of and accounting rules for bioenergy, as the current terminology and labelling provide countries and companies with a perverse incentive to prioritise bioenergy over non-combustible renewable energy sources.

48

Exhibit 7 to Decl. of Angel Hsu
194

## 3.4 Offsetting 2.0? Agrifood companies' use of land sequestration CDR in the value chain

### Summary

Carbon dioxide removals (CDR) are crucial to reach net-zero emissions globally by mid-century in the food and agriculture sector, land sequestration CDR measures can contribute not only to climate change mitigation but can also support biodiversity and reduce reliance on chemical inputs and pesticides. However, companies in the food and agriculture sector are currently counting on land sequestration carbon dioxide removals within their value chain to meet significant portions of their emission reduction targets, sometimes referred to as 'insetting'. Besides major uncertainties around the permanence and potential of land sequestration CDR, the aggregation of removals and emission reductions is hiding a lack of commitment and progress towards the necessary agricultural transitions for all agricultural sub-sectors. As a first step towards addressing the existing ambiguity, companies could set emission reduction targets for specific agricultural emission sources, if it is not yet feasible for companies to completely disaggregate removals from emission reductions for all agricultural sub-sectors. Organisations developing benchmarks, target validators and standard setters can contribute to this practice by providing additional guidance covering emission reduction requirements for specific agricultural emission sources.

**Is the term 'insetting' on the way out? Fewer companies refer to the buzzword in their climate strategies, but the same practices persist under different descriptions.** 'Insetting' is a business-driven concept and refers to offsetting within the food and agriculture sector, mainly involving land sequestration carbon dioxide removals (CDR) within the value chain. Food and agriculture companies assessed in this iteration of the CCRM no longer refer to the term 'insetting', but describe the same practices using different terms. For instance, Nestlé refers to "carbon scope 3 removals" (Nestlé, 2023b, p. 44).

### Enhanced land sequestration CDR is crucial for reaching global temperature targets, especially in the food sector... *

There are clear signs that land sequestration CDR is becoming an increasingly key strategy in the food and agriculture sector. Four of the five assessed food and agriculture companies mention some form of land sequestration CDR in their climate strategy, with some companies making these measures a central component. The mitigation potential and feasibility of land sequestration CDR measures remain uncertain, but they can significantly contribute to mitigating emissions (Costa et al., 2022; Boehm et al., 2023, p. 126). In 1.5°C-aligned pathways, global residual emissions mainly persist in the food and agriculture sector since reducing agricultural emissions – in particular methane and nitrous oxide – to zero is not feasible with currently available technologies and practices. Therefore, CDR will play an important role – on a global scale – to balance out the significant residual emissions from the sector. However, the required ratio of emission reductions versus removals in companies' climate strategies remains uncertain. In addition to removing carbon dioxide, practices related to land sequestration CDR in the agriculture sector can increase biodiversity and reduce reliance on chemical inputs and pesticides while maintaining agricultural productivity in a changing climate (Boehm et al., 2023, p. 126).

**... but in parallel to enhancing CDR practices, food and agriculture companies need to pursue sectoral transitions to achieve deep emission reductions.** While the increased attention on CDR measures is a positive development, they should not be seen as an alternative to emission reductions that must also be achieved and require a more fundamental and carefully planned transition. Although residual emissions in the sector will mainly consist of methane and nitrous oxide, the volume of those GHGs also still need to reduce drastically and rapidly. We find that some companies in the food and agriculture sector treat emission reductions and land sequestration CDR within the value chain interchangeably in their plans for meeting targets, making their targets incomparable (see Table 9). From most of the companies we assess, we see limited signs of measures that can lead to significant emission reductions in the sector: the practice of aggregating

removals with emissions can obscure the lack of progress in the agriculture transition, especially with regards to reducing methane from livestock and nitrous oxide emissions from fertilisers, which are some of the most important yet challenging emission sources for the sector to address. Land sequestration CDR is not comparable to emission reductions from a climate perspective. Land sequestration CDR is associated with no to limited permanence: there is a very high likelihood of re-release of the carbon dioxide into the atmosphere within years or decades (Deprez et al., 2024). For example, lands could be mismanaged, and forests can be subject to wildfires. For CDR to effectively substitute emission reductions, carbon storage must be guaranteed for centuries (Wang et al., 2023). Agricultural emissions also need to be significantly reduced in the decade of critical climate action: land sequestration CDR needs to happen in addition to deep emission reductions.

**Despite the shortcomings described above, the Science-Based Targets initiative's (SBTi) Forest, Land and Agriculture (FLAG) guidance allows for an undefined and potentially substantial role of land sequestration in achieving emission reduction targets.** SBTi's FLAG guidance describes that removals on land owned or operated by a company or within a company's value chain can count toward achieving a FLAG target (SBTi, 2023b, p. 34), but does not specify to what extent. Although the FLAG guidance states that historical emissions and removals need to be reported separately, it does not call for separate targets. Neither the SBTi FLAG guidance nor SBTi's Net Zero Standard specifies the share of land sequestration CDR allowed for emission reduction targets.

**Separate emission reduction and emission removal targets would significantly increase transparency and reduce ambiguity of food and agriculture companies' climate strategies; benchmarks for the food and agriculture sector should also call for a clear distinction between these targets.** The food and agriculture sector is one of the sectors with significant residual emissions by mid-century in the global 1.5°C-aligned emission pathways, and CDR from land

*49*

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu
195

sequestration are pivotal in achieving net-zero and eventually net-negative emissions. However, food and agriculture companies, as well as some existing sectoral benchmarks, currently do not set out a transparent vision for the role of emission reductions vis-à-vis removals in the sector. Further research is required to clarify what appropriate pathways would be and how to account for them. Ultimately, food and agriculture companies' targets would become substantially more informative and constructive with the clear separation of emission removals from emission reductions.

**Additional emission reduction targets for some specific agricultural emission sources could help alleviate the ambiguity of targets, especially if it is not yet feasible for companies to completely disaggregate removals from emission reductions for all agricultural sub-sectors.** With the current state of reporting guidance, measurement tools and protocols, as well as scientific benchmarks covering food and agriculture and

land sequestration CDR, it is indeed challenging to separate the removals from reductions in emissions accounting in some agricultural subsectors. However, there are also highly significant agricultural emission sources for which this disaggregation is possible. If it is not yet feasible to require companies to set separate FLAG targets for removals and emissions, target validators and standard setters could ask companies set additional emission reduction commitments for specific emission sources where possible and highly relevant. For example, in addition to its overarching FLAG target, **Danone has set an additional and more specific target for reducing methane emissions from fresh milk** (see Danone, p.118). Ultimately, such additions would clarify the meaning of companies' overarching targets and guide the sector into a more fundamental transition, which requires deep emission reductions and – for some emission sources – fundamental changes to the business model.

**Insetting – or land sequestration CDR within the value chain – often resembles offsetting practices, but with fewer control mechanisms.** In addition to the previously mentioned concerns, insetting practices often represent a mixed bag of activities that can range from being genuinely within the value chain to resembling offsetting practices. Improved soil treatment to enhance carbon sequestration of agricultural land would be an example of CDR within the value chain. But companies also, for example, may engage in activities like tree planting in proximity to crop production. Although this measure takes place close to the value chain activities and related measures, it can be viewed as offsetting due to uncertain link to the actual value chain. In addition, there is a lack of control mechanisms for insetting in place. In many cases, it remains unclear who is responsible for the quality control, accounting, and external validation.

**Table 13:** Role of CDR towards the FLAG emission reduction targets of agrifood companies

| COMPANY | FLAG TARGETS | ROLE OF CDR IN FLAG TARGETS | TRANSPARENCY (long-term targets) | INTEGRITY (long-term targets) | INTEGRITY OF MEASURES UPSTREAM SCOPE 3 (mainly agricultural emissions) |
|---|---|---|---|---|---|
| Danone | Net zero by 2050, including a reduction of:<br>• FLAG emissions by 30% by 2030<br>• non-FLAG emissions by 42% by 2030<br>• all emissions by 67.7% by 2050 (implicit only). | We assume that the 67.7% emission reduction component **does not include CDR** within the value chain, since:<br>• Those measures are described under Danone's plans for neutralising its 22.3% residual emissions<br>• Danone also commits to a specific methane reduction target. | 🔴 Poor<br>67.7% emission reduction commitment is only implicit. | 🟡 Moderate<br>The emission reduction commitment meets some benchmarks. | 🟡 Reasonable<br>Plans to increase revenue share stemming from plant-based protein. Understood as increase in plant-based protein and decrease in animal-based protein production. |
| Mars | Net zero by 2050, including a reduction of:<br>• FLAG emissions by 46% by 2030 and 72% by 2050<br>• non-FLAG emissions by 42% by 2030 and 90% by 2050. | Mars explicitly states that target realisation for 2030 **does not include CDR** within the value chain, but the potential role of CDR 2050 is not explicit. | 🟡 Moderate<br>Potential role of CDR for long-term not entirely clear. | 🟢 High<br>The emission reduction commitment meets benchmarks. | 🟡 Moderate<br>Range of measures until 2030 that can bring about significant emission reductions, but no information on measures after 2030; no measures identified that contribute to the agriculture transition after 2030. Explicitly no role of CDR until 2030. |
| Nestlé | Net zero by 2050, including a reduction of:<br>• FLAG emissions by 50% by 2030<br>• non-FLAG emissions by 50% by 2030 and 90% by 2050. | Nestlé's Net Zero Roadmap indicates a **major role for land sequestration CDR in its value chain towards its emission reduction targets**: the 2030 targets translate to just 16-24% emission reduction commitment across all value chain emissions, while CDR measures and carbon exclusions make up close to 50%. The potential role of CDR for 2050 is not explicit. | 🔴 Poor<br>The emission reduction commitment is far from what the communicated pledges imply. | ❓ Unknown<br>The integrity of the long-term target is unclear because of the significant role of CDR measures. | 🔴 Poor<br>Measures until 2030 include a mixed bag of land sequestration CDR and emission reductions. No measures identified that contribute to the agriculture transition after 2030. |
| Tesco | Net zero by 2050, including a reduction of:<br>• FLAG emissions by 39% by 2032 and 72% by 2050<br>• non-FLAG emissions by 55% by 2032 and 90% by 2050. | Tesco does not specify whether and to what extent its FLAG targets are dependent on CDR, and does not commit to other specific targets for agricultural non-CO2 emissions. **It is not clear to what extent Tesco plans to reduce its agricultural emissions.** However, Tesco's non-FLAG emissions account for the majority of its footprint, and the targets here indicate a commitment to deep decarbonisation of these emission sources. | 🔴 Poor<br>Target scope exclusions only presented in CDP disclosure. No information on role of CDR provided. | 🟡 Moderate<br>FLAG emission target unclear, but non-FLAG emission target accounts for majority of the company's emissions. | 🔴 Very poor<br>Little to measures identified that will lead to deep emission reductions. No measures identified that contribute to the agriculture transition after 2030. |

Exhibit 7 to Decl. of Angel Hsu
196

## Recommendations for disaggregating CDR and emission reductions in agriculture

**Recognising that** carbon dioxide removals are not an equivalent substitute for the reduction of agricultural methane and nitrous oxide emissions but rather an important additional objective:

› **Benchmarks, standards and guidance (e.g. SBTi FLAG guidance):** The existing benchmarks and guidance documents for the food and agriculture sector need to call for separate emission reduction and carbon dioxide removal targets. Realising the accounting tools and mechanisms are highly limited and pose a significant challenge to this, a first step towards separating removals from reductions would be to require additional emission reduction targets for specific emission sources. Guidance documents and benchmarks should emphasise the need for emission reductions, underlining the necessity for the agricultural transition.

› **Food and agriculture companies** should set clear emission reduction targets and specify what share of their net-zero targets will be realised with removals versus reductions, communicating transparently about the challenges the sector faces, including the relatively high volume of residual emissions.

51

Exhibit 7 to Decl. of Angel Hsu
197

## 3.5 Neutralising residual emissions: allocation of scarce carbon dioxide removal potential

### Summary

Companies' reliance on carbon dioxide removals to fulfil their net-zero targets is too high compared to what their residual emissions should be. Furthermore, they mostly rely on land sequestration CDR, which carries a high risk of non-permanence. High-quality CDR is a scarce resource, which means that a strict definition of residual emissions is needed, ideally at regulatory level or within existing corporate guidelines. Separate targets for emission reduction and carbon dioxide removal could offer a more credible and constructive approach compared to overarching net-zero targets.

Though transparency on the role of CDR in long-term strategies is often lacking, we observe that companies tend to excessively rely on them to achieve their climate neutrality targets.

Out of the 37 companies listed in Table 14, 13 are transparent about their reliance on CDR technologies to achieve their net-zero target, while 24 do not report the share of CDR they rely on. For five companies, it is not clear whether they rely on CDR or not.

For 12 out of the 13 companies that do report on CDR, we observe a high overall reliance, with CDR accounting for more than 9 percent of their 2019 emissions. However, such reliance is deemed inappropriate due to scarcity and the risk of mitigation deterrence. Except for the agriculture sector, long-term targets across all sectors should reach 94% to 100% reductions (SBTi, 2023d, p. 28).

Furthermore, land sequestration CDR is the most frequently type of CDR mentioned by companies (seven out of 10 reporting on the type of CDR they plan to use), although it faces significant challenges of non-permanence. Additionally, these plans for land sequestration CDR neutralisation are *in addition* to the biological neutralisation already included within the supply chain in the agriculture and land use sectors, mentioned in the previous section.

Table 14 indicates that there is no clear improvement in how companies communicate their neutralisation plans since the first CCRM two years ago.

52

Exhibit 7 to Decl. of Angel Hsu
198

Case 2:24-cv-00801-ODW-PVC   Document 89-25   Filed 04/07/25   Page 54 of 164
Page ID #:8831

**Table 14:** Companies' plans for claiming the neutralisation of their emissions towards net zero or carbon neutrality targets

| COMPANY | TARGET | RELIANCE ON CDR | MAIN TYPE OF CDR | INTEGRITY |
|---|---|---|---|---|
| **Companies for which the role of CDR towards net zero or carbon neutrality targets can be reasonably determined** | | | | |
| H&M Group | Net zero emissions by 2040 | ~10% of 2019 emissions | DACCS | Reasonable |
| Holcim | Net zero emissions by 2050 | <10% of 2019 emissions | Passive carbonation | Reasonable |
| Maersk | Net zero emissions by 2040 | ~10% of 2019 emissions | Land sequestration CDR | Moderate |
| Iberdrola | Net zero emissions before 2040 | ~9% of 2019 emissions | Land sequestration CDR | Very poor |
| Apple | Carbon neutrality by 2030 | ~36% of 2019 emissions | Land sequestration CDR | Very poor |
| Engie | Net zero carbon by 2045 | ~14% of 2019 emissions | Unclear | Very poor |
| Google | Net zero emissions by 2030 | ~50% of 2019 emissions | Unclear | Very poor |
| Ahold Delhaize | Net zero emissions by 2050 | ~18% of 2019 emissions | Unclear | ? |
| Enel | Zero emissions in 2040 | <2% of 2019 emissions | Unclear | ? |
| Inditex | Net zero emissions by 2040 | ~11% of 2019 emissions | Unclear | ? |
| Nike | Net zero emissions by 2050 | ~9% of 2019 emissions | Unclear | ? |
| Stellantis | Net zero carbon by 2038 | ~9% of 2019 emissions | Unclear | ? |
| ThyssenKrupp | Climate neutral by 2050 | ~9% of 2019 emissions | Unclear | ? |
| **Companies providing no details on the role of CDR towards net zero or carbon neutrality targets** | | | | |
| Adidas | Climate neutral by 2050 | Unclear | Unclear | ? |
| Amazon | Net zero carbon by 2040 | Unclear | Land sequestration CDR | ? |
| American Airlines | Net zero emissions by 2050 | Unclear | Unclear | ? |
| Deutsche Post DHL | Net zero emissions by 2050 | Unclear | Unclear | ? |
| Duke Energy | Net zero carbon by 2050 | Unclear | Unclear | ? |
| Fast Retailing | Carbon neutrality by 2050 | Unclear | Unclear | ? |
| Foxconn | Net zero emissions by 2050 | Unclear | Unclear | ? |
| JBS | Net zero emissions by 2040 | Unclear | Unclear | ? |
| Mars | Net zero emissions by 2050 | Unclear | Unclear | ? |
| Mercedes-Benz | Carbon neutrality by 2039 | Unclear | Technical CDR | ? |
| Microsoft | Carbon negative by 2030 | Unclear | Land sequestration CDR | ? |
| Nestle | Net zero emissions by 2050 | Unclear | Unclear | ? |
| PepsiCo | Net zero emissions by 2040 | Unclear | Unclear | ? |
| Tesco | Net zero emissions by 2050 | Unclear | Unclear | ? |
| Daimler Trucks | Carbon neutral by 2050 | Unclear | Unclear | ? |
| KEPCO | Carbon neutral by 2050 | Unclear | Unclear | ? |
| Toyota | Carbon neutral by 2050 | Unclear | Land sequestration CDR | ? |
| Volkswagen | Carbon neutral by 2050 | Unclear | Unclear | ? |
| Volvo Group | Net zero emissions by 2040 | Unclear | Unclear | ? |
| **Companies where neutralisation plans are unclear because targets cover only selected emission sources** | | | | |
| ArcelorMittal | Net zero emissions by 2050 | Unclear | Unclear | ? |
| Carrefour | Carbon neutrality by 2040 | Unclear | Unclear | ? |
| Danone | Net zero emissions by 2050 | Unclear | Land sequestration CDR | ? |
| Samsung Electronics | Net zero emissions by 2050 | Unclear | Unclear | ? |
| Walmart | Zero operational emissions by 2040 | Unclear | Unclear | ? |

Table includes the 37 companies included in the sample of the 2023 and 2024 editions of the CCRM

Corporate Climate Responsibility Monitor 2024

53

Exhibit 7 to Decl. of Angel Hsu
199

54

High-quality CDR is a scarce resource, which means that a strict definition of residual emissions is needed, ideally at regulatory level or, at the very least, within existing corporate guidelines.

**Multiple issues related to the mitigation hierarchy, non-permanence of carbon storage, scarcity of storage potential, and environmental damages require strict regulation of CDR by national governments.** The mitigation hierarchy prioritises emissions reductions. Emissions reductions and removals are not equivalent (Zickfeld et al., 2021). Removals cannot reverse the effects of climate change caused by emissions, and even technical removals with a higher permanence are not equivalent to emissions not occurring in the first place, as they would need unachievably high liability guarantees and continued monitoring, reporting, verification (MRV).

The permanence of carbon dioxide removals must be guaranteed over a timeframe of centuries to millennia. The release of previously sequestered carbon negates any benefits of the sequestration: at the point at which the carbon dioxide is released, the atmospheric concentration of carbon dioxide is restored to the same value that it would have been had the CDR activity never taken place.

Scarce sustainable carbon dioxide removal potential must be reserved for balancing out residual emissions in sectors where the technical mitigation potential of existing technologies remains very limited, for it to remain possible to achieve global net-zero emissions. The challenges of permanence and scarcity are explained in more detail in section 4.1.3 of the Methodology Version 4.0 (NewClimate Institute, 2024).

The allocation of scarce CDR potential across companies is a challenging task, which is why CDR should be treated as a public good rather than something for companies to claim as their own. The allocation of scarce resources must align with global net- zero goals and adhere to a CDR hierarchy, rather than being on a first-come, first-served basis (Deprez et al., 2024). Ideally, governments would set separate targets for emissions reductions and CDR based on a very strict definition of residual emissions. They could then allocate the scarce CDR potential to sectors and companies in need, based on the CDR hierarchy and supported by rigorous MRV and liability requirements. We observe the emergence of legislation regarding the use of CDR, with requirements on CDR volumes to achieve net zero at the national level. For example, the proposal for the EU's 2040 target by the EU Commission includes different scenarios on removals depending on the target level (European Commission, 2024, p. 6).

**The key issue of scarcity is not well addressed in currently available guidelines for corporate climate target setting.** Existing corporate guidelines like the Oxford Principles for Net Zero Aligned Carbon Offsetting, the SBTi Corporate Net Zero Standard and the ISO Net Zero Guidelines, address the issue of demand for removals by defining residual emissions. The ISO standard defines them as GHGs that remain "after taking all possible actions" (ISO, 2022). The SBTi provides figures on long-term science-based targets at sectoral level (SBTi, 2023d, p. 28), showing varying demand for removals across sectors. However, none of the standards address the challenge of matching this demand with the supply of high-quality removals. There is no assessment regarding the scarcity of high-quality removals, and it remains unclear whether their definition of residual emissions or their assumptions about demand match with the actual supply. Corporate guidelines on net zero should address this challenge in the future, just as they are increasingly addressing the issue of permanence of removals.

**Based on these issues, we conclude that it could only be credible for companies to complement their emissions reductions strategy with removals under specific conditions.** This should be based on a strict definition of residual emissions and the use of only carbon dioxide removals with a high likelihood of sufficient permanence. Scarce potential and environmental damages mean that CDR measures cannot be considered a credible alternative to emissions reductions for emission sources that could feasibly be eliminated.

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu
200

Separate emission reduction and carbon dioxide removal targets may be a more credible and constructive approach compared to net-zero targets.

**We find that it is more credible for corporates to set three separate types of targets for emission reductions, land sequestration removals and industrial removals, without neutralisation claims.** There is already extensive literature on the benefits of separate targets for emissions reductions and removals (McLaren et al., 2019). The separation approach applies to targets but also underlines the difference in timelines for emissions reductions (most urgent) and removals (needed for residual emissions at the end of a mitigation journey). The approach implies that a set of different policies and measures as well as MRV systems are needed for each of them, with the aim to increase environmental integrity.

Going further and splitting the target on removals into two different targets for permanent and for non-permanent removals is only a logical further step. This introduces different currencies on intrinsically different units, reinforces the mitigation hierarchy, and emphasises that counterbalancing emissions with removals entails different types of risks.

Removals are best financed by instruments other than the carbon markets, as these tend towards the cheapest options available.

The voluntary carbon markets are not the right instrument to channel funding for CDR. The integration of emission reductions and removals (with different degrees of permanence) into a single system means that removals are very likely to be used to offset emissions. This contradicts the principle that emission reductions and removals are not equivalent. Furthermore, carbon markets tend to invest in low-hanging fruits and cheap (low-quality) credits, whereas technical removals are one of the most expensive options existing today. The results of our analysis show that companies not only tend to overly rely on large volumes of CDR, but the majority of those which specify also rely on land sequestration CDR with high risks of non-permanence. On the voluntary carbon markets, these types of CDR are traded at much lower prices than other types of removals (Christie-Miller and Harvey, 2022). The supply of removals on these markets could be inflated by the lack of quality criteria, particularly on permanence, which would provide greater scope for emissions increase and delay emissions reductions.

Therefore, we find it is preferable to channel support for carbon dioxide removals through other instruments, for example, by implementing climate contributions, using auctioning revenues from existing carbon pricing mechanisms, establishing procurement schemes, or putting other obligations directly on companies (De Simone, Fabiole, Stoefs, 2023, p. 31).

## Recommendations for the appropriate allocation of scarce CDR potential for neutralising residual emissions

✓ **Regulators and corporate guidelines on net zero** should require companies to set three separate types of targets for emission reductions, land sequestration removals and industrial removals without neutralisation claims, and to report transparently on volumes and quality criteria set for biological and industrial removals.

✓ **Regulators and corporate guidelines on net zero** should limit the concept of residual emissions to sectors where the technical mitigation potential of existing technologies remains very limited. They should also address the issue of scarcity of high-quality removals and include a scientific assessment on whether their assumptions on demand for removals match the supply.

✓ **Companies** should not source their removals through the voluntary carbon markets but through other instruments. If these instruments do not exist yet at national level, companies should advocate for the introduction of a robust scheme on removals that is compatible with global net zero.

Exhibit 7 to Decl. of Angel Hsu
201

# 4 Where next for corporate climate accountability?

## 4.1 From carbon neutrality claims to more constructive climate contributions

### Summary

As of 2023, only a minority of the companies assessed currently use carbon credits to make potentially misleading carbon neutrality claims, with some even moving away from such claims. European business consultancies and carbon credit sellers are also transitioning away from carbon neutrality labels. In the EU, legislators and advertising ombudsmen are ruling against carbon neutrality claims in the European Union, though similar developments have yet to materialise in other regions. Such developments significantly improve the transparency of companies' climate communications. Climate contributions – finance provided by a company to support climate change action without claiming to neutralise its own emissions – may be a more constructive model to scale up voluntary climate finance. Despite this, only a small number of the companies in this report are contributing to climate change mitigation beyond their value chains without claiming neutralisation of emissions, and the volumes of support from these companies remain modest. New guidance including SBTi's 2024 report on beyond value chain mitigation (BVCM) constitute concrete steps towards operationalising and mainstreaming climate contributions, but there remains a lack of specificity on the claims that companies can and cannot make based on the contributions they provide. In 2024, details on claim terminology and potential finance recipients need to be clarified to enable companies and consultancies to move forward with this approach.

Voluntary climate finance from corporates could significantly contribute to financing climate action where resources are limited, especially in developing countries. Historically, corporate climate finance has largely been generated through the voluntary carbon markets. In these markets, companies typically purchase carbon credits derived from emission reduction projects around the world to claim that their own emissions have been offset. But mechanisms for scaling up voluntary climate finance should not undermine transparency and incentives for companies to prioritise necessary measures for deep reductions in their own emissions. This section explores the signals that carbon neutrality claims may be on their way out and assesses progress in operationalising climate contributions as an alternative model to scale up voluntary climate finance.

### The beginning of the end for unsubstantiated carbon neutrality claims?

**Only a minority of the companies assessed currently claim that their businesses or specific products are carbon neutral, and some companies are moving away from such claims while continuing to contribute voluntary climate finance.** Among the 20 companies assessed in section B of this report, only four – Daimler Truck, Danone, Mars and Volkswagen – reported in 2022 or 2023 that certain products or aspects of their businesses were carbon neutral, achieved through the use of carbon credits.

Table 15 shows why we have rated all of these claims to be of very poor or unclear integrity: each claim applies to only a fraction of the respective company's emissions, and none of the companies provide evidence that the carbon credits they procure are of sufficiently high quality to be considered equivalent to reducing the company's own emissions (see also Methodology section 4.1.2 regarding the limitations of carbon credits for offsetting claims).

The remaining 16 companies assessed in section B of this report did not make any form of carbon neutrality claim in 2022 or 2023, although several of these companies have made such claims in the past. Nestlé announced in 2023 that it would move away from carbon neutrality claims based on offsets at the group and brand level (ESG Today, 2023), although the company indicates that some of its brands continue to purchase carbon credits for their 'consumer engagement strategy', without specifying the exact claims associated with those credits (Nestlé, 2023b, p. 41). Evian – a major brand of Danone – also announced in 2023 that it will not seek recertification of its carbon neutrality label after 2023 (Evian, 2023), although Danone continues to make modest contributions to climate change mitigation beyond its value chain (see further details below). Nike, Stellantis, and Volvo Group previously procured carbon credits to make carbon neutrality claims but no longer make such claims. Other major companies such as easyJet and Gucci also publicly announced a move away from offsetting and carbon neutrality claims in 2023 (Carbon Herald, 2023), Google and Microsoft – both of which received a poor rating for the integrity of their carbon neutrality claims in the 2023 Corporate Climate Responsibility Monitor – appear to be quietly shifting away from these claims. We could not identify any new references to their previously prominent carbon neutrality claims on their websites or public reports in 2023, even though both companies still appear to procure carbon credits equivalent to their scope 1 and 2 emissions. However, not all companies are moving in the same direction: by contrast, Apple stepped up its carbon neutrality narrative with the announcement of its carbon-neutral smart watches in 2023 (see reaction; NewClimate Institute, 2023b).

56

Exhibit 7 to Decl. of Angel Hsu
202

**Table 15:** Integrity of carbon neutrality claims identified from the companies assessed in this report

| WHAT IS THE CLAIM? | AND WHAT DOES THE CLAIM REALLY MEAN? | |
|---|---|---|
| **Daimler Truck** claims that its "European production plants are CO₂-neutral on balance". | Daimler Truck's claim covers all production sites in Europe (Daimler Truck, 2023b, 2023a, p. 78, 2024, p. 84). It is based on an unspecified combination of efficiency measures, the procurement and generation of renewable electricity, and the procurement of carbon credits (Daimler Truck, 2023a). The company reports to procure only Gold Standard verified carbon credits but mostly refers to carbon crediting projects for renewable electricity generation (Daimler Truck, 2023a, p. 94, 2024); the additionality of such low-hanging fruit projects is highly contentious (see Methodology section 4.1.2). | **?** Unclear integrity |
| **Danone** claims carbon neutrality for some production sites. | Danone asserts that it "builds its net zero commitment around the carbon neutrality of its production sites" (Danone, 2023a, p. 152). While the report is ambiguous about the coverage of this claim, other sources indicate that six of Danone's production facilities are certified by the Carbon Trust as carbon neutral (Danone, 2022). It is unclear how many facilities Danone operates worldwide, and whether these six plants represent a significant volume of production. We could only identify information about two of these plants, in Ireland and Brazil. In both cases, the claims are based on a combination of standalone RECs, and the procurement of carbon credits to offset the remaining emissions (Danone, 2020b, 2021). Standalone RECs – essentially offsetting certificates for electricity – are the lowest quality means for procuring renewable electricity and are unlikely to have any meaningful impact to reduce GHG emissions (see section 3.2). For offsetting the rest of its emissions, Danone reports that it procures carbon credits from forest conservation projects in Brazil (Danone, 2021) but we could identify no details on the type of credits it procures in Ireland. While forest conservation will require more financial support to reach the scale required globally to limit the most damaging effects of climate change, such carbon storage does not offer the permanence to be considered equivalent to the reduction of emissions (see Methodology section 4.1.3). | **Very poor integrity** |
| **Mars** claims that some of its brands and products – including Mars Bar – are carbon neutral in some geographies. | Mars's brand carbon neutrality claims cover only a small selection of its flagship brand products, and only in a selection of geographies. Mars Bar – for example – claims to be carbon neutral in the UK, Ireland and Canada (Mars, 2023b). We could not identify a list of other Mars products that claim carbon neutrality. The carbon neutral claim is based on the procurement of carbon credits and covers the full value chain emissions of the product, including scope 1, 2 and 3 emissions from raw material extraction to disposal, meaning that the degree of compensation may be more commensurate than in the cases where companies make claims after offsetting only a portion of emissions. However, there are significant issues that affect the transparency of these claims. Firstly, although Mars specifies that emission reductions are a key component of the mitigation hierarchy before carbon credit procurement, the company does not specify to what extent emission reductions need to be achieved before a product is eligible to procure carbon credits and make this claim; it appears as if there is no minimum requirement for emission reductions and that carbon credit procurement can be the primary means for brands to claim carbon neutrality. Secondly, we could not identify information on the projects from which Mars has procured carbon credits. Without this information, the carbon neutrality claims are unsubstantiated and their integrity is unclear. | **?** Unclear integrity |
| **Volkswagen** claims the carbon neutral delivery of electric cars and carbon neutral production sites in Europe. | The Volkswagen Group claims "carbon neutral delivery" for electric vehicles by several of its European brands (Volkswagen, 2023b, 2024). Such claims might lead customers to believe that Volkswagen successfully managed to fully decarbonise electric vehicles' value chain, including supply chain and their production. However, the company does not specify the share of emissions it has reduced along vehicle's value chain, for example by using low-carbon steel for its vehicles manufacturing. The company further claims that eight production sites operate on a "carbon neutral basis". In contrast, Volkswagen's German and Czech production sites rely on Volkswagen's own electricity generation that remains highly dependent on fossil fuels. The Group's subsidiary VW Kraftwerk GmbH, which is responsible for the electricity and heat supply for German and Czech production plants, reports a share of around 37% of coal and fossil gas in its 2022 electricity mix (VW Kraftwerk, 2023). To offset these emissions for its carbon neutral delivery claim, Volkswagen purchased carbon credits of a total volume of 5.9 MtCO₂e in 2022 and 8.5 MtCO₂e in 2023 (Volkswagen, 2023b, 2024). These credits mainly stem from nature-based projects and carbon dioxide removals, for example the Kariba mega-project, of which the company exited the project entirely in October 2022 following allegations of inflated climate benefits and issues related to due diligence (Elgin and White, 2023). Volkswagen also plans to develop own projects generating carbon credits through a joint venture with ClimatePartner formed in 2022, but has yet to provide any further information on its future activities and the type of projects (Volkswagen, 2024; Volkswagen ClimatePartner, 2024). | **Very poor integrity** |



**In 2023, there was a notable trend among business consultancies and carbon credit sellers transitioning away from carbon neutrality labels.** The business consultancy *myclimate*, an internationally recognised provider of carbon credits and carbon neutrality labels, announced in December 2022 that it will discontinue its climate neutrality label and transition to a new impact label aligning with the climate contribution model. This announcement explicitly recognises that the current market cannot deliver carbon credits that can credibly facilitate climate neutral claims in the era of the Paris Agreement (myclimate, 2022). Following suit, in April 2023, another business consultancy *ClimatePartner* introduced a "ClimatePartner certified" label while discontinuing their carbon neutral label (ClimatePartner, 2023); Similarly, in June 2023, SouthPole announced its transition from their carbon neutrality labels to an alternative "Funding Climate Action" label, noting the increased scrutiny on carbon neutrality claims and the need for claims that can be made with confidence and transparency (SouthPole, 2023).

In the EU, legislators are ruling against carbon neutrality claims, although similar developments have yet to materialise in other regions. In 2024, the EU adopted a ban on climate-neutral advertising on products and services (European Parliament, 2024). This breakthrough legislation marks the first time globally where policymakers have banned carbon neutrality claims, potentially setting a precedent for regulatory developments in other countries.

Exhibit 7 to Decl. of Angel Hsu

203

57

Corporate Climate Responsibility Monitor 2024

## Operationalising the climate contribution approach

A **climate contribution** refers to finance provided by a company to support climate change action beyond the company's own value chain, without claiming to neutralise its own emissions. A company can claim to *contribute to* climate change mitigation activities, when it does so without claiming ownership of the emission reduction outcomes and without subtracting associated reductions from their own GHG inventory or net-zero target. In contrast to offsetting claims, which are more prone to greenwashing accusations, the climate contributions approach preserves transparency, and helps address some of the most challenging "double counting" issues associated with the accounting of emission reductions by both "buyer" companies and "seller" countries (Fearnehough et al., 2023).

At least 4 of 20 companies report providing financial support for climate change mitigation projects without making associated offsetting claims. Danone, Stellantis, Volkswagen, and Walmart report their support for mitigation projects beyond their value chains without making neutralisation claims, although the scale of these projects appears too small to align with SBTi's new beyond value chain mitigation (BVCM) recommendations, and none of these companies report their methods for determining the volume of their contributions. Despite positive developments during 2023 to operationalise the climate contribution approach, the model has not yet reached the degree of maturity to be implemented at scale. Nevertheless, some major companies, such as Klarna and Spotify, have started to transition towards this approach.

The 2023 *Corporate Climate Responsibility Monitor* explored a number of potential reasons for the slow uptake of this approach (Day, Mooldijk, Hans, et al., 2023, p. 67) We perceived that there was insufficient pressure from consumers, investors, or governments to enhance the environmental integrity of neutralisation claims and regulate offsetting claims, as well as companies' lack of knowledge and awareness that may hinder the adoption of the climate contribution approach. However, 2023 saw significant developments addressing these barriers.

**The publication of guidelines in 2023 and 2024 constitute concrete steps towards operationalising and mainstreaming climate contributions, but there remains a lack of specificity on the claims that companies can and cannot make based on the contributions they provide.** Several developments in 2023 have contributed to moving the climate contribution model from a theoretical concept towards an implementation-ready model. However, undefined details that require further elaboration will determine the extent to which these developments represent a significant step forward or merely a repackaging of old approaches.

- **The Gold Standard** published a "Step by step guidance for organisations taking responsibility for their unabated emissions" (Gold Standard, 2024) which follows all best practice recommendations on BVCM and also provides prescriptive guidelines on claims.

- **SBTi recommendations for beyond value chain mitigation (BVCM)**

In February 2024, SBTi published the outcome of its consultation process on recommendations for companies to engage in BVCM (Benson et al., 2024). The outcome is an operationalisation of the climate contribution approach; companies are recommended to provide finance – based on a carbon price applied to the volume of their own emission footprint – to climate change mitigation efforts outside of the companies' value chain. Our methodology for assessing the integrity of climate contributions is aligned with SBTi's main recommendations for BVCM, including the use of a money-for-tonne model for determining financial contributions through a science-aligned carbon price across all scope 1, 2 and 3 emissions (Benson et al., 2024). However, the SBTi report does not rule out the possibility of companies making compensation claims under the BVCM approach, which is a highly relevant omission. If a decision is made to depart from the core principles of SBTi to allow offsetting toward target fulfilment (*see section 1.2*), then the BVCM recommendations could have a substantially different meaning compared to the current situation.

- **VCMI Claims Code of Practice**

The Voluntary Carbon Markets Integrity Initiative (VCMI) has released its integrity guidelines for corporate use of carbon credits. In some regards, the concept of VCMI's Silver, Gold, and Platinum "carbon integrity" claims outlines a transparent and constructive approach. Under these claims, companies that have already achieved their climate targets can additionally procure carbon credits to take responsibility for their unabated emissions. These claims constitute a form of climate contribution approach. However, such contributions would be delivered exclusively through a tonne-for-tonne model with carbon crediting projects, which may make the claims more prone to potentially misleading communications regarding the extent to which emissions are considered to be neutralised. This concern is heightened by the fact that the precise terms of the claim remain somewhat ambiguous, although companies are *recommended* not to claim the neutralisation of their emissions through this means (VCMI, 2023a). Despite this potentially positive development, it remains to be seen whether the VCMI *carbon integrity* claims will be picked up by companies, compared to VCMI's separate claims framework, the beta scope 3 flexibility claims.

In contrast to the contribution model set out in the carbon integrity claims, VCMI's beta Scope 3 Flexibility Claim would revive the traditional offsetting narrative, allowing companies to offset emissions towards their scope 3 targets, posing a major risk to corporate ambition (*see section 1.2*).

Exhibit 7 to Decl. of Angel Hsu
204

Corporate Climate Responsibility Monitor 2024

## What may happen in 2024?

**Details on claim terminology and finance recipients need to be clarified.** Although the SBTi BVCM recommendations and VCMI carbon integrity claims represent frameworks that could be used for mainstreaming the climate contribution approach, key details for implementation remain unaddressed. Most importantly, the potential links between these frameworks and any emerging flexibility mechanisms need to be clarified: the claims that companies can make with the contributions that they provide should be specified in clear terms to avoid a new generation of inconsistent and potentially misleading communications. More guidance is needed regarding where and how climate contributions could be channelled. With these details, business consultancies and project developers will be able to follow a clear framework, and more companies will be able to start using this model.

**Identifying and supporting high-hanging fruit projects is crucial.** The high hanging fruit of mitigation potential refers to the technologies and measures to decarbonise emission sources that remain otherwise entirely inaccessible to host country governments in the near- and medium-term future, on account of extraordinary costs or other insurmountable barriers that cannot reasonably be overcome (Day, Mooldijk, Posada, et al., 2023). The increasing clarity on how to pursue climate contributions should lead to a significant increase in flows of voluntary climate finance from companies. However, there remains a major concern about the quality and diversity of projects that can attract voluntary climate finance. The pathways to the operationalisation of climate contributions through the SBTi BVCM report and the VCMI Claims Code of Practice are quite focused on the continued use of carbon crediting projects under a contribution narrative. It may be possible but is likely very challenging for companies to aim for the high-hanging fruit of climate change mitigation projects, which are in great need of support to unlock and scale-up technologies and practices for deeper decarbonisation of the most challenging emission sources. There remains a gap for an initiative to identify high-hanging fruit projects, for companies who wish to demonstrate their superior ambition.



59

Exhibit 7 to Decl. of Angel Hsu
205

## 4.2 Revision of the GHG Protocol

One of the major developments of 2023 for the architecture of corporate climate accountability frameworks is the initiation of the revision process for the GHG Protocol Corporate Standard and the GHG Protocol Guidelines for Scope 2 and Scope 3 accounting. This extensive process is expected to result in the publication of revised standards and guidelines in 2026.

The standards and guidelines of the GHG Protocol are highly influential for the transparency and integrity of corporate climate action. They form a foundation for most of the other voluntary initiatives and governmental legislations that make up the landscape of the global corporate climate accountability framework, including major initiatives such as the Science Based Targets initiative. The revised GHG Protocol standards and guidelines will determine whether companies have tangible incentives or requirements to implement high-quality strategies and affect the extent to which companies can identify and exploit potential accounting loopholes to exaggerate their plans and progress.

Given that aspects of the GHG Protocol standards and guidelines underpin many of the key issues assessed in this report, our analysis of various topics in sections 1, 2 and 3 each includes recommendations for the GHG Protocol revision process. These recommendations are compiled and summarised in this section. Further details on each recommendation can be found in the respective sections.

### Resisting pressure to integrate offsetting into inventories

✓ **The categorisation and accounting of value chain emissions should be reconsidered to help companies, standard setters and other stakeholders to focus on the most critical decarbonisation indicators** for each sector, which are well within companies' direct control. Flexibility through offsetting is not the right solution to address the challenges that companies understandably face in implementing scope 3 targets *(see section 1.2).*

✓ **Scope 2 and 3 guidance should not introduce 'project-based accounting'** as an alternative to claim emissions reductions *(see section 3.2).* A proposal for the revision of the scope 2 guidance to introduce a new accounting method – labelled 'project-based accounting' – would allow companies to claim reductions in their scope 2 emissions based on emissions avoided from renewable energy projects implemented anywhere in the world, whether inside or outside of the local grid region or market. Allowing for 'project-based accounting' either in scope 2 or scope 3 would essentially be the same in practice to offsetting with carbon credits, and ignores the responsibility that companies have to contribute to efforts to decarbonise the electricity grids that they use and the other emission sources that their businesses are built on. It is a highly contentious proposal for improving the GHG-P Guidance, given the increasing awareness of the various fundamental limitations of offsetting and the general shift we perceive away from this practice *(see section 4.1).*

✓ **Scope 3 guidance should only allow the introduction of 'market-based methods' for upstream scope 3 emissions if measures are taken to ensure high transparency and integrity of renewable electricity procurement** *(see improving market-based accounting methods below).* If done with high transparency and integrity, this could incentivise companies to better develop their supply chain emission reduction strategies and engage with suppliers to help them reduce their energy-related emissions.

### Improving market-based accounting methods

These recommendations serve to improve transparency on key issues surrounding electricity procurement, enabling the identification of companies pursuing best practice approaches and encouraging the others to follow suit *(see section 3.2).*

✓ **Scope 2 guidance should increase granularity on reporting for procurement of renewable electricity** to distinguish between procurement methods such as standalone RECs, PPAs, and others, recognising the stark differences in the impact of these procurement constructs regarding the additionality of the renewable electricity that the companies claim.

✓ **Scope 2 guidance should also impose stronger requirements on the additionality** of renewable electricity procurement constructs, such as restrictions on the use of standalone RECs.

✓ **Scope 2 guidance should require companies to disclose information on the matching approach** used when procuring renewable electricity and encourage a move towards hourly matching. This is crucial because hourly matching would stimulate demand for additional and novel renewable energy generation and storage technologies, while annual matching hides a significantly embedded reliance on fossil fuel generation.

Corporate Climate Responsibility Monitor 2024

60

Exhibit 7 to Decl. of Angel Hsu
206

**Recognising that bioenergy is not an equal alternative to non-combustible renewables**

➤ **The GHG protocol should include specific information on how to account for bioenergy emissions in all emission scopes.** Within this guidance, it should be clear that bioenergy is not an equal alternative to modern renewables (see Section 3.3). Bioenergy is not an emissions-free energy source and is highly likely to have negative sustainability implications. These include, but are not limited to, deforestation, biodiversity loss, and food insecurity. Even when companies source bioenergy from 'sustainable' sources, there is the inherent problem that by using any type of bioenergy at all – which is and will remain a scarce resource – they push other companies to use non-sustainable biomass. To limit global warming to 1.5°C and protect ecosystems, it is key to reduce overall demand for biomass. Companies operating in sectors with viable alternatives for decarbonisation should pursue those avenues. (see section 3.5)

**Clearer guidance on relevant boundaries for 'direct' and 'indirect' use-phase emissions from sold products**

➤ **Scope 3 guidance should require companies to report both 'direct' and 'indirect' use-phase emissions from their sold products separately.** This could be done by creating an additional category for 'indirect' use-phase emissions. Direct use-phase emissions stem from products that directly consume energy when used, such as machinery or vehicles. Indirect use-phase emissions originate from products that indirectly consume energy when used, such as clothing that requires washing. It is important to separate these two categories as the level of control that a company has over indirect use-phase emissions is usually significantly lower than that over direct use-phase emissions. Additionally, integrating indirect use-phase emissions into company targets can sometimes be misleading as those emissions are largely outside the company's control. Indirect use-phase emissions can be reduced through independent processes such as efficiency improvements in equipment and grid decarbonisation, without direct intervention of the company setting the target.

➤ **The extent to which 'direct' and 'indirect' use-phase emissions from sold products should be considered a mandatory part of the GHG Protocol Corporate Standard should depend on the specific circumstances of the sector and the relevance of these emissions for companies' overall targets and strategies.** These categories are currently put together with the latter marked as optional for reporting. This is a significant gap in the existing standard as use-phase emissions can be very significant relative to the company's total value chain emissions. In some cases, such as for electricity retailers, the absence of a requirement to report emissions related to sales of products that are not directly sold to end-users creates an accounting loophole. Electricity retailers that purchase lower-cost wholesale electricity comprising a mix of renewable and non-renewable sources could claim zero downstream emissions if they claim to have passed the renewable portion of that electricity onto customers while reselling the remaining electricity to other sales partners. This could diminish incentives for electricity retailers to pursue high-quality renewable electricity procurement

➤ **Scope 3 guidance should also be further specified to include information on reporting boundaries for certain products.** Especially when companies' products are positioned 'upstream' in the value chain, such as raw materials or inputs like steel, which go through numerous subsequent processes before reaching an end consumer. In these cases, it is crucial to clarify not only which types of 'use-phase' emissions that need to be reported but also up to which point companies need to track and report emissions. Without that clarity, companies operating upstream in the value chain could experience significant uncertainty regarding their emissions. For example, Thyssen-Krupp, a steel and machinery manufacturer, reported 614 MtCO₂e of downstream scope 3 emissions in 2020, but only 1.8 MtCO₂e for the same category in 2021 (Thyssenkrupp, 2022; Day, Mooldijk, Hans, et al., 2023), although both methods would be consistent with GHG Protocol guidelines. Such an improvement would help companies better understand which emissions they need to take responsibility for and set targets and measures accordingly.

61

Exhibit 7 to Decl. of Angel Hsu
207

SER 487

## 4.3 Evolving from voluntary initiatives to formal accountability

*Some extracts of this section are adapted from The Corporate Accountability Loop (Hans et al., 2023).*

### Summary

The integrity of the current corporate accountability system is impaired by inherent tensions deriving from a lack of institutional separation and direct corporate influence. Multiple functions of the corporate accountability system are currently performed by a small group of overlapping initiatives without sufficient institutional separation and independence. This setup allows companies to directly influence activities under specific accountability functions, despite them being the entities to be held accountable. Urgent adjustments are needed to establish institutional separation and independence among actors performing the functions of standard setting, validations, and mobilisation. A mature and functional system eventually requires a shift from voluntary initiatives to regulation, accredited verification and validation entities, and effective advocacy and litigation.

The findings of our analysis show that – while voluntary initiatives play a key role in the current corporate climate accountability system – the current over-reliance on voluntary initiatives for many functions of the system does not result in sufficiently credible corporate climate action, despite the increasing urgency of the climate crisis. These pioneering initiatives were formed at a time when corporate climate action was in its early stages. As we have now reached a stage where most of the largest and most influential multinational corporates regularly announce targets and strategies to reduce emissions, the model of voluntary mobilisation may have outgrown its original purpose.

Recognising the need for enhanced integrity within the current system, the UNFCCC Secretariat released its Recognition and Accountability Framework (RAF) in 2023 and is engaged in consultations regarding its implementation plan (UNFCCC, 2023c).

Status quo: The integrity of the current corporate accountability system is impaired by inherent tensions deriving from a lack of institutional separation and direct corporate influence.

Hans et al. (2023) outlined the key conceptual functions of the corporate climate accountability system in the Corporate Accountability Loop (Figure 6). In assessing the status quo of this system and the capacity of these key functions to operate effectively, the authors identified key issues in the current framework that create inherent tensions:

▲ **A small group of overlapping initiatives perform multiple functions within the current corporate accountability system without sufficient institutional separation and independence.**

Single initiatives or actors perform multiple functions simultaneously, including (1) developing standards (2) mobilising companies, and (3) validating companies' strategies. For example, several partner initiatives to the UNFCCC's Race to Zero campaign, such as the Science Based Targets initiative (SBTi) or the SME Climate Hub, perform these multiple functions, often resulting from their role as pioneering entities in mobilising and enabling companies to set climate strategies.

These initiatives were established at a time when corporate climate action was in its infancy, and the combination of these functions may have been considered most effective at the time. However, the global business community has now reached a stage where it has become standard practice for most of the largest and most influential multinational corporates to announce targets and strategies to reduce emissions. In this evolved context, voluntary initiatives and even their philanthropic supporters might face an inherent tension stemming from the multifaceted nature of their roles. On the one hand, for example, the development of a standard for 1.5°C-compatible corporate transition plans should be based on the requirements indicated by the latest scientific literature, even if this might imply very challenging benchmarks. On the other hand, if the initiative developing such a standard is also performing the function of mobilising as many companies as possible to participate, then it may be necessary to identify compromises that could undermine each of those important functions.

▲ **Companies often hold significant influence over activities under specific accountability functions, despite them being the entities to be held accountable for.**

In the current system, companies play an integral role in consensus-aligned development processes for voluntary standards and decarbonisation benchmarks. Such processes aim to reconcile scientific findings with corporate interests, with companies dedicating substantial personnel and financial resources to participate and influence these processes. Companies' climate strategies subsequently are directly assessed against these standards, guidance, or decarbonisation benchmarks that they helped to develop in the first place. This creates a conflict of interests for companies as they directly influence activities conducted by voluntary initiatives and actors under the core accountability functions of the current system.

Corporate Climate Responsibility Monitor 2024

62

## Exhibit 7 to Decl. of Angel Hsu
## 208

**Prompt adjustments to the existing system:
Establish institutional separation and
independence between actors performing the
functions of *standard setting, validations, and
mobilisation.***

The existing shortcomings of the current corporate
accountability system call for immediate improvements to
facilitate a move towards higher integrity and to better identify
genuine corporate leadership.

> **Institutional separation for key functions of the
> accountability system** mitigates some of the most
> fundamental tensions that impair the integrity of the
> current system. Mobilisation and capacity-building
> initiatives should aim to engage as many companies as
> possible, while those setting science-aligned standards
> should not compromise between companies' interests
> and scientific findings.

> **Compliance, grievance, and whistle-blowing
> mechanisms must be introduced within existing
> initiatives** to accompany this institutional separation.
> Such mechanisms enable researchers, civil society,
> and other actors to scrutinise corporate climate
> strategies and accountability process to flag potential
> issues. These issues may include companies' non-
> compliance with standards or validators' failure to
> follow procedures for validation and verification.
> Such mechanisms would also depend on independent
> oversight bodies that can ensure the removal of
> companies' validations in case of non-compliance.

**Evolution to formal accountability: Shift from voluntary initiatives to regulation, accredited verification
and validation entities, and effective advocacy and litigation.**

The United Nation's High-Level Expert Group (HLEG) 'Integrity Matters' report on net-zero pledges emphasised the need to develop
"regulation and standards in areas including net zero pledges, transition plans and disclosure" as one of their ten recommendations
(UN HLEG, 2022). The corporate climate accountability system is already being reshaped by emerging climate regulations around the
world. This shift is crucial for determining how target validations and performance verifications will be executed, and whether the
system enables effective advocacy and litigation activities:

> **The legally binding nature of regulation contributes to an enforceable accountability system** in which it is no longer
> voluntary for companies to commit to corporate climate strategies and in which companies and validators can be held
> accountable for misleading targets and claims that undermine the integrity of corporate climate action. Recently, several
> governments have introduced, or are introducing, regulation on issues such as corporate emission disclosures or corporate
> transition plans (Hale et al., 2022; Oxford Net Zero, 2023). In the EU, for example, regulations across multiple EU
> directives could lead to legally binding requirements for corporate climate disclosure and corporate transition plans in line
> with EU-specific 1.5°C decarbonisation benchmarks (Pugliese and Godinot, 2022). Comprehensive regulation introduced
> in one jurisdiction can directly influence other jurisdictions due to the global nature of corporate value chains.

> **The introduction of regulation or international standards will enable target validations and performance verifications by
> accredited and legally liable entities.** Like traditional financial auditing by accounting firms, entities performing validations
> and verifications could undergo accreditations by regulators and can be held legally liable in case of negligence.

> **The formalisation of the accountability system can enhance the effectiveness of the advocacy and litigation activities.**
> In recent years, numerous plaintiffs such as NGOs, citizens, and environmental law firms across different jurisdictions
> have engaged in litigation activities against inadequate corporate climate action (Setzer and Higham, 2022; 2023;
> UNEP, 2023). The emergence of legislation might introduce more specific legal liabilities for companies, as well as
> voluntary initiatives and actors involved in the validation and verification of 1.5°C-compatible climate strategies. Such
> legal liability does not exist in the current system, which prevents advocacy and litigation from effectively holding
> companies accountable through legal means.

> **This necessary shift includes an important role for voluntary initiatives.** The shift to legally binding regulation is necessary
> to achieve a functional accountability system but it might be prone to several potential issues. Regulations might be
> fragmented across different countries or regions worldwide, may not aligned with the latest science due to political
> considerations and the influence of vested interests, and could reinforce global inequalities through transboundary effects.
> In this context, voluntary initiatives and actors can play an important future role in scrutinising forthcoming regulations
> and continuing to advance the understanding of good practice according to the latest science, equity, and climate
> justice considerations. Such activities can promote upward convergence to common and high-ambition standards by
> consolidating good practice approaches and support their transition into legally binding measures (Hale, 2021).

63

Exhibit 7 to Decl. of Angel Hsu
209

**SER 489**

**Figure 6:** Key conceptual functions of an effective corporate climate accountability system (Hans et al., 2023)



**Core functions**

Necessity to perform functions in an **independent, enforceable and mandatory** manner to ensure high integrity corporate climate action.

**Supportive functions**

Cross-cutting functions essential to support and control on proper functionality of core functions.

Exhibit 7 to Decl. of Angel Hsu
210

## 4.4 Summary of recommendations for the evolution of the corporate climate accountability system

### Recommendations for strengthening the corporate climate accountability system

**Evolution from carbon neutrality claims to beyond value chain mitigation (BVCM) contributions**

✓ **Regulators** worldwide should replicate the EU's landmark legislation banning the use of carbon neutrality claims for products and services, recognising the fundamental limitations of such claims.

✓ **SBTi** and **VCMI** should further align their recommendations for climate contributions. These recommendations should provide more specificity on how exactly companies could channel finance and should specify that such contributions cannot lead to neutralisation claims; BVCM should not be used as an umbrella term to legitimate the further use of carbon credits and/or climate neutrality claims (see section 1.2).

**GHG Protocol revision process**

To strengthen integrity, the GHG Protocol revision process should:

✓ Improve market-based accounting methods by increasing reporting granularity, additionally requirements and hourly matching for renewable electricity procurement.

✓ Resist pressure to integrate offsetting into inventories through so-called 'project-based accounting'.

✓ Recognise that bioenergy is not an equal alternative to non-combustible renewables and include guidance on how to account for bioenergy emissions in all emission scopes.

✓ Clarify guidance on relevant sector-specific reporting boundaries for 'direct' and 'indirect' use-phase emissions from sold products, recognising the specific circumstances of each sector.

**Current and future voluntary standard setters (e.g. SBTi, GHG Protocol and CDP):**

✓ Standard setters should ensure to follow science-aligned approaches to the development of standards, guidance, and decarbonisation benchmarks. Such processes would need to be proactively safeguarded against excessive direct influence or compromise with corporate interests.

✓ Standard setters should introduce compliance, grievance, and whistleblowing mechanisms in voluntary initiatives to enable effective public scrutiny.

**Regulators at the national and international level**

✓ Regulators should initiate a shift from voluntary accountability initiatives and towards formal regulation that includes accredited verification and validation entities, and enables effective advocacy and litigation.

✓ Regulators should establish institutional separation and **independence** between actors performing the functions of *standard setting, validations and mobilisation*.

65

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu
211

SER 491



SECTION B

# COMPANY ANALYSES

66

This section of the 2024 *Corporate Climate Responsibility Monitor* includes an in-depth assessment of the integrity of the climate change mitigation strategies from 20 of the world's largest companies.

Case 2:24-cv-00801-ODW-PVC    Document 89-25    Filed 04/07/25    Page 67 of 164
Page ID #:8844

Exhibit 7 to Decl. of Angel Hsu
212

**We assess five of the largest global companies – excluding majority state-owned companies – from four key sectors: agrifood producers and retailers, automobile manufacturing, electric utilities, and fashion.**

- For electric utilities and fashion, we select the top five global companies from each of these sectors according to their annual revenue in 2022 (Forbes, 2023). For electric utilities, this includes **Duke Energy, Enel, ENGIE, Iberdrola and Korea Electric Power Corporation (KEPCO)**. For fashion, this includes **Adidas, Fast Retailing, H&M Group, Inditex and Nike.**

- For automobile manufacturers, we select the top five global companies by revenue including also at least 2 companies that are specialised in producing heavy duty trucks only. This is to gain insights on the integrity of climate plans for heavy duty vehicle manufacturing, since previous iterations of the *Corporate Climate Responsibility Monitor* have focused only on light duty vehicle manufacturing. The selection includes **Daimler Truck, Stellantis, Toyota, Volkswagen Group and Volvo Group.**

- For the agrifood sector, we select the four largest companies with targets formulated under SBTi's new FLAG guidance: **Nestlé, Tesco, Mars, Danone.** This specific sample selection is to test the hypothesis that the new FLAG guidance can improve the integrity of agrifood companies' targets. In addition to these four companies, we also select **Walmart** for assessment due to its high relevance as by far the largest company in the sector, and as the largest company in the world across all sectors.

- Our selection for all sectors excludes majority state-owned companies due to our perception that fundamental differences in management structures and decision-making structures for climate change strategy may significantly detract from the comparability of these companies' plans, and the insights that we can draw from the company sample.

**Most – but not all – of the companies assessed have committed to high-profile climate change mitigation pledges under the Science Based Targets initiative.** The key objective of the analysis is to identify replicable good practice while assessing the integrity of the most influential global corporate actors that are putting themselves forwards as climate leaders and role models for other companies. Scrutiny of their plans is also necessary to identify whether these influential leaders really are setting the right examples, and whether the guidance and frameworks upon which they are making their plans are sufficient. However – aside from in the agrifood sector – this was not a selection criterion for this iteration of the Corporate Climate Responsibility Monitor; we have assessed the largest companies by revenue, according to the considerations listed above, and it is a coincidence that most of these companies are also members of major initiatives such as SBTi.

An overview of the selected companies and our evaluations is presented in Table 16. The 20 companies covered by this monitor account for approximately USD 2.3 trillion of revenue in 2022 (Forbes, 2023). Their total self-reported GHG emission footprints in 2019, including scope 3 emissions, amount to approximately 3.9 $GtCO_2e$. This is equivalent to roughly 7% of global GHG emissions.[5] Eight of the 20 companies selected through the process described above were also assessed in the 2022 or 2023 Corporate Climate Responsibility Monitor.

5   *Some overlap in emission statistics is likely in the cases that one company's scope 3 emissions are included in the scope 1 or 2 emissions of another company. We anticipate that any overlap is marginal and of limited significance to the key insights derived from this report. The companies' combined emission footprint may also be higher, due to some companies' incomplete emission disclosure.*



67

Exhibit 7 to Decl. of Angel Hsu
213

**Table 16:** Overview of companies assessed in the Corporate Climate Responsibility Monitor 2024 (companies are listed alphabetically within each integrity rating category)

| HIGH INTEGRITY | HEADLINE PLEDGE | TRANSPARENCY | INTEGRITY | PAGE |
|---|---|---|---|---|
| No companies achieved a high integrity rating | | | | |

| REASONABLE INTEGRITY | HEADLINE PLEDGE | TRANSPARENCY | INTEGRITY | PAGE |
|---|---|---|---|---|
| Enel | Zero emissions in 2040 | | | p. 92 |
| Iberdrola | Net zero emissions before 2040 | | | p. 96 |

| MODERATE INTEGRITY | HEADLINE PLEDGE | TRANSPARENCY | INTEGRITY | PAGE |
|---|---|---|---|---|
| Danone | Net zero emissions by 2050 | | | p. 118 |
| H&M Group | Net zero emissions by 2040 | | | p. 108 |
| Inditex | Net zero emissions by 2040 | | | p. 110 |
| Mars | Net zero emissions by 2050 | | | p. 120 |
| Nike | Net zero emissions by 2050 | | | p. 112 |
| Stellantis | Carbon net-zero by 2038 | | | p. 76 |
| Volvo Group | Net zero emissions by 2040 | | | p. 84 |

| LOW INTEGRITY | HEADLINE PLEDGE | TRANSPARENCY | INTEGRITY | PAGE |
|---|---|---|---|---|
| Adidas | Carbon neutral by 2050 | | | p. 104 |
| Daimler Truck | $CO_2$-neutrality by 2050 | | | p. 74 |
| ENGIE | Net zero carbon by 2045 | | | p. 94 |
| Duke Energy | Net zero carbon by 2050 | | | p. 90 |
| Fast Retailing | Carbon neutral by 2050 | | | p. 106 |
| Nestlé | Net zero emissions by 2050 | | | p. 122 |
| Tesco | Net zero emissions by 2050 | | | p. 124 |
| Volkswagen Group | Carbon neutral by 2050 | | | p. 81 |
| Walmart | Zero emissions in operations by 2040 | | | p. 126 |

| VERY LOW INTEGRITY | HEADLINE PLEDGE | TRANSPARENCY | INTEGRITY | PAGE |
|---|---|---|---|---|
| KEPCO | Carbon neutrality by 2050 | | | p. 98 |
| Toyota | Carbon neutral by 2050 | | | p. 78 |

**5-point scale** ● High ◐ Reasonable ◐ Moderate ◐ Low ◐ Very low   See individual company analyses.

Assessments were made based on public information identified by the authors. A poor rating may not necessarily be an indication that a company's climate strategy is weak, but could also indicate that the information was insufficient to confirm good practice. Ambitious companies can improve their ratings by ensuring that all aspects of their climate responsibility strategies are transparently and accurately disclosed, and in the public domain.

Our company-specific assessments include a rating of the **transparency** and **integrity** of their approaches across four key elements of corporate climate responsibility as presented in the methodological overview (Good Practice Overview, p13): **1 - Tracking and disclosure of emissions; 2 - Setting specific and substantiated targets; 3 - reducing emissions; and 4 - Responsibility for unabated and residual emissions.**

Our assessments include a rating of the transparency and integrity of companies' approaches. **Transparency** refers to the extent to which a company publicly discloses the information necessary to fully understand the integrity of its approaches towards the various elements of corporate climate responsibility. **Integrity**, in this context, measures the quality, credibility and comprehensiveness of those approaches.

Full details on our methodology for assessing good practice across these four areas can be found in the accompanying methodological document: *Guidance and assessment criteria for good practice corporate emission reduction and net-zero targets: Version 4.0* (NewClimate Institute, 2024).

The *Corporate Climate Responsibility Monitor* promotes transparency with the philosophy that consumers, regulators, shareholders, and other observers should be able to follow and assess the integrity of companies' claims. Accordingly, the company assessments in this section are based only on publicly available information that could be identified by the authors. Each rating represents the authors' understanding of the publicly available information. In some cases, company information was scattered across different sources (e.g. annual reports, press releases and statements, webpages, and other marketing materials); it is possible in this process that information may have been misinterpreted, or overlooked. Companies should consider how to present information as transparently as possible, to ensure that observers are able to readily identify all the relevant information necessary to understand their climate strategies.

Exhibit 7 to Decl. of Angel Hsu
214

# 5 Automotive manufacturers

## 5.1 Sector highlights

- **Automotive manufacturers' emissions mostly originate in the use phase of its sold cars, vans, trucks, and buses and from sourced products such as steel or batteries.** The accelerated phase-in of electric vehicles and the procurement of low-carbon products provide key levers for manufacturers to address these emissions along their value chain.

- **Emission disclosures by automotive manufacturers remain inadequate and incomplete.** Light-duty vehicle manufacturers generally underreport the use-phase emissions of sold cars (Volkswagen, Toyota) while heavy-duty vehicle manufacturers show a mixed picture, with some disclosing use-phase emissions (Volvo Group) and others not at all (Daimler Truck). Integrated companies producing both light- and heavy-duty vehicles do not include the latter's use-phase emissions in their group level reporting (Volkswagen, Toyota).

- **The integrity of emission reduction targets differs substantially between light- and heavy-duty manufacturers.** Light-duty vehicle manufacturers continue to set inadequate 2030 targets without 1.5°C-aligned phase-out targets for internal combustion engines (Volkswagen, Toyota). Only Stellantis stands out with its 2030 ICE phase-out target for the European market. Heavy-duty vehicle manufacturers apply generally ambitious target-setting approaches. Some companies set specific short-term targets towards 2030 (brands under Volkswagen Group, Volvo Group) while others set specific 1.5°C-aligned phase-out dates in the longer term towards 2050 (Daimler Truck) alongside supporting the charging infrastructure roll-out.

- **Emissions from the sourcing of upstream material like steel remain poorly addressed across the entire manufacturer's sample.** Only Volvo Group lays out more comprehensive and transparent plans by targeting at least 10% low-carbon steel and aluminium procurement by 2030 supported by signed purchase agreements and collaborations with low-carbon steel producers.

- **Automotive manufacturers generally fail to clarify the extent to which their net-zero and carbon neutrality targets beyond 2030 will be achieved through offsetting.** Companies neither disclose the envisioned amount nor type of carbon credits to offset or neutralise emission in the future (Daimler Truck, Toyota, Volkswagen, Volvo Group). Some companies communicate climate contributions beyond their value chain although these remain very modest compared to today's emissions (Stellantis, Volkswagen).

Table 17 provides a summary overview of our transparency and integrity ratings for Daimler Truck, Stellantis, Toyota, Volkswagen Group, and Volvo Group.

**Table 17: Overview of integrity ratings for automobile manufacturing companies**



| COMPANY | HEADLINE PLEDGE | INTEGRITY | Tracking & disclosure of emissions | Target setting | Emission reduction measures | Climate contributions & offsetting | PAGE |
|---|---|---|---|---|---|---|---|
| Stellantis | Carbon net zero by 2038 | | | | | | p. 76 |
| Volvo Group | Net zero emissions by 2040 | | | | | | p. 84 |
| Daimler Truck | CO₂ neutrality on the roads and throughout the entire value chain globally by 2050 | | | | | | p. 74 |
| Volkswagen Group | Carbon neutral by 2050 | | | | | | p. 81 |
| Toyota | Carbon neutral by 2050 | | | | | | p. 78 |

Exhibit 7 to Decl. of Angel Hsu
215

## 5.2 Sectoral transition framework

The IPCC's Sixth Assessment Report emphasises the need for a rapid and transformative change of the global transport sector to stay below the Paris Agreement's 1.5°C temperature limit. Global transport-related $CO_2$ emissions including global aviation and maritime shipping must fall by around 59% by 2050 relative to modelled 2020 emissions to limit warming to 1.5°C (IPCC, 2022, p. 32; Pathak et al., 2022, p. 98). These global reductions are subject to regionally differentiated trends.

Global emissions from cars and vans (light duty vehicles) must significantly decline by 2030 across all geographies given readily available zero-emission technologies and reach zero emissions globally by 2050 at the latest. For advanced economies, the International Energy Agency (IEA) estimates that annual use-phase $CO_2$ emissions from light-duty vehicles need to be reduced by around 45% by 2030, over 90% by 2040 and finally reach zero emissions by 2050 to be compatible with the 1.5°C temperature limit (IEA, 2023c, p. 93), all compared to a 2022 baseline. In emerging markets and developing economies, the IEA states that $CO_2$ emissions from cars and vans can be reduced at a slower pace towards zero emissions by 2050, namely by around 10% by 2030 and over 70% by 2040 compared to a 2022 baseline. In this context, recently published literature identifies global 1.5°C-compatible emission intensities for newly sold passenger vehicles of around 30 $gCO_2$ per passenger km by 2030, further going down to less than 1 $gCO_2$ by 2050 (Dietz et al., 2023, p. 8).

Global emissions from heavy trucks and buses (heavy-duty vehicles) follow a more geographically differentiated trajectory considering less mature zero-carbon technologies available. Similarly to cars and vans, emissions from heavy-duty vehicles in advanced economies must reach zero emissions by 2050 and reduce by around 20% by 2030 and 70% by 2040 in the interim. Emissions from the use of heavy trucks and buses in emerging markets and developing economies can still increase by 5% by 2030 and then reduce by around 35% and 85% respectively by 2040 and 2050. In this context, recently published literature defines 1.5°C-compatible emission intensities from the use of heavy-duty trucks as of 30–61 $gCO_2$ per tonne-km by 2030 (IEA, 2023c; Teske et al., 2023), further going down to 0–3 $gCO_2$ per tonne-km by 2050.

Automotive manufacturers' climate strategies ought to avoid false technological solutions with inferior efficiency, sustainability, and effectiveness. Such technologies include, among others, the use of biofuels, e-fuels, and fuel cell vehicles for light-duty transport. For example, biofuel production at scale faces the high likelihood of competing with other environmental and social interests, such as food production, biodiversity, and forest protection (Clarke et al., 2022, p. 42). This is especially relevant for the automotive sector given that technological alternatives are readily available, while sustainably sourced biofuel might be needed in other sectors of the economy with fewer alternatives available like aviation. Alternative fuels such as e-fuel produced with hydrogen energy and hydrogen-based fuel cells, however, also require much greater amounts of renewable electricity production than battery electric vehicles (Transport & Environment, 2018). Such technologies therefore might only be an efficient, effective and sustainable alternative—alongside battery electric vehicles—for heavy-duty market segments (Jaramillo et al., 2022, pp. 1070–1071).



70

Exhibit 7 to Decl. of Angel Hsu
216

## Key actions and measures for automotive manufacturers

**Measures addressing emissions from the use of light-duty vehicles (downstream scope 3)**

Emissions from the use of sold cars and vans (scope 3 category 11) represent the largest source of emissions across automobile manufacturers' value chains.

### Phase-out of internal combustion engines (ICEs)    `Critical transitional measure`

Electric vehicles powered by decarbonised electricity have a large potential to reduce land-based transport greenhouse gas emissions on life cycle basis (IPCC, 2022, p. 32). Several studies identify 1.5°C-aligned decarbonisation milestones for the phase out of internal combustion engines (ICEs) replaced by electric and low-emission vehicles at the global and regional level (CAT, 2020, p. 27; UNFCCC, 2021, pp. 10–11; Teske et al., 2022, p. 4; WBA, 2022; Boehm et al., 2023, pp. 77–78; IEA, 2023c, pp. 88, 93).

**Global**

- The global sales share for zero emission vehicles must reach 67–95% by 2030 and 100% between 2035–2040 (CAT, 2020, p. 27; Boehm et al., 2023, pp. 77–78; IEA, 2023c, pp. 88, 93)

- These decarbonisation milestones consequently leading to a complete phase-out of ICE sales by 2035–2040 are in line with the COP26 declaration on zero emission cars mandating 100% of total sales of passenger vehicles and vans by 2040 globally (COP26 Presidency, 2021; SBTi, 2024f, pp.16–17.

**Advanced economies**

- Advanced economies such as China, US, the EU27 and Japan must already reach a 95–100% sales share of zero emission vehicles by 2030 and 100% latest by 2035 (ICAT, 2020, p. 27; UNFCCC, 2021, pp. 10–11; Teske et al., 2022, p. 4).

- These decarbonisation milestones are fully in line with the COP26 declaration on zero emission cars mandating 100% of total sales of passenger vehicles and vans in leading markets by 2035 (COP26 Presidency, 2021; SBTi, 2024f, pp.16–17).

### Support the roll-out of vehicle charging infrastructure    `Enabling measure`

The electric vehicles uptake requires large-scale investments in electric charging infrastructure and related grid connections (Pathak et al., 2022, p. 98; IEA, 2023b, pp. 123–129). Recent analysis estimates the need for around 17 million public electric vehicle charging points globally by 2030, 18 million by 2035 and 31 million by 2050 (IEA, 2023c, p. 93). Automotive manufacturers can directly and indirectly support the roll-out of vehicle charging infrastructure, for example through investments or collaborations to install and operate publicly accessible charging points.

*Enabling measures* to support the roll-out of vehicle charging infrastructure can underpin and substantiate an automotive manufacturer's 1.5°C-compatible business model, but still critically hinge on the phase-out of internal combustion engines (ICEs).

### Support of demand management solutions    `Enabling measure`

The systemic transformation of the passenger transport sector will require demand management solutions to reduce single vehicle usage (Pathak et al., 2022, p. 98; Boehm et al., 2023, pp. 76–98). Such demand-side measures can include, among others, the support of carpooling, public transportation, and mobility-as-a-service while investing in integrated urban mobility solutions. These measures generally aim to decrease individual vehicle ownership and encourage alternative mobility concepts.

*Enabling measures* to support demand management solutions can underpin and substantiate an automotive manufacturer's 1.5°C-compatible business model, but still critically hinge on the phase-out of internal combustion engines (ICEs).

71

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu

217

## Measures to address emissions from the use of heavy-duty vehicles (downstream scope 3)

Emissions from the use of trucks, buses, and other heavy-duty vehicles (scope 3 category 11) represent the largest source of emissions across automotive manufacturers' value chains.

### Development & phase-in of zero-carbon heavy-duty vehicles    Critical transitional measure

Decarbonizing long-range heavy-duty vehicles like trucks and buses can be achieved through battery-electric haulage, electric road systems, and hydrogen- or biofuel-based technologies (Pathak et al., 2022, p. 98). Challenges related to driving range, costs, and infrastructure availability need to be addressed, particularly in the commercialisation of hydrogen-based fuel-cell vehicles that require an increased capacity for low-carbon hydrogen production to be an effective emissions reduction strategy. Several studies identify 1.5°C-aligned decarbonisation milestones for the phase out of internal combustion engines (ICEs) in buses and heavy trucks at the global and regional level (UNFCCC, 2021, pp. 10–11; Mission Possible Partnership, 2022, p. 40; Boehm et al., 2023, pp. 77–78; IEA, 2023c, pp. 88, 93).

**Heavy-duty trucks**

- The global sales share of battery electric vehicles (BEVs) and fuel cell electric vehicles (FCEVs) must reach between 30–37% by 2030 globally and 100% by 2040 in advanced economies and China (UNFCCC, 2021, pp. 10–11; Boehm et al., 2023, pp. 77–78; IEA, 2023c, pp. 88, 93).

- A complete phase-out of trucks with internal combustion engines would need to be achieved between 2045–2050 globally (Boehm et al., 2023, pp. 77–78; IEA, 2023c, pp. 88, 93).

**Buses**

- The global sales share of BEVs and FCEVs must be reach between 56–60% by 2030 globally and 100% by 2030 in advanced economies and China (UNFCCC, 2021, pp. 10–11; Boehm et al., 2023, pp. 77–78; IEA, 2023c, pp. 88, 93).

- A complete phase-out of buses with internal combustion engines would need to be achieved between 2035–2050 globally (Boehm et al., 2023, pp. 77–78; IEA, 2023b, pp. 88, 93).

### Support the roll-out of charging infrastructure    Enabling measure

The roll-out of charging infrastructure plays a crucial role for the electrification of heavy-duty vehicles like trucks and buses, given the substantial costs associated with high-power charging infrastructure (Jaramillo et al., 2022, pp. 1071–1073). Investment in shared charging infrastructure at key transport hubs, such as bus and truck depots, freight distribution centres, and ports, is essential to encourage the transition to battery electric and fuel cell electric vehicles in the heavy transport sector. Recent analyses, for example, estimate the need for around 12 million hydrogen refuelling stations globally by 2030, 15 million by 2035 and 45 million by 2050 (IEA, 2023c, p. 93).

*Enabling measures to support the roll-out of charging infrastructure can underpin and substantiate an automotive manufacturer's 1.5°C-compatible business model, but still critically hinge on the phase-out of internal combustion engines (ICEs).*

72

Exhibit 7 to Decl. of Angel Hsu
218

## Measures to address emissions from sourced materials to produce cars, vans, trucks, and buses (upstream scope 3)

Emissions from purchased goods and services to produce cars, vans, trucks, and buses (scope 3 category 1) represents the second largest emissions source across automotive manufacturers' value chains.

### Sourcing of low-carbon steel, aluminium, and other materials
**Critical transitional measure**

The sourcing of low-carbon steel, aluminium and other upstream materials is highly relevant for the decarbonisation of an automotive manufacturer's value chain considering that the production of these materials is currently an emissions-intensive process (WEF, 2020, p. 15; W. Liu et al., 2023).

To support the procurement of zero-carbon upstream materials, automotive manufacturers can, among other solutions, partner with suppliers committed to producing zero-emission upstream materials, invest in research and development of innovative production methods, or adopt responsible sourcing practices. Additionally, they can engage in circular economy practices, such as recycling and reusing components, to further minimise environmental impact and promote a more sustainable and decarbonised automotive industry.

### Sourcing and/or in-house production of low-carbon batteries
**Critical transitional measure**

The manufacture of electric-vehicle batteries can account for up to 60% of the embedded greenhouse-gas emissions in electric vehicle production (Linder et al., 2023, p. 2). For this reason, reducing emissions during the battery manufacturing stage is indispensable to fully harness the emissions mitigation capabilities of battery electric vehicles (Pathak et al., 2022, p. 98). To support the external procurement or in-house production of zero-carbon batteries, automotive manufacturers can support the switch to renewable energy at every step throughout the battery value chain, invest in research and development of innovative production methods, and entre into strategic collaboration with suppliers of zero-carbon batteries.

73



Exhibit 7 to Decl. of Angel Hsu
219

# 5.3 Daimler Truck

**1 TRACKING AND DISCLOSURE OF EMISSIONS** | TRANSPARENCY & INTEGRITY

| | | |
|---|---|---|
| Tracking and disclosure | Not available in 2022 | |
| Major emission sources | Not available due to incomplete emissions disclosure. | |
| Disclosure | No disclosure of upstream and downstream s3 emissions, critically undermining the understanding of its emission profile across the value chain. | |
| Subsidiary coverage | ❓ It is unclear whether subsidiaries are covered in the emissions reporting and disclosure. | |

| | | tCO₂e |
|---|---|---|
| Downstream Scope 3 | Not disclosed | ? |
| Upstream Scope 3 | Not disclosed | ? |
| Scope 2 | | 0.59 |
| Scope 1 | | 0.36 |

**2 SETTING EMISSION REDUCTION TARGETS**

| | SECTOR | REVENUE | EMISSIONS | PLEDGE | TRANSPARENCY | INTEGRITY |
|---|---|---|---|---|---|---|
| | Automobiles | USD 53.6 bn (2022) | Not available (2022) | CO₂-neutrality on the roads and throughout the entire value chain globally by 2050 | Poor | Poor |

**Headline target or pledge**: *CO₂-neutrality on the roads and throughout the entire value chain globally by 2050*

| | | TRANSPARENCY | INTEGRITY |
|---|---|---|---|
| **Short-term targets** (up to 2030) | • Carbon neutrality for s1 and s2 by 2025 in EU, India, Japan, and USA<br>• 42% absolute reduction in s1 and s2 by 2030 below 2021<br>• Aspirational ZEV sales share of "up to 60%" by 2030 for EU, USA, and Japan | S1 S2 S3↑ S3↓ | |
| Scope coverage | | | ? |
| Own emission reductions (compared to full value chain in 2019) | | | |
| **Medium-term targets** (2031–2040) | • Carbon neutrality for s1 and s2 by 2039 globally<br>• Carbon neutrality for upstream s3 by 2039 in USA, EU and Japan<br>• 100% ZEV sales by 2039 in EU, USA and Japan | S1 S2 S3↑ S3↓ | |
| Scope coverage | | | ? |
| Own emission reductions (compared to full value chain in 2019) | | | |
| **Longer-term targets** (2041 – onward) | • Carbon neutrality for s1, s2 and s3 by 2050 globally<br>• Carbon neutrality for upstream s3 by 2050 globally<br>• 100% ZEV sales by 2050 globally* | S1 S2 S3↑ S3↓ | |
| Scope coverage | | | ? |
| Own emission reductions (compared to full value chain in 2019) | | | |

Additional notes (TRANSPARENCY / INTEGRITY column):
- Aspirational and vaguely formulated ZEV sales share for key markets (EU, USA, Japan) with unclear impact. No other s3 reduction target.
- 1.5°C-aligned target for 100% ZEV sales in key markets (EU, USA, Japan). No reduction pledges alongside scope-specific carbon neutrality targets.
- 1.5°C-aligned target for 100% ZEV sales globally by 2050. No reduction pledge alongside carbon neutrality targets (company-wide & scope-specific).

**3 REDUCING OWN EMISSIONS**

| | | TRANSPARENCY | INTEGRITY |
|---|---|---|---|
| Operational emissions (scope 1) | Not assessed. | N/A | N/A |
| Renewable electricity (scope 2) | 100% RE claim for most European sites with hourly matching, but no info on procurement constructs. 100% RE target for all sites globally by 2030. | | ? |
| Upstream emissions (scope 3) | Some minor actions to reduce upstream s3 emissions, but not addressing key sources such as steel. No details on timeline, scope and impact. | | |
| Downstream emissions (scope 3) | Relevant measures for use phase emissions, including ZEV technologies and charging infrastructure. Limited details on timeline and impact up to 2030. | | |

**4 RESPONSIBILITY FOR UNABATED AND RESIDUAL EMISSIONS** | TRANSPARENCY | INTEGRITY

| | | TRANSPARENCY | INTEGRITY |
|---|---|---|---|
| Climate contributions today (Beyond value-chain mitigation) | No climate contributions identified. | Poor | ? |
| Misleading offsetting claims today | Carbon neutrality claim for European production sites (s1 and s2). Very limited information on type and amount of credits purchased in 2022. | | ? |
| Approach to residual emissions | Unclear to what extent Daimler Trucks plans to rely on CDR to reach its various future carbon neutrality targets by 2039 and 2050. | | ? |

5-point rating scale: ● Very good ● Good ● Intermediate ● Poor ● Very poor – **Transparency** refers to the disclosure of information. **Integrity** refers to the quality and credibility of the approach.
**Sources**: Daimler Truck (2021, 2022a, 2022b, 2023) and Shades of Green (2023)

74

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu
220

**SER 500**

*This assessment is based on the 2022 sustainability report; the information in the 2023 sustainability report published in March 2024 does not lead to any changes in our evaluation.*

## Daimler Truck

**Daimler Truck AG (hereafter: Daimler Truck) is one of the world's largest manufacturers of heavy-duty vehicles such as trucks and buses. Most of its emissions originate from the use phase of its sold trucks and buses, as well as sourced materials like steel, but the company does not disclose these emissions along its value chain. Ambitious sales targets for zero emission vehicles and plans to roll out charging infrastructure in key markets by 2039 and 2050 indicate the intend towards the 1.5°C-aligned transition by mid-century. However, significant gaps remain in Daimler Truck's climate strategy, particularly regarding the transparency and specificity on its reduction measures for 2030 and its offsetting strategy to meet its carbon neutrality pledges.**

**Daimler Truck has not disclosed any emissions related to its value chain. Despite spin-off from its former parent AG in 2021 in the company's 2023 sustainability reporting, we could not identify any estimates or transparent explanations for this absence** (Daimler Truck, 2022b, 2023a; Shades of Green, 2023, p. 5). While the company annually reports on its operational emissions (scope 1 and 2), emissions from the use-phase of sold heavy-duty vehicles and the sourcing of upstream products such as steel, aluminium or batteries represent by far the largest share of emissions along heavy-duty vehicle manufacturers' value chains.

**Ambitious sales targets for zero emission vehicles in key markets by 2039 and globally by 2050 indicate Daimler Truck's intend to transition away from internal combustion engines in the region in alignment with the 1.5°C temperature goal.** Daimler Truck pledges 100% sales of battery electric vehicles (BEVs) and fuel cell electric vehicles (FCEVs) in Europe, the United States and Japan by 2039 – and globally by 2050 (Daimler Truck, 2023a, pp. 78, 81–82, 93). These targets align with the 1.5°C-compatible milestones identified in the literature (see *detailed assessment in Annex I*). For 2030, however, the company only sets an aspirational and non-committal intention to sell 'up to 60%' of zero-emission vehicles in Europe, Japan, and the United States by 2030 (Daimler Truck, 2023a, pp. 78, 81, 93). The vague and non-committal wording of 'up to' gives the company leeway to sell significantly fewer vehicles. We could not identify any lower-bound or committal sales target for 2030. For this reason, we cannot assess the company's 2030 ambition.

Daimler Truck aims to meet the sales targets by promoting the roll-out of charging infrastructure. The company has formed two jointed ventures in its key markets of Europe and the United States (Daimler Truck, 2021, 2022a). In Europe, it has partnered with other manufacturers Tradon and Volvo Group to invest EUR 0.5 billion in deploying a high-performance public charging network for battery electric trucks and coaches (Daimler Truck, 2021). In the United States, the company entered into a joint venture with a total funding volume of USD 0.65 billion to develop a nationwide charging network for BEV and FCEVs (Daimler Truck, 2022a).

**Daimler Truck's carbon neutrality pledges for 2025, 2039 and 2050 remain unsubstantiated as the company provides no information on the extent to which it will reduce its own emissions.** The company sets no specific emission reduction target accompanying its 2050 carbon neutrality pledge for the scope- and geography-specific pledges between 2025 and 2050. Since the company's pledges do not entail any commitment to deep decarbonisation (i.e., a reduction of at least 90% of 2019 emissions across the entire value chain), labelling them as 'carbon neutrality targets' may mislead consumers and investors and does not align with recent guidance on meaningful target setting (ISO, 2022; UN HLEG, 2022; SBTi, 2023d).

**Daimler Truck's climate strategy includes some smaller-scale activities to reduce upstream value chain emissions but does not provide comprehensive plans nor specific milestones to meet its targets.** For example, Daimler Truck does not communicate its participation in CDP's supply chain program or its plans to electrify logistic supplying the German Wörth production plant by 2030 (Daimler Truck, 2023a, pp. 90–91). While these are relevant measures Daimler Truck does not present a comprehensive package of measures, including their respective timelines, scope, and expected impact, to decarbonise purchased products and services like low-carbon steel. It remains unclear how the company intends to achieve its objective for carbon-neutral products and services in Europe, the United States and Japan by 2039 (Daimler Truck, 2023a, p. 78).

**The lack of disclosure on procurement constructs to meet its 100% renewable targets undermines the promising setup of quarter-hourly matching for procured electricity by most European production sites.** Daimler Truck claims that, in 2022, most of its European production sites have procured 100% renewable electricity from wind, solar and hydropower while matching production and demand every quarter hour (Daimler Truck, 2023a, p. 94). However, the company does not disclose any information on the procurement constructs underpinning this claim. Similarly, the lack of information on future procurement constructs prevents an independent evaluation of its target to supply 100% renewable electricity to production sites in the United States, Japan, and India by 2025 and all in-house production sites globally by 2030 (Daimler Truck, 2023a, p. 94).

**Daimler Truck provides limited information on the amount and type of carbon credits used to claim 'carbon neutral' production by European production sites in 2022.** To make this claim, Daimler Truck has offset its scope 1 and scope 2 emissions at European production sites and selected other sites using Gold Standard-verified carbon credits for emission mitigation projects (Daimler Truck, 2023a, p. 94). Apart from illustrative project examples of geothermal energy installation and reduction of $CO_2$ emission during the process of drinking water purification, the company neither specifies the extent to which it relies on offset credits nor the type and prices for the credits purchased, making this claim highly ambiguous and contentious. All other carbon neutrality claims by Daimler Truck face similar issues as Daimler Truck does not communicate quantity and substance behind its carbon neutrality strategy. Moreover, the focus of the carbon neutrality claim on production sites may be misleading to non-expert audiences, given that most of the company's GHG emission footprint derives from the use of vehicles. The type of vehicles manufactured vehicles is the most relevant climate issue, rather than the way in which the vehicles are produced.

Exhibit 7 to Decl. of Angel Hsu
221



Exhibit 7 to Decl. of Angel Hsu
222

The assessment is based on the 2022 Corporate Social Responsibility (CSR) report; the information in the 2022 CSR report published in April 2024 does not lead to any changes in our evaluation.

## Stellantis

**Stellantis is an automotive company headquartered in the Netherlands, comprising brands such as Fiat, Peugeot, Opel and Citroën. Most of Stellantis' emissions originate in the use phase of its vehicles (88% of 2022 emissions). The company commits to reaching 'carbon net-zero' in 2038, with its plans to reduce at least 90% of its vehicles' CO$_2$ emissions intensity across their life cycle and offset all remaining emissions. Stellantis' targets for 2025 and 2030 focus on short-term emissions reductions and vehicle electrification in key markets. They only partially align with the 1.5°C-aligned sectoral pathways for the automobile industry.**

**Key developments over the past year:** We have identified only limited developments and minor updates to Stellantis' climate strategy since the previous analysis was published in February 2023 (Day, Mooldijk, Hans, et al., 2023). In 2022, Stellantis disclosed its full global scope 3 emissions, whereas it previously only published partial scope 3 emissions for Europe in 2021. Furthermore, Stellantis no longer makes neutrality claims for its scope 1 and 2 emissions for its South American production facility in Goiânia. Stellantis has further clarified the phrasing of both its overarching 2030 target across the entire value chain emissions and its carbon net-zero target by 2038, specifying that they are intensity targets instead of absolute reduction targets.

**Stellantis commits to an ambitious overarching 2030 target to reduce its emissions intensity across the vehicle life cycle by 50% along the entire value chain compared to 2021 levels.** The company also has a 2038 target based on several sub-targets for different emission sources: vehicle production, the vehicle use phase, and its supply chain (Stellantis, 2023a, pp. 59, 60–61). For emissions from the vehicle use phase, the company aims to sell 100% battery electric vehicles (BEVs) for passenger cars in Europe and 50% BEVs for passenger cars and light-duty trucks in the US by 2030. These two key markets were responsible for 45% and 31% of the company's sales in 2022, respectively. While Stellantis' target for the European market aligns with the 1.5°C-aligned decarbonisation milestones, its targets for the US market and aspirational sales shares for Brazil, India, and China, as outlined in its strategic blueprint Dare Forward 2030 (Stellantis, 2022), do not (see detailed assessment in the *Annex II*).

Stellantis has not signed the clean-vehicle pledge announced at COP26 in November 2021, in which competing automakers from several

countries, including the US and Germany, committed to exclusively producing electric vehicles by 2035 at the latest to support limiting global warming to 1.5°C (COP26 Presidency, 2021).

**Stellantis' emissions reduction measures emphasise a rapid transition towards electric mobility, but the company continues to invest in the development of other technologies, such as e-fuels, hydrogen-based fuel cells, and biofuels with highly uncertain efficiency and sustainability.** To support the electrification of its vehicle fleet as part of its effort to reduce downstream scope 3 emissions, Stellantis implements several vehicle charging solutions. For example, Stellantis is investing in the development of a public fast charging network slated to operate 35,000 fast chargers by 2030 across South Europe, with additional undisclosed numbers in North America (Stellantis, 2023a, pp. 39–40). The company also invests in measures to reduce emissions in the use phase of its vehicles by enhancing fuel efficiency in existing combustion engine vehicle lines, exploring alternative fuels like e-fuel produced with hydrogen energy, and hydrogen-based fuel cells for vehicle propulsion. However, these latter two drive technologies would require significantly more renewable electricity production compared to BEVs (Transport & Environment, 2018).

**Stellantis remains vague on specific measures to decarbonise its upstream scope 3 emissions from sourced materials.** In 2022, the company stated that 'more than 65% of strategic [...] suppliers committed to comply with the Paris Agreement': the company aims to increase this share to 95% by 2030 (Stellantis, 2023a, p. 62). The company also plans to decrease the emissions of 'green materials' in its vehicles, aiming to launch the first vehicles containing 25% of them by 2025 (Stellantis, 2023a, p. 51). Stellantis defines green materials as recycled materials, materials of natural origin, and bio-sourced materials but remains vague on specific underlying definitions (Stellantis, 2023a, p. 329). While Stellantis introduces a higher-level approach to address its upstream supply chain emissions alongside its target to cut the carbon footprint of purchased parts for its BEV by 40% by 2030 (Stellantis, 2023a, p. 64), the company has yet to disclose specific information on intended measures and procurement targets for low-carbon steel and other emission-intensive materials (Stellantis, 2023a, pp. 125–127).

**Stellantis aims to achieve 'carbon net zero' across its value chain by 2038 while limiting the use of offsets to less than 10% of its 2021 emissions.** As part of this commitment, the company commits

to reducing its emissions intensity across its vehicles life cycles by at least 90% compared to 2021 (Stellantis, 2023a, pp. 62–63). Stellantis plans to offset the remaining emissions through carbon dioxide removals and other offsetting solutions. The company remains in the process to developing its offsetting strategy carbon including the selection of adequate carbon removal technologies (Stellantis, 2023a, p. 64).

In a departure from its stance in 2021, Stellantis no longer claims that it offsets current scope 1 and 2 emissions from its Brazilian plant in Goiânia. It also seems that Stellantis is no longer procuring carbon credits from projects such as energy generation from landfill waste, reforestation, and environmental restoration efforts (Stellantis, 2023a, p. 115). Instead, Stellantis continues to provide financial support for climate actions beyond its immediate value chain without asserting the neutralisation of its own emissions. This is reflected in its adoption of a climate contributions approach through initiatives to support and restore biodiversity (Stellantis, 2023a, p. 401). However, we could not identify any information on the extent of these contributions.

**Stellantis currently relies mainly on lower-quality RECs to claim a share of 27% renewables in its electricity consumption.** The company surpassed its 2025 target of reaching 50% decarbonised electricity by 2025, reporting a share of 55% in 2022. However, the company does not clearly define what it means by 'decarbonized' electricity, which could include renewables, nuclear, and potentially other lower carbon technologies (Stellantis, 2023a, p. 124). Its renewable electricity consumption accounted for only 27% of its total electricity consumption in 2022 (Stellantis, 2023, p. 113). With no specific renewable electricity target set, its goal to achieve 100% decarbonized electricity by 2030 does not guarantee a high share of renewable electricity (Stellantis, 2023a, p. 48). The company currently procures most of its renewable electricity through lower-quality RECs, likely with limited impact on fostering additional new renewable generation capacity (Stellantis, 2023a, p. 114). Alongside RECs, the company procures less than 2% of its renewable electricity through higher-quality PPAs and its own on-site generation capacity (Stellantis, 2023, p. 114). The company does not disclose further information on the procurement constructs it plans to rely on in the future to meet its 100% decarbonized electricity target in 2030 (Stellantis, 2023a, p. 113).

Exhibit 7 to Decl. of Angel Hsu
223

# 5.5 Toyota

**TRANSPARENCY & INTEGRITY**

| SECTOR | REVENUE | EMISSIONS | PLEDGE | TRANSPARENCY | INTEGRITY |
|---|---|---|---|---|---|
| Automobiles | USD 282.6 bn (2022) | 616.7 MtCO₂e (2022) | Carbon neutral by 2050 | Poor | Very poor |

## ① TRACKING AND DISCLOSURE OF EMISSIONS

**Tracking and disclosure** — 616.7 MtCO₂e in 2022

**Major emission sources** — Use phase of sold vehicles (downstream s3, 79%); purchased goods and services (upstream s3, 20%)

**Disclosure** — Toyota discloses emissions across all scopes but third-party analysis calls integrity of downstream s3 disclosure into question. Subsidiaries also partially excluded in latter.

**Subsidiary coverage** — Subsidiaries are only partially covered in the emissions reporting and disclosure.

MtCO₂e
- Downstream Scope 3: 527.54
- Upstream Scope 3: 121.75
- Scope 2: 3.81
- Scope 1: 2.37

## ② SETTING EMISSION REDUCTION TARGETS

**Headline target or pledge** — *Carbon neutral by 2050*

**Short-term targets** (up to 2030)
- s1, s2 & s3 - vehicle life-cycle emissions intensity reduction
- 30% reduction by 2030 below 2019

s3 - vehicle use-phase emissions intensity
- 33.3% reduction for LDVs by 2030 below 2019
- 11.6% reduction for HDVs by 2030 below 2019*

Scope coverage: S1 S2 S3
Own emission reductions (compared to full value chain in 2019): No 1.5°C-aligned phaseout dates for ICEs. Intensity targets for life-cycle and use-phase emissions not quantifiable.

**Medium-term targets** (2031–2040)
*s1 & s2*
- 65% absolute reduction by 2035 below 2019
- Carbon neutrality by 2035 (offsets allowed)

*s3 - vehicle use-phase emissions intensity*
- 50% reduction by 2035 below 2019*

Scope coverage: S1 S2 S3
Own emission reductions (compared to full value chain in 2019): No 1.5°C-aligned phaseout dates for ICEs. Target for s1 & s2 equals a 1% reduction across the value chain. s3 intensity target not quantifiable.

**Longer-term targets** (2041 onward) — *Carbon neutral by 2050 (group-wide) and additional scope-specific carbon neutrality pledges by 2050*

Scope coverage: S1 S2 S3
Own emission reductions (compared to full value chain in 2019): All emission scopes covered. No emission reduction commitment alongside carbon neutrality pledges by 2050. No 1.5°C-aligned phaseout dates for ICEs.

## ③ REDUCING OWN EMISSIONS

| | | TRANSPARENCY | INTEGRITY |
|---|---|---|---|
| **Operational emissions** (scope 1) | <1% of 2022 emissions — Not assessed. | N/A | N/A |
| **Renewable electricity** (scope 2) | 1% of 2022 emissions — Very limited information on RE procurement in public reporting. RE accounts for just 20% of electricity demand in 2022 with aim to reach 25% in 2025. | | |
| **Upstream emissions** (scope 3) | 20% of 2022 emissions — No measures identified that aim to reduce upstream scope 3 emissions. | | |
| **Downstream emissions** (scope 3) | 79% of 2022 emissions — Some measures on vehicle electrification but limited details on scope and timelines. Development of other LDV technologies with highly uncertain efficiency and impact. | | |

## ④ RESPONSIBILITY FOR UNABATED AND RESIDUAL EMISSIONS

| | TRANSPARENCY | INTEGRITY |
|---|---|---|
| Climate contributions today (beyond value-chain mitigation) — No climate contributions identified. | | |
| Misleading offsetting claims today — No offsetting claim identified. | N/A | N/A |
| Approach to residual emissions — Targets for 2035 (~2.2 MtCO₂e) and 2050 (extent unclear) depend on CDR. No information on criteria for type of projects. | | ? |

5-point rating scale: High | Reasonable | Moderate | Poor | Very poor — **Transparency** refers to the disclosure of information. **Integrity** refers to the quality and credibility of the approach.

**Sources:** Toyota (2022, 2023a, 2023b, 2023c), Toyota Europe (2021, 2023a, 2023b, 2023d); and Hsu (2022, 2023a, 2023b)

Corporate Climate Responsibility Monitor 2024

78

Exhibit 7 to Decl. of Angel Hsu
224

SER 504

## Toyota

**Toyota Motor Corporation (hereafter: Toyota) is one of the world's largest manufacturers of motor vehicles. Most of the company's emissions footprint derives from the use of its sold cars, vans, trucks, and buses (79% of 2022 emissions) and from sourced materials such as steel (20%). Toyota's climate strategy is critically undermined by a general lack of transparency and specificity in its emission disclosure, emissions reduction measures and pledges. Toyota's plans for light- and heavy-duty vehicle electrification fall significantly short of 1.5 °C-aligned decarbonisation milestones for the automobile industry.**

**Key developments over the past year:** We could identify only minor changes to Toyota's climate strategy since the company was previously analysed as part of the 'Assessing Net Zero – Integrity Review of 10 Japanese Companies' report, published in May 2023, using the *Corporate Climate Responsibility Monitor 2022* methodology (Odawara and Hirata, 2023, pp. 35–37). Accordingly, differences in evaluation mainly result from the further development of our methodology and evaluation criteria (NewClimate Institute, 2024).

**Toyota's headline and scope-specific carbon neutrality pledges for 2050 remain unsubstantiated as the company provides no information on the extent to which it will reduce its own emissions.** Apart from vague references to the Paris Agreement's temperature limit (for example reference in Toyota, 2023b, p. 23), the company does not explain how its 2050 carbon neutrality pledges align with key 1.5°C-compatible decarbonisation milestones for the automobile industry (see detailed assessment in *Annex I*). The company does not disclose any further information on the extent to which it will reduce its own emissions by 2050 as part of this pledge and only vaguely communicates its intention to rely on carbon credits by an undefined amount to meet its 2050 target (Toyota, 2023b, p. 45).

**The interim targets for 2030 and 2035 do not include commitments to phase out internal combustion engines for light-duty vehicles in key markets by 2030 or shortly thereafter, falling significantly short of 1.5°C-aligned climate action in the automobile sector.** Only for the European Union and the United Kingdom, Toyota has set a target to reach a 50% sales share of electric light-duty vehicles by 2030 and to only sell zero-emission vehicles by 2035 (Toyota

Europe, 2021, 2023a, 2023b, p. 5). However, this targeted sales share for 2030 merely reflects the automobile sector's business-as-usual development for Europe, rather than the 1.5°C-compatible climate ambition going beyond this. The IEA estimates that the EV sales share for Europe will reach around 50% under its stated policies and announced pledges scenario (IEA, 2023b, p. 114), while electric light-duty vehicle sales for Europe and other key markets should reach 95%–100% by 2030 to stay below the Paris Agreement's warming limit of 1.5°C (CAT, 2020, p. 27; UNFCCC, 2021, pp. 10–11; Teske et al., 2022, p. 4). We cannot not identify any such targets for other key markets for light-duty vehicles such as Japan, the United States or China. Toyota's Chairman Akio Toyoda as recently as January 2024 states that Toyota will reach not more than 30% of electric vehicles in total sales (Takahashi, 2024). We cannot identify any specific targets for the phase in of zero-emission heavy-duty vehicles by 2030 (see *Box 2*).

**Alongside fully battery electric vehicles, Toyota further invests in the development of other technologies with highly uncertain efficiency and sustainability, such as pillars of its light-duty vehicle decarbonisation strategy, such as hydrogen, e-fuels, and biofuels.** Toyota does not communicate its intended sales share for each of those technologies by 2030 or thereafter (Toyota, 2023b, pp. 19, 22–23, 2023c, p. 6). Recent scientific literature raises concerns on energy efficiency and sustainability for all of these technologies to effectively and efficiently decarbonise light-duty vehicle transport towards 2030 and beyond (Jaramillo et al., 2022, pp. 1064–1071). E-fuel produced with hydrogen and hydrogen-based fuel cells, for example, would require much greater amounts of renewable electricity production than BEVs (Transport & Environment, 2018). The absence of a specific timeline for the complete phase-out of internal combustion engines for light-duty vehicles in key markets towards 2030 and the promotion of technologies other than battery electric vehicles leaves major gaps in Toyota's climate strategy (see detailed assessment in *Annex I*).

Toyota has also not signed the non-legally binding COP26 declaration, which commits to a fully electric fleet by 2035 in alignment with the 1.5°C target of the Paris Agreement as of April 2024. This is in contrast to competing manufacturers that have already signed up to it (COP26 Presidency, 2021; A2Z Coalition, 2023). Recent analysis also suggests that Toyota's disclosed life-

cycle emissions of sold vehicles are underreported by more than 60%, primarily due to unrealistic assumptions regarding vehicle lifetimes (Bonaccorsi et al., 2022).

**Toyota's climate strategy discloses limited details on its activities to reduce emissions from sourced upstream materials such as low-carbon steel, despite representing almost one-fifth of its emissions across the value chain.** For the procurement of low-carbon steel, for example, Toyota only provides information on small-scale pilots for its race-car vehicle production (Toyota, 2023b, p. 23; W. Liu et al., 2023, p. 13). We could not identify any measures or plans aimed at systematically reducing emissions from purchased steel and other sourced products. As for the production of batteries, Toyota aims to further develop lithium-ion and solid-state batteries with enhanced performance towards 2026 as part of its technological roadmap (Laussink, 2023; Toyota, 2023a, p. 3). While in-house battery production would enable Toyota to directly influence battery-related emissions by decarbonising its own scope 1 and 2 emissions, we could not identify any plan or activities to reduce these emissions in the future. For the procurement of renewable electricity — one of the key levers to reduce emissions from battery production — the company provides little information on its renewable procurement strategies, despite claiming a 20% share of renewable electricity in 2022 and aiming to reach 25% by 2025 (Toyota, 2023b).

**Toyota remains vague on its offsetting strategy to meet its carbon neutrality targets for 2035 and 2050.** In 2035, Toyota plans to offset at least 2.2 MtCO$_2$e to fulfil its carbon neutrality target for operational emissions. The company intends to reduce 68% of its scope 1 and 2 emissions by 2035 below 2019 levels and to offset the remaining 32% (Toyota, 2023b, p. 45). It is unclear to what extent the company plans to rely on carbon credits to achieve its 2050 carbon neutrality pledge. The company neither communicates the type of carbon credits nor any integrity criteria for its future purchases, making these carbon neutrality pledges highly ambiguous and contentious.

79

Exhibit 7 to Decl. of Angel Hsu
225

Case 2:24-cv-00801-ODW-PVC    Document 89-25    Filed 04/07/25    Page 81 of 164
Page ID #:8858



## Box 1: Analysis of Toyota's subsidiary Hino producing heavy-duty vehicles

Toyota produces heavy-duty trucks and buses through its subsidiary Hino. Hino's revenue of USD 11.5 billion in the financial year of 2023 (April 2022 to March 2023) accounts for around 4% of Toyota's total revenue over the same period (Hino, 2023a, p. 15). Hino's total emissions amount to 41 MtCO₂e for 2021 (Hino, 2022, p. 57), of which around 93% originate in the use phase of sold heavy-duty vehicles. Toyota does not include these downstream emissions from the use of HDVs in its group-wide emissions disclosure (Toyota, 2023b, p. 47, see footnote 2 of Table A).

**The lack of detailed information on base year emissions data or the link between group- and subsidiary-level intensity targets raises questions about Hino's target setting for 2030 and beyond.** Similar to Toyota's group-level pledge, Hino's carbon neutrality target for 2050 lacks substantiation, with no information provided on the extent to which the carbon neutrality target is to be achieved through emission reductions as opposed to offsetting (Hino, 2022, 2023b). In the period leading up to 2030, Toyota and Hino commit to different intensity reduction targets for the heavy-duty vehicles' use phase. Toyota aims for an 11.6% reduction below 2019 levels, while Hino targets a 40% reduction below 2013 levels. We could neither identify any explanation on how these targets relate to each other nor the disclosure of any base year emissions data for Hino's scope 3 emissions in 2013. Additionally, we cannot identify specific targets for the phase-in of zero-emission heavy-duty vehicles by 2030, neither at the group level by Toyota nor at the subsidiary level by Hino (see detailed assessment in *Annex I*).

**Hino provides limited information on its implemented or planned measures to achieve its emission reduction targets.** We cannot identify targets for the phase-in of zero-emission heavy-duty vehicles by 2030, nor the expansion of related charging infrastructure (for example in Hino, 2022, 2023b). Recent literature indicates that globally 30–37% of heavy-duty trucks should be battery electric vehicles (BEVs) and fuel cell electric vehicles (FCEVs) by 2030 to align with the 1.5°C Paris-Agreement temperature limit (UNFCCC, 2021, pp. 10–11; Boehm et al., 2023, pp. 77–78; IEA, 2023c, pp. 88, 93). Hino also does not communicate any information on measures to address emissions related to the procurement of upstream materials such as low-carbon steel.

80

Exhibit 7 to Decl. of Angel Hsu
226

# 5.6 Volkswagen Group

**TRANSPARENCY & INTEGRITY**

| SECTOR | REVENUE | EMISSIONS | PLEDGE |
|---|---|---|---|
| Automobiles | USD 293.6 bn (2022) | 727.6 MtCO₂e (2022) | Carbon neutral by 2050 |

## ① TRACKING AND DISCLOSURE OF EMISSIONS

| | | TRANSPARENCY | INTEGRITY |
|---|---|---|---|
| Tracking and disclosure | 727.6 MtCO₂e in 2022 | | |
| Major emission sources | Use phase of sold vehicles (downstream s3, 86%), purchased goods and services (upstream s3, 13%) | | |
| Disclosure | Emissions disclosed for all scopes but third-party analysis questions integrity of LDV downstream s3 disclosure. All HDV-related scope 3 emissions fully excluded from group-level disclosure. | | |
| Subsidiary coverage | ◐ Subsidiaries are only partially covered in the emissions reporting and disclosure. | | |

MtCO₂e

| | | |
|---|---|---|
| Downstream Scope 3 | | 623.13 |
| Upstream Scope 3 | | 95.19 |
| Scope 2 | | 4.65 |
| Scope 1 | | 4.46 |

## ② SETTING EMISSION REDUCTION TARGETS

**TRANSPARENCY** · **INTEGRITY**

**Headline target or pledge** · *Carbon neutral by 2050*

- 50% absolute reduction of s1 and s2 by 2030 below 2018
- 30% intensity reduction of LDV life-cycle emissions by 2030 below 2018
- Various EVs sales targets for different geographies

**Short-term targets** (up to 2030)

S1 · S2 · S3↑ · S3↓

Scope coverage — No 1.5°C-aligned phaseout dates for ICEs. Target for s1 & s2 equals a 3% reduction across the value chain. S3 intensity for s2 or 2025 no longer mentioned.

Own emission reductions (compared to full value chain in 2019) — **?**

**Medium-term targets** (2031 – 2040)

S1 · S2 · S3↑ · S3↓ · N/A

Scope coverage — Volkswagen sets no medium-term emissions reduction target towards 2040.

Own emission reductions (compared to full value chain in 2019) — No medium-term emissions reduction target towards 2040 identified. Several aspirational brand-specific EVs sales targets.

**Longer-term targets** (2040 onward) · *Carbon neutral by 2050*

S1 · S2 · S3↑ · S3↓

Scope coverage — All emission scopes covered. No emissions reduction commitment alongside carbon neutrality pledge. No 1.5°C-aligned phaseout dates for ICEs.

Own emission reductions (compared to full value chain in 2019) — **?**

## ③ REDUCING OWN EMISSIONS

| | | TRANSPARENCY | INTEGRITY |
|---|---|---|---|
| Operational emissions (scope 1) | 1% of 2022 emissions | Not assessed. | N/A | N/A |
| Renewable electricity (scope 2) | 1% of 2022 emissions | Extensive use of low-quality RECs to claim 99% of renewable electricity procured in Europe in 2022. Plans to use more PPAs in the future but limited information provided. | | |
| Upstream emissions (scope 3) | 13% of 2022 emissions | Several intended activities to reduce upstream scope 3 emissions mentioned but very limited details on timeline, milestones and expected impact. | | |
| Downstream emissions (scope 3) | 86% of 2022 emissions | Relevant measures for key emission sources, including investments in vehicle electrification. Limited details on timeline and expected impact. | | |

## ④ RESPONSIBILITY FOR UNABATED AND RESIDUAL EMISSIONS

| | | TRANSPARENCY | INTEGRITY |
|---|---|---|---|
| Climate contributions today (Beyond-value-chain mitigation) | Climate contributions through Volkswagen Financial Services for project protecting moorlands in Germany. Details on financial volume not identified. | | |
| Misleading offsetting claims today | 5.9 MtCO₂e credits in 2022 for various claims (e.g. carbon neutral production sites). Mainly land sequestration CDR and 'lowest-hanging fruit' projects. | | |
| Approach to residual emissions | 2050 target depends on CDR to unclear extent. A joint venture with ClimatePartner develops land sequestration CDR. | | |

**5-point rating scale:** ● High ● Reasonable ● Moderate ● Poor ● Very poor — **Transparency** refers to the disclosure of information. **Integrity** refers to the quality and credibility of the approach.

**Sources:** Volkswagen (2023a, 2023b, 2023c);Volkswagen ClimatePartner (2024), Traton (2023a, 2023b), MAN (2023), Navistar (2023), Scania (2023), Volkswagen Truck & Bus (2023), and PWC (2022a, 2022b)

Corporate Climate Responsibility Monitor 2024

81

Exhibit 7 to Decl. of Angel Hsu
227

*The assessment is based on the 2022 sustainability report; the information in the 2023 sustainability report published in March 2024 does not lead to any changes in our evaluation.*

## Volkswagen Group

**Volkswagen AG (hereafter: Volkswagen Group) is one of the world's largest manufacturers of motor vehicles. Most of the company's emissions originate in the use phase of its sold cars, vans, trucks, and buses (86% of 2022 emissions) and from sourced materials such as steel (13%). Over the past three years, the company has shown little progress in aligning its group-level climate targets with the latest science and voluntary standards. The company aims to become carbon neutral by 2050 but has not clarified the extent to which it will reduce emissions to achieve this pledge. Despite a range of emission reduction measures across all scopes, Volkswagen's climate strategy for light-duty vehicle electrification and its 2030 targets fall short of decarbonisation milestones for the automobile industry to be in line with the Paris Agreement's 1.5°C global warming limit.**

**Key developments over the past year:** We have identified only limited developments and minor updates to Volkswagen's climate strategy since the previous analysis was published in February 2023 (Day, Mooldijk, Hans, et al., 2023). In 2023, for example, the company increased its targeted share of fully electric vehicles sold in Europe from 60% to 70%. Volkswagen has neither provided further clarity on its 2050 carbon neutrality target nor committed to specific phase-out dates for internal combustion engines. A first-time analysis of all of Volkswagen's subsidiary Traton, which manufactures all of Volkswagen's heavy-duty vehicles, has further revealed that Volkswagen does not include any of the scope 3 emissions from heavy-duty vehicles in its group-level emissions disclosure.

**Volkswagen has shown no progress in enhancing its group-level targets, which remain incompatible with the Paris Agreement 1.5°C temperature limit, and no longer publicly refers to its 2025 target.** Notably, there has been no improvement in providing details for Volkswagen's 2050 carbon neutrality target, initially announced in 2019, despite requirements for long-term pledges laid out by the UN High-Level Expert Group and the International Organization for Standardization (ISO, 2022; UN HLEG, 2022). It remains entirely unclear to what extent the carbon neutrality target is to be achieved through emission reductions, as opposed to offsetting. The company also lacks any emission reduction target for its upstream value chain emissions towards 2030 and beyond, despite being responsible for 13% of its 2022 emissions.

We can no longer find any public reference by Volkswagen to its 2025 reduction target for vehicle use-phase emission intensity in the sustainability reporting of 2023 (Volkswagen, 2023a, 2023a). The target aimed at reducing emission intensity by 30% between 2018 and 2025 was critically undermined by the specified role of offsetting (see previous assessment in Day, Mooldijk, Hans, et al., 2023, pp. 115–116, 159–160). The discontinuation of the target, rather than its clarification, would leave the company without any tangible emission reduction goal within the next five years. Recent analysis further suggests that Volkswagen currently underreports its disclosed life-cycle emissions of sold vehicles by more than 50% due to unrealistic assumptions on vehicle lifetimes (Bonaccorsi et al., 2022, p. 15).

**Despite recent integrity issues with carbon credits purchased in the voluntary carbon market, Volkswagen's climate strategy continues to rely on offsetting as well as group-wide carbon neutrality target for 2050 and to make present-day carbon neutrality claims for production lines.** Volkswagen has started acquiring carbon credits from the Kariba mega-project in Zimbabwe. In 2022 alone, the company purchased carbon credits of around 1.1 MtCO₂e from this project (Volkswagen, 2023a), representing roughly 20% of the total 5.9 MtCO₂e purchased that year. However, the Swiss project developer South Pole, who ran the Kariba mega-project, decided to terminate and withdraw from the project entirely in October 2023 following allegations of inflated climate benefits and issues related to due diligence (Elgin and White, 2023). This case underscores the inherent risks associated with offsetting practices relying on carbon credits to offset one of its first customers along the value chain (see Section 2.1.). Besides purchasing carbon credits in the voluntary carbon market, Volkswagen formed a joint venture with Climate Partner in 2022 to develop its own projects for issuing carbon credits from biological carbon dioxide removal. The companies have not yet provided any further information on the scope and timeline of its future activities (Volkswagen ClimatePartner, 2024).

Volkswagen does not commit to the phaseout of internal combustion engines for light-duty vehicles sold in key markets by 2030, significantly falling short of 1.5°C-aligned climate action in the automobile sector. Volkswagen increased its targeted share for electric light-duty vehicles sold in Europe by 2030 from 60% to 70%, while continuing to commit to at least a 50% share in China and the US (Volkswagen, 2023c, p. 8). In these main markets, electric light-duty vehicles sales should reach 95%–100% by 2030 to stay below the Paris Agreement's warming limit of 1.5°C (CAT, 2020, p. 27; UNFCCC, 2021, pp. 10–11; Teske et al., 2022, p. 4). The absence of a specific timeline for the complete phaseout of internal combustion engines for key markets towards 2030 or shortly thereafter leaves major gaps in the company's climate strategy (see detailed assessment in Annex I). Unlike some other automobile manufacturers in the US or Germany, Volkswagen has also not signed the COP26 declaration committing to only sell electric vehicles by 2035 to support achieving the 1.5°C target of the Paris Agreement as of April 2024 (COP26 Presidency, 2021; A22 Coalition, 2023). Despite the shortcomings of Volkswagen's targets for light-duty vehicles, sales targets for heavy-duty zero-emission vehicles by 2030 do meet the 1.5°C Paris Agreement compatible milestones for most of Volkswagen's brands (see Box I).

**The climate strategy provides limited details on the scope, timeline, and indented impact of Volkswagen's activities to reduce emissions of purchased upstream materials such as steel and batteries.** Volkswagen, for example, has signed a memorandum of understanding with steel producer Salzgitter to become one of its first customers of low-CO₂ steel. The company also plans to set binding CO₂ targets for suppliers of upstream materials, such as battery manufacturers (Volkswagen, 2023b, pp. 42–43; W. Liu et al., 2023, p. 14). Despite these steps in the right direction, the lack of details and specific milestones hinders an independent assessment of their level of ambition and comprehensiveness.

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu
228

## Box 2: Analysis of Volkswagen Group's subsidiary Traton producing heavy-duty vehicles

Volkswagen produces heavy-duty trucks and buses through its subsidiary Traton. Traton manages four different vehicle brands: Scania, MAN, Navistar, and Volkswagen Truck & Bus. In 2022, Traton generated revenue of EUR 40.3 billion in 2022 (ca. USD 42.5 billion), accounting for around 14% of Volkswagen Group's total revenue for the same year (Traton, 2023b).

**Traton does not disclose consolidated up- and downstream scope 3 emissions across its four brands.** The annual emissions from the use-phase of sold heavy-duty vehicles might be way higher than 300 MtCO₂e considering the most recently published sustainability reports by each of the four brands (MAN, 2023, p. 17; Navistar 2023, p. 156; Scania, 2023, p. 156; Volkswagen Truck & Bus, 2022, p. 137). As of April 2024, the Volkswagen Group does not include any of the scope 3 emission for its four heavy-duty vehicles' brands in its annual emissions disclosure. Traton only reports consolidated scope 1 and scope 2 emissions (Traton, 2023a, p. 29).

**Traton's brand-level targets for selling zero-emission vehicles by 2030 mostly align with 1.5°C Paris Agreement-compatible milestones for heavy-duty vehicles by 2030.** While Traton does not set any group-level emission reduction targets across all heavy-duty vehicle brands, each individual brand commits to its own targets (Traton, 2023a, pp. 17–20). MAN, Scania and Navistar International Cooperation — covering 26 out of Volkswagen Group's 28 production sites for heavy-duty vehicles — all pledge to reach a minimum 40% sales share for heavy-duty zero-emission vehicles by 2030 (Traton, 2023a, p. 17). These commitments are in line with the 1.5°C Paris Agreement-compatible decarbonisation milestones for heavy duty trucks. Scania (net-zero carbon by 2040) and MAN (greenhouse gas neutral by 2050) additionally commit to net-zero targets under the SBTi Net Zero Standard (Traton, 2023a, p. 12). As with Volkswagen Group's overarching carbon neutrality target, we were unable to identify any post-2040 emission reduction target by the two brands alongside the subsidiary-level net-zero and carbon neutrality pledges

**Traton and its brands have started to implement measures to support the roll-out of charging infrastructure and reduce emissions of upstream materials, although uncertainties regarding their scope and intended impact remain.** Scania, for example, commits to procuring '100% green batteries, green steel, green aluminium, and green cast iron in its European production by 2030'. The commitment lacks specificity on how much it aims to reduce emissions versus relying on offsetting to meet this claim (Traton, 2023a, p. 13). As a member of The First Mover Coalition, Scania also aims to procure at least 10% of low-carbon steel and aluminium by 2030 (FMC, 2022c; 2022a). However, the effectiveness of these steps in achieving the claimed '100% green' procurement of zero-emission steel or aluminium remains uncertain. It is also unclear to what extent the cooperation between Scania and H2 Green Steel will cover Scania's steel demand in 2023 (Volkswagen, 2023b, p. 43). Traton also contributes to the establishment of charging infrastructure, with more than 1,700 public charging points in Europe as part of its joint venture that involves a EUR 0.5 billion investment, alongside Daimler Truck and Volvo Group (Traton, 2023a, p. 18).

83

Exhibit 7 to Decl. of Angel Hsu
229



Exhibit 7 to Decl. of Angel Hsu
230

The assessment is based on the 2022 sustainability report; the information in the 2023
sustainability report published in March 2024 does not lead to any changes in our evaluation.

# Volvo Group

*Note to readers: This assessment exclusively focuses on the climate strategy of AB Volvo as a producer of heavy-duty vehicles. It does not assess the business activities and climate strategy of the Volvo Car Group, which produces light-duty vehicles. The two companies operate independently of each other, despite sharing the Volvo brand name.*

**AB Volvo (hereafter: Volvo Group) is one of the world's largest manufacturers of heavy-duty vehicles, such as trucks, buses, industrial and marine engines. Most of the company's emissions originate from the use phase of its vehicles and engines (96% of 2022 emissions) and from sourced materials such as steel (~4%). The company commits to ambitious targets and measures to phase in zero-emission vehicles leading up to 2030. Its climate strategy also introduces the first credible steps to address emissions from the upstream value chain. However, the Volvo Group's plans for climate action beyond 2030 lack transparency and specificity.**

**Volvo Group transparently discloses its operational and use phase emissions of sold vehicles, while reporting on all other emissions in the up- and downstream value chain is still under development.** An explorative analysis conducted by the company estimates that emissions in the upstream value chain – such as those from the sourcing of steel, aluminium, and other materials – accounted for approximately 4% of total emissions in 2022 (Volvo Group, 2023a, pp. 23, 154–155, 177). No further comparative analysis of a similar kind has been done for either of the downstream value chain emissions, such as those associated with the end-of-life treatment of sold vehicles. For this reason, we estimate Volvo Group's total emissions to be at least 299 MtCO₂ in 2022, but likely higher if other categories not estimated currently were to be included.

**The company's transparent and ambitious targets towards 2030 put a distinct focus accelerating the needed phase in of zero-emission vehicles in this crucial period for climate change.** For this period, the company sets vehicle type-specific reduction targets for use-phase emissions (Volvo Group, 2023a, p. 151), including intensity targets for heavy-duty trucks and buses, and absolute reduction targets for construction equipment, industrial, and marine engines. In addition, the target to sell "at least 35% of

electric vehicles by 2030 across all vehicle types globally meets the 1.5°C-compatible benchmarks for heavy-duty trucks, which accounted for 66% of Volvo Group's revenue in 2022 (Volvo Group, 2023a, pp. 16, 151). However, for buses, which represented 4% of Volvo Group's revenue in 2022, the sales share of battery electric vehicles (BEVs) and fuel cell electric vehicles (FCEVs) must reach between 56–60% by 2030 globally and 100% by 2030 in advanced economies and China (see *detailed assessment in Annex I*).

The Volvo Group shows less transparency and specificity for the period beyond 2030. While the phase-in of BEVs and FCEVs will likely accelerate towards 2040, the company has not committed to specific sales targets for this period. Instead, it refers to aspirational developments under an "illustrative scenario for 1.5°C" (Volvo Group, 2023a, pp. 16, 155). The company plans for phasing in zero-emission vehicles is still on track towards 2040 are further called into question as it intends to continue selling vehicles with internal combustion engines (ICEs) running on biofuels, such as renewable liquid, hydrogenated vegetable oil, and biogas to an unspecified extent (Volvo Group, 2023a, pp. 16, 155). Although Volvo Group acknowledges the limited availability of sustainable biofuels (Volvo Group, 2023a, p. 158), it does not outline any specific criteria or guidelines to ensure the fuels' sustainability (Volvo Group, 2023b). The use of biofuels at scale faces multiple sustainability issues and should be avoided if technological alternatives are readily available (see *more information in Section 3.3*).

**Comprehensive measures support the phase-in of electric vehicles by 2030 and take the first credible steps to address emissions from the upstream value chain.** The company formed a joint venture together with Traton and Daimler Truck jointly investing EUR 0.5 billion to roll out a high-performance public charging network for battery electric trucks and coaches (Volvo Group, 2023a, p. 35). The company also invests in the R&D and the expansion of own production capacities for batteries and hydrogen fuel cells (Volvo Group, 2023a, pp. 18–19; 189). To address its upstream value chain emissions, Volvo Group is one of the world's first vehicle manufacturers to publicly set procurement targets for low-carbon alternatives to production materials like steel. As a founding member of The First Mover Coalition, the company commits to sourcing at least 10% of low-carbon steel and primary aluminium (FMC, 2022c,

2022a; Volvo Group, 2023a, p. 177). For the purchase of low-carbon steel, the company entered into supply agreements with SSAB in 2021 and with H2 Green Steel starting in 2026 (Volvo Group, 2021, 2023c, 2023a). Through these agreements, the company produced its first vehicle with zero-carbon steel in 2021 and began introducing fossil-free steel into parts of its vehicle product range in 2022 (Volvo Group, 2023a, p. 33). In 2023, the company started partnering with Norsk Hydro to establish a roadmap for increasing 'near zero' aluminium use before 2030 and supplying 'net zero' aluminium in 2040 (Volvo Group, 2024). Volvo Group does not specify what it means by near zero or net zero aluminium.

**The climate strategy remains unsubstantiated in defining Volvo Group's 2040 net-zero target related to offsetting and renewable electricity procurement.** The company discloses neither the extent to which it will reduce its own emissions by 2040 as part of this pledge, nor the amount and type of carbon credits it intends to use to claim net zero. Recently published guidance on meaningful net-zero target setting emphasises both of these aspects (ISO, 2022; UN HLEG, 2022; SBTi, 2023d). While Volvo Group might follow The First Mover Coalition's guidelines on "scalable and durable" carbon removal solutions (FMC, 2022b) could not identify any reference to this in Volvo's sustainability reporting. Similarly, the reporting provides no detailed information on the company's renewable electricity procurement, despite emphasising the need for increased sourcing of renewable energy beyond the 48% achieved in 2022 (Volvo Group, 2023a, pp. 155–156).

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu
231

# 6 Electric utilities

## 6.1 Sector highlights

- **Electric utilities' emissions are primarily derived from electricity generation, sales of fossil gas and the upstream fuel chain** (which includes the resale of purchased electricity and the extraction, transport, and processing of fuels). The complete phase-out of fossil fuels and a rapid shift to renewables are the two main levers for electric utilities to decarbonise.

- **Likely driven by regulations, European companies generally demonstrate higher ambition than Duke Energy and KEPCO.** This is likely driven by legal compliance and more stringent regulations adopted in the EU, especially the EU emissions trading scheme. Duke Energy and KEPCO's targets fall short of global benchmarks, with a delayed phase-out of coal and fossil gas, and inadequate renewable energy targets. None of the five electric utilities present a comprehensive strategy for fossil gas phase-out.

- **Despite mostly operating in advanced economies, none of the assessed companies have committed to achieving net-zero emissions by 2035.** Both Iberdrola and Enel aim to reach (net) zero emissions by 2040, while ENGIE aims to reach net zero by 2045, and Duke Energy and KEPCO by 2050. All assessed companies would need to target net zero by 2035 to align their pledges with sectoral and regional benchmarks (IEA, 2023c, p. 79).

- **Several electric utilities pursue controversial solutions.** CCUS, bioenergy, and advanced nuclear technologies can distract electric utilities from investing in renewable generation and supporting electrification in end-use sectors.

- **Two of the five electric utilities do not clarify to what extent they will rely on offsetting to achieve their net-zero targets, while the other three provide limited details on how they will neutralise remaining emissions by their net-zero target year.** Duke Energy and KEPCO do not provide an emission reduction commitment alongside their net-zero pledge at all. Enel, Iberdrola, and ENGIE commit to reduce emissions across their value chain by 98%, 90% and, 84%, respectively. However, they provide limited details on the type of CDR they will use to neutralise their remaining emissions. None of the companies discloses information on climate contributions beyond the value chain.

Table 18 provides a summary overview of our (transparency) and integrity ratings for Iberdrola, Enel, ENGIE, Duke Energy, and KEPCO.

**Table 18: Overview of integrity ratings for electric utilities.**



| COMPANY | HEADLINE PLEDGE | INTEGRITY | Tracking & disclosure of emissions | Target setting | Emission reduction measures | Climate contributions & offsetting | PAGE |
|---|---|---|---|---|---|---|---|
| Iberdrola | Net-zero emissions before 2040 | | | | | | p. 96 |
| Enel | Zero emissions in 2040 | | | | | | p. 92 |
| ENGIE | Net-zero carbon by 2045 | | | | | | p. 94 |
| Duke Energy | Net zero carbon by 2050 | | | | | | p. 90 |
| KEPCO | Carbon neutrality by 2050 | | | | | | p. 98 |

Exhibit 7 to Decl. of Angel Hsu
232

**SER 512**



87

## 6.2 Sectoral transition framework

**Approximately three-quarters of global emissions are linked to energy, with 40% of this attributed to electricity and heat generation.** Currently, the power sector is dominated by fossil fuels, with coal alone accounting for nearly 40% of global electricity generation (Ritchie and Rosado, 2020; Climate Watch and World Resources Institute, 2022). In order for other sectors to fully decarbonise, it is necessary that the power sector switches to renewable generation within the next two decades, and earlier in advanced economies. Electricity's share of final energy consumption is anticipated to surge from 20% today to over 50% by 2050 (IEA, 2023c, p. 79). End-use sectors, like transport, buildings, and certain industries like textiles and food, are expected to electrify in their efforts to decarbonise. Furthermore, electricity paves the way for decarbonisation in sectors that are difficult to electrify, like chemicals, steel, and aviation, by facilitating the production of green hydrogen (Henderson et al., 2020, p. 14; IRENA, 2023a, p. 16).

**Aligning with the 1.5°C pathway requires a steep and immediate reduction in both absolute emissions and carbon intensity.** According to the IEA Net Zero Report, aligning the energy sector with a 1.5°C-compatible pathway requires a 44% emissions reduction globally in 2030 compared to 2021(IEA, 2023c, p. 79). Correspondingly, the global power sector will have to reduce its emission intensity to 48-186 $gCO_2$/kWh by 2030, and 0-23 $gCO_2$/kWh by 2040 (Dietz, Gardiner, et al., 2021, p. 7; Boehm et al., 2023, p. 29; CAT, 2023b, p. 20; IEA, 2023c, p. 199). This can be achieved by increasing the share of low-carbon energy sources, particularly renewables, and phasing out carbon-intensive fossil fuels (IPCC, 2022, p. 8). Under the 1.5°C-compatible trajectory, the electricity sector is required to be the first to achieve net zero — by 2035 for advanced economies, by 2040 for China, and by 2045 for the rest of the world (IEA, 2023c, p. 79). By 2050, it is anticipated that the electric utilities will not only have zero carbon emissions but also employ negative emissions technologies to achieve a state of negative carbon intensity (Dietz, Gardiner, et al., 2021, p. 7; Boehm et al., 2023, p. 29; IEA, 2023c, p. 199).

**Decarbonising the power sector is not only technically feasible, but also economically viable and environmentally beneficial.** In many countries, renewable energy has become the most cost-effective option for generating power due to its declining costs, which have fallen below the fossil fuel cost range (Boehm et al., 2023, p. 33; IRENA, 2023b, p. 36). Over the past decade, the weighted average levelized cost of electricity (LCOE) for solar PV have dropped by 80%, onshore wind by 65%, and offshore wind by 54%. Additionally, the cost of short-duration energy storage is also falling rapidly, reaching around 89% between 2010 and 2021, and is expected to decrease even further (Ladislaw and Naimoli, 2020, p. 2; BloombergNEF, 2022; Boehm et al., 2023, p. 33; Cole and Karmakar, 2023, p. 4). As a sector with the most advanced and readily available technological options for mitigation, electric utilities need not continue relying on fossil fuel-based generation systems in the medium and long term, which entail expensive social and environmental externalities (CAT, 2016, p. 7; IRENA, 2016, p. 7).

**Electric utilities' climate strategies ought to avoid false technological solutions on the path to climate neutrality.** Such solutions include the use of bioenergy, the use of CC(U)S, and the transfer (or sale) of polluting infrastructure to other companies. Bioenergy production is associated with a range of sustainability issues, including deforestation, biodiversity loss, uncertain GHG emissions reductions, and food insecurity *(see Section 3.3 of this report and Section 3 of the methodology document)*. The scarcity of sustainable bioenergy resources means that they should only be used in sectors where there are limited alternatives, which is not the case for the electricity utility sector (ETC, 2021, p. 62). Regarding CC(U)S, benchmarks indicate that this technology can only have a very minimal role in a decarbonised power sector; and only for gas power plants (CAT, 2023b, p. 10). CC(U)S extend the lifetime of fossil fuel and is a distraction from investing in true solutions. In addition, CC(U)S is faced with high challenges such as a high energy demand, imperfect capture rates, scarcity of storage potential, and very high costs compared to the costs of renewables and energy storage.

Exhibit 7 to Decl. of Angel Hsu
233

# Key actions and measures for electric utilities

## Measures to address electricity generation and its associated emissions along the value chain (scope 1 and/or upstream scope 3)

The primary source of emissions for electric utilities typically stem from electricity generation and its associated emissions along the value chain. Depending on the company's structure and business model, these emissions can be categorised under either scope 1 or upstream scope 3 (category 3). Collectively, these sources typically account for more than three quarters of the emissions profile of electric utilities.

### Phase out of coal, oil, and gas for electricity and heat generation  Critical transitional measure

Phasing out fossil fuels represents the most important measure for decarbonising electricity to prevent investing in assets that will become stranded and locking in emissions that will derail us from staying in a 1.5°C trajectory (IEA, 2023c). Achieving this measure requires electric utilities to comply with the following milestones:

**Global**

- All (unabated) coal-fired power plants must be phased out globally by 2040 (Boehm et al., 2023, p. 29; CAT, 2023b, p. 1; IEA, 2023c, p. 92).

- All large oil-fired power plants must be fully phased out globally by 2040 (IEA, 2023c, p. 92).

- All unabated fossil gas-fired power plants must be phased out globally by 2040, with a minimal role for CCUS (CAT, 2023b, p. 1). Fossil gas should constitute less than 5% of electricity generation by 2040, reducing further to 0-1% by 2050 (Boehm et al., 2023, p. 29; CAT, 2023b, p. 12; IEA, 2023c, p. 92).

**Advanced economies**

- All unabated coal-fired power plants must be phased out in advanced economies by 2030 (CAT, 2023b, p. 1; IEA, 2023c, p. 92).

- All unabated fossil gas-fired power plants must be phased out in advanced economies by 2035, with a minimal role for CCUS (CAT, 2023b, p. 1).

### Scale up renewables rapidly  Critical transitional measure

The acceleration of renewable energy adoption is the second key pillar in achieving steep reduction in carbon intensity, with a decarbonisation pathway that may vary based on regional differences (for detailed figures on the share of renewables in electricity generation milestones for certain countries, see CAT (2023b, p. 16). To align with a 1.5°C trajectory, electric utilities must ensure for operations that meet these benchmarks:

- Renewables should constitute between 59-89% in global electricity generation by 2030, 85-97% by 2040, and 89-100% by 2050 (IEA, 2022b, p. 138, 2023c, p. 197; Teske, 2022, p. 296; Boehm et al., 2023, p. 29; CAT, 2023b, p. 16; IRENA, 2023c, pp. 22, 75). Variable renewable (wind and solar) will comprise between 40-78% in global electricity generation by 2030, 66-91% by 2040, and 70-96% by 2050 (IEA, 2022b, p. 138, 2023c, p. 197; Teske, 2022, p. 296; Boehm et al., 2023, p. 29; IRENA, 2023c, pp. 22, 75).

- Renewables need to account for 68-77% of total installed capacity by 2030 and 82-94% by 2050, with higher shares in advanced economies (IEA, 2023c, p. 197; IRENA, 2023c, pp. 22, 75). Annual addition of variable renewable (wind and solar) capacity should reach approximately 1,100 GW by 2030, almost four times greater than the capacity added in 2022 (around 300 GW) (IEA, 2022b, p. 138, 2023c, p. 197; IRENA, 2023c, pp. 22, 75). China, the EU, and the United States are expected to account for 75% of this annual capacity addition.

88

Exhibit 7 to Decl. of Angel Hsu
234



## Improve power system reliability and flexibility    Enabling measure

Improving grid reliability and flexibility is a prerequisite to allow higher penetration of renewables, given the variable nature of wind and solar energy, alongside the increasing demands of electrification, which reshapes load curves and boosts demand variability (IEA, 2022b, pp. 214–216; Jafari et al., 2022). According to IEA (IEA, 2023a, pp. 7-9 27,42-44,51,90,102-105, 2023c, p. 80) and IRENA (2023c, p. 152), grid expansion and improvement is crucial to effectively integrate an increasing amount of renewable sources while ensuring supply security and enhancing resilience against extreme weather events. Currently, over 3,000 GW of renewable power projects, half of which are in advanced stages, are awaiting grid connection. This backlog highlights the risk of the grid becoming a significant bottleneck in the energy transition. In addition, the process of developing new

grid infrastructure can take up to 15 years, from planning to commissioning, in contrast to an average of 5 years for renewable projects. In advanced economies such as the EU, the US, and South Korea, delays in grid development could lead to increased reliance on fossil gas beyond 2030, potentially making energy less affordable and more susceptible to price volatility due to dependence on coal and fossil gas. This underscores the urgency for electric utilities, especially those owning transmission and distribution operations, to invest significantly in grid expansion and improvement in the short-term, in line with the scale required to meet these benchmarks:

- Grid investments are expected to double by 2030, rising from around USD 300 billion in 2022 to USD 680 billion, with a focus on digitalisation and modernisation of distribution systems (IEA, 2023e, p. 49, 2023c, pp. 80, 107, 146). By 2030, transmission and distribution grids need to expand by 2 million kilometres annually to reach approximately 90 million kilometres in total.

- As battery storage emerges as an important option for grid flexibility in systems with a high share of variable renewables, it is anticipated that global utility-scale battery capacity will reach approximately 1,000 GW by 2030 and could exceed 4,000 GW by 2050 (IEA, 2022b, pp. 215–216, 2023c, pp. 83, 197).

## Measures to address emissions from the sale of fossil gas (downstream scope 3)

Depending on the business model, another significant source of emissions for electric utility companies typically stems from the sale of fossil gas. This is categorised under downstream scope 3 (category 11). In line with the previous measures, electric utilities should actively facilitate the switch from fossil fuels to cleaner energy alternatives for the end-use sectors. This not only supports the broader industry transition but also directly addresses the primary emissions sources, which predominantly arise from fossil-based electricity generation and sales of fossil gas.

## Support electrification and alternatives in other sectors    Enabling measure

Transitioning from fossil fuels to electricity and lower-carbon fuel alternatives like green hydrogen in end-use sectors is one of the identified measures to align with the 1.5° pathway (IPCC, 2022, p. 29). Deep electrification of end-use sectors has the potential to cut emissions by 20–25% in buildings, 50–60% in transport, and 15–30% in industries (IRENA, 2019, pp. 6-7; Nadel, 2019). This is especially evident in applications such as heat pumps, electric light-duty vehicles, and low-to-medium temperature industrial processes. Complementarily, green hydrogen serves as a solution to overcome the limits of electrification to decarbonise the sectors that are difficult to electrify, such as chemicals, shipping, aviation, and high-temperature applications in the iron and steel industry (The Hydrogen Council and McKinsey & Company, 2021, pp. 13–17; Lorentz et al., 2023, p. 9). The role of electric utilities can be pivotal in this transition, taking the lead

in infrastructure investments and promoting partnerships, such as by scaling up green hydrogen production facilities, investing in EV charging infrastructure, or promoting the adoption of heat pumps for customers, which contributes to meet the following Paris-aligned benchmarks:

- Investments in clean hydrogen (mostly green hydrogen) and its derivatives infrastructure currently stand at approximately USD 1 billion annually in 2022 and need to increase to USD 100–150 billion annually by 2030 and USD 170 billion annually by 2050 (IEA, 2023c, p. 141; IRENA, 2023c, p. 23).

- Electrolyser capacity needs to be scaled up from 0.5 GW in 2022 to 428 GW by 2030 and 5,722 GW by 2050 (IRENA, 2023c, p. 23).

- Annual green hydrogen production must be ramped up from 0.03 million tonne in 2021, to 58 million tonne by 2030 and 330 million tonne by 2050 (Boehm et al., 2023, p. 61).

- Investments for EV charging infrastructure and adoption support currently stand at USD 30 billion per year in 2022, and need to reach USD 137 billion per year by 2030 and USD 364 billion per year by 2050 (IRENA, 2023c, p. 23).

- Investments in heat pumps, presently at USD 64 billion per year in 2022, needs to rise to USD 237 billion per year by 2030 and USD 230 billion per year by 2050 (IRENA, 2023c, p. 23).

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu
235



Exhibit 7 to Decl. of Angel Hsu
236

## Duke Energy

**Duke Energy Corporation, headquartered in the United States, is a major energy holding company operating in six federal states. It specialises in the generation, transmission, and distribution of electricity, as well as the storage, distribution, and transportation of fossil gas. In 2022, two-thirds of its emissions originated from electricity generation, while a quarter comes from the upstream fuel chain, which includes the resale of purchased electricity and the extraction, transport, and processing of fuels. Over 60% of the company's electricity generation capacity derived from coal and fossil gas in 2022. Duke Energy committed to achieving net-zero emissions by 2050 and set short- and medium-term goals. However, insufficient renewable energy targets, a delayed coal phase-out, and the risk of over-reliance on fossil gas undermine these climate targets. Duke's climate strategy falls short of decarbonisation milestones for electric utilities needed to align with the Paris Agreement's 1.5°C global warming limit.**

**Duke Energy's emission reduction target for 2030 is insufficient to contribute to the deep emission reductions required for the power sector by that year.** The company aims to reduce its scope 1 emissions by at least 50% below 2005 levels by 2030 (Duke Energy, 2023b, p. 17, 2023a, p. 65), which translates to only a 14% reduction below 2019 levels. Not only is this short-term target insufficient, but Duke Energy had already managed to reduce its scope 1 emissions by 44% below 2005 levels in 2022, indicating that the company needs to undertake only minimal additional efforts to reach its 2030 target of 50% reduction in scope 1 emissions (Duke Energy, 2023b, p. 16). As part of this 50% reduction commitment, Duke Energy pledged to achieve net-zero methane emissions from natural gas distribution (scope 1). However, the energy utility provides no further details on this commitment, including the expected role of offsetting versus own emission reductions.

**Duke Energy's commitment to achieving net-zero emissions by 2050 does not meet the timelines required for electric utilities in advanced economies, which need to reach net zero by 2035** (IEA, 2023c). As milestones on the pathway to net zero, Duke Energy commits to reducing its scope 2 and selected scope 3 emissions by 50% below 2021 levels by 2035, and to reducing its scope 1 carbon emissions by 80% below 2005 levels by 2040 (Duke Energy, 2023a, p. 65). Neither these interim targets nor the 2050 net-zero pledge meet sectoral

and regional benchmarks, which require power utilities in the United States to achieve net zero between 2035 and 2040 (CAT, 2023b, p. 1; IEA, 2023c, p. 62). While Duke specifies that it will reduce emissions on the path to 2050 (Duke Energy, 2022, p. 18, 2023b, p. 22), the company provides no details on the amount of emissions it plans to offset or the type of offsetting projects it plans to pursue (Duke Energy, 2023a, p. 53). Moreover, Duke Energy's publications frequently underscore that achieving its climate targets hinges on external factors, such as regulatory approvals, enabling policies, and technology advancements (Duke Energy, 2023a, p. 48,52,71). This emphasis indicates a potentially passive approach to accelerating climate action, despite the company's significant role in the energy sector.

**Duke Energy's approach to phasing out coal-fired and gas-fired electricity generation does not align with the 1.5°C-compatible benchmarks for the sector and creates risks of increased reliance on fossil gas and related stranded assets.** Duke Energy plans to reduce its coal generation to 5% of the mix by 2030 and to phase out coal completely by 2035, but with the caveat that these targets are subject to regulatory approvals (Duke Energy, 2023a, p. 29). This timeline lags behind the 1.5°C-compatible phase-out timeline of 2030 for advanced economies (CAT, 2023b, p. 1; IEA, 2023c, p. 62). Despite its plans to halt fossil gas-fired power plant construction after 2030, Duke Energy instead relies on anticipated hydrogen capabilities and hydrogen blending in gas turbines (Duke Energy, 2022, p. 18,67, 2023a, p. 43), which could support up to 2 GW of fossil gas assets that it expects to run fully on fossil gas beyond the designated coal plant phase-out year (Duke Energy, 2022, p. 60). The company only sets a goal to phase out its gas-powered generation portfolio by 2050 (Duke Energy, 2023a, pp. 48-49), which is 15 years beyond the advised timeline for developed countries (CAT, 2023b, p. 1).

**Instead of rapidly increasing the share of renewable energy deployment, Duke Energy plans to incorporate false solutions like CCUS and biogas.** In 2022, renewable energy accounted for only 8% of Duke Energy's total electricity generation (Duke Energy, 2023a, p. 22). The company's renewable targets in its generation mix – 18% by 2030, 35% by 2040, and 40% by

2050 – fall far short of 1.5°C-compatible sectoral benchmarks in the United States, which suggest a renewable mix of 68%-86% by 2030, 85%-95% by 2035, 93%-97% by 2040, and 99%-100% by 2050 (Duke Energy, 2022, p. 18, 2023b, p. 22, 2023a, p. 20; CAT, 2023b, p. 16). At the same time, the company considers resorting to CCUS for its coal-fired power plants and combined cycle power plants (Duke Energy, 2023a, p. 37,44). Reliance on CCUS in electricity generation faces severe risks due to the unproven efficacy of these technologies and their potential environmental impacts. Duke Energy also regards renewable natural gas (RNG) from waste-based feedstocks as a 'carbon neutral' fuel (Duke Energy, 2023b, p. 31), potentially overlooking the fuel's negative sustainability implications while diverting attention from the need to invest in real solutions (Saadat et al., 2020). The investment in RNG might prolong the use of fossil gas infrastructure rather than representing a genuine pivot towards more sustainable alternatives, such as renewables-based electrification.

91

Exhibit 7 to Decl. of Angel Hsu
237



Exhibit 7 to Decl. of Angel Hsu
238

# Enel

Enel is an international energy based in Italy. Most of the company's emissions originate from electricity production and heat (39%), sales of gas (17%), and the upstream fuel chain (29%), which includes the purchase of electricity and the extraction and transport of coal and gas. The company aims to achieve net-zero emissions in 2040. This commitment translates to a 98% reduction of all emissions below 2019 levels. Enel commits to phasing out coal by 2027 and gas by 2040. The company's strategy lays the groundwork for a new business model focused on renewable energy generation and the electrification of customers in the building and mobility sectors. Overall, Enel's climate strategy is mostly aligned with the 1.5° pathway for the power sector for both 2030 and 2040.

Enel's 2030 intensity targets represent a step in the right direction but should be enhanced to meet decarbonisation benchmarks for Europe. The company commits to reducing the carbon intensity of power generation (scope 1) to 72 gCO₂e/kWh and integrated power (from both own electricity generation and electricity purchased) to 73 gCO₂e/kWh power by 2030 (Enel, 2023a, pp. 88–89). While these targets fall within the lower end of global benchmarks for the power sector (Dietz, Gardiner, et al., 2021, p. 7; CAT, 2023b, p. 20; IEA, 2023c, p. 199; Jaeger et al., 2023, p. 11), they do not meet the carbon intensity benchmarks set for the EU (CAT, 2023b, p. 19). Further, Enel commits to reduce absolute emissions across the value chain by 59% between 2019 and 2030, which would be in line with the 1.5°C-compatible trajectories for the sector at the global level. However, steeper reductions would be needed in the EU, where Enel generates the majority of its revenues.

Enel's pledge to aim for deep decarbonisation by 2040 falls slightly short of the timelines required for electric utilities in advanced economies, which need to reach net zero by 2035 (IEA, 2023c, p. 79). Enel commits to net-zero emissions by 2040 (Enel, 2023b, p. 24), which translates to a reduction of 98% below 2019 levels (see integrity assessment in Annex I). Although Enel's 2040 intensity targets of 0 gCO₂e/kWh for power generation and integrated power align with the global benchmarks, electric utilities in Europe should reach these intensity levels already in the 2030s (CAT, 2023b, p. 20). According to the IEA (IEA, 2023c, p. 79), the power sector in advanced economies should reach net zero by 2035.

Enel commits to fully phasing out coal by 2027 and gas by 2040, meeting global and regional benchmarks. Enel's commitment on coal extends to scope 1 (its own generation) as well as scope 3 upstream (purchased electricity) emissions. The company also plans to exit from gas-fired generation and retail gas sales by 2040. These commitments are in line with the IEA's recommendation for advanced economies to phase out coal by 2030 and to limit the share of unabated gas in electricity generation to 5% by 2040 (IEA, 2023c, p. 92).

Enel's strategy emphasises on renewables and electrification. Enel is investing heavily in renewable energy, aiming to reach an 85% share of renewables in total installed capacities by 2030 and achieve full reliance on renewables by 2040. This target surpasses the 1.5°C-compatible benchmarks for the sector, which recommends a 68% share of renewable energy in total installed capacity by 2030 to limit global warming to 1.5°C (IEA, 2023c, p. 197). In parallel, Enel is focusing on electrifying sectors that currently rely on liquid fossil fuels. It is expanding its charging network to promote e-mobility and supporting the installation of heat pumps for domestic heating and induction cooktops in kitchens to facilitate the transition in the building sector. The company refrains from investing in potentially false solutions such as bioenergy and CCUS.

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu
239



94

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu
240

# ENGIE

ENGIE is an international energy utility based in France. Most of the company's emissions originate from energy production (electricity, heating, and cooling) (36%), sales of gas (35%), and upstream fuel chain (26%), mostly involving the resale of purchased electricity and the extraction and transport of raw materials. ENGIE aims to achieve net-zero emissions by 2045, which is defined as a 90% GHG reduction compared to 2017 levels. Gas will continue to play a role in the company's operations even after reaching its net-zero target in 2045. ENGIE commits to a coal phase-out by 2027, although it is unclear whether this also covers electricity purchased for retail and shares in power plants it does not control. Overall, ENGIE's climate strategy for 2030 and 2045 does not align with the 1.5° pathway for the power sector, which poses a risk of delaying decarbonisation in other sectors.

ENGIE presents various absolute and intensity reduction targets, but for some targets we could not identify the emission sources they cover. For instance, it is unclear what ENGIE means by its target to reduce "other GHG emissions, including scope 3 from procurement, capital goods and the upstream of purchased fuels and electricity" to 85 MtCO₂e (ENGIE, 2023, p. 16). ENGIE does not specify what other emission sources are covered by this target. As a result, it is not possible to aggregate ENGIE's various targets and understand the emission reductions across the value chain the company commits to. Based on our own analysis, we estimate that the various targets translate to a reduction of at least 24% by 2030, compared to 2019 levels (see integrity assessment in Annex I).

ENGIE's short- and long-term climate targets are incompatible with the 1.5°C pathway for the sector. Aligning the energy sector with the 1.5°C-compatible pathway requires a steep and immediate reduction in carbon intensity and emissions over this decade. The net-zero emissions target by 2045 allows high volumes of residual emissions (14% of 2019 levels), with unspecified use of carbon sinks to neutralise them (ENGIE, 2023, p. 68). ENGIE's intensity targets for 2030, set at 110g CO₂e per kWh for energy production (i.e. electricity, heating and cooling in scope 1) and energy consumption (scope 2), as well as 153g CO₂e per kWh for energy sales produced (scopes 1 and 3) and purchased (scope 3), are at the upper end of the carbon intensity range recommended in existing literature

(Dietz, Gardiner, et al., 2021, p. 7; CAT, 2023b, p. 20; IEA, 2023c, p. 199; Jaeger et al., 2023, p. 11). In terms of absolute targets, ENGIE's target of reducing emissions by at least 24% between 2021 and 2030 (based on our own calculations, see integrity assessment in Annex II) falls significantly short of the sector benchmark, which aims for a 44% reduction in the power sector globally (IEA, 2023, p. 62), and would postpone most of the necessary reductions beyond 2030. Additionally, the company has not set any interim targets between 2030 and its long-term target in 2045.

There is some ambiguity surrounding ENGIE's commitment to phase out coal, and the company does not plan to end gas use in its power plants fleet. The company has set a coal phase-out goal by 2027 (ENGIE, 2023, p. 68), but it is unclear whether this commitment only refers to ENGIE's own power plants or also covers electricity purchased for resale and ENGIE's share in power plants it does not control. In addition, ENGIE does not commit to significantly decommission its gas power plants by 2030, which would be necessary to get on track for eventually phasing out gas. The company insists on the role of gas as a suitable flexibility option in the decarbonisation of the energy sector and supports the use of CCS to extend the life of gas power plants (ENGIE, 2023, p. 66).

The pace of transitioning to alternatives appears too slow and relies on flawed assumptions. ENGIE is scaling up renewable energy capacity, with a focus on wind and solar in its strategy. The goal is to reach a 58% of renewables capacity in its energy mix by 2030. However, global benchmarks for the sector indicate that a 68% share of renewable energy in total installed capacity is necessary by 2030 to stay below the Paris Agreement's warming limit of 1.5°C (IEA, 2023c, p. 193). Regarding gas sales, ENGIE commits to achieving 100% decarbonised gas by 2045, but its strategy relies on potentially false solutions such as large amounts of biomethane and the use of green hydrogen in sectors where more energy-efficient alternatives exist. Overall, the company's sustainability report indicates that it does not support the vision of large-scale electrification but sees the role of (decarbonised) gas as crucial in the transformation.

The assessment is based on the 2022 sustainability report; the information in the 2023 sustainability report does not lead to any changes in our evaluation.

Exhibit 7 to Decl. of Angel Hsu
241



Exhibit 7 to Decl. of Angel Hsu
242

## Iberdrola

**Iberdrola is a multinational energy utility headquartered in Spain. Around half of the company's emissions originate from the upstream fuel chain, which includes the resale of purchased electricity and the extraction, transport, and processing of fuels, while a quarter comes from the sales of fossil gas. Iberdrola has set both short- and medium-term goals to achieve net-zero emissions across its entire value chain by 2039. The company shut down its last coal-powered plants in 2020 and focuses on scaling up its renewable energy capacity generation, alongside phasing in green hydrogen to support decarbonisation in other sectors. These targets and measures align Iberdrola's climate strategy mostly with a 1.5°C-compatible trajectory. Despite these positive steps, a comprehensive plan to completely phase out fossil gas is still missing.**

While Iberdrola aims for deep decarbonisation by 2039, the company would need to bring its net-zero commitment forward by four years to be fully aligned with 1.5°C-compatible benchmarks for electric utilities in advanced economies (IEA, 2023c, p. 79). Iberdrola committed to net zero across all emission scopes before 2040 (Iberdrola, 2023f, p. 1). Alongside this net-zero target, the company pledged to reduce its own emissions by 90% below 2020 levels (Iberdrola, 2023g). While the IEA suggests that the global energy sector should reach net zero by 2045, advanced economies should reach this milestone already ten years earlier (IEA, 2023c, p. 79). Given that Iberdrola mainly operates in the European Union, United Kingdom and the United States, the company would have to bring its net-zero target forward to 2035 to meet this regional benchmark. Iberdrola's interim target is to achieve carbon neutrality in scope 1 and 2 emissions by 2030 (Iberdrola, 2023a), equivalent to a 68% reduction across the value chain compared to 2021. While this level of emissions reduction would be in line with the 1.5°C-compatible trajectories for the sector by 2030, using the term 'carbon neutrality' can be misleading to consumers and investors, as 'carbon neutral' suggests that Iberdrola will be close to fully decarbonised (see integrity assessment in Annex II).

Although Iberdrola has completed its coal phase-out, the company has not published a comprehensive fossil gas phase-out plan: the company neither commits to fully phasing out its fossil gas-fired power plant nor commits to a fossil gas exit date. The company closed its last coal plant in 2020, well ahead of the 2030 deadlines for the phase-out of unabated coal in advanced economies (CAT, 2023b, p. 1; Iberdrola, 2023f, pp. 87–88; IEA, 2023c, p. 62). However, Iberdrola has not yet publicly announced a plan for completely phasing out its gas-fired power plants, which account for 15% of its own installed capacity and 24% of its own electricity generation (Iberdrola, 2023b, p. 101, 2023d, p. 19). The only action taken towards addressing its fossil gas assets is the planned sale of its gas-fired power plants in Mexico instead of complete decommissioning (Iberdrola, 2023b). This misses the benchmark for aligning with a 1.5°C pathway, which requires advanced economies to phase out unabated gas by 2035 and the rest of the world by 2040 (CAT, 2023b, p. 1).

Iberdrola invests a significant portion of its capital expenditure to increase renewable energy capacity. In 2022, Iberdrola's own installed renewable energy capacity accounted for 66% of its total installed capacity, while its own renewable energy generation accounted for 46% of its total generation (Iberdrola, 2023g). Iberdrola aims to significantly expand its renewable capacity from 40 GW in 2022 to 95 GW by 2030, which will constitute approximately 93% of its total installed capacity (Iberdrola, 2020, p. 6). This target shows that the company is on track to meet global 1.5°C-compatible benchmarks, which recommend a 68%-77% share of renewable energy in total installed capacity and a 59%-89% share of renewable energy in generation mix by 2030 (Boehm et al., 2023, p. 29; CAT, 2023b, p. 16; IEA, 2023c, p. 197; IRENA, 2023c, pp. 22, 75). Also in 2022, Iberdrola allocated 86% of its capital expenditure to activities that support the implementation of critical transitional and enabling measures identified for electric utilities (see Section 7.2: Electric Utilities – Sectoral Transition Frameworks). Around half of this investment was directed toward solar PV, wind, and hydropower projects, with the remaining portion allocated to the grid (Iberdrola, 2023d, pp. 245–246). Iberdrola is also adopting green hydrogen and electrification technologies, including extensive electric vehicle charging infrastructure (Iberdrola, 2023f, p. 98).

Iberdrola's strategy for claiming the neutralisation of its residual emissions relies on ecosystem conservation and restoration, which is not a credible equivalent to reducing emissions. The company plans to achieve net zero by neutralising the remaining 10% of its 2020 emissions through land sequestration carbon dioxide removal (Iberdrola, 2023f, p. 111). Central to this plan is the Carbon2Nature venture owned by Iberdrola, which aims to plant 20 million trees by 2030, predominantly in Latin American countries. The company anticipates that this initiative will have a carbon capture and storage capacity of over 6 million tonne $CO_2$ over the next 30 years (Iberdrola, 2022, 2023e). Due to several environmental constraints and the non-permanent nature of these removals, this does not represent a credible equivalent to emissions reduction (see Section 9.5 in this report and Section 4.1.3 in the Methodology document).

Exhibit 7 to Decl. of Angel Hsu
243



Exhibit 7 to Decl. of Angel Hsu
244

## KEPCO

Korea Electric Power Corporation (KEPCO) is a major state-owned electric utility headquartered in South Korea. KEPCO accounts for almost 60% of the country's generation capacity and engages in overseas projects in 14 countries, mainly in the Asia Pacific region. The majority of the company's emissions originate from the upstream fuel chain (54%), which includes the purchase of electricity and the extraction and transport of coal and fossil gas, followed by electricity generation of its group companies (37%). More than 60% of KEPCO's generation capacity is comprised of coal and fossil gas. KEPCO committed to carbon neutrality by 2050, but 1.5°C compatibility for the power sector in advanced economies requires net-zero emissions already by 2035. KEPCO's carbon neutrality target may be further undermined by inconsistent reporting, inadequate renewable targets, a delayed coal phaseout, and the risk of gas lock-in.

**KEPCO's emission disclosure lacks consistency and transparency.** The company's emissions data appears unclear and inconsistent, as KEPCO uses non-standardised units and categories across various emission scopes. In its 2022 sustainability report, KEPCO even presents differing figures for scope 1 and 2 emissions within the same document, both in the main section and the appendix (KEPCO, 2022, pp. 78-79,180-181). This inconsistency extends to the presentation of key milestones in KEPCO's strategic roadmap, making it difficult to assess essential metrics like carbon intensity, phaseout dates for fossil fuels, and generation and capacity mix. For instance, its overseas coal phaseout roadmap features varying years, showing one set of figures for 2022 and 2030, a different set of figures for 2030 and 2035, and another set for 2030 and 2050 (KEPCO, 2022, p. 59). Such inconsistency complicates the understanding of KEPCO's long-term plans and comparing them against established benchmarks.

**KEPCO's interim and long-term goals for carbon neutrality not only fall short of aligning with a 1.5°C-compatible pathway, but the plans to achieve them remain vague, too.** KEPCO pledged to achieve carbon neutrality by 2050, mirroring the South Korean government's goal. However, it does not meet the urgent timelines required for electric utilities in advanced economies, which should aim for net zero by 2035 (IEA, 2023c, p. 79). KEPCO's carbon neutrality target and its short-term target for 2030 exclude scope

3 emissions, which is equivalent to over half of its total emissions in 2021 (KEPCO, 2022, p. 69,181). Also, details are missing from the plans to achieve those targets. The company does not specify the total share of the overseas emissions it would set to achieve, although emissions reductions within the value chain and what share will come from neutralisation. Overall, KEPCO's carbon neutrality roadmap fails to articulate how the implementation of each mitigation measure will translate to tangible emissions reductions.

**KEPCO's coal and fossil gas phaseout appears too slow, posing the risk of stranded assets.** KEPCO commits to phasing out coal and fossil gas by 2050 (Climate Action 100+, 2022; KEPCO, 2022, p. 59,68), 15-20 years later than the required timeline for advanced economies (CAT, 2023b, p. 1; IEA, 2023c, p. 62). KEPCO is still actively involved in constructing new coal-fired plants in Vietnam (2.4 GW) and Indonesia (2 GW) (KEPCO, 2022, p. 58). By 2030, KEPCO plans to expedite coal exit from overseas projects by selling its existing coal-fired power plants (KEPCO, 2022, p. 59), instead of decommissioning them. Another concern arises from KEPCO's conviction of gas as a 'transition fuel' in its coal phaseout plan, as evidenced by the company's decision to increase the capacity of combined cycle gas power plants, both domestically and internationally, to replace its coal fleets (KEPCO, 2022, p. 54,56, 2023, p. 32). For example, the recently commissioned gas-fired power plant in Malaysia is expected to operate for another 21 years, thereby increasing the risk of future stranded assets (KEPCO, 2022, p. 54,60).

**KEPCO's progress in incorporating in renewables into its energy mix is critically inadequate to be aligned with 1.5°C trajectories for the sector.** In 2022, only 3.3% of its electricity production came from renewables, remaining stagnant from 2021 (KEPCO, 2022, p. 11, 2023, p. 11). The company's target of increasing this share to 21.5% by 2030 (KEPCO, 2022, p. 70) significantly lags behind the 1.5°C-compatible global benchmark of 59-89% renewables share by 2030 (Boehm et al., 2023, p. 29; CAT, 2023b, p. 16; IEA, 2023c, p. 197; IRENA, 2023c, pp. 22, 75). KEPCO's strategy also includes co-firing 20% of ammonia in coal-fired power generation and 50% of hydrogen in gas-fired power generation by 2036, with a goal of reaching 100% by 2050 (KEPCO, 2023, p. 13). There is a risk that such plans would extend the use of existing fossil fuel infrastructure, rather than a genuine pivot towards more sustainable alternatives, such as renewables-based electrification.

KEPCO's emissions reductions measure involves commercialising carbon capture, utilisation, and storage (CCUS) technologies, which we consider a false solution for the power sector. If unable to sell its overseas coal assets by 2030, KEPCO plans to resort to CCUS as a backup plan (KEPCO, 2022, p. 59,69,76). This reliance on CCUS in electricity generation faces severe risks given these technologies' unproven efficacy and potential environmental impacts, not to mention that it comes at a high cost compared to switching to renewables (Grant et al., 2021). KEPCO's earnings have been on a downward trend, with a substantial operating loss in the fiscal year 2022 due to high and volatile energy costs, as well as capped electricity rates in South Korea (Ng and Ilango, 2022; Ng, 2023). This financial trend highlights the potential risk of relying on CCUS, which practically means continuing its dependence on fossil fuels.

Exhibit 7 to Decl. of Angel Hsu
245

# 7 Fashion

## 7.1 Sector highlights

- Emissions in the fashion sector stem mostly from sourcing raw materials and from material production. Many of these emissions can be addressed by sourcing renewable electricity and electrifying processes such as textile preparation and colouration. For fashion retailers, most emissions are located in the supply chain.

- We see an improvement in fashion retailers' emissions disclosure and target setting practices, both for medium- and long-term targets.

- The extent to which companies' seemingly ambitious targets are credible will largely depend on the integrity of their strategies for renewable energy in the supply chain. Despite limited details on supply chain measures, we see signs of high reliance on bioenergy and renewable energy certificates to claim emission reductions. This could significantly undermine the real ambition of these companies' targets.

- It remains unclear to what extent companies' measures will contribute to and be sufficient for achieving their targets. All the companies assessed mostly demonstrate awareness of what the key decarbonisation measures for the sector are. However, they present their planned measures in quite ambiguous terms.

- We have not seen any clear references to more fundamental business-model transitions, although most companies reflect on the need for the fashion sector to become more sustainable in terms of resource use and GHG emissions. This is especially important as a shift towards a sustainable fashion industry will necessarily mean producing and selling fewer products, which can be at odds with the fast fashion business-model.

Table 19 provides a summary overview of our transparency and integrity ratings for Adidas, Fast Retailing, H&M Group, Inditex and Nike.

**Table 19:** Overview of integrity ratings for fashion companies

| COMPANY | HEADLINE PLEDGE | INTEGRITY | Tracking & disclosure of emissions | Target setting | Emission reduction measures | Climate contributions & offsetting | PAGE |
|---|---|---|---|---|---|---|---|
| H&M Group | Net zero emissions by 2040 | | | | | | p. 108 |
| Inditex | Net zero emissions by 2040 | | | | | | p. 110 |
| Nike | Net zero emissions by 2050 | | | | | | p. 112 |
| Adidas | Climate neutral by 2050 | | | | | | p. 104 |
| Fast Retailing | Carbon neutral by 2050 | | | | | | p. 106 |

100

Exhibit 7 to Decl. of Angel Hsu
246

## 7.2 Sectoral transition framework

The global fashion industry currently emits 0.9–1.2 GtCO₂e per year, or around 5% of global emissions (Nature Climate Change Editorial, 2018; Sadowski, 2023). The sector needs to significantly reduce emissions to align with the Paris agreement 1.5°C temperature goal. According to recent literature, apparel producers will need to reduce its scope 1 emissions by 39–44%, scope 2 by 49–67% and scope 3 by 37% below 2019 levels by 2030 (Dietz, Hastreiter, et al., 2021; Teske, 2022, p. 327). Additionally, the 2023 One Earth Climate Model requires the leather and textile manufacturing industry to reduce the carbon intensity of its electricity and heat supply to 57 gCO₂/kWh by 2030 (Teske et al., 2023 data provided in Dataset 2). For fashion companies such as those covered in our analysis, these benchmarks apply to their supply chain. Finally, SBTi requires fashion companies to reduce their scope 1, 2 and 3 emissions by 4.2% a year to be 1.5°C compatible (SBTi, 2018, p. 20).

Emissions from major fashion brands are located mostly in the supply chain. For apparel companies, scope 1 emissions (with science-based targets) only account for 1% of their total emissions, while scope 3 represents around 96% (Ley et al., 2021). The supply chain of fashion companies can be broken down into four distinct categories (Sadowski et al., 2021; Sadowski, 2023):

* **Tier 4 – raw material extraction:** this includes the cultivation of crops used for fabric such as cotton, as well as the extraction of materials such as nylon and polyester from fossil fuels. It is responsible for around 23% of scope 3 emissions.

* **Tier 3 – raw material processing:** this includes processing raw materials into yarn and other intermediate products. It is responsible for around 15% of scope 3 emissions.

* **Tier 2 – material production:** this includes textile formation (knitting or weaving yarn into fabric), preparation, such as scouring, coloration and additional coloration and finishing, such as heat setting. It is responsible for around 53% of scope 3 emissions.

* **Tier 1 – finished product assembly:** this includes the final assembly of products, including cutting and sewing of fabric into garments. It is responsible for around 8% of scope 3 emissions.

By far, the largest source of emissions in this industry is the use of fossil fuels to produce electricity and heat for manufacturing. Especially significant is the use of coal to generate heat for tier 2 processes. Acknowledging this, many companies set out plans to replace coal for biomass in their tier 2 suppliers, claiming that biomass burning would be a zero or close to zero emissions fuel source. This position has been seriously challenged by recent research, which has identified a series of direct and indirect impacts of the widespread use of biomass, such as incentives for deforestation, which casts serious doubt over the potential benefits of switching to biomass (Searchinger and Heimlich, 2015; Sterman et al., 2018; Flynn and Ball, 2023; Trend Asia, 2023). The industry should instead push towards full electrification of the manufacturing process, as well as the large-scale development of renewable electricity to meaningfully and sustainably reduce their scope 3 emissions.

To sustainably meet demand in future years, these companies will likely need to go beyond increasing energy efficiency and the use of renewables, to also shift their business model towards more quality and less quantity. This shift needs to involve a focus on quality and durability of products, policies to resale, repair and recycle them, and fundamentally, a shift towards less production. According to some estimates, around 73% of the growth in apparel manufacturing between 1980 and 2014 can be attributed to the rise of cheap, fossil fuel-based fabrics such as nylon and polyester. These emissions cannot be eliminated, and there are no readily available, carbon-free alternatives (Stand.earth, 2023). Additionally, many sources of the industry's emissions that are technically possible to abate, are in practice challenging to reduce at the needed pace, and in a sustainable and fair way to workers in manufacturing hubs. Growing demand, and intense competition drive prices down and make it all the more challenging. The fundamental problem with the fast fashion business model is already well understood and acknowledged by major fashion companies, but there is still a long way to go to achieve meaningful change (Drew and Yehounme, 2017; Stand.earth, 2023).

101

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu
247

## Key actions and measures for the fashion sector

### Measures to reduce emissions from raw materials (upstream scope 3)

These emissions are currently some of the hardest to eliminate from the fashion industry value chain, as there are no GHG-free alternatives. However, these emissions can be reduced by increasing the use of current lower-GHG alternatives, and the development and adoption of innovative alternatives.

**Commit to lower-GHG material sourcing targets, including recycled fibres and preferred cotton while specifying the GHG-performance of both traditional and alternative products sourced**  Critical transitional measure

Emissions from raw materials vary significantly across materials. Commonly used synthetic materials such as polyester and nylon are made from crude oil and have a substantially higher GHG footprint than natural materials. For example, a 2018 study estimated that the emissions associated with producing a polyester t-shirt are 5.5 kg $CO_2$e, compared to 2.1 kg $CO_2$e for the production of a cotton t-shirt (Nature Climate Change Editorial, 2018). However, although its GHG footprint is lower, the use of cotton as a raw material also brings its complications, for example land and water use, pesticide pollution, and competition with food crops for arable land.

Current alternatives include mechanically-recycled polyester, mechanically-recycled nylon, organic/preferred cotton, mechanically-recycled cotton and viscose sourced from sustainable fibres (Ley et al., 2021; Sadowski et al., 2021; Sadowski, 2023). However, challenges associated with these processes such as energy requirements and costs also need to be addressed by companies. One especially important aspect is that recycled materials should stem from products of the industry (i.e. apparel and related products), which for polyester and nylon might be significantly more challenging to process than alternatives such as plastic bottles.

**Invest in innovative alternatives such as biosynthetic fibres and cotton alternatives to accelerate their development**  Enabling measure

Innovative alternatives include biosynthetic fibres, including Bio-PET (Polyethylene terephthalate), Bio-PA (Polyamide e.g. nylon) and polyhydroxyalkanoates (PHA). They also include the use of other natural fibres alternative to cotton, such as hemp, which can be "cottonised" to resemble the properties of cotton (Ley et al., 2021; Sadowski et al., 2021; Sadowski, 2023).

**Support suppliers to implement sustainable farming practices to increase the GHG-efficiency of production**  Enabling measure

Beyond committing to source higher shares of sustainable materials, companies can also help their tier 4 suppliers, which can sometimes be smaller businesses, to implement best farming practices to reduce the GHG-intensity of their products.

102

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu
248

SER 528

## Measures to reduce emissions from manufacturing (upstream scope 3)

Manufacturing emissions in the fashion industry stem mostly from power and heat. There are three main ways to reduce them: RE procurement and generation, increasing energy efficiency, and electrification.

### Commit to 100% renewable electricity in the supply chain

**Critical transitional measure**

Renewable electricity procurement is key to decarbonise the fashion industry manufacturing process. Emissions from tier 1 and 3 of the manufacturing process stem mostly from electricity, and could be greatly reduced by switching to 100% renewables using high-quality procurement constructs (Ley et al., 2021; Sadowski et al., 2023).

### Invest in energy efficiency measures, particularly to reduce their need for thermal energy in tier 2 processes (for example through dry processing)

**Critical transitional measure**

Efficiency measures are low-hanging fruit to reduce emissions because they have high returns on investment through energy savings. However, they also carry high upfront costs. Energy efficiency measures with high impact mostly focus on conserving and recovering heat.

One key measure to reduce emissions from apparel manufacturing is switching to dry processing (tier 2), which can decrease energy use by around 80%. Tier 2 process emissions, which represent over half of the industry's emissions, come from the use of coal to generate heat for textile processing, which is done in large tanks of hot water.

### Commit to phase-out coal from value chain, replacing it with renewable heat (such as CSP), or through the electrification of key tier 2 processes (such as dyeing and finishing)

**Critical transitional measure**

Electrification of heat generation processes will also be necessary to ensure that the manufacturing process can achieve zero GHG emissions. Currently some major fashion brands are starting to make a move away from coal towards biomass for heat production, but this does not necessarily reduce emissions compared to fossil fuels, and it can have other adverse effects.

## Measures to shift towards a more sustainable business model

### Set reduced overproduction targets and policies to stop discarding new products

**Critical transitional measure**

A low-hanging fruit to reduce the environmental impact of the industry is to reduce the number of products being discarded throughout the value chain, but especially at the retail level. For example, according to some estimates, reducing overproduction (that is the waste generated due to unsold stock) by 10% through more efficient supply chains and more accurate demand forecast tools could reduce industry-wide emissions by 9% by 2030 (Berg et al., 2020).

### Set resale, repair and recycle programs with meaningful and clear targets

**Enabling measure**

Most large fashion brands now have at least some type of resale, repair or recycle programmes. These can be useful to support a shift to more sustainable business model without overproduction, but without scale, they will likely not have a meaningful impact. Companies need to clearly communicate the scope and scale of their programmes, and transparently show how they can help reduce consumption by extending product life. It is especially important for companies to also address the limitations of current recycling practices, especially for used apparel and related products.

103

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu
249



Exhibit 7 to Decl. of Angel Hsu 250

The assessment is based on the 2022 sustainability report; the information in the 2023 sustainability report published in March 2024 does not lead to any changes in our evaluation.

## Adidas

Adidas AG, headquartered in Germany, is one of the world's largest sportswear brands. About 90% of its emissions stem from the production and processing of raw materials and assembly of clothes and shoes (all scope 3, category 1). Adidas implements several promising measures for the decarbonisation of its supply chain, including to phase out coal and increase the use of renewables. However, the company's 2030 target is insufficient to be aligned with 1.5°C-compatible benchmarks for the sector, and its climate neutrality target for 2050 is not yet substantiated with a clear commitment to reduce emissions across the value chain.

Adidas's 2025 climate neutrality target for its own operations has the potential to mislead consumers, while the 2050 climate neutrality target for all emissions is not substantiated with an emission reduction target. Adidas aims to achieve climate neutrality in its own operations by 2025. Within this target, the company committed to reduce scope 1 and 2 emissions by 90% below a 2017 baseline. Since operational emissions account for just 1% of Adidas's emissions along the value chain, this climate neutrality target is highly likely to be misleading to consumers. Adidas also committed to climate neutrality across the value chain by 2050 but has not provided further information on this target (Adidas, 2024). It remains unclear what share of its value chain emissions Adidas plans to reduce towards achieving its climate neutrality claim and what share will be offset with reductions or removals outside the company's value chain.

Adidas's 2030 target may be partially aligned with 1.5°C-compatible benchmarks, but Adidas has not yet made progress towards the target since 2017, and its significance is not entirely clear due to highly variable emissions reported in recent years. The significance of Adidas's target to reduce emissions by 30% by 2030 is not immediately clear, since Adidas does not publish its emissions for the target base year in 2017 in its public documentation. The 2017 baseline emissions are only available in Adidas's non-public CDP response (Adidas, 2023a, pp. 69–74). The meaning of the target is further complicated by the fact that Adidas reports major fluctuations in emissions in the period between 2017 and 2023: 2019 emissions are nearly double the reported emissions in 2017, while values for 2021 to 2023 are closer to the 2017 values. We estimate that the target

translates to approximately a reduction of 32–44% of the company's full value chain emissions, compared to average emissions in the time frame between 2017 and 2023. This would indicate a significant reduction, and the upper end of that estimate would be aligned with sector-specific emission reduction benchmarks for the textile and leather industry, which indicate that emissions should decrease by at least 41% between 2019 and 2030 to be aligned with a 1.5°C-compatible trajectory (Teske, 2022, pp. 322, 327). However, the feasibility of achieving the target is called into question by the fact that until 2023, Adidas had not achieved any absolute decrease in emissions below 2017 levels.

Adidas's Decarbonization Manifesto' combines a range of promising approaches, incentives, and requirements for its suppliers to move away from using coal in the production process. Adidas requires its tier 1 and tier 2 suppliers to phase-out coal boilers by 2025 but allows them to switch to natural gas or biomass (Adidas, 2024, p. 87). Neither is a credible decarbonisation option: switching to natural gas-fired boilers may lead to locking in fossil fuels, while biomass production and combustion leads to GHG emissions and a range of other sustainability problems, including biodiversity loss (see section 3.3).

Adidas's plan to provide support for suppliers to access PPAs to procure renewable electricity could represent another promising signal (Adidas, 2024, p. 87). However, we could not identify further details on what this support entails and what outcomes it has achieved. At the same time, Adidas also encourages suppliers to procure standalone RECs, which are far less likely to result in real emission reductions than PPAs. High-quality procurement constructs can be especially difficult to access in some countries, so it is encouraging to see evidence of advocacy efforts with national governments and grid operators in Indonesia, Cambodia and Vietnam (Adidas, 2023b, p. 84). Adidas also reports that it will consider suppliers' performance on renewable electricity procurement in their supplier assessment process.

Adidas's plans for "sustainable articles" are unsubstantiated and may not result in significant GHG emission reductions. The company set out the ambition that 90% of its articles will be sustainable by 2025 (Adidas, 2024, p. 90), using an ambiguous

definition. Adidas considers articles to be sustainable "when they show environmental benefits versus conventional articles due to the materials used, meaning that they are – to a significant degree – made with environmentally preferred materials". While Adidas provides examples of such materials, these were insufficient to appreciate their mitigation potential. There are also concerns about the effectiveness of some of the standards that Adidas uses to select "environmentally preferred materials". For instance, while the company claims that 99% of its leather volume is audited in accordance with the Leather Working Group protocol (Adidas, 2024, p. 91), the production of its sneakers is linked to animal husbandry in and deforestation of the Amazon (Stand.earth, 2021; Heugten, 2024). Adidas does not follow the HLEG's key recommendation to a deforestation-free supply chain by 2025 (UN HLEG, 2022, p. 26). The committed to a "deforestation and conversion free" leather supply chain by 2030 and started to map its supply chain beyond tier 3 suppliers, but does not yet present a concrete set of measures to end deforestation linked to leather production (Adidas, 2024, pp. 92, 94). Adidas plans to set "deforestation and conversion free" targets for natural rubber and timber-derived materials in the future.

105

Exhibit 7 to Decl. of Angel Hsu
251



Exhibit 7 to Decl. of Angel Hsu
252

# Fast Retailing

*The assessment is based on the 2022 sustainability report; the information in the 2023 sustainability report published in March 2024 does not lead to any changes in our evaluation.*

**Fast Retailing Co., Ltd. (Fast Retailing) is a Japanese fashion retail multinational company that owns the Uniqlo brand, among others. Most of its emissions stem from materials sourcing and manufacturing of the products. While it would normally tackle these emissions, the company facilitates suppliers to develop emission reduction plans, but it discloses few details on the goals and ambitions of these plans. The company's 2030 emission reduction targets fall short of what is needed to limit global warming to 1.5°C.**

**Key developments over the past year:** We could identify only minor changes to Fast Retailing's sustainability strategy from our previous analysis of the case study in the 2022 *Corporate Climate Responsibility Monitor* (Day et al., 2022). Accordingly, only minor modifications were made to this case study.

**Fast Retailing's 2030 targets collectively amount to a reduction of 19% of the company's emissions footprint compared to 2019, which is not aligned with global efforts to limit global warming to 1.5°C.** Fast Retailing has two targets to be achieved by 2030, these are validated to be 1.5°C-compatible by the SBTi. The first one is 20% absolute reduction of supply-chain emissions, specifically from raw materials, fabric, and garment production for the Uniqlo and GU brands, which represent ~95% of the company's revenue (Fast Retailing, 2023b, p. 17). The second one is 90% absolute reduction of operational emissions (scopes 1 and 2, under direct company control) (Fast Retailing, 2021, p. 29). These two targets cover 74% of the company's emissions footprint and exclude emission sources like the end-of-life treatment of sold products. They equate to an emissions reduction commitment of just 15% across the full value chain, compared to 2019 levels, falling short of the IPCC's estimate of minimum 43% global GHG emission reductions by 2030 to keep warming below 1.5°C (IPCC, 2022). Furthermore, a sectoral 1.5°C-aligned benchmark indicates that fashion retailers should reduce upstream scope 3 emissions by a minimum of 41% between 2019 and 2030 (Teske, 2022), but Fast Retailing only commits to 16% upstream scope 3 emission reductions by that year.

**Fast Retailing has expressed the aim to reach net-zero emissions by 2050, but it has not disclosed a concrete plan for emission reductions between 2030 and 2050.** Fast Retailing's

climate strategy focuses on 2030 emission reduction targets. Although it expresses the intention to 'strengthen our efforts to achieve net zero GHG emissions by 2050' (Fast Retailing, 2023b, p. 102), it does not outline how the effect will be reached in the future. The company does not disclose whether it will reach the net-zero target through further emission reductions or through emissions offsetting in the 2030–2050 period.

**Fast Retailing's emission reduction measures focus on emission reduction plans for supplying factories, but details on how the company engages with suppliers—the company's main source of emissions—remain limited.** To address emissions from corporate sites, Fast Retailing aims to improve energy efficiency by installing LED lighting, automatic temperature control, and more efficient air conditioning (Fast Retailing, 2023b, p. 56, 2023a). However, these measures only target 5% of the company's emissions footprint (scope 2) (Fast Retailing, 2023a). Fast Retailing's most significant source of emissions (76% of its emissions footprint) is the manufacturing of garments in third-party factories, including raw material production, fabric production, and sewing. To address these emissions, the company reports to be recycling more materials and piloting clothing repair stations (Unido, 2022; Fast Retailing, 2023a). While repair stations could potentially extend products' lifetimes, they would have a significant impact in emission reductions only if they would lead to a shift in consumer behaviour and a reduction in the volume of new garments purchased and produced. We did not identify any clear indication that Fast Retailing is preparing to shift away from a fast fashion business model.

**Fast Retailing also claims to cooperate with suppliers by providing them with supplier-tailored emission reduction plans** (Fast Retailing, 2023b, p. 56, 2023a). These include energy-saving and renewable-energy measures, like eliminating coal energy from manufacturing processes, and Fast Retailing pledges support for their implementation (Fast Retailing, 2023b, p. 56). However, the company does not provide specifics on the coverage and depth of the emission reduction plans, what its pledged support entails, or how it aims to enforce them. While this level of supplier interaction may represent good practice, the lack of details does not facilitate a complete understanding of whether Fast Retailing's strategy will be sufficiently effective at reducing supply-chain emissions.

**Fast Retailing aims to use 100% renewable electricity by 2030, but it does not commit to procurement options that would likely result in additional renewable electricity capacity.** In 2022, Fast Retailing claims to have sourced 42% of its electricity consumption from renewable sources (Fast Retailing, 2023a, p. 3). In 2021, the company recently installed solar PV capacity at 13 stores in Japan, and in 2022 it expanded the initiative to its North America and Southeast Asia stores, specifying that electricity will be procured through PPAs. However, the company's electricity procurement in 2022 came almost exclusively from standalone RECs. To ensure that its 2030 renewable electricity target results in truly additional renewable electricity capacity and the abatement of the company's energy-related emissions, Fast Retailing should move towards high-quality constructs and 24/7 matching.

Exhibit 7 to Decl. of Angel Hsu
253

**SER 533**

## 7.5 H&M Group

| | SECTOR | REVENUE | EMISSIONS | PLEDGE | TRANSPARENCY | INTEGRITY |
|---|---|---|---|---|---|---|
| | Fashion | USD 22.1 bn (2022) | 6.1 MtCO₂e (2022) | Net zero by 2040 | Reasonable | Moderate |

### 1 TRACKING AND DISCLOSURE OF EMISSIONS

**TRANSPARENCY & INTEGRITY**

| | | |
|---|---|---|
| Tracking and disclosure | 6.1 MtCO₂e in 2022 | |
| Major emission sources | Scope 3 accounts for 94% of H&M's emissions. Purchased goods (67%) are the most important source. Use of sold products is shown separately and not counted towards the total. | |
| Disclosure | GHG reported for all years and most categories. Activity indicators provided for all scopes. Lowest S2 value used for total emissions. | |
| Subsidiary coverage | ● Subsidiaries are covered in the emissions reporting and disclosure. | |

MtCO₂e

| | |
|---|---|
| Downstream Scope 3 | 1.7 |
| Upstream Scope 3 | 5.5 |
| Scope 2 | 0.5 |
| Scope 1 | 0 |

### 2 SETTING EMISSION REDUCTION TARGETS

| | | |
|---|---|---|
| Headline target or pledge | **Net zero by 2040** | |
| **Short-term targets** (up to 2030) | Reduce scope 1, 2, and 3 by 56% below 2019 levels | S1 S2 S1↑ S3↓ |
| Scope coverage | 56% by 2030 | Target includes all relevant information. Target in line with existing benchmarks. |
| Own emission reductions (compared to full value chain in 2019) | | |
| **Medium-term targets** (2031 – 2040) | Reducing scope 1, 2 and 3 emissions by 90% below 2018 | S1 S2 S1↑ S3↓ |
| Scope coverage | 90% by 2040 | Target includes all relevant information. Target in line with existing benchmarks. |
| Own emission reductions (compared to full value chain in 2019) | | |
| **Longer-term targets** (2041 – onward) | No target identified. | S1 S2 S1↑ S3↓ |
| Scope coverage | N/A | No target identified. |
| Own emission reductions (compared to full value chain in 2019) | | |

### 3 REDUCING OWN EMISSIONS

**TRANSPARENCY** | **INTEGRITY**

| | | | |
|---|---|---|---|
| Operational emissions (scope 1) | 0.4% of 2022 emissions | Not assessed. | N/A N/A |
| Renewable electricity (scope 2) | 7.6% of 2022 emissions | H&M signals that it plans to use PPAs to implement its 2030 target for 100% renewable electricity, but does not commit to hourly matching. | ◐ ◐ |
| Upstream emissions (scope 3) | 88.9% of 2022 emissions | Measures cover all key areas but lack sufficient information to estimate impact, especially regarding the use of biomass and reducing (over)production. | ◐ ◐ |
| Downstream emissions (scope 3) | 3.1% of 2022 emissions | Not assessed. | N/A N/A |

### 4 RESPONSIBILITY FOR UNABATED AND RESIDUAL EMISSIONS

**TRANSPARENCY** | **INTEGRITY**

| | | | |
|---|---|---|---|
| Climate contributions today (Beyond value-chain mitigation) | Unclear whether H&M plans to make climate contributions, for example through its LEAF membership. | ◑ | ? |
| Misleading offsetting claims today | No offsetting claim identified. | N/A | N/A |
| Approach to residual emissions | Plan to neutralise residual emissions equal to 10% of 2019 emissions. Agreements have been signed for DACCS, but LEAF coalition membership may also imply a partial reliance on biological CDR. | ◐ | ◐ |

5-point rating scale: ● High ● Reasonable ● Moderate ● Poor ● Very poor  — **Transparency** refers to the disclosure of information. **Integrity** refers to the quality and credibility of the approach.

**Sources:** H&M Group (2023a, 2023b, 2023c, 2023d)

Corporate Climate Responsibility Monitor 2024

108

Exhibit 7 to Decl. of Angel Hsu
254

## H&M Group

The assessment is based on the 2022 sustainability report; the information in the 2023 sustainability report published in March 2024 does not lead to any changes in our evaluation.

**H&M Group is a Sweden-based fast fashion retailer that comprises of eight brands, including H&M, COS and Monki. The majority of H&M Group's emissions stem from fabric production, garment manufacturing and raw materials (-92%). Although H&M Group has ambitious emission reduction targets for 2030 and 2040, those may be undermined by the lack of a clear plan for implementing measures to achieve those targets.**

**Key developments over the past year:** We could identify only minor changes to H&M Group's sustainability strategy since our previous analysis of the case study in the 2022 *Corporate Climate Responsibility Monitor* (Day et al., 2022). Accordingly, only minor modifications were made to this case study.

**H&M Group plans to reduce emissions across its value chain by 56% by 2030 and by 90% by 2040 below 2019. These may be ambitious targets that signal the need for immediate climate action, as long as they are not undermined by reliance on standalone RECs and biomass to claim decarbonisation of the supply chain.** Their 2040 net-zero target is accompanied by the commitment to reduce emissions across the value chain by 90%. H&M group plans to offset the remaining 10% of emissions with "permanent" carbon dioxide removals and has recently signed an agreement for direct air capture (DAC) (H&M Group, 2023d, p. 31). This ambition level goes beyond the global benchmark for a 1.5-compatible emission reduction trajectory. However, the true ambition level of H&M Group's targets depends on the measures used to achieve them. Based on their latest CDP disclosure, we see signals that the company could be planning to rely heavily on standalone RECs and biomass to claim the decarbonisation of its supply chain, which could severely compromise these targets (H&M Group, 2023b).

**H&M Group committed to a target of 100% renewable electricity in the supply chain by 2030, but the significance of the target may be undermined by the lack of commitment to electrify key manufacturing processes.** The company states that by 2030, the electricity sourced in the supply chain will be 100% renewable (H&M Group, 2023d, p. 26). Given that most of the company's suppliers are based in Southeast Asia, where policies are often not conducive to renewable energy procurement, this target may be ambitious. However, much

of the energy consumption in the clothing manufacturing process typically derives from other energy carriers, and we identify no commitment to shift to non-combustible sources of renewable power (e.g., wind, solar, hydro, and geothermal), but only a mention of a "push to phase out coal and electrify steam" (H&M Group, 2023a). As such, the supply chain renewable electricity target may be somewhat misleading due to its limited significance. We could also not clearly identify how H&M Group plans to achieve this target. The company lists several initiatives, including an *Energy Expert Team* that provides suppliers with data, information and training on renewable energy and energy efficiency, and the initiation of a *Sustainable Supplier Facility* that allows brands and suppliers to co-invest in decarbonisation technologies (H&M Group, 2023c). These plans may represent good practice examples for supplier engagement, but further details would be necessary to understand their real impact.

**H&M Group covers most key emission reduction measures; however, more detailed information is needed to understand their likely reduction impact.** Decarbonising the fashion sector requires a diverse set of reduction measures, including reducing overproduction, phasing out coal, switching to renewable energy, maximising material and energy efficiency, and ramping up the development of innovative materials (Berg et al., 2020; Ley et al., 2021; Sadowski et al., 2021). While H&M Group refers to most of these measures in its public communications, it stops short of disclosing to what extent these will reduce emissions across the value chain (H&M Group, 2023d). For example, measures to support farmers (tier 4, as well as tier 1 and 2 suppliers cover necessary areas but lack detail about the GHG impact of their implementation. Measures and targets related to sourcing more sustainable and recycled materials (so-called "preferred materials") provide enough detail to understand the current situation and progress towards targets but lack information regarding the GHG performance of "preferred materials" and recycled materials, to understand the full impact of the switch. H&M Group refers to external sustainability standards to define what counts under their "preferred materials", such as the Materials Sustainability Index, but fail to disclose GHG performance data of their current and future materials. The company also highlights various innovative materials they are investing in but does not outline to what scale these could be used in the next decade and what

their emission reduction potential is. Finally, while the company claims to be in the process of shifting towards a circular fashion model, it does not refer to the impact of such a shift on its production volumes, resource intensity and GHG footprint.

**H&M Group commits to 100% renewable energy in its own operations, but this target will only result in real emission reduction if the renewable energy is sourced from high-quality constructs.** H&M Group claims that in 2022, 92% of its electricity consumption came from renewable sources (H&M Group, 2023d, p. 31). This is mostly done through the procurement of standalone RECs, which in some cases are purchased in one country and used in another. For example, H&M Group uses Norwegian RECs to claim their electricity consumption in Bulgaria and Croatia came from renewable sources. Standalone RECs do not generally contribute to the installation of additional renewable energy capacity and are not a suitable approach for companies to reduce their electricity-related emissions. In 2024, H&M group complemented their existing renewables target, by adding that by 2030, at least half of the renewable energy procured for their own operations should come from PPAs with new renewable electricity generation (H&M Group 2024, p21). H&M Group could further improve its future renewable sourcing strategy by making clearer commitments to using only high-quality constructs and moving to a 24/7 matching approach.

Exhibit 7 to Decl. of Angel Hsu
255

SER 535

# 7.6 Inditex

**TRACKING AND DISCLOSURE OF EMISSIONS** | TRANSPARENCY & INTEGRITY

| | SECTOR | REVENUE | EMISSIONS | PLEDGE | TRANSPARENCY | INTEGRITY |
|---|---|---|---|---|---|---|
| | Fashion | USD 34.2 bn (2022) | 14.2 MtCO₂e (2022) | Net zero by 2040 | Reasonable | Moderate |

## ① TRACKING AND DISCLOSURE OF EMISSIONS

**Tracking and disclosure:** 14.2 MtCO₂e in 2022

**Major emission sources:** Scope 3 accounts for 97% of Inditex's emissions. Purchased goods (77%) are the most important source. Use of sold products is shown separately and not counted towards the total.

**Disclosure:** GHG reported for all years and most categories. Activity indicators provided for all scopes. Lowest S2 value used for total emissions.

**Subsidiary coverage:** ● Subsidiaries are covered in the emissions reporting and disclosure.

MtCO₂e

- Downstream Scope 3: 3.8
- Upstream Scope 3: 13.4
- Scope 2: 0.5
- Scope 1: 0

## ② SETTING EMISSION REDUCTION TARGETS

**Headline target or pledge:** **Net zero by 2040**

**Short-term targets** (up to 2030)
Reducing scope 1 and 2 emissions by 90% and scope 3 by 50% below 2018 levels by 2030

Scope coverage: S1 S2 S3↑ S3↓

Own emission reductions (compared to full value chain in 2019): **46%** (by 2030)
Target in line with existing benchmarks, but no interim target identified.

**Medium-term targets** (2031–2040)
Reducing scope 1, 2 and 3 emissions by 90% below 2018

Scope coverage: S1 S2 S3↑ S3↓

Own emission reductions (compared to full value chain in 2019): **91%** (by 2040)
Target in line with existing benchmarks, but no interim target identified.

**Longer-term targets** (2041 onward) — No target identified.

Scope coverage: S1 S2 S3↑ S3↓ N/A

Own emission reductions (compared to full value chain in 2019): N/A
No target identified.

## ③ REDUCING OWN EMISSIONS

**Operational emissions** (scope 1): 0.1% of 2022 emissions — Not assessed.

**Renewable electricity** (scope 2): 3.2% of 2022 emissions — Inditex is increasing its use of PPAs to reach 60% of its electricity consumption by 2030, improving its previous reliance on standalone RECs for its 100% renewable claim.

**Upstream emissions** (scope 3): 94.3% of 2022 emissions — Measures cover all key areas but lack sufficient information to clarify impact, especially regarding the use of biomass and reducing (over)production.

**Downstream emissions** (scope 3): 2.5% of 2022 emissions — Not assessed.

| | TRANSPARENCY | INTEGRITY |
|---|---|---|
| Operational emissions | N/A | N/A |
| Renewable electricity | (partial) | (partial) |
| Upstream emissions | (partial) | (partial) |
| Downstream emissions | N/A | N/A |

## ④ RESPONSIBILITY FOR UNABATED AND RESIDUAL EMISSIONS

**Climate contributions today** (Beyond-value-chain-mitigation): No climate contributions identified.

**Misleading offsetting claims today:** No offsetting claim identified.

**Approach to residual emissions:** Plans to neutralise residual emissions equal to 11% of 2019 emissions to achieve 2040 net zero target. No further details provided.

| | TRANSPARENCY | INTEGRITY |
|---|---|---|
| Climate contributions today | (dotted) | (dotted) |
| Misleading offsetting claims today | N/A | N/A |
| Approach to residual emissions | (partial) | (partial) |

5-point rating scale: ● High ● Reasonable ● Moderate ● Poor ● Very poor — **Transparency** refers to the disclosure of information. **Integrity** refers to the quality and credibility of the approach.

**Sources:** Inditex (2023a, 2023b)

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu
256

## Inditex

**Industia de Diseno Textil S.A. (Inditex) is a Spanish-based multinational fashion retailer, better known for its flagship brand Zara. It is the biggest fast fashion group in the world by revenue, with USD 34.2 billion in 2022.** A brief description of the system from its supply chain, especially those related to the sourcing and processing of raw materials. **Inditex's pledge for net-zero emissions by 2040 implies an ambitious 89% emission reduction below 2019 levels, which is aligned with 1.5°C benchmarks for the sector. However, the sufficiency of Inditex's emission reduction measures to meet the company's ambitious targets remains unclear.**

**Inditex's net zero pledge is now substantiated by a deep emission reduction target across the value chain.** Since our last analysis in February 2023, Inditex has submitted its climate commitments (Inditex, 2023b, p.7) which now include a commitment to achieve a 90% emission reduction across all scopes by 2040 below 2019 levels. We have estimated that this target implies an 89% reduction below 2019 levels by 2040, which is aligned with sector-specific benchmarks to limit global warming to 1.5°C. Inditex's new target represents a significant improvement compared to our previous assessment, but its significance for reducing global emissions will hinge on how emissions in the value chain are reduced.

**The company's interim 2030 targets amount to a 46% emissions reduction below 2019 levels, which is also likely aligned with global efforts to limit global warming to 1.5°C.** Inditex has also updated its interim emission reduction targets as the ones it specified that its scope 1 and 2 target of a 90% reduction below 2018 levels only covers market-based scope 2 emissions, excluding location-based scope 2 emissions (for more information on why it is important that companies report scope 2 emissions under both accounting methods, please see Methodology Section 1.1). Inditex has also committed to reducing its scope 3 emissions (excluding capital goods and franchises) by 50% below 2018 levels (Inditex, 2023b, p. 7). This target has been substantially improved since our last assessment in 2022 (up from 20%), and now brings Inditex's overall 2030 climate commitments in line with existing 1.5°C-compatible benchmarks.

**Inditex's current approach to procuring renewable electricity has significant limitations that undermine its 100% renewables claim.** With the information available, we understand that over 99% of Inditex's operational electricity consumption in 2022 was matched

by standalone RECs of unspecified vintages. Self-generation projects in specific locations accounted for a very minor share of supply. Although Inditex specifies that it purchases RECs from the same grid on which demand is placed, the purchase of standalone RECs offers no real prospects for supporting additional renewable energy capacity and grid decarbonisation in many regions, including Europe, which is the major region of Inditex's operations (Mulder and Zomer, 2016; Bronder et al., 2018; Bjørn et al., 2022). Recognising the need to improve its renewable electricity procurement, Inditex aims to source 60% of its electricity demand from own generation and PPAs and VPPAs by 2030 (Inditex, 2024b, p. 10). While this is likely a step forward from their current practice of 99% standalone REC procurement, the integrity of their new target will depend on details such as the location and type of the installations they purchase electricity from, as well the matching method used (see section 3.2).

**Inditex's emission reduction measures cover most key areas but are not detailed enough to understand their potential significance.** Inditex has targets and measures to reduce emissions from raw materials sourcing, including switching to 'preferred materials' such as organic cotton and investing in innovative fibres that can substitute either cotton or fossil fuel-based fibres such as nylon (Inditex, 2023a, 2023b). However, the company does not present a clear estimate of what these measures would mean in terms of emission reduction. Inditex also has clear targets and measures to increase recycling and reusing its products and shows detailed information to help readers understand the order of magnitude of the current implementation of its measures today (Inditex, 2023b, 2023a). Reaching deep decarbonisation will require Inditex to move away from a quantity-focused fast fashion business model to a less resource intensive production model. Inditex's strategy includes a shift towards increasing the durability of its products, as well as increasing circularity of the materials used (Inditex, 2023b, 2023a), but it stops short of estimating what the achievement of its climate targets will mean for its business volume and resource use.

**Inditex plans to phase out coal from its supply chain, but is encouraging suppliers to move to bioenergy, which would have negative climate and environmental consequences.** While Inditex states to encourage electrification of processes, where possible, the company also encourages suppliers to move to bioenergy in some processes. Inditex could be clearer about for which processes and in what situations it pursues bioenergy as a sustainable solution. If Inditex encourages suppliers to use bioenergy for processes

that could be electrified, this can considerably undermine the significance of any renewable electricity targets set for the supply chain. While the IEA considers bioenergy a "renewable" energy source, the sustainable potential for bioenergy is very limited and should only be used for processes that cannot be electrified or otherwise served by modern renewable heat sources such as concentrated solar or geothermal energy (see discussion in section 3.3). A substantial increase in demand for bioenergy will contribute to issues such as biodiversity loss, water pollution, land conflicts and an increase GHG emissions.

**Information on electricity use and renewable electricity targets in the supply chain is very limited, despite the high relevance of this emission source in Inditex's overall value chain.** A substantial share of emissions from manufacturing textiles derive from carbon-intensive electricity use, so switching to renewable electricity in the supply chain is a critical measure in decarbonising the fashion industry (Berg et al., 2020; Ley et al., 2021; Sadowski et al., 2021). While Inditex's GHG emission disclosure in 2022 indicated that over 94% of its full value chain emissions (excluding indirect use-phase emissions) derive from the company's supply chain, we could not identify any quantitative estimates on electricity consumption within the supply chain, nor on renewable electricity generation or procurement instruments. The target for facilities in the supply chain to "increase the purchase and/or generation of electricity coming from 100% renewable sources" (Inditex, 2023a) is potentially misleading. This could be misunderstood as a target for 100% renewable electricity, although it only sets to increase the procurement of renewable energy to an unclear extent and without a target in sight. In its 2023 sustainability report, Inditex includes a target to procure at least 50% of the electricity used for manufacturing processes in its supply chain from renewable sources by 2030, and 100% by 2040 (Inditex, 2024a, p. 201). However, it stops short of determining which procurement mechanisms will be used to achieve its target, which can greatly influence its integrity. Additionally, without a parallel commitment to electrify manufacturing processes, Inditex's supply chain target leaves out a significant share of its emissions, especially those associated with the use of coal boilers.

The assessment is mostly based on the 2022 sustainability report; the information in the 2023 sustainability report published in March 2024 was only considered when it led to changes in our evaluation.

111

Exhibit 7 to Decl. of Angel Hsu
257



Exhibit 7 to Decl. of Angel Hsu
258

The assessment is based on the 2022 sustainability report; the information in the 2023
sustainability report published in March 2024 does not lead to any changes in our evaluation.

# Nike

Nike Inc. is a US-based multinational fashion retailer. It is one of the largest in the world by revenue, reaching USD 51.2 billion in 2022. Like other large fashion retailers, Nike's emissions stem mostly from its supply chain, especially from sourcing materials and manufacturing. Nike's most prominent emission reduction targets imply a ~41% reduction by 2030 below 2019 levels, which is almost aligned with 1.5°C compatible benchmarks for the fashion sector. It remains unclear to what extent Nike's proposed measures will be sufficient to achieve its targets.

Nike's 2030 targets imply a 41% reduction in total value chain emissions below 2019 levels, which is aligned with 1.5°C compatible benchmarks for the fashion sector. The targets are prominently presented and all the relevant emissions data to understand their impact is available in the company's own reports (Nike, 2023, p. 108). Nike's scope 3 target does not include emissions from the use of sold products, which represent a significant share of the company's total emissions. However, this is because these emissions stem mostly from the washing and drying of Nike's products, over which the company has little control. This is an optional rather than a mandatory reporting category of the GHG Protocol Corporate Standard, and its exclusion from the target is reasonable. Including these emissions in the target could be misleading, as major progress towards the targets could otherwise be achieved by the decarbonisation of the power grid and improvements in appliance efficiency, with little to no action from the company. Nike also set out a 2050 net zero target which is not prominently presented, but rather only mentioned once at the end of its 2022 impact report (Nike, 2023, p. 182). The target implies a 91% reduction in total value chain emissions below 2019 levels, which meets 1.5°C-compatible benchmarks for the fashion sector.

Nike's strategy covers most of the key decarbonisation measures identified for the sector but lacks sufficient detail to understand their expected GHG impact. Nike commits to eliminating coal from its value chain by 2030 and it mentions potentially sustainable solutions such as the electrification of steam, but the company stops short of committing to non-combustible sources of renewable power (e.g. wind, solar, hydro, and geothermal), leaving open the option of less sustainable energy solutions such as the use of biomass. The company also reports to engage with suppliers to increase energy efficiency, as well as on-site renewables and purchasing renewable energy. Nike mentions that it only plans to use standalone RECs or other certificates as a bridge measure until higher quality options are available. However, there is no associated target or timeline to phase out the use of renewables in Nike's supply chain, nor a clear commitment to move entirely away from low quality procurement constructs such as standalone RECs. Nike has targets to improve the GHG footprint of its materials, including a target to increase "preferred materials" to 50% of all materials by 2025, with an estimated 0.5 MtCO₂e saving, and to reduce waste from the manufacturing process. Its strategy also covers other related aspects such as repairing and reselling used products but does not include associated targets. Finally, Nike's strategy does not include information on other key aspects such as engagement with tier 4 suppliers (such as a farmers) to incentivise adoption of best practices, plans to invest in innovative materials, or plans to reduce (over)production.

Nike also set out a series of 2025 targets to reduce emissions in its own operations and to address some emission sources in its value chain. Its main targets are to reduce scope 1 and 2 emissions by 70% below 2020 levels by 2025. Nike indicates that these targets will be achieved mostly through purchases of renewable electricity (Nike, 2023, p. 13). Other targets include to maintain emissions from manufacturing and transportation. The existence of short-term targets is a positive signal that the company is committed to immediate action. However, the significance of their targets will depend on the measures pursued to achieve them, especially related to the procurement of renewable electricity.

Nike claims that its operational electricity consumption derives 96% from renewable sources today, and aims for 100% by 2025 (Nike, 2024, p. 12), but the quality of procurement constructs remains unclear. Roughly a quarter of its renewable electricity demand is met by RECs and three quarters by PPAs (Nike, 2023, pp. 192–193). Only a relatively insignificant share of electricity demand today is generated with own capacity. Nike provides limited details on the PPA constructs, many of which appear to be established with generation facilities located in different countries to the location of consumption. Therefore, clarity is still lacking regarding the extent to which the PPAs lead to additional renewable electricity capacity on the grid, and the extent to which Nike's claim of 93% renewable electricity is met by adequate constructs.





Exhibit 7 to Decl. of Angel Hsu
259

SER 539

# 8  Food & agriculture

## 8.1 Sector highlights

- **Emissions from the food and agriculture companies assessed here mainly stem from upstream agricultural emissions (scope 3)**, from livestock (enteric fermentation), crop production, fertiliser production and application, and land-use change (deforestation). A large share of these emissions can be reduced by reducing animal-source food and increasing plant-rich foods in diets, eliminating deforestation and minimising food loss and waste.

- **We see an improvement in the quality of some food and agriculture companies' emissions reporting and disclosure:** some of the companies we assessed cover a larger share of their upstream and downstream value chain emissions in their disclosure. Public-facing sustainability reports now generally include a breakdown of scope 3 emissions, highlighting the emissions-intensive nature of sourcing of ingredients.

- **Four out of the five food and agriculture companies assessed here have targets that are aligned with SBTi's FLAG guidance**, which also means that the companies have separate targets for their energy and industry-related emissions and for their forest, land and agriculture (FLAG) emissions. In general, we see a reasonable level of long-term ambition for non-FLAG emissions among the assessed companies.

- **For the FLAG targets, however, land sequestration CDR plays an undefined role, significantly undermining the real ambition level of some companies' targets.** Current guidance allows companies to aggregate emissions and removals, and allows for land sequestration CDR to count toward emission reduction targets, due to the difficulties of disaggregating emissions and sequestration in some agricultural sectors.

- **The potentially significant role for land sequestration CDR obscures the lack of critical transition measures for emission reductions in the food and agriculture sector.** Only one company presents a plan to increase the share of plant-based protein and products with a lower carbon footprint. The lack of real commitments to transition toward less emissions-intensive business models, such as focusing on plant-based protein to reduce livestock herds, is not immediately clear from companies' FLAG targets due to the significant potential role of CDR towards their emission reduction targets *(see also section 3.4)*.

Table 20 provides a summary overview of our transparency and integrity ratings for Danone, Mars, Nestlé, Tesco and Walmart.

**Table 20: Overview of integrity ratings for agrifood companies**

| COMPANY | HEADLINE PLEDGE | INTEGRITY | Tracking & disclosure of emissions | Target setting | Emission reduction measures | Climate contributions & offsetting | PAGE |
|---|---|---|---|---|---|---|---|
| Danone | Net zero emissions by 2050 | ◑ | ◑ | ◑ | ◕ | ◔ | p. 118 |
| Mars | Net zero emissions by 2050 | ◑ | ◑ | ◕ | ◑ | ◔ | p. 120 |
| Nestlé | Net zero emissions by 2050 | ◔ | ◑ | ◔ | ◔ | ◔ | p. 122 |
| Walmart | Zero emissions in operations by 2040 | ○ | ◔ | ○ | ◑ | ○ | p. 126 |
| Tesco | Net zero emissions by 2050 | ○ | ◔ | ? | ◔ | ○ | p. 124 |

Exhibit 7 to Decl. of Angel Hsu
260

SER 540

## 8.2 Sectoral transition framework

Food system emissions are estimated to account for almost a third of global emissions annually: 16 GtCO₂e per year (Crippa et al., 2021; Boehm et al., 2023). A deep and rapid transition in the food system is crucial: even if fossil fuel emissions were to be eliminated immediately, global food system emissions alone would make it impossible to limit global warming to 1.5°C (Clark et al., 2020). Against this backdrop, the IPCC's Sixth Assessment Report states that a rapid decrease in food system emissions requires extensive and unprecedented actions from both the demand and supply sides.

Companies assessed here include food processors and retailers. Almost 90% such companies' disclosed emissions are attributable to scope 3 emissions. The largest emission sources include livestock, crop cultivation, land use, and land-use change, so measures to reduce these emissions are crucial to limit warming to 1.5°C (T. C. Liu et al., 2023, p. 6). Major emissions generated from the food system include deforestation and land clearing, production and use of fertilizers and other agrichemicals, enteric fermentation during the production of ruminants (cows, sheep, goats), production of rice paddies, livestock manure and combustion of fossil fuels in food production and supply chains (Clark et al., 2020). Relevant emission reduction strategies for the food and agriculture sector include (Roe et al., 2019; Clark et al., 2020):

* Reducing the emissions from agricultural activities (with reducing emissions from enteric fermentation, synthetic fertilizer production, and rice cultivation being the main measures),
* Halting deforestation and land degradation
* Shifting to regional, plant-based diets
* Lowering per capita calorie intake
* Increasing agricultural yields
* Reducing food loss and waste
* Enhancing soil carbon sequestration

If these crucial measures are implemented with an accelerated pace, global food system emissions could reach net zero, or even reach net negative emissions, by 2050. This requires deep emission reductions of annually 3.3%, as well as exploiting the emission removals of the sector through extensive soil carbon sequestration, land restoration, pursuing agroforestry and improved land and forest management (Clark et al., 2020; Costa et al., 2022).

The livestock sector is responsible for 80% of global methane (CH₄) emissions – a very potent greenhouse gas with an immediate warming effect – and for about 12% of anthropogenic warming to date (Reisinger et al., 2021). If current livestock expansion rates remain the same, emissions from land-use change could emit 6 GtCO₂e/year by 2050, representing about 65% of total agricultural emissions (Searchinger et al., 2019, p. 23). By expanding into natural ecosystems, livestock systems are also a major driver of land-use change and deforestation, causing significant CO₂ emissions and biodiversity loss (Searchinger et al., 2019; Boehm et al., 2023, p. 105). Global pathways consistent with limiting warming to 1.5°C with no or limited overshoot call for livestock methane emissions to fall by 38% by 2050 relative to 2010 and continue to decline toward 2100 (Reisinger et al., 2021). Failure to reduce livestock methane emissions would seriously impede the feasibility of limiting warming to 1.5°C. Dietary changes, such as adopting plant-rich diets will be essential to reduce methane emissions.

Various emissions benchmarks are presented in the literature. The lack of a single agreed-upon benchmark stems from the sector's complexity and the need to balance multiple objectives such as emissions reductions, food security, farmer livelihoods, biodiversity, and emissions removals. The targets range from reducing absolute agricultural production emissions by 39% by 2050 compared to 2017 levels (Boehm et al., 2023, p. 126) to an 85% reduction in emissions by 2050 compared to 2020 levels (Roe et al., 2019; Dietz and Jahn, 2024). The wide range of benchmarks is linked to differing assumptions around the role of land sequestration CDR, possible demand-side shifts related to diets, and certain measures' technical potential. In 1.5°C-aligned pathways, global residual emissions mainly persist in the food and agriculture sector, since reducing to zero emissions is not feasible with today's known technologies and methods. Land sequestration CDR plays an important role – on a global scale – to get the sector's emissions to net zero, but what roles emission reductions and removals should play in companies' climate strategies remain unclear.

115

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu
261

## Key actions and measures for the food and agriculture sector

**Measures to reduce methane emissions and emissions from livestock**

### Reduce animal-source food and increase plant-rich foods in diets
**Critical transitional measure**

The most immediate measure to reduce livestock methane emissions due to enteric fermentation is a significant shift in protein consumption in high-consuming regions away from animal-based towards plant-based and alternative proteins with lower environmental impacts. It also frees up land, currently used for livestock systems, to be used for more carbon efficient uses without affecting food security (Reisinger et al., 2021). Literature provides various levels of reduction in meat and dairy consumption: Roe et al. (2021, p. 825) describe a 50% adoption of plant-based diets by 2050, while Boehm et al. (2023, p. 125) illustrate that to be 1.5°C compatible, ruminant meat consumption needs to reduce from 91 kcal/capita/day in 2020 to 60 kcal/capita/day in

2050, reducing overall consumption by 24%. Reducing animal-based food consumption by only 10% would nearly eliminate net cropland expansion (Searchinger et al., 2019, p. 80). While the shift to plant-based protein comes with many benefits, there are also social, economic, and cultural challenges related to it. It must entail a just transition for livestock farmers, as roughly 1.3 billion livelihoods depend on livestock systems (Reisinger et al., 2021). Companies play a crucial role in influencing the availability, affordability, convenience and desirability of certain foods and the market for plant-based foods presents a strong business case (Searchinger et al., 2019, pp. 92–94; Bloomberg Intelligence, 2021).

### Reduce emissions from livestock
**Enabling measure**

Alongside the shift towards more plant-based diets, enabling measures to reduce the emissions of livestock directly are needed to already start reducing the emissions intensity. Existing measures include increasing feed quality, increasing meat productivity, and manure management. Novel technologies could help achieve further supply-side methane emissions reductions if cost and R&D constraints are overcome. These technologies include synthetic methane inhibitors, a methane vaccine (pending proof of concept), low-emissions breeding and the use of seaweed as a feed additive (Reisinger et al., 2021, p. 7).

**Measures to reduce emissions from the production of food (upstream scope 3)**

Global GHG emissions intensity of agricultural production need to decline by 31% by 2030 and 56% by 2050 relative to 2017 levels (Boehm et al., 2023, p. 126).

### Removal measure: increase soil health for enhanced carbon sequestration    **Critical transitional measure**

Alongside deep emissions reductions, the interest in the potential for soil carbon sequestration on working agricultural lands to remove critical emissions is growing. The potential mitigation impact of soil carbon sequestration can be significant (Costa et al., 2022), but the potential and its feasibility are still debated among researchers (Boehm et al., 2023, p. 126). The practices to increase carbon sequestration are often called 'regenerative' and include a range of measures such as erosion control, use of larger root plants, reduced tillage, restoration of degraded soils, and agroforestry (Roe et al., 2019, p. 825). Such practices can improve soil health, increase biodiversity, and reduce reliance on chemical inputs and pesticides while maintaining agricultural productivity in a changing climate (Boehm et al., 2023, p. 126).

Added to the uncertainty and lack of data concerning soil carbon sequestration, 'regenerative' practices cannot replace other critical measures, especially regarding ruminant emissions. Recent studies show that reducing emissions intensity for ruminants through soil carbon sequestration is overly optimistic (Wang et al., 2023). Hence, emission reduction measures remain of the upmost importance; it is most appropriate to adopt separate emission reduction and emission removal.

### Sustainably increase crop and livestock productivity on existing agricultural land
**Critical transitional measure**

More food and feeds need to be produced on existing agricultural lands while lowering the emissions intensity of agricultural production (Boehm et al., 2023, p. 124). Productivity can be increased through a range of measures. Some measures such as agroforestry can lead to increased crop yield compared to conventional farming methods on top of other positive ecological impacts (Kuyah et al., 2019). When increasing productivity sustainably, the need to depend on emerging and uncertain measures, such as carbon sequestration, decreases (Costa et al., 2022, p. 5).

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu
262



**Shift away from the use of fossil fuels in the food and agriculture supply chain**

Enabling measure

The current food system is responsible for approximately 30% of the world's energy consumption (T. C. Liu et al., 2023, p. 4). Scaling renewable energy, enhancing fuel efficiency, electrifying transport fleets, and improving synthetic fertiliser production are all necessary measures for shifting the current food systems away from fossil fuels. Nitrogen fertiliser production and use represent approximately 5% of global GHG emissions (Gao and Serrenho, 2023).

**Measures to reduce food loss and waste (upstream and downstream scope 3)**

**Reduce the share of food production lost or wasted by 50% by 2030 compared to 2016 levels, and maintain these levels through 2050** Critical transitional measure

About 24% of food is lost or wasted between production and consumption each year, causing unnecessarily higher levels of production and landfill emissions (Searchinger et al., 2019, p. 52; Boehm et al., 2023, p. 124). Therefore, reducing food loss and waste is a crucial measure to limit the growth in demand for agricultural goods (Boehm et al., 2023, p. 124). Food loss occurs during the production, post-harvest and processing stages, whereas food waste occurs when safe food is discarded from the retail store to the point of intended consumption (Searchinger et al., 2019, p. 53). Corporations play an important role as a lot of downstream consumer waste takes place in restaurants and retail markets, not just homes. Companies can fight food loss by engaging with their suppliers to reduce waste and implementing food loss and waste programs (Boehm et al., 2023, p. 138). Food waste can also be reduced through improvements to infrastructure or innovative methods to sell food that would otherwise be wasted (Clark et al., 2020).

**Reduce emissions from cooling and refrigeration (scope 1 for food retailers, scope 3 for food producers)**

**Reduce the use of HFCs and switch to climate friendly refrigerants**

Enabling transitional measure

In order to avoid food losses and waste while global temperatures are rising, refrigeration will be increasingly important. Currently, the most commonly used refrigerants are hydrofluorocarbons (HFCs), which have high global warming potentials (Roberts, 2017). About 40% of refrigerant and cooling emissions can be avoided by 2030 by using low global warming potential natural refrigerants (Green Cooling Initiative, 2015, p. 7). Alternative refrigerants with low or zero global warming potential are available on the market but currently face financial and technical challenges to rapid uptake (Boehm et al., 2023, p. 55).

117

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu

263

# 8.3 Danone

**TRANSPARENCY & INTEGRITY**

## 1 TRACKING AND DISCLOSURE OF EMISSIONS

| | |
|---|---|
| Tracking and disclosure | 25.7 MtCO₂e in 2022 |
| Major emission sources | Almost 80% of emissions from upstream scope 3. 76% from purchased goods and services. Downstream transportation second most important (10%). |
| Disclosure | Consistent reporting and disclosure, but several scopes not accounted for and further breakdown of sources would be beneficial for better understanding. Scope 2 market-based used for total emissions. |
| Subsidiary coverage | Subsidiaries are only partially covered in the emissions reporting and disclosure. |

MtCO₂e
- Downstream Scope 3: 3.9
- Upstream Scope 3: 20.2
- Scope 2: 0.8
- Scope 1: 0.8

## 2 SETTING EMISSION REDUCTION TARGETS

**SECTOR** Food and Agriculture
**REVENUE** USD 29.1 bn (2022)
**EMISSIONS** 25.7 MtCO₂e (2022)
**PLEDGE** Net-zero emissions by 2050

**Headline target or pledge** — *Net-zero emissions by 2050*

**Short-term targets** (up to 2030)
Reduce absolute scope 1 and 2 emissions 47.2% by 2030 (2020 baseline), absolute scope 1 and 3 FLAG emissions 30.3%, scope 3 non-FLAG 42.2%, methane emissions from fresh milk 30%.

*Scope coverage:* S1 S2 S3
*Own emission reductions (compared to full value chain in 2019):* 30% by 2030

2030 targets may be 1.5°C aligned for some key emission sources, but targets do not cover all emissions, so translate to a 30% reduction of 2019 value chain emissions. Danone has a methane target, but provides no baseline emissions, so could not be quantified.

**Medium-term targets** (2031–2040)
No target identified.

*Scope coverage:* S1 S1† S1‡
*Own emission reductions (compared to full value chain in 2019):* N/A

No target identified.

**Longer-term targets** (2041–onward)
Net zero emissions across the value chain by 2050.

*Scope coverage:* S1 S2† S3‡
*Own emission reductions (compared to full value chain in 2019):* 62.7% by 2050

The net-zero target does not cover all emissions. It is not accompanied by an explicit emission reduction commitment, but an estimate for residual emissions implies significant emission reductions.

## 3 REDUCING OWN EMISSIONS

| | |
|---|---|
| Operational emissions (scope 1) | 3% of 2022 emissions | Not assessed. |
| Renewable electricity (scope 2) | 3% of 2022 emissions | Very limited public reporting on RE procurement. Majority comes from low-quality contracts. No information on planned contracts identified. |
| Upstream emissions (scope 3) | 79% of 2022 emissions | Several measures identified for deep reduction of emissions, most notably a plan to increase share of plant-based protein. Emission reduction strategy includes short-term and longer-term measures. |
| Downstream emissions (scope 3) | 15% of 2022 emissions | Limited detail on measures related to downstream emissions. |

## 4 RESPONSIBILITY FOR UNABATED AND RESIDUAL EMISSIONS

**Climate contributions today** (Beyond-value-chain mitigation)
Mitigation beyond value chain through "Livelihoods Fund(s)": €68.8 M invested in period 2011–2023, partially in return for product-level carbon neutrality claims. Since 2023, an undefined volume of support continues without offsetting claims.

**Misleading offsetting claims today**
Carbon neutral production sites based mostly on a combination of RECs and carbon credits.

**Approach to residual emissions**
Definition of residual emissions unclear due to the exclusion of significant volumes of emissions in the scope of the net zero target. Neutralisation plans include land sequestration CDR and other carbon capture technologies.

5-point rating scale: High, Reasonable, Moderate, Poor, Very poor — **Transparency** refers to the disclosure of information. **Integrity** refers to the quality and credibility of the approach.
**Sources:** Danone (2020, 2023a, 2023b)

118

Exhibit 7 to Decl. of Angel Hsu
264

Corporate Climate Responsibility Monitor 2024

**SER 544**

## Danone

Danone S.A. is a French corporation that mainly produces dairy and dairy products. The largest share of its emissions occurs in scope 3, with purchased goods and services, mainly related to milk and dairy ingredients, making up 78% of its value chain emissions in 2022. Danone has a net-zero target for 2050 and committed to emissions reductions of 34.7% by 2030. Due to a limited scope coverage, the latter target translates to emission reduction of 30% compared to the full value chain emissions in 2019. This is almost in line with 1.5°C-aligned benchmarks for the sector. Furthermore, the company plans to increase its share of plant-based protein production and has a target to reduce its methane emissions by 30% by 2030.

**Though some emission sources are not covered by Danone's targets, the company's short-term targets reflect the need for a rapid emission reduction in the sector.** Danone has emission reduction targets for 2030 that cover a selected share of emissions: some minor scope 3 emissions categories are excluded, summing to roughly 5.7 MtCO₂e, equivalent to 20% of 2019 value chain emissions (Danone, 2020a, pp. 73–90, 2023b, p. 14). Besides presenting the baseline emissions and absolute targeted emission levels, the company does not make the scope exclusion explicit in its latest *Climate Transition Plan*, which limits the transparency of Danone's climate strategy. Danone's short-term climate strategy includes various targets, with different levels of ambition for different emission sources (Danone, 2023b, p. 16). When assuming the excluded emission sources remain constant until 2030, the company's targets translate to 30% of emission reductions by 2030, compared to 2019 reported value chain emissions. With this, Danone's targets are almost in line with 1.5°C benchmarks for the food and agriculture, but the company could improve the transparency around excluding a share of emissions (*see Annex II*).

**Although Danone does not have an emission reduction target as part of its net-zero target, the company estimates that its residual emissions will be 4.5 MtCO₂e in 2050 and wants to "neutralise" those with carbon credits or "insetting"** (Danone, 2023b, p. 38). The estimated residual emissions imply emission reductions of roughly 80%, compared to its 2020 baseline emissions. When comparing to 2019 value chain emissions, assuming the aforementioned emissions outside

the target's coverage stay at a constant level of 5.7 MtCO₂e, the emission reductions are roughly 64%. Danone describes that it will either purchase carbon credits to reach net zero, or realise land sequestration of carbon dioxide removals through own projects (which is also referred to as 'insetting' by others) (Danone, 2023b, p. 38). Danone does not describe in much detail what kind of projects it will depend on, but mentions land sequestration, carbon dioxide removals and carbon capture without further specification (Danone, 2023b, p. 38). Nonetheless, the implied plan for emission reductions of roughly 64% would be almost in line with sectoral benchmarks for the food and agriculture sector.

**In its *Climate Transition Plan*, Danone presents potentially comprehensive emissions reduction measures, including plans to increase the share of plant-based protein** (Danone, 2023b, pp. 18; 35). This measure strengthens the integrity of Danone's longer-term climate strategy. Since the implementation of Danone's planned measures for the short-term would mean reaching the technical and physical limitations of methane reductions in the livestock sector without reducing dairy production, increasing the share of plant-based protein is a crucial additional measure to reach deeper levels of emission reductions (Reisinger et al., 2021). Danone describes the importance of dairy for "healthy, sustainable and accessible diets" (Danone, 2023c, p. 4), but also highlights its plans to further increase the share of plant-based and low-carbon products (Danone, 2023b, pp. 35–36). Our current understanding of Danone's goal is that low-carbon products in its main source of business is that it entails a reduction in livestock and absolute dairy production, but Danone could clarify this further. Given the uncertainty, the developments regarding Danone's dairy production and livestock volumes need to be closely monitored. By increasing the share of plant-based protein production, the company creates an opportunity to transition away from an emissions-intensive business model and to achieve deeper emission reductions in the longer term.

**Danone's climate strategy includes a target to reduce methane emissions related to fresh milk production by 30%, compared to 2020 levels** (Danone, 2023c, p. 3). Danone is a signatory to the Global Methane Pledge, and even though the company does not report on methane emissions yet, it is commendable that Danone is one of the first major agrifood companies to set a target for reducing methane emissions, which is one of the most challenging and critical emission sources of the sector (Reisinger et al., 2021). During COP28, Danone pledged to start reporting on its methane emissions in 2024 (Douglas, 2023).



Exhibit 7 to Decl. of Angel Hsu
265

Case 2:24-cv-00801-ODW-PVC    Document 89-25    Filed 04/07/25    Page 121 of 164
Page ID #:8898

# 8.4 Mars

## ① TRACKING AND DISCLOSURE OF EMISSIONS

| | TRANSPARENCY & INTEGRITY |
|---|---|

**Tracking and disclosure**
30.9 MtCO₂e in 2022 — Not assessed.

**Major emission sources**
94% of 2022 emissions occurred in scope 3; 73% from purchased goods and services (mainly agriculture and land-use change), 16% from downstream transportation.

Mars pursues some high-quality RE procurement constructs, but public reporting is limited and the coverage of the target unclear.

**Disclosure**
Mars annually reports to CDP, but does not disclose in public-facing reporting annually. Its Net Zero Roadmap has a breakdown of emissions, but not using conventional reporting standards.

**Subsidiary coverage**
● Subsidiaries are covered in the emissions reporting and disclosure.

| | MtCO₂e |
|---|---|
| Downstream Scope 3 | 4.9 |
| Upstream Scope 3 | 24.2 |
| Scope 2 | 1.0 |
| Scope 1 | 0.8 |

## ② SETTING EMISSION REDUCTION TARGETS

| SECTOR | REVENUE | EMISSIONS | PLEDGE | TRANSPARENCY | INTEGRITY |
|---|---|---|---|---|---|
| Food and Agriculture | USD 45 bn (2022) | 30.9 MtCO₂e (2022) | Net-zero GHG emissions by 2050 in full value chain. | ⚠ Moderate | ⚠ Moderate |

**Headline target or pledge** — *Net-zero GHG emissions by 2050 in full value chain.*

Reduce value chain emissions by 27% by 2025 and 50% by 2030 (2015 baseline).

**Short-term targets** (up to 2030)

| | | | |
|---|---|---|---|
| S1 | S2 | S3↑ | S3↓ |

Scope coverage — 50% by 2030

Own emission reductions (compared to full value chain in 2019) — Main emission reduction target (50% by 2030) is transparently presented and in line with sectoral and global benchmarks. Carbon sequestration is not considered as part of target.

**Medium-term targets** (2031-2040)

| | | |
|---|---|---|
| S1 | S2† | S3↑ | S3↓ |

N/A — No target identified — No target identified.

Scope coverage
Own emission reductions (compared to full value chain in 2019)

**Longer-term targets** (2041-onward)

| | | | |
|---|---|---|---|
| S1 | S2 | S3↑ | S3↓ |

Net-zero emissions by 2050 — 80% by 2050

Scope coverage
Own emission reductions (compared to full value chain in 2019) — Long-term net-zero target includes an emission reduction of 80%. Although this is aligned with sectoral benchmarks, role of biological CDR remains uncertain. With 50% from 2030, target is already in line with sectoral benchmarks.

## ③ REDUCING OWN EMISSIONS

| | TRANSPARENCY | INTEGRITY |
|---|---|---|

**Operational emissions** (scope 1) — 3% of 2022 emissions — N/A — N/A

**Renewable electricity** (scope 2) — 3% of 2022 emissions — Some critical measures are presented, that – in sum – will bring the emissions in line with 2030 target. Post-2030 emission reduction strategy is lacking.

**Upstream emissions** (scope 3) — 78% of 2022 emissions

**Downstream emissions** (scope 3) — 16% of 2022 emissions — No measures identified that can reduce emissions of this scope.

## ④ RESPONSIBILITY FOR UNABATED AND RESIDUAL EMISSIONS

| | PLEDGE | TRANSPARENCY | INTEGRITY |
|---|---|---|---|
| | Net-zero GHG emissions by 2050 in full value chain. | ⚠ Moderate | ⚠ Moderate |

**Climate contributions today** (Beyond-value-chain-mitigation) — No climate contributions identified.

**Misleading offsetting claims today** — Carbon neutrality claims for specific brands. Information insufficient to determine the integrity of the claims. — ?

**Approach to residual emissions** — Net-zero target includes neutralisation of residual emissions equal to 20% of 2019 emissions. Limited further details.

5-point rating scale: ● High ● Reasonable ⚠ Moderate ● Poor ● Very poor

**Sources:** Mars (2023a, 2023b, 2023d)

– **Transparency** refers to the disclosure of information. **Integrity** refers to the quality and credibility of the approach.

120

Exhibit 7 to Decl. of Angel Hsu
266

Corporate Climate Responsibility Monitor 2024

# Mars

**Mars Incorporated, headquartered in the US, is a private company that produces confectionary and pet food and provides animal care services. Almost three-quarters of reported emissions occur in upstream scope 3, mainly from agriculture and land-use change. Mars has a net-zero target for 2050 which includes an emission reduction commitment of 80% and a 2030 emission reduction target of 50%. The company presents its 2030 target with a range of emission reduction measures that appear aligned with the targeted level, independent of measures for land sequestration carbon dioxide removals. Mars's ambition in the short-term is in line with 1.5°C-benchmarks, but the company does not present an emission reduction strategy for after 2030. More details on its net-zero strategy as well as regular reporting would improve the transparency of the company's climate plans.**

Mars's targets up to 2030 are in line with sectoral and global 1.5°C-aligned benchmarks. Mars has emission reduction targets for 2025 and 2030 of 27% and 50% respectively, compared to 2015 levels (Mars, 2023d, p. 12, 2023c, p. 8). These targets also translate to 27% and 50% compared to 2019 value chain emissions and are in line with benchmarks for the global food sector (*see Annex II*). They signal the need for a rapid decrease in Mars's value chain emissions and represent commitments to real emission reductions: the company explicitly states that the targets do not depend on offsets or carbon sequestration on farms (Mars, 2023c, p. 26). The company does support enhanced land sequestration carbon dioxide removal (CDR), but states it will not use those removals for target realisation (Mars, 2023a). By providing this explicit clarification and confirming the integrity of its ambition, Mars acknowledges the current accounting limitations of CDR and prioritises deep emission reductions over contentious removal claims, while other companies are extensively counting on land sequestration CDR towards their more ambiguous targets.

In its net-zero roadmap, Mars presents a diverse set of emission reduction measures until 2030, which appear in line with the targeted emission levels. The presentation of measures is moderately transparent and well-structured. Mars presents the emission reduction potential of seven emission sources and divides them into 21 emission reduction measures (Mars, 2023c, pp. 25–32). The company presents a business-as-

usual scenario and targeted emissions of each emission source, as well as the emission reduction potential of each measure. However, the descriptions of measures are generally vague and often lack detail. Acknowledging that its deforestation-related emissions are significant, Mars describes the most significant reductions for agriculture and land-use change, with halting deforestation related to cocoa production being the most important measure (Mars, 2023c, p. 28), accounting for almost a quarter of the total emission reduction potential. Increased use of renewable electricity across Mars's value chain also plays a significant role in the company's strategy (Mars, 2023c, pp. 25–33), which accounts for almost a fifth of the total emission reduction potential, mainly to reduce scope 3 emissions. Mars presents emission reduction measures that can – in total – reduce the company's value chain emissions by more than the desired 50% by 2030 (Mars, 2023c, pp. 25–32).

It remains unclear how Mars plans to reduce emissions further after 2030. Although Mars's strategy until 2030 appears to be aligned with 1.5°C benchmarks, significant gaps remain for after 2030, both in terms of emission reduction measures as well as targets. The measures that Mars presents appear to have limited emission reduction potential beyond 2030; deeper emission reductions would be dependent on the implementation of other measures, which may be very difficult to implement at a later stage if not already planned for now. For example, Mars does not present any plans to meaningfully reduce emissions related to dairy production (Mars, 2023c, p. 27), which likely makes up a substantial part of the agricultural emissions. This emission source requires the initiation of a transition soon, in order to ensure deep emission reductions by 2050. More information on Mars's longer-term emission reduction strategy is needed for a thorough and fair assessment of the company's 2050 target.

**Mars's net-zero target is substantiated with an 80% emission reduction target, but potential reliance on land sequestration CDR leaves the integrity of this target unclear.** By specifying that the net-zero target leaves a reduction of at least 80% of its value chain emissions, Mars indicates a long-term ambition that could be in line with sectoral benchmarks (Mars, 2023c, p. 9). However, while Mars rules out the use of CDR towards its 2030 targets, the company does not specify whether CDR could play a role in achieving the 80% of emission reductions by

2050. Still, if Mars maintains its planned reductions of 50% until 2050, the emission reductions might be in line with sectoral benchmarks, regardless of the use of CDR.

**Renewable electricity is key to Mars's emission reduction strategy, mainly to reduce scope 3 emissions, but the company only provides little information on planned procurement constructs.** Mars describes its ambition to include 100% renewable energy by 2040 (Mars, 2023d, p. 12), but also reports to have reached its limit for onsite wind and solar capacity (Mars, 2023c, p. 33). The company states that it plans to use more PPAs but does not provide any more details on this, nor on the measures it will take to support the use of renewable electricity in the supply chain (Mars, 2023c, p. 33). More information is needed to assess whether this will lead to real and meaningful emission reductions.

**Mars does not regularly and publicly report on all of the most relevant sustainability indicators.** Mars's disclosure of today's emission reduction practices and emissions is minimal. Its public-facing annual sustainability report does not include a disclosure of emissions or other relevant data (Mars, 2023d, pp. 12–15). Mars only disclosed its emissions in its one-time publication presenting its net-zero roadmap (Mars, 2023c, p. 10). It only reports thorough data on a regular basis through its non-public CDP responses. The lack of regular public-facing reporting limits a thorough understanding of the company's emissions trends and efficacy of existing and future emission reduction measures.

121

Exhibit 7 to Decl. of Angel Hsu
267

SER 547



Exhibit 7 to Decl. of Angel Hsu
268

# Nestlé

**Switzerland-based Nestlé S.A. (Nestlé) is the world's largest food and beverage company by revenue, with brands such as KitKat, Maggi, and Nespresso. The biggest share of Nestlé's emissions is related to agricultural activities. Nestlé commits to reaching net-zero GHG emissions by 2050, and published new targets aligned with the Science Based Targets initiative (SBTi) Forest, Land and Agriculture (FLAG) guidance in 2023. Although these updates could mark an improvement in Nestlé's climate strategy, Nestlé's targets remain potentially misleading and ambiguous due to an unspecified amount of land sequestration carbon dioxide removals within the value chain, referred to as "carbon scope 3 removals". Nestlé did not publish updated baseline emissions for its 2030 target, so we continue to interpret that the pledge to reduce emissions by 50% by 2030 translates to emission reductions of just 16–24% based on measures presented in its Net Zero Roadmap, which does not include clear plans for the deep decarbonisation of agricultural emissions.**

**Key developments over the past year:** Nestlé updated its 2030 and 2050 net-zero pledge since the previous iteration of this analysis in February 2023 (Day, Mooldijk, Hans, et al., 2023), aligning its pledge with the SBTi FLAG guidance (SBTi, 2022a). These updates represent only minor changes compared to the information previously assessed. Hence, we did not identify any improvements on the key issues that undermine Nestlé's climate strategy.

**Nestlé's emission reduction pledges may be misleading. We interpret that the pledge to reduce emissions by 50.4% by 2030 translates to only 16–24% emission reductions compared to the company's emissions in 2019.** Nestlé's SBTi-certified targets include emission reduction targets of 20% by 2025 and 50.4% by 2030, with 2018 as a base year, which marks a very slight increase from its previous 50% target. The company now presents a separate 50% reduction target in FLAG emissions by 2030 (SBTi, 2023e; Nestlé, 2024, p. 12). In its Net Zero Roadmap, Nestlé presents its interim emission reduction targets for each emission source compared to a business-as-usual scenario, showing the targeted emission levels for each emission source for 2030 (Nestlé, 2023b, p. 4). We calculate from the figures presented in the company's Net Zero Roadmap that its commitments

translate to just a 16% reduction of the company's full value chain emissions in 2019, or a maximum of 24% under the most optimistic interpretation (*see further details on the target and this calculation in Annex 1*).

**Nestlé's 2050 net-zero pledge remains ambiguous due to limited scope coverage and an unspecified role of land sequestration carbon dioxide removals.** Based on the company's Net Zero Roadmap, we have calculated that Nestlé's 2050 net-zero pledge covers 81.4% of Nestlé's 2018 emissions footprint (Nestlé, 2023b, pp. 6–8). However, it is not clear if this can be the right baseline, since this would in theory fall short of SBTi requirements for net-zero targets to cover at least 90% of a company's emissions. Nestlé did not publish its updated baseline emissions for 2018 alongside its new SBTi FLAG targets, but does present the covered emissions of more recent reporting years in its latest sustainability report (Nestlé, 2024, p. 8). The company does not provide a comparison with full value-chain emissions of 2018. The updated net-zero pledge now includes a 90% emissions reduction commitment for industry- and energy-related emissions and a 75% emission reduction target for FLAG emissions by 2050 (Nestlé, 2024, p. 12), but the latter includes an undefined role for land sequestration carbon dioxide removals (CDR). Further clarification on the role of land sequestration CDR is needed to understand whether the 2050 pledge represents a commitment that will lead to permanent, deep emission reductions. This is particularly relevant given the extensive role for CDR vis-à-vis emission reductions in the company's plan for implementing its 2030 target.

**Nestlé states that it "will not rely on offsetting"** (Nestlé, 2023a, p. 12) **and does not refer to 'insetting' anymore, but will rely on land sequestration CDR for its target realisation and makes emission removals claims today.** Although the company says it will not rely on offsetting for target realisation, it also describes that Nestlé's brands do purchase carbon credits for their "consumer engagement strategy", without specifying what exact claims are being made with those (Nestlé, 2023b, p. 41). Without further information on the volume and projects supported as well as the claims being made, it is not clear whether this alternative approach constitutes credible climate contributions or a repackaging of potentially misleading claims with new terminologies. The company continues to claim the neutralisation of emissions

through land sequestration CDR taking place within its value chain in its public-facing documents, though to a lower extent. Nestlé claimed to have removed 4.3 MtCO₂e in 2022 (Nestlé, 2023a, p. 12), but presents removals of only 0.76 MtCO₂e in 2023 (Nestlé, 2024, p. 7). The company no longer describes removals as 'insetting', but as "carbon scope 3 removals" and "natural climate solutions" (Nestlé, 2023b, pp. 20, 39–41, 45). The company presents plans to remove 25.2 MtCO₂e of land sequestration CDR by 2030: 13 MtCO₂e through undefined "carbon scope 3 removals", and 12.2 MtCO₂e land sequestration CDR measures presented alongside emission reduction measures (Nestlé, 2023b, pp. 14, 19). This volume equates almost a quarter of 2018 value chain emissions.

**Nestlé's plans do not include sufficiently transformational measures to achieve the decarbonisation of agricultural emissions in the long run.** The majority of Nestlé's GHG emissions derive from upstream agricultural activities. The agriculture sector faces major challenges for decarbonisation: existing technologies and measures to mitigate the emissions intensity of many agricultural products have limited potential, especially for the livestock sector, which accounted for a quarter of Nestlé's reported emissions in 2023 (Nestlé, 2024, p. 7). Although Nestlé's range of emission reduction measures are expected to lead to a respectable 48% reduction of manufacturing emissions by 2030, they will reduce value chain emissions from dairy, livestock, soil, and forests, which are far more significant emission sources, by just 6% between 2018 and 2030, excluding measures to claim that emissions are offset through land sequestration CDR (Nestlé, 2023b, pp. 14, 19, 20). These emission sources represent the most significant challenge for agri-businesses to claim that they are on a path to deep decarbonisation without major innovations to drastically reduce the emissions footprint of livestock agriculture or diversifying away from this highly GHG emissions intensive industry.

123

Exhibit 7 to Decl. of Angel Hsu

269

SER 549

# 8.6 Tesco

## 1 TRACKING AND DISCLOSURE OF EMISSIONS

**Tracking and disclosure:** 77.5 MtCO₂e in 2022

**Major emission sources:** ~50% of reported emissions are related to purchased goods and services, and ~40% to use of sold products (though unclear what this entails).

**Disclosure:** A major share of scope 3 emissions is omitted from some GHG inventory tables in public-facing reporting.

**Subsidiary coverage:** Subsidiaries are only partially covered in the emissions reporting and disclosure. It remains unclear to what extent subsidiaries are currently covered.

| | MtCO₂e |
|---|---|
| Downstream Scope 3 | 33.6 |
| Upstream Scope 3 | 42.2 |
| Scope 2 | 0.6 |
| Scope 1 | 1 |

## 2 SETTING EMISSION REDUCTION TARGETS

| SECTOR | REVENUE | EMISSIONS | PLEDGE | TRANSPARENCY | INTEGRITY |
|---|---|---|---|---|---|
| Food and Agriculture | USD 67.8 bn (2022) | 77.5 MtCO₂e (2022) | Net zero by 2050 across the full value chain | Poor | Poor |

**Headline target or pledge:** *Net zero by 2050 across the full value chain.*

**Short-term targets** (up to 2030): Reduce scope 1 & 2 by 60% by 2025 and by 85% by 2030/2015 baseline.
Scope coverage: S1 S2 S3↓ — 1% by 2030
Own emission reductions (compared to full value chain in 2019): Transparent short-term targets, but cover only a very small share of emissions. No meaningful scope 3 targets before 2032.

**Medium-term targets** (2031-2040): Reduce scope 3 energy & industrial emissions by 55% by 2032 (2019 baseline), reduce scope 3 FLAG emissions by 39% by 2032 (2019 baseline). Net zero scope 1 and 2 by 2035.
Scope coverage: S1 S2 S3↓ — 27-45% by 2032
Own emission reductions (compared to full value chain in 2019): Medium-term targets that could translate to deep emission reductions, but major scope exclusions that are not presented in public-facing documentation. Undefined role of CDR that could undermine targets.

**Longer-term targets** (2041-onward): Net zero across value chain by 2050. Reduce non-FLAG scope 3 emissions by 90% by 2050 (2019 baseline), and scope 3 FLAG by 72% by 2050 (2019 baseline).
Scope coverage: S1 S2 S3↓ — 63-74% by 2050
Own emission reductions (compared to full value chain in 2019): Net-zero target, presented with emission reduction targets. Scope exclusions not presented in public-facing documentation. FLAG targets integrity unclear, as role of CDR is undefined. Non-FLAG targets are sufficient.

## 3 REDUCING OWN EMISSIONS

| | TRANSPARENCY | INTEGRITY |
|---|---|---|
| **Operational emissions** (scope 1) — 1% of 2022 emissions | | |
| **Renewable electricity** (scope 2) — 1% of 2022 emissions | | |
| **Upstream emissions** (scope 3) — 55% of 2022 emissions | | |
| **Downstream emissions** (scope 3) — 43% of 2022 emissions | | |

**Operational emissions** (scope 1): Not assessed.

**Renewable electricity** (scope 2): Limited level of detail on electricity consumption in public-facing documentation. Claim of 100% RE consumption today; ~90% of demand is met with RECs.

**Upstream emissions** (scope 3): Little to no measures identified that meaningfully reduce upstream scope 3 emissions.

**Downstream emissions** (scope 3): Plans to reduce emissions from downstream transport. No further measures identified that can meaningfully reduce emissions in this scope.

## 4 RESPONSIBILITY FOR UNABATED AND RESIDUAL EMISSIONS

| | TRANSPARENCY | INTEGRITY |
|---|---|---|
| **Climate contributions today** (Beyond value-chain mitigation) | | N/A |
| **Misleading offsetting claims today** | N/A | N/A |
| **Approach to residual emissions** | | ? |

**Climate contributions today** (Beyond value-chain mitigation): No climate contributions identified.

**Misleading offsetting claims today:** No offsetting claims identified.

**Approach to residual emissions:** No information provided on how emissions will be neutralised towards net-zero claims in the future.

5-point rating scale: High · Reasonable · Moderate · Poor · Very poor
**Sources:** Tesco (2023a, 2023b, 2024)

*Transparency* refers to the disclosure of information. *Integrity* refers to the quality and credibility of the approach.

Corporate Climate Responsibility Monitor 2024

124

Exhibit 7 to Decl. of Angel Hsu
270

# Tesco

**Tesco PLC is a UK-based groceries multinational and general retailer. Almost 90% of Tesco's emissions occur in scope 3: roughly 50% of its emissions footprint is related to purchased goods and services, mainly produced upstream from the production of the products the retailer sells, and almost 40% from the use of its sold products. Tesco's headline pledge is to reach net-zero emissions across its value chain by 2050. In the short term, the company mainly focuses on scope 1 and 2 targets, which will not lead to meaningful reductions in its value chain emissions. Moreover, partial exclusions of scope 3 emissions in its short- and medium-term targets are not transparently communicated. Tesco's long-term targets for non-FLAG emissions appear reasonably ambitious, but the company does not specify the potentially significant role of land sequestration carbon dioxide removals for its FLAG targets. It remains unclear how the company plans to realise these targets: its emission reduction strategy lacks detail and the presented measures are unlikely to lead to deep emission reductions.**

**Tesco focuses disproportionally on scope 1 and 2 in its emission reduction strategy and emissions disclosure; the company does not have any targets that will lead to deep emission reductions in the short term.** The most important reason for the latter is that Tesco does not have any emission reduction targets for scope 3 before 2032 (Tesco, 2024). Tesco's climate strategy until 2030 focuses on scope 1 and 2, whereby these scopes account for only 1% of value chain emissions (Tesco, 2023a, pp. 103–115). This focus is also reflected in the company's public-facing emissions disclosure, where less than 1% of scope 3 emissions are presented – covering only emissions related to business travel and a selected share of transport and distribution (Tesco, 2023b, pp. 19; 23). Tesco's targets until 2030 translate to emission reductions of 1% by 2030, compared to 2019 value chain emissions.

**Tesco's emission reduction targets for the medium-term cover only a share of total emissions, which is not transparently communicated.** Tesco's targets are to reduce non-Forest, Land, and Agriculture (FLAG) scope 3 emissions by 55% and FLAG-related emissions by 39%, by 2032 and compared to a 2019 baseline (Tesco, 2024). However, Tesco covers only 67% of baseline emissions with both targets (Tesco, 2023a, pp. 47–58). Due to these scope exclusions, we estimate that Tesco's targets

would translate to emission reductions somewhere in the range of 27–45% compared to 2019 value chain emissions. Tesco specifies the scope exclusions only in its CDP disclosure and not in its public-facing communication on its climate strategy (Tesco, 2023a, pp. 47–60). The public-facing targets imply a higher level of ambition than they entail in reality.

**Tesco presents its emission reduction plans with a very limited level of detail, and it is not clear how the presented measures can lead to deep emission reductions.** The company presents only a few emission reduction measures in broad terms, and the measures that target scope 3 mainly put the responsibility with others. Tesco hopes that suppliers and consumers will undertake extensive action, without indicating intent to provide extensive support or requirements (Tesco, 2023b, p. 24). Currently, the company shows little to no commitment to implementing emission reduction measures that would be of high relevance for a retailer with significant FLAG emissions, such as commitments to increase the share of plant-based protein sales or a deforestation-free supply chain Tesco describes measures to improve health- and biodiversity-related aspects of its environmental impact more extensively on its climate change webpage (Tesco, 2024). The company states it will publish a transition plan in 2024 (Tesco, 2023a, p. 73).

**Tesco presents emission reduction commitments of 72% and 90% for FLAG and non-FLAG emissions respectively alongside its net-zero pledge (Tesco, 2024), where the latter represents a reasonable level of ambition, while the FLAG target remains ambiguous.** Since Tesco's non-FLAG emissions account for almost two-thirds of its emissions footprint, a large share of its emissions is subject to the reasonably ambitious 90% emission reduction target. For the FLAG emissions, however, we find that the limited scope coverage and likely dependence on land sequestration carbon dioxide removals, as explicitly allowed in SBTi's FLAG guidance, reduces the potential emission reduction commitment substantially. As for Tesco's medium-term targets, the targets' baseline emissions of scope 3 categories 3 (fuel and energy-related activities) and 11 (use of sold products) differ significantly from the emissions reported elsewhere. Scope exclusions and the related transparency issues lead us to estimate that the targets translate to an emission reduction range of 63–74% in 2050. These estimates partially rely on an undefined role of land sequestration carbon dioxide removals

that will reduce the real emission reduction commitment even further. Tesco claims that these targets are in line with SBTi's FLAG guidance and Net Zero Standard, but it remains uncertain whether the limited scope coverage is in line with the requirements presented in those guides.

Exhibit 7 to Decl. of Angel Hsu
271

Case 2:24-cv-00801-ODW-PVC    Document 89-25    Filed 04/07/25    Page 127 of 164
Page ID #:8904

# 8.7 Walmart

TRANSPARENCY & INTEGRITY

| SECTOR | REVENUE | EMISSIONS | PLEDGE | TRANSPARENCY | INTEGRITY |
|---|---|---|---|---|---|
| Food and Agriculture | USD 611.3 bn (2022) | 301.8 MtCO₂e (2022) | Zero emissions across global operations by 2040. | ● Poor | ● Poor |

## 1 TRACKING AND DISCLOSURE OF EMISSIONS

**Tracking and disclosure** — 301.8 MtCO₂e in 2022

**Major emission sources** — Major emission sources are related to purchased goods and services (upstream scope 3, 95%).

**Disclosure** — In public-facing documentation, Walmart only reports on scope 1 and 2 emissions. Scope 3 emissions are only reported in CDP disclosure.

**Subsidiary coverage** — ● Subsidiaries are covered in the emissions reporting and disclosure.

| | MtCO₂e |
|---|---|
| Downstream Scope 3 | 1.6 |
| Upstream Scope 3 | 282.4 |
| Scope 2 | 10 |
| Scope 1 | 7.9 |

## 2 SETTING EMISSION REDUCTION TARGETS

**Headline target or pledge** — *Zero emissions across global operations by 2040.*

**Short-term targets** (up to 2030) — Reduce scope 1 & 2 emissions by 35% by 2025 and 65% by 2030, compared to 2015 levels.

S1  S2  S3↑  S3↓   5% by 2030

Scope coverage
Own emission reductions (compared to full value chain in 2019) — Short- to medium-term targets translate to 5% emission reductions compared to 2019 value chain emissions: this is not in line with 1.5°C-benchmarks.

**Medium-term targets** (2031 - 2040) — Zero emissions in operations by 2040.

S1  S2  S3↑  S3↓   5% by 2040

Scope coverage
Own emission reductions (compared to full value chain in 2019) — Long-term target translates to 9% emission reductions, compared to 2019 value chain emissions. This is not in line with 1.5°C-benchmarks.

**Longer-term targets** (2041 - onward) — No target identified.

S1  S2  S3↑  S3↓   N/A

Scope coverage
Own emission reductions (compared to full value chain in 2019) — No target identified.

## 3 REDUCING OWN EMISSIONS

| | TRANSPARENCY | INTEGRITY |
|---|---|---|
| **Operational emissions** (scope 1) — 3% of 2022 emissions | ● | ● |
| Measures to reduce scope 1 emissions presented including changing refrigerants and electrifying transport, but only in vague terms. | | |
| **Renewable electricity** (scope 2) — 3% of 2022 emissions | ● | ● |
| Aims for higher-quality RE contracts to reach 100% RE by 2035, but RE share remains modest. Information only provided in CDP disclosure. | | |
| **Upstream emissions** (scope 3) — 94% of 2022 emissions | ● | ● |
| Significant categories of upstream scope 3 emissions addressed through supplier engagement programme, but information remains vague. | | |
| **Downstream emissions** (scope 3) — 1% of 2022 emissions | N/A | N/A |
| Not assessed. | | |

## 4 RESPONSIBILITY FOR UNABATED AND RESIDUAL EMISSIONS

| | TRANSPARENCY | INTEGRITY |
|---|---|---|
| **Climate contributions today** (Beyond-value-chain mitigation) — Commits to protect/restore 50 million acres of land by 2030, without neutralisation claim; reached 30 million acres in 2022. Very limited detail on emissions impact provided. | ● | ? |
| **Misleading offsetting claims today** — No offsetting claims today identified. | N/A | N/A |
| **Approach to residual emissions** — Explicitly states that it will achieve its targets without carbon offsets, but does not have a target that covers scope 3 emissions. | ● | ? |

5-point rating scale: ● High ● Reasonable ● Moderate ● Poor ● Very poor — **Transparency** refers to the disclosure of information. **Integrity** refers to the quality and credibility of the approach.

**Sources:** Walmart (2020a, 2021a, 2022, 2022b, 2023a, 2023c, 2023d) and Schneider Electric (2022)

Corporate Climate Responsibility Monitor 2024

126

Exhibit 7 to Decl. of Angel Hsu
272

## Walmart

**Walmart Inc. (Walmart) is a US-based retail corporation that operates grocery stores, department stores, and hypermarkets. Most of Walmart's emissions (94% of 2022 emissions) originate in the very large and diverse value chain (scope 3). Walmart has set targets to take responsibility for its operational scope 1 and 2 emissions. However, its strategy for upstream scope 3 emissions, which account for most of the company's overall climate impact, lacks a clear reduction commitment.** Walmart sets no emissions reduction target for scope 3 emissions but rather builds on Project Gigaton, a programme in which Walmart engages with its suppliers to set targets and reduce emissions themselves voluntarily. Walmart does not have a separate target for FLAG emissions.

**Key developments over the past year:** We could identify only minor changes to Walmart's sustainability strategy since our previous analysis of the case study in the 2023 Corporate Climate Responsibility Monitor (Day, Mooldijk, Hans, et al. 2023). The company states it no longer anticipates reaching its 2025 emissions reduction target and does not provide an explanation for this setback, putting into question the credibility of its scope 1 and 2 emissions targets. Walmart has continued to increase the number of suppliers signed up to its Project Gigaton engagement programme to reduce upstream scope 3 emissions. Since the publication of its scope 1 and 2 SBTi targets in 2016, Walmart has made no progress in target ambition, despite the critical insufficiency of these targets in the context of the climate crisis now many years later. Accordingly, only minor modifications were made to this case study.

**Walmart has not updated its highly insufficient targets since launching them in 2016; its targets still cover a negligible share of emissions.** Walmart's headline target is to reduce its scope 1 and 2 emissions, referred to as 'operational emissions', to zero by 2040, complemented by interim targets for 2025 and 2030. The company does not seek to offset emissions and commits to sourcing 100% renewable energy in global operations (scope 1 and 2) by 2035 (Walmart, 2023b). Walmart has set interim emission reduction targets for its scope 1 and 2 emissions: reductions of 35% by 2025 and 65% by 2030, compared to a 2015 baseline (Walmart, 2022a, p. 28). The targets translate to approximately a 25% emission reduction from scopes 1 and 2 by 2025 and 60% by 2030,

from a 2019 baseline. Including scope 3 emissions, the targets translate to only a 5% emission reduction by 2030 and 9% by 2050, compared to 2019 levels (Walmart, 2023c, p. 19). In addition to the very limited level of ambition associated with these targets, their credibility is further called into question by Walmart's announcement in 2023 that it anticipates being unable to reach its 2025 target (Walmart, 2023b).

**In 2017, Walmart launched Project Gigaton to address scope 3 emissions, which account for 94% of the company's emissions footprint, but the potential impact of the measures remains unclear.** To address scope 3 emissions, the company launched its Project Gigaton in 2017. Through Project Gigaton, Walmart wants to engage suppliers, offering them guidance to reduce their emissions in six areas: energy, nature, product use and design, waste, packaging, and transportation (Walmart, 2023c, p. 20). Suppliers can sign up to the programme and receive access to resources and training that help them set their own targets and design strategies to tackle their emissions. The project includes key sector reduction measures such as sourcing 20 relevant commodities 'more sustainably' by 2025 using various certifications to guarantee the level of sustainability. However, it remains unclear what impact these measures will have on its scope 3 emissions (Walmart, 2023c, p. 18). Measures concerning renewable energy procurement under Project Gigaton are more transparent. To increase the share of renewable electricity in its supply chain, Walmart supports suppliers to access collaborative Power Purchase Agreements (PPAs) (Schneider Electric, 2022) (Walmart 2023c). Since 2017, around 5,200 suppliers have joined the programme (Walmart, 2023c, p. 20), while these suppliers account for 12% of all suppliers, they account for roughly 75% of US net sales (Walmart, 2023d, p. 96), an increase from last year's 4,500 suppliers (Walmart, 2022). With Project Gigaton, Walmart aims to reduce 1 GtCO₂e in cumulative scope 3 emissions in the period between 2017 and 2030. The progress of Project Gigaton is measured through avoided CO₂e emissions, using a business-as-usual (BAU) scenario as a baseline (Walmart, 2023a, p. 4). Walmart notes that this approach for calculating progress does not align with GHG Protocol's Corporate Value Chain Standard. As we were unable to identify the variables included in Walmart's BAU calculations, we could not evaluate to what extent reported progress compares to real emissions reductions. Although Project Gigaton is presented as a central

element of Walmart's sustainability strategy, the company did not commit to any targets for scope 3 emissions. How the cumulative emission reductions are aligned with a 1.5°C trajectory remains unclear.

**Walmart's public-facing reporting neglects a large share of emissions; Walmart can improve its GHG emissions reporting to ensure transparency and accountability.** In its public climate change strategy, the company does not disclose its scope 3 emissions, which account for 94% of the company's total emissions in 2022 (Walmart, 2023d, pp. 59–67). In its CDP disclosure, Walmart partially reports on its scope 3 emissions: a share of downstream scope 3 emissions are being recalculated (Walmart, 2023d). Furthermore, its main reporting of emissions from energy procurement (scope 2) uses a market-based accounting approach. This reduced energy procurement emissions by more than 3 MtCO₂e in 2022 compared to a location-based accounting approach. Scope 3 and location-based scope 2 emission estimates are only included in Walmart's disclosure to CDP, which the company makes publicly accessible by publishing it on its website (Walmart, 2023d, pp. 56–67); not in its public-facing sustainability documentation.

**Walmart commits not to use offsets to reach its target for zero operational emissions, while pledging to make a climate contribution to support nature-based solutions without claiming to neutralise its emissions.** Walmart explicitly plans to reduce scope 1 and 2 emissions to zero by 2040, without the use of offsets (Walmart, 2021a,b, 2023b). Walmart and Walmart Foundation have committed to protect or restore 50 million acres of land by 2030, without linking this contribution to a neutralisation claim (Walmart, 2020a). This is an effective approach to supporting nature-based solutions for climate change mitigation outside of its value chain. However, Walmart could improve their transparency on these contributions by disclosing further information on how it determines the volume of support. It remains unclear whether this is linked to assuming responsibility for unabated emissions, particularly given that scope 3 emissions are not included in Walmart's main climate targets.

127

Exhibit 7 to Decl. of Angel Hsu
273

# Glossary and abbreviations

| Additional potential (of CDR) | See "Scarcity (of CDR)" |
|---|---|
| AFOLU | Agriculture, Forestry and Other Land Uses |
| BECCS | Bioenergy with carbon capture and storage |
| BEV | Battery electric vehicles |
| Biological capture and storage | See "Nature-based solutions". |
| BVCM | Beyond value chain mitigation (SBTi terminology); see *Climate contribution* |
| CAR | Climate Action Reserve |
| CCS | Carbon capture and storage |
| CCU | Carbon capture and utilisation |
| Climate contribution | We define climate contributions as the financial support provided by a company to support climate change action beyond the company's own value chain, without claiming the neutralisation of its own emissions in return. |
| Carbon dioxide removals (CDR) | All scenarios consistent with a 1.5°C temperature increase include a major role for carbon dioxide removals (Rogelj et al. 2018) This includes nature-based solutions for carbon sequestration in forests, soils, peatlands and mangroves, technological solutions such as BECCS and DACCS with underground storage, and solutions with mineral storage. |
| Carbon credit | A carbon credit is a certified unit of a reduction of GHG emissions, or a removal of carbon dioxide (see *Carbon dioxide removals*). Companies sometimes used carbon credits to claim to balance out GHG emissions elsewhere. |
| CDM | Clean Development Mechanism |
| CDP | Formerly the Carbon Disclosure Project: Many companies report emissions as well as other details of their climate strategies to CDP. CDP provide companies with a certified rating of their level of climate transparency, which is often used in company's marketing materials. |
| CEO | Chief Executive Officer |
| CO₂ | Carbon dioxide |
| COP | Conference of the Parties (see UNFCCC). |
| DACCS | Direct Air Carbon Capture and Storage. see also "*Carbon dioxide removals (CDR)*" |
| DRI-EAF | Direct reduced iron – Electric arc furnace |
| ESG | Environmental Social Governance |
| EU | European Union |
| EV | Electric vehicle |
| FLAG | Forest, Land and Agriculture Science Based Target Setting Guidance (a standard by the Science Based Targets initiative for land-based emissions disclosure and target setting). |
| GHG Protocol | The GHG Protocol is an initiative driven by the World Resources Institute and World Business Council for Sustainable Development, that provides international guidance and standards for GHG emissions accounting. |
| GHG | Greenhouse gas |
| Guarantees of origin (GOs) | Other terminology for Renewable Energy Certificates (REC), see "*Renewable Energy Certificates (REC)*" |
| HDV | Heavy-duty vehicle |

Exhibit 7 to Decl. of Angel Hsu
274

| Term | Definition |
|---|---|
| High-hanging fruit | The high-hanging fruit of mitigation potential refers to the technologies and measures to decarbonise emission sources that remain otherwise entirely inaccessible to host country governments in the near- and mid-term future, on account of high costs or other insurmountable barriers that cannot reasonably be overcome. |
| HLEG | The United Nations' High-Level Expert Group on the Net-Zero Emissions Commitments of Non-State Entities |
| ICT | Information and communications technology |
| IEA | International Energy Agency |
| Inseting | 'Inseting' is a business-driven concept used by a limited number of actors with no universally accepted definition. Inseting is often described as offseting within the value chain. The approach can lead to low credibility GHG emission offseting claims and presents a significant risk of double counting the same emission reductions. |
| Integrity (rating) | The Corporate Climate Responsibility Monitor assesses the transparency and integrity of companies' climate pledges. Integrity, in this context, is a measure of the quality, credibility and comprehensiveness of a company's approaches towards the various elements of corporate climate responsibility. |
| IPCC | Intergovernmental Panel on Climate Change |
| IRA | Inflation Reduction Act |
| ISO | International Organisation for Standardisation |
| Land sequestration CDR | Measures for carbon dioxide removal that involve biological carbon capture and storage in natural ecosystems, such as soils, forests, peatland and mangroves. |
| LEV | Low-emission vehicles |
| LNG | Liquified natural gas |
| Location-based method (for scope 2 emissions accounting) | The location-based method for scope 2 emissions accounting reflects the average emission intensity of the electricity grid from which the consumer's energy is delivered. |
| Market-based method (for scope 2 emissions accounting) | The market-based method for scope 2 emissions accounting reflects the emissions from electricity generation specifically procured by the consumer (which may not reflect the electricity they actually consume from a grid that features multiple buyers and sellers). It derives emission factors from contractual renewable electricity procurement instruments. |
| Nationally determined contributions (NDCs) | Nationally determined contributions (NDCs) are the pledges made by national governments to the United Nations Framework Convention on Climate Change to mitigate climate change. The Paris Agreement requires all Parties to submit and regularly update their NDCs to represent their possible highest level of ambition. Recognising the insufficiency of climate change mitigation commitments in existing NDCs, the Glasgow Pact from COP26 urged all Parties to update their NDCs again ahead of COP27. |
| Neutralisation | Fundamentally, companies' plans to neutralise emissions towards net zero targets constitute a form of offseting. Nevertheless, we recognise an emerging consensus that the terminology 'neutralisation' is differentiated by other forms of offseting on the basis that it should apply only to residual emissions. |
| Non-GHG climate forcers | Non-GHG climate forcers include the emission of gases and aerosols, and processes that change cloud abundance, leading to radiative forcing. Radiative forcing is a change in the balance of radiation in the atmosphere, which contributes to global warming. For example, the non-GHG climate forcers are estimated to increase the climate impact of GHG emissions from the aviation industry by a factor of approximately 3 (Atmosfair, 2016). |
| Offseting | See carbon credits. |
| Permanence (of CDR) | The permanence of a CDR outcome refers to the timescale and degree to which sequestered carbon remains stored and not released into the atmosphere. |

Exhibit 7 to Decl. of Angel Hsu
275

Corporate Climate Responsibility Monitor 2024

130

| Term | Definition |
|---|---|
| Power purchase agreement (PPA) | A PPA is a long-term contract between an electricity provider and an electricity consumer, usually spanning 10-20 years. The consumer agrees to purchase a certain amount of electricity from a specific asset under a pre-determined pricing arrangement. PPAs are generally signed with new renewable energy installations and form part of the project investment decision (NewClimate Institute and Data-Driven EnviroLab, 2020). PPAs can also be signed for existing installations, in which case it is less likely the PPA results in additional renewable electricity capacity. However, it may be that the existing installations would cease operations if the operator cannot sign a new PPA. |
| PV | Photovoltaics |
| R&D | Research & development |
| Renewable energy certificate (REC) | Renewable Energy Certificates (RECs) are also known under various names, such as Guarantees of Origin (GOs) or Energy Attribute Certificates (EACs). RECs can be acquired simply as an accounting tool alongside other renewable electricity procurement constructs, or may be procured as "standalone RECs".<br><br>Standalone RECs: The procurement of RECs without any accompanying renewable electricity procurement construct, such as a PPA. |
| Residual emissions | Residual emissions are the remaining GHG emissions from hard-to-abate emission sources where no known feasible options remain for further decarbonisation. (See also unabated emissions) |
| Scarcity (of CDR) | The maximum potential of most carbon dioxide removal measures is technically limited, and even further restricted by environmental constraints. Due to issues such as land requirements, high water consumption, high energy consumption, land degradation and pollution, among other environmental costs, carbon dioxide removal technologies can only be scaled-up so far without significantly endangering sustainable development goals, including food security. The scarcity of carbon dioxide removals measures – in terms of their maximum absolute or annual technical potential – is an important consideration when evaluating the feasibility of net-zero claims at the level of individual actors. Robust future use of scarce carbon dioxide removal options must be consistent with achieving net-zero and eventually net-negative emissions at the global level, which is required to avoid the most damaging effects of climate change over the coming decades. |
| Science Based Targets initiative (SBTi) | SBTi reviews and certifies the climate targets of companies who join the initiative as members. Companies' climate targets are certified as 1.5°C or 2°C compatible if they align with SBTi's own methodology and benchmarks. |
| Scope (of GHG emissions) | The GHG Protocol Corporate Standard classifies a company's GHG emissions into three 'scopes' (WBCSD and WRI, 2004). |
| Scope 1 emissions | Scope 1 emissions are direct emissions from owned or controlled sources. |
| Scope 2 emissions | Scope 2 emissions are indirect emissions from the generation of purchased energy (see also location-based method and market-based method). |

Exhibit 7 to Decl. of Angel Hsu
276

Case 2:24-cv-00801-ODW-PVC    Document 89-25    Filed 04/07/25    Page 132 of 164
Page ID #:8909

| Scope 3 emissions | Scope 3 emissions are all indirect emissions (not included in scope 2) that occur in the value chain of the reporting company, including both upstream and downstream emissions (GHG Protocol, 2013). |
| Upstream scope 3 emission sources | Upstream emissions are indirect GHG emissions related to purchased or acquired goods and services (GHG Protocol, 2013). |
| Downstream scope 3 emission sources | Downstream emissions are indirect GHG emissions related to sold goods and services (GHG Protocol, 2013). |
| Normal scope 3 emission sources | The GHG Protocol's Scope 3 Standard identifies 15 distinct reporting categories for scope 3 emission sources, and requires companies to quantify and report scope 3 emissions from each category (GHG Protocol, 2013). |
| Optional scope 3 emission sources (indirect use-phase emissions) | Indirect use-phase emissions are described by the GHG Protocol Scope 3 Standard (GHG Protocol, 2013) as an optional reporting component. In contrast to direct use-phase emissions from products, such as the energy consumption of vehicles and appliances, indirect use-phase emissions refer to the emissions that occur indirectly from the use of a product. For example, apparel requires washing and drying; soaps and detergents are often used with heated water. |
| Sustainable aviation fuels (SAF) | Sustainable aviation fuels are aviation fuels derived from renewables or waste considering certain sustainability criteria. |
| Transparency (rating) | The Corporate Climate Responsibility Monitor assesses the transparency and integrity of companies' climate pledges. Transparency ratings refer to the extent to which a company publicly discloses the information necessary to fully understand the integrity of that company's approaches towards the various elements of corporate climate responsibility. |
| UN | United Nations |
| UNFCCC | United Nations Framework Convention on Climate Change |

| Unabated emissions | Unabated emissions are GHG emissions from emission sources for which further emission reductions are technically feasible at that point in time. (See also residual emissions) |
| Value chain emissions | A company's full value-chain emissions refers to the entirety of scope 1, scope 2, and scope 3 emissions. |
| US | United States |
| Value chain emissions | A company's full value-chain emissions refers to the entirety of scope 1, scope 2, and scope 3 emissions. |

131

Exhibit 7 to Decl. of Angel Hsu

277

**SER 557**

# References

24/7 Carbon-Free Energy Compact (2024) 24/7 Carbon-Free Energy: Our signatories. Available at: https://gocarbonfree247.com/our-signatories/ (Accessed: 15 January 2024)

A2Z Coalition (2023) Accelerating to Zero Coalition - Signatories (Status: 24.11.2023), Accelerating to Zero Coalition. Available at: https://acceleratingtozero.org/signatories/ (Accessed: 24 November 2023)

Adidas (2023a) adidas AG - Climate Change Questionnaire 2023, Adidas, CDP. Available at: https://www.cdp.net/en/responses?queries%5Bname%5D=adidas (Accessed: 27 November 2023)

Adidas (2023b) Annual Report 2022, Herzogenaurach, Germany: Adidas. Available at: https://report.adidas-group.com/2022/en/ (Accessed: 5 December 2023)

Adidas (2024) Annual Report 2023, Herzogenaurach, Germany: Adidas. Available at: https://www.adidas-group.com/media/filer_public/78/51/7851feb6-4255-482e-ab74-2a5f77ba2f6b/2023_annual_report_adidas_en_final.pdf (Accessed: 14 March 2024)

Ahmed, S, Warne, T., Smith, E., et al. (2021) 'Systematic review on effects of bioenergy from edible versus inedible feedstocks on food security', npj Science of Food, 5(9). doi:10.1038/s41538-021-00091-6

Atmosfair (2016) Atmosfair Flight Emissions Calculator. Berlin, Germany: Atmosfair gGmbH. Available at: https://www.atmosfair.de/en/ (Accessed: 27 January 2023)

Audi (2024) Sustainability (Status: 22.02.2024), Audi AG. Available at: https://www.audi.com/en/sustainability.html (Accessed: 22 February 2024)

Benson, S, Family, A., Watson, E, et al. (2024) Above and beyond an SBTi report on the design and implementation of beyond value chain mitigation (BVCM). Science Based Targets initiative (SBTi). Available at: https://sciencebasedtargets.org/resources/files/Above-and-Beyond-Report.pdf (Accessed: 15 February 2024)

Berg, A., Magnus, K.-H., Kappelmark, S., et al. (2020) Fashion on climate: How the fashion industry can urgently act to reduce its greenhouse gas emissions. McKinsey & Company and Global Fashion Agenda. Available at: https://www.mckinsey.com/industries/retail/our-insights/fashion-on-climate (Accessed: 17 August 2023)

Beyond Food Fuels (2024) About Us - Beyond Fossil Fuels. Available at: https://beyondfossilfuels.org/about-us/ (Accessed: 14 October 2022)

Bjørn, A., Lloyd, S.M., Brander, M. and Matthews, H.D. (2022) 'Renewable energy certificates threaten the integrity of corporate science-based targets', Nature Climate Change, 12, pp. 539–546. doi:10.1038/s41558-022-01379-5

Bloomberg Intelligence (2021) 'Plant-Based Foods Market to Hit $162 Billion in Next Decade, Projects Bloomberg Intelligence', Bloomberg, 11 August. Available at: https://www.bloomberg.com/company/press/plant-based-foods-market-to-hit-162-billion-in-next-decade-projects-bloomberg-intelligence/

BloombergNEF (2022) Electric Vehicle Outlook 2022. London: Bloomberg Finance L.P. Available at: https://bnef.turtl.co/story/evo-2022/page/1?teaser=yes (Accessed: 14 October 2022)

Boehm, S, Lebling, K., Levin, K., et al. (2021) State of Climate Action 2021. Systems Transformations Required to Limit Global Warming to 1.5°C. Washington, DC., United States of America: World Resources Institute (WRI). doi:10.46830/wrirpt.21.00048

Boehm, S, Jeffery, L., Hecke, J., et al. (2023) State of Climate Action 2023. Berlin and Cologne, Germany; San Francisco, CA. Washington, DC. Germany; San Francisco, CA. Washington, DC: Bezos Earth Fund, Climate Action Tracker, Climate Analytics, ClimateWorks Foundation, NewClimate Institute, the United Nations Climate Change High-Level Champions, and World Resources Institute. Available at: https://www.climateactiontracker.org/documents/1177/State_of_Climate_Action_2023.pdf (Accessed: 15 November 2023)

Bölük, G. and Kaplan, R. (2022) 'Effectiveness of renewable energy incentives on sustainability: evidence from dynamic panel data analysis for the EU countries and Turkey', Environmental Science and Pollution Research, 29(18), pp. 26413–26430. doi:10.1007/s11356-021-17801-5

Bonaccorsi, I., Ferraro, E. and Mausam, M. (2022) Oil companies in disguise - On a ticking 'carbon bomb' called 'Scope 3 emissions' mandatory reporting', And why investors should avoid oil stocks and care ESG ratings. Transport & Environment. Available at: https://www.transportenvironment.org/wp-content/uploads/2022/09/Carbon-ESG-finance-Car-Study-V3.pdf (Accessed: 28 December 2022)

Brander, M., Gillenwater, M. and Ascui, F. (2018) 'Creative accounting: A critical perspective on the market-based method for reporting purchased electricity (scope 2) emissions', Energy Policy, 112, pp. 29–33. doi:10.1016/j.enpol.2017.09.051

Calvin, K, Cowie, A., Berndes, G., et al. (2020) 'Bioenergy for climate change mitigation: Scale and sustainability', GCB Bioenergy, 13, pp. 1346–1371. doi:10.1111/gcbb.12863

Carbon Herald (2022) Major Corporations Scrap Carbon Offset Efforts To Focus On Reductions. Available at: https://carbonherald.com/major-corporations-scrap-carbon-offsets-to-focus-on-reductions/ (Accessed: 1 March 2024)

CAT (2016) The ten most important short term steps to limit warming to 1.5°C. Berlin, Germany: Climate Action Tracker (NewClimate Institute, Climate Analytics, Ecofys). Available at: http://climateactiontracker.org/assets/publications/publications/CAT_10_Steps_for_1p5.pdf (accessed on 17 November 2016) (Accessed: 17 November 2016)

CAT (2020) Paris Agreement Compatible Sectoral Benchmarks. Berlin, Germany: Climate Action Tracker (Climate Analytics, NewClimate Institute). Available at: https://climateactiontracker.org/documents/753/CAT_2020-07-10_ParisAgreementBenchmarks_FullReport.pdf (Accessed: 7 March 2024)

CAT (2023a) China Country Assessment, Climate Action Tracker (Climate Analytics, NewClimate Institute). Available at: https://climateactiontracker.org/countries/china/ (Accessed: 13 March 2024)

CAT (2023b) Clean electricity within a generation: Paris-aligned benchmarks for the power sector. Berlin, Germany: Climate Action Tracker (Climate Analytics, NewClimate Institute). Available at: https://climateactiontracker.org/publications/paris-aligned-benchmarks-power-sector/ (Accessed: 19 October 2023)

CAT (2024a) Methodology for 1.5C compatible sectoral benchmarks. Berlin, Germany: Climate Action Tracker (Climate Analytics, NewClimate Institute). Available at: https://climateactiontracker.org/publications/sectors-action/ (Accessed: 16 February 2024)

CAT (2024b) Pulling the plug on fossils in power. Berlin, Germany: Climate Action Tracker (NewClimate Institute, Climate Analytics). Available at: https://climateactiontracker.org/publications/pulling-the-plug-on-fossils-in-power/ (Accessed: 7 February 2024)

CAT (2024c) South Korea Country Assessment, Climate Action Tracker (NewClimate Institute, Climate Analytics). Available at: https://climateactiontracker.org/countries/south-korea/ (Accessed: 16 February 2024)

CAT (2024d) USA Country Assessment, Climate Action Tracker (NewClimate Institute, Climate Analytics). Available at: https://climateactiontracker.org/countries/usa/policies-action/ (Accessed: 16 February 2024)

Christie-Miller, T. and Harvey, V. (2022) Carbon Dioxide Removal in the VCM. Available at: https://bezerocarbon.com/insights/removals-in-the-vcm#references (Accessed: 14 February 2024)

Clark, M.A., Domingo, N.G.G., Colgan, K., et al. (2020) 'Global food system emissions could preclude achieving the 1.5° and 2°C climate change targets', Science, 370(6517), pp. 705–708. doi:10.1126/science.aba7357

Clarke, L., Wei, Y.-M., Navarro, A. de la V., et al. (2022) 'Energy Systems', in Shukla, P.R. et al. (eds) IPCC, 2022: Climate Change 2022: Mitigation of Climate Change. Contribution of Working Group III to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change. Cambridge, UK and New York, NY, USA: Cambridge University Press. doi:10.1017/9781009157926.008

Climate Action 100+ (2022) NEETCO commits to carbon neutrality and coal phase out by 2050, Climate Action 100+, 31 January. Available at: https://www.climateaction100.org/news/repco-commits-to-carbon-neutrality-and-coal-phase-out-by-2050/

Climate Group (2021) Your membership benefits. Climate Group. Available at: https://www.theclimategroup.org/sites/default/files/2021-07/Your%20Membership%20Benefits%20-%20RE100%20EV100%20EP100%20campaigns.pdf (Accessed: 30 November 2023)

Climate Watch and World Resources Institute (2022) Historical Country Greenhouse Gas Emissions Data. Washington, DC, USA: World Resources Institute. Available at: https://www.climatewatchdata.org/ghg-emissions (Accessed: 11 October 2023)

ClimatePartner (2023) ClimatePartner introduces new solution for climate action. Available at: https://www.climatepartner.com/en/news/climatepartner-introduces-new-solution-for-climate-action (Accessed: 11 July 2023)

Cobbing, M. and Vicaire, Y. (2017) Fashion at the Cross Roads: A review of initiatives to slow and close the loop in the fashion industry. Hamburg, Germany: Greenpeace Germany. Available at: https://www.greenpeace.org/international/publication/6969/fashion-at-the-crossroads/ (Accessed: 4 March 2024)

Cole, W. and Karmakar, A. (2023) Cost Projections for Utility-Scale Battery Storage: 2023 Update. Golden, Colorado, USA: NREL. Available at: https://www.nrel.gov/docs/fy23osti/85332.pdf (Accessed: 16 October 2023)

Collins, W.J., Webber, C.P., Cox, P.M., et al. (2018) 'Increased importance of methane reduction for a 1.5 degree target', Environmental Research Letters, 13, p. 054003. doi:10.1088/1748-9326/aab89c

COP26 Presidency (2021) Policy paper: COP26 declaration on accelerating the transition to 100% zero emission cars and vans. UK Government. Available at: https://www.gov.uk/government/publications/cop26-declaration-zero-emission-cars-and-vans/full-publication-date-history (Accessed: 2 November 2022)

Corporate Climate Responsibility Monitor 2024

132

Exhibit 7 to Decl. of Angel Hsu

278

SER 558

133

Costa, C.J. Wallenberg, E., Benitez, M., et al. (2022) Roadmap for achieving net-zero emissions in global food systems by 2050', Scientific Reports, 12(15064), pp. 1–11. doi: https://doi.org/10.1038/s41598-022-18601-1

Crippa, M., Solazzo, E., Guizzardi, D., et al. (2021) 'Food systems are responsible for a third of global anthropogenic GHG emissions', Nature Food, 2(3), pp. 198–209. doi:10.1038/s43016-021-00225-9

Crnjaik, R. F. Oke, U., Re, A., and Cerutti, A. (2022) Decoupling action: Averting multiple threats to food security, European countries are accelerating the shift from fossil fuels towards renewables. Center for Research on Energy and Clean Air (CREA) & Ember Climate. Available at: https://ember-climate.org/app/uploads/2022/06/Ember-EU-national-plans-slash-fossil-fuels.pdf (Accessed: 23 January 2024)

Daimler Truck (2021) Daimler Truck, the TRATON GROUP and Volvo Group sign joint venture agreement for European high-performance charging network. Press release. Daimler Truck AG. Available at: https://www.daimlertruck.com/en/newsroom/pressrelease/daimler-truck-the-traton-group-and-volvo-group-sign-joint-venture-agreement-for-european-high-performance-charging-network-51853097 (Accessed: 1 December 2023)

Daimler Truck (2022a) 'Joint Venture for public charging infrastructure in the U.S. Daimler Truck, 31 January. Available at: https://www.daimlertruck.com/en/newsroom/pressrelease/joint-venture-for-public-charging-infrastructure-in-the-us-77152680/ (Accessed: 30 November 2023)

Daimler Truck (2022b) Sustainability Report 2021. Leinfelden-Echterdingen, Germany: Daimler Truck AG. Available at: https://www.daimlertruck.com/fileadmin/user_upload/documents/sustainability/daimler-truck-sustainability-report-2021.pdf (Accessed: 30 November 2023)

Daimler Truck (2022b) Green Production (Status: 01.12.2023). Daimler Truck AG. Available at: https://www.daimlertruck.com/en/nachhaltigkeit/e-environment/green-production (Accessed: 1 December 2023)

Daimler Truck (2024) Annual Report 2023. Leinfelden-Echterdingen, Germany: Daimler Truck AG. Available at: https://www.daimlertruck.com/fileadmin/user_upload/documents/investors/reports/annual-report-2023/daimler-truck-annual-report-2023-incl-combined-management-report-idhs-ag.pdf (Accessed: 14 March 2024)

Danone (2020a) Danone – Climate Change Questionnaire 2020. Paris, France: Danone. Available at: https://www.cdp.net/en/responses?queries%5Bname%5D=Danone (Accessed: 14 March 2024)

Danone (2020b) Danone announces landmark carbon neutral certification of its baby formula production facility in Wexford (Ireland), in line with commitments to reach Net Zero by 2050. Available at: https://www.danone.com/content/dam/corp/global/danonecom/medias/media-en/2020/business/danone-landmark-carbon-neutral-certification-baby-formula-production-facility-wexford-ireland.pdf (Accessed: 1 March 2024)

Danone (2021) Danone announces landmark certification of its specialized nutrition production site in Brazil on three key environmental pillars: Carbon Neutrality, Water Reduction and Zero-Waste-to-Landfill. Available at: https://www.danone.com/content/dam/corp/global/danonecom/medias/media-en/2021/business/pr-danone-brazil-triple-engagement.pdf (Accessed: 1 March 2024)

Danone (2022) Danone announces its Renew Danone: A global energy excellence programme to drive energy efficiency, resilience and decarbonisation journey. Available at: https://www.danone.com/content/dam/corp/global/danonecom/medias/media-en/2022/corporatecommitments/Energy-excellence-programme.pdf (Accessed: 1 March 2024)

Danone (2023a) 2022 Universal Registration Document. Danone S.A. Available at: https://www.danone.com/content/dam/corp/global/danonecom/medias/media-en/2023/corporatecommitments/danone-urd2022-eng.pdf (Accessed: 1 March 2024)

Danone (2023b) Climate Transition Plan. Paris, France: Danone S.A. Available at: https://www.danone.com/content/dam/corp/global/danonecom/about-us-impact/policies-and-commitments/en/climate-transition-plan-2023-v2.pdf (Accessed: 22 December 2023)

Danone (2023c) Danone's Methane Ambition. Paris, France: Danone S.A. Available at: https://www.danone.com/content/dam/corp/global/danonecom/about-us-impact/policies-and-commitments/en/2023/methane-matters.pdf (Accessed: 9 December 2023)

Dao, T., Mostafa, S., Fiani, F., et al. (2022) Corporate Climate Responsibility Monitor 2022: Assessing the Transparency and Integrity of Companies' Emission Reduction and Net-Zero Targets. New Climate Institute, Berlin and Cologne, Germany: NewClimate Institute & Carbon Market Watch. Available at: https://newclimate.org/wp-content/uploads/2022/02/CorporateClimateResponsibilityMonitor2022.pdf (Accessed: 9 February 2022)

Dao, T., Mostafa, S., Fiani, F., et al. (2023) The evolution of voluntary climate finance towards the high hanging fruit of climate action. Cologne and Berlin, Germany: NewClimate Institute. Available at: https://newclimate.org/resources/publications/the-high-hanging-fruit-of-corporate-climate-action (Accessed: 20 June 2023)

Department for Energy Security & Net Zero (2023) Biomass Strategy 2023. London, United Kingdom: UK Government. Available at: https://www.gov.uk/government/publications/biomass-strategy (Accessed: 15 February 2024)

Deprez, A., Leadley, P., Dooley, K., et al. (2024) 'Sustainability limits needed for CO₂ removal', Science (New York, N.Y.), 383(6682), pp. 484–486. doi:10.1126/science.adj6171

Dietz, S., Gardiner, D., Jahn, V. and Schiavi, A. (2021) Carbon performance assessment of electricity utilities: Note on methodology (November 2021). London, United Kingdom: Transition Pathway Initiative (TPI). Available at: https://www.transitionpathwayinitiative.org/publications/94.pdf?type=Publication (Accessed: 22 January 2024)

Dietz, S., Harvey, E., Jahn, V. and Keller, A.N. (2022) TPI Carbon Performance Assessment of Food Producers: Discussion paper. London, United Kingdom: Transition Pathway Initiative (TPI). Available at: https://www.transitionpathwayinitiative.org/publications/97.pdf?type=Publication (Accessed: 13 December 2022)

Dietz, S., Hastreiter, N. and Scheer, A. (2021) Carbon performance assessment of Other Industrials companies: discussion paper (November 2021). London, United Kingdom: Transition Pathway Initiative (TPI). Available at: https://www.transitionpathwayinitiative.org/publications/97.pdf?type=Publication (Accessed: 26 September 2022)

Dietz, S. and John, V. (2024) Carbon Performance assessment of food producers: note on methodology. London, United Kingdom: Transition Pathway Initiative (TPI). Available at: https://www.transitionpathwayinitiative.org/publications/uploads/2024-carbon-performance-assessment-of-food-producers-note-on-methodology (Accessed: 6 February 2024)

Douglas, L. (2023) 'COP28 summit: Global dairy companies join alliance to cut methane', Reuters, 5 December. Available at: https://www.reuters.com/sustainability/climate-energy/global-dairy-companies-announce-alliance-cut-methane-2023-12-05/ (Accessed: 14 March 2024)

Drax (2024) Drax Power Station. Available at: https://www.drax.com/about-us/our-sites-and-businesses/drax-power-station/ (Accessed: 11 March 2024)

Drew, D. and Whisurme, G. (2017) The Apparel Industry's Environmental Impact in 6 Graphics, WRI Blog, WRI. Available at: https://www.wri.org/insights/apparel-industrys-environmental-impact-6-graphics (Accessed: 7 November 2023)

Duke Energy (2019) Ready for What's Next. Duke Energy 2019 Annual Report and Form 10-K. Duke Energy. Available at: https://s201.q4cdn.com/583391453/files/doc_financials/2019/ar/2019-duke-energy-annual-report.pdf (Accessed: 14 March 2024)

Duke Energy (2021) Powering the Clean Energy Information. Duke Energy 2021 Annual Report and Form 10-K. Duke Energy. Available at: https://s201.q4cdn.com/583391453/files/doc_financials/2021/ar/2021-duke-energy-annual-report.pdf (Accessed: 14 March 2024)

Duke Energy (2022) Ambition, Action. Results. Duke Energy 2021 Annual Report and Form 10-K. Duke Energy. Available at: https://s201.q4cdn.com/583391453/files/doc_downloads/2022/04/2022-energy-information-update-w-reg-p.pdf (Accessed: 1 December 2023)

Duke Energy (2023a) Advancing Toward a Clean, Affordable, and Reliable Energy Future. Duke Energy Climate Report 2022. Duke Energy. Available at: https://s201.q4cdn.com/583391453/files/doc_downloads/esg/key-documents/2023/climate-report-2022.pdf (Accessed: 1 December 2023)

Duke Energy (2023b) Ambition, Action. Results: 2022 Impact Report. Duke Energy. Available at: https://s201.q4cdn.com/583391453/files/doc_downloads/esg/key-documents/2022.pdf (Accessed: 1 December 2023)

Elgin, B. and White, N. (2023) 'Carbon Offset Market Faces Chaos as African Mega-Project Collapses', Bloomberg Green, 27 October. Available at: https://www.bloomberg.com/news/articles/2023-10-27/shaky-zimbabwe-project-puts-whole-carbon-market-at-risk?leadSource=uverify wall (Accessed: 13 December 2023)

Enel (2020) Open Power for a Brighter Future. Enel 2019 Sustainability Report. Rome, Italy: Enel SpA. Available at: https://www.enel.com/content/dam/enel-com/documenti/investitori/informazione-finanziaria/2019/annuali/en/sustainability-report_2019.pdf (Accessed: 13 March 2024)

Enel (2021) Open Power for a Brighter Future. Enel Integrated Annual Report 2020. Rome, Italy: Enel SpA. Available at: https://www.enel.com/content/dam/enel-com/documenti/investitori/informazione-finanziaria/2020/annuali/en/integrated-annual-report_2020.pdf (Accessed: 13 March 2024)

Enel (2023a) Open for a Brighter Future. Enel 2022 Sustainability Report. Enel SpA. Available at: https://www.enel.com/content/dam/enel-com/documenti/investitori/sostenibilita/2022/sustainability-report-2022.pdf (Accessed: 14 December 2023)

ENGIE (2023) Accelerating the energy transition. 2023 ENGIE Integrated Report. France: Engie. Available at: https://www.engie.com/sites/default/files/assets/documents/2024-03/ENGIE_RI23_EN_MEL.pdf (Accessed: 19 December 2023)

ENGIE (2024) Acting for an affordable energy transition and desirable for all. ENGIE 2024 Integrated Report. Engie. Available at: https://www.engie.com/sites/default/files/assets/documents/2024-03/ENGIE_RI24_VA_0103.pdf (Accessed: 14 March 2024)

ESG Today (2023) Nestlé Moves Away from Carbon Offsets to Focus on Emissions Reductions Across Brands. Available at: https://www.esgtoday.com/nestle-moves-away-from-carbon-offsets-to-focus-on-emissions-reductions-across-brands/ (Accessed: 1 March 2024)

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu
279

- ETC (2021) Bioresources within a Net-Zero Emissions Economy: Making a Sustainable Approach Possible. Energy Transitions Commission. Available at: https://www.energy-transitions.org/wp-content/uploads/2022/07/ETC-Bioresources-Report-Final.pdf (Accessed: 05 October 2022)

- European Commission (2022) Implementing the Repower EU Action Plan: Investment needs, hydrogen accelerator and achieving the bio-methane targets. Brussels, Belgium. Available at: https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:52022SC0230&from=EN (Accessed: 7 March 2024)

- European Commission (2023) State of the Energy Union Report 2023. Brussels, Belgium: European Commission. Available at: https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A52023DC0650&qid=1&format=PDF (Accessed: 11 March 2024)

- European Commission (2024) Securing our future. Available at: https://climate.ec.europa.eu/document/download/2cut7710-5fc3-42bf-add8-9a3af271f970_en?filename=2040 Climate Target Communication_en_0.pdf (Accessed: 9 February 2024)

- European Commission (2024) MEPs adopt new law banning promoting and misleading product information. Available at: https://www.europarl.europa.eu/news/en/press-room/20231109IPR10713/meps-adopt-new-law-banning-greenwashing-and-misleading-product-information (Accessed: 4 March 2024)

- European Parliament and the Council of the European Union (2023a) Regulation on CO2 emission performance standards for new passenger cars and new light commercial vehicles. Brussels, Belgium: Council of the European Union. Available at: https://www.consilium.europa.eu/en/press/press-releases/2023/03/28/fit-for-55-council-adopts-regulation-on-co2-emissions-for-new-cars-and-vans/ (Accessed: 13 March 2024)

- European Parliament and the Council of the European Union (2023b) Renewable Energy Directive (2023/2413): Official Journal of the European Union [Preprint]. Brussels, Belgium: European Union. Available at: https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A32023L2413&qid=1697264355105

- Eurostat (2023) 22% of energy consumed in 2022 came from renewables', Eurostat, 22 December. Available at: https://ec.europa.eu/eurostat/web/products-eurostat-news/w/ddn-20231222-2

- Evian (2023) Climate impact. Available at: https://www.evian.com/en_us/sustainability/carbon-neutral/reducing-our-carbon-footprint/?text=Since 2000%2C Carbon Trust has.will not seek global recertification. (Accessed: 5 March 2024)

- Fast Retailing (2021) Integrated Report 2021 LifeWear, Changing the World. Tokyo, Japan: Fast Retailing Co., Ltd. Available at: https://www.fastretailing.com/eng/ir/library/annual.html (Accessed: 29 September 2022)

- Fast Retailing (2023a) Response to Climate Change. Tokyo, Japan: Fast Retailing Co., Ltd. Available at: https://www.fastretailing.com/eng/sustainability/environment/climate.html (Accessed: 30 September 2022)

- Fast Retailing (2023b) Sustainability Report 2022. Fast Retailing Co., Ltd. Available at: https://www.fastretailing.com/eng/sustainability/library/report.pdf/FCT-170593912495560R+HtmlView (Accessed: 22 January 2024)

- Feamileugh, H., Skribbe, R., Grandjent, J. de, et al. (2022) A guide to climate contributions: taking responsibility for emissions without offsetting. Cologne and Berlin, Germany: NewClimate Institute. Available at: https://newclimate.org/resources/publications/a-guide-to-climate-contributions-taking-responsibility-for-emissions (Accessed: 15 January 2024)

- Flynn, G. and Ball, A. (2023) 'Threats in the furnace: Can fashion brands tackle illegal logging in their Cambodian supply chains?', Mongabay News, 12 July. Available at: https://news.mongabay.com/2023/07/forests-in-the-furnace-can-fashion-brands-tackle-illegal-logging-in-their-cambodian-supply-chains/

- FMC (2022a) First Movers Coalition - Aluminium commitment. First Mover Coalition (FMC), World Economic Forum (WEF). Department of State of the United States of America. Available at: https://www3.weforum.org/docs/WEF_First_Movers_Coalition_Aluminium_Commitment_2022.pdf (Accessed: 13 December 2023)

- FMC (2022b) First Movers Coalition - Carbon removal commitment. First Mover Coalition (FMC), World Economic Forum (WEF). Department of State of the United States of America. Available at: https://www3.weforum.org/docs/WEF_First_Movers_Coalition_Carbon_Removal_CDR_2022.pdf (Accessed: 13 December 2023)

- FMC (2022c) Steel commitment. First Mover Coalition (FMC), World Economic Forum (WEF). US Department of the State. Available at: https://www3.weforum.org/docs/WEF_First_Movers_Coalition_Steel_2022.pdf (Accessed: 13 December 2023)

- Forbes (2023) The Global 2000 (2022). Forbes. Available at: https://www.forbes.com/lists/global2000/ (Accessed: 30 December 2023)

- Gao, Y. and Serrenho, A.C. (2023) 'Greenhouse gas emissions from nitrogen fertilizers could be reduced by up to one-fifth of current levels by 2050 with combined interventions', Nature Food, 4, pp. 170–178. doi:https://doi.org/10.1038/s43016-023-00698-w

- GHG Protocol (2004) The GHG Protocol Corporate Accounting and Reporting Standard. Geneva, Switzerland and New York, USA: World Resources Institute (WRI) and World Business Council for Sustainable Development (WBCSD). Available at: https://ghgprotocol.org/corporate-standard (Accessed: 30 November 2023)

- GHG Protocol (2013) Technical Guidance for Calculating Scope 3 Emissions (version 1.0). Supplement to the Corporate Value Chain (Scope 3) Accounting & Reporting Standard. Geneva, Switzerland and New York, USA: World Resources Institute (WRI), World Business Council for Sustainable Development (WBCSD). Available at: https://ghgprotocol.org/sites/default/files/ghgp/standards/Scope3_Calculation_Guidance_0.pdf (Accessed: 30 November 2023)

- GHG Protocol (2023) Standards Update Process: Frequently Asked Questions. Available at: https://ghgprotocol.org/blog/standards-update-process-frequently-asked-questions (Accessed: 27 November 2023)

- Gold Standard (2024) Funding Beyond Value Chain Mitigation - Step by step guidance for organizations taking responsibility for their emissions. Gold Standard. Available at: https://www.goldstandard.org/events/launch-of-funding-beyond-value-chain-mitigation-the-missing-piece-of-corporate-climate-responsibility-for-emission (Accessed: 27 March 2024)

- Government of the Netherlands (2023) Group of European countries aim to decarbonize their electricity system by 2035, 18 December. Available at: https://www.government.nl/latest/news/2023/12/18/group-of-european-countries-aim-to-decarbonize-their-electricity-system-by-2035

- Grant, N., Hawkes, A., Napp, T. and Gambhir, A. (2021) 'Cost reductions in renewables can substantially erode the value of carbon capture and storage in mitigation pathways', One Earth, 4(11), pp. 1588–1601. doi:10.1016/j.oneear.2021.10.024

- Green Cooling Initiative (2015) Green Cooling Technologies: Market Trends in Selected Refrigeration and Air Conditioning Subsectors. Available at: https://hmgroup.com/wp-content/uploads/2023_en_gcl_study_market_trends.pdf (Accessed: 23 February 2024)

- H&M Group (2022) Sustainability Disclosure 2021. Stockholm, Sweden: H&M Group. Available at: https://hmgroup.com/sustainability/sustainability-reporting/ (Accessed: 21 October 2022)

- H&M Group (2023a) Climate. Available at: https://hmgroup.com/sustainability/circularity-and-climate/climate/ (Accessed: 10 January 2023)

- H&M Group (2023b) H&M Group : Climate Change Questionnaire 2022. H&M CDP. Available at: https://hmgroup.com/sustainability/circularity-and-climate/climate-reporting/ (Accessed: 16 August 2023)

- H&M Group (2023c) H&M Group further invests in the decarbonisation of its value chain', Press Release H&M Group, 2 August. Available at: https://hmgroup.com/news/hm-group-further-invests-in-the-decarbonisation-of-its-value-chain/

- H&M Group (2023d) Sustainability Disclosure 2022. Stockholm, Sweden: H&M Group. Available at: https://hmgroup.com/ (Accessed: 18 August 2023)

- H&M Group (2024) Sustainability Disclosure 2023. H&M Group. Available at: https://hmgroup.com/sustainability/sustainability-reporting/ (Accessed: 2 April 2024).

- Hale, T. (2021) University net zero: are the conveyor belt. Blavatnik School of Government, University of Oxford. Available at: https://www.bsg.ox.ac.uk/sites/default/files/2021-11/2021-11 Hale Net Zero Policy Memo.pdf (Accessed: 24 May 2022)

- Hale, T., Smith, S.M., Black, R., et al. (2022) 'Assessing the rapidly-emerging landscape of net zero targets', Climate Policy, 22(1), pp. 18–29. doi:10.1080/14693062.2021.2013155

- Hansman, F. (2023) The corporate climate accountability loop - Introducing key functions of an accountability system for corporate climate action, and selected spotlights on how to improve the system's status quo. Berlin, Germany: NewClimate Institute. doi:10.5281/466027a

- Hearn, D., Haswack, C. and Sachs, L. (2023) 'Antitrust and Sustainability: A Landscape Analysis', SSRN Electronic Journal [Preprint]. doi:10.2139/ssrn.4547522

- Henderson, K., Pinner, D., Rogers, M., et al. (2020) Climate math: What a 1.5-degree pathway would take. McKinsey & Company. Available at: https://www.mckinsey.com/capabilities/sustainability/our-insights/climate-math-what-a-1-point-5-degree-pathway-would-take-final.pdf (Accessed: 11 October 2023)

- Hougten, V. van (2024) 'Adidas' most popular sneakers linked to deforestation and modern slavery in Brazil', Follow the Money, 16 January. Available at: https://www.ftm.eu/articles/the-dark-side-of-your-adidas-sneaker?share=WVVmWV11pMfytovBDOq12P-hX8GNGGvuQ2uwV4cZvKGZ3hHbj67Ko2m4F&utm_medium=social&utm_campaign=share&source=freburton

- Hino (2022) Hino Sustainability Report 2021. Hino, Japan: Hino Motors Ltd. Available at: https://www.hino-global.com/corp/csr/backnumber/pdf/2021/sr21_environment.pdf (Accessed: 27 November 2023)

- Hino (2023a) Financial Results for FY2023. Hino Motors Ltd. Available at: https://www.hino-global.com/corp/for_investors/financial_result/assets/ (Accessed: 18 December 2023)

- Hino (2023b) Strategy of Hino towards Carbon Neutrality. Hino Motors Ltd. Available at: https://www.hino-global.com/corp/for_investors/financial_result/assets/ (Accessed: 18 December 2023)

Exhibit 7 to Decl. of Angel Hsu

134

Hof, C., Voskamp, A., Biber, M.F., et al. (2018) Bioenergy cropland expansion may offset positive effects of climate change mitigation for global vertebrate diversity, PNAS, 115(52), pp. 13294–13299. doi:10.1073/pnas.1807745115

Holmark, R. (2012) 'Harvesting in boreal forests and the biofuel carbon debt', Climatic Change, 112, pp. 415–428. doi:10.1007/s10584-011-0222-6

Iberdrola (2020) 'Biomass Conclusions and Vision 2020'. Available at: https://www.iberdrola.com/documents/20125/42253/Outlook_2020_2030_Conclusions_4.pdf/6dac5272-51c1-4f65-5327b-9945a23356c7t-1633101638412

Iberdrola (2021) Iberdrola's Statement of Non-Financial Information: 2020 Sustainability Report. Available at: https://www.iberdrola.com/documents/20125/42400/gsm21_IA_SustainabilityReport20.pdf/a474f494-b582-0a9a-1132-5d181da2304c?t=1631263714327 (Accessed: 14 March 2024)

Iberdrola (2022) Iberdrola promoted the planting two million trees in 2020 and 2021, a matter that will increase to 20 million in 2030. Available at: https://www.iberdrola.com/sustainability/biodiversity/trees-program (Accessed: 29 January 2024)

Iberdrola (2023a) Iberdrola, global leader in climate action. Available at: https://www.iberdrola.com/sustainability/against-climate-change/climate-action (Accessed: 29 January 2024)

Iberdrola (2023b) Iberdrola Factbook 2023. Iberdrola. Available at: https://www.iberdrola.com/documents/20125/41740/Iberdrola_factbook_2023.pdf (Accessed: 29 January 2024)

Iberdrola (2023c) Iberdrola's intensity emissions: CO₂ emissions, among the lowest generated by utilities. Available at: https://www.iberdrola.com/sustainability/environment/environmental-management/greenhouse-gas-inventory-intensity-emissions (Accessed: 31 January 2024)

Iberdrola (2023d) Iberdrola's Net Zero Roadmap. Available at: https://www.iberdrola.com/documents/20125/791167/gsm23_IA_SustainabilityReport2022.pdf (Accessed: 17 November 2023)

Iberdrola (2023e) Iberdrola launches CarbonZBnature to reduce the global carbon footprint through nature-based solutions. Available at: https://www.iberdrola.com/press-room/news/detail/iberdrola-launches-carbonzbnature-to-reduce-the-global-carbon-footprint-through-nature-based-solution (Accessed: 28 January 2024)

Iberdrola (2023f) Iberdrola SA – Climate Change Questionnaire 2023. Iberdrola, CDP. Available at: https://www.iberdrola.com/documents/20125/41506/CDP_Climate_Change23.pdf (Accessed: 17 November 2023)

Iberdrola (2023f) Iberdrola's scorecard: The sustainability assessment of the Iberdrola group. Available at: https://www.iberdrola.com/sustainability/investors/sustainability-assessment-scorecard (Accessed: 29 January 2024)

Iberdrola (2024a) We signed an agreement to sell more than 8,400 MW of combined-cycle gas in Mexico for €6 billion. Available at: https://www.iberdrola.com/press-room/news/detail/we-signed-an-agreement-to-sell-more-than-8400-mw-of-combined-cycle-gas-in-mexico-for-6-billion (Accessed: 21 February 2024)

Iberdrola (2024b) Iberdrola's Statement of Non-Financial Information: 2023 Sustainability Report. Iberdrola. Available at: https://www.iberdrola.com/documents/20125/42400/gsm24_IA_SustainabilityReport2023.pdf (Accessed: 14 March 2024)

IEA (2020) A Net Zero by 2050: A Roadmap for the Global Energy Sector. Paris, France: International Energy Agency. Available at: https://www.iea.org/reports/net-zero-by-2050 (Accessed: 3 August 2023)

IEA (2022a) World Energy Outlook 2022. Available at: https://www.iea.org/reports/world-energy-outlook-2022 (Accessed: 4 January 2023)

IEA (2023a) Iberdrola launches Grids and Secure Energy Transitions: Enhancing the foundations of resilient, sustainable and affordable power systems. IEA. Available at: https://www.iea.org/topics/world-energy-outlook-2023 (Accessed: 27 February 2024)

IEA (2023b) Global EV Outlook 2023: Catching up with climate ambitions. Paris, France: International Energy Agency (IEA). Available at: https://iea.blob.core.windows.net/assets/dacf14d2-eabc-498a-8263-9f97fd5dc327/GEVO2023.pdf (Accessed: 9 January 2024)

IEA (2023c) Net Zero Roadmap: A Global Pathway to Keep the 1.5°C Goal in Reach (2023 Update). Paris, France: International Energy Agency. Available at: https://iea.blob.core.windows.net/assets/13dab083-08c3-4dfd-a887-42a3ebe533bc/NetZeroRoadmap_AGlobalPathwaytoKeepthe1.5CGoalinReach-2023Update.pdf (Accessed: 18 October 2023)

IEA (2023d) 'Tracking transport'. Available at: https://www.iea.org/energy-system/transport (Accessed: 3 August 2023)

IEA (2024a) World Energy Investment 2023. Available at: https://iea.blob.core.windows.net/assets/8834d3af-af60-4df0-9643-72e2684f7221.WorldEnergyInvestment2023.pdf (Accessed: 2 November 2023)

IEA (2024b) Bioenergy. Energy system overview. Paris, France: International Energy Agency. Available at: https://www.iea.org/energy-system/renewables/bioenergy (Accessed: 30 November 2023)

Inditex (2023a) Inditex Group Annual Report 2022 – Statement of non-financial information. Inditex. Available at: https://static.inditex.com/annual_report_2022.pdf/Statement-on-non-financial-Information-2022.pdf (Accessed: 30 November 2023)

Inditex (2023b) Inditex Group 2022. Available at: https://www.inditex.com/itxcomweb/en/media/cdd54d-4c9f-4ec9-72ab-f55d28d659f01/Inditex+New+Sustainability+Commitments.pdf?t=1690537936b41 (Accessed: 19 January 2024)

Inditex (2024a) 2023 Statement of Non-Financial Information. Inditex. Available at: https://static.inditex.com/annual_report_2023/en/Statement-of-Non-Financial-Information.pdf (Accessed: 22 March 2024)

Inditex (2024b) Climate Transition Plan. Inditex. Available at: https://www.inditex.com/itxcomweb/api/media/4/bdad864c-3266-4a49-a629-0b8bf5b4e83e/Climate+Transition+Plan.pdf?t=1733556093371 (Accessed: 22 March 2024)

IPCC (2019) '8.3 Water Contribution', in Calvo Buendía, E., Tanabe, K., Kranjc, A., Baasansuren, J., Fukuda, M., Ngarize S., Osako, A., Pyrozhenko, Y. and Shermanau, P. and Federici, S. (eds) 2019 Refinement to the 2006 IPCC Guidelines for National Greenhouse Gas Inventories. Intergovernmental Panel on Climate Change (IPCC) Task Force on National Greenhouse Gas Inventories, p. 5. Available at: https://www.ipcc-nggip.iges.or.jp/public/2019rf/vol2.html

IPCC (2021) Climate Change – Summary for Policymakers (SPM), Sixth Assessment Report of the Intergovernmental Panel on Climate Change. Edited by H.O. Pörtner et al. Geneva, Switzerland: Intergovernmental Panel on Climate Change (IPCC). doi:10.1017/9781009157926.002

IRENA (2016) The True Cost of Fossil Fuels: Saving on the Externalities of Air Pollution and Climate Change. IRENA. Available at: https://www.irena.org/-/media/Files/IRENA/Agency/Publication/2016/IRENA_True_Cost_of_Fossil_Fuels_Saving_on_the_Externalities_of_Air-Pollution_and_Climate-Change_2016.pdf (Accessed: 11 October 2023)

IRENA (2019) Electrification with Renewables: Driving the transformation of energy services. Available at: https://www.irena.org/-/media/Files/IRENA/Agency/Publication/2019/Jan/IRENA_RE_Electrification_SGCC_2019_preview.pdf (Accessed: 11 October 2023)

IRENA (2023a) Innovation landscape for smart electrification: Decarbonising end-use sectors with renewable power. IRENA. Available at: https://www.irena.org/Publications/2023/Jun/Innovation-landscape-for-smart-electrification (Accessed: 11 October 2023)

IRENA (2023b) Renewable power generation costs in 2022. IRENA. Available at: https://www.irena.org/-/media/Files/IRENA/Agency/Publication/2023/Aug/IRENA_Renewable_power_generation_costs_in_2022.pdf (Accessed: 11 October 2023)

IRENA (2023c) World Energy Transitions Outlook 2023: 1.5°C Pathway. Abu Dhabi: International Renewable Energy Agency. Available at: https://www.irena.org/-/media/Files/IRENA/Agency/Publication/2023/Jun/IRENA_World_energy_transitions_outlook_2023.pdf?rev=8b5cd2eeb4ef8ecb531d83793da971 (Accessed: 19 October 2023)

ISO (2022) Net Zero Guidelines – Accelerating the transition to net zero. Geneva, Switzerland: International Organization for Standardization (ISO). Available at: https://www.iso.org/obp/ui#iso:iso:42445:1:v1:en (Accessed: 18 October 2023)

Jaeger, J., Boehm, S., Schumer, C., et al. (2023) Methodology Underpinning the State of Climate Action Series: 2023 Update. World Resources Institute. Available at: https://www.wri.org/research/methodology-underpinning-state-climate-action-series-2023-update (Accessed: 18 October 2023)

Jafari, M., Botterud, A. and Sakti, A. (2022) 'Decarbonizing power systems: A critical review of the role of energy storage', Renewable and Sustainable Energy Reviews, 158, p. 112077. doi:10.1016/j.rser.2022.112077

Jaramillo, P., Kahn Ribeiro, S., Newman, P., et al. (2022) 'Chapter 10 - Transport', in Shukla, P.R. et al. (eds) IPCC, 2022: Climate Change 2022: Mitigation of Climate Change. Contribution of Working Group III to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change. Cambridge, UK and New York, NY, USA: Cambridge University Press. doi:10.1017/9781009157926.012

KEPCO (2022) Korea Electric Power Corporation Sustainability Report 2022. Korea Electric Power Corporation (KEPCO). Available at: https://home.kepco.co.kr/kepco/EN/D/htmlView/ENDBHP001.do (Accessed: 9 November 2023)

KEPCO (2023) The End of Great Energy Transition: A Global Energy Company Contributing to Korea's Future Growth - KEPCO & Group Companies Sustainability Report 2023. KEPCO. Available at: https://home.kepco.co.kr/kepco/EN/A/htmlView/SHAFHP001.do?menuCd=EN79ZP026 (Accessed: 15 February 2024)

Kikstra, J., Mardani, F.A., Mayer, A.L., et al. (2015) 'Bioenergy and Biodiversity: Key Lessons from the Literature', Environmental Management, 56, pp. 1377–1396. doi:10.1007/s00267-015-0559-0

Kuyah, S., Whitney, C.W., Jonsson, M., et al. (2019) 'Agroforestry delivers a win-win solution for ecosystem services in sub-Saharan Africa. A meta-analysis', Agronomy for Sustainable Development, 39(5), pp. 1–18. doi:https://doi.org/10.1007/s13593-019-0589-8

Ladislaw, S. and Naimoli, S.J. (2020) Climate Solutions Series: Decarbonizing the Electric Power Sector. Center for Strategic & International Studies (CSIS). Available at: https://www.csis.org/analysis/climate-solutions-series-decarbonizing-electric-power-sector (Accessed: 9 October 2023)

Lara, L. (2023) Stellantis to Launch Hybrid Ethanol Cars in Brazil by 2024', Bloomberg, 1 August. Available at: https://www.bloomberg.com/news/articles/2023-08-01/stellantis-to-launch-hybrid-ethanol-cars-in-brazil-by-2024

Leussink, D. (2023) 'Toyota unveils sweeping plans for new battery tech, EV innovation', Reuters, 13 June. Available at: https://www.reuters.com/business/autos-transportation/toyota-market-next-gen-2026-built-by-new-unit-2023-06-13/

Lee, K., Majdik, R. van, Hugill, R., et al. (2021) Unlocking the trillion-dollar fashion decarbonisation opportunity: Existing and innovative solutions. Apparel Impact Institute (Aii) and Fashion for Good. Available at: https://apparelimpact.org/reports/unlocking-the-trillion-dollar-fashion-decarbonisation-opportunity-report/ (Accessed: 17 August 2023)

Corporate Climate Responsibility Monitor 2024

Exhibit 7 to Decl. of Angel Hsu
281

- Linder, M., Nauclér, T., Nekovar, S. and Pfeiffer, A. (2023) The race to decarbonize electric-vehicle batteries. McKinsey & Company. Available at: https://www.mckinsey.com/industries/automotive-and-assembly/our-insights/the-race-to-decarbonize-electric-vehicle-batteries (Accessed 12 December 2023)

- Liu, T.C., Wu, Y.C. and Chau, C.F. (2023) An Overview of Carbon Emission Mitigation in the Food Industry: Efforts, Challenges, and Opportunities', Processes, 11(7). doi:10.3390/pr11071993

- Liu, W., Hao, J. and Kong, A. (2023) Breaking The Mold: The Role of Automakers In Steel Decarbonisation. Greenpeace East Asia. Available at: https://www.greenpeace.org/static/planet4-eastasia-stateless/2023/05/e45b70a3-auto_steel_report_2023_greenpeace.pdf (Accessed 12 December 2023)

- Lorentz, B., Tralau, J., and Philp, P. (2023) Green hydrogen: Energizing the path to net zero. Deloitte. Available at: https://www2.deloitte.com/us/en/insights/industry/renewable-energy/green-hydrogen-energy-transition.html (Accessed 14 October 2023)

- Lutz, N. et al. (2023) Net Zero Tracker: In the pipeline. Available at: https://s1-net-edcdn.com/Reports/NTZ_In_the_Pipeline_Status_Fossil_Fuel_Phase_Outs_2023.pdf?v=1701634513 (Accessed: 28 February 2024)

- Majumdar, A., Shukla, S., Singh, A.A. and Arora, S. (2020) 'Circular Fashion: Properties of fabrics made from mechanically recycled poly-ethylene terephthalate (PET) bottles', Resources, Conservation and Recycling, 161, p. 104915. doi:https://doi.org/10.1016/j.resconrec.2020.104915

- MAN (2023) Sustainability Report 2022. Munich, Germany: MAN Truck & Bus. Available at: https://www.man.org/mg_media/media/dam/content_medien/doc/man_annualreports/MAN_group_Sustainability_1/about_man_1/sustainability_1/MAN_Sustainability_Report_2022_EN.pdf (Accessed 22 February 2024)

- Manouri, R. (2023) 'COP26: Organisations unite on rate of carbon credits for voluntary corporate climate action', Carbon Pulse, 4 December. Available at: https://carbon-pulse.com/243809/

- Mars (2023a) Climate Action Position Statement. Available at: https://www.mars.com/about/policies-and-practices/climate-action (Accessed: 1 March 2024)

- Mars (2023b) Mars Carbon Neutral Brands. Available at: https://www.mars.com/about/policies-and-practices/mars-carbon-neutral-brands (Accessed: 1 March 2024)

- Mars (2023c) Net Zero Roadmap. McLean, United States of America: Mars, Incorporated. Available at: https://www.mars.com/sites/g/files/jydpyr316/files/2023-10/NetZeroRoadmap_15December 2023.pdf

- McLaren, D.P., Tyfield, D.P., Willis, R., et al (2019) 'Beyond "Net-Zero": A Case for Separate Targets for Emissions Reduction and Negative Emissions', Frontiers in Climate, 1, p. 4. doi:10.3389/fclim.2019.00004

- Mission Possible Partnership (2022) Making zero-emissions trucking possible: An industry-backed, 1.5°C-aligned transition strategy. Available at: https://www.missionpossiblepartnership.org/wp-content/uploads/2022/11/Making-Zero-Emissions-Trucking-Possible.pdf (Accessed: 18 October 2023)

- Mitchell, S.R., Harmon, M.E. and O'Connell, K.E.B. (2012) 'Carbon debt and carbon sequestration parity in forest bioenergy production', GCB Bioenergy, 4, pp. 818–827. doi:10.1111/j.1757-1707.2012.01173.x

- Møllere, M. (2022) E-fuels in trucks: expensive, scarce, and less green than batteries. Brussels, Belgium: Transport & Environment. Available at: https://www.transportenvironment.org/wp-content/uploads/2022/11/202211_trucks_BET_vs_e-fuels-1.pdf (Accessed: 11 March 2022)

- Montel and Ember (2024) Carbon Price Tracker. Available at: https://ember-climate.org/data/data-tools/carbon-price-viewer/ (Accessed: 9 February 2024)

- Moskv16, S., Hørt, F., Marquardt, M., et al. (2022) Evaluating corporate target setting in the setting in the Netherlands. Berlin and Cologne, Germany: NewClimate Institute. Available at: https://newclimate.org/sites/default/files/2022-07/NewClimate_Evaluating_corporate_target_setting_in_the_Netherlands_July22.pdf (Accessed: 12 October 2023)

- Moskvik, S., Day, T. and Smit, S. (2024) Navigating the nuances of corporate renewable electricity procurement: Spotlight on Fashion and Tech. Berlin and Cologne, Germany: NewClimate Institute. Available at: https://newclimate.org/resources/publications/navigating-the-nuances-of-corporate-renewable-electricity-procurement (Accessed: 20 February 2024)

- Morkk, A., Opsomer, R., Hermann, S., et al (2017) A new textile economy: redesigning fashion's future. Ellen MacArthur Foundation. Available at: https://ellenmacarthurfoundation.org/a-new-textiles-economy (Accessed: 2 September 2023)

- Mulder, M. and Zeamer, S.P.E. (2016) 'Contribution of green islands in electricity retail markets to fostering renewable energy', Energy Policy, 99, pp. 100–109. doi:https://doi.org/10.1016/j.enpol.2016.09.040

- Nadel, S. (2019) 'Electrification in the Transportation, Buildings, and Industrial Sectors: a Review of Opportunities, Barriers, and Policies', Current Sustainable/Renewable Energy Reports, 6(4), pp. 158–168. doi:10.1007/s40518-019-00138-z

- Nature Climate Change Editorial (2018) 'The price of fast fashion', Nature Climate Change, 8(1), p. 1. doi:10.1038/s41558-017-0058-9

- Navixtar (2023) Sustainability Report 2022. Lisle, Illinois, USA: Navistar, Inc. Available at: https://www.navistar.com/-/media/Project/Navistar/Navistar/Social-Impact-Environment/2022-SR-FINAL.pdf?rev=16dedd684284fabe8a45e95e (Accessed: 22 February 2024)

- Nestlé (2022a) Creating Shared Value and Sustainability Report 2021. Switzerland: Nestlé S.A. Available at: https://www.nestle.com/sites/default/files/2022-03/creating-shared-value-sustainability-report-2021-en.pdf (Accessed: 22 February 2024)

- Nestlé (2022b) Nestlé's Net Zero Roadmap. Switzerland: Nestlé S.A. Available at: https://www.nestle.com/sites/default/files/2021-12/nestle-net-zero-roadmap-en.pdf (Accessed: 31 January 2024)

- Nestlé (2023a) Nestlé's Net Zero Roadmap | March 2023. Vevey, Switzerland: Nestlé S.A. Available at: https://www.nestle.com/sites/default/files/2023-12/nestle-net-zero-roadmap-en.pdf (Accessed: 5 February 2024)

- Nestlé (2024) Creating Shared Value and Sustainability Report 2023. Vevey, Switzerland: Nestlé S.A. Available at: https://www.nestle.com/sites/default/files/2024-02/creating-shared-value-sustainability-report-2023-en.pdf (Accessed: 6 March 2024)

- Net Zero Tracker (2023) Net Zero Stocktake 2023. Cologne, Berlin, Oxford, London, North Carolina: NewClimate Institute, Oxford Net Zero, Energy & Climate Intelligence Unit, Data-Driven EnviroLab. Available at: https://s1-net-edcdn.com/Reports/Net_Zero_Stocktake_2023.pdf?v=1697216492 (Accessed 5 September 2023)

- NewClimate Institute (2022a) Guidance and assessment criteria for good practice corporate emission reduction and net zero targets: Version 3.0. Berlin and Cologne, Germany: NewClimate Institute. Available at: https://newclimate.org/sites/default/files/2023-02/NewClimate_CCRM2023_Methodology_Feb23.pdf (Accessed: 21 February 2023)

- NewClimate Institute (2023b) Reaction: Apple unveils its first carbon neutral products. Available at: https://newclimate.org/news/reaction-apple-unveils-its-first-carbon-neutral-products (Accessed: 1 March 2024)

- NewClimate Institute (2024a) Guidance and assessment criteria for good practice corporate emission reduction and net zero targets: Version 4.0. Berlin and Cologne, Germany: NewClimate Institute. Available at: https://about.cdia.com/ten/newsroom/reports/ty23-nike-inc-impact-reports (Accessed: 27 August 2023)

- NewClimate Institute and Data-Driven EnviroLab (2020) Navigating the nuances of net zero targets. Thomas Day, Silke Mooldijk and Takeshi Kuramochi (NewClimate Institute) and Angel Hsu, Zhi Yi Yeo, Amy Weinfurter, Yin Xi Tan, Ian French, Yoku Nangdeo, Odele Tan, Sowmya Raghavan, Elwin Lim, and Ajay Nair (Data-Driven EnviroLab). Available at: https://newclimate.org/2020/10/22/navigating-the-nuances (Accessed: 12 October 2023)

- Ng, C. (2023) 'KEPCO makes moves but can it avoid a death spiral?', The Institute for Energy Economics and Financial Analysis (IEEFA), 21 November. Available at: https://ieefa.org/resources/kepco-makes-moves-can-it-avoid-death-spiral

- Ng, C. and Ilango, H-J. (2022) KEPCO's Clean Energy Transition Hangs in the Balance. The Institute for Energy Economics and Financial Analysis (IEEFA). Available at: https://ieefa.org/sites/default/files/2022-05/... (Accessed: 13 November 2023)

- Nike (2023) FY22 NIKE, Inc. Impact Report. Available at: https://about.nike.com/en/newsroom/reports/fy22-nike-inc-impact-report (Accessed: 27 August 2023)

- Nike (2024a) FY23 Nike, Inc. Impact Report. Nike. Available at: https://about.nike.com/en/newsroom/reports/fy23-nike-inc-impact-report (Accessed: 26 March 2024)

- Odawara, H. and Hirata, K. (2023) Assessing Net Zero Integrity Review of 10 Japanese Companies. Climate Integrate. Available at: https://climateintegrate.org/wp-content/uploads/2023/05/Assessing-Net-Zero-EN.pdf (Accessed: 9 June 2024)

- Oxford Net Zero (2023) Tracking Net Zero Regulation and Policy. University of Oxford. Available at: https://netzeroclimate.org/regulation-tracking/ (Accessed: 1 September 2023)

- Pathak, M., Slade, R., Pichs-Madruga, R., et al. (2022) 'Technical summary', in Shukla, P.R. et al. (eds) Climate Change 2022: Mitigation of Climate Change. Contribution of Working Group III to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change. Cambridge, UK and New York, NY, USA: Cambridge University Press. doi:10.1017/9781009157926.002

- Puglisse, A. and Godfned, S. (2022) Recommendations for a consistent EU Regulatory Framework on corporate sustainability targets and transitions. WWF. Available at: https://wwfeu.awsassets.panda.org/downloads/recommendations_for_a_consistent_eu_regulatory_framework.pdf (Accessed: 19 July 2023)

- Race to Zero (2022) Starting Line and Leadership Practices 3.0 - Minimum criteria required for participation in the Race to Zero campaign. Bonn, Germany: UNFCCC. Available at: https://climatechampions.unfccc.int/wp-content/uploads/2022/06/Race-to-Zero-Criteria-3.0-4.pdf (Accessed: 27 July 2022)

- RE100 (2023) Driving renewables in a time of change: RE100 Annual Disclosure Report 2022. Available at: https://www.there100.org/driving-renewables-time-change-re100-annual-disclosure-report-2022 (Accessed: 22 September 2023)

- RE100 (2024) RE100 2023 Annual Disclosure Report. Climate Group. Available at: https://www.there100.org/our-work/publications/re100-2023-annual-disclosure-report (Accessed: 14 March 2024)

- Reisinger, A., Clark, H., Cowie, A.L., et al (2021) 'How necessary and feasible are reductions of methane emissions from livestock to support stringent temperature goals?', Phil. Trans. R. Soc. A. 379(20200452), pp. 1–18. doi:https://doi.org/10.1098/rsta.2020.0452

Exhibit 7 to Decl. of Angel Hsu

282

136

Corporate Climate Responsibility Monitor 2024

137

Exhibit 7 to Decl. of Angel Hsu

283

- Ritchie, H. and Rosado, P. (2020) Electricity Mix, Our World in Data. Available at: https://ourworldindata.org/electricity-mix (Accessed: 14 October 2023)

- Roberts, M.W. (2017) 'Finishing the job: The Montreal Protocol moves to phase down hydrofluorocarbons', RECIEL, 26, pp. 220–230. doi: https://doi.org/10.1111/reel.12225

- Robinson-Tillett, S. (2024) 'SBTi axes net zero commitments of 200+ companies', Responsible Investor. Available at: https://www.responsible-investor.com/sbti-axes-net-zero-commitments-of-200-companies/ (Accessed: 14 March 2024)

- Roe, S., Streck, C., Obersteiner, M. et al. (2019) 'Contribution of the land sector to a 1.5°C world', Nature Climate Change, 9, pp. 817–828. doi: https://doi.org/10.1038/s41558-019-0591-9

- Roe, S., Streck, C., Beach, R., et al. (2021) 'Land-based measures to mitigate climate change: Potential and feasibility by country', Global Change Biology, 27(23), pp. 6025–6058. doi:10.1111/gcb.15873

- Rogelj, J., Shindell, D., Jiang, K., et al. (2018) 'Mitigation Pathways Compatible with 1.5°C in the Context of Sustainable Development', in Masson-Delmotte, V. et al. (eds) Global Warming of 1.5°C. An IPCC Special Report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways, in the context of strengthening the global response to the threat of climate change, Cambridge, UK and New York, NY, USA: Cambridge University Press, pp. 93–174. Available at: https://www.ipcc.ch/sr15/chapter/chapter-2/

- RWE (2024) Discover bioenergy: Biomass & Biogas. Available at: https://www.rwe.com/en/our-energy/discover-renewables/bioenergy/ (Accessed: 15 February 2024)

- Saadat, S., Vespa, M. and Krosnick, M. (2020) Rhetoric vs. Reality: The Myth of 'Renewable Natural Gas' for Building Decarbonization, Earthjustice & Sierra Club. Available at: http://earthjustice.org/wp-content/uploads/report_building-decarbonization-2020.pdf#page=1 (Accessed: 26 January 2024)

- Sadowski, M. (2023) Taking Stock of Progress Against the Roadmap to Net Zero. Available at: https://apparelimpact.org/wp-content/uploads/2023/06/AII_RoadmapReport-6-15-1.pdf (Accessed: 7 November 2023)

- Sadowski, M., Perkins, L. and McGarvey, E. (2021) Roadmap to Net Zero: Delivering Science-Based Targets in the Apparel Sector, World Resources Institute. Washington D.C., United States of America: World Resources Institute (WRI) and Apparel Impact Institute (Aii). doi:10.46830/wrirep.20.00004

- SBTi (2018) Apparel and footwear sector – Science-based targets guidance, Science Based Targets initiative (SBTi), CDP, United Nations Global Compact, World Resources Institute (WRI): World Wide Fund for Nature (WWF). Available at: https://sciencebasedtargets.org/resources/legacy/2019/06/SBT_App_Guide_final_0718.pdf (Accessed: 26 September 2022)

- SBTi (2022a) Forest, Land and Agriculture Science Based Target Setting Guidance, Science Based Target initiative. Available at: https://sciencebasedtargets.org/resources/files/SBTi-FLAG-Guidance-Aug22.pdf (Accessed: 19 February 2024)

- SBTi (2022b) Forest, Land and Agriculture Science Based Target Setting Guidance, Science Based Targets initiative (SBTi), CDP, United Nations Global Compact, World Resources Institute (WRI): World Wide Fund for Nature (WWF). Available at: https://sciencebasedtargets.org/resources/files/SBTi-FLAG-Guidance.pdf (Accessed: 28 September 2022)

- SBTi (2022c) Transport – Our updated OEMS policy (Status: October 2022), Science Based Targets initiative (SBTi). Available at: https://sciencebasedtargets.org/net-zero/transport#transport-updated-oems-policy (Accessed: 11 October 2022)

- SBTi (2022d) Summary of 1.5°C Target-Setting Requirements by Automaker (Status: October 2022), Science Based Targets initiative (SBTi). Available at: https://sciencebasedtargets.org/resources/files/OurKEYRequirementsofTransportUpdatedOEMspolicy1.pdf (Accessed: 18 October 2022)

- SBTi (2023a) Forest, Land and Agriculture Science Based Target Setting Guidance, Version 1.1 (December 2023), Science Based Targets initiative (SBTi). Available at: https://sciencebasedtargets.org/resources/files/Forest-Land-and-Agriculture-Science-Based-Target-Setting-Guidance.pdf (Accessed: 17 February 2024)

- SBTi (2023b) Procedure for validations of SBTi targets, Version 1.0 (December 2023), Science Based Targets initiative (SBTi). Available at: https://sciencebasedtargets.org/resources/files/Procedure-for-validation-of-SBTi-targets.pdf (Accessed: 14 March 2024)

- SBTi (2023c) SBTi Corporate Net-Zero Standard, Version 1.1 (April 2023), Science Based Targets initiative (SBTi). Available at: https://sciencebasedtargets.org/resources/files/Net-Zero-Standard.pdf (Accessed: 30 November 2023)

- SBTi (2024a) Target Dashboard, Nestlé, Science Based Targets initiative (SBTi). Available at: https://sciencebasedtargets.org/target-dashboard (Accessed: 31 January 2024)

- SBTi (2024a) Business Ambition for 1.5°C campaign - Final report, Science Based Targets initiative (SBTi). Available at: https://sciencebasedtargets.org/resources/files/Science-Based-Targets-Ambition-final-report.pdf#asisc=2800269#p8s.url (Accessed: 14 March 2024)

- SBTi (2024b) FAQS - Information about the SBTi and science-based targets [Status: 05.03.2024], Science Based Targets initiative (SBTi). Available at: https://sciencebasedtargets.org/faqs#how-often-is-the-sbtis-validation-updated-with-new-targets-and-commitments (Accessed: 5 March 2024)

- T&E (2023) Biofuels and a twist in trucks will make it harder for aviation and shipping to go green. Brussels, Belgium: Transport & Environment (T&E). Available at: https://www.transportenvironment.org/wp-content/uploads/2023/11/202311_TE_briefing_fuels_trucks_vs_aviation_shipping-1.pdf (Accessed: 11 March 2024)

- SBTi (2024d) SBTi Corporate Net-Zero Standard, Version 1.2 (March 2024), Science Based Targets initiative (SBTi). Available at: https://sciencebasedtargets.org/resources/files/Net-Zero-Standard.pdf (Accessed: 14 March 2024)

- SBTi (2024e) Why is temperature alignment given for scope 1 and 2 targets only, not scope 3? [Status: March 2024], Science Based Targets initiative (SBTi). Available at: https://sciencebasedtargets.org/faqs#why-is-temperature-alignment-given-for-scopes-1-and-2-targets-only-not-scope-3 (Accessed: 14 March 2024)

- SBTi (2024f) Land sector transport science-based target-setting guidance (Version 1.0, March 2024), Science Based Targets initiative (SBTi). Available at: https://sciencebasedtargets.org/resources/files/Land-Transport-Guidance.pdf (Accessed: 21 March 2024)

- Scania (2023) Sustainability Report 2022, Södertälje, Sweden: Scania AB. Available at: https://www.scania.com/content/dam/group/investor-relations/annual-reviews/download-full-reports/scania-annual-and-sustainability-report-2022.pdf (Accessed: 4 November 2023)

- Schneider Electric (2022) Gigaton PPA. Available at: https://gigatonppa.com/ (Accessed: 4 December 2022)

- Searchinger, T., Waite, R., Hanson, C., et al. (2018) 'Creating a Sustainable Food Future: A Menu of Solutions to Feed Nearly 10 Billion People by 2050 - Final report', Washington, D.C.: World Resources Institute. Available at: https://research.wri.org/wrr-food

- Searchinger, T. and Heimlich, R. (2015) Avoiding Bioenergy Competition for Food Crops and Land, 9. WRI. Available at: https://www.wri.org/research/avoiding-bioenergy-competition-food-crops-and-land (Accessed: 2 February 2024)

- Searchinger, T.D., Beringer, T., Holtsmark, B., et al. (2018) 'Europe's renewable energy directive poised to harm global forests', Nature Communications, 9, p. 3741. doi:10.1038/s41467-018-06175-4

- Setzer, J. and Higham, C. (2022) Global trends in climate change litigation: 2022 snapshot, London, United Kingdom: Grantham Research Institute on Climate Change and the Environment; Centre for Climate Change Economics and Policy. Available at: https://www.lse.ac.uk/granthaminstitute/wp-content/uploads/2022/08/Global-trends-in-climate-change-litigation-2022-snapshot.pdf (Accessed: 16 December 2022)

- Setzer, J. and Higham, C. (2023) Global Trends in Climate Change Litigation: 2023 Snapshot, London, United Kingdom: Grantham Research Institute on Climate Change and the Environment and the Centre for Climate Change Economics and Policy. Available at: https://www.lse.ac.uk/granthaminstitute/wp-content/uploads/2023/06/Global_trends_in_climate_change_litigation_2023_snapshot.pdf (Accessed: 28 July 2023)

- Shades of Green (2023) Daimler Truck Group - Green Finance Framework Second Opinion. Available at: https://www.dnv.com/news/shades-of-green-second-opinion/ (Accessed: 29 November 2023)

- SouthPole (2023) South Pole calls for businesses to align around new future proof green claims: Funding Climate Action. Available at: https://www.southpole.com/news/south-pole-calls-for-businesses-to-align-around-new-future-proof-green-claim-funding-climate-action (Accessed: 11 July 2023)

- Stand.earth (2023) Fossil Free Fashion Scorecard. Stand.earth. Available at: https://stand.earth/fashion-the-problem/ (Accessed: 7 November 2023)

- Stellantis (2022) Dare Forward 2030: Stellantis Long-Term Strategic Plan. Amsterdam, The Netherlands: Stellantis N.V. Available at: https://www.stellantis.com/content/dam/stellantis-corporate/group/strategic-plan-2030/2022-03-01_Strategic_Plan.pdf (Accessed: 6 April 2024)

- Stellantis (2023a) 2022 Corporate Social Responsibility Report: Powered by Our Diversity, We Lead the Way The World Moves. Hoofddorp, The Netherlands: Stellantis N.V. Available at: https://www.stellantis.com/content/dam/stellantis-corporate/sustainability/csr-disclosure/stellantis/2022-csr-report.pdf (Accessed: 22 January 2024)

- Stellantis (2023b) Annual Report and Form 20-F for the year ended December 31, 2022, Stellantis N.V. Available at: https://www.stellantis.com/content/dam/stellantis-corporate/investors/financial-reports/Stellantis-NV-20221231-Annual-Report.pdf (Accessed: 17 January 2023)

- Sterman, J.D., Siegel, L. and Rooney-Varga, J.N. (2018) 'Does replacing coal with wood lower CO2 emissions? Dynamic lifecycle analysis of wood bioenergy', Environmental Research Letters, 13(1), p. 015007. doi:10.1088/1748-9326/aaa512

Corporate Climate Responsibility Monitor 2024

138

Takahashi, N. (2024) 'Toyota Chairman Predicts Battery Electric Cars Will Only Reach 30% Share', Bloomberg, 23 January. Available at: https://www.bloomberg.com/news/articles/2024-01-23/toyota-chairman-predicts-battery-electric-cars-will-only-reach-30-share (Accessed: 24 February 2024)

TerMeulen, M.T., Colombo, S.J., Luvisio, D., et al. (2015) 'Carbon debt repayment or carbon sequestration parity? Lessons from a forest bioenergy case study in Ontario, Canada', GCB Bioenergy, 7, pp. 704–716. doi:10.1111/gcbb.12198

Tesco (2023a) Tesco - Climate Change Questionnaire 2023, Tesco. CDP. Available at: https://www.cdp.net/en/responses?queries%5Bsearch%5D=tesco (Accessed: 15 January 2024)

Tesco (2023b) Tesco Annual Report and Financial Statement 2023, Welwyn Garden City, United Kingdom: Tesco PLC. Available at: https://www.tescoplc.com/media/u1m6q5qf/tesco-plc-annual-report-2023.pdf (Accessed: 30 January 2024)

Tesco (2024) Climate Change, Tesco PLC. Available at: https://www.tescoplc.com/sustainability/planet/climate-change/ (Accessed: 30 January 2024)

Tesla, S. (2022) Achieving the Paris Climate Agreement Goals. Part 2: Science-based Target Setting for the Finance Industry — Net-Zero Sectoral 1.5°C Pathways for Real Economy Sectors. Cham, Switzerland: Springer. Available at: https://link.springer.com/content/pdf/10.1007/978-3-030-99177-7.pdf (Accessed: 24 August 2022)

Teske, S., Bratzel, S., Tellermann, R., et al. (2022) The Internal Combustion Engine Bubble. Hamburg, Germany: Greenpeace. Available at: https://www.greenpeace.de/publikationen/ICE-Bubble_0.pdf (Accessed: 11 November 2022)

Teske, S., Rispler, J., Niklas, S., et al. (2023) 'Net-zero 1.5°C sectoral pathways for G20 countries: energy and emissions data to inform science-based decarbonization targets', SN Applied Sciences, 5(9), p. 252. doi:10.1007/s42452-023-05481-x

The Hydrogen Council and McKinsey & Company (2021) Hydrogen for Net-Zero A critical cost-competitive energy vector. Available at: https://hydrogencouncil.com/wp-content/uploads/2021/11/Hydrogen-for-Net-Zero_Full-Report.pdf (Accessed: 16 October 2023)

The White House (2021) 'President Biden Announces Steps to Drive American Leadership Forward on Clean Cars and Trucks', 5 August. Available at: https://www.whitehouse.gov/briefing-room/statements-releases/2021/08/05/fact-sheet-president-biden-announces-steps-to-drive-american-leadership-forward-on-clean-cars-and-trucks/

ThyssenKrupp (2022) Climate Change 2022, CDP Climate Change Questionnaire Responses. CDP. Available at: https://www.cdp.net/en/responses?queries%5Bsearch%5D=thyssenkrupp (Accessed: 28 December 2023)

Tol, D., Frateur, T., Verbeek, M., et al. (2022) Techno-economic update potential of zero-emission trucks in Europe. The Hague, The Netherlands: TNO. Available at: https://www.cedelft.eu/wp-content/uploads/sites/2/2022/11/bbz_techno-economic_update_potential_of_zero-emission_trucks_in_europe.pdf (Accessed: 11 March 2024)

Toyota (2023a) Let's Change the Future with BEVs (June 2023), Toyota Motor Corporation. Available at: https://global.toyota/pages/global_toyota/mobility/toyota-brand/environment/beyond_zero/2023/06/02_en.pdf?page=19 (Accessed: 18 December 2023)

Toyota (2023b) Sustainability Data Book 2023, Toyota, Japan, Japan: Toyota Motor Corporation. Available at: https://global.toyota/pages/global_toyota/sustainability/report/sdb/sdb23_en.pdf (Accessed: 23 November 2023)

Toyota (2023c) Views on Climate Public Policies 2023, Toyota, Japan: Toyota Motor Corporation. Available at: https://global.toyota/en/sustainability/esg/climate-change/climate_public_policy/ (Accessed: 6 February 2024)

Toyota (2023d) Toyota Motor Corporation - Climate Change 2023, CDP Climate Change Questionnaire Responses. CDP. Available at: http://www.cdp.net/en/formatted_responses/responses?campaign_id=74243094&discloser_id=892567&locale=en&organization_name=Toyota+Motor+Corporation&organization_number=19259&project_year=2023&redirect=https%3A%2F%2Fcdp.credit360.com%2Fsurveys... (Accessed: 14 December 2023)

Toyota Europe (2021) Toyota Motor Europe outlines its path to 100% CO₂ reduction by 2035, Press Release. Toyota Motor Corporation. Available at: https://newsroom.toyota.eu/toyota-motor-europe-outlines-its-path-to-100-co2-reduction--by-2035/ (Accessed: 24 November 2022)

Toyota Europe (2023a) Electrification (Status: 24.11.2023), Toyota Motor Corporation. Available at: https://www.toyota-europe.com/electrification (Accessed: 16 November 2023)

Toyota Europe (2023b) Written evidence from Toyota Motor Europe. Toyota, Japan: Toyota Motor Europe. Available at: https://committees.parliament.uk/writtenevidence/124649/pdf/ (Accessed: 6 February 2024)

TPI (2023a) Toyota (Assessment of 9 February 2023). Transition Pathway Initiative (TPI). Available at: https://www.transitionpathwayinitiative.org/companies/toyota (Accessed: 23 November 2023)

TPI (2023b) Volkswagen (Assessment of 9 February 2023). Transition Pathway Initiative (TPI). Available at: https://www.transitionpathwayinitiative.org/companies/volkswagen (Accessed: 23 November 2023)

Transport & Environment (2018) How to decarbonise European transport by 2050. Brussels, Belgium: Transport & Environment. Available at: https://www.transportenvironment.org/discover/how-decarbonise-european-transport-2050/ (Accessed: 24 October 2022)

Traton (2022a) ESG Factbook 2023 (Status: August 2022). Munich, Germany: Volkswagen Group. Available at: https://traton.com/dam/jcr:9bd1125-78ae-4611-8956-723a8d7bc317/TRATON_ESG_Factbook_230809.pdf (Accessed: 11 December 2023)

Traton (2023a) TRATON GROUP records over €40 billion in sales revenue in 2022 for the first time and looks ahead to 2023 with optimism. Press Release. Traton Group. Available at: https://traton.com/en/newsroom/press-releases/traton-group-records-over-40-billion-euro-in-sales-revenue-in-2022.html (Accessed: 13 December 2023)

Trend Asia (2023) Indonesian and international CSOs call on the fashion industry to rule out biomass in order to ensure a clean energy transition away from fossil fuels and false solutions, Trend Asia. Available at: https://trendasia.org/en/indonesian-and-international-csos-call-on-the-fashion-industry-to-rule-out-biomass-in-order-to-ensure-a-clean-energy-transition-away-from-fossil-fuels-and-false-solutions/ (Accessed: 7 November 2022)

UN HLEG (2022) Integrity Matters: Net Zero Commitments by Businesses, Financial Institutions, Cities and Regions. United Nations' High-Level Expert Group on the Net Zero Emissions Commitments of Non-State Entities. Available at: https://www.un.org/sites/un2.un.org/files/high-level_expert_group_n7b.pdf (Accessed: 29 November 2022)

UNEP (2023) Global Climate Litigation Report: 2023 Status Review, Nairobi, Kenya: United Nations Environment Programme. Available at: https://wedocs.unep.org/bitstream/handle/20.500.11822/43008/global_climate_litigation_report_2023.pdf?sequence=3 (Accessed: 17 September 2023)

UNFCCC Race to Zero (2021) Net Zero Financing Roadmaps, Available at: https://assets.bbhub.io/company/sites/63/2021/10/NZFRi-Key-Messages.pdf

UNFCCC (2021) Upgrading our systems together 'A global challenge to accelerate sector breakthroughs for COP26 — and beyond. UNFCCC Climate Champions. Available at: https://racetozero.unfccc.int/wp-content/uploads/2021/09/2030-breakthroughs-upgrading-our-systems-together.pdf (Accessed: 7 December 2022)

UNFCCC (2023a) Conference of the Parties serving as the meeting of the Parties to the Paris Agreement', United Nations Framework Convention on Climate Change, pp. 1–21. Available at: https://unfccc.int/sites/default/files/resource/cma2023_L17_adv.pdf

UNFCCC (2023b) NAZCA Global Climate Action portal. Available at: https://climateaction.unfccc.int/ (Accessed: 27 January 2023)

UNFCCC (2022a) UNFCCC Secretariat Recognition and Accountability Framework for non-Party stakeholder climate action (Version 1.0, 4 June 2023). Bonn, Germany: United Nations Climate Change Secretariat (UNFCCC). Available at: https://unfccc.int/sites/default/files/resource/Recognition_and_Accountability_Framework_June_2023.pdf... (Accessed: 18 December 2023)

Uniqlo (2022) UNIQLO Launches RE:UNIQLO STUDIO in London Report Store. Fast Retailing Co., Ltd. Available at: https://www.fastretailing.com/eng/group/news/2209911300.html (Accessed: 22 November 2022)

Vattenfall (2024) Mölnlichen Värtet CHP plant. Available at: https://powerplants.vattenfall.com/nordic/vartan-vartet/ (Accessed: 15 February 2024)

VCMI (2023a) Claims Code of Practice: Building integrity in voluntary carbon markets. Voluntary Carbon Markets Integrity Initiative. Available at: https://vcmintegrity.org/wp-content/uploads/2023/11/VCMI-Claims-Code-of-Practice/ (Accessed: 7 December 2023)

VCMI (2023b) Scope 3 Flexibility Claim - Beta version. Voluntary Carbon Markets Integrity Initiative (VCMI). Available at: https://vcmintegrity.org/wp-content/uploads/2023/11/Scope-3-Flexibility-Claim-Beta.pdf (Accessed: 6 December 2023)

Volkswagen (2022) Volkswagen Aktiengesellschaft. Sustainability Report 2021. Wolfsburg, Germany: Volkswagen AG. Available at: https://www.volkswagen-group.com/en/publications/more/nonfinancial-documents/sustainability-report/2021/Nonfinancial_Report_2021_e.pdf (Accessed: 14 October 2022)

Volkswagen (2023a) Volkswagen AG - Climate Change Questionnaire 2023. Volkswagen, CDP. Available at: https://www.cdp.net/en/responses?queries%5Bsearch%5D=volkswagen (Accessed: 18 December 2023)

Volkswagen (2023b) Volkswagen Aktiengesellschaft. Sustainability Report 2022. Wolfsburg, Germany: Volkswagen AG. Available at: https://www.volkswagen-group.com/en/publications/more/group-sustainability-report-1644/download?disposition=attachment (Accessed: 16 November 2023)

Volkswagen (2023c) Volkswagen Group Association Climate Review 2023. Volkswagen Group. Available at: https://www.volkswagen-group.com/en/publications/more/associations-review-w22.pdf (Accessed: 15 December 2023)

Volkswagen (2023d) Volkswagen Group - Annual Report 2022. Volkswagen Group Annual Report. Wolfsburg, Germany: Volkswagen Group. Available at: https://annualreport2022.volkswagenag.com/_assets/downloads/entire-vw-ar22.pdf (Accessed: 13 December 2023)

Volkswagen (2024) Volkswagen Aktiengesellschaft. Sustainability Report 2023. Wolfsburg, Germany: Volkswagen AG. Available at: https://www.volkswagen-group.com/en/publications/more/group-sustainability-report-2023-2674/download?disposition=attachment (Accessed: 14 March 2024)

Volkswagen ClimatePartner (2024) Projects - Forests are important carbon sinks (Status: 22.02.2024), Website. Volkswagen ClimatePartner GmbH. Available at: https://www.volkswagen-climatepartner.com/en/projects (Accessed: 13 December 2023)

Volkswagen Truck & Bus (2023) Sustainability Report 2022. Reverde, Brazil: Volkswagen Truck & Bus. Available at: https://sustentabilidade.vwco.com.br/assets/pdf/VWCO_RS2022_EN.pdf (Accessed: 22 February 2024)

Volvo Group (2021) Volvo Group and SSAB to collaborate on the world's first vehicles of fossil-free steel, Press Release. Volvo Group. Available at: https://www.volvogroup.com/en/news-and-media/news/2021/apr/news-3958623.html (Accessed: 11 December 2023)

Exhibit 7 to Decl. of Angel Hsu
284

Corporate Responsibility Monitor 2024

139

Exhibit 7 to Decl. of Angel Hsu
285

- Volvo Group (2023a) Geared for Growth Content - Annual Report 2022. Gothenburg, Sweden: Volvo Group. Available at: https://www.volvogroup.com/content/dam/volvo-group/markets/master/investors/reports-and-presentations/annual-reports/AB-Volvo-Annual-Report-2022.pdf (Accessed: 4 December 2023)

- Volvo Group (2023b) Unlocking the power of renewable fuels for a more sustainable future [Status: 11.12.2023]. Volvo Group. Available at: https://www.volvogroup.com/en/sustainable-transportation/sustainable-solutions/biofuels.html (Accessed: 12 March 2024)

- Volvo Group (2023c) Volvo Group secures increased volumes of near zero emissions steel through collaboration with H2 Green Steel, Press Release. Volvo Group. Available at: https://www.volvogroup.com/en/news-and-media/news/2023/sep/volvo-group-secures-increased-volumes-of-near-zero-emissions-steel-through-collaboration-with-h2-green-steel.html (Accessed: 11 December 2023)

- Volvo Group (2024) Geared for growth - Annual Report 2023. Gothenburg, Sweden: Volvo Group. Available at: https://www.volvo-group.com/content/dam/volvo-group/markets/master/investors/reports/annual-reports/2024/AB-Volvo-Annual-Report-2023.pdf (Accessed: 14 March 2024)

- VW Kraftwerk (2023) Stromkennzeichnung gem. § 42 Energiewirtschaftsgesetz. VW Kraftwerk GmbH

- Waldenes, V. (2022) 'Volkswagen brand will only produce electric cars in Europe from 2033 - brand chief', Reuters, 26 October. Available at: https://www.reuters.com/business/autos-transportation/volkswagen-brand-will-be-electric-only-carmaker-europe-2033-brand-chief-2022-10-26/

- Walmart (2022) Project Gigaton. Available at: https://www.walmartsustainabilityhub.com/climate/project-gigaton (Accessed: 2 December 2022)

- Walmart (2023a) 2023 Project Gigaton Accounting Methodology. Walmart, Inc. Available at: https://www.walmartsustainabilityhub.com/content/dam/walmartsustainability-hub/documents/project-gigaton/project-gigaton-accounting-methodology.pdf (Accessed: 26 January 2024)

- Walmart (2023b) Climate Change. Available at: https://corporate.walmart.com/purpose/esgreport/environmental/climate-change (Accessed: 26 January 2024)

- Walmart (2023c) Environment, Social and Governance Highlights FY2023. Walmart, Inc. Available at: https://corporate.walmart.com/content/dam/corporate/documents/esgreport/fy2023-walmart-esg-highlights.pdf (Accessed: 26 January 2024)

- Walmart (2023d) Walmart, Inc. CDP Climate Change Questionnaire 2022. Walmart Inc. and CDP. Available at: https://corporate.walmart.com/content/dam/corporate/documents/esgreport/our-esg-priorities/2022/CDP-Climate-Submission.pdf (Accessed: 25 January 2024)

- Wang, Y., de Boer, I.J.M., Persson, U.M., et al. (2023) 'Risk to rely on soil carbon sequestration to offset global ruminant emissions', Nature Communications, 14(7625), pp. 1–9. doi: https://doi.org/10.1038/s41467-023-43432-3

- WBA (2022) Automotive - Methodology [Status: 11.10.2022]. World Benchmarking Alliance; CDP: French Environment and Energy Management Agency (ADEME). Available at: https://www.worldbenchmarkingalliance.org/publication/automotive/methodology/ (Accessed: 11 October 2022)

- WEF (2020) Forging Ahead: A materials roadmap for the zero-carbon car. World Economic Forum (WEF); McKinsey & Company. Available at: http://www3.weforum.org/docs/WEF_Forging_Ahead_2020.pdf (Accessed: 12 December 2023)

- WRI and WBCSD (2023) Summary of Proposed Submissions Related to Scope 2 Guidance. GHG Protocol. Available at: https://ghgprotocol.org/sites/default/files/2023-12/scope-2-proposal-summary.pdf (Accessed: 6 February 2024)

- Worrell, E. and Galitsky, C. (2017) Energy Efficiency Improvement and Cost Saving Opportunities for Cement Making: An ENERGY STAR Guide for Energy and Plant Managers. Lawrence Berkeley National Laboratory. Available at: https://www.energystar.gov/sites/default/files/tools/Cement_Industry_2017.pdf (Accessed: 15 August 2017)

- Worrell, E. and Cuglić, P. (2017) Europe's Coal-Fired Power Plants: Rough Times Ahead Analysis of the Impact of a New Round of Pollution Controls. Available at: http://vesa.org/wp-content/uploads/2017/03/Europe-Coal-Fired-Plants_Rough-Times-Ahead_May_2017.pdf (Accessed: 15 August 2017)

- Xinhuanet (2023) 'Vehicle Purchase Tax Exemption Policy for NEVs Extended to the End of 2027', Xinhuanet, 21 June. Available at: http://www.news.cn/politics/2023-06/21/c_1129710813.htm?utm_source=NewsletterfanSelf_medium=email&utm_term=2023-11-16&utm_campaign=China-Briefing+29+June+China_Germany+climate+dealCG4+2+ru+China+electric+vehicle+policy+moving+67%

- Zhang, X. (2023) Biomass Burning : The Fashion Industry's False Phase-Out Contents. Stand.earth. Available at: https://stand.earth/wp-content/uploads/2023/11/2023-Biomass-brand-analysis-report_Final.pdf (Accessed: 11 March 2024)

- Zickfeld, K., Azevedo, D., Mathesius, S. and Matthews, H.D. (2021) 'Asymmetry in the climate–carbon cycle response to positive and negative CO₂ emissions', Nature Climate Change, 11(7), pp. 613–617. doi:10.1038/s41558-021-01061-2

SER 565

# Annex I – Companies assessed in this report

We assess 20 companies in this report. We refer to them using shortened names (see left column) but assess the company and all subsidiaries covered by the full name (see right column).

| Shortened name | Full name |
| --- | --- |
| Adidas | Adidas AG |
| Daimler Truck | Daimler Truck AG |
| Danone | Danone S.A. |
| Duke Energy | Duke Energy Corporation |
| Enel | Enel |
| ENGIE | ENGIE |
| Fast retailing | Fast Retailing Co., Ltd. |
| H&M Group | H & M Hennes & Mauritz AB |
| Iberdrola | Iberdrola |
| Inditex | Industria de Diseno Textil S.A. |
| KEPCO | Korean Electric Power Corporation |
| Mars | Mars Incorporated |
| Nestlé | Nestlé S.A. |
| Nike | Nike Inc. |
| Stellantis | Stellantis N.V. |
| Tesco | Tesco PLC |
| Toyota | Toyota Motor Corporation |
| Volkswagen Group | Volkswagen AG |
| Volvo Group | AB Volvo |
| Walmart | Walmart AG |

## Selection criteria

We assess **the top three global companies for each of the eight following sectors**, according to their annual revenue in 2022 (Forbes, 2023): electric utilities; fashion; food and agriculture; automobile manufacturers. Our analysis excludes majority state-owned companies due to our perception that fundamental differences in management structures and decision-making structures for climate change strategy may significantly detract from the comparability of these companies' plans, and the insights that we can draw from the company sample.

**For food and agriculture** – after including the largest company of the sector – we then include only companies with targets formulated under SBTi's new FLAG guidance, to test the hypothesis that the new FLAG guidance can improve the integrity of agrifood companies' targets.

**For automobile manufacturers**, we include also the largest 2 companies producing trucks only, to understand credibility of plans for heavy duty vehicles.

For this iteration of the Corporate Climate Responsibility Monitor, we did not require "membership of a Race to Zero Initiative" as criteria for selection. For example, Daimler Trucks, Korea Electric and Stellantis do not have SBTi targets or other links to Race to Zero campaign. This counters the misguided critique that we attack the best leading companies.

The 20 companies covered by this monitor account for approximately USD 2.3 trillion of revenue in 2022, approximately 6% of revenue from the world's largest 500 companies (Forbes, 2023). Their total self-reported GHG emission footprints in 2019, including scope 3 emissions, amount to approximately 3.9 GtCO$_2$e. This is equivalent to roughly 7% of global GHG emissions.[6]

Section A also includes updates to the companies assessed in the 2022 and 2023 iterations of the Corporate Climate Responsibility Monitor, covering 51 companies in total. These 51 companies account for approximately USD 6.1 trillion of revenue in 2022, approximately 16% of revenue from the world's largest 500 companies (Forbes, 2023). Their total self-reported GHG emission footprints in 2019, including scope 3 emissions, amount to approximately 8.8 GtCO$_2$e. This is equivalent to roughly 15% of global GHG emissions.

---

6   Some overlap in emission statistics is likely in the cases that one company's scope 3 emissions are included in the scope 1 or 2 emissions of another company in this analysis. We anticipate that any overlap is marginal and of limited significance to the key insights derived from this report. The companies' combined emission footprint may also be higher than this estimate, due to some companies' incomplete emission disclosure.

Exhibit 7 to Decl. of Angel Hsu
286

SER 566

Updated assessments for companies covered in CCRM 22 and CCRM 23

Alongside the detailed analysis of the 20 focus companies of this report, we have updated parts of 31 company assessments previously covered in the Corporate Climate Responsibility Monitors of 2022 and 2023 (or our analyses in Part A (Day et al., 2022; Day, Mooldijk, Hans, et al., 2023). We refer to them using shortened names (see left column) but assess the company and all subsidiaries covered by the full name (see right column).

| Shortened name | Full name |
|---|---|
| *Corporate Climate Responsibility Monitor 2023* | |
| Ahold Delhaize | Koninklijke Ahold Delhaize N.V. |
| Amazon | Amazon.com, Inc. |
| American Airlines | American Airlines Group Inc. |
| Apple | Apple Inc. |
| ArcelorMittal | ArcelorMittal S.A. |
| Carrefour | Carrefour S.A. |
| Deutsche Post DHL | Deutsche Post AG (Deutsche Post DHL Group) |
| Foxconn | Hon Hai Precision Industry Co., Ltd. |
| Google | Alphabet Inc. |
| Holcim | Holcim Limited |
| JBS | JBS S.A. |
| Maersk | A.P. Møller – Maersk A/S |
| Mercedes-Benz | Mercedes-Benz Group AG |
| Microsoft | Microsoft Corporation |
| PepsiCo | PepsiCo, Ltd. |
| Samsung Electronics /Samsung | Samsung Electronics Co., Ltd. |
| Thyssenkrupp | ThyssenKrupp AG |

| Shortened name | Full name |
|---|---|
| *Corporate Climate Responsibility Monitor 2022* | |
| Accenture | Accenture Plc |
| BMW | BMW AG |
| CVS Health | CVS Health Corporation |
| Deutsche Telekom | Deutsche Telekom AG |
| E.ON | E.ON SE |
| GlaxoSmithKline | GlaxoSmithKline Plc |
| Hitachi | K.K. Hitachi Seisakusho |
| IKEA | Inter IKEA Holding B.V. and Ingka Holding B.V. |
| Novartis | Novartis AG |
| Saint-Gobain | Compagnie de Saint-Gobain S.A. |
| Sony | Sony Group Corporation |
| Unilever | Unilever Plc |
| Vale | Vale S.A. |
| Vodafone | Vodafone Group Plc |

141

Exhibit 7 to Decl. of Angel Hsu
287

# Annex II – Target integrity assessments

## Adidas

| Short term targets towards 2030 | Medium term targets for the period 2031-2040 | Long term targets for the period beyond 2040 |
|---|---|---|
| Moderate | Very poor | Very poor |

**◆ What are the targets and what do they actually mean?**

| | | |
|---|---|---|
| Adidas's 2025 climate neutrality target covers scope 1 and 2 emissions only and requires these emission sources to be reduced by 90% between 2017 and 2025. This is equivalent to the reduction of approximately 1% of Adidas's total value chain emissions in 2019.<br><br>The target for a 30% reduction of value chain GHG emissions between 2017 and 2030 is more significant, covering all of the company's disclosed value chain emissions. We estimate that the w target translates to approximately a reduction of 32-44% of the company's full value chain emissions compared to average emissions levels in the period 2017 to 2023. The upper end of the range is compared to average emissions in the time frame between 2017 and 2023, the lower end of the range is compared to the same average but excluding years that appear as extreme outliers. | No targets identified. | Adidas pledges carbon neutrality by 2050, but does not commit to a deep emissions reduction target alongside this pledge. The terminology of this target may be misleading; net-zero targets can give consumers and investors the impression that the company aims to reach deep levels of emission reductions, which the company does not commit to. |

**◆ Is this emission reduction commitment in line with 1.5°C-compatible trajectories or benchmarks for the sector?**

| | | |
|---|---|---|
| Adidas 2030 target may be partially aligned with 1.5°C-compatible benchmarks, but the company has made limited very progress since 2017.<br><br>The meaning of the target is complicated by the fact that Adidas does not publish its emissions for the target base year in 2017 in public documentation, and that Adidas reports changes in its emissions in the period between 2017 and 2023, without providing explanations. Accordingly, a direct translation to 2019 emissions for comparison to benchmarks and other companies is not possible.<br><br>A 32-44% reduction below average 2017-2022 emission levels would be significant, and the upper end of that estimate would be aligned with global economy-wide benchmarks to keep warming below 1.5°C (43% by 2030 compared to 2019 levels) (IPCC, 2022). Given that emissions in the fashion industry occur in various sectors, including agriculture and energy, we expect the industry to decarbonise at the same speed as this global trajectory.<br><br>The upper end of our estimated 32-44% emission reduction range also meets sector benchmarks, though the lower range falls short of it: the textile and leather industry and the manufactured fibres and synthetic rubber industry should reduce their GHG emissions by 41% and 46%, respectively (2022, pp. 322, 327).<br><br>While Adidas's 2030 may be partially aligned with 1.5°C-compatible benchmarks, the company has made limited progress towards its target. In 2023, Adidas reported total emissions at 5.1 MtCO₂e (excluding indirect use-phase emissions). This was the first year that the company reported emissions lower than the 2017 baseline of 5.8 MtCO₂e. | Adidas's lack of targets for the period 2031-2040 neglects the need for interim targets to chart a trajectory towards the company's long-term vision as recommended by the UN High Level Expert Group on Net Zero (UN HLEG, 2022). | We consider the lack of an explicit emission reduction target alongside the carbon neutrality pledge as highly insufficient considering the need for deep and credible emission reductions towards mid-century to stand a reasonable chance of limiting global warming to 1.5°C (IPCC, 2022). |

Exhibit 7 to Decl. of Angel Hsu

288

**SER 568**

## Daimler Truck

| Short term targets towards 2030 | Unclear | Medium term targets for the period 2031-2040 | Moderate | Long term targets for the period beyond 2040 | Moderate |
|---|---|---|---|---|---|

### ➤ What are the targets and what do they actually mean?

**Short term targets towards 2030:**

Daimler Truck commits to the following emission targets towards 2030:

- Carbon neutrality for scope 1 and 2 emissions (production facilities) in Europe, India, Japan, and the US by 2025.
- 42% reduction scope 1 and 2 emissions by 2030 below 2021.

While not committing to any scope 3 emission reduction target towards 2030, Daimler Truck intends to sell "up to 60%" of zero-emission vehicles by 2030 in Europe, Japan and the US [Daimler Truck, 2023a, pp. 78, 81, 93]. We interpret this as an aspirational upper bound to sell zero-emission vehicles (ZEV) by 2030 while reserving Daimler Truck's right to stay below it. The company does not set any minimum lower bound.

We cannot independently quantify Daimler Truck emissions reduction by 2030 along the entire value chain as the company does not publicly disclose scope 3 emissions

**Medium term targets for the period 2031-2040:**

Daimler Truck commits to carbon neutrality for scope 1 and 2 emissions by 2039, but does not commit to a specific emissions reduction target for these scopes alongside this pledge. Since the company's carbon neutrality pledge does not entail any explicit commitment to meet the target [Daimler Truck, 2023a, p. 93].

The company does not commit to any scope 3 emission reduction targets towards 2040 but intends to offer 100% of zero-emission vehicles by 2039 in Europe, Japan, and the US [Daimler Truck, 2023a, pp. 81, 93]. For these three geographies, the company aims for carbon neutral products and services in its supply chain by 2039 [Daimler Truck, 2023a, pp. 81, 93].

We cannot independently quantify Daimler Truck emissions reduction by 2040 along the entire value chain as the company does not publicly disclose scope 3 emissions

**Long term targets for the period beyond 2040:**

Daimler Truck aims to achieve carbon neutrality across the entire value chain by 2050, but does not commit to a specific emissions reduction target alongside this pledge. Since the company's carbon neutrality pledge does not entail any explicit commitment to deep decarbonisation, labelling it as a 'carbon neutrality' target may be misleading.

Daimler Truck also aims to sell only zero-emission vehicles worldwide by 2050, with a target already set to achieve this in Europe, the United States and Japan by 2039 already [Daimler Truck, 2023a, pp. 78, 81].

### ➤ Is this emission reduction commitment in line with the 1.5°C compatible trajectories or benchmarks for the sector?

**Short term targets towards 2030:**

We cannot independently assess Daimler Truck's aspirational and non-committal intention to sell zero-emission vehicles by 2030 against existing 1.5°C-aligned milestones. Recent literature suggest a low 30-37% of heavy-duty trucks should be battery electric vehicles (BEVs) and fuel cell electric vehicles (FCEVs) globally by 2030 to align with the 1.5°C Paris Agreement targets [UNFCCC, 2021, pp. 10-11; Boehm et al, 2023, pp. 77-78; IEA, 2023c, pp. 88, 93]. Daimler Truck merely outlines its intention to sell "up to 60%" of zero-emission vehicles by 2030 in Europe, Japan, and the United States [Daimler Truck, 2023a, pp. 78, 81, 93]. These key markets jointly represent around 75% of its total revenue in 2022. We interpret this as an aspirational upper bound for the sales of ZEVs, allowing Daimler Truck leeway to sell fewer vehicles if necessary. In addition, we cannot find any targets for the sale of zero-emission vehicles by 2030 in other markets, which collectively accounted for 25% of total revenue in 2022. Furthermore, there is no emission reduction target for its upstream scope 3 emissions.

**Medium term targets for the period 2031-2040:**

Daimler Truck's 2039 interim targets partially meet 1.5°C Paris Agreement-aligned milestones for heavy-duty vehicle manufacturers in advanced economies and Group 3 of the existing literature [UNFCCC, 2021, pp. 10-11; Mission Possible Partnership, 2022, p. 40; Boehm et al, 2023, pp. 77-78; IEA, 2023c, pp. 88, 93].

Daimler Truck aims to offer 100% of zero-emission vehicles by 2039 in Europe, Japan and the United States [Daimler Truck, 2023a, pp. 81, 93], jointly representing around 75% of total revenue as key markets in 2022. This is in line with the 1.5°C-compatible shares of 100% battery electric vehicles (BEVs) and fuel cell electric vehicles (FCEVs) by 2040 in advanced economies and Group 3 [UNFCCC, 2021, pp. 10-11; Boehm et al, 2023, pp. 77-78; IEA, 2023c, pp. 88-93]. However, we could not identify any targets for the sale of zero-emission vehicles towards 2040 in other markets outside Europe, Japan, and the US, which collectively accounted for 25% of total revenue in 2022. Additionally, we could not identify specific targets for its scope 1, 2, and upstream scope 3 emissions alongside the two scope-specific carbon neutrality pledges.

**Long term targets for the period beyond 2040:**

Daimler Truck's global target to sell 100% zero-emission vehicles by 2050 meets the 1.5°C-aligned milestones identified in existing literature [UNFCCC, 2021, pp. 10-11; Mission Possible Partnership, 2022, p. 40; Boehm et al, 2023, pp. 77-78; IEA, 2023c, pp. 88, 93]. This global phase-out date for ICEs in heavy-duty vehicles is in line with upper range of decarbonisation milestones identified in the literature, which suggests reaching a 100% share of battery electric vehicles (BEVs) and fuel cell electric vehicles (FCEVs) between 2045-2050 globally [Boehm et al, 2023, pp. 77-78; IEA, 2023c, pp. 88, 93].

Exhibit 7 to Decl. of Angel Hsu
289

## Danone

| Short term targets towards 2030 (Reasonable) | Medium term targets for the period 2031-2040 (Very poor) | Long term targets for the period beyond 2040 (Moderate) |
|---|---|---|

**➤ What are the targets and what do they actually mean?**

**What are the targets and what do they actually mean?**
By 2030, compared to 2020 levels:
- Reduce scope 1 (excluding FLAG emissions) and 2 emissions by 47.2%
- Reduce scope 1 and 3 FLAG emissions by 90.3%
- Reduce scope 3 non-FLAG emissions by 42.0%
- Reduce methane emissions from fresh milk by 30%

**Danone's short term targets translate to an emission reduction of 30% compared to 2019 value chain emissions.** The share of emissions not covered equals roughly 6 MtCO₂e in 2030, when comparing the baseline emissions presented in the Climate Transition Plan to emissions disclosed under CDP.

**We could not include Danone's methane target in this estimate.** Danone does not provide baseline emissions for methane specifically, and it is unclear whether this target is contained within – or additional to – other scope 1 and 3 targets.

*(Medium term)* No targets identified for the 2031-2040 period

*(Long term)* **Danone does not commit to a deep emissions reduction target alongside its 2050 net zero pledge. However, the company's estimated residual emissions in 2050 would imply an emission reduction of roughly 63% compared to 2019 value chain emissions.** Since these estimated reductions under the net-zero pledge fall short of a commitment to deep emission reductions (i.e. at least 90% below 2019 levels globally, or 72% for the agriculture sector), we consider that the terminology of the net zero target may be potentially misleading. Moreover, the company's net zero pledge does not entail an explicit commitment to this level of emission reductions.

**➤ Is this emission reduction commitment in line with 1.5°C-compatible trajectories or benchmarks for the sector?**

**Danone's range of short term targets almost meets 1.5°C Paris Agreement-aligned milestones for the food and agriculture sector identified in existing literature for the emission sources that they cover, although some emission sources are not covered by the targets.** Teske (2022, p. 328) describes that between 2019 and 2030, the food and agriculture industry should reduce its scope 3 emissions by 34%. Overall, the company's 2030 targets – including emission sources that are not covered by the target – are almost aligned with this benchmark.

Boehm et al. (2022) describe emission reduction requirements of 17% for enteric fermentation and 21% for manure management, both below 2017 levels. Danone's standard emission reduction targets go beyond these levels.

The SBTi published its guidance for Forest, Land, and Agriculture (FLAG) in 2022. Although the FLAG guidance requires companies to commit to annual reductions of at least 3.03%, translating to reductions of 30.3% between 2020 and 2030 (SBTi, 2022b, pp. 44-45), this includes land sequestration carbon dioxide removals. We cannot use the FLAG guidance for this assessment due to the lack of specificity on the role of emission reductions vis-à-vis land sequestration CDR towards aligning with 1.5°C-compatible transition pathways for the sector

*(Medium term)* Danone's lack of targets for the period 2031-2040 neglects the need for interim targets to chart a trajectory towards the company's long-term vision as recommended by the UN High Level Expert Group on Net Zero (UN-HLEG, 2022).

*(Long term)* **We find that Danone's 2050 target meets 1.5°C Paris Agreement-aligned milestones for food and agriculture sector.** Teske (2022, p. 329) identifies 1.5°C-aligned absolute emission reduction milestones for various emission sources of agricultural activities, which represent upstream scope 3 emissions for Danone. All energy-related emissions need to reduce 100% by 2050, whereas AFOLU emissions and non-CO₂ emissions need to reduce by 42% by 2050 below 2019 levels. In sum, these required reductions mean a reduction of 51% across all scopes, below 2019 levels. Danone's implied emission reduction commitment aligns with this.

The Transition Pathways Initiative (TPI) derives an emission intensity per tonne of agricultural input aligned with '1.5°C' trajectories by 2050: 0.414 tCO₂/tonne agricultural input (Dietz et al., 2022, p. 13). This represents an 85% reduction in intensity compared to 2.751 tCO₂/tonne agricultural input in the 2020 base year. Due to a lack of information on intensity and volumes of agricultural input, we cannot directly assess whether Danone's implied emission reduction commitment meets these intensity benchmarks. However, the implied emission reduction commitment and plan to increase the share of plant-based protein in production contribute to the shift that is signaled by the required change in intensities.

Boehm et al. (2023) describe emission reduction requirements of 27% for enteric fermentation and 39% for manure management, both below 2017 levels. Danone's implied emission reduction commitment goes beyond these levels.

We evaluate Danone's implied emission reduction commitment moderate rather than high or reasonable because Danone does not commit to the implied reductions that we derive from the company's estimated residual emissions. The company only provides an estimate of residual emissions, so we do not consider this to represent an explicit emission reduction commitment.

Exhibit 7 to Decl. of Angel Hsu
290

## Duke Energy

| Short term targets towards 2030 | Very Poor | Medium-term targets for the period 2031-2040 | Poor | Long-term targets for the period beyond 2040 | Very poor |
|---|---|---|---|---|---|
| **◆ What are the targets and what do they actually mean?** | | | | | |
| Duke Energy commits to the following emission reduction targets towards 2030 (Duke Energy, 2023a, p. 65):<br>• Reduction of scope 1 carbon emissions from electricity generation by at least 50% below 2005 levels<br>• Net-zero methane emissions from its fossil gas distribution business<br><br>The company's scope 1 target translates to a reduction of 16% across the value chain below 2019 levels by 2030. Duke Energy anticipates that its target intensity from scope 1 emissions will be about 225 gCO2e/kWh by 2030 (Duke Energy, 2022, p. 58).<br><br>Alongside these emission reduction targets, Duke Energy plans to expand its renewable energy portfolio to constitute 20% of its total generation capacity by 2030, and to reduce the share of coal in its total generation to below 5% by 2030, pending regulatory approval. | | Duke Energy set the following targets towards 2040 (Duke Energy, 2023a, p. 65,67):<br>• Reduction of carbon scope 1 emissions from electricity generation by 80% below 2005 levels by 2040<br>• Reduction of scope 2 and some scope 3 emissions (fossil fuel procurement, power purchased for resale, and downstream use of gas) by 50% below 2021 levels by 2025.<br><br>**These commitments translate to a reduction of 39% across the value chain below 2019 levels by 2040.**<br><br>Duke Energy aims to reach 35,000 MW of renewable energy capacity by 2035 and anticipates renewable generation share of 35% by 2040. Duke Energy aims to exit from coal generation by 2035, pending regulatory approval (Duke Energy, 2023a, p. 65). | | Duke Energy has pledged to achieve net-zero carbon emissions by 2050 (Duke Energy, 2023a, p. 65). Since Duke Energy's net-zero pledge does not include a specific emission reduction commitment, we consider that the terminology of this target may be misleading. 'Net zero' terminology can give the impression that Duke Energy aims to reach deep levels of emission reductions, which the company does not commit to.<br><br>Duke Energy aims to reach 40% renewable generation and to phase out fossil gas in generation by 2050 (Duke Energy, 2023a, p. 20,48,49). | |
| **◆ Is this emission reduction commitment in line with 1.5°C-compatible trajectories or benchmarks for the sector?** | | | | | |
| **Duke Energy's short term targets do not meet 1.5°C Paris Agreement-aligned milestones for electric utilities based on available literature.** The IEA Net-Zero Report highlights that the energy sector needs to reduce emissions by 44% by 2030 relative to 2021 levels to align with a 1.5°C pathway (IEA, 2023c). Duke Energy's emissions reduction target translates to an 8% reduction within that period, falling far below the sector benchmark.<br><br>**Duke Energy's projected carbon intensity of approximately 225 gCO2e/kWh by 2030 does not align with sectoral benchmarks** (Boehm et al. (2023, p. 29) and CAT (2023b, p. 20) find that carbon intensity should decrease to a range of 25-26 gCO2e/kWh in the United States by 2030. Teske et al. (Teske et al., 2023) proposes a maximum of 64 gCO2e/kWh in OECD countries. TPI's benchmark of 138 gCO2e/kWh in the United States (TPI's benchmark is taken from the IEA's 2021 Net Zero by 2050 report, but the IEA (2023) has since revised this benchmark to 184 gCO2e/kWh (Dietz, Gardiner, et al., 2021; IEA, 2023c). The IEA foresees higher levels of CCS and BECCS than CAT and the State of Climate Action report (Boehm et al., 2023, p. 29)<br><br>Duke Energy's target for 20% renewable energy by 2030 falls far below the 68%-86% benchmark for the United States (CAT, 2023b, p. 16) | | **Duke Energy's medium-term targets do not meet 1.5°C Paris Agreement-aligned milestones for electric utilities based on available literature.** Developed countries need to reach net-zero emissions by 2035 to stay within a 1.5°C-compatible pathway (equivalent to 0 gCO2e/kWh) (IEA, 2023c). The company's projected carbon intensity for 2040 is estimated to be around 46 gCO2e/kWh by 2040. This is partly due to the company's plan to retire certain coal fleets only by 2035, missing the more stringent phase-out recommendation for advanced economies by 2030, despite recent literature suggesting the need for the full phase-out of unabated fossil gas in the United States by 2040 (CAT, 2023b, p. 12). Duke Energy's renewable energy target of 35% in its generation mix by 2040 falls significantly short of the 1.5°C-aligned benchmarks, which recommend 85%-95% renewables by 2035 and 93%-97% renewables by 2040 in the United States (CAT, 2023b, p. 16) | | **Duke Energy's long-term net-zero by 2050 target does not meet a 1.5°C Paris Agreement-aligned milestones for electric utilities.** Duke Energy's commitment to achieving net-zero emissions by 2050 does not meet the urgent timelines required for electric utilities in advanced economies, which need to reach net zero by 2035 (IEA, 2023c). The company's plan to phase out fossil gas only by 2050 indicates a slow transition pace away from fossil-fuel-based electricity generation and poses the risk of a fossil gas lock-in and stranded assets. Duke Energy's renewable energy target of 40% in its generation mix by 2050 also falls significantly short of the global 1.5°C-aligned benchmarks, which recommend a range of 99%-100% renewable energy by 2050 (CAT, 2023b, p. 16) | |

Exhibit 7 to Decl. of Angel Hsu
291

## Enel

| Short term targets towards 2030 — Moderate | Medium term targets for the period 2031-2040 | Reasonable |
|---|---|---|
| **♦ What are the targets and what do they actually mean?** Enel commits to the following emission reduction targets towards 2030, compared to 2017, which translate to a **reduction of 59% across the value chain by 2030.** • 68% reduction in all absolute scope 1, 2 and 3 GHG emissions. • 80% reduction in carbon intensity relating to power generation, resulting in a carbon intensity of 72 gCO$_2$e/kWh (covering 98% of scope 1 emissions). • 78% reduction in carbon intensity relating to integrated power, resulting in a carbon intensity of 73 gCO$_2$e/kWh (covering 98% of scope 1 emissions and 73% of scope 3 emissions, category 3). • 55% reduction in absolute emissions relating to gas retail (covering 100% of scope 3 emissions, category 11) • 55% reduction in 'additional absolute GHG emissions' (covering 0.4% of scope 1 emissions, 100% of scope 2 emissions, 28.6% of scope 3 emissions, category 1 for the 2030 target, and 26.6% of scope 3 emissions, category 3. Enel also commits to phasing-out coal in electricity generation by 2027, and achieving an 85% share of renewables in total installed capacity by 2030. **♦ Is this emission reduction commitment in line with the 1.5°C compatible trajectories or benchmarks for the sector?** **Enel's 2030 targets partially meet the 1.5°C Paris Agreement aligned milestones for electric utilities, as identified in existing literature.** Boehm et al. (2023, p. 29) and CAT (2023a, p. 20) suggest that global carbon intensity should decrease to 48-90 gCO$_2$e/kWh by 2030, and to 6-12 gCO$_2$e/kWh in the EU (CAT, 2023b, p. 19). Teske et al. (Teske et al., 2023) propose 132 gCO$_2$e/kWh (globally) and 98 gCO$_2$e/kWh in the EU. The benchmark by the Transition Performance Initiative of 138 gCO$_2$e/kWh is taken from the IEA's 2021 Net Zero by 2050 report, but the IEA has since revised this benchmark to 186 gCO$_2$e/kWh (Dietz, Gardiner, et al., 2021; IEA, 2023a). The IEA allows for higher levels of CCS and BECCS than CAT and the State of Climate Action report (Boehm et al., 2023, p. 29) Enel's intensity targets fall within the lower end of this range, with 72g CO$_2$e/kWh for power generation (scope 1) and 73g CO$_2$e/kWh for integrated power. However, these targets are significantly higher than the benchmarks set for the EU where Enel generated 83% of its revenues in 2022 (Enel, 2023a, p. 460) Enel's emission reduction target of 59% by 2030 below 2019 levels (own calculations) is in line with the 1.5°C compatible pathway for the energy sector supported by the IEA (IEA, 2023c). The recommends a 44% absolute emissions reduction globally by 2030, compared to 2021. However, in the EU, the power sector needs to achieve even steeper emission reductions and reach net zero by 2035 (IEA, 2023c). Enel's target of 55% of renewable capacity in its energy mix by 2030 surpasses global benchmarks, which recommend a share of 68% renewable energy in installed capacities by 2030 (IEA, 2023c) | Enel has pledged to achieve **net zero emissions by 2040, including at least 90% emission reductions,** compared to 2017. • 99% reduction in all absolute scope 1, 2 and 3 GHG emissions. • 100% reduction in carbon intensity relating to power generation (covering 98% of scope 1 emissions). • 100% reduction in carbon intensity relating to integrated power (covering 98% of scope 1 emissions and 73% of scope 3 emissions, category 3). • 100% reduction in absolute emissions relating to gas retail (covering 100% of scope 3 emissions, category 11) • 90% reduction in additional absolute GHG emissions, resulting in residual emissions of 2.5 Mt CO$_2$e (covering 0.4% of scope 1 emissions, 100% of scope 2 emissions, 28.6% of scope 3 emissions, category 1 for the 2030 target and 40% for the 2040 target, and 26.6% of scope 3 emissions, category 3). Enel also commits to phase-out gas in electricity generation and exit from retail gas sales by 2040. | **Enel's 2040 medium-term targets partly meet the 1.5°C Paris Agreement aligned milestones for electric utilities, as identified in existing literature.** Enel aims to achieve zero carbon intensity for electricity generation (including its own generation and purchased electricity) by 2040 and to exit from gas by the same year. These goals are in line with the 1.5°C-compatible pathway suggested in the IEA Net Zero Report, which requires the energy sector to reach a CO$_2$ intensity of electricity generation at 3g CO$_2$e/kWh in 2040 (IEA, 2023b, p199). However, Enel's headline target of achieving net-zero emissions by 2040 falls short of the urgent timelines required for electric utilities in advanced economies, which should aim for net zero by 2035 (IEA, 2023c). On the other hand, Enel's target of 100% of renewable capacity in its energy mix by 2040 surpasses the 1.5°C-compatible global benchmarks, which recommends a share of 80% renewable energy in installed capacities (IEA, 2023c). |

Exhibit 7 to Decl. of Angel Hsu

292



**SER 572**

ENGIE

| Short term targets towards 2030 | Very poor | Medium term targets for the period 2031-2040 | Very poor | Long term targets for the period beyond 2040 | Very poor |
|---|---|---|---|---|---|
| **What are the targets and what do they actually mean?** | | | | | |

ENGIE commits to the following targets towards 2030, compared to 2022 (own calculations)
- 40% reduction in absolute GHG emissions from energy production (scopes 1 and 3)
- 26% reduction in absolute GHG emissions from final gas sales (scope 3)
- 42% reduction in carbon intensity for energy production (scope 1) and energy consumption (scope 2), resulting in a carbon intensity of $110 gCO_2e/kWh$
- 44% reduction in carbon intensity for energy sales produced (scopes 1 and 3) and purchased (scope 3), resulting in a carbon intensity of $152 gCO_2e/kWh$
- 6% reduction in absolute 'other GHG emissions, including scope 3 from procurement, capital goods, and the upstream of purchased fuels and electricity (scope 3 categories 1, 2 and 3)'

ENGIE also commits a coal-phase out by 2027 for own electricity generation, and a 58% share of renewables capacity in its electricity mix by 2030.

ENGIE's absolute targets of 43 MtCO₂e from energy production and 52 MtCO₂e from final gas sales amount to a **reduction of at least 24% below 2019 levels across full value-chain emissions by 2030** (based on own calculations). The company's different targets span different scopes, with coverage sometimes not specified, making it impossible to aggregate them into one single absolute target for 2030.

*Medium term:* No target identified

*Long term:* **ENGIE aims to reach net zero by 2045.** Their commitment is 'net zero carbon' but we understand this to cover all GHG emissions, because Enel accompanies the target by a commitment to reduce GHG by 90%. This translates to a **reduction of 86% by 2045 below 2019 levels** across the entire value chain alongside its net zero pledge. Since this reduction target falls short of a commitment to deep emission reductions (i.e. at least 90% below 2019 levels), we consider that the 'net zero' terminology may be misleading. This position is in line with the ISO Guidelines for Net Zero and the SBTi Net Zero Standard (ISO, 2022; SBTi, 2023b).

**Is the emission reduction commitment in line with 1.5°C-compatible trajectories or benchmarks for the sector?**

*Short term:* **ENGIE's 2030 targets do not meet the 1.5°C Paris Agreement aligned milestones for electric utilities, as identified in existing literature.** Boehm et al. (2023, p. 29) and CAT (2023b, p. 20) suggest that global carbon intensity should decrease to 48-90 gCO₂e/kWh by 2030, and to 6-12 gCO₂e/kWh in the EU (CAT, 2023b, p 19), Triste et al. (Triste et al., 2023) propose 132 gCO₂/kWh globally and 98 gCO₂/kWh in the EU. The benchmark by the Transition Performance Initiative of 138 gCO₂e/kWh is taken from the EA's 2021 Net Zero by 2050 report, but the IEA has since revised this benchmark to 186 gCO₂e/kWh (Dietz, Gardiner, et al., 2021; IEA, 2023a) The IEA allows for higher levels of CCS and BECCS than CAT and the State of Climate Action report (Boehm et al., 2023, p. 29).

ENGIE's intensity targets fall within the upper part of the benchmark range: 110 gCO₂e/kWh for energy production (scope 2) and energy consumption (scope 2) and 153 gCO₂e/kWh for energy sales produced (scopes 1 and 3) and purchased (scope 3). However, they significantly surpass the benchmarks for the EU, where ENGIE has 40% of its installed capacities (ENGIE, 2023, p. 3).

According to the IEA Net Zero Report, aligning the energy sector with a 1.5°C-compatible pathway requires a 44% emissions reduction globally by 2030 compared to 2021 (IEA, 2023c). In Europe, the power sector needs to achieve even steeper emission reductions and reach net zero by 2035 (IEA, 2023c). ENGIE's targets fall significantly short of this benchmark. Engie's target of 58% of renewable capacity also falls short of the global benchmark for a 65% renewable energy capacity share by 2030 (IEA, 2023a).

*Medium term:* ENGIE's absence of targets for the period towards 2040 neglects the need for interim targets to chart a trajectory towards the company's long-term vision, as recommended by the UN High-Level Expert Group on Net Zero (UN-HLEG, 2022).

*Long term:* **ENGIE's 2045 target does not meet 1.5°C Paris Agreement aligned milestones for electric utilities identified in existing literature.** The emissions reduction target of 86% below 2019 levels means that the company plans to still emit up to 26 MtCO₂ e GHG emissions by 2045, although alternatives to achieve zero emissions in the electric utilities sector already exist. The IEA and CAT emphasise that staying within a 1.5°C-compatible pathway will require electric utilities in developed countries like the EU to reach net zero (equivalent to 0 gCO₂e/kWh) by 2035, ten years earlier than 2045 (CAT, 2023b; IEA, 2023a).

Exhibit 7 to Decl. of Angel Hsu

293

## Fast Retailing

| Short term targets towards 2030 | **Very poor** | Medium term targets for the period 2031-2040 | **Very poor** | Long term targets for the period beyond 2040 | **Very poor** |
|---|---|---|---|---|---|
| **➤ What are the targets and what do they actually mean?** | | | | | |
| For 2030, Fast retailing commits to<br><br>• Reduce absolute emissions from its own operations (such as stores and main offices) by 90% below 2019 levels.<br><br>• Reduce absolute emissions from raw materials, fabric, and garment production for the Uniqlo and GU brands by 20% by 2030 below 2019 levels.<br><br>**These targets equate to a commitment to reduce all value chain emissions footprint by 19% by 2030, compared to 2019 levels.** | | No targets identified. | | Fast Retailing pledges to reach **net-zero emissions by 2050, but does not commit to a deep emissions reduction target alongside this pledge.** The terminology of this target may be misleading: net-zero targets can give consumers and investors the impression that the company aims to reach deep levels of emission reductions, which the company does not commit to. | |
| **➤ Is this emission reduction commitment in line with 1.5°C-compatible trajectories or benchmarks for the sector?** | | | | | |
| **Is this emission reduction commitment in line with 1.5°C-compatible trajectories or benchmarks for the sector? These targets do not meet cross-sectoral and sector-specific 1.5°C Paris Agreement aligned milestones identified in existing literature.** According to the IPCC's global economy-wide benchmarks to keep warming below 1.5°C, GHG emissions should reduce by 43% by 2030 compared to 2019 levels (IPCC, 2022). Given that emissions in the fashion industry occur in various sectors, including agriculture and energy, we expect the industry to decarbonise at the same speed as this global trajectory. Fast Retailing's targets fall short of this global benchmark.<br><br>The targets also miss sectoral benchmarks. Teske (2022, pp. 322, 327) considers that between 2019 and 2030, the textile and leather industry and the manufactured fibres and synthetic rubber industry should reduce their GHG emissions by 45% and 46%, respectively. To be in line with these sectoral benchmarks, Fast Retailing's target for upstream scope 3 emissions should be set at a level of at least 45%. However, its target for upstream scope 3 emissions represents a 16% reduction below 2019.<br><br>Assuming that emissions are reduced 'linearly in the 2019-2030 period, Fast Retailing is currently committed to annual emission reductions of 8.2% for scopes 1 and 2 and 1.3% for scope 3, by 2030. The SBTi guidance requires companies in the apparel industry to commit to annual reductions in their scope 1, 2 and 3 emissions of at least 2.5% to comply with the 'well below 2°C' benchmark and 4.2% to comply with the SBTi's 1.5°C benchmark (SBTi, 2018, pp. 22, 27). While Fast Retailing's reduction target for scope 1 and 2 emissions is likely aligned with the SBTi's 1.5°C, its target for scope 3 does not even meet the 'well below 2°C' benchmark. | | Fast Retailing's lack of targets for the period 2031-2040 neglects the need for interim targets to chart a trajectory towards the company's long-term vision as recommended by the UN High Level Expert Group on Net Zero (UN HLEG, 2022). | | **We consider the lack of an explicit emission reduction target alongside the net zero pledge as highly insufficient** considering the need for deep and credible emission reductions towards mid-century to stand a reasonable chance of limiting global warming to 1.5°C (IPCC, 2022). | |

Exhibit 7 to Decl. of Angel Hsu
294

148

## H&M Group

| Short term targets towards 2030 | Reasonable | Medium term targets for the period 2031-2040 | Reasonable | Long term targets for the period beyond 2040 | N/A |
|---|---|---|---|---|---|
| **➤ What are the targets and what do they actually mean?** | | | | | |
| | | H&M Group commits to an emissions reduction target of 90% by 2040 below 2019 levels across the entire value chain alongside its net-zero pledge. | | H&M Group does not commit to any emission reduction target beyond 2040, but has already committed to deep decarbonisation in the medium term towards 2040. | |
| **➤ Is this emission reduction commitment in line with 1.5°C compatible trajectories or benchmarks for the sector?** | | | | | |
| H&M Group's 2030 emission reduction target meets global and sectoral 1.5°C aligned benchmarks. Given that emissions in the fashion industry occur in various sectors, including agriculture and energy, we consider this target aligned with global benchmarks that require GHG and CO₂ emissions to reduce by 43% and 48% by 2030 respectively (IPCC, 2022). Teske (2022) considers that between 2019 and 2030, the textile and leather industry and the manufactured fibres and synthetic rubber industry should reduce their GHG emissions in absolute terms by 41% and 46%, respectively. This covers all emissions associated with producing fabrics and other materials and manufacturing the clothes. To be in line with these sectoral benchmarks, H&M Group's target for upstream scope 3 emissions should be set at a level of at least 41%. The company's target goes beyond this reduction level. | | H&M Group's 2040 emission reduction target meets global and sectoral 1.5°C aligned benchmarks. Given that emissions in the fashion industry occur in various sectors, including agriculture and energy, we consider this target aligned with global benchmarks. According to the IPCC's global economy-wide benchmarks to keep warming below 1.5°C, GHG emissions should reduce by 80% by 2040, compared to 2019 levels (IPCC, 2022). The target also meets benchmarks for fashion retailers' upstream scope 3 emissions. According to Teske (2022), emissions in the manufactured fibres and synthetic rubber industry need to reduce by 76% and emissions in the textile and leather sector by 74% by 2040, below 2019 levels. These emissions form part of H&M Group's upstream scope 3 emissions. | | | |
| We evaluate H&M Group's 2030 target as 'reasonable' rather than 'high' integrity because of the lack of a corresponding short-term target within a five-year timeframe to substantiate it. Setting short-term interim targets in a similar format as its 2030 targets requiring immediate action and accountability are of primary importance for credible corporate commitments to fight climate change (ISO, 2022; UN HLEG, 2022). | | We evaluate H&M Group's 2040 target as 'reasonable' integrity rather than 'high' because of the lack of interim targets on five-year intervals, as per the recommendations of the UN High Level Expert Group on Net Zero (ISO, 2022; UN HLEG, 2022). | | | |

Exhibit 7 to Decl. of Angel Hsu
295

## Iberdrola

| Short term targets towards 2030 | Reasonable | Medium-term targets for the period 2031–2040 | Moderate |
|---|---|---|---|

### ◆ What are the targets and what do they actually mean?

| | | | |
|---|---|---|---|
| Iberdrola has pledged to reach carbon neutrality in scope 1 and 2 emissions by 2030. Furthermore, it commits to reducing absolute scope 1, 2 and 3 GHG emissions by 65% by 2030 compared to a 2020 base year with the following breakdown (Iberdrola, 2023a):<br><br>• A reduction of scope 1 and 2 GHG emissions from power generation by 83% per kWh.<br>• A reduction of scope 1 and 2 GHG emissions from fuel and energy-related activities, covering all sold electricity, by 85% per kWh.<br>• A reduction of absolute scope 3 GHG emissions from the use of sold products by 42%.<br>• A reduction of all remaining absolute scope 3 GHG emissions by 46%.<br><br>To substantiate its short- and medium-term targets, Iberdrola also estimates a path to reduce absolute scope 1, 2 and 3 GHG emissions by 20% by 2026 from a 2020 base year (Iberdrola, 2023a).<br><br>**These targets translate to a reduction of 64% across the value chain below 2019 levels by 2030 and a reduction of 61% across the value chain below 2021 levels** by 2030. Since the company's short-term pledge does not entail any commitment to deep decarbonisation (i.e., reduction of at least 90% of 2019 emissions across the entire value chain), we consider that the 'carbon neutrality' terminology of its short-term target may be misleading. Using 'carbon neutrality' terminology can give consumers and investors the impression that Iberdrola aims to reach deep levels of emission reductions, which the company does not commit to. | | Iberdrola has pledged to achieve net zero across all scopes before 2040. This commitment translates to a reduction in scope 1, 2 and 3 emissions by 90% by 2039 from a 2020 base year with the following breakdown (Iberdrola, 2023a):<br><br>• A reduction of scope 1 and 2 GHG emissions from power generation by 94% per kWh.<br>• A reduction of scope 1 and 2 GHG emissions from fuel and energy-related activities, covering all sold electricity, by 95% per kWh.<br>• A reduction of absolute scope 3 GHG emissions from the use of sold products by 90%<br>• A reduction of all remaining absolute scope 3 GHG emissions by 90%<br><br>Iberdrola commits to an emissions reduction target of at least 90% by 2040 below 2019 levels across the entire value chain alongside its net-zero pledge. | |

### ◆ Is this emission reduction commitment in line with a 1.5°C-compatible trajectory or benchmarks for the sector?

| | | | |
|---|---|---|---|
| Iberdrola's short term emissions reduction commitments are in line with a 1.5°C trajectory for the electric utilities, based on available literature. The IEA Net Zero by 2050 Report highlights that the energy sector needs to reduce emissions by 44% by 2030 relative to 2021 levels to align with a 1.5°C pathway (IEA, 2022a). Iberdrola's emissions reduction target of 61% from 2021 to 2030 (own calculations) exceeds this industry benchmark.<br><br>Iberdrola has already closed its last coal plants in 2020, significantly ahead of the 2030 deadline for phasing out unabated coal in advanced economies (CAT, 2023b; IEA, 2023a). In 2030, Iberdrola's own renewable energy installed capacity will account for 93% of its total installed capacity, which outperforms the global benchmarks of 69-77% of renewable energy installed capacity by 2030 (IEA, 2023c; IRENA, 2023c). The company's focus on renewables is expected to contribute to a significant reduction in Iberdrola's carbon intensity for energy production (scope 1). By 2030, its emission intensity is expected to fall below 10 gCO₂e/kWh, making a 90% decrease from 2019 levels (Iberdrola, 2023c, 2023d, p. 64). This figure is notably lower than the recommended carbon intensity target in 2030 also falls within the recommended carbon intensity range of 48-186 gCO₂e/kWh by 2030 to stay below the 1.5°C threshold as suggested by existing literature (Dietz, Gardiner, et al., 2021; Boehm et al., 2023; CAT, 2023c; 2023b; IEA, 2023c; Jaeger et al., 2023; Teske et al., 2023). Iberdrola's carbon intensity target in 2030 also falls within the recommended carbon intensity range of 6–12 gCO₂e/kWh in the EU27 region by 2030 to align with a 1.5°C pathway (CAT, 2023b, p. 20). | | **Iberdrola's 2040 medium-term targets partially meet the 1.5°C Paris Agreement-aligned milestones for electric utilities, based on available literature.** Iberdrola's 2040 net-zero target falls short of the more urgent timelines recommended for electric utilities in advanced economies, which are advised to aim for net zero by 2035 (IEA, 2023c). While the IEA suggests that the global energy sector should reach net zero by 2045, advanced economies should reach this milestone a decade earlier (IEA, 2023c). Given that Iberdrola operates mainly in the European Union, United Kingdom and United States, the company should bring its net-zero target forward to 2035 to meet these regional benchmarks. Moreover, Iberdrola has yet to announce a strategy for the phase-out of its fossil gas-fired power plant portfolio or for ending its fossil gas sales. To align with a 1.5°C pathway, Iberdrola should phase out unabated fossil gas by 2035 in developed countries (CAT, 2023a; IEA, 2023a), and by 2040 in developing countries (CAT, 2023b, p. 1). Additionally, Iberdrola's 2040 target is assessed as having 'moderate' integrity rather than 'reasonable' due to the lack of a corresponding target within a five-year timeframe to substantiate it. | |

150

Exhibit 7 to Decl. of Angel Hsu
296

Case 2:24-cv-00801-ODW-PVC    Document 89-25    Filed 04/07/25    Page 152 of 164
Page ID #:8929

## Inditex

| | Reasonable | Reasonable | N/A |
|---|---|---|---|
| **Short term targets towards 2030** | **Medium term targets for the period 2031-2040** | **Long term targets for the period beyond 2040** | |

### ➤ What are the targets and what do they actually mean?

| Short term targets towards 2030 | Medium term targets for the period 2031-2040 | Long term targets for the period beyond 2040 |
|---|---|---|
| Inditex has set out two interim GHG emissions targets: <br><br> • Reduce scope 1 and 2 emissions by 90% (below 2018) levels by 2030. <br> • Reduce scope 3 emissions by 50% (below 2018 levels) by 2030. <br><br> **The targets jointly represent a reduction of 46% by 2030 across the entire value chain below 2019 levels.** To estimate the implied reduction in Inditex's targets, we consider their whole value chain emissions, which we calculate by using the larger scope 2 estimate. For Inditex, this is the location-based estimate. As Inditex's targets clearly state that they only apply to market-based scope 2 emissions, we first calculate the scope 2 emission reduction based on the market-based estimate and then tally up that reduction against Inditex's full value chain emissions. | Inditex's headline pledge includes a **commitment to reach net zero GHG emissions by 2040.** Alongside its headline pledge, Inditex commits to reducing its full value chain emissions (scope 1, 2, and 3) by 90% below 2018 levels. <br><br> **This target represents a reduction of 89% below 2019 levels by 2040.** Since the net zero pledge entails a commitment to deep decarbonisation across the entire value chain, we consider that the net zero terminology is unlikely to be misleading. Net zero targets can give consumers and investors the impression that the company aims to reach deep levels of emission reductions, which the company has committed itself to do. | Inditex does not commit to any emission reduction target beyond 2040, but has already committed to deep decarbonisation in the medium term towards 2040. |

### ➤ Is this emission reduction commitment in line with 1.5°C-compatible trajectories or benchmarks for the sector?

| Short term targets towards 2030 | Medium term targets for the period 2031-2040 | Long term targets for the period beyond 2040 |
|---|---|---|
| **Inditex's commitment for emission reductions across the value chain meet 1.5°C-aligned milestones as identified in existing literature.** According to the IPCC's global economy-wide benchmarks to keep warming below 1.5°C, GHG emissions should reduce by 43% by 2030, compared to 2019 (IPCC, 2022). Given that emissions in the fashion industry occur in various sectors, including agriculture and energy, we expect the industry to decarbonise at the same speed as this global trajectory. Inditex's targets currently meet this global benchmark. <br><br> The company's scope 3 2030 target is also aligned with other 1.5°C-compatible sectoral benchmarks. Teske (2022) considers that between 2019 and 2030, the textile and leather industry and the manufactured fibres and synthetic rubber industry should reduce their GHG emissions by 41% and 46%, respectively. This covers all emissions associated with producing fabrics and other materials and manufacturing the clothes. To be in line with these sectoral benchmarks, Inditex's target for upstream scope 3 emissions should be set at a level of at least 41%. Inditex's scope 3 target implies a reduction of 48% below 2019 levels when considering only scope 3 emissions. | **Inditex's reduction commitment across the value chain meets 1.5°C-aligned milestones as identified in existing literature.** According to the IPCC's global economy-wide benchmarks to keep warming below 1.5°C, GHG emissions should reduce by 80% by 2040, compared to 2019 (IPCC, 2022). Given that emissions in the fashion industry occur in various sectors, including agriculture and energy, we expect the industry to decarbonise at the same speed as this global trajectory. Inditex's targets currently meet this global benchmark. <br><br> **The company's 2040 target is also aligned with other 1.5°C-compatible sectoral benchmarks.** Teske (2022) considers that between 2019 and 2040, the textile and leather industry and the manufactured fibres and synthetic rubber industry should reduce their scope 1 GHG emissions by 71-74%, scope 2 by 92%, and scope 3 by 94%. Inditex's implied target of reducing their whole value chain emissions by 89% below 2019 levels clearly meets these benchmarks. | |

Corporate Climate Responsibility Monitor 2024

151

Exhibit 7 to Decl. of Angel Hsu
297

**SER 577**

## KEPCO

| Short term targets towards 2030 | Very poor | Medium term targets for the period 2031-2040 | Very poor | Long term targets for the period beyond 2040 | Very poor |
|---|---|---|---|---|---|
| **→ What are the targets and what do they actually mean?** | | | | | |
| KEPCO commits to reducing its scope 1 and 2 emissions by 47.4% by 2030, using 2018 as the baseline (KEPCO, 2023, p. 31). Alongside this, the company aims for renewables to account for 21.5% of its total generation capacity by 2030 (KEPCO, 2022, p. 70).<br><br>KEPCO's commitment to reducing emissions for scope 1 and 2 translates to a **reduction of 18% across the value chain by 2030 compared to its 2019 baseline, or 22% below 2021 levels** (own calculations). | | No target identified. | | KEPCO has pledged to reach **carbon neutrality for its operations (i.e. scopes 1 and 2) by 2050**, but does not present a specific emissions reduction commitment alongside this pledge.<br><br>Since the company's pledge does not entail any commitment to deep decarbonisation, we consider that the 'carbon neutrality' terminology of this target may be misleading. | |
| **→ Is this emission reduction commitment in line with 1.5°C-compatible trajectories or benchmarks for the sector?** | | | | | |
| **KEPCO's short term emissions reduction commitments do not align with the 1.5°C trajectory for the electric utilities sector, based on available literature.** According to the IEA Net Zero by 2050 Report, aligning the energy sector with a 1.5°C-compatible pathway requires a 44% emissions reduction globally in 2030 compared to 2021 (IEA, 2021c). In South Korea, an advanced economy, the power sector needs to realise steeper emission reductions and reach net zero by 2035 (IEA, 2022a). KEPCO's commitment to a reduction of 22% between 2021 and 2030 (own calculation) falls well below the sector benchmark and would postpone necessary reductions beyond 2030.<br><br>KEPCO's target of achieving a 21.5% share of renewable generation in its energy mix also falls short of global benchmarks (KEPCO, 2022, p. 70), which recommend a range of 59-89% renewables share in total generation by 2030 (Boehm et al., 2023; CAT, 2022b; IEA, 2022b; IRENA, 2022a).<br><br>Due to limited data disclosed by KEPCO, we were unable to assess the company's carbon intensity and its alignment with a 1.5°C pathway. | | KEPCO's lack of medium-term targets towards 2040 reflects the need for interim targets to chart a trajectory towards the company's long-term vision as recommended by the UN High Level Expert Group on Net Zero (UN HLEG, 2022, p. 15). | | **KEPCO's long term goal of achieving carbon neutrality by 2050 does not meet the 1.5°C Paris Agreement-aligned milestones for electric utilities.** While we are unable to calculate the actual reductions across the full value chain associated with the carbon neutrality target due to limited data, it is evident that the target does not meet the urgent timelines required for electric utilities in advanced economies, such as South Korea, which should aim for net-zero emissions by 2035 (IEA, 2023c). Additionally, KEPCO's carbon neutrality target excludes scope 3 emissions, which account for over half of the company's current emissions. Bringing the company on the 1.5°C-compatible trajectory requires substantial emission reductions across all scopes, including scope 3 | |

152

Exhibit 7 to Decl. of Angel Hsu

298

**SER 578**

## Mars

| Short term targets towards 2030 | High | Medium term targets for the period 2031-2040 | Very poor | Long term targets for the period beyond 2040 | Reasonable |
|---|---|---|---|---|---|
| **◆ What are the targets and what do they actually mean?** | | | | | |
| Mars commits to reduce 2015 value chain emissions (roughly equal to 2019 emissions) by **27% by 2025, and by 50% by 2030.** | | No targets identified for the 2031-2040 period. | | Mars has pledged **net zero emissions by 2050.** Mars commits to an emissions reduction target of 80% by 2050 below 2019 levels across the entire value chain alongside its net-zero pledge. We assume that the company does not plan to claim land sequestration carbon dioxide removals towards this 80% target, as the company has explicitly ruled this out for its 50% 2030 target. | |
| **◆ Is this emission reduction commitment in line with 1.5°C-compatible trajectories or benchmarks for the sector?** | | | | | |
| **Mars's two short term targets meet 1.5°C Paris Agreement aligned milestones for the food and agriculture sector identified in existing literature.** Teske (2022, p. 328) describes that between 2019 and 2030, the food and agriculture industry should reduce its scope 3 emissions by 34%. Mars specifies that it does not plan to use land sequestration carbon dioxide removals for the realisation of its 2030 target. The company's 2030 target goes beyond the benchmarks identified for the sector, and Mars has a short-term target for 2025 that corresponds with its 2030 target too. | | Mars's lack of targets for the period 2031-2040 neglects the need for interim targets to chart a trajectory towards the company's long-term vision as recommended by the UN High Level Expert Group on Net Zero (UN HLEG, 2022) | | We find that Mars's 2050 target meets 1.5°C Paris Agreement aligned milestones for food and agriculture sector. Teske (2022, p. 328) identifies 1.5°C-aligned absolute emission reduction milestones for various emission sources of agricultural activities, which represent upstream scope 3 emissions for Mars. All energy-related emissions need to reduce 100% by 2050, whereas AFOLU emissions and non-CO₂ emissions need to reduce 42% by 2050 below 2019 levels. In turn, these required reductions mean a reduction of 51% across all scopes, below 2019 levels. Mars's implied emission reduction commitment aligns with this.

The Transition Pathways Initiative (TPI) derives an emission intensity per tonne of agricultural input aligned with 1.5°C trajectories by 2050: 0.414 tCO₂/tonne agricultural input (Dietz et al., 2022, p. 13). This represents an 85% reduction in intensity compared to 2.751 tCO₂/tonne agricultural input in the 2020 base year. Due to a lack of information on intensity and volumes of agricultural input, we cannot directly assess whether Mars's implied emission reduction commitment meets these intensity benchmarks. Moreover, TPI specifies that their benchmarks were developed for human food only, and Mars's products are only partially for human consumption. However, Mars's emission reduction target alongside its 2050 net-zero target contribute to the shift that is signalled by the required change in intensities. Boehm et al. (2023) describe emission reduction requirements of 29% for enteric fermentation and 39% for manure management, both below 2017 levels. Mars's emission reduction target goes beyond these levels.

We cannot evaluate Mars's target against SBTi's FLAG Guidance and Net Zero Standard for this assessment due to the lack of specificity on the role of emission reductions vis-à-vis land sequestration CDR in those guidances, towards aligning with 1.5°C-compatible transition pathways for the sector. There are high uncertainties regarding the permanence and potential of CDR within the agrifood value chain.

We evaluate Mars's implied emission reduction target reasonable rather than high because of the lack of interim targets on five-year intervals, as per the recommendations of the UN High Level Expert Group on Net Zero (ISO, 2022; UN HLEG, 2022). | |

Exhibit 7 to Decl. of Angel Hsu
299

**SER 579**

Case 2:24-cv-00801-ODW-PVC    Document 89-25    Filed 04/07/25    Page ID #:8932    Page 155 of 164

Nestlé

| Short term targets towards 2030 | Poor | Medium term targets for the period 2031-2040 | Very poor | Long term targets for the period beyond 2040 | Unclear |
|---|---|---|---|---|---|
| ◆ What are the targets and what do they actually mean? | | | | | |
| Nestlé pledges to reduce its emissions by 20% by 2025 and 50.4% by 2030, compared to a 2018 baseline, and to reduce its FLAG emissions by 50% by 2030. **We interpret that the pledge to reduce emissions by 50.4% by 2030 which translates to only 16%-24% emission reductions compared to the company's full value chain emissions in 2019.** | | Nestlé sets no emissions reduction target for the medium-term towards 2040 (2031–2040). | | Nestlé's headline pledge of net-zero GHGs by 2050 includes a commitment to reduce emissions by 90% across its entire value chain compared to its 2018 levels, and to reduce its scope 3 FLAG emissions by 75% compared to 2018 levels (SBTi, 2023e). These targets include both reductions and removals. **Due to an undefined role of land sequestration carbon dioxide removals, Nestlé's emission reduction commitment remains unclear.** | |
| In its Net Zero Roadmap (Nestlé, 2023b), Nestlé presents its interim emission reduction targets compared to a business-as-usual scenario and shows the targeted emission levels for each emission source for 2030. We calculate from the figure presented in the company's Net Zero Roadmap (Nestlé, 2023b) that the company actually commits to reduce its full emission footprint from 116 MtCO₂e in 2019 to between 91-97 MtCO₂e in 2030. This would represent a reduction of just 16-24% of the company's full value chain emissions. The stark difference between this range and the 50% target communicated by Nestlé lies in the company's exclusion of various emission sources from its pledge, as well as the inclusion of measures for land sequestration and technical carbon removal and storage which Nestlé accounts as negative emissions. | | | | | |
| The range of 16-24% is due to different potential interpretations of the unclearly defined measure to 'transform the product portfolio', through which Nestlé states that it plans to 'reduce future emissions growth' by 6 MtCO₂e (Nestlé, 2023b, p. 21). The upper end of the 16-24% range is based on the optimistic assumption that the 6 MtCO₂e refers to further emission reductions across several emission sources and compared to 2019 levels. However, the ambiguous presentation of this measure in the Net Zero Roadmap could also refer to a 6 MtCO₂e reduction compared to unspecified future emissions growth, which may not lead to any further emission reductions compared to 2019 levels. | | | | | |
| ◆ Is this emission reduction commitment in line with 1.5°C-compatible trajectories or benchmarks for the sector? | | | | | |
| Nestlé's 2030 medium-term targets is neither met cross-sectoral nor sector-specific 1.5°C Paris-Agreement-aligned decarbonisation milestones. The majority of Nestlé's emission footprint derives from agricultural emissions. In the absence of available benchmarks from scientific literature for mixed good producers, we compare Nestlé's 16-24% emission reductions by 2030 to available 1.5°C-aligned benchmarks for agriculture, and cross-sector global benchmarks. Global cross-sectoral benchmarks require GHG and CO₂ emissions to reduce by 43% and 48% between 2019 and 2030, respectively (IPCC, 2022). Pathways for global agriculture and food sector in Tiske et al. (2022, p. 328) indicate that scope 3 emissions should reduce by at least 34% between 2019 and 2030. Although the 50% reduction communicated by Nestlé would appear to align the company with these benchmarks, our interpretation of Nestlé's target translates to just a 16-24% reduction of the full value chain emissions in 2019 means that Nestlé's plans fall far short of any of these benchmarks. | | | | We are unable to compare Nestlé's 2050 targets to sectoral 1.5°C-aligned benchmarks as the exact target ambition remains unclear, due to an undefined role of land sequestration carbon dioxide removals. | |
| The SBTi published its guidance for Forest, Land, and Agriculture (FLAG) in 2022. Although the FLAG guidance requires companies to commit to annual reductions of at least 3.03%, translating to reductions of 30.3% between 2020 and 2030 (SBTi, 2022a, pp. 44-45), this includes land sequestration CDR. We cannot use the FLAG guidance for this assessment due to the lack of specificity on the role of emission reductions vis-à-vis land sequestration CDR, towards aligning with 1.5°C-compatible transition pathways for the sector. | | | | | |

Corporate Climate Responsibility Monitor 2024

154

Exhibit 7 to Decl. of Angel Hsu
300

**SER 580**

Nike

| Short term targets towards 2030 | Reasonable | Medium term targets for the period 2031-2040 | Very poor | Long term targets for the period beyond 2040 | Reasonable |
|---|---|---|---|---|---|
| **➔ What are the targets and what do they actually mean?** | | | | | |
| Nike has set out two interim emission reduction targets. <br> • Reduce scope 1 and scope 2 by 65% below 2015 levels by 2030. <br> • Reduce scope 3 by 30% below 2015 levels by 2030. This target excludes indirect emissions from the use phase of products (scope 3 category 11). <br><br> These targets jointly translate to a reduction of 41% by 2030 across the entire value chain below 2019 levels. To estimate the implied reduction in Nike's targets, we consider the whole value chain emissions excluding indirect use phase emissions, which are calculated using the larger scope 2 estimate, which in Nike's case is the location-based estimate. However, because Nike's targets clearly state that it only plans to reduce its market-based scope 2, we calculate the scope 2 emission reduction based on the market-based estimate, and then tally up our reduction against Nike's full value chain emissions. | | No targets identified. | | Nike's long term pledge includes a commitment to reach net-zero GHG emissions by 2050. Alongside its pledge, Nike commits to reducing its full value chain emissions (scope 1, 2, and 3) by 90% below 2015 levels. <br><br> This target represents a **reduction of 91% by 2050 below 2019 levels.** Since the net zero pledge entails a commitment to deep decarbonisation across the entire value chain, we consider that the net zero terminology is unlikely to be misleading. Net zero targets can give consumers and investors the impression that the company aims to reach deep levels of emission reductions, which Nike has committed to. | |
| **➔ Is this emission reduction commitment in line with 1.5°C compatible trajectories or benchmarks for the sector?** | | | | | |
| Nike's commitments for reductions across the value chain are close to meeting 1.5°C-aligned milestones identified in existing literature. According to the IPCC's global economy-wide benchmarks to keep warming below 1.5°C, GHG emissions should reduce by 43% by 2030, compared to 2019 (IPCC, 2022). Given that emissions in the fashion industry occur in various sectors, including agriculture and energy, we expect the industry to decarbonise at the same speed as this global trajectory. Nike's targets, which represent a 41% reduction, are close to this global benchmark. <br><br> The company's 2030 scope 3 target is almost aligned with other 1.5°C-compatible sectoral benchmarks. Nike's scope 3 target of a 30% reduction below 2015 levels translates to a 40% reduction of scope 3 emissions below 2019 levels. This falls just short of sectoral benchmarks, which require a reduction of upstream supply chain emissions of at least 41% by 2030. Teske (2022) considers that between 2019 and 2030, the textile and leather industry and the manufactured fibres and synthetic rubber industry should reduce their GHG emissions by 41% and 46%, respectively. This covers all emissions associated with producing fabrics and other materials and manufacturing the clothes, in other words, Nike's upstream scope 3 emissions. | | Nike's lack of targets for the period 2031-2040 neglects the need for interim targets to chart a trajectory towards the company's long-term vision as recommended by the UN High Level Expert Group on Net Zero (UN HLEG, 2022). | | Nike's 2050 target seems to be aligned with 1.5°C-compatible sectoral benchmarks. Teske (2022) considers that between 2019 and 2050, the textile and leather industry and the manufactured fibres and synthetic rubber industry should reduce their scope 1 GHG emissions by 100%, scope 2 by 100%, and scope 3 by 48%. Nike's implied target of reducing their whole value chain emissions by 91% below 2019 levels seems to meet these benchmarks, although some uncertainties remain on whether the company's target meets these benchmarks for all scopes. To clarify this, Nike could publish further details on how Nike plans to achieve their 2050 target, including reaching 100% renewables in their supply chain, and fully addressing emissions from manufacturing of their products from tier 2 to tier 4 suppliers. | |

Exhibit 7 to Decl. of Angel Hsu
301

## Stellantis

| Short term targets towards 2030 | Medium term targets for the period 2031-2040 | Reasonable |
| --- | --- | --- |
| **Moderate** | | |

### ◆ What are the targets and what do they actually mean?

Stellantis commits to an overarching intensity emission reduction target of 50% by 2030 across the entire value chain, compared to 2021 levels. The overarching interim target is supported by the following absolute and intensity targets, all using a 2021 base year:

- To reduce absolute scope 1 and 2 emissions by 50% by 2025 and by 75% by 2030
- To reduce scope 3 emission intensity by 50% by 2030.
- To sell 100% BEVs for passenger cars in Europe and 50% BEVs for passenger cars and light-duty trucks in the US by 2030
- To reduce the emission intensity of purchased parts per BEV by 40% by 2030

Due to the company's recent formation, we cannot recalculate the targeted emission reductions compared to a 2019 base year.

### ◆ Is this emission reduction commitment in line with 1.5°C-compatible trajectories or benchmarks for the sector?

**Stellantis' 2030 targets meet some of the 1.5°C Paris Agreement-aligned milestones for automobile manufacturers'** downstream scope 3 emissions, as identified in existing literature (CAT, 2020, p. 27; UNFCCC Race to Zero, 2021, pp. 10–11; Teske et al, 2022, p. 4; VBRA, 2022; Boehm et al, 2023, pp. 77–78; IEA, 2023d, pp. 88, 93). To stay within the 1.5°C temperature limit, sales of electric LDVs – those with zero tailpipe emissions – should reach 67%–95% by 2030 globally (CAT, 2020, p. 27; Boehm et al, 2023, pp. 77–78; IEA, 2023b, pp. 88, 93). In Stellantis' main markets such as the European Union and the US, electric LDV sales should reach 95%–100% by 2030 and 100% by 2035 in all developed markets (CAT, 2020, p. 27; UNFCCC, 2021, pp. 10–11; Teske et al, 2022, p. 4). The company only meets these benchmarks for its target to sell 100% EVs in the EU by 2030 but falls short for its target of 50% in the US in the US market. Stellantis aims to reach 100% by 2038 only.

Apart from the core targets for the EU and US markets, the company has not committed to any further phase-out dates for internal combustion engines in other sales markets or other vehicle categories, such as light commercial vehicles. Stellantis presented aspirational EV sale shares by 2030 for the Middle East and Africa regions, Brazil, India and the Asia Pacific region, and China, as part of its strategic blueprint Dare Forward 2030 published in 2022 (Stellantis, 2022). These indicative targets miss the 1.5°C-compatible sectoral benchmarks for Brazil, India, and China (CAT, 2020, p. 27). The targeted sale shares are:

- >25% share of LEVs in the Middle East and Africa regions.
- ~20% share of LEVs in Brazil (compared to 45-95% for all LDV sales being electric by 2030 in the 1.5°C-aligned scenario)
- ~50% share of BEVs in India and the Asia Pacific region (compared to 80-95% for all LDV sales being electric by 2030 in the 1.5°C-aligned scenarios, including two- and three-wheelers)
- 60% of share of passenger car BEVs in China (compared to 95-100% for all LDV sales being electric by 2030 in the 1.5°C-aligned scenarios, including two- and three-wheelers)

Stellantis no longer claims that its scope 3 emissions 2030 targets are aligned with SBTi. Instead, it refers to the SBTi's guidance on the transport sector for its scope 1 and 2 targets, which it claims are aligned with a 1.5°C scenario (Stellantis, 2023, p. 113).

| | | |

Stellantis commits to an overarching pledge of carbon net zero by 2038 includes a commitment to reduce the emissions intensity across its vehicles' life cycle by at least 90% across its entire value chain, compared to 2021 levels. Stellantis will subsequently offset less than 10% of its 2021 emissions by 2038. Due to the company's recent formation, we cannot recalculate the targeted emission reductions to a 2019 base year.

**Stellantis' 2038 targets meet some of the 1.5°C Paris Agreement-aligned milestones for automobile manufacturers.** The automobile industry should only sell electric vehicles by 2030–2035 globally to comply with the 1.5°C-compatible decarbonisation milestones (CAT, 2020, p. 27; Boehm et al, 2023, p. 77–78; UNFCCC, 2021, pp. 10–11; IEA, 2022a, p. 27; Teske et al, 2022, p. 4). Stellantis does not explicitly commit to this specific benchmark for its entire vehicle fleet sold globally (CAT, 2020, p. 27). Instead, it focuses on certain markets, such as the EU by 2030 and the US by 2038, which were responsible for 76% of all sales in 2022 (Stellantis, 2023b, p. 37). We could not identify regional reduction trajectories aligned with the 1.5°C.

Exhibit 7 to Decl. of Angel Hsu
302

**SER 582**

Case 2:24-cv-00801-ODW-PVC    Document 89-25    Filed 04/07/25    Page 158 of 164
Page ID #:8935

**Tesco**

| Short term targets towards 2030 — Very poor | Medium term targets for the period 2031-2040 — Poor | Long term targets for the period beyond 2040 — Moderate |
|---|---|---|

**◆ What are the targets and what do they actually mean?**

| | | |
|---|---|---|
| Scope 1 and 2, base year 2015 | Scope 1 and 2, base year 2015 | Net-zero emissions by 2050. |
| • Reduce emissions by 85% by 2030 (voluntary target) | • Reduce emissions by 83% by 2032 | |
| | • Reduce emissions by 90% by 2035 | Scope 3, base year 2019: |
| Tesco's short-term targets equate to emission reductions of 1% compared to 2019 value chain emissions. | | • Reduce non-FLAG emissions by 90% by 2050 |
| | Scope 3, base year 2019: | • Reduce FLAG emissions by 72%, by 2050 |
| | • Reduce non-FLAG emissions by 55%, by 2032 | |
| | • Reduce FLAG emissions by 39%, by 2032 | Tesco commits to emissions reduction targets of at least 90% by 2050 below 2019 levels for non-FLAG emissions in scope 3, and 72% for FLAG emissions in scope 3. The targets equate to emission reductions of 63-74% compared to 2019 value chain emissions. To determine this range, we applied the same methodological steps as explained for the medium-term targets. |
| | Tesco medium-term targets equate to emission reductions of 27-45% compared to 2019 value chain emissions, but the role of land sequestration and carbon dioxide removals remains unclear. | |
| | | |
| | The range is related to uncertainties around the exact scope coverage of the medium-term targets. Tesco reports higher emissions for scope 3, category 11 (use of sold products) and lower emissions for category 1 (fuel and energy-related activities), than the emission reports in the baseline emissions of the targets (both the lower and higher end of the range includes the presented baseline emissions for category 1, rather than the lower reported emissions. For the lower end of the range, we use the reported emissions for category 11, and apply the reported coverage share on those emissions. We assume the share of emissions not covered under target to stay constant. The higher range of the emissions uses the same coverage share that Tesco reports, but applies it on the reported baseline emissions. | |

**◆ Is this emission reduction commitment in line with 1.5°C-compatible trajectories or benchmarks for the sector?**

| | | |
|---|---|---|
| Due to the lack of scope 3 targets, Tesco's short-term emission reduction commitment is far below a 1.5°C trajectory for the sector and can be considered to be of low significance in the context of the company's full GHG emission footprint. Teske (2022, p. 328) describes that between 2019 and 2030, the food and agriculture industry should reduce its scope 3 emissions by 34%. Overall, the company's 2030 target does not align with this benchmark. | Due to the limited scope coverage and limited ambition, Tesco's range of short-term targets do not meet 1.5°C Paris Agreement-aligned milestones for the food and agriculture sector identified in existing literature. | Tesco's target for non-FLAG emissions is close to 1.5°C benchmarks, but the meaning of the target for FLAG emissions is unclear. |
| | | Tesco's target for non-FLAG emissions, accounting for two-thirds of its emissions footprint, reflect a commitment to deep emission reductions, but fall short of 1.5°C benchmarks for the sector. Teske (2022, p. 328) identifies 1.5°C-aligned absolute emission reduction milestones for various emission sources of agricultural activities, finding that all energy-related emissions need to reduce 100% by 2050. |
| Boehm et al. (2023) describe emission reduction requirements of 17% for enteric fermentation and 21% for manure management, both below 2017 levels. Tesco does not meet these emission reduction levels with its 2030 target. | | |
| | | However, since Tesco claims to fully align its strategy with the SBTi FLAG guidance, there is a substantial likelihood that the company will depend on extensive land sequestration or carbon dioxide removal in the value chain for making its targets for FLAG emissions. We do not consider this an adequate approach to claim neutralisation of emissions, among other reasons, due to high uncertainties regarding permanence and potential. |
| The SBTi published its guidance for Forest, Land, and Agriculture (FLAG) in 2022. Although the FLAG guidance requires companies to commit to annual reductions of at least 3.03%, translating to reductions of 30.3% between 2020 and 2030 (SBTi, 2022b, pp. 44–45), this includes land sequestration and carbon dioxide removals. We cannot use the FLAG guidance for this assessment due to the lack of specificity on the role of emission reductions vis-à-vis land sequestration CDR, towards aligning with 1.5°C-compatible transition pathways for the sector. If we were to include the 30.3% benchmark, Tesco's short-term targets would also not align with this benchmark due to its negligible emission reduction commitment. | | Due to the lack of clarity on the extent to which the FLAG target will be achieved through real emission reductions, we consider that there is effectively a lack of any specific commitment for reducing these FLAG emissions. We also do not identify clear signals from the company's measures or other target that would suggest that there is a clear plan to embark on the agricultural transitions that would be necessary to significantly reduce agricultural emissions, especially methane and nitrous oxide. |

Exhibit 7 to Decl. of Angel Hsu
303

**SER 583**

## Toyota

| Short term targets towards 2030 | Very poor | Medium term targets for the period 2014-2040 | Very poor | Long-term targets for the period beyond 2040 | Very poor |
|---|---|---|---|---|---|
| **What are the targets and what do they actually mean?** | | | | | |
| Toyota commits to the following emission reduction targets by 2030: <br>• Scope 1 & 2: 30% absolute emissions reduction from scope 1 and 2 by 2025 (below 2019 levels, without allowing offsets to meet the target) <br>• Scope 3 – Category 11 <br>  ○ 30% CO₂ emissions intensity reduction per kilometre for passenger light-duty vehicles and light commercial vehicles by 2025 for Japan, United States, Europe, China, Canada, Brazil, Saudi Arabia, India, Australia, Taiwan, Thailand, and Indonesia (below 2019 levels, not allowing for offsets to meet the target) <br>  ○ 33.3% CO₂ emissions intensity reduction per vehicle kilometre for passenger light-duty vehicles and light commercial vehicles by 2030 (below 2019 levels, without allowing offsets to meet the target) <br>  ○ 11.6% CO₂ emissions intensity reduction per vehicle kilometre for medium and heavy freight trucks by 2030 (below 2019 levels, without allowing offsets to meet the target) <br>  ○ All emissions across the value chain <br>  ○ 18% GHG emissions intensity reduction per vehicle across scopes 1, 2 and 3 emissions by 2025 (below 2019 levels, without allowing offsets to meet the target) <br>  ○ 30% GHG emissions intensity reduction per vehicle across scopes 1, 2 and 3 emissions by 2030 (below 2019 levels, without allowing offsets to meet the target) <br><br>Toyota has also set a target to reach a 50% sales share of electric vehicles by 2030 and only sell zero-emission vehicles by 2035 for the European Union and the United Kingdom (Toyota Europe, 2021, 2023a). <br><br>We cannot independently quantify Toyota's interim intensity targets in terms of absolute emission intensity targets for 2030. Toyota has disclosed to CDP that its 2030 target for LDVs is equivalent to an estimated 23.1% reduction of absolute emissions from scope 3 category 11, and its 2030 target for HDVs is equivalent to an estimated 0.5% (Toyota, 2023d). This CDP disclosure is not publicly available, and the assumptions that underpin the estimate are not clear. | | Toyota commits to the following emission reduction targets by 2035: <br>• Scope 1 & 2 <br>  ○ 68% absolute emissions reduction by 2035 across scope 1 and scope 2 emissions (below 2019 levels, without allowing offsets to meet the target) <br>• Carbon neutrality for CO₂ emissions from production plants' scope 1 and scope 2 emissions by 2035 (no base year, with offsets allowed to meet target) <br>• Downstream Scope 3 – Category 11: 50% CO₂ emissions intensity reduction per kilometre for new vehicles by 2035 (below 2019 levels, without allowing offsets to meet the target) <br><br>Toyota's 2035 absolute emissions reduction target for scope 1 and 2 is equivalent to less than a 1% emission reduction by 2035 below 2019 levels across the entire value chain. We cannot independently quantify Toyota's 2035 interim intensity targets for scope 3 emissions. | | Toyota – as well as subsidiary Hino, which produces heavy-duty vehicles – aim to achieve carbon neutrality by 2050, but neither Toyota nor Hino commit to a specific emissions reduction target alongside this pledge. Since the company's carbon neutrality pledge does not entail any explicit commitment to deep decarbonisation, labelling it as a 'carbon neutrality target' may be misleading and commits to the following scope-specific pledges by 2050: <br>• Scope 1 & 2 <br>  ○ Carbon neutrality for GHG emissions from corporate activities by 2050 <br>  ○ Zero CO₂ emissions of production plants' scope 1 and scope 2 emissions by 2050 <br>• Downstream Scope 3 – Category 11: Carbon neutrality for average GHG emissions per vehicle by 2050 <br>  ○ All emissions scopes across the value chain: Carbon neutrality for GHG emissions across scope 1,2 and 3 emissions | |
| **Is this emission reduction commitment in line with 1.5°C-compatible trajectories or benchmarks for the sector?** | | | | | |
| **Light-duty vehicles** <br>**Toyota's 2030 interim targets do not meet 1.5°C Paris-Agreement aligned milestones for automobile manufacturers' downstream scope 3 emissions,** as identified in existing literature (CAT, 2020, p. 27; UNFCCC, 2021, pp. 10–11; Teske et al., 2022, p. 4; WBA, 2022; Boehm et al., 2023, pp. 77–78; IEA, 2023c, pp. 88, 93). Sales of electric light-duty vehicles with zero tailpipe emissions should reach 67%–95% by 2030 globally in line with the 1.5°C warming limit (CAT, 2020, Boehm et al., 2023; IEA, 2023c). Toyota's main markets such as the European Union, China and the US, electric LDV sales should reach 95%–100% by 2030 and 100% by 2035 across all leading markets (CAT, 2020; UNFCCC, 2021; IPCC, 2022; Teske et al., 2022). <br><br>The company significantly falls short of the global 1.5°C-aligned benchmarks for 2030, and it provides no market-specific phase-out dates for internal combustion engines. Toyota's target to reach a 50% sales share of electric vehicles by 2030 in the EU and the UK reflects the automobile sector's business-as-usual development. Toyota's aligned scope 3 benchmarks in 2030 require that the EV share market in Toyota's key markets will reach around 50% under its stated policies and announced pledges scenario (IEA, 2023b, p. 114). We cannot identify such targets for its other key markets. Toyota aims to sell 3.5 m BEVs globally by 2030 (Toyota, 2023b). <br><br>Toyota still refers to the 58% lifetime CO₂ reduction of its scope 3 emissions intensity target (Toyota, 2023b). However, SBTi has inadvertently paused the use of its methodology for automakers, citing its incompatibility with the 1.5°C temperature limit (SBTi, 2022f). The Transition Pathway Initiative (TPI) does not deem the company's 2030 target for downstream scope 3 emissions as aligned with its Below 2 Degrees Scenario benchmarks (TPI, 2023a). The TPI's assessment is however based on the previous scope 3 emissions intensity from the use of heavy-duty trucks as a 1.5-degree benchmark of below 31 gCO₂e/vkm (note: this is 5 degree benchmark of below 31 gCO₂e/vkm). <br><br>**Heavy-duty vehicles** <br>**We cannot independently assess Toyota's climate targets for heavy-duty vehicles against existing 1.5°C-aligned benchmarks.** While Toyota and Hino commit to intensity reduction targets for the heavy-duty vehicles' use phase emissions at the group and subsidiary level, respectively, the companies provide no explanation on how these targets relate to existing 1.5°C target of the Paris-Agreement. 1.5°C-compatible emissions intensities from the use of heavy-duty trucks are at 30–41 gCO₂e per tonne kilometre by 2030 (IEA, 2023c; Teske et al., 2023 data provided in Dataset 2). However, Toyota estimates that this will reduce total scope 3 emissions only by 0.5% by 2030 below 2019 levels (Toyota, 2023d). <br><br>We cannot identify targets for the phase-out of zero emission heavy-duty vehicles by 2030, neither at the group level by Toyota nor at the subsidiary level by Hino. Recent literature indicates that the 1.5°C Paris-Agreement compatible shares should reach 20%–37% of battery electric vehicles (BEVs) and fuel cell electric vehicles (FCEVs) heavy-duty trucks of global annual sales by 2030 (UNFCCC, 2021, pp. 10–11; Boehm et al., 2023, pp. 77–78; IEA, 2023c, pp. 88, 93). | | Toyota's 2035 interim targets do not meet 1.5°C Paris-Agreement–aligned milestones for automobile manufacturers' downstream scope 3 emissions for light-duty vehicles, as identified in existing literature (CAT, 2020, p. 27; UNFCCC, 2021, pp. 10–11; Teske et al., 2022, p. 4; WBA, 2022; Boehm et al., 2023, pp. 77–78; IEA, 2023c, pp. 88, 93). All light-duty vehicle (LDV) sales should be electric—that is, have zero tailpipe emissions—by 2035 in key markets such as Japan, the European Union, China and the US to stay below the 1.5°C warming limit (CAT, 2020, p. 27; Boehm et al., 2023, pp. 77–78; IEA, 2023c, pp. 88, 93). The company only provides market-specific internal combustion engines (ICE) phase-out dates for the European Union and the United Kingdom, where Toyota has set a target to only sell zero-emissions vehicles by 2035 (Toyota Europe, 2021, 2023a). We could not identify such targets for its other key markets. Toyota has not signed the non-legally binding declaration committing to a fully electric fleet by 2035 to support achieving the 1.5°C target of the Paris-Agreement, despite competing manufacturers signing up to it (COP26 Presidency, 2021, A22 Coalition, 2021). | | We find the absence of any post-2040 emission reduction target alongside Toyota's carbon neutrality goal highly insufficient, especially considering the substantial near- and medium-term emission reductions needed mid-century to have a reasonable chance of limiting global warming to 1.5°C (IPCC, 2022). To align with the 1.5°C-compatible deep decarbonisation pathways, Toyota should transition to selling only electric vehicles with zero tailpipe emissions by 2035 globally (CAT, 2020, p. 27; UNFCCC, 2021, pp. 10–11; Teske et al., 2022, p. 4; WBA, 2022; Boehm et al., 2023, pp. 77–78; IEA, 2023c, pp. 88, 93). In 2022, downstream emissions from the use of cold vehicles amounted to around 76% of Toyota's emissions in 2022, but the company has not committed to a phase-out date for internal combustion engines in the context of its carbon neutrality pledge. | |

Exhibit 7 to Decl. of Angel Hsu
304

## Volkswagen Group

| Short term targets towards 2030 | Medium term targets for the period 2030-2040 | Long term targets for the period beyond 2040 |
|---|---|---|
| **Poor** | **Very poor** | **Very poor** |

### ➜ What are the targets and what do they actually mean?

**Short term targets towards 2030**

Volkswagen Group commits to the following emission reduction targets towards 2030:

- 30% intensity emissions reduction per kilometre for new passenger cars and light-duty vehicles by 2030 (below 2018 levels, without allowing offsets to meet the target).
- 50.4% absolute emissions reduction by 2030 across scope 1 and scope 2 emissions (below 2018 levels, without allowing offsets to meet the target).

The Volkswagen Group further communicates several targeted sales shares for electric light-duty vehicles by 2030:

- at least 70% in the European Union
- at least 50% in the United States and China

The Volkswagen Group also states that these targets represent minimum requirements for the Group's brands. Each brand may set individual targets going beyond the group-level targets for this timeframe (Volkswagen, 2023, p. 47). While Volkswagen does not commit to group-level targets for heavy-duty vehicles, each of the four brands under its subsidiary Traton sets its own targets (Traton, 2023a, pp. 17, 23, see also [blue] in the written assessment).

Volkswagen's 2030 absolute emissions reduction target for scope 1 and 2 is equivalent to a 3% emission reduction below 2019 levels across the entire value chain. We cannot independently quantify Volkswagen's interim intensity target for scope 3 emissions. Volkswagen indicated in its CDP disclosure that this target is equivalent to an estimated 6% reduction of absolute emissions from scope 3 category 11 (Volkswagen, 2023a). This CDP disclosure is not publicly available, and the assumptions that underpin the estimate are not clear, for example for sales volumes assumed in 2030.

Volkswagen no longer refers to any group-wide short-term targets towards 2000 within a five-year interval in its latest sustainability reporting of 2023 (Volkswagen, 2023b, 2023c, 2023d). Previously, the company had set a 2023 intensity reduction target for $CO_2$ emission of light-duty vehicles that explicitly relied on an unspecified amount of offset (Volkswagen, 2022, pp. 24, 44).

### ➜ Is this emission reduction commitment in line with 1.5°C-compatible trajectories or benchmarks for the sector?

**Light-duty vehicles**

Volkswagen's 2030 interim targets do not meet the 1.5°C Paris Agreement-aligned milestones for automobile manufacturers' scope 3 emissions from the use of light-duty vehicles (LDVs), as identified in existing literature (CAT, 2020, p. 27; UNFCCC, 2021, pp. 10-11; Teske et al., 2022, p. 4; WBA, 2022; Boehm et al., 2023, pp. 77-78; IEA, 2023c, pp. 88, 93). Sales of electric LDVs, with zero tailpipe emissions, should reach 67%-95% by 2030 globally to stay below the 1.5°C warming limit (CAT, 2020; Boehm et al., 2023; IEA, 2023c). In Volkswagen's main markets such as the European Union, China and the US, electric vehicles should reach 70%-100% by 2030 and 100% by 2035 across all main markets (CAT, 2020, p. 27; UNFCCC, 2021, pp. 10-11; Teske et al., 2022, p. 4).

The Volkswagen Group commits to reach at least a 50% electric vehicle share by 2030 in the US and China, and at least 70% in the European Union (Volkswagen, 2023c, p. 8). These three markets jointly represent 85% of all vehicles sales in 2022 (Volkswagen, 2023d, p. 128). The company significantly falls short of the global 1.5°C-aligned benchmarks for 2030, and it provides no market-specific phaseout dates for internal combustion engines.

The Volkswagen Group still refers to the SBTi's 2°C verification of its scope 3 emissions intensity target (Volkswagen, 2023b, p. 47). However, SBTi has confirmed having paused the use of its methodology for automakers, citing its incompatibility with the 1.5°C target (SBTi, 2022f). The Transition Pathway Initiative (TPI) does not share the company's 2009 targets for downstream scope 3 emissions as aligned with a Below 2 Degrees Scenario benchmark (TPI, 2023b). The TPI's interpretation of Volkswagen's 2009 target of 114 $gCO_2e/km$ falls significantly short of its Below 2 Degree Scenario benchmark (lower than 81 $gCO_2e/km$) and its 1.5 Degree benchmark (lower than 31 $gCO_2e/km$).

**Heavy-duty vehicles**

Volkswagen produces heavy-duty trucks and buses through its subsidiary Traton. Traton manages four different vehicle brands: Scania, MAN, Navistar, and Volkswagen Truck & Bus.

The 2030 targets by Traton's four brands mostly meet 1.5°C Paris Agreement-aligned milestones for downstream scope 3 emissions of heavy-duty vehicle manufacturers, as identified in existing literature (UNFCCC, 2021, pp. 10-11; Mission Possible Partnership, 2021, p. 40; Boehm et al., 2023, pp. 77-78; IEA, 2023c, pp. 88, 93) MAN, Scania and Navistar (International Operations) — covering 76 out of Volkswagen Group's 28 sales shares for heavy-duty vehicles — all pledge to reach 40% sales share of heavy-duty zero-emission vehicles (ZEVs) by 2030 (Traton, 2023a, p. 17). These commitments are in line with the global 1.5°C-compatible shares for heavy-duty trucks of 30%-37% of battery electric vehicles (BEVs) and fuel cell electric vehicles (FCEVs) by 2030 (UNFCCC, 2021; Boehm et al., 2023). Trucks represented 85% of all heavy-duty vehicle sales by Traton in 2022 (Traton, 2023b). Volkswagen Truck & Bus — Volkswagen Group's fourth brand producing heavy-duty vehicles in Brazil — has not committed to any target to increase the sales share of heavy-duty vehicles.

**Medium term targets for the period 2030-2040**

Volkswagen sets no emissions reduction targets for medium-term towards 2040 (2031-2040).

Some of Volkswagen's brands like Audi or Volkswagen Passenger Cars do communicate aspirational sales shares for electric light-duty vehicles for their respective brands (Waldersee, 2022; Audi, 2024). For example, Audi intends to gradually phasing out the production of combustion engines by 2033 (Audi, 2024). Volkswagen Group does not present these as integral part of their group-level climate strategy.

Volkswagen's absence of targets for the period 2031-2040 reflects the need for interim targets to chart a trajectory towards the company's long-term vision, as recommended by the UN High Level Expert Group on Net-Zero (UN HLEG, 2022).

**Long term targets for the period beyond 2040**

The Volkswagen Group aims to achieve carbon neutrality by 2050, but does not commit to a deep emissions reduction target alongside its 2050 net-zero pledge. Since the company's carbon neutrality pledge does not entail any explicit commitment to deep decarbonisation, labelling it as a 'carbon neutrality target' may be misleading.

Volkswagen's subsidiaries – Scania, MAN and Porsche – have further committed to net-zero long-term net-zero and carbon neutrality targets by 2040 or beyond (Volkswagen, 2023b, p. 47).

We find the absence of any post-2040 emission reduction targets alongside Volkswagen Group's carbon neutrality goal highly insufficient, especially considering the urgent need for substantial and credible emission reductions towards mid-century. To give a reasonable chance of limiting global warming to 1.5°C (IPCC, 2022).

To align with the 1.5°C-compatible decarbonisation milestones, the automobile industry should transition to selling only electric vehicles globally by 2030-2035 (CAT, 2020, p. 27; UNFCCC, 2021, pp. 10-11; Teske et al., 2022, p. 4; WBA, 2022; Boehm et al., 2023, pp. 77-78; IEA, 2023c, pp. 88, 93) In 2022, downstream emissions from the use of sold vehicles constituted around 74% of Volkswagen's emissions, but the company has not committed to any phase-out dates for internal combustion engines across its different brands in the context of its carbon neutrality pledge.

Exhibit 7 to Decl. of Angel Hsu

305

**SER 585**

## Volvo Group

| Short term targets towards 2030 | Reasonable | Medium term targets for the period 2031-2040 | Unclear | Long term targets for the period beyond 2040 | N/A |
|---|---|---|---|---|---|
| **◆ What are the targets and what do they actually mean?** | | | | | |
| Volvo Group commits to the following emission reduction targets by 2030 below 2019 levels: <br> • 50% absolute emissions reduction across scope 1 and scope 2 emissions <br> • 30% absolute emissions reduction from use of construction equipment (part of scope 3 category 11 emissions) <br> • 40% $CO_2$ emissions intensity reduction per vehicle kilometre for heavy-duty trucks <br> • 40% $CO_2$ emissions intensity reduction per vehicle kilometre for buses <br><br> Apart from these emission reduction targets, Volvo Group commits to selling "at least" 35% of electric vehicles by 2030 (Volvo Group, 2020a, pp. 16, 151). <br><br> Volvo Group's 2030 absolute emissions reduction target for scopes 1 and 2 is equivalent to less than a 1% reduction by 2030 below 2019 levels across the entire value chain. We cannot independently quantify Volvo Group's interim intensity targets for scope 3 emissions. | | **The Volvo Group aims to achieve net-zero emissions across the entire value chain by 2040, but does not commit to a deep emissions reduction target alongside its 2040 net-zero pledge.** Since the company's carbon neutrality pledge does not entail any explicit commitment to deep decarbonisation, labelling it as a 'carbon neutrality' target may be misleading. <br><br> In addition, the company commits to an 37.5% absolute emissions reduction by 2034 from the use of industrial and marine engines as part of its scope 3 category 11 emissions. | | **Volvo Group communicates no additional emission reduction targets for the long-term beyond 2040.** For this reason, the issues discussed around the Volvo Group's 2040 net-zero target and its indicative electric vehicle shares under an 'illustrative scenario for 1.5°C' similarly apply for the period beyond 2040 (see assessment above). | |
| **◆ Is the emission reduction commitment in line with 1.5°C compatible trajectories or benchmarks for the sector?** | | | | | |
| **The Volvo Group's 2030 interim targets mostly meet 1.5°C Paris Agreement-aligned milestones for heavy-duty vehicle manufacturers' downstream scope 3 emissions, as identified in existing literature** (UNFCCC, 2021, pp. 10-11; Mission Possible Partnership, 2022, p. 40; Boehm et al., 2023, pp. 77-78; IEA, 2023c, pp. 88, 93). Volvo Group commits to selling "at least" 35% of electric vehicles by 2030 (Volvo Group, 2020a, pp. 16, 151). However, the company does not further differentiate between heavy-duty trucks, buses, and other construction equipment and industrial machinery. For heavy-duty trucks, recent literature identifies the 1.5°C Paris Agreement-compatible range of 30-37% battery electric vehicles (BEVs) and fuel cell electric vehicles (FCEVs) sold by 2030 globally (UNFCCC, 2021, pp. 10-11; Boehm et al., 2023, pp. 77-78; IEA, 2023c, pp. 88, 93). Volvo Group's target, if applied to heavy-duty trucks responsible for 66% of the company's revenue in 2022, would thus meet this benchmark range. For buses, the 1.5°C Paris Agreement-compatible sales share of BEVs and FCEVs must reach between 56-60% by 2030 globally and 100% by 2030 in advanced economies and China (UNFCCC, 2021; 2022; Boehm et al., 2023; IEA, 2023c). Volvo Group's target, if applied to buses responsible for 4% of the company's revenue in 2022, would fall short of this benchmark range. | | We cannot independently assess Volvo Group's medium-term targets towards 2040 against existing 1.5°C-aligned benchmarks for the heavy-duty vehicle sector. Unlike for 2030, Volvo Group provides no specific target share for electric vehicles by 2040 but rather shows indicative shares under an 'illustrative scenario for 1.5°C' (Volvo Group, 2023a, pp. 16, 155). This includes an unspecified share of internal combustion engines using sustainable biofuels and other fossil-free fuels. For heavy-duty trucks, recent literature identifies the 1.5°C Paris Agreement-compatible shares of battery electric vehicles (BEVs) and fuel cell electric vehicles (FCEVs) of 100% by 2040 (UNFCCC, 2021, pp. 10-11; Boehm et al., 2023, pp. 77-78; IEA, 2023c, pp. 88, 93). <br><br> We further consider the lack of an emission reduction target alongside Volvo Group's group-wide 2040 net-zero target as insufficient, considering the need for deep and credible emission reductions towards mid-century to stand a reasonable chance of limiting global warming to 1.5°C (IPCC, 2022). | | | |

Corporate Climate Responsibility Monitor 2024

160

Exhibit 7 to Decl. of Angel Hsu

306

## Walmart

| Short term targets towards 2030 | Medium term targets for the period 2031-2040 | Long term targets for the period beyond 2040 |
| Very poor | Very poor | Very poor |
|---|---|---|
| **◆ What are the targets and what do they actually mean?** | | |
| Walmart committed to the following emission reduction targets for 2030:<br><br>• Scope 1 and scope 2  35% emission reduction by 2025 from 2015<br>• Scope 1 and scope 2  65% emission reduction by 2030 from 2015<br><br>Walmart's short- and medium-term targets translate to reducing emissions by 5% by 2030, compared to 2019 value chain emissions. | Walmart committed **to zero emissions in operations by 2040** (scope 1 and 2).<br><br>We estimate that Walmart's emission reduction target is **equivalent to a commitment to reduce around 9% of its emissions across the value chain by 2040**, compared to 2019 levels. Walmart's 2040 target covers only scope 1 and scope 2 emissions, which account for approximately 9% of the company's GHG emission footprint in 2019. | Walmart sets no emissions reduction target for the long term beyond 2040 (from 2041 onwards). |
| **◆ Is this emission reduction commitment in line with 1.5°C compatible trajectories or benchmarks for the sector?** | | |
| Walmart's scope 3 emissions account for 95% if its emission footprint. In the absence of available benchmarks from scientific literature for mixed-good retailers, we compare Walmart's 5% emission reductions by 2030 to available 1.5°C-aligned benchmark. Walmart's 2030 medium-term targets rather meet cross-sectoral nor sector-specific 1.5°C Paris Agreement-aligned decarbonisation milestones. Teske (2022, p. 328) describes that between 2019 and 2030, the food and agriculture industry should reduce its scope 3 emissions by 34%. Walmart's short-term targets falls far short of this benchmark.<br><br>The SBTi published its guidance for Forest, Land, and Agriculture (FLAG) in 2022. Although the FLAG guidance requires companies to commit to annual reductions of at least 3.03% (translating to reductions of 30.3% between 2020 and 2030 (SBTi, 2022b, pp. 44-45), this includes land sequestration carbon dioxide removals. We cannot use the FLAG guidance for this assessment due to the lack of specificity on the role of emission reductions vis-à-vis land sequestration CDR towards aligning with 1.5°C-compatible transition pathways for the sector. If we were to include the 30.3% benchmark, Walmart's commitments would still far short of it. | We consider the lack of any post-2030 emission reduction commitments for scope 3, alongside Walmart's targets for scope 1 and 2 as highly insufficient, considering the need for deep and credible emission reductions towards mid-century to stand a reasonable chance of limiting global warming to 1.5°C (IPCC, 2022). | |

Corporate Climate Responsibility Monitor 2024

161

Exhibit 7 to Decl. of Angel Hsu
307

**SER 587**

# Annex III – Additional assumptions for Part A analysis

The aggregated impact analysis across the 20 companies' climate strategies assessed in Section A of the *Corporate Climate Responsibility Monitor 2024* contains several assumptions that are *additional* to the assumptions presented in the individual company assessments in Section B. These additional assumptions concern the interpretation of corporate intensity targets for automobile manufacturers. Several companies commit to intensity targets for the period up to 2030 that cannot directly be translated into absolute emission reduction commitments. To give a most optimistic scenario of the emission reductions that companies' emission reductions could lead to, we present aggregated findings with the scenario that companies' intensity targets will lead to an equivalent emissions reduction in *absolute* terms. In other words, we present the scenario that activity levels remain constant until 2030. We consider that this aggregated scenario is highly optimistic and unlikely in some cases; accordingly, we do not use this optimistic scenario for the company-specific integrity assessments in Section B, where we evaluate companies' real commitments.

## Stellantis

We interpret Stellantis' intensity targets for 2030 (50% by 2030 below 2021 across all value chain emissions) as an absolute target, assuming constant activity levels.

## Toyota

For the upper bound estimate, we assume that Toyota's intensity targets are equivalent to absolute emission reduction targets. For this purpose, we interpret Toyota's intensity targets for light-duty vehicles (LDVs) for 2030 (33.3% by 2030 below 2019 for downstream scope 3 use phase emission) as an absolute target, assuming constant activity levels. Similarly, we interpret Toyota's intensity targets for heavy-duty vehicles (HDVs) for 2030 (11.6% by 2030 below 2019 for downstream scope 3 use phase emissions) as an absolute target, assuming constant activity levels. Together with Toyota's absolute target for scope 1 and 2 (30% by 2025 below 2013), these targets jointly translate into a 26% absolute reduction by 2030 below 2019 levels across the entire value chain.

For the lower bound estimate, we use the estimate provided by CDP for Toyota's 2030 LDV and HDV intensity target, which indicates an estimated 23.1% reduction of absolute emissions from scope 3 category 11 for LDVs and a 0.5% reduction for HDVs (Toyota, 2023d). It is important to note that the CDP disclosure is not publicly available, and the assumptions underpinning the estimate are unclear (e.g., for sales volumes assumed in 2030). When combined with Toyota's absolute target for scope 1 and 2 (30% by 2025 below 2013), these targets jointly translate into a 17% absolute reduction by 2030 below 2019 levels across the entire value chain.

## Volkswagen

For the upper bound estimate, we assume that the Volkswagen's intensity targets are equivalent to absolute emission reduction targets. For this purpose, we interpret Volkswagen's intensity targets for LDVs for 2030 (30% by 2030 below 2018 for downstream scope 3 use phase emissions) as an absolute target, assuming constant activity levels. While neither Volkswagen nor Traton set group-level targets for HDVs, the brands Scania (20% intensity reduction per vehicle km by 2025 below 2015), MAN (28% intensity reduction per vehicle km by 2030 below 2019) and Navistar (24–25% g$CO_2$e/ton mile by 2027 below 2017) do so at the brand level. We assume these translate into a 20% intensity reduction across all HDV brands below 2019 levels and, subsequently, an absolute target assuming constant activity levels. Together with Volkswagen's absolute target for scope 1 and 2 (50.4% by 2030 below 2018), these targets collectively translate into a 23% absolute reduction by 2030 below 2019 levels across the entire value chain.

For the lower bound estimate, we follow the same approach for HDVs as outlined above but use the estimate for Volkswagen's 2030 LDVs intensity target disclosed by CDP, which indicates an estimated 6% reduction of absolute emissions from scope 3 category 11 for LDVs (Volkswagen, 2023a). It is important to note that the CDP disclosure is not publicly available, and the assumptions underpinning the estimate are unclear (e.g., for sales volumes assumed in 2000). When combined with Volkswagen's absolute target for scope 1 and 2 (50.4% by 2030 below 2018), these targets jointly translate into a 13% absolute reduction by 2030 below 2019 levels across the entire value chain.

## Volvo Group

We interpret Volvo Group's intensity targets for trucks and buses for 2030 (40% by 2030 below 2019 for downstream scope 3 use phase emissions each) as an absolute target, assuming constant activity levels. Together with Volvo Group's absolute target for scope 1 and 2 (50% by 2030 below 2013), the use phase of emissions of construction equipment (30% by 2030 below 2019) and the use phase of emissions from industrial and marine engines (37.5% by 2034 below 2019), these targets jointly translate into a 35% absolute reduction by 2030 below 2019 levels across the entire value chain.

162

Exhibit 7 to Decl. of Angel Hsu
308

Case 2:24-cv-00801-ODW-PVC    Document 89-25    Filed 04/07/25    Page 164 of 164    Page ID #:8941



The rapid acceleration in the volume of corporate climate pledges, combined with the fragmentation of approaches and the general lack of regulation or oversight, means that it is more difficult than ever to distinguish between real climate leadership and unsubstantiated greenwashing.

The Corporate Climate Responsibility Monitor 2024 evaluates the climate strategies of 20 major corporations. It critically analyses the transparency and integrity of corporate pledges and claims to identify replicable good practice and areas for improvement.

NEW CLIMATE INSTITUTE

CARBON MARKET WATCH

Exhibit 7 to Decl. of Angel Hsu
309

# Exhibit 6
# to Declaration of Angel Hsu

# United Nations Framework Convention on Climate Change Race to Zero Campaign,
# Race to Zero Criteria 3.0 (2022)

Exhibit 6 to Decl. of Angel Hsu
142

## Starting Line and Leadership Practices 3.0 -
*Minimum criteria required for participation in the Race to Zero campaign*

- *In force from 15 June 2022 for new applicants;*
- *In force from 15 June 2023 for existing Partners and their members.*

Race to Zero is the UN-backed global campaign rallying non-state actors – including companies, cities, regions, financial, educational, and healthcare institutions – to take rigorous and immediate action to halve global emissions within this decade  and deliver a healthier, fairer, zero carbon world in time to achieve the goals of the Paris Agreement. All members are committed to race towards the same overarching goal: reducing emissions across all scopes swiftly and fairly in line with science, with transparent action plans, robust near-term and long-term targets, and annual reporting against their progress. Led by the High-Level Climate Champions for Climate Action, Nigel Topping (COP26) and Dr Mahmoud Mohieldin (COP27), following their mandate from the member states of the UN Framework Convention on Climate Change (UNFCCC), Race to Zero mobilises actors across the global economy radical collaboration to decarbonise, giving national governments the confidence to go further, faster.

To help accelerate meaningful progress towards halving global emissions by 2030 and to ensure the integrity of the campaign, Race to Zero both sets a minimum floor for robust net zero commitments, and also lays out bold leadership practices for members to strive for. An independent Expert Peer Review Group reviews all Race to Zero partners against these criteria, and partners are in turn responsible for ensuring their members meet the criteria. Race to Zero is, in parallel, developing an accountability mechanism to ensure that members who persistently fail to comply with these criteria will be removed from the Race.

The R2Z criteria are delineated in two categories:
- 'Starting line' criteria lay out minimum requirements for all members to meet, below which members cannot fall if they wish to join and remain in the campaign.
- 'Leadership practices' signal how leading entities can light the way to a net zero world.

These criteria are supported by three complementary documents:
- 'Interpretation guide', first published last year, provides guidance for EPRG members and Partners for how to assess applications from Partners and shares insights for members to learn from to implement these criteria;
- 'Lexicon' lists key terms in the net zero space, aiming to drive convergence in the use of language and to encourage specificity in using important terms.

Exhibit 6 to Decl. of Angel Hsu
143
**SER 591**

| | Starting line | Leadership practices |
|---|---|---|
| **Pledge** | Pledge at the head-of-organisation level to reach (net) zero GHGs as soon as possible, and by 2050 at the latest, in line with the scientific consensus on the global effort needed to limit warming to 1.5C with no or limited overshoot, recognising that this requires phasing down and out all unabated fossil fuels as part of a global, just transition.<br><br>Set an interim target to achieve in the next decade, which reflects maximum effort toward or beyond a fair share of the 50% global reduction in CO2 by 2030. Targets must cover all greenhouse gas emissions:<br>1. Including scopes 1, 2 and 3 for businesses and other organisations;<br>2. Including all territorial emissions for cities and regions;<br>3. For financial entities, including all portfolio/financed/facilitated/insured emissions;<br>4. Including land-based emissions. | **Target absolute zero or net negative emissions**<br>*Reduce emissions to absolute zero with no remaining residual emissions, or go further and ensure your activities remove more GHGs than they produce. See Lexicon for further details.*<br><br>**Adopt inclusive boundaries**<br>*Widen the scope of your target to include cumulative emissions, especially where these are significant (for all actors) and / or consumption emissions (for cities, states, and regions). See Lexicon for further details.*<br><br>**Set twin targets for reductions and removals**<br>*In addition to your emissions reductions targets, compensate for any unabated emissions year on year through investment in high quality carbon credits, disclose neutralisation strategies that demonstrate the integrity of commitments to neutralise unabated emissions and state how you plan to ultimately neutralise any residual emissions by 2050 through high-quality, permanent removals.*<br><br>**Set specific targets for short-term reduction of methane and other GHGs**<br>*Pledge to reduce methane emissions by at least 34% by 2030, in line with the IPCC's 6th Assessment Report, and make near-term pledges to reduce other high global warming potential GHG emissions.*<br><br>**Protect nature**<br>*Pledge to halt deforestation and protect biodiversity, making your activities consistent with climate resilient development. Pledge to make finance consistent with climate resilient development including ending deforestation and conversion of other natural ecosystems, and respecting biodiversity.*<br><br>**Contribute to 2030 Breakthroughs**<br>*Set sectoral targets in line with the 2030 Breakthroughs or more ambitious sector targets. For financial institutions, use sector-specific targets that drive emissions reductions and do not simply shift investment from high-emitting to low-emitting sectors.* |
| **Plan** | Within 12 months of joining, publicly disclose a Transition Plan, City/Region Plan, or equivalent which outlines how all other Race to Zero criteria will be met, including what actions will be taken within the next 12 months, within 2-3 years, and by 2030. | **Support a just transition**<br>*Explain how you will support communities affected by both climate impacts and the climate transition, and strengthen their participation in achieving the global goal of having emissions by 2030, seeking to address injustices and build towards a more equitable future.*<br><br>**Integrate nature**<br>*Drawing on the Convention on Biological Diversity, integrate the conservation and sustainable use of biological diversity into relevant sectoral or cross-sectoral plans, programmes and policies.*<br>**Empower stakeholders** |

Exhibit 6 to Decl. of Angel Hsu

144