No. 25-5327

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*,

*Plaintiffs-Appellants,*

v.

LIANE M. RANDOLPH, IN HER OFFICIAL CAPACITY AS CHAIR OF THE CALIFORNIA
AIR RESOURCES BOARD, *et al.*,

*Defendants-Appellees.*

**On Appeal from the United States District Court
for the Central District of California**
No. 2:24-cv-00801-ODW-PVC

## SUPPLEMENTAL EXCERPTS OF RECORD
## VOLUME 4 OF 10

ROB BONTA
  *Attorney General of California*
ANNADEL A. ALMENDRAS
  *Senior Assistant Attorney General*
LAURA ZUCKERMAN
MYUNG J. PARK
  *Supervising Deputy Attorneys
  General*

CAITLAN MCLOON
KATHERINE GAUMOND
EMILY HAJARIZADEH
M. ELAINE MECKENSTOCK
DYLAN REDOR
ELIZABETH SONG
  *Deputy Attorneys General*
CALIFORNIA DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6438
Caitlan.McLoon@doj.ca.gov

October 16, 2025                    *Attorneys for Defendants-Appellees*

Manager or its affiliates. Manager shall have the right to purchase such materials, supplies, insurance (subject to the terms of this Agreement), and/or services in its own name and charge Owner a pro rata allocable share of the cost of the foregoing; provided, however, that the pro rata cost of such purchase to Owner shall not result in expenses that are either inconsistent with the expenses of other "U-Haul branded" locations in the general vicinity of the applicable Property or greater than would otherwise be incurred at competitive prices and terms available in the area where the Property is located; and provided further, Manager shall give Owner access to records (at no cost to Owner) so Owner may review any such expenses incurred.

o.  Deposit of Gross Revenues. All revenue from operations at the Property ("Gross Revenue") shall be deposited daily by Manager into (i) a bank account that has been established for the benefit of Owner (the "Deposit Account") and maintained by Manager (or its parent company); or (ii) a collective bank account (the "Collective Account") maintained by Manager (or its parent company) for the benefit of multiple property owners. In either case, although the account may be in Owner's name, Owner's right to the proceeds therein only extends to Owner's Revenue. Within 3 business days after receipt, Manager shall transfer Owner's Revenue in the Deposit Account or Collective Account, as the case may be, to Owner's separately identified depositary account pledged to Lender ("Blocked Account"). To the extent that Gross Revenue is deposited into a Collective Account, Manager (or its parent company) shall on a daily basis reconcile such Collective Account and maintain such records as shall clearly identify the respective interest of each property owner in such account. Manager shall not, and shall not permit any other property owner or any affiliate of Manager to, borrow, lend, or use Owner's Revenue prior to the deposit of such revenue into the Blocked Account. The payment of Owner's U-Move Commissions shall be governed by the terms of the Dealer Contract. Nothing in this Section shall be construed to limit Owner's access to Owner's Revenue. All funds shall be deposited and applied as required pursuant to Owner's loan documents with Lender.

p.  Obligations under Loan Documents and other Material Contracts. Manager shall take such actions as are necessary or appropriate under the circumstances to ensure, to the extent Manager is privy to the information, that Owner is in compliance with the terms of the Loan Documents and any other material agreement relating to the Property to which Owner is a party and for which Manager is privy to the information. Notwithstanding the foregoing, nothing herein contained shall be deemed to obligate Manager to fund from its own resources any payments owed by Owner under the Loan Documents or otherwise be deemed to make Manager a direct obligor under the Loan Documents.

q.  Segregation. Owner and Manager shall maintain the Property and Owner's Revenue in such a manner that it is not costly or difficult to segregate, ascertain, or identify Owner's individual assets from those of Manager or any other person.

3.  **Duties of Owner**. Owner shall cooperate with Manager in the performance of Manager's duties under this Agreement and to that end, upon the request of Manager, shall provide, at such rental charges as are deemed appropriate, reasonable office space for Manager employees on the premises of the Property (to the extent available). Owner shall not unreasonably withhold or delay any consent or authorization to Manager required or appropriate under this Agreement. Owner shall provide Manager with copies of all Loan Documents and any amendments thereto.

4.  **Compensation of Manager.**

a.  Reimbursement of Expenses. Manager shall be entitled to request and receive timely reimbursement for all timely authorized out-of-pocket reasonable and customary expenses ("Expenses") actually incurred by Manager in the discharge of its duties hereunder. Such

Exhibit 1 to Decl. of James Burton
151
**SER 890**

expense reimbursement shall be due by the last business day of each month, for all expenses billed during such month, unless a written request is received by Manager detailing a legitimate dispute as to a billed amount. Such reimbursement shall be the obligation of Owner, whether or not Owner's Revenues are sufficient to pay such amounts.

b.   <u>Management Fee</u>.  Owner shall pay to Manager as the full amount due for the services herein provided a monthly fee (the "Property Management Fee") which shall be six percent (6%) of the Property's current month Owner's Revenue, as determined on a cash basis.  The Property Management Fee payment shall be included with the reimbursement of Expenses pursuant to Section 4(a) above, for the same month.  The invoice for the management fees shall be itemized and shall include reasonable detail to explain the expenses incurred. It is further understood and agreed that, except as provided in this Section 4, Manager shall not be entitled to additional compensation of any kind in connection with its performance of its duties under this Agreement.

c.   <u>Inspection of Books and Records</u>.  Owner shall have the right, upon prior reasonable notice to Manager, to inspect Manager's books and records with respect to the Property, to assure that proper fees and charges are assessed hereunder. Manager shall cooperate with any such inspection.  Owner shall bear the cost of any such inspection; provided, however, that if it is clearly demonstrated that Manager has overcharged Owner by more than 5% in any given quarter and such overcharge was not caused in whole or part by Owner, the cost of such inspection shall be borne by Manager. Manager shall promptly reimburse Owner for any overpayment.

5.   **Use of Trademarks, Service Marks, and Related Items**. Owner acknowledges the significant value of the "U-Haul" name in the operations of Owner's property, and it is therefore understood and agreed that the name, trademark, and service mark "U-Haul", and related marks, slogans, caricatures, designs, and other trade or service items (the "Manager Trade Marks") shall be utilized for the non-exclusive benefit of Owner in the rental and operation of the Property, and in comparable operations elsewhere. It is further understood and agreed that the Manager Trade Marks shall remain and be at all times the property of Manager or its affiliates, and that, except as expressly provided in this Agreement, Owner shall have no right whatsoever therein.  Owner agrees that during the term of this Agreement the sign faces at the property will have the name "U-Haul." Upon termination of this Agreement at any time for any reason, all such use by and for the benefit of Owner of any such Manager Trade Marks in connection with the Property shall be terminated and any signs bearing any of the foregoing shall be removed from view and no longer used by Owner.  In addition, upon termination of this Agreement at any time for any reason, Owner shall not enter into any new leases of Property using the Manager lease form or use other forms prepared by Manager.  It is understood and agreed that Manager will use and shall be unrestricted in its use of such Manager Trade Marks in the management and operation of other storage facilities both during and after the expiration or termination of the term of this Agreement.

6.   **<u>Default; Termination</u>.**

a.   Any material failure by Manager or Owner (a "<u>Defaulting Party</u>") to perform its respective duties or obligations hereunder (other than a default by Owner under Section 4 of this Agreement), which material failure is not cured within thirty (30) calendar days after receipt of written notice of such failure from the non-defaulting party, shall constitute an event of default hereunder; provided, however, the foregoing shall not constitute an event of default hereunder in the event the Defaulting Party commences cure of such material failure within such thirty (30) day period and diligently prosecutes the cure of such material failure thereafter but in no event shall such extended cure period exceed ninety (90) days from the date of receipt by the non-defaulting party of written notice of such material default; provided further, however, that in the event such

Exhibit 1 to Decl. of James Burton
152
**SER 891**

material failure constitutes a default under the terms of the Loan Documents and the cure period for such matter under the Loan Documents is shorter than the cure period specified herein, the cure period specified herein shall automatically shorten such that it shall match the cure period for such matter as specified under the Loan Documents. In addition, following notice to Manager of the existence of any such material failure by Manager, Owner shall have the right to cure any such material failure by Manager, and any sums so expended in curing shall be owed by Manager to such curing party and may be offset against any sums owed to Manager under this Agreement.

b. Any material failure by Owner to perform its duties or obligations under Section 4, which material failure is not cured within ten (10) calendar days after receipt of written notice of such failure from Manager, shall constitute an event of default hereunder.

c. Subject to the terms of the Loan Documents, either party hereto shall have the right to terminate this Agreement, with or without cause, by giving not less than ninety (90) days' written notice to the other party hereto, pursuant to Section 14 hereof.

d. Upon termination of this Agreement, (i) Manager shall promptly return to Owner all monies, books, records, and other materials held by Manager for or on behalf of Owner and shall otherwise cooperate with Owner to promote and ensure a smooth transition to the new manager, and (ii) Manager shall be entitled to receive its Property Management Fee and reimbursement of expenses through the effective date of such termination, including the reimbursement of any prepaid expenses for periods beyond the date of termination (such as advertising).

7. **Indemnification.** Manager hereby agrees to indemnify, defend, and hold Owner, all persons and companies affiliated with Owner, and all officers, shareholders, directors, employees, and agents of Owner and of any affiliated companies or persons (collectively, the "Indemnified Persons") harmless from any and all costs, expenses, attorneys' fees, suits, liabilities, judgments, damages, and claims in connection with the management of the Property and operations thereon (including the loss of use thereof following any damage, injury, or destruction), arising from any cause or matter whatsoever, including without limitation, any environmental condition or matter caused by Manager's operation of the Property, except to the extent attributable to the willful misconduct or negligence on the part of the Indemnified Persons.

8. **Assignment.** Manager shall not assign this Agreement, or any portion hereof of the duties hereunder, to any party without the consent of Owner.

9. **Standard for Property Manager's Responsibility.** Manager agrees that it will perform its obligations hereunder according to industry standards, in good faith, and in a commercially-reasonable manner.

10. **Estoppel Certificate.** Each of Owner and Manager agree to execute and deliver to each other, from time to time, within ten (10) business days after the requesting party's request, a statement in writing certifying, to the extent true, that this Agreement is in full force and effect, and to such parties' knowledge there are no uncured defaults (or specifying such defaults if they are claimed) and any such other matters as may be reasonably requested by such requesting party

11. **Term, Scope.** Subject to the provisions hereof, this Agreement shall have an initial term (such term, as extended or renewed in accordance with the provisions hereof, being called the "Term") commencing on the date hereof (the "Commencement Date") and ending on the later of (i) the last day of the 300th calendar month next following the date hereof, or (ii) the maturity date, repayment, or prepayment of the relevant loan under the applicable Loan Documents (the "Expiration Date"); provided however, the parties shall have the right upon mutual agreement to terminate this Agreement with respect to any individual Property no longer subject to the Loan Documents (for instance due to a significant casualty or condemnation of such Property).

Exhibit 1 to Decl. of James Burton
153
**SER 892**

12. **Headings**. The headings contained herein are for convenience of reference only and are not intended to define, limit, or describe the scope or intent of any provision of this Agreement.

13. **Governing Law**. The validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties shall be governed by the internal laws of the State of Nevada

14. **Notices**. Any notice required or permitted herein shall be in writing and shall be personally delivered or mailed first class postage prepaid or delivered by an overnight delivery service to the respective addresses of the parties set forth above on the first page of this Agreement, or to such other address as any party may give  to the other in writing.  Any notice required by this Agreement will be deemed to have been given when personally served or one day after delivery to an overnight delivery service or five days after deposit in the first class mail. Any notice to Owner shall be to 207 E Clarendon, Phoenix, AZ  85012. Any notice to Manager shall be c/o U-Haul International, Inc., 2721 North Central Avenue, Phoenix, AZ 85004, Attn:  Legal Dept.

15. **Severability**. Should any term or provision hereof be deemed invalid, void, or unenforceable either in its entirety or in a particular application, the remainder of this Agreement shall nonetheless remain in full force and effect and, if the subject term or provision is deemed to be invalid, void or unenforceable only with respect to a particular application, such term or provision shall remain in full force and effect with respect to all other applications.

16. **Successors**. This Agreement shall be binding upon and inure to the benefit of the respective parties hereto and their permitted assigns and successors in interest.

17. **Attorneys' Fees**. In any dispute arising under this Agreement, the prevailing party shall be entitled to recover from the other party all costs including without limitation reasonable attorneys' and experts' fees and costs.

18. **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

---

Exhibit 1 to Decl. of James Burton
154
**SER 893**

IN WITNESS WHEREOF, the undersigned execute this Property Management Agreement as of the date set forth above.

Owner:
Mercury Storage 1-A, LLC,
a Nevada limited liability company

By: _____
     Stuart M. Shoen, Vice President

Manager:

U-Haul Co. of Florida, a Florida corporation
U-Haul Co. of Indiana, Inc., an Indiana corporation
U-Haul Co. of North Carolina, a North Carolina corporation
U-Haul Co. of New Mexico, Inc., a New Mexico corporation
U-Haul Co. of Nevada, Inc., a Nevada corporation
U-Haul Co. of Texas, a Texas corporation

By: _____
     Wesley Chadwick, Assistant Secretary

Exhibit 1 to Decl. of James Burton
155
**SER 894**

# Exhibit A

### List of Properties

| Center # | Street | City | State | Zip |
|---|---|---|---|---|
| 785041 | 11410 West Colonial Drive | Ocoee | FL | 34761 |
| 759051 | 1650 West 81St Avenue | Merrillville | IN | 46410 |
| 780022 | 3919 East Franklin Boulevard | Gastonia | NC | 28056 |
| 724026 | 1401 Rio Rancho Boulevard | Rio Rancho | NM | 87124 |
| 807058 | 1098 Stephanie Place | Henderson | NV | 89014 |
| 741066 | 11383 Amanda Lane | Dallas | TX | 75238 |
| 746028 | 8518 Highway 6 South | Houston | TX | 77083 |

The Property shall automatically include, without any further action necessary under this Agreement, any After Acquired Adjacent Property and After Acquired Leasehold Property as defined in the Loan Documents.

---

Exhibit 1 to Decl. of James Burton

156

**SER 895**

<u>PROPERTY MANAGEMENT AGREEMENT</u>

THIS PROPERTY MANAGEMENT AGREEMENT (this "<u>Agreement</u>") is entered into as of February _2__, 2024 by and among **Mercury Storage 1-B, LLC**, a Nevada limited liability company ("<u>Owner</u>"), and the **subsidiaries of U-Haul International, Inc.** set forth on the signature block hereto (each a "<u>Manager</u>" and collectively "<u>Managers</u>").

<u>RECITALS</u>

A.   Owner holds the leasehold interest in the real property and all improvements thereon and appurtenances thereto located at the street addresses identified on **<u>Exhibit A</u>** hereto (hereinafter, collectively the "Property").

B.   Owner intends that the Property be rented on a space-by-space retail basis to individuals, business entities, or other entities for use as self-storage and portable storage facilities.

C.   Owner desires that Manager manage the Property and Manager desires to act as the property manager for the Property, all in accordance with the terms and conditions of this Agreement.

D.   The parties agree that this Agreement supersedes and replaces any other property management agreement ("Prior Agreement") between the parties hereto and/or their respective predecessors in interest, as the case may be, with respect to the Property, any such Prior Agreement is hereby terminated as of the date hereof.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto hereby agree as follows.

1.   **<u>Employment.</u>**

    a.   Owner hereby retains Manager, and Manager agrees to act as manager of the Property upon the terms and conditions hereinafter set forth.

    b.   Owner acknowledges that Manager, and/or Manager affiliates, is in the business of managing self-storage and portable-storage facilities and businesses conducted thereat, including, but not limited to, the sale of packing supplies and rental of trucks and equipment, both for its own account and for the account of others.  It is hereby expressly agreed that notwithstanding this Agreement, Manager and such affiliates may continue to engage in such activities, may manage facilities other than those presently managed by Manager and its affiliates (whether or not such other facilities may be in direct or indirect competition with Owner), and may in the future engage in other business which may compete directly or indirectly with activities of Owner.

    c.   In the performance of its duties under this Agreement, Manager shall occupy the position of an independent contractor with respect to Owner.  Nothing contained herein shall be construed as making the parties hereto (or any of them) partners or co-parties to a joint venture, nor construed as making Manager an employee of Owner.

Exhibit 1 to Decl. of James Burton
157
**SER 896**

2.  **Duties and Authority of Manager**. Manager shall have the following duties and authority, subject to the terms and conditions of this Agreement, on behalf of and as agent of the Owner:

    a.  <u>General Duties and Authority</u>.  Manager shall have the sole and exclusive duty and authority to fully manage the Property and supervise and direct the business and affairs associated or related to the daily operation thereof, to collect on behalf of Owner all revenues related to the Property, to pay on behalf of Owner all expenses of the Property, and to execute on behalf of Owner such documents and instruments as, in the sole judgment of Manager, are reasonably necessary or advisable under the circumstances in order to fulfill Manager's duties hereunder.  Such duties and authority shall include, without limitation, those set forth below. Notwithstanding the foregoing or any other term or provision herein, upon notice to Manager, Owner shall have the right to assume responsibility for the direct payment of certain expenses of Owner, as may be determined by Owner.  In such event, Owner shall provide an accounting of such costs to Manager.  In the event Owner fails to provide such accounting to Manager, Manager shall assume no liability for nonpayment for such expenses so assumed by Owner. The parties acknowledge and agree that Owner will retain title to, ownership of, and exclusive right to control the Property, subject to the terms of this Agreement, and that portion of the Gross Revenue (as hereinafter defined) owned by Owner ("Owner's Revenue"); and that Manager will not acquire title to, any interest in, or any income or revenues from the Property or Owner's Revenue. For purposes of this Agreement, Owner's Revenue consists of the revenue from portable and self-storage operations (excluding U-Box delivery fees), retail sales, miscellaneous income and the commissions ("U-Move Commissions") paid to Owner pursuant to the terms of that Dealership Contract between Owner and Manager dated as of the date hereof (the "Dealer Contract"), in each case with respect to the Property. In performing its services and making any payments hereunder, Manager will make known to third parties that Manager is acting solely as the agent of Owner. Under no circumstances will Manager represent or hold itself out to any third party as having any title to or property interest in the Property or Owner's Revenue. Manager shall perform all of its obligations under this Agreement in a professional manner consistent with the standards it employs at all of its managed locations.

    b.  <u>Renting of the Property</u>.  Manager shall establish policies and procedures for the marketing activities for the Property, and shall advertise the Property through such media as Manager deems advisable. Manager's marketing activities for the Property shall be consistent with the scope and quality implemented by Manager and its affiliates at any other properties operated by Manager or its affiliates.  Manager shall have the sole discretion, which discretion shall be exercised in good faith, to establish the terms and conditions of occupancy by the tenants of the Property, and Manager is hereby authorized to enter into rental agreements on behalf and for the account of Owner with such tenants and to collect rent from such tenants on behalf and for the account of Owner. Manager may jointly advertise the Property with other properties owned or managed by Manager or its affiliates, and in that event, Manager shall reasonably allocate the cost of such advertising among such properties.

    c.  <u>Repair, Maintenance, and Improvements</u>. Manager shall make, execute, supervise, and have control over the making and executing of all decisions concerning the acquisition of furniture, fixtures, and supplies for the Property, and may purchase, lease, or otherwise acquire the same and which items shall be owned by Manager. Manager shall make and execute, or supervise and have control over the making and executing of, all decisions concerning the maintenance, repair, and landscaping of the Property, provided, however, that such maintenance, repair, and landscaping shall be consistent with that of other properties operated by Manager or its

Exhibit 1 to Decl. of James Burton
158
**SER 897**

affiliates. Manager shall, on behalf of Owner, negotiate and contract for and supervise the installation of all capital improvements related to the Property; provided, however, that Manager agrees to secure the prior written approval of Owner on all such expenditures in excess of $10,000.00 for any one item, except monthly or recurring operating charges and/or emergency repairs if in the opinion of Manager such emergency repairs are necessary to protect the Property from damage or to maintain services to the Owner or any customers. In the event such emergency repairs exceed $10,000, Manager shall notify Owner and the insurer as applicable of the cost estimate for such work.

d. <u>Personnel</u>. Manager shall select all vendors, suppliers, contractors, subcontractors, and employees with respect to the Property and shall hire, discharge, and supervise all labor and employees required for the operation and maintenance of the Property. Any employees so hired shall be employees of Manager, and shall be carried on the payroll of Manager. Employees may include, but need not be limited to, on-site resident managers, on-site assistant managers, and relief managers located, rendering services, or performing activities on the Property in connection with its operation and management. The cost of employing such persons shall not exceed prevailing rates for comparable persons performing the same or similar services with respect to real estate similar to the Property in the general vicinity of each respective Property. Manager shall be responsible for all legal and insurance requirements relating to its employees.

e. <u>Service Agreements</u>. Manager shall negotiate and execute on behalf of Owner such agreements which Manager deems necessary or advisable for the furnishing of utilities, services, concessions, and supplies, for the maintenance, repair, and operation of the Property and such other agreements which may benefit the Property or be incidental to the matters for which Manager is responsible hereunder.

f. <u>Other Decisions</u>. Manager shall make the decisions in connection with the day-to-day operations of the Property.

g. <u>Regulations and Permits</u>. Manager shall comply in all respects with any statute, ordinance, law, rule, regulation, or order of any governmental or regulatory body pertaining to the Property (collectively, "Laws"), respecting the use of the Property or the maintenance or operation thereof, the non-compliance with which could reasonably be expected to have a material adverse effect on Owner or any Property. Manager shall apply for and obtain and maintain, on behalf of Owner, all licenses and permits required or advisable (in the reasonable judgment of Manager) in connection with the management and operation of the Property. Notwithstanding the foregoing, Manager shall be permitted to contest any Applicable Laws to the extent and pursuant to the same conditions that Owner is permitted to contest any Laws. To the extent that Manager does not comply, Manager will be responsible for the costs and penalties incurred as a result of the non-compliance.

h. <u>Records and Reports of Disbursements and Collections</u>. Manager shall establish, supervise, direct, and maintain the operation of a system of cash record keeping and bookkeeping with respect to all receipts and disbursements and all business activities and operations conducted by Manager in connection with the management and operation of the Property. Manager shall be responsible for cash shortages and discrepancies incurred in the normal course of management operations. The books, records, and accounts shall be maintained at the Manager's office or at Owner's office, or at such other location as Manager and Owner shall determine, and shall be available and open to examination and audit quarterly by Owner, its representatives, its lender, if any ("Lender") or such Lender's representative. Manager shall cause to be prepared and delivered to Owner a monthly statement on a per-Property basis of receipts, expenses, and

Exhibit 1 to Decl. of James Burton
159
**SER 898**

charges, and any other information as reasonably required by Owner to prepare its financial statements, together with a statement on a per-Property basis of the disbursements made by Manager during such period on Owner's behalf, which shall include separate lines for prepaid items and inventory. Manager shall provide Owner with rent rolls and occupancy reports if requested.

i. <u>Collection</u>.  Manager shall be responsible for the billing and collection of all receipts and for payment of all expenses with respect to the Property and shall be responsible for establishing policies and procedures to minimize the amount of bad debts. Bad debt incurred as a result of non-compliance with management policies and procedures (such as improper verifications or acceptance of bad credit cards or bad checks) will be the responsibility of Manager.

j. <u>Legal Actions</u>. Manager shall cause to be instituted, on behalf and in its name or in the name of Owner as appropriate, any and all legal actions or proceedings Manager deems necessary or advisable in connection with the Property, including without limitation, to collect charges, rent, or other income due to Owner with respect to the Property and to oust or dispossess tenants where appropriate or other persons unlawfully in possession under any lease, license, concession agreement, or otherwise, and to collect damages for breach thereof or default thereunder by such Owner, licensee, concessionaire, or occupant.

k. <u>Insurance</u>.  Manager will insure, on its Master Policy, against all liabilities at the Property at Manager's sole cost and expense ("General Liability Insurance"). Any deductibles or self-insured retentions with respect to the General Liability Insurance shall be at Manager's (or Manager's U-Haul affiliates') responsibility and sole cost and expense. Manager will insure equipment at Manager's cost, as determined by Manager. If requested by Owner, Manager will obtain for Owner, at Owner's sole cost and expense, a policy of property insurance ("Property and Casualty Insurance"). Any such Property & Casualty Insurance shall meet Lender's required coverage, to include earthquake, flood, and other Lender requirements, as the case may be, and shall be the cost of Owner.

l. <u>Taxes</u>.  During the term of this Agreement, Manager shall pay on behalf of Owner, prior to delinquency, real estate taxes, personal property taxes, and other taxes assessed to or levied upon the Property, but only in the event requested by Owner. If requested, Manager will charge to Owner an expense monthly equal to 1/12 of annual real property taxes.

m. <u>Limitations on Manager Authority</u>. Notwithstanding anything to the contrary set forth in this Section 2, Manager shall not, without obtaining the prior written consent of Owner, (i) rent storage space in the Property by written lease or agreement for a stated term in excess of one year unless such lease or agreement is terminable by the giving of not more than thirty (30) days' written notice, (ii) alter the building or other structures of the Property in violation of loan documents executed by Owner in connection with the Property ("Loan Documents"); (iii) enter on behalf of Owner any other agreements which exceed a term of one year and are not terminable on thirty (30) days' notice at the will of Owner, without penalty, payment, or surcharge; (iv) act in violation of any Law, (v) violate any term or condition of the Loan Documents; (vi) fail to correct any misunderstanding of any third party of which Manager becomes aware as to the separateness of Owner and Manager; or (vii) exercise any authority to act on behalf of Owner, or hold itself out has having such authority, beyond the actual scope of authority granted by Owner.

n. <u>Shared Expenses</u>.  Owner acknowledges that certain economies may be achieved with respect to certain expenses to be incurred by Manager on behalf of Owner hereunder if materials, supplies, insurance, or services are purchased by Manager in quantity for use not only in connection with Owner's business at the Property but in connection with other properties owned or managed by

Exhibit 1 to Decl. of James Burton
160
**SER 899**

Manager or its affiliates. Manager shall have the right to purchase such materials, supplies, insurance (subject to the terms of this Agreement), and/or services in its own name and charge Owner a pro rata allocable share of the cost of the foregoing; provided, however, that the pro rata cost of such purchase to Owner shall not result in expenses that are either inconsistent with the expenses of other "U-Haul branded" locations in the general vicinity of the applicable Property or greater than would otherwise be incurred at competitive prices and terms available in the area where the Property is located; and provided further, Manager shall give Owner access to records (at no cost to Owner) so Owner may review any such expenses incurred.

o.   Deposit of Gross Revenues. All revenue from operations at the Property ("Gross Revenue") shall be deposited daily by Manager into (i) a bank account that has been established for the benefit of Owner (the "Deposit Account") and maintained by Manager (or its parent company); or (ii) a collective bank account (the "Collective Account") maintained by Manager (or its parent company) for the benefit of multiple property owners. In either case, although the account may be in Owner's name, Owner's right to the proceeds therein only extends to Owner's Revenue. Within 3 business days after receipt, Manager shall transfer Owner's Revenue in the Deposit Account or Collective Account, as the case may be, to Owner's separately identified depositary account pledged to Lender ("Blocked Account"). To the extent that Gross Revenue is deposited into a Collective Account, Manager (or its parent company) shall on a daily basis reconcile such Collective Account and maintain such records as shall clearly identify the respective interest of each property owner in such account. Manager shall not, and shall not permit any other property owner or any affiliate of Manager to, borrow, lend, or use Owner's Revenue prior to the deposit of such revenue into the Blocked Account. The payment of Owner's U-Move Commissions shall be governed by the terms of the Dealer Contract. Nothing in this Section shall be construed to limit Owner's access to Owner's Revenue. All funds shall be deposited and applied as required pursuant to Owner's loan documents with Lender.

p.   Obligations under Loan Documents and other Material Contracts. Manager shall take such actions as are necessary or appropriate under the circumstances to ensure, to the extent Manager is privy to the information, that Owner is in compliance with the terms of the Loan Documents and any other material agreement relating to the Property to which Owner is a party and for which Manager is privy to the information. Notwithstanding the foregoing, nothing herein contained shall be deemed to obligate Manager to fund from its own resources any payments owed by Owner under the Loan Documents or otherwise be deemed to make Manager a direct obligor under the Loan Documents.

q.   Segregation. Owner and Manager shall maintain the Property and Owner's Revenue in such a manner that it is not costly or difficult to segregate, ascertain, or identify Owner's individual assets from those of Manager or any other person.

3.   **Duties of Owner**. Owner shall cooperate with Manager in the performance of Manager's duties under this Agreement and to that end, upon the request of Manager, shall provide, at such rental charges as are deemed appropriate, reasonable office space for Manager employees on the premises of the Property (to the extent available). Owner shall not unreasonably withhold or delay any consent or authorization to Manager required or appropriate under this Agreement. Owner shall provide Manager with copies of all Loan Documents and any amendments thereto.

4.   **Compensation of Manager.**

a.   Reimbursement of Expenses. Manager shall be entitled to request and receive timely reimbursement for all timely authorized out-of-pocket reasonable and customary expenses ("Expenses") actually incurred by Manager in the discharge of its duties hereunder. Such

Exhibit 1 to Decl. of James Burton
161

expense reimbursement shall be due by the last business day of each month, for all expenses billed during such month, unless a written request is received by Manager detailing a legitimate dispute as to a billed amount. Such reimbursement shall be the obligation of Owner, whether or not Owner's Revenues are sufficient to pay such amounts.

b.  <u>Management Fee</u>. Owner shall pay to Manager as the full amount due for the services herein provided a monthly fee (the "Property Management Fee") which shall be six percent (6%) of the Property's current month Owner's Revenue, as determined on a cash basis. The Property Management Fee payment shall be included with the reimbursement of Expenses pursuant to Section 4(a) above, for the same month. The invoice for the management fees shall be itemized and shall include reasonable detail to explain the expenses incurred. It is further understood and agreed that, except as provided in this Section 4, Manager shall not be entitled to additional compensation of any kind in connection with its performance of its duties under this Agreement.

c.  <u>Inspection of Books and Records</u>. Owner shall have the right, upon prior reasonable notice to Manager, to inspect Manager's books and records with respect to the Property, to assure that proper fees and charges are assessed hereunder. Manager shall cooperate with any such inspection. Owner shall bear the cost of any such inspection; provided, however, that if it is clearly demonstrated that Manager has overcharged Owner by more than 5% in any given quarter and such overcharge was not caused in whole or part by Owner, the cost of such inspection shall be borne by Manager. Manager shall promptly reimburse Owner for any overpayment.

5.  **Use of Trademarks, Service Marks, and Related Items**. Owner acknowledges the significant value of the "U-Haul" name in the operations of Owner's property, and it is therefore understood and agreed that the name, trademark, and service mark "U-Haul", and related marks, slogans, caricatures, designs, and other trade or service items (the "Manager Trade Marks") shall be utilized for the non-exclusive benefit of Owner in the rental and operation of the Property, and in comparable operations elsewhere. It is further understood and agreed that the Manager Trade Marks shall remain and be at all times the property of Manager or its affiliates, and that, except as expressly provided in this Agreement, Owner shall have no right whatsoever therein. Owner agrees that during the term of this Agreement the sign faces at the property will have the name "U-Haul." Upon termination of this Agreement at any time for any reason, all such use by and for the benefit of Owner of any such Manager Trade Marks in connection with the Property shall be terminated and any signs bearing any of the foregoing shall be removed from view and no longer used by Owner. In addition, upon termination of this Agreement at any time for any reason, Owner shall not enter into any new leases of Property using the Manager lease form or use other forms prepared by Manager. It is understood and agreed that Manager will use and shall be unrestricted in its use of such Manager Trade Marks in the management and operation of other storage facilities both during and after the expiration or termination of the term of this Agreement.

6.  **Default; Termination**.

a.  Any material failure by Manager or Owner (a "<u>Defaulting Party</u>") to perform its respective duties or obligations hereunder (other than a default by Owner under Section 4 of this Agreement), which material failure is not cured within thirty (30) calendar days after receipt of written notice of such failure from the non-defaulting party, shall constitute an event of default hereunder; provided, however, the foregoing shall not constitute an event of default hereunder in the event the Defaulting Party commences cure of such material failure within such thirty (30) day period and diligently prosecutes the cure of such material failure thereafter but in no event shall such extended cure period exceed ninety (90) days from the date of receipt by the non-defaulting party of written notice of such material default; provided further, however, that in the event such

Exhibit 1 to Decl. of James Burton
162
**SER 901**

material failure constitutes a default under the terms of the Loan Documents and the cure period for such matter under the Loan Documents is shorter than the cure period specified herein, the cure period specified herein shall automatically shorten such that it shall match the cure period for such matter as specified under the Loan Documents. In addition, following notice to Manager of the existence of any such material failure by Manager, Owner shall have the right to cure any such material failure by Manager, and any sums so expended in curing shall be owed by Manager to such curing party and may be offset against any sums owed to Manager under this Agreement.

    b.    Any material failure by Owner to perform its duties or obligations under Section 4, which material failure is not cured within ten (10) calendar days after receipt of written notice of such failure from Manager, shall constitute an event of default hereunder.

    c.    Subject to the terms of the Loan Documents, either party hereto shall have the right to terminate this Agreement, with or without cause, by giving not less than ninety (90) days' written notice to the other party hereto, pursuant to Section 14 hereof.

    d.    Upon termination of this Agreement, (i) Manager shall promptly return to Owner all monies, books, records, and other materials held by Manager for or on behalf of Owner and shall otherwise cooperate with Owner to promote and ensure a smooth transition to the new manager, and (ii) Manager shall be entitled to receive its Property Management Fee and reimbursement of expenses through the effective date of such termination, including the reimbursement of any prepaid expenses for periods beyond the date of termination (such as advertising).

7.    **Indemnification.** Manager hereby agrees to indemnify, defend, and hold Owner, all persons and companies affiliated with Owner, and all officers, shareholders, directors, employees, and agents of Owner and of any affiliated companies or persons (collectively, the "Indemnified Persons") harmless from any and all costs, expenses, attorneys' fees, suits, liabilities, judgments, damages, and claims in connection with the management of the Property and operations thereon (including the loss of use thereof following any damage, injury, or destruction), arising from any cause or matter whatsoever, including without limitation, any environmental condition or matter caused by Manager's operation of the Property, except to the extent attributable to the willful misconduct or negligence on the part of the Indemnified Persons.

8.    **Assignment.** Manager shall not assign this Agreement, or any portion hereof of the duties hereunder, to any party without the consent of Owner.

9.    **Standard for Property Manager's Responsibility.** Manager agrees that it will perform its obligations hereunder according to industry standards, in good faith, and in a commercially-reasonable manner.

10.    **Estoppel Certificate.** Each of Owner and Manager agree to execute and deliver to each other, from time to time, within ten (10) business days after the requesting party's request, a statement in writing certifying, to the extent true, that this Agreement is in full force and effect, and to such parties' knowledge there are no uncured defaults (or specifying such defaults if they are claimed) and any such other matters as may be reasonably requested by such requesting party

11.    **Term, Scope.** Subject to the provisions hereof, this Agreement shall have an initial term (such term, as extended or renewed in accordance with the provisions hereof, being called the "Term") commencing on the date hereof (the "Commencement Date") and ending on the later of (i) the last day of the 300th calendar month next following the date hereof, or (ii) the maturity date, repayment, or prepayment of the relevant loan under the applicable Loan Documents (the "Expiration Date"); provided however, the parties shall have the right upon mutual agreement to terminate this Agreement with respect to any individual Property no longer subject to the Loan Documents (for instance due to a significant casualty or condemnation of such Property).

Exhibit 1 to Decl. of James Burton
163
**SER 902**

12. **Headings**. The headings contained herein are for convenience of reference only and are not intended to define, limit, or describe the scope or intent of any provision of this Agreement.

13. **Governing Law**. The validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties shall be governed by the internal laws of the State of Nevada

14. **Notices**. Any notice required or permitted herein shall be in writing and shall be personally delivered or mailed first class postage prepaid or delivered by an overnight delivery service to the respective addresses of the parties set forth above on the first page of this Agreement, or to such other address as any party may give  to the other in writing.  Any notice required by this Agreement will be deemed to have been given when personally served or one day after delivery to an overnight delivery service or five days after deposit in the first class mail. Any notice to Owner shall be to 207 E Clarendon, Phoenix, AZ  85012. Any notice to Manager shall be c/o U-Haul International, Inc., 2721 North Central Avenue, Phoenix, AZ 85004, Attn:  Legal Dept.

15. **Severability**. Should any term or provision hereof be deemed invalid, void, or unenforceable either in its entirety or in a particular application, the remainder of this Agreement shall nonetheless remain in full force and effect and, if the subject term or provision is deemed to be invalid, void or unenforceable only with respect to a particular application, such term or provision shall remain in full force and effect with respect to all other applications.

16. **Successors**. This Agreement shall be binding upon and inure to the benefit of the respective parties hereto and their permitted assigns and successors in interest.

17. **Attorneys' Fees**. In any dispute arising under this Agreement, the prevailing party shall be entitled to recover from the other party all costs including without limitation reasonable attorneys' and experts' fees and costs.

18. **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

---

Exhibit 1 to Decl. of James Burton
164
**SER 903**

IN WITNESS WHEREOF, the undersigned execute this Property Management Agreement as of the date set forth above.

<u>Owner</u>:
Mercury Storage 1-B, LLC,
a Nevada limited liability company


By: _____
    Stuart M. Shoen, Vice President


<u>Manager:</u>

U-Haul Co. of Arizona, an Arizona corporation
U-Haul Co. of Florida, a Florida corporation
U-Haul Co. of Kansas, Inc., a Kansas corporation
U-Haul Co. of Massachusetts and Ohio, Inc., a Massachusetts corporation
U-Haul Co. of Oklahoma, Inc., an Oklahoma corporation
U-Haul Co. of Texas, a Texas corporation


By: _____
    Wesley Chadwick, Assistant Secretary

Exhibit 1 to Decl. of James Burton

165

# Exhibit A

**List of Properties**

| Center # | Street | City | State | Zip |
|---|---|---|---|---|
| 858046 | 21621 North 26Th Avenue | Phoenix | AZ | 85027 |
| 956082 | 14500 South Orange Blossom Trail | Orlando | FL | 32837 |
| 829054 | 3851 South Orlando Drive | Sanford | FL | 32773 |
| 853032 | 9250 Marshall Drive | Lenexa | KS | 66215 |
| 872036 | 224 Washington Street | Stoughton | MA | 02072 |
| 791064 | 499 Montgomery Street | Chicopee | MA | 01020 |
| 957067 | 5715 West 6Th Street | Stillwater | OK | 74074 |
| 859023 | 3501 William D Tate Ave | Grapevine | TX | 76051 |

The Property shall automatically include, without any further action necessary under this Agreement, any After Acquired Adjacent Property and After Acquired Leasehold Property as defined in the Loan Documents.

Exhibit 1 to Decl. of James Burton
166
**SER 905**

<u>PROPERTY MANAGEMENT AGREEMENT</u>

THIS PROPERTY MANAGEMENT AGREEMENT (this "<u>Agreement</u>") is entered into as of February _2__, 2024 by and among **Mercury Storage 1-C, LLC**, a Nevada limited liability company ("<u>Owner</u>"), and the **subsidiaries of U-Haul International, Inc.** set forth on the signature block hereto (each a "<u>Manager</u>" and collectively "<u>Managers</u>").

<u>RECITALS</u>

A.   Owner holds the leasehold interest in the real property and all improvements thereon and appurtenances thereto located at the street addresses identified on **<u>Exhibit A</u>** hereto (hereinafter, collectively the "Property").

B.   Owner intends that the Property be rented on a space-by-space retail basis to individuals, business entities, or other entities for use as self-storage and portable storage facilities.

C.   Owner desires that Manager manage the Property and Manager desires to act as the property manager for the Property, all in accordance with the terms and conditions of this Agreement.

D.   The parties agree that this Agreement supersedes and replaces any other property management agreement ("Prior Agreement") between the parties hereto and/or their respective predecessors in interest, as the case may be, with respect to the Property, any such Prior Agreement is hereby terminated as of the date hereof.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto hereby agree as follows.

1.   **<u>Employment.</u>**

    a.   Owner hereby retains Manager, and Manager agrees to act as manager of the Property upon the terms and conditions hereinafter set forth.

    b.   Owner acknowledges that Manager, and/or Manager affiliates, is in the business of managing self-storage and portable-storage facilities and businesses conducted thereat, including, but not limited to, the sale of packing supplies and rental of trucks and equipment, both for its own account and for the account of others.  It is hereby expressly agreed that notwithstanding this Agreement, Manager and such affiliates may continue to engage in such activities, may manage facilities other than those presently managed by Manager and its affiliates (whether or not such other facilities may be in direct or indirect competition with Owner), and may in the future engage in other business which may compete directly or indirectly with activities of Owner.

    c.   In the performance of its duties under this Agreement, Manager shall occupy the position of an independent contractor with respect to Owner.  Nothing contained herein shall be construed as making the parties hereto (or any of them) partners or co-parties to a joint venture, nor construed as making Manager an employee of Owner.

Exhibit 1 to Decl. of James Burton
167
**SER 906**

2.     **Duties and Authority of Manager**. Manager shall have the following duties and authority, subject to the terms and conditions of this Agreement, on behalf of and as agent of the Owner:

a.     General Duties and Authority.  Manager shall have the sole and exclusive duty and authority to fully manage the Property and supervise and direct the business and affairs associated or related to the daily operation thereof, to collect on behalf of Owner all revenues related to the Property, to pay on behalf of Owner all expenses of the Property, and to execute on behalf of Owner such documents and instruments as, in the sole judgment of Manager, are reasonably necessary or advisable under the circumstances in order to fulfill Manager's duties hereunder.  Such duties and authority shall include, without limitation, those set forth below. Notwithstanding the foregoing or any other term or provision herein, upon notice to Manager, Owner shall have the right to assume responsibility for the direct payment of certain expenses of Owner, as may be determined by Owner.  In such event, Owner shall provide an accounting of such costs to Manager.  In the event Owner fails to provide such accounting to Manager, Manager shall assume no liability for nonpayment for such expenses so assumed by Owner. The parties acknowledge and agree that Owner will retain title to, ownership of, and exclusive right to control the Property, subject to the terms of this Agreement, and that portion of the Gross Revenue (as hereinafter defined) owned by Owner ("Owner's Revenue"); and that Manager will not acquire title to, any interest in, or any income or revenues from the Property or Owner's Revenue. For purposes of this Agreement, Owner's Revenue consists of the revenue from portable and self-storage operations (excluding U-Box delivery fees), retail sales, miscellaneous income and the commissions ("U-Move Commissions") paid to Owner pursuant to the terms of that Dealership Contract between Owner and Manager dated as of the date hereof (the "Dealer Contract"), in each case with respect to the Property. In performing its services and making any payments hereunder, Manager will make known to third parties that Manager is acting solely as the agent of Owner. Under no circumstances will Manager represent or hold itself out to any third party as having any title to or property interest in the Property or Owner's Revenue. Manager shall perform all of its obligations under this Agreement in a professional manner consistent with the standards it employs at all of its managed locations.

b.     Renting of the Property.  Manager shall establish policies and procedures for the marketing activities for the Property, and shall advertise the Property through such media as Manager deems advisable. Manager's marketing activities for the Property shall be consistent with the scope and quality implemented by Manager and its affiliates at any other properties operated by Manager or its affiliates.  Manager shall have the sole discretion, which discretion shall be exercised in good faith, to establish the terms and conditions of occupancy by the tenants of the Property, and Manager is hereby authorized to enter into rental agreements on behalf and for the account of Owner with such tenants and to collect rent from such tenants on behalf and for the account of Owner. Manager may jointly advertise the Property with other properties owned or managed by Manager or its affiliates, and in that event, Manager shall reasonably allocate the cost of such advertising among such properties.

c.     Repair, Maintenance, and Improvements.  Manager shall make, execute, supervise, and have control over the making and executing of all decisions concerning the acquisition of furniture, fixtures, and supplies for the Property, and may purchase, lease, or otherwise acquire the same and which items shall be owned by Manager. Manager shall make and execute, or supervise and have control over the making and executing, of all decisions concerning the maintenance, repair, and landscaping of the Property, provided, however, that such maintenance, repair, and landscaping shall be consistent with that of other properties operated by Manager or its

Exhibit 1 to Decl. of James Burton
168
**SER 907**

affiliates.  Manager shall, on behalf of Owner, negotiate and contract for and supervise the installation of all capital improvements related to the Property; provided, however, that Manager agrees to secure the prior written approval of Owner on all such expenditures in excess of $10,000.00 for any one item, except monthly or recurring operating charges and/or emergency repairs if in the opinion of Manager such emergency repairs are necessary to protect the Property from damage or to maintain services to the Owner or any customers.  In the event such emergency repairs exceed $10,000, Manager shall notify Owner and the insurer as applicable of the cost estimate for such work.

d.  <u>Personnel</u>. Manager shall select all vendors, suppliers, contractors, subcontractors, and employees with respect to the Property and shall hire, discharge, and supervise all labor and employees required for the operation and maintenance of the Property.  Any employees so hired shall be employees of Manager, and shall be carried on the payroll of Manager. Employees may include, but need not be limited to, on-site resident managers, on-site assistant managers, and relief managers located, rendering services, or performing activities on the Property in connection with its operation and management.  The cost of employing such persons shall not exceed prevailing rates for comparable persons performing the same or similar services with respect to real estate similar to the Property in the general vicinity of each respective Property. Manager shall be responsible for all legal and insurance requirements relating to its employees.

e.  <u>Service Agreements</u>.  Manager shall negotiate and execute on behalf of Owner such agreements which Manager deems necessary or advisable for the furnishing of utilities, services, concessions, and supplies, for the maintenance, repair, and operation of the Property and such other agreements which may benefit the Property or be incidental to the matters for which Manager is responsible hereunder.

f.  <u>Other Decisions</u>.  Manager shall make the decisions in connection with the day-to-day operations of the Property.

g.  <u>Regulations and Permits</u>. Manager shall comply in all respects with any statute, ordinance, law, rule, regulation, or order of any governmental or regulatory body pertaining to the Property (collectively, "Laws"), respecting the use of the Property or the maintenance or operation thereof, the non-compliance with which could reasonably be expected to have a material adverse effect on Owner or any Property. Manager shall apply for and obtain and maintain, on behalf of Owner, all licenses and permits required or advisable (in the reasonable judgment of Manager) in connection with the management and operation of the Property. Notwithstanding the foregoing, Manager shall be permitted to contest any Applicable Laws to the extent and pursuant to the same conditions that Owner is permitted to contest any Laws. To the extent that Manager does not comply, Manager will be responsible for the costs and penalties incurred as a result of the non-compliance.

h.  <u>Records and Reports of Disbursements and Collections</u>. Manager shall establish, supervise, direct, and maintain the operation of a system of cash record keeping and bookkeeping with respect to all receipts and disbursements and all business activities and operations conducted by Manager in connection with the management and operation of the Property. Manager shall be responsible for cash shortages and discrepancies incurred in the normal course of management operations. The books, records, and accounts shall be maintained at the Manager's office or at Owner's office, or at such other location as Manager and Owner shall determine, and shall be available and open to examination and audit quarterly by Owner, its representatives, its lender, if any ("Lender") or such Lender's representative.  Manager shall cause to be prepared and delivered to Owner a monthly statement on a per-Property basis of receipts, expenses, and

Exhibit 1 to Decl. of James Burton
169
**SER 908**

charges, and any other information as reasonably required by Owner to prepare its financial statements, together with a statement on a per-Property basis of the disbursements made by Manager during such period on Owner's behalf, which shall include separate lines for prepaid items and inventory. Manager shall provide Owner with rent rolls and occupancy reports if requested.

i.    <u>Collection</u>.  Manager shall be responsible for the billing and collection of all receipts and for payment of all expenses with respect to the Property and shall be responsible for establishing policies and procedures to minimize the amount of bad debts. Bad debt incurred as a result of non-compliance with management policies and procedures (such as improper verifications or acceptance of bad credit cards or bad checks) will be the responsibility of Manager.

j.    <u>Legal Actions</u>. Manager shall cause to be instituted, on behalf and in its name or in the name of Owner as appropriate, any and all legal actions or proceedings Manager deems necessary or advisable in connection with the Property, including without limitation, to collect charges, rent, or other income due to Owner with respect to the Property and to oust or dispossess tenants where appropriate or other persons unlawfully in possession under any lease, license, concession agreement, or otherwise, and to collect damages for breach thereof or default thereunder by such Owner, licensee, concessionaire, or occupant.

k.    <u>Insurance</u>.  Manager will insure, on its Master Policy, against all liabilities at the Property at Manager's sole cost and expense ("General Liability Insurance"). Any deductibles or self-insured retentions with respect to the General Liability Insurance shall be at Manager's (or Manager's U-Haul affiliates') responsibility and sole cost and expense. Manager will insure equipment at Manager's cost, as determined by Manager. If requested by Owner, Manager will obtain for Owner, at Owner's sole cost and expense, a policy of property insurance ("Property and Casualty Insurance"). Any such Property & Casualty Insurance shall meet Lender's required coverage, to include earthquake, flood, and other Lender requirements, as the case may be, and shall be the cost of Owner.

l.    <u>Taxes</u>.  During the term of this Agreement, Manager shall pay on behalf of Owner, prior to delinquency, real estate taxes, personal property taxes, and other taxes assessed to or levied upon the Property, but only in the event requested by Owner. If requested, Manager will charge to Owner an expense monthly equal to 1/12 of annual real property taxes.

m.    <u>Limitations on Manager Authority</u>. Notwithstanding anything to the contrary set forth in this Section 2, Manager shall not, without obtaining the prior written consent of Owner, (i) rent storage space in the Property by written lease or agreement for a stated term in excess of one year unless such lease or agreement is terminable by the giving of not more than thirty (30) days' written notice, (ii) alter the building or other structures of the Property in violation of loan documents executed by Owner in connection with the Property ("Loan Documents"); (iii) enter on behalf of Owner any other agreements which exceed a term of one year and are not terminable on thirty (30) days' notice at the will of Owner, without penalty, payment, or surcharge; (iv) act in violation of any Law, (v) violate any term or condition of the Loan Documents; (vi) fail to correct any misunderstanding of any third party of which Manager becomes aware as to the separateness of Owner and Manager; or (vii) exercise any authority to act on behalf of Owner, or hold itself out has having such authority, beyond the actual scope of authority granted by Owner.

n.    <u>Shared Expenses</u>. Owner acknowledges that certain economies may be achieved with respect to certain expenses to be incurred by Manager on behalf of Owner hereunder if materials, supplies, insurance, or services are purchased by Manager in quantity for use not only in connection with Owner's business at the Property but in connection with other properties owned or managed by

Exhibit 1 to Decl. of James Burton
170
**SER 909**

Manager or its affiliates. Manager shall have the right to purchase such materials, supplies, insurance (subject to the terms of this Agreement), and/or services in its own name and charge Owner a pro rata allocable share of the cost of the foregoing; provided, however, that the pro rata cost of such purchase to Owner shall not result in expenses that are either inconsistent with the expenses of other "U-Haul branded" locations in the general vicinity of the applicable Property or greater than would otherwise be incurred at competitive prices and terms available in the area where the Property is located; and provided further, Manager shall give Owner access to records (at no cost to Owner) so Owner may review any such expenses incurred.

o.    <u>Deposit of Gross Revenues</u>. All revenue from operations at the Property ("Gross Revenue") shall be deposited daily by Manager into (i) a bank account that has been established for the benefit of Owner (the "Deposit Account") and maintained by Manager (or its parent company); or (ii) a collective bank account (the "Collective Account") maintained by Manager (or its parent company) for the benefit of multiple property owners.  In either case, although the account may be in Owner's name, Owner's right to the proceeds therein only extends to Owner's Revenue.  Within 3 business days after receipt, Manager shall transfer Owner's Revenue in the Deposit Account or Collective Account, as the case may be, to Owner's separately identified depositary account pledged to Lender ("Blocked Account"). To the extent that Gross Revenue is deposited into a Collective Account, Manager (or its parent company) shall on a daily basis reconcile such Collective Account and maintain such records as shall clearly identify the respective interest of each property owner in such account.  Manager shall not, and shall not permit any other property owner or any affiliate of Manager to, borrow, lend, or use Owner's Revenue prior to the deposit of such revenue into the Blocked Account. The payment of Owner's U-Move Commissions shall be governed by the terms of the Dealer Contract. Nothing in this Section shall be construed to limit Owner's access to Owner's Revenue.  All funds shall be deposited and applied as required pursuant to Owner's loan documents with Lender.

p.    <u>Obligations under Loan Documents and other Material Contracts</u>. Manager shall take such actions as are necessary or appropriate under the circumstances to ensure, to the extent Manager is privy to the information, that Owner is in compliance with the terms of the Loan Documents and any other material agreement relating to the Property to which Owner is a party and for which Manager is privy to the information.  Notwithstanding the foregoing, nothing herein contained shall be deemed to obligate Manager to fund from its own resources any payments owed by Owner under the Loan Documents or otherwise be deemed to make Manager a direct obligor under the Loan Documents.

q.    <u>Segregation</u>. Owner and Manager shall maintain the Property and Owner's Revenue in such manner that it is not costly or difficult to segregate, ascertain, or identify Owner's individual assets from those of Manager or any other person.

3.    **Duties of Owner**. Owner shall cooperate with Manager in the performance of Manager's duties under this Agreement and to that end, upon the request of Manager, shall provide, at such rental charges as are deemed appropriate, reasonable office space for Manager employees on the premises of the Property (to the extent available). Owner shall not unreasonably withhold or delay any consent or authorization to Manager required or appropriate under this Agreement. Owner shall provide Manager with copies of all Loan Documents and any amendments thereto.

4.    **Compensation of Manager**.

a.    <u>Reimbursement of Expenses</u>.  Manager shall be entitled to request and receive timely reimbursement for all timely authorized out-of-pocket reasonable and customary expenses ("Expenses") actually incurred by Manager in the discharge of its duties hereunder.  Such

Exhibit 1 to Decl. of James Burton
171
**SER 910**

expense reimbursement shall be due by the last business day of each month, for all expenses billed during such month, unless a written request is received by Manager detailing a legitimate dispute as to a billed amount. Such reimbursement shall be the obligation of Owner, whether or not Owner's Revenues are sufficient to pay such amounts.

b.    Management Fee.  Owner shall pay to Manager as the full amount due for the services herein provided a monthly fee (the "Property Management Fee") which shall be six percent (6%) of the Property's current month Owner's Revenue, as determined on a cash basis. The Property Management Fee payment shall be included with the reimbursement of Expenses pursuant to Section 4(a) above, for the same month. The invoice for the management fees shall be itemized and shall include reasonable detail to explain the expenses incurred. It is further understood and agreed that, except as provided in this Section 4, Manager shall not be entitled to additional compensation of any kind in connection with its performance of its duties under this Agreement.

c.    Inspection of Books and Records.  Owner shall have the right, upon prior reasonable notice to Manager, to inspect Manager's books and records with respect to the Property, to assure that proper fees and charges are assessed hereunder. Manager shall cooperate with any such inspection. Owner shall bear the cost of any such inspection; provided, however, that if it is clearly demonstrated that Manager has overcharged Owner by more than 5% in any given quarter and such overcharge was not caused in whole or part by Owner, the cost of such inspection shall be borne by Manager. Manager shall promptly reimburse Owner for any overpayment.

5.    **Use of Trademarks, Service Marks, and Related Items**. Owner acknowledges the significant value of the "U-Haul" name in the operations of Owner's property, and it is therefore understood and agreed that the name, trademark, and service mark "U-Haul", and related marks, slogans, caricatures, designs, and other trade or service items (the "Manager Trade Marks") shall be utilized for the non-exclusive benefit of Owner in the rental and operation of the Property, and in comparable operations elsewhere. It is further understood and agreed that the Manager Trade Marks shall remain and be at all times the property of Manager or its affiliates, and that, except as expressly provided in this Agreement, Owner shall have no right whatsoever therein. Owner agrees that during the term of this Agreement the sign faces at the property will have the name "U-Haul." Upon termination of this Agreement at any time for any reason, all such use by and for the benefit of Owner of any such Manager Trade Marks in connection with the Property shall be terminated and any signs bearing any of the foregoing shall be removed from view and no longer used by Owner. In addition, upon termination of this Agreement at any time for any reason, Owner shall not enter into any new leases of Property using the Manager lease form or use other forms prepared by Manager. It is understood and agreed that Manager will use and shall be unrestricted in its use of such Manager Trade Marks in the management and operation of other storage facilities both during and after the expiration or termination of the term of this Agreement.

6.    **Default; Termination.**

a.    Any material failure by Manager or Owner (a "Defaulting Party") to perform its respective duties or obligations hereunder (other than a default by Owner under Section 4 of this Agreement), which material failure is not cured within thirty (30) calendar days after receipt of written notice of such failure from the non-defaulting party, shall constitute an event of default hereunder; provided, however, the foregoing shall not constitute an event of default hereunder in the event the Defaulting Party commences cure of such material failure within such thirty (30) day period and diligently prosecutes the cure of such material failure thereafter but in no event shall such extended cure period exceed ninety (90) days from the date of receipt by the non-defaulting party of written notice of such material default; provided further, however, that in the event such

Exhibit 1 to Decl. of James Burton
172
**SER 911**

material failure constitutes a default under the terms of the Loan Documents and the cure period for such matter under the Loan Documents is shorter than the cure period specified herein, the cure period specified herein shall automatically shorten such that it shall match the cure period for such matter as specified under the Loan Documents. In addition, following notice to Manager of the existence of any such material failure by Manager, Owner shall have the right to cure any such material failure by Manager, and any sums so expended in curing shall be owed by Manager to such curing party and may be offset against any sums owed to Manager under this Agreement.

b.    Any material failure by Owner to perform its duties or obligations under Section 4, which material failure is not cured within ten (10) calendar days after receipt of written notice of such failure from Manager, shall constitute an event of default hereunder.

c.    Subject to the terms of the Loan Documents, either party hereto shall have the right to terminate this Agreement, with or without cause, by giving not less than ninety (90) days' written notice to the other party hereto, pursuant to Section 14 hereof.

d.    Upon termination of this Agreement, (i) Manager shall promptly return to Owner all monies, books, records, and other materials held by Manager for or on behalf of Owner and shall otherwise cooperate with Owner to promote and ensure a smooth transition to the new manager, and (ii) Manager shall be entitled to receive its Property Management Fee and reimbursement of expenses through the effective date of such termination, including the reimbursement of any prepaid expenses for periods beyond the date of termination (such as advertising).

7.    **Indemnification.** Manager hereby agrees to indemnify, defend, and hold Owner, all persons and companies affiliated with Owner, and all officers, shareholders, directors, employees, and agents of Owner and of any affiliated companies or persons (collectively, the "Indemnified Persons") harmless from any and all costs, expenses, attorneys' fees, suits, liabilities, judgments, damages, and claims in connection with the management of the Property and operations thereon (including the loss of use thereof following any damage, injury, or destruction), arising from any cause or matter whatsoever, including without limitation, any environmental condition or matter caused by Manager's operation of the Property, except to the extent attributable to the willful misconduct or negligence on the part of the Indemnified Persons.

8.    **Assignment.** Manager shall not assign this Agreement, or any portion hereof of the duties hereunder, to any party without the consent of Owner.

9.    **Standard for Property Manager's Responsibility.** Manager agrees that it will perform its obligations hereunder according to industry standards, in good faith, and in a commercially-reasonable manner.

10.    **Estoppel Certificate.** Each of Owner and Manager agree to execute and deliver to each other, from time to time, within ten (10) business days after the requesting party's request, a statement in writing certifying, to the extent true, that this Agreement is in full force and effect, and to such parties' knowledge there are no uncured defaults (or specifying such defaults if they are claimed) and any such other matters as may be reasonably requested by such requesting party

11.    **Term, Scope.** Subject to the provisions hereof, this Agreement shall have an initial term (such term, as extended or renewed in accordance with the provisions hereof, being called the "Term") commencing on the date hereof (the "Commencement Date") and ending on the later of (i) the last day of the 300th calendar month next following the date hereof, or (ii) the maturity date, repayment, or prepayment of the relevant loan under the applicable Loan Documents (the "Expiration Date"); provided however, the parties shall have the right upon mutual agreement to terminate this Agreement with respect to any individual Property no longer subject to the Loan Documents (for instance due to a significant casualty or condemnation of such Property).

Exhibit 1 to Decl. of James Burton
173
**SER 912**

12. **Headings**. The headings contained herein are for convenience of reference only and are not intended to define, limit, or describe the scope or intent of any provision of this Agreement.

13. **Governing Law**. The validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties shall be governed by the internal laws of the State of Nevada

14. **Notices**. Any notice required or permitted herein shall be in writing and shall be personally delivered or mailed first class postage prepaid or delivered by an overnight delivery service to the respective addresses of the parties set forth above on the first page of this Agreement, or to such other address as any party may give  to the other in writing.  Any notice required by this Agreement will be deemed to have been given when personally served or one day after delivery to an overnight delivery service or five days after deposit in the first class mail. Any notice to Owner shall be to 207 E Clarendon, Phoenix, AZ  85012. Any notice to Manager shall be c/o U-Haul International, Inc., 2721 North Central Avenue, Phoenix, AZ 85004, Attn:  Legal Dept.

15. **Severability**. Should any term or provision hereof be deemed invalid, void, or unenforceable either in its entirety or in a particular application, the remainder of this Agreement shall nonetheless remain in full force and effect and, if the subject term or provision is deemed to be invalid, void or unenforceable only with respect to a particular application, such term or provision shall remain in full force and effect with respect to all other applications.

16. **Successors**. This Agreement shall be binding upon and inure to the benefit of the respective parties hereto and their permitted assigns and successors in interest.

17. **Attorneys' Fees**. In any dispute arising under this Agreement, the prevailing party shall be entitled to recover from the other party all costs including without limitation reasonable attorneys' and experts' fees and costs.

18. **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Exhibit 1 to Decl. of James Burton
174
**SER 913**

IN WITNESS WHEREOF, the undersigned execute this Property Management Agreement as of the date set forth above.

Owner:
Mercury Storage 1-B, LLC,
a Nevada limited liability company

By: _____
    Stuart M. Shoen, Vice President

Manager:

U-Haul Co. of Arizona, an Arizona corporation
U-Haul Co. of Colorado, a Colorado corporation
U-Haul Co. of Florida, a Florida corporation
U-Haul Co. of Georgia, a Georgia corporation
U-Haul Co. of Nevada, Inc., a Nevada corporation
U-Haul Co. of Ner York and Vermont, Inc., a New York corporation
U-Haul Co. of Virginia, a Virginia corporation

By: _____
    Wesley Chadwick, Assistant Secretary

Exhibit 1 to Decl. of James Burton
175

# Exhibit A

**List of Properties**

| Center # | Street | City | State | Zip |
|---|---|---|---|---|
| 822059 | 3425 South 40Th Street | Phoenix | AZ | 85040 |
| 834035 | 1750 East County Line Road | Highlands Ranch | CO | 80126 |
| 829057 | 2055 N Semoran Boulevard | Winter Park | FL | 32792 |
| 829073 | 7803 North Orange Blossom Trail | Orlando | FL | 32810 |
| 879055 | 2040 Scenic Highway N | Snellville | GA | 30078 |
| 807025 | 333 N Nellis Blvd | Las Vegas | NV | 89110 |
| 803034 | 780 East 138Th Street | Bronx | NY | 10454 |
| 921025 | 804 W Roslyn Rd | Colonial Heights | VA | 23834 |

The Property shall automatically include, without any further action necessary under this Agreement, any After Acquired Adjacent Property and After Acquired Leasehold Property as defined in the Loan Documents.

Exhibit 1 to Decl. of James Burton
176

PROPERTY MANAGEMENT AGREEMENT

THIS PROPERTY MANAGEMENT AGREEMENT (this "Agreement") is entered into as of February 14, 2024 by and among **Mercury Storage 2, LLC**, a Nevada limited liability company ("Owner"), and the **subsidiaries of U-Haul International, Inc.** set forth on the signature block hereto (each a "Manager" and collectively "Managers").

RECITALS

A.   Owner holds the leasehold interest in the real property and all improvements thereon and appurtenances thereto located at the street addresses identified on **Exhibit A** hereto (hereinafter, collectively the "Property").

B.   Owner intends that the Property be rented on a space-by-space retail basis to individuals, business entities, or other entities for use as self-storage and portable storage facilities.

C.   Owner desires that Manager manage the Property and Manager desires to act as the property manager for the Property, all in accordance with the terms and conditions of this Agreement.

D.   The parties agree that this Agreement supersedes and replaces any other property management agreement ("Prior Agreement") between the parties hereto and/or their respective predecessors in interest, as the case may be, with respect to the Property, any such Prior Agreement is hereby terminated as of the date hereof.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto hereby agree as follows.

1.   **Employment.**

   a.   Owner hereby retains Manager, and Manager agrees to act as manager of the Property upon the terms and conditions hereinafter set forth.

   b.   Owner acknowledges that Manager, and/or Manager affiliates, is in the business of managing self-storage and portable-storage facilities and businesses conducted thereat, including, but not limited to, the sale of packing supplies and rental of trucks and equipment, both for its own account and for the account of others.  It is hereby expressly agreed that notwithstanding this Agreement, Manager and such affiliates may continue to engage in such activities, may manage facilities other than those presently managed by Manager and its affiliates (whether or not such other facilities may be in direct or indirect competition with Owner), and may in the future engage in other business which may compete directly or indirectly with activities of Owner.

   c.   In the performance of its duties under this Agreement, Manager shall occupy the position of an independent contractor with respect to Owner.  Nothing contained herein shall be construed as making the parties hereto (or any of them) partners or co-parties to a joint venture, nor construed as making Manager an employee of Owner.

Exhibit 1 to Decl. of James Burton
177
**SER 916**

2.     **Duties and Authority of Manager**. Manager shall have the following duties and authority, subject to the terms and conditions of this Agreement, on behalf of and as agent of the Owner:

a.     <u>General Duties and Authority</u>.  Manager shall have the sole and exclusive duty and authority to fully manage the Property and supervise and direct the business and affairs associated or related to the daily operation thereof, to collect on behalf of Owner all revenues related to the Property, to pay on behalf of Owner all expenses of the Property, and to execute on behalf of Owner such documents and instruments as, in the sole judgment of Manager, are reasonably necessary or advisable under the circumstances in order to fulfill Manager's duties hereunder.  Such duties and authority shall include, without limitation, those set forth below. Notwithstanding the foregoing or any other term or provision herein, upon notice to Manager, Owner shall have the right to assume responsibility for the direct payment of certain expenses of Owner, as may be determined by Owner.  In such event, Owner shall provide an accounting of such costs to Manager.  In the event Owner fails to provide such accounting to Manager, Manager shall assume no liability for nonpayment for such expenses so assumed by Owner. The parties acknowledge and agree that Owner will retain title to, ownership of, and exclusive right to control the Property, subject to the terms of this Agreement, and that portion of the Gross Revenue (as hereinafter defined) owned by Owner ("Owner's Revenue"); and that Manager will not acquire title to, any interest in, or any income or revenues from the Property or Owner's Revenue. For purposes of this Agreement, Owner's Revenue consists of the revenue from portable and self-storage operations (excluding U-Box delivery fees), retail sales, miscellaneous income and the commissions ("U-Move Commissions") paid to Owner pursuant to the terms of that Dealership Contract between Owner and Manager dated as of the date hereof (the "Dealer Contract"), in each case with respect to the Property. In performing its services and making any payments hereunder, Manager will make known to third parties that Manager is acting solely as the agent of Owner. Under no circumstances will Manager represent or hold itself out to any third party as having any title to or property interest in the Property or Owner's Revenue. Manager shall perform all of its obligations under this Agreement in a professional manner consistent with the standards it employs at all of its managed locations.

b.     <u>Renting of the Property</u>.  Manager shall establish policies and procedures for the marketing activities for the Property, and shall advertise the Property through such media as Manager deems advisable. Manager's marketing activities for the Property shall be consistent with the scope and quality implemented by Manager and its affiliates at any other properties operated by Manager or its affiliates.  Manager shall have the sole discretion, which discretion shall be exercised in good faith, to establish the terms and conditions of occupancy by the tenants of the Property, and Manager is hereby authorized to enter into rental agreements on behalf and for the account of Owner with such tenants and to collect rent from such tenants on behalf and for the account of Owner. Manager may jointly advertise the Property with other properties owned or managed by Manager or its affiliates, and in that event, Manager shall reasonably allocate the cost of such advertising among such properties.

c.     <u>Repair, Maintenance, and Improvements</u>. Manager shall make, execute, supervise, and have control over the making and executing of all decisions concerning the acquisition of furniture, fixtures, and supplies for the Property, and may purchase, lease, or otherwise acquire the same and which items shall be owned by Manager. Manager shall make and execute, or supervise and have control over the making and executing, of all decisions concerning the maintenance, repair, and landscaping of the Property, provided, however, that such maintenance, repair, and landscaping shall be consistent with that of other properties operated by Manager or its

Exhibit 1 to Decl. of James Burton
**SER 917**

affiliates.  Manager shall, on behalf of Owner, negotiate and contract for and supervise the installation of all capital improvements related to the Property; provided, however, that Manager agrees to secure the prior written approval of Owner on all such expenditures in excess of $10,000.00 for any one item, except monthly or recurring operating charges and/or emergency repairs if in the opinion of Manager such emergency repairs are necessary to protect the Property from damage or to maintain services to the Owner or any customers.  In the event such emergency repairs exceed $10,000, Manager shall notify Owner and the insurer as applicable of the cost estimate for such work.

d.  <u>Personnel</u>. Manager shall select all vendors, suppliers, contractors, subcontractors, and employees with respect to the Property and shall hire, discharge, and supervise all labor and employees required for the operation and maintenance of the Property.  Any employees so hired shall be employees of Manager, and shall be carried on the payroll of Manager. Employees may include, but need not be limited to, on-site resident managers, on-site assistant managers, and relief managers located, rendering services, or performing activities on the Property in connection with its operation and management.  The cost of employing such persons shall not exceed prevailing rates for comparable persons performing the same or similar services with respect to real estate similar to the Property in the general vicinity of each respective Property. Manager shall be responsible for all legal and insurance requirements relating to its employees.

e.  <u>Service Agreements</u>.  Manager shall negotiate and execute on behalf of Owner such agreements which Manager deems necessary or advisable for the furnishing of utilities, services, concessions, and supplies, for the maintenance, repair, and operation of the Property and such other agreements which may benefit the Property or be incidental to the matters for which Manager is responsible hereunder.

f.  <u>Other Decisions</u>.  Manager shall make the decisions in connection with the day-to-day operations of the Property.

g.  <u>Regulations and Permits</u>. Manager shall comply in all respects with any statute, ordinance, law, rule, regulation, or order of any governmental or regulatory body pertaining to the Property (collectively, "Laws"), respecting the use of the Property or the maintenance or operation thereof, the non-compliance with which could reasonably be expected to have a material adverse effect on Owner or any Property. Manager shall apply for and obtain and maintain, on behalf of Owner, all licenses and permits required or advisable (in the reasonable judgment of Manager) in connection with the management and operation of the Property. Notwithstanding the foregoing, Manager shall be permitted to contest any Applicable Laws to the extent and pursuant to the same conditions that Owner is permitted to contest any Laws. To the extent that Manager does not comply, Manager will be responsible for the costs and penalties incurred as a result of the non-compliance.

h.  <u>Records and Reports of Disbursements and Collections</u>. Manager shall establish, supervise, direct, and maintain the operation of a system of cash record keeping and bookkeeping with respect to all receipts and disbursements and all business activities and operations conducted by Manager in connection with the management and operation of the Property. Manager shall be responsible for cash shortages and discrepancies incurred in the normal course of management operations. The books, records, and accounts shall be maintained at the Manager's office or at Owner's office, or at such other location as Manager and Owner shall determine, and shall be available and open to examination and audit quarterly by Owner, its representatives, its lender, if any ("Lender") or such Lender's representative.  Manager shall cause to be prepared and delivered to Owner a monthly statement on a per-Property basis of receipts, expenses, and

Exhibit 1 to Decl. of James Burton
179
**SER 918**

charges, and any other information as reasonably required by Owner to prepare its financial statements, together with a statement on a per-Property basis of the disbursements made by Manager during such period on Owner's behalf, which shall include separate lines for prepaid items and inventory. Manager shall provide Owner with rent rolls and occupancy reports if requested.

i.    <u>Collection</u>.  Manager shall be responsible for the billing and collection of all receipts and for payment of all expenses with respect to the Property and shall be responsible for establishing policies and procedures to minimize the amount of bad debts. Bad debt incurred as a result of non-compliance with management policies and procedures (such as improper verifications or acceptance of bad credit cards or bad checks) will be the responsibility of Manager.

j.    <u>Legal Actions</u>. Manager shall cause to be instituted, on behalf and in its name or in the name of Owner as appropriate, any and all legal actions or proceedings Manager deems necessary or advisable in connection with the Property, including without limitation, to collect charges, rent, or other income due to Owner with respect to the Property and to oust or dispossess tenants where appropriate or other persons unlawfully in possession under any lease, license, concession agreement, or otherwise, and to collect damages for breach thereof or default thereunder by such Owner, licensee, concessionaire, or occupant.

k.    <u>Insurance</u>.  Manager will insure, on its Master Policy, against all liabilities at the Property at Manager's sole cost and expense ("General Liability Insurance"). Any deductibles or self-insured retentions with respect to the General Liability Insurance shall be at Manager's (or Manager's U-Haul affiliates') responsibility and sole cost and expense. Manager will insure equipment at Manager's cost, as determined by Manager. If requested by Owner, Manager will obtain for Owner, at Owner's sole cost and expense, a policy of property insurance ("Property and Casualty Insurance"). Any such Property & Casualty Insurance shall meet Lender's required coverage, to include earthquake, flood, and other Lender requirements, as the case may be, and shall be the cost of Owner.

l.    <u>Taxes</u>.  During the term of this Agreement, Manager shall pay on behalf of Owner, prior to delinquency, real estate taxes, personal property taxes, and other taxes assessed to or levied upon the Property, but only in the event requested by Owner. If requested, Manager will charge to Owner an expense monthly equal to 1/12 of annual real property taxes.

m.    <u>Limitations on Manager Authority</u>. Notwithstanding anything to the contrary set forth in this Section 2, Manager shall not, without obtaining the prior written consent of Owner, (i) rent storage space in the Property by written lease or agreement for a stated term in excess of one year unless such lease or agreement is terminable by the giving of not more than thirty (30) days' written notice, (ii) alter the building or other structures of the Property in violation of loan documents executed by Owner in connection with the Property ("Loan Documents"); (iii) enter on behalf of Owner any other agreements which exceed a term of one year and are not terminable on thirty (30) days' notice at the will of Owner, without penalty, payment, or surcharge; (iv) act in violation of any Law, (v) violate any term or condition of the Loan Documents; (vi) fail to correct any misunderstanding of any third party of which Manager becomes aware as to the separateness of Owner and Manager; or (vii) exercise any authority to act on behalf of Owner, or hold itself out has having such authority, beyond the actual scope of authority granted by Owner.

n.    <u>Shared Expenses</u>. Owner acknowledges that certain economies may be achieved with respect to certain expenses to be incurred by Manager on behalf of Owner hereunder if materials, supplies, insurance, or services are purchased by Manager in quantity for use not only in connection with Owner's business at the Property but in connection with other properties owned or managed by

Exhibit 1 to Decl. of James Burton
180
**SER 919**

Manager or its affiliates. Manager shall have the right to purchase such materials, supplies, insurance (subject to the terms of this Agreement), and/or services in its own name and charge Owner a pro rata allocable share of the cost of the foregoing; provided, however, that the pro rata cost of such purchase to Owner shall not result in expenses that are either inconsistent with the expenses of other "U-Haul branded" locations in the general vicinity of the applicable Property or greater than would otherwise be incurred at competitive prices and terms available in the area where the Property is located; and provided further, Manager shall give Owner access to records (at no cost to Owner) so Owner may review any such expenses incurred.

o.    Deposit of Gross Revenues. All revenue from operations at the Property ("Gross Revenue") shall be deposited daily by Manager into (i) a bank account that has been established for the benefit of Owner (the "Deposit Account") and maintained by Manager (or its parent company); or (ii) a collective bank account (the "Collective Account") maintained by Manager (or its parent company) for the benefit of multiple property owners.  In either case, although the account may be in Owner's name, Owner's right to the proceeds therein only extends to Owner's Revenue.  Within 3 business days after receipt, Manager shall transfer Owner's Revenue in the Deposit Account or Collective Account, as the case may be, to Owner's separately identified depositary account pledged to Lender ("Blocked Account"). To the extent that Gross Revenue is deposited into a Collective Account, Manager (or its parent company) shall on a daily basis reconcile such Collective Account and maintain such records as shall clearly identify the respective interest of each property owner in such account.  Manager shall not, and shall not permit any other property owner or any affiliate of Manager to, borrow, lend, or use Owner's Revenue prior to the deposit of such revenue into the Blocked Account. The payment of Owner's U-Move Commissions shall be governed by the terms of the Dealer Contract. Nothing in this Section shall be construed to limit Owner's access to Owner's Revenue.  All funds shall be deposited and applied as required pursuant to Owner's loan documents with Lender.

p.    Obligations under Loan Documents and other Material Contracts. Manager shall take such actions as are necessary or appropriate under the circumstances to ensure, to the extent Manager is privy to the information, that Owner is in compliance with the terms of the Loan Documents and any other material agreement relating to the Property to which Owner is a party and for which Manager is privy to the information.  Notwithstanding the foregoing, nothing herein contained shall be deemed to obligate Manager to fund from its own resources any payments owed by Owner under the Loan Documents or otherwise be deemed to make Manager a direct obligor under the Loan Documents.

q.    Segregation. Owner and Manager shall maintain the Property and Owner's Revenue in such a manner that it is not costly or difficult to segregate, ascertain, or identify Owner's individual assets from those of Manager or any other person.

3.    **Duties of Owner**. Owner shall cooperate with Manager in the performance of Manager's duties under this Agreement and to that end, upon the request of Manager, shall provide, at such rental charges as are deemed appropriate, reasonable office space for Manager employees on the premises of the Property (to the extent available). Owner shall not unreasonably withhold or delay any consent or authorization to Manager required or appropriate under this Agreement. Owner shall provide Manager with copies of all Loan Documents and any amendments thereto.

4.    **Compensation of Manager**.

a.    Reimbursement of Expenses.  Manager shall be entitled to request and receive timely reimbursement for all timely authorized out-of-pocket reasonable and customary expenses ("Expenses") actually incurred by Manager in the discharge of its duties hereunder.  Such

Exhibit 1 to Decl. of James Burton
181
**SER 920**

expense reimbursement shall be due by the last business day of each month, for all expenses billed during such month, unless a written request is received by Manager detailing a legitimate dispute as to a billed amount.  Such reimbursement shall be the obligation of Owner, whether or not Owner's Revenues are sufficient to pay such amounts.

b.    <u>Management Fee</u>.  Owner shall pay to Manager as the full amount due for the services herein provided a monthly fee (the "Property Management Fee") which shall be six percent (6%) of the Property's current month Owner's Revenue, as determined on a cash basis.  The Property Management Fee payment shall be included with the reimbursement of Expenses pursuant to Section 4(a) above, for the same month.  The invoice for the management fees shall be itemized and shall include reasonable detail to explain the expenses incurred. It is further understood and agreed that, except as provided in this Section 4, Manager shall not be entitled to additional compensation of any kind in connection with its performance of its duties under this Agreement.

c.    <u>Inspection of Books and Records</u>.  Owner shall have the right, upon prior reasonable notice to Manager, to inspect Manager's books and records with respect to the Property, to assure that proper fees and charges are assessed hereunder. Manager shall cooperate with any such inspection.  Owner shall bear the cost of any such inspection; provided, however, that if it is clearly demonstrated that Manager has overcharged Owner by more than 5% in any given quarter and such overcharge was not caused in whole or part by Owner, the cost of such inspection shall be borne by Manager. Manager shall promptly reimburse Owner for any overpayment.

5.    **Use of Trademarks, Service Marks, and Related Items**. Owner acknowledges the significant value of the "U-Haul" name in the operations of Owner's property, and it is therefore understood and agreed that the name, trademark, and service mark "U-Haul", and related marks, slogans, caricatures, designs, and other trade or service items (the "Manager Trade Marks") shall be utilized for the non-exclusive benefit of Owner in the rental and operation of the Property, and in comparable operations elsewhere.  It is further understood and agreed that the Manager Trade Marks shall remain and be at all times the property of Manager or its affiliates, and that, except as expressly provided in this Agreement, Owner shall have no right whatsoever therein.  Owner agrees that during the term of this Agreement the sign faces at the property will have the name "U-Haul." Upon termination of this Agreement at any time for any reason, all such use by and for the benefit of Owner of any such Manager Trade Marks in connection with the Property shall be terminated and any signs bearing any of the foregoing shall be removed from view and no longer used by Owner.  In addition, upon termination of this Agreement at any time for any reason, Owner shall not enter into any new leases of Property using the Manager lease form or use other forms prepared by Manager.  It is understood and agreed that Manager will use and shall be unrestricted in its use of such Manager Trade Marks in the management and operation of other storage facilities both during and after the expiration or termination of the term of this Agreement.

6.    **Default; Termination**.

a.    Any material failure by Manager or Owner (a "<u>Defaulting Party</u>") to perform its respective duties or obligations hereunder (other than a default by Owner under Section 4 of this Agreement), which material failure is not cured within thirty (30) calendar days after receipt of written notice of such failure from the non-defaulting party, shall constitute an event of default hereunder; provided, however, the foregoing shall not constitute an event of default hereunder in the event the Defaulting Party commences cure of such material failure within such thirty (30) day period and diligently prosecutes the cure of such material failure thereafter but in no event shall such extended cure period exceed ninety (90) days from the date of receipt by the non-defaulting party of written notice of such material default; provided further, however, that in the event such

Exhibit 1 to Decl. of James Burton
182
**SER 921**

material failure constitutes a default under the terms of the Loan Documents and the cure period for such matter under the Loan Documents is shorter than the cure period specified herein, the cure period specified herein shall automatically shorten such that it shall match the cure period for such matter as specified under the Loan Documents. In addition, following notice to Manager of the existence of any such material failure by Manager, Owner shall have the right to cure any such material failure by Manager, and any sums so expended in curing shall be owed by Manager to such curing party and may be offset against any sums owed to Manager under this Agreement.

b.    Any material failure by Owner to perform its duties or obligations under Section 4, which material failure is not cured within ten (10) calendar days after receipt of written notice of such failure from Manager, shall constitute an event of default hereunder.

c.    Subject to the terms of the Loan Documents, either party hereto shall have the right to terminate this Agreement, with or without cause, by giving not less than ninety (90) days' written notice to the other party hereto, pursuant to Section 14 hereof.

d.    Upon termination of this Agreement, (i) Manager shall promptly return to Owner all monies, books, records, and other materials held by Manager for or on behalf of Owner and shall otherwise cooperate with Owner to promote and ensure a smooth transition to the new manager, and (ii) Manager shall be entitled to receive its Property Management Fee and reimbursement of expenses through the effective date of such termination, including the reimbursement of any prepaid expenses for periods beyond the date of termination (such as advertising).

7.    **Indemnification**.  Manager hereby agrees to indemnify, defend, and hold Owner, all persons and companies affiliated with Owner, and all officers, shareholders, directors, employees, and agents of Owner and of any affiliated companies or persons (collectively, the "Indemnified Persons") harmless from any and all costs, expenses, attorneys' fees, suits, liabilities, judgments, damages, and claims in connection with the management of the Property and operations thereon (including the loss of use thereof following any damage, injury, or destruction), arising from any cause or matter whatsoever, including without limitation, any environmental condition or matter caused by Manager's operation of the Property, except to the extent attributable to the willful misconduct or negligence on the part of the Indemnified Persons.

8.    **Assignment**. Manager shall not assign this Agreement, or any portion hereof of the duties hereunder, to any party without the consent of Owner.

9.    **Standard for Property Manager's Responsibility**. Manager agrees that it will perform its obligations hereunder according to industry standards, in good faith, and in a commercially-reasonable manner.

10.    **Estoppel Certificate**.  Each of Owner and Manager agree to execute and deliver to each other, from time to time, within ten (10) business days after the requesting party's request, a statement in writing certifying, to the extent true, that this Agreement is in full force and effect, and to such parties' knowledge there are no uncured defaults (or specifying such defaults if they are claimed) and any such other matters as may be reasonably requested by such requesting party

11.    **Term, Scope**. Subject to the provisions hereof, this Agreement shall have an initial term (such term, as extended or renewed in accordance with the provisions hereof, being called the "Term") commencing on the date hereof (the "Commencement Date") and ending on the later of (i) the last day of the 300th calendar month next following the date hereof, or (ii) the maturity date, repayment, or prepayment of the relevant loan under the applicable Loan Documents (the "Expiration Date"); provided however, the parties shall have the right upon mutual agreement to terminate this Agreement with respect to any individual Property no longer subject to the Loan Documents (for instance due to a significant casualty or condemnation of such Property).

Exhibit 1 to Decl. of James Burton
183
**SER 922**

12. **Headings**. The headings contained herein are for convenience of reference only and are not intended to define, limit, or describe the scope or intent of any provision of this Agreement.

13. **Governing Law**. The validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties shall be governed by the internal laws of the State of Nevada

14. **Notices**. Any notice required or permitted herein shall be in writing and shall be personally delivered or mailed first class postage prepaid or delivered by an overnight delivery service to the respective addresses of the parties set forth above on the first page of this Agreement, or to such other address as any party may give to the other in writing. Any notice required by this Agreement will be deemed to have been given when personally served or one day after delivery to an overnight delivery service or five days after deposit in the first class mail. Any notice to Owner shall be to 207 E Clarendon, Phoenix, AZ 85012. Any notice to Manager shall be c/o U-Haul International, Inc., 2721 North Central Avenue, Phoenix, AZ 85004, Attn: Legal Dept.

15. **Severability**. Should any term or provision hereof be deemed invalid, void, or unenforceable either in its entirety or in a particular application, the remainder of this Agreement shall nonetheless remain in full force and effect and, if the subject term or provision is deemed to be invalid, void or unenforceable only with respect to a particular application, such term or provision shall remain in full force and effect with respect to all other applications.

16. **Successors**. This Agreement shall be binding upon and inure to the benefit of the respective parties hereto and their permitted assigns and successors in interest.

17. **Attorneys' Fees**. In any dispute arising under this Agreement, the prevailing party shall be entitled to recover from the other party all costs including without limitation reasonable attorneys' and experts' fees and costs.

18. **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

---

Exhibit 1 to Decl. of James Burton
184
**SER 923**

IN WITNESS WHEREOF, the undersigned execute this Property Management Agreement as of the date set forth above.

Owner:
Mercury Storage 2, LLC,
a Nevada limited liability company


By: _____
       Stuart M. Shoen, Vice President


Manager:

U-Haul Co. of Alabama, Inc., an Alabama corporation
U-Haul Co. of Arizona, an Arizona corporation
U-Haul Co. of Colorado, a Colorado corporation
U-Haul Co. of Florida, a Florida corporation
U-Haul Co. of Georgia, a Georgia corporation
U-Haul Co. of Minnesota, a Minnesota corporation
U-Haul Co. of Massachusetts and Ohio, Inc., a Massachusetts corporation
U-Haul Co. of Texas, a Texas corporation
U-Haul Co. of Virginia, a Virginia corporation


By: _____
       Wesley Chadwick, Assistant Secretary

Exhibit 1 to Decl. of James Burton
185
**SER 924**

# Exhibit A

### List of Properties

| Center # | Street | City | State | Zip |
|---|---|---|---|---|
| 762077 | 523 Hamric Dr W | Oxford | AL | 36203 |
| 822025 | 20618 North Cave Creek Rd | Phoenix | AZ | 85024 |
| 937024 | 2122 Hwy 69 | Prescott | AZ | 86301 |
| 762025 | 750 South Buckley Road | Aurora | CO | 80017 |
| 786042 | 3939 W Gandy Boulevard | Tampa | FL | 33611 |
| 784052 | 11490 San Jose Boulevard | Jacksonville | FL | 32223 |
| 785027 | 600 South Kirkman Road | Orlando | FL | 32811 |
| 763025 | 7242 Hwy 85 | Riverdale | GA | 30274 |
| 879034 | 1150 Dogwood Dr SE | Conyers | GA | 30012 |
| 726051 | 6895 - 151St Street W | Apple Valley | MN | 55124 |
| 928075 | 3850 Cleveland Avenue | Columbus | OH | 43224 |
| 746044 | 20435 Katy Freeway | Katy | TX | 77450 |
| 756028 | 3501 E Central Tx Expwy | Killeen | TX | 76543 |
| 795048 | 10480 Dumfries Road | Manassas | VA | 20110 |

The Property shall automatically include, without any further action necessary under this Agreement, any After Acquired Adjacent Property and After Acquired Leasehold Property as defined in the Loan Documents.

Exhibit 1 to Decl. of James Burton
186
**SER 925**

## PROPERTY MANAGEMENT AGREEMENT

THIS PROPERTY MANAGEMENT AGREEMENT (this "Agreement") is entered into as of February 14, 2024 by and among **Mercury Storage 3, LLC**, a Nevada limited liability company ("Owner"), and the **subsidiaries of U-Haul International, Inc.** set forth on the signature block hereto (each a "Manager" and collectively "Managers").

### RECITALS

A.   Owner holds the leasehold interest in the real property and all improvements thereon and appurtenances thereto located at the street addresses identified on **Exhibit A** hereto (hereinafter, collectively the "Property").

B.   Owner intends that the Property be rented on a space-by-space retail basis to individuals, business entities, or other entities for use as self-storage and portable storage facilities.

C.   Owner desires that Manager manage the Property and Manager desires to act as the property manager for the Property, all in accordance with the terms and conditions of this Agreement.

D.   The parties agree that this Agreement supersedes and replaces any other property management agreement ("Prior Agreement") between the parties hereto and/or their respective predecessors in interest, as the case may be, with respect to the Property, any such Prior Agreement is hereby terminated as of the date hereof.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto hereby agree as follows.

1.   **Employment.**

   a.   Owner hereby retains Manager, and Manager agrees to act as manager of the Property upon the terms and conditions hereinafter set forth.

   b.   Owner acknowledges that Manager, and/or Manager affiliates, is in the business of managing self-storage and portable-storage facilities and businesses conducted thereat, including, but not limited to, the sale of packing supplies and rental of trucks and equipment, both for its own account and for the account of others.  It is hereby expressly agreed that notwithstanding this Agreement, Manager and such affiliates may continue to engage in such activities, may manage facilities other than those presently managed by Manager and its affiliates (whether or not such other facilities may be in direct or indirect competition with Owner), and may in the future engage in other business which may compete directly or indirectly with activities of Owner.

   c.   In the performance of its duties under this Agreement, Manager shall occupy the position of an independent contractor with respect to Owner.  Nothing contained herein shall be construed as making the parties hereto (or any of them) partners or co-parties to a joint venture, nor construed as making Manager an employee of Owner.

Exhibit 1 to Decl. of James Burton
187
**SER 926**

2.  **Duties and Authority of Manager**. Manager shall have the following duties and authority, subject to the terms and conditions of this Agreement, on behalf of and as agent of the Owner:

a.  <u>General Duties and Authority</u>.  Manager shall have the sole and exclusive duty and authority to fully manage the Property and supervise and direct the business and affairs associated or related to the daily operation thereof, to collect on behalf of Owner all revenues related to the Property, to pay on behalf of Owner all expenses of the Property, and to execute on behalf of Owner such documents and instruments as, in the sole judgment of Manager, are reasonably necessary or advisable under the circumstances in order to fulfill Manager's duties hereunder.  Such duties and authority shall include, without limitation, those set forth below. Notwithstanding the foregoing or any other term or provision herein, upon notice to Manager, Owner shall have the right to assume responsibility for the direct payment of certain expenses of Owner, as may be determined by Owner.  In such event, Owner shall provide an accounting of such costs to Manager.  In the event Owner fails to provide such accounting to Manager, Manager shall assume no liability for nonpayment for such expenses so assumed by Owner. The parties acknowledge and agree that Owner will retain title to, ownership of, and exclusive right to control the Property, subject to the terms of this Agreement, and that portion of the Gross Revenue (as hereinafter defined) owned by Owner ("Owner's Revenue"); and that Manager will not acquire title to, any interest in, or any income or revenues from the Property or Owner's Revenue. For purposes of this Agreement, Owner's Revenue consists of the revenue from portable and self-storage operations (excluding U-Box delivery fees), retail sales, miscellaneous income and the commissions ("U-Move Commissions") paid to Owner pursuant to the terms of that Dealership Contract between Owner and Manager dated as of the date hereof (the "Dealer Contract"), in each case with respect to the Property. In performing its services and making any payments hereunder, Manager will make known to third parties that Manager is acting solely as the agent of Owner. Under no circumstances will Manager represent or hold itself out to any third party as having any title to or property interest in the Property or Owner's Revenue. Manager shall perform all of its obligations under this Agreement in a professional manner consistent with the standards it employs at all of its managed locations.

b.  <u>Renting of the Property</u>.  Manager shall establish policies and procedures for the marketing activities for the Property, and shall advertise the Property through such media as Manager deems advisable. Manager's marketing activities for the Property shall be consistent with the scope and quality implemented by Manager and its affiliates at any other properties operated by Manager or its affiliates.  Manager shall have the sole discretion, which discretion shall be exercised in good faith, to establish the terms and conditions of occupancy by the tenants of the Property, and Manager is hereby authorized to enter into rental agreements on behalf and for the account of Owner with such tenants and to collect rent from such tenants on behalf and for the account of Owner. Manager may jointly advertise the Property with other properties owned or managed by Manager or its affiliates, and in that event, Manager shall reasonably allocate the cost of such advertising among such properties.

c.  <u>Repair, Maintenance, and Improvements</u>. Manager shall make, execute, supervise, and have control over the making and executing of all decisions concerning the acquisition of furniture, fixtures, and supplies for the Property, and may purchase, lease, or otherwise acquire the same and which items shall be owned by Manager. Manager shall make and execute, or supervise and have control over the making and executing, of all decisions concerning the maintenance, repair, and landscaping of the Property, provided, however, that such maintenance, repair, and landscaping shall be consistent with that of other properties operated by Manager or its

Exhibit 1 to Decl. of James Burton
188
**SER 927**

affiliates. Manager shall, on behalf of Owner, negotiate and contract for and supervise the installation of all capital improvements related to the Property; provided, however, that Manager agrees to secure the prior written approval of Owner on all such expenditures in excess of $10,000.00 for any one item, except monthly or recurring operating charges and/or emergency repairs if in the opinion of Manager such emergency repairs are necessary to protect the Property from damage or to maintain services to the Owner or any customers. In the event such emergency repairs exceed $10,000, Manager shall notify Owner and the insurer as applicable of the cost estimate for such work.

d. <u>Personnel</u>. Manager shall select all vendors, suppliers, contractors, subcontractors, and employees with respect to the Property and shall hire, discharge, and supervise all labor and employees required for the operation and maintenance of the Property. Any employees so hired shall be employees of Manager, and shall be carried on the payroll of Manager. Employees may include, but need not be limited to, on-site resident managers, on-site assistant managers, and relief managers located, rendering services, or performing activities on the Property in connection with its operation and management. The cost of employing such persons shall not exceed prevailing rates for comparable persons performing the same or similar services with respect to real estate similar to the Property in the general vicinity of each respective Property. Manager shall be responsible for all legal and insurance requirements relating to its employees.

e. <u>Service Agreements</u>. Manager shall negotiate and execute on behalf of Owner such agreements which Manager deems necessary or advisable for the furnishing of utilities, services, concessions, and supplies, for the maintenance, repair, and operation of the Property and such other agreements which may benefit the Property or be incidental to the matters for which Manager is responsible hereunder.

f. <u>Other Decisions</u>. Manager shall make the decisions in connection with the day-to-day operations of the Property.

g. <u>Regulations and Permits</u>. Manager shall comply in all respects with any statute, ordinance, law, rule, regulation, or order of any governmental or regulatory body pertaining to the Property (collectively, "Laws"), respecting the use of the Property or the maintenance or operation thereof, the non-compliance with which could reasonably be expected to have a material adverse effect on Owner or any Property. Manager shall apply for and obtain and maintain, on behalf of Owner, all licenses and permits required or advisable (in the reasonable judgment of Manager) in connection with the management and operation of the Property. Notwithstanding the foregoing, Manager shall be permitted to contest any Applicable Laws to the extent and pursuant to the same conditions that Owner is permitted to contest any Laws. To the extent that Manager does not comply, Manager will be responsible for the costs and penalties incurred as a result of the non-compliance.

h. <u>Records and Reports of Disbursements and Collections</u>. Manager shall establish, supervise, direct, and maintain the operation of a system of cash record keeping and bookkeeping with respect to all receipts and disbursements and all business activities and operations conducted by Manager in connection with the management and operation of the Property. Manager shall be responsible for cash shortages and discrepancies incurred in the normal course of management operations. The books, records, and accounts shall be maintained at the Manager's office or at Owner's office, or at such other location as Manager and Owner shall determine, and shall be available and open to examination and audit quarterly by Owner, its representatives, its lender, if any ("Lender") or such Lender's representative. Manager shall cause to be prepared and delivered to Owner a monthly statement on a per-Property basis of receipts, expenses, and

Exhibit 1 to Decl. of James Burton
189
**SER 928**

charges, and any other information as reasonably required by Owner to prepare its financial statements, together with a statement on a per-Property basis of the disbursements made by Manager during such period on Owner's behalf, which shall include separate lines for prepaid items and inventory. Manager shall provide Owner with rent rolls and occupancy reports if requested.

i.    <u>Collection</u>.  Manager shall be responsible for the billing and collection of all receipts and for payment of all expenses with respect to the Property and shall be responsible for establishing policies and procedures to minimize the amount of bad debts. Bad debt incurred as a result of non-compliance with management policies and procedures (such as improper verifications or acceptance of bad credit cards or bad checks) will be the responsibility of Manager.

j.    <u>Legal Actions</u>. Manager shall cause to be instituted, on behalf and in its name or in the name of Owner as appropriate, any and all legal actions or proceedings Manager deems necessary or advisable in connection with the Property, including without limitation, to collect charges, rent, or other income due to Owner with respect to the Property and to oust or dispossess tenants where appropriate or other persons unlawfully in possession under any lease, license, concession agreement, or otherwise, and to collect damages for breach thereof or default thereunder by such Owner, licensee, concessionaire, or occupant.

k.    <u>Insurance</u>.  Manager will insure, on its Master Policy, against all liabilities at the Property at Manager's sole cost and expense ("General Liability Insurance"). Any deductibles or self-insured retentions with respect to the General Liability Insurance shall be at Manager's (or Manager's U-Haul affiliates') responsibility and sole cost and expense. Manager will insure equipment at Manager's cost, as determined by Manager. If requested by Owner, Manager will obtain for Owner, at Owner's sole cost and expense, a policy of property insurance ("Property and Casualty Insurance"). Any such Property & Casualty Insurance shall meet Lender's required coverage, to include earthquake, flood, and other Lender requirements, as the case may be, and shall be the cost of Owner.

l.    <u>Taxes</u>.  During the term of this Agreement, Manager shall pay on behalf of Owner, prior to delinquency, real estate taxes, personal property taxes, and other taxes assessed to or levied upon the Property, but only in the event requested by Owner. If requested, Manager will charge to Owner an expense monthly equal to 1/12 of annual real property taxes.

m.    <u>Limitations on Manager Authority</u>. Notwithstanding anything to the contrary set forth in this Section 2, Manager shall not, without obtaining the prior written consent of Owner, (i) rent storage space in the Property by written lease or agreement for a stated term in excess of one year unless such lease or agreement is terminable by the giving of not more than thirty (30) days' written notice, (ii) alter the building or other structures of the Property in violation of loan documents executed by Owner in connection with the Property ("Loan Documents"); (iii) enter on behalf of Owner any other agreements which exceed a term of one year and are not terminable on thirty (30) days' notice at the will of Owner, without penalty, payment, or surcharge; (iv) act in violation of any Law, (v) violate any term or condition of the Loan Documents; (vi) fail to correct any misunderstanding of any third party of which Manager becomes aware as to the separateness of Owner and Manager; or (vii) exercise any authority to act on behalf of Owner, or hold itself out has having such authority, beyond the actual scope of authority granted by Owner.

n.    <u>Shared Expenses</u>. Owner acknowledges that certain economies may be achieved with respect to certain expenses to be incurred by Manager on behalf of Owner hereunder if materials, supplies, insurance, or services are purchased by Manager in quantity for use not only in connection with Owner's business at the Property but in connection with other properties owned or managed by

Exhibit 1 to Decl. of James Burton
190
**SER 929**

Manager or its affiliates. Manager shall have the right to purchase such materials, supplies, insurance (subject to the terms of this Agreement), and/or services in its own name and charge Owner a pro rata allocable share of the cost of the foregoing; provided, however, that the pro rata cost of such purchase to Owner shall not result in expenses that are either inconsistent with the expenses of other "U-Haul branded" locations in the general vicinity of the applicable Property or greater than would otherwise be incurred at competitive prices and terms available in the area where the Property is located; and provided further, Manager shall give Owner access to records (at no cost to Owner) so Owner may review any such expenses incurred.

o.    <u>Deposit of Gross Revenues</u>. All revenue from operations at the Property ("Gross Revenue") shall be deposited daily by Manager into (i) a bank account that has been established for the benefit of Owner (the "Deposit Account") and maintained by Manager (or its parent company); or (ii) a collective bank account (the "Collective Account") maintained by Manager (or its parent company) for the benefit of multiple property owners.  In either case, although the account may be in Owner's name, Owner's right to the proceeds therein only extends to Owner's Revenue.  Within 3 business days after receipt, Manager shall transfer Owner's Revenue in the Deposit Account or Collective Account, as the case may be, to Owner's separately identified depositary account pledged to Lender ("Blocked Account"). To the extent that Gross Revenue is deposited into a Collective Account, Manager (or its parent company) shall on a daily basis reconcile such Collective Account and maintain such records as shall clearly identify the respective interest of each property owner in such account.  Manager shall not, and shall not permit any other property owner or any affiliate of Manager to, borrow, lend, or use Owner's Revenue prior to the deposit of such revenue into the Blocked Account. The payment of Owner's U-Move Commissions shall be governed by the terms of the Dealer Contract. Nothing in this Section shall be construed to limit Owner's access to Owner's Revenue.  All funds shall be deposited and applied as required pursuant to Owner's loan documents with Lender.

p.    <u>Obligations under Loan Documents and other Material Contracts</u>. Manager shall take such actions as are necessary or appropriate under the circumstances to ensure, to the extent Manager is privy to the information, that Owner is in compliance with the terms of the Loan Documents and any other material agreement relating to the Property to which Owner is a party and for which Manager is privy to the information.  Notwithstanding the foregoing, nothing herein contained shall be deemed to obligate Manager to fund from its own resources any payments owed by Owner under the Loan Documents or otherwise deemed to make Manager a direct obligor under the Loan Documents.

q.    <u>Segregation</u>. Owner and Manager shall maintain the Property and Owner's Revenue in such a manner that it is not costly or difficult to segregate, ascertain, or identify Owner's individual assets from those of Manager or any other person.

3.    **Duties of Owner**. Owner shall cooperate with Manager in the performance of Manager's duties under this Agreement and to that end, upon the request of Manager, shall provide, at such rental charges as are deemed appropriate, reasonable office space for Manager employees on the premises of the Property (to the extent available). Owner shall not unreasonably withhold or delay any consent or authorization to Manager required or appropriate under this Agreement. Owner shall provide Manager with copies of all Loan Documents and any amendments thereto.

4.    **Compensation of Manager**.

a.    <u>Reimbursement of Expenses</u>.  Manager shall be entitled to request and receive timely reimbursement for all timely authorized out-of-pocket reasonable and customary expenses ("Expenses") actually incurred by Manager in the discharge of its duties hereunder.  Such

Exhibit 1 to Decl. of James Burton
191
**SER 930**

expense reimbursement shall be due by the last business day of each month, for all expenses billed during such month, unless a written request is received by Manager detailing a legitimate dispute as to a billed amount. Such reimbursement shall be the obligation of Owner, whether or not Owner's Revenues are sufficient to pay such amounts.

    b.    <u>Management Fee</u>. Owner shall pay to Manager as the full amount due for the services herein provided a monthly fee (the "Property Management Fee") which shall be six percent (6%) of the Property's current month Owner's Revenue, as determined on a cash basis. The Property Management Fee payment shall be included with the reimbursement of Expenses pursuant to Section 4(a) above, for the same month. The invoice for the management fees shall be itemized and shall include reasonable detail to explain the expenses incurred. It is further understood and agreed that, except as provided in this Section 4, Manager shall not be entitled to additional compensation of any kind in connection with its performance of its duties under this Agreement.

    c.    <u>Inspection of Books and Records</u>. Owner shall have the right, upon prior reasonable notice to Manager, to inspect Manager's books and records with respect to the Property, to assure that proper fees and charges are assessed hereunder. Manager shall cooperate with any such inspection. Owner shall bear the cost of any such inspection; provided, however, that if it is clearly demonstrated that Manager has overcharged Owner by more than 5% in any given quarter and such overcharge was not caused in whole or part by Owner, the cost of such inspection shall be borne by Manager. Manager shall promptly reimburse Owner for any overpayment.

5.    **Use of Trademarks, Service Marks, and Related Items**. Owner acknowledges the significant value of the "U-Haul" name in the operations of Owner's property, and it is therefore understood and agreed that the name, trademark, and service mark "U-Haul", and related marks, slogans, caricatures, designs, and other trade or service items (the "Manager Trade Marks") shall be utilized for the non-exclusive benefit of Owner in the rental and operation of the Property, and in comparable operations elsewhere. It is further understood and agreed that the Manager Trade Marks shall remain and be at all times the property of Manager or its affiliates, and that, except as expressly provided in this Agreement, Owner shall have no right whatsoever therein. Owner agrees that during the term of this Agreement the sign faces at the property will have the name "U-Haul." Upon termination of this Agreement at any time for any reason, all such use by and for the benefit of Owner of any such Manager Trade Marks in connection with the Property shall be terminated and any signs bearing any of the foregoing shall be removed from view and no longer used by Owner. In addition, upon termination of this Agreement at any time for any reason, Owner shall not enter into any new leases of Property using the Manager lease form or use other forms prepared by Manager. It is understood and agreed that Manager will use and shall be unrestricted in its use of such Manager Trade Marks in the management and operation of other storage facilities both during and after the expiration or termination of the term of this Agreement.

6.    **Default; Termination**.

    a.    Any material failure by Manager or Owner (a "<u>Defaulting Party</u>") to perform its respective duties or obligations hereunder (other than a default by Owner under Section 4 of this Agreement), which material failure is not cured within thirty (30) calendar days after receipt of written notice of such failure from the non-defaulting party, shall constitute an event of default hereunder; provided, however, the foregoing shall not constitute an event of default hereunder in the event the Defaulting Party commences cure of such material failure within such thirty (30) day period and diligently prosecutes the cure of such material failure thereafter but in no event shall such extended cure period exceed ninety (90) days from the date of receipt by the non-defaulting party of written notice of such material default; provided further, however, that in the event such

Exhibit 1 to Decl. of James Burton
192
**SER 931**

material failure constitutes a default under the terms of the Loan Documents and the cure period for such matter under the Loan Documents is shorter than the cure period specified herein, the cure period specified herein shall automatically shorten such that it shall match the cure period for such matter as specified under the Loan Documents. In addition, following notice to Manager of the existence of any such material failure by Manager, Owner shall have the right to cure any such material failure by Manager, and any sums so expended in curing shall be owed by Manager to such curing party and may be offset against any sums owed to Manager under this Agreement.

b. Any material failure by Owner to perform its duties or obligations under Section 4, which material failure is not cured within ten (10) calendar days after receipt of written notice of such failure from Manager, shall constitute an event of default hereunder.

c. Subject to the terms of the Loan Documents, either party hereto shall have the right to terminate this Agreement, with or without cause, by giving not less than ninety (90) days' written notice to the other party hereto, pursuant to Section 14 hereof.

d. Upon termination of this Agreement, (i) Manager shall promptly return to Owner all monies, books, records, and other materials held by Manager for or on behalf of Owner and shall otherwise cooperate with Owner to promote and ensure a smooth transition to the new manager, and (ii) Manager shall be entitled to receive its Property Management Fee and reimbursement of expenses through the effective date of such termination, including the reimbursement of any prepaid expenses for periods beyond the date of termination (such as advertising).

7. **Indemnification**. Manager hereby agrees to indemnify, defend, and hold Owner, all persons and companies affiliated with Owner, and all officers, shareholders, directors, employees, and agents of Owner and of any affiliated companies or persons (collectively, the "Indemnified Persons") harmless from any and all costs, expenses, attorneys' fees, suits, liabilities, judgments, damages, and claims in connection with the management of the Property and operations thereon (including the loss of use thereof following any damage, injury, or destruction), arising from any cause or matter whatsoever, including without limitation, any environmental condition or matter caused by Manager's operation of the Property, except to the extent attributable to the willful misconduct or negligence on the part of the Indemnified Persons.

8. **Assignment**. Manager shall not assign this Agreement, or any portion hereof of the duties hereunder, to any party without the consent of Owner.

9. **Standard for Property Manager's Responsibility**. Manager agrees that it will perform its obligations hereunder according to industry standards, in good faith, and in a commercially-reasonable manner.

10. **Estoppel Certificate**. Each of Owner and Manager agree to execute and deliver to each other, from time to time, within ten (10) business days after the requesting party's request, a statement in writing certifying, to the extent true, that this Agreement is in full force and effect, and to such parties' knowledge there are no uncured defaults (or specifying such defaults if they are claimed) and any such other matters as may be reasonably requested by such requesting party

11. **Term, Scope**. Subject to the provisions hereof, this Agreement shall have an initial term (such term, as extended or renewed in accordance with the provisions hereof, being called the "Term") commencing on the date hereof (the "Commencement Date") and ending on the later of (i) the last day of the 300th calendar month next following the date hereof, or (ii) the maturity date, repayment, or prepayment of the relevant loan under the applicable Loan Documents (the "Expiration Date"); provided however, the parties shall have the right upon mutual agreement to terminate this Agreement with respect to any individual Property no longer subject to the Loan Documents (for instance due to a significant casualty or condemnation of such Property).

Exhibit 1 to Decl. of James Burton
193
**SER 932**

12. **Headings**. The headings contained herein are for convenience of reference only and are not intended to define, limit, or describe the scope or intent of any provision of this Agreement.

13. **Governing Law**. The validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties shall be governed by the internal laws of the State of Nevada

14. **Notices**. Any notice required or permitted herein shall be in writing and shall be personally delivered or mailed first class postage prepaid or delivered by an overnight delivery service to the respective addresses of the parties set forth above on the first page of this Agreement, or to such other address as any party may give to the other in writing. Any notice required by this Agreement will be deemed to have been given when personally served or one day after delivery to an overnight delivery service or five days after deposit in the first class mail. Any notice to Owner shall be to 207 E Clarendon, Phoenix, AZ  85012. Any notice to Manager shall be c/o U-Haul International, Inc., 2721 North Central Avenue, Phoenix, AZ 85004, Attn:  Legal Dept.

15. **Severability**. Should any term or provision hereof be deemed invalid, void, or unenforceable either in its entirety or in a particular application, the remainder of this Agreement shall nonetheless remain in full force and effect and, if the subject term or provision is deemed to be invalid, void or unenforceable only with respect to a particular application, such term or provision shall remain in full force and effect with respect to all other applications.

16. **Successors**. This Agreement shall be binding upon and inure to the benefit of the respective parties hereto and their permitted assigns and successors in interest.

17. **Attorneys' Fees**. In any dispute arising under this Agreement, the prevailing party shall be entitled to recover from the other party all costs including without limitation reasonable attorneys' and experts' fees and costs.

18. **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

---

Exhibit 1 to Decl. of James Burton
194
**SER 933**

IN WITNESS WHEREOF, the undersigned execute this Property Management Agreement as of the date set forth above.

Owner:
Mercury Storage 3, LLC,
a Nevada limited liability company


By: _____
     Stuart M. Shoen, Vice President


Manager:

U-Haul Co. of Arizona, an Arizona corporation
U-Haul Co. of Colorado, a Colorado corporation
U-Haul Co. of Florida, a Florida corporation
U-Haul Co. of Georgia, a Georgia corporation
U-Haul Co. of Illinois, Inc., an Illinois corporation
U-Haul Co. of Louisiana, a Louisiana corporation
U-Haul Company of Missouri, a Missouri corporation
U-Haul Co. of Nevada, Inc., a Nevada corporation
U-Haul Co. of Tennessee, a Tennessee corporation
U-Haul Co. of Texas, a Texas corporation
U-Haul Co. of Virginia, a Virginia corporation


By: _____
     Wesley Chadwick, Assistant Secretary

Exhibit 1 to Decl. of James Burton
195
**SER 934**

# Exhibit A
### List of Properties

| Center # | Street | City | State | Zip |
|---|---|---|---|---|
| 822083 | 9264 Technology Drive | Fountain Hills | AZ | 85268 |
| 858047 | 8746 West Bell | Peoria | AZ | 85382 |
| 862036 | 15250 East 40Th Ave | Denver | CO | 80239 |
| 956038 | 13301 S Orng Blsm Trl | Orlando | FL | 32837 |
| 863026 | 1290 Pleasant Hill Road | Lawrenceville | GA | 30244 |
| 739050 | 4504 W Northwest Hwy | Crystal Lake | IL | 60014 |
| 856031 | 195 S Route 59 | Aurora | IL | 60504 |
| 743057 | 4100 Barksdale Boulevard #108 | Bossier City | LA | 71112 |
| 875051 | 3990 N Service Road | Saint Peters | MO | 63301 |
| 838068 | 2450 North Rainbow Boulevard | Las Vegas | NV | 89108 |
| 938057 | 1691 Mallory Ln (1691 Moores Ct) | Brentwood | TN | 37027 |
| 733027 | 1501 North Dallas Parkway | Plano | TX | 75903 |
| 745043 | 351 Gulf Freeway South | League City | TX | 77573 |
| 946051 | 8207 Terminal Road | Lorton | VA | 22079 |

The Property shall automatically include, without any further action necessary under this Agreement, any After Acquired Adjacent Property and After Acquired Leasehold Property as defined in the Loan Documents.

Exhibit 1 to Decl. of James Burton
196

<u>PROPERTY MANAGEMENT AGREEMENT</u>

THIS PROPERTY MANAGEMENT AGREEMENT (this "<u>Agreement</u>") is entered into as of February 16, 2024 by and among **Mercury Storage 4, LLC**, a Nevada limited liability company ("<u>Owner</u>"), and the **subsidiaries of U-Haul International, Inc.** set forth on the signature block hereto (each a "<u>Manager</u>" and collectively "<u>Managers</u>").

<u>RECITALS</u>

A.   Owner holds the leasehold interest in the real property and all improvements thereon and appurtenances thereto located at the street addresses identified on **<u>Exhibit A</u>** hereto (hereinafter, collectively the "Property").

B.   Owner intends that the Property be rented on a space-by-space retail basis to individuals, business entities, or other entities for use as self-storage and portable storage facilities.

C.   Owner desires that Manager manage the Property and Manager desires to act as the property manager for the Property, all in accordance with the terms and conditions of this Agreement.

D.   The parties agree that this Agreement supersedes and replaces any other property management agreement ("Prior Agreement") between the parties hereto and/or their respective predecessors in interest, as the case may be, with respect to the Property, any such Prior Agreement is hereby terminated as of the date hereof.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto hereby agree as follows.

1.   **<u>Employment.</u>**

a.   Owner hereby retains Manager, and Manager agrees to act as manager of the Property upon the terms and conditions hereinafter set forth.

b.   Owner acknowledges that Manager, and/or Manager affiliates, is in the business of managing self-storage and portable-storage facilities and businesses conducted thereat, including, but not limited to, the sale of packing supplies and rental of trucks and equipment, both for its own account and for the account of others.  It is hereby expressly agreed that notwithstanding this Agreement, Manager and such affiliates may continue to engage in such activities, may manage facilities other than those presently managed by Manager and its affiliates (whether or not such other facilities may be in direct or indirect competition with Owner), and may in the future engage in other business which may compete directly or indirectly with activities of Owner.

c.   In the performance of its duties under this Agreement, Manager shall occupy the position of an independent contractor with respect to Owner.  Nothing contained herein shall be construed as making the parties hereto (or any of them) partners or co-parties to a joint venture, nor construed as making Manager an employee of Owner.

Exhibit 1 to Decl. of James Burton
197

**SER 936**

2.   **Duties and Authority of Manager**. Manager shall have the following duties and authority, subject to the terms and conditions of this Agreement, on behalf of and as agent of the Owner:

a.   <u>General Duties and Authority</u>.  Manager shall have the sole and exclusive duty and authority to fully manage the Property and supervise and direct the business and affairs associated or related to the daily operation thereof, to collect on behalf of Owner all revenues related to the Property, to pay on behalf of Owner all expenses of the Property, and to execute on behalf of Owner such documents and instruments as, in the sole judgment of Manager, are reasonably necessary or advisable under the circumstances in order to fulfill Manager's duties hereunder.  Such duties and authority shall include, without limitation, those set forth below. Notwithstanding the foregoing or any other term or provision herein, upon notice to Manager, Owner shall have the right to assume responsibility for the direct payment of certain expenses of Owner, as may be determined by Owner.  In such event, Owner shall provide an accounting of such costs to Manager.  In the event Owner fails to provide such accounting to Manager, Manager shall assume no liability for nonpayment for such expenses so assumed by Owner. The parties acknowledge and agree that Owner will retain title to, ownership of, and exclusive right to control the Property, subject to the terms of this Agreement, and that portion of the Gross Revenue (as hereinafter defined) owned by Owner ("Owner's Revenue"); and that Manager will not acquire title to, any interest in, or any income or revenues from the Property or Owner's Revenue. For purposes of this Agreement, Owner's Revenue consists of the revenue from portable and self-storage operations (excluding U-Box delivery fees), retail sales, miscellaneous income and the commissions ("U-Move Commissions") paid to Owner pursuant to the terms of that Dealership Contract between Owner and Manager dated as of the date hereof (the "Dealer Contract"), in each case with respect to the Property. In performing its services and making any payments hereunder, Manager will make known to third parties that Manager is acting solely as the agent of Owner.  Under no circumstances will Manager represent or hold itself out to any third party as having any title to or property interest in the Property or Owner's Revenue. Manager shall perform all of its obligations under this Agreement in a professional manner consistent with the standards it employs at all of its managed locations.

b.   <u>Renting of the Property</u>.  Manager shall establish policies and procedures for the marketing activities for the Property, and shall advertise the Property through such media as Manager deems advisable. Manager's marketing activities for the Property shall be consistent with the scope and quality implemented by Manager and its affiliates at any other properties operated by Manager or its affiliates.  Manager shall have the sole discretion, which discretion shall be exercised in good faith, to establish the terms and conditions of occupancy by the tenants of the Property, and Manager is hereby authorized to enter into rental agreements on behalf and for the account of Owner with such tenants and to collect rent from such tenants on behalf and for the account of Owner. Manager may jointly advertise the Property with other properties owned or managed by Manager or its affiliates, and in that event, Manager shall reasonably allocate the cost of such advertising among such properties.

c.   <u>Repair, Maintenance, and Improvements</u>. Manager shall make, execute, supervise, and have control over the making and executing of all decisions concerning the acquisition of furniture, fixtures, and supplies for the Property, and may purchase, lease, or otherwise acquire the same and which items shall be owned by Manager. Manager shall make and execute, or supervise and have control over the making and executing, of all decisions concerning the maintenance, repair, and landscaping of the Property, provided, however, that such maintenance, repair, and landscaping shall be consistent with that of other properties operated by Manager or its

Exhibit 1 to Decl. of James Burton
198
**SER 937**

affiliates.  Manager shall, on behalf of Owner, negotiate and contract for and supervise the installation of all capital improvements related to the Property; provided, however, that Manager agrees to secure the prior written approval of Owner on all such expenditures in excess of $10,000.00 for any one item, except monthly or recurring operating charges and/or emergency repairs if in the opinion of Manager such emergency repairs are necessary to protect the Property from damage or to maintain services to the Owner or any customers.  In the event such emergency repairs exceed $10,000, Manager shall notify Owner and the insurer as applicable of the cost estimate for such work.

d. <u>Personnel</u>. Manager shall select all vendors, suppliers, contractors, subcontractors, and employees with respect to the Property and shall hire, discharge, and supervise all labor and employees required for the operation and maintenance of the Property.  Any employees so hired shall be employees of Manager, and shall be carried on the payroll of Manager. Employees may include, but need not be limited to, on-site resident managers, on-site assistant managers, and relief managers located, rendering services, or performing activities on the Property in connection with its operation and management.  The cost of employing such persons shall not exceed prevailing rates for comparable persons performing the same or similar services with respect to real estate similar to the Property in the general vicinity of each respective Property. Manager shall be responsible for all legal and insurance requirements relating to its employees.

e. <u>Service Agreements</u>.  Manager shall negotiate and execute on behalf of Owner such agreements which Manager deems necessary or advisable for the furnishing of utilities, services, concessions, and supplies, for the maintenance, repair, and operation of the Property and such other agreements which may benefit the Property or be incidental to the matters for which Manager is responsible hereunder.

f. <u>Other Decisions</u>.  Manager shall make the decisions in connection with the day-to-day operations of the Property.

g. <u>Regulations and Permits</u>. Manager shall comply in all respects with any statute, ordinance, law, rule, regulation, or order of any governmental or regulatory body pertaining to the Property (collectively, "Laws"), respecting the use of the Property or the maintenance or operation thereof, the non-compliance with which could reasonably be expected to have a material adverse effect on Owner or any Property. Manager shall apply for and obtain and maintain, on behalf of Owner, all licenses and permits required or advisable (in the reasonable judgment of Manager) in connection with the management and operation of the Property. Notwithstanding the foregoing, Manager shall be permitted to contest any Applicable Laws to the extent and pursuant to the same conditions that Owner is permitted to contest any Laws. To the extent that Manager does not comply, Manager will be responsible for the costs and penalties incurred as a result of the non-compliance.

h. <u>Records and Reports of Disbursements and Collections</u>. Manager shall establish, supervise, direct, and maintain the operation of a system of cash record keeping and bookkeeping with respect to all receipts and disbursements and all business activities and operations conducted by Manager in connection with the management and operation of the Property. Manager shall be responsible for cash shortages and discrepancies incurred in the normal course of management operations. The books, records, and accounts shall be maintained at the Manager's office or at Owner's office, or at such other location as Manager and Owner shall determine, and shall be available and open to examination and audit quarterly by Owner, its representatives, its lender, if any ("Lender") or such Lender's representative.  Manager shall cause to be prepared and delivered to Owner a monthly statement on a per-Property basis of receipts, expenses, and

Exhibit 1 to Decl. of James Burton
199
**SER 938**

charges, and any other information as reasonably required by Owner to prepare its financial statements, together with a statement on a per-Property basis of the disbursements made by Manager during such period on Owner's behalf, which shall include separate lines for prepaid items and inventory. Manager shall provide Owner with rent rolls and occupancy reports if requested.

i.    <u>Collection</u>.  Manager shall be responsible for the billing and collection of all receipts and for payment of all expenses with respect to the Property and shall be responsible for establishing policies and procedures to minimize the amount of bad debts. Bad debt incurred as a result of non-compliance with management policies and procedures (such as improper verifications or acceptance of bad credit cards or bad checks) will be the responsibility of Manager.

j.    <u>Legal Actions</u>. Manager shall cause to be instituted, on behalf and in its name or in the name of Owner as appropriate, any and all legal actions or proceedings Manager deems necessary or advisable in connection with the Property, including without limitation, to collect charges, rent, or other income due to Owner with respect to the Property and to oust or dispossess tenants where appropriate or other persons unlawfully in possession under any lease, license, concession agreement, or otherwise, and to collect damages for breach thereof or default thereunder by such Owner, licensee, concessionaire, or occupant.

k.    <u>Insurance</u>.  Manager will insure, on its Master Policy, against all liabilities at the Property at Manager's sole cost and expense ("General Liability Insurance"). Any deductibles or self-insured retentions with respect to the General Liability Insurance shall be at Manager's (or Manager's U-Haul affiliates') responsibility and sole cost and expense. Manager will insure equipment at Manager's cost, as determined by Manager. If requested by Owner, Manager will obtain for Owner, at Owner's sole cost and expense, a policy of property insurance ("Property and Casualty Insurance"). Any such Property & Casualty Insurance shall meet Lender's required coverage, to include earthquake, flood, and other Lender requirements, as the case may be, and shall be the cost of Owner.

l.    <u>Taxes</u>.  During the term of this Agreement, Manager shall pay on behalf of Owner, prior to delinquency, real estate taxes, personal property taxes, and other taxes assessed to or levied upon the Property, but only in the event requested by Owner. If requested, Manager will charge to Owner an expense monthly equal to 1/12 of annual real property taxes.

m.    <u>Limitations on Manager Authority</u>. Notwithstanding anything to the contrary set forth in this Section 2, Manager shall not, without obtaining the prior written consent of Owner, (i) rent storage space in the Property by written lease or agreement for a stated term in excess of one year unless such lease or agreement is terminable by the giving of not more than thirty (30) days' written notice, (ii) alter the building or other structures of the Property in violation of loan documents executed by Owner in connection with the Property ("Loan Documents"); (iii) enter on behalf of Owner any other agreements which exceed a term of one year and are not terminable on thirty (30) days' notice at the will of Owner, without penalty, payment, or surcharge; (iv) act in violation of any Law, (v) violate any term or condition of the Loan Documents; (vi) fail to correct any misunderstanding of any third party of which Manager becomes aware as to the separateness of Owner and Manager; or (vii) exercise any authority to act on behalf of Owner, or hold itself out has having such authority, beyond the actual scope of authority granted by Owner.

n.    <u>Shared Expenses</u>. Owner acknowledges that certain economies may be achieved with respect to certain expenses to be incurred by Manager on behalf of Owner hereunder if materials, supplies, insurance, or services are purchased by Manager in quantity for use not only in connection with Owner's business at the Property but in connection with other properties owned or managed by

Exhibit 1 to Decl. of James Burton
200
**SER 939**

Manager or its affiliates. Manager shall have the right to purchase such materials, supplies, insurance (subject to the terms of this Agreement), and/or services in its own name and charge Owner a pro rata allocable share of the cost of the foregoing; provided, however, that the pro rata cost of such purchase to Owner shall not result in expenses that are either inconsistent with the expenses of other "U-Haul branded" locations in the general vicinity of the applicable Property or greater than would otherwise be incurred at competitive prices and terms available in the area where the Property is located; and provided further, Manager shall give Owner access to records (at no cost to Owner) so Owner may review any such expenses incurred.

o.  Deposit of Gross Revenues. All revenue from operations at the Property ("Gross Revenue") shall be deposited daily by Manager into (i) a bank account that has been established for the benefit of Owner (the "Deposit Account") and maintained by Manager (or its parent company); or (ii) a collective bank account (the "Collective Account") maintained by Manager (or its parent company) for the benefit of multiple property owners.  In either case, although the account may be in Owner's name, Owner's right to the proceeds therein only extends to Owner's Revenue.  Within 3 business days after receipt, Manager shall transfer Owner's Revenue in the Deposit Account or Collective Account, as the case may be, to Owner's separately identified depositary account pledged to Lender ("Blocked Account"). To the extent that Gross Revenue is deposited into a Collective Account, Manager (or its parent company) shall on a daily basis reconcile such Collective Account and maintain such records as shall clearly identify the respective interest of each property owner in such account.  Manager shall not, and shall not permit any other property owner or any affiliate of Manager to, borrow, lend, or use Owner's Revenue prior to the deposit of such revenue into the Blocked Account. The payment of Owner's U-Move Commissions shall be governed by the terms of the Dealer Contract. Nothing in this Section shall be construed to limit Owner's access to Owner's Revenue.  All funds shall be deposited and applied as required pursuant to Owner's loan documents with Lender.

p.  Obligations under Loan Documents and other Material Contracts. Manager shall take such actions as are necessary or appropriate under the circumstances to ensure, to the extent Manager is privy to the information, that Owner is in compliance with the terms of the Loan Documents and any other material agreement relating to the Property to which Owner is a party and for which Manager is privy to the information.  Notwithstanding the foregoing, nothing herein contained shall be deemed to obligate Manager to fund from its own resources any payments owed by Owner under the Loan Documents or otherwise deemed to make Manager a direct obligor under the Loan Documents.

q.  Segregation. Owner and Manager shall maintain the Property and Owner's Revenue in such a manner that it is not costly or difficult to segregate, ascertain, or identify Owner's individual assets from those of Manager or any other person.

3.  **Duties of Owner**. Owner shall cooperate with Manager in the performance of Manager's duties under this Agreement and to that end, upon the request of Manager, shall provide, at such rental charges as are deemed appropriate, reasonable office space for Manager employees on the premises of the Property (to the extent available). Owner shall not unreasonably withhold or delay any consent or authorization to Manager required or appropriate under this Agreement. Owner shall provide Manager with copies of all Loan Documents and any amendments thereto.

4.  **Compensation of Manager**.

a.  Reimbursement of Expenses.  Manager shall be entitled to request and receive timely reimbursement for all timely authorized out-of-pocket reasonable and customary expenses ("Expenses") actually incurred by Manager in the discharge of its duties hereunder.  Such

Exhibit 1 to Decl. of James Burton
201
**SER 940**

expense reimbursement shall be due by the last business day of each month, for all expenses billed during such month, unless a written request is received by Manager detailing a legitimate dispute as to a billed amount.  Such reimbursement shall be the obligation of Owner, whether or not Owner's Revenues are sufficient to pay such amounts.

    b.    <u>Management Fee</u>.  Owner shall pay to Manager as the full amount due for the services herein provided a monthly fee (the "Property Management Fee") which shall be six percent (6%) of the Property's current month Owner's Revenue, as determined on a cash basis.  The Property Management Fee payment shall be included with the reimbursement of Expenses pursuant to Section 4(a) above, for the same month.  The invoice for the management fees shall be itemized and shall include reasonable detail to explain the expenses incurred. It is further understood and agreed that, except as provided in this Section 4, Manager shall not be entitled to additional compensation of any kind in connection with its performance of its duties under this Agreement.

    c.    <u>Inspection of Books and Records</u>.  Owner shall have the right, upon prior reasonable notice to Manager, to inspect Manager's books and records with respect to the Property, to assure that proper fees and charges are assessed hereunder. Manager shall cooperate with any such inspection.  Owner shall bear the cost of any such inspection; provided, however, that if it is clearly demonstrated that Manager has overcharged Owner by more than 5% in any given quarter and such overcharge was not caused in whole or part by Owner, the cost of such inspection shall be borne by Manager. Manager shall promptly reimburse Owner for any overpayment.

5.    **Use of Trademarks, Service Marks, and Related Items**. Owner acknowledges the significant value of the "U-Haul" name in the operations of Owner's property, and it is therefore understood and agreed that the name, trademark, and service mark "U-Haul", and related marks, slogans, caricatures, designs, and other trade or service items (the "Manager Trade Marks") shall be utilized for the non-exclusive benefit of Owner in the rental and operation of the Property, and in comparable operations elsewhere.  It is further understood and agreed that the Manager Trade Marks shall remain and be at all times the property of Manager or its affiliates, and that, except as expressly provided in this Agreement, Owner shall have no right whatsoever therein.  Owner agrees that during the term of this Agreement the sign faces at the property will have the name "U-Haul." Upon termination of this Agreement at any time for any reason, all such use by and for the benefit of Owner of any such Manager Trade Marks in connection with the Property shall be terminated and any signs bearing any of the foregoing shall be removed from view and no longer used by Owner.  In addition, upon termination of this Agreement at any time for any reason, Owner shall not enter into any new leases of Property using the Manager lease form or use other forms prepared by Manager.  It is understood and agreed that Manager will use and shall be unrestricted in its use of such Manager Trade Marks in the management and operation of other storage facilities both during and after the expiration or termination of the term of this Agreement.

6.    **Default; Termination.**

    a.    Any material failure by Manager or Owner (a "<u>Defaulting Party</u>") to perform its respective duties or obligations hereunder (other than a default by Owner under Section 4 of this Agreement), which material failure is not cured within thirty (30) calendar days after receipt of written notice of such failure from the non-defaulting party, shall constitute an event of default hereunder; provided, however, the foregoing shall not constitute an event of default hereunder in the event the Defaulting Party commences cure of such material failure within such thirty (30) day period and diligently prosecutes the cure of such material failure thereafter but in no event shall such extended cure period exceed ninety (90) days from the date of receipt by the non-defaulting party of written notice of such material default; provided further, however, that in the event such

Exhibit 1 to Decl. of James Burton
202
**SER 941**

material failure constitutes a default under the terms of the Loan Documents and the cure period for such matter under the Loan Documents is shorter than the cure period specified herein, the cure period specified herein shall automatically shorten such that it shall match the cure period for such matter as specified under the Loan Documents. In addition, following notice to Manager of the existence of any such material failure by Manager, Owner shall have the right to cure any such material failure by Manager, and any sums so expended in curing shall be owed by Manager to such curing party and may be offset against any sums owed to Manager under this Agreement.

b.    Any material failure by Owner to perform its duties or obligations under Section 4, which material failure is not cured within ten (10) calendar days after receipt of written notice of such failure from Manager, shall constitute an event of default hereunder.

c.    Subject to the terms of the Loan Documents, either party hereto shall have the right to terminate this Agreement, with or without cause, by giving not less than ninety (90) days' written notice to the other party hereto, pursuant to Section 14 hereof.

d.    Upon termination of this Agreement, (i) Manager shall promptly return to Owner all monies, books, records, and other materials held by Manager for or on behalf of Owner and shall otherwise cooperate with Owner to promote and ensure a smooth transition to the new manager, and (ii) Manager shall be entitled to receive its Property Management Fee and reimbursement of expenses through the effective date of such termination, including the reimbursement of any prepaid expenses for periods beyond the date of termination (such as advertising).

7.    **Indemnification**. Manager hereby agrees to indemnify, defend, and hold Owner, all persons and companies affiliated with Owner, and all officers, shareholders, directors, employees, and agents of Owner and of any affiliated companies or persons (collectively, the "Indemnified Persons") harmless from any and all costs, expenses, attorneys' fees, suits, liabilities, judgments, damages, and claims in connection with the management of the Property and operations thereon (including the loss of use thereof following any damage, injury, or destruction), arising from any cause or matter whatsoever, including without limitation, any environmental condition or matter caused by Manager's operation of the Property, except to the extent attributable to the willful misconduct or negligence on the part of the Indemnified Persons.

8.    **Assignment**. Manager shall not assign this Agreement, or any portion hereof of the duties hereunder, to any party without the consent of Owner.

9.    **Standard for Property Manager's Responsibility**. Manager agrees that it will perform its obligations hereunder according to industry standards, in good faith, and in a commercially-reasonable manner.

10.    **Estoppel Certificate**. Each of Owner and Manager agree to execute and deliver to each other, from time to time, within ten (10) business days after the requesting party's request, a statement in writing certifying, to the extent true, that this Agreement is in full force and effect, and to such parties' knowledge there are no uncured defaults (or specifying such defaults if they are claimed) and any such other matters as may be reasonably requested by such requesting party

11.    **Term, Scope**. Subject to the provisions hereof, this Agreement shall have an initial term (such term, as extended or renewed in accordance with the provisions hereof, being called the "Term") commencing on the date hereof (the "Commencement Date") and ending on the later of (i) the last day of the 300th calendar month next following the date hereof, or (ii) the maturity date, repayment, or prepayment of the relevant loan under the applicable Loan Documents (the "Expiration Date"); provided however, the parties shall have the right upon mutual agreement to terminate this Agreement with respect to any individual Property no longer subject to the Loan Documents (for instance due to a significant casualty or condemnation of such Property).

Exhibit 1 to Decl. of James Burton
203
**SER 942**

12. **Headings**. The headings contained herein are for convenience of reference only and are not intended to define, limit, or describe the scope or intent of any provision of this Agreement.

13. **Governing Law**. The validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties shall be governed by the internal laws of the State of Nevada

14. **Notices**. Any notice required or permitted herein shall be in writing and shall be personally delivered or mailed first class postage prepaid or delivered by an overnight delivery service to the respective addresses of the parties set forth above on the first page of this Agreement, or to such other address as any party may give to the other in writing. Any notice required by this Agreement will be deemed to have been given when personally served or one day after delivery to an overnight delivery service or five days after deposit in the first class mail. Any notice to Owner shall be to 207 E Clarendon, Phoenix, AZ 85012. Any notice to Manager shall be c/o U-Haul International, Inc., 2721 North Central Avenue, Phoenix, AZ 85004, Attn: Legal Dept.

15. **Severability**. Should any term or provision hereof be deemed invalid, void, or unenforceable either in its entirety or in a particular application, the remainder of this Agreement shall nonetheless remain in full force and effect and, if the subject term or provision is deemed to be invalid, void or unenforceable only with respect to a particular application, such term or provision shall remain in full force and effect with respect to all other applications.

16. **Successors**. This Agreement shall be binding upon and inure to the benefit of the respective parties hereto and their permitted assigns and successors in interest.

17. **Attorneys' Fees**. In any dispute arising under this Agreement, the prevailing party shall be entitled to recover from the other party all costs including without limitation reasonable attorneys' and experts' fees and costs.

18. **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

---

Exhibit 1 to Decl. of James Burton
204
**SER 943**

IN WITNESS WHEREOF, the undersigned execute this Property Management Agreement as of the date set forth above.

<u>Owner</u>:
Mercury Storage 4, LLC,
a Nevada limited liability company


By: _____
    Stuart M. Shoen, Vice President



<u>Manager:</u>

U-Haul Co. of Arizona, an Arizona corporation
U-Haul Co. of Florida, a Florida corporation
U-Haul Co. of Illinois, Inc., an Illinois corporation
U-Haul Co. of Maryland, Inc., a Maryland corporation
U-Haul Company of Missouri, a Missouri corporation
U-Haul Co. of Mississippi, a Mississippi corporation
U-Haul Co. of Texas, a Texas corporation



By: _____
    Wesley Chadwick, Assistant Secretary

Exhibit 1 to Decl. of James Burton
205

# Exhibit A

**List of Properties**

| Center # | Street | City | State | Zip |
|---|---|---|---|---|
| 858044 | 13440 West Bell Road | Surprise | AZ | 85374 |
| 858027 | 13511 W Westgate Dr | Surprise | AZ | 85378 |
| 787069 | 103530 Overseas Highway | Key Largo | FL | 33037 |
| 757026 | 11855 South Cicero Ave | Alsip | IL | 60803 |
| 856053 | 11238 S Rte 59 | Naperville | IL | 60564 |
| 818034 | 8671 Central Avenue | Capitol Heights | MD | 20743 |
| 875054 | 2000 Highway K | O Fallon | MO | 63366 |
| 748034 | 1303 West 7Th Street | Hattiesburg | MS | 39401 |
| 737023 | 9001 S Ih35 Northbound | Austin | TX | 78744 |
| 836088 | 2729 North Collins Street | Arlington | TX | 76006 |
| 859041 | 525 North Stimmons Freeway | Lewisville | TX | 75067 |

The Property shall automatically include, without any further action necessary under this Agreement, any After Acquired Adjacent Property and After Acquired Leasehold Property as defined in the Loan Documents.

Exhibit 1 to Decl. of James Burton

206

**SER 945**

<u>PROPERTY MANAGEMENT AGREEMENT</u>

THIS PROPERTY MANAGEMENT AGREEMENT (this "<u>Agreement</u>") is entered into as of February 15, 2024 by and among **Mercury Storage 5, LLC**, a Nevada limited liability company ("<u>Owner</u>"), and the **subsidiaries of U-Haul International, Inc.** set forth on the signature block hereto (each a "<u>Manager</u>" and collectively "<u>Managers</u>").

<u>RECITALS</u>

A.   Owner owns the real property and all improvements thereon and appurtenances thereto located at the street addresses identified on **Exhibit A** hereto (hereinafter, collectively the "Property").

B.   Owner intends that the Property be rented on a space-by-space retail basis to individuals, business entities, or other entities for use as self-storage and portable storage facilities.

C.   Owner desires that Manager manage the Property and Manager desires to act as the property manager for the Property, all in accordance with the terms and conditions of this Agreement.

D.   The parties agree that this Agreement supersedes and replaces any other property management agreement ("Prior Agreement") between the parties hereto and/or their respective predecessors in interest, as the case may be, with respect to the Property, any such Prior Agreement is hereby terminated as of the date hereof.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto hereby agree as follows.

1.   **Employment.**

a.   Owner hereby retains Manager, and Manager agrees to act as manager of the Property upon the terms and conditions hereinafter set forth.

b.   Owner acknowledges that Manager, and/or Manager affiliates, is in the business of managing self-storage and portable-storage facilities and businesses conducted thereat, including, but not limited to, the sale of packing supplies and rental of trucks and equipment, both for its own account and for the account of others.  It is hereby expressly agreed that notwithstanding this Agreement, Manager and such affiliates may continue to engage in such activities, may manage facilities other than those presently managed by Manager and its affiliates (whether or not such other facilities may be in direct or indirect competition with Owner), and may in the future engage in other business which may compete directly or indirectly with activities of Owner.

c.   In the performance of its duties under this Agreement, Manager shall occupy the position of an independent contractor with respect to Owner.  Nothing contained herein shall be construed as making the parties hereto (or any of them) partners or co-parties to a joint venture, nor construed as making Manager an employee of Owner.

Exhibit 1 to Decl. of James Burton
207
**SER 946**

2. **Duties and Authority of Manager**. Manager shall have the following duties and authority, subject to the terms and conditions of this Agreement, on behalf of and as agent of the Owner:

a. <u>General Duties and Authority</u>. Manager shall have the sole and exclusive duty and authority to fully manage the Property and supervise and direct the business and affairs associated or related to the daily operation thereof, to collect on behalf of Owner all revenues related to the Property, to pay on behalf of Owner all expenses of the Property, and to execute on behalf of Owner such documents and instruments as, in the sole judgment of Manager, are reasonably necessary or advisable under the circumstances in order to fulfill Manager's duties hereunder. Such duties and authority shall include, without limitation, those set forth below. Notwithstanding the foregoing or any other term or provision herein, upon notice to Manager, Owner shall have the right to assume responsibility for the direct payment of certain expenses of Owner, as may be determined by Owner. In such event, Owner shall provide an accounting of such costs to Manager. In the event Owner fails to provide such accounting to Manager, Manager shall assume no liability for nonpayment for such expenses so assumed by Owner. The parties acknowledge and agree that Owner will retain title to, ownership of, and exclusive right to control the Property, subject to the terms of this Agreement, and that portion of the Gross Revenue (as hereinafter defined) owned by Owner ("Owner's Revenue"); and that Manager will not acquire title to, any interest in, or any income or revenues from the Property or Owner's Revenue. For purposes of this Agreement, Owner's Revenue consists of the revenue from portable and self-storage operations (excluding U-Box delivery fees), retail sales, miscellaneous income and the commissions ("U-Move Commissions") paid to Owner pursuant to the terms of that Dealership Contract between Owner and Manager dated as of the date hereof (the "Dealer Contract"), in each case with respect to the Property. In performing its services and making any payments hereunder, Manager will make known to third parties that Manager is acting solely as the agent of Owner. Under no circumstances will Manager represent or hold itself out to any third party as having any title to or property interest in the Property or Owner's Revenue. Manager shall perform all of its obligations under this Agreement in a professional manner consistent with the standards it employs at all of its managed locations.

b. <u>Renting of the Property</u>. Manager shall establish policies and procedures for the marketing activities for the Property, and shall advertise the Property through such media as Manager deems advisable. Manager's marketing activities for the Property shall be consistent with the scope and quality implemented by Manager and its affiliates at any other properties operated by Manager or its affiliates. Manager shall have the sole discretion, which discretion shall be exercised in good faith, to establish the terms and conditions of occupancy by the tenants of the Property, and Manager is hereby authorized to enter into rental agreements on behalf and for the account of Owner with such tenants and to collect rent from such tenants on behalf and for the account of Owner. Manager may jointly advertise the Property with other properties owned or managed by Manager or its affiliates, and in that event, Manager shall reasonably allocate the cost of such advertising among such properties.

c. <u>Repair, Maintenance, and Improvements</u>. Manager shall make, execute, supervise, and have control over the making and executing of all decisions concerning the acquisition of furniture, fixtures, and supplies for the Property, and may purchase, lease, or otherwise acquire the same and which items shall be owned by Manager. Manager shall make and execute, or supervise and have control over the making and executing, of all decisions concerning the maintenance, repair, and landscaping of the Property, provided, however, that such maintenance, repair, and landscaping shall be consistent with that of other properties operated by Manager or its

Exhibit 1 to Decl. of James Burton
208
**SER 947**

affiliates. Manager shall, on behalf of Owner, negotiate and contract for and supervise the installation of all capital improvements related to the Property; provided, however, that Manager agrees to secure the prior written approval of Owner on all such expenditures in excess of $10,000.00 for any one item, except monthly or recurring operating charges and/or emergency repairs if in the opinion of Manager such emergency repairs are necessary to protect the Property from damage or to maintain services to the Owner or any customers. In the event such emergency repairs exceed $10,000, Manager shall notify Owner and the insurer as applicable of the cost estimate for such work.

d. <u>Personnel</u>. Manager shall select all vendors, suppliers, contractors, subcontractors, and employees with respect to the Property and shall hire, discharge, and supervise all labor and employees required for the operation and maintenance of the Property. Any employees so hired shall be employees of Manager, and shall be carried on the payroll of Manager. Employees may include, but need not be limited to, on-site resident managers, on-site assistant managers, and relief managers located, rendering services, or performing activities on the Property in connection with its operation and management. The cost of employing such persons shall not exceed prevailing rates for comparable persons performing the same or similar services with respect to real estate similar to the Property in the general vicinity of each respective Property. Manager shall be responsible for all legal and insurance requirements relating to its employees.

e. <u>Service Agreements</u>. Manager shall negotiate and execute on behalf of Owner such agreements which Manager deems necessary or advisable for the furnishing of utilities, services, concessions, and supplies, for the maintenance, repair, and operation of the Property and such other agreements which may benefit the Property or be incidental to the matters for which Manager is responsible hereunder.

f. <u>Other Decisions</u>. Manager shall make the decisions in connection with the day-to-day operations of the Property.

g. <u>Regulations and Permits</u>. Manager shall comply in all respects with any statute, ordinance, law, rule, regulation, or order of any governmental or regulatory body pertaining to the Property (collectively, "Laws"), respecting the use of the Property or the maintenance or operation thereof, the non-compliance with which could reasonably be expected to have a material adverse effect on Owner or any Property. Manager shall apply for and obtain and maintain, on behalf of Owner, all licenses and permits required or advisable (in the reasonable judgment of Manager) in connection with the management and operation of the Property. Notwithstanding the foregoing, Manager shall be permitted to contest any Applicable Laws to the extent and pursuant to the same conditions that Owner is permitted to contest any Laws. To the extent that Manager does not comply, Manager will be responsible for the costs and penalties incurred as a result of the non-compliance.

h. <u>Records and Reports of Disbursements and Collections</u>. Manager shall establish, supervise, direct, and maintain the operation of a system of cash record keeping and bookkeeping with respect to all receipts and disbursements and all business activities and operations conducted by Manager in connection with the management and operation of the Property. Manager shall be responsible for cash shortages and discrepancies incurred in the normal course of management operations. The books, records, and accounts shall be maintained at the Manager's office or at Owner's office, or at such other location as Manager and Owner shall determine, and shall be available and open to examination and audit quarterly by Owner, its representatives, its lender, if any ("Lender") or such Lender's representative. Manager shall cause to be prepared and delivered to Owner a monthly statement on a per-Property basis of receipts, expenses, and

Exhibit 1 to Decl. of James Burton
209
**SER 948**

charges, and any other information as reasonably required by Owner to prepare its financial statements, together with a statement on a per-Property basis of the disbursements made by Manager during such period on Owner's behalf, which shall include separate lines for prepaid items and inventory. Manager shall provide Owner with rent rolls and occupancy reports if requested.

i.    <u>Collection</u>.  Manager shall be responsible for the billing and collection of all receipts and for payment of all expenses with respect to the Property and shall be responsible for establishing policies and procedures to minimize the amount of bad debts. Bad debt incurred as a result of non-compliance with management policies and procedures (such as improper verifications or acceptance of bad credit cards or bad checks) will be the responsibility of Manager.

j.    <u>Legal Actions</u>. Manager shall cause to be instituted, on behalf and in its name or in the name of Owner as appropriate, any and all legal actions or proceedings Manager deems necessary or advisable in connection with the Property, including without limitation, to collect charges, rent, or other income due to Owner with respect to the Property and to oust or dispossess tenants where appropriate or other persons unlawfully in possession under any lease, license, concession agreement, or otherwise, and to collect damages for breach thereof or default thereunder by such Owner, licensee, concessionaire, or occupant.

k.    <u>Insurance</u>.  Manager will insure, on its Master Policy, against all liabilities at the Property at Manager's sole cost and expense ("General Liability Insurance"). Any deductibles or self-insured retentions with respect to the General Liability Insurance shall be at Manager's (or Manager's U-Haul affiliates') responsibility and sole cost and expense. Manager will insure equipment at Manager's cost, as determined by Manager. If requested by Owner, Manager will obtain for Owner, at Owner's sole cost and expense, a policy of property insurance ("Property and Casualty Insurance"). Any such Property & Casualty Insurance shall meet Lender's required coverage, to include earthquake, flood, and other Lender requirements, as the case may be, and shall be the cost of Owner.

l.    <u>Taxes</u>.  During the term of this Agreement, Manager shall pay on behalf of Owner, prior to delinquency, real estate taxes, personal property taxes, and other taxes assessed to or levied upon the Property, but only in the event requested by Owner. If requested, Manager will charge to Owner an expense monthly equal to 1/12 of annual real property taxes.

m.    <u>Limitations on Manager Authority</u>. Notwithstanding anything to the contrary set forth in this Section 2, Manager shall not, without obtaining the prior written consent of Owner, (i) rent storage space in the Property by written lease or agreement for a stated term in excess of one year unless such lease or agreement is terminable by the giving of not more than thirty (30) days' written notice, (ii) alter the building or other structures of the Property in violation of loan documents executed by Owner in connection with the Property ("Loan Documents"); (iii) enter on behalf of Owner any other agreements which exceed a term of one year and are not terminable on thirty (30) days' notice at the will of Owner, without penalty, payment, or surcharge; (iv) act in violation of any Law, (v) violate any term or condition of the Loan Documents; (vi) fail to correct any misunderstanding of any third party of which Manager becomes aware as to the separateness of Owner and Manager; or (vii) exercise any authority to act on behalf of Owner, or hold itself out has having such authority, beyond the actual scope of authority granted by Owner.

n.    <u>Shared Expenses</u>. Owner acknowledges that certain economies may be achieved with respect to certain expenses to be incurred by Manager on behalf of Owner hereunder if materials, supplies, insurance, or services are purchased by Manager in quantity for use not only in connection with Owner's business at the Property but in connection with other properties owned or managed by

Exhibit 1 to Decl. of James Burton
210
**SER 949**

Manager or its affiliates. Manager shall have the right to purchase such materials, supplies, insurance (subject to the terms of this Agreement), and/or services in its own name and charge Owner a pro rata allocable share of the cost of the foregoing; provided, however, that the pro rata cost of such purchase to Owner shall not result in expenses that are either inconsistent with the expenses of other "U-Haul branded" locations in the general vicinity of the applicable Property or greater than would otherwise be incurred at competitive prices and terms available in the area where the Property is located; and provided further, Manager shall give Owner access to records (at no cost to Owner) so Owner may review any such expenses incurred.

o.   <u>Deposit of Gross Revenues</u>. All revenue from operations at the Property ("Gross Revenue") shall be deposited daily by Manager into (i) a bank account that has been established for the benefit of Owner (the "Deposit Account") and maintained by Manager (or its parent company); or (ii) a collective bank account (the "Collective Account") maintained by Manager (or its parent company) for the benefit of multiple property owners. In either case, although the account may be in Owner's name, Owner's right to the proceeds therein only extends to Owner's Revenue. Within 3 business days after receipt, Manager shall transfer Owner's Revenue in the Deposit Account or Collective Account, as the case may be, to Owner's separately identified depositary account pledged to Lender ("Blocked Account"). To the extent that Gross Revenue is deposited into a Collective Account, Manager (or its parent company) shall on a daily basis reconcile such Collective Account and maintain such records as shall clearly identify the respective interest of each property owner in such account. Manager shall not, and shall not permit any other property owner or any affiliate of Manager to, borrow, lend, or use Owner's Revenue prior to the deposit of such revenue into the Blocked Account. The payment of Owner's U-Move Commissions shall be governed by the terms of the Dealer Contract. Nothing in this Section shall be construed to limit Owner's access to Owner's Revenue. All funds shall be deposited and applied as required pursuant to Owner's loan documents with Lender.

p.   <u>Obligations under Loan Documents and other Material Contracts</u>. Manager shall take such actions as are necessary or appropriate under the circumstances to ensure, to the extent Manager is privy to the information, that Owner is in compliance with the terms of the Loan Documents and any other material agreement relating to the Property to which Owner is a party and for which Manager is privy to the information. Notwithstanding the foregoing, nothing herein contained shall be deemed to obligate Manager to fund from its own resources any payments owed by Owner under the Loan Documents or otherwise deemed to make Manager a direct obligor under the Loan Documents.

q.   <u>Segregation</u>. Owner and Manager shall maintain the Property and Owner's Revenue in such a manner that it is not costly or difficult to segregate, ascertain, or identify Owner's individual assets from those of Manager or any other person.

3.   **Duties of Owner**. Owner shall cooperate with Manager in the performance of Manager's duties under this Agreement and to that end, upon the request of Manager, shall provide, at such rental charges as are deemed appropriate, reasonable office space for Manager employees on the premises of the Property (to the extent available). Owner shall not unreasonably withhold or delay any consent or authorization to Manager required or appropriate under this Agreement. Owner shall provide Manager with copies of all Loan Documents and any amendments thereto.

4.   **Compensation of Manager**.

a.   <u>Reimbursement of Expenses</u>.  Manager shall be entitled to request and receive timely reimbursement for all timely authorized out-of-pocket reasonable and customary expenses ("Expenses") actually incurred by Manager in the discharge of its duties hereunder.  Such

Exhibit 1 to Decl. of James Burton
211
**SER 950**

expense reimbursement shall be due by the last business day of each month, for all expenses billed during such month, unless a written request is received by Manager detailing a legitimate dispute as to a billed amount. Such reimbursement shall be the obligation of Owner, whether or not Owner's Revenues are sufficient to pay such amounts.

b.    <u>Management Fee</u>.  Owner shall pay to Manager as the full amount due for the services herein provided a monthly fee (the "Property Management Fee") which shall be six percent (6%) of the Property's current month Owner's Revenue, as determined on a cash basis.  The Property Management Fee payment shall be included with the reimbursement of Expenses pursuant to Section 4(a) above, for the same month.  The invoice for the management fees shall be itemized and shall include reasonable detail to explain the expenses incurred. It is further understood and agreed that, except as provided in this Section 4, Manager shall not be entitled to additional compensation of any kind in connection with its performance of its duties under this Agreement.

c.    <u>Inspection of Books and Records</u>.  Owner shall have the right, upon prior reasonable notice to Manager, to inspect Manager's books and records with respect to the Property, to assure that proper fees and charges are assessed hereunder. Manager shall cooperate with any such inspection.  Owner shall bear the cost of any such inspection; provided, however, that if it is clearly demonstrated that Manager has overcharged Owner by more than 5% in any given quarter and such overcharge was not caused in whole or part by Owner, the cost of such inspection shall be borne by Manager. Manager shall promptly reimburse Owner for any overpayment.

5.    **Use of Trademarks, Service Marks, and Related Items**. Owner acknowledges the significant value of the "U-Haul" name in the operations of Owner's property, and it is therefore understood and agreed that the name, trademark, and service mark "U-Haul", and related marks, slogans, caricatures, designs, and other trade or service items (the "Manager Trade Marks") shall be utilized for the non-exclusive benefit of Owner in the rental and operation of the Property, and in comparable operations elsewhere.  It is further understood and agreed that the Manager Trade Marks shall remain and be at all times the property of Manager or its affiliates, and that, except as expressly provided in this Agreement, Owner shall have no right whatsoever therein.  Owner agrees that during the term of this Agreement the sign faces at the property will have the name "U-Haul." Upon termination of this Agreement at any time for any reason, all such use by and for the benefit of Owner of any such Manager Trade Marks in connection with the Property shall be terminated and any signs bearing any of the foregoing shall be removed from view and no longer used by Owner.  In addition, upon termination of this Agreement at any time for any reason, Owner shall not enter into any new leases of Property using the Manager lease form or use other forms prepared by Manager.  It is understood and agreed that Manager will use and shall be unrestricted in its use of such Manager Trade Marks in the management and operation of other storage facilities both during and after the expiration or termination of the term of this Agreement.

Exhibit 1 to Decl. of James Burton
212
**SER 951**

6. **Default; Termination**.

    a.    Any material failure by Manager or Owner (a "<u>Defaulting Party</u>") to perform its respective duties or obligations hereunder (other than a default by Owner under Section 4 of this Agreement), which material failure is not cured within thirty (30) calendar days after receipt of written notice of such failure from the non-defaulting party, shall constitute an event of default hereunder; provided, however, the foregoing shall not constitute an event of default hereunder in the event the Defaulting Party commences cure of such material failure within such thirty (30) day period and diligently prosecutes the cure of such material failure thereafter but in no event shall such extended cure period exceed ninety (90) days from the date of receipt by the non-defaulting party of written notice of such material default; provided further, however, that in the event such material failure constitutes a default under the terms of the Loan Documents and the cure period for such matter under the Loan Documents is shorter than the cure period specified herein, the cure period specified herein shall automatically shorten such that it shall match the cure period for such matter as specified under the Loan Documents. In addition, following notice to Manager of the existence of any such material failure by Manager, Owner shall have the right to cure any such material failure by Manager, and any sums so expended in curing shall be owed by Manager to such curing party and may be offset against any sums owed to Manager under this Agreement.

    b.    Any material failure by Owner to perform its duties or obligations under Section 4, which material failure is not cured within ten (10) calendar days after receipt of written notice of such failure from Manager, shall constitute an event of default hereunder.

    c.    Subject to the terms of the Loan Documents, either party hereto shall have the right to terminate this Agreement, with or without cause, by giving not less than ninety (90) days' written notice to the other party hereto, pursuant to Section 14 hereof.

    d.    Upon termination of this Agreement, (i) Manager shall promptly return to Owner all monies, books, records, and other materials held by Manager for or on behalf of Owner and shall otherwise cooperate with Owner to promote and ensure a smooth transition to the new manager, and (ii) Manager shall be entitled to receive its Property Management Fee and reimbursement of expenses through the effective date of such termination, including the reimbursement of any prepaid expenses for periods beyond the date of termination (such as advertising).

7. **Indemnification**. Manager hereby agrees to indemnify, defend, and hold Owner, all persons and companies affiliated with Owner, and all officers, shareholders, directors, employees, and agents of Owner and of any affiliated companies or persons (collectively, the "Indemnified Persons") harmless from any and all costs, expenses, attorneys' fees, suits, liabilities, judgments, damages, and claims in connection with the management of the Property and operations thereon (including the loss of use thereof following any damage, injury, or destruction), arising from any cause or matter whatsoever, including without limitation, any environmental condition or matter caused by Manager's operation of the Property, except to the extent attributable to the willful misconduct or negligence on the part of the Indemnified Persons.

8. **Assignment**. Manager shall not assign this Agreement, or any portion hereof of the duties hereunder, to any party without the consent of Owner.

9. **Standard for Property Manager's Responsibility**. Manager agrees that it will perform its obligations hereunder according to industry standards, in good faith, and in a commercially-reasonable manner.

10. **Estoppel Certificate**. Each of Owner and Manager agree to execute and deliver to each other, from time to time, within ten (10) business days after the requesting party's request, a statement in writing certifying, to the extent true, that this Agreement is in full force and effect, and to such parties'

Exhibit 1 to Decl. of James Burton

213

**SER 952**

knowledge there are no uncured defaults (or specifying such defaults if they are claimed) and any such other matters as may be reasonably requested by such requesting party

11. **Term, Scope**. Subject to the provisions hereof, this Agreement shall have an initial term (such term, as extended or renewed in accordance with the provisions hereof, being called the "Term") commencing on the date hereof (the "Commencement Date") and ending on the later of (i) the last day of the 300th calendar month next following the date hereof, or (ii) the maturity date, repayment, or prepayment of the relevant loan under the applicable Loan Documents (the "Expiration Date"); provided however, the parties shall have the right upon mutual agreement to terminate this Agreement with respect to any individual Property no longer subject to the Loan Documents (for instance due to a significant casualty or condemnation of such Property).

12. **Headings**. The headings contained herein are for convenience of reference only and are not intended to define, limit, or describe the scope or intent of any provision of this Agreement.

13. **Governing Law**. The validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties shall be governed by the internal laws of the State of Nevada

14. **Notices**. Any notice required or permitted herein shall be in writing and shall be personally delivered or mailed first class postage prepaid or delivered by an overnight delivery service to the respective addresses of the parties set forth above on the first page of this Agreement, or to such other address as any party may give to the other in writing. Any notice required by this Agreement will be deemed to have been given when personally served or one day after delivery to an overnight delivery service or five days after deposit in the first class mail. Any notice to Owner shall be to 207 E Clarendon, Phoenix, AZ 85012. Any notice to Manager shall be c/o U-Haul International, Inc., 2721 North Central Avenue, Phoenix, AZ 85004, Attn: Legal Dept.

15. **Severability**. Should any term or provision hereof be deemed invalid, void, or unenforceable either in its entirety or in a particular application, the remainder of this Agreement shall nonetheless remain in full force and effect and, if the subject term or provision is deemed to be invalid, void or unenforceable only with respect to a particular application, such term or provision shall remain in full force and effect with respect to all other applications.

16. **Successors**. This Agreement shall be binding upon and inure to the benefit of the respective parties hereto and their permitted assigns and successors in interest.

17. **Attorneys' Fees**. In any dispute arising under this Agreement, the prevailing party shall be entitled to recover from the other party all costs including without limitation reasonable attorneys' and experts' fees and costs.

18. **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Exhibit 1 to Decl. of James Burton
214
**SER 953**

IN WITNESS WHEREOF, the undersigned execute this Property Management Agreement as of the date set forth above.

Owner:
Mercury Storage 5, LLC,
a Nevada limited liability company


By: _____
    Stuart M. Shoen, Vice President



Manager:

U-Haul Co. of Arizona, an Arizona corporation
U-Haul Co. of Florida, a Florida corporation
U-Haul Co. of Nevada, Inc., a Nevada corporation
U-Haul Co. of Texas, a Texas corporation


By: _____
    Wesley Chadwick, Assistant Secretary

---

Exhibit 1 to Decl. of James Burton
215
**SER 954**

# Exhibit A

### List of Properties

| Center # | Street | City | State | Zip |
|---|---|---|---|---|
| 858045 | 42301 N 41St Dr | Anthem | AZ | 85086 |
| 858034 | 42102 N Vision Way | Anthem | AZ | 85086 |
| 858084 | 42202 N Vision Way | Anthem | AZ | 85086 |
| 858075 | 4114-4124 W. Fortune Drive | Anthem | AZ | 85086 |
| 830071 | 4457 Kernel Circle | Fort Myers | FL | 33916 |
| 830079 | 4340 Kernel Circle | Fort Myers | FL | 33916 |
| 838023 | 160 West Craig Road | North Las Vegas | NV | 89032 |
| 876024 | 8450 Montana | El Paso | TX | 79925 |
| 835056 | 1245 South Beckley | De Soto | TX | 75115 |
| 836026 | 1101 E Loop 820 | Fort Worth | TX | 76120 |

The Property shall automatically include, without any further action necessary under this Agreement, any After Acquired Adjacent Property and After Acquired Leasehold Property as defined in the Loan Documents.

Exhibit 1 to Decl. of James Burton
216
**SER 955**

## PROPERTY MANAGEMENT AGREEMENT

THIS PROPERTY MANAGEMENT AGREEMENT (this "Agreement") is entered into as of February 15, 2024 by and among **Mercury Storage 6, LLC**, a Nevada limited liability company ("Owner"), and the **subsidiaries of U-Haul International, Inc.** set forth on the signature block hereto (each a "Manager" and collectively "Managers").

RECITALS

A.   Owner owns the real property and all improvements thereon and appurtenances thereto located at the street addresses identified on **Exhibit A** hereto (hereinafter, collectively the "Property").

B.   Owner intends that the Property be rented on a space-by-space retail basis to individuals, business entities, or other entities for use as self-storage and portable storage facilities.

C.   Owner desires that Manager manage the Property and Manager desires to act as the property manager for the Property, all in accordance with the terms and conditions of this Agreement.

D.   The parties agree that this Agreement supersedes and replaces any other property management agreement ("Prior Agreement") between the parties hereto and/or their respective predecessors in interest, as the case may be, with respect to the Property, any such Prior Agreement is hereby terminated as of the date hereof.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto hereby agree as follows.

1.   **Employment.**

    a.   Owner hereby retains Manager, and Manager agrees to act as manager of the Property upon the terms and conditions hereinafter set forth.

    b.   Owner acknowledges that Manager, and/or Manager affiliates, is in the business of managing self-storage and portable-storage facilities and businesses conducted thereat, including, but not limited to, the sale of packing supplies and rental of trucks and equipment, both for its own account and for the account of others.  It is hereby expressly agreed that notwithstanding this Agreement, Manager and such affiliates may continue to engage in such activities, may manage facilities other than those presently managed by Manager and its affiliates (whether or not such other facilities may be in direct or indirect competition with Owner), and may in the future engage in other business which may compete directly or indirectly with activities of Owner.

    c.   In the performance of its duties under this Agreement, Manager shall occupy the position of an independent contractor with respect to Owner.  Nothing contained herein shall be construed as making the parties hereto (or any of them) partners or co-parties to a joint venture, nor construed as making Manager an employee of Owner.

Exhibit 1 to Decl. of James Burton
217
**SER 956**

2.    **Duties and Authority of Manager**. Manager shall have the following duties and authority, subject to the terms and conditions of this Agreement, on behalf of and as agent of the Owner:

a.    <u>General Duties and Authority</u>.  Manager shall have the sole and exclusive duty and authority to fully manage the Property and supervise and direct the business and affairs associated or related to the daily operation thereof, to collect on behalf of Owner all revenues related to the Property, to pay on behalf of Owner all expenses of the Property, and to execute on behalf of Owner such documents and instruments as, in the sole judgment of Manager, are reasonably necessary or advisable under the circumstances in order to fulfill Manager's duties hereunder.  Such duties and authority shall include, without limitation, those set forth below. Notwithstanding the foregoing or any other term or provision herein, upon notice to Manager, Owner shall have the right to assume responsibility for the direct payment of certain expenses of Owner, as may be determined by Owner.  In such event, Owner shall provide an accounting of such costs to Manager.  In the event Owner fails to provide such accounting to Manager, Manager shall assume no liability for nonpayment for such expenses so assumed by Owner. The parties acknowledge and agree that Owner will retain title to, ownership of, and exclusive right to control the Property, subject to the terms of this Agreement, and that portion of the Gross Revenue (as hereinafter defined) owned by Owner ("Owner's Revenue"); and that Manager will not acquire title to, any interest in, or any income or revenues from the Property or Owner's Revenue. For purposes of this Agreement, Owner's Revenue consists of the revenue from portable and self-storage operations (excluding U-Box delivery fees), retail sales, miscellaneous income and the commissions ("U-Move Commissions") paid to Owner pursuant to the terms of that Dealership Contract between Owner and Manager dated as of the date hereof (the "Dealer Contract"), in each case with respect to the Property. In performing its services and making any payments hereunder, Manager will make known to third parties that Manager is acting solely as the agent of Owner. Under no circumstances will Manager represent or hold itself out to any third party as having any title to or property interest in the Property or Owner's Revenue. Manager shall perform all of its obligations under this Agreement in a professional manner consistent with the standards it employs at all of its managed locations.

b.    <u>Renting of the Property</u>.  Manager shall establish policies and procedures for the marketing activities for the Property, and shall advertise the Property through such media as Manager deems advisable. Manager's marketing activities for the Property shall be consistent with the scope and quality implemented by Manager and its affiliates at any other properties operated by Manager or its affiliates.  Manager shall have the sole discretion, which discretion shall be exercised in good faith, to establish the terms and conditions of occupancy by the tenants of the Property, and Manager is hereby authorized to enter into rental agreements on behalf and for the account of Owner with such tenants and to collect rent from such tenants on behalf and for the account of Owner. Manager may jointly advertise the Property with other properties owned or managed by Manager or its affiliates, and in that event, Manager shall reasonably allocate the cost of such advertising among such properties.

c.    <u>Repair, Maintenance, and Improvements</u>. Manager shall make, execute, supervise, and have control over the making and executing of all decisions concerning the acquisition of furniture, fixtures, and supplies for the Property, and may purchase, lease, or otherwise acquire the same and which items shall be owned by Manager. Manager shall make and execute, or supervise and have control over the making and executing, of all decisions concerning the maintenance, repair, and landscaping of the Property, provided, however, that such maintenance, repair, and landscaping shall be consistent with that of other properties operated by Manager or its

Exhibit 1 to Decl. of James Burton
218
**SER 957**

affiliates.  Manager shall, on behalf of Owner, negotiate and contract for and supervise the installation of all capital improvements related to the Property; provided, however, that Manager agrees to secure the prior written approval of Owner on all such expenditures in excess of $10,000.00 for any one item, except monthly or recurring operating charges and/or emergency repairs if in the opinion of Manager such emergency repairs are necessary to protect the Property from damage or to maintain services to the Owner or any customers.  In the event such emergency repairs exceed $10,000, Manager shall notify Owner and the insurer as applicable of the cost estimate for such work.

d.   <u>Personnel</u>. Manager shall select all vendors, suppliers, contractors, subcontractors, and employees with respect to the Property and shall hire, discharge, and supervise all labor and employees required for the operation and maintenance of the Property.  Any employees so hired shall be employees of Manager, and shall be carried on the payroll of Manager. Employees may include, but need not be limited to, on-site resident managers, on-site assistant managers, and relief managers located, rendering services, or performing activities on the Property in connection with its operation and management.  The cost of employing such persons shall not exceed prevailing rates for comparable persons performing the same or similar services with respect to real estate similar to the Property in the general vicinity of each respective Property. Manager shall be responsible for all legal and insurance requirements relating to its employees.

e.   <u>Service Agreements</u>.  Manager shall negotiate and execute on behalf of Owner such agreements which Manager deems necessary or advisable for the furnishing of utilities, services, concessions, and supplies, for the maintenance, repair, and operation of the Property and such other agreements which may benefit the Property or be incidental to the matters for which Manager is responsible hereunder.

f.   <u>Other Decisions</u>.  Manager shall make the decisions in connection with the day-to-day operations of the Property.

g.   <u>Regulations and Permits</u>. Manager shall comply in all respects with any statute, ordinance, law, rule, regulation, or order of any governmental or regulatory body pertaining to the Property (collectively, "Laws"), respecting the use of the Property or the maintenance or operation thereof, the non-compliance with which could reasonably be expected to have a material adverse effect on Owner or any Property. Manager shall apply for and obtain and maintain, on behalf of Owner, all licenses and permits required or advisable (in the reasonable judgment of Manager) in connection with the management and operation of the Property. Notwithstanding the foregoing, Manager shall be permitted to contest any Applicable Laws to the extent and pursuant to the same conditions that Owner is permitted to contest any Laws. To the extent that Manager does not comply, Manager will be responsible for the costs and penalties incurred as a result of the non-compliance.

h.   <u>Records and Reports of Disbursements and Collections</u>. Manager shall establish, supervise, direct, and maintain the operation of a system of cash record keeping and bookkeeping with respect to all receipts and disbursements and all business activities and operations conducted by Manager in connection with the management and operation of the Property. Manager shall be responsible for cash shortages and discrepancies incurred in the normal course of management operations. The books, records, and accounts shall be maintained at the Manager's office or at Owner's office, or at such other location as Manager and Owner shall determine, and shall be available and open to examination and audit quarterly by Owner, its representatives, its lender, if any ("Lender") or such Lender's representative.  Manager shall cause to be prepared and delivered to Owner a monthly statement on a per-Property basis of receipts, expenses, and

Exhibit 1 to Decl. of James Burton
219
**SER 958**

charges, and any other information as reasonably required by Owner to prepare its financial statements, together with a statement on a per-Property basis of the disbursements made by Manager during such period on Owner's behalf, which shall include separate lines for prepaid items and inventory. Manager shall provide Owner with rent rolls and occupancy reports if requested.

i.     <u>Collection</u>.   Manager shall be responsible for the billing and collection of all receipts and for payment of all expenses with respect to the Property and shall be responsible for establishing policies and procedures to minimize the amount of bad debts. Bad debt incurred as a result of non-compliance with management policies and procedures (such as improper verifications or acceptance of bad credit cards or bad checks) will be the responsibility of Manager.

j.     <u>Legal Actions</u>. Manager shall cause to be instituted, on behalf and in its name or in the name of Owner as appropriate, any and all legal actions or proceedings Manager deems necessary or advisable in connection with the Property, including without limitation, to collect charges, rent, or other income due to Owner with respect to the Property and to oust or dispossess tenants where appropriate or other persons unlawfully in possession under any lease, license, concession agreement, or otherwise, and to collect damages for breach thereof or default thereunder by such Owner, licensee, concessionaire, or occupant.

k.     <u>Insurance</u>.   Manager will insure, on its Master Policy, against all liabilities at the Property at Manager's sole cost and expense ("General Liability Insurance"). Any deductibles or self-insured retentions with respect to the General Liability Insurance shall be at Manager's (or Manager's U-Haul affiliates') responsibility and sole cost and expense. Manager will insure equipment at Manager's cost, as determined by Manager. If requested by Owner, Manager will obtain for Owner, at Owner's sole cost and expense, a policy of property insurance ("Property and Casualty Insurance"). Any such Property & Casualty Insurance shall meet Lender's required coverage, to include earthquake, flood, and other Lender requirements, as the case may be, and shall be the cost of Owner.

l.     <u>Taxes</u>.   During the term of this Agreement, Manager shall pay on behalf of Owner, prior to delinquency, real estate taxes, personal property taxes, and other taxes assessed to or levied upon the Property, but only in the event requested by Owner. If requested, Manager will charge to Owner an expense monthly equal to 1/12 of annual real property taxes.

m.     <u>Limitations on Manager Authority</u>. Notwithstanding anything to the contrary set forth in this Section 2, Manager shall not, without obtaining the prior written consent of Owner, (i) rent storage space in the Property by written lease or agreement for a stated term in excess of one year unless such lease or agreement is terminable by the giving of not more than thirty (30) days' written notice, (ii) alter the building or other structures of the Property in violation of loan documents executed by Owner in connection with the Property ("Loan Documents"); (iii) enter on behalf of Owner any other agreements which exceed a term of one year and are not terminable on thirty (30) days' notice at the will of Owner, without penalty, payment, or surcharge; (iv) act in violation of any Law, (v) violate any term or condition of the Loan Documents; (vi) fail to correct any misunderstanding of any third party of which Manager becomes aware as to the separateness of Owner and Manager; or (vii) exercise any authority to act on behalf of Owner, or hold itself out has having such authority, beyond the actual scope of authority granted by Owner.

n.     <u>Shared Expenses</u>. Owner acknowledges that certain economies may be achieved with respect to certain expenses to be incurred by Manager on behalf of Owner hereunder if materials, supplies, insurance, or services are purchased by Manager in quantity for use not only in connection with Owner's business at the Property but in connection with other properties owned or managed by

Exhibit 1 to Decl. of James Burton
220
**SER 959**

Manager or its affiliates. Manager shall have the right to purchase such materials, supplies, insurance (subject to the terms of this Agreement), and/or services in its own name and charge Owner a pro rata allocable share of the cost of the foregoing; provided, however, that the pro rata cost of such purchase to Owner shall not result in expenses that are either inconsistent with the expenses of other "U-Haul branded" locations in the general vicinity of the applicable Property or greater than would otherwise be incurred at competitive prices and terms available in the area where the Property is located; and provided further, Manager shall give Owner access to records (at no cost to Owner) so Owner may review any such expenses incurred.

o.   Deposit of Gross Revenues. All revenue from operations at the Property ("Gross Revenue") shall be deposited daily by Manager into (i) a bank account that has been established for the benefit of Owner (the "Deposit Account") and maintained by Manager (or its parent company); or (ii) a collective bank account (the "Collective Account") maintained by Manager (or its parent company) for the benefit of multiple property owners.  In either case, although the account may be in Owner's name, Owner's right to the proceeds therein only extends to Owner's Revenue.  Within 3 business days after receipt, Manager shall transfer Owner's Revenue in the Deposit Account or Collective Account, as the case may be, to Owner's separately identified depositary account pledged to Lender ("Blocked Account"). To the extent that Gross Revenue is deposited into a Collective Account, Manager (or its parent company) shall on a daily basis reconcile such Collective Account and maintain such records as shall clearly identify the respective interest of each property owner in such account.  Manager shall not, and shall not permit any other property owner or any affiliate of Manager to, borrow, lend, or use Owner's Revenue prior to the deposit of such revenue into the Blocked Account. The payment of Owner's U-Move Commissions shall be governed by the terms of the Dealer Contract. Nothing in this Section shall be construed to limit Owner's access to Owner's Revenue.  All funds shall be deposited and applied as required pursuant to Owner's loan documents with Lender.

p.   Obligations under Loan Documents and other Material Contracts. Manager shall take such actions as are necessary or appropriate under the circumstances to ensure, to the extent Manager is privy to the information, that Owner is in compliance with the terms of the Loan Documents and any other material agreement relating to the Property to which Owner is a party and for which Manager is privy to the information.  Notwithstanding the foregoing, nothing herein contained shall be deemed to obligate Manager to fund from its own resources any payments owed by Owner under the Loan Documents or otherwise be deemed to make Manager a direct obligor under the Loan Documents.

q.   Segregation. Owner and Manager shall maintain the Property and Owner's Revenue in such a manner that it is not costly or difficult to segregate, ascertain, or identify Owner's individual assets from those of Manager or any other person.

3.   **Duties of Owner**. Owner shall cooperate with Manager in the performance of Manager's duties under this Agreement and to that end, upon the request of Manager, shall provide, at such rental charges as are deemed appropriate, reasonable office space for Manager employees on the premises of the Property (to the extent available). Owner shall not unreasonably withhold or delay any consent or authorization to Manager required or appropriate under this Agreement. Owner shall provide Manager with copies of all Loan Documents and any amendments thereto.

4.   **Compensation of Manager**.

a.   Reimbursement of Expenses.  Manager shall be entitled to request and receive timely reimbursement for all timely authorized out-of-pocket reasonable and customary expenses ("Expenses") actually incurred by Manager in the discharge of its duties hereunder.  Such

Exhibit 1 to Decl. of James Burton
221
**SER 960**

expense reimbursement shall be due by the last business day of each month, for all expenses billed during such month, unless a written request is received by Manager detailing a legitimate dispute as to a billed amount. Such reimbursement shall be the obligation of Owner, whether or not Owner's Revenues are sufficient to pay such amounts.

b.      <u>Management Fee</u>. Owner shall pay to Manager as the full amount due for the services herein provided a monthly fee (the "Property Management Fee") which shall be six percent (6%) of the Property's current month Owner's Revenue, as determined on a cash basis. The Property Management Fee payment shall be included with the reimbursement of Expenses pursuant to Section 4(a) above, for the same month. The invoice for the management fees shall be itemized and shall include reasonable detail to explain the expenses incurred. It is further understood and agreed that, except as provided in this Section 4, Manager shall not be entitled to additional compensation of any kind in connection with its performance of its duties under this Agreement.

c.      <u>Inspection of Books and Records</u>. Owner shall have the right, upon prior reasonable notice to Manager, to inspect Manager's books and records with respect to the Property, to assure that proper fees and charges are assessed hereunder. Manager shall cooperate with any such inspection. Owner shall bear the cost of any such inspection; provided, however, that if it is clearly demonstrated that Manager has overcharged Owner by more than 5% in any given quarter and such overcharge was not caused in whole or part by Owner, the cost of such inspection shall be borne by Manager. Manager shall promptly reimburse Owner for any overpayment.

5.      **Use of Trademarks, Service Marks, and Related Items**. Owner acknowledges the significant value of the "U-Haul" name in the operations of Owner's property, and it is therefore understood and agreed that the name, trademark, and service mark "U-Haul", and related marks, slogans, caricatures, designs, and other trade or service items (the "Manager Trade Marks") shall be utilized for the non-exclusive benefit of Owner in the rental and operation of the Property, and in comparable operations elsewhere. It is further understood and agreed that the Manager Trade Marks shall remain and be at all times the property of Manager or its affiliates, and that, except as expressly provided in this Agreement, Owner shall have no right whatsoever therein. Owner agrees that during the term of this Agreement the sign faces at the property will have the name "U-Haul." Upon termination of this Agreement at any time for any reason, all such use by and for the benefit of Owner of any such Manager Trade Marks in connection with the Property shall be terminated and any signs bearing any of the foregoing shall be removed from view and no longer used by Owner. In addition, upon termination of this Agreement at any time for any reason, Owner shall not enter into any new leases of Property using the Manager lease form or use other forms prepared by Manager. It is understood and agreed that Manager will use and shall be unrestricted in its use of such Manager Trade Marks in the management and operation of other storage facilities both during and after the expiration or termination of the term of this Agreement.

Exhibit 1 to Decl. of James Burton
222
**SER 961**

6.  **Default; Termination**.

    a.    Any material failure by Manager or Owner (a "<u>Defaulting Party</u>") to perform its respective duties or obligations hereunder (other than a default by Owner under Section 4 of this Agreement), which material failure is not cured within thirty (30) calendar days after receipt of written notice of such failure from the non-defaulting party, shall constitute an event of default hereunder; provided, however, the foregoing shall not constitute an event of default hereunder in the event the Defaulting Party commences cure of such material failure within such thirty (30) day period and diligently prosecutes the cure of such material failure thereafter but in no event shall such extended cure period exceed ninety (90) days from the date of receipt by the non-defaulting party of written notice of such material default; provided further, however, that in the event such material failure constitutes a default under the terms of the Loan Documents and the cure period for such matter under the Loan Documents is shorter than the cure period specified herein, the cure period specified herein shall automatically shorten such that it shall match the cure period for such matter as specified under the Loan Documents. In addition, following notice to Manager of the existence of any such material failure by Manager, Owner shall have the right to cure any such material failure by Manager, and any sums so expended in curing shall be owed by Manager to such curing party and may be offset against any sums owed to Manager under this Agreement.

    b.    Any material failure by Owner to perform its duties or obligations under Section 4, which material failure is not cured within ten (10) calendar days after receipt of written notice of such failure from Manager, shall constitute an event of default hereunder.

    c.    Subject to the terms of the Loan Documents, either party hereto shall have the right to terminate this Agreement, with or without cause, by giving not less than ninety (90) days' written notice to the other party hereto,  pursuant to Section 14 hereof.

    d.    Upon termination of this Agreement, (i) Manager shall promptly return to Owner all monies, books, records, and other materials held by Manager for or on behalf of Owner and shall otherwise cooperate with Owner to promote and ensure a smooth transition to the new manager, and (ii) Manager shall be entitled to receive its Property Management Fee and reimbursement of expenses through the effective date of such termination, including the reimbursement of any prepaid expenses for periods beyond the date of termination (such as advertising).

7.  **Indemnification**.  Manager hereby agrees to indemnify, defend, and hold Owner, all persons and companies affiliated with Owner, and all officers, shareholders, directors, employees, and agents of Owner and of any affiliated companies or persons (collectively, the "Indemnified Persons") harmless from any and all costs, expenses, attorneys' fees, suits, liabilities, judgments, damages, and claims in connection with the management of the Property and operations thereon (including the loss of use thereof following any damage, injury, or destruction), arising from any cause or matter whatsoever, including without limitation, any environmental condition or matter caused by Manager's operation of the Property, except to the extent attributable to the willful misconduct or negligence on the part of the Indemnified Persons.

8.  **Assignment**. Manager shall not assign this Agreement, or any portion hereof of the duties hereunder, to any party without the consent of Owner.

9.  **Standard for Property Manager's Responsibility**. Manager agrees that it will perform its obligations hereunder according to industry standards, in good faith, and in a commercially-reasonable manner.

10. **Estoppel Certificate**. Each of Owner and Manager agree to execute and deliver to each other, from time to time, within ten (10) business days after the requesting party's request, a statement in writing certifying, to the extent true, that this Agreement is in full force and effect, and to such parties'

Exhibit 1 to Decl. of James Burton
223
**SER 962**

knowledge there are no uncured defaults (or specifying such defaults if they are claimed) and any such other matters as may be reasonably requested by such requesting party

11.  **Term, Scope**. Subject to the provisions hereof, this Agreement shall have an initial term (such term, as extended or renewed in accordance with the provisions hereof, being called the "Term") commencing on the date hereof (the "Commencement Date") and ending on the later of (i) the last day of the 300th calendar month next following the date hereof, or (ii) the maturity date, repayment, or prepayment of the relevant loan under the applicable Loan Documents (the "Expiration Date"); provided however, the parties shall have the right upon mutual agreement to terminate this Agreement with respect to any individual Property no longer subject to the Loan Documents (for instance due to a significant casualty or condemnation of such Property).

12.  **Headings**. The headings contained herein are for convenience of reference only and are not intended to define, limit, or describe the scope or intent of any provision of this Agreement.

13.  **Governing Law**. The validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties shall be governed by the internal laws of the State of Nevada

14.  **Notices**. Any notice required or permitted herein shall be in writing and shall be personally delivered or mailed first class postage prepaid or delivered by an overnight delivery service to the respective addresses of the parties set forth above on the first page of this Agreement, or to such other address as any party may give  to the other in writing.  Any notice required by this Agreement will be deemed to have been given when personally served or one day after delivery to an overnight delivery service or five days after deposit in the first class mail. Any notice to Owner shall be to 207 E Clarendon, Phoenix, AZ  85012. Any notice to Manager shall be c/o U-Haul International, Inc., 2721 North Central Avenue, Phoenix, AZ 85004, Attn:  Legal Dept.

15.  **Severability**. Should any term or provision hereof be deemed invalid, void, or unenforceable either in its entirety or in a particular application, the remainder of this Agreement shall nonetheless remain in full force and effect and, if the subject term or provision is deemed to be invalid, void or unenforceable only with respect to a particular application, such term or provision shall remain in full force and effect with respect to all other applications.

16.  **Successors**. This Agreement shall be binding upon and inure to the benefit of the respective parties hereto and their permitted assigns and successors in interest.

17.  **Attorneys' Fees**. In any dispute arising under this Agreement, the prevailing party shall be entitled to recover from the other party all costs including without limitation reasonable attorneys' and experts' fees and costs.

18.  **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Exhibit 1 to Decl. of James Burton
224
**SER 963**

IN WITNESS WHEREOF, the undersigned execute this Property Management Agreement as of the date set forth above.

<u>Owner</u>:
Mercury Storage 6, LLC,
a Nevada limited liability company


By: _____
    Stuart M. Shoen, Vice President



<u>Manager:</u>

U-Haul Co. of Florida, a Florida corporation
U-Haul Co. of Georgia, a Georgia corporation
U-Haul Co. of Nevada, Inc., a Nevada corporation
U-Haul Co. of New Jersey, Inc., a New Jersey corporation
U-Haul Co. of Texas, a Texas corporation
U-Haul Co. of Virginia, a Virginia corporation



By: _____
    Wesley Chadwick, Assistant Secretary

Exhibit 1 to Decl. of James Burton
225
**SER 964**

# Exhibit A

**List of Properties**

| Center # | Street | City | State | Zip |
|---|---|---|---|---|
| 829053 | 2395 South Volusia Avenue | Orange City | FL | 32763 |
| 777026 | 2085 Cobb Parkway | Kennesaw | GA | 30152 |
| 777033 | 2085 Cobb Pkwy | Kennesaw | GA | 30152 |
| 813061 | 8505 North Cresent Boulevard | Pennsauken | NJ | 08109 |
| 838024 | 8620 S Las Vegas Boulevard | Las Vegas | NV | 89123 |
| 931025 | 10061 W University Dr | McKinney | TX | 75069 |
| 931043 | 10057 W University Dr | McKinney | TX | 75071 |
| 755057 | 14225 Northwest Freeway | Houston | TX | 77040 |
| 946065 | 14523 Telegraph Road | Woodbridge | VA | 22192 |

The Property shall automatically include, without any further action necessary under this Agreement, any After Acquired Adjacent Property and After Acquired Leasehold Property as defined in the Loan Documents.

Exhibit 1 to Decl. of James Burton
226
**SER 965**

EXHIBIT 21

**U-HAUL HOLDING COMPANY**
**(Nevada)**
**Consolidated Subsidiaries**

| Name of Entity | Jurisdiction of Incorporation |
|---|---|
| Patriot Truck Leasing, LLC | NV |
| | |
| Picacho Peak Investments Co. | NV |
| Picacho Peak, LLC | NV |
| | |
| ARCOA Risk Retention Group, Inc. | NV |
| | |
| U-Haul International Shipping, LLC | NV |
| | |
| Repwest Insurance Company | AZ |
| Republic Claims Service Co. | AZ |
| Ponderosa Insurance Agency, LLC | AZ |
| Ponderosa Self-Storage Liability Group, LLC | AZ |
| RWIC Investments, Inc. | AZ |
| | |
| Oxford Life Insurance Company | AZ |
| Oxford Life Insurance Agency, Inc. | AZ |
| Christian Fidelity Life Insurance Company | TX |
| | |
| Amerco Real Estate Company | NV |
| Amerco Real Estate Company of Texas, Inc. | TX |
| Amerco Real Estate Services, Inc. | NV |
| Rainbow-Queen Properties, L.L.C. | AZ |
| Two PAC Company | NV |
| Twenty PAC Company | NV |
| Twenty-One PAC Company | NV |
| Nationwide Commercial Co. | AZ |
| AREC RW, LLC | AZ |
| 13622 66th, LLC | NV |

Exhibit 1 to Decl. of James Burton
227
**SER 966**

| Name of Entity | Jurisdiction of Incorporation |
|---|---|
| AREC Holdings, LLC | DE |
| AREC 1, LLC | DE |
| AREC 2, LLC | DE |
| AREC 3, LLC | DE |
| AREC 4, LLC | DE |
| AREC 5, LLC | DE |
| AREC 6, LLC | DE |
| AREC 7, LLC | DE |
| AREC 8, LLC | DE |
| AREC 9, LLC | DE |
| AREC 10, LLC | DE |
| AREC 11, LLC | DE |
| AREC 12, LLC | DE |
| AREC 13, LLC | DE |
| AREC 14, LLC | NV |
| AREC 15, LLC | NV |
| AREC 19, LLC | NV |
| AREC 20, LLC | NV |
| AREC 21, LLC | NV |
| AREC 22, LLC | DE |
| AREC 23, LLC | DE |
| AREC 24, LLC | DE |
| AREC 25, LLC | DE |
| AREC 26, LLC | DE |
| AREC 27, LLC | DE |
| AREC 28, LLC | DE |
| AREC 29, LLC | DE |
| AREC 30, LLC | DE |
| AREC 31, LLC | DE |
| AREC 32, LLC | DE |
| AREC 33, LLC | DE |
| AREC 34, LLC | DE |
| AREC 35, LLC | DE |
| AREC 36, LLC | DE |
| AREC 37, LLC | DE |
| AREC 38, LLC | DE |
| AREC 39, LLC | DE |
| AREC 40, LLC | NV |
| AREC 41, LLC | DE |
| AREC 42, LLC | DE |

Exhibit 1 to Decl. of James Burton

228

**SER 967**

| Name of Entity | Jurisdiction of Incorporation |
|---|---|
| AREC 43, LLC | DE |
| AREC 44, LLC | DE |
| AREC 45, LLC | DE |
| AREC 46, LLC | DE |
| AREC 47, LLC | DE |
| AREC 48, LLC | DE |
| AREC 49, LLC | NV |
| AREC 50, LLC | NV |
| AREC 2018, LLC | NV |
| AREC QOF, LLC | NV |
| 20 Oak Harbor, LLC | NV |
| 41 Haig, LLC | NV |
| 53 Roanoke, LLC | NV |
| 74-5583 Pawai, LLC | NV |
| 125 Beechwood, LLC | NV |
| 333 Sunrise, LLC | NV |
| 370 Orange Street, LLC | NV |
| 407 Park, LLC | NV |
| 506 Fesslers, LLC | NV |
| 625 & 639 8th Avenue, LLC | NV |
| 700 54th Avenue, LLC | NV |
| 8201 Santa Fe (CA), LLC | NV |
| 1315 3rd, LLC | NV |
| 1450 Walbridge, LLC | NV |
| 1506 Woodlawn, LLC | DE |
| 1508 Woodlawn, LLC | DE |
| CRP Holdings Dunleavey, LLC | DE |
| 1833 Egg Harbor Road, LLC | NV |
| 2022 MC, LLC | NV |
| 2115 West, LLC | NV |
| 2317 Route 70, LLC | DE |
| 2823 Nashville Road, LLC | DE |
| 3400 MacArthur, LLC | NV |
| 3410 Galena, LLC | DE |
| 3463 Billy Hext, LLC | NV |
| 3700 Bigelow, LLC | NV |
| 4029 Golden, LLC | DE |
| 4251 Hiawatha, LLC | NV |
| 4795 Charlotte, LLC | NV |
| 5655 Whipple, LLC | NV |

Exhibit 1 to Decl. of James Burton
229

| Name of Entity | Jurisdiction of Incorporation |
|---|---|
| 8250 Hwy 99, LLC | NV |
| 8272 Hwy 59, LLC | NV |
| Foster 81st, LLC | DE |
| Kansas City 454, LLC | NV |
| Rosehill Street, LLC | NV |
| West 16th, LLC | DE |
| West 136, LLC | DE |
| Shoen Family Holdings, LLC | NV |
| AREC 1031 Holdings, LLC | NV |
| 8 Erie EAT, LLC | NV |
| 53 Technology EAT, LLC | NV |
| 60 Burrell Plaza EAT, LLC | NV |
| 88 Birnie EAT, LLC | NV |
| 176 Ragland EAT, LLC | NV |
| 200-220 North Point EAT, LLC | NV |
| 207 Simpson EAT, LLC | NV |
| 339-341 Lehigh EAT, LLC | NV |
| 463 Lakewood EAT, LLC | NV |
| 529 & Westgreen EAT, LLC | NV |
| 665 Perry EAT, LLC | NV |
| 800 28 EAT, LLC | NV |
| 817 Appleyard EAT, LLC | NV |
| 900 Roswell EAT, LLC | NV |
| 950 25th EAT, LLC | NV |
| 1200 Main EAT, LLC | NV |
| 1320 Grandview EAT, LLC | NV |
| 1450 South West EAT, LLC | NV |
| 2811 Vista EAT, LLC | NV |
| 4225 Hiawatha EAT, LLC | NV |
| 5204 Links EAT, LLC | NV |
| 6805 Corporate EAT, LLC | NV |
| 6910 Richmond EAT, LLC | NV |
| 8135-8171 Houghton Lake EAT, LLC | NV |
| 10412 Sprague EAT, LLC | NV |
| 10681 Loop 1604 EAT, LLC | NV |
| Dimond EAT, LLC | NV |
| Marginal EAT, LLC | NV |
|  |  |

Exhibit 1 to Decl. of James Burton

230

**SER 969**

| Name of Entity | Jurisdiction of Incorporation |
|---|---|
| U-Haul International, Inc. | NV |
| United States: | |
| A & M Associates, Inc. | AZ |
| Web Team Associates, Inc. | NV |
| eMove, Inc. | NV |
| U-Haul Business Consultants, Inc. | AZ |
| U-Haul Leasing & Sales Co. | NV |
| RTAC, LLC | NV |
| U-Haul R Fleet, LLC | NV |
| 2010 BE-BP-2, LLC | NV |
| 2010 U-Haul S Fleet, LLC | NV |
| 2010 TM-1, LLC | NV |
| 2010 TT-1, LLC | NV |
| 2010 DC-1, LLC | NV |
| 2013 U-Haul R Fleet, LLC | NV |
| 2013 BP, LLC | NV |
| 2013 U-Haul R Fleet 2, LLC | NV |
| 2013 BOA-BE, LLC | NV |
| 2013 U-Haul R Fleet 3, LLC | NV |
| 2013 NYCB-BE, LLC | NV |
| U-Haul Moving Partners, Inc. | NV |
| U-Haul Self-Storage Management (WPC), Inc. | NV |
| U-Haul Co. of Alabama, Inc. | AL |
| U-Haul Co. of Alaska | AK |
| U-Haul Co. of Arizona | AZ |
| Boxman Rentals, LLC | NV |
| U-Haul Titling, LLC | NV |
| 2010 U-Haul Titling 2, LLC | NV |
| 2010 U-Haul Titling 3, LLC | NV |
| 2013 U-Haul Titling 1, LLC | NV |
| 2013 U-Haul Titling 2, LLC | NV |
| 2013 U-Haul Titling 3, LLC | NV |
| CGAF Holdings, LLC | NV |
| Casa Grande Alternative Fuel Co., LLC | NV |
| U-Haul Co. of Arkansas | AR |
| U-Haul Co. of California | CA |
| U-Haul Co. of Colorado | CO |
| U-Haul Co. of Connecticut | CT |
| U-Haul Co. of District of Columbia, Inc. | DC |
| U-Haul Co. of Florida | FL |

Exhibit 1 to Decl. of James Burton
231

| Name of Entity | Jurisdiction of Incorporation |
|---|---|
| 6810 US Hwy 1, LLC | NV |
| 1800 State Road, LLC | NV |
| Sample Square Office Park Property Owners' Master Association, Inc. | FL |
| U-Haul Co. of Florida 2, LLC | DE |
| U-Haul Co. of Florida 3, LLC | DE |
| U-Haul Co. of Florida 4, LLC | DE |
| U-Haul Co. of Florida 5, LLC | DE |
| U-Haul Co. of Florida 8, LLC | DE |
| U-Haul Co. of Florida 9, LLC | DE |
| U-Haul Co. of Florida 10, LLC | DE |
| U-Haul Co. of Florida 905, LLC | DE |
| U-Haul Co. of Florida 14, LLC | NV |
| U-Haul Co. of Florida 15, LLC | NV |
| U-Haul Co. of Florida 19, LLC | NV |
| U-Haul Co. of Florida 21, LLC | NV |
| U-Haul Co. of Florida 22, LLC | DE |
| U-Haul Co. of Florida 23, LLC | DE |
| U-Haul Co. of Florida 24, LLC | DE |
| U-Haul Co. of Florida 25, LLC | DE |
| U-Haul Co. of Florida 26, LLC | DE |
| U-Haul Co. of Florida 28, LLC | DE |
| U-Haul Co. of Florida 30, LLC | DE |
| U-Haul Co. of Florida 31, LLC | DE |
| U-Haul Co. of Florida 32, LLC | DE |
| U-Haul Co. of Florida 33, LLC | DE |
| U-Haul Co. of Florida 34, LLC | DE |
| U-Haul Co. of Florida 35, LLC | DE |
| U-Haul Co. of Florida 42, LLC | DE |
| U-Haul Co. of Florida 44, LLC | DE |
| U-Haul Co. of Florida 48, LLC | DE |
| U-Haul Co. of Florida 49, LLC | NV |
| U-Haul Co. of Florida 50, LLC | NV |
| U-Haul Co. of Georgia | GA |
| U-Haul of Hawaii, Inc. | HI |
| U-Haul Co. of Idaho, Inc. | ID |
| U-Haul Co. of Illinois, Inc. | IL |
| U-Haul Co. of Indiana, Inc. | IN |
| U-Haul Co. of Iowa, Inc. | IA |
| U-Haul Co. of Kansas, Inc. | KS |

Exhibit 1 to Decl. of James Burton

232

| Name of Entity | Jurisdiction of Incorporation |
|---|---|
| U-Haul Co. of Kentucky | KY |
| U-Haul Co. of Louisiana | LA |
| U-Haul Co. of Maine, Inc. | ME |
| U-Haul Co. of Maryland, Inc. | MD |
| U-Haul Co. of Massachusetts and Ohio, Inc. | MA |
| Collegeboxes, LLC | MA |
| U-Haul Co. of Michigan | MI |
| U-Haul Co. of Minnesota | MN |
| U-Haul Co. of Mississippi | MS |
| U-Haul Company of Missouri | MO |
| U-Haul Co. of Montana, Inc. | MT |
| U-Haul Co. of Nebraska | NE |
| U-Haul Co. of Nevada, Inc. | NV |
| U-Haul Co. of New Hampshire, Inc. | NH |
| U-Haul Co. of New Jersey, Inc. | NJ |
| U-Haul Co. of New Mexico, Inc. | NM |
| U-Haul Co. of New York and Vermont, Inc. | NY |
| U-Haul Co. of North Carolina | NC |
| U-Haul Co. of North Dakota | ND |
| U-Haul Co. of Oklahoma, Inc. | OK |
| U-Haul Co. of Oregon | OR |
| U-Haul Co. of Pennsylvania | PA |
| U-Haul Co. of Rhode Island | RI |
| U-Haul Co. of South Carolina, Inc. | SC |
| U-Haul Co. of South Dakota, Inc. | SD |
| U-Haul Co. of Tennessee | TN |
| U-Haul Co. of Texas | TX |
| U-Haul Propane of Texas, LLC | NV |
| U-Haul Co. of Utah, Inc. | UT |
| U-Haul Co. of Virginia | VA |
| U-Haul Co. of Washington | WA |
| U-Haul Co. of West Virginia | WV |
| U-Haul Co. of Wisconsin, Inc. | WI |
| U-Haul Co. of Wyoming, Inc. | WY |
| UHIL Holdings, LLC | DE |
| UHIL 1, LLC | DE |
| UHIL 2, LLC | DE |
| UHIL 3, LLC | DE |
| UHIL 4, LLC | DE |
| UHIL 5, LLC | DE |

Exhibit 1 to Decl. of James Burton
233

| Name of Entity | Jurisdiction of Incorporation |
|---|---|
| UHIL 6, LLC | DE |
| UHIL 7, LLC | DE |
| UHIL 8, LLC | DE |
| UHIL 9, LLC | DE |
| UHIL 10, LLC | DE |
| UHIL 11, LLC | DE |
| UHIL 12, LLC | DE |
| UHIL 13, LLC | DE |
| UHIL 14, LLC | NV |
| UHIL 15, LLC | NV |
| UHIL 16, LLC | NV |
| UHIL 19, LLC | NV |
| UHIL 20, LLC | NV |
| UHIL 21, LLC | NV |
| UHIL 22, LLC | DE |
| UHIL 23, LLC | DE |
| UHIL 24, LLC | DE |
| UHIL 25, LLC | DE |
| UHIL 26, LLC | DE |
| UHIL 27, LLC | DE |
| UHIL 28, LLC | DE |
| UHIL 29, LLC | DE |
| UHIL 30, LLC | DE |
| UHIL 31, LLC | DE |
| UHIL 32, LLC | DE |
| UHIL 33, LLC | DE |
| UHIL 34, LLC | DE |
| UHIL 35, LLC | DE |
| UHIL 36, LLC | DE |
| UHIL 37, LLC | DE |
| UHIL 38, LLC | DE |
| UHIL 39, LLC | DE |
| UHIL 40, LLC | NV |
| UHIL 41, LLC | DE |
| UHIL 42, LLC | DE |
| UHIL 43, LLC | DE |
| UHIL 44, LLC | DE |
| UHIL 45, LLC | DE |
| UHIL 46, LLC | DE |
| UHIL 47, LLC | DE |

Exhibit 1 to Decl. of James Burton

234

**SER 973**

| Name of Entity | Jurisdiction of Incorporation |
|---|---|
| UHIL 48, LLC | DE |
| UHIL 49, LLC | NV |
| UHIL 50, LLC | NV |
| UHIL RW, LLC | DE |
| | |
| Canada: | |
| U-Haul Co. (Canada) Ltd. U-Haul Co. (Canada) Ltee | ON |
| U-Haul Inspections Ltd. | BC |

Exhibit 1 to Decl. of James Burton

235

**SER 974**

EXHIBIT 23.1

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in Registration Statement Nos. 33-56571 and 333-268891 on Form S-3 of our reports dated May 30, 2024, relating to the financial statements of U-Haul Holding Company and the effectiveness of U-Haul Holding Company's internal control over financial reporting appearing in this Annual Report on Form 10-K for the year ended March 31, 2024.

/s/ Deloitte and Touche

Tempe, Arizona
May 30, 2024

---

Exhibit 1 to Decl. of James Burton
236
**SER 975**

<u>Consent of Independent Registered Public Accounting Firm</u>

We hereby consent to the incorporation by reference in the Registration Statements on Form S-3 (No. 33-56571 and 333-268891) of U-Haul Holding Company (the Company) of our report dated June 1, 2023, except for the effects of the modified retrospective adoption of Accounting Standards Update No. 2018-12, Financial Services— Insurance (Topic 944): Targeted Improvements to the Accounting for Long-Duration Contracts, discussed in Note 3,as to which the date is May 30, 2024, relating to the consolidated financial statements and schedules, which appears in this Annual Report on Form 10-K.

/s/ BDO USA, P.C.
Phoenix, Arizona

May 30, 2024

---

Exhibit 1 to Decl. of James Burton

237

**SER 976**

EXHIBIT 31.1

**Rule 13a-14(a)/15d-14(a) Certification**

I, Edward J. Shoen, certify that:

1.  I have reviewed this annual report on Form 10-K of U-Haul Holding Company;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.  The Registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.  The Registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

/s/  Edward J. Shoen
_____
Edward J. Shoen
President and Chairman of the Board

Date: May 30, 2024

Exhibit 1 to Decl. of James Burton
238
**SER 977**

EXHIBIT 31.2

**Rule 13a-14(a)/15d-14(a) Certification**

I, Jason A. Berg, certify that:

1. I have reviewed this annual report on Form 10-K of U-Haul Holding Company;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4. The Registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. The Registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

/s/  Jason A. Berg

Jason A. Berg
Chief Financial Officer

Date: May 30, 2024

Exhibit 1 to Decl. of James Burton
239
**SER 978**

EXHIBIT 32.1

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Form 10-K for the year ended March 31, 2024 of U-Haul Holding Company (the "Company"), as filed with the Securities and Exchange Commission on May 30, 2024 (the "Report"), I, Edward J. Shoen, President and Chairman of the Board of the Company, certify, to the best of my knowledge and belief, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, and

2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/  Edward J. Shoen

Edward J. Shoen
President and Chairman of the Board

Date: May 30, 2024

---

Exhibit 1 to Decl. of James Burton
240
**SER 979**

EXHIBIT 32.2

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Form 10-K for the year ended March 31, 2024 of U-Haul Holding Company (the "Company"), as filed with the Securities and Exchange Commission on May 30, 2024 (the "Report"), I, Jason A. Berg, Chief Financial Officer of the Company, certify, to the best of my knowledge and belief, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, and

2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/  Jason A. Berg
Jason A. Berg
Chief Financial Officer

Date: May 30, 2024

---

Exhibit 1 to Decl. of James Burton
241
**SER 980**

# U-HAUL HOLDING COMPANY

### POLICY FOR THE
### RECOVERY OF ERRONEOUSLY AWARDED COMPENSATION

A.  OVERVIEW

      In accordance with Section 303A.14 of the New York Stock Exchange Listed Company Manual (the **"Section 303A.14"**), Section 10D and Rule 10D-1 of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**") ("**Rule 10D-1**"), the Board of Directors (the "**Board**")of U-Haul Holding Company (the "**Company**") has adopted this Policy (the "**Policy**") to provide for the recovery of erroneously awarded Incentive-based Compensation from Executive Officers. All capitalized terms used and not otherwise defined herein shall have the meanings set forth in Section H, below.

B.  RECOVERYOF ERRONEOUSLY AWARDEDCOMPENSATION

      (1) In the event the Company is required to prepare an Accounting Restatement, the Company will recover reasonably promptly the Erroneously Awarded Compensation Received in accordance with Section 303A.14 and Rule 10D-1 as follows:

      (i)  After an Accounting Restatement, the Compensation Committee (if composed entirely of independent directors, or in the absence of such a committee, a majority of independent directors serving on the Board) (the "**Committee**") shall determine the amount of any Erroneously Awarded Compensation Received by each Executive Officer and shall notify reasonably promptly each Executive Officer with a written notice containing the amount of any Erroneously Awarded Compensation and a demand for repayment or return of such compensation, as applicable.

      (a)  For Incentive-based Compensation based on (or derived from) the Company's stock price or total shareholder return, where the amount of Erroneously Awarded Compensation is not subject to mathematical recalculation directly from the information in the applicable Accounting Restatement:

      i.  The amount to be repaid or returned shall be determined by the Committee based on a reasonable estimate of the effect of the Accounting Restatement on the Company's stock price or total shareholder return upon which the Incentive-based Compensation was Received; and

      ii.  The Company shall maintain documentation of the determination of such reasonable estimate and provide the relevant documentation as required to the NYSE.

      (ii)  The Committee shall have discretion to determine the appropriate means of recovering Erroneously Awarded Compensation based on the particular facts and circumstances. Notwithstanding the foregoing, except as set forth in Section B(2) below, in no event may the Company accept an amount that is less than the amount of Erroneously Awarded Compensation in satisfaction of an Executive Officer's obligations hereunder.

      (iii) To the extent that the Executive Officer has already reimbursed the Company for any Erroneously Awarded Compensation Received under any duplicative recovery obligations established by the Company or applicable law, it shall be appropriate for any such reimbursed amount to be credited to the amount of Erroneously Awarded Compensation that is subject to recovery under this Policy.

---

Exhibit 1 to Decl. of James Burton
242
**SER 981**

(iv) To the extent that an Executive Officer fails to repay all Erroneously Awarded Compensation to the Company when due, the Company shall take all actions reasonable and appropriate to recover such Erroneously Awarded Compensation from the applicable Executive Officer.

(2) Notwithstanding anything herein to the contrary, the Company shall not be required to take the actions contemplated by Section B(1) above if the Committee(which, as specified above, is composed entirely of independent directors or in the absence of such a committee, a majority of the independent directors serving on the Board) determines that recovery would be impracticable *and* any of the following two conditions are met:

(i)  The Committee has determined that the direct expenses paid to a third party to assist in enforcing the Policy would exceed the amount to be recovered. Before making this determination, the Companymust make a reasonable attempt to recover the Erroneously Awarded Compensation, document such attempt(s) and provide such documentation to the NYSE; or

(ii) Recovery would likely cause an otherwise tax-qualified retirement plan, under which benefits are broadly available to employees of the Company, to fail to meet the requirements of Section 401(a)(13) or Section 411(a) of the Internal Revenue Code of 1986, as amended, and regulations thereunder.

(3) This Policy applies to all Clawback Eligible Incentive Compensation. For the avoidance of doubt, this Policy shall apply to all such Executive Officers who Received Erroneously Awarded Compensation during the applicable Recovery Period, regardless of whether any misconduct occurred or an Executive Officer was responsible for the preparation of the Company's financial statements. Further, the Company's obligation to recover Erroneously Awarded Compensation is not dependent on if or when restated financial statements are filed.

C.  DISCLOSURE REQUIREMENTS

The Company shall file all disclosures with respect to this Policy required by applicable U.S. Securities and Exchange Commission ("*SEC*") filings and rules.

D.  PROHIBITION OF INDEMNIFICATION

The Company shall not be permitted to insure or indemnify any Executive Officer against (i) the loss of any Erroneously Awarded Compensation that is repaid,returned or recovered pursuant to the terms of this Policy, or (ii) any claims relating to the Company's enforcement of its rights under this Policy. Further,the Company shall not enter into any agreement that exempts any Incentive-based Compensation that is granted, paid or awarded to an Executive Officer from the application of this Policy or that waives the Company's right to recovery of any Erroneously Awarded Compensation, and this Policy shall supersede any such agreement(whether entered into before, on or after the effective date of this Policy).

E.  ADMINISTRATION AND INTERPRETATION

This Policy shall be administered by the Committee, and any determinations made by the Committee shall be final and binding on all affected individuals.

The Committee is authorized to interpret and construe this Policy and to make all determinations necessary, appropriate, or advisable for the administration of this Policy and for the Company's compliance with Section 303A.14, Section 10D, Rule 10D-1 and any other applicable law, regulation, rule or interpretation of the SEC or NYSE promulgated or issued in connection therewith.

Exhibit 1 to Decl. of James Burton
243

F.   AMENDMENT; TERMINATION

The Committee may amend this Policy from time to time in its discretion and shall amend this Policy as it deems necessary. Notwithstanding anything in this Section F to the contrary, no amendment or termination of this Policy shall be effective if such amendment or termination would (after taking into account any actions taken by the Company contemporaneously with such amendment or termination) cause the Company to violate any federal securities laws, SEC rule or NYSE rule.

G.   OTHER RECOVERY RIGHTS

This Policy shall be binding and enforceable against all Executive Officers and, to the extent required by applicable law or guidance from the SEC or NYSE, their beneficiaries, heirs, executors, administrators or other legal representatives. The Committee intends that this Policy will be applied to the fullest extent required by applicable law. Any employment agreement, equity award agreement, compensatory plan or any other agreement or arrangement with an Executive Officer shall be deemed to include, as a condition to the grant of any benefit thereunder, an agreement by the Executive Officer to abide by the terms of this Policy. Any right of recovery under this Policy is in addition to, and not in lieu of, any other remedies or rights of recovery that may be available to the Company under applicable law, regulation or rule or pursuant to the terms of any policy of the Company or any provision in any employment agreement, equity award agreement, compensatory plan, agreement or other arrangement.

H.   DEFINITIONS

For purposes of this Policy, the following capitalized terms shall have the meanings set forth below.

(1) "*Accounting Restatement*" means an accounting restatement due to the material noncompliance of the Company with any financial reporting requirement under the securities laws, including any required accounting restatement to correct an error in previously issued financial statements that is material to the previously issued financial statements (a "Big R" restatement), or that would result in a material misstatement if the error were corrected in the current period or left uncorrected in the current period (a "little r" restatement).

(2) "*Clawback Eligible Incentive Compensation*" means all Incentive-based Compensation Received by an Executive Officer (i) on or after October 2, 2023, (ii) after beginning service as an Executive Officer, (iii) who served as an Executive Officer at any time during the applicable performance period relating to any Incentive-based Compensation (whether or not such Executive Officer is serving at the time the Erroneously Awarded Compensation is required to be repaid to the Company), (iv) while the Company has a class of securities listed on a national securities exchange or a national securities association, and (v) during the applicable Clawback Period (as defined below).

(3) "*Clawback Period*" means, with respect to any Accounting Restatement, the three completed fiscal years of the Company immediately preceding the Restatement Date (as defined below), and if the Company changes its fiscal year, any transition period of less than nine months within or immediately following those three completed fiscal years.

(4) "*Erroneously Awarded Compensation*" means, with respect to each Executive Officer in connection with an Accounting Restatement, the amount of Clawback Eligible Incentive Compensation that exceeds the amount of Incentive-based Compensation that otherwise would have been Received by an Executive Officer had it been determined based on the restated amounts, computed without regard to any taxes paid.

(5) "*Executive Officer*" means each individual who is currently or was previously designated as an "officer" of the Company as defined in Rule 16a-1(f) under the Exchange Act. For the avoidance of doubt, the

Exhibit 1 to Decl. of James Burton
244
**SER 983**

identification of an executive officer for purposes of this Policy shall include each executive officer who is or was identified pursuant to Item 401(b)of Regulation S-K or Item 6.A of Form 20-F, as applicable, as well as the principal financial officer and principal accounting officer (or, if there is no principal accounting officer, the controller).

(6) "*Financial Reporting Measures*" means measures that are determined and presented in accordance with the accounting principles used in preparing the Company's financial statements, and all other measures that are derived wholly or in part from such measures. Stock price and total shareholder return (and any measures that are derived wholly or in part from stock price or total shareholder return)shall, for purposes of this Policy, be considered Financial Reporting Measures. For the avoidance of doubt, a Financial Reporting Measure need not be presented in the Company's financial statements or included in a filing with the SEC.

(7) "*Incentive-based Compensation*" means any compensation that is granted, earned or vested based wholly or in part upon the attainment of a Financial Reporting Measure.

(8) "*NYSE*" means the New York Stock Exchange.

(9) "*Received*" means,with respect to any Incentive-based Compensation, actual or deemed receipt, and Incentive-based Compensation shall be deemed received in the Company's fiscal period during which the Financial Reporting Measure specified in the Incentive-based Compensation award is attained, even if the payment or grant of the Incentive-based Compensation to the Executive Officer occurs after the end of that period.

(10)   "*Restatement Date*" means the earlier to occur of (i) the date the Board, a committee of the Board or the officers of the Company authorized to take such action if Board action is not required, concludes, or reasonably should have concluded, that the Company is required to prepare an Accounting Restatement, or (ii) the date a court, regulator or other legally authorized body directs the Company to prepare an Accounting Restatement.

Effective December 2023.

Exhibit 1 to Decl. of James Burton
245
**SER 984**

**Exhibit A**

**ATTESTATION AND ACKNOWLEDGEMENT OF POLICY FOR THE RECOVERY OF ERRONEOUSLY AWARDED COMPENSATION**

By my signature below, I acknowledge and agree that:

> .  I have received and read the attached Policy for the Recovery of Erroneously Awarded Compensation (this "***Policy***").
>
> I hereby agree to abide by all of the terms of this Policy both during and after my employment with the Company, including, without limitation, by promptly repaying or returning any Erroneously Awarded Compensation to the Company as determined in accordance with this Policy.

Signature:  ------------------

Printed Name:  ------------------

Date:  ----------------------------

---

Exhibit 1 to Decl. of James Burton

246

**SER 985**

ROB BONTA
Attorney General of California
MYUNG J. PARK (SBN 210866)
LAURA J. ZUCKERMAN (SBN 161896)
Supervising Deputy Attorneys General
DAVID ZAFT (SBN 237365)
M. ELAINE MECKENSTOCK (SBN 268861)
CAITLAN MCLOON (SBN 302798)
EMILY HAJARIZADEH (SBN 325246)
DYLAN REDOR (SBN 338136)
KATHERINE GAUMOND (SBN 349453)
Deputy Attorneys General
  300 South Spring Street, Suite 1702
  Los Angeles, CA 90013-1230
  Telephone: (213) 269-6438
  Fax: (916) 731-2128
  E-mail: Caitlan.McLoon@doj.ca.gov
*Attorneys for Defendants Liane M. Randolph,
Steven S. Cliff, and Robert A. Bonta*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION,**<br><br>Plaintiffs,<br><br>v.<br><br>**LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California,**<br><br>Defendants. | 2:24-cv-00801-ODW-PVCx<br><br>**DECLARATION OF JAMES P. BURTON IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:      May 5, 2025<br>Time:      1:30 PM<br>Courtroom: 5D<br>Judge:     The Honorable Otis D. Wright, II<br>Trial Date: Not Set<br>Action Filed: 1/30/2024 |

1

## DECLARATION OF JAMES P. BURTON

I, James P. Burton, hereby declare:

1.     I have been retained by counsel for Defendants Liane M. Randolph, Steven S. Cliff, and Robert A. Bonta, in their official capacities, as an expert in connection with the above-captioned litigation. I have actual knowledge of the matters stated in this declaration and can truthfully testify to those matters.

### Qualifications of the Declarant[1]

2.     This declaration was prepared by James P. Burton, a licensed certified public accountant ("CPA") in California and Colorado. For 35 years until my retirement from Grant Thornton LLP ("Grant Thornton" or the "Firm")[2] on May 31, 2024, I provided audit and accounting related services to organizations of all sizes and industries. Grant Thornton is the U.S. member firm of Grant Thornton International Limited, a global public accounting network that provides audit, tax, and advisory services. The Firm has been providing services since 1924 and has U.S. revenues in excess of $2 billion annually. I held a variety of roles at Grant Thornton, including 25 years as an audit partner with eight of those years as Chief Auditor, and the final 3.5 years as the Firm's Environmental, Social, and Governance ("ESG") & Sustainability services practice lead. In these roles I assisted with many types of corporate reporting, including sustainability reporting, financial statements, and internal controls. I was responsible for developing the Firm's attest and service approach for sustainability related reporting and disclosure. As part of this work, I advised companies on decisions around the type of reporting to publish; how to gather and prepare the data and information necessary for reporting; the systems, processes and controls needed for reporting;

---

[1] A true and correct copy of declarant's CV is available at Dkt. 53-1.
[2] From April-October 1997, I was the CFO of a privately-held semiconductor materials and services company from which I resigned to return to my position previously held at Grant Thornton LLP.

1    and the requirements to comply with reporting principles, standards, and guidelines.

2    I also performed audits and attestations of reported information.

3            3.      While leading the ESG & Sustainability practice at Grant Thornton, I

4    participated in or oversaw sustainability reporting and disclosure services delivered

5    to more than 100 entities. These organizations ranged in size from less than $50

6    million to over $100 billion in annual revenue and included both publicly-listed and

7    privately-held entities across more than a dozen industries and market segments.

8    These services included assisting with strategic decision making around when and

9    how to begin reporting sustainability related information; which standards to

10   follow; the regulatory landscape and market activity; and best practices around

11   sustainability reporting. I also assisted organizations with identifying gaps in their

12   reporting processes and controls, improving the reported data and information, and

13   developing disclosures that comply with various reporting standards and

14   frameworks including, among others, the Greenhouse Gas ("GHG") Protocol, the

15   Task Force on Climate-Related Financial Disclosure ("TCFD") recommendations,

16   and the Sustainability Accounting Standards Board ("SASB")[3] standards.

17           4.      I have been a member of the Assurance Services Executive Committee

18   ("ASEC") of the American Institute of Certified Public Accountants ("AICPA")

19   since 2016 and held the role of committee chair from August 2018 to May 2024.

20   The ASEC mission is to support the accounting profession in serving the public

21   interest by anticipating, identifying, assessing and addressing evolving market

22   needs and demand for assurance and advisory solutions. ASEC develops relevant

23   thought leadership, guidance, criteria, and other member resources to support a

24   dynamic profession that continuously evolves to provide high quality, value-added,

25   innovative assurance and advisory solutions. ASEC focuses on efforts related to

26   blockchain, artificial intelligence, cybersecurity and sustainability, among other

27   _____

28   [3] In August 2022, the International Sustainability Standards Board ("ISSB") assumed
     responsibility for the reporting standards developed by SASB.

emerging topics, and provides strategic direction in identifying and developing innovative new assurance and advisory opportunities. I am also a member of ASEC's Sustainability Assurance and Advisory Task Force, a group that addresses current matters related to sustainability reporting.

**Methodology**

5.    I have read and am familiar with California Senate Bills 253 and 261 ("S.B. 253" and "S.B. 261"), as amended by Senate Bill 219, and other materials submitted to the court in connection with this litigation that are referenced in this declaration, including the declaration from Edward J. Shoen submitted to the Court on February 25, 2025 as docket number 78-3 (the "Shoen Declaration").

6.    In developing my opinions for this declaration, I consulted the body of professional standards, guidelines, application material, and other reporting resources available to entities who prepare and report ESG and sustainability related information, including GHG emissions and climate risk information, in the marketplace. I also relied upon the standards, interpretations and application material available to providers of assurance services who issue attestation reports over climate risk and GHG information.

7.    I relied on information that is customarily reviewed and utilized by experts in my field of sustainability reporting, financial reporting, and audit and attestation services.

8.    I also relied on my own personal knowledge, training, and experience in the field of sustainability reporting, financial reporting, and audit and attestation services.

**Scope of this Declaration**

9.    During the course of the litigation surrounding S.B. 253 and S.B. 261, statements have been submitted to the court that I believe warrant further discussion. This declaration addresses certain of those statements and provides additional information on the reporting of GHG emissions and climate risks as

4

1  called for under these laws (collectively, "emissions and climate risk reporting"). I

2  refer the Court to my initial declaration submitted on July 24, 2024, as docket

3  number 53, for further background and explanations of emissions and climate risk

4  reporting conventions generally.

5          10.     Throughout this declaration, references are made to the Shoen

6  Declaration, which conveys a list of concerns and challenges Mr. Shoen claims are

7  associated with the reporting requirements required by S.B. 253 and S.B. 261. As a

8  CPA, I have assisted numerous companies with implementing emissions reporting

9  and climate risk reporting, and from those engagements I have experience directly

10  related to the matters included in the Shoen Declaration.

11          11.     I have not been engaged by or been able to consult with Mr. Shoen or

12  any members of the management of U-Haul Holding Company and its subsidiaries

13  (collectively, "UHHC") to corroborate the information contained in this declaration

14  as it relates to UHHC. I have read and considered information made publicly

15  available by UHHC through its filings with the U.S. Securities and Exchange

16  Commission (the "SEC"), UHHC's corporate website, and other documents in the

17  public domain. I have confidence that my observations expressed herein are

18  accurate and supportable based on the reporting standards referenced in S.B. 253

19  and S.B. 261.

20  **Mr. Shoen's Alleged Concerns Regarding Personnel and Cost**
**Requirements**

21

22          12.     Mr. Shoen claims that "[b]uilding the apparatus necessary to comply

23  with the requirements of S.B. 253 and S.B. 261 . . . comes at a great cost and

24  commitment of personnel hours" and "[w]ith respect to IT alone, U-Haul

25  preliminarily estimates that this would require approximately 30 additional

26  dedicated team members to build and then support these processes on an ongoing

27  basis at an estimated cost exceeding $3,000,000 per year." Shoen Decl. ¶¶ 10-12.

28

5

13.     The magnitude of the personnel commitment claimed by UHHC far exceeds any personnel requirements I have observed in assisting companies with reports utilizing similar protocols. In my experience, a sustainability reporting team comprises personnel from across the organization representing the various functions that interact with the creation, gathering, analysis and documentation of the information required for the reporting of emissions and climate risk. This often includes finance and accounting, operations, human resources, IT, sustainability, internal audit, and legal groups within a company, many of whom perform sustainability reporting related activities in addition to their other responsibilities. In my experience, most entities meeting the size threshold for reporting under S.B. 253 and S.B. 261 can manage emissions and climate risk reporting with a total team of 3-5 dedicated personnel—not just IT—collaborating with others from within the organization. On this basis alone, the costs and personnel commitments are likely to be significantly less than the amounts claimed by Mr. Shoen, especially because UHHC is smaller than many of the entities with which I have familiarity and because the reporting it will be required to do under S.B. 253 and S.B. 261 is narrower than the sustainability reporting these entities performed.

14.     Mr. Shoen states UHHC "will need to develop policies and internal controls to analyze the vast quantity of data collected; and it will need time to test its internal processes before they go live." Shoen Decl., ¶ 11. To develop the policies and internal controls referenced by Mr. Shoen, it is likely UHHC will be able to leverage existing policies and internal controls to considerably reduce the effort required. And, as described in the following sections, Mr. Shoen may overestimate the "vast" amount of data needed. To report GHG emissions and climate risks, UHHC will use data that is currently available within its financial reporting systems.

6

### MR. SHOEN'S ALLEGED CONCERNS REGARDING UHHC'S Independent Dealers

15.      Mr. Shoen asserts, "[u]nder S.B. 253, U-Haul would likely be responsible for reporting emissions and climate risks from all U-Haul Dealers." Shoen Decl. ¶ 26. I do not believe the conclusion is consistent with the requirements of the GHG Protocol, the TCFD, or how UHHC operates its business. In fact, contrary to Mr. Shoen's assertion, and depending on regulatory guidance developed by CARB, UHHC may not be required to include *any* emissions of its independent dealers in its reported emissions because these businesses are not owned or controlled by UHHC and fall outside the organizational reporting boundary of UHHC. When reporting GHG emissions under the GHG Protocol, entities report only the emissions that fall within the organizational boundary of the organization.[4] The following paragraphs (¶¶ 16-20) explain why I believe the independent dealers fall outside the organizational boundary of UHHC.

16.      Mr. Shoen references the variety of business-types that make up its dealer network: "Dealers include: self-storage facilities, auto repair garages, gas stations, convenience stores, used car dealerships, hardware stores, tire shops, furniture stores, grocery stores, repair shops, car washes, auto parts stores, motels, hotels, restaurants, wireless phone stores, appliance stores, nurseries, and office supply stores- just to name a few." Shoen Decl. ¶ 9. He also states that the independent dealers "are multiservice businesses" like, for example, "a gas station." *Id*. ¶ 28. UHHC makes no mention within its annual report on Form 10-K for the fiscal year ended March 31, 2024 (the "2024 10-K") or in other SEC filings of including these *independent* dealers within its operating or financial results.

17.      UHHC includes the gross revenue from equipment rental (whether rented at a company retail outlet or at an independent dealer) in its financial statements and the separate operations of dealers are not included in its financial

---

[4] The guidance for organizational boundaries is found in *The GHG Protocol Corporate Accounting and Reporting Standard* (2004). Dkt 53-2 at 16-23.

7

1  results "Self-moving equipment rentals are recognized over the contract period that

2  trucks and moving equipment are rented".[5] These dealers only earn a commission

3  from facilitating the rental of UHHC equipment: "Independent U-Haul dealers

4  receive rental equipment from the Company, act as rental agents and are paid a

5  commission based on gross revenues generated from their U-Haul rentals."[6] The

6  2024 10-K further states "our independent dealers do not hold any of our

7  inventory."[7] These disclosures and contractual agreements demonstrate that the

8  dealers are *independent* businesses, are not consolidated within the financial

9  statements of UHHC, and do not represent franchises of UHHC.

10      18.      The GHG Protocol, in scope 3 category 14, requires the inclusion of

11  franchisee emissions within the reporting entity's GHG inventory.[8] It does not

12  make analogies to other business models or operational structures that should also

13  apply the franchise guidance. The UHHC Template Dealer Contract states "this

14  Agreement is an agency relationship and shall not under any circumstances

15  constitute a franchise under any law."[9] Given how UHHC operates its business (that

16  is, that dealers are not franchisees), it would be unusual for the company to

17  conclude it should report the emissions of its independent dealers in its own GHG

18  inventory.

19      19.      UHHC is not the only company in the US that operates through a

20  network of independent dealers. PPG [10] (NYSE: PPG), a global leader in paints,

21  coatings, and specialty materials, operates "[m]ore than 15,000 points of sale,

22  including 750 company-owned stores, 6,600 independent dealer locations, and

---

[5] 2024 10-K, page F-42, attached hereto as Ex. 1.
[6] *Id.* at 3.
[7] *Id.* at F-13.
[8] Dkt. 53-17 at 130-135.
[9] Exhibit 10.36 to the 2024 10-K (referenced in Ex. 1 at 54), U-Haul Template Dealer Contract at 4(k), attached hereto as Ex. 2.
[10] In December 2024 PPG sold its U.S. and Canada architectural coatings operations that included its independent dealer network. This transaction does not alter the computation of its GHG inventory or its determination of the individual components of scope 1, 2, and 3 emissions as reported in its 2023 sustainability report.

8

1  8,100 major home improvement centers and retailer locations across the U.S.,

2  Canada and Puerto Rico."[11] PPG does not include the results of its independent

3  dealers in its financial results. PPG prepares a comprehensive sustainability report

4  that includes, among other disclosures, the emissions[12] and climate risk[13]

5  disclosures referenced in S.B. 253 and S.B. 261, respectively. Within these reports,

6  PPG does not include the activities of its independent dealers and does not report

7  any emissions from scope 3 category 14 for franchisees.

8      20.      The reporting standards incorporated into S.B. 253 and S.B. 261 (that

9  is, the GHG Protocol and the TCFD) limit the inclusion of emissions and climate

10  risk information to entities that are within the organizational and operational

11  boundaries of the reporting entity. Based on the business structure between UHHC

12  and the independent dealers and the lack of financial consolidation, depending on

13  regulatory guidance developed by CARB, it is unlikely any of the independent

14  dealer operations would be included in UHHC's emissions and climate risk

15  reporting.

16                    **Mr. Shoen's Alleged Concerns Regarding Data Collection**

17      21.      Mr. Shoen makes numerous references to additional claimed

18  challenges and complexities of gathering the information needed to prepare the

19  reporting required by S.B. 253 and S.B. 261. For example, he states: "U-Haul will

20  have to begin building the systems and compile data, not only from its own

21  operations, but from its 800 individual utility providers," Shoen Decl., ¶ 15; "U-

22  Haul will need to determine where the required information is located, both within

23  its own operations and those of its independent Dealers," *id.*, ¶ 11; and "it would

24

25      [11] *See* PPG press release dated October 17, 2024 at page 2, https://news.ppg.com/press-releases/press-release-details/2024/PPG-reaches-agreement-to-sell-architectural-coatings-U.S.-and-Canada-business-to-American-Industrial-Partners-announces-comprehensive-cost-reduction-program/default.aspx attached hereto as Ex. 3.

26      [12] *ESG Report 2023* of PPG page 109, https://www.ppg.com/en-US/sustainability

27  attached hereto as Ex. 4.
    [13] Ex. 4 at 47. *See also TCFD Index* of PPG, https://www.ppg.com/en-

28  US/sustainability/tcfd-index.

1  have to rely on third parties to provide that data to calculate its scope 3 emissions,"
2  *id.*, ¶ 19.

3    22.    A GHG emissions inventory does require data to prepare the necessary
4  reporting; however, as noted in my original declaration, both emissions and climate
5  risk reporting are not as challenging as entities initially expect. Burton Decl. (Dkt.
6  53), ¶¶ 17 et seq.

7    23.    Contrary to Mr. Shoen's claims, the information and data needed by
8  UHHC to prepare its GHG emissions reporting is mostly available from within its
9  existing financial records and not from independent dealers or third parties. Given
10  UHHC's ability to provide timely and accurate financial reporting in its SEC
11  filings, and its statements in its 2024 10-K regarding it having effective internal
12  control over financial reporting ("ICFR") [14], UHHC should not have significant
13  concerns with its ability to collect this data or the accuracy and veracity of this
14  information. Compliance with S.B. 253 is unlikely to be excessively challenging for
15  the company.

16    24.    To report its scope 1 information, UHHC will use data associated with
17  its fleet of vehicles, its real estate holdings, and its corporate operations, to which it
18  will apply readily available emission factors.[15] UHHC clearly has high confidence
19  in these data points and they are readily accessible; for example, citing 800 utility
20  providers, Shoen Decl. ¶ 15, and 2,200 locations, Shoen Decl. ¶ 8 , and providing
21  specific numbers of assets such as 188,700 trucks[16] in its 10K disclosures.

22    25.    Computing scope 1 GHG emissions will not require UHHC to obtain
23  any information from its independent dealers that it does not already possess. The
24  largest element of UHHC's scope 1 emissions would come from its vehicle fleet.
25  According to its 2024 10-K disclosures and its dealer agreement template, UHHC

26  _____
[14] Ex. 1 at 46.
27  [15] The process of computing GHG emissions from operational information using computational formulae, conversion factors and emission factors was addressed in Burton Decl. (Dkt. 53), ¶¶ 29-31. *See also* ¶ 29 below.
28  [16] Ex. 1 at 3

10

owns all the vehicles used in its operations; the independent dealers act only as agents facilitating the rental of such equipment and receiving a commission for such rentals. UHHC keeps accurate records of vehicle mileage and configurations, and the dealer agreement imposes a monetary penalty to dealers for any inaccurate mileage reporting.[17] Using this mileage information, UHHC would apply emission factors to the fuel used in these vehicles and the average miles per gallon achieved by each vehicle type to compute the scope 1 emissions.

26.     Mr. Shoen states UHHC would need to alter or amend contracts for the collection of any required information: "[I]t has to begin revising contracts and otherwise collecting this information immediately." Shoen Decl., ¶ 29. This does not have to be the case. Even if UHHC needed data from its dealers related to UHHC equipment, which I believe is highly unlikely given UHHC's detailed accounting records, UHHC already has terms in its dealer contract that "permit U-Haul representatives to enter Dealer's premises at any reasonable time to inspect or remove U-Haul Equipment accounting records."[18]

27.     Any additional scope 1 emissions from heating and cooling equipment used at its owned or leased facilities (if even material[19]) would be computed using the operating data from such equipment and not require information from outside sources.

28.     Most scope 2 emissions for UHHC will consist of the indirect emissions from the electricity used at its owned or leased facilities. Mr. Shoen suggests that some of UHHC's utility providers lack sophistication and may not be able to provide additional data on emission matters. Shoen Decl., ¶ 15 ("utility providers (some of which don't even accept electronic payment and are unlikely to be able to

---

[17] Ex. 2 at 4c.
[18] Ex. 2 at 4d.
[19] Like the concept of materiality found in securities law and financial reporting, many entities exclude from the disclosure of emissions activities that individually and in the aggregate are not material to the reported emissions of the organization. I would expect UHHC to evaluate its operations for materiality and likely exclude certain emitting sources from the overall emissions reporting on the basis of materiality.

11

1  provide U-Haul the required information)"). However, it likely will not be

2  necessary for UHHC to obtain additional information from its utility providers.

3  Given its effective ICFR, UHHC has accurate records of the electricity purchased

4  and used in its operations. Using the volume information included on the invoices

5  associated with these electricity purchases, depending on regulatory guidance

6  developed by CARB, UHHC will likely be able to use emission factors for

7  electricity supplied from the grid to compute scope 2 emissions.

8      29.    As noted in my prior declaration, scope 3 emissions represent indirect

9  emissions from 15 categories of activities. *See* Burton Decl. (Dkt. 53) ¶¶ 31 et seq. I

10  previously described the various options available to a reporting entity for its scope

11  3 emissions. *Id.* ¶ 31c. In his Declaration, Mr. Shoen claims operational constraints

12  regarding interactions and contractual relationships with its independent dealers, for

13  example "if U-Haul included a requirement to collect this data in its contracts, it

14  would risk losing a very substantial portion of its Dealer network." Shoen Decl.

15  ¶ 27. To the contrary, depending on regulatory guidance developed by CARB,

16  UHHC may be able to utilize the computational approaches within the GHG

17  Protocol that solely use information already available to the reporting entity and do

18  not require data from third parties to calculate the relevant scope 3 emissions data.

19  For example, under the GHG Protocol guidance, UHHC could use the expense data

20  recorded in its general ledger to compute the scope 3 emissions from purchased

21  goods and services using the spend-based method allowed in the GHG Protocol.[20]

22  These computational methods would significantly limit or eliminate the need to

23  gather data from its dealer network and would not "threaten[] the very essence of

24  U-Haul's business model." Shoen Decl., ¶ 27.

25

---

26  [20] *Technical Guidance for Calculating Scope 3 Emissions (version 1.0): Supplement to the Corporate Value Chain (Scope 3) Accounting and Reporting Standard*, World Resources Institute
27  & World Business Council for Sustainable Development (2023)
28  https://ghgprotocol.org/sites/default/files/2023-03/Scope3_Calculation_Guidance_0%5B1%5D.pdf, Dkt. 53-17 at 20-35.

### Mr. Shoen's Alleged Concerns Regarding the Cost and Utility of Emission Factors

30.       Emission factors for the computation of GHG emissions are available from many sources, including free resources from the U.S. Environmental Protection Agency ("EPA") available at its GHG Emissions Factors Hub.[21]  This data is not difficult to apply, and many entities use emission factors together with commercially available spreadsheet applications (such as Microsoft Excel) to compute emissions. Many other more robust commercially available and widely-used applications are available (for example Envizi[22] and EnergyCap[23]) that automate the collection of utility data and prepare the necessary emissions calculations.

31.       Scope 1 and 2 emissions computations would not be challenging or beyond the capability of UHHC. Mr. Shoen claims in his discussion regarding the impact of S.B. 253 that UHHC would "be forced to engage in high-priced guesswork (assumptions and prognostications multiplied by industry-wide average emissions factors or average emission factors for energy generation) to generate inherently inaccurate data." Shoen Decl. ¶ 16. That emission factors incorporate averages does not equate the use of such factors with guesswork. The use of emission factors for the computation of a GHG emissions inventory is widely accepted and, in my experience, of the thousands of entities that report GHG emissions[24] all use emission factors to prepare the disclosures.

32.       Concerning the impact that making the disclosures called for in S.B. 253 and S.B. 261 could have on the certification of SEC disclosures, Mr. Shoen

---

[21] EPA's GHG Emission Factors Hub was designed to provide organizations with a regularly updated and easy-to-use set of default emission factors for organizational greenhouse gas reporting. *GHG Emission Factors Hub*, EPA, https://www.epa.gov/climateleadership/ghg-emission-factors-hub, attached hereto as Ex. 5.

[22] *IBM Envizi: Utility Bill Analytics,* IBM, https://www.ibm.com/products/envizi/utility-bill-analytics.

[23] *Energycap UtilityManagement,* EnergyCap, https://www.energycap.com/utility-bill-energy-management-software/.

[24] Burton Decl. (Dkt. 53), ¶ 14.

13

1    reiterates "Complying with these new laws would require U-Haul to make
2    disclosures that, while based on a good faith effort and great expense, will be based
3    on high-priced guesswork (assumptions and prognostications multiplied by
4    industry-wide average emissions factors or average emission factors for energy
5    generation) which ultimately yield inaccurate data compared to reality." Shoen
6    Decl. ¶ 42. However, the use of estimates and assumptions to prepare financial
7    disclosures is an established and accepted approach for reporting entities.[25] Indeed,
8    companies—including UHHC—routinely make numerous estimates when
9    preparing financial reports. For example, in its 2024 10-K, UHHC identifies the
10   following as the critical accounting estimates used in its financial reporting: the
11   recovery of property, plant and equipment; insurance reserves including life
12   insurance, property & casualty, and self-insurance liability; impairment of
13   investments; and income taxes.[26] Simply because a reported item or amount
14   involves an estimate does not make it inaccurate, whether for purposes of financial
15   reporting or emissions and climate risk reporting. Mr. Shoen himself certifies the
16   financial disclosures in UHHC's SEC filings that include, and rely on, estimates
17   and assumptions.[27] There is no reason why UHHC cannot apply these same skills to
18   produce complete and accurate emissions and climate risk reporting and to allow its
19   executives to make the required certifications over disclosure controls and
20   procedures.
21       33.    Mr. Shoen also claims that "Due to the inherent inaccuracies in
22   calculating the data required for reporting, disclosures will require updates as
23   methodologies and calculations become more advanced and accurate. These
24   inaccuracies and updates will undoubtedly lead to litigation." Shoen Decl. ¶ 42.
25   However, the need to update standards is not new or specific to emissions and
26   climate risk reporting standards. Financial reporting standards also evolve and are

27       [25] Burton Decl. (Dkt. 53), ¶¶ 23-25.
         [26] Ex. 1 at 19-21
28       [27] *See, e.g.*, Ex. 1 at Exhibit 31.1

14

1  updated regularly to reflect changes in the marketplace and experiences and needs

2  of users. These updates have not been understood to render the prior accounting

3  standards inaccurate or the reports prepared using such standards unreliable.

4  Whether or not GHG emissions and climate risk disclosures will require updating in

5  the future and lead to litigation, as Mr. Shoen posits, is speculative; however, in my

6  experience with financial reporting, companies that provide reliable, transparent,

7  and complete reporting are better protected from such risks, and I would expect

8  similar outcomes related to emissions and climate risk reporting.

9  **Mr. Shoen's Alleged Concerns Regarding Compliance with S.B. 261**

10  34.  UHHC will also be subject to the requirements of S.B. 261. Mr.

11  Shoen's stated concerns about S.B. 261 relate mostly to the nature and

12  appropriateness of the disclosures, and he makes only high-level, conclusory claims

13  regarding the actions needed to prepare the disclosure. *See* Shoen Decl. ¶¶ 37-38

14  ("S.B. 261's requirements would force U-Haul to expend considerable time and

15  resources. U-Haul will have to begin building the systems and contracts to comply

16  with S.B. 261 immediately and at great cost and commitment of personnel hours.").

17  35.  In my prior declaration, I explained the TCFD disclosures and the

18  nature of such disclosures, including disclosures that relate to the corporate

19  governance process and strategy considerations around climate risk. Burton Decl.

20  (Dkt. 53) ¶¶ 34a-34b. Based on a review of publicly available documents from

21  UHHC, UHHC already makes TCFD aligned disclosures and therefore it likely has

22  in place several aspects of governance and oversight related to emissions and

23  climate risk reporting.

24  36.  The company's risk factor disclosures in its 2024 10-K include

25  statements about transition risk[28]: "Existing and future laws or regulations favoring

26  electric, autonomous, and connected vehicles may negatively impact the

27  composition of our fleet and negatively affect our business and results of

28  _____

[28] Transition risk is described in Burton Decl. (Dkt. 53), at ¶ 37.

15

operations."[29] This risk factor indicates "The growing insistence that the future of the economy will be based on an all-electric solution instead of a hybrid version or other alternative fuels may create an infrastructure in which personal interstate travel will be uneconomical or severely regulated, which could materially and adversely affect our moving business, results of operations, and financial position."[30] This is exactly the type of disclosure the TCFD calls for regarding strategy and, with some additional explanatory information from UHHC, would be responsive to the requirements for TCFD reporting, the protocol referenced in S.B. 261.[31]

37.     UHHC also includes on its website a section on Sustainability where it identifies the following goals:

- Continually improve the environmental, social, and economic performance of our products, services and activities.
- Pursue proactive solutions to pollution prevention, energy conservation and waste reduction in accordance with our principles to reduce, adaptively-reuse and recycle materials.
- Provide a safe, healthy and supportive environment that helps build a high-performing diverse workforce.
- Integrate environmentally-friendly technologies and innovations into product and service lifecycle management.
- Develop and implement comprehensive climate-change strategies to manage and mitigate our greenhouse gas (GHG) emissions.
- Promote sustainable local communities through operational responsibility, social investment, and philanthropic programs in accordance with our principles of availability, accessibility, affordability, and accountability.

---

[29] Ex. 1 at 8.
[30] *Id.* at 9.
[31] *Implementing the Recommendations of the Task Force on Climate-related Financial Disclosures,* Dkt. 53-5.

16

- Enhance stakeholder engagement through active and effective communications to our customers, employees, dealers, shareholders, governments and communities, and business partners and suppliers.[32]

38.    In my experience, most companies do not advertise sustainability goals, such as UHHC is doing here, without significant evaluation and analysis of the intended outcomes and actions necessary to accomplish the goals and oversight of the disclosures. As such, the information available to UHHC related to its stated sustainability goals provides a strong foundation on which to prepare the disclosures required by S.B. 261, and likely would reduce the time, effort, and costs associated with these disclosures. Specifically, with a stated sustainability goal such as "Develop and implement comprehensive climate-change strategies to manage and mitigate our greenhouse gas (GHG) emissions,"[33] I would expect UHHC to either have in place or be in the process of establishing governance, strategies, and risk management processes and policies around the GHG mitigation goal, and measurement methods and evaluation criteria to help the organization assess whether or not it was achieving this goal. The TCFD-aligned disclosures called for in S.B. 261 merely asks companies like UHHC to disclose these policies, processes, targets, and metrics.[34] UHHC's stated GHG mitigation goal also suggests they intended to implement such actions regardless of whether S.B. 261 (or S.B. 253) comes into force.

39.    Notably, Mr. Shoen omits any reference in his declaration to UHHC's insurance businesses.[35] While it is not clear these businesses would be subject to the

---

[32] *Sustainability Vision and Goals,* UHHC, https://www.uhaul.com/Articles/Sustainability/Vision-Goals-198/#:~:text=Our%20Vision&text=We%20embrace%20our%20responsibility%20to,to%20meet%20their%20own%20needs, attached hereto as Ex. 6.

[33] *Id.*

[34] *Implementing the Recommendations of the Task Force on Climate-related Financial Disclosures,* Dkt. 53-5.

[35] "Through Repwest Insurance Company ("Repwest") and ARCOA Risk Retention Group ("ARCOA"), our property and casualty insurance subsidiaries, we manage the property, liability and related insurance claims processing for U-Haul®. Oxford Life Insurance Company

(continued...)

17

1    disclosure requirements of S.B. 261,[36] existing disclosures from these operations

2    suggest the company currently has a process in place to consider climate risk.

3    Oxford, its life insurance business, recently provided disclosures under the National

4    Association of Insurance Commissioners ("NAIC") Climate Risk Disclosure

5    Survey.[37] Those responses indicate the company's conclusion that climate change

6    risk creates minimal exposure for Oxford. These disclosures demonstrate the

7    company has familiarity with the topic and the governance processes necessary to

8    make public disclosures about climate change risk. In my initial declaration, I

9    included a discussion regarding the various types of disclosures a reporting entity

10   may make depending on the outcome of its climate risk assessment activities.

11   Burton Decl. (Dkt. 53), ¶ 38. With the pending changes to the NAIC climate risk

12   survey questions in alignment with TCFD[38], which I would expect Oxford to be

13   presently considering, the experience addressing such disclosures should reduce the

14   learning curve necessary for UHHC's moving and storage business to prepare the

15   disclosures called for in S.B. 261.

16         40.       Mr. Shoen states, "U-Haul considers the information that S.B. 261

17   requires to be controversial and disagrees with including this type of information on

18   its public website - as indicated by such opinions' absence on its website." Shoen

19   Decl., ¶ 40. UHHC's existing public disclosures — the risk factor addressing

20   transition risk associated with electric vehicles included in its 2024 10-K, the

---

("Oxford"), our life insurance subsidiary, sells life insurance, Medicare supplement insurance, annuities and other related products to the senior market." Ex. 1 at 3.

[36] S.B. 261 states that a "[c]overed entity" does not include a business entity that is subject to regulation by the Department of Insurance in this state, or that is in the business of insurance in any other state." Health and Safety Code Section 38533(a)(4).

[37] *NAIC Climate Risk Disclosure Survey Results,* Oxford Life Insurance Company, attached hereto as Ex. 7. Survey responses submitted by Oxford can be obtained from the California Department of Insurance NAIC Climate Risk Disclosure Survey Results database https://interactive.web.insurance.ca.gov/apex_extprd/f?p=201:6:::NO:RP::

[38] On April 8, 2022, the National Association of Insurance Commissioners, which includes California's Insurance Commissioner, adopted a new standard for insurance companies to report their climate-related risks, in alignment with TCFD. Entities required to respond to the NAIC Climate Risk Survey using the new TCFD aligned questions have until August 29, 2025 to respond.

18

1    Oxford disclosures in response to the NAIC survey regarding its climate change

2    risk assessment, and the sustainability goal of mitigating its GHG emissions

3    included on the company's website — contradict Mr. Shoen's statement and

4    suggest UHHC is comfortable with making conclusions on climate change risk and

5    the processes necessary to make such disclosures.

6    **Mr. Shoen's Alleged Concerns Regarding Scope 4 Emissions**

7        41.        Mr. Shoen makes several statements in his declaration about scope 4

8    emissions. Shoen Decl. ¶¶ 30-33. The official definition from the World Resources

9    Institute (the group who developed and manage the GHG Protocol) is: "Avoided

10   emissions are emission reductions that occur outside of a product's life cycle or

11   value chain, but as a result of the use of that product. Examples of products (goods

12   and services) that avoid emissions include low-temperature detergents, fuel-saving

13   tires, energy-efficient ball-bearings, and teleconferencing services. Other terms

14   used to describe avoided emissions include climate positive, net-positive

15   accounting, and scope 4."[39] The reporting and disclosure of avoided emissions has

16   been limited for a variety of reasons, including difficulty to determine, comparisons

17   against hypothetical scenarios, lack of consistency, and fears of greenwashing.[40] A

18   researcher examined the prevalence of such reporting, and after performing a

19   comprehensive search of SEC filings, identified only 19 companies that made

20   reference to avoided emissions in filings with the SEC.[41]

21       42.        For purposes of computing a GHG inventory, the GHG Protocol

22   prohibits offsetting an entity's GHG inventory (that is the aggregation of its scope

---

23   [39] *Do We Need a Standard to Calculate Avoided Emissions* (November 5, 2013), Laura
24   Drauker and the World Resources Institute, https://www.wri.org/insights/do-we-need-standard-calculate-avoided-emissions attached hereto as Ex. 8.
     [40]    *Measuring Scope 4 emissions: what boards need to know*, Jessica Tasman-Jones on FT
25   Professional, https://professional.ft.com/en-gb/blog/measuring-scope-4-emissions-what-boards-need-to-know/ attached hereto as Ex. 9, and, *As Companies Grapple with Scope 3, Scope 4*
26   *Comes into Play* (July 11, 2002), Lindsay Frost in Agenda, A service from the Financial Times,
     https://www.agendaweek.com/lead/enroll/3659904/471054?from=https://www.agendaweek.com/
27   c/3659904/471054/companies_grapple_with_scope_scope_comes_into_play?&referrerId=1&referrerDomain=google.com attached hereto as Ex. 10.
     [41]    Ex. 10.
28

1   1, 2, and 3 emissions) by avoided emissions. However, neither the GHG Protocol

2   nor S.B. 253 restricts a company from separately disclosing avoided emissions. An

3   example of a company that separately reports avoided emissions along with its

4   scope 1, 2, and 3 GHG inventory, as well as many other sustainability topics

5   including TCFD, is Tesla. Following the guidance of the GHG Protocol, avoided

6   emissions are not offset from its GHG inventory but the avoided emissions of over

7   20 million metric tons of $CO_2e$ are prominently disclosed and explained in its

8   report.[42] UHHC is free to similarly disclose avoided emissions, and Mr. Shoen's

9   concerns are unwarranted.

11      I declare under penalty of perjury that the foregoing are true and correct.

12   Executed on this day, the 5th of April, 2025, in Scottsdale, Arizona.

JAMES P. BURTON
CPA

---

[42] *Impact Report 2023*, Tesla, pp. 19-25, https://www.tesla.com/impact attached hereto as Ex. 11.

20

**SER 1005**

# Exhibit 56

# to Declaration of Thomas P. Lyon

# Greenhouse Gas Disclosure and Emissions Benchmarking

Exhibit 56 to Decl. of Lyon
1465
**SER 1006**

# Journal of Accounting Research

DOI: 10.1111/1475-679X.12473
Journal of Accounting Research
Vol. 61 No. 2 May 2023
Printed in U.S.A.

CHICAGO BOOTH 

# Greenhouse Gas Disclosure and Emissions Benchmarking

SORABH TOMAR*

Received 22 September 2019; accepted 29 October 2022

ABSTRACT

I examine the effects of the U.S. Greenhouse Gas (GHG) Reporting Program, which requires thousands of industrial facilities to measure and report their GHG emissions. I show that facilities reduce their GHG emissions by 7.9% following the disclosure of emissions data. The evidence indicates that benchmarking—whereby facilities use the disclosures of their peers to assess their own relative GHG performance—spurs emission reductions. Firms' concerns about future legislation appear to motivate this behavior and measurement alone (without disclosure) seems not to reduce emissions.

*Southern Methodist University Cox School of Business

Accepted by Rodrigo Verdi. This paper is based on my dissertation. I thank my committee members—Hans Christensen (co-chair), Christian Leuz (co-chair), Mark Maffett, and Abbie Smith—for their invaluable guidance. I am also grateful to Ray Ball, Phil Berger, John Barrios, Jeremy Bertomeu, Neil Bhattacharya, Matthew Bloomfield, Michael Braun, Matthias Breuer, Joey Choi (discussant), Jung Ho Choi, Carolyn Deller, Hemang Desai, João Granja, Michael Greenstone, Matthew Gustafson (discussant), Jody Grewal (discussant), Doug Hanna, Russ Hamilton, Yanrong Jia, Ginger Jin (discussant), Jean-Marie Meier, Dan Millinet, Liz Moyer, DJ Nanda, Jing Pan, Rachna Prakash (discussant), Robbie Sanders, Doug Skinner, Mark Templeton, Wayne Taylor, Marcel Tuijn, Hayoung Yoon, an anonymous associate editor, two anonymous reviewers, and seminar participants at CUNY Baruch College, Deakin University, LSE, Southern Methodist University, UCLA, University of Chicago, AAA FARS Conference, FMCG Conference, NBER Measuring and Reporting Corporate Carbon Footprints Conference, RSFE, and University of Delaware Weinberg Center/ECGI Corporate Governance Symposium for helpful comments and suggestions. I thank U.S. EPA's Emissions Inventory and Analysis Group for providing much data necessary for this study and Nivedita Gupta for valuable research assistance. An online appendix to this paper can be downloaded at https://www.chicagobooth.edu/jar-online-supplements.

451

© 2023 The Chookaszian Accounting Research Center at the University of Chicago Booth School of Business.

Exhibit 56 to Decl. of Lyon
1466
**SER 1007**

452     S. TOMAR

My study highlights how mandatory GHG disclosure can create real effects for peers.

**JEL codes :** D72, M40, Q54, Q56

**Keywords:** disclosure; ESG; climate change; benchmarking; peer effects; real effects; political pressure

## 1. Introduction

This paper studies the U.S. Greenhouse Gas Reporting Program (U.S. Program) to understand how mandatory, granular disclosure affects the greenhouse gas (GHG) emissions of reporting entities. It highlights the role of *benchmarking* in producing real effects, whereby facilities reduce emissions after observing the GHG disclosures of their peers. Among environmental, social, and governance (ESG) topics, climate change has received substantial attention, given its potentially catastrophic risks (Eccles and Klimenko [2019], Hoegh-Guldberg et al. [2018]). GHG disclosure mandates are thus increasingly being adopted in different regions of the world. Notably, the U.S. Securities and Exchanges Commission (SEC) proposed an extensive climate-related disclosure rule in 2022. The impact of disclosure in areas such as toxic pollution (Chen, Hung, and Wang [2018], Hamilton [2005]) suggests potential benefits in the GHG setting.

Administered by the U.S. Environmental Protection Agency (EPA), the U.S. Program was implemented in 2010, broadly for use in guiding potential future GHG policies. It requires thousands of U.S. facilities to report their yearly emissions by GHG and production activity. Disclosure frequently extends to the process or unit level (boiler, furnace, etc.). In 2010, the U.S. Program covered over 6,200 facilities that together emitted 3.2 billion tons of carbon dioxide equivalent (T $CO_2$e), roughly half of total U.S. emissions. Importantly, although facilities began measuring GHG emissions in 2010, the data were not publicly disclosed until 2012. The U.S. Program therefore provides two years of pretreatment data for this study about the effects of public disclosure. Further, because most facilities did not previously disclose GHG emissions, the U.S. Program allows study of the impact of information provision rather than of the aggregation or dissemination of existing information.

Prosocial disclosure rules often aim to create an *action-cycle*, whereby disclosed information becomes embedded in the decisions of users, and user responses, in turn, feed back into disclosers' decisions (Hombach and Sellhorn [2019], Weil et al. [2006]). Although the U.S. Program provides a significant amount of new information, there are reasons to question whether it produces a firm-level action-cycle around GHG emissions. The U.S. Program's government website might lack salience to stakeholders, its facility-level data are difficult to aggregate and exclude emissions generated abroad, and the diffuse nature of global warming increases the coordination costs of stakeholder action around the disclosed data. Yet,

14756701, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12475 by University Of Michigan Library, Wiley Online Library on [24/06/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 56 to Decl. of Lyon
1467
**SER 1008**

14795796, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING    453

U.S. Program data are also granular and informative about operations. Facilities might therefore use their peers' disclosures to identify red flags and drive down their own emissions. Given these arguments, it bears empirical examination whether the U.S. Program reduces emissions.

I divide my analysis into three parts. First, I conduct difference-in-differences tests to examine whether the U.S. Program leads to GHG emission reductions. Second, I present evidence supporting benchmarking, whereby facilities use their peers' disclosures when reducing emissions. Third, I present supplementary evidence to more completely understand the U.S. Program's effects, including the role of external stakeholder pressure and whether facilities reduce emissions during the measurement phase of the U.S. Program (prior to disclosure).

My difference-in-differences tests show that GHG emissions decline by 7.9% following U.S. Program disclosure. Canadian facilities provide a plausible counterfactual—they share many commonalities with U.S. facilities and have been disclosing their GHG emissions since 2004. The estimation accounts for industry-specific trends and time-invariant facility characteristics. Additional tests show that emission reductions are not achieved by simply curbing or offshoring economic activity. Rather, firms are seen to increase capital expenditures, suggesting they make investments to reduce GHG emissions.

To assess benchmarking, I present four sets of supportive evidence. First, I show that measures of within-industry emissions dispersion fall by 20–31%. This is consistent with greater overlap in facilities' information following disclosure. Second, I show that a facility's carbon intensity, relative to that of its peers (and revealed through disclosure), predicts its subsequent emissions reduction. This is consistent with managers using disclosed data to assess whether their facilities are more or less carbon intensive than peers. This relation only emerges when carbon intensity is constructed using data publicly observable at that time (and not timelier data not yet publicly available at that time), which helps to rule out nondisclosure-based explanations.

Third, I classify some facilities as benchmarkers based on how much their owner-firms search for their peers' financial information, à la Bernard, Blackburne, and Thornock [2020]. Benchmarkers have significantly larger GHG emission reductions relative to nonbenchmarkers. Fourth, I employ a novel measure of industrial process-similarity using the techniques of Fetter et al. [2022]. GHG emission reductions are largest when peer facilities have lower initial similarity—this is consistent with the notion that preexisting diversity in processes provides more scope for benchmarking to reduce emissions. I also show that facilities in a peer group become more similar in terms of processes after U.S. Program disclosure. Further, they end up sharing more (less) processes with their carbon light (carbon intense) peers.

Turning to supplementary evidence about the U.S. Program's effects, I first explore the role of external pressure in motivating emission reductions and benchmarking. I find a larger U.S. Program treatment effect when

Exhibit 56 to Decl. of Lyon
1468
**SER 1009**

454    S. TOMAR

facilities have climate-progressive senators, supporting the idea that facilities are attentive to the prospect of climate change–related legislation. Because constituents can seek to influence climate policy (Gelles [2022]), I also consider the role of political connections forged through campaign contributions. The U.S. Program treatment effect is larger for facilities connected to their House representatives, consistent with these facilities being more concerned about legislation or trying to shed their representatives in a favorable environmental light. In comparison, I find no strong evidence of emissions pressure from capital markets, customers, or the general public around U.S. Program disclosure.

My other supplementary evidence concerns the impact of emissions measurement and anticipation of external pressure prior to U.S. Program disclosure. Using Bayesian methods, I estimate U.S. facilities' unobservable pre-U.S. Program $CO_2$ emissions (i.e., for years 2008 and 2009). Although I find a decline in $CO_2$ emissions after U.S. Program disclosure, there is no significant emissions response when facilities first start measuring and reporting their emissions nonpublicly to the EPA (prior to disclosure). These results underscore the importance of public disclosure in producing emission reductions.

Although GHG disclosure mandates are becoming increasingly common (see Australia, the European Union, and the United Kingdom for policy examples), little is known about their effects. My paper demonstrates that they can produce an important social benefit by reducing GHG emissions. Though such reductions are not always the intent—the SEC states that its proposed rule primarily informs investors—this paper nonetheless highlights several points that may be informative for policy-makers interested in emission reductions: (1) benchmarking can play an important role in reducing emissions, and considering the U.S. Program, this seems more likely when disclosed data are granular; (2) the prospect of climate legislation is a factor that facility managers likely consider when implementing emission reductions (Glazer and McMillan [1992], Maxwell, Lyon, and Hackett [2000], Suijs and Wielhouwer [2019]); and (3) measurement and reporting to the regulator alone might not affect emissions. Recent work also highlights the potential of GHG disclosure mandates to reduce emissions (Bauckloh et al. [2022], Downar et al. [2021], Jouvenot and Krueger [2021], Matisoff [2013], Yang, Muller, and Liang [2022]). Because these papers study emissions data that are already available in another venue prior to the disclosure rules they study, they measure an effect incremental to the one I measure.[1]

My paper also contributes to the literature on the real effects of ESG disclosure. First, it measures the initial impact of information provision

---

[1] Several papers also study the real effects of voluntary GHG emissions disclosures (e.g., Qian and Schaltegger [2017], Bolton and Kacperczyk [2021]). This paper differs by estimating a treatment effect unconditional on latent factors that might also drive emission reductions (e.g., a desire to create institutional legitimacy; Luo [2019]).

14759701, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University of Michigan Library, Wiley Online Library on [24/04/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 56 to Decl. of Lyon
1469
SER 1010

14796796, 2021, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12373 by University Of Michigan Library, Wiley Online Library on [24/09/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING     455

on the disclosed outcome, rather than the impact of aggregating or disseminating information available elsewhere (e.g., Bennear and Olmstead [2008], Christensen et al. [2017]). Second, it documents the effectiveness of disclosure with respect to an externality with large collective action costs and relatively low salience and immediacy, rather than a setting where emissions are toxic and local (i.e., where effects are salient and stakeholders have low coordination costs) (e.g., Chen et al. [2018], Delmas, Montes-Sanchom, and Shimshack [2010], Graham and Miller [2001], Hamilton [2005]). Lastly, it shows that ESG disclosure can facilitate benchmarking. Roychowdhury, Shroff, and Verdi [2019] note the difficulty of identifying peer effects, given Manski's [1993] reflection problem. Although there is some evidence that firms take cues from rivals' financial and operational disclosures (Durnev and Mangen [2009], Fetter et al. [2022], Grennan and Swanson [2020], Li [2016]), firms' ESG practices could vary markedly in motivation (stakeholder orientation, alignment with financial objectives, virtue signaling, etc.), leaving the utility of peers' ESG disclosures less clear. Cao, Liang, and Zhan [2019] show that firms improve their ESG performance after their peers pass ESG-focused resolutions. They highlight a competitive concern about peers' ESG performance but do not address the role of disclosure regulation in promoting benchmarking.

## 2. Setting: The U.S. GHG Reporting Program

The Consolidated Appropriations Act of 2008 provided funds for the U.S. EPA to develop a mandatory GHG reporting rule, covering most sectors of the U.S. economy. The U.S. Program's main goal is to collect data for use in potential GHG rule-making, including emissions pricing, which had considerable support at that time (Richardson [2012]). Based on its experiences with programs such as the Toxic Release Inventory (TRI), the EPA also recognized that the U.S. Program could raise awareness of emissions among stakeholders and emitters, which could facilitate emission reductions (US EPA [2009]). The EPA proposed a mandatory GHG reporting rule on April 10, 2009, and, after soliciting comments, finalized a rule on October 30, 2009. Over this period and the following year, the prospects for U.S. GHG emissions pricing dimmed significantly.[2] The U.S. Program, however, remained intact.

The U.S. Program took effect on January 1, 2010, with the first reports due for submission to the EPA on September 30, 2011. The 2010 data were publicly disclosed by the EPA on January 11, 2012. Figure 1 provides a timeline of the key dates as they relate to the empirical tests. The U.S. Program requires facilities to report their GHG emissions by specific gas, coming

---

[2] The posited reasons for this include high unemployment after the Great Recession, lobbying by high emitters, the Senate's refusal to vote on the Waxman-Markey Bill, the growing politicization of climate policy, and the Obama administration's pivot toward healthcare, financial regulation, and energy independence.

Exhibit 56 to Decl. of Lyon
1470
**SER 1011**

14750746, 2021, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-4768.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

456   S. TOMAR



FIG 1.—Timeline of important U.S. Greenhouse Gas Reporting Program events.

from any of 41 source categories. Disclosure thresholds vary by source category, but 25,000T $CO_2$e is the most common threshold. Depending on the source category, facilities must disclose additional information at the sub-facility level (i.e., unit or process level). Thus, the U.S. Program provides very granular data.[3]

U.S. Program reports are self-certified by facilities (i.e., third-party verification is not required). Nonetheless, the U.S. Program does promote data quality. Its electronic reporting platform provides real-time feedback about potential errors to reporting facilities. The EPA then subjects reports to a series of electronic checks, after which it can question facilities to understand any irregularities. Furthermore, the U.S. Program is given force by the U.S. Clean Air Act, which lets the EPA levy penalties of up to \$37,500 per day of a violation, which includes failure to report emissions, failure to retain adequate records, and report falsification. That said, the EPA has yet to take any enforcement action regarding the U.S. Program.

U.S. Program data are publicly accessible in multiple formats. One is an interactive map geared toward novice users. Facility-level data are also available in spreadsheet format. Advanced users can access the totality of U.S. Program data by querying the EPA's Envirofacts database. From direct communications with the EPA, the GHG portion of Envirofacts received over

---

[3] Examples of GHGs are carbon dioxide ($CO_2$) and methane—$CO_2$ is the chief GHG emitted by facilities. Examples of source categories are stationary combustion and cement manufacturing. 25,000T $CO_2$e is equivalent to the emissions from the energy used by 2,200 homes in a year or 131 railroad cars of coal. To assess whether a facility falls below an inclusion threshold, the EPA requires a submission of pen-and-paper calculations based on the amount of resources consumed and default conversion factors. For facilities included in the U.S. Program, the EPA prescribes several measurement methods. For example, there are four measurement tiers for measuring $CO_2$ emissions from fossil fuel combustion. Larger emitting units must use higher tiers. Tier 1 is based on the mass of fuel used and default laboratory factors. Tier 4, in contrast, requires continuous emissions monitoring to directly measure $CO_2$ emissions at a fixed cost of \$25,000–\$75,000 (Singh et al. [2015]). When reporting on stationary combustion, facilities must report the following, among other things, for each combustion unit: its type (e.g., boiler, furnace), its maximum thermal input power, the types of fuel it uses, its emissions, and any relevant emissions calculations. This serves well to illustrate the granularity of U.S. Program data.

Exhibit 56 to Decl. of Lyon
1471
SER 1012

14796796, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING     457

100,000 page-views from January 2013 to June 2020, indicating the data are frequently accessed. The EPA also provides the names of reporting facilities' highest level U.S. owners, though the naming conventions are often inconsistent across years.

### 3. Related Literature and Hypothesis Development

Prosocial disclosure mandates span many areas, including workplace safety, public health, and mineral extraction rights (Christensen et al. [2017], Jin and Leslie [2003], Johnson [2020], Dranove et al. [2003], Rauter [2020]). Often, their goal is to create an action-cycle, whereby disclosure affects the decisions of information users (e.g., restaurant customers), and disclosing firms anticipate these decisions and change their behavior accordingly.

As discussed in section 2, the EPA recognizes the potential for an action-cycle to emerge around the U.S. Program. Potential users include regulators, the public, investors, and, as will be discussed, peer facilities. In the environmental domain, mandatory disclosure has led listed Chinese firms to reduce toxic $SO_2$ and wastewater emissions (Chen et al. [2018]) and utilities to improve their environmental performance (Bennear and Olmstead [2008], Delmas et al. [2010]). The EPA's TRI is perhaps the most studied pollution disclosure rule and is credited for a dramatic decline in toxic emissions (Weil et al. [2006], Graham and Miller [2001]). The TRI and U.S. Program have similarities—both are administrated by the EPA, do not target a specific stakeholder group, provide information at the facility level or finer, and span a wide range of industries. As such, the TRI serves as a useful reference point for conjectures about the U.S. Program's effects. The apparent success of the TRI and other disclosures in improving environmental outcomes suggests that disclosure can play a role in curbing GHG emissions too. This leads to the first hypothesis, expressed in alternate form as follows:

*H1*: Facilities reduce their GHG emissions following U.S. Program disclosure.

A number of factors, however, militate against H1. The U.S. Program's presence on a government website might lack the salience of financial statements or customer reports (Bennear and Olmstead [2008], Christensen et al. [2017]). Further, aggregation of facility-level data is cumbersome and incompletely depicts a firm's global emissions. Thus, the potential for external pressure at the firm level loses some force.[4]

---

[4] Online appendix A1.1 describes the 766 letters about general stationary fuel combustion (the largest GHG emissions source) that the EPA received after proposing the U.S. Program. The vast majority are from manufacturers arguing that reporting requirements are excessive and that reporting granularity should be no finer than the facility level, owing to financial and proprietary cost concerns. Environmental advocates submitted seven letters pushing for more comprehensive emissions reporting. A handful of state government agencies submitted letters

Exhibit 56 to Decl. of Lyon
1472
**SER 1013**

458   S. TOMAR

Additionally, GHGs are quite different pollutants to those covered by the TRI and similar EPA programs. The latter are toxic, making their effects (e.g., illness, acid rain) salient and likely to trigger outrage. They also act locally, reducing the coordination costs of stakeholder action (e.g., shaming, litigation; Coase [1960]). In contrast, GHG emissions are largely non-toxic, and reducing them entails global coordination costs: Each emitter contributes only marginally to the global temperature, and affected stakeholders are widely dispersed. Reducing emissions might also entail significant direct costs. Weighed against the cited disclosure research, these factors highlight the importance of empirically testing the relation between GHG disclosure and emissions.

Attention must also be paid to how emission reductions could occur. Firms can mimic the ESG behavior of their competitors, and target-setting plays an important role in GHG emission-reduction strategies (Cao et al. [2019], Ioannou, Li, and Serafeim [2016]). Connecting these ideas with the U.S. Program's significant granularity, one hypothesis is that facilities (perhaps with the help of engineering consultants) might be better able to assess their own relative GHG performance once they have access to the U.S. Program data of their peers. I call this *benchmarking*. My second hypothesis, expressed in alternate form, is as follows:

*H2*: Facilities use their peers' GHG emissions disclosures for benchmarking (i.e., to better assess their own GHG performance).

Benchmarking could be driven by pressure from environmentally conscious stakeholders, who have shown a concern for relative ESG performance (Clarkson et al. [2015], Hartzmark and Sussman [2019]). Fung and O'Rourke [2000] describe how journalists and environmentalists fixated on the worst TRI performers. Facilities could benchmark their GHG emissions because they expect that outsiders will likewise benchmark these emissions.

Firms take cues from their peers' disclosures in financial contexts (Foster [1989], Shroff et al. [2014]). They also occasionally forgo energy-efficiency improvements that have positive net present value, possibly because of incomplete information (McKinsey Global Energy and Materials [2009], Gerarden, Newell, and Stavins [2017]). Therefore, profit and efficiency motives could also drive benchmarking. Grennan and Swanson [2020] and Fetter et al. [2022] highlight such behavior in fracking and hospital settings. External pressure and profit/efficiency motives could coexist and interact, making it difficult to disentangle them. For example, external pressure could lead firms to discover profitable improvements. H2 therefore considers benchmarking generally.

---

requiring clarification of the rules, and a few GHG consulting firms made recommendations for measurement methods. No letters were from the investing community.

14759701, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/04/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 56 to Decl. of Lyon
1473
**SER 1014**

14796794, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING          459

## 4.  GHG Emission Reductions Following Disclosure

### 4.1  CONTROL SAMPLE

A credible estimation of the U.S. Program's real effects must account for other factors that could lead facilities' GHG emissions to decline (e.g., changes in customer demand, input prices, and available production methods). To this end, I use Canadian facilities as a control group. Canadian facilities emitting over 100,000T (50,000T) $CO_2$e have been reporting their GHG emissions to Environment Canada since 2004 (2009). The scope of both reporting programs allows me to examine the U.S. Program's effect across a wide range of industries.[5]

Several features of the United States and Canada support their comparability in terms of facility-level GHG output. First, both are developed countries, and the United States is by far Canada's largest trading partner; online appendix A2, figure A1, shows that yearly percentage changes in both countries' GDPs move together closely. Thus, many general supply and demand shocks that affect GHG emissions should affect both countries similarly. Second, the countries are culturally similar. Online appendix A2, figure A2, shows the comovement of climate change interest in both countries (measured using Google Trends). This suggests that both countries' facilities face similar patterns in public pressure about GHG emissions. Third, both countries' energy markets are highly integrated through an extensive oil and gas pipeline network. Shocks to fossil fuel demand and supply should therefore propagate across both countries. Finally, the countries' environmental regulators co-operate in terms of non–climate change issues, which affects facilities' production costs and technologies used and, in turn, their GHG emissions (Weiss [1998]).

If the comparability arguments above hold, the time series of U.S. and Canadian facilities' emissions should bear out parallel trends prior to U.S. Program disclosure. Figure 2(a) supports the validity of the parallel trends assumption. The figure plots mean logged GHG emissions by country and year for this study's sample. The two countries' facilities' emissions share similar changes from 2010 to 2011, after which U.S. facilities' emissions steadily decline. To assess parallel trends going further back, I estimate $CO_2$ emissions for a subsample of U.S. facilities for the years 2008 to 2013. Section 6.3 discusses the estimation process. Figure 2(b) shows that the trends in both countries' facility $CO_2$ emissions are roughly parallel prior to disclosure and diverge noticeably following disclosure.

The availability of Canadian Program data does not necessarily negate the usefulness of U.S. Program data for benchmarking. First, the U.S. Program requires granular unit- and process-level disclosures, whereas the

---

[5] Other potential control groups include U.S. facilities in state-level programs, U.S. power plants, and facilities owned by firms reporting to the Carbon Disclosure Project (CDP). Online appendix A2 discusses these groups and highlights institutional features that hinder their use as control groups.

Exhibit 56 to Decl. of Lyon
1474
**SER 1015**

14763796, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/04/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

460    S. TOMAR



FIG 2.—Average logged emissions for U.S. and Canadian facilities. Figure 2(a) plots aver-
age annual GHG emissions (in logged T $CO_2e$) for U.S. and Canadian facilities that re-
ported emissions to their national GHG reporting programs. Figure 2(b) plots average an-
nual reported $CO_2$ emissions for Canadian facilities and estimated $CO_2$ for a subsample of
U.S. facilities—the estimation is described in section 6.3. For visual consistency, both fig-
ures use a balanced panel and exclude Massachusetts facilities, which began emissions re-
porting and disclosure a year earlier than other U.S. facilities as part of a state-level program.
Additional data filters are described in sections 4.2 and 6.3. The appendix provides variable
definitions.

Canadian Program does not. Second, U.S. facilities can combine U.S. Pro-
gram data with their knowledge about local peers (details about their out-
put of goods, regulatory pressures, etc.) to set more relevant benchmarks.[6]
U.S. facility managers arguably have less expertise about more distant
Canadian facilities (Engelberg, Ozoguz, and Wang [2018]).

---

[6] For example, the manager of a U.S. cement-making facility might gauge how much cement
a local peer produces as they compete in the same market. When U.S. Program data become
public, the manager can then assess whether his or her own facility uses more or less fuel, per
unit of cement produced, than the peer.

Exhibit 56 to Decl. of Lyon
1475
**SER 1016**

14795796, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING    461

### 4.2 DATA AND DESCRIPTIVE STATISTICS

The U.S. and Canadian Program's facility-level GHG emissions spreadsheets provide the main data used in this study.[7] Power plants (NAICS code 2211) are excluded because they are subject to detailed reporting requirements prior to the U.S. Program. They also face substantial regulatory incentives and scrutiny related to GHG emissions (see online appendix A2). Municipal waste facilities (NAICS code 5622) are excluded because they emit methane, with the emission rate driven by waste composition and by ambient conditions, including pressure, rainfall, and temperature (Héroux, Guy, and Millette [2010], Santhosh, Lakshmikanthan, and Sivakumar Babu [2017]). These factors potentially manifest differently across the United States and Canada. I exclude California facilities because California strictly regulates environmental issues, raising concerns about comparability with the rest of the sample (see online appendix A2). Lastly, noncorporate entities are excluded because benchmarking appeals to a notion of competition with peers. For noncorporate entities, it is unclear what the ultimate operating objective is (e.g., customer service, cost minimization, profit maximization, employment, or social welfare).

Tables 1a-c show data coverage across a range of industries and states/provinces. The five most common industries and states/provinces account for 58% and 36% of the sample. Though many industries have zero Canadian observations, 88% of observations share an industry-year with one or more observations from the other country. Table 2(a) shows that U.S. facilities compose 90% of the sample and emit roughly half the amount of GHGs per facility ($e^{11.0-11.8} - 1 = -0.55$), reflecting the larger size of the U.S. industrial sector and the U.S. Program's lower GHG reporting threshold. U.S. facilities faced a similar average gas price and fewer GHG efficiency regulations during the sample period.

### 4.3 RESEARCH DESIGN

To test H1, which predicts a reduction in GHG emissions following U.S. Program disclosure, I estimate the following difference-in-differences equa-

---

[7] In 2011, GHGs from 10 additional source categories (e.g., electronics manufacturing, fluorinated GHG production) became applicable for U.S. Program reporting. Emissions from these source categories are excluded to maintain comparability across years and because several of these categories were not included in the Canadian Program. To code facility ownership type, data are obtained from the U.S. and Canadian Programs about the highest parent owner from the respective country. I consider owners with ≥ 50% facility ownership and use Bloomberg research reports to manually identify the global parent company. A global parent is coded as public if it has a GVKEY in the Compustat database or has a quoted stock price. It is coded as noncorporate if the parent's name includes words such as "county," "state," "city," or "university." The remaining global parents are coded as private. This process took between 50 to 100 hours, highlighting the difficulty (and likely imperfections) in cleanly aggregating U.S. Program emissions to the firm level.

Exhibit 56 to Decl. of Lyon
1476
**SER 1017**

462   S. TOMAR

**TABLE 1A**

*Facility-Year Frequency by Four-Digit NAICS Industry and Country*

| Industry | Canada $N$ | United States $N$ | GHG Mean ($10^5$T $CO_2$e) |
|---|---|---|---|
| Aerospace Product and Parts Manuf. | 0 | 90 | 40 |
| Agriculture, Construction, and Mining Machinery Manuf. | 0 | 28 | 45 |
| Alumina and Aluminum Production | 43 | 193 | 384 |
| Animal Food Manuf. | 0 | 14 | 54 |
| Animal Slaughtering and Processing | 0 | 299 | 36 |
| Architectural, Engineering, and Related Services | 0 | 6 | 36 |
| Basic Chemical Manuf. | 114 | 1,667 | 272 |
| Beverage Manuf. | 4 | 88 | 67 |
| Cement and Concrete Product Manuf. | 60 | 326 | 611 |
| Clay Product and Refractory Manuf. | 3 | 43 | 73 |
| Coal Mining | 59 | 93 | 82 |
| Coating, Engraving, Heat Treating, and Allied Activities | 0 | 16 | 73 |
| Colleges, Universities, and Professional Schools | 0 | 27 | 94 |
| Computer and Peripheral Equipment Manuf. | 0 | 8 | 6 |
| Converted Paper Product Manuf. | 0 | 19 | 65 |
| Dairy Product Manuf. | 0 | 52 | 31 |
| Electrical Equipment Manuf. | 0 | 12 | 2 |
| Engine, Turbine, and Transmission Equipment Manuf. | 0 | 21 | 33 |
| Fabric Mills | 0 | 8 | 97 |
| Facilities Support Services | 0 | 8 | 1,050 |
| Forging and Stamping | 0 | 36 | 45 |
| Foundries | 12 | 153 | 62 |
| Fruit and Vegetable Preserving and Specialty Food Manuf. | 9 | 134 | 45 |
| General Medical and Surgical Hospitals | 0 | 32 | 35 |
| Glass and Glass Product Manuf. | 8 | 345 | 79 |
| Grain and Oilseed Milling | 16 | 338 | 234 |
| Household Appliance Manuf. | 0 | 8 | 25 |
| Iron and Steel Mills and Ferroalloy Manuf. | 44 | 494 | 679 |
| Lessors of Real Estate | 0 | 8 | 69 |
| Lime and Gypsum Product Manuf. | 48 | 346 | 292 |
| Metal Ore Mining | 50 | 64 | 341 |
| Metalworking Machinery Manuf. | 0 | 8 | 53 |
| Motor Vehicle and Parts and Supplies Wholesalers | 0 | 8 | 448 |
| Motor Vehicle Manuf. | 18 | 138 | 62 |
| Motor Vehicle Parts Manuf. | 0 | 58 | 33 |
| Natural Gas Distribution | 24 | 73 | 214 |
| Nonferrous Metal (except Aluminum) Production | 32 | 136 | 110 |
| Nonmetallic Mineral Mining and Quarrying | 40 | 170 | 182 |
| Office Furniture (including Fixtures) Manuf. | 20 | 4 | 8 |
| Oil and Gas Extraction | 469 | 2,095 | 156 |
| Other Chemical Product and Preparation Manuf. | 6 | 60 | 119 |
| Other Electrical Equipment and Component Manuf. | 0 | 12 | 77 |

*(Continued)*

14756794, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-6765.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 56 to Decl. of Lyon
1477
**SER 1018**

14795796, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING        463

TABLE 1A—(Continued)

| | | | |
|---|---|---|---|
| Other Fabricated Metal Product Manuf. | 0 | 15 | 23 |
| Other Food Manuf. | 0 | 86 | 58 |
| Other Miscellaneous Manuf. | 24 | 16 | 31 |
| Other Nonmetallic Mineral Product Manuf. | 7 | 145 | 81 |
| Other Pipeline Transportation | 0 | 6 | 22 |
| Paint, Coating, and Adhesive Manuf. | 0 | 12 | 1 |
| Pesticide/Fertilizer/Other Agricultural Chemical Manuf. | 35 | 197 | 640 |
| Petroleum and Coal Products Manuf. | 74 | 606 | 1,089 |
| Petroleum and Petroleum Products Merchant Wholesalers | 0 | 9 | 29 |
| Pharmaceutical and Medicine Manuf. | 0 | 113 | 62 |
| Pipeline Transportation of Crude Oil | 0 | 20 | 71 |
| Pipeline Transportation of Natural Gas | 49 | 1,835 | 55 |
| Plastics Product Manuf. | 11 | 52 | 75 |
| Printing and Related Support Activities | 0 | 12 | 22 |
| Pulp, Paper, and Paperboard Mills | 195 | 880 | 190 |
| Railroad Rolling Stock Manuf. | 0 | 8 | 46 |
| Resin, Synthetic Rubber, and Synthetic Fiber Manuf. | 12 | 342 | 301 |
| Rubber Product Manuf. | 3 | 78 | 40 |
| Sawmills and Wood Preservation | 0 | 21 | 10 |
| Scheduled Air Transportation | 0 | 8 | 47 |
| Scientific Research and Development Services | 0 | 30 | 64 |
| Seafood Product Preparation and Packaging | 0 | 8 | 36 |
| Semiconductor and Other Electronic Component Manuf. | 0 | 146 | 31 |
| Soap, Cleaning Compound, and Toilet Preparation Manuf. | 0 | 25 | 75 |
| Steel Product Manuf. from Purchased Steel | 8 | 50 | 79 |
| Sugar and Confectionery Product Manuf. | 8 | 108 | 188 |
| Support Activities for Mining | 0 | 297 | 47 |
| Textile and Fabric Finishing and Fabric Coating Mills | 0 | 24 | 39 |
| Textile Furnishings Mills | 0 | 31 | 45 |
| Tobacco Manuf. | 0 | 12 | 84 |
| Traveler Accommodation | 0 | 12 | 67 |
| Utility System Construction | 0 | 4 | 70 |
| Veneer, Plywood, and Engineered Wood Product Manuf. | 16 | 60 | 32 |
| Water, Sewage and Other Systems | 19 | 167 | 151 |
| All | 1,540 | 13,173 | 234 |

tion using ordinary least squares (OLS):

$$GHG_{it} = \beta_1 \mathbb{1}_{[t \geq 2012]t} + \beta_2 US_i + \beta_3 \mathbb{1}_{[t \geq 2012]t} * US_i + \gamma X_{it} + \eta_i + \eta_{kt} + \varepsilon_{it}. \quad (1)$$

I also conduct cross-sectional tests by estimating the following equation:

$$GHG_{it} = \beta_1 \mathbb{1}_{[t \geq 2012]t} + \beta_2 US_i + \beta_3 \mathbb{1}_{[t \geq 2012]t} * US_i$$
$$+ \beta_4 \mathbb{1}_{[t \geq 2012]t} * US_i * \mathbb{1}_{[CROSS-SECTION]it} + \gamma X_{it} + \eta_i + \eta_{kt} + \varepsilon_{it}, \quad (2)$$

Exhibit 56 to Decl. of Lyon
1478
**SER 1019**

14769761, 2021, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12371 by University Of Michigan Library, Wiley Online Library on [24/04/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

464    S. TOMAR

**TABLE 1B**

*Facility-Year Frequency by U.S. State*

| State | United States $N$ |
|---|---|
| Alabama | 430 |
| Alaska | 122 |
| Arizona | 112 |
| Arkansas | 370 |
| Colorado | 294 |
| Connecticut | 69 |
| Delaware | 32 |
| Florida | 184 |
| Georgia | 291 |
| Hawaii | 16 |
| Idaho | 106 |
| Illinois | 511 |
| Indiana | 421 |
| Iowa | 364 |
| Kansas | 278 |
| Kentucky | 285 |
| Louisiana | 1,129 |
| Maine | 57 |
| Maryland | 53 |
| Massachusetts | 90 |
| Michigan | 429 |
| Minnesota | 299 |
| Mississippi | 233 |
| Missouri | 184 |
| Montana | 73 |
| Nebraska | 154 |
| Nevada | 62 |
| New Hampshire | 16 |
| New Jersey | 130 |
| New Mexico | 198 |
| New York | 249 |
| North Carolina | 224 |
| North Dakota | 111 |
| Ohio | 560 |
| Oklahoma | 386 |
| Oregon | 143 |
| Pennsylvania | 586 |
| Rhode Island | 12 |
| South Carolina | 220 |
| South Dakota | 85 |
| Tennessee | 260 |

*(Continued)*

where $i$, $k$, and $t$ are the indices for facilities, four-digit NAICS industries, and years 2010 to 2013, respectively. *GHG* is logged tons of $CO_2$e emitted. *US* indicates U.S.-located facilities, $\mathbb{1}_{[t \geq 2012]}$ indicates years 2012 and onward (2011 and onward for Massachusetts facilities, whose emissions were disclosed a year earlier through a state-level program), and $\mathbb{1}_{[\text{CROSS-SECTION}]}$

Exhibit 56 to Decl. of Lyon

1479

**SER 1020**

14796796, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12475 by University of Michigan Library, Wiley Online Library on [24/09/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING     465

**TABLE 1B**—*(Continued)*

| State | United States $N$ |
|---|---|
| Texas | 1,921 |
| Utah | 175 |
| Vermont | 16 |
| Virginia | 173 |
| Washington | 198 |
| West Virginia | 211 |
| Wisconsin | 280 |
| Wyoming | 371 |
| All | 13,173 |

**TABLE 1C**
*Facility-Year Frequency by Canadian Province*

| Province | Canada $N$ |
|---|---|
| Alberta | 524 |
| British Columbia | 253 |
| Manitoba | 34 |
| New Brunswick | 36 |
| Newfoundland and Labrador | 28 |
| Northwest Territories | 16 |
| Nova Scotia | 27 |
| Ontario | 325 |
| Prince Edward Island | 4 |
| Quebec | 196 |
| Saskatchewan | 97 |
| All | 1,540 |

These tables count the observations used in the primary regression analysis (table 3, column 4) by four-digit NAICS industry-country and by Canadian province/U.S. state. The sample spans 2010 to 2013 and comprises U.S. and Canadian facilities that reported GHG emissions to their national GHG reporting programs. Data filters are described in section 4.2.

indicates U.S. facilities of particular cross-sectional interest. GHG emissions are logged to account for scale differences across facilities; as such, $\beta_3$ approximates the percentage change in emissions following the U.S. Program's first data disclosure. $X$ denotes the control variables described below. The use of facility and industry-year fixed effects means the estimation accounts for persistent facility characteristics and industry-level shocks. The industry definition is granular (e.g., *3311: iron and steel mills and ferro-alloy manufacturing*). Standard errors are clustered by industry-year to account for shocks cross-sectionally correlated within industries.

Logged GDP (value-added) is included at the two-digit NAICS-country-year level to account for industry-region–specific shocks to demand and supply. The year-lagged-logged regional natural gas price is included to account for variation in incentives to use natural gas, which is more $CO_2$-efficient than oil. Given that U.S. natural gas production increased after 2005 on account of hydraulic fracturing, a concern is that greater avail-

Exhibit 56 to Decl. of Lyon
1480
**SER 1021**

466     S. TOMAR

**TABLE 2**
*Descriptive Statistics*

(a) Facility level

|  | | Canada | | | | | |
|---|---|---|---|---|---|---|---|
|  | N | Mean | SD | q1 | q25 | q50 | q75 | q99 |
| *GHG* | 1,540 | 11.8 | 1.52 | 6.67 | 11.1 | 11.7 | 12.8 | 15.3 |
| *GDP* | 1,540 | 11.9 | 0.316 | 10.6 | 11.7 | 12.1 | 12.1 | 12.1 |
| *GAS_PRICE* | 1,540 | 1.29 | 0.204 | 0.891 | 1.12 | 1.31 | 1.45 | 1.56 |
| *REGULATIONS* | 1,540 | 6.39 | 2.37 | 2 | 6 | 7 | 8 | 10 |

|  | | United States | | | | | |
|---|---|---|---|---|---|---|---|
|  | N | Mean | SD | q1 | q25 | q50 | q75 | q99 |
| *GHG* | 13,173 | 11.0 | 1.52 | 6.03 | 10.3 | 10.9 | 11.8 | 14.9 |
| *GDP* | 13,173 | 13.90 | 0.793 | 12.5 | 13.0 | 14.5 | 14.5 | 14.5 |
| *GAS_PRICE* | 13,173 | 1.30 | 0.189 | 0.891 | 1.02 | 1.38 | 1.45 | 1.52 |
| *REGULATIONS* | 13,173 | 2.40 | 1.53 | 1 | 1 | 2 | 3 | 8 |

(b) Firm level

|  | N | Mean | SD | q1 | q25 | q50 | q75 | q99 |
|---|---|---|---|---|---|---|---|---|
| *CAPEX* | 1,189 | 0.081 | 0.080 | 0.003 | 0.032 | 0.055 | 0.101 | 0.448 |
| *GROSS_MARGIN* | 1,189 | 0.330 | 0.201 | 0.025 | 0.181 | 0.277 | 0.441 | 0.838 |
| *US* | 1,189 | 0.887 | 0.290 | 0.000 | 1.00 | 1.00 | 1.00 | 1.00 |
| *GDP* | 1,189 | 13.8 | 0.948 | 11.7 | 12.9 | 14.5 | 14.5 | 14.5 |
| *GAS_PRICE* | 1,189 | 1.30 | 0.189 | 0.891 | 1.08 | 1.38 | 1.43 | 1.52 |
| *REGULATIONS* | 1,189 | 2.56 | 1.82 | 1 | 1 | 2 | 3 | 8 |
| *LEVERAGE* | 1,189 | 0.597 | 0.217 | 0.146 | 0.477 | 0.587 | 0.698 | 1.272 |
| *MV ($bn)* | 1,189 | 22.6 | 43.8 | 0.060 | 1.60 | 5.48 | 23.4 | 211 |
| *MTB* | 1,189 | 3.25 | 24.2 | −5.06 | 1.23 | 1.83 | 2.72 | 16.5 |

Table 2(a) describes the observations used in primary regression analysis (table 3, column 4). Its sample spans 2010 to 2013 and comprises U.S. and Canadian facilities that reported GHG emissions to their national GHG reporting programs. Table 2(b) describes the highest-level parent-firm of these facilities. Data filters are described in sections 4.2 and 4.4.2. The appendix provides variable definitions.

ability of natural gas might lead U.S. facilities to reduce their GHG emissions. I use prices from Dawn Ontario and AECO Storage in Canada's east and west, and Dominion South, Henry Hub, SoCal Border, and Kern River in the United States' northeast, south, west, and center. These data come from SNL Financial and Alberta Energy Regulator. Lastly, the number of efficiency incentives and regulations that are both applicable to a facility and implemented at the federal or state levels are included. The regulations typically relate to building energy use, and the incentives typically exist as rebates for energy efficiency improvements. These data come from North Carolina State University's DSIRE and Natural Resources Canada's Directory of Energy Efficiency and Alternative Energy Programs.

Exhibit 56 to Decl. of Lyon
1481
SER 1022

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING          467

TABLE 3

*Facility GHG Emission Reductions Following U.S. Program Disclosure*

| VARIABLES | (1) GHG | (2) GHG | (3) GHG | (4) GHG |
|---|---|---|---|---|
| $\mathbb{1}_{[t \geq 2012]} * US$ | −0.302 | −0.121*** | −0.065** | −0.082** |
|  | (0.255) | (0.039) | (0.027) | (0.033) |
| $\mathbb{1}_{[t \geq 2012]}$ | 0.067 | 0.136** | 0.035 | 0.051 |
|  | (0.175) | (0.060) | (0.066) | (0.066) |
| $US$ | −0.605*** |  |  |  |
|  | (0.172) |  |  |  |
| $GDP$ |  |  |  | 0.220 |
|  |  |  |  | (0.420) |
| $GAS\_PRICE$ |  |  |  | −0.021 |
|  |  |  |  | (0.342) |
| $REGULATIONS$ |  |  |  | −0.007 |
|  |  |  |  | (0.008) |
| Observations | 15,041 | 14,791 | 14,713 | 14,713 |
| Adjusted $R^2$ | 0.028 | 0.897 | 0.902 | 0.902 |
| Facility & Year fixed effects |  | Y |  |  |
| Facility & Ind-Year fixed effects |  |  | Y | Y |

Standard errors clustered by industry-year in parentheses; ***$p$<0.01, **$p$<0.05, *$p$<0.1. This table is discussed in section 4.4.1 and shows how U.S. facilities' logged GHG emissions change following the U.S. GHG Reporting Program's first disclosure of emissions data in January 2012. Canadian facilities provide the control. The sample spans 2010 to 2013 and comprises U.S. and Canadian facilities that reported emissions to their national GHG reporting programs. Data filters are described in section 4.2. The appendix provides variable definitions.

## 4.4 EMISSIONS REDUCTION FINDINGS

*4.4.1. GHG Emissions Levels.* Table 3 shows the results of estimating equation (1), which tests for a GHG emissions reduction for U.S. facilities following U.S. Program disclosure. Moving from column 1 to 2 shows that facility and year fixed effects explain a large portion of the GHG emissions variation. Column 3 shows that using industry-year fixed effects reduces the estimate on $\beta_3$ appreciably, highlighting the importance of controlling for industry-level shocks. Column 4 shows that including control variables slightly increases the estimated treatment effect. Column 4 provides the baseline result: Consistent with H1, U.S. facilities reduce emissions by 7.9% ($e^{-0.082} - 1$; p = 0.014), relative to Canadian facilities, following the first disclosure of U.S. Program data in 2012.[8] This is a 4.1% standard deviation

---

[8] For comparison, related papers—Downar et al. [2021], Jouvenot and Krueger [2021], and Yang, Muller, and Liang [2022]—estimate 14%, 12%, and 7% emission reductions. These studies capture the effects of dissemination and aggregation of existing information, whereas my paper estimates a treatment effect for facilities that largely had no emissions information available elsewhere. Online appendix A3 describes long-run emission patterns following disclosure. Facilities that eventually exit the U.S. Program see a large emissions reduction of 33.2%. Later entrants to the U.S. Program see a significant emissions increase of 10.3%, consistent with these facilities often being growing ones.

14796784, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 56 to Decl. of Lyon
1482
SER 1023

468    S. TOMAR



Fig 3.—Emissions differences (U.S.−Canada) by year relative to the 2011 difference. As described in section 4.4.1, these figures plot the $\beta_{3,k}$s obtained from estimating the following OLS equation: $GHG_{it}$ or $CO2_{it} = \beta_1 US_t + \sum_{k \in 2008\ (or\ 2010)\ to\ 2013}^{excluding\ 2011} (\beta_{2,k} \mathbb{1}_{\{t=k\}} + \beta_{3,k} \mathbb{1}_{\{t=k\}} * US_t) + \gamma X_{it} + \eta_i + \eta_{jt} + \varepsilon_{it}$. The $\beta_{3,k}$s track how U.S. and Canadian facilities' emissions differ relative to their 2011 difference. U.S. $CO_2$ emissions are estimated as described in section 6.3. The sample comprises U.S. and Canadian facilities that reported GHG emissions to their national GHG reporting programs. Additional data filters are described in sections 4.2 and 6.3. The appendix provides variable definitions.

change in U.S. facilities' logged GHG emissions or a 21% standard deviation change when GHG emissions are residualized against the fixed effects (see DeHaan [2021]).

To explore the GHG emissions reduction dynamically, I estimate a version of equation (1) in which the $US$ dummy interacted with a sequence of dummies that indicate each sample year except for 2011 (the reference year). Figure 3(a) plots this sequence of interactions. It supports H1 by showing that the relative emissions differential stays close to zero until the U.S. Program's first disclosure, after which U.S. facilities display a relative decline in emissions. Figure 3(a) also supports the parallel trends assumption.

Online appendix A4, table A2, shows the GHG emissions reduction result is not driven by oil and gas facilities or the few states that have GHG

14759791, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12478 by University Of Michigan Library, Wiley Online Library on [24/04/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 56 to Decl. of Lyon
1483
SER 1024

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING          469

emissions pricing. It is also robust to including noncorporate facilities and municipal waste facilities, extending the sample window forward to 2016, and using an entropy-balanced panel of facilities. Another concern might be that emission reductions are unlikely to materialize in a year. Longer lead-times do exist for emissions reduction changes, such as retrofits of complex equipment for a new fuel type—this is consistent with the continued decrease in emissions in figure 3(a) in 2013. However, less complex retrofits or replacements, maintenance, calibration, and optimization, and other behavioral changes can be implemented within a year.[9]

*4.4.2. Offshoring, Reduced Economic Activity, and Investments.* Facilities could reduce reported GHG emissions by moving emissions generation abroad, beyond the U.S. Program's reach. This explanation would not predict emission reductions in industries with less geographically mobile production (i.e., where the produced goods have a high weight-to-value ratio or are fragile, or the raw materials are immobile). To address this possibility, I estimate a version of equation (2) that measures an incremental emissions reduction for facilities in industries with less mobile production (e.g., cement and concrete).[10] Table 4, column 1, shows that emission reductions are concentrated in facilities with relatively immobile production, which is inconsistent with the idea that reductions are driven by offshoring.

Facilities could also achieve lower GHG emissions by curbing economic activity. To address this possibility, I first produce a facility-level measure of carbon intensity ($CO_2$ emissions per unit of goods produced). $CO_2$ is largely produced by burning fuels. Online appendix A5 details this measure. Summarized briefly, I use the emissions of pollutants that do *not* largely arise from burning fuels as a proxy for the quantity of goods produced. These data come from the EPA's National Emissions Inventory and Emissions Inventory System (U.S. NEI/EIS), which provides information about U.S. facilities' hazardous air emissions (not GHGs), and Environment Canada's National Pollutant Release Inventory. Importantly, the U.S. data are available at the facility-process-pollutant level. As an example, when paper and pulp facilities convert wood chips to pulp, a chemical treatment produces volatile organic compounds (VOCs). The idea is that producing the same amount of paper will produce the same amount of VOCs, even if the fuel combustion step that heats the wood chips becomes

---

[9] For example, Colket et al. [2012] report that a combustion control system and a sensor package retrofit for a 25 MMBtu boiler at Watervliet Arsenal in New York State resulted in a 4% reduction in $CO_2$ emissions. Full deployment, including commissioning, was completed in three days.

[10] These industries are cement and concrete product manufacturing; converted paper product manufacturing; glass and glass product manufacturing; metal ore mining; natural gas distribution; nonmetallic mineral mining and quarrying; oil and gas extraction; pipeline transportation of natural gas; pulp, paper, and paperboard mills; support activities for mining; and water, sewage, and other systems.

14790799, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-6708.12371 by University Of Michigan Library, Wiley Online Library on [24/09/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 56 to Decl. of Lyon
1484
SER 1025

470   S. TOMAR

**TABLE 4**

*Offshoring, Reduced Economic Activity, and Investments*

| | Facility-Year Level | | | Firm-Year Level | |
|---|---|---|---|---|---|
| Variables | (1) GHG | (2) CARBON_INT | (3) CARBON_INT | (4) CAPEX | (5) GROSS_MARGIN |
| $\mathbb{1}_{[t\geq2012]} * US * \mathbb{1}_{[LOW\ MOBILITY]}$ | -0.147** | | | | |
| | (0.073) | | | | |
| $\mathbb{1}_{[t\geq2012]} * US$ | -0.018 | -0.072** | -0.075 | 0.025** | 0.018 |
| | (0.024) | (0.034) | (0.050) | (0.012) | (0.013) |
| GAS_PRICE | -0.004 | 0.354 | 0.356 | 0.036 | -0.227* |
| | (0.343) | (0.320) | (0.329) | (0.129) | (0.129) |
| REGULATIONS | -0.011 | | -0.002 | -0.002 | -0.006* |
| | (0.008) | | (0.011) | (0.002) | (0.003) |
| GDP | 0.807 | | -0.045 | -0.023** | 0.060 |
| | (0.593) | | (0.534) | (0.010) | (0.037) |
| MV | | | | 0.065 | 0.186 |
| | | | | (0.101) | (0.220) |
| LEVERAGE | | | | -0.033 | -0.088*** |
| | | | | (0.031) | (0.030) |
| MTB | | | | -0.000 | 0.000 |
| | | | | (0.000) | (0.000) |
| Observations | 14,713 | 6,149 | 6,149 | 1,187 | 1,189 |
| Adjusted $R^2$ | 0.902 | 0.968 | 0.968 | 0.726 | 0.921 |
| Facility & Ind-Year fixed effects | Y | Y | Y | | |
| Firm & Ind-Year fixed effects | | | | Y | Y |

Standard errors clustered by industry-year in parentheses; ***$p < 0.01$, **$p < 0.05$, *$p < 0.1$. This table is discussed in section 4.4.2. Column 1 shows how U.S. facilities' logged GHG emissions change following the U.S. GHG Reporting Program's first disclosure of emissions data in January 2012, with an emphasis on industries in which production is difficult to relocate. Columns 2 and 3 examine changes in U.S. facilities' carbon intensity. Columns 4 and 5 examine changes in U.S. firms' capital expenditures and gross margins. Canadian facilities/firms provide the control. The sample spans 2010 to 2013 and comprises U.S. and Canadian facilities (or their owners) that reported emissions to their national GHG reporting programs. Data filters are described in sections 4.3 and 4.4.2. The appendix provides variable definitions.

14767961, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/terms-and-conditions on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 56 to Decl. of Lyon
1485
SER 1026

14796794, 2021, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12373 by University Of Michigan Library, Wiley Online Library on [24/09/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING    471

more efficient. Thus, $CO_2$ emissions can be scaled by VOC emissions to produce a carbon intensity proxy for paper and pulp facilities.

Carbon intensity should not respond to U.S. Program disclosure if facilities curb economic activity to reduce GHG emissions. To test this implication, I estimate a version of equation (1) that uses logged carbon intensity as the dependent variable. For this and all other dependent variables based on ratios, I winsorize at the first and 99th percentiles. I require a balanced panel because the U.S. reporting threshold for noncombustion pollutants varies across years.[11] My preferred specification excludes *GDP* and *REGULATIONS* as control variables. *GDP* captures industry supply and demand shocks, which should not affect carbon intensity. *REGULATIONS* varies at the state level, as does the regulation of noncombustion pollutants (Chemical Watch [2019]). If energy efficiency regulation/incentives and (non-GHG) pollution regulation are jointly determined by states, *REGULATIONS* has a potentially complicated relation with carbon intensity. Column 2 shows that U.S. facilities' carbon intensity falls by roughly 7% in response to U.S. Program disclosure; this is similar to the emissions *level* change of −7.9%, suggesting that U.S. facilities do not reduce GHG emissions by simply curbing economic activity. Column 3 shows that the carbon intensity reduction remains similar in magnitude but loses statistical significance when including all control variables ($p = 0.14$).

To explore the idea that facilities instead make tangible investments to reduce GHG emissions, I examine firm-level capital expenditures (CAPEX). To aggregate my data to the firm level, I take weighted averages of the facility-level independent variables described in section 4.3, with weights based on each facility's 2011 GHG emissions. Because some firms have facilities in both Canada and United States, the *US* variable becomes continuous, ranging from zero to one. I then estimate the following OLS equation:

$$CAPEX_{jt} = \beta_1 \mathbb{1}_{\{t \geq 2012\}t} + \beta_2 US_j + \beta_3 \mathbb{1}_{\{t \geq 2012\}t} * US_j$$
$$+ \gamma X_{jt} + \eta_j + \eta_{kt} + \varepsilon_{jt}. \tag{3}$$

$j$ indexes a firm, and *CAPEX* is capital expenditures divided by lagged assets. $X$ contains the firm-level aggregates of the facility-level controls and a firm's market capitalization, leverage, and market-to-book ratio (to capture potential firm-level economies of scale in managing emissions, financing constraints, and growth opportunities; Kogan and Papanikolaou [2014], Myers [1977]).

Consistent with the idea that firms invest to reduce GHG emissions, column 4 shows that, following U.S. Program disclosure, U.S. firms' CAPEX increases by 2.5% of assets relative to Canadian firms. Tangible investments and other workflow changes could affect operational performance

---

[11] The years 2008, 2011, and 2014 are comprehensive years characterized by lower emissions reporting thresholds, and thus they cover more facilities. These years' data form part of the EPA's National Emissions Inventories. Emissions data for the noncomprehensive years—2009, 2010, 2012, and 2013—are found in the U.S. Emission Inventory System database and were provided directly by the EPA.

Exhibit 56 to Decl. of Lyon
1486
SER 1027

472   S. TOMAR

(e.g., by changing cost structure aspects). Consistent with Downar et al. [2021], however, column 5 shows no significant change in gross margins for U.S. Program firms.[12] These firm-level results require caveats. First, financial statement variables capture economic activity outside of the United States and from nonfacility aspects of a business, but U.S. Program data do not. Additionally, many manufacturing costs are recognized when sales are made, yet the associated GHG emissions can occur in earlier years. Therefore, these tests corroborate that facilities made real changes following U.S. Program disclosure, but they do not quantify the financial costs and benefits of these changes.

## 5. Benchmarking of GHG Emissions

This section presents evidence supporting H2, which states that facilities use their peers' GHG emission disclosures to benchmark their own GHG performance.

### 5.1 EMISSIONS DISPERSION

Grennan and Swanson [2020] show that the dispersion of negotiated prices paid by hospitals for supplies shrinks after the hospitals gain access to the purchase price history of their peers. Similarly, Berger, Choi, and Tomar [2022] document lower profitability dispersion when Korean firms provide detailed cost disclosures. If benchmarking under the U.S. Program facilitates a convergence in practices, I expect there to be less dispersion in GHG emissions after disclosure. I test this prediction by estimating the following OLS equation:

$$GHG\_DISP_{ckt} = \beta_1 \mathbb{1}_{\{t \geq 2012\}t} + \beta_2 US_c + \beta_3 \mathbb{1}_{\{t \geq 2012\}t} * US_c + \gamma X_{ckt}$$
$$+ \eta_{ck} + \eta_t + \varepsilon_{ckt}. \tag{4}$$

$c$ indexes country. $GHG\_DISP$ is the within-industry-country standard deviation, or 90th–10th percentile difference, of raw GHG emissions (in 1,000T $CO_2$e). $X$ contains the standard deviations of $GAS\_PRICE$ and $REGULATIONS$. I include industry-country and year fixed effects. Columns 1 and 2 of table 5 provide high-level evidence consistent with benchmarking. They show that the within-industry emissions standard deviation and 90th–10th percentile difference decline for U.S. industries, relative to Canadian ones, after U.S. Program disclosure. These reductions are 20% and 31% of the mean U.S. industry, preperiod emissions dispersion values ($p = 0.044$, $p = 0.038$). These results are silent, however, about whether poor GHG performers reduce their emissions more than others. Specifically, high-emitting facilities might nevertheless emit a low amount of GHGs per unit of goods produced.

---

[12] Online appendix A6, table A4, shows that, in the long run, the CAPEX increase becomes statistically insignificant, consistent with investments being a one-off. The change in gross margins remains statistically insignificant.

14766791, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12475 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 56 to Decl. of Lyon
1487
**SER 1028**

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING 473

**TABLE 5**

Benchmarking—GHG Emissions Convergence and the Effect of Relative Carbon Intensity on Emission Reductions

| Variables | Industry-Year Level | | Facility Level | | | |
|---|---|---|---|---|---|---|
| | (1)\newline GHG_SD | (2)\newline GHG_P90_P10 | (3)\newline CH_CO2_2012 | (4)\newline CH_CO2_2012 | (5)\newline CH_CO2_2012 | (6)\newline CH_CO2_2012 |
| $1_{i \in 2012} * US$ | -45.962**\newline(21.937) | -63.004**\newline(28.775) | | | | |
| CARBON_INT_2010 | | | -0.090**\newline(0.012) | -0.070*\newline(0.040) | -0.091***\newline(0.018) | -0.121***\newline(0.041) |
| CARBON_INT_2011 | | | | 0.053\newline(0.045) | | 0.041\newline(0.042) |
| GAS_PRICE | -494.360\newline(338.720) | -671.100\newline(444.313) | 1.652***\newline(0.125) | 1.647***\newline(0.123) | 1.647***\newline(0.159) | 1.643***\newline(0.158) |
| REGULATIONS | 8.219\newline(19.589) | 6.217\newline(25.696) | -0.058\newline(0.042) | -0.057\newline(0.041) | -0.062\newline(0.053) | -0.061\newline(0.053) |
| Observations | 392 | 392 | 1,111 | 1,111 | 545 | 545 |
| Adjusted $R^2$ | 0.961 | 0.960 | 0.263 | 0.264 | 0.200 | 0.201 |
| Ind-Country & Year fixed effects | Y | Y | | | | |
| Industry fixed effects | | | Y | Y | Y | Y |
| Carbon intense facilities | | | | | Y | Y |

Standard errors in parentheses (clustered by industry in columns 3 to 6). ***$p < 0.01$; **$p < 0.05$; *$p < 0.1$. This table is discussed in sections 5.1 and 5.2. Columns 1 and 2 examine how the within-industry dispersion of U.S. facility GHG emission changes following the U.S. GHG Reporting Program's first disclosure of emissions data in 2012. They examine the standard deviation and 90th–10th percentile difference. The sample spans 2010 to 2013 and comprises U.S. and Canadian facilities that reported emissions to their national GHG Reporting Programs. Canadian facilities' emissions provide the control. Columns 3 to 6 show how the percentage change in U.S. facilities' carbon dioxide ($CO_2$) emissions from 2011 to 2012 responds to their 2010 within-industry-state rankings of carbon intensity ($CO_2$ emissions scaled by proxy for goods produced). This ranking becomes publicly known in 2012. The sample comprises U.S. facilities only. Data filters are described in sections 4.2, 5.1, and 5.2. The appendix provides variable definitions.

Exhibit 56 to Decl. of Lyon
1488
**SER 1029**

14786706, 2021, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12371 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

474   S. TOMAR

### 5.2 RELATIVE CARBON INTENSITY AS REVEALED THROUGH DISCLOSURE

Under the benchmarking hypothesis, facility managers will use available U.S. Program data—and not timelier data that is yet to be disclosed—to establish whether their facilities are more or less carbon intense than those of their peers. My next set of tests condition on emissions data in the same way. Given the previous results (i.e., emission reductions coupled with lower emissions dispersion), I predict that facilities revealed, through U.S. Program disclosure, to be more carbon intense than peers will have larger subsequent emission reductions.

My starting point is the facility-level carbon intensity measure used in section 4.4.2: $CO_2$ emissions scaled by emissions of a noncombustion pollutant proxy for the quantity of goods produced. For two reasons, I normalize this measure within industry-state so that the highest value becomes one (most carbon intense) and the lowest value becomes zero (most carbon light). First, it might be more useful to benchmark against industry-peers that compete in local markets. Second, many U.S. states directly regulate VOCs (the noncombustion pollutant most commonly used by my measure) to a greater extent than federal regulations require (Chemical Watch [2019]). I then test whether relative carbon intensity—based on 2010 values that were publicly disclosed at the start of 2012—predicts emission reductions in 2012 by estimating the following OLS equation:

$$CH\_CO2\_2012_i = \beta_1 CARBON\_INT\_2010_i + \beta_2 CARBON\_INT\_2011_i$$
$$+ \gamma X_i + \eta_k + \varepsilon_i. \tag{5}$$

$CH\_GHG\_2012$ is the percentage change in 2012 $CO_2$ emissions, relative to 2011, $CARBON\_INT\_2010$ is peer-normalized carbon intensity based on 2010 values, $X$ contains the year-lagged percentage change in natural gas price and the change in efficiency incentives and regulations. I include industry fixed effects. The observation level is a facility, and only U.S. facilities are considered.

Table 5, column 3, provides results consistent with benchmarking. Facilities that are revealed by U.S. Program disclosure to be relatively carbon intense reduce their $CO_2$ emissions more in 2012. This pattern, however, could be driven by natural technological convergence or mean reversion in carbon intensity and not disclosure. Additionally, facilities might have been aware of their GHG performance without benchmarking and merely waited until disclosure in 2012 to determine the discount attached to GHG intensity by external stakeholders. Under these alternatives, 2011 carbon intensity would be a better, more relevant predictor of 2012 emission reductions. From a disclosure perspective, however, the U.S. Program data needed to construct 2011 carbon intensity were not public in 2012.

Column 4 presents the results when both 2010 and 2011 carbon intensities are included as regressors. Consistent with a disclosure/benchmarking effect, it shows that 2010 carbon intensity is significantly associated with 2012 $CO_2$ reductions but that 2011 carbon intensity is not: Benchmarking requires observability of emissions data and not just their existence.

Exhibit 56 to Decl. of Lyon
1489
SER 1030

14796794, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING    475

Columns 5 and 6 limit the sample to facilities with above-industry-median carbon intensity. The results become more striking.

Columns 4 and 6 identify benchmarking by exploiting the staggering in time of U.S. Program disclosure relative to the measurement date. Further, by exploiting purely within-U.S. facility variation, they allay the concern that table 3's results are driven purely by unobserved, time-varying differences between U.S. and Canadian facilities.

### 5.3 EFFECT OF A BENCHMARKING HISTORY

The next set of tests examines whether facilities with a propensity for benchmarking reduce their GHG emissions more following U.S. Program disclosure. Bernard et al. [2020] produce a novel measure of across-firm information flows based on the extent to which firms acquire their rivals' financial information from the SEC's EDGAR database. Using their EDGAR-search data, I classify a facility as a benchmarker if its owner searches for an above-industry-median number of other firms' financial information.[13] I then estimate a version of equation (2) that measures an incremental emissions reduction for benchmarker facilities.

The coefficient estimate on $\mathbb{1}_{[\text{BENCHMARKER}]}$ in table 6, column 1, shows that the incremental emissions reduction for benchmarkers is insignificantly negative. This test uses few observations, however, because of the low sample overlap between Bernard et al. [2020] and this study. Bernard et al. [2020] also provide a data set that is five times larger but with a 60% firm-identifier accuracy. Column 2 provides the results when using this larger sample. The estimate of $\beta_4$ is similar in magnitude and gains statistical significance—benchmarkers reduce their emissions by 7.4% ($e^{-0.077} - 1$) percentage points more than nonbenchmarkers do. Column 3 presents the results from estimating a version of equation (1) that measures a separate (nonincremental) emissions reduction for each tercile of U.S. facilities based on their benchmarking. The emissions reduction increases monotonically by tercile ($p = 0.060$ for the difference between high and low terciles).

These results further support the benchmarking channel.[14] They also help to address the possibility that facilities did not benchmark but in-

---

[13] I thank Darren Bernard, Terrence Blackburne, and Jacob Thornock for sharing their data.

[14] In terms of information flows between connected entities, online appendix A7, table A5, shows that 31% of the variation in (idiosyncratic) GHG emission changes following U.S. Program disclosure is common to facilities owned by the same firm. However, it is difficult to attribute this common variation purely to information flows across same-firm facilities (Manski [1993]). Online appendix A7, table A6, shows that emission changes for connected firms do not significantly predict emission changes for focal firms, defining connection based on common investors and overlapping board members. Online appendix A7, table A7, shows that emission reductions around U.S. Program disclosure are not significantly different when considering the following two proxies for information frictions within the firm: (1) the size of management guidance errors and (2) whether a facility is located far from its owner-firm's headquarters. In sum, the evidence about information flows between connected entities is less conclusive.

Exhibit 56 to Decl. of Lyon
1490
SER 1031

14756794, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12475 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

476   S. TOMAR

**TABLE 6**

*Benchmarking—Effect of Being a "Benchmarker" on Facility GHG Emission Reductions*

| Variables | (1) $GHG$ | (2) $GHG$ | (3) $GHG$ |
|---|---|---|---|
| $\mathbb{1}_{[t \geq 2012]} * US * \mathbb{1}_{[\text{BENCHMARKER}]}$ | −0.077 | −0.077* | |
| | (0.062) | (0.040) | |
| $\mathbb{1}_{[t \geq 2012]} * US$ | −0.034 | −0.072* | |
| | (0.032) | (0.041) | |
| $\mathbb{1}_{[t \geq 2012]} * US * \mathbb{1}_{[67th-100th \text{ pctile BENCHMARKER}]}$ | | | −0.171*** |
| | | | (0.064) |
| $\mathbb{1}_{[t \geq 2012]} * US * \mathbb{1}_{[35th-67th \text{ pctile BENCHMARKER}]}$ | | | −0.093* |
| | | | (0.055) |
| $\mathbb{1}_{[t \geq 2012]} * US * \mathbb{1}_{[0th-35th \text{ pctile BENCHMARKER}]}$ | | | −0.074* |
| | | | (0.040) |
| $GDP$ | −0.063 | −0.036 | −0.042 |
| | (0.270) | (0.563) | (0.568) |
| $GAS\_PRICE$ | −0.595 | −0.951*** | −0.914*** |
| | (0.385) | (0.300) | (0.279) |
| $REGULATIONS$ | 0.001 | −0.007 | −0.007 |
| | (0.007) | (0.009) | (0.009) |
| Observations | 2,988 | 5,289 | 5,289 |
| Adjusted $R^2$ | 0.954 | 0.930 | 0.930 |
| Ind-Year & Facility fixed effects | Y | Y | Y |

Standard errors clustered by industry-year in parentheses; *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$. This table is discussed in section 5.3. It explores whether the extent to which a facility's owner accesses the information of its peers affects the reduction in that facility's logged GHG emissions following the U.S. GHG Reporting Program's first disclosure of emissions data in 2012. A facility is classified as a "benchmarker" if its owner accesses an above-median amount of its peer firms' financial information from the U.S. SEC's EDGAR website (see Bernard et al. [2020]). The sample spans 2010 to 2013 and comprises U.S. and Canadian facilities that reported emissions to their national GHG Reporting Programs. Canadian facilities' emissions provide the control. Data filters are described in sections 4.2 and 5.3. The appendix provides variable definitions.

stead began implementing emission reductions with long lead-times in 2010 (prior to disclosure) because of anticipated external pressure. This alternative explanation does not explain why the emission reductions are larger for benchmarkers. A caveat for these results is that they exploit cross-sectional variation that is not randomly assigned at the time of the U.S. Program (i.e., whether a facility's owner chooses to be a benchmarker). The results should therefore be viewed in the context of the other benchmarking results in section 5.

## 5.4 PROCESS CONVERGENCE

The last set of benchmarking tests explores whether the processes that facilities employ converge after U.S. Program disclosure. Returning to the process-level U.S. NEI/EIS data described in section 4.4.2, I focus on processes that burn fossil fuels or waste.[15] In the spirit of Fetter et al. [2022], I

---

[15] Online appendix A5 describes how I identified these processes. An example of a fuel combustion process is *External Combustion Boilers: Commercial/Institutional: Bituminous/Subbituminous Coal: Pulverized Coal: Wet Bottom (Subbituminous Coal).*

Exhibit 56 to Decl. of Lyon
1491
**SER 1032**

14796794, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12471 by University of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING        477

### TABLE 7A
*Benchmarking—Facility Process Convergence Statistics*

| Facilities and their... | % Chg. Similarity | $p$ Val |
| --- | --- | --- |
| ...contemporaneous peers | 10.5 | 0.008 |
| ...prior carbon-light peers | 6.3 | 0.048 |
| ...prior carbon-intense peers | −3.4 | 0.037 |

then compute a Jaccard process-similarity index between each U.S. facility and its (hypothetical) representative state-industry peer in a given year. Online appendix A8 details this index's construction, but briefly, for a facility with one peer, the index divides the number of unique processes that both facilities employ by the number of unique processes they together employ (i.e., the intersection of their processes used divided by the union). When a facility has multiple peers, this computation also includes weights that capture the prevalence of a process across peer facilities.

Table 7a, row 1, presents the average *percentage* change in similarity when moving from 2010 to 2013 (the start and end of the main sample). Of the distinct processes used by a facility *or* its peers, the fraction used by the facility *and* its peers increases by roughly 10% (not percentage points), on average, after U.S. Program disclosure ($p = 0.008$). Meanwhile, the average similarity *level* changes insignificantly from 0.281 and 0.276 ($p = 0.27$). These percentage and level changes imply that facilities with low initial similarity to peers become more similar to their peers (relative to facilities that are already fairly similar to their peers).[16] To link these results to emission reductions, I estimate a version of equation (1) that measures a separate emissions reduction for each tercile of U.S. facilities based on their 2010 similarities with representative peers.

Consistent with the earlier argument, table 7b, column 1, shows that the U.S. Program treatment effect is largest for facilities in peer groups marked by low initial similarity and fades as initial similarity grows ($p = 0.035$ for the difference between high and low terciles). Benchmarking is more useful when there is a preexisting diversity in the processes used among peers. Similarly, Bernard et al. [2020] show that information flows better predict future R&D mimicking among firms with low product similarity.

To explore the benchmarking prediction that facilities shift their processes toward (away from) those of their carbon light (carbon intense) peers, I reemploy the relative carbon intensity measure used in section 5.2. When producing a facility's 2010 representative peer, I now require the constituent peer facilities to have a 2010 carbon intensity rank ≤ 0.33

---

[16] The distinction between level changes and percentage changes in Jaccard similarity is important. If focusing on level changes, the results in this subsection become statistically insignificant. Some industries, however, might have more potential processes to choose from, giving them a different similarity baseline. A focus on percentage changes accounts for these baselines.

Exhibit 56 to Decl. of Lyon
1492
**SER 1033**

478   S. TOMAR

14767996, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12475 by University Of Michigan Library, Wiley Online Library on [24/04/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**TABLE 7 B**
*Benchmarking—Process Changes and Facility GHG Emission Reductions*

| Variables | (1) $CO2$ | (2) $CO2$ | (3) $CO2$ |
|---|---|---|---|
| $\mathbb{1}_{[t \geq 2012]} * US * \mathbb{1}_{[LOW\ SIMILARITY]}$ | −0.192** (0.079) | | |
| $\mathbb{1}_{[t \geq 2012]} * US * \mathbb{1}_{[MED.\ SIMILARITY]}$ | −0.119** (0.053) | | |
| $\mathbb{1}_{[t \geq 2012]} * US * \mathbb{1}_{[HIGH\ SIMILARITY]}$ | −0.018 (0.043) | | |
| $\mathbb{1}_{[t \geq 2012]} * US$ | | −0.102** (0.044) | −0.101** (0.044) |
| $\mathbb{1}_{[t \geq 2012]} * US * \mathbb{1}_{[IMPROVE]}$ | | −0.070 (0.047) | −0.112 (0.090) |
| Observations | 7,096 | 3,528 | 3,497 |
| Adjusted $R^2$ | 0.936 | 0.950 | 0.947 |
| Ind-Year & Facility fixed effects | Y | Y | Y |

Standard errors clustered by industry-year in parentheses; *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$. This table is discussed in section 5.4. Table 7a examines whether facilities become more (less) similar to their carbon light (carbon intense) peers following the U.S. GHG Reporting Program's first disclosure of emissions data in 2012. Column 1 of table 7b examines how the emission reductions of a facility varies with the degree of process-similarity across the facilities in its industry-state. Column 2 examines how the emissions reduction of a facility is affected when its processes become more similar to its more carbon light peers; Column 3 does the same, but further conditions on the facility becoming less similar to its carbon intense peers. The sample spans 2010 to 2013 and comprises U.S. and Canadian facilities that reported emissions to their national GHG reporting programs. Data filters are described in sections 4.2 and 5.4. The appendix provides variable definitions.

(i.e., carbon light peers). I then compute Jaccard similarities between (1) a facility in 2010 and its 2010 carbon light representative peer and (2) that facility in 2013 and its 2010 carbon light representative peer. Table 7a, row 2, presents the average percentage change when moving from the former similarity to the latter. After U.S. Program disclosure, facilities become 6.3% proportionally more similar to their carbon light peers (as these peers were in 2010; $p = 0.048$). I then recompute the percentage change in Jaccard similarity, except considering a facility's carbon intense representative peer (whose constituent facilities have a 2010 carbon intensity rank > 0.67). Table 7a, row 3, shows that facilities become 3.4% proportionally less similar to their carbon intense peers after U.S. Program disclosure ($p = 0.037$).

Table 7b presents the results from estimating a version of equation (2) that connects these last process-similarity results to $CO_2$ emission changes. Column 2 shows that, for facilities that shift their processes toward their carbon light peers, the incremental emissions reduction is a statistically insignificant 6.8% ($e^{-0.070} - 1$; $p = 0.142$). Column 3 provides a similar inference when focusing on facilities that also become less like their carbon intense peers (10.6% incremental reduction; $p = 0.212$).

My process convergence results echo those of Fetter et al. [2022], who show that mandatory disclosure induces fracking firms to shift their fracking chemical compositions toward those of their more productive peers. There are some caveats. First, there is likely to be variation within a

Exhibit 56 to Decl. of Lyon
1493
**SER 1034**

14767969, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING          479

process as defined by the U.S. NEI/EIS. Thus, some process changes will not appear in the data, nor will behavioral changes (e.g., maintenance and calibration). This might explain why an emissions reduction is observed for the broader sample of facilities whose processes did not change in the U.S. NEI/EIS data. Second, the process convergence tests do not use a Canadian control sample (for which process-level data are not available). Thus, they are not provided as conclusive evidence of benchmarking but rather to give context to the other benchmarking results. Third, these results do not disentangle whether process convergence results from facilities embarking on a technological search after benchmarking or whether peers' GHG disclosures themselves provide technological cues. By whichever pathway, benchmarking prompts facilities to make real changes.

## 6. Supplementary Analyses

I now provide supplementary evidence about the U.S. Program's effects. I first explore sources of external pressure that might motivate emission reductions and benchmarking.

### 6.1 EXTERNAL PRESSURE: CONCERN ABOUT FUTURE LEGISLATION

A major U.S. Program aim is to aid future potential GHG-related rulemaking (see section 2). Thus, I study whether concern about future GHG legislation motivates emission reductions. Once U.S. facilities learn about their own GHG performance, they might self-regulate to avoid facing stringent legislation (e.g, Maxwell et al. [2000], Suijs and Wielhouwer [2019]). Sanchez, Matthews, and Fischbeck [2012], however, argue that the U.S. Program would be unlikely to yield benefits because U.S. climate policy lacked momentum at the time.

I proxy for GHG legislation pressure by exploiting geographic variation in political support for climate-progressive legislation. For a given legislator-year, I use League of Conservation Voters' Scorecards to compute the fraction of climate-progressive bills that federal legislator supported from 2008 to that year. For senators, I then take the within-state average. Highlighting the partisan nature of climate politics (e.g., McCright and Dunlap [2011]), Democratic Party membership explains 86% of senators' and House representatives' climate-progressiveness scores.

I then estimate a version of equation (2) that measures an incremental emissions reduction for facilities whose legislators have above-industry-median climate progressiveness. Table 8a, column 1, shows a 5.1% ($e^{-0.052} - 1$) incremental emissions reduction for facilities with climate-progressive senators, following U.S. Program disclosure. Column 2 reveals no statistically significant impact of representatives' progressiveness. Column 3 considers both groups of legislators simultaneously and yields the

Exhibit 56 to Decl. of Lyon
1494
SER 1035

14726796, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12475 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

480     S. TOMAR

**TABLE 8A**

*External Pressure—Climate Change Progressiveness of Legislators and Facility GHG Emission Reductions*

| Variables | (1) GHG | (2) GHG | (3) GHG | (4) GHG |
|---|---|---|---|---|
| $\mathbb{1}_{[t \geq 2012]} * US$ | −0.057* | −0.081** | −0.059* | −0.050* |
| | (0.029) | (0.031) | (0.031) | (0.030) |
| $\mathbb{1}_{[t \geq 2012]} * US * \mathbb{1}_{[CC\ HOUSE]}$ | | −0.004 | 0.006 | |
| | | (0.019) | (0.022) | |
| $\mathbb{1}_{[t \geq 2012]} * US * \mathbb{1}_{[CC\ SENATE]}$ | −0.052* | | −0.053* | |
| | (0.028) | | (0.031) | |
| $\mathbb{1}_{[t \geq 2012]} * SEN\_CC\_SCR$ | | | | −0.084** |
| | | | | (0.035) |
| $SEN\_CC\_SCR$ | | | | −0.033 |
| | | | | (0.077) |
| $GDP$ | 0.215 | 0.220 | 0.214 | 0.147 |
| | (0.423) | (0.419) | (0.423) | (0.397) |
| $GAS\_PRICE$ | −0.054 | −0.023 | −0.050 | −0.034 |
| | (0.338) | (0.344) | (0.336) | (0.337) |
| $REGULATIONS$ | −0.007 | −0.007 | −0.007 | −0.007 |
| | (0.007) | (0.008) | (0.007) | (0.007) |
| Observations | 14,713 | 14,713 | 14,713 | 14,713 |
| Adjusted $R^2$ | 0.902 | 0.902 | 0.902 | 0.902 |
| Ind-Year & Facility fixed effects | Y | Y | Y | Y |

Standard errors clustered by industry-year in parentheses; *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$. This table is discussed in section 6.1. It examines how the climate change progressiveness of a facility's state senators and U.S. House representative affect that facility's reduction in logged GHG emissions following the U.S. GHG Reporting Program's first disclosure of emissions data in 2012. Legislators' climate change progressiveness is measured using those legislators' voting records on climate change progressive bills. The sample spans 2010 to 2013 and comprises U.S. and Canadian facilities that reported emissions to their national GHG reporting programs. Data filters are described in section 4.2. The appendix provides variable definitions.

same inferences as columns 1 and 2. Concern about GHG legislation outcomes at the Senate appears to motivate emission reductions.[17]

Senators frequently turn over and can adjust their stances on issues. To assess the impact of this variation on emissions, I estimate the following OLS equation:

$$GHG_{it} = \beta_1 \mathbb{1}_{[t \geq 2012]t} + \beta_2 US_i + \beta_3 \mathbb{1}_{[t \geq 2012]t} * US_i$$
$$+ \beta_4 SENATE\_CC\_SCORE_{it}$$
$$+ \beta_5 \mathbb{1}_{[t \geq 2012]t} * SENATE\_CC\_SCORE_{it} + \gamma X_{it} + \eta_i + \eta_{kt} + \varepsilon_{it}. \quad (6)$$

$SENATE\_CC\_SCORE$ is the raw senatorial climate-progressiveness score described above (its value is set to zero for Canadian facilities). The use of facility fixed effects, which absorb average location effects, makes equa-

---

[17] Online appendix A7, table A5, shows that emission reductions associated with senatorial progressiveness are not common to facilities in other states owned by the same firm. That is, when reacting to concern about GHG legislation, firms consider their individual facilities' visibility to legislators.

Exhibit 56 to Decl. of Lyon
1495
**SER 1036**

14795796, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12471 by University Of Michigan Library, Wiley Online Library on [24/09/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING    481

tion (6) akin to a changes specification. The estimate of $\beta_4$ in column 4 shows that changes in senatorial progressiveness are insignificantly negatively associated with GHG emissions before U.S. Program disclosure. The estimate on $\beta_5$, however, shows that this association becomes larger and statistically significant after disclosure. A one standard deviation change in *SENATE_CC_SCORE* (33.2%) implies a 3.9% GHG emissions reduction under disclosure—facilities respond more to concern about legislation once they can benchmark using peers' disclosures.

Facilities with political connections could face different emissions reduction incentives. Facilities might use their connections to stifle future GHG legislation (Gelles [2022], Weiss, Lefton, and Lyon [2010]). Connected facilities could then exhibit a muted emissions response to disclosure. Alternatively, in exchange for preferential treatment in other domains (e.g., Cooper, Gulen, and Ovtchinnikov [2010], Tahoun [2014]), facilities might reduce GHG emissions to cast their local legislators in a favorable environmental light. Connected facilities might also be more concerned about legislation generally (Hassan, Hollander, Tahoun, and van Lent [2019]). In these latter cases, politically connected facilities might reduce GHG emissions more once they can benchmark using U.S. Program data. To explore these possibilities, I estimate the following OLS equation:

$$GHG_{it} = \beta_1 \mathbb{1}_{\{t \geq 2012\}t} + \beta_2 US_i + \beta_3 \mathbb{1}_{\{t \geq 2012\}t} * US_i + \beta_4 \mathbb{1}_{\{LEGIS\_CONN\}it}$$
$$+ \beta_5 \mathbb{1}_{\{t \geq 2012\}t} * \mathbb{1}_{\{LEGIS\_CONN\}it} + \gamma X_{it} + \eta_i + \eta_{kt} + \varepsilon_{it}. \qquad (7)$$

$\mathbb{1}_{\{LEGIS\_CONN\}}$ indicates U.S. facilities owned by firms that made campaign contributions to the senators or representatives of those facilities—I consider these facilities politically connected. To identify contributing firms, I use data provided by Hassan et al. [2019], which are based on data from OpenSecrets.org.[18] Only public firms in my sample can be matched to these data, and thus I exclude U.S. facilities not owned by public firms.

Table 8b, column 1, shows that a senator connection does not significantly affect facilities' GHG emissions, either pre- or post–U.S. Program disclosure (considering $\hat{\beta}_4$ and $\hat{\beta}_5$). Column 2 shows that a representative connection has a significantly greater negative effect on GHG emissions following disclosure (although $\hat{\beta}_4 + \hat{\beta}_5$ is insignificantly negative). Column 3 considers connections to senators and representatives simultaneously and yields the same inferences as columns 1 and 2. After being able to benchmark using U.S. Program disclosures, representative connected facilities worry more about GHG legislation, or they try to cast their representative in a favorable environmental light. Although the idea of political connections granting preferential treatment seems socially harmful, the contribution

---

[18] I thank Tarek Hassan, Stephan Hollander, Markus Schwedeler, Ahmed Tahoun, and Laurence Van Lent for sharing their data. Regarding timing, if firm A contributes to senator B's successful November 2010 election campaign, $\mathbb{1}_{\{LEGIS\_CONN\}}$ indicates firm A's facilities in senator B's state in 2011 and the remaining years of senator B's term.

Exhibit 56 to Decl. of Lyon
1496
SER 1037

482   S. TOMAR

14706794, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**TABLE 8B**
*External Pressure—Political Connections and Facility GHG Emission Reductions*

| Variables | (1) $GHG$ | (2) $GHG$ | (3) $GHG$ |
|---|---|---|---|
| $\mathbb{1}_{[t \geq 2012]} * US$ | $-0.067*$ | $-0.068*$ | $-0.064*$ |
|  | $(0.037)$ | $(0.035)$ | $(0.036)$ |
| $\mathbb{1}_{[t \geq 2012]} * \mathbb{1}_{[\text{SENATE CONN.}]}$ | $-0.060$ |  | $-0.030$ |
|  | $(0.039)$ |  | $(0.034)$ |
| $\mathbb{1}_{[\text{SENATE CONN.}]}$ | $0.029$ |  | $0.017$ |
|  | $(0.036)$ |  | $(0.036)$ |
| $\mathbb{1}_{[t \geq 2012]} * \mathbb{1}_{[\text{HOUSE CONN.}]}$ |  | $-0.084**$ | $-0.063**$ |
|  |  | $(0.040)$ | $(0.031)$ |
| $\mathbb{1}_{[\text{HOUSE CONN.}]}$ |  | $0.048$ | $0.037$ |
|  |  | $(0.033)$ | $(0.029)$ |
| Observations | 11,286 | 11,286 | 11,286 |
| Adjusted $R^2$ | 0.906 | 0.906 | 0.906 |
| Ind-Year & Facility fixed effects | Y | Y | Y |

Standard errors clustered by industry-year in parentheses; *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$. This table is discussed in section 6.1. It examines how the presence of U.S. GHG Reporting Program disclosure affects the relation between a facility's GHG emissions and its political connections. Political connections are measured using the existence of known election campaign contributions from facilities' owners to incumbent legislators. The sample spans 2010 to 2013 and comprises U.S. and Canadian facilities that reported emissions to their national GHG reporting programs. Data filters are described in section 4.2. The appendix provides variable definitions.

facilities provided in this latter case (lower GHG emissions) seems socially beneficial.[19]

A caveat for this subsection's results is that they are based on cross-sectional variation that is not randomly assigned at the time of the U.S. Program (i.e., a facility's location and its owner's choice to contribute to a legislator's campaign). Thus, they should be considered alongside the U.S. Program's broad purpose to provide guidance for future rule-making.

### 6.2 EXTERNAL PRESSURE: INVESTOR SCRUTINY

Although section 3 describes why the U.S. Program might not create a GHG emissions action-cycle at the firm level, given the recent growth in ESG investing, the willingness of capital market regulators to require emissions disclosures, and the tendency of capital markets to make across-firm comparisons (De Franco, Hope, and Larocque [2015]), I explore

---

[19] That facilities appear more responsive to the Senate regarding legislation pressure (table 8a) and more responsive to the House regarding connections (table 8b) is consistent with the literature. Diermeier, Keane, and Merlo [2005] suggest that the nonpecuniary, policy-shaping rewards to being in Congress are large, and especially so for senators. Meanwhile, Tahoun and van Lent [2019] find that voting in the House is associated with representatives' personal wealth interests, but the equivalent association is weaker for senators. Relatedly, Cooper, Gulen, and Ovtchinnikov [2010] show that firms contributing to legislators have positive future abnormal returns, and that there is an incremental House effect after controlling for the Senate effect.

Exhibit 56 to Decl. of Lyon
1497
**SER 1038**

14796796, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING          483



FIG. 4.—External pressures—buy-and-hold industry-adjusted returns around GHG disclosure. These figures are described in section 6.2. They depict the buy-and-hold excess returns for two sets of firms over different windows relative to the date of the U.S. GHG Reporting Program's first data release. The sample comprises the owner-firms of U.S. facilities that reported GHG emissions. "GHG Intense" ("GHG Light") firms have above (below) industry-median GHG emissions divided by COGS (as computed for 2010). Data filters are described in sections 4.2 and 4.4.2.

whether investor pressure moderates the GHG emissions response to U.S. Program disclosure.

I begin by measuring firm-level GHG intensity for 2010 (constructible by the public in 2012) by aggregating facility emissions to the firm level and then dividing by cost of goods sold (a proxy for economic activity). I then split U.S.-facility–only firms into groups with above and below industry-median 2010 GHG intensity. Figure 4 plots the average buy-and-hold industry-adjusted returns for both groups of firms around U.S. Program disclosure. With the exception of a return runup for GHG intense firms from days $-50$ to $-30$ in figure 4(a), the two return time-series track each other and do not suggest a differential stock market reaction to disclosure. Online appendix A9.1, table A8, presents the related regression-based evidence. Echoing figure 4(a), the incremental buy-and-hold returns for GHG intense firms around disclosure are statistically insignificant.[20]

_____

[20] In online appendix A9.1, table A9, I study the holdings of ESG-focused mutual funds and shareholder resolutions; I find no strong evidence of investor pressure. Online appendix A9.1, table A10, shows that the GHG emissions reduction around U.S. Program disclosure is larger for facilities owned by firms that are nonpublic or that report higher environmental political risk and climate change exposure to investors. Because these cross-sectional results can be interpreted in multiple ways, I place less weight on them. Online appendix A9.2, table

Exhibit 56 to Decl. of Lyon
1498
SER 1039

484   S. TOMAR

### 6.3 GHG EMISSION RESPONSES PRIOR TO U.S. PROGRAM DISCLOSURE

To understand the U.S. Program's effects more completely, I explore emission responses prior to disclosure. Facilities knew as early as April 2009 that their emissions would be publicly disclosed, and thus they might have anticipated stakeholder pressure (e.g., Fiechter, Hitz, and Lehmann [2022]). The U.S. Program's measurement requirements might also have improved managers' own-firm GHG information sets (e.g., Shroff [2017]). These forces could have led facilities to curb emissions prior to disclosure. Grennan and Swanson [2020] and Shroff [2020] also disentangle pre- and post-disclosure responses. In terms of information creation, my setting less resembles that of Grennan and Swanson [2020], where hospitals were arguably aware of the prices they paid to suppliers, and more resembles that of Shroff [2020], where firms possibly learned about their auditors' quality following PCAOB inspections.

To address a key empirical challenge—the absence of GHG emissions data for years prior to U.S. Program implementation (e.g., for 2008 and 2009)—I estimate U.S. facilities' $CO_2$ emissions by leveraging the physical relations underlying fossil fuel combustion. The key idea is that the same fuel burned under the same conditions should produce $CO_2$ (a GHG) and carbon monoxide (CO; toxic, not a GHG, and disclosed since 2008 in the U.S. NEI/EIS) in constant proportions (Gurney et al. [2009b]). The estimation is detailed in online appendix A11.1, and is briefly as follows. I employ a Bayesian linear model to relate U.S. facilities' logged $CO_2$ emissions to their process-level CO emissions. The model inputs are (1) facility-level $CO_2$ emissions from the 2014 U.S. Program, (2) process-level CO emissions from the 2014 NEI/EIS, and (3) a set of priors about the process-level $CO_2$-CO relations, provided by Gurney et al. [2009a]. I then combine the estimated $CO_2$-CO relations with U.S. facilities' process-level CO emissions from 2008 to 2013 to produce estimates of these facilities' logged $CO_2$ emissions.[21] To measure the U.S. Program's effect prior to disclosure, I extend

--------

A11, shows no significant evidence of pressure from the public or customers. The emissions reduction is not significantly different for facilities in (1) states with higher intensities of belief in human-caused climate change and (2) industries with relatively more business-to-customer economic activity. Regarding profit/efficiency motives, online appendix A10, table A12, shows that emission reductions for U.S. facilities near the Canadian border are muted when they have a nearby Canadian peer. These U.S. facilities possibly benchmarked their GHG emissions against their Canadian peers prior to the U.S. Program; given that their emissions were not subject to external pressure via disclosure at that time, this suggests benchmarking for profit/efficiency motives. However, the muted response is statistically insignificant—few U.S. facilities provide the needed variation by having nearby Canadian peers—leaving the result only suggestive.

[21] The estimation relies heavily on U.S. Program data and hence could not be conducted prior to the U.S. Program. Online appendix A11.1, figure A4, shows that the Bayesian estimates explain 42% of the variation in out-of-sample actual values. Variation in factors such as equipment specification, CO abatement technology, and fuel carbon content reduces the goodness of fit. For reference, naive OLS estimates explain 35% of the variation in actual

Exhibit 56 to Decl. of Lyon
1499
**SER 1040**

14756794, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12475 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

14796794, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University of Michigan Library, Wiley Online Library on [24/09/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING     485

the sample window back to 2008 and estimate the following OLS equation:

$$CO2_{it} = \beta_1 \mathbb{1}_{\{t \geq 2010\}t} + \beta_2 \mathbb{1}_{\{t \geq 2012\}t} + \beta_3 US_i + \beta_4 \mathbb{1}_{\{t \geq 2010\}t} * US_i$$
$$+ \beta_5 \mathbb{1}_{\{t \geq 2012\}t} * US_i + \gamma X_{it} + \eta_i + \eta_{jt} + \varepsilon_{it}. \quad (8)$$

$CO2$ is logged T $CO_2$ emissions, estimated as above for U.S. facilities and as reported by Canadian facilities. $\beta_4$ captures facilities' emission responses prior to U.S. Program disclosure. A balanced panel is required because the Canadian Program's reporting threshold fell from 100,000T to 50,000T $CO_2$e in 2009 and because the CO reporting thresholds are lower in 2008, 2011, and 2013 (see footnote 11).

Table 9, column 1, presents the results when facility and year fixed effects are included, and column 2 includes control variables and industry-year fixed effects. Both columns show no significant emissions response in 2010 and 2011, when facilities begin measuring and reporting emissions (absent disclosure); however, both show a significant emissions reduction after disclosure in 2012, consistent with table 3. The column 2 estimate of the emissions reduction following disclosure is 11.2% ($e^{-0.119} - 1$; p = 0.019). Figure 3(b), the expanded sample window analog of figure 3(a), mirrors this pattern of U.S. emissions relative to Canadian emissions. Figure 3(b) also provides further support for the parallel trends assumption.[22]

To assess pre-disclosure emission responses without using estimated data, I study firm-level emissions data voluntarily submitted to the CDP, a non-profit organization that surveys firms annually about their GHG performance. During my sample period, CDP surveys are sent to S&P 500 firms and the 200 largest Canadian firms by market capitalization. I collect CDP data from years 2008 to 2013 for firms within the industries in my U.S. Program sample. I then estimate the following OLS equation:

$$GHG_{jt} = \beta_1 \mathbb{1}_{\{t \geq 2010\}t} + \beta_2 \mathbb{1}_{\{t \geq 2012\}t} + \beta_3 US_j + \beta_4 \mathbb{1}_{\{t \geq 2010\}t} * US_j$$
$$+ \beta_5 \mathbb{1}_{\{t \geq 2012\}t} * US_j + \gamma X_{jt} + \eta_j + \eta_{kt} + \varepsilon_{jt}. \quad (9)$$

$GHG$ is logged tons of Scope 1 (on-site, nonvehicular) GHG emissions reported to the CDP, and $X$ contains a firm's market capitalization, leverage, and market-to-book ratio as controls (as in section 4.4.2). I use a balanced panel to mitigate concerns about selection effects related the CDP participation decision.

---

values (or 8% if treating negative, infeasible OLS fitted value as zeroes). The Bayesian approach fares better because it assigns sensible distributions to the parameters (e.g., no negative support) and incorporation of priors that shrink noisy parameter estimates toward plausible values.

[22] Because estimated $CO_2$ emissions are based on carbon monoxide data that come from the EPA's NEI/EIS, these tests also support the credibility of U.S. Program data. For this paper's results to be explained by misreporting, facilities would have to be shown to misreport not only their GHG emissions but also their toxic pollutant emissions and the processes they employ (which are also studied in section 5.4). Combined with the enforceability of the U.S. Program and U.S. NEI/EIS under the U.S. Clean Air Act, these tests make the misreporting explanation unlikely, given the extent of sustained legal and reputation risk it would entail.

Exhibit 56 to Decl. of Lyon
1500
SER 1041

14759794, 2021, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12371 by University Of Michigan Library, Wiley Online Library on [24/04/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

486    S. TOMAR

**TABLE 9**

*Emission Responses Prior to U.S. Program Disclosure*

| Variables | (1) CO2 | (2) CO2 | (3) GHG | (4) GHG |
|---|---|---|---|---|
| $\mathbb{1}_{[t \geq 2012]} * US$ | −0.133*** | −0.119*** | −0.175** | −0.072 |
| | (0.038) | (0.045) | (0.078) | (0.118) |
| $\mathbb{1}_{[t \geq 2010]} * US$ | 0.017 | 0.037 | −0.055 | 0.042 |
| | (0.034) | (0.042) | (0.115) | (0.122) |
| GDP | | −0.152 | | |
| | | (0.429) | | |
| GAS_PRICE | | 0.059 | | |
| | | (0.204) | | |
| REGULATIONS | | −0.002 | | |
| | | (0.009) | | |
| MV | | | | −0.225 |
| | | | | (1.082) |
| LEVERAGE | | | | 0.668** |
| | | | | (0.313) |
| MTB | | | | −0.001 |
| | | | | (0.001) |
| Observations | 6,078 | 6,078 | 550 | 550 |
| Adjusted $R^2$ | 0.864 | 0.864 | 0.986 | 0.984 |
| Year and Facility fixed effects | Y | | | |
| Ind-Yr and Facility fixed effects | | Y | | |
| Year and Firm fixed effects | | | Y | |
| Ind-Yr and Firm fixed effects | | | | Y |

Standard errors clustered by industry-year in parentheses; *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$. This table is discussed in section 6.3. It examines how U.S. facilities' GHG emissions change following the implementation of the U.S. GHG Reporting Program. Columns 1 and 2 examine logged $CO_2$ emissions (estimated for U.S. facilities as described in section 6.3). Columns 3 and 4 examine logged Scope 1 GHG emissions voluntarily disclosed by large firms under the Carbon Disclosure Project. The samples span 2008 to 2013, with Canadian observations forming the control. Data filters are described in sections 4.2 and 6.3. The appendix provides variable definitions.

Table 9, column 3, provides the results obtained when using firm and year fixed effects, and column 4 adds industry-year fixed effects and control variables. Although the column 4 estimate on $\beta_5$ is statistically insignificant, the results corroborate those in columns 1 and 2. Collectively, table 9 highlights uncertainty around whether measurement and private reporting of GHG emissions leads to emission reductions.[23] Yet, these same tests suggest

---

[23] For instance, the estimate of $\mathbb{1}_{[t \geq 2010]} * US$ in table 9, column 2—one of the more precise estimates—gives a 95% confidence interval of (−3.1%, 11%). In online appendix A11.2, I assess pre-disclosure emission responses by exploiting only within-U.S. facility variation. Using the same techniques as in section 5.2, I show that 2010 carbon intensity rank does not significantly predict $CO_2$ emission reductions in 2011, as might be expected if U.S. Program measurement and private reporting to the EPA drives emission reductions. Columns 3 and 4 also raise the question of whether highly aggregated CDP data substitute for granular U.S. Program data in terms of driving emission reductions. Online appendix A12 explores facilities' emission reductions by CDP participation and disclosure status, and by whether facilities had peers participating in the CDP. The results support the nonsubstitutability of U.S. Program information with CDP information.

Exhibit 56 to Decl. of Lyon

1501

**SER 1042**

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING          487

disclosure-driven effects. I leave it to future research to make a stronger claim about pre-disclosure emission responses.

### 7. Conclusion

I explore whether the mandatory, granular disclosures of the U.S. Program lead to GHG emission reductions. I find that U.S. facilities reduce emissions by 7.9% following U.S. Program disclosure. In contrast to much of the related research, I estimate a treatment effect for facilities that mostly had no other GHG emissions information in the public domain. My emissions and process-based tests are consistent with facilities using the U.S. Program data of their peers for benchmarking. Supplementary analyses suggest that concern about GHG legislation partly motivates emission reductions and that measurement alone (absent disclosure) does not significantly reduce emissions.

My paper contributes to the literature on the real effects of ESG disclosures. It also has policy relevance. The main implication is that an ESG disclosure mandate can produce real effects through benchmarking. Considering the nature of U.S. Program disclosures, data granularity can facilitate this process while also improving the usefulness of disclosed data for stakeholders interested in a subset of a firm's activities (e.g., regional legislators interested in GHGs produced locally). However, aggregation of ESG information can also produce real effects (e.g., Christensen et al. [2017]), suggesting a tradeoff around the level of granularity.

My paper leaves important avenues for future research. First, it considers the U.S. Program from a benefits perspective (i.e., emission reductions). A potentially significant cost of the program is the potential stifling of innovation through disclosure of proprietary information (e.g., Breuer, Leuz, and Vanhaverbeke [2022]). Further work assessing this cost would allow for a more rounded view of the U.S. Program's impact. Second, this paper examines the effect of a single reporting/disclosure event. Although recent work in this area is very beneficial, further research on other mandatory GHG disclosure settings will be valuable. Climate change affects many stakeholders, and variation in the institutional features studied in the future can highlight different economic channels that affect emission patterns.

14756766, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 56 to Decl. of Lyon
1502
**SER 1043**

488   S. TOMAR

## APPENDIX: VARIABLE DESCRIPTION

### Facility-Level Analyses

| Variable Name | Description |
| --- | --- |
| CARBON_INT | Logarithm of: $CO_2$ emissions in metric tons divided by noncombustion pollutant in metric tons |
| CH_CO2_2012 | The percentage change in $CO_2$ emissions in 2012 relative to 2011 |
| CO2 | $CO_2$ emissions in logged metric tons. In table 9, these are estimated for U.S. facilities. |
| GHG | Greenhouse gas (GHG) emissions in logged metric tons $CO_2$ equivalent |
| GHG_SD | Standard deviation of raw GHG emissions, in thousands of metric tons $CO_2$ equivalent, within country-industry-year |
| GHG_P90_P10 | 90th minus 10th percentile of raw GHG emissions, in thousands of metric tons $CO_2$ equivalent, within country-industry-year |
| $\mathbb{1}_{[t \geq k]}$ | Indicates year $k$ ($k-1$ for Massachusetts observations) and beyond |
| $\mathbb{1}_{(CROSS-SECTION)}$ | Indicates U.S. facilities in a cross-section as described in the relevant section and table description |
| CARBON_INT_201X | $CO_2$ emissions over industry-specific noncombustion pollutant emissions in 201X, normalized within industry-state |
| GAS_PRICE | Yearly, regional, lagged natural gas price (logged) |
| GDP | Gross domestic product at the country-year two-digit NAICS industry level (logged value-added) |
| REGULATIONS | Number of energy reduction incentives/regulations applicable to a facility, implemented at the federal or state/province level |
| SENATE_CC_SCORE | For a U.S. state, the average of the following over each of its active senators: the percentage of climate-change progressive bills, since 2008, that senator has supported |
| US | Indicates a U.S. facility |

14756701, 2021, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-6701.12475 by University Of Michigan Library, Wiley Online Library on [24/04/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 56 to Decl. of Lyon
1503
**SER 1044**

14796794, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University of Michigan Library, Wiley Online Library on [24/09/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING    489

*Firm-Level Analyses*

| Variable Name | Description |
| --- | --- |
| CAPEX | Compustat item CAPX, over beginning total assets |
| GROSS_MARGIN | Gross profit over revenue |
| LEVERAGE | Total liabilities over total assets |
| MV | Market value of equity, in millions |
| MTB | Market value of equity over book value of equity |

Firm-level analogs of *US*, *GDP*, *GAS_PRICE*, and *REGULATIONS* are formed by taking weighted-averages of these variables across facilities within firm-year. Facilities' GHG emissions in 2011 form the weights.

*Regression Equation Indices*

| Index | Feature |
| --- | --- |
| $i$ | Facility |
| $j$ | Firm |
| $k$ | Four-digit NAICS industry |
| $c$ | Country |
| $t$ | Year |

### REFERENCES

BAUCKLOH, T.; C. KLEIN; T. PIOCH; and F. SCHIEMANN. "Under Pressure? The Link Between Mandatory Climate Reporting and Firms' Carbon Performance." *Organization and Environment* 0 (2022): 1-24.

BENNEAR, L. S., and S. M. OLMSTEAD. "The Impacts of the 'Right To Know': Information Disclosure and the Violation of Drinking Water Standards." *Journal of Environmental Economics and Management* 56 (2008): 117–30.

BERGER, P. G.; J. H. CHOI; and S. TOMAR. "Breaking It Down: Economic Consequences of Disaggregated Cost Disclosures." SSRN Working paper, 2022.

BERNARD, D.; C. BLACKBURNE; and J. THORNOCK. "Information Flows Among Rivals and Corporate Investment." *Journal of Financial Economics* 136 (2020): 760–79.

BOLTON, P., and M. KACPERCZYK. "Carbon Disclosure and the Cost of Capital." SSRN Working paper, 2021.

BREUER, M.; C. LEUZ; and S. VANHAVERBEKE. "Reporting Regulation and Corporate Innovation." NBER Working paper, 2022.

CAO, J.; H. LIANG; and X. ZHAN. "Peer Effects of Corporate Social Responsibility." *Management Science* 65 (2019): 5487–5503.

CHEMICAL WATCH. "Feature: US States Adopt Tough Line on Volatile Organic Compounds." 2019. Available at https://chemicalwatch.com/77489/feature-us-states-adopt-tough-line-on-volatile-organic-compounds.

CHEN, Y. C.; M. HUNG; and Y. WANG. "The Effect of Mandatory CSR Disclosure on Firm Profitability and Social Externalities: Evidence from China." *Journal of Accounting and Economics* 65 (2018): 169–90.

CHRISTENSEN, H. B.; E. FLOYD; L. Y. LIU; and M. MAFFETT. "The Real Effects of Mandated Information on Social Responsibility in Financial Reports: Evidence from Mine-Safety Records." *Journal of Accounting and Economics* 64 (2017): 284–304.

Exhibit 56 to Decl. of Lyon
1504
**SER 1045**

490    S. TOMAR

CLARKSON, P. M.; Y. LI; M. PINNUCK; and G. RICHARDSON. "The Value Relevance of Greenhouse Gas Emissions Under the European Union Carbon Emissions Trading Scheme." *European Accounting Review* 24 (2015): 551–80.

COASE, R. H. "The Problem of Social Cost." *Journal of Law and Economics* 3 (1960): 1–44.

COLKET, M.; R. GARVEY; H. HOLLICK; D. LISCINSKY; J. MANTESE; G. PONCIA; and K. SWANSON. "High Efficiency - Reduced Emissions Boiler Systems for Steam, Heat, and Processing." Technical report, 2012, Environmental Security Technology Certification Program.

COOPER, M. J.; H. GULEN; and A. V. OVTCHINNIKOV. "Corporate Political Contributions and Stock Returns." *Journal of Finance* 65 (2010): 687–724.

DE FRANCO, G.; O. K. HOPE, and S. LAROCQUE. "Analysts' Choice of Peer Companies." *Review of Accounting Studies* 20 (2015): 82–109.

DEHAAN, E. "Using and Interpreting Fixed Effects Models." SSRN Working paper, 2021.

DELMAS, M.; M. MONTES-SANCHOM; and J. SHIMSHACK. "Mandatory Information Disclosure Policies: Evidence from the Electric Industry." *Economic Inquiry* 48 (2010): 483–98.

DIERMEIER, D.; M. KEANE; and A. MERLO. "A Political Economy Model of Congressional Careers." *American Economic Review* 95 (2005): 347–73.

DOWNAR, B.; J. ERNSTBERGER; S. REICHELSTEIN; S. SCHWENEN; and A. ZAKLAN. "The Impact of Carbon Disclosure Mandates on Emissions and Financial Operating Performance." *Review of Accounting Studies* 26 (2021): 1137–75.

DRANOVE, D.; D. KESSLER; M. MCCLELLAN; and M. SATTERTHWAITE. "Is More Information Better? The Effects of 'Report Cards' on Health Care Providers." *Journal of Political Economy* 111. (2003): 555–558.

DURNEV, A., and C. MANGEN. "Corporate Investments: Learning from Restatements." *Journal of Accounting Research* 47 (2009): 679–720.

ECCLES, R. G., and S. KLIMENKO. "The Investor Revolution." *Harvard Business Review* (2019): 106–16.

ENGELBERG, J.; A. OZOGUZ; and S. WANG. "Know Thy Neighbor: Industry Clusters, Information Spillovers, and Market Efficiency." *Journal of Financial and Quantitative Analysis* 53 (2018): 1937–61.

FETTER, T. R.; A. STECK; C. TIMMINS; and D. WRENN. "Learning By Viewing? Social Learning, Regulatory Disclosure, and Firm Productivity in Shale Gas." NBER Working paper, 2022.

FIECHTER, P.; J. M. HITZ; and N. LEHMANN. "Real Effects of a Widespread CSR Reporting Mandate: Evidence from the European Union's CSR Directive." *Journal of Accounting Research* 60 (2022): 1499–1549.

FOSTER, G. "Externalities and Financial Reporting." *Journal of Finance* 35 (1989): 521–33.

FUNG, A., and D. O'ROURKE. "Reinventing Environmental Regulation from the Grassroots Up: Explaining and Expanding the Success of the Toxics Release Inventory." *Environmental Management* 25 (2000): 115–27.

GELLES, D. "How Republicans Are 'Weaponizing' Public Office Against Climate Action." *New York Times.* August 5, 2022.

GERARDEN, T. D.; R. G. NEWELL; and R. N. STAVINS. "Assessing the Energy-Efficiency Gap." *Journal of Economic Literature* 55 (2017): 1486–1525.

GLAZER, A., and H. MCMILLAN. "Pricing by the Firm Under Regulatory Threat." *Quarterly Journal of Economics* 107 (1992): 1089–99.

GRAHAM, M., and C. MILLER. "Disclosure of Toxic Releases in the United States." *Environment: Science and Policy for Sustainable Development* 43 (2001): 8–20.

GRENNAN, M., and A. SWANSON. "Transparency and Negotiated Prices: The Value of Information in Hospital-Supplier Bargaining." *Journal of Political Economy* 128 (2020): 1234–68.

GURNEY, K. R.; D. L. MENDOZA; S. GEETHAKUMAR; Y. ZHOU; V. CHANDRASEKARAN; C. C. MILLER; A. GODBOLE; B. SEIB; W. ANSLEY; S. PERAINO; X. CHEN; U. MALOO; J. KAM; J. BINIOON; M. FISHER; and S. DE LA RUE DU CAN. "Vulcan Science Methods Documentation." 2009a. Available at http://vulcan.rc.nau.edu/assets/files/Vulcan.documentation.v2.0.online.pdf.

14766784, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/09/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 56 to Decl. of Lyon
1505
**SER 1046**

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING        491

GURNEY, K. R.; D. L. MENDOZA; Y. ZHOU; M. L. FISCHER; C. C. MILLER; S. GEETHAKUMAR; and S. DE LA RUE DU CAN. "High Resolution Fossil Fuel Combustion CO2 Emission Fluxes for the United States." *Environmental Science & Technology* 43 (2009b): 5535–41.

HAMILTON, J. *Regulation Through Revelation: The Origin, Politics, and Impacts of the Toxics Release.* Cambridge: Cambridge University Press, 2005.

HARTZMARK, S. M., and A. B. SUSSMAN. "Do Investors Value Sustainability? A Natural Experiment Examining Ranking and Fund Flows." *Journal of Finance* 74 (2019): 2789–2837.

HASSAN, T. A.; S. HOLLANDER; L. VAN LENT; and A. TAHOUN. "Firm-Level Political Risk: Measurement and Effects." *Quarterly Journal of Economics* 134 (2019): 2135–2202.

HÉROUX, M.; C. GUY; and D. MILLETTE. "A Statistical Model for Landfill Surface Emissions." *Journal of the Air and Waste Management Association* 60 (2010): 219–28.

HOEGH-GULDBERG, O.; D. JACOB; M. TAYLOR; M. BINDO; S. BROWN; I. CAMILLONI; A. DIEDHIOU; R. DJALANTE; K. L. EBI; F. ENGELBRECHT; J. GUIOT; Y. HIJIOKA; S. MEHROTRA; A. PAYNE; S. I. SENEVIRATNE; A. THOMAS; R. WARREN; and G. ZHOU. "2018: Impacts of 1.5°C Global Warming on Natural and Human Systems." pp. 175–311. Technical report, 2018, Intergovernmental Panel on Climate Change.

HOMBACH, K., and T. SELLHORN. "Shaping Corporate Actions Through Targeted Transparency Regulation: A Framework and Review of Extant Evidence." *Schmalenbach Business Review* 71 (2019): 137–68.

IOANNOU, I.; S. X. LI; and G. SERAFEIM. "The Effect of Target Difficulty on Target Completion: The Case of Reducing Carbon Emissions." *The Accounting Review* 91 (2016): 1467–92.

JIN, G., and P. LESLIE. "The Effect of Information Product Quality: Evidence from Restaurant Hygiene Grade Cards." *Quarterly Journal of Economics* 118 (2003): 409–51.

S JOHNSON, M. "Regulation by Shaming: Deterrence Effects of Publicizing Violations of Workplace Safety and Health Laws." *American Economic Review* 110 (2020): 1866–1904.

JOUVENOT, V., and P. KRUEGER. "Mandatory Corporate Carbon Disclosure: Evidence from a Natural Experiment." SSRN Working paper, 2021.

KOGAN, L., and D. PAPANIKOLAOU. "Growth Opportunities, Technology Shocks, and Asset Prices." *Journal of Finance* 69 (2014): 675–718.

LI, V. "Do False Financial Statements Distort Peer Firms' Decisions?" *Accounting Review* 91 (2016): 251–78.

LUO, L. "The Influence of Institutional Contexts on the Relationship Between Voluntary Carbon Disclosure and Carbon Emission Performance." *Accounting and Finance* 59 (2019): 1235–64.

MANSKI, C. F. "Identification of Endogenous Social Effects: The Reflection Problem." *Review of Economic Studies* 60 (1993): 531.

MATISOFF, D. C. "Different Rays of Sunlight: Understanding Information Disclosure and Carbon Transparency." *Energy Policy* 55 (2013): 579–92.

MAXWELL, J. W.; T. P. LYON; and S. C. HACKETT. "Self-Regulation and Social Welfare: The Political Economy of Corporate Environmentalism." *The Journal of Law and Economics* 43 (2000): 583–618.

MCCRIGHT, A. M., and R. E. DUNLAP. "The Politicization of Climate Change and Polarization in the American Public's Views of Global Warming, 2001-2010." *Sociological Quarterly* 52 (2011): 155–94.

MCKINSEY GLOBAL ENERGY AND MATERIALS. "Unlocking Energy Efficiency Opportunities." Technical report, 2009, McKinsey & Company.

MYERS, S. C. "Determinants of Corporate Borrowing." *Journal of Financial Economics* 5 (1977): 147–75.

QIAN, W., and S. SCHALTEGGER. "Revisiting Carbon Disclosure and Performance: Legitimacy and Management Views." *British Accounting Review* 49 (2017): 365–79.

RAUTER, T. "The Effect of Mandatory Extraction Payment Disclosures on Corporate Payment and Investment Policies Abroad." *Journal of Accounting Research* 58 (2020): 1075–1116.

RICHARDSON, N. "Policy Significance of EPA's Greenhouse Gas Reporting Program." Technical report, 2012, Resources for the Future.

14767x, 2021, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/09/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 56 to Decl. of Lyon
1506
**SER 1047**

492   S. TOMAR

ROYCHOWDHURY, S.; N. SHROFF; and R. S. VERDI. "The Effects of Financial Reporting and Disclosure on Corporate Investment: A Review." *Journal of Accounting and Economics* 68 (2019): 1–27.

SANCHEZ, M.; S. MATTHEWS; and P. FISCHBECK. "How Much Is United States Greenhouse Gas Emissions Certainty Worth?" *Energy Policy* 51(2012): 259–63.

SANTHOSH, L. G.; P. LAKSHMIKANTHAN; and G. L. SIVAKUMAR BABU. "Laboratory Investigation of Large Scale MSW Reactor Under Anaerobic Conditions." *Indian Geotechnical Journal* 47 (2017): 395–409.

SHROFF, N. "Corporate Investment and Changes in GAAP." *Review of Accounting Studies* 22 (2017).

SHROFF, N. "Real Effects of PCAOB International Inspections." *Accounting Review* 95 (2020): 399–433. 1–63.

SHROFF, N.; R. S. VERDI; and G. YU. "Information Environment and the Investment Decisions of Multinational Corporations." *Accounting Review* 89 (2014): 759–90.

SINGH, N.; K. BACHER; R. SONG; M. E. SOTOS; and L. YIN. "Guide for Designing Mandatory Greenhouse Gas Reporting Programs." Technical report, 2015, Partnership for Market Readiness.

SUIJS, J., and J. L. WIELHOUWER. "Disclosure Policy Choices Under Regulatory Threat." *RAND Journal of Economics* 50 (2019): 3–28.

TAHOUN, A. "The Role of Stock Ownership by US Members of Congress on the Market for Political Favors." *Journal of Financial Economics* 111 (2014): 86–110.

TAHOUN, A., and L. VAN LENT. "The Personal Wealth Interests of Politicians and Government Intervention in the Economy." *Review of Finance* 23 (2019): 37–74.

US EPA. "Mandatory Reporting of Greenhouse Gases." *Federal Register (40 CFR Parts 86, 87, 89 et al.)* 74 (2009).

WEIL, D.; A. FUNG; M. GRAHAM; and E. FAGOTTO. "The Effectiveness of Regulatory Disclosure Policies." *Journal of Policy Analysis and Management* 25 (2006): 155–81.

L WEISS, A.. "An Analysis of the North American Agreement On Environmental Cooperation." *ILSA Journal of International & Comparative Law* 5 (1998): 185–218.

WEISS, D. J.; R. LEFTON; and S. LYON. "Dirty Money." 2010. Available at https://www.americanprogressaction.org/article/dirty-money/.

YANG, L.; N. Z. MULLER; and P. J. LIANG. "The Real Effects of Mandatory CSR Disclosure on Emissions: Evidence from the Greenhouse Gas Reporting Program." NBER Working paper, 2022.

14753766, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/04/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 56 to Decl. of Lyon
1507
**SER 1048**

# Exhibit 55

## to Declaration of Thomas P. Lyon

# THE REAL EFFECTS OF MANDATORY CSR DISCLOSURE ON EMISSIONS: EVIDENCE FROM THE GREENHOUSE GAS REPORTING PROGRAM

Exhibit 55 to Decl. of Lyon
1419
**SER 1049**

NBER WORKING PAPER SERIES

THE REAL EFFECTS OF MANDATORY CSR DISCLOSURE ON EMISSIONS: EVIDENCE
FROM THE GREENHOUSE GAS REPORTING PROGRAM.

Lavender Yang
Nicholas Z. Muller
Pierre Jinghong Liang

Working Paper 28984
http://www.nber.org/papers/w28984

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
July 2021

The authors appreciate feedback from participants at the March 2021 SEEK workshop on "Impacts of Environmental Regulation on Innovation and Firm Performance" hosted by ZEW Mannheim. The authors also gratefully acknowledge financial support provided by alumni of the Tepper School of Business at Carnegie Mellon University. Lavender Yang acknowledges the financial support by the William Larimer Mellon Fellowship. Cagla Akin provided able research assistance. All errors are our own. The views expressed herein are those of the authors and do not necessarily reflect the views of the National Bureau of Economic Research.

NBER working papers are circulated for discussion and comment purposes. They have not been peer-reviewed or been subject to the review by the NBER Board of Directors that accompanies official NBER publications.

© 2021 by Lavender Yang, Nicholas Z. Muller, and Pierre Jinghong Liang. All rights reserved. Short sections of text, not to exceed two paragraphs, may be quoted without explicit permission provided that full credit, including © notice, is given to the source.

Exhibit 55 to Decl. of Lyon
1420
**SER 1050**

The Real Effects of Mandatory CSR Disclosure on Emissions: Evidence from the Greenhouse Gas Reporting Program.
Lavender Yang, Nicholas Z. Muller, and Pierre Jinghong Liang
NBER Working Paper No. 28984
July 2021
JEL No. G38,L21,M14,M41,Q54

## ABSTRACT

We examine the real effects of the Greenhouse Gas Reporting Program (GHGRP) on electric power plants in the United States. Starting in 2010, the GHGRP requires both the reporting of greenhouse gas emissions by facilities emitting more than 25,000 metric tons of carbon dioxide per year to the Environmental Protection Agency and the public dissemination of the reported data in a comprehensive and accessible manner. Using a difference-in-difference research design, we find that power plants that are subject to the GHGRP reduced carbon dioxide emission rates by 7%. The effect is stronger for plants owned by publicly traded firms. We detect evidence of strategic behavior by firms that own both GHGRP plants and non-GHGRP plants. Such firms strategically reallocate emissions between plants to reduce GHGRP-disclosed emissions. We interpret this as evidence that the program is costly to the affected firms. Our results offer new evidence that public or shareholder pressure is a primary channel through which mandatory Corporate Social Responsibility (CSR) reporting programs affect firm behavior.

Lavender Yang
4765 Forbes Ave
Tepper School of Business
Pittsburgh, PA 15213
yinyang@andrew.cmu.edu

Pierre Jinghong Liang
Tepper School of Business
5000 Forbes Ave
Pittsburgh, PA 15213
liangj@andrew.cmu.edu

Nicholas Z. Muller
Department of Engineering, and Public Policy
Tepper School of Business
Carnegie Mellon University
4215 Tepper Quad
5000 Forbes Avenue
Pittsburgh, PA 15213
and NBER
nicholas.muller74@gmail.com

Exhibit 55 to Decl. of Lyon
1421
**SER 1051**

# 1   Introduction

Traditional approaches to the management of market failure involve direct government intervention. Motivated, in part, by the recognition that regulatory approaches may be ineffective, incomplete, or infeasible, societies have increasingly relied on a common understanding of acceptable firm conduct to govern businesses' behavior. Broadly, this tack is referred to as Corporate Social Responsibility (CSR). To be effective, CSR measures must require the disclosure of firms' CSR-related behaviors. As yet, no such mandatory CSR reporting standards are in place on an economy-wide basis in the United States. As the reliance on CSR to affect change in firm performance gains momentum, an open question pertains to the consequences of large-scale, mandatory CSR reporting standards.

Recent events suggest that firms' response to broad-based CSR reporting requirements is a policy relevant consideration. In January of 2021, the Biden administration issued an executive order arguing for climate change-related disclosure in all economic sectors of the United States (U.S.) economy.[1] Further, in 2020, a Commissioner of the Securities and Exchange Commission (SEC) argued for a move toward standardized Environmental, Social, and Governance (ESG) disclosures.[2] And, most recently, the SEC has committed to review its ESG disclosure policies.

The present paper stands poised to inform this policy discussion. We offer causal evidence regarding the impact of mandatory CSR-relevant disclosure on firms' emission behavior. Specifically, we investigate whether a nation-wide mandatory reporting and disclosure requirement, the Greenhouse Gas Reporting Program (GHGRP), for plant level carbon dioxide ($CO_2$) emissions, a principal greenhouse gas (GHG), affects subsequent emissions. To answer this research question, we exploit differential disclosure requirements under the GHGRP. This regulation requires all facilities in the U.S. that emit more than 25,000 tons of $CO_2$ per year to report their $CO_2$ emissions to federal regulators who, in turn, release the data to the public in a comprehensive and accessible

---

[1]The executive order 14008 signed in January 2021 contains the language that the "Federal Government must drive assessment, disclosure, and mitigation of climate pollution and climate-related risks in every sector of our economy", which is interpreted as "[i]t now appears that U.S. regulators will consider playing a more central role in disclosure practices" by legal practitioners. See this HBS forum post: https://corpgov.law.harvard.edu/2021/02/07/esg-disclosures/

[2]In a 2020 speech, Commissioner Allison Heeren Lee remarked that "the time for silence has passed. It's time for the SEC to lead a discussion—to bring all interested parties to the table and begin to work through how to get investors the standardized, consistent, reliable, and comparable ESG disclosures they need to protect their investments and allocate capital toward a sustainable economy. ... We should partner with and leverage the great work that has already been done by private standard setters and others on many of these issues. See, e.g., SASB, TCFD, PRI, Global Reporting Initiative, International Integrated Reporting Council, and Partnership for Carbon Accounting Financials."

Exhibit 55 to Decl. of Lyon
1422
**SER 1052**

manner. Our research design exploits a unique data opportunity. For the U.S. utility sector, both pre- and post-GHGRP emissions data are available for all power plants (including those emitting less than the 25,000 ton threshold). This context facilitates the use of quasi-experimental econometric designs to assess the causal effect of the GHGRP disclosure on firm behavior. Specifically, we use a difference-in-differences (DID) specification to determine whether plants whose $CO_2$ emission reports are required to be publicly disclosed through the GHGRP behave differently than those not subjected to the program. We hypothesize a reduction in the emission rates for plants covered by the GHGRP relative to those not covered.

We construct a sample of U.S. power plants that spans the years 2004 to 2018. The GHGRP was enacted in 2010, with the first reported data becoming available in 2011. The Emissions and Generation Integrated Database (eGRID) [3] provides annual emissions of $CO_2$ as well as generation of electricity for all power plants in the U.S. Plant ownership information is provided by the U.S. Department of Energy's (DOE) Energy Information Administration (EIA).[4] Our primary outcome variable of interest is the plant level emission rate, defined as $CO_2$ (tons)/MWH.

Within the utility sector, our study focuses on the impact of a specific role of mandated environmental-related disclosure: *raising the profile of emission information to the public.* For the utility sector, emissions data prior to the GHGRP were collected and reported to the U.S. DOE, including those plants below the eventual GHGRP reporting threshold. These data were indeed available to the public but in a less accessible manner than under the GHGRP. Finding, cleaning, and analyzing these data prior to the establishment of GHGRP would have been considerably more costly than afterwards. The GHGRP provides more accessibility, standardization, comparability, higher frequency reporting or timeliness, and overall a higher national prominence of the emissions data reported by the treated plants. We describe these data and the reporting requirements in detail in Section 2 and 3, and in Appendix A. Thus, to the extent the DID results demonstrate causal evidence, the effect is caused by the *raised profile* of the emission information, not necessarily the creation of altogether *new* information.

Our central empirical results are summarized as follows. First, we detect a significant reduction in $CO_2$ emission rates for plants that are subject to the mandated disclosure requirements under the

---

[3] United States Environmental Protection Agency (EPA) (2020b)
[4] U.S. Energy Information Administration (2020a)

2

Exhibit 55 to Decl. of Lyon
1423
**SER 1053**

GHGRP. In our main specification, plants whose emission reports are disclosed through GHGRP reduced their $CO_2$ emission rates by 7% ($p < 0.01$). The model includes both county and year fixed effects to control for unobserved factors that may influence emission behavior. This result is robust to a number of different specifications. Second, the reduction in emission rates is larger in magnitude (10%, $p < 0.05$) for plants owned by publicly traded firms. In a triple difference specification, membership in the Standard and Poor's (S&P) 500 suggests an even larger effect of 11% ($p < 0.05$). These results are consistent with public or shareholder pressure to reduce emission intensities working through capital market channels. Finally, we find evidence of strategic behavior in firms that own multiple plants: companies that own facilities which are covered by the GHGRP, as well as facilities below the reporting threshold, reduce emission rates at plants covered by the GHGRP while increasing the $CO_2$ discharge rates at plants below the reporting threshold. This effect is large (emission rates increase at non-disclosure plants by between 25% and 56%). This form of emission leakage provides direct evidence that firms find GHGRP-disclosure costly.

The present study leverages the unique data context of the U.S. utility sector and the GHGRP in the following ways. First, because the GHGRP is the first nationwide mandatory GHG disclosure policy, it is an ideal setting in which to investigate the effect of large-scale CSR disclosure on firm behavior. Second, emissions data from power plants in the U.S. exist both before and after the enactment of the GHGRP. As discussed above, the emissions data prior to the GHGRP was costly to access, clean, and analyze. The GHGRP comprehensively organizes and disseminates this data, making it far more accessible to interested parties. Third, detailed data on the ownership of plants facilitates an empirical analysis of the channel through which disclosure affects firm behavior. That is, by either controlling for ownership or stratifying the sample by ownership of plants, we can test whether publicly traded firms with plants enrolled in the GHGRP behave differently.

Our study is closely related to recent work on the real effects of mandatory disclosure of GHG emissions. Specifically, using emission data at the installation level before and after the Mandatory Carbon Reporting (MCR) in the United Kingdom, Downar et al. (2020) compare the difference in emission behavior by UK-incorporated firms who are effected by MCR to non-UK-incorporated firms before and after the implementation of MCR, using a DID research design. The paper found significant GHG emssion reductions following the MCR among the treated firms relative to the control firms. Also in the context of MCR, but focusing on the set of firms who voluntarily disclosed

3

Exhibit 55 to Decl. of Lyon
1424
**SER 1054**

GHG information before the MCR, Grewal (2021) documents additional reductions in emissions for these voluntary disclosers after the MCR was enacted. In the U.S. setting, Tomar (2019) studies the impact of the GHGRP on the non-utility sectors for which pre-GHGRP emission data were generally unavailable. Further, the control facilities in Tomar (2019) are located in Canada under a different reporting regime. The pre-policy period includes only 2010, during which time plants were collecting emissions data for disclosure in 2011. The disclosure events studied in Matisoff (2013) are state-level mandatory requirements and firms' own voluntary disclosure via responses to surveys by the Carbon Disclosure Project (CDP). The paper's mixed-results raise the issue of how mandatory versus voluntary disclosure effects firm behavior (see Matisoff (2013) page 580).The present paper also pertains directly to prior work on the more general aspects of CSR and ESG disclosure covered by Christensen et al. (2019) and legal dimensions of extending the existing "safe harbor rule" to include CSR and ESG criteria (Hazen, 2021).[5]

There is also a literature in environmental economics that studies the impacts of disclosure on various measures of financial and environmental performance. Kanashiro (2020) studies the effect of the Toxic Release Inventory (TRI) on investments in environmental technology and the establishment of environmental governance boards. Belay and Jensen (2020) explore the effect of mandatory disclosure of antibiotic use in the agriculture sector and find reductions in use, conditional on firms' being required to disclose use. Fisk and Good (2019) examine the oil and gas extraction industry and the effects of required chemical use reporting. More broadly, Fraas and Lutter (2016) examine the use of disclosure laws across numerous federal agencies. The authors provide suggestions for improving their effectiveness. Delmas and Lessem (2014) distinguish between private and public information and explore the effect of providing the latter (a form of disclosure) on consumer behavior through the lens of cultivating a green reputation. Relatedly, Lyon and Maxwell (2011) probe the use of disclosure by firms as a strategic lever to manipulate or manage activists' perception of firm performance. Delmas et al. (2011) find that disclosure laws in the electricity sector (that pre-date the GHGRP) asymmetrically affect firm behavior, with cleaner firms becoming cleaner

---

[5]Hazen (2021) recommends that "The recommendations herein do not include a mandate that corporations be socially responsible. Rather, the recommendations include the ways in which the law can better accommodate the increasing number of observers and investors who want to promote corporate social responsibility. With respect to the securities laws, this means enhancing disclosures to enable investors who care about social responsibility to make more informed investment choices" (page 5) and a "safe harbor could have a significant impact on encouraging ESG disclosures without unduly exposing the company to risks of liability." (page 43)

4

Exhibit 55 to Decl. of Lyon
1425
**SER 1055**

and dirtier firms exhibiting limited change. Lastly, Lyon and Shimshack (2015) report that third party disclosure of environmental performance abnormally boosted the returns of firms in the top quintile of performance. Finally, aspects of our work relate to earlier papers studying emissions leakage in contexts where firms face binding regulation, not disclosure laws. Chen (2009) examines the relocation of $CO_2$ from capped to uncapped regions following a regional cap-and-trade program. Babiker (2005) finds the 1997 Kyoto Protocol could lead to significant carbon leakage due to relocation of production. Lastly, Fow (2020), Fischer and Fox (2012), and Böhringer et al. (2017) study the effectiveness of various environmental policies at mitigating carbon leakage.

The remainder of the paper is organized as follows: Section 2 provides background information on the regulation GHGRP and the regulatory background on the electric power industry. Section 3 outlines the data collection and descriptive statistics. Section 4 explains the research design and formulates our research questions. Section 5 presents the empirical results. Finally, Section 6 concludes.

## 2   Institutional Background

### 2.1   Greenhouse Gas Reporting Program (GHGRP)

In response to the FY2008 Consolidated Appropriation Amendment, EPA issued a proposed rule on March 10, 2009 that required "mandatory reporting of greenhouse gas emissions above appropriate thresholds in all sectors of the economy of the United States".[6] As directed by the Congress, the agency was also granted to "use its existing authority under the Clean Air Act"[6] to gather necessary information for the purpose of carrying out any provision of the Clean Air Act (CAA). The new reporting regulation calls on facilities that emit 25,000 metric tons or more of GHG emissions per year to submit an annual report to EPA starting in 2011 for the calendar year 2010. The rule requires reporting of annual emissions of carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$), sulfur hexafluoride ($SF_6$), hydrofluorocarbons ($HFC_s$), perfluorocarbons ($PFC_s$), and other fluorinated gases in metric tons. In addition, the agency provides detailed guidelines to ensure the accuracy of the reported data through monitoring and a multi-step verification process.[7]

---

[6] On April 10, 2009. the proposed rule was published in the Federal Register (www.regulations.gov) under Docket ID No. EPA-HQ-OAR-2008-0508:

[7] See Figure 3 in Appendix A for details.

5

Exhibit 55 to Decl. of Lyon
1426
**SER 1056**

Whether or not a facility must report was initially determined by the facility's emission level in the year of 2010. A reporting facility can cease reporting if its annual GHG emissions are either (1) less than 25,000 metric tons of $CO_2$ for five consecutive years or (2) less than 15,000 metric tons of $CO_2$ for three consecutive years. In addition, if the facility's annual GHG emissions subsequently increase to the 25,000 metric tons threshold in any calendar year, the facility must start reporting again to EPA annually. About 8,000 facilities are covered by this regulation and the total reported emission represents approximately half of total U.S. GHG emissions.[8]

The GHGRP is solely a reporting and dissemination requirement: eligible individual facilities are required to report their emission to the the federal regulators and the data are made available to the public in a comprehensive and accessible manner. It does not in any way regulate GHG emissions or require any emission reductions. The GHGRP provides EPA, other government agencies, and outside stakeholders with economy-wide data on facility-level GHG emissions. Although some existing regulations and voluntary programs collect and disclose emission data, these programs are different in nature from the GHGRP. Many of these programs are initiated at the state or regional level where annual emission reporting is rare and a long delay between data collection and reporting is often observed. Other programs cover specific industries or report emissions at a firm level instead of providing detailed emissions and production processes for individual facilities.[9] In contrast, the GHGRP encompasses all sectors in the U.S. economy and it delivers more timely and standardized emission data.

To encourage the broader dissemination of the collected data to external stakeholders, EPA publishes its collected data using an interactive online platform - the Facility Level Information on Greenhouse Gases Tool (FLIGHT).[10] FLIGHT allows users to create customized filters by facility, industry, location, or fuel type, and to view data in various formats including maps, tables, charts,

---

[8]Description of GHGRP coverage from the EPA's website states "total reported emissions from these facilities are about 3 billion metric tons CO2e, which is about 50 percent of total U.S. GHG emissions. Additional GHGs are accounted for by approximately 1,000 suppliers. In total, data covering 85-90 percent of U.S. GHG emissions are reported". See full report at https://www.epa.gov/ghgreporting/learn-about-greenhouse-gas-reporting-program-ghgrp

[9]For example, voluntary disclosure programs such as the Carbon Disclosure Project (CDP) runs a global environmental disclosure system that collects self-reported annual data from governments (cities, states, and regions) and corporations, and it does not collect facility-level emissions. Similarly, data providers such as Trucost generally gather firm-level emission data from individual CSR reports. By comparison, while eGrid provides detailed facility-level emission data, it only covers power plants, and the data is published every other year. We also provide a side-by-side comparison of the eGrid and GHGRP data in Appendix A.

[10]See Figure 2 in Appendix A for an example of visualization map

6

Exhibit 55 to Decl. of Lyon
1427
**SER 1057**

and graphs for individual facilities and groups of facilities. In addition, EPA also provides the data in downloadable formats and publishes detailed analyses of various industries that report under the program. According to the EPA, "information in the database can be used by communities to identify nearby sources of greenhouse gas emissions, help business track emissions and identify cost- and fuel-saving opportunities, inform policy at the state and local levels, and provide important information to the finance and investment communities."[11]

The primary goal of the GHGRP was to inform future climate change policies including emission standards, a carbon tax, or a cap-and-trade program. To date, no such policy stipulating binding emission limits exists. As discussed above, the emissions reporting threshold presents a unique econometric opportunity to causally identify the effect of the GHGRP on firm behavior. However, the 25,000 ton cutoff also raises the issue of emission leakage; incomplete regulation encourages firms to reallocate discharges outside the scope of a policy's jurisdiction. Several papers explore emission leakage and our work builds on this literature (Babiker, 2005, Böhringer et al., 2017, Chen, 2009, Fischer and Fox, 2012, Fow, 2020).[11]

## 2.2   The Electric Power Industry

In this paper, we focus on the electric power industry for the following reasons. First, the electric power industry is one of the largest sources of greenhouse gas emissions in the United States. Reports from EPA show that in 2018, the electricity sector was the second largest source of U.S. greenhouse gas emissions, accounting for 26.9 percent of the U.S. total greenhouse gas emissions.[12] Second, the data availability for power plants is generally superior to other economic sectors that feature large stationary point sources. Emissions of several pollutants have been closely tracked from power plants for several decades. Power output, plant characteristics, operations, fuel consumption, and environmental controls are also reported on a facility-level basis. This enables computation and tracking of emission rates. The existence of these data both before and after the GHGRP facilitates the implementation of DID models to test causal hypotheses related to firm behavior.

---

[11]See details on EPA's website https://www.epa.gov/ghgreporting/greenhouse-gas-reporting-program-and-us-inventory-greenhouse-gas-emissions-and-sinks

[12]The EPA collected and reported 2018 industry level emission data in the Inventory of US Greenhouse Gas Emissions and Sinks. See the full report at https://www.epa.gov/sites/production/files/2020-02/documents/us-ghg-inventory-2020-main-text.pdf

7

Exhibit 55 to Decl. of Lyon
1428
SER 1058

## 3  Data

### 3.1  Primary Sample Selection: the eGRID sample

We obtain data on plant-level $CO_2$ emissions and facility characteristics from eGRID, which is a comprehensive data source that provides plant-specific environmental information for U.S. electricity generating plants.[13] Since eGRID publishes data roughly every two years, we obtain data for the following years: 2004, 2005, 2007, 2009, 2010, 2012, 2014, 2016, and 2018.

From this sample of 62,552 plant-years, we drop 35,968 observations that are missing $CO_2$ emission rates or where the $CO_2$ emission rates are non-positive[14]. We also eliminate observations related to Combined Heat and Power (CHP) plants (8,136 plant-years) because CHP plants are less comparable to non-CHP plants. We restrict our analyses to plants that use coal, oil, and gas as their primary fuel types. Finally, we require plants in the sample to be actively deployed (i.e., not idling) both before and after the year of GHGRP implementation (2010). This yields a final sample of 16,075 plant-year observations. We determine a plant's GHGRP treatment status by matching facilities that reported to GHGRP by plant name and location.[15] We refer to this sample as the eGRID sample. It is our primary estimation data set.

To construct the firm-level panel dataset from the plant-level data, we use plant-ownership information provided in eGRID (2004-2012) and Form EIA-860 (2014-2018).[16] We then consolidate our observations at the firm-year level. We drop observations where ownership information is not available and merge this sample with Compustat data to obtain firms' financial information.[17] For each firm-year observation, we compute the total plants owned, the number of plants owned by treatment status and fuel type, average emission rates, and average emission rates by treatment

---

[13]eGRID reports annual information on electric generation, resources mix, emissions of carbon dioxide ($CO_2$), nitrogen oxides ($NO_x$), sulfur dioxide ($SO_2$), and other emission-related information at the plant-level. These data are self-reported by the plants to comply with regulations related to the three following reports, CAMD's Power Sector Emission Data, EIA-860, and EIA-923.

[14]A plant could report negative emission rates resulting from negative *net* generations. This occurs when the amount of station use electricity exceeds the total amount of electricity generated at the plant. However, these plants still have positive emissions and the negative reported emission rates do not fairly represent their emission performance. Hence, we decided to drop them in our empirical analysis.

[15]Alternatively, we could have determined a plant's treatment status using the general reporting threshold. Facilities are required to report under the GHGRP if their annual GHG emissions exceed 25,000 metric tons of $CO_2$. However, an additional requirement for the electric power industry requires facilities under special programs such as the Acid Rain Program also report to EPA regardless of its emission levels. Hence, using the general threshold method could misclassify some plants' treatment status and underestimate the number of plants treated.

[16] U.S. Energy Information Administration (2020a)

[17]Compustat Industrial Annual Data (2020)

8

Exhibit 55 to Decl. of Lyon
1429
**SER 1059**

status. The final firm-level sample contains 744 observations.

## 3.2   Alternative Measure of $CO_2$ Emissions: the EIA sample

To test whether our primary findings are an artifact of the self-reported emission data in eGRID, we construct an alternative measure of $CO_2$ emissions using fuel consumption data. We refer to this sample as the EIA sample. We obtain plant-level fuel consumption data from Form EIA-906/923 during the sample period 2006-2015.[18] The fuel consumption data are reported annually during our sample period as opposed to the bi-annual eGRID sample. The higher frequency of reporting results in a larger sample of 22,862 plant-year observations. We construct the estimated emissions output by multiplying fuel consumption (in physical units), heat input (in mmBtus per physical unit), and emission factors (in ton $CO_2$/mmBtu)[19].

## 3.3   Descriptive Statistics

Table 1 presents the summary statistics for our plant-level sample. Panel A shows summary statistics from the eGRID sample with self-reported emission rates. The variable GHGRP is an indicator variable which assumes a value of one if a plant is covered by GHGRP in a given year and zero otherwise. Plant fuel type variables and plant ownership variables are defined as indicator variables. The sample is almost evenly split between GHGRP plants and non-GHGRP plants, 56% of plants are GHGRP plants. The mean net generation in the sample is 1,319,306 MWh and the mean $CO_2$ emission rate is 2,044 lb/MWh. Panel B shows summary statistics using the estimated $CO_2$ emissions from fuel consumption. While the EIA sample is larger, key variables such as the $CO_2$ emission rate, net generation, and GHGRP treatment status are comparable between the two samples. We winsorize all continuous plant-year variables at the 1 percent and 99 percent levels.

Table 2 reports the descriptive statistics at the firm-year level. Firms in the sample own up to 21 plants, while an average firm owns between five and six power plants. In Table 2, GHGRP is an indicator variable which assumes a value of one if a firm owns at least one GHGRP plant and zero otherwise. The mean weighted average $CO_2$ emission rate at the firm level is 2,299 lb/MWh, which is slightly higher than the plant-level average. Fuel type data shows approximately half of

---

[18] U.S. Energy Information Administration (2020b)

[19] See https://www.eia.gov/tools/faqs/faq.php?id=73t=11

9

Exhibit 55 to Decl. of Lyon
1430
**SER 1060**

the plants in a firm's portfolio use gas as their primary fuel, a third of the plants use coal as primary fuel, and the rest use oil. Lastly, we present the common financial reporting variables from firms' 10K through the Compustat database.

Table 1: Plant-level Summary Statistics

Panel A: eGrid Sample

| (N of Plants = 2,055) | N | Mean | Stdev | Median | Q1 | Q3 |
|---|---|---|---|---|---|---|
| $CO_2$ Emission Rate (lb/MWh) | 16,075 | 2,044 | 1,729 | 1,713 | 1,302 | 2,262 |
| Net Generation (MWh) | 16,075 | 1,319,306 | 2,751,623 | 40,715 | 505 | 1,221,177 |
| GHGRP | 16,075 | 0.560 | 0.496 | 1 | 0 | 1 |
| *Plant Fuel Type* | | | | | | |
| Gas | 16,075 | 0.487 | 0.500 | 0 | 0 | 1 |
| Coal | 16,075 | 0.202 | 0.401 | 0 | 0 | 0 |
| Oil | 16,075 | 0.311 | 0.463 | 0 | 0 | 1 |
| *Plant Ownership* | | | | | | |
| Owned by Public Firms | 14,357 | 0.300 | 0.458 | 0 | 0 | 1 |
| Owned by S&P Member Firms | 14,357 | 0.225 | 0.418 | 0 | 0 | 0 |

Panel B: EIA Sample

| (N of Plants = 2,522) | N | Mean | Stdev | Median | Q1 | Q3 |
|---|---|---|---|---|---|---|
| $CO_2$ Emission Rate (lb/MWh) | 22,862 | 2,196 | 18,129 | 1,701 | 1,298 | 2,215 |
| Net Generation (MWh) | 22,862 | 858,156 | 1,727,425 | 35,419 | 872 | 606,463 |
| Fuel Consumption (mmBtu) | 22,862 | 1,366,432 | 2,875,486 | 103,943 | 914 | 973,201 |
| GHGRP | 22,862 | 0.479 | 0.500 | 0 | 0 | 1 |

This table presents summary statistics for the sample of power plants. Data in Panel A are sourced from eGrid. We report key plant-level characteristics including emission rates, generations, and indicator variables GHGRP status, fuel types, and ownership information. Our sample period is from 2004 to 2018, where years 2006, 2008, 2011, 2013, 2015, and 2017 are not reported. Panel B includes fuel consumption data, the computed carbon emission rates, generation, and treatment status. We retrieve the annual data from EIA Form EIA-906/923 during 2006-2015.

# 4   Research Design

## 4.1   Real effects of the GHGRP

To examine the real effects of mandatory disclosure on GHG emissions, we test for a causal relationship between a plant's GHGRP treatment status and its emission rates. We employ a DID design and conduct our main empirical test at both the plant-level and the firm-level, as described

10

Exhibit 55 to Decl. of Lyon
1431
**SER 1061**

Table 2: Firm-level Summary Statistics

|  | N | Mean | Stdev | Median | Q1 | Q3 |
|---|---|---|---|---|---|---|
| Total Plants Owned | 744 | 5.38 | 3.69 | 4 | 3 | 7 |
| GHGRP Plants Owned | 744 | 3.98 | 2.98 | 3 | 2 | 6 |
| Firm-level GHGRP indicator | 744 | 0.93 | 0.26 | 1 | 1 | 1 |
| $CO_2$ Emission Rate (lb/MWh) | 744 | 2,299 | 12,370 | 1,846 | 1,308 | 2,178 |
| *Plant by Fuel Type* |  |  |  |  |  |  |
| Gas | 744 | 0.54 | 0.34 | 0.50 | 0.30 | 0.83 |
| Coal | 744 | 0.30 | 0.32 | 0.22 | 0 | 0.50 |
| Oil | 744 | 0.16 | 0.27 | 0 | 0 | 0.25 |
| *Financial Performance* |  |  |  |  |  |  |
| Total Assets *(in millions $)* | 744 | 12,192 | 15,631 | 6,437 | 3,339 | 14,253 |
| Revenue *(in millions $)* | 744 | 3,927 | 4,573 | 2,097 | 1,202 | 4,730 |
| Profitability (%) | 742 | 9.61 | 3.03 | 9.35 | 8.11 | 10.87 |
| ROA (%) | 744 | 2.76 | 6.64 | 2.85 | 2.14 | 3.46 |
| Operating Cash Flow (%) | 742 | 6.32 | 2.35 | 6.21 | 5.20 | 7.29 |
| CAPEX (%) | 742 | 7.46 | 3.85 | 6.83 | 5.27 | 8.88 |
| Fixed Assets (%) | 744 | 71.56 | 11.14 | 73.72 | 65.87 | 79.11 |
| Inventory (%) | 734 | 2.64 | 1.71 | 2.28 | 1.59 | 3.17 |
| Cash (%) | 744 | 1.61 | 2.61 | 0.59 | 0.15 | 1.86 |
| Book Leverage (%) | 744 | 33.63 | 9.77 | 31.96 | 28.43 | 36.87 |
| Net Leverage (%) | 744 | 32.01 | 9.34 | 31.19 | 27.28 | 35.70 |
| Interest (%) | 742 | 1.98 | 0.84 | 1.81 | 1.46 | 2.23 |

This table presents the firm-level summary statistics from 2004 to 2018. Plant characteristics are sourced from eGrid, hence we do not collect financial accounting variables for the following years: 2006, 2008, 2011, 2013, 2015, and 2017. We collect firms' financial reporting variables from Compustat. Variable definitions are provided in Appendix B

11

Exhibit 55 to Decl. of Lyon
1432
**SER 1062**

in 1a and 1b, respectively:

$$log(CO_2Rate)_{it} = \beta_0 + \beta_1\text{GHGRP}_{it} + \beta_2\text{Post}_{it} + \beta_3\text{Post}_{it} \times \text{GHGRP}_{it} + \alpha_t + \delta_c + u_{it} \quad (1a)$$

$$log(CO_2Rate)_{ft} = \beta_0 + \beta_1\text{GHGRP}_{ft} + \beta_2\text{Post}_{ft} + \beta_3\text{Post}_{ft} \times \text{GHGRP}_{ft} + \alpha_t + \gamma_f + \epsilon_{ft} \quad (1b)$$

where t indicates the year, i indexes the plant, and f represents the firm. Post is an indicator variable that equals one if the observation is in the post-GHGRP period (i.e., 2010 and after), and 0 otherwise. In Equation 1a, the treatment variable $\text{GHGRP}_{it}$ assumes the value of one only if the plant was ever subject to the mandatory disclosure requirement under the GHGRP. A firm is considered treated (i.e. $\text{GHGRP}_{ft}$ =1) if it owns at least one GHGRP plant.

Our primary outcome variable of interest is the logarithm of plant annual $CO_2$ emission rates (in lb/MWh). This measure captures emission changes normalized by output levels. We define the firm-level annual $CO_2$ emission rates (in lb/MWh) by taking the weighted average emission rates of all plants owned by a firm. Standard errors are clustered at the plant level in Equation 1a and firm level in Equation 1b. Our main specification in Equation 1a includes year fixed effects $\alpha_t$ and county fixed effects $\delta_c$ to account for county-level, time-invariant confounders and common time-varying factors affecting the response variable of interest. We also test several alternative specifications. To ensure our results are not influenced by state regulations, we include year and state fixed effects.[20] In another specification, we include plant fixed effects to control for any unobserved, time-invariant plant-specific characteristics. Similarly, in Equation 1b, we include firm and year fixed effects.

In the DID context, causal inference relies on the assumption that $CO_2$ emission trends for GHGRP plants and non-GHGRP plants were parallel prior to the GHGRP. In Figure 1, we plot the year fixed effects coefficients from Equation 1a. These figures generally show common pre-trends in emission rates for GHGRP plants and non-GHGRP plants. We argue that the firms could not have anticipated or manipulated their treatment status prior to the regulation. The initial announcement of the regulatory threshold of 25,000 metric tons $CO_{2e}$ was published in the Federal Register in a Proposed Rule in April 2009. The EPA selected the reporting threshold

---

[20]Matisoff (2013) finds no real effects of mandatory GHG reporting on emission performance for power plants subject to state-level programs.

Exhibit 55 to Decl. of Lyon
1433
**SER 1063**



(a) Estimated Emission using eGRID Data

(b) Estimated Emission using Fuel Consumption Data

Figure 1: Parallel Trends

Panel (a) shows the change in estimated $CO_2$ emissions for GHGRP plants and non-GHGRP plants by year using data from eGrid. Panel (b) shows same using fuel consumption data from Form EIA906/923.

specifically for the GHGRP by evaluating the number of reporters and the coverage of emissions under several alternative thresholds.[21] In Appendix C, Figure 7 reports density plots of $CO_2$ emission rates around the reporting threshold. We do not observe any discontinuities in emissions for years before and after the adoption of GHGRP. This provides evidence against the widespread manipulation of emissions data.

## 4.2   Central Hypothesis

We hypothesize that the GHGRP encouraged plants to reduce their $CO_2$ emission rates. We test this central hypothesis using the structure in equations 1a and 1b. Irrespective of the direction of the effect, we expect that the GHGRP changed emission behavior for the following reasons. First, in contrast to state reporting programs where "data must be obtained from state energy offices and may not be complete, up to date, or available online" (Matisoff, 2013), the GHGRP collects emission reports by facilities and it also publishes the reported data annually in a comprehensive and accessible manner. It also develops an interactive online tool that allows users to search, view, and download data. Second, this reporting program increased the profile of carbon emission disclosure.[22]

---

[21]Details published in Regulatory Impact Analysis for the Mandatory Reporting of Greenhouse Gas Emissions Proposed Rule (GHG Reporting) in March 2009.

[22]See Table 10 in Appendix A for a data profile comparison between GHGRP and eGrid.

13

Exhibit 55 to Decl. of Lyon
1434
**SER 1064**

The regulation has media coverage that explains the details and significance of the program.[23] Hence, even for the electric power industry, where power plants were historically monitored by regulators, we expect the program to affect emission behavior because it provides new, improved, and most importantly, more widely disseminated information to the public. Our position that the GHGRP reporting requirements will affect firm behavior is grounded in the prior literature. Michelon et al. (2015) question whether CSR reporting can affect change due to its lack of relevance and credibility. The mandatory nature of the GHGRP coupled with its implementation by the EPA speaks directly to this concern. Further, CSR disclosure differs from traditional financial disclosure because it requires additional expertise to interpret the information. Therefore, it is critical that the information is collected and disclosed in a way that is relevant, timely, accessible, and understandable (Weil et al., 2006). We argue that the structure and mandatory nature of the GHGRP satisfies these criteria.

The previous accounting literature documents several economic effects of corporate disclosure. Disclosure can mitigate problems associated with information asymmetries and agency costs. This, in turn, leads to several tangible capital market benefits, including lower cost of capital and increased firm value (Dhaliwal et al., 2011, Marshall et al., 2009, Plumlee et al., 2015, Matsumura et al., 2014). Christensen et al. (2019) consider a potential widespread mandatory adoption of CSR reporting standards analyzed in the extant academic research. The authors argue that CSR reporting mandates may induce real effects on firms' CSR activities through a feedback channel, as firms respond to stakeholder and societal pressure. Christensen et al. (2019) point out that such mandates could also induce negative real effects if firms attempt to manage the disclosed information. The papers that focus on voluntary disclosure provide mixed results on the association between CSR disclosure and CSR performance (Clarkson et al., 2008, Patten, 2002).

Despite these ambiguous results from the existing literature, we contend that the GHGRP will induce reductions in emission rates because of the nature of emissions disclosure that it provides and because of the mounting evidence that market participants are increasingly attuned to firms' environmental performance.

---

[23]We have collected some media coverage on GHGRP, see Figures 4,5,6 in Appendix A for details.

14

Exhibit 55 to Decl. of Lyon
1435
**SER 1065**

## 4.3   Mechanism

Several channels can potentially explain why firms that own power plants might respond to the GHGRP. If the GHGRP increased public awareness about environmental performance, then reputation concerns, shareholder pressure, regulatory threats, and lobbying from other special interest groups could incentivize plants to improve on their GHG emission controls (Reid and Toffel, 2009, Saeidi et al., 2015). Among the possible channels described above, we test two possible mechanisms: public or shareholder pressure and the threat of future regulatory actions. Both are discussed here in turn.

We conduct two sets of tests to examine whether public or shareholder pressure motivates plants to respond to the GHGRP. First, we test whether the effect of GHGRP is significantly different for plants owned by publicly traded firms by including a triple interaction term as shown in Equation 2. Here, the coefficient of interest is $\beta_7$. This allows for a differential impact of the GHGRP on $CO_2$ emission rates for publicly traded firms.

$$log(CO_2 Rate)_{it} = \beta_0 + \beta_1 \text{GHGRP}_{it} + \beta_2 \text{Post}_{it} + \beta_3 \text{Post}_{it} \times \text{GHGRP}_{it}$$
$$+ \beta_4 \text{Public}_{it} + \beta_5 \text{Public}_{it} \times \text{Post}_{it} + \beta_6 \text{Public}_{it} \times \text{GHGRP}_{it} \qquad (2)$$
$$+ \beta_7 \text{Public}_{it} \times \text{Post}_{it} \times \text{GHGRP}_{it} + \alpha_t + \delta_c + u_{it}$$

In a related test, we partition the sample according to whether the plant is owned by a publicly-traded firm. For each sub-sample, we estimate the regression model in Equation 1a.

We also test the possibility that future regulatory threats affect firms' behavior by examining emission rates before and after the Clean Power Plan (CPP) was repealed. The CPP was initially coupled with the GHGRP as binding regulation that would have limited firms' $CO_2$ emissions. However, the CPP was repealed in 2017, before its emission limits ever took effect. If firms reduced emissions in anticipation of the CPP limits, we argue that $CO_2$ would have rebounded after its repeal. The empirical results of this test are presented in Appendix C Table 11.

15

Exhibit 55 to Decl. of Lyon
1436
**SER 1066**

### 4.4   Robustness

One potential threat to the validity of our identification strategy arises if firms' emission behavior is driven by another major regulation (aside from the CPP treated above) that differentially affects GHGRP plants and non-GHGRP plants. We explore this issue as it pertains to the CAA. Under the CAA, EPA has the authority to set National Ambient Air Quality Standards for common air pollutants (not $CO_2$) and to monitor ambient pollution levels. A geographic area that meets the standard qualifies as an attainment area, and areas that fail to comply with the standard are stipulated as nonattainment areas. We obtain annual county-level compliance status data during our sample period from the EPA's Green Book.[24] We add CAA attainment status to Equation 1a in a triple-difference specification as shown in Equation 3. This tack compares the effect of the GHGRP for plants in attainment areas, and plants in nonattainment areas:

$$log(CO_2Rate)_{it} = \beta_0 + \beta_1 \text{GHGRP}_{it} + \beta_2 \text{Post}_{it} + \beta_3 \text{Post}_{it} \times \text{GHGRP}_{it}$$
$$+\beta_4 \text{CAA}_{ct} + \beta_5 \text{CAA}_{ct} \times \text{Post}_{it} + \beta_6 \text{CAA}_{ct} \times \text{GHGRP}_{it} \qquad (3)$$
$$+\beta_7 \text{CAA}_{ct} \times \text{Post}_{it} \times \text{GHGRP}_{it} + \alpha_t + \delta_c + u_{it}$$

In Equation 3, $\text{CAA}_{ct}$ is an indicator variable that is equal to 1 if the plant is located in a county that is designated as a non-attainment area in that year. Fixed effects enter Equation 3 as described previously. The coefficient of interest is $\beta_7$. This tests whether firms in non-attainment areas respond differently to the GHGRP than those in attainment areas.

## 5   Empirical Results

### 5.1   Real Effects on Plant-level Emissions

Table 3 presents the results from estimating Equation 1a. Columns (1) through (4) use the eGRID sample. Columns (5) and (6) use the EIA sample. Column (1) reports the results of our preferred specification which includes year and county fixed effects. Consistent with our hypothesis and previous research on the effects of mandatory carbon emission disclosure (Downar et al., 2020, Tomar, 2019), we find that relative to non-GHGRP plants, plants that are subject to the GHGRP

---

[24]United States Environmental Protection Agency (EPA) (2020a)

16

Exhibit 55 to Decl. of Lyon
1437
**SER 1067**

reduced annual $CO_2$ emission rates by 7.1% after the regulation ($p < 0.01$). For an average GHGRP plant prior to the regulation, this reduction in the post-GHGRP period is equivalent to about 130 lb/MWh carbon emission.

Our results are robust across several alternative specifications. In Column (2), we use year and state fixed effects to address potential concerns with various carbon disclosure policies at the state level (Matisoff, 2013). Columns (3) and (6) include year and plant fixed effects to control for plant-specific determinants of emission rates. Column (4) uses year and owner fixed effects to control for firm-specific characteristics. In Column (5), county fixed effects are excluded due to data availability. Across these specifications, the coefficient on the interaction term between GHGRP and Post is negative and significant ($p < 0.01$). The estimated emission reductions range between just under 4% to just over 10%. Using the EIA sample yields smaller reduction estimates than the eGRID sample. Collectively, our results in Table 3 corroborate our hypothesis that power plants reduced their carbon emission rates in response to the GHGRP.

### 5.1.1   Fuel Switching

Next, we study how plants subject to the GHGRP reduced emission rates by changing the type of fuel used. Different fuels produce different $CO_2$ emission rates.[25] One channel for power plants to achieve lower emission rates is to switch from dirtier fuels such as coal to cleaner fuels such as gas. Plants in the sample use oil, gas, or coal as primary fuels. First, we construct a binary variable which indicates whether a plant changed its primary fuel type after the GHGRP. This binary variable is substituted for $CO_2$ emission rates as the dependent variable in Equation (1a). We then fit this model using a logit estimator. We present the results of this exercise in Columns (1) and (2) in Table 4. In Column (1), the coefficient on the interaction between GHGRP and Post is 0.441, with a z-statistic of 2.14. Comparing to non-GHGRP plants, the odds that a GHGRP plant switches its primary fuel type in the post-regulation period are 55.4% greater. A similar result manifests in Column (2). These results suggest that GHGRP plants are more likely to switch

---

[25]Reports from the EIA show that the amount of $CO_2$ emitted (in pounds) per unit of energy output or heat content for coal (anthracite), diesel fuel, and natural gas are 228.6, 161.3, and 117. See the full report at https://www.eia.gov/tools/faqs/faq.php?id=73t=11

Exhibit 55 to Decl. of Lyon
1438
**SER 1068**

Table 3: Effects of the GHGRP on Plant-level Emissions Rates

| | $\log(CO_2$ Emission Rate) | | | | | |
| | eGRID Reported Emissions | | | | EIA Est. Emissions | |
| | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| GHGRP$_{i,t}$ | -0.149*** | -0.091*** | | -0.249*** | -0.280*** | |
| | (-4.45) | (-3.73) | | (-6.67) | (-16.25) | |
| Post$_{i,t}$ | 0.011 | 0.029 | 0.006 | 0.007 | -0.028** | 0.018 |
| | (0.70) | (1.59) | (0.34) | (0.33) | (-1.99) | (1.20) |
| GHGRP$_{i,t}$ | -0.071*** | -0.106*** | -0.050*** | -0.080*** | -0.037*** | -0.042*** |
| $\times$ Post$_{i,t}$ | (-4.75) | (-6.64) | (-3.27) | (-4.22) | (-3.08) | (-3.35) |
| | | | | | | |
| N | 16,075 | 16,075 | 16,075 | 13,486 | 22,862 | 22,862 |
| Adj.$R^2$ | 0.388 | 0.100 | 0.663 | 0.345 | 0.080 | 0.625 |
| | | | | | | |
| Year FE | Y | Y | Y | Y | Y | Y |
| County FE | Y | N | N | N | N | N |
| State FE | N | Y | N | N | N | N |
| Plant FE | N | N | Y | N | N | Y |
| Owner FE | N | N | N | Y | N | N |

This table presents results on the effects of the GHGRP on plant-level carbon emission rates. Columns (1) - (4) use reported annual $CO_2$ emission rates from eGrid in the sample period 2004-2018 with missing observations for years 2006, 2008, 2011, 2013, 2015 and 2017. Columns (4) and (5) use estimated annual $CO_2$ emission rates with fuel consumption data from Form EIA906/923 in the sample period 2006-2015. The outcome variables are winsorized at 1 and 99 percentiles for each year. Standard errors are clustered by plants, and t-statistics are shown in the parentheses below the coefficient estimates. *$p < 0.1$; **$p < 0.05$; ***$p < 0.01$.

18

Exhibit 55 to Decl. of Lyon
1439
**SER 1069**

primary fuel types following the regulation.

Does fuel switching contribute to the lower emission rates for plants enrolled in the GHGRP? To answer this, we split the sample into two groups based on their primary fuel types; gas-fired plants are placed in one group, and coal and oil plants are placed in the second group. We then re-estimate the logit regression model described above. Table 4 Column (3) shows GHGRP plants that use gas are less likely to switch fuels. The coefficient on the interaction term is -0.913, with a z-statistic of -2.77. In contrast, Column (4) shows GHGRP plants that used dirtier fuels (i.e. coal and oil) as their primary fuel are more likely to switch fuels. The coefficient of interest is 2.021, with a z-statistic of 5.49.

These results cannot conclusively rule out that coal and oil plants switched fuels for reasons other than (or in addition to) enrollment in the GHGRP. For example, natural gas became inexpensive relative to coal over the sample period. However, the fact that GHGRP enrollment was defined at an arbitrary threshold (25,000 tons) suggests that being in the program did affect the propensity for coal and oil plants to switch fuels. That is, why would a coal-fired plant just above the reporting threshold be more likely to switch to gas than a similar plant below the threshold?

Table 4: Effects of the GHGRP on Plant Primary Fuel

| | Full Sample | | Gas Plants | Non-Gas Plants |
|---|---|---|---|---|
| | \multicolumn{4}{c}{Dummy Variable: *Fuel Change*} |
| | (1) | (2) | (3) | (4) |
| $GHGRP_{i,t}$ | -0.331 | | | |
| | (-1.52) | | | |
| $Post_{i,t}$ | 16.428 | 16.828 | 15.832 | 15.164 |
| | (0.03) | (0.02) | (0.03) | (0.03) |
| $GHGRP_{i,t} \times Post_{i,t}$ | 0.441** | 0.533** | -0.913*** | 2.021*** |
| | (2.14) | (2.45) | (-2.77) | (5.49) |
| N | 16,075 | 16,075 | 7,654 | 8,421 |
| Year FE | Y | Y | Y | Y |
| County FE | Y | N | N | N |
| Plant FE | N | Y | Y | Y |

This table presents results on the effects of the GHGRP on plants' fuel change decisions. Columns (1) and (2) include all observations. Column (1) includes both year and county fixed effects, and Columns (2) - (4) use year and plant fixed effects. Next, we divide our sample into two sub-samples, gas plants and non-gas (coal and oil) plants. We estimate the logit regression on these two sub-samples and present the results in Columns (3) and (4). And z-statistics are shown in the parentheses below the coefficient estimates. $*p < 0.1$; $**p < 0.05$; $***p < 0.01$.

19

Exhibit 55 to Decl. of Lyon
1440
SER 1070

#### 5.1.2 Additional Robustness Tests

Table 5: Robustness Test: Clean Air Act

|  | $\log(CO_2$ Emission Rate) | |
|---|---|---|
|  | (1) | (2) |
| $\text{GHGRP}_{i,t}$ | -0.140*** | -0.103** |
|  | (-3.58) | (-2.58) |
| $\text{Post}_{i,t}$ | 0.008 | 0.013 |
|  | (0.44) | (0.75) |
| $\text{CAA}_{c,t}$ | -0.014 | 0.051 |
|  | (-0.33) | (1.05) |
| $\text{CAA}_{c,t} \times \text{Post}_{i,t}$ | 0.013 | -0.006 |
|  | (0.41) | (-0.18) |
| $\text{CAA}_{c,t} \times \text{GHGRP}_{i,t}$ | -0.015 | -0.128** |
|  | (-0.28) | (-2.27) |
| $\text{GHGRP}_{i,t} \times \text{Post}_{i,t}$ | -0.072*** | -0.082*** |
|  | (-3.90) | (-4.78) |
| $\text{GHGRP}_{i,t} \times \text{Post}_{i,t} \times \text{CAA}_{c,t}$ | -0.007 | 0.021 |
|  | (-0.19) | (0.52) |
|  |  |  |
| N | 16,075 | 16,075 |
| $\text{Adj.} R^2$ | 0.388 | 0.389 |
|  |  |  |
| Year FE | Y | Y |
| County FE | Y | Y |

This table examines whether another major environmental regulation, the Clean Air Act (CAA), induces GHGRP plants to reduce carbon emissions and presents results on the triple difference regressions in Equation 3. We define our second treatment variable, CAA, as the non-attainment status of a county. Column (1) defines all partially non-attainment counties as treated, and Column (2) defines only fully non-attainment counties as treated. The outcome variables are winsorized at 1 and 99 percentiles for each year. Standard errors are clustered by plants, and t-statistics are shown in the parentheses below the coefficient estimates. *$p < 0.1$; **$p < 0.05$; ***$p < 0.01$.

To ensure our results are robust to other major environmental policies in place during the sample period, we examine whether the effect of the GHGRP is differentially affected by CAA attainment status. Plants located in non-attainment areas, where air pollution exceeds allowable limits, are often required to reduce emissions of air pollution. This may affect $CO_2$ emission rates. We test whether the findings in Table 3 are affected by CAA attainment status using the triple difference regression in Equation 3. We present the results in Table 5. In Column (1), the non-attainment indicator assumes a value of one if a county is designated as non-attainment for at least one pollutant. And in Column (2), the non-attainment indicator assumes a value of one if a county is out of attainment for all pollutants with ambient limits stipulated by the CAA. In both columns,

20

Exhibit 55 to Decl. of Lyon
1441
SER 1071

the coefficient on the triple interaction term $GHGRP_{i,t} \times Post_{i,t} \times CAA_{c,t}$ is insignificant and close to zero. And the $GHGRP_{i,t} \times Post_{i,t}$ term is similar in magnitude to that reported in Table 3. Collectively, these results suggest the findings in Table 3 are not affected by air quality regulations.

### 5.2   Public or Shareholder Pressure

In this section, we examine public or shareholder pressure as one plausible mechanism through which disclosure affects power plants' emission behavior. We test the shareholder pressure hypothesis using Equation 2. Table 6 presents the results. Power plants in our sample are owned by a mix of private investors, federal, state, or municipal government, and public shareholders. We use public ownership as the empirical proxy for shareholder pressure. Column (1) shows public ownership is strongly and positively associated with $CO_2$ emission rates. We present the results of fitting Equation 2 in Column (2). Consistent with our previous findings, the coefficient on $Post_{it} \times GHGRP_{it}$ is $-0.066$ (p < 0.01). The coefficient on the triple interaction term is negative but not significant. Next, we separate our sample into two groups based on ownership type: public and non-public ownership. We re-estimate Equation 1a using both samples and the results are shown in Columns (3) and (4), respectively. Column (3) shows a 9.9% reduction in $CO_2$ emission rates for GHGRP plants owned by publicly traded firms (p < 0.05). Column (4) indicates the GHGRP effect for plants owned by governments and private investors is 6% (p < 0.01). We interpret the difference in the effect of the GHGRP between the two samples as indicative of the effect due to shareholder pressure.

In Table 7, we refine our approach by including an indicator for whether plants are owned by firms on the S&P 500. We argue that shareholder pressure should be a more tangible force for firms that are included in the S&P Index since such firms are larger in size and receive more investor attention. In Column (2), we present the triple difference regression model, which shows a significant and negative coefficient on the triple interaction term. This result indicates that plants in the GHGRP owned by firms on the S&P 500 reduce their emission rates by 11% more than plants owned by S&P firms not in the GHGRP and GHGRP plants not owned by firms on the S&P 500. Columns (3) and (4) present findings that are consistent with Column (2); firms listed

21

Exhibit 55 to Decl. of Lyon
1442
**SER 1072**

Case 2:24-cv-00801-ODW-PVC   Document 56-55   Filed 07/24/24   Page 25 of 46   Page ID #:7423

Table 6: Effects of the GHGRP and Publicly Traded Firms

| | log($CO_2$ Emission Rate) | | | |
| --- | --- | --- | --- | --- |
| | Full Sample | | Sub-Sample | |
| | | | Public | Non-Public |
| | (1) | (2) | (3) | (4) |
| GHGRP$_{i,t}$ | -0.145*** | -0.160*** | -0.145 | -0.168*** |
| | (-3.94) | (-4.37) | (-1.57) | (-3.95) |
| Post$_{i,t}$ | 0.010 | 0.008 | -0.031 | 0.013 |
| | (0.57) | (0.45) | (-0.70) | (0.65) |
| GHGRP$_{i,t}\times$ Post$_{i,t}$ | -0.084*** | -0.066*** | -0.099** | -0.060*** |
| | (-5.36) | (-3.88) | (-2.31) | (-3.47) |
| Owned by Public$_{i,t}$ | 0.091*** | 0.072 | | |
| | (3.43) | (1.10) | | |
| Owned by Public$_{i,t}$ | | 0.008 | | |
| $\times$ Post$_{i,t}$ | | (0.20) | | |
| Owned by Public$_{i,t}$ | | 0.052 | | |
| $\times$ GHGRP$_{i,t}$ | | (0.72) | | |
| GHGRP$_{i,t}\times$ Post$_{i,t}$ | | -0.056 | | |
| $\times$ Owned by Public$_{i,t}$ | | (-1.22) | | |
| N | 14,357 | 14,357 | 4,311 | 10,046 |
| Adj.$R^2$ | 0.390 | 0.390 | 0.470 | 0.425 |
| Year FE | Y | Y | Y | Y |
| County FE | Y | Y | Y | Y |

This table presents results on the effects of the GHGRP on plant-level outcomes for plants owned by publicly traded firms. Column (1) adds the Owned by Public indicator variable as an additional control in our main DiD model. Column (2) presents the triple difference regression described in Equation 2 with Owned by Public as a second treatment variable. In Columns (3) and (4), we sort our sample into two groups based on whether the plant is owned by a publicly-traded firm, and estimate Equation 1a. The outcome variables are winsorized at 1 and 99 percentiles for each year. Standard errors are clustered by plants, and t-statistics are shown in the parentheses below the coefficient estimates. *$p < 0.1$; **$p < 0.05$; ***$p < 0.01$.

22

Exhibit 55 to Decl. of Lyon
1443
SER 1073

Table 7: Effects of the GHGRP and S&P Member Firms

| | log($CO_2$ Emission Rate) | | | |
| | Full Sample | | Sub-Sample | |
| | | | S&P Member | Non-S&P Member |
| | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| GHGRP$_{i,t}$ | -0.141*** | -0.169*** | -0.095 | -0.169*** |
| | (-3.78) | (-4.74) | (-0.62) | (-4.54) |
| Post$_{i,t}$ | 0.017 | 0.005 | 0.025 | 0.017 |
| | (1.00) | (0.29) | (0.43) | (0.91) |
| GHGRP$_{i,t}\times$ Post$_{i,t}$ | -0.077*** | -0.059*** | -0.140** | -0.056*** |
| | (-4.96) | (-3.51) | (-2.54) | (-3.30) |
| S&P Member$_{i,t}$ | 0.029 | -0.102 | | |
| | (0.98) | (-1.19) | | |
| S&P Member$_{i,t}$ $\times$ Post$_{i,t}$ | | 0.097* | | |
| | | (1.78) | | |
| S&P Member$_{i,t}$ $\times$ GHGRP$_{i,t}$ | | 0.161* | | |
| | | (1.73) | | |
| GHGRP$_{i,t}\times$ Post$_{i,t}$ $\times$ S&P Member$_{i,t}$ | | -0.111** | | |
| | | (-1.96) | | |
| N | 14,357 | 14,357 | 3,234 | 11,123 |
| Adj.$R^2$ | 0.388 | 0.389 | 0.559 | 0.380 |
| Year FE | Y | Y | Y | Y |
| County FE | Y | Y | Y | Y |

This table presents results on the effects of GHGRP on plant-level outcomes for plants owned by firms included in the S&P Index. Column (1) adds the S&P Member indicator variable as an additional control in our main DID model. Column (2) presents the triple difference regression described in Equation 2 with S&P Member as a second treatment variable. In Columns (3) and (4), we sort our sample into two groups based on whether a plant is owned by a firm that is included in the S&P Index and estimate Equation 1a. The outcome variables are winsorized at 1 and 99 percentiles for each year. Standard errors are clustered by plants, and t-statistics are shown in the parentheses below the coefficient estimates. *$p < 0.1$; **$p < 0.05$; ***$p < 0.01$.

Exhibit 55 to Decl. of Lyon
1444
**SER 1074**

on the S&P 500 exhibit larger emission reductions than other plant owners. We contend that shareholder pressure is driving this additional reduction in $CO_2$ emission rates.

### 5.3 Firm-Level Strategic Behavior

In this section, we study firms' strategic behavior in response to the GHGRP. To do so, we estimate Equation 1b. The results are shown in Table 8. Columns (1) and (2) appear to contradict the plant-level outcomes; we do not find evidence that treated firms change emission rates across their portfolio of plants. In light of the negative and significant effect of the GHGRP on plant emission rates evident in Table 3, the null effect of the GHGRP at the firm-level must mean that emissions rates for non-GHGRP plants owned by GHGRP firms increased significantly in the post-regulation period. Hence, we suspect that firms with both GHGRP and non-GHGRP plants are strategically reallocating emissions from treated to untreated plants.

We explore this behavior by estimating Equation 1b with emission rates at non-GHGRP plants as the outcome variable. The results are shown in Columns (3) and (4) of Table 8. The coefficient on the interaction term is the effect of firm enrollment in the GHGRP on non-GHGRP plants' $CO_2$ emission rates, relative to plants owned by firms that do not report to the GHGRP at all. The results corroborate our hypothesis that firms strategically manage their emissions between GHGRP plants and non-GHGRP plants. In Column (3), we find a large (nearly 56%) and significant ($p <$ 0.05) treatment effect on $CO_2$ emission rates at GHGRP firms' non-GHGRP plants. In Column (4) the effect is smaller but still indicates an economically significant increase in $CO_2$ emission rates for GHGRP firm's non-GHGRP plants.

Table 8 suggests that while we find a significant reduction in plant-level emission rates, the overall effect on emissions is limited because firms can strategically manage their portfolio of plants to attenuate total emission reductions by substituting $CO_2$ emissions between GHGRP plants and non-GHGRP plants. In Appendix C Table 12, we show that our plant-level emission reduction results remain significant even after we control for this strategic behavior.[26]

The evidence of strategic behavior among firms required to disclose their emissions is especially important to the design of CSR disclosure programs. The efficacy of CSR disclosure laws in

---

[26]Specifically, we remove non-reporting plants owned by reporting firms and rerun the main DID specification. The estimated $\beta_2$ is $-6.4\%$ and remains significant. See details in Appendix C Table 12.

Exhibit 55 to Decl. of Lyon
1445
**SER 1075**

changing firms' behavior is adversely affected when firms can simply move economic activity, and emissions, outside the scope of disclosure. Moving emissions to non-disclosing plants is a form of leakage, previously discussed in the context of binding regulations (Babiker, 2005, Böhringer et al., 2017, Chen, 2009, Fischer and Fox, 2012, Fow, 2020). We argue that leakage is direct evidence that firms with exposure to the GHGRP view disclosure as costly. Assuming that firms maximize profits given available information, a decision to reallocate production and emissions to plants outside the purview of the GHGRP must reflect firms' expectations that profits will be adversely affected by disclosure of current emissions. Alternatively, companies would not elect to respond to the GHGRP by reallocating emissions to plants outside the scope of the program if they did not anticipate future benefits in the form of higher firm values from the perspective of outside investors, stronger customer loyalty, or avoided future regulatory penalties.

Table 8: Effects of the GHGRP on Firm-level Emissions

| | $\log(CO_2 \text{ Emission Rate})$ | | | |
| | Firm Average | | Non-GHGRP Plants' Average | |
| | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| $\text{GHGRP}_{f,t}$ | -0.086 | -0.386** | -0.377* | -0.125 |
| | (-0.81) | (-1.81) | (-1.65) | (-0.94) |
| $\text{Post}_{f,t}$ | -0.266** | -0.320*** | 0.159 | -0.092 |
| | (-2.06) | (-3.38) | (0.52) | (-0.46) |
| $\text{GHGRP}_{f,t} \times \text{Post}_{f,t}$ | 0.154 | 0.072 | 0.556** | 0.247* |
| | (1.39) | (0.99) | (2.42) | (1.69) |
| | | | | |
| N | 744 | 744 | 407 | 407 |
| $\text{Adj}.R^2$ | 0.301 | 0.605 | 0.003 | 0.607 |
| | | | | |
| Year FE | Y | Y | Y | Y |
| Firm FE | N | Y | N | Y |
| Firm Controls | Y | N | Y | N |

This table presents results on the effects of the GHGRP on firm-level carbon emissions rates using Equation 1b. The outcome variable in Columns (1) and (2) is the weighted average of all plants owned by a firm. In Columns (3) and (4), we take the weighted average of all non-GHGRP plants owned by a firm as the outcome variable, hence the observation size drops from 744 to 408 due to the exclusion of firms with no GHGRP plants. Columns (1) and (3) use year fixed effects and control for the following firm characteristics, firm size, leverage ratio, number of plants owned, number of gas plants owned, and number of coal plants owned. Columns (2) and (4) include both year and firm fixed effects. All continuous variables are winsorized at 1 and 99 percentiles for each year, and t-statistics are shown in the parentheses below the coefficient estimates. *$p < 0.1$; **$p < 0.05$; ***$p < 0.01$.

25

Exhibit 55 to Decl. of Lyon
1446
**SER 1076**

## 5.4   Firm Financial Performance

In this section of the analysis, we examine the change in firms' financial position before and after the GHGRP. There are two central reasons why we suspect firms' financial indicators may change in response to the GHGRP. First, as argued above, disclosure is costly for firms because the reporting facility must allocate resources to collect, monitor, and prepare the information requested. Second, previous sections show that GHGRP plants respond to the program by reducing CO emission rates. This likely stimulates a reallocation of resources relative to the case where inputs are optimized for profit maximization.

We present the results of firms' financial performance in Table 9. We employ t-tests comparing the means of several measures of firms' financial position for GHGRP and non-GHGRP firms. In the spirit of our DID approach, we assess mean performance before and after the GHGRP was enacted. We elect not to use DID models here because the parallel trends assumption, critical to causal inference, is violated for many of the financial variables.

Table 9: T-tests on Firm Financial Performance

|  | GHGRP Firm | | | | Non-GHGRP Firm | | | |
|  | Mean | | | | Mean | | | |
|  | Pre | Post | (2-1) | t | Pre | Post | (4-3) | t |
|  | (1) | (2) |  |  | (3) | (4) |  |  |
| Profitability (%) | 10.23 | 9.07 | -1.16 | -5.97 | 10.69 | 10.35 | -0.34 | -0.19 |
| Log(Rev) | 7.58 | 7.86 | 0.28 | 3.93 | 7.97 | 8.40 | 0.43 | 1.37 |
| Operating CF (%) | 6.43 | 6.15 | -0.28 | -1.83 | 6.30 | 7.64 | 1.34 | 1.00 |
| ROA (%) | 3.02 | 2.61 | -0.41 | -0.91 | 3.50 | 1.95 | -1.54 | -1.54 |
| CAPEX (%) | 7.58 | 7.50 | -0.08 | -0.29 | 5.17 | 7.31 | 2.14 | 2.00 |
| PP&E (%) | 71.23 | 73.56 | 2.33 | 3.02 | 55.84 | 59.81 | 3.97 | 0.89 |
| Inventory (%) | 2.82 | 2.45 | -0.37 | -3.13 | 2.33 | 3.85 | 1.52 | 1.40 |
| Cash (%) | 1.67 | 1.49 | -0.18 | -0.90 | 2.47 | 2.04 | -0.43 | -0.52 |
| Book Leverage (%) | 34.24 | 33.96 | -0.28 | -0.36 | 30.12 | 26.46 | -3.66 | -1.93 |
| Net Leverage (%) | 32.56 | 32.47 | -0.09 | -0.13 | 27.66 | 24.42 | -3.24 | -1.40 |
| Interest (%) | 2.20 | 1.86 | -0.34 | -5.07 | 2.11 | 1.47 | -0.64 | -4.56 |

This table employs t-test results comparing the means of firms' financial reporting variables before and after the GHGRP. A firm is treated as a GHGRP firm if it owns at least one GHGRP plant, otherwise it is treated as a non-GHGRP firm. We report the means and t-statistics separately for GHGRP firms and non-GHGRP firms. See Appendix B for variables definitions.

Overall, Table 9 suggests firms exposed to the GHGRP exhibited inferior financial performance

Exhibit 55 to Decl. of Lyon
1447
SER 1077

relative to firms that do not own plants in the GHGRP. For GHGRP firms, revenues increased by 28% (p < 0.01) after the enactment of the program. However, this increase is less than that for non-GHGRP firms (43%) though the latter effect is imprecisely estimated. Operating cash flow fell for GHGRP firms. It increased for non-GHGRP firms. While profitability decreased for both groups of companies, the decline was over three times greater for GHGRP firms. Similarly, capital expenditures and inventories expanded for companies without GHGRP plants. These measures fell, or were essentially flat for GHGRP firms. While both groups of firms exhibit falling leverage, GHGRP firms show considerably smaller reductions in both book and net leverage than companies without exposure to the GHGRP. Finally, interest expenses decreased nearly two times as much for non-GHGRP firms relative to GHGRP firms.

We are not claiming that the changes in firms' relative or absolute financial position due to exposure to the GHGRP are a causal relationship. We nonetheless argue that Table 9 provides compelling evidence that the GHGRP adversely affected firms' financial outcomes. The earlier results in the paper, which we do claim are the result of a causal relationship, indicate that firms (especially large, publicly-traded firms) substantially change their production decisions, as evidenced both by reduced emission rates at GHGRP plants and increased discharges at facilities outside the scope of the GHGRP. We argue that the results in Table 9 are the financial signature of these changes made in response to the GHGRP.

## 6   Conclusion

As corporate social responsibility gains momentum, an important open question pertains to the consequences of mandatory CSR reporting. We explore this topic by examining the real effect of a nation-wide mandatory reporting program for greenhouse gas emissions. We initially hypothesize that the program would cause emission rates to fall because the GHGRP enhanced the accessibility and timeliness of previously hidden information and that investors, shareholders, and other market participants would value firms with lower emission rates. Consistent with our hypothesis, we find a significant reduction in emission rates by reporting facilities. On average, plants covered by GHGRP reduced $CO_2$ emission rates by 7%, relative to the non-reporting plants. We contend that this effect was at least partially driven by public or shareholder pressure, or firms' anticipation

27

Exhibit 55 to Decl. of Lyon
1448
**SER 1078**

of the pressure, in light of the disclosure. Support for this mechanism evinces in the much larger reduction in emission rates for plants owned by firms on the S&P 500.

Attenuating the estimated reduction in emission rates is a form of leakage which we detect when analyzing firm-level outcomes. Specifically, we find evidence, for firms that own both GHGRP and non-GHGRP plants, that emission rates at these firms' non-reporting plants increased significantly compared to non-reporting firms'. Leakage is evidence that firms view disclosure as bearing costs or risk. That is, since reallocating emissions from GHGRP to non-GHGRP plants is itself costly, it must be the case that firms anticipate some benefit from avoiding disclosure.

Our results are likely to be of interest to both academics and policymakers. We contribute to the literature examining the effect of disclosure on environmental performance. This paper also highlights that how information disclosure occurs matters. First, we demonstrate that a nationwide disclosure program affects firm behavior. Second, the paper shows that reporting thresholds present the opportunity for leakage which attenuates net emission reductions. Third, the behavioral changes observed herein firmly support the notion that companies expect relevant stakeholders to respond to new information in ways that the firms would like to avoid. As such, our paper makes the case that standardized, mandatory CSR reporting (without thresholds) has the potential to induce large-scale changes in firm behavior that may have appreciable social benefits.

28

Exhibit 55 to Decl. of Lyon
1449
**SER 1079**

# References

Mitigating emissions leakage in incomplete carbon markets. *Journal of the Association of Environmental and Resource Economists (Conditionally Accepted)*, 2020.

U.S. Energy Information Administration. "form eia-860, annual electric generator report", 2020a. Available from EIA's web site: https://www.eia.gov/survey.

U.S. Energy Information Administration. "forms eia-923,power plant operations report (formerly eia-906,power plant report", 2020b. Available from EIA's web site: https://www.eia.gov/survey.

M. H. Babiker. Climate change policy, market structure, and carbon leakage. *Journal of International Economics*, 65(2):421–445, 2005. URL https://EconPapers.repec.org/RePEc:eee:inecon:v: 65:y:2005:i:2:p:421-445.

D. G. Belay and J. D. Jensen. 'the scarlet letters': Information disclosure and self-regulation: Evidence from antibiotic use in denmark. *Journal of Environmental Economics and Management*, 104:102385, 2020. ISSN 0095-0696. doi: https://doi.org/10.1016/j.jeem.2020.102385. URL https: //www.sciencedirect.com/science/article/pii/S009506962030108X.

C. Böhringer, K. E. Rosendahl, and H. B. Storrøsten. Robust policies to mitigate carbon leakage. *Journal of Public Economics*, 149:35–46, 2017. ISSN 0047-2727. doi: https: //doi.org/10.1016/j.jpubeco.2017.03.006. URL https://www.sciencedirect.com/science/article/ pii/S004727271730049X.

Y. Chen. Does a regional greenhouse gas policy make sense? a case study of carbon leakage and emissions spillover. *Energy Economics*, 31(5):667–675, 2009. ISSN 0140-9883. doi: https: //doi.org/10.1016/j.eneco.2009.02.003. URL https://www.sciencedirect.com/science/article/pii/ S0140988309000309.

H. Christensen, L. Hail, and C. Leuz. Adoption of csr and sustainability reporting standards: Economic analysis and review. *SSRN Electronic Journal*, 01 2019. doi: 10.2139/ssrn.3427748.

P. M. Clarkson, Y. Li, G. D. Richardson, and F. P. Vasvari. Revisiting the relation between environmental performance and environmental disclosure: An empirical analysis. *Accounting, Organizations and Society*, 33(4):303–327, 2008. ISSN 0361-3682. URL https://www.sciencedirect. com/science/article/pii/S0361368207000451.

Compustat Industrial Annual Data, 2020. URL https://wrds-web.wharton.upenn.edu/wrds/.

Exhibit 55 to Decl. of Lyon
1450
**SER 1080**

Available: Standard   Poor's/Compustat [2020 December]. Retrieved from Wharton Research Data Service.

M. A. Delmas and N. Lessem. Saving power to conserve your reputation? the effectiveness of private versus public information. *Journal of Environmental Economics and Management*, 67 (3):353–370, 2014. ISSN 0095-0696. doi: https://doi.org/10.1016/j.jeem.2013.12.009. URL https://www.sciencedirect.com/science/article/pii/S0095069614000072.

M. A. Delmas, M. J. Montes-Sancho, and J. Shimshack. Information disclosure policies: Evidence from the electricity industry. *Economic Inquiry*, 48(2):483–498, 2011. doi: http://dx.doi.org/10.1111/j.1465-7295.2009.00227.x. URL https://ssrn.com/abstract=1578522.

D. S. Dhaliwal, O. Z. Li, A. Tsang, and Y. G. Yang. Voluntary nonfinancial disclosure and the cost of equity capital: The initiation of corporate social responsibility reporting. *The Accounting Review*, 86(1):59–100, 2011. ISSN 00014826. URL http://www.jstor.org/stable/29780225.

B. Downar, J. Ernstberger, S. J. Reichelstein, S. Schwenen, and A. Zaklan. The impact of carbon disclosure mandates on emissions and financial operating performance. *ZEW - Centre for European Economic Research Discussion Paper*, (20-038), 2020. URL SSRN:https://ssrn.com/abstract=3693670.

C. Fischer and A. K. Fox. Comparing policies to combat emissions leakage: Border carbon adjustments versus rebates. *Journal of Environmental Economics and Management*, 64 (2):199–216, 2012. ISSN 0095-0696. doi: https://doi.org/10.1016/j.jeem.2012.01.005. URL https://www.sciencedirect.com/science/article/pii/S0095069612000186.

J. M. Fisk and A. Good. Information booms and busts: Examining oil and gas disclosure policies across the states. *Energy Policy*, 127:374–381, 2019. ISSN 0301-4215. doi: https://doi.org/10.1016/j.enpol.2018.12.032. URL https://www.sciencedirect.com/science/article/pii/S0301421518308371.

A. G. Fraas and R. Lutter. How effective are federally mandated information disclosures? *Journal of Benefit-Cost Analysis*, 7(2):326–349, 2016. doi: 10.1017/bca.2016.8.

J. Grewal. Real effects of disclosure regulation on voluntary disclosers. *Journal of Accounting and Economics*, page 101390, 2021.

T. L. Hazen. Corporate and securities law impact on social responsibility and corporate purpose. *Boston College Law Review*, 62(3), 2021.

30

Exhibit 55 to Decl. of Lyon
1451
**SER 1081**

P. Kanashiro. Can environmental governance lower toxic emissions? a panel study of u.s. high-polluting industries. *Business Strategy and the Environment*, 29(4):1634–1646, 2020. doi: https://doi.org/10.1002/bse.2458. URL https://onlinelibrary.wiley.com/doi/abs/10.1002/bse.2458.

T. P. Lyon and J. W. Maxwell. Greenwash: Corporate environmental disclosure under threat of audit. *Journal of Economics & Management Strategy*, 20(1):3–41, 2011. doi: https://doi.org/10.1111/j.1530-9134.2010.00282.x. URL https://onlinelibrary.wiley.com/doi/abs/10.1111/j.1530-9134.2010.00282.x.

T. P. Lyon and J. P. Shimshack. Environmental disclosure: Evidence from newsweek's green companies rankings. *Business & Society*, 54(5):632–675, 2015. doi: 10.1177/0007650312439701. URL https://doi.org/10.1177/0007650312439701.

S. Marshall, D. Brown, and M. Plumlee. The impact of voluntary environmental disclosure quality on firm value. *Academy of Management Proceedings*, 2009(1):1–6, 2009. doi: 10.5465/ambpp.2009.44264648. URL https://doi.org/10.5465/ambpp.2009.44264648.

D. C. Matisoff. Different rays of sunlight: Understanding information disclosure and carbon transparency. *Energy Policy*, 55:579 – 592, 2013. ISSN 0301-4215. doi: https://doi.org/10.1016/j.enpol.2012.12.049. URL http://www.sciencedirect.com/science/article/pii/S0301421512011020.

E. M. Matsumura, R. Prakash, and S. Vera-Munoz. Firm-value effects of carbon emissions and carbon disclosure. *The Accounting Review*, 89:695–724, 04 2014. doi: 10.2308/accr-50629.

G. Michelon, S. Pilonato, and F. Ricceri. Csr reporting practices and the quality of disclosure: An empirical analysis. *Critical Perspectives on Accounting*, 33:59–78, 2015. ISSN 1045-2354. doi: https://doi.org/10.1016/j.cpa.2014.10.003. URL https://www.sciencedirect.com/science/article/pii/S1045235414001051.

D. M. Patten. The relation between environmental performance and environmental disclosure: a research note. *Accounting, Organizations and Society*, 27(8):763–773, 2002. ISSN 0361-3682. doi: https://doi.org/10.1016/S0361-3682(02)00028-4. URL https://www.sciencedirect.com/science/article/pii/S0361368202000284.

M. Plumlee, D. Brown, R. M. Hayes, and R. S. Marshall. Voluntary environmental disclosure quality and firm value: Further evidence. *Journal of Accounting and Public Policy*, 34(4):336–361, 2015. ISSN 0278-4254. doi: https://doi.org/10.1016/j.jaccpubpol.2015.04.004. URL https://www.sciencedirect.com/science/article/pii/S0278425415000320.

Exhibit 55 to Decl. of Lyon
1452
**SER 1082**

E. M. Reid and M. W. Toffel. Responding to public and private politics: corporate disclosure of climate change strategies. *Strategic Management Journal*, 30(11):1157–1178, 2009. doi: https://doi.org/10.1002/smj.796. URL https://onlinelibrary.wiley.com/doi/abs/10.1002/smj.796.

S. P. Saeidi, S. Sofian, P. Saeidi, S. P. Saeidi, and S. A. Saaeidi. How does corporate social responsibility contribute to firm financial performance? the mediating role of competitive advantage, reputation, and customer satisfaction. *Journal of Business Research*, 68(2): 341–350, 2015. ISSN 0148-2963. doi: https://doi.org/10.1016/j.jbusres.2014.06.024. URL https://www.sciencedirect.com/science/article/pii/S0148296314002215.

S. Tomar. Csr disclosure and benchmarking-learning: Emissions responses to mandatory greenhouse gas disclosure. *SMU Cox School of Business Research Paper*, (19-17), 2019. ISSN 3448904. doi: 10.2139/ssrn.3448904. URL https://ssrn.com/abstract=3448904.

United States Environmental Protection Agency (EPA). "nonattainment areas for criteria pollutants (green book)", 2020a. Available from EPA's web site: https://www.epa.gov/green-book [2020 July].

United States Environmental Protection Agency (EPA). "emissions generation resource integrated database (egrid), 2019", 2020b. Washington, DC: Office of Atmospheric Programs, Clean Air Markets Division. Available from EPA's eGRID web site: https://www.epa.gov/egrid.

D. Weil, A. Fung, M. Graham, and E. Fagotto. The effectiveness of regulatory disclosure policies. *Journal of Policy Analysis and Management*, 25(1):155–181, 2006. doi: https://doi.org/10.1002/pam.20160. URL https://onlinelibrary.wiley.com/doi/abs/10.1002/pam.20160.

Exhibit 55 to Decl. of Lyon
1453
SER 1083

# A    Appendix: Additional GHGRP Information

Table 10: Data Profile Comparison

| | eGrid | GHGRP |
|---|---|---|
| **Accessibility** | | |
| Frequency | Bi-Annually[1] | Annually |
| Data Formats | Raw data in spreadsheets [2] | FLIGHT: An interactive website with mapping features;[3] Data highlights: A high-level summary of reported data by industry; Downloadable data files |
| Initial Data | 1996 | 2010 |
| **Informativeness** | | |
| Scope | A comprehensive inventory of environmental attributes of electric power system that integrates data from EIA Forms EIA-860 and EIA-923 and EPA's Clean Air Markets Program | Facilities that emit 25,000 metric tons of carbon dioxide equivalent ($CO_2$e) per year in 41 industries are required to report GHG emissions |
| Verification | Varies depending on the data source. eGrid makes some adjustments to deal with missing and ambiguous data | Multi-step data verification [4] |
| Authority | Varies depending on the data source. | Clean Air Act |
| **Usefulness** | | |
| Intended Use | Typically used for GHG registries and inventories, carbon footprints, consumer information disclosure, emission inventories and standards, power market changes, and avoided emission estimates | Identify nearby sources of GHG emissions; track emissions and identify cost-saving opportunities; inform policy at the state and local levels; provide important information to the finance and investment communities |

Source: EPA's website
(1) eGrid publishes data approximately every other year. See details on EPA's website.
(2) eGrid has recently updated the layout of their website and added maps and graphs under eGrid Explorer.
(3) See Figure 2
(4) See Figure 3

Exhibit 55 to Decl. of Lyon
1454
**SER 1084**



Source: EPA

Figure 2: Facility Level Information on Greenhouse Gases Tool (FLIGHT)

34

Exhibit 55 to Decl. of Lyon
1455
**SER 1085**

## GHGRP Report Verification Process



Source: EPA

Figure 3: GHGRP Report Verification Process

Exhibit 55 to Decl. of Lyon
1456
**SER 1086**

4/12/2021                    EPA proposes GHG reporting program | Biomassmagazine.com

**EPA proposes GHG reporting program**

By Suzanne Retka Schill



ADVERTISEMENT

Large emitters of greenhouse gases (GHGs) will have to file their first annual GHG emissions reports with the U.S. EPA in 2011, if a new rule is adopted as proposed. EPA held about 100 meetings with more than 250 stakeholders, including trade associations, industries, environmental groups, and state and regional governments, during the development of the rule. Hearings were scheduled for April 6 and 7 in Washington, D.C., and April 16 in Sacramento, Calif. Written comments will be accepted for 60 days after the official publication of the proposed rule in the Federal Register. To read the text of the proposal and supporting information visit the Web site at www.epa.gov/climatechange/emissions/ghgrulemaking.

In general, the EPA proposed the new rule for suppliers of fossil fuels or industrial GHGs, manufacturers of vehicles and engines, and facilities that emit 25,000 metric tons or more of carbon dioxide equivalent per year. The GHGs covered by the proposed rule are carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, sulfur hexafluoride, and other fluorinated gases including nitrogen trifluoride and hydrofluorinated ethers.

The EPA estimated approximately 13,000 facilities will be covered under the rule, accounting for 85 percent to 90 percent of U.S. GHG emissions. The threshold is roughly equivalent to the annual GHG emissions from 4,500 passenger vehicles, 58,000 barrels of oil consumed or 131 railcars filled with coal. The vast majority of small businesses will fall well below the threshold and thus not be required to report. The EPA estimated that it will cost the private sector $160 million for the first year and $127 million in each subsequent year to comply with the new reporting requirement.

In most cases, the required data will come from the facility level, with a few exceptions where the reporting will be done at the corporate level. Among the exceptions are vehicle and engine manufacturers, fossil fuel importers and exporters, and local gas distribution companies. Under the EPA proposal, the first emissions report would be due on March 31, 2011, for emissions that occured during calendar year 2010. At that time, reporters would need to present total annual GHG emissions as an aggregate as well as separate emissions data for each source and supply category identified by the EPA. Fuel use and feedstock inputs used to generate emissions are to be reported, but not emissions from land-use changes or carbon storage.

EPA has published information sheets for each of the source categories covered in the proposed rule on its Web site under the resources link. In addition to manufacturers of chemicals and gases, the source categories include energy-intensive industries such as refineries, coal mines, electrical generation, cement production, electronics

biomassmagazine.com/articles/2612/epa-proposes-ghg-reporting-program                    1/2

Figure 4: Media Coverage of GHGRP (1)

36

Exhibit 55 to Decl. of Lyon
1457
**SER 1087**



Figure 5: Media Coverage of GHGRP (2)

37

Exhibit 55 to Decl. of Lyon
1458
**SER 1088**



BLOG POST | 03.08.2006 | LAURA ROCKWELL

# New EPA Rule Establishes Mandatory Greenhouse Gas Reporting

EPA is creating a nationwide database of greenhouse gas emissions, an important first step on the path to reducing U.S. emissions.

The Environmental Protection Agency released a proposed Mandatory Greenhouse Gas Reporting Rule for sixty days of public comment, with a final rule expected in late 2009. The proposal would cover 85 to 90 percent of US greenhouse gas emissions. This process is the result of legislation passed in December, 2007 that directed the EPA to design a national, mandatory GHG emissions registry. EPA's work on a national registry lagged under the previous administration, but has received fast-track priority under incoming Administrator Lisa Jackson.

The plan would require 13,000 facilities to report their emissions. Facilities that emit 25,000 metric tons of greenhouse gases annually would be covered, and small businesses will be exempt. Reporting for sectors such as the utilities, oil and gas producers, and chemical refineries would start in 2011, while automobile manufacturers will start up on their 2011 models.

## Welcome Milestone

A national greenhouse gas registry is a major development in U.S. climate change policy, because it is the cornerstone of cap-and-trade, or indeed, any policy to measure and reduce emissions. Before the government can implement emission reduction policies, they first need to have solid and reliable emissions data. Otherwise, there would be no way to ensure that emissions sources—such as power plants and factories—are achieving reductions.

The EPA previously had no comprehensive way to track emissions data at the individual facility or business level. An EPA national registry will provide transparency and support a variety of climate change policies and programs at the national,

Figure 6: Media Coverage of GHGRP (3)

38

Exhibit 55 to Decl. of Lyon
1459
**SER 1089**

## B   Appendix: Additional Variable Definitions

| Variable | Definition |
|---|---|
| Size | Log of Total Assets |
| Profitability | Operating Income Before Depreciation / Lagged Assets $\times$ 100% |
| Log(Rev) | Log of Total Revenue |
| Operating Cash Flow | (Operating Income Before Depreciation - Interest and Related Expense - Total Income Taxes) / Lagged Assets $\times$ 100% |
| ROA | Income Before Extraordinary Items / Total Assets $\times$ 100% |
| CAPEX | Capital Expenditures / Lagged Assets $\times$ 100% |
| PP&E | Property, Plant and Equipment / Total Assets $\times$ 100% |
| Inventory | Total Inventories / Total Assets $\times$ 100% |
| Cash | Cash and Short-Term Investments / Total Assets $\times$ 100% |
| Book Leverage | (Long-Term Debt + Debt in Current Liabilities) / Total Assets $\times$ 100% |
| Net Leverage | (Long-Term Debt + Debt in Current Liabilities - Cash and Short-Term Investments) / Total Assets $\times$ 100% |
| Interest | Interest and Related Expense / Lagged Assets $\times$ 100% |

39

Exhibit 55 to Decl. of Lyon
1460
**SER 1090**

## C  Appendix: Additional Tables and Figures

Table 11: Effects of the Clean Power Plan Nullification on Plant-level Emissions Rates

| | $\log(CO_2$ Emission Rate) | | | |
| | Full Sample | | Post-GHGRP Sample | |
| | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| $\text{GHGRP}_{i,t}$ | -0.149*** | | -0.218*** | |
| | (-4.45) | | (-5.81) | |
| $\text{Post}_{i,t}$ | 0.001 | -0.003 | | |
| | (0.08) | (-0.15) | | |
| $\text{CPP}_{i,t}$ | 0.033* | 0.018 | 0.034* | 0.011 |
| | (1.83) | (1.01) | (1.67) | (0.54) |
| $\text{GHGRP}_{i,t} \times \text{Post}_{i,t}$ | -0.063*** | -0.046*** | | |
| | (-4.13) | (-2.99) | | |
| $\text{GHGRP}_{i,t} \times \text{CPP}_{i,t}$ | -0.049** | -0.021 | -0.043** | -0.010 |
| | (-2.39) | (-1.04) | (-2.08) | (-0.46) |
| | | | | |
| N | 16,075 | 16,075 | 8,798 | 8,798 |
| Adj.$R^2$ | 0.388 | 0.663 | 0.407 | 0.722 |
| | | | | |
| Year FE | Y | Y | Y | Y |
| County FE | Y | N | Y | N |
| Plant FE | N | Y | N | Y |

This table presents results on the effects of the Clean Power Plan (CPP) Nullification on plant-level carbon emission rates. $CPP$ is defined as a binary variable that is equal to one if the observation is from 2017 and after. Columns (1) and (2) include all observations, whereas Columns (3) and (4) only include observations after 2010. All continuous variables are winsorized at 1 and 99 percentiles for each year, and t-statistics are shown in the parentheses below the coefficient estimates. $^*p < 0.1$; $^{**}p < 0.05$; $^{***}p < 0.01$.

40

Exhibit 55 to Decl. of Lyon
1461
**SER 1091**

Table 12: Effects of the GHGRP on Plant-level Emissions Rates

|  | $\log(CO_2$ Emission Rate) |  |  |  |
|---|---|---|---|---|
|  | (1) | (2) | (3) | (4) |
| $\text{GHGRP}_{i,t}$ | -0.125*** | -0.238*** | -0.082*** | -0.233*** |
|  | (-3.28) | (-6.22) | (-1.73) | (-2.75) |
| $\text{Post}_{i,t}$ | -0.005 | -0.015 | -0.016 | -0.010 |
|  | (-0.25) | (-0.73) | (-0.78) | (-0.45) |
| $\text{GHGRP}_{i,t} \times \text{Post}_{i,t}$ | -0.064*** | -0.059*** | -0.055*** | -0.077*** |
|  | (-3.91) | (-3.13) | (-2.92) | (-3.63) |
|  |  |  |  |  |
| N | 13,423 | 13,423 | 12,396 | 12,396 |
| Adj.$R^2$ | 0.400 | 0.373 | 0.390 | 0.382 |
|  |  |  |  |  |
| Year FE | Y | Y | Y | Y |
| County FE | Y | N | Y | N |
| Owner FE | N | Y | N | Y |

This table presents results on the effects of the GHGRP on plant-level carbon emission rates excluding non-reporting plants owned by GHGRP firms. Columns (1) and (2) exclude such plants that are owned by publicly traded firms, and Columns (3) and (4) extend these plants to all ownership types. All continuous variables are winsorized at 1 and 99 percentiles for each year, and t-statistics are shown in the parentheses below the coefficient estimates. *$p < 0.1$; **$p < 0.05$; ***$p < 0.01$.

41

Exhibit 55 to Decl. of Lyon
1462
**SER 1092**

Table 13: T-test on Firm Financial Performance

| | Firm with both GHGRP and non-GHGRP Plants | | | |
| | Mean | | | |
| | *Pre* | *Post* | | |
| | (1) | (2) | (2-1) | *t* |
|---|---|---|---|---|
| Profitability (%) | 10.34 | 9.34 | -1.00 | -3.88 |
| Log(Rev) | 7.73 | 8.07 | 0.34 | 3.35 |
| Operating CF (%) | 6.44 | 6.29 | -0.15 | -0.74 |
| ROA (%) | 3.18 | 2.53 | -0.65 | -2.20 |
| CAPEX (%) | 7.53 | 7.72 | 0.19 | 0.50 |
| PP&E (%) | 70.38 | 73.31 | 2.93 | 2.99 |
| Inventory (%) | 2.96 | 2.50 | -0.46 | -2.69 |
| Cash (%) | 1.20 | 1.44 | 0.24 | 0.99 |
| Book Leverage (%) | 34.15 | 33.73 | -0.42 | -0.39 |
| Net Leverage (%) | 32.94 | 32.29 | -0.65 | -0.67 |
| Interest (%) | 2.22 | 1.82 | -0.40 | -4.05 |

This table employs t-test results comparing the means of firms' financial reporting variables before and after the GHGRP. We restrict the sample to firms that own both GHGRP and non-GHGRP plants. See Appendix B for variables definitions.

42

Exhibit 55 to Decl. of Lyon
1463
**SER 1093**

Case 2:24-cv-00801-ODW-PVC   Document 56-55   Filed 07/24/24   Page 46 of 46   Page ID #:7444



(a) 2007         (b) 2009

(c) 2010         (d) 2012

Figure 7: Density Plots

Panels (a) through (d) show the density plots of $CO_2$ emissions in short tons around the reporting threshold for years before and after the adoption of the GHGRP in 2010. The vertical reference line represents the reporting threshold of 25,000 metric tons. We do not observe any discontinuity around the threshold both before and right after the adoption of GHGRP.

43

Exhibit 55 to Decl. of Lyon
1464
**SER 1094**

# Exhibit 54

# to Declaration of Thomas P. Lyon

# The impact of carbon disclosure mandates on emissions and financial operating performance

Exhibit 50 to Decl. of Lyon
1379
**SER 1095**

Review of Accounting Studies (2021) 26:1137–1175
https://doi.org/10.1007/s11142-021-09611-x



# The impact of carbon disclosure mandates on emissions and financial operating performance

Benedikt Downar[1] · Jürgen Ernstberger[1] · Stefan Reichelstein[2,3] · Sebastian Schwenen[1] · Aleksandar Zaklan[4]

Accepted: 1 June 2021 / Published online: 5 August 2021
© The Author(s) 2021

## Abstract

We examine the impact of a disclosure mandate for greenhouse gas emissions on firms' subsequent emission levels and financial operating performance. For UK-incorporated listed firms a carbon disclosure mandate was adopted in 2013. Our difference-in-differences design shows that firms affected by the mandate reduced their emissions by about 8% relative to a control group of European firms. At the same time, our tests indicate that the treated firms experienced no significant changes in their gross margins. Taken together, our findings indicate that the reporting mandate had a real effect on the variable to be disclosed without adversely affecting the financial operating performance of the treated firms.

**Keywords** Disclosure of nonfinancial information · Mandatory disclosure · Greenhouse gas emissions · Real effects

**JEL Classification** Q28 · Q40 · M41 · M48

## 1 Introduction

Climate change is widely regarded as one of the most vexing societal challenges of our time. The root cause of this challenge is the fundamental externality that arises when

An earlier version of this paper was titled "Fighting Climate Change with Disclosure? The Real Effects of Mandatory Greenhouse Gas Emission Disclosure." This paper has benefited from insightful comments by Stephen Penman (the editor), two anonymous reviewers, Naomi Soderstrom (discussant), Jan Abrell, Irma Malafronte (discussant), Helene Naegele, Thorsten Sellhorn as well as participants at the Review of Accounting Studies conference, the Annual Congress of the European Accounting Association, the World Congress of Environmental and Resource Economists, the VHB Congress, and seminar participants at the universities Erlangen-Nuremberg, Copenhagen, Mannheim, Mainz, St. Gallen, Oldenburg, and Passau. Reichelstein thanks the DFG under grant TRR-266 for partial financial support.

✉ Sebastian Schwenen
   sebastian.schwenen@tum.de

Extended author information available on the last page of the article

🖂 Springer

Exhibit 50 to Decl. of Lyon
1380
**SER 1096**

1138                                                                                    B. Downar et al.

economic subjects do not internalize the full social cost of their greenhouse gas (GHG) emissions. The continuing mismatch between the private and social costs of GHG emissions has arguably resulted in a large-scale global market failure.[1] Policymakers have begun to counteract this mismatch through a range of policy tools, such as carbon pricing and direct emissions regulations.[2] At the same time, relatively little is known about the potential impact of a disclosure mandate that merely requires firms to report their carbon footprint without any obligation to reduce these emissions over time.[3]

A central axiom in management accounting, dating back to Drucker (1954), postulates that "what gets measured, also gets managed." Inside firms, this linkage is plausible and well-documented to the extent that the variable of interest is included in the firm's performance evaluation and incentive system.[4] The linkage between measurement and subsequent improvements becomes more tenuous in a market setting where firms disclose the variable of interest to the general public. It appears plausible that a mere requirement to report carbon emissions will "incentivize" firms to improve upon their subsequent emissions (even though such improvements are costly), provided that firms also anticipate being "rewarded" by different stakeholder groups for these improvements.

Numerous studies on Corporate Social Responsibility (CSR) and Environmental, Social and Governance (ESG) activities have observed that improvements in outcome variables are often difficult to establish because there is no commonly accepted measurement framework, e.g., labor practices that are deemed sustainable.[5] The lack of a well-defined measurement framework also makes it difficult, if not practically impossible, to have subsequent outcomes verified by third parties.[6] In these respects, greenhouse gas emissions are a relative exception, as they involve physical measurements, the delineation of scope (e.g., so-called Scope 1 or Scope 2 emissions), and an aggregate score for multiple greenhouse gases in order to arrive at a measure of $CO_2$ equivalents.

The main hypothesis examined in this paper is whether mandatory reporting entails a real GHG emission reduction effect, possibly because of stakeholder pressure on firms to subsequently "manage"—in the sense of Drucker (1954)—their carbon emissions. It seems plausible that firms will do so because multiple stakeholder groups, including customers, employees, and investors, regard corporate emissions as a negative firm attribute. In that sense, a disclosure mandate may create a "pillory" with regard to a firm's carbon footprint.[7] As firms can point to improvements with regard to

---

[1] The so-called Stern Review (Stern 2006) famously refers to climate change as "the greatest market failure ever seen."

[2] See Ellerman et al. (2010), Anderson and Di Maria (2011), Bel and Joseph (2015), Murray and Maniloff (2015), and Martin et al. (2016).

[3] As discussed in more detail below, contemporaneous papers by Tomar (2019), Jouvenot and Krueger (2020), and Grewal (2021) also examine the real effects of carbon disclosure mandates.

[4] See, for instance, Young and O'Byrne (2001) and Kaplan and Anderson (2007).

[5] See, for instance, Christensen et al. (2017), Fiechter et al. (2020), Grewal et al. (2019), and Grewal and Serafeim (2020) for a comprehensive assessment of the many recent studies on corporate sustainability management.

[6] Kanodia (2007) develops a model framework in which the designer faces a trade-off in setting a precision standard for disclosures due to the real (investment) effects that emerge in the ensuing market equilibrium.

[7] A particular firm-level outcome variable, like pollution, that is publicly known and viewed as a negative by investors is also the central feature in the models of Heinkel et al. (2001) and Friedman and Heinle (2016).

🖄 Springer

Exhibit 50 to Decl. of Lyon
1381
**SER 1097**

The impact of carbon disclosure mandates on emissions and financial...          1139

this publicly reported "bad" in the future, they will arguably improve their standing with different stakeholder groups.[8]

Our study evolves around the Companies Act 2006 (Strategic Report and Directors' Report) Regulations 2013. This act imposed a mandate on publicly listed UK-incorporated firms to report their GHG emissions as part of their annual financial reports. Prior to this mandate, companies had an obligation to gather and report the emissions of their individual installations (i.e., production sites such as power plants or steel mills) that were regulated under the European Union Emissions Trading System (EU ETS) to a publicly available register.[9] Prior to 2013, there was no obligation for publicly listed UK firms to report their overall "carbon footprint" as the aggregate of their installation-level emissions in the annual corporate report. In that sense, the regulation increased *transparency*, as interested parties no longer had to trace emission figures at the installation level back to the parent companies owning the installation.

To examine the impact of the UK GHG emission disclosure mandate on subsequent emissions and financial performance, we adopt a difference-in-differences (DiD) approach surrounding the implementation of the Companies Act. We compare the difference between pre- and post-mandate emission data for affected firms with emission data for a sample of control firms. In our study, this comparison is made feasible by tracing the emissions of all installations, as reported to the central EU ETS registry, back to the firms in our sample for a ten-year time window around the year 2013. The treatment group in our DiD design consists of installations that are located in the UK or another European country but are ultimately owned by UK-incorporated, publicly listed companies.[10] The control group consists of installations that are ultimately owned by companies not subject to the 2013 act—that is, publicly listed firms in other EU countries.

Our results provide evidence of a significant reduction in GHG emissions following the disclosure mandate for firms in the treatment group relative to the control group. The effect is sizable insofar as firms subject to the mandate, on average, reduce their GHG emissions by about 8% between the pre- and the post-mandate periods.

The 2013 UK mandate also requires firms to disclose a carbon intensity variable that expresses total $CO_2$-equivalent emissions in relation to some activity measure such as output, cost, or revenues. Such a ratio measure will be more informative about actual emission improvements for firms that have experienced substantial growth or contraction over time. We estimate the effect of the disclosure mandate on firms' carbon intensity by considering both sales and cost of goods sold (COGS) as the activity variable in the denominator. We find that the firms in the treatment group exhibit a significant incremental reduction in carbon intensity of approximately 13% (10%) when the denominator in the carbon

---

[8] Prior studies document real effects of disclosure regulation on investment (Biddle and Hilary 2006; Biddle et al. 2009; Graham et al. 2011; Cheng et al. 2013; Shroff et al. 2014; Shroff 2017), mine safety Christensen et al. (2017), and managerial short-termism (Ernstberger et al. 2017; Granja 2018; Kraft et al. 2018).

[9] The EU Transaction Log records yearly emissions from all installations regulated under the EU Emissions Trading System.

[10] Our study focuses on data of all installations covered by the EU ETS, i.e., emissions within the 27 member states of the European Union and Norway. Since data on installations in other countries is not available, we cannot rule out carbon leakage between firms' European and non-European installations. However, Dechezleprêtre et al. (2019) find no evidence of carbon substitution effects across countries.


Springer

Exhibit 50 to Decl. of Lyon
1382
**SER 1098**

intensity ratio is COGS (sales). Finally, we provide evidence that our results are robust to alternative empirical design choices, to reliance on a balanced rather than unbalanced sample, and to a matched-sample approach.

The magnitude of the reduction in emissions and carbon intensity may appear surprising for two reasons. First, as mentioned above, the information about Scope 1 emissions at the level of individual installations was already available prior to the 2013 mandate, albeit in dispersed form. As such, the mandate arguably only "pilloried" the treated firms to the extent that firm-level emissions became more accessible and transparent. Second, more than two-thirds of the treated firms in our sample participated in the Carbon Disclosure Project (CDP), which provides a global forum for firms and/or their subsidiaries to supply voluntary information about their GHG emissions and ongoing efforts to reduce them.[11] There are no binding reporting standards or informational requirements for disclosures submitted to the CDP. A reflection of this lack of formal requirements is that the CDP rates the participating firms with a score regarding the credibility and comprehensiveness of their voluntary disclosures. One way to interpret the UK GHG reporting mandate is that the obligation to report total corporate Scope 1 and 2 GHG emissions forced the unravelling of a partial disclosure equilibrium that was in effect prior to 2013.

With regard to the financial impact of the 2013 disclosure mandate, it would be surprising to find that the regulation had improved the financial operating performance of the treated firms. If firms had anticipated such beneficial effects, they could have pre-committed to provide information on emission reductions in their annual reports. Thus, one would expect that abnormal efforts to reduce GHG emissions are costly. Firms can reduce emissions in the short and medium run through a range of measures, including input substitutions and the outsourcing of carbon intensive activities. The well-known study by McKinsey (2009) suggests that some industries may have access to low-cost abatement options, such as installation retrofits.[12] Yet, there does not seem to be a general understanding of the abatement potential (in terms of tons of $CO_2$ saved) of these low cost options.

Any cost increases associated with abnormal carbon reduction efforts could be partially offset by higher sales. Such revenue increases could simply reflect pricing power that allows firms to pass on the increase in their production costs. At the same time, and in line with our notion of "stakeholder pressure," any differential increase in sales could also reflect that firms reporting significant carbon emission reductions in their annual reports attain greater loyalty from their customers.

Testing the hypothesis of a net-zero effect on revenues and cost, our DiD analysis shows that the treated firms do not experience a significant incremental impact in terms of their gross margins following the 2013 regulation. In separate explorations of the overall effect of the mandate on financial operating performance, our regression results indicate that the treated firms exhibit a small, but statistically insignificant, increase in both production costs and sales relative to the firms in the control group. The same conclusion emerges for capital expenditures that may have been undertaken to achieve

---

[11] Broadstock et al. (2018) point to the endogeneity issues that have afflicted empirical studies on voluntary corporate disclosures of GHG emissions.
[12] The 2018 IPCC report discusses the abatement potential of different options.

Exhibit 50 to Decl. of Lyon
1383
**SER 1099**

The impact of carbon disclosure mandates on emissions and financial...                          1141

the emission reductions. Taken together, our findings indicate that the disclosure requirement for publicly listed UK firms does not lead to a deterioration in their financial operating performance.

The final part of our analysis explores cross-sectional variation among the treated firms in their response to the disclosure requirement. In this part, we exploit the information available at the individual installation rather than the aggregate firm level. Specifically, we construct a complexity index that ranks firm heterogeneity in terms of the number of installations firms operate, the percentage of emissions these firms incur abroad, and the number of sectors in which firms are active. Our findings indicate that firms with a higher complexity score tend to reduce emissions at a lesser rate than their less complex counterparts.

Several other contemporaneous studies have examined the effects of mandatory reporting on corporate GHG emissions. Closest to our study are papers by Jouvenot and Krueger (2020), Grewal (2021), and Tomar (2019), the first two of which also focus on the UK disclosure mandate for GHG emissions in 2013. To quantify the impact of the mandate on subsequent emission levels, Jouvenot and Krueger (2020) rely on voluntarily disclosed information in the CDP database and on emission estimates issued by private organizations that track corporate GHG emissions. In contrast, our analysis relies on the granular, time-consistent, and verified data provided to the European Union Transaction Log (EUTL) register at the level of individual production sites, both prior to and after the mandate. Beyond the impact of the mandate on actual emissions, our study examines the impact on financial operating performance, while Jouvenot and Krueger (2020) study the consequences of the mandate on investments by large institutional investors, on media coverage, and on stock prices.

In a study complementary to ours, Grewal (2021) focuses on firms that were already reporting information about their carbon emissions to the Carbon Disclosure Project (CDP). Grewal (2021) establishes that, following the 2013 regulation, the subset of treated UK firms reports larger emission reductions than their counterparts not subject to the regulation. Furthermore, the incremental effect is more pronounced for firms with a relatively high level of pre-mandate emissions. These findings are consistent with our interpretation that the reporting mandate has an additional "pillory effect" beyond the information that firms already disclosed through channels like the CDP. In contrast to our approach, though, Grewal's (2021) analysis considers self-reported emission levels both before and after the mandate, rather than the emission figures verified under the European ETS system.

Tomar (2019) studies the effect of a regulation that obligates large US production facilities to report their emissions to the US Environmental Protection Agency. In contrast to the UK regulation, however, there was, and still is, no requirement that US firms disclose their emissions in the aggregate as part of the annual report. Thus, the post-mandate disclosure requirement in Tomar's study is similar to the pre-mandate setting that UK firms faced on account of the EU ETS regulations prior to the 2013 act. Regarding pre-treatment emission levels, Tomar (2019) develops an estimation technique for both the treatment and the control group. At the same time, Tomar's main conclusions, like those of the other two studies discussed above, are broadly consistent with our first result that a disclosure mandate resulted in a significant reduction in subsequent GHG emissions.

<span style="float:right">⚐ Springer</span>

Exhibit 50 to Decl. of Lyon
1384
**SER 1100**

1142                                                                                                           B. Downar et al.

Beyond the issue of GHG emissions, our study adds to the broader literature on the real effects of disclosure mandates regarding environmental and hazardous outcomes. Christensen et al. (2017) provide evidence that the Dodd-Frank Act provision requiring firms engaged in natural resource extraction to report on mine accidents and citations on mines in their annual reports did lead to improved worker safety in the mines of the regulated firms.[13] In another recent study, Chen et al. (2018) show that mandatory CSR reporting decreases local pollution levels, i.e., wastewater and sulfur dioxide ($SO_2$) emissions, in Chinese cities in which firms affected by the CSR mandate are located. Chen et al. also argue that the CSR mandate was associated with a decrease in firms' accounting rates of return.

Similar to the setting in Christensen et al. (2017) and Chen et al. (2018), our central hypothesis is that the disclosure mandate increases transparency and thereby creates pressure on management to improve the outcome variable in question. In case of mine safety or local environmental pollution, the hypothesized "pillory effect" is highly plausible because the reported information will be of interest to local media outlets and analysts. In contrast, with global pollution, the intensity of stakeholder pressure is less clear because the costs associated with GHG pollution, and therefore the benefits of reducing them, are distributed globally and thus affect *local* stakeholders only proportionally.[14]

The remainder of this paper proceeds as follows. Section 2 introduces the regulatory background and develops the hypotheses to be tested. Section 3 describes the research design. Section 4 presents the results. Section 5 presents sensitivity and additional analyses. We conclude in Section 6.

## 2 Regulatory background and hypothesis development

### 2.1 Regulatory background

The Companies Act 2006 (Strategic Report and Directors' Report) Regulations 2013 were presented to the UK Parliament by the Department for Business, Innovation and Skills (BIS) in June 11, 2013. The act was published in August 2013 and came into effect on October 1, 2013. Accordingly, "listed companies" are required to disclose their direct and indirect GHG emissions in their annual reports. Section 385 (2) of the act defines a listed company as a UK-incorporated company whose equity shares are listed on the Main Market of the London Stock Exchange, an exchange in a European Economic Area state, the New York Stock Exchange, or Nasdaq. The act applies to all fiscal years ending on or after September 30, 2013.

In particular, the 2013 act requires that companies disclose, in the Directors' Report, their direct (Scope 1) and indirect (Scope 2) GHG emissions during the last 12 months.

---

[13] As in our study, the information to be reported annually was already public prior to the regulation, since firms had to report it to the Mine Safety and Health Administration. In that sense, the disclosure mandate merely highlighted an individual firm's performance with regard to the outcome variable.

[14] Prior literature has established that $SO_2$ is a local hazard affecting human health outcomes and agricultural yields (Muller et al. 2011; EPA 2019), while $CO_2$ constitutes a non-toxic, yet global long-term threat to the stability of the world's climate. In that sense, the effects of $SO_2$ are significantly different from those of GHG emissions like $CO_2$.

 Springer

Exhibit 50 to Decl. of Lyon
1385
**SER 1101**

Case 2:24-cv-00801-ODW-PVC   Document 56-54   Filed 07/24/24   Page 8 of 40   Page ID #:7366

The impact of carbon disclosure mandates on emissions and financial...                    1143

Direct emissions are those caused by the combustion of fuels and the operation of production facilities. Indirect emissions are those resulting from the purchase of electricity, heat, steam, or cooling. The following greenhouse gases are to be included in the report: carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$), hydrofluorocarbons (HFCs), perfluorocarbons (PFCs), and sulfur hexafluoride ($SF_6$). Companies are not required to provide individual emission figures for each of the greenhouse gases listed. Instead, they are asked to report the aggregate annual quantity of GHG emissions in $tCO_2eq$, with the weights determined according to the weights set by the Intergovernmental Panel on Climate Change.[15] In addition to the total Scope 1 and Scope 2 $tCO_2eq$, companies must report a carbon intensity metric that relates emissions to some activity measure such as sales or cost of goods sold.

In addition to GHG emissions, the act imposes disclosure requirements pertaining to the diversity of directors, senior managers, and other employees as well as broader social and human rights issues. UK companies also face new obligations to report on environmental matters and developments that are likely to affect their business in the future. In Appendix A, we provide an overview of the new reporting items. While there is no indication that any of these reporting requirements confound our results, we cannot rule out that the broader environmental reporting mandate might also have influenced the propensity of the UK firms to reduce their carbon emissions.

The GHG disclosure mandate does not prescribe a specific method for calculating GHG emissions, but it requires the use of "robust and accepted methods" (DEFR 2013) and recommends a "widely recognized independent standard" (DEFR 2013). It encourages companies to "use relevant information from other domestic and international regulatory reporting processes" (DEFR 2013), such as data collected through the EU Emissions Trading Scheme (EU ETS), the approach taken in this study.

The data collected under the auspices of the EU ETS is publicly available in the European Union Transaction Log (EUTL) register, which provides information at the installation level, including its identification, operator, NACE code, and the activity type it is assigned to in the EU ETS (e.g., production of bulk chemicals or combustion of fuels). We refer to the emissions reported to the EUTL as *actual* (Scope 1) emissions. While the actual volume of GHG in the flue gases of a particular facility is inherently difficult to track in real time, we view the detailed Monitoring, Reporting and Verification (MRV) framework adopted by the European Union as a fairly precise method for determining actual emissions. Specifically, the MRV regulations describe (i) the allowable method for calculating the emissions by different facilities given their activity levels (Monitoring), (ii) the firms' reporting requirements (Reporting), and (iii) the external parties that national regulators can accredit as verifiers (Verification). Finally, the reported and verified emissions are subject to confirmation by an independent reviewer. These detailed regulations are intended to prevent underreporting of emissions by firms, which would allow them to purchase fewer emission allowances. This standardized measurement appears to have been unchanged in the years surrounding the UK disclosure mandate.

---

[15] The UK Government publishes the conversion factors for GHG emissions to $tCO_2$ equivalents on an annual basis. These factors are generally consistent with IPCC guidelines and the regulations under the EU ETS. The report must be approved by the board of directors and reviewed by the statutory auditor, while compliance with the act is enforced by the UK Financial Reporting Council. Directors of the affected firms face fines for being reckless or failing to take reasonable steps to ensure compliance (paragraph 415, (4) and (5) of the act).

 Springer

Exhibit 50 to Decl. of Lyon
1386
SER 1102

Since its introduction in 2005, the EU ETS has become the world's largest multinational emissions trading system.[16] This cap-and-trade mechanism covers industries that account for about 45% of the European Union's GHG emissions (Ellerman et al. 2016).[17] The remaining emissions not covered under the ETS system come primarily from the transportation, residential, and agricultural sectors (DECC 2016). Installations are covered by the EU ETS if they include a facility with a rated thermal input of at least 20 MW—enough to supply about 15,000 households with electricity at a given point in time—or if they fall into one or several of the following manufacturing segments: oil refineries, coke ovens, iron and steel, cement clinker, glass, lime, bricks, ceramics, pulp, paper and board, aluminum, petrochemicals, ammonia, nitric, adipic and glyoxylic acid production (European Commission 2015). Due to these rules, EU ETS coverage is concentrated in the sectors of energy supply and industrial manufacturing, covering approximately 79% of all UK emissions in 2014. Finally, note that the implementation of the act took place in the same year as the transition of the EU ETS to its third trading period, which covered the years 2013–2020.[18] The underlying scheme generating the emission data used in this paper hence spans two trading periods, and the transition to the third period took place concurrently to the introduction of the act. In Appendix B, we discuss these concurrent changes in more detail. We believe none affects our treatment and control group differentially.

Annual emissions by installations vary widely, ranging from a few thousand tons per year at small installations to several million tons at large coal power plants. The average (mean) UK installation covered by the EU ETS had emissions of about 100,000 tons of $CO_2$ equivalents during our sample period.

From an inference perspective, there are several benefits to our approach of tracking direct (Scope 1) GHG emissions from individual installations according to the EU ETS data. Most importantly, the reported figures were measured and audited consistently both before and after the UK disclosure mandate went into effect. Unlike other studies, such as Tomar (2019), we therefore do not have to estimate a firm's emissions prior to the reporting mandate. In the context of our disclosure study, there is an additional advantage to focusing on Scope 1 emissions as the outcome variable. As explained in more detail in Section 3.5, UK power producers were subject to sector-specific emission charges and therefore had additional financial incentives to reduce their Scope 1 emissions during our observation window. Any such improvements will therefore carry through as improvements in the Scope 2 emissions of UK based installations that purchase electricity from the grid. If emissions are measured as the total of Scope 1 and Scope 2 emissions, a reduction in a firm's carbon emissions after the mandate could therefore be merely the result of lower Scope 1 emissions by the upstream electricity producers.

---

[16] Emission trading systems similar to the EU ETS have also been introduced in a few other jurisdictions. In the US, the California cap-and-trade scheme covers GHG emissions from power generation and industrial activities of facilities based in California (Air Resources Board 2016), and the Regional Greenhouse Gas Initiative covers emissions from electricity production in nine Northeastern and Mid-Atlantic states (RGGI 2013).

[17] For our sample country, the UK, the EU ETS covers a similar share of total emissions. For instance, in 2014, the first full year after the introduction of the disclosure rule, the EU ETS covered about 41% of total UK emissions. In 2014, total UK emissions were 514 million tons of $CO_2$eq, while the sum of verified emissions of all UK installations in the UK was 208 million tons of $CO_2$eq (DECC 2016).

[18] The first trading period covered the years 2005–2007, while the second encompassed 2008–2012.

Exhibit 50 to Decl. of Lyon
1387
**SER 1103**

The impact of carbon disclosure mandates on emissions and financial...        1145

To examine changes in emissions at the firm level, we assign all installations to their respective owners and aggregate the emissions data at the installation level for each firm. As illustrated in Fig. 1, the mapping from installations to firms (mathematically, a function) is carried out for both the treated UK-headquartered firms and the control group of firms that were not subject to the mandate.

We emphasize that in the context of our study the disclosure mandate did not make additional information publicly available, as the emissions of the treated firms were already accessible to the general public, albeit in a rather fragmented form, through the EUTL register. In essence, the informational effect of the disclosure mandate was to increase *transparency*, because an interested observer no longer had to carry out the mapping shown in Fig. 1 to calculate a firm's overall Scope 1 emissions.

### 2.2 Hypothesis development

The hypotheses tested in this paper pertain both to changes in GHG emissions and to changes in the financial operating performance of the firms subject to the UK disclosure mandate. Broadly, our approach is consistent with the so-called targeted disclosure cycle theory (Fung et al. 2007). Accordingly, disclosures influence the behavior of receivers (stakeholders), leading to real effects in the variables to be disclosed in the future. The information providers anticipate these behavioral changes and take actions that enable more favorable disclosures.

In a recent survey article, Hombach and Sellhorn (2019) lay out a set of criteria for corporate reporting mandates to have real effects, that is, effects on the variables that are being disclosed. Aside from sufficiently precise reporting standards and compliance requirements, the reporting variables in question must generate additional public information, or at least increase transparency about the variable in question. In order for real effects to emerge from a reporting mandate, Hombach and Sellhorn (2019) also posit that the disclosed information must be broadly value relevant, possibly by illuminating potential future risks to the business. Finally, management must have both the discretion and the motivation to subsequently improve the outcome variable.



**Fig. 1** Mapping of installations to firms. This figure shows the mapping of data at the installation level (as reported in the EU ETS) to treatment and control group firms. Using information on the (ultimate) owner of each installation, we map installations to either a treatment or a control group firm. The link between the installation owner and the ultimate owner (i.e., firm in our sample) is established by the Ownership Links and Enhanced EUTL Dataset Project (OLP), which provides the name and Bureau-van-Dijk identification number of an installation's ultimate parent company

 Springer

Exhibit 50 to Decl. of Lyon
1388
**SER 1104**

1146

The preceding criteria all appear to be met by the UK 2013 disclosure mandate. In addition to a specific reporting standard and the prospect of enforcement, it is plausible that multiple stakeholder groups of the treated firms, including customers, employees and capital providers, view the firm's carbon footprint as a negative. Because of the externality associated with the firm's emissions on the world's climate, these constituents would intrinsically prefer a lower carbon footprint, though they are likely to understand that certain emissions levels are unavoidable in the short run if the firm is to remain competitive in its product markets.

If the firms subject to the 2013 carbon disclosure mandate did indeed reduce their emissions more than the control group, the natural follow-on question is whether these efforts had a tangible impact on financial operating performance. On the benefit side, firms may anticipate that potential production cost increases can at least be partially passed on to consumers. While the possibility of pass-through generally depends on a firm's cost structure and pricing power, a tangible reduction in publicly reported carbon emissions will arguably improve the firm's public image. That, in turn, may lead to greater customer loyalty and thus a lower price elasticity of demand for customers who regard the firm's carbon footprint as a negative attribute.[19] From that perspective, emission reductions in the interest of "stakeholder capitalism" would at least be partially aligned with the interests of shareholders.

Another stakeholder group that may react favorably to improvements in reported carbon emissions are the firm's employees. For the same reasons as articulated in connection with customers, some employees will be intrinsically concerned about the climate-damaging effects of the firm's emissions. This group will tend to identify more strongly with an organization that can publicly and credibly claim to be innovative and progressive on the issue of climate change. To the innovating firms, the potential benefit from such an improvement in public perception is that ceteris paribus less compensation may be required to retain valued employees.

Finally, management of the firms in our treatment group may anticipate penalties by the capital markets unless improvements in carbon emissions can be claimed in the time periods following a disclosure mandate. In recent years, institutional equity investors have become increasingly vocal that meaningful sustainability practices are becoming a major criterion for the inclusion of firms in their portfolios. A potential penalty for firms that are viewed as stagnant in their emission levels (or other sustainability activities) is that they may be "shunned" by some investor groups, leading to an increase in their cost of equity capital.[20] Kraus and Amir (2010) and Friedman and Heinle (2016) develop formal models wherein investors, in equilibrium, effectively exert pressure on management to improve a firm's sustainability practices.[21] The preference structure of these institutional investors may directly reflect the intrinsic preferences of their capital providers. Some institutional investors have also explicitly stated that they view sustainability practices as an effective mitigation strategy with

---

[19] Reichelstein and Hoyt (2011) argue that this linkage was important for management at the outdoor equipment retailer REI in setting sustainability targets, including a substantial carbon footprint reduction.

[20] A widely reported illustration of such "penalties" was provided by the CEO of BlackRock, Larry Fink, in his annual letter to CEOs in 2020, when he stated, "We will be increasingly disposed to vote against management and board directors when companies are not making sufficient progress on sustainability-related disclosures and the business practices and plans underlying them" (Sprouse 2020).

[21] Disclosure is not an issue in these models, as the CSR variable of interest is assumed to be publicly known.

🏛 Springer

Exhibit 50 to Decl. of Lyon
1389
**SER 1105**

The impact of carbon disclosure mandates on emissions and financial...          1147

regard to future financial risks, specifically the risk of carbon intensive assets becoming economically impaired.[22]

Arguments suggesting that the real effect of the UK mandate could be minor include the possibility that the added transparency resulting from the disclosure requirement was inconsequential insofar as concerned parties could already access the EU transaction log prior to the mandate. Furthermore, with some additional information gathering effort, interested parties could trace the emissions from individual installations back to the parent companies owning the installations (Fig. 1).

We also note that a substantial share of the treatment firms in our sample did already report information about their GHG emissions to the Carbon Disclosure Project prior to 2013. These disclosures, however, are neither subject to binding reporting standards nor verified by a third party.[23] Participation in the CDP has always been voluntary and therefore reflects self-selection by the participating firms.[24] Nonetheless, as emphasized in Grewal's (2021) study, these disclosures may already have conveyed material firm-level information about emissions ahead of the act.[25] Finally, while the treated firms may indeed have perceived their annual emissions reports as a "pillory," the actual reduction potential available to them in the short and medium run, i.e., over a period of five or six years in our post-mandate observation window, may have been limited. This may be especially plausible because many of the treated firms were already subject to carbon pricing under the EU ETS system and therefore already had an incentive to adjust their production processes in the direction of more energy- and carbon-efficiency.

Mindful of the preceding countervailing considerations, we nonetheless state the following hypothesis.

> H1: *Firms subject to the UK mandate for annual disclosure of GHG emissions attain a larger reduction in their Scope 1 emissions than firms not subject to the mandate.*

The Companies Act 2006 (Strategic Report and Directors' Report) Regulations 2013 also require firms to disclose a carbon intensity variable that relates raw emissions of $CO_2$ equivalents to a meaningful indicator of production activity. Thus, the carbon intensity variable should indicate whether a reduction in emissions can be attributed to a mere reduction in production volume, or, conversely, whether an increase in

---

[22] The belief that long-term value maximization requires management practices that are environmentally and socially sustainable is emphasized, for instance, by investment funds like Generation Investment Capital (Reichelstein and Bebb 2016).

[23] A survey of UK equity fund managers shows that the lack of detailed requirements concerning reporting methodologies and organizational boundaries, as well as the lack of a third-party audit or review, was an important barrier for their reliance on voluntary GHG emission data (Trucost 2009).

[24] Examining voluntary carbon disclosure in the UK retail sector, Sullivan and Gouldson (2012) indicate that voluntary disclosure limits investors' ability to assess corporate climate performance due to different scopes of reporting and inconsistencies in the information being reported. In addition, DEFRA (2010) states that "even though CDP data is widely regarded as the most complete and comprehensive dataset on climate disclosure, many question quality of data as an issue which is inevitable with any voluntary disclosure scheme not requiring third party verification."

[25] According to a survey of PricewaterhouseCoopers (PwC) in partnership with the Carbon Disclosure Project (CDP), voluntary reporting of GHG emissions by a company raised the awareness of emissions for the board of directors, employees and the general public (PwC and CDP 2010).

 Springer

Exhibit 50 to Decl. of Lyon
1390
**SER 1106**

1148                                                                                                    B. Downar et al.

emissions can be attributed to production growth. For the denominator in the carbon intensity measure, we consider both sales and cost of goods sold, noting that, for the firms in our treatment group, both of these variables were arguably affected by the disclosure mandate of 2013. In direct analogy to hypothesis H1, we hypothesize that the UK disclosure mandate of 2013 also had a real effect on the carbon intensity of the treated firms.

> H2: *Firms subject to the UK mandate for annual disclosure of GHG emissions attain a larger reduction in their carbon intensity than firms not subject to the mandate.*

Our next hypothesis pertains to the financial performance of the treated firms. In order to reduce their carbon footprint, firms will presumably incur higher production costs. The magnitude and shape of the individual abatement cost curves, however, appear difficult to gauge, and are likely to vary considerably by industry. Several emission reduction measures will conceivably be available to firms in the manufacturing sector in the short and medium run. For instance, onsite fossil fuel power plants can be idled, with the requisite power and heat then procured from outside vendors. This would induce a shift from Scope 1 to Scope 2 emissions, with firms likely to care primarily about their "own" Scope 1 emissions.[26]

   Additional reduction measures include possible input substitutions that reduce the reliance on carbon-intensive materials like coal. For production processes requiring high operating temperatures, for instance, firms in carbon-intensive industries like steel and cement can switch from using coal or oil as a heating agent to electricity or less carbon-intensive agents like natural gas or hydrogen. Finally, holding output and production processes constant, many businesses will be in a position to reduce their fossil-fuel consumption and, thus, their emissions through investments in equipment that is more energy efficient.

   The impact of alternative carbon reduction measures on overall manufacturing costs has to date not been estimated reliably at the level of individual industries. The carbon abatement curves by McKinsey (2009) suggest that, for moderate GHG reductions, firms will be able to identify considerable "low hanging fruit" with a corresponding small cost per ton of $CO_2$ abated. Even if the cost per ton abated were to assume an extremely high value of say 100 euro per ton, the median firm in our sample, with carbon emissions of one million tons per year, would only experience a 10 million euro increase in manufacturing costs if it were to reduce emissions by 10 %. Furthermore, the impact of any such measures on a firm's gross margin percentage (defined as sales minus cost of goods sold divided by sales) would be offset by any corresponding sales revenue increases. The usual possibilities of a cost pass-through may be enhanced for firms that demonstrate improvements in their carbon footprint in the post-mandate period on account of greater customer loyalty expressing itself in a lower price elasticity of demand.

   The combination of cost increases that are likely to be minor in comparison to overall production costs and the potential for improved customer loyalty due to emission reductions leads us to the following hypothesis.

------

[26] By procuring power from outside vendors, a firm will also lower its total Scope 1 plus Scope 2 emissions, if the grid power it purchases is less carbon intensive.

🗐 Springer

Exhibit 50 to Decl. of Lyon
1391
**SER 1107**

The impact of carbon disclosure mandates on emissions and financial...          1149

*H3: Firms subject to the UK mandate for annual disclosure of GHG emissions exhibit no change in their gross margins compared to firms not subject to the mandate.*

Since the firms in our treatment group represent a wide cross-section of UK firms, it is natural to ask whether certain subgroups did achieve carbon emission reductions that differed substantially from the group average. In this context, we differentiate among firms according to the number of installations they own, the percentage of GHG emissions they incur outside of the UK, and the number of sectors they are active in. We use these three variables as the basis of a complexity score, and hypothesize that less complex firms, on average, achieve larger GHG emission reductions following the 2013 mandate.

Our intuitive reasoning underlying the following hypothesis is that less complex firms will, all else equal, find it easier to identify emission reductions that can be achieved across the board. UK-headquartered firms with a larger conglomerate structure could arguably also find it more difficult to incentivize country managers to implement local emission reductions. Finally, such firms may perceive a lesser benefit in terms of their standing with different stakeholder groups due to an overall improvement in GHG emissions as reported by the UK parent company.

*H4: Firms subject to the UK mandate with a higher complexity score reduce their GHG emissions by a smaller percentage than their UK counterparts with a lower complexity score.*

## 3 Research design and data

### 3.1 Empirical test: Hypothesis H1

We use the following firm-level staggered difference-in-differences approach to estimate the effect of the GHG emission disclosure mandate on actual emissions following the UK Companies Act:

$$E = \alpha_0 + \alpha_1 \cdot Post + \alpha_2 \cdot Post \cdot Treat + \sum Control\ variables \\ + Fixed\ effects\ for\ firms + Fixed\ effects\ for\ years + Industry\ time\ trends + \varepsilon \quad (1)$$

All variables are defined in Table 1. Our dependent variable $E$ indicates the natural logarithm of $CO_2$-equivalent GHG emissions at the aggregate level of the firm owning the installation (as illustrated in Fig. 1). Emission data for one firm-year observation are based on emission data on the portfolio of installations owned by the firm in a particular year.[27]

---

[27] We also estimate the model at the level of individual installations. For this test, we adjust all firm-level variables accordingly. For example, instead of aggregate emissions at the firm level, we consider emissions of the individual installation as the dependent variable. In a similar vein, we insert fixed effects at the installation rather than firm level. Since we have no data on the characteristics of individual installations except for emissions and operating activity, we keep the time-variant characteristics of the firm owning the installation as control variables for this regression.

 Springer

Exhibit 50 to Decl. of Lyon
1392
**SER 1108**

1150                                                                                            B. Downar et al.

*Post* is a binary variable indicating periods after the mandate for GHG emission disclosure. Our study is based on observations from the years 2009–2018. The mandate for GHG emission disclosure applies to all fiscal years ending on or after September 30, 2013. If a firm's fiscal year ends before this date, we define the emissions reported for the calendar year 2013 as a pre-treatment observation. If a firm's financial year ends on or after September 30, 2013, we define emissions reported for the calendar year 2013 as a post-treatment observation. As a consequence, the mandate to disclose GHG emissions applies to firms as of 2013 or 2014 (staggered implementation), depending on the respective fiscal year-end date.

*Treat* is an indicator variable that assumes the value of one if a firm was subject to the mandate and zero otherwise. As the control group, we use firms not subject to the mandate for GHG emission disclosure. Specifically, the control group consists of listed firms headquartered in other EU15 countries. Our primary variable of interest is $\alpha_2 \cdot Post \cdot Treat$. A significant negative coefficient on $\alpha_2$ indicates that, on average, the treated firms achieved an incremental reduction in emissions following the disclosure mandate.

In estimating Eq. (1), we include a set of time-variant control variables at the firm level to account for differences in firm characteristics that might influence a firm's incentives and abilities to reduce emission levels. Specifically, we control for firm size, because larger firms might have a higher willingness and ability to reduce emissions, as they are more visible to the public and might have economies of scope or scale in reducing emissions. We also include asset intensity. Firms with a larger asset base may have to invest in new technologies to reduce carbon emissions, while firms with relatively fewer assets could facilitate emission reductions in the short term through operational changes. Another control variable is the price-to-book ratio, because future growth opportunities may be related to a firm's ability to reduce its carbon emissions. We finally include leverage, to account for outside control by creditors and the financing potential for reducing emissions.

To account for different country-level developments between firms listed in the UK and EU countries, we control for countries' GDP and changes in producer prices as measured by the Producer Price Index. To control for time-specific and firm-specific unobserved heterogeneity, we include firm and year fixed effects for all tests.[28] Year fixed effects capture annual effects that pertain to all firms, such as changes in gasoline prices.[29] Finally, we include yearly time trends for the industry in which a firm operates, where we define industries based on the SIC 1 sector classification.[30] Industry trends capture the industry-specific developments over time, e.g., increasing prices of inputs specific to certain industries.

To reduce the influence of outliers, we winsorize all continuous variables at the 1st and 99th percentiles.[31] We draw our inferences based on standard errors that are two-way clustered by country (12 clusters) and year (10 clusters), reflecting that all

---

[28] Since we control for firm fixed effects, the binary variable corresponding to the treatment group firms is absorbed by the fixed effects. This variable is therefore excluded from all tests.

[29] Because of the staggered implementation, we are able to estimate a model including year fixed effects as well as a variable indicating periods after the mandate for GHG emission disclosure (*Post*).

[30] For the installation-level analysis, we use the NACE Rev. 2 industry classification, as SIC codes are not available at the installation level.

[31] We obtain virtually identical results using no outlier treatment.

⁂ Springer

Exhibit 50 to Decl. of Lyon
1393
SER 1109

The impact of carbon disclosure mandates on emissions and financial...                    1151

**Table 1** Definition of variables

| Variable | Definition | Data Source |
|---|---|---|
| Dependent variables | | |
| ln(Emissions) | Natural logarithm of yearly emissions in metric tons of $CO_2$eq. | EU ETS |
| ln(Emissions/COGS) | Natural logarithm of yearly emissions scaled by COGS. | EU ETS, Worldscope |
| ln(Emissions/Sales) | Natural logarithm of yearly emissions scaled by sales. | EU ETS, Worldscope |
| Gross Margin | Sales minus COGS scaled by sales. | Worldscope |
| ln(COGS) | Natural logarithm of COGS. | Worldscope |
| ln(Sales) | Natural logarithm of sales. | Worldscope |
| Experimental variables | | |
| Post | Indicator variable, 1: financial years ending on or after September 30, 2013, 0: otherwise. | BvD Orbis |
| Treat | Indicator variable, 1: UK listed and incorporated firm affected by the disclosure mandate, i.e., UK-incorporated company whose equity capital is either listed on the Main Market of the London Stock Exchange, an exchange in a European Economic Area state, the New York Stock Exchange or Nasdaq, 0: otherwise. | BvD Orbis |
| Complexity | First principal component of the following variables measured using values prior to treatment: (1) number of installations belonging to a firm, (2) percentage of foreign emissions of all installations belonging to a firm, and (3) number of different sectors of all installations belonging to a firm. | EU ETS |
| Control variables | | |
| Size | Natural logarithm of a firm's market value in thousand USD. | Worldscope |
| Leverage | Total debt divided by total assets. | Worldscope |
| Asset Intensity | Property, plant, and equipment divided by total assets. | Worldscope |
| Price-to-Book | Market value to book value. | Worldscope |
| GDP | Natural logarithm of a country's gross domestic product in million euro. | Eurostat |
| Input prices | Annual growth rate of the country-level producer price index. | Eurostat |

This table defines all variables used in this study

 Springer

Exhibit 50 to Decl. of Lyon
1394
**SER 1110**

installations of a UK-listed and incorporated firm are subject to the mandate, independent of the actual geographic location or industry classification of an installation.[32]

### 3.2 Empirical test: Hypothesis H2

To estimate the effects of the GHG emission disclosure mandate on carbon intensity, we run the following regression at the firm level:

$$CI = \beta_0 + \beta_1 \cdot Post + \beta_2 \cdot Post \cdot Treat + \sum Control\ variables \atop + Fixed\ effects\ for\ firms + Fixed\ effects\ for\ years + Industry\ time\ trends + \varepsilon \quad (2)$$

Table 1 again lists the formal definitions of all variables. The dependent variable measures carbon intensity, which is defined as the natural logarithm of emissions to the cost of goods sold (COGS). Thus, carbon intensity expresses the tons of $CO_2$ equivalent per euro of goods that the firm sold in a particular year. As before, we employ a staggered difference-in-differences approach with the same regressors as in Eq. (1). In a variant of Eq. (2), we use the natural logarithm of emissions to sales as our alternative carbon intensity measure.[33] We estimate our regressions for H2 only at the firm level because production costs and sales data are not available at the installation level.

### 3.3 Empirical test: Hypothesis H3

To test the impact of the disclosure mandate on gross margins, we estimate the following regression at the firm level:

$$GM = \gamma_0 + \gamma_1 \cdot Post + \gamma_2 \cdot Post \cdot Treat + \sum Control\ variables \atop + Fixed\ effects\ for\ firms + Fixed\ effects\ for\ years + Industry\ time\ trends + \varepsilon \quad (3)$$

Here, *GM* represents the gross margin, defined as sales minus cost of goods sold, scaled by sales.[34] Again, we employ a staggered difference-in-differences approach. *Post* and *Treat* are defined as before. The variable of interest is *Post · Treat*. According to H3, we expect no significant coefficient on *Post · Treat*. All control variables and fixed effect variables are as explained above.

### 3.4 Empirical test: Hypothesis H4

To test how a firm's complexity influences the impact of the disclosure mandate on GHG emissions, we estimate the following regression at the firm level:

---

[32] Results are robust using one-way clustering at the country-year level (120 clusters) to account for a potential influence of a lower number of clusters when using two-way clustering.

[33] Our approach here reflects that we only have access to information regarding the composite measure of sales or cost of goods sold, but not the quantities produced or sold of individual products.

[34] We find qualitatively unchanged results for net profits, defined as sales minus cost of goods sold minus SG&A expense scaled by sales.

🖉 Springer

Exhibit 50 to Decl. of Lyon
1395
**SER 1111**

The impact of carbon disclosure mandates on emissions and financial...                1153

$$E = \delta_0 + \delta_1 \cdot Post + \delta_2 \cdot Post \cdot Treat + \delta_3 \cdot Post \cdot Treat \cdot Complexity$$
$$+\delta_4 \cdot Post \cdot Complexity + \sum Control\ variables + Fixed\ effects\ for\ firms \quad (4)$$
$$+Fixed\ effects\ for\ years + Industry\ time\ trends + \varepsilon$$

Here, *Complexity* is an aggregate score that relies on information regarding the firms' installations, as recorded in the EU ETS registry data. Specifically, we compute the complexity score by conducting a principal component analysis using the following three variables: the firm's total number of installations, percentage of emissions abroad, and the number of sectors in which it has active installations. We rely on the first principal component of the component analysis and measure the score using pre-treatment period values.[35] A higher score indicates that a firm has a more complex operating structure. To test H4, we interact the DiD coefficient *Post · Treat* with the complexity score.

### 3.5 Data

Table 2 delineates the sample selection process. Our starting sample comprises all EU ETS installations with emission data for the period 2009–2018 (14,003 installations). We first assign all installations to their ultimate owner. Figure 1 illustrates the assignment of installations to firms. In a first step, we exclude all installations where data on the ultimate owner is missing, because in these cases we are not able to assign installations to the treatment or control group. The link between the installation and the ultimate corporate owner is established by the Ownership Links and Enhanced EUTL Dataset Project (OLP).[36] The OLP provides the name and Bureau-van-Dijk identification number (BvD-ID) of an installation's parent company. Next, we drop installations owned by firms with missing information on the fiscal year end in the BvD Orbis database. These steps lead to a sample of 6,327 installations owned by 1,994 unique firms.

Next, we limit our sample to installations owned by firms from EU15 countries. As we only observe emissions regulated under the EU ETS, we focus on European firms for all tests. This step results in a sample of 5,196 installations owned by 1,486 unique firms.

We also limit the sample to listed firms, because disclosure and emission reduction effects might differ between listed and unlisted firms. By restricting our sample to listed firms, we ensure the comparability of treatment and control firms.[37] This step leads to a sample of 2,274 installations owned by 197 unique firms.[38]

---

[35] The eigenvalue of the first principal component is 1.64. Eigenvalues of all remaining principal components are below 1.

[36] Data and a technical note describing the mapping from installations to ultimate owners is available at https://cadmus.eui.eu/handle/1814/64596. Note that the mapping in the OLP dataset was conducted in 2013, based on ownership information for 2005–2007. As it affected UK and non-UK companies, any potential impact its publication may have had on emissions is captured by year fixed effects.

[37] In sensitivity analyses, we perform a matched sample approach to account for differences in emissions between firms and find virtually unchanged results.

[38] We note that the number of listed firms in the EU ETS is rather small compared to the total number of listed firms in Europe. This is because a relatively small number of manufacturing firms account for a large share of total emissions (CDP 2017). Thus, a smaller sample size does not impair the external validity of our findings.

 Springer

Exhibit 50 to Decl. of Lyon
1396
**SER 1112**

1154                                                                                 B. Downar et al.

We further exclude firms from countries with other confounding regulations.[39] During our sample period, only Ireland implemented an emission-related regulation (InsideIreland.ie 2009). We also exclude installations for which the ultimate owner changed during the sample period because, otherwise, the assignment of the treatment group might be biased. These two restrictions lead to a sample of 2,212 installations owned by 193 unique firms.

Our sample also excludes installations in the energy supply sector based on the NACE Rev.2 sector code 35. This exclusion reflects that, for this sector, the UK government implemented an additional policy to increase the EU ETS allowance price in 2013 (the so-called "Carbon Price Floor" [CPF]). The CPF applies to electricity producers (Hirst 2018) and provides an additional emission charge beyond the EU ETS. Thus, the inclusion of these installations would likely lead to results overstating the impact of the disclosure mandate.[40] This restriction leads to a sample of 1,224 installations owned by 175 unique firms.

Next, we exclude installations in case of maintenance as well as temporary or permanent shutdowns because these emission reductions are likely unrelated to the mandate to disclose GHG emissions.[41] To identify maintenance, we exclude installations if their minimum emission level over the sample period is less than 1% of their maximal emission level. We identify temporary or permanent shutdowns based on incomplete emission data over time.[42] This step leads to a sample of 754 installations owned by 140 unique firms.

To estimate disclosure effects at the firm level, we next aggregate installation-level emissions to the firm level. At the firm level, we exclude firm-years with missing data for estimating our specified regression models. Firm-level accounting data are taken from Worldscope Datastream. This leads to a sample of 1,268 firm-years from 130 unique firms. Finally, we exclude firms without at least one observation prior to and after the passage of the Companies Act, to ensure applicability of a difference-in-differences approach. This step leads to a final firm-level sample of 1,257 firm years from 127 unique firms. The final installation-level sample consists of 7,267 installation years from 729 unique installations. In this sample, 24 firms belong to the treatment group, and 104 firms belong to the control group. An average sample firm operates 5.74 unique installations.

Table 3 presents the sample composition by country. All our treatment group firms are incorporated in the UK, whereas most of our control group firms are incorporated in France, Germany, Spain, and Sweden.

---

[39] We focus on potentially confounding regulations on non-financial disclosure because they are the most likely to bias our results. UK and other major countries (France, Germany, Italy, Spain) implemented the EU Directive 2013/34/EU into national law in 2015. However, this directive most significantly affected small companies, and the changes primarily related to financial disclosure. An adaptation of the directive to require non-financial disclosure (EU Directive 2014/95/EU) was only relevant for fiscal years 2017 and later. Our results are robust to a shorter sample period.

[40] We find virtually unchanged results if we keep energy sector installations in the sample.

[41] As an example, Lynemouth Power Station reported 2,717,964 tCO$_2$eq in 2014; 1,287,305 tCO$_2$eq in 2015; and 1,059 tCO$_2$eq in 2016.

[42] We find virtually unchanged results if we use a lower threshold (0.5%) or a higher threshold (5%). If we keep all installations independent of (temporary) shutdowns, we obtain higher point estimates and hence estimate a lower bound of the treatment effect.

⁑ Springer

Exhibit 50 to Decl. of Lyon
1397
**SER 1113**

The impact of carbon disclosure mandates on emissions and financial...                1155

**Table 2** Sample selection

| Initial sample | Installation level | | Firm level | |
|---|---|---|---|---|
| | Installation years | Unique installations | Firm years | Unique firms |
| All installations listed in the EU ETS with non-missing emission data. Sample period 2009–2018 | 109,029 | 14,003 | | |
| Installation-level exclusion of | | | | |
| installations without known ultimate owner or date of fiscal year end | 50,268 | 6,327 | | 1,994 |
| installations owned by non-EU firms | 41,419 | 5,196 | | 1,486 |
| installations owned by unlisted firms | 18,861 | 2,274 | | 197 |
| installations affected by confounding regulations or ownership changes | 18,409 | 2,212 | | 193 |
| energy sector installations | 10,018 | 1,224 | | 175 |
| virtually closed installations (i.e., maintenance and temporary or permanent shutdown) | 7,540 | 754 | 1,399 | 140 |
| **Firm-level exclusion of** | | | | |
| missing firm-level variables for estimating Eqs. (1)–(4) | 7,293 | 735 | 1,268 | 130 |
| firms without at least one observation prior to and after the implementation of the Companies Act | 7,267 | 729 | 1,257 | 127 |
| **Final sample for firm-level regression analyses** | | | 1,257 | 127 |
| **Final sample for installation-level regression analyses** | 7,267 | 729 | | |

This table delineates the sample selection for estimating the influence of the disclosure mandate on firms' GHG emission levels and operating performance

Given the exclusion of energy sector installations, the firms in our sample are mostly manufacturing firms: 548 firm-year observations belong to the SIC industry 2 (i.e. SIC 2000–2999), and 366 belong to the SIC industry 3 (i.e. SIC 3000–3999).

Table 4 reports descriptive statistics (Panel A) and correlations (Panel B) for our final sample. The average treatment (control) group firm in our sample produces yearly emissions of 807,641 (1,280,441) $tCO_2eq$. We observe that treated firms emit less GHG, on average, and have a lower carbon intensity, a higher COGS, higher sales, and a higher gross margin than control firms. Due to a skewed distribution, we use log-transformed emissions, carbon intensity, COGS, and sales in our regression analyses. We also find that firms in the treatment group are larger and more highly leveraged and have higher asset intensity and price to book ratio compared to control group firms. With regard to the Pearson and Spearman correlations, we do not observe high correlations between the continuous control variables.

 Springer

Exhibit 50 to Decl. of Lyon
1398
**SER 1114**

1156                                                                                           B. Downar et al.

**Table 3**  Sample composition

|                   | Control group | Treatment group | Total |
|-------------------|---------------|-----------------|-------|
| Austria           | 40            | 0               | 40    |
| Belgium           | 60            | 0               | 60    |
| Germany           | 216           | 0               | 216   |
| Denmark           | 30            | 0               | 30    |
| Spain             | 147           | 0               | 147   |
| Finland           | 80            | 0               | 80    |
| France            | 238           | 0               | 238   |
| United Kingdom    | 0             | 237             | 237   |
| Luxembourg        | 10            | 0               | 10    |
| The Netherlands   | 50            | 0               | 50    |
| Portugal          | 39            | 0               | 39    |
| Sweden            | 110           | 0               | 110   |
| Total             | 1,020         | 237             | 1,257 |

This table presents the geographic distribution of sample firms. Treatment group firms are listed and incorporated in the United Kingdom. Control group firms are listed and incorporated in other EU15 states

## 4 Results

### 4.1 Impact of the 2013 act on GHG emissions and carbon intensity

Table 5 reports our findings regarding the impact of the GHG disclosure mandate on subsequent GHG emissions. We also test the impact of the mandate on carbon intensity using two alternative definitions: the ratio of emissions to COGS, and the ratio of emissions to sales. By taking logarithms, we can interpret a transformed value of the corresponding coefficients as additive percentage changes.

Columns (I) and (II) in Table 5 present results of our estimations using installation-level emission data. While our main interest is at the firm level, the installation-level estimates establish a baseline result that allows us to assess possible effects of aggregating installation-level data to the firm level. Columns (I) and (II) present the findings without and with firm-level control variables, respectively. In all specifications, we use installation and year fixed effects and industry time trends.

In column (I) of Table 5 the coefficient on the variable of interest *Post · Treatment* is significantly negative (p: <0.05). This result is also sizable in economic terms, as affected firms on average decreased their GHG emissions by about 8%, compared to companies not affected by the act. The 8% estimate reflects that $1 - \exp(-0.082) = 0.078$. Controlling for differences in firm characteristics (column (II)) leads to a virtually unchanged estimate of −0.082. We note that the high adjusted $R^2$ is due to the stringent fixed effects specification, which absorbs installation-specific and year-specific unobservable heterogeneity as well as industry trends. The installation-level results provide evidence for H1 that emissions of the treated firms decreased compared to installations owned by firms in the control group.

 Springer

Exhibit 50 to Decl. of Lyon
1399
**SER 1115**

Case 2:24-cv-00801-ODW-PVC   Document 56-54   Filed 07/24/24   Page 22 of 40   Page ID #:7380

The impact of carbon disclosure mandates on emissions and financial... 1157

**Table 4** Summary statistics

| | Observations | Mean | Lower quartile | Median | Upper quartile | Std. deviation |
|---|---|---|---|---|---|---|
| **Panel A: Treatment group** | | | | | | |
| Emissions (t CO2eq) | 237 | 807,641 | 22,758 | 46,866 | 210,766 | 2,531,567 |
| ln(Emissions/COGS) | 237 | −4.342 | −5.827 | −4.109 | −2.852 | 2.371 |
| ln(Emissions/Sales) | 237 | −4.936 | −6.247 | −4.805 | −3.410 | 2.340 |
| Gross margin | 237 | 0.414 | 0.169 | 0.368 | 0.614 | 0.241 |
| COGS (in 000 USD) | 237 | 28,626,680 | 2,391,940 | 6,983,428 | 17,766,722 | 62,940,982 |
| Sales (in 000 USD) | 237 | 39,905,596 | 3,244,526 | 19,164,979 | 33,768,396 | 74,750,754 |
| Size | 237 | 16.149 | 15.065 | 16.917 | 18.050 | 2.410 |
| Asset intensity | 237 | 0.354 | 0.147 | 0.347 | 0.507 | 0.209 |
| Leverage | 237 | 0.278 | 0.187 | 0.259 | 0.374 | 0.126 |
| Price-to-Book | 237 | 3.228 | 1.358 | 2.662 | 4.316 | 2.548 |
| GDP | 237 | 14.591 | 14.464 | 14.563 | 14.701 | 0.129 |
| Input prices | 237 | 0.018 | −0.006 | 0.032 | 0.048 | 0.050 |
| **Panel B: Control group** | | | | | | |
| Emissions (t CO2eq) | 1,020 | 1,280,441 | 29,646 | 158,607 | 508,018 | 3,372,687 |
| ln(Emissions/COGS) | 1,020 | −3.463 | −5.027 | −3.201 | −1.523 | 2.384 |
| ln(Emissions/Sales) | 1,020 | −3.878 | −5.658 | −3.559 | −1.839 | 2.386 |
| Gross margin | 1,020 | 0.313 | 0.195 | 0.280 | 0.410 | 0.170 |
| COGS (in 000 USD) | 1,020 | 17,775,563 | 1,304,696 | 6,176,737 | 16,956,210 | 30,224,753 |
| Sales (in 000 USD) | 1,020 | 24,945,878 | 2,428,856 | 9,170,987 | 29,294,051 | 40,554,125 |
| Size | 1,020 | 15.451 | 14.336 | 15.786 | 16.822 | 1.954 |
| Asset intensity | 1,020 | 0.341 | 0.208 | 0.324 | 0.463 | 0.171 |
| Leverage | 1,020 | 0.257 | 0.165 | 0.246 | 0.337 | 0.131 |

⩜ Springer

Exhibit 50 to Decl. of Lyon
1400
**SER 1116**

Case 2:24-cv-00801-ODW-PVC   Document 56-54   Filed 07/24/24   Page 23 of 40   Page ID #:7381

1158                                                                                                          B. Downar et al.

**Table 4** (continued)

|  | Observations | Mean | Lower quartile | Median | Upper quartile | Std. deviation |
|---|---|---|---|---|---|---|
| Price-to-Book | 1,020 | 1.704 | 0.912 | 1.425 | 2.216 | 1.214 |
| GDP | 1,020 | 13.805 | 12.940 | 13.890 | 14.647 | 0.933 |
| Input prices | 1,020 | 0.008 | −0.015 | 0.003 | 0.026 | 0.033 |

**Panel C: Correlations**

|  |  | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ln(Emissions) | (1) | 1.00 |  |  |  |  |  |  |  |  |  |  |  |
| ln(Emissions/COGS) | (2) | **0.65** | 1.00 |  |  |  |  |  |  |  |  |  |  |
| ln(Emissions/Sales) | (3) | **0.67** | **0.99** | 1.00 |  |  |  |  |  |  |  |  |  |
| Gross margin | (4) | **−0.19** | 0.04 | −0.10 | 1.00 |  |  |  |  |  |  |  |  |
| ln(COGS) | (5) | **0.32** | **−0.51** | **−0.47** | **−0.27** | 1.00 |  |  |  |  |  |  |  |
| ln(Sales) | (6) | **0.29** | **−0.52** | **−0.51** | **−0.10** | **0.98** | 1.00 |  |  |  |  |  |  |
| Size | (7) | **0.21** | **−0.48** | **−0.51** | **0.19** | **0.83** | **0.89** | 1.00 |  |  |  |  |  |
| Asset intensity | (8) | **0.27** | **0.47** | **0.48** | −0.04 | **−0.28** | **−0.30** | **−0.26** | 1.00 |  |  |  |  |
| Leverage | (9) | 0.04 | **−0.14** | **−0.14** | −0.04 | **0.22** | **0.22** | **0.16** | 0.01 | 1.00 |  |  |  |
| Price-to-Book | (10) | **−0.24** | **−0.26** | **−0.31** | **0.32** | 0.05 | **0.12** | **0.34** | **−0.18** | 0.04 | 1.00 |  |  |
| GDP | (11) | **−0.18** | **−0.33** | **−0.35** | **0.17** | **0.21** | **0.24** | **0.20** | **−0.24** | 0.03 | **0.09** | 1.00 |  |
| Input prices | (12) | −0.01 | 0.00 | −0.01 | 0.05 | −0.02 | −0.01 | 0.00 | −0.01 | −0.03 | −0.03 | −0.01 | 1 |

This table shows the descriptive statistics for all variables used in the regression separately for treatment (Panel A) and control firms (Panel B). In Panels A and B, values for emissions, costs, and sales are in non-log form. Panel C presents Pearson correlations for all variables used for the empirical analyses. Bold figures in Panel C indicate statistically significant correlations that are at least at the 10% level. Variables are defined in Table 1. All continuous variables are winsorized at the 1st and 99th percentiles

Springer

Exhibit 50 to Decl. of Lyon
1401
**SER 1117**

The impact of carbon disclosure mandates on emissions and financial... 1159

**Table 5** The effect of a GHG disclosure mandate on emissions and carbon intensity

| | Installation level | | Firm level | | | |
|---|---|---|---|---|---|---|
| | (I) | (II) | (III) | (IV) | (V) | (VI) |
| Dependent variable: | ln(Emissions) | ln(Emissions) | ln(Emissions) | ln(Emissions) | ln(Emissions/COGS) | ln(Emissions/Sales) |
| Experimental variables | | | | | | |
| Post*Treat | −0.085** | −0.082** | −0.094*** | −0.077** | −0.130** | −0.095** |
| | (−2.400) | (−2.287) | (−5.397) | (−3.128) | (−3.183) | (−2.332) |
| Post | 0.016 | 0.015 | 0.128*** | 0.110** | 0.117** | 0.075* |
| | (1.432) | (0.759) | (5.178) | (2.861) | (2.559) | (1.871) |
| Control variables | | | | | | |
| Size | | −0.030 | | −0.007 | −0.227*** | −0.274*** |
| | | (−0.961) | | (−0.289) | (−4.407) | (−5.392) |
| Asset intensity | | −0.002 | | 0.388 | 0.479 | 0.508 |
| | | (−0.008) | | (1.437) | (0.974) | (1.123) |
| Leverage | | −0.215 | | −0.130 | −1.014*** | −0.833** |
| | | (−0.719) | | (−0.368) | (−3.383) | (−2.529) |
| Price-to-Book | | −0.006 | | −0.005 | 0.041*** | 0.043*** |
| | | (−0.531) | | (−0.802) | (4.179) | (3.901) |
| GDP | | | | −0.226* | −0.631** | −0.431* |
| | | | | (−1.931) | (−2.874) | (−2.057) |
| Input prices | | | | −0.252 | −0.405 | −0.321 |
| | | | | (−0.703) | (−0.613) | (−0.583) |
| Industry trends | yes | yes | yes | yes | yes | yes |
| Installation/firm fixed effects | yes | yes | yes | yes | yes | yes |
| Year fixed effects | yes | yes | yes | yes | yes | yes |

✎ Springer

Exhibit 50 to Decl. of Lyon
1402
**SER 1118**

Case 2:24-cv-00801-ODW-PVC    Document 56-54    Filed 07/24/24    Page 25 of 40    Page ID #:7383

1160      B. Downar et al.

**Table 5** (continued)

| Dependent variable: | Installation level | | Firm level | | | |
|---|---|---|---|---|---|---|
| | (I) ln(Emissions) | (II) ln(Emissions) | (III) ln(Emissions) | (IV) ln(Emissions) | (V) ln(Emissions/COGS) | (VI) ln(Emissions/Sales) |
| *Observations* | 7,267 | 7,267 | 1,257 | 1,257 | 1,257 | 1,257 |
| *Adjusted R²* | 0.956 | 0.956 | 0.987 | 0.987 | 0.982 | 0.983 |

This table presents the results of estimating the effect of a GHG disclosure mandate on GHG emissions (model (1)) and carbon intensity (model (2)). The dependent variable in columns (I)–(IV) is the natural logarithm of yearly emissions in metric tons of $CO_2$-eq. The dependent variable in column (V) is the natural logarithm of yearly emissions in metric tons of $CO_2$-eq scaled by cost of goods sold. The dependent variable in column (VI) is the natural logarithm of yearly emissions in metric tons of $CO_2$-eq scaled by sales. Reported values are coefficients and t-statistics in parentheses. Variables are defined in Table 1. All continuous variables are winsorized at the 1st and 99th percentiles. ***, **, and * indicate significance at 0.01, 0.05, and 0.1 levels, respectively. Standard errors are clustered by country and year

🍃 Springer

Exhibit 50 to Decl. of Lyon
1403
**SER 1119**

The impact of carbon disclosure mandates on emissions and financial...          1161

Columns (III) and (IV) in Table 5 present results analogous to those in columns (I) and (II), but at the firm level. These and all remaining firm-level regressions control for unobserved heterogeneity by including year and owner-specific fixed effects. We also account for industry-level trends at the one-digit SIC level. Column (III) reports estimates without further firm- or country-level controls. We again find a negative and significant coefficient estimate on $Post \cdot Treat$ (p: <0.01), indicating a reduction in GHG emissions for treated firms by about 9%. This reduction is comparable to the emission reduction of about 8% measured using installation-level emission data (column (I)), suggesting that the reduction in emissions occurs fairly evenly across installations owned by each firm. In the richer specification including further covariates (column IV), we control for the same firm-level covariates as in column (II) as well as for country-level control variables. Column (IV) corroborates the magnitude of the emission reduction obtained in the simpler model. It reports a similar estimated effect, about 8% (p: <0.05), when controlling for the firm-level variables: size, the ratio of fixed assets to total assets, leverage, and price-to-book value (PTB). The additional controls ln(GDP) and input prices account for potential differences in aggregate demand and cost developments, respectively. The analysis of firm-level emissions thus also supports hypothesis H1.

In the final set of regressions shown in Table 5, we estimate the effect of the act on firm-level carbon intensity. This dependent variable, defined as either emissions divided by COGS or emissions divided by sales, ensures that any observed emission reductions are not merely a consequence of reductions in production volume. Columns (V) and (VI) report the estimates when including all covariates. The findings are similar to those for $ln(emissions)$, with estimated reductions in carbon intensity of about 13% (p: <0.05) when using COGS as the denominator and of about 10% (p: <0.05) when using sales as a denominator. These results indicate that the emission reductions were not mainly driven by a decline in output or capacity utilization.[43]

The main assumption underlying the difference-in-differences approach is a common trend between treatment and control group firms (Roberts and Whited 2013). To examine whether a common pre-treatment trend exists for emissions and carbon intensities, we follow common approaches in the existing literature (Bertrand and Mullainathan 2003; Serfling 2016). Specifically, we replace the interaction terms $Post \cdot Treatment$ with separate interaction terms for each period relative to the implementation of the GHG mandate in 2013. We adjust time periods to reflect the staggered nature of the treatment. When estimating the model, insignificant pre-treatment coefficients close to zero indicate the validity of a common pre-treatment trend.

In our tests of parallel trends we focus on firm-level emissions and emission-intensity.[44] Fig. 2 shows the results for firm-level emissions. Values on the y-axis show point estimates and 90% confidence intervals. Values on the x-axis refer to the number of years removed from the start of the post-treatment period. The benchmark period is t = −1, i.e., the last pre-treatment year. Due to the staggered nature of the treatment, t = −1 is 2012 for many installations, and 2013 for others. Each point estimate shown in Fig. 2 therefore captures the difference in the emission levels

---

[43] Our results on the emission reductions (H1) are robust to controlling for COGS and sales in columns (III) and (IV) in Table 5, instead of using these variables as denominators of emissions, as in columns (V) and (VI).
[44] We observe parallel trends during the pre-treatment period also for installation-level emissions.

 Springer

Exhibit 50 to Decl. of Lyon
1404
**SER 1120**

1162          B. Downar et al.

between the treatment and control groups relative to $t=-1$. The pre-treatment period consists of the periods $t<=-4$ to $t=-1$, while periods $t=0$ to $t>=4$ constitute the post-treatment period. We aggregate the coefficients for the first and last periods depicted, also due to the staggered treatment. Accordingly, the $t<=-4$ value represents the average of the coefficient estimates for the interactions between each *Treat* variable and year dummies for periods four or more years prior to treatment. Analogously, the $t>=4$ value is the average of the estimates for the interactions between *Treat* and year dummies for periods four or more years after treatment.

Regarding firm-level emissions, Fig. 2 indicates a difference in pre-treatment and post-treatment coefficients. While treated firms have somewhat higher pre-treatment emissions than the control group four years prior to the mandate, this difference is fairly stable and close to zero during the three-year pre-treatment period. Point estimates are not significantly different from zero in any year from $t>-4$ to $t=-1$.[45] Based on these results, we do not find any violation of the common trends assumption for firm-level emissions. The estimates for the period $t=0$ to $t>=4$ show the evolution of the treatment effect over time. We observe that emissions in the treatment group decrease immediately after the start of the post-treatment period. The treated firms decrease their emissions and maintain their reductions for the first two years until $t=1$. Thereafter, emission levels converge again between the two groups.

A comparison with the findings in Grewal (2021) may be instructive. First, while Grewal's (2021) emission measure consists of total Scope 1 and Scope 2 emissions, we focus solely on Scope 1 emissions. Second, while our estimated average emission reduction is consistent with the main finding in Grewal (2021), the results from our event study design suggest that the effect on emissions is transitory. The findings in the two studies are therefore complementary, as both the samples and the emission outcome variables differ.

Figure 3 shows the results for carbon intensity. A similar picture emerges as in Fig. 2, irrespective of whether we define carbon intensity as emissions divided by COGS (Fig. 3, Panel a) or as emissions divided by sales (Fig. 3, Panel b). Point estimates are not significantly different from zero in any year from $t>-4$ to $t=-1$, thus supporting the common trend assumption. Again, we observe a clear treatment effect, which manifests itself at the beginning of the post-treatment period. As with emissions, coefficients immediately after the start of the post-treatment period are negative and marginally significant, while point estimates converge to zero in later years.

---

[45] As shown in Figs. 2 and 3, we cannot rule out a violation of the parallel trend assumption further than four years ahead of the mandate. Using a shorter pre-treatment period beginning at $t=-3$ instead yields more stable trends but lower treatment effects, i.e., ranging between $-0.108$ and $-0.054$. Yet, these lower estimates are attributable to our strict and conservative sample composition. This composition already provides a lower bound of the effect, because we exclude installations that are subject to temporary or permanent shutdowns. If we instead attribute temporary shutdowns to the disclosure mandate, i.e., opt for a less strict approach, we find more pronounced negative effects even for the shortened-time series (point estimates ranging between $-0.186$ and $-0.158$), as well as for the full sample (point estimates ranging between $-0.212$ and $-0.185$). If we attribute temporary as well as permanent shutdowns to the disclosure mandate, i.e., opt for the least strict approach, we find negative effects for the shortened-time series (point estimates ranging between $-0.274$ and $-0.247$) as well as for the full time-series (point estimates ranging between $-0.302$ and $-0.275$).

 Springer

Exhibit 50 to Decl. of Lyon
1405
SER 1121

Case 2:24-cv-00801-ODW-PVC   Document 56-54   Filed 07/24/24   Page 28 of 40   Page ID
#:7386



**Fig. 2** Emission levels around the disclosure mandate. This figure shows the change in verified GHG emissions surrounding the disclosure mandate. Values on the y-axis show differences in the natural logarithm of emissions of treated and control group firms and 90% confidence intervals. To obtain these estimates, we replicate model (1) but replace Post · Treat with separate interaction terms for each individual period surrounding the mandate. To account for the staggered implementation of the disclosure mandate, we adjust time periods using relative time periods. Values on the x-axis indicate periods relative to the first-time application of the mandate (t = 0). For firms with fiscal year end after September 30, 2013, t = 0 refers to the year 2013. For firms with fiscal year end before September 30, 2013, t = 0 refers to the year 2014. Periods t = −2, t = −3, and t < = −4 are prior to the first-time application of the disclosure mandate. Periods t = 0, t + 1, and t > = 2 are on or after the first-time application of the disclosure mandate. We use the last year prior to the first-time application (t = −1) as the benchmark period

### 4.2 Effects on financial operating performance

Our next set of tests addresses the effects of the mandate on the financial operating performance. Table 6 present the results. In column (I), we show the results without including further control variables. We find a significantly negative treatment effect on the firms' gross margins. Column (II) of Table 6 shows the results when controlling for firm size, asset intensity, leverage, and PTB, as well as for a country's GDP and changes in input prices—the point estimate becomes statistically insignificant. This result shows that the gross margins of disclosing firms following the 2013 mandate are not statistically different from the margins of our control group of non-disclosing firms, providing support for hypothesis H3.

To further explore our findings on H3, we investigate the individual components of the gross margin, i.e., production costs and sales. The unaffected gross margins we documented before do not rule out any increases in production costs. Stable gross margins could likewise be consistent with a simultaneous increase in both costs *and* sales.

We first estimate the treatment effect of the UK mandate on changes in production costs and rerun our DiD estimation using the logarithm of costs of goods sold as the dependent variable. Column (III) in Table 6 presents the results without further control variables. The findings suggest that firms subject to the mandate incur, on average, a

 Springer

Exhibit 50 to Decl. of Lyon
1406
**SER 1122**

1164                                                                                                    B. Downar et al.





**Fig. 3** Carbon intensity around the disclosure mandate. Panel A: ln(Emissions/COGS). Panel B: ln(Emissions/Sales). This figure shows the change in carbon intensity surrounding the disclosure mandate. Panel A shows carbon intensity defined as ln(*Emissions/COGS*). Panel B shows carbon intensity defined as ln(*Emissions/Sales*). Values on the y-axis show differences in carbon intensity reductions of treated and control group firms and 90% confidence intervals. To obtain these estimates, we replicate model (2) but replace Post · Treat with separate interaction terms for each individual year surrounding the mandate. To account for the staggered implementation of the disclosure mandate, we adjust time periods using relative time periods. Values on the x-axis indicate periods relative to the first-time application of the disclosure mandate (t = 0). For firms with fiscal year end after September 30, 2013, t = 0 refers to the year 2013. For firms with fiscal year end before September 30, 2013, t = 0 refers to the year 2014. Periods t = −2, t = −3, and t <= −4 are prior to the first-time application of the disclosure mandate. Periods t = 0, t = +1, and t >= 2 are on or after the first-time application of the disclosure mandate. We use the last year prior to the first-time application (t = −1) as the benchmark period

🌱 Springer

Exhibit 50 to Decl. of Lyon
1407
**SER 1123**

Case 2:24-cv-00801-ODW-PVC   Document 56-54   Filed 07/24/24   Page 30 of 40   Page ID #:7388

The impact of carbon disclosure mandates on emissions and financial...          1165

statistically significant increase in production costs of about 10% (p: <0.1). Based on this simple specification, the estimates suggest that emission reductions have been costly to firms. However, after adding the same control variables used in the other tests, the point estimate is reduced in magnitude and becomes statistically insignificant, as shown in column (IV) of Table 6. Thus, when taking account of the different firm and country characteristics, our results imply that firms were indeed able to find low-cost options when reducing their GHG emissions. In untabulated regressions, we confirm this result in a corresponding test when using capital expenditures (CAPEX) as the dependent variable instead of costs of goods sold. Hence, the observed emission reductions cannot be related to an increase in capital expenditures for, e.g., more energy-efficient machinery and appliances, either.

**Table 6**  The effect of a GHG disclosure mandate on financial operating performance

| Dependent variable: | (I)<br>Gross margin | (II)<br>Gross margin | (III)<br>ln(COGS) | (IV)<br>ln(COGS) | (V)<br>ln(Sales) | (VI)<br>ln(Sales) |
|---|---|---|---|---|---|---|
| Experimental variables | | | | | | |
| *Post Treatment* | **−0.030*** | **−0.015** | **0.107*** | **0.067** | **0.046** | **0.025** |
| | **(−3.623)** | **(−1.032)** | **(2.255)** | **(1.531)** | **(1.075)** | **(0.580)** |
| *Post* | 0.024*** | 0.018** | −0.086** | −0.007 | −0.040 | 0.034 |
| | (3.468) | (2.388) | (−2.516) | (−0.257) | (−1.647) | (1.335) |
| Control variables | | | | | | |
| *Size* | | 0.022*** | | 0.200*** | | 0.248*** |
| | | (3.349) | | (3.923) | | (4.998) |
| *Asset intensity* | | 0.008 | | −0.164 | | −0.141 |
| | | (0.150) | | (−0.455) | | (−0.441) |
| *Leverage* | | −0.071 | | 0.846*** | | 0.677*** |
| | | (−1.202) | | (4.787) | | (4.996) |
| *Price-to-Book* | | −0.001 | | −0.044*** | | −0.047*** |
| | | (−0.629) | | (−3.311) | | (−3.372) |
| *GDP* | | −0.150* | | 0.409* | | 0.253 |
| | | (−1.932) | | (2.151) | | (1.734) |
| *Input prices* | | −0.091 | | 0.157 | | 0.088 |
| | | (−1.174) | | (0.358) | | (0.214) |
| *Industry trends* | yes | yes | yes | yes | yes | yes |
| *Installation/firm fixed effects* | yes | yes | yes | yes | yes | yes |
| *Year fixed effects* | yes | yes | yes | yes | yes | yes |
| *Observations* | 1,257 | 1,257 | 1,257 | 1,257 | 1,257 | 1,257 |
| *Adjusted R²* | 0.902 | 0.905 | 0.986 | 0.988 | 0.988 | 0.990 |

This table presents the results of estimating the effect of a GHG disclosure mandate on financial operating performance (Eq. (3)). The dependent variable in columns (I) and (II) is the yearly gross margin. The dependent variable in columns (III) and (IV) is the natural logarithm of yearly COGS. The dependent variable in columns (V) and (VI) is the natural logarithm of yearly sales. Reported values are coefficients and t-statistics in parentheses. Variables are defined in Table 1. All continuous variables are winsorized at the 1st and 99th percentiles. ***, **, and * indicate significance at 0.01, 0.05, and 0.1 levels, respectively. Standard errors are clustered by country and year

 Springer

Exhibit 50 to Decl. of Lyon
1408
**SER 1124**

1166                                                                                      B. Downar et al.

We also run our estimation using the logarithm of sales as the dependent variable. With stable gross margins and statistically unchanged production costs, we expect to see no changes in sales. Columns (V) and (VI) of Table 6 show the results. The findings without and with covariates validate this conjecture.

Finally, we examine the parallel pre-treatment trends in both COGS and sales for UK and EU firms. For instance, we could fail to identify cost effects for the UK-disclosing firms, if EU firms in our control group experienced an upward trend in costs for other reasons. In Fig. 4, we plot the common trend graphs for COGS and sales. As before, we compute the differences for UK and EU firms for each year by replacing the interaction term *Post · Treatment* with separate interaction terms for each period relative to the year of the implementation of the disclosure mandate. The differences in COGS between UK and EU firms are statistically not different from zero during the pre-treatment years. For sales, we observe largely insignificant pre-treatment differences between UK and EU firms. During the post-treatment period, the point estimates are greater than zero, yet insignificant for most periods.

Taken together, the results in this section show that disclosing firms do not experience significant cost or sales increases, on average, and consequently no significant effect on gross margins. As such, our findings provide no support for the concern that GHG disclosure mandates could have a deteriorating effect on financial operating performance.

Finally, we exploit information about the complexity of a firm's installation portfolio by interacting the treatment variable with a complexity measure. Column (I) in Table 7 shows that firms with a more complex installation structure, i.e., with higher complexity scores, reduce their emissions by less than less complex firms. Columns (II) and (III) of Table 7 show that this finding is robust to using the two alternative definitions for carbon intensity. Columns (IV)–(VI) indicate that our results on operating performance are largely unaffected by including the information on firm complexity. This finding is intuitive, as firms with more complex operating structures reduce emissions to a lesser extent. We also do not expect to see any changes in gross margins, costs, or sales. In conclusion, firms with a more complex corporate structure are less successful at reducing both emissions and carbon intensity, thus providing supporting evidence for H4.

## 5 Sensitivity and additional analyses

In this section, we report the findings from sensitivity tests and additional analyses. For our first sensitivity test, we construct a matched sample of treatment and control firms. Accordingly, we match each treatment firm with a control group firm within the same SIC-1 industry based on average pre-treatment emission levels, i.e., a one-to-one matching without replacement.[46] We use the same dependent variables as in our main tests. Table 8 presents the results and shows that our estimates are qualitatively similar to the ones obtained before. Furthermore, we use an industry-balanced sample, i.e., only firms from industries with treatment and control group observations. This approach leads to unchanged results.

---

[46] We find similar results if we match on average pre-treatment firm size (i.e., market value of equity).

 Springer

Exhibit 50 to Decl. of Lyon
1409
**SER 1125**

Case 2:24-cv-00801-ODW-PVC    Document 56-54    Filed 07/24/24    Page 32 of 40    Page ID #:7390

The impact of carbon disclosure mandates on emissions and financial...                    1167





**Fig. 4** Change in operating performance surrounding the disclosure mandate. *Panel A: ln(COGS). Panel B: ln(Sales).* This figure shows the change in a firm's financial operating performance surrounding the disclosure mandate. Values on the y-axis show differences in the natural logarithm of emissions of treated and control group firms and 90% confidence intervals. To obtain these estimates, we replicate model (3) but replace Post · Treat with separate interaction terms for each individual period surrounding the disclosure mandate. To account for the staggered implementation of the act, we adjust time periods using relative time periods. Values on the x-axis indicate periods relative to the first-time application of the disclosure mandate (t=0). For firms with fiscal year end after September 30, 2013, t=0 refers to the year 2013. For firms with fiscal year end before September 30, 2013, t=0 refers to the year 2014. Periods t=−2, t=−3, and t<=−4 are prior to the first-time application of the disclosure mandate. Periods t=0, t=+1, and t>=2 are on or after the first-time application of the disclosure mandate. We use the last year prior to the first-time application (t=−1) as the benchmark period.

 Springer

Exhibit 50 to Decl. of Lyon
1410
**SER 1126**

We acknowledge that during our sample period France mandated broad corporate disclosures regarding environmental stewardship. While we kept French installations for our main tests, we find virtually unchanged results for emission reductions and operating performance if we exclude installations owned by French firms. Our results on emission reductions and operating performance are also robust to not excluding energy sector installations or only excluding electricity installations from our sample. As discussed in our data section, electricity installations have been subject to additional climate regulations during our observation period.

We also validate the robustness of our findings to the sample period and emission data availability: (1) we exclude the entry-into-force year of the Companies Act, (2) we do not exclude installations without emissions in a single year or maintenance during the sample period, and (3) we use a balanced sample at the firm level, i.e., we only use firms with data for all sample periods. All three approaches lead to unchanged emission results.

In concluding this section, we note that, with regard to other potentially confounding regulations within the European Union, we are unable to document either a concurring regulation or another event that would explain our results. Of course, we cannot rule out that an unspecified event, which coincided with the 2013 act and differentially affected listed firms in the UK, had a confounding effect on our findings. Finally, we only investigate the effects of one GHG emission disclosure regulation on specific firms (covered by the EU ETS) in one country (UK) for a specific period (2009–2018).

## 6 Concluding remarks

This study contributes to the growing literature on the effects of disclosure requirements for firms' activities in the ESG domain. While there appears to be considerable interest in having standardized reports on such activities, there does not seem to be a generally accepted measurement and verification framework for many ESG variables. Environmental pollution is an exception in this regard, because for many pollutants firms already have to demonstrate compliance with existing regulations. Our study on the effect of the 2013 mandate that required UK firms to disclose their greenhouse gas emissions in annual reports exploits the fact that most European manufacturing sites already had to have their reported emissions verified under the rules of the European Emission Trading scheme.

The introduction of the Companies Act 2006 (Strategic Report and Directors' Report) Regulations 2013 provides a source of exogenous variation in the disclosure regime of firms located in different countries. We find that installations belonging to UK companies subject to the disclosure mandate exhibit significant reductions in GHG emissions compared to installations in the control group, after including various time-variant and time-invariant fixed effects as well as firm specific control variables. Specifically, the treated firms reduced emissions by about 8% following the disclosure mandate, relative to pre-treatment emission levels. These results obtain at both the installation level and the firm level. We observe comparable incremental reductions in the carbon intensity of the treated firms when total emissions are scaled either by sales or cost of goods sold. Additional cross-sectional tests indicate that multinational firms with more complex operations tend to reduce their emissions by a smaller percentage than their less complex counterparts.

Springer

Exhibit 50 to Decl. of Lyon
1411
SER 1127

Case 2:24-cv-00801-ODW-PVC    Document 56-54    Filed 07/24/24    Page 34 of 40    Page ID #:7392

The impact of carbon disclosure mandates on emissions and financial...    1169

**Table 7** The effect of installation portfolio complexity on emission and financial operating performance

| | Emissions | | | Operating financial performance | | |
|---|---|---|---|---|---|---|
| | (I) | (II) | (III) | (IV) | (V) | (VI) |
| Dependent variable: | ln(Emissions) | ln(Emissions/ COGS) | ln(Emissions/ Sales) | Gross margin | ln(COGS) | ln(Sales) |
| Experimental variables | | | | | | |
| *Post · Treat* | **−0.076\*\*** | **−0.128\*\*** | **−0.093\*\*** | **−0.015** | **0.067** | **0.025** |
| | **(−3.101)** | **(−3.181)** | **(−2.358)** | **(−1.008)** | **(1.537)** | **(0.588)** |
| *Post · Treat · Complexity* | **0.056\*\*\*** | **0.085\*\*** | **0.085\*\*** | **0.000** | **−0.001** | **−0.003** |
| | **(3.466)** | **(3.000)** | **(2.960)** | **(0.111)** | **(−0.019)** | **(−0.087)** |
| *Post* | 0.116\*\* | 0.125\*\* | 0.085\* | 0.017\* | −0.005 | 0.032 |
| | (2.829) | (2.609) | (1.943) | (2.081) | (−0.202) | (1.271) |
| *Post · Complexity* | −0.003 | −0.010 | 0.003 | −0.008 | 0.007 | −0.005 |
| | (−0.218) | (−0.474) | (0.144) | (−1.413) | (0.460) | (−0.462) |
| Control variables | | | | | | |
| *Size* | −0.007 | −0.227\*\*\* | −0.273\*\*\* | 0.021\*\*\* | 0.201\*\*\* | 0.247\*\*\* |
| | (−0.281) | (−4.420) | (−5.355) | (3.267) | (3.983) | (4.995) |
| *Asset intensity* | 0.381 | 0.473 | 0.491 | 0.014 | −0.170 | −0.137 |
| | (1.416) | (0.956) | (1.082) | (0.256) | (−0.468) | (−0.427) |
| *Leverage* | −0.133 | −1.017\*\*\* | −0.839\*\*\* | −0.069 | 0.844\*\*\* | 0.678\*\*\* |
| | (−0.376) | (−3.378) | (−2.555) | (−1.188) | (4.766) | (5.060) |
| *Price-to-Book* | −0.005 | 0.041\*\*\* | 0.043\*\*\* | −0.001 | −0.044\*\*\* | −0.047\*\*\* |
| | (−0.794) | (4.452) | (4.270) | (−0.813) | (−3.300) | (−3.387) |
| *GDP* | −0.221\* | −0.627\*\* | −0.419\* | −0.154\*\* | 0.414\* | 0.250 |
| | (−1.861) | (−2.854) | (−2.034) | (−2.309) | (2.206) | (1.747) |
| *Input prices* | −0.239 | −0.389 | −0.297 | −0.096 | 0.162 | 0.083 |
| | (−0.654) | (−0.579) | (−0.528) | (−1.210) | (0.365) | (0.204) |
| *Industry trends* | yes | yes | yes | yes | yes | yes |
| *Firm fixed effects* | yes | yes | yes | yes | yes | yes |
| *Year fixed effects* | yes | yes | yes | yes | yes | yes |
| *Observations* | 1,257 | 1,257 | 1,257 | 1,257 | 1,257 | 1,257 |
| *Adjusted R²* | 0.987 | 0.982 | 0.983 | 0.905 | 0.988 | 0.990 |

This table presents the results of estimating the effect of a GHG disclosure mandate on GHG emissions and financial operating performance depending on a firm's installation portfolio complexity (model (4)). The dependent variables in columns (I)–(III) indicate a firm's emissions and carbon intensity. The dependent variables in columns (IV)–(VI) indicate financial operating performance. Reported values are coefficients and t-statistics in parentheses. Variables are defined in Table 1. All continuous variables are winsorized at the 1st and 99th percentiles. \*\*\*, \*\*, and \* indicate significance at 0.01, 0.05, and 0.1 levels, respectively. Standard errors are clustered by country and year

With regard to financial consequences, we find that in the years following the mandate the treated firms experienced a small, but statistically insignificant, increase in both their production costs and their sales. The latter effect is consistent with the interpretation of firms having improved their public image with customers on account of having improved a central CSR variable. Since the small and statistically insignificant increases in both revenues and



Springer

Exhibit 50 to Decl. of Lyon
1412
SER 1128

**Table 8** Results for matched sample

| Dependent variable: | Emissions | | | Operating financial performance | | |
|---|---|---|---|---|---|---|
| | (I) ln(Emissions) | (II) ln(Emissions/COGS) | (III) ln(Emissions/Sales) | (IV) Gross margin | (V) ln(COGS) | (VI) ln(Sales) |
| Experimental variables | | | | | | |
| Post · Treat | **−0.105***** | **−0.167*** | **−0.133*** | **−0.020** | **0.070** | **0.024** |
| | **(−4.228)** | **(−2.024)** | **(−2.733)** | **(0.473)** | **(0.396)** | **(0.611)** |
| Post | 0.212*** | 0.252*** | 0.187*** | 0.033 | −0.055 | 0.017 |
| | (4.372) | (4.749) | (4.276) | (0.123) | (0.219) | (0.623) |
| Control variables | | | | | | |
| Size | 0.029** | −0.158*** | −0.228*** | 0.035** | 0.139** | 0.212*** |
| | (2.655) | (−3.417) | (−5.933) | (0.040) | (0.017) | (0.001) |
| Asset intensity | 0.449 | 0.701 | 0.898* | −0.073 | −0.337 | −0.425 |
| | (1.387) | (1.338) | (2.291) | (0.402) | (0.309) | (0.126) |
| Leverage | 0.287 | −0.933* | −0.740 | −0.048 | 1.104*** | 0.940*** |
| | (0.593) | (−1.994) | (−1.733) | (0.462) | (0.002) | (0.001) |
| Price-to-Book | 0.001 | 0.046** | 0.047** | −0.001 | −0.041*** | −0.044*** |
| | (0.055) | (2.350) | (2.424) | (0.314) | (0.010) | (0.004) |
| GDP | −0.064 | −1.024* | −0.622 | −0.175 | 0.992** | 0.710* |
| | (−0.309) | (−1.947) | (−1.174) | (0.254) | (0.032) | (0.098) |
| Input prices | 0.069 | 0.110 | 0.297 | −0.100 | −0.100 | −0.221 |
| | (0.098) | (0.107) | (0.278) | (0.540) | (0.890) | (0.752) |
| Industry trends | yes | yes | yes | yes | yes | yes |
| Firm fixed effects | yes | yes | yes | yes | yes | yes |
| Year fixed effects | yes | yes | yes | yes | yes | yes |
| Observations | 472 | 472 | 472 | 472 | 472 | 472 |
| Adjusted $R^2$ | 0.982 | 0.981 | 0.983 | 0.937 | 0.990 | 0.992 |

This table presents the results of estimating the effect of a GHG disclosure mandate on GHG emissions and operating performance. We use a one-to-one matching without replacement on pre-treatment emissions for firms within the same SIC-1 industry. Reported values are coefficients and $p$-values in parentheses. Variables are defined in Table 1. All continuous variables are winsorized at the 1st and 99th percentiles. ***, **, and * indicate significance at 0.01, 0.05, and 0.1 levels, respectively. Standard errors are clustered by country and year

costs net out to a zero effect in the gross margins, our results indicate that the disclosure mandate did not have a deteriorating effect on the financial operating performance of the firms subject to the act.

The emissions data for the firms in our treatment group had already been publicly available prior to the UK mandate, albeit in a distributed form, so outside observers had to incur search costs in order to assign installation-level emissions to publicly listed firms. Our empirical findings are consistent with the hypothesis that the disclosure requirement made firm-specific carbon footprint information directly accessible to stakeholders and thus resulted in additional transparency, which motivated the firms' management to achieve greater emission reductions.

⩗ Springer

Exhibit 50 to Decl. of Lyon
1413
**SER 1129**

In the current debate about alternative policy tools for addressing the impending climate crisis, economists generally point to pricing carbon emissions or subsidizing low-carbon energy alternatives. The findings in this paper indicate that the increased transparency associated with greenhouse gas reporting mandates, like the 2013 act in the UK, could be another policy lever for reducing corporate carbon emissions.

## Appendix A: Reporting items for the Strategic Report according to The Companies Act 2006 (Strategic Report and Directors' Report) Regulations 2013

| Disclosure requirement | Section of the Act |
| --- | --- |
| Annual quantity of emissions in tonnes of carbon dioxide equivalent from activities for which that company is responsible including the combustion of fuel; and the operation of any facility (listed firms) | P. 7, 15. (2) |
| Annual quantity of emissions in tonnes of carbon dioxide equivalent resulting from the purchase of electricity, heat, steam or cooling by the company for its own use (listed firms) | P. 7, 15. (3) |
| Methodologies used to calculate the information on carbon dioxide equivalents (listed firms) | P. 7, 16. |
| At least one ratio which expresses the quoted company's annual emissions in relation to a quantifiable factor associated with the company's activities (listed firms) | P. 17, 17. |
| Not only the information required by paragraphs 15(2) and (3) and 17, but also that information as disclosed in the report for the preceding financial year. | P. 17, 18. |
| Description of the company's strategy (listed firms) | Ch. 4A, 414C (8) (a) |
| Description of the company's business model (listed firms) | Ch. 4A, 414C (8) (b) |
| A breakdown showing at the end of the financial year the number of persons of each sex who were directors of the company (listed firms) | Ch. 4A, 414C (8) (c) (i) |
| A breakdown showing at the end of the financial year the number of persons of each sex who were senior managers of the company (listed firms) | Ch. 4A, 414C (8) (c) (ii) |
| A breakdown showing at the end of the financial year the number of persons of each sex who were employees of the company (listed firms) | Ch. 4A, 414C (8) (c) (iii) |
| Fair review of the company's business | Ch. 4A, 414C (2) (a) |
| Description of the principal risks and uncertainties facing the company | Ch. 4A, 414C (2) (b) |
| Balanced and comprehensive analysis of the development and performance of the business | Ch 4A, 414C (3) (a) |
| Balanced and comprehensive analysis of the position of the company's business at the end of the year | Ch. 4A, 414C (3) (b) |
| Analysis using financial key performance indicators | Ch. 4A, 414C (4) (a) |
| Where appropriate: analysis using other key performance indicators, including information relating to environmental matters and employee matters | Ch. 4A, 414C (4) (b) |
| To the extent necessary for an understanding of the development, performance or position of the company's business: main trends and factors likely to affect the future development, performance and position (listed firms) | Ch. 4A, 414C (7) (a) |
| To the extent necessary for an understanding of the development, performance or position of the company's business: information about environmental matters (including the impact of the company's business on the environment) including information about any policies of the company in relation to those matters and the effectiveness of those policies (listed firms) | Ch. 4A, 414C (7) (b) (i) |

 Springer

Exhibit 50 to Decl. of Lyon
1414
**SER 1130**

1172                                                                                    B. Downar et al.

(continued)

| | |
|---|---|
| To the extent necessary for an understanding of the development, performance or position of the company's business: information about the company's employees including information about any policies of the company in relation to those matters and the effectiveness of those policies (listed firms) | Ch. 4A, 414C (7) (b) (ii) |
| To the extent necessary for an understanding of the development, performance or position of the company's business: information about social, community and human rights issues including information about any policies of the company in relation to those matters and the effectiveness of those policies (listed firms) | Ch. 4A, 414C (7) (b) (iii) |

This table provides a detailed overview of all new disclosure requirements of The Companies Act 2006 (Strategic Report and Directors' Report) Regulations 2013. The first column shows the newly required disclosure in the strategic report. The second column shows the section of the act.

### Appendix B: Major changes in the EU ETS regulation surrounding the introduction of the third trading period in 2013

Two key changes to the design of the EU ETS took place in the third trading period. First, an EU-wide cap was introduced, stipulating a decrease by 1.74% each year relative to a pre-specified baseline emission level. Second, whereas until 2012 almost all allowances were allocated free of charge, a greater share of allowances was auctioned starting in 2013. These changes could potentially call into question the causal effect of the act, if the changes in the ETS system differentially affected UK firms compared to firms in the control group.

With respect to the introduction of the EU-wide cap, this change was intended to decrease the political cost of decentralized cap-setting coordinated by the European Commission (see, e.g., Ellerman et al. 2016). Since allowances could be traded across the EU without any restrictions, as they could prior to 2013, there is no reason to believe that UK firms had either advantages or disadvantages with respect to their regulatory burden due to the change in cap setting, compared to firms in other EU countries.

Regarding the shift toward a greater share of allowances being auctioned, we note that the electricity sector was primarily affected by this development, with power generators in the majority of European countries losing the vast majority of their free allocation in 2013. However, as we exclude the power sector from the empirical analysis in this paper due to the potential bias stemming from the introduction of the UK Carbon Price Floor in 2013 (as explained in Section 3.5), the rise of allowance auctioning for power generators is not a concern for our analysis.

In the industrial sectors, which are the focus of this paper, free allocation continued to be the dominant form of distributing the aggregate emissions cap. About 97%–98% of industrial emissions were represented by sectors that were deemed to be at risk of carbon leakage during the period after 2013. The firms in this sector therefore received their full allotment of free allowances (ECA 2020). As the vast majority of the industrial sector's emissions continued to be covered by free allowances, there is no

Exhibit 50 to Decl. of Lyon
1415
**SER 1131**

The impact of carbon disclosure mandates on emissions and financial...                                1173

indication that UK firms were subject to advantages or disadvantages in comparison to firms from other EU countries.

**Funding**   Open Access funding enabled and organized by Projekt DEAL.

**Data availability**   Publicly available from the sources cited in the text.

**Open Access** This article is licensed under a Creative Commons Attribution 4.0 International License, which permits use, sharing, adaptation, distribution and reproduction in any medium or format, as long as you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons licence, and indicate if changes were made. The images or other third party material in this article are included in the article's Creative Commons licence, unless indicated otherwise in a credit line to the material. If material is not included in the article's Creative Commons licence and your intended use is not permitted by statutory regulation or exceeds the permitted use, you will need to obtain permission directly from the copyright holder. To view a copy of this licence, visit http://creativecommons.org/licenses/by/4.0/.

## References

Air Resources Board. 2016. Regulation for the California cap on greenhouse gas emissions and market-based compliance mechanisms.

Anderson, B., and C. Di Maria. 2011. Abatement and allocation in the pilot phase of the EU ETS. *Environmental and Resource Economics* 48: 83–103. https://doi.org/10.1007/s10640-010-9399-9.

Bel, G., and S. Joseph. 2015. Emission abatement: Untangling the impacts of the EU ETS and the economic crisis. *Energy Economics* 49: 531–539. https://doi.org/10.1016/j.eneco.2015.03.014.

Bertrand, M., and S. Mullainathan. 2003. Enjoying the quiet life? Corporate governance and managerial preferences. *Journal of Political Economy* 111: 1043–1075. https://doi.org/10.1086/376950.

Biddle, G.C., and G. Hilary. 2006. Accounting quality and firm-level capital investment. *The Accounting Review* 81: 963–982. https://doi.org/10.2308/accr.2006.81.5.963.

Biddle, G.C., G. Hilary, and R.S. Verdi. 2009. How does financial reporting quality relate to investment efficiency? *Journal of Accounting and Economics* 48: 112–131. https://doi.org/10.1016/j.jacceco.2009.09.001.

Broadstock, D.C., A. Collins, L.C. Hunt, and K. Vergos. 2018. Voluntary disclosure, greenhouse gas emissions and business performance: Assessing the first decade of reporting. *British Accounting Review* 50: 48–59. https://doi.org/10.1016/j.bar.2017.02.002.

CDP. 2017. New report shows just 100 companies are source of over 70% of emissions. https://www.cdp.net/en/articles/media/new-report-shows-just-100-companies-are-source-of-over-70-of-emissions.

Chen, Y.-C., M. Hung, and Y. Wang. 2018. The effect of mandatory CSR disclosure on firm profitability and social externalities: Evidence from China. *Journal of Accounting and Economics* 65: 169–190. https://doi.org/10.1016/j.jacceco.2017.11.009.

Cheng, M., D. Dhaliwal, and Y. Zhang. 2013. Does investment efficiency improve after the disclosure of material weaknesses in internal control over financial reporting? *Journal of Accounting and Economics* 56: 1–18. https://doi.org/10.1016/j.jacceco.2013.03.001.

Christensen, H.B., E. Floyd, L.Y. Liu, and M.G. Maffett. 2017. The real effects of mandated information on social responsibility in financial reports: Evidence from mine-safety records. *Journal of Accounting and Economics* 64: 284–304. https://doi.org/10.1016/j.jacceco.2017.08.001.

DECC. 2016. Department of Energy & climate change: 2014 UK greenhouse gas emissions, final figures. *Statistical release.*

Dechezleprêtre, A., C. Genaioli, R. Martin, and M. Muûls. 2019. Searching for carbon leaks in multinational companies. *Centre for Climate Change Economics and Policy Working Paper No. 165.*

DEFR. 2013. *Environmental reporting guidelines: Including mandatory greenhouse gas emissions reporting guidance.*

DEFRA. 2010. The contribution that reporting of greenhouse gas emissions makes to the UK meeting its climate change objectives: A review of the current evidence. https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/69262/pb13449-corporate-reporting-101130.pdf.

 Springer

Exhibit 50 to Decl. of Lyon
1416
**SER 1132**

1174                                                                    B. Downar et al.

Drucker, P.F. 1954. *The practice of management*. Harper Business.

ECA. 2020. The EU's Emissions Trading System: free allocation of allowances needed better targeting. https://www.eca.europa.eu/en/Pages/DocItem.aspx?did=54392.

Ellerman, A.D., F.J. Convery, C. de Perthuis, E. Alberola, B.K. Buchner, A. Delbosc, et al. 2010. *Pricing carbon*. Cambridge University Press.

Ellerman, A.D., C. Marcantonini, and A. Zaklan. 2016. The European Union emissions trading system: Ten years and counting. *Review of Environmental Economics and Policy* 10: 89–107. https://doi.org/10.1093/reep/rev014.

EPA. 2019. U.S. Environmental Protection Agency. Sulfur dioxide basics. https://www.epa.gov/so2-pollution/sulfur-dioxide-basics.

Ernstberger, J., B. Link, M. Stich, and O. Vogler. 2017. The real effects of mandatory quarterly reporting. *The Accounting Review* 92: 33–60. https://doi.org/10.2308/accr-51705.

European Commission. 2015. EU ETS Handbook.

Fiechter, P., J.-M. Hitz, and N. Lehmann. 2020. Real effects in anticipation of mandatory disclosures: Evidence from the European Union's CSR directive. *Working Paper*.

Friedman, H.L., and M.S. Heinle. 2016. Taste, information, and asset prices: Implications for the valuation of CSR. *Review of Accounting Studies* 21: 740–767. https://doi.org/10.1007/s11142-016-9359-x.

Fung, A., D. Weil, and M. Graham. 2007. *Full disclosure: The perils and promise of transparency*. Cambridge University Press.

Graham, J.R., M. Hanlon, and T. Shevlin. 2011. Real effects of accounting rules: Evidence from multinational firms' investment location and profit repatriation decisions. *Journal of Accounting Research* 49: 137–185. https://doi.org/10.1111/j.1475-679X.2010.00395.x.

Granja, J. 2018. Disclosure regulation in the commercial banking industry: Lessons from the national banking era. *Journal of Accounting Research* 56: 173–216. https://doi.org/10.1111/1475-679X.12193.

Grewal, J. 2021. Real effects of disclosure regulation on voluntary disclosers. *Journal of Accounting and Economics (in press)*. https://doi.org/10.1016/j.jacceco.2021.101390.

Grewal, J., E.J. Riedl, and G. Serafeim. 2019. Market reaction to mandatory nonfinancial disclosure. *Management Science* 65: 3061–3084. https://doi.org/10.1287/mnsc.2018.3099.

Grewal, J., and G. Serafeim. 2020. Research on corporate sustainability: Review and directions for future research. *Foundations and Trends® in Accounting* 14: 73–127.

Heinkel, R., A. Kraus, and J. Zechner. 2001. The effect of green investment on corporate behavior. *Journal of Financial and Quantitative Analysis* 36: 431–449. https://doi.org/10.2307/2676219.

Hirst, D. 2018. Carbon Price floor (CPF) and the price support mechanism.

Hombach, K., and T. Sellhorn. 2019. Shaping corporate actions through targeted transparency regulation: A framework and review of extant evidence. *Schmalenbach Business Review* 71: 137–168. https://doi.org/10.1007/s41464-018-0065-z.

InsideIreland.ie. 2009. Carbon tax of €15 a tonne announced. https://web.archive.org/web/20120328031928/http://insideireland.ie/2009/12/09/archive2313-2373/.

IPCC. 2018. Global warming of 1.5°C. https://www.ipcc.ch/sr15/.

Jouvenot, V., and P. Krueger. 2020. Reduction in corporate greenhouse gas emissions under prescriptive disclosure requirements. *Working Paper*.

Kanodia, C. 2007. Accounting disclosure and real effects. *Foundations and Trends® in Accounting* 1: 167–258. https://doi.org/10.1561/1400000003.

Kaplan, R.S., and S.R. Anderson. 2007. *Time-driven activity-based costing: A simpler and more powerful path to higher profits*. Harvard Business School Press.

Kraft, A.G., R. Vashishtha, and M. Venkatachalam. 2018. Frequent financial reporting and managerial myopia. *The Accounting Review* 93: 249–275. https://doi.org/10.2308/accr-51838.

Kraus, A., and R. Amir. 2010. Reducing managers' incentives to cannibalize: Managerial stock options when shareholders are diversified. *Journal of Financial Intermediation* 19: 439–460. https://doi.org/10.1016/j.jfi.2009.05.001.

Martin, R., M. Muûls, and U.J. Wagner. 2016. The impact of the European Union emissions trading scheme on regulated firms: What is the evidence after ten years? *Review of Environmental Economics and Policy* 10: 129–148. https://doi.org/10.1093/reep/rev016.

McKinsey. 2009. Pathways to a low-carbon economy – Version 2 of the global greenhouse gas abatement cost curve. McKinsey & Company.

Muller, N.Z., R. Mendelsohn, and W. Nordhaus. 2011. Environmental accounting for pollution in the United States economy. *American Economic Review* 101: 1649–1675. https://doi.org/10.1093/reep/rev016.

 Springer

Exhibit 50 to Decl. of Lyon
1417
**SER 1133**

The impact of carbon disclosure mandates on emissions and financial...                                    1175

Murray, B.C., and P.T. Maniloff. 2015. Why have greenhouse emissions in RGGI states declined? An econometric attribution to economic, energy market, and policy factors. *Energy Economics* 51: 581–589. https://doi.org/10.1016/j.eneco.2015.07.013.

PwC and CDP. 2010. Review of the contribution of reporting to GHG emissions reductions and associated costs and benefits: Report to the Department for Environment, Food and Rural Affairs.

Reichelstein, S., and D. Bebb. 2016. Sustainable investing at generation investment management (case no.SM257).

Reichelstein, S., and D. W. Hoyt. 2011. REI's solar energy program (case no.BE17).

RGGI. 2013. Model rule part XX CO2 budget trading program. Originally issued Feb 7, 2013. Revised Dec 23, 2013.

Roberts, M. R., and T. M. Whited. 2013. Endogeneity in empirical corporate finance. In *Handbook of the Economics of Finance* (Vol. 2, pp. 493–572). Elsevier.

Serfling, M. 2016. Firing costs and capital structure decisions. *The Journal of Finance* 71: 2239–2286. https://doi.org/10.1111/jofi.12403.

Shroff, N. 2017. Corporate investment and changes in GAAP. *Review of Accounting Studies* 22: 1–63. https://doi.org/10.1007/s11142-016-9375-x.

Shroff, N., R.S. Verdi, and G. Yu. 2014. Information environment and the investment decisions of multinational corporations. *The Accounting Review* 89: 759–790. https://doi.org/10.2308/accr-50643.

Sprouse, W. 2020. BlackRock CEO: Climate change is causing a 'fundamental reshape of finance. *CFO Magazine*.

Stern, N. 2006. Stern review on the economics of climate change. Government of the United Kingdom.

Sullivan, R., and A. Gouldson. 2012. Does voluntary carbon reporting meet investors' needs? *Journal of Cleaner Production* 36: 60–67. https://doi.org/10.1016/j.jclepro.2012.02.020.

Tomar, S. 2019. CSR disclosure and benchmarking-learning: Emissions responses to mandatory greenhouse gas disclosure. *Working Paper*.

Trucost. 2009. Carbon risks in UK equity funds: Trucost study of the carbon footprints of portfolios and carbon management in pension fund assets.

Young, S.D., and S.F. O'Byrne. 2001. *EVA and value-based management: A practical guide to implementation*. McGraw-Hill.

**Publisher's note** Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.

## Affiliations

**Benedikt Downar**[1] · **Jürgen Ernstberger**[1] · **Stefan Reichelstein**[2,3] · **Sebastian Schwenen**[1] · **Aleksandar Zaklan**[4]

[1]    School of Management, Technical University of Munich, Munich, Germany

[2]    University of Mannheim, Mannheim, Germany

[3]    Stanford Graduate School of Business, Stanford, CA, USA

[4]    German Institute for Economic Research, DIW Berlin, Berlin, Germany

≜ Springer

Exhibit 50 to Decl. of Lyon
1418
**SER 1134**

# Exhibit 53

# to Declaration of Thomas P. Lyon

# Institutional investors, climate disclosure, and carbon emissions

Exhibit 53 to Decl. of Lyon
1343
**SER 1135**

Journal of Accounting and Economics 76 (2023) 101640



Contents lists available at ScienceDirect

## Journal of Accounting and Economics

journal homepage: www.journals.elsevier.com/
journal-of-accounting-and-economics



# Institutional investors, climate disclosure, and carbon emissions



Shira Cohen [a], Igor Kadach [b], Gaizka Ormazabal [c, *]

[a] *San Diego State University, CA, USA*
[b] *IESE Business School, Spain*
[c] *IESE Business School, CEPR & ECGI, Spain*

## ARTICLE INFO

*Article history:*
Received 27 April 2022
Received in revised form 5 June 2023
Accepted 21 August 2023
Available online 26 August 2023

*JEL classification:*
G11
Q54
M41

*Keywords:*
Climate-related disclosure
Shareholder activism
Institutional ownership
Carbon emissions

## ABSTRACT

Exploiting the unique features of the CDP, the world-leading platform of corporate climate risk disclosures, we study the relationship between institutional investors' demand for climate-related information (as reflected in their CDP signatory status), firms' decision to disclose this information, and corporate carbon emissions. We provide systematic international evidence that ownership by CDP signatories is positively associated with the probability of disclosing information to the CDP, and that such disclosure is associated with subsequent lower carbon emissions. We also observe that CDP signatories are more likely to engage with and divest from top emitters disclosing to the CDP. Overall, these results are consistent with the notion that investor demand for climate-related information results in greater corporate disclosure and contributes to firms' decisions to lower future carbon emissions.

© 2023 The Authors. Published by Elsevier B.V. This is an open access article under the CC BY-NC-ND license (http://creativecommons.org/licenses/by-nc-nd/4.0/).

## 1. Introduction

There is an ongoing debate over the role of institutional shareholders in the current efforts to achieve net-zero emissions by 2050. While some contend that asset managers can contribute significantly in pushing companies to reduce their carbon footprint, others are more skeptical and recommend that authorities focus on traditional regulatory tools (i.e., carbon taxes, cap-and-trade systems, and prescriptive regulation).[1] This skepticism is fueled by the perception that a substantial number of institutional investors engage in "greenwashing" (i.e., "window-dressing" actions that have little real impact on the reduction of actual emissions).[2] This paper contributes to this debate by exploring two interrelated questions: Does investor demand for

---

\* Corresponding author. Avenida Pearson 21, 08034 Barcelona, Spain.
*E-mail address:* gormazabal@iese.edu (G. Ormazabal).
[1] For a recent discussion, see Tallarita (2023).
[2] Recent regulatory developments illustrate that the concern about "greenwashing" is perceived as first-order. On November 27, 2019, the European Parliament approved Regulation (EU) 2019/2088 on sustainability-related disclosures in the financial services sector. The U.S. Securities and Exchange Commission (SEC) announced in March 2021 the creation of a Climate and ESG Task Force with the goal of identifying climate and ESG-related misconduct.

https://doi.org/10.1016/j.jacceco.2023.101640
0165-4101/© 2023 The Authors. Published by Elsevier B.V. This is an open access article under the CC BY-NC-ND license (http://creativecommons.org/licenses/by-nc-nd/4.0/).

Exhibit 53 to Decl. of Lyon
1344
**SER 1136**

S. Cohen, I. Kadach and G. Ormazabal                                                    Journal of Accounting and Economics 76 (2023) 101640

climate-related data induce firms to disclose this information? And is such firm disclosure followed by a decrease in carbon emissions?[3]

To address these questions, we rely on the world's largest platform of (voluntary) climate risk disclosure: the CDP (formerly known as the Carbon Disclosure Project).[4] The CDP is a uniquely suited setting for the purpose of this study. Unlike other institutional networks with an interest in climate change — notably the UN Principles for Responsible Investment (PRI) — the CDP offers its signatories private access to corporate climate risk information, collected by the platform specifically on their behalf. Furthermore, the CDP publicly discloses the list of its signatories, and as such, becoming a CDP signatory can be interpreted as equivalent to publicly requesting climate-related information.

From an empirical perspective, the fact that institutional investors publicly sign up to the CDP platform allows us to observe both cross-sectional and time-series variation in investors' demand for climate risk disclosures. Moreover, the CDP gathers climate-related information from a wide cross-section of firms around the world. This is important given that our research questions relate to a global effort to reduce emissions. Finally, unlike other data sources that cover all aspects of ESG (Environmental, Social, and Governance) information, the CDP focuses only on environmental data. Empirically, this helps us avoid the potential confounding effect of non-environmental ESG information.

Our first hypothesis is that institutional investors' demand for climate-related information (as reflected in an investor becoming a CDP signatory) induces firms to disclose information to the CDP. Asset managers could demand climate-related information for two reasons that should not be viewed as mutually exclusive: they believe that climate-related performance affects prices (e.g., Friedman and Heinle, 2016; Krueger et al., 2020); and/or they believe that improving the environmental performance of their portfolio will help them attract or retain clients that are sensitive towards climate risk (Barzuza et al., 2020). As a result, firms are plausibly induced to disclose to the CDP to attract/retain investors that care about the content of the CDP database and/or to avoid other investor actions that may be potentially costly for managers and/or directors (e.g., withheld votes at annual meetings).

However, it is also possible that investor demand for climate-related information does not induce firms to disclose information to the CDP. First, CDP disclosures are costly for firms to complete. Such costs might outweigh expected benefits, thereby preventing full unravelling (Grossman and Hart, 1980). Moreover, investors could sign up to the CDP because they care about the signaling value of being a signatory, rather than the information content itself.[5] In this case, it is unclear whether firms would feel pressured to disclose their climate information. This possibility is supported by anecdotal evidence and by recent empirical work looking at institutional investors that sign up as PRI signatories but do not exhibit superior environmental performance in their portfolios (e.g., Gibson et al., 2022; Kim and Yoon, 2022; Liang et al., 2022).

Our second hypothesis is that CDP disclosure predicts relatively lower levels of carbon emissions. There are at least two plausible mechanisms through which this may occur. First, investors could use the CDP disclosures to engage with firms on environmental issues. For example, the CDP data could be used to select engagement targets and/or to identify environmental issues in preparation for meetings with firm management. As shown in prior work (e.g., Dimson et al., 2021), engagement activities often pressure firms to enhance their environmental performance. Second, investors could use the disclosed information for portfolio allocation decisions, which would pressure firms to decrease emissions to preempt potential divestment.

That said, it is also plausible that investors use the CDP information in ways that do not induce firms to improve environmental performance. For example, asset managers could use the CDP data to short stocks of pro-environmental firms. Furthermore, investors could use the CDP information in ways that induce only a relatively small decrease in emissions. As such, whether CDP disclosure contributes to a significant decrease in corporate carbon emissions is an open empirical question.

Our tests are based on a sample of more than 7000 public firms from 51 countries during the period from 2003 to 2020. Our first main finding is a positive firm-level association between the ownership of CDP signatories and the probability of disclosing climate-related information to the CDP, a result that is consistent with our first hypothesis, namely that the presence of CDP signatories induces firms to disclose. The association is robust to a demanding battery of tests: we use a variety of fixed effect structures, an instrumental variables (IV) approach to isolate plausible exogenous variation in institutional ownership by CDP signatories, and a quasi-natural experiment using additions of stocks into the Morgan Stanley Capital International All Country World Index (MSCI ACWI).

Consistent with our second hypothesis, we also find that disclosing information to the CDP is associated with a decrease in carbon emissions. This result also holds in a matching analysis around the time firms start disclosing to the CDP. To gauge whether the documented association relates to the signatory institutions, rather than to other potential users of the CDP information, we apply three cumulative restrictions to the sample. First, we include only cases where only CDP signatories have access to the disclosures.[6] Second, we further focus the analysis on cases where CDP signatories own a substantial stake

---

[3] The reporting of corporate information related to climate risk is in itself an issue of significant public interest in the current economic and social context. In a recently published report examining the potential implications of climate risk for global financial stability, the Financial Stability Board warns that the success of mitigating climate related risks depends directly on the information (i.e., disclosures) available to assess these risks (FSB, 2020).

[4] The CDP is a global not-for-profit organization that maintains the world's largest comprehensive database on corporate response to climate change related risks, including carbon emissions.

[5] In addition to being highlighted on the CDP website, signatories often publicize their signatory status on their annual CSR reports.

[6] The CDP offers firms the option to make the information available only to signatory investors. Please see section 2 for a detailed discussion.

Exhibit 53 to Decl. of Lyon
1345
**SER 1137**

S. Cohen, I. Kadach & G. Ormazabal

*Journal of Accounting and Economics 76 (2023) 101640*

in the firm and thus likely have enough clout to influence firm decision-making. Third, we restrict the analysis to CDP signatories that are also PRI signatories (i.e., institutional investors that have made further public environmental commitments). All three analyses confirm the firm-level association between CDP disclosure and corporate carbon emissions. Additional tests further indicate that the negative association between CDP disclosure and carbon emissions is not driven by a reduction in firm-level business activity (as measured by sales and total asset volume).

We next explore the empirical validity of the two hypothesized mechanisms that may explain the association between CDP information and carbon emissions: engagement and divestment. For tractability purposes, our analysis focuses on data from the three largest asset managers – BlackRock, Vanguard, and State Street – often referred to as the "Big Three". Our results suggest that firms that disclose to the CDP and emit higher levels of carbon emissions are more likely to be engaged by the Big Three (via calls and in-person meetings, as disclosed in investment stewardship reports). When looking at divestment as another potential mechanism, we find that disclosing firms with higher levels of emissions are more likely to exhibit a decrease in ownership by CDP signatories. These patterns continue to hold when we restrict the sample to observations in which the information is only disclosed to CDP signatories; to observations where CDP signatories hold a substantial stake in the firm; and to observations where these institutional investors also publicly commit to the UN PRI. Overall, the evidence supports the validity of the two hypothesized mechanisms explaining the association between CDP disclosure and carbon emissions.

To the extent that disclosing to the CDP and reducing emissions are both decisions made by the firm, the documented association between CDP disclosure and carbon emissions needs to be interpreted with caution. The cause of the emission reductions might not be disclosure per se, as disclosure is part of a bundle of actions and firms might decide to disclose because they anticipate making emission reductions. Nonetheless, taken together with our tests on engagement and divestment, the association between CDP disclosure and carbon emissions is consistent with the notion that investors use the information in ways that –directly or indirectly– prompt firms to improve environmental performance.

The results of this paper inform several strands of research in accounting and finance. Most prominently, our paper contributes to the nascent literature on the role of institutional investors in the current efforts to meet societal environmental objectives. Central to the debate is the underlying motivation behind institutional investors' public commitment to sustainability. In a survey on climate risk perceptions, Krueger et al. (2020) find that one of the main motivations for institutions to incorporate climate risk into their investment decision processes is to protect their own public image and reputation. This survey evidence also suggests that some investors believe that reducing carbon emissions increases the value of their portfolio. However, whether these perceptions and incentives are strong enough to enable real change remains an open question. Some papers suggest that institutional investors are effective in inducing firms to improve environmental performance (Dyck et al., 2019; Azar et al., 2021; Dimson et al., 2021; Barko et al., 2022).[7] In contrast, other papers highlight inconsistencies between institutional investors' public commitment to sustainability and their actions (Gibson et al., 2022; Kim and Yoon, 2022; Liang et al., 2022; Raghunandan and Rajgopal, 2022), and attribute these inconsistencies to greenwashing.[8] Our work contributes to this line of research by showing that institutional investors' demand for climate-related information is associated with an increase in corporate disclosure and a reduction in carbon emissions.[9]

Our study also contributes to the literature on voluntary disclosure of climate risk information. Prior research documents that firms that voluntarily disclose climate risk information, and in particular, carbon emissions data, exhibit higher market valuations (e.g., Matsumura et al., 2014) and lower cost of capital (Matsumura et al., 2017). More closely related to our study, a paper by Ilhan et al. (2023) provides survey and archival evidence suggesting that a higher concentration of institutional investors, particularly those from high social norm countries, is associated with a greater likelihood that firms disclose their climate risk information to the CDP. Our paper contributes to this line of research by documenting that the disclosure of climate-related information is associated with investors' demand for this information (reflected in their status as CDP signatories) and by providing suggestive evidence that these investors use the information in ways that may explain an association between climate disclosure and firm-level carbon emissions.

---

[7] Dyck et al. (2019) and Barko et al. (2022) focus on the effect of institutional investors' impact on firm-level ESG scores. More closely related to our study are Dimson et al. (2021), who analyze the coordinated engagement of PRI members committed to responsible investment, and Azar et al. (2021), who pose that the Big Three induce firms to reduce their carbon emissions. These papers, however, do not look at climate risk disclosure. We study a specific, but particularly important, shareholder request for climate-related information.

[8] Gibson et al. (2022) find no improvement in ESG scores among U.S. firms that sign onto the PRI. However, for institutions domiciled outside of the U.S., these authors find that PRI signatories that claim to incorporate ESG considerations into their active equity holdings have better portfolio ESG scores than non-PRI signatories. Looking at active managers, Kim and Yoon (2022) find that PRI signatories do not improve their ESG scores and experience a decrease in returns. Liang et al. (2022) examine hedge funds and find that PRI signatories underperform both green and non-green matched funds. Raghunandan and Rajgopal (2022) document that the portfolios of self-denominated ESG funds do not exhibit lower emissions.

[9] Our results are not necessarily inconsistent with those in recent papers concluding that institutional investors engage in greenwashing. First, the incentives to become a CDP signatory could be different from those to become a PRI signatory. Moreover, prior studies often measure the real outcomes of environmental performance using ESG scores, whereas we focus on subsequent reduction in carbon emissions. Finally, taken together with these prior studies, our paper helps shed light on the extent to which greenwashing is pervasive in the current economy.

Exhibit 53 to Decl. of Lyon
1346
**SER 1138**

S. Cohen, I. Kadach and G. Ormazabal

Journal of Accounting and Economics 76 (2023) 101640

## 2. Institutional background and hypotheses

### 2.1. Institutional background

The CDP is a global nonprofit organization founded in 2000 to help companies and cities disclose their environmental impact. The CDP began sending out requests for climate-related information in 2003 on behalf of 35 investors, and as such became the first platform attempting to link firm environmental performance with investor fiduciary duty. In response to that first questionnaire, 245 companies disclosed their climate risk information. In 2006, the CDP began sending out questionnaires to constituents of widely used indexes such as the S&P 500, FTSE 600, ASX 200 and the MSCI ACWI. Today the CDP houses disclosures from over 9600 global companies, representing over 50 percent of the global market capitalization. It is the largest global repository of carbon emissions information and the largest database on corporate response to climate change-related risks. The CDP platform has been endorsed by numerous institutions and world leaders and some have referred to it as the "gold standard" of environmental reporting.[10] Institutions gain access to the full set of corporate climate-related disclosures maintained by the CDP when they become CDP signatories.

The CDP questionnaire includes information related to climate change governance and strategy; greenhouse gas reduction targets; regulatory, physical, and other risks and opportunities; greenhouse gas emissions; external verification, and other topics. The CDP asks companies to report their greenhouse gas emissions according to the Greenhouse Gas Protocol (i.e., including scope 1, scope 2, and scope 3). The information is collected on an annual basis. While exact dates may vary each year, typically the CDP sends out its questionnaires in January. The platform also provides companies with guidance for preparing their information. The CDP's online response system opens around March/April and firms can provide their information until July/August of a given year. The firms' disclosures are available on the CDP site in October, and the CDP's official scores and annual reports are produced in December/January.

Answering the CDP questionnaire entails non-trivial preparation costs. Just the set of instructions needed to answer the CDP questionnaire contains more than 100 pages. The questionnaire itself includes a large amount of detailed information. Producing this information requires effort and costs on the part of the firm in terms of data collection, estimation, and/or verification. The information requested on carbon emissions is a case in point. Further, the costs to answer the questionnaire are higher for first-time disclosers, as answers to some questions could be partially re-used in subsequent years.

Firms' participation in the CDP questionnaire is voluntary. Disclosing firms have the option to mark their response as either "Public" or "Private". Particularly relevant to our study, responses marked as "Private" are available only to the signatory investors of the CDP (non-signatory investors and the general public cannot access this information). Responses marked as "Public" can be accessed by the public at no cost.[11] Note that marking the information as "Private" on the CDP is not necessarily in violation of Regulation Fair Disclosure (Reg FD) or other similar international regulations. Central to these regulatory requirements is that if material information is disclosed privately, it must also be made available publicly. However, the CDP information is not material in the regulatory sense of the term. In fact, the "Private" disclosure to the CDP by thousands of firms around the world confirms that, in practice, this is not an issue (please see Online Appendix OA for a more detailed discussion).

### 2.2. Investor demand for CDP information and firm disclosure to the CDP (H1)

Our first hypothesis (H1) is that investor demand for climate information (reflected by the investor becoming a CDP signatory) induces firms to disclose information to the CDP.[12] Two considerations suggest that investors likely find the content within the CDP disclosures to be informative. First, unlike climate-related information found in public filings (e.g., annual reports or corporate social responsibility reports), CDP disclosures are standardized. This facilitates comparability across firms, as respondents follow a consistent disclosure format. Moreover, the climate-related information in the CDP is typically more extensive than that in public filings (which is often limited or non-existent). These considerations are particularly important in light of recent survey evidence suggesting that investors use climate-related information for portfolio allocation

---

[10] For example, Christiana Figueres, former Executive Secretary of the UN Framework Convention on Climate Change, commented in 2010: "The Carbon Disclosure Project is to the future of business what the x-ray machine was to the then future of medicine. Without it we would never see inside of the patient's health." (www.cdp.net). In 2018 the CDP aligned its disclosure platform with the Task Force on Climate-related Financial Disclosure (TCFD), which is endorsed by the Financial Stability Board and supported by major institutional investors. Currently, the CDP represents hundreds of global signatories, with over $106 trillion in assets under management.

[11] Firms have the option to (1) respond to the questionnaire and allow the CDP to make the responses publicly available (in which case the response permission is marked as "Public"); (2) respond to the questionnaire but allow the CDP to make the responses available only to institutional investors who are signatories of the CDP (in which case the response permission is marked as "Private"); (3) provide partial information, such as links to information generally available on the firm's website, for instance their CSR reports, without answering the CDP questionnaire; (4) respond indicating their decision to decline participation; or (5) not respond.

[12] Investors could induce firms to disclose to the CDP without explicitly asking for it (firms could interpret investor's signatory status as an implicit demand for the information). However, in some cases the call to disclose to the CDP is explicit. For example, Janus Henderson Investors, in their 2020 Annual Sustainability Report, state that "[t]he Carbon Disclosure Project (CDP) organization has become the 'gold standard' for reporting globally on carbon emissions, climate change risks, and opportunities. We encourage portfolio companies to participate in the disclosure project. Climate change is a key engagement topic for the strategy."

4

Exhibit 53 to Decl. of Lyon
1347
**SER 1139**

S. Cohen, I. Kadach and G. Ormazabal                                                    *Journal of Accounting and Economics 76 (2023) 101640*

decisions and for engagement purposes (Krueger et al., 2020). As shown in prior literature, institutional investors care about environmental performance because they believe that such performance may affect prices (e.g., Krueger et al., 2020; Bolton and Kacperczyk, 2021; Bolton and Kacperczyk, 2022) and/or can help them attract or retain clients that are sensitive towards climate risk (Barzuza et al., 2020).[13]

Moreover, the release of the CDP information may also trigger divestment and/or activism by shareholders.[14] However, that said, it is likely that the costs of disclosing to the CDP are lower than those of releasing that same information in public filings, as the CDP information is not filed with regulators and access is often restricted to CDP signatories (which potentially results in lower litigation risk and less activism from stakeholders other than CDP signatories).[15]

Yet, on the other hand, institutional investors may benefit from signing up to the CDP in ways that do not necessarily induce firms to answer the CDP questionnaire. Similar to PRI signatories, CDP signatories often display their association on their corporate websites and sustainability reports.[16] This suggests that signing up to the CDP could be a form of signaling mechanism for investment firms, a commitment that could attract environmentally conscious investors. Moreover, PRI signatories have an added incentive to become CDP signatories in that doing so helps satisfy certain requirements needed to remain active PRI members.[17] If investors sign up to the CDP because they care about the signaling value of being a signatory, but not about the information content itself, it is unclear whether firms would feel pressured to disclose to the platform.

Whether the costs of signing up to the CDP are significant enough to strengthen the credibility of investors' pledges to improve environmental performance is an open empirical question. The monetary cost is trivial; an annual fee of $1475 for investors with more than $1bn in AUM and $975 for all others (the charge was introduced in 2018 to deter signatories with little real interest in the information). However, this does not necessarily mean that signing up to the CDP is costless. The CDP asks signatories to leave if their behavior is deemed inconsistent with the environmental objectives of the initiative. The exclusion could damage the affected institution's public image. Even if permitted to remain, signatories could bear reputational costs to the extent that clients, analysts, or commentators publicly denounce such inconsistencies.

*2.3. CDP disclosure and carbon emissions (H2)*

Our second hypothesis (H2) is that CDP disclosure predicts relatively lower levels of carbon emissions. The hypothesized association does not require that CDP disclosure per se causes the emission reductions; we recognize that disclosure is typically part of a bundle of simultaneous corporate actions and that firms might decide to disclose because they anticipate making emission reductions. Rather, the argument is that investors demand climate risk disclosure and use it in ways that — directly or indirectly — prompt firms to reduce emissions. This idea is consistent with prior research suggesting that investors care about corporate emissions because they believe environmental performance may affect prices and/or helps attract investment clients (e.g., Barzuza et al., 2020; Krueger et al., 2020; Bolton and Kacperczyk, 2021; Bolton and Kacperczyk, 2022).

We explore two plausible mechanisms for H2: (i) engagement and (ii) divestment. Investors could use the CDP disclosures in engagements with firms on environmental issues. In particular, the CDP data could be used to select engagement targets and/or to identify environmental issues in preparation for a meeting with corporate managers.[18] Investors could also use information from the CDP for portfolio allocation decisions. In this case, it is also plausible that firms might decrease emissions to preempt potential divestment or to avoid further divestment.

Yet, investors could use CDP information in ways that do not influence firms to improve environmental performance. For example, arbitrageurs could be interested in the disclosed data if they believe that climate policies are value-destroying and/or overpriced. Furthermore, investors could use CDP information in ways that induce only a relatively small decrease in emissions (i.e., a decrease that is not large enough to be reflected in statistically significant results). As such, whether CDP disclosure is accompanied by a decrease in emissions is an open empirical question.

**3. Data and sample**

Our initial sample includes the universe of public firms contacted by the CDP from 2003 to 2020. We start the analysis in 2003 because that was the first year the CDP conducted its survey by sending out its questionnaire to a cross-section of FT Global 500 constituents. We obtain greenhouse gas emissions data from Trucost, a commercial provider of corporate carbon

---

[13] Indeed, some major investors have been quite vocal in their support of a sustainable economy and in pledging their commitment to responsible investment. For example, in his 2021 annual letter to CEOs Larry Fink (CEO of BlackRock) writes: "We have long believed that our clients, as shareholders in your company, will benefit if you can create enduring, sustainable value for *all* of your stakeholders" (see https://www.blackrock.com/corporate/investor-relations/larry-fink-ceo-letter).

[14] The CDP information released could generate investor reactions that are costly for the firm, but not responding to an explicit demand for such data could elicit even more costly reactions (Matsumura et al., 2014).

[15] Consistent with this argument, the annual reports (and social responsibility reports) of the firms that answer the CDP questionnaire rarely contain information as detailed as in the CDP database. We confirm this by analyzing the public disclosures of 20 firms randomly selected from our sample of CDP disclosers. In their public filings we found a general discussion of potential risks associated with climate change, but no mention of the CDP and its data.

[16] For examples, see the websites of Troy Asset Management, Janus Henderson Investments, and Franklin Templeton.

[17] In recent years, the PRI has introduced some requirements that increase signatory accountability. Signing up to the CDP helps satisfy PRI Principles 1–4.

[18] This possibility is supported by recent survey evidence by Krueger et al. (2020). A number of institutional investors surveyed by these authors state that they select firms for engagements on climate related issues by analyzing their portfolio firms' carbon footprint.

Exhibit 53 to Decl. of Lyon
1348
**SER 1140**

S. Cohen, I. Kadach and G. Ormazabal                                                                     Journal of Accounting and Economics 76 (2023) 101640

emissions data.[19] Trucost collects carbon emission data from publicly available sources, such as corporate websites, annual reports, CSR reports, the CDP, and direct communications with companies. If a covered firm does not publicly disclose its carbon emissions, Trucost estimates the firm's annual carbon emissions based on an environmental profiling model.

We obtain accounting and market data from Compustat Global, Compustat North America, and Datastream/WorldScope. These datasets provide stock price, balance sheet, and income statement information for a large number of international firms. We gather information on institutional ownership from the FactSet/LionShares database.

Table 1, Panel A, outlines the sample selection procedure. We start with 108,787 firm-year observations in the CDP dataset (i.e., the firms to which the CDP sent a request to complete the questionnaire). To be included in our sample, we require non-missing institutional ownership and financial data. The resulting sample consists of 76,284 firm-year observations corresponding to 8614 firms from 51 countries. Some of the tests require non-missing Trucost data, which is only available from 2005 to 2020. This restricts the sample size in these analyses to 56,432 observations corresponding to 7155 firms.

Table 1, Panels B-E, present descriptive statistics for our sample (see Appendix A for variable definitions). As shown in Panel B, the average ownership by CDP signatories is 11%, with a standard deviation of 12% and a 75th percentile of 17%. This suggests that, on average, the CDP signatories can exert substantial influence on firms (for example, in the form of voting). Total institutional ownership (i.e., the sum of Signatories_Hldg and OtherInst_Hldg) is 28% on average, a value that is in line with prior studies examining institutional ownership around the world (Bena et al., 2017). Panel B also shows that our sample composition includes a wide variety of firms in terms of size, leverage, and profitability.

Panel C of Table 1 provides descriptive information on our key variables by year. Carbon emissions and institutional ownership are higher in earlier years of our sample period. These patterns are probably due to the fact that the CDP has gradually expanded its coverage (by increasing its universe to include smaller firms with lower emissions and lower institutional ownership). Panel C also shows an increase in the number of CDP signatories during the sample period and an increase in PRI signatories, especially after the 2015 Paris Agreement.

Panel D of Table 1 presents descriptive statistics by industry. Our sample covers a wide range of industries and is consistent with prior literature on international investing. In addition, we observe that companies from industries with relatively high level of carbon emissions (e.g., oil and petroleum products, steel works) are less likely to disclose to the CDP.

Panel E of Table 1 presents descriptive statistics by country. Our sample covers a wide range of countries from Europe, Asia, North and South America, Africa, and the Middle East. We observe that disclosure to the CDP is more common among companies from Scandinavia and Western Europe.

## 4. Institutional investors and the disclosure of climate-related information

Our first set of tests aims to shed light on hypothesis H1, namely that investor demand for climate information (reflected in an investor becoming a CDP signatory) induces firms to disclose information to the CDP.

### 4.1. The association between CDP signatories and firms' disclosure to the CDP

We start our empirical analysis by testing the association between the probability of answering the CDP questionnaire and the fraction of shares held by CDP signatories. Finding a positive association would be consistent with H1. We estimate the following OLS model:

$$CDP\_Disclosure_{it} = \alpha + \beta * Signatories\_Hldg_{it-1} + \eta * OtherInst\_Hldg_{it-1} + \gamma * Controls_{it-1} + \tau_t + \delta_i + \varepsilon_{it}, \tag{1}$$

The dependent variable, $CDP\_Disclosure_{it}$, is defined as an indicator variable that equals one if company $i$ submitted the CDP questionnaire in year $t$, and zero otherwise. The experimental variable $Signatories\_Hldg$ is defined as the fraction of the firm's equity held by institutional investors with CDP signatory status. The influence of CDP signatories in the firm increases with the fraction of shares owned by these investors.

Equation (1) includes a vector of firm-level control variables. We first control for ownership of non-signatory institutions. $OtherInst\_Hldg$ is the fraction of the firm's equity held by institutional investors with other CDP signatories. We also control for firm fundamentals potentially associated with climate disclosure. The corresponding variables are included in the vector $Controls$, defined as follows. $Size$ is the logarithm of total assets. $Log(BM)$ is the logarithm of the book-to-market ratio (book value of equity divided by market value of equity). $ROA$ is defined as net income scaled by total assets. $Return$ is computed as the buy and hold return over the year. $Leverage$ is computed as the sum of the long-term debt and the debt in current liabilities over the firm's total assets. $Tangibility$ is the ratio of property, plant, and equipment over the firm's total assets. $Dividends$ is measured as total amount of dividends scaled by net income.

---

[19] Trucost is a widely used source of firm carbon emission data within the corporate sector (for example, both MSCI and S&P use Trucost data in their indexes) and among international organizations such as UNEP FI (i.e., the United Nations Environment Program Finance Initiative). It has also been used and validated in academic studies (e.g., Bolton and Kacperczyk, 2021).

Exhibit 53 to Decl. of Lyon
1349
**SER 1141**

S. Cohen, I. Kadach and G. Ormazabal
*Journal of Accounting and Economics 76 (2023) 101640*

**Table 1**
Sample and descriptive statistics.

**Panel A. Sample construction**

| Sample observations | # Firm-Years | # Distinct Firms |
|---|---|---|
| Observations in CDP from 2003 to 2020 | 108,787 | 10,640 |
| Observations with non-missing institutional ownership information | 81,155 | 9015 |
| Observations with non-missing accounting and market data | 76,284 | 8614 |
| Observations with non-missing Trucost data | 56,432 | 7155 |

**Panel B. Main variables**

| | # Obs. | Mean | Std Dev | P25 | Median | P75 |
|---|---|---|---|---|---|---|
| CDP_Disclosure | 76,284 | 0.40 | 0.49 | 0.00 | 0.00 | 1.00 |
| Inst_Hldg | 76,284 | 0.28 | 0.28 | 0.07 | 0.17 | 0.39 |
| Signatories_Hldg | 76,284 | 0.11 | 0.12 | 0.02 | 0.08 | 0.17 |
| OtherInst_Hldg | 76,284 | 0.18 | 0.23 | 0.02 | 0.08 | 0.21 |
| Size | 76,284 | 8.14 | 1.86 | 6.89 | 8.07 | 9.33 |
| Log(BM) | 76,284 | −0.70 | 0.97 | −1.16 | −0.58 | −0.08 |
| ROA | 76,284 | 0.04 | 0.09 | 0.01 | 0.04 | 0.08 |
| Leverage | 76,284 | 0.25 | 0.19 | 0.09 | 0.23 | 0.36 |
| Tangibility | 76,284 | 0.30 | 0.25 | 0.08 | 0.24 | 0.47 |
| Dividends | 76,284 | 0.39 | 0.64 | 0.00 | 0.26 | 0.53 |
| Return | 76,284 | 0.13 | 0.52 | −0.16 | 0.04 | 0.29 |
| Log(Sales) | 76,284 | 7.48 | 1.81 | 6.38 | 7.53 | 8.68 |

**Panel C. By year**

| Year | Inst_Hldg | # CDP signatories | Signatories_Hldg | # PRI signatories | CDP_Disclosure | Log (CO$_2$) |
|---|---|---|---|---|---|---|
| 2003 | 0.44 | 35 | 0.02 | – | 0.36 | – |
| 2004 | 0.45 | 95 | 0.05 | – | 0.50 | – |
| 2005 | 0.46 | 147 | 0.07 | – | 0.58 | 12.79 |
| 2006 | 0.42 | 215 | 0.11 | 85 | 0.45 | 12.22 |
| 2007 | 0.38 | 309 | 0.13 | 158 | 0.53 | 12.10 |
| 2008 | 0.33 | 388 | 0.12 | 247 | 0.50 | 11.88 |
| 2009 | 0.29 | 461 | 0.13 | 358 | 0.45 | 11.58 |
| 2010 | 0.27 | 526 | 0.11 | 462 | 0.48 | 11.38 |
| 2011 | 0.26 | 570 | 0.11 | 581 | 0.46 | 11.32 |
| 2012 | 0.27 | 663 | 0.12 | 718 | 0.42 | 11.19 |
| 2013 | 0.28 | 733 | 0.12 | 836 | 0.41 | 11.12 |
| 2014 | 0.28 | 806 | 0.12 | 984 | 0.39 | 11.05 |
| 2015 | 0.27 | 854 | 0.13 | 1133 | 0.38 | 10.92 |
| 2016 | 0.27 | 845 | 0.12 | 1329 | 0.37 | 10.64 |
| 2017 | 0.27 | 821 | 0.11 | 1621 | 0.37 | 10.64 |
| 2018 | 0.27 | 676 | 0.14 | 2011 | 0.32 | 10.63 |
| 2019 | 0.26 | 542 | 0.14 | 2665 | 0.34 | 10.59 |
| 2020 | – | 517 | 0.11 | 3575 | 0.37 | 10.03 |

**Panel D. By industry**

| Industry | # Obs. | # firms | Inst_Hldg | Signatories_Hldg | CDP_Disclosure |
|---|---|---|---|---|---|
| Food | 3773 | 438 | 0.24 | 0.09 | 0.43 |
| Mining and Minerals | 2912 | 325 | 0.26 | 0.10 | 0.34 |
| Oil and Petroleum Products | 3425 | 382 | 0.32 | 0.12 | 0.40 |
| Textiles, Apparel, and Footware | 1072 | 131 | 0.23 | 0.09 | 0.33 |
| Consumer Durables | 1414 | 173 | 0.26 | 0.11 | 0.38 |
| Chemicals | 2587 | 290 | 0.23 | 0.10 | 0.42 |
| Drugs, Soap, Perfumes, and Tobacco | 2972 | 338 | 0.29 | 0.10 | 0.42 |
| Construction and Construction Materials | 5481 | 596 | 0.21 | 0.11 | 0.35 |
| Steel Works | 2116 | 216 | 0.17 | 0.10 | 0.35 |
| Fabricated Products | 502 | 51 | 0.30 | 0.12 | 0.44 |
| Machinery and Business Equipment | 7188 | 808 | 0.34 | 0.14 | 0.47 |
| Automobiles | 2188 | 234 | 0.27 | 0.10 | 0.38 |
| Transportation | 4370 | 447 | 0.26 | 0.11 | 0.42 |
| Utilities | 4744 | 456 | 0.25 | 0.08 | 0.41 |
| Retail Stores | 3870 | 436 | 0.33 | 0.12 | 0.40 |
| Banks, Insurance and Other Financials | 11,237 | 1309 | 0.26 | 0.12 | 0.40 |
| Other | 16,435 | 1984 | 0.32 | 0.12 | 0.39 |

**Panel E. By country**

| Country | # Obs. | # firms | Inst_Hldg | Signatories_Hldg | CDP_Disclosure |
|---|---|---|---|---|---|
| Argentina | 91 | 11 | 0.17 | 0.02 | 0.21 |
| Australia | 2650 | 326 | 0.14 | 0.08 | 0.44 |
| Austria | 380 | 39 | 0.18 | 0.12 | 0.59 |

*(continued on next page)*

7

Exhibit 53 to Decl. of Lyon
1350
**SER 1142**

S. Cohen, I. Kadach and G. Ormazabal                                    *Journal of Accounting and Economics 76 (2023) 101640*

**Table 1** (*continued*)

Panel E. By country

| Country | # Obs. | # firms | Inst_Hldg | Signatories_Hldg | CDP_Disclosure |
|---|---|---|---|---|---|
| Belgium | 715 | 100 | 0.13 | 0.08 | 0.30 |
| Brazil | 1336 | 164 | 0.19 | 0.11 | 0.57 |
| Canada | 3306 | 347 | 0.43 | 0.14 | 0.48 |
| Chile | 386 | 49 | 0.07 | 0.03 | 0.21 |
| China | 4260 | 591 | 0.10 | 0.03 | 0.10 |
| Colombia | 155 | 20 | 0.05 | 0.02 | 0.50 |
| Czech Republic | 96 | 12 | 0.13 | 0.06 | 0.21 |
| Denmark | 539 | 52 | 0.23 | 0.10 | 0.56 |
| Egypt | 193 | 19 | 0.07 | 0.03 | 0.03 |
| Finland | 634 | 60 | 0.28 | 0.14 | 0.74 |
| France | 3426 | 377 | 0.18 | 0.10 | 0.37 |
| Germany | 3306 | 345 | 0.20 | 0.12 | 0.47 |
| Greece | 138 | 17 | 0.17 | 0.23 | 0.33 |
| Hong Kong | 1319 | 150 | 0.15 | 0.08 | 0.21 |
| Hungary | 155 | 21 | 0.10 | 0.04 | 0.19 |
| India | 3875 | 400 | 0.13 | 0.05 | 0.19 |
| Indonesia | 903 | 114 | 0.08 | 0.04 | 0.05 |
| Ireland | 517 | 60 | 0.40 | 0.18 | 0.47 |
| Israel | 274 | 31 | 0.21 | 0.05 | 0.19 |
| Italy | 1248 | 152 | 0.15 | 0.10 | 0.49 |
| Japan | 8136 | 765 | 0.15 | 0.15 | 0.45 |
| Luxembourg | 27 | 7 | 0.05 | 0.03 | 0.00 |
| Malaysia | 749 | 85 | 0.08 | 0.04 | 0.13 |
| Mexico | 481 | 74 | 0.18 | 0.06 | 0.42 |
| Morocco | 58 | 7 | 0.01 | 0.00 | 0.00 |
| Netherlands | 874 | 123 | 0.32 | 0.16 | 0.51 |
| New Zealand | 649 | 68 | 0.10 | 0.05 | 0.41 |
| Norway | 794 | 89 | 0.23 | 0.18 | 0.51 |
| Pakistan | 356 | 35 | 0.06 | 0.01 | 0.01 |
| Peru | 164 | 19 | 0.16 | 0.04 | 0.09 |
| Philippines | 397 | 41 | 0.09 | 0.05 | 0.19 |
| Poland | 821 | 103 | 0.26 | 0.15 | 0.08 |
| Portugal | 386 | 41 | 0.10 | 0.08 | 0.50 |
| Qatar | 104 | 18 | 0.03 | 0.01 | 0.04 |
| Russia | 758 | 94 | 0.09 | 0.04 | 0.20 |
| Saudi Arabia | 133 | 31 | 0.01 | 0.01 | 0.04 |
| Singapore | 405 | 40 | 0.13 | 0.08 | 0.42 |
| South Africa | 1214 | 123 | 0.19 | 0.08 | 0.69 |
| South Korea | 4522 | 580 | 0.08 | 0.04 | 0.23 |
| Spain | 1197 | 127 | 0.15 | 0.09 | 0.52 |
| Sweden | 1134 | 138 | 0.36 | 0.16 | 0.66 |
| Switzerland | 1671 | 180 | 0.24 | 0.12 | 0.53 |
| Taiwan | 2033 | 204 | 0.13 | 0.07 | 0.31 |
| Thailand | 534 | 64 | 0.11 | 0.02 | 0.22 |
| Turkey | 1257 | 164 | 0.07 | 0.04 | 0.39 |
| U. A. Emirates | 153 | 25 | 0.09 | 0.06 | 0.22 |
| UK | 5528 | 633 | 0.37 | 0.20 | 0.58 |
| USA | 11,847 | 1279 | 0.79 | 0.18 | 0.50 |

This table reports descriptive statistics for the sample used in our tests. Panel A describes the procedure to construct our sample. Panel B presents descriptive statistics for the main variables used in our tests. Panel C presents descriptive statistics by year. Panel D presents descriptive statistics by industry affiliation. Panel E presents descriptive statistics by country. See Appendix A for variable definitions.

Because the relationship between *Signatories_Hldg* and *CDP_Disclosure* is likely shaped by economy-wide variation, equation (1) includes year fixed effects. To mitigate the concern that the results may be driven by unobserved time-invariant firm heterogeneity, we also include firm fixed effects. In equation (1), $\tau_t$ and $\delta_i$ denote year and firm-fixed effects, respectively. In Table OD.1 of the Online Appendix we include a variety of alternative fixed effect structures, namely country-year, industry-year, size-decile-year, and country-industry-year fixed effects. To the extent that they are year-specific, these alternative fixed effects control for any shock affecting the country, the industry, or firms of similar size. The independent variables are measured at the end of the prior year (i.e., they are lagged one period). All continuous variables are winsorized at the 1st and 99th percentiles to mitigate the effect of outliers. Standard errors are clustered at the firm level (see Online Appendix OD, Table OD.2, for robustness to alternative clustering options). Table OD.3 in the Online Appendix repeats the analysis using a logistic regression (instead of an OLS model).

Table 2 presents the results of estimating equation (1). In Panel B we replace the variable *Signatories_Hld* with an indicator variable for observations in which *Signatories_Hld* is larger than 5%, *I(Signatories_Hldg>5%)*. This alternative variable captures cases in which CDP signatories hold a non-negligible ownership stake and thus can exert substantial influence on the firm.

8

Exhibit 53 to Decl. of Lyon
1351
**SER 1143**

S. Cohen, I. Kadach and G. Ormazabal   Journal of Accounting and Economics 76 (2023) 101640

**Table 2**
Disclosure of carbon emissions and holdings of CDP signatories.

Panel A. Continuous variable

| | | Dependent Variable: *CDP_Disclosure* | | | |
|---|---|---|---|---|---|
| | | (1) | (2) | (3) | (4) |
| *Signatories_Hldg* | $\beta_1$ | 0.44*** | 0.41*** | 0.38*** | 0.27*** |
| | | (14.94) | (14.29) | (12.78) | (8.22) |
| *OtherInst_Hldg* | $\beta_2$ | 0.16*** | 0.12*** | 0.13*** | 0.13*** |
| | | (5.15) | (4.11) | (4.53) | (3.81) |
| *Size* | | 0.05*** | 0.09*** | 0.10*** | 0.04*** |
| | | (14.95) | (19.63) | (20.47) | (5.91) |
| *Log(BM)* | | −0.04*** | −0.04*** | −0.04*** | −0.01*** |
| | | (−11.40) | (−11.15) | (−12.41) | (−3.90) |
| *ROA* | | 0.09*** | 0.07** | 0.07*** | 0.12*** |
| | | (3.38) | (2.49) | (2.66) | (4.91) |
| *Leverage* | | −0.10*** | −0.11*** | −0.12*** | −0.04* |
| | | (−5.36) | (−6.12) | (−6.26) | (−1.73) |
| *Tangibility* | | 0.08*** | 0.01 | 0.01 | −0.01 |
| | | (5.99) | (0.66) | (0.51) | (−0.44) |
| *Dividends* | | 0.01*** | 0.01*** | 0.01*** | −0.00 |
| | | (3.14) | (3.19) | (3.27) | (−1.08) |
| *Return* | | 0.00 | 0.00 | −0.01*** | −0.01*** |
| | | (0.34) | (0.05) | (−5.03) | (−4.65) |
| *Log(Sales)* | | 0.07*** | 0.04*** | 0.04*** | 0.02*** |
| | | (19.39) | (10.02) | (9.70) | (3.12) |
| *Country FE* | | YES | YES | YES | n.a. |
| *Industry FE* | | NO | YES | YES | n.a. |
| *Year FE* | | NO | NO | YES | YES |
| *Firm FE* | | NO | NO | NO | YES |
| R² | | 0.30 | 0.32 | 0.33 | 0.65 |
| # Obs. | | 76,284 | 76,284 | 76,284 | 75,755 |
| H0: $\beta_1 = \beta_2$ (p-value) | | <0.001 | <0.001 | <0.001 | <0.001 |

Panel B. Indicator for significant holdings

| | Dependent Variable: *CDP_Disclosure* | | | |
|---|---|---|---|---|
| | (1) | (2) | (3) | (4) |
| *I(Signatories_Hldg>5%)* | 0.12*** | 0.11*** | 0.10*** | 0.04*** |
| | (18.52) | (17.24) | (15.14) | (6.23) |
| *OtherInst_Hldg* | 0.10*** | 0.07** | 0.08*** | 0.05 |
| | (3.37) | (2.39) | (2.86) | (1.56) |
| *Size* | 0.05*** | 0.09*** | 0.10*** | 0.05*** |
| | (14.85) | (19.46) | (20.30) | (6.45) |
| *Log(BM)* | −0.04*** | −0.04*** | −0.04*** | −0.01*** |
| | (−11.03) | (−10.87) | (−12.14) | (−4.38) |
| *ROA* | 0.07*** | 0.05* | 0.06** | 0.13*** |
| | (2.69) | (1.95) | (2.19) | (5.23) |
| *Leverage* | −0.09*** | −0.10*** | −0.10*** | −0.05* |
| | (−4.63) | (−5.30) | (−5.48) | (−1.94) |
| *Tangibility* | 0.08*** | 0.01 | 0.01 | −0.00 |
| | (5.92) | (0.65) | (0.46) | (−0.14) |
| *Dividends* | 0.01** | 0.01*** | 0.01*** | −0.00 |
| | (2.43) | (2.59) | (2.75) | (−1.17) |
| *Return* | 0.00 | 0.00 | −0.01*** | −0.01*** |
| | (0.73) | (0.35) | (−4.82) | (−4.66) |
| *Log(Sales)* | 0.07*** | 0.04*** | 0.04*** | 0.02*** |
| | (19.01) | (9.95) | (9.60) | (3.10) |
| *Country FE* | YES | YES | YES | n.a. |
| *Industry FE* | NO | YES | YES | n.a. |
| *Year FE* | NO | NO | YES | YES |
| *Firm FE* | NO | NO | NO | YES |
| R² | 0.30 | 0.32 | 0.33 | 0.65 |
| # Obs. | 76,284 | 76,284 | 76,284 | 75,755 |

This table presents an analysis of the association between CDP disclosure and ownership by CDP signatories. The dependent variable, *CDP_Disclosure*, is an indicator variable that equals one if a company submits the CDP questionnaire in year *t*, and zero otherwise. In Panel A, the experimental variable, *Signatories_Hldg*, is the fraction of the firm's equity owned by mutual funds that are CDP signatories in year *t*-1. *OtherInst_Hldg* is the fraction of the firms' equity owned by funds managed by institutions that are not CDP signatories in year *t*-1. In Panel B, the experimental variable, *I(Signatories_Hldg>5%)*, is an indicator variable that equals one if CDP signatories own more than 5% of the firm's equity in year *t*-1, and zero otherwise. The control variables are defined in Appendix A. Control variables are measured in year *t*-1. See Appendix A for variable definitions. Standard errors are clustered at the firm level. *t*-statistics are in parentheses. *, **, and *** denote significance at the 10%, 5%, and 1% levels (two-tail) respectively. Intercepts are omitted.

Exhibit 53 to Decl. of Lyon
1352
**SER 1144**

Case 2:24-cv-00801-ODW-PVC   Document 56-53   Filed 07/24/24   Page 11 of 36   Page ID #:7333

S. Cohen, I. Kadach and G. Ormazabal                                                                                    Journal of Accounting and Economics 76 (2023) 101640

The coefficient on *Signatories_Hldg* in Table 2, Panel A, is positive and statistically significant across all specifications, regardless of the fixed effect structure. The magnitude of the coefficient on *Signatories_Hldg* ranges from 0.27 to 0.44, depending on the specification. A coefficient of 0.27 suggests that a one within-fixed-effect standard deviation increase in *Signatories_Hldg* (0.06) is associated with an increase of approximately 1.6 percentage points in the probability that the firm answers the CDP questionnaire.[20] Furthermore, the coefficient on *Signatories_Hldg* is significantly larger than the coefficient on *OtherInst_Hldg* (Table 2, Panel A, shows that the coefficients on *Signatories_Hldg* and *OtherInst_Hldg* are significantly different at a *p*-value of less than 0.001). That is, the observed association between *Signatories_Hldg* and carbon disclosure does not merely reflect a general association between institutional ownership and disclosure (e.g., Bushee and NOE, 2000).

The results in Table 2, Panel B, are consistent with those in Panel A. The coefficient on *I(Signatories_Hldg>5%)* is positive and statistically significant in all specifications, with the magnitude of the coefficient ranging from 0.04 to 0.12. As such, these patterns also support the notion that the CDP signatories influence the probability that firms answer the CDP questionnaire. The estimates suggest that the magnitude of the effect ranges from 4% to 12%. Overall, the results from Table 2 are consistent with H1.

In Table OD.4 of the Online Appendix we repeat the analysis in Table 2 for the subsample of observations with non-missing Trucost data. We conduct this additional analysis to enhance comparability with the results presented in later sections of the paper that require restricting the sample to observations with non-missing Trucost data. As a further robustness check, the test in Table OD.4 also controls for the firm's lagged carbon emissions. As shown in Table OD.4, we obtain similar results.

*4.2. Regression discontinuity design around the bottom of the MSCI index*

Our next set of analyses exploits plausible exogenous variation in the ownership of CDP signatories induced by inclusion/exclusion of the sample firms in the MSCI ACWI (i.e., the Morgan Stanley Capital International All Country World Index). This methodological approach is grounded in prior literature (e.g., Aggarwal et al., 2011; Bena et al., 2017).[21] The MSCI index includes large and mid-cap companies from 23 developed and 23 developing countries. For each country, companies are ranked in descending order based on their market capitalization. We restrict our analysis to the vicinity of the bottom of the index (i.e., to those firms around the addition threshold into MSCI ACWI in that year). We focus on the period from 2005 to 2020 due to limitations in the availability of data on MSCI ACWI membership. We estimate the following model:

$$CDP\_Disclosure_{it} = \alpha + \beta_1*MSCI_{it} + \beta_2*Rank_{it} + \beta_3*Rank_{it}*MSCI_{it} + \gamma*Controls_{it-1} + \tau_t + \delta_s + \mu_k + \varepsilon_{it}, \qquad (2)$$

*CDP_Disclosure* and *Controls* are as in equation (1). *MSCI* is an indicator variable that equals one if the firm is included in the MSCI index, and zero otherwise. In line with prior literature (Boone and White, 2015; Crane et al., 2016) equation (2) also includes two additional variables, *Rank* and *Rank*MSCI*, where *Rank* is defined as the position of the company in the ranking of sample firms based on market capitalization. In the narrow bandwidth around the index threshold, the variable *MSCI* captures random variation in companies' market capitalization, which largely determines the composition of the index. As such, *MSCI* could be treated as plausibly exogenous. $\tau_t$, $\delta_s$, and $\mu_k$ indicate year, industry, and country fixed effects, respectively.

To confirm that this plausibly exogenous variation in the MSCI index is associated with signatory holdings, we estimate the following model:

$$Signatories\_Hldg_{it} = \alpha + \beta_1*MSCI_{it} + \beta_2*Rank_{it} + \beta_3*Rank_{it}*MSCI_{it} + \gamma*Controls_{it-1} + \tau_t + \delta_s + \mu_k + \varepsilon_{it}, \qquad (3)$$

Table 3 presents the results of estimating equations (2) and (3). The estimation of equation (2) confirms that the plausibly exogenous variation in the inclusion in the MSCI index is associated with a higher probability that the firm discloses to the CDP. The estimation of equation (3) confirms that such exogenous variation is accompanied by an increase in the holdings of CDP signatories. Overall, these results are consistent with H1.

Tables OD.5 and OD.6 of the online appendix include two variants of this test that estimate a 2SLS model using the inclusion in the MSCI as an instrumental variable. In the first test, we restrict the analysis around the bottom of the index (as in the above tests). In the second test, we include all sample observations. As shown in the online appendix, the results of these tests are also consistent with H1. In addition, Table OD.7 includes higher orders polynomials of *Rank*. We find similar results.

*4.3. Stock additions to the MSCI index*

To complement the previous tests, we take a second approach by focusing on additions of stocks to the MSCI ACWI. This variant of the analysis in Table 3 is also used in the literature studying the effect of institutional ownership around the world

---

[20] We use the within-fixed-effect standard deviation to interpret the magnitude of the coefficient on *Signatories_Hldg* (0.27) in Table 2, Panel A, since the specification corresponding to this estimation includes firm fixed effects (deHaan 2021). A similar computation is not feasible in Table 2, Panel B, as the variable of interest, *I(Signatories_Hldg>5%)*, is binary (deHaan, 2021).

[21] Firms are sequentially included in the index starting from the largest ones until the cumulative share of index constituents reaches 85% of the free float-adjusted market capitalization of the country's listed equity. To promptly adjust for changes in market capitalizations, MSCI adjusts the set of constituents at the end of every calendar quarter.

Exhibit 53 to Decl. of Lyon
1353
**SER 1145**

S. Cohen, I. Kadach and G. Ormazabal Journal of Accounting and Economics 76 (2023) 101640

**Table 3**
Analysis around the lower threshold of the MSCI ACWI.

| | Dep. var.: Signatories_Hldg | | | Dep. var.: CDP_Disclosure | | |
|---|---|---|---|---|---|---|
| | Bandwidth [-100; +100] (1) | Bandwidth [-300; +200] (2) | Bandwidth [-300; +300] (3) | Bandwidth [-100; +100] (4) | Bandwidth [-300; +200] (5) | Bandwidth [-300; +300] (6) |
| MSCI | 0.02*** | 0.03*** | 0.02*** | 0.04** | 0.04*** | 0.04*** |
| | (7.90) | (8.75) | (8.15) | (2.45) | (3.38) | (3.35) |
| Rank | -0.00 | -0.00 | -0.001* | 0.00 | -0.00 | -0.001* |
| | (-0.88) | (-0.32) | (-1.70) | (0.05) | (-0.35) | (-1.86) |
| Rank*MSCI | 0.00 | 0.00 | 0.00 | 0.001* | 0.00 | 0.00 |
| | (0.36) | (0.24) | (0.86) | (1.65) | (0.55) | (0.14) |
| Controls | YES | YES | YES | YES | YES | YES |
| Country FE | YES | YES | YES | YES | YES | YES |
| Industry FE | YES | YES | YES | YES | YES | YES |
| Year FE | YES | YES | YES | YES | YES | YES |
| $R^2$ | 0.29 | 0.28 | 0.28 | 0.35 | 0.34 | 0.34 |
| # Obs. | 18,962 | 24,239 | 27,285 | 18,962 | 24,239 | 27,285 |

This table presents an analysis of variation in ownership by CDP signatories and CDP disclosure in the vicinity of the lower threshold of the MSCI ACWI. *Signatories_Hldg* is the fraction of the firm's equity owned by institutional investors that are CDP signatories in year *t*. *CDP_Disclosure* is an indicator variable that equals one if the firm submits the CDP questionnaire in year *t*, and zero otherwise. *MSCI* equals one if the firm is included in the MSCI ACWI in year *t*, and zero otherwise. *Rank* is the position of the company in the ranking of sample firms based on market capitalization year *t*. *Controls* includes the same control variables as in Table 2, all measured in year *t*-1. See Appendix A for variable definitions. "Bandwidth" indicates the number of ranking positions (based on market capitalization) above and below the threshold. Standard errors are clustered at the firm level. *t*-statistics are in parentheses. *, **, and *** denote significance at the 10%, 5%, and 1% levels (two-tail) respectively. Intercepts are omitted.

(i.e., Bena et al., 2017).[22] Following this prior work, we examine ownership and disclosure patterns around the time a stock is added to the MSCI ACWI. Our treatment group includes the 1848 sample firms added to this index at some point between 2006 and 2020. In the control group, we include all the sample firms that are not added to the MSCI index during that period. For both groups of firms, we include all the observations during the sample period and estimate the following model:

$$Signatories\_Hldg_{it} = \beta_1 * Treatment_i * Post_{it} + \gamma * Controls_{it-1} + \tau_t + \delta_i + \varepsilon_{it}, \quad (4)$$

$$CDP\_Disclosure_{it} = \beta_1 * Treatment_i * Post_{it} + \gamma * Controls_{it-1} + \tau_t + \delta_i + \varepsilon_{it}, \quad (5)$$

where *Treatment* is an indicator variable that equals one if a firm *i* is added to the MSCI ACWI at some point during the sample period, and zero otherwise. *Post* is an indicator variable that equals one in the year a firm is added to the MSCI ACWI and thereafter, and zero otherwise. Similar to previous tests, the specification includes firm and year fixed effects.

We also conduct a variant of the previous analysis using propensity score matching. We match every treatment observation with one non-treated observation from the same industry and year. For every treatment and control firm we include observations for a five-year period (-2; +2) around the treatment year. Including these five years of data around the addition to MSCI ACWI requires restricting the sample of potential treatment years to the period 2006-2018. The test of covariate balance (Table OD.8 in the Online Appendix) confirms that the matched treatment and control groups are comparable.

Table 4 presents the results. Panel A corresponds to the analysis including all observations. Panel B corresponds to the analysis including the subsample of matched treatment-control pairs. The results parallel those in Table 3; compared to the control sample, ownership by CDP signatories increases significantly after a treated firm is added to the MSCI ACWI and the treated firms are more likely to answer the CDP questionnaire. Fig. 1 maps out the results of estimating a dynamic version of Table 4, Panel A (the figure shows differences in the probability of CDP disclosure between the treatment and control groups in each year relative to the year of the addition to the MSCI index). The results confirm that there is no pre-trend (the differences are not statistically significant before the addition) and show an increase in CDP disclosure for the treatment firms after the addition.

Overall, the evidence presented in Table 4 and Fig. 1 support our interpretation of the results in Table 2, namely that the presence of CDP signatories induces firms to disclose climate-related information to the CDP, and thus is consistent with H1.

## 5. Climate-related disclosure and subsequent carbon emissions

Our second set of tests aims to shed light on hypothesis H2, namely that CDP disclosures predict lower levels of carbon emissions.

---

[22] Our approach based on the MSCI index is "one-sided" (i.e., the firms included in the index experience an increase, not a decrease, in institutional ownership). An alternative approach used in the literature exploits the reconstitution of the Russell indexes. Prior studies use two discontinuities created by the design of the Russell indexes: (i) the Russell 1000/2000 cut-off, which is "two-sided" in the sense that firms on both sides of the threshold experience changes in institutional ownership, and (ii) the Russell 3000 cut-off (i.e., the lower cut-off of the index), which is "one-sided". The approaches based on the Russell indexes are restricted to the U.S.; our sample contains international firms.

11

Exhibit 53 to Decl. of Lyon
1354
**SER 1146**

S. Cohen, I. Kadach and G. Ormazabal

*Journal of Accounting and Economics 76 (2023) 101640*

**Table 4**
Additions to the MSCI ACWI.

**Panel A. All sample observations**

| Variable | Dependent variable: | |
|---|---|---|
| | Signatories_Hldg (1) | CDP_Disclosure (2) |
| Treatment*Post | 0.01* | 0.03*** |
| | (1.78) | (2.65) |
| Controls | YES | YES |
| Year FE | YES | YES |
| Firm FE | YES | YES |
| $R^2$ | 0.73 | 0.65 |
| # Obs. | 75,755 | 75,755 |

**Panel B. Propensity score matching**

| Variable | Dependent variable: | |
|---|---|---|
| | Signatories_Hldg (1) | CDP_Disclosure (2) |
| Treatment*Post | 0.01*** | 0.03* |
| | (3.16) | (1.92) |
| Controls | YES | YES |
| Year FE | YES | YES |
| Firm FE | YES | YES |
| $R^2$ | 0.85 | 0.76 |
| # Obs. | 6176 | 6176 |

This table presents an analysis of ownership by CDP signatories and CDP disclosure around the time a stock is added to MSCI ACWI. The treatment group includes firms added to the MSCI ACWI during the sample period. In Panel A, the control group includes all sample firms that are never included in the index during the sample period. The test includes all sample observations for both the treatment and the control group. In Panel B the analysis is restricted to treatment and control observations obtained through propensity score matching. For every treated firm, a control firm is selected among non-treated firms from the same industry and year using propensity scores. The covariates used to construct propensity scores are the vector of controls in Table 2 (see also Table OD.8 in the Online Appendix). For every treatment and control observation the test includes a 5-year period around the treatment year ($-2$; $+2$). *Signatories_Hldg*, is the fraction of the firm's equity owned by institutional investors that are CDP signatories in year *t*. *CDP_Disclosure*, is an indicator variable that equals one if the firm submits the CDP questionnaire in year *t*, and zero otherwise. *Treatment* is an indicator variable that equals one if a firm is added to the MSCI ACWI in year *t*, and zero otherwise. *Post* is an indicator variable that equals one in the year a firm is added to the MSCI ACWI and thereafter, and zero otherwise. *Controls* includes the same control variables as in Table 2, also measured in year *t*-1. See Appendix A for variable definitions. Standard errors are clustered at the firm level. *t*-statistics are in parentheses. *, **, and *** denote significance at the 10%, 5%, and 1% levels (two-tail) respectively. Intercepts are omitted.

## 5.1. CDP disclosures and subsequent $CO_2$ emissions

We start by exploring whether CDP disclosures are associated with subsequent levels of carbon emissions. Finding a negative association would be consistent with H2. We estimate the following model:

$$Log(CO_2)_{it+s} = \alpha + \beta*CDP\_Disclosure_{it} + \gamma *Controls_{it-1} + \tau_t + \delta_i + \varepsilon_{it} \qquad (6)$$

where $Log(CO_2)$ is the natural logarithm of a firm's direct GHG emissions (scope 1) measured in equivalents of metric tons of $CO_2$ and $s = \{0, 1, 2\}$.[23] *CDP_Disclosure* and the control variables are as previously defined (please see Appendix A for variable definitions). Sub-indexes *i* and *t* refer to firm *i* and year *t*, respectively. $\tau_t$ and $\delta_i$ denote year and firm fixed effects, respectively.

Table 5 presents the results of this test.[24] The coefficient on our main variable of interest, *CDP_Disclosure*, is negative and statistically significant, which is consistent with H2. The magnitude of the coefficient on *CDP_Disclosure* ranges from $-0.07$ to $-0.10$, which indicates that, after disclosing to the CDP, corporate $CO_2$ emissions are between 7% and 10% lower on average

---

[23] The GHG Protocol breaks down total GHG emissions into three "scopes". Scope 1 emissions relate to direct GHG emissions (i.e., sources that are owned or controlled by the company); scope 2 emissions relate to emissions from purchased heat and electricity; scope 3 emissions relate to emissions from the supply chain and other sources not owned or controlled by the company (e.g., employee business travel, outsourced business activities).

[24] Table OD.9 in the online appendix presents the results of repeating the analysis for indirect emissions (i.e., scope 2 and scope 3). In contrast to Table 5, Table OD.9 reveals that the coefficient on *CDP_Disclosure* is not significant for scope 2 and 3 emissions in year *t*+1. One possible explanation for these weaker results is that, unlike scope 1 emissions, a firm's scope 2 and scope 3 emissions are not directly controlled by the firm's management.

Exhibit 53 to Decl. of Lyon
1355
**SER 1147**

Case 2:24-cv-00801-ODW-PVC    Document 56-53    Filed 07/24/24    Page 14 of 36    Page ID #:7336

S. Cohen, I. Kadach and G. Ormazabal                                                    Journal of Accounting and Economics 76 (2023) 101640



**Fig. 1. Addition to MSCI ACWI and Disclosure to the CDP.** This figure depicts the firm's disclosure to CDP status around the firm's addition to MSCI ACWI. We re-estimate the specification from column (2) of Table 4, Panel A, replacing the *Treatment*Post* interaction with separate indicator variables, each marking one year over the $t-8$ to $t+8$ period before the year of the addition to MSCI ACWI ($t = 0$). We omit the indicator for year $t-1$. It therefore serves as a benchmark and has a coefficient value of zero (and no confidence interval). The figure plots the coefficient estimates of the 16 years together with their 95 percent confidence intervals. The dependent variable is *CDP_Disclosure*, is an indicator that equals one if the company submits the CDP questionnaire in year $t$, and zero otherwise. Black dots denote that the coefficient is statistically different from that of the indicator for period $t-1$ (two-tailed, 5% level).

over the next years.[25] As shown in the Online Appendix (Table OD.10), our inferences are unaffected when we use alternative fixed effect structures (i.e., country-year and industry-year fixed effects).

Table 5 shows that the disclosure to the CDP is followed by lower scope 1 emissions in $t$, $t+1$ and $t+2$. While some strategies to reduce emissions need more than one year to yield results, firms could also curb emissions relatively quickly. For example, companies could rebalance their product mix based on their carbon emissions and/or reduce the amount of input materials (Starbucks' introduction of a strawless cold drink lid is a case in point).

We consider the possibility that the results in Table 5 are driven by our sample firms divesting their $CO_2$ producing assets after the first CDP disclosure. While this could be one way (among others) to reduce emissions, it could also reflect a change in firm strategy not necessarily related with an intent to improve environmental performance. To explore the empirical validity of this concern, we replace the dependent variable in Table 5 with the logarithm of sales and with the logarithm of total assets. As shown in Table OD.11 in the Online Appendix, future sales and total assets increase (rather than decrease) among firms disclosing to the CDP, which is not consistent with the idea that the reduction in $CO_2$ emissions is driven by a reduction in the economic activity of the disclosing firms.

*5.2. First-time disclosure to the CDP*

As an alternative test of H2, we repeat the previous analysis focusing on the year when firms initiate disclosure to the CDP. Accordingly, our "treatment" group includes the 4352 sample firms that are CDP respondents (i.e., firms that disclose to the CDP at least once between 2005 and 2020).[26] As a "control" group, we include all the sample firms that are not CDP respondents (i.e., firms that never disclose to the CDP during the sample period). For both groups of firms, we include all the observations during the sample period and estimate the following model:

$$Log(CO_2)_{it} = \beta_1 * CDP\ Respondent_i * Post_{it} + \gamma * Controls_{it-1} + \tau_t + \delta_i + \varepsilon_{it}, \tag{7}$$

---

[25] While smaller in magnitude, our results are comparable to the findings of prior literature on the mandatory disclosure of carbon emissions. Studies examining the UK's mandatory greenhouse gas disclosure requirement find that firms reduce their carbon emissions by an average of 16 percent (Jouvenot and Krueger, 2019; Downar et al., 2021). Other studies, examining the mandatory disclosure requirement for powerplants in the United States, find that powerplants reduce their emissions by approximately 8 percent (Tomar, 2023) and by 10 percent for those publicly traded (Yang et al., 2021).

[26] We use the language "treatment" and "control" in the interest of clarity in the description of the test. However, we emphasize that this is a descriptive test and that the "treatment" is an endogenous choice by the firm.

Exhibit 53 to Decl. of Lyon
1356
**SER 1148**

S. Cohen, I. Kadach and G. Ormazabal                                                    Journal of Accounting and Economics 76 (2023) 101640

**Table 5**
Disclosure to the CDP and CO2 emissions.

| Indep. variables: | Dependent variable: Log [$CO_2 (t+s)$] | | |
|---|---|---|---|
| | $s = 0$ (1) | $s = 1$ (2) | $s = 2$ (3) |
| CDP_Disclosure | −0.07*** (−4.23) | −0.08*** (−5.07) | −0.10*** (−6.21) |
| Inst_Hldg | 0.08 (1.00) | 0.10 (1.19) | 0.08 (0.90) |
| Size | 0.23*** (6.96) | 0.28*** (9.04) | 0.27*** (8.91) |
| Log(BM) | −0.01 (−0.98) | −0.04*** (−3.00) | −0.05*** (−4.00) |
| ROA | 0.18* (1.90) | 0.28*** (2.71) | 0.28*** (2.66) |
| Leverage | 0.00 (0.01) | −0.01 (−0.09) | −0.04 (−0.50) |
| Tangibility | 0.44*** (3.16) | 0.42*** (3.05) | 0.32** (2.37) |
| Dividends | 0.01 (1.11) | 0.00 (0.60) | 0.01 (1.25) |
| Return | 0.05*** (6.99) | 0.05*** (6.68) | 0.05*** (6.93) |
| Log(Sales) | 0.53*** (14.72) | 0.30*** (9.39) | 0.17*** (5.50) |
| Year FE | YES | YES | YES |
| Firm FE | YES | YES | YES |
| $R^2$ | 0.95 | 0.95 | 0.95 |
| # Obs. | 66,816 | 64,977 | 62,963 |

This table presents an analysis of the association between carbon emissions and CDP disclosure. Log[$CO_2 (t+s)$] is the logarithm of the firm's direct $CO_2$ emissions (scope 1) measured in year $t+s$, where $t$ is the year of the CDP disclosure and $s = 0, 1, 2$ in columns (1), (2), and (3), respectively. CDP_Disclosure is an indicator variable that equals one if the company submits the CDP questionnaire in year $t$, and zero otherwise. Control variables are defined in Appendix A and measured in year $t$-1. Standard errors are clustered at the firm level. $t$-statistics are in parentheses. *, **, and *** denote significance at the 10%, 5%, and 1% levels (two-tail) respectively. Intercepts are omitted.

where Log($CO_2$) is the natural logarithm of the firm's direct $CO_2$ emissions (scope 1). CDP Respondent is an indicator variable that equals one if a firm $i$ starts disclosing to the CDP for the first time during the sample period, and zero otherwise. Post is an indicator variable that equals one in the year a firm files its first CDP questionnaire and thereafter, and zero otherwise. We include Controls (i.e., the vector of controls in Table 5) to account for any remaining covariate imbalance. The coefficient on CDP Respondent*Post captures the differential effect between the "treatment" and "control" groups following the firms' initial disclosure to the CDP.

As in section 4.3, we conduct a variant of the previous analysis using propensity score matching. We match every CDP respondent in the first year of disclosure with one observation with no CDP disclosure from the same industry and year. In this second test, we focus on a (−2; +2) year window around the first disclosure year. The test of covariate balance (Table OD.12 in the Online Appendix) confirms that the two matched groups of observations are comparable.

**Table 6**
First-time disclosure to the CDP.

| Indep. variables: | Dep. Var: Log [$CO_2 (t)$] | |
|---|---|---|
| | All sample observations (1) | Propensity score matching (2) |
| CDP Respondent*Post | −0.11*** (−5.32) | −0.11*** (−4.05) |
| Controls | YES | YES |
| Year FE | YES | YES |
| Firm FE | YES | YES |
| R-squared | 0.95 | 0.96 |
| Observations | 66,816 | 8500 |

This table presents an analysis of carbon emissions around the time a firm starts disclosing to the CDP. The test in column (1) includes all CDP respondents (i.e., all the sample firms that disclosed at least once to the CDP during the sample period) and all CDP non-respondents (i.e., all the sample firms that never disclose to the CDP during the sample period).The test includes all sample observations for both CDP respondents and non CDP respondents The test in column (2) restricts the sample to observations obtained through propensity score matching. Each CDP respondent in the first year of disclosure is matched to an observation with no CDP disclosure from the same industry and year. The analysis is based on a window of (−2; +2) years around the year of first CDP disclosure. Log[$CO_2 (t)$] is the logarithm of the firm's direct $CO_2$ emissions (Scope 1). CDP Respondent is an indicator variable that equals one if a firm starts disclosing to the CDP for the first time during the sample period, and zero otherwise. Post is an indicator variable that equals one in the year when the first CDP questionnaire is filed and thereafter, and zero otherwise. Controls includes the same control variables as in Table 5, also measured in year $t$-1. See Appendix A for variable definitions. Standard errors are clustered at the firm level. $t$-statistics are in parentheses. *, **, and *** denote significance at the 10%, 5%, and 1% levels (two-tail) respectively. Intercepts are omitted.

Exhibit 53 to Decl. of Lyon
1357
**SER 1149**

Case 2:24-cv-00801-ODW-PVC    Document 56-53    Filed 07/24/24    Page 16 of 36    Page ID #:7338

S. Cohen, I. Kadach and G. Ormazabal

Journal of Accounting and Economics 76 (2023) 101640



**Fig. 2.  First disclosure to the CDP and CO2 Emissions.** This figure depicts the corporate carbon emissions around the first disclosure to CDP. We re-estimate the specification from column (1) of Table 6, replacing the *CDP Respondent*Post* interaction with separate indicator variables, each marking one year over the t−8 to t+8 period relative to the year of the first disclosure to CDP TPD (t = 0). We omit the indicator for year t−1. It therefore serves as a benchmark and has a co-efficient value of zero (and no confidence interval). The figure plots the coefficient estimates of the 16 years together with their 95 percent confidence intervals. The dependent variable is the logarithm of the firm's direct $CO_2$ emissions (Scope 1). Black dots denote that the coefficient is statistically different from that of the indicator for period t-1 (two-tailed, 5% level).

Table 6 presents the results. Column (1) corresponds to the analysis including the full sample. Column (2) corresponds to the analysis including the matched control group. Consistent with H2, the interaction *CDP Respondent*Post* is negative and significant indicating that, relative to the control group, firms that disclose to the CDP for the first time exhibit significantly lower $CO_2$ emissions in the subsequent years.[27] As shown in Table OD.13 in the Online Appendix, our inferences are robust to using coarsened exact matching. Fig. 2 shows the results of a dynamic version of the Column (1) of Table 6. Consistent with H2, we observe no significant reduction in emissions in the years prior to the firm's first disclosure to the CDP, but a significant reduction thereafter.

### 5.3.  Signatory investors' exclusive access to CDP data

We also refine the analysis in Table 5 by exploiting a key institutional feature of the CDP platform. As previously explained, if a firm decides to respond to the questionnaire and disclose its information to the CDP, it then has the option to mark its response as either "Public" or "Private". Responses marked as "Private" are available only to the signatory investors of the CDP; non-signatory investors and the general public cannot access this information. Responses marked as "Public" can be accessed by the general public at no cost through the CDP website. To the extent that other parties (e.g., non-signatory institutions, environmental activists, regulators) do not have access to information restricted to CDP signatories, any observed outcomes in cases marked as "Private" should be driven by CDP signatories.[28]

Table 7 presents the results of estimating equation (6) restricting the analysis to observations where a firm opts to grant access to its disclosed information only to CDP signatories. In columns (1) and (2) we exclude firms that marked their responses as "Public". In columns (3) and (4) we introduce an additional condition: we exclude cases in which CDP signatories own less than five percent of the firm's equity. This restriction ensures that the CDP signatories have enough clout to influence

---

[27] *CDP_Disclosure* in Table 5 equals zero if the firm stops disclosing to the CDP (temporarily or permanently). In contrast, *CDP Respondent*Post* in Table 6 equals one in these cases (it flags all observations after the firm starts disclosing for the first time). There are 7459 such cases in our sample. This explains the difference in the magnitude of the two coefficients.

[28] Several considerations suggest that stakeholders other than CDP signatories do not systematically obtain CDP disclosures marked as "Private". First, if the information leaked in all cases, we would not observe, as we do, a high percentage of firms choosing "private" disclosure. Second, it is unclear that investors have an incentive to leak the information. Note that access to the CDP disclosures is an informational advantage for signatory investors. Sharing the information would dilute this benefit. Moreover, investors are not allowed to "resell" the CDP information (see: www.cdp.net/en/info/terms-and-conditions). Breaking the CDP rules is not inconsequential; the CDP asks signatories to leave if their behavior is deemed inconsistent with the environmental objectives of the initiative. The exclusion could damage the affected institution's public image. Furthermore, as argued in detail in Online Appendix OA private disclosure to the CDP is unlikely to be prosecuted for violation of Reg FD.

Exhibit 53 to Decl. of Lyon
1358
**SER 1150**

S. Cohen, I. Kadach and G. Ormazabal                                          Journal of Accounting and Economics 76 (2023) 101640

**Table 7**
Signatory investors' exclusive access to CDP data.

| | Dependent variable: Log [$CO_2$ (t + s)] | | | | | |
|---|---|---|---|---|---|---|
| | Only Signatories have access | | Only Signatories have access and Signatories own >5% | | Only Signatories have access and Signatories of both CDP and PRI own >5% | |
| | s = 1 | s = 2 | s = 1 | s = 2 | s = 1 | s = 2 |
| | (1) | (2) | (3) | (4) | (5) | (6) |
| *CDP_Disclosure* | −0.06*** | −0.08*** | −0.08*** | −0.10*** | −0.09*** | −0.12*** |
| | (−3.35) | (−4.24) | (−3.66) | (−4.53) | (−4.12) | (−5.00) |
| *Controls* | YES | YES | YES | YES | YES | YES |
| *Year FE* | YES | YES | YES | YES | YES | YES |
| *Firm FE* | YES | YES | YES | YES | YES | YES |
| $R^2$ | 0.95 | 0.95 | 0.95 | 0.94 | 0.95 | 0.94 |
| # Obs. | 50,090 | 49,623 | 47,755 | 47,282 | 46,404 | 45,941 |

This table presents an analysis of the association between carbon emissions and CDP disclosure applying several additional sample restrictions. The dependent variable is the logarithm of the firm's direct $CO_2$ emissions (scope 1). *CDP_Disclosure* is an indicator variable that equals one if a company submits the CDP questionnaire in year $t$, and zero otherwise. Columns (1)–(2) report results restricting the analysis to cases in which only CDP signatories have access to the CDP data (i.e., the test excludes firms whose CDP questionnaire can be accessed by the general public). Columns (3)–(4) introduces the additional restriction that CDP signatories own more than 5% of shares in the firm. Columns (5)–(6) introduces the additional restriction that the CDP signatories are also PRI signatories. *Controls* includes the same control variables as in Table 5, also measured in year $t$-1. See Appendix A for other variable definitions. Standard errors are clustered at the firm level. $t$-statistics are in parentheses. *, **, and *** denote significance at the 10%, 5%, and 1% levels (two-tail) respectively. Intercepts are omitted.

corporate decisions, including reporting choices. In columns (5) and (6) we introduce a further condition: we impose that the CDP signatories owning more than five percent of the shares be PRI signatories as well.[29] That is, we focus on CDP signatories that have made public commitments to sustainability principles.

As shown in Table 7, the coefficient on *CDP_Disclosure* is negative and significant across specifications. This coefficient increases in magnitude as we progressively impose additional restrictions. The results are strongest in the most restrictive specifications (i.e., models (5) and (6)), namely when the information is only disclosed to CDP signatories, CDP signatories hold a substantial stake in the firm, and these investors also publicly commit themselves to sustainability principles.

Taken together, the results in Tables 5–7 are consistent with H2 (the disclosure to the CDP is followed by lower carbon emissions). To the extent that the patterns are attributable to CDP signatories (only they have access to the disclosed information), the evidence implies that institutional investors could be using the CDP information in ways that induce firms to reduce corporate emissions. In section 6 we provide more direct evidence on two such ways: engagement and divestment.

*5.4. Alternative explanations*

We consider two possible alternative explanations of the patterns documented in Tables 5–7 Online Appendix OB analyzes the possibility that Trucost systematically overestimates emissions in the period before a firm starts disclosing to the CDP and subsequently follows firm CDP disclosures (under the assumption that these are more accurate). As we explain in detail in the Online Appendix, this possibility is remote, as Trucost does not have access to the CDP data for firms that choose to make their CDP disclosures "Private".

Online Appendix OC analyzes the possibility that the results in Tables 5–7 are driven by firms' underreporting of emissions to the CDP. If, as shown in prior literature, firms manipulate earnings disclosures, it is also plausible that they manipulate CDP disclosures. In the Online Appendix, we offer several considerations suggesting that, while plausible, firms' misreporting to the CDP is unlikely to drive our results.[30]

## 6. CDP disclosures and mechanisms to influence corporate behavior

Our third set of tests aims to shed light on the economic mechanisms underlying H2 (i.e., the mechanisms explaining an association between CDP disclosures and subsequent carbon emissions). As discussed in section 2.3., we explore two such mechanisms: engagement and divestment.

---

[29] The number of CDP signatories and the number PRI signatories do not necessarily go hand-in-hand; while the majority of CDP signatories are PRI signatories, the reverse does not hold. One potential explanation is that the two organizations serve different purposes (the PRI encompasses ESG-related matters, whereas the CDP focuses on issues related to the 'E' portion of ESG).

[30] CDP disclosures could have spillover effects on non-disclosing firms. One possibility is that non-disclosure affects investors' beliefs about non-disclosing firms. If investors typically interpreted lack of disclosure as bad news, they would also act on non-disclosure firms, and we would not observe statistical patterns in Tables 5–7 Instead, our results suggest that there is no full unravelling. Another possibility is that non-disclosing firms learn from CDP disclosures. If non-disclosing firms believed that cutting emissions gives disclosing firms a competitive advantage, non-disclosing firms would also decrease emissions and we would find no results in Tables 5–7 But non-disclosing firms do not have access to "Private" CDP disclosures (only investors do).

16

Exhibit 53 to Decl. of Lyon
1359
**SER 1151**

Case 2:24-cv-00801-ODW-PVC   Document 56-53   Filed 07/24/24   Page 18 of 36   Page ID #:7340

*S. Cohen, I. Kadach and G. Ormazabal*                                                                 *Journal of Accounting and Economics 76 (2023) 101640*

### 6.1. Engagement

We start by analyzing institutional investors' engagements with the firms in their portfolios. To keep the analysis tractable, we focus on the three largest CDP signatories: BlackRock, Vanguard, and State Street. We focus on these investment firms, often referred to as the "Big Three," for the following reasons. The first is data availability; the Big Three recently started publicly disclosing in investment stewardship reports (ISR) detailed data on private engagements with their portfolio firms. Second, while the public disclosure of engagements may not be unique to the Big Three, collecting these data for all the investment funds present in our sample would be prohibitively costly. Third, studying the Big Three is in and of itself interesting in light of the recent debate on the role of these large investment managers in the economy (e.g., Tallarita, 2023).

We manually collect engagement information from the ISRs published by BlackRock, State Street, and Vanguard. Black-Rock's ISRs include engagements data from 7/1/2017 to 6/30/2020. Vanguard's ISRs include engagements data from 7/1/2018 to 6/30/2020. State Street's ISRs include engagements data from 1/1/2014 to 12/31/2020. Consistent with prior research (Azar et al., 2021), we exclude engagements by letters and include only comprehensive engagements via calls and in-person meetings.[31]

We next check that our main inference from Table 2 also holds for the Big Three; we re-estimate our benchmark specifications from Table 2 replacing $Signatories\_Hldg$ with $Big3\_Hld$, and replacing $I(Signatories\_Hldg{>}5\%)$ with $I(Big3\_Hldg{>}5\%)$. The results of these tests (presented in Table 8, Panel A) are consistent with those in Table 2; the coefficients on $Big3\_Hldg$ and $I(Big3\_Hldg{>}5\%)$ are positive and statistically significant. That is, higher level of ownership by the Big Three institutions is associated with higher probability of CDP disclosure. Columns 1 and 3 suggest that one within-firm standard deviation increase in $Big3\_Hldg$ (i.e., 0.018) is associated with 2% higher frequency of CDP disclosure. Columns 2 and 4 suggest that the frequency of CDP disclosure is 11% higher among firms where the Big Three hold more than 5% of shares.

Having checked that the Big Three are among the CDP signatories that appear to induce firms to disclose information to the CDP, we next conduct a multivariate test on the determinants of the probability that a given firm is engaged by each of the Big Three. We construct three separate left-hand side indicator variables, one for each of the Big Three investors. Each indicator variable equals one if the firm is included in the list of engagements disclosed in the ISR of the respective Big Three institution, and zero otherwise. The corresponding three variables are labelled as *Engagement by BlackRock*, *Engagement by State Street*, and *Engagement by Vanguard*, respectively.

The right-hand side variables are as follows. *CDP_Disclosure* is as previously defined (i.e., an indicator variable that equals one if the firm discloses to the CDP, and zero otherwise). *Top_Emitter* is an indicator variable that equals one if the firm is in the top quartile by carbon emissions in its industry, and zero otherwise. *BlackRock_Hldg* is the fraction of the firm's shares held by funds managed by BlackRock (similar variables are constructed for Vanguard and State Street). The specification also includes a vector of controls for firm characteristics: *Size, Log(BM), ROA, Leverage, Tangibility, Dividends* and *Return*, all of them as previously defined (see Appendix A for variable definitions).

Table 8, Panel B, presents the results. The coefficient on the interaction *Top_Emitter*CDP_Disclosure* is positive and statistically significant. This result is consistent with the likelihood of a Big Three engagement being greater if the target firm exhibits higher levels of carbon emissions in the previous year and discloses this information through the CDP questionnaire. The coefficients on Big Three ownership (i.e., *BlackRock_Hldg, StateStreet_Hldg, Vanguard_Hldg*) are positive and statistically significant, which is consistent with the notion that the Big Three are more likely to engage with firms on which they have greater influence. To the extent that the ownership metrics also gauge the economic interest of the Big Three in the firm, the evidence is also consistent with the notion that these large investors believe that the value of their portfolios could vary with the level of carbon emissions. Finally, the coefficient on *Size* is positive and significant, confirming that the Big Three focus their engagement efforts on relatively larger firms. The focus on larger firms is consistent with these firms being more influential (more visible) and having a potentially stronger impact on climate change. As shown in Table OD.14 in the Online Appendix, our inferences do not change if we conduct the analysis considering the Big Three as one combined group of investors (i.e., pooling their engagements and holdings).

Overall, the results in Table 8 suggest that the Big Three selectively engage with portfolio firms on environmental issues. But more importantly for the purpose of our paper, the results in Table 8 suggest that the Big Three demand emission information through the CDP platform and use the information to select engagement targets among a plethora of portfolio companies.[32]

### 6.2. Divestment

We next explore whether signatories use the CDP information for asset allocation purposes. In parallel to our analysis in section 6.1, we examine whether investors use the disclosed information to divest from firms with higher emissions. We conduct the analysis distinguishing between active and index funds among CDP signatories. We use two alternative measures

---

[31] According to our data, BlackRock engaged with 3102 firms, State Street engaged with 1999 firms, and Vanguard engaged with 1301 firms. See Azar et al. (2021) for more details on the engagement data.

[32] Consistent with this interpretation, in a recent survey by Krueger et al. (2020) institutional investors responded that they select firms for engagements on climate related issues by analyzing their portfolio firms' carbon footprint.

Exhibit 53 to Decl. of Lyon

1360

**SER 1152**

S. Cohen, I. Kadach and G. Ormazabal                                                                Journal of Accounting and Economics 76 (2023) 101640

**Table 8**
Engagement.

Panel A. Big Three ownership and disclosure

|  | Dependent Variable: CDP_Disclosure | | | |
|---|---|---|---|---|
|  | (1) | (2) | (3) | (4) |
| Big3_Hldg | 1.03*** | | 0.95*** | |
|  | (7.37) | | (7.03) | |
| I(Big3_Hldg>5%) | | 0.11*** | | 0.03*** |
|  | | (11.42) | | (3.72) |
| Controls | YES | YES | YES | YES |
| Country FE | YES | YES | n.a. | n.a. |
| Industry FE | YES | YES | n.a. | n.a. |
| Year FE | YES | YES | YES | YES |
| Firm FE | NO | NO | YES | YES |
| $R^2$ | 0.33 | 0.33 | 0.65 | 0.65 |
| # Obs. | 76,284 | 76,284 | 75,755 | 75,755 |

Panel B. Disclosure and Big Three engagement

|  | Dependent variable: | | |
|---|---|---|---|
|  | Engagement by Black Rock | Engagement by State Street | Engagement by Vanguard |
|  | (1) | (2) | (3) |
| CDP_Disclosure*Top_Emitter | 0.05*** | 0.04*** | 0.04*** |
|  | (4.88) | (8.52) | (4.28) |
| CDP_Disclosure | 0.04*** | 0.00 | 0.00 |
|  | (5.44) | (0.52) | (0.72) |
| BlackRock_Hldg | 3.68*** | | |
|  | (19.96) | | |
| StateStreet_Hldg | | 4.00*** | |
|  | | (17.62) | |
| Vanguard_Hldg | | | 0.80*** |
|  | | | (5.05) |
| Top_Emitter | −0.03*** | −0.01*** | −0.01 |
|  | (−3.03) | (−3.47) | (−1.02) |
| Size | 0.07*** | 0.03*** | 0.04*** |
|  | (16.71) | (15.46) | (12.23) |
| Log(BM) | −0.02*** | −0.01*** | −0.02*** |
|  | (−7.39) | (−9.30) | (−7.78) |
| ROA | −0.05 | 0.01 | −0.02 |
|  | (−1.37) | (0.41) | (−0.70) |
| Leverage | −0.08*** | −0.04*** | −0.06*** |
|  | (−5.08) | (−6.31) | (−4.37) |
| Tangibility | −0.02 | 0.00 | 0.00 |
|  | (−1.17) | (0.46) | (0.19) |
| Dividends | −0.00 | 0.00 | 0.01* |
|  | (−0.38) | (0.83) | (1.76) |
| Return | −0.00 | 0.001* | −0.01 |
|  | (−0.74) | (1.71) | (−0.95) |
| Log(Sales) | 0.01 | 0.00 | 0.00 |
|  | (1.44) | (0.91) | (0.52) |
| Country FE | YES | YES | YES |
| Industry FE | YES | YES | YES |
| Year FE | YES | YES | YES |
| $R^2$ | 0.26 | 0.14 | 0.22 |
| # Obs. | 17,114 | 36,468 | 11,125 |

This table presents an analysis of the association between CDP disclosures and engagements by the Big Three with portfolio companies. Panel A presents an analysis of the association between Big Three ownership and firms' disclosure to the CDP. The dependent variable *CDP_Disclosure* is an indicator variable that equals one if a company submits the CDP questionnaire in year *t*, and zero otherwise. *Big3_Hldg* is the fraction of the firm's equity owned by BlackRock, Vanguard, and State Street in year *t*; *I(Big3_Hldg>5%)* is an indicator variable that equals one if BlackRock, Vanguard, and State Street own more than 5% of the firm's equity in year *t*. In Panel A all independent variables are measured in year *t*-1. Panel B presents an analysis of the association between the probability of engagement by the Big Three and CDP disclosure. *Engagement by X* equals one if X engages with the firm in that year, and zero otherwise (X being one of the Big Three). *Top_Emitter* is an indicator variable that equals one if the company is in the top industry quartile based on the amount of $CO_2$ emissions in that year, and zero otherwise. *Top_Emitter* and *CDP_Disclosure* are measured in year *t*. *Controls* includes the same control variables as in Table 2, also measured in year *t*-1. See Appendix A for variable definitions. Standard errors are clustered at the firm level. *t*-statistics are in parentheses. \*, \*\*, and \*\*\* denote significance at the 10%, 5%, and 1% levels (two-tail) respectively. Intercepts are omitted.

18

Exhibit 53 to Decl. of Lyon
1361
**SER 1153**

S. Cohen, I. Kadach and G. Ormazabal  Journal of Accounting and Economics 76 (2023) 101640

as the dependent variable: *Active_Signatories_Hldg* is the fraction of shares owned by signatories that are active funds and *Index_Signatories_Hldg* is the fraction of shares owned by signatories that are index funds. We regress each of the dependent variables on the interaction of *Top_Emitter* with *CDP_Disclosure* (defined as in Table 8, Panel B). That is, we test whether firms with the highest levels of emissions, and that disclose to the CDP, exhibit relatively lower ownership by CDP signatories representing active and passive funds.

We conduct the analysis measuring holdings in $t$ and $t+1$ to allow for the possibility that funds incorporate in $t+1$ information disclosed at the end of $t$. The specification also includes the vector of controls for firm characteristics used in prior tests, including *Size, Log(BM), ROA, Leverage, Tangibility, Dividends*, and *Return* (see Appendix A for variable definitions). We also include firm (and year) fixed effects to control for potentially confounding variation. In parallel to previous tests, we apply the sequential refinement process described in section 5.3 (see also Table 7). That is, in addition to focusing exclusively on disclosures marked as "Private" and restricted to CDP signatories, we impose that CDP signatories hold a substantial stake in the firm and that these investors also be publicly committed to sustainability (PRI) principles (as in Table 7, we apply these restrictions sequentially and cumulatively).

**Table 9**
Institutional holdings: Firm-level analysis.

Panel A. Active funds

| | Dependent variable: *Active_Signatories_Hldg* ($t + s$) | | | | | |
|---|---|---|---|---|---|---|
| | Only Signatories have access | | Only Signatories have access Signatories own >5% | | Only Signatories have access Signatories of both CDP and PRI own >5% | |
| | $s = 0$ | $s = 1$ | $s = 0$ | $s = 1$ | $s = 0$ | $s = 1$ |
| | (1) | (2) | (3) | (4) | (5) | (6) |
| CDP_Disclosure* Top_Emitter | −0.005** | −0.005** | −0.008*** | −0.009*** | −0.010*** | −0.012*** |
| | (−2.00) | (−2.19) | (−2.77) | (−2.81) | (−3.17) | (−3.30) |
| CDP_Disclosure | 0.006*** | 0.004** | 0.013*** | 0.009*** | 0.017*** | 0.012*** |
| | (4.23) | (2.85) | (6.87) | (4.60) | (7.88) | (5.31) |
| Top_Emitter | 0.002 | 0.003 | 0.003 | 0.003 | 0.003 | 0.003 |
| | (1.35) | (1.42) | (1.44) | (1.52) | (1.49) | (1.60) |
| Controls | YES | YES | YES | YES | YES | YES |
| Year FE | YES | YES | YES | YES | YES | YES |
| Firm FE | YES | YES | YES | YES | YES | YES |
| $R^2$ | 0.759 | 0.758 | 0.760 | 0.759 | 0.761 | 0.760 |
| # Obs. | 47,243 | 42,532 | 44,947 | 40,323 | 43,575 | 38,965 |

Panel B. Index funds

| | Dependent variable: *Index_Signatories_Hldg* ($t + s$) | | | | | |
|---|---|---|---|---|---|---|
| | Only Signatories have access | | Only Signatories have access Signatories own >5% | | Only Signatories have access Signatories of both CDP and PRI own >5% | |
| | $s = 0$ | $s = 1$ | $s = 0$ | $s = 1$ | $s = 0$ | $s = 1$ |
| | (1) | (2) | (3) | (4) | (5) | (6) |
| CDP_Disclosure* Top_Emitter | −0.001 | 0.000 | 0.000 | 0.002 | 0.001 | 0.003 |
| | (−0.59) | (0.16) | (0.25) | (1.19) | (0.40) | (1.37) |
| CDP_Disclosure | 0.003*** | 0.003*** | 0.005*** | 0.005*** | 0.006*** | 0.006*** |
| | (4.57) | (4.30) | (5.18) | (4.89) | (5.86) | (5.62) |
| Top_Emitter | 0.002* | 0.003** | 0.002* | 0.003* | 0.002* | 0.003** |
| | (2.00) | (2.15) | (1.88) | (2.04) | (1.84) | (2.00) |
| Controls | YES | YES | YES | YES | YES | YES |
| Year FE | YES | YES | YES | YES | YES | YES |
| Firm FE | YES | YES | YES | YES | YES | YES |
| $R^2$ | 0.763 | 0.774 | 0.764 | 0.776 | 0.766 | 0.777 |
| # Obs. | 47,243 | 42,532 | 44,947 | 40,323 | 43,575 | 38,965 |

This table presents a firm-level analysis of the association between CDP disclosures and institutional holdings. The unit of observation is firm-year. In Panel A, *Active_Signatories_Hldg* is the fraction of shares owned by signatories that are active funds in year $t$. In Panel B, *Index_Signatories_Hldg* is the fraction of shares owned by signatories that are index funds in year $t$. *CDP_Disclosure* is an indicator variable that equals one if a company submits the CDP questionnaire in year $t$, and zero otherwise. *Top_Emitter* is an indicator variable that equals one if the company is in the top industry quartile based on the amount of $CO_2$ emissions in in year $t$, and zero otherwise. Columns (1)–(2) report results restricting the analysis to cases in which only CDP signatories have access to the CDP data (i.e., we exclude firms whose CDP questionnaire can be accessed by the general public). Columns (3)–(4) introduces the additional restriction that CDP signatories own more than 5% of shares in the firm. Columns (5)–(6) introduces the additional restriction that the CDP signatories are also PRI signatories. *Controls* includes the same control variables as in Table 2, also measured in year $t$-1. See Appendix A for other variable definitions. Standard errors are clustered at the firm level. $t$-statistics are in parentheses. *, **, and *** denote significance at the 10%, 5%, and 1% levels (two-tail) respectively. Intercepts are omitted.

19

Exhibit 53 to Decl. of Lyon
1362
**SER 1154**

*S. Cohen, I. Kadach and G. Ormazabal*    *Journal of Accounting and Economics 76 (2023) 101640*

Table 9 presents the results. To the extent that index investors are less likely to adjust their portfolios based on specific information releases (such as climate-related disclosures), we expect the results to be stronger among active funds. Consistent with this idea, Panels A and B of Table 9 show that the negative coefficient on the interaction *CDP_Disclosure*Top_Emitter* is significant for active fund ownership, but not for index fund ownership. We obtain the same inferences when we repeat the analysis using total signatory holdings as an alternative dependent variable (see Table OD.15).

Table OD.16 repeats the analysis at the fund level. The dependent variable is the annual change in the holdings of the fund at a firm in a given year (the unit of observation is fund-firm-year). The specification includes fund-year fixed effects (in addition to firm fixed effects). Focusing on the variation within the portfolio of a given fund in a given year allows us to control for the determinants of the funds' investment decisions at the portfolio level. As shown in Table OD.16, we find that CDP signatories are more likely to adjust their portfolios by decreasing their position in firms that disclose to the CDP with the highest levels of emissions within their industries (see column 1). In contrast, we do not find such a pattern for other funds (see column 2 of Table OD.16). The results in Table OD.16 confirm our interpretation of Table 9: signatory investors use the CDP information to divest from firms with higher emissions.

## 7. Conclusion

We examine whether institutional investors who sign up to the CDP influence firms' disclosure of climate risk information, and whether such disclosure predicts lower levels of carbon emissions. We find that firms with a higher ownership stake of CDP signatories are more likely to disclose their climate risk information to the CDP. This result is robust to the use of demanding fixed effect structures as well as tests exploiting plausible exogenous variation in institutional ownership.

In addition, we find evidence that firm disclosure to the CDP is accompanied by lower carbon emissions. This result continues to hold when we restrict the sample to observations in which CDP signatories are privy to firm-specific climate disclosures not accessible to the public; observations in which CDP signatories hold a substantial stake in the firm; and observations in which CDP signatories also publicly commit themselves to sustainability (PRI) principles.

We also explore the mechanisms potentially explaining the association between CDP disclosure and carbon emissions. We document that investors are more likely to engage with top emitting firms after they disclose to the CDP. We also find lower investor holdings among top emitters after these firms disclose to the CDP. Taken together, the results suggest that investor demand for climate-related information is associated with greater corporate climate disclosure and lower carbon emissions.

## Acknowledgements

An earlier version of this paper has been circulated under the title "Why do Institutional Investors Request Climate Related Disclosures?" We thank Ed de Haan (the editor), an anonymous referee, Jeffrey Hales (the discussant), and conference participants at the 2022 annual conference of the Journal of Accounting and Economics. We also thank Amir Amel-Zadeh (discussant), Pascual Berrone, Brian Davidson, Fabrizio Ferraro, Tim Haight (discussant), Jukka Kettunen (discussant), Heedong Kim (discussant), Peter Pope, Robert Raney, and seminar participants at the Active Management Research Alliance (AMRA), the Alliance for Research on Corporate Sustainability (ARCS) Annual Conference, the American Accounting Association (AAA) Annual Meeting, the AAA Western Region Meeting, the Canadian Academic Accounting Association (CAAA) Annual Conference, the Eighth International Symposium on Environment and Energy Finance, the European Accounting Association (EAA) Annual Congress, the AAA Financial Accounting and Reporting Section (FARS), Florida Atlantic University, Free University of Bozen-Bolzano, Inquire UK (Institute for Quantitative Investment Research), London School of Economics, University of Cyprus, NEOMA Sustainable Finance Conference, OCC Symposium on Climate Risk in Banking & Finance, San Diego State University Corporate Governance Institute, Swiss Winter Accounting Conference, and the University of California San Diego for helpful comments and suggestions. We also thank Rubén López, Dimitroula Tserkezi, and Carles Vila for their excellent research assistance. This paper is the recipient of the Outstanding Paper Award at the 2022 ARCS Annual Conference. Shira Cohen gratefully acknowledges financial support from the San Diego State University Seed Grant Program. Igor Kadach gratefully acknowledges the financial support of the State Research Agency (AEI) of the Spanish Ministry of Science, Innovation and Universities - PID2020-115069 GB-I00/AEI/10.13039/501100011033. Gaizka Ormazabal thanks the "Cátedra de Dirección de Instituciones Financieras y Gobierno Corporativo del Grupo Santander", the BBVA Foundation (grant "Ayudas a Investigadores, Innovadores, y Creadores Culturales"), the Marie Curie Fellowship and the Spanish Ministry of Science and Innovation, grant ECO2018- 97335-P.

Exhibit 53 to Decl. of Lyon

1363

**SER 1155**

S. Cohen, I. Kadach and G. Ormazabal   *Journal of Accounting and Economics 76 (2023) 101640*

## Appendix A. Variable definitions

| | |
|---|---|
| CDP_Disclosure | Indicator variable that equals one if a company submits the CDP questionnaire in that year, and zero otherwise. |
| CDP Respondent | Indicator variable that equals one if a firm starts disclosing to the CDP for the first time during the sample period, and zero otherwise. |
| Signatories_Hldg | Fraction of the firm's equity owned by mutual funds that are currently CDP signatories. |
| I(Signatories_Hldg>5%) | Indicator variable that equals one if CDP signatories own more than 5% of the firm's equity. |
| OtherInst_Hldg | Fraction of the firms' equity owned by funds managed by institutions that are not CDP signatories. |
| Size | Logarithm of the firm's total assets. |
| Log(BM) | Logarithm of the book value of common equity scaled by the market value of equity. |
| ROA | Net income scaled by total assets. |
| Leverage | Total debt scaled by total assets. Total debt is the sum of long-term debt and the debt in current liabilities. |
| Tangibility | Property, Plant and Equipment (PPE) scaled by total assets. |
| Dividends | Total amount of dividends scaled by net income. |
| Return | Firm's buy and hold return over the year. |
| Log(Sales) | Logarithm of the book value of sales. |
| MSCI | The instrumental variable, indicator variable that equals one if stock i is a member of the MSCI ACWI in year t, and zero otherwise. |
| Rank | The position of the company in the ranking of sample firms based on market capitalization relative to the MSCI ACWI addition threshold. |
| Log(CO$_2$) | Logarithm of the firm's direct GHG emissions (scope 1) measured in equivalents of metric tons of CO$_2$. |
| Inst_Hldg | Fraction of the firm's equity owned by institutional investors. |
| Engagement by BlackRock | Indicator variable that equals one if BlackRock engages with the firm from July 1, 2017 until June 30, 2020, and zero otherwise. The data includes all engagements. |
| Engagement by State Street | Indicator variable that equals one if State Street Global Advisors engages with the firm from January 1, 2014 until December 31, 2020, and zero otherwise. The data includes engagements about Environmental/Social issues. |
| Engagement by Vanguard | Indicator variable that equals one if Vanguard engages with the firm from July 1, 2018 until June 30, 2020, and zero otherwise. The data includes engagements about "Oversight of strategy and risk" (which include environmental issues). |
| Big3_Hldg | Big Three's holding in the firm, namely, the fraction of the firms' equity owned by mutual funds managed by BlackRock, Vanguard, or State Street Global Advisors. |
| I(Big3_Hldg>5%) | Indicator variable that equals one if the fraction of the firm's equity owned by mutual funds managed by BlackRock, Vanguard, or State Street Global Advisors is more than 5%. |
| BlackRock_Hldg | BlackRock's holdings in the firm, namely, the fraction of the firms' equity owned by BlackRock's mutual funds. |
| StateStreet_Hldg | State Street's holdings in the firm, namely, the fraction of the firms' equity owned by State Street Global Advisors's mutual funds. |
| Vanguard_Hldg | Vanguard's holdings in the firm, namely, the fraction of the firms' equity owned by State Vanguard's mutual funds. |
| NonBig3_Hldg | Non-Big Three's holdings in the firm, namely, the fraction of the firms' equity owned by funds managed by institutions other than BlackRock, Vanguard, and State Street Global Advisors. |
| Top_Emitter | Indicator variable that equals one if a company is in top quartile by the amount of CO$_2$ emissions in its industry. |

## Online Appendix

### OA. CDP disclosures and Reg FD

In this appendix we analyze the possibility that "private" CDP disclosures (i.e., disclosures with exclusive access to CDP signatories) are a violation of the SEC's Regulation Fair Disclosure (Reg FD) issued in 2000. Reg FD requires that, if companies disclose material information privately, they must also make this information publicly available.[33] The concern is that making CDP disclosures available only for a subset of investors (i.e., signatories) may not be compliant with Reg FD.

We note that at the time of the writing of this paper, there is still no regulation requiring companies to disclose material information related to climate risk. As such, companies may not necessarily deem their climate risk information to be material. Hence, marking the information as "private" on the CDP platform may not necessarily be in violation of Reg FD.

We add several additional considerations to illustrate this point:

It is well-known that the vast majority of companies do not report climate related information in public filings. And if they do, the disclosure is often considered "boilerplate".

The SEC has recently issued a regulatory proposal to require companies to disclose climate information, but the proposal is still open for comments. Until there is formal regulation the fine line between material and non-material information persists.

Furthermore, if truthful financial reporting is difficult to enforce, it is not a stretch that managers may skirt the ambiguity of materiality. Perhaps this is the reason why the SEC is no longer relying on the 2010 Disclosure Guidance and instead proposing disclosure regulation.

The following quote from Reg FD can be useful to further illustrate the above reasoning:

---

[33] Similar regulations exist around the world. For example, the Market Abuse Directive (MAD) in the European Union.

Exhibit 53 to Decl. of Lyon
1364
**SER 1156**

S. Cohen, I. Kadach and G. Ormazabal                                                    Journal of Accounting and Economics 76 (2023) 101640

> *"The regulation does not require use of a particular method, or establish a "one size fits all" standard for disclosure; rather, it leaves the decision to the issuer to choose methods that are reasonably calculated to make effective, broad, and non-exclusionary public disclosure, given the particular circumstances of that issuer. Indeed, we have modified the language of the regulation to note that the issuer may use a method "or combination of methods" of disclosure, in recognition of the fact that it may not always be possible or desirable for an issuer to rely on a single method of disclosure as reasonably designed to effect broad public disclosure."* https://www.sec.gov/rules/final/33-7881.htm

As a further illustration, please see footnote 16 in the following document:
https://www.ici.org/system/files/2022-06/22-ici-cl-sec-climate-proposal.pdf

> *"Disclosure that is furnished, but not filed in Form 10-K is not subject to strict liability under Section 18 of the Exchange Act, disclosure controls or procedures, or certifications. The Commission previously has permitted companies to furnish rather than file certain information. See, e.g., Regulation Fair Disclosure, Release No. 34- 43154 (August 15, 2000), available at* https://www.sec.gov/rules/final/33-7881.htm *(where the Commission noted that while Regulation FD requires a company that discloses material non-public information to make that material information broadly available, it recognizes that companies may not always know if the information is material and providing a means to make it available will help to minimize liability concerns)."*

We conclude that, in the current regulatory framework, it is not easy to make a court case that "private" disclosure to the CDP violates Reg FD. Consistent with this is the fact is that thousands of firms around the world are providing "private" information to the CDP and are not facing legal complications for doing so (we are not aware of any legal action against firms and/or the CDP based on such claim). This suggests that this type of disclosure must not be a blatant violation of Reg FD in the US or similar rules around the world.

*OB. Potential biases in Trucost data*

In this section of the appendix we analyze the possibility that our inferences are affected by biases in Trucost data. In fact, prior work documents differences between vendor-estimated and firm disclosed emissions figures that are correlated with firm fundamentals (Aswani et al., 2022). In the context of our study, the concern is that, if Trucost uses CDP disclosures, the results in Table 5 could reflect that Trucost systematically over-estimates carbon emissions before the firm starts disclosing to the CDP.

To address this concern, we proceed in several steps.

  i) We analyze whether this alternative explanation is consistent with all our results.
 ii) We explore the validity of our explanation that Trucost does not have access to CDP data for firms that choose to make their CDP disclosures "private". This means that, for these observations, Trucost estimates emissions both before and after the firm starts disclosing to the CDP.
iii) We offer additional considerations.
  i) Consistency of this alternative explanation with our results:

Some of the documented empirical patterns are hard to reconcile with the notion that the patterns in Table 5 are explained by Trucost's potential overestimation of carbon emissions. The bias correction would occur only in the first year of disclosure. However, we find a subsequent decrease in emissions in year t+1 and t+2, namely a decrease in emissions conditional on the firm disclosing to the CDP.

Moreover, it is unclear why Trucost estimation bias should vary pre/post disclosure specifically in cases where only signatories have access to the CDP data, and in cases where CDP signatories own a substantial stake in the firm and are also PRI signatories (see Table 7). To the extent that the subsample in Table 7 excludes firm-year observations with "public" disclosures to the CDP, the information environment that Trucost faces in this subsample is the same before and after the firm starts disclosing to the CDP. In other words, the patterns in Table 7 are difficult to explain by a potential estimation bias in Trucost estimations for observations corresponding to firms that do not disclose to the CDP in that year.

ii) Trucost does not have access to CDP data for firms that choose to make their CDP disclosures "private"

Trucost is not a CDP signatory (among other things, because Trucost is not an institutional investor). Consequently, in theory Trucost does not have access to the "private" CDP disclosures. There is the possibility that Trucost obtains these data in other ways, but we do not expect this to happen in a systematic way.

To corroborate this point, we analyze the sources of Trucost emissions data for the last year of our sample (2020) (Trucost includes a data item with this information). We focus on observations corresponding to companies that disclose to CDP "publicly" or "privately".

In cases where the firm chooses to disclose to the CDP "publicly", we observe that Trucost indicates CDP as source of emission data in roughly 70% of the cases. This suggests that in the majority of cases Trucost considers that the emission estimates in the CDP are of reasonable quality (i.e., not too different from what Trucost would estimate on its own).

Exhibit 53 to Decl. of Lyon
1365
**SER 1157**

*S. Cohen, I. Kadach & G. Ormazabal*                                                                                      *Journal of Accounting and Economics 76 (2023) 101640*

In contrast, in cases where the firm chooses to disclose to the CDP "privately", we observe that Trucost indicates CDP as source of emissions data in only 2% of the cases (13 companies). We investigate these cases one by one. We find that most of these cases likely reflect some sort of error. In particular.

(1) In 3 of these cases, the CDP report is submitted "publicly", but the summary Excel spreadsheet provided by CDP erroneously claim the report to be "private".
(2) In other 3 cases, the company reports to CDP "privately", but then posts the pdf of the CDP report on their corporate website.
(3) In 5 cases, Trucost uses data from prior year reports to the CDP that were "public" (in two cases the information for the current year was still not available and perhaps for this reason reports were mistakenly coded as "private", in the other three cases companies decided to switch from "public" reporting to "private" reporting).
(4) For the remaining 2 cases, we could not find any clear explanation of why Trucost uses "private" CDP information.

Removing these observations does not affect our results.

Taken together, this evidence is hard to reconcile with the idea that Trucost has systematic access to CDP disclosures that a company chooses to restrict to CDP signatories ("private" disclosures). As such, there is no reason to expect that, for these observations, Trucost estimates are fundamentally different in the pre- and post-disclosure periods. In other words, this corroborates point "i" above: A potential overestimation of emissions by Trucost in the period before a firm starts disclosing to the CDP cannot explain the results in Table 7.

iii) Other considerations:

As an additional consideration, we note that it is unclear why Trucost would have an incentive to systematically over-estimate emissions. If there is no intentional bias, Trucost's estimation error should be randomly distributed around zero.

Finally, even if our results in Tables 5–7 do not reflect a real decrease in CO2 emissions, but are driven instead by Trucost's overestimation (which we find unplausible for the reasons described above), the documented patterns suggest that CDP disclosures matter. At the very least, they suggest that the platform is instrumental in correcting a systematic overestimation of carbon emissions. This is particularly important considering that, if Trucost (i.e., a specialized company with estimation expertise) unintentionally overestimates emissions, it is likely that other external parties (i.e., market participants, regulators) also make a similar mistake when estimating emissions.

*References*

Aswani, J., Raghunandan, A., Rajgopal, S., 2022. Are carbon emissions associated with stock returns? Working paper.

*OC. Potential biases in CDP disclosures*

In this appendix we analyze the possibility that our inferences are affected by biases in firms' disclosures to the CDP. Considering that misreporting of earnings is well-documented in prior literature, the possibility that firms misreport to the CDP seems realistic.

While we concede that misreporting to the CDP is plausible, we offer several considerations that, taken together, suggest that such misreporting is unlikely to drive our results.

First, the interpretation that our results in Tables 5–7 are driven by firms' underreporting of emissions to the CDP raises the question of why market participants would not see through such misreporting.[34] CDP signatories could detect emissions misreporting by comparing the CDP and Trucost data. The possibility that CDP signatories do not pay attention to firms' CDP disclosures seems particularly remote considering that we document that investors actively engage with firms and make divestment decisions in a way correlated with the information on the platform (see Tables 8, 9). Moreover, it is unlikely that firms under-report when investors are more likely to pay closer attention to the released information (i.e., when monitoring is more intense); note that Table 7 documents that our results are more pronounced in cases where only signatories have access to the CDP data, and in cases where CDP signatories own a substantial stake in the firm and are also PRI signatories. Relatedly, a key benefit of the CDP is that the platform provides standardized information that is easily comparable across portfolio companies. Investors and other users can identify reporting biases by benchmarking the information of a given company with that of its peers, or by checking year-to-year consistency.

Next, even though firms self-report climate risk information to the CDP, the disclosed data is commonly perceived as being of reasonable quality. The CDP encourages firms to verify the data submitted.[35] Moreover, the CDP enhances firms' reporting incentives by publishing an annual list (called the 'A-list') that includes a selected group of firms based on the quality of their disclosures. Firms that make it to the A-list are highlighted on the CDP site. To qualify for entry into the CDP 'A-list' firms must

---

[34] If detected, untruthful reporting to the CDP will likely impose significant costs on firms. For example, users of the CDP information could penalize the reporting firm through disinvestment or by increasing the cost of capital.
[35] A list of verification standards it accepts is available at: https://www.cdp.net/en/guidance/verification.

Exhibit 53 to Decl. of Lyon
1366
**SER 1158**

S. Cohen, I. Kadach and G. Ormazabal                                                Journal of Accounting and Economics 76 (2023) 101640

verify at least 70% of both scope 1 and 2 emissions. Consistent with the perception that the CDP information is reliable, several previous academic studies have used these data (e.g., Matsumura et al., 2014; Bolton and Kacperczyk 2021).

Finally, to explore the validity of our reasoning, we conduct an additional analysis of our data. For tractability purposes, we focus on the last year of our sample period. In year 2020, 2241 companies completed section "C6: Emissions Data" of the CDP Climate Change Questionnaire. Among these disclosers 789 companies provided information about past years emissions (2016−2018) in addition to the requested emissions data for year 2019. Of these, only 37 firms (1.7%) provided the additional information for the purpose of restating previously disclosed emissions numbers. Overall, restatements of CDP emission data are rare, which suggests that, on average, the information is of reasonable quality.

*OD.I. Signatory Holdings and CDP Disclosure:*

*Additional Robustness Tests*

This section of the online appendix includes the following tests:

Table OD.1. Replicating the analysis in Table 2 using alternative fixed effect structures.
Table OD.2. Replicating the analysis in Table 2 using alternative clustering of standard errors.
Table OD.3. Replicating the analysis in Table 2 using alternative econometric model: logistic regression.
Table OD.4. Replicating the analysis in Table 2 using restricted subsample.

**Table OD.1**
Replicating the analysis in Table 2 using alternative fixed effect structures

| | Dependent Variable: CDP_Disclosure | | | | |
|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) |
| Signatories_Hldg | 0.34*** | 0.26*** | 0.26*** | 0.25*** | 0.27*** |
| | (10.22) | (8.10) | (8.19) | (7.69) | (8.23) |
| OtherInst_Hldg | 0.15*** | 0.15*** | 0.14*** | 0.14*** | 0.17*** |
| | (4.51) | (4.38) | (4.29) | (4.20) | (4.93) |
| Size | | 0.05*** | 0.05*** | 0.04*** | 0.05*** |
| | | (6.22) | (6.18) | (3.98) | (6.04) |
| Log(BM) | | −0.01*** | −0.01*** | −0.01*** | −0.01*** |
| | | (−3.29) | (−3.73) | (−3.47) | (−2.77) |
| ROA | | 0.08*** | 0.13*** | 0.11*** | 0.08*** |
| | | (3.37) | (5.43) | (4.71) | (3.04) |
| Leverage | | −0.05** | −0.05* | −0.04* | −0.06** |
| | | (−2.22) | (−1.91) | (−1.89) | (−2.36) |
| Tangibility | | 0.00 | −0.00 | −0.01 | 0.05* |
| | | (0.06) | (−0.14) | (−0.30) | (1.79) |
| Dividends | | −0.00 | −0.00 | −0.00 | 0.00 |
| | | (−0.02) | (−1.08) | (−1.25) | (0.24) |
| Return | | −0.01*** | −0.01*** | −0.01*** | −0.01*** |
| | | (−4.70) | (−4.90) | (−5.03) | (−4.88) |
| Log(Sales) | | 0.02*** | 0.02*** | 0.02*** | 0.02** |
| | | (3.45) | (2.92) | (3.16) | (2.49) |
| Firm FE | YES | YES | YES | YES | YES |
| Year FE | YES | NO | NO | NO | NO |
| Country-Year FE | NO | YES | NO | NO | NO |
| Industry-Year FE | NO | NO | YES | NO | NO |
| Size Decile-Year FE | NO | NO | NO | YES | NO |
| Country-Industry-Year FE | NO | NO | NO | NO | YES |
| $R^2$ | 0.65 | 0.67 | 0.65 | 0.65 | 0.72 |
| # Obs. | 75,755 | 75,715 | 75,746 | 75,753 | 71,737 |

This table assesses the sensitivity of the results in Table 2 (i.e., the association between ownership by CDP signatories and carbon emissions disclosure) to alternative fixed-effect structures. Except for the fixed effects, the rest of the specification is as in Table 2 t-statistics are in parentheses. *, **, and *** denote significance at the 10%, 5%, and 1% levels (two-tail) respectively. Intercepts are omitted.

24

Exhibit 53 to Decl. of Lyon
1367
**SER 1159**

S. Cohen, I. Kadach and G. Ormazabal

Journal of Accounting and Economics 76 (2023) 101640

**Table OD.2**
Replicating the analysis in Table 2 using alternative clustering of standard errors

| Clustering: | Dependent Variable: CDP_Disclosure | | |
|---|---|---|---|
| | Country, industry | Country, industry, year | Firm, year |
| | (1) | (2) | (3) |
| Signatories_Hldg | 0.27*** | 0.27*** | 0.27*** |
| | (4.27) | (4.17) | (6.71) |
| OtherInst_Hldg | 0.13* | 0.13* | 0.13*** |
| | (1.87) | (1.97) | (3.93) |
| Size | 0.04*** | 0.04*** | 0.04*** |
| | (3.95) | (4.08) | (5.82) |
| Log(BM) | −0.01** | −0.01** | −0.01*** |
| | (−2.39) | (−2.28) | (−3.21) |
| ROA | 0.12*** | 0.12*** | 0.12*** |
| | (4.59) | (4.58) | (4.62) |
| Leverage | −0.04 | −0.04 | −0.04 |
| | (−1.13) | (−1.14) | (−1.69) |
| Tangibility | −0.01 | −0.01 | −0.01 |
| | (−0.40) | (−0.40) | (−0.42) |
| Dividends | −0.00 | −0.00 | −0.00 |
| | (−1.11) | (−1.10) | (−1.04) |
| Return | −0.01*** | −0.01* | −0.01** |
| | (−3.61) | (−2.01) | (−2.18) |
| Log(Sales) | 0.02*** | 0.02*** | 0.02*** |
| | (3.25) | (3.72) | (3.46) |
| Firm FE | YES | YES | YES |
| Year FE | YES | YES | YES |
| $R^2$ | 0.65 | 0.65 | 0.65 |
| # Obs. | 75,755 | 75,755 | 75,755 |

This table assesses the sensitivity of the results in Table 2 (i.e., the association between ownership by CDP signatories and carbon emissions disclosure) to alternative clustering options. In column 1 standard errors are double clustered at the country and industry level. In column 2 standard errors are triple clustered at the country, industry and year level. In column 3 standard errors are double clustered at the firm and year level. The empirical specification is as in Table 2 t-statistics are in parentheses. *, **, and *** denote significance at the 10%, 5%, and 1% levels (two-tail) respectively. Intercepts are omitted.

**Table OD.3**
Replicating the analysis in Table 2 using an alternative econometric model: logistic regression

| | Dependent Variable: CDP_Disclosure | |
|---|---|---|
| | (1) | (2) |
| Signatories_Hldg | 3.76*** | 3.70*** |
| | (19.72) | (16.78) |
| OtherInst_Hldg | −0.04 | −0.02 |
| | (−0.42) | (−0.23) |
| Size | 0.14*** | 0.09*** |
| | (6.43) | (3.23) |
| Log(BM) | −0.14*** | −0.12*** |
| | (−6.75) | (−4.94) |
| ROA | 1.08*** | 0.96*** |
| | (5.09) | (3.89) |
| Leverage | −0.40*** | −0.37*** |
| | (−3.51) | (−2.79) |
| Tangibility | 0.22** | 0.56*** |
| | (2.57) | (4.58) |
| Dividends | 0.09*** | 0.10*** |
| | (4.68) | (4.65) |
| Return | 0.00 | 0.01 |
| | (0.06) | (0.38) |
| Log(Sales) | 0.46*** | 0.58*** |
| | (18.27) | (15.01) |

(continued on next page)

25

Exhibit 53 to Decl. of Lyon
1368
**SER 1160**

*S. Cohen, I. Kadach and G. Ormazabal*                                          *Journal of Accounting and Economics 76 (2023) 101640*

**Table OD.3** (*continued*)

|  |  | Dependent Variable: *CDP_Disclosure* |  |
|---|---|---|---|
|  |  | (1) | (2) |
| *Log(CO2)* |  |  | −0.04*** |
|  |  |  | (−2.95) |
| Pseudo R$^2$ |  | 0.18 | 0.16 |
| # Obs. |  | 76,284 | 56,432 |

This table assesses the sensitivity of the results in Table 2 (i.e., the association between ownership by CDP signatories and carbon emissions disclosure) to using a logistic regression (instead of OLS). The variable definitions are as in Table 2. Standard errors are clustered at the firm level. *t*-statistics are in parentheses. *, **, and *** denote significance at the 10%, 5%, and 1% levels (two-tail) respectively. Intercepts are omitted.

**Table OD.4**
Replicating the analysis in Table 2 using restricted subsample

Panel A. Continuous variable

|  |  | Dependent Variable: *CDP_Disclosure* |  |  |  |
|---|---|---|---|---|---|
|  |  | (1) | (2) | (3) | (4) |
| *Signatories_Hldg* | $\beta_1$ | 0.38*** | 0.34*** | 0.34*** | 0.26*** |
|  |  | (11.63) | (10.83) | (10.51) | (6.66) |
| *OtherInst_Hldg* | $\beta_2$ | 0.15*** | 0.11*** | 0.11*** | 0.13*** |
|  |  | (4.49) | (3.52) | (3.24) | (3.10) |
| *Size* |  | 0.05*** | 0.09*** | 0.09*** | 0.05*** |
|  |  | (11.02) | (13.07) | (13.44) | (4.74) |
| *Log(BM)* |  | −0.04*** | −0.03*** | −0.04*** | −0.01*** |
|  |  | (−8.60) | (−7.86) | (−8.68) | (−2.67) |
| *ROA* |  | 0.17*** | 0.12*** | 0.13*** | 0.15*** |
|  |  | (4.68) | (3.32) | (3.50) | (4.48) |
| *Leverage* |  | −0.09*** | −0.11*** | −0.11*** | −0.04 |
|  |  | (−4.17) | (−4.78) | (−4.60) | (−1.27) |
| *Tangibility* |  | 0.07*** | 0.06** | 0.05** | −0.00 |
|  |  | (3.57) | (2.51) | (2.25) | (−0.06) |
| *Dividends* |  | 0.01*** | 0.01*** | 0.01*** | −0.00 |
|  |  | (3.66) | (3.63) | (3.67) | (−0.95) |
| *Return* |  | −0.00 | −0.00 | −0.02*** | −0.01*** |
|  |  | (−0.79) | (−1.10) | (−5.42) | (−3.90) |
| *Log(Sales)* |  | 0.08*** | 0.08*** | 0.08*** | 0.03*** |
|  |  | (13.25) | (9.97) | (9.71) | (3.12) |
| *Log(CO2)* |  | 0.01** | −0.01*** | −0.01*** | −0.01 |
|  |  | (2.23) | (−4.71) | (−4.90) | (−1.29) |
| Country FE |  | YES | YES | YES | n.a. |
| Industry FE |  | NO | YES | YES | n.a. |
| Year FE |  | NO | NO | YES | YES |
| Firm FE |  | NO | NO | NO | YES |
| R$^2$ |  | 0.30 | 0.33 | 0.34 | 0.67 |
| # Obs. |  | 56,431 | 56,431 | 56,431 | 55,979 |
| H0: $\beta_1 = \beta_2$ (p-value) |  | <0.001 | <0.001 | <0.001 | 0.002 |

Panel B. Indicator for significant holdings

|  | Dependent Variable: *CDP_Disclosure* |  |  |  |
|---|---|---|---|---|
|  | (1) | (2) | (3) | (4) |
| *I(Signatories_Hldg>5%)* | 0.11*** | 0.10*** | 0.10*** | 0.03*** |
|  | (13.27) | (11.94) | (11.67) | (3.61) |
| *OtherInst_Hldg* | 0.09*** | 0.06** | 0.06* | 0.03 |
|  | (2.92) | (2.06) | (1.80) | (0.90) |
| *Size* | 0.05*** | 0.09*** | 0.09*** | 0.05*** |
|  | (11.06) | (13.02) | (13.39) | (5.19) |
| *Log(BM)* | −0.03*** | −0.03*** | −0.04*** | −0.01*** |
|  | (−8.40) | (−7.76) | (−8.57) | (−3.22) |
| *ROA* | 0.15*** | 0.11*** | 0.12*** | 0.15*** |

26

Exhibit 53 to Decl. of Lyon
1369
**SER 1161**

S. Cohen, I. Kadach and G. Ormazabal   Journal of Accounting and Economics 76 (2023) 101640

**Table OD.4** (continued )

Panel B. Indicator for significant holdings

| | Dependent Variable: *CDP_Disclosure* | | | |
|---|---|---|---|---|
| | (1) | (2) | (3) | (4) |
| | (4.18) | (2.98) | (3.15) | (4.70) |
| *Leverage* | −0.08*** | −0.09*** | −0.09*** | −0.05 |
| | (−3.56) | (−4.09) | (−3.92) | (−1.57) |
| *Tangibility* | 0.07*** | 0.06** | 0.05** | 0.01 |
| | (3.32) | (2.45) | (2.18) | (0.16) |
| *Dividends* | 0.01*** | 0.01*** | 0.01*** | −0.00 |
| | (3.13) | (3.22) | (3.27) | (−0.98) |
| *Return* | −0.00 | −0.00 | −0.02*** | −0.01*** |
| | (−0.57) | (−0.95) | (−5.21) | (−3.92) |
| *Log(Sales)* | 0.08*** | 0.08*** | 0.08*** | 0.03*** |
| | (13.15) | (10.07) | (9.81) | (3.12) |
| *Log(CO2)* | 0.01** | −0.01*** | −0.01*** | −0.01 |
| | (2.46) | (−4.63) | (−4.84) | (−1.35) |
| Country FE | YES | YES | YES | n.a. |
| Industry FE | NO | YES | YES | n.a. |
| Year FE | NO | NO | YES | YES |
| Firm FE | NO | NO | NO | YES |
| $R^2$ | 0.30 | 0.33 | 0.34 | 0.67 |
| # Obs. | 56,431 | 56,431 | 56,431 | 55,979 |

This table presents an analysis of the association between CDP disclosure and ownership by CDP signatories. The dependent variable, *CDP_Disclosure*, is an indicator variable that equals one if a company submits the CDP questionnaire in that year, and zero otherwise. In Panel A, the experimental variable, *Signatories_Hldg*, is the fraction of the firm's equity owned by mutual funds that are CDP signatories in that year. *OtherInst_Hldg* is the fraction of the firms' equity owned by funds managed by institutions that are not CDP signatories. In Panel B, the experimental variable, *I(Signatories_Hldg>5%)*, is an indicator variable that equals one if CDP signatories own more than 5% of the firm's equity. The control variables are defined in Appendix A. The results correspond to the subsample of 56,431 firm-years from 2006 to 2020 with non-missing carbon emissions data from Trucost. Independent variables are measured at the end of the prior year. See Appendix A for variable definitions. Standard errors are clustered at the firm level. *t*-statistics are in parentheses. *, **, and *** denote significance at the 10%, 5%, and 1% levels (two-tail) respectively. Intercepts are omitted.

*OD.II. Signatory holdings and CDP disclosure:*

*Additional tests based on the MSCI Index*

   To further sharpen identification, we conduct an instrumental variables (IV) analysis using the firm's membership in the MSCI All Country World Index (MSCI ACWI) as an instrument for the ownership of CDP signatories (i.e., *Signatories_Hldg*) regressions. To the extent that a large percentage of the investments of CDP signatories are based on this index, the inclusion (exclusion) of a firm in the MSCI ACWI is likely to increase (decrease) the position of these investors in the company (i.e., the relevance assumption of the IV analysis is likely to hold). The resulting variation in *Signatories_Hldg* is plausibly exogenous because the inclusion of a firm in the index is determined by a mechanical rule based on market capitalization. That is, MSCI ACWI membership status is likely to satisfy the exclusion restriction of the IV analysis.

   We estimate a two-stage least squares (2SLS) model. In the first stage we instrument ownership of CDP signatories using the following specification:

$$Signatories\_Hldg_{it-1} = \alpha + \beta*MSCI_{it-1} + \gamma*Controls_{it-1} + \tau_t + \delta_s + \mu_k + \varepsilon_{it} \qquad (OD.1)$$

   where $MSCI_{it}$, the instrumental variable, defined as an indicator equal to one if stock $i$ is assigned to the MSCI ACWI Index in year $t$, and zero otherwise. In the second stage, we estimate the following model:

$$CDP\_Disclosure_{it} = \alpha + \beta*\widehat{Signatories\_Hldg}_{it-1} + \gamma*Controls_{it-1} + \tau_t + \delta_s + \mu_k + \varepsilon_{it} \qquad (OD.2)$$

   $\widehat{Signatories\_Hldg}_{it-1}$ is the fitted value from the first stage (i.e., equation (OD.1)). In both models (i.e., equations (OD.1) and (OD.2)), the vector of control variables, *Controls* is defined as in equation (1) in the paper.

   We first estimate the 2SLS model in the vicinity around the bottom of the MSCI index, as in section 4.2 in the paper (i.e., the regression discontinuity design). The results are presented in Table OD.5. To further check the robustness of our inferences, we re-estimate specifications from columns (3) and (4) of Table 2 using all sample observations (i.e., we do not restrict the analysis to the vicinity around the bottom of the MSCI index) and using MSCI to instrument *Signatories_Hldg*. The results are presented in Table OD.6.

Exhibit 53 to Decl. of Lyon
1370
**SER 1162**

S. Cohen, I. Kadach and G. Ormazabal    Journal of Accounting and Economics 76 (2023) 101640

As shown in Tables OD.5 and OD.6, the coefficient on $Signatories\_Hldg_{it-1}$ is positive and statistically significant, suggesting that the increase in signatory holdings induced by the inclusion in the MSCI index (i.e., the plausibly exogenous variation in $Signatories\_Hldg$) is associated with an increase in firms' CDP disclosure.

**Table OD.5**
Analysis around the Lower Threshold of the MSCI ACWI: Using the inclusion in the index as an IV

| | First Stage | | | Second Stage | | |
|---|---|---|---|---|---|---|
| | Dep. var.: Signatories_Hldg | | | Dep. var.: CDP_Disclosure | | |
| | Bandwidth [-100; +100] (1) | Bandwidth [-200; +200] (2) | Bandwidth [-300; +300] (3) | Bandwidth [-100; +100] (4) | Bandwidth [-200; +200] (5) | Bandwidth [-300; +300] (6) |
| MSCI | 0.02*** (7.90) | 0.03*** (8.75) | 0.02*** (8.15) | | | |
| $\widehat{Signatories\_Hldg}$ | | | | 1.42** (2.46) | 1.75*** (3.36) | 1.74*** (3.27) |
| Rank | −0.00 (−0.88) | −0.00 (−0.32) | −0.00* (−1.70) | 0.00 (0.31) | −0.00 (−0.22) | −0.00 (−0.94) |
| Rank*MSCI | 0.00 (0.36) | 0.00 (0.24) | 0.00 (0.86) | 0.00 (1.49) | 0.00 (0.43) | −0.00 (−0.26) |
| Controls | YES | YES | YES | YES | YES | YES |
| Country FE | YES | YES | YES | YES | YES | YES |
| Industry FE | YES | YES | YES | YES | YES | YES |
| Year FE | YES | YES | YES | YES | YES | YES |
| $R^2$ | 0.29 | 0.28 | 0.28 | 0.05 | 0.02 | 0.02 |
| # Obs. | 18,962 | 24,239 | 27,285 | 18,962 | 24,239 | 27,285 |

This table presents a variant of the analysis in Table 3 that uses the inclusion in the index as IV (instrumental variable). $Signatories\_Hldg$ is the fraction of the firm's equity owned by institutional investors that are CDP signatories in that year. $CDP\_Disclosure$, is an indicator variable that equals one if the firm submits the CDP questionnaire in that year, and zero otherwise. $MSCI$ equals one if the firm is included in the MSCI ACWI in that year, and zero otherwise. $Rank$ is the position of the company in the ranking of sample firms based on market capitalization. $Controls$ includes the same control variables as in Table 2. $\widehat{Signatories\_Hldg}$ is the fitted value of $Signatories\_Hldg$ from the first stage estimation. "Bandwidth" indicates the number of ranking positions (based on market capitalization) above and below the threshold. See Appendix A for other variable definitions. Independent variables are measured at the end of the prior year. Standard errors are clustered at the firm level. $t$-statistics are in parentheses. *, **, and *** denote significance at the 10%, 5%, and 1% levels (two-tail) respectively. Intercepts are omitted.

**Table OD.6**
Using the inclusion in the MSCI as an IV: Analysis using all sample observations

| | First Stage | | Second Stage | |
|---|---|---|---|---|
| | Dep. var.: Signatories_Hldg | | Dep. var.: CDP_Disclosure | |
| | (1) | (2) | (3) | (4) |
| MSCI | 0.02*** (6.71) | 0.01*** (4.44) | | |
| $\widehat{Signatories\_Hldg}$ | | | 7.91*** (6.45) | 1.86* (1.84) |
| Controls | YES | YES | YES | YES |
| Country FE | YES | n.a. | YES | n.a. |
| Industry FE | YES | n.a. | YES | n.a. |
| Year FE | YES | YES | YES | YES |
| Firm FE | NO | YES | NO | YES |
| Kleibergen-Paap F-stat. | 45.0 | 19.7 | – | – |
| $R^2$ | 0.29 | 0.78 | −2.71 | −0.09 |
| # Obs. | 76,284 | 75,755 | 76,284 | 75,755 |

This table reports estimates from an instrumental variable (IV) 2SLS analysis exploiting the composition of the MSCI ACWI index to instrument ownership by CDP signatories. $MSCI$, the instrument, equals one if stock $i$ is a member of the MSCI ACWI Index in year $t$, and zero otherwise; $\widehat{Signatories\_Hldg}$ is the fitted value of $Signatories\_Hldg$ from the first stage estimation. The experimental variable, $Signatories\_Hldg$, is the fraction of the firm's equity owned by institutional investors that were CDP signatories in year $t$. The dependent variable, $CDP\_Disclosure$, is an indicator variable that equals one if the firm submits CDP questionnaire in year $t$, and zero otherwise. The rest of the variables are defined in Appendix A. Independent variables are measured at the end of the prior year. The sample spans from 2003 to 2020, and includes 76,621 firm-year observations. Standard errors are clustered at the firm level. $t$-statistics are in parentheses. *, **, and *** denote significance at the 10%, 5%, and 1% levels (two-tail) respectively. Intercepts are omitted. Finally, we report $R^2$ for completeness, however it has no statistical meaning in the context of 2SLS/IV.

Exhibit 53 to Decl. of Lyon
1371
**SER 1163**

S. Cohen, I. Kadach and G. Ormazabal    Journal of Accounting and Economics 76 (2023) 101640

**Table OD.7**
Analysis around the Lower Threshold of the MSCI ACWI. Robustness to the degree of polynomial specification

| Dep. Var: CDP_Disclosure | Bandwidth [−100; +100] | | | Bandwidth [−200; +200] | | | Bandwidth [−300; +300] | | |
|---|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| MSCI | 0.04** | 0.03** | 0.03** | 0.04*** | 0.05*** | 0.05*** | 0.04*** | 0.05*** | 0.05*** |
| | (2.46) | (2.41) | (2.40) | (3.36) | (3.57) | (3.53) | (3.40) | (3.70) | (3.70) |
| Rank | 0.00 | −0.00 | −0.00 | −0.00 | 0.00** | 0.00** | −0.00 | 0.00 | 0.00 |
| | (0.20) | (−0.14) | (−0.35) | (−0.34) | (1.97) | (2.30) | (−1.38) | (1.32) | (1.17) |
| Rank*MSCI | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | −0.00 | −0.00 | −0.00 |
| | (1.49) | (1.51) | (1.58) | (0.53) | (0.23) | (0.16) | (−0.23) | (−0.27) | (−0.19) |
| Rank^2 | −0.00 | −0.00 | 0.00 | 0.00 | 0.00 | −0.00* | −0.00 | −0.00 | 0.00 |
| | (−0.67) | (−0.75) | (1.12) | (0.06) | (0.84) | (−1.72) | (−1.30) | (−0.66) | (0.35) |
| Rank^3 | | 0.00 | 0.00 | | −0.00*** | −0.00*** | | −0.00*** | −0.00*** |
| | | (0.46) | (0.73) | | (−3.83) | (−4.32) | | (−3.92) | (−3.77) |
| Rank^4 | | | −0.00 | | | 0.00** | | | −0.00 |
| | | | (−1.49) | | | (2.45) | | | (−0.59) |
| Controls | YES | YES | YES | YES | YES | YES | YES | YES | YES |
| Country FE | YES | YES | YES | YES | YES | YES | YES | YES | YES |
| Industry FE | YES | YES | YES | YES | YES | YES | YES | YES | YES |
| Year FE | YES | YES | YES | YES | YES | YES | YES | YES | YES |
| $R^2$ | 0.35 | 0.35 | 0.35 | 0.34 | 0.34 | 0.34 | 0.34 | 0.34 | 0.34 |
| # Obs. | 18,962 | 18,962 | 18,962 | 24,239 | 24,239 | 24,239 | 27,285 | 27,285 | 27,285 |

This table presents an analysis of variation in CDP disclosure in the vicinity of the lower threshold of the MSCI ACWI. Dependent variable: *CDP_Disclosure* is an indicator variable that equals one if the firm submits the CDP questionnaire in that year, and zero otherwise. *MSCI* equals one if the firm is included in the MSCI ACWI in that year, and zero otherwise. *Rank* is the position of the company in the ranking of sample firms based on market capitalization. *Controls* includes the same control variables as in Table 2. See Appendix A for variable definitions. "Bandwidth" indicates the number of ranking positions (based on market capitalization) above and below the threshold. Independent variables are measured at the end of the prior year. Standard errors are clustered at the firm level. *t*-statistics are in parentheses. *, **, and *** denote significance at the 10%, 5%, and 1% levels (two-tail) respectively. Intercepts are omitted.

**Table OD.8**
Additions to the MSCI index: Descriptive statistics of the matched treatment and control groups

| Variable | Mean values | | Difference | |
|---|---|---|---|---|
| | Treatment | Control | t-stat. | p-value |
| Inst_Hldg | 0.29 | 0.30 | −0.68 | 0.496 |
| Size | 8.66 | 8.79 | −1.47 | 0.141 |
| Log(BM) | −0.91 | −0.99 | 1.38 | 0.169 |
| ROA | 0.06 | 0.06 | −0.50 | 0.615 |
| Leverage | 0.26 | 0.25 | 0.72 | 0.472 |
| Tangibility | 0.29 | 0.28 | 0.63 | 0.531 |
| Dividends | 0.40 | 0.42 | −0.64 | 0.523 |
| Return | 0.36 | 0.30 | 1.86 | 0.062 |
| Log(Sales) | 8.00 | 8.17 | −1.94 | 0.052 |

This table provides descriptive statistics of the covariates for the propensity score matching test in Table 4, Panel B of the paper. The statistics are presented separately for the treatment and control groups obtained from the matching exercise. Variables are defined in Appendix A.

*OD.III. CDP Disclosure and CO2 Emissions: Additional tests*

This section of the online appendix includes the following additional tests:
Table OD.9. CDP Disclosure and CO2 Emissions: Scope 2 and Scope 3.
Table OD.10. CDP Disclosure and CO2 Emissions: Alternative fixed effect structures.
Table OD.11. CDP Disclosure and Subsequent Sales and Total Assets.
Table OD.12. First-Time Disclosure to the CDP: Descriptive statistics of the matched treatment and control groups.
Table OD.13. First-Time Disclosure to the CDP: Coarsened Exact Matching.

Exhibit 53 to Decl. of Lyon
1372
**SER 1164**

S. Cohen, I. Kadach and G. Ormazabal

Journal of Accounting and Economics 76 (2023) 101640

**Table OD.9**
CDP disclosure and CO2 emissions: Scope 2 and Scope 3

| Indep. variables: | Dependent variable: Log [CO2 (t + s)] | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Scope 2 | | | Scope 3 | | |
| | s = 0 | s = 1 | s = 2 | s = 0 | s = 1 | s = 2 |
| | (1) | (2) | (3) | (4) | (5) | (6) |
| CDP_Disclosure | 0.01 | −0.02 | −0.04** | 0.01** | −0.01 | −0.02** |
| | (0.70) | (−1.10) | (−2.44) | (2.10) | (−1.19) | (−2.21) |
| Inst_Hldg | −0.09 | −0.06 | −0.03 | 0.19*** | 0.21*** | 0.19*** |
| | (−1.16) | (−0.74) | (−0.38) | (5.89) | (5.04) | (3.99) |
| Size | 0.28*** | 0.30*** | 0.27*** | 0.25*** | 0.29*** | 0.28*** |
| | (10.72) | (11.48) | (9.74) | (13.88) | (15.35) | (13.49) |
| Log(BM) | −0.03** | −0.05*** | −0.06*** | −0.05*** | −0.07*** | −0.08*** |
| | (−2.55) | (−4.48) | (−4.82) | (−8.22) | (−9.88) | (−9.64) |
| ROA | 0.30*** | 0.45*** | 0.52*** | 0.28*** | 0.38*** | 0.43*** |
| | (3.46) | (4.40) | (5.14) | (5.28) | (5.60) | (5.96) |
| Leverage | −0.13* | −0.14* | −0.10 | −0.15*** | −0.16*** | −0.12*** |
| | (−1.84) | (−1.93) | (−1.30) | (−4.41) | (−3.95) | (−2.59) |
| Tangibility | −0.01 | 0.01 | −0.07 | 0.19*** | 0.24*** | 0.15** |
| | (−0.13) | (0.14) | (−0.65) | (3.14) | (3.48) | (2.23) |
| Dividends | −0.00 | 0.00 | 0.01 | 0.00 | 0.01 | 0.01* |
| | (−0.37) | (0.49) | (1.43) | (0.89) | (1.52) | (1.89) |
| Return | 0.06*** | 0.07*** | 0.06*** | 0.06*** | 0.07*** | 0.06*** |
| | (9.39) | (9.93) | (9.21) | (14.48) | (13.30) | (12.27) |
| Log(Sales) | 0.48*** | 0.27*** | 0.16*** | 0.57*** | 0.33*** | 0.19*** |
| | (16.49) | (9.47) | (5.35) | (25.57) | (16.03) | (8.61) |
| Year FE | YES | YES | YES | YES | YES | YES |
| Firm FE | YES | YES | YES | YES | YES | YES |
| $R^2$ | 0.91 | 0.91 | 0.91 | 0.98 | 0.97 | 0.97 |
| # Obs. | 66,831 | 64,988 | 62,976 | 66,878 | 65,033 | 63,022 |

This table repeats the analysis in Table 5 for firms' indirect $CO_2$ emissions. In columns (1)–(3) the dependent variable is the logarithm of the emissions due to purchased electricity (Scope 2). In columns (4)–(6) the dependent variable is the logarithm of the firm's other supply chain emissions (Scope 3). The rest of the specification is as in Table 5. Standard errors are clustered at the firm level. $t$-statistics are in parentheses. *, **, and *** denote significance at the 10%, 5%, and 1% levels (two-tail) respectively. Intercepts are omitted.

**Table OD.10**
CDP Disclosure and CO2 Emissions: Alternative Fixed Effects Structures

| Indep. variables: | Dependent variable: Log [CO$_2$ (t + s)] | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | s = 0 | s = 1 | s = 2 | s = 0 | s = 1 | s = 2 |
| | (1) | (2) | (3) | (4) | (5) | (6) |
| CDP_Disclosure | −0.06*** | −0.07*** | −0.07*** | −0.06*** | −0.07*** | −0.09*** |
| | (−3.87) | (−4.05) | (−4.66) | (−3.79) | (−4.71) | (−6.01) |
| Inst_Hldg | 0.26*** | 0.27*** | 0.22** | 0.14* | 0.16* | 0.13 |
| | (3.25) | (3.19) | (2.50) | (1.74) | (1.93) | (1.57) |
| Size | 0.22*** | 0.27*** | 0.26*** | 0.24*** | 0.28*** | 0.27*** |
| | (6.81) | (8.61) | (8.37) | (7.15) | (8.88) | (8.62) |
| Log(BM) | −0.01 | −0.04*** | −0.04*** | −0.02** | −0.05*** | −0.05*** |
| | (−1.06) | (−2.74) | (−3.39) | (−2.08) | (−3.59) | (−4.21) |
| ROA | 0.14 | 0.27*** | 0.28*** | 0.21** | 0.33*** | 0.36*** |
| | (1.53) | (2.58) | (2.66) | (2.33) | (3.30) | (3.52) |
| Leverage | −0.03 | −0.04 | −0.06 | −0.01 | −0.02 | −0.06 |
| | (−0.39) | (−0.50) | (−0.86) | (−0.14) | (−0.34) | (−0.74) |
| Tangibility | 0.48*** | 0.47*** | 0.36*** | 0.41*** | 0.39*** | 0.30** |
| | (3.45) | (3.40) | (2.78) | (2.86) | (2.73) | (2.17) |
| Dividends | 0.01 | 0.00 | 0.01 | 0.01* | 0.01 | 0.01* |
| | (1.18) | (0.36) | (1.27) | (1.79) | (1.35) | (1.80) |
| Return | 0.06*** | 0.06*** | 0.06*** | 0.04*** | 0.05*** | 0.05*** |
| | (7.80) | (7.71) | (7.84) | (6.42) | (6.40) | (6.74) |
| Log(Sales) | 0.54*** | 0.30*** | 0.17*** | 0.53*** | 0.31*** | 0.17*** |
| | (14.40) | (9.10) | (5.12) | (14.69) | (9.52) | (5.52) |
| Firm FE | YES | YES | YES | YES | YES | YES |

30

Exhibit 53 to Decl. of Lyon
1373
**SER 1165**

S. Cohen, I. Kadach and G. Ormazabal

Journal of Accounting and Economics 76 (2023) 101640

**Table OD.10** (*continued*)

| Indep. variables: | Dependent variable: Log [$CO_2$ $(t + s)$] | | | | | |
|---|---|---|---|---|---|---|
| | $s = 0$ | $s = 1$ | $s = 2$ | $s = 0$ | $s = 1$ | $s = 2$ |
| | (1) | (2) | (3) | (4) | (5) | (6) |
| *Country-Year FE* | YES | YES | YES | NO | NO | NO |
| *Industry-Year FE* | NO | NO | NO | YES | YES | YES |
| $R^2$ | 0.95 | 0.95 | 0.95 | 0.95 | 0.95 | 0.95 |
| # Obs. | 66,804 | 64,963 | 62,950 | 66,812 | 64,973 | 62,960 |

This table assesses the sensitivity of the results in Table 5 (i.e., the association between CDP disclosure and subsequent carbon emissions) to alternative fixed-effect structures. Except for the fixed effects, the rest of the specification is as in Table 5 t-statistics are in parentheses. *, **, and *** denote significance at the 10%, 5%, and 1% levels (two-tail) respectively. Intercepts are omitted.

**Table OD.11**
CDP Disclosure and Subsequent Sales and Total Assets

| | Log [*Sales* $(t + s)$] | | Log [*Assets* $(t + s)$] | |
|---|---|---|---|---|
| | $s = 1$ | $s = 2$ | $s = 1$ | $s = 2$ |
| | (1) | (2) | (3) | (4) |
| *CDP_Disclosure* | 0.02*** | 0.02*** | 0.02*** | 0.01** |
| | (3.61) | (2.86) | (3.66) | (2.13) |
| *Inst_Hldg* | 0.26*** | 0.24*** | 0.21*** | 0.20*** |
| | (5.56) | (4.46) | (6.12) | (4.93) |
| *Size* | 0.30*** | 0.29*** | 0.61*** | 0.44*** |
| | (15.05) | (13.03) | (37.53) | (25.69) |
| *Log(BM)* | −0.05*** | −0.06*** | −0.05*** | −0.07*** |
| | (−6.06) | (−6.84) | (−9.36) | (−9.56) |
| *ROA* | 0.39*** | 0.37*** | 0.48*** | 0.57*** |
| | (6.87) | (5.29) | (11.24) | (11.39) |
| *Leverage* | −0.11*** | −0.14*** | −0.23*** | −0.28*** |
| | (−2.66) | (−2.98) | (−6.53) | (−6.27) |
| *Tangibility* | 0.22*** | 0.21*** | 0.12*** | 0.12** |
| | (4.38) | (3.75) | (2.94) | (2.43) |
| *Dividends* | 0.01** | 0.01 | 0.01*** | 0.01** |
| | (2.47) | (1.61) | (4.15) | (2.44) |
| *Return* | 0.07*** | 0.07*** | 0.05*** | 0.05*** |
| | (14.58) | (12.27) | (13.48) | (13.37) |
| *Log(Sales)* | 0.34*** | 0.17*** | 0.05*** | 0.05*** |
| | (15.17) | (6.64) | (3.65) | (3.30) |
| *Year FE* | YES | YES | YES | YES |
| *Firm FE* | YES | YES | YES | YES |
| $R^2$ | 0.97 | 0.97 | 0.98 | 0.98 |
| # Obs. | 66,177 | 58,580 | 66,284 | 58,685 |

This table presents an analysis of the association between CDP disclosure and subsequent sales and total assets. Log[*Sales* $(t + s)$] is the logarithm of the firm's sales measured in $t + s$ where $t$ is the year of the CDP disclosure and $s = 1, 2$ in columns (1) and (2), respectively. Log[*Assets* $(t + s)$] is the logarithm of the total assets measured in $t + s$ where $t$ is the year of the CDP disclosure and $s = 1, 2$ in columns (3) and (4), respectively. *CDP_Disclosure*, is an indicator variable that equals one if the company submits the CDP questionnaire in that year, and zero otherwise. See Appendix A for other variable definitions. The analysis includes firm-year observations from 2003 to 2019. Independent variables are measured at the end of the prior year. Standard errors are clustered at the firm level. *t*-statistics are in parentheses. *, **, and *** denote significance at the 10%, 5%, and 1% levels (two-tail) respectively. Intercepts are omitted.

Exhibit 53 to Decl. of Lyon
1374
**SER 1166**

S. Cohen, I. Kadach and G. Ormazabal    Journal of Accounting and Economics 76 (2023) 101640

**Table OD.12**
First-Time Disclosure to the CDP: Descriptive statistics of the matched treatment and control groups

| Variable | Treatment | | Control | | Difference | |
|---|---|---|---|---|---|---|
| | *Mean* | *Std. Dev.* | *Mean* | *Std. Dev.* | *t-stat* | *p-value* |
| *Size* | 8.38 | 1.42 | 8.34 | 1.39 | 1.32 | 0.19 |
| *Log(BM)* | −0.81 | 0.86 | −0.79 | 0.92 | −1.14 | 0.26 |
| *ROA* | 0.05 | 0.07 | 0.05 | 0.08 | −0.39 | 0.70 |
| *Leverage* | 0.26 | 0.19 | 0.24 | 0.19 | 2.64 | 0.00 |
| *Tangibility* | 0.30 | 0.26 | 0.30 | 0.25 | 0.61 | 0.54 |
| *Dividends* | 0.39 | 0.64 | 0.37 | 0.60 | 2.07 | 0.04 |
| *Return* | 0.17 | 0.54 | 0.18 | 0.56 | −0.98 | 0.33 |
| *Log(Sales)* | 7.75 | 1.24 | 7.75 | 1.21 | 0.00 | 0.99 |

This table provides descriptive statistics of the covariates for the propensity score matching test in Table 6, Panel B of the paper. The statistics are presented separately for the treatment and control groups obtained from the matching exercise. See Appendix A for variable definitions.

**Table OD.13**
First-time Disclosure to the CDP: CEM

Panel A. Descriptive statistics

| Variable | Treatment | | Control | | Difference | |
|---|---|---|---|---|---|---|
| | *Mean* | *Std. Dev.* | *Mean* | *Std. Dev.* | *t-stat* | *p-value* |
| *Size* | 8.58 | 1.63 | 8.56 | 1.63 | 0.80 | 0.42 |
| *Log(BM)* | −0.56 | 0.59 | −0.55 | 0.59 | −0.35 | 0.73 |
| *ROA* | 0.05 | 0.04 | 0.05 | 0.04 | 0.68 | 0.50 |
| *Leverage* | 0.16 | 0.14 | 0.16 | 0.14 | 0.09 | 0.93 |
| *Tangibility* | 0.17 | 0.19 | 0.17 | 0.19 | 0.12 | 0.91 |
| *Dividends* | 0.41 | 0.50 | 0.39 | 0.52 | 1.97 | 0.05 |
| *Return* | 0.05 | 0.25 | 0.05 | 0.25 | −0.17 | 0.86 |
| *Log(Sales)* | 7.77 | 1.23 | 7.51 | 1.24 | 11.12 | 0.00 |

Panel B. $CO_2$ emissions as a function of disclosure to the CDP

| Indep. variables: | Dep. Var: Log [$CO_2$ (t)] | |
|---|---|---|
| | No CEM Weights (1) | CEM Weights (2) |
| *Treatment*Post* | −0.22*** | −0.21*** |
| | (−4.62) | (−4.41) |
| *Controls* | YES | YES |
| Country FE | n.a. | n.a. |
| Industry FE | n.a. | n.a. |
| Year FE | YES | YES |
| Firm FE | YES | YES |
| $R^2$ | 0.96 | 0.96 |
| Observations | 9645 | 9645 |

This table presents a variant of the analysis in Table 6 using coarsened exact matching (CEM). The treated group consists of the 4199 firms that started disclosing carbon emissions for the first time during the period 2005−2020. Panel A reports descriptive statistics on observable covariates for treatment and control observations after coarsened exact matching on *Size*, *Log(BM)*, *ROA*, *Leverage*, *Tangibility*, and *Return*. Panel B analyzes $CO_2$ emissions after the firm's first disclosure to the CDP. The dependent variable is the logarithm of the firm's direct $CO_2$ emissions (Scope 1). *Treatment* is an indicator variable that equals one if a firm started systematically disclosing its carbon emissions for the first time during the period 2005−2020, and zero otherwise. *Post* is an indicator variable that equals one in the year of the first CDP questionnaire is filed and thereafter, and zero otherwise. Results in the column titled *CEM Weights* are computed using CEM and the results reported in the column titled *No CEM Weights* are computed using the same common support sample as the *CEM Weights* column, but without applying the CEM weights. The control variables in Panel B are the covariates in Panel A. The variables are defined in Appendix A. Standard errors are clustered at the firm level. *t*-statistics are in parentheses. *, **, and *** denote significance at the 10%, 5%, and 1% levels (two-tail) respectively. Intercepts are omitted.

*OD.IV. Engagements and Divestment: Additional tests*

This section of the online appendix includes the following additional tests:
Table OD.14. Engagements: Treating the Big Three as a group.

32

Exhibit 53 to Decl. of Lyon
1375
**SER 1167**

S. Cohen, I. Kadach and G. Ormazabal
Journal of Accounting and Economics 76 (2023) 101640

Table OD.15. Divestment: Firm-level analysis using total signatory holdings.
Table OD.16. Institutional Holdings: Fund-level analysis.

**Table OD.14**
Engagements: Treating the Big Three as a group

|  | Dependent Variable: Big3_Engagement | |
|---|---|---|
|  | (1) | (2) |
| CDP_Disclosure*Top_Emitter | 0.02*** | 0.02*** |
|  | (3.06) | (3.07) |
| CDP_Disclosure | 0.01** | 0.01** |
|  | (2.42) | (2.39) |
| Top_Emitter | −0.00 | −0.00 |
|  | (−1.05) | (−1.06) |
| Size | 0.01*** | 0.01*** |
|  | (10.19) | (10.13) |
| Log(BM) | −0.01*** | −0.01*** |
|  | (−9.75) | (−9.70) |
| ROA | −0.03*** | −0.03*** |
|  | (−2.89) | (−2.94) |
| Leverage | −0.03*** | −0.03*** |
|  | (−5.05) | (−5.04) |
| Tangibility | 0.03*** | 0.03*** |
|  | (6.13) | (6.12) |
| Dividends | −0.00*** | −0.00*** |
|  | (−2.92) | (−2.83) |
| Return | 0.00 | 0.00* |
|  | (1.53) | (1.66) |
| Log(Sales) | 0.01*** | 0.01*** |
|  | (7.10) | (7.13) |
| Year FE | YES | NO |
| Fund FE | YES | NO |
| Fund-Year FE | NO | YES |
| $R^2$ | 0.04 | 0.05 |
| # Obs. | 52,260 | 52,260 |

This table presents a variant of the analysis in Table 8, Panel B treating the Big Three as a group in fund-firm-year panel. The dependent variable, Big3_Engagement, is an indicator variable that equals one if BlackRock, State Street, or Vanguard engages with the firm about environmental issues, and zero otherwise. Top_Emitter is an indicator variable that equals one if a company is in the top industry quartile based on the amount of $CO_2$ emissions in that year, and zero otherwise. CDP_Disclosure is an indicator variable that equals one if a company submitted CDP questionnaire, and zero otherwise. Standard errors are clustered at the firm level. t-statistics are in parentheses. *, **, and *** denote significance at the 10%, 5%, and 1% levels (two-tail) respectively. Intercepts are omitted.

**Table OD.15**
Divestment: Firm-level analysis using total signatories holdings

|  | Dependent variable: Signatories_Hldg ($t + s$) | | | | | |
|---|---|---|---|---|---|---|
|  | Only Signatories have access | | Only Signatories have access Signatories own >5% | | Only Signatories have access Signatories of both CDP and PRI own >5% | |
|  | s = 0 | s = 1 | s = 0 | s = 1 | s = 0 | s = 1 |
|  | (1) | (2) | (3) | (4) | (5) | (6) |
| CDP_Disclosure* Top_Emitter | −0.005 | −0.005 | −0.007* | −0.007 | −0.009** | −0.009* |
|  | (−1.550) | (−1.460) | (−1.796) | (−1.482) | (−2.001) | (−1.761) |
| CDP_Disclosure | 0.010*** | 0.008*** | 0.018*** | 0.014*** | 0.023*** | 0.018*** |
|  | (4.713) | (3.657) | (6.943) | (5.156) | (7.983) | (5.954) |
| Top_Emitter | 0.004* | 0.005* | 0.005* | 0.005* | 0.005* | 0.005* |
|  | (1.703) | (1.891) | (1.713) | (1.907) | (1.720) | (1.928) |
| Size | 0.033*** | 0.028*** | 0.034*** | 0.029*** | 0.035*** | 0.029*** |
|  | (10.358) | (8.283) | (10.386) | (8.381) | (10.303) | (8.299) |
| Log(BM) | −0.009*** | −0.011*** | −0.010*** | −0.011*** | −0.009*** | −0.011*** |
|  | (−5.102) | (−5.894) | (−4.923) | (−5.764) | (−4.658) | (−5.509) |
| ROA | 0.066*** | 0.073*** | 0.064*** | 0.074*** | 0.064*** | 0.074*** |

(continued on next page)

Exhibit 53 to Decl. of Lyon
1376
**SER 1168**

S. Cohen, I. Kadach and G. Ormazabal                                                        Journal of Accounting and Economics 76 (2023) 101640

**Table OD.15** (continued)

| | Dependent variable: Signatories_Hldg (t + s) | | | | | |
|---|---|---|---|---|---|---|
| | Only Signatories have access | | Only Signatories have access Signatories own >5% | | Only Signatories have access Signatories of both CDP and PRI own >5% | |
| | s = 0 | s = 1 | s = 0 | s = 1 | s = 0 | s = 1 |
| | (1) | (2) | (3) | (4) | (5) | (6) |
| | (6.047) | (6.232) | (5.837) | (6.138) | (5.805) | (6.164) |
| Leverage | −0.050*** | −0.037*** | −0.051*** | −0.038*** | −0.051*** | −0.040*** |
| | (−5.548) | (−3.657) | (−5.460) | (−3.634) | (−5.459) | (−3.737) |
| Tangibility | 0.018* | 0.024** | 0.018* | 0.023** | 0.017* | 0.023** |
| | (1.892) | (2.226) | (1.756) | (2.073) | (1.651) | (2.044) |
| Dividends | 0.001 | 0.000 | 0.001 | 0.001 | 0.001 | 0.000 |
| | (1.566) | (0.660) | (1.557) | (0.740) | (1.412) | (0.465) |
| Return | 0.005*** | 0.006*** | 0.005*** | 0.006*** | 0.005*** | 0.006*** |
| | (5.328) | (6.924) | (5.140) | (6.618) | (5.026) | (6.539) |
| Log(Sales) | 0.000 | −0.000 | 0.000 | −0.000 | 0.001 | −0.000 |
| | (0.146) | (−0.040) | (0.132) | (−0.181) | (0.205) | (−0.128) |
| Year FE | YES | YES | YES | YES | YES | YES |
| Firm FE | YES | YES | YES | YES | YES | YES |
| $R^2$ | 0.77 | 0.77 | 0.77 | 0.77 | 0.77 | 0.77 |
| # Obs. | 47,243 | 42,532 | 44,947 | 40,323 | 43,575 | 38,965 |

This table presents a variant of the analysis in Table 9 using total signatories holdings. Signatories_Hldg is the fraction of shares owned by CDP signatories. The sample and the rest of the specification are as in Table 9. Standard errors are clustered at the firm level. t-statistics are in parentheses. *, **, and *** denote significance at the 10%, 5%, and 1% levels (two-tail) respectively. Intercepts are omitted.

**Table OD.16**
Institutional Holdings: Fund-level analysis

| | | Dependent Variable: Δ_Fund_Ownership | |
|---|---|---|---|
| | | CDP signatories | Other funds |
| | | (1) | (2) |
| CDP_Disclosure*Top_Emitter | β | −0.012*** | −0.003 |
| | | (−4.92) | (−1.04) |
| CDP_Disclosure | | −0.002 | −0.011*** |
| | | (−1.14) | (−6.12) |
| Top_Emitter | | 0.002 | 0.005*** |
| | | (0.94) | (2.77) |
| Size | | −0.003 | 0.013*** |
| | | (−0.95) | (4.18) |
| Log(BM) | | −0.013*** | −0.012*** |
| | | (−7.01) | (−6.04) |
| ROA | | −0.110*** | −0.060*** |
| | | (−8.70) | (−4.35) |
| Leverage | | 0.092*** | 0.054*** |
| | | (11.23) | (7.06) |
| Tangibility | | −0.023*** | 0.016* |
| | | (−2.88) | (1.74) |
| Dividends | | −0.003*** | −0.000 |
| | | (−3.97) | (−0.23) |
| Return | | −0.001 | −0.040*** |
| | | (−0.42) | (−13.31) |
| Log(Sales) | | −0.006*** | −0.016*** |
| | | (−3.03) | (−7.10) |
| Firm FE | | YES | YES |
| Fund-Year FE | | YES | YES |

Exhibit 53 to Decl. of Lyon
1377
**SER 1169**

*S. Cohen, I. Kadach and G. Ormazabal*                                                                 *Journal of Accounting and Economics 76 (2023) 101640*

**Table OD.16** (*continued*)

| | Dependent Variable: Δ_*Fund_Ownership* | |
| | CDP signatories | Other funds |
| | (1) | (2) |
| $R^2$ | 0.33 | 0.33 |
| # Obs. | 8,328,323 | 8,001,296 |
| H0: β(1) = β(2) | *p*-value = 0.011 | |

This table presents a fund-level analysis of the association between CDP disclosures and institutional holdings. The unit of observation is fund-year. Δ_*Fund_Ownership* is the fractional change in the number of firm's shares owned by a particular institutional investor. *CDP_Disclosure* is an indicator variable that equals one if the company submits the CDP questionnaire in that year, and zero otherwise. *Top_Emitter* is an indicator variable that equals one if the company is in the top industry quartile based on the amount of $CO_2$ emissions in that year, and zero otherwise. See Appendix A for other variable definitions. Column (1) includes the funds that are CDP signatories. Column (2) includes the funds that are not CDP signatories. Included portfolio firms either disclose to the CDP but restrict access to signatories or do not disclose to the CDP. Independent variables are measured at the end of the prior year. Standard errors are clustered at the fund level. *t*-statistics are in parentheses. *, **, and *** denote significance at the 10%, 5%, and 1% levels (two-tail) respectively. Intercepts are omitted.

## References

Aggarwal, R., Erel, I., Ferreira, M., Matos, P., 2011. Does governance travel around the world? Evidence from institutional investors. J. Financ. Econ. 100 (1), 154–181. https://doi.org/10.1016/j.jfineco.2010.10.018.

Azar, J., Duro, M., Kadach, I., Ormazabal, G., 2021. The Big Three and corporate carbon emissions around the world. J. Financ. Econ. 142 (2), 674–696. https://doi.org/10.1016/j.jfineco.2021.05.007.

Barko, T., Cremers, M., Renneboog, L., 2022. Shareholder engagement on environmental, social, and governance performance. J. Bus. Ethics 180, 777–812. https://doi.org/10.1007/s10551-021-04850-z.

Barzuza, M., Curtis, Q., Webber, D.H., 2020. Shareholder value (s): index fund ESG activism and the new millennial corporate governance. South. Calif. Law Rev. 93, 1243–1321. https://doi.org/10.2139/ssrn.3439516.

Bena, J., Ferreira, M., Matos, P., Pires, P., 2017. Are foreign investors locusts? The long-term effects of foreign institutional ownership. J. Financ. Econ. 126, 122–146. https://doi.org/10.1016/j.jfineco.2017.07.005.

Bolton, P., Kacperczyk, M., 2021. Do investors care about carbon risk? J. Financ. Econ. 142 (2), 517–549. https://doi.org/10.1016/j.jfineco.2021.05.008.

Bolton, P., Kacperczyk, M., 2022. Global pricing of carbon-transition risk. J. Financ. https://doi.org/10.2139/ssrn.3550233. forthcoming.

Boone, A., White, J., 2015. The effect of institutional ownership on firm transparency and information production. J. Financ. Econ. 117 (3), 508–533. https://doi.org/10.1016/j.jfineco.2015.05.008.

Bushee, B., Noe, C., 2000. Corporate disclosure practices, institutional investors, and stock return volatility. J. Account. Res. 171–202. https://doi.org/10.2307/2672914.

Crane, A., Michenaud, S., Weston, J., 2016. The effect of institutional ownership on payout policy: evidence from index thresholds. Rev. Financ. Stud. 29 (6), 1377–1408. https://doi.org/10.1093/rfs/hhw012.

deHaan, E., 2021. Using and Interpreting Fixed Effects Models. https://doi.org/10.2139/ssrn.3699777. Working paper.

Dimson, E., Karakaş, O., Li, X., 2021. Coordinated Engagements. European Corporate Governance Institute – Finance. https://doi.org/10.2139/ssrn.3209072. Working Paper. 721/2021.

Downar, B., Ernstberger, J., Reichelstein, S., Schwenen, S., Zaklan, A., 2021. The impact of mandatory carbon reporting on emissions and financial operating performance. Rev. Account. Stud. 26, 1137–1175. https://doi.org/10.1007/s11142-021-09611-x.

Dyck, A., Lins, K., Roth, L., Wagner, H., 2019. Do institutional investors drive corporate social responsibilities? International evidence. J. Financ. Econ. 131, 693–714. https://doi.org/10.1016/j.jfineco.2018.08.013.

Friedman, H., Heinle, M., 2016. Taste, information, and asset prices: implications for the valuation of CSR. Rev. Account. Stud. 21, 740–767. https://doi.org/10.1007/s11142-016-9359-x.

FSB (Financial Stability Board), 2020. The Implications of Climate Change for Financial Stability. FSB, Basel, Switzerland. https://www.fsb.org/2020/11/the-implications-of-climate-change-for-financial-stability/.

Gibson, R., Glossner, S., Krueger, P., Matos, P., Steffen, T., 2022. Do responsible investors invest responsibly? Rev. Finance 26 (6), 1389–1432. https://doi.org/10.1093/rof/rfac064.

Grossman, S., Hart, O., 1980. Disclosure laws and takeover bids. J. Finance 35 (2), 323–334. https://doi.org/10.1111/j.1540-6261.1980.tb02161.x.

Ilhan, E., Krueger, P., Sautner, Z., Starks, L.T., 2023. Climate risk disclosure and institutional investors. Rev. Financ. Stud., forthcoming. https://doi.org/10.2139/ssrn.3437178.

Jouvenot, V., Krueger, P., 2019. Mandatory Corporate Carbon Disclosure: Evidence from a Natural Experiment. https://doi.org/10.2139/ssrn.3434490. Working paper.

Kim, S., Yoon, A., 2022. Assessing active managers' commitment to ESG evidence from United Nations principles for responsible investment. Manag. Sci. 69 (2), 741–758. https://doi.org/10.1287/mnsc.2022.4394.

Krueger, P., Sautner, Z., Starks, L., 2020. The importance of climate risks for institutional investors. Rev. Financ. Stud. 33 (3), 1067–1111. https://doi.org/10.1093/rfs/hhz137.

Liang, H., Sun, L., Teo, M., 2022. Responsible hedge funds. Rev. Finance 26 (6), 1585–1633. https://doi.org/10.1093/rof/rfac028.

Matsumura, E., Prakash, R., Vera-Munoz, S., 2014. Firm-value effects of carbon emissions and carbon disclosures. Account. Rev. 89, 695–724. https://doi.org/10.2139/ssrn.1921809.

Matsumura, E., Prakash, R., Vera-Munoz, S., 2017. To Disclose or not to Disclose climate-change risk in form 10-K: does Materiality Lie in the Eyes of the Beholder? Working paper. https://doi.org/10.2139/ssrn.2986290.

Raghunandan, A., Rajgopal, S., 2022. Do ESG funds make stakeholder-friendly investments? Rev. Account. Stud. 27, 822–863. https://doi.org/10.1007/s11142-022-09693-1.

Tallarita, R., 2023. The limits of portfolio primacy. Vanderbilt Law Rev. 76 (2), 511–569. https://doi.org/10.2139/ssrn.3912977.

Tomar, S., 2023. Greenhouse gas disclosure and emissions benchmarking. J. Account. Res. 61 (2), 451–492. https://doi.org/10.1111/1475-679X.12473.

Yang, L., Muller, N., Liang, P., 2021. The Real Effects of Mandatory CSR Disclosure on Emissions: Evidence from the Greenhouse Gas Reporting Program. National Bureau of Economic Research, w28984. https://doi.org/10.2139/ssrn.3880217.

Exhibit 53 to Decl. of Lyon
1378
**SER 1170**

# Exhibit 39

# to Declaration of Thomas P. Lyon

# Climate Change and Asset Prices: Are Corporate Carbon Disclosure and Performance Priced Appropriately?

Exhibit 39 to Decl. of Lyon
927
**SER 1171**

Case 2:24-cv-00801-ODW-PVC   Document 56-39   Filed 07/24/24   Page 2 of 29   Page ID #:6908



Journal of Business Finance & Accounting

*Journal of Business Finance & Accounting*, 44(1) & (2), 35–62, January/February 2017, 0306-686X
doi: 10.1111/jbfa.12217

# Climate Change and Asset Prices: Are Corporate Carbon Disclosure and Performance Priced Appropriately?

Andrea Liesen, Frank Figge, Andreas Hoepner and Dennis M. Patten[*]

**Abstract:**   This paper empirically assesses the relevance of information on corporate climate change disclosure and performance to asset prices, and discusses whether this information is priced appropriately. Findings indicate that corporate disclosures of quantitative greenhouse gas (GHG) emissions and, to a lesser extent, carbon performance are value relevant. We use hand-collected information on quantitative GHG emissions for 433 European companies and build portfolios based on GHG disclosure and performance. We regress portfolios on a standard four factor model extended for industry effects over the years 2005 to 2009. Results show that investors achieved abnormal risk-adjusted returns of up to 13.05% annually by exploiting inefficiently priced positive effects of (complete) GHG emissions disclosure and good corporate climate change performance in terms of GHG efficiency. Results imply that, firstly, information costs involved in carbon disclosure and management do not present a burden on corporate financial resources. Secondly, investors should not neglect carbon disclosure and performance when making investment decisions. Thirdly, during the period analysed, financial markets were inefficient in pricing publicly available information on carbon disclosure and performance. Mandatory and standardised information on carbon performance would consequently not only increase market efficiency but result in better allocation of capital within the real economy.

**Keywords:** carbon disclosure, climate change, value relevance, disclosure quality, GHG emissions, market efficiency, stock performance

## 1. INTRODUCTION

Climate change has developed into a widely accepted threat to our planet that requires urgent regulatory responses (Stern, 2006; and IPCC, 2007). Within the European

[*]The first author is affiliated with the Umeå School of Business and Economics, Umeå University, Sweden. The second author is from Kedge Business School, Marseille, France. The third author is from the ICMA Centre, Henley Business School, University of Reading. The fourth author is at the Department of Accounting, Illinois State University, Norman, USA. The authors would like to especially thank the anonymous reviewer, as well as seminar participants at the UN PRI conference 2013, for their very useful comments. The authors gratefully acknowledge funding from the MISTRA foundation. MISTRA played no role in the study design, the collection, analysis, and interpretation of data, in the writing of the manuscript or the decision to submit the paper for publication. (Paper received February 2014, revised revision accepted July 2016).

**Address for correspondence:** Andrea Liesen, Umeå School of Business and Economics, Umeå University, 901 87 Umeå, Sweden.
e-mail: liesen@sustainablevalue.com

© 2016 John Wiley & Sons Ltd

Exhibit 39 to Decl. of Lyon
928
**SER 1172**

14689957, 2017, 1-2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jbfa.12217 by University Of Michigan Library, Wiley Online Library on [21/09/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

36                     LIESEN, FIGGE, HOEPNER AND PATTEN

Union (EU), the European Union Emissions Trading Scheme (EU ETS), the EU policy guiding principles to make polluters pay (European Council, 2006) and national taxes on energy use and carbon dioxide are just a few examples of political initiatives aiming to reduce climate change. At the same time, market initiatives such as the Carbon Disclosure Project (CDP) (Carbon Disclosure Project, 2008) and the Climate Principles (The Climate Group, 2011) have been established to motivate reductions in corporate GHG emissions, turn 'climate change into a business risk' (Pattberg, 2012, p. 619), or to allow investors to better grasp the financial risk stemming from climate change.

Among companies, the concern that climate change impacts or potentially impacts financial performance appears to be widely recognised: of the 358 FT500 companies that responded to the CDP during the earlier years covered in this study, 87% reported that climate change constitutes a commercial risk and/or challenge to their business (Carbon Disclosure Project, 2006). On financial markets, as a consequence of these risks and the imminent challenge to transform to a low carbon economy, a significant re-distribution of shareholder wealth is expected to take place (Carbon Trust, 2006). Nevertheless, and despite the growth of the socially responsible investment (SRI) industry in recent decades, market participants only slowly adjust their investment behaviour to incorporate the financial risks resulting from political and market initiatives for the mitigation of climate change. For example, it was estimated that during one of the years investigated in this study less than 0.1% of the over $40 trillion in assets of the investors that are signatories to the CDP were 'invested in any investment strategy which explicitly and systematically takes climate risk into account' (Innovest, 2007, p. 3).

Investment practitioners generally expect that financial markets are 'only beginning to recognise the magnitude of impact the transition to a low carbon global economy will have on companies' competitive positions and long-term valuations' (Goldman Sachs Group, 2009, p. 2), and as a result the financial risk represented by political and market initiatives for the shift towards a low-carbon economy 'may not yet be fully reflected in share prices' (FTSE Group, 2012, p. 4).[1] These statements from the investment practitioner community suggest a potential inefficiency of the market to appropriately price information on the financial risk stemming from climate change. According to the efficient markets hypothesis (EMH), efficient financial markets price available information (Fama, 1970). Moderate proponents of EMH argue that markets in practice are fairly – but not always – efficient (Renshaw, 1984; and Worthington and Higgs, 2004). When markets are inefficient, market participants can use value-relevant information, i.e. information that is relevant to the future earnings potential of a stock, to achieve abnormal risk-adjusted returns. Once identified, market participants will erase these abnormal risk-adjusted returns by trading on the underlying information and, as a result, turn financial markets efficient (Lee, 2001). Stock markets are thus made efficient by market participants believing they are inefficient (Grossmann and Stiglitz, 1980; and Dimson and Mussavian, 1998), searching for inefficiencies and acting on arbitrage opportunities. The same underlying process is valid for the appropriate pricing of value-relevant information on corporate sustainability performance. As noted by, for example, Derwall et al. (2005) and Renneboog et al. (2008), risk-adjusted returns of companies with good sustainability performance will only be

---

1 Similar conclusions can also be drawn for the granting of corporate bank loans (Hoepner et al., 2016).

© 2016 John Wiley & Sons Ltd

Exhibit 39 to Decl. of Lyon
929
SER 1173

CLIMATE CHANGE AND ASSET PRICES                              37

persistently higher than those of companies with poor sustainability performance when the financial market does not price information on sustainability performance efficiently.

In the context of this study, the market inefficiency to price the financial risk stemming from climate change appropriately hinted at by investment practitioners above allows us to determine whether information on corporate carbon disclosure and performance is value relevant. To empirically assess this research question, a Carhart four factor model (C4FM) (Carhart, 1997), extended for industry effects, is applied to a sample of 433 European companies over the years 2005 to 2009, inclusive. We build portfolios using a unique data set of hand-collected information on quantitative corporate GHG emissions disclosure practices and performance gathered from corporate reports. Results suggest that quantitative corporate carbon disclosure and, to a lesser extent, carbon performance were relevant to asset prices of European companies and not priced appropriately during our period of investigation. Investors could achieve abnormal risk-adjusted returns of up to 13.05% ($p < 0.01$) per year when investing in portfolios constructed from (complete) GHG emissions disclosure and, to a lesser extent, good corporate climate change performance expressed as GHG efficiency. We find only very limited support for information on absolute levels of GHG emissions being relevant to asset prices. Results are robust to various further tests controlling for, among other things, national differences in environmental fiscal policies, other non-financial disclosure by corporations, the completeness of corporate GHG emissions disclosure, the impact of the financial crisis and the EU ETS.

Our results have implications for investors, companies and regulators. For investors, our findings suggest that information on corporate carbon disclosure and performance must be taken into account in investment analysis, as they are relevant for financial markets. For companies, results show that the information costs for (complete) corporate carbon disclosure and efficiency management do not present a burden on corporate financial resources. To the contrary, our findings suggest that, for example, companies not disclosing (complete) information on quantitative GHG emissions are valued less by financial markets, thus generating a strong argument for companies to engage in high-quality non-financial disclosure in order to reduce information asymmetry. For the real economy, the inefficient pricing of publicly available information on carbon disclosure and performance results in an inefficient allocation of capital, given that investments in real assets are heavily influenced by the valuation of financial assets. This could impede economic growth (Hayek, 1941) and creates a strong argument for regulators to enforce mandatory and standardised information on carbon performance, which would not only increase market efficiency but result in a better allocation of capital within the real economy.

The remainder of this paper is organised as follows. Section 2 provides an analysis of existing related literature. Section 3 develops our hypotheses. Section 4 describes the research methodology, sample and data. Section 5 presents our empirical results, and Section 6 provides a discussion of the implications of our findings.

## 2. PRIOR LITERATURE

Interest in whether financial markets value corporate sustainability disclosure and performance (CSP) dates back to at least the 1970s, but studies controlling for factors

© 2016 John Wiley & Sons Ltd

14683957, 2017, 1-2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jbfa.12217 by University Of Michigan Library, Wiley Online Library on [21/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 39 to Decl. of Lyon
930
SER 1174

38                          LIESEN, FIGGE, HOEPNER AND PATTEN

nowadays known to influence stock market performance (use of a C4FM) are relatively limited. Controlling for such factors is, however, particularly important in the context of SRI, as SRI portfolios have been found to rely quite heavily on small stocks and stocks with a low book-to-market ratio (Cortez et al., 2012). Using the C4FM, and thus controlling for systematic risk (Sharpe, 1964; Lintner, 1965; and Mossin, 1966), company size (Banz, 1981), book-to-market ratio (Fama and French, 1992) and the momentum effect (Jegadeesh and Titman, 1993), ensures that abnormal returns found can be attributed to the impact of CSP. At the same time, industry composition is generally thought to impact portfolio returns and Dess et al. (1990) argue that not controlling for industry effects can result in a misleading interpretation of results.

Within the domain of studies using the C4FM, Kempf and Osthoff (2007) rely on the socially responsible ratings from KLD Research & Analytics and find that following the simple trading strategy of buying stocks with high ratings and selling stocks with low ratings over the 1992–2004 period, using industry-balanced investment portfolios, resulted in significant annualised alphas of up to 8.7%. Similarly, but focusing more specifically on environmental performance, Derwall et al. (2005) used eco-efficiency scores from the rating agency Innovest Strategic Value Advisors and examined returns for a sample ranging from 170 to 450 US companies over the 1995–2003 period. Also constructing portfolios according to simple trading rules, Derwall et al. (2005) document that, controlling for industry effects, firms performing 'relatively well along environmental dimensions collectively provide superior returns' (p. 58). More specifically, they found an annualised alpha of around 6% for a strategy that goes long in the best-in-class environmental portfolio and short in the worst-in-class environmental portfolio.

Finally, and most closely related to our investigation, Ziegler et al. (2011) looked at between 447 and 1790 European and US firms over the years 2001–2006, inclusive. They built portfolios based on two binary dummy indicators for corporate climate change disclosure derived from the Asset4 database. The indicators represent information on whether a company reports *whether or not* 'it believes that climate change can represent commercial risks and/or opportunities' (Ziegler et al., 2011, p. 1287) and *whether or not* a company reports 'on initiatives or new production techniques, to recycle, reduce, reuse, substitute or phase out $CO_2$ or $CO_2$ equivalents in the production process' (Ziegler et al., 2011, p. 1287). Applying a C4FM, they fail to find significant out- or underperformance of any portfolio over the whole period under investigation. However, in additional tests they show risk-adjusted abnormal returns for the energy sector in the US and for the sub-period 2004–2006 in Europe. These results thus highlight that value relevance of information can differ between industries and across time periods.

Each of the recent studies summarised above suggests that CSP information may be relevant to financial markets and inappropriately priced. We extend this body of research by examining the value relevance and pricing of quantitative carbon disclosure and performance in a large European sample over a period of five years, controlling for factors known to explain stock performance and industry effects.

### 3. HYPOTHESES DEVELOPMENT

Political and market initiatives for the reduction of global warming inflict unknown future costs on companies and thus are an important factor in making corporate

© 2016 John Wiley & Sons Ltd

14683957, 2017, 1-2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jbfa.12217 by University Of Michigan Library, Wiley Online Library on [21/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 39 to Decl. of Lyon
931
SER 1175

CLIMATE CHANGE AND ASSET PRICES                    39

carbon disclosure and performance relevant to asset pricing. In the EU, the EU ETS is currently the cornerstone of policies combating climate change, but in addition to the EU ETS, various other political and market initiatives target the reduction of GHG emissions. For example, various European countries have introduced some form of tax on carbon dioxide. The likelihood of the remaining European countries taxing carbon remains to some extent unpredictable. The abrupt cancellation of the introduction of a significant carbon tax in France one month prior to its supposed start date is a case in point (Kanter, 2009). Political uncertainties also continue to exist at the level of European policy, where the guiding principles of the renewed EU Sustainable Development Strategy include making polluters pay and integrating climate change in all relevant European policies (European Council, 2006). However, it continues to be unclear into what specific measures these intended policies and principles for a reduction of GHG emissions will translate. Nevertheless, Sullivan (2009) generally summarises that policy measures to reduce GHG emissions will grow and not only affect heavy emitters but all companies.

The uncertainty from the political environment underlies several market initiatives that relate to the financial risk stemming from climate change. Examples include the CDP (Carbon Disclosure Project, 2008), the Climate Principles (The Climate Group, 2011), the Investor Network on Climate Risk (Investor Network on Climate Risk, 2010), the Institutional Investors Group on Climate Change (IIGCC 2010) and The Carbon Principles (The Carbon Principles Banks, 2008). The politically induced value relevance of corporate carbon disclosure and performance is consequently also reinforced through these market initiatives.

To examine the relevance of corporate carbon disclosure and performance to asset prices we rely on four proxies, each capturing differences in climate change disclosure or performance. We distinguish between disclosure and performance, as they relate to different estimation and information risks and Doda et al. (2016) suggest there is not necessarily a relation between the existence of corporate carbon disclosure and carbon performance.

Our first disclosure proxy is the existence of disclosure of absolute levels of GHG emissions. In addition to the political and market initiatives discussed above, arguments rooted in stakeholder theory (Freeman, 1994) and legitimacy theory (Deegan, 2007) suggest that information on corporate GHG emissions could be relevant to the valuation of the firm. Corporate climate change disclosure answers the call from various stakeholder groups for information on corporate contributions to global warming (Kolk et al., 2008; and Doda et al., 2016). Disclosure may foster stakeholder support and help ensure that corporate actions are seen as legitimate, i.e. 'desirable, proper, or appropriate' (Suchman, 1995, p. 574), thus preventing stakeholder actions that could negatively impact the financial performance of the firm. Additional arguments for the value relevance of corporate carbon disclosure relate to estimation and information risk. Generally speaking, stocks for which only limited information is available have higher estimation risk (Barry and Brown, 1985), as higher levels of value relevant information on a stock allow for a better and more reliable estimation of its specific future cash flow. Riedl and Serafeim (2009, p. 25) summarise that when investors cannot obtain sufficient company-specific information, they base their valuation on information that is not firm-specific. The disclosure of GHG emissions should thus allow for better estimation of specific future cash flows, as market participants do not have to infer their estimates on less specific information

© 2016 John Wiley & Sons Ltd

Exhibit 39 to Decl. of Lyon
932
SER 1176

40                        LIESEN, FIGGE, HOEPNER AND PATTEN

on exposure to the financial implications of climate change (Aerts et al., 2008). In this context of estimation risk, for example, Dhaliwal et al. (2012) show that the existence of CSR disclosure reduces the level of analyst forecast error.

   At the same time, prior research (Deegan and Rankin, 1997; Hassel and Nilsson, 2006; and Campbell and Slack, 2011) documents that stockbrokers and mainstream analysts do not incorporate environmental information in the majority of their decision-making processes or investment recommendations. These findings, together with the statements of the investment practitioner community summarised above, lead us to believe that financial markets may be inefficient in pricing carbon disclosure and performance appropriately. If so, value relevance would manifest itself as performance differences of risk-adjusted returns between portfolios constructed from companies disclosing and those not disclosing quantitative GHG emissions. We consequently hypothesise:

   **H1:** Portfolios constructed from companies disclosing and those not disclosing quantitative GHG emissions show differences in risk-adjusted returns.

   In addition to analysing the relevance of the choice to disclose GHG emissions information, we also examine the relevance of the completeness of corporate disclosure of absolute levels of GHG emissions. Several studies argue that information quality is relevant to asset prices (Francis et al., 2005; Leuz and Verrecchia, 2005; and Kim and Qi, 2010), while other studies show that the quality of quantitative carbon disclosure is low (Sullivan, 2009; Dingwerth and Eichinger, 2010; and Liesen et al., 2015). Our proxy for information quality is represented by the completeness of corporate disclosure of quantitative GHG emissions, measured by means of a Disclosure Completeness Index. This Disclosure Completeness Index (DCI) is constructed in line with the requirements of the dominant reporting guidelines, i.e. the GHG Protocol (WBCSD, 2004), the CDP (Carbon Disclosure Project, 2011) and the Global Reporting Initiative (GRI) (Global Reporting Initiative, 2000–2006). As we discuss in more detail below, we classify completeness of disclosure relative to scope [i.e. including emissions resulting from both internal corporate activities (scope 1) and electricity purchases (scope 2)], type (i.e. including not only $CO_2$ but also other GHGs), and reporting boundary (i.e. including emissions on group-wide activities) (cf. Liesen et al., 2015). Because complete disclosure of absolute GHG emissions enables investors to reduce the degree of error in estimating future cash flows (cf. Cormier and Magnan, 2007), it should consequently reduce estimation and information risk (Barry and Brown, 1985). Assuming the market is in a state of inefficiency with regard to the appropriate pricing of financial risk stemming from climate change during the time of our study, the value relevance of the underlying information would manifest itself as performance differences of risk-adjusted returns between portfolios constructed from companies disclosing complete levels of GHG emissions and those who do not. We hypothesise:

   **H2:** Portfolios constructed from companies disclosing complete levels of GHG emissions and those disclosing incompletely show differences in risk-adjusted returns.

   Our third proxy relates to climate change performance and represents companies' levels of absolute GHG emissions. We argue that the magnitude of absolute GHG

© 2016 John Wiley & Sons Ltd

1468597, 2017, 1-2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jbfa.12217 by University Of Michigan Library, Wiley Online Library on [21/09/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 39 to Decl. of Lyon
933
**SER 1177**

1468957, 2017, 1-2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jbfa.12217 by University Of Michigan Library, Wiley Online Library on [21/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

CLIMATE CHANGE AND ASSET PRICES                41

emission determines a company's exposure and the sensitivity of its returns towards the political, market and stakeholder initiatives for the reduction of climate change discussed above, and is therefore a parameter of estimation risk. The large share of companies with comparatively high absolute levels of GHG emissions is more exposed to, for example, the uncertain future financial liabilities under the EU ETS. Prior studies (e.g. Mahapatra, 1984; Luo and Bhattacharya, 2009; and Salama et al., 2011) document that companies with good environmental and/or social performance show lower systematic risk, thus suggesting performance is value relevant. As described in more detail below, to operationalise our proxy we categorise companies based on their absolute levels of GHG emissions as high, medium and low emitters. In an inefficient market, portfolios constructed from these different levels of absolute levels of GHG emissions would deliver different risk-adjusted returns. We consequently hypothesise:

**H3:** Portfolios constructed from companies with high, medium and low absolute levels of emissions show differences in risk-adjusted returns.

Finally, we use the level of GHG efficiency, expressed as the net income in € per ton of GHG emissions, as a proxy for climate change performance. We argue that levels of GHG efficiency are a parameter of estimation risk as the future financial performance of companies generating comparatively lower levels of net income per ton of GHG emissions would be impacted more heavily by any future regulatory or market initiatives for the reduction of GHG emissions. The future financial performance of companies with higher GHG efficiency, on the other hand, is less sensitive to external events on climate change. In this context, for example, Clarkson et al. (2004) show that relative environmental performance indicators developed from Toxics Release Inventory emissions data in the US served as a good predictor of future environmental liabilities for companies in the pulp and paper industry. In an inefficient market, portfolios constructed from different levels of GHG efficiency (as described in detail in Section 4) would deliver different risk-adjusted returns. We consequently hypothesise:

**H4:** Portfolios constructed from companies with high, medium and low GHG efficiency show differences in risk-adjusted returns.

### 4. RESEARCH METHODS

*(i) Sample*

To test these hypotheses we use a sample of European Union FTSE All World-Index (FTSE AWI) constituents excluding the financial service industry[2] as of January for each of the years 2005 to 2009. FTSE AWI covers companies with large or medium-sized market capitalisation. In total, 433 different companies with 1,756 firm-year observations constitute our initial sample (sample A). This initial sample is used to test our proxy referring to the existence of disclosure of GHG emissions. Our second

2 The common practice to exclude financial service companies from the sample is applied in this study as their increased leverage and sensitivity to market developments makes financial service firms incomparable with companies from other industries (Fama and French, 1992; Foerster and Sapp, 2005; and Shleifer and Vishny, 1997).

© 2016 John Wiley & Sons Ltd

Exhibit 39 to Decl. of Lyon
934
**SER 1178**

42                    LIESEN, FIGGE, HOEPNER AND PATTEN

sample – sample B – contains only those companies from sample A that report GHG emissions on at least the majority of corporate activities[3] in the year preceding index inclusion. Sample B consists of 297 different companies with a total of 1,028 firm-year observations, and it is used to test the proxies concerning disclosure completeness, absolute levels of GHG emissions and GHG efficiency.

### (ii) Empirical Model

We use a European C4FM (Carhart, 1997) extended for industry effects. Although the C4FM has become a standard model (Fama and French, 2010), it has not been used frequently with European samples (von Arx and Ziegler, 2014). However, Gregory et al. (2013) show the model is applicable for analyses of larger companies outside the US, and Fama and French (2011, p. 4) summarise that a local (European) model can 'capture local average returns rather well'. Using a C4FM extended for industry effects (cf. Derwall et al., 2005; Geczy et al., 2005; and Hoepner et al., 2011) helps to ensure that abnormal risk-adjusted returns identified in this research are not, in fact, driven by factors already known to determine abnormal stock performance or differing industry composition of portfolios. Not controlling for industry effects can result in a misleading interpretation of results (Dess et al., 1990). This is particularly relevant in the context of this study, as industry affiliation has been found to be a determinant of environmental disclosure practices and performance (Brammer and Pavelin, 2008; Prado-Lorenzo et al., 2009; and Dawkins and Fraas, 2010), which are the basis for our portfolio construction criteria. To control the returns of a portfolio in the C4FM for industry effects, orthogonalised industry performance variables are added to the model (cf. Derwall et al., 2005; Geczy et al., 2005; and Hoepner et al., 2011). Several further design choices have to be made when applying a C4FM, and these are detailed in the remainder of this section. For all portfolios, a buy-and-hold strategy and a long–short trading strategy are applied and regressed on the C4FM extended for industry effects (model (1)), which is defined as:

$$R_{it} - R_{ft} = \alpha_i + \beta_i(R_{mt} - R_{ft}) + s_i SMB_t + h_i HML_t + p_i UMD_t + m_i \text{Oil \& Gas}_t$$
$$+ _i\text{Basic Materials}_t + o_i\text{Industrials}_t + r_i\text{Consumer Goods}_t$$
$$+ u_i\text{Health Care}_t + v_i\text{Consumer Services}_t + w_i\text{Telecom}_t$$
$$+ y_i\text{Utilities}_t + z_i\text{Technology}_t + \varepsilon_{it} \qquad (1)$$

where $R_{it}$ is the logarithm of the continuously compounded return of portfolio $i$ at month $t$, $R_{ft}$ is the logarithm of the continuously compounded risk-free return rate, $\alpha_i$ is the alpha coefficient representing excess return, $\beta_i$ is the beta coefficient representing systematic risk, $R_{mt}$ is the logarithm of the continuously compounded return of the market, $SMB_t$ is the measure of the historic excess returns of small-cap over large-cap stocks, $HML_t$ is the measure of the historic excess returns of value stocks over growth stocks, $UMD_t$ is the measure of the historic excess returns of winner-stocks over loser-stock, and $\varepsilon_{it}$ is the error term that captures the return variation that cannot be

---

3 Climate change disclosures on less than the majority of corporate activities are not considered here as these do not allow drawing credible conclusions on a company's performance.

© 2016 John Wiley & Sons Ltd

Exhibit 39 to Decl. of Lyon
935
**SER 1179**

CLIMATE CHANGE AND ASSET PRICES                                43

explained by the model. $h_i$ to $z_i$ are the coefficients that measure the sensitivity of the portfolio's return to the different factors and orthogonalised industry returns.

The three months Euro Interbank Offered Rate (Euribor) is used as the risk-free rate of return $R_{ft}$.[4] The return of the market $R_{mt}$ is depicted by the return of all non-financial European constituents of the FTSE AWI, i.e. all companies in sample A. The calculation of $SMB_t$, $HML_t$ and $UMD_t$ are carried out in line with Fama and French (1992) and Carhart (1997), respectively. Given that our sample only includes mid-size and large-cap companies included in a major equity index, we do not expose our analysis to the common risk of over-representing small illiquid stocks by, for example, choosing incorrect breakpoints for the calculation of $SMB_t$, $HML_t$ and $UMD_t$ factors (cf. Gregory et al., 2013). The discussion of results in the remainder of this paper focuses on regression results obtained with equal-weighted portfolio returns, which have been regressed on equal-weighted market returns and control variables, as well as equal-weighted $SMB$, $HML$ and $UMD$ factors.[5] Value-weighted returns obtained using a model with value-weighted factors are shown in the section on further analysis.

Industry control variables are the orthogonalised return of a portfolio constructed from companies in a respective industry – based on the FTSE Industry Classification Benchmark (FTSE Group, 2010) – at month $t$, and represent the share of the return of the industry that cannot be explained by market developments and thus constitute purely industry-specific return characteristics.

### (iii) Data Collection and Portfolio Formation

We collected data for accounting figures and stock performance from the Thomson Reuters Datastream database. Data on Euribor rates was obtained from www.euribor-rates.eu (Triami Media, 2011). For tests of robustness, we extracted the implicit tax rate on energy of each represented country from the publications of the European Commission (Eurostat, 2011a), social and governance disclosure rating scores from Bloomberg (Bloomberg, 2015) and information on which companies owned installations that were part of the EU ETS from the publicly available database of Carbon Market Data (Carbon Market Data, 2011).

The data collection process for proxies related to climate change disclosure and performance can be summarised as a three-step process. First, we collected over 4,000 corporate reports issued by the sample firms over our period of interest. These reports included sustainability reports, CSR reports, environmental reports and financial reports. Second, we hand-reviewed the reports as well as the sample companies' websites and, if no information on GHG emissions were found, answers to the CDP (Carbon Disclosure Project, 2011). We extracted GHG emissions data from these sources when they covered at least the majority of corporate activities. In

---

4 To convert the three months Euribor into the monthly continuously compounded risk-free return an investor would receive, each per annum stated return is transformed into a 91 days return by multiplying it by 91/365.25. Subsequently, one is added to the result and the sum is taken to the power of 30.4375/91, whereby 30.4375 is one twelfth of 365.25 days, i.e. one month. The continuously compounded monthly risk-free return is then obtained by computing the natural logarithm of the result (Hoepner and Zeume, 2014).

5 A common argument against using equal-weighted returns is that any abnormal return found with equal-weighted returns may be driven by micro-caps and model problems relating to micro-caps (Fama, 1998). This argument does not, however, apply in the context of this study, as our sample only includes mid-size and large-cap companies.

© 2016 John Wiley & Sons Ltd

Exhibit 39 to Decl. of Lyon

936

**SER 1180**

44                    LIESEN, FIGGE, HOEPNER AND PATTEN

terms of data sources, GHG emissions data were extracted from corporate reports for 84% of companies in the sample, with approximately one in five data points stemming from annual financial reports and the remaining data points extracted from sustainability reports, CSR reports, environmental reports or company websites. For 16% of companies, emissions data was extracted from the CDP in at least one year. It should be noted that while several European countries introduced guidelines or some form of legislation for environmental, sustainability or CSR reporting before or during the time of this study, a comprehensive and standardised disclosure of absolute numbers of quantitative GHG emissions in Europe was only mandatory for companies that have installations in the EU ETS during the period covered by our investigation. We control for the impact of EU ETS on our results in a test of robustness.

Finally, we classified the GHG emissions data gathered according to its completeness in line with the requirements of the three dominant voluntary reporting guidelines for corporate GHG emissions, namely the GHG Protocol (WBCSD, 2004), the CDP (Carbon Disclosure Project, 2011) and the GRI (Global Reporting Initiative, 2000–2006) (cf. Liesen et al., 2015). More specifically, we classified completeness of GHG emissions reporting in each firm year with respect to:

(i)   scope, i.e. including emissions resulting from both internal corporate activities (scope 1) and electricity purchases (scope 2),

(ii)  type, i.e. including not only $CO_2$ but also other GHGs, and

(iii) reporting boundary, i.e. including emissions on group-wide activities.[6]

Using these classifications, we scored companies' disclosure completeness as follows: a company reporting scope 1 and scope 2 emissions received one point (and zero otherwise). Furthermore, a company reporting on GHG emissions other than just $CO_2$ received one point (and zero otherwise). Finally, a company disclosing emissions on group-wide activities received one point (and zero otherwise). As such, disclosure completeness scores could range from zero to three. While the wording used by companies to describe the scope and reporting boundary of their carbon performance is not standardised, this classification allows for a systematic classification of the completeness of quantitative carbon disclosure. For example, in 2005 Reed Elsevier reported scope 1 $CO_2$ emissions (Reed Elsevier, 2005, p. 46) for 'more than 75% of our key facilities which account for more than 75% of our turnover' (Reed Elsevier, 2005, p. 43), thus scoring 0 on the DCI, as the company does not report scope 2 emissions, no GHG emissions other than $CO_2$ and no emissions for group-wide activities. Diageo, in their 2008 report, show scope 1 and scope 2 GHG emissions (Diageo, 2008, p. 22), stating that 'environmental data cover production and distribution sites and large office locations (those at which at least 50 employees are based)' (Diageo, 2008,

---

6 GRI, CDP and the GHG Protocol differ in their requirements for reporting boundaries. CDP and GHG Protocol both demand disclosure of all corporate activities. GRI 3.1 reporting guidelines require that disclosure covers at least all entities that 'generate significant sustainability impacts' (Global Reporting Initiative, 2011, p. 18). To account for this difference in requirements in our study, group-wide activities refers to emissions data covering all or almost all corporate activities; or expressed as a percentage figure more than 90% of manufacturing activities and more than 90% of all other activities.

© 2016 John Wiley & Sons Ltd

14680957, 2017, 1-2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jbfa.12217 by University of Michigan Library, Wiley Online Library on [21/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 39 to Decl. of Lyon
937
**SER 1181**

CLIMATE CHANGE AND ASSET PRICES                                    45

p. 36), thus scoring 3 on the DCI. Descriptive statistics for the portfolios constructed from companies' scores on the DCI are displayed in Table 1.

Based on the data gathered, we formed portfolios as of January each year, which we updated annually.[7] Focusing on our first disclosure proxy, we formed two mutually exclusive portfolios ('Reporting GHG' and 'Not Reporting GHG') based on a company's choice to disclose GHG emissions data. Next, we constructed portfolios based on the completeness scores. Separate portfolios were constructed for company-years where disclosure scores were zero, one, two, and three, respectively. For example, the '3 DCI Score' portfolio contains only companies reporting complete GHG emissions, i.e. report scope 1 and scope 2 GHG emissions for a group-wide reporting boundary. Turning to our performance proxies, we identified the level of absolute GHG emissions as reported by companies using the disclosures as discussed above. Based on the amount of emissions reported, we classified the sample companies across three categories following the approach of Fama and French (1995) in their categorisation of companies' market capitalisation for the investigation of the size risk premium: firms with the highest 30% of emissions in the sample are classified as high emitters, whereas companies with the lowest 30% of absolute levels of emissions are considered as low emitters. The remaining 40% of sample companies are classified as medium emitters. We construct separate portfolios across the three classifications ('High GHG', 'Medium GHG' and 'Low GHG').

Finally, to operationalise our GHG efficiency proxy, and similar to the process for GHG emissions, we allocate companies across three separate categories. The 30% of companies with the highest GHG efficiency scores (calculated as net income in € divided by tons of GHG emissions) are placed in the 'High GHG Efficiency' portfolio, the 30% with the lowest GHG efficiency are included in the 'Low GHG Efficiency' portfolio, and the remaining 40% of companies are grouped in the 'Medium GHG Efficiency' portfolio. Descriptive statistics for the respective portfolios are displayed in Table 1.

## 5. RESULTS

Table 2 presents the results of portfolios regressed on the C4FM extended for industry effects. The Reporting GHG portfolio generates an annualised alpha of 1.72% ($p < 0.01$, adjusted $R^2$ of over 99%). The returns of the Reporting GHG portfolio show exposure to the orthogonalised returns of the Oil & Gas industry, Industrials, Consumer Goods, Telecommunication and Utilities, i.e. returns of the portfolio have been corrected for their exposure to the performance of these industries. The Not Reporting GHG portfolio generates an annualised loss of $-2.62\%$ ($p < 0.01$, adjusted $R^2$ of over 99%). The statistically significant exposure to the SMB factor for this portfolio is small but positive, suggesting that the Not Reporting GHG portfolio contains companies with a smaller market capitalisation, which is intuitive as company size is known to determine environmental disclosure habits (Patten, 2002; Brammer and Pavelin, 2006). The portfolio also shows a significant positive exposure on the HML factor, suggesting that it contains predominantly stocks with a high book-to-market ratio.

---

7 In a robustness test reported in Table 3, we construct factors and portfolios in June of each year. The statistical significance of the results remains the same.

© 2016 John Wiley & Sons Ltd

14689957, 2017, 1-2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jbfa.12217 by University Of Michigan Library, Wiley Online Library on [21/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 39 to Decl. of Lyon
938
SER 1182

14689507, 2017, 1-2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jbfa.12217 by University Of Michigan Library, Wiley Online Library on [22/09/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

46  LIESEN, FIGGE, HOEPNER AND PATTEN

## Table 1
### Descriptive Statistics

| Sample / Portfolios | Annualised excess returns Mean | Annualised excess returns SD | Number of companies 2005 | 2006 | 2007 | 2008 | 2009 | Mean market value of equity in billion € 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Panel A: Samples** | | | | | | | | | | | | |
| Sample A: All companies | | | 348 | 352 | 353 | 360 | 343 | | | | | |
| Sample B: Disclosing companies | | | 148 | 185 | 204 | 242 | 249 | | | | | |
| **Panel B: Portfolios based on Carbon Disclosure Proxies** | | | | | | | | | | | | |
| Reporting GHG – $R_f$ | 5.18% | 0.19 | 148 | 185 | 204 | 242 | 249 | 19.64 | 20.17 | 22.08 | 12.53 | 13.55 |
| Not Reporting GHG$^c$ – $R_f$ | 0.34% | 0.20 | 200 | 167 | 149 | 118 | 94 | 6.43 | 7.24 | 7.42 | 3.06 | 4.84 |
| 0 DCI Score – $R_f$ | 2.02% | 0.20 | 23 | 22 | 14 | 16 | 12 | 15.98 | 14.02 | 13.89 | 6.68 | 9.69 |
| 1 DCI Score – $R_f$ | 5.36% | 0.19 | 63 | 81 | 89 | 94 | 76 | 14.97 | 16.86 | 21.65 | 13.54 | 13.70 |
| 2 DCI Score – $R_f$ | 4.61% | 0.20 | 49 | 65 | 78 | 100 | 118 | 29.08 | 26.27 | 23.83 | 12.07 | 13.49 |
| 3 DCI Score – $R_f$ | 7.49% | 0.18 | 13 | 17 | 23 | 32 | 43 | 13.12 | 20.57 | 22.77 | 13.96 | 14.52 |

*(Continued)*

© 2016 John Wiley & Sons Ltd

Exhibit 39 to Decl. of Lyon
939
**SER 1183**

## Table 1
### Continued

| Sample / Portfolios | Annualised excess returns | | Number of companies | | | | | Mean market value of equity in billion € | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | SD | 2005 | 2006 | 2007 | 2008 | 2009 | 2005 | 2006 | 2007 | 2008 | 2009 |
| **Panel C: Portfolios based on Carbon Performance Proxies** | | | | | | | | | | | | |
| High GHG – $R_f$ | 8.75% | 0.20 | 44 | 56 | 61 | 73 | 75 | 26.09 | 29.91 | 33.48 | 20.42 | 19.68 |
| Medium GHG – $R_f$ | 4.85% | 0.19 | 59 | 74 | 82 | 97 | 100 | 21.11 | 20.38 | 22.75 | 11.95 | 13.35 |
| Low GHG – $R_f$ | 1.89% | 0.19 | 44 | 56 | 61 | 73 | 75 | 11.22 | 10.14 | 9.78 | 5.43 | 7.69 |
| High GHG-efficiency – $R_f$ | 2.37% | 0.17 | 44 | 56 | 61 | 73 | 75 | 22.72 | 19.64 | 20.96 | 12.54 | 15.51 |
| Medium GHG-efficiency – $R_f$ | 5.54% | 0.18 | 59 | 74 | 82 | 97 | 100 | 19.11 | 22.29 | 22.58 | 12.71 | 14.69 |
| Low GHG-efficiency – $R_f$ | 7.17% | 0.23 | 44 | 56 | 61 | 73 | 75 | 17.25 | 17.86 | 22.53 | 12.29 | 10.07 |

*Notes:*
Panel A shows the number of companies in sample A and B. Sample A: 'All companies' is used to test our proxy referring to the existence of disclosure of GHG emissions. Sample B: 'Disclosing companies' is used to test the proxies concerning disclosure completeness, absolute levels of GHG emissions and GHG-efficiency. For Panels B and C the first column depicts the mean and standard deviation (SD) of the equal-weighted annualised returns of portfolios in excess of the risk-free rate of return $R_f$. The following columns show for each year under analysis the number of stocks in each portfolio and the mean market equity of companies in the portfolios in billion €. Panel B shows portfolios based on carbon disclosure proxies: 'Reporting GHG' and 'Not Reporting GHG' portfolios are constructed from companies that publicly report absolute levels of GHG emissions or not. Four portfolios ('0 DCI Score', '1 DCI Score', '2 DCI Score', '3 DCI Score') are constructed from the developed Disclosure Completeness Index (DCI) with, for example, '3 DCI Score' representing complete reporting, i.e. a portfolio constructed from companies reporting of scope 1 and scope 2 GHG emissions for a group-wide reporting boundary. Panel C shows portfolios based on carbon performance proxies: Three portfolios ('High GHG', 'Medium GHG', 'Low GHG') are constructed from absolute levels of GHG-emissions with firms with the highest 30% of emissions in the sample included in the 'High GHG' portfolio, companies with the lowest 30% of absolute levels of emissions grouped in the 'Low GHG' portfolio and the remaining 40% of sample companies included in the 'Medium GHG' portfolio. Analogously, three portfolios ('High GHG-efficiency', 'Medium GHG-efficiency', 'Low GHG efficiency') are constructed using the same percentages for levels of GHG-efficiency expressed as net income in € per ton of GHG emissions.

© 2016 John Wiley & Sons Ltd

14687957, 2017, 1-2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1467-9957.12127 by University Of Michigan Library, Wiley Online Library on [21/09/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 39 to Decl. of Lyon
940
**SER 1184**