No. 25-5327

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*,

*Plaintiffs-Appellants,*

v.

LIANE M. RANDOLPH, IN HER OFFICIAL CAPACITY AS CHAIR OF THE CALIFORNIA
AIR RESOURCES BOARD, *et al.*,

*Defendants-Appellees.*

**On Appeal from the United States District Court
for the Central District of California**
No. 2:24-cv-00801-ODW-PVC

## SUPPLEMENTAL EXCERPTS OF RECORD
## VOLUME 5 OF 10

ROB BONTA
  *Attorney General of California*
ANNADEL A. ALMENDRAS
  *Senior Assistant Attorney General*
LAURA ZUCKERMAN
MYUNG J. PARK
  *Supervising Deputy Attorneys
  General*

CAITLAN MCLOON
KATHERINE GAUMOND
EMILY HAJARIZADEH
M. ELAINE MECKENSTOCK
DYLAN REDOR
ELIZABETH SONG
  *Deputy Attorneys General*
CALIFORNIA DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6438
Caitlan.McLoon@doj.ca.gov
*Attorneys for Defendants-Appellees*

October 16, 2025

48    LIESEN, FIGGE, HOEPNER AND PATTEN

## Table 2
## Main Regression Results

| Portfolio | α | (Rm−Rf) | SMB | HML | UMD | Oil & Gas | Basic Materials | Indus-trials | Consumer Goods | Health Care | Consumer Services | Telecom | Utilities | Tech-nology | Adj. R² | F-statistic | Prob F-statistic |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Panel A: Portfolios based on Carbon Disclosure Proxies** | | | | | | | | | | | | | | | | | |
| Reporting GHG | 1.722%*** | 0.995%*** | −0.051 | −0.008 | 0.002 | 0.060** | 0.085 | 0.174* | 0.149* | 0.043 | 0.151 | 0.067** | 0.095** | 0.017 | 0.997 | 1803.815 | 0.000 |
| Not Reporting GHG | −2.615%*** | 0.995%*** | 0.101** | 0.064** | −0.021 | −0.079* | −0.098 | −0.226 | −0.191 | −0.063 | −0.183 | −0.103* | −0.094 | −0.021 | 0.995 | 929.107 | 0.000 |
| Long Reporting GHG–Short Not Reporting GHG | 4.338%*** | −0.090 | −0.151** | −0.073* | 0.022 | 0.140** | 0.183 | 0.401 | 0.340 | 0.107 | 0.334 | 0.171** | 0.187 | 0.037 | 0.461 | 4.884 | 0.000 |
| 0 DCI Score | −8.148%*** | 1.035%*** | −0.160 | 0.200** | 0.287* | 0.021 | 0.251 | 0.396 | 0.375 | 0.072 | −0.202 | −0.108 | 0.494** | 0.135 | 0.955 | 97.050 | 0.000 |
| 1 DCI Score | 2.033% | 0.964%*** | −0.014 | 0.005 | −0.038 | 0.027 | −0.022 | 0.009 | 0.114 | −0.019 | 0.010 | −0.041 | 0.076 | 0.014 | 0.984 | 273.572 | 0.000 |
| 2 DCI Score | 1.506% | 1.020%*** | −0.085 | 0.023 | −0.034 | 0.047 | −0.026 | 0.120 | −0.052 | −0.031 | 0.010 | 0.119 | −0.023 | −0.039 | 0.982 | 292.170 | 0.000 |
| 3 DCI Score | 4.902%*** | 0.979%*** | −0.105 | −0.113 | 0.071 | 0.050 | 0.326 | 0.179 | 0.211 | 0.045 | 0.523 | 0.241* | 0.049 | 0.038 | 0.939 | 70.349 | 0.000 |
| Long 3 DCI Score–Short 0 DCI Score | 13.050%*** | −0.055 | 0.055 | −0.314** | −0.217 | 0.125 | 0.095 | −0.217 | −0.164 | 0.169 | 0.725 | 0.247 | −0.445* | −0.097 | 0.403 | 4.066 | 0.000 |
| **Panel B: Portfolios based on Carbon Performance Proxies** | | | | | | | | | | | | | | | | | |
| High GHG | 0.739% | 0.971%*** | −0.143* | 0.275*** | 0.094 | 0.247** | 0.409** | 0.639** | 0.375 | 0.148 | 0.429 | 0.066 | 0.634*** | 0.154** | 0.979 | 212.896 | 0.000 |
| Medium GHG | 0.911% | 1.035%*** | −0.239*** | −0.068 | −0.039 | −0.116 | −0.247 | −0.452 | −0.296 | −0.123 | −0.560 | −0.113 | −0.389** | −0.147 | 0.982 | 354.395 | 0.000 |
| Low GHG | 3.611%* | 0.968%*** | 0.281** | −0.211** | −0.035 | 0.111* | 0.203* | 0.552** | 0.518** | 0.158* | 0.825*** | 0.308*** | 0.182* | 0.096 | 0.977 | 191.442 | 0.000 |
| Long Low GHG–Short High GHG | 2.872% | −0.004 | 0.424*** | −0.486*** | −0.129 | −0.136 | −0.206 | −0.087 | 0.143 | 0.010 | 0.396 | 0.242* | −0.452* | −0.058 | 0.678 | 10.535 | 0.000 |
| High GHG efficiency | 3.035%** | 0.932%*** | −0.133 | −0.162** | −0.043 | −0.031 | −0.056 | 0.132 | 0.216 | 0.066 | 0.261 | 0.168** | −0.066 | 0.025 | 0.972 | 159.124 | 0.000 |
| Medium GHG efficiency | 2.594%* | 1.090%*** | −0.222*** | −0.136* | −0.033 | 0.139** | 0.098 | 0.012 | 0.270 | 0.045 | 0.225 | 0.001 | −0.073 | −0.048 | 0.984 | 281.407 | 0.000 |
| Low GHG efficiency | −1.067% | 1.012%*** | 0.294*** | 0.315*** | 0.090 | 0.050 | 0.215 | 0.451 | −0.068 | 0.024 | −0.040 | 0.058 | 0.477** | 0.095 | 0.984 | 272.892 | 0.000 |
| Long High GHG efficiency–Short Low GHG efficient | 4.102%** | −0.080 | −0.377*** | −0.477*** | −0.134 | −0.081 | −0.271 | −0.319 | 0.284 | 0.043 | 0.302 | 0.109 | −0.543** | −0.070 | 0.795 | 18.561 | 0.000 |

(Continued)

© 2016 John Wiley & Sons Ltd

1468957, 2017, 1, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/beer.12217 by University Of Michigan Library, Wiley Online Library on [22/06/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 39 to Decl. of Lyon
941
**SER 1186**

CLIMATE CHANGE AND ASSET PRICES                                              49

**Table 2**
**Continued**

*Notes:*
Portfolios are regressed on a Carhart 4 Factor Model (C4FM) controlled for industry effects using monthly equal-weighted returns and equal-weighted SMB, HML and UMD factors. The calculation of SMB, HML and UMD factors are carried out in line with Fama and French (1992) and Carhart (1997), respectively. Columns show the annualised alpha in per cent ($\alpha$), beta estimations ($R_m - R_f$), coefficient exposure on the SMB, HML, and UMD factors as well as on orthogonalised industry returns. The adjusted $R^2$ is shown as a measure of model fit. The *p*-value for the *F*-statistic and the *p*-value for the *F*-statistic (Prob *F*-Statistic) are also presented. The number of observations is 60 months in all regressions. Sample A: All companies' is used to test our proxy referring to the existence of disclosure of GHG emissions. Sample B: 'Disclosing companies' is used to test the proxies concerning disclosure completeness, absolute levels of GHG emissions and GHG efficiency. Panel A shows portfolios based on carbon disclosure proxies: 'Reporting GHG' and 'Not Reporting GHG' portfolios are constructed from companies that publicly report absolute levels of GHG emissions or not. Four portfolios ('0 DCI Score', '1 DCI Score', '2 DCI Score', '3 DCI Score') are constructed from the developed Disclosure Completeness Index (DCI) with, for example, '3 DCI Score' representing complete reporting, i.e. a portfolio constructed from companies reporting of scope 1 and scope 2 GHG emissions for a group-wide reporting boundary. Panel B shows portfolios based on carbon performance proxies: Three portfolios ('High GHG', 'Medium GHG', 'Low GHG') are constructed from absolute levels of GHG emissions with firms with the highest 30% of emissions in the sample included in the 'High GHG' portfolio, companies with the lowest 30% of absolute levels of emissions grouped in the 'Low GHG' portfolio and the remaining 40% of sample companies included in the 'Medium GHG' portfolio. Analogously, three portfolios ('High GHG efficiency' 'Medium GHG efficiency' 'Low GHG efficiency') are constructed using the same percentages for levels of GHG efficiency. Level of GHG efficiency expressed as net income per € income in € per ton of GHG emissions. The respective long-short portfolios are also presented.*** ** and * indicate 1%, 5% and 10% significance levels, respectively. Coefficient covariances and standard errors are made heteroscedasticity and autocorrelation consistent based on Newey and West (1987).

© 2016 John Wiley & Sons Ltd

14682957, 2017, 1-2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jbfa.12217 by University Of Michigan Library, Wiley Online Library on [23/09/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 39 to Decl. of Lyon
942
**SER 1187**

14683957, 2017, 1-2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jbfa.12217 by University Of Michigan Library, Wiley Online Library on [22/09/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

50                          LIESEN, FIGGE, HOEPNER AND PATTEN

An investor going long in companies reporting GHG emissions and short in companies not reporting GHG emissions generates an annualised alpha of 4.34% ($p < 0.01$). Although the GHG emissions data were obtained from publicly available sources, we concede, analogous to Ball (1994), that there are information costs, as well as hypothetical transaction costs involved in the gathering of information for this proxy and carrying out the investment strategy. As such, we also assess the significance of the abnormal risk-adjusted returns assuming a rather high annual total expense ratio of 1.5% for carrying out the investment strategy (cf. Statman, 2000; Geczy et al., 2005; and Renneboog et al., 2008).[8] The alpha remains statistically significant with the expense ratio accounted for.

Our results suggest that the market is inefficient and that portfolios constructed from companies disclosing and those not disclosing quantitative GHG emissions show differences in risk-adjusted returns. Hypothesis H1 is consequently confirmed. The existence of disclosure of quantitative GHG emissions is relevant to asset prices.

Table 2 also presents the results of portfolios constructed from GHG emission disclosure completeness as operationalised in the Disclosure Completeness Index. Companies reporting complete GHG emissions, i.e. the 3 DCI Score portfolio, show a significant annualised return of 4.90% ($p < 0.05$, adjusted $R^2$ of 94%). Furthermore, companies with incomplete GHG emissions reporting, i.e. the 0 DCI Score portfolio, show a significant annualised loss of $-8.15\%$ ($p < 0.01$, adjusted $R^2$ of 96%). The 0 DCI Score portfolio shows significant positive exposure on the HML and UMD factors, suggesting that it contains predominantly value stocks which performed well historically. Interestingly, all other portfolios display very little exposure to the size, value and momentum effect, indicating that companies within the respective portfolios, on average, show little abnormality in terms of size, book-to-market ratio and historical performance. The fact that companies that only partially or anecdotally report on their emissions, i.e. show a DCI Score of 1 or 2, do not generate statistically significant returns or losses, suggests that markets need clear signals and value information certainty.

A trading strategy that goes long in companies reporting completely (3 DCI Score portfolio) and short in companies reporting incompletely (0 DCI Score portfolio) generates an annualised alpha of 13.05% ($p < 0.01$). The differences in risk-adjusted returns suggest that the market is inefficient and values the quality of carbon disclosure as relevant. Hypothesis H2 is consequently confirmed.[9] The completeness of disclosure of quantitative GHG emissions is relevant to asset prices.

Main regression results obtained with portfolios constructed from differing absolute levels of GHG emissions are also presented in Table 2. Both, the High GHG and the Medium GHG portfolio load significantly and negatively on the SMB factor, indicating that larger companies tend to have higher levels of GHG emissions, which

---

8  To that end, the annual total expense ratio is split into monthly expenses and deducted from the returns of the long–short portfolios and the regression is repeated. As a result, portfolio returns are reduced by 1.5% annually. In our study, results of all equal-weighted long–short portfolios remain statistically significant with the expense ratio accounted for, except for GHG efficiency, where the results of the long–short regression and robustness tests controlling for other non-financial disclosure (SG), as well as the completeness of GHG emissions reporting (comp. weighted), are no longer significant at conventional levels.

9  The number of companies in the 3 Score and 0 Score portfolios is low in some of the years under analysis (see Table 1), yet still sufficiently high to ensure that portfolio results are not driven by the individual performance of a few companies. Given the use of equal-weighted returns, the possibility that portfolio results are driven by the individual performance of a few large companies in the portfolio is further reduced.

© 2016 John Wiley & Sons Ltd

Exhibit 39 to Decl. of Lyon
943
**SER 1188**

14689957, 2017, 1-2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jbfa.12217 by University Of Michigan Library, Wiley Online Library on [23/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

CLIMATE CHANGE AND ASSET PRICES                51

is intuitive. The Low GHG portfolio generates an annualised alpha of 3.61% ($p <$ 0.10, adjusted $R^2$ of 98%). However, when hypothetical information and transaction costs are accounted for, the alpha of the Low GHG portfolio becomes statistically insignificant. In other words, when a total expense ratio of 1.50% is assumed, no statistically significant outperformance is found. There is also no outperformance of the long–short portfolio. Hypothesis H3 is consequently rejected, as there are no substantial differences in risk-adjusted returns between portfolios constructed from companies with high, medium and low absolute levels of emissions.

Results of tests of our final proxy for carbon performance, GHG efficiency, are also presented in Table 2. The portfolio constructed from companies with a high GHG efficiency generates an annualised alpha of 3.04% ($p < 0.05$, adjusted $R^2$ of 97%). The Medium GHG Efficiency portfolio shows an annualised return of 2.59% ($p < 0.10$, adjusted $R^2$ of 98%). The Low GHG Efficiency portfolio shows a negative performance but is statistically insignificant at conventional significance levels. A trading strategy going long in companies with a high GHG efficiency and short in companies with a low GHG efficiency generates an annualised alpha of 4.10% ($p < 0.10$). Results show that portfolios constructed from companies with high, medium and low GHG efficiency show differences in risk-adjusted returns. Hypothesis H4 is consequently confirmed. The market regards information on companies' GHG efficiency as relevant to asset prices.

It must be noted these main results are contingent upon the choices for our research design as discussed in the section on research methods. We believe, however, that choosing a local version of C4FM applied to a sample that excludes micro-caps and controlling for industry effects (cf. Carhart, 1997; Derwall et al., 2005; Geczy et al., 2005; Fama and French, 2010; 2011; Hoepner et al., 2011; and Gregory et al., 2013) adheres to a current best available standard. To add further credence to our main results, we run a series of robustness tests, and we discuss these in the following section.

*(i) Further Analysis*

The analysis above shows that the relevance of information on carbon disclosure and performance in terms of GHG efficiency does not stem from factors known to determine abnormal risk-adjusted returns or the industry composition of the portfolios constructed. In this section, we perform further tests of robustness. Given the importance of the EU ETS to the financial impact of climate change on companies in Europe, as well as the fact that companies affiliated to the EU ETS are required to report scope 1 $CO_2$ emissions for parts of their activities (DEFRA, 2011) and thus might have a spurious relation to portfolio construction, we control for companies' affiliation to the EU ETS in model (2).[10] To that end, orthogonalised returns of an equal-weighted portfolio constructed from companies not affiliated with the EU ETS are deducted from orthogonalised returns of an equal-weighted portfolio constructed from companies affiliated to the EU ETS and the resulting factor (ETS) is added to

10 During the time of the study the EU ETS showed a clear industry focus. For example, for three out of the nine industries in our sample, less than 2% companies were affiliated with the EU ETS. We therefore do not control for industry affiliation in model (2).

© 2016 John Wiley & Sons Ltd

Exhibit 39 to Decl. of Lyon
944
**SER 1189**

14685957, 2017, 1-2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jbfa.12217 by University Of Michigan Library, Wiley Online Library on 22/09/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

52                         LIESEN, FIGGE, HOEPNER AND PATTEN

the original C4FM model:

$$R_{it} - R_{ft} = \alpha_i + \beta_i(R_{mt} - R_{ft}) + s_i SMB_t + h_i HML_t + p_i UMD_t$$
$$+ m_i ETS_t + \varepsilon_{it} \tag{2}$$

where $ETS_i$ is calculated by deducting orthogonalised returns of an equal-weighted portfolio constructed from companies not affiliated with the EU ETS from orthogonalised returns of an equal-weighted portfolio constructed from companies affiliated to the EU ETS.

As shown in Table 3, results concerning our proxies relating to disclosure and the quality of disclosure remain statistically the same when controlling for the effect of affiliation to the EU ETS.

The results of performance-based portfolios are insignificant when the effect of affiliation to the EU ETS is controlled for (see Table 3). This finding suggests that the value relevance identified with regard to GHG efficiency – but not disclosure – is erased when companies' affiliation with the EU ETS is taken into account. In other words, the performance of portfolios constructed from GHG efficiency is correlated with affiliation to the EU ETS, thus suggesting that EU ETS legislation is related to GHG efficiency, which seems plausible.

While the EU ETS is the primary regulatory tool at the European level, fiscal ambitions to reduce carbon emissions differ across European countries. To control for these national differences, we use the level of implicit taxes on energy consumption (cf. Jeffrey and Perkins, 2014), which is calculated by Eurostat as the energy tax revenues of a country in relation to its final energy consumption (Eurostat, 2011a). Given that 79% of GHG emissions in the EU arise from energy (Eurostat, 2011b), the implicit taxes on energy can indicate a country's level of ambition to reduce GHG emissions through national fiscal policies. Descriptive information on the country composition of our sample and the national implicit energy tax levels are shown in Appendix A. We derive country composition from the location of company headquarters. Accordingly, while this control captures national differences in fiscal policies, a potential shortcoming arises as companies in the sample have different levels of international activities and taxes are levied locally.

To control for countries' differing ambitions to reduce global warming through national fiscal policy, orthogonalised returns of equal-weighted portfolios constructed from companies originated in countries with an implicit energy tax rate below the median of the sample are deducted from orthogonalised returns of equal-weighted portfolios constructed from companies originated in countries with an implicit energy tax rate above the median of the sample and the resulting factor (Entax) is added to model (1). In doing so, we address the concern that differences in national environmental regulation impact our results. The statistical significance of results remains the same for the disclosure portfolios, while the portfolio constructed from GHG efficiency loses its statistical significance (see Table 3), suggesting that taxes on energy consumption are related to GHG efficiency, which seems plausible.

While the focus of our study is carbon disclosure and performance, disclosure on other non-financial issues might drive the results obtained. To control for this potential effect, we use an average of the social and governance disclosure score of Bloomberg

© 2016 John Wiley & Sons Ltd

Exhibit 39 to Decl. of Lyon
945
**SER 1190**

CLIMATE CHANGE AND ASSET PRICES 53

## Table 3
### Further Analysis of Regressions Results

| Robustness Test | $\alpha$ | $(R_m - R_f)$ | SMB | HML | UMD | ETS | Entax | SG | No Info SG | Crisis | Industry | Adj. $R^2$ | F-statistic | Prob F-statistic |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Panel A: Long Reporting GHG – Short Not Reporting GHG** | | | | | | | | | | | | | | |
| C4FM + ETS | 4.655%*** | 0.024 | −0.290*** | −0.101*** | 0.002 | 0.112 | | | | | No | 0.453 | 10.757 | 0.000 |
| C4FM + Industry + Entax | 4.178%*** | −0.001 | −0.157** | −0.064 | 0.028 | | −0.031 | | | | Yes | 0.452 | 4.471 | 0.000 |
| C4FM + Industry + SG | 4.068%*** | −0.018 | −0.013 | −0.136 | −0.006 | | | 0.372*** | −0.102* | | Yes | 0.629 | 7.657 | 0.000 |
| C4FM + Industry + Crisis | 4.445%*** | −0.002 | −0.150** | −0.074* | 0.021 | | | | | −0.001 | Yes | 0.449 | 4.438 | 0.000 |
| C4FM + Industry (June) | 4.477%*** | −0.010 | 0.141 | −0.048 | 0.042 | | | | | | Yes | 0.470 | 5.031 | 0.000 |
| C4FM + Industry (June, outlier) | 4.244%*** | −0.012 | −0.012 | −0.010 | 0.020 | | | | | | Yes | 0.469 | 4.924 | 0.000 |
| C4FM + Industry (June, value-weighted, outlier) | 3.050%* | −0.026 | 0.175 | −0.117 | −0.008 | | | | | | Yes | 0.414 | 4.208 | 0.000 |
| **Panel B: Long 3 DCI Score–Short 0 DCI Score** | | | | | | | | | | | | | | |
| C4FM + ETS | 10.014%*** | −0.036 | −0.145 | −0.199* | −0.167 | −0.647*** | | | | | No | 0.193 | 3.815 | 0.005 |
| C4FM + Industry + Entax | 12.979%*** | −0.056 | 0.052 | −0.310* | −0.214 | | −0.014 | | | | Yes | 0.390 | 3.694 | 0.000 |
| C4FM + Industry + SG | 12.911%*** | −0.074 | 0.215 | −0.388*** | −0.239 | | | 0.360 | −0.157 | | Yes | 0.412 | 3.753 | 0.000 |
| C4FM + Industry + Crisis | 8.782%** | 0.007 | −0.013 | −0.254 | −0.162 | | | | | 0.044** | Yes | 0.420 | 4.048 | 0.000 |
| C4FM + Industry (June) | 15.862%*** | 0.023 | −0.069 | −0.586*** | −0.163 | | | | | | Yes | 0.479 | 5.167 | 0.000 |
| C4FM + Industry (June, outlier) | 17.276%*** | 0.081 | −0.051 | −0.659*** | −0.171 | | | | | | Yes | 0.465 | 4.942 | 0.000 |
| C4FM + Industry (June, value-weighted, outlier) | 6.523%* | 0.160 | 0.221 | −0.274 | −0.010 | | | | | | Yes | 0.373 | 3.705 | 0.000 |
| **Panel C: Long Low GHG–Short High GHG** | | | | | | | | | | | | | | |
| C4FM + ETS | 0.257% | −0.005 | 0.010 | −0.099 | 0.005 | −1.155*** | | | | | No | 0.652 | 23.143 | 0.000 |
| C4FM + Industry + Entax | 2.100% | −0.006 | 0.397*** | −0.443*** | −0.101 | | −0.153 | | | | Yes | 0.679 | 9.902 | 0.000 |
| C4FM + Industry + SG | 3.242% | −0.004 | 0.471*** | −0.506*** | −0.111 | | | −0.064 | −0.139 | | Yes | 0.673 | 9.096 | 0.000 |
| C4FM + Industry + Crisis | −0.859% | 0.051 | 0.365*** | −0.434*** | −0.082 | | | | | 0.038** | Yes | 0.692 | 10.452 | 0.000 |
| C4FM + Industry (June) | 3.836% | 0.073 | −0.173 | −0.526*** | −0.051 | | | | | | Yes | 0.640 | 9.080 | 0.000 |
| C4FM + Industry (June, outlier) | 0.647% | −0.070* | −0.286*** | −0.404*** | 0.049 | | | | | | Yes | 0.648 | 9.362 | 0.000 |
| C4FM + Industry (June, value-weighted, outlier) | 3.743%** | −0.127*** | −0.054 | −0.329*** | 0.041 | | | | | | Yes | 0.754 | 14.879 | 0.000 |
| C4FM + Industry (comp. weighted) | 2.870% | −0.004 | 0.424*** | −0.486*** | −0.129 | | | | | | Yes | 0.677 | 10.534 | 0.000 |

(Continued)

© 2016 John Wiley & Sons Ltd

14683957, 2017, 1-2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.12217 by University Of Michigan Library, Wiley Online Library on [23/06/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 39 to Decl. of Lyon
946
**SER 1191**

Case 2:24-cv-00801-ODW-PVC   Document 56-39   Filed 07/24/24   Page 21 of 29   Page ID #:6927

54                           LIESEN, FIGGE, HOEPNER AND PATTEN

**Table 3**
**Continued**

**Panel D: Long High GHG efficiency–Short Low GHG efficiency**

| Robustness Test | α | $(R_m - R_f)$ | SMB | HML | UMD | ETS | Entax | SG | No Info SG | Crisis | Industry | Adj. $R^2$ | F-statistic | Prob F-statistic |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CFEM + EU ETS | 1.633%** | −0.105* | −0.641*** | −0.086 | 0.065 | −0.981*** | | | | | No | 0.672 | 25.135 | 0.000 |
| CFEM + Industry + Entax | 2.539%** | −0.084* | −0.431*** | −0.390*** | −0.077 | | −0.309*** | | | | Yes | 0.816 | 19.630 | 0.000 |
| CFEM + Industry + SG | 4.346%** | −0.079 | −0.356** | −0.488*** | −0.121 | | | −0.062 | −0.079 | | Yes | 0.788 | 15.625 | 0.000 |
| CFEM + Industry + Crisis | 0.631% | −0.029 | −0.431*** | −0.428*** | −0.090 | | | | | 0.036* | Yes | 0.894 | 18.254 | 0.000 |
| CFEM + Industry (June) | 5.710%*** | −0.079 | 0.341*** | −0.527*** | −0.060 | | | | | | Yes | 0.788 | 17.916 | 0.000 |
| CFEM + Industry (June, outlier) | 3.896% | −0.094*** | 0.136 | −0.484*** | 0.048 | | | | | | Yes | 0.749 | 14.566 | 0.000 |
| CFEM + Industry (June, value-weighted, outlier) | 8.459%*** | −0.200*** | 0.131 | −0.424*** | 0.054 | | | | | | Yes | 0.797 | 18.824 | 0.000 |
| CFEM + Industry (comp. weighted) | 4.259%* | −0.095 | −0.378*** | −0.469*** | −0.105 | | | | | | Yes | 0.786 | 17.651 | 0.000 |

*Notes:*

Basic model components and portfolio formation for Panels A to D are described in Table 1. The following tests of robustness are shown: To control for the potential effect of the European Emissions Trading Scheme, orthogonalised returns of an equal-weighted portfolio constructed from companies not affiliated with the EU ETS are deducted from orthogonalised returns of an equal-weighted portfolio constructed from companies affiliated to the European Emissions Trading Scheme and the resulting factor (ETS) is added to the C4FM, representing model (2). To control for countries differing ambitions to reduce global warming through national fiscal policy, orthogonalised returns of equal-weighted portfolios constructed from companies originated in countries with an implicit energy tax rate below the median of the sample are deducted from orthogonalised returns of equal-weighted portfolios constructed from companies originated in countries with an implicit energy tax rate above the median of the sample and the resulting factor (Entax) is added to model (1). The implicit energy tax rate on energy is calculated as energy tax revenues of a country in relation to its final energy consumption in € per ton oil equivalent (Eurostat, 2011a). To control for the potential effect of differences in companies' non-financial reporting, orthogonalised returns of equal-weighted portfolios constructed from companies with an average of Bloomberg social and governance score below the median of the sample are deducted from orthogonalised returns of equal-weighted portfolios constructed from companies with an average of Bloomberg social and governance score above the median of the sample and the resulting factor (SG) is added to model (1), while including companies where no score was available in a third portfolio (No Info SG). To determine the effect of the last financial market crisis on our results, we include a variable in model (1) that is coded zero in each month in which market crisis and otherwise corresponds to the absolute value of accumulated continuously compounded stock market excess return since the last month coded zero (Hoepner and Zeume, 2014). The resulting factor (Crisis) is multiplied by −1 for ease of interpretation. Further tests of robustness include portfolio creation in June (June), controlling for the effect of outliers by using all companies of sample A except the smallest 5% and largest 5% of companies in terms of market capitalisation (June, outlier) and using value-weighted portfolio returns and control factors (June, value-weighted, outlier), i.e. value-weighted returns are computed using all companies except the smallest 5% and largest 5% of companies in terms of market capitalisation with portfolio creation in June. Finally, to control for the possibility that results of portfolios constructed from absolute levels of GHG emissions (Panel C) and GHG efficiency (Panel D) are driven by incomplete reporting, each company's score on our Disclosure Completeness Index (DCI) is divided by the sum of scores for all companies in a respective portfolio at month *t*, and the resulting disclosure completeness weight is used to weight the returns of the respective stocks in the portfolio (comp. weight). Industry indicates whether industry effects are controlled for in a respective model.***, ** and * indicate 1%, 5% and 10% significance levels, respectively. Coefficient covariances and standard errors are made heteroscedasticity and autocorrelation consistent based on Newey and West (1987).

© 2016 John Wiley & Sons Ltd

Exhibit 39 to Decl. of Lyon
947
**SER 1192**

CLIMATE CHANGE AND ASSET PRICES 55

(Bloomberg, 2015).To that end, orthogonalised returns of equal-weighted portfolios constructed from companies with an average of Bloomberg social and governance score below the median of the sample are deducted from orthogonalised returns of equal-weighted portfolios constructed from companies with an average of Bloomberg social and governance score above the median of the sample and the resulting factor (SG) is added to model (1), while including companies where no score was available in a third portfolio (No Info SG). In doing so, we address the concern that the level of other non-financial disclosure drives our results. As can be seen from Table 3, results remain statistically the same for all portfolios.

In an additional robustness test, the effect of the financial market crisis is controlled for. Following Hoepner and Zeume (2014), an additional control variable for financial market crisis is included in model (1), which corresponds to the accumulated drawdown of the stock market at month $t$. The control variable ($Crisis$) is coded zero in each month in which the market return $R_{mt}$ is above the risk-free return $R_{ft}$. If the market return $R_{mt}$ is below the risk-free return $R_{ft}$, the respective month is defined as a month of financial market crisis and the control variable corresponds to the absolute value of accumulated continuously compounded stock market excess return since the last month coded zero. The resulting factor is multiplied by $-1$ for ease of interpretation. Exposure on the $Crisis$ factor is significant and positive for all portfolios except the existence of reporting (see Table 3), suggesting these portfolios outperform the market in months of financial market crisis, i.e. the crisis is not reducing the value relevance of the information assessed in this study.

To further test the robustness of our results, we construct and update all factors and portfolios in this study as of June of each year (June) in model (1). As can be seen from Table 3, our primary results hold and show higher risk-adjusted returns for all portfolios. We next control for the effect of outliers and construct the respective long–short portfolios using all companies except the smallest 5% and largest 5% of companies of the sample in terms of market capitalisation (June, outlier). As reported in Table 3, results of equal-weighted portfolios remain statistically the same, except for portfolios constructed from levels of GHG efficiency, whose statistical significance is lowered to $p = 0.12$. To control for the effect of alternative weighting procedures on our results, we repeat this analysis with value-weighted portfolio results regressed on value-weighted control factors in model (1) built in June (value-weighted, June, outlier).[11] Results remain qualitatively the same for portfolios constructed from disclosure proxies (see Table 3). Interestingly, value-weighted results for portfolios constructed from absolute levels of GHG emissions and GHG efficiency show higher differences in risk-adjusted returns (see Table 3). For example, an investor going long in companies with high GHG efficiency and short in companies with low GHG efficiency generates an annualised alpha of 8.46% ($p < 0.01$).

Finally, as shown in Table 1, only a small percentage of our sample firms are reporting GHG emissions data in a complete manner. As such, it is possible that results for portfolios constructed from companies with low absolute levels of GHG emissions and high GHG efficiency are driven by incompletely reporting companies. To control

---

11 When portfolio returns are value-weighted, they are winsorised using all companies except the smallest 5% and largest 5% of companies in terms of market capitalisation. The largest 5% of over 340 companies in the sample present between 29% and 37% of the sample market capitalisation in the months under investigation. We eliminated these outliers from the sample to ensure that these are not main drivers of our value-weighted results (cf. Edmans, 2011; and Gibson Brandon and Wang, 2013).

© 2016 John Wiley & Sons Ltd

Exhibit 39 to Decl. of Lyon
948
SER 1193

14683957, 2017, 1-2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jbfa.12217 by University Of Michigan Library, Wiley Online Library on [23/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

56                          LIESEN, FIGGE, HOEPNER AND PATTEN

for this potential bias, we weight our carbon performance-based portfolios according to reporting completeness and repeat the analysis in model (1). More specifically, the score of a company on the DCI is divided by the sum of all scores of companies on the DCI in a respective portfolio at month $t$. The resulting disclosure completeness weight is multiplied by the returns of the respective stocks in the portfolio. The continuously compounded monthly return of an equal-weighted portfolio is then generated by computing the natural logarithm of the sum of the disclosure-weighted returns of all stocks in the portfolio. As a result, the returns of a portfolio constructed from absolute levels of GHG emissions and weighted by disclosure completeness cannot be primarily driven by companies that report GHG emissions in an incomplete manner. Regression results are presented in Table 3. The statistical significance of results obtained with absolute levels of GHG emissions or GHG efficiency remains the same when controlling for the completeness of disclosure.

## 6. CONCLUSION AND DISCUSSION

Our analysis provides evidence that the existence and quality of corporate carbon disclosures, as well as the information on the level of GHG efficiency, is regarded as relevant to asset prices and not priced appropriately during the time of this study. We find only very limited support for information on absolute levels of GHG emissions being considered value relevant by financial markets over the same period. In summary, our findings thus suggest that disclosure proxies on corporate climate risk exposure are considered more relevant by financial markets than climate change performance expressed as absolute levels of GHG emissions. Possible explanations for this finding are that markets value information certainty, which in turn leads to, among other things, better analyst forecasts (Dhaliwal et al., 2012) and lower estimation risk (see e.g. Barry and Brown, 1985), while absolute levels of GHG emissions are not considered an adequate proxy for climate change risk by market participants. Another explanation may be that market participants are not able to correctly evaluate the risk attached to absolute levels of GHG emissions or that disclosure serves to reduce investor uncertainty regardless of the level of absolute GHG performance.

Our results have three main implications relating to companies, investors and regulators. For companies, results show that information costs involved in corporate carbon disclosure and efficiency management do not present a burden on corporate financial resources, as they are relevant to asset pricing. Companies reporting (complete) GHG emissions in line with the GHG Protocol, GRI and the CDP generate significant risk-adjusted abnormal returns. At the same time, our results suggest that incompletely reporting companies were penalised by financial markets during the time of this study. We also find evidence, though less strong, that information on carbon performance is valued by the market. Results should thus motivate companies to engage in this type of high-quality non-financial disclosure and management.

For investors, results suggest they should no longer neglect information on carbon disclosure and performance when making investment decisions. In the state of market inefficiency evidenced in our study, investors could obtain abnormal risk-adjusted returns of up to 13.05% per year by exploiting the inappropriately priced positive effects of (complete) GHG emissions disclosure and good corporate climate change performance in terms of GHG efficiency. For example, Schwert (2003) showed that

© 2016 John Wiley & Sons Ltd

14685957, 2017, 1-2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jbfa.12217 by University Of Michigan Library, Wiley Online Library on [21/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 39 to Decl. of Lyon
949
**SER 1194**

CLIMATE CHANGE AND ASSET PRICES                                    57

inefficiencies disappear once they are published, i.e. research causes the market to become more efficient as a result of market participants acting on the arbitrage opportunities evidenced. Interestingly, when exploiting the arbitrage opportunities evidenced in this research, the interests of SRI and mainstream investors would appear to be aligned. The value-driven SRI investor (Derwall et al., 2011) would tend to invest in companies reporting (complete) GHG emissions and showing a comparatively good climate change performance for ethical reasons. The mainstream investor, out of purely financial motivation, would also invest in these companies in order to benefit from the inefficiency of the financial market to correctly price the positive effect of (complete) GHG emissions reporting and good climate change performance expressed as GHG efficiency. During this period of exploiting the market inefficiency identified, the interests of both types of investors would consequently be aligned, simultaneously resulting in a reduction of the exposure of their portfolios towards the information and estimation risk associated with companies that do not report (complete) GHG emissions and have low GHG efficiency.

As discussed, according to the efficient markets hypothesis, market participants will erase the abnormal risk-adjusted returns identified by acting on arbitrage opportunities and, as a result, the financial market will at some point be efficient. In this scenario of market efficiency, investors will no longer be able to generate a risk-adjusted abnormal return by investing in companies that report (complete) GHG emissions and show a comparatively good climate change performance. However, in this scenario of an efficient market, the value-driven SRI investor does not act irrationally by investing in companies that, for example, show high GHG efficiency, as long as the portfolio is reasonably diversified. Fama and French (2007) believe that socially responsible investors trade in parts of their risk-adjusted return for knowledge that their investments do not violate their social or environmental conscience. If however, lower returns stem from lower systematic information and estimation risk, as could be the case for companies reporting (complete) GHG emissions and showing high GHG efficiency, the socially responsible investor is not irrational and does not receive lower levels of risk-adjusted returns (Liesen, 2015).

Finally, our results suggest that in the evidenced inefficient state, the stock market does not sufficiently take into account the information and estimation risk related to carbon disclosure and performance when allocating ownership of capital stock. Inefficient allocation of capital comes at a cost not only to investors but to the whole economy, given that the valuation of financial assets has a strong effect on investments in real assets (Barro, 1990; and Bodie et al., 2008). If stock prices do not accurately reflect the intrinsic value of the firm, the beta coefficient calculated under consideration of these stock prices is incorrect. Consequently, the cost of equity, which is often calculated based on historic betas, is also incorrect, and in turn the overall cost of capital of companies in our sample cannot be expected to be estimated correctly. When incorrect rates for the cost of capital of companies are used as hurdle rates for investment decisions by corporate decision makers, the capital in the economy is not allocated efficiently, as companies do not know their respective opportunity costs and therefore cannot correctly determine the profitability of capital investment decisions (Easley and O'Hara, 2004). As a result, all companies in the sample can be expected to pursue value-destroying projects and/or incorrectly reject value-enhancing projects, which would impede economic growth (Hayek, 1941). In this context, it appears that strong regulation on mandatory and high-quality corporate

© 2016 John Wiley & Sons Ltd

Exhibit 39 to Decl. of Lyon
950
**SER 1195**

14689507, 2017, 1-2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jbfa.12217 by University Of Michigan Library, Wiley Online Library on [21/09/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

58                           LIESEN, FIGGE, HOEPNER AND PATTEN

climate change disclosure – resulting in more standardised disclosure – would not only help increase market efficiency (cf. Chung et al., 2012) but result in better investment decisions in the real economy, which should present a strong motivation for policy makers.


APPENDIX A: COUNTRY STATISTICS

| | 2005 | | 2006 | | 2007 | | 2008 | | 2009 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Country | No. of companies | Tax rate | No. of companies | Tax rate | No. of companies | Tax rate | No. of companies | Tax rate | No. of companies | Tax rate |
| Austria | 5 | €156/t | 5 | €150/t | 6 | €141/t | 6 | €150/t | 7 | €150/t |
| Belgium | 11 | €104/t | 10 | €107/t | 10 | €103/t | 10 | €112/t | 9 | €97/t |
| Czech Republic | 3 | €79/t | 5 | €94/t | 5 | €99/t | 4 | €109/t | 4 | €127/t |
| Denmark | 11 | €307/t | 10 | €290/t | 9 | €280/t | 10 | €273/t | 11 | €268/t |
| Finland | 9 | €111/t | 10 | €112/t | 10 | €105/t | 13 | €103/t | 13 | €115/t |
| France | 49 | €169/t | 56 | €163/t | 58 | €163/t | 61 | €161/t | 61 | €161/t |
| Germany | 40 | €213/t | 42 | €207/t | 40 | €202/t | 44 | €204/t | 44 | €194/t |
| Greece | 7 | €103/t | 7 | €100/t | 7 | €96/t | 6 | €102/t | 6 | €102/t |
| Hungary | 5 | €84/t | 6 | €87/t | 5 | €86/t | 3 | €98/t | 3 | €98/t |
| Ireland | 4 | €159/t | 4 | €155/t | 4 | €151/t | 4 | €153/t | 4 | €153/t |
| Italy | 24 | €214/t | 22 | €208/t | 25 | €210/t | 27 | €200/t | 24 | €187/t |
| Netherlands | 16 | €170/t | 16 | €182/t | 15 | €193/t | 14 | €178/t | 16 | €190/t |
| Poland | 6 | €67/t | 7 | €84/t | 6 | €88/t | 5 | €101/t | 5 | €108/t |
| Portugal | 5 | €142/t | 5 | €149/t | 5 | €148/t | 6 | €149/t | 6 | €143/t |
| Spain | 24 | €125/t | 25 | €119/t | 24 | €120/t | 25 | €118/t | 23 | €115/t |
| Sweden | 18 | €199/t | 18 | €197/t | 21 | €200/t | 20 | €197/t | 21 | €190/t |
| United Kingdom | 111 | €221/t | 104 | €213/t | 103 | €211/t | 101 | €218/t | 86 | €180/t |

*Notes:*
Country of origin and implicit tax rate on energy. This table shows the number of companies in sample A per country of origin and the implicit tax rate on energy per country at $t-1$. The implicit tax rate on energy is calculated as energy tax revenues of a country in € in relation to its final energy consumption per ton oil equivalent (Eurostat, 2011a).


## REFERENCES

Aerts, W., D. Cormier and M. Magnan (2008), 'Corporate environmental disclosure, financial markets and the media: An international perspective', *Ecological Economics*, Vol. 64, No. 3, pp. 643–659.

Ball, R. (1994), 'The development, accomplishments and limitations of the theory of stock market efficiency', *Managerial Finance*, Vol. 20, No. 2, pp. 3–48.

Banz, R. (1981), 'The relationship between return and market value of common stock', *Journal of Financial Economics*, Vol. 9, No. 1, pp. 3–18.

Barro, R. J. (1990), 'The stock market and investment', *Review of Financial Studies*, Vol. 3, No. 1, pp. 115–31.

Barry, C. B. and S. J. Brown (1985), 'Differential information and security market equilibrium', *Journal of Financial Quantitative Analysis*, Vol. 20, No. 4, pp. 407–22.

Bloomberg (2015), 'Equities'. Available at http://www.bloomberg.com/professional/markets/equities/ (last accessed 20 September 2016).

Bodie, Z., A. Kane and A. J. Marcus (2008), 'The efficient market hypothesis', in *Essentials of Investments*. Boston, MA: McGraw-Hill Irwin.

Brammer, S. and S. Pavelin (2006), 'Voluntary environmental disclosures by large UK companies', *Journal of Business Finance & Accounting*, Vol. 33, No. 7–8, pp. 1168–88.

—— and —— (2008), 'Factors influencing the quality of corporate environmental disclosure', *Business Strategy and the Environment*, Vol. 17, pp. 120–36.

© 2016 John Wiley & Sons Ltd

Exhibit 39 to Decl. of Lyon
951
**SER 1196**

CLIMATE CHANGE AND ASSET PRICES                    59

Campbell, D. and R. Slack (2011), 'Environmental disclosure and environmental risk: sceptical attitudes of UK sell-side bank analysts', *British Accounting Review*, Vol. 43, No. 1, pp. 54–64.

Carbon Disclosure Project (2006), Carbon Disclosure Project Report 2006 – Global FT500 (London: Carbon Disclosure Project).

—— (2008), Carbon Disclosure Project Report 2008 – Global 500 (London: Carbon Disclosure Project).

—— (2011), 'What we do'. Available at https://www.cdp.net/en/info/about-us (last accessed 20 September 2016).

Carbon Market Data (2011), 'World Carbon Market Database'. Available at http://www.carbonmarketdata.com/en/products/world-ets-database/presentation (last accessed 20 September 2016).

Carbon Trust (2006), *Climate Change and Shareholder Value* (London: Carbon Trust).

Carhart, M. M. (1997), 'On persistence in mutual fund performance', *The Journal of Finance*, Vol. 52, No. 1, pp. 57–82.

Chung, J., H. Kim, W. Kim and Y. K. Yoo (2012), 'Effects of disclosure quality on market mispricing: evidence from derivative-related loss announcements', *Journal of Business Finance & Accounting*, Vol. 39, No. 7–8, pp. 936–59.

Clarkson, P. M., Y. Li and D. R. Gordon (2004), 'The market valuation of environmental capital expenditures by pulp and paper companies', *The Accounting Review*, Vol. 79, No. 2, pp. 329–53.

Cormier, D. and M. Magnan (2007), 'The revisited contribution of environmental reporting to investors' valuation of a firm's earnings: an international perspective', *Ecological Economics*, Vol. 62, No. 3–4, pp. 613–26.

Cortez, M. C., F. Silva and N. Areal (2012), 'Socially responsible investing in the global market: the performance of US and European funds', *International Journal of Finance & Economics*, Vol. 17, No. 3, pp. 254–71.

Dawkins, C. and J. Fraas (2010), 'Coming clean: the impact of environmental performance and visibility on corporate climate change disclosure', *Journal of Business Ethics*, Vol. 100, No. 2, pp. 303–22.

Deegan, C. (2007), 'Organizational legitimacy as a motive for sustainability reporting', in J. Unerman, J. Bebbington and B. O'Dwyer (eds.), *Sustainability Accounting and Accountability* (London: Routledge), pp. 127–49.

—— and M. Rankin (1997), 'The materiality of environmental information to users of annual reports', *Accounting, Auditing & Accountability Journal*, Vol. 10, No. 4, pp. 562–83.

DEFRA (2011), *Measuring and Reporting of Greenhouse Gas Emissions by UK Companies: A Consultation on Options* (London: Department for Environment, Food and Rural Affairs).

Derwall, J., N. Guenster, R. Bauer and K. Koedijk (2005), 'The eco-efficiency premium puzzle', *Financial Analysts Journal*, Vol. 61, No. 2, pp. 51–63.

——, K. Koedijk and J. Ter Horst (2011), 'A tale of values-driven and profit-seeking social investors', *Journal of Banking & Finance*, Vol. 35, No. 8, pp. 2137–47.

Dess, G. G., R. D. Ireland and M. A. Hitt (1990), 'Industry effects and strategic management research', *Journal of Management*, Vol. 16, No. 1, pp. 7–27.

Dhaliwal, D. S., S. Radhakrishnan, A. Tsang and Y. G. Yang (2012), 'Nonfinancial disclosure and analyst forecast accuracy: international evidence on corporate social responsibility disclosure', *The Accounting Review*, Vol. 87, No. 3, pp. 723–59.

Diageo (2008), *Corporate Citizenship Report 2008* (London: Diageo plc).

Dimson, E. and M. Mussavian (1998), 'A brief history of market efficiency', *European Financial Management*, Vol. 4, No. 1, pp. 91–103.

Dingwerth, K. and M. Eichinger (2010), 'Tamed transparency: how information disclosure under the Global Reporting Initiative fails to empower', *Global Environmental Politics*, Vol. 10, No. 3, pp. 74–96.

Doda, B., C. Gennaioli, A. Gouldson, D. Grover and R. Sullivan (2016), 'Are corporate carbon management practices reducing corporate carbon emissions?', *Corporate Social Responsibility and Environmental Management*, Vol. 23, No. 5, pp. 257–70.

Easley, D. and M. O'Hara (2004), 'Information and the cost of capital', *The Journal of Finance*, Vol. 59, No. 4, pp. 1553–83.

© 2016 John Wiley & Sons Ltd

14683957, 2017, 1-2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jbfa.12217 by University of Michigan Library, Wiley Online Library on [21/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 39 to Decl. of Lyon
952
**SER 1197**

60                         LIESEN, FIGGE, HOEPNER AND PATTEN

Edmans, A. (2011), 'Does the stock market fully value intangibles? Employee satisfaction and equity prices', *Journal of Financial Economics*, Vol. 101, No. 3, pp. 621–40.

European Council (2006), Renewed EU Sustainable Development Strategy (Brussels: Council of the European Union).

Eurostat (2011a), 'Implicit tax rate on energy'. Available at http://epp.eurostat.ec. europa.eu/tgm/table.do?tab=table&plugin=1&language=en&pcode=tsien040.

—— (2011b), 'Driving forces behind EU-27 greenhouse gas emissions over the decade 1999–2008', in V. Bolla and V. Pendolovska (eds.), *Statistics in Focus – General and Regional Statistics. Statistics in Focus – Environment and Energy.* (Brussels: European Union).

Fama, E. F. (1970), 'Efficient capital markets: a review of theory and empirical work', *The Journal of Finance*, Vol. 25, No. 2, pp. 383–417.

—— (1998), 'Market efficiency, long-term returns, and behavioral finance', *Journal of Financial Economics*, Vol. 49, pp. 283–306.

—— and K. French (1992), 'The cross-section of expected stock returns', *The Journal of Finance*, Vol. 47, pp. 427–65.

—— and —— (1995), 'Size and book-to-market factors in earnings and returns', *The Journal of Finance*, Vol. 50, No. 1, pp. 131–55.

—— and —— (2007), 'Disagreement, tastes, and asset prices', *Journal of Financial Economics*, Vol. 83, No. 3, pp. 667–89.

—— and —— (2010), 'Luck versus skill in the cross-section of mutual fund returns', *The Journal of Finance*, Vol. 65, No. 5, pp. 1915–47.

—— and —— (2011), 'Size, value and momentum in international stock returns' (Tuck School of Business Working Paper No. 2011–85, Chicago Booth Research Paper No. 11–10).

Foerster, S. R. and S. G. Sapp (2005), 'Valuation of financial versus non-financial firms: a global perspective', *Journal of International Financial Markets, Institutions and Money*, Vol. 15, No. 1, pp. 1–20.

Francis, J., R. LaFond, P. Olsson and K. Schipper (2005), 'The market pricing of accruals quality', *Journal of Accounting and Economics*, Vol. 39, No. 2, pp. 295–327.

Freeman, R. E. (1994), 'The politics of stakeholder theory', *Business Ethics*, Vol. 4, No. 4, pp. 409–21.

FTSE Group (2010), 'Industry Classification Benchmark (ICB)'. Available at www.icbenchmark. com (last accessed 20 September 2016).

—— (2012), 'FTSE CDP Carbon Strategy Index Series'. Available at http://www. ftse.com/Indices/FTSE_CDP_Carbon_Strategy_Index_Series/Downloads/FTSE_CDP_ Carbon_Strategy_Methodology_Overview.pdf. URL no longer available.

Geczy, C. C., R. F. Stambaugh and D. Levin (2005), 'Investing in socially responsible mutual funds' (Working Paper, University of Pennsylvania).

Gibson Brandon, R. and S. Wang (2013), 'Liquidity risk, return predictability, and hedge funds' performance: an empirical study', *Journal of Financial and Quantitative Analysis*, Vol. 48, No. 1, pp. 219–44.

Global Reporting Initiative (2000–2006), *G3 Guidelines – Sustainability Reporting Guidelines* (Amsterdam: Global Reporting Initiative).

—— (2011), *Sustainability Reporting Guidelines – Version 3.1* (Amsterdam: Global Reporting Initiative).

Goldman Sachs Group (2009), 'Change is coming: A framework for climate change – a defining issue of the 21st century'. Available at http://www.goldmansachs.com/our-thinking/archive/crossing-the-rubicon-immersive/change-is-coming-a-framework-for-climate-change.pdf.

Gregory, A., R. Tharyan and A. Christidis (2013), 'Constructing and testing alternative versions of the Fama–French and Carhart models in the UK', *Journal of Business Finance & Accounting*, Vol. 40, No. 1–2, pp. 172–214.

Grossmann, S. J. and J. E. Stiglitz (1980), 'On the impossibility of informationally efficient markets', *American Economic Review*, Vol. 70, No. 3, pp. 393–408.

Hassel, L. and H. Nilsson (2006), 'An empirical study of the actual use of environmental information by financial analysts', Proceedings of Nordic Academy of Management 1st Winter Conference, Umeå, 16–18 March.

© 2016 John Wiley & Sons Ltd

14680957, 2017, 1–2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jbfa.12217 by University Of Michigan Library, Wiley Online Library on [21/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 39 to Decl. of Lyon
953
**SER 1198**

14685957, 2017, 1-2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jbfa.12217 by University of Michigan Library, Wiley Online Library on [23/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

## CLIMATE CHANGE AND ASSET PRICES 61

Hayek, F. A. (1941), *The Pure Theory of Capital* (Chicago, IL: University of Chicago Press).

Hoepner, A. G. and S. Zeume (2014), 'Fiduciary duty and "sin stocks": is vice really nice?', in J. P. Hawley, A. G. F. Hoepner, K. L. Johnson, J. Sandberg and E. J. Waitzer (eds.), *Handbook of Institutional Investment and Fiduciary Duty* (Cambridge: Cambridge University Press), pp. 181–206.

———, H. G. Rammal and M. Rezec (2011), 'Islamic mutual funds financial performance and international investment style: evidence from 20 countries', *European Journal of Finance*, Vol. 17, Nos. 9–10, pp. 829–50.

———, I. Oikonomou, B. Scholtens and M. Schröder (2016), 'The effects of corporate and country sustainability characteristics on the cost of debt: an international investigation', *Journal of Business Finance & Accounting*, Vol. 43, No. 1–2, pp. 158–190.

Innovest (2007), *Carbon Beta and Equity Performance: An Empirical Analysis* (New York: Innovest Strategic Value Advisors).

Investor Network on Climate Risk (2010), 'About INCR'. Available at http://www.ceres.org/incr/about (last accessed 20 September 2016).

IPCC (2007), *Climate Change 2007: The Physical Science Basis – Summary for Policymakers* (Geneva: Intergovernmental Panel on Climate Change).

Jeffrey, C. and J. D. Perkins (2014), 'The relationship between energy taxation and business environmental protection expenditures in the European Union', *International Journal of Accounting*, Vol. 49, No. 4, pp. 403–25.

Jegadeesh, N. and S. Titman (1993), 'Returns to buying winners and selling losers: implications for stock market efficiency', *The Journal of Finance*, Vol. 48, NBo. 1, pp. 65–91.

Kanter, J. (2009), 'Council in France blocks a carbon tax as weak on polluters', *The New York Times*, 30 December.

Kempf, A. and P. Osthoff (2007), 'The Effect of Socially Responsible Investing on Portfolio Performance', *European Financial Management*, Vol. 13, No. 5, pp. 908–922.

Kim, D. and Y. Qi (2010), 'Accruals quality, stock returns, and macroeconomic conditions', *The Accounting Review*, Vol. 85, No. 3, pp. 937–78.

Kolk, A., D. Levy and J. Pinkse (2008), 'Corporate responses in an emerging climate regime: the institutionalization and commensuration of carbon disclosure', *European Accounting Review*, Vol. 17, No. 4, pp. 719–45.

Lee, C. M. C. (2001), 'Market efficiency and accounting research: a discussion of "Capital market research in accounting" by S.P. Kothari', *Journal of Accounting and Economics*, Vol. 31, pp. 233–53.

Leuz, C. and R. Verrecchia (2005), 'Firms' capital allocation choices, information quality, and the cost of capital' (Working Paper, University of Pennsylvania).

Liesen, A. (2015), 'Climate change and financial market efficiency', *Business & Society*, Vol. 54, No. 4, pp. 511–39.

———, A. G. Hoepner, D. M. Patten and F. Figge (2015), 'Does stakeholder pressure influence corporate GHG emissions reporting? Empirical evidence from Europe', *Accounting, Auditing & Accountability Journal*, Vol. 28, No. 7, pp. 1047–74.

Lintner, J. (1965), 'The valuation of risk assets and the selection of risky investments in stock portfolios and capital budgets', *Review of Economics and Statistics*, Vol. 17, pp. 13–37.

Luo, X. and C. B. Bhattacharya (2009), 'The debate over doing good: corporate social performance, strategic marketing levers, and firm-idiosyncratic risk', *Journal of Marketing*, Vol. 73, No. 6, pp. 198–213.

Mahapatra, S. (1984), 'Investor reaction to corporate social accounting', *Journal of Business Finance & Accounting*, Vol. 11, No. 1, pp. 29–40.

Mossin, J. (1966), 'Equilibrium in a capital asset market', *Econometrica*, Vol. 34, No. 4, pp. 768–83.

Newey, W. K. and K. D. West (1987), 'A simple, positive semi-definite, heteroskedasticity and autocorrelation consistent covariance matrix', *Econometrica*, Vol. 55, No. 3, pp. 703–8.

Pattberg, P. (2012), 'How climate change became a business risk: analyzing nonstate agency in global climate politics', *Environment and Planning C: Government and Policy*, Vol. 30, No. 4, pp. 613–26.

Patten, D. M. (2002), 'The relation between environmental performance and environmental disclosure: a research note', *Accounting, Organizations and Society*, Vol. 27, No. 8, pp. 763–73.

© 2016 John Wiley & Sons Ltd

Exhibit 39 to Decl. of Lyon
954
**SER 1199**

62                         LIESEN, FIGGE, HOEPNER AND PATTEN

Prado-Lorenzo, J.-M., L. Rodríguez-Domínguez, I. Gallego-Álvarez and I.-M. García-Sánchez(2009), 'Factors influencing the disclosure of greenhouse gas emissions in companies world-wide', *Management Decision*, Vol. 47, No. 7, pp. 1133–57.
Reed Elsevier (2005), *Making an Impact – Corporate Responsibility Report 2005* (London: Reed Elsevier Ltd).
Renneboog, L., J. Ter Horst and C. Zhang (2008), 'Socially responsible investments: institutional aspects, performance, and investor behavior', *Journal of Banking & Finance*, Vol. 32, No. 9, pp. 1723–42.
Renshaw, E. F. (1984), 'Stock market panics: a test of the efficient market hypothesis', *Financial Analysts Journal*, Vol. 40, No. 3, pp. 48–51.
Riedl, E. J. and G. Serafeim (2009), 'Information risk and fair value: an examination of equity betas and bid-ask spreads' (Working paper 10-008, Harvard Business School).
Salama, A., K. Anderson and J. S. Toms (2011), 'Does community and environmental responsibility affect firm risk? Evidence from UK panel data 1994–2006', *Business Ethics: A European Review*, Vol. 20, No. 2, pp. 192–204.
Schwert, G. W. (2003), 'Anomalies and market efficiency', in G.M. Constantinides, M. Harris and R. M. Stulz (eds.), *Handbook of the Economics of Finance* (Amsterdam: Elsevier), pp. 939–74.
Sharpe, W. (1964), 'Capital asset prices: a theory of market equilibrium under conditions of risk', *The Journal of Finance*, Vol. 19, No. 3, pp. 425–42.
Shleifer, A. and R. W. Vishny (1997), 'A survey of corporate governance', *The Journal of Finance*, Vol. 52, No. 2, pp. 737–83.
Statman, M. (2000), 'Socially responsible mutual funds', *Financial Analysts Journal*, Vol. 56, No. 3, pp. 30–9.
Stern, N. (2006), *Stern Review: The Economics of Climate Change* (Cambridge: Cambridge University Press).
Suchman, M. C. (1995), 'Managing Legitimacy: Strategic and Institutional Approaches', *The Academy of Management Review*, Vol. 20, No. 3, pp. 571–610.
Sullivan, R. (2009), 'The management of greenhouse gas emissions in large European companies', *Corporate Social Responsibility and Environmental Management*, Vol. 16, No. 6, pp. 301–9.
The Carbon Principles Banks (2008), 'Statement of Intent'. Available at http://carbonprinciples.org/intent.php. URL no longer available.
The Climate Group (2011), 'The Climate Principles'. Available at https://www.theclimategroup.org/news/climate-principles (last accessed 20 September 2016).
Triami Media (2011), 'Euribor interest rates 2009'. Available at http://de.euribor-rates.eu/euribor-2009.asp?i1=6&i2=1 (last accessed 20 September 2016).
von Arx, U. and A. Ziegler (2014), 'The effect of corporate social responsibility on stock performance: new evidence for the USA and Europe', *Quantitative Finance*, Vol. 14, No. 6, pp. 977–91.
WBCSD (2004), 'The Greenhouse Gas Protocol – A Corporate Accounting and Reporting Standard' (Conches-Geneva and Washington, DC: World Resources Institute, World Business Council for Sustainable Development).
Worthington, A. C. and H. Higgs (2004), 'Random walks and market efficiency in European equity markets', *Global Journal of Finance and Economics*, Vol. 1, No. 1, pp. 59–78.
Ziegler, A., T. Busch and V. H. Hoffmann (2011), 'Disclosed corporate responses to climate change and stock performance: an international empirical analysis', *Energy Economics*, Vol. 33, No. 6, pp. 1283–94.

© 2016 John Wiley & Sons Ltd

Exhibit 39 to Decl. of Lyon
955
**SER 1200**

# Exhibit 36

# to Declaration of Thomas P. Lyon

# Global Pricing of Carbon-Transition Risk

Exhibit 36 to Decl. of Lyon
819
**SER 1201**

## The Journal of FINANCE
### The Journal of THE AMERICAN FINANCE ASSOCIATION

THE JOURNAL OF FINANCE • VOL. LXXVIII, NO. 6 • DECEMBER 2023

# Global Pricing of Carbon-Transition Risk

PATRICK BOLTON and MARCIN KACPERCZYK[*]

## ABSTRACT

The energy transition away from fossil fuels exposes companies to carbon-transition risk. Estimating the market-based premium associated with carbon-transition risk in a cross section of 14,400 firms in 77 countries, we find higher stock returns associated with higher levels and growth rates of carbon emissions in all sectors and most countries. Carbon premia related to emissions growth are greater for firms located in countries with lower economic development, larger energy sectors, and less inclusive political systems. Premia related to emission levels are higher in countries with stricter domestic climate policies. The latter have increased with investor awareness about climate change risk.

PUBLIC OPINION, GOVERNMENTS, BUSINESS LEADERS, and institutional investors all over the world are awakening to the urgency of combatting climate change.[1] This growing concern about climate change may crystalize into a faster and perhaps more disorderly transition away from fossil fuels to

[*]Patrick Bolton is with Columbia University; Imperial College; CEPR; and NBER. Marcin Kacperczyk is with Imperial College and CEPR. We thank Lucian Bebchuk; John Cochrane; Harrison Hong; Paul Hsu; Louis Kaplow; Paymon Khorrami; Christian Leuz; Pedro Matos; Stefan Nagel (the editor); Kunal Sachdeva; Zacharias Sautner; two referees; and the associate editor for many helpful suggestions. We are also grateful to seminar participants at the Bank for International Settlements, Bank of England, Bank of Italy, Bank of Japan, Blackrock, Danmarks Nationalbank Climate Conference, Florida State University, Harvard Law School, HEC Montreal, Imperial College, INSEAD, Mayo Finance Seminar, McGill, NBER LTAM Meetings, NBIM, Rice University, University of Alberta, University of Cyprus, University of Geneva Climate Conference, University of Miami, UNPRI, Virtual Seminar on Climate Economics, and the World Bank for their comments. We are grateful to Trucost for giving us access to their corporate carbon emissions data, and to Adrian Lam and Jingyu Zhang for their very helpful research assistance. Some of the ideas in this paper have been reported in the working draft, "Carbon Premium around the World." This project has received funding from the European Research Council (ERC) under the ERC Advanced Grant program (grant agreement No. 885552 Investors and Climate Change). We have read *The Journal of Finance's* disclosure policy and have no conflicts of interest to disclose.

Correspondence: Marcin Kacperczyk, Imperial College, London Business School, London, SW7 2AZ, UK, e-mail: m.kacperczyk@imperial.ac.uk

This is an open access article under the terms of the Creative Commons Attribution-NonCommercial License, which permits use, distribution and reproduction in any medium, provided the original work is properly cited and is not used for commercial purposes.

[1] Some of the most notable actions include the national and pan-national initiatives, such as Conference of the Parties (COP), Nationally Declared Contributions (NDCs) supported by the United Nations, or the G20 Taskforce for Climate-related Financial Disclosure (TCFD).

DOI: 10.1111/jofi.13272

© 2023 The Authors. *The Journal of Finance* published by Wiley Periodicals LLC on behalf of American Finance Association.

Exhibit 36 to Decl. of Lyon
820
**SER 1202**

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

3678     *The Journal of Finance®*

renewable energy. By now, over 100 countries have committed to carbon net neutrality targets, representing nearly 50% of the world's gross domestic product (GDP). In addition, several multilateral agreements and other commitments to reduce carbon emissions have been reached.[2] This, in turn, means greater carbon-transition risk for companies, especially those that rely more on fossil fuel production or consumption. From an individual firm's perspective, transition risk reflects the uncertain rate of adjustment toward carbon neutrality. From investors' perspective, the risk also embodies evolving beliefs about the transition to cleaner energy. Hence, transition risk is the amalgamation of a wide range of shocks, including changes in climate policy, reputational impacts, shifts in market preferences and norms, and technological innovation. In this paper, we take a (forward-looking) global financial market perspective to evaluate the economic importance investors attach to this transition risk by looking at stock prices of a large set of global companies with different degrees of exposure to this risk.

The economics literature on climate change following Nordhaus (1991) has framed the issue of mitigation of climate change as a public goods problem that requires a global Pigouvian carbon tax to internalize the externality of carbon emissions. The tax should be set equal to the social cost of carbon (SCC) to achieve efficiency, where the SCC is given by the discounted, expected, and physical harm from a warming climate caused by the accumulation of carbon particles in the atmosphere. This literature does not address the transition risk that firms relying on fossil energy face as the economy adjusts to a renewable energy base. In contrast, the finance literature on climate change is more directly concerned with the pricing of climate change risk, in particular, transition risk. But this literature is still in its infancy, and we currently only have patchy evidence on the pricing of carbon-transition risk, and especially on the various sources of this risk. Accordingly, in this study we attempt a more systematic, a more wide-ranging analysis than has been done to date on the pricing of transition risk. We explore how corporate carbon emissions together with country characteristics that reflect the country's likely progress in the energy transition affect stock returns of over 14,400 listed companies in 77 countries over a period ranging from 2005 to 2018. This is essentially the universe of all listed companies globally for which it is possible to obtain carbon emissions data and represents 80% of the market value of all public firms.

As is well known, cross-country studies are beset by endogeneity and identification challenges, as country-level variation can be driven by many different sources. In this study, we can to some extent overcome these challenges by exploiting rich country-, industry-, and firm-level variation in carbon emissions and other characteristics to identify the different sources of transition risk relating to technological shifts, social norms, and energy policies. This granularity of firm-level observations can be combined with various fixed effects

---

[2] Some of the prominent examples include China's commitment to carbon net neutrality by 2060, and Japan's and the United Kingdom's commitments by 2050. See Bolton and Kacperczyk (2021b) for more details on net zero commitments.

Exhibit 36 to Decl. of Lyon
821
**SER 1203**

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [09/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*Global Pricing of Carbon*                    3679

to better understand what is driving transition risk. To our knowledge, this is the first study in economics on transition risk with such a large panel data structure.

The first contribution of our paper is to shed light on the distribution of corporate carbon emissions across all countries in our sample. In most studies on global carbon emissions, the unit of analysis is the country and little information is provided about the breakdown of emissions across companies within each country. According to *Fortune* magazine, in 2017 the 500 largest companies in the world generated \$30 trillion in revenues.[3] This represents 37.5% of world GDP, which was around \$80 trillion in 2017 according to the Central Intelligence Agency's CIA World Factbook. It is thus natural to view climate change mitigation not just through the lens of the largest emitting countries, but also through the lens of the largest emitting companies.

As a second contribution of our paper, we estimate the size of a global carbon-transition risk premium by relating lagged firm-level emissions to individual stock returns. Given the lack of concern about climate change until recently, a plausible null hypothesis is that we should not find higher stock returns for companies with higher carbon emissions over our sample period, with the exception perhaps of Europe (and to some extent the United States, Japan, and a few other OECD countries). A reasonable alternative hypothesis, however, is that investors do pay attention to climate risk and that a carbon premium is to be found in the parts of the world responsible for the highest fraction of carbon emissions, that is, in the largest and most developed economies. It is in these economies that emission reductions are most urgent and therefore where transition risk is highest.

A few general striking results emerge from our analysis. The first general finding is that the carbon premium is positively related to both the level of emissions and the year-to-year growth in emissions, controlling for characteristics that predict returns. Given that the carbon transition is in essence transitory, carbon transition risk a priori ought to be reflected in both the levels and rates of change in emissions. We also find that the premium is related to both direct emissions from production (scope 1) and indirect emissions from firms in the supply chain (scope 2 & scope 3). All the results are statistically and economically highly significant. As an example, a one-standard-deviation increase in cross-sectional scope 1 emissions is associated with a 1.1% increase in annualized stock returns. A comparable result for changes in emissions is 2.2%. In general, the magnitude of the effect is stronger when we account for underlying differences across industries, which underscores the importance of industry adjustment in any study of carbon-transition risk. It is also stronger for indirect scope 3 emissions.

Our findings bring out the fact that a firm's exposure to carbon-transition risk is proportional to the level of its emissions. This is a very robust finding, which goes against the near exclusive focus of attention on emission intensity (the ratio of carbon emissions over sales, assets, or kWh) by practitioners

---

[3] https://fortune.com/global500/2018/.

Exhibit 36 to Decl. of Lyon
822
**SER 1204**

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13273 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

3680                    *The Journal of Finance®*

and other climate finance studies. There are two reasons why asset managers have focused on emission intensity. First, from a portfolio diversification perspective, the emission intensity measure allows for a portfolio construction approach that is independent of the size of the portfolio. Second, emission intensity treats firms of different sizes the same way. Firms are evaluated on their carbon efficiency per unit of sales. By that metric, a large firm can be seen as more environmentally friendly than a small firm, even though its climate impact in terms of the size of its carbon emissions is much larger.

To be sure, the *Financial Times*-Statista ranking of Europe's Climate Leaders ranks which companies performed best in terms of improving their carbon intensity. As the 2022 *Financial Times* article listing the best performers explains: "The 400 companies listed below are those that achieved the greatest reduction in their Scope 1 and 2 greenhouse gas (GHG) emissions intensity over a 5-year period (2015–20) this time."[4] Two problematic examples from this list (among others) are Fortum, with a reported 29.8% reduction in emission intensity, but an increase in total emissions of 157.2%; and Axereal, with a 23.8% reduction in emission intensity, but an increase in total emissions of 236.2%. The list of climate leaders also includes companies with huge GHG emissions, for example, Engie with 40.9 million tons of $CO_2e$ for 2020, or Holcim Group with 117 million tons of $CO_2e$. These examples vividly illustrate the difficulty with carbon intensity as a measure of carbon-transition risk.

Given the limited and fast disappearing carbon budget (consistent with maintaining a temperature rise below 1.5° C with 83% probability),[5] any improvement in carbon efficiency is, of course, desirable. Yet, the overriding objective for the world is to achieve carbon neutrality and bring net emissions down to zero. The fact that all net zero pledges are in terms of absolute emission reduction targets is telling. What the world needs and aims for is first a reduction in carbon emission levels, and second only an improvement in carbon efficiency. It is therefore to be expected that investor exposure to carbon-transition risk would be proportional to the level of emissions. The size of emissions is also the core focus of institutional investor initiatives to reduce carbon emissions, such as Climate Action 100+, which aims "to ensure [that] the world's largest corporate GHG emitters take necessary action on climate change."[6]

Interestingly, the levels of and growth in emissions affect the carbon premium independently, which we interpret as reflecting both a long-run and short-run component in carbon transition. Given that emissions are highly persistent over time, the level of emissions picks up the long-run exposure to transition risk, whereas changes reflect a company's short-run drift away from (or into) greater future emissions. Changes in emissions could also reflect

---

[4] Neville Hawcock, "Special Report: Europe's Climate Leaders 2022," *Financial Times*, April 8, 2022, https://www.ft.com/climate-leaders-europe-2022.

[5] See Intergovernmental Panel on Climate Change (IPCC) "Climate Change 2021, The Physical Science Basis, Summary for Policy Makers," https://www.ipcc.ch/report/sixthassessment-report-working-group-i.

[6] See https://www.climateaction100.org/.

Exhibit 36 to Decl. of Lyon
823
**SER 1205**

15406261, 2025, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [09/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*Global Pricing of Carbon*                                    3681

changes in earnings, but we control for this effect by adding the company's return on equity and sales growth to our independent variables.

To provide additional robustness to our estimation of the carbon premium, and to partially address the possibility that stock returns are noisy, we also relate carbon emissions to firms' book-to-market ratios. We find that a one-standard-deviation increase in cross-sectional direct emissions is associated with 13% higher book-to-market ratios, again controlling for a host of fixed effects and firm characteristics. These results corroborate our return-based findings. In particular, the economic magnitude of these findings is within the range of our return estimates. This adds further evidence against the interpretation that the carbon premium is driven by unexpected return components.

A second general finding is a positive and significant carbon premium in most areas of the world. It is present in North America, Europe, and Asia, but with different magnitudes. It is less present in the Southern Hemisphere region, but this is an economically and socially more diverse group of countries. Our cross-country results also suggest that financial markets are not fully integrated globally. A simple categorization of countries based on their level of economic development does not explain the variation in carbon premium across countries. However, at a more granular level, we find that the short-term carbon premium is generally higher among firms that are headquartered in countries with more modest economic development. It is higher in countries with lower GDP per capita, countries whose economic output relies more on the manufacturing sector, and in countries with less developed healthcare sectors. Yet, the same characteristics cannot explain the cross-country variation in the long-term carbon premium. These results stand in contrast to the common view that carbon transition is exclusively a problem for developed countries.

As a third general contribution of our paper, we study the different sources of this carbon-transition risk. The main premise of our tests is that in partially segmented markets, the local country environment can amplify or mitigate the average premium. Since country-level evidence is possibly subject to omitted variables bias, we exploit firm-level variation in carbon emissions in conjunction with a variety of firm-level controls and fixed effects to better identify each economic channel. Our identification approach is similar to the one effectively used by Rajan and Zingales (1998) in their study of the link between financial development and economic growth.

We identify several country-level characteristics that matter significantly. We group these characteristics into two broad categories, respectively, political or social factors, and energy factors. Regarding political factors, we find that both "voice" and "rule of law" significantly affect the short-run carbon premium associated with the growth in emissions. More democratic countries (with stronger rules of law) tend to have lower carbon premia, other things equal. Further, we find that the long-term carbon premium is larger in countries with tighter climate policies. This finding suggests that investors perceive climate policies to be permanent and unlikely to be reversed. Notably, when we separate domestic policies from international agreements, we find that only the former are economically significant, and the latter have a very

Exhibit 36 to Decl. of Lyon
824
**SER 1206**

15496261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

3682        *The Journal of Finance*®

small effect. This result underscores the importance of political coordination costs associated with climate policies, a problem that has beset the international community in recent years.

When we consider country-level variations in the energy mix, we find that the carbon premium is lower in countries with a higher share of renewable energy, and higher in countries with greater dependence on the energy sector. The energy mix effect is reflected in the short-term premium, which suggests that any technological shocks are perceived as transitory, or alternatively as a factor that is hard to estimate in the long run. Interestingly, we find that a country's energy consumption is not a significant predictor of the carbon premium, which underscores the importance of distinguishing between the production and consumption sides of energy.

Finally, we also find that in the countries that have been exposed to greater damages from climate disasters (such as floods, wild fires, and droughts) there is no significantly different carbon premium. This result suggests that the carbon premium does not reflect physical climate risks, nor that physical risk is positively correlated with transition risk, or that (consistent with the findings of Hong, Li, and Xu (2019)) transition risk may be more salient to investors in countries experiencing rising physical risk.

The sociopolitical and energy-related channels mostly reflect the cash flow effects related to transition risk. Of equal importance may be discount rate effects that reflect investors' perceptions about carbon-transition risk. To assess the importance of the latter, we consider natural time period breaks in our sample period. Given that climate change has become a major issue for investors only recently, we explore how the carbon premium has changed in recent years. We compare the estimated premia for the 2 years leading up to the Paris agreement in 2015 and following the agreement. Several striking results emerge from this analysis. First, when we pool all countries together, we find that there was no significant premium right before the Paris agreement, but a highly significant and large premium after the agreement. This result is consistent with the view that the Paris agreement has changed investors' awareness regarding the urgency of climate change. Second, the change in the carbon premium is mostly related to long-term risks, which, given our previous results, suggests that the Paris agreement led investors to update their beliefs about the long-term impact of climate policy tightness rather than on the short-term impact of technological shocks or changes in the political environment. Finally, when we break down the change in the carbon premium around the Paris agreement by continent, we find that the premium has sharply risen in Asia, and less so in North America and Europe. In effect, Asia is entirely responsible for the rise in the global carbon premium around the Paris agreement.

A difficult question to answer is how changes in carbon-transition risk get impounded into asset prices. From an equilibrium perspective, our results imply the existence of a transition stage during which prices of assets with low emissions are bid up while prices of assets with high emissions are bid down in response to changing investor beliefs. The different repricing phases are

Exhibit 36 to Decl. of Lyon
825
**SER 1207**

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*Global Pricing of Carbon*                                                    3683

difficult to pin down since individual asset prices may transition at different times and at different speeds. Still, we provide some evidence that such repricing has indeed taken place. We show that the rise in the use of renewable technology coincides with the decrease in stock prices of oil majors. Similar findings can be observed for countries that rely more on natural resources. These repricing effects are economically large and underscore the importance of the energy transition to a new equilibrium.

## I. Related Literature

We are obviously not the first to undertake a cross-country analysis in sustainable finance. The closest analysis to ours is by Görgen et al. (2021), who construct a carbon risk factor using stock return differences between a group of "brown" and "green" firms around the world. Their paper is mostly focused on the pricing properties of the factor and not on transition risk itself. It does not relate stock returns to any of the mechanisms that are central to our paper, such as short-term versus long-term risk, or technology, social, and policy risk. Also related in terms of general subject matter are the studies by Dyck et al. (2019) and Gibson et al. (2022), both of which explore how environmental, social, and governance (ESG)-motivated investing varies around the world. Notably, neither of these studies addresses the pricing of carbon-transition risk, which is the focus of our paper.

Next to this cross-country literature there is, of course, a growing country-level climate finance literature, mostly focused on the United States. In an early theoretical contribution, Heinkel, Kraus, and Zechner (2001) have shown how divestment from companies with high emissions can give rise to higher stock returns. An early study by Matsumura, Prakash, and Vera-Munoz (2014) finds that emissions are associated with lower firm values. Similarly, Chava (2014) finds that firms with higher carbon emissions have a higher cost of capital. More recently, Ilhan, Sautner, and Vilkov (2021) have found that carbon emission risk is reflected in out-of-the-money put option prices. Hsu, Li, and Tsou (2023) derive and test a model showing that highly polluting firms are more exposed to environmental regulation risk and command higher average returns. Engle et al. (2020) have constructed an index of climate news through textual analysis of the *Wall Street Journal* and other media and show how a dynamic portfolio strategy can be implemented that hedges risk with respect to climate change news. Monasterolo and De Angelis (2020) explore whether investors demand higher risk premia for carbon-intensive assets following the COP21 agreement. Garvey, Iyer, and Nash (2018) study the effect of changes in direct emissions on stock returns, and Bolton and Kacperczyk (2021a) find that there is a significantly positive effect of carbon emissions on U.S. firms' stock returns for both direct and indirect carbon emissions. Among all these studies, the last one is most closely related given its focus on carbon pricing and the use of similar data sources. Nevertheless, that paper is mostly focused on carbon pricing and the response of portfolio managers to transition risk. More fundamentally, because it is solely based on U.S. data, that paper is

Exhibit 36 to Decl. of Lyon
826
**SER 1208**

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13273 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

3684                         *The Journal of Finance®*

silent on the mechanisms driving transition risk, which is the central focus of
this paper.

Other related studies have explored the asset pricing consequences of
greater material risks linked to climate events and global warming. Bansal,
Kiku, and Ochoa (2016) reveal the asset pricing implications of rising tem-
peratures using an equilibrium framework with an endogenous temperature
process embodied in a standard long-run risk model. Hong, Wang, and Yang
(2023) propose an asset pricing model in which natural disaster mitigation
costs are priced in the cross section of firms. Hong, Li, and Xu (2019) find that
the rising drought risk caused by climate change is not efficiently priced by
stock markets.

The remainder of the paper is organized as follows: Section II outlines
the conceptual framework for our empirical tests, Section III describes the
data and provides summary statistics, Section IV discusses the results, and
Section V concludes.

## II. Conceptual Framework

We begin by outlining a conceptual framework that could account for the
presence of carbon-transition risk for investors in a global economy on the way
to decarbonization in the next couple of decades. The basic concept of carbon-
transition risk is meant to capture investor uncertainty with respect to all the
changes companies will be faced with along the expected pathway to *carbon
net neutrality*. The net zero targets that many countries and companies have
embraced are anchored around the current scientific consensus on the need
to eliminate global carbon emissions by 2050 to avoid increases in average
temperatures of more than 1.5 C relative to preindustrial levels that would
pose a threat to human existence.

We illustrate the formal link between global emissions and temperature
changes in Figure 1. This Intergovernmental Panel on Climate Change (IPCC)
graph provides simulations of various scenarios relating the changes in emis-
sions and projected temperature outcomes. As is illustrated, to stay within a
1.5 C limit, global emissions would need to go down to zero by 2050, from the
level of 420 Gt of $CO_2$ as of 2018. Since then, the problem has become even
more dire, as the latest IPCC report warns that additional carbon emissions as
of 2020 should not exceed a cumulative total of 300Gt of $CO_2$. Achieving this
goal involves a complete *transition* of the corporate sector from brown to green
energy. Such a radical transition will come with new risks, which we define
as *carbon-transition risk*. Importantly, this risk will materialize irrespective of
the physical damages due to future changes in climate.

This carbon-transition risk should be understood in the context of a non-
stationary climate that is evolving in response to the accumulation of carbon
emissions in the atmosphere. Because the underlying economy and climate
are nonstationary, carbon-transition risk is also a nonstationary risk. Even if
there is no unexpected change in a company's emissions, the carbon premium
can change with time simply because the underlying economy is nonstationary.

Exhibit 36 to Decl. of Lyon
827
**SER 1209**

*Global Pricing of Carbon*                                                    3685



Figure 1. Global emissions and projected average annual global temperature. (Color figure can be viewed at wileyonlinelibrary.com)

Also, the marginal effect of emissions is different depending on how close we are to a potentially cataclysmic tipping point.

The closer we get to exhausting the carbon budget, the worse any marginal emissions will be. The transition to a net zero economy involves a finite time frame. Thus, for the same level of emissions, coming closer to the end date (say, 2050) is going to be riskier for a given company because of the increasing pressure to eliminate emissions. That is why the premium is likely to be rising over time even if a company's level of emissions does not change. Of course, this does not necessarily mean that the carbon premium will rise steadily over time. A more plausible scenario could be an abrupt unexpected downward repricing of brown assets or upward repricing of green assets.

From an asset pricing perspective, we can split carbon-transition risk into two separate sources: risks tied to cash flows and risks associated with changes in discount rates. The cash flow channel concerns all the risks related to the cost of decarbonization, stranded assets, and technological shocks. Further, these adjustment costs and the speed at which they materialize are affected by the degree of climate policy tightness, which itself is uncertain. Another amplifying effect works through capital expenditures, which are required to refit the economy for renewable energy use. The rate at which these capital expenditures are made over the next decades is difficult to predict. Even if one can predict the relative vulnerabilities of certain industries, cash flow outcomes as well as investors' beliefs for individual firms are far from certain. Take the auto industry for example. All car manufacturers are now scrambling to switch to electric vehicles (EVs). Except for Tesla and new EV entrants, their market values have taken a beating (another way of saying that there is a carbon

Exhibit 36 to Decl. of Lyon
828
**SER 1210**

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [09/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

3686                          *The Journal of Finance®*

premium on their stocks). Which of these companies will successfully transition to 100% EVs is difficult to say.

There are no models for the energy transition that can be readily applied to capture carbon-transition risk. However, equilibrium models in which technological risk is priced, as in Kogan and Papanikolaou (2014) and Hsu, Li, and Tsou (2023), are helpful reference points to guide the analysis of carbon-transition risk. In addition, the asset pricing model of Hong, Wang, and Yang (2023), which links natural disaster mitigation costs to asset prices in the cross section of firms could be applied to determine the impact on firm valuation of expected future carbon-transition costs. Other helpful related frameworks are the equilibrium models with uncertainty about policy changes of Pastor and Veronesi (2013). The basic prediction from these models is that risk-averse investors require compensation for holding assets that are exposed to carbon-transition risk, so that the equilibrium firms with greater exposure to carbon-transition risk offer higher expected returns. Note that the same prediction would obtain if investors simply developed a distaste for brown companies. These investors would require compensation for holding their noses, so to speak, so that brown companies would also offer higher returns even if there is no divestment in equilibrium.

The carbon premium can also be affected by changes in discount rates and investor expectations about carbon-transition risk. An important aspect of investor preferences and expectations is how the prevailing socioeconomic environment shapes investors' attitudes and outlooks toward climate change. In a society that values protection of the environment and combatting climate change, one should expect that investors will demand greater premia for holding assets associated with high carbon emissions. The role of social preferences works in a way similar to specialized and incomplete information in the equilibrium models of Merton (1987), Pastor, Stambaugh, and Taylor (2021), or Pedersen, Fitzgibbons, and Pomorski (2021), which generate higher risk premia driven by limitations imposed on investors' effective investment opportunity sets. This discount rate channel is different from the categorical divestment channel, as in the "sin stock" literature (Hong and Kacperczyk (2009)). The main difference is that it involves an intensive margin adjustment, with investors demanding higher compensation for holding assets with greater exposure to carbon-transition risk, rather than an extensive margin adjustment by a fraction of categorical divestors. Of course, both discount rate channel and divestment channels could be present in practice. Our findings of a significant carbon premium in all sectors, not just in the coal, oil, and gas sector, suggest that the discount rate channel is an important factor and that carbon risk premia are not just caused by divestment.

Each of these different channels is a plausible driver of carbon-transition risk. Determining their relative importance is largely an empirical question. Also, determining the size of the premium associated with carbon-transition risk is an empirical matter. Our empirical analysis aims to provide a quantitative assessment of each channel. Following Bolton and Kacperczyk (2021a), we use firm-level carbon emissions as proxies for the relative exposure of a

Exhibit 36 to Decl. of Lyon
829
**SER 1211**

15406261, 2025, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13372 by University Of Michigan Library, Wiley Online Library on [09/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*Global Pricing of Carbon* 3687



**Figure 2. Decarbonization pathways conditional on period-specific emissions**. (Color figure can be viewed at wileyonlinelibrary.com)

company to carbon-transition risk. We distinguish between the level of emissions, which indicates the firm's distance from a net zero emission target (a measure of long-term risk), and the growth rate of emissions, which indicates the rate at which a company is decarbonizing (a measure of short-term risk). Firms that keep increasing their emissions may be seen as riskier due to their growing future decarbonization challenge. In this respect, carbon emissions are a state variable that investors care about, and increasingly so, just as investors care about vulnerabilities such as supply bottlenecks and commodity price changes. In our empirical tests, we use the cross-sectional variation in both measures to characterize differences in corporate exposures to carbon-transition risk. Interestingly, we find that long-term and short-term carbon-transition risk are not highly correlated at the firm level.

Carbon emissions are plausibly a time-dependent state variable. The same level of emissions in year $t$ does not reflect the same conditions as in year $t-1$ or year $t+1$. The reason is that any year that passes brings a firm closer to the net zero target deadline. If the level of emissions in year $t$ remains the same as in year $t-1$, this means that the firm faces a steeper decarbonization challenge in year $t$ than it did in year $t-1$, as Figure 2 below illustrates. Therefore, investors' perceptions of carbon transition risk evolve as they update their information about a firm's year-to-year decarbonization progress. The most recent carbon emissions data reflect investors' best assessment of the decarbonization effort their firm faces going forward. Given that the underlying context evolves over time, this means that the information contained in the emissions of year $t-1$ is superseded by those of year $t$ as they are gradually revealed. We illustrate this logic in Figure 2 below.

The figure displays the level of emissions $E$ in years $t-1$ and $t$. The level of emissions sets the pathway to net zero by year $T$. When investors observe the new level of emissions for year $t$, the information contained in the previous year's emissions $E_{t-1}$ is obsolete because it no longer informs investors about the transition risk reflected in the new pathway starting in year $t$. This

Exhibit 36 to Decl. of Lyon
830
**SER 1212**

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13271 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

3688                    *The Journal of Finance®*

observation suggests that the news effect of the emissions in any given year should dissipate over time, as investors gradually learn about the likely new yearly emission numbers. Therefore, any carbon premium we may identify is likely to be linked to a transitory firm-level state variable. This firm-level state variable can be transitory even if yearly emissions are highly persistent. As the figure shows, the level $E_t$ is almost the same as the level $E_{t-1}$, yet the pathway gets steeper as time passes. What investors care about is the transition risk embedded in the pathway to net zero going forward; the slope of this pathway changes even if the level of emissions remains unchanged. The level of emissions, of course, can itself change, but, as we show, this change is quite volatile and hard to predict. As a result, there is a lot of news content in the latest emission numbers.

The strength of our empirical analysis is its global reach. Given that firms in different countries may face different carbon transition paths, it is natural to explore whether such variation in geographic location matters for asset prices. From the perspective of investors pricing transition risk, what matters is the ability to share risk with other investors as well as across different assets. Under the hypothesis of fully integrated markets and a global representative investor, one should expect the pricing of transition risk not to vary much across different locations. On the other hand, under (partially) segmented markets, one would expect to see clear differences in pricing across different locations. This heterogeneity could result from different policy regimes, different technological progress, or different perceptions of the threat of climate change. Thus, our empirical tests should shed useful light on the degree of market integration in pricing carbon risk.

In the rest of the paper, we build on the broad notions above and test them empirically using a large cross section of publicly listed firms from around the world.

### III. Data and Sample

Our primary database matches two data sets: Trucost, which provides annual information on firm-level carbon and other GHG emissions, and FactSet, which assembles data on stock returns and corporate balance sheets. We performed the matching using ISIN as a main identifier. In some instances, in which the ISIN was not available to create a perfect match, we relied on matching based on company names.[7] Finally, when there were multiple subsidiaries of a given company, we used the primary location as a matching entity. The ultimate matching produced 14,468 unique companies out of 16,222 companies available in Trucost. They represent 77 countries. Among the companies we were not able to match, more than twothirds are not listed, and the remaining ones are small and are not available through Factset. The top three countries in terms of missing data are China, Japan, and the United States. Our sample

---

[7] After standardizing the company names in FactSet and Trucost, we choose companies whose names have a similarity score of one, based on the standardized company names.

Exhibit 36 to Decl. of Lyon
831
**SER 1213**

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [09/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*Global Pricing of Carbon* 3689

covers more than 98% of publicly listed companies (in terms of their market capitalization) for which we have emissions data, representing 80% to 85% of the market value of all publicly listed firms available in Factset. Since Trucost sample firms fairly uniformly across different industries, our sample ought to cover as a first approximation the value-weighted emissions of the Factset universe. We augment these data with country-level variables from the World Bank, Germanwatch (the provider of the global climate policy index and the climate risk index [CRI]), Morgan Stanley (for the MSCI world index data), and IBES (for analyst earnings growth forecasts).

*A. Data on Corporate Carbon Emissions*

The Trucost EDX firm-level carbon emissions database follows the Greenhouse Gas Protocol that sets the standards for measuring corporate emissions.[8] The Greenhouse Gas Protocol distinguishes between three different sources of emissions: Scope 1 emissions, which cover direct emissions over 1 year from establishments that are owned or controlled by the company; these include all emissions from fossil fuel used in production. Scope 2 emissions come from the generation of purchased heat, steam, and electricity consumed by the company. Scope 3 emissions are caused by the operations and products of the company but occur from sources not owned or controlled by the company; these include emissions from the production of purchased materials, product use, waste disposal, and outsourced activities. The Greenhouse Gas Protocol provides detailed guidance on how to identify a company's most important sources of scope 3 emissions and how to calculate them. For purchased goods and services, this basically involves measuring inputs, or "activity data," and applying emission factors to these purchased inputs that convert activity data into emissions data. Trucost upstream scope 3 data are constructed using an input-output model that provides the fraction of expenditures from one sector across all other sectors of the economy. This model is extended to include sector-level emission factors, so that an upstream scope 3 emission estimate can be determined from each firm's expenditures across all sectors from which it obtains its inputs.[9]

The Trucost database reports all three scopes of carbon emissions in units of tons of $CO_2$ emitted in a year. We first provide basic summary statistics on carbon emissions across our 77 countries aggregated up from the firm-level emissions reported by Trucost. Table I reports the country-level distribution of firms in our sample and various measures of emissions broken down into scope 1, scope 2, and scope 3. We consider the average total yearly emissions in tons of $CO_2$ equivalent per firm in each country (*S1TOT*, *S2TOT*, and *S3TOT*), the (winsorized at 2.5%) yearly percentage rate of change in emissions (*S1CHG*,

---

[8] See https://ghgprotocol.org.

[9] Downstream scope 3 emissions, caused by the use of sold products, can also be estimated and are increasingly reported by companies. Trucost has only recently started assembling these data; given its much shorter time span, we did not include these data in our study.

Exhibit 36 to Decl. of Lyon
832
**SER 1214**

3690     *The Journal of Finance*®

**Table I**
**Carbon Emissions by Country: 2005 to 2018**

S1TOT (S2TOT; S3TOT) measures the firm-level average (by country) of scope 1(scope 2; scope 3) carbon emissions measured in tons of CO2e.
S1CHG (S2CHG; S3CHG) measures the percentage growth rate in carbon emissions of scope 1 (scope 2; scope 3) (winsorized at 2.5%). TOTS1
(TOTS2; TOTS3) is a sum of S1TOT (S2TOT; S3TOT) within a country in a given year (averaged across all years).

| Code | Country | Frequency | Percentage | # co. | S1TOT | S2TOT | S3TOT | S1CHG | S2CHG | S3CHG | TOTS1 | TOTS2 | TOTS3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AE | UAE | 1,748 | 0.2 | 34 | 382,822 | 45,424 | 133,220 | 10.93% | 16.32% | 11.05% | 13,000,000 | 1,106,904 | 3,338,979 |
| AR | Argentina | 550 | 0.06 | 6 | 1,977,235 | 259,067 | 1,032,782 | 11.18% | 38.18% | 10.24% | 9,816,885 | 1,137,898 | 4,831,946 |
| AT | Austria | 3,741 | 0.42 | 42 | 1,543,117 | 175,280 | 1,478,427 | 10.00% | 16.37% | 7.56% | 34,500,000 | 4,073,719 | 33,900,000 |
| AU | Australia | 37,405 | 4.21 | 471 | 580,313 | 225,151 | 390,624 | 14.38% | 20.19% | 11.88% | 141,000,000 | 51,700,000 | 91,500,000 |
| BD | Bangladesh | 254 | 0.03 | 5 | 112,458 | 23,661 | 145,789 | 16.66% | 25.97% | 14.83% | 490,572 | 106,452 | 624,504 |
| BE | Belgium | 3,883 | 0.44 | 52 | 1,611,505 | 398,625 | 1,586,838 | 5.88% | 11.12% | 6.28% | 35,200,000 | 9,368,517 | 39,000,000 |
| BG | Bulgaria | 123 | 0.01 | 3 | 49,815 | 11,011 | 44,659 | 34.85% | 6.04% | 14.60% | 1,010,125 | 85,163 | 303,958 |
| BH | Bahrain | 198 | 0.02 | 3 | 1,986 | 5,858 | 28,640 | 7.04% | 8.84% | 9.21% | 5,696 | 16,924 | 83,299 |
| BR | Brazil | 10,249 | 1.15 | 126 | 1,846,871 | 200,604 | 2,147,921 | 11.05% | 16.74% | 9.09% | 119,000,000 | 12,700,000 | 145,000,000 |
| BW | Botswana | 68 | 0.01 | 2 | 3,986 | 16,534 | 38,093 | 12.15% | 21.45% | 21.82% | 6,650 | 28,041 | 64,964 |
| CA | Canada | 25,479 | 2.87 | 399 | 1,179,827 | 194,523 | 794,471 | 13.80% | 18.99% | 11.30% | 226,000,000 | 35,700,000 | 144,000,000 |
| CH | Switzerland | 12,638 | 1.42 | 172 | 1,751,558 | 219,020 | 1,848,782 | 5.40% | 9.95% | 5.63% | 142,000,000 | 18,500,000 | 144,000,000 |
| CI | Côte d'Ivoire | 154 | 0.02 | 2 | 10,867 | 13,642 | 102,418 | 5.46% | 6.50% | 6.45% | 18,779 | 25,697 | 181,503 |
| CL | Chile | 3,991 | 0.45 | 37 | 2,520,658 | 150,335 | 526,513 | 9.99% | 17.85% | 9.09% | 61,800,000 | 3,816,032 | 13,500,000 |
| CN | China | 73,490 | 8.28 | 1,660 | 4,009,318 | 258,028 | 1,121,424 | 17.16% | 24.86% | 16.47% | 2,910,000,000 | 232,000,000 | 841,000,000 |
| CO | Colombia | 1,141 | 0.13 | 13 | 2,638,497 | 153,165 | 1,602,004 | 16.65% | 23.03% | 13.89% | 24,900,000 | 1,460,375 | 14,600,000 |
| CZ | Czech Republic | 446 | 0.05 | 5 | 80,966 | 84,133 | 106,096 | 3.29% | 8.69% | -2.05% | 298,304 | 276,486 | 311,847 |
| DE | Germany | 19,023 | 2.14 | 253 | 4,126,920 | 584,281 | 3,403,940 | 7.12% | 13.69% | 7.24% | 458,000,000 | 70,800,000 | 397,000,000 |
| DK | Denmark | 4,310 | 0.49 | 48 | 1,830,641 | 81,427 | 715,844 | 6.29% | 8.37% | 5.98% | 48,000,000 | 2,101,215 | 19,200,000 |
| EE | Estonia | 116 | 0.01 | 2 | 1,324,801 | 23,427 | 72,707 | 10.45% | 18.91% | 5.49% | 2,649,601 | 46,855 | 145,415 |
| EG | Egypt | 2,855 | 0.32 | 30 | 1,300,763 | 71,534 | 347,754 | 4.98% | 10.42% | 5.58% | 22,200,000 | 1,285,661 | 6,255,982 |
| ES | Spain | 7,140 | 0.8 | 84 | 3,733,641 | 254,727 | 2,095,625 | 9.14% | 15.39% | 6.55% | 153,000,000 | 11,100,000 | 89,400,000 |
| FI | Finland | 4,049 | 0.46 | 42 | 1,401,658 | 320,239 | 1,548,562 | 2.96% | 10.18% | 3.74% | 34,300,000 | 7,964,368 | 37,800,000 |
| FR | France | 20,256 | 2.28 | 248 | 3,537,015 | 457,697 | 2,902,571 | 7.12% | 11.09% | 6.26% | 411,000,000 | 57,400,000 | 355,000,000 |
| GB | UK | 68,153 | 7.68 | 660 | 1,037,499 | 263,688 | 1,350,755 | 7.47% | 8.86% | 6.25% | 436,000,000 | 110,000,000 | 560,000,000 |

*(Continued)*

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13273 by University Of Michigan Library, Wiley Online Library on [03/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
833
**SER 1215**

*Global Pricing of Carbon* 3691

**Table 1**—*Continued*

| Code | Country | Frequency | Percentage | # co. | S1TOT | S2TOT | S3TOT | S1CHG | S2CHG | S3CHG | TOTS1 | TOTS2 | TOTS3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GH | Ghana | 235 | 0.03 | 2 | 3,583 | 3,103 | 68,338 | 0.63% | 3.23% | 2.96% | 6,882 | 5,945 | 133,928 |
| GR | Greece | 1,929 | 0.22 | 23 | 4,208,318 | 155,010 | 938,891 | 13.98% | 18.93% | 7.11% | 47,800,000 | 2,284,545 | 11,200,000 |
| HK | Hong Kong | 28,827 | 3.25 | 830 | 1,963,473 | 177,584 | 524,083 | 14.95% | 28.14% | 14.69% | 383,000,000 | 45,200,000 | 119,000,000 |
| HR | Croatia | 128 | 0.01 | 2 | 839,807 | 101,136 | 745,120 | −6.99% | −1.29% | 12.21% | 1,503,091 | 194,606 | 1,321,002 |
| HU | Hungary | 474 | 0.05 | 3 | 2,033,690 | 348,850 | 2,292,191 | 8.91% | 22.72% | 0.16% | 6,100,691 | 1,046,018 | 6,871,986 |
| ID | Indonesia | 8,865 | 1 | 130 | 982,778 | 88,318 | 416,476 | 12.58% | 14.81% | 10.12% | 62,100,000 | 5,377,655 | 28,000,000 |
| IE | Ireland | 1,749 | 0.2 | 20 | 1,013,523 | 88,576 | 854,927 | 5.99% | 9.48% | 5.64% | 12,700,000 | 1,108,046 | 10,300,000 |
| IL | Israel | 5,688 | 0.64 | 92 | 207,414 | 49,185 | 289,135 | 12.32% | 15.74% | 9.46% | 9,144,490 | 1,943,727 | 10,900,000 |
| IN | India | 33,514 | 3.78 | 518 | 3,452,714 | 141,930 | 1,006,817 | 13.04% | 19.06% | 12.24% | 831,000,000 | 34,700,000 | 248,000,000 |
| IS | Iceland | 81 | 0.01 | 3 | 1,257 | 1,412 | 26,849 | 32.91% | 28.11% | 28.32% | 3,156 | 3,806 | 67,937 |
| IT | Italy | 6,656 | 0.75 | 107 | 4,129,000 | 307,340 | 2,549,945 | 6.26% | 11.40% | 5.64% | 169,000,000 | 14,300,000 | 118,000,000 |
| JM | Jamaica | 68 | 0.01 | 2 | 335 | 1,422 | 11,711 | 1.05% | 16.31% | 12.74% | 671 | 2,843 | 23,423 |
| JO | Jordan | 196 | 0.02 | 4 | 1,325 | 6,190 | 30,871 | −7.52% | 0.47% | 6.09% | 4,338 | 17,295 | 102,857 |
| JP | Japan | 124,903 | 14.07 | 2,258 | 1,312,299 | 231,427 | 1,511,355 | 4.90% | 10.72% | 5.22% | 380,000,000 | 204,000,000 | 1,250,000,000 |
| KE | Kenya | 524 | 0.06 | 8 | 103,831 | 8,819 | 75,464 | 24.97% | 27.08% | 14.38% | 799,872 | 58,883 | 458,581 |
| KW | Korea | 51,738 | 5.83 | 843 | 1,243,235 | 166,251 | 1,001,098 | 10.34% | 14.19% | 9.15% | 397,000,000 | 60,700,000 | 344,000,000 |
| KZ | Kazakhstan | 45 | 0.01 | 1 | 1,153 | 1,005 | 21,863 | 19.74% | 18.64% | 13.32% | 1,153 | 1,005 | 21,863 |
| LB | Lebanon | 85 | 0.01 | 2 | 3,788 | 11,484 | 34,112 | 10.68% | 13.73% | 19.42% | 5,696 | 17,485 | 54,787 |
| LK | Sri Lanka | 452 | 0.05 | 4 | 11,715 | 29,408 | 42,644 | 10.17% | 23.04% | 6.94% | 28,522 | 89,216 | 136,662 |
| LT | Lithuania | 58 | 0.01 | 1 | 1,590 | 4,595 | 18,366 | 23.73% | 20.36% | 21.61% | 1,590 | 4,595 | 18,366 |
| LU | Luxembourg | 54 | 0.01 | 3 | 1,035 | 1,368 | 8,149 | −33.03% | −36.01% | −24.82% | 2,263 | 2,823 | 17,197 |
| MA | Morocco | 1,352 | 0.15 | 13 | 1,690,454 | 67,664 | 307,399 | 6.16% | 8.18% | 5.86% | 15,400,000 | 582,425 | 2,563,349 |
| MU | Mauritius | 114 | 0.01 | 3 | 925 | 1,368 | 9,340 | 45.24% | 67.68% | 27.90% | 2,115 | 3,259 | 22,106 |
| MX | Mexico | 4,157 | 0.47 | 65 | 630,508 | 322,220 | 1,146,013 | 10.20% | 15.55% | 9.50% | 23,000,000 | 10,100,000 | 36,900,000 |
| MY | Malaysia | 12,596 | 1.42 | 188 | 1,289,048 | 58,716 | 364,614 | 12.85% | 18.36% | 9.32% | 108,000,000 | 6,093,201 | 32,100,000 |
| NG | Nigeria | 1,182 | 0.13 | 16 | 1,556,752 | 68,555 | 299,827 | 1.31% | 5.69% | 0.65% | 23,600,000 | 1,024,925 | 4,236,235 |
| NL | Netherlands | 5,579 | 0.63 | 63 | 5,563,867 | 702,550 | 2,898,875 | 5.06% | 7.38% | 4.50% | 188,000,000 | 23,700,000 | 97,700,000 |
| NO | Norway | 5,680 | 0.64 | 97 | 1,269,294 | 294,583 | 1,627,966 | 10.02% | 13.26% | 9.33% | 49,000,000 | 9,238,739 | 56,700,000 |

*(Continued)*

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
834
**SER 1216**

3692       *The Journal of Finance*®

**Table I**—*Continued*

| Code | Country | Frequency | Percentage | # co. | S1TOT | S2TOT | S3TOT | S1CHG | S2CHG | S3CHG | TOTS1 | TOTS2 | TOTS3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NZ | New Zealand | 3,011 | 0.34 | 50 | 393,267 | 32,502 | 239,998 | 5.67% | 9.68% | 8.79% | 8,036,961 | 707,115 | 5,067,580 |
| OM | Oman | 488 | 0.05 | 8 | 369,577 | 60,682 | 106,543 | 6.60% | 16.64% | 8.10% | 2,686,115 | 433,197 | 755,255 |
| PE | Peru | 544 | 0.06 | 5 | 1,023,906 | 213,257 | 201,341 | 15.87% | 18.77% | 10.71% | 3,617,539 | 755,370 | 721,199 |
| PH | Philippines | 5,583 | 0.63 | 72 | 1,077,980 | 87,818 | 518,201 | 17.10% | 26.63% | 12.66% | 49,100,000 | 4,010,504 | 23,100,000 |
| PK | Pakistan | 3,169 | 0.36 | 51 | 750,597 | 40,021 | 217,645 | 12.02% | 14.41% | 9.61% | 25,900,000 | 1,223,456 | 6,959,005 |
| PL | Poland | 5,672 | 0.64 | 60 | 2,368,805 | 158,750 | 619,717 | 12.22% | 18.37% | 10.16% | 94,300,000 | 6,032,271 | 22,200,000 |
| PT | Portugal | 1,351 | 0.15 | 17 | 3,179,836 | 233,808 | 1,365,071 | 2.71% | 12.34% | 3.92% | 26,400,000 | 1,974,726 | 11,800,000 |
| QA | Qatar | 1,222 | 0.14 | 23 | 611,145 | 45,424 | 210,790 | 7.31% | 12.18% | 6.43% | 10,900,000 | 812,774 | 3,752,829 |
| RO | Romania | 250 | 0.03 | 4 | 886,381 | 56,688 | 680,844 | 14.92% | 9.79% | 8.08% | 3,381,664 | 202,319 | 2,430,224 |
| RS | Serbia | 168 | 0.02 | 3 | 272,240 | 23,975 | 196,896 | 23.17% | 18.38% | 19.48% | 601,691 | 55,795 | 452,004 |
| RU | Russia | 1,925 | 0.22 | 26 | 10,100,000 | 816,962 | 6,098,643 | 16.11% | 19.48% | 9.72% | 147,000,000 | 10,800,000 | 72,600,000 |
| SA | Saudi Arabia | 1,088 | 0.12 | 98 | 2,345,866 | 1,002,530 | 1,190,067 | -10.47% | 8.66% | 4.26% | 66,100,000 | 22,600,000 | 43,600,000 |
| SE | Sweden | 11,560 | 1.3 | 174 | 228,060 | 74,868 | 703,569 | 7.48% | 11.15% | 7.88% | 17,000,000 | 6,014,555 | 53,200,000 |
| SG | Singapore | 9,881 | 1.11 | 145 | 864,602 | 122,194 | 1,143,235 | 12.55% | 18.94% | 10.64% | 55,800,000 | 8,285,673 | 74,100,000 |
| SI | Slovenia | 220 | 0.02 | 3 | 13,270 | 26,995 | 71,210 | 1.05% | 21.79% | 5.40% | 37,469 | 78,045 | 203,048 |
| TH | Thailand | 5,767 | 0.65 | 106 | 2,089,681 | 167,475 | 674,012 | 14.69% | 23.17% | 13.21% | 88,800,000 | 6,770,391 | 31,000,000 |
| TN | Tunisia | 140 | 0.02 | 2 | 239 | 235 | 5,106 | -6.55% | 0.70% | -1.53% | 477 | 469 | 10,212 |
| TR | Turkey | 4,706 | 0.53 | 58 | 1,697,617 | 130,762 | 768,350 | 15.98% | 18.69% | 8.58% | 55,000,000 | 4,237,040 | 23,400,000 |
| TW | Taiwan | 41,061 | 4.63 | 684 | 530,858 | 134,310 | 531,483 | 10.24% | 17.23% | 7.74% | 135,000,000 | 41,300,000 | 147,000,000 |
| UG | Uganda | 88 | 0.01 | 1 | 842 | 1,470 | 4,194 | 34.73% | 71.91% | 4.62% | 842 | 1,470 | 4,194 |
| US | USA | 175,377 | 19.76 | 3,013 | 2,012,926 | 323,727 | 1,733,058 | 7.87% | 13.84% | 8.24% | 2,330,000,000 | 403,000,000 | 2,100,000,000 |
| VN | Vietnam | 820 | 0.09 | 15 | 479,322 | 43,086 | 343,905 | 12.19% | 18.35% | 14.68% | 6,087,639 | 552,733 | 4,260,247 |
| ZA | South Africa | 14,883 | 1.68 | 148 | 1,074,195 | 444,228 | 423,650 | 10.53% | 17.41% | 6.08% | 95,900,000 | 41,400,000 | 40,100,000 |
| ZW | Zimbabwe | 56 | 0.01 | 2 | 15,480 | 14,546 | 138,070 | -6.75% | 1.28% | 8.77% | 48,346 | 45,915 | 457,559 |
| Total | | 887,429 | 100 | 14,468 | 1,874,065 | 246,606 | 1,301,047 | 9.73% | 15.35% | 8.86% | 11,813,099,883 | 1,615,895,170 | 7,990,066,031 |

Exhibit 36 to Decl. of Lyon
835
**SER 1217**

*Global Pricing of Carbon* 3693

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

S2CHG, and S3CHG), and the total yearly emissions by country (*TOTS1*, *TOTS2*, and *TOTS3*).

The largest country by number of observations is obviously the United States, but remarkably it only represents around 19.8% of total observations, with Japan a close second with 14% of observations, and China as third with around 8.2% of observations. Importantly for our analysis, Table I highlights that the majority of the listed firms in our sample is not concentrated in these three large economies. In aggregate, the entire population of countries in our sample produces a staggering 11.81 billion tons of scope 1, 1.62 billion tons of scope 2, and 7.99 billion tons of scope 3 emissions per year. The three biggest contributors in terms of total carbon emissions produced are China producing 2.91 billion tons of scope 1 emissions per year, followed by the United States with 2.33 billion, and Japan contributing 980 million. The same three countries also dominate scope 2 and scope 3 emissions, except that the ranking changes, with the United States producing 2.1 billion of scope 3 emissions, followed by Japan with 1.25 billion, and China with 841 million tons of $CO_2$.

The global production of emissions does not necessarily reflect the contribution of each firm to the total, as the relative sizes of countries vary. In fact, the top three countries in terms of scope 1 emissions per firm are Russia, the Netherlands, and Greece, with their respective emission levels of 10.1 million, 5.6 million, and 4.2 million tons of $CO_2$ per year. An average Russian firm also leads the rankings in terms of scope 3 emissions with 6.1 million tons of $CO_2$, followed by Germany and France, with respective numbers of 3.4 and 2.9 million tons of $CO_2$. A slightly different picture can be painted when we compare firm-level emission intensities. The most intense countries in terms of scope 1 emissions include Estonia, Morocco, and Peru. Among the largest countries, Russia, India, and China score relatively high, while France, Japan, and the United Kingdom score relatively low.

Another striking observation is that carbon emissions are growing in most countries throughout our sample period. The country with the highest growth rate in scope 1 emissions is Mauritius, with an average yearly growth rate of 45%. The second largest is Bulgaria, with a 35% growth rate, and the third, fourth, and fifth largest are, respectively, Iceland, Kenya, and Lithuania. All these five countries have witnessed rapid GDP growth over our sample period. Among the largest economies, the ones with the highest growth rate in emissions are China with nearly 18%, the Russian Federation with 16%, the United States with 7.9%, and Germany with 7.1% growth rates. Among the countries with the lowest growth rates in scope 1 emissions are, remarkably, Saudi Arabia with a negative 10.5% growth rate (this may reflect the fact that a lot of companies have gone public over our sample period, lowering the average per-company scope 1 emissions), Luxembourg with a negative 33% growth rate, and Jordan with a minus 7.5% growth rate. When it comes to the growth rate in scope 3 emissions, some of these rankings are reversed, reflecting the fact that some countries increasingly rely on imports whose production generates high emissions. Thus, Saudi Arabia has a 4.3% growth rate in scope 3 emissions.

Exhibit 36 to Decl. of Lyon
836
**SER 1218**

3694                      *The Journal of Finance®*

2005-2011



**Figure 3.  Total annual carbon emissions by country.** (Color figure can be viewed at wiley-onlinelibrary.com)

2005-2011



**Figure 4.  Average annual total carbon emissions per firm.** (Color figure can be viewed at wileyonlinelibrary.com)

In Figures 3 and 4, we further represent the detailed cross-country variation in total emissions over two equal-length time periods, which classify countries into four categories by their performance in these metrics. The left panel of each figure represents scope 1 emissions, the middle panel scope 2 emissions, and the right panel scope 3 emissions. As can be seen in

Exhibit 36 to Decl. of Lyon
837
**SER 1219**

15405261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [09/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*Global Pricing of Carbon*                    3695

Figure 3, the countries with the highest total average yearly emissions are first, the countries with the highest GDP, second the countries with the largest populations, and third the largest commodity exporting countries. Important exceptions are Sweden, which has the lowest emissions among developed countries, Iceland, and the Czech Republic. Importantly for our analysis, there is considerable cross-country variation in total emissions. To the extent that the carbon premium reflects concerns about the level of emissions, we expect to see considerable variation in the premium across countries.

We further show how the performance of countries has changed from the first half period of our sample from 2005 to 2011, to the second half period from 2012 to 2018. The most noteworthy changes are the deterioration in total emission performance of Latin America, the Russian Federation, Turkey, and Australia.

Interestingly, however, there is little correlation between a country's levels of total emissions and average per-firm emissions, as can be seen in Figure 4, which represents the cross-country variation in average per-firm emissions. Among the worst performers in the world in per-firm emissions are the United States, Saudi Arabia, Argentina, Colombia, China, the Russian Federation, India, Japan, and the European Union (excluding the United Kingdom).

In Table II, Panel A, we report summary statistics on per-firm carbon emissions in units of tons of $CO_2$ emitted in a year, normalized using the natural log scale. Thus, the log of total scope 1 emissions of the average firm in our sample (*LOGS1TOT*) is 10.32, with a standard deviation of 2.95. Note that the median number is the largest for scope 3 emissions (*LOGS3TOT*), indicating that most companies in our sample are significantly exposed to indirect emissions. To mitigate the impact of outliers, we have winsorized all growth measures at the 2.5% level. In Panel B, we report the correlations between the total emissions variable and the emission percentage change variable for the three different categories of emissions. Interestingly, the correlation coefficients are quite low, indicating that the emission change variable reflects a different type of variation in the data.

In Panel C, we study the autocorrelation patterns of both levels and rates of change of emissions. Formally, we estimate the regression model of annual emissions measures with their respective 1-year lags only (in columns (1) to (3)), and year-month- and firm-fixed effects (in columns (4) to (6)). We double the cluster standard errors by firm and year. The results indicate a significant persistence of emission levels, even after controlling for fixed effects, and almost no persistence in the rates of change measure. These results provide additional empirical support for emission levels as a metric of long-term transition risk and emission changes as a metric of short-term transition risk.

Finally, Panel D provides summary statistics on stock returns and several control variables we use in our subsequent tests. The dependent variable, $RET_{i,t}$, in our cross-sectional return regressions is the monthly return of an individual stock $i$ in month $t$. We use the following control variables in our cross-sectional regressions: $LOGSIZE_{i,t}$, which is given by the natural logarithm of firm $i$'s market capitalization (price times shares outstanding) at the

Exhibit 36 to Decl. of Lyon
838
**SER 1220**

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

3696                                    *The Journal of Finance®*

## Table II
## Summary Statistics

This tables reports summary statistics (averages, medians, and standard deviations) for the variables used in regressions. The sample period is from 2005 to 2018. Panels A and B report the emission variables and their pairwise correlations. Panel C shows the results from the autocorrelation results for the levels and changes in emissions measured at an annual frequency. Columns (1) to (3) include no fixed effects, while columns (4) to (6) include year- and firm-fixed effects. Standard errors (in parentheses) are double clustered by firm and year. Panel D reports summary statistics of the control variables. $RET$ is the monthly stock return; $LOGSIZE$ is the natural logarithm of market capitalization (in $ million); $B/M$ is the book value of equity divided by market value of equity; $ROE$ is the return on equity; $LEVERAGE$ is the book value of leverage defined as the book value of debt divided by the book value of assets; $MOM$ is the cumulative stock return over the 1 year period; $INVEST/A$ is the CAPEX divided by book value of assets; $HHI$ is the Herfindahl index of the business segments of a company with weights proportional to revenues; $LOGPPE$ is the natural logarithm of plant, property, and equipment (in $ million); $VOLAT$ is the monthly stock return volatility calculated over the 1 year period; $MSCI_{i,t}$ is an indicator variable equal to 1 if a stock $i$ is part of MSCI World Index in year $t$, and 0 otherwise. $SALESGR$ is the annual percentage change in firm revenues. $LTG$ is the mean consensus forecast of long-term earnings growth. $GDPPC$ is a country's GDP per capita. $MANUFPERC$ is the percentage of a country's output that is attributed to the manufacturing sector. $HEALTHEXPPC$ is the value of expenses on health per capita. $ELRENEW$ is a country's percentage contribution of renewable energy to the total energy production. $ENINT$ is a country's energy intensity. $ENUSEPC$ is a country's energy consumption per capita. Rule of law, $RULELAW$, captures perceptions of the extent to which agents have confidence in and abide by the rules of society, and in particular the quality of contract enforcement, property rights, the police, and the courts, as well as the likelihood of crime and violence. The measure is standardized between −2.5 and 2.5. $VOICE$ reflects perceptions of the extent to which a country's citizens are able to participate in selecting their government, as well as freedom of expression, freedom of association, and a free media. The measure is standardized between −2.5 and 2.5. $GINI$ is a country's Gini inequality index as a percentage. $INTPOLICY$ is a country's tightness of climate international policies. $DOMPOLICY$ is a country's tightness of climate domestic policies. $CRI$ is a country's index of physical climate risk. ***1% significance; **5% significance; *10% significance.

### Panel A: Carbon Emissions

| Variable | Mean | Median | Standard Deviation |
|---|---|---|---|
| Log (Carbon Emissions Scope 1 (tons CO2e)) (*LOGS1TOT*) | 10.317 | 10.135 | 2.951 |
| Log (Carbon Emissions Scope 2 (tons CO2e)) (*LOGS2TOT*) | 10.173 | 10.233 | 2.265 |
| Log (Carbon Emissions Scope 3 (tons CO2e)) (*LOGS3TOT*) | 11.966 | 12.021 | 2.219 |
| Growth Rate in Carbon Emissions Scope 1 (winsorized at 2.5%) (*S1CHG*) | 9.73% | 3.34% | 41.34% |
| Growth Rate in Carbon Emissions Scope 2 (winsorized at 2.5%) (*S2CHG*) | 15.35% | 5.83% | 49.01% |
| Growth Rate in Carbon Emissions Scope 3 (winsorized at 2.5%) (*S2CHG*) | 8.86% | 5.44% | 25.74% |

*(Continued)*

Exhibit 36 to Decl. of Lyon
839
**SER 1221**

*Global Pricing of Carbon*          3697

**Table II**—*Continued*

### Panel B: Carbon Emissions: Cross-Correlations

| Variables | S1CHG | S2CHG | S3CHG | LOGS1TOT | LOGS2TOT | LOGS3TOT |
|---|---|---|---|---|---|---|
| *S1CHG* | 1 | | | | | |
| *S2CHG* | 0.485 | 1 | | | | |
| *S3CHG* | 0.555 | 0.503 | 1 | | | |
| *LOGS1TOT* | 0.040 | −0.004 | −0.045 | 1 | | |
| *LOGS2TOT* | −0.020 | 0.045 | −0.061 | 0.736 | 1 | |
| *LOGS3TOT* | −0.047 | −0.046 | −0.059 | 0.808 | 0.824 | 1 |

### Panel C: Autocorrelations

| Variables | (1) LOGS1TOT | (2) LOGS2TOT | (3) LOGS3TOT | (4) LOGS1TOT | (5) LOGS2TOT | (6) LOGS3TOT |
|---|---|---|---|---|---|---|
| $LOGS1TOT_{t,-12}$ | 0.981*** (0.002) | | | 0.640*** (0.030) | | |
| $LOGS2TOT_{t,-12}$ | | 0.962*** (0.005) | | | 0.613*** (0.029) | |
| $LOGS3TOT_{t,-12}$ | | | 0.973*** (0.005) | | | 0.647*** (0.027) |
| Constant | 0.222*** (0.027) | 0.462*** (0.069) | 0.386*** (0.067) | 3.809*** (0.313) | 4.076*** (0.301) | 4.349*** (0.332) |
| Year-fixed effects | No | No | No | Yes | Yes | Yes |
| Firm-fixed effects | No | No | No | Yes | Yes | Yes |
| Observations | 64,568 | 64,575 | 64,635 | 61,357 | 61,366 | 61,426 |
| R-squared | 0.962 | 0.936 | 0.973 | 0.975 | 0.956 | 0.983 |

(*Continued*)

15406261, 2023, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
840
**SER 1222**

3698                    *The Journal of Finance*®

**Table II**—*Continued*

| Variables | (1)<br>S1CHG | (2)<br>S2CHG | (3)<br>S3CHG | (4)<br>S1CHG | (5)<br>S2CHG | (6)<br>S3CHG |
|---|---|---|---|---|---|---|
| $S1CHG_{t-12}$ | 0.016 | | | -0.120*** | | |
| | (0.014) | | | (0.017) | | |
| $S2CHG_{t-12}$ | | -0.009 | | | -0.135*** | |
| | | (0.012) | | | (0.014) | |
| $S3CHG_{t-12}$ | | | 0.088** | | | -0.068** |
| | | | (0.029) | | | (0.029) |
| Constant | 0.077*** | 0.127*** | 0.062*** | 0.086*** | 0.143*** | 0.074*** |
| | (0.011) | (0.018) | (0.019) | (0.001) | (0.002) | (0.002) |
| Year-fixed effects | No | No | No | Yes | Yes | Yes |
| Firm-fixed effects | No | No | No | Yes | Yes | Yes |
| Observations | 52,175 | 52,173 | 52,232 | 47,912 | 47,914 | 47,974 |
| $R$-squared | 0.000 | 0.000 | 0.009 | 0.162 | 0.164 | 0.241 |

*(Continued)*

15496261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13273 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
841
**SER 1223**

*Global Pricing of Carbon*     3699

**Table II**—*Continued*

Panel D: Regression Controls

| Variables | Mean | Median | Standard Deviation |
|---|---|---|---|
| RET (%) | 1.076 | 0.054 | 10.229 |
| LOGSIZE | 11.105 | 9.644 | 5.212 |
| B/M (winsorized at 2.5%) | 0.572 | 0.440 | 0.510 |
| LEVERAGE (winsorized at 2.5%) | 0.227 | 0.209 | 0.175 |
| MOM (winsorized at 2.5%) | 0.136 | 0.089 | 0.383 |
| INVEST/A (winsorized at 2.5%) | 0.049 | 0.035 | 0.048 |
| HHI | 0.798 | 0.985 | 0.252 |
| LOGPPE | 7.748 | 7.684 | 3.313 |
| ROE (winsorized at 2.5%) | 11.094 | 10.870 | 16.076 |
| VOLAT (winsorized at 2.5%) | 0.090 | 0.079 | 0.051 |
| MSCI | 0.337 | 0 | 0.473 |
| SALESGR (winsorized at 2.5%) | 0.095 | 0.062 | 0.240 |
| LTG (winsorized at 1%) | 12.80 | 11.55 | 11.48 |
| GDPPC | 36,540.75 | 44,508 | 19,253 |
| MANUFPPERC (%) | 15.93 | 12.99 | 7.43 |
| HLTHEXPPC | 4,235.74 | 4,099.47 | 3,025.87 |
| ELRENEW (%) | 5.33 | 3.83 | 5.71 |
| ENINT | 5.19 | 5.20 | 1.66 |
| ENUSEPC | 4,476.64 | 3,921.90 | 2,186.91 |
| RULELAW | 1.15 | 1.53 | 0.77 |
| VOICE | 0.73 | 1.03 | 0.85 |
| GINI (%) | 36.96 | 35.40 | 6.32 |
| INTPOLICY | 0.49 | 0.58 | 0.29 |
| DOMPOLICY | 0.53 | 0.51 | 0.27 |
| CRI | 46.84 | 44.83 | 25.86 |

15409261, 2023, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
842
**SER 1224**

15496261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13275 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

3700                     *The Journal of Finance®*

end of year $t$; $B/M_{i,t}$, which is firm $i$'s book value divided by its market cap at the end of year $t$; $LEVERAGE_{i,t}$, which is the ratio of debt to book value of assets; momentum, $MOM_{i,t}$, which is given by the average of the most recent 12 months' returns on stock $i$, leading up to and including month $t-1$; capital expenditures $INVEST/A_{i,t}$, which we measure as the firm's capital expenditures divided by the book value of its assets; a measure of the firm's specialization, $HHI_{i,t}$, which is the Herfindahl concentration index of the firm with respect to its different business segments, based on each segment's revenues; the firm's stock of physical capital, $LOGPPE_{i,t}$, which is given by the natural logarithm, of the firm's property, plant, and equipment; the firm's earnings performance $ROE_{i,t}$, which is given by the ratio of firm $i$'s net yearly income divided by the value of its equity; the firm's idiosyncratic risk, $VOLAT_{i,t}$, which is the standard deviation of returns based on the past 12 month's returns; and, $MSCI_{i,t}$, which is an indicator variable equal to 1 if a stock $i$ is part of the MSCI World index in year $t$, and 0 otherwise. $SALESGR_{i,t}$ is the annual growth rate in firm sales, $LTG$ is the analyst forecasts of the long-term earnings growth for firm $i$ at time $t$, averaged across all analysts. To mitigate the impact of outliers, we have winsorized *B/M, LEVERAGE, INVEST/A, ROE, MOM,* and *VOLAT* at the 2.5% level, and *LTG* at the 1% level.

In Panel D, we also summarize all the relevant variables that we use in our cross-sectional analysis. These include measures related to technological progress, energy intensity, socioeconomic development, policy environment, and physical risk. We define each one explicitly in their respective tests in Section V. The average firm's monthly stock return equals 1.08%, with a standard deviation of 10.23%. The average firm has a market capitalization of $66 billion, significantly larger than the size of the median firm in our sample, which is $15 billion. The average book-to-market ratio is 0.57, and average book leverage is 23%. The average return on equity equals 11.1%, slightly more than the median of 10.87%.

Table III provides summary statistics by year for the total number of firms in our sample in any given year, and the level and percentage change in emissions for all three *scope* categories. Note the large increase in coverage after 2015, when the number of firms jumps from 5,427 in 2015 to 11,961 in 2016. This is because Trucost has been able to substantially expand the set of firms for which it collects data on carbon emissions from 2016 onward. For most of our empirical tests, we rely on cross-sectional variation in the data, so that we are less exposed to a possible structural break in the data in 2016. Moreover, many of our results hold when we restrict our sample to legacy firms, that is, those present in the sample prior to 2016.

We also report the distribution of firms by industry in Table IA.I, using the six-digit Global Industry Classification (GIC6). Our global database should reflect a greater proportion of firms in manufacturing and agriculture than is the case in developed economies. This is indeed what is reflected in Table IV, with 580 companies in the machinery industry; 530 in the chemicals industry; 520 in the electronic equipment, instruments, and components industry; 506 in metals and mining; and 440 food products companies. In the services sector,

Exhibit 36 to Decl. of Lyon
843
**SER 1225**

*Global Pricing of Carbon* 3701

**Table III**
**Carbon Emissions by Year**

The table reports the annual averages across all countries of all emission variables over the period 2005 till 2018.

| Year | Number of Firms | S1TOT | S2TOT | S3TOT | S1CHG | S2CHG | S3CHG | TOTS1 | TOTS2 | TOTS3 |
|------|------|------|------|------|------|------|------|------|------|------|
| 2005 | 3,232 | 2,391,417 | 246,612 | 1,822,093 | – | – | – | 917000000 | 106000000 | 828000000 |
| 2006 | 3,532 | 2,367,787 | 264,064 | 1,705,187 | 16.18% | 18.59% | 9.83% | 894000000 | 115000000 | 749000000 |
| 2007 | 3,689 | 2,488,889 | 290,500 | 1,800,563 | 18.89% | 22.94% | 15.94% | 934000000 | 125000000 | 766000000 |
| 2008 | 3,736 | 2,541,971 | 330,705 | 1,679,148 | 9.34% | 18.13% | −0.16% | 955000000 | 146000000 | 728000000 |
| 2009 | 3,949 | 2,285,281 | 311,700 | 1,643,489 | 3.24% | 8.47% | 10.02% | 870000000 | 136000000 | 720000000 |
| 2010 | 4,098 | 2,407,166 | 308,070 | 1,633,414 | 14.26% | 18.14% | 8.34% | 904000000 | 130000000 | 689000000 |
| 2011 | 4,221 | 2,563,380 | 322,518 | 1,825,353 | 9.51% | 15.73% | 14.51% | 937000000 | 136000000 | 761000000 |
| 2012 | 4,253 | 2,402,493 | 317,779 | 1,791,769 | 8.71% | 10.60% | 3.31% | 868000000 | 133000000 | 748000000 |
| 2013 | 4,912 | 2,211,603 | 297,793 | 1,619,450 | 7.06% | 8.43% | 4.06% | 878000000 | 135000000 | 743000000 |
| 2014 | 5,323 | 2,118,666 | 292,460 | 1,432,881 | 6.88% | 20.46% | 4.90% | 895000000 | 142000000 | 694000000 |
| 2015 | 5,427 | 2,009,876 | 276,453 | 1,228,497 | 3.87% | 2.48% | −1.76% | 860000000 | 137000000 | 604000000 |
| 2016 | 11,961 | 1,038,161 | 143,425 | 693,127 | 5.95% | 11.13% | 10.81% | 1130000000 | 183000000 | 902000000 |
| 2017 | 12,817 | 1,046,853 | 167,407 | 759,076 | 13.60% | 26.03% | 19.03% | 1230000000 | 221000000 | 1050000000 |
| 2018 | 8,781 | 1,136,396 | 148,745 | 729,199 | 10.53% | 12.24% | 6.21% | 1050000000 | 142000000 | 663000000 |

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
844
**SER 1226**

3702       *The Journal of Finance*®

## Table IV
## Predictors of Carbon Emissions

The sample period is from 2005 to 2018. The dependent variables are carbon emission levels (Panel A) and the growth in emissions (Panel B). All variables are defined in Tables I and II. We report the results of the pooled regression with standard errors (in parentheses) double clustered at the firm and year levels. All regressions include year-month-fixed effects and country-fixed effects. In columns (4) to (6), we additionally include Trucost industry-fixed effects. ***1% significance; **5% significance; *10% significance.

### Panel A: Levels

| Variables | (1) LOGS1TOT | (2) LOGS2TOT | (3) LOGS3TOT | (4) LOGS1TOT | (5) LOGS2TOT | (6) LOGS3TOT |
|---|---|---|---|---|---|---|
| LOGSIZE | −0.085** | 0.265*** | 0.210*** | 0.329*** | 0.472*** | 0.453*** |
| | (0.039) | (0.023) | (0.016) | (0.020) | (0.027) | (0.023) |
| B/M | −0.093 | 0.108** | −0.007 | 0.371*** | 0.451*** | 0.381*** |
| | (0.061) | (0.040) | (0.037) | (0.044) | (0.051) | (0.047) |
| ROE | 0.010*** | 0.011*** | 0.014*** | 0.008*** | 0.008*** | 0.009*** |
| | (0.002) | (0.001) | (0.001) | (0.001) | (0.001) | (0.001) |
| LEVERAGE | 0.533** | 0.326 | −0.363* | 0.669*** | 0.671*** | 0.370*** |
| | (0.221) | (0.226) | (0.170) | (0.099) | (0.127) | (0.097) |
| INVEST/A | 5.021*** | 1.079** | −1.882*** | −1.136*** | −1.928*** | −3.089*** |
| | (0.698) | (0.396) | (0.300) | (0.371) | (0.322) | (0.287) |
| HHI | −2.038*** | −0.763*** | −1.232*** | −1.216*** | −0.660*** | −0.722*** |
| | (0.145) | (0.087) | (0.118) | (0.074) | (0.059) | (0.062) |
| LOGPPE | 0.782*** | 0.469*** | 0.534*** | 0.428*** | 0.336*** | 0.346*** |
| | (0.026) | (0.014) | (0.014) | (0.015) | (0.016) | (0.016) |
| MSCI | 0.119* | 0.226*** | 0.203*** | 0.176*** | 0.256*** | 0.218*** |
| | (0.059) | (0.045) | (0.041) | (0.040) | (0.049) | (0.042) |
| Constant | 6.359*** | 3.850*** | 6.456*** | 3.902*** | 2.415*** | 4.555*** |
| | (0.383) | (0.263) | (0.240) | (0.215) | (0.260) | (0.212) |
| Year/month-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | No | No | No | Yes | Yes | Yes |
| Observations | 886,751 | 886,895 | 887,429 | 874,592 | 874,736 | 875,270 |
| R-squared | 0.544 | 0.531 | 0.621 | 0.779 | 0.715 | 0.793 |

*(Continued)*

15406261, 2023, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13271 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
845
**SER 1227**

*Global Pricing of Carbon*                    3703

**Table IV**—*Continued*

Panel B: Growth in Emissions

| Variables | (1) S1CHG | (2) S2CHG | (3) S3CHG | (4) S1CHG | (5) S2CHG | (6) S3CHG |
|---|---|---|---|---|---|---|
| LOGSIZE | 0.025*** | 0.029*** | 0.025*** | 0.025*** | 0.027*** | 0.025*** |
|  | (0.002) | (0.005) | (0.002) | (0.002) | (0.005) | (0.003) |
| B/M | −0.060*** | −0.061*** | −0.066*** | −0.067*** | −0.069*** | −0.070*** |
|  | (0.009) | (0.009) | (0.006) | (0.009) | (0.009) | (0.007) |
| ROE | −0.002*** | −0.002*** | −0.001*** | −0.001*** | −0.002*** | −0.001*** |
|  | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) |
| LEVERAGE | 0.060*** | 0.064*** | 0.049*** | 0.060*** | 0.063*** | 0.043*** |
|  | (0.015) | (0.012) | (0.011) | (0.012) | (0.012) | (0.008) |
| INVEST/A | 0.594*** | 0.589*** | 0.372*** | 0.451*** | 0.525*** | 0.317*** |
|  | (0.073) | (0.098) | (0.069) | (0.085) | (0.063) | (0.052) |
| HHI | 0.007 | −0.022 | 0.019*** | 0.011* | −0.017 | 0.020*** |
|  | (0.008) | (0.012) | (0.005) | (0.005) | (0.014) | (0.004) |
| LOGPPE | −0.021*** | −0.021*** | −0.020*** | −0.023*** | −0.022*** | −0.021*** |
|  | (0.003) | (0.002) | (0.002) | (0.003) | (0.002) | (0.002) |
| MSCI | −0.033*** | −0.041*** | −0.030*** | −0.033*** | −0.040*** | −0.029*** |
|  | (0.005) | (0.005) | (0.005) | (0.005) | (0.005) | (0.004) |
| Constant | 0.004 | 0.037 | −0.025 | 0.020 | 0.071 | −0.015 |
|  | (0.024) | (0.059) | (0.026) | (0.024) | (0.062) | (0.031) |
| Year/month-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | No | No | No | Yes | Yes | Yes |
| Observations | 765,387 | 765,397 | 765,949 | 755,257 | 755,267 | 755,819 |
| R-squared | 0.036 | 0.044 | 0.119 | 0.047 | 0.055 | 0.131 |

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13273 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
846
**SER 1228**

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

3704                    *The Journal of Finance®*

the largest represented industries are banking, with 679 banks and real estate, with 619 companies (some of which are also engaged in construction and development).

Finally, we report summary statistics on the main determinants of carbon emissions in Table IV. We regress in turn the log of total firm-level emissions and the percentage change in total emissions on the following firm-level characteristics: *LOGSIZE, B/M, ROE, LEVERAGE, INVEST/A, HHI, LOGPPE,* and *MSCI.* To allow for systematic differences in correlations across countries and over time, we include year-month-fixed effects and country-fixed effects, so that our identification comes from within-country variation across firms. In columns (4) to (6), we further include industry-fixed effects (following the classification of Trucost[10]) to account for possible differences across industries. The results are also robust to using GIC6 codes, though these are less desirable because they may capture companies with different emission profiles.

In Panel A, we show considerable variation across industries in the effect of these variables on emissions (e.g., the $R$-square increases from 0.696 to 0.779 when we add industry-fixed effects to the regression for *LOGS1TOT*). Accordingly, we focus on the regressions with industry-fixed effects and note that total emissions significantly increase with the size of the firm (in particular, if it is a constituent of the MSCI world index), its book-to-market ratio, its leverage, and its tangible capital stock (*PPE*). This is altogether not surprising to the extent that emissions are generated by economic activity, which is proportional to the size of the firm. Somewhat surprising is the strong effect of leverage. One possible explanation is that firms with higher emissions may anticipate a future drop in profitability due to transition risk and, as a result, take more leverage. Interestingly, investment has a strong negative effect on emissions, suggesting that new capital vintages are more carbon efficient. Industry specialization (a high Herfindahl index [HHI]) also has a negative effect on emissions, perhaps because nonspecialized conglomerates tend to be larger. Alternatively, conglomeration can reflect a firm's response to potential costs of high emissions in a particular sector.

## IV. Results

We organize our discussion into three subsections. The first subsection reports results on the pricing of carbon-transition risk throughout the world, the second reports results related to specific drivers of carbon-transition risk, and the third subsection briefly discusses how carbon-transition risk may be gradually priced in as the underlying economy is transitioning away from fossil fuels.

---

[10] These roughly correspond to a three-digit SIC classification.

Exhibit 36 to Decl. of Lyon
847
**SER 1229**

15406261, 2025, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [05/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*Global Pricing of Carbon*                                              3705

### A. Pricing Carbon-Transition Risk throughout the World

In this section, we present our main findings on the pricing of carbon-transition risk. We begin by reporting findings for the full sample of firms. We then proceed to show how the carbon premium is distributed across geographic locations.

### A.1. Empirical Specification

Our analysis of carbon-transition risk centers on two different cross-sectional regression models relating individual companies' stock returns to carbon emissions. Rather than a factor-based model, we take a firm characteristic–based approach along the lines of Daniel and Titman (1997). This approach is particularly well suited given the rich cross-sectional variation in firm characteristics in our sample.[11] As shown in Bolton and Kacperczyk (2021a), the following characteristics are particularly relevant when using carbon emissions as the main sorting variable: firm size, book-to-market, leverage, capital expenditures over assets, property plant and equipment, return on equity, sales growth, sectoral diversification, and a measure of stock price momentum and volatility. This characteristic–based approach also allows us to take full advantage of fixed effects along time, country, and industry dimensions. Further, we can better account for potential dependence of residuals by using a clustering methodology. Finally, the advantage of taking a characteristic-based approach is that we do not need to take a stance on the underlying asset pricing model. One basic conceptual difficulty with the choice of asset pricing model in the context of a complex pricing problem such as climate change risk, is that such a model has not yet been formulated. However, since we do not take a risk-factor approach, we cannot explore the presence of a "carbon alpha" or of any mispricing of carbon-transition risk. Our aim is more limited: to provide a comprehensive picture of the cross-sectional variation in stock-level returns throughout the world. Stated differently, our approach is to identify a company's "carbon beta."

We begin by linking companies' monthly stock returns to their corresponding *total* emissions and other characteristics, all lagged by 1 month. This regression model reflects the long-run, structural, firm-level impact of emissions on stock returns. Taking absolute carbon neutrality as a benchmark, one can think of this measure as a rough proxy for the quantity of risk a firm is exposed to at a given point in time. Specifically, we estimate the following model:

$$RET_{i,t} = a_0 + a_1\big(TOT\ Emissions\big)_{i,t-1} + a_2 Controls_{i,t-1} + \mu_t + \varepsilon_{i,t}, \qquad (1)$$

where $RET_{i,t}$ measures the stock return of company $i$ in month $t$ and *TOT Emissions* is a generic term standing for *LOGS1TOT, LOGS2TOT,*

[11] The risk factor-based approach has been a popular method for measuring risk premia in a single country, but in a fully global study such as this one, this approach is problematic because of the difficulties in specifying appropriate factor-mimicking portfolios for a large number of countries with limited data, and because of cross-country comparability issues.

Exhibit 36 to Decl. of Lyon
848
**SER 1230**

15496261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13271 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

3706                    *The Journal of Finance®*

and *LOGS3TOT*. The vector of firm-level controls includes the firm-specific variables *LOGSIZE, B/M, LEVERAGE, MOM, INVEST/ASSETS, HHI, LOGPPE, ROE,* and *VOLAT*.

Second, we relate companies' *growth in* annual total emissions to their monthly stock returns by estimating the following cross-sectional regression model:

$$RET_{i,t} = a_0 + a_1(Total\ Emissions)_{i,t-1} + a_2 Controls_{i,t-1} + \mu_t + \epsilon_{i,t}. \quad (2)$$

The percentage change in total emissions (*S1CHG, S2CHG,* and *S3CHG*) captures the short-run impact of emissions on stock returns. In particular, changes in total emissions reflect the extent to which companies load up on, or decrease, their material risk with respect to carbon emissions. From a transition perspective, this measure captures the position of a firm on a long-term path toward carbon neutrality. In this respect, it is complementary to the long-term objective captured by the level of emissions.

We estimate these two cross-sectional regressions using pooled OLS. In both models, we also include country-fixed effects, as well as year-month-fixed effects. Hence, our identification is cross-sectional in nature. In some tests, we also include the same set of industry-fixed effects as in Table IV to capture within-industry variation across firms. In all the model specifications, we double cluster standard errors at the firm and year levels, which allows us to account for any cross-firm correlation in the residuals as well as capture the fact that some control variables, including emissions, are measured at an annual frequency. Our coefficient of interest is $a_1$.

### A.2. Evidence from the United States and China

We begin our analysis by comparing the results for our regression models in the two economies with the largest emissions, China and the United States. We report the results in Table V. These two economies differ in fundamental ways, and one would expect the carbon premium to reflect basic differences in the level of economic and financial development and in the legal and political regimes. Yet, we find that the results for scope 1 emissions are surprisingly similar, which suggests that firm-level variation in emissions may be more relevant for transition risk than are the differences between the two countries. Specifically, once one controls for industry and time as well as a battery of firm characteristics, firm-level differences in *LOGS1TOT* generate a highly significant carbon premium of similar size both in China (.069) and in the United States (.071), or equivalently an annualized value of 1.18% and 0.95% per one-standard-deviation change in total emission levels in each country, respectively.[12] Using a slightly shorter period (from 2005 to 2017), Bolton and Kacperczyk (2021a) find that the premium for U.S. companies is slightly lower. Here

---

[12] Throughout the paper, whenever we refer to a one-standard-deviation movement, we calculate standard deviations of a given variable, taking into account the impact of all other controls in

Exhibit 36 to Decl. of Lyon
849
**SER 1231**

*Global Pricing of Carbon* 3707

### Table V
### Carbon Emissions and Stock Returns: United States and China

The sample period is from 2005 to 2018. The dependent variable is *RET*, measured monthly. The main independent variables are carbon emission levels (Panel A) and the growth in emissions (Panel B). All variables are defined in Tables I and II. We report the results of the pooled regression with standard errors (in parentheses) double clustered at the firm and year level. All regressions include year-month-fixed effects, country-fixed effects, and industry-fixed effects. ***1% significance; **5% significance; *10% significance.

Panel A: Levels

| Dependent Variable *RET* | (1) | (2) United States | (3) | (4) | (5) China | (6) |
|---|---|---|---|---|---|---|
| LOGS1TOT | 0.071*** (0.021) | | | 0.069** (0.030) | | |
| LOGS2TOT | | 0.075* (0.036) | | | 0.147* (0.073) | |
| LOGS3TOT | | | 0.126** (0.044) | | | 0.208* (0.106) |
| LOGSIZE | -0.115 (0.129) | -0.134 (0.135) | -0.159 (0.138) | -0.338*** (0.096) | -0.369*** (0.111) | -0.387*** (0.114) |
| B/M | 0.535 (0.347) | 0.522 (0.340) | 0.496 (0.345) | 1.003** (0.395) | 0.963*** (0.373) | 0.944** (0.363) |
| LEVERAGE | -0.453 (0.266) | -0.456 (0.257) | -0.467* (0.261) | -0.113 (0.198) | -0.121 (0.186) | -0.194 (0.172) |
| MOM | 0.296 (0.328) | 0.305 (0.327) | 0.307 (0.328) | 1.014* (0.517) | 1.005* (0.511) | 0.993* (0.501) |
| INVEST/A | 0.407 (2.422) | 0.507 (2.420) | 0.734 (2.343) | -0.403 (0.786) | -0.150 (0.866) | -0.062 (0.869) |
| HHI | 0.013 (0.117) | -0.037 (0.093) | 0.001 (0.108) | 0.610 (0.431) | 0.561 (0.418) | 0.563 (0.413) |
| LOGPPE | 0.011 (0.043) | 0.014 (0.045) | 0.000 (0.044) | 0.058 (0.079) | 0.038 (0.066) | 0.003 (0.054) |
| ROE | 0.005* (0.003) | 0.005* (0.003) | 0.005 (0.003) | 0.026* (0.013) | 0.025* (0.012) | 0.023* (0.012) |
| VOLAT | 3.793 (3.655) | 3.635 (3.597) | 3.715 (3.636) | -2.932 (1.966) | -2.983 (1.941) | -2.829 (1.911) |
| Constant | 0.548 (0.944) | 0.704 (1.000) | 0.195 (1.003) | 2.882* (1.585) | 2.727 (1.613) | 2.251 (1.814) |
| Year/month-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 143,367 | 143,340 | 143,461 | 60,210 | 60,210 | 60,210 |
| R-squared | 0.224 | 0.224 | 0.224 | 0.301 | 0.301 | 0.301 |

(Continued)

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
850
**SER 1232**

3708      *The Journal of Finance®*

**Table V**—*Continued*

Panel B: Growth in Emissions

| Dependent Variable: RET | (1) | (2) United States | (3) | (4) | (5) China | (6) |
|---|---|---|---|---|---|---|
| S1CHG | 0.679*** | | | 0.759** | | |
| | (0.159) | | | (0.256) | | |
| S2CHG | | 0.294* | | | 0.587*** | |
| | | (0.137) | | | (0.193) | |
| S3CHG | | | 1.254** | | | 1.899*** |
| | | | (0.467) | | | (0.504) |
| LOGSIZE | −0.145 | −0.130 | −0.163 | −0.315*** | −0.307*** | −0.337*** |
| | (0.103) | (0.103) | (0.103) | (0.092) | (0.090) | (0.098) |
| B/M | 0.560 | 0.538 | 0.603* | 0.969** | 0.903** | 1.031** |
| | (0.343) | (0.343) | (0.320) | (0.386) | (0.361) | (0.382) |
| LEVERAGE | −0.593** | −0.567** | −0.598** | −0.047 | −0.002 | −0.104 |
| | (0.250) | (0.251) | (0.253) | (0.226) | (0.218) | (0.237) |
| MOM | 0.209 | 0.238 | 0.151 | 0.872 | 0.876 | 0.717 |
| | (0.331) | (0.335) | (0.320) | (0.509) | (0.493) | (0.450) |
| INVEST/A | −0.283 | −0.086 | −0.536 | −0.987 | −1.312 | −1.401 |
| | (2.425) | (2.374) | (2.453) | (0.785) | (0.754) | (0.793) |
| HHI | −0.114 | −0.081 | −0.125 | 0.539 | 0.534 | 0.426 |
| | (0.096) | (0.100) | (0.096) | (0.425) | (0.414) | (0.395) |
| LOGPPE | 0.074 | 0.061 | 0.089 | 0.091 | 0.085 | 0.103 |
| | (0.048) | (0.046) | (0.051) | (0.083) | (0.083) | (0.093) |
| ROE | 0.007*** | 0.006** | 0.007*** | 0.027* | 0.026* | 0.026* |
| | (0.003) | (0.003) | (0.003) | (0.013) | (0.013) | (0.013) |
| VOLAT | 2.678 | 2.842 | 2.622 | −2.699 | −2.833 | −2.934 |
| | (3.904) | (3.895) | (3.998) | (1.964) | (2.031) | (2.018) |
| Constant | 1.335 | 1.264 | 1.354 | 3.050* | 3.031* | 3.198* |
| | (0.753) | (0.765) | (0.777) | (1.604) | (1.586) | (1.608) |
| Year/month-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 141,035 | 140,974 | 141,106 | 58,980 | 58,980 | 58,980 |
| R-squared | 0.227 | 0.227 | 0.227 | 0.303 | 0.302 | 0.304 |

15496261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
851
**SER 1233**

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [09/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*Global Pricing of Carbon*                                          3709

we find a higher premium estimated over the time interval between 2005 and 2018. This higher premium is in line with the findings of Bolton and Kacperczyk (2021a) that the carbon premium is rising over time, especially after the Paris agreement of 2015.

The finding of a firm-level carbon premium for listed Chinese companies is novel and surprising. Although China in many ways has been a pioneer in the promotion of renewable energy, it does not stand out for its ESG institutional investor constituency, nor for its institutional investors' focus on carbon emissions. Yet, financial markets in China do price in a carbon premium at the firm level, both when it comes to direct emissions as well as indirect emissions. The magnitude of the premium is slightly lower relative to that in the United States. The quantitative similarities in the results across the two economies are slightly weaker for the carbon premium associated with the growth in emissions, as can be seen in Panel B. Still, for both countries, the premium is highly statistically significant, though the magnitudes of the premium for China are 10% to 20% higher. The latter finding could be due to the fact that a smaller fraction of companies in China disclose their emissions and to the generally higher growth rate in emissions of Chinese companies.

### A.3. Unconditional Results

We next turn to the estimation of the model for the full sample of 77 countries. Relative to our previous specification, we also include country-fixed effects to account for country-specific variation in the data. We report the results in Table VI. In columns (1) to (3), the estimates are for regressions without industry adjustment; in columns (4) to (6), we include industry-fixed effects. In Panel A, we report the results for the level of carbon emissions. Throughout all specifications, we find a positive and mostly statistically significant effect of total emissions on individual stock returns, consistent with the hypothesis that higher-emission firms are riskier. Interestingly, when we do not control for industry, the economic significance of the carbon premium at the firm level for total scope 1 emissions is much smaller. One possibility is that some firms (or industries) with high emissions have experienced unexpectedly low returns. One example could be the recent devaluation of the energy sector following the decline in commodity prices. For that reason, it seems natural to focus on within-industry variations in carbon emissions. Indeed, when we add an industry-fixed effect, the premium is large and highly significant. A one-standard-deviation increase in *LOGS1TOT* across firms, equal to 1.4, is associated with a return premium of 1.06% per year. These results indicate that variations in stock returns across industries swamp variations in firm-level emissions within a given industry. In our untabulated results, we have also included country-fixed effects interacted with year-month-fixed effects, and industry-fixed effects interacted with year-month-fixed effects, to account

the model, including fixed effects. This is equivalent to calculating the standard deviation of the residual from the predictive model of each emission measure in the model.

Exhibit 36 to Decl. of Lyon
852
**SER 1234**

3710                    The Journal of Finance®

**Table VI**
**Carbon Emissions and Stock Returns: Full Sample**

The sample period is from 2005 to 2018. The dependent variable is *RET*. The main independent variables are carbon emission levels (Panel A) and the growth in emissions (Panel B). Panel C includes both levels and changes of respective emissions. In Panels D and E, we consider different (monthly) lag structures for the measures of emissions. All variables are defined in Tables I and II. We report the results of the pooled regression with standard errors (in parentheses) double clustered at the firm and year level. All regressions include year-month-fixed effects and country-fixed effects. In columns (4) to (6), we additionally include industry-fixed effects. Panels D and E only include specifications with the full set of fixed effects. ***1% significance; **5% significance; *10% significance.

| Dependent Variable: RET | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| | | | Panel A: Levels | | | |
| LOGS1TOT | 0.027 | | | 0.063*** | | |
| | (0.021) | | | (0.015) | | |
| LOGS2TOT | | 0.093*** | | | 0.113*** | |
| | | (0.029) | | | (0.027) | |
| LOGS3TOT | | | 0.112*** | | | 0.164*** |
| | | | (0.031) | | | (0.035) |
| LOGSIZE | -0.149*** | -0.180*** | -0.180*** | -0.185*** | -0.222*** | -0.244*** |
| | (0.041) | (0.042) | (0.043) | (0.041) | (0.042) | (0.044) |
| B/M | 0.519** | 0.512** | 0.522** | 0.630** | 0.608*** | 0.597** |
| | (0.217) | (0.215) | (0.216) | (0.218) | (0.212) | (0.213) |
| LEVERAGE | -0.426** | -0.431** | -0.362** | -0.373** | -0.402** | -0.386** |
| | (0.180) | (0.167) | (0.165) | (0.158) | (0.146) | (0.150) |
| MOM | 1.028** | 1.035** | 1.035** | 1.021** | 1.030** | 1.033** |
| | (0.365) | (0.366) | (0.364) | (0.370) | (0.370) | (0.369) |
| INVEST/A | -0.741 | -0.693 | -0.392 | -0.435 | -0.275 | 0.006 |
| | (1.102) | (1.157) | (1.215) | (1.064) | (1.090) | (1.103) |
| HHI | 0.010 | 0.028 | 0.097 | 0.055 | 0.056 | 0.102 |
| | (0.119) | (0.117) | (0.114) | (0.125) | (0.121) | (0.127) |
| LOGPPE | -0.002 | -0.024 | -0.039 | 0.009 | -0.001 | -0.020 |
| | (0.018) | (0.022) | (0.023) | (0.017) | (0.017) | (0.018) |
| ROE | 0.014*** | 0.013*** | 0.012*** | 0.013*** | 0.013*** | 0.013*** |
| | (0.004) | (0.004) | (0.004) | (0.004) | (0.004) | (0.004) |

*(Continued)*

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
853
**SER 1235**

*Global Pricing of Carbon* 3711

**Table VI—***Continued*

**Panel A: Levels**

| Dependent Variable: RET | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| VOLAT | 0.129 | −0.052 | 0.009 | 0.359 | 0.309 | 0.334 |
| | (3.539) | (3.482) | (3.522) | (3.203) | (3.182) | (3.201) |
| Year/month-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | No | No | No | Yes | Yes | Yes |
| Observations | 746,499 | 746,642 | 747,139 | 736,711 | 736,854 | 737,351 |
| R-squared | 0.150 | 0.150 | 0.150 | 0.151 | 0.151 | 0.151 |

**Panel B: Growth in Emissions**

| Dependent Variable: RET | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| S1CHG | 0.437*** | | | 0.453*** | | |
| | (0.086) | | | (0.088) | | |
| S2CHG | | 0.250*** | | | 0.255*** | |
| | | (0.067) | | | (0.069) | |
| S3CHG | | | 1.157*** | | | 1.175*** |
| | | | (0.278) | | | (0.288) |
| LOGSIZE | −0.156*** | −0.153*** | −0.170*** | −0.170*** | −0.166*** | −0.183*** |
| | (0.041) | (0.040) | (0.041) | (0.039) | (0.039) | (0.040) |
| B/M | 0.506** | 0.500** | 0.537** | 0.640** | 0.633** | 0.672** |
| | (0.217) | (0.216) | (0.217) | (0.221) | (0.220) | (0.220) |

*(Continued)*

15480261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
854
**SER 1236**

3712                          *The Journal of Finance®*

**Table VI—**Continued

**Panel B: Growth in Emissions**

| Dependent Variable: RET | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| LEVERAGE | −0.459** | −0.444** | −0.492** | −0.393** | −0.379** | −0.421** |
| | (0.179) | (0.173) | (0.173) | (0.150) | (0.145) | (0.144) |
| MOM | 0.958** | 0.974** | 0.880** | 0.944** | 0.961** | 0.867** |
| | (0.362) | (0.363) | (0.350) | (0.368) | (0.369) | (0.356) |
| INVEST/A | −1.000 | −0.870 | −1.180 | −0.785 | −0.690 | −0.963 |
| | (1.180) | (1.194) | (1.204) | (1.059) | (1.058) | (1.058) |
| HHI | −0.046 | −0.036 | −0.064 | −0.033 | −0.022 | −0.051 |
| | (0.127) | (0.128) | (0.124) | (0.122) | (0.124) | (0.120) |
| LOGPPE | 0.029 | 0.025 | 0.041* | 0.047** | 0.043** | 0.060*** |
| | (0.021) | (0.020) | (0.020) | (0.017) | (0.017) | (0.018) |
| ROE | 0.014*** | 0.014*** | 0.014*** | 0.014*** | 0.014*** | 0.014*** |
| | (0.004) | (0.004) | (0.004) | (0.004) | (0.004) | (0.004) |
| VOLAT | −0.146 | −0.059 | −0.175 | 0.182 | 0.252 | 0.169 |
| | (3.602) | (3.619) | (3.670) | (3.258) | (3.274) | (3.308) |
| Year/month-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | No | No | No | Yes | Yes | Yes |
| Observations | 735,359 | 735,362 | 735,903 | 725,745 | 725,748 | 726,289 |
| R-squared | 0.151 | 0.151 | 0.152 | 0.153 | 0.153 | 0.153 |

*(Continued)*

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
855
**SER 1237**

*Global Pricing of Carbon*　　　3713

**Table VI—Continued**

Panel C: Joint Regressions

| Dependent Variable: RET | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| LOGS1TOT | 0.016 | | | 0.046*** | | |
| | (0.021) | | | (0.014) | | |
| S1CHG | 0.429*** | | | 0.430*** | | |
| | (0.086) | | | (0.087) | | |
| LOGS2TOT | | 0.082** | | | 0.099*** | |
| | | (0.029) | | | (0.025) | |
| S2CHG | | 0.221*** | | | 0.213*** | |
| | | (0.068) | | | (0.069) | |
| LOGS3TOT | | | 0.104*** | | | 0.150*** |
| | | | (0.029) | | | (0.033) |
| S3CHG | | | 1.138*** | | | 1.135*** |
| | | | (0.279) | | | (0.285) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | No | No | No | Yes | Yes | Yes |
| Observations | 735,121 | 735,206 | 735,903 | 725,507 | 725,592 | 726,289 |
| R-squared | 0.151 | 0.151 | 0.152 | 0.153 | 0.153 | 0.153 |

*(Continued)*

15496261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13273 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
856
**SER 1238**

3714     *The Journal of Finance®*

**Table VI—Continued**

**Panel D: Alternative Lags (Levels)**

| Dependent Variable: RET | (1) | (2) Lag 3 | (3) | (4) | (5) Lag 6 | (6) | (7) | (8) Lag 12 | (9) |
|---|---|---|---|---|---|---|---|---|---|
| LOGS1TOT | 0.056*** (0.016) | | | 0.042** (0.015) | | | 0.023 (0.015) | | |
| LOGS2TOT | | 0.108*** (0.027) | | | 0.095*** (0.028) | | | 0.074** (0.025) | |
| LOGS3TOT | | | 0.149*** (0.035) | | | 0.117*** (0.032) | | | 0.080** (0.027) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 736,433 | 736,552 | 737,057 | 736,023 | 736,106 | 736,623 | 735,197 | 735,208 | 735,749 |
| R-squared | 0.151 | 0.151 | 0.151 | 0.151 | 0.151 | 0.151 | 0.151 | 0.151 | 0.151 |

**Panel E: Alternative Lags (Changes)**

| Dependent Variable: RET | (1) | (2) Lag 3 | (3) | (4) | (5) Lag 6 | (6) | (7) | (8) Lag 12 | (9) |
|---|---|---|---|---|---|---|---|---|---|
| S1CHG | 0.377*** (0.078) | | | 0.259*** (0.074) | | | -0.078 (0.075) | | |
| S2CHG | | 0.214** (0.070) | | | 0.165** (0.074) | | | -0.054 (0.058) | |
| S3CHG | | | 1.009*** (0.273) | | | 0.684** (0.310) | | | -0.079 (0.188) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 703,278 | 703,267 | 703,806 | 669,337 | 669,305 | 669,841 | 600,010 | 599,938 | 600,466 |
| R-squared | 0.155 | 0.155 | 0.156 | 0.160 | 0.160 | 0.160 | 0.172 | 0.172 | 0.172 |

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
857
**SER 1239**

for any demand-side shocks affecting different countries and industries. The estimated risk premia from these models are only slightly smaller than those reported here, which suggests that our results are not affected by transitory, business-cycle shocks but are more reflective of permanent shocks, such as transition risk.

Note that the coefficient of *LOGS3TOT* is highly significant in the regressions without and with industry-fixed effects. It is also economically significant, as a one-standard-deviation increase in *LOGS3TOT* is associated with a return premium of 1.81% for the specification without industry-fixed effects, and 1.97% with the fixed effects.

The results with respect to the growth in carbon emissions are all highly significant and are not affected at all by the inclusion of industry-fixed effects, as can be seen in Panel B. In the model with industry fixed effects, per one-standard-deviation change in scope 1 and scope 3, the corresponding return premia amount to 2.17% and 3.38% per year, slightly smaller in magnitude than the effects we observed for the levels of emissions. Of course, statistically speaking, taking differences in emissions is close to including firm-fixed effects in the model with levels of emissions.[13]

Our conceptual framework posits that the two different emission measures proxy for two types of transition risk: a short-term and a long-term risk component. A natural question is to what extent these two measures capture independent variation in stock returns. Evidence in Table II shows that they are largely independent of each other given the relatively small correlations. We test this relative independence using a return regression model that jointly includes both measures. We report the results in Panel C. In columns (1) to (3), we present the results with country- and time-fixed effects and in columns (4) to (6) we add industry-fixed effects. We find that in the joint model both measures of emissions retain their positive coefficients and economic significance, which further confirms our starting premise that they capture economically different sources of risk.

In another test, we assess the predictions of our model with respect to *carbon intensity*, a measure of firms' total emissions scaled by their revenues. This measure has been the focus of other research on investment strategies based on discriminating between green and brown firms, and on asset managers' exclusionary screening policies (e.g., Garvey, Iyer, and Nash (2018), and Cheema-Fox et al. (2021)), but when it comes to carbon-transition risk, carbon intensity does not directly capture the transition effort of a firm to attain net zero. As we have pointed out in the introduction, a reduction in emission intensity does not necessarily correspond to a reduction in total emissions. The level of

---

[13] We have also explored the robustness of our results to different cut-offs for our measure of emission changes. Specifically, we have considered measures that are winsorized at the 1% level. The results, reported in Table IA.II of the Internet Appendix, are broadly consistent with those we obtain in the baseline specification. (The Internet Appendix is available in the online version of the article on *The Journal of Finance* website). We note that the results for unwinsorized metrics, even though statistically significant, would be less desired because of significant outliers in the right tail of the empirical distribution.

15406261, 2025, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [09/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
858
**SER 1240**

15496261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13271 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

3716                    *The Journal of Finance®*

emissions is a more direct proxy for carbon-transition risk exposure than emission intensity. Dividing by sales revenue introduces noise: when emission intensity changes it could be because of a change in sales revenue or because of a change in the level of emissions. One potential concern with linking emission levels to stock returns could be that, if variations in emissions are driven entirely by variations in the firm's operating activities, emission levels could be a proxy for sales revenues, so that the effect of emissions on stock returns could simply reflect the effect of sales revenue on stock returns. Note, however, that we do control for firm size so that the effect of size on emission levels is accounted for. With a noisier proxy for carbon-transition risk exposure, one should expect a less significant result. When we link carbon intensity to stock returns, we indeed find no statistically significant relation. These results are presented in Table IA.III of the Internet Appendix.

As an additional robustness check, we also associate carbon emissions with *annual* returns. The results are reported in Table IA.IV and corroborate our main findings relating carbon emissions to *monthly* returns.

The overarching conclusion from this part of our analysis is that firm-level global stock returns reflect firm-level variation in both *total emissions* and *growth in total emissions*, which indicates that investors price carbon-transition risk both from a short-term and long-term perspective.

### A.4. Book-to-Market Ratios

It is well known that stock returns are noisy proxies for expected returns. It is sometimes possible to get more precise measures of expected returns based on analyst forecasts. However, a major challenge with this approach is that (i) analyst forecasts are only available for a relatively small subset of global stocks, (ii) analyst forecasts may be biased because of industry incentive structures, and (iii) the metric of implied cost of equity critically depends on the postulated valuation model.

As an alternative, we look at the pricing of carbon emissions from a different perspective and relate our firm-level carbon emission measures to book-to-market ratios, which tend to be more stable over time and are available for a large set of firms. Looking at book-to-market ratios helps us to better distinguish the explanation of our results as one based on required expected returns as opposed to one due to luck. Accordingly, we estimate the following regression model:

$$LNBM_{i,t} = a_0 + a_1(TOT\ Emissions)_{i,t} + a_2 Controls_{i,t-1} + \mu_t + \epsilon_{i,t}. \qquad (3)$$

Our dependent variable is the natural logarithm of the firm book-to-market ratio, *LNBM*. Our control variables include *MSCI*, *MOM*, *VOLAT*, and *SALESGR*. In addition, we use 1- and 2-year-ahead measures of *SALESGR* to proxy for future cash flow growth and *LTG* to proxy for long-term earnings growth forecasts. Finally, in all specifications, we include country- and

Exhibit 36 to Decl. of Lyon
859
**SER 1241**

15406261, 2025, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*Global Pricing of Carbon*                                      3717

year-month-fixed effects. Some variants of our tests also include industry-fixed effects. As before, we double cluster standard errors at the firm and year level. We present the results in Table VII.

In Panel A, the main independent variables of interest are *LOGS1TOT, LOGS2TOT*, and *LOGS3TOT*. Consistent with our hypothesis of the presence of carbon-transition risk, we find that companies with high emissions have higher book-to-market ratios. The effects are statistically significant in the model that does not account for industry-fixed effects, in columns (1) to (3). As before, the magnitudes become even stronger when we add industry-fixed effect. In terms of economic significance, a one-standard-deviation increase in cross-sectional scope 1 emissions is associated with a 13.2% increase in book-to-market ratios. The results for scope 2 and scope 3 emissions are comparable in magnitude.

A natural question is whether these magnitudes are comparable to those obtained from the return regressions. To answer this question, we take a simple Gordon growth model with an expected growth rate of 4% and expected return of 12% (these numbers roughly correspond to an average stock) and ask how much of an increase in expected returns is required to get a 13% lower valuation for high carbon emission stocks. For these parameters, this would imply a number that is slightly less than a 1.4% excess return. This value is slightly higher in magnitude than that estimated using our return regressions, but in general it falls within a one-standard-error bound of the return coefficient. Hence, statistically speaking, the two numbers are not very different from each other.

In Panel B, we consider the specification with the growth in emissions as the main independent variable. We estimate the same empirical model as before and find a strong positive effect of changes in emissions on the log-book-to-market variable. The effect is statistically and economically highly significant both in the model without and with industry-fixed effects.

We note that in the above tests our sample size is naturally restricted due to data limitations imposed by the computation of *LTG*. To ensure that our results are not spuriously driven by the smaller sample, we repeat our analysis using the model without *LTG*, but with a sample size that is comparable to that used in our return models. We report the results in Table IA.V of the Internet Appendix. In these large data, we find the effects that are statistically more significant but broadly consistent in terms of their magnitudes with our baseline results.

Overall, we conclude that our baseline results on stock returns are unlikely to be explained by unexpected returns (or noise therein). They are more consistent with a systematic repricing of assets with different levels of emissions and changes thereof. Hence, in the remaining parts of the paper we continue with the specifications with stock returns as a main dependent variable.

Exhibit 36 to Decl. of Lyon
860
**SER 1242**

3718                                   *The Journal of Finance*®

**Table VII**
**Carbon Emissions and Stock Book-to-Market Ratios: Full Sample**

The sample period is from 2005 to 2018. The dependent variable is *LNBM*. The main independent variables are carbon emission levels (Panel A) and the growth in emissions (Panel B). All variables are defined in Tables I and II. We report the results of the pooled regression with standard errors (in parentheses) double clustered at the firm and year level. All regressions include year-month-fixed effects and country-fixed effects. In columns (4) to (6), we additionally include industry-fixed effects. ***1% significance; **5% significance; *10% significance.

**Panel A: Levels**

| Dependent Variable: *LNBM* | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| *LOGS1TOT* | 0.021** | | | 0.056*** | | |
| | (0.007) | | | (0.009) | | |
| *LOGS2TOT* | | -0.005 | | | 0.057*** | |
| | | (0.010) | | | (0.009) | |
| *LOGS3TOT* | | | 0.016 | | | 0.079*** |
| | | | (0.014) | | | (0.012) |
| *MSCI* | -0.208*** | -0.173*** | -0.203*** | -0.235*** | -0.255*** | -0.274*** |
| | (0.034) | (0.036) | (0.035) | (0.031) | (0.033) | (0.033) |
| *MOM* | -0.634*** | -0.623*** | -0.631*** | -0.596*** | -0.591*** | -0.597*** |
| | (0.070) | (0.069) | (0.069) | (0.057) | (0.055) | (0.056) |
| *VOLAT* | 1.982** | 1.928** | 1.965*** | 2.151*** | 2.028*** | 2.197*** |
| | (0.629) | (0.623) | (0.618) | (0.426) | (0.410) | (0.399) |
| *SALESGR* | -0.496*** | -0.513*** | -0.504*** | -0.487*** | -0.498*** | -0.498*** |
| | (0.058) | (0.056) | (0.057) | (0.058) | (0.058) | (0.058) |
| *SALESGR*$_{+12}$ | -0.376*** | -0.411*** | -0.389*** | -0.307*** | -0.311*** | -0.290*** |
| | (0.037) | (0.046) | (0.044) | (0.038) | (0.038) | (0.037) |
| *SALESGR*$_{+24}$ | -0.351*** | -0.384*** | -0.361*** | -0.282*** | -0.282*** | -0.269*** |
| | (0.069) | (0.075) | (0.074) | (0.046) | (0.049) | (0.046) |
| *LTG* | -0.012*** | -0.013*** | -0.013*** | -0.008*** | -0.008*** | -0.008*** |
| | (0.002) | (0.002) | (0.002) | (0.002) | (0.002) | (0.001) |
| Year/month-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | No | No | No | Yes | Yes | Yes |
| Observations | 88,390 | 88,349 | 88,426 | 87,093 | 87,052 | 87,129 |
| R-squared | 0.263 | 0.259 | 0.260 | 0.475 | 0.474 | 0.477 |

*(Continued)*

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
861
**SER 1243**

*Global Pricing of Carbon*                3719

**Table VII—***Continued*

**Panel B: Growth in Emissions**

| Dependent Variable: *LNBM* | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| *S1CHG* | 0.066*** (0.020) | | | 0.029 (0.021) | | |
| *S2CHG* | | 0.045*** (0.013) | | | 0.022* (0.012) | |
| *S3CHG* | | | 0.030 (0.123) | | | -0.027 (0.037) |
| *MSCI* | -0.180*** (0.033) | -0.181*** (0.033) | -0.180*** (0.033) | -0.165*** (0.029) | -0.165*** (0.029) | -0.165*** (0.029) |
| *MOM* | -0.624*** (0.069) | -0.624*** (0.069) | -0.624*** (0.069) | -0.587*** (0.056) | -0.587*** (0.056) | -0.587*** (0.056) |
| *VOLAT* | 1.909*** (0.623) | 1.917*** (0.623) | 1.916*** (0.628) | 1.884*** (0.457) | 1.882*** (0.457) | 1.884*** (0.456) |
| *SALESGR* | -0.566*** (0.063) | -0.552*** (0.052) | -0.541*** (0.134) | -0.524*** (0.072) | -0.521*** (0.060) | -0.473*** (0.076) |
| $SALESGR_{t+12}$ | -0.411*** (0.044) | -0.412*** (0.044) | -0.406*** (0.044) | -0.349*** (0.041) | -0.350*** (0.040) | -0.347*** (0.039) |
| $SALESGR_{t+24}$ | -0.379*** (0.071) | -0.379*** (0.071) | -0.379*** (0.071) | -0.327*** (0.053) | -0.325*** (0.054) | -0.327*** (0.052) |
| *LTG* | -0.013*** (0.002) | -0.013*** (0.002) | -0.013*** (0.002) | -0.009*** (0.002) | -0.009*** (0.002) | -0.009*** (0.002) |
| Year/month-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | No | No | No | Yes | Yes | Yes |
| Observations | 88,414 | 88,338 | 88,426 | 87,117 | 87,041 | 87,129 |
| R-squared | 0.260 | 0.260 | 0.259 | 0.466 | 0.466 | 0.466 |

15409261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
862
**SER 1244**

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

3720 *The Journal of Finance®*

### A.5. Information Observability and Carbon Premium

An important aspect of any risk premium analysis concerns the measurability of information on which investors condition their investment choices. While some elements of our analysis are typical of any standard approach in the literature, others are unique in the context of carbon-transition risk. As we have noted, progress in the transition is reflected in the rate of change in emissions, which is why we should expect a priori transition risk to be tied to both the level and rate of change in emissions. Such horizon effects should be present even over shorter time spans. Hence, one should not expect the risk premium to be independent of when we observe emissions relative to stock prices. This is an important difference with respect to classical asset pricing, which essentially presumes a stationary world and stochastic general equilibrium.

To ensure that all the conditioning information is in investors' information sets at the time of the realization of returns, we have performed several robustness checks with different lags of emission information, since investors' information sets are not perfectly observable. We have considered lags of 3 months, 6 months, and 12 months between the end of the year for which emissions are reported and the month when returns are realized. Using the different lags, we estimate the models in equations (1) and (2). We report the results in Panels D and E of Table VI for the levels and changes of emissions. In most specifications, the premium for the level of emissions remains large and significant for the different lags. In turn, the premium based on emission changes is positive and significant for up to 6 months but becomes insignificant after 12 months.

These results raise two questions. First, why does the premium persist for such a long period? And second, why does it disappear after 12 months? Our answer to the first question is that investors have limited attention and do not immediately absorb all the new information about carbon emissions at the firm level (Kacperczyk, van Nieuwerburgh, and Veldkamp (2016)). The information about carbon emissions for year $t$ is gradually reflected in returns over the year. A related way to micro-found the friction would be with a model of slow-moving capital (Duffie (2010)). Our answer to the second question is that carbon emission numbers become stale after a while, and after a year the information in these numbers is subsumed in the new numbers. Interestingly, when we compare the effect of lagging emissions on returns for respectively levels and changes, we find that the former retains information longer than the latter. The rate of change in emissions is naturally less persistent and conveys more transitory information. In other words, the news component is larger for the rate of change in emissions numbers than for the emission levels numbers.

In our benchmark specification, we measure carbon emissions 1 month before the returns are realized. The reason for this choice is largely dictated by the horizon effects and information staleness discussed above. We also note that investors can obtain more accurate forecasts of future cash flow risk related to carbon emissions from industry and firm characteristics. The more up to date their information about firm characteristics is, the more accurate are

Exhibit 36 to Decl. of Lyon
863
**SER 1245**

their forecasts of emissions and returns, which is why basing returns predictions on too long lags for the firm characteristics would underestimate the true return premium. As an example, if we lag emissions by 12 months, that would be saying that investors do not condition their forecasts on any updates in firm characteristics for an entire year. This does not seem plausible. Therefore, we believe that shorter lags, of 1 or 3 months, are more natural than a 12-month lag.

We have also explored the extent to which emissions are a persistent characteristic. We ask how different is the effect of emissions on stock returns when we abstract from any news effect contained in the latest emission numbers? To do this, we replace the actual emission numbers in years $\tau < t = 2018$ in our sample with emission estimates based on a backward imputation of the emissions in year 2018, the last year of the sample. We can then determine how different the carbon premium is when we relate it to emissions that are imputed back in time versus the actual year-by-year emission numbers. If the premia are similar, this would suggest that emissions in year $t$ are a good statistic for emissions in years $t-\tau$ for all $\tau < t$ in our sample. This is indeed what we find and report in Table IA.VI, which suggests that carbon-transition risk, as proxied by the level of emissions, is a persistent characteristic when you take out any news effects.

Another important issue is with respect to the delayed availability of emissions numbers from Trucost. First, the fact that our analysis is based on data from Trucost does not mean that Trucost is the only source of information on carbon emissions for investors. Investors can acquire information about corporate carbon emissions from other sources. Indeed, large asset managers like BlackRock or Amundi rely on multiple data sources for carbon emissions that are not all available at the same time. For example, a lot of firms disclose their emissions first to the Carbon Disclosure Project organization, data that then are merged into and combined with other sources by Trucost. Different information that is likely to be highly correlated with Trucost information (given that all providers use the same data collection protocols) becomes available at different times. Furthermore, investors are likely to be heterogeneous with respect to access to information about carbon emissions. Therefore, the information set of investors is likely to be updated earlier than the information set of the econometrician. In fact, in an additional (untabulated) test, we explore whether there are announcement returns around the date when Trucost enters the data on emissions into its database and we find no effect. Stated differently, our analysis is not meant to identify a trading strategy based on Trucost data; we use these data only as a proxy for carbon-transition risk.

A related concern is about how Trucost gathers and aggregates the data on corporate carbon emissions: Could the methodology that Trucost uses directly affect the size of the carbon premium? Trucost reports two types of data, one that is directly taken from corporate reports and another that is estimated using its own prediction model. Could it be that the estimated emission numbers are noisy or biased because of the methodology used by Trucost? We find the possibility of a systematic bias that is correlated with future stock returns

15409261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [09/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
864
**SER 1246**

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

3722                     *The Journal of Finance®*

unlikely, given the weak evidence of autocorrelation in stock returns typically
found in empirical studies. To evaluate the differences in carbon-transition
risk, as they relate to whether the carbon emissions are based on corporate
disclosures or are estimated, we take advantage of information provided by
Trucost on how particular emissions data have been sourced. We define an
indicator variable *Disclosure* if emissions for firm $i$ at time $t$ are based on di-
rectly disclosed information, and zero if they come from an estimate based on
a model-based approach. We amend our return regression by adding this vari-
able and its interactions with our measures of carbon emissions. We report the
results in Table IA.VII. The results show two effects. First, the level of the
carbon premium is lower for emissions based on directly disclosed data, a find-
ing that is inconsistent with the uncertainty reduction hypothesis. Second, the
premium remains positive and significant for both types of data, especially in
the model with industry-fixed effects. Hence, we conclude that the source of
emission data does not alter the qualitative aspects of our results.[14]

While our analysis considers different information sets based on monthly
frequency, it is important to note that corporate emissions data from Trucost
are provided at an annual frequency. However, the annual measurement of
corporate emissions should not imply that our empirical tests should be cast
at an annual frequency for stock returns. Even if data for corporate carbon
emissions are released at an annual frequency, investors' information sets get
updated at a greater than annual frequency. It is more plausible that investors'
learning process is continuous, and that more information gets processed over
time. This process can further rationalize the fact that the impact of emissions
gets progressively smaller with an increasing lag between when emissions are
available and when returns are measured.

Finally, a common concern could be that emissions and stock returns are en-
dogenously related through the company's production channel. For example,
better business opportunities could be associated with higher sales and could
generate both higher emissions and higher realized returns. We note that this
prediction is not borne out in our data. Market value does not increase with
higher emissions (consistent with business opportunities getting better). We
find the exact opposite result, that the book-to-market ratio is positively re-
lated to carbon emissions. Stock prices are lower rather than higher for firms

---

[14] In a related paper, Aswani, Raghunandan, and Rajgopal (2023) find that the carbon premium
associated with the level of emissions goes to zero for companies that directly disclose their emis-
sions and suggest that investors may not be pricing carbon risk at all. Our results differ in that
we find a positive premium for both types of emission sources in a sample that includes roughly
five times more firms than in their sample. More importantly, we note that the smaller magni-
tude of the carbon premium for directly disclosed emissions is consistent with a model in which
firms endogenously decide whether to disclose their emissions. In this model, a benefit for the firm
of disclosing emissions is a lower risk premium achieved by lowering the perceived uncertainty
investors face with respect to carbon-transition risk. Hence, our evidence is fully consistent with
the hypothesis that investors do price carbon-transition risk, but differently for different levels
of perceived uncertainty. We provide an extensive analysis of this economic mechanism in Bolton
and Kacperczyk (2021c).

Exhibit 36 to Decl. of Lyon
865
**SER 1247**

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [09/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*Global Pricing of Carbon* 3723

with higher levels and higher growth in emissions. Thus, to the extent that production endogeneity is a concern, the estimates we provide constitute a lower bound on the true effect of carbon emissions on the risk premium.

### A.6. Geographic Distribution

By looking at the geographic distribution of the carbon premium, we can assess how our unconditional results are driven by a particular region. The economics literature on climate change has emphasized the importance of the spatial distribution of climate policies (Nordhaus and Yang (1996)) and physical impacts (Cruz and Rossi-Hansberg (2023)). Different regions have different exposures to climate change as well as different capacities to adapt. With respect to transition risk, one might expect that a country's economic development, social norms, or headline risk may be equally important. At the same time, financial market integration may erase some of the country-level heterogeneity.

We evaluate the geographic distribution of carbon-transition risk pricing by comparing four different regions: North America, Europe, Asia, and Southern Hemisphere countries (defined as "Others"). We define the respective indicator variables: (i) *Namerica* for firms that are located in North America, (ii) *Europe* for firms located in Europe, and (iii) *Asia* for firms located in Asia. The omitted category is firms located in the Southern Hemisphere. We test two hypotheses simultaneously: whether risk premia are positive and statistically significant, and whether they differ from each other.

We report the results in Table VIII, Panel A, for the level of emissions, and in Panel B for the growth in emissions. For brevity, we focus on scope 1 and scope 3 emissions. We find that the carbon premium is generally larger in North America, Europe, and Asia than in the residual Southern Hemisphere group of countries. However, the only statistically significant result, at the 10% level, is for firms located in North America. Importantly, all premia, especially those that absorb industry-fixed effects, are positive and statistically significant. When it comes to the growth in emissions, the magnitudes of the effects for Europe are visibly smaller than those in North America and Asia. Still, they are all positive and statistically significant. The regions of the world that stand out are Africa, Australia, and South America, where the coefficient of *S1CHG* is borderline significant in the baseline model and insignificant when we add industry-fixed effects. This result is quite interesting, as these countries are least aligned with the principle of carbon neutrality.

An important robustness question is what matters more? Where the company is headquartered (which is the determinant of classification in our data), or where emissions are generated? This distinction may be particularly relevant for firms with global operations, which are subject to different social pressures, policies, or headline risk. While the granularity of our data does not allow us to attribute total firm emissions to individual plants, we can evaluate whether the impact of firm emissions differs in a sample of multinational companies versus those operated in a single country. Empirically, we define an

Exhibit 36 to Decl. of Lyon
866
**SER 1248**

3724                    *The Journal of Finance®*

**Table VIII**
**Carbon Emissions and Stock Returns: Regional**

The sample period is from 2005 to 2018. The dependent variable is *RET*. The main independent variables are carbon emission levels (Panel A) and the growth in firm-level total emissions (Panel B). All variables are defined in Tables I and II. We report the results of the pooled regression with standard errors (in parentheses) double clustered at the firm and year level. All regressions include year-month-fixed effects and country-fixed effects. All regression models include the controls of Table VI (unreported for brevity). In columns (4) to (6), we additionally include Truecost industry-fixed effects. ***1% significance; **5% significance; *10% significance.

|  | | | Panel A: Levels | | | |
|---|---|---|---|---|---|---|
| Dependent Variable: *RET* | (1) | (2) | (3) | (4) | (5) | (6) |
| *LOGS1TOT* | −0.001 (0.031) | | | 0.041 (0.024) | | |
| *LOGS2TOT* | | 0.065 (0.038) | 0.075 (0.043) | | 0.092** (0.036) | |
| *LOGS3TOT* | | | | | | 0.132*** (0.042) |
| *Namerica*LOGS1TOT* | 0.042* (0.020) | | | 0.043* (0.020) | | |
| *Namerica*LOGS2TOT* | | 0.051 (0.039) | 0.065 (0.042) | | 0.044 (0.037) | |
| *Namerica*LOGS3TOT* | | | | | | 0.059 (0.043) |
| *Europe*LOGS1TOT* | 0.028 (0.019) | | | 0.019 (0.020) | | |
| *Europe*LOGS2TOT* | | 0.022 (0.029) | 0.042 (0.031) | | 0.014 (0.031) | |
| *Europe*LOGS3TOT* | | | | | | 0.040 (0.033) |
| *Asia*LOGS1TOT* | 0.029 (0.022) | | | 0.020 (0.021) | | |
| *Asia*LOGS2TOT* | | 0.027 (0.036) | 0.028 (0.039) | | 0.020 (0.036) | |
| *Asia*LOGS3TOT* | | | | | | 0.022 (0.041) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes |
| Yearmonth-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | No | No | No | Yes | Yes | Yes |
| Observations | 746,499 | 746,642 | 747,139 | 736,711 | 736,854 | 737,351 |
| R-squared | 0.150 | 0.150 | 0.150 | 0.151 | 0.151 | 0.152 |

(Continued)

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
867
**SER 1249**

*Global Pricing of Carbon* 3725

**Table VIII**—*Continued*

|  |  |  | Panel B: Growth in Emissions |  |  |  |
| --- | --- | --- | --- | --- | --- | --- |
| Dependent Variable: *RET* | (1) | (2) | (3) | (4) | (5) | (6) |
| S1CHG | 0.230** (0.098) |  |  | 0.275** (0.112) |  |  |
| S2CHG |  | 0.054 (0.090) |  |  | 0.078 (0.098) |  |
| S3CHG |  |  | 0.780** (0.349) |  |  | 0.843** (0.383) |
| Namerica*S1CHG | 0.362** (0.138) |  |  | 0.341** (0.136) |  |  |
| Namerica*S2CHG |  | 0.211* (0.114) |  |  | 0.193 (0.112) |  |
| Namerica*S3CHG |  |  | 0.499 (0.337) |  |  | 0.464 (0.345) |
| Europe*S1CHG | −0.010 (0.091) |  |  | −0.050 (0.099) |  |  |
| Europe*S2CHG |  | 0.039 (0.115) |  |  | 0.020 (0.120) |  |
| Europe*S3CHG |  |  | 0.007 (0.457) |  |  | −0.028 (0.464) |
| Asia*S1CHG | 0.322** (0.142) |  |  | 0.287* (0.142) |  |  |
| Asia*S2CHG |  | 0.340*** (0.104) |  |  | 0.314** (0.105) |  |
| Asia*S3CHG |  |  | 0.607 (0.420) |  |  | 0.541 (0.430) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | No | No | No | Yes | Yes | Yes |
| Observations | 735,359 | 735,362 | 735,903 | 725,745 | 725,748 | 726,289 |
| R-squared | 0.151 | 0.151 | 0.152 | 0.153 | 0.153 | 0.153 |

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13273 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
868
**SER 1250**

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

3726                          *The Journal of Finance®*

indicator variable, *FORDUM*, equal to 1 for firms that have at least some sales generated abroad and 0 for firms whose sales are entirely from a single country. Next, we estimate the models in equations (1) and (2) with an additional interaction term between measures of emissions and *FORDUM*.

We present the results in Table IA.VIII. Across all empirical specifications, we find only weak evidence that firms with multinational operations exhibit different sensitivities of their stock returns with respect to total firm emissions. For the specifications with the level of emissions, the interaction terms are small and statistically insignificant and for the specifications with the growth in emissions, the interaction term is significant at the 10% level for scope 3 emissions. Overall, it does not seem that the geographic source of firm-level emissions is a primary driver of the carbon premium in our data.

In sum, our continent-level results reveal that carbon-transition risk is economically relevant in most geographic regions and that there is some geographic variation in the carbon premium throughout the world, even though it is mostly related to short-term measures of carbon-transition risk. In the final part of this section, we turn to an investigation of whether carbon-transition risk is tied to a country's economic development, one of the main issues that frames discussions of international climate mitigation agreements.

### A.7. Economic Development

The level of a country's economic development is an important consideration when it comes to climate policy. Typically, richer countries are expected to, and have for the most part, made stronger commitments to combat climate change. Rich countries have a greater responsibility to combat climate change as they are the source of the largest cumulative emissions over the past two centuries by far. Another reason to expect a lower carbon premium in developing countries is simply that currently these countries have low levels of emissions. In addition, these countries' economies are not as deeply founded on fossil fuel energy consumption and may therefore be able to transition more easily to a renewable energy development path. On the other hand, if these countries depend a lot on fossil fuels, they may be less willing to adjust in the short-run.

In this section, we explore the empirical relevance of these arguments. A remarkable general finding, as we show in Table IA.IX, is that the carbon premium does not seem to be related to countries' overall level of development. We first broadly categorize developed countries as the G20 countries and the remaining group of countries as developing countries.[15] When we add industry-fixed effects, we observe from Table IA.IX (Panel A) that the G20 group of countries have highly significant carbon premia related to the level of emissions for all three scope categories. But this is also the case for the most part for the group of developing countries (scope 2 emissions are only significant at the 10% level for this group). Moreover, the size of the coefficients is similar. As

---

[15] The results are qualitatively very similar, reported in Panel B, if we define developed countries based on the Organisation for Economic Co-operation and Development (OECD) membership.

Exhibit 36 to Decl. of Lyon
869
**SER 1251**

*Global Pricing of Carbon*                                      3727

for the short-run effects of carbon emissions on stock returns, we observe that
they are again highly significant for both the G20 countries (controlling for in-
dustry) and the group of developing countries. Also, the size of the coefficients
is again broadly similar.

Admittedly, the above classification of countries into two groups, develop-
ing and developed, is rather coarse, and there is substantial heterogeneity in
country characteristics within each group. Accordingly, we also investigate the
effect of interacting GDP per capita, and other development variables such
as the share of the manufacturing sector in GDP and health expenditure per
capita, with the level and changes in emissions. As we show in Panel A of
Table IX, the interaction of per capita GDP and the level of emissions is in-
significant. The same is true for the interaction of the share of manufacturing
and the level of emissions, and for the interaction of per capita health expendi-
tures and the level of emissions. Overall, these results indicate that differences
in development do not appear to explain much of the variation in long-run car-
bon premia across countries. On the other hand, when we interact the same
variables with the percentage change in emission, as a measure of short-term
risk, a slightly different picture emerges. Now, firms located in countries with
higher GDP per capita and a more developed health system have statistically
smaller stock returns. Further, firms located in countries with a higher depen-
dence on the manufacturing sector in their output creation have higher stock
returns. These results are consistent with the view that firms in developed
countries face lower challenges in conforming to their country's carbon neutral-
ity objective. The growth in the emissions variable tells us the sustainability
of a country's development path. If, for example, the growth in emissions in a
developing country is large because of high reliance on coal, then, in effect, the
companies in that developing country are exposed to greater future transition
risk when pressure grows to phase out coal.

Altogether, both regional and economic variation in carbon-transition risk
likely nest several specific factors that contribute to the observed results. In-
vestigating the origins of these factors is the subject of our next section.

### B. Carbon-Transition Risk Drivers

Even though the notion of carbon-transition risk has been commonly re-
ferred to in policy discussions, surprisingly little is known about the different
sources of this risk. Part of the reason is that most of the studies on carbon-
transition risk are either highly aggregated or focus on a single country or
industry (e.g., Bolton and Kacperczyk (2021a), Hsu, Li, and Tsou (2023)). Also,
many commentators often reduce carbon-transition risk purely to policy un-
certainty, whereas other dimensions (for example, technological innovation or
the prevailing belief system) are clearly relevant.

We explore several channels through which carbon-transition risk could
manifest itself: technological, socioeconomic, regulatory policy, and reputation
risk, all of which affect future cash flows and changing investor attention to cli-
mate change as a source of variation for the discount-rate channel. The main

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
870
**SER 1252**

15480261, 2025, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/02/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

3728                                      *The Journal of Finance*®

## Table IX
## Carbon Emissions and Stock Returns: Economic Development

The sample period is from 2005 to 2018. The dependent variable is *RET*. The main independent variables are carbon emission levels (Panel A) and the growth in emissions (Panel B). *GDPPC* measures a country's GDP per capita in current dollars in a given year, *MANUFPERC* is the percentage of a country's GDP that is produced in a given year in the manufacturing sector, and *HLTHEXPPC* is a country's health expenditures per capita in current dollars in a given year. All other variables are defined in Tables I and II. We report the results of the pooled regression with standard errors (in parentheses) double clustered at the firm and year level. All regression models include the controls of Table VI (unreported for brevity), year-month-fixed effects, and country-fixed effects. In selected columns, we additionally include Trucost industry-fixed effects. ***1% significance; **5% significance; *10% significance.

| Dependent Variable: *RET* | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Panel A: Levels | | | | | | | |
| *GDPPC* | −106.966** | −107.168** | −102.286** | −102.108** | | | | | | | | |
| | (50.082) | (50.443) | (50.288) | (50.647) | | | | | | | | |
| *MANUFPERC* | | | | | 13.721 | 15.378* | 14.549* | 16.083* | | | | |
| | | | | | (8.422) | (8.635) | (8.418) | (8.586) | | | | |
| *HLTHEXPPC* | | | | | | | | | −0.048 | −0.130 | −0.040 | −0.106 |
| | | | | | | | | | (0.195) | (0.202) | (0.193) | (0.196) |
| *LOGSITOT* | 0.030 | | 0.064*** | | 0.030 | | 0.072*** | | 0.009 | | 0.047** | |
| | (0.021) | | (0.018) | | (0.023) | | (0.019) | | (0.022) | | (0.018) | |
| *LOGSITOT* | | 0.118*** | | 0.170*** | | 0.136*** | | 0.191*** | | 0.079** | | 0.131*** |
| | | (0.032) | | (0.033) | | (0.032) | | (0.033) | | (0.031) | | (0.034) |
| *GDPPC*LOGSITOT* | −0.113 | | −0.101 | | | | | | | | | |
| | (0.418) | | (0.402) | | | | | | | | | |
| *GDPPC*LOGSITOT* | | −0.210 | | −0.272 | | | | | | | | |
| | | (0.655) | | (0.612) | | | | | | | | |
| *MANUFPERC*LOGSITOT* | | | | | −0.028 | | −0.068 | | | | | |
| | | | | | (0.112) | | (0.106) | | | | | |
| *MANUFPERC*LOGSITOT* | | | | | | −0.139 | | −0.161 | | | | |
| | | | | | | (0.173) | | (0.164) | | | | |
| *HLTHEXPPC*LOGSITOT* | | | | | | | | | 0.003 | | 0.003 | |
| | | | | | | | | | (0.003) | | (0.003) | |
| *HLTHEXPPC*LOGSITOT* | | | | | | | | | | 0.008* | | 0.007 |
| | | | | | | | | | | (0.005) | | (0.005) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Year-month-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | No | No | Yes | Yes | No | No | Yes | Yes | No | No | Yes | Yes |
| Observations | 712,325 | 712,965 | 702,742 | 703,382 | 679,747 | 680,362 | 671,251 | 671,866 | 484,562 | 485,071 | 478,735 | 479,244 |
| *R*-squared | 0.150 | 0.150 | 0.152 | 0.152 | 0.152 | 0.152 | 0.153 | 0.153 | 0.175 | 0.175 | 0.177 | 0.177 |

*(Continued)*

Exhibit 36 to Decl. of Lyon
871
**SER 1253**

**Table IX—Continued**

Panel B: Growth in Emissions

| Dependent Variable: RET | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GDPPC | -112.536** (50.414) | -115.011** (50.457) | -107.466** (50.642) | -109.815** (50.689) | | | | | | | | |
| MANUFPERC | | | | | 11.674 (8.243) | 10.472 (8.228) | 12.035 (8.256) | 10.880 (8.244) | | | | |
| HITHEXPPC | | | | | | | | | -0.044 (0.194) | -0.072 (0.196) | -0.034 (0.193) | -0.064 (0.195) |
| S1CHG | 0.587*** (0.112) | | 0.600*** (0.112) | | 0.088 (0.101) | | 0.112 (0.102) | | 0.654*** (0.131) | | 0.688*** (0.131) | |
| S3CHG | | 1.485*** (0.263) | | 1.505*** (0.266) | | 0.492* (0.266) | | 0.543** (0.264) | | 1.439*** (0.287) | | 1.501*** (0.291) |
| GDPPC*S1CHG | -4.601* (2.466) | | -4.510* (2.461) | | | | | | | | | |
| GDPPC*S3CHG | | -11.536* (6.250) | | -11.598* (6.250) | | | | | | | | |
| MANUFPERC*S1CHG | | | | | 2.230*** (0.621) | | 2.163*** (0.625) | | | | | |
| MANUFPERC*S3CHG | | | | | | 3.863*** (1.453) | | 3.650** (1.454) | | | | |
| HITHEXPPC*S1CHG | | | | | | | | | -0.045* (0.024) | | -0.047** (0.024) | |
| HITHEXPPC*S3CHG | | | | | | | | | | -0.093 (0.058) | | -0.098* (0.057) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | No | No | Yes | Yes | No | No | Yes | Yes | No | No | Yes | Yes |
| Observations | 701,797 | 702,341 | 692,387 | 692,831 | 669,831 | 670,340 | 661,480 | 661,989 | 479,950 | 480,373 | 474,176 | 474,599 |
| R-squared | 0.151 | 0.152 | 0.153 | 0.153 | 0.153 | 0.153 | 0.154 | 0.155 | 0.175 | 0.176 | 0.177 | 0.177 |

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/05/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
872
**SER 1254**

15496261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

3730                    *The Journal of Finance®*

challenge in identifying each of the channels empirically is that to a large extent we can only measure transition risk drivers at the country level. As is well known, regression specifications that relate stock returns to country-level characteristics, could yield biased estimates due to omitted country-level variables. To mitigate this concern, we rely on firm-level variation in carbon emissions and estimate the role of the different mechanisms by interacting the country variables with firm-level emissions. This approach follows closely the identification strategy of Rajan and Zignales (1998), which also interacts country-level financial development variables with industry-level financial constraints. In our tests, we are also able to sharpen our empirical identification by absorbing additional firm-level, industry-level, and country-level variation through a mix of observable characteristics and fixed effects.

### B.1. Technological Mix

An important source of carbon-transition risk is technological change in energy production and carbon capture. As they transition to carbon neutrality, firms may find themselves at different points in their energy mix, carbon intensity, and outside demand for energy. The more distant the firms are from their target technology profile in a new green equilibrium, the more they are exposed to potential aggregate technology shocks. The resulting risk may come from unexpectedly high costs of green energy production as well as uncertainty about such costs.[16]

In this section, we explore the importance of these factors for the pricing of carbon-transition risk. We classify technology factors into three categories; the first two relate to the production side of carbon emissions and the third relates to the consumption side. First, we investigate whether firms located in countries with a higher share of renewable energy have lower carbon premia. Second, we explore whether the size of the fossil fuel production sector affects the carbon premium. We hypothesize that firms located in countries in which the share of the energy sector is large would have a larger carbon premium. Third, consumption of energy per capita may indicate how far the transition to a low-emission economy has progressed. It may also indicate the expected demand for fossil fuel energy going forward. We expect that firms in countries with high energy consumption are exposed to higher transition risk.

The results of this analysis are reported in Table X. We uncover a few interesting patterns. First, we find that green and brown energy variables do not matter much for how stock returns react to emission levels. Across all specifications, the coefficients of the interaction terms are small and statistically insignificant. The exception is the interaction term between scope 3 emissions and the reliance on renewable energy. This effect, however, is only marginally significant. Second, the hypothesis that a more renewable energy–based

---

[16] A separate issue that we do not explore formally in the paper is the uncertainty about the depreciation of any stranded assets and their impact on firm value. Atanasova and Schwartz (2020) analyze the empirical importance of this issue in the oil and gas industry.

Exhibit 36 to Decl. of Lyon
873
**SER 1255**

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*Global Pricing of Carbon* 3731

## Table X
### Carbon Emissions and Stock Returns: Energy Structure

The sample period is from 2005 to 2018. The dependent variable is *RET*. The main independent variables are carbon emission levels (Panel A) and the growth in emissions (Panel B). *ELRENEW* measures a country's share of electricity generated by renewable power plants in total electricity generated by all types of plants in a given year; *ENINT* is the ratio between energy supply and gross domestic product measured at purchasing power parity in a given country. Energy intensity is an indication of how much energy is used to produce one unit of economic output in a given year; *ENUSEPC* is a country's energy consumption (in kg of oil equivalent per capita) in a given year. All other variables are defined in Tables I and II. We report the results of the pooled regression with standard errors (in parentheses) double clustered at the firm and year level. All regression models include the controls of Table VI (unreported for brevity), year-month-fixed effects, and country-fixed effects. In selected columns, we additionally include industry-fixed effects. ***1% significance; **5% significance; *10% significance.

**Panel A: Levels**

| Dependent Variable: RET | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ELRENEW | 7.869* | 2.588 | 8.161* | 2.322 | | | | | | | | |
| | (4.150) | (5.042) | (4.164) | (5.059) | | | | | | | | |
| ENINT | | | | | -7.864 | 2.400 | -9.565 | 5.223 | | | | |
| | | | | | (60.851) | (61.263) | (60.818) | (61.358) | | | | |
| ENUSEPC | | | | | | | | | -1.386** | -1.427** | -1.442*** | -1.411** |
| | | | | | | | | | (0.545) | (0.550) | (0.546) | (0.554) |
| LOGSITOT | 0.006 | | 0.059*** | | 0.030 | | 0.069** | | -0.005 | | | |
| | (0.024) | | (0.020) | | (0.028) | | (0.027) | | (0.024) | | | |
| LOGSITOT | | 0.077** | | 0.132*** | | 0.162*** | | 0.222*** | | 0.085** | 0.038* | 0.153*** |
| | | (0.030) | | (0.034) | | (0.052) | | (0.053) | | (0.039) | (0.021) | (0.041) |
| ELRENEW*LOGSITOT | 0.028 | | 0.010 | | | | | | | | | |
| | (0.175) | | (0.176) | | | | | | | | | |
| ELRENEW*LOGSITOT | | 0.480* | | 0.518* | | | | | | | | |
| | | (0.288) | | (0.289) | | | | | | | | |
| ENINT*LOGSITOT | | | | | -0.443 | | -0.209 | | | | | |
| | | | | | (0.551) | | (0.525) | | | | | |
| ENINT*LOGSITOT | | | | | | -1.198 | | -1.299 | | | | |
| | | | | | | (0.844) | | (0.840) | | | | |
| ENUSEPC*LOGSITOT | | | | | | | | | 0.004 | | 0.005 | |
| | | | | | | | | | (0.005) | | (0.005) | |
| ENUSEPC*LOGSITOT | | | | | | | | | | 0.006 | | 0.002 |
| | | | | | | | | | | (0.007) | | (0.007) |
| Controls | No | Yes | Yes | Yes | No | No | Yes | Yes | No | No | Yes | Yes |
| Year/month-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | No | No | Yes | Yes | No | No | Yes | Yes | No | No | Yes | Yes |
| Observations | 438,446 | 438,918 | 433,249 | 433,721 | 438,488 | 438,960 | 433,291 | 433,763 | 423,298 | 423,770 | 418,233 | 418,705 |
| R-squared | 0.185 | 0.186 | 0.187 | 0.187 | 0.185 | 0.185 | 0.187 | 0.187 | 0.190 | 0.190 | 0.192 | 0.192 |

*(Continued)*

Exhibit 36 to Decl. of Lyon
874
**SER 1256**

3732 *The Journal of Finance®*

**Table X—Continued**

Panel B: Growth in Emissions

| Dependent Variable: *RET* | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *ELRENEW* | 8.254** | 8.221** | 8.434** | 8.389** | | | | | | | | |
| | (3.387) | (3.381) | (3.401) | (3.395) | | | | | | | | |
| *ENINT* | | | | | −25.255 | −29.735 | −24.552 | −29.244 | | | | |
| | | | | | (60.766) | (60.556) | (60.724) | (60.459) | | | | |
| *ENUSEPC* | | | | | | | | | −1.397** | −1.385** | −1.446** | −1.431** |
| | | | | | | | | | (0.553) | (0.552) | (0.553) | (0.553) |
| *S1CHG* | 0.597*** | | 0.644*** | | 0.021 | | 0.039 | | 0.313** | | 0.316** | |
| | (0.113) | | (0.114) | | (0.199) | | (0.199) | | (0.155) | | (0.153) | |
| *S3CHG* | | 1.201*** | | 1.294*** | | 0.113 | | 0.158 | | 0.728* | | 0.760** |
| | | (0.289) | | (0.289) | | (0.400) | | (0.395) | | (0.373) | | (0.372) |
| *ELRENEW*S1CHG* | −1.839* | | −2.068* | | | | | | | | | |
| | (1.087) | | (1.089) | | | | | | | | | |
| *ELRENEW*S3CHG* | | 0.905 | | −0.502 | | | | | | | | |
| | | (2.671) | | (2.675) | | | | | | | | |
| *ENINT*S1CHG* | | | | | 9.254** | | 9.562** | | | | | |
| | | | | | (4.009) | | (4.037) | | | | | |
| *ENINT*S3CHG* | | | | | | 20.786*** | | 21.199*** | | | | |
| | | | | | | (7.830) | | (7.854) | | | | |
| *ENUSEPC*S1CHG* | | | | | | | | | 0.036 | | 0.044 | |
| | | | | | | | | | (0.033) | | (0.033) | |
| *ENUSEPC*S3CHG* | | | | | | | | | | 0.097 | | 0.107 |
| | | | | | | | | | | (0.083) | | (0.082) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | No | No | Yes | Yes | No | No | Yes | Yes | No | No | Yes | Yes |
| Observations | 433,851 | 434,226 | 428,710 | 429,085 | 433,893 | 434,268 | 428,752 | 429,127 | 418,791 | 419,166 | 413,782 | 414,157 |
| R-squared | 0.186 | 0.186 | 0.188 | 0.188 | 0.186 | 0.186 | 0.188 | 0.188 | 0.190 | 0.191 | 0.192 | 0.193 |

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
875
**SER 1257**

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*Global Pricing of Carbon*                                    3733

economy is associated with lower carbon premia is broadly borne out in the data when it comes to firm-level growth in emissions. Firms located in countries with a larger fraction of renewable energy production have lower carbon premia with respect to their year-to-year emissions growth, as indicated by the negative highly significant coefficients for the interaction terms. Similarly, we find that the coefficients of the interaction terms between the share of the energy sector and the growth in emissions are highly significant and positive, indicating that investors perceive the risk with respect to carbon emissions to be greater in countries with large fossil fuel energy sectors. Interestingly, the countries with higher reliance on renewables and lower reliance on fossil fuels are typically developed countries, which could partly explain why we found that short-term transition risk is priced more for developing countries. At the same time, we find that energy use is not significantly related to stock returns irrespective of the risk measure on which we focus. One reason could be that the energy source being consumed may be green. Also, the place of consumed energy need not be the same as the country in which it is sourced. In sum, the distinction between short-term and long-term reactions to technological mix suggests that this variable is transitory in nature, at least when assessed from the capital markets perspective. The energy mix cannot inform the long-term costs of the transition, as any potential product or process innovation in this market is likely to modify future expectations.

Overall, we find strong evidence that a country's energy production mix is an important predictor of how investors price risk with respect to short-term changes in emissions, but not with respect to the level of emissions. The gist of these results is broadly consistent with our hypothesis that uncertainty about technological change increases transition risk. Our decomposition further reveals that production side factors are more relevant for investors than energy consumption factors.

### B.2. Sociopolitical Environment

Uncertainty about future carbon emission policies depends on the institutional and sociopolitical environment that shapes government action. We should expect lower policy uncertainty in politically stable and socially harmonious societies, and in countries with more democratic institutions that tend to reduce the risk of arbitrary policy swings. In contrast, less equal societies are more likely to waver in their policy commitments and make less predictable progress toward carbon neutrality. This greater climate policy uncertainty, in turn, is likely to be reflected in a higher carbon premium. We explore this channel by looking at whether a country's "rule of law" and "voice" affects the carbon premium of its companies. The rule of law captures perceptions of the extent to which agents have confidence in and abide by the rules of society, and in particular the quality of contract enforcement, property rights, the police, and the courts, as well as the likelihood of crime and violence. The measure *RULELAW*, is standardized between $-2.5$ and $2.5$. Voice reflects perceptions of the extent to which a country's citizens are able to participate in

Exhibit 36 to Decl. of Lyon
876
**SER 1258**

15496261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

3734                              *The Journal of Finance*®

selecting their government, as well as freedom of expression, freedom of association, and a free media. The standardized value, defined as *VOICE*, lies between 2.5 and −2.5. The 2.5 indicates the situation in which there is no obstacle to expressing voice and −2.5 number reflects situations in which people have no way of expressing their voices. Another indirect measure of social and political stability we look at is the country's income inequality, as measured by the Gini coefficient. All three country measures are obtained at an annual frequency from the World Bank. As before, we interact each of these variables with the level and growth of emissions to distinguish between long-term and short-term effects. We report the results in Table XI.

We do not find a significant effect of any of these variables on the premium associated with the level of emissions and conclude from these results that social factors do not appear to affect the long-run risk associated with carbon emissions. All coefficients of the interaction terms in Panel A are small and statistically insignificant. In contrast, we find that sociopolitical factors do matter for investors' carbon-transition risk perceptions in the short-run. As reported in Panel B, the coefficients of the interaction terms between "rule of law" and changes in emissions, and between "voice" and changes in emissions, are both highly significant and negative, indicating that the carbon premium is lower in countries with better rule of law and more democratic political institutions. Similarly, the coefficient of the interaction term between the Gini coefficient and changes in emissions is significant and positive, meaning that in countries with higher inequality, the carbon premium is likely to be larger. Overall, these results on the effect of sociopolitical factors are consistent with the view that greater social harmony produces less climate policy uncertainty. But these effects manifest themselves in the short-run, presumably because the socioeconomic environment can evolve, so that current conditions are seen as having a transitory impact on policy uncertainty by investors. For example, the political environment and social norms can change in the medium- and long-term; hence, any constraints imposed in the short-run may no longer bind in the long-run. From a different angle, one can link our prior findings on the heterogeneity in short-term risk premia between developed and developing countries to the different states of socioeconomic capital across countries.

### B.3. *Climate Policy Tightness*

Transition risk is often associated with expected regulatory changes dictating the adjustment to a green economy. Investor expectations of future climate-related policies can be an important risk component. Firms located in countries in which the government has made the most ambitious pledges to reduce carbon emissions may therefore be associated with a higher carbon premium. This is particularly true when local regulations are reinforced by pan-governmental policy actions, such as the United Nations-led COP initiative.

Climate change mitigation policies may originate from two sources: domestic regulators or international pan-governmental agreements. In this section, we evaluate the importance of each of the channels separately using unique

Exhibit 36 to Decl. of Lyon
877
**SER 1259**

Global Pricing of Carbon                                                    3735

**Table XI**
**Carbon Emissions and Stock Returns: Sociopolitical Environment**

The sample period is from 2005 to 2018. The dependent variable is *RET*. The main independent variables are carbon emission levels (Panel A) and the growth in emissions (Panel B). *RULELAW* measures a country's perceptions in a given year of the extent to which agents have confidence in and abide by the rules of society, and in particular the quality of contract enforcement, property rights, the police, and the courts, as well as the likelihood of crime and violence. Estimate gives the country's score on the aggregate indicator, in units of a standard normal distribution. *VOICE* captures perceptions in a given year of the extent to which a country's citizens are able to participate in selecting their government, as well as freedom of expression, freedom of association, and a free media. Estimate gives the country's score on the aggregate indicator, in units of a standard normal distribution. *GINI* is a country's GINI index in a given year. All other variables are defined in Tables I and II. We report the results of the pooled regression with standard errors (in parentheses) double clustered at the firm and year level. All regression models include the controls of Table VI (unreported for brevity), year-month-fixed effects, and country-fixed effects. In selected columns, we additionally include industry-fixed effects. ***1% significance; **5% significance; *10% significance.

|  | | | | | | Panel A: Levels | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dependent Variable: *RET* | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) |
| RULELAW | −0.677 (0.752) | −0.721 (0.766) | −0.660 (0.755) | −0.705 (0.776) | | | | | | | | |
| VOICE | | | | | −0.700 (0.805) | −0.676 (0.822) | −0.723 (0.803) | −0.697 (0.828) | | | | |
| GINI | | | | | | | | | −6.619 (12.017) | −7.181 (11.998) | −6.753 (12.000) | −7.776 (11.998) |
| LOGS1TOT | 0.026 (0.017) | | 0.061*** (0.015) | | 0.031* (0.017) | | 0.067*** (0.014) | | 0.020 (0.081) | | 0.023 (0.081) | |
| LOGS3TOT | | 0.108*** (0.025) | | 0.162*** (0.028) | | 0.120*** (0.024) | | 0.173*** (0.027) | | 0.085 (0.115) | | 0.081 (0.115) |
| RULELAW*LOGS1TOT | 0.002 (0.009) | | 0.002 (0.009) | | | | | | | | | |
| RULELAW*LOGS3TOT | | 0.004 (0.015) | | 0.003 (0.015) | | | | | | | | |
| VOICE*LOGS1TOT | | | | | −0.005 (0.011) | | −0.006 (0.011) | | | | | |
| VOICE*LOGS3TOT | | | | | | −0.009 (0.018) | | −0.010 (0.018) | | | | |

(Continued)

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2026]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
878
**SER 1260**

Case 2:24-cv-00801-ODW-PVC   Document 56-36   Filed 07/24/24   Page 61 of 79   Page ID #:6859

3736                                   The Journal of Finance®

**Table XI—Continued**

**Panel A: Levels**

| Dependent Variable: RET | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GINI*LOGS1TOT | | | | | | | | | 0.027 (0.219) | 0.069 (0.296) | | |
| GINI*LOGS3TOT | | | | | | | | | | | 0.124 (0.219) | 0.195 (0.302) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | No | No | Yes | Yes | No | No | Yes | Yes | No | No | Yes | Yes |
| Observations | 746,289 | 746,929 | 736,501 | 737,141 | 746,289 | 746,929 | 736,501 | 737,141 | 238,048 | 238,236 | 235,027 | 235,215 |
| R-squared | 0.150 | 0.150 | 0.151 | 0.152 | 0.150 | 0.150 | 0.151 | 0.152 | 0.195 | 0.195 | 0.198 | 0.198 |

**Panel B: Growth in Emissions**

| Dependent Variable: RET | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RULELAW | -0.627 (0.743) | -0.606 (0.744) | -0.610 (0.743) | -0.587 (0.745) | | | | | | | | |
| VOICE | | | | | -0.778 (0.811) | -0.782 (0.815) | -0.806 (0.811) | -0.804 (0.816) | | | | |
| GINI | | | | | | | | | -7.074 (12.484) | -8.585 (12.489) | -6.232 (12.425) | -7.788 (12.419) |
| S1CHG | 0.599*** (0.097) | | 0.613*** (0.097) | | 0.535*** (0.075) | | 0.547*** (0.075) | | -0.469 (0.396) | | -0.402 (0.399) | |
| S3CHG | | 1.512*** (0.226) | | 1.524*** (0.228) | | 1.327*** (0.179) | | 1.339*** (0.180) | | -1.072 (1.024) | | -0.887 (1.020) |
| RULELAW*S1CHG | -0.145** (0.060) | | -0.144** (0.060) | | | | | | | | | |
| RULELAW*S3CHG | | -0.331** (0.151) | | -0.326** (0.150) | | | | | | | | |
| VOICE*S1CHG | | | | | -0.145*** (0.051) | | -0.140*** (0.051) | | | | | |
| VOICE*S3CHG | | | | | | -0.275** (0.130) | | -0.266** (0.130) | | | | |

(Continued)

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13273 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
879
**SER 1261**

*Global Pricing of Carbon*                3737

**Table XI—Continued**

Panel B: Growth in Emissions

| Dependent Variable: *RET* | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *GINI\*SICHG* | | | | | | | | | 2.521** (1.075) | 6.030** (2.677) | 2.378** (1.084) | 5.687** (2.675) |
| *GINI\*S2CHG* | | | | | | | | | | | | |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | No | No | Yes | Yes | No | No | Yes | Yes | No | No | Yes | Yes |
| Observations | 735,150 | 735,694 | 725,536 | 726,080 | 735,150 | 735,694 | 725,536 | 726,080 | 236,017 | 236,159 | 233,026 | 233,168 |
| R-squared | 0.151 | 0.152 | 0.153 | 0.153 | 0.151 | 0.152 | 0.153 | 0.153 | 0.196 | 0.196 | 0.199 | 0.199 |

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
880
**SER 1262**

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

3738                              *The Journal of Finance*®

data on country-specific regulatory tightness. Our policy data come from Germanwatch. To our knowledge, ours is the first large-sample study that evaluates the direct importance of both types of policies for global stock returns. Each year, Germanwatch collects information on all climate-related policies and converts this information into a numerical score, where a higher number means a stricter regulatory regime. We define two variables that we interact with firm-level carbon emissions. *INTPOLICY* is a normalized measure of international policy tightness; *DOMPOLICY* is a normalized measure of domestic policy tightness.[17] We interact each of the two variables with the level and growth in firm emissions.

We report the results in Table XII. Two interesting findings emerge. First, in Panel A, we show that the effects of climate policy operate on the carbon premium associated with carbon emission levels. The effect is positive and economically significant for both scope 1 and scope 3 emissions, and statistically significant for scope 3 emissions. On the other hand, neither type of climate policy tightness affects the carbon premium associated with the year-by-year growth in emissions, as shown in Panel B. These results support the view that carbon policies are seen by investors as permanent shocks to carbon-transition risk. That is, investors' perspective appears to be that climate policies that are already in place are largely irreversible. Second, and perhaps more unexpectedly, we find that between the two types of climate policies, domestic ones have a bigger effect on the carbon premium. This result sheds light on many analysts' concerns that the commitments made by countries in Paris or Glasgow could be empty promises, that is, that commitments made through international agreements lack credibility unless they are translated into domestic policy. It is only when these commitments are followed up by domestic policy implementation that investors start paying attention.

### B.4. Brown Reputation Risk

An important component of transition risk is reputation risk. A few fossil fuel-intensive industries that we define as "salient" are known to attract negative media coverage, which could further amplify transition risk. Hence, the question of whether the carbon premium is mostly concentrated in the oil and gas, utilities, and motor sectors that are the focus of much negative press. Could it be that the reason behind much cross-sector variation in the carbon premium lies in the negative reputation earned by brown sectors? Given that the media focus is largely on the salient brown industries, one would expect that the investors in companies in these sectors price-in an additional risk compensation for their exposure to the negative stigma of holding these stocks.

To explore this hypothesis, we estimate a modified regression specification from that in Table VI, conditional on whether a company belongs to one of the salient industries mentioned above, or not. We define an indicator variable,

---

[17] Further details on the methodology behind the policy measures can be obtained from the Germanwatch website, at https://www.germanwatch.org/en/21110.

Exhibit 36 to Decl. of Lyon
881
**SER 1263**

Global Pricing of Carbon 3739

## Table XII
### Carbon Emissions and Stock Returns: Climate Policy Tightness

The sample period is from 2005 to 2018. The dependent variable is RET. The main independent variables are carbon emission levels (Panel A) and the growth in emissions (Panel B). INTPOLICY measures the strictness of a country's international climate policy in a given year. DOMPOLICY measures the strictness of a country's domestic climate policy in a given year. All other variables are defined in Tables I and II. We report the results of the pooled regression with standard errors (in parentheses) double clustered at the firm and year level. All regression models include the controls of Table VI (unreported for brevity), year-month-fixed effects, and country-fixed effects. In selected columns, we additionally include Trucost industry-fixed effects. ***1% significance; **5% significance; *10% significance.

#### Panel A: Levels

| Dependent Variable: RET | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|
| INTPOLICY | −0.684 | −1.171 | −0.624 | −1.272 | | | | |
| | (0.387) | (1.009) | (0.384) | (0.983) | | | | |
| DOMPOLICY | | | | | −1.087* | −2.634** | −1.094* | −2.723** |
| | | | | | (0.566) | (1.014) | (0.535) | (0.971) |
| LOGS1TOT | 0.044* | | 0.083*** | | 0.001 | 0.041 | 0.037 | |
| | (0.023) | | (0.022) | | (0.024) | (0.027) | (0.027) | |
| LOGS3TOT | | 0.123*** | | 0.171*** | | | | 0.088** |
| | | (0.038) | | (0.040) | | | | (0.030) |
| INTPOLICY*LOGS1TOT | −0.015 | | −0.020 | | | | | |
| | (0.040) | | (0.041) | | | | | |
| INTPOLICY*LOGS3TOT | | 0.027 | | 0.035 | | | | |
| | | (0.086) | | (0.084) | | | | |
| DOMPOLICY*LOGS1TOT | | | | | 0.064 | 0.041 | 0.065 | |
| | | | | | (0.050) | | (0.048) | |
| DOMPOLICY*LOGS3TOT | | | | | | 0.181** | | 0.188** |
| | | | | | | (0.076) | | (0.072) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | No | No | Yes | Yes | No | No | Yes | Yes |
| Observations | 551,075 | 551,642 | 544,127 | 544,694 | 551,075 | 551,642 | 544,127 | 544,694 |
| R-squared | 0.153 | 0.153 | 0.155 | 0.155 | 0.153 | 0.153 | 0.154 | 0.155 |

(Continued)

15450261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
882
**SER 1264**

**Table XII**—*Continued*

Panel B: Growth in Emissions

| Dependent Variable: RET | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|
| INTPOLICY | -0.852** | -0.892** | -0.842** | -0.891** | | | | |
| | (0.314) | (0.302) | (0.316) | (0.306) | | | | |
| DOMPOLICY | | | | | -0.386 | -0.430 | -0.383 | -0.430 |
| | | | | | (0.272) | (0.280) | (0.280) | (0.289) |
| S1CHG | 0.570*** | | 0.598*** | | 0.475*** | | 0.492*** | |
| | (0.125) | | (0.109) | | (0.121) | | (0.105) | |
| S3CHG | | 1.264** | | 1.252** | | 0.984 | | 0.998* |
| | | (0.534) | | (0.513) | | (0.573) | | (0.542) |
| INTPOLICY*S1CHG | -0.175 | | -0.176 | | | | | |
| | (0.186) | | (0.170) | | | | | |
| INTPOLICY*S3CHG | | -0.119 | | -0.038 | | | | |
| | | (0.574) | | (0.555) | | | | |
| DOMPOLICY*S1CHG | | | | | -0.001 | | 0.011 | |
| | | | | | (0.201) | | (0.194) | |
| DOMPOLICY*S3CHG | | | | | | 0.364 | | 0.395 |
| | | | | | | (0.711) | | (0.679) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | No | No | Yes | Yes | No | No | Yes | Yes |
| Observations | 544,610 | 545,073 | 537,766 | 538,229 | 544,610 | 545,073 | 537,766 | 538,229 |
| R-squared | 0.155 | 0.155 | 0.156 | 0.157 | 0.154 | 0.155 | 0.156 | 0.157 |

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
883
**SER 1265**

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*Global Pricing of Carbon* 3741

*SALIENT*, equal to 1 if the company belongs to one of the salient industries, and 0 otherwise. Our coefficients of interest are those of the interaction effect between *SALIENT* and respective emission measures. If these salient brown industries are indeed more stigmatized, one would expect the carbon premium to be smaller in the other sectors. In terms of our conditional regression specification, this would mean that the coefficient of the interaction term is positive and statistically significant.

We report the results in Table XIII. By and large, we find that the premium associated with the level of emissions is not statistically different for salient and nonsalient industries, and, if anything, the direction of the effect goes against the hypotheses of a premium being present mostly in salient industries. The results are slightly different for the premium associated with the growth in emissions. Here, we find a slightly stronger effect for changes in scope 3 emissions on returns for companies that operate in salient industries.

This finding could also mean that a stigma has mostly already been "baked in" in these brown sectors but is yet to materialize in the other sectors that have faced less analyst scrutiny. These findings are also consistent with the results in Table VI that variations in stock returns associated with carbon emissions across industries swamp within-industry variations. Another possibility is that the stigma could extend to an entire country when the country is disproportionately dependent on brown sectors, as is the case for many countries in the "Others" category. By this interpretation, the weaker results we found for this category could be due to this baked-in stigma associated with an overdependence on brown sectors. Note, however, that our regressions include country-fixed effects, which to some extent absorb any such country-level effects.

### B.5. Physical Risk

Much of the economics literature on climate risk has sought to estimate the expected physical damages due to climate change. A natural hypothesis is that transition risk is positively correlated with physical risk. As countries are exposed to more severe weather events caused by climate change, one would expect that there will be greater support for policies combatting climate change in these countries. In other words, the extent to which a country has been exposed to climate disasters may shape investors' beliefs about the cost of long-term damage due to climate change. To test this hypothesis, we use a country-level, year-by-year index measuring physical risk (CRI) from Germanwatch. This index is based on the frequency of climate-related damages. Countries with higher values of the CRI index are considered to have higher physical risk. We estimate the coefficients of the interaction terms between CRI and firm-level emission measures, both their levels and growth rates. The results are reported in Table IA.X. Columns (1) to (4) show the results based on total emissions, and columns (5) to (8) show the results based on growth rates. Consistent with the hypothesis that physical risk amplifies the carbon premium associated with transition risk, we find that positive values for the interaction

Exhibit 36 to Decl. of Lyon
884
**SER 1266**

3742                                  The Journal of Finance®

## Table XIII
## Carbon Emissions and Stock Returns: Reputational Risk

The sample period is from 2005 to 2018. SALIENT is an indicator variable equal to 1 for all companies in the oil and gas (GICS = 2), utilities (GICS = 65-69), and motor (GICS = 18, 19, 23) industries, and 0 for companies in all other industries. The dependent variable is RET. The main independent variables are carbon emission levels (columns (1) to (4)) and the growth in emissions (columns (5) to (8)), all interacted with SALIENT. All variables are defined in Tables I and II. We report the results of the pooled regression with standard errors (in parentheses) double clustered at the firm and year level. All regressions include year-month-fixed effects and country-fixed effects. All regression models include the controls of Table VI (unreported for brevity). In even-numbered columns, we additionally include Trucost industry-fixed effects. ***1% significance; **5% significance; *10% significance.

| Dependent Variable: RET | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|
| LOGS1TOT | 0.047 | | 0.073** | | | | | |
| | (0.032) | | (0.024) | | | | | |
| SALIENT | 0.417 | 0.945 | 0.331 | 0.350 | 0.247 | 0.202 | 0.142 | 0.095 |
| | (0.530) | (0.651) | (0.328) | (0.403) | (0.156) | (0.155) | (0.119) | (0.113) |
| SALIENT*LOGS1TOT | −0.006 | | −0.006 | | | | | |
| | (0.040) | | (0.028) | | | | | |
| LOGS3TOT | | 0.159*** | | 0.176*** | | | | |
| | | (0.034) | | (0.036) | | | | |
| SALIENT*LOGS3TOT | | −0.053 | | −0.013 | | | | |
| | | (0.045) | | (0.033) | | | | |
| S1CHG | | | | | 0.433** | | 0.472** | |
| | | | | | (0.191) | | (0.200) | |
| SALIENT*S1CHG | | | | | 0.010 | | −0.020 | |
| | | | | | (0.205) | | (0.209) | |
| S3CHG | | | | | | 0.555 | | 0.601 |
| | | | | | | (0.404) | | (0.412) |
| SALIENT*S3CHG | | | | | | 0.710* | | 0.671* |
| | | | | | | (0.369) | | (0.367) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | No | Yes | No | Yes | No | Yes | No | Yes |
| Observations | 744,864 | 745,504 | 735,109 | 735,749 | 733,724 | 734,268 | 724,143 | 724,687 |
| R-squared | 0.150 | 0.150 | 0.151 | 0.151 | 0.151 | 0.152 | 0.153 | 0.153 |

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [09/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
885
SER 1267

15406261, 2025, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [05/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*Global Pricing of Carbon*                                              3743

terms with emission changes. However, all these coefficients are statistically insignificant. Also, contrary to our prediction, the coefficients of the interaction terms with emission levels are negative (again, however, these coefficients are statistically and economically small). Hence, greater physical risk exposure for a country because of climate change, and greater incidence of physical climate shocks, does not result in greater carbon transition risk.

Overall, we conclude that transition risk does not appear to be significantly linked to different exposures to physical risk, perhaps because physical risk is a localized risk, and is unlikely to affect all regions with the same intensity, whereas the carbon transition is a global issue, which is largely independent of whether physical risks materialize in a specific country or not. It is simply a reflection of the shift away from fossil fuels. Indeed, countries like Australia, Brazil, and Russia, or U.S. states like Texas, Florida, or West Virginia, that have experienced massive climate disasters, have not seen a political movement emerge to shut down coal mines and other fossil fuel-dependent economic activity. Somehow the political process in these countries (and U.S. states) does not seem to commingle physical and transition risk.

### B.6. Changes in Investor Awareness

Our analysis so far has explored the carbon premium through the cash flow uncertainty channel. Another force that could affect the carbon premium is the discount rate channel related to changing investor perceptions about climate change and carbon-transition risk. Bolton and Kacperczyk (2021a) find evidence of a discount rate channel, with investor perceptions of carbon-transition risk changing over time, but their evidence is based purely on U.S. companies, which naturally raises the question of external validity. More importantly, this evidence has little to say about what aspects of transition risk are altered by the changed beliefs. Although our analysis here includes 77 countries, we cannot clearly isolate the effects of this channel given that we are pooling all observations from 2005 to 2018 together. However, we can explore how the carbon premium reacts to salient events that could reshape public perceptions of climate change. One such defining event is the landmark Paris climate agreement at the COP21 in December 2015. This event has enhanced the salience of the climate debate worldwide and raised the importance of possible transition risk going forward. It is therefore to be expected that the event has likely changed investors' perception of risk along multiple dimensions, including future energy costs, social preferences, or policy changes. Our empirical analysis around this event captures the aggregate effect, encompassing all the above possibilities, of investors' responses to this event.

Specifically, we define an indicator variable *Paris* that is equal to 0 for the 2 years (from 2014 to 2015) preceding the Paris agreement and equal to 1 for the 2 years (from 2016 to 2017) following the agreement. Next, we regress stock returns on carbon emissions interacted with *Paris*. We report the results in Table XIV, which provides the estimates for the differences in levels and changes in emissions for our aggregate sample of 77 countries. Notably, there

Exhibit 36 to Decl. of Lyon
886
**SER 1268**

3744      *The Journal of Finance®*

**Table XIV**
**Carbon Emissions and Stock Returns: The Role of Investor Awareness**

The dependent variable is *RET*. The main independent variables are carbon emission levels (columns (1) to (4)) and the growth in emissions (columns (5) to (8)). All variables are defined in Tables I and II. We report the results of the pooled regression with standard errors (in parentheses) double clustered at the firm and year level. *Paris* is an indicator variable equal to 0 for the period January 2014–November 2015 (2 years before Paris COP21 conference) and equal to 1 for the period January 2016–December 2017 (2 years after Paris COP21 conference). All regression models include the controls of Table VI (unreported for brevity), year-month-fixed effects, and country-fixed effects. In selected columns, we additionally include Trucost industry-fixed effects. ***1% significance; **5% significance; *10% significance.

| Dependent Variable: RET | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|
| LOGS1TOT | -0.045 (0.031) | | -0.017 (0.031) | | | | | |
| LOGS3TOT | | 0.060 (0.047) | | 0.119** (0.050) | | | | |
| S1CHG | | | | | 0.658*** (0.158) | | 0.662*** (0.157) | |
| S3CHG | | | | | | 1.864*** (0.344) | | 1.856*** (0.350) |
| Paris*LOGS1TOT | 0.132*** (0.048) | | 0.133*** (0.048) | | | | | |
| Paris*LOGS3TOT | | 0.098* (0.053) | | 0.101* (0.054) | | | | |
| Paris*S1CHG | | | | | -0.207 (0.210) | | -0.198 (0.211) | |
| Paris*S3CHG | | | | | | -0.716 (0.528) | | -0.757 (0.550) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | No | No | Yes | Yes | No | No | Yes | Yes |
| Observations | 301,993 | 302,309 | 298,113 | 298,429 | 295,469 | 295,780 | 291,686 | 291,997 |
| R-squared | 0.061 | 0.061 | 0.064 | 0.064 | 0.062 | 0.062 | 0.065 | 0.065 |

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
887
**SER 1269**

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [09/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*Global Pricing of Carbon*                    3745

is no significant premium associated with the level of scope 1 emissions right before Paris (even with industry-fixed effects), whereas there is a significantly larger positive premium after Paris. We also find a significant increase in the premium for the level of scope 3 emissions. In turn, the results for changes in emissions are significant in the pre-Paris period and show no significant difference with the post-Paris period. One way to interpret these contrasting results is that, because of COP21, investors significantly updated their beliefs about long-term transition risk. Consistent with our previous findings, these results also suggest that the Paris agreement has been particularly important in reshaping investor beliefs about forthcoming climate-related policies. Indeed, this has been a popular narrative among practitioners and policy makers.

In which parts of the world did the Paris agreement have the biggest effect? To explore this question, we estimate the same model as in Table XIV for each continent. We report the results for the level of carbon emissions in Table XV. Remarkably, there is no apparent change for North America. Both before and after the Paris agreement, there is no significant carbon premium associated with the level of emissions. In Europe, both before and after Paris, there is a significant carbon premium (except that the premium for scope 1 emissions becomes insignificant after Paris). As a result, there is no significant change in the value of the premium around the Paris event for Europe. The biggest and most statistically significant change is in Asia, where the carbon premium was insignificant before Paris, but became highly significant after Paris. This is true whether we exclude China or not. Finally, in the other continents (Africa, Australia, and South America) there is also a significant positive change before and after Paris, even though this change is based on a smaller sample size.

Another relevant breakdown is between the group of G20 countries and the group of other countries. The results are reported in Table IA.XI. Again, the difference in the carbon premium before and after Paris is dramatic for the group of G20 countries. Before the agreement there was no significant carbon premium, but after the agreement there is a highly significant positive premium, whether we include industry-fixed effects or not. In contrast, the changes in the other group of countries are much smaller. While there is a shift toward a significant premium, it is mostly for scope 3 emissions.

We also undertake this analysis after excluding the salient industries associated with fossil fuels. Recall that our cross-sectional analysis when we pool all years together established that the carbon premium is present even beyond these industries. The results reported in Table IA.XII reveal similar robustness in the carbon premium around the Paris shock. Indeed, there is a highly significant and positive premium associated with the level of emissions in other industries as well after Paris.[18]

---

[18] We have also tested whether the changing awareness results are driven by the sample of new companies that Trucost has added to its database. The results, in Table IA.XIII, show similar effects for the "legacy sample," so it is unlikely that the addition of the new companies is driving the results.

Exhibit 36 to Decl. of Lyon
888
**SER 1270**

3746        *The Journal of Finance*®

**Table XV**

**Carbon Total Firm Emissions and Stock Returns: Awareness (Regional)**

The dependent variable is monthly *RET*. The main independent variable is carbon emission level. All variables are defined in Tables I and II. We report the results of the pooled regression with standard errors (in parentheses) double clustered at the firm and year level. *Paris* is an indicator variable equal to 0 for the period January 2014–November 2015 (2 years before the Paris COP21 conference) and equal to 1 for the period January 2016–December 2017 (2 years after the Paris COP21 conference). All regression models include the controls of Table VI (unreported for brevity), year–month-fixed effects, and country-fixed effects. In selected columns, we additionally include Trucost industry-fixed effects. Panel A samples firms from North America, Panel B from Europe, Panel C from Asia, and Panel D from all the remaining countries. ***1% significance; **5% significance; *10% significance.

|  | | Panel A: North America | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Dependent Variable: *RET* | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| | North America | | | | | North America (excl. USA) | | |
| *LOGS1TOT* | −0.035 | | −0.013 | | −0.078 | | 0.009 | |
| | (0.059) | | (0.060) | | (0.078) | | (0.089) | |
| *LOGS3TOT* | | 0.106 | | 0.071 | | 0.209 | | 0.196 |
| | | (0.093) | | (0.104) | | (0.125) | | (0.159) |
| *Paris*LOGS1TOT* | 0.083 | | 0.079 | | 0.072 | | 0.090 | |
| | (0.081) | | (0.077) | | (0.115) | | (0.122) | |
| *Paris*LOGS3TOT* | | −0.052 | | −0.044 | | −0.211 | | −0.190 |
| | | (0.109) | | (0.102) | | (0.163) | | (0.170) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | No | No | Yes | Yes | No | No | Yes | Yes |
| Observations | 74,410 | 74,503 | 73,442 | 73,535 | 12,978 | 13,025 | 12,876 | 12,923 |
| *R*-squared | 0.090 | 0.090 | 0.098 | 0.098 | 0.105 | 0.106 | 0.119 | 0.120 |

*(Continued)*

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
889
**SER 1271**

*Global Pricing of Carbon*  3747

**Table XV**—*Continued*

Panel B: Europe

| Dependent Variable: RET | (1) Europe | (2) | (3) | (4) | (5) EU | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|
| LOGS1TOT | -0.022 (0.041) | | -0.011 (0.043) | | -0.022 (0.041) | | -0.011 (0.043) | |
| LOGS3TOT | | 0.099 (0.069) | | 0.176** (0.079) | | 0.099 (0.069) | | 0.176** (0.079) |
| Paris*LOGS1TOT | 0.089 (0.061) | | 0.091 (0.061) | | 0.089 (0.061) | | 0.091 (0.061) | |
| Paris*LOGS3TOT | | 0.065 (0.083) | | 0.062 (0.082) | | 0.065 (0.083) | | 0.062 (0.082) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | No | No | Yes | Yes | No | No | Yes | Yes |
| Observations | 63,965 | 64,034 | 62,911 | 62,980 | 63,965 | 64,034 | 62,911 | 62,980 |
| R-squared | 0.097 | 0.097 | 0.105 | 0.105 | 0.097 | 0.097 | 0.105 | 0.105 |

*(Continued)*

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
890
**SER 1272**

3748                     The Journal of Finance®

**Table XV**—*Continued*

Panel C: Asia

| Dependent Variable: RET | Asia (1) | (2) | (3) | (4) | (5) | Asia (excl. China) (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|
| LOGS1TOT | −0.055 (0.033) | | −0.034 (0.036) | | −0.031 (0.029) | | −0.025 (0.030) | |
| LOGS3TOT | | 0.007 (0.057) | | 0.097 (0.067) | | 0.077 (0.073) | | 0.147* (0.078) |
| Paris*LOGS1TOT | 0.161*** (0.052) | | 0.166*** (0.051) | | 0.128*** (0.041) | | 0.132*** (0.041) | |
| Paris*LOGS3TOT | | 0.208*** (0.071) | | 0.216*** (0.074) | | 0.089 (0.081) | | 0.092 (0.083) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry-fixed effects | No | No | Yes | Yes | No | No | Yes | Yes |
| Observations | 134,732 | 134,814 | 133,201 | 133,283 | 105,375 | 105,457 | 103,988 | 104,070 |
| R-squared | 0.078 | 0.078 | 0.082 | 0.083 | 0.062 | 0.062 | 0.067 | 0.067 |

(*Continued*)

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13273 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
891
**SER 1273**

Global Pricing of Carbon 3749

**Table XV**—*Continued*

Panel D: Others

| Dependent Variable: *RET* | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| | | Others | | |
| *LOGS1TOT* | −0.163*** | | | |
| | (0.057) | | | |
| *LOGS3TOT* | | −0.129 | −0.055 | −0.000 |
| | | (0.081) | (0.084) | (0.112) |
| *Paris*LOGS1TOT* | 0.271*** | | 0.267*** | |
| | (0.083) | | (0.087) | |
| *Paris*LOGS3TOT* | | 0.268** | | 0.253** |
| | | (0.109) | | (0.109) |
| Controls | Yes | Yes | Yes | Yes |
| Year/month-fixed effects | Yes | Yes | Yes | Yes |
| Country-fixed effects | Yes | Yes | Yes | Yes |
| Industry-fixed effects | No | No | Yes | Yes |
| Observations | 28,251 | 28,323 | 27,924 | 27,996 |
| R-squared | 0.067 | 0.067 | 0.078 | 0.077 |

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
892
**SER 1274**

15496261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13275 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

3750 *The Journal of Finance®*

All in all, these results paint a rather striking picture of the pricing of transition risk across countries. The expectation of a significant long-term change in the carbon premium seems to be reflected in salient events, such as the Paris agreement. The striking and surprising finding here is that awareness about carbon risk, as reflected in the carbon premium, has changed the most in Asia, where investor awareness has jumped after the Paris agreements, whereas it has remained basically unchanged in Europe and North America, either because these regions already had greater awareness of climate change (Europe), or because they had less awareness and did not revise their beliefs (North America). To further explore this conjecture, we look at the predictability of national reforms (measured by *DOMPOLICY*) from the previous year's international policy framework (measured by *INTPOLICY*), before and after Paris, for the three different regions, Asia, Europe, and North America. In the regression model, we also include country-fixed effects. Consistent with our narrative, we find that there is predictive power of national policies in past international commitments following the Paris agreement. It is the highest for Asia, much lower for Europe, and the opposite for North America, the last result being consistent with the fact that the U.S. administration around Paris has mostly moved in the opposite direction from the international framework. We report these results in Table IA.XIV.

One potential concern with the risk premium interpretation is that we have measured changes in the risk premium over relatively short periods, even if a period of a decade and a half is not that short. Could it be that our findings are just a random draw? Although it is not possible to test this luck hypothesis, one should bear in mind that the Paris agreement is a particularly salient event and its important consequences have been established in other contexts. Also, the last decade has witnessed a significant increase in climate-related events, and a sharp increase in media coverage of these events, so that our interpretation based on changing risk (perceptions) has a solid grounding in these trends.[19]

### C. Transitioning to a Green Equilibrium

Our results are broadly consistent with the existence of a return premium compensating investors for the carbon-transition risk they face. But at what point did investors begin to demand compensation for this risk? Basic logic suggests that the period in which carbon-transition risk is compensated should be preceded by a period during which assets are repriced to reflect the new risk. This repricing can in principle be a protracted process that parallels the economic shift from a brown to a green equilibrium. Moreover, the repricing is driven by changes in investor awareness about climate change risk. During this transition phase, one would expect to see increased demand (and there-

---

[19] In untabulated tests, we have also tested the change in the risk premium by using the long period from 2005 to 2015 as the pre-period. The results for the interactions terms are qualitatively similar.

Exhibit 36 to Decl. of Lyon
893
**SER 1275**

*Global Pricing of Carbon*                                      3751

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [09/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

fore higher prices) for assets with low levels of emissions, and decreased de-
mand (and lower prices) for assets with high levels of emissions. Although this
adjustment mechanism is straightforward, testing for such asset price adjust-
ments is challenging, especially in the context of heterogenous global financial
markets, in which individual assets may transition at different times and at
different speeds.

In the absence of a clear large-scale empirical setting, we fall back on sug-
gestive evidence from one individual sector, the tobacco industry, in which such
a repricing process accompanied the rebranding of tobacco companies as "sin
stocks." As Hong and Kacperczyk (2009) show, the reclassification of the to-
bacco industry as a sin asset class meant that tobacco companies were added
to the divestment lists of many investors. This divestment movement resulted
in higher expected returns (Merton (1987)). Prior to the 1950s, the negative
health effects of tobacco consumption were not known; in fact, many consid-
ered tobacco a cure. This perception changed following the reports of the U.S.
Surgeon General, which resulted in a massive change in beliefs about the indus-
try. Consequently, the 1950–1970 period saw a massive revaluation of the
industry, with tobacco companies being valued at much lower multiples. Fol-
lowing this repricing, however, tobacco companies over the subsequent four
decades delivered very large returns.

We believe that a similar process is underway in the energy industry, with
green energy companies being valued at much higher multiples and some
brown companies already being valued at lower multiples. We can infer some
of these repricing effects from some of our tests. As highlighted in Table XIII,
when we exclude salient industries from our sample the effect of scope 1 emis-
sion levels on stock returns increases relative to the unconditional value in
Table VI, which means that the salient industries, on an average, underper-
formed other sectors (with lower emissions) over our sample period. Interest-
ingly, however, this difference only appears in regressions without industry-
fixed effects, which suggests that the repricing has been a broad categorical
repricing of the whole industry rather than individual firms in these indus-
tries. Of course, this repricing need not be a once-and-for-all revaluation as it
appears to have been for the tobacco industry. In fact, it seems to us that in-
vestors' attitudes toward carbon emissions are much more dynamic, and thus
it is quite possible that one could witness multiple waves of repricing followed
by periods with high returns. This is in fact what we think our data capture.
Because the carbon transition process is ongoing, this can only be a speculative
inference, which we expect future out-of-sample tests of the carbon transition
will confirm.

### V. Conclusion

If global warming is to be checked, the global economy will have to wean
itself off fossil fuels and reduce carbon emissions to zero by 2050 or 2060 at the
latest. This translates into a year-to-year rate in emissions reductions equal
to the drop we have witnessed in 2020 as a result of the COVID-19 pandemic.

Exhibit 36 to Decl. of Lyon
894
**SER 1276**

3752                    *The Journal of Finance*®

Whether the global economy will be able to stick to such a rate of reduction in the use of fossil fuels, whether the reduction in emissions will be smooth or highly nonlinear and abrupt, is impossible to say. But what is certain is that in the coming years and decades investors will be exposed to substantial transition risk. Given that stock markets are fundamentally forward looking, it is natural to ask whether and to what extent this transition risk is reflected in stock returns.

We have taken the broadest possible look at this question by analyzing the pricing of carbon-transition risk at the firm level in a cross section of over 14,400 listed companies in 77 countries. To date, very little is known about how carbon emissions affect stock returns around the world. Our wide-ranging exploratory study provides a first glimpse into this question. We have found evidence of a widespread, significant, and rising carbon premium—higher stock returns for companies with higher carbon emissions. This premium is not just present in a few countries (the United States and the European Union) or in a few sectors tied to fossil fuels. It is ubiquitous, affecting firms in all sectors over three continents: Asia, Europe, and North America. Moreover, stock returns are related not just to firms' direct emissions but also to their indirect emissions through the supply chain and the carbon premium is associated both with the year-to-year growth in emissions (a short-run carbon-transition risk exposure) and the level of emissions (a long-run exposure).

Finally, we find that carbon-transition risk is not just a reflection of climate policy uncertainty but is also tied to uncertainty with respect to technological progress in renewable energy and the sociopolitical environment that could support or undermine climate policies. In turn, time-series patterns point to a time-varying carbon premium, with the premium rising significantly following the COP21 meeting.

At a broad level, our study is relevant for the discussions centered on carbon taxation as a means to achieve reductions in emissions. While the idea of a carbon tax is appealing based on economic first principles, it clearly faces practical obstacles. A major impediment to the introduction of a global carbon tax is coordination among political parties with diverse interests and financial capacities. Our study suggests that financial markets could play an important amplifying role. The increasing cost of equity for companies with higher emissions can be seen as a form of taxation through capital markets.

Our study is obviously not free of empirical challenges. One particular concern is that the shifting beliefs about climate change during our sample period are unusual and unlikely to be representative of the climate shocks that will unfold in the foreseeable future. It could be that investors have overreacted to the Paris agreement and all the attention devoted to climate change issues over our sample period. If that were the case, we would not really be picking up a persistent expected return difference. Rather, we would be finding return premia driven by nonpersistent shocks to investor beliefs. This is a possibility that we cannot rule out. But, given the climate science, this seems highly unlikely. If anything, evidence of an overheating planet is building day by day and alarm about climate change is rising. Given that carbon emissions

15496261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 36 to Decl. of Lyon
895
**SER 1277**

15406261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [09/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*Global Pricing of Carbon* 3753

continue to rise, the net zero commitments will be harder to achieve, which means that carbon-transition risk is rising. It is therefore far more likely that investor concerns about carbon-transition risk will grow. This, of course, means that we are potentially underestimating the size of the carbon premium.

Initial submission: July 19, 2021; Accepted: July 7, 2022
Editors: Stefan Nagel, Philip Bond, Amit Seru, and Wei Xiong

## REFERENCES

Aswani, Jitendra, Aneesh Raghunandan, and Shivaram Rajgopal, 2023, Are carbon emissions associated with stock returns?, *Review of Finance* (forthcoming).

Atanasova, Christina V., and Eduardo Schwartz, 2020, Stranded fossil fuel reserves and firm value, NBER Working Paper 26497.

Bansal, Ravi, Dana Kiku, and Marcelo Ochoa, 2016, Climate change and growth risks, NBER Working Paper 23009.

Bolton, Patrick, and Marcin Kacperczyk, 2021a, Do investors care about carbon risk?, *Journal of Financial Economics* 142, 517–549.

Bolton, Patrick, and Marcin Kacperczyk, 2021b, Firm commitments, Working paper, Imperial College London.

Bolton, Patrick, and Marcin Kacperczyk, 2021c, Carbon disclosure and the cost of capital, Working paper, Imperial College London.

Chava, Sudheer, 2014, Environmental externalities and cost of capital, *Management Science* 60, 2223–2247.

Cheema-Fox, Alexander, Bridget Realmuto LaPerla, George Serafeim, David Turkington, and Hui Wang, 2021, Decarbonizing everything, *Financial Analysts Journal* 77, 93–108.

Cruz, Jose-Louis, and Esteban Rossi-Hansberg, 2023, The economic geography of global warming, *Review of Economic Studies* (forthcoming).

Daniel, Kent, and Sheridan Titman, 1997, Evidence on the characteristics of cross-sectional variation in returns, *Journal of Finance* 52, 1–33.

Duffie, Darrell, 2010, Presidential address: Asset price dynamics with slow-moving capital, *Journal of Finance* 65, 1237–1267.

Dyck, Alexander, Karl Lins, Lukas Roth, and Hannes Wagner, 2019, Do institutional investors drive corporate social responsibility? International evidence, *Journal of Financial Economics* 131, 693–714.

Engle, Robert, Stefano Giglio, Heebum Lee, Bryan Kelly, and Johannes Stroebel, 2020, Hedging climate change news, *Review of Financial Studies* 33, 1184–1216.

Garvey, Gerald T., Mohanaraman Iyer, and Joanna Nash, 2018, Carbon footprint and productivity: Does the "E" in ESG capture efficiency as well as environment? *Journal of Investment Management* 16, 59–69.

Gibson, Rajna, Simon Glossner, Philipp Krueger, Pedro Matos, and Tom Steffen, 2022, Do responsible investors invest responsibly? *Review of Finance* 26, 1389–1432.

Görgen, Maximilian, Andrea Jacob, Martin Nerlinger, Ryan Riordan, Martin Rohleder, and Marco Wilkens, 2021, Carbon risk, Working paper, University of Augsburg.

Heinkel, Robert, Alan Kraus, and Josef Zechner, 2001, The effect of green investment on corporate behavior, *Journal of Financial and Quantitative Analysis* 36, 431–450.

Hong, Harrison, and Marcin Kacperczyk, 2009, The price of sin: The effects of social norms on markets, *Journal of Financial Economics* 93, 15–36.

Hong, Harrison, Frank W. Li, and Jiaming Xu, 2019, Climate risks and market efficiency, *Journal of Econometrics* 208, 265–281.

Hong, Harrison, Neng Wang, and Jinqiang Yang, 2023, Mitigating disaster risks in the age of climate change, *Econometrica* (forthcoming).

Exhibit 36 to Decl. of Lyon
896
**SER 1278**

15496261, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jofi.13272 by University Of Michigan Library, Wiley Online Library on [07/07/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

3754                          *The Journal of Finance®*

Hsu, Po-Hsuan, Kai Li, and Chi-Yang Tsou, 2023, The pollution premium, *Journal of Finance* 78, 1343–1392.

Ilhan, Emirhan, Zacharias Sautner, and Grigory Vilkov, 2021, Carbon tail risk, *Review of Financial Studies* 34, 1540–1571.

Kacperczyk, Marcin, Stijn van Nieuwerburgh, and Laura Veldkamp, 2016, A rational theory of mutual funds' attention allocation, *Econometrica* 84, 571–626.

Kogan, Leonid, and Dimitris Papanikolaou, 2014, Growth opportunities, technology shocks, and asset prices, *Journal of Finance* 69, 675–718.

Matsumura, Ella Mae, Rachna Prakash, and Sandra C. Vera-Muñoz, 2014, Firm-value effects of carbon emissions and carbon disclosures, *Accounting Review* 89, 695–724.

Merton, Robert C., 1987, A simple model of capital market equilibrium with incomplete information, *Journal of Finance* 42, 483–510.

Monasterolo, Irene, and Luca De Angelis, 2020, Blind to carbon risk? An analysis of stock market's reaction to the Paris Agreement, *Ecological Economics* 170, 1–10.

Nordhaus, William D., 1991, To slow or not to slow: The economics of the greenhouse effect, *Economic Journal* 101, 920–937.

Nordhaus, William D., and Zili Yang, 1996, A regional dynamic general-equilibrium model of alternative climate-change strategies, *American Economic Review* 86, 741–765.

Pastor, Lubos, Robert F. Stambaugh, and Lucian A. Taylor, 2021, Sustainable investing in equilibrium, *Journal of Financial Economics* 142, 550–571.

Pastor, Lubos, and Pietro Veronesi, 2013, Political uncertainty and risk premia, *Journal of Financial Economics* 110, 520–545.

Pedersen, Lasse Heje, Shaun Fitzgibbons, and Lukasz Pomorski, 2021, Responsible investing: The ESG-efficient frontier, *Journal of Financial Economics* 142, 572–597.

Rajan, Raghuram G., and Luigi Zingales, 1998, Financial dependence and growth, *American Economic Review* 88, 559–586.

### Supporting Information

Additional Supporting Information may be found in the online version of this article at the publisher's website:

**Appendix S1:** Internet Appendix.
**Replication Code.**

Exhibit 36 to Decl. of Lyon
897
**SER 1279**

# Exhibit 33

# to Declaration of Thomas P. Lyon

# The effect of climate disclosure on stock market performance: Evidence from Norway

Exhibit 33 to Decl. of Lyon
736
**SER 1280**



Received: 14 December 2021 | Revised: 30 September 2022 | Accepted: 14 October 2022

DOI: 10.1002/sd.2437

**RESEARCH ARTICLE**

 WILEY

# The effect of climate disclosure on stock market performance: Evidence from Norway

## Yevheniia Antoniuk 🟢

Nord University Business School, Nord University, Bodø, Norway

**Correspondence**
Yevheniia Antoniuk, Nord University Business School, Nord University, Bodø N-8049, Norway.
Email: yevhenliia.antoniuk@nord.no

**Abstract**

Increased concerns about climate change and its economic impact emphasize the necessity of sustainable investment and have become a demanded research topic. Via voluntary carbon and climate-related disclosure, companies indicate their exposure to climate change risks and how they counteract them. Investors seeking to reduce the climate risk of their portfolios can utilize this information. Using the 2010–2020 Carbon Disclosure Project scoring for companies in Norway, I formed portfolios of stocks with high, low, and no scores. These portfolios represent lower, higher, and unknown climate risks, respectively. The results suggest that a value-weighted portfolio of firms with high scores generates an extra 1.3% annualized return over the market. This portfolio steadily outperformed the market in recent years based on the information and Sortino ratios. However, after controlling for recognized risk factors, the high-score portfolio has no abnormal return unless energy stocks are excluded. In contrast, low- and no-score portfolios were penalized for bearing higher climate risk so that there is a significant climate alpha after 2016. This research highlights that a climate-aligned investment strategy is profitable while offering lower climate change risk exposure.

**KEYWORDS**

carbon disclosure, climate risks, portfolio investment, sustainable investment

## 1 | INTRODUCTION

Climate change mitigation is receiving growing attention from the public, policymakers, and investors (Bender et al., 2019; Clapp et al., 2017; Guyatt, 2011; Hunt & Weber, 2019). A transition to a low-carbon economy is a way to cope with climate change. Since this transition calls for actions on different levels by many actors, the financial market has a unique role in providing funds for their implementation. However, financial markets still lack a corresponding green structure (D'Orazio & Popoyan, 2019) to facilitate mitigation at a sufficient level even though some innovative funding tools such as green bonds are available (Horsch & Richter, 2017). There is also a horizon

mismatch between climate change consequences and financial implications that must be overcome for a successful transition to a low-carbon economy (Louche et al., 2019).

Nordic countries are seen as leaders in low-carbon economy transition because they aim to be fossil fuel-free and state this in their national strategies (Sovacool, 2017). Norway is a particular case among Nordic countries due to the special role of fossil fuels in the country's development. The Oslo Stock Exchange (OSE) is oil and gas driven; companies from the energy sector make up 18% of the total OSE Benchmark Index (only the industrial sector is larger[1]). Unlike other Nordic countries, Norway's carbon emission per capita income remains high and therefore has to cut down its emissions further

This is an open access article under the terms of the Creative Commons Attribution-NonCommercial License, which permits use, distribution and reproduction in any medium, provided the original work is properly cited and is not used for commercial purposes.
© 2022 The Author. *Sustainable Development* published by ERP Environment and John Wiley & Sons Ltd.

Exhibit 33 to Decl. of Lyon
737
**SER 1281**

ANTONIUK

Sustainable Development **WILEY** | 1009

(Urban & Nordensvärd, 2018). Norway actively works towards the goal of reducing its greenhouse gas (GHG) emissions. After the reached climate agreement at *Stortinget* (the Norwegian Parliament) in 2008, significant steps in addressing climate change were implemented via the Climate Change Act (2017). This act set forth Norwegian climate change goals for years 2030 and 2050. While Norwegian companies have adopted climate neutrality as a part of their corporate strategies, large investors such as Norges Bank Investment Management, which manages the Norwegian sovereign wealth fund, are interested in how the risk–return relationship will adjust to climate issues (Hong et al., 2020).

The historical importance of the oil and gas sector in Norway and Norway's active contribution to the low-carbon economy transition make Norway a unique context for studying sustainable investments. Some studies have already examined sustainable investments in Norway based on environmental, social, and governmental (ESG) ratings (Steen et al., 2020) and sustainability proxies (Fiskerstrand et al., 2020), but have not found these strategies profitable. In contrast to previous research with sustainability as an overarching focus, this article only focuses on climate change in portfolio formation. Norway's special emphasis on climate change mitigation and adaptation on the legislative level might affect the stock market and enable climate-aligned investments.

When considering climate change and its associated risks, financial markets find a disclosure on climate change risk more valuable than reporting on the absolute levels of GHG emissions (Liesen, 2015; Liesen et al., 2017). This incentivizes studying climate disclosure, data for which were obtained from the Carbon Disclosure Project (CDP) climate change reports for this article. The CDP is non-for-profit organization that assesses companies' disclosure based on the information provided annually in the questionnaire covering the topics of current carbon footprint and future adaptation and mitigation plans. The CDP database is proven to be a reliable source of disclosure information for academic research (Gasbarro et al., 2017; Kouloukoui et al., 2019; Sakhel, 2017; Schiemann & Sakhel, 2019).

This article aims to fill the gap in understanding how sustainability goals and climate change affect the stock market by studying the relationship between voluntary carbon disclosure and stock performance. The objective is to investigate whether the performance of the Norwegian exchange-traded companies varies with climate risk disclosure.

The companies are gathered in portfolios based on their scores from 2010 to 2019 CDP reports to achieve this. Different risk-return measures show that the portfolio of companies with fuller disclosure performed better since 2010 and outperformed the market and sustainable indices. Controlling for common risk factors revealed that the portfolios of companies that do not disclose their carbon and climate performance have negative excess returns. This article adds to the understanding of the investors' reaction to climate change disclosure by investigating short-term investments in the stock market. The study's results show that climate risk-aligned investment is a viable investment strategy for the Norwegian stock market.

A review of existing literature and the explanation of hypothesis development are presented in the next section. The data and methodology are explained in Section 3, while Section 4 presents the empirical results, and Section 5 discusses them and makes concluding remarks.

## 2 | THEORETICAL FRAMEWORK AND RESEARCH HYPOTHESIS

Climate change is a new topic in the sustainable investment literature (Daugaard, 2020). The main question is whether sustainable strategies can outperform benchmark (market portfolio) investments, whilst having a good performance based on these factors individually or combined. Thus far, research based on the aggregated ESG scores has provided evidence that neither portfolios of high-ESG-score stocks (Auer & Schuhmacher, 2016) nor sustainable stock indices (de Souza Cunha et al., 2019) outperform low-ESG-score stocks and traditional indices globally.

However, a later work of "Do Low-Carbon Investments in Emerging Economies Pay Off? Evidence from the Brazilian Stock Market" Souza Cunha et al. (2021) show that Brazilian carbon-efficient companies outperform both the market and sustainability index. Soler-Dominguez et al. (2021) provide further evidence that a location can impact the performance of the climate-efficient companies: The American and Canadian portfolios outperform the European ones in terms of annualized returns. In contrast, certified with environmental label Chinese companies perform better environmentally but not financially (He et al., 2022).

In Sweden, for example, socially responsible mutual funds have a similar performance to conventional funds (Leite et al., 2018). Previous ESG research on the Norwegian stock market also shows that ESG ranking level does not affect performance or create an abnormal risk-adjusted return for mutual funds (Steen et al., 2020). Similarly, there is no difference in the returns of high and low ESG-ranked Norwegian stocks, according to Fiskerstrand et al. (2020). Thus, the Nordic countries were considered in studies on sustainable, not climate investments.

Currently, investors have access to corporate environmental performance via companies' reports or third-party agencies (i.e., ESG ratings). Only some ratings have metrics that could potentially be used in climate performance measures (Rekker et al., 2019). Moreover, ESG ratings given to one company are often different among rating providers (Berg et al., 2020). This decreases opportunities for implementing climate-aligned portfolios based on ESG ratings, therefore alternative information sources should be considered. Scientific studies often rely on the climate change scoring from CDP organization as a source of climate performance information (Gasbarro et al., 2017; Kouloukoui et al., 2019; Sakhel, 2017). The CDP's questionnaire is a way for companies to voluntary report on carbon emissions annually. The CDP claims that to face climate change and deal with its associated risks, it is necessary to understand exposure to it, and to measure it.[2] CDP assigns scores to companies based on their answers to the

10991719, 2022, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/sd.2437 by University Of Michigan Library, Wiley Online Library on [21/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 33 to Decl. of Lyon
738
**SER 1282**

1010    WILEY— Sustainable Development                                                                                    ANTONIUK

questionnaire about climate risk. Scoring depends on the extent to which the questionnaire is answered and the quality of the given disclosure. Information in the CDP reports are important for investors and valued in the market. This is because the disclosure of physical risks exposure helps to reduce information asymmetry, especially for companies that fall under climate change-related regulations (Schiemann & Sakhel, 2019).

Some financial studies within environmental performance focus specifically on carbon emissions. Levi and Newton (2016) found that investing in the most polluting stocks can cost as much as 3.7% per year in risk-adjusted returns. According to Hunt and Weber (2019) and Plantinga and Scholtens (2021), the fossil fuel divestment strategy does not reduce risk-adjusted returns while offering decreased carbon exposure. When considering climate change risks associated with emissions, some researchers have studied the effect of emission disclosure (Alsaifi et al., 2020; Jaggi et al., 2017; Liesen et al., 2017; Schiemann & Sakhel, 2019), while others have investigated the relationship between the emission rates and companies' performance (Bender et al., 2019; Capasso et al., 2020). It appears that disclosure on carbon pays off. For example, US energy companies with disclosure have better stock performance, while a long-short portfolio of companies that do and do not disclose has become more profitable over time in Europe (Ziegler et al., 2011). Liesen et al. (2017) demonstrate that European companies with better disclosure of GHG emissions have positive abnormal returns. A long-short portfolio also generates a positive abnormal return. Liesen et al. (2017) also claim that disclosure proxies are more relevant for the financial market than environmental performance expressed in absolute GHG emissions levels. Reduced emission (or carbon) intensity has a positive correlation with companies' financial performance, such as Tobin's $q$, which Busch and Hoffmann (2011) use as a measure because it "reflects reputational effects, investor trust, and investor risk", and return-on-equity (Secinaro et al., 2020).

Grauel and Gotthardt (2016) highlight that national context matters for climate change-related disclosure because companies from countries with more stringent environmental policies and multinational companies are more likely to participate in the CDP questionnaire. There is a significant positive relationship between carbon disclosure and the market value of Italian firms (Jaggi et al., 2017). After the repeal of the carbon tax in Australia, the market began to react to companies' carbon performance as better carbon performance led to significantly higher market returns (Qian et al., 2020). However, in the UK, carbon disclosure announcements receive a negative reaction since good environmental performance can be associated with additional costs, according to Alsaifi et al. (2020).

## 2.1 | Hypothesis development

This article contributes to the literature on the impact of climate risk on investment. It studies the relationship between climate risk disclosure and companies' risk adjusted returns.

Climate risks for investors can be described as a function of probability, vulnerability, and exposure (Clapp et al., 2017). If climate risk probability is shared either globally (as in case of global warming, physical climate risk) or locally (as for climate policies, transitional climate risk), exposure and vulnerability are company specific. A climate exposure here should be understood as a measure of possible loss(es) of both physical and financial assets. For example, for transitional risks, the exposure can be measure via carbon footprint as regulation will be likely aim at GHG emissions. The higher footprint, the higher compliance costs, hence the lower expected cashflow. This means that companies that provide information about their emission levels and associate costs have an advantage since their profits are already partly adjusted for climate change-related costs. Moreover, according to the market's perception, companies with a larger carbon footprint are more likely to default ceteris paribus (Capasso et al., 2020); meaning they are considered riskier assets.

The vulnerability of investment "depends on how well the sector or asset can adapt to the impact" (Clapp et al., 2017, p. 10). Climate vulnerability restricts access to finance in general (Kling et al., 2021) Investors are therefore interested in companies with lower vulnerability and, thus, a better adaptability. Companies can reduce their vulnerability by implementing measures that will lower damage from identified risks or help with efficient adaptation. If a company takes active management of its exposure and vulnerability, it bears lower climate risks.

It means that investors concerned about climate risks can lean towards fossil divestment to reduce or eliminate exposure to high climate risk stocks. This will decrease demand on such stocks and lower risk-sharing opportunities leading to higher expected returns. This is referred to as a climate risk premium (Bolton & Kacperczyk, 2021). Alternatively, investors might be value-driven and prefer only low climate risk stocks due to expectations about better future cash flows as companies' contribution to climate change adaptation and mitigation becomes priced in the long term (Derwall et al., 2011). An increased demand for low climate risk stocks can lead to climate premium, for example, as Bernardini et al. (2021) discovered for the electric vehicle market. Given such pricing, long-term investing in low climate risk stocks with simultaneous short selling of high climate risk stock could be a profitable strategy (In et al., 2019). Therefore, I formulate the following hypothesis:

> Portfolios constructed from companies with different levels of climate disclosure show differences in risk-adjusted returns.

## 3 | DATA AND METHODOLOGY

A dataset concerning the Norwegian companies that participated or were invited to participate in the CDP questionnaire was constructed. Companies were asked to provide information about their carbon footprint and actions that they take or plan to implement to reduce the effects of climate change on the activities. Thus, the information

10991719, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/sd.2437 by University Of Michigan Library, Wiley Online Library on [21/09/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 33 to Decl. of Lyon
739
**SER 1283**

ANTONIUK

Sustainable Development **WILEY** | 1011



**FIGURE 1** (a) Responses of Norwegian companies to the Carbon Disclosure Project (CDP) questionnaire, by type. The vertical axis shows the number of companies and the horizontal axis years. (b) Responses of Norwegian companies to the CDP questionnaire, industry breakdown within the same score category. The vertical axis shows the number of companies and the horizontal axis years.

in CDP reports is a good proxy for climate change exposure and vulnerability. At present, CDP scores for companies are freely available since 2010 at their official website (www.cdp.net). The scoring methodology has changed during the last 10 years. Before 2016, companies received a numeric disclosure score (0–100) and a character-based performance score (A–F). Since 2016, scores from A to F, with A being the best, were introduced. The recent questionnaire is aligned with recommendations of the Task Force on Climate-Related Financial Disclosures (TCFD). Thus, it measures companies' climate-related risks and opportunities in line with the TCFD and asks them to identify the financial implications of such risks.

Companies' CDP rankings from 2010 to 2021 represent all possible values in the rank range A(-), B(-), C(-), D(-), E, F, and not scored. It is not beneficial to address ranks separately because it results in small subsets with similar qualitative characteristics within neighboring subsets. Thus, all scores were re-arranged into three groups: high (A and B), low (C, D, E, and F), and no-score (referred to as none in the figures/tables)[3] based on the 2016 scoring methodology (Figure 1a). Additionally, the responses "see another/other" were removed from the dataset to ensure that each company is included only once, giving preference to the parent company if both parent and subsidiary company disclose. It is worth mentioning that scores before and after 2016 are not directly comparable; accordingly, I relied on the score translation given by CDP

(2016), where C80 in 2015 corresponds to B- in 2016, for example. In total, there were 105 Norwegian companies for the period 2010–2021 that received CDP questionnaires. Although the number of participating companies slightly increases from 50 in 2010 to 67 in 2021, the coverage of companies' responses becomes better with fewer companies declining participation in the questionnaire. Fewer companies leave the CDP questionnaire unfilled.[4]

I constructed stock portfolios based on two methodologies: equal weighting (EW) and value weighting (VW). A portfolio is rebalanced after a new scoring arrives.[5] I assigned updated categories to the companies (high, low, or none) and recorded their market capitalization on these dates. This means that a portfolio includes all the stocks with the same CDP score category at the time of rebalancing ($\tau$). A portfolio structure is thus dynamic and depends on the share of each stock in the total portfolio's market capitalization at the rebalancing:

$$r_{pt} = \sum_{i=1}^{N} w_{it} \cdot r_{it}$$

$$w_{it} = \begin{cases} \dfrac{1}{N} & \text{(EW)} \\ w_{it} = \dfrac{\text{Market capitalization}_{it}}{\sum\limits_{i=1}^{N} \text{Market capitalization}_{it}}, \tau \le t < \tau_{t+1} & \text{(VW)} \end{cases} \quad (1)$$

[0991719, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/sd.2437 by University Of Michigan Library, Wiley Online Library on [21/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 33 to Decl. of Lyon
740
**SER 1284**

1012 | WILEY—Sustainable Development

ANTONIUK

where, $r_{pt}$ is a return at time $t$ of the portfolio $p$ that includes $N$ stocks; $r_{it}$ is a return of the stock $i$ at time $t$; $w_{it}$ is a weight of stock $i$ at time $t$; and $\tau$ is a date when a new score is published.

For the VW portfolios, the weights of individual stocks are determined on the score publishing date and remain constant until the next publishing.

I focus on two types of portfolios: long portfolios that assume investing in stocks from one scoring category (high, low, and none) and self-financed long–short portfolios that imply buying stocks with high scores and selling stocks with lower scores (low and none, separately). For portfolio performance analysis, I used the following measures: The Sharpe ratio, the information ratio (IR), the expected shortfall (ES), and the Sortino ratio. These are characteristic measures for the ex-post returns and are widely applied in the economics literature. The Sharpe (1994) ratio shows the reward in terms of excess return per unit of risk:

$$S_h = \frac{\overline{R}_p - \overline{r}_f}{\sigma_p} \qquad (2)$$

where $\overline{R}_p$ is the mean return to the portfolio, $\overline{r}_f$ is the mean return to a risk-free asset, and $\sigma_p$ is the standard deviation of the portfolio returns. Thus, if higher returns come from the cost of higher risk ($\sigma_p$), the investor will be worse off if $S_h$ decreases.

The IR is similar to the Sharpe ratio by construction but compares portfolio returns with a benchmark, not a risk-free asset:

$$IR = \frac{\overline{R}_p - \overline{R}_B}{\sigma_{R_p - R_B}} \qquad (3)$$

where $\overline{R}_B$ is the mean return to the benchmark, $\overline{R}_p - \overline{R}_B$ is called an active return, $\sigma_{R_p - R_B}$ is called the tracking error and is the standard deviation of the difference between portfolio and benchmark returns. In this article, I apply the IR for the whole period as well as two-year rolling estimates of the ratio.

It is important to consider a downside risk as low-carbon risk assets could be more sensitive to tails risk (Reboredo et al., 2022). The ES is a coherent measure of downside risk. When given at the 95% confidence level, ES shows the average return in the worst 5% of cases. The Sortino and Meer (1991) ratio shown an excess return per unit of downside risk ($\sigma_d$):

$$\text{Sortino ratio} = \frac{\overline{R}_p - \text{MAR}}{\sigma_d}, \sigma_d = \frac{1}{n}\sum_{i=1}^{n}\left[\min\left(R_{pi} - \text{MAR}; 0\right)\right]^2, \qquad (4)$$

where MAR is a minimum acceptable return. This study uses MAR = 0.

To control returns for the risk factors, I applied Fama and French (1993) three-factor model (FF3) to portfolio returns:

$$r_{pt} - r_{ft} = \alpha + \beta_M(r_{Mt} - r_{ft}) + \beta_{smb}\text{SMB}_t + \beta_{hml}\text{HML}_t + \varepsilon_t \qquad (5)$$

where $r_M$ is the return to the market portfolio, $SMB$ is the small minus big-cap factor, and HML is the high minus low book-to-market-ratio factor.

To assess companies' performance, I used stock data from the OSE, which was obtained from TITLON, a database containing stock and bond prices and accounting data for all publicly listed firms from 1980 to 2020. I then matched CDP scoring for these 105 companies with the stock market data. I removed private companies and those that have not been traded for a long time (i.e., those companies that do not have sufficient stock price history) from the data.

Thus, I have a dataset consisting of daily returns of 104 companies with tradable stocks from 2010 to 2020. Additionally, I used the OSE index (OSEBX) as a proxy for the market and Fama-French's SMB and HML factors for OSEBX portfolios. A risk-free rate ($r_f$) given in TITLON is based on the log difference of the Norwegian Overnight Weighted Average rate from the Norwegian Central Bank after 2013 and the Norwegian Interbank Offered Rate before that.[6] I also used the Dow Jones Sustainability Index Nordic (DJSND) to compare the stocks' performance. The DJSND tracks the stocks of Nordic leaders in corporate sustainability. It helps to compare created portfolios with a thematic index in addition to the market. Since DJSND is denominated in US dollars, returns are adjusted for the exchange rate to make all returns calculated in Norwegian krone (NOK). I used the historical data for the exchange rate (USD-NOK) based on real-time quotes. A new, currency-adjusted time-series of DJSND return hereafter is referred to as DJSN.

## 4 | EMPIRICAL RESULTS

On average during 2010–2016, the no-score portfolio consists of 28 companies, while the high- and low-score portfolios are smaller with 15 and 13 companies, respectively. In recent years, the portfolios' sizes became the opposite. Companies with no score are also smaller on average (see Table 1). The median capitalization of the stock with low scores is higher than that of high-score stocks. However, the high-score stocks are more heterogeneous because they have a wider range of market capitalization.

The returns of stocks are highly and positively correlated: their correlations lie between 0.74 and 0.77. The correlation is even higher between the market and categorized stocks; it is in the 0.85–0.92 range. This suggests that industries and companies of different sizes are represented similarly to the Norwegian stock market. Energy, industrial, and financial companies represent a substantial portion of the CDP questionnaire participants (Figure 1b). Healthcare companies tend not to participate, while companies in the telecommunication sector score highly.

Despite a high correlation, the categorized stocks differ sharply in terms of risk–return profile. Low-score and no-score stocks produce 6–9 bp of monthly return, which is 9 times lower than high-score stocks. Moreover, the latter stocks are less volatile: the high-score stocks have a standard deviation of 4.5% while that of the other stocks is around 6%. DJSN earns 12 bp more than the market (OSEBX) monthly, or 93 bp, which is similar to the returns of the high-score stocks. The volatility of DJSN is lower than and the market's one (3.6% and 4.4% respectively, the latter is close to that of high-score stocks [4.47%]).

Exhibit 33 to Decl. of Lyon
741
SER 1285

10991719, 2025, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/sd.2437 by University Of Michigan Library, Wiley Online Library on [21/06/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

ANTONIUK

Sustainable Development
WILEY 1013

**TABLE 1**  Summary statistics for risk factors, indices, and the Norwegian stocks in the sample.

| | Mean | SD | Min | Median | Max | Skewness | Kurtosis | Capitalization | Obs. |
|---|---|---|---|---|---|---|---|---|---|
| Market | 0.81 | 4.40 | −14.83 | 1.08 | 16.56 | −0.20 | 1.87 | | 2739 |
| DJSN | 0.93 | 3.58 | −10.41 | 0.56 | 9.29 | −0.18 | 0.27 | | 2739 |
| SMB | 0.61 | 4.38 | −15.06 | 0.67 | 14.65 | −0.18 | 1.35 | | 2739 |
| HML | −0.65 | 6.02 | −16.42 | −1.20 | 16.08 | 0.08 | 0.15 | | 2739 |
| High | 0.81 | 4.47 | −14.55 | 0.84 | 17.51 | 0.08 | 2.08 | | 36,549 |
| Low | 0.06 | 5.88 | −20.20 | −0.13 | 22.31 | 0.04 | 2.03 | | 31,600 |
| None | 0.09 | 6.21 | −31.50 | 0.36 | 21.20 | −0.90 | 5.10 | | 63,311 |

*Note*: The table includes the size (SMB) and value (HML) factors, Oslo Stock Exchange Index (market), and currency-adjusted Dow Jones Sustainability Index Nordic (DJSN). The average (mean), minimum (min), median (median), and maximum (max) monthly returns and their *SD* are given in percentages. The capitalization column shows the distribution of the market capitalization for stocks with different scorings (high, low, none). Presented rectangles on boxplots show the interquartile range and median capitalization. The total number of used daily observations is given in obs column.



**FIGURE 2**  Performance of the portfolios, 2010–2020. Stocks' weights in the value-weighted portfolios are calculated based on market capitalization. The hyphen in the labels separates stocks' categories that are bought and short-sold, in that order. Wider vertical grey lines show the rebalance dates.

## 4.1 | Equally weighted portfolios

A strategy to invest an equal amount into the categorized stocks seems to have a positive outcome only for stocks in the high-score category (Figure 2). The low-score and no-score long portfolios began to lose value after the rebalancing in late 2014 when the new CDP scoring arrived. Within a five-year period (2014–2020), the value of the low-score portfolio was reduced by more than 70%. The no-score portfolio performed slightly better: by 2020, it lost 25% of its initial value, while the low-score portfolio lost 57% of its initial value (illustrated in darker gray lines in Figure 2a). Even though the high-score portfolio added 57% to the initial value by 2020 (Figure 2a, light gray line), its return is twice as low as that of

the benchmarks. Its risk-adjusted compensation of 13 bp per unit risk is much lower than that offered by the Norwegian stock market (33 bp) and DJSN (40 bp). The ES for the high-score portfolio, market, and DJSN of 3% per day contrasts with the 3.6% for the low-score and no-score portfolios.

The long-short portfolios performed better. These portfolios are climate aligned, meaning that investors go long in stocks with better CDP scores and short stocks with lower CDP scores. Therefore, there are two portfolios to analyze: high-low and high-none. Both high-low and high-none stocks' portfolios increased their value over time, adding 104 and 80% respectively to the initial investments (Figure 2b, orange and red lines). This means that they produced 8% and 7% of the annualized return respectively, which

Exhibit 33 to Decl. of Lyon
742
**SER 1286**

**1014** | **WILEY** Sustainable Development

ANTONIUK

10911774, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/sd.2437 by University Of Michigan Library, Wiley Online Library on [21/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**TABLE 2** The annualized measures of portfolios' performance.

**a. Equally weighted**

|  | Market | DJSN | High | Low | None | High-low | High-none |
|---|---|---|---|---|---|---|---|
| Return | 0.077 | 0.091 | 0.038 | −0.062 | −0.037 | 0.079 | 0.070 |
| SD | 0.180 | 0.186 | 0.165 | 0.227 | 0.173 | 0.164 | 0.114 |
| Sharpe ratio | 0.331 | 0.396 | 0.132 | −0.337 | −0.300 | 0.376 | 0.460 |
| Inf. ratio: market |  | 0.104 | −0.402 | −1.030 | −1.050 | 0.008 | −0.034 |
| Inf. ratio: DJSN | −0.104 |  | −0.344 | −0.755 | −0.793 | −0.046 | −0.098 |
| Sortino ratio | 0.044 | 0.050 | 0.027 | −0.015 | −0.011 | 0.048 | 0.060 |
| ES | −0.030 | −0.029 | −0.030 | −0.036 | −0.036 | −0.028 | −0.016 |

**b. Value-weighted**

|  | Market | DJSN | High | Low | None | High-low | High-none |
|---|---|---|---|---|---|---|---|
| Return | 0.077 | 0.091 | 0.090 | −0.037 | −0.025 | 0.107 | 0.108 |
| SD | 0.180 | 0.186 | 0.181 | 0.228 | 0.187 | 0.153 | 0.125 |
| Sharpe ratio | 0.331 | 0.396 | 0.398 | −0.227 | −0.215 | 0.584 | 0.721 |
| Inf. ratio: market |  | 0.104 | 0.178 | −0.950 | −1.220 | 0.117 | 0.140 |
| Inf. ratio: DJSN | −0.104 |  | −0.011 | −0.648 | −0.744 | 0.064 | 0.072 |
| Sortino ratio | 0.044 | 0.050 | 0.051 | −0.004 | −0.004 | 0.067 | 0.083 |
| ES | −0.030 | −0.029 | −0.026 | −0.035 | −0.035 | −0.027 | −0.017 |

*Note:* This table reports the annualized return (return) annualized *SD*, and Sharpe ratio based on the historical risk-free rate with an average of 1.6%. Information ratios are based on the Oslo stock exchange index (inf. ratio: market) and the currency-adjusted Dow Jones Sustainability Index Nordic (inf. ratio: DJSN) benchmarks. The downside risk measures—Sortino ratio and expected shortfall (ES)—were calculated for a target return of zero and a confidence level of 95%. Stocks' weights in the value-weighted portfolios are calculated based on market capitalization.



**FIGURE 3** Historical information ratio for portfolios with a 2-year rolling window. Stocks' weights in the value-weighted portfolios are calculated based on market capitalization. Dashed vertical lines correspond with the detected structural breaks for the scored portfolios

are comparable with the 7.7% of the market and 9% of the DSJN. However, high-low and high-none volatilities are lower, which produces higher Sharpe ratios than the market offers. These portfolios are also superior to the market portfolio and DJSN based on the ES measure.

If the information and Sortino ratios define portfolios' performance, the high-low portfolio is the only one that outperforms the Norwegian market (Table 2). If compared with the currency-adjusted DJSND, equally weighted long-short portfolios underperformed significantly.

Exhibit 33 to Decl. of Lyon
743
**SER 1287**

ANTONIUK  **Sustainable Development** **WILEY** | **1015**

## 4.2 | Value weighted portfolios

The VW portfolio has a higher return in general. The low-score and no-score long portfolios have negative returns, as is the case for the EW portfolios. The low-score portfolio reduced its value by approximately 15% during 2010–2019. The no-score portfolio performed slightly better by losing 4% of the initial value (Figure 2c). The high-score portfolio added 50% to the value in the last 5 years and 98% of the initial value in total. This is comparable with the appreciation of the benchmark portfolios. It is easy to see a high correlation of the high-score portfolio with the Norwegian stock market Figure 2. The high-score portfolio also has the lowest volatility among the categorized portfolios: its returns vary within 18%

annually (Table 1). This is similar to the volatility of the benchmark portfolios.

Nevertheless, the average returns of the high-score portfolio are 1.3% higher than those of the market, meaning that the VW portfolio of climate-aligned stocks outperforms the market. The high-score portfolio also outperforms both the market and DJSN by a marginal 67 and 2 bp of compensation per unit of overall risk respectively, and by 4 and 3 bp, respectively, in compensation for downside risk. In the VW strategy, the high-score portfolio performed better than the market according to the information and Sortino ratios as well.

The long-short portfolios performed better. The portfolios of high-low and high-none stocks both increased their value over time more than both benchmarks. This means that the former produced

**TABLE 3** Regression results of the Fama–French three-factor model.

| a. Value weighted portfolios | Alpha | | Market | | SMB | | HML | | $R^2$ |
|---|---|---|---|---|---|---|---|---|---|
| High | 0.001 | | 0.954 | *** | 0.075 | *** | 0.034 | *** | 0.868 |
| Low | −0.037 | ** | 1.082 | *** | −0.045 | *** | 0.080 | *** | 0.745 |
| None | −0.036 | *** | 0.994 | *** | −0.227 | *** | −0.046 | *** | 0.826 |
| High-low | 0.030 | ** | −0.040 | *** | 0.302 | *** | 0.081 | *** | 0.122 |
| High-none | 0.032 | * | −0.128 | *** | 0.119 | *** | −0.046 | *** | 0.047 |

| b. Equally weighted portfolios | Alpha | | Market | | SMB | | HML | | $R^2$ |
|---|---|---|---|---|---|---|---|---|---|
| High | −0.014 | | 0.836 | *** | −0.260 | *** | −0.036 | *** | 0.710 |
| Low | −0.063 | *** | 1.082 | *** | −0.282 | *** | 0.015 | | 0.671 |
| None | −0.34 | *** | 0.882 | *** | −0.410 | *** | −0.002 | | 0.776 |
| High-low | 0.014 | | −0.046 | *** | 0.150 | *** | −0.034 | *** | 0.038 |
| High-none | 0.043 | ** | −0.246 | *** | 0.021 | | −0.051 | *** | 0.070 |

| c. Value weighted portfolios without energy stocks | Alpha | | Market | | SMB | | HML | | $R^2$ |
|---|---|---|---|---|---|---|---|---|---|
| High | 0.009 | | 0.868 | *** | 0.067 | *** | −0.024 | *** | 0.794 |
| Low | 0.005 | | 0.918 | *** | −0.024 | | 0.005 | | 0.617 |
| None | −0.012 | | 0.861 | *** | −0.260 | *** | −0.077 | *** | 0.727 |
| High-low | 0.016 | | 0.006 | | 0.327 | *** | 0.053 | *** | 0.119 |
| High-none | −0.002 | | −0.050 | *** | 0.091 | *** | −0.029 | * | 0.013 |

| d. Equally weighted portfolios without energy stocks | Alpha | | Market | | SMB | | HML | | $R^2$ |
|---|---|---|---|---|---|---|---|---|---|
| High | 0.025 | ** | 0.750 | *** | −0.224 | *** | −0.050 | *** | 0.752 |
| Low | −0.08 | | 0.796 | *** | −0.230 | *** | −0.073 | *** | 0.542 |
| None | 0.002 | | 0.760 | *** | −0.429 | *** | −0.031 | *** | 0.711 |
| High-low | 0.017 | | −0.010 | | 0.205 | *** | −0.019 | * | 0.064 |
| High-none | 0.027 | | −0.046 | *** | 0.006 | | 0.023 | | 0.003 |

*Note:* This table reports estimated coefficients for long portfolios of stocks with high, low, and no scores, and long-short portfolios of these stocks constructed with equal weighting (a and c) and value weighting by market capitalization (b and d). Alpha stands for an intercept given as a percentage of daily return, market is a slope for risk-adjusted return of Oslo stock exchange index (or beta-coefficient), and SMB and HML are size and value factors. Asterisks indicate the significance of the coefficients: *p < .1; **p < .05; ***p < .01. Subtables c and d show regression results for the sample without energy stocks. $R^2$ shows a coefficient of determination for each portfolio.

Exhibit 33 to Decl. of Lyon
744
**SER 1288**

10901709, 2021, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/sd.2437 by University Of Michigan Library, Wiley Online Library on [21/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**1016** | **WILEY** Sustainable Development

ANTONIUK



**FIGURE 4**   Performance of the portfolios without stocks from the energy sector, 2010–2020. Stocks' weights in the value-weighted portfolios are calculated based on market capitalization. The hyphen in the labels separates stocks categories that are bought and short-sold, in that order. Wider vertical grey lines show the rebalance dates.

10.8% of annualized returns. However, the high-low and high-none volatilities are lower, which produced higher Sharpe ratios than both the market and sustainability index. This outperformance exists when portfolios are compared by the IR and downside risk-based measures. The IR with DJSN as a benchmark shows that the high-low and high-none portfolios have ratios of 0.064 and 0.072, respectively. These are the only two cases of positive IRs with DJSN as a benchmark (Table 2). The testing also shows that the IR of the high-low portfolio is statistically greater than zero.

### 4.3 | Historical performance

To ensure that the obtained results persist, I calculated a rolling IR for the portfolios based on the daily data and then annualized it (Figure 3). I used two-year overlapping rolling windows to obtain a smoother trend. I also checked the one-year window and found that the results held. The no-score portfolio has the only negative IR. This means that the portfolio of companies that do not report on climate change never outperforms OSEBX.

I ran the FF3 (Equation 5) to determine whether disclosing companies' higher returns can be explained by exposure to the risk factors (Table 3a,b). Based on the FF3, the equally weighted long portfolios are more exposed to the large-cap stocks. These portfolios have a negative alpha, which is insignificant for the high portfolio. Alpha, or excess return, was −6.3 bp for the low-score portfolio and −3.4 bp for the no-score portfolio daily. The high-none long-short portfolio offers a positive excess return of 4.3 bp, which is significant only at a 5% level.

Based on the FF3, the VW high portfolio is more exposed to small-cap value stocks because of positive $\beta_{smb}$ and $\beta_{hml}$, corroborating Alsaifi et al. (2020) research. In contrast, low- and no-score stocks are

negatively correlated with the SMB factor and must include large-cap stocks predominantly. I checked portfolios' annual market capitalization and did not find a significant difference in capitalization between them (except for two pairs in different years). This means that size is not the main factor driving differences in excess returns for the created portfolios. The high-none portfolio offer positive excess returns of 4.3 bp for the VW strategy, which is significant at a 5% level.

### 4.4 | Additional analysis

The energy sector has large share on the Norwegian stock market because of the oil and gas industry's contribution to the country's economy. Fluctuations in the price of oil consequently affect the Norwegian stock market. Oil price is also an important consideration in this study because the decline in IR for the low- and no-score portfolios coincides with the oil price plunge in 2014 through 2016. For this reason, I examined the performance of the portfolios conditioned on industry and time.

I ran a structural break test on the excess returns of the long portfolios following an approach described in Pretis et al. (2018). The results suggested few periods when the portfolio alphas changed (available in the Appendices and marked on Figure 3). One of them is December 2014, when low-scored portfolio excess returns and IR of EW high portfolio declined. This supports an assumption about the influence of the oil price on these portfolios.

Applying the asset pricing models on high, low, and no-scored portfolios within the same industry showed that the energy sector had significant negative abnormal returns for EW and VW portfolios for all specifications (Table A4, in Appendices). These findings suggest that the energy sector could drive some of the estimated abnormal returns. It is likely that a combination of fossil fuel divestment,

Exhibit 33 to Decl. of Lyon
745
**SER 1289**

ANTONIUK



WILEY | **1017**

**TABLE 4**  The annualized measure of portfolios performance by subperiods.

| | High (1) | High (2) | High (3) | Low (1) | Low (2) | Low (3) | None (1) | None (2) | None (3) | High-low (1) | High-low (2) | High-low (3) | High-none (1) | High-none (2) | High-none (3) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Return | 0.059 | 0.030 | 0.345 | -0.048 | 0.192 | 0.337 | -0.020 | -0.122 | 0.215 | -0.010 | 0.067 | 0.117 | 0.069 | 0.162 | 0.077 |
| SD | 0.197 | 0.158 | 0.313 | 0.255 | 0.328 | 0.328 | 0.206 | 0.174 | 0.345 | 0.155 | 0.125 | 0.170 | 0.133 | 0.117 | 0.185 |
| Sharpe ratio | 0.195 | 0.130 | 1.090 | -0.372 | 1.013 | -0.292 | -0.188 | -0.741 | 0.616 | -0.071 | 0.458 | 0.557 | 0.363 | 1.296 | 0.407 |
| Inf. ratio: market | -0.075 | 0.154 | -0.140 | -1.027 | -0.729 | -0.163 | -0.979 | -1.661 | -0.848 | -1.144 | 0.219 | 0.182 | 0.018 | 0.734 | -0.834 |
| Inf. ratio: DSJN | -0.001 | -0.156 | -0.194 | -0.661 | -0.469 | -0.383 | -0.495 | -1.061 | -0.665 | -1.217 | -0.016 | 0.220 | 0.031 | 0.641 | -1.007 |
| Sortino ratio | 0.035 | 0.021 | 0.097 | -0.017 | -0.013 | 0.093 | 0.000 | -0.051 | 0.060 | 0.001 | 0.053 | 0.065 | 0.053 | 0.124 | 0.048 |
| ES | -0.028 | -0.049 | -0.058 | -0.037 | -0.053 | -0.056 | -0.037 | -0.057 | -0.085 | -0.019 | -0.017 | -0.033 | -0.017 | -0.017 | -0.015 |

Note: This table reports the annualized return (return), annualized SD, and Sharpe ratio based on the historical risk-free rate with an average of 1.6% for value-weighted portfolios, where stocks are weighted by market capitalization. Information ratios are based on the Oslo stock exchange index (inf. ratio: market) and currency-adjusted Dow Jones Sustainability Index Nordic (inf. ratio: DSJN) benchmarks. The downside risk measures—Sortino ratio and expected shortfall (ES)—were calculated for a target return of zero and a confidence level of 95%. The period 1 covers 2010 to 2015 (before 2016), the period 2 is for 2016–2019, the period 3 is after 2020.

lowered oil sector growth, and demand–supply mismatch affected stocks' and portfolios' performance. Thus, the portfolios without energy stocks should be considered.

Overall, the performance of the portfolios without energy stocks was similar: portfolios of higher-scored stocks performed better than stocks with lower or no scores in absolute terms. The new portfolios of high- and low-score stocks still exhibited good performance (Figure 4a,c) since they added over 80% of their initial value by 2020. The no-score portfolio underperformed the others and the market and offers 53% above the initial value for EW and 45% for VW portfolios.

The difference can be observed for the long-short portfolios. All portfolios constructed by long-term investing in higher scored stocks and selling short those with lower scores had lower returns than the benchmarks in 2010 through 2019 (Figure 4b,d). The high-none portfolio performed the best, adding 45% (for EW) and 67% (for VW) of the value since 2010. However, major positive returns for this portfolio happened after 2016. The high-low portfolio increased by only 25%, which is four times less than the market did. The high-low portfolio's stable performance (Figure 4d) suggests that scored stocks for long and short investment have similar returns and risks (as Figure 4a,c show); thus, they almost offset each other.

According to the Sharpe and information ratios, most portfolios do not beat the benchmarks (Appendices, Table A1). The VW high-none portfolio offers a slightly higher (0.353 vs. 0.331) reward per unit of risk when the Sharpe ratio is considered. The high-score portfolio is superior according to the Sharpe, Sortino, and information ratios for EW and VW approaches Figure A1.

After controlling for risk factors (Table 3c,d), only the EW portfolio of high-score stocks generated an excess return of 2.5 bp daily that is statistically significant. Estimates for alpha in VW portfolios without energy stocks show the same relationship: the better the score, the higher the alpha, albeit insignificant estimates of alphas. The obtained regression results also hold for the extended factor model, including the liquidity and momentum factors (Appendices, Table A2).

Because the oil price plunge in 2014 and the CDP methodology change in 2016 could impact the portfolio performance, I compared the excess returns before and after the mentioned periods for the full sample and the sub-sample without energy stocks. Additionally, the period beginning in 2020 was considered to analyze changes that happened on the market during COVID-19. The results suggest that the abnormal returns indeed changed between these periods: the EW low portfolio performed worse after 2014/2016 than before, while the EW high-none portfolio began to earn 7.8 bp daily (Appendices, Table A3). Similar is true for the VW portfolios. The EW high-low portfolio without energy stocks has a positive and significant alpha only after 2016. At the same time, there is also significant positive alpha for the high-score and significant negative alpha for no-score portfolios after 2016. Results show that after 2016 no-energy VW high-low portfolios generate from 4.4 to 5.4 bp daily (or 1% monthly). Portfolios' excess returns mostly have not changed during COVID, except for the EW low-score portfolio, which started to generate negative 21 bp.

10991778, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/sd.2437 by University Of Michigan Library, Wiley Online Library on [21/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 33 to Decl. of Lyon
746
**SER 1290**

1018 **WILEY** Sustainable Development ANTONIUK

I calculated the performance measure for the portfolios before (period 1) and after 2016 (period 2), as well as under COVID-19 (period 3). Indeed, the risk and return profiles of the VW portfolios changed between periods (Table 4). The second period looks less volatile since all portfolios have a lower standard deviation than before, but these differences in variances are not significant according to the F-test.

In period 3, portfolios of the stocks that received higher scores (i.e., high and low) increased their returns. All portfolios exhibit a smaller ES. However, the increase in average returns between periods is found to be statistically insignificant. Albeit increased average variance, Sharpe ratio become better for the low-score portfolio (from 0.19 to 1.01) and the high-score portfolio (from 0.13 to 1.09). In addition, the Sortino ratio of all portfolios become higher in the third period.

There were also changes in the performance of long-short portfolios. According to the standard deviation, both portfolios become less volatile in the second period, which the F-test on variances supports. This allowed the portfolio high-none to beat the market according to all measures based on ratios in the second period. However, COVID impacted negatively performance of the long-short portfolios. The described dynamic between first two periods suggests that climate-aligned stocks have better performance that holds over time and improves. The portfolio of non-disclosing stocks systematically has not only lower but negative returns and higher downside risks. This dynamic was disrupted by the unexpected negative shock to the market from the COVID-19.

## 5 | DISCUSSION

Distinguishing companies in the Norwegian stock market by their climate risk exposure creates a strategy of climate-aligned investment. This study suggests that the Norwegian stock market appreciates companies' sustainable performance. The stocks of companies that disclose climate risks and work to reduce risk exposure are found to generate an extra 1.3% annualized return over the market return. The high-score stocks' portfolio offers 9% of annual returns, which is comparable to the return from the DJSND when adjusted to currency. Higher returns and similar to the market's volatility create a better performance of low climate risk companies in terms of risk compensation, allowing them to outperform the market portfolio.

It is important to account for the energy sector's influence due to its prominent presence on the stock market and its contribution to the Norwegian economy. The results show the improved performance measures for the long portfolios after excluding energy stocks, but not for long-short portfolios. The energy stock exclusion does not affect the average stock size in the portfolios.

The high-score portfolios with lower climate risk do not have abnormal returns after controlling for the value and size risk factors. However, significant positive abnormal returns were found for the high-scored portfolio without energy stocks. The EW portfolio offers 6.4% of abnormal annual returns (2.5 bp daily). The divestment assumption can explain this result: the increased demand for low climate risk

stocks raised the returns for no-energy stocks. For example, Derwall et al. (2011) suggest that "doing well while doing good" can stem from the error-in-expectation and should be corrected in the long run, leading to a gradual decrease in low climate risk abnormal returns.

Nonetheless, this article shows that a low climate risk portfolio has gained a positive return recently. The two-year rolling window IR shows that the high-score portfolio steadily outperformed the benchmark after 2016. This suggests that low-climate-risk companies could gain extra value in the future as this trend continues and a legislative basis for climate disclosure comes into place.

The results for the whole sample portfolios with higher climate risk also point towards divestment because low and no-score portfolios experience negative average returns. They also have significantly negative abnormal returns, suggesting that the market penalizes companies with higher climate risks, as evidenced by the 9.7% annualized abnormal loss for the low-score portfolio (−4 bp daily). The underperformance of this portfolio can be a sign of divestment from companies with higher climate risk and a shift to lower climate risk companies. However, the analysis shows no compensation for the additional climate risk suggesting no climate premium.

There are positive and significant alphas for the long-short high-none unrestricted EW portfolios. In recent years—after 2016—EW energy-free and VW full sample high-low portfolios also offer on average 4–5 bp of daily abnormal returns. This supports previous findings that shorting high-carbon-footprint companies helps to deal with climate risks (Andersson et al., 2016). However, unlike the results in the paper by Liesen et al. (2017), positive returns of long-short portfolios do not come from outperformance of low climate risks stocks, but significant underperformance of ones with higher risks.

The underperformance of companies with unknown or higher climate risks is an interesting finding within sustainable investment research. It highlights that the market might account for climate risks by offering lower returns for non-climate-aligned companies, which contrasts with previously provided evidence of positive alpha for companies with higher $CO_2$ emissions (i.e., higher climate risks) (Bolton & Kacperczyk, 2021). Findings suggest that the Norwegian market does not compensate for higher climate risk exposure. When there is compensation, investors are willing to hold riskier assets if this risk is priced properly. This study shows that investors might not want to hold stocks with higher climate risk at all. This can be explained by the fact that sustainable investing has become mainstream, extending the argument Leite et al. (2018) made for Sweden. This means that the market is more mature for sustainable investment and can provide a reasonable valuation of carbon and climate-related performance.

Although there is no compensation for additional climate exposure, investors can get better annualized total returns, making decisions based on the disclosure. Performance measures for recent years prove that portfolios with non-disclosing companies do not beat the market and undercompensate portfolio risks.

Since investors are not ready to divest from fossil fuels even after considering climate and fossil fuel risks as long as such investments are profitable (Christophers, 2019), they might distinguish stocks within sectors based on long-term climate alignment. This means that

Exhibit 33 to Decl. of Lyon
747
**SER 1291**

Sustainable Development   **WILEY** | **1019**

disclosing energy companies could have an advantage over non-disclosing companies allowing them to generate a positive total return (see Table A4 for sector-related results).

If risk factors in terms of long portfolios explain a significant portion of the total variance (67%–86%), FF3 explains only up to 11% of the total variance of long-short portfolios. This means that the climate-aligned long-short portfolios' returns are not preliminarily driven by compensation for the exposure to size and value risk factors. The stable outperformance of the high-score portfolio over the market portfolio on the OSE since 2016, suggests that low climate risk companies could gain extra value in the future.

## 5.1 | Implications

1. *Theory:* The portfolio analysis of the disclosing companies suggests that the Norwegian stock market penalizes companies with higher climate risks. This finding contradicts the theoretical assumption that additional risk is compensated for. It suggests that investors do not require compensation as for high climate risks as they might prefer to avoid such risk.
2. *Policy:* As it is shown for the case of Norway, the stock market may compensate for additional risk associated with climate change for some sectors but not for the market as whole. Thus, tailoring and implementation of the climate policy should account for its potential asymmetric effect, also among sectors to avoid strategically disadvantageous changes on the market.
3. *Practice:* Climate-aligned portfolios generate abnormal returns, and the Norwegian stock market penalizes companies with higher climate risks. Thus, it is beneficial for socially responsible investors to short-sell the low-score companies, because this offers outstanding performance and hedging against climate risks. Long-short portfolios based on high-score stocks have a negative market beta, meaning that these portfolios can offer a hedge opportunity against market downturns.

## 5.2 | Limitations

Despite the unique prerequisites for sustainable investing, the Norwegian stock market is comparatively small, which might limit the results' generalizability. This demonstrates that further research must be conducted on different (and larger) samples from different markets to determine whether these findings are country specific. A longer-term dynamic of portfolio performance should be studied further to identify whether error-in-expectation is present. Although this study follows a traditional approach in asset pricing, it could be beneficial to include also other control variables such as macro- and corporate governance factors that potentially impact firm performance.

## ACKNOWLEDGMENTS

The author would like to thank Thomas Leirvik and Frode Kjærland for their comments on the previous version of this paper and their guidance in improving it.

## ORCID

*Yevheniia Antoniuk* https://orcid.org/0000-0003-0727-3047

## ENDNOTES

[1] As of August 2020.

[2] CDP also works with other environmental topics: freshwater and forest. For of this paper, the focus is on climate change scoring.

[3] I decided to omit the medium-score category because preliminary results show that it has similar characteristics to the low-score category.

[4] Even though both declining to participate and leaving the questionnaire unfilled lead to a missing carbon disclosure, they represent different attitudes. A company declining to participate decides to hold back information. A company with no response provides no signal to the market.

[5] The approximated ranking announcement were on January 1, 2009; September 20, 2010; October 13, 2011; October 1, 2012; September 12, 2013; October 1, 2014; November 2, 2015; October 25, 2016; October 27, 2017; January 22, 2019; and October 20, 2020 according to the research.

[6] Historical data is partly available at the Norwegian Central Bank's website: www.norges-bank.no

## REFERENCES

Alsaifi, K., Elnahass, M., & Salama, A. (2020). Market responses to firms' voluntary carbon disclosure: Empirical evidence from the United Kingdom. *Journal of Cleaner Production, 262,* 121377. https://doi.org/10.1016/j.jclepro.2020.121377

Andersson, M., Bolton, P., & Samama, F. (2016). Hedging climate risk. *Financial Analysts Journal, 72*(3), 13–32. https://doi.org/10.2469/faj.v72n3.4

Auer, B. R., & Schuhmacher, F. (2016). Do socially (ir)responsible investments pay? New evidence from international ESG data. *Quarterly Review of Economics and Finance, 59,* 51–62. https://doi.org/10.1016/j.qref.2015.07.002

Bender, J., Bridges, T. A., & Shah, K. (2019). Reinventing climate investing: Building equity portfolios for climate risk mitigation and adaptation. *Journal of Sustainable Finance and Investment, 9*(3), 191–213. https://doi.org/10.1080/20430795.2019.1579512

Berg, F., Koelbel, J. F., & Rigobon, R. (2020). *Aggregate confusion: The divergence of ESG ratings* (pp. 1–42). MIT Sloan School of Management.

Bernardini, E., di Giampaolo, J., Faiella, I., & Poli, R. (2021). The impact of carbon risk on stock returns: Evidence from the European electric utilities. *Journal of Sustainable Finance and Investment, 11*(1), 1–26. https://doi.org/10.1080/20430795.2019.1569445

Bolton, P., & Kacperczyk, M. T. (2021). Do investors care about carbon risk? *Journal of Financial Economics, 142*(2), 517–549. https://doi.org/10.1016/j.jfineco.2021.05.008

Busch, T., & Hoffmann, V. H. (2011). How hot is your bottom line? Linking carbon and financial performance. *Business and Society, 50*(2), 233–265. https://doi.org/10.1177/0007650311398780

Capasso, G., Gianfrate, G., & Spinelli, M. (2020). Climate change and credit risk. *Journal of Cleaner Production, 266,* 121634. https://doi.org/10.1016/j.jclepro.2020.121634

CDP. (2016). *CDP climate change report 2016* (pp. 1–38). CDP Europe.

Christophers, B. (2019). Environmental beta or how institutional investors think about climate change and fossil fuel risk. *Annals of the American Association of Geographers, 109*(3), 754–774. https://doi.org/10.1080/24694452.2018.1489213

Clapp, C., Lund, H. F., Borgar, A., & Lannoo, E. (2017). Shades of climate risk: Categorizing climate risk for investors. Oslo: CICERO Center for International Climate Research. CICERO, 46.

Exhibit 33 to Decl. of Lyon
748
**SER 1292**

10991719, 2021, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/sd.2437 by University Of Michigan Library, Wiley Online Library on [21/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License



Daugaard, D. (2020). Emerging new themes in environmental, social and governance investing: A systematic literature review. *Accounting & Finance*, 60(2), 1501–1530. https://doi.org/10.1111/acfi.12479

de Souza Cunha, F. A. F., de Oliveira, E. M., Orsato, R. J., Klotzle, M. C., Cyrino Oliveira, F. L., & Caiado, R. G. G. (2019). Can sustainable investments outperform traditional benchmarks? Evidence from global stock markets. *Business Strategy and the Environment*, 29(2), 682–697. https://doi.org/10.1002/bse.2397

Derwall, J., Koedijk, K., & Ter Horst, J. (2011). A tale of values-driven and profit-seeking social investors. *Journal of Banking and Finance*, 35(8), 2137–2147. https://doi.org/10.1016/j.jbankfin.2011.01.009

de Souza Cunha, F. A., Meira, E., Orsato, R. J., Klotzle, M. C., & Lucena, A. F. (2021). Do low-carbon investments in emerging economies pay off? Evidence from the brazilian stock market. *International Review of Financial Analysis*, 74, 101700. https://doi.org/10.1016/j.irfa.2021.101700

D'Orazio, P., & Popoyan, L. (2019). Fostering green investments and tackling climate-related financial risks: Which role for macroprudential policies? *Ecological Economics*, 160, 25–37. https://doi.org/10.1016/j.ecolecon.2019.01.029

Fama, E. F., & French, K. (1993). Common risk factors in the returns on stocks and bonds. *Journal of Financial Economics*, 33, 3–56. https://doi.org/10.1016/0304-405X(93)90023-5

Fiskerstrand, S. R., Fjeldavli, S., Leirvik, T., Antoniuk, Y., & Nenadić, O. (2020). Sustainable investments in the Norwegian stock market. *Journal of Sustainable Finance and Investment*, 10(3), 294–310. https://doi.org/10.1080/20430795.2019.1677441

Gasbarro, F., Iraldo, F., & Daddi, T. (2017). The drivers of multinational enterprises' climate change strategies: A quantitative study on climate-related risks and opportunities. *Journal of Cleaner Production*, 160, 8–26. https://doi.org/10.1016/j.jclepro.2017.03.018

Grauel, J., & Gotthardt, D. (2016). The relevance of national contexts for carbon disclosure decisions of stock-listed companies: A multilevel analysis. *Journal of Cleaner Production*, 133, 1204–1217. https://doi.org/10.1016/j.jclepro.2016.05.182

Guyatt, D. (2011). *Climate change scenarios - Implications for strategic asset allocation* (pp. 1–132). Carbon Trust and International Finance Cooperation.

He, D., Ren, S., & Zeng, H. (2022). Environmental labeling certification and firm environmental and financial performance: A resource management perspective. *Business Strategy and the Environment*, 31, 751–767. https://doi.org/10.1002/BSE.2915

Hong, H., Karolyi, G. A., & Scheinkman, J. A. (2020). Climate finance. *Review of Financial Studies*, 33(3), 1011–1023. https://doi.org/10.1093/rfs/hhz146

Horsch, A., & Richter, S. (2017). Climate change driving financial innovation: The case of green bonds. *The Journal of Structured Finance*, 23(1), 79–90. https://doi.org/10.3905/jsf.2017.2017.1.055

Hunt, C., & Weber, O. (2019). Fossil fuel divestment strategies: Financial and carbon-related consequences. *Organization and Environment*, 32(1), 41–61. https://doi.org/10.1177/1086026618773985

In, S. Y., Park, K. Y., & Monk, A. (2019). Is "being green" rewarded in the market? An empirical investigation of decarbonization risk and stock returns (p. 54). Stanford: Stanford Global Projects Center.

Jaggi, B., Allini, A., Macchioni, R., & Zampella, A. (2017). Do investors find carbon information useful? Evidence from Italian firms. *Review of Quantitative Finance and Accounting*, 50(1), 1031–1056. https://doi.org/10.1007/s11156-017-0653-x

Kling, G., Volz, U., Murinde, V., & Ayas, S. (2021). The impact of climate vulnerability on firms' cost of capital and access to finance. *World Development*, 137, 105131. https://doi.org/10.1016/j.worlddev.2020.105131

Kouloukoui, D., de Oliveira Marinho, M. M., da Silva Gomes, S. M., Kiperstok, A., & Torres, E. A. (2019). Corporate climate risk management and the implementation of climate projects by the world's largest emitters. *Journal of Cleaner Production*, 238, 117935. https://doi.org/10.1016/j.jclepro.117935

Leite, C., Cortez, M. C., Silva, F., & Adcock, C. (2018). The performance of socially responsible equity mutual funds: Evidence from Sweden. *Business Ethics: A European Review*, 27(2), 108–126. https://doi.org/10.1111/beer.12174

Levi, M., & Newton, D. (2016). Flash of green: Are environmentally driven stock returns sustainable? *Managerial Finance*, 42(11), 1091–1109. https://doi.org/10.1108/MF-10-2015-0291

Liesen, A. (2015). Climate change and financial market efficiency. *Business & Society*, 54(4), 511–539. https://doi.org/10.1177/0007650314558392

Liesen, A., Figge, F., Hoepner, A., & Patten, D. M. (2017). Climate change and asset prices: Are corporate carbon disclosure and performance priced appropriately? *Journal of Business Finance and Accounting*, 44(1–2), 35–62. https://doi.org/10.1111/jbfa.12217

Louche, C., Busch, T., Crifo, P., & Marcus, A. (2019). Financial markets and the transition to a low-carbon economy: Challenging the dominant logics. *Organization and Environment*, 32(1), 3–17. https://doi.org/10.1177/1086026619831516

Plantinga, A., & Scholtens, B. (2021). The financial impact of fossil fuel divestment. *Climate Policy*, 21(1), 107–119. https://doi.org/10.1080/14693062.2020.1806020

Pretis, F., Reade, J. J., & Sucarrat, G. (2018). Automated general-to-specific (GETS) regression modeling and indicator saturation for outliers and structural breaks. *Journal of Statistical Software*, 86(3), 1–44. https://doi.org/10.18637/jss.v086.i03

Qian, W., Suryani, A. W., & Xing, K. (2020). Does carbon performance matter to market returns during climate policy changes? Evidence from Australia. *Journal of Cleaner Production*, 259, 121040. https://doi.org/10.1016/j.jclepro.2020.121040

Reboredo, J. C., González, L. A. O., & González, C. A. L. O. (2022). Low carbon transition risk in mutual fund portfolios: Managerial involvement and performance effects. *Business Strategy and the Environment*, 31, 950–968. https://doi.org/10.1002/BSE.2928

Rekker, S. A. C., Humphrey, J. E., & O'Brien, K. R. (2019). Do sustainability rating schemes capture climate goals? *Business & Society*, 60(1), 000765031982576. https://doi.org/10.1177/0007650319825764

Sakhel, A. (2017). Corporate climate risk management: Are European companies prepared? *Journal of Cleaner Production*, 165, 103–118. https://doi.org/10.1016/j.jclepro.2017.07.056

Schiemann, F., & Sakhel, A. (2019). Carbon disclosure, contextual factors, and information asymmetry: The case of physical risk reporting. *European Accounting Review*, 28(4), 791–818. https://doi.org/10.1080/09638180.2018.1534600

Secinaro, S., Brescia, V., Calandra, D., & Saiti, B. (2020). Impact of climate change mitigation policies on corporate financial performance: Evidence-based on European publicly listed firms. *Corporate Social Responsibility and Environmental Management*, 27(6), 2491–2501. https://doi.org/10.1002/csr.1971

Sharpe, W. F. (1994). The Sharpe ratio. *The Journal of Portfolio Management*, 21(1), 49–58. https://doi.org/10.3905/jpm.1994.409501

Soler-Domínguez, A., Matallín-Sáez, J. C., de Mingo-López, D. V., & Tortosa-Ausina, E. (2021). Looking for sustainable development: Socially responsible mutual funds and the low-carbon economy. *Business Strategy and the Environment*, 30, 1751–1766. https://doi.org/10.1002/BSE.2713

Sortino, F. A., & van der Meer, R. (1991). Downside risk. *Journal of Portfolio Management*, 17(4), 27–31. https://doi.org/10.3905/jpm.1991.409343

Sovacool, B. K. (2017). Contestation, contingency, and justice in the Nordic low-carbon energy transition. *Energy Policy*, 102, 569–582. https://doi.org/10.1016/j.enpol.2016.12.045

Steen, M., Moussawi, J. T., & Gjolberg, O. (2020). Is there a relationship between Morningstar's ESG ratings and mutual fund performance? *Journal of Sustainable Finance and Investment*, 10(4), 349–370. https://doi.org/10.1080/20430795.2019.1700065

Exhibit 33 to Decl. of Lyon
749
**SER 1293**

ANTONIUK **Sustainable Development** WILEY **1021**

Urban, F., & Nordensvärd, J. (2018). Low carbon energy transitions in the Nordic countries: Evidence from the environmental Kuznets curve. *Energies*, 11(9), 2209. https://doi.org/10.3390/en11092209

Ziegler, A., Busch, T., & Hoffmann, V. H. (2011). Disclosed corporate responses to climate change and stock performance: An international empirical analysis. *Energy Economics*, 33(6), 1283–1294. https://doi.org/10.1016/j.eneco.2011.03.007

**How to cite this article:** Antoniuk, Y. (2023). The effect of climate disclosure on stock market performance: Evidence from Norway. *Sustainable Development*, 31(2), 1008–1026. https://doi.org/10.1002/sd.2437

## APPENDIX A

### A.1 | ALTERNATIVE SPECIFICATIONS

This subsection presents the results of the additional analysis. Table A1 reports the performance measures for a sub-sample that excludes energy stocks. The results suggest that the restricted long portfolios have better average returns, compensation for downside risk, and lower variance and expected shortfall than the unrestricted portfolios.

Table A2 reports the regression analysis results based on the Fama–French three-factor model augmented by the momentum and liquidity risk factors. The estimates are similar to the initial model, presented in Table 3.

**TABLE A1** The annualized measures of portfolios' performance without energy stocks.

| a. Equally weighted | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | **Market** | **DJSN** | **High** | **Low** | **None** | **High-low** | **High-none** |
| Return | 0.077 | 0.091 | 0.111 | 0.074 | 0.053 | 0.020 | 0.046 |
| SD | 0.180 | 0.186 | 0.155 | 0.179 | 0.158 | 0.140 | 0.120 |
| Sharpe Ratio | 0.331 | 0.396 | 0.598 | 0.315 | 0.232 | 0.029 | 0.248 |
| Inf. Ratio: market | | 0.104 | 0.321 | −0.024 | −0.189 | −0.244 | −0.146 |
| Inf. Ratio: DSJN | −0.104 | | 0.130 | −0.102 | −0.235 | −0.303 | −0.209 |
| Sortino Ratio | 0.044 | 0.050 | 0.067 | 0.043 | 0.034 | 0.018 | 0.040 |
| ES | −0.030 | −0.029 | −0.027 | −0.029 | −0.034 | −0.022 | −0.016 |
| b. Value-weighted | | | | | | | |
| | **Market** | **DJSN** | **High** | **Low** | **None** | **High-low** | **High-none** |
| Return | 0.077 | 0.091 | 0.111 | 0.075 | 0.034 | 0.012 | 0.065 |
| SD | 0.180 | 0.186 | 0.175 | 0.212 | 0.173 | 0.167 | 0.136 |
| Sharpe ratio | 0.331 | 0.396 | 0.532 | 0.273 | 0.100 | −0.025 | 0.353 |
| Inf. ratio: market | | 0.104 | 0.379 | −0.013 | −0.396 | −0.256 | −0.054 |
| Inf. ratio: DSJN | −0.104 | | 0.133 | −0.090 | −0.365 | −0.306 | −0.117 |
| Sortino ratio | 0.044 | 0.050 | 0.062 | 0.040 | 0.024 | 0.013 | 0.048 |
| ES | −0.030 | −0.029 | −0.026 | −0.032 | −0.033 | −0.029 | −0.019 |

*Note*: This table reports the annualized return (return) annualized SD, and Sharpe ratio based on the historical risk-free rate with an average of 1.6%. Information ratios are based on the Oslo stock exchange index (inf. ratio: market) and the currency-adjusted Dow Jones Sustainability Index Nordic (inf. ratio: DJSN) benchmarks. The downside risk measures—Sortino ratio and expected shortfall (ES)—were calculated for a target return of zero and a confidence level of 95%. Stocks' weights in the value-weighted portfolios are calculated based on market capitalization.

Exhibit 33 to Decl. of Lyon
750
**SER 1294**

1022 | **WILEY** — Sustainable Development

ANTONIUK

**TABLE A2**   Regression results of the Fama–French three-factor model, augmented by the liquidity and momentum factors.

**a. Value weighted portfolios**

| | Alpha | | Market | | SMB | | HML | | LIQ | | MOM | | $R^2$ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| High | 0.002 | | −0.029 | *** | 0.078 | *** | 0.029 | *** | −0.018 | * | 0.947 | *** | 0.869 |
| Low | −0.035 | ** | −0.036 | *** | −0.040 | ** | 0.074 | *** | −0.027 | * | 1.073 | *** | 0.746 |
| None | −0.033 | *** | −0.070 | *** | −0.219 | *** | −0.054 | *** | 0.003 | | 0.979 | *** | 0.830 |
| High-low | 0.029 | ** | 0.041 | *** | 0.297 | *** | 0.084 | *** | −0.020 | | −0.032 | ** | 0.126 |
| High-none | 0.032 | * | 0.006 | | 0.118 | | −0.044 | *** | 0.010 | | −0.126 | *** | 0.047 |

**b. Equally weighted portfolios**

| | Alpha | | Market | | SMB | | HML | | LIQ | | MOM | | $R^2$ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| High | −0.013 | | −0.005 | | −0.259 | *** | −0.041 | *** | −0.051 | *** | 0.832 | *** | 0.712 |
| Low | −0.059 | *** | −0.085 | *** | −0.271 | *** | 0.004 | | −0.009 | | 1.063 | *** | 0.675 |
| None | −0.031 | *** | −0.074 | *** | −0.402 | *** | 0.010 | | 0.010 | | 0.867 | *** | 0.782 |
| High-low | 0.013 | | 0.069 | *** | 0.143 | *** | −0.032 | ** | −0.061 | *** | −0.035 | ** | 0.053 |
| High-none | 0.040 | * | 0.080 | *** | 0.012 | | −0.045 | *** | −0.042 | * | −0.231 | *** | 0.079 |

**c. Value weighted portfolios without energy stocks**

| | Alpha | | Market | | SMB | | HML | | LIQ | | MOM | | $R^2$ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| High | 0.009 | | 0.008 | | 0.066 | *** | −0.021 | *** | 0.023 | ** | 0.871 | *** | 0.794 |
| Low | 0.005 | | 0.004 | | −0.024 | | 0.005 | | −0.008 | | 0.919 | *** | 0.617 |
| None | −0.010 | | −0.037 | *** | −0.255 | *** | −0.082 | *** | −0.002 | | 0.853 | *** | 0.729 |
| High-low | 0.013 | | 0.045 | *** | 0.321 | *** | 0.060 | *** | 0.025 | | 0.018 | | 0.123 |
| High-none | −0.003 | | 0.004 | | 0.090 | *** | −0.026 | | 0.031 | | −0.048 | *** | 0.014 |

**d. Equally weighted portfolios without energy stocks**

| | Alpha | | Market | | SMB | | HML | | LIQ | | MOM | | $R^2$ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| High | 0.024 | ** | 0.014 | * | −0.226 | *** | −0.048 | *** | −0.003 | | 0.753 | *** | 0.752 |
| Low | −0.006 | | −0.048 | *** | −0.224 | *** | −0.078 | *** | 0.000 | | 0.785 | *** | 0.544 |
| None | 0.004 | | −0.041 | *** | −0.425 | *** | −0.034 | *** | 0.013 | | 0.752 | *** | 0.713 |
| High-low | 0.015 | | 0.056 | *** | 0.199 | *** | −0.014 | | −0.016 | | 0.001 | | 0.072 |
| High-none | 0.024 | | 0.063 | *** | −0.002 | | 0.030 | ** | −0.003 | | −0.033 | ** | 0.010 |

*Note:* This table reports estimated coefficients for long portfolios of stocks with high, low, and no score, and long-short portfolios of these stocks constructed with equal weighting (a and c) and value weighting by market capitalization (b and d). Alpha stands for an intercept given as a percentage of daily return, market is a slope for risk-adjusted returns of Oslo stock exchange index (or beta-coefficient), SMB and HML are size and value factors, LIQ and MOM are liquidity and momentum factors. Stars show significance of the coefficients: *$p < .1$; **$p < .05$; ***$p < .01$. Subtables c and d show regression results for the sample without energy stocks. $R^2$ shows a coefficient of determination for each portfolio.

Exhibit 33 to Decl. of Lyon
751
**SER 1295**

10991719, 2025, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/sd.2437 by University Of Michigan Library, Wiley Online Library on [21/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

ANTONIUK

Sustainable Development WILEY | 1023

**TABLE A3**  Estimated portfolios' excess returns for different subsamples based on the Fama–French three-factor model.

**a. Equally weighted portfolios, whole sample**

|  | 2010–2020 | | Before 2014 | After 2014 | | Before 2016 | | After 2016 | | After Covid | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| High | −0.014 | | 0.010 | −0.034 | * | −0.005 | | 0.001 | | −0.139 | |
| Low | −0.063 | *** | −0.004 | −0.103 | *** | −0.08 | * | −0.080 | ** | −0.215 | ** |
| None | −0.034 | *** | −0.015 | −0.048 | *** | −0.031 | ** | −0.028 | | −0.076 | |
| High-low | 0.014 | | 0.016 | 0.011 | | 0.019 | | 0.026 | | −0.065 | |
| High-none | 0.043 | ** | 0.005 | 0.066 | ** | 0.026 | | 0.078 | ** | 0.074 | |

**b. Equally weighted portfolios, sample without energy stocks**

|  | 2010–2020 | | Before 2014 | After 2014 | Before 2016 | After 2016 | | After Covid |
|---|---|---|---|---|---|---|---|---|
| High | 0.019 | * | 0.018 | 0.018 | 0.020 | 0.026 | * | 0.009 |
| Low | −0.007 | | −0.012 | −0.004 | 0.004 | 0.004 | | −0.131 |
| None | −0.002 | | 0.013 | −0.012 | 0.020 | −0.031 | * | −0.052 |
| High-low | 0.015 | | −0.004 | 0.028 | −0.007 | 0.054 | ** | 0.060 |
| High-none | 0.021 | | 0.021 | 0.019 | 0.009 | 0.019 | | 0.138 |

**c. Value-weighted portfolios, whole sample**

|  | 2010–2020 | | Before 2014 | | After 2014 | | Before 2016 | | After 2016 | | After Covid |
|---|---|---|---|---|---|---|---|---|---|---|---|
| High | 0.001 | | 0.007 | | −0.005 | | 0.002 | | 0.008 | | −0.024 |
| Low | −0.037 | ** | −0.013 | | −0.053 | ** | −0.049 | ** | −0.022 | | −0.011 |
| None | −0.036 | *** | −0.035 | ** | −0.034 | ** | −0.031 | ** | −0.038 | ** | −0.066 |
| High-low | 0.030 | ** | 0.032 | | 0.026 | | 0.025 | | 0.044 | * | 0.040 |
| High-none | 0.032 | * | 0.011 | | 0.045 | * | 0.043 | * | 0.027 | | −0.015 |

**d. Value-weighted portfolios, sample without energy stocks**

|  | 2010–2020 | Before 2014 | After 2014 | Before 2016 | After 2016 | | After Covid |
|---|---|---|---|---|---|---|---|
| High | 0.009 | 0.014 | 0.004 | 0.012 | 0.004 | | 0.010 |
| Low | 0.006 | −0.001 | 0.010 | 0.003 | −0.005 | | 0.058 |
| None | −0.015 | −0.007 | −0.020 | 0.001 | −0.036 | * | −0.051 |
| High-low | 0.018 | 0.011 | 0.020 | 0.004 | 0.037 | | 0.058 |
| High-none | −0.003 | 0.006 | −0.010 | 0.002 | 0.006 | | −0.050 |

Note: This table reports estimated alphas (excess returns) for long portfolios of stocks with high, low, and no scores as well as long-short portfolios of these stocks constructed with equal weighting and value weighting by market capitalization. Stars show significance of the coefficients: $*p < .1$; $**p < .05$; $***p < .01$.

10991719, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/sd.2437 by University Of Michigan Library, Wiley Online Library on [21/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 33 to Decl. of Lyon
752
SER 1296

1024 | WILEY—Sustainable Development                                                                                           ANTONIUK

**TABLE A4**    Estimated abnormal returns for industry portfolios by categories.

**a. Equally weighted portfolios, CAPM**

| Sector | High | | $R^2$ | Low | | $R^2$ | None | | $R^2$ |
|---|---|---|---|---|---|---|---|---|---|
| Energy | −0.174 | *** | 0.282 | −0.159 | *** | 0.453 | −0.124 | *** | 0.524 |
| Industrials | 0.038 | | 0.221 | −0.013 | | 0.167 | −0.055 | ** | 0.321 |
| Financials | 0.013 | | 0.579 | 0.010 | | 0.489 | 0.015 | | 0.499 |
| Consumer Staples | 0.033 | | 0.303 | −0.007 | | 0.249 | 0.062 | ** | 0.215 |
| Consumer Discretionary | −0.003 | | 0.070 | −0.099 | | 0.115 | −0.059 | | 0.150 |
| Health Care | | | | | | | −0.022 | | 0.083 |
| Information Technology | 0.045 | | 0.210 | 0.030 | | 0.187 | −0.043 | | 0.183 |
| Materials | −0.011 | | 0.419 | 0.002 | | 0.396 | −0.001 | | 0.334 |
| Telecom | 0.017 | | 0.377 | | | | | | |
| Utilities | 0.088 | ** | 0.098 | −0.024 | | 0.040 | 0.084 | * | 0.028 |

**b. Value-weighted portfolios, CAPM**

| Sector | High | | $R^2$ | Low | | $R^2$ | None | | $R^2$ |
|---|---|---|---|---|---|---|---|---|---|
| Energy | −0.029 | | 0.571 | −0.120 | *** | 0.491 | −0.080 | *** | 0.651 |
| Industrials | 0.044 | | 0.240 | 0.006 | | 0.187 | −0.054 | ** | 0.393 |
| Financials | 0.010 | | 0.627 | 0.024 | | 0.456 | 0.003 | | 0.540 |
| Consumer Staples | 0.026 | | 0.342 | −0.007 | | 0.249 | 0.046 | | 0.233 |
| Consumer Discretionary | −0.014 | | 0.078 | −0.084 | | 0.117 | −0.058 | | 0.125 |
| Health Care | | | | | | | −0.015 | | 0.116 |
| Information Technology | 0.046 | | 0.211 | 0.028 | | 0.191 | −0.061 | | 0.154 |
| Materials | −0.020 | | 0.423 | 0.000 | | 0.393 | 0.004 | | 0.341 |
| Telecom | 0.017 | | 0.377 | | | | | | |
| Utilities | 0.084 | ** | 0.096 | −0.024 | | 0.040 | 0.086 | * | 0.028 |

**c. Equally weighted portfolios, FF3**

| Sector | High | | $R^2$ | Low | | $R^2$ | None | | $R^2$ |
|---|---|---|---|---|---|---|---|---|---|
| Energy | −0.166 | *** | 0.293 | −0.145 | *** | 0.476 | −0.112 | *** | 0.559 |
| Industrials | 0.048 | | 0.264 | −0.006 | | 0.197 | −0.040 | * | 0.409 |
| Financials | 0.017 | | 0.582 | 0.013 | | 0.491 | 0.022 | | 0.547 |
| Consumer Staples | 0.029 | | 0.316 | 0.016 | | 0.268 | 0.061 | ** | 0.234 |
| Consumer Discretionary | 0.005 | | 0.136 | −0.105 | * | 0.129 | −0.034 | | 0.212 |
| Health Care | | | | | | | −0.014 | | 0.120 |
| Information Technology | 0.047 | | 0.280 | 0.018 | | 0.286 | −0.035 | | 0.284 |
| Materials | −0.010 | | 0.420 | 0.003 | | 0.405 | −0.005 | | 0.338 |
| Telecom | 0.006 | | 0.413 | | | | | | |
| Utilities | 0.097 | ** | 0.146 | −0.024 | | 0.040 | 0.091 | * | 0.033 |

**d. Value-weighted portfolios, FF3**

| Sector | High | | $R^2$ | Low | | $R^2$ | None | | $R^2$ |
|---|---|---|---|---|---|---|---|---|---|
| Energy | −0.023 | | 0.576 | −0.107 | *** | 0.509 | −0.071 | *** | 0.669 |
| Industrials | 0.051 | * | 0.279 | 0.011 | | 0.207 | −0.045 | ** | 0.451 |
| Financials | 0.014 | | 0.634 | 0.026 | | 0.459 | 0.008 | | 0.567 |
| Consumer Staples | 0.021 | | 0.350 | 0.016 | | 0.268 | 0.045 | | 0.255 |
| Consumer Discretionary | −0.006 | | 0.134 | −0.093 | | 0.130 | −0.035 | | 0.179 |
| Health Care | | | | | | | −0.008 | | 0.158 |
| Information Technology | 0.047 | | 0.279 | 0.016 | | 0.298 | −0.053 | | 0.255 |

19915779, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/sd.2437 by University Of Michigan Library, Wiley Online Library on [21/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 33 to Decl. of Lyon
753
**SER 1297**

ANTONIUK

Sustainable Development WILEY | 1025

**TABLE A4** (Continued)

**d. Value-weighted portfolios, FF3**

| Sector | High | | $R^2$ | Low | | $R^2$ | None | | $R^2$ |
|---|---|---|---|---|---|---|---|---|---|
| Materials | −0.019 | | 0.424 | 0.001 | | 0.403 | 0.000 | | 0.346 |
| Telecom | 0.006 | | 0.413 | | | | | | |
| Utilities | 0.092 | ** | 0.143 | −0.024 | | 0.040 | 0.092 | * | 0.032 |

**e. Equally weighted portfolios, FF3 + MOM**

| Sector | High | | $R^2$ | Low | | $R^2$ | None | | $R^2$ |
|---|---|---|---|---|---|---|---|---|---|
| Energy | −0.164 | *** | 0.293 | −0.138 | *** | 0.482 | −0.105 | *** | 0.569 |
| Industrials | 0.047 | | 0.265 | −0.005 | | 0.198 | −0.037 | | 0.411 |
| Financials | 0.020 | | 0.585 | 0.012 | | 0.491 | 0.023 | | 0.548 |
| Consumer Staples | 0.028 | | 0.317 | 0.018 | | 0.269 | 0.060 | ** | 0.234 |
| Consumer Discretionary | 0.003 | | 0.136 | −0.089 | | 0.144 | −0.029 | | 0.214 |
| Health Care | | | | | | | −0.012 | | 0.120 |
| Information Technology | 0.045 | | 0.282 | 0.015 | | 0.288 | −0.033 | | 0.285 |
| Materials | −0.012 | | 0.420 | 0.005 | | 0.406 | −0.006 | | 0.339 |
| Telecom | 0.005 | | 0.414 | | | | | | |
| Utilities | 0.097 | ** | 0.146 | −0.028 | | 0.046 | 0.092 | ** | 0.033 |

**f. Value-weighted portfolios, FF3 + MOM**

| Sector | High | | $R^2$ | Low | | $R^2$ | None | | $R^2$ |
|---|---|---|---|---|---|---|---|---|---|
| Energy | −0.019 | | 0.579 | −0.100 | *** | 0.516 | −0.063 | *** | 0.682 |
| Industrials | 0.050 | * | 0.279 | 0.011 | | 0.207 | −0.042 | ** | 0.453 |
| Financials | 0.016 | | 0.635 | 0.023 | | 0.460 | 0.010 | | 0.568 |
| Consumer Staples | 0.020 | | 0.351 | 0.018 | | 0.269 | 0.043 | | 0.256 |
| Consumer Discretionary | −0.008 | | 0.135 | −0.078 | | 0.145 | −0.030 | | 0.181 |
| Health Care | | | | | | | −0.007 | | 0.158 |
| Information Technology | 0.046 | | 0.281 | 0.012 | | 0.299 | −0.051 | | 0.255 |
| Materials | −0.022 | | 0.425 | 0.004 | | 0.404 | −0.001 | | 0.346 |
| Telecom | 0.005 | | 0.414 | | | | | | |
| Utilities | 0.093 | ** | 0.143 | −0.028 | | 0.046 | 0.093 | ** | 0.033 |

**g. Equally weighted portfolios, FF3 + LIQ**

| Sector | High | | $R^2$ | Low | | $R^2$ | None | | $R^2$ |
|---|---|---|---|---|---|---|---|---|---|
| Energy | −0.162 | *** | 0.296 | −0.144 | *** | 0.476 | −0.112 | *** | 0.559 |
| Industrials | 0.049 | | 0.265 | −0.005 | | 0.198 | −0.040 | * | 0.409 |
| Financials | 0.016 | | 0.582 | 0.013 | | 0.491 | 0.021 | | 0.547 |
| Consumer Staples | 0.030 | | 0.316 | 0.040 | | 0.293 | 0.060 | ** | 0.235 |
| Consumer Discretionary | 0.002 | | 0.138 | −0.107 | * | 0.130 | −0.039 | | 0.216 |
| Health Care | | | | | | | −0.013 | | 0.120 |
| Information Technology | 0.046 | | 0.280 | 0.013 | | 0.291 | −0.035 | | 0.284 |
| Materials | −0.009 | | 0.420 | 0.004 | | 0.405 | −0.005 | | 0.338 |
| Telecom | 0.004 | | 0.417 | | | | | | |
| Utilities | 0.098 | ** | 0.147 | −0.031 | | 0.048 | 0.095 | ** | 0.036 |

**h. Value-weighted portfolios, FF3 + LIQ**

| Sector | High | | $R^2$ | Low | | $R^2$ | None | | $R^2$ |
|---|---|---|---|---|---|---|---|---|---|
| Energy | −0.022 | | 0.577 | −0.106 | *** | 0.509 | −0.070 | *** | 0.669 |
| Industrials | 0.051 | * | 0.279 | 0.011 | | 0.207 | −0.045 | ** | 0.451 |

(Continues)

10991719, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/sd.2437 by University Of Michigan Library, Wiley Online Library on [21/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 33 to Decl. of Lyon
754
SER 1298

10991719, 2022, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/sd.2437 by University Of Michigan Library, Wiley Online Library on [21/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**1026** | **WILEY** Sustainable Development                                                                 ANTONIUK

**TABLE A4**   (Continued)

h.  Value-weighted portfolios, FF3 + LIQ

| Sector | High | | $R^2$ | Low | $R^2$ | None | | $R^2$ |
|---|---|---|---|---|---|---|---|---|
| Financials | 0.014 | | 0.634 | 0.026 | 0.459 | 0.007 | | 0.567 |
| Consumer Staples | 0.023 | | 0.351 | 0.040 | 0.293 | 0.043 | | 0.256 |
| Consumer Discretionary | −0.009 | | 0.136 | −0.095 | 0.130 | −0.040 | | 0.184 |
| Health Care | | | | | | −0.006 | | 0.159 |
| Information Technology | 0.047 | | 0.279 | 0.012 | 0.302 | −0.053 | | 0.255 |
| Materials | −0.019 | | 0.424 | 0.002 | 0.403 | −0.001 | | 0.346 |
| Telecom | 0.004 | | 0.417 | | | | | |
| Utilities | 0.094 | ** | 0.144 | −0.031 | 0.048 | 0.096 | ** | 0.036 |

*Note:* This table reports estimated coefficients for long portfolios of stocks with high, low, and no scores from the same industry and constructed with equal weighting and value weighting (by market capitalization). Alpha stands for an intercept given as a percentage of daily return. In the model specification, CAPM is the capital asset pricing model with market factor only, Fama–French three-factor model (FF3) also includes SMB and HML, which are size and value factors. LIQ and MOM are liquidity and momentum factors. Stars show significance of the coefficients: *$p < .1$; **$p < .05$; ***$p < .01$. $R^2$ shows a coefficient of determination for each portfolio.

## A.2 | PORTFOLIO PERFORMANCE CONDITIONED BY TIME

I performed a structural breaks analysis based on the approach described in Pretis et al. (2018). The impulse saturation method can detect structural breaks without pre-specification of suspected dates. It relies on autoregressive modeling of the abnormal returns generated from the Fama–French three-factor model. Suggested paths with significant steps in the excess return levels are present in Figure A1.

There are four major periods when the changes have happened. After closer examination, almost all of them are related to sustainable development and investing:

1. August 2011: A big plunge of the Oslo Stock Exchange index.
2. December 2014: The Ministry of Finance of Norway released new guidelines concerning responsible investment for the

Government Pension Fund Global, effective from January 1, 2015.
3. February 2016: Statistics Norway showed that investments in oil and gas extraction felt more than it was predicted due to the further reduction of the exploration activities.
4. March 2020: The Norwegian Government announced a national lockdown after an abrupt rise in the reported cases of SARS-CoV-2 infections.

## A.3 | INDUSTRY EFFECT

The portfolios within each sector were considered and the excess return of each were estimated. Energy portfolios in all model specifications have negative abnormal returns.



**FIGURE A1**   Detected structural breaks in the time-series of estimated abnormal returns. Structural breaks are detected with the impulse saturation method, described in Pretis et al. (2018). Abnormal returns are estimated by Fama–French three-factor model on the weekly data.

Exhibit 33 to Decl. of Lyon
755
**SER 1299**

# Exhibit 32

# to Declaration of Thomas P. Lyon

# Firm-Value Effects of Carbon Emissions and Carbon Disclosures

Exhibit 32 to Decl. of Lyon
704
**SER 1300**

Case 2:24-cv-00801-ODW-PVC   Document 56-32   Filed 07/24/24   Page 2 of 32   Page ID
#:6685



Firm-Value Effects of Carbon Emissions and Carbon Disclosures

Author(s): Ella Mae Matsumura, Rachna Prakash and Sandra C. Vera-Muñoz

Source: *The Accounting Review*, MARCH 2014, Vol. 89, No. 2 (MARCH 2014), pp. 695-724

Published by: American Accounting Association

Stable URL: https://www.jstor.org/stable/24468367

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*American Accounting Association* is collaborating with JSTOR to digitize, preserve and extend access to *The Accounting Review*

This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
705
**SER 1301**

*THE ACCOUNTING REVIEW*
Vol. 89, No. 2
2014
pp. 695–724

American Accounting Association
DOI: 10.2308/accr-50629

# Firm-Value Effects of Carbon Emissions and Carbon Disclosures

**Ella Mae Matsumura**
*University of Wisconsin–Madison*

**Rachna Prakash**
*The University of Mississippi*

**Sandra C. Vera-Muñoz**
*University of Notre Dame*

**ABSTRACT:** Using hand-collected carbon emissions data for 2006 to 2008 that were voluntarily disclosed to the Carbon Disclosure Project by S&P 500 firms, we examine the effects on firm value of carbon emissions and of the *act* of voluntarily disclosing carbon emissions. Correcting for self-selection bias from managers' decisions to disclose carbon emissions, we find that, on average, for every additional thousand metric tons of carbon emissions, firm value decreases by $212,000, where the median emissions for the disclosing firms in our sample are 1.07 million metric tons. We also examine the firm-value effects of managers' decisions to disclose carbon emissions. We find that the median value of firms that disclose their carbon emissions is about $2.3 billion higher than that of comparable non-disclosing firms. Our results indicate that the markets

---

The authors gratefully acknowledge the insightful comments of John Harry Evans III (senior editor), two anonymous reviewers, Bill Baber, Brad Badertscher, Massimiliano Bonacchi, Jeff Burks, Eugene Canjels, Xia Chen, Tom Eggert, Jim Irving, Bjorn Jorgensen, Bill Kinney, Stephannie Larocque, Oliver Zhen Li, Dawn Matsumoto, Fred Mittelstaedt, Bill Nichols, Elizabeth Odders-White, Mina Pizzini, Dave Ricchiute, Tatiana Sandino, Jason Schloetzer, Lloyd Tanlu, Naomi Soderstrom, Anne Terlaak, David Tsui, Linda Vincent, Dan Wangerin, Terry Warfield, workshop participants at Colorado State University, George Mason University, Rochester Institute of Technology, Tel Aviv University, University of Southern California, The University of Texas at El Paso, Darden School of Business-University of Virginia, University of Washington, University of Wisconsin–Madison Department of Accounting Brownbag, the Wisconsin School of Business Rays of Research Seminar, the 2010 Global Accounting and Organizational Change Conference, the 2010 JAAF/KPMG Foundation Conference, the 2011 AAA/MAS Research Conference, the 2011 AAA/FARS Conference, the invaluable research assistance of Luke Derheimer, Manisha Goswami, Megan Hastings, Amie Yuran Li, Meng Li, Hang Zhang, and Jie Zhu, the database procurement support of Stephen Hayes, and the editorial assistance of Dorothy Brady. Also, we appreciate helpful insights from Liz Logan and Maria Moat, partners at PricewaterhouseCoopers LLP, and from Ricky Ashenfelter and Jarrett Jackson, consultants at ClearCarbon by Deloitte. We gratefully acknowledge Maia Kutner and the Carbon Disclosure Project and KLD Research & Analytics, Inc. for making their data available to us. The authors gratefully acknowledge financial support by KPMG's Global Valuation Institute. Professor Prakash gratefully acknowledges financial support from the CFMP at Georgetown University, and the FEAD grant from Rochester Institute of Technology. Professor Vera-Muñoz gratefully acknowledges financial support by KPMG through the Department of Accountancy and the Business Information Center, University of Notre Dame.

Editor's note: Accepted by John Harry Evans III.

*Submitted: May 2011*
*Accepted: July 2013*
*Published Online: October 2013*

695

This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
706
**SER 1302**

696                                                                          *Matsumura, Prakash, and Vera-Muñoz*

penalize all firms for their carbon emissions, but a further penalty is imposed on firms that
do not disclose emissions information. The results are consistent with the argument that
capital markets impound both carbon emissions and the act of voluntary disclosure of
this information in firm valuations.

**Keywords:** *GHG emissions; voluntary disclosures; firm value.*

**JEL Classifications:** *G14; Q51; M14.*

**Data Availability**: *Data are available from the sources identified in the study.*

# I. INTRODUCTION

Interest in climate-change risk from institutional investors and various other stakeholders has
grown 18-fold in the past decade (PricewaterhouseCoopers 2012, 6) and some sell-side
analysts are integrating the financial implications of carbon emissions into their investment
recommendations (Eccles, Krzus, and Serafeim 2011). Some observers predict that concern about
the relationship between carbon or greenhouse gas (GHG) emissions and global climate change will
drive a redistribution of value from firms that do not control carbon emissions successfully to firms
that do (GS Sustain 2009, 1). Despite this heightened interest, there is little research regarding the
association between carbon emissions, their disclosures, and firm value. Motivated by concern
about climate-change risk and carbon emission levels as expressed by investors, regulators,
standard-setters, and other stakeholders, we estimate the effects on firm value of carbon emissions
and of the *act* of voluntarily disclosing carbon emissions.

Our inquiry is important because recent major initiatives exert pressure on U.S. and non-U.S.
firms to increase transparency through disclosures of new nonfinancial climate change and
environmental information, including carbon emissions. These initiatives stem from organizations
such as the Carbon Disclosure Project (CDP), Ceres, the Global Reporting Initiative (GRI), the
Investor Network on Climate Risk (INCR), and the International Integrated Reporting Committee
(IIRC).[1] Thus, corporate managers also face growing shareholder pressure to evaluate and report on
the risks and opportunities their companies face with respect to climate change, including the
exposure of their firms to regulatory and market influences. Notably, climate-change-related
shareholder resolutions, as a percentage of all shareholder resolutions, grew from 14 percent in
2004 to 27 percent in 2009 (Ernst & Young 2011).

A firm's enhanced reputation for environmental responsibility, such as investing in renewable
energy alternatives that reduce carbon emissions, can potentially bring economic benefits from the
broader stakeholder community. These benefits include increased revenues; positive perceptions of
employees, customers, suppliers, and other stakeholders who identify the corporation with its
environmentally friendly side (Simnett, Nugent, and Huggins 2009a), a more talented and
committed work force (Castelo Branco and Lima Rodrigues 2006), and fewer potential claimants
on the firm's rents through fines or other compliance costs (Sharfman and Fernando 2008).
Collectively, pressure from shareholders and outside organizations creates an impetus for internal
management control systems to collect and analyze climate-change-related information, to disclose

---

[1] The CDP, an independent not-for-profit organization acting on behalf of hundreds of institutional investors,
holds the largest repository of carbon emissions information. Ceres is a national network of investors,
environmental organizations, and other public interest groups working with companies and investors to address
sustainability challenges such as global climate change. The Global Reporting Initiative (GRI) developed what is
now the most widely used sustainability reporting framework around the world. The IIRC brings together a
cross-section of representatives from the corporate, accounting, securities, regulatory, NGOs, and standard-
setting sectors responsible for individual elements of reporting.



*The Accounting Review*
*March 2014*

This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
707
**SER 1303**

*Firm-Value Effects of Carbon Emissions and Carbon Disclosures*                                                                697

it, and to understand the financial consequences of decisions related to climate change as well as broader sustainability issues (Institute of Chartered Accountants in England and Wales 2004).[2] Thus, even though there are no explicit costs to firms for emitting GHG in the U.S., evidence on the extent to which capital markets incorporate carbon emissions into firm valuation will help U.S. firms make important decisions regarding the broad cost-benefit trade-offs of allocating resources to carbon emissions-reduction initiatives (Thaler and Sunstein 2009).[3]

Our study also lends insight into matters addressed by U.S. and international accounting standard-setters and regulators. For example, in January 2010, the SEC responded to investors' concerns about required climate-change-related disclosures by providing explicit guidance on disclosures of risks and opportunities related to climate change in SEC regulatory filings. In conjunction with this guidance, SEC Commissioner Elisse Walter expressed concern that "many public companies are in fact providing disclosure about significant climate-change-related matters through mechanisms outside of the disclosure documents they file with the Commission."[4] Indeed, the International Auditing and Assurance Standards Board (IAASB) recently approved ISAE 3410, Assurance Engagements on Greenhouse Gas Statements, which provides guidance for independent assurance on GHG statements issued by U.S. and international firms (International Auditing and Assurance Standards Board [IAASB] 2012).[5] According to the IAASB, the independent assurance can be provided to report on an entity's GHG statement prepared: "(a) As part of a regulatory disclosure regime; (b) As part of an emissions trading scheme; or (c) To inform investors and others on a voluntary basis" (IAASB 2012, para. 1).

Extant accounting research reports that capital markets use environmental disclosure/liability information in assessing how well firms manage exposure to environmental risk (Barth and McNichols 1994; Blacconiere and Patten 1994; Cormier and Magnan 1997; Campbell, Sefcik, and Soderstrom 1998). These papers examine environmental disclosures mandated by government agencies such as the U.S. Environmental Protection Agency (EPA) and the Canadian Environment Ministries, or by financial reporting regulations, and the disclosures pertain to toxic substances with well-identified risks. In contrast, carbon emissions have ill-defined risks; further, disclosure of carbon emissions is voluntary. Other related research examines the market-value relevance of excess emissions allowances within the context of the enacted sulfur dioxide ($SO_2$) emissions trading scheme (ETS) in the U.S. (Hughes 2000; Johnston, Sefcik, and Soderstrom 2008).[6] $SO_2$ emissions measurement involves highly accurate continuous emissions monitoring (CEM) systems, reporting of these emissions in the U.S. is mandatory, and $SO_2$ emission allowances are traded in the market. It follows that, unlike the measurement uncertainty inherent in carbon emissions,[7] there

---

[2] Emissions from various greenhouse gases are expressed in carbon-dioxide equivalents ($CO_2$-e) based on their global warming potential. The Environmental Protection Agency (EPA) has concluded that the more carbon emissions there are in the atmosphere, the more heat is trapped. This leads to rising temperatures and, thus, climate change. Source: http://www.epa.gov/climatechange

[3] For example, Microsoft recently announced that it has established an internal "price" for carbon as part of its drive to become carbon-neutral (Vagus 2012). The company has determined its own carbon price based on the cost of buying offsets, whereby the entity pays for decreasing another entity's emissions or increasing another entity's removals, compared to a hypothetical baseline, and the price of investing in renewable energy.

[4] Commissioner Walter's full speech is available at: http://www.sec.gov/news/speech/2010/spch012710ebw-climate.htm

[5] The standard, approved in March 2012, is effective for assurance reports covering periods ending on or after September 30, 2013.

[6] The EPA states, "The Clean Air Act requires the EPA to set national ambient air quality standards (NAAQS) for sulfur dioxide and five other pollutants considered harmful to public health and the environment (the other pollutants are ozone, particulate matter, nitrogen dioxide, carbon monoxide, and lead)." Source: http://www.epa.gov/ttn/naaqs/standards/so2/s_so2_index.html

[7] Measurement of carbon emissions often involves estimation. The EPA provides guidance for such estimation at http://www.epa.gov/climateleadership



American Accounting Association

This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
708
**SER 1304**

*Matsumura, Prakash, and Vera-Muñoz*

is little uncertainty about the nature, measurement, and magnitude of the cost of $SO_2$ emissions. Furthermore, findings in Hughes (2000) and Johnston et al. (2008) are based on small samples and/ or a few industries.

Unlike toxic emissions, during the period of our study carbon emissions were largely unregulated in the U.S. and firms were not required to disclose them. Accounting research on the market-value relevance of voluntarily disclosed carbon emissions is rare. Using a sample of 58 publicly traded Australian firms expected to be affected by a proposed national ETS, Chapple, Clarkson, and Gold (2013) find that the markets penalize firms that will be affected by the proposed ETS. However, they only study firms that disclose emissions and do not address how the capital markets integrate both carbon emissions and the act of voluntary disclosure of this information into firm valuations.

Our study adds to extant accounting research by examining the effect of carbon emissions on firm value after correcting for self-selection bias, as well as the effect on firm value of the act of voluntarily disclosing carbon emissions. We hand-collect carbon emissions data from 2006 to 2008 for S&P 500 firms to investigate the hypothesis that firm value is negatively associated with carbon emissions. We obtain all carbon emissions data publicly available from CDP, about 40 percent of our sample. We also divide our sample based on whether firms will be subject to the EPA's GHG Mandatory Reporting Rule (Environmental Protection Agency [EPA] 2009).[8] Because firms in our sample period choose to disclose their carbon emissions, we correct for self-selection bias by incorporating systematic firm- and industry-level characteristics in our analyses.

We find that, on average, for each additional thousand metric tons of carbon emissions for our sample of S&P 500 firms, firm value decreases by $212,000.[9] This translates into a firm-value penalty of $1.4 billion for firms in the third quartile in terms of carbon emissions relative to firms in the first quartile.[10]

We conduct several sensitivity tests to assess the robustness of our main results and our inferences are unchanged. These tests include estimating the effects of carbon emissions on firm value using the Ohlson (1995) model, and estimating the relationship between changes in firm value and changes in carbon emissions. In two additional tests, we use December fiscal year-end firms only,[11] and also control for the effects of other unbooked liabilities to rule them out as alternative explanations for our main results.

Our finding of a negative association between carbon emissions and firm value begs the question, "If the capital markets penalize firms for their carbon emissions, then why do firms choose to disclose information on them?" We argue that managers weigh the costs and benefits of disclosing carbon emissions and choose to disclose only when the perceived benefits of doing so outweigh the perceived costs. Therefore, we also examine the firm-value effects of the act of voluntarily disclosing carbon emissions. Using propensity score matching (Rosenbaum 2005) and doubly robust regression (Imbens and Wooldridge 2007), we find that the median market value of firms that disclose their carbon emissions is about $2.3 billion higher than that of their non-disclosing counterparts. The median market value of the sample disclosing firms is

---

[8]  The EPA's Greenhouse Gas Mandatory Reporting Rule requires fossil fuel and industrial gas suppliers, direct GHG emitters, and manufacturers of heavy-duty and off-road vehicles and engines to report their GHG emissions to the EPA, beginning with carbon emissions for 2010.

[9]  To provide some perspective on this number, we note that the net present value of $17 per metric ton of carbon emissions discounted in perpetuity at an interest rate of 8 percent is approximately $212 (that is, $212,000 per thousand metric tons of carbon emissions).

[10]  The median emissions for our sample firms are 1.07 million metric tons.

[11]  The carbon emissions data are for calendar year *t*, while our accounting data are for fiscal year *t*. A majority of our sample firms have a December fiscal year-end, so to minimize the effects of different fiscal and calendar year-ends, we also conduct analyses including only firms that have a December fiscal year-end.



This content downloaded from \
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC \
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon \
709 \
**SER 1305**

*Firm-Value Effects of Carbon Emissions and Carbon Disclosures*                                                    699

approximately $16 billion. These results, combined with our main result of a negative association between carbon emissions and firm value, are consistent with the argument that capital markets impound both carbon emissions and the act of voluntary disclosure of this information in firm valuations. While all firms are penalized for their carbon emissions regardless of whether they disclose them, firms that do not disclose their carbon emissions face a further capital market penalty.

Our study contributes to the accounting literature in four distinct and important ways. First, extant accounting research examines nonfinancial mandated environmental disclosures involving relative certainty regarding the nature, measurement, and magnitude of the cost of the emissions. Examples include studies of $SO_2$ emissions by Hughes (2000) and Johnston et al. (2008), or financial accounting information associated with measurement uncertainty that affects estimation of reported accounting numbers for Superfund liabilities (Campbell, Sefcik, and Soderstrom 2003). In contrast, we focus on carbon emissions, which are largely unregulated in the U.S. but involve significant climate-change risk.[12] There is considerable uncertainty about the measurement and reporting of carbon emissions, which are currently disclosed at management's discretion in the U.S. Our study provides empirical evidence concerning the extent to which investors incorporate often unassured, uncertain nonfinancial information in their firm-value assessments. Further, our study provides evidence on the extent to which the markets use environmental information from sources other than regulatory agencies for firm valuation.

Second, we examine the relation between carbon emissions and firm value for disclosing and non-disclosing firms, correcting for self-selection bias associated with managers' decisions to disclose carbon emissions. To our knowledge, this is the first study that does so. Third, our paper is the first to investigate the relation between the magnitude of carbon emissions and firm value and estimate the price that U.S. capital markets are imputing to carbon emissions. Fourth, our study provides empirical evidence of a firm-value penalty for non-disclosing firms. To our knowledge, this is the first study to provide empirical evidence on the firm-value effects of *both* the decision to voluntarily disclose carbon emissions *and* the magnitude of carbon emissions.

We next review the literature and develop our hypothesis. Sections III and IV present our research design and results, respectively, and Section V concludes the paper.

## II. INSTITUTIONAL CONTEXT, THEORY, AND HYPOTHESIS

U.S. firms face increasing pressure from various stakeholders, including investors, financial risk managers, insurance companies, carbon traders, and NGOs, to measure, disclose, monitor, and manage their carbon emissions (Fornaro, Winkelman, and Glodstein 2009). Other potential carbon-related costs include capital expenditures resulting from environmental initiatives, such as acquiring or developing less carbon-intensive technologies and processes, research and development to develop goods and services associated with lower carbon emissions, and other corporate initiatives such as reducing employees' carbon footprint. Carbon emissions have also become an essential element in analyzing a company's risk profile, potential "unbooked" liabilities and costs without lasting economic benefits (such as fines, penalties, and awards from lawsuits), and firms' financial performance. For instance, Standard & Poor's downgraded the debt of a large U.K. power-generating company, Drax, owing in part to future business risks from new European emissions trading rules that are expected to increase carbon costs (Barley 2009).

---

[12] Climate-change risk encompasses risks driven by: changes in regulation, changes in physical climate parameters, and changes in other climate-related developments (see https://www.cdproject.net/CDP%20Questionnaire%20Documents/Investor-CDP-2013-Information-Request.pdf).



This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
710
**SER 1306**

Case 2:24-cv-00801-ODW-PVC   Document 56-32   Filed 07/24/24   Page 8 of 32   Page ID #:6691

700                                                          *Matsumura, Prakash, and Vera-Muñoz*

Some stakeholders advocate a tax on carbon emissions or an emissions allowance system. To put such potential direct costs in perspective, on average, S&P 500 firms emit 382 tons of carbon dioxide-equivalent, $CO_2$-e, for every U.S. \$1 million of revenue that they generate (Investor Responsibility Research Center Institute [IRRCi]/Trucost Report 2009). If the Report's suggested market price of \$28.24 were applied to each ton of $CO_2$-e emitted by the S&P 500 firms, then carbon emission costs would total over \$92.8 billion, or 1.08 percent of revenue from the companies in 2007, and 5.5 percent of earnings before interest, tax, depreciation, and amortization (IRRCi/Trucost Report 2009).

## Theory and Hypothesis

Accounting research on the value relevance of firms' environmental disclosures falls into three broad categories. The first includes studies examining the market valuation of environmental disclosures that are mandated either by accounting standards (Barth and McNichols [1994], Blacconiere and Patten [1994], and Campbell et al. [1998] on Superfund liabilities), or by the government (Hughes [2000] and Johnston et al. [2008] on sulfur dioxide [$SO_2$] emissions; Cormier and Magnan [1997] on water pollution; and Connors, Johnston, and Silva-Gao [2013] on TRI valuation).[13] The first subset of these studies focuses on the extent to which the markets view as adequate the amounts recognized by firms for Superfund-related liabilities.

The second subset in the first category examines the market-value relevance of excess emission allowances for the $SO_2$ ETS in the U.S. (Hughes 2000; Johnston et al. 2008). Hughes (2000) examines the firm-value effects of $SO_2$ emissions using a sample of publicly traded electric utilities targeted as high-polluting by the 1990 Clean Air Act Amendments (CAAA). He finds that the market penalizes the high-polluting utilities during 1989 to 1991, the years that are most likely associated with new CAAA compliance costs. Johnston et al. (2008) extends Hughes (2000) by examining the value relevance of $SO_2$ emission allowances held by publicly traded U.S. electric utilities, which are subject to the 1990 CAAA ETS. The authors find support for their reasoning that emission allowances above a firm's current needs have two components—an asset value and a real option value—that will be valued by the market.

Unlike the institutional context of our study in which carbon emissions are measured or estimated and disclosed voluntarily, $SO_2$ emissions are measured using highly accurate CEM systems, reporting of $SO_2$ emissions in the U.S. is mandatory, and $SO_2$ emission allowances are traded in the market. It follows that there is relative certainty about the nature, measurement, and magnitude of the cost of $SO_2$ emissions. Although the findings in Hughes (2000) and Johnston et al. (2008) are based on small samples and/or a few industries, the results of these studies are consistent with a negative association between electric utilities' $SO_2$ emissions and market value.

The second broad category examines the market valuation of environmental capital expenditures (Clarkson, Li, and Richardson 2004; Cho, Freedman, and Patten 2012). Using a sample from the pulp and paper industry for 1989 to 2000, Clarkson et al. (2004) examine the market valuation of environmental capital expenditures conditional on the firms' environmental performance. They predict and find that the market places a positive value on environmental expenditures for low-polluting firms, but assigns no value to the environmental expenditures of high-polluting firms. Further, they find that investors use disclosures of environmental capital expenditures to assess unbooked environmental liabilities for high-polluting firms. More recently, Cho et al. (2012) use a sample of *Fortune* 500 firms operating in industries subject to the EPA's

---

[13] The EPA collects data annually from facilities that release or transfer certain toxic chemicals. The Toxics Release Inventory (TRI) data are available on the EPA website (http://www.epa.gov/tri/triprogram/whatis.htm).


American
Accounting
Association

*The Accounting Review*
*March 2014*

This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
711
**SER 1307**

*Firm-Value Effects of Carbon Emissions and Carbon Disclosures*                    701

TRI program, and find that companies use the disclosure of environmental capital spending as a
strategic tool to address their exposure to political and regulatory concerns.

The third broad category examines more recent research on the market valuation of *voluntarily*
disclosed carbon emissions. Chapple et al. (2013) examine the association between a dichotomous
measure of high- and low-carbon emissions intensity and the market value of equity for a sample of
58 publicly traded Australian firms originally subject to a proposed national ETS. Using a modified
Ohlson (1995) valuation model, the study finds that carbon-intense firms suffer a penalty of 6.57
percent of market capitalization. However, the study does not account for the voluntary nature of
the firms' carbon emission disclosures or for potential self-selection bias during the sample period
of 2006 to 2009. Further, unlike our sample of S&P 500 firms, the more carbon-intensive firms in
their sample are generally smaller, less profitable, and riskier than their less carbon-intensive
counterparts.[14]

Walley and Whitehead (1994, 47) argue that "[i]n a world where [managers] cannot do
everything, only a value-based approach allows informed trade-offs between [environmental] costs
and benefits." Our research addresses this point by examining the effect of carbon emissions on
firm value after correcting for self-selection bias associated with managers' decisions to voluntarily
disclose carbon emissions. Moreover, we estimate the effect on firm value of disclosing carbon
emissions.

We draw on value relevance research (Barth, Beaver, and Landsman 2001; Holthausen and
Watts 2001) as a theoretical framework for assessing whether a nonfinancial environmental
performance metric in the form of carbon emission levels provides information that investors use
for firm valuation. Based on this research, we posit that if capital markets believe that carbon
emissions are relevant for valuation and are measured reliably enough, carbon emission levels will
have significant market-value implications (Barth et al. 2001).

Although carbon emissions information is self-reported and frequently unassured, it may
nevertheless be reasonably credible. First, the markets can assess the credibility of the data by
comparing them to similar data from other firms in the same industry, and some of the data may be
assured. Some firms operate in jurisdictions such as the European Union, where emissions are
regulated. Second, although responding to the CDP questionnaire is voluntary, once a firm decides
to participate, it is significantly more likely to participate in the future (Stanny 2013). These
repeated interactions between the CDP and the firm will generally increase the cost of reporting
untruthfully, particularly as more firms in the industry decide to report and assurance of emissions
becomes more widespread. Untruthful reporting that is eventually revealed can damage the firm's
overall reporting credibility and expose it to litigation risk.

Market-value penalties associated with carbon emissions reflect first, the perceived relationship
between carbon emission levels and the firms' climate change related risk profile. This risk is driven
by climate change regulation, uncertainty surrounding new regulatory compliance, and uncertainty
surrounding physical climate parameters, such as severe weather (Epstein 2008, 62). The second
source of market-value penalty is the cost of measuring, disclosing, monitoring, and reducing
carbon emissions. According to natural-resource-based theory (Hart 1995), a firm's key resources
and capabilities affect its ability to sustain its competitive advantage. This argument points to the
importance, for firm valuation, of cost-benefit trade-offs of allocating resources to carbon emissions
reduction initiatives (Thaler and Sunstein 2009). It follows that firms that do not integrate climate
change risk into their business strategy (e.g., by investing in renewable energy alternatives that
reduce carbon emissions) are likely to lower investors' market-value expectations relative to firms

---

[14] Finally, a few other studies examine factors that affect firms' decisions to adopt proactive environmental
strategies (Clarkson, Li, Richardson, and Vasvari 2011), and whether corporate social performance enhances
financial performance (Dhaliwal, Li, Tsang, and Yang 2011; also, see a literature review by Clarkson [2012]).



This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
712
**SER 1308**

702                                                      *Matsumura, Prakash, and Vera-Muñoz*

that do (Hart 1995; Epstein 2008, 145). Consistent with these arguments, we propose the following hypothesis (in alternative form) regarding the firm-value effect of carbon emissions:

**H1:** Firm value is negatively associated with carbon emissions.

There are at least two reasons why our hypothesis may not obtain. First, carbon emissions meet the definition of an externality. There is currently a great deal of uncertainty regarding the extent to which U.S. firms will be required to internalize the cost of their carbon emissions in the future. In turn, the market is likely to reflect such uncertainty in valuing future liabilities from carbon emissions. Also, firms may be able to pass along the cost of their carbon emissions to their consumers and/or supply chain partners (Initiative for Global and Environmental Leadership [IGEL]/Knowledge@Wharton 2012), thus reducing the firms' share of the costs of carbon emissions.[15] Second, if the capital markets view voluntarily disclosed carbon emissions as insufficiently reliable (Barth et al. 2001), then they may disregard this information when making firm-value assessments (Simnett, Vanstraelen, and Chua 2009b). Despite these considerations, the results of Hughes (2000), Johnston et al. (2008), and Chapple et al. (2013), as discussed above, lead us to predict a negative association between carbon emissions and firm value.

**Firm-Value Effects of Decision to Disclose Carbon Emissions**

If the capital markets penalize firms for their carbon emissions, then why do firms choose to disclose them? In general, disclosures provide benefits through reduced information asymmetry between the firm and outsiders, including its investors, thus facilitating efficient allocation of scarce resources (Healy and Palepu 2001). Firms making truthful voluntary carbon emission disclosures deliver transparent nonfinancial information to investors that informs them of future costs that may be imposed upon the firm due to its carbon emissions. If firms do not disclose carbon emissions, then investors will not only impute the firms' carbon emissions, but also likely treat non-disclosure as an adverse signal and penalize non-disclosing firms (Milgrom 1981). Also, investors are likely to undertake costly information searches regarding the non-disclosers' emissions, thus increasing costs to investors and, ultimately, the firms' costs (Johnston 2005). Research on voluntary corporate social responsibility (CSR) disclosures documents that firms that issue CSR reports experience a decrease in their cost of capital if the firms show superior CSR performance (Dhaliwal et al. 2011).[16] Voluntary disclosures are also used to reduce potential regulatory intervention (Blacconiere and Patten 1994).

Furthermore, the act of disclosure itself, even in the absence of mandated behavioral changes, can be associated with beneficial consequences from the investors' viewpoint. For example, an unintended benefit of the TRI disclosure rule under the Emergency Planning and Community Right to Know Act was a large reduction in toxic emissions in the U.S. (Thaler and Sunstein 2009). Environmentally concerned groups tend to target the worst TRI offenders, thus producing an "environmental blacklist." Consistent with Thaler and Sunstein's (2009) concept of "social nudge," firms seek to avoid appearing on such a list because the ensuing bad publicity could lower the company's market value. Therefore, companies that end up on the list are motivated to take steps to

---

[15] Nevertheless, firms with lower carbon costs will have a competitive advantage through lower total costs, *ceteris paribus*.

[16] Although both Dhaliwal et al. (2011) and our paper include an examination of voluntary disclosures, we also analyze the firm-value effect of the magnitude of carbon emissions. This information is much more precise with respect to carbon emissions than the binary environmental performance measures of strengths and weaknesses on particular components used in Dhaliwal et al. (2011). Further, their paper describes only rewards (in the form of lower cost of equity) for disclosing positive news (CSR reports), and does not discuss the cost of disclosing *per se*.


American Accounting Association

*The Accounting Review*
*March 2014*

This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
713
**SER 1309**

*Firm-Value Effects of Carbon Emissions and Carbon Disclosures* 703

reduce their TRI in order to be removed from the list, and the companies not yet on the list are motivated because they want to ensure that they do not end up there. Although carbon disclosures are voluntary, firms face considerable pressure to disclose their emissions. Hence, similar motivations exist for disclosers to reduce their carbon emissions. Moreover, a firm that discloses its carbon emissions signals its ability to measure its emissions, a prerequisite for managing them. This discussion suggests that the markets will reward the firms that disclose their carbon emissions.

Moser and Martin (2012, 804) argue that viewing CSR activities and related disclosures more broadly as being motivated by shareholders and non-shareholders alike raises issues that do not fall within the traditional perspective of shareholder value maximization. This argument implies that it is likely that allocation of scarce corporate resources to some CSR investments, such as measuring and disclosing carbon emissions, is made *at the expense* of shareholders. For instance, carbon emission disclosures can impose proprietary costs on some firms (Li, Richardson, and Thornton 1997). Also, government regulators such as the EPA can use disclosures by high-carbon-emitting firms as grounds for investigations that can ultimately increase those firms' compliance costs. Furthermore, carbon emissions disclosures could invite costly litigation by previously uninformed victims of GHG-related climate change, benefit competitors' green-marketing strategies aimed at environmentally conscious consumers, and provide ammunition for public interest groups (e.g., Ceres) to press for stricter regulation. In summary, under some circumstances the markets will penalize firms that voluntarily disclose their carbon emissions.

Because the answer to the question, "Why do firms choose to disclose their carbon emissions?" is not self-evident in the context of this study, we address the question by examining the firm-value effects of the act of voluntarily disclosing carbon emissions. By investigating whether the markets reward or penalize voluntary disclosers of carbon emissions, we provide insights on the two perspectives discussed above.

### III. RESEARCH DESIGN

**Sample and Data**

Our sample consists of all S&P 500 firms for the three-year period 2006 to 2008. We choose 2006 as the initial year because the S&P 500 firms were first included as a group in the 2007 CDP report, which provides 2006 data. We choose 2008 as our final year because in April 2009 the EPA issued a proposed rule on GHG mandatory reporting that became effective on December 29, 2009 requiring reporting of carbon emissions for 2010 and thereafter (EPA 2009).[17] To avoid confounding voluntary disclosure to the CDP with the transition to the EPA's mandatory reporting rule, we exclude 2009 data. In order to maintain a constant sample over this period we use firms that were included in the S&P 500 index on December 31, 2007.

We hand-collect carbon emissions data from 2006 to 2008 from the CDP database.[18] The CDP requests information from the world's largest companies as measured by market capitalization. Currently, the CDP acts on behalf of 665 institutional investors representing more than $78 trillion

---

[17] The original reporting deadline of March 30, 2011 for 2010 was extended to September 30, 2011.
[18] This entailed manually collecting and cross-validating carbon emissions numbers from data purchased from the CDP with *individual* firm responses available at the CDP website for all S&P 500 firms for our three-year period. We found numerous discrepancies between the data in the individual firm responses and the CDP's annual summary reports on S&P 500 firms, usually because the summaries only report data available up to the point when the summaries were prepared. For example, the summary report for a given year could show a firm as "not responding," while the CDP website would show the firm as responding in that year. These discrepancies imply that caution should be used in relying exclusively on the CDP annual summary reports.

*The Accounting Review*
March 2014


American Accounting Association

This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
714
**SER 1310**

Case 2:24-cv-00801-ODW-PVC   Document 56-32   Filed 07/24/24   Page 12 of 32   Page ID #:6695

704                                                                                     *Matsumura, Prakash, and Vera-Muñoz*

in assets under management.[19] The number of firms answering the CDP survey increased from 235 in 2003 to more than 3,000 companies in 2011, including 81 percent of the Global 500 firms and 68 percent of the S&P 500 firms. PricewaterhouseCoopers LLP has been the global sponsor of the CDP since 2008, with responsibility for analyzing the survey responses for the S&P 500, Global 500, and FTSE 600 companies.[20]

The CDP questionnaire elicits information on carbon emissions in metric tons, energy, and trading.[21] Participation in the CDP questionnaire is voluntary and different sets of firms (1) do not respond or respond indicating their decision to decline participation; (2) provide partial information, such as links to information generally available at the firm's website, for instance their CSR reports, without answering the questionnaire; (3) respond to the questionnaire but allow the CDP to make the responses available only to institutional investors who are signatories of the CDP; and (4) respond to the questionnaire and allow the CDP to make the responses publicly available.

Table 1 provides the S&P 500 firms' responses to the CDP questionnaire and carbon emissions for the years 2006 to 2008. Of the total sample, 550 firm-years (38.12 percent) reflect responses that firms allow to be publicly available, and 184 firm-years (12.75 percent) reflect responses by firms that do not allow their responses to be made public. Further, 205 firm-years (14.21 percent) come from firms that provide only partial information to the CDP. As explained in Table 1, footnote c, for 35 firm-years we were able to obtain carbon emissions data from the firms' responses to the CDP questionnaire in a subsequent year. In total, we obtained carbon emissions data for 584 firm-years of 1,443 firm-year observations, or 40.47 percent, representing 256 firms. The disclosures per year are as follows (untabulated): 162 (28 percent) are from 2006, 202 (35 percent) are from 2007, and 220 (37 percent) are from 2008.

Of the original 1,443 firm-year observations in Table 1, we lose 78 for which we are unable to obtain information necessary to run the disclosure-choice model, and 815 observations for which carbon emissions data are not available (Table 2). Therefore, we estimate the firm-value model in Equation (1) below with the remaining 550 firm-year observations.[22]

We also collect environmental performance data from KLD STATS, a database that includes annual snapshots of the environmental, social, and governance (ESG) performance of companies rated by KLD Research & Analytics, Inc. Each year, KLD freezes its ratings to reflect the firm status at calendar year-end. KLD STATS provides a binary summary of KLD's ratings based on each firm's environmentally proactive and damaging activities. There are six proactive dimensions, including recycling and clean energy, and seven damaging dimensions, including substantial fines

---

[19] See https://www.cdproject.net/en-US/Pages/About-Us.aspx. Institutional investors who sign the CDP questionnaire are known as "CDP signatories."

[20] See http://www.pwc.com/gx/en/sustainability/publications/carbon-disclosure-project/about.jhtml. We explored other potential sources of carbon emissions data, including the Chicago Climate Exchange (CCX), 10-K reports filed with the SEC, CSR reports, the Pew Center on Global Climate Change, and state and regional reporting initiatives. However, we deemed these sources unsuitable for our study because they do not uniformly report carbon emissions data, or provide only limited data that include very few S&P 500 firms, or report data by facility or state, but not by firm.

[21] Firms must respond to this section using the GHG Protocol Corporate Standard (Revised Edition), available at: http://www.ghgprotocol.org/standards/corporate-standard. Firms report their global carbon emissions broken down by Scope 1 (direct emissions from GHG sources owned or controlled by the firm), Scope 2 (indirect emissions caused by the firm's consumption of electricity, heat, cooling or steam brought into its reporting boundary), and Scope 3 (emissions from employee business travel, external distribution/logistics, disposal of the company's products and services, and the company's supply chain). A number of firms in our sample do not provide carbon emissions broken down into scopes.

[22] Of the firms that provide carbon emissions information, the two industries with the largest number of observations in our sample are chemical manufacturing and utilities, with 71 firm-years each (untabulated).


American Accounting Association

*The Accounting Review*
*March 2014*

This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
715
**SER 1311**

*Firm-Value Effects of Carbon Emissions and Carbon Disclosures*                                    705

### TABLE 1

### S&P 500 Firms' Responses to CDP Questionnaire and Carbon Emissions Information for Years 2006 to 2008

|  | Carbon Emissions Available? | | | | | |
|---|---|---|---|---|---|---|
|  | No | Percent | Yes | Percent | Total | Percent |
| Responded to CDP Questionnaire?[a] |  |  |  |  |  |  |
| Response publicly available | 1[b] | 0.07 | 549 | 38.04 | 550 | 38.11 |
| Response not publicly available | 183 | 12.68 | 1[c] | 0.07 | 184 | 12.75 |
| Provided partial information | 201 | 13.93 | 4[c] | 0.28 | 205 | 14.21 |
| No/Declined to participate | 474 | 32.85 | 30[c] | 2.08 | 504 | 34.93 |
| Total firm-year observations | 859 | 59.53 | 584 | 40.47 | 1,443 | 100.00 |
| Less: Observations with missing information for disclosure-choice model | 44 |  | 34 |  | 78 |  |
| Final sample of firm-year observations | 815 | 59.71 | 550 | 40.29 | 1,365 | 100.00 |

[a] The carbon emissions data are collected annually by the CDP on behalf of institutional investors, purchasing organizations, and government bodies. Participation in the CDP questionnaire is voluntary. Therefore, firms may choose to: not respond to the questionnaire/decline to participate; respond to the questionnaire but not allow the CDP to make the responses publicly available; or respond to the questionnaire and allow CDP to make the responses publicly available.

[b] One firm that responded to the CDP questionnaire and made its responses publicly available did not provide carbon emissions.

[c] These firms declined to participate in the CDP questionnaire, or did not allow the CDP to make their responses publicly available, or provided only partial information in one year; however, we were able to obtain their carbon emissions data from the firms' responses to the CDP questionnaire in a subsequent year.

or penalties paid for violations of environmental regulations.[23] In each case, if KLD identifies a proactive initiative or a damaging action in a particular dimension, then it indicates this with a 1, otherwise the dimension is coded 0.

### Empirical Models

#### *Firm-Value Effects of Carbon Emissions*

We examine the firm-value effect of carbon emissions using the balance sheet valuation model commonly used in prior literature such as Barth and McNichols (1994) and Campbell et al. (2003). Because managers *choose* to disclose their carbon emissions to the CDP and the public, our sample may be systematically biased, that is, suffer from self-selection bias. We correct for this by jointly estimating the decision to disclose carbon emissions (discussed in the next subsection) and the effect of carbon emissions on firm value (Heckman 1979; Maddala 1983). Equation (1) shows the firm-value model:

$$MKT_t = \beta_0 + \beta_1 TCO2_t + \beta_2 ASSET_t + \beta_3 LIAB_t + \beta_4 OPINC_t + \varepsilon_t, \qquad (1)$$

where our proxy for firm value, $MKT_t$, is the market value of common equity (in millions of dollars), calculated as the number of shares outstanding multiplied by the price per share of the firm's common stock at the end of calendar year $t$. Although the emissions data for the current year

---

[23] For further details, see the KLD Manual at WRDS: https://wrds-web.wharton.upenn.edu/wrds

*The Accounting Review*
*March 2014*



This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
716
**SER 1312**

706                                *Matsumura, Prakash, and Vera-Muñoz*

## TABLE 2
### Descriptive Statistics

**Panel A: Full Sample and Breakdown of Sample by EPA Group**

| Variable | Full Sample | | | | | EPA = 1 | | EPA = 0 | | t-stat p-value | Wilcoxon p-value |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | Q1 | Median | Q3 | Std. Dev. | Mean | Median | Mean | Median | | |
| **Firm-Value Model (n = 550)[a]** | | | | | | n = 229 | | n = 321 | | | |
| MKT | 33,111.41 | 7,718.98 | 16,013.08 | 33,403.01 | 45,718.14 | 31,926.01 | 16,470.81 | 33,957.06 | 15,297.94 | 0.69 | 0.36 |
| TCO2 | 11,455.41 | 262.66 | 1,068.10 | 6,849.44 | 26,712.11 | 23,741.68 | 6,467.23 | 2,690.44 | 484.67 | 0.00 | 0.00 |
| ASSET | 59,940.55 | 9,176.52 | 19,415.11 | 40,519.00 | 148,840.00 | 35,161.54 | 22,970.00 | 77,617.79 | 17,750.87 | 0.00 | 0.31 |
| LIAB | 46,803.25 | 5,054.00 | 12,330.00 | 25,288.00 | 137,389.90 | 22,326.47 | 14,437.00 | 64,264.88 | 10,342.00 | 0.00 | 0.11 |
| OPINC | 3,880.59 | 795.00 | 1,616.05 | 3,618.00 | 6,754.85 | 3,876.16 | 1,710.00 | 3,883.74 | 1,563.00 | 0.50 | 0.22 |
| **Disclosure-Choice Model (n = 1,365)[a]** | | | | | | n = 401 | | n = 964 | | | |
| CNCRN | 0.67 | 0.00 | 0.00 | 1.00 | 1.15 | 1.54 | 1.00 | 0.31 | 0.00 | 0.00 | 0.00 |
| STRNG | 0.53 | 0.00 | 0.00 | 1.00 | 0.92 | 0.89 | 1.00 | 0.38 | 0.00 | 0.00 | 0.00 |
| PROPDISCL | 39.81 | 25.00 | 40.00 | 57.14 | 24.19 | 54.89 | 57.14 | 33.54 | 34.78 | 0.00 | 0.00 |
| SIZE | 9.55 | 8.57 | 9.41 | 10.32 | 1.37 | 9.56 | 9.56 | 9.55 | 9.36 | 0.47 | 0.09 |
| MF | 4.87 | 0.00 | 4.00 | 8.00 | 4.72 | 5.12 | 5.00 | 4.77 | 4.00 | 0.11 | 0.21 |
| BM | 0.49 | 0.24 | 0.39 | 0.62 | 0.41 | 0.44 | 0.37 | 0.51 | 0.39 | 0.01 | 0.15 |
| LEV | 0.40 | 0.21 | 0.38 | 0.57 | 0.26 | 0.42 | 0.42 | 0.40 | 0.36 | 0.03 | 0.00 |
| II | 80.43 | 71.78 | 81.28 | 89.69 | 14.42 | 78.26 | 79.45 | 81.33 | 82.00 | 0.00 | 0.00 |
| FRNSALE | 25.62 | 0.00 | 21.23 | 44.89 | 25.04 | 29.04 | 30.30 | 24.20 | 17.23 | 0.00 | 0.00 |

*(continued on next page)*

American Accounting Association

This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
717
**SER 1313**

*Firm-Value Effects of Carbon Emissions and Carbon Disclosures* 707

**TABLE 2 (continued)**

**Panel B: Breakdown of Sample by Availability of Carbon Emissions Data**

| Variable | DISC_CDP = 1 | | DISC_CDP = 0 | | t-stat p-value | Wilcoxon p-value |
|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | | |
| Firm-Value Model | n = 550 | | n = 815[b] | | | |
| MKT | 33,111.41 | 16,013.08 | 14,323.46 | 8,288.10 | 0.00 | 0.00 |
| TCO2 | 11,455.41 | 1,068.10 | — | — | — | — |
| ASSET | 59,940.55 | 19,415.11 | 38,263.42 | 8,539.00 | 0.00 | 0.00 |
| LIAB | 46,803.25 | 12,330.00 | 32,118.06 | 5,027.43 | 0.02 | 0.00 |
| OPINC | 3,880.59 | 1,616.05 | 1,921.13 | 831.00 | 0.00 | 0.00 |
| Disclosure-Choice Model | | | | | | |
| CNCRN | 1.05 | 0.00 | 0.41 | 0.00 | 0.00 | 0.00 |
| STRNG | 0.96 | 1.00 | 0.24 | 0.00 | 0.00 | 0.00 |
| PROPDISCL | 54.48 | 55.26 | 29.92 | 30.77 | 0.00 | 0.00 |
| SIZE | 9.97 | 9.87 | 9.27 | 9.05 | 0.00 | 0.00 |
| MF | 5.39 | 5.00 | 4.53 | 4.00 | 0.00 | 0.37 |
| BM | 0.46 | 0.38 | 0.51 | 0.39 | 0.02 | 0.01 |
| LEV | 0.42 | 0.40 | 0.39 | 0.37 | 0.03 | 0.00 |
| II | 77.31 | 77.71 | 82.53 | 83.63 | 0.00 | 0.00 |
| FRNSALE | 32.40 | 32.07 | 21.04 | 13.64 | 0.00 | 0.00 |

[a] We estimate the firm-value model using the 550 firm-year observations for which carbon emissions data are available. We estimate the disclosure-choice model using the 1,365 firm-year observations comprising both disclosing and non-disclosing firms.
[b] For *MKT* we have data for only 812 firm-years in the *DISC_CDP* = 0 group. The three missing firm-year observations are for one firm for which we were not able to obtain both shares outstanding and price data.
For variable definitions see Appendix A.

do not become available to the markets until the middle of the following year, we treat subsequent realizations of the emissions as our best estimate of market expectations.[24]

Our independent variable of interest, $TCO2_t$, denotes carbon emissions in thousands of metric tons. Consistent with our hypothesis of a negative association between carbon emissions and firm value, we expect a negative $TCO2_t$ coefficient. Following prior related research (Barth and McNichols 1994; Campbell et al. 2003), our balance sheet valuation model includes total assets ($ASSET_t$) and liabilities ($LIAB_t$) at the end of the fiscal year, with a positive coefficient expected for $ASSET_t$ and a negative coefficient expected for $LIAB_t$. Consistent with prior research (Barth and McNichols 1994; Campbell et al. 2003) and Barth and Clinch's (2009) finding that unscaled market value of equity estimates generally perform better than scaled market value models, we do not scale $MKT_t$ or $TCO2_t$ in this model. Moreover, the coefficients from an unscaled model are intuitive and economically meaningful (Ziliak and McCloskey 2004).

To control for potential correlated omitted variable bias, we include a proxy for the firm's operating income in year $t$, denoted as $OPINC_t$. Firms with higher operating income are not only valued more highly by the markets, but they are also better able to invest resources for measuring

---

[24] Although using subsequent realizations gives rise to a look-ahead bias, this is not a concern for our study because we are not proposing trading strategies based on carbon emissions data, but instead are documenting an average firm-value effect. Using end-of-the-year market values is also in line with other literature examining valuation implications of environmental data (Barth and McNichols 1994; Johnston et al. 2008).



This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
718
**SER 1314**

708                                                                          *Matsumura, Prakash, and Vera-Muñoz*

and controlling their carbon emissions. It follows that firms with better performance are more likely to have both higher market values and lower emissions. Therefore, we include $OPINC_t$ as an additional control variable in Equation (1) and predict a positive association between $OPINC_t$ and $MKT_t$. To control for industry-level characteristics, we include industry fixed effects at the two-digit SIC code level in Equation (1). Our financial statement data are from the Compustat database unless otherwise indicated.

### Choice to Disclose Carbon Emissions

Firms choose to disclose carbon emissions to the CDP if the perceived benefits of doing so outweigh the perceived costs. Firms are unlikely to disclose their carbon emissions to the CDP if: (1) they have low carbon emissions such that the cost of measuring and collecting this information exceeds the benefits of doing so; (2) the firms have significant carbon emissions but have yet to implement internal measurement systems and processes to collect emissions information; and (3) the firms have a high level of emissions and therefore are reluctant to disclose this "bad news" to investors and other outside stakeholders due to proprietary and other related costs.[25] Because managers' evaluations of the perceived benefits and costs of disclosing are unobservable, we rely on voluntary disclosure theory (Verrecchia 1983; Healy and Palepu 2001) to model managers' disclosure decisions as a function of various firm- and industry-level characteristics.

To control for self-selection, we jointly estimate the decision to disclose carbon emissions and the effect of carbon emissions on firm value (Equation (1)). Equation (2) shows the logit model we use to examine the disclosure choice:

$$
\begin{aligned}
DISC\_CDP_t = {} & \beta_0 + \beta_1 STRNG_t + \beta_2 CNCRN_t + \beta_3 PROPDISCL_t + \beta_4 SIZE_t + \beta_5 MF_t \\
& + \beta_6 BM_t + \beta_7 LEV_t + \beta_8 II_t + \beta_9 FRNSALE_t + \beta_{10} DISC\_CDP_{t-1} + \beta_{11} EPA_t \\
& + \varepsilon_t,
\end{aligned}
$$

(2)

where $DISC\_CDP_t$ is an indicator variable that is coded as 1 if the firm discloses its year $t$ carbon emissions data to the CDP and allows public disclosure by the CDP, and 0 otherwise. We select the independent variables in model (2) based on economic theory (Akerlof 1970; Milgrom 1981) and on prior research on environmental disclosures (Li et al. 1997; Clarkson, Li, Richardson, and Vasvari 2008).

### Environmental Performance Variables

Economic theory predicts that firms with good performance (good type) have incentives to separate themselves from firms with poor performance (bad type) to avoid an adverse selection problem. That is, firms voluntarily reveal credible private information to distinguish themselves from the worst performers (Akerlof 1970; Milgrom 1981). Consistent with this, Clarkson et al. (2008) provide evidence, based on a sample of 191 firms in five high-pollution industries, that firms with better (worse) environmental performance on TRI emissions are more (less) likely to provide voluntary environmental disclosures in environmental and CSR reports.

Economic theory and empirical evidence suggest that firms that are more environmentally proactive, through initiatives such as implementing strong pollution-prevention programs and using renewable energy, have incentives to voluntarily disclose environmental information such as carbon emissions in order to reveal their environmental type, which is not directly observable by investors and other external stakeholders. Thus, we expect a positive coefficient on $STRNG_t$, our measure of

---

[25] We thank an anonymous reviewer for these insights.


American
Accounting
Association

This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
719
**SER 1315**

*Firm-Value Effects of Carbon Emissions and Carbon Disclosures*                                    709

environmentally proactive initiative, measured as the sum of KLD's environmentally proactive performance ratings for a firm in year $t$.

In contrast, economic theory offers competing predictions for environmentally damaging firms. On one hand, firms that are more environmentally damaging are less likely to voluntarily disclose environmental information if outsiders are unable to distinguish whether the non-disclosure is due to poor environmental performance or a desire to not reveal proprietary information (Verrecchia 1983). That is, environmentally damaging firms have incentives not to disclose in order to pool with other non-disclosure firms ascribed by outsiders as the "average" type (Verrecchia 1983; Healy and Palepu 2001). This reasoning argues for a negative coefficient for $CNCRN_t$, our measure of environmentally damaging action, where $CNCRN_t$ is the sum of KLD's environmentally damaging action ratings for a firm in year $t$. On the other hand, if outsiders are able to separate poor performers from good performers, then better performers within the pool of environmentally damaging firms have incentives to disclose. This is because absent such disclosure, uninformed investors and other external stakeholders will form more pessimistic beliefs about management's knowledge of the firms' environmental liabilities based upon publicly available information, thus increasing the probability of disclosure (see Li et al 1997, Proposition 3d). This discussion predicts a positive $CNCRN_t$ coefficient. Given these two competing theories, we do not predict a sign for $CNCRN_t$.

We examine $STRNG_t$ and $CNCRN_t$ separately because KLD's proactive dimensions are largely distinct from the damaging dimensions. Moreover, prior research (Hughes, Anderson, and Golden 2001; Deegan 2002; Cho et al. 2012) suggests that the likelihood of environmental disclosures by environmentally proactive firms is dissimilar to that of environmentally damaging firms.

### Other Independent Variables

$PROPDISCL_t$ measures the proportion of firms in an industry that disclose carbon emissions to the CDP. Consistent with Brown (2011), as more firms in a given industry disclose their carbon emissions, non-disclosers feel greater pressure to disclose them to avoid negative perceptions by outside stakeholders. In addition, we draw on theory showing that as more firms in an industry disclose, outsiders' assessments of the magnitude of non-disclosing firms' environmental liability increase, making it less costly for these firms to report higher liabilities (Li et al. 1997). Furthermore, managers of firms in the same industry face similar cost-benefit trade-offs and may contemporaneously come to a decision to disclose carbon emissions. Finally, based on conversations with sustainability consultants who have direct experience with the CDP questionnaire process, we assume that managers are able to exchange information on such voluntary disclosures with other firms in their industry. Thus, we capture both industry pressure and individually optimal disclosure decisions by including $PROPDISCL_t$, defined as the ratio of firms disclosing their carbon emissions in year $t$ to the total firms in the industry in our sample in year $t$ (using the two-digit SIC code). We expect a positive $PROPDISCL_t$ coefficient.

Prior research provides evidence of other systematic firm-level characteristics that may increase the likelihood that firms will respond to the CDP questionnaire and disclose their carbon emissions. For example, Stanny and Ely (2008) and Stanny (2013) examine characteristics of firms that respond to the CDP survey and find that size is positively correlated with the probability that firms will respond. Therefore, we include $SIZE_t$, measured using the log of the firm's total assets, and expect a positive sign on this variable. Firms that have a higher propensity to voluntarily disclose information in general may also be more likely to disclose their carbon emissions. Following Clarkson, Fang, Li, and Richardson (2010), we include the number of management forecasts issued by the firm during the year, denoted as $MF_t$, to control for the firm's general disclosure propensity. We expect a positive $MF_t$ coefficient.



This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
720
**SER 1316**

710 *Matsumura, Prakash, and Vera-Muñoz*

We control for firm growth by including the book-to-market ratio ($BM_t$) of the firm, but we do not predict a sign for $BM_t$. Prior research finds that firms with higher disclosure quality have lower cost of debt (Sengupta 1998). Consistent with higher-leverage firms providing higher-quality disclosures, we expect the coefficient on firm leverage, $LEV_t$, to be positive. Since the CDP is a consortium of large institutional investors, firms with higher institutional holdings may be more likely to disclose their carbon emissions, owing to investors' calls for more transparent disclosures about socially responsible activities (Plumlee, Brown, Hayes, and Marshall 2010). Alternatively, firms with fewer institutional investors may be more likely to respond to the CDP questionnaire to attract more institutional investors. Thus, we also control for the proportion of total shares outstanding held by institutional investors, $II_t$, from the Thomson Reuters 13-F database, but do not predict its sign.

Product market interactions affect firms' voluntary disclosures (Khanna, Palepu, and Srinivasan 2004) and European Union firms with higher proportions of international sales are more likely to disclose their carbon emissions (Stanny and Ely 2008). Therefore, to control for international product market interactions, we include in our logit model annual foreign sales as a proportion of total sales ($FRNSALE_t$) from the Worldscope database. S&P 500 firms that generate more earnings from outside the U.S. are more likely to respond to the CDP questionnaire, so we expect a positive $FRNSALE_t$ coefficient.

Consistent with Stanny (2013), we include an indicator variable, $EPA_t$, which is coded as 1 for firms that will be subject to the EPA's GHG mandatory reporting rule, and 0 otherwise.[26] Many of the firms in the $EPA = 1$ group also have industry-specific reporting requirements regarding their GHG emissions.[27] Therefore, we expect a positive coefficient for $EPA_t$. We include a lagged emissions indicator, $DISC\_CDP_{t-1}$, as an additional explanatory variable in our logit model. We expect a positive coefficient on $DISC\_CDP_{t-1}$, consistent with Stanny's (2013) finding that firms that responded to the CDP questionnaire in the previous year are eight times more likely to respond in the current year; that is, these disclosure decisions are "sticky." Finally, to control for industry-level characteristics, we include industry fixed effects at the two-digit SIC code level in Equation (1).

**Firm-Value Effects of Decision to Disclose Carbon Emissions**

As argued earlier, managers weigh the perceived costs and benefits of disclosing carbon emissions and choose to disclose only if the benefits of doing so outweigh the costs. Prior research on voluntary disclosures finds that *ceteris paribus*, firms that choose higher levels of voluntary disclosures have higher market values (Healy and Palepu 2001). Therefore, we also examine the firm-value effects of the decision to voluntarily disclose carbon emissions.

Using propensity score matching (Rosenbaum 2005), we compare the firm values for the firms that choose to disclose their carbon emissions with a matched sample of firms that choose to not disclose this information. To calculate the propensity scores we run a logit model using all the variables in Equations (1) and (2) above, except $TCO2_t$ and $DISC\_CDP_{t-1}$. We exclude $TCO2_t$ because it is available only for disclosing firms and $DISC\_CDP_{t-1}$ because it is the dependent variable in the previous year, and therefore not a "proper" covariate (Stuart and Rubin 2008). We match each disclosing firm to the closest non-disclosing firm(s) using two different matching algorithms, nearest-neighbor matching and caliper matching, and test for the difference in means and medians of firm value between the matched firms.

---

[26] Consistent with the EPA, we use the North American Industry Classification System (NAICS) to classify firms as $EPA = 1$ and $EPA = 0$.

[27] For instance, firms in the Oil and Gas industry are required to calculate their GHG emissions using techniques provided by the Compendium of GHG Emission Estimation Methodologies for the Oil and Gas Industry and the Petroleum Industry Guidelines for Reporting GHG Emissions.

 American Accounting Association

*The Accounting Review*
*March 2014*

This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
721
**SER 1317**

*Firm-Value Effects of Carbon Emissions and Carbon Disclosures* 711

There is a trade-off between: (1) including in the model all observable characteristics that distinguish the disclosing and non-disclosing firms; and (2) the ability to find a non-disclosing firm that matches each disclosing firm on all the included characteristics (Wooldridge 2012). Therefore, to increase the probability of finding a match, we also estimate the model after dropping some of the variables that are not significant in the original model. Propensity score matching alone is often sufficient to yield consistent or even efficient estimates. However, because it may not completely eliminate all systematic differences between the disclosing and non-disclosing firm means, we augment propensity score matching by using doubly robust regression (Imbens and Wooldridge 2007). Also, doubly robust regression allows us to obtain robust standard errors (Wooldridge 2012). More specifically, after matching our disclosing ($DISC\_CDP_t = 1$) and non-disclosing firms ($DISC\_CDP_t = 0$) using the propensity scores calculated from the logit model, we estimate Equation (1) for only the matched sample, replacing $TCO2_t$ with $DISC\_CDP_t$ and using the propensity scores as weights.

### IV. RESULTS

**Descriptive Statistics**

Panel A of Table 2 shows summary statistics for our full sample of S&P 500 firms. Panel A also shows the sample breakdown by EPA group, those firms required by the EPA to disclose their carbon emissions for 2010 and thereafter ($EPA = 1$), and firms exempt from the EPA's reporting rule ($EPA = 0$). Panel B of Table 2 provides summary statistics for our sample firms broken down into $DISC\_CDP = 1$, those that disclosed their carbon emissions publicly in the CDP questionnaire, and those that did not, $DISC\_CDP = 0$. We winsorize all the continuous variables at the 1 percent level on both tails of the distribution.

As shown in Table 2, Panel A, the distributions of both $MKT$ and $TCO2$ are significantly skewed. Therefore, we report parametric tests for the means and nonparametric tests for the medians. Panel A confirms that our sample consists of extremely large firms, with mean (median) market value ($MKT$) of $33.11 ($16.01) billion. The mean of $TCO2$ is considerably larger than the median $TCO2$, indicating the presence of some large carbon emitters. Carbon emissions are significantly higher for the $EPA = 1$ group. Also, there is no significant difference in the market value of firms in the $EPA = 1$ and $EPA = 0$ groups.

Panel A of Table 2 also shows that the mean book values of total assets ($ASSET$) and total liabilities ($LIAB$) are significantly higher for the $EPA = 0$ group than for the $EPA = 1$ group. However, the respective median book values are not significantly different between the $EPA = 1$ and $EPA = 0$ groups at conventional levels. Taken together, the aforementioned firm characteristics indicate that the difference in carbon emissions between the two groups is not an artifact of firm size. Further, Panel B of Table 2 shows that the $DISC\_CDP = 1$ firms are bigger than the $DISC\_CDP = 0$ firms for $MKT$, $ASSET$, and $LIAB$, with significantly larger mean and median for the former group (p = 0.00).

Panel A of Table 2 shows that, consistent with institutional investors owning a significant portion of S&P 500 firms, both the mean and median institutional investors ($II$) ownership for our sample firms is about 80 percent. Panels A and B show that both the percentage of foreign sales, $FRNSALE$, and the percentage of firms disclosing emissions relative to the total firms in the industry, $PROPDISCL$, are higher for the $EPA = 1$ and $DISC\_CDP = 1$ groups. Interestingly, the mean and median levels of $II$ are higher for firms in the $EPA = 0$ and $DISC\_CDP = 0$ groups.

Table 3 reports Spearman rank (Pearson) correlation coefficients above (below) the diagonal. Because a number of the variables used in our analyses are indicator variables and there is



This content downloaded from 35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
722
**SER 1318**

712            *Matsumura, Prakash, and Vera-Muñoz*

**TABLE 3**

**Correlation Coefficients**

| | MKT | TCO2 | ASSET | LIAB | OPINC | CNCRN | STRNG | PROP-DISC | SIZE | MF | BM | LEV | II | FRN-SALE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MKT | | 0.150 | 0.450 | 0.381 | 0.753 | 0.197 | 0.224 | 0.074 | 0.560 | 0.005 | -0.162 | -0.071 | -0.324 | 0.176 |
| TCO2 | 0.267 | | 0.045 | 0.008 | 0.296 | 0.552 | -0.004 | 0.213 | 0.227 | -0.023 | 0.113 | 0.063 | -0.248 | -0.123 |
| ASSET | 0.642 | 0.403 | | 0.995 | 0.728 | 0.000 | -0.005 | -0.082 | 0.687 | -0.142 | 0.137 | 0.296 | -0.218 | -0.100 |
| LIAB | 0.539 | 0.426 | 0.965 | | 0.680 | -0.029 | -0.022 | -0.094 | 0.654 | -0.144 | 0.135 | 0.318 | -0.198 | -0.111 |
| OPINC | 0.818 | 0.366 | 0.748 | 0.693 | | 0.204 | 0.122 | 0.002 | 0.623 | -0.064 | -0.030 | 0.128 | -0.242 | 0.051 |
| CNCRN | 0.172 | 0.684 | 0.234 | 0.242 | 0.265 | | 0.357 | 0.375 | 0.212 | 0.002 | 0.010 | 0.074 | -0.201 | 0.091 |
| STRNG | 0.193 | 0.230 | 0.142 | 0.130 | 0.195 | 0.391 | | 0.281 | 0.126 | 0.112 | -0.114 | -0.008 | -0.124 | 0.365 |
| PROP/DISCL | 0.102 | 0.474 | 0.146 | 0.155 | 0.172 | 0.401 | 0.346 | | 0.095 | 0.098 | -0.025 | 0.099 | -0.171 | 0.202 |
| SIZE | 0.642 | 0.403 | 1.000 | 0.965 | 0.748 | 0.234 | 0.142 | 0.146 | | -0.109 | 0.223 | 0.314 | -0.373 | -0.172 |
| MF | 0.035 | -0.025 | -0.100 | -0.093 | 0.035 | 0.035 | 0.119 | 0.113 | -0.100 | | -0.159 | -0.049 | 0.039 | 0.002 |
| BM | -0.282 | 0.103 | 0.297 | 0.263 | -0.058 | 0.062 | -0.076 | 0.028 | 0.297 | -0.145 | | -0.066 | 0.027 | -0.249 |
| LEV | -0.108 | 0.256 | 0.276 | 0.443 | 0.089 | 0.118 | -0.001 | 0.116 | 0.276 | -0.029 | 0.046 | | -0.054 | -0.226 |
| II | -0.345 | -0.277 | -0.385 | -0.361 | -0.349 | -0.217 | -0.133 | -0.180 | -0.385 | 0.044 | 0.007 | -0.054 | | 0.029 |
| FRNSALE | 0.121 | -0.178 | -0.177 | -0.226 | 0.003 | 0.115 | 0.355 | 0.204 | -0.177 | 0.038 | -0.288 | -0.255 | 0.033 | |

Coefficients in italic are significant at p < 0.10.
Coefficients in bold are significant at p < 0.01.
Coefficients in plain text are not significant (p > 0.10).
n = 550 for firm-value model and n = 1,365 for disclosure-choice model. See note a in Table 2.
Spearman rank (Pearson) correlation coefficients are below (above) the diagonal.
For variable definitions see Appendix A.

American Accounting Association

This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
723
**SER 1319**

Case 2:24-cv-00801-ODW-PVC   Document 56-32   Filed 07/24/24   Page 21 of 32   Page ID #:6704

*Firm-Value Effects of Carbon Emissions and Carbon Disclosures*                                   713

considerable skewness in the data, as described above, we discuss the Spearman rank correlation coefficients here. *TCO2* and *MKT* are positively correlated, which may be due to firm size; that is, larger firms with high *MKT* also have higher carbon emissions. The correlation between emissions (*TCO2*) and leverage (*LEV*) is positive and significant (0.256; $p < 0.01$), indicating that firms with higher emissions have more assets-in-place or are more capital-intensive (i.e., investments already made by the firm), compared to firms with lower emissions, which may have more growth opportunities (i.e., more real options for future investments) (Myers 1977). The correlation between *TCO2* and percentage of shares held by institutional investors (*II*) is −0.277 ($p < 0.01$), consistent with high-carbon-emitting firms having lower institutional investor holdings. Finally, the correlation between *TCO2* and the percentage of foreign sales (*FRNSALE*) is −0.178 ($p < 0.01$), indicating that higher- (lower-) carbon-emitting firms have a lower (higher) percentage of foreign sales.

**Firm-Value Effects of Carbon Emissions**

To correct for self-selection, we estimate the Heckman model (Heckman 1979; Maddala 1983) using the Full Information Maximum Likelihood (FIML) approach (Tucker 2010); that is, we estimate the firm-value model (Equation (1)) jointly with the disclosure-choice model (Equation (2)). Correcting for self-selection bias allows us to make inferences about the average effect of carbon emissions on firm value for all the firms in the sample, not just for the firms that disclose their emissions. Table 4 presents our results. We report t-statistics based on robust standard errors.

The coefficient on $TCO2_t$ in Equation (1) for the full sample ($\beta_1 = -0.212$; $p < 0.01$) is negative and significant, consistent with H1. This result has economic significance because, on average, for every additional thousand metric tons of carbon emissions, firm value decreases by $212,000. This translates to a $1.4 billion reduction in firm-value moving from a firm in the first quartile of carbon emissions to one in the third quartile of emissions. The signs of coefficients on the other variables in the model are as expected.

To examine whether the markets value carbon emissions differently for the *EPA* = 1 and *EPA* = 0 groups, we estimate Equation (1) separately for each subgroup. Table 4 shows that the coefficient on $TCO2_t$ for the *EPA* = 1 group is negative and significant ($\beta_1 = -0.182$; $p < 0.01$). Similarly, the coefficient on $TCO2_t$ for the *EPA* = 0 group is negative ($\beta_1 = -0.176$); however, it is not significant at conventional levels ($p = 0.11$).

Although FIML is more efficient, it may be less robust than Limited Information Maximum Likelihood (LIML), the two-step estimator (Wooldridge 2002, 566). Therefore, we also run the analyses above using LIML (untabulated). Specifically, we calculate the Inverse Mills Ratio (IMR) from the disclosure-choice model, and then include it in the firm-value model.[28] We include industry-level fixed effects in the firm-value model. Our results are unchanged except for the *EPA* = 0 group, where the coefficient on $TCO2_t$ is now significant at $p < 0.01$.

---

[28] Lennox, Francis, and Wang (2012) point out the importance of imposing "exclusion restrictions" when using the Heckman procedure. This is because absence of exclusion restrictions in the selection model (Equation (2)) can lead to biased coefficients that may be due to multicollinearity in the firm-value model (Equation (1)). The exclusion restriction requires at least one variable in the selection model that is conceptually excluded from the firm-value model. To satisfy the exclusion restriction, we include in our selection model a number of variables, such as *PROPDISCL*, *FRNSALE*, and *EPA*, which are related to the firm's decision to disclose carbon emissions but do not directly affect firm value. Thus, we exclude these variables from the firm-value model. Lennox et al. (2012) point out the importance of testing for multicollinearity when using the Heckman procedure. We find that the variance inflation factor (VIF) for the IMR is less than 2 for the full sample and for the *EPA* = 1 and *EPA* = 0 subgroups, thus indicating that multicollinearity is not an issue.



This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
724
**SER 1320**

714                                                                                  *Matsumura, Prakash, and Vera-Muñoz*

### TABLE 4
### Firm-Value Effects of Carbon Emissions

| Variable | Pred. Sign | Full Sample | | EPA = 1 | | EPA = 0 | |
|---|---|---|---|---|---|---|---|
| | | Coeff. | Z-stat | Coeff. | Z-stat | Coeff. | Z-stat |
| $TCO2_t$ | H1: − | −0.212*** | −3.72 | −0.182*** | −3.89 | −0.176 | −1.24 |
| $ASSET_t$ | + | 1.129*** | 8.82 | 1.597*** | 5.95 | 1.228*** | 7.09 |
| $LIAB_t$ | − | −1.186*** | −9.18 | −1.624*** | −5.97 | −1.310*** | −7.57 |
| $OPINC_t$ | + | 4.421*** | 10.49 | 1.907** | 2.06 | 5.200*** | 8.08 |
| **Disclosure-Choice Model ($DISC\_CDP_t$)** | | | | | | | |
| $CNCRN_t$ | ? | −0.034 | −0.51 | 0.077 | 1.00 | −0.279** | −2.14 |
| $STRNG_t$ | + | 0.305*** | 4.29 | 0.283*** | 2.40 | 0.293*** | 2.65 |
| $PROPDISCL_t$ | + | 0.025*** | 5.41 | 0.017** | 2.08 | 0.030*** | 5.59 |
| $SIZE_t$ | + | 0.394*** | 6.03 | 0.658*** | 5.46 | 0.331*** | 5.58 |
| $MF_t$ | + | 0.014 | 1.26 | 0.005 | 0.30 | 0.016 | 1.14 |
| $BM_t$ | ? | −0.619*** | −4.23 | −1.481*** | −5.79 | −0.446*** | −2.95 |
| $LEV_t$ | + | −0.527§§§ | −2.38 | −0.840§§ | −2.34 | −0.444§§ | −1.74 |
| $II_t$ | ? | −0.001 | −0.27 | −0.008 | −1.34 | 0.000 | 0.06 |
| $FRNSALE_t$ | + | 0.009*** | 3.40 | 0.006 | 1.19 | 0.008** | 2.26 |
| $DISC\_CDP_{t−1}$ | + | 1.286*** | 7.30 | 0.679*** | 3.24 | 1.607*** | 9.45 |
| $EPA_t$ | + | 0.268 | 1.07 | | | | |
| Likelihood Ratio $\chi^2$ | | 2.88* | | 22.31*** | | 0.14 | |
| n | | 1,365 | | 401 | | 964 | |
| Uncensored | | 550 | | 229 | | 321 | |

*, **, *** Denote significance at p < 0.10, < 0.05, and < 0.01, respectively, one-tailed where a directional prediction is made.
§§, §§§ Denote significance at p < 0.05 and < 0.01, respectively, if the coefficient is significant in the opposite direction where a directional prediction is made. Otherwise, p-values are two-tailed.
For parsimony, coefficients on industry dummies are not reported.
Using the Full Information Maximum Likelihood (FIML) method, we estimate the Heckman (1979) model to correct for selection bias; that is, we estimate the firm-value model jointly with the disclosure choice model. We estimate the model on the full sample and separately for $EPA = 1$ and $EPA = 0$ firms. We include industry fixed effects at the two-digit SIC code level in both models. We report Z-statistics based on Huber-White robust standard errors:

$$MKT_t = \beta_0 + \beta_1 TCO2_t + \beta_2 ASSET_t + \beta_3 LIAB_t + \beta_4 OPINC_t + \varepsilon_t. \tag{1}$$

Disclosure-Choice Model:

$$DISC.CDP_t = \beta_0 + \beta_1 CNCRN_t + \beta_2 STRNG_t + \beta_3 PROPDISCL_t + \beta_4 SIZE_t + \beta_5 MF_t + \beta_6 BM_t + \beta_7 LEV_t$$

$$+ \beta_8 II_t + \beta_9 FRNSALE_t + \beta_{10} DISC.CDP_{t−1} + \beta_{11} EPA_t + \varepsilon_t. \tag{2}$$

$DISC\_CDP_t$ is an indicator variable equal to 1 if the firm publicly discloses carbon emissions, and 0 otherwise. The likelihood ratio $\chi^2$ statistic is a test of the null hypothesis that there is no self-selection. The p-value for the goodness-of-fit test in this table is 0.00.
For variable definitions see Appendix A.

Also, Table 4 shows that the likelihood ratio Chi-square statistics that test the null hypothesis of no self-selection are significant for the full sample and for the $EPA = 1$ group, thus highlighting the importance of correcting for self-selection bias when examining the relationship between carbon emissions and firm value. Our results for the full sample as well as for the $EPA = 1$ group are both economically large and statistically significant. Overall, our results support our prediction that firm value is negatively associated with carbon emissions.


American Accounting Association

*The Accounting Review*
*March 2014*

This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
725
**SER 1321**

*Firm-Value Effects of Carbon Emissions and Carbon Disclosures*                                                                715

**Self-Selection: Choice to Voluntarily Disclose Carbon Emissions**

Table 4 also presents the results of estimating the disclosure-choice model in Equation (2). For the full sample and for firms in both the $EPA = 1$ and $EPA = 0$ groups, the coefficient on $STRNG_t$ is positive and significant ($p < 0.01$). These results indicate that in both groups, the higher the firms' scores on environmentally proactive initiatives, the more likely they are to disclose their carbon emissions. The coefficient on $CNCRN_t$ is not significantly different from zero for the full sample and for firms in the $EPA = 1$ group. In contrast, for firms in the $EPA = 0$ group, the coefficient on $CNCRN_t$ is negative and significant ($p < 0.05$), thus indicating that the higher the firms' scores on environmentally damaging actions, the less likely they are to disclose their carbon emissions.

The coefficient on $PROPDISCL_t$ is positive and significant for the full sample ($p < 0.01$) and for firms in both the $EPA = 1$ and $EPA = 0$ groups ($p < 0.05$ and $p < 0.01$, respectively), consistent with the probability of disclosure increasing as more firms in the industry disclose. The coefficient on $SIZE_t$ is positive and highly significant ($p < 0.01$), consistent with prior voluntary disclosure literature. Contrary to our expectations, firms with higher leverage, $LEV_t$, are less likely to disclose their carbon emissions. The coefficient on $FRNSALE_t$ is positive and significant for the full sample ($p < 0.01$) and for firms in the $EPA = 0$ group ($p < 0.05$). This is consistent with Stanny and Ely (2008), who find that the proportion of firms' foreign sales to total sales is positively associated with the firms' choice to respond to the CDP questionnaire. Finally, consistent with expectations, we find that firms that disclosed their carbon emissions in the prior year are significantly more likely to disclose their emissions in the current year ($p < 0.01$), indicating that the disclosure decision is sticky. The coefficients on the other variables in the model are either as predicted or not significantly different from 0.

**Firm-Value Effects of Decision to Disclose Carbon Emissions**

Our results indicate that the markets impose a penalty for firms' carbon emissions. This raises the question: "Why do firms voluntarily disclose their carbon emissions, given that the markets treat them as a cost or liability?" As discussed in Section II, it is not clear whether the markets will reward or penalize voluntary disclosers of carbon emissions. We address this question by using propensity score matching and doubly robust regression to examine the firm-value effects of the act of voluntarily disclosing carbon emissions, represented by $DISC\_CDP_t$.

Table 5, Panel A presents two logit models for the disclosure choice: (i) the full model with all the covariates from Equations (1) and (2); and (ii) a reduced model including only selected covariates. We use two matching algorithms: (i) nearest neighbor matching, and (ii) caliper matching with a distance of 0.01. To assess the quality of matching, we present the covariate balance for each model after matching. In the full model, we find that only some of the covariates are significant in explaining the firms' choice to disclose. The differences in means of the covariates for the matched firms indicate that the matched firms differ on only $LEV_t$ and $OPINC_t$ ($p < 0.05$). Covariate balances for caliper matching are similar to the balances for nearest neighbor matching. To increase the number of firms that we are able to match, we next drop covariates that are both (i) statistically insignificant in the logit model and (ii) insignificantly different between the disclosing and non-disclosing firms after matching. In this reduced model, the means of the covariates are now different for $MF_t$ and $LEV_t$ ($p < 0.10$) and for $FRNSALE_t$ and $EPA_t$ ($p < 0.05$) using nearest neighbor matching. None of the covariates are significantly different from 0 using caliper matching.

Table 5, Panel B presents the differences in the mean firm values for disclosing and non-disclosing firms. Using nearest neighbor matching, the difference in the mean firm values of the propensity score matched firms is approximately \$13.61 billion for the full model, and approximately \$11.42 billion for the reduced model, both significant at $p < 0.01$. Using caliper


American Accounting Association

This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
726
**SER 1322**

716          *Matsumura, Prakash, and Vera-Muñoz*

## TABLE 5
### Firm-Value Effects of Decision to Disclose Carbon Emissions: Propensity-Score Matching
### Panel A: Logit Model for Propensity Score Matching[a]

| | Full Model | | | | | Reduced Model | | | | |
| | Estimates | | Covariate Bal (Near Neighbor) | | | Estimates | | Covariate Bal (Near Neighbor) | | |
| Variable | Coeff. | Z-stat | Disct. | Non-Disct. | Z-stat | Coeff. | Z-stat | Disct. | Non-Disct. | Z-stat |
|---|---|---|---|---|---|---|---|---|---|---|
| $CNCRN_i$ | −0.036 | −0.35 | 1.03 | 1.01 | 0.23 | | | 1.036 | 1.05 | −0.13 |
| $STRNG_i$ | 0.795*** | 6.84 | 0.97 | 0.88 | 1.40 | 0.833*** | 7.48 | 0.979 | 0.94 | 0.64 |
| $PROPDISCL_i$ | 0.061*** | 7.36 | 53.46 | 54.16 | −0.62 | 0.060*** | 7.40 | 52.867 | 52.58 | 0.25 |
| $SIZE_i$ | 0.547*** | 4.51 | 9.97 | 9.97 | 0.05 | 0.535*** | 6.16 | 10.030 | 10.03 | 0.03 |
| $MF_i$ | 0.034* | 1.93 | 5.45 | 5.93 | −1.38 | 0.030* | 1.75 | 5.352 | 5.95 | −1.71* |
| $BM_i$ | 0.030 | 0.71 | 0.47 | 0.51 | −1.57 | | | 0.379 | 0.42 | −0.32 |
| $LEV_i$ | −0.243 | −0.69 | 0.42 | 0.46 | −2.25** | −0.209 | −0.81 | 0.430 | 0.47 | −1.77* |
| $II_i$ | −0.003 | −0.44 | 77.21 | 78.17 | −1.15 | | | 77.190 | 78.37 | −1.42 |
| $FRNSALE_i$ | 0.021*** | 4.77 | 32.15 | 33.73 | −0.94 | 0.021*** | 4.96 | 32.277 | 36.05 | −2.31** |
| $EPA_i$ | 0.729* | 1.87 | 0.43 | 0.38 | 1.55 | 0.927** | 2.43 | 0.420 | 0.35 | 2.34** |
| $ASSET_i$ | 0.000 | 0.58 | 58,418 | 48,523 | 1.340 | | | 68,491 | 79,315 | −1.010 |
| $LIAB_i$ | 0.000 | −0.65 | 46,112 | 38,952 | 1.020 | | | 56,218 | 69,450 | −1.280 |
| $OPINC_i$ | 0.000 | 0.86 | 3,841 | 2,685 | 3.710*** | 0.000** | 2.55 | 4,208 | 4,073 | 0.310 |
| n | 1,234 | | | | | 1,286 | | | | |
| Treated | 538 | | | | | 559 | | | | |
| Pseudo $R^2$ | 0.299 | | | | | 0.303 | | | | |

*, **, *** Denote significance at p < 0.10, < 0.05, and < 0.01, respectively.

[a] We match firms that disclose their carbon emissions, $DISC\_CDP = 1$ with firms that do not disclose their carbon emissions, $DISC\_CDP = 0$, using the following logit model that includes all the variables in Equations (1) and (2). We use two matching algorithms, nearest neighbor matching and caliper matching with a distance of 0.01. We include industry fixed effects at the two-digit SIC code level:

$$DISC.CDP_i = \beta_0 + \beta_1 CNCRN_i + \beta_2 STRNG_i + \beta_3 PROPDISCL_i + \beta_4 SIZE_i + \beta_5 MF_i + \beta_6 BM_i + \beta_7 LEV_i + \beta_8 II_i + \beta_9 FRNSALE_i + \beta_{10} EPA_i + \beta_{11} ASSET_i + \beta_{12} LIAB_i + \beta_{13} OPINC_i + \varepsilon_i.$$

To increase the overlap between the disclosing and non-disclosing firms (i.e., the common support area), we also estimate a reduced model excluding covariates that were not significant in the logit regression, and covariates whose means did not differ significantly after matching. We report covariate balance means and Z-stats to test how equal (balanced) the disclosing and non-disclosing firms are for each covariate after matching. Covariate balances are similar using caliper matching in the full model. In the reduced model there are no covariates that are significantly different between the disclosing and non-disclosing firms using caliper matching.

(continued on next page)

American Accounting Association

*The Accounting Review*
*March 2014*

This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
727
**SER 1323**

*Firm-Value Effects of Carbon Emissions and Carbon Disclosures* 717

### TABLE 5 (continued)

**Panel B: Difference in Mean Firm Values of Propensity Score-Matched Firms[b]**

| | | Full Model | | | | Reduced Model | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Disclosers | Non-Discl. | Diff. | Z-stat | Disclosers | Non-Discl. | Diff. | Z-stat |
| Nearest Neighbor | Mean firm value | 33,440.7 | 19,829.2 | 13,611.5*** | 4.50 | 34,077.0 | 22,661.5 | 11,415.5*** | 3.04 |
| | n | 538 | 696 | | | 559 | 727 | | |
| Caliper (0.01) | Mean firm value | 29,615.2 | 19,718.8 | 9,896.4*** | 3.64 | 30,309.1 | 22,836.1 | 7,473.0** | 2.26 |
| | n | 496 | 696 | | | 519 | 727 | | |

*, **, *** Denote significance at $p < 0.10$, $< 0.05$, and $< 0.01$, respectively.
[b] Using the propensity scores from the logit regressions in Panel A, we match our disclosing firms ($DISC\_CDP_t = 1$) with the non-disclosing firms ($DISC\_CDP_t = 0$). This panel provides the difference in means of the firm value for our matched firms, i.e., the average effect on the disclosing firms, using both nearest neighbor and caliper matching algorithms.

**Panel C: Doubly Robust Regression Estimates of Mean and Median Firm Value[c]**

| | | Mean Firm Value[d] | | | | Median Firm Value[e] | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Full Model | | Reduced Model | | Full Model | | Reduced Model | |
| | | Coefficient | Z-stat | Coefficient | Z-stat | Coefficient | Z-stat | Coefficient | Z-stat |
| Nearest Neighbor | $DISC\_CDP_t$ | 6,352.7*** | 2.75 | 5,712.7** | 2.55 | 2,869.4*** | 9.19 | 2,268.5*** | 8.34 |
| | n | 1,234 | | 1,286 | | 1,076 | | 1,118 | |
| Caliper (0.01) | $DISC\_CDP_t$ | 5,160.8*** | 3.53 | 5,062.5*** | 2.74 | 2,265.0*** | 4.79 | 2,097.8*** | 8.76 |
| | n | 992 | | 1,038 | | 992 | | 1,038 | |

*, **, *** Denote significance at $p < 0.10$, $< 0.05$, and $< 0.01$, respectively.
[c] After matching our disclosing and non-disclosing firms using the propensity scores calculated in Panel A for the two models, we examine the difference in the mean and median firm values between the disclosing and non-disclosing firms using the following regression:

$$MKT_t = \beta_0 + \beta_1 DISC.CDP_t + \beta_2 ASSET_t + \beta_3 LIAB_t + \beta_4 OPINC_t + \varepsilon_t.$$

The regressions are run using propensity scores from the logit model in Panel A.
[d] We include industry fixed effects in the regression model and report Z-statistics based on robust standard errors.
[e] We do not include industry fixed effects in the median regressions because the model does not converge with industry fixed effects.
For variable definitions see Appendix A.

matching, the difference in the mean firm values is smaller: $9.90 billion for the full model (p < 0.01) and $7.47 (p < 0.05) billion for the reduced model.

To eliminate any remaining bias after propensity score matching, we run doubly robust regressions of firm value on the firms' decision to disclose carbon emissions, $DISC\_CDP_t$. Results for the full model in Table 5, Panel C, show that the mean firm value of disclosing firms is significantly higher than that of non-disclosing firms by approximately $6.35 billion ($5.16 billion) for nearest neighbor (caliper) matching (p < 0.01). Similarly, results for the reduced model show that, on average, the mean firm value of disclosing firms is higher than non-disclosing firms by

*March 2014*



This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
728
**SER 1324**

718 *Matsumura, Prakash, and Vera-Muñoz*

approximately \$5.71 (\$5.06) billion for nearest neighbor (caliper) matching. These differences are significant at $p < 0.01$. The difference in mean firm value is smaller using doubly robust regression as compared to the results from propensity score matching only. This suggests that there was some residual bias, which we were able to remove using doubly robust regression.

We also estimate the effects of disclosing carbon emissions on median firm value, matching firms using propensity scores and then estimating quantile regressions using weights from the matching procedure (Table 5, Panel C). We do not include industry fixed effects in the quantile regression because our model does not converge, but we do include industry fixed effects in the matching procedure. Our results using nearest neighbor (caliper) matching for the reduced model show that the median firm value of disclosing firms is about \$2.27 (\$2.10) billion higher than that of non-disclosing firms. These differences are significant at $p < 0.01$. The differences in median firm values between disclosing and non-disclosing firms are slightly higher using the full model ($p < 0.01$).[29]

**Sensitivity Analyses**

We conduct several sensitivity analyses to assess the robustness of our main results. First, we examine the relationship between changes in firm value, ($\Delta MKT_t$) and changes in carbon emissions, $\Delta TCO2_t$ (Table 6). Consistent with our main results, we find that increases in carbon emissions are associated with decreases in firm value. In particular, the coefficient on $\Delta TCO2_t$ is negative and significant for the full sample ($p < 0.01$), for the $EPA = 1$ group ($p < 0.05$), and for the $EPA = 0$ group ($p < 0.10$).

Second, we scale both the dependent and independent variables in Equation (1) by the number of common shares outstanding. Our inferences (untabulated) regarding the negative association between $TCO2_t$ and $MKT_t$ are unchanged for the full sample and for the $EPA = 1$ group. However, for the $EPA = 0$ group, the negative coefficient on $TCO2_t$ is now significant ($p < 0.01$). We also scale all of the variables by sales and our results are unchanged.

Third, we estimate the firm-value effects of carbon emissions using the Ohlson (1995) model, which provides a theoretical framework for the interpretation of the $TCO2$ coefficient in terms of the valuation implications of the firms' carbon emissions. Specifically, we estimate the following valuation model jointly with the disclosure-choice model specified in Equation (2):

$$MKT_t = \beta_0 + \beta_1 TCO2_t + \beta_2 CEQ_t + \beta_3 IBEI_t + \varepsilon_t, \tag{3}$$

where $CEQ_t$ is the value of common equity of the firm and $IBEI_t$ is income before extraordinary items. We scale all the variables in the model by common shares outstanding. Our results (untabulated) show that the coefficient on $TCO2_t$ is negative and significant ($p < 0.05$ for the full sample and for the $EPA = 1$ group, and $p < 0.01$ for the $EPA = 0$ group). Other coefficients are also in the expected direction and significant ($p < 0.05$).

Fourth, we include firms with December fiscal year-end only. Because the carbon emissions data and market-value data are for the calendar year-end but the accounting data are for fiscal year-end, using firms with December fiscal year-end only better aligns the accounting data with carbon emissions and market-value data. Our results (untabulated) are consistent with the main results reported in Table 4. In other untabulated analyses, we also include return on assets as an additional control variable in the logit model. This variable is significant for the full sample and

---

[29] Our results do not imply that all firms are penalized equally for non-disclosure. Instead, the difference in market value that we document in Table 5 is the difference in the mean and median (Panel C) firm value for disclosing versus non-disclosing firms, conditional on various firm-level characteristics, including carbon emissions.



This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
729
**SER 1325**

*Firm-Value Effects of Carbon Emissions and Carbon Disclosures* 719

### TABLE 6
### Firm-Value Effects of Carbon Emissions Changes Model

| $\Delta MKT_t$ | | Full Sample | | $EPA = 1$ | | $EPA = 0$ | |
|---|---|---|---|---|---|---|---|
| Variable | Pred. Sign | Coeff. | t-stat | Coeff. | t-stat | Coeff. | t-stat |
| $\Delta TCO2$ | H1: − | −0.045*** | −2.45 | −0.063** | −2.17 | −0.020* | −1.28 |
| $\Delta ASSET$ | + | 1.207*** | 4.90 | 2.158*** | 2.60 | 1.005*** | 4.52 |
| $\Delta LIAB$ | − | −0.040 | −0.30 | −0.942*** | −2.58 | 0.074 | 0.76 |
| $\Delta OPINC$ | + | 0.097** | 1.73 | 0.028 | 0.21 | 0.121** | 1.67 |
| n | | 313 | | 136 | | 177 | |
| $R^2$ | | 0.2 | | 0.2 | | 0.33 | |

*, **, *** Denote significance at p < 0.10, < 0.05, and < 0.01, respectively, one-tailed where a directional prediction is made. Otherwise, p-values are two-tailed.

We estimate the following model to examine the percentage change in firm value as a function of the percentage change in carbon emission levels, controlling for other factors that are associated with firm value. We include firm fixed effects in all the estimations. We estimate the model on the full sample and separately for $EPA = 1$ and $EPA = 0$ firms. We report t-statistics based on Huber-White robust standard errors:

$$\Delta MKT_t = \beta_0 + \beta_1 \Delta TCO2_t + \beta_2 \Delta ASSET_t + \beta_3 \Delta LIAB_t + \beta_4 \Delta OPINC_t + \varepsilon_t.$$

Variable Definitions:
$\Delta MKT_t = [(MKT_t + DIV_t) - (MKT_{t-1} + DIV_{t-1})]/(MKT_{t-1} + DIV_{t-1})$;
$DIV_t =$ dividend for year $t$;
$\Delta TCO2_t = (TCO2_t - TCO2_{t-1})/TCO2_{t-1}$;
$\Delta ASSET_t = (ASSET_t - ASSET_{t-1})/ASSET_{t-1}$;
$\Delta LIAB_t = (LIAB_t - LIAB_{t-1})/LIAB_{t-1}$; and
$\Delta OPINC_t = (OPINC_t - OPINC_{t-1})/OPINC_{t-1}$.
The other variables are as defined in Appendix A.

for the $EPA = 0$ group (p < 0.05), and not significant for the $EPA = 1$ group. Our main results remain unchanged.

Finally, because our firm-value model controls only for assets and liabilities that are recognized on the firms' balance sheets, we conduct sensitivity analyses (untabulated) to rule out the alternative explanation that the negative coefficient on $TCO2_t$ in Table 4 is proxying for other unbooked liabilities. We first add TRI emissions, $TRI_t$, in Equation (1) as a proxy for other unbooked environmental liabilities, following Clarkson et al. (2010).[30] Because TRI data are unavailable for some firms, we lose over 60 percent of the observations from the $EPA = 0$ group (we lose over 43 percent of the observations from the full sample). The coefficient on $TRI_t$ is negative and significant for the full sample and for the $EPA = 1$ group, but it is not significant for the $EPA = 0$ group. We next include the firms' credit ratings as a proxy for all other relevant information, including all unbooked liabilities. The coefficient on credit ratings is positive and significant (p < 0.01), consistent with the intuition that firms with higher credit ratings have higher firm values. For both these analyses, our results for $TCO2_t$ remain unchanged. Taken together, the results of our

---

[30] Specifically, we measure $TRI_t$ as TRI emissions scaled by sales. Consistent with Clarkson et al. (2011), we then assign the scaled TRI emissions into deciles within each industry (two-digit SIC code).


American Accounting Association

This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
730
**SER 1326**

720                                                   *Matsumura, Prakash, and Vera-Muñoz*

sensitivity analyses are generally consistent with our main results and support our prediction that firm value is negatively associated with carbon emissions.[31]

## V. CONCLUSION AND DISCUSSION

Using carbon emissions data for 2006 to 2008 that S&P 500 firms disclosed voluntarily, we find that the capital markets integrate both carbon emissions and the *act* of voluntary disclosure of this information into their firm valuations. The markets penalize all firms for their carbon emissions; firms that do not disclose their carbon emissions face a further penalty for non-disclosure. To our knowledge, this is the first study to provide empirical evidence on the firm-value effects of *both* the choice to voluntarily disclose carbon emissions and the magnitude of carbon emissions.

We predict and find a negative association between carbon emissions and firm value. Correcting for self-selection bias associated with managers' decisions to disclose carbon emissions, we find that for every additional thousand metric tons of carbon emissions, firm value decreases, on average, by $212,000. Our finding of a negative association between carbon emissions and firm value begs the question: "If the capital markets penalize firms for their carbon emissions, then why do firms choose to disclose them?" We posit that managers weigh the costs and benefits of disclosing carbon emissions and choose to disclose only if the perceived benefits of doing so outweigh the perceived costs. Accordingly, we also estimate the firm-value effects of the act of voluntarily disclosing carbon emissions. Using propensity score matching and doubly robust regression, we find that the median firm value is about $2.3 billion higher for firms that disclose their carbon emissions compared to firms that choose to not disclose them.

By providing scholarly evidence on the firm-value effects of carbon emissions, we supply managers with information that will help them make important decisions regarding the cost-benefit trade-offs of allocating resources to measuring, disclosing, and reducing carbon emissions. Our findings suggest that non-disclosure of carbon emissions may be costly for firms and is associated with a lower firm value, *ceteris paribus*. These findings are also important for boards of directors and managers because failure to integrate climate change into business strategy may reduce firm value (GS Sustain 2009).

Our findings are important to U.S. and international regulators and standard-setters as they work toward developing standards for measuring, assuring, and reporting on a firm's GHG statement. Our results suggest that capital markets incorporate information not only on the firm's choice to disclose its carbon emissions, but also on the level of these emissions. These valuations are consistent with demands by users and preparers for clearer guidelines from regulators and standard-setters for measuring and disclosing GHG emissions.

Of equal importance is the assurance of GHG emissions by an independent third party, which is currently not mandated in the U.S. Therefore, the firms in our sample choose whether to voluntarily disclose their emissions levels and, if they do so, then whether to provide assurance for their emissions and the type of assurance provider. Currently, many firms are required to have their carbon emissions assured, for example, by a public accounting firm, or verified by a governmental

---

[31] We also address the conjecture that the insignificant results for the $EPA = 0$ group in Table 4 are due to a lack of power. This conjecture is corroborated by analyses that (1) reduce the number of observations without reducing noise; (2) reduce noise only; or (3) reduce the number of observations as well as noise. Regarding (1), when we include *TRI* in Equation (1), we lose over 60 percent of the observations from the $EPA = 0$ group. With this loss in power, the coefficient on *TCO2* is not statistically significant. Regarding (2), when we winsorize the data at the 5 percent level, the coefficient for the $EPA = 0$ group is significant at $p < 0.10$. Regarding (3), using only December fiscal year-end firms better aligns the accounting data and the emissions data. The *TCO2* coefficient for the $EPA = 0$ group is significant at $p < 0.10$. Thus, our tests support our conjecture that the statistically insignificant results for the $EPA = 0$ firms are due to a lack of power.


American
Accounting
Association

*The Accounting Review*
*March 2014*

This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
731
**SER 1327**

Case 2:24-cv-00801-ODW-PVC   Document 56-32   Filed 07/24/24   Page 29 of 32   Page ID #:6712

*Firm-Value Effects of Carbon Emissions and Carbon Disclosures*                                    721

agency, such as the EPA through their Climate Leaders program. Furthermore, other firms have their emissions monitored by internal auditors. Also, some of the firms in our sample have voluntarily joined self-regulatory organizations, such as the Chicago Climate Exchange or the California Climate Action Registry, which require independent third-party assurance. This diverse institutional context points to the important role played by U.S. and international regulators and standard-setters in considering whether to require more uniformity in the assurance of GHG emissions with the goal of increasing the reliability of this information.

Having found evidence of a negative association between carbon emissions and firm value, in future research we plan to examine the association between carbon emissions and components of firm value. Another potentially fruitful area of research could address the challenges surrounding assurance of carbon emissions. Currently, the extent of independent third-party assurance and what constitutes assurance are ill-defined (Simnett et al. 2009b). International accounting research on assurance of GHG emission statements is gaining momentum (Zhou, Green, and Simnett 2012; Huggins, Green, and Simnett 2011), thus pointing to the increasing relevance of this issue. As more years of data become available from private and publicly available sources, future research could examine the value of assurance of carbon emissions and the association between assurance of carbon emissions and market value.

## REFERENCES

Akerlof, G. 1970. The market for "lemons": Quality uncertainty and the market mechanism. *Quarterly Journal of Economics* 90:629–650.

Barley, R. 2009. Drax in power struggle with S&P. *Wall Street Journal* (June 24).

Barth, M. E., W. H. Beaver, and W. R. Landsman. 2001. The relevance of the value relevance literature for financial accounting standard-setting: Another view. *Journal of Accounting and Economics* 31: 77–104.

Barth, M. E., and G. Clinch. 2009. Scale effects in capital markets-based accounting research. *Journal of Business Finance and Accounting* 36 (3/4): 253–288.

Barth, M. E., and M. F. McNichols. 1994. Estimation and market valuation of environmental liabilities relating to Superfund sites. *Journal of Accounting Research* 32 (Supplement): 177–209.

Blacconiere, W. G., and D. M. Patten. 1994. Environmental disclosures, regulatory costs, and changes in firm value. *Journal of Accounting and Economics* 18 (3): 355–377.

Brown, J. L. 2011. The spread of aggressive corporate tax reporting: A detailed examination of the corporate-owned life insurance shelter. *The Accounting Review* 86 (1): 23–57.

Campbell, K., S. E. Sefcik, and N. S. Soderstrom. 1998. Site uncertainty, allocation uncertainty, and Superfund liability valuation. *Journal of Accounting and Public Policy* 17: 331–366.

Campbell, K., S. E. Sefcik, and N. S. Soderstrom. 2003. Disclosure of private information and reduction of uncertainty: Environmental liabilities in the chemical industry. *Review of Quantitative Finance and Accounting* 21: 349–378.

Castelo Branco, M., and L. Lima Rodrigues. 2006. Corporate social responsibility and resource-based perspectives. *Journal of Business Ethics* 69: 111–132.

Chapple, L., P. M. Clarkson, and D. L. Gold. 2013. The cost of carbon: Capital market effects of the proposed emission trading scheme (ETS). *Abacus* 49 (1): 1–33.

Cho, C. H., M. Freedman, and D. M. Patten. 2012. Corporate disclosure of environmental capital expenditures. *Accounting, Auditing, and Accountability Journal* 25 (3): 486–507.

Clarkson, P. M. 2012. The valuation relevance of environmental performance: Evidence from the academic literature. In *Contemporary Issues in Sustainability Accounting, Assurance and Reporting*, Chapter 2, edited by S. Jones, and J. Ratnatunga, 11–42. Bingley, U.K.: Emerald Group Publishing Limited.

Clarkson, P. M., X. Fang, Y. Li, and G. Richardson. 2010. *The Relevance of Environmental Disclosures: Are Such Disclosures Incrementally Informative?* Working paper, University of Queensland, Georgia State University, and University of Toronto.

 American Accounting Association

This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
732
**SER 1328**

Clarkson, P. M., Y. Li, and G. D. Richardson. 2004. The market valuation of environmental expenditures by pulp and paper companies. *The Accounting Review* 79 (2): 329–353.

Clarkson, P. M., Y. Li, G. D. Richardson, and F. P. Vasvari. 2008. Revisiting the relation between environmental performance and environmental disclosure: An empirical analysis. *Accounting, Organizations and Society* 33: 303–327.

Clarkson, P. M., Y. Li, G. D. Richardson, and F. P. Vasvari. 2011. Does it really pay to be green? Determinants and consequences of proactive environmental strategies. *Journal of Accounting and Public Policy* 30: 122–144.

Connors, E., H. H. Johnston, and L. Silva-Gao. 2013. The informational value of Toxics Release Inventory performance. *Sustainability, Accounting, Management and Policy Journal* 4 (1): 32–55.

Cormier, D., and M. Magnan. 1997. Investors' assessment of implicit environmental liabilities: An empirical investigation. *Journal of Accounting and Public Policy* 16: 215–241.

Deegan, C. 2002. The legitimizing effect of social and environmental disclosures: A theoretical foundation. *Accounting, Auditing, and Accountability Journal* 15: 282–311.

Dhaliwal, D., O. Z. Li, A. Tsang, and Y. G. Yang. 2011. Voluntary nonfinancial disclosure and the cost of equity capital: The initiation of corporate social responsibility reporting. *The Accounting Review* 86 (1): 59–100.

Eccles, R. G., M. P. Krzus, and G. Serafeim. 2011. Market interest in nonfinancial information. *Journal of Applied Corporate Finance* 23 (4): 113–127.

Environmental Protection Agency. 2009. *Mandatory Reporting of Greenhouse Gases*. 74 FR 56260. Available at: http://www.gpo.gov/fdsys/pkg/FR-2009-10-30/pdf/E9-23315.pdf

Epstein, M. J. 2008. *Making Sustainability Work—Best Practices in Managing and Measuring Corporate, Social, Environmental, and Economic Impacts*. San Francisco, CA: Berrett Koehler.

Ernst & Young. 2011. Climate change and sustainability: Shareholders press boards on social and environmental risks. *Ernst & Young LLP* 1–5.

Fornaro, J. M., K. A. Winkelman, and D. Glodstein. 2009. Accounting for emissions. *Journal of Accountancy* (July): 40–45.

GS Sustain. 2009. *Change is Coming: A Framework for Climate Change—A Defining Issue of the 21st Century*. New York, NY: The Goldman Sachs Group, Inc.

Hart, S. L. 1995. A natural-resource-based view of the firm. *The Academy of Management Review* 20 (4): 986–1014.

Healy, P. M., and K. G. Palepu. 2001. Information asymmetry, corporate disclosure, and the capital markets: A review of the empirical disclosure literature. *Journal of Accounting and Economics* 31: 405–440.

Heckman, J. J. 1979. Sample selection bias as a specification error. *Econometrica* 47: 153–162.

Holthausen, R. W., and R. L. Watts. 2001. The relevance of the value-relevance literature for financial accounting standard-setting. *Journal of Accounting and Economics* 31: 3–75.

Huggins, A., W. J. Green, and R. Simnett. 2011. The competitive market for assurance engagements on greenhouse gas statements: Is there a role for assurers from the accounting profession? *Current Issues in Auditing* 5 (2): A1–A12.

Hughes, S. B., A. Anderson, and S. Golden. 2001. Corporate environmental disclosures: Are they useful in determining environmental performance? *Journal of Accounting and Public Policy* 20: 217–240.

Hughes II, K. E. 2000. The value relevance of nonfinancial measures of air pollution in the electric utility industry. *The Accounting Review* 75 (2): 209–228.

IGEL/Knowledge@Wharton. 2012. *Special Report. Greening the Supply Chain: Best Practices and Future Trends*. Initiative for Global and Environmental Leadership and Knowledge@Wharton, June, 1–28. Available at: http://knowledge.wharton.upenn.edu/special-report/greening-the-supply-chain-best-practices-and-future-trends

Imbens, G., and J. Wooldridge. 2007. *What is New in Econometrics: Estimation of Average Treatment Effects Under Unconfoundedness. Lecture 1, Summer*. Cambridge, MA: National Bureau of Economic Research.

This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

*Firm-Value Effects of Carbon Emissions and Carbon Disclosures* 723

Institute of Chartered Accountants in England and Wales. 2004. *Information for Better Markets— Sustainability: The Role of Accountants*. London, U.K.: ICAEW.

International Auditing and Assurance Standards Board (IAASB). 2012. *Assurance Engagements on Greenhouse Gas Statements*. International Standard on Assurance Engagements No. 3410. New York, NY: International Federation of Accountants.

IRRCi/Trucost. 2009. *Carbon Risks and Opportunities in the S&P 500*. Investor Responsibility Research Center Institute and Trucost Plc. Available at: http://www.irrcinstitute.org/pdf/irrc_trucost_0906.pdf

Johnston, D. M., S. E. Sefcik, and N. S. Soderstrom. 2008. The value relevance of greenhouse gas emissions allowances: An exploratory study in the related United States $SO_2$ market. *European Accounting Review* 17: 747–764.

Johnston, J. S. 2005. *Signaling Social Responsibility: on the Law and Economics of Market Incentives for Corporate Environmental Performance. Scholarship At Penn Law*. Working paper 66, University of Pennsylvania Law School.

Khanna, T., K. G. Palepu, and S. Srinivasan. 2004. Disclosure practices of foreign companies interacting with U.S. markets. *Journal of Accounting Research* 42: 475–508.

Lennox, C. S., J. R. Francis, and Z. Wang. 2012. Selection models in accounting research. *The Accounting Review* 87 (2): 589–616.

Li, Y., G. B. Richardson, and D. B. Thornton. 1997. Corporate disclosure of environmental liability information: Theory and evidence. *Contemporary Accounting Research* (Fall): 435–474.

Maddala, G. S. 1983. *Limited-Dependent and Qualitative Variables in Econometrics*. New York, NY: Cambridge University Press.

Milgrom, P. R. 1981. Good news and bad news: Representation theorems and applications. *Bell Journal of Economics* (Autumn): 380–391.

Moser, D. V., and P. R. Martin. 2012. A broader perspective on corporate social responsibility research in accounting. *The Accounting Review* 87 (3): 797–806.

Myers, S. 1977. The determinants of corporate borrowings. *Journal of Financial Economics* 5: 147–175.

Ohlson, J. A. 1995. Earnings, book values, and dividends in equity valuation. *Contemporary Accounting Research* (Spring): 661–687.

Plumlee, M., D. Brown, R. Hayes, and S. Marshall. 2010. *Voluntary Environmental Disclosure Quality and Firm Value: Further Evidence*. Working paper, The University of Utah and Portland State University.

PricewaterhouseCoopers. 2012. *Do Investors Care About Sustainability? Seven Trends Provide Clues*. (March). New York, NY: PwC.

Rosenbaum, P. R. 2005. Observational study. In *Encyclopedia of Statistics in Behavioral Science*, Vol. 3, edited by B. S. Everitt, and D. C. Howell, 1451–1462. Chichester, PA: John Wiley & Sons, Ltd.

Sengupta, P. 1998. Corporate disclosure quality and cost of debt. *The Accounting Review* 73 (4): 459–474.

Sharfman, M. P., and C. S. Fernando. 2008. Environmental risk management and the cost of capital. *Strategic Management Journal* 29: 569–592.

Simnett, R., M. Nugent, and A. L. Huggins. 2009a. Developing an international assurance standard on greenhouse gas statements. *Accounting Horizons* 23 (4): 347–363.

Simnett, R., A. Vanstraelen, and W. F. Chua. 2009b. Assurance on sustainability reports: An international comparison. *The Accounting Review* 84 (3): 937–967.

Stanny, E. 2013. Voluntary disclosures of emissions by US firms. *Business Strategy and the Environment* 22 (3): 145–158.

Stanny, E., and K. Ely. 2008. Corporate environmental disclosures about the effects of climate change. *Corporate Social Responsibility and Environmental Management* 15: 338–348.

Stuart, E. A., and D. B. Rubin. 2008. Best practices in quasi-experimental designs: Matching methods for causal inference. In *Best Practices in Quantitative Methods*, edited by J. Osborne, 155–176. Thousand Oaks, CA: Sage Publications.

Thaler, R. H., and C. R. Sunstein. 2009. Saving the planet. In *Nudge: Improving Decisions About Health, Wealth, and Happiness*, 185–198. London, U.K.: Penguin Books.



This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
734
**SER 1330**

Case 2:24-cv-00801-ODW-PVC   Document 56-32   Filed 07/24/24   Page 32 of 32   Page ID #:6715

724 *Matsumura, Prakash, and Vera-Muñoz*

Tucker, J. W. 2010. Selection bias and econometric remedies in accounting and finance research. *Journal of Accounting Literature* 29: 31–57.

Vagus, S. 2012. Microsoft to adopt internal cap-and-trade practice for carbon emissions. *Hydrogen Fuel News* (May 14). Available at: http://www.hydrogenfuelnews.com/microsoft-to-adopt-internal-cap-and-trade-practice-for-carbon-emissions/853650

Verrecchia, R. 1983. Discretionary disclosure. *Journal of Accounting and Economics* 5: 179–194.

Walley, N., and B. Whitehead. 1994. It's not easy being green. *Harvard Business Review* (May-June): 46–52.

Wooldridge, J. 2002. *Econometric Analysis of Cross Section and Panel Data*. Cambridge, MA: The MIT Press.

Wooldridge, J. 2012. Treatment effect estimation with unconfounded assignment. *American Accounting Association/Financial Accounting and Reporting Section Workshop*, Chicago. Available at: http://www.ruf.rice.edu/~kr10/slides_fars_2012.pdf

Zhou, S., W. Green, and R. Simnett. 2012. *The Decision to Assure and Assurance Provider Choice: Evidence From the GHG Assurance Market*. Working paper, Australian School of Business.

Ziliak, S. T., and D. N. McCloskey. 2004. Significance redux. *The Journal of Socio-Economics* 33: 665–675.

---

## APPENDIX A

### Variable Definitions

| | | |
|---|---|---|
| *MKT* | = | market value of common equity at the end of the calendar year, calculated as: SHROUT * PRC (in $ millions), where (SHROUT * PRC) = common shares outstanding multiplied by price per share; |
| *TCO2* | = | total carbon emissions in metric tons for year *t* (in thousands); |
| *ASSET* | = | book value of the firm's total assets (AT) at the end of fiscal year *t* (in $ millions); |
| *LIAB* | = | book value of the firm's total liabilities (LT) at the end of fiscal year *t* (in $ millions); |
| *OPINC* | = | firm's operating income (in $ millions) after depreciation (OIADP) for fiscal year *t*; |
| *CNCRN* | = | number of damaging ratings (concerns) for the firm identified in KLD; |
| *STRNG* | = | number of proactive ratings (strengths) for the firm identified in KLD; |
| *PROPDISCL* | = | ratio of the number of firms in the two-digit SIC industry code with publicly available carbon emissions to the total number of firms in the industry in our sample; |
| *SIZE* | = | log of the firm's total assets at the end of the fiscal year; |
| *MF* | = | number of management forecasts issued by the firm during the year; |
| *BM* | = | firm's book-to-market ratio; |
| *LEV* | = | firm's leverage, measured as (DLTT + DLC)/(DLTT + DLC + CEQ); |
| *II* | = | percentage of total shares outstanding held by institutional investors, from the Thomson Reuters 13-F database; |
| *FRNSALE* | = | firm's foreign sales as a percentage of total sales for the year, from the Worldscope database; |
| *EPA* | = | an indicator variable equal to 1 if the firm operates in an industry that will be required by the EPA's GHG Mandatory Reporting Rule to report its GHG emissions, and 0 otherwise; and |
| *DISC_CDP* | = | an indicator variable equal to 1 if the firm discloses its carbon emissions to the CDP and to the public, and 0 otherwise. |

---


American Accounting Association

This content downloaded from
35.7.13.75 on Sun, 14 Jul 2024 19:04:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 32 to Decl. of Lyon
735
**SER 1331**

# Exhibit 21

# to Declaration of Thomas P. Lyon

# Employees' response to corporate greenwashing

Exhibit 21 to Decl. of Lyon
495
**SER 1332**



Received: 10 May 2022    Revised: 8 December 2022    Accepted: 18 December 2022

DOI: 10.1002/bse.3351

**RESEARCH ARTICLE**



# Employees' response to corporate greenwashing

Jennifer L. Robertson[1] |   A. Wren Montgomery[2] |   Timur Ozbilir[3]

[1]DAN Department of Management and Organizational Studies, Western University, London, ON, Canada

[2]Ivey Business School, Western University, London, ON, Canada

[3]The University of Toronto, Toronto, ON, Canada

**Correspondence**
Jennifer L. Robertson, DAN Department of Management and Organizational Studies, Western University, London, ON, Canada.
Email: jennifer.robertson@uwo.ca

**Funding information**
Social Sciences and Humanities Research Council, Grant/Award Number: 430-2016-00234

**Abstract**

Research on corporate greenwashing has expanded rapidly in recent years. At the same time, emerging studies in related literatures have found that employees are seeking out firms that are social and environmental leaders, and employee activism within firms is growing. However, the effect of firms' exaggeration and misrepresentation of environmental claims, or greenwashing, on their own employees has been overlooked. Accordingly, we investigate greenwashing from an organizational psychology lens, exploring the impact it can have on employees, and whether these effects differ for different types of employees. Using data collected at three separate time points from a sample of employees educated in environmental science/sustainability, our results show that greenwashing was positively related to perceptions of corporate hypocrisy, which in turn, resulted in higher turnover intentions. We also found that these relationships were moderated by employees' level of environmental education. By uncovering the deleterious effects greenwashing can have for employees, and by extension for their employers, these findings generate insights into the extent to which corporate environmental communications can backfire.

**KEYWORDS**

corporate hypocrisy, environmental communication, greenwashing, internal stakeholders, micro-CSR

## 1 | INTRODUCTION

In the spring of 2019, over 8700 Amazon employees signed an open letter to their CEO, Jeff Bezos, demanding the company to take concrete and equitable action on climate change. Posted online on Medium,[1] the letter was remarkable both in that it illustrated a growing role for employees as key activists and outspoken corporate stakeholders, but also because it was based on insider knowledge (Briscoe & Gupta, 2016) of the company's claimed environmental policies and practices. Although not using the term, the letter explicitly outlined several instances of Amazon's greenwashing,

pointing to empty promises on the firm's Shipment Zero plan, donations to climate-denying legislators and support for expanding and accelerating oil and gas extraction. With insider knowledge and the rare opportunity to look behind the "emerald curtain" of their employer's environmental communications, employees were not impressed.

Amazon, however, is by no means alone in their corporate greenwashing. According to Ogilvy and Mather, greenwashing is reaching "epidemic proportions" (Hsu, 2011), and studies have shown that 98% of products making green claims are based on various forms of greenwashing (TerraChoice, 2009). As green claims multiply rapidly in the corporate race towards ESG (environmental, social, governance) investing and "net zero" commitments, attention to and concern over greenwashing has become even more widespread. For example, U.K.-based non-profit InfluenceMap finds that over 55% of ESG funds exaggerated their claims and 70% failed to meet their ESG targets (Quinson, 2021). Similarly, commentators ranging from academics and

**Abbreviations:** CEO, Chief Executive Officer; CSR, Corporate Social Responsibility; ESG, Environmental, Social Governance.

[1]https://amazonemployees4climatejustice.medium.com/public-letter-to-jeff-bezos-and-the-amazon-board-of-directors-82a8405f5e38.

Exhibit 21 to Decl. of Lyon
496
**SER 1333**

**4016** | WILEY Business Strategy and the Environment

ROBERTSON ET AL.

practitioners to Greta Thunberg have expressed concern over rampant greenwashing in rapidly emerging net zero commitments (Black et al., 2021).

As incidents of greenwashing—formally defined as "any communication that misleads people into adopting overly positive beliefs about an organization's environmental performance, practices or products" (Lyon & Montgomery, 2015, p. 226)—have mushroomed in recent years, so too has academic research on the topic (see Lyon & Montgomery, 2015, and Gatti et al., 2019, for reviews). This work has focused on characterizing greenwashing (e.g., Delmas & Burbano, 2011; Seele & Gatti, 2017), estimating its prevalence (e.g., Coen et al., 2022; Kim & Lyon, 2011; Marquis et al., 2016), identifying its drivers (e.g., Alves, 2009; Delmas & Burbano, 2011; Kim & Lyon, 2015), and calculating its impacts on financial and sustainability outcomes (e.g., Flowers et al., 2020; Testa et al., 2018). The unintended negative consequences of greenwashing have also captured great scholarly interest, particularly with respect to how greenwashing can negatively impact the offending company's reputation and share price (e.g., Lyon & Montgomery, 2013; Testa et al., 2018; Walker & Wan, 2012), and to an even greater extent, consumers. For example, research has shown that greenwashing negatively affects consumers' trust in a product's or brand's claims about its environmental performance (Aji & Sutikno, 2015; Chen & Chang, 2013), brand evaluations, attitudes and purchases (Chang, 2011; Nyilasy et al., 2014; Parguel et al., 2011), product quality perceptions (Pancer & McShane, 2013), attitudes towards corporate advertisements and brands (Schmuck et al., 2018), participation in a company's green initiatives (Rahman et al., 2014), and integrity of communication judgements (De Jong et al., 2018).

Although the extant literature is rich and clearly identifies the negative impacts of greenwashing on external stakeholders, research investigating the impact of greenwashing on internal stakeholders is almost nonexistent. With the exception of a very recent study (e.g., Li et al., 2022), the effect of greenwashing on employees has not yet been considered—as of 2019, the most recent review of the greenwashing literature (Gatti et al., 2019) did not include a single study that examined the consequences of greenwashing for employees. This is surprising for several reasons. First, employees are aware of incidents of corporate greenwashing as indicated in the example of Amazon provided above. Second, employees are uniquely positioned for impact as internal, rather than external, stakeholders. For example,

employees as "institutional insiders" are emerging as important social movement activists from within the firm, potentially using internal pressures, resources and tactics to achieve change on pressing social and environmental issues (Briscoe & Gupta, 2016; DeCelles et al., 2020). At the same time, a growing body of research has found that employees, especially sought-after younger workers, are seeking meaningful work and are concerned about firms' social and environmental impacts (Burbano, 2016; Montgomery et al., 2020). Third, it is well documented within the organizational psychology literature, specifically micro-corporate social responsibility (CSR) research (see Gond et al., 2017 for a review), that much like consumers, employees are also affected by an organization's environmental actions and communications. Although most of the micro-CSR research has focused on employees' positive reactions, a handful of studies (e.g., Donia et al., 2017, 2019; Vlachos et al., 2010) have explored whether employees might react negatively to inauthentic CSR activity, while a couple other recent studies (e.g., Babu et al., 2020; Scheidler et al., 2019) have examined employees' response to corporate hypocrisy (Miao & Zhou, 2020). For these reasons, we assert that examining the impact of greenwashing on employees is both important and timely.

Accordingly, we draw upon theories within organizational behaviour, and micro-CSR more specifically, and integrate them with research on greenwashing to develop several hypotheses that seek to examine if employees are negatively impacted by greenwashing. We use a sample of employees who have an educational background in environmental science/sustainability as they would be more likely to be knowledgeable about actions that constitute corporate greenwashing. As such, they would be more likely to detect and, therefore, be affected by greenwashing. Further, we sought to determine whether differences exist in how employees who are highly sensitive to environmental matters (as indicated by their commitment to formal education in an environmentally-related area) react to greenwashing. Based on this sample, we hypothesize that greenwashing will be indirectly linked to higher turnover intentions through employees' perceptions of corporate hypocrisy. However, as higher levels of education (e.g., doctoral degree) indicate deeper levels of commitment to an area of study, we expect that the indirect effects of greenwashing will differ among employees with different levels of education in environmental sciences and/or sustainability (see Figure 1 for a depiction of our theoretical model).



FIGURE 1    Conceptual model

14353057, 2023, 7, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3331 by University Of Michigan Library, Wiley Online Library on [22/04/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 21 to Decl. of Lyon
497
SER 1334

ROBERTSON ET AL.                                                    Business Strategy and the Environment   WILEY  4017

By examining these hypotheses, we make several important theoretical and practical contributions. First, we extend the lens of the growing body of greenwashing research to an increasingly influential yet previously overlooked stakeholder group, namely employees. This is important because employees are proving to be an increasingly active and outspoken stakeholder group and are essential to consider in emerging research on the relationship between greenwashing and stakeholders. Second, we extend theory and research on micro-CSR. Although scholars have begun to recognize that employees react negatively to inauthentic CSR (e.g., Donia et al., 2017, 2019; Vlachos et al., 2010), the notion that greenwashing can have deleterious effects for employees has largely been overlooked. Third, we build on recent work that has examined the effects of corporate hypocrisy (e.g., Babu et al., 2020; Scheidler et al., 2019) by identifying greenwashing as an antecedent of employees' perceptions of hypocrisy. Fourth, by demonstrating that greenwashing indirectly impacts turnover intentions only for employees with a graduate degree in environmental science/sustainability, we reveal an important boundary condition. Finally, from a practical perspective, our findings provide important information that can be used to dissuade organizations from greenwashing in the first place, and interventions designed to help organizations redress their greenwashing activity may be developed. Further, suggestions for a business strategy that takes a more holistic approach to environmental governance and communication is inferred from our research.

## 2 | THEORETICAL DEVELOPMENT

### 2.1 | The impact of greenwashing on employees' perceptions of corporate hypocrisy

Research on micro-CSR has demonstrated that much like consumers, internal stakeholders respond to CSR activity. To date, however, this research has focused almost exclusively on employees' positive reactions. For example, employees' CSR perceptions have been positively linked to organizational commitment and identification (e.g., Kim et al., 2010; Turker, 2009), organizational citizenship behaviours (e.g., Rupp et al., 2013), job satisfaction (e.g., Valentine & Fleischman, 2008), job performance (e.g., Jones, 2010; Korschun et al., 2014), employee well-being (e.g., Ahmed et al., 2020), and employees' own engagement in environmental activities (e.g., Afsar et al., 2018; Tian & Robertson, 2019), amongst other positive outcomes (see Glavas, 2016, and Gond et al., 2017, for more detailed reviews). Further, research has shown that an organization's environmental infrastructure, culture, and management support are key drives of employees' environmental attitudes and behaviour (see Young et al., 2015, for a review).

The relationships between CSR and positive outcomes have been predominantly explained by social identity theory (Tajfel, 1978; Tajfel & Turner, 1985). According to this theory, employees' self-continuity and self-distinctiveness is reinforced when they perceive their organization as having high prestige and an attractive image, and

as a result, their self-enhancement needs are fulfilled (Brammer et al., 2014; Dutton et al., 1994; Hogg & Terry, 2000). More specifically, with respect to self-continuity, the social identity perspective suggests that an employee's positive self-concept is reinforced when the employee believes that their organization's values mirror their own (Brammer et al., 2014; Dutton et al., 1994; Hogg & Terry, 2000). In terms of self-distinctiveness, employees who work for socially responsible companies feel a sense of uniqueness because such companies are often seen as prestigious (Glavas & Godwin, 2013; Jones et al., 2014). More recently, May et al. (2015) have expanded this view by integrating the theory of the moral self (Shao et al., 2008) with social identity theory, suggesting that employees morally identify with their organization when they perceive that the organization exhibits ethical traits (May et al., 2015), which they interpret as reflecting their own social and moral identity and standing.

While an organization's CSR activities can lead to positive employee outcomes through social and moral identification, this relationship may turn negative when employees perceive a misalignment between the organization's social and moral value systems and their own (Scheidler et al., 2019). Such misalignment is likely to occur when employees perceive corporate greenwashing. Greenwashing often involves concealing unfavourable information and/or selectively disclosing favourable information about the organization's environmental performance (Lyon & Maxwell, 2011), making false claims about the environmental features of a product or service (Bradford, 2007) and issuing promises that the organization fails to live up to (Lyon & Montgomery, 2015). Such actions may be viewed as unethical, immoral, and in contrast to one's own social and moral identity and standing and, as such, may lead the employee to perceive the organization in a negative light. In particular, perceptions of greenwashing may evoke perceptions of corporate hypocrisy (Lyon & Montgomery, 2015; Scheidler et al., 2019; Walker & Wan, 2012); that is, employees who perceive a gap between their employer's environmental claims and actions may start to view their organization as hypocritical (i.e., when an organization wishes to appear as something it is not; Wagner et al., 2009).

Despite the emergence of research in recent years focusing on the impact of CSR strategy/initiatives on perceptions of corporate hypocrisy (e.g., Scheidler et al., 2019), no study to date has investigated the relationship between perceived greenwashing and perceived corporate hypocrisy specifically. At times, greenwashing has been referred to as a form or an extreme case of corporate hypocrisy (e.g., Balluchi et al., 2020; Seele & Gatti, 2017). In this study, we argue that perceived greenwashing is distinct from and an antecedent of perceived corporate hypocrisy. Perceived greenwashing refers to employees' subjective observations and evaluations of their organizations' environmentally related communications, whereas perceived corporate hypocrisy involves a moral judgment about the organization itself, triggered by perceptions of greenwashing. This is consistent with Wagner et al.'s (2009) assertion that a company's communication strategy affects perceptions of hypocrisy. If the communication strategy conflicts with corporate behaviours (i.e., relies on greenwashing), the sense of hypocrisy among stakeholders will likely increase

Exhibit 21 to Decl. of Lyon
498
SER 1335

0999KB, 2023, 7, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3331 by University Of Michigan Library, Wiley Online Library on [22/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**4018** | **WILEY** — Business Strategy and the Environment

(Miao & Zhou, 2020; Wagner et al., 2009). Employees, especially those who are knowledgeable about sustainability, are in a unique position as a stakeholder group to detect greenwashing behaviour and conclude that the organization is acting hypocritically (Brunsson, 1993). This is because of their role as institutional insiders allows them to compare their daily work experience with how the company is portrayed in the media (Scheidler et al., 2019). Therefore, we propose that greenwashing will lead to perceptions of corporate hypocrisy among employees.

> **Hypothesis 1.** *Employees' perceptions of greenwashing are positively associated with their perceptions of corporate hypocrisy*

## 2.2 | A moderated mediation model of corporate hypocrisy and environmental education

Perceptions of corporate hypocrisy among employees can be damaging to organizations. Given their insider status, employees are credible sources of CSR information for external stakeholders (Dawkins, 2004; Morsing et al., 2008; Scheidler et al., 2019). Although research on the impact of corporate hypocrisy on employee outcomes is scarce, the handful of studies on the topic suggest that employees' perceptions of corporate hypocrisy may result in turnover or turnover intentions (Allam et al., 2020; Greenbaum et al., 2015; Scheidler et al., 2019), or may influence employees' attitudes known to predict turnover, including emotional exhaustion (Scheidler et al., 2019), and organizational identification (Miao & Zhou, 2020).

The relationship between perceptions of corporate hypocrisy and turnover intentions can be explained in light of social and moral identity theory (Dutton et al., 1994; May et al., 2015; Tajfel, 1978). Employees who perceive their organization as hypocritical will likely view the organization as unattractive, and therefore, not identify with it because an image of hypocrisy will diminish an employee's sense of self-continuity and self-distinctiveness, and neglect to fulfil self-enhancement needs. Employees are unlikely to bask in the reflected glory of their hypocritical organizations, as feelings of pride or reward that arise from working for a prestigious organization (Dutton et al., 1994; Kim et al., 2010) are unlikely to develop in employees who work for greenwashing companies. In contrast, these employees are most likely to feel ashamed, cynical, and quite possibly ire, ultimately negatively impacting self-enhancement needs. Furthermore, employees who perceive their organization as hypocritical will have a hard time reconciling the reality with the desired ideal, resulting in a conflict between the organization's values and their own (Foreman & Whetten, 2002; Scheidler et al., 2019). Consequently, employees will likely seek a way to disassociate themselves from the organization (Philippe & Koehler, 2005), resulting in intentions to leave the organization all together. Therefore, it is plausible to expect that perceptions of corporate hypocrisy evoked by perceived greenwashing will lead to greater intention to quit among employees.

However, research on the effects of perceived organizational social and environmental responsibility on individual outcomes has demonstrated that the effects are contingent on individual characteristics (e.g., Miao & Zhou, 2020; Turker, 2009). Further, in their review of factors that affect environmental concern and behaviour, Gifford and Nilsson (2014) note that individuals are unlikely to be concerned about environmental issues if they know little to nothing about the issue. Drawing from these separate bodies of research, we expect that environmental education will be important in our context for a couple of reasons. First, education in a particular area results in more in-depth knowledge structures (i.e., mental templates imposed on environments to give them meaning; Walsh, 1995) about that area (Evans & Davis, 2011). As such, we expect formal educational training in environmental studies will sharpen a student's ability to distinguish greenwashing from substantive environmental claims. Second, being part of a community of students in a given area is expected to inculcate and reinforce a shared set of proenvironmental norms that would strengthen an employee's commitment to authentic environmental action. Therefore, we test our hypotheses on a sample of participants who have a degree in environmental science and/or sustainability who, we believe, will be more likely, compared to the general public, to detect greenwashing given their familiarity with the concepts.

Although it is reasonable to expect that all employees with a degree in environmental science and/or sustainability will be similar in perceiving greenwashing as hypocritical, their behavioural responses to hypocrisy may be contingent upon their level of education. According to social identity theory, people understand themselves in terms of self-categorization (Alvesson et al., 2008; Ashforth & Mael, 1989; Ellemers et al., 2003; Tajfel & Turner, 1979). One of the categories people use to classify themselves is occupation, suggesting that participation in an occupation builds one's identity (Kielhofner, 2008). Hence, an individual's occupational identity, described as the degree to which an individual's self-image is attached to their career (Kielhofner, 2008), is part of their overall social identity. Research (e.g., Ulfsdotter & Linde, 2014) has demonstrated that one of the main predictors of occupational identity is educational level. Those with a higher education level who have spent a long time in educational training tend to experience higher levels of occupational identity as they are likely to have adopted an associated culture and ideology (Becker & Carper, 1956; Ulfsdotter & Linde, 2014). Consequently, compared to employees with an undergraduate/college degree in environmental science and/or sustainability, employees with a graduate degree would be expected to experience higher levels of stress and social and moral disidentification when they are faced with a value incongruence between themselves and their organization triggered by their perceptions of corporate hypocrisy (Miao & Zhou, 2020; Scheidler et al., 2019). In support of this assertion, previous research has demonstrated that the importance of CSR to the individual—often self-reported—moderates the relationship between CSR perceptions and employee outcomes, such as organizational identification (Miao & Zhou, 2020). Pursuing a graduate degree in environmental science and/or sustainability would constitute a more

10999836, 2023, 7, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3331 by University Of Michigan Library, Wiley Online Library on [22/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 21 to Decl. of Lyon
499
**SER 1336**

ROBERTSON ET AL.

Business Strategy and the Environment **WILEY** | 4019

0990836, 2025, 3, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3331 by University Of Michigan Library, Wiley Online Library on [22/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

objective measure of the importance of CSR to the individual as self-report measures may be subject to socially desirable responding (Vesely & Klöckner, 2020). Therefore, we hypothesize:

> **Hypothesis 2.** *The relationship between perceived corporate hypocrisy and turnover intentions is moderated by environmental education, such that it is stronger for higher levels of education.*

Given the proposed relationships between perceived greenwashing, perceived corporate hypocrisy, and turnover intentions, environmental education could also moderate the mediation of corporate hypocrisy, demonstrating a model of moderated mediation. Thus:

> **Hypothesis 3.** *The mediating effect of perceived corporate hypocrisy is moderated by environmental education, such that the indirect effect of perceived greenwashing on turnover intentions via perceived corporate hypocrisy is stronger for higher levels of education.*

# 3 | METHOD

## 3.1 | Sample and procedure

To recruit participants with an environmentally related degree, we used two methods. First, we recruited a sample of employed adults by having the Development and Alumni Relations Office of an environmental science and sustainability program at an American University advertise our recruitment ad to their alumni. To supplement this and increase our sample size, we recruited through social media (e.g., Facebook and LinkedIn) and a professional association to which the first author has ties. Participants recruited through these methods were asked if they held an environmentally related degree, and if so, indicate the type of degree they achieved (e.g., Bachelor of Environmental Science).

To minimize common method bias, we collected data at three time points, separated by two-week intervals (Podsakoff et al., 2012; Spector, 2019). In our analyses, we use data on demographic variables, including level of education, and perceived greenwashing collected at time 1, corporate hypocrisy at time 2, and turnover intentions at time 3. Within all three surveys, participants were instructed to select specific responses (e.g., please select "strongly disagree") on certain questions to ensure quality data and safeguard against random responding (DeSimone et al., 2015). After eliminating participants who failed the attention check questions in any survey, and then matching remaining participants' surveys across time periods, we retained a sample of 205 participants.

Of the total, 54.1% of the participants were female, most were Caucasian (62.9%), and on average 34.03 years old ($SD = 8.55$). Participants had been employed in their organizations for an average of 5.91 years ($SD = 4.79$) and worked an average of 40.71 ($SD = 4.09$) hours per week. Of the total, 11.2% held a college/technical diploma,

45.9% held an undergraduate degree, 39% held a master's degree, and 3.9% held a doctoral degree.

## 3.2 | Measures

### 3.2.1 | Perceptions of greenwashing

Consistent with research on the effects of CSR on employees, we opted to measure greenwashing through employees' perceptions rather than attempting to measure it in an "objective" manner because, much like CSR activity (e.g., Tian & Robertson, 2019), greenwashing is "in the eye of the beholder" (Gatti et al., 2019, p. 8). As such, perceptions of it may differ between employees. An established scale measuring perceived *organizational* greenwashing could not be located. Thus, we adapted and modified Chen and Chang's (2013) measure of consumer perceptions of *product* greenwashing. Sample items include "My organization makes misleading claims about its environmental activities" and "My organization exaggerates its environmental achievements." Participants responded to this measure on a scale of 1 (*strongly disagree*) to 5 (*strongly agree*). The internal consistency was .95.

### 3.2.2 | Perceptions of corporate hypocrisy

We measured employees' perceptions of corporate hypocrisy using three items from the six-item scale developed by Wagner et al. (2009). Consistent with previous research on corporate hypocrisy (e.g., Miao & Zhou, 2020; Scheidler et al., 2019), the reverse coded items were dropped from the scale. A sample item is "My organization pretends to be something that it is not." The response scale ranged from 1 (*strongly disagree*) to 7 (*strongly agree*). The internal consistency was .94.

### 3.2.3 | Environmental education

Participants were asked about the highest level of education they achieved: College/technical diploma, undergraduate degree, master's degree, or doctoral degree. The four levels of education were grouped into two categories to test the moderation hypotheses. College technical diploma and undergraduate degree were combined to create the first group (Undergraduate degree), and master's and doctoral degrees were combined to create the second group (Graduate degree).

### 3.2.4 | Turnover intentions

Participants responded to Kelloway et al.'s (1999) measure of turnover intentions (e.g., "I am thinking about leaving my organization") on a scale of 1 (*strongly disagree*) to 5 (*strongly agree*). The internal consistency was .92.

Exhibit 21 to Decl. of Lyon
500
**SER 1337**

**4020** | WILEY  ROBERTSON ET AL.

### 3.2.5 | Control variables

Since several demographic characteristics have been linked to a more proenvironmental orientation, such as age, and gender (Gifford & Nilsson, 2014), which may account for employees being more affected by greenwashing activity, we controlled for these variables in our analyses. Further, because stakeholders may be more affected by greenwashing activity conducted by organizations operating in certain industries (Torelli et al., 2020), we also controlled for type of industry.

### 3.3 | Analyses

For hypothesis testing, we used ordinary least squares path analysis as implemented by Hayes' (2018) PROCESS macro for SPSS (Model 14—moderated mediation). Controlling for age, gender, and industry, we used different time points for our variables of interest (i.e., time 1 greenwashing predicts time 3 turnover intentions, mediated by perceived corporate hypocrisy at time 2) to minimize common method

bias. Unstandardized regression coefficients are reported for all analyses. Descriptive data, reliability coefficients, and intercorrelations for all variables appear in Table 1.

## 4 | RESULTS

As expected, perceived greenwashing was positively associated with perceived corporate hypocrisy ($b = 1.07$, $p < .001$, 95% CI = [0.95, 1.20]). Hypothesis 1 was supported. Hypothesis 2 predicted that environmental education would moderate the relationship between perceived corporate hypocrisy and turnover intentions. Consistent with Hayes' (2018) recommendation to focus on the interaction effect and probe the interaction to determine the effect of the independent variable at varying levels of the moderator, we do not report the main effect of perceived corporate hypocrisy on turnover intentions. Rather, we first report the interaction effects between perceived corporate hypocrisy and turnover intentions and then report the effects of perceived corporate hypocrisy at the two different levels of environmental education. Results from these analyses (Table 2)

**TABLE 1**  Means, standard deviations, correlations, and reliabilities

|  | M | SD | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| 1. Age | 34.03 | 8.55 |  |  |  |  |  |  |  |
| 2. Gender | 1.55 | .51 | −.12 |  |  |  |  |  |  |
| 3. Industry | 10.39 | 3.36 | .11 | −.204** |  |  |  |  |  |
| 4. Education level | 1.43 | .50 | .273** | .243** | −.189** |  |  |  |  |
| 5. Greenwashing | 2.66 | 1.28 | −.05 | −.263** | .07 | −.348** | (.95) |  |  |
| 6. Perceived corporate hypocrisy | 3.62 | 1.80 | −.12 | −.262** | .176* | −.319** | .787** | (.94) |  |
| 7. Turnover intentions | 2.12 | 1.02 | −.174* | .239** | −.140* | .162* | −.176* | −.09 | (.92) |

*Note:* Bold typeface denotes reliability coefficients.
*$p < .05$.**$p < .01$.

| Path | Symbol | Estimate | SE | t | p | LLCI | ULCI |
|---|---|---|---|---|---|---|---|
| **Mediation** |  |  |  |  |  |  |  |
| GW → CH | a | 1.073 | .062 | 17.320 | <.001 | 0.951 | 1.195 |
| CorHyp → turn | b | −0.388 | .137 | −2.828 | .005 | −0.658 | −0.117 |
| GW → turn | c′ | −0.128 | .087 | −1.466 | .144 | −0.300 | −0.044 |
| **Indirect effects** |  |  |  |  |  |  |  |
| Undergrad | a * b1 | −0.051 | .076 |  |  | −0.204 | 0.095 |
| Grad | a * b2 | 0.314 | .103 |  |  | 0.102 | 0.513 |
| **Conditional effects** |  |  |  |  |  |  |  |
| CH * EE → TO | - | 0.340 | .087 | 3.908 | <.001 | 0.169 | 0.512 |
| CH → TO (undergrad) | b1 | −0.048 | .071 | −0.671 | .503 | −0.187 | 0.092 |
| CH → TO (grad) | b2 | 0.293 | .080 | 3.665 | <.001 | 0.135 | 0.451 |
| IMM |  | 0.365 | .114 |  |  | 0.141 | 0.586 |

**TABLE 2**  Results of the moderated mediation analysis, PROCESS Model l4 ($N = 205$)

*Note:* LLCI and ULCI values represent bias corrected 95% confidence intervals. GW = Greenwashing, CH = Perceived Corporate Hypocrisy, EE = Environmental Education, TO = Turnover, Undergrad = Undergraduate/College, Grad = Graduate.

Exhibit 21 to Decl. of Lyon
501
**SER 1338**

19990838, 2023, 7, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3331 by University Of Michigan Library, Wiley Online Library on [25/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Case: 25-5327, 10/16/2025, DktEntry: 19.6, Page 155 of 296

ROBERTSON ET AL. Business Strategy and the Environment —WILEY | **4021**

demonstrate that the interaction effect of environmental education on the relationship between perceived corporate hypocrisy and turnover intentions was significant ($b = .34$, $p < .01$, 95% CI = [0.17, 0.51]), with conditional effects revealing that perceived corporate hypocrisy was positively related to turnover intentions for employees with a graduate degree ($b = .29$, $p < .01$, 95% CI = [0.14, 0.45]) but was not significantly associated with turnover intentions for employees with a college or undergraduate degree ($b = −.048$, $p = .50$, 95% CI = [−0.19, 0.09]). Thus, Hypothesis 2 was supported. The results are presented in Table 2 and Figure 2.

Finally, Hypothesis 3 predicted that environmental education would moderate the indirect effect of perceived corporate hypocrisy. The index of moderated mediation indicated that environmental education moderated the indirect effect of perceived corporate hypocrisy in the relationship between greenwashing and turnover intentions ($b = .37$, 95% CI = [0.14, 0.59]). The indirect effect of perceived corporate hypocrisy was significant for those with a graduate degree ($b = .31$, 95% CI = [0.10, 0.51]), but not for those with a college or undergraduate degree ($b = −.05$, 95% CI = [−0.20, 0.10]). For those with a graduate degree, perceived corporate hypocrisy fully mediated the relationship between perceived greenwashing and turnover intentions. Hypothesis 3, therefore, was supported. The results are presented in Table 2 and Figure 3.

## 5 | DISCUSSION

Given the fact that greenwashing activity has reached "epidemic proportions" (Hsu, 2011), it behooves scholarly research to investigate its negative effects. Although research in marketing is increasingly uncovering the impact of greenwashing on external stakeholders (i.e., consumers), with the exception of a single recent study (e.g., Li et al., 2022), the effect of greenwashing on internal stakeholders (i.e., employees) has not yet been fully considered. This is especially timely and relevant as a large body of research (i.e., micro-CSR) now documents that employees react to their organizations' social and environmental actions.

Accordingly, we sought to expand and integrate the research on greenwashing with the organizational psychology research on micro-CSR by examining how perceived greenwashing negatively affects employees' perceptions of their employer and their behavioural intentions. Using a sample of employees who were educated in environmental science and/or sustainability, we found that perceived greenwashing was positively related to perceived corporate hypocrisy. Furthermore, perceived greenwashing was associated with turnover intentions via perceptions of corporate hypocrisy for employees who held a graduate degree (i.e., master's or doctoral) in environmental science and/or sustainability. For employees with an undergraduate



**FIGURE 2**    Interaction of perceived corporate hypocrisy and environmental education



**FIGURE 3**    Results of the moderated mediation analysis, PROCESS Model 14

Exhibit 21 to Decl. of Lyon
502
**SER 1339**

10999836, 2023, 7, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3351 by University Of Michigan Library, Wiley Online Library on [23/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**4022** | WILEY — Business Strategy and the Environment

ROBERTSON ET AL.

degree (or college/technical diploma), perceived greenwashing was related to perceived corporate hypocrisy but not turnover intentions.

We extend theory and research on greenwashing and micro-CSR in several ways. First, our findings contribute to the greenwash literature by extending the focus of the negative impact of this phenomenon beyond external stakeholders to internal stakeholders, specifically to employees. Examining the impact of greenwashing on employees is important as employees are often the first to become aware of discrepancies between their organizations' CSR communications and actions. Employees' perceptions of greenwashing can be damaging to organizations not only because such perceptions may potentially lead to negative attitudes and behaviours towards the organization but also because employees are considered a credible source of company-related information for external stakeholders (Morsing et al., 2008). By focusing on employees, we provide a more comprehensive understanding of the impacts of greenwashing, as well as the negative effects greenwashing can have on *all* stakeholder groups.

Second, we address a gap in the CSR literature, which has focused largely on employees' positive reactions to CSR, by examining the deleterious effects greenwashing can have on employees. The emphasis on positive outcomes of CSR in research may have mistakenly created the false assumption that any corporate prosocial or environmental activity is good for personnel management (Donia & Sirsly, 2016). Our research begins to dispel this myth by providing evidence that greenwashing represents a dark side of CSR activity that negatively affects certain employees' perceptions (i.e., hypocrisy) of their organization and their workplace attitudes (i.e., turnover intentions).

Third, we build on recent work that has investigated the effects of corporate hypocrisy (e.g., Babu et al., 2020; Miao & Zhou, 2020; Scheidler et al., 2019) by identifying greenwashing as an antecedent of perceived corporate hypocrisy. Within the literature, greenwashing has been referred to as a form or extreme case of corporate hypocrisy (e.g., Balluchi et al., 2020). While this may be true in the sense that hypocritical companies often use greenwashing as a way to deceive stakeholders, we believe it is important to understand the difference between the two concepts when examining their impact on employee outcomes. In this paper, perceived greenwashing refers to employees' observations and evaluations regarding their employer's environmentally-related communications, whereas perceived corporate hypocrisy refers to a moral judgment made by employees about their organization as a whole. Indeed, our findings demonstrate that perceived greenwashing is an antecedent of corporate hypocrisy, such that employees who perceive their employers as greenwashing are likely to think of them as hypocritical.

Fourth, our findings on the moderating role of educational level in the mediated link between greenwashing and turnover intentions builds upon very nascent research that is beginning to identify boundary conditions to the deleterious effects of greenwashing on firms (Torelli et al., 2020). More specifically, we found that perceived greenwashing led to perceptions of hypocrisy regardless of educational level; however, there was a positive association between perceived hypocrisy and turnover intentions for those with a graduate level

training but not for those with lower levels of environmental education. These results provide an understanding of which employee groups organizations should be concerned about their greenwashing activity affecting. Further, this important boundary condition around educational level deserves future study and consideration in the impacts of greenwashing, suggesting that other stakeholders' reactions to greenwashing, such as consumers, investors, and policymakers may also hinge on their level of education and knowledge about sustainability.

Fifth, our findings surrounding the moderating effect of education level informs personnel recruitment and selection. Prior research suggests that many firms engage in symbolic management, decoupling what they say and what they do, often with apparently little penalty for doing so (Delmas & Montes-Sancho, 2010; Westphal & Zajac, 1998). Specifically, recent work has suggested that firms can gain competitive advantage by greening themselves in order to attract higher-quality employees at a lower cost (Brekke & Nyborg, 2008; Burbano, 2016; Nyborg & Zhang, 2013). Our study finds an important but previously unexplored boundary conditions for the success of such strategies, and in particular, on the extent to which firms engaging in them rely on employees with specialized training in an area with strong prosocial norms. Instead, strategists must reconsider that while firms pursuing this approach may reap some short-term gains, they also face risks by engaging in greenwashing practices. Such practices can negatively affect employees' perceptions of the organization. As a result, businesses that seek to differentiate themselves using a greening strategy, and hire employees with training and expertise in this area, must be careful to "walk the talk" and engage in substantive rather than purely symbolic management if they hope to achieve a sustainable competitive advantage.

Finally, our study brings together emerging insights from greenwashing with important new academic and practitioner insights on the growing role of internal stakeholders and employees' activism in influencing firm activities (Briscoe & Gupta, 2016). As stated at the outset, with employee activism growing, and our study's findings that employees are negatively impacted by perceived greenwashing, it stands to reason that employees may become stirred to take either internal steps towards change or public and external action when they detect that their firm is greenwashing. Firms making broad and sweeping claims on ESG and net-zero will be well served to ensure that employees understand and can verify that these commitments are genuine and material. In turn, social movements and activists may wish to better understand employees' education levels and training and the types of campaigns (DeCelles et al., 2020) that may engage these potentially integral internal change agents.

## 5.1 | Practical implications

Practically speaking, our research provides useful knowledge about why organizations might be dissuaded from greenwashing, thereby reducing the social and environmental harm that arises from it. Greenwashing can negatively impact employees—to the extent that

Exhibit 21 to Decl. of Lyon
503
**SER 1340**

19990876, 2023, 7, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3331 by University Of Michigan Library, Wiley Online Library on [12/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

ROBERTSON ET AL.

**Business Strategy and the Environment**—**WILEY**⌐ **4023**

15353966, 2023, 7, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3331 by University Of Michigan Library, Wiley Online Library on [12/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

they might consider leaving the organization—and presumably by extension hurt corporate performance. Further, it is possible that employees may publicize their employer's greenwashing activity as a retaliatory response, which in turn, may result in more deleterious effects, such as product boycotting and incurred environmental sanctions and fines.

By empirically demonstrating the detrimental impact of greenwashing on employees, our research highlights the need for well-balanced communication and management strategies that are both externally and internally focused. Companies should be aware that inadequate and inconsistent communication of green activities to employees may make it difficult for employees to gain a complete understanding of their company's environmental goals and programs, resulting in unfavourable evaluations of the company's overall environmental engagement (Falchi et al., 2022; Heras-Saizarbitoria et al., 2020, Huang et al., 2022). On the other hand, a heavy emphasis on external activities, especially in the absence of a strong internal environmental strategy, may cause employees to question the motives of the company (de Vries et al., 2015; Scheidler et al., 2019), contributing to employees' negative perceptions. Therefore, companies would benefit from adopting a more holistic approach to environmental governance by fostering stronger collaboration between CSR and HR departments and creating committees where employees from all functions in the organization are represented. Such an approach would not only increase corporate disclosure by ensuring that information about green activities is communicated widely within the organization, but also minimize the potential for negative perceptions by engaging employees in the decision-making process.

Our finding that employees can detect their company's greenwashing indicates that companies should exercise caution with respect to their green communications to ensure clarity and transparency. Stakeholders often approach CSR communication with scepticism (Coombs & Holladay, 2013), which suggests that employees may suspect greenwashing regardless of the company's intentions or even when it is absent by objective criteria (Balluchi et al., 2020; de Vries et al., 2015; Seele & Gatti, 2017; Suchman., 1995). There is growing research evidence (e.g., Forehand & Grier, 2003; Terwel et al., 2009) demonstrating that one of the main determinants of how stakeholders perceive green communication is their attributions regarding the organization's motive for engaging in environmental activities. For example, de Vries et al. (2015) demonstrated in several experiments that suspicions of greenwashing were reduced when companies acknowledged relatively more self-interested economic motives instead of communicating purely altruistic motives. Therefore, companies should think carefully about how they communicate their motives to internal stakeholders in the most transparent manner. To avoid pitfalls in green communication, managers can use assessment tools (e.g., Nemes et al., 2022) to systematically evaluate claims for potential greenwashing and as a guide to avoid greenwashing in environmental communications.

Further, an organization accused of greenwashing should demonstrate ways in which the company has altered its environmental communications and/or practices to be more authentic. Organizations whose employees perceive the company as greenwashing might well

benefit from using a third-party medium (e.g., the media or an environmental certification) to communicate that their environmental practices are genuine. Third-party communication has been shown to be evaluated more positively than messages from sources internal to the organization (Skard & Thorbjornsen, 2014). Thus, using a third-party medium may alter employees' sceptical perceptions of their organizations' greening activity.

Finally, our findings point to the importance of monitoring employees' perceptions towards corporate environmental activities and communications. Most companies tend not to include employee related metrics in their environmental and social governance reporting (Bianchi et al., 2022). Moreover, research shows that employee related metrics often do not factor into environmental decision-making as much as economic pressures and top management's commitment (Lisi., 2018). Our study suggests that monitoring employee level indicators would not only help companies improve their environmental communication but also provide opportunities for companies to address the potential scepticism among employees, which might lead to negative behaviours.

## 5.2 | Limitations and future research

Several limitations affect our research. Importantly, we cannot draw causal conclusions from our data. Thus, experimental research that manipulates levels of greenwashing is encouraged. Following Burbano (2016), experimental field research that utilizes an online labour market in which employees are hired to do temporary work for a fictitious organization may be one way to provide causal evidence for the deleterious effects of greenwashing.

Further, although we believe the use of our data represents a robust test of our hypotheses, particularly given Spector's (2019) recommendation that cross-sectional designs are acceptable when researching a new area in which it has not yet been established if X and Y covary, as is the case for our research, our inability to conduct longitudinal tests remains a limitation. We, therefore, encourage future research to use stronger longitudinal designs.

Our study focuses on employees' perceptions of greenwashing, which are evoked when there is a gap between the reality and the perception induced in the employee by corporate communications (Balluchi et al., 2020; Walker & Wan, 2012). Through greenwashing, organizations attempt to communicate something that does not exist in reality, or that exists only in part, or that exists but not as it is communicated (Walker & Wan, 2012). However, in some cases the communication can still be considered as credible by stakeholders. Conversely, legitimate communications regarding environmental performance may be perceived as greenwashing by stakeholders for various reasons, including a general cynicism towards CSR communication (Illia et al., 2013), and a lack of visibility with regard to CSR initiatives (Jauernig & Valentinov, 2019). Future research should consider these factors that can shape employees' perceptions of greenwashing so that organizations can adopt a communication strategy that is hypocrisy avoidant.

Exhibit 21 to Decl. of Lyon
504
**SER 1341**

**4024** | WILEY — Business Strategy and the Environment

We encourage future studies to identify other potential negative outcomes of greenwashing. Looking to the marketing, economics, and managerial literature on greenwashing may be fruitful in this regard. For example, within the marketing literature it has been shown that product greenwashing affects consumers' participation in a company's green initiatives (e.g., Rahman et al., 2014). Extending this suggests greenwashing may affect employees' engagement in their organization's CSR initiatives, as well as their proenvironmental behaviour. Further, we encourage future studies to examine other mechanisms, such as organizational identification, through which greenwashing exerts its effects. It would also be fruitful to examine other boundary conditions to the negative effects of greenwashing by examining if greenwashing affects other employee groups differently (e.g., full versus part time or temporary employees). Future research could also examine how greenwashing affects other internal stakeholders, such as job seekers. Finally, research should examine how other forms of CSR may backfire. For example, research has begun to examine "brownwashing," a phenomenon in which companies understate their environmental performance (Kim & Lyon, 2015; Robertson et al., 2017). It may be the case that when organizations implement environmental policies and practices, but publicly de-emphasize their success (i.e., brownwash), employees will lack an understanding of whether or not supporting environmental initiatives is valued or effective.

## 6 | CONCLUSION

The goal of this research was to contribute to the literature on greenwashing and micro-CSR by investigating the impact of perceived greenwashing on employees' perceptions of corporate hypocrisy and turnover intentions amongst a sample of employees with an educational background in an environmentally related area. We found that greenwashing indirectly leads to greater turnover intentions for employees with higher levels of environmental education. Our findings provide important insights into the psychological effects of this phenomenon—insights that contribute to our understanding of how corporate environmental actions can backfire and have deleterious effects on some employees. Overall, our research provides compelling evidence to dissuade corporate greenwashing activity. Certainly, Amazon discovered their employees' concerns over the company's greenwashing claims the hard way in 2019 and made significant changes aligned with employees demands afterwards, promising to eliminate carbon emissions by 2040 (Briscoe & Gupta, 2021). But as Tariq Fancy, BlackRock's former chief investment officer of Sustainable Investing, continues to publicly call the company to account over its deception and the financial industry's "greenwashing" (Fancy, 2021), firms must reconsider employees as a key stakeholder—and one not to be trifled with—when contemplating greenwashing.

## ACKNOWLEDGEMENTS

This manuscript draws on research supported by the Social Sciences and Humanities Research Council (grant number 430-2016-00234).

The authors gratefully acknowledge Dr. Thomas Lyon for his contributions to this research.

## ORCID

*Jennifer L. Robertson* https://orcid.org/0000-0001-9402-9629

## REFERENCES

Afsar, B., Cheema, S., & Javed, F. (2018). Activating employee's pro-environmental behaviors: The role of CSR, organizational identification, and environmentally specific servant leadership. *Corporate Social Responsibility and Environmental Management*, 25, 904–911. https://doi.org/10.1002/csr.1506

Ahmed, M., Zehou, S., Raza, S. A., Qureshi, M. A., & Yousufi, S. Q. (2020). Impact of CSR and environmental triggers on employee green behavior: The mediating effect of employee well-being. *Corporate Social Responsibility and Environmental Management*, 27, 2225–2239. https://doi.org/10.1002/csr.1960

Aji, H. M., & Sutikno, B. (2015). The extended consequence of greenwashing: Perceived consumer skepticism. *International Journal of Business and Information*, 10, 433–468.

Allam, I., Scagnelli, S., & Corazza, L. (2020). Sustainability reporting, a new type of companies' hypocrisy: Zara and Volkswagen cases. In B. Díaz Díaz, N. Capaldi, S. O. Idowu, & R. Schmidpeter (Eds.), *Responsible business in a changing world: CSR, sustainability, ethics and governance* (pp. 195–211). Springer. https://doi.org/10.1007/978-3-030-36970-5_12

Alves, I. (2009). Green spin everywhere: How greenwashing reveals the limits of the CSR paradigm. *Journal of Global Change and Governance*, I/1, 1–12.

Alvesson, M., Ashcraft, K. L., & Thomas, R. (2008). Identity matters: Reflections on the construction of identity subjugation in organization studies. *Organization*, 15(1), 5–28.

Ashforth, B. E., & Mael, F. (1989). Social identity theory and the organization. *Academy of Management Review*, 14, 20–39.

Babu, N., De Roeck, K., & Raineri, N. (2020). Hypocritical organizations: Implications for employee social responsibility. *Journal of Business Research*, 114, 376–384. https://doi.org/10.1016/j.jbusres.2019.07.034

Balluchi, F., Lazzini, A., & Torelli, R. (2020). CSR and greenwashing: A matter of perception in the search for legitimacy. In *Accounting, accountability and society*. Springer. https://doi.org/10.2139/ssrn.3721199

Becker, H., & Carper, J. W. (1956). The development of identification with an occupation. *The American Journal of Sociology*, 61, 289–298.

Bianchi, G., Testa, F., Tessitore, S., & Iraldo, F. (2022). How to embed environmental sustainability: The role of dynamic capabilities and managerial approaches in a life cycle management perspective. *Business Strategy and the Environment*, 31(1), 312–325. https://doi.org/10.1002/bse.2889

Black, R., Smith, S., & Hale, T. (2021). The conversation. Retrieved September 2021, from https://theconversation.com/net-zero-despite-the-greenwash-its-vital-for-tackling-climate-change-160329

Bradford, R. (2007). *Greenwash Confronted: Misleading Advertisement Regulation in the EU and its Member States*. Friends of the Earth Europe.

Brammer, S., He, H., & Mellahi, K. (2014). Corporate social responsibility, employee organizational identification, and creative effort: The moderating impact of corporate ability. *Group & Organization Management*, 40, 323–352.

Brekke, K. A., & Nyborg, K. (2008). Attracting responsible employees: Green production as labor market screening. *Resource and Energy Economics*, 30(4), 509–526.

Briscoe, F., & Gupta, A. (2016). Social activism in and around organizations. *Academy of Management Annals*, 10(1), 671–727. https://doi.org/10.5465/19416520.2016.1153261

19990836, 2023, 7, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3331 by University of Michigan Library, Wiley Online Library on [22/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 21 to Decl. of Lyon
505
**SER 1342**

ROBERTSON ET AL.  **WILEY** ⎮ **4025**

Briscoe, F., & Gupta, A. (2021, Winter). Business disruption from the inside out. *Stanford Social Innovation Review*, 19(1), 48–54.

Brunsson, N. (1993). The necessary hypocrisy. *Thunderbird International Business Review*, 35(1), 1–9.

Burbano, V. C. (2016). Social responsibility messages and worker wage requirements: Field experimental evidence from online labor marketplaces. *Organization Science*, 27(4), 1010–1028. https://doi.org/10.1287/orsc.2016.1066

Chang, C. (2011). Feeling ambivalent about going green. *Journal of Advertising*, 40, 19–32. https://doi.org/10.2753/JOA0091-3367400402

Chen, Y. S., & Chang, C. H. (2013). Greenwash and green trust: The mediation effects of green consumer confusion and green perceived risk. *Journal of Business Ethics*, 114, 489–500. https://doi.org/10.1007/s10551-012-1360-0

Coen, D., Herman, K., & Pegram, T. (2022). Are corporate climate efforts genuine? An empirical analysis of the climate 'talkwalk' hypothesis. *Business Strategy and the Environment*, 31, 3040–3059. https://doi.org/10.1002/bse.3063

Coombs, T., & Holladay, S. J. (2013). The pseudo-panopticon: The illusion created by CSR-related transparency and the internet. *Corporate Communications*, 18(2), 212–227. https://doi.org/10.1108/13563281311319490

Dawkins, J. (2004). Corporate responsibility: The communication challenge. *Journal of Communication Management*, 9(2), 108–119. https://doi.org/10.1108/13632540510621362

De Jong, M. D., Harkink, K. M., & Barth, S. (2018). Making green stuff? Effects of corporate greenwashing on consumers. *Journal of Business and Technical Communication*, 32, 77–112. https://doi.org/10.1177/1050651917729863

de Vries, G., Terwel, B. W., Ellemers, N., & Daamen, D. D. L. (2015). Sustainability or profitability? How communicated motives for environmental policy affect public perceptions of corporate greenwashing. *Corporate Social Responsibility and Environmental Management*, 22(3), 142–154. https://doi.org/10.1002/csr.1327

DeCelles, K. A., Sonenshein, S., & King, B. G. (2020). Examining anger's immobilizing effect on institutional insiders' action intentions in social movements. *Administrative Science Quarterly*, 65(4), 847–886. https://doi.org/10.1177/0001839219879646

Delmas, M. A., & Burbano, V. C. (2011). The drivers of greenwashing. *California Management Review*, 54, 64–87. https://doi.org/10.1525/cmr.2011.54.1.64

Delmas, M. A., & Montes-Sancho, M. J. (2010). Voluntary agreements to improve environmental quality: Symbolic and substantive cooperation. *Strategic Management Journal*, 31, 575–601.

DeSimone, J. A., Harms, P. D., & DeSimone, A. J. (2015). Best practice recommendations for data screening. *Journal of Organizational Behavior*, 36, 171–181. https://doi.org/10.1002/job.1962

Donia, M. B., Ronen, S., Sirsly, C. A. T., & Bonaccio, S. (2019). CSR by any other name? The differential impact of substantive and symbolic CSR attributions on employee outcomes. *Journal of Business Ethics*, 157, 503–523. https://doi.org/10.1007/s10551-017-3673-5

Donia, M. B., & Sirsly, C. A. T. (2016). Determinants and consequences of employee attributions of corporate social responsibility as substantive or symbolic. *European Management Journal*, 34, 232–242. https://doi.org/10.1016/j.emj.2016.02.004

Donia, M. B., Sirsly, C. A. T., & Ronen, S. (2017). Employee attributions of corporate social responsibility as substantive or symbolic: Validation of a measure. *Applied Psychology*, 66, 103–142. https://doi.org/10.1111/apps.12081

Dutton, J. E., Dukerich, J. M., & Harquail, C. V. (1994). Organizational images and member identification. *Administrative Science Quarterly*, 39, 239–263. https://doi.org/10.2307/2393235

Ellemers, N., Alexander, S. H., Michael, J. P., & van Knippenberg, D. (2003). Social identity at work: Developments, debates, direction. In A.

Haslam, et al. (Eds.), *Social identity at work. Developing theory for organizational practice*. Psychology Press.

Evans, W. R., & Davis, W. D. (2011). An examination of perceived corporate citizenship, job applicant attraction, and CSR work role definition. *Business & Society*, 50, 456–480. https://doi.org/10.1177/0007650308323517

Falchi, A., Grolleau, G., & Mzoughi, N. (2022). Why companies might under-communicate their efforts for sustainable development and what can be done? *Business Strategy and the Environment*, 31(5), 1938–1946. https://doi.org/10.1002/bse.2991

Fancy, T. (2021, March 16). USA Today. Retrieved from https://www.usatoday.com/story/opinion/2021/03/16/wall-street-esg-sustainable-investing-greenwashing-column/6948923002/

Flowers, M. E., Matisoff, D. C., & Noonan, D. S. (2020). In the LEED: Racing to the top in environmental self-regulation. *Business Strategy and the Environment*, 29(6), 2842–2856. https://doi.org/10.1002/bse.2547

Forehand, M. R., & Grier, S. (2003). When is honesty the best policy? The effect of stated company intent on consumer skepticism. *Journal of Consumer Psychology*, 13, 349–356. https://doi.org/10.1207/S15327663JCP1303_15

Foreman, P., & Whetten, D. A. (2002). Members' identification with multiple-identity organizations. *Organization Science*, 13(6), 618–635. https://doi.org/10.1287/orsc.13.6.618.493

Gatti, L., Seele, P., & Rademacher, L. (2019). Grey zone in–greenwash out. A review of greenwashing research and implications for the voluntary-mandatory transition of CSR. *International Journal of Corporate Social Responsibility*, 4, 6. https://doi.org/10.1186/s40991-019-0044-9

Gifford, R., & Nilsson, A. (2014). Personal and social factors that influence pro-environmental concern and behaviour: A review. *International Journal of Psychology*, 49, 141–157. https://doi.org/10.1002/ijop.12034

Glavas, A. (2016). Corporate social responsibility and organizational psychology: An integrative review. In A. Glavas, C. R. Willness, & D. A. Jones (Eds.), *Corporate Social Responsibility and Organizational Psychology: Quid Pro Quo* (pp. 21–33). Frontiers Media.

Glavas, A., & Godwin, L. N. (2013). Is the perception of 'goodness' good enough? Exploring the relationship between perceived corporate social responsibility and employee organizational identification. *Journal of Business Ethics*, 114, 15–27. https://doi.org/10.1007/s10551-012-1323-5

Gond, J. P., El Akremi, A., Swaen, V., & Babu, N. (2017). The psychological microfoundations of corporate social responsibility: A person-centric systematic review. *Journal of Organizational Behavior*, 38, 225–246. https://doi.org/10.1002/job.2170

Greenbaum, R. L., Mawritz, M. B., & Piccolo, R. F. (2015). When leaders fail to "walk the talk" supervisor undermining and perceptions of leader hypocrisy. *Journal of Management*, 41(3), 929–956. https://doi.org/10.1177/0149206312442386

Hayes, A. F. (2018). *Introduction to mediation, moderation, and conditional process analysis: A regression-based approach* (Second ed.). Guilford Press.

Heras-Saizarbitoria, I., Boiral, O., Allur, E., & García, M. (2020). Communicating environmental management certification: Signaling without signals? *Business Strategy and the Environment*, 29(2), 422–431. https://doi.org/10.1002/bse.2374

Hogg, M. A., & Terry, D. J. (2000). The dynamic, diverse, and variable faces of organizational identity. *Academy of Management Review*, 25, 150–152. https://doi.org/10.5465/amr.2000.27711645

Hsu, T. (2011). Skepticism grows over products touted as eco-friendly. Los Angeles Times, May 21.

Huang, Y., Francoeur, C., & Brammer, S. (2022). What drives and curbs brownwashing? *Business Strategy and the Environment*, 31(5), 2518–2532. https://doi.org/10.1002/bse.3041

14759974, 2023, 7, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3331 by University Of Michigan Library, Wiley Online Library on [22/09/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 21 to Decl. of Lyon
506
**SER 1343**

**4026** | WILEY Business Strategy and the Environment

ROBERTSON ET AL.

Illia, L., Zyglidopoulos, S. C., Romenti, S., Rodriguez-Canovas, B., & del Valle Brena, A. G. (2013). Communicating corporate social responsibility to a cynical public. *MIT Sloan Management Review*, *54*, 15–18.

Jauernig, J., & Valentinov, V. (2019). CSR as hypocrisy avoidance: A conceptual framework. *Sustainability Accounting, Management and Policy Journal*, 10(1), 2–25. https://doi.org/10.1108/SAMPJ-05-2018-0141

Jones, D. A. (2010). Does serving the community also serve the company? Using organizational identification and social exchange theories to understand employee responses to a volunteerism programme. *Journal of Occupational and Organizational Psychology*, *83*, 857–878. https://doi.org/10.1348/096317909X477495

Jones, D. A., Willness, C. R., & Madey, S. (2014). Why are job seekers attracted by corporate social performance? Experimental and field tests of three signal-based mechanisms. *Academy of Management Journal*, *57*, 383–404. https://doi.org/10.5465/amj.2011.0848

Kelloway, E. K., Gottlieb, B. H., & Barham, L. (1999). The source, nature, and direction of work and family conflict: A longitudinal investigation. *Journal of Occupational Health Psychology*, *4*, 337–346. https://doi.org/10.1037/1076-8998.4.4.337

Kielhofner, G. (2008). *Model of human occupation: Theory and application*. Lippincott Williams & Wilkins.

Kim, E.-H., & Lyon, T. P. (2011). Strategic environmental disclosure: Evidence from the DOE's voluntary greenhouse gas registry. *Journal of Environmental Economics and Management*, *61*, 311–326. https://doi.org/10.1016/j.jeem.2010.11.001

Kim, E.-H., & Lyon, T. P. (2015). Greenwash vs. brownwash: Exaggeration and undue modesty in corporate sustainability disclosure. *Organization Science*, *26*, 705–723. https://doi.org/10.1287/orsc.2014.0949

Kim, H.-R., Lee, M., Lee, H.-T., & Kim, N.-M. (2010). Corporate social responsibility and employee–company identification. *Journal of Business Ethics*, *95*, 557–569. https://doi.org/10.1007/s10551-010-0440-2

Korschun, D., Bhattacharya, C. B., & Swain, S. D. (2014). Corporate social responsibility, customer orientation, and the job performance of frontline employees. *Journal of Marketing*, *78*, 20–37. https://doi.org/10.1509/jm.11.0245

Li, W., Li, W., Seppänen, V., & Koivumäki, T. (2022). How and when does perceived greenwashing affect employees' job performance? Evidence from China. *Corporate Social Responsibility and Environmental Management*, 29(5), 1722–1735. https://doi.org/10.1002/csr.2321

Lisi, I. E. (2018). Determinants and performance effects of social performance measurement systems. *Journal of Business Ethics*, 152(1), 225–251. https://doi.org/10.1007/s10551-016-3287-3

Lyon, T. P., & Maxwell, J. W. (2011). Greenwash: Corporate environmental disclosure under threat of audit. *Journal of Economics and Management Strategy*, 20, 3–41. https://doi.org/10.1111/j.1530-9134.2010.00282.x

Lyon, T. P., & Montgomery, A. W. (2013). Tweetjacked: The impact of social media on corporate greenwash. *Journal of Business Ethics*, 118, 747–757. https://doi.org/10.1007/s10551-013-1958-x

Lyon, T. P., & Montgomery, A. W. (2015). The means and end of greenwash. *Organization and Environment*, 28, 223–249. https://doi.org/10.1177/1086026615575332

Marquis, C., Toffel, M. W., & Zhou, Y. (2016). Scrutiny, norms, and selective disclosure: A global study of greenwashing. *Organization Science*, 27, 483–504. https://doi.org/10.1287/orsc.2015.1039

May, D. R., Chang, Y. K., & Shao, R. (2015). Does ethical membership matter? Moral identification and its organizational implications. *Journal of Applied Psychology*, 100(3), 681–694. https://doi.org/10.1037/a0038344

Miao, Q., & Zhou, J. (2020). Corporate hypocrisy and counterproductive work behavior: A moderated mediation model of organizational identification and perceived importance of CSR. *Sustainability*, 12, 1847. https://doi.org/10.3390/su12051847

Montgomery, A. W., Wolske, K., & Lyon, T. P. (2020). The Millenial 'meh': Correlated groups as collective agents in the automobile field. *Journal of Management Studies*, 58(3), 673–717. https://doi.org/10.1111/joms.12606

Morsing, M., Schultz, M., & Nielsen, K. U. (2008). The 'Catch 22' of communicating CSR: Findings from a Danish study. *Journal of Marketing Communications*, 14(2), 97–111. https://doi.org/10.1080/13527260701856608

Nemes, N., Scanlan, S. J., Smith, P., Smith, T., Aronczyk, M., Hill, S., Lewis, S. L., Montgomery, A. W., Tubiello, F. N., & Stabinsky, D. (2022). An integrated framework to assess greenwashing. *Sustainability (Basel, Switzerland)*, 14(8), 4431. https://doi.org/10.3390/su14084431

Nyborg, K., & Zhang, T. (2013). Is corporate social responsibility associated with lower wages? *Environmental and Resource Economics*, 55, 107–117. https://doi.org/10.1007/s10640-012-9617-8

Nyilasy, G., Gangadharbatla, H., & Paladino, A. (2014). Perceived greenwashing: The interactive effects of green advertising and corporate environmental performance on consumer reactions. *Journal of Business Ethics*, 125, 693–707. https://doi.org/10.1007/s10551-013-1944-3

Pancer, E., & McShane, L. (2013). Gauging greenwashing and questioning quality: The unintended effects of environmental claims on perceptions of product effectiveness. In T. Meyvis & R. Ragunathan (Eds.), *Advances in consumer psychology (Vol. 5)*. Society for Consumer Psychology.

Parguel, B., Benoît-Moreau, F., & Larceneux, F. (2011). How sustainability ratings might deter 'greenwashing': A closer look at ethical corporate communication. *Journal of Business Ethics*, 102, 15–28. https://doi.org/10.1007/s10551-011-0901-2

Philippe, T. W., & Koehler, J. W. (2005). A factor analytical study of perceived organizational hypocrisy. *SAM Advanced Management Journal*, 70(2), 13–20.

Podsakoff, P. M., MacKenzie, S. B., & Podsakoff, N. P. (2012). Sources of method bias in social science research and recommendations on how to control it. *Annual Review of Psychology*, 65, 539–569. https://doi.org/10.1146/annurev-psych-120710-100452

Quinson, S. (September 1, 2021). Regulators intensify ESG scrutiny as greenwashing explodes. Bloomberg Green. Retrived from: https://www.bloomberg.com/news/articles/2021-09-01/regulatory-scrutiny-of-esg-greenwashing-is-intensifying

Rahman, I., Park, J., & Gen-qing Chi, C. (2014). Consequences of "greenwashing": Consumers' reactions to hotels' green initiatives. *International Journal of Contemporary Hospitality Management*, 27, 1064–1081.

Robertson, J. L., Montgomery, A. W., & Lyon, T.P. (2017). The causes, methods and consequences of brownwashing. Ivey Sustainability Conference, Richard Ivey School of Business, Western University.

Rupp, D. E., Shao, R., Thornton, M. A., & Skarlicki, D. P. (2013). Applicants' and employees' reactions to corporate social responsibility: The moderating effects of first-party justice perceptions and moral identity. *Personnel Psychology*, 66, 895–933. https://doi.org/10.1111/peps.12030

Scheidler, S., Edinger-Schons, L. M., Spanjol, J., & Wieseke, J. (2019). Scrooge posing as Mother Teresa: How hypocritical social responsibility strategies hurt employees and firms. *Journal of Business Ethics*, 157, 339–358. https://doi.org/10.1007/s10551-018-3788-3

Schmuck, D., Matthes, J., & Naderer, B. (2018). Misleading consumers with green advertising? An affect–reason–involvement account of greenwashing effects in environmental advertising. *Journal of Advertising*, 47, 127–145. https://doi.org/10.1080/00913367.2018.1452652

Seele, P., & Gatti, L. (2017). Greenwashing revisited: In search of a typology and accusation-based definition incorporating legitimacy strategies. *Business Strategy and the Environment*, 26, 239–252. https://doi.org/10.1002/bse.1912

10990836, 2023, 7, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3351 by University Of Michigan Library, Wiley Online Library on [22/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 21 to Decl. of Lyon

507

**SER 1344**

ROBERTSON ET AL.



**WILEY** | 4027

Shao, R., Aquino, K., & Freeman, D. (2008). Beyond moral reasoning: A review of moral identity research and its implications for business ethics. *Business Ethics Quarterly*, *18*(4), 513–540. https://doi.org/10.5840/beq200818436

Skard, S., & Thorbjørnsen, H. (2014). Is publicity always better than advertising? The role of brand reputation in communicating corporate social responsibility. *Journal of Business Ethics*, *124*, 149–160. https://doi.org/10.1007/s10551-013-1863-3

Spector, P. E. (2019). Do not cross me: Optimizing the use of cross-sectional designs. *Journal of Business and Psychology*, *34*, 125–137. https://doi.org/10.1007/s10869-018-09613-8

Suchman, M. C. (1995). Managing legitimacy: Strategic and institutional approaches. *The Academy of Management Review*, *20*(3), 571. https://doi.org/10.2307/258788

Tajfel, H. (1978). Social categorization, social identity, and social comparison. In H. Tajfel (Ed.), *Differentiation between social groups: Studies in the social psychology of intergroup relations* (pp. 61–76). Academic Press.

Tajfel, H., & Turner, J. C. (1979). An integrative theory of inter-group conflict. In W. G. Austin & S. Worchel (Eds.), *The social psychology of intergroup relations* (pp. 33–47). Brooks/Cole.

Tajfel, H., & Turner, J.-C. (1985). The social identity theory of intergroup behaviour. In S. Worchel & W. G. Austin (Eds.), *Psychology of intergroup relations* (pp. 7–24). Nelson Hall.

TerraChoice. (2009). The Seven Sins of Greenwashing. Retrieved from http://sinsofgreenwashing.org/findings/greenwashing-report-2009/ on June 2012.

Terwel, B. W., Harinck, F., Ellemers, N., & Daamen, D. D. L. (2009). How organizational motives and communications affect public trust in organizations: The case of carbon dioxide capture and storage. *Journal of Environmental Psychology*, *29*, 290–299. https://doi.org/10.1016/j.jenvp.2008.11.004

Testa, F., Miroshnychenko, I., Barontini, R., & Frey, M. (2018). Does it pay to be a greenwasher or a brownwasher? *Business Strategy and the Environment*, *27*(7), 1104–1116. https://doi.org/10.1002/bse.2058

Tian, Q., & Robertson, J. L. (2019). How and when does perceived CSR affect employees' engagement in voluntary pro-environmental behavior? *Journal of Business Ethics*, *155*, 399–412. https://doi.org/10.1007/s10551-017-3497-3

Torelli, R., Balluchi, F., & Lazzini, A. (2020). Greenwashing and environmental communication: Effects on stakeholders' perceptions. *Business Strategy and the Environment*, *29*(2), 407–421. https://doi.org/10.1002/bse.2373

Turker, D. (2009). Measuring corporate social responsibility: A scale development study. *Journal of Business Ethics*, *85*, 411–427. https://doi.org/10.1007/s10551-008-9780-6

Ulfsdotter, E. Y., & Linde, M. (2014). Being or doing a profession: Work as a matter of social identity. *The International Journal of Interdisciplinary Cultural Studies*, *8*, 33–43.

Valentine, S., & Fleischman, G. (2008). Ethics programs, perceived corporate social responsibility and job satisfaction. *Journal of Business Ethics*, *77*, 159–172. https://doi.org/10.1007/s10551-006-9306-z

Vesely, S., & Klöckner, C. A. (2020). Social desirability in environmental psychology research: Three meta-analyses. *Frontiers in Psychology*, *11*, 1395. https://doi.org/10.3389/fpsyg.2020.01395

Vlachos, P. A., Theotokis, A., & Panagopoulos, N. G. (2010). Sales force reactions to corporate social responsibility: Attributions, outcomes, and the mediating role of organizational trust. *Industrial Marketing Management*, *39*, 1207–1218. https://doi.org/10.1016/j.indmarman.2010.02.004

Wagner, T., Lutz, R. J., & Weitz, B. A. (2009). Corporate hypocrisy: Overcoming the threat of inconsistent corporate social responsibility perceptions. *Journal of Marketing*, *73*, 77–91.

Walker, K., & Wan, F. (2012). The harm of symbolic actions and greenwashing: Corporate actions and communications on environmental performance and their financial implications. *Journal of Business Ethics*, *109*, 227–242. https://doi.org/10.1007/s10551-011-1122-4

Walsh, J. P. (1995). Managerial and organizational cognition: Notes from a trip down memory lane. *Organization Science*, *6*, 280–321. https://doi.org/10.1287/orsc.6.3.280

Westphal, J. D., & Zajac, E. J. (1998). The symbolic management of stockholders: Corporate governance reforms and shareholder reactions. *Administrative Science Quarterly*, *43*, 127–153. https://doi.org/10.2307/2393593

Young, W., Davis, M., McNeill, I. M., Malhotra, B., Russell, S., Unsworth, K., & Clegg, C. W. (2015). Changing behaviour: Successful environmental programmes in the workplace. *Business Strategy and the Environment*, *24*, 689–703. https://doi.org/10.1002/bse.1836

**How to cite this article:** Robertson, J. L., Montgomery, A. W., & Ozbilir, T. (2023). Employees' response to corporate greenwashing. *Business Strategy and the Environment*, *32*(7), 4015–4027. https://doi.org/10.1002/bse.3351

0990836, 2023, 7, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3351 by University Of Michigan Library, Wiley Online Library on [25/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 21 to Decl. of Lyon
508
**SER 1345**

# Exhibit 20

# to Declaration of Thomas P. Lyon

# Two interventions for mitigating the harms of greenwashing on consumer perceptions

Exhibit 20 to Decl. of Lyon

472

**SER 1346**



Received: 14 February 2023 | Revised: 28 June 2023 | Accepted: 12 July 2023

DOI: 10.1002/bse.3520

**RESEARCH ARTICLE**



# Two interventions for mitigating the harms of greenwashing on consumer perceptions

Ravi Dutta-Powell ⦿ | Joshua J. Rhee ⦿ | Saul Wodak

The Behavioural Insights Team, Sydney, New South Wales, Australia

**Correspondence**
Ravi Dutta-Powell, The Behavioural Insights Team, Suite 3, L12, 309 Kent St, Sydney, New South Wales 2000, Australia.
Email: ravi.dutta.powell@gmail.com

**Funding information**
This work was funded by Clean State, an environmental NGO based in Western Australia.

**Abstract**

Growing demand for environmentally friendly products has led to an increase in companies exaggerating their environmental credentials, a practice commonly referred to as "greenwashing." To identify the impact of greenwashing and to test potential interventions, we designed an online experiment featuring a series of three advertisements featuring hypothetical companies. A representative sample of 2352 participants were randomised into a control group or one of two intervention groups. Intervention groups saw either a literacy or prebunking intervention, both designed to enable participants to identify common greenwashing strategies. We find that greenwashing is effective—participants were significantly more likely to agree that fictional companies in greenwashed ads had higher green credentials compared with companies depicted in nongreenwashed ads. This effect was most pronounced for those with higher levels of self-reported environmental concern. We also find that our interventions reduce the impact of greenwashing—participants in both intervention groups rated the green credentials of companies with greenwashed ads significantly lower than participants in the control group. This effect appears to be driven partly by increasing general scepticism of the green credentials of firms and partly by increasing scepticism specifically towards greenwashed claims.

**KEYWORDS**
green advertising, greenwashing, misinformation, perceived greenwashing

## 1 | INTRODUCTION

Climate change is an existential threat requiring urgent action to minimise the risk of associated harm. As consumer awareness of climate change has increased, so too has the market for environmentally friendly products. However, this growing demand for environmentally friendly products has also led to a parallel increase in companies attempting to take advantage of the trend by exaggerating or overstating their environmental credentials, a practice commonly referred to as "greenwashing."

"Greenwashing" has a range of definitions, but in general, it involves making claims about the environmental practices of a company or the environmental sustainability of a product or service, which are either unable to be substantiated or are actively misleading (see, e.g., Lyon & Montgomery, 2015; Parguel et al., 2011; Seele & Gatti, 2017; TerraChoice, 2010). It can include a variety of communications strategies and practices that create false positive perceptions of an entity's environmental performance. Importantly, greenwashing includes both intentionally and unintentionally misleading consumers. It is distinct from green advertising or green marketing, when companies promote products or services based on legitimate environmental benefits. Research has highlighted the existence of greenwashing in both developed (Coen et al., 2022; Heras-Saizarbitoria et al., 2020; Wedari et al., 2021; Zharfpeykan, 2021)

**Abbreviation:** NGO, non-government organisation.
Ravi Dutta-Powell, Joshua J. Rhee, and Saul Wodak are members of The Behavioural Insights Team.

Exhibit 20 to Decl. of Lyon
473
SER 1347

DUTTA-POWELL ET AL.

Business Strategy and the Environment **WILEY** | **883**

10990836, 2024, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3520 by University Of Michigan Library, Wiley Online Library on [29/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

and developing countries (Rahman & Nguyen-Viet, 2022; Yang et al., 2020). Importantly, the problem of greenwashing appears to be increasing over time, with multiple studies over a range of time periods calling out a steady rise in greenwashing (Delmas & Burbano, 2011; Nemes et al., 2022).

A significant strand of previous work on greenwashing has focused on categorising and classifying greenwashing (de Freitas Netto et al., 2020; Gallicano, 2011; Gatti et al., 2019; TerraChoice, 2010), as well as attempting to estimate its pervasiveness (Coen et al., 2022; Marquis et al., 2016). From this work and from our scan of the media, we identified a number of different types of greenwashing. Given that there is a wide diversity of environmental claims that could be the subject of greenwashing, as well as many methods for greenwashing, we chose to focus on two of the more prevalent types of greenwashing as they relate to climate change and carbon emissions: (1) *misrepresenting core business* (Nemes et al., 2022) and (2) *promoting individual responsibility* (Supran & Oreskes, 2021). Misrepresenting core business involves organisations making a specific environmental claim, which distracts audience attention from the environmental impact of the organisations' wider operations. The most common form of misrepresenting core business involves promoting vague or scientifically disputable net zero emissions goals—for example, fossil fuel companies promoting efforts to reduce emissions in their operational offices or car fleets while ignoring the fact that the majority of emissions is generated by the use of their products.

Promoting individual responsibility involves encouraging individuals to take action to mitigate climate change. While individual actions by consumers and citizens play an important role in mitigating climate change, their contribution to global emissions pales in comparison with the impact that large corporations have. For instance, the 2018 fossil fuel emissions from Australia's six top coal carbon majors alone were equivalent to the whole of Australia's domestic emissions (Moss & Fraser, 2019).

This study has several key contributions to the literature. First, we identify the impact of greenwashing, including identifying whether those with a greater level of concern for the environment are more or less impacted by greenwashing. Second, in line with Fernandes et al. (2020), we test the impact of potential literacy interventions and extend this to include a prebunking intervention from the disinformation literature. To this, we designed an online experiment to compare a series of three advertisements featuring hypothetical companies. Participants in our study were randomised into a control group or one of two intervention groups, and their perceptions of the environmental credentials of the companies associated with the three ads were measured. The two intervention groups received a short intervention designed to highlight common strategies used by companies when they attempt to greenwash, both drawn from the disinformation literature—a literacy intervention and a prebunking intervention. Notably, our study involves a representative sample of 2352 Australians—an order of magnitude more participants than most extant greenwashing studies, and involves adults that are

representative of the broader population (as opposed to undergraduate university students).

## 2 | BACKGROUND AND LITERATURE REVIEW

### 2.1 | Strategies to combat greenwashing

Research on how to protect consumers from greenwashing has typically focused either on the role of public shaming through NGOs (Berrone et al., 2017; Elhajjar & Dekhili, 2015; Markham et al., 2014) or direct government intervention (Feinstein, 2013; Gatti et al., 2019; Riccolo, 2021). Recent research has also highlighted technological solutions—for example, one study found that blockchain technology could be used to protect consumers against product-level greenwashing (Nygaard & Silkoset, 2022). Outside of these two focus areas, there has been relatively little work done to identify strategies for combating greenwashing. However, greenwashing can be considered a type of misinformation, and thus, one way to combat it may be to draw on insights from the misinformation literature.

When approaching greenwashing as misinformation, literacy interventions have received the most empirical attention to date out of the greenwashing specific interventions (Eng et al., 2021; Fernandes et al., 2020; Mather et al., 2001). Literacy interventions typically seek to increase knowledge and understanding of the underlying concepts and techniques used by those putting out misinformation. Notably, there is some overlap with interventions that are designed to improve advertising literacy, which seeks to educate consumers about techniques used by advertisers to persuade consumers, and interventions designed to increase literacy with respect to potential misinformation (Jeong et al., 2012; Malmelin, 2010; Spielvogel & Terlutter, 2013).

Results demonstrate that the effects of literacy interventions are mixed—for example, text-based literacy tips do appear to increase individuals' ability to classify an advertisement as deceptive and are made more effective when engagement with information is increased by presenting one tip per screen or with an interactive quiz delivered after the information is presented. However, interventions appear to be less effective when customers are faced with the increased cognitive load of having to decide between different products (Fernandes et al., 2020). Similarly, when participants are quizzed on their ability to identify greenwashing after initial exposure to an informative text, their self-confidence in identifying greenwashing lowers—despite the fact that this method of knowledge consolidation through quizzing seems effective in increasing literacy (Naderer & Opree, 2021).

Another approach common in other misinformation spaces is prebunking, which seeks to help people recognise and resist subsequently encountered misinformation, even if it is novel (Ecker et al., 2022). The key idea of prebunking is to expose individuals to small amounts of misinformation in order to "build up" their resistance

Exhibit 20 to Decl. of Lyon
474
**SER 1348**

**884** | **WILEY** Business Strategy and the Environment

DUTTA-POWELL ET AL.

to more sinister strains of misinformation. While this specific intervention has not previously been applied to the context of greenwashing, prebunking strategies have been used effectively to mitigate the impacts of COVID-19 and climate change misinformation (Basol et al., 2021; Maertens et al., 2020). They appear to work in part by reducing the perceived reliability of misinformation (Maertens et al., 2021). Therefore, we develop our first two hypotheses:

> **Hypothesis 1.** Interventions that use literacy or prebunking will lead to consumers having lower perceptions of green credentials for companies engaged in greenwashing.

> **Hypothesis 2.** Interventions that use literacy or prebunking will lead to consumers viewing environmental claims as having lower reliability.

## 2.2 | The impact of greenwashing

A major strand of research has attempted to identify the impacts of greenwashing on consumers. A number of studies have argued that greenwashing may have potential negative effects on firms when it is correctly identified by consumers (Akturan, 2018; Berrone et al., 2017; H. Chen et al., 2019; Y.-S. Chen & Chang, 2013; Mangini et al., 2020; Nyilasy et al., 2014; Szabo & Webster, 2021; Torelli et al., 2020) and may even impact employee retention (Robertson et al., 2023). However, many consumers rely on heuristics and mental shortcuts when making judgements (Tversky & Kahneman, 1974), and as such are not likely to deeply evaluate claims made in advertisements. This means that greenwashing could be effective at swaying consumers to purchase less environmentally friendly products if they are unable to accurately identify instances of greenwashing—indeed, it appears that some types of greenwashing can be highly effective at confusing consumers, even those with higher levels of environmental knowledge (Parguel et al., 2015; Schmuck et al., 2018).

In contrast, some researchers have argued that knowledge of environmental issues is likely to lead to better environmental choices (Kim et al., 2016), and indeed, the concept underpinning a literacy intervention is the idea that by increasing consumer knowledge and understanding, we can combat misinformation. One open question is whether the individual's underlying concern about the environment will impact their susceptibility to greenwashing and to greenwashing interventions—on the one hand, increased concern for the environment is associated with greater environmental knowledge (Pagiaslis & Krontalis, 2014), meaning they should be less susceptible to greenwashing and gain less benefits from any interventions. On the other hand, this presupposes that they are accurately able to identify greenwashing in the first place—if instead they are not able to identify it, then it may in fact be the case that they are more susceptible to greenwashing and they are more likely to benefit from our

interventions (Schmuck et al., 2018). Given that there has been a significant growth in greenwashing over time, it is highly likely that consumers are not effectively identifying greenwashing.

A broader concern of greenwashing is that it may lead to a "crowding-out" effect, whereby consumers may perceive that sufficient progress is being taken to mitigate climate change, and thus, this might lead to lower support for greater action by governments or industry to combat climate change (Werfel, 2017). Recent research has suggested that while individual climate change mitigation behaviour does not have this crowding-out effect (Carrico, 2021; Lacroix et al., 2022; Maki et al., 2019; Sparkman et al., 2021; Willis & Schor, 2012), it is unclear whether this extends to perceptions of industry and/or government behaviour on climate change. Hence, we put forward a third hypothesis:

> **Hypothesis 3.** Consumers who see greenwashed ads, without any intervention, will express lower support for governments and businesses to take action to mitigate climate change.

## 3 | METHOD

A total of 2352 participants were recruited via an online panel provider (Pureprofile) during April 2022. A representative sampling procedure was applied that stratified across the same age and sex subgroupings used in the most recently available Australian census and sampled participants in each subgroup in proportion to the national adult population (see Table 1 for sample demographics). After collecting demographics and a measure of environmental concern (described in Section 3.1), we randomly assigned participants to one of the three conditions. The control group received no intervention, while the other two groups received interventions designed to combat greenwashing. The two interventions were a prebunking intervention and a literacy intervention.

Prior to completing the main task, participants in the two intervention conditions were first shown introductory text:

> "Greenwashing" is the practice of organisations misleading consumers by presenting themselves as more environmentally friendly than they actually are.
> Consumers today are increasingly concerned about the environmental impact caused by the products or services that they either directly or indirectly consume.
> Many organisations whose core business practices have detrimental impacts on the environment have become increasingly wary of these consumer concerns about the environment, and look for ways to acknowledge them without changing their core business practices. These organisations often use advertising or messaging tactics to mislead consumers about the environmental benefits of the products or services they provide. This allows organisations to acknowledge these consumer concerns without changing their core business practices.

19990X0X, 2024, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3530 by University Of Michigan Library, Wiley Online Library on [29/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 20 to Decl. of Lyon
475
**SER 1349**

DUTTA-POWELL ET AL.

Business Strategy and the Environment

WILEY | 885

10990836, 2024, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3520 by University Of Michigan Library, Wiley Online Library on [29/09/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**TABLE 1**   Sample demographics.

| | Treatment condition | | | |
|---|---|---|---|---|
| | Control | Literacy | Prebunking | Total |
| Gender | | | | |
| Male | 393 | 379 | 392 | 1164 |
| Female | 385 | 396 | 405 | 1186 |
| Age | | | | |
| 18–24 | 83 | 99 | 96 | 278 |
| 25–29 | 70 | 61 | 76 | 207 |
| 30–34 | 78 | 78 | 70 | 226 |
| 35–39 | 70 | 63 | 72 | 205 |
| 40–44 | 72 | 69 | 62 | 203 |
| 45–49 | 68 | 65 | 73 | 206 |
| 50–54 | 61 | 63 | 65 | 189 |
| 55–59 | 62 | 68 | 57 | 187 |
| 60–64 | 57 | 55 | 56 | 168 |
| 65+ | 159 | 154 | 170 | 483 |
| Economic conservatism | 3.97 (1.50) | 3.99 (1.48) | 4.04 (1.51) | 4.00 (1.50) |
| Social conservatism | 3.77 (1.66) | 3.85 (1.73) | 3.85 (1.64) | 3.82 (1.67) |
| Environmental concern | 5.50 (1.31) | 5.44 (1.34) | 5.39 (1.38) | 5.44 (1.34) |

Participants in the Literacy Intervention condition were then presented with further information on the two forms of greenwashing we selected for the trial:

While greenwashing can come in a number of different forms, two practices that are commonly used include:
1. Misrepresenting the company's core business; and
2. Promoting an individual's responsibility for environmental sustainability (instead of the organisation's actions and responsibility).
The next few pages will go through each of these in more detail, and how they may be misleading.

After reading this section, participants were presented with a more detailed description of each form of greenwashing, alongside a mock-up ad portraying it (see Appendix A).

Participants in the Prebunking Intervention condition were not presented with descriptions of the two forms of greenwashing in advance. Instead, immediately after reading the introductory text, they were asked to select one advertisement (out of a selection of three) that they thought would be most effective in achieving a specified greenwashing goal. Response validation logic was used to only allow participants to advance to the next screen when they selected the advertisement that corresponds to the specific form of greenwashing that serves the motivation described. Participants who chose an incorrect option were informed that their answer was incorrect and were asked to select a different option before they could proceed. Once participants selected the appropriate response option,

they were provided immediate feedback on why the specific advertisement was misleading. No specific feedback about the "incorrect advertisement" responses was provided to participants.

Participants were then shown an introduction to the main task, which involved sequentially viewing three mock ads by fictional energy companies (see Appendix A), two of which had been "greenwashed." Specifically, the greenwashed ads made claims of the types highlighted in the intervention—one ad highlighted that the corporate offices were using green energy (misrepresenting the core business), while the other ad encouraged the reader to calculate their carbon footprint using an online calculator (promoting an individual's responsibility for environmental sustainability). The remaining nongreenwashed ad focused on the fact that the business was creating thousands of jobs. The three ads were presented in a randomised order and were designed by the researchers to reflect the types of ads and claims that are typically produced by fossil fuel companies. After each ad, they responded to a series of multiple choice questions to measure the psychological impact of these ads. This included questions about the perceived green credentials of the company in the ad, perceived reliability of the green credentials, and perceived economic and community credentials (economic and community credential questions were included to ensure that we did not overly prime participants to think about the environment and to have some questions that would be more relevant for the third, nongreenwashed ad). Once participants responded to the ad outcomes for all three ads, participants completed a selection of follow-up questions including questions about their perceptions of responsibility of different actors to mitigate climate change (individuals, governments, and companies).

Exhibit 20 to Decl. of Lyon
476
SER 1350

886 **WILEY**  DUTTA-POWELL ET AL.



**The effect of Greenwashed vs Non-Greenwashed ads on perceived Green Credentials of Company among participants in the Control condition**

**FIGURE 1** The effect of greenwashed versus nongreenwashed ads on perceived green credentials—control condition participants only.

19999836, 2024, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3530 by University Of Michigan Library, Wiley Online Library on [29/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**TABLE 2** Regression results for average green credentials of companies featured in greenwashed ads (ads 1 and 2), by treatment.

|  | Unadjusted OLS | OLS with controls |
|---|---|---|
| Control | 4.92*** | 3.24*** |
|  | (0.04) | (0.21) |
| Literacy | −0.58*** | −0.58*** |
|  | (0.06) | (0.05) |
| Prebunking | −0.65*** | −0.61*** |
|  | (0.06) | (0.05) |

*Note:* Standard deviations appear in parentheses below the means.
*$p < .05$, **$p < .01$, and ***$p < .001$ (two-tailed test).

Finally, participants in all three conditions received a short explanation of greenwashing and were asked about their opinions on a series of questions related to greenwashing.

## 3.1 | Measures

### 3.1.1 | Level of environmental concern

We adapted elements from the environmental attitudes inventory (Milfont & Duckitt, 2010) to identify individual differences in consumers' level of concern about environmental issues. Specifically,

consumers were asked whether they agreed or disagreed with the statements on a 1–7 scale (where 1 = *strongly disagree* and 7 = *strongly agree*) with the following statements:

- "I am concerned about the impacts of climate change."
- "More needs to be done to protect and preserve the natural world."
- "Controls should be placed on industry to protect the environment from pollution, even if it means things will cost more."
- "If things continue on their present course, we will soon experience a major ecological catastrophe."
- "I think that it is important to buy products and services from companies that are environmentally friendly."

Participants' responses on these statements were averaged, such that higher scores indicated higher levels of environmental concern ($\alpha = .94$).

### 3.1.2 | Green credentials

To identify greenwashing, we measured consumers' perceptions of the eco-friendly or "green" practices of the featured company, adapted from previous work (Hartmann & Apaolaza-Ibáñez, 2009). Since the ads were deliberately greenwashed in a way that was designed to increase the green credentials, any difference between the arms would help us identify the potential impacts of

Exhibit 20 to Decl. of Lyon
477
**SER 1351**

DUTTA-POWELL ET AL.

**Business Strategy and the Environment** | WILEY | **887**

10990836, 2024, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3526 by University Of Michigan Library, Wiley Online Library on [29/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

greenwashing and of our interventions. Specifically, consumers were asked whether they agreed or disagreed with the statements on a 1–7 scale (where $1 = strongly\ disagree$ and $7 = strongly\ agree$) with the following three statements: "This company helps protect the environment"; "This company is actively reducing its impact on climate change"; and "This company is environmentally friendlier than other competing brands." Consumers' responses on these items were averaged such that higher scores indicated consumers perceived the company has having higher green credentials ($\alpha = .91$).



FIGURE 2    Effect of the interventions on consumers with "high" ($+1\ SD$) or "low" ($-1\ SD$) levels of environmental concern.



FIGURE 3    Participants' ratings of green credentials of companies, by advertisement and treatment.

Exhibit 20 to Decl. of Lyon
478
**SER 1352**

**888** | WILEY  DUTTA-POWELL ET AL.

19990836, 2024, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3530 by University Of Michigan Library, Wiley Online Library on [29/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

### 3.1.3 | Perceived reliability

A measure of consumers' perceptions of the relevant advertisement as a reliable source of information about the featured company's green credentials. Specifically, consumers were asked how reliable the advertisement was as an indicator of the company's environmental practices on a 1–7 scale (where 1 = *extremely unreliable* and 7 = *extremely reliable*). This is a common measure used when assessing the impact of misinformation (see, e.g., Basol et al., 2021; Fernandes et al., 2020; Maertens et al., 2020, 2021).

### 3.1.4 | Perceptions of responsibility to mitigate climate change

How much responsibility different groups (individuals, private companies, and governments) were perceived to have to mitigate climate change. Specifically, participants were asked to rate the responsibility for each group on a 1–7 scale (where 1 = *None of the responsibility* and 7 = *All of the responsibility*).

## 4 | RESULTS

### 4.1 | Greenwashing effect

After viewing greenwashed advertisements, consumers were on average more likely to agree that the featured company had strong green credentials (4.97 out of 7), compared with companies depicted in a nongreenwashed advertisement (3.54 out of 7) (see Figure 1). Over half (57%) of consumers in the control condition believed that greenwashed claims were a reliable source of information about a company's eco-practices.

### 4.2 | Green credentials

Participants in both intervention groups rated the green credentials of the hypothetical firms lower than those in the control group. We conducted a simple OLS regression with green credentials as the depending variable and treatment assignment as independent variables, as well as a second regression that added a set of covariates to the simple regression (age, gender, education level, household income, who they voted in the last federal election, self-rated political lean on social issues, and level of environmental concern). Results for the two greenwashed ads (ads 1 and 2) were compared between the control and intervention groups.

On average, participants agreed less with statements about the green credentials of the fictional companies shown in the greenwashed ads. They resulted in a 0.58 (literacy, *p* < .001) and 0.61 (prebunking, *p* < .001) point shift on a *7-point scale*—moving participants from on average *slightly agree* (5) to part way between *neither agree nor disagree* (4) and *slightly agree* (5) (see Table 2 for results for

participant ratings of green credentials for greenwashed ads). Note that despite our intervention, consumers on average still were slightly inclined to agree with the statements about green credentials. This result confirms our first hypothesis that literacy or prebunking will lead to consumers having lower perceptions of green credentials for companies engaged in greenwashing.

Interestingly, while respondents in the control group were generally more likely to agree that the companies in greenwashed ads had stronger green credentials (compared with treatment groups), this was particularly pronounced among those with high concern for the environment (+1 *SD*) as compared with those with lower concern (−1 *SD*) (see Figure 2).

Digging deeper, it appears that the effect of the interventions occurs through two mechanisms. First, they appear to generate a general level of scepticism of green credentials. This is evidenced by the fact that the green credential rating of the third ad (which does not make any environmental claims) is lower in both intervention groups than the control. However, the interventions also appear to be especially effective at generating scepticism of environmental claims—the effect of both the literacy and prebunking interventions were larger for the greenwashed ads than for the nongreenwashed ad (see Figure 3). However, it is unclear whether this greater scepticism towards environmental claims applies only to greenwashed claims (as in the ads shown) or it applies to all environmental claims.

### 4.3 | Reliability

The literacy and prebunking interventions also increased doubt towards claims in greenwashed ads (ads 1 and 2). Participants who received the literacy intervention were significantly less likely than those in the control group to agree that greenwashed advertisements were reliable indicators of a company's environmental practices (0.56-point reduction on the 7-point scale, *p* < .001), as were those in the prebunking intervention (0.50-point reduction on the 7-point scale, *p* < .001). Notably, in this case, we were able to shift respondents from being slightly positive to being almost totally neutral, moving from an average of 4.57 in the control group to an average of approximately 4 in the intervention groups (corresponding with a

**TABLE 3** Regression results for reliability of environmental claims of greenwashed ads, by treatment.

|  | Unadjusted OLS | OLS with controls |
|---|---|---|
| Control | 4.57*** | 3.45 |
|  | (0.04) | (0.22) |
| Literacy | −0.56*** | −0.57*** |
|  | (0.06) | (0.06) |
| Prebunking | −0.53*** | −0.51*** |
|  | (0.06) | (0.05) |

*Note:* Standard deviations appear in the parentheses below the means.
\**p* < .05, \*\**p* < .01, and \*\*\**p* < .001 (two-tailed test).

Exhibit 20 to Decl. of Lyon
479
**SER 1353**

DUTTA-POWELL ET AL.

Business Strategy
and the Environment

WILEY | 889

**TABLE 4**   Regression results for perceived responsibility of different groups to combat climate change, by treatment.

|  | Individual responsibility | | Companies' responsibility | | Government responsibility | |
|---|---|---|---|---|---|---|
|  | Unadjusted OLS | OLS with controls | Unadjusted OLS | OLS with controls | Unadjusted OLS | OLS with controls |
| Control | 4.94*** | 2.14*** | 5.45*** | 3.01*** | 5.73*** | 3.52*** |
|  | (0.05) | (0.24) | (0.04) | (0.23) | (0.05) | (0.25) |
| Literacy | −0.06 | −0.05 | −0.03 | 0.00 | −0.01 | 0.02 |
|  | (0.07) | (0.06) | (0.06) | (0.05) | (0.07) | (0.06) |
| Prebunking | −0.12+ | −0.08 | −0.08 | −0.03 | −0.11+ | −0.06 |
|  | (0.07) | (0.06) | (0.06) | (0.05) | (0.07) | (0.06) |

*Note*: Standard deviations appear in the parentheses below the means.
+$p < .1$.
*$p < .05$, **$p < .01$, and ***$p < .001$ (two-tailed test).

value of "neither agree nor disagree") (Table 3). This result confirms our second hypothesis.

### 4.4 | Perceived climate mitigation responsibility

Overall, consumers think that the Government is most responsible for addressing climate change, followed closely by companies and then individuals. Notably, the interventions did not change consumers' attitudes about perceived responsibility to mitigate climate change (Table 4). This result rejects our third hypothesis.

## 5 | DISCUSSION AND CONCLUSION

The aim of this study was to identify the potential impacts of greenwashing and to test whether two potential interventions could be effective at overcoming its effects. Our results showed that greenwashing increases the perceived green credentials of firms that engage in the practice—across all experimental groups, the control group consistently rated the hypothetical firms as having better environmental credentials than those in the treatment groups. This is consistent with previous literature—when consumers' perceptions of environmental claims are measured in an objective way, numerous studies have shown that they are unable to correctly identify deceptive or greenwashed claims (Carlson et al., 1993; Fernandes et al., 2020; Segev et al., 2016; Xie et al., 2015). Note that the firms were entirely fictional, and one of the advertisements did not even make any specific claim about the firms' environmental practices; it merely suggested using an online calculator to calculate a person's carbon footprint. Nonetheless, the imagery alone was enough to substantially increase perceptions of green credentials.

A key contribution of this study is the fact that we have also used a measure of environmental concern and found that the greenwashing effect appears to be the strongest for those with greater levels of self-reported environmental concern. That is, the consumers who are most likely to be focused on environmental issues are the ones that are most likely to have their perceptions of firms' green credentials

improved by greenwashing. However, despite these effects, there was no change in participants' perceptions of who was responsible for taking action against climate change—perceptions of individual, company, and governmental responsibility were consistent across all groups, a finding that is consistent with wider literature on crowding-out effects (Carrico, 2021; Lacroix et al., 2022; Maki et al., 2019; Sparkman et al., 2021; Willis & Schor, 2012).

Our results also show that there are strategies that can effectively mitigate the impacts of greenwashing to some extent. Both interventions caused statistically significant decreases in perceived green credentials of companies that engaged in greenwashing, compared with the control. In this way, the work builds on a growing body of research that has used literacy interventions in particular to combat greenwashing (Fernandes et al., 2020) or shown that objective information can help consumers in identifying deceptive claims (Schmuck et al., 2018). The novel addition of our research is that we have conducted, to our knowledge, the largest study of this kind by about an order of magnitude, using a representative sample of adults of all ages and backgrounds. Looking more closely at the result, this overall effect appears to occur in two parts. First, it engenders an overall scepticism of environmental credentials of all companies—participants in the intervention groups rated the green credentials of the company in the third ad lower than participants in the control group, despite the third ad making no environmental claims whatsoever. Second, it also appears to have an additional impact on firms making greenwashed claims—the first two ads also had an even larger difference between control and treatment groups' ratings of green credentials than the third ad.

This result has a number of implications for practitioners and policymakers. First, policymakers may be able to use the methods in this study to develop more scalable interventions that can be used to inoculate consumers against greenwashing interventions. These could be modified and updated as greenwashing tactics evolve and change over time. Alternatively, environmental advocacy organisations could also consider developing their own interventions that use literacy or prebunking to try and educate consumers. There may even be a role for some within industry to take a role in educating consumers—firms that are actually taking meaningful action on climate change will be

Exhibit 20 to Decl. of Lyon
480
SER 1354

10990836, 2024, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3520 by University Of Michigan Library, Wiley Online Library on [29/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

890 | WILEY—Business Strategy and the Environment

19990836, 2024, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3520 by University Of Michigan Library, Wiley Online Library on [29/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

keen to ensure that they are rewarded and their competitors do not simply greenwash their way into consumers' good graces. Hence, firms that are good environmental actors may also have an incentive to educate consumers through our methods.

However, while we have generated interest results, there are still many unresolved questions and there is significant scope for further research. First, while greenwashing is clearly an undesirable practice, there are still many companies that engage in legitimate environmentally friendly activities and are keen to use these as a point of difference. Our current intervention appears to make consumers generally sceptical of the environmental credentials of companies but particularly sceptical of greenwashed claims. However, the only environmental claims shown were greenwashed—it may be that the intervention simply makes consumers more sceptical of *all* environmental claims, greenwashed or legitimate. Further research could consider whether consumers react differently to legitimate environmental claims and whether the interventions need to be modified to enable this. Finding a way to deliver an intervention that enables consumers to both detect greenwashing while also identifying legitimate environmental claims is likely to be of particular interest to those firms engaged in legitimate green practices, as well as to policymakers more broadly.

Second, the trial focused on hypothetical companies, in order to avoid any preconceptions about specific brands that consumers might have. But ultimately greenwashing occurs with real brands. A key area for further research is therefore understanding whether this research replicates on real world examples of greenwashed advertisements with mainstream brands or corporations.

Third, while we have shown that greenwashing appears to shift the perception of green credentials, particularly for those consumers concerned about the environment, it is not entirely clear how that might translate into purchasing decisions or how much our interventions might blunt those effects. Some research has considered the impact of environmental credentials on brand trust and intentions to purchase, but further research could involve discrete choice experiments to understand the potential dollar impacts of greenwashing and our potential interventions.

There are also avenues to investigate the practical policy applications of this work. For example, the experiment involved showing consumers the interventions and then immediately showing potentially greenwashed ads. However, in reality, consumers are likely to see greenwashed ads long after any potential intervention. Testing whether the effects of the interventions persist over a longer period of time—such as a period of weeks or months—will reveal whether the results are sustained in the long term and whether this represents a viable way of combating greenwashing.

Similarly, the interventions as currently designed are still reasonably involved and require consumers to dedicate some time and attention to them. Finding a way to distil the interventions such that they are shorter and sharper would be of great interest to policymakers and NGOs—creating a version of the interventions that can appear "on the side of a bus" would enable them to be scaled significantly.

Importantly, further research may reveal that our interventions are unable to fully mitigate the impacts of greenwashing, which means that there is a need for stronger interventions or even regulatory action to combat greenwashing.

## CONFLICT OF INTEREST STATEMENT

All authors declare that they have no conflicts of interest.

## ORCID

*Ravi Dutta-Powell* https://orcid.org/0000-0003-4197-3477
*Joshua J. Rhee* https://orcid.org/0000-0002-6245-7060

## REFERENCES

Akturan, U. (2018). How does greenwashing affect green branding equity and purchase intention? An empirical research. *Marketing Intelligence & Planning*, *36*(7), 809–824. https://doi.org/10.1108/MIP-12-2017-0339

Basol, M., Roozenbeek, J., Berriche, M., Uenal, F., McClanahan, W. P., & van der Linden, S. (2021). Towards psychological herd immunity: Cross-cultural evidence for two prebunking interventions against COVID-19 misinformation. *Big Data & Society*, *8*(1), 20539517211013868. https://doi.org/10.1177/20539517211013868

Berrone, P., Fosfuri, A., & Gelabert, L. (2017). Does greenwashing pay off? Understanding the relationship between environmental actions and environmental legitimacy. *Journal of Business Ethics*, *144*(2), 363–379. https://doi.org/10.1007/s10551-015-2816-9

Carlson, L., Grove, S. J., & Kangun, N. (1993). A content analysis of environmental advertising claims: A matrix method approach. *Journal of Advertising*, *22*(3), 27–39. https://doi.org/10.1080/00913367.1993.10673409

Carrico, A. R. (2021). Climate change, behavior, and the possibility of spill-over effects: Recent advances and future directions. *Current Opinion in Behavioral Sciences*, *42*, 76–82. https://doi.org/10.1016/j.cobeha.2021.03.025

Chen, H., Bernard, S., & Rahman, I. (2019). Greenwashing in hotels: A structural model of trust and behavioral intentions. *Journal of Cleaner Production*, *206*, 326–335. https://doi.org/10.1016/j.jclepro.2018.09.168

Chen, Y.-S., & Chang, C.-H. (2013). Greenwash and green trust: The mediation effects of green consumer confusion and green perceived risk. *Journal of Business Ethics*, *114*(3), 489–500. https://doi.org/10.1007/s10551-012-1360-0

Coen, D., Herman, K., & Pegram, T. (2022). Are corporate climate efforts genuine? An empirical analysis of the climate 'talk-walk' hypothesis. *Business Strategy and the Environment*, *31*(7), 3040–3059. https://doi.org/10.1002/bse.3063

de Freitas Netto, S. V., Sobral, M. F. F., Ribeiro, A. R. B., & Soares, G. R. d. L. (2020). Concepts and forms of greenwashing: A systematic review. *Environmental Sciences Europe*, *32*(1), 19. https://doi.org/10.1186/s12302-020-0300-3

Delmas, M. A., & Burbano, V. C. (2011). The drivers of greenwashing. *California Management Review*, *54*(1), 64–87. https://doi.org/10.1525/cmr.2011.54.1.64

Ecker, U. K., Lewandowsky, S., Cook, J., Schmid, P., Fazio, L. K., Brashier, N., Kendeou, P., Vraga, E. K., & Amazeen, M. A. (2022). The psychological impact of misinformation belief and its resistance to correction. *Nature Reviews Psychology*, *1*(1), 13–29. https://doi.org/10.1038/s44159-021-00006-y

Elhajjar, S., & Dekhili, S. (2015). Could the greenbashing be a solution for the environmental advertising failures. In *14th International marketing trends congress*. Paris-Venice Marketing Trends Association.

Exhibit 20 to Decl. of Lyon
481
**SER 1355**



10990836, 2024, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3520 by University Of Michigan Library, Wiley Online Library on [29/06/2024], See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Eng, N., DiRusso, C., Troy, C. L., Freeman, J. R., Liao, M. Q., & Sun, Y. (2021). 'I had no idea that greenwashing was even a thing': Identifying the cognitive mechanisms of exemplars in greenwashing literacy interventions. *Environmental Education Research, 27*(11), 1599–1617. https://doi.org/10.1080/13504622.2021.1976732

Feinstein, N. (2013). Learning from past mistakes: Future regulation to prevent greenwashing. *Boston College Environmental Affairs Law Review, 40,* 229.

Fernandes, J., Segev, S., & Leopold, J. K. (2020). When consumers learn to spot deception in advertising: Testing a literacy intervention to combat greenwashing. *International Journal of Advertising, 39*(7), 1115–1149. https://doi.org/10.1080/02650487.2020.1765656

Gallicano, T. D. (2011). A critical analysis of greenwashing claims. *The Public Relations Journal, 5*(3), 1–21.

Gatti, L., Seele, P., & Rademacher, L. (2019). Grey zone in–greenwash out. A review of greenwashing research and implications for the voluntary-mandatory transition of CSR. *International Journal of Corporate Social Responsibility, 4*(1), 1–15.

Hartmann, P., & Apaolaza-Ibáñez, V. (2009). Green advertising revisited: Conditioning virtual nature experiences. *International Journal of Advertising, 28*(4), 715–739. https://doi.org/10.2501/S0265048 709200837

Heras-Saizarbitoria, I., Boiral, O., & Díaz de Junguitu, A. (2020). Environmental management certification and environmental performance: Greening or greenwashing? *Business Strategy and the Environment, 29*(6), 2829–2841. https://doi.org/10.1002/bse.2546

Jeong, S. H., Cho, H., & Hwang, Y. (2012). Media literacy interventions: A meta-analytic review. *Journal of Communication, 62*(3), 454–472. https://doi.org/10.1111/j.1460-2466.2012.01643.x

Kim, Y., Yun, S., Lee, J., & Ko, E. (2016). How consumer knowledge shapes green consumption: An empirical study on voluntary carbon offsetting. *International Journal of Advertising, 35*(1), 23–41. https://doi.org/10.1080/02650487.2015.1096102

Lacroix, K., Carman, J. P., Goldberg, M. H., Gustafson, A., Rosenthal, S. A., & Leiserowitz, A. (2022). Does personal climate change mitigation behavior influence collective behavior? Experimental evidence of no spillover in the United States. *Energy Research & Social Science, 94,* 102875. https://doi.org/10.1016/j.erss.2022.102875

Lyon, T. P., & Montgomery, A. W. (2015). The means and end of greenwash. *Organization & Environment, 28*(2), 223–249. https://doi.org/10.1177/1086026615575332

Maertens, R., Anseel, F., & van der Linden, S. (2020). Combatting climate change misinformation: Evidence for longevity of inoculation and consensus messaging effects. *Journal of Environmental Psychology, 70,* 101455. https://doi.org/10.1016/j.jenvp.2020.101455

Maertens, R., Roozenbeek, J., Basol, M., & van der Linden, S. (2021). Long-term effectiveness of inoculation against misinformation: Three longitudinal experiments. *Journal of Experimental Psychology: Applied, 27*(1), 1–16. https://doi.org/10.1037/xap0000315

Maki, A., Carrico, A. R., Raimi, K. T., Truelove, H. B., Araujo, B., & Yeung, K. L. (2019). Meta-analysis of pro-environmental behaviour spillover. *Nature Sustainability, 2*(4), 307–315. https://doi.org/10.1038/s41893-019-0263-9

Malmelin, N. (2010). What is advertising literacy? Exploring the dimensions of advertising literacy. *Journal of Visual Literacy, 29*(2), 129–142. https://doi.org/10.1080/23796529.2010.11674677

Mangini, E. R., Amaral, L. M., Conejero, M. A., & Pires, C. S. (2020). Greenwashing study and consumers' behavioral intentions. *Consumer Behavior Review, 4*(3), 229–244. https://doi.org/10.51359/2526-7884.2020.244488

Markham, D., Khare, A., & Beckman, T. (2014). Greenwashing: A proposal to restrict its spread. *Journal of Environmental Assessment Policy and Management, 16*(4), 1450030. https://doi.org/10.1142/S1464333214500306

Marquis, C., Toffel, M. W., & Zhou, Y. (2016). Scrutiny, norms, and selective disclosure: A global study of greenwashing. *Organization Science, 27*(2), 483–504. https://doi.org/10.1287/orsc.2015.1039

Mather, N., Bos, C., & Babur, N. (2001). Perceptions and knowledge of pre-service and inservice teachers about early literacy instruction. *Journal of Learning Disabilities, 34*(5), 472–482. https://doi.org/10.1177/002221940103400508

Milfont, T. L., & Duckitt, J. (2010). The environmental attitudes inventory: A valid and reliable measure to assess the structure of environmental attitudes. *Journal of Environmental Psychology, 30*(1), 80–94. https://doi.org/10.1016/j.jenvp.2009.09.001

Moss, J., & Fraser, P. (2019). *Australia's carbon majors report. Practical Justice Initiative, UNSW.< Climatejustice. Co/Wp-Content/Uploads/2019/10/Australias-Carbon-Majors-Report-2019-1. Pdf>.* University of New South Wales. Accessed, 2(2), 21.

Naderer, B., & Opree, S. J. (2021). Increasing advertising literacy to unveil disinformation in green advertising. *Environmental Communication, 15*(7), 923–936. https://doi.org/10.1080/17524032.2021.1919171

Nemes, N., Scanlan, S. J., Smith, P., Smith, T., Aronczyk, M., Hill, S., Lewis, S. L., Montgomery, A. W., Tubiello, F. N., & Stabinsky, D. (2022). An integrated framework to assess greenwashing. *Sustainability, 14*(8), 4431. https://doi.org/10.3390/su14084431

Nygaard, A., & Silkoset, R. (2022). Sustainable development and greenwashing: How blockchain technology information can empower green consumers. *Business Strategy and the Environment.* https://doi.org/10.1002/bse.3338

Nyilasy, G., Gangadharbatla, H., & Paladino, A. (2014). Perceived greenwashing: The interactive effects of green advertising and corporate environmental performance on consumer reactions. *Journal of Business Ethics, 125,* 693–707. https://doi.org/10.1007/s10551-013-1944-3

Pagiaslis, A., & Krontalis, A. K. (2014). Green consumption behavior antecedents: Environmental concern, knowledge, and beliefs. *Psychology & Marketing, 31*(5), 335–348. https://doi.org/10.1002/mar.20698

Parguel, B., Benoît-Moreau, F., & Larceneux, F. (2011). How sustainability ratings might deter 'greenwashing': A closer look at ethical corporate communication. *Journal of Business Ethics, 102*(1), 15–28. https://doi.org/10.1007/s10551-011-0901-2

Parguel, B., Benoît-Moreau, F., & Russell, C. A. (2015). Can evoking nature in advertising mislead consumers? The power of 'executional greenwashing'. *International Journal of Advertising, 34*(1), 107–134. https://doi.org/10.1080/02650487.2014.996116

Rahman, S., & Nguyen-Viet, B. (2022). Towards sustainable development: Coupling green marketing strategies and consumer perceptions in addressing greenwashing. *Business Strategy and the Environment, 32,* 2420–2433. https://doi.org/10.1002/bse.3256

Riccolo, A. (2021). The lack of regulation in preventing greenwashing of cosmetics in the US. *Journal of Legislation, 47,* 133.

Robertson, J. L., Montgomery, A. W., & Ozbilir, T. (2023). Employees' response to corporate greenwashing. *Business Strategy and the Environment,* bse.3351. https://doi.org/10.1002/bse.3351

Schmuck, D., Matthes, J., & Naderer, B. (2018). Misleading consumers with green advertising? An affect–reason–involvement account of greenwashing effects in environmental advertising. *Journal of Advertising, 47*(2), 127–145. https://doi.org/10.1080/00913367.2018.1452652

Seele, P., & Gatti, L. (2017). Greenwashing revisited: In search of a typology and accusation-based definition incorporating legitimacy strategies: Greenwashing revisited. *Business Strategy and the Environment, 26*(2), 239–252. https://doi.org/10.1002/bse.1912

Segev, S., Fernandes, J., & Hong, C. (2016). Is your product really green? A content analysis to reassess green advertising. *Journal of Advertising, 45*(1), 85–93. https://doi.org/10.1080/00913367.2015.1083918

Sparkman, G., Attari, S. Z., & Weber, E. U. (2021). Moderating spillover: Focusing on personal sustainable behavior rarely hinders and can boost climate policy support. *Energy Research & Social Science, 78,* 102150. https://doi.org/10.1016/j.erss.2021.102150

Exhibit 20 to Decl. of Lyon
482
**SER 1356**



Spielvogel, J., & Terlutter, R. (2013). Development of TV advertising literacy in children: Do physical appearance and eating habits matter? *International Journal of Advertising*, 32(3), 343–368. https://doi.org/10.2501/IJA-32-3-343-368

Supran, G., & Oreskes, N. (2021). Rhetoric and frame analysis of ExxonMobil's climate change communications. *One Earth*, 4(5), 696–719. https://doi.org/10.1016/j.oneear.2021.04.014

Szabo, S., & Webster, J. (2021). Perceived greenwashing: The effects of green marketing on environmental and product perceptions. *Journal of Business Ethics*, 171(4), 719–739. https://doi.org/10.1007/s10551-020-04461-0

TerraChoice. (2010). *The sins of greenwashing—Home and family edition.* TerraChoice. https://www.twosides.info/wp-content/uploads/2018/05/Terrachoice_The_Sins_of_Greenwashing_-_Home_and_Family_Edition_2010.pdf

Torelli, R., Balluchi, F., & Lazzini, A. (2020). Greenwashing and environmental communication: Effects on stakeholders' perceptions. *Business Strategy and the Environment*, 29(2), 407–421. https://doi.org/10.1002/bse.2373

Tversky, A., & Kahneman, D. (1974). Judgment under uncertainty: Heuristics and biases: Biases in judgments reveal some heuristics of thinking under uncertainty. *Science*, 185(4157), 1124–1131. https://doi.org/10.1126/science.185.4157.1124

Wedari, L. K., Jubb, C., & Moradi-Motlagh, A. (2021). Corporate climate-related voluntary disclosures: Does potential greenwash exist among Australian high emitters reports? *Business Strategy and the Environment*, 30(8), 3721–3739. https://doi.org/10.1002/bse.2836

Werfel, S. H. (2017). Household behaviour crowds out support for climate change policy when sufficient progress is perceived. *Nature Climate Change*, 7(7), 512–515. https://doi.org/10.1038/nclimate3316

Willis, M. M., & Schor, J. B. (2012). Does changing a light bulb lead to changing the world? Political action and the conscious consumer. *The Annals of the American Academy of Political and Social Science*, 644(1), 160–190. https://doi.org/10.1177/0002716212454831

Xie, G. X., Cavallero, A., & Cheng, M. (2015). Reluctant for a reason? A persuasion knowledge perspective on green advertising. In *Communicating sustainability for the green economy* (pp. 151–167). Routledge.

Yang, Z., Nguyen, T. T. H., Nguyen, H. N., Nguyen, T. T. N., & Cao, T. T. (2020). Greenwashing behaviours: Causes, taxonomy and consequences based on a systematic literature review. *Journal of Business Economics and Management*, 21(5), 1486–1507. https://doi.org/10.3846/jbem.2020.13225

Zharfpeykan, R. (2021). Representative account or greenwashing? Voluntary sustainability reports in Australia's mining/metals and financial services industries. *Business Strategy and the Environment*, 30(4), 2209–2223. https://doi.org/10.1002/bse.2744

**How to cite this article:** Dutta-Powell, R., Rhee, J. J., & Wodak, S. (2024). Two interventions for mitigating the harms of greenwashing on consumer perceptions. *Business Strategy and the Environment*, 33(2), 882–903. https://doi.org/10.1002/bse.3520

Exhibit 20 to Decl. of Lyon
483
**SER 1357**

DUTTA-POWELL ET AL.

Business Strategy and the Environment — WILEY | 893

0990836, 2024, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3520 by University Of Michigan Library, Wiley Online Library on [29/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**APPENDIX A: FULL TEXT OF SURVEY AND INTERVENTIONS**

At the start, randomise participants into one of three treatment groups. Some items to be shown only to certain treatment groups (see below).

1. What is your gender? [gender] [single forced choice]

○ Woman [woman]
○ Man [male]
○ Non-binary/gender diverse [nonbi]
○ My gender identity isn't listed. [other]
○ I'd prefer not to say [nores]

2. What is your age? [age] [single forced choice]

○ 18–24 [1]
○ 25–29 [2]
○ 30–34 [3]
○ 35–39 [4]
○ 40–44 [5]
○ 45–49 [6]
○ 50–54 [7]
○ 55–59 [8]
○ 60–64 [9]
○ 65+ [10]

3. Which state do you live in? [state] [single forced choice]

○ Australian Capital Territory [1]
○ New South Wales [2]
○ Victoria [3]
○ Queensland [4]
○ South Australia [5]
○ Western Australia [6]
○ Tasmania [7]
○ Northern Territory [8]
○ Other [9]

4. What is your highest level of education? [education] [single forced choice]

○ Some high school [1]
○ Completed high school [2]
○ TAFE/trade certificate [3]
○ TAFE diploma [4]
○ University undergraduate degree [5]
○ University postgraduate degree [6]

5. What is your household annual income before tax? [income] [single forced choice]

○ Less than $20,000 [1]
○ $20,000–$39,999 [2]
○ $40,000–$59,999 [3]
○ $60,000–$79,999 [4]
○ $80,000–$99,999 [5]
○ $100,000–$119,999 [6]
○ $120,000–$139,999 [7]
○ $140,000–$159,999 [8]
○ $160,000–$179,999 [9]
○ $180,000–$199,999 [10]
○ $200,000 or more [11]
○ Prefer not to say [12]

6. Which party did you vote for in the House of Representatives at the most recent Australian federal election? [vote] [single forced choice]

○ Liberal-National Coalition (LNP) [1]
○ Labor (ALP) [2]
○ Greens [3]
○ One Nation [4]
○ Katter's Australian Party [5]
○ Centre Alliance [6]
○ Independent [7]
○ Other (please specify) [8] [free text option]
○ Did not vote [9]
○ Prefer not to say [10]

7. Please indicate your political beliefs from left/liberal to right/conservative on issues of the economy (e.g., social welfare, government spending, tax cuts) [social_lean]: [one choice per row]

1. Left/liberal   2.   3.   4.   5.   6.   7. Right/conservative

8. Please indicate your political beliefs from left/liberal to right/conservative on social issues (e.g., immigration, homosexual marriage, abortion) [eco_lean]: [one choice per row]

1. Left/liberal   2.   3.   4.   5.   6.   7. Right/conservative

Exhibit 20 to Decl. of Lyon
484
**SER 1358**

894 | WILEY— Business Strategy and the Environment

NEW PAGE

How much do you agree or disagree with the following statements? [one choice per row]

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| I am concerned about the impacts of climate change [con1] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |
| More needs to be done to protect and preserve the natural world [con2] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |
| Controls should be placed on industry to protect the environment from pollution, even if it means things will cost more [con3] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |
| If things continue on their present course, we will soon experience a major ecological catastrophe [con4] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |
| I think that it is important to buy products and services from companies that are environmentally friendly [con5] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |

NEW PAGE—SHOW ONLY TO TREATMENT 2

"Greenwashing" is the practice of organisations misleading consumers by presenting themselves as more environmentally friendly than they actually are.

Consumers today are increasingly concerned about the environmental impact caused by the products or services that they either directly or indirectly consume.

Many organisations whose core business practices have detrimental impacts on the environment have become increasingly wary of these consumer concerns about the environment, and look for ways to acknowledge them without changing their core business practices. These organisations often use advertising or messaging tactics to mislead consumers about the environmental benefits of the products or services they provide. This allows organisations to acknowledge these consumer concerns without changing their core business practices.

While greenwashing can come in a number of different forms, two practices that are commonly used include:

1. Misrepresenting the company's core business; and
2. Promoting an individual's responsibility for environmental sustainability (instead of the organisation's actions and responsibility).

The next few pages will go through each of these in more detail, and how they may be misleading.

NEW PAGE—SHOW ONLY TO TREATMENT 2

Misrepresenting core business

A strategy often used by organisations to make it appear as though they are taking action to help the environment, in order to distract from the organisation's overall environmental impact. For example, this company is highlighting its work planting trees, to distract from the heavy pollution caused by its broader operations.



NEW PAGE—SHOW ONLY TO TREATMENT 2

Promoting individual responsibilityA strategy that organisations use to encourage individual environmental actions, in order to distract from the much larger environmental impact of the organisation's own practices.

19990976, 2024, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3520 by University Of Michigan Library, Wiley Online Library on [25/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 20 to Decl. of Lyon
485
SER 1359

DUTTA-POWELL ET AL.

 Business Strategy and the Environment WILEY 895



For example, this company is telling individuals to "turn off the lights" (which will have a small impact on carbon emissions). This is to distract from the fact that the company's activities generate more emissions than lots of households combined.

NEW PAGE—SHOW ONLY TO TREATMENT 3

Consumers today are increasingly concerned about the environmental impact caused by the products or services that they either directly or indirectly consume.

Many organisations whose core business have detrimental impacts on the environment have become increasingly wary of these changes in public perception, and often use advertising or messaging tactics to mislead consumers about the environmental benefits of the products or services they provide.

NEW PAGE—SHOW ONLY TO TREATMENT 3

Randomise the order that the images appear in—participants need to select the correct image to proceed.

If you were planning a marketing campaign for this company, which of the following advertisements would you use to make it seem that the company is taking active steps to help the environment, without actually having to change the company's core business practices?

  

Exhibit 20 to Decl. of Lyon
486
SER 1360

10999836, 2024, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3520 by University Of Michigan Library, Wiley Online Library on [29/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**896** | WILEY — Business Strategy and the Environment

DUTTA-POWELL ET AL.

If participants select either of these images, do not let them proceed—instead pop up "That's not correct, please try again."

Only proceed if they select this image.

NEW PAGE—SHOW ONLY TO TREATMENT 3

**Misrepresenting core business** is a strategy often used by organisations to make it appear as though they are taking action to help the environment, in order to distract from the organisation's overall environmental impact.

For example, this company is highlighting its work planting trees, to distract from the heavy pollution caused by its broader operations.



NEW PAGE—SHOW ONLY TO TREATMENT 3

Randomise the order that the images appear in—participants need to select the correct image to proceed.

If you were planning a marketing campaign for this company, which of the following advertisements would you use to exaggerate the importance of actions individual consumers can take to mitigate climate change?





Exhibit 20 to Decl. of Lyon
487
SER 1361

19990838, 2024, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3520 by University Of Michigan Library, Wiley Online Library on [29/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

DUTTA-POWELL ET AL.  WILEY | 897

If participants select either of these images, do not let them proceed—instead pop up "That's not correct, please try again."

Only proceed if they select this image.

NEW PAGE—SHOW ONLY TO TREATMENT 3

**Promoting individual responsibility** is a strategy that organisations use to encourage individual environmental actions. By putting the spotlight on the responsibility that individuals have to reduce their environmental impact, the advertisement takes attention away from the outsized role that the organisation plays in harming the environment. For example, this company is telling individuals to "turn off the lights" (which will have a small impact on carbon emissions). This is to distract from the fact that the company's activities generate more emissions than lots of households combined.



NEW PAGE

We're now going to show you some ads for some hypothetical companies, and we'll ask you some questions about your opinions of these companies. Don't worry if you aren't familiar with the company, just answer with your honest opinion.

Note for programming—randomise the order in which the next three pages appear.NEW PAGE

19990876, 2024, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3520 by University Of Michigan Library, Wiley Online Library on [29/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 20 to Decl. of Lyon
488
**SER 1362**

**898** | WILEY — Business Strategy and the Environment   DUTTA-POWELL ET AL.



9. After seeing this advertisement, to what extent do you believe that … [one choice per row]

| | | | | | | |
|---|---|---|---|---|---|---|
| This company helps protect the environment [ad1_env1] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |
| This company is actively reducing its impact on climate change [ad1_env2] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |
| This company is environmentally friendlier than other competing brands [ad1_env3] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |
| This company has a positive impact on the community [ad1_bus1] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |
| This company makes a positive influence on the economy [ad1_bus2] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |
| This company cares about the needs of the community [ad1_bus3] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |

10. How reliable are the contents of this advertisement as an indicator of this company's environmental practices? [ad1_env_rel] [one choice per row]

| 1. Extremely unreliable | 2. Unreliable | 3. Somewhat unreliable | 4. Neither reliable nor unreliable | 5. Somewhat reliable | 6. Reliable | 7. Extremely reliable |
|---|---|---|---|---|---|---|

19990838, 2024, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3520 by University Of Michigan Library, Wiley Online Library on [29/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 20 to Decl. of Lyon
489
**SER 1363**

DUTTA-POWELL ET AL.

Business Strategy and the Environment — WILEY | **899**

11. How confident are you in your judgement about this company's environmental practices based on this advertisement alone? [ad1_env_rel] [one choice per row]

| 1. Not at all confident | 2. | 3. | 4. | 5. | 6. | 7. Extremely confident |
|---|---|---|---|---|---|---|

12. How reliable are the contents of this advertisement as an indicator of the company's day to day business practices? [ad1_bus_rel]

| 1. Extremely unreliable | 2. Unreliable | 3. Somewhat unreliable | 4. Neither reliable nor unreliable | 5. Somewhat reliable | 6. Reliable | 7. Extremely reliable |
|---|---|---|---|---|---|---|

13. How confident are you in your judgement about this company's day to day business practices based on this advertisement alone? [ad1_bus_con] [one choice per row]

| 1. Not at all confident | 2. | 3. | 4. | 5. | 6. | 7. Extremely confident |
|---|---|---|---|---|---|---|

NEW PAGE



Exhibit 20 to Decl. of Lyon
490
SER 1364

19990836, 2024, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3520 by University Of Michigan Library, Wiley Online Library on [29/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

900 | WILEY — Business Strategy and the Environment

DUTTA-POWELL ET AL.

14. After seeing this advertisement, to what extent do you believe that … [one choice per row]

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| This company helps protect the environment [ad2_env1] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |
| This company is actively reducing its impact on climate change [ad2_env2] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |
| This company is environmentally friendlier than other competing brands [ad2_env3] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |
| This company has a positive impact on the community [ad2_bus1] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |
| This company makes a positive influence on the economy [ad2_bus2] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |
| This company cares about the needs of the community [ad2_bus3] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |

15. How reliable are the contents of this advertisement as an indicator of this company's environmental practices? [ad2_env_rel] [one choice per row]

| 1. Extremely unreliable | 2. Unreliable | 3. Somewhat unreliable | 4. Neither reliable nor unreliable | 5. Somewhat reliable | 6. Reliable | 7. Extremely reliable |
|---|---|---|---|---|---|---|

16. How confident are you in your judgement about this company's environmental practices based on this advertisement alone? [ad2_env_rel] [one choice per row]

| 1. Not at all confident | 2. | 3. | 4. | 5. | 6. | 7. Extremely confident |
|---|---|---|---|---|---|---|

17. How reliable are the contents of this advertisement as an indicator of the company's day to day business practices? [ad2_bus_rel] [one choice per row]

| 1. Extremely unreliable | 2. Unreliable | 3. Somewhat unreliable | 4. Neither reliable nor unreliable | 5. Somewhat reliable | 6. Reliable | 7. Extremely reliable |
|---|---|---|---|---|---|---|

Exhibit 20 to Decl. of Lyon
491

10990836, 2024, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3520 by University Of Michigan Library, Wiley Online Library on [29/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

DUTTA-POWELL ET AL.

Business Strategy and the Environment

WILEY | 901

18. How confident are you in your judgement about this company's day to day business practices based on this advertisement alone? [ad2_bus_con] [one choice per row]

| 1. Not at all confident | 2. | 3. | 4. | 5. | 6. | 7. Extremely confident |
|---|---|---|---|---|---|---|

NEW PAGE



19. After seeing this advertisement, to what extent do you believe that … [one choice per row]

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| This company helps protect the environment [ad3_env1] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |
| This company is actively reducing its impact on climate change [ad3_env2] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |
| This company is environmentally friendlier than other competing brands [ad3_env3] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |
| This company has a positive impact on the community [ad3_bus1] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |
| This company makes a positive influence on the economy [ad3_bus2] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |
| This company cares about the needs of the community [ad3_bus3] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |

10990836, 2024, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3520 by University Of Michigan Library, Wiley Online Library on [29/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 20 to Decl. of Lyon
492
**SER 1366**

**902** | WILEY — Business Strategy and the Environment                                          DUTTA-POWELL ET AL.

20. How reliable are the contents of this advertisement as an indicator of this company's environmental practices? [ad3_env_rel] [one choice per row]

| 1. Extremely unreliable | 2. Unreliable | 3. Somewhat unreliable | 4. Neither reliable nor unreliable | 5. Somewhat reliable | 6. Reliable | 7. Extremely reliable |
|---|---|---|---|---|---|---|

21. How confident are you in your judgement about this company's environmental practices based on this advertisement alone? [ad3_env_rel] [one choice per row]

| 1. Not at all confident | 2. | 3. | 4. | 5. | 6. | 7. Extremely confident |
|---|---|---|---|---|---|---|

22. How reliable are the contents of this advertisement as an indicator of the company's day to day business practices? [ad3_bus_rel] [one choice per row]

| 1. Extremely unreliable | 2. Unreliable | 3. Somewhat unreliable | 4. Neither reliable nor unreliable | 5. Somewhat reliable | 6. Reliable | 7. Extremely reliable |
|---|---|---|---|---|---|---|

23. How confident are you in your judgement about this company's day to day business practices based on this advertisement alone? [ad3_bus_con] [one choice per row]

| 1. Not at all confident | 2. | 3. | 4. | 5. | 6. | 7. Extremely confident |
|---|---|---|---|---|---|---|

NEW PAGE

How much responsibility do you think each of these entities has in acting to reduce ongoing climate change? [one choice per row]

24. Thanks for your answers. We're now going to ask some more general questions.

| | 1. None of the responsibility | 2. | 3. | 4. | 5. | 6. | 7. All of the responsibility |
|---|---|---|---|---|---|---|---|
| Individuals [individuals] | 1. None of the responsibility | 2. | 3. | 4. | 5. | 6. | 7. All of the responsibility |
| Private companies [companies] | 1. None of the responsibility | 2 | 3 | 4 | 5 | 6 | 7. All of the responsibility |
| The government [companies] | 1. None of the responsibility | 2 | 3 | 4 | 5 | 6 | 7. All of the responsibility |

19990838, 2024, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3520 by University Of Michigan Library, Wiley Online Library on [29/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 20 to Decl. of Lyon
493
**SER 1367**

DUTTA-POWELL ET AL.                                                          Business Strategy and the Environment  —WILEY | 903

NEW PAGE

Consumers today are increasingly concerned about the environmental impact caused by the products or services that they either directly or indirectly consume.

**Greenwashing** refers to the act of misleading consumers about the environmental practices of an organisation or government, or the environmental benefits of a product or service.

25.  How much do you agree or disagree with the following statements? [one choice per row]

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| I am concerned about companies engaging in greenwashing [gen_out1] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |
| It's up to individual consumers to investigate whether companies' environmental claims are accurate [gen_out2] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |
| Companies who use greenwashing are being intentionally deceptive [gen_out3] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |
| Governments need to take action to stop greenwashing [gen_out4] | 1. Strongly disagree | 2. Disagree | 3. Somewhat disagree | 4. Neither agree nor disagree | 5. Somewhat agree | 6. Agree | 7. Strongly agree |

END SURVEY

10990836, 2024, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/bse.3520 by University Of Michigan Library, Wiley Online Library on [26/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 20 to Decl. of Lyon
494
**SER 1368**

# Exhibit 19

# to Declaration of Thomas P. Lyon

# The Optimal Amount of
# Discretion to Allow in Disclosure

Exhibit 19 to Decl. of Lyon
452
**SER 1369**

Case 2:24-cv-00801-ODW-PVC    Document 56-19    Filed 07/24/24    Page 2 of 20    Page ID #:6433



# OXFORD JOURNALS
## OXFORD UNIVERSITY PRESS

The Optimal Amount of Discretion to Allow in Disclosure

Author(s): Michael J. Fishman and Kathleen M. Hagerty

Source: *The Quarterly Journal of Economics*, May, 1990, Vol. 105, No. 2 (May, 1990), pp. 427–444

Published by: Oxford University Press

Stable URL: http://www.jstor.com/stable/2937794

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*Oxford University Press* is collaborating with JSTOR to digitize, preserve and extend access to *The Quarterly Journal of Economics*

This content downloaded from
35.7.46.71 on Sun, 07 Jul 2024 15:55:16 +00:00
All use subject to https://about.jstor.org/terms

Exhibit 19 to Decl. of Lyon
453
**SER 1370**

# THE OPTIMAL AMOUNT OF DISCRETION TO ALLOW IN DISCLOSURE*

### Michael J. Fishman and Kathleen M. Hagerty

In this paper a party with private information can verifiably disclose some, but not all, of his information. The optimal amount of discretion to allow the informed party is studied. That is, should the informed party be allowed unlimited discretion in choosing which elements of his information set to disclose, or should restrictions be imposed that limit this discretion? The model is formulated in the spirit of a "persuasion game." It is demonstrated that under certain circumstances, rules that limit discretion increase the informativeness of disclosures and thus improve economic decisions.

## I. Introduction

Frequently, parties to an economic transaction are asymmetrically informed. This may lead to the disclosure of some information. In fact, it has been argued [Grossman, 1981; Grossman and Hart, 1980; Milgrom, 1981; Milgrom and Roberts, 1986] that if verifiable disclosure is costless, an informed party will disclose all of his information. This is because failure to do so induces an uninformed party to believe that the withheld information is unfavorable.

This paper considers a setting where full verifiable disclosure is not feasible. An informed party can disclose some, but not all, of his information. The optimal amount of discretion to allow the informed party is studied. That is, should the informed party be allowed unlimited discretion in choosing which elements of his information set to disclose, or should restrictions be imposed to limit this discretion? It is demonstrated that under certain circumstances, rules that limit the informed party's discretion increase the informativeness of a disclosure and thus improve economic decisions.[1]

The model analyzed is similar to one of the models in Milgrom

---

*This paper previously circulated under the title, "Disclosure Rules When Verifiability is Limited." We are grateful to Jeremy Bulow, Ron Dye, Kose John, Ravi Krishnaswamy, Bill Rogerson, Duane Seppi, the referees, and seminar participants at the University of California, Berkeley, the University of Chicago, Northwestern University, Stanford University and the Symposium on Strategic Issues in Financial Contracting at Indiana University, for helpful comments and discussions.
1. The focus here is whether disclosure rules can be beneficial. We do not address how disclosure rules, if beneficial, are optimally imposed. These rules might be imposed by government regulation, industry self-regulation, or private contracting.

© 1990 by the President and Fellows of Harvard College and the Massachusetts Institute of Technology.
The Quarterly Journal of Economics, May 1990

This content downloaded from
35.7.46.71 on Sun, 07 Jul 2024 15:55:16 +00:00
All use subject to https://about.jstor.org/terms

Exhibit 19 to Decl. of Lyon
454
SER 1371

428        *QUARTERLY JOURNAL OF ECONOMICS*

[1981]. A seller privately observes $N$ signals about an object for sale. It is assumed that the seller can verifiably disclose the realizations of at most, $K < N$ of the signals. We take $K = 1$. In this setting, we introduce rules that limit the informed party's discretion. These rules require the informed party to disclose a signal from a prespecified subset of the available signals.

Milgrom [1981] demonstrates that there is an equilibrium in which the seller discloses the $K$ "most favorable" signals. A buyer rationally infers that the $N − K$ signals that were withheld are less favorable than the least favorable signal that was disclosed. So while the seller discloses only $K$ signals, the buyer learns something about all $N$ signals. We show that in this type of equilibrium, limiting discretion may lead to more informative disclosures. In addition, we show that there are other types of equilibria in which unlimited discretion leads to the most informative disclosures.

An example of the type of problem that we are considering is found in a capital market. Suppose that an entrepreneur is seeking financing for a project about which he has private information. The entrepreneur discloses some of his information by releasing a financial statement. There are a number of different ways to prepare the financial statement that lead to different information being conveyed. For reasons of cost and brevity, one method for preparing the statement is chosen, and how profitable the project appears depends on the chosen method. Restrictions on discretion of the form considered here can be thought of as the specification of the set of generally accepted accounting principles that can be used to prepare the financial statement.

Another example concerns product testing. Manufacturers may supply consumers with the results of product tests. There are many ways to construct tests and how good a product appears depends on which test is performed. Restricting a manufacturer's discretion corresponds to restricting his choice of tests. For example, in 1974 the Federal Trade Commission specified a standardized procedure for testing stereo amplifiers, and if a manufacturer chose to disclose information concerning an amplifier's performance, it had to disclose the rating as determined by this test. The purpose of this rule was to increase the informativeness of manufacturers' disclosures (see Stevenson [1980]).

A third example is found in a labor market. Suppose that a worker with private information about his ability is seeking employment. The worker discloses some information about himself in an interview. Since the worker's expertise may vary across topics, how talented the worker appears depends upon which topics are dis-

This content downloaded from
35.7.46.71 on Sun, 07 Jul 2024 15:55:16 +00:00
All use subject to https://about.jstor.org/terms

Exhibit 19 to Decl. of Lyon
455
**SER 1372**

*THE OPTIMAL AMOUNT OF DISCRETION TO ALLOW*      429

cussed. Restrictions on discretion may take the form of the employer selecting the agenda of topics to be discussed.

A number of other interesting variations on the models of costless, verifiable disclosure have been studied. Farrell [1986] and Matthews and Postlewaite [1985] study models in which a seller chooses whether to become informed about product quality, and a buyer is unable to observe this decision. The seller makes an information acquisition decision as well as a disclosure decision. Dye [1986], Jovanovic [1982], and Verrecchia [1983] study models in which an informed party can, at some cost, make a verifiable disclosure. In equilibrium, if the private information is sufficiently favorable, it is disclosed, and otherwise, the information is withheld. Dye [1985] studies a model in which an informed party must choose a reporting procedure (defined as a partition on the sample space of "types") from a given set of procedures. There, as is the case here and in the studies cited above, the key point is that the information revealed by a disclosure is not confined to the information "contained" in that disclosure. Information is also revealed by the informed party's choice of how, or what, to disclose.

The paper is organized as follows. In Section II we describe the model. In Section III we present two equilibria of the model, and for each, we determine the optimal amount of discretion to allow in disclosing information. In Section IV we conclude the paper.

## II. THE MODEL

The model is formulated in the spirit of a "persuasion game." For concreteness we discuss the problem in terms of a capital market setting. A risk-neutral entrepreneur is endowed with a project, and a group of competitive, risk-neutral investors are endowed with cash. To introduce a potential gain from trade, assume that the entrepreneur cannot undertake the project himself. He can, however, sell the project to the investors and is willing to do so at any positive price. The value of the project, denoted by $\theta$, is unknown to all. The entrepreneur privately observes $N > 1$ signals on $\theta$, denoted by $x = (x_1, x_2, \ldots, x_N)$. The value of $N$ is common knowledge. The entrepreneur can verifiably disclose only one of the $N$ signals, and this disclosure is costless. This captures the notion, albeit in an extreme way, that full disclosure is prohibitively costly. This specification simplifies the analysis considerably, though the intuition behind the results requires only that full disclosure be infeasible.

The problem unfolds as follows. The entrepreneur privately

This content downloaded from
35.7.46.71 on Sun, 07 Jul 2024 15:55:16 +00:00
All use subject to https://about.jstor.org/terms

Exhibit 19 to Decl. of Lyon
456
**SER 1373**

430          *QUARTERLY JOURNAL OF ECONOMICS*

observes $x$ and makes a disclosure. Investors then price the project. If, conditional on the disclosure, the expected value of the project is positive, investors bid its price up to this expected value. The entrepreneur receives this price, the project is undertaken, and investors receive $\theta$. If, conditional on the disclosure, the expected value of the project is not positive, investors will not pay any positive price. The project is not undertaken, and the entrepreneur and the investors receive zero.[2]

For simplicity, the following distributional assumptions are made. The value of the project, $\theta$, has the following distribution:

$$\theta = \begin{cases} H & \text{with probability } q \\ L & \text{with probability } 1 - q, \end{cases}$$

where $0 < q < 1$, and $L < 0 < H$.[3] Conditional on $\theta$, the signals $x_1, x_2, \ldots, x_N$ have the following distribution. For $i = 1, \ldots, N$:
If $\theta = H$, then

$$x_i = \begin{cases} h & \text{with probability } p_H \\ l & \text{with probability } 1 - p_H; \end{cases}$$

and if $\theta = L$, then

$$x_i = \begin{cases} h & \text{with probability } 1 - p_L \\ l & \text{with probability } p_L, \end{cases}$$

where $0 < p_L, p_H \leq 1$, and $p_L + p_H \neq 1$ (if $p_L + p_H = 1$, then, $x_i$ contains no information on $\theta$). Without loss of generality let $p_H + p_L > 1$. This is the monotone likelihood ratio property which implies that $x_i = h$ is good news and $x_i = l$ is bad news. Higher values of $p_H$ or $p_L$ result in more informative signals. These distributions are common knowledge.

A limitation on discretion is a restriction requiring the entrepreneur to disclose a signal from a prespecified subset of the $N$ signals.

2. Note that contracts contingent on $\theta$ are not considered. This can be justified if $\theta$ cannot be verified. For instance, if the project is one of many operated by the investors, then the project's profitability can be misrepresented by transferring profits across projects. Alternatively, the entrepreneur's consumption horizon may be shorter than the time until $\theta$ is realized. Leland and Pyle [1977] also study a model in which an entrepreneur has private information on a project. There, the entrepreneur can enter into contracts contingent on the project's profitability; however, he can make no verifiable disclosures.
3. If $\theta$ is always negative, then disclosure is irrelevant, as the project is never financed. If $\theta$ is always positive, then disclosure affects the distribution of wealth between the entrepreneur and investors. It does not, however, affect any allocative decisions. For in this case, the project is always financed.

This content downloaded from
35.7.46.71 on Sun, 07 Jul 2024 15:55:16 +00:00
All use subject to https://about.jstor.org/terms

Exhibit 19 to Decl. of Lyon
457
**SER 1374**

*THE OPTIMAL AMOUNT OF DISCRETION TO ALLOW*     431

Since the signals are independent and identically distributed, conditional on $\theta$, the amount of discretion allowed is fully characterized by the number of signals that the entrepreneur is allowed to choose from. Let $k$, where $1 \leq k \leq N$, denote the amount of discretion allowed. For example, if $k = 1$, the entrepreneur has no discretion in choosing which signal to disclose; and if $k = N$, the entrepreneur has complete discretion. Without loss of generality assume that for a given $k$ the allowable disclosures for the entrepreneur are the first $k$ signals; i.e., $i \in \{1, \ldots, k\}$.[4]

Given a level of discretion $k$, the entrepreneur chooses $i \leq k$, and investors observe that "$x_i = h$" or "$x_i = l$," whichever is the case. Note that investors observe the identity "$i$," as well as the realization of the signal.[5] Let the conditional probability density function $\sigma(i|x,k)$ denote the entrepreneur's disclosure strategy; $\sigma$ specifies the probability of disclosing signal $i$ given $x$ and $k$. Let the conditional probability density function $g(\theta|d,k)$, denote investors' updated beliefs, conditional on a disclosure $d$, and $k$. With these updated beliefs investors compute the conditional expectation of $\theta$: $E[\theta|d,k] = Hg(H|d,k) + Lg(L|d,k)$. The price of the project as a function of the entrepreneur's disclosure is $P(d,k) = \max \{0, E[\theta|d,k]\}$.

An equilibrium consists of a disclosure strategy for the entrepreneur, $\sigma$, and beliefs for the investors, $g$, where for a given $k$, (i) $\sigma$ maximizes the entrepreneur's expected payoff given $g$ and $k$; (ii) $g$ is consistent with $\sigma$ and Bayes' rule for disclosures that are made in equilibrium.

Since the entrepreneur cannot fully disclose his information, inefficient (relative to an environment of full disclosure) financing decisions may be made. Investors may finance a project even though the entrepreneur's information indicates that the project is not profitable, and vice versa. The optimal amount of discretion in disclosure is that which minimizes the expected social loss from inefficient financing decisions. Since investors act as competitive

This content downloaded from
35.7.46.71 on Sun, 07 Jul 2024 15:55:16 +00:00
All use subject to https://about.jstor.org/terms

Exhibit 19 to Decl. of Lyon
458
**SER 1375**

432        *QUARTERLY JOURNAL OF ECONOMICS*

bidders, minimizing the expected social loss coincides with maximizing the entrepreneur's expected gain. The expected social loss is equal to

(1)   $Z(k) = Hq \operatorname{prob}(E[\theta|d,k] \leq 0 | \theta = H)$

$$- L(1 - q) \operatorname{prob} (E[\theta|d,k] > 0 | \theta = L),$$

which is computed using the equilibrium strategy and beliefs. This is the expected social cost of not financing a good project (a type 1 error) plus the expected social cost of financing a bad project (a type 2 error).

### III. Equilibrium

There are multiple equilibria. Two equilibria are discussed in detail. Whether limitations on discretion are beneficial depends on which equilibrium is attained.

#### A. The Neutral Disclosure Strategy Equilibrium

Take $k$ as given, and consider the following "neutral" disclosure strategy. If all of the allowable signals have a realization of $l$, then the entrepreneur evenly randomizes across these signals. However, if any of the allowable signals have a realization of $h$, then the entrepreneur evenly randomizes over these signals. For example, suppose that $N = 5$, $k = 3$, and $x = (l,h,h,h,l)$. Then the entrepreneur discloses $x_2 = h$ with probability $\frac{1}{2}$, or $x_3 = h$ with probability $\frac{1}{2}$. Formally, this disclosure strategy is specified as follows. Let $t_j(x)$ denote the number of $h$ realizations in the first $j$ elements of $x$. For $i > k$, $\sigma(i|x,k) = 0$. For $i \leq k$,

$$\sigma(i|x,k) = \begin{cases} 1/t_k(x) & \text{if } x_i = h \\ 0 & \text{if } x_i = l \text{ and } x_j = h \text{ for some } j \leq k \\ 1/k & \text{if } x_i = l \text{ for all } i \leq k. \end{cases}$$

This disclosure strategy is the analogue of a strategy that, in the case of continuous signals, calls for disclosing the signal with the best realization.

PROPOSITION 1. There is an equilibrium in which the neutral disclosure strategy is used.

*Proof of Proposition 1.* See Appendix.

In the neutral disclosure strategy equilibrium (NDSE), if the entrepreneur discloses $x_i = l$, investors learn that the first $k$ signals

This content downloaded from
35.7.46.71 on Sun, 07 Jul 2024 15:55:16 +00:00
All use subject to https://about.jstor.org/terms

Exhibit 19 to Decl. of Lyon
459
**SER 1376**

*THE OPTIMAL AMOUNT OF DISCRETION TO ALLOW*    433

are all $l$'s. If he discloses $x_i = h$, they learn that there is at least one $h$ among the first $k$ signals. In this equilibrium, given a disclosure of $x_i = h$, the project price is the same regardless of the identity $i$ of the signal. This is why it is optimal for the entrepreneur to randomize in choosing among favorable signals to disclose. Investors' updated beliefs are formally specified as (A1) in the proof.

In the NDSE investors' conditional expectation of $\theta$ is higher if an $h$ is disclosed. Also, when using NDSE beliefs, if

$$(2) \qquad E[\theta|x_i = h,k] > 0 \geq E[\theta|x_i = l,k],$$

then the project is financed if the disclosure is favorable, and not financed if the disclosure is unfavorable. For both good and bad projects, the probability of a favorable disclosure increases in $k$. This is because a higher $k$ allows more chances to make a favorable disclosure. This implies that if (2) holds, as $k$ increases, more projects, both good and bad, are financed. Thus, if (2) holds, the higher $k$ is, the higher is the probability of financing a bad project, and the lower is the probability of not financing a good project. This tradeoff between type 1 and type 2 errors determines the optimal value of $k$.

Before stating the results on the optimal value of $k$, the statement of some preliminary results is useful.

LEMMA 1.   In the NDSE

$$(3) \qquad \text{if } p_L, p_H < 1, \text{ then } E[\theta|d,k] \text{ is decreasing in } k;$$

if $N = \infty$, then

$$(4a) \qquad \lim_{k \to \infty} E[\theta|x_i = l,k] = L;$$

$$(4b) \qquad \text{if } p_L < 1, \lim_{k \to \infty} E[\theta|x_i = h,k] = E[\theta].$$

It is straightforward to verify these claims, so the proof is omitted. Condition (3) states that when signals are imperfect, for any given disclosure, investors' beliefs become more pessimistic as $k$ increases. This is because, with a higher $k$, it is easier to make a favorable disclosure. Condition (4a) states that with infinite discretion, an unfavorable disclosure is perfectly informative, and (4b) states that with infinite discretion and $p_L < 1$, a favorable disclosure is completely uninformative.

There are cases in which disclosure has no social value. If the

This content downloaded from
35.7.46.71 on Sun, 07 Jul 2024 15:55:16 +00:00
All use subject to https://about.jstor.org/terms

Exhibit 19 to Decl. of Lyon
460
**SER 1377**

434        *QUARTERLY JOURNAL OF ECONOMICS*

most favorable disclosure possible does not lead to the project being
financed, then it is never financed. Similarly, if the most unfavor-
able disclosure possible leads to the project being financed, then it is
always financed. In these cases the choice of $k$ is irrelevant. By (3)
the most favorable disclosure is $x_1 = h$ when no discretion is
allowed, and the most unfavorable disclosure is $x_i = l$ when
complete discretion is allowed. Therefore, disclosure has social
value in the NDSE only if

$$(5) \qquad E[\theta \mid x_1 = h, k = 1] > 0 \geq E[\theta \mid x_i = l, k = N].$$

Assume that (5) holds for the remainder of the discussion of the
NDSE.

The optimal amount of discretion is the value of $k$ that
minimizes the equilibrium loss function. To develop this loss
function, two definitions are useful. Define $k_h$ as follows. If for $k =
N$ a disclosure of an $h$ results in the project being financed (i.e., the
left-hand side of (2) is satisfied using NDSE beliefs), let $k_h = N$.
Otherwise, let $k_h$ equal the largest integer value of $k$ such that a
disclosure of an $h$ results in the project being financed. Define $k_l$ to
be the smallest integer value of $k$ such that a disclosure of an $l$
results in the project not being financed (i.e., the right-hand side of
(2) is satisfied using NDSE beliefs). Condition (5) implies that $k_h \geq
k_l$. For $k > k_h$, no projects receive financing regardless of the
disclosure, and for $k < k_l$, all projects receive financing regardless of
the disclosure.

The loss function given by (1) can now be specified for the
NDSE:

$$(6) \quad Z(k) = \begin{cases} -L(1-q) & \text{if } k < k_l; \\ -L(1-q)(1-p_L^k) + Hq(1-p_H)^k & \text{if } k_l \leq k \leq k_h; \\ Hq & \text{if } k > k_h. \end{cases}$$

Let $k^*$ denote a value of $k \in \{1, 2, \ldots, N\}$ that minimizes $Z(k)$ as
given by (6). Since $k^*$ must be an integer, for $s \in \mathcal{R}$, define

$$I(s) = \begin{cases} s^+ & \text{if } -L(1-q)(1-p_L^{s^+}) + Hq(1-p_H)^{s^+} \\ & \leq -L(1-q)(1-p_L^{s^-}) + Hq(1-p_H)^{s^-}; \\ s^- & \text{otherwise,} \end{cases}$$

where $s^+$ is the smallest integer greater than or equal to $s$ and $s^-$ is
the largest integer less than $s$.

This content downloaded from
35.7.46.71 on Sun, 07 Jul 2024 15:55:16 +00:00
All use subject to https://about.jstor.org/terms

Exhibit 19 to Decl. of Lyon
461
**SER 1378**

THE OPTIMAL AMOUNT OF DISCRETION TO ALLOW        435

PROPOSITION 2.  In the NDSE if (5) holds, then

(i) if $p_L = p_H = 1$, then any $k \in \{1, \dots, N\}$ is optimal;
(ii) if $p_L < p_H = 1$, then $k^* = 1$;
(iii) if $p_H < p_L = 1$, then $k^* = N$;
(iv) if $p_L, p_H < 1$, then

$$(7) \qquad k^* = \begin{cases} k_l & \text{if } I(w^*) < k_l \\ I(w^*) & \text{if } k_l \le I(w^*) \le k_h \\ k_h & \text{if } I(w^*) > k_h, \end{cases}$$

where $w^* \in \mathcal{R}$ is the value of $w$ that minimizes $-L(1-q)$ $(1 - pLw) + Hq(1 - pH)w$.

*Proof of Proposition 2.*  See Appendix.

When $k_l \le k \le k_h$, disclosing $x_i = h$ leads to the project being financed, and disclosing $x_i = l$ leads to the project not being financed. For $k$ outside these bounds, disclosure has no social value because investors' financing decisions depend only on their prior beliefs. Thus, the optimal value of $k$ satisfies these bounds. Consider the four subcases. For (i) any signal conveys perfect information on $\theta$, and thus limitations on discretion do not matter. For (ii) disclosing $x_i = l$ perfectly conveys the information that $\theta = L$, so good projects are always financed (i.e., there are no type 1 errors). In this case, allowing no discretion is optimal as this minimizes the chance that a bad project is financed. For (iii) disclosing $x_i = h$ perfectly conveys the information that $\theta = H$, so bad projects are never financed (i.e., there are no type 2 errors). In this case, allowing complete discretion is optimal as this minimizes the chance that a good project is not financed. For (iv) the probability of both types of errors is positive. To understand the particular value of $k^*$ for this case, note that $w^*$ is the value of $w$ that minimizes $-L(1-q)$ $(1 - p_L^w) + Hq(1 - p_H)^w$ (the formula for $w^*$ appears in the Proof of Proposition 2). Taking the integer constraint into account and given the properties of the loss function, the minimizer becomes $I(w^*)$. Taking the constraint that $k_l \le k \le k_h$ into account yields $k^*$.

COROLLARY 1.  In the NDSE if (5) holds and $p_L, p_H < 1$, then
(i) no discretion, i.e., $k^* = 1$, is optimal if and only if

$$(8) \qquad -L(1-q)/Hq > p_H(1-p_H)/p_L(1-p_L);$$

(ii) complete discretion, i.e., $k^* = N$, is optimal if and only if

$$(9) \qquad -L(1-q)/Hq \le p_H(1-p_H)^{N-1}/p_L^{N-1}(1-p_L).$$

This content downloaded from
35.7.46.71 on Sun, 07 Jul 2024 15:55:16 +00:00
All use subject to https://about.jstor.org/terms

Exhibit 19 to Decl. of Lyon
462
**SER 1379**

436     *QUARTERLY JOURNAL OF ECONOMICS*

(iii) For a sufficiently large $N$, limited discretion is optimal, i.e., $k^* < N$.

*Proof of Corollary 1.* See Appendix.

Part (i) of the corollary establishes necessary and sufficient conditions, when $p_L$, $p_H < 1$, for it to be optimal to allow no discretion. The difference between $k = 1$ and $k = m > 1$ concerns realizations of $x \in X_m = \{x | x_1 = l, x_i = h \text{ for some } 1 < i \le m\}$. If $x \in X_m$, then the entrepreneur discloses $x_1 = l$ if $k = 1$ and $x_i = h$ if $k = m$. If $x \notin X_m$, then the entrepreneur makes the same disclosure for both $k = 1$ and $k = m$. By (8) in the NDSE, $E[\theta | x \in X_m] < 0$ for $m \ge 2$, and a level of discretion that leads to this set of "types" receiving financing is dominated by one that does not. Thus, it is optimal to allow no discretion. Similar intuition underlies part (ii) which establishes necessary and sufficient conditions, when $p_L$, $p_H < 1$, for it to be optimal to allow complete discretion. Part (iii) simply states that with a large number of signals, some limitation on discretion is optimal.

Corollary 2 establishes comparative statics results concerning the optimal amount of discretion.

COROLLARY 2. In the NDSE if (5) holds and $p_L, p_H < 1$, then the optimal level of discretion, $k^*$ is nondecreasing in $L, H$, and $q$.

*Proof of Corollary 2.* See Appendix.

There are two reasons for this result. First, for a disclosure to be useful, an unfavorable disclosure must lead to a different decision than a favorable disclosure. Consider a project for which the market's priors are favorable. A disclosure of an $l$ leads to the project not being financed only if there were numerous opportunities to disclose an $h$. Otherwise a disclosure of an $l$ is interpreted as unrepresentative of the project's quality. Alternatively put, the entrepreneur must fail an easy test. Therefore, since prior beliefs become more favorable as $L, H$, and $q$ increase, the optimal amount of discretion also increases. The second reason for the result is that as $L, H$, and $q$ increase, the expected social cost of financing a bad project falls relative to the expected social cost of not financing a good project. Therefore, more discretion should be allowed so that more projects have favorable disclosures, and thus receive financing. This is like handicapping in reverse. The more (less) favorable the market's prior beliefs are about an entrepreneur's project, the easier (harder) it should be for the entrepreneur to make a favorable disclosure.

This content downloaded from
35.7.46.71 on Sun, 07 Jul 2024 15:55:16 +00:00
All use subject to https://about.jstor.org/terms

Exhibit 19 to Decl. of Lyon
463
**SER 1380**

THE OPTIMAL AMOUNT OF DISCRETION TO ALLOW        437

### B. The Lexicographic Disclosure Strategy Equilibrium

Another equilibrium involves a "lexicographic" disclosure strategy. For a given $k$ this strategy is defined as follows. If all of the allowable signals have a realization of $l$, then the entrepreneur evenly randomizes across these signals. However, if any of the allowable signals have a realization of $h$, then the entrepreneur does not randomize. The lexicographic disclosure strategy calls for disclosing the first favorable signal in $x$. For example, suppose that $N = 5$, $k = 3$, and $x = (l,h,h,h,l)$. The entrepreneur could make a favorable disclosure with signals 2 or 3. This strategy calls for disclosing $x_2 = h$ with probability 1. Formally, the lexicographic disclosure strategy is specified as follows. For $i > k$, $\sigma(i|x, k) = 0$. For $i \le k$,

$$\sigma(i|x,k) = \begin{cases} 1 & \text{if } x_i = h \text{ and } t_i(x) = 1; \\ 1/k & \text{if } x_j = l \text{ for all } j \le k; \\ 0 & \text{otherwise.} \end{cases}$$

PROPOSITION 3. There is an equilibrium in which the lexicographic disclosure strategy is used.

*Proof of Proposition 3.* See Appendix.

In the lexicographic disclosure strategy equilibrium (LDSE), if the entrepreneur discloses $x_i = l$, investors learn that the first $k$ signals are all $l$'s. If he discloses $x_i = h$, they learn that for $j < i$, $x_j = l$ and that there is at least one $h$ among signals $i$ through $k$. In this equilibrium, given a disclosure of $x_i = h$, the project price is higher the lower the value of $i$. This is why it is optimal for the entrepreneur to show a priority in choosing among favorable signals to disclose. Investors' updated beliefs are formally specified as (A3) in the proof.

We now determine the optimal amount of discretion to allow for the LDSE. Unlike the analysis of the NDSE, this determination can be made without explicit reference to the equilibrium loss function.

PROPOSITION 4. In the LDSE an optimal value of $k$ is equal to $N$.

*Proof of Proposition 4.* See Appendix.

Disclosure induces a partition on the set of possible signals observed by the entrepreneur. In the LDSE, as $k$ increases, this partition becomes finer. This is because a signal $i > 1$ is disclosed only if $x_j = l$, for $j < i$. So disclosing a particular signal effectively

This content downloaded from
35.7.46.71 on Sun, 07 Jul 2024 15:55:16 +00:00
All use subject to https://about.jstor.org/terms

Exhibit 19 to Decl. of Lyon
464
**SER 1381**

438      *QUARTERLY JOURNAL OF ECONOMICS*

provides full information on every signal that "precedes" it. Therefore, adding signals to the allowable set can only provide investors with the possibility of more information. Therefore, it is optimal to give the entrepreneur complete discretion.

There may be more than one optimal value of $k$. In the LDSE, for $i < j \le k$, $E[\tilde{\theta} | x_i = h, k] > E[\tilde{\theta} | x_j = h, k]$. Therefore, if $E[\tilde{\theta} | x_i = h, k] < 0$, for some $i < N$, then any $k \ge i - 1$ is optimal. Allowing additional discretion beyond $k = i - 1$ is more informative (i.e., it induces a finer partition on the set of possible signals) but does not raise welfare. This is because the project is not financed regardless of whether the disclosure is $x_{i-1} = l$, $x_i = h$ or $x_j = h$ for $j > i$.

In the NDSE entrepreneurs evenly randomize over favorable disclosures. This may seem reasonable since the signals are, conditional on $\theta$, independent and identically distributed. Further, the LDSE may seem unreasonable. Why should the entrepreneur assign a priority over i.i.d. signals in disclosing information? It is therefore interesting that more information is transmitted between the entrepreneur and investors in the LDSE as compared with the NDSE. In both equilibria, for a given $k$, investors learn something about the first $k$ signals of $x$. If these $k$ signals are all $l$'s, then in both equilibria, the entrepreneur discloses $x_i = l$, and investors learn that the $k$ signals are all $l$'s. Suppose that the $k$ signals are not all $l$'s. In the NDSE investors learn that at least one of these $k$ signals has a realization of $h$. In the LDSE investors may learn more because disclosing $x_i = h$ also tells investors that for $j < i$, $x_j = l$ (disclosing $x_1 = h$ tells investors only that at least one of the $k$ signals has a realization $h$). Thus, for all $k$ the same or more information is conveyed by a disclosure in the LDSE as compared with one in the NDSE. In turn, investors make better financing decisions, and welfare is higher.[6]

6. While we study a case with equally informative signals, both types of equilibria can arise when the informativeness of signals varies. Consider an example with two signals, signal 1 being more informative than signal 2. Adding subscripts denoting the signal to $p_H$ and $p_L$, let $p_{H1} = p_{L1} = 0.9$ and $p_{H2} = p_{L2} = 0.8$, and let $q = 0.5$. Suppose that complete discretion in disclosure is allowed; i.e., $k = 2$. There is an LDSE in which the entrepreneur discloses $x_1$, the more informative signal, whenever $x_1 = h$. There is also a type of NDSE in which the entrepreneur is indifferent between disclosing signal 1 or signal 2 given that they have the same realization. In this equilibrium, if $x_1 = h$ and $x_2 = h$, then the entrepreneur discloses $x_1$ with probability 2/13 and discloses $x_2$ with probability 11/13, and with either disclosure, the project price is $(7H + 2L)/9$. Finally, there is a "reverse" LDSE in which the entrepreneur discloses $x_2$, the less informative signal, whenever $x_2 = h$. In this equilibrium disclosing $x_2 = h$ leads to a project price of $(4H + L)/5$ and disclosing $x_1 = h$ leads to a project price of $(9H + 4L)/13$.

This content downloaded from
35.7.46.71 on Sun, 07 Jul 2024 15:55:16 +00:00
All use subject to https://about.jstor.org/terms

Exhibit 19 to Decl. of Lyon
465
**SER 1382**

### IV. CONCLUSION

This paper examines rules that limit discretion in disclosure when full verifiable disclosure is not possible. We find that such rules may raise social welfare in a setting in which an informed party can verifiably disclose one of $N$ signals. In practice, a variety of disclosure regulations specify the type of information to be disclosed as well as the quantity of information to be disclosed. For instance, generally accepted accounting principles specify the set of allowable procedures for computing items such as depreciation, cost-of-goods-sold, etc. The alternative is to allow any procedure. The results of this paper provide a framework for understanding how such restrictions on discretion can make disclosures more informative.

Two equilibria were analyzed.[7] In one equilibrium, the NDSE, it was shown that under certain conditions, limited discretion is optimal; while in the other equilibrium, the LDSE, complete discretion is optimal. Therefore, to use this theory to evaluate the merit of disclosure rules for a particular situation, it is important to consider which equilibrium is more plausible. The more efficient LDSE requires that the uninformed parties coordinate on the "order" of the signals. This is not necessary for the NDSE. Such coordination is difficult when there are many uninformed parties. Thus, the NDSE (LDSE) seems more plausible when there are many (few) uninformed parties.

Consider the three examples discussed in the Introduction. For a public securities offering, which involves many uninformed investors, an NDSE seems more plausible. If so, then Corollary 2 suggests the following about limiting discretion for public equity offerings. Suppose that new businesses are more likely to fail than established businesses. Then more discretion should be allowed in preparing

---

7. Note that the standard refinements of sequential equilibria cannot be applied here. This is because for the two equilibria studied, there are no out-of-equilibrium moves.

Also note that there may be equilibria other than the NDSE and the LDSE. For instance, there may be equilibria that are combinations of these two equilibria where entrepreneurs assign priorities across subsets of signals, and randomize within subsets. Uninformative equilibria are also possible. Consider the strategy in which the entrepreneur discloses $x_1 = h$ if all $N$ signals are $h$'s or if only $x_1 = h$, and discloses $x_i = l$ otherwise. If $k = N > 3$, $p_L = p_H = p$, and

$$1 - Nz + Nz^{N-1} - z^N = 0,$$

where $z = (1 - p)/p$ (there is a $p > 1/2$ that satisfies this equation), then there is an equilibrium in which this strategy is used, and updated beliefs are the same as prior beliefs.

This content downloaded from
35.7.46.71 on Sun, 07 Jul 2024 15:55:16 +00:00
All use subject to https://about.jstor.org/terms

Exhibit 19 to Decl. of Lyon
466
**SER 1383**

440            *QUARTERLY JOURNAL OF ECONOMICS*

financial statements in support of a seasoned equity offering as compared with an initial public offering. (In practice, the same accounting rules govern both types of offerings.) Similar logic applies to consumer product testing. With many consumers, coordinating beliefs regarding signal order is difficult, and thus the NDSE seems more plausible. Therefore, the results suggest that manufacturers of established products should have more discretion in presenting test results than manufacturers of new products. In a job interview the LDSE is plausible. For in this case, there is one uninformed party (the interviewer) rather than many, so coordinating beliefs is not a problem. The interviewer can simply state the order that he believes the job candidate to be following.

An interesting extension concerns informational externalities. Suppose that there are many entrepreneurs with projects to be financed. Also suppose that the $i$th signal observed by one entrepreneur contains some noise that is common to the $i$th signal observed by other entrepreneurs. Then there is an incentive to impose more "standardized" disclosure requirements. Standardization makes it easier to filter out the common noise. This allows the market to more efficiently price projects, and increases the efficiency of the flow of capital.[8]

APPENDIX

*Proof of Proposition 1.* Consider the neutral disclosure strategy and beliefs given by

$$g(H|x_i = l, k) = 1 - g(L|x_i = l, k)$$

$$= \frac{q(1 - p_H)^k}{q(1 - p_H)^k + (1 - q)p_L^k}$$

(A1)        $$g(H|x_i = h, k) = 1 - g(L|x_i = h, k)$$

$$= \frac{q(1 - (1 - p_H)^k)}{q(1 - (1 - p_H)^k) + (1 - q)(1 - p_L^k)}.$$

Suppose that $t_k(x) > 0$. Since $g(H|x_i = h, k) = g(H|x_j = h, k) > g(H|x_m = l, k)$, $P(x_i = h, k) = P(x_j = h, k) \geq P(x_m = l, k)$, and the entrepreneur is indifferent across favorable disclosures which are

---

8. Easterbrook and Fischel [1984] discuss informational externalities as a motivation for standardized disclosure requirements.

This content downloaded from
35.7.46.71 on Sun, 07 Jul 2024 15:55:16 +00:00
All use subject to https://about.jstor.org/terms

Exhibit 19 to Decl. of Lyon
467
**SER 1384**

*THE OPTIMAL AMOUNT OF DISCRETION TO ALLOW*     441

preferred to unfavorable disclosures. Thus, $\sigma(i|x,k) = 1/t_k(x)$ if $x_i = h$ and $\sigma(i|x,k) = 0$ otherwise is optimal. Suppose that $t_k(x) = 0$. Since $g(H|x_i = l,k) = g(H|x_j = l,k)$, $P(x_i = l,k) = P(x_j = l,k)$, and the entrepreneur is indifferent across disclosures. Thus, $\sigma(i|x,k) = 1/k$ is optimal. It is straightforward to verify that (A1) is consistent with $\sigma$ and Bayes' rule.

<div align="right">Q.E.D.</div>

*Proof of Proposition 2.* Using (3) and (5), it can be verified that

$$Z(k)\big|_{k \notin \{k_l,\dots,k_h\}} \geq Z(k)\big|_{k \in \{k_l,\dots,k_h\}}.$$

Therefore, an optimal choice of $k$ is a solution to the following problem:

$$\min_k Z(k) \quad \text{subject to } k \in \{k_l, \dots, k_h\}.$$

Consider the four subcases.

(i) If $p_H = p_L = 1$, then $k_l = 1$, $k_h = N$ and $Z(k) = 0$ for $k \in \{1, \dots, N\}$. Thus, any $k \in \{1, \dots, N\}$ is optimal.

(ii) If $p_L < p_H = 1$, then $k_l = 1$ and $Z(k) = -L(1-q)(1-p_L^k)$ for $k \in \{1, \dots, k_h\}$. Since $Z(k)$ is increasing in $k$, $k^* = 1$.

(iii) If $p_H < p_L = 1$, then $k_h = N$ and $Z(k) = Hq(1 - p_H)^k$ for $k \in \{k_l, \dots, N\}$. Since $Z(k)$ is decreasing in $k$, $k^* = N$.

(iv) If $p_H, p_L < 1$, then $1 \leq k_l \leq k_h \leq N$ and $Z(k) = -L(1-q)(1-p_L^k) + Hq(1-p_H)^k$ for $k \in \{k_l, \dots, k_h\}$. Note that $\partial Z(w)/\partial w = 0$ at

$$w = w^* \equiv \left\{ \ln\left[\frac{-L(1-q)}{Hq}\right] + \ln\left[\frac{\ln(p_L)}{\ln(1-p_H)}\right] \right\} \bigg/ \ln\left[\frac{1-p_H}{p_L}\right].$$

Further, it can be verified that

(A2)     $$\frac{\partial Z(w)}{\partial w} > (<)\, 0 \text{ as } w > (<)\, w^*.$$

Thus, $w = w^*$ is the unconstrained minimizer of $-L(1-q)(1-p_L^w) + Hq(1-p_H)^w$. By (A2): If $I(w^*) < k_l$, then $k^* = k_l$; if $k_l \leq I(w^*) \leq k_h$, then $k^* = I(w^*)$; and if $k_h < I(w^*)$, then $k^* = k_h$. This completes the proof.

<div align="right">Q.E.D.</div>

*Proof of Corollary 1.*

(i) Inequality (8) implies that $E[\theta|x_1 = l, k = 1] < 0$ and thus $k_l = 1$. Consider the two possible cases, $k_h = 1$ and $k_h > 1$. If $k_h = 1$,

This content downloaded from
35.7.46.71 on Sun, 07 Jul 2024 15:55:16 +00:00
All use subject to https://about.jstor.org/terms

Exhibit 19 to Decl. of Lyon
468
**SER 1385**

442            *QUARTERLY JOURNAL OF ECONOMICS*

then by (7) $k^* = 1$. Suppose that $k_h > 1$. Inequality (8) implies that $Z(2) > Z(1)$. Thus, by (A2) $w^* < 2$, and $I(w^*) \leq 1$. Thus, by (7) $k^* = 1$.

Now suppose that $k^* = 1$. Since $k^* \geq k_l$, $k_l = 1$. Consider the two possible cases, $k_h = 1$ and $k_h > 1$. If $k_h = 1$, then $E[\theta|x_i = h, k = 2] \leq 0$, which implies (8). Suppose that $k_h > 1$. Since $k^* = 1$, $Z(2) > Z(1)$, which implies (8).

(ii) Inequality (9) implies that $E[\theta|x_i = h, k = N] \geq 0$ and thus $k_h = N$. Consider the two possible cases, $k_l = N$ and $k_l < N$. If $k_l = N$, then by (7) $k^* = N$. Suppose that $k_l < N$. Inequality (9) implies that $Z(N-1) \geq Z(N)$. Thus, by (A2) $w^* > N - 1$, and $I(w^*) \geq N$. Thus, by (7) $k^* = N$.

Now suppose that $k^* = N$. Since $k^* \leq k_h$, $k_h = N$. Consider the two possible cases, $k_l = N$ and $k_l < N$. If $k_l = N$, then $E[\theta|x_i = l, k = N - 1] > 0$, which implies (9). Suppose that $k_l < N$. Since $k^* = N$, $Z(N-1) \geq Z(N)$, which implies (9).

(iii) By Lemma 1 there exists a finite $\overline{N}$ such that for $N > \overline{N}$, $k_l < N$. Note that $I(w^*)$ does not depend on $N$, and consider an $N > \max\{\overline{N}, I(w^*)\}$. Suppose that $k_h < N$. Then by (7) $k^* \leq k_h < N$. Suppose that $k_h = N$. Then by (7) $k^* = \max\{k_l, I(w^*)\} < N$.

Q.E.D.

*Proof of Corollary 2.* To emphasize the dependence of $I(\cdot)$ on $L$, $H$, and $q$, rewrite this function as $I(w;L,H,q)$ (we continue to suppress notation indicating dependence on $p_L$ and $p_H$). It will be shown that $k_l$, $k_h$, and $I(w^*;L,H,q)$ are nondecreasing in $L$, $H$, and $q$, which by (7), implies the result.

For any $d$ and $k$, $E[\theta|d,k]$ is increasing in $L$, $H$, and $q$. This implies that $k_l$ and $k_h$ are nondecreasing in $L$, $H$, and $q$. It is immediate that $w^*$ is increasing in $L$, $H$, and $q$. It remains to be shown that $I(w^*;L,H,q)$ is nondecreasing in $w^*$, holding $p_L$ and $p_H$ fixed. Let $w_i$ denote the value of $w^*$ when $L = L_i$, $H = H_i$, and $q = q_i$, for $i = 1, 2$, and suppose that $w_2 > w_1$. There are two cases to consider.

(i) $w_2 > I(w_1;L_1,H_1,q_1)$. Then $w_2^- \geq I(w_1;L_1,H_1,q_1)$ which implies that $I(w_2;L_2,H_2,q_2) \geq I(w_1;L_1,H_1,q_1)$.

(ii) $w_2 \leq I(w_1;L_1,H_1,q_1)$. This implies that $I(w_1;L_1,H_1,q_1) = w_1^+ = w_2^*$. This implies that

$$\frac{p_H}{1-p_L}\left[\frac{1-p_H}{p_L}\right]^{w_1^-} \geq \frac{-L_1(1-q_1)}{H_1 q_1}.$$

Since $w_2 > w_1$, we have that $-L_1(1-q_1)/H_1 q_1 > -L_2(1-q_2)/H_2 q_2$

This content downloaded from
35.7.46.71 on Sun, 07 Jul 2024 15:55:16 +00:00
All use subject to https://about.jstor.org/terms

Exhibit 19 to Decl. of Lyon
469
**SER 1386**

*THE OPTIMAL AMOUNT OF DISCRETION TO ALLOW*     443

which implies that the above inequality holds when $L_2$, $H_2$, and $q_2$ replace $L_1$, $H_1$, and $q_1$. Thus, $I(w_2;L_2,H_2,q_2) = w_2^*$, and we have that $I(w_1;L_1,H_1,q_1) = I(w_2;L_2,H_2,q_2)$.

Q.E.D.

*Proof of Proposition 3.* Consider the lexicographic disclosure strategy and beliefs given by

$$g(H|x_i = l, k) = 1 - g(L|x_i = l, k)$$

$$= \frac{q(1 - p_H)^k}{q(1 - p_H)^k + (1 - q)p_L^k}$$

(A3)     $$g(H|x_i = h, k) = 1 - g(L|x_i = h, k)$$

$$= \frac{qp_H(1 - p_H)^{i-1}}{qp_H(1 - p_H)^{i-1} + (1 - q)(1 - p_L)p_L^{i-1}}.$$

Say that $t_k(x) > 0$. For $i < j$, $g(H|x_i = h,k) > g(H|x_j = h,k) > g(H|x_m = l,k)$, and thus $P(x_i = h,k) \geq P(x_j = h,k) \geq P(x_m = l,k)$. Thus, the entrepreneur prefers disclosing $x_i = h$ to $x_j = h$ and $x_m = l$. Thus, $\sigma(i|x,k) = 1$ if $t_i(x) = 1$ and $\sigma(i|x,k) = 0$ otherwise is optimal. Say that $t_k(x) = 0$. Since $g(H|x_i = l,k) = g(H|x_j = l,k)$, $P(x_i = l,k) = P(x_j = l,k)$ and the entrepreneur is indifferent across disclosures. Thus, $\sigma(i|x,k) = 1/k$ is optimal. It is straightforward to verify that (A3) is consistent with $\sigma$ and Bayes' rule.

Q.E.D.

*Proof of Proposition 4.* Let $B_l(k) = \{x|x_j = l$ if $j \leq k\}$; and let $B_h(i) = \{x|x_j = l$ if $j < i, x_i = h\}$. For a given $k$, the partition induced by disclosure is given by

(A4)     $$\{B_l(k)\}, \{B_h(1)\}, \ldots, \{B_h(k)\}.$$

For $k = N$ the partition induced by disclosure is given by

(A5)     $$\{B_l(N)\}, \{B_h(1)\}, \ldots, \{B_h(k)\}, \ldots, \{B_h(N)\}.$$

For $k < N$, the partition (A5) is finer than the partition (A4). Thus, the expected social loss with $k < N$ is at least as high as with $k = N$.

Q.E.D.

NORTHWESTERN UNIVERSITY

This content downloaded from
35.7.46.71 on Sun, 07 Jul 2024 15:55:16 +00:00
All use subject to https://about.jstor.org/terms

Exhibit 19 to Decl. of Lyon
470
**SER 1387**

444        *QUARTERLY JOURNAL OF ECONOMICS*

### REFERENCES

Dye, R. A., "Strategic Accounting Choice and the Effects of Alternative Financial Reporting Requirements," *Journal of Accounting Research,* XXIII (1985), 544–74.
——, "Proprietary and Nonproprietary Disclosures," *Journal of Business,* LIX (1986), 331–66.
Easterbrook, F., and D. R. Fischel, "Mandatory Disclosure and the Protection of Investors," *Virginia Law Review,* LXX (1984), 669–715.
Farrell, J., "Voluntary Disclosure: Robustness of the Unraveling Result, and Comments on Its Importance," in *Antitrust and Regulation,* R. Grieson, ed. (Lexington: Lexington Books, 1986).
Fishman, M. J., and K. M. Hagerty, "Disclosure Decisions by Firms and the Competition for Price Efficiency," *Journal of Finance,* XLIV (1989), 633–46.
Grossman, S. J., "The Informational Role of Warranties and Private Disclosure About Product Quality," *Journal of Law and Economics,* XXIV (1981), 461–83.
——, and O. D. Hart, "Disclosure Laws and Takeover Bids," *Journal of Finance,* XXXV (1980), 323–34.
Jovanovic, B., "Truthful Disclosure of Information," *Bell Journal of Economics,* XIII (1982), 36–44.
Leland, H. E., and D. H. Pyle, "Informational Asymmetries, Financial Structure and Financial Intermediation," *Journal of Finance,* XXXII (1977), 371–87.
Matthews, S., and A. Postlewaite, "Quality Testing and Disclosure," *Rand Journal of Economics,* XVI (1985), 328–40.
Milgrom, P. R., "Good News and Bad News: Representation Theorems and Applications," *Bell Journal of Economics,* XII (1981), 380–91.
——, and J. Roberts, "Relying on the Information of Interested Parties," *Rand Journal of Economics,* XVII (1986), 18–32.
Stevenson, R. B., *Corporations and Information* (Baltimore: The Johns Hopkins University Press, 1980).
Verrecchia, R. E., "Discretionary Disclosure," *Journal of Accounting and Economics.* V (1982) 179–94.

This content downloaded from
35.7.46.71 on Sun, 07 Jul 2024 15:55:16 +00:00
All use subject to https://about.jstor.org/terms

Exhibit 19 to Decl. of Lyon
471
**SER 1388**

# Exhibit 17

# to Declaration of Thomas P. Lyon

# DETECTING FALSE ACCOUNTS IN INTERMEDIATED VOLUNTARY DISCLOSURE

Exhibit 17 to Decl. of Lyon
421
**SER 1389**

© *Academy of Management Discoveries*
2021, Vol. 7, No. 1, 40–56.
Online only
https://doi.org/10.5465/amd.2018.0229

# DETECTING FALSE ACCOUNTS IN INTERMEDIATED VOLUNTARY DISCLOSURE

PATRICK J. CALLERY
Carleton University

JESSICA PERKINS
University of California, Santa Barbara



Intermediated voluntary disclosure is a rapidly diffusing practice that addresses broad stakeholder demand for credible information transparency on corporate policies and performance along dimensions of societal interest. Building upon substantial literatures on proprietary disclosure, research has begun to rigorously document antecedents and outcomes of intermediated disclosure. However, theory remains relatively silent on how two important aspects of this mechanism—lack of audit oversight and provision of evaluative ratings—create incentives for uptake of an overlooked mode of misleading disclosures: false accounts. Moreover, research has not definitively addressed the degree to which intermediated voluntary disclosures are verifiable or truthful, nor the associated significance for long-term institutional credibility. This study uses forensic analysis of detailed corporate disclosures to one prominent intermediary to develop and validate novel constructs that establish evidence of false claims. Our findings demonstrate that firms routinely manipulate intermediary ratings with false claims, undermining institutional and societal goals. The results identify several factors that may improve ability to differentiate substantive firm performance from false accounts. This study contributes to our understanding of firm incentives and strategies for engagement with voluntary mechanisms and the ability of those practices to improve governance; it also identifies new opportunities for theoretical and empirical research.

The authors would like to thank Bill Kuni and Mary Yang for their generous support of this research, provided through the H. William Kuni Bren Fellows Award at the University of California, Santa Barbara. We thank Tom Lyon, Matt Potoski, Sarah Anderson, Steve Barley, and Magali Delmas for their valuable feedback and guidance in our development of this manuscript. We also thank Associate Editor Paul Ingram and two anonymous referees, whose suggestions have helped improve this paper.

40

Copyright of the Academy of Management, all rights reserved. Contents may not be copied, emailed, posted to a listserv, or otherwise transmitted without the copyright holder's express written permission. Users may print, download, or email articles for individual use only.

Exhibit 17 to Decl. of Lyon
422
**SER 1390**

2021                                     *Callery and Perkins*                                     41

"Voluntary disclosure intermediaries" (VDIs) are third-party organizations that systematically collect issue-specific information directly from firms and analyze, aggregate, and disseminate consolidated information in a fixed framework to the general public or subscribers (Fabrizio & Kim, 2019). VDIs typically dictate a fixed information-reporting format that limits firm discretion, reducing opportunity for exaggeration and obfuscation (Fishman & Hagerty, 1990). Like other information intermediaries (e.g., financial analysts, sustainability ratings schemes), these actors credibly serve as a neutral arbiter of corporate claims, neutralizing conflict of interest concerns. Many VDIs also provide evaluative ratings of firm disclosures, effectively endorsing those firms that meet issue-specific criteria (Doh, Howton, Howton, & Siegel, 2010).

Using a variety of standards and evaluative mechanisms,[1] VDIs promise to enhance corporate transparency and drive improvement in performance on issues of importance to investors as well as society at large (Kolk, Levy, & Pinkse, 2008). However, extant literature suggests that some intermediaries may fail to generate improved performance among adopters along dimensions specifically targeted by the program (Cho, Guidry, Hageman, & Patten, 2012; Kim & Lyon, 2011; Matisoff, 2013; Milne & Gray, 2013), suggesting potential for symbolic management by participating firms (Delmas & Montes-Sancho, 2010). Accordingly, prior research on firm manipulation of intermediated voluntary disclosure has primarily followed the institutional literature on independent voluntary disclosure, focused largely on decoupling (Crilly, Hansen, & Zollo, 2016; Wijen, 2014) and impression management (Marquis, Toffel, & Zhou, 2016; McDonnell & King, 2013).

But VDIs have important, fundamental characteristics that may create incentives for different modes of misrepresentation. One distinguishing aspect of VDIs is the lack of formal audit mechanism to verify accuracy and reliability of disclosures. Absent this accountability mechanism, firms may have incentive to falsify claims when the probability of detection is low (Bagnoli & Watts, 2017; Kim & Lyon, 2011). One fundamental safeguard used to promote accountability in disclosure is a statement of assurance from a certified third party, and many corporations pursue such assurance in proprietary reports (Perego & Kolk, 2012).

However, while obtaining assurance is generally associated with perceived rigor and accuracy (Hummel & Schlick, 2016), assurance is subject to manipulation (Ball, Owen, & Gray, 2000; Boiral & Gendron, 2011) and an imperfect verification mechanism.

Another common, yet potentially problematic, feature of VDI programs is the provision of evaluative performance ratings based on the content of firm disclosures. Commensurable ratings simplify and reduce the cost of the stakeholder evaluation process by offering a simple metric to compare firms on certain terms (Rindova, Williamson, Petkova, & Sever, 2005). By bearing information-processing costs, credible VDIs allow stakeholders to gravitate toward a simple endorsement or interpretable metric rather than scrutinize the complex, underlying data through costly proprietary analysis (Bae, Wilcoxen, & Popp, 2010; Lyon & Shimshack, 2015). A credible intermediary's rating thus holds considerable influence over a firm's reputation (Rindova, Martins, Srinivas, & Chandler, 2018). Accordingly, control over a firm's public rating becomes an important aspect of its organizational impression management (Luca & Smith, 2015). Once a firm decides to disclose information leading to such a rating, it faces powerful incentives to improve its rating in order to enhance stakeholder perceptions of performance (Chatterji & Toffel, 2010; Stern & James, 2016). VDI transparency in evaluation methodology may enhance credibility with stakeholders, but it also provides firms with explicit instructions for tuning self-reports to optimize the rating (Espeland & Sauder, 2007).

We argue that theory has not sufficiently addressed this new form of decentralized institution and the embedded incentives that shape firm disclosure strategy. Our understanding of firm efforts to misrepresent performance is largely limited to selective disclosure (Marquis et al., 2016) and use of language to embellish or obfuscate (Fabrizio & Kim, 2019; Hahn & Lülfs, 2014). Intermediated voluntary disclosure is perhaps more akin to regulated financial disclosure, which relies on rules, external audit, and materiality. Whereas financial disclosure research also attends to linguistic obfuscation (see Loughran & McDonald, 2016, for a review) and selective disclosure (Healy & Palepu, 2001), an important aspect of this literature examines ways that firms manipulate regulated financial disclosures through false accounts (Harris & Bromiley, 2007; Healy & Wahlen, 1999). Voluntary disclosure literature abounds with rich theory and

---

[1] For example, the Global Reporting Initiative maintains a voluntary information reporting standard that firms apply to their proprietary corporate sustainability reports; the Dow Jones Sustainability Index solicits applications from firms to be recognized as a top performer in corporate sustainability; the CDP (formerly the Carbon Disclosure Project) solicits standard format disclosures on corporate greenhouse gas emissions policy and performance and quantitatively evaluates firm responses.



Author's voice:
Who is the intended audience of
your research?

Exhibit 17 to Decl. of Lyon
423
**SER 1391**

Case 2:24-cv-00801-ODW-PVC   Document 56-17   Filed 07/24/24   Page 4 of 18   Page ID #:6404

42                                        *Academy of Management Discoveries*                                 March

empirical evidence on the nature of firms to use language to mislead but is yet largely silent on prevalence of false accounts of quantifiable performance. Few studies have found direct evidence of false claims in intermediated voluntary disclosure (e.g., see Kim & Lyon, 2011), and the need to deepen our understanding of firm motives and methods presents a potentially rich area for development of theory. As markets and regulators begin to embrace integrated reporting (Grewal, Riedl, & Serafeim, 2019), it is increasingly important to understand the ways in which firms may misrepresent material non-financial performance (Khan, Serafeim, & Yoon, 2016). This emerging institutional transformation leads to our motivating research question: Do we empirically observe that firms misrepresent intermediated disclosure through false accounts?

As an important step toward addressing this question and improving understanding of the phenomenon, this study uses exploitative abduction (Bamberger, 2018) to empirically examine whether and how firms may falsify disclosures to influence VDI ratings. We conduct a forensic analysis of detailed data contained in corporate disclosures to the CDP (formerly the Carbon Disclosure Project) and develop and validate statistical measures of both strategic inconsistencies in reported greenhouse gas (GHG) emissions performance over time and opportunistic behavior in response to ratings-based incentives. Our findings indicate that firms do indeed misrepresent non-financial performance through provision of false claims of GHG emissions reductions. We further identify several factors—different levels of external assurance obtained, VDI evaluative ratings, and sectoral exposure to public scrutiny—that affect firm propensity for misleading disclosures.

This study makes several contributions to our knowledge of intermediated voluntary disclosure and false accounts of non-financial performance. First, we highlight the phenomenon of false accounts in disclosure as distinct from decoupling practices and outline the need for new theory to understand modes and motivations for this avenue of performance misrepresentation.

Second, we develop a novel, rigorous empirical examination of detailed quantitative disclosures, looking beyond the mere decision to disclose and into the deeper significance of incentives that shape how information is disclosed and the strategic purpose that is served. We provide evidence of false accounts in intermediated disclosure with the intent to influence ratings (and perhaps second-order market value benefits), demonstrating how rating schemes may generate perverse incentives. Moreover, we provide new empirical evidence of firms' use of different levels of third-party assurance to either signal substantive management or further

shield misleading disclosures from scrutiny. Finally, we highlight two complementary, problematic aspects of intermediated voluntary disclosure—lack of audit and provision of evaluative ratings—and offer practical guidance for both the structure of disclosure mechanisms and methods for stakeholders to use to evaluate firm disclosures that will help reduce the incidence of false accounts and resulting inefficiencies.

The remainder of the paper is organized as follows: the next section introduces the empirical setting, our derivation and validation of the main empirical measures, and the additional variables; the third section describes our analytical approach and main results. A final section offers a brief discussion of the key findings of this work, including a development of four propositions that highlight implications and opportunities for further theoretical and empirical research.

## DATA AND MEASURES

### Research Setting

To evaluate the propensity of firms to make false claims through intermediated disclosures, we obtained comprehensive corporate disclosure data from the CDP, a prominent VDI. The CDP is a United Kingdom-based not-for-profit organization founded in 2002 with the broad support of institutional investors that seeks to influence corporations to make voluntary disclosures regarding performance and risks related to climate change. GHG emissions and climate change risk management are increasingly relevant to investors as they weigh the long-term risks and opportunities faced by firms. The number of firms responding to the CDP has increased from fewer than 200 in 2003 to more than 1,800 in 2015, while institutional investor signatories supporting the CDP mission numbered 822 in 2015, lending it substantial normative and coercive influence as a voluntary disclosure mechanism (Reid & Toffel, 2009).

Since 2003, the CDP has annually distributed to the largest publicly traded global firms questionnaires consisting of a series of questions (more than 250 items in 2015) and utilizing a variety of response formats, including discrete-choice menus, numerical entry, free text, and document uploads. Starting in 2010, the CDP developed and compiled evaluative ratings for each firm based on disclosure content. One measure—the CDP performance score—is a categorical rank score that places firms in one of six performance bands (A, A−, B, C, D, E) based on the CDP's assessment of their overall climate change management. The CDP assigns performance score points for certain, specified responses across all types of questionnaire items noted above; points are

Exhibit 17 to Decl. of Lyon
424
**SER 1392**

2021      *Callery and Perkins*      43

aggregated and firms sorted into performance bands (letter scores) within common industry groups. Importantly, the CDP provides firms with its detailed scoring methodology in advance, so that attentive respondents can estimate with confidence how individual responses will be scored.

Recent research has found evidence, using the fog index of readability (Fabrizio & Kim, 2019), of obfuscation in CDP free-text responses, but we note that other research has found the fog index to be imprecise and largely inconclusive (Bushee, Gow, & Taylor, 2018; Loughran & McDonald, 2016). Moreover, falsified claims represent a substantively different construct—and an arguably more pernicious phenomenon—than mere textual obfuscation. In the present study, we take advantage of quantitative CDP responses (numerical entry and discrete choice) to develop measures that are directly comparable between firms and within firms over time. Furthermore, the validity of quantitative responses is not objectively verifiable externally, offering firms a simple way to influence performance scores with relative certainty, regardless of whether those responses are true or false representations of actual performance.

### Derived Measures and Validation

We thoroughly examined the CDP questionnaires and corresponding firm disclosure data over time to understand whether and how firms might surreptitiously manipulate disclosed information in order to enhance performance scores. Over the years 2011 to 2015, the questionnaire's content and scoring methodology were mostly consistent, but with minor variations during that period.[2] This circumstance allowed us to develop of a novel measure of false accounts and associated measures that help validate the first.

***Inconsistency.*** We detected *Inconsistency* when a firm claimed a reduction in GHG emissions in one year that contradicted an actual increase (based on our calculations) in reported emissions relative to the prior year. Most firms report Scope 1 and 2 absolute emissions, revenue intensity of emissions (i.e., per unit revenue), and employment intensity of emissions (i.e., per employee) to the CDP each year. A responding firm will report numerical values for (a) current-year emissions and (b) percentage change in emissions relative to the prior year, as well as a discrete-choice selection specifying

(c) the direction of change in emissions (i.e., decreased or increased). The CDP awards performance points if a firm selects a "decrease" in emissions (and specifies that the decrease is due in part to emissions reduction activities, rather than changes in the firm's reporting boundaries, divestiture, etc.).

We exploited the panel data structure of CDP responses over time to effectively audit each firm's claim for the direction and magnitude of emissions changes. If the firm's current year's emissions disclosure was less (more) than the prior year's emissions disclosure, we assumed the firm had made an *actual* emissions reduction (increase). We thus considered two separate measures of inconsistency. The binary variable *Overstated* (i.e., the firm overstated its emissions reductions) took a value of "1" when a firm claimed an emissions decrease that contradicted our calculation of an *actual* emissions increase; otherwise, it took a value of "0." The binary variable *Understated* (i.e., the firm understated its emissions reductions) took a value of "1" when a firm that claimed an emissions increase that contradicted our calculation of an *actual* emissions decrease; otherwise, it was coded "0."[3]

To better illustrate this measure, we provide, in Table 1, example calculations for three anonymous firms from the sample. In our sample, we found that 11.6% of firm-year observations made *Overstated* claims and 6.8% of observations made *Understated* claims (see also Table 3, below).

Clearly, there are possible reasons that a firm might legitimately claim an emissions reduction (or increase) inconsistent with its quantitative emissions reports. First, firms may need to "restate" prior year emissions for operational or other changes, which could render our audit methodology inconclusive. However, each year the CDP offered firms the opportunity to restate aspects of prior year disclosures. We compiled the most recent prior year disclosure (whether original or restated) as the baseline for emissions reduction claims, reducing the possibility that firms could be legitimately reporting an emissions decrease that contradicted prior year disclosures. Second, it is plausible that a firm may simply err when providing information about its emissions trends relative to the prior year. A primary concern is thus whether internally inconsistent disclosures are truly false claims or whether they are the result of fundamental errors in a responding firm's execution of the questionnaire response (i.e., incompetence). To demonstrate evidence that inconsistency represents strategic misrepresentation and not simply

---

[2] The CDP questionnaire underwent substantial changes in 2011, making data from 2010 and earlier difficult to compare. Additionally, the CDP revamped its scoring methodology in 2016, resulting in different performance rating scales.

[3] We thank both Tom Lyon and an anonymous reviewer for suggesting this analysis.

Exhibit 17 to Decl. of Lyon

425

**SER 1393**

Case 2:24-cv-00801-ODW-PVC   Document 56-17   Filed 07/24/24   Page 6 of 18   Page ID #:6406

**TABLE 1**
**Examples of Inconsistency and Opportunism Determination**

|  | Firm A | Firm B | Firm C |
|---|---|---|---|
| *Inconsistency* |  |  |  |
| 2014 reported revenue intensity of emissions | 56.1 | 413.9 | 11.5 |
| 2015 reported revenue intensity of emissions | 59.6 | 393 | 10.9 |
| 2015 claimed change in emissions | −1.8% | −5.6% | +1.6% |
| 2015 claimed direction of change | Decrease | Decrease | Increase |
| 2015 actual change (authors' calculation) | +6.2% | −5.0% | −5.2% |
| Inconsistency | *Overstated* = 1 | (consistent) | *Understated* = 1 |
| Magnitude of misstatement | −8.0% | −0.6% | +12.0% |
| *Opportunism* |  |  |  |
| Board member or senior executive signed off on CDP report: |  |  |  |
| 2014 (Yes = 0 pts, No = 0 pts) | No | Yes | No |
| 2015 (Yes = 2 pts: No = 0 pts) | Yes | Yes | No |
| Opportunism | *Opportunism* = 1 | *Opportunism* = 0 | *Opportunism* = 0 |

*Note*: Emissions intensity = metric tons "carbon dioxide equivalent" ($CO_2e$) per unit revenue in millions of domestic currency.

incompetence, in the following section, we present two static, comparative analyses indicating the propensity of firms with temporally inconsistent emissions disclosures to be distinctly aware of their disclosed data.

***Non-randomly distributed misstatements.*** First, we observed systematic differences in the magnitude of misstatement for inconsistent firms relative to consistent firms. As noted above, each responding firm reported an emissions intensity figure and a corresponding change from the prior year. We then calculated the "actual" change in emissions, assuming the emissions claimed in the prior year disclosure was accurate.[4] Comparing sample means between types, we found firms that reported inconsistent emissions reductions overstated those reductions (relative to actual) by significantly more ($\mu_1 = -20.4\%$) than firms that consistently reported emissions reductions ($\mu_0 = 2.0\%$, two-sample $t = 31.76$). Moreover, we also found firms that inconsistently reported emissions increases understated the actual reductions by significantly more ($\mu_1 = 23.9\%$) than firms that consistently reported emissions increases ($\mu_0 = -1.8\%$, $t = 17.33$). Comparable tests of equality of medians (robust to outliers) were similarly definitive, with $p < .001$. Admittedly, these figures are discrepant largely owing to our very definition of inconsistency: *Overstated* (*Understated*) misstatements are necessarily less (greater) than zero,

while consistent firms have misstatements distributed with means relatively close to zero.

We then identified stronger evidence of strategic misstatement (as opposed to incompetence) by comparing the distribution of misstatement magnitude (see Table 1) between all inconsistent and all consistent firms. Figure 1a plots a histogram of the difference between reported and actual percentage changes in emissions for each of the three firm types. Dark gray bars correspond to *Overstated* disclosures (by definition, all dark gray bars are left of zero), light gray bars correspond to *Understated* disclosures, and clear bars correspond to firms that reported consistently. Negative numbers indicate that reported emissions reductions were greater in magnitude than actual emissions reductions. Consistent firms have misstatements tightly distributed around zero ($\mu = 0.8\%$, $\sigma = 13\%$) with long, thin tails (excess kurtosis = 23). If we assume such misstatements are representative of a random error distribution in emissions reporting, the corresponding distribution of inconsistent misstatements is comparatively non-random ($\mu = -7.0\%$, $\sigma = 30\%$, excess kurtosis = 1.7) and bimodal with relatively few misstatements clustered near zero. Figure 1b presents a quantile–quantile (Q–Q) plot comparing the two distributions, displaying the characteristically steep "S" curve of a bimodal distribution. These observations suggest, perhaps circumstantially, intentional efforts to misstate disclosed performances relative to actual.

To further corroborate this assessment, Figures 2a and 2b display histograms and Q–Q plots, respectively, of the claimed percentage changes in

---

[4] We make this assumption because (a) firms may specify when making changes in emissions reporting boundaries and inventory computation methodologies, and (b) firms have the opportunity to restate prior year disclosures, which we incorporated into the analysis. In concert with the analysis on opportunistic disclosures discussed below, we argue it is highly plausible that such firms are distinctly aware of the relationship between current and prior year disclosures.



Author's voice:
How did the paper evolve and change as you worked on it?

Exhibit 17 to Decl. of Lyon
426
**SER 1394**



2021             *Callery and Perkins*             45

## FIGURE 1
### Magnitude of Misstatement in Emissions Intensity Percentage Reduction Claims



Histogram comparison             Q–Q plot

emissions by firm type—a directly disclosed value instead of a calculated difference, as in the prior analysis. Here, it can be seen that claimed emissions changes are more tightly distributed about zero for inconsistent firms (a two-sample $t$ test of equal means yields $t = 7.81$ for reported reductions and $t = 3.93$ for reported increases). A plausible explanation for this finding may be that inconsistent firms actually seek to minimize the discrepancy from prior year disclosures by claiming a change that is "just enough" to achieve the desired binary outcome. We note such reasoning is generally consistent with prior research demonstrating the propensity of firms to manage financial earnings in order to meet certain thresholds of tangible importance (Burgstahler & Dichev, 1997; Degeorge, Patel, & Zeckhauser, 1999).

*Opportunism.* The second static analysis used a novel measure derived from our forensic analysis of CDP data to provide further suggestive evidence of intent to make misleading emissions disclosures. This measure—*Opportunism*—evaluated firm responses to exogenous changes in scoring for various questionnaire items. While the questionnaire's content remained largely consistent throughout the study period, the CDP did make minor changes in its allotment of performance score points each year. Firms seeking to increase performance scores at minimal cost were more likely to change their responses to individual questionnaire items whenever there was a directly tangible benefit (and lack of significant threat of audit) to do so. We identified several instances of such scoring changes and mapped all changes in individual firm responses (relative to prior year disclosures) to those questions. Our binary measure *Opportunism* was assigned a value of "1" for any observation in which a firm changed its

response to a subject question from a non-scoring answer to a scoring answer for the year in which the scoring change became effective, and "0" otherwise. An example from one such question is provided in Table 1; note that firms need only exhibit *Opportunism* in one case each year to be assigned the positive value.[5] Simple $t$ tests of sample means confirmed that *Overstated* disclosures were significantly more likely to exhibit *Opportunism* ($\mu_1 = 0.38$) than consistent disclosures ($\mu_0 = 0.23$; $t = 9.20$, $p < .001$), whereas *Understated* disclosures ($\mu_1 = 0.27$) were not significantly different from consistent ones ($t = 1.26$, $p = .21$). A Kruskal–Wallis rank test indicated that all three firm types were representative of the different populations ($\chi^2 = 43.32$, $p < .001$).

Again, firm responses to most of these scoring changes are prima facie difficult to conclusively ascribe to strategic misrepresentation, substantive performance improvement, or mere coincidence. To test the validity of this measure, we found that aggregate responses to at least one such change could be identified through quasi-experimental methods. We described one instance of a scoring change to an individual question as a "treatment" condition and could compare changes in firm responses to this question relative to a comparable "control" question. This example is summarized in Table 2. In 2014, this question was worth 0 points regardless of the answer. In 2015, the CDP changed the methodology to award 2 performance points for the "preferred" answer—and

---

[5] We also coded a ratio that tracked the ratio of total opportunities taken by a firm in each year. Results were similar for both measures, and so we kept the more parsimonious binary measure for subsequent analyses.

Exhibit 17 to Decl. of Lyon

427

**SER 1395**

**FIGURE 2**
**Emissions Intensity Percentage Reduction Claims**



**Histogram comparison**                    **Q–Q plot**

the percentage of responding firms that changed response from a non-scoring answer to the scoring answer more than doubled. To test for exogeneity of this effect, we analyzed changes in responses to a comparable control question that had no change in scoring over the same period; almost no changes in aggregate responses to this question were observed in the same time frame. Though not a true experiment, an equivalent "treatment effect" of roughly 137% presents compelling evidence of *Opportunism* in response to changes in scoring methodology.

**Independent Variables**

To analyze factors associated with both sides of our inconsistency measure, and to understand the drivers associated with making (and protecting from scrutiny) such claims, we use several variables (discussed below) drawn from the CDP data, financial data from Thomson-Reuters Worldscope, and GHG emissions and environmental disclosure data from Trucost.

*Performance.* Evaluative ratings provide a tangible incentive for firms to submit a CDP response that improves their scores. We assigned an ordinal scale to the CDP's letter-grade performance bands, where "A" equaled 6 and "E" equaled 1 (the CDP includes a grade of "A−," which we scored as 5).[6] We classified firms into industry groups according to the four-digit Global Industry Classification Standard (GICS) code and calculated the variable *Performance* as a firm's

previous year CDP performance score minus the average score of all other rated firms in the same GICS industry group, yielding a continuously distributed numerical variable. A positive value indicated that the firm had a higher than average performance score within its industry group.

*Assurance.* Whereas the CDP does not provide a formal audit of firm disclosures, firms may obtain costly third-party assurance of GHG emissions inventories. The CDP questionnaire solicits information on whether firms have obtained reasonable or limited (i.e., "high" or "moderate" level, respectively) assurance.[7] Unlike other CDP questionnaire items that rely on self-report, firms claiming assurance of emissions inventories are required to provide a formal certificate of third-party assurance as evidence. In our analysis, firms that provided a certificate of reasonable assurance were assigned an indicator variable *Reasonable* with a value of "1," and

---

[6] We also categorized performance score on a 5-point scale with "A−" firms alternatively scoring 5 and 4, with no substantial change in results in either case.

[7] Reasonable assurance is often associated with the term "audit," whereas limited assurance is often associated with the term "review." More accurately, the level of assurance provided in an assurance engagement corresponds to the level of assurance risk: risk that the assurer expresses an inappropriate conclusion when client information is materially misstated. The assurer's findings in a reasonable assurance engagement are generally regarded as sufficiently low assurance risk to be expressed in a positive opinion; for example, "In our opinion, the information is correct in all material respects based on the evaluation criteria." Findings in a limited assurance engagement generally carry higher assurance risk and are expressed in a negative opinion; for example, "Nothing has come to our attention that causes us to believe that the information is not correct in all material respects based on the evaluation criteria."

Exhibit 17 to Decl. of Lyon
428
**SER 1396**

2021 *Callery and Perkins* 47

TABLE 2
**Quasi-Experiment Demonstrating Opportunism in Scoring Methodology Changes**

| CDP question | 2014 max. points | 2015 max. points | % changed response |
|---|---|---|---|
| *Control:* | | | |
| **1.1** Where is the highest level of direct responsibility for climate change within your organization? | 2 | 2 | < 1 |
| *Treatment:* | | | |
| **15.1** Please provide the (name/title) for the person who has signed off (approved) the CDP climate change response. | 0 | 2 | 137 |

*Notes*: Maximum points were scored if the response to either question was "board member" or "executive officer." "Treatment effect" was roughly 137%: the percentage of firms that changed their answer to Question 15.1 relative to those that changed their response to Question 1.1.

"0" otherwise; those with evidence of limited assurance for GHG emissions were assigned an indicator variable *Limited* with a value of "1," and "0" otherwise.

**Control Variables**

Disclosure of material risks through financial reports is generally recognized as good practice in order to reduce the probability of future legal action in the event of stock price collapse or other shocks (Healy & Palepu, 2001). Given that certain stakeholders have developed sophisticated monitoring mechanisms (Cohen, Malloy, & Nguyen, 2018), consistency in disclosure between channels is important in order to avoid scrutiny. It follows that firms disclosing emissions levels and climate risks through regulated disclosure channels are less likely to make false claims. We assigned the indicator variable *RegDisclose* with a value of "1" for firms that indicated on their CDP response having made such disclosure through mainstream financial reports or other regulatory filings; otherwise, they were coded "0."

The effectiveness of management performance incentives as a solution to the agency problem has been disputed (Westphal & Zajac, 1994). Long-term incentive plans are often symbolic and can deter from more substantive corporate governance controls (Westphal & Zajac, 1998). Furthermore, higher levels of performance incentives lead to greater risk-taking and are associated with greater environmental harm (Minor, 2016). However, compensation incentives oriented toward environmental performance are associated with a range of favorable outcomes (Flammer, Hong, & Minor, 2019). We assigned the indicator variable *MgmtIncentive* with a value of "1" for firms that claimed active executive management performance incentives for climate change-related issues on their CDP response, and "0" otherwise.

Prior research has found firms tend to use obfuscating language to embellish performance or distract attention from problems (Fabrizio & Kim, 2019; Hahn & Lülfs, 2014), and thus may also be associated with propensity for false claims. We extracted all free-text response items in the CDP questionnaires with performance score implications (according to the CDP scoring methodology) and computed an aggregate *Fog Index* (see Loughran & McDonald, 2016) for each firm-year observation. Other research has found firms tend to use selective disclosure—highlighting good news and withholding bad news—to mislead stakeholders about performance (Kim & Lyon, 2011; Lyon & Maxwell, 2011), which may likewise be associated with a propensity for inconsistency. We used the Trucost *Selective Disclosure* index, calculated in the same manner as was done in Marquis et al. (2016), where a positive number indicates that a firm has disclosed low-impact environmental issues (good news) and concealed higher-impact issues (bad news).

Environmentally sensitive industries (ESIs) are often subject to more environmental regulations and greater stakeholder scrutiny of environmental impacts (Reid & Toffel, 2009), and thus firms may have stronger incentives for consistent emissions disclosures. We defined the indicator *ESI* for firms in GICS sectors corresponding to Energy, Materials, and Utilities. Firms operating in consumer-facing industries (CFIs) tend to be highly visible in public discourse and may thus be subject to greater stakeholder awareness of environmental performance and disclosures. However, CFI firms, on average, are arguably subject to lesser regulatory oversight (relative to ESI firms) and may perceive a lower probability of detection false claims. We defined *CFI* as firms in GICS sectors corresponding to Consumer Discretionary and Consumer Staples.

Larger firms tend to have greater public visibility and are often subject to greater scrutiny regarding environmental impacts. We use total assets as a relevant measure for firm size and take the natural logarithm (*ln Assets*) to account for the skewed distribution. Firm profitability is associated with greater resources and capacity for attention to environmental performance. We used the return on assets (*ROA*) measure of accounting profits. These financial variables, obtained from Thomson-Reuters Worldscope,

Exhibit 17 to Decl. of Lyon
429
**SER 1397**

48 *Academy of Management Discoveries* March

were lagged one year to correspond with the CDP disclosure time frame. Firms with larger environmental footprints, in any industry, may face heightened stakeholder scrutiny of environmental impact (Lyon & Maxwell, 2011). The variable *GHGIntensity* was the natural logarithm of estimated firm-level GHG emissions per unit revenue, provided by Trucost. Trucost estimates emissions based partly on firm-level disclosures (including to the CDP), and augments those estimates using proprietary input–output modeling based on sector-level data from multiple sources, including government censuses and surveys, industry reports, and other economic data.

## ANALYSIS AND RESULTS

### Descriptive Statistics

The final sample contained 5,098 unique firm-year observations from 1,475 individual firms over the sample period 2011–2015; taking lags on key CDP variables reduced the working sample to 3,835 observations from 1,306 firms. Table 3 presents a summary of descriptive statistics and covariate correlations. An examination of variance inflation factors (VIF) indicates that multicollinearity is not a concern (all individual VIF < 2, model mean VIF = 1.36). Summary statistics of the indicator variables in Table 3 show that roughly 12% of the working sample exhibited *Overstated*, 7% *Understated*, and 17% *Opportunism*; 20% of observations obtained *Reasonable* assurance and 43% *Limited*.

### Empirical Models

To address our main research question, we performed a panel logit regression on the two types of inconsistency using the main predictor variables outlined above, and included interactions between key independent variables. *Opportunism* is closely associated with inconsistency (as described above), but may be a noisy measure in that it likely picks up legitimately substantive performance improvements by some firms in addition to opportunistic behavior by others. Firms in different industry groups (e.g., *ESI* and *CSI*) may also exhibit different motivations (and disclosure strategies) for improving performance ratings. By examining these interaction effects, we obtained a clearer picture of how those characteristics may be associated with false claims.

To evaluate how these factors are associated with a firm's temporal decision to provide false claims, we also ran a second set of analyses using first difference (FD) transformations of key variables noted above. For example, we assigned a firm with *Overstated*

inconsistency in one year that was consistent in the prior year the FD variable *Overstated Add* value of "1" (otherwise, "0"), and, if an *Overstated* firm resumed consistency in the following year, we assigned the variable *Overstated Drop* value of "1" (otherwise, "0"). We computed similar measures corresponding to *Opportunistic Add* and *Opportunistic Drop*. To estimate the effects of a change in assurance on inconsistency, we coded two indicator variables for an "upgrade" from *Limited-to-Reasonable* assurance, and a "downgrade" from *Reasonable-to-Limited*.[8] Finally, to estimate the effects of relative improvement in prior year *Performance Prior*, we coded *Performance Prior* as a lagged FD (year $t-1$ minus year $t-2$); to estimate effects of anticipated improvement in the current year, we coded *Performance Next* as a forward FD (year $t$ minus year $t-1$).[9]

We used a mixed effects logit estimator in the first analysis to account for the presence of both within-firm fixed effects and random effects (two-level model, random intercept by firm), and included year fixed effects with robust standard errors clustered by firm. For the second analysis, likelihood ratio (LR) tests confirmed that the random effects were statistically zero and standard logistic regression provided equivalent results (we kept firm-level cluster-robust standard errors in all models). All coefficients reported in the following tables are logit log-odds; the narrative summary of results contains occasional reference to odds ratios to aid interpretation of practical significance.

Our sample was necessarily limited to CDP respondents; whereas firms endogenously select into this group, all analyses were designed within the context of firms that choose to prepare a disclosure to the CDP; all dependent and key independent variables were derived from CDP disclosure data. We note that selection bias correction models were specified for selection on the dependent variable (Certo, Busenbark, Woo, & Semadeni, 2016), whereas our sample was restricted to a group of participating firms; there was no intergroup selection among dependent and independent variables.

---

[8] We also coded indicators for all other possible changes between no assurance and either level.

[9] Because *Performance* is already a lagged measure ($t-1$), the backward measure captures a firm's prior realized improvement, while the forward measure captures a firm's anticipated improvement following from the current year disclosure, which is only observed by the firm some months after submitting its response.

Exhibit 17 to Decl. of Lyon
430
**SER 1398**

2021 *Callery and Perkins* 49

**TABLE 3**
**Summary Statistics and Correlations**

|  |  | Mean | SD | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | *Overstated* | 0.116 | 0.320 | 1.00 | | | | | | | | | | | | | |
| 2 | *Understated* | 0.068 | 0.252 | −.13 | 1.00 | | | | | | | | | | | | |
| 3 | *Opportunism* | 0.170 | 0.376 | .06 | −.04 | 1.00 | | | | | | | | | | | |
| 4 | *Performance* | 0.018 | 1.23 | 0.00 | 0.02 | −.14 | 1.00 | | | | | | | | | | |
| 5 | *Reasonable* | 0.196 | 0.397 | −.02 | 0.01 | −.02 | 0.12 | 1.00 | | | | | | | | | |
| 6 | *Limited* | 0.430 | 0.495 | 0.02 | 0.02 | 0.00 | 0.29 | −.49 | 1.00 | | | | | | | | |
| 7 | *ESI* | 0.229 | 0.420 | −.05 | −.01 | −.00 | 0.00 | 0.24 | −.13 | 1.00 | | | | | | | |
| 8 | *CFI* | 0.218 | 0.413 | 0.01 | 0.03 | −.02 | −.01 | −.08 | 0.03 | −.29 | 1.00 | | | | | | |
| 9 | *MgmtIncentive* | 0.569 | 0.495 | 0.02 | 0.02 | −.01 | 0.28 | 0.09 | 0.11 | 0.09 | −.02 | 1.00 | | | | | |
| 10 | *RegDisclose* | 0.490 | 0.500 | −.01 | 0.04 | −.16 | 0.14 | 0.10 | 0.07 | 0.11 | 0.01 | 0.13 | 1.00 | | | | |
| 11 | *FogIndex* | 18.6 | 6.48 | −.02 | −.02 | 0.05 | −.07 | −.05 | −.03 | −.07 | 0.02 | −.04 | −.10 | 1.00 | | | |
| 12 | *SelectDisclose* | −30.4 | 31.5 | 0.02 | 0.02 | −.01 | −.05 | −.09 | 0.06 | −.37 | 0.13 | −.12 | −.06 | 0.04 | 1.00 | | |
| 13 | ln *Assets* | 16.6 | 1.67 | 0.02 | 0.00 | −.01 | 0.24 | 0.10 | 0.17 | −.02 | −.15 | 0.11 | 0.00 | 0.01 | 0.05 | 1.00 | |
| 14 | *ROA* | 5.71 | 7.09 | 0.04 | 0.04 | −.01 | −.00 | −.05 | 0.02 | −.12 | 0.13 | 0.00 | 0.01 | 0.02 | 0.03 | −.20 | 1.00 |
| 15 | ln *GHGIntensity* | 3.94 | 1.86 | −.05 | 0.01 | 0.01 | 0.04 | 0.18 | −.09 | 0.64 | −.09 | 0.13 | 0.11 | −.06 | −.45 | −.19 | −.05 |

## Factors Associated with Inconsistency

Results of the first analysis are displayed in Table 4. Model 1 presents results from regression of *Overstated* inconsistency on the independent variables of interest. Results indicate that *Opportunism* is strongly associated with *Overstated*, as we expected based on the static analyses discussed above. The log-odds coefficient of 0.364 ($p = .001$) indicates that opportunistic firms were 44% more likely to overstate emissions reductions, all else being equal. *Reasonable* and *Limited* assurance are both weakly disassociated ($p = .11$ and $p = .21$, respectively) and *Performance* moderately associated—a one letter grade higher industry-relative performance score corresponds to a 7% greater likelihood of overstatement ($p = .12$). ESI firms were moderately disassociated ($p = .09$), roughly 25% less likely to overstate emissions reductions, all else being equal. Interestingly, among factors predicted by extant literature, *Fog Index* was disassociated with propensity for overstatement ($p = .09$) and *SelectDisclose* had no significant relationship; nor do *RegDisclose* or *MgmtIncentive*. We comment on these results further in the Discussion section.

Model 2 includes interactions of *Opportunism* with key indicator variables. Results indicate that *Opportunistic* firms with *Reasonable* assurance were no more likely to overstate emissions reductions than those without; however, other firms with *Reasonable* assurance were significantly less likely (34%, $p = .03$) to overstate. Meanwhile, no significant relationship was observed with *Limited* assurance. Model 3 adds interactions of industry dummies with prior year industry-relative performance; the results indicate no moderating effect of *ESI* on the relationship of *Performance* with *Overstated*. However, higher-performing firms in *CFIs* are significantly more

likely to overstate emissions reductions; a one letter grade higher performance corresponds to 20% greater likelihood of overstatement for *CFI* firms ($p = .07$).

Next, Models 4–6 repeat these analyses using *Understated* inconsistency as the dependent variable. We note that an LR test indicated that the mixed effects logit for Models 4–6 results converge to a standard logistic regression. Model 4 indicates that *Opportunistic* firms were less likely to understate emissions reductions, all else being equal ($p < .001$). Surprisingly, no other independent variables were strongly associated with *Understated*, though we note firms with higher emissions intensity were significantly more likely to understate reductions, controlling for other factors. Adding interaction terms (Models 5–6) yields no new insight into the drivers of *Understated* emissions reduction claims.

## Factors Associated with Changes to Inconsistency

Results of the second analysis—predictors of changes to *Overstated* inconsistency—are shown in Table 5. Models 1–3 evaluate instances in which firms overstated emissions reductions after making consistent disclosures in the prior year, whereas Models 4–6 evaluate instances in which firms made consistent disclosures after overstating reductions in the prior year.[10] Some observations were dropped due to inclusion of lagged variables. LR tests of mixed effects logit regressions were not significant, indicating appropriate use of standard logistic

---

[10] We also analyzed factors associated with changes to *Understated* inconsistency; as with the analysis in Table 4, we did not find meaningful evidence of significant factors and do not report those results here.

Exhibit 17 to Decl. of Lyon
431
**SER 1399**

50                                          *Academy of Management Discoveries*                                          March

### TABLE 4
### Factors Associated with Inconsistency

| | (1) *Overstated* | (2) *Overstated* | (3) *Overstated* | (4) *Understated* | (5) *Understated* | (6) *Understated* |
|---|---|---|---|---|---|---|
| *Opportunism* | 0.364*** | 0.271 | −0.267 | −0.593*** | −0.520* | −0.521* |
| | (0.106) | (0.182) | (0.182) | (0.158) | (0.273) | (0.273) |
| *Reasonable* | −0.247 | −0.415** | −0.416** | 0.118 | 0.171 | 0.167 |
| | (0.157) | (0.190) | (0.190) | (0.187) | (0.201) | (0.201) |
| *Limited* | −0.157 | −0.163 | −0.172 | 0.052 | 0.062 | 0.064 |
| | (0.126) | (0.152) | (0.152) | (0.156) | (0.174) | (0.174) |
| *Reasonable × Opportunism* | | 0.437 | 0.441* | | −0.243 | −0.242 |
| | | (0.267) | (0.267) | | (0.413) | (0.413) |
| *Limited × Opportunism* | | 0.022 | 0.025 | | −0.047 | −0.049 |
| | | (0.224) | (0.224) | | (0.338) | (0.338) |
| *Performance* | 0.069 | 0.070 | 0.026 | −0.064 | −0.064 | −0.074 |
| | (0.044) | (0.044) | (0.051) | (0.058) | (0.058) | (0.071) |
| *ESI* | −0.285* | −0.286* | −0.296* | −0.284 | −0.284 | −0.286 |
| | (0.169) | (0.169) | (0.169) | (0.203) | (0.203) | (0.203) |
| *CFI* | −0.041 | −0.043 | −0.064 | 0.186 | 0.187 | 0.187 |
| | (0.126) | (0.126) | (0.128) | (0.150) | (0.149) | (0.150) |
| *Performance × ESI* | | | 0.040 | | | 0.066 |
| | | | (0.108) | | | (0.144) |
| *Performance × CFI* | | | 0.177* | | | −0.011 |
| | | | (0.096) | | | (0.116) |
| *MgmtIncentive* | 0.089 | 0.089 | 0.081 | 0.139 | 0.139 | 0.142 |
| | (0.104) | (0.104) | (0.104) | (0.135) | (0.135) | (0.135) |
| *RegDisclose* | −0.031 | −0.031 | −0.033 | 0.124 | 0.125 | 0.124 |
| | (0.114) | (0.113) | (−0.114) | (0.137) | (0.138) | (0.138) |
| *FogIndex* | −0.014* | −0.014* | 0.014 | 0.003 | 0.003 | 0.003 |
| | (0.008) | (0.008) | (0.008) | (0.010) | (0.010) | (0.010) |
| *SelectDisclose* | −0.001 | −0.001 | −0.001 | 0.001 | 0.001 | 0.001 |
| | (0.002) | (0.002) | (0.002) | (0.002) | (0.002) | (0.002) |
| ln *Assets* | 0.042 | 0.041 | 0.041 | −0.015 | −0.015 | −0.015 |
| | (0.032) | (0.032) | (0.032) | (0.045) | (0.045) | (0.045) |
| *ROA* | 0.024*** | 0.024*** | 0.024*** | 0.006 | 0.006 | 0.006 |
| | (0.007) | (0.007) | (0.007) | (0.010) | (0.010) | (0.010) |
| ln *GHGIntensity* | −0.015 | −0.015 | −0.013 | 0.100** | 0.100** | 0.100** |
| | (0.037) | (0.037) | (0.037) | (0.045) | (0.045) | (0.045) |
| Constant | −2.439*** | −2.397*** | −2.404*** | −2.748*** | −2.766*** | −2.763*** |
| | (0.610) | (0.613) | (0.611) | (0.825) | (0.827) | (0.830) |
| Observations | 3,835 | 3,835 | 3,835 | 3,835 | 3,835 | 3,835 |
| Number of firms | 1,306 | 1,306 | 1,306 | 1,306 | 1,306 | 1,306 |
| Log likelihood | −1629 | −1628 | −1626 | −1047 | −1047 | −1047 |
| Model $\chi^2$ | 43.21 | 46.25 | 49.74 | 35.47 | 36.57 | 36.79 |
| LR test $\chi^2$ | 6.339 | 6.306 | 6.312 | 0.196 | 0.192 | 0.191 |

*Note*: Robust standard errors clustered by firm in parentheses.
***$p < .01$
**$p < .05$
*$p < .10$

regression. Models 1–3 all indicate engaging in *Opportunism* was strongly associated with initiating *Overstated* claims. Moreover, firms that dropped from *Reasonable-to-Limited* were roughly twice as likely to initiate such misstatements ($p = .025$ in model 1). Again, we find higher *Fog Index* disassociated with initiating false claims. Meanwhile, Models 4–6 all indicate that disengaging from prior year *Opportunism* is associated with dropping a prior year *Overstated* claim.

Within each group of three models, we evaluated different realizations of industry-relative *Performance*.

Model 2 indicates that an improvement in performance realized in the prior year is not significantly associated with initiating *Overstated* claims, while Model 5 indicates that one letter grade higher in relative performance in the prior year has 16% greater odds (relative to a firm with constant *Performance*) of dropping a prior year *Overstated* claim, all else being equal. Model 3 indicates that anticipated current-year improvements in relative performance are significantly associated with initiating *Overstated* claims, while Model 6 indicates no such relationship with dropping overstatements.

Exhibit 17 to Decl. of Lyon
432
**SER 1400**

2021                                   *Callery and Perkins*                                   51

**TABLE 5**
**Factors Associated with Changes to Inconsistency**

| | (1) Overstated Add | (2) Overstated Add | (3) Overstated Add | (4) Overstated Drop | (5) Overstated Drop | (6) Overstated Drop |
|---|---|---|---|---|---|---|
| *OpportunismAdd* | 0.359*** | 0.259*** | 0.233*** | 0.081 | 0.150 | 0.123 |
| | (0.114) | (0.148) | (0.116) | (0.165) | (0.176) | (0.166) |
| *OpportunismDrop* | -0.199 | -0.207 | -0.206 | 0.428*** | 0.266 | 0.402** |
| | (0.176) | (0.198) | (0.179) | (0.164) | (0.178) | (0.168) |
| *Limited-to-Reasonable* | -0.022 | -0.067 | -0.041 | -0.145 | -0.168 | -0.085 |
| | (0.302) | (0.404) | (0.302) | (0.412) | (0.446) | (0.411) |
| *Reasonable-to-Limited* | 0.565** | 0.642** | 0.519* | 0.262 | 0.226 | 0.336 |
| | (0.251) | (0.300) | (0.265) | (0.308) | (0.336) | (0.311) |
| *Performance* | 0.019 | | | 0.142*** | | |
| | (0.040) | | | (0.051) | | |
| *PerformancePrior* | | 0.060 | | | 0.148** | |
| | | (0.058) | | | (0.061) | |
| *PerformanceNext* | | | 0.141*** | | | 0.000 |
| | | | (0.050) | | | (0.063) |
| *ESI* | -0.240 | -0.155 | -0.222 | -0.280 | -0.241 | -0.303* |
| | (0.151) | (0.190) | (0.151) | (0.177) | (0.190) | (0.182) |
| *CFI* | -0.054 | -0.010 | -0.076 | -0.075 | -0.122 | -0.040 |
| | (0.113) | (0.144) | (0.114) | (0.142) | (0.153) | (0.143) |
| *MgmtIncentive* | 0.030 | -0.207* | 0.014 | -0.014 | 0.036 | 0.072 |
| | (0.097) | (0.122) | (0.096) | (0.130) | (0.132) | (0.126) |
| *RegDisclose* | -0.046 | -0.007 | -0.049 | 0.171 | 0.192 | 0.219* |
| | (0.108) | (0.129) | (0.108) | (0.135) | (0.139) | (0.133) |
| *FogIndex* | -0.016** | -0.018* | -0.016** | -0.014 | -0.014 | -0.015 |
| | (0.007) | (0.011) | (0.008) | (0.010) | (0.011) | (0.010) |
| *SelectDisclose* | -0.001 | 0.000 | -0.000 | -0.001 | -0.002 | -0.002 |
| | (0.002) | (0.002) | (0.002) | (0.002) | (0.002) | (0.002) |
| ln *Assets* | 0.009 | 0.005 | -0.004 | 0.044 | 0.047 | 0.067** |
| | (0.029) | (0.037) | (0.029) | (0.035) | (0.035) | (0.034) |
| *ROA* | 0.019*** | 0.013 | 0.013** | 0.012 | 0.018** | 0.016* |
| | (0.006) | (0.008) | (0.007) | (0.008) | (0.009) | (0.009) |
| ln *GHGIntensity* | -0.028 | -0.005 | -0.027 | -0.024 | -0.049 | -0.029 |
| | (0.034) | (0.041) | (0.034) | (0.041) | (0.043) | (0.041) |
| *Constant* | -1.948*** | -1.725** | -1.620*** | -2.707*** | -2.738*** | -3.219*** |
| | (0.558) | (0.706) | (0.546) | (0.669) | (0.688) | (0.655) |
| Observations | 3,835 | 2,659 | 3,693 | 3,066 | 2,566 | 2,976 |
| Number of firms | 1,306 | 1,099 | 1,263 | 1,275 | 1,097 | 1,244 |
| Log likelihood | -1470 | -976.6 | -1425 | -1020 | -904.2 | -999.2 |
| Model $\chi^2$ | 51.43 | 26.36 | 55.57 | 37.05 | 28.43 | 27.93 |

*Note:* Robust standard errors clustered by firm in parentheses.
\*\*\* $p < .01$
\*\* $p < .05$
\* $p < .10$

Exhibit 17 to Decl. of Lyon

433

**SER 1401**

## DISCUSSION AND CONCLUSION

The results summarized above provide a novel glimpse into the problem of false accounts in intermediated voluntary disclosure of non-financial performance. This research highlights new opportunity to develop theory on motives and modes of false accounts in this context. We organize the following discussion around a series of four propositions that signify potential implications for theory and practice informed by our findings.

*Proposition 1. Firms that "game" disclosure standards in one way are more likely to do so in other, less visible ways.*

Our measure of inconsistency identifies firms that misstate emissions reductions relative to prior year disclosures, and we present multiple statistical analyses to validate apparent intent to falsify claims. Our corroborating measure of opportunism, based on firm responsiveness to exogenous changes in disclosure ratings methodology, significantly predicts inconsistency, and is partly identified through a unique, natural quasi-experiment hidden in the data. This relationship suggests that firms seeking to leverage the mechanism for its apparent reputational benefit (a higher performance score) are more likely to manipulate the system in other, more pernicious ways to achieve greater ends. We also found evidence of inconsistent disclosures in the other direction, suggesting some firms may seek to understate actual emissions reductions, corroborating recent research on firm efforts to distract attention from positive environmental performance (Carlos & Lewis, 2018; Kim & Lyon, 2014). The joint findings that opportunistic firms are both significantly more likely to materially overstate emissions reductions and less likely to understate reductions adds credence to the validity of the measures.

The empirical methods we have developed here may just scratch the surface of strategies that opportunistic firms might employ to mislead investors and the general public. With the emerging trend of implementing big data in empirical research, our relatively simple methods and provocative findings suggest substantial potential for data mining and forensic analysis to address research questions in this domain. In particular, we hope this study opens the door to new lines of data-intensive research to highlight other inconsistencies in disclosure. For example, future work may compare and verify self-reported data through VDIs against other public disclosures or third-party reports (e.g., Grewal, 2019).

*Proposition 2. Firms may variably employ one or more distinct disclosure strategies with intent to mislead, and choice of strategy may be determined by firm-specific context, capabilities, and appetite for risk.*

VDIs promise to improve firm transparency and performance by standardizing disclosure formats, limiting firm discretion in reporting relative to proprietary disclosures, and serving as neutral arbiters of disclosure content. However, extant literature on VDIs largely focuses on a common theoretical tradition of decoupling, using text analysis (Fabrizio & Kim, 2019) and linguistic styles (Crilly et al., 2016) to infer intent to mislead. The present study finds that providing false accounts is a demonstrably different phenomenon from linguistic obfuscation or selective disclosure, emphasizing the need for greater understanding of how firms may conceal strategic misstatements. Notably, we found obfuscation in text responses (measured by the Fog index) is negatively associated with false emissions reduction claims, suggesting that these two modes of misleading disclosures comprise wholly different strategic approaches to influencing external perceptions of performance. The choice of a specific disclosure strategy with intent to mislead may be rooted within other industry or firm-specific factors, motivating further research on this topic. Moreover, given the relative lack of strict accountability imposed and tangible incentives provided by VDIs, we perceive rich opportunity for future research into how VDIs attain institutional credibility given evidence of both symbolic management and false claims by firms.

*Proposition 3. Firms may exploit the lack of sufficient audit oversight in disclosure to strategically mask false or otherwise misleading claims.*

Voluntary disclosure is generally not subject to external audit, and firms may choose to obtain external assurance to provide verification of claims. This study contributes to our understanding of the reliability of external assurance in verifying corporate disclosures and as an additional signal of credibility when a firm's "type" is not observable. We found (see Table 4) that opportunistic firms obtaining either level of assurance are no less likely to make false claims of emissions reductions, but that non-opportunistic firms obtaining reasonable assurance are significantly less likely to do so. This partly corroborates recent research that suggests firms making substantive progress are likely to select reasonable assurance as a differentiating signal (Bagnoli &



Author's voice:
What is the social relevance of your research?

Exhibit 17 to Decl. of Lyon
434
**SER 1402**

2021                                     Callery and Perkins                                     53

Watts, 2017); however, the effect is neutralized for opportunistic firms, suggesting that such firms may seize upon lax or inconsistent standards of assurance to shield false claims from scrutiny. While this study does not offer conclusive evidence of such, we build on prior work suggesting propensity for manipulation of assurance (Gürtürk & Hahn, 2016; Perego & Kolk, 2012); future research may leverage methods developed in this study to explore the effects of variations in assurance quality—such as measurement methodology or competence of the provider—on misrepresentation of performance.

A more nuanced view of how firms use assurance in support of misleading disclosure emerges from our marginal analysis (Table 5). These results indicate that firms changing from reasonable to limited assurance in a given year are associated with initiating overstated emissions reduction claims; this finding suggests firms falsifying emissions disclosure may strategically drop a quality level to reduce the risk of detection. Further empirical research on stakeholder perceptions of different assurance levels and adoption by firms for strategic purposes may yield new insights toward improving the credibility of assurance as a reliable source of external verification. Moreover, the reliance on assurance as a substitute for external audit in emerging regimes of mandatory environmental disclosure must be carefully weighed.

*Proposition 4. Firms making false accounts may employ sophisticated temporal strategies for manipulating external performance ratings to maintain perceived advantage while managing detection risk.*

Our findings on the effects of relative performance rating are also surprising and warrant further research. Prior research on the effects of ratings on firm behavior and subsequent performance suggests that lower-rated firms will seek to improve ratings by addressing performance shortfalls (Chatterji & Toffel, 2010). Whereas our study does not evaluate substantive performance improvements specifically, we observe that firms with higher ratings than their industry peers are significantly more likely to overstate emissions reductions. Moreover, we find that, while firms in ESIs are less likely to make false claims (perhaps due to higher regulatory oversight and external scrutiny), opportunistic firms in CFIs are more likely to do so. This finding raises new questions regarding the motivations of higher-performing firms in sectors where environmental performance is more cosmetic (less material): higher ratings may create incentives for managers to take greater risks to maintain those ratings (Bertels & Peloza, 2008; Tetrault Sirsly & Lvina, 2019). Firms in less sensitive industries may be

subject to lower scrutiny of claims and seek to leverage impression management among a less sophisticated stakeholder base (Crilly et al., 2016). Upward pressure from lower-rated competitors drives higher-risk behavior among leaders (Bothner, Kang, & Stuart, 2007); future research may explore more directly the competitive dynamics of firms' positioning as leaders in managing climate change risks. For example, recent research has shown escalating conflict among actors of similar structure (Piezunka, Lee, Haynes, & Bothner, 2018); we may observe heightened intragroup rivalry on managing stakeholder perceptions in this domain.

In this study, we analyzed such dynamics across the entire sample of CDP responders. Our findings indicate that improved ratings in prior years are associated with dropping prior inconsistencies (Table 5, Model 5), suggesting that perhaps false claims have had the desired effect (an improved rating) and the firm can resume a lower-risk course of action. Undetected false claims may be riskier to maintain year over year, so firms may move in and out to satisfy strategic needs. We also find that an anticipated rating improvement in the current year is associated with adding inconsistent claims (Table 5, Model 3), suggesting that firms are aware of the tangible benefit of overstating and that such strategies may be generally effective. We offer that future research may study such dynamics among closer rivals.

Our exploration of relevant control variables also yielded some interesting null findings. The results indicated that disclosure of management performance incentives for climate change was not significantly associated with inconsistency, which loosely corroborates recent research findings that social and environmental performance incentives are often effective at driving desired improvements in corporate non-financial performance (Flammer et al., 2019; Hong, Li, & Minor, 2016), as opposed to exacerbating agency problems (Westphal & Zajac, 1994). However, we caution that our measure was taken as a self-reported, binary indicator from CDP responses, lacking the richer content and structure of incentives used in recent research noted above. We likewise note that our measure of selective disclosure (from Trucost) was not associated with inconsistency; while this observation arguably runs counter to Proposition 1 noted above, it may provide some rationale for Proposition 2, further highlighting tension between the two and a need for new research to more deeply examine similarities and differences between multiple misleading disclosure strategies. Finally, we also found no significant association between comparable voluntary disclosures through regulatory channels and inconsistency. However, we did find a positive (if weakly significant) association with regulatory disclosures and

Exhibit 17 to Decl. of Lyon
435
**SER 1403**

Case 2:24-cv-00801-ODW-PVC   Document 56-17   Filed 07/24/24   Page 16 of 18   Page ID #:6416

dropping prior *Overstated* inconsistency, suggesting that these channels may serve as a deterrent to making false accounts.

This research offers several practical contributions to the emerging field of intermediated disclosure. As markets and regulators increasingly move toward formal adoption of integrated reporting, disclosure mechanisms must evolve to address two prominent concerns as discussed above: the need to ensure appropriate audit and verification of firm claims, and incentives created through the provision of commensurable rating schemes. We note that such incentives are not only those directly associated with the rating itself, but also downstream implications of disclosure data usage once it is in the public domain. In the context of this study, we found that many prominent ESG rating schemes (i.e., those providing information services to institutional investors) use CDP emissions data, suggesting that misrepresented emissions might propagate undetected throughout the ESG investing ecosystem. Interviews conducted by the authors with multiple institutional investors indicate that, once such data enters the mainstream, it is often taken at face value without critical scrutiny.

This study is not without limitations; whereas symbolic firms typically employ multiple, diverse methods to manipulate disclosures (Healy & Wahlen, 1999), we derived a single measure of false accounts (inconsistency). Our measures of inconsistency and opportunism were relatively simple to derive and withstand several statistical validity checks, yet we acknowledge the measures may capture some legitimate claims along with false ones. For example, some inconsistencies may be attributable to shifts in firm reporting boundaries (Stanny, 2018); however, we again note that firms are permitted by the CDP to restate disclosures for just such occurrences. Moreover, our statistical analysis of overstated and understated inconsistencies shows significantly different distributions on both deviations from prior year claims (which may be affected by changes in reporting boundaries) and current year claims (which are not similarly affected).

In conclusion, with this study, we sought to determine whether innovative empirical analyses could detect evidence of quantifiable false accounts—distinguishable from more subtle efforts to mislead through decoupling—in firm disclosures through VDIs. We developed a novel measure of inconsistency in corporate claims of GHG emissions reductions and validated it using statistical analysis along with other novel measures derived from a forensic analysis of detailed firm disclosures to the CDP over several years. Additional empirical analyses are beginning to assess the drivers and temporal dynamics of such false accounts, and we

suggest new potential avenues for theory development related to strategic interactions between firms and disclosure intermediaries, in addition to several promising areas for future empirical research to build upon our findings. Finally, our findings will also help voluntary mechanisms identify loopholes that enable false accounts and to develop appropriate means with which to reduce their incidence.

### REFERENCES

Bae, H., Wilcoxen, P., & Popp, D. 2010. Information disclosure policy: Do state data processing efforts help more than the information disclosure itself? *Journal of Policy Analysis and Management*, 29(1): 163–182.

Bagnoli, M., & Watts, S. G. 2017. Voluntary assurance of voluntary CSR disclosure. *Journal of Economics & Management Strategy*, 26(1): 205–230.

Ball, A., Owen, D. L., & Gray, R. 2000. External transparency or internal capture? The role of third-party statements in adding value to corporate environmental reports. *Business Strategy and the Environment*, 9(1): 1–23.

Bamberger, P. A. 2018. AMD—Clarifying what we are about and where we are going. *Academy of Management Discoveries*, 4(1): 1–10.

Bertels, S., & Peloza, J. 2008. Running just to stand still? Managing CSR reputation in an era of ratcheting expectations. *Corporate Reputation Review*, 11(1): 56–72.

Boiral, O., & Gendron, Y. 2011. Sustainable development and certification practices: Lessons learned and prospects. *Business Strategy and the Environment*, 20(5): 331–347.

Bothner, M. S., Kang, J.-H., & Stuart, T. E. 2007. Competitive crowding and risk taking in a tournament: Evidence from NASCAR racing. *Administrative Science Quarterly*, 52(2): 208–247.

Burgstahler, D., & Dichev, I. 1997. Earnings management to avoid earnings decreases and losses. *Journal of Accounting and Economics*, 24(1): 99–126.

Bushee, B. J., Gow, I. D., & Taylor, D. J. 2018. Linguistic complexity in firm disclosures: Obfuscation or information? *Journal of Accounting Research*, 56(1): 85–121.

Carlos, W. C., & Lewis, B. W. 2018. Strategic silence: Withholding certification status as a hypocrisy avoidance tactic. *Administrative Science Quarterly*, 63(1): 130–169.

Certo, S. T., Busenbark, J. R., Woo, H.-S., & Semadeni, M. 2016. Sample selection bias and Heckman models in strategic management research. *Strategic Management Journal*, 37(13): 2639–2657.

Exhibit 17 to Decl. of Lyon
436
**SER 1404**

*Callery and Perkins*

Chatterji, A. K., & Toffel, M. W. 2010. How firms respond to being rated. **Strategic Management Journal**, 31(9): 917–945.

Cho, C. H., Guidry, R. P., Hageman, A. M., & Patten, D. M. 2012. Do actions speak louder than words? An empirical investigation of corporate environmental reputation. **Accounting, Organizations and Society**, 37(1): 14–25.

Cohen, L., Malloy, C., & Nguyen, Q. 2020. Lazy prices. **Journal of Finance**, 75(3): 1371–1415.

Crilly, D., Hansen, M., & Zollo, M. 2016. The grammar of decoupling: A cognitive–linguistic perspective on firms' sustainability claims and stakeholders' interpretation. **Academy of Management Journal**, 59(2): 705–729.

Degeorge, F., Patel, J., & Zeckhauser, R. 1999. Earnings management to exceed thresholds. **Journal of Business**, 72(1): 1–33.

Delmas, M. A., & Montes-Sancho, M. J. 2010. Voluntary agreements to improve environmental quality: Symbolic and substantive cooperation. **Strategic Management Journal**, 31(6): 575–601.

Doh, J. P., Howton, S. D., Howton, S. W., & Siegel, D. S. 2010. Does the market respond to an endorsement of social responsibility? The role of institutions, information, and legitimacy. **Journal of Management**, 36(6): 1461–1485.

Espeland, W. N., & Sauder, M. 2007. Rankings and reactivity: How public measures recreate social worlds. **American Journal of Sociology**, 113(1): 1–40.

Fabrizio, K. R., & Kim, E.-H. 2019. Reluctant disclosure and transparency: Evidence from environmental disclosures. **Organization Science**, 30(6): 1207–1231.

Fishman, M. J., & Hagerty, K. M. 1990. The optimal amount of discretion to allow in disclosure. **Quarterly Journal of Economics**, 105(2): 427–444.

Flammer, C., Hong, B., & Minor, D. 2019. Corporate governance and the rise of integrating corporate social responsibility criteria in executive compensation: Effectiveness and implications for firm outcomes. **Strategic Management Journal**, 40(7): 1097–1122.

Grewal, J. 2019. **Disclosure of emerging trends: Evidence from climate change business opportunities.** Working Paper. Retrieved from https://corporate-sustainability. org/wp-content/uploads/Disclosure-of-Emerging-Trends.pdf

Grewal, J., Riedl, E. J., & Serafeim, G. 2019. Market reaction to mandatory nonfinancial disclosure. **Management Science**, 65(7): 3061–3084.

Gürtürk, A., & Hahn, R. 2016. An empirical assessment of assurance statements in sustainability reports: Smoke screens or enlightening information? **Journal of Cleaner Production**, 136: 30–41.

Hahn, R., & Lülfs, R. 2014. Legitimizing negative aspects in GRI-oriented sustainability reporting: A qualitative analysis of corporate disclosure strategies. **Journal of Business Ethics**, 123(3): 401–420.

Harris, J., & Bromiley, P. 2007. Incentives to cheat: The influence of executive compensation and firm performance on financial misrepresentation. **Organization Science**, 18(3): 350–367.

Healy, P. M., & Palepu, K. G. 2001. Information asymmetry, corporate disclosure, and the capital markets: A review of the empirical disclosure literature. **Journal of Accounting and Economics**, 31(1): 405–440.

Healy, P. M., & Wahlen, J. M. 1999. A review of the earnings management literature and its implications for standard setting. **Accounting Horizons**, 13(4): 365–383.

Hong, B., Li, Z., & Minor, D. 2016. Corporate governance and executive compensation for corporate social responsibility. **Journal of Business Ethics**, 136(1): 199–213.

Hummel, K., & Schlick, C. 2016. The relationship between sustainability performance and sustainability disclosure: Reconciling voluntary disclosure theory and legitimacy theory. **Journal of Accounting and Public Policy**, 35(5): 455–476.

Khan, M., Serafeim, G., & Yoon, A. 2016. Corporate sustainability: First evidence on materiality. **Accounting Review**, 91(6): 1697–1724.

Kim, E.-H., & Lyon, T. P. 2011. Strategic environmental disclosure: Evidence from the DOE's voluntary greenhouse gas registry. **Journal of Environmental Economics and Management**, 61(3): 311–326.

Kim, E.-H., & Lyon, T. P. 2014. Greenwash vs. brownwash: Exaggeration and undue modesty in corporate sustainability disclosure. **Organization Science**, 26(3): 705–723.

Kolk, A., Levy, D., & Pinkse, J. 2008. Corporate responses in an emerging climate regime: The institutionalization and commensuration of carbon disclosure. **European Accounting Review**, 17(4): 719–745.

Loughran, T., & McDonald, B. 2016. Textual analysis in accounting and finance: A survey. **Journal of Accounting Research**, 54(4): 1187–1230.

Luca, M., & Smith, J. 2015. Strategic disclosure: The case of business school rankings. **Journal of Economic Behavior & Organization**, 112: 17–25.

Lyon, T. P., & Maxwell, J. W. 2011. Greenwash: Corporate environmental disclosure under threat of audit. **Journal of Economics & Management Strategy**, 20(1): 3–41.

Exhibit 17 to Decl. of Lyon
437
**SER 1405**

Lyon, T. P., & Shimshack, J. P. 2015. Environmental disclosure: Evidence from *Newsweek's* green companies rankings. **Business & Society**, 54(5): 632–675.

Marquis, C., Toffel, M. W., & Zhou, Y. 2016. Scrutiny, norms, and selective disclosure: A global study of greenwashing. **Organization Science**, 27(2): 483–504.

Matisoff, D. C. 2013. Different rays of sunlight: Understanding information disclosure and carbon transparency. **Energy Policy**, 55: 579–592.

McDonnell, M.-H., & King, B. 2013. Keeping up appearances: Reputational threat and impression management after social movement boycotts. **Administrative Science Quarterly**, 58(3): 387–419.

Milne, M. J., & Gray, R. 2013. W(h)ither ecology? The triple bottom line, the Global Reporting Initiative, and corporate sustainability reporting. **Journal of Business Ethics**, 118(1): 13–29.

Minor, D. 2016. **Executive compensation and environmental harm.** Working Paper. Retrieved from https://ssrn.com/abstract=2714438

Perego, P., & Kolk, A. 2012. Multinationals' accountability on sustainability: The evolution of third-party assurance of sustainability reports. **Journal of Business Ethics**, 110(2): 173–190.

Piezunka, H., Lee, W., Haynes, R., & Bothner, M. S. 2018. Escalation of competition into conflict in competitive networks of formula one drivers. **Proceedings of the National Academy of Sciences of the United States of America**, 115(15): E3361–E3367.

Reid, E. M., & Toffel, M. W. 2009. Responding to public and private politics: Corporate disclosure of climate change strategies. **Strategic Management Journal**, 30(11): 1157–1178.

Rindova, V. P., Martins, L. L., Srinivas, S. B., & Chandler, D. 2018. The good, the bad, and the ugly of organizational rankings: A multidisciplinary review of the literature and directions for future research. **Journal of Management**, 44(6): 2175–2208.

Rindova, V. P., Williamson, I. O., Petkova, A. P., & Sever, J. M. 2005. Being good or being known: An empirical examination of the dimensions, antecedents, and consequences of organizational reputation. **Academy of Management Journal**, 48(6): 1033–1049.

Stanny, E. 2018. Reliability and comparability of GHG disclosures to the CDP by U.S. electric utilities. **Social and Environmental Accountability Journal**, 38(2): 111–130.

Stern, I., & James, S. D. 2016. Whom are you promoting? Positive voluntary public disclosures and executive turnover. **Strategic Management Journal**, 37(7): 1413–1430.

Tetrault Sirsly, C.-A., & Lvina, E. 2019. From doing good to looking even better: The dynamics of CSR and reputation. **Business & Society**, 58(6): 1234–1266.

Westphal, J. D., & Zajac, E. J. 1994. Substance and symbolism in CEOs' long-term incentive plans. **Administrative Science Quarterly**, 39(3): 367–390.

Westphal, J. D., & Zajac, E. J. 1998. The symbolic management of stockholders: Corporate governance reforms and shareholder reactions. **Administrative Science Quarterly**, 43(1): 127–153.

Wijen, F. 2014. Means versus ends in opaque institutional fields: Trading off compliance and achievement in sustainability standard adoption. **Academy of Management Review**, 39(3): 302–323.



**Patrick J. Callery** (patrick.callery@carleton.ca) is assistant professor of strategic management at Carleton University's Sprott School of Business. He holds a PhD in economics and environmental science & management from the University of California, Santa Barbara. His research concerns strategic management and innovation in the context of climate change.

**Jessica Perkins** (JessicaLeePerkins@gmail.com) holds a BS and MS in environmental engineering from Tufts University, and a master's in technology management and PhD in environmental science & management from the University of California, Santa Barbara. Jessica has worked on environmental management at Fortune 500 companies, and is currently the director of sustainability at Apeel Sciences.



Exhibit 17 to Decl. of Lyon
438
**SER 1406**

# Exhibit 14

# to Declaration of Thomas P. Lyon

# An Integrated Framework to Assess Greenwashing

Exhibit 14 to Decl. of Lyon
348
**SER 1407**





*Article*

# An Integrated Framework to Assess Greenwashing

Noémi Nemes [1], Stephen J. Scanlan [2], Pete Smith [3], Tone Smith [4], Melissa Aronczyk [5], Stephanie Hill [6], Simon L. Lewis [7], A. Wren Montgomery [8], Francesco N. Tubiello [9] and Doreen Stabinsky [10,*]

[1] Department of Political Science, University of Vienna, 7/2nd Floor, 1010 Vienna, Austria; noemin80@univie.ac.at

[2] Department of Sociology and Anthropology, Ohio University, Bentley Annex 162, Athens, OH 45701, USA; scanlans@ohio.edu

[3] Institute of Biological and Environmental Sciences, University of Aberdeen, 23 St Machar Drive, Aberdeen AB24 3UU, UK; pete.smith@abdn.ac.uk

[4] Institute for Multilevel Governance and Development, Vienna University of Economics and Business, Welthandelsplatz 1/D4, 1020 Vienna, Austria; tone.smith@a1.net

[5] School of Communication & Information, Rutgers University, 4 Huntington St, New Brunswick, NJ 08901, USA; melissa.aronczyk@rutgers.edu

[6] Communication and Culture, Ryerson University, 350 Victoria Street, Toronto, ON M5B 2K3, Canada; steph.hill@ryerson.ca

[7] Department of Geography, University College London, Gower Street, London WC1E 6BT, UK; s.l.lewis@ucl.ac.uk

[8] Ivey Business School, Western University, 1255 Western Rd, London, ON N6G 0N1, Canada; wmontgomery@ivey.ca

[9] Statistics Division, Food and Agriculture Organisation, Viale delle Terme di Caracalla, 00153 Roma, Italy; francesco.tubiello@fao.org

[10] College of the Atlantic, 105 Eden Street, Bar Harbor, ME 04660, USA

* Correspondence: dstabinsky@coa.edu



**Citation:** Nemes, N.; Scanlan, S.J.; Smith, P.; Smith, T.; Aronczyk, M.; Hill, S.; Lewis, S.L.; Montgomery, A.W.; Tubiello, F.N.; Stabinsky, D. An Integrated Framework to Assess Greenwashing. *Sustainability* **2022**, *14*, 4431. https://doi.org/10.3390/su14084431

Academic Editor: Roberta Costa

Received: 26 February 2022
Accepted: 28 March 2022
Published: 8 April 2022

**Publisher's Note:** MDPI stays neutral with regard to jurisdictional claims in published maps and institutional affiliations.



**Copyright:** © 2022 by the authors. Licensee MDPI, Basel, Switzerland. This article is an open access article distributed under the terms and conditions of the Creative Commons Attribution (CC BY) license (https://creativecommons.org/licenses/by/4.0/).

**Abstract:** In this paper we examine definitions of 'greenwashing' and its different forms, developing a tool for assessing diverse 'green' claims made by various actors. Research shows that significant deception and misleading claims exist both in the regulated commercial sphere, as well as in the unregulated non-commercial sphere (e.g., governments, NGO partnerships, international pledges, etc.). Recently, serious concerns have been raised over rampant greenwashing, in particular with regard to rapidly emerging net zero commitments. The proposed framework we developed is the first actionable tool for analysing the quality and truthfulness of such claims. The framework has widespread and unique potential for highlighting efforts that seek to delay or distract real solutions that are urgently needed today to tackle multiple climate and environmental crises. In addition, we note how the framework may also assist in the development of practices and communication strategies that ultimately avoid greenwashing.

**Keywords:** green claims; greenwashing; greenwashing framework; misleading/deceptive environmental communication; net zero; public relations; selective disclosure; sustainability; transparency

## 1. Introduction

Awareness is growing around the world about deceptive or outright false environmental claims made by companies, non-profits, and even governments when communicating their strategies on environment and climate issues. These claims can be used to promote the organisations' social status, relationships with consumers and employees, or short-term profits, while avoiding making more substantive changes necessary to rapidly reduce negative impacts on the environment. Despite this growing awareness, greenwashing remains widespread. A recent review of 500 global websites led by the UK's Competition and Markets Authority and the Netherlands Authority for Consumers and Markets (as part of the International Consumer Protection and Enforcement Network) showed that roughly 40% of

Exhibit 14 to Decl. of Lyon
349
**SER 1408**

*Sustainability* **2022**, *14*, 4431

green claims fall into the category of greenwash. Most countries have regulations in place for minimizing misleading claims, but most focus on commercial practices only. For example, in the US, the Federal Trade Commission produced the FTC Green Guides [1]; the EU has launched the Unfair Commercial Practices Directive [2] and a Guidance Document [3] on its implementation; and in the UK, the Advertising Standards Association Codes [4] have laid down requirements for responsible advertisement. The most recent effort is the Guidance on Green claims code by the UK's Competition and Markets Authority [5], which aims to help businesses comply with the law when making environmental claims. While non-business actors, non-profits and government activities go unregulated, even within the 'regulated' business sector, the high percentage of greenwashing in advertising suggests that companies feel sufficiently confident that they will not be held accountable for their claims. Other than piecemeal efforts by NGOs, bloggers, and journalists–such as the Guardian's year-long series "tracking the unprecedented efforts to hold the fossil fuel industry to account" [6] or ClientEarth's Greenwashing Files [7]—greenwashing beyond commercial practices remains largely unmonitored. Furthermore, accountability efforts, as well as national regulations, often leave out non-commercial actors and non-advertisements (e.g., pledges, partnerships, certifications), where greenwashing also occurs.

Significant deception and misleading claims have been identified in this sphere, with some even embedded in law. A recent example is the EU taxonomy on sustainable finance, which lists controversial energy sources, among them ethanol and wood biomass, as sustainable [8] while including gas and nuclear in the green taxonomy [9]. Sustainability certification, when not conducted rigorously, can also be used as green cover for corporations and governments to deepen the assault on ecosystems and social and indigenous rights. Such multi-stakeholder initiatives may give false environmental credibility to so-called 'sustainable' or 'more sustainable' products/services, as recently reported by MSI Integrity [10] in 'Not Fit for Purpose'. Climate-neutral and net-zero claims similarly may deceive people through purposefully vague formulations: the thousands of net-zero commitments announced by governments and firms can be interpreted and implemented in as many ways as there are actors who have committed to them.

The problem we address is that there is no universal definition of greenwashing or standard of behaviour that would help to detect it. The purpose of this paper, therefore, is to fill this gap in the recognition and understanding of misleading and deceptive environmental communication by providing a framework to assess greenwashing by organisations. At the same time, we recognize that there are many actors committed to minimizing negative environmental impacts of companies and organizations. A strong and coherent set of guidelines such as those we develop can also help positive actions to be fully understood and supported by the public.

The primary objective in this article is to develop a science-based assessment tool to promote discussions around transparency and accountability, inform the public about how they could be potentially misled with false solutions and pledges and help different actors to avoid greenwashing. The integrated framework that we include in the linked Supplementary Table S1 is based on (a) integrating existing theoretical greenwashing frameworks and the different types, varieties and so-called 'sins' of greenwashing that the literature has presented to date, and (b) developing it further to create an actionable framework to assess greenwashing efforts by any actors. Along with the assessment framework, we provide an operational definition of greenwashing, which is intended to encompass a variety of misleading communications and practices that intentionally or not, induce false positive perceptions of an organisation's environmental performance. In doing this, we promote dialogue that importantly fine-tunes the meaning of greenwashing as a complement to determining the methods we propose for assessing it.

## 2. Materials and Methods

We conducted an extensive review and qualitative analysis of the academic research literature to identify the main types or varieties of greenwashing and the different indicators

Exhibit 14 to Decl. of Lyon
350
**SER 1409**

*Sustainability* **2022**, *14*, 4431                                                                                                3 of 13

or questions that have been offered to test for its presence. We were mostly interested in papers that focused on typologies of greenwash and detecting greenwashing, and we undertook a multi-step process to identify and analyse these. In doing so, we focused on the academic literature but also searched practitioner outlets and resources to ensure our review was systematic.

In the first step of our analysis, we identified three prominent articles and reviews for synthesis in our framework development. We did not intend to replicate recent systematic academic reviews of the greenwashing literature (e.g., [11–13]). Instead, we sought to build on their outcomes and analysis as a basis from which to extend the limited research on identifying and detecting greenwashing. Their resultant subsets of literature formed the nucleus of our overview of literature and the basis of our framework development, as described below.

First, Lyon and Montgomery [11] reviewed and synthesized the multidisciplinary research on greenwashing and reviewed 34 papers in three categories: drivers of greenwash; varieties of greenwash and the impacts of greenwash. Because of our research objective, we focused merely on the literature that they included while discussing the different varieties of greenwash. Second, Gatti et al. [12] searched for the keywords "greenwash" and "greenwashing" in the titles and abstracts of English articles between the period 1995 and 2018. The authors then conducted a qualitative content analysis to assess the core findings and identified the following categories of research: the meaning of greenwashing; the antecedents and drivers of greenwashing; the consequences of greenwashing; how to reduce greenwashing; and how to detect greenwashing. For our research purposes, we then focused on those articles which Gatti et al. identified within the category of "how to detect greenwashing". Third, de Freitas et al. [13] also conducted a systematic review on the concepts and forms of greenwashing using the keywords of "greenwash", "greenwashing" and "greenwasher" in the academic search engines of Web of Science and Scopus. The authors searched for these keywords in the titles, abstracts, introductions and conclusions and identified a list of 67 publications between 2009 and 2018. Similar to our objectives, de Freitas et al. also looked for the phenomenon characteristics and typology of greenwashing, and out of the 67 documents, found 17 that provided insights on these aspects.

In the second step of our methodology, we wanted to move beyond scholarly articles on the issues of greenwashing and its detection and so we conducted a thorough internet search (using Google) with the keywords "greenwash checklist", "greenwash indicators" and "greenwashing frameworks" to include non-academic and practitioner sources. Here, we searched for resources and organizations that offered criteria or checklists to help assess/guide companies to avoid greenwashing. Many of these (e.g., [14–16]) had already been identified and highlighted in the academic articles analysed in our review in the prior step. However, through our search process we were able to add additional practitioner resources (e.g., [17–19]) that had not been identified in prior literature. These helped us to inform and develop our analysis and novel greenwashing framework.

Finally, as a third step, we also investigated the legal contexts within the EU, the UK, and the US and included in our framework insights from the guidelines that have been established in those governments to help companies to avoid misleading environmental claims in their advertisements and other environmental communications. All these different sources formed the backbone of our framework especially with regards to determining the various varieties of greenwashing and their descriptions (included in the first and second columns of the Supplementary Table S1).

During this review we found that academics have not yet come up with a single, widely agreed upon and applicable method of measuring greenwashing objectively. One of the pioneers in identifying and analysing greenwashing was the Center for Media and Democracy founded by John Stauber in 1993. Their books [20,21] and other efforts paved the way for investigative research into greenwashing and related deceptive practices and their effects on consumers. Over the last decades, extensive work has been done to categorize and quantify product-level greenwashing. For example, Gillespie [22] identified

Exhibit 14 to Decl. of Lyon
351
**SER 1410**

*Sustainability* **2022**, *14*, 4431

"ten signs of greenwash", ranging from "fluffy language," words or terms with no clear meaning such as "eco-friendly", to "outright lying," as in totally fabricated claims or data. The TerraChoice Environmental Marketing [14] categorized product-level greenwashing into "seven sins". These range from the "sin of the hidden trade-off", committed by suggesting a product is green based on an unreasonably narrow set of attributes without attention to other environmental issues, to the "sin of fibbing", which is committed by making false environmental claims. The other sins are the sin of no proof; sin of vagueness; sin of irrelevance; sin of lesser of two evils; and sin of worshipping false labels.

Greenpeace [15] defined four greenwashing detection criteria: dirty company, ad bluster, political spin, and "it's the law, stupid!". In 2007, EnviroMedia Social Marketing in collaboration with the University of Oregon implemented the "Greenwashing Index Scoring Criteria" and a tool was made available on the internet (www.greenwashingindex.com, accessed on 17 February 2022) which allowed users to assess the amount of greenwashing in ads claiming to be green. They used the following criteria in their assessment: the ad misleads with words; the ad misleads with visuals and/or graphics; the ad makes a green claim that is vague or seemingly unprovable; the ad overstates or exaggerates how green the product/company/service actually is; and the ad leaves out or masks important information, making the green claim sound better than it is.

Gallicano [23] created the first integrated framework based on synthesizing the methods by four organisations used for assessing greenwashing claims (Greenpeace, the EnviroMedia Social Marketing and the University of Oregon, TerraChoice Environmental Marketing (now Underwriters Laboratory) and the Committee of Advertising Practice). The framework developed by Gallicano consisted of seven main themes: Skeleton in the closet; The Right hand isn't talking to the left hand; Magic Tricks, Larger than Life; May I have the definition please?; Law and order; and Truth and Fiction. In addition, a description of the meanings of each of these is provided alongside an explanation of their significance. This framework allowed comparisons and contrasts of the public environmental criticisms using the case of Starbucks' online information and corporate social responsibility reports (see appendix of Gallicano [23]).

Next, focusing on conceptualization and theoretical development, Lyon and Montgomery [11] synthesized the research on greenwashing and highlighted several varieties of greenwash. Importantly they noted that the literature was not mature enough to have identified all its forms: Selective disclosure; Empty green claims and policies; Dubious certifications and labels; Co-opted NGO endorsements/partnerships; Ineffective public voluntary programs; Misleading narrative and discourse; and Misleading visual imagery. In presenting these ideas the authors provided great insight into understanding the many definitions of greenwashing and its various forms, contributing to greater clarification of the concept, and providing tools for understanding its presence.

Zanasi, Rota, Trerè and Falciatori [24] took this a step further by developing an analytical tool that includes a list of indicators derived from several different organisations (Greenpeace, EnviroMedia Social Marketing and the University of Oregon, Terrachoice, Futerra) and authors. This work covers a broad range of sustainability dimensions as well as offers communication suggestions in order to avoid greenwashing, focusing on the agrifood sector in particular. The authors suggest a number of indicators for greenwashing assessment including: Analysing the entire product's Life Cycle; Ad contents should be accessible, complete and verifiable; The language should be understandable and non-misleading; Communicate sustainable activities only when they are effective, meaningful and voluntary; Involve/engage; Do not use misleading "green" images; and Choose reliable third party certification schemes. They suggest that further studies should weigh the different greenwashing indicators in order to appreciate their relevance in contributing to the overall level of meaningful communication on the subject.

Taken together, these various evaluation tools and frameworks from both the academic literature and monitoring organisations provide a foundation for our work here. In addition to examining national guidelines on green marketing (e.g., [1,2,4]), in our framework we

Exhibit 14 to Decl. of Lyon
352
**SER 1411**

*Sustainability* **2022**, *14*, 4431                                                                                  5 of 13

mostly draw on sources from TerraChoice Environmental Marketing [14]; EnviroMedia Social Marketing and the University of Oregon [16]; BSR & Furterra [17]; Gillespie [22]; Greenpeace [15]; Gallicano [23]; Lyon & Montgomery [11]; Parguel, Benoit-Moreau and Russell [25]; Berrone [26]; Scanlan [27]; Siano et al. [28]; Contreras-Pacheco and Claasen [29]; Zanasi et al. [24]; and Sourcewatch [18]. We discuss the integration of these ideas in the section that follows, seeking to build on their work with our assessment framework.

### 3. Results

*3.1. Greenwashing: Definition and Varieties*

As a concept, greenwashing has been examined from a number of academic disciplines in addition to being a part of conversations among various government bodies and non-governmental organisations. Research contributing to its conceptualization and understanding has come from the fields of business (including advertising, ethics, and marketing), media and communications, environmental studies and management, production engineering, law, and the social sciences (including economics, geography, political science, psychology, and sociology) among others. Given the diversity of perspectives that are a part of the conversation, it should come as no surprise that no single definition of the concept has been universally accepted. Furthermore, as greenwashing becomes increasingly important and attracts more attention, definitions continue to evolve, therefore presenting a moving target of sorts as policymakers, practitioners, and scholars discuss the issue.

What has emerged instead is a collection of definitions that are connected through overlapping ideas that reveal a number of core elements of the concept or ways that it manifests itself. Greenwashing can therefore take on multiple forms and reflect a variety of components of interest that present both objective and subjective realities. In this paper, it is not our intention to resolve debate over what definition is best nor develop what we believe to be the universal standard. We instead can refer the reader to a number of important academic studies that have done this in a far more thorough manner than what we are able to do here including de Freitas Netto et al. [13]; Gatti et al. [12]; Lyon and Montgomery [11]; or Seele and Gatti [30]. We simply want to enable a basic understanding of the concept and its various manifestations for the reader while presenting a simple definition that can serve as a benchmark for using the framework that we have developed to assess its prevalence.

The Appendix A contains a collection of several definitions for greenwashing. Reflecting the larger conversation on the topic, these come from a range of academic analyses [13,31–34], consumer organisations [19,35], government entities [3,36], media [37,38] and non-governmental organisations [18,39] among others. In addition, definitions of the concept are also quite common from various dictionary or encyclopaedia sources [40], with Becker-Olsen and Potucek [41] providing a particularly meaningful definition given the corporate social responsibility context in which it appears:

Greenwashing refers to the practice of falsely promoting an organisation's environmental efforts or spending more resources to promote the organisation as green than are spent to engage in environmentally sound practices. Thus, greenwashing is the dissemination of false or deceptive information regarding an organisation's environmental strategies, goals, motivations, and actions.

An often-used definition of greenwashing comes from the marketing and consulting organisation TerraChoice, which is now a subsidiary of Underwriters Laboratories [14]: "Greenwashing is the act of misleading consumers regarding the environmental practices of a company or the environmental benefits of a product or service". This definition captures the essence of the core ideas that are central to the many available definitions, thus reflecting the most important themes in its conceptualizations. Furthermore, complementing its "seven sins of greenwashing" and examples used to identify it (see [42]), TerraChoice's conceptualization and application connect well with the framework we develop here.

New empirical analyses of greenwashing are constantly emerging in the wake of seemingly expanding consumer demands for corporate accountability and social responsibility

Exhibit 14 to Decl. of Lyon
353
**SER 1412**

*Sustainability* **2022**, *14*, 4431

alongside concerns about climate change and the environment. Furthermore, theoretical considerations have evolved in a way that requires a continual reassessment of the definition and forms of the concept. For example, definitions and research on the topic typically has viewed greenwashing as a deliberate corporate action fraught with misleading elements, focused on the deception of stakeholders. More recent literature on greenwashing suggest that it is not necessarily deliberate and furthermore encompasses a range of phenomena that go well beyond simply the disclosure of information (see [11,25]) though of course others (e.g., [37,43]) may disagree regarding the intentionality dynamic thus indicating the importance of ongoing debate.

In another example of the concept's evolution, the literature also shows that just like corporations, NGOs, and governments can engage in greenwashing: in fact, they may often serve as partners in corporate greenwashing [11] or manage public perception of a specific policy or various programs [38,44]. Sometimes "greenwashing" is not out of malice, but instead due to ignorance of environmental issues and environmental laws. It can also be a result of poorly conceived public relations efforts, which lead to the promotion of false or misleading environmental claims. In addition, the study of greenwashing is primarily concerned with environmental issues, a notion that Gatti et al. [12] (p. 6) reinforce in their finding that 61.6% of the studies they reviewed felt this exclusively to be the case. However, there are far reaching implications, and as this same study further notes, 38% believe that the concept relates to social issues as well (Ibid). For this reason and for purposes of both developing and applying a framework for its assessment, it is essential to consider the consequences that greenwashing has with regard to interface between the environment and society and its connections to additional components that are important to corporate social responsibility (see [12,45]).

Finally, building on the emergent literature and for the purpose of framework development and assessment, we have developed the following working definition, which we derive from the sources noted above: greenwashing is an umbrella term for a variety of misleading communications and practices that intentionally or not, induce false positive perceptions of an organisation's environmental performance. It can be conducted by companies, governments, politicians, research organisations, international organisations, banks and NGOs too and it can range from slight exaggeration to full fabrication, thus there are different shades of greenwashing. The Supplementary Table S1 presents the 13 main varieties/themes of greenwashing. Table 1 below is intended to reflect a sample of definitions that appear in the framework.

**Table 1.** Glossary of terms appearing in the integrated framework to assess greenwashing.

| Terms | Definitions |
|---|---|
| Claim | Evidence that organisations use to prove their point. Claims can take the form of verbal or written statements, pictures, reports, ads, but also collective aspirations by stakeholder groups; pledges; codes of conduct that define specific production or sourcing practices; and sectoral standards including principles, criteria and forms of verification agreed on by several stakeholders within a sector. |
| Greenwashing | An umbrella term for a variety of misleading communications and practices that intentionally or not, induce false positive perceptions of an organisation's environmental performance. |
| Organisation | An entity–such as a company, a consultancy, bank or an association (e.g., NGO)–comprising one or more people and having a particular purpose. For the purposes of the framework, governments and sub-national actors are also treated as organisations. |

Exhibit 14 to Decl. of Lyon
354
**SER 1413**

*Sustainability* **2022**, *14*, 4431

**Table 1.** *Cont.*

| Terms | Definitions |
|---|---|
| Transparency | A form of public exposure used to display communicative power. Assessments of transparency go beyond mere availability of information [46]. They must consider the means of transparency (e.g., self-disclosure versus legal requirement), the context of transparency (e.g., Through whose labour is the transparency achieved? Who controls the timing, scope, and particularities of information distribution?) and the beneficiaries of transparency (e.g., self-branding exercise or civic obligation)? [47] |

### 3.2. Integrating Greenwashing Frameworks

Greenwashing frameworks, guidelines and checklists have been developed by several actors, among them academics, NGOs, and business consultants for a variety of reasons. BSR & Futerra [17] in their practical manual for companies on greenwashing, offered a useful categorisation for avoiding the various types of greenwash: impact (ensuring it's real), alignment (building support internally and externally) and communication (ensuring it is accurate). They advised that when an actor wants to communicate a message about environmental issues, (a) it should be based on real, significant impact; (b) it should be aligned with multiple functions within the organisation and the integrity of claims should be checked by credible third parties; and (c) the communication should be focused on clarity and transparency. We have decided to follow these three categories within our framework as they capture all the various types and varieties of greenwashing in a meaningful way.

The resulting framework consists of 13 themes, describing the various types of claims used in greenwashing, all taken from existing literature (see first column of the Supplementary Table S1 for the list of themes). First, we have included themes in our framework that appeared in several research publications. Because some of them have been named differently by the various authors, we use names that best reflect the descriptions of the themes. Second, we included the descriptions of the different themes (second column of the Supplementary Table S1). Next, we integrated various statements, indicators, and questions that either the scientific literature on greenwashing examined or those non-academic discussions of greenwashing have deemed to be important (third column of the Supplementary Table S1) regarding the previously described themes. Where the different sources offered some statements that could be changed into the format of a question, we have integrated these, sometimes with modification so that the question is applicable for testing within the framework.

We discovered a large gap in the academic literature. While several authors have referred to different forms of greenwashing, in some themes (most noticeably in 'dubious certifications & labels' and 'co-opted endorsement'), we did not find corresponding questions, statements or criteria that could help to assess whether an actor engages in greenwashing. For instance, under what circumstances could certification schemes support greenwashing? Similarly, when could national agencies or NGOs be accused of contributing to corporate greenwashing? We have not found answers in the literature to these questions. Our framework therefore offers a first attempt to incorporate indicators in the fields where current literature on greenwashing has not included guidance on specific themes, issues, or organisations.

In addition, we have not found any attempt in the academic literature to give weights to the different indicators in greenwashing frameworks. One option is to choose core indicators which could be weighted more heavily than other indicators. Another option to avoid the weighting of indicators (which is prone to subjective judgment) is to give each question a point and include more questions in some themes than in others. This would mean that some themes have greater value in the potential overall score that results by virtue of their multiple assessment dimensions. However, which themes weigh more is also a subjective decision. A final option is to agree on themes having equal weight, meaning that the weight of indicator questions is different depending on the number of

Exhibit 14 to Decl. of Lyon
355
**SER 1414**

*Sustainability* **2022**, *14*, 4431

questions within one theme. One of the disadvantages of this last option is that themes like outright 'lying' do not have a stronger moral weight than simply using 'jargon' or 'misleading symbols' in communication. This makes equal weighting of themes difficult to justify. However, it is similarly difficult to give more weight to themes with more questions, when for example out-right lying is captured with a single indicator. Because of the lack of any attempt to assign weight to the different indicators in greenwashing literature, and the subjectivity that is needed to decide on various weights, we have decided not to assign any score or weight to the different indicators and themes.

Finally, no literature was found with proposed methods for accounting for the different degree or severity of the potential impact of greenwash. This is important in that greenwashing can have different impacts depending on the type, scope, and severity of the application. For example, deflecting the serious consequences of fossil fuels on climate change through influence peddling and denial seems far more severe in scope than simply using a green image in a magazine ad. The results of greenwashing remain the same, however. Our framework can be applied to real cases to pinpoint the obvious and likely greenwashing, as well as to offer a tool that can help an actor to more robustly communicate positive actions taken while avoiding any shade of greenwashing.

## 4. Discussion: How to Use the Framework

The framework is intended to be an operational tool, not just an academic exercise. It can be used as a tool by organisations as a guide to communicating environmental claims while avoiding greenwashing, and by users more widely to distinguish genuine green claims from false and misleading statements. It can be a useful tool for activists, NGOs, journalists, researchers, policymakers or others who want to systematically assess an organisation's claims for potential greenwashing within a unified and consistent analysis framework. Some claims might intuitively seem like greenwashing, but one might not know how to rigorously assess whether they are or not. This framework provides a structured way to ask questions about the different varieties of greenwashing to evaluate whether the organisation under assessment could be considered as engaging in greenwashing or not. It is not meant as a framework to benchmark organisations, but simply to analyse whether they are involved in greenwashing.

The way to use this framework is therefore quite straightforward: one needs to find a claim that is potentially a greenwash and check it against the list of indicator questions contained in the framework. Some questions will be irrelevant to the claim, in which case they can be ignored. Others may not be known or publicly available to the person doing the assessment (e.g., the marketing budget of a corporation) and thus these questions can be answered with an 'unknown'. Often, various sources need to be consulted in order to answer questions, including the organisation's own website, social media, ads in radio/TV/print, as well as recent sustainability or annual reports and financial statements. In the end, if there is any question answered with a 'yes' in the framework the organisation is already to some extent involved in greenwashing. As mentioned above, the framework is not meant to analyse the degree of greenwashing-hence if the questions (even if some of them) within a theme/variety of greenwashing is answered affirmatively (so the claim is a greenwash according to some indicator questions), the organisation already has fallen prey to greenwashing. Finally, some questions cannot be answered with a straightforward yes/no, thus an in-between answer, with the response 'likely greenwash' has been incorporated to better account for such situations and highlight areas needing additional research or scrutiny.

This framework provides a comprehensive tool for evaluating the environmental claims of organisations. It is intended to be used to evaluate specific claims and therefore has limited usefulness to questions of societal level systems and structures. For instance, the greenwashing framework does not address questions of economic growth and overconsumption, product quality, labour, inequality, or social justice. Likewise, this assessment tool does not account for different sizes of organisations, particularly small organisations,

Exhibit 14 to Decl. of Lyon
356
**SER 1415**

*Sustainability* **2022**, *14*, 4431

and their differing material abilities. Nor does it address broader questions about the usefulness of certification schemes, which must be assessed on their own merits. This framework is best used to assess the public environmental claims made by organisations and uncover lies, half-truths, and misleading claims.

The tool is also meant to be a dynamic, living framework that needs to be fine-tuned and revised regularly as more and more claims are being tested. It cannot be a one-time product but needs to evolve alongside various environmental communication strategies and practices. Thus, the authors of this paper, as members of the CSSN Working Group on Spinning Climate Change, would like to regularly adapt the framework as more claims are being tested.

## 5. Conclusions

This paper presents an integrated framework to support avoiding greenwashing by actors of any kind, including corporations, governments, and other organisations. The framework collects in one set of greenwashing themes a broader range of indicators linked to possible sources of greenwashing and could support effective sustainability policies and genuine green marketing and communication strategies at the level of any organisation. In addition, it may also be used by others wishing to hold various actors accountable for the claims they make. In this regard, the framework can be seen as a monitoring tool of sorts by academics, activists, or consumers, among others, who are interested in better understanding the practice of greenwashing and informing stakeholders of the practice. Scoring of different greenwashing indicators has so far not been attempted in literature. However, greenwashing can already be identified when an indicator question is answered with a 'yes'. Zanasi et al. [24] pointed out that further studies are necessary to weigh the different green marketing and greenwashing indicators in order to understand their relevance in contributing to the overall level of correct communication. Since such studies are currently lacking, this paper focussed on (a) defining the different varieties of greenwashing by different actors that have been mentioned in the academic literature, and (b) presenting a tool to support the assessment of diverse green claims by any actor. This framework potentially provides a useful basis for a numerical greenwashing index—used internally or externally—to better understand the degree of greenwashing in various cases. Furthermore, the phrasing of the different greenwashing indicator questions, as well as fine-tuning the various answers, could be improved by testing the framework on different green claims.

Persistent vigilance, especially of the fossil fuel industries and those relying heavily on the use of fossil fuels (e.g., transport, construction, utilities, mining and processing, manufacturing, agriculture, fashion, etc.) is essential to closely scrutinise messages and call into question blatant misinformation [27]. In the era of "alternative facts", there is a pressing need for regulation of claims and accountability regarding science versus "fake solutions" on environmental issues. Social movements and NGOs play a role in this, but there is also an important place for the news media and government agencies to contribute. This framework offers a mechanism to develop a solid evidence base for identifying greenwashing not just of corporations, but of ill-designed government policies, of certification schemes giving credibility to business-as-usual practices, and of any other actors claiming exaggerated environmental benefits. Close scrutiny is especially needed now in the rush to tackle the climate and biodiversity crises in which we find ourselves.

**Supplementary Materials:** The following supporting information can be downloaded at: https://www.mdpi.com/article/10.3390/su14084431/s1, Table S1: Integrated Framework of Greenwashing.

**Author Contributions:** Writing—original draft, N.N., S.J.S., P.S. and T.S.; writing—reviewing and editing, M.A., S.H., S.L.L., A.W.M., F.N.T. and D.S.; supervision, D.S. All authors have read and agreed to the published version of the manuscript.

Exhibit 14 to Decl. of Lyon
357
SER 1416

*Sustainability* **2022**, *14*, 4431

**Funding:** This research was funded by the Department of Political Science at University of Vienna, Austria and the Institute at Brown for Environment and Society, USA, in association with Climate Social Science Network.

**Institutional Review Board Statement:** Not applicable.

**Informed Consent Statement:** Not applicable.

**Data Availability Statement:** Not applicable.

**Conflicts of Interest:** The authors declare no conflict of interest. The funders had no role in the design of the study; in the collection, analyses, or interpretation of data; in the writing of the manuscript, or in the decision to publish the results. The views expressed in this publication are those of the individual authors and do not necessarily reflect the views or policies of their respective institutions.

## Appendix A. Collection of Greenwashing Definitions

| Definition |
| --- |
| "The act of disseminating disinformation to consumers regarding the environmental practices of a company or the environmental benefits of a product or service" [31], p. 424. |
| "Greenwashing refers to the practice of falsely promoting an organisation's environmental efforts or spending more resources to promote the organisation as green than are spent to actually engage in environmentally sound practices. Thus, greenwashing is the dissemination of false or deceptive information regarding an organisation's environmental strategies, goals, motivations, and actions" [41]. |
| "Disinformation disseminated by an organisation so as to present an environmentally responsible public image" [40]. |
| "Greenwashing is when a company or organisation spends more time and money on marketing themselves as environmentally friendly than on minimizing their environmental impact. It is a deceitful advertising gimmick intended to mislead consumers who prefer to buy goods and services from environmentally conscious brands" [37]. |
| "(1) The phenomenon of socially and environmentally destructive corporations attempting to preserve and expand their markets by posing as friends of the environment and leaders in the struggle to eradicate poverty. (2) Environmental whitewash. (3) Any attempt to brainwash consumers or policy makers into believing that polluting mega-corporations are the key to environmentally sound sustainable development (4) Hogwash [39]. |
| "greenwashing is taken to mean two main things. It can be when companies—usually mega corporations and sometimes politicians—try to hide or cover up their less-than-stellar environmental records with a grand, public gesture towards green causes the other type of greenwashing is where companies and brands use words like 'green', 'sustainable', 'eco-friendly', or 'vegan' simply as a marketing ploy, without any deep interrogation over what those terms actually mean. And crucially-without any accountability for their actions" [38]. |
| The authors note two different major classifications of greenwashing, including "product/service level claim greenwashing, which uses textual arguments that explicitly or implicitly refer to the ecological benefits of a product or service to create a misleading environmental claim" [13:7] while "executional greenwashing suggests nature-evoking elements such as images using colors (e.g., green, blue) or sounds (e.g., sea, birds). Backgrounds representing natural landscapes (e.g., mountains, forests, oceans), or pictures of endangered animal species (e.g., pandas dolphins) or renewable sources of energy (e.g., wind, waterfalls) are examples of executional nature-evoking elements" [13], p. 10. |
| "the act of misleading consumers regarding the environmental practices of organisations (firm-level greenwashing) or the environmental benefits of a product or service (product-level greenwashing)" [32], p. 66. |
| "Greenwashing is the process by which organisations spread misleading perceptions about their products or services that suggest they are more environmentally responsible than is the reality. The practice of greenwashing is used regularly by corporations, governments, and other entities to deceive the public into believing that they are doing more for the environment than they truly are in order to gain better public perception" [35]. |
| "Greenwashing is used to describe the practice of companies launching adverts, campaigns, products etc. under the pretence that they are environmentally beneficial, often in contradiction to their environmental and sustainability record in general" [19]. |

Exhibit 14 to Decl. of Lyon
358
**SER 1417**

| Definition |
| --- |
| "The expressions 'environmental claims' and 'green claims' refer to the practice of suggesting or otherwise creating the impression (in a commercial communication, marketing or advertising) that a good or a service has a positive or no impact on the environment or is less damaging to the environment than competing goods or services. This may be due to its composition, how it has been manufactured or produced, how it can be disposed of and the reduction in energy or pollution expected from its use. When such claims are not true or cannot be verified, this practice is often called 'greenwashing'. 'Greenwashing' can relate to all forms of business- to-consumer commercial practices concerning the environmental attributes of goods or services. According to the circumstances, this can include all types of statements, information, symbols, logos, graphics and brand names, and their interplay with colours, on packaging, labelling, advertising, in all media (including websites) and made by any organisation, if it qualifies as a "trader" and engages in commercial practices towards consumers" [3], p. 95. |
| "Greenwashing is the process of conveying a false impression or providing misleading information about how a company's products are more environmentally sound. Greenwashing is considered an unsubstantiated claim to deceive consumers into believing that a company's products are environmentally friendly" [43]. |
| "greenwash can be characterized as the selective disclosure of positive information about a company's environmental or social performance, while withholding negative information on these dimensions" [33], p. 5. |
| "the word greenwash is used to cover any communication that misleads people into adopting overly positive beliefs about an organisation's environmental performance, practices, or products the important phenomenon of misleading environmental communication" [11], p. 226. |
| "Greenwashing is the practice of promoting environmentally friendly programs to deflect attention from an organisation's environmentally unfriendly or less savory activities" [34], p. 19. |
| Focus on "executional greenwashing whereby nature-evoking elements in the ad execution may induce false perceptions of a brand's greenness, whether intentionally or not on the part of the advertiser" [25], p. 108. |
| "Greenwashing is the unjustified appropriation of environmental virtue by a company, an industry, a government, a politician or even a non-government organisation to create a pro-environmental image, sell a product or a policy, or to try and rehabilitate their standing with the public and decision makers after being embroiled in controversy" [18]. |
| "The act of misleading consumers regarding the environmental practices of a company or the environmental benefits of a product or service" [48]. |
| "Communication that misleads people (e.g., consumers and stakeholders) regarding environmental performance/benefits by disclosing negative information and disseminating positive information about an organisation, service, or product" [49], pp. 372–373. |
| "Greenwashing is the act of misleading consumers regarding the environmental practices of a company or the environmental benefits of a product or service" [42]. |
| "The practice of advertising a product or process as "green" or environmentally friendly, when the product really is not, or does not achieve the advertised marketing claims. A false or misleading picture of environmental friendliness used to conceal or obscure damaging activities" [36]. |

**References**

1. FTC. Guides for the Use of Environmental Marketing Claims. 2012. Available online: https://www.ftc.gov/policy/federal-register-notices/guides-use-environmental-marketing-claims-green-guides (accessed on 17 February 2022).
2. European Commission. Unfair Commercial Practices Directive. In Proceedings of the Directive 2005/29/EC of the European Parliament and of the Council of 11 May 2005 Concerning Unfair Business-to-Consumer Commercial Practices in the Internal Market, Brussels, Belgium, 11 May 2005.
3. European Commission. Guidance on the Implementation/Application of Directive 2005/29/EC Unfair Commercial Practices. SWD (2016) I63 Final. Available online: https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:52016SC0163&from=FR (accessed on 17 February 2022).
4. ASA. UK Code of Non-Broadcast Advertising and Direct & Promotional Marketing, 11-Environmental Claims. (N.d.). Available online: https://www.asa.org.uk/type/non_broadcast/code_section/11.html (accessed on 17 February 2022).
5. Competition and Markets Authority. Green Claims Code: Making Environmental Claims—Guidance for Businesses Making Environmental Claims in the UK. 2021. Available online: https://www.gov.uk/government/publications/green-claims-code-making-environmental-claims (accessed on 17 February 2022).
6. McGreal, C. Big Oil and Gas Kept a Dirty Secret for Decades. Now They May Pay the Price. *The Guardian*. 30 June 2021. Available online: https://www.theguardian.com/environment/2021/jun/30/climate-crimes-oil-and-gas-environment (accessed on 17 February 2022).

Exhibit 14 to Decl. of Lyon
359
**SER 1418**

*Sustainability* **2022**, *14*, 4431

7.   ClientEarth. The Greenwashing Files. 2021. Available online: https://www.clientearth.org/the-greenwashing-files/ (accessed on 17 February 2022).
8.   CleanTechnica. Greenwashing of EU Finance Law Sparks Walkout by Experts. 2021. (Originally Published on Transport & Environment by Eoin Bannon). Available online: https://cleantechnica.com/2021/04/25/greenwashing-of-eu-finance-law-sparks-walkout-by-experts/ (accessed on 17 February 2022).
9.   Rankin, J. EU in Row over Inclusion of Gas and Nuclear in Sustainability Guidance. *The Guardian*. 21 December 2021. Available online: https://www.theguardian.com/world/2021/dec/21/eu-in-row-over-inclusion-of-gas-and-nuclear-in-sustainability-guidance (accessed on 17 February 2022).
10.  MSI Integrity. Not-Fit-for-Purpose. The Grand Experiment of Multi-Stakeholder Initiatives in Corporate Accountability, Human Rights and Global Governance. 2020. Available online: https://www.msi-integrity.org/not-fit-for-purpose/ (accessed on 17 February 2022).
11.  Lyon, T.P.; Montgomery, A.W. The Means and End of Greenwash. *Organ. Environ.* **2015**, *28*, 223–249. Available online: https://journals.sagepub.com/doi/10.1177/1086026615575332 (accessed on 17 February 2022). [CrossRef]
12.  Gatti, L.; Seele, P.; Rademacher, L. Grey Zone in—Greenwash Out. A Review of Greenwashing Research and Implications for the Voluntary-Mandatory Transition of CSR. *Int. J. Corp. Soc. Responsib.* **2019**, *4*, 6. [CrossRef]
13.  De Freitas Netto, S.V.; Facao Sobrãl, M.F.; Bezerra Riberio, A.R.; da Luz Soares, G.R. Concepts and Forms of Greenwashing: A Systematic Review. *Environ. Sci. Eur.* **2020**, *32*, 19. [CrossRef]
14.  TerraChoice// Underwriters Laboratory. The Seven Sins of Greenwashing. Environmental Claims in Consumer Markets. Summary Report: North America. 2009. Available online: https://www.ul.com/insights/sins-greenwashing (accessed on 17 February 2022).
15.  Coombs, W.T.; Holladay, S.J. Managing Corporate Social Responsibility: A Communication Approach. 2011, p. 74. Available online: https://onlinelibrary.wiley.com/doi/book/10.1002/9781118106686 (accessed on 17 February 2022).
16.  *EnviroMedia Social Marketing and the University of Oregon*; Greenwashing Index: Ankara, Turkey, 2009.
17.  BSR & Futerra. Understanding and Preventing Greenwash: A Business Guide. 2009. Available online: https://www.bsr.org/reports/Understanding%20_Preventing_Greenwash.pdf (accessed on 17 February 2022).
18.  Sourcewatch. "Greenwashing". The Center for Media and Democracy. Available online: https://www.sourcewatch.org/index.php/Greenwashing (accessed on 17 February 2022).
19.  Ethical Consumer. What is Greenwashing. 2020. Available online: https://www.ethicalconsumer.org/transport-travel/what-greenwashing (accessed on 17 February 2022).
20.  Stauber, J.; Rampton, S. *Toxic Sludge is Good for You: Lies, Damn Lies, and the Public Relations Industry*; Common Courage Press: Monroe, ME, USA, 1995.
21.  Rampton, S.; Stauber, J. *Trust Us, We're Experts: How Industry Manipulates Science and Gambles with Your Future*; Penguin Putnam Inc.: New York, NY, USA, 2002.
22.  Gillespie, E. The Ten Signs of Greenwash. Green Marketing Summit, Futerra Sustainability Communications. 2009. Available online: https://www.brighttalk.com/webcast/43/2609/the-ten-signs-of-greenwash-and-how-to-avoid-them (accessed on 17 February 2022).
23.  Gallicano, T. A Critical Analysis of Greenwashing Claims. *Public Relat. J.* **2011**, *5*, 1–21. Available online: https://www.researchgate.net/publication/305438010_A_Critical_Analysis_of_Greenwashing_Claims (accessed on 17 February 2022).
24.  Zanasi, C.; Rota, C.; Trerè, S.; Falciatori, S. An Assessment of the Food Companies Sustainability Policies through a Greenwashing Indicator. In Proceedings of the System Dynamics and Innovation in Food Networks, Innsbruck-Igls, Austria, 13–17 February 2017; Available online: http://centmapress.ilb.uni-bonn.de/ojs/index.php/proceedings/article/view/1707 (accessed on 17 February 2022).
25.  Parguel, B.; Benoit-Moreau, F.; Russell, C.A. Can Evoking Nature in Advertising Mislead Consumers? The Power of 'Executional Greenwashing'. *Int. J. Advert.* **2015**, *34*, 107–134. [CrossRef]
26.  Berrone, P. *Green Lies: How Greenwashing Can Destroy a Company (and How to Go Green without the Wash)*; CreateSpace: Scotts Valley, CA, USA, 2016.
27.  Scanlan, S. Framing Fracking: Scale-Shifting and Greenwashing Risk in the Oil and Gas Industry. *Local Environ.* **2017**, *22*, 1311–1337. Available online: https://www.tandfonline.com/doi/abs/10.1080/13549839.2017.1345877?scroll=top&needAccess=true&journalCode=cloe20 (accessed on 17 February 2022). [CrossRef]
28.  Siano, A.; Vollero, A.; Conte, F.; Amabile, S. "More than words": Expanding the taxonomy of greenwashing after the Volkswagen scandal. *J. Bus. Res.* **2017**, *71*, 27–37. [CrossRef]
29.  Contreras-Pacheco, O.E.; Claasen, C. Fuzzy reporting as a way for a company to greenwash: Perspectives from the Colombian reality. *Probl. Perspect. Manag.* **2017**, *16*, 526–536. [CrossRef]
30.  Seele, P.; Gatti, L. Greenwashing Revisited: In Search of a Typology and Accusation-Based Definition Incorporating Legitimacy Strategies. *Bus. Strategy Environ.* **2017**, *26*, 239–252. [CrossRef]
31.  Baum, L.M. It's Not Easy Being Green or Is It? A Content Analysis of Environmental Claims in Magazine Advertisements from the United States and United Kingdom. *Environ. Commun.* **2012**, *6*, 423–440. [CrossRef]
32.  Delmas, A.M.; Burbano, V.C. The Drivers of Greenwashing. *Calif. Manag. Rev.* **2011**, *54*, 64–87. [CrossRef]

Exhibit 14 to Decl. of Lyon
360
SER 1419

33. Lyon, T.P.; Maxwell, J.W. Greenwash: Corporate Environmental Disclosure under Threat of Audit. *J. Econ. Manag. Strategy* **2011**, *20*, 3–41. [CrossRef]
34. Marquis, C.; Toffel, M.W. *The Globalization of Corporate Environmental Disclosure: Accountability or Greenwashing?* Harvard School of Business: Cambridge, MA, USA, 2011; pp. 11–115.
35. Ecolife. What is Greenwashing? Ecolife Dictionary. Available online: http://www.ecolife.com/define/greenwashing.html (accessed on 17 February 2022).
36. U.S. EPA. Vocabulary Catalog: Top Green Home Terms. Available online: https://sor.epa.gov/sor_internet/registry/termreg/searchandretrieve/glossariesandkeywordlists/search.do?details=&glossaryName=Top%20Green%20Home%20Terms (accessed on 17 February 2022).
37. Corcione, A. What is Greenwashing? *Business News Daily*, 2020. Available online: https://www.businessnewsdaily.com/10946-greenwashing.html (accessed on 17 February 2022).
38. De Ferrer, M. What Is Greenwashing and Why Is It a Problem? *Euronews*, 2020. Available online: https://www.euronews.com/green/2020/09/09/what-is-greenwashing-and-why-is-it-a-problem (accessed on 17 February 2022).
39. CorpWatch. Greenwash Fact Sheet. 2001. Available online: https://www.corpwatch.org/article/greenwash-fact-sheet (accessed on 17 February 2022).
40. Oxford English Dictionary. *Concise Oxford English Dictionary*, 10th ed.; Pearsall, J., Ed.; Oxford University Press: Oxford, UK, 2003.
41. Becker-Olsen, K.; Potucek, S. Greenwashing. In *Encyclopedia of Corporate Social Responsibility*; Idowu, S.O., Capaldi, N., Zu, L., Das Gupta, A., Eds.; Springer: Berlin/Heidelberg, Germany, 2013. [CrossRef]
42. TerraChoice/Underwriters Laboratory. The Sins of Greenwashing: Home and Family Edition (2010). Available online: http://faculty.wwu.edu/dunnc3/rprnts.TheSinsofGreenwashing2010.pdf (accessed on 17 February 2022).
43. Kenton, W. *Greenwashing*; Investopedia: New York, NY, USA, 2021; Available online: https://www.investopedia.com/terms/g/greenwashing.asp (accessed on 17 February 2022).
44. Harlan, T. Green Development or Greenwashing? A Political Ecology Perspective on China's Green Belt and Road. *Eurasian Geogr. Econ.* **2021**, *62*, 202–226. [CrossRef]
45. De Jong Menno, D.T.; Huluba, G.; Beldad, A.D. Different Shades of Greenwashing: Consumers' Reactions to Environmental Lies, Half-Lies, and organisations Taking Credit for Following Legal Obligations. *J. Bus. Tech. Commun.* **2019**, *34*, 38–76. [CrossRef]
46. Ball, C. What Is Transparency? *Public Integr.* **2009**, *11*, 293–308. [CrossRef]
47. Wood, T.; Aronczyk, M. Publicity and Transparency. *Am. Behav. Sci.* **2020**, *64*, 11. [CrossRef]
48. Sustainable Furnishings Council. Glossary. Available online: https://sustainablefurnishings.org/glossary (accessed on 17 February 2022).
49. Tateishi, E. Craving Gains and Claiming 'Green' by Cutting Greens? An Exploratory Analysis of Greenfield Housing Developments in Iskandar Malaysia. *J. Urban Aff.* **2018**, *40*, 370–393. [CrossRef]

Exhibit 14 to Decl. of Lyon
361
**SER 1420**

# Exhibit 13

# to Declaration of Thomas P. Lyon

# The Means and End of Greenwash

Exhibit 13 to Decl. of Lyon
320
**SER 1421**

Article

# The Means and End of Greenwash

Organization & Environment
2015, Vol. 28(2) 223–249
© 2015 SAGE Publications
Reprints and permissions:
sagepub.com/journalsPermissions.nav
DOI: 10.1177/1086026615575332
oae.sagepub.com

(S)SAGE

## Thomas P. Lyon[1] and A. Wren Montgomery[2]

### Abstract

Corporate claims about environmental performance have increased rapidly in recent years, as has the incidence of greenwash, that is, communication that misleads people into forming overly positive beliefs about an organization's environmental practices or products. References to greenwash in the literature have grown rapidly since the term was introduced more than 2 decades ago, with a sharp increase in articles since 2011. We review and synthesize this fragmented and multidisciplinary literature, showing that greenwash is a broad umbrella term that encompasses a variety of specific forms of misleading environmental communication. More research is needed that identifies and catalogues the varieties of greenwash, theorizes and models their mechanisms drawing on existing social science research, and measures their impacts on corporate performance and social welfare.

### Keywords

greenwash, corporate social responsibility, symbolic management, decoupling, information disclosure

Corporate claims about environmental performance—at both the product level and the corporate level—have increased rapidly in recent years. Green advertising grew almost 300% between 2006 and 2009 (TerraChoice, 2009), and sales of green products and services were projected to climb from $230 billion in 2009 to $845 billion by 2015 (Delmas & Burbano, 2011). More than 75% of S&P 500 companies have sections of their websites devoted to disclosing information about their social and environmental policies and performance (Alves, 2009). In 2012, 176 major global firms used social media to conduct a sustainability dialogue with stakeholders, up from 60 two years earlier (Yeomans, 2013).

As corporate green claims have mushroomed, however, consumers have grown increasingly skeptical about their authenticity. They have good reason to be wary: revered advertising agency Ogilvy and Mather says that greenwashing is reaching "epidemic proportions" (Hsu, 2011). Evidence suggests that greenwashing has become an important part of corporate marketing practice over the past decade. TerraChoice, an environmental marketing firm, released a report in 2007 that studied the environmental claims of 1,018 products sold in "big box" retailers in the United States and Canada (TerraChoice, 2007). The report concluded that all but one of the products made claims that were demonstrably false or risked misleading consumers. A follow-up study in 2009 found many more products that made environmental claims and that 98% of the

---

[1]University of Michigan, Ann Arbor, MI, USA
[2]Queen's University, Kingston, ON, Canada

**Corresponding Author:**
Thomas P. Lyon, University of Michigan, 701 Tappan Street, Ann Arbor, MI 48109, USA.
Email: tplyon@umich.edu

Exhibit 13 to Decl. of Lyon
321
**SER 1422**

224                                                    *Organization & Environment 28(2)*

2,219 products making such claims committed at least one of the "Seven Sins of Greenwashing" (TerraChoice, 2009).[1]

Greenwashing is not without risk for companies: environmental activists and concerned citizens increasingly denounce corporate environmental efforts as simply public relations campaigns. For example, the Coca-Cola Company came under attack and was awarded a Polaris Institute "greenwashing award" when it made unverifiable claims it had cut back its water usage by about 4% annually in order to reduce its water footprint Lyon & Montgomery, 2013). In addition, companies increasingly face financial risks for making misleading green claims. For example, SC Johnson, a company with a long history of environmental initiatives, recently settled for an undisclosed sum a class-action lawsuit brought by Mr. Wayne Koh of California, who claimed that the company's "Greenlist" logo on Windex misled him into believing the product was certified by an independent third party (Hoffman, 2013).

Greenwash is also of concern to policy makers. In October 2012, the U.S. Federal Trade Commission (FTC) released a revision to its Guides for the Use of Environmental Marketing Claims ("Green Guides"). The Guides are similar to the Practical Guidance offered by the United Kingdom's Department for Environment, Food and Rural Affairs (DEFRA), originally issued in 2003 and updated in 2011. They offer best practice guidelines for avoiding misleading environmental claims. Although the Green Guides do not carry the force of law, the FTC has recently filed complaints against companies whose claims were seen as misleading to a "reasonable consumer." For example, in February 2010 the FTC warned against labeling paper plates and other products biodegradable when in fact they most often end up in landfills.

Academic research has paralleled the growing public and media concern over greenwash. The number of scholarly articles mentioning greenwash grew rapidly in recent years to a total of almost 800 English-language papers, with a sharp increase in articles since 2011. Greenwash is a topic ripe for literature review because it is important in practice, because it has become an increasingly important topic in the academic literature, and because it raises challenging issues and research opportunities at the intersection of numerous academic disciplines.

In this review, we survey and synthesize the progress that has been made in researching greenwash, but also seek to redirect that research. We argue that greenwash is a broad umbrella term that encompasses a variety of modes of misleading communication. Recent attempts to define greenwash have sometimes cast too narrow a net and missed the full range of misleading environmental communications. We call for research that identifies and catalogues the varieties of greenwash, draws on extant social science to theorize and model their mechanisms, and measures their impacts. Because greenwash occurs at both the product level and the corporate level, we also call for multilevel work that characterizes the degree of skepticism different individuals bring to corporate green claims, and explains how this heterogeneity in attitudes shapes the way stakeholder groups respond to greenwash.

In the next section, we discuss how to define greenwash, arguing for a broad notion consistent with the popular usage of the term to encompass communications that mislead receivers into adopting overly positive beliefs about an organization's environmental performance. We next discuss mechanisms of misleading communication from a variety of disciplines, before turning to a review of various trends in the literature on greenwash, which crosses disciplinary boundaries between accounting, marketing, business ethics, economics, political science, management, communications, and strategy. With this background in mind, we discuss more thoroughly the subset of the literature that takes greenwash as its primary focus, highlighting theoretical and empirical findings on the actors, antecedents, forms, and impacts of greenwash. We then turn more speculatively to forces that could help bring about the end of greenwash and finally conclude with implications for future research and practice.

Exhibit 13 to Decl. of Lyon
322
**SER 1423**

## What Is Greenwash?

Popular usage of the term *greenwash* encompasses a range of communications that mislead peo-
ple into adopting overly positive beliefs about an organization's environmental performance,
practices, or products. The website stopgreenwash.org, hosted by Greenpeace, begins with this:
"Every day, Americans are bombarded with advertising about environmentally friendly goods
and services. But how many really are green, and how many are just pretending?" It also says the
word greenwash is "used to describe the act of misleading consumers regarding the environmen-
tal practices of a company or the environmental benefits of a product or service." *The Concise
Oxford English Dictionary* (10th Edition) defines greenwash as follows: "Disinformation dis-
seminated by an organization so as to present an environmentally responsible public image; a
public image of environmental responsibility promulgated by or for an organization etc. but
perceived as being unfounded or intentionally misleading." All these notions of greenwash reflect
concern with communication that misleads people into holding overly positive beliefs about an
organization's environmental performance, practices, or products.

Naturally, scholars have attempted to be more precise about exactly what constitutes green-
wash, but to date there is no consensus. Laufer (2003) does not define greenwashing precisely,
but presents a set of elements of greenwashing that include "confusion," "fronting," and "postur-
ing."[2] Delmas and Burbano (2011) offer a clearer definition: "Poor environmental performance
and positive communication about environmental performance" (p.65).However, this definition
presumes it is possible to summarize a firm's aggregate environmental performance and catego-
rize it as negative or positive as well as to summarize a firm's aggregate communications as
negative or positive. Lyon and Maxwell (2011) offer an even more precise definition: "Selective
disclosure of positive information about a company's environmental or social performance, with-
out full disclosure of negative information on these dimensions, so as to create an overly positive
corporate image" (p. 9). However, this definition focuses narrowly on the disclosure of "hard,"
or verifiable, information about environmental performance, and misses phenomena such as
vague claims, the use of visual imagery, and "image advertising."

Bowen (2014) presents the first book-length scholarly study of greenwashing. She is con-
cerned that the academic literature on greenwashing is limited by four assumptions: (1) green-
washing is only about information disclosure, (2) greenwashing is deliberate, (3) greenwashing
is initiated primarily by companies, and (4) greenwashing is beneficial to firms and costly to
society. Thus, she proposes instead the broader notion of "symbolic corporate environmental-
ism," which she defines as the "shared meanings and representations" surrounding "changes
made by managers inside organizations that they describe as primarily for environmental rea-
sons" (p. 3). She sees greenwash as "a specific subset of symbolic corporate environmentalism
in which the changes are both 'merely symbolic' and deliberately so" (p. 3).

While we share many of Bowen's concerns, our review of the cross-disciplinary literature on
greenwash shows that it encompasses a range of phenomena that go well beyond information
disclosure, and that greenwash can range from slight exaggeration to full fabrication. In addition,
the literature (and public policy regarding deceptive advertising) strongly suggests that what peo-
ple take from a communication is subjective and filtered through their own mental formations, so
that greenwashing need not be deliberate. People may infer too much from even carefully circum-
scribed communications. The literature also shows that just like corporations, NGOs, and govern-
ments can engage in greenwashing; indeed, they may often serve as partners in corporate
greenwashing. Finally, although the literature generally views greenwashing as detrimental, we
agree with Bowen that it may not always be entirely bad for society, and that research needs to dig
deeper and clarify when the benefits of increased "green talk" may outweigh the harms.

Consider some examples. Bowen and Aragon-Correa (2014, p. 108) mention "egregious
examples of greenwashing, such as Mazda's use of the Dr. Seuss cartoon character The Lorax to

Exhibit 13 to Decl. of Lyon
323
**SER 1424**

226                                                                            *Organization & Environment 28(2)*

'speak for the trees' and endorse Mazda's SkyActiv technology with a 'Certified Truffula Tree Seal of Approval.'" This is clearly not an example of information disclosure; instead it involves appropriating an image from a work of children's fiction that carries certain positive associations and linking it to a product. Or consider Shell's use of an image of a smokestack with flowers sprouting from it, which DEFRA forced Shell to withdraw because it violated DEFRA's Green Guides. Such visual images are not disclosure, but many would consider them greenwash.

In view of the wide range of communications that may be considered greenwash, we argue that the literature needs to begin to think in terms of "varieties of greenwash." In both the popular and the scholarly press, the word greenwash is used to cover any communication that misleads people into adopting overly positive beliefs about an organization's environmental performance, practices, or products. We believe it makes sense to stick with this broad use of the word, and to focus scholarly attention on the various ways in which greenwash occurs. This has the benefit of aligning scholarly and popular usage of the word. Perhaps more important, this broad view of greenwash encourages interdisciplinary discussion of the important phenomenon of misleading environmental communication. To facilitate this interdisciplinary dialogue, the next section presents constructs relating to misleading communication from a variety of disciplines.

## Varieties of Misleading Communication

Constructs related to "misleading" communications appear in numerous disciplines (see Table 1), especially organization theory, economics, and marketing. In this section, we describe several major mechanisms of misleading communications. Given our broad conception of greenwash, any can be a variety of greenwash if applied to environmental communications.

### *Organization Theory*

There is a large literature in organization theory on decoupling and symbolic management. This work begins from the idea that organizations must conform to the demands of external constituencies in order to avoid censure from stakeholders and to achieve and maintain "legitimacy" (DiMaggio & Powell, 1983; Meyer & Rowan, 1977). Meyer and Rowan's (1977) foundational work warns that the very fact that conformity to social norms holds advantages for firms may incite misbehavior, and that organizations may manage outside impressions by "decoupling" their internal activities from the structural facade they present to the outside world.

In the environmental sphere, decoupling is referred to as a variety of greenwash. Decoupling is commonly used to refer to structural features of an organization, such as the creation of a Sustainability Department, which can be meaningless if the department is understaffed and has little sway within the organization. However, decoupling is also used to refer to promises or policies that are not backed up by corresponding actions, a practice often referred to as "symbolic management" (Westphal & Zajac, 1994). Making and breaking implied environmental promises is clearly deceptive (Bansal & Clelland, 2004; Delmas & Montes-Sancho, 2010; Ramus & Montiel, 2005), and hence a form of greenwash, but it is not the same as selectively disclosing hard evidence.

Emerging literature suggests that the familiar decoupling of structure and activity is retreating in the face of information technology, but that a decoupling of means and ends may be emerging in its place (Bromley & Powell, 2012). Wijen (2014) applies this line of reasoning to sustainability, an "opaque" field where causal connections are complex, and argues that if external stakeholders enforce compliance with specific practices they may inadvertently exacerbate means/ends decoupling if the practices are not sufficient to achieve the desired ends. Thus, firms and their stakeholders may jointly produce irrelevant actions that merely appear to be solving the problem of concern, creating potential for greenwash.

Exhibit 13 to Decl. of Lyon
324

**Table 1.** Mechanisms of Misleading Behavior.

| Construct | Definition | References | Examples |
|---|---|---|---|
| Decoupling | Disconnect between the structures and the activities of an organization | Meyer and Rowan (1977) | Ineffectual Environment, Health and Safety (EHS) departments |
| Means/End decoupling | Disconnect between the actions and the goals of an organization | Bromley and Powell (2012) | Biofuels are adopted to reduce global warming, but it is unclear they help |
| Symbolic management | Disconnect between promises and actions | Westphal and Zajac (1994); Ramus and Montiel (2005) | Firms promise to green themselves but do not |
| Halo effect | Inability to evaluate individual attributes apart from an overall impression | Thorndike (1920); Russo, Metcalf, and Stephens (2004) | Consumer learns a firm's products are organic, so also assumes they must use renewable energy |
| Astroturf lobbying | Covert funding of a "front group" that can make an argument more credibly than the funder | Lyon and Maxwell (2004) | "CARE for Michigan" (funded by utilities) lobbies against renewable energy |
| Pooling | Taking the same costly action as a more able individual in order to appear identical | Spence (1973); Delmas and Montes-Sancho (2010) | Firms join voluntary programs but do not change behavior |
| Selective disclosure | Disclosing positive information while withholding negative information | Lyon and Maxwell (2011); Lyon and Montgomery (2013) | "Driers help protect the environment. They save trees from being used for paper towels." |
| Cheap talk | Verbal claim with nothing to back it up | Farrell and Rabin (1996 | Firms promise to green themselves but do not |
| Costly state falsification | Expending effort to distort the ability of others to verify the state of the world | Lacker and Weinberg (1989); Hamilton and Zilberman (2006) | Fraudulent ecolabels |
| Incomplete comparisons | Comparison for which adequate referents are not provided | Shimp (1978) | "Acme is more effective" |
| Implied superiority | Suggests one product is better than other without quite saying so | Snyder (1989) | "No other product is more effective" |

## Economics

Economics offers a wealth of game-theoretic models of interactions between parties with asymmetric levels of information. Overall, this work suggests that it is hard to deceive sophisticated, skeptical audiences.

*Signaling Models.*  Sophisticated players are not fooled by another player's simple verbal claims to be outstanding, since they are just "cheap talk." As a result, senders of information take costly

Exhibit 13 to Decl. of Lyon
325
**SER 1426**

Case 2:24-cv-00801-ODW-PVC   Document 56-13   Filed 07/24/24   Page 7 of 28   Page ID #:6306

actions that they hope will "signal" their underlying type, such as obtaining a graduate degree (Spence, 1973). Crucially, such inferences are only informative if high-quality senders find it sufficiently less costly to send the signal than do low-quality senders. Otherwise, a "pooling equilibrium" emerges in which low-quality types mimic the action of the high-quality types, and receivers of information (e.g., employers) learn nothing from the action. In such an equilibrium, nobody is "fooled" into adopting false beliefs, but receivers are unable to distinguish good from bad and hence are misled about quality, being forced to assume that all are average.

*Disclosure Models.* Unlike signaling models, disclosure models involve attempts to persuade another player of something by releasing "hard" or verifiable information that can be credibly communicated to others. A sophisticated audience with skeptical beliefs will assume the worst unless given hard evidence to refute their innate skepticism. Thus, a failure to disclose information will be interpreted as an admission of poor performance (Milgrom, 1981) and attempts to hide information will fail. If audiences are uncertain as to whether the firm in fact possesses hard information, however, then a failure to disclose may simply indicate that the firm itself is not fully informed (Krishna & Morgan, 2001). Under these circumstances, positive disclosures can lead audiences to adopt overly favorable views of the firm's performance, that is, they can be misleading (Shin, 2003).

*Costly State Falsification.* Agents can also expend resources to distort what others observe about the state of the world (Lacker & Weinberg, 1989). Even if the second party is aware of the possibility of costly state falsification, there is often no way to completely undo its effects. Thus, fraud in markets with ecolabeled products may persist unless thorough audits are conducted (Hamilton & Zilberman, 2006). As another example, firms may covertly fund right-wing activist groups ("brown NGOs") to lobby against environmental protections, a practice known as "astroturf lobbying" (Lyon & Maxwell, 2004).

## Marketing

The law around deceptive marketing suggests that what counts as misleading depends crucially on how individuals interpret particular claims (Oswald, 2011). From this perspective, greenwash is truly in the eye of the beholder and not an inherent aspect of a given communication. If most consumers assume "all natural" means that a product meets USDA Organic standards, then it would be misleading to make the claim that a product is all natural if it is not organic. Empirical work on misleading advertising takes a very similar view: advertising is misleading if an exposed group holds more false beliefs than a comparison group (Russo et al., 1981). Obviously some people tend to be gullible and others skeptical, and what counts as greenwash will differ between the two groups. This perspective is consistent with the literature in information economics that emphasizes whether the receiver of information holds skeptical beliefs or not.

The literature on deceptive advertising has identified a number of ways in which claims can be misleading (Darke & Ritchie, 2007). For example, incomplete comparisons suggest one product is better than another without giving details, such as "Acme is more effective" (Shimp, 1978). Implied superiority claims suggest a product is better than others without quite saying so ("no other product is more effective"), and without even necessarily establishing that any products in the category are effective (Snyder, 1989).

Another well-known phenomenon in marketing is the "halo effect," in which consumers grant products broad images or evaluations that fail to reflect granular variation in specific attributes (Kardes, Posavac, & Cronley, 2004). For example, a consumer might learn a firm's products are organic, so also assumes they must use renewable energy. Studies commissioned by the FTC show that the halo effect is important for product-level green claims, and thus an integral part of

Exhibit 13 to Decl. of Lyon
326
**SER 1427**

Case 2:24-cv-00801-ODW-PVC   Document 56-13   Filed 07/24/24   Page 8 of 28   Page ID
#:6307

greenwashing (U.S. FTC, 2010). This phenomenon closely resembles the impact of selective disclosure as modeled by Lyon and Maxwell (2011), who show that a firm's disclosure of one positive environmental outcome can cause consumers to believe it is likely to have other positive outcomes as well.

A rich vein of research on consumer skepticism as a result of deceptive advertising also provides insight to the study of greenwash and its outcomes. This research posits that deceptive advertising may lead to consumer distrust and may have significant negative consequences for the firm and advertising more broadly (e.g., Darke & Ritchie, 2007). It also suggests that distrust caused by deception may spill over to other persons and situations. Pollay (1986) posits that deception, once detected, may lead to general distrust of communications from political and community leaders, generating a "community of cynics." The concept of greenwash specifically has to date received only limited attention in the marketing literature (e.g., Chang, 2011; Pancer & McShane, 2013), but it is widely recognized that companies seek to gain legitimacy and address stakeholder concerns through environmentally friendly product marketing (e.g., Handelman & Stephen, 1999). Similarly, several studies have noted that exaggerated or misleading environmental claims have led to consumer skepticism about green claims in general (e.g., Chang, 2011; Mohr, Eroglu, & Ellen, 1998), suggesting important impacts of deception broadly, and greenwash more specifically, on social welfare.

## Trends in the Literature

In this section, we provide perspective on academic research into greenwash by presenting a variety of quantitative measures of trends in publications that mention greenwash.

### *Methodology*

In order to assess the academic literature on the topic, and ensure our results were both replicable and valid, we used the ABI/Inform Global database, which claims to be the most comprehensive and diverse source of information on business. First, to assess the full domain of interest in greenwash, we began with a general search across the variety of outlets included in the database, which ranged from trade journals, popular press and reports through to working papers, conference proceedings, and finally scholarly journals. This search returned 5,447 articles ranging from 1980 to 2014. Next, to focus more specifically on academic research, we searched for articles in academic journals between 1950 and 2014 that contained the search term *greenwash* as well as common alternatives.[3] Because of the cross-disciplinary nature of the topic, we chose not to limit our search by subject area. This search returned 810 journal articles ranging from 1993 to 2014. For the purposes of our trends analysis, we curtailed our results at the last full year of publication, 2013, and excluded 2014 publications. We also excluded articles that appeared in our search yet were not relevant to the topic of greenwash including those appearing due to author name (Green and Wash) and descriptions of unrelated topics including biology (feather coloration), geography (topographical descriptions), antiquities (paint techniques), home appliances (green washing-machines), and literature (trends in language usage). We included only full-length peer-reviewed articles from scholarly journals and excluded book reviews, editorials, and conference papers. While some articles include only a single passing mention of greenwash, we included these in this preliminary stage of our analysis to track trends in the usage of the term in the academic literature. This process returned 793 journal articles that used the term *greenwash*.

Seeking to identify research that took greenwash as its central construct or focus, rather than simply offering a passing mention of the term, we then selected those papers that used the search terms in the title or abstract for further analysis. This search returned 105 journal articles, beginning in 1995, with 98 articles once we excluded year 2014 publications. We classified the research

Exhibit 13 to Decl. of Lyon
327
**SER 1428**



**Figure 1.** Annual number of articles mentioning greenwash by outlet type.

approaches taken in these 98 publications to get a sense of how the field of study is developing. To further sharpen our focus, we used the ISI Web of Knowledge (*Journal Citation Reports*) journal rankings to identify the most prominent articles among the 98 for further analysis. We included only those papers in journals that had received an impact factor ranking (1 year, 5 year, or both), but did not seek to further weigh or assess papers based on these journal rankings. Therefore, 34 journal articles that were both ranked by ISI and that included the selected search terms in the title or abstract were highlighted for more careful analysis. This more focused subset of the literature forms the nucleus of the overview of literature that follows, and these articles are indicated with asterisks in the Reference list.

## Results

Our initial broad search resulted in 5,447 results across a variety of outlet types (see Figure 1). Of particular note, we see the first interest in greenwash emerging in the popular press through newspaper and magazine articles. This was soon followed by academic interest and scholarly articles, but newspapers, magazines, and particularly trade journals were the primary outlets for the discussion of greenwash throughout almost all of the period we review, reaching a combined output of 889 articles in 2008. However, articles from these outlets peaked in that same year, and in 2012 and 2013 scholarly writings on greenwash, which had continued a steady climb since their first appearance, surpassed the popular press and became the dominant outlet for greenwash publications.

Our second and more specific search, focusing on scholarly journals only (minus the exclusions described above), resulted in 793 journal articles for further analysis. These results show a growing interest in greenwash that extends across academic disciplines, with 119 papers published in 2013 alone (see Figure 2).

Next, we categorized the academic results by publication outlet. Table 2 presents a list of the scholarly journals that have published the most papers mentioning greenwash, which together represent more than one third of all papers that mention the word; we included all 15 journals that have published 8 or more articles mentioning greenwash. At the top of the list are the *Journal of*

Exhibit 13 to Decl. of Lyon
328
**SER 1429**

*Lyon and Montgomery*                                                                                           231



**Figure 2.** Annual number of scholarly journal articles mentioning greenwash.

*Business Ethics* (with 103 articles) and *Organization & Environment* (with 21 articles), followed by a wide range of journals covering accounting, agriculture, corporate governance, environmental economics, communications, and policy (see Table 2).

When narrowing our search to only those papers published through 2013 that used the search terms in their titles or abstracts, suggesting that the idea of greenwash was more central to the research, we found 98 papers. The number of articles in this group jumped sharply beginning in 2011, with more than 40% of these papers published since then, suggesting deepening scholarly interest in the topic.

We next reviewed these 98 articles in more detail, and characterized each paper as either "conceptual," "empirical," or "other." Conceptual papers included those raising broad philosophical issues, those offering frameworks for classifying issues related to greenwash, those offering theories that generate hypotheses about causal relationships, and papers offering formal models that give guidance regarding the magnitude of various causal relationships. Movement from one of these types to the next shows evidence of increasingly complete and robust understanding of a phenomenon, but because there are only 10 conceptual papers in the 98 we were focusing on, we did not break out the subcategories within "conceptual" further. Empirical papers included both quantitative and qualitative work, with the most common type of empirical papers being a content analysis of communication in a corporate annual report, website, or corporate social responsibility (CSR) report. Papers that did not fit into either the conceptual or empirical categories were highly varied, and included discussions, commentaries, reviews, and anecdotal and illustrative case studies.

Our categorization of the nature of the 98 academic papers reveals a wide variety of approaches to the scholarly study of greenwash and changes in these methodological approaches over time (see Table 3). This pattern is not unique to greenwash. Lockett, Moon, and Visser (2006), in a history of the field of CSR, draw on Kuhn's work on scientific progress and note a common pattern in developing research areas. Theoretical approaches tend to emerge early on and are later followed by empirical tests of these early assumptions and

Exhibit 13 to Decl. of Lyon
329
**SER 1430**

232                                                                                   *Organization & Environment 28(2)*

**Table 2.** Top 15 Scholarly Journals for Greenwash Research.

| Journal name | Number of articles |
|---|---|
| *Journal of Business Ethics* | 103 |
| *Organization & Environment* | 21 |
| *Accounting, Auditing & Accountability Journal* | 17 |
| *Capitalism, Nature, Socialism* | 16 |
| *Alternatives Journal* | 13 |
| *Social Responsibility Journal* | 12 |
| *Agriculture and Human Values* | 11 |
| *MIT Sloan Management Review* | 11 |
| *Business Strategy and the Environment* | 9 |
| *Corporate Communications* | 9 |
| *Corporate Reputation Review* | 9 |
| *Management Decision* | 9 |
| *Corporate Governance* | 8 |
| *Environmental and Resource Economics* | 8 |
| *Journal of Communication Management* | 8 |

**Table 3.** Type of Research on Greenwash by Year.

| Year | Conceptual | Empirical | | | Other | Total |
|---|---|---|---|---|---|---|
| | | Quantitative | Qualitative | Total | | |
| 2013 | 4 | 3 | 3 | 6 | 7 | 17 |
| 2012 | 0 | 3 | 1 | 4 | 6 | 10 |
| 2011 | 2 | 2 | 5 | 7 | 6 | 15 |
| 2010 | 1 | 0 | 2 | 2 | 6 | 9 |
| 2009 | 0 | 2 | 2 | 4 | 4 | 8 |
| 2008 | 1 | 1 | 3 | 4 | 7 | 12 |
| 2007 | 0 | 1 | 3 | 4 | 2 | 6 |
| 2006 | 0 | 1 | 0 | 1 | 0 | 1 |
| 2005 | 0 | 1 | 0 | 1 | 0 | 1 |
| 2004 | 0 | 0 | 0 | 0 | 2 | 2 |
| 2003 | 1 | 0 | 0 | 0 | 2 | 3 |
| 2002 | 0 | 0 | 0 | 0 | 2 | 2 |
| 2001 | 0 | 1 | 0 | 1 | 1 | 2 |
| 2000 | 1 | 0 | 0 | 0 | 1 | 2 |
| 1999 | 0 | 0 | 0 | 0 | 2 | 2 |
| 1998 | 0 | 0 | 0 | 0 | 1 | 1 |
| 1997 | 0 | 0 | 1 | 1 | 1 | 2 |
| 1996 | 0 | 0 | 0 | 0 | 1 | 1 |
| 1995 | 0 | 0 | 0 | 0 | 2 | 2 |
| Total | 10 | 15 | 20 | (35) | 53 | 98 |
| | 10.2% | 15.3% | 20.4% | (35.7%) | 54.1% | 100% |

*Note.* Conceptual = papers focused solely on a theoretical or conceptual contribution including theories, models, and frameworks; Empirical = papers presenting data along with analysis; Other = papers that do not offer scientific contributions including nonempirical case studies (i.e., anecdotal or illustrative examples), discussions, essays, reviews, commentaries and opinion pieces, and book reviews.

Exhibit 13 to Decl. of Lyon
330
**SER 1431**

parameters. As research develops further, and consensus emerges on theory, the proportion of empirical papers begins to increase with a general shift from qualitative to quantitative theoretical approaches over time.

During the first decade of academic research on greenwash, 1995 to 2004, fully 15 of the 19 papers published were neither conceptual nor empirical; instead, papers tended to be broader and more polemical in nature. Many examined specific case studies to inductively determine what counts as greenwash and to assess what sorts of effects it might have. As the study of greenwash has matured, however, so too has the quality and rigor of academic research on the topic. During the 5 years from 2005 to 2009, half of the 28 papers were empirical, with one conceptual paper and the remainder in the "other" category. In the 4 years from 2010 to 2013, we see a growing body of theory on greenwash, with conceptual papers that include theories and models attempting to explain types of greenwash drivers, outcomes, and actors. As well, we see an expanding body of papers that offer both empirical knowledge and new theoretical insights (we classified all papers with empirical content as empirical). The empirical studies are highly varied including case studies, interviews, narrative and discourse analysis, visual imagery, and ethnographies among the qualitative approaches. The even more nascent quantitative greenwash research includes the use of surveys, experiments, simulations, and large financial data sets. Only two papers used multi-method approaches in their empirical analysis and these were classified according to the predominant method. We also note the prevalence of various forms of content analysis in these studies including both qualitative and quantitative approaches. In total, 18 empirical studies used some form of content analysis including analysis of company reports, advertising, press releases, and websites. Overall, our analysis of the types of research being employed to study greenwash reveals increasing theoretical rigor and empirical sophistication as research on the topic has matured. Nevertheless, there is only one formal mathematical model in the literature (covering selective disclosure as a form of greenwash), a relatively small number of empirical papers with large enough data sets to test hypotheses about the drivers of greenwash, and very little empirical work on the impacts of greenwash.

Finally, as mentioned above, when we restricted ourselves to papers in ISI-ranked journals with greenwash in their title or abstract, we came up with 34 articles (denoted with an asterisk in our list of References). These form the basis for our qualitative discussion and review below, but they will be supplemented with papers published in 2014 and other papers that use the related constructs discussed earlier.

## The Means of Greenwash

In this and the following sections, we review in more detail the 34 papers published in ISI-ranked journals that focus on greenwash, in an effort to offer an overview and synthesis of the state of knowledge to date. In order to provide a true synthesis, we position these papers with respect to the findings and insights from the related theories and constructs identified above, and examples identified through our review of popular press and practitioner-oriented materials. We also include in the discussion papers on greenwash that were published in 2014, along with selected papers that make use of closely related concepts. This effort allows us to present a synthesis of and emerging framework for the state of theoretical and empirical knowledge of greenwash. We begin by moving beyond solely corporate involvement to identify the full array of actors who may participate in greenwash. We then present an emerging theoretical framework that captures the internal and external drivers of greenwash. Next, despite the fact that the impacts of greenwash have proven challenging to quantify, we review several papers that make promising efforts in this realm. Finally, we turn to extant theory on the deterrents of greenwash and promising avenues for seeking an "end" to greenwash.

Exhibit 13 to Decl. of Lyon
331
**SER 1432**

234                                                    *Organization & Environment 28(2)*

### Greenwashing Actors

The papers reviewed here overwhelmingly identify corporate actors as the primary perpetrators of greenwash (e.g., Cliath, 2007; Delmas & Burbano, 2011; Fox, 1997; Kim & Lyon, 2011, 2014; Lyon & Maxwell, 2011; Lyon & Montgomery, 2013; Matejek & Gössling, 2014; Ramus & Montiel, 2005; Relaño, 2011; Walker & Wan, 2012). However, Bowen and Aragon-Correa (2014) note that this literature, based largely in management disciplines, may offer an overly narrow view of the phenomenon. Indeed, our broad review revealed cases of greenwashing being conducted by governments (Lightfoot & Burchell, 2004; Stephenson, Doukas, & Shaw, 2012; Szili & Rofe, 2007); politicians (Boehmer-Christiansen, 1995a); university administrators (Fox, 1997; Jones, 2012); research organizations (Nelson, Earle, Howard-Grenville, Haack, & Young, 2014); environmental policy experts (Boehmer-Christiansen, 1995b); and industries (Fava, Baer, & Cooper, 2011; Lu & Realff, 2013; Mills, 2009). Studies also examine accusations of greenwash leveled at international organizations including the United Nations, World Bank, and OECD due to their involvement in programs such as the Global Environmental Facility (Young, 1999) and their promotion of "green economy" initiatives (Borel-Saladin & Turok, 2013).

These papers also highlight important concerns over greenwash within NGOs and social movements themselves. Young (1999) describes the "quandary" faced by NGOs as to whether to work within existing institutional structures, and risk co-optation and participation in greenwash, or to work from outside the system. For instance, although Al Gore's climate change awareness efforts have been lauded by some environmental NGOs, Luke (2008) explores accusations that Gore's activities may be simply greenwashing existing economic and social structures. Similarly, Lee (2009) details the efforts of a South Carolina community conservation group to "police the motives" of members in order to prevent the involvement of those who are merely "greenwashing growth" (p. 317). Finally, in an in-depth case study of the United Kingdom's 2007 Climate Camp protests and ongoing green movement, Plows (2008) explains the growing clashes over objectives and definitions of success among this broad group of activists. As the movement succeeded on many fronts, and green ideals became more mainstream, conflicts developed between "strong green" and "weak green" actors leading to accusations of co-optation and greenwash.

### Drivers of Greenwash

As the literature on greenwash has matured, an increasing number of papers address the factors, circumstances, and characteristics affecting which companies are more likely to greenwash than others. Delmas and Burbano (2011) offer a broad theoretical interdisciplinary framework that incorporates a wide range of drivers of greenwash, grouping them into three levels: external, organizational, and individual. Here, we focus our review on external and organizational drivers as these have received both theoretical and empirical attention in the extant research. We begin with an emphasis on theoretical approaches before turning to empirical findings. We summarize the drivers of greenwashing in Table 4.

External drivers of greenwash include pressures from both nonmarket actors, such as regulators and NGOs, and market actors, such as consumers, investors, and competitors (Delmas & Burbano, 2011). The most important antecedent of greenwash is lax and uncertain government regulation, which creates a low chance of being punished for greenwash. This weak regulatory environment allows firms to manipulate consumer and investor demands for green products, services, and firms. Delmas and Burbano's (2011) framework also identifies several organization-level drivers of greenwashing including firm incentive structure and ethical climate, effectiveness of intra-firm communication, and organizational inertia. The authors note the interaction between the internal and external environment, emphasizing that a lax regulatory environment will lead organizational drivers to have more salient effects.

Exhibit 13 to Decl. of Lyon
332
**SER 1433**

*Lyon and Montgomery*                                                     235

**Table 4.** Drivers of Corporate Greenwash.

| Drivers of greenwash | Relevant academic research |
| --- | --- |
| External/environmental | |
| Lax regulatory environment | Delmas and Burbano (2011) |
| Weak political pressure | Delmas and Montes-Sancho (2010) |
| Threat of regulation | Kim and Lyon (2011) |
| Weak pressure from environmental groups | Kim and Lyon (2011); Marquis and Toffel (2013) |
| Weak relationships with government agencies | Delmas and Montes-Sancho (2010) |
| Weak connection to industry trade groups | Delmas and Montes-Sancho (2010) |
| Weak connections to global economic system | Marquis and Toffel (2013) |
| Internal/organizational | |
| Low visibility | Delmas and Montes-Sancho (2010) |
| Large size | Kim and Lyon (2011) |
| Being "relatively" green | Marquis and Toffel (2013) |
| Growing firms | Kim and Lyon (2014) |
| Firms in a service industry | Ramus and Montiel (2005) |

Lyon and Maxwell (2011) offer a formal economic model of greenwash as selective disclosure. The model focuses on investors as the drivers of corporate greening, tracing the interacting effects of a firm's green reputation, the quality of a firm's internal organizational information system, and the ability of activists to punish firms for greenwashing. All firms prefer to greenwash if there is no punishment for doing so, but if activists pose a serious threat of punishing greenwash then firms will diverge in their greenwashing strategies. Firms with strong green reputations coast on them and reduce their green communications, while those with brown reputations fully disclose their performance; those with middling reputations continue to take the risk of greenwashing, especially if they do not have strong environmental management systems. Thus, the key antecedents of greenwash are middling environmental reputation, imperfect internal environmental management systems, and relatively weak environmental activists.

Most discussion of misleading environmental communications has focused on firms exaggerating their environmental performance, but it is also possible that firms will understate their environmental activities. Kim and Lyon (2014) advance a theory of "brownwash" in which firms understate their environmental activities when financial performance deteriorates, so that investors do not think they are wasting money on unnecessary green initiatives. The data support the theory, and also show that both brownwash and greenwash are attenuated by heightened scrutiny from environmental activists.

This theoretical attention to the role of the external regulatory and political environment as a driver of greenwash is echoed in several empirical papers. For example, Delmas and Montes-Sancho (2010) found that greenwash was more likely among firms that experienced less political pressure at the state level and were less dependent on local and federal regulatory agencies. Along the same lines, Kim and Lyon (2011) found that greenwashers tended to be large firms facing a threat of increased regulation, but that pressure from environmental groups reduced the likelihood of greenwash. Similarly, Marquis and Toffel (2013) found that greenwash was more likely among firms headquartered in countries with relatively weak scrutiny from activists and relatively isolated from the rest of the world.

Much of the greenwash literature has focused on the pressures placed on an organization by its external environment, suggesting greenwash is a reactive response. A smaller but promising body of research, however, suggests that greenwash can also be used strategically to proactively influence that environment and to affect field change. For example, the use of environmental

Exhibit 13 to Decl. of Lyon
333
**SER 1434**

236                                         *Organization & Environment 28(2)*

discourse and rhetoric has been termed *greenwash* when used as a political tool to further otherwise unpopular infrastructure (Szili & Rofe, 2007) and energy and taxation policies (Boehmer-Christiansen, 1995a; Stephenson et al., 2012). Greenwash may also be used by organizations and actors who are attempting to maintain or preserve existing positions of power through green rhetoric and symbolic actions (Borel-Saladin & Turok, 2013; Jones, 2012; Luke, 2008; Young, 1999).

Turning to internal drivers of greenwash, Ramus and Montiel (2005) found that implementation of environmental policies was weaker in service companies than in manufacturing companies. Kim and Lyon (2014) found that growing firms, which are likely to face future regulatory interactions, are more likely to greenwash. In addition, they found that firms in highly competitive states are likely to brownwash when they have negative levels of net income, but that firms in highly regulated states do not. These results suggest that corporate environmental communications are shaped by interactions between internal and external factors.

Although the external environment has numerous impacts on greenwash behaviors, emerging literature suggests that the advent of social media inserts a further dynamic into this relationship. Lyon and Montgomery (2013) offer a theoretical framework for the impact of social media on greenwash. They posit that social media make it easier for activists to both detect and punish greenwash and hypothesize that social media will help to rein in greenwash generally, and in the process drive firms with green reputations toward less communication and firms with brown reputations toward greater communication. This framework is supported by early empirical findings on the role of social media communication of CSR showing that Fortune 500 firms with higher CSR ratings adopt Twitter earlier, develop online followers faster, receive stronger social media responses to their tweets, and are more likely to be retweeted (Lee, Oh, & Kim, 2013). In addition, the authors find that firms with high corporate social *irresponsibility* (CSIR) ratings are also more likely to be retweeted than the average, providing support for Lyon and Montgomery's (2013) analysis of "tweetjacking." Thus, additional antecedents of greenwash in light of the advent of social media may include the mode of communication used by a company, with less symmetric modes more likely to contain greenwash, and the content of a message, with corporate-level messages more likely to contain greenwash than are product-level messages since it is easier to create a green product with a clean track record than a green company with a clean track record.

### Varieties of Greenwash

As mentioned above in connection with Table 3, the empirical literature on greenwash has emphasized corporate information disclosures, such as those that appear in corporate annual reports, 10-Ks, corporate sustainability reports, and reports to the Carbon Disclosure Project. However, these are by no means the only forms that greenwash can take. We highlight several varieties of greenwash below, along with examples from the academic literature. We do not claim that the list below is collectively exhaustive, as the literature is not yet mature enough for us to feel confident that all varieties of greenwash have been identified. Moreover, the items on the list may not even appear to be mutually exclusive, since a corporate annual report can include selective disclosure of verifiable information, a narrative, and photographs. Nevertheless, they are conceptually distinct.

*Selective Disclosure.* Selective disclosure is perhaps the most widely studied form of greenwash. It is somewhat surprising, then, that the literature finds conflicting results over whether cleaner firms issue more disclosures or not. Patten (2002) and Cho and Patten (2007) find that firms with worse environmental records (as measured by higher ratios of toxic chemical emissions to sales) have higher levels of environmental disclosures, while Clarkson, Li, Richardson, and Vasvari (2008) find that firms with better environmental records (again measured by toxic emissions)

Exhibit 13 to Decl. of Lyon
334
**SER 1435**

have higher levels of environmental disclosures. Philippe and Durand (2011) find that merely releasing a corporate sustainability report, even without actually making environmental improvements, improved a firm's overall reputation, although in environmentally sensitive industries a firm's environmental reputation could only be enhanced if the report was backed up by substantive improvements. Kim and Lyon (2011) find that corporate disclosures of emissions were a form of greenwash because, on average, firms that did not disclose reduced their carbon footprints while firms that did disclose actually increased their footprints.

*Empty Green Claims and Policies.*  The literatures on decoupling and symbolic management emphasize that firms often issue claims, promises, or policies that they fail to live up to; in the environmental domain, such failures count as greenwash. In economic language, such pronouncements can be thought of as "cheap talk," and would only be expected to be convincing to stakeholders whose interests are closely aligned with those of the firm, for example, perhaps some shareholders. Bansal and Clelland (2004) find that firms with poor environmental reputations can reduce their unsystematic risk by making public expressions of commitment to the environment, suggesting that investors were indeed swayed by cheap talk. Ramus and Montiel (2005) similarly find significant evidence of greenwash via unfulfilled promises, which appears to be more likely in service industries than manufacturing industries.

*Dubious Certifications and Labels.*  Certification to externally defined standards is often thought to be a solution to the problem of greenwash, as outlined in the following section, substituting the credibility of a third-party certifier for a firm's own claims. However, while certifications at both the product level and the company level offer significant promise in limiting greenwash, they are not immune to the phenomenon themselves. One potential problem with product-level ecolabels is that they may be vulnerable to fraud by unscrupulous producers (Hamilton & Zilberman, 2006). Based on several consumer studies, Sirieix, Delanchy, Remaud, Zepeda, and Gurviez (2013) examine the impact of the proliferation of product ecolabels on greenwash perceptions, finding that certain labels (such as supermarket house-labels) may be seen as greenwash on their own and may in turn detract from the value of otherwise trusted ecolabels when used in combination. Similarly, Lozano, Blanco, and Rey-Maquieira (2010) argue that the emergence of reports of greenwashing in an industry sector may threaten the long-run survival of successful industry ecolabeling schemes.

At the company level, ISO 14001 for environmental management is perhaps the best-known certification scheme, but evidence on its performance is mixed. In the United States, a study of more than 3,700 facilities found that regulatory compliance is higher at certified facilities (Potoski & Prakash, 2005). In Mexico, however, a study of more than 80,000 facilities found that ISO certification had no measurable impact on compliance (Blackman, 2012). And in Canada, an in-depth analysis of nine certified organizations found that at a majority of them the certification process was treated as a ritual simply to impress external stakeholders (Boiral, 2007). Thus, in some circumstances, corporate environmental certification may be a form of greenwash.

*Co-Opted NGO Endorsements/Partnerships.*  Cross-sectoral partnerships to achieve green objectives are by no means new. Yet although success stories certainly exist (Stafford, Polonsky, & Hartman, 2000), there remains much concern over the potential for environmental NGOs to be co-opted in this process or to simply aid in greenwashing corporate activities. In an early case study of such alliances, Westley and Vredenburg (1991) document the internal dissension and external challenges from Greenpeace and others faced by a Canadian partnership between the NGO Pollution Probe and the Loblaw grocery chain over endorsement of the firm's new "green" product line. Theoretical studies on greenwash have also documented disparate views among environmental NGOs regarding when such partnerships are legitimate and when they constitute greenwash (e.g., Lee, 2009; Luke, 2008; Plows, 2008; Young, 1999).

Exhibit 13 to Decl. of Lyon
335
**SER 1436**

238                                                                    *Organization & Environment 28(2)*

*Ineffective Public Voluntary Programs.* Firms participate in government-sponsored voluntary programs for a variety of reasons, but participation may not lead to environmental improvements. For example, early participants in the EPA's Climate Leaders program reduced their carbon footprint more than nonparticipants, but late joiners did not (Delmas & Montes-Sancho, 2010); this suggests that for the late joiners, participation was a form of greenwash. Similarly, participants in the DOE's Voluntary Greenhouse Gas Registry did not reduce their carbon footprints any faster than nonparticipants (Kim & Lyon, 2011). Henriques, Bryan, and Montiel (2013) argue that the effectiveness of public voluntary programs depends on the stringency of their standards and their ability to enforce penalties against joiners who fail to meet the standards; they support this thesis with empirical evidence on two different voluntary programs in Mexico.

*Misleading Narrative and Discourse.* Environmental or green narratives, while sometimes indicating more substantive sustainable activities, have been used as a form of rhetoric and deception to greenwash a firm's environmental record, as was the case with British Petroleum's "beyond petroleum" campaign (Matejek & Gössling, 2014). In a study of the environmental reports of 100 *Fortune* 1000 companies, Mason and Mason (2012) use discourse analysis to identify rhetorical strategies applied at micro and macro discursive levels to shape audience members' evaluative beliefs about corporate environmental performance, and to attempt to avoid accusations of greenwash.

The role of corporate–customer discourse in greenwash may become more important with the advent of social media, although these new technologies may also help to police against misleading communications. Lyon and Montgomery (2013) emphasize the importance of communication form: defaulted (no communication), one-way communication (e.g., online annual reports), two-way asymmetric (e.g., blogs), or two-way symmetric (e.g., Facebook or Twitter). Moving along this spectrum exposes the firm to greater risk of pushback from social media users. However, the use of two-way communication in green marketing also aids firms in creating awareness and reducing confusion, and may ultimately help to avoid the impacts of greenwash accusations (Fernando, Suganthi, & Sivakumaran, 2014).

*Misleading Visual Imagery.* Two of the papers reviewed here explicitly address the role of visuals and symbols in greenwash. Noting that numerous luxury brands use biodiversity symbols (e.g., crocodiles, horses, jaguars) in their logos, Cervellon (2013) uses semiotics techniques to model the process by which consumers "decode" the relationship of high-status brands to sustainability. Reactions to communication of such activities vary based on brand status (ascribed vs. achieved luxury), illustrating a complex relationship between semiotics, CSR, and perceptions of greenwash (Cervellon, 2013). Cliath (2007) also examines labels at the product level, exploring product labels as a technology or artifact that allows consumers to identify social and environmental relationships behind the product.

## Impacts of Greenwash

Greenwash may have both intended and unintended impacts. Organizations that engage in greenwash presumably intend to reap benefits. However, society as a whole may also be affected. While empirical research on the impacts of greenwash is still in its infancy, we discuss the extant research in this section.

*Impacts on the Greenwasher.* Greenwash is thought to have numerous benefits to firms. For instance, it may undermine political mobilization in support of environmental legislation reducing the ability of consumers to "vote with their pocketbooks," while also delaying needed regulatory protections (e.g., Delmas & Montes-Sancho, 2010; Hsu, 2011). Intriguingly, however, our review reveals that greenwash may in fact not pay for some of the very firms who are practicing it.

Exhibit 13 to Decl. of Lyon
336
**SER 1437**

*Lyon and Montgomery* 239

A study of 162 banks in 22 countries identifies three motives for banks participating in CSR activities—strategic choice, altruism, and greenwash (Wu & Shen, 2013). The authors find a positive relationship between CSR and various measures of financial performance, but this relationship was nonexistent for banks simply greenwashing their activities and paying "lip service" to CSR while making no substantive changes. Similarly, a study of top Canadian firms in highly polluting industries finds that greenwash and symbolic environmental activities by firms have a negative effect on financial performance (Walker & Wan, 2012). In a survey of Taiwanese electronics consumers, Chen and Chang (2013) find that greenwash negatively influences consumer confusion and perceptions of risk, reducing consumers' "green trust" of a product's environmental claims. Also considering the challenges of consumer confusion regarding CSR claims and greenwash, Parguel, Benoit-Moreau, and Larceneux (2011) develop a series of experimental studies on the impact of greenwash on consumer sustainable purchase decisions. The authors find that consumers seek to determine a company's intrinsic motivations, and understand but generally do not weigh extrinsic motivations, in evaluating CSR communications. These perceptions of a company's CSR motives mediate the effect of corporate CSR communication on brand evaluations and purchases (Parguel et al., 2011).

The limited marketing research that addresses deceptive green communications makes similar findings suggesting that perceptions of greenwash affect product judgments and purchase behaviors. Chang (2011) finds that consumers may discount the believability of green claims and form more negative evaluations, when they perceive that a firm is expending high levels of effort to persuade them of a "green claim." Pancer and McShane (2013) extend these findings with several experiments on green packaging, finding that products portrayed as environmentally friendly without sufficient substantiation lead to reduced product quality perceptions. This "greenwashing discount" negatively impacts purchase intentions.

*Impacts on Society.* The popular press has begun to recognize that greenwash may undermine trust in corporate environmental impacts (Hsu, 2011), as have various government agencies. Several of the papers reviewed here make early yet promising attempts to capture these impacts, suggesting that exposure to greenwash may lead to "increasing consumer cynicism and mistrust" (Jahdi & Acikdilli, 2009, p. 103), as appears to happen in other areas where deceptive advertising occurs (Darke & Ritchie, 2007). Exposure to greenwash also leaves consumers feeling both overwhelmed and confused by CSR claims and corporate motives in making such claims (Parguel et al., 2011).

## The End of Greenwash

Three specific mechanisms for deterring greenwash are discussed in the greenwash literature we reviewed: pressure from civil society including social media, the use of ecolabels, and government restrictions on deceptive marketing practices.

### Civil Society and Social Media Pressure

As mentioned above, several empirical papers find that strong environmental groups may deter greenwash through a variety of activities including "naming and shaming" by individuals or civil society organizations. The power of civil society to challenge greenwashing is enhanced by the emergence of social media. Indeed, some scholars hope that greenwash will soon be eliminated in the wake of advances in information technology (Bowen, 2014). Numerous websites now call attention to greenwash. For example, Greenpeace targets Shell's green communications through their website "Arctic Ready" (www.arcticready.com), which "openly mocks" the company's marketing efforts (Fernando et al., 2014). If enough consumers or investors respond, these tools

Exhibit 13 to Decl. of Lyon
337
**SER 1438**

240                                                             *Organization & Environment 28(2)*

can make greenwash unprofitable. Such technology may also mean that firms' misleading social media campaigns can quickly be turned against them by critical bloggers and tweeters, a process known as "tweetjacking" (Lyon & Montgomery, 2013). A danger with this approach to deterring greenwash is that firms may respond by cutting back on environmental communications (Lyon & Maxwell, 2011) or may be deterred from making improvements in the first place, with unfortunate results for society.

Various forms of evaluation of CSR efforts have also made similar attempts to address the challenges of greenwash through public attention, frequently through measures such as sustainability ratings (Parguel et al., 2011). Through a series of experiments, Parguel et al. (2011) conclude that where CSR claims have proliferated and have led to consumer confusion, independent sustainability ratings are an antecedent to consumer brand attributions and enhance the efficiency of CSR communications, helping consumers to assess corporate motives, process communications, and make responsible purchase decisions. The authors also note an asymmetric response to good and poor ratings whereby poor ratings damage corporate brand evaluation and penalize nonvirtuous firms while encouraging the virtuous to continue their CSR efforts. However, in a theoretical discussion of ratings schemes, Jones (2012) posits that the United Kingdom's university sustainability ratings system, termed *green league tables*, may have in fact served as a mechanism of greenwash, limiting campus activism and organizational citizenship efforts around sustainability.

Finally, a limited but potentially promising avenue for civil society and consumer pressure may lie at the retailer level. For example, a more prominent role for experienced and educated retailers in given product categories may alleviate challenges presented by consumer confusion and lack of trust (Chen and Chang, 2013). Similarly, retailers that emphasize labeled products may empower consumers who are seeking authentic labels to better vote with their pocketbooks (Cliath, 2007).

### Ecolabeling

Perhaps the most widespread current approach to eliminating greenwash is the use of environmental certification by trusted third parties, a process often known as ecolabeling. There are many types of ecolabels currently in use. Gruère (2013) offers a typology of labels based on a set of 12 characteristics,[4] yielding in principle over half a million possible types of labels. One type of label, however, is strongly dominant in the market. It is consumer facing, focused on a single issue, oriented to renewable resources (food, agriculture, or forest products), run by a nonprofit voluntary organization, does not use life-cycle analysis, is not focused on product-level processes and production methods, is based in Europe or North America, and has a national scope. Many of the most familiar ecolabels are of this type, including Marine Stewardship Certification and Forest Stewardship Certification.

It is often thought that industry resists environmental certification, but this is frequently not the case. Several of the greenwash papers reviewed here reflect the struggles of industries ranging from banking (Relaño, 2011), tourism (Smith & Font, 2014) and hotels (Chan, 2013), to oil and gas (Stephenson et al., 2012), construction (Fava et al., 2011; Lu & Realff, 2013), and insurance (Mills, 2009), seeking to introduce green initiatives while limiting the potential for members to simply greenwash their activities. Many suggest solutions ranging from industry-wide codes of practice (Smith & Font, 2014) to product category rules that may serve to "level the playing field" (Fava et al., 2011) among industry players and to inhibit greenwash. Kirchhoff (2000) goes further to offer a conceptual economic model of the ability of a third-party labeling system, possibly combined with fines for cheating, to effectively prevent greenwash.

Although ecolabels are clearly a positive development, they suffer from a number of shortcomings. First, single-issue ecolabels can easily be used by companies interested in making selective disclosures of positive attributes while ignoring negative impacts, a form of greenwash

Exhibit 13 to Decl. of Lyon
338
**SER 1439**

*Lyon and Montgomery*                                                                                    241

that has been termed the *Sin of the Hidden Tradeoff*. Second, when ecolabels compete, there can
be a tendency for a "race to the bottom" to emerge, weakening the inducements for improvement
that labels can offer (Fischer & Lyon, 2014). Third, label competition can be rendered useless if
consumers are uncertain which ecolabels are more stringent than others (Harbaugh, Maxwell, &
Rousillon, 2011). Fourth, if there is inadequate monitoring and enforcement of label standards,
firms may be able to fraudulently sell brown products as green ones (Hamilton & Zilberman,
2006; Kirchhoff, 2000) or pass themselves off as greener companies than they really are
(Blackman, 2012; Boiral, 2007). For all these reasons, certifications and ecolabels are unlikely to
deliver society to the promised land of full information. Instead, it is possible they are leading to
a world of information overload and consumer confusion. Indeed, the Organization for Economic
Cooperation and Development has become concerned about the impacts of label proliferation
and convened discussions on the topic on June 10 and 11, 2014.

### Government Regulation and Legislation

Although ratings, ecolabels, and similar independent standards are frequently cited as necessary
and promising instruments to limit greenwashing, they may not be foolproof. Several papers
reviewed here suggest that there may also be a need for government oversight to ensure the
"availability and seriousness of such sources" (Parguel et al., 2011), while others view regulation
as a "best" case scenario (Smith & Font, 2014). Firms may in fact lobby government for enhanced
oversight and regulation to prevent greenwashing by competitors (Kirchhoff, 2000).

The FTC in the United States and the DEFRA in the United Kingdom revised their "Green
Guides" in 2012 (U.S. FTC, 2012) in an attempt to address the recent proliferation of greenwash-
ing. Both organizations focus squarely on marketing communications that could be "deceptive."
They warn against making unqualified environmental claims and offer detailed guidance regard-
ing what constitutes deceptive communications.

Toward this end, the FTC recently commissioned Harris Interactive to conduct a survey of
3,777 individuals to better understand the inferences consumers draw from green claims on prod-
ucts. The findings were striking. If consumers see a general green claim (this product is "green"),
a full 27% assume the product has no negative environmental attributes at all. Larger percentages
assume the product has specific attributes such as recycled content (61%), biodegradability
(53%), or that it is nontoxic (45%). Even when a claim is qualified ("green—made with recycled
material"), 31% assume it has other green attributes as well. Thus, companies must understand
the inferences made by consumers from particular green claims to avoid complaints from the
FTC.[5] The Harris findings provide strong evidence that even narrow claims create a "halo effect"
for a product. The FTC has broken new ground by basing its guidance on results of emerging
behavioral research.

Can the Green Guides eliminate greenwash? Section 260.4 of the new Green Guides cautions
marketers about making general green claims, and specifies that if a product has been changed,
and the company touts its environmental improvements, it may need to present a more compre-
hensive analysis if other attributes have worsened. This welcome guidance directly targets hid-
den tradeoffs, but its impact is limited. If a firm wishes to make narrower specific claims, such as
that the product is "formaldehyde free," it is still not required to provide information about the
full environmental footprint of the product. Thus, the Green Guides may reduce, but they do not
eliminate, the Sin of the Hidden Tradeoff.

## Implications for Future Research

Greenwash is a multifaceted phenomenon that is of great interest to both the public and, increas-
ingly, to scholars. Because there are many varieties of greenwash, which draw interest across

Exhibit 13 to Decl. of Lyon
339
**SER 1440**

*Organization & Environment 28(2)*

many disciplines, it provides an excellent ground on which to integrate scholarship regarding misleading organizational behavior and communication. By bringing together and synthesizing existing findings on greenwash, we have aimed to bring conceptual clarity to the topic, and to integrate theory and findings across disciplinary barriers. Based on our review, in this section we identify some theoretical, conceptual, and empirical gaps in our current body of knowledge, the answers to which will address theoretically meaningful and practically relevant questions for both greenwash theory, the broader literature on misleading organizational behavior, and for practice.

## Interdisciplinary Dialogue on Deception

We believe greenwash provides an opening for an interdisciplinary dialogue on deception that will produce valuable new insights. Economic models of sophisticated rational agents have yielded great insight into specific ways informed agents can take advantage of uninformed agents. In reality, though, humans are highly fallible, they have limited attention spans, overestimate their own abilities, use simple heuristics instead of making thorough analyses, and naively trust others with shared backgrounds or ideologies. Research from psychology, sociology, marketing, management, accounting, finance, organizational behavior, and information science can help build more realistic models of human cognition and its vulnerability to deception and confusion. Greenwash provides a lens that can focus all these disciplines on a phenomenon of common interest and practical importance. Moreover, FTC policy requires that companies understand how a "reasonable" consumer interprets green claims, so policy makers and companies as well as scholars, need a better understanding of the cognitive processes of typical consumers.

Our cross-disciplinary review highlights areas where the greenwash literature could continue to integrate existing theory from a variety of disciplines, enrich its existing concepts, and identify important areas for new work. Like Bowen (2014), we have highlighted the need for a broader inquiry into greenwash that goes beyond corporate disclosure decisions. Scholarly work on greenwash as selective disclosure has arguably advanced the farthest, having not just a framework for analysis but also a clear theory with testable quantitative predictions and empirical work testing at least some of the hypotheses. However, rather than implying that disclosure is the only form of greenwash, this progress on one *variety* of greenwash highlights the need for further research to clarify the full range of varieties of greenwash, develop fully articulated models of each variety, and subject the models to empirical testing.

In particular, current studies of greenwash and symbolic actions have focused primarily on firms' verbal rhetoric and messaging. Little attention has been paid to the role of visual imagery and rhetoric in shaping green communications and messaging. Nascent research in communications, marketing, and even institutional theory examines the persuasive role of visual rhetoric and semiotics (e.g., Birdsell & Groarke, 2007; Lefsrud, Graves, & Phillips, 2014; Scott & Batra, 2003), suggesting that visual imagery may be more attention-grabbing, elicit richer inferences, be more pleasurable, and ultimately be more convincing than verbal statements (e.g., McQuarrie & Mick, 2003). Further research on the implications of these concepts for greenwashing, where advertisers frequently use environmental imagery and colors while avoiding making more overt verbal claims, offers significant promise.

## Multilevel Impacts of Greenwash

Additional interdisciplinary insights will flow from integrating more nuanced models of human cognition with theories of organizational behavior and collective action. Greenwash research currently lacks an understanding of the effects of greenwash at the individual level within the organizations that carry on misleading behaviors, reflecting a broader neglect of micro-level processes in CSR research more generally (Aguinis & Glavas, 2012). Nascent psychology and

Exhibit 13 to Decl. of Lyon
340
**SER 1441**

*Lyon and Montgomery*                                                                    243

organizational behavior studies have begun to identify important internal outcomes for green and socially responsible firms, including improved employee psychological health, trust, job satisfaction, and stronger organizational commitment (Robertson & Barling, 2013, 2014), all of which have been linked in prior research to positive organizational outcomes. These positive organizational impacts of being "green" suggest additional possible drivers of, and incentives for, greenwashing behaviors. Anecdotal evidence of employee whistle-blowing suggests that many employees are both aware of, and deeply concerned about, greenwashing practices by their own organizations and leaders. Future research should investigate whether organizations that are greenwashing have a less positive or even a negative impact on employee environmental passion and actions as well as on psychological health, trust, commitment, and productivity—all of which could negatively impact firm performance.

More work is also needed on the interactions between individual cognition and the actions of stakeholder groups. Consumers vary widely in how much attention they pay to the greenness of individual companies and products. Thus, particular communications will evoke different responses from different individuals. What happens when collective action, such as the passage of new legislation, is required to accomplish certain outcomes? Even if greenwash does not fool everyone, it may mislead enough people to preempt or delay collective action from emerging—as appears to have happened with climate change legislation (Oreskes & Conway, 2010). Further research that shows how greenwash affects the actions of stakeholders such as policy makers, activists, consumer groups, and investors is very important.

### Empirical Needs

There is as yet little consensus on how to identify and measure greenwash objectively, very little knowledge about the extent of greenwashing, inadequate evidence on the drivers and deterrents of greenwash, and little knowledge of its impacts on product sales and corporate reputation, much less on broader measures of social welfare. The field badly needs thorough, careful empirical analysis of the impacts of greenwash, which requires both an ability to identify greenwash clearly and to measure its effects. Indeed, this may be the single most important thing researchers can do to move the literature forward. By identifying multiple varieties of greenwash, and attempting to link them to constructs of misleading behaviors and communication in various fields, we have tried to accelerate this process.

In particular, we still know remarkably little about the extent of greenwash and whether it is increasing or decreasing over time. The management literature has begun to question the viability of decoupling strategies over time (Bromley & Powell, 2012; Wijen, 2014) finding that internal and external pressures on the decoupled or greenwashing firm can eventually lead to "recoupling" as actors seek to adapt actual practices to match their publicly stated policies (Tilcsik, 2010). This research suggests that firms' ability to successfully greenwash may decline over time in response to stakeholder pressures. Yet empirical evidence on whether greenwash is being erased over time is sorely lacking.

In addition, the advent of social media technologies poses several emerging challenges for organizations seeking to greenwash their behaviors. Early work in this area posits that social media may benefit those firms participating in CSR activities and communicating honestly about their actions, and make successful greenwashing more challenging (Bowen, 2014; Lee et al., 2013; Lyon & Montgomery, 2013). Although this limited research suggests that social media aids consumers in responding to corporate greenwash, a recent study by Fernando et al. (2014) identifies the potential for social media and blogs to actually enhance consumers' ability to set "agendas" on sustainability and proactively influence organizations and media. There is much more work to be done in this area to explore the effects of social media on greenwash including studies of variation across communication media, changing communication demands on various

Exhibit 13 to Decl. of Lyon
341
**SER 1442**

*Organization & Environment 28(2)*

stakeholders, characteristics of firms and stakeholders that participate, and the potential impact of information "overload."

### Social Welfare

Last but not least is the question of whether greenwash is always socially damaging, or whether it might be socially beneficial under certain circumstances (Bowen, 2014), for example, by increasing green awareness. Most of the existing literature either does not address the broader social welfare issue directly or makes broad assertions about welfare without strong empirical support. More conceptual work on this topic is badly needed, starting with a thorough assessment of the various ways greenwash can be harmful, and the possibility that greenwash can act as an incentive to organizations to substantively green themselves further.

The welfare impacts of greenwash are especially difficult to ascertain when the scientific links between environmental actions and environmental outcomes are unclear. Well-intentioned activists may demand certain practices of companies, and companies may truthfully and precisely state what they and their products are doing to help the environment, but in the absence of scientific understanding of what makes a difference these actions may mean little (Wijen, 2014). Although further natural science research on the links between environmental actions and outcomes is clearly crucial, social scientists have an important role to play as well. Research into the complex causal processes of social change will help to clarify when small improvements pave the way for future gains and when they merely lull society into complacency and delay the larger social changes that are required.

We began this project thinking that a more precise definition of greenwash would help focus future research, but we have come to a very different view: greenwash is an umbrella term for a whole family of behaviors that induce people to hold overly positive views of an organization's environmental performance. What is needed is not to corral "greenwash" into a narrow definition but rather to flesh out the taxonomy of greenwash, measure the prevalence of the varieties of greenwash, theorize the social welfare impacts of greenwash, and identify the impacts of greenwash on greenwashing organizations and society more broadly. The study of greenwash is still young and much important work remains to be done.

### Declaration of Conflicting Interests

The author(s) declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

### Funding

The author(s) received no financial support for the research, authorship, and/or publication of this article.

### Notes

1. The Seven Sins are the Sins of: the Hidden Tradeoff (touts one attribute but ignores others); No Proof; Vagueness; Worshiping False Labels; Irrelevance (true but unimportant); the Lesser of Two Evils (true but ignores larger harms of product category); and Fibbing. For more details, see TerraChoice (2009).
2. Confusion (p. 257) is achieved through "careful document control and strict limits on the flow of information made available to regulators and prosecutors." Fronting (p. 257) "is realized by subordinate scapegoating or reverse whistle blowing," and may involve such strategies as "cast doubt on the severity of the problem" or "emphasize uncertainty associated with the problem." Posturing (p. 256) involves the use of "front groups" to influence legislation or suggest that particular policies enjoy widespread "grassroots" support.
3. We included the frequently used alternative spellings "green wash" and "green-wash" as well as "greenwashing," "green washing," and "green-washing."

Exhibit 13 to Decl. of Lyon
342
**SER 1443**

4.  The 12 characteristics are communication channel, means of communication, communication scope, communication content, standard setter, ownership, mode of governance, transparency, methods for environmental assessment, monitoring and auditing, standard focus, and standard scope.
5.  The Harris research is discussed in detail in U.S. FTC (2010), but it is dispersed throughout the document, particularly in sections IV.F, V, and VI.

## References

Note: ISI-ranked journals with greenwash in their title or abstract are denoted with an asterisk.

Aguinis, H., & Glavas, A. (2012). What we don't know about corporate social responsibility research: A review and research agenda. *Journal of Management, 38,* 932-968.

Alves, I. (2009). Green spin everywhere: How greenwashing reveals the limits of the CSR paradigm. *Journal of Global Change and Governance, II*(1), 1-26.

Bansal, P., & Clelland, I. (2004). Talking trash: Legitimacy, impression management, and unsystematic risk in the context of the natural environment. *Academy of Management Journal, 47*(1), 93-103.

Birdsell, D. S., & Groarke, L. (2007). Outlines of a theory of visual argument. *Argumentation and Advocacy, 43*(3/4), 103-113.

Blackman, A. (2012). Does eco-certification boost regulatory compliance in developing countries? ISO 14001 in Mexico. *Journal of Regulatory Economics, 42,* 242-263.

*Boehmer-Christiansen, S. (1995a). Britain and the International Panel on Climate Change: The impacts of scientific advice on global warming. *Environmental Politics, 30*(1), 1-18.

*Boehmer-Christiansen, S. (1995b). Reflections on scientific advice and EC transboundary pollution policy. *Science and Public Policy, 40,* 195-203.

Boiral, O. (2007). Corporate greening through ISO 14001: A rational myth? *Organization Science, 18,* 127-146.

*Borel-Saladin, J. M., & Turok, I. N. (2013). The green economy: Incremental change or transformation? *Environmental Policy and Governance, 23,* 209-220.

Bowen, F. (2014). *After greenwashing: Symbolic corporate environmentalism and society.* Cambridge, England: Cambridge University Press.

Bowen, F., & Aragon-Correa, J. A. (2014). Greenwashing in corporate environmentalism research and practice: The importance of what we say and do. *Organization & Environment, 27,* 107-112.

Bromley, P., & Powell, W. W. (2012). From smoke and mirrors to walking the talk: Decoupling in the contemporary world. *Academy of Management Annals, 6,* 483-530.

*Cervellon, M.-C. (2013). Conspicuous conservation: Using semiotics to understand sustainable luxury. *International Journal of Market Research, 55,* 695-717.

*Chan, E. S. (2013). Gap analysis of green hotel marketing. *International Journal of Contemporary Hospitality Management, 25,* 1017-1048.

Chang, C. (2011). Feeling ambivalent about going green: Implications for green advertising processing. *Journal of Advertising, 40*(4), 19-32.

*Chen, Y.-S., & Chang, C.-H. (2013). Greenwash and green trust: the mediation effects of green consumer confusion and green perceived risk. *Journal of Business Ethics, 114,* 489-500.

Cho, C. H., & Patten, D. M. (2007). The role of environmental disclosures as tools of legitimacy: A research note. *Accounting, Organizations and Society, 32,* 639-647.

Clarkson, P. M., Li, Y., Richardson, G. D., & Vasvari, F. P. (2008). Revisiting the relation between environmental performance and environmental disclosure: An empirical analysis, 2008. *Accounting, Organizations and Society, 33,* 303-327.

*Cliath, A. G. (2007). Seeing shades: Ecological and socially just labeling. *Organization & Environment, 20*(4), 413-439.

Darke, P. R., & Ritchie, R. B. (2007, February). The defensive consumer: Advertising deception, defensive processing, and distrust. *Journal of Marketing Research, 44,* 114-127.

*Delmas, M. A., & Burbano, V. C. (2011). The drivers of greenwashing. *California Management Review, 54*(1), 64-87.

Delmas, M., & Montes-Sancho, M. (2010). Voluntary agreements to improve environmental quality: Symbolic and substantive cooperation. *Strategic Management Journal, 31,* 575-601.

Exhibit 13 to Decl. of Lyon
343
**SER 1444**

DiMaggio, P. J., & Powell, W. W. (1983). The Iron Cage revisited: Institutional isomorphism and collective rationality in organizational fields. *American Sociological Review, 48*, 147-160.

Farrell, J., & Rabin, M. (1996). Cheap talk. *Journal of Economic Perspectives, 10*(3), 103-118.

*Fava, J., Baer, S., & Cooper, J. (2011). Green(er) product standard trends in North America. *Journal of Industrial Ecology, 39*(1), 9-12.

Fernando, A. G., Suganthi, L., & Sivakumaran, B. (2014). If you blog, will they follow? Using online media to set the agenda for consumer concerns on "greenwashed" environmental claims. *Journal of Advertising, 43*, 167-180.

Fischer, C., & Lyon, T. P. (2014). Competing environmental labels. *Journal of Economics and Management Strategy, 23*, 692-716.

*Fox, J. D. (1997). Leasing the Ivory Tower at a social justice university. *Organization & Environment, 10*, 259-277.

Gruère, G. (2013). *A characterisation of environmental labelling and information schemes* (OECD Environment Working Papers, No. 62). Paris, France: OECD Publishing. http://dx.doi.org/10.1787/5k3z11hpdgq2-enOECD

Harbaugh, R., Maxwell, J. W., & Rousillon, B. (2011). Label confusion: The Groucho effect of uncertain standards. *Management Science, 57*, 1512-1527.

Hamilton, S. F., & Zilberman, D. (2006). Green markets, eco-certification, and equilibrium fraud. *Journal of Environmental Economics and Management, 52*, 627-644.

Handelman, J. M., & Stephen, J. A. (1999). The role of marketing actions with a social dimension: Appeals to the institutional environment. *Journal of Marketing, 63*(3), 33-48.

Henriques, I., Bryan, W. H., & Montiel, I. (2013). Spillover effects of voluntary environmental programs on greenhouse gas emissions: Lessons from Mexico. *Journal of Policy Analysis and Management, 32*, 296-322.

Hoffman, A. J. (2013). *SC Johnson and the Greenlist Backlash* (Case 1-429-300). Ann Arbor, MI: William Davidson Institute, University of Michigan.

Hsu, T. (2011, May 21). Skepticism grows over products touted as eco-friendly. *Los Angeles Times*. Retrieved from http://articles.latimes.com/2011/may/21/business/la-fi-greenwash-20110521

*Jahdi, K. S., & Acikdilli, G. (2009). Marketing communications and corporate social responsibility (CSR): Marriage of convenience or shotgun wedding? *Journal of Business Ethics, 88*, 103-113.

*Jones, D. R. (2012). Looking through the "greenwashing glass cage" of the green league table towards the sustainability challenge for UK universities. *Journal of Organizational Change Management, 25*, 630-647.

Kardes, F. R., Posavac, S. S., & Cronley, M. L. (2004). Consumer inference: A review of processes, bases, and judgment contexts. *Journal of Consumer Psychology, 14*, 230-256.

*Kim, E.-H., & Lyon, T.P. (2011). Strategic environmental disclosure: Evidence from the DOE's Voluntary Greenhouse Gas Registry. *Journal of Environmental Economics and Management, 61*, 311-326.

Kim, E-H., & Lyon, T. P. (2014). Greenwash vs. brownwash: Exaggeration and undue modesty in corporate sustainability disclosure, *Organization Science*. Advance online publication. doi:10.1287/orsc.2014.0949

*Kirchhoff, S. (2000). Green business and blue angels. *Environmental and Resource Economics, 15*, 403-420.

Krishna, V., & Morgan, J. (2001). A theory of expertise. *Quarterly Journal of Economics, 116*, 747-775.

Lacker, J. M., & Weinberg, J. A. (1989). Optimal contracts under costly state falsification. *Journal of Political Economy, 97*, 1345-1363.

*Laufer, W. S. (2003). Social accountability and corporate greenwashing. *Journal of Business Ethics, 43*, 253-261.

*Lee, C. W. (2009). Conservation as a territorial ideology. *City & Community, 54*, 301-328.

Lee, K., Oh, W.-Y., & Kim, N. (2013). Social media for socially responsible firms: Analysis of Fortune 500's Twitter profiles and their CSR/CSIR ratings. *Journal of Business Ethics, 118*, 791-806.

Lefsrud, L. M. Graves, H., & Phillips, N. (2014, July). *A theory of visual rhetoric in legitimacy struggles* (Sub-theme 07: (SWG) Visualizing Institutions and Knowledge). 30th EGOS Colloquium, Rotterdam, Netherlands.

*Lightfoot, S., & Burchell, J. (2004). Green hope or greenwash? The actions of the European Union at the World Summit on Sustainable Development. *Global Environmental Change, 14*, 337-344.

Exhibit 13 to Decl. of Lyon
344
**SER 1445**

Lockett, A., Moon, J., & Visser, W. (2006). Corporate social responsibility in management research: Focus, nature, salience and sources of influence. *Journal of Management Studies, 43*, 115-136.

*Lozano, J., Blanco, E., & Rey-Maquieira, J. (2010). Can ecolabels survive in the long run? The role of initial conditions. *Ecological Economics, 25*, 2525-2534.

*Lu, D., & Realff, M. J. (2013). The design of a sustainability assessment standard using life cycle information. *Journal of Industrial Ecology, 61*, 493-503.

*Luke, T. W. (2008). The politics of true convenience or inconvenient truth: Struggles over how to sustain capitalism, democracy, and ecology in the 21st century. *Environment and Planning A, 7*, 1811-1824.

Lyon, T., & Maxwell, J. W. (2004). Astroturf: Interest group lobbying and corporate strategy. *Journal of Economics & Management Strategy, 13*, 561-597.

*Lyon, T., & Maxwell, J. W. (2011). Greenwash: Corporate environmental disclosure under threat of audit. *Journal of Economics & Management Strategy, 20*, 3-41.

*Lyon, T., & Montgomery, A. W. (2013). Tweetjacked: The impact of social media on corporate greenwash. *Journal of Business Ethics, 118*, 747-757.

*Mason, M., & Mason, R. (2012). Communicating a green corporate perspective: Ideological persuasion in the corporate environmental report. *Journal of Business and Technical Communication, 26*, 479-506.

Matejek, S., & Gössling, T. (2014). Beyond legitimacy: A case study in BP's "green lashing." *Journal of Business Ethics, 120*, 571-584.

Marquis, C., & Toffel, M. W. (2013). *Scrutiny, norms, and selective disclosure: A global study of greenwashing* (Harvard Business School Working Paper, No. 11-115). Retrieved from http://www.hbs.edu/faculty/Pages/item.aspx?num=40289

McQuarrie, E. F., & Mick, D. G. (2003). The contribution of semiotic and rhetorical perspectives to the explanation of visual persuasion in advertising. In L. G. Scott & R. Batra (Eds.), *Persuasive imagery: A consumer response perspective* (pp. 191-221). Mahwah, NJ: Erlbaum.

Meyer, J. W., & Rowan, B. (1977). Institutionalized organizations: Formal structure as myth and ceremony. *American Journal of Sociology, 83*, 340-363.

Milgrom, P. R. (1981). Good news and bad news: Representation theorems and applications. *Bell Journal of Economics, 12*, 380-391.

*Mills, E. (2009). A global review of insurance industry responses to climate change. *Geneva Papers on Risk and Insurance: Issues and Practice, 20*, 323-359.

Mohr, L. A., Eroglu, D., & Ellen, P. S. (1998). The development and testing of a measure of skepticism toward environmental claims in marketers' communications. *Journal of Consumer Affairs, 32*(1), 30-55.

Nelson, A., Earle, A., Howard-Grenville, J., Haack, J., & Young, D. (2014). Do innovation measures actually measure innovation? Obliteration, symbolic adoption, and other finicky challenges in tracking innovation diffusion. *Research Policy, 43*, 927-940.

Oreskes, N., & Conway, E. M. (2010). *Merchants of doubt: How a handful of scientists obscured the truth on issues from tobacco smoke to global warming*. New York, NY: Bloomsbury.

Oswald, L. J. (2011). *The law of marketing* (2nd ed.). Mason, OH: South-Western, Cengage Learning.

Pancer, E., & McShane, L. (2013). Gauging greenwashing and questioning quality: The unintended effects of environmental claims on perceptions of product effectiveness. In T. Meyvis & R. Ragunathan (Eds.), *Advances in consumer psychology* (Vol. 5, pp. 150). San Antonio, TX: Society for Consumer Psychology.

*Parguel, B., Benoit-Moreau, F., & Larceneux, F. (2011). How sustainability ratings might deter "greenwashing": A closer look at ethical corporate communication. *Journal of Business Ethics, 22*, 15-28.

Patten, D. (2002). The relation between environmental performance and environmental disclosure: A research note. *Accounting, Organizations, and Society, 27*, 763-773.

Philippe, D., & Durand, R. (2011). The impact of norm-conforming behaviors on firm reputation. *Strategic Management Journal, 32*, 969-993.

*Plows, A. (2008). Towards an analysis of the "success" of UK green protests. *British Politics, 8*(1), 92-109.

Polaris Institute. (2005). Coca-Cola Company wins corporate greenwash award. http://www.polarisinstitute.org/coca_cola_company_wins_corporate_greenwashing_award

Pollay, R. W. (1986). The distorted mirror: Reflections on the unintended consequences of advertising. *Journal of Marketing, 50*(2), 18-36.

Exhibit 13 to Decl. of Lyon
345
**SER 1446**

Potoski, M., & Prakash, A. (2005). Green clubs and voluntary governance: ISO 14001and firms' regulatory compliance. *American Journal of Political Science, 49*, 235-248.

*Ramus, C., & Montiel, I. (2005). When are corporate environmental policies a form of greenwashing? *Business & Society, 44*, 377-414.

*Relaño, F. (2011). Maximizing social return in the banking sector. *Corporate Governance, 17*, 274-284.

Robertson, J., & Barling J. (2013). Greening organizations through leaders' influence on employees' pro-environmental behaviors. *Journal of Organizational Behavior, 34*, 176-194.

Robertson, J. L., & Barling J. (2014). Corporate social responsibility and psychologically healthy workplaces. In A. Day, E. K. Kelloway, & J. Hurrell (Eds.), *Workplace well-being: Building positive and psychologically healthy workplaces* (pp. 264-280). London, England: Wiley-Blackwell.

Russo, J. E., Metcalf, B. L., & Stephens, D. (1981). Identifying misleading advertising. *Journal of Consumer Research, 8*, 119-131.

Scott, L. M., & Batra, R. (2003). *Persuasive imagery: A consumer response perspective*. Mahwah, NJ: Erlbaum.

Shimp, T. A. (1978). Do incomplete comparisons mislead? *Journal of Advertising Research, 18*, 21-27.

Shin, H. S. (2003). Disclosures and asset returns. *Econometrica, 71*, 105-133.

*Sirieix, L., Delanchy, M., Remaud, H., Zepeda, L., & Gurviez, P. (2013). Consumers' perceptions of individual and combined sustainable food labels: A UK pilot investigation. *International Journal of Consumer Studies, 37*, 143-151.

Smith, V. L., & Font, X. (2014). Volunteer tourism, greenwashing and understanding responsible marketing using market signalling theory. *Journal of Sustainable Tourism, 22*, 942-963.

Snyder, R. (1989, Winter). Misleading characteristics of implied-superiority claims. *Journal of Advertising, 18*, 54-61.

Spence, M. (1973). Job market signaling. *Quarterly Journal of Economics, 87*, 355-374.

Stafford, E. R., Polonsky, M. J., & Hartman, C. L. (2000). Environmental NGO-business collaboration and strategic bridging: A case analysis of the Greenpeace-Foron alliance. *Business Strategy and the Environment, 9*, 122-135.

*Stephenson, E., Doukas, A., & Shaw, K. (2012). Greenwashing gas: Might a "transition fuel" label legitimize carbon-intensive natural gas development? *Energy Policy, 11*, 452-459.

*Szili, G., & Rofe, M. W. (2007). Greening port misery: marketing the green face of waterfront redevelopment in port Adelaide, South Australia. *Urban Policy and Research, 22*, 363-384.

TerraChoice. (2007). *The six sins of greenwashing*. Retrieved from http://sinsofgreenwashing.org/findings/greenwashing-report-2007/

TerraChoice. (2009). *The seven sins of greenwashing*. Retrieved from http://sinsofgreenwashing.org/findings/greenwashing-report-2009/

Tilcsik, A. (2010). From ritual to reality: Demography, ideology, and decoupling in a post-communist government agency. *Academy of Management Journal, 53*, 1474-1498.

Tolliver-Nigro, H. (2009, June 29). Green market to grow 267 percent by 2012. Retrieved from www.matternetwork.com/2009/6/green-market-grow-267-percent.cfm.

U.S. Federal Trade Commission. (2010, October 15). *16 C.F.R. Part 260: Guides for the use of environmental marketing claims: Request for public comment on proposed, revised guides* (Matter No. P954501). Washington, DC: Author.

U.S. Federal Trade Commission. (2012, October 11). Guides for the use of environmental marketing claims; final rule (16 CFR Part 260). *Federal Register, 77*(197). Retrieved from http://www.ftc.gov/policy/federal-register-notices/guides-use-environmental-marketing-claims-green-guides

*Walker, K., & Wan, F. (2012). The harm of symbolic actions and green-washing: Corporate actions and communications on environmental performance and their financial implications. *Journal of Business Ethics, 109*, 227-242.

Westley, F., & Vredenburg, H. (1991). Strategic bridging: The collaboration between environmentalists and business in the marketing of green products. *Journal of Applied Behavioral Science, 27*, 65-90.

Westphal, J. D., & Zajac, E. J. (1994). Substance and symbolism in CEOs' long-term incentive plans. *Administrative Science Quarterly, 39*, 367-390.

Wijen, F. (2014). Means versus ends in opaque institutional fields: Trading off compliance and achievement in sustainability standard adoption. *Academy of Management Review, 39*, 302-323.

Exhibit 13 to Decl. of Lyon
346
**SER 1447**

*Wu, M.-W., & Shen, C.-H. (2013). Corporate social responsibility in the banking industry: Motives and financial performance. *Journal of Banking & Finance, 37*, 3529-3547.

Yeomans, M. (2013). Communicating sustainability: The rise of social media and storytelling. *The Guardian*. Retrieved from http://www.guardian.co.uk/sustainable-business/communicating-sustainability-social-media-storytelling?CMP=

*Young, Z. (1999). NGOs and the global environmental facility: Friendly foes? *Environmental Politics, 14*, 243-267.

## Author Biographies

**Thomas P. Lyon** holds the Dow Chair of Sustainable Science, Technology and Commerce at the University of Michigan, with appointments in both the Ross School of Business and the School of Natural Resources and Environment. Professor Lyon is a leader in using economic analysis to understand corporate environmental strategy and his book Corporate Environmentalism and Public Policy, published by Cambridge University Press, is the first rigorous economic analysis of this increasingly important topic.

**A. Wren Montgomery** is a Ph.D. candidate in Organizational Behavior at Queen's University and a visiting Scholar at the University of Michigan's Erb Institute, where she is researching emerging pressures on water resources and institutions, field and institutional change, corporate sustainability, and social entrepreneurship. Prior to her PhD, she worked as a management and government relations consultant and as a policy analyst and strategist at senior levels of government

Exhibit 13 to Decl. of Lyon
347
**SER 1448**

# Exhibit 12

# to Declaration of Thomas P. Lyon

# Strategic environmental disclosure: Evidence from the DOE's voluntary greenhouse gas registry

Exhibit 12 to Decl. of Lyon
303
**SER 1449**

ARTICLE IN PRESS

Journal of Environmental Economics and Management ▮ (▮▮▮▮) ▮▮▮–▮▮▮



Contents lists available at ScienceDirect

## Journal of
## Environmental Economics and Management

journal homepage: www.elsevier.com/locate/jeem



# Strategic environmental disclosure: Evidence from the DOE's voluntary greenhouse gas registry ☆

Eun-Hee Kim [a], Thomas P. Lyon [b],*

[a] Department of Strategic Management and Public Policy, The School of Business, The George Washington University, 2201 G Street, NW, Washington, DC, 20052, USA
[b] Erb Institute for Global Sustainable Enterprise, Stephen M. Ross School of Business and School of Natural Resources and Environment, University of Michigan, 701 Tappan Street, Ann Arbor, MI 48109, USA

## ARTICLE INFO

Article history:
Received 27 May 2008

Keywords:
Information disclosure
Public voluntary programs
Early reduction credits
Greenhouse gas
Electric utilities
Greenwash
The 1605(b) program

## ABSTRACT

Although mandatory disclosure programs have been studied extensively, strategic voluntary environmental disclosures by firms are not well understood. We study the motivations for and impacts of firms' strategic disclosure of greenhouse gas reductions to the US government. We first model firms' joint abatement and disclosure decisions, incorporating both economic and political incentives. We then use data from the Department of Energy's Voluntary Greenhouse Gas Registry to compare reported reductions to actual emissions. We find that participants in the program engage in highly selective reporting: in the aggregate, they increase emissions over time but report reductions. In contrast, non-participants decrease emissions over time. Participants tend to be large firms facing strong regulatory pressure; pressure from environmental groups reduces the likelihood of participating, suggesting such groups viewed the program as a form of greenwash. Participating in the 1605(b) program had no significant effect on a firm's changes in carbon intensity over time.

© 2011 Published by Elsevier Inc.

## 1. Introduction

Environmental information disclosure programs have been hailed as the "Third Wave" of environmental regulation, following initial reliance on "command and control" policies such as Best Available Control Technology standards and a subsequent shift toward market-based policies such as tradable emissions permits [24]. A growing empirical literature suggests that mandatory disclosure programs do indeed lead to improved environmental performance, although the mechanisms by which this occurs remain somewhat unclear [2,4,5].

The effects of voluntary, as opposed to mandatory, environmental disclosures are more controversial. Non-governmental organizations (NGOs) often decry corporate environmental claims as mere greenwash, intended to unfairly bolster a dirty company's public image.[1] Furthermore, there is no academic consensus on whether voluntary environmental disclosures and environmental performance are even positively correlated. Economic models of disclosure imply a positive relationship,

☆ An earlier version of this paper was circulated under the title "Greenhouse Gas Reductions or Greenwash?: The DOE's 1605b Program." We would like to thank editor Charles Mason and two anonymous referees for comments that led to substantial improvements in the paper, as well as Joe Aldy, Magali Delmas, Arnaud Reynaud, Charles Rossmann, and participants in seminars at Arizona, Berkeley, Dartmouth, Harvard, Toronto, Toulouse, and the University of Michigan for helpful comments.
* Corresponding author. Fax: +1 734 936 8715.
E-mail addresses: eunheek@gwu.edu (E.-H. Kim), tplyon@umich.edu (T.P. Lyon).
[1] Webster's New Millenium Dictionary of English defines greenwash as "The practice of promoting environmentally friendly programs to deflect attention from an organization's environmentally unfriendly or less savory activities."

0095-0696/$ - see front matter © 2011 Published by Elsevier Inc.
doi:10.1016/j.jeem.2010.11.001

Please cite this article as: E.-H. Kim, T.P. Lyon, Strategic environmental disclosure: Evidence from the DOE's voluntary greenhouse gas registry, J. Environ. Econ. Manage. (2011), doi:10.1016/j.jeem.2010.11.001

Exhibit 12 to Decl. of Lyon
304
SER 1450

Case 2:24-cv-00801-ODW-PVC   Document 56-12   Filed 07/24/24   Page 3 of 17   Page ID #:6285

ARTICLE IN PRESS

2                          *E.-H. Kim, T.P. Lyon / Journal of Environmental Economics and Management ▮ (▮▮▮▮) ▮▮▮–▮▮▮*

since firms with better performance will have more positive outcomes to disclose [16,22,23,27], and there exists some empirical literature to support this view [1,3]. In contrast, some management scholars argue that firms increase their disclosures after an accident or other negative event in order to bolster their tarnished reputations [18], and there exists empirical support for this view as well [19]. In light of these mixed findings, it is not surprising that many environmental advocates are distrustful of voluntary environmental disclosures and wary of greenwash.[2]

Most previous work measures voluntary environmental disclosures using content analysis of statements in corporate annual reports, corporate social responsibility reports and 10Ks.[3] In this paper, we take an alternative approach, making use of a unique dataset created by section 1605(b) of the Energy Policy Act of 1992, which directed the Department of Energy to create a registry in which companies could record their voluntary reductions of greenhouse gas (GHG) emissions, in terms of tons of $CO_2$. For most industries, it is difficult to compare these disclosures against actual environment performance, since the US currently has no federal regulation of GHG emissions. However, electric utilities must report detailed fuel use data to the Federal Energy Regulatory Commission (FERC), so we can compare their actual emissions performance against the disclosures they make through the DOE's Voluntary Greenhouse Gas Registry.[4] Thus, we are able to directly examine the link between reports and environmental performance, without having to interpret corporate statements through content analysis.

In order to sharpen our focus on the factors motivating firms to make voluntary environmental disclosures, we create a formal model of firms' incentives for emissions reductions. We model the economic benefit from disclosure as an increased chance of obtaining "early reduction credits" (ERCs) that would have value if the US were to impose an emissions cap in the future.[5] We incorporate both economic and political incentives, and in addition, we analyze firms' incentives for disclosure of their emissions reduction efforts.

Our empirical analysis finds that participants in the program generally engaged in highly selective reporting of successful emissions reduction projects, without disclosing their overall carbon footprint. Indeed, in the aggregate, participants increased emissions over time but reported reductions, while non-participants actually decreased emissions over time. In terms of who participates, our empirical results indicate that large firms, who may have had lower costs of participation, were more likely to join the program. Political pressures also played a significant role: participation was more likely in states that devote greater resources to enforcement, and in states that had not yet passed a Renewable Portfolio Standard (RPS). In addition, the fear of a backlash from NGOs appears to have been real: firms were less likely to participate in states with more environmental group members per capita. Finally, we use propensity-score matching to test whether participation had a measurable effect on changes over time in a firm's $CO_2$ emissions intensity ($CO_2$ emissions per unit of generation), and find it to be statistically insignificant.

## 2. The 1605(b) program

The voluntary registry program was established by section 1605(b) of the Energy Policy Act of 1992. A critical aspect of its design is that there were no hard and fast rules about how to report reductions.[6] First, voluntary reporters could choose to report reductions at the "entity level" (entire firm) or at the "project level" (individual reduction project). Moreover, reporters could define the boundary of the entity or project.[7] Reporters were even allowed to report entity-level reductions just as the sum of project-level reductions. Second, voluntary reporters also had leeway in choosing baseline emissions against which to measure their reductions: historical or hypothetical. In the case of historical emissions, reporters could select any one year between 1987 and 1990 or use an average of any of those years. In the case of hypothetical emissions, reporters estimated what emissions would have been without entity- or project-level reductions. Third, reporters could report either reductions in absolute emissions or reductions in emissions intensity. Fourth, voluntary reporters could report indirect reductions or sequestration as well as direct reductions.[8]

In 2003, the latest year covered in this paper, the 1605(b) program received a total of 98 reports from the electric power sector and the reports provided information on 485 GHG emissions projects. The projects covered a wide range from reducing emissions at the electric power generation, transmission and distribution stages to demand-side management and carbon sequestration.[9]

---

[2] Lyon and Maxwell (2011) present a theoretical model that combines a persuasion game with an NGO watchdog that punishes greenwash, thus combining the economic and management approaches.

[3] Most of this work appears in the accounting literature [3,8,19].

[4] Converting fuel use to carbon emissions is straightforward, as shown in Table 1.

[5] The value of such permits can be large indeed. According to the Carbon Trust, electric utilities in the UK made profits of over $1 billion in 2005 from carbon permits they were allocated under the E.U. Emission Trading Scheme.

[6] Because our analysis is based on the data firms reported to the 1605(b) program during 1995–2003, the unique features we describe do not reflect the revised guidelines that went into effect on June 1, 2006.

[7] This information is based on personal correspondence with EIA's 1605(b) project manager, Mr. Stephen E. Calopedis (October 18, 2005).

[8] Direct reductions refer to reductions from sources owned by the reporter. Indirect reductions refer to reductions from sources not owned by the reporter but somehow affected by reporter actions. An example of indirect reductions is a decrease in power plant emissions due to a decrease in end-use electricity consumption, which in turn is at least partly attributable to electric utilities' demand side management programs. Sequestration refers to the removal and storage of carbon from the atmosphere in carbon sinks such as trees, plants, or underground reservoirs. See [26] for details.

[9] To illustrate the kinds of projects actually reported to the program, we provide three short case studies, which are contained in an appendix at JEEM's online archive of supplementary material; this archive may be accessed at http://aere.org/journals/.

Please cite this article as: E.-H. Kim, T.P. Lyon, Strategic environmental disclosure: Evidence from the DOE's voluntary greenhouse gas registry, J. Environ. Econ. Manage. (2011), doi:10.1016/j.jeem.2010.11.001

Exhibit 12 to Decl. of Lyon
305
SER 1451

ARTICLE IN PRESS

*E.-H. Kim, T.P. Lyon / Journal of Environmental Economics and Management ▮ (▮▮▮▮) ▮▮▮–▮▮▮*    3

Why should firms participate? The DOE's Voluntary Registry website suggests that benefits of participation are primarily in the form of publicity and improved relationships with regulators, though it also hints obliquely at ERCs in its reference to establishing a baseline for measurement.[10] In fact, it is our reading that ERCs provided the most potent incentive for participation in 1605b. Support for this view comes from comments filed by interested parties during the process that led up to the program revisions that went into place in 2006. For example, the Edison Electric Institute (EEI), the trade association of investor-owned electric utilities, argued firms have many motives for participating, including recording transferable credits, obtaining credit for past actions, and improving public relations. However, the bulk of the EEI comments focused on transferable credits, and argued vigorously for project-level reporting. In opposition to EEI, the Natural Resources Defense Council (NRDC), an environmental NGO, condemned project-level reporting, arguing that it allows companies to game the system by "cherry picking" the projects they want to report. NRDC argued that entity-wide reporting obviated the need for project-level reporting.

Our formal model incorporates both of these possibilities, and suggests that neither EEI nor NRDC fully captured the impacts of alternative disclosure strategies. The EEI ignores the fact that without entity-wide information, the firm can withhold information on actions that increased emissions, such as marketing efforts to expand sales. The NRDC ignores the fact that firms in high-growth areas may have rising emissions through no fault of their own. Our model incorporates both of these possibilities.

### 3. An economic model of early emissions reduction and disclosure

The most conspicuous economic benefit from participating in the 1605(b) program was the possibility that participants would receive early reduction credits (ERCs), which might have significant value if the US eventually creates a tradable permits scheme for GHG emissions [11,17]. In particular, participants would benefit if the government adopted an allocation scheme for permits that would award them free permits for reductions in GHG emissions made prior to the beginning of the trading scheme. In fact, just such a proposal was introduced by Senators John Chafee (R-RI) and Joseph Lieberman (D-CT) in the 105th and 106th Congresses. Despite the failure of both bills to pass, these proposals made industry (and investors) keenly aware that ERCs could be awarded at some point in the future.

In this section, we present a simple model of a firm's early reduction strategy and disclosure behavior when faced with the possibility of earning ERCs. Building on the model of Kennedy [11], we add a number of important extensions. First, with regard to federal regulation, we allow for uncertainty about both the passage of a carbon cap, and the awarding of ERCs conditional on the passage of a carbon cap. Second, we allow for uncertainty regarding the rules by which ERCs will be allocated, should they in fact be awarded. In particular, we model both the possibility that (a) ERCs will be awarded based on the individual emissions reduction projects that a firm can demonstrate that it has undertaken, and (b) ERCs will be awarded based on reductions in a firm's total historical emissions over time. As we will see below, this uncertainty regarding the nature of the regulatory rule affects both a firm's emissions reduction investments and its disclosure behavior. Third, we allow for the possibility of state-level regulations that require emissions reductions. Since the primary policy tool used by states in this regard has been the Renewable Portfolio Standard (RPS), we focus on this policy. We allow for the possibility that early reductions might reduce the probability of RPS legislation being passed [15,21]. Finally, we incorporate the possibility that environmental activists take action to oppose what they view as greenwash; specifically, we allow NGOs to investigate environmental claims they find to be incomplete or misleading, and to punish offending firms through attack campaigns [13].

#### 3.1. The basic model

We consider a three-period model, $t \in \{0,1,2\}$, in which the firm minimizes its expected costs of complying with emissions regulations. Define

| | |
|---|---|
| $B_t$ | business-as-usual emissions in period $t$ |
| $E_t$ | actual emissions in period $t$ |
| $\delta$ | growth in business-as-usual emissions each period |
| $D_t$ | demand-side reductions in period $t$ |
| $S_t$ | supply-side reductions in period $t$ |
| $K_t(S_t)$ | cost of supply-side reductions in period $t$ |
| $L_t(D_t)$ | cost of demand-side reductions in period $t$ |

Business-as-usual emissions are governed by the process $B_t = (1+\delta)B_{t-1}$. The firm knows its own growth rate, but the regulator does not. The firm's emissions are simply $E_0 = B_0$ in period 0, $E_1 = B_1 - D_1 - S_1$ in period 1 and $E_2 = B_2 - D_2 - S_2 - S_2$ in

---

[10] "The voluntary reporting program provides an opportunity for you to gain recognition for the good effects of your actions—recognition from your customers, your shareholders, public officials, and the Federal government. Reporting the results of your actions adds to the public groundswell of efforts to deal with the threat of climate change. Reporting can show that you are part of various initiatives under the President's Climate Action Plan. Your reports can also record a baseline from which to measure your future actions. Finally, your reports, along with others, can contribute to the growing body of information on cost-effective actions for controlling greenhouse gases." http://www.eia.doe.gov/oiaf/1605/1605(b).html.

Please cite this article as: E.-H. Kim, T.P. Lyon, Strategic environmental disclosure: Evidence from the DOE's voluntary greenhouse gas registry, J. Environ. Econ. Manage. (2011), doi:10.1016/j.jeem.2010.11.001

Exhibit 12 to Decl. of Lyon
306
**SER 1452**

ARTICLE IN PRESS

period 2. Note that we assume supply-side investments have a longer-term impact on emissions than demand-side reductions, reflecting the notion that the latter may have a behavioral component whose reduction requires ongoing investment. We assume that both $K_t(S_t)$ and $L_t(D_t)$ are increasing and convex for positive $S_t$ and $D_t$.

We allow the firm to choose $D_t < 0$. This represents marketing efforts to expand sales, in the form of economic development efforts targeted towards attracting new businesses to the firm's service territory, encouraging customers to purchase additional energy-using appliances, or offering declining block tariffs that encourage increases in energy consumption at the margin. We focus on incremental changes in the firm's marketing efforts that are induced by the pursuit of ERCs and that go beyond the level that would be profit-maximizing in their absence. Hence we assume $L_t(D_t)$ is positive, decreasing, and convex for negative $D_t$. Over the entire range of $D_t$, $L_t(D_1)$ is positive and convex, with a minimum at $L_t(0)=0$.[11]

We assume that in period 1 there is no regulatory constraint on emissions, but in period 2 there might be. If emissions regulation is passed, it sets a maximum allowable level of emissions for the firm and imposes a fee on all emissions beyond that level; such a scheme could be the result of either a carbon tax or a cap-and-trade policy. We assume that the firm makes its investment choices in period 2 before it learns whether an emissions fee is imposed. Thus, ERCs may be earned both for reductions in periods 1 and 2.

During our sample period, 11 states imposed Renewable Portfolio Standards (RPSs), which require utilities to supply a minimum amount of renewable energy in their generation portfolios [14]. The passage of these new rules may have led firms to reduce their carbon emissions. Firms in other states may have anticipated that they might face similar policies in the future. To capture this political context, we assume there is a probability $\sigma$ that the state legislature imposes an RPS that mandates a minimum amount of renewable energy, $S_{Reg}$, which must be provided by the firm in period 2. If the firm falls below this level then it must pay a penalty of $\lambda$ for each unit that it falls short. We assume $\sigma$ is a decreasing function of $S_1$, which reflects the idea that firms may be able to preempt regulation by making proactive environmentally friendly investments.[12] Finally, we recognize that NGOs are concerned about the information that firms disclose to customers, investors and regulators. In particular, we assume that NGOs oppose corporate "greenwash," which we interpret as selective disclosure of favorable information while withholding unfavorable information.[13] In the context of our model, the NGO opposes GHG disclosures that "cherry-pick" good projects and fail to report activities such as economic development investments that stand to increase a firm's carbon footprint. In our model, the primary situation for which the firm has an incentive to withhold information is $D_1$, and the firm only withholds this information if it has chosen $D_1 < 0$. Thus, we operationalize the NGO's attack on greenwash as follows: if the firm fails to fully report, then it expects that the NGO will investigate it with some probability $\eta$, and impose a punishment of magnitude A if the NGO concludes the firm made an investment $D_1 < 0$ which it has withheld in its 1605b report; thus the firm's expected punishment for selective disclosure is $\eta A$.

To incorporate the foregoing considerations in the model, define

| | |
|---|---|
| $\rho$ | probability of an emissions price in period 2 |
| $P$ | emissions price in period 2 if one is imposed |
| $\alpha$ | probability early reduction credits are granted if an emissions price is imposed |
| $\sigma(S_1)$ | Probability of state-level renewable energy legislation |
| $S_{Reg}$ | Supply-side emissions reduction required under state renewable energy legislation |
| $\lambda$ | Penalty imposed per unit by which the firm's supply-side reductions fall short of the regulatory requirement |
| $\eta$ | Probability of NGO audit and penalty if the firm engages in selective disclosure |
| $A$ | Level of harm imposed on the firm if the NGO successfully audits and attacks the firm for greenwash |
| $R$ | Early reduction credits granted for reductions prior to imposition of a cap |

Note that $R$ could be defined in a variety of ways, project-based ($R^P=S_1+D_1+S_2+D_2$), or reductions against historical baseline (either using period 0 or period 1 as the baseline). Under the 1605b program, firms had a choice of which baseline to use. If $R$ is project-based, then the firm will not report projects for which $D_1 < 0$, as the regulator would not grant ERCs for them. If ERCs are granted on a historical basis, the firm can choose which baseline year it prefers. (It will choose period 1 if $E_1 > E_0$, or $\delta B_0 > D_1 + S_1$, that is, if the growth in emissions from period 0 to period 1 outweighs any reductions undertaken by the firm in period 1.) If $D_1 < 0$, this obviously makes the firm more inclined to choose a period 1 baseline. Thus, the use of a historical baseline can create a moral hazard problem for the firm, giving it incentives to artificially inflate its emissions in the base period. Clearly, selective disclosure by the firm can have socially detrimental effects, by enabling it to get away with increasing emissions in period 1. We will explore the firm's choice of period 1 reductions in more detail below.

The firm faces uncertainty regarding the allocation method that will be used by the regulator. The probability $\alpha$ that ERCs are granted is the sum of $\beta$, the probability ERCs are allocated based on projects if there is a permit market, and $\gamma$, the probability ERCs are allocated based on historical reductions if there is a permit market.

---

[11] We focus on $D_1$, $D_2 < 0$ is possible, but we ignore it for simplicity. Adding $D_2 < 0$ will add some technical completeness but also add more complexity without much new insight.

[12] Although we would expect the passage of RPS legislation to require greater investments in $S_2$, this result might not be observed immediately in the data, since states typically give firms a number of years lead time before requirements begin to bind.

[13] See [13] for further discussion of the appropriate definition of greenwash, and a theoretical model of NGO attempts to discourage it.

Please cite this article as: E.-H. Kim, T.P. Lyon, Strategic environmental disclosure: Evidence from the DOE's voluntary greenhouse gas registry, J. Environ. Econ. Manage. (2011), doi:10.1016/j.jeem.2010.11.001

Exhibit 12 to Decl. of Lyon
307
SER 1453

ARTICLE IN PRESS

*E.-H. Kim, T.P. Lyon / Journal of Environmental Economics and Management ∎ (∎∎∎∎) ∎∎∎–∎∎∎* 5

The firm's objective is to minimize expected costs, which depend upon disclosure strategy as well as investments in abatement. In our setting, full disclosure can be implemented either by a firm listing all of its projects (including those for which $D_1 < 0$) or by disclosing both entity-level emissions $E_1$ and $E_2$ along with projects $S_1$ and $S_2$. Note that simply reporting at the entity level alone is not enough to constitute full disclosure, since without project-level reporting as well, the regulator cannot distinguish "bad luck" (in the form of growth in BAU emissions) from "bad management" (in the form of a failure to invest in emissions reductions). We do not consider project-level reporting to be equivalent to full disclosure, since as we show below the firm has incentives to disclose fully at the project level and there is no way to verify that the firm listed all of its projects.

### 3.2. Incentives under full disclosure

If the firm opts for full disclosure then there is no risk of a greenwash penalty. If historical reductions are measured as $E_0 - E_2$, then ERCs are determined by $E_0 - E_2 = B_0 - [(1+\delta)^2 B_0 - D_2 - S_1 - S_2] = -\delta(2+\delta)B_0 + D_2 + S_1 + S_2$. Thus, when the firm discloses fully, its expected costs are

$$C = K_1(S_1) + K_2(S_2) + L(D_1) + L(D_2) + \rho P\Big[((1+\delta)^2 B_0 + D_2 - S_1 - S_2) - \beta(S_1 + D_1 + S_2 + D_2) - \gamma(-\delta(2+\delta)B_0 + D_2 + S_1 + S_2)\Big]$$
$$+ \lambda\sigma(S_1)\max\{S_{Reg} - S_2, 0\}.$$

If historical reductions are measured as $E_1 - E_2$, then ERCs are determined by

$$E_1 - E_2 = [(1+\delta)B_0 - D_1 - S_1] - \Big[(1+\delta)^2 B_0 - D_2 - S_1 - S_2\Big] = -\delta(1+\delta)B_0 - D_1 + D_2 + S_2,$$

so

$$C = K_1(S_1) + K_2(S_2) + L(D_1) + L(D_2) + \rho P\Big[((1+\delta)^2 B_0 - D_2 - S_1 - S_2) - \beta(S_1 + D_1 + S_2 + D_2) - \gamma(-\delta(1+\delta)B_0 - D_1 + D_2 + S_2)\Big]$$
$$+ \lambda\sigma(S_1)\max\{S_{Reg} - S_2, 0\}.$$

First-order conditions for $S_1$ and $D_1$ depend on the baseline year. For year 0, the FOCs are

$$\frac{\partial C}{\partial S_1} = \frac{\partial K_1}{\partial S_1} - \rho P(1 + \beta + \gamma) + \lambda\sigma'(S_1)\max\{S_{Reg} - S_2, 0\} = 0 \text{ and } \frac{\partial C}{\partial D_1} = \frac{\partial L_1}{\partial D_1} - \rho P\beta = 0.$$

For baseline year 1, the FOCs are

$$\frac{\partial C}{\partial S_1} = \frac{\partial K_1}{\partial S_1} - \rho P(1 + \beta) + \lambda\sigma'(S_1)\max\{S_{Reg} - S_2, 0\} = 0 \text{ and } \frac{\partial C}{\partial D_1} = \frac{\partial L_1}{\partial D_1} - \rho P(\beta - \gamma) = 0.$$

For $S_1$, the firm equates the marginal cost of the supply-side abatement activity to the sum of (a) the expected value of marginal avoided purchases of carbon permits, which consists of both the direct impact of reducing emissions (and hence avoiding the need to buy more permits) plus the expected value of ERCs received in the event ERCs are awarded[14] and (b) the expected value of a marginal reduction in the risk of a legislatively-imposed RPS.

For $D_1$, the firm must choose between setting $D_1 < 0$, which inflates the historical emissions in period 1, or setting $D_1 > 0$ in the hopes of obtaining ERCs on a project basis. For a period 0 baseline, the firm obtains ERCs for $D_1 > 0$ if they end up being allocated on a project basis, but not if ERCs are based on historical reductions, since $D_1$ affects neither period 0 nor period 2 emissions. For a period 1 baseline, the incentive to increase $D_1$, and pursue ERCs based on project-level allocations, is countered by the incentive to reduce $D_1$ and avoid losing ERCs by reducing emissions in the historical baseline year. If $\beta > \gamma$, then the firm equates the marginal cost of the demand-side abatement activity to the expected value of ERCs received, taking into account the difference in probabilities of ERCs being allocated based on projects vs. historical reductions. If $\beta < \gamma$, then the only solution involves $D_1 < 0$, and the possibility of ERCs distorts the firm's choice to a more negative level of $D_1$ than would be selected in the absence of ERCs.

First-order conditions for $S_2$ and $D_2$ do not depend upon the baseline year, and are

$$\frac{\partial C}{\partial S_2} = \frac{\partial K_2}{\partial S_2} - \rho P(1 + \beta + \gamma) - \lambda\sigma(S_1)I[S_{Reg} > S_2] = 0 \text{ and } \frac{\partial C}{\partial D_2} = \frac{\partial L_2}{\partial D_2} - \rho P(1 + \beta + \gamma) = 0.$$

For $S_2$, the firm equates the marginal cost of the supply-side abatement activity to the sum of (a) the expected value of marginal avoided purchases of carbon permits, which consists of both the direct impact of reducing emissions (and hence avoiding the need to buy more permits) plus the expected value of ERCs received in the event ERCs are awarded on either a project basis or on the basis of historical reductions, and (b) the marginal reduction in the expected penalty for failing to comply with an RPS, should one be imposed.

For $D_2$, the firm equates the marginal cost of the demand-side reduction to the expected value of marginal avoided purchases of carbon permits, which consists of both the direct impact of reducing emissions (and hence avoiding the need to

---

[14] If the historical baseline year is 0, then the firm receives ERCs for $S_1$ regardless of whether ERCs are allocated on a project or a historical basis. If the baseline year is 1, then the firm receives ERCs for $S_1$ only in the event that ERCs are allocated on a project basis. This is because $S_1$ affects emissions in both periods, and so does not affect the difference in emissions between the two periods.

Please cite this article as: E.-H. Kim, T.P. Lyon, Strategic environmental disclosure: Evidence from the DOE's voluntary greenhouse gas registry, J. Environ. Econ. Manage. (2011), doi:10.1016/j.jeem.2010.11.001

Exhibit 12 to Decl. of Lyon
308
**SER 1454**

ARTICLE IN PRESS

6 *E.-H. Kim, T.P. Lyon / Journal of Environmental Economics and Management ▮ (▮▮▮▮) ▮▮▮–▮▮▮*

buy more permits) plus the expected value of ERCs received in the event ERCs are awarded on either a project basis or on the basis of historical reductions. Note that compared to demand-side reductions, supply-side reductions create the added benefit of reducing regulatory risk.

### 3.3. Incentives for selective disclosure

If the firm does not disclose fully, then it may be able to obtain more ERCs, but it also faces the risk of a greenwash penalty. If a baseline year of 0 is used for historical emissions, then expected costs are

$$C = K_1(S_1) + K_2(S_2) + L(D_1) + L(D_2) + \rho P \Big[ ((1+\delta)^2 B_0 - D_2 - S_1 - S_2) - \beta(S_1 + \max\{D_1, 0\} + S_2 + D_2)$$
$$- \gamma(-\delta(2+\delta)B_0 + D_2 + S_1 + S_2) \Big] + \lambda \sigma(S_1) \max\{S_{Reg} - S_2, 0\} + \eta A.$$

Alternatively, if historical reductions are measured as $E_1 - E_2$, then expected costs are

$$C = K_1(S_1) + K_2(S_2) + L_1(D_1) + L_2(D_2) + \rho P \Big[ (-D_2 - S_1 - S_2) - \beta(S_1 + \max\{D_1, 0\} + S_2 + D_2) - \gamma(-\delta(1+\delta)B_0 - D_1 + D_2 + S_2) \Big]$$
$$+ \lambda \sigma(S_1) \max\{S_{Reg} - S_2, 0\} + \eta A.$$

Expected costs are increased by the risk of a greenwash penalty, but this could be outweighed by the benefits of hiding information about negative $D_1$ and thus obtaining more ERCs. Compared to the full disclosure case, first-order conditions for $S_1$, $S_2$, and $D_2$ are unchanged. The first-order condition for $D_1$ is different from the full disclosure case. For baseline 0, the FOC is

$$\frac{\partial C}{\partial D_1} = \frac{\partial L_1}{\partial D_1} - \rho P(\beta I[D_1 > 0]) = 0$$

For baseline year 1, the FOC is

$$\frac{\partial C}{\partial D_1} = \frac{\partial L_1}{\partial D_1} - \rho P(\beta I[D_1 > 0] - \gamma) = 0$$

If $D_1$ is positive, the first-order conditions are the same as the full disclosure case. For negative $D_1$, the indicator function means that the firm no longer faces a marginal cost in lost ERCs for $D_1 < 0$. Thus, for a period 0 baseline, negative $D_1$ is more attractive at the margin than under full disclosure, so if the firm does choose a negative $D_1$ it will be at a larger absolute value than in the full disclosure case. However, although the greenwash penalty does not enter the first-order condition, it is a real fixed cost faced by the firm if it engages in selective disclosure; hence, it may deter the firm from choosing a negative $D_1$. For a period 1 baseline, once again a negative $D_1$ is the only possible solution, and selective disclosure leads to a value of $D_1$ that is larger in absolute value than under full disclosure.

There is a subtle difference between incentives under full and incentives under selective disclosure. Under full disclosure, if ERCs are based on projects then choosing $D_1 < 0$ will cause the firm to lose some ERCs. Under selective disclosure, however, the firm hides information about $D_1 < 0$, which gives it incentives to choose a more negative value of $D_1$, since it further artificially inflates the historical baseline emissions in period 1. Of course, the firm must balance the economic benefits of selective disclosure against the risk of punishment for greenwash, and may opt not to pursue the benefits of selectivity if the expected penalty is too high.

We summarize the foregoing analysis in the following proposition.

**Proposition 1.** *Growing firms are more likely to disclose selectively. The firm has incentives to engage in selective disclosure when it chooses $D_1 < 0$, which is more likely when $\delta B_0 > D_1 + S_1$. The incentive to disclose selectively is increasing in $\gamma$, and decreasing in $\beta$.*

### 3.4. Comparative statics of abatement incentives

In this section, we develop a series of propositions regarding the firm's incentives to pursue different types of emissions abatement, how they are affected by changes in the parameters of the model, and what they imply for participation in 1605b. We begin our comparative statics analysis by exploring how the possibility of ERCs (and the method of allocating them) changes a firm's incentives to invest in supply-side and demand-side emissions reductions. The following proposition follows immediately from the first order conditions.

**Proposition 2.** *The possibility of earning ERCs induces a firm to increase $S_1$, $S_2$, and $D_2$. If the firm chooses a historical baseline of period 0, or if $\beta - \gamma > 0$ then the firm increases its investment in $D_1$, but if the firm chooses a historical baseline of period 1 and $\beta - \gamma < 0$ then the firm decreases its investment in $D_1$.*

Proposition 2 shows that the chance to earn ERCs does indeed motivate a firm to increase its investments $S_1$, $S_2$, and $D_2$ in emissions reductions. Whether the firm invests more in period 1 demand-side reductions is unclear. The reason is that granting emissions based on historical reductions may give the firm incentives to inflate its initial level of emissions by choosing $D_1 < 0$.

To the best of our knowledge, there is no indication that Congress or the Department of Energy ever indicated that ERCs were more likely to be allocated based on verifiable abatement projects or on reductions against a historical baseline. Indeed,

Please cite this article as: E.-H. Kim, T.P. Lyon, Strategic environmental disclosure: Evidence from the DOE's voluntary greenhouse gas registry, J. Environ. Econ. Manage. (2011), doi:10.1016/j.jeem.2010.11.001

Exhibit 12 to Decl. of Lyon
309
**SER 1455**

ARTICLE IN PRESS

*E.-H. Kim, T.P. Lyon / Journal of Environmental Economics and Management ▮ (▮▮▮▮) ▮▮▮–▮▮▮*                    7

the great latitude granted to reporters under the 1605b program suggests substantial uncertainty regarding the ultimate nature of the allocation process. Given this uncertainty, it is important to understand whether we can confidently expect that the prospect of obtaining ERCs would lead firms to increase abatement, or whether instead it is possible that the perverse incentives created by historical ERC allocation might outweigh the positive incentives. This is the subject of Proposition 3.

**Proposition 3.** *If $L_t(D_t)$ is symmetric about 0, then the prospect of earning ERCs unambiguously increases the firm's incentives for abatement, regardless of uncertainty on the allocation rule. Hence, all other things equal, firms that participate in the 1605b program are expected to reduce their carbon emissions more than those that do not participate.*

**Proof.** Proposition 2 shows that ERCs induce increases in $S_1$, $S_2$, and $D_2$. We will show that symmetry of $L_t(D_t)$ about 0 is sufficient to ensure that $D_2 > |D_1|$, and hence total abatement is increased by ERCs. This inequality follows from the first-order conditions for $D_1$ and $D_2$. The first-order condition for $D_2$ is $\partial L_2/\partial D_2 = \rho P(1+\beta+\gamma)$. The greatest incentive for a negative value of $D_1$ occurs when the firm engages in selective disclosure and the baseline year is 1. Then the first-order condition for $D_1$ is $\partial L_1/\partial D_1 = -\rho P\gamma$. Obviously $-\rho P\gamma$ is strictly smaller in absolute value than $\rho P(1+\beta+\gamma)$. Hence, if $L_t(D_t)$ is symmetric about 0, then $D_2 > |D_1|$ regardless of the values of $\beta$ and $\gamma$, and the prospect of ERCs leads the firm to increase its abatement.  □

Thus, we have identified conditions under which the prospect of ERCs induces the firm to increase its abatement, even when there is a chance that the ERCs will be allocated based upon historical reductions.[15] This implies that firms that participate in the 1605b program ought to have lower emissions, *ceteris paribus*.[16]

We turn now to identifying some empirical implications of the model for firms' incentives for participation in the 1605b program.

**Proposition 4.** *Firms with lower marginal costs of abatement have greater incentive to participate in the 1605b program.*

**Proof.** Marginal costs of abatement are reflected in $\partial K_t/\partial S_t$ and $\partial L_t/\partial D_t$. Any parameter change that lowers $\partial K_t/\partial S_t$ or $\partial L_t/\partial D_t$, but leaves the rest of the marginal conditions unchanged, will increase the benefits obtained by the firm from joining the 1605b program and hence increase participation.  □

There are a number of firm characteristics that would be expected to lower abatement costs, which we discuss in more detail in Section 5. Next, we turn to a pair of propositions concerning the impact of political pressure on disclosure behavior.

**Proposition 5.** *A firm has greater incentive to participate in the 1605b program when it faces a greater threat of state regulation.*

**Proof.** The first-order condition with respect to $S_1$ shows that investment in $S_1$ increases as $\sigma'(S_1)$ increases. In addition, the first-order condition with respect to $S_2$ shows that investment in $S_2$ increases as $\sigma(S_1)$ increases. When the firm has greater emissions reductions to report, it has a greater incentive to participate in the 1605b program.  □

The strength of regulatory threats is difficult to observe directly, but can be detected with a number of proxies. For example, states whose Congressional delegations are rated more favorably by the League of Conservation Voters are more likely to pass new environmental legislation. Likewise, states that allocate significant effort to regulatory enforcement are more likely to support new legislation. In addition, states that have not yet passed RPS legislation pose a regulatory threat that firms may be motivated to preempt.

Finally, we address the firm's incentive to avoid 1605b participation in order to avoid being attacked as a greenwasher.

**Proposition 6.** *A firm has less incentive to disclose selectively as $\eta A$ increases.*

**Proof.** Evident by comparing the firm's expected costs with full and selective disclosure. As $\eta A$ increases, selective disclosure becomes less profitable, and the firm has less incentive to engage in the practice of selective disclosure.  □

The expected penalty for greenwashing is difficult to measure directly, but is likely to increase when a firm faces a larger number of environmental group members in its service territory. We discuss the specific variables we use to test Propositions 4–6 in more detail in Section 5.

## 4. Econometric models

The propositions presented in Section 3 can be grouped into two categories, depending upon whether they address: (1) participation in the 1605(b) program, or (2) the impact of the 1605(b) program. Here, we describe the econometric strategies we use to study each category.

---

[15] Kennedy [11] finds that ERCs do not implement the first-best levels of investment in abatement, because they induce the firm to divert investment away from long-term R&D on abatement, and toward early-term reductions. Nevertheless, his model still implies that the prospect of ERCs increases abatement compared to no prospect of ERCs.

[16] From an econometric perspective, of course, all other things are not necessarily held equal. We therefore implement our test of this hypothesis by normalizing by initial emissions level; that is, we examine firms' emissions intensity rather than their total emissions.

Please cite this article as: E.-H. Kim, T.P. Lyon, Strategic environmental disclosure: Evidence from the DOE's voluntary greenhouse gas registry, J. Environ. Econ. Manage. (2011), doi:10.1016/j.jeem.2010.11.001

Exhibit 12 to Decl. of Lyon
310
**SER 1456**

8                          *E.-H. Kim, T.P. Lyon / Journal of Environmental Economics and Management ▪ (▪▪▪▪) ▪▪▪–▪▪▪*

### 4.1. Participation in the 1605(b) program

We begin by modeling the decision to participate in the 1605(b) program as a binary choice. Because most firms did not change their participation status over time,[17] we model participation cross-sectionally, asking whether a firm ever participated. We let firm $i$'s propensity to participate be denoted by

$$D_i^* = \mathbf{X}_i\beta + \varepsilon_i$$

where $\mathbf{X}_i$ is an array of independent variables, $\beta$ is a vector of coefficients, and $\varepsilon_i$ is a random variable distributed according to the normal distribution. Since participation is a discrete decision, we then denote it by

$$D_i = 1 \quad \text{if} \quad D_i^* > 0 \text{ and } D_i = 0 \text{ otherwise.}$$

Then the probability of participation is

$$\mathrm{P}_i = Prob(D_i = 1 | \mathbf{X}_i) = Prob(-\varepsilon_i < \mathbf{X}_i\beta) = F(\mathbf{X}_i\beta)$$

where $F$ is the cumulative distribution of $\varepsilon_i$. If $\varepsilon_i$ is normally distributed with $\varepsilon_i \sim N(0, \sigma^2)$, then

$$\mathrm{P}_i = \Phi(\mathbf{X}_i\beta)$$

where $\Phi$ is the standard normal cumulative distribution. Thus, to study the binary choice of participation or non-participation in the 1605(b) program, we use probit analysis. We expect that firms participate in the 1605(b) program if their net benefits with participation are greater than their net benefits without participation. Accordingly, in our probit models, we include various factors that affect the benefits and costs of 1605(b) participation as regressors. We describe these regressors in detail in Section 5.

In addition to understanding which firms choose to participate in the 1605b program, we would like to understand what drives them to report fully or selectively. In our setting, the most complete form of reporting is to disclose at both at the project and the entity levels. Clearly project-level reporting alone is not complete because firms may fail to report activities that increase emissions. Even entity-level reporting is not a complete account of the firm's abatement activities unless accompanied by project-level reporting, because companies whose demand is shrinking can achieve entity-wide emissions reductions without incurring any costs to reduce emissions. Thus, among the 1605(b) participants, the variable that represents the extent of disclosure is clearly ordered: no reporting, reporting at one level only, and reporting (informatively) at two levels. Therefore, ideally, we would model the extent of disclosure using ordered multinomial models.

As we discuss further below, the challenge is that our cross-sectional sample is extremely skewed: 53 firms do not participate at all, 42 firms participate at one level, and only 3 firms report informatively at two levels. We tested the proportional odds assumption, implicit in ordered probit models, that the relationship between each pair of outcome groups is the same, and found it to be violated. Specifically, the $p$-values from the likelihood-ratio tests of the equality of coefficients across response categories range from 0.01 to 0.005 in alternative model specifications. Thus, in our context, it is impossible to make use of the ordered nature of the extent of disclosure in the 1605(b) program; the vast majority of firms either does not disclose at all, or disclose at one level only, so we focus on the participation decision.

### 4.2. Impact of the 1605(b) program

In addition to understanding motives for participation, we are interested in whether participation in the 1605(b) program led firms to improve their environmental performance over time. We measure environmental performance improvement as the change in $CO_2$ emissions intensity ($CO_2$ emissions per megawatt-hour of net generation), a measure that is not directly affected by firm size.

A difficulty in estimating the impact of participation arises because firms self-select into the program, so the factors that drive firms to participate in the 1605(b) program may be correlated with changes in greenhouse gas emissions intensity. Since there are no proper instrumental variables that allow us to estimate the impact of the 1605(b) program using the standard two-step procedure, we turn to propensity score matching, an increasingly popular method for evaluating treatment effects related to environmental issues [6,8,9]. The basic concept behind propensity score matching is that firms are paired based on estimates of their propensity to participate, and the fact that one receives the treatment while the other does not. Since our sample consists of multiple covariates, including continuous variables that make it difficult to match on exact covariate values, we match on the probability of receiving the treatment conditional on covariates [20]. The identifying assumption of the propensity score matching technique is that selection into treatment is associated only with observable characteristics, which implies

$$Y_1, Y_0 \perp D | P(\mathbf{X})$$

where $Y_1$ and $Y_0$ indicate the outcome with and without treatment $D$, respectively. The array $\mathbf{X}$ represents covariates that affect the likelihood of treatment, i.e., participation in the 1605(b) program. The conditional independence assumption allows

---

[17] Only 25 firms in our sample show variation in participation status during 1995–2003, and 22 of these changes occurred in 2003.

Exhibit 12 to Decl. of Lyon
311
**SER 1457**

ARTICLE IN PRESS

treatment to be considered as a randomized experiment, so we have

$$E[Y_0|D=1, \ P(\mathbf{X})] = E[Y_0|D=0, P(\mathbf{X})]$$

The average effect of treatment on the treated can be calculated as follows:

$$E[Y_1 - Y_0|D=1] = E[Y_1|D=1, P(\mathbf{X})] - E[Y_0|D=0, P(\mathbf{X})]$$

Typically, the conditional probability of treatment, $P(\mathbf{X})$, is estimated using standard logit or probit models. Following the estimation strategy for the participation probability, we use probit models. Assuming $\mathbf{X}$ includes all the relevant variables that affect the decision to participate in the program; the average treatment effect on the treated is unbiased. In other words, unobservable variables play no role in the treatment assignment and outcome determination. In the case of 1605b, we might speculate that firms would be more likely to participate if their management held stronger personal convictions about preventing climate change, or if they had particularly good personal relationships with the DOE. Since these same factors also make it more likely that the firm would actually reduce its carbon intensity over time, we are biased towards finding a significant impact of the 1605b program using propensity score matching.

The evaluation results can be sensitive to the chosen matching method and the set of regressors used to estimate propensity scores [10]. Thus, we use a variety of covariates and propensity score matching algorithms; we describe these in more detail below. We impose the common support condition, so that matching is performed over the propensity scores region that is common to the treated and untreated groups. Upon calculating propensity scores, we conduct the balance test to ensure that the means of the propensity scores and the means of the covariates are not significantly different in the treated and the corresponding untreated groups.

## 5. Data

Our sample consists of 98 investor-owned electric utilities (IOUs) over the period 1995–2003. The total number of observations in the sample is 837, and thus a firm is in the sample for about 8 years. The 1605(b) participation data were collected from the DOE's Voluntary Registry website.[18] Financial, operational and environmental performance-related data for IOUs were obtained from Platts, a company specializing in energy industry data. State-level variables were compiled from appropriate websites, including the Environmental Protection Agency (EPA), the League of Conservation Voters, and the Database of State Incentives for Renewable Energy. Table 1 provides a list of explanatory variables used in this paper and their definitions.

Greenhouse gas emissions are calculated based on fuel consumption. We take this approach rather than using direct observations from the continuous emissions monitoring system (CEMS) for several reasons. First, the Natural Resources Defense Council (NRDC) reported that turbulent flow in the emissions stack could bias the CEMS estimates upward by 10–30%.[19] Second, NRDC also found cases where the CEMS data deviate from the EIA and FERC estimates when the latter two agreed for the most part. In these cases of discrepancies, NRDC used the FERC-based estimates. Third, we were able to obtain a more complete dataset using the fuel consumption data than would have been possible using the CEMS data alone. In cases where fuel consumption data were not available, we supplemented our fuel consumption-based estimates with adjusted CEMS estimates to increase the number of observations.[20] We also conducted estimations using $CO_2$ emissions intensity as our measure of greenhouse gas emissions, which we compute by taking $CO_2$ emissions divided by net generation in megawatt-hours (MWh).The rest of the variables in Table 1 proxy for various economic and political incentives that could affect participation in the 1605(b) program.

To test Proposition 4, we include several variables designed to capture the presence of low-cost opportunities for emissions reductions. These include size (as captured by electric operating revenues); heatrate (the ratio of heat input to electricity generated), which is a direct measure of combustion inefficiency; capacity factor (ratio of energy generated to capacity), a measure of how well capacity is used; and fuel switch saving (a measure of how much money a firm could save by switching from oil to natural gas). In addition, we include growth in generation, since generation growth allows firms to add new generating units with the latest and cleanest technologies. We also include a measure of the fraction of a firm's power that is derived from carbon-free hydroelectric and nuclear sources.

Proposition 5 addresses political pressures affecting 1605b participation, and we include several variables to capture these effects. These include League of Conservation Voters ratings for the US House and Senate delegations in each state, as a measure of overall environmental preferences in the state. We also include a measure of the stringency of Renewable Portfolio Standards (RPS) in each state. As shown in Proposition 5, early reductions might help preempt the introduction of RPS in states without RPS. In addition, we include a variable that captures state-level enforcement and inspection activities associated with environmental issues in general.

Finally, Proposition 6 predicts that firms will be less likely to participate in 1605(b) when they face greater scrutiny from environmental activists opposed to greenwash. We proxy for activist pressure using the density of subscribers to *Sierra*

---

[18] http://www.eia.doe.gov/oiaf/1605/frntvrgg.html.

[19] www.nrdc.org/air/energy/rbr/append.asp.

[20] Although we ultimately chose not to use the CEMS data as our primary data source, we did run our estimations using this data as a robustness check. Results were qualitatively similar to what we obtained from the fuel consumption data.

Please cite this article as: E.-H. Kim, T.P. Lyon, Strategic environmental disclosure: Evidence from the DOE's voluntary greenhouse gas registry, J. Environ. Econ. Manage. (2011), doi:10.1016/j.jeem.2010.11.001

Exhibit 12 to Decl. of Lyon
312
**SER 1458**

ARTICLE IN PRESS

10 *E.-H. Kim, T.P. Lyon / Journal of Environmental Economics and Management ▮ (▮▮▮▮) ▮▮▮–▮▮▮*

**Table 1**
Explanatory variables and their definitions.

| Variables | Definition (unit of measurement) |
| --- | --- |
| $CO_2$ emissions | Total carbon dioxide ($CO_2$) emissions ($10^9$ lbs) |
| | This is calculated based on fuel consumption data. First, total carbon input is calculated using carbon coefficients 25.97 for Coal, 14.47 for Natural Gas, 17.51 for Refinery Gas, 19.95 for Distillate fuel (Oil-L), 21.49 for Residual fuel (Oil-H) and 27.85 for Petroleum Coke (The units for carbon coefficients are Million Metric Tons per Quadrillion Btu).[a] |
| | These estimates are then converted to $CO_2$ emissions by multiplying by 3.7, the molecular weight of $CO_2$ relative to carbon. When carbon input data is missing, but Continuous Emissions Monitoring System (CEMS) data are available, CEMS data are used instead[b] |
| $CO_2$ emissions intensity | $CO_2$ emissions per net generation (lbs/MWh) |
| | Net generation (MWh) is defined as the amount of gross generation less the electrical energy consumed at generating stations |
| Sierra subscription per thousand population | Number of subscriptions to Sierra magazine per thousand population at the state level in 2000 |
| Electric operating revenue | Revenue from sales of electricity ($10^9$$). |
| Heatrate | The ratio of heat input to net energy generated (Btu/kWh) |
| Capacity factor | The ratio of energy generated to the maximum that could have been generated. It is calculated by dividing net generation (MWh) by (nameplate capacity (MW) × 8760 (h)) |
| Fraction of hydro and nuclear | The ratio of energy generated from hydro and nuclear units to total energy generated. |
| LCV scores | The League of Conservation Voters (LCV)'s scorecards for US Senate and House |
| Renewable Portfolio Standards | State Renewable Portfolio Standard index. It is calculated by the difference between the goal year and the enacted or effective year, whichever comes first[c] |
| Growth in generation | Percentage growth in firm-level net generation over the longest time period in the sample |
| Fuel switch saving | Low cost and low carbon fuel switching opportunity ($10^6$$) |
| | Estimated for the month with the highest generation for the year, this is calculated by ordering generators from the lowest to highest cost, and multiplying the amount of oil-based generation times the difference in fuel costs between oil and natural gas if oil-based and natural gas-based generation are adjacent in the dispatch order and the cost of natural gas is lower |
| Enforcement | State-level enforcement and inspection activities obtained from the EPA ECHO database |

[a] Documentation for Emissions of Greenhouse Gases in the US 2003, [25, p. 189].
[b] An adjustment factor is calculated to convert Platts' $CO_2$ emissions data to fuel-based $CO_2$ estimates. The fuel-based estimates are regressed on Platts' reported emissions data and the inverse of the coefficient, 0.7527, is used as an adjustment factor. This aligns well with NRDC's report that continuous emissions monitoring data could be biased upward by 10–30% relative to fuel-based estimates. www.nrdc.org/air/energy/rbr/append.asp.
[c] State Renewable Portfolio Standards data are obtained from www.dsireusa.org.

magazine in a given state. This variable represents the strength of environmental groups in the state. A negative coefficient indicates that environmental activists viewed 1605(b) participation as a form of greenwash, and that firms responded to this attitude. We also check the significance of interaction terms between Sierra subscriptions and $CO_2$ emissions, and between Sierra subscriptions and $CO_2$ emissions intensity, since NGOs may target their pressure toward the dirtiest firms [13].

Table 2 provides summary statistics for the explanatory variables used in our analysis, both in the aggregate and by participation category for 1995 and 2003.

## 6. Results

We begin with summary measures that provide a broad overview of participation in the program. We then turn to estimates of the factors driving participation in the 1605(b) program. Finally, we discuss the impact of the 1605(b) program.

### 6.1. Overview

In the aggregate, there is a large gap between actual and reported emissions reductions over the period 1996–2003, as can be seen in Fig. 1. The reported reductions data are collected from the DOE's Voluntary Registry website. The actual entity-level reductions are calculated against the base year 1995 using fuel input and emissions data obtained from Platts, as shown in Table 1. Participants in the 1605(b) program reported significant reductions in tons of greenhouse gases emitted while increasing their emissions. Upon comparing reported and actual reductions at the firm level, we find that for 68% of firms, the 1605(b) program reported positive reductions while the firm's actual emissions rose. Ironically, firms that did *not* participate in the program actually reduced their emissions, as shown in Fig. 2.

The sharp disconnect between actual emissions and reported reductions suggests that 1605(b) participants took advantage of the program's loose reporting requirements, selectively reporting on successful projects while remaining silent about any actions that increased emissions. Indeed, environmental groups have decried the 1605(b) program because it

Please cite this article as: E.-H. Kim, T.P. Lyon, Strategic environmental disclosure: Evidence from the DOE's voluntary greenhouse gas registry, J. Environ. Econ. Manage. (2011), doi:10.1016/j.jeem.2010.11.001

Exhibit 12 to Decl. of Lyon
313
**SER 1459**

ARTICLE IN PRESS

*E.-H. Kim, T.P. Lyon / Journal of Environmental Economics and Management ▮ (▮▮▮▮) ▮▮▮–▮▮▮*     11

**Table 2**
Descriptive statistics.

| Variables | Entire sample ($N=98$) | | 1605(b) participants ($N=45$) | | 1605(b) non-participants ($N=53$) | |
|---|---|---|---|---|---|---|
| | Mean | Std. dev. | Mean | Std. dev. | Mean | Std. dev. |
| *Year 2003* | | | | | | |
| $CO_2$ emissions | 16.88471 | 18.07051 | 26.38348 | 20.48595 | 8.116603 | 9.218318 |
| $CO_2$ emissions intensity | 947.2028 | 480.0793 | 1016.555 | 456.2868 | 883.1851 | 498.2953 |
| Sierra subscription per thousand population | 0.780096 | 0.531047 | 0.668315 | 0.276731 | 0.875005 | 0.664278 |
| Electric operating revenue | 1.27218 | 1.617865 | 2.132534 | 2.013254 | 0.541691 | 0.518223 |
| Heatrate | 8490.768 | 3770.109 | 9174.969 | 3011.638 | 7909.842 | 4253.28 |
| Capacity factor | 0.485825 | 0.178964 | 0.499636 | 0.158134 | 0.4741 | 0.195654 |
| Fraction of hydro and nuke | 0.245194 | 0.391585 | 0.238294 | 0.363687 | 0.251165 | 0.417667 |
| LCV score: senate | 38.23469 | 33.09991 | 36.48667 | 30.23288 | 39.73585 | 35.57125 |
| LCV score: house | 39.29592 | 20.38911 | 40.22222 | 16.42599 | 38.50943 | 23.36222 |
| Renewable Portfolio Standard | 0.175706 | 0.391249 | 0.174713 | 0.427253 | 0.176549 | 0.362053 |
| Growth in net generation | 0.148871 | 0.477374 | 0.141705 | 0.292654 | 0.154946 | 0.594122 |
| Fuel switch saving | 0.020704 | 0.122529 | 0.015363 | 0.028031 | 0.02524 | 0.165212 |
| Enforcement | 0.078058 | 0.072319 | 0.096209 | 0.083344 | 0.062647 | 0.057891 |
| *Year 1995* | | | | | | |
| $CO_2$ emissions | 15.84954 | 15.69642 | 22.83077 | 17.87731 | 8.674385 | 8.580692 |
| $CO_2$ emissions intensity | 954.2005 | 449.3003 | 959.2578 | 450.0819 | 949.0026 | 454.8194 |
| Sierra subscription per thousand population | 0.780096 | 0.531047 | 0.668315 | 0.276731 | 0.875005 | 0.664278 |
| Electric operating revenue | 1.00954 | 1.363063 | 1.709461 | 1.724707 | 0.415268 | 0.406077 |
| Heatrate | 8741.166 | 3593.887 | 9293.67 | 2890.789 | 8272.059 | 4066.185 |
| Capacity factor | 0.484159 | 0.165836 | 0.476524 | 0.13144 | 0.490642 | 0.191283 |
| Fraction of hydro and nuke | 0.211247 | 0.362694 | 0.245505 | 0.35564 | 0.17699 | 0.370409 |
| LCV score: senate | 41.81633 | 28.88775 | 43.33333 | 28.6404 | 40.5283 | 29.30713 |
| LCV score: house | 40.60204 | 18.19977 | 40.93333 | 13.28601 | 40.32075 | 21.64111 |
| Renewable Portfolio Standard[a] | 0 | 0 | 0 | 0 | 0 | 0 |
| Growth in net generation | 0.148871 | 0.477374 | 0.141705 | 0.292654 | 0.154946 | 0.594122 |
| Fuel switch saving | 0.010181 | 0.029844 | 0.012554 | 0.026455 | 0.007957 | 0.032829 |
| Enforcement | 0.078058 | 0.072319 | 0.096209 | 0.083344 | 0.062647 | 0.057891 |

[a] State adoption of Renewable Portfolio Standards did not begin until 1998.



**Fig. 1.** 1605(b) Reported reductions (IOUs) vs. actual reductions (IOUs).

"encourages firms to make filings not on their entire corporate emissions profile, but on cherry-picked emission reduction projects."[21]

---

[21] The quotes are taken from pages 3–4 of the comments on the 1605(b) program filed by a group of seven environmental groups on June 5, 2002, available on the web at http://www.pi.energy.gov/enhancingGHGregistry/comments/documents/doniger.doc. This complaint is consistent with Lyon and Maxwell's ([13], p. 8) definition of greenwash as "selective disclosure of positive information about a company's environmental or social performance, without full disclosure of negative information on these dimensions, so as to create an overly positive corporate image."

Exhibit 12 to Decl. of Lyon
314
**SER 1460**

ARTICLE IN PRESS

12          *E.-H. Kim, T.P. Lyon / Journal of Environmental Economics and Management ▮ (▮▮▮▮) ▮▮▮–▮▮▮*



Fig. 2. Actual reductions: IOU participants vs. IOU non-participants.

**Table 3**
Number of firms reporting at the entity and project levels.[a]

| Reporting mode | Year | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
| One category only | | | | | | | | | |
| Project only[b] | 58 | 56 | 57 | 57 | 58 | 60 | 59 | 60 | 82 |
| Entity only | 6 | 6 | 5 | 5 | 5 | 5 | 5 | 4 | 4 |
| Sub-total | 64 | 62 | 62 | 62 | 63 | 65 | 64 | 64 | 86 |
| Two categories | | | | | | | | | |
| Entity ≠ Project[c] | 8 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |

[a] Includes 1605b participants categorized as Electric Providers, which includes non-IOUs such as municipal, city, and federal utilities [26].
[b] Number of firms reporting either at the project level only, or at both project and entity levels but with entity-level reductions simply the sum of project-level reductions.
[c] Number of firms whose reported entity-level reductions are not equal to the sum of project-level reductions.

We examine the extent of selective disclosure in Table 3, which shows the number of firms opting for particular disclosure formats over time. We distinguish three groups of firms. First are firms that do not provide any information. Second are those which provide information either at the project level or at the entity level. (Those firms that report at both the project and the entity levels, but whose entity-level report is simply the sum of their project-level reductions are included in this category because entity-level reports do not provide any additional information.) Third are firms that report at both the project and the entity level, and whose entity-level report is not simply the sum of its projects.

It is evident from Table 3 that the vast bulk of companies that participate in the 1605b program opt to report only at the project level. Furthermore, the percentage that does so rose from 82% in 1995 to 87% in 2003. Selective disclosure is clearly the dominant mode of participating in the 1605(b) program.

Fig. 3 shows changes in carbon intensity over time across different subgroups of firms: those that never participated, those that participated at least once, and those that participated at both entity and project levels with entity-level reductions not equal to the sum of project-level reductions. 1605(b) participants and non-participants are similar in terms of their environmental performance, as measured by $CO_2$ emissions intensity. While 1605(b) participants that reported at both the entity and project levels performed a little better than the other two groups, their performance worsened over time.

## 6.2. Participation

We analyze factors that motivate firms to participate in the 1605(b) program using probit models. There is relatively little within-group variation in 1605b participation. Thus, in our empirical analysis, we make use of cross-sectional variations in the participation status among 98 investor-owned electric utilities. Since the number of participants is largest in 2003, we use data for 2003.[22] We use contemporaneous values of independent variables in order to capture changes that motivated firms

---

[22] If 2003 data is missing for an observation, we use the last year in the sample.

Please cite this article as: E.-H. Kim, T.P. Lyon, Strategic environmental disclosure: Evidence from the DOE's voluntary greenhouse gas registry, J. Environ. Econ. Manage. (2011), doi:10.1016/j.jeem.2010.11.001

Exhibit 12 to Decl. of Lyon
315
**SER 1461**

ARTICLE IN PRESS

E.-H. Kim, T.P. Lyon / Journal of Environmental Economics and Management ▮ (▮▮▮▮) ▮▮▮–▮▮▮    13



Fig. 3. $CO_2$ emissions intensity over time.

**Table 4**
Participation in the 1605(b) program: marginal effects.

| Variables | Probit marginal effects (dependent variable: binary dummy that indicates participation) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $CO_2$ emissions | 0.00437 (0.00755) | 0.00286 (0.00762) | | | 0.00453 (0.00749) | 0.00311 (0.00747) | | |
| $CO_2$ emissions intensity | | | 0.000161 (0.000108) | 8.70E−05 (0.000108) | | | 0.000113 (9.45e−05) | 3.76E−05 (9.40e−05) |
| Sierra subscription per thousand population | −0.525[*] (0.292) | | −0.522[*] (0.286) | | −0.530[*] (0.293) | | −0.517[*] (0.289) | |
| Electric operating revenue | 0.397*** (0.130) | 0.391*** (0.127) | 0.471*** (0.111) | 0.435*** (0.103) | 0.416*** (0.124) | 0.419*** (0.121) | 0.486*** (0.109) | 0.456*** (0.100) |
| Heatrate | 9.92E−06 (4.25e−05) | 3.85E−05 (4.42e−05) | −4.76E−06 (4.52e−05) | 2.92E−05 (4.63e−05) | −4.80E−06 (1.99e−05) | 1.21E−05 (2.19e−05) | −1.61E−05 (2.27e−05) | 9.82E−06 (2.47e−05) |
| Capacity factor | −0.183 (0.429) | −0.279 (0.450) | 0.0359 (0.449) | −0.122 (0.477) | −0.224 (0.421) | −0.345 (0.441) | −0.101 (0.426) | −0.277 (0.453) |
| Fraction of hydro and nuke | 0.152 (0.423) | 0.256 (0.414) | 0.175 (0.448) | 0.247 (0.420) | | | | |
| LCV score: senate | −0.00128 (0.00364) | −0.00353 (0.00361) | 0.000288 (0.00380) | −0.0027 (0.00377) | −0.00072 (0.00355) | −0.00272 (0.00353) | 0.000341 (0.00371) | −0.00256 (0.00367) |
| LCV score: house | 0.00754 (0.00596) | 0.00504 (0.00575) | 0.0044 (0.00627) | 0.00333 (0.00617) | 0.00695 (0.00593) | 0.00434 (0.00571) | 0.00451 (0.00625) | 0.00371 (0.00614) |
| Renewable Portfolio Standard | −0.464[**] (0.236) | −0.464[*] (0.244) | −0.515[**] (0.240) | −0.477[**] (0.243) | −0.475[**] (0.234) | −0.462[*] (0.241) | −0.502[**] (0.237) | −0.461[*] (0.239) |
| Growth in net generation | −0.0876 (0.121) | −0.0799 (0.114) | −0.114 (0.125) | −0.0903 (0.115) | −0.109 (0.113) | −0.103 (0.109) | −0.129 (0.119) | −0.105 (0.111) |
| Fuel switch saving | −0.537 (2.745) | −0.513 (2.137) | −0.6 (2.533) | −0.552 (2.088) | −0.7 (4.408) | −0.666 (3.188) | −0.668 (3.059) | −0.61 (2.451) |
| Enforcement | | 3.140[***] (1.148) | | 3.080[***] (1.180) | | 2.904[***] (1.112) | | 2.839[**] (1.134) |

Marginal effects are calculated at the means of the independent variables. Standard errors in parenthesis.
[***] $p < 0.01$.
[**] $p < 0.05$.
[*] $p < 0.1$.

to join even after the initial year of the program. The results are shown in Table 4 and reported in terms of the associated marginal effects (calculated at the means of the independent variables).

We consistently find that dirtier firms, as represented by higher $CO_2$ emissions or emissions intensity, are more likely to participate, although the effect is not statistically significant. Proposition 4 garners moderate support, as shown by the fact

Please cite this article as: E.-H. Kim, T.P. Lyon, Strategic environmental disclosure: Evidence from the DOE's voluntary greenhouse gas registry, J. Environ. Econ. Manage. (2011), doi:10.1016/j.jeem.2010.11.001

Exhibit 12 to Decl. of Lyon
316
**SER 1462**

ARTICLE IN PRESS

14 *E.-H. Kim, T.P. Lyon / Journal of Environmental Economics and Management ▮ (▮▮▮▮) ▮▮▮–▮▮▮*

that opportunities for low-cost abatement played a role in participation decisions.[23] Large firms, as measured by electric operating revenue, were significantly more likely to participate, which may reflect the role of scale economies in making participation cost-effective. The marginal effect, i.e., the slope of the probability function relating independent variables to probability, is about 0.4. This means that the change in the probability of participation for an incremental change in revenue at the mean is 0.4. The effects of other factors such as heatrates, capacity factors, fraction of hydro and nuclear, and opportunities for savings from fuel switching are not statistically significant.

Proposition 5, which predicts that firms facing greater political pressure are more likely to participate, also receives support. Enforcement has a strong positive effect on 1605(b) participation; at the mean, the change in the probability of participation for an incremental change in enforcement is roughly 3.[24] We find that firms are less likely to participate in states with an RPS, and that participation is less likely the stronger is the RPS. This is consistent with the notion that firms may participate in 1605(b) in an attempt to preempt a state RPS. Once the RPS is passed, however, preemption is no longer possible, and participation in 1605(b) flags. League of Conservation Voters scores, however, do not have significant effects on participation.

Proposition 6 receives support, suggesting that environmental activists associated with the Sierra Club perceived 1605(b) participation as greenwash and attempted to penalize firms that participated. The marginal effect is around $-0.5$, meaning that an incremental increase in Sierra club membership per thousand population at the mean decreases the probability of participation by 0.5. This result helps to explain why non-participants elected not to join the program. Staying out of the program avoids the risk of being labeled a greenwasher.

Overall, we find strong evidence that large firms were more likely to participate in the DOE's Voluntary Greenhouse Gas Registry; this result is consistent with the notion that firms with low-cost abatement opportunities were more likely to participate. Also, participation was more likely in states with higher enforcement activities and states that had not passed RPS legislation, consistent with the notion that political pressure played a role in influencing participation. Finally, there is strong evidence that participation was less likely in states with strong Sierra Club membership, suggesting that environmental groups considered 1605(b) participation to be greenwash rather than meaningful action.

### 6.3. The impact of the 1605(b) program

Did 1605(b) participants improve their environmental performance over time compared to non-participants? To answer this question, we make use of the propensity score matching method using changes in $CO_2$ emissions intensity from 1995 to 2003 as the outcome variable.[25] We calculate changes in $CO_2$ emissions intensity as follows:

$$\text{Outcome variable} = \frac{(CO_2 \text{ emissions intensity in 1995} - CO_2 \text{ emissions intensity in 2003})}{CO_2 \text{ emissions intensity in 1995}}.$$

Since larger $CO_2$ emissions intensity indicates poorer environmental performance, changes in $CO_2$ emissions intensity calculated as above are positive if environmental performance improved over time, that is, if $CO_2$ emissions intensity in 2003 is lower than $CO_2$ emissions intensity in 1995. Negative values indicate that environmental performance deteriorated over time. Independent variables used to estimate propensity scores are in terms of their 1995 values, in order to avoid endogeneity concerns.[26]

The estimation results for the effect of treatment on the treated are shown in Table 5. We do not find substantial support for Proposition 3's prediction that 1605b participants improve their performance over time. Although the estimated treatment effects are positive in most of our estimations, often ranging from 10% to 35% over the 8 year period, they are not statistically significant. Thus, we conclude that the 1605(b) program did not have a significant impact on $CO_2$ emissions intensity. The sum of the numbers of treatment and controls is less than the sample size because we use the common support condition. Those treated observations whose predicted probability is larger than the largest predicted probability for non-participation are dropped from matching.

We use alternative matching algorithms to estimate treatment effects on the treated. Since our cross-sectional sample size is not large, Kernel matching is helpful in keeping the size of matched observations as large as possible. Kernel matching, however, can exacerbate potential problems of inexact matching because all non-treated observations are used, although weights are used to take into account closeness to the treated observations. Thus, we use other matching algorithms such as caliper, stratification, and nearest neighbor matching to test the robustness of the insignificance of the treatment effect on the treated. For every treated observation, the nearest neighbor matching chooses the untreated observation whose propensity score is closest as a control. Stratification/interval matching divides the range of variation in propensity scores into equal intervals between treated and untreated groups such that within each interval the treated and untreated observations have, on average, the same propensity score. Treatment effect on the treated is then calculated as the weighted average, with weights representing the distribution of the treated units across the blocks. Caliper/radius matching uses all the untreated

---

[23] Recall that Propositions 1–3 generate insights about the program but are not directly testable.
[24] The marginal effect of an independent variable is the derivative (that is, the slope) of the predicted probability. Thus, the marginal effect can be greater than one.
[25] When the observation has no data for 1995 or 2003, we use the first or the last year available in the sample.
[26] If 1995 data is missing for an observation, we use the first year in the sample.

Please cite this article as: E.-H. Kim, T.P. Lyon, Strategic environmental disclosure: Evidence from the DOE's voluntary greenhouse gas registry, J. Environ. Econ. Manage. (2011), doi:10.1016/j.jeem.2010.11.001

Exhibit 12 to Decl. of Lyon
317
SER 1463

ARTICLE IN PRESS

E.-H. Kim, T.P. Lyon / Journal of Environmental Economics and Management ▮ (▮▮▮▮) ▮▮▮–▮▮▮    15

**Table 5**
Impact of the 1605(b) program.

| Matching | Average treatment effect on the treated (participation in 1605(b) program) | | | |
|---|---|---|---|---|
| | Kernel | Caliper/radius (0.10) | Stratification/interval | Nearest neighbor |
| (1)[a] | 0.121 (0.180) | 0.152 (0.197) | 0.193 (0.220/0.246) | −0.137 (0.286/0.256) |
| Number of treatment | 39 | 26 | 24 | 39 |
| Number of controls | 23 | 28 | 38 | 14 |
| (2)[a] | 0.311 (0.355) | 0.365 (0.231) | 0.201 (0.228) | −0.046 (0.516/0.510) |
| Number of treatment | 39 | 24 | 20 | 39 |
| Number of controls | 23 | 28 | 42 | 14 |
| (3)[a] | 0.158 (0.215) | 0.333[b] (0.236) | 0.322 (0.294) | 0.348 (0.538/0.290) |
| Number of treatment | 39 | 36 | 24 | 39 |
| Number of controls | 27 | 29 | 42 | 12 |
| (4)[a] | 0.182 (0.341) | 0.381[b] (0.214) | 0.256 (0.227) | 0.059 (0.285/0.452) |
| Number of treatment | 39 | 31 | 25 | 39 |
| Number of controls | 24 | 28 | 38 | 15 |
| (5)[a] | 0.127 (0.172) | 0.219 (0.202) | 0.174 (0.211/0.228) | −0.042 (0.466/0.252) |
| Number of treatment | 39 | 26 | 24 | 39 |
| Number of controls | 24 | 27 | 39 | 13 |
| (6)[a] | 0.186 (0.321) | 0.192[d] (0.163) | 0.225 (0.209/0.227) | 0.009 (0.140/0.425) |
| Number of treatment | 39 | 28 | 23 | 39 |
| Number of controls | 21 | 26 | 37 | 14 |
| (7)[a] | 0.184 (0.187) | 0.234[e] (0.205) | 0.332 (0.303) | 0.128 (0.443/0.212) |
| Number of treatment | 39 | 39 | 23 | 39 |
| Number of controls | 27 | 26 | 39 | 15 |
| (8)[a] | 0.300 (0.388) | 0.266[c] (0.209) | 0.322 (0.247/0.273) | 0.247 (0.493/0.430) |
| Number of treatment | 39 | 27 | 26 | 39 |
| Number of controls | 24 | 27 | 37 | 16 |

Standard errors in parenthesis. When there are two standard errors, the second one is a bootstrapped standard error. When there is only one, it is bootstrapped (the raw standard errors are not available) except for caliper/radius matching, where it is a raw standard error.

[a] (1)–(8) refer to models displayed in the probit table (Table 5).
[b] Caliper: 0.15.
[c] Caliper: 0.2.
[d] Caliper: 0.25.
[e] Caliper: 0.35.

observations within the pre-assigned caliper as controls. Throughout we allow matching with replacement so that the same untreated observations could be used more than once as control. Regardless of the matching algorithm used, the treatment effect on the treated is not significant. We do not find any evidence that participants in the 1605(b) program improved their environmental performance over time significantly more than non-participants.

The results of treatment effects can also be sensitive to different specifications used to estimate propensity scores. Thus, we use alternative specifications to calculate propensity scores ((1)–(8)). As shown in Table 5, our finding of insignificance of the treatment effect is robust to different model specifications. Thus, we conclude that the 1605(b) program did not have any significant effect on the $CO_2$ emissions intensity of program participants.

## 7. Conclusions

In this paper, we have provided a theoretical and empirical exploration of the use of strategic environmental disclosures of greenhouse gas emissions. We developed a formal model that emphasizes firms' pursuit of early reduction credits (ERCs), but also takes into account a variety of political pressures. We tested the model's predictions using a unique government data registry to explore the causes and consequences of electric utilities' participation in the Department of Energy's Voluntary Greenhouse Gas Registry. With this data, we are able to provide an unusually sharp comparison of firms' environmental disclosures with their actual environmental performance, because utilities are regulated and must file detailed fuel-use data with the Federal Energy Regulatory Commission.

We show that in the aggregate, participants in the Voluntary Registry increased emissions over time but reported reductions, while non-participants decreased emissions over time. Our results clearly demonstrate that participants made selective disclosures of positive environmental results, while withholding information on negative results. Participants tended to be large firms, as measured by revenues. Political factors played important but subtle roles in firms' disclosure behavior. The threat that a state would impose an RPS in the future increased participation, as did stronger state enforcement of environmental laws. In contrast, a greater presence of environmental group members in a given state significantly decreased the likelihood of participation. Nevertheless, although political factors played a significant role, the public comments of the utility trade association strongly suggest that the primary driver for participation in the program was the possibility of obtaining early reduction credits.

Please cite this article as: E.-H. Kim, T.P. Lyon, Strategic environmental disclosure: Evidence from the DOE's voluntary greenhouse gas registry, J. Environ. Econ. Manage. (2011), doi:10.1016/j.jeem.2010.11.001

Exhibit 12 to Decl. of Lyon
318
**SER 1464**

ARTICLE IN PRESS

16                *E.-H. Kim, T.P. Lyon / Journal of Environmental Economics and Management ▮ (▮▮▮▮) ▮▮▮–▮▮▮*

Our results indicate that the 1605b program's reporting flexibility undermined the credibility and effectiveness of the program. This aligns with previous theoretical findings that disclosure programs can be made more informative by limiting reporting discretion [7]. The Carbon Disclosure Project, for example, asks firms a highly structured and detailed set of questions, rather than allowing them to report as they so desire.[27] Fortunately, it appears the Department of Energy (DOE) has learned some valuable lessons from the 1605b program. In its 2006 revisions to the program, DOE required entity-wide registration of reductions by firms that hoped to earn ERCs. Thus, utilities lost their bid to retain the extraordinary flexibility of the original reporting system. The resolution to this heated debate – entity-wide reporting for registering reductions – makes it much more difficult for 1605(b) participants to obtain early reduction credits while increasing their overall GHG emissions. Future reporting programs would do well to take the 1605b experience to heart.

**References**

[1] S.A. Al-Tuwaijri, T.E. Christensen, K.E. Hughes, The relations among environmental disclosure, environmental performance, and economic performance: a simultaneous equations approach, Accounting, Organizations and Society 29 (2004) 447–471.
[2] L.S. Bennear, S.M. Olmstead, The impacts of the "Right to Know": information disclosure and the violation of drinking water standards, Journal of Environmental Economics and Management 56 (2008) 117–130.
[3] P.M. Clarkson, Y. Li, G.D. Richardson, F.P. Vasvari, Revisiting the relation between environmental performance and environmental disclosure: an empirical analysis, Accounting, Organizations and Society 33 (2008) 303–327.
[4] S. Dasgupta, D. Wheeler, H. Wang, Disclosure strategies for pollution control, in: T. Teitenberg, H. Folmer (Eds.), International Yearbook of Environmental and Resource Economics 2006/2007: A Survey of Current Issues, Edward Elgar, Northhampton, MA2007, pp. 93–119.
[5] M. Delmas, M. Montes-Sancho, J. Shimshack, Information disclosure policies: evidence from the electricity industry, Economic Inquiry 48 (2010) 483–498.
[6] P.J. Ferraro, C. McIntosh, M. Ospina, The effectiveness of the US endangered species act: an econometric analysis using matching methods, Journal of Environmental Economics and Management 54 (2007) 245–261.
[7] M.J. Fishman, K.M. Hagerty, The optimal amount of discretion to allow in disclosure, Quarterly Journal of Economics 105 (1990) 427–444.
[8] P.G. Fredriksson, D.L. Millimet, Comparative politics and environmental taxation, Journal of Environmental Economics and Management 48 (2004) 705–722.
[9] M. Greenstone, Did the clean air act cause the remarkable decline in sulfur dioxide concentrations?, Journal of Environmental Economics and Management 47 (2004) 585–611
[10] J.J. Heckman, H. Ichimura, P.E. Todd, Matching as an econometric evaluation estimator, Review of Economic Studies 65 (2) (1998) 261–294.
[11] P.W. Kennedy, Optimal early action on greenhouse gas emissions, Canadian Journal of Economics 35 (2002) 16–35.
[12] E.-H. Kim, T.P. Lyon, When does institutional investor activism increase shareholder value?: the carbon disclosure project, Working Paper, University of Michigan, 2010.
[13] T.P. Lyon, J.W. Maxwell, Greenwash: corporate environmental disclosure under threat of audit, Journal of Economics and Management Strategy 20 (2011) 3–41.
[14] T.P. Lyon, H. Yin, Why do states adopt renewable portfolio standards? An empirical investigation, Energy Journal 31 (2010) 131–155.
[15] J.W. Maxwell, T.P. Lyon, S.C. Hackett, Self-regulation and social welfare: the political economy of corporate environmentalism, Journal of Law and Economics 43 (2000) 583–617.
[16] P. Milgrom, Good News, Bad news: representation theorems and applications, Bell Journal of Economics 12 (1981) 191–380.
[17] I.W.H. Parry, M. Toman, Early emission reduction programs: an application to $CO_2$ policy, Energy Journal 23 (2002) 73–95.
[18] D.M. Patten, Exposure, legitimacy, and social disclosure, Journal of Accounting and Public Policy 10 (1991) 297–308.
[19] D.M. Patten, Intra-industry environmental disclosures in response to the Alaskan oil spill: a note on legitimacy theory, Accounting, Organizations and Society 17 (1992) 471–475.
[20] P.R. Rosenbaum, D.B. Rubin, The central role of the propensity score in observational studies for causal effects, Biometrika 70 (1) (1983) 41–55.
[21] K. Segerson, T. Miceli, Voluntary environmental agreements: good news or bad news for the environment?, Journal of Environmental Economics and Management 36 (1998) 109–130.
[22] H.S. Shin, Disclosures and asset returns, Econometrica 71 (2003) 105–133.
[23] B. Sinclair-Desgagne, E. Gozlan, A theory of environmental risk disclosure, Journal of Environmental Economics and Management 45 (2003) 377–393.
[24] T. Tietenberg, Disclosure strategies for pollution control, Environmental and Resource Economics 11 (1998) 587–602.
[25] US Energy Information Administration, Documentation for Emissions of Greenhouse Gases in the United States 2003, DOE/EIA-0638(2003), Office of Integrated Analysis and Forecasting, 2005.
[26] US Energy Information Administration, Voluntary Reporting of Greenhouse Gases 2003, DOE/EIA-0608(2003), Office of Integrated Analysis and Forecasting, 2005.
[27] R. Verrecchia, Discretionary disclosure, Journal of Accounting and Economics 5 (1983) 179–194.

---

[27] See Kim and Lyon [12] for a detailed analysis of the Carbon Disclosure Project.

Please cite this article as: E.-H. Kim, T.P. Lyon, Strategic environmental disclosure: Evidence from the DOE's voluntary greenhouse gas registry, J. Environ. Econ. Manage. (2011), doi:10.1016/j.jeem.2010.11.001

Exhibit 12 to Decl. of Lyon
319
**SER 1465**

# Exhibit 9

# to Declaration of Thomas P. Lyon

# Do investors care about carbon risk?

Exhibit 9 to Decl. of Lyon
204
**SER 1466**

Journal of Financial Economics 142 (2021) 517–549



Contents lists available at ScienceDirect

# Journal of Financial Economics

journal homepage: www.elsevier.com/locate/jfec



# Do investors care about carbon risk? ☆



Patrick Bolton [a,b], Marcin Kacperczyk [a,b,*]

[a] Columbia University, Imperial College London, CEPR, and NBER, United States
[b] Imperial College London and CEPR, United Kingdom

### ARTICLE INFO

*Article history:*
Received 21 October 2019
Revised 24 September 2020
Accepted 23 October 2020
Available online 14 May 2021

*JEL classification:*
G12
G23
G30
D62

*Keywords:*
Carbon emissions
Climate change
Stock returns
Institutional investors

### ABSTRACT

We study whether carbon emissions affect the cross-section of US stock returns. We find that stocks of firms with higher total carbon dioxide emissions (and changes in emissions) earn higher returns, controlling for size, book-to-market, and other return predictors. We cannot explain this carbon premium through differences in unexpected profitability or other known risk factors. We also find that institutional investors implement exclusionary screening based on direct emission intensity (the ratio of total emissions to sales) in a few salient industries. Overall, our results are consistent with an interpretation that investors are already demanding compensation for their exposure to carbon emission risk.

© 2021 Elsevier B.V. All rights reserved.

## 1. Introduction

Many studies seek to explain the cross-sectional pattern of stock returns based on exposures to aggregate risk factors such as size and book-to-market ratios, or firm-specific risk linked to observable firm characteristics. One variable that has so far been missing from the analysis is corporate carbon emissions. This omission may be for historical reasons, as concerns over global warming linked to carbon dioxide ($CO_2$) emissions from human activity have only recently become salient. But, both the evidence of rising temperatures and the renewed policy efforts to curb $CO_2$ emissions raise the question of whether carbon emissions represent a material risk for investors that is reflected in the cross-section of stock returns and portfolio holdings.

Two major developments, in particular, suggest that this may be the case. First, the Paris COP 21 climate agreement of December 2015, with 195 signatories committing to limit global warming to well below 2 °C above preindustrial levels. Second, the rising engagement of the finance industry with climate change, largely as a result of the call to non-governmental actors to join the fight against climate change at the COP 21. Institutional investors are increasingly tracking the greenhouse gas emissions of listed firms and forming coalitions such as Climate Action 100+ to engage with companies to reduce their

☆ We thank Jawad Addoum, Franklin Allen, Eric Bouyé, Kent Daniel, Charles Donovan, Elyse Douglas, Gerry Garvey, Lukasz Pomorski, Ailsa Roell, Zacharias Sautner, Gireesh Shrimali, Michela Verardo, Jeff Wurgler, and the referee for helpful suggestions. We also appreciate comments from seminar participants at Blackrock, EFA Conference, IESE, Newcastle University, the New Frontiers in Investment Research conference, NHH Bergen, NYU Law Roundtable on Climate Disclosure, UBS, University of Cardiff, and University College Dublin. We are grateful to Trucost for giving us access to their corporate carbon emissions data, and to Jingyu Zhang for very helpful research assistance. This project has received funding from the European Research Council (ERC) under the ERC Advanced Grant programme (grant agreement No. 885552 Investors and Climate Change).

* Corresponding author.
*E-mail addresses:* pb2208@columbia.edu (P. Bolton), mkacperc@ic.ac.uk (M. Kacperczyk).

https://doi.org/10.1016/j.jfineco.2021.05.008
0304-405X/© 2021 Elsevier B.V. All rights reserved.

Exhibit 9 to Decl. of Lyon
205
**SER 1467**

P. Bolton and M. Kacperczyk *Journal of Financial Economics 142 (2021) 517–549*

carbon emissions.[1] More and more asset owners are following the lead of the Church of England Pension Fund, whose stated goal is "to demonstrate transparently that it has delivered on its commitment to be aligned to the Paris Agreement."[2]

Even if the US has pulled out of the Paris Agreement under the Trump administration, and even if the commitments of the other remaining signatories are only partially credible, major curbs in $CO_2$ emissions are likely to be introduced over the next decade. Primarily affected by these curbs are the companies with operations generating high $CO_2$ emissions, or with activities linked to companies in the value chain that have high $CO_2$ emissions. In light of these developments, one would expect to see the risk with respect to carbon emissions to be reflected in the cross-section of stock returns. Yet, considerable skepticism remains, not least in the US where the Trump administration had worked to upend regulations that limit $CO_2$ emissions. For example, Darren Woods, ExxonMobil's CEO, recently declared that "Individual companies setting targets and then selling assets to another company so that their portfolio has a different carbon intensity has not solved the problem for the world." And that ExxonMobil was "taking steps to solve the problem for society as a whole and not try and get into a beauty competition."[3]

The lack of consensus among institutional investors around climate change naturally raises the possibility that carbon risk may not yet be reflected in asset prices. To find out, in this paper we systematically explore whether investors demand a carbon risk premium by looking at how stock returns vary with $CO_2$ emissions across firms and industries. We undertake a standard cross-sectional analysis, asking whether carbon emissions affect cross-sectional US stock returns.

There are several ways in which one might expect $CO_2$ emissions to affect stock returns. First, since $CO_2$ emissions are tied to fossil-fuel energy use, returns are affected by fossil-fuel energy prices and commodity price risk. Relatedly, firms with disproportionately high $CO_2$ emissions may be exposed to carbon pricing risk and other regulatory interventions to limit emissions. The firms that are most reliant on fossil energy are also more exposed to technology risk from lower-cost renewable energy. Forward-looking investors may seek compensation for holding the stocks of disproportionately high $CO_2$ emitters and the associated higher carbon risk they expose themselves to, giving rise to a positive relation in the cross-section between a firm's own $CO_2$ emissions and its stock returns. We refer to this as the carbon risk premium hypothesis.

An interesting question is whether carbon emissions are perceived to be a systematic risk factor and whether the carbon risk premium is tied to loadings on this risk factor. Carbon emissions could be a systematic risk factor if expected regulatory interventions to curb emissions apply uniformly to all emissions. For example, if a large federal carbon tax were to be introduced, this would be a systematic shock affecting all companies with significant emissions. Alternatively, most regulatory interventions could be introduced in a piecemeal way at the state, industry, and municipal level. Similarly, technological improvements in the use of renewable energy could be mostly targeted to particular operations or sectors. In this case, one would not expect carbon emissions to be a systematic risk factor.

A second hypothesis is that financial markets are pricing carbon risk inefficiently and the risk associated with carbon emissions is underpriced. Carbon risk may not be fully integrated by most investors, who by force or habit look at future cash-flow projections through local thinking à la Gennaioli and Shleifer (2010), ignoring unrepresentative information about global warming and its attendant risks. To be sure, the cash-flow scenarios commonly used by financial analysts do not directly refer to carbon emissions and their possible future repricing. A recent study by In et al. (2019) on a different sample than ours finds that a portfolio that is long stocks of companies with low carbon emissions and short stocks of companies with high emissions generates positive abnormal returns. We refer to this hypothesis as the market inefficiency, or carbon alpha, hypothesis. An important question we explore is whether financial markets underprice carbon risk (after controlling for other known risk factors, industry, and firm characteristics) to the point that responsible investors, who care about carbon emissions and climate change, could be "doing well by doing good."

A third hypothesis is that the stocks of firms with high emissions are like other "sin stocks"; they are shunned by socially responsible, or ethical, investors to such an extent that the spurned firms present higher stock returns. A key question in this respect is how investors identify the firms to be divested from. Do they look at carbon emissions at the firm level, or do they pigeonhole firms into broader categories such as the industry they operate in? Even socially responsible investors that care about climate change may use sparse models (à la Gabaix, 2014) and not look much beyond industry categorizations, such as the energy and electric utility sectors, which produce a disproportionate share of $CO_2$ emissions. Prominent divestors like the Rockefeller Brothers Fund, for example, who have pledged to divest from fossil fuel companies, largely focus on energy companies that extract coal and oil from tar sands.[4] We refer to this as the divestment hypothesis.

A pioneer in producing company-level $CO_2$ emissions data is the Carbon Disclosure Project (CDP).[5] It has been joined by other leading providers of carbon data, including MSCI ESG Research and Trucost, among others.[6] While more and more institutional investors make use of the data, it is not known how much individual companies' stock returns are actually affected by the availability of

---

[1] See http://www.climateaction100.org/.

[2] Statement made by Adam Matthews, the fund's director of ethics and engagement. The Church of England Pension Fund is co-chairing the IIGCC initiative.

[3] Quoted in Exxon CEO Calls Rivals' Climate Targets a 'Beauty Competition' by Kevin Crowley, *Bloomberg News*, March 5, 2020, https://www.bnnbloomberg.ca/exxon-ceo-calls-rivals-climate-targets-a-beauty-competition-1.1400957.

[4] See https://www.rbf.org/mission-aligned-investing/divestment.

[5] See http://www.cdp.net/en-US/Pages/About-Us.aspx.

[6] See https://www.msci.com/climate-change-solutions and https://www.trucost.com/policy-academic-research.

Exhibit 9 to Decl. of Lyon
206
**SER 1468**

P. Bolton and M. Kacperczyk

Journal of Financial Economics 142 (2021) 517–549

these more granular $CO_2$ emissions data to financial analysts. Our study relies on the Trucost EDX data, which cover around 1000 listed companies since fiscal year 2005, and over 2900 listed companies in the US since fiscal year 2016. We match these data with the FactSet returns and balance sheet data for all US-listed companies from 2005 to 2017.

Carbon emissions from a company's operations and economic activity are typically grouped into three different categories: direct emissions from production (scope 1), indirect emissions from consumption of purchased electricity, heat, or steam (scope 2), and other indirect emissions from the production of purchased materials, product use, waste disposal, outsourced activities, etc. (scope 3). The scope 3 category in turn is separated into upstream and downstream indirect emissions. The data on scope 1 and scope 2 emissions are widely reported. The scope 3 emissions on the other hand are estimated using an input-output matrix. Although scope 3 emissions are the most important component of companies' emission in a number of industries (e.g., automobile manufacturing), they have not been reported by companies until recently.

Our main broad finding is that carbon emissions significantly affect stock returns. For all three categories of emissions, we find a positive and statistically significant effect on firms' stock returns. We designate the higher returns associated with higher emissions as a carbon premium. We estimate how this carbon premium is related to three different measures of corporate emissions: 1) the total level of emissions; 2) the year-by-year change in emissions; and 3) emission intensity, which measures carbon emissions per unit of sales. A striking result is that the carbon premium is related to the level of (and to changes in) emissions, but not to emission intensity. One reason why the premium is tied to total emissions is that regulations limiting emissions are more likely to target activities where the level of emissions is highest. For example, in its planned climate stress test, the Bank of England focuses only on large firms and measures risk in terms of required reductions in the level of emissions (see the 2021 biennial exploratory scenario on the financial risks from climate change (Bank of England discussion paper, 2019)). Similarly, since technological change generally involves a fixed cost, renewable energy is more likely to displace fossil fuels in firms where returns to scale are highest. Another consideration is that since emission intensity is a ratio, it is likely to be a noisier metric of carbon risk exposure. Two firms with identical emission intensities may vary substantially in their levels of emissions. Indeed, this is what we find: the correlation coefficient between the level of scope 1 emissions and emission intensity is 0.6, and significantly less for scope 2 and scope 3. Nevertheless, it is somewhat surprising that we find no premium associated with emission intensity since emission-intensive firms might well be the first to become unprofitable should the carbon price rise. Investors would then demand a premium for holding these firms.

Interestingly, there is also a significant carbon premium associated with the year-to-year growth in emissions. As one would expect, we find that the level of emissions is highly persistent. Hence, emission levels reflect a long-run

risk exposure with respect to carbon emissions. Changes in emissions, in turn, reflect short-run effects; how much worse, or better, carbon risk gets. Of course, changes in emissions could also indicate changes in earnings, but we control for this effect by adding the company's return on equity, sales growth, and earnings growth, among our independent variables.

The carbon premium is economically significant: A one-standard-deviation increase in respectively the level and change of scope 1 emissions leads to a 15-bps and 26-bps increase in stock returns, or respectively a 1.8% and 3.1% annualized increase. In addition, a one-standard-deviation increase in the level and change of scope 2 emissions leads to respectively a 24-bps and 18-bps increase in stock returns, or a 2.9% and 2.2% annualized increase. Finally, a corresponding one-standard-deviation increase in the level and change of scope 3 emissions increases stock returns by 33 bps and 31 bps per month, or 4.0% and 3.8% on an annual basis. Importantly, firms with higher emissions generate higher returns, after controlling for size, book-to-market, momentum, other well-recognized variables that predict returns, and firm characteristics, such as the value of property, plant & equipment (PPE), and investment over assets.

Other things equal, a carbon premium is the reflection of a lower investor demand for stocks of companies associated with high emissions. In equilibrium, this lower demand translates into a lower stock price, and possibly also lower holdings of high-emission stocks by some categories of investors. Following Hong and Kacperczyk (2009), we explore to what extent companies with high carbon emissions are treated like "sin stocks" by institutional investors. We find that, in aggregate, institutional investors do hold a significantly smaller fraction of companies with high scope 1 emission intensity, but they are not underweight companies with high levels of emissions. When we disaggregate by investor categories (mutual funds, insurance companies, banks, pension funds, and hedge funds), we find that insurance companies, pension funds, and mutual funds are underweight scope 1 emission intensity. The negative ownership effect of moving from high to low scope 1 emission-intensity firms is economically large and accounts for about 15%–20% of the cross-sectional variation in the ownership variable. This finding is in line with the rise in the sustainable investment movement and the popular negative exclusionary screening investment strategy followed by funds with an environmental, social, and governance (ESG) tilt.[7]

We find that divestment is only based on scope 1 emission intensity. This is true both in aggregate and for each institutional investor category. Essentially, institutional investors have been applying exclusionary screens (or not) solely on the basis of scope 1 emission intensity. Even more remarkable, we find that when we exclude the in-

---

[7] See Krueger, Sautner, and Starks (2020). Also, according to the Global Sustainable Investment Review 2018, negative/exclusionary screening is the largest sustainable investment strategy globally, representing $19.8 trillion of assets under management. http://www.gsi-alliance.org/wp-content/uploads/2019/03/GSIR_Review2018.3.28.pdf.

Exhibit 9 to Decl. of Lyon

207

**SER 1469**

P. Bolton and M. Kacperczyk                                                                    Journal of Financial Economics 142 (2021) 517–549

dustries with the highest $CO_2$ emissions (oil & gas, utilities, and motor industries), there is no significant exclusionary screening at all by institutional investors. In other words, the exclusionary screening is done entirely in these salient industries; in all other industries, there is no significant divestment. Overall, these findings lead us to reject the divestment hypothesis. First, although there is significant divestment by institutional investors, it is not directly linked to an effect on stock returns. Institutional investor portfolios are significantly underweight firms with high scope 1 emission intensity, but stock returns are not affected significantly by emission intensity.

Our finding that stock returns are positively related to the level (and changes) of carbon emissions is largely consistent with the view that investors are pricing in a carbon risk premium at the firm level. This result contradicts the carbon alpha hypothesis, whereby investors holding a portfolio long stocks of companies with low carbon emissions and short stocks of companies with high emissions generates positive abnormal returns. Garvey et al. (2018) and In et al. (2019) suggest that portfolios that sort stocks by emission intensity (going long stocks with low intensity and short stocks with high intensity) generate a positive alpha. In contrast, we find that there is no significant effect of carbon intensity on stock returns. Our study differs in two important respects from theirs. First, we cover a different time period and sample of firms. Second, we control for industry, firm characteristics, and known risk factors, while neither of these studies includes all of these controls. Controlling for industry significantly affects the results. Also, in contrast to In et al. (2019), we analyze the effects of carbon emissions for each scope category separately, thereby avoiding double counting.

Another important finding is that the carbon premium has only materialized recently. We show that if we look back to the 1990s by imputing the 2005 cross-sectional distribution of total emissions to the 1990s, there is no significant carbon premium, consistent with the view that investors at that time likely did not pay as much attention to carbon emissions. However, if we apply the same analysis to our sample period, by imputing the 2017 cross-sectional distribution of emissions back throughout our sample period, we find that there is a highly significant carbon premium.

To summarize, investors seem to take a somewhat schizophrenic attitude to carbon emissions. On the one hand, institutional investors clearly want to take a proactive approach by divesting from industries with high $CO_2$ emissions. On the other hand, this categorical exclusionary screening approach only partially addresses the carbon risk issue. Indeed, investors price in a carbon emission risk premium at the firm level in all industries even though divestment is concentrated in the industries with the highest $CO_2$ emissions (oil & gas, utilities, and transportation industries). If there is one general lesson that emerges from our analysis it is that carbon risk cannot just be reduced to a fossil fuel *supply* problem. It is also a *demand* problem. Once one factors in both the supply and demand aspects, all companies in all sectors are exposed to various degrees to carbon emissions risk. A coarse exclusionary approach focusing only on the energy and utility sectors misses the full extent of the problem investors face. Accounting for carbon risk is also required on the demand side, which inevitably involves the careful tracking of emissions at the firm level in all sectors.

Our study is related to a rapidly growing literature on climate change and financial markets. An early study by Matsumura, Prakash, and Vera-Munoz (2014) of S&P 500 firms between 2006 and 2008 looks at the effects of direct carbon emissions on firm value, and the effects of voluntary public disclosure of emissions (through CDP) on firm value. They find that higher emissions are associated with lower firm values, but that voluntary disclosure mitigates the negative valuation effect of emissions. Relatedly, Chava (2014) looks at the effects of environmental concerns, as reflected in KLD ratings, on firms' cost of capital. He finds that firms that derive substantial revenues from the sale of coal or oil, as reflected in a KLD rating, are associated with a higher implied cost of capital. In an extensive survey of institutional investors, Krueger et al. (2020) also find that institutional investors believe that carbon emissions represent a material risk. Among their responses, institutional investors also say that they do not believe that there is substantial underpricing of carbon risk. Andersson et al. (2016) propose a carbon risk hedging strategy for passive investors based on low carbon indexes.

More recently, Ilhan et al. (2020) find that carbon emissions increase downside risk as reflected in out-of-the-money put option prices. Hsu et al. (2019) look at the effects of environmental pollution on the cross-section of stock returns. They find that highly polluting firms are more exposed to environmental regulation risk and command higher average returns. Engle et al. (2020) construct an index of climate news through textual analysis of *The Wall Street Journal* and other media and show how a dynamic portfolio strategy can be implemented that hedges risk with respect to climate change news. Görgen et al. (2019) construct a carbon-risk factor and estimate a carbon beta for firms. Monasterolo and De Angelis (2019) explore whether investors demand higher risk premia for carbon-intensive assets following the COP 21 agreement.

Other related studies explore the asset pricing consequences of greater material risks linked to climate events and global warming. Hong et al. (2019) find that the rising drought risk caused by climate change is not efficiently priced by stock markets. Several studies examine climate change and real estate prices. Baldauf et al. (2020) find little evidence of declining prices as a result of greater flood risk due to sea level rise. Bakkensen and Barrage (2017) find that climate risk beliefs in coastal areas are highly heterogeneous and that rising flood risk due to climate change is not fully reflected in coastal house prices. Bernstein et al. (2019) find that coastal homes vulnerable to sea-level rise are priced at a 6.6% discount relative to similar homes at higher elevations. However, in a related study, Murfin and Spiegel (2020) find no evidence that sea level rise risk is reflected in residential real estate prices. Finally, Giglio et al. (2018) use real estate pricing data to infer long-run discount rates for valuing investments in climate change abatement.

Exhibit 9 to Decl. of Lyon

208

**SER 1470**

P. Bolton and M. Kacperczyk
Journal of Financial Economics 142 (2021) 517–549

The remainder of the paper is organized as follows. In Section 2, we describe the data and provide summary statistics. We discuss the results in Section 3. Concluding remarks are in Section 4.

## 2. Data and sample

Our primary database covers the 2005–2017 period and is largely a result of matching two data sets by Trucost and FactSet in the US. Trucost provides information on corporate carbon and other greenhouse gas emissions. FactSet provides data on stock returns, corporate fundamentals, and institutional ownership. We performed the matching using ISIN as a main identifier. In some instances, in which ISIN was not available to create a perfect match, we relied on matching based on company names (after standardizing the company names in FactSet and Trucost we match the names with a similarity score of one). Finally, when there are multiple subsidiaries of a given company, we used the primary location as a matching entity. The ultimate matching produced 3421 unique companies out of 3481 companies available in Trucost. Among the 60 companies we were not able to match, more than half are not exchange listed and the remaining ones are small. Hence, we believe our data cover almost the entire universe of companies with available emission data.

### 2.1. Data on corporate carbon emissions

Firm-level carbon emissions data are assembled by seven main providers: CDP, Trucost, MSCI, Sustainalytics, Thomson Reuters, Bloomberg, and ISS. All these providers follow the Greenhouse Gas Protocol that sets the standards for measuring corporate emissions.[8] More and more companies disclose their greenhouse gas emissions, and most large corporations report their emissions to CDP. Other providers rely on the CDP data and supplement it with other sources. Emissions can be measured directly at the source or more commonly by applying conversion factors to energy use. The Greenhouse Gas Protocol distinguishes between three different sources of emissions: scope 1 emissions, which cover direct emissions over one year from establishments that are owned or controlled by the company; these include all emissions from fossil fuel used in production. Scope 2 emissions come from the generation of purchased heat, steam, and electricity consumed by the company. Scope 3 emissions are caused by the operations and products of the company but occur from sources not owned or controlled by the company. These include emissions from the production of purchased materials, product use, waste disposal, and outsourced activities.

In some sectors, like automobile manufacturing, by far the most important component of their emissions is the aggregation of all their scope 3 emissions. The Greenhouse Gas Protocol distinguishes between 15 different categories of scope 3 emissions, including purchased goods and services, capital goods, upstream & downstream transportation and distribution, waste generated in operations, business travel, employee commuting, processing & use of sold

products, and end-of-life treatment of sold products.[9] According to CDP's 2016 Climate Change Report, most scope 3 emissions are concentrated in two categories: purchased goods and services (around 44%) and use of sold products (around 48%).[10] The Greenhouse Gas Protocol provides detailed guidance on how to identify a company's most important sources of scope 3 emissions and how to calculate them. For purchased goods and services, this basically involves measuring inputs, or "activity data," and applying emission factors to these purchased inputs that convert activity data into emissions data. The upstream scope 3 data from Trucost that we use is constructed using an input-output model that provides the fraction of expenditures from one sector across all other sectors of the economy. This model is extended to include sector-level emission factors, so that an upstream scope 3 emissions estimate can be determined from each firm's expenditures across all sectors from which it obtains its inputs (see Trucost, 2019). Downstream scope 3 emissions caused by sold products can also be estimated and are increasingly reported by companies. Trucost has recently started assembling this data, but we were not able to include it our study.

Because they are easier to measure, and because disclosure requirements are stricter, data on scope 1 and scope 2 have been more systematically reported and accurately estimated. As Busch et al. (2018) show, there is very little variation in the reported scope 1 and 2 emissions data across the data providers. Correlations in the reported scope 1 (scope 2) data average 0.99 (0.98), across the five providers CDP, Trucost, MSCI, Sustainalytics, and Thomson Reuters.[11] However, when it comes to estimated scope 1 and scope 2 emissions (when reported data are missing), the correlations drop to 0.79 and 0.63, respectively for the three providers, Trucost, MSCI, and Sustainalytics, that offer these estimates. Finally, only two data providers, Trucost and ISS ESG, provide estimates of scope 3 emissions. The Trucost EDX database we use in our main analysis reports all three scopes of carbon emissions in units of tons of $CO_2$ emitted in a year. We report the summary statistics of the emissions variables in Panel A of Table 1.

The average firm in our sample produces 1.97 million tons of scope 1 emissions, and is tied to 1.72 million tons of scope 3 emissions. The quantity of scope 2 emissions is relatively smaller, at 342,000 tons of $CO_2$ equivalent. Notably, the median number is the largest for scope 3 emissions, as almost all companies in our sample are tied to a significant quantity of such emissions. The scope 1, 2, and 3 measures are in units of tons of $CO_2$ and normalized using the natural log scale. We also report annual growth rates in each emission measure. To mitigate the impact of outliers, we winsorize all growth measures at the 2.5% level. The carbon intensity of a company is expressed as tons of $CO_2$ equivalent divided by the com-

---

[8] See https://ghgprotocol.org.

[9] See http://ghgprotocol.org/standards/scope-3-standard.

[10] See CDP 2016 Climate Change Report "Tracking Progress on Corporate Climate Action."

[11] More than 6,300 companies worldwide answered CDP's climate change questionnaire in 2018. Of these, 76% disclosed scope 1 emissions, 68% scope 2 emissions, and 38% scope 3 emissions (see https://www.cdp.net).

Exhibit 9 to Decl. of Lyon
209
SER 1471

Case 2:24-cv-00801-ODW-PVC   Document 56-9   Filed 07/24/24   Page 7 of 34   Page ID #:6190

P. Bolton and M. Kacperczyk

*Journal of Financial Economics 142 (2021) 517–549*

**Table 1**
Summary statistics.

This tables reports summary statistics (averages, medians, and standard deviations) for the variables used for the six sets of regressions. The sample period is 2005–2017. **Panel A** reports the emission variables. **Panel B** reports the cross-sectional return variables. *RET* is the monthly stock return; *LOGSIZE* is the natural logarithm of market capitalization (in $ million); *B/M* is the book value of equity divided by market value of equity; *ROE* is the return on equity; *LEVERAGE* is the book value of leverage defined as the book value of debt divided by the book value of assets; *MOM* is the cumulative stock return over the one-year period; *INVEST/A* is the CAPEX divided by book value of assets; *HHI* is the Herfindahl index of the business segments of a company with weights proportional to revenues; *LOGPPE* is the natural logarithm of plant, property & equipment (in $ million); *BETA* is the CAPM beta calculated over the one year period; *VOLAT* is the monthly stock return volatility calculated over the one year period. **Panel C** reports the time-series variables. *MKTRF* is the monthly return on the value-weighted stock market net of the risk free rate; *HML* is the monthly return on the portfolio long value stocks and short growth stocks; *SMB* is the monthly return on the portfolio long small-cap stocks and short large-cap stocks; *MOM* is the monthly return on the portfolio long 12-month stock winners and short 12-month past losers; *CMA* is the monthly return of a portfolio that is long on conservative investment stocks and short on aggressive investment stocks; *BAB* is the monthly return of a portfolio that is long on low-beta stocks and short on high-beta stocks; *LIQ* is the liquidity factor of Pastor and Stambaugh; *NET ISSUANCE* is the monthly return of a portfolio that is long on high-net-issuance stocks and short on low-net-issuance stocks. Net issuance for year *t* is the change in the natural log of split-adjusted shares outstanding from the fiscal yearend in *t*-2 to the fiscal yearend in *t*-1; *IDIO VOL* is the monthly return of a portfolio that is long on low idiosyncratic volatility stocks and short on high idiosyncratic volatility stocks. **Panel D** reports the ownership variables. $IO_{i,t}$ is the fraction of the shares of company *i* held by institutions in the FactSet database at the end of year *t*. *IO* is calculated by aggregating the shares held by all types of institutions at the end of the year, and then dividing this amount by shares outstanding at the end of the year. $IO\_BANKS$ is the ownership by banks; $IO\_INSURANCE$ is the ownership by insurance companies; $IO\_INVESTCOS$ is the ownership by investment companies (e.g., mutual funds); $IO\_ADVISERS$ is the ownership by independent investment advisers; $IO\_PENSIONS$ is the ownership by pension funds; $IO\_HFS$ is the ownership by hedge funds. $PRINV_{i,t}$ is the inverse of firm *i*'s share price at the end of year *t*; $TOT\ VOLAT_{i,t}$ is the standard deviation of daily stock returns for company *i* over the one-year period; $VOLUME_{i,t}$ is the average daily trading volume (in $million) of stock *i* over the calendar year *t*; $NASDAQ_{i,t}$ is an indicator variable equal to one if a stock *i* is listed on NASDAQ in year *t*, and zero otherwise; $SP500_{i,t}$ is an indicator variable equal to one if a stock *i* is part of the S&P 500 Index in year *t*, and zero otherwise.

| Variable | Mean | Median | Std. Dev. |
|---|---|---|---|
| *Panel A: Emission variables* | | | |
| Log (Carbon Emissions Scope 1 (tons $CO_2$e)) | 10.55 | 10.47 | 2.95 |
| Log (Carbon Emissions Scope 2 (tons $CO_2$e)) | 10.52 | 10.66 | 2.36 |
| Log (Carbon Emissions Scope 3 (tons $CO_2$e)) | 12.31 | 12.46 | 2.25 |
| Growth Rate in Carbon Emissions Scope 1 (winsorized at 2.5%) | 0.08 | 0.03 | 0.36 |
| Growth Rate in Carbon Emissions Scope 2 (winsorized at 2.5%) | 0.14 | 0.05 | 0.45 |
| Growth Rate in Carbon Emissions Scope 3 (winsorized at 2.5%) | 0.09 | 0.06 | 0.24 |
| Carbon Intensity Scope 1 (tons $CO_2$e/USD m.)/100 (winsorized at 2.5%) | 1.92 | 0.15 | 5.88 |
| Carbon Intensity Scope 2 (tons $CO_2$e/USD m.)/100 (winsorized at 2.5%) | 0.34 | 0.18 | 0.46 |
| Carbon Intensity Scope 3 (tons $CO_2$e/USD m.) /100 (winsorized at 2.5%) | 1.58 | 0.98 | 1.59 |
| Carbon Intensity Direct (winsorized at 2.5%)/100 | 2.12 | 0.16 | 6.45 |
| Carbon Intensity Indirect (winsorized at 2.5%)/100 | 1.04 | 0.58 | 1.31 |
| GHG Direct Impact Ratio (winsorized at 2.5%) | 0.75 | 0.06 | 2.29 |
| GHG Indirect Impact Ratio (winsorized at 2.5%) | 0.71 | 0.47 | 0.68 |
| *Panel B: Cross-sectional return variables* | | | |
| RET (%) | 1.14 | 1.08 | 10.84 |
| LOGSIZE | 8.25 | 8.25 | 1.57 |
| B/M (winsorized at 2.5%) | 0.50 | 0.39 | 0.41 |
| LEVERAGE (winsorized at 2.5%) | 0.24 | 0.22 | 0.18 |
| MOM (winsorized at 0.5%) | 0.15 | 0.11 | 0.45 |
| INVEST/A (winsorized at 2.5%) | 0.05 | 0.03 | 0.05 |
| ROE (winsorized at 2.5%, in%) | 9.76 | 11.32 | 21.23 |
| HHI | 0.82 | 1.00 | 0.24 |
| LOGPPE | 6.22 | 6.34 | 2.26 |
| BETA | 1.10 | 1.05 | 0.44 |
| VOLAT (winsorized at 0.5%) | 0.10 | 0.08 | 0.06 |
| SALESGR (winsorized at 0.5%) | 0.02 | 0.03 | 0.30 |
| EPSGR (winsorized at 0.5%) | 0.01 | 0.00 | 0.43 |
| *Panel C: Time-series variables* | | | |
| MKTRF (in%) | 0.70 | 1.06 | 4.08 |
| HML (in%) | 0.00 | −0.22 | 2.57 |
| SMB (in%) | 0.07 | 0.04 | 2.26 |
| MOM (in%) | 0.07 | 0.36 | 4.53 |
| CMA (in%) | 0.02 | −0.06 | 1.39 |
| BAB (in%) | 0.49 | 0.74 | 2.66 |
| LIQ (in%) | 0.15 | 0.38 | 3.59 |
| NET ISSUANCE (in%) | 0.51 | 0.55 | 1.65 |
| IDIO VOL (in%) | −0.18 | 0.03 | 5.27 |
| *Panel D: Ownership variables* | | | |
| IO (in%) | 76.84 | 82.93 | 22.22 |
| IO_BANKS (in%) | 0.10 | 0.07 | 0.16 |
| IO_INSURANCE (in%) | 0.35 | 0.13 | 3.11 |
| IO_INVESTCOS. (in%) | 18.19 | 18.37 | 8.64 |
| IO_ADVISERS (in%) | 43.94 | 46.11 | 15.39 |
| IO_PENSIONS (in%) | 3.40 | 3.51 | 2.31 |
| IO_HFS (in%) | 10.87 | 7.73 | 10.04 |
| PRINV (winsorized at 0.5%) | 0.05 | 0.03 | 0.11 |
| VOLAT (winsorized at 0.5%) | 0.10 | 0.08 | 0.06 |
| VOLUME (in $million) (winsorized at 2.5%) | 0.44 | 0.21 | 0.56 |
| NASDAQ | 0.30 | 0.00 | 0.46 |
| SP500 | 0.37 | 0.00 | 0.48 |

Exhibit 9 to Decl. of Lyon
210
**SER 1472**

P. Bolton and M. Kacperczyk Journal of Financial Economics 142 (2021) 517–549

**Table 2**

Stock characteristics by emission calculation.

The table reports the sample means of the main variables over the 2005–2017 period. All variables are defined in Table 1. Imputed includes all firms for which Trucost estimates the levels of emissions. Direct includes all firms for which data is directly available.

| Calculation Method | Imputed | Direct |
|---|---|---|
| SCOPE 1 TOT | 1,366,013 | 5,954,876 |
| SCOPE 2 TOT | 264,203 | 957,827 |
| SCOPE 3 TOT | 1,433,741 | 4,057,516 |
| SCOPE 1 INT | 211.76 | 588.91 |
| SCOPE 2 INT | 35.89 | 68.26 |
| SCOPE 3 INT | 158.11 | 197.92 |
| RET (%) | 1.00 | 1.09 |
| LOGSIZE | 8.22 | 9.64 |
| B/M | 0.50 | 0.48 |
| LEVERAGE | 0.24 | 0.27 |
| MOM | 0.15 | 0.13 |
| INVEST/A | 0.05 | 0.05 |
| ROE | 9.88 | 14.89 |
| HHI | 0.84 | 0.72 |
| LOGPPE | 6.19 | 8.03 |
| BETA | 1.13 | 1.04 |
| VOLAT | 0.10 | 0.07 |
| SALESGR (%) | 1.67 | −0.16 |
| EPSGR (%) | 1.53 | 0.25 |

pany's revenues in million US dollar units, also winsorized at the 2.5% level. The average (unwinsorized) scope 1 intensity in our sample equals 265.26 tons/million, while the intensities for scope 2 and scope 3 are 39.64 tons/million and 164.22 tons/million, respectively. The EDX database also provides information on whether the emissions data was reported or estimated, which allows us to do a sensitivity analysis and determine how the results are affected by the exclusion of the estimated data. We describe how the data breaks down into firms with reported and estimated emissions data in Table 2. As Matsumura, Prakash, and Vera-Munoz (2014) note, firms that do not report their emissions are typically smaller (and therefore have smaller emissions) and are less profitable. But in other respects, firms that report their emissions have similar characteristics to those that do not. In particular, their stock returns, volatility, leverage, book-to-market ratios, capital expenditures, and betas are very similar.

We also report alternative measures Trucost provides, in particular: i) *CARBON DIRECT*, which adds three additional greenhouse gas to the GHG Protocol scope 1 measures; ii) *CARBON INDIRECT*, which covers a slightly broader set of emissions by the direct suppliers to a company than scope 2; iii) *GHG DIRECT*, measured in US dollars, which covers all direct external environmental impacts of a company. Trucost applies a monetary value to GHG emissions quantities, which represents the global average damage of each environmental impact; and iv) *GHG INDIRECT*, which covers indirect supply chain environmental impacts. These are estimated impacts based on Trucost's environmental impact models. Again, these are reported in US dollars and represent the global average damages of each environmental impact.

How correlated are these different emission variables? We report the cross-correlations in Panel A of Table 3. As one would expect, the levels of all three categories of

emissions are positively correlated. Yet, the coefficients are relatively small. Similarly, the level of scope 1 emissions is obviously positively correlated with scope 1 emission intensity, but the size of the coefficient is only 0.6, reflecting the fact that two firms with the same scope 1 intensity may have very different levels of emissions. A large firm, with high emissions, can have the same emission intensity as a small firm. The low correlation between levels and intensity is even more pronounced for scope 2 (0.24) and scope 3 (0.27). In Panel B, we also report the autocorrelation coefficients for the different measures of emissions. Emission levels for all three categories are highly persistent, with an autocorrelation coefficient of 0.977 for scope 1, 0.955 for scope 2, and 0.967 for scope 3. Interestingly, the year-to-year growth in emissions also has some persistence, especially for scope 3 emissions. As for the emission intensity variables they are, not surprisingly, also highly persistent as sales are highly persistent.

We also analyze the average values of all three emission sources over time. Fig. 1 and Table 4 present the results. As one might expect, there is a steady decline in scope 1 and scope 3 emissions at the firm level over time as a result of energy efficiency improvements, technological innovations, and an increase in the reliance on renewable energy sources. There is a sharp decline in scope 1 emissions from 2015 to 2016. However, this mainly reflects the addition by Trucost of many smaller firms to the sample in 2015, as can be seen in Fig. 2. The addition of all these firms to the sample also explains why total scope 3 emissions sharply increase from 2015 to 2016, and why total scope 1 emissions remain flat even though per-firm emissions decline. All these results are further confirmed by the numbers in Panels A and B of Table 4; averages for all firms in our sample are in Panel A while those conditioned on the presence in the sample prior to 2015 are in Panel B. We can see that when we drop the new firms added in 2016 from the sample, the averages for 2016 and 2017 are very close to the numbers in 2015. While we still observe some decline in scope 1 emissions, there is no such decline in scope 2 and scope 3 emissions. If anything, the numbers for scope 3 emissions go up, although not by much.

We note that firms with significant emissions are represented in a wide range of industries. In Table 5, we present the distribution of firms in our sample with respect to the six-digit Global Industry Classification (GIC 6). Banks, biotech, and oil & gas are the most represented industries, with each one having more than 150 firms.[12] In Table 6, we provide a list of industries with the highest and the lowest intensity of emissions. Power, electric, and multi-utility industries produce the most scope 1 emissions, while consumer finance, thrifts and mortgages, and capital markets are the cleanest. The ranking is somewhat different when we classify industries with respect to their scope 2 and scope 3 emissions. Metals and mining, electric utilities, and construction materials are the three most scope 2 emission-intensive industries (the cleanest industries mimic those based on scope 1 classification). In turn,

---

[12] Some firms in this table are classified into multiple industries; hence, the total number of firms in the table (3917) exceeds the number of unique firms in our sample (3421).

Exhibit 9 to Decl. of Lyon

211

**SER 1473**

Case 2:24-cv-00801-ODW-PVC Document 56-9 Filed 07/24/24 Page 9 of 34 Page ID #:6192

**Table 3**
Carbon emissions: correlations.
The sample period is 2005–2017. Panel A presents the cross-correlations among emission variables. Panel B presents the coefficients from estimating the AR(1) model for various measures of emissions. All regressions include year-month fixed effects. We cluster standard errors at firm and year dimensions. The emission variables are defined in Table 1. ***1% significance; **5% significance; *10% significance.

**Panel A: Cross-correlations**

|  | SCOPE 1 TOT | SCOPE 2 TOT | SCOPE 3 TOT | SCOPE 1 INT | SCOPE 2 INT | SCOPE 3 INT |
|---|---|---|---|---|---|---|
| SCOPE 1 TOT | 1.00 | | | | | |
| SCOPE 2 TOT | 0.39 | 1.00 | | | | |
| SCOPE 3 TOT | 0.51 | 0.75 | 1.00 | | | |
| SCOPE 1 INT | 0.60 | 0.03 | 0.03 | 1.00 | | |
| SCOPE 2 INT | 0.05 | 0.24 | 0.02 | 0.10 | 1.00 | |
| SCOPE 3 INT | 0.21 | 0.09 | 0.27 | 0.25 | 0.10 | 1.00 |

**Panel B: Autocorrelations**

| VARIABLES | (1) LOG (SCOPE 1) | (2) LOG (SCOPE 2) | (3) LOG (SCOPE 3) | (4) ΔSCOPE 1 | (5) ΔSCOPE 2 | (6) ΔSCOPE 3 | (7) SCOPE 1 INT | (8) SCOPE 2 INT | (9) SCOPE 3 INT |
|---|---|---|---|---|---|---|---|---|---|
| LOG (SCOPE 1 TOT)$_{t-1}$ | 0.977*** (0.003) | | | | | | | | |
| LOG (SCOPE 2 TOT)$_{t-1}$ | | 0.955*** (0.005) | | | | | | | |
| LOG (SCOPE 3 TOT)$_{t-1}$ | | | 0.967*** (0.004) | | | | | | |
| ΔSCOPE 1$_{t-1}$ | | | | 0.045* (0.021) | | | | | |
| ΔSCOPE 2$_{t-1}$ | | | | | 0.025 (0.015) | | | | |
| ΔSCOPE 3$_{t-1}$ | | | | | | 0.190*** (0.047) | | | |
| SCOPE 1 INT$_{t-1}$ | | | | | | | 0.945*** (0.005) | | |
| SCOPE 2 INT$_{t-1}$ | | | | | | | | 0.946*** (0.012) | |
| SCOPE 3 INT$_{t-1}$ | | | | | | | | | 0.969*** (0.021) |
| Constant | 0.281*** (0.033) | 0.573*** (0.052) | 0.475*** (0.046) | 0.057*** (0.001) | 0.106*** (0.002) | 0.053*** (0.003) | 0.065*** (0.013) | 0.026*** (0.004) | 0.031 (0.033) |
| Year/month F.E. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 156,446 | 156,374 | 156,578 | 122,686 | 122,602 | 122,794 | 156,578 | 156,578 | 156,578 |
| R-squared | 0.972 | 0.945 | 0.975 | 0.014 | 0.020 | 0.085 | 0.962 | 0.850 | 0.964 |

524

Exhibit 9 to Decl. of Lyon
212

*P. Bolton and M. Kacperczyk*

*Journal of Financial Economics 142 (2021) 517–549*









**Fig. 1.** Carbon emissions: time series summary.
The data source is Trucost and the data sample period is 2005–2017. Panels A and B present average firm emissions (in tons of $CO_2$ equivalent to revenues in $ million). The emissions are broken down into scope 1, scope 2, and scope 3 emissions. In Panel B, *GHG Direct* and *GHG Indirect* are impact ratios expressed as a percentage of costs in revenues (in $ million). *Carbon direct* and *Carbon indirect* are intensities expressed in tons of $CO_2$ equivalent to revenues in $ million. Panels C and D present the total emissions (across all firms) per year.

food products, metals and mining, and construction materials are the three most scope 3 emission-intensive industries. Internet software and services, health care technologies, and software are the three least emission-intensive industries. The Trucost industry classification is finer than the GIC six-digit classification. Given that we control for industry a natural question is how sensitive the results are to the classification itself. The classification in theory could be so fine that it includes only one firm in each industry or so coarse that it includes all firms in one industry. Adding industry fixed effects would be meaningless under these polar classification systems. As a robustness check, we also perform our analysis under the GIC classification and report the results in Table A.4 in the Appendix.

Finally, we observe not only substantial variation in the growth rates of emissions across different industries, but also significant variation in the rates of all three categories of emissions across firms within the same industry. Fig. 3 displays the time series plots of the average cross-sectional standard deviations of emission growth rates across all firms (Panel A) and across all firms within a given GIC 6 industry (Panel B). Even though the scale of the variation in Panel A is larger than that in Panel B, there is still a significant dispersion in emissions in Panel B. Moreover, the standard deviation in carbon emission growth rates is very stable over time. In particular, the standard deviation did not significantly change following the addition of new firms to the sample in 2015.

### 2.2. Variables in cross-sectional return regressions

Our empirical analysis of stock returns employs a monthly measure of returns as a dependent variable. In our cross-sectional return regressions, the dependent variable $RET_{i,t}$ is the monthly return of an individual stock $i$ in month $t$. Our return data primarily comes from FactSet, but for a small subset of delisted firms, we replace the return data with delisting-adjusted values from Compustat. Finally, we remove observations with returns greater than 100% to mitigate the impact of outliers. The number of excluded firm/month observations is 109 and its exclusion does not materially affect our results. However, using unrestricted returns data would be problematic as the data, for example, include four observations with monthly returns greater than 10,000%.

Our control variables are defined as follows: $LOGSIZE_{i,t}$ is the natural logarithm of firm $i$'s market capitalization (price times shares outstanding) at the end of year $t$; $B/M_{i,t}$ is firm $i$'s book value divided by its market capitalization at the end of year $t$; $LEVERAGE$ is the book leverage of the company; $ROE_{i,t}$ is the firm's earnings performance, given by the ratio of firm $i$'s net yearly income divided by the value of its equity; $MOM_{i,t}$ is the average of the most recent 12 months' returns on stock $i$, leading up to and including month $t-1$; $INVEST/A$ represents the firm's capital expenditures divided by the book value of its assets; $HHI$ is the Herfindahl concentration index of firms with respect to different business segments, based on each segment's revenues; $LOGPPE$ is the natural logarithm, of the firm's property, plant, and equipment; $BETA_{i,t}$ is the market beta of firm $i$ in year $t$, calculated over the one year period

Exhibit 9 to Decl. of Lyon
213
**SER 1475**

P. Bolton and M. Kacperczyk

Journal of Financial Economics 142 (2021) 517–549



**Fig. 2.** Carbon emissions: sample selection.
The data source is Trucost. The figure presents the number of firms with valid emission data over the 2005–2017 period.

**Table 4**
Carbon emissions over time.
The table reports the cross-sectional averages of scope 1, scope 2, and scope 3 levels and intensity variables over the 2005–2017 period. Panel A considers a full sample of firms. Panel B is restricted to a sample of firms that existed prior to 2016. The emissions variables are defined in Table 1.

| | | | Panel A: Full sample | | | |
|---|---|---|---|---|---|---|
| Year | SCOPE 1 TOT | SCOPE 2 TOT | SCOPE 3 TOT | SCOPE 1 INT | SCOPE 2 INT | SCOPE 3 INT |
| 2005 | 2,697,225 | 335,402 | 2,414,925 | 411.16 | 37.55 | 229.79 |
| 2006 | 2,775,999 | 379,869 | 2,229,797 | 373.64 | 39.17 | 205.90 |
| 2007 | 2,893,335 | 410,656 | 2,281,158 | 341.57 | 37.38 | 193.13 |
| 2008 | 3,147,450 | 683,294 | 2,750,231 | 308.70 | 39.75 | 164.33 |
| 2009 | 2,482,940 | 385,670 | 1,907,531 | 334.35 | 41.41 | 184.06 |
| 2010 | 2,655,585 | 400,848 | 1,987,772 | 339.68 | 40.47 | 173.56 |
| 2011 | 2,639,823 | 440,716 | 2,217,712 | 305.06 | 40.20 | 169.39 |
| 2012 | 2,417,298 | 431,992 | 2,222,692 | 308.23 | 39.57 | 160.65 |
| 2013 | 2,223,849 | 398,491 | 2,046,741 | 335.82 | 39.22 | 159.69 |
| 2014 | 2,255,386 | 425,080 | 1,979,578 | 281.89 | 54.37 | 152.26 |
| 2015 | 2,161,598 | 419,362 | 1,783,537 | 273.32 | 56.79 | 150.77 |
| 2016 | 883,498 | 184,335 | 858,982 | 154.25 | 33.66 | 139.00 |
| 2017 | 809,277 | 176,805 | 935,203 | 139.29 | 33.88 | 145.53 |
| | | | Panel B: Legacy sample | | | |
| Year | SCOPE 1 TOT | SCOPE 2 TOT | SCOPE 3 TOT | SCOPE 1 INT | SCOPE 2 INT | SCOPE 3 INT |
| 2005 | 2,697,225 | 335,402 | 2,414,925 | 411.16 | 37.55 | 229.79 |
| 2006 | 2,775,999 | 379,869 | 2,229,797 | 373.64 | 39.17 | 205.90 |
| 2007 | 2,893,335 | 410,656 | 2,281,158 | 341.57 | 37.38 | 193.13 |
| 2008 | 3,147,450 | 683,294 | 2,750,231 | 308.70 | 39.75 | 164.33 |
| 2009 | 2,482,940 | 385,670 | 1,907,531 | 334.35 | 41.41 | 184.06 |
| 2010 | 2,655,585 | 400,848 | 1,987,772 | 339.68 | 40.47 | 173.56 |
| 2011 | 2,639,823 | 440,716 | 2,217,712 | 305.06 | 40.20 | 169.39 |
| 2012 | 2,417,298 | 431,992 | 2,222,692 | 308.23 | 39.57 | 160.65 |
| 2013 | 2,223,849 | 398,491 | 2,046,741 | 335.82 | 39.22 | 159.69 |
| 2014 | 2,255,386 | 425,080 | 1,979,578 | 281.89 | 54.37 | 152.26 |
| 2015 | 2,161,598 | 419,362 | 1,783,537 | 273.32 | 56.79 | 150.77 |
| 2016 | 1,993,060 | 404,850 | 1,874,254 | 269.09 | 45.78 | 167.35 |
| 2017 | 1,922,550 | 404,904 | 2,149,459 | 243.38 | 44.95 | 176.12 |

Exhibit 9 to Decl. of Lyon
214
**SER 1476**

*P. Bolton and M. Kacperczyk*    *Journal of Financial Economics 142 (2021) 517–549*

**Table 5**

Industry representation by number of firms.

The table reports the distribution of unique firms in our sample with regard to GIC 6 industry classification. *Total* represents the total number of firms in our sample. The sample period is 2005–2017.

| GIC 6 | Industry Name | # of Firms |
|---|---|---|
| 1 | Energy Equipment & Services | 75 |
| 2 | Oil, Gas & Consumable Fuels | 164 |
| 3 | Chemicals | 81 |
| 4 | Construction Materials | 17 |
| 5 | Containers & Packaging | 21 |
| 6 | Metals & Mining | 47 |
| 7 | Paper & Forest Products | 12 |
| 8 | Aerospace & defense | 46 |
| 9 | Building Products | 32 |
| 10 | Construction & Engineering | 36 |
| 11 | Electrical Equipment | 54 |
| 12 | Industrial Conglomerates | 16 |
| 13 | Machinery | 118 |
| 14 | Trading Companies & Distributors | 40 |
| 15 | Commercial Services & Supplies | 69 |
| 16 | Professional Services | 42 |
| 17 | Air Freight & Logistics | 15 |
| 18 | Airlines | 13 |
| 19 | Marine | 27 |
| 20 | Road & Rail | 31 |
| 21 | Transportation Infrastructure | 5 |
| 22 | Auto Components | 43 |
| 23 | Automobiles | 8 |
| 24 | Household Durables | 64 |
| 25 | Leisure Products | 21 |
| 26 | Textiles, Apparel & Luxury Goods | 41 |
| 27 | Hotels, Restaurants & Leisure | 95 |
| 28 | Diversified Consumer Services | 38 |
| 29 | Media | 83 |
| 30 | Distributors | 8 |
| 31 | Internet & Direct Marketing Retail | 45 |
| 32 | Multiline Retail | 17 |
| 33 | Specialty Retail | 110 |
| 34 | Food & Staples Retailing | 27 |
| 35 | Beverages | 17 |
| 36 | Food Products | 57 |
| 37 | Tobacco | 9 |
| 38 | Household Products | 12 |
| 39 | Personal Products | 15 |
| 40 | Health Care Equipment & Supplies | 109 |
| 41 | Health Care Providers & Services | 77 |
| 42 | Health Care Technology | 20 |
| 43 | Biotechnology | 203 |
| 44 | Pharmaceuticals | 87 |
| 45 | Life Sciences Tools & Services | 34 |
| 46 | Banks | 260 |
| 47 | Thrifts & Mortgage Finance | 61 |
| 48 | Diversified Financial Services | 28 |
| 49 | Consumer Finance | 37 |
| 50 | Capital Markets | 92 |
| 51 | Mortgage Real Estate Investment Trusts (REITs) | 22 |
| 52 | Insurance | 111 |
| 53 | Internet Software & Services | 100 |
| 54 | IT Services | 102 |
| 55 | Software | 150 |
| 56 | Communications Equipment | 47 |
| 57 | Technology Hardware, Storage & Peripherals | 34 |
| 58 | Electronic Equipment, Instruments & Components | 82 |
| 59 | Semiconductors & Semiconductor Equipment | 103 |
| 60 | Diversified Telecommunication Services | 34 |
| 61 | Wireless Telecommunication Services | 15 |
| 62 | Media | 49 |
| 63 | Entertainment | 22 |
| 64 | Interactive Media & Services | 29 |
| 65 | Electric Utilities | 42 |
| 66 | Gas Utilities | 17 |
| 67 | Multi-Utilities | 30 |
| 68 | Water Utilities | 13 |
| 69 | Independent Power and Renewable Electricity Producers | 17 |
| 70 | Equity Real Estate Investment Trusts (REITs) | 184 |
| 71 | Real Estate Management & Development | 35 |
| Total | | 3917 |

Exhibit 9 to Decl. of Lyon
215
**SER 1477**

P. Bolton and M. Kacperczyk

Journal of Financial Economics 142 (2021) 517–549

**Table 6**

Carbon emission production by industry.

Panel A reports the top 10 of GIC 6 industries in terms of average emission production (scope 1, scope 2, scope 3). Panel B reports the bottom 10 of GIC 6 industries in terms of average emission production (scope 1, scope 2, scope 3). The sample period is 2005–2017. The emission variables are expressed in tons of $CO_2e$.

| Panel A: Largest emissions (avg.) | | | | | |
|---|---|---|---|---|---|
| GIC 6 | Scope 1 | GIC 6 | Scope 2 | GIC 6 | Scope 3 |
| 69 | 33,300,000 | 34 | 2,163,081 | 23 | 18,700,000 |
| 65 | 30,700,000 | 23 | 2,094,174 | 36 | 11,800,000 |
| 18 | 17,600,000 | 6 | 1,749,360 | 37 | 6,847,386 |
| 67 | 17,200,000 | 3 | 1,475,783 | 12 | 6,575,213 |
| 6 | 6,343,545 | 7 | 1,375,637 | 35 | 6,106,099 |
| 2 | 6,302,663 | 60 | 1,219,956 | 2 | 6,049,237 |
| 17 | 4,316,221 | 12 | 1,014,037 | 34 | 5,882,429 |
| 4 | 3,827,648 | 38 | 994,783 | 38 | 4,313,762 |
| 7 | 3,286,922 | 32 | 825,501 | 6 | 3,580,245 |
| 3 | 3,280,770 | 2 | 820,777 | 22 | 3,285,134 |
| Panel B: Smallest emissions (avg.) | | | | | |
| GIC 6 | Scope 1 | GIC 6 | Scope 2 | GIC 6 | Scope 3 |
| 47 | 601 | 47 | 1756 | 47 | 15,193 |
| 50 | 6767 | 42 | 11,824 | 51 | 27,069 |
| 46 | 6965 | 19 | 21,798 | 68 | 41,182 |
| 49 | 7469 | 16 | 22,653 | 42 | 64,097 |
| 64 | 7649 | 43 | 24,606 | 71 | 84,764 |
| 51 | 8770 | 50 | 35,404 | 70 | 102,300 |
| 53 | 8898 | 51 | 36,013 | 16 | 114,132 |
| 55 | 9132 | 66 | 39,177 | 46 | 116,073 |
| 42 | 11,657 | 45 | 44,082 | 28 | 145,311 |
| 16 | 17,895 | 46 | 45,627 | 43 | 151,772 |

using daily data; $VOLAT_{i,t}$ is the standard deviation of returns based on the past 12 months of monthly returns; $SALESGR_{i,t}$ is the dollar change in annual firm revenues normalized by last month's market capitalization; $EPSGR_{i,t}$ is the dollar change in annual earnings per share, normalized by the firm's equity price. To eliminate the impact of outliers, we winsorize B/M, LEVERAGE, and INVEST/A at the 2.5% level, and MOM, VOLAT, SALESGR, and EPSGR at the 0.5% level. We report the summary statistics of these variables in Panel B of Table 1.

The average firm's monthly stock return is 1.14%, with a standard deviation of 10.84%. The average firm has a market capitalization of $13 billion, with a median value of $3.8 billion. The average book-to-market ratio is 0.50, while the average book leverage is 24%. The average market beta is 1.10, slightly more than that of the market.

### 2.3. Variables in the time series return regressions

The variables for our time series regressions are defined as follows: $MKTRF_t$ is the monthly return of the CRSP value-weighted portfolio in month $t$, net of the risk-free rate; $SMB_t$, $HML_t$, $MOM_{t \text{ and } CMAt}$ are well-known portfolio return series downloaded from Ken French's website: SMB is the monthly return of a portfolio that is long on small stocks and short on large stocks; HML is the monthly return of a portfolio that is long on high book-to-market stocks and short on low book-to-market stocks; MOM is the monthly return of a portfolio that is long on past one-year return winners and short on past one-year return losers; CMA is the monthly return of a portfolio that is long on conservative investment stocks and short on ag-

gressive investment stocks. BAB is the monthly return of a portfolio that is long on low-beta stocks and short on high-beta stocks; LIQ is the liquidity factor of Pastor and Stambaugh; NET ISSUANCE is the monthly return of a portfolio that is long on high-net-issuance stocks and short on low-net-issuance stocks. Net issuance for year $t$ is the change in the natural log of split-adjusted shares outstanding from the fiscal yearend in $t$-2 to the fiscal yearend in $t$-1; IDIO VOL is the monthly return of a portfolio that is long on low idiosyncratic volatility stocks and short on high idiosyncratic volatility stocks. We present the summary statistics for the various portfolio returns in Panel C of Table 1.

The average market risk premium in our sample is 0.7% per month. Other factors with relatively high risk premia are net issuance and BAB. Somewhat atypically, the value factor return in our sample is equal to 0%. Similarly, the momentum factor generates a mere 0.07% per month, and the volatility factor has a negative return of −0.18% per month.

### 2.4. Variables in divestment regressions

Our institutional ownership regression variables are: $IO_{i,t}$, which is the fraction of the shares of company $i$ held by institutions in the FactSet database at the end of year $t$. IO is calculated by aggregating the shares held by all types of institutions at the end of the year, and then dividing this value by the number of shares outstanding at the end of the year. We further decompose the institutional ownership with respect to subgroups of owners. IO_BANKS is the ownership by banks; IO_INSURANCE is the ownership by insurance companies; IO_INVESTCOS

Exhibit 9 to Decl. of Lyon
216
**SER 1478**

**Fig. 3.** Standard deviation of carbon emission growth rates.

The data source is Trucost. Panel A presents the cross-sectional standard deviation of firm-level emissions. Panel B presents the cross-sectional standard deviation of firm level emissions within GIC-6 industries, all averaged across all the industries in a given year. All emissions are broken down into scope 1, scope 2, and scope 3, over the 2005–2017 period. The emission levels are measured in millions of tons of $CO_2$ equivalent and are winsorized at the 1% level.

is the ownership by investment companies (e.g., mutual funds); IO_ADVISERS is the ownership by independent investment advisers; IO_PENSIONS is the ownership by pension funds and IO_HFS is the ownership by hedge funds. Even though the total institutional ownership captures the intensive margin only, the range of disaggregated ownership variables varies from 0% to 100% (as long as the total institutional ownership in the data has a positive value).

The control variables in the ownership regressions include $PRINV_{i,t}$, which is the inverse of firm $i$'s share price at the end of year $t$; $VOLAT_{i,t}$ is the standard deviation of monthly stock returns for firm $i$ over the one-year period; $VOLUME_{i,t}$ is the average daily trading volume (in \$million) of stock $i$ over the calendar year $t$. $NASDAQ_{i,t}$ is an indicator variable equal to one if a stock $i$ is listed on NASDAQ in year $t$, and zero otherwise; $SP500_{i,t}$ is an indicator variable equal to one if a stock $i$ is part of the S&P 500 Index in

Exhibit 9 to Decl. of Lyon
217
**SER 1479**

P. Bolton and M. Kacperczyk

Journal of Financial Economics 142 (2021) 517–549

year $t$, and zero otherwise. We report the summary statistics for these variables in Panel D of Table 1.

The average $IO$ is 0.77, and the cross-sectional standard deviation of $IO$ is 0.22. In other words, in a typical year, a typical firm has about 77% of its shares held by institutional investors, and the standard deviation of institutional ownership in a typical cross-section is 22%. Among the different institutional owners, independent advisers are the biggest holders, with an average stock's ownership equal to 43.9%, followed by investment companies with an average 18.2% ownership. Banks and insurance companies, in turn, are the smallest institutional owners. The average daily stock return volatility in our sample is 10% or annualized 158.7%. The average daily stock volume is $440,000. Finally, about 30% of stock-month observations are companies listed on NASDAQ, and 37% observations are firms from the S&P 500 Index.

## 3. Results

We begin our analysis by investigating the determinants of scope 1, scope 2, and scope 3 emissions. We then turn to the evaluation of the carbon return premium in the cross-section of stocks. We next explore the time-series properties of the cross-sectional carbon premium with respect to well-known risk factors. Finally, we consider the divestment hypothesis by looking at institutional ownership patterns.

### 3.1. Determinants of carbon emissions

Since emissions are not reported by all companies, one basic issue to explore first is how companies that do report their emissions compare with non-reporting companies. To assess the quantitative differences on the extensive margin, we compare various firm-level characteristics for the reporting and non-reporting firms. We describe basic summary statistics of the two categories of firms in Table A.1 of the Appendix. As one might expect, we find that larger firms are more likely to report their emissions. Also, firms with lower book-to-market ratios and higher book leverage are more likely to report emissions. At the same time, the two groups of firms do not differ significantly in terms of their stock returns and investment levels.

Next, we assess the differences in emission levels, year-by-year changes, and emission intensities across firms using a regression framework. Our dependent variables are levels, changes, and intensities of scope 1, scope 2, and scope 3. Since there is little theory that can guide us on what determines the level of carbon emissions, especially with regard to their different sources, we include a host of firm-level variables, comprising $LOGSIZE$, $B/M$, $ROE$, $LEVERAGE$, $INVEST/A$, $HHI$, $LOGPPE$, $SALESGR$, and $EPSGR$. To reflect the possibility that firm-level emissions could concentrate across firms and over time, we cluster standard errors at the firm and year levels. Standard errors in all panel regressions become significantly smaller in alternative specifications that cluster at the firm, industry, time, or industry and time levels. We present the results in Table 7.

Not surprisingly, all three categories of emission levels, and changes in emissions, are significantly positively re-

lated to $LOGSIZE$. However, scope 1 and scope 3 emission intensities are weakly negatively related to $LOGSIZE$. The level of emissions is also significantly associated with high book-to-market ratios, high tangible capital (PPE), highly levered firms, and firms with high growth in sales and earnings. On the other hand, the level of emissions is lower for firms with high capital expenditures, although these growth firms are associated with high increases in emissions. Interestingly, only diversification (HHI) and tangible capital significantly affect emission intensity.

### 3.2. Evidence on cross-sectional returns

For all three categories of emissions, we relate in turn the level of companies' emissions, the year-to-year growth in emissions, and the companies' emission intensity to their corresponding stock returns in the cross-section. We first estimate the following cross-sectional regression model using pooled OLS:

$$RET_{i,t} = a_0 + a_1 LOG \ (TOT \ Emissions)_{i,t} + a_2 Controls_{i,t-1} + \mu_t + \varepsilon_{i,t}, \quad (1)$$

where $RET_{i,t}$ measures the stock return of company $i$ in month $t$ and $Emissions$ is a generic term alternately standing for $SCOPE\ 1$, $SCOPE\ 2$, and $SCOPE\ 3$ emissions. The vector of controls includes a host of firm-specific variables known to predict returns, such as $LOGSIZE$, $B/M$, $ROE$, $LEVERAGE$, $MOM$, $INVEST/A$, $HHI$, $LOGPPE$, $BETA$, $VOLAT$, $SALESGR$, and $EPSGR$.[13] We also include year/month fixed effects. We cluster standard errors at the firm and year levels. Our coefficient of interest is $a_1$.

We report the results in Table 8, Panel A. Column 1 shows the results for $SCOPE\ 1$; column 2 for $SCOPE\ 2$, and column 3 for $SCOPE\ 3$. For all three categories of emissions, we find a positive and statistically significant effect on firms' stock returns. The effect is also economically significant: a one-standard-deviation increase in $SCOPE\ 1$ leads to a 13-bps increase in stock returns, or 1.5% annualized, and a one-standard-deviation increase in $SCOPE\ 2$ leads to a 23-bps increase in stock returns, or 2.8% annualized. Finally, a one-standard-deviation increase in $SCOPE\ 3$ increases stock returns by 30 bps per month, or 3.6% annualized.

Since emissions tend to cluster significantly within specific industries, a question of interest is whether the firm-specific differences can be attributed to industry-specific effects. To examine this possibility, we additionally include industry-fixed effects using the Trucost industry classification. The results presented in columns 4 to 6 are quite striking. Including industry effects significantly strengthens the cross-sectional dispersion of returns due to carbon emissions. In fact, the economic significance increases by anywhere between 70% and 280% relative to the model without industry effects.

We also plot the time series of the cumulative values of the unadjusted and industry-adjusted carbon premia in

---

[13] $HHI$, $SALESGR$, and $EPSGR$ are measured as of time $t$ to reflect the fact that all three may have a nontrivial contemporaneous effect on the level of emissions at time $t$.

Exhibit 9 to Decl. of Lyon
218
**SER 1480**