No. 25-5327

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*,

*Plaintiffs-Appellants,*

v.

LIANE M. RANDOLPH, IN HER OFFICIAL CAPACITY AS CHAIR OF THE CALIFORNIA
AIR RESOURCES BOARD, *et al.*,

*Defendants-Appellees.*

**On Appeal from the United States District Court
for the Central District of California**
No. 2:24-cv-00801-ODW-PVC

## SUPPLEMENTAL EXCERPTS OF RECORD
## VOLUME 6 OF 10

ROB BONTA
  *Attorney General of California*
ANNADEL A. ALMENDRAS
  *Senior Assistant Attorney General*
LAURA ZUCKERMAN
MYUNG J. PARK
  *Supervising Deputy Attorneys
  General*

CAITLAN MCLOON
KATHERINE GAUMOND
EMILY HAJARIZADEH
M. ELAINE MECKENSTOCK
DYLAN REDOR
ELIZABETH SONG
  *Deputy Attorneys General*
CALIFORNIA DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA  90013-1230
Telephone: (213) 269-6438
Caitlan.McLoon@doj.ca.gov

October 16, 2025                    *Attorneys for Defendants-Appellees*

P. Bolton and M. Kacperczyk

Journal of Financial Economics 142 (2021) 517–549

**Table 7**
Determinants of carbon emissions.

The sample period is 2005–2017. The dependent variables are natural logarithm of total emissions, percentage change in total emissions, and carbon intensity. All variables are defined in Table 1. We report the results of the pooled regression with standard errors clustered at the firm level and year (in parentheses). All regressions include year-month fixed effects and industry-fixed effects. ***1% significance; **5% significance; *10% significance.

| Variables | (1) LOG (SCOPE 1) | (2) LOG (SCOPE 2) | (3) LOG (SCOPE 3) | (4) ΔSCOPE 1 | (5) ΔSCOPE 2 | (6) ΔSCOPE 3 | (7) SCOPE 1 INT | (8) SCOPE 2 INT | (9) SCOPE 3 INT |
|---|---|---|---|---|---|---|---|---|---|
| LOGSIZE | 0.438*** | 0.571*** | 0.572*** | 0.026*** | 0.026*** | 0.027*** | -0.118* | 0.002 | -0.021** |
| | (0.036) | (0.032) | (0.022) | (0.008) | (0.008) | (0.006) | (0.063) | (0.006) | (0.009) |
| B/M | 0.464*** | 0.555*** | 0.562*** | -0.033** | -0.038 | -0.041** | -0.003 | 0.003 | 0.000 |
| | (0.060) | (0.059) | (0.054) | (0.015) | (0.021) | (0.017) | (0.107) | (0.010) | (0.013) |
| ROE | 0.006*** | 0.006*** | 0.007*** | -0.002*** | -0.002*** | -0.001*** | -0.002 | -0.000 | 0.000 |
| | (0.001) | (0.001) | (0.001) | (0.000) | (0.001) | (0.000) | (0.002) | (0.000) | (0.000) |
| LEVERAGE | 0.531** | 0.625*** | 0.574*** | 0.026 | 0.010 | 0.019 | 0.364 | 0.002 | -0.056* |
| | (0.196) | (0.188) | (0.162) | (0.020) | (0.030) | (0.023) | (0.230) | (0.030) | (0.030) |
| INVEST/A | -2.026*** | -1.950*** | -2.457*** | 0.676*** | 0.706*** | 0.530*** | -0.586 | -0.067 | -0.446** |
| | (0.489) | (0.460) | (0.432) | (0.145) | (0.132) | (0.117) | (1.161) | (0.153) | (0.201) |
| HHI | -1.044*** | -0.569*** | -0.499*** | 0.014 | -0.024 | 0.023** | -2.185*** | 0.009 | -0.260*** |
| | (0.119) | (0.081) | (0.063) | (0.021) | (0.024) | (0.008) | (0.497) | (0.030) | (0.062) |
| LOGPPE | 0.376*** | 0.372*** | 0.317*** | -0.033*** | -0.034*** | -0.030*** | 0.127*** | 0.025*** | 0.026*** |
| | (0.036) | (0.037) | (0.023) | (0.005) | (0.006) | (0.006) | (0.042) | (0.007) | (0.007) |
| SALESGR | 0.237*** | 0.190** | 0.231** | 0.311*** | 0.343*** | 0.320*** | -0.085 | -0.019** | 0.010 |
| | (0.059) | (0.062) | (0.077) | (0.042) | (0.041) | (0.030) | (0.070) | (0.007) | (0.024) |
| EPSGR | 0.137** | 0.146** | 0.144** | -0.005 | -0.011 | 0.001 | 0.009 | 0.006* | -0.002 |
| | (0.049) | (0.049) | (0.050) | (0.008) | (0.012) | (0.006) | (0.038) | (0.003) | (0.006) |
| Year/month F.E. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry F.E. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 189,187 | 189,115 | 189,283 | 156,506 | 156,410 | 156,578 | 189,283 | 189,283 | 189,283 |
| R-squared | 0.899 | 0.849 | 0.905 | 0.150 | 0.136 | 0.320 | 0.786 | 0.650 | 0.935 |

Exhibit 9 to Decl. of Lyon
219

P. Bolton and M. Kacperczyk                                          *Journal of Financial Economics 142 (2021) 517–549*

**Table 8**

Carbon emissions and stock returns.

The sample period is 2005–2017. The dependent variable is *RET*. All variables are defined in Table 1. We report the results of the pooled regression with standard errors clustered at the firm and year level (in parentheses). All regressions include year-month fixed effects. In the regressions for columns 4 through 6, we additionally include industry-fixed effects. Panel A reports the results for the natural logarithm of total firm-level emissions; Panel B reports the results for the percentage change in carbon total emissions; Panel C reports the results for carbon emission intensity. \*\*\*1% significance; \*\*5% significance; \*10% significance.

| Panel A: Total emissions | | | | | | |
|---|---|---|---|---|---|---|
| Variables | (1) | (2) | (3) | (4) | (5) | (6) |
| LOG (SCOPE 1 TOT) | 0.043\*\* | | | 0.164\*\*\* | | |
| | (0.023) | | | (0.036) | | |
| LOG (SCOPE 2 TOT) | | 0.098\*\* | | | 0.167\*\*\* | |
| | | (0.042) | | | (0.048) | |
| LOG (SCOPE 3 TOT) | | | 0.135\*\* | | | 0.312\*\*\* |
| | | | (0.046) | | | (0.071) |
| LOGSIZE | −0.140 | −0.184 | −0.193 | −0.302\* | −0.327\* | −0.410\*\* |
| | (0.163) | (0.167) | (0.165) | (0.148) | (0.154) | (0.163) |
| B/M | 0.460 | 0.469 | 0.444 | 0.656\*\* | 0.642\*\* | 0.562\*\* |
| | (0.260) | (0.266) | (0.258) | (0.234) | (0.229) | (0.224) |
| LEVERAGE | −0.559\* | −0.579\* | −0.498\* | −0.699\*\*\* | −0.712\*\*\* | −0.790\*\*\* |
| | (0.272) | (0.280) | (0.274) | (0.177) | (0.171) | (0.167) |
| MOM | 0.321 | 0.348 | 0.338 | 0.284 | 0.294 | 0.301 |
| | (0.276) | (0.272) | (0.274) | (0.291) | (0.290) | (0.290) |
| INVEST/A | −2.218 | −1.914 | −1.587 | 0.277 | 0.267 | 0.699 |
| | (1.740) | (1.794) | (1.838) | (2.111) | (2.126) | (2.082) |
| ROE | 0.010\* | 0.009 | 0.008 | 0.009\* | 0.009\* | 0.007\* |
| | (0.005) | (0.005) | (0.005) | (0.004) | (0.004) | (0.004) |
| HHI | 0.032 | −0.026 | 0.137 | 0.130\* | 0.052 | 0.111 |
| | (0.110) | (0.112) | (0.101) | (0.072) | (0.073) | (0.071) |
| LOGPPE | −0.015 | −0.027 | −0.045 | 0.020 | 0.019 | −0.017 |
| | (0.100) | (0.088) | (0.090) | (0.058) | (0.058) | (0.057) |
| BETA | 0.059 | 0.023 | 0.047 | 0.045 | 0.040 | 0.063 |
| | (0.131) | (0.131) | (0.130) | (0.148) | (0.147) | (0.146) |
| VOLAT | 0.978 | 0.674 | 0.749 | 0.622 | 0.501 | 0.549 |
| | (3.571) | (3.415) | (3.506) | (3.290) | (3.285) | (3.269) |
| SALESGR | 0.692 | 0.688 | 0.672 | 0.679 | 0.686 | 0.648 |
| | (0.429) | (0.430) | (0.420) | (0.412) | (0.412) | (0.407) |
| EPSGR | 0.592\*\* | 0.589\*\* | 0.575\*\* | 0.637\*\* | 0.636\*\* | 0.615\*\* |
| | (0.234) | (0.231) | (0.232) | (0.231) | (0.233) | (0.227) |
| Year/month F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry F.E. | No | No | No | Yes | Yes | Yes |
| Observations | 184,288 | 184,216 | 184,384 | 184,288 | 184,216 | 184,384 |
| R-squared | 0.203 | 0.204 | 0.204 | 0.206 | 0.206 | 0.206 |
| Panel B: Growth rate in total emissions | | | | | | |
| Variables | (1) | (2) | (3) | (4) | (5) | (6) |
| ΔSCOPE 1 | 0.641\*\*\* | | | 0.627\*\*\* | | |
| | (0.153) | | | (0.144) | | |
| ΔSCOPE 2 | | 0.345\*\* | | | 0.321\*\* | |
| | | (0.125) | | | (0.120) | |
| ΔSCOPE 3 | | | 1.203\*\*\* | | | 1.186\*\*\* |
| | | | (0.318) | | | (0.314) |
| LOGSIZE | −0.023 | −0.013 | −0.037 | −0.107 | −0.099 | −0.121 |
| | (0.110) | (0.112) | (0.111) | (0.114) | (0.115) | (0.117) |
| B/M | 0.391 | 0.388 | 0.410\* | 0.771\*\* | 0.764\*\* | 0.789\*\*\* |
| | (0.232) | (0.233) | (0.226) | (0.257) | (0.257) | (0.246) |
| LEVERAGE | −0.433\* | −0.414\* | −0.441\* | −0.794\*\*\* | −0.785\*\*\* | −0.799\*\*\* |
| | (0.217) | (0.216) | (0.213) | (0.213) | (0.217) | (0.214) |
| MOM | 0.204 | 0.217 | 0.166 | 0.160 | 0.175 | 0.124 |
| | (0.265) | (0.268) | (0.267) | (0.264) | (0.266) | (0.264) |
| INVEST/A | −2.508 | −2.244 | −2.638 | −0.620 | −0.463 | −0.807 |
| | (1.820) | (1.848) | (1.867) | (2.326) | (2.291) | (2.341) |
| ROE | 0.009\*\* | 0.009\*\* | 0.009\*\* | 0.008\* | 0.008\*\* | 0.009\*\* |
| | (0.004) | (0.004) | (0.004) | (0.003) | (0.003) | (0.003) |
| HHI | −0.143 | −0.112 | −0.162 | −0.072 | −0.056 | −0.089 |
| | (0.154) | (0.153) | (0.151) | (0.098) | (0.097) | (0.102) |
| LOGPPE | −0.006 | −0.015 | 0.006 | 0.053 | 0.045 | 0.066 |
| | (0.058) | (0.057) | (0.060) | (0.041) | (0.041) | (0.044) |
| BETA | 0.109 | 0.119 | 0.106 | 0.155 | 0.166 | 0.145 |

(Continued on next page)

Exhibit 9 to Decl. of Lyon

220

**SER 1483**

P. Bolton and M. Kacperczyk                                                           *Journal of Financial Economics 142 (2021) 517–549*

**Table 8**
(Continued)

| Panel B: Growth rate in total emissions | | | | | |
|---|---|---|---|---|---|
| Variables | (1) | (2) | (3) | (4) | (5) | (6) |
|  | (0.165) | (0.165) | (0.168) | (0.158) | (0.157) | (0.162) |
| VOLAT | 1.853 | 2.004 | 1.800 | 1.373 | 1.504 | 1.341 |
|  | (4.240) | (4.226) | (4.274) | (4.072) | (4.075) | (4.107) |
| SALESGR | 0.459 | 0.544 | 0.280 | 0.463 | 0.549 | 0.284 |
|  | (0.447) | (0.454) | (0.430) | (0.429) | (0.434) | (0.402) |
| EPSGR | 0.573** | 0.573** | 0.568** | 0.641** | 0.641** | 0.636** |
|  | (0.247) | (0.246) | (0.250) | (0.263) | (0.263) | (0.266) |
| Year/month F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry F.E. | No | No | No | Yes | Yes | Yes |
| Observations | 153,051 | 152,955 | 153,123 | 153,051 | 152,955 | 153,123 |
| R-squared | 0.218 | 0.218 | 0.218 | 0.221 | 0.221 | 0.222 |

| Panel C: Emission intensity | | | | | |
|---|---|---|---|---|---|
| Variables | (1) | (2) | (3) | (4) | (5) | (6) |
| SCOPE 1 INT | −0.010 |  |  | 0.005 |  |  |
|  | (0.012) |  |  | (0.006) |  |  |
| SCOPE 2 INT |  | 0.145 |  |  | 0.081 |  |
|  |  | (0.121) |  |  | (0.074) |  |
| SCOPE 3 INT |  |  | 0.055 |  |  | 0.048 |
|  |  |  | (0.033) |  |  | (0.075) |
| LOGSIZE | −0.154 | −0.133 | −0.124 | −0.229 | −0.230 | −0.229 |
|  | (0.169) | (0.159) | (0.164) | (0.142) | (0.141) | (0.142) |
| B/M | 0.456 | 0.470 | 0.479* | 0.732** | 0.732** | 0.732** |
|  | (0.264) | (0.269) | (0.258) | (0.243) | (0.243) | (0.244) |
| LEVERAGE | −0.545* | −0.558* | −0.532* | −0.608*** | −0.606*** | −0.603*** |
|  | (0.264) | (0.269) | (0.263) | (0.195) | (0.195) | (0.196) |
| MOM | 0.332 | 0.321 | 0.317 | 0.282 | 0.282 | 0.281 |
|  | (0.277) | (0.279) | (0.279) | (0.292) | (0.292) | (0.291) |
| INVEST/A | −1.953 | −2.047 | −1.916 | −0.041 | −0.037 | −0.022 |
|  | (1.815) | (1.823) | (1.867) | (2.123) | (2.127) | (2.134) |
| ROE | 0.010* | 0.010* | 0.010* | 0.010** | 0.010** | 0.010** |
|  | (0.005) | (0.005) | (0.005) | (0.004) | (0.004) | (0.004) |
| HHI | −0.139 | −0.069 | 0.028 | −0.032 | −0.043 | −0.030 |
|  | (0.137) | (0.113) | (0.082) | (0.074) | (0.072) | (0.067) |
| LOGPPE | 0.034 | 0.010 | 0.006 | 0.081 | 0.079 | 0.080 |
|  | (0.099) | (0.087) | (0.093) | (0.065) | (0.064) | (0.066) |
| BETA | 0.047 | 0.045 | 0.051 | 0.035 | 0.034 | 0.036 |
|  | (0.131) | (0.131) | (0.131) | (0.148) | (0.148) | (0.148) |
| VOLAT | 1.027 | 0.978 | 1.028 | 0.577 | 0.558 | 0.572 |
|  | (3.512) | (3.527) | (3.563) | (3.296) | (3.297) | (3.300) |
| SALESGR | 0.709 | 0.714 | 0.712 | 0.718 | 0.719 | 0.717 |
|  | (0.435) | (0.432) | (0.427) | (0.414) | (0.413) | (0.413) |
| EPSGR | 0.600** | 0.600** | 0.600** | 0.660** | 0.660** | 0.661** |
|  | (0.234) | (0.232) | (0.232) | (0.235) | (0.236) | (0.235) |
| Year/month F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry F.E. | No | No | No | Yes | Yes | Yes |
| Observations | 184,384 | 184,384 | 184,384 | 184,384 | 184,384 | 184,384 |
| R-squared | 0.203 | 0.203 | 0.203 | 0.206 | 0.206 | 0.206 |

Fig. 4. Because different emission variables have different supports, we express the magnitudes in terms of unit standard deviation of each variable at each cross-section in time, so that all plots of the cumulative effect show comparable numbers in terms of economic significance. As can be seen in the figure, there are large positive cumulative returns for all measures of total emissions. The economic magnitudes of the effect become even larger once we factor in differences in industry exposures.

We next estimate the same cross-sectional regression model (1) replacing the level of emissions (*LOG (Emissions TOT)*) with the year-to-year growth in emissions (Δ*(Emissions)*). The results are reported in Table 8, Panel B.

We find again a positive and statistically significant effect of the growth in emissions on stock returns. Interestingly, controlling for industry makes almost no difference when it comes to the effect of the growth in emissions. To allay any concern that our results may be driven by the correlation between emissions and size, we provide additional robustness tests in which we estimate univariate regression models with respective emission variables only, and regressions with emissions and size only. The results, reported in Table A.2 of the Online Appendix indicate that size is an important control when one considers the level of total emissions as a regressor but it is not as important in the model with the growth rate of emissions. Note

Exhibit 9 to Decl. of Lyon
221
**SER 1484**

*P. Bolton and M. Kacperczyk*                                                                                                            *Journal of Financial Economics 142 (2021) 517–549*





**Fig. 4.** Carbon cumulative return premia: level effect.
Figures show the cumulative values of carbon premia estimated from the cross-sectional regressions of monthly returns on the natural logarithm of the level of scope 1, scope 2, and scope 3 emissions. The regressions include the same set of controls as in Table 7. Panel A shows the plots for the model without industry fixed effects, while Panel B shows the results with industry-fixed effects as additional control. The data source is Trucost and the sample period is 2005–2017.

also that *ROE* has a significant positive effect on stock returns under this specification (it is insignificant in the specification with emission levels). We attribute this to the fact that firms with high emission growth likely also have higher earnings, which could result in higher stock returns (to the extent that the higher earnings outcome is unanticipated).

We also plot the time series of the cumulative values of the unadjusted and industry-adjusted carbon premia re-

lated to the growth in emissions in Fig. 5. All measures of emissions exhibit a steady rate of increase in the carbon premium over time.

Finally, we estimate the cross-sectional regression model in (1) for emission intensities. We report the results in Table 8, Panel C. There is no significant effect of emission intensity on returns for any of the three categories of emissions, whether we control for industry or not. The cumulative effect of emission intensity on the carbon pre-

Exhibit 9 to Decl. of Lyon
222
**SER 1485**

*P. Bolton and M. Kacperczyk*                                                  *Journal of Financial Economics 142 (2021) 517–549*





**Fig. 5.** Carbon cumulative return premia: change effect.
Figures show the cumulative values of carbon premia estimated from the cross-sectional regressions of monthly returns on the percentage changes (year over year) of scope 1, scope 2, and scope 3 emission levels. The regressions include the same set of controls as in Table 7. Panel A shows the plots for the model without industry fixed effects, while Panel B shows the results with industry-fixed effects as additional control. The data source is Trucost and the sample period is 2005–2017.

mium, presented in Fig. 6, is also quite weak, with the exception of scope 2 for which we observe a slightly positive trend. Overall, these results reveal that there is a significant carbon premium with respect to the level of emissions, reflecting firms' long-run risk exposure to carbon emissions, and a premium with respect to the growth in emissions, which capture the more short-term evolution of firms' risk exposure to future emissions.

One open question with our analysis above is that we use carbon emission data in year $t$ to explain monthly returns over the same year $t$. This could conceivably introduce a look-ahead bias. That is, under this specification we might unwittingly relate stock returns for some months in year $t$ to emission data that might not yet have been available to investors. To address this question, we undertake the following robustness check. We relate monthly

stock returns with a lag of respectively 0 to 12 months between the time when emissions are reported and the month when returns are realized.

Another interpretation of the results with lagged returns is that investors have limited attention and do not immediately absorb new information about carbon emissions at the firm level (Kacperczyk et al., 2016). In that case, carbon emissions for year $t$ will be gradually reflected in returns over the year. An additional consideration is that investors obtain information about carbon emissions from multiple sources that are not all available at the same time. For example, a lot of firms disclose their emissions first to the CDP, data which then is merged into and combined with other sources by Trucost. Different information that is likely to be highly correlated with other information (given that all providers use the same data collection protocols)

535

Exhibit 9 to Decl. of Lyon
223
**SER 1486**

Case 2:24-cv-00801-ODW-PVC   Document 56-9   Filed 07/24/24   Page 21 of 34   Page ID #:6204

*P. Bolton and M. Kacperczyk*        *Journal of Financial Economics 142 (2021) 517–549*





**Fig. 6.** Carbon cumulative return premia: intensity effect.
Figures show the cumulative values of carbon premia estimated from the cross-sectional regressions of monthly returns on the carbon intensity of scope 1, scope 2, and scope 3 emissions. The regressions include the same set of controls as in Table 7. Panel A shows the plots for the model without industry fixed effects, while Panel B shows the results with industry-fixed effects as additional control. The data source is Trucost and the sample period is 2005–2017.

becomes available at different times. This is another reason why carbon emissions are only gradually reflected in stock returns.

We report the results in Table A.3. A remarkable pattern emerges from this analysis. Panel A1 reports the results for LOG *(SCOPE 1 TOT)*. The coefficient is statistically significant for the first month (without industry fixed effects), remains significant at the 5% level until month 6 (with industry fixed effects), and is insignificant thereafter. Not surprisingly, it takes time for information about emis-

sions to be reflected in stock prices, but eventually (after six months or so) this information appears to be fully absorbed. Essentially the same pattern is observed for the level of scope 2 and scope 3 emissions (with a somewhat faster (slower) integration of scope 2 (scope 3) emission information into stock prices), as the results in Panels A2 and A3 show. The same pattern is present for the growth in total emissions, as can be seen in panels B1, B2, and B3. However, emission intensity is nearly always insignificant, as we report in Panels C1, C2, and C3. The only visible ex-

Exhibit 9 to Decl. of Lyon
224
**SER 1487**

*P. Bolton and M. Kacperczyk*                                                                                     *Journal of Financial Economics 142 (2021) 517–549*



**Fig. 7.** Carbon intensity and institutional ownership: cumulative effect.

Figures show the cumulative values of the coefficient of emission intensity estimated from the cross-sectional regressions of monthly firm-level institutional ownership on scope 1, scope 2, and scope 3 emissions intensity. The regressions include the same set of controls as Table 11. Panel A shows the plots for the full sample, Panel B shows the results for the sample of firms excluding salient industries (GIC 19, 20, 23), Panel C shows the results for the sample of firms excluding the same salient industries and also firms that are added to the sample post 2015. The data source is Trucost and the sample period is 2005–2017.

Exhibit 9 to Decl. of Lyon
225
**SER 1488**

P. Bolton and M. Kacperczyk

Journal of Financial Economics 142 (2021) 517–549

**Table 9**

Carbon emissions and stock returns net of earnings returns.

The sample period is 2005–2017. The dependent variable is $RET$ net of daily return realized on the earnings announcement day. All variables are defined in Table 1. We report the results of the pooled regression with standard errors clustered at the firm and year level (in parentheses). All regressions include year-month fixed effects. In the regressions for columns 4 through 6, we additionally include industry-fixed effects. Panel A reports the results for the natural logarithm of total emissions; Panel B reports the results for the percentage change in carbon total emissions; Panel C reports the results for carbon emission intensity. ***1% significance; **5% significance; *10% significance.

| Panel A: Total emissions | | | | | | |
|---|---|---|---|---|---|---|
| Variables | (1) | (2) | (3) | (4) | (5) | (6) |
| LOG (SCOPE 1 TOT) | 0.044* (0.024) | | | 0.152*** (0.031) | | |
| LOG (SCOPE 2 TOT) | | 0.088** (0.040) | | | 0.150*** (0.044) | |
| LOG (SCOPE 3 TOT) | | | 0.121** (0.047) | | | 0.279*** (0.067) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry F.E. | No | No | No | Yes | Yes | Yes |
| Observations | 184,288 | 184,216 | 184,384 | 184,288 | 184,216 | 184,384 |
| R-squared | 0.220 | 0.221 | 0.220 | 0.223 | 0.223 | 0.223 |
| Panel B: Growth rate in total emissions | | | | | | |
| Variables | (1) | (2) | (3) | (4) | (5) | (6) |
| ΔSCOPE 1 | 0.552*** (0.137) | | | 0.532*** (0.131) | | |
| ΔSCOPE 2 | | 0.288** (0.111) | | | 0.266** (0.108) | |
| ΔSCOPE 3 | | | 0.896** (0.313) | | | 0.882** (0.316) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry F.E. | No | No | No | Yes | Yes | Yes |
| Observations | 153,051 | 152,955 | 153,123 | 153,051 | 152,955 | 153,123 |
| R-squared | 0.235 | 0.236 | 0.235 | 0.239 | 0.239 | 0.239 |
| Panel C: Emission intensity | | | | | | |
| Variables | (1) | (2) | (3) | (4) | (5) | (6) |
| SCOPE 1 INT | −0.008 (0.011) | | | 0.004 (0.007) | | |
| SCOPE 2 INT | | 0.155 (0.124) | | | 0.079 (0.068) | |
| SCOPE 3 INT | | | 0.050 (0.032) | | | 0.029 (0.071) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry F.E. | No | No | No | Yes | Yes | Yes |
| Observations | 184,384 | 184,384 | 184,384 | 184,384 | 184,384 | 184,384 |
| R-squared | 0.220 | 0.220 | 0.220 | 0.223 | 0.223 | 0.223 |

ception is scope 1 emission intensity, which is significant at the 5% level in month 6 in the model with industry fixed effects. We conclude from this analysis that our results are not biased by a look-ahead effect.

Another possible explanation is that firms with higher emissions have also been exposed to unexpected positive value shocks. We explore this hypothesis by analyzing returns that strip out the effect of earnings surprises. Specifically, we subtract from the monthly stock returns the component that is realized on earnings announcement days and re-estimate the regression model in (1) with the adjusted returns. We report the results in Table 9 for the level of total emissions (Panel A), for the growth rate of emissions (Panel B), and for emission intensity (Panel C). We find no significant differential effect of earnings an-

nouncements on the carbon premium. Stocks with higher levels and growth rates of emissions still have higher returns, and emission intensity is still insignificant.

### 3.3. Carbon premium and risk factors

Is the carbon premium linked to traditional risk factors? To answer this question, we estimate the following time-series regression model using monthly data:

$$a_{1,t} = c_0 + \mathbf{c}\mathbf{F}_t + \varepsilon_t, \qquad (2)$$

where $a_{1,t}$ is the carbon return premium estimated from the cross-sectional Fama-MacBeth regression in Eq. (1); $\mathbf{F}$ is a set of factor-mimicking portfolios that includes MK-TRF, HML, SMB, MOM, CMA, BAB, LIQ, NET ISSUANCE, and

Exhibit 9 to Decl. of Lyon
226
**SER 1489**

P. Bolton and M. Kacperczyk

Journal of Financial Economics 142 (2021) 517–549

IDIO VOL. These factors have been widely used in many studies of asset prices. There are also economic reasons to believe that they could be meaningfully related to our carbon factor. Specifically, the first five factors correspond to the classic framework of Fama and French. In light of our results reported above, firm-level emissions are related to firm size and to firms' growth opportunities; hence we include both the SMB and HML factors. The investment factor, CMA, controls for any differences in investments across firms. The market and momentum factors are standard controls in all time-series regressions. The BAB factor controls for the possibility that high carbon risk firms may be exposed to margin investments. The liquidity factor controls for possible differences in market liquidity among firms with different levels of carbon emissions, which could arise if some firms are not as actively traded as others due to ESG norm-based reasons. The net-issuance factor controls for any variation in capital structure and market timing by firm managers. Finally, the idiosyncratic volatility factor controls for the possibility that the measure of risk we capture may be idiosyncratic in nature. We calculate the standard errors of the coefficients using the Newey-West procedure with 12 lags to account for autocorrelation in error terms. Our coefficient of interest is $c_0$, which measures the residual carbon premium, controlling for other risk/style factors.

Panel A in Table 10 shows the results for the carbon premium related to total emissions. In the odd columns, we report the unconditional carbon premium as a benchmark. In the even columns, we report results from regressions that add various factors MKTRF, HML, SMB, MOM, CMA, BAB, LIQ, NET ISSUANCE, and IDIO VOL. Comparing the odd and even columns for the respective scope categories of emissions, we find that the carbon premium remains statistically and economically significant after we adjust for differential factor exposures. However, the economic size of the premium is about 10%–20% smaller in magnitude. Overall, the regression intercepts from the cross-sectional return regressions are both economically and statistically significant in the presence of various risk factors.

Panel B shows the results for the carbon premium related to the growth rate in total emissions. We find again that the set of standard risk factors cannot explain the average value of the carbon premium for any of the emissions categories. This time, however, the difference in magnitudes across specifications is much smaller. Panel C gives the results for emission intensity. Whether unconditionally or conditionally on the risk factors, we find no significant carbon premium.

Overall, our time-series regression results show that the carbon premium cannot be explained by known risk factors. This result reinforces the finding in Section 3.2 that the level of carbon emissions contains independent information about the cross-section of average returns.

### 3.4. The divestment hypothesis

An important possible explanation for the observed carbon premium could be under-diversification resulting from divestment and exclusionary screening of stocks with high

carbon emissions by institutional investors implementing a sustainable investment policy. To the extent that some investors may shun companies with high carbon emissions, risk sharing would be limited, and idiosyncratic risk could be priced (e.g., Merton, 1987; Hong and Kacperczyk, 2009). If the extent of such divestment is high, one would expect to see significant pricing effects.

We test this possibility by looking at the portfolio holdings of institutional investors. Formally, we estimate the following pooled regression model:

$$IO_{i,t} = d_0 + d_1 Emission_{j,t} + d_2 Controls_{j,t} + \varepsilon_{i,t}. \quad (3)$$

We consider ownership effects based on carbon intensity, the measure that is most aligned with explicit mandates imposed by socially sensitive asset managers. In the Online Appendix, Table A.4, we also present the results for the less commonly used measures of total emissions and growth in emissions. As these results confirm, these variables have no significant impact on institutional investor portfolios. The vector of controls includes LOGSIZE, PRINV, B/M, MOM, BETA, VOLAT, VOLUME, NASDAQ, and SP500. All regressions include year/month fixed effects. Also, carbon emissions tend to vary geographically, due to resource-driven firm locations. It is thus possible that the geographic location may also interact with ownership incentives. We test this idea by including in the ownership regression state fixed effects determined by the firm headquarters' locations (in even columns). Our coefficient of interest is $d_1$, which measures the degree of avoidance of firms with greater carbon emissions. We cluster standard errors at the industry and year levels.

In Panel A of Table 11, we report the results for the aggregate institutional ownership measure. Columns 1 and 2 show the results for SCOPE 1 INT, respectively without and with state fixed effects. Both coefficients are negative and statistically significant at the 5% level. The economic effect of the divestment is relatively modest: a one-standard-deviation increase in SCOPE 1 leads to approximately a 1.3-percentage-point decrease in aggregate institutional ownership, which is about 6.3% of the cross-sectional standard deviation in ownership. In contrast, the coefficients are statistically insignificant for SCOPE 2 INT and SCOPE 3 INT, indicating that the exclusionary screens institutional investors apply in constructing their portfolios are entirely based on SCOPE 1 INT.

The institutional investor world pools a number of different constituencies with possibly different investor pressures. We conjecture that certain institutions, such as insurance companies, investment advisers, or pension funds, are more likely to face investor pressure, and thus they avoid high-emission companies, as opposed to mutual funds and hedge funds who are natural arbitrageurs. We test this hypothesis formally by dividing the institutional investors' universe into six categories: banks, insurance companies, investment companies, independent advisers, pension funds, and hedge funds. For each category, we obtain their stock-level institutional ownership and estimate the regression model in (3) for each of them separately. Panel B reports the results broken down by investor category. We observe a strong cross-sectional variation in the ownership patterns. Insurance companies, in-

Exhibit 9 to Decl. of Lyon
227
**SER 1490**

P. Bolton and M. Kacperczyk

*Journal of Financial Economics 142 (2021) 517–549*

vestment advisers, and pension funds tend to hold less of the high scope 1 emission companies. At the same time, we observe positive, though weaker, ownership effects for banks, investment companies, and hedge funds, consistent with these groups being natural arbitrageurs. The di-

vestment effects are economically large. A movement in *SCOPE 1 INT* from one standard deviation below the mean to one standard deviation above the mean, corresponding to a spread between low and high-emission firms leads to a reduction in ownership by 21%, 5%, and 4% of the

**Table 10**

Can the carbon premium be explained by risk factors?

The sample period is 2005–2017. The dependent variable is the monthly carbon premium estimated each period using a cross-sectional return regression. All variables are defined in Table 1. We report the results of the time-series regression with standard errors adjusted for autocorrelation with 12 lags using Newey-West test (in parentheses). Panel A reports the results for the natural logarithm of contemporaneous total emissions; Panel B reports the results for the percentage change in carbon emissions; Panel C reports the results for carbon emission intensity. ***1% significance; **5% significance; *10% significance.

**Panel A: Total emissions**

| | LOG (SCOPE 1 TOT) | | LOG (SCOPE 2 TOT) | | LOG (SCOPE 3 TOT) | |
|---|---|---|---|---|---|---|
| Variables | (1) | (2) | (3) | (4) | (5) | (6) |
| MKTRF | | −1.176 | | 3.298*** | | 3.429** |
| | | (0.714) | | (1.084) | | (1.357) |
| HML | | −6.020*** | | −4.284** | | −6.444** |
| | | (1.598) | | (1.759) | | (2.537) |
| SMB | | −0.331 | | 1.184 | | 1.539 |
| | | (0.887) | | (2.858) | | (1.840) |
| MOM | | 0.399 | | −3.853** | | −3.580*** |
| | | (0.559) | | (1.721) | | (1.281) |
| CMA | | 0.086*** | | 0.053 | | 0.116*** |
| | | (0.028) | | (0.036) | | (0.036) |
| BAB | | 0.772 | | 0.303 | | 1.581 |
| | | (0.824) | | (1.749) | | (1.681) |
| LIQ | | 2.658*** | | 0.816 | | 3.094*** |
| | | (0.768) | | (1.135) | | (1.016) |
| NET ISSUANCE | | 1.250 | | −1.603 | | 0.376 |
| | | (1.015) | | (2.207) | | (2.352) |
| IDIO VOL | | 1.566** | | 0.986 | | 0.414 |
| | | (0.723) | | (1.070) | | (1.319) |
| Constant | 0.058** | 0.053** | 0.085** | 0.070*** | 0.103*** | 0.065** |
| | (0.026) | (0.023) | (0.037) | (0.027) | (0.035) | (0.027) |
| Industry adj. | No | No | No | No | No | No |
| Adj. R2 | 0.001 | 0.331 | 0.001 | 0.335 | 0.001 | 0.247 |
| Observations | 156 | 156 | 156 | 156 | 156 | 156 |

**Panel B: Growth rate in total emissions**

| | ΔSCOPE 1 | | ΔSCOPE 2 | | ΔSCOPE 3 | |
|---|---|---|---|---|---|---|
| Variables | (1) | (2) | (3) | (4) | (5) | (6) |
| MKTRF | | 4.847 | | −2.463 | | 8.303 |
| | | (5.605) | | (2.516) | | (8.965) |
| HML | | −8.427** | | −5.897* | | −17.483** |
| | | (3.853) | | (3.362) | | (7.113) |
| SMB | | −15.284** | | −9.960* | | −23.109* |
| | | (6.419) | | (5.667) | | (13.738) |
| MOM | | 3.223 | | 3.703 | | 9.171 |
| | | (4.704) | | (2.727) | | (8.912) |
| CMA | | −0.159* | | −0.153*** | | −0.468*** |
| | | (0.087) | | (0.058) | | (0.168) |
| BAB | | −8.919*** | | 2.396 | | 11.861 |
| | | (3.255) | | (2.036) | | (8.199) |
| LIQ | | 0.808 | | −1.343 | | 9.512* |
| | | (2.495) | | (2.342) | | (4.847) |
| NET ISSUANCE | | 4.702 | | 1.724 | | 15.976 |
| | | (5.262) | | (4.821) | | (13.211) |
| IDIO VOL | | 3.851 | | 6.477* | | 16.111 |
| | | (6.820) | | (3.474) | | (11.811) |
| Constant | 0.640*** | 0.643*** | 0.435*** | 0.463*** | 1.559*** | 1.424*** |
| | (0.089) | (0.120) | (0.065) | (0.063) | (0.237) | (0.250) |
| Industry adj. | No | No | No | No | No | No |
| Adj. R2 | 0.001 | 0.107 | 0.001 | 0.178 | 0.001 | 0.290 |
| Observations | 144 | 144 | 144 | 144 | 144 | 144 |

(continued on next page)

Exhibit 9 to Decl. of Lyon

228

**SER 1491**

P. Bolton and M. Kacperczyk

Journal of Financial Economics 142 (2021) 517–549

**Table 10**
(continued)

| | Panel C: Emission intensity | | | | | |
|---|---|---|---|---|---|---|
| | SCOPE 1 INT | | SCOPE 2 INT | | SCOPE 3 INT | |
| Variables | (1) | (2) | (3) | (4) | (5) | (6) |
| MKTRF | | −0.793*** | | 1.790 | | 0.820 |
| | | (0.177) | | (2.810) | | (0.880) |
| HML | | −0.927*** | | −6.181 | | −4.063** |
| | | (0.315) | | (4.340) | | (1.635) |
| SMB | | −1.027** | | −9.486 | | −0.722 |
| | | (0.519) | | (6.371) | | (1.214) |
| MOM | | 0.855*** | | −1.195 | | −0.449 |
| | | (0.214) | | (2.970) | | (0.597) |
| CMA | | 0.001 | | 0.008 | | 0.039 |
| | | (0.007) | | (0.101) | | (0.031) |
| BAB | | 0.302 | | −4.055 | | −0.645 |
| | | (0.391) | | (3.961) | | (0.915) |
| LIQ | | 0.229 | | 0.372 | | 2.608*** |
| | | (0.297) | | (2.942) | | (0.800) |
| NET ISSUANCE | | 0.445 | | −6.006 | | −0.139 |
| | | (0.304) | | (5.742) | | (1.159) |
| IDIO VOL | | 0.333 | | 8.908*** | | 0.424 |
| | | (0.293) | | (3.069) | | (0.723) |
| Constant | −0.006 | −0.004 | 0.121 | 0.181* | 0.018 | 0.012 |
| | (0.008) | (0.007) | (0.102) | (0.097) | (0.027) | (0.028) |
| Industry adj. | No | No | No | No | No | No |
| Adj. R2 | 0.001 | 0.413 | 0.001 | 0.135 | 0.001 | 0.104 |
| Observations | 156 | 156 | 156 | 156 | 156 | 156 |

cross-sectional standard deviation of ownership for investment advisers, insurance companies, and pension funds, respectively. In particular, given its large aggregate shares of stock holdings, the effect through investment advisers could lead to significant pricing effects. In sharp contrast to the results for *SCOPE 1 INT*, we observe that (with the exception of banks loading up positively on *SCOPE 3 INT*) all coefficients for the different investor types are small and statistically insignificant, which suggests that institutional investors do not seem to discriminate between stocks with regard to their scope 2 and scope 3 emission intensities.

Overall, institutional investors do significantly divest from firms associated with high *SCOPE 1 INT*. They do not screen companies based on the level of their emissions (or growth in emissions), even though the carbon premium is associated with these variables. They prefer to screen firms based on how efficiently they use fossil fuel energy and do not seem to be concerned about reducing their exposure to the level of carbon emissions per se. We conclude from these findings that, unlike for "sin" stocks (as shown by Hong and Kacperczyk, 2009), limited risk sharing caused by divestment cannot alone explain why we observe a return premium for companies with higher levels (and growth) of emissions.

### 3.5. Coarse categorization

It is often pointed out that only a handful of industries produce the most significant fraction of carbon emissions.[14] The typical salient industries that are mentioned

are oil & gas (GIC = 2), utilities (GIC = 65–69), and transportation (GIC = 19, 20, and 23). It is therefore natural to wonder whether our results are disproportionately driven by these sectors, and whether our cross-sectional carbon premium would become significantly smaller if we exclude these industries from our analysis.

In Table 12, we report the results for the subset of firms, excluding the sectors mentioned above. Panel A reports the results for total emissions, Panel B for the growth rate in emissions, and Panel C for emission intensity. Compared with the results in Table 8, we observe that, if anything, excluding these salient sectors strengthens the results on the firm-level carbon premium. These findings imply that there is a coarser categorization of companies by investors within the salient industries, where returns are less sensitive to differences in emissions across firms.

In Table 13, we report the results on institutional ownership when the salient high-CO$_2$ industries are excluded. Consistent with Gabaix (2014), we find that coarse industry-level categorization drives our divestment results. Indeed, there is no significant divestment in the other industries. This is true in the aggregate as well as for the different categories of investors. It is as if investors decided to reduce their exposure to certain industries by divesting from some firms but holding on to the best in class in terms of scope 1 emission intensity in those industries. In Table A.5 of the Online Appendix, we provide additional evidence on this result with respect to levels and changes in emissions. We do not observe any divestment based on levels of emissions, but some divestment based on the

---

[14] For instance, in a 2016 report, the International Energy Agency estimates that 39% of CO$_2$ emissions come from electricity and heat

production, 30% from transport, and 11% from industrial production (see https://www.iea.org/media/statistics/Energy_and_CO2_Emissions_in_the_OECD.pdf).

Exhibit 9 to Decl. of Lyon
229
SER 1492

P. Bolton and M. Kacperczyk

*Journal of Financial Economics 142 (2021) 517–549*

**Table 11**

Carbon emissions and institutional ownership.

The sample period is 2005–2017. The dependent variable in Panel A is *IO*. The dependent variables in Panel B, Panel C, and Panel D are *IO_BANK, IO_INSURANCE, IO_INVESTCOS, IO_ADVISERS, IO_PENSIONS*, and *IO_HFS*. Panels A-D present the result for contemporaneous measures of emission intensity. Panel B presents the results for *SCOPE 1*, Panel C presents the results for *SCOPE 2*, and Panel D presents the results for *SCOPE 3*. All variables are defined in Table 1. We report the results of the pooled regression with standard errors clustered at the industry and year level (in parentheses). All regressions include year-month fixed effects. In Panel A, the regressions for columns 2, 4, and 6 additionally include state-fixed effects. All regressions in Panels B-D include state fixed effects. ***1% significance; **5% significance; *10% significance.

| Panel A: Aggregate ownership (Emission intensity) | | | | | |
|---|---|---|---|---|---|
| Variables | (1) | (2) | (3) | (4) | (5) | (6) |
|  | (0.085) | (0.083) |  |  |  |  |
| SCOPE 2 INT |  |  | −0.383 | −0.381 |  |  |
|  |  |  | (1.621) | (1.610) |  |  |
| SCOPE 3 INT |  |  |  |  | 0.094 | −0.130 |
|  |  |  |  |  | (0.550) | (0.581) |
| LOGSIZE | 2.078 | 1.847 | 2.096 | 1.859 | 2.104 | 1.850 |
|  | (1.510) | (1.702) | (1.484) | (1.706) | (1.499) | (1.706) |
| PRINV | −29.353*** | −37.098*** | −29.333*** | −37.161*** | −29.308*** | −37.200*** |
|  | (5.614) | (6.448) | (5.611) | (6.392) | (5.640) | (6.476) |
| MOM | −1.453 | −1.792* | −1.542 | −1.871** | −1.544 | −1.858* |
|  | (0.937) | (0.876) | (0.895) | (0.823) | (0.920) | (0.856) |
| B/M | −1.165 | −0.890 | −1.533 | −1.205 | −1.498 | −1.216 |
|  | (1.423) | (1.602) | (1.366) | (1.541) | (1.339) | (1.549) |
| BETA | 9.123*** | 9.470*** | 9.332*** | 9.705*** | 9.300*** | 9.695*** |
|  | (1.508) | (1.459) | (1.421) | (1.375) | (1.430) | (1.388) |
| VOLAT | −7.617 | 4.118 | −6.867 | 4.770 | −7.095 | 4.532 |
|  | (14.257) | (12.827) | (13.550) | (11.939) | (14.024) | (12.565) |
| VOLUME | −4.427*** | −4.612** | −4.379*** | −4.568** | −4.389*** | −4.582** |
|  | (1.400) | (1.636) | (1.422) | (1.650) | (1.378) | (1.626) |
| NASDAQ | −1.159 | −1.529 | −0.875 | −1.255 | −0.751 | −1.292 |
|  | (1.467) | (1.700) | (1.431) | (1.638) | (1.303) | (1.505) |
| SP500 | 2.559 | 1.711 | 2.418 | 1.508 | 2.394 | 1.510 |
|  | (2.120) | (2.093) | (2.122) | (2.088) | (2.129) | (2.095) |
| Year/month F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| State fixed effect | No | Yes | No | Yes | No | Yes |
| Observations | 170,701 | 160,406 | 170,701 | 160,406 | 170,701 | 160,406 |
| R-squared | 0.121 | 0.166 | 0.118 | 0.162 | 0.118 | 0.162 |

| Panel B: Disaggregate ownership | | | | | |
|---|---|---|---|---|---|
| Variables | (1) Banks | (2) Insurance | (3) Invest. Cos. | (4) Advisers | (5) Pensions | (6) Hedge Funds |
| SCOPE 1 INT | 0.001** | −0.011* | 0.026 | −0.258*** | −0.009* | 0.033 |
|  | (0.000) | (0.005) | (0.022) | (0.056) | (0.004) | (0.028) |
| SCOPE 2 INT | 0.009 | −0.253 | −0.139 | −0.156 | 0.049 | 0.108 |
|  | (0.006) | (0.144) | (0.406) | (0.992) | (0.097) | (0.441) |
| SCOPE 3 INT | 0.004* | −0.021 | 0.038 | 0.052 | 0.028 | −0.230 |
|  | (0.002) | (0.071) | (0.115) | (0.409) | (0.030) | (0.151) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| State fixed effect | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 160,406 | 160,406 | 160,406 | 160,406 | 160,406 | 160,406 |

growth of scope 2 and scope 3 emissions. This divestment is particularly strong for pension funds.

### 3.6. Investor awareness

The carbon premium in stock returns could also be affected by the changing awareness of investors about carbon risk. In particular, one would expect that periods with greater climate change awareness would have a higher carbon premium. We evaluate this hypothesis in two ways. First, we compare the estimated carbon premium before and after the Paris Agreement in 2015. Second, we impute carbon emissions in the 1990s based on their levels in

2005 and estimate the carbon premium over this decade and compare this premium to the one obtained over our sample period, when similarly imputing back carbon emissions based on the levels of emissions in 2017. Both tests offer complementary views on the role of changing investors' attention. The first test allows us to assess the short-term impact of changing attention, while the second test is more suited for the long-term changes in attention.

The Paris Agreement possibly raised both the awareness of risks tied to carbon emissions and the prospect of regulatory interventions to limit carbon emissions. One could therefore expect that the carbon risk premium would increase after 2015 following the Paris Agreement. We test

Exhibit 9 to Decl. of Lyon
230
SER 1493

P. Bolton and M. Kacperczyk

*Journal of Financial Economics 142 (2021) 517–549*

**Table 12**

Carbon emissions and stock returns: excluding salient industries.

The sample period is 2005–2017. The dependent variable is *RET*. All variables are defined in Table 1. We report the results of the pooled regression with standard errors clustered at the industry level (in parentheses). The sample excludes companies in the oil and gas (gic=2), utilities (gic=65–69), and transportation (gic=18, 19, 23) industries All regressions include year-month fixed effects. In the regressions for columns 4–6, we additionally include industry-fixed effects. Panel A reports the results for the natural logarithm of total emissions; Panel B reports the results for the percentage change in carbon emissions; Panel C reports the results for carbon emission intensity. ***1% significance; **5% significance; *10% significance.

| Panel A: Total emissions | | | | | | |
|---|---|---|---|---|---|---|
| Variables | (1) | (2) | (3) | (4) | (5) | (6) |
| LOG (SCOPE 1 TOT) | 0.072** | | | 0.177*** | | |
| | (0.025) | | | (0.044) | | |
| LOG (SCOPE 2 TOT) | | 0.097** | | | 0.227*** | |
| | | (0.039) | | | (0.057) | |
| LOG (SCOPE 3 TOT) | | | 0.117** | | | 0.324*** |
| | | | (0.048) | | | (0.074) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry F.E. | No | No | No | Yes | Yes | Yes |
| Observations | 164,094 | 164,166 | 164,190 | 164,094 | 164,166 | 164,190 |
| R-squared | 0.213 | 0.213 | 0.213 | 0.216 | 0.216 | 0.216 |
| Panel B: Growth rate in total emissions | | | | | | |
| Variables | (1) | (2) | (3) | (4) | (5) | (6) |
| $\Delta$SCOPE 1 | 0.657*** | | | 0.630*** | | |
| | (0.151) | | | (0.142) | | |
| $\Delta$SCOPE 2 | | 0.463*** | | | 0.438*** | |
| | | (0.117) | | | (0.112) | |
| $\Delta$SCOPE 3 | | | 1.480*** | | | 1.456*** |
| | | | (0.321) | | | (0.322) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry F.E. | No | No | No | Yes | Yes | Yes |
| Observations | 135,522 | 135,570 | 135,594 | 135,522 | 135,570 | 135,594 |
| R-squared | 0.230 | 0.230 | 0.230 | 0.233 | 0.233 | 0.233 |
| Panel C: Emission intensity | | | | | | |
| Variables | (1) | (2) | (3) | (4) | (5) | (6) |
| SCOPE 1 INT | 0.004 | | | −0.012 | | |
| | (0.016) | | | (0.016) | | |
| SCOPE 2 INT | | 0.154 | | | 0.150 | |
| | | (0.102) | | | (0.112) | |
| SCOPE 3 INT | | | 0.054 | | | 0.160* |
| | | | (0.035) | | | (0.078) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry F.E. | No | No | No | Yes | Yes | Yes |
| Observations | 164,190 | 164,190 | 164,190 | 164,190 | 164,190 | 164,190 |
| R-squared | 0.213 | 0.213 | 0.213 | 0.216 | 0.216 | 0.216 |

this hypothesis by estimating the regression model in (1) on the two sub-periods: 2005–2015, and 2016–2017.[15] We report the results in Table 14. We find that indeed the premium associated with all three categories of emissions is larger during the 2016–2017 subperiod, especially for scope 1 and scope 2. This could be seen as evidence that investors care more about carbon risk following the Paris Agreement. However, an important caveat is that our sample increases after 2015, so that the difference in returns pre and post Paris could be attributed to the new firms that were added to our sample. We explore this possibility

in the Online Appendix and indeed find in Table A.6 that the increase in return premium is mostly due to the addition of the new firms. We find that when we exclude the new firms, the carbon premium becomes insignificant in the two years following the Paris Agreement. The insignificance of the carbon premium does not necessarily mean that carbon risk is no longer priced after the Paris Agreement in 2015; it could be due to a weak statistical power given how noisy returns tend to be.

We further explore the cross-sectional variation of the effect of the Paris Agreement by examining whether the awareness that the Paris Agreement raised had a differential effect on the returns of firms with different exposures to carbon policy risk. We measure the exposures using our three measures of firm-level emissions. Our treatment

---

[15] To enhance the statistical robustness of our results, we now cluster standard errors at the firm and year-month levels.

Exhibit 9 to Decl. of Lyon
231
SER 1494

P. Bolton and M. Kacperczyk

*Journal of Financial Economics 142 (2021) 517–549*

**Table 13**

Carbon emissions and institutional ownership: excluding salient industries.

The sample excludes companies in the oil & gas (gic=2), utilities (gic=65–69), and transportation (gic=18, 19, 23) industries. The sample period is 2005–2017. Panel A presents the results for aggregate ownership for contemporaneous carbon intensity measures, Panel B for disaggregated ownership. All variables are defined in Table 1. We report the results of the pooled regression with standard errors clustered at the industry and year level (in parentheses). All regressions include year-month fixed effects. In Panel A, the regressions for columns 2, 4, and 6, the regressions additionally include state-fixed effects. All regressions for Panel B results include state-fixed effects. $***$1%; $**$5%; $*$10% significance.

| Panel A: Aggregate ownership | | | | | | |
|---|---|---|---|---|---|---|
| Variables | (1) | (2) | (3) | (4) | (5) | (6) |
| SCOPE 1 INT | −0.015 | −0.007 | | | | |
| | (0.094) | (0.104) | | | | |
| SCOPE 2 INT | | | −0.565 | −0.525 | | |
| | | | (1.968) | (2.024) | | |
| SCOPE 3 INT | | | | | 0.421 | 0.246 |
| | | | | | (0.538) | (0.568) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| State fixed effect | No | Yes | No | Yes | No | Yes |
| Observations | 152,799 | 143,337 | 152,799 | 143,337 | 152,799 | 143,337 |
| R-squared | 0.126 | 0.169 | 0.126 | 0.169 | 0.127 | 0.170 |

| Panel B: Disaggregate ownership | | | | | | |
|---|---|---|---|---|---|---|
| Variables | (1) | (2) | (3) | (4) | (5) | (6) |
| | Banks | Insurance | Invest. Cos. | Advisers | Pensions | Hedge Funds |
| SCOPE 1 INT | 0.001$*$ | −0.013 | −0.059 | −0.060 | 0.009 | 0.114 |
| | (0.000) | (0.012) | (0.041) | (0.078) | (0.010) | (0.068) |
| SCOPE 2 INT | 0.006 | −0.298$*$ | −0.320 | −0.224 | 0.051 | 0.261 |
| | (0.006) | (0.164) | (0.487) | (1.252) | (0.124) | (0.523) |
| SCOPE 3 INT | 0.004$*$ | −0.015 | 0.063 | 0.436 | 0.041 | −0.282 |
| | (0.002) | (0.077) | (0.125) | (0.376) | (0.031) | (0.170) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| State fixed effect | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 143,337 | 143,337 | 143,337 | 143,337 | 143,337 | 143,337 |

sample is the subset of firms in the largest quartile of the distribution of firms sorted by the size of their carbon emission as of the end of 2014. We match these firms with a control group of firms with similar characteristics identified by two different techniques: the nearest neighbor and the Mahalanobis distance. The matching characteristics we use are the same as those we include in our return regressions. We report the results based on the nearest neighbor matching in Table 15. The results based on Mahalanobis matching are qualitatively similar.

To validate the quality of our matching, in Table A.7, we show, as an example, the balance test for the matched samples of treatment and control firms based on the scope 1 emission levels. We find that the two samples are not very different from each other along many firm-level dimensions. Notable exceptions are market capitalization, book-to-market ratio, return on equity, and property plant and equipment for which the differences are statistically significant, though not economically large. Importantly, the differences in market capitalization and PPE are expected given that the treatment sample is based on the size of firm emissions, which are strongly correlated with both characteristics. Next, we compare the returns of firms in the treatment and control groups in the one-year period around the Paris Agreement of December 2015. Formally, we estimate the following difference-in-differences regres-

sion model:

$$RET_{i,t} = e_0 + e_1 TREAT * AFTER_{j,t} + e_2 Controls_{i,t}$$
$$+ e_3\mu_i + e_4\mu_t + \varepsilon_{i,t}, \tag{4}$$

where $TREAT$ is a generic indicator variable taking the value one for firms in the treatment sample and zero for firms in the control sample, and $AFTER$ is an indicator variable equal to zero for the period 2015/05–2015/11 and equal to one for the period 2015/12–2016/05. We also include firm and year-month fixed effects in the regression. We estimate this model separately for each scope and emission measure. In the regressions, the sorts correspond to each scope measure, which then separately identify each individual treatment variable. Our coefficient of interest is $e_1$, which measures the differential effect of the change on firms with high emissions and firms with low emissions.

In Panel A of Table A.7, we present the results for the level of total emissions. We find a strong and positive effect on returns based on scope 1 emissions, but no significant effects for the other two scopes of emissions. The effect is economically large, implying that the Paris Agreement resulted in an average increase in returns of more than 10.6% over the six-month period. In Panel B, we show the results based on changes in emissions. While the magnitudes of the results for scope 1 and scope 3 based on the model with industry fixed effects are fairly large

544

Exhibit 9 to Decl. of Lyon

232

**SER 1495**

P. Bolton and M. Kacperczyk

*Journal of Financial Economics 142 (2021) 517–549*

**Table 14**

Carbon emissions and stock returns: sub-periods.

The sample period is 2005–2017. The dependent variable is *RET*. All variables are defined in Table 1. We report the results of the pooled regression with standard errors clustered at the firm and year/month level (in parentheses). All regressions include year-month fixed effects and industry-fixed effects. We report the results for the natural logarithm of contemporaneous total emissions in Panel A; the results for the growth rate in firm emissions in Panel B; and the results for emission intensity in Panel C. ***1% significance; **5% significance; *10% significance.

| | Panel A: Total emissions | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2005–2015 | | | 2016–2017 | | |
| Variables | (1) | (2) | (3) | (4) | (5) | (6) |
| LOG (SCOPE 1 TOT) | 0.127*** | | | 0.205** | | |
| | (0.037) | | | (0.075) | | |
| LOG (SCOPE 2 TOT) | | 0.127*** | | | 0.233** | |
| | | (0.042) | | | (0.087) | |
| LOG (SCOPE 3 TOT) | | | 0.265*** | | | 0.340*** |
| | | | (0.086) | | | (0.107) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 121,694 | 121,622 | 121,778 | 62,594 | 62,594 | 62,606 |
| R-squared | 0.268 | 0.269 | 0.269 | 0.115 | 0.115 | 0.115 |
| | Panel B: Growth rate in total emissions | | | | | |
| | 2005–2015 | | | 2016–2017 | | |
| Variables | (1) | (2) | (3) | (4) | (5) | (6) |
| $\Delta$SCOPE 1 | 0.610*** | | | 0.629** | | |
| | (0.161) | | | (0.249) | | |
| $\Delta$SCOPE 2 | | 0.265*** | | | 0.459** | |
| | | (0.097) | | | (0.193) | |
| $\Delta$SCOPE 3 | | | 1.259*** | | | 1.032** |
| | | | (0.355) | | | (0.436) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 108,888 | 108,804 | 108,948 | 44,163 | 44,151 | 44,175 |
| R-squared | 0.278 | 0.279 | 0.279 | 0.089 | 0.089 | 0.089 |
| | Panel C: Emission intensity | | | | | |
| | 2005–2015 | | | 2016–2017 | | |
| Variables | (1) | (2) | (3) | (4) | (5) | (6) |
| SCOPE 1 INT | 0.005 | | | 0.010 | | |
| | (0.007) | | | (0.019) | | |
| SCOPE 2 INT | | 0.091 | | | 0.117 | |
| | | (0.094) | | | (0.125) | |
| SCOPE 3 INT | | | 0.030 | | | 0.040 |
| | | | (0.091) | | | (0.087) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 121,778 | 121,778 | 121,778 | 62,606 | 62,606 | 62,606 |
| R-squared | 0.268 | 0.268 | 0.268 | 0.114 | 0.114 | 0.114 |

(between 3.7% and 4.5%), they are statistically insignificant. In Panel C, we present the results based on carbon intensity. Surprisingly, we find a strong negative coefficient for scope 3 emissions. The effects for the other two scopes are small and insignificant. Overall, these results on the differential cross-sectional effects of the Paris Agreement are broadly consistent with our other results but their statistical significance is relatively small. Again, one of the reasons could be the relatively small statistical power of the tests, as returns are generally quite noisy. Another reason could be that the salient effects, such as Paris

Agreement, take a longer time to materialize in investors' beliefs.

To offer a longer-term perspective on the changing investors' beliefs, we exploit the fact that climate change and carbon emissions were not yet salient issues in the 1990s. It is only in the last two decades, with the accumulation of $CO_2$ in the atmosphere and the repeated record-breaking temperatures, that climate change has turned into a widespread concern. This naturally raises the question of whether stock returns were already affected by corporate carbon emissions in the 1990s. If information about firm-

545

Exhibit 9 to Decl. of Lyon
233
**SER 1496**

P. Bolton and M. Kacperczyk

Journal of Financial Economics 142 (2021) 517–549

**Table 15**

Paris Agreement and stock returns: difference-in-differences estimation.

The dependent variable is *RET*. Our treatment sample is the subset of firms in the largest quartile of the distribution of firms sorted by the size of their carbon emission as of the end of 2014. We match these firms with a control group of firms with similar characteristics identified by the nearest neighbor method. The matching characteristics we use are the same as those in our return regressions. *TREAT* is a generic indicator variable taking the value one for firms in the treatment sample and zero for firms in the control sample, and *AFTER* is an indicator variable equal to zero for the period 2015/05–2015/11 and equal to one for the period 2015/12–2016/05. We estimate this model separately for each scope and emission measure. In the regressions, the sorts correspond to each scope measure which then separately identify each individual treatment variable. We also include firm and year-month fixed effects in the regression. All variables are defined in Table 1. Standard errors (in parentheses) are clustered at the firm and year/month level. All regressions for columns 4–6 include industry-fixed effects. We report the results for the natural logarithm of contemporaneous total emissions in Panel A; the results for the growth rate in firm emissions in Panel B; and the results for emission intensity in Panel C. ***1% significance; **5% significance; *10% significance.

| Panel A: Total emissions | | | | | | |
|---|---|---|---|---|---|---|
| Variables | (1) | (2) | (3) | (4) | (5) | (6) |
| TREAT1*AFTER | 10.615*** | | | 10.705*** | | |
| | (1.175) | | | (1.200) | | |
| TREAT2*AFTER | | −1.783 | | | −1.681 | |
| | | (5.861) | | | (5.821) | |
| TREAT3*AFTER | | | −8.917 | | | −8.782 |
| | | | (6.081) | | | (6.127) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes |
| Firm F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry F.E. | No | No | No | Yes | Yes | Yes |
| Observations | 5452 | 6604 | 6604 | 5452 | 6604 | 6324 |

| Panel B: Growth rate in total emissions | | | | | | |
|---|---|---|---|---|---|---|
| Variables | (1) | (2) | (3) | (4) | (5) | (6) |
| TREAT1*AFTER | 0.438 | | | 4.425 | | |
| | (4.426) | | | (3.373) | | |
| TREAT2*AFTER | | −3.712 | | | 0.361 | |
| | | (3.541) | | | (2.592) | |
| TREAT3*AFTER | | | 0.396 | | | 3.671 |
| | | | (4.338) | | | (3.927) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes |
| Firm F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry F.E. | No | No | No | Yes | Yes | Yes |
| Observations | 5764 | 5706 | 5901 | 5764 | 5706 | 5901 |

| Panel C: Emission intensity | | | | | | |
|---|---|---|---|---|---|---|
| Variables | (1) | (2) | (3) | (4) | (5) | (6) |
| TREAT1*AFTER | 2.825 | | | 2.855 | | |
| | (5.876) | | | (5.994) | | |
| TREAT2*AFTER | | −0.016 | | | 0.021 | |
| | | (5.344) | | | (5.417) | |
| TREAT3*AFTER | | | −7.614*** | | | −7.749*** |
| | | | (2.070) | | | (2.128) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes |
| Firm F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry F.E. | No | No | No | Yes | Yes | Yes |
| Observations | 4540 | 4853 | 4736 | 4540 | 4853 | 4736 |

level emissions was scarce and/or investors did not pay attention to carbon risk, one would expect that the pricing effects we identify between 2005 and 2017 would be much smaller back then. Given that our carbon emissions data begins in 2005, we cannot evaluate this hypothesis directly. However, we can impute back the unobserved emissions data for each firm in the 1990s from the values we observe later on. In other words, since emission levels are highly autocorrelated and the cross-sectional variation in emissions is stable over time (see Fig. 3), it seems reasonable, as a first pass, to assume that the cross-sectional vari-ation of emissions in the 1990s tracks closely that observed in our data.

Specifically, we make the assumption that each firm with stocks trading during the 1990s has an emission intensity equal to the first officially reported value in the 2005–2017 period. We then collect the time-series information on each company's revenues for the 1990–1999 period and impute the total value of emissions for each firm by taking the product of the emission intensity coefficient and the firm's time-varying sales. We thus obtain a panel of imputed total corporate emissions for 1990–1999. We

Exhibit 9 to Decl. of Lyon
234
SER 1497

P. Bolton and M. Kacperczyk

Journal of Financial Economics 142 (2021) 517–549

**Table 16**

Carbon emissions and stock returns (imputed emissions).

The sample period is 1990–1999. The dependent variable is *RET*. All variables are defined in Table 1. We report the results of the pooled regression with standard errors clustered at the firm and year level (in parentheses). All regressions include year-month fixed effects. In the regressions for columns 4 through 6, we additionally include industry-fixed effects. The total level of emissions is imputed using the earliest observed level of emission intensity for each firm for the period 2005–2017 (in Panel A) and for 1990–1999 (in Panel B) and scaling it by respective revenue values. ***1% significance; **5% significance; *10% significance.

| | Panel A: (2005–2017) | | | | | |
|---|---|---|---|---|---|---|
| Variables | (1) | (2) | (3) | (4) | (5) | (6) |
| LOG (SCOPE 1 TOT) | 0.097*** (0.024) | | | 0.291*** (0.046) | | |
| LOG (SCOPE 2 TOT) | | 0.186*** (0.043) | | | 0.336*** (0.065) | |
| LOG (SCOPE 3 TOT) | | | 0.245*** (0.043) | | | 0.585*** (0.127) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry F.E. | No | No | No | Yes | Yes | Yes |
| Observations | 161,122 | 161,062 | 161,313 | 161,122 | 161,062 | 161,313 |
| R-squared | 0.199 | 0.200 | 0.200 | 0.203 | 0.203 | 0.204 |
| | Panel B: (1990–1999) | | | | | |
| Variables | (1) | (2) | (3) | (4) | (5) | (6) |
| LOG (SCOPE 1 TOT) | −0.037 (0.034) | | | 0.082 (0.078) | | |
| LOG (SCOPE 2 TOT) | | 0.033 (0.045) | | | 0.236 (0.134) | |
| LOG (SCOPE 3 TOT) | | | 0.005 (0.059) | | | 0.318* (0.162) |
| Controls | Yes | Yes | Yes | Yes | Yes | Yes |
| Year/month F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry F.E. | No | No | No | Yes | Yes | Yes |
| Observations | 59,878 | 59,878 | 59,878 | 59,878 | 59,878 | 59,878 |
| R-squared | 0.149 | 0.149 | 0.149 | 0.156 | 0.156 | 0.156 |

do exactly the same for emissions over our sample period. That is, we take the emission intensity coefficient for 2017 and impute back total emissions over the 2017–2005 sample period by multiplying this coefficient with the firm's sales year by year. This latter imputation has the additional benefit of adding imputed emissions to our sample for all the new firms added to our sample in 2016 and provides another robustness check of our findings.

Next, we estimate the regression model in (1) using the imputed emission values for both time periods and report the results in Table 16. The process of imputation is not suitable to explain the variation in emission growth rates since changes in emissions would vary one to one with changes in revenues. We have therefore considered an alternative model in which we have fixed the growth rates at the first available reported value and used it for all dates in the 1990–1999 period. The results from this estimation, available upon request, indicate that again the carbon premium is insignificant. The results in Panel A for the period of our sample indicate that this imputation works and that there is a significant carbon premium associated with the imputed level of emissions for all three scope categories. Notably, the magnitude of the results is even stronger than for the reported emission data. In contrast, the results in Panel B for the 1990s indicate that there was no significant carbon premium over this period. This finding is consistent with the quite plausible view that investors did not yet in-

ternalize carbon risk over this time period, but began to do so in the last two decades, as reporting on climate change, the effects of global warming, technological progress in renewable energy, and political action to curb carbon emissions intensified.

### 3.7. Robustness

We have explored a number of alternatives that provide insight on the effects we document. We report the specific tables in the Online Appendix. Below, we briefly summarize the main findings in these tables.

First, we estimate the carbon premium excluding the period of the financial crisis, which we define as the period from August 2007 to July 2009. The reason for excluding the financial crisis is that during this period the level of emissions is artificially low because of the crisis and stock returns are highly volatile. As a result, the relation between stock returns and carbon emissions may be distorted by the observations from the crisis period. Broadly, we find in Table A.8 that excluding the crisis period does not affect our results in a major way.

Second, we explore the robustness of our results to the alternative GIC 6-digit industry classification. How much does this alternative classification affect changes in the estimates when industry fixed effects are included? Again, the results, reported in Table A.9, are broadly similar to

Exhibit 9 to Decl. of Lyon
235
SER 1498

P. Bolton and M. Kacperczyk

Journal of Financial Economics 142 (2021) 517–549

those obtained under the finer Trucost industry classification. Third, we exclude the salient industries from our analysis of the carbon premium pre and post Paris Agreement. The results are reported in Table A.10. If anything, the increase in the size of the premium is more pronounced in the non-salient industries (with the exception, possibly, of scope 3 emissions).

Fourth, we split the sample into two categories of firms, those that report their emissions and those for which emissions are estimated, and contrast how the carbon premium varies across the two categories. The results are reported in Table A.11. The coefficient for the level of scope 1 emissions is slightly smaller and slightly less significant for firms that disclose their emissions than for firms that do not. This is not entirely surprising given that, other things equal, firms are more likely to disclose their emissions if their performance on that dimension is better. Alternatively, firms that go out of their way to disclose may also have taken steps to reduce their emissions.[16] Overall, the carbon premium is larger and more significant for the firms that do not disclose their emissions for all categories of emissions and for both emission levels and the growth in emissions (with one exception for scope 3 emission levels).

Fifth, we estimate the premium associated with the level and intensity of all three categories of emissions added up together. This is to facilitate comparison with the results in Garvey et al. (2018) and In et al. (2019). As one might expect based on our results for the disaggregated emissions, there is a highly significant premium associated with the level of emissions, but not with emission intensity. The results are presented in Table A.12. Sixth, we also report how institutional investor portfolios are not underweight companies with high levels of emissions (or high growth rates) in Table A.4. If anything, institutional investors load up on scope 2 and scope 3 emission levels. This could be a mechanical effect of their exclusionary screening policies based on scope 1 emission intensity.

Seventh, we further report how institutional investor portfolios are affected by the level of emissions in the companies they hold outside the salient industries tied to fossil fuels. We report the results in Table A.5. Interestingly, institutional investor portfolios load up on all three scope emission levels in the non-salient industries. Again, this is likely the consequence of institutional investors' exclusionary screening in the salient industries. If they hold less in these industries, they must hold more in other industries. Table A.13 also reports the exposure to emission levels of institutional investors' portfolios in the salient industries. Here we observe that their portfolios do not exhibit a significant tilt away from or into firms with high emission levels (with the exception of scope 3 emissions, where they are significantly underweight).

Eighth, we explore how sensitive the carbon premium is to the addition of other firm characteristics besides size. Table A.2 reports the results. It turns out that, controlling for other firm characteristics such as B/M, PPE, leverage, etc. matters. Without these controls, there is no significant premium associated with the level of emissions; however, the growth in emissions remains highly significant. Note also that when we add industry fixed effects, adding size as a control or not affects results, with a significant premium associated with the level of scope 1 emissions appearing only when we control for size.

Ninth, we check the robustness of our ownership regressions with respect to outliers using the natural logarithm transformation. The results, in Table A.14, indicate that there is no significant difference compared to our baseline results in Table 8. Tenth, we estimate the carbon premium on only the subset of firms for which we have carbon emission data before 2016. The results are reported in Table A.15. Although the size of the premium is a little smaller, it is broadly in line with the one estimated on the full sample.

## 4. Conclusion

How is climate change affecting stock returns? This is a fundamental question for the burgeoning field of climate change and finance. It is also a fundamental question for policy makers who are seeking to enlist investors in the fight against climate change. We address this question by undertaking a cross-sectional stock returns analysis, with carbon emissions as a firm characteristic, and find robust evidence that carbon emissions significantly and positively affect stock returns. There is a straightforward link between climate change mitigation and the reduction in carbon emissions. Whether through the production of their goods and services, or through the use of their products, firms are differentially affected by policies to curb carbon emissions and by renewable-energy technology shocks. Our evidence suggests that investors are discerning these cross-sectional differences and are pricing in carbon risk. We also find that the carbon premium cannot be explained through a sin stock divestment effect. Divestment takes place in a coarse way in a few industries such as oil and gas, utilities, and automobiles, and is entirely based on scope 1 emission intensity screens. Notably, we find no carbon premium associated with emission intensity. Moreover, outside the salient industries where all the divestment takes place, we find a robust, persistent, and significant carbon premium at the firm level for all three categories of emission levels and growth rates.

## References

Andersson, M., Bolton, P., Samama, F., 2016. Hedging climate risk. Financ. Anal. J. 72 (3), 13–32.

Baldauf, M., Garlappi, L., Yannelis, C., 2020. Does climate change affect real estate prices? Only if you believe in it. Rev. Financ. Stud. 33, 1256–1295.

Bernstein, A., Gustafson, M., Lewis, R., 2019. Disaster on the horizon: the price effect of sea level rise. J. Financ. Econ 134 (2), 253–272.

Busch, T., Johnson, M., Pioch, T., 2018. Consistency of Corporate Carbon Emission Data. University of Hamburg Report WWF Deutschland, Hamburg.

---

[16] The magnitudes of the coefficients of the estimated emissions could also be affected by measurement error. In general, such measurement error leads to attenuation bias; irrespective of the direction of the bias our comparisons should be treated with caution in the absence of a systematic adjustment for such an error.

Exhibit 9 to Decl. of Lyon

236

**SER 1499**

*P. Bolton and M. Kacperczyk*

*Journal of Financial Economics 142 (2021) 517–549*

Chava, S., 2014. Environmental externalities and cost of capital. Manage. Sci. 60 (9), 2223–2247.

Engle, R., Giglio, S., Lee, H., Kelly, B., Stroebel, J., 2020. Hedging climate change news. Rev. Financ. Stud. 33, 1184–1216.

Giglio, S., Maggiori, M., Rao, K., Stroebel, J., Weber, A., 2018. Climate Change and Long-Run Discount rates: Evidence from Real Estate Chicago Booth Research Paper No. 17–22.

Gabaix, X., 2014. A sparsity-based model of bounded rationality. Q. J. Econ. 129 (4), 1661–1710.

Gennaioli, N., Shleifer, A., 2010. What comes to mind. Q. J. Econ. 125 (4), 1399–1433.

Garvey, G.T., Iyer, M., Nash, J., 2018. Carbon footprint and productivity: does the "E" in ESG capture efficiency as well as environment? J. Invest. Manage. 16 (1), 59–69.

Görgen, M., Jacob, A., Nerlinger, M., Riordan, R., Rohleder, M., Wilkens, M., 2019. Carbon risk. Unpublished working Paper. University of Augsburg.

Hong, H., Kacperczyk, M., 2009. The price of sin: the effects of social norms on markets. J. Financ. Econ. 93 (1), 15–36.

Hong, H., Li, F.W., Xu, J., 2019. Climate risks and market efficiency. J. Econom. 208 (1), 265–281.

Hsu, P.-.H., Li, K., Tsou, C.Y., 2019. The Pollution Premium Unpublished working paper. HKUST.

Ilhan, E., Sautner, Z., Vilkov, G., 2020. Carbon tail risk. Rev. Financ. Stud. forthcoming.

In, S.Y., Park, K.Y., Monk, A., 2019. Is 'being green' Rewarded in the market? An empirical Investigation of Decarbonization and Stock Returns Unpublished working paper. Stanford Global Project Center https://ssrn.com/abstract=3020304 .

Kacperczyk, M., Van Nieuwerburgh, S., Veldkamp, L., 2016. A rational theory of mutual funds' attention allocation. Econometrica 84 (2), 571–626.

Krueger, P., Sautner, Z., Starks, L., 2020. The importance of climate risks for institutional investors. Rev. Financ. Stud. 33, 1067–1111.

Merton, R.C., 1987. A simple model of capital market equilibrium with incomplete information. J. Finance 42, 483–510.

Monasterolo, I., De Angelis, L., 2019. Blind to Carbon risk? An analysis of Stock Market's Reaction to the Paris Agreement. University of Bologna Unpublished working paper.

Murfin, J., Spiegel, M., 2020. Is the risk of sea level rise capitalized in residential real estate? Rev. Financ. Stud. 33, 1217–1255.

Exhibit 9 to Decl. of Lyon

237

**SER 1500**

ROB BONTA
Attorney General of California
GARY E. TAVETIAN (SBN 117135)
MYUNG J. PARK (SBN 210866)
Supervising Deputy Attorneys General
M. ELAINE MECKENSTOCK (SBN 268861)
CAITLAN MCLOON (SBN 302798)
EMILY HAJARIZADEH (SBN 325246)
DYLAN REDOR (SBN 338136)
Deputy Attorneys General
 300 South Spring Street, Suite 1702
 Los Angeles, CA  90013-1230
 Telephone:  (213) 269-6438
 Fax:  (213) 897-2802
 E-mail:  Caitlan.McLoon@doj.ca.gov
*Attorneys for Defendants Liane M. Randolph,
Steven S. Cliff, and Robert A. Bonta*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION,**<br><br>Plaintiffs,<br><br>v.<br><br>**LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, and STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California,**<br><br>Defendants. | 2:24-cv-00801-FMO-PVCx<br><br>**DECLARATION OF ELIZABETH SCHEEHLE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:          September 9, 2024<br>Time:          1:30 p.m.<br>Courtroom:  6D<br>Judge:         The Honorable Otis D. Wright II<br>Trial Date:   Not Set<br>Action Filed: 1/30/2024 |

1

## DECLARATION OF ELIZABETH SCHEEHLE

I, Elizabeth Scheehle, hereby declare:

1.      I am currently the Chief of the Research Division of the California Air Resources Board (CARB).  I have been asked by Counsel for Defendants to submit this declaration in support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment.  I make this declaration based on my personal knowledge and expertise in the matters within, and upon my review of relevant rulemaking, reports, and other documents discussed below.

2.      I have a Bachelor of Science Degree in Earth and Atmospheric Sciences from the Georgia Institute of Technology, a Master of Public Policy Degree from the Kennedy School of Government at Harvard University, and a Master of Public Health Degree from the Bloomberg School of Public Health at Johns Hopkins University.

3.      I have broad experience with climate science and research, which I have acquired through more than 20 years of work in climate change and air quality programs, starting at the U.S. Environmental Protection Agency (U.S. EPA).  There, I led national and international efforts on non-carbon dioxide greenhouse gases. I served as an expert for the United Nations Framework Convention on Climate Change and the Intergovernmental Panel on Climate Change (IPCC). In that role, I earned recognition for contributing to the IPCC's Nobel Prize. I continued my career at the U.S. EPA, developing its Carbon Capture and Sequestration expertise, including comprehensive risk assessment considerations.

4.      I joined CARB's Research Division in 2007 and led three climate change-related efforts: carbon capture and sequestration, an ozone-depleting substance offset protocol, and an early action climate measure. I was a Section Manager of the Research Division's GHG Technology and Field-Testing Section before joining the Cap-and-Trade Program in CARB's Industrial Strategies

2

Division. In 2014, I became a Branch Chief in the Industrial Strategies Division, overseeing oil and gas operations, alternative fuel regulations, and carbon capture and sequestration programs.

5. In 2018, I began my current role as Chief of the Research Division. In that capacity, I oversee CARB's research program, which investigates the causes of human health and welfare impacts from air pollutant emissions and the potential for reducing those impacts through emission reduction strategies. I also lead the development and implementation of multidisciplinary research plans and studies to provide a robust scientific foundation for our air quality and climate policy decisions. In addition, the Division implements programs on indoor air quality and high global warming potential gas mitigation.  A true and correct copy of my CV is attached hereto as **Exhibit (Ex.) 1**.

6. Methodology:

a I have been asked by the California Department of Justice to submit this declaration, based on my independent opinions and expertise, regarding the scientific literature on climate change.

b In developing my opinions for this declaration, I consulted a wide range of scholarly literature on the topics I am discussing.  The key research papers and reports on which I rely are cited below and copies of them will be made available.

c I have relied on information that is customarily reviewed and relied upon by experts in the field of climate science.  There is a large body of scientific research has been conducted, which led to a large body of knowledge on climate change by scientists from different research centers and universities across the world.

d I have relied on my own personal knowledge, training, and experience in the field of climate science. I have also attended numerous scientific workshops or Webinars to discuss and communicate with national and

3

1   international entities with varying expertise in science and policy development of

2   climate change.

3        7.     Climate change is well-documented and has scientific consensus. It is

4   driven by the accumulation of greenhouse gases (GHGs) in the atmosphere,

5   including carbon dioxide ($CO_2$), methane (CH4), nitrous oxide ($N_2O$), and

6   hydrofluorocarbons (HFCs), among others. These gases retain heat on Earth that

7   would otherwise escape back into space. Increasing concentrations of GHGs in the

8   atmosphere thus cause a continuing increase of the planet's average temperature

9   over time, disrupting established geophysical systems (such as ocean circulation)

10   and ecosystems across the globe. Since the Industrial Revolution, the predominant

11   source of climate change-causing GHG emissions has been human activities.

12   Human activities cause the emission of GHGs in various ways, including

13   deforestation and the combustion of fossil fuels for energy.

14        8.     The history of climate change and its processes are well-documented,

15   and show rising concentrations of GHGs over time. $CO_2$, methane, and nitrous

16   oxide are the GHGs with the largest impacts. Of those three, $CO_2$ has the most

17   impact because, even though it absorbs less heat per molecule than methane or

18   nitrous oxide, it is more abundant and stays in the atmosphere much longer. Before

19   the Industrial Revolution started in the mid-1700s, the global average amount of

20   $CO_2$ in the atmosphere was about 280 parts per million. The most recent data from

21   the National Oceanic and Atmospheric Association (NOAA), available on the

22   NOAA website, shows that levels of these three human-caused GHGs continued

23   their steady climb during 2023.[1]  A true and correct copy of a PDF printout of the

24   NOAA website displaying this data is attached as **Exhibit 2**.  As NOAA's data

25   shows, the global concentration of atmospheric $CO_2$, as measured at the Earth's

26   surface, averaged across all 12 months of 2023 was 419.3 parts per million (ppm),

27       
[1] NOAA Research, *No Sign of Greenhouse Gas Increases Slowing in 2023* (April

28   2024), https://research.noaa.gov/2024/04/05/no-sign-of-greenhouse-gases-increases-slowing-in-2023/.

<div align="center">4</div>

1   an increase of 2.8 ppm during the year. This was the 12th consecutive year $CO_2$

2   increased by more than two ppm, extending the highest sustained rate of $CO_2$

3   increases during the 65-year monitoring record. Atmospheric methane, less

4   abundant than $CO_2$ but more potent at trapping heat in the atmosphere, rose to an

5   average of 1922.6 parts per billion (ppb). The 2023 methane increase over 2022

6   was 10.9 ppb, the 5th highest since renewed methane growth started in 2007.

7   Methane levels in the atmosphere are more than 160% higher than their pre-

8   industrial levels. Data collected from NOAA's Global Monitoring Laboratory

9   shows that, in 2023, levels of nitrous oxide, the third-most significant human-

10  caused GHG, reached 336.6 ppb.[2]  A true and correct copy of a PDF printout of the

11  NOAA Global Monitoring Laboratory website is attached as **Exhibit 3.**  Nitrous

12  oxide concentrations are 25% higher than the pre-industrial level of 270 ppb.

13      9.      Through the United Nations (UN) Intergovernmental Panel on

14  Climate Change (IPCC), thousands of scientists work together to collect and

15  analyze the latest available research related to climate change, its effects, and

16  potential responses. In August 2021, the IPCC Working Group 1 released part of

17  the 6th Assessment Report (AR6) titled "Climate Change 2021: The Physical

18  Basis,"[3] which reaffirmed with high confidence that there is a near-linear

19  relationship between cumulative anthropogenic $CO_2$ emissions and the global

20  warming they cause. The temperature response to rising carbon dioxide levels is a

21  crucial metric that predicts the potential negative impacts of climate change.  A

22  true and correct copy of the IPCC Working Group 1's 6th Assessment Report is

23  attached as **Exhibit 4**.

24      10.     The scientific consensus shows that because of this dramatic uptick in

25  $CO_2$ concentrations, the average global surface temperature has increased by

26  ───────────────

[2] NOAA Global Monitoring Laboratory, *Trends in Atmospheric Carbon Dioxide*,

27  https://gml.noaa.gov/ccgg/trends/.

[3] IPCC, *Climate Change 2021: The Physical Science Basis, Sixth Assessment*

28  *Report* (2021), https://report.ipcc.ch/ar6/wg1/IPCC_AR6_WGI_FullReport.pdf.

5

1  around 1.1 degrees Celsius compared with the average in 1850–1900—a level that

2  hasn't been witnessed since 125,000 years ago, before the most recent ice age.[4] A

3  true and correct copy of the IPCC 2021 Summary for Policymakers, which reflects

4  this scientific consensus, is attached as **Exhibit 5**. An international group of

5  researchers analyzed multiple data sets with current measurements and historical

6  reconstructions. Their research concludes that, in the extratropical regions of the

7  Northern Hemisphere (including Europe), the summer of 2023 was the warmest in

8  2,000 years.[5] A true and correct copy of their article discussing this research,

9  published in *Nature*, is attached here as **Exhibit 6**.

10       11.    According to analyses by the National Aeronautics and Space

11  Administration (NASA) and NOAA,[6] 2023 was by far the warmest year on record,

12  with billions of people worldwide experiencing many costly climate-driven

13  weather events in the United States and worldwide. The ten warmest years in the

14  174-year record occurred in the previous decade (2014–2023). A true and correct

15  copy of the NASA press release describing this analysis is attached as **Exhibit 7**.

16  An outlook for 2024, created by NASA and NOAA, suggests a one-in-three chance

17  that this year will be warmer than 2023, with a 99% chance that 2024 will rank

18  among the top five warmest years recorded.[7] A true and correct copy of a news

19  ─────────────

20  [4] IPCC, *AR6 Summary for Policymakers* (2021),
   https://www.ipcc.ch/report/ar6/wg1/downloads/report/IPCC_AR6_WGI_SPM_final.pdf.  IPCC uses the reference period 1850–1900 to approximate pre-industrial

21  temperature, as this is the earliest period with near-global observations.

22  [5] Esper, J., Torbenson, M. & Büntgen, U., *2023 Summer Warmth Unparalleled Over the Past 2,000 Years*, Nature 631 (2024), https://doi.org/10.1038/s41586-024-07512-y.

23  

24  [6] Fox, K. & Jacobs, P., NASA, *NASA Analysis Confirms 2023 as Warmest Year on Record* (Jan. 12, 2024), https://www.nasa.gov/news-release/nasa-analysis-confirms-2023-as-warmest-year-on-record/.

25  [7] Karsen, N., WINK, *NASA and NOAA: 2023 was the Warmest Year on Record*,

26  (Jan. 12, 2024), https://winknews.com/2024/01/12/nasa-noaa-press-conference/;

27  NOAA, *2023 was the World's Warmest Year on Record, By Far* (Jan. 12, 2024),
   https://www.noaa.gov/news/2023-was-worlds-warmest-year-on-record-by-far.

28  

6

1     article describing NASA and NOAA's outlook is attached as **Exhibit 8**.   New data

2     from the Copernicus Climate Change Service also confirms that June 2024 marks

3     12 consecutive months where global temperatures exceeded 1.5 degrees C (2.7

4     degrees F) above pre-industrial levels, the threshold scientists say is necessary to

5     avoid the worst impacts of climate change.[8]   A true and correct copy of the

6     Copernicus Climate Change Service's Press Release presenting its data is attached

7     as **Exhibit 9**.  The period 1850-1900 is the designated "pre-industrial" reference

8     period. 1850-1900 was chosen precisely because there is a reasonable instrument

9     record of climate worldwide. Scientists assess that there has been a certain amount

10     of temperature change from 1850-1900 up to now. A true and correct copy of a

11     NOAA news article discussing this data is attached as **Exhibit 10**.  Climate change

12     has intensified and increased the likelihood of global heatwaves, as shown by the

13     extreme temperatures experienced in June 2024.

14         12.     Consistent with global and U.S. observations, data from California's

15     Office of Environmental Health shows that California temperatures have risen

16     since records began in 1895, with the rate of increase accelerating since the 1980s.[9]

17     Attached as **Exhibit 11** is a true and correct copy of California's Office of

18     Environmental Health Hazard Assessment's November 2022 report.  Average

19     summer temperatures in California have risen by approximately 3 degrees

20     Fahrenheit (1.8 degrees Celsius) since 1896, with more than half of that increase

21     occurring since the early 1970s  Consistent with the overwhelming scientific

22     consensus, studies show that by mid-century, the number of counties experiencing

23     at least one day with a heat index above 125 degrees Fahrenheit is projected to

24   [8] Copernicus Climate Change Service, *June 2024 Marks 12th Month of Global Temperature Reaching 1.5°C Above Pre-Industrial* (July 4, 2024),

25   https://climate.copernicus.eu/copernicus-june-2024-marks-12th-month-global-temperature-reaching-15degc-above-pre-

26   industrial?apcid=0065832f1641868dfb5c8c00.

27   [9] Office of Environmental Health Hazard Assessment, California Environmental Protection Agency, *Indicators of Climate Change in California* (2022),

28   https://oehha.ca.gov/climate-change/epic-2022.

1 increase from 50 to over 1,000.[10]  A true and correct copy of a news article

2 discussing those studies' findings is attached as **Exhibit 12**.  Extreme heat is the

3 leading cause of climate-related deaths globally and in California, claiming more

4 lives than wildfires, floods, or drought. Studies conducted by California's Office of

5 Environmental Health Hazard Assessment indicate that rising temperatures have a

6 significant impact on ecosystems, human health, and overall well-being.[11]  A true

7 and correct copy of California's Office of Environmental Health Hazard

8 Assessment's May 2018 report is attached as **Exhibit 13**.

9       13. Consistent with the overwhelming scientific consensus, studies show

10 that the warming climate is also driving up ocean surface temperatures. In 2023,

11 the ocean had an above-average yearly temperature departure of +1.04°C

12 (+1.87°F)—the 10th highest in the 114-year record. Nine of Oceania's ten warmest

13 years have occurred since 2005. The upper ocean heat content—the amount of heat

14 stored in the top 2000 meters of the ocean—was a record high in 2023. Ocean heat

15 content is a key climate indicator because the oceans store 90% of the excess heat

16 in the Earth's system. The indicator has been tracked globally since 1958, and there

17 has been a steady upward trend since about 1970. Data from NOAA demonstrates

18 that the five highest values have all occurred in the last five years.[12]  A true and

19 correct copy of a news article published by NOAA discussing its data and findings

20 is attached as **Exhibit 14**.

21       14. Data shows that in the past 150 years, humans have significantly

22 increased the amount of $CO_2$ in the atmosphere, and the ocean has absorbed about

[10] John Muyskens et al., The Washington Post, *More Dangerous Heat Waves are On the Way: See the Impact by Zip Code* (Aug. 15, 2022), https://www.washingtonpost.com/climate-environment/interactive/2022/extreme-heat-risk-map-us/.

[11] Office of Environmental Health Hazard Assessment, *Indicators of Climate Change in California* (May 2018), https://oehha.ca.gov/media/downloads/climate-change/report/2018caindicatorsreportmay2018.pdf.

[12] NOAA, *Assessing the Global Climate in 2023* (Jan. 2024), https://www.ncei.noaa.gov/news/global-climate-202312.

8

29% of this additional carbon. Adding additional $CO_2$ to the ocean is changing its chemistry, making it more acidic and slowing its ability to take up more $CO_2$. If the ocean starts to take up less $CO_2$, more is left in the atmosphere, which can contribute to additional warming. Furthermore, global warming and regional temperatures contribute to rising sea levels, from ocean thermal expansion to melting sea ice and glaciers worldwide. The IPCC 2021 Summary for Policymakers (SPM)[13] provides a high-level summary of the understanding of the current state of the climate, as reported by the leading scientists who prepared and reviewed it based on the overwhelming weight of scientific evidence. The SPM report states it is very likely to virtually certain that regional mean relative sea level rise will continue throughout the 21st century. Extreme sea level events that occurred once per century in the recent past are projected to occur at least annually, leading to loss of land, resources, infrastructure, and life. Several recent studies demonstrated the extraordinary nature of these impacts by finding that prior studies had underestimated the impacts of sea-level rise, storms, and flooding in California,[14] showing that local $CO_2$ concentrations above Monterey Bay fluctuate by time of day likely because of the surrounding environment and topography, likely increasing the expected rate of acidification of the Bay;[15] and showing the waters of the California current ecosystem have already acidified by over twice the global average.[16]   True and correct copies of these studies are attached as **Exhibits 15, 16, and 17**.

---

[13] IPCC AR6 2021, *supra* note 4.

[14] Patrick L. Barnard, et al., *Dynamic Flood Modeling Essential to Assess the Coastal Impacts of Climate Change*, 9 Scientific Reports 4309 (Mar. 13, 2019), https://www.nature.com/articles/s41598-019-40742-z.

[15] Northcott D., Sevadjian J., Sancho-Gallegos D.A., Wahl C., Friederich J., & Chavez F.P., *Impacts of Urban Carbon Dioxide Emissions on Sea-air Flux and Ocean Acidification in Nearshore Waters*, PLoS ONE (Mar. 27, 2019), https://doi.org/10.1371/journal.pone.0214403.

[16] E.B. Osborne, *et al.*, *Decadal Variability in Twentieth-century Ocean Acidification in the California Current Ecosystem*, 13 Nature Geoscience 43–49 (Dec. 6, 2019), https://doi.org/10.1038/s41561-019-0499-z.

9

15. Consistent with the overwhelming scientific consensus, studies show that the cumulative effects of continued GHG emissions could trigger climate tipping points, thresholds of abrupt and irreversible change, such as higher sea levels, ocean circulation changes, or drought in some regions. Two IPCC Special Reports (published in 2018 and 2019) [17, 18] suggest that tipping points could be exceeded by warming of even between 1 and 2 degrees Celsius. True and correct copies of these Special Reports are attached as **Exhibits 18 and 19**. The IPCC 2021 AR6 places new emphasis on climate tipping points. The report defines a tipping point as an "abrupt change"—a threshold that, once crossed, can cause elements of the Earth system to change into an entirely different state. These tipping points have varying degrees of probability but are high risk because they could lead to dramatic climate change. As global temperature increases, threshold environmental events are increasingly likely to occur that will themselves significantly accelerate climate change beyond current projections.

16. From record temperatures to increasingly intense wildfires[19] to rising sea levels and increasingly acidic seas[20] to less reliable snowpack[21] to increased risk of megaflooding-,[22] studies show that climate change poses an immediate and

---

[17] IPCC, *Special Report: Global Warming of 1.5°C* (2018), *https://www.ipcc.ch/sr15/*.

[18] IPCC, *IPCC Special Report: Ocean and Cryosphere in a Changing Climate* (2019), *https://www.ipcc.ch/site/assets/uploads/sites/3/2019/12/SROCC_FullReport_FINAL.pdf*.

[19] N.S. Diffenbaugh, A.G. Konings, & C.B. Field, *Atmospheric Variability Contributes to Increasing Wildfire Weather But Not as Much as Global Warming*, PNAS (Nov. 10, 2021), https://www.pnas.org/content/118/46/e2117876118.

[20] E.B. Osborne, et al., *supra* note 16.

[21] P.W. Mote, et al., *Dramatic Declines in Snowpack in the Western US*, 1 NPJ Climate and Atmospheric Science (Mar. 2, 2018), https://doi.org/10.1038/s41612-018-0012-1.

[22] X. Huang & D. Swain, *Climate Change is Increasing the Risk of a California Megaflood*, 8 Science Advances 31 (Aug. 2022), https://www.science.org/doi/epdf/10.1126/sciadv.abq0995.

10

1   escalating threat. This finding is consistent with prior work reporting progressively
2   larger increases in projected extreme precipitation events for increasing event
3   magnitudes. True and correct copies of these studies are attached as **Exhibits 20,**
4   **17, 21, and 22**. These studies represent notably large increases in risk of California
5   mega-storm events due to climate change, as they transform an event that
6   previously would have occurred once every two centuries into one that may occur
7   approximately three times per century. Warmer air temperatures alter precipitation
8   and runoff patterns, affecting the availability of freshwater supplies and increasing
9   the risk of severe weather events. In addition to aggravating drought conditions,
10  climate change increases the risk of a California megaflood. California's intense
11  rainfall in early 2023 caused landslides and floods, leading to billions of dollars in
12  damage and at least 20 deaths. Similarly, in early 2024, a powerful atmospheric
13  river—a narrow but intense jet of Pacific Ocean moisture—resulted in landslides
14  that destroyed homes and blocked roads, powerful winds, and power outages.[23] A
15  true and correct copy of a news article discussing this atmospheric river is attached
16  as **Exhibit 23**.  Atmospheric rivers are also predicted to become more extreme as
17  the climate warms, with a sharp increase in rainfall rates.
18          17.     In addition, consistent with the scientific consensus, studies
19  show that a warming climate in the western United States is causing changes to the
20  wildfire regime, with wildfires increasing in frequency, duration, and severity in
21  the Western United States.[24,25] True and correct copies of one such study, as well

---

[23]  Climate Adaptation Platform, *Climate Change Doubles Megaflood Risk in California* (Feb. 22, 2024), https://climateadaptationplatform.com/climate-change-doubles-megaflood-risk-in-california/.

[24] J.K. Balch, et al., *Human-started Wildfires Expand the Fire Niche Across the United States*, 114(11) PNAS 2946–51 (Feb. 27, 2017), https://doi.org/10.1073/pnas.1617394114.

[25] Kasha Patel, NASA Earth Observatory, *6 Trends to Know about Fire Season in the Western U.S.* (Nov. 29, 2018),

11

1 as a news article discussing other studies, are attached as **Exhibit 24 and 25**.

2 Another study has shown that California's annual wildfire extent has increased

3 fivefold since the 1970s.[26]  A true and correct copy of this study is attached as

4 **Exhibit 26**.  This trend was mainly due to an eightfold increase in summertime

5 forest-fire area and was very likely driven by the drying of fuels promoted by

6 human-induced warming.[27] A study also suggests that wildfire smoke is a rapidly

7 growing health threat and could become one of the deadliest climate impacts

8 within decades.[28] A true and correct copy of this study is attached as **Exhibit 27**,

9 and a news article discussing it is attached as **Exhibit 28**.  Another study shows

10 that continued climate change will further amplify the number of days with

11 extreme fire weather by the end of the century (absent any additional actions taken

12 in accordance with the U.N. Paris commitments).[29]  A true and correct copy of this

13 study is attached as **Exhibit 29**.

14

15

16 _____

17 https://earthobservatory.nasa.gov/blogs/earthmatters/2018/11/29/6-trends-to-know-about-fire-season-in-the-western-u-s/.

18 [26] Williams, A. P., Abatzoglou, J. T., Gershunov, A., Guzman-Morales, J., Bishop, D. A., Balch, J. K., & Lettenmaier, D. P., *Observed Impacts of Anthropogenic

19 Climate Change on Wildfire in California*, 7 AGU 8 (Aug. 2019),

20 https://doi.org/10.1029/2019EF001210.

21 [27] *Id*.

22 [28] Marshall Burke, et al., *The Changing Risk and Burden of Wildfire in the United States*, PNAS 118(2) e2011048118 (Jan. 12, 2021),
https://doi.org/10.1073/pnas.2011048118; Tony Barboza, L.A. Times, *Wildfire

23 Smoke Now Causes Up to Half the Fine-Particle Pollution in Western U.S., Study Finds* (Jan. 13, 2021), https://www.latimes.com/california/story/2021-01-

24 13/wildfire-smoke-fine-particle-pollution-western-us-study (new study blames climate change for worsening air quality and health risks in both urban and rural

25 communities in recent years).

26 [29] Michael Goss, et al., *Climate Change is Increasing the Risk of Extreme Autumn Wildfire Conditions Across California*, Environmental Research Letters (Aug. 20,

27 2020), https://opensky.ucar.edu/islandora/object/articles%3A23599.

28

1

2       I declare under penalty of perjury that the foregoing is true and correct.

3   Executed on this day, the 23rd of July, 2024, in Sacramento, California.

4

5

6

7   _____

8       ELIZABETH SCHEEHLE

9

10

11  SA2024300503
    66947743.docx

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13

# Exhibit 33
# to Declaration of George Georgiev

# Report by CERES: Climate Risk Management in the U.S. Insurance Sector: An Analysis of Climate Risk Disclosures.

Exhibit 33 to Decl. of Georgiev
1111
**SER 1514**

Case 2:24-cv-00801-ODW-PVC    Document 54-33    Filed 07/24/24    Page 2 of 49    Page ID #:4186






# Climate risk management in the U.S. insurance sector

## An analysis of climate risk disclosures

**July 2023**







Exhibit 33 to Decl. of Georgiev
1112

## About the report

This report was a joint undertaking by Ceres and the California Department of Insurance to review, analyze and present findings from insurance company responses to the National Association of Insurance Commissioners' (NAIC) 2021 Climate Disclosure Survey, which is aligned with the Task Force on Climate-related Financial Disclosures (TCFD) framework for climate risk disclosure. The purpose of this report is to encourage improvement in the comprehensiveness of climate-related disclosures in future years and provide insights that may be valuable to insurance regulators and other stakeholders.

The California Department of Insurance analyzed the reports using python-based text mining methods developed by Banco de España for evaluating climate-related disclosures. Separately, Ceres commissioned AI-powered software provider Manifest Climate to measure TCFD-alignment with a machine learning-based algorithm. In this report, these complementary results are presented together.

## Acknowledgments

### Lead Authors

**Kara Voss**, Ph.D., Climate Finance Specialist, Climate & Sustainability Branch, California Department of Insurance
**Steven M. Rothstein**, Managing Director, Ceres Accelerator for Sustainable Capital Markets, Ceres
**Michael Peterson**, Deputy Commissioner for Climate & Sustainability, California Department of Insurance

Special thanks to Report Consultant **Paul Hodgson** for his work on this report and the detailed analysis of the 15 companies that accompanies this report.

We would like to express our deep appreciation who provided very useful assistance with this project, including Rabab A. Charafeddine, Deborah Halberstadt, Esteban Mendoza, Ope Oyewole, and Michael Soller at the California Department of Insurance, Maya Aglialoro, Monica Barros, Maura Conron, Jim Coburn, LJ DeLuca, Laura Draucker, Charles Gibbons, Randi Mail, and Dan Saccardi at Ceres, and experts at the Banco de España, Teresa Caminero and Ángel Ivan Moreno.

Technical analysis conducted by Manifest Climate, with special thanks to project leads:
**Ahmad Ghazi**, Data Science Manager
**Jeff Horlor**, Head of Sales
**Adam Rochwerg**, Head of Climate Solutions

Ceres and the California Department of Insurance would like to thank the following people for contributing their valuable time and thoughtful feedback to this project and informing our recommendations. The views expressed in this paper are Ceres' and the California Department of Insurance alone and do not necessarily reflect those of these contributors.

**Grace Arnold**, Commissioner, Minnesota Department of Commerce
**Susan Bernard**, Deputy Commissioner for Financial Surveillance, California Department of Insurance
**George Bradner**, Assistant Deputy Commissioner of Property & Casualty Division, Connecticut Insurance Department
**Jay Bruns**, Senior Climate Policy Advisor, Washington State Office of the Insurance Commissioner
**David Carlin**, TCFD Programme Lead, United Nations Environment Programme Finance Initiative
**Wanchin Chou**, Assistant Deputy Commissioner and Chief Actuary Heads Expanded Division, Connecticut Insurance Department
**Elizabeth Kelleher Dwyer**, Director, Rhode Island Department of Business Regulation

Exhibit 33 to Decl. of Georgiev
1113
**SER 1516**

**Jennifer Gardner**, Catastrophic Risk and Resilience Research Manager, National Association of Insurance Commissioners

**Ted Lamm**, Senior Research Fellow, Climate, Center for Law, Energy & the Environment, UC Berkeley School of Law

This report was made possible with support from Bloomberg Philanthropies and the Schauble Family Foundation. The opinions and views of the authors do not necessarily state or reflect those of the funder(s).

## About Ceres

Ceres is a nonprofit organization working with the most influential capital market leaders to solve the world's greatest sustainability challenges. Through our powerful networks and global collaborations of investors, companies, and nonprofits, we drive action and inspire equitable market-based and policy solutions throughout the economy to build a just and sustainable future. For more information, visit **ceres.org** and follow **@CeresNews**.

## About the Ceres Accelerator for Sustainable Capital Markets

Ceres is a nonprofit organization working with the most influential capital market leaders to solve the world's greatest sustainability challenges. The Ceres Accelerator for Sustainable Capital Markets is a center of excellence within Ceres that aims to transform the practices and policies that govern capital markets to reduce the worst financial impacts of the climate crisis. It spurs action on climate change as a systemic financial risk — driving the large-scale behavior and systems change needed to achieve a net zero emissions economy through key financial actors including investors, banks, and insurers. The Ceres Accelerator also works with corporate boards of directors on improving governance of climate change and other sustainability issues. For more information, visit **ceres.org/accelerator**.

Exhibit 33 to Decl. of Georgiev
1114
**SER 1517**

# Contents

1. Executive Summary......................................................................................................6
2. Introduction.............................................................................................................8
3. Methods In-brief.....................................................................................................10
4. Results.................................................................................................................14

   Overview ...............................................................................................................14

   TCFD Pillar 1: Governance .....................................................................................23

      A. Role of Governing Board Oversight................................................................. 23

      B. Role of Senior Management Oversight ........................................................... 24

   TCFD Pillar 2: Strategy..........................................................................................25

      A. Risks and Opportunities.................................................................................. 25

      B. Impact on Organization ................................................................................... 26

      C. Resilience of Strategy...................................................................................... 29

   TCFD Pillar 3: Risk Management .......................................................................... 31

      A. Risk Identification and Assessment Process .................................................31

      B. Risk Management Process ............................................................................... 34

      C. Integration into Overall Risk Management.....................................................35

   TCFD Pillar 4: Metrics and Targets .......................................................................36

      A. Climate-Related Metrics .................................................................................. 36

      B. Risks Associated with Greenhouse Gas Emissions ........................................ 38

      C. Climate-Related Targets................................................................................... 39

5. Conclusion of TCFD Disclosure Results .................................................................41

6. Additional Questions of Interest............................................................................ 42

7. Appendix...............................................................................................................45

   Appendix I: Additional Figure ................................................................................ 45

   Appendix II: Key Concept Questions ...................................................................... 46

      TCFD Pillar 1: Governance ................................................................................... 46

      TCFD Pillar 2: Strategy ......................................................................................... 46

      TCFD Pillar 3: Risk Management .......................................................................... 47

      TCFD Pillar 4: Metrics and Targets ...................................................................... 48

Exhibit 33 to Decl. of Georgiev

1115

**SER 1518**

## Executive Summary

This report is the first systematic review of U.S. insurance companies' climate risk strategies, yielding new insights that will assist the work of risk managers and regulators to maintain a sustainable insurance sector. The costs of climate change are already apparent to the insurance sector.

Catastrophic events, such as wildfires and hurricanes, are becoming more severe in many places — making insurance more important for individuals and businesses while more challenging to secure. Insurance regulators are tasked with safeguarding a reliable insurance market for consumers through this challenge. In a sector that fuels itself by assuming risk, accessible information on how this risk is being managed is critical for regulatory oversight that maintains a healthy, accessible market.

In 2022, fifteen U.S. state insurance regulators implemented the National Association of Insurance Commissioners' (NAIC) Climate Risk Disclosure Survey, receiving responses from more than 1,500 companies representing over 80% of the U.S. insurance market. While some states have been administering a version of the Climate Risk Disclosure Survey for over a decade, this reporting year (2021) marked the first iteration in which the questions were aligned with the prompts from the Task Force on Climate-related Financial Disclosures (TCFD) recommendations on climate risk reporting. The TCFD framework, developed in 2017 by financial industry participants at the request of Financial Stability Board to improve and increase reporting on climate-related financial information, is built upon 11 specific recommended disclosures that fall within four broad categories, or pillars – governance, strategy, risk management, and metrics and targets.

When risks are identified and managed, insurance is more available and affordable for the public. Globally, recognition is growing that climate risk disclosures can encourage more thorough risk awareness and risk mitigation by businesses and provide necessary information for regulators, investors, lenders, insurers, and the public to understand how companies are approaching climate risk management and to fill critical data gaps. However, these disclosures are only valuable if the information in them is accessible, can be analyzed, and leads to improvement in practices.

The goal is not simply disclosure; the transparency afforded by these disclosures is critical for informing actions that can keep insurance available and reliable in the face of rising climate risks. Climate-related disclosures are one of the many tools that regulators have to assess climate risk, ensure a healthy insurance market, and close insurance protection gaps, such as examinations, scenario analysis, and data collections. Comprehensive climate risk disclosures can provide an annual snapshot of the insurance sector, informing these other exercises and filling remaining data gaps where they may exist, for the benefit of a broad array of stakeholders.

This study, developed jointly by the largest U.S. state insurance regulator, the California Department of Insurance, and Ceres, represents the first comprehensive attempt to review and describe the contents of the TCFD-aligned Climate Risk Disclosure Survey Responses for the insurance sector.

Climate risks are impacting major sectors of regional and national economies, presenting multiple risks to insurance companies. The insurance sector, including both regulators and businesses, has ample risk expertise and experience, from actuaries, risk management professionals, risk scientists, and financial analysts. As insurers develop more robust strategies to meet the challenge of managing climate risk, insurer disclosures will include more specificity, and regulators and other stakeholders will need aggregate analysis to identify systemic risks and emerging practices.

Exhibit 33 to Decl. of Georgiev
1116
**SER 1519**

**Insurance company responses to the Climate Risk Disclosure Survey demonstrate diverse, and sometimes sophisticated, approaches to climate risk management.** The responses provide specific information that may be useful for regulators, including:

- Many insurers describe purchasing reinsurance as their primary strategy for managing climate risk, while some reinsurers describe how climate risk is leading them to reprice or reduce their offerings.
- Some insurers describe reliance on their reinsurance provider for climate risk education, expertise, and resources.
- Insurers are offering a variety of new products that support risk reduction among their customers or that support clean technology, including discounts for risk reducing retrofits, insurance products for renewable energy, green endorsements, and other products.
- Insurers describe a diverse array of strategies for managing climate risk and sometimes explain their reasoning for employing certain climate risk management strategies over others.
- Many insurers describe managing any material climate risk in the same way that they manage any other risk to their business, through their enterprise risk management process.

## Key quantitative findings

- Some 78% of the reports (387 out of 494) disclosed information related to six or more of the TCFD recommended disclosures, while 23% disclosed 10 or more, and 13% disclosed information on all 11 TCFD recommended disclosures.
- The 2022 Climate Risk Disclosure Survey achieved a very high rate of response from insurance companies. Insurers across all types of business (Property & Casualty, life, health, etc.) and all sizes provided detailed disclosures according to the TCFD recommendations.
- Among the four TCFD pillars, the responses to risk management and strategy were the strongest, both in terms of number of reports providing any information (473 and 471 reports, respectively) and in terms of the detail of the information. They included information on integration of climate risk into enterprise risk management, specific opportunities for insurance products that support clean technology, and specific climate risks, such as those associated with extreme weather, changes in the spread of disease, policies regulating greenhouse gas emissions, and changing consumer preferences.
- Nearly 20% of the reports mention scenario analysis explicitly but not all reports specify for which risks. At least 5% mention modeling scenarios where global temperatures increases remain 2 degrees Celsius or lower and more than 3% where global temperatures rise more than 2 degrees Celsius, and 3% explicitly mention climate scenario analysis for both scenario types.
- Metrics and targets was the pillar with the weakest responses, with only 193 reports providing any information and very few encompassing a comprehensive set of climate-related metrics.
- Approximately 12% of the reports stated their scope 3 emissions (indirect emissions from the value chain), giving specific values often for multiple consecutive years.
- While all types of business demonstrated an ability to disclose detailed information, there were significant differences by type of business. For example:
  - Property & Casualty insurers provided the most comprehensive information on climate-related risks and opportunities, as well as impacts to their businesses.
  - Health and life insurers, as compared to other types, provided the greatest detail on the resilience of their strategy (strategy recommended disclosure c).
  - Health insurers had the greatest fraction of reports disclosing information on risk management and strategy, but this margin was small since the vast majority of reports from all types of business disclosed information on these pillars and the information was often minimally comprehensive.

Exhibit 33 to Decl. of Georgiev
1117
**SER 1520**

- Life insurance had a higher fraction of reports disclosing information under metrics and targets than other types and had the highest indicator for comprehensiveness in this pillar of all types.

Ceres commissioned Manifest Climate to perform a detailed analysis on 15 of the companies and groups that addressed all or almost all of the 11 TCFD recommended disclosures, against specific recommendations of the TCFD framework. A **separate report** highlights areas of their disclosures that were informative, comprehensive, and effective for both investors and peer companies.

TCFD reporting is widely used in financial markets and is supported by over 101 jurisdictions globally. The NAIC Climate Risk and Resiliency Task Force has noted that alignment with the TCFD framework provides a baseline supervisory tool to assess how climate-related risks may affect the insurance sector, while also creating a consistent approach that reduces redundancy in reporting and encourages shared learning. The TCFD guidelines also provide consistent disclosure standards across financial sectors, as well as the flexibility for insurance companies to respond with information that is relevant to the specific risks they face in their types of business. This report underscores the benefits of that approach, providing a window into the diversity of strategies, approaches, and engagement by insurance companies in identifying risks and implementing mitigation strategies to address those risks.






Exhibit 33 to Decl. of Georgiev
1118
**SER 1521**

# Introduction

Understanding climate risks and opportunities is central to the sustainability of a strong insurance sector. Insurance companies are exposed to a multitude of risks associated with climate disasters, with skyrocketing costs from increased losses. And these impacts have significant consequences for individuals and businesses, threatening the availability and reliability of insurance — a critical tool for hastening recovery.

The costs of climate intensified events are already apparent, with lingering consequences for impacted communities. According to the National Centers for Environmental Information, part of the National Oceanic and Atmospheric Administration, since 1980 there have been 357 natural disasters in the U.S. that had damages of more than $1 billion. These disasters spanned a variety of perils — 174 severe storms, 41 flood events, 22 winter storms, 30 droughts and heat waves[1], 21 wildfires, 60 tropical cyclones, and nine freezes (extreme cold). The total cost of these events exceeded 99 lives and $2.54 trillion. The cost of individual disasters can be more extreme, such as Hurricane Harvey which cost approximately $152 billion in 2017, and the 2017 western wildfires and 2022 western U.S. drought and heat waves, which each cost approximately $22 billion. These are likely underestimates as they include insured and uninsured physical damage to buildings and vehicles, damage to public assets and agricultural assets, and wildfire suppression costs, but do not include business interruption, environmental degradation, supply chain effects, and mental or physical healthcare related costs, among other factors.

The frequency of these billion-dollar events is increasing dramatically with significant implications for financial resilience for communities. According to non-profit climate researcher Climate Central, the time between billion-dollar disasters[2] in the U.S. in the last five years from 2017 to 2021 was just 18 days on average, compared to 82 days in the 1980s. According to data from Swiss Re and Munich Re, natural disasters cost the insurance industry $76 billion in 2020 globally, and around $280 billion in 2021, of which roughly $120 billion was insured.

The impacts, both financial and nonfinancial, of these climate-driven disasters fall most heavily on people with low and moderate-incomes and people of color who struggle to recover their lives and livelihoods, especially when they are uninsured or underinsured. However, through public policy and private sector innovation, insurance markets can adapt to be more inclusive and provide critical services for equitable recovery from climate disasters.

Health and longevity consequences of climate change and economic changes may also impact the insurance sector and insurance protection gaps. The World Health Organization (WHO) projects that climate change will result in 250,000 additional deaths per year between 2030 and 2050 from malnutrition, malaria, diarrhea, and heat stress. Changes in the spread of vector-borne diseases, extreme heat, and natural disasters can impact the underwriting, operations, and investments of insurance companies now and in the future. At the same time, changes in the global economy as a result of the uncertain scope and scale of society actions to adapt to and mitigate climate change impacts may pose significant risks to insurers that are not prepared for such changes.

The purpose of this report is to demonstrate and provide insights from two methods of review for the Climate Risk Disclosure Survey responses that insurers operating in certain states submit to U.S. state insurance regulators annually. This study is timely, capturing the first year of responses in which the Climate Risk Disclosure Survey was aligned with the recommendations of the TCFD.

---

1. In the NCEI dataset, deaths associated with drought are the result of extreme heat, although not all droughts are associated with extreme heat.

2. Inflation adjusted to 2023 using the Consumer Price Index.

Exhibit 33 to Decl. of Georgiev
1119
SER 1522

At this time, the TCFD framework for climate risk disclosure is used widely across jurisdictions and economic sectors, with TCFD aligned reporting supported in 101 countries, and implemented or required by various financial regulators worldwide including in New Zealand, the United Kingdom, France, and Hong Kong.

This review and analysis provide:

- An accessible overview of information that insurers disclosed on climate risk governance, strategy, risk management, and metrics and targets in their responses to the Climate Risk Disclosure Survey, for NAIC members, insurers, and the public.
- A guide for how insurance companies may improve the specificity of their disclosures by providing more comprehensive information about their exposure and efforts in response to climate risk.
- A gauge for insurance regulators in the U.S. and internationally to understand how companies are considering and responding to climate risk, demonstrated through tangible examples.
- A reference for interested parties to quickly locate responses that are likely to be comprehensive in nature and examples of the diversity of strategies insurance companies are developing to address multiple risks.

Participation in the Climate Risk Disclosure Survey among states has grown rapidly in recent years and market coverage has grown steadily, receiving responses for over 80% of the U.S. insurance market in 2022, representing over $2 trillion in direct premiums written. This analysis uses responses from text mining and machine learning approaches to provide an efficient method for gathering information from a large number of climate-related disclosures. As of 2023, there are 27 member states and jurisdictions administering the Climate Risk Disclosure Survey — American Samoa, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Guam, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Northern Marianas Islands, Oregon, Pennsylvania, Puerto Rico, Rhode Island, U.S. Virgin Islands, Vermont, and Washington. Experience from other industry disclosures in line with TCFD recommendations indicates that disclosure responses get more and more descriptive and comprehensive in each consecutive year that companies file them. Consistent review will allow an opportunity to monitor and document this progress in future years, and ensure that these submissions are accessible and transparent, and provide productive information to all stakeholders.

Exhibit 33 to Decl. of Georgiev
1120
**SER 1523**

# Methods In-brief

## The TCFD pillars and recommended disclosures

In developing its recommendations, the TCFD structured them around four thematic areas, which it calls pillars – governance, strategy, risk management, and metrics and targets. The four pillars are supplemented by several recommended key climate-related financial disclosures. The 11 recommended disclosures fill out the framework with more detailed information that will help investors and others understand how reporting organizations think about and assess climate-related risks and opportunities. The TCFD also provides additional detail in sector-specific guidance for each recommendation. As Figure 1 shows, three of the pillars have three recommended disclosures each (A through C), while one, governance, has just two recommended disclosures (governance A and governance B).

| Governance | Strategy | Risk Management | Metrics and Targets |
|---|---|---|---|
| a  Describe the board's oversight of climate-related risks and opportunities. | a  Describe the climate-related risks and opportunities the organization has identified over the short, medium, and long term. | a  Describe the organization's processes for identifying and assessing climate-related risks. | a  Disclose the metrics used by the organization to assess climate- related risks and opportunities in line with its strategy and risk management process. |
| b  Describe management's role in assessing and managing climate-related risks and opportunities. | b  Describe the impact of climate-related risks and opportunities on the organization's businesses, strategy, and financial planning. | b  Describe the organization's processes for managing climate-related risks. | b  Disclose Scope 1, Scope 2, and, if appropriate, Scope 3 greenhouse gas (GHG) emissions, and the related risks. |
|  | c  Describe the resilience of the organization's strategy, taking into consideration different climate-related scenarios, including a 2°C or lower scenario. | c  Describe how processes for identifying, assessing, and managing climate-related risks are integrated into the organization's overall risk management. | c  Describe the targets used by the organization to manage climate-related risks and opportunities and performance against targets. |

**Figure 1.** TCFD Pillars and Recommended Disclosures. Source: Task Force on Climate-related Financial Disclosures.

## Methods overview

The study utilizes two complimentary methods of review for TCFD-aligned Climate Risk Disclosure Survey responses[3]:

1. A machine learning (ML) based approach that provides an indicator for whether a given report provides any information related to each of the 11 detailed TCFD recommended disclosures; and

2. A rules-based text mining (RBTM) approach that provides an indicator for the comprehensiveness, or level of detail, of any information provided related to the TCFD recommended disclosures

The machine learning approach was performed by Manifest Climate commissioned by Ceres, while the rules-based text mining approach was performed by the California Department of Insurance using methods developed by researchers at Banco de España.

3. The Climate Risk Disclosure Survey responses are hosted by the California Department of Insurance on a public database: https://www.insurance.ca.gov/0250-insurers/0300-insurers/0100-applications/ClimateSurvey/

Exhibit 33 to Decl. of Georgiev
1121
**SER 1524**

### Machine Learning approach

Using advanced machine learning in combination with climate experts, Manifest Climate's models assess how well an organization's climate-related disclosures align to different disclosure frameworks and standards. Based on these assessments, Manifest Climate can recommend specific actions that an organization can take to improve its overall climate response.

Manifest Climate's alignment model examines whether an organization's disclosures broadly address the information required or requested by leading frameworks and standards. For example, it assesses whether an organization's disclosures generally trend toward alignment with the recommended disclosures of the TCFD and/or other standard setting bodies. (For the current analysis, Manifest Climate focused on TCFD alignment.)

The machine learning algorithm relies on a dataset of climate risk-related text from a variety of sources where the sentences or paragraphs have been labeled by experts indicating whether the human reader thought that it counted towards the recommended disclosure or not. Then the algorithm scans the Climate Risk Disclosure Survey responses (in this case) at a high level and uses natural language processing and machine learning to recognize patterns (words, phrases, and sentence structures) that are similar to what was labeled by the humans as aligning with the TCFD recommendations. The algorithm uses these patterns to replicate this labeling. The result of the alignment model is a one (or a zero) for each of the 11 TCFD recommendations depending upon whether the report does (or does not) include information related to that recommendation.

As an example, **1.** below would be labeled **1** or 'yes' for a description of board oversight, but zero or 'no' for outlining management's role. And **2.** would be labeled zero or 'no' for board oversight and **1** 'yes' for management's role.

1. The Board of Directors reviews the Group ESG performance and programs twice annually as a minimum, in addition to any specific review related to an ESG topic that falls within the remit of each of the Committees (i.e. the Nomination Committee's review of diversity & inclusion performance, the Audit Committee's of climate-related risks factors, and the Strategic Committee orientation and monitoring of the SustainAgility program).

2. Through the CCT, I am overseeing the implementation of the climate strategy we introduced in December 2020, and monitoring the Group's progress against the seven pathways to delivering our targets and net zero ambition.

Manifest Climate also has capabilities to assess the detail of reports through their "detailed assessment model." Ceres, in partnership with Manifest Climate, performed a detailed analysis on 15 of the companies that addressed all, or almost all, of the 11 TCFD recommended disclosures, against specific recommendations of the TCFD framework. It highlights areas of their disclosures that were informative, comprehensive, and effective for both investors and peer companies. The details and results of this analysis, along with a benchmarking tool, and a list of all insurers that completed Climate Risk Disclosure Survey responses, can be found **here**.

Manifest Climate's detailed assessment model examines an organization's disclosures at a more granular level than an alignment review. It is based on a methodology that, like the alignment model, draws on multiple frameworks, but which deconstructs those frameworks to extract specific criteria against which an organization's disclosures can be judged. For example, the first recommendation of the TCFD asks organizations to disclose how the board oversees climate-related risks and opportunities. This is a general statement, which can be unpicked – by reference to TCFD guidance – to identify a number of criteria that can be used to evaluate board oversight, such as

Exhibit 33 to Decl. of Georgiev
1122
**SER 1525**

the cadence of board meetings on climate, and the processes that underpin the board's climate oversight. Manifest Climate's detailed assessment model uses 12 elements for that first recommendation. And it takes a similar approach to the remaining sub-pillars of the TCFD.

Note that Manifest's Climate's detailed assessment model, which was used to perform the in-depth analysis of 15 reports, evaluates organizational disclosures in a specific way. In this context, it is possible for an organization to disclose against a TCFD recommendation, but for that disclosure not to satisfy the specific criteria used in the Manifest Climate model. This is because Manifest Climate, generally (and by design), takes a relatively narrow view of what represents a decision-useful disclosure. Note too that the dataset used for this analysis was limited in scope. It is possible for an organization to disclose climate-relevant information in multiple places, and the Manifest Climate platform is able to perform a multi-source review, but this was beyond the scope of the present analysis.

### Rules-based text mining approach

To understand which reports provided comprehensive, detailed information on each TCFD recommended disclosure, the California Department of Insurance employed a rules-based text mining (RBTM) approach to evaluate the responses according to specific criteria, or rules.



**Figure 2.** Schematic of rules-based text mining approach. Rules were developed to search for key concepts using combinations of labels. A lexicon was used to match words to overarching labels. Points were assigned for each rule.

The rules provide a process for systematic review of the TCFD reports to identify specific points that are relevant and convey meaningful information. The rules-based text mining approach and tools were developed by researchers at Banco de España to evaluate TCFD alignment in financial reporting by companies within their jurisdiction. It uses a set of evaluation criteria, or "rules," related to the key detailed information for each TCFD recommended disclosures. Each rule can be attributed a different number of points, to reflect how detailed or important the information prompted by the rule is. If a company provides information that counts towards following the rules for a given recommended disclosure, they will achieve a higher RBTM indicator for comprehensiveness. To calculate the indicator for each recommended disclosure, the average number of points obtained for each key concept was calculated and scaled to a number between one and 10. For the overall indicator, the indicators for all recommended disclosures were averaged.

Exhibit 33 to Decl. of Georgiev
1123
**SER 1526**

The maximum indicator (10) conveys that the report provided information for all of the evaluation criteria (rules). Conversely, the minimum indicator of zero conveys that the report did not provide any information related to any of the evaluation criteria.

The rules are constructed from combinations of overarching labels that apply to words with a shared meaning. For example, a rule developed to search for information about the frequency with which a sustainability committee meets may utilize the labels "Sustainability Committee" and "periodicity." The label "Sustainability Committee" may apply to the phrases "Climate Committee," "Sustainability Committee" or "Sustainability Council." The label "periodicity" may apply to phrases such as "bi-weekly," "twice a month," or "annually." A manual review of each excerpt is performed using a Python-based tool to ensure that the labels have been applied appropriately in context. More detail on this method can be found in the methods report, Application of Text Mining to the Analysis of Climate-Related Disclosures, by Ángel Ivan Moreno and Teresa Caminero from Banco de España[4].

A report that disclosed information on a given TCFD recommendation according to the Manifest Climate machine learning algorithm may still receive an indicator of zero in the rules-based approach if the information provided does not align with the specific criteria from the rules, as this is different from the criteria that the machine learning algorithm was trained on. Likewise, a report that disclosed information on all 11 TCFD recommended disclosures according to the machine learning algorithm, may receive the maximum RBTM indicator (10) if the details of that information align with the specific rules, or criteria, from the rules-based approach, or may receive a lower indicator if some of the criteria are not met.

### Treatment of Climate Risk Disclosure Survey responses

In 2022, insurance companies were given the option to submit their Climate Risk Disclosure Surveys by uploading a PDF to a database, or to respond to an online survey with text boxes for each TCFD pillar[5]. Companies are encouraged to provide one comprehensive response. However, a few companies and groups responded in multiple ways with distinct information in each. For example, by responding to the online survey and also uploading a supplemental PDF with figures, or by responding to the online survey and also uploading a TCFD report. While this is discouraged, it was decided that both responses would be counted towards review of a company or group's response in this analysis for this first year and considered as a single report.

Companies are required to submit responses individually to the database. However, companies that are part of a group often submit identical responses to their other group members, particularly when climate risk management is handled at the group level. This results in many duplicate surveys. For this analysis, duplicates were removed. Some companies that were not required to file a report chose to do so voluntarily. These voluntary submissions were often from companies that were members of a group where some, but not all, of the group members were subject to a requirement

After removal of duplicates and consolidation of multiple response documents from single companies, there were 446 unique reports remaining. In the machine learning-based results, submissions for groups representing multiple types of business were counted once for each type of business they represented, leading to 494 separate reports for the purposes of analysis of the number of responses related to each of the TCFD recommendations.

---

4. Researchers at Banco de España are continuing to improve and expand on these tools, making them available to other financial regulators. Their recent advances include application of a Large Language Model filtering method to reduce false positives and allow for flexibility of the rules approach while harnessing the ability of the LLM models to "understand" context.

5. The RBTM analysis requires conversion of documents to a machine readable format. Information stored in figures will not be captured by the program and information within tables may not be accurately labeled if there is insufficient context or if the table is fragmented during the conversion process.

Exhibit 33 to Decl. of Georgiev
1124
SER 1527

# Results

## Overview

To understand how and to what extent U.S. insurance companies are aligning their Climate Risk Disclosure Survey responses with each of the recommendations of the TCFD framework some 4,700 pages were examined using machine learning and rules-based text mining approaches. In this report, the results are presented: a) in comparison with other sectors and geographies using published information from the TCFD 2022 Status Report, b) separated by type of business (e.g. life, P&C, health, title), and c) separated by company size. On average, companies' responses were 10 pages in length, however this varied by type of business with title and health insurers providing the shortest reports (average 3-5 pages), and property and casualty (P&C) and life insurers providing the longest reports (average 11-16 pages).

Of the submissions[6], approximately half of the responses (218) are from P&C insurers, a quarter (114) are from life insurers, 57 are from health insurers, and 11 are from title insurers. The remaining quarter is split between groups of insurers covering multiple types, with the most common combination being groups that have both life and P&C companies (32 submissions).

In the machine learning analysis performed by Manifest Climate, insurers with multiple types of business were analyzed such that each type of business was treated as a separate entity. In other words, if Acme Insurance was both a health and life insurer, Acme Health Insurance was treated as one entity and Acme Life Insurance was treated as another. This resulted in a total of 494 entities.

## Number of reports containing each of the TCFD recommended disclosures (ML approach)

The machine learning-based analysis, performed by Manifest Climate in partnership with Ceres, provides an indicator of whether or not the report included any information related to a given recommended disclosure of the TCFD Framework, regardless of the level of detail provided for that recommended disclosure.

Most Climate Risk Disclosure Survey reports (78%)[7] provided information on more than six of the 11 TCFD recommended disclosures. A significant number of reports, 23%, provided information on more than 10 of the TCFD recommended disclosures. Only 12 reports, from a variety of types of business, made none of the TCFD recommended disclosures (Figure 3).

---

6.  This breakdown of Climate Risk Disclosure Survey submissions is out of the 446 unique responses, and does not double count for groups with multiple types (e.g Life, Health, P&C) of companies.

7. The Manifest Climate Machine learning results double count reports from groups with multiple types of business, once for each business type they represent, resulting in statistics out of a total of 494 reports.

Exhibit 33 to Decl. of Georgiev

1125

**SER 1528**



**Figure 3.** Histogram showing the distribution of results for how many TCFD recommended disclosures were included in each of the Climate Risk Disclosure Survey Responses. For example, 12 reports didn't provide any information related to the TCFD recommendations, and 63 reports provided information on all 11 of the recommendations. These numbers are out of a total of 949, since groups representing multiple types of companies were double counted — once for each type of business.  Source: Manifest Climate

Out of the four TCFD pillars--risk management, strategy, governance, and metrics and targets – the metrics and targets pillar was identified as the pillar with the fewest reports providing information, across all three of its recommended disclosures (Figure 4). As an example of the types of metrics that could be disclosed in this pillar, the TCFD guidance for insurance companies recommends that insurers and reinsurers provide aggregated risk exposure to weather-related catastrophes, the extent to which their underwriting and investment activities are aligned with a well below 2-degrees Celsius scenario, greenhouse gas emission metrics, and a variety of targets.



**Figure 4.** Number of reports disclosing information on each of the four TCFD pillars. These numbers are out of a total of 949, since groups representing multiple types of companies were double counted — once for each type of business. Source: Manifest Climate

In contrast to the weak responses for metrics and targets, the number of reports providing information related to the risk management and strategy pillars are almost equal at over 470 reports each, with the governance pillar in a close third place, at 438 reports.

While climate risks impact companies from all types of insurance business (life, P&C, health, title, and more), the impacts may vary leading to differences in their responses to the Climate Risk Disclosure Survey. To understand these differences, we conducted an analysis of disclosures by individual type of business (Figure 5).

Exhibit 33 to Decl. of Georgiev
1126
**SER 1529**

As can be seen in the charts below, health insurance reports were slightly more likely than other types to provide information related to the risk management and strategy pillars, though other types were not far behind (Figure 5). Life insurance reports were most likely to provide information related to the governance and metrics and targets pillars, as compared to other types.

Very few title insurers responded to the Climate Risk Disclosure Survey, and those that did generally provided very little information related to the TCFD recommended disclosures. However, title insurance responses consistently provided information on senior management's role in climate risk management, with 78% of responses providing this (Figure 5).

Across all types of business, nearly all reports provided information on risk management and very few reports provided information on metrics and targets (Figure 5).



**Figure 5**. Percentage of reports disclosing each of the four pillars by type of business. Source: Manifest Climate

A company's size may also impact its decision-making on the management of climate risk. To understand differences in Climate Risk Disclosure Survey responses by size, the responses were classified by their nationwide direct premium written ($) (Figure 6). This proxy for company size represents the amount that each company or group (and associated subsidiaries) collected in premiums for the reporting year. The responses were classified into categories of low, medium, or high direct premium written with an approximately even number of companies/groups in each category[8]. Note that truly small companies (Less than $100 million in direct premium written) are exempt from the reporting requirement and are therefore not fully represented this sample.[9]

---

8.  Companies/groups with less than or equal to $388,565,760M in direct premium were classified as "low"; Companies/groups with between $388,565,760M and $1,664,750,243 were classified as "medium"; Above this was classified as "high." This resulted in 163 low, 163 medium, and 168 high direct premium written  companies/groups based on the 33rd percentile and the 66th percentile of direct premium written for the 494 reports. If a group had multiple types of companies, it was counted one for each type of company and the premium category is based on the sum of the premiums for all of the businesses of that type within the group.

Exhibit 33 to Decl. of Georgiev
1127
**SER 1530**

**Reports from individual companies and groups of all sizes[10] demonstrated capability to provide information related to many of the TCFD recommended disclosures. However, large companies and groups generally were more likely to provide information each of the TCFD recommended disclosures than smaller companies or groups.** For the first and second recommendations under the strategy and risk management pillars, where disclosures were generally strong, the differences between large (high direct premium written) and smaller (low direct premium written) companies/groups were not as apparent, with each size category contributing approximately equally to the responses related to these pillars (Figure 6). The impact of business size was much more apparent for the strategy recommendation related to resilience of strategy (Strategy C) and the risk management recommendation related to integrating climate risk into overall risk management (risk management C), with large companies/groups contributing to over 40% of the related responses, while only making up a third of the sample (Figure 6). This indicates that larger companies may be more advanced in conducting and reporting on scenario analysis and are more likely to have incorporated climate risk into their enterprise risk management.

**The largest differences based upon size of business were for the metrics and targets recommendations.** For this pillar, large (high direct premium written) companies and groups contributed more than half of the related responses, despite being only a third of the sample. Small companies only contributed 17% of the metrics and targets-related responses, despite also making up a third of the sample (33%). Across all sizes, metrics and targets was the weakest pillar, while the risk management and the strategy pillars vied for position as the strongest.



**Figure 6.** Contribution of company/group size, measured by nationwide direct premium written, to the Climate Risk Disclosure Survey responses with information on each of the TCFD pillars and each of the 11 recommendations. Companies were distributed into the three size categories, with nearly even numbers of companies in each, base upon their direct premium written[13] Source: Manifest Climate

The reports very consistently provided information related to 'climate-related risks and opportunities the organization identified over the short, medium, and long term' (strategy A) and 'the impact of climate-related risks and opportunities on the organization's businesses, strategy, and financial planning' (strategy B). In fact, the second recommendation under the strategy pillar (strategy B) was the most consistently disclosed recommendation of them all. The reports also very commonly provided information related to the second governance recommendation – 'describe management's role in assessing and managing climate-related risks and opportunities.'

Exhibit 33 to Decl. of Georgiev
1128
**SER 1531**

### Benchmarking with other sectors and geographies

**Alignment with the TCFD recommendations within these reports from U.S. insurers far outpaces other sectors and nations.** Climate Risk Disclosure Survey Responses provided information on more of the TCFD recommended disclosures than a separate sample of reports from varying sectors and geographies that was separately analyzed, using a similar machine learning approach, by the TCFD Task Force in its **2022 Status Report**. (The TCFD 2022 status report reviewed 1,434 companies, including 118 insurance companies that ranged in size from $118 million to $130 billion in assets.)

Specifically, the Climate Risk Disclosure Survey response reports from U.S. insurers in certain states provided information related to approximately 65% of the TCFD recommendations (7.2 of 11 recommended disclosures), while the reports from other sectors and geographies disclosed 38% on average. The disclosure rate for U.S. insurers was most similar to the rate for European companies (across sectors), which was 60%, and far greater than Asia Pacific companies (36%). All regions showed significant increases in disclosure rates from 2017 figures, of between 11 and 23 percentage points.

It is worth noting that the sample of reports analyzed in the **2022 Status Report** included financial filings, annual reports, sustainability reports, and other relevant documents, while the Climate Risk Disclosure Survey responses are prompted directly by specific climate risk-related questions aligned with the TCFD and may therefore be more likely to achieve greater alignment. This also showcases a strength of the Climate Risk Disclosure Survey in eliciting specific, relevant information.

The TCFD Task Force's sample included reporting from North American companies from many sectors that, on average, adhered to 29% of the TCFD recommended disclosures — indicating that U.S. insurers may be achieving more TCFD-aligned information than other U.S. sectors. Globally, the TCFD Task Force's research found that disclosure rates varied among sectors. The average percentage of disclosure of the 11 recommendations by industry were: energy 43%; materials and buildings 42%; banking 41%; insurance 41%; agriculture, food, and forest products 37%; consumer goods 33%; transportation 32%; and technology and media 15%.

While 13% of the U.S. Climate Risk Disclosure Survey responses disclosed all 11 of the TCFD recommended disclosures, only 4% of the cross-sectoral multinational sample of reports analyzed by the TCFD Task Force disclosed information on all 11 recommended disclosures.

The global, cross-sectoral research by the TCFD Task Force found that reporting of TCFD-aligned information increased by **32% per year between** 2017 and 2021, indicating that the alignment with the TCFD framework will likely grow over time.

Most of the insurers who responded to the TCFD-aligned Climate Risk Disclosure Survey were required to do so by their state insurance regulator. However, in the TCFD Task Force's research (on many sectors and geographies), the reasons for companies' disclosure of TCFD-aligned information varied. Some 85% of companies, when surveyed, indicated that they provided TCFD-aligned information because climate-related issues are material to the company, 77% because investors ask for the information, and only 26% because TCFD is required by law or regulation for that company.

While U.S. insurers were least likely to disclose information on the metrics and targets pillar, the TCFD Task Force research found that in their cross-sectoral, global set of reports, governance was the pillar least frequently reported on, with only 29% of companies disclosing board oversight, and only 22% management's role.

While in the TCFD Task Force's research, the global insurance industry largely displayed greater alignment with the TCFD framework than other sectors, the alignment values were still lower than what was found for the Climate Risk Disclosure Survey of insurers from certain U.S. states. Notably, this trend is bucked for the metrics and targets pillar. The global insurance sector reports and the all-sector European reports display a much higher rate of disclosure of metrics and targets than the Climate Risk Disclosure Survey responses.

Exhibit 33 to Decl. of Georgiev

1129

**SER 1532**

**Table 1.** Comparison of the average percent of the TCFD recommendations, or recommended disclosures, in reports analyzed in the 2022 TCFD Status Report, to that for the NAIC Climate Risk Disclosure Surveys from reporting year 2021. The TCFD 2022 status report sample represented financial filings, annual reports, sustainability reports, and other relevant documents from 1,434 companies including 118 insurance companies. The insurance companies reviewed ranged in size from $118 million to $130 billion in assets.

| Recommendation | TCFD 2022 Status Update | TCFD 2022 Status Update | Climate Risk Disclosure Survey |
|---|---|---|---|
| | All sectors, European | Insurance sector, Global | |
| Board Oversight | 42% | 36% | 59% |
| Management's Role | 40% | 31% | 89% |
| Risks and Opportunities | 75% | 58% | 92% |
| Impact on Organization | 63% | 46% | 95% |
| Resilience of Strategy | 35% | 25% | 50% |
| Risk ID and Assessment Processes | 59% | 45% | 90% |
| Risk Management Processes | 55% | 49% | 94% |
| Integration into Overall Risk Management | 58% | 52% | 68% |
| Climate-Related Metrics | 81% | 38% | 33% |
| Scope 1, 2, 3 GHG Emissions | 75% | 33% | 33% |
| Climate-Related Targets | 74% | 33% | 22% |

### Detail related to the TCFD recommended disclosures (RBTM approach)

**The rules-based text mining (RBTM) method provides an indicator metric representing the comprehensiveness of any information provided for each TCFD recommended disclosure.** The machine learning generated metric provided by Manifest Climate in this study represents whether a report provided any information for each of the TCFD recommended disclosures, regardless of the level of detail provided for that recommended disclosure. The machine learning algorithm is optimized to identify information that aligns with the TCFD framework, but is not, per se, optimized for insurers or for the specific information prompted by the Climate Risk Disclosure Survey. In order to understand which reports provided comprehensive, detailed information on each TCFD recommended disclosures and insurer-specific guidance, a rules-based text mining RBTM approach was used to evaluate the responses according to specific criteria, or "rules."

These rules were developed based upon a synthesis of not only the TCFD recommendations, but the additional guidance for insurance companies for the TCFD framework, and the specific questions and prompts in the Climate Risk Disclosure Survey. The rules were synthesized from these sources based upon expert judgement by senior staff members at the California Department of Insurance Climate & Sustainability Branch.

This method will heavily favor reports that comprehensively address the four pillars: governance, strategy, risk management, and metrics and targets. Comprehensive answers include specifically discussing the spectrum of risks and opportunities relevant to an insurance company's business, the structures and

Exhibit 33 to Decl. of Georgiev
1130
**SER 1533**

processes they are using to identify and manage those risks, how these decisions fit into the broader market, regulatory, and social environment, and how they are setting targets and measuring climate-relevant variables, including emissions.



**Figure 7.** Bar chart showing the number of reports classified into each of five categories, ranging from not comprehensive to comprehensive, based upon the indicators developed using the rules-based text mining approach (RBTM indicator: 0 – not comprehensive, 0 to 3 – minimally comprehensive, 3 to 6 – moderately comprehensive, 6 to 9 – mostly comprehensive, 9 to 10 – comprehensive). Colors represent different types, or combination of types, of business. Source: California Department of Insurance

**Insurers with any type of business are capable of obtaining a high indicator of comprehensiveness under this framework.** Figure 7 shows the number of reports classified into each of five categories of comprehensiveness, ranging from not comprehensive to comprehensive, based upon the rules-based text mining indicator for each report. Note that the range of RBTM indicator for each category is not equal, with the "not comprehensive" category representing only reports that received exactly zero for their RBTM indicator, while the other categories represent ranges of indicators. The colors represent the reports grouped by the type (or types) of business that they represent.

There are reports from insurers of several types of business (multiple colors) in the moderately and mostly comprehensive categories, based on their RBTM indicators, demonstrating that all types of business can provide comprehensive, detailed information in their Climate Risk Disclosure Surveys, and aligning with the TCFD framework.

At the same time, no single report achieved a completely comprehensive report (RBTM 9-10), meaning that there is significant room for improvement. Fifteen reports came close in the mostly comprehensive category (RBTM 6-9). These reports were from life insurers, P&C insurers, insurance groups with subsidiaries offering both life and P&C types, and one insurance group with life and health types. The reports most commonly fell within the minimally comprehensive category with over 280 reports receiving RBTM indicators greater than zero but less than three.

Only 15 reports fell into the "not comprehensive category" with RBTM indicators of zero. These reports did not provide information that aligned with any of the rules or evaluation criteria developed for the RBTM approach. As previously noted, a report that was considered to disclose information on a given TCFD recommendation by the machine learning algorithm may still receive an indicator of zero in the rules-based approach if the information provided does not align with the specific criteria from the rules.

Exhibit 33 to Decl. of Georgiev
1131
**SER 1534**

The reports that provided the most comprehensive and detailed disclosures, as measured by their RBTM indicator, were reports from groups that represented both life and P&C types. These reports, on average, achieved an RBTM indicator of 4.27 out of 10. These groups tended to be large in size, averaging just over $7 billion in direct premiums written, while the average direct premiums written for P&C-only and life-only groups were $1.5 billion and $6.9 billion, respectively. The individual report with the most comprehensive score, as measured by the RBTM, was a life insurer. The vast majority (90%) of health insurers provided minimally comprehensive responses. In comparison, 67% of P&C insurers, 60% of life insurers, and 55% of title insurers fell into this category.

**The most comprehensive information in these filings was related to the risk management pillar, while the reports provided the least comprehensive information on metrics and targets.** This aligns with Manifest Climate and Ceres' finding that the largest number of reports provided information on risk management and the fewest on metrics and targets. The reports commonly provided sophisticated descriptions on the risks and opportunities facing their businesses, impacts to their organization, and risk management processes. The majority disclosed climate change as part of their enterprise risk management process. However, relatively few discussed the use of scenario analysis in their strategy and risk management processes. Of the four pillars, the metrics and targets pillar demonstrated the weakest overall indicators. The strongest recommended disclosure within metrics and targets was in response to questions on greenhouse gas emissions.

**Large companies and groups are more likely to provide comprehensive responses, but individual companies and groups of all sizes have demonstrated that they are capable of providing comprehensive responses and receiving a high RBTM indicator.** The companies and groups represented in the sample ranged in size from $100 million in direct premiums written, up to over $150 billion in direct premiums written. While there is statistically significant (99.9% confidence) correlation between the indicator received and the size of the company and group, as measured by the direct premium written, the correlation is not strong (Pearson $r^2 = 0.12$), meaning that many large companies/groups received low indicators for comprehensiveness and many small companies/groups still received high indicators for comprehensiveness.

At least 180 reports (40%) state that climate risk exposure is not material or is not a considerable risk to the organization at this time. However, many of these companies still provide detailed information on the ways they are working to or plan to address climate risk. More than 90 reports mention that climate change has limited to no material impact on their business because of the type of business they write. These responses are largely from life and annuity, workers compensation, title insurers, insurers writing Medicare prescription drug plans, and dental insurers. At least eight reports state that the company or group is too small to be impacted by climate change and/or too small to address it through governance, engagement with policyholders, climate risk analysis, or metrics and targets. These companies ranged in size from $124 million to $3.47 billion in direct premiums written.

The remaining sections will provide detail for each TCFD recommended disclosures summarizing the number of disclosures found in the machine-learning based analysis and the information searched for by the rules-based method and provide examples from reports that provided detailed information on the recommended disclosure, as evident in their RBTM indicator.

Exhibit 33 to Decl. of Georgiev
1132
**SER 1535**



**Figure 8.** Bar chart showing the number of reports classified into each of five categories, ranging from not comprehensive to comprehensive, based upon the indicators developed using the rules-based text mining approach for each TCFD recommended disclosure. Colors represent different types, or combination of types, of business. Source: California Department of Insurance

Exhibit 33 to Decl. of Georgiev

1133

**SER 1536**

## TCFD Pillar 1: Governance

Climate risk assessment and awareness is essential for strong risk management strategies for insurance businesses, and the TCFD recognizes the importance of being prepared for the substantial and varied risks faced by the insurance sector. The governance pillar of the TCFD Framework recommends that companies disclose the organization's governance around climate-related risks and opportunities. The Climate Risk Disclosure Survey aligns directly with the TCFD prompts under this pillar.

### A. Role of governing board oversight

**The first recommended disclosure under the governance pillar is to describe the governing board's engagement and oversight of climate-related risks and opportunities.**

#### Number of disclosures (ML approach)

The machine learning-based analysis by Manifest Climate and Ceres found that 292 reports out of the 494, representing 59%, included some kind of information on the role of the governing board in management of climate risk.

#### Detail of disclosures (RBTM approach)

The rules-based methodology employed rules to evaluate the description of the role of board oversight. These rules focused on concepts related to the board's involvement in acknowledging, discussing, and monitoring climate risk and sustainability issues, as well as its involvement in a defined strategy for addressing climate risk. These rules assign higher weightage to disclosures that detail the relationship between the board and any climate or sustainability committees, including the frequency of interactions between these committees and the board. Moreover, disclosures that discuss climate performance linked remuneration for the board received greater credit. In cases where disclosures outline the existence of a committee or committees responsible for climate-related matters, even if it is not specifically a sustainability committee, partial credit is assigned.

**Life insurers, as compared to reports from other types, provided the most comprehensive disclosures under this recommended disclosure, receiving an average indicator of 3.48 out of 10.** This was followed closely by P&C insurers, which received an average indicator of 3.31 out of 10.

Figure 8 represents the number of reports classified into each of five categories, ranging from not comprehensive to comprehensive, based on their RBTM indicator for each subpillar. Reports from different types of business, or combinations of types, are represented by different colors.

Over 14% of the reports, from varying types of business, provided mostly comprehensive responses. One report, from a P&C company, obtained the maximum possible indicator of 10, meaning that it comprehensively provided information on the governing board's oversight of climate risk in accordance with the evaluation criteria (rules). There were reports from insurers of all types of business that provided moderately comprehensive responses on this subpillar, as shown by the multitude of colors present in that category. Some 96 P&C insurers and 53 life insurers provided enough detail fall into this category.

Over 120 (27%) reports fall into the category of "not comprehensive" responses for the first subpillar under governance, meaning that they did not provide any information that was aligned with the evaluation criteria, or "rules," for governing board oversight of climate risk and therefore received an RBTM indicator of zero. Of these reports, 53 were P&C insurers, 30 were life insurers, and 32 were health insurers. As previously noted, a report that was considered to disclose information on a given TCFD recommendation by the machine learning algorithm may still receive an indicator of zero in the rules-based approach if the information provided does not align with the specific criteria from the rules.

Exhibit 33 to Decl. of Georgiev
1134
**SER 1537**

**COMPANY SPOTLIGHT**

Specificity on the makeup and frequency of engagement by the board on climate risks was an important indicator. The **Hartford Fire and Casualty** (Direct premiums written: $18 billion; Types: Life/P&C), stated that its full board of directors has oversight of sustainability matters, including climate-related issues, received routine updates on these risks and their impact on the company, and met five times in 2021. This company described in detail how each of its governance structures is involved in climate and sustainability strategy. Its report describes its sustainability governance committee, which is comprised of senior management, executes the sustainability strategy and reports to the full board of directors annually. This committee has several sustainability subcommittees that meet at least quarterly and regularly report progress to the full committee.

## B. Role of senior management oversight

**The second recommended disclosure under the governance pillar is to describe the management's role in assessing and managing climate-related risks and opportunities.**

### Number of disclosures (ML approach)

438 reports (89%) provided some kind of information on the role of senior management in management of climate risk, making this the most commonly disclosed recommendation under the governance pillar.

### Detail of disclosures (RBTM approach)

The rules utilized for evaluating reports on the TCFD recommendation related to the role of senior management focus on concepts pertaining to whether the senior management of the company recognizes, discusses, and monitors climate risk and sustainability issues, as well as their involvement in a well-defined strategy for addressing climate risk. These "rules," or evaluation criteria, attribute greater weightage to disclosures that provide details about the relationship between senior management and any climate or sustainability committees, including the frequency of committee meetings. Furthermore, disclosures that discuss climate performance linked remuneration for senior management are also given increased credit. In cases where disclosures describe the existence of a committee or committees responsible for climate-related matters, even if they are not specifically sustainability committees, partial credit is assigned.

**Life insurers were the single type of business that provided the most comprehensive information related to senior management's management of climate risk, similar to what was found for the board oversight of climate risk.** The average RBTM indicator for life insurers was 2.88 out of 10, closely followed by P&C insurers (2.18 out of 10). An individual P&C insurer provided the most comprehensive information, as measured by the RBTM indicator of 8.89 out of 10.

The distribution of RBTM indicators (Figure 8) for senior management of climate risk was similar to what was found for board oversight of climate risk. Slightly more reports provided information that aligned with the rules, with only 97 reports (22%) falling into the "not comprehensive" category because they did not align with any of the rules. Over 130 reports (29%) provided moderately comprehensive information and at least 37 (8%) provided mostly comprehensive information related to senior management oversight of climate risk. These reports came from insurers representing all types of business, demonstrating the ability to provide comprehensive responses. No single insurer provided completely comprehensive information (RBTM 9-10), demonstrating that there is room for improvement. The most common category, with 179 responses (40%), was minimally comprehensive, representing reports that provided information according to enough of the evaluation criteria to obtain indicators between zero and 3.

Exhibit 33 to Decl. of Georgiev
1135
**SER 1538**

COMPANY SPOTLIGHT

Specificity again was a driving factor for the results. **Argo Group** (Direct premiums written: $820 million; Type: P&C) described its Sustainability Working Group, which meets every six weeks to discuss climate change issues and coordinate activities for the Group's sustainability plan. The working group includes a climate risk and sustainability officer from the executive committee, who reports to the executive committee on these issues quarterly. The sustainability working group receives a detailed threat and opportunity analysis of the major sustainability risks facing the organization every six months and escalates key issues to the enterprise risk management steering committee. The executive committee also has a key performance indicator dashboard, which is presented to the executive risk committee, reporting on over 20 metrics to track sustainability performance against targets.

## TCFD Pillar 2: Strategy

The strategy pillar of the TCFD framework recommends that companies disclose the actual and potential impacts of climate-related risks and opportunities on the organization's businesses, strategy, and financial planning where such information is material. Under this section, the Climate Risk Disclosure Survey also requests that insurers disclose steps they have taken to engage key constituencies on the topic of climate risk and resiliency, plans to reduce GHG emissions it its operations, and resilience of the insurer's strategy to a 2 degrees Celsius or lower warming scenario. The Climate Risk Disclosure Survey also requests that insurers disclose any products or services to support the transition to a low-carbon economy or help customers adapt to climate-related risk.

### A. Risks and opportunities

**The first disclosure under the strategy pillar recommends that companies describe the climate-related risks and opportunities the organization has identified over the short, medium, and long term.**

#### Number of disclosures (ML approach)
454 reports (92%) included information related to risk and opportunities under the strategy pillar, making this the third most frequently provided recommended disclosure overall.

#### Detail of disclosures (RBTM approach)
The rules, or evaluation criteria, employed for evaluating disclosures within the Risks and Opportunities recommended disclosure prioritizes reports that provide specific details about insurance opportunities and specific climate risks within defined short, medium, and long-term timeframes. Disclosures are assessed based on their descriptions and discussion of both transition risks and physical risks. Furthermore, if extreme weather is discussed as part of the climate risks, it is considered as a component contributing to the fulfillment of this disclosure.

The rules assigned additional credit to disclosures that delve into opportunities for organizational cost savings through efficiency enhancements, exposure of investment portfolios to climate risks, and climate risks impacting underwriting activities. Furthermore, these rules assign weightage to discussions surrounding the reputational, litigation, and transition risk impacts on the company.

**P&C insurers on average provided the most comprehensive information on risks and opportunities, as measured by their RBTM indicator of 4.** An individual group with both life and P&C types provided the most comprehensive information related to this recommended disclosure, as measured by its RBTM score of 9.39 out of 10.

Exhibit 33 to Decl. of Georgiev
1136
**SER 1539**

The distribution of RBTM indicators (Figure 8) for risks and opportunities under the strategy pillar shows that these responses were markedly improved in their comprehensiveness, as compared to the responses for the governance pillar. Only around 19 (or 4%) of the reports received an RBTM indicator of zero, meaning that they didn't provide any information that aligned with the rules. The remaining responses provided a variety of levels of comprehensiveness. At least 100 responses provided mostly comprehensive responses, and three reports provided fully comprehensive (RBTM 9-10) responses.

### COMPANY SPOTLIGHT

**Selective Insurance Group** (Direct premiums written: $2.94 billion; Type: P&C) highlighted several key risks and opportunities related to climate change. Its response identified short-term risks associated with increased model uncertainty surrounding severe weather events resulting in higher catastrophe loss. It also noted medium-term investment losses from physical risk to infrastructure affecting property values, and transition risks due to technology changes affecting asset prices. In addition, its report discussed medium transition risks to underwriting due to evolving consumer preferences and medium-term regulatory risks limiting flexibility to exit personal lines segments. Its report also discussed short-term climate opportunities associated with selling renewable energy generated at its facilities, short-term opportunities for strengthening relationship to customers by helping them prepare for extreme weather with value-added services and technologies within its personal lines segment, demand for climate smart products and products for emerging industries in the medium term, and new investment opportunities as the low-carbon economy and clean energy matures in the long term.

#### Policies related to fossil fuel underwriting

**Several insurers disclosed that they have adjusted their underwriting policies related to fossil fuels.** Some insurers disclose that they have updated their company policies and are no longer accepting new underwriting risk for companies where more than a specified share of their exposures arise from the extraction or production of energy from thermal coal or from coalfired generation projects. Some others broadly describe phasing out of thermal coal from insurance, facultative reinsurance, and investment portfolios, and limiting business related to oil sands and the Arctic National Wildlife Refuge. However, several other insurers and reinsurers describe opposition to these types of exclusions, with some indicating that it is irresponsible to remove this coverage while these facilities and practices are still in use in critical areas.

Climate litigation risk was also disclosed as a factor in underwriting decisions. **Argo Group** noted that it considered climate-related litigation risk as a motivating factor in its 2020 decision for AMA to no longer provide directors & officers insurance on a direct basis to major clients.

### B. Impact on organization

**The second recommended disclosure under the strategy pillar of the TCFD framework advises companies to describe the impact of climate-related risks and opportunities on the organization's businesses, strategy, and financial planning.** The supplemental TCFD guidance for insurance companies recommends that insurers and reinsurers report quantitative and qualitative information on the impacts on broker or client selection and development of specific climate-related products or competencies. The supplemental TCFD guidance for asset owners recommends disclosures about how climate-related risks and opportunities are factored into relevant investment strategies.

Exhibit 33 to Decl. of Georgiev
1137
**SER 1540**

### Number of disclosures (ML approach)

467 reports (95%) provided information on the impact of climate-related risk and opportunities on business, strategy, and financial planning, making this the most commonly disclosed recommendation across **all** TCFD recommended disclosures.

### Detail of disclosures (RBTM approach)

The rules employed to assess disclosures within the impact on organization strategy pillar recommended disclosure are designed to identify concepts pertaining to the specific impacts of climate risks on the company and its corresponding strategy for addressing these risks. Emphasis is placed on disclosures that articulate defined objectives associated with the company's strategy for investments and underwriting. Reports that mention external standards for climate-related disclosure, metrics calculation, or climate risk management in relation to their strategy receive additional credit. In addition, the rules give credit to companies that discuss opportunities to mitigate greenhouse gas emissions in their operations.

The rules prioritize reports that incorporate discussions on reducing emissions and energy, as well as fuel, water, and waste consumption as integral components of their strategy. Companies are also assigned credit for discussions of how climate change factors into interaction with or selection of brokers and clients. Moreover, reports that highlight the utilization of external or internal climate research to inform their strategy are also favored. Lastly, the rules for this recommended disclosure also prompt discussion of opportunities associated with climate smart financial instruments and insurance products that promote climate smart practices.

**P&C insurers were the type of business that, on average, provided the most comprehensive information on the impact of climate change on their organizations** (**RBTM indicator of 2.53 out of 10**). However, an individual life insurer received the highest indicator (8.63).

The distribution of RBTM indicators (Figure 8) for climate impacts on the organization under the strategy pillar shows that the responses were not quite as strong, in their comprehensiveness, as the first recommended disclosure under the strategy pillar (risks and opportunities). At least 38 reports received an RBTM of zero, indicating that they didn't provide any information aligned with the evaluation criteria (rules). However, the majority of the reports (>280) provided either minimally or moderately comprehensive information.  Some 25 reports provided mostly comprehensive information, but none achieved the highest category of comprehensive, meaning that while the disclosures are still relatively strong for the "impact on organization" recommended disclosure, there is still room for improvement.

### COMPANY SPOTLIGHT

The **TIAA Family of Companies** (Direct premiums written: $16 billion; Type: Life) discussed in its report impacts on its business associated with increased energy costs, shifts in consumer demand, and increased regulatory requirements. The report discussed the need to adapt to these changes, while avoiding stakeholder scrutiny or reputational or brand impairment. It mentions that TIAA, through Nuveen, offers investment strategies across multiple asset classes that are designed with the goal to outperform in a low-carbon transition. These strategies generally look to prioritize companies and assets that are relatively more resilient to and will benefit from the low-carbon and net zero transition. Nuveen actively engages with portfolio companies to improve disclosure of their climate-related metrics and risks and encourages them to set targets for emissions reduction which align to the 2015 Paris Agreement goals.

The **TIAA** report specifically identifies that, as a multi-asset class investment vehicle, the General Account is sensitive to regulatory changes over the short, medium, and long term. The report also

Exhibit 33 to Decl. of Georgiev
1138
**SER 1541**

states that despite the increasing urgency surrounding climate change, many issuers do not quantify and disclose emissions. This may lead to understatement of associated financial risks. Once the difference in reporting dissipates, markets can function more efficiently to price climate risks. The report discloses that TIAA is working with regulators, such as the SEC, the EU Commission and the UK FCA, on climate risk regulation to support the development of disclosure regimes.

### Climate smart insurance products

**At least 28 companies and groups mention opportunities or existing products that fall under a general category of "climate smart" insurance products.** Among these is **AXA**'s sustainability linked insurance program, where the cost of the insurance premium is linked to the client's goal to reach 55% of its total installed capacity from renewable sources by a target date. **AXA** also describes performance insurance solutions for the technical risks associated with breakthrough low-carbon technologies.

Many of these climate smart insurance products are in the form of renewable energy or green technology insurance or reinsurance products. **AXIS Capital, Arch Insurance, Chubb, Everest, HDI Global, The Hartford, Markel Insurance, Swiss Re, Travelers Insurance, Tokio Marine Group, United Guarantee Residential Insurance Company, SirusPoint,** and **Munich Re,** among others, all describe offering products to the renewables sector. These include credit insurance or surety products for wind, solar, and hydropower projects and other cleantech products. It also includes expanded tax liability insurance coverage to protect against the loss of investment or production tax credits for renewable energy projects.

Some reports, including that from **FMH** group, describe coverage endorsements to encourage or subsidize farmers to adopt climate smart agricultural practices. The **Cincinnati Insurance Companies** describes offering policyholders new products, including coverage for green buildings that allows them to rebuild damaged buildings in more energy efficient ways. **Utica National Insurance Group** describes ISO Green Coverage Endorsements to help cover costs if the insured has "environmentally friendly" equipment or substitute such equipment during a claim. **SiriusPoint** describes launching a full services climate underwriting and distribution advisory firm in partnership with **Parameter Climate.** C**ourtesy Insurance** and **Sentruity** describe new products specifically focused on electric vehicles. Lastly, **W. R. Berkeley Corporation** describes one of its operating units, which has an insurance product for restoration of wetlands and streams.

As the promotion and desire for greater adoption of electric vehicles (EVs) grow for both personal and commercial purposes, so does the need for robust and reliable EV charging infrastructure especially in rural communities. As a result, some insurance companies and groups are already providing insurance coverage for home charging equipment as well as accounting for additional costs and risk via homeowner policies. In addition, the specialized equipment related to EVs and their high replacement cost have a greater potential impact on insurance premiums compared to their internal combustion engine counterparts. Insuring EV charging infrastructure involves assessing risks such as potential damage to equipment, liability for accidents or injuries, and cybersecurity threats, while also considering the unique characteristics and requirements of charging stations.

Over 45 companies and groups specifically reference electric vehicle charging infrastructure in their reports. The majority of these entities discuss the integration of charging infrastructure within their operational facilities. Moreover, they anticipate that the gradual expansion of charging infrastructure will result in increased demand for electric vehicle insurance over time.

Exhibit 33 to Decl. of Georgiev
1139
**SER 1542**

**The Hartford Fire and Casualty** distinguishes itself by claiming to be the first insurer to have offered coverage for garage EV charging stations within its homeowners policies. Some insurers disclose their investments in charging infrastructure companies, indicating their commitment to supporting the growth of charging networks. One company states that its subsidiaries track metrics associated with the number of EV charging stations. A number of reports cite limitations in charging infrastructure as a significant factor preventing the utilization of EVs within their claim services fleets. They cite this constraint as a reason for maintaining conventional vehicles.

In terms of strategic initiatives, **CSAA** includes mobile charging stations as part of its driver assistance strategy. **Toyota Motor Insurance Company** outlines its ongoing study aimed at comprehending the electrical infrastructure requirements necessary to successfully transition 240 shunt trucks from diesel to electric power. Toyota also describes its work with Kenworth to roll out 10 hydrogen fuel cell electric heavy-duty trucks at the Port of Los Angeles.

### Insurance products and incentives for risk reduction

**A variety of products are being offered to incentivize adaptation or risk reduction in the insurance industry.** Some companies and groups, such as **CSAA Insurance Group** and **Agency Insurance Company**, provide replacement cost endorsements. **Assurant, AXIS Capital, Electric Insurance Company, Everest**, and other insurers offer discounts for fortified homes. Premium discounts for wind, fire, and hail mitigation features are available from companies and groups like **Auto Owners Insurance, Farm Bureau Financial Services, Farmer's Alliance Mutual Insurance, Farmers Insurance**, and many others. These discounts are also extended to policyholders by companies/groups such as **Homeowners Choice, WT Holdings, Pacific Specialty Insurance Company**, and **State Farm**.

In addition to mitigation discounts, approximately 20 other reports emphasize the importance of risk management resources and loss prevention services, which they offer for free to their policyholders. **FMH** rewards farmers who adopt climate smart agricultural practices, such as planting cover crops or using no till or minimum till practices, with premium discounts. Split deductibles for wind and hail losses are provided by **Farm Bureau**. Equipment breakdown coverage is offered by **Farmers Alliance Mutual Insurance, Merchants Insurance Group, Penn National Insurance**, and **WR Berkley Corporation**. Farmers Insurance gives discounts to homeowners with Energy Star/EPA Certified Homes, LEED Certified Homes, Fortified Homes, Automatic Gas Shutoff Valves, or Whole House Water Leak Detection systems. **Nationwide** and **WT Holdings** mention discounts on mitigation devices, while **Pharmacist Mutual xInsurance Company** promotes sustainability among policyholders through incentives. **USAA Group** offers premium discounts to homeowners eligible for Florida Building Code Credits and FireWise USA Communities, which is a U.S. nationwide program established by the National Fire Protection Association.

### C. Resilience of strategy

**The final recommended disclosure under the strategy pillar of the TCFD framework recommends that companies describe the resilience of the organization's business, strategy, and financial planning.** The supplemental TCFD guidance for insurance companies recommends insurers and reinsurers that perform climate-related scenario analysis on underwriting activities provide information on a 2-degrees C scenario and a greater than 2-degrees scenario for physical effects of climate change. The supplemental guidance for asset owners recommends that companies disclose how climate-related scenarios are used to inform investments in specific assets.

Exhibit 33 to Decl. of Georgiev
1140
**SER 1543**

### Number of disclosures (ML approach)

249 reports (50%) that provided information related to this recommended disclosure, significantly fewer than the number of reports that provided information according to the other recommendations under the strategy pillar.

The challenges involved in conducting a scenario analysis, according to research of the TCFD Task Force, are the cause for low disclosure levels against this recommendation. For example, the **2022 TCFD Status Report** stated: "51% of respondents identified specific issues related to implementing the Strategy recommendation, with 36% of those respondents highlighting issues related to conducting climate-related scenario analysis such as selecting relevant scenarios and identifying key inputs and parameters." In addition, the TCFD Task Force's status report also noted that the majority of companies globally did not disclose information on specific scenarios.

### Detail of disclosures (RBTM approach)

The rules or evaluation criteria employed for evaluating disclosures within the recommended disclosure focus on identifying concepts related to the utilization of climate scenario analysis or climate scenarios to assess the resilience of the company's business and strategy across a range of possible futures. The rules strongly prioritize companies that provide reports on quantitative climate-specific scenario analysis or stress testing exercises, as they demonstrate a robust approach to assessing climate risks and utilize both greater than 2-degrees Celsius scenarios for physical risks and below 2-degrees Celsius scenarios for transition risks.

However, partial credit is given to companies that mention the qualitative utilization of scenarios to evaluate their management practices, recognizing their acknowledgement of the importance of scenario analysis. Furthermore, the rules may assign a modest amount of credit to companies that mention stress testing, even if they do not explicitly specify the use of climate scenarios in their analysis.

**While the vast majority of companies or groups, — 205 and 164, respectively — provided either not comprehensive (RBTM of zero) or minimally comprehensive responses on this recommended disclosure (Figure 8), at least 15 of those that did provided information in a way that comprehensively addressed the TCFD recommendations, allowing them to achieve RBTM indicators between 9 and 10.** This was the case across most types of business – health, life, P&C, and reports from groups with companies from multiple business types. The reports that fell within the minimally or moderately comprehensive category were those that mentioned the use of climate or extreme weather scenarios but did not provide significant specific information about the scenarios used, the time horizons, the risks addressed, or other details. The comprehensive responses generally did provide this information and described how scenario analysis fits into their strategy for addressing climate risk.

#### COMPANY SPOTLIGHT

Unum Group (Direct premiums written: $7.84 billion; Type: Life) stated that quantitative scenario analysis for investments supports its decision to integrate climate change analysis into its overall risk assessment process. It describes quantitative scenario analysis of the transition risk in Unum's investment portfolio using International Energy Agency (IEA) scenarios and quantitative scenario analysis of Unum Group's underwriting practices modeling impacts at below 2-degrees Celsius and above 2-degrees Celsius scenarios across multiple time horizons. The group states that the underwriting scenario supports effective management of climate risks, including transition and physical risk impacts. The underwriting scenario analysis was conducted on key insurance risk factors including morbidity, mortality, persistency, and longevity to understand climate change's impact on these factors over a 30-year time horizon. The group modeled each scenario's financial impact relative to

Exhibit 33 to Decl. of Georgiev
1141
**SER 1544**

baseline expected cash flows for claim incidences and recoveries, mortality and lapses. Additionally, Unum Group evaluated impacts of scenarios to operating expenses relative to baseline expenses. Through the scenario analysis, the company identified the ability to reprice group contracts as a significant measure against climate-related risks, as well as business diversification across geographies and regular risks. The company identified that its exposure to higher risk industries is limited, with the ability to replace lost business with emerging sectors.

### Transition risk versus physical risk scenario analysis

**Climate scenario analysis or stress testing can be used for assessment of transition risk, physical risk, or both.** At least 87 submissions mention scenario analysis explicitly, but not all reports specify which risks. Transition risks are likely to be most evident in results of scenario analysis exercises that utilize a below 2-degrees Celsius warming climate scenario. At least 30 reports explicitly mention using a below 2-degrees Celsius warming scenario in their scenario analysis exercises. Another nine companies and groups mention doing transition risk scenario analysis but may not mention a specific temperature threshold. Another 14 or more companies and groups describe using a below 2-degrees Celsius scenario in the context of a process (e.g. analysis, risk assessment), but may not explicitly state that it is a formal scenario analysis exercise. In total, 102 reports mention a 2-degrees Celsius or below scenario in some context.

Physical risks are likely to be most evident in the results of scenario analysis exercises that utilize a greater than 2-degrees Celsius warming climate scenario. At least 17 reports explicitly mention using a greater than 2-degrees Celsius warming scenario in their scenario analysis exercises. Another 11 companies and groups mention doing physical risk scenario analysis but may not mention a temperature. Another 19 or more companies and groups describe using a greater than 2-degrees Celsius scenario in the context of a process (for example, for analysis, risk assessment), but may not explicitly state that it is a formal scenario analysis exercise. In total, 37 reports mention a greater than 2-degrees Celsius scenario in some context. At least 23 reports mention both a 2-degrees Celsius or lower and a greater than 2-degrees Celsius scenario, and 13 explicitly mention climate scenario analysis for both scenario types.

## TCFD Pillar 3: Risk management

The risk management pillar of the TCFD framework recommends that companies disclose how the organization identifies, assesses, and manages climate-related risks. Under this section, the Climate Risk Disclosure Survey also asks that insurers disclose underwriting exposure to climate-related risks, any steps that have been taken to encourage policyholders to manage their potential physical and transition climate related risks, impacts to the insurer's investment portfolio, and whether and how climate risks are addressed in the insurers' enterprise-risk management process or a separate process. The insurers are also asked to disclose the climate scenarios, if any, that are used to evaluate underwriting risks and investment risks.

The supplemental TCFD guidance for insurance companies recommends that insurers and reinsurers describe processes for risk management of the underwriting portfolio including physical risks, liability and litigation risks, and transition risks resulting from a reduction in insurable interest due to a decline in value, changing energy costs, or implementation of carbon regulation. The supplemental guidance for asset owners recommends that companies describe engagement with investee companies to encourage better disclosure and practices related to climate risks and improve data availability.

### A. Risk identification and assessment process

**The first recommended disclosure under the risk management pillar advises companies to describe the organization's process for identifying and assessing climate-related risks.**

Exhibit 33 to Decl. of Georgiev
1142
**SER 1545**

### Number of disclosures (ML approach)

445 reports (90%) included information on climate risk identification and assessment processes, making this the fourth most disclosed of all TCFD recommended disclosures.

### Detail of disclosures (RBTM approach)

The rules employed to evaluate disclosures within the risk identification and assessment process recommended that disclosures aim to identify concepts related to the identification and assessment of risks. Emphasis is placed on reports that detail the utilization of climate scenarios as a means to identify key risks to the company's business. This recommended disclosure encompasses the identification of liability and emerging regulatory risks associated with climate and relevant climate-related alliances or international goals and agreements. Furthermore, the rules for this recommended disclosure seek out reports that discuss the company's engagement with investee companies, asset managers, and policyholders concerning climate risk matters. These recommended disclosure rules also evaluate disclosures related to the role of reinsurance in their process.

**Many insurers, with varying types of business, provided comprehensive information on this recommended disclosure.** Some life, P&C, and life/P&C combined groups received indicators as high as 9.58 out of 10. The 31 reports representing groups with both life and P&C companies fared best in this recommended disclosure, receiving an average indicator of 5.66.

The distribution of RBTM indicators (Figure 8) for risk identification and assessment process under the risk management pillar is similar to that for the strategy – risks and opportunities recommended disclosure. At least 11 companies and groups earned RBTM indicators between nine and 10, meaning that they provided fully comprehensive responses in accordance with the rules. Most insurers (194 and 127) provided minimally to moderately comprehensive responses, while 56 (12.5%) provided responses that did not address the rules, or evaluation criteria, earning an RBTM indicator of zero.

### COMPANY SPOTLIGHT

**Aflac** (Direct premiums written: $5.43 billion; Type: Life), described its risk assessment process. **Aflac** discloses that it became a signatory of the Principles for Responsible Investment (PRI) in November of 2021. The company integrates climate risk into its enterprise risk management process by utilizing a risk assessment matrix. Risk ratings are assigned based on the impact and likelihood of each enterprise risk, categorized as critical, high, medium, or low. High-risk ratings indicate significant financial or strategic effects with extreme or major impacts, while critical-risk ratings represent potential major disruptions. Ongoing and annual risk assessments involve a comprehensive approach, considering emerging risks such as climate risks and engaging business units. Periodic assessments are conducted to evaluate climate-related risks, focusing on reputation, products, and investments. Stakeholder engagement plays a vital role in identifying and addressing climate-related risks, safeguarding the company's brand reputation. Climate risks are also considered in investment assessments, taking into account issuer exposure, sustainability considerations, and potential impacts on business and financial conditions. Additionally, the company evaluates climate-related risks in products, including acute and chronic physical risks, while recognizing the need for further assessment and data to quantify their impacts. The company specifically identified market risks as relevant for its investment portfolio as changes in supply and demand for products and services impact investee companies. It identified acute physical risks to its real estate assets and insurance products such as natural disasters. The company identified the potential for higher lapse rates or claims in the wake of natural disasters. In addition, the company's offerings and pricing may be impacted by changes in the prevalence or geographic range of novel viruses due to climate change.

Exhibit 33 to Decl. of Georgiev
1143
**SER 1546**

### Role of reinsurance in risk management strategies

**Approximately 216 reports mention reinsurance, however some of these are from companies and groups that sell reinsurance.** Many companies describe evaluating their climate risks alongside consideration of their reinsurance contracts and indicate that they view reinsurance as part of their climate risk management strategy. For example, **Bretheren Mutual Insurance Company** describes the purchase of reinsurance as "a critical tool for the insurance industry in managing climate related risk." Some describe this as their primary strategy for addressing their climate-related catastrophe exposure. For example, **Clear Blue Insurance Group** states that the most significant risk to its underwriting portfolio is a hurricane loss from climate-related exposures, and that the company manages this risk by purchasing catastrophe reinsurance. **Columbia Insurance Group** mentions that it manages its exposure in coastal regions with reinsurance. **FMH** states that its primary climate-related risks are to its underwriting portfolio and that it "primarily mitigates these risks via reinsurance." Many companies go as far as to say that reinsurance coverage is a (or the) factor leading them to conclude that their climate risk is not a material threat or solvency concern for their company.

At the same time, some reinsurers describe exiting the market. Even if they do not describe existing contraction of offerings, many reinsurers describe the ability to withdraw from a position at the end of a policy year, or adjust pricing, as important risk management strategies for their business. **Federated Insurance** describes how in 2021 it reduced its assumed reinsurance exposure by reducing the number of property catastrophe treaties, a form of reinsurance contract, it supports from three to two. **Argo Group** disclosed that in 2020, it announced the sale of its reinsurance business providing property catastrophe reinsurance, citing the increasing uncertainty inherent in climate change-related property exposures as part of the business rational for doing so. **Amerisure** explains that it has observed increasing upward rate pressure in the reinsurance markets as reinsurers spread the cost of these events around to all of their clients. Many other companies describe anticipating this risk, but do not directly state that this is already being felt. **Swiss Re** states that it has actively de-risked its portfolio of aggregate excess of loss covers in the last two years because of inadequate pricing, but believes that the natural catastrophe market is healthy.

Many insurance companies and groups describe the risk of rising costs or lack of availability of reinsurance. **Agency Insurance Company** mentions a medium-term risk that reinsurance companies may be strained due to changing climate conditions. **Allianz** alludes to this as well. **Farmers Insurance** describes availability of reinsurance as among the top concerns facing the organization. **AmTrust** describes a risk of reinsurance counterparties introducing strict climate-related minimum standards that may be onerous. As an example, **Associated Industries of Massachusetts** mentions reinsurance exclusions on its voluntary book of business prohibiting it from insuring certain lines of businesses, including oil and gas operations, steamship lines, aviation, and chemical manufacturing.

Several insurers point to recent changes that they have made to reinsurance treaties to reflect climate risks. For example, **Arabella** states that in recognition of the recent trend of increasing frequency of natural catastrophes, it has, over the past few years, increased the limits of its reinsurance program to provide coverage for return periods well in excess of the 1-in-100 year period to ensure capital adequacy for the most extreme events. **CSE Insurance Group** describes how it has adjusted its reinsurance strategy over the past few years as the frequency and severity of wildfires has changed, in order to protect the company from high frequency/low severity events and how it is exiting protection from low frequency/high severity events.

Companies also allude to the role of reinsurance providers and brokers in providing technical capacity related to climate risks. Some companies and groups mention that their catastrophe modeling is provided by their reinsurance broker as part of the placement process (for example, **Agency Insurance Company**, **Alaska National Insurance Company**, **Amerisure**, **Co-Operative Insurance Companies**, and **Fairfax**

Exhibit 33 to Decl. of Georgiev
1144
**SER 1547**

**Financial Holdings**). Others mention that they consult their reinsurance partners for climate-related issues. For example, A**rabella Insurance Group** mentions annually engaging its reinsurance partners that are viewed as leading research institutions on climate change to understand the risks to the property and casualty industry. Many others, such as **Co-operative Insurance Companies** and **Mutual of Enumclaw Insurance Company**, describe relying on climate risk education from their reinsurance brokers.

Some companies mention reinsurance or reinsurance-like support from government or quasi-government entities. For example, **Hudson Insurance Group** describes its crop insurance business as potentially impacted by climate change, but states that the risk is mitigated by reinsurance provided by the U.S. government. As another example, **Assurant** stated that it views some of its tail risk as having been transferred to the Florida Hurricane Catastrophe Fund.

### Investment management

Insurance companies commonly rely on asset managers to handle their investment portfolios. Asset managers provide expertise in managing and allocating funds across various asset classes, such as stocks, bonds, and real estate, with the goal of generating returns for the insurance company. However, insurance companies should be aware and involved in the content and management of their investment portfolios even when working with an asset manager. A substantial number of reports, specifically 61, refer to asset managers, and the majority of them discuss the incorporation of climate risk into their investment process. However, in many cases, the reports do not provide explicit details on how precisely climate risk factors or drivers influence the ultimate investment decisions.


## B. Risk management process

**The second recommended disclosure in the risk management pillar of the TCFD recommendations prompts description of the organization's process for managing climate-related risks.**

### Number of disclosures (ML approach)

464 reports (94%) provided information on climate risk management processes, making this the second most disclosed of all TCFD recommended disclosures.

### Detail of disclosures (RBTM approach)

The supplemental guidance for insurance companies recommends that insurers and reinsurers describe risk models used to manage climate-related risks in relation to product development or pricing. The Climate Risk Disclosure Survey also prompts disclosures on the use of catastrophe modeling to manage climate-related risks. In addition, it requests that insurers and reinsurers consider disclosing metrics on climate-related exposure, such as alignment with scenarios, probable maximum loss, climate Value at Risk (VaR), carbon intensity, and the amount of financed or underwritten GHG emissions. The supplemental guidance for asset owners recommends companies describe how they consider and manage their investment portfolios' position with respect to the transition to a low-carbon economy.

The rules utilized to evaluate disclosures within the risk management process recommended disclosure focus on identifying concepts pertaining to the integration of climate change into the company's enterprise risk management program and the comprehensive management of significant risks, including transition risk, litigation risk, reputational risk, and extreme weather risk. The rules favor reports that discuss any plans to position the investment portfolio in light of a transition to a low-carbon economy. Credit is awarded to reports that elaborate on existing, anticipated, or potential changes in client preferences related to climate change.

Exhibit 33 to Decl. of Georgiev
1145
**SER 1548**

Under this recommended disclosure, reports are also given credit for discussing incentives to encourage policyholders to manage their potential physical and transition risks.

This TCFD recommended disclosure prompts information on the use of modeling. While the TCFD recommendations and the Climate Risk Disclosure Survey aim to gather information from insurers on the use of models for evaluation of climate risk, it is very difficult in the existing responses to determine which models described incorporate climate change and which models do not. Therefore, in this analysis disclosures are analyzed for the use of modeling of catastrophe risk even if it does not explicitly include climate change. If future iterations are pursued, this may be adjusted.

**All types of business demonstrated a high capacity to provide detailed, comprehensive information on this recommended disclosure.** P&C insurers were the single type that, on average, provided the most comprehensive information related to this recommended disclosure (average 3.85 out of 10). Insurers with both life and P&C types provided even more comprehensive information earning, on average, an indicator of 5.56 out of 10. Even title insurers, who generally did not provide comprehensive information on the other recommended disclosures, provided enough information to receive some credit here (indicator of 1.17 out of 10).

**Nearly half (221) of the responses for climate risk management processes within the risk management pillar fell within the categories of moderately or mostly comprehensive, making this the strongest recommended disclosure.** Only 36 reports (8%) provided responses that were not comprehensive, meaning that they did not provide any information that aligned with the rules. However, only two companies and groups (one life and one life/P&C) provided fully comprehensive responses, revealing that there is room for improvement.

### COMPANY SPOTLIGHT

**Sun Life** (Direct premiums written: $4.48 billion; Type: Life) integrates climate risk management into its risk framework, governance, and supporting processes. The company's definition of climate risk includes the physical impacts of climate change and the effects of transitioning to a lower carbon economy, encompassing various risks such as damage to assets, reduced investment values, litigation risks, health impacts, and socio-economic and regulatory changes. The company incorporates climate-related risks into its investment decisions, conducting analyses on physical risks, business model risks, and carbon transition risks. Each asset management business within the company adopts its own approach to identify, assess, monitor, and respond to climate-related risks, employing methods such as climate risk surveys, risk analysis, emissions data analysis, stranded asset modeling, and engagements on decarbonization. The company has environmental risk management programs in place to mitigate potential financial and reputational impacts from environmental issues on its properties, including the implementation of business continuity plans. The company evaluates climate change-related hazards and works to enhance the resilience of its buildings against events such as tornadoes, floods, storms, and coastline flooding.

### C. Integration into overall risk management

**The final recommendation of the risk management pillar advises companies to describe how the processes for identifying, assessing, and managing climate-related risks are integrated into the organization's overall risk management.**

Exhibit 33 to Decl. of Georgiev
1146
**SER 1549**

### Number of disclosures (ML approach)

338 reports (68%) provided information related to the integration of climate risk identification, assessment, and management into the organization's overall risk management. Significantly fewer reports disclose information related to this recommendation, as compared to the other recommendations under the risk management pillar.

### Detail of disclosures (RBTM approach)

The rules employed to assess this recommended disclosure aim to identify reports that address the integration of climate change into the company's enterprise risk management system, and how frequently the risk management process occurs. These rules prioritize reports that explicitly discuss the incorporation of climate risks into the overall process of identifying, assessing, and managing risks. Additionally, emphasis is placed on reports that provide details about a specific risk control system implemented in relation to climate risks. The rules give credit to reports that discuss the employment of a business continuity plan, and that discuss how climate scenarios are used to analyze investment and underwriting risks.

**Insurers across types (P&C, life, health) demonstrated capacity to provide comprehensive information on this recommended disclosure and received indicators as high as 8.57.** Groups that had both life and P&C types were, on average, the cohort with the highest indicator under this recommended disclosure (5.43 out of 10).

At least 300 of the responses for integration into overall risk management fell either within the "moderately" or "mostly" comprehensive categories, meaning that insurers were often quite sophisticated in their response under this pillar. These covered many types of business. Less than 80 reports did not provide any information that aligned with the rules and therefore fell within the not comprehensive category.

### COMPANY SPOTLIGHT

**CareFirst** (Direct premiums written: $9.81 billion; Type: Health) recognizes climate change as a significant social determinant of health that impacts the physical environment and health of communities. The company acknowledges that climate change, through extreme weather events and other consequences, will disproportionately affect vulnerable communities, including people of color and those with lower socioeconomic status. **CareFirst** actively engages in addressing social determinants of health by advocating for policies and programs that promote health equity and inclusion. The company has processes in place to identify and assess climate change-related risks and their potential financial implications. **CareFirst** works with regulators to ensure its capitalization accounts for the impacts of climate change on healthcare consumption. The company continuously monitors policyholders' health to protect against emerging risks, including climate change. The organization's annual enterprise risk assessment process identifies climate change as a key risk, and comprehensive action plans are developed and monitored to address the identified risks.

## TCFD Pillar 4: Metrics and Targets

The metrics and targets pillar of the TCFD recommendations advises companies to disclose the metrics and targets used to assess and manage relevant climate-related risks and opportunities, where such information is material.

### A. Climate-related metrics

**The first recommended disclosure under the metrics and targets pillar of the TCFD recommendations advises companies to disclose the metrics and targets used to assess and manage relevant climate-related risks and opportunities, where such information is material.** The supplemental guidance

Exhibit 33 to Decl. of Georgiev
1147
**SER 1550**

for insurance companies recommends that insurers and reinsurers provide aggregated risk exposure to weather-related catastrophes, and the extent to which their underwriting activities are aligned with a well below 2-degrees Celsius scenario. The supplemental guidance for asset owners recommends that companies provide metrics used for investment decisions related to climate risk, and how their investment portfolio aligns with a well below 2-degrees Celsius scenario.

### Number of disclosures (ML approach)

164 reports (33%) included information on climate-related metrics. All three metrics and targets recommended disclosures were weaker than the recommendations under other pillars, in terms of the number of reports disclosing this information. However, this recommended disclosure on climate-related metrics had the greatest number of reports containing information on it, as compared to the other recommendations under the metrics and targets pillar.

### Detail of disclosures (RBTM approach)

The rules employed to assess disclosures within the climate-related metrics recommended disclosure aim to identify reports that provide information on various metrics related to renewable energy, emissions reductions, waste reduction, electricity or energy consumption, water consumption, and fuel consumption. These rules prioritize reports that provide specific numerical values for these metrics and methodologies used for calculating metrics, enabling a more precise understanding of the company's performance in these areas. The rules also favor reports that discuss remuneration policies, use of an internal carbon price, and metrics on alignment of insurance underwriting and investment activities with a well below 2-degrees Celsius scenario. Finally, the rules favor reports that discuss underwriting metrics such as probable maximum loss and climate value at risk.

**It is worth noting that there were limited instances of reports that encompassed a comprehensive set of climate-related metrics,** indicating that the inclusion of such detailed metrics remains relatively uncommon among the analyzed reports.

**Across all types of business, very few insurers provided comprehensive information about climate-related metrics.** At least 132 companies or groups of companies didn't provide any information that aligned with the rules, and therefore received an RBTM indicator of zero. Another 282 companies or groups of companies provided minimally comprehensive responses (RBTM indicators between zero and 3). Groups with both health and life insurance companies were most likely to disclose comprehensive climate-related metrics, achieving a 2.3 out of 10 on average. No other type of business obtained a higher average indicator than two out of 10. No single report received an indicator higher than a 6.67 out of 10, meaning there is significant room for improvement in the disclosures under this recommendation.

### COMPANY SPOTLIGHT

**John Hancock/Manulife** (Direct premiums written: $22 billion; Type: Life), which operates under the name Manulife outside of the United States, gives values for measurement of the avoided CO2 emissions from its low-carbon investments and green bond investments from its general account. For measurement of scope 1, 2, 3 financed emissions, the company describes using the PCAF Global GHG Accounting and Reporting Standard. For energy consumption, it reports energy use in ekWh for corporate, real estate, green power, investment, and other categories, in addition to total energy use. The company gives values for real estate water consumption in million metrics cubed and in terms of water use intensity (m³/sq ft). It also discloses that it has added goals linked to its climate action plan into its executive performance assessment and compensation. The company discloses using a Climate Value at Risk metric for equity, bond, and real estate portfolios. The company also gives metrics for trees planted, percent of farms that have regenerative practices, and real estate under a sustainable building certification program, among other metrics.

Exhibit 33 to Decl. of Georgiev
1148
**SER 1551**

### Internal carbon pricing

**Zurich American Insurance Company** describes using an internal carbon price set at $15 per ton in 2020, subject to an annual increase. **Swiss Re** describes that it was the first multinational company to announce a triple-digit ($100-200 per tonne of $CO_2$) internal carbon price on both direct and indirect operational greenhouse gas emissions. **American Family Insurance** describes using an internal carbon cost for shadow pricing, using a price based on the open market-based price of carbon allowances in the EU emissions trading system. The company discloses that the use of an internal carbon price has impacted its business most by influencing investment decisions in energy efficiency projects, and included an example from determining a business case for building a 197 MW solar array on the grounds of one of its facilities.

## B. Risk associated with GHG emissions

**The second recommended disclosure of the metrics and targets pillar of the TCFD recommendations prompts companies to disclose scope 1, 2, and, if appropriate, scope 3 greenhouse gas emissions and the related risks.** The supplemental guidance for insurance companies recommends that insurers and reinsurers include weighted average carbon intensity or GHG emissions associated with commercial property and specialty lines of business where data and methodologies allow. The supplemental guidance for asset owners recommends that companies disclose GHG emissions for assets they own and weighted average carbon intensity for investments, calculated with the Global GHG Accounting and Reporting Standard.

### Number of disclosures (ML approach)

164 reports (33%) included information related to scope 1, 2, and 3 greenhouse gas emissions.

### Detail of disclosures (RBTM approach)

The rules employed to assess disclosures within the scope 1, 2, and 3 GHG emissions recommended disclosure are designed to identify reports that provide comprehensive information on greenhouse gas emissions. These rules prioritize reports that include both absolute emissions and emissions intensity metrics for scope 1, 2, and 3 emissions.

By requiring the provision of both absolute emissions and emissions intensity metrics, these rules aim to capture a holistic understanding of a company's GHG emissions profile. This approach enables a thorough assessment of the company's performance in managing and reducing emissions across different scopes, including emissions from direct operations (scope 1), indirect emissions from purchased electricity (scope 2), and indirect emissions from the value chain (scope 3).

**Across all types of business, very few insurers provided comprehensive metrics on greenhouse gas emissions.** At least 295 companies and groups didn't provide any information for this recommended disclosure that aligned with the rules, earning them RBTM indicators of zero. There were limited instances (six) of reports that achieved the maximum possible indicator of 10 out of 10. These reports came from P&C-only groups and companies, life-only groups and companies, and groups with both life and health companies, demonstrating **capacity for emissions reporting regardless of insurance type of business**. Life insurers and insurers offering multiple types including life tended to produce the most comprehensive disclosures according to this recommended disclosure.

Approximately 54 responses (12%) reported their scope 3 emissions, giving specific values often for multiple consecutive years. Another 52 companies and groups mentioned scope 3 emissions in some way but may not have given values or specific enough information to gain the full points associated with this rule. Only five responses seemed to include specific scope 3 emissions intensity metrics, though 14 mentioned scope 3 emissions intensity without giving values.

Exhibit 33 to Decl. of Georgiev

1149

**SER 1552**

**COMPANY SPOTLIGHT**

**Thrivent** (Direct premiums written: $5 billion; Type: Life) disclosed scope 1, 2, and 3 emissions and scope 1 and 2 emissions intensities according to the GHG Protocol.

**Cigna** (Direct premiums written: $30 billion; Types: Health/Life) disclosed scopes 1, 2, and 3 emissions metrics, as well as energy consumption/intensity and water consumption/intensity.

**HCSC** (Direct premiums written: $45 billion; Type: Health) disclosed specific metrics for its scope 1, scope 2, and certain scope 3 emissions. The company's emissions data was externally verified utilizing the World Resources Institute/World Business Council for Sustainable Development Greenhouse Gas Protocol Corporate Counting and Reporting Standard for scopes 1 and 2 and the WRI/WBCSD Greenhouse Gas Protocol Corporate Value Chain Accounting and Reporting Standard for scope 3. The report described exactly which categories of scope 3 emissions were included in its analysis, which included emissions associated with purchased goods and services, waste generated in operations, business travel, leased assets, and other categories. This report did not give metrics for waste, water, and fuel consumption.

**United Fire Group** (UFG) (Direct premiums written: $547 million; Type: P&C) did not disclose emissions metrics but gave metrics for total natural gas consumed, year-over-year change in natural gas consumption, total electricity purchased, year-over-year change in electricity purchased, water usage in gallons, waste generated in tons, paper recycled in tons, and percentage recycled.

## C. Climate-related targets

**The final recommended disclosure of the metrics and targets pillar of the TCFD recommendations advises that companies describe the targets used by the organization to manage climate-related risks and opportunities and performance against targets.**

### Number of disclosures (ML approach)
109 reports (22%) included information related to climate-related targets, making this the least frequently disclosed of all TCFD recommended disclosures.

### Detail of disclosures (RBTM approach)
The rules employed to assess disclosures within the climate-related targets recommended disclosure are designed to identify reports that provide comprehensive information on targets related to climate-related metrics. These rules prioritize reports that discuss targets for renewable energy, emissions reductions, waste reduction, electricity or energy consumption, water consumption, and fuel consumption.

By emphasizing the inclusion of specific values and timelines for these targets, these rules aim to evaluate the level of ambition and clarity in a company's approach to addressing climate-related challenges. Reports that provide specific targets enable a more precise assessment of a company's commitment and progress towards achieving sustainable outcomes in areas such as renewable energy adoption, emissions reduction, waste management, and resource consumption.

Through the evaluation of these metrics and targets, the rules facilitate the identification of companies that demonstrate a proactive and accountable approach to managing climate-related issues and fostering sustainable practices within their operations.

**Across all types of business, very few insurers provided comprehensive information about climate-related targets.** The vast majority of companies and groups (more than 350) didn't provide any information that aligned with the rules, and therefore received RBTM indicators of zero. While health insurers

Exhibit 33 to Decl. of Georgiev
1150
**SER 1553**

generally provided less comprehensive information than other types for the other TCFD recommended disclosures, for the climate-related targets pillar they fared better than P&C and title insurers. Multi-type insurers tended to provide more comprehensive disclosures on this recommended disclosure than single type insurers. There were limited instances of individual reports that did provide highly specific and comprehensive reports. For example, one report from a company that offers both life and P&C types achieved an indicator of 8.33 out of 10.

### COMPANY SPOTLIGHT

> **Banner Life** (Direct premiums written: $2.27 billion; Type: Life) describes its net zero by 2050 target for its operations. The company also describes its goal to enable all new homes the group builds from 2030 to be capable of operating with net zero emissions by 2030. The group is planning to set Science Based Targets by the end of 2022 and publish them. **Banner Life** describes quantitatively its progress towards its target, in terms of scope 1 and 2 (location) emissions. Banner also describes its goal for its asset portfolio to be net zero by 2050, aligned with the 1.5-degrees Celsius Paris agreement objective. Progress towards this target is measured in investment portfolio carbon intensity, including equities and bonds but not cash and derivatives. The company aims to reduce the portfolio GHG emissions intensity by 18.5% by 2025 and by 50% by 2030, as compared to a 2019 baseline. **Banner Life** reports progress towards that goal, giving specific emissions intensity values for 2020 and 2021. It also reports progress in terms of the degree Celsius alignment – stating that its portfolio in 2021 was aligned with a 2.72-degrees Celsius pathway (and a 2.85-Celsius pathway in 2020).

#### Specificity of net zero targets: investments and operations

As part of their individual business strategies, certain insurance companies have aligned their business actions with net zero targets. Net zero targets may apply to investments, operations, underwriting activities, or any combination of these components. At least 20 unique submissions, representing 10% of the U.S. market by premiums written nationwide, mention net zero targets relating to their investments by or before 2050, with some specifying that the target applies to their general account investments. At least nine companies and groups, representing a 7% market share, specifically disclose that their net zero target applies to their operations (scope 1 and 2), often with an earlier target year between 2030 and 2050. Some have narrower targets, such as ones applying to only certain operational buildings, for example. At least seven companies and groups, representing 2.3% of the market, mention net zero targets specifically for their underwriting portfolios. In total, approximately 14% of the U.S. market by premiums written nationwide mentioned net zero targets in their responses. Several companies and groups lacked the specificity and clarity expected when communicating their net zero targets and could improve the quality of their disclosures with a breakdown of operational (scope 1 and 2), as well as financed emission and underwritten emission targets (scope 3). The vast majority of submissions contained no net zero targets.

Exhibit 33 to Decl. of Georgiev
1151
**SER 1554**

## Conclusion of TCFD disclosure results

In the 2021 TCFD-aligned Climate Risk Disclosure Survey responses, companies made disclosures on a range of issues including transition risk, scope 3 metrics and targets, carbon offsets, and carbon pricing.

The majority, 78%, of the reports, provided information on more than six of the 11 TCFD recommended disclosures and nearly a quarter of the reports provided information on more than 10. Only 12 reports, from a variety of types of business, made none of the TCFD recommended disclosures, according to the machine learning analysis. However, the level of detail of the information provided varied substantially. More than half of the reports provided minimally comprehensive information, and only fifteen provided information that was mostly comprehensive, indicating significant room to increase the depth of the survey responses.

According to the machine learning analysis, of the four main TCFD pillars, the metrics and targets pillar was identified as the pillar with the fewest reports providing information. For example, only 22% of reports included information related to climate-related targets. In these categories, there tended to be very little detail disclosed, with the exception of a few standout reports. This is an area that may require additional capacity building to ensure that companies are disclosing the metrics and targets that they are using and have thoughtfully considered adopting appropriate metrics and targets if they have not already.

In contrast, reports providing information related to the risk management and strategy pillars were relatively ubiquitous, at over 470 reports each. For the risk management pillar, the information disclosed tended to be relatively comprehensive. The vast majority (upwards of 90%) of reports provided some information related to the impact of climate-related risks and opportunities on business, strategy, and financial planning, climate risk identification and assessment, and climate risk management. Nearly 70% of the reports described climate risk in the context of their enterprise risk management systems.

Despite there being many comprehensive disclosures on the other TCFD recommendations related to strategy, few reports provided information on the resilience of their business under different climate scenarios, and even fewer provided comprehensive information on this topic. This recommendation prompts disclosures related to climate scenario analysis and could be an area for additional capacity building efforts in the insurance sector to encourage appropriate climate risk management.

The most comprehensive and detailed disclosures, as measured by the rules-based text mining indicator, were reports from groups that represented both life and P&C types combined, and were groups that tended to be large, averaging just over $7 billion in direct premiums written. In the risk management recommended disclosures, P&C insurers on average provided the most comprehensive information on risks and opportunities and on the impact of climate change on their organizations.

While there is certainly room for improvement in the comprehensiveness of disclosures, both in alignment with the TCFD framework and in the detail provided for each prompt, this is the first year for which the Climate Risk Disclosure Survey has been aligned with the TCFD Framework. In other industries that require TCFD reporting, disclosures have become increasingly detailed in years two, three and four, with disclosures aligning further with the framework. Improved levels of disclosure, consistently applied using the TCFD pillars and recommended disclosures, encourage cross-company analysis, by industry practitioners and investors.

Within the insurance sector, all companies should be encouraged to look at the range of responses and consider how else they can mitigate climate risk and capitalize on climate opportunities. There is a lot of information within these disclosures — from the use of carbon offsets to the adoption of remote work — to consider for implementation. In addition to employees, management and investors, customers, regula-

Exhibit 33 to Decl. of Georgiev
1152
**SER 1555**

tors and lobbyists are going to be assessing these disclosures. Also, while the risks and opportunities that the industry faces are not universal across all types of business, climate risk is affecting the entire industry and these disclosures provide critical information related to all types of insurance companies.

We are eager to see the next set of disclosures and the expanded coverage and detail.

## Additional Questions of Interest

The Climate Risk Disclosure Survey responses provide valuable and unique insights into the approaches that insurers are taking to address climate risks and opportunities. These responses can provide insights that reach beyond the direct prompts and guidelines of the TCFD framework. The following section highlights questions sourced from the Climate & Sustainability Branch at California Department of Insurance, and answers that have been developed through queries using the text mining tool.

### What do the reports say about the U.S. Flood Insurance market?

Some reports describe the challenges with private flood insurance in the U.S. **Co-operative Insurance Companies** states that it evaluated, with the help of its reinsurer, the possibility of offering flood coverage, but determined that the private market for this coverage is not yet competitive and tabled the offering. **SirusPoint** uses the National Flood Insurance Program (NFIP) as an example of how some risks may become uninsurable over time. The company notes that U.S. flood protection is highly supported by the U.S. government, given the difficulty that private markets have in fully covering the risk due to lack of confidence in the ability to anticipate frequency and severity and maintain adequate margins for business to be viable.

However, some submissions indicate that insurers see opportunities for private flood insurance moving forward. **NYCM** describes supporting supplementary flood insurance education through its agents.

**Chubb** describes offering private flood insurance (primary and excess policies) to homeowners who have higher limits, basement coverage, more coverage for precession possessions, etc. than the NFIP, which they note dominates the market, covers. **Grange Insurance Association** and **Hiscox** both indicate that they have identified flood insurance as a potential climate-related growth opportunity.

**Arch Insurance** describes seeing opportunities for underwriting flood control infrastructure as public and private entities address changing climate. **Assurant** says that additional risk and U.S. policy support for climate-related risk insurance (e.g. NFIP) may offer additional opportunities to pool risk and develop new products in the Global Housing Business. **Liberty Mutual** describes its partnership with FloodFlash, a parametric insurance product, to expand access to commercial flood insurance in areas that were historically unable to get flood coverage or had difficulty doing so. It also describes personalized flood warnings with Previsco. Lastly, **Swiss Re** describes QuickFlood – a simplified flood insurance product for lower risk flood zones in the U.S.

### Do any of the insurers discuss methane, hydrofluorocarbons, or other greenhouse gases within their goals?

At least four companies and groups make reference to methane, while one mentions nitrous oxide, which is commonly considered a short-lived climate pollutant, or "super pollutant" similar to methane or hydro-fluorocarbons (HFCs). However, none of them address HFCs or refrigerants. Furthermore, none of these companies and groups provide specific targets for reducing these emissions.

One of the companies acknowledging methane is **Caterpillar Insurance Co**, which discusses the utilization of methane gas as fuel in its power systems. Another group, **Co-operative Insurance Companies**, ad-

Exhibit 33 to Decl. of Georgiev
1153
**SER 1556**

dresses methane in the context of litigation risk, expressing concerns regarding its farm owner portfolios in Vermont due to methane gas generated from bovines in dairy farms. The **Interinsurance Exchange of the Americas** includes methane and nitrous oxide emissions in its carbon footprint. Lastly, **Secura Insurance** mentions collaborating with asset managers who engage with portfolio companies to implement programs aimed at reducing methane and CO2 emissions.

### Do insurers mention investments in carbon markets?

In the transition to green energy, insurance companies, as major financial institutions, will play a crucial role by monetizing greener energy sources and investing in climate change solutions. It is important to prioritize the quality of carbon offsets and ensure they are used only as a last resort for emissions that cannot be avoided. The rise of carbon markets that verify, validate, and sell carbon credits will be encouraged through investments, promoting necessary growth. Additionally, investments in stocks, bonds, and markets that drive a decrease in our reliance on carbon are essential beyond offsetting emissions (scopes 1-3).

Among the roughly 20 companies and groups that discuss carbon credits, many highlight their commitment to procuring carbon offsets as a means of neutralizing residual emissions. **AXA** mentions the inclusion of Blue Carbon Resilience Credits, which will be further elaborated on in the subsequent section dedicated to nature-based solutions. Additionally, **AXA** acknowledges the acquisition of carbon credits to compensate for emissions resulting from air travel, which is consistently identified as the largest contributor to its carbon footprint.

**AIG** specifically discusses providing coverage for tax credits available for investments in eligible renewable energy projects, including, but not limited to solar farms, wind turbines, fuel cell power plants and carbon capture and sequestration. **FMH** discusses the opportunities that farmers may have to sell carbon credits associated with the carbon sequestered on their land by crops.

**HCSC, Liberty Mutual Group, MetLife, Tokio Marine Holdings**, **Universal Property** and **Casualty Insurance Company**, and other entities describe their investment in renewable energy credits. **Tokio Marine Holdings** delves into the carbon credits associated with its mangrove planting projects.

### Is there discussion of drayage trucks or zero emissions trucks?

Drayage trucks are used to transport containers and bulk freight between ports and other facilities such as rail facilities, distribution centers, and other near-port locations. They are historically diesel-fueled, heavy-duty vehicles but recently there has been significant effort in certain states, including California, to transition to cleaner fuel sources. Drayage trucks are essential to operations and economies around seaports and for goods movement to much of the country. As the demand for zero-emissions trucks increases, insurance companies may be adapting their policies to cover these vehicles. Insuring zero-emissions trucks presents unique considerations due to their advanced technology, higher initial costs, and specialized maintenance requirements. Insurance companies may be working to develop specialized coverage options and risk assessment models tailored to the specific needs and risks associated with zero-emissions trucks to support their adoption and provide appropriate coverage for operators and owners.

Solely **Toyota Motor Insurance Company** addresses the topic of drayage operations. Specifically, they reveal the delivery of ten fuel cell electric heavy-duty Class 8 trucks to demonstration fleet customers for the purpose of conducting drayage operations at ports. Notably, within the initial five months of operation, these trucks successfully accumulated over 8,000 miles of in-service travel, all accomplished with zero emissions.

Exhibit 33 to Decl. of Georgiev
1154
**SER 1557**

### Is there mention of nature-based solutions in these reports?

Nature-based solutions refer to the preservation or restoration of natural ecosystems and biodiversity to provide protection or services and address environmental challenges. Insurance companies are increasingly recognizing the value of nature-based solutions in managing and mitigating risks associated with climate change and natural disasters. By investing in and supporting nature-based solution initiatives, such as reforestation, wetland restoration, and coastal protection, insurers can enhance resilience, reduce the severity of risks, and potentially lower insurance claims related to events such as flooding, wildfires, and storms.

**AXA** highlights its collaboration with The Nature Conservancy on Blue Carbon Resilience Credits, which serve to assess the combined benefits of carbon sequestration and resilience provided by coastal wetland ecosystems. Additionally, **AXA** discusses its Coastal Risk Index, a tool that maps present and future flood hazards resulting from climate change while integrating the protective advantages of coastal ecosystems into insurance models.

**W.R. Berkeley Corporation** discloses the creation of a new insurance product within one of its operating units. This product specifically caters to clients engaged in the restoration, construction, enhancement, and preservation of wetlands and streams. The aim is to offset the loss of resources resulting from other projects authorized by the U.S. Army Corps of Engineers. By providing coverage, the operating unit instills confidence in customers regarding the successful completion of these aquatic resource construction endeavors. The disclosure states that the unit has extended coverage to over 34 policyholders involved in the development of more than 3,500 acres of wetlands.

**John Hancock/Manulife**, which operates internationally as Manulife, addresses the increasing popularity of natural climate solutions, which entail protecting, sustainably managing, and restoring natural or modified ecosystems in a manner that effectively and adaptively addresses societal challenges. As a timberland and agricultural investment manager and member of the WBCSD's Nature Action and Forest Solutions Group Projects, John Hancock/Manulife Group emphasizes that its core business revolves around managing nature.

**Swiss Re** also acknowledges nature-based solutions and its role in supporting and enabling investments in natural assets that facilitate climate adaptation and mitigation. However, the report does not provide extensive detail on this aspect.

**Apollo Group** mentions its strategic planning and maintenance of native grasses and wetlands at Athene's West Des Moines campus as a measure to reduce flood risk in the area.

**Fairfax Financial Group/Allied World** mentions its co-authorship of research insurance reports highlighting the value of nature, particularly the performance of natural systems such as wetlands and forests in the face of hurricanes, floods, wildfires, and other disasters.

**Toyota** highlights its collaborative efforts with multiple partners in habitat restoration, including the provision of grants for invasive species removal, prescribed burns, wetland maintenance, and stimulation of native seed banks in preserves across southern Michigan.

**Tokio Marine Holdings** discusses its funding of mangrove planting projects and the ecosystem services generated as a result. Over the past 20 years, the valuation of these services has reached approximately 118.5 billion yen, with an expected increase to 391.2 billion yen by the end of 2038.

Exhibit 33 to Decl. of Georgiev
1155
**SER 1558**

# Appendix

## Appendix I: Additional Figure



**Figure 9**. Box plot and associated points for the nationwide Direct Premiums Written ($) for groups in each type of business or combination of types.

Exhibit 33 to Decl. of Georgiev
1156
**SER 1559**

## Appendix II: Key Concept Questions

### TCFD Pillar 1: Governance

Governance, Board Oversight Key Questions:

- Does the report discuss climate change in the context of board activities?
- Does the report mention climate-performance linked remuneration for the board?
- Does the report mention a board-level sustainability committee that meets with a defined frequency or a below-board level sustainability committee that reports with a defined frequency to the board?
- Does the board discuss climate risk?
- Is the board involved in a strategy for addressing climate risk?
- Is the board staying informed of or monitoring climate risks?
- Is there a board level sustainability committee?

Governance, Management's Role Key Questions

- Does the report discuss climate change in the context of senior management activities?
- Does the report discuss sustainability in the context of senior management activities?
- Does the report mention climate-performance linked remuneration for senior management?
- Does the report mention a sustainability committee with senior management participation that meets with a defined frequency?
- Does the report mention a sustainability committee that meets with a defined frequency?
- Does the report mention a sustainability committee?
- Does the senior management discuss climate risk?
- Is the senior management involved in a strategy for addressing climate risk?
- Does the senior management stay informed of or monitor climate risks?

### TCFD Pillar 2: Strategy

Strategy, Risks and Opportunities Key Questions:

- Does the report discuss specific insurance opportunities and specific climate risks?
- Does the report discuss climate risks?
- Does the report discuss risks and opportunities with specific time horizons?
- Does the report discuss risks with specific time horizons?
- Does the report discuss transition risks?
- Does the report discuss physical risks?
- Does the report discuss extreme weather as climate risk?
- Does the report discuss opportunities for cost savings through efficiency improvements?
- Does the report discuss exposure of investment portfolios to climate risks?
- Does the report discuss climate-related underwriting risks?
- Does the report discuss reputational or litigation risks?

Strategy, Impact on Organization Key Questions

- Does the report discuss direct impacts of climate risks on the company?
- Does the report discuss a specific climate strategy?
- Does the report mention standards for climate-related risk disclosure, calculation, or management?
- Does the report mention specific emissions reductions objectives in its strategy?
- Does the report mention reductions in energy consumption?
- Does the report mention reduction of fuel consumption?
- Does the report mention reduction of water consumption?

Exhibit 33 to Decl. of Georgiev
1157
**SER 1560**

- Does the report mention waste reduction?
- Does the report mention internal or external research related to climate?
- Does the report discuss the impact of a transition to a low-carbon economy on the business?
- Does the report mention specific objectives related to climate in its strategy?
- IDoes the report discuss how climate change impacts client or broker selection?
- Does the report discuss development of sustainable insurance products (products that support the transition to a low-carbon economy or help customers adapt to climate-related risk)?
- Does the report discuss climate-related client engagement?
- Does the report discuss opportunities to mitigate greenhouse gas emissions in its operations?
- Does the report discuss how climate risks factor into investment strategy?

Strategy, Resilience of Strategy Key Questions

- Does the report discuss climate scenario analysis informing their strategy?
- Does the report discuss using a greater than 2-degrees Celsius scenario for physical risk analysis?
- Does the report discuss using a below 2-degrees Celsius scenario for transition risk analysis?

## TCFD Pillar 3: Risk Management

Risk Management, Risk Identification and Assessment Key Questions

- Does the report mention utilization of scenarios to identify climate risks?
- Does the report identify liability or litigation risks?
- Does the report identify and consider existing or emerging regulatory requirements related to climate change?
- Does the report identify relevant climate-related alliances or international goals/agreements?
- Does the report describe the relation to other risks?
- Does the report describe the process for identifying risks to insurance portfolios by geography, business division or product segment (eg. physical risks from weather, transition risks from a reduction in insurable interest due to a decline in value, or other risks)?
- Does the report discuss engagement with investee companies or asset managers?

Risk Management, Risk Management Processes

- Does the report describe how climate risk fits into the context of their enterprise risk management system?
- Does the report discuss management of litigation risks?
- Does the report discuss client preferences in the context of climate risk?
- Does the report discuss management of reputational risk?
- Does the report discuss management of extreme weather risks?
- Does the report discuss use of risk models?
- Does the report discuss plans to position investment portfolio through a transition to a low-carbon economy?
- Does the report discuss incentives to encourage policyholders to manage their potential physical and/or transition risks?

Risk Management, Integration into Overall Risk Management

- Does the report mention climate change in the context of their enterprise risk management system?
- Does the report discuss integrated identification, assessment, and management of climate risks?
- Does the report mention a risk control system?
- Does the company have a business continuity plan?

Exhibit 33 to Decl. of Georgiev
1158
**SER 1561**

- Does the report discuss the climate scenarios used to analyze underwriting risks?
- Does the report discuss the climate scenarios used to analyze investment risks?
- Discuss frequency of risk management process?

## TCFD Pillar 4: Metrics and Targets

Metrics and Targets, Climate-Related Metrics

- Does the report discuss renewable energy metrics with specific values given?
- Does the report discuss emissions reduction metrics with specific values given?
- Does the report discuss waste reduction metrics with specific values given?
- Does the report discuss electricity or energy consumption metrics with specific values given?
- Does the report discuss water consumption metrics with specific values given?
- Does the report discuss fuel consumption metrics with specific values given?
- Does the report discuss remuneration policies?
- Does the report discuss use of an internal carbon price?
- Does the report discuss the methodologies used for calculating metrics?
- Does the report discuss underwriting metrics (eg. probable maximum loss, value at risk)?
- Does the report discuss metrics of alignment of insurance underwriting and investment activities with a well below 2-degrees Celsius scenario?

Metrics and Targets, Scope 1, 2, 3 GHG Emissions

- Does the report discuss emissions of any scope with specific values given?
- Does the report discuss scope 3 emissions with specific values given?
- Does the report discuss scope 2 emissions with specific values given?
- Does the report discuss scope 1 emissions with specific values given?
- Does the report discuss scope 3 emissions intensity with specific values given?
- Does the report discuss scope 2 emissions intensity with specific values given?
- Does the report discuss scope 1 emissions intensity with specific values given?
- GHG emission of assets and weighted average carbon intensity?

Metrics and Targets, Climate-Related Targets

- Does the report discuss a target for renewable energy?
- Does the report discuss a target for emissions reductions?
- Does the report discuss a target for waste reduction?
- Does the report discuss a target for energy consumption reduction?
- Does the report discuss a target for water consumption reduction?
- Does the report discuss a target for specific scopes of emission reductions?

Exhibit 33 to Decl. of Georgiev
1159
**SER 1562**

# Exhibit 32
# to Declaration of George Georgiev

# Press Release: U.S. Insurance Commissioners Endorse Internationally Recognized Climate Risk Disclosure Standard for Insurance Companies.

Exhibit 32 to Decl. of Georgiev
1100
**SER 1563**

U.S. Insurance Commissioners Endorse Internationally Recognized Cli...          https://content.naic.org/article/us-insurance-commissioners-endorse-inte...





in (https://
www.linkedin.com/
shareArticle?
url=https://
content.naic.org/
article/us-
insurance-
commissioners-
endorse-
internationally-

f (https://
facebook.com/
sharer.php?
u=https://
content.naic.org/
article/us-
insurance-
commissioners-
endorse-
internationally-

(http://
www.twitter.com/
share?url=https://
content.naic.org/
article/us-
insurance-
commissioners-
endorse-
internationally-
recognized-
climate-risk-
disclosure-
standard)

**Kansas City (April 8, 2022)**

Exhibit 32 to Decl. of Georgiev
1101
**SER 1564**

U.S. Insurance Commissioners Endorse Internationally Recognized Cli...          https://content.naic.org/article/us-insurance-commissioners-endorse-inte...

recognized-          recognized-
climate-risk-        climate-risk-
disclosure-          disclosure-
standard)            standard)

# U.S. Insurance Commissioners Endorse Internationally Recognized Climate Risk Disclosure Standard for Insurance Companies

*Bipartisan action requires use of Task Force on Climate-Related Financial Disclosures for annual state-led survey to protect consumers starting this year*

A bipartisan group of state insurance regulators led by Insurance Commissioners Ricardo Lara of California and David Altmaier of Florida adopted a new standard for insurance companies to report their climate-related risks, in alignment with the international Task Force on Climate-Related Financial Disclosures (TCFD). The TCFD standard is the international benchmark for climate risk disclosure and will help insurance regulators and the public to better understand the climate-related risks to the U.S. insurance market, which is the largest in the world. This announcement during the National Association of Insurance Commissioners' (NAIC) spring meeting in Kansas City, Missouri, puts U.S. state insurance regulators on the

2 of 10

Exhibit 32 to Decl. of Georgiev
1102
**SER 1565**

U.S. Insurance Commissioners Endorse Internationally Recognized Cli...          https://content.naic.org/article/us-insurance-commissioners-endorse-inte...

forefront of climate risk disclosure to protect consumers.

Commissioners Lara and Altmaier are co-chairs of the NAIC Climate Risk & Resiliency Task Force (Task Force), which was established in 2020 to coordinate all of the NAIC's domestic and international efforts on climate-related risk and resiliency issues. The Task Force developed the new TCFD-aligned survey over a 14-month public participation process led by Oregon Insurance Commissioner Andrew Stolfi and Rhode Island Superintendent Elizabeth Dwyer in coordination with Commissioners Lara and Altmaier, and marks the first update to the NAIC's Climate Risk Disclosure Survey approach since it was created in 2010.

The Task Force determined that implementing a TCFD-aligned disclosure framework would enhance transparency about how insurance companies manage climate-related risks and opportunities and incorporate international best practices, among other benefits that the Task Force identified in the **new standard** (/sites/default/files/inline-files/2022ProposedClimateRiskSurvey_0.pdf?msclkid=e24cf6f2b47211eca09ac1c752e22857). Insurance regulators from France, Switzerland, and the United Kingdom currently require TCFD-aligned reports. U.S. financial regulators such as the U.S. Securities and Exchange Commission are also taking steps toward requiring TCFD-aligned disclosures for other financial institutions.

Under the new standard, insurance companies required to

3 of 10

Exhibit 32 to Decl. of Georgiev
1103
**SER 1566**

U.S. Insurance Commissioners Endorse Internationally Recognized Cli...        https://content.naic.org/article/us-insurance-commissioners-endorse-inte...

respond to the annual NAIC Climate Risk Disclosure Survey will need to comply with TCFD reporting by November 2022. Fifteen states – including California, Connecticut, Delaware, District of Columbia, Maine, Maryland, Massachusetts, Minnesota, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington – have committed to utilize the NAIC survey in 2022 for insurance companies licensed in their jurisdictions, representing nearly 80 percent of the U.S. insurance market. While 28 insurance companies provided TCFD-compliant reports in 2021, this list will grow to nearly 400 insurance companies and groups  as a result of the consensus demonstrated today.

"Our global climate crisis affects every state, requiring us to reach across partisan divides to find solutions that protect all people," **said California Insurance Commissioner Ricardo Lara**. "By holding insurance companies to this global standard for climate disclosure, insurance regulators are showing the power of united leadership in our efforts to address climate change and reduce the negative impacts on insurance consumers."

"The NAIC's action shows that our system of state-based insurance regulation remains strong and flexible in responding to changing conditions in our markets and our world," **said Florida Insurance Commissioner David Altmaier**. "Thank you to my fellow regulators for your commitment to work together to protect consumers."

4 of 10

Exhibit 32 to Decl. of Georgiev
1104
**SER 1567**

U.S. Insurance Commissioners Endorse Internationally Recognized Cli...          https://content.naic.org/article/us-insurance-commissioners-endorse-inte...

"We have all been affected by climate-related events, including wildfires, floods, and increased extreme weather. The first NAIC climate risk survey, created more than 10 years ago, led the way at the time, and it's great to see the NAIC lead again by being the first U.S. financial system regulator to adopt TCFD-aligned disclosure requirements," **said Oregon Insurance Commissioner Andrew Stolfi**. "I'm grateful for the robust participation in this process over the past year and the strong support to adopt internationally aligned climate risk disclosures, and I look forward to continuing our work by supporting insurers in shifting to this new reporting framework."

"Enacting the TCFD standard will give insurance regulators greater oversight of insurance companies' strategies for addressing climate change through investments, board governance, and all areas of their operation, helping us to protect consumers in the future by reducing climate risks," **said Elizabeth Dwyer, Superintendent of Banking and Insurance for Rhode Island**.

"Our bipartisan action to endorse a common standard for disclosing insurance companies' climate risks shows progress is possible on protecting consumers from the threats of a warming planet," **said Maryland Insurance Commissioner Kathleen Birrane**. "Through our collective state level actions we are protecting consumers from climate risks that affect our whole nation."

"I am delighted that the NAIC has adopted changes to our

Exhibit 32 to Decl. of Georgiev
1105
**SER 1568**

U.S. Insurance Commissioners Endorse Internationally Recognized Cli...          https://content.naic.org/article/us-insurance-commissioners-endorse-inte...

NAIC Climate Risk Disclosure Survey. Participating insurers will now disclose their climate change exposure using the internationally accepted TCFD," **said Mike Kreidler, Insurance Commissioner of Washington and member of the Sustainable Insurance Forum**. "Nearly 20 years ago I was privileged to start creating the Survey with my then-Climate Change Committee co-chair from Nebraska. I'm pleased that the Survey is now updated to reflect state-of-the-art disclosure requirements in line with international standards."

"Consumers in every state are facing increased threats from extreme weather. Taking united action is more critical than ever before to protect consumers' access to affordable insurance," **said Connecticut Insurance Commissioner Andrew N. Mais**. "These standards for reporting insurance companies' climate risks and strategies will help regulators and consumers better understand and address the impacts of climate change."

"Few regulators have more experience and insight into the macroeconomic effects of climate risk than insurance regulators," **said Mike Consedine, Chief Executive Office of the National Association of Insurance Commissioners**. "By modernizing the NAIC climate disclosure survey for the first time since its inception, participating members are taking a comprehensive and unified approach to protecting consumers through our state-based system of insurance regulation."

6 of 10

Exhibit 32 to Decl. of Georgiev
1106
**SER 1569**

U.S. Insurance Commissioners Endorse Internationally Recognized Cli...          https://content.naic.org/article/us-insurance-commissioners-endorse-inte...

International regulators and climate groups who have called for compliance with TCFD disclosures welcomed the news.

"With insurance companies' investments and underwriting reaching around the globe, it is critical that insurance regulators speak the same language as we seek to protect markets from climate risks," **said Anna Sweeney, who supervises the United Kingdom's insurance sector and serves as Chair of the UNDP Sustainable Insurance Forum**. "With this landmark action by U.S. regulators, alongside the work of a number of leading jurisdictions, we are well on our way to holding the global insurance sector to the same standard, allowing nations and states to work across borders like never before."

"By putting U.S. insurance companies on the same level of accountability and transparency with other global sectors and insurance markets in terms of managing and disclosing climate risks, U.S. state insurance regulators are showing the kind of leadership on a national scale that will help meet the global goals of climate-resilient communities and net-zero economies," **said Butch Bacani, who leads the U.N.'s Principles for Sustainable Insurance Initiative**, the largest collaboration between the U.N. and the global insurance industry.

"Aligning U.S. insurance companies' climate disclosures with the global norm is a major step forward to protect financial markets and consumers who rely on insurance for

7 of 10

Exhibit 32 to Decl. of Georgiev
1107
**SER 1570**

U.S. Insurance Commissioners Endorse Internationally Recognized Cli...          https://content.naic.org/article/us-insurance-commissioners-endorse-inte...

safety and security," **said Steven Rothstein, Managing Director, Ceres Accelerator for Sustainable Capital Markets**. "The bipartisan leadership of Commissioner Lara of California and Commissioner Altmaier of Florida is in short supply around the globe. It is needed more than ever before as we address climate-related financial risks across investment portfolios and global supply chains."

# # #

**Media notes:**

- The Task Force for Climate-Related Financial Disclosures released the standards in 2017. The Task Force consists of 31 members from G-20 nations. Click here to read more: **https://www.fsb-tcfd.org/** (https://www.fsb-tcfd.org/)

- TCFD reporting includes sections on governance, strategy, risk management, investments, and metrics, requiring companies to measure their progress and commit to reducing climate risks across all areas of their business.

**About the National Association of Insurance Commissioners**

As part of our state-based system of insurance regulation in the United States, the National Association of Insurance Commissioners (NAIC) provides expertise, data, and analysis for insurance commissioners to effectively regulate

8 of 10

Exhibit 32 to Decl. of Georgiev
1108
**SER 1571**

U.S. Insurance Commissioners Endorse Internationally Recognized Cli...          https://content.naic.org/article/us-insurance-commissioners-endorse-inte...

the industry and protect consumers. The U.S. standard-setting organization is governed by the chief insurance regulators from the 50 states, the District of Columbia and five U.S. territories. Through the NAIC, state insurance regulators establish standards and best practices, conduct peer reviews, and coordinate regulatory oversight. NAIC staff supports these efforts and represents the collective views of state regulators domestically and internationally.



© 1991-2024 National Association of Insurance Commissioners.

All rights reserved.

Stop.Call.Confirm is a registered service mark of the National Association of Insurance Commissioners.

SERVICES
MyNAIC
iSite+
Financial Statement Filing
Automated Valuation Service
Account Manager

RESOURCES
Resource Center
Newsroom
Publications
Meetings and Events
Education and Training
Glossary of Insurance Terms

SUPPORT
Contact
Help
Careers

Privacy Policy    Accessibility    Connect    Workplace    myNAIC CMS

9 of 10

Exhibit 32 to Decl. of Georgiev
1109
**SER 1572**

U.S. Insurance Commissioners Endorse Internationally Recognized Cli...          https://content.naic.org/article/us-insurance-commissioners-endorse-inte...

Exhibit 32 to Decl. of Georgiev
1110
**SER 1573**

# Exhibit 4
# to Declaration of George Georgiev

# George S. Georgiev, *The Breakdown of the Public–Private Divide in Securities Law: Causes, Consequences, and Reforms*, 18 N.Y.U. J. L. & Bus. 221 (2021).

Exhibit 4 to Decl. of Georgiev
158
**SER 1574**

New York University

# JOURNAL OF LAW & BUSINESS

| Volume 18 | FALL 2021 | Number 1 |

## THE BREAKDOWN OF THE PUBLIC–PRIVATE DIVIDE IN SECURITIES LAW: CAUSES, CONSEQUENCES, AND REFORMS

### George S. Georgiev*

*As a regulatory scheme, U.S. securities law has traditionally been designed around a set of lines—the "public–private divide"—which separate public companies, public capital, and public markets, from private companies, private capital, and private markets. Until the early 2000s, the lines were successful in establishing two largely coherent legal realms—a highly regulated public realm and a lightly regulated private realm. A series of bold and often-inconsistent reforms between 2002 and 2020, however, have transformed this longstanding regime into a low-friction system wherein public capital flows to both public and private companies, private capital is ever more abundant, and firms can effectively eschew public company status, which is both more costly and much less essential to firm success than ever before. This Article contends that, taken together, these developments have led to the breakdown of the public–private divide: in effect, the boundaries between the regulated and unregulated realms have been removed and the public–private distinction has lost its descriptive and explanatory power as an organizing principle of securities law. The Article contributes to the literature by (1) putting forward a novel and comprehensive analytical account of the breakdown of the public–private divide (up through the completion of the deregulatory cycle), (2) identifying the consequences of these developments with respect to specific firm constituencies and on a systemic level,*

* Associate Professor, Emory University School of Law. For helpful comments and discussions, I thank Steven Bank, Jennifer Fan, Kristin Johnson, Kay Levine, Jonathan Nash, Mariana Pargendler, Joanna Shepherd, Verity Winship, and participants in presentations at Emory University School of Law and the 2021 National Business Law Scholars Conference. This project has also benefitted from many conversations over the years with other members of the corporate and securities law academy and the feedback of several securities lawyers. I am grateful to the *N.Y.U. Journal of Law & Business* team for superb editorial assistance. I welcome comments and reactions via email and retain responsibility for any errors or omissions.

Exhibit 4 to Decl. of Georgiev
159
**SER 1575**

222          *NYU JOURNAL OF LAW & BUSINESS*          [Vol. 18:221

*and (3) investigating possible reforms and their expected effectiveness in returning securities law to a state of conceptual coherence. The scale of the problems suggests that the necessary reforms are likely to be foundational. Given past experience with hasty and crisis-driven legislation enacted by Congress, the Article urges the SEC to commence a broad deliberative process involving multiple stakeholders to rethink the appropriate structure of securities law. The outputs from this process will be particularly valuable whenever the next window of opportunity for change arises.*

INTRODUCTION ........................................... 223
 I. THE ARCHITECTURE, GOALS, AND MEANS OF THE
    REGULATORY REGIME ............................ 235
    A. *The Public–Private Divide* ...................... 236
    B. *Becoming a Public Company* ..................... 239
       1. *Motivations for Going Public* .............. 240
       2. *Pathways to Going Public* ................. 243
    C. *Regulatory Means and Ends* .................... 247
       1. *The Public Company Regulatory Regime* .... 248
       2. *Investor Protection, Capital Formation, and
          Beyond* .................................. 255
 II. THE ROAD TO THE BREAKDOWN OF THE
     PUBLIC–PRIVATE DIVIDE ......................... 258
    A. *SOX as Shock . . . and Scapegoat* .............. 258
    B. *The Deregulatory Cascade* ..................... 264
    C. *Capital Raising in 2021 vs. 2000:
       An Illustration* ............................... 275
    D. *The Fungibility of Public and Private Capital* ... 277
III. CONSEQUENCES OF THE BREAKDOWN OF THE
     PUBLIC–PRIVATE DIVIDE ......................... 278
    A. *Elective Regulation, Quasi-Federalization, and
       "Issuer Choice"* .............................. 279
    B. *Securities Law's Diminished Regulatory Capacity.* 283
    C. *Fragmented Investor Protection* ................ 286
    D. *Increased Vulnerability of Employee-Investors* ..... 290
 IV. REFORMS: CONCEPTUAL APPROACHES AND
     ROADBLOCKS .................................... 292
    A. *Rebuilding the Public–Private Divide* .......... 294
       1. *Regulating the Private Realm* ............. 294
       2. *Expanding the Public Realm* .............. 295
       3. *The "Shareholders of Record" Solution* ...... 297
    B. *Circumventing the Public–Private Divide* ....... 303
    C. *Reform Preconditions and Process* .............. 307
CONCLUSION ............................................. 309

Exhibit 4 to Decl. of Georgiev
160
**SER 1576**

2021]        *THE BREAKDOWN OF THE PUBLIC–PRIVATE DIVIDE*        223

APPENDIX: SELECTED DATA ON TRENDS IN CAPITAL
    MARKETS.................................................. 312
    *Figure A–1: Number of U.S. Listed IPOs (1995–2021)* . 312
    *Figure A–2: Number of U.S. Listed and U.S. Private*
      *Equity-Owned Companies (2000–2017)* ........... 313
    *Figure A–3: Assets Under Management for U.S. Buyout*
      *Industry (1990–2019)*........................... 313
    *Figure A–4: Volume of Capital Raised by U.S.*
      *Companies in Public and Private Markets*
      *(2009–2017)* .................................... 314
    *Figure A–5: Volume of Capital Raised by U.S.*
      *Companies in Exempt and Registered Offerings*
      *(2009–2018) (SEC)* ............................. 314
    *Figure A–6: Growth of Global Private Equity and Public*
      *Equity (%) (2000–2020)* ........................ 315
    *Figure A–7: Time to IPO and Market Capitalization at*
      *IPO: Amazon, Google, Facebook, Uber* ............. 315
    *Figure A–8: Number of Unicorns and Total Capital*
      *Raised by Unicorns in United States, China, and Rest*
      *of the World (2016–2021)* ........................ 316
    *Figure A–9: Quarterly Stock Buybacks by S&P 500*
      *Companies (1998–2019)*.......................... 316

## INTRODUCTION

The first two decades of the 21st century were a busy and turbulent time for securities law. The regulatory regime, which had grown in a slow and adaptive fashion since its inception during the 1930s, was transformed in fundamental ways by three landmark bills—the Sarbanes–Oxley Act of 2002, the Dodd–Frank Act of 2010, and the 2012 JOBS Act—and a series of related rulemakings by the Securities and Exchange Commission (SEC).[1] Many of these reforms were decidedly pro-regulatory and served to heighten the disclosure and governance obligations of public companies in the name of "investor protection"—the original mainstay of securities law—alongside looser, public-regarding goals such as transparency and accountability.[2] But just as many of the reforms were deregulatory, seeking to change securities law in order to promote

---

1. *See infra* Sections II.A–B.
2. *See infra* Section I.C.

Exhibit 4 to Decl. of Georgiev
161
**SER 1577**

"capital formation," a more recent mainstay.[3] Comparing securities law in 2021 to securities law in 2001, prior to the Sarbanes–Oxley Act, one cannot help but observe that there is a lot more regulation today than there was two decades ago, but that this regulation covers fewer firms and is easier than ever to avoid.

As a regulatory scheme, U.S. securities law has traditionally been designed around a set of lines—the "public–private divide"—which separate public companies, public capital, and public markets, from private companies, private capital, and private markets. The divide has always been imperfect and, its foundational role notwithstanding, somewhat undertheorized.[4] Until the early 2000s, however, it was successful in establishing two largely coherent legal realms—a highly regulated public one and a lightly regulated private one.

A wide-lens analysis of the myriad of changes in securities law over the past two decades reveals that the public–private divide is no more. Even though the law still distinguishes between public and private companies, capital, and markets, the two coherent legal realms have been supplanted by a low-friction system in which public capital flows to private companies, private capital is ever more abundant, and firms can effectively eschew public company status, which is both more costly and much less essential to firm success than ever before.

Consider the following regulatory paradox: it is possible today for two firms that are *identical* in virtually every respect—business model, size and scope of operations, enterprise value, access to capital, number of shareholders, number of employees, and so on—to have *widely different* regulatory obligations. The firm that is a public company (Firm A) would need to provide public disclosure on a regular basis about its results of operations, financial condition, trends and risks affecting the business, executive compensation, corporate governance arrangements, and various other topics. It would need to estab-

---

3. *See infra* Section II.B.
4. *See infra* Section I.A. For the first and now-classic analysis of securities law reforms with respect to a "public–private divide" and the introduction of the term to the literature, see Donald C. Langevoort & Robert B. Thompson, *"Publicness" in Contemporary Securities Regulation After the JOBS Act*, 101 GEO. L.J. 337 (2013); *see also* Robert B. Thompson & Donald C. Langevoort, *Redrawing the Public–Private Boundaries in Entrepreneurial Capital Raising*, 98 CORNELL L. REV. 1573 (2013).

Exhibit 4 to Decl. of Georgiev
162
SER 1578

lish and maintain robust internal controls and procedures over financial reporting. Its board of directors would need to have specially designated committees with strict qualification requirements for those serving on them.[5]

By contrast, the firm that is a private company (Firm B) would have to do none of that. It could operate in secrecy, avoid public scrutiny, and eschew the internal governance structures required of public companies.[6] And while both firms would be covered by the anti-fraud provisions of SEC Rule 10b-5, Firm A would still be much more likely to face an enforcement action.[7] There are even spillover effects beyond securities law.[8] The key to understanding the paradox is that (1) public company regulation generally kicks in only if a firm elects to finance itself on the *public* capital markets instead of the *private* capital markets, and (2) that private markets are now just as abundant, which renders public company status virtually irrelevant from an access-to-capital point of view. The public company regulatory paradox is a direct consequence of the breakdown of the public–private divide in securities law described in this Article.

––––––––––

5. The Sarbanes–Oxley Act requires public companies to have an audit committee and disclose whether the committee has a member who is a financial expert. The Dodd–Frank Act requires public companies to have a compensation committee comprised of independent directors. The New York Stock Exchange listing requirements, which are, in effect, mandatory for public companies, add an overlay by requiring public companies seeking a listing to have a nominating or corporate governance committee. *See infra* Section I.C.1.

6. To be sure, the two firms will be subject to the entity laws of their respective states of organization. If both are corporations incorporated in Delaware, for example, they would be subject to the Delaware General Corporation Law. State corporate codes, however, are consciously designed to be "enabling"; as a result, they generally avoid mandatory rules and instead rely primarily on default rules and opt-in rules. *See generally* Frank H. Easterbrook & Daniel R. Fischel, *The Corporate Contract*, 89 Colum. L. Rev. 1416, 1417 (1989).

7. *See, e.g.*, Verity Winship, *Private Company Fraud*, 54 U.C. Davis L. Rev. 663, 724–29 (2020) (presenting data on SEC enforcement actions against private companies, which remain rare).

8. As an "issuer" of securities, Firm A would be subject to all provisions in the Foreign Corrupt Practices Act (FCPA), whereas Firm B would be subject to a limited subset and would, again, face less scrutiny and less enforcement. *See* Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd-1–3, 78m(a) (distinguishing the categories of "domestic concern" and "issuer" of securities").

Exhibit 4 to Decl. of Georgiev
163
SER 1579

226                        *NYU JOURNAL OF LAW & BUSINESS*                        [Vol. 18:221

In addition to being illogical, the new regulatory reality is deeply problematic for the way it thwarts core goals of the modern administrative state. Congress enacted the original securities laws to protect investors from the types of market abuses that precipitated the stock market crash of 1929 and the ten-year Great Depression that followed. Much of the complex and costly infrastructure of securities regulation was built to protect investors by placing conditions on firms' access to capital, as well as restrictions on ordinary investors' ability to invest in non-public companies.[9] This expansive investor protection framework notwithstanding, another element of the regulatory paradox is that an investor today can invest with the same ease in *both* Firm A and Firm B—benefitting from investor protections in the first case but not in the second. Even more bizarrely, both firms would likely be contained in the broadly diversified portfolios that have become a staple of standard 401(k) retirement plans and other popular investment vehicles. Accordingly, it would be difficult for an investor to avoid putting money in the unregulated firm (Firm B), even if this were an express goal based on an informed choice. Today's investors, in other words, are routinely exposed to both regulated and unregulated firms, which undermines the logic of investor protection.[10]

What this Article calls *the public company regulatory paradox* has been a creeping phenomenon taking shape over a number of years. The idiosyncratic architecture of U.S. corporate law, with responsibility for regulation effectively shared by the federal government and the states, and with built-in regulatory competition among the states, has always been predisposed to some degree of inconsistency.[11] However, the present moment represents an inflection point of singular import, which requires us to recognize the paradox and reckon with it head-on. There are at least three reasons for this. First, a fuller picture is starting to emerge of the far-reaching consequences of a deregulatory cycle in the area of capital markets, which began with the 2012 JOBS Act, continued with the 2015 FAST Act,

---

9.  *See infra* Section I.A.
10. *See infra* Section III.C.
11. *See, e.g.*, John C. Coates IV, *Private vs. Political Choice of Securities Regulation: A Political Cost/Benefit Analysis*, 41 VA. J. INT'L L. 531 (2001); Mark J. Roe, *Delaware's Competition*, 117 HARV. L. REV. 588 (2003).

Exhibit 4 to Decl. of Georgiev
164
**SER 1580**

2021]        *THE BREAKDOWN OF THE PUBLIC–PRIVATE DIVIDE*        227

and was completed in November 2020 during the last days of the Trump administration.[12] Second, there is now a growing appetite for developing targeted solutions to various problems in the capital markets; any new reform proposals, however, should be cognizant of the breakdown of the public–private divide and the changed metastructure of securities law. Third, and relatedly, the sheer scale of the trends suggests that the existing framework needs to be rethought.

Consider, for example, the dramatic rise of "unicorns"—private firms with an implied market valuation of at least $1 billion; such once-rare firms are among the most prominent manifestations of the deregulation of capital raising during the 2010s. Figure 1 presents relevant data.

FIGURE 1: NUMBER AND AGGREGATE VALUATION OF U.S.-BASED UNICORNS (2012–2021)[13]



Whereas there were approximately 43 unicorn firms in the United States when the term was coined in 2013, at the end of December 2020 their number stood at 251. Just eleven months later, at the start of December 2021, it had nearly doubled to 473. The aggregate implied valuation of U.S. unicorns now stands at $1.58 trillion, which is an eleven-fold in-

---

12. *See infra* Section II.B. For a summary of the expansive November 2020 reforms, see *infra* notes 165–66 and accompanying text.

13. This data has been compiled by the author from the current and historical editions of the unicorn list maintained by CB Insights. *See The Complete List of Unicorn Companies*, CB INSIGHTS, https://www.cbinsights.com/research-unicorn-companies. The data for 2021 is as of December 3, 2021.

Exhibit 4 to Decl. of Georgiev
165
SER 1581

228                 *NYU JOURNAL OF LAW & BUSINESS*                 [Vol. 18:221

crease since 2013, and a nearly three-fold increase in 2021 alone.[14]

The tectonic shifts in capital markets are by no means limited to the arrival and proliferation of unicorns. The annual number of initial public offerings (IPOs) in the United States has fluctuated considerably over the past 30 years, from a peak of over 500 IPOs per year for much the late 1990s, to fewer than 100 IPOs per year for parts of the 2000s, to over 400 IPOs in 2020 and over 900 in 2021.[15] Whereas the number of U.S. public companies exceeded the number of U.S. private equity-owned companies by a considerable margin in 2000, two decades later these positions have been reversed.[16] Assets under management in the U.S. buyout industry, a key source of private capital, have grown steadily—and more than ten-fold—between 1990 and 2019.[17] While data on capital raising in the opaque private markets is incomplete, it still shows that during the 2010s more capital was raised on the private markets than on the public markets.[18] Today's unicorns rely on the private markets for the growth-intensive stages of their lifecycle, whereas older-generation tech companies, such as Amazon, Google/Alphabet, and Facebook, relied predominantly on the public markets.[19] The typical age of tech firms going public was 7.8 years between 1980 and 2011; since 2012, the year of the passage of the JOBS Act, it has increased to 11 years.[20]

--------

14. In considering this data, it is important to bear in mind that the number of unicorns is a function of both entry and exit. The total number of unicorns increases each time a private startup reaches a $1 billion valuation, and it decreases when a startup goes public via an IPO (thereby losing its unicorn status) or gets acquired by another unicorn or by a public company. As a result, at any given point in time the total number of unicorns and the aggregate valuation of all unicorns depend on macroeconomic factors, private capital-raising conditions, the state of the public markets (which provide a reference point for private company valuations), IPO conditions, M&A activity, and other factors. Because of its symbolic nature, the $1 billion benchmark has not been adjusted for inflation; the valuation data is presented in current-year dollars.

15. *See infra* Appendix, Figure A–1.

16. *See infra* Appendix, Figure A–2.

17. *See infra* Appendix, Figure A–3.

18. *See infra* Appendix, Figure A–4 and Figure A–5. A global comparison of the growth of public market capitalization and private equity net asset values over time reveals a similar trend. *See infra* Appendix, Figure A–6.

19. *See infra* notes 198–200; *see also infra* Appendix, Figure A–7.

20. *See infra* note 59 and accompanying text.

Exhibit 4 to Decl. of Georgiev
166
**SER 1582**

The headline story that emerges from these datapoints is clear: not only have U.S. capital markets been in a state of flux, but the balance between the *public* and *private* sides has shifted for companies, capital, and markets. As we will see, regulatory policy (*both* regulation and deregulation) is an inextricable part of understanding and explaining this transformation: many of the trends have been driven, at least to some degree, by regulatory policy; many of them have served as a justification for significant changes in regulatory policy, and, today, these trends have implications for regulatory policy.

A seminal article on contemporary securities regulation written by Donald Langevoort and Robert Thompson in 2013 opens by observing that "[s]ecurities regulation is under extraordinary stress today."[21] Langevoort & Thompson's article was prescient about many of the effects of the JOBS Act and spurred an extensive literature; its framing observation is true today more than ever. Writing in 2017, Elisabeth de Fontenay highlighted the deregulation of private capital and linked it to the decline of the public company, ultimately concluding that the existing legal arrangements likely are not sustainable.[22] In analyzing emerging developments, a number of other scholars touched on the broader theme of the eroding distinction between the public and private sides of securities regulation, as did financial and legal commentators.[23] All the while, the SEC continued to shift the foundations of securities law—a process that concluded only at the start of 2021 with the arrival of a new administration.

This Article contributes to the literature in three primary ways. First, it puts forward a novel and comprehensive analytical account of the breakdown of the public–private divide. This account includes an analysis of the full deregulatory cycle, including the major changes to the capital raising framework adopted in late 2020. The account goes further in its assessment of the nature and extent of the changes—the use of "breakdown" as opposed to merely "erosion" is intentional—and it identifies the public company regulatory paradox as a major manifestation of the breakdown. The analytical account

_____

21. Langevoort & Thompson, *supra* note 4, at 337.
22. *See* Elisabeth de Fontenay, *The Deregulation of Private Capital and the Decline of the Public Company*, 68 Hastings L.J. 445, 447 (2017).
23. *See* sources cited in Parts I–IV.

Exhibit 4 to Decl. of Georgiev
167
**SER 1583**

also weaves in extensive evidence about the history, political economy, and capital market impact of the regulatory developments. Second, the Article contributes by analyzing the consequences from the breakdown of the public–private divide on specific firm constituencies (investors and employee-investors) and on a systemic level; the systemic consequences in particular are surprising but heretofore unexamined. Finally, the Article contributes to the literature by investigating possible reforms, including a proposal likely to show up on the SEC's regulatory agenda, and by assessing these proposals' expected effectiveness in returning securities law to a state of conceptual coherence. In this regard, the Article intentionally avoids making substantive recommendations and instead proposes a deliberative process whereby the SEC and relevant stakeholders can arrive at the most appropriate substantive solutions.

The Article proceeds in four main parts, each of which is previewed below.

Part I begins by describing the classic public–private divide in the securities law. More than anything, the public–private divide is a convenient device for conceptualizing the structure of securities law. The locus and nature of the public–private divide has traditionally been a function of the two regulatory spheres established on either side of it: a heavily regulated "public realm" where public companies raise capital from the investing public on the public markets, and a lightly regulated (and often unregulated) "private realm" where private companies raise private capital from special classes of investors on non-public markets. After defining the public–private divide, Part I discusses the various mechanisms for becoming a public company, the evolving rationales for making this choice, and the ever more complex framework regulating the disclosure and governance obligations of public companies.

Part II focuses on the road to the breakdown of the public–private divide. The story starts with the 2002 Sarbanes–Oxley Act, adopted in the aftermath of massive accounting fraud at Enron, WorldCom, Tyco, and elsewhere, which I argue served as the system shock that set into motion many of the developments that followed. By imposing new substantive and disclosure mandates on public companies, Sarbanes–Oxley represented a signal step in the "federalization" of corporate governance, a much-criticized development.

Exhibit 4 to Decl. of Georgiev
168
**SER 1584**

2021]     *THE BREAKDOWN OF THE PUBLIC–PRIVATE DIVIDE*     231

The 2010 Dodd–Frank Act, adopted in the aftermath of the financial crisis and massive taxpayer-funded corporate bailouts of 2008–2009, imposed additional regulation and deepened the role of the federal government in corporate law. The transformative changes put in place by Sarbanes–Oxley and Dodd–Frank coincided with a growing sense of alarm over the apparent decline of U.S. public capital markets at the time, as evidenced by the declining annual number of IPOs and the overall number of public companies, which in turn raised concerns about a loss of global competitiveness.[24]

The two contemporaneous developments were quickly bundled together to suggest that there was a causal relationship: (over)regulation as the cause of economic trouble. Although subsequent research revealed other, more plausible explanations for the decline in public capital markets, and although the decline in IPOs proved to be a temporary phenomenon, the overregulation narrative had already taken hold in the media and among policymakers.[25] The result was the JOBS Act, passed with bipartisan support in 2012, which set off what this Article calls a deregulatory cascade: a cycle of deregulatory measures aiming to facilitate firms' capital raising, which continued through 2020. As we will see, some of these measures exacerbated the very problems they set out to address, which, in turn, became the rationale for yet more deregulation.[26] Two figures included in this Part provide a simplified visual representation of the shifting trends in the flows of capital among public and private firms, and public and private markets since the early 2000s due to the various deregulatory developments. Ultimately, these developments have led to the breakdown of the foundational public–private divide in securities law and the full realization of the present-day public company regulatory paradox.[27]

---

24. *See infra* Section II.A.

25. *See infra* Section II.A.

26. *See infra* Section II.B. The deregulatory cascade entailed the following six developments, some of which are mutually-overlapping: enabling the rise of unicorns; emphasizing private markets over public markets; enabling the dramatic rise of private equity; allowing public capital into private companies; transforming public capital into private capital; and promoting regulation-lite regimes. *See infra* Section II.B.

27. *See infra* Section II.C.

Exhibit 4 to Decl. of Georgiev

169

**SER 1585**

232          *NYU JOURNAL OF LAW & BUSINESS*          [Vol. 18:221

Part III shifts the focus from causes to consequences. It finds that the consequences of the breakdown of the public–private divide have been profound both on a conceptual and practical level and that they implicate multiple constituencies within and outside the firm. Four broad themes emerge. First, the federalization of corporate governance, much criticized in academic and policy circles over the past two decades, today looks more like *quasi-federalization*: the regulatory provisions at issue are tied to public capital raising and can now be easily avoided or circumvented by raising capital on the private markets instead. This is a backdoor, market-based "issuer choice" regulatory regime, whose merits remain contested in the academic literature and have never been seriously considered, much less endorsed, by policymakers.[28] Second, and relatedly, the breakdown of the public–private divide has undermined the regulatory capacity of securities law: firms can avoid important disclosure and governance mandates by delaying or never going public, by going private, or by selling off "bad" assets to a private company. Since public company regulation has come to fulfill important roles in ensuring corporate transparency and accountability—and to the extent this development is a desirable one—the breakdown of the public–private divide is a problem not just for capital market participants, but for society as a whole.[29]

The third and fourth sets of consequences relate to mainstream investors and employee-investors, respectively. As regards mainstream investors, there has been a decoupling of the exclusive relationship between public companies and mainstream investors and, consequently, an attenuation of the logic of investor protection upon which much of securities regulation rests. The investor protection issues concern both efficient pricing, i.e., the most basic term of any securities transaction, and matters such as the difficulties in maximizing risk-adjusted returns within an investment portfolio due to information asymmetries, suboptimal corporate governance, and inadequate access to appropriate investment opportunities.[30]

In addition, the breakdown of the public–private divide compounds the problems faced by a special class of inves-

---

28. *See infra* Section III.A.
29. *See infra* Section III.B.
30. *See infra* Section III.C.

Exhibit 4 to Decl. of Georgiev
170
**SER 1586**

tors—employees of startup companies who usually receive a considerable amount of their total compensation in illiquid and hard-to-value private company stock and stock options and who are incapable of mitigating through diversification the firm-specific risk associated with their investment of both financial and human capital via the employment relationship. Unlike in the past, these problems are no longer capped in size or duration, because startups can now raise unlimited amounts of private capital (with larger private startups having more employees and, accordingly, more employee-investors), and because startups can remain private, and thus untouched by federal corporate governance regulation, virtually indefinitely.[31]

Part IV considers possible avenues for reform. One set of options relates to *rebuilding the public–private divide*—either by filling various regulatory gaps in the lightly-regulated private realm, or by adjusting regulation to expand the size of the public realm.[32] As an example of the latter, SEC Commissioner Allison Herren Lee recently put forward a simple, yet bold proposal: The SEC should revise the concept of "shareholder of record" used in existing legislation to more accurately capture the true number of beneficial owners—a change that will automatically push a number of large private companies into the heavily-regulated public realm. An analysis of this proposal suggests that it will be an effective tool for rebuilding the original public–private divide—and a blunt one at that, which, somewhat counterintuitively, puts its feasibility into question. While Commissioner Lee's proposal will address most of the problems stemming from the breakdown of the public–private divide, it does not solve, and will likely exacerbate, problems related to employee-investors.[33]

A second set of reform options entails *circumventing the public–private divide* rather than rebuilding it. This can be done by shifting some of the economic regulation that currently operates through securities law to other regulatory domains, in effect lowering the distinction between public and private companies.[34] These options are not mutually exclusive but

---

31. *See infra* Section III.D.
32. *See infra* Section IV.A.
33. *See infra* Section IV.A.3.
34. *See infra* Section IV.B.

Exhibit 4 to Decl. of Georgiev
171
SER 1587

they are likely to be difficult and costly to implement. Given historical patterns of regulation, as well as the political and logistical roadblocks to reform, the Article posits that securities law may well need to wait until the next big market crisis—or its next "critical juncture"—before the public company regulatory paradox can be addressed.[35]

Despite its unspecified timing and outcome, this conclusion need not be viewed as defeatist. There is much that the SEC, capital market participants, and other corporate governance stakeholders can do now to ensure that when the opportunity for reform arises, it will be used to optimize the regulatory landscape. The recent history of securities regulation is replete with examples of hastily implemented reforms that did not enjoy broad support,[36] making careful deliberation all the more important. The recent breakdown of the public–private divide around which securities regulation has been organized since the 1930s puts the field in disarray but it also offers opportunities for blue sky thinking. In order to be able to seize on these opportunities for innovation, it is crucial to understand exactly where we are today and how we got here—a key goal of this Article.

Before proceeding with the main exposition, a brief note about scope, approach, and nomenclature. While the Article touches on all *major* trends and regulatory developments in U.S. capital markets since the early 2000s that are relevant to the topic, it does not catalog every rule change; indeed, to do so in this context would be impossible. In addition, while the Article contains extensive technical detail, it ultimately seeks to translate and analyze discrete legal developments on a conceptual level—in line with the fact that the public–private divide is a conceptual device for thinking about the regulation of capital raising and capital markets. This makes it necessary to balance generality and specificity, with all the attendant trade-offs. To facilitate the translation process, the Article also

---

35. *See infra* Section IV.C.
36. The 2012 JOBS Act is the most prominent recent example. As discussed in Section II.B, the JOBS Act was heavily influenced by industry lobbyists. Even though some of its provisions dealt with highly-technical aspects of securities law, and even though the SEC (as the competent administrative agency) expressed skepticism about some of the bill's provisions, the SEC's objections barely registered and failed to prevent passage of the bill. *See infra* notes 161–63 and accompanying text.

Exhibit 4 to Decl. of Georgiev
172
**SER 1588**

purposefully avoids various specialized terms from the securities law rulebook unless their use is required by context,[37] and, where the context permits, it uses other, more general terms, which have a commonly-understood meaning in the legal and policy community, but no statutory definition.[38] Finally, the Article identifies various trends with the help of available data, and analyzes their legal and economic determinants as well as their policy implications. It is worth keeping in mind, of course, that in certain circumstances data is limited or imperfect, and that causal inferences are always open to contestation.[39]

## I.
## THE ARCHITECTURE, GOALS, AND MEANS OF THE REGULATORY REGIME

To set the stage for the analytical core of the Article, this Part provides an overview of the structure and scope of securities law as it pertains to public and private companies, public and private investor capital, and public and private markets. It does so by discussing the legal provisions that serve to construct the public–private divide, the reasons for and mechanics

---

37. This includes using "public company" in lieu of specialized terms such as "issuer," "registrant," and "reporting company," unless those are required in order to draw a meaningful distinction.

38. These terms include "public capital" (generally, capital raised or traded on the public capital markets and/or capital raised from or traded by investors not subject to qualification restrictions), "private capital" (generally, capital raised or traded on private capital markets and/or capital raised from or traded by qualified investors in line with specific regulatory exemptions), "public investors" (generally, mainstream investors whose access to investment opportunities is regulated and, traditionally, has been more limited), and "private investors" (investors who qualify for special and less-regulated investment opportunities in addition to the opportunities available to public investors).

39. The following quote from John Coates applies to many of the matters discussed in this Article: "[C]orporate governance is not rocket science—in fact, it is much more complicated than rocket science. . . . [T]here are few consensus views among researchers about any non-trivial topic . . . and evidence tends to emerge slowly, is rarely uncontested, and is subject to constant (and often dramatic reevaluation)." *Protecting Shareholders and Enhancing Public Confidence by Improving Corporate Governance: Hearing Before the Subcomm. on Sec., Ins., & Inv. of the S. Comm. on Banking, Hous., & Urb. Affs.*, 111th Cong. 45 (July 29, 2009) (statement of John C. Coates IV, Professor, Harvard Law School).

Exhibit 4 to Decl. of Georgiev
173
**SER 1589**

236                    *NYU JOURNAL OF LAW & BUSINESS*                    [Vol. 18:221

of becoming a public company, and the far-reaching regulatory consequences of taking on public company status.

## A. *The Public–Private Divide*

The public–private divide is a useful conceptual device for making sense of much of the original design of U.S. securities law.[40] Each of the securities law statutes, including the Securities Act, the Securities Exchange Act, and the Investment Company Act, covers certain economic actors or economic activities while exempting other economic actors or economic activities from regulation; in other words, each of the statutes draws lines. In the aggregate, these lines create two regulatory spheres: a heavily-regulated "public realm" where public companies raise capital from the investing public on the public markets, and a lightly-regulated (and often unregulated) "private realm" where private companies raise private capital from special classes of investors on non-public markets. The *public–private divide* is what separates the public and private—regulated and unregulated—realms. The "breakdown of the public–private divide," then, refers to the removal of the boundaries between these two realms and the notion that, functionally, the public–private distinction has lost both its descriptive and its explanatory power as an organizing principle of securities law.

The genesis of the public–private distinction is Congress' observation in 1933 that the Securities Act, the first of the modern securities laws, should not regulate transactions "where the public benefits are too remote."[41] The Securities Act put this principle in practice by distinguishing between public (or "registered") offerings, which are subject to extensive disclosure requirements and communication restrictions,[42] and "transactions by an issuer not involving any public

---

40. *See* Langevoort & Thompson, *supra* note 4, at 339 (2013) (conceptualizing the public–private divide and noting that it "has long been an entirely under theorized aspect of securities regulation").

41. Comm. on Interstate & Foreign Com., House Report on Securities Act of 1933, H.R. Rep. No. 73–85, at 5 (1933).

42. The disclosure requirements at the offering stage under the Securities Act are a subset of the disclosure requirements described in Section I.C.1 *infra*; the publicity restrictions relate to gun-jumping and other communication prohibitions. *See* Latham & Watkins LLP, U.S. IPO Guide (2021), https://bit.ly/3rCzt0m.

Exhibit 4 to Decl. of Georgiev

174

**SER 1590**

2021]        *THE BREAKDOWN OF THE PUBLIC–PRIVATE DIVIDE*        237

offering," which are exempt from registration.[43] Since the term "public offering" was left undefined in the statute, it fell to the SEC, with a subsequent assist from the Supreme Court, to map out the public–private line in the Securities Act.

Early on, the SEC focused on a multi-factor approach that reflected an expansive understanding of publicness.[44] In 1953, the Supreme Court held that an offering to investors who can "fend for themselves" was not a public offering.[45] In 1982, the SEC issued Regulation D, which largely codified existing practice and anchored the public–private divide with reference to factors such as aggregate offering price, number and status of investors, and publicity.[46] Significantly, Regulation D placed heavy reliance on the category of "accredited investors"—sophisticated investors who can "fend for themselves" and who are allowed to participate in private offerings because they do not need the full protections of the Securities Act.[47] Institutions fit easily within the logic of this concept. In the case of individual investors, however, sophistication was much more difficult to capture and the SEC used high income and high net worth as proxies.[48] Issuers could avoid registration—and the bulk of securities regulation—as long as they conducted a

---

43. *See* Securities Act of 1933 (Securities Act) § 4(a)(2), 15 U.S.C. § 77d(a)(2). Even though private offerings fall inside the unregulated private realm, private offerings must still comply with various procedures in order to attain and retain their "private" status.

44. *See* Letter of General Counsel, Securities Act Release No. 285, 1935 WL 27,785 (Jan. 24, 1935). The release covered the following considerations with respect to whether or not an offering constituted a "public offering": "(1) [t]he number of offerees and their relationship to each other and to the issuer[,] . . . (2) [t]he number of units offered[,] . . . (3) [t]he size of the offering," and "(4) [t]he manner of offering." *Id.*

45. SEC v. Ralston Purina Co., 346 U.S. 119, 120 (1953).

46. *See* Revision of Certain Exemptions From Registration for Transactions Involving Limited Offers and Sales, Release No. 33–6389 (Mar. 8, 1982), 47 Fed. Reg. 11,251.

47. It is a less-known fact that the "accredited investor" concept was created by Congress, not the SEC, pursuant to the Small Business Incentive Act of 1980. *See id.*, at 11,251–52.

48. Among other criteria, Regulation D defines as accredited investors individuals with an annual income over $200,000 or net worth of at least $1 million. 17 C.F.R. §§ 230.501(a)(5)–(6). Because this definition has never been updated to account for inflation, these thresholds are much lower in real terms today than they were in 1982. In other words, it takes significantly less wealth today than it did in 1982 for an investor to be deemed sophisticated. *See infra* note 183 and accompanying text. The changes implemented

Exhibit 4 to Decl. of Georgiev
175
**SER 1591**

238                     *NYU JOURNAL OF LAW & BUSINESS*                     [Vol. 18:221

small offering, to a limited number of sophisticated investors, and without engaging in general solicitation and general advertising.[49] As we will see in Section II.B, the deregulatory cascade of the 2010s has had a particularly erosive effect on these categories, which has contributed to the breakdown of the public–private divide.

The Exchange Act also helps structure the public–private divide. For one, it defines the content of public company regulation (discussed in Section I.C.1), since it sets out the requirements for "reporting companies"—this is the content of the regulation in the regulated public realm.[50] In addition, the Exchange Act draws the line between public and private companies: As discussed in more detail in Section I.B, public companies are those that have conducted a registered offering of securities, elected to list securities on a national securities exchange, or fall above certain size thresholds pertaining to number of investors and value of assets.

The Exchange Act complements the Securities Act, but also reflects a different and somewhat inconsistent approach: Whereas the focus of the Securities Act is on *investor qualification*, as determined by wealth and sophistication, the Exchange Act generally focuses on the *funding choices and size attributes* of the issuer.[51] (The JOBS Act introduced further inconsistency by importing the concept of accredited investor into Section 12(g) of the Exchange Act;[52] because Section 12(g) has become largely irrelevant, however, the significance of this change is more symbolic than practical.)

---

in November 2020 expanded the definition by adding indicators of financial literacy as qualifying factors. *Id.*

49. Regulation D, Rules 504–06, 17 C.F.R. §§ 230.504–06.

50. *See infra* Section I.C.1.

51. The inconsistency in the public–private lines under the Securities Act and the Exchange Act was first discussed in works by Donald Langevoort & Robert Thompson, and Adam Pritchard. *See* Langevoort & Thompson, *supra* note 4 (noting a "gross inconsistency in how the two main securities statutes—the Securities Exchange Act of 1934 and the Securities Act of 1933—approach [the public–private] divide"); A.C. Pritchard, *Revisiting "Truth in Securities" Revisited: Abolishing IPOs and Harnessing Private Markets in the Public Good*, 36 SEATTLE U. L. REV. 999, 1000 (2013) ("Both the Securities Act and the Exchange Act reflect a public–private divide, but they take very different approaches to drawing that line.").

52. *See infra* note 77 and accompanying text.

Exhibit 4 to Decl. of Georgiev
176
**SER 1592**

The final building block of the public–private divide relates to the regulation of *pools of capital*. The basic distinction here is between registered investment companies, such as mutual funds and money-market funds, which are subject to stringent regulation under the Investment Company Act of 1940, and private investment companies, including private equity funds and hedge funds, which are generally exempt from registration.[53] As we will see in Section II.B, the deregulation of this sphere has increased the supply of private capital; this increased supply has been able to satisfy the increased demand for private capital, which has been driven by the deregulation of matters governed by the Securities Act and the Exchange Act.

### B.    *Becoming a Public Company*

All mainstream business entities in the United States are organized under state law. Among those, corporations incorporated in Delaware are the most common type of entity that chooses to become a public company by following one of the pathways established by federal securities law.[54] An entity that has not chosen to become a public company is referred to as a private company. The sections that follow discuss two key background matters: why firms become public companies, and how they go about doing it. Despite the seeming continuity of U.S. capital markets, the answers to both questions have evolved in

---

53. For a comprehensive and original analysis of the public–private divide as it pertains to investment companies, see Cary Martin Shelby, *Are Hedge Funds Still Private? Exploring Publicness in the Face of Incoherency*, 69 S.M.U. L. REV. 405 (2016). For an insightful analysis of the historical origins of the distinctive public–private line in this area, see John D. Morley, *Collective Branding and the Origins of Investment Management Regulation*, 6 VA. L. & BUS. REV. 341 (2012).

54. Note that while the corporation is the most common type of public company, limited partnerships, limited liability companies, and other entity types may also opt into the public company category established by federal law. Foreign business entities, somewhat confusingly referred to as "foreign *private* issuers," may also opt into all or, more commonly, a subset of U.S. public company regulation. Delaware's dominance as the preferred jurisdiction of incorporation for public companies is illustrated by the fact that in 2020 nearly 68% of Fortune 500 companies were registered in Delaware and approximately 93% of new U.S. IPOs were conducted by Delaware-registered entities. *See* DEL. DIV. CORPS, 2020 ANNUAL REPORT STATISTICS (2020), https://bit.ly/317nqNq.

Exhibit 4 to Decl. of Georgiev
177
**SER 1593**

recent years as a result of market developments and in re-
sponse to regulation.

### 1. Motivations for Going Public

On a conceptual level, becoming a public company en-
tails a bargain: a heretofore private company gains access to
large and highly liquid pools of public capital, which enables it
to raise funds quickly, efficiently, and at low cost, but, in re-
turn, the company becomes subject to an extensive federal
regulatory regime. The foundational rationale for this re-
gime's existence is the need to protect the "investing public"—
the investors, i.e., suppliers of capital, who buy and sell securi-
ties on the public markets.[55]

The access-to-capital justification for going public has al-
ways had the greatest currency, but it increasingly fails to ac-
count for the observed market reality. The expanded supply of
*private capital* due to the deregulatory cascade of the 2010s
makes access to *public capital* much less of a growth impera-
tive.[56] Tech firms such as Uber, Airbnb, and Dropbox were
able to support their growth with private capital for years
before they chose to go public, in each case reaching a previ-
ously-unimaginable scale and attaining the status of "unicorns"
(private valuation of at least $1 billion), and, subsequently,
"decacorns" (private valuation of at least $10 billion).[57] With
so much private capital on offer, the process of going public—
and becoming subject to federal corporate governance regula-
tion—can  be put off for a long time: the median age of U.S.

---

55.  *See, e.g.,* Michael D. Guttentag, *Protection from What? Investor Protection
and the JOBS Act,* 13 U.C. Davis Bus. L.J. 207, 221–22 (2013); Joel Seligman,
The Transformation of Wall Street: A History of the Securities and
Exchange Commission and Modern Corporate Finance 19, 50 (1982).

56.  *See infra* Sections II.B–C.

57.  *See, e.g.,* George S. Georgiev, *Securities Laws are Speed Bumps that Prevent
Uber-Sized Wrecks,* Hill (June 29, 2017), https://bit.ly/3D3b5aa [hereinafter
Georgiev, *Uber-Sized Wrecks*] (discussing the rise of unicorns and associated
regulatory issues). The most recent additions to the unicorn nomenclature
are the terms "hectocorn" and "centicorn," which refer to a private company
with an implied valuation of over $100 billion. While unicorns are now com-
monplace, hectocorns or centicorns do remain rare. *See* Michael Sheetz, *Elon
Musk's SpaceX Hits $100 Billion Valuation After Secondary Share Sale,* CNBC
(Oct. 8, 2021), https://cnb.cx/3rhq3XD (noting that SpaceX has become
the first, and so far the only, U.S.-based company to reach an implied private
valuation over $100 billion).

Exhibit 4 to Decl. of Georgiev
178
**SER 1594**

2021]        *THE BREAKDOWN OF THE PUBLIC–PRIVATE DIVIDE*        241

tech firms going public in 1999 was 4 years, whereas in 2020 it was 12 years.[58] Based on 40 years of data, the pre-JOBS Act (1980–2011) average median was 7.8 years (notwithstanding the dot-com bust and the global financial crisis, both of which delayed many IPOs and skew this number upwards), whereas the post-JOBS Act (2012–2020) average median had increased considerably to 11 years.[59]

Beside public versus private capital, another relevant distinction for explaining the changed market realities relates to the increased importance of *non-financial capital* relative to financial capital. Evidence suggests that firms in certain industries have more difficulty attracting human capital than financial capital, and, simultaneously, that human capital has become more important than financial capital to many firms' success.[60] A recent study observed that "[p]ossibly for the first time in history, we're talent-constrained instead of [financial] capital-constrained."[61]

The increase in the relative importance of human capital as a result of changes in the economy has impacted the IPO calculus: At many firms, the going-public decision, ostensibly about raising new financial capital, has become subordinate to concerns about attracting and keeping human capital, i.e., the skills and knowledge embodied in the firm's employees. Startups often use their own equity to cover part of the compensa-

---

58. *See* JAY R. RITTER, INITIAL PUBLIC OFFERING: UPDATED STATISTICS 12 tbl. 4a (2021), https://site.warrington.ufl.edu/ritter/files/IPO-Statistics.pdf [hereinafter *Ritter's IPO Database*].

59. Author's calculations based on data contained in *Ritter's IPO Database*. A prominent discontinuity in the trend occurred in 2008: In the period 1980–2007, the median IPO age ranged between 4 and 9 years; in the period 2008–2020, it ranged between 9 and 14 years. *Id.* Ritter's annual data is reported as a median; my calculations for multiple-year periods take the average of the annual median figures, hence the references to "average median."

60. *See, e.g.*, Vijay Govindarajan et al., *Why We Need to Update Financial Reporting for the Digital Era*, HARV. BUS. REV. (June 8, 2018), https://bit.ly/3rxRpJn (noting that "[f]inancial capital is assumed to be virtually unlimited, while certain types of human capital are in short supply").

61. Eric Ries, *Foreword* to SCOTT KUPOR, SECRETS OF SAND HILL ROAD: VENTURE CAPITAL AND HOW TO GET IT, at xi (2019). *See also* George S. Georgiev, *The Human Capital Management Movement in U.S. Corporate Law*, 95 TUL. L. REV. 639 (2021) [hereinafter Georgiev, *Human Capital Management*] (discussing firms' adaptive responses to the increased significance of human capital).

Exhibit 4 to Decl. of Georgiev
179
SER 1595

242            *NYU JOURNAL OF LAW & BUSINESS*            [Vol. 18:221

tion packages for executive and non-executive employees.[62] Doing so has considerable advantages: saving on salary expenses, managing liquidity, and aligning performance incentives. However, by the time a firm has a sizeable workforce and/or has been in existence for some time, there is also a sizeable (and often vocal) group of stakeholders—the firm's employees—who have a vested interest in the firm going public.[63] Employees prefer for the stock they receive as part of their compensation to be publicly traded because public company stock is free of trading restrictions, has greater liquidity, and may command a premium over otherwise-identical private company stock.[64] The human capital justification for going public does not apply consistently across the economy; instead, it is a consideration predominantly at tech firms that have a substantial need for professionals whose skills are scarce.

    To be sure, any IPO decision is unlikely to be driven by a single factor. Beside human capital, there are a number of other ancillary considerations and explanations that do not revolve around the need to raise new equity capital.[65]

---

62. *See, e.g.*, Elizabeth Pollman, *Startup Governance*, 168 U. PA. L. REV. 155 (2019) (describing the process and associated legal challenges).

63. *See, e.g.*, Erin Griffith, *Inside Airbnb, Employees Eager for Big Payouts Pushed It to Go Public*, N.Y. TIMES (Sept. 20, 2019), https://nyti.ms/3HXxdqd (noting tensions among Airbnb's 6,000-person workforce due to delays in the IPO process).

64. For an overview of the relevant considerations, see Eric D. Schoenborn, *Equity Compensation at Private Firms: How to Compete for Executive Talent*, SOC'Y FOR HUMAN RES. MGT. (Jan. 15, 2009), https://bit.ly/31b9D8s.

65. For example, going public gives firms opportunities to adjust their capital structure. For one, it enables firms to *return equity capital* to existing investors by making it possible to borrow more efficiently on the *public debt markets*. Alternatively, it enables them to replace one set of investors (venture capital and private equity funds) with another set of investors (those investing through the public markets). Separately, firms may pursue an IPO because public companies are widely covered in the financial and general press and enjoy a significant amount of free publicity relative to private companies; this is of particular value to consumer-facing businesses. Public company stock can also serve as an acquisition currency, meaning that an acquisitive firm would benefit from public company status. Finally, going public may send a positive signal about a firm's maturity and the quality of its corporate governance: the decision to go public can function as a bonding mechanism, which might yield real benefits in terms of the cost of capital. *See, e.g.*, John C. Coffee, Jr., *The Impact of Cross-Listings and Stock Market Competition on International Corporate Governance*, in GLOBAL MARKETS, DOMESTIC INSTITUTIONS 437 (Curtis J. Milhaupt ed., 2003) (discussing the benefits of

Exhibit 4 to Decl. of Georgiev
180
**SER 1596**

2. *Pathways to Going Public*

Whereas the justifications for taking on public company status come from the realm of business strategy, the process of doing so is driven by law. Becoming a public company generally involves a carefully choreographed, multi-stage process that requires financial advisors (underwriters), legal advisors, auditors, public relations experts, and others. By far, the most common and most well-known scenario involves conducting an IPO under the Securities Act of 1933 by issuing new securities as a means of raising additional equity capital.[66] Traditional IPOs involve a great degree of intentionality, planning, and expense,[67] all of which have contributed to recent deviations from the default approach.

Another path to going public involves listing already-existing securities on a national stock exchange; this process triggers public company status through the registration requirements contained in the Securities Exchange Act of 1934.[68] While relatively uncommon until recently, this avenue for taking on public company status gained more prominence after Spotify's direct listing transaction in 2018 and the New York Stock Exchange's subsequent efforts to amend its listing requirements to facilitate such transactions.[69] Spotify's direct listing resulted in a near-instantaneous $30 billion public com-

---

U.S.-style public company regulation in terms of access to capital); Amir N. Licht, *Cross-Listing and Corporate Governance: Bonding or Avoiding?*, 4 CHI. J. INT'L L. 141 (2003) (discussing the nexus between listing on the regulated public markets and enhanced access to capital).

66. *See* Securities Act § 5(c), 15 U.S.C. § 77e(c) (2012) (prohibiting the sale of any security unless a registration statement is effective); *id.* § 77d(a)(2) (declaring that the prohibition does not apply to "transactions by an issuer not involving any public offering"). The specific prescriptions of the Securities Act, as well as the liability provisions that apply to issuers, their directors and officers, and to underwriters have made the traditional IPO process both structured and standardized.

67. *See, e.g.*, LATHAM & WATKINS LLP, *supra* note 42 (providing a detailed guide to the mechanics of the traditional IPO process).

68. *See* Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78l(d) (2011).

69. *See* Marc D. Jaffe et al., *Spotify Case Study: Structuring and Executing a Direct Listing*, HARV. L. SCH. F. ON CORP. GOVERNANCE (July 5, 2018), https://bit.ly/3FZO8GN (discussing Spotify's innovative direct listing transaction). Other companies that have taken advantage of this route include Slack, Palantir, Asana, and Thryv Holdings. *See* Anna T. Pinedo et al., *Primary Direct Listings: A Hybrid Approach to a Traditional IPO Alternative*, HARV. L. SCH. F. ON

Exhibit 4 to Decl. of Georgiev
181
**SER 1597**

pany valuation.[70] One considerable advantage to direct listings is the cost saving. Whereas companies pursuing traditional IPOs pay as much as 7% of the IPO proceeds in fees to their underwriters and often deliberately underprice the stock to ensure an "IPO pop" on the first day of public trading, companies going public through direct listings can avoid these costs.[71] Relatedly, removing underwriters from the process also removes the risk of misaligned incentives in IPO pricing.[72]

Mergers, acquisitions, and spin-off transactions are also used to create public companies, or take on public company status, without conducting a traditional IPO. SPAC transactions—controversial but booming—involve the public listing of a shell company (a special-purpose acquisition vehicle), which uses the IPO proceeds to acquire an existing operating company; the upshot is that the operating company attains public company status without going through the disclosure and due diligence process associated with a traditional IPO.[73] As illustrated by Figure A–1 in the Appendix, such transactions have experienced a dramatic resurgence since 2017, having previously enjoyed a brief spell of popularity immediately

---

CORP. GOVERNANCE (Jan. 24, 2021), https://bit.ly/3leYdYc (discussing precedent transactions and the SEC's evolving approach to direct listings).

70. *See* Katie Roof, *Spotify Opens at $165.90, Valuing Company at Almost $30 Billion*, TECHCRUNCH (Apr. 3, 2018), https://tcrn.ch/3rejoh7.

71. *See* Matt Levine, *How to Disrupt the IPO Pop*, BLOOMBERG OP. (Oct. 4, 2019), https://bloom.bg/3D1uxE0. Evidence suggests that the average IPO is underpriced by approximately 20% to ensure that the stock price rises on the first day of trading, which benefits large institutional investors that received initial allocations. *See Ritter's IPO Database, supra* note 58, at 4 (reporting that "money left on the table" for all IPOs conducted between 1980 and 2020 averaged 20.1% of proceeds on a proceeds-weighted basis); *see also* John C. Coffee, Jr., *The Irrepressible Myth That SEC Overregulation Has Chilled IPOs*, COLUM. L. SCH. BLUE SKY BLOG (May 29, 2018), https://bit.ly/3pbqa4j (discussing IPO mechanics and associated costs).

72. *See, e.g.,* Patrick M. Corrigan, *Footloose with Green Shoes: Can Underwriters Profit from IPO Underpricing?*, 38 YALE J. ON REG. 908, 914 (2021) (noting that "[g]reen shoe options break the incentive alignment of underwriters and issuers to price IPOs as high as possible, since underwriters maximize the value of green shoe options by pricing the IPO as *low* as possible").

73. *See, e.g.,* John Detrixhe, *IPOs Are Popping Like It's 1999, and Executives Are Fed Up*, YAHOO (Sept. 3, 2020), https://yhoo.it/3E7kYF1. The securities law liability implications of both SPACs and direct listings are as-yet uncharted territory. *See* John C. Coates, *Statement by Acting Director Coates on SPACs, IPOs and Liability Risk Under the Securities Laws*, HARV. L. SCH. F. ON CORP. GOVERNANCE (Apr. 9, 2021), https://bit.ly/3D30FaD.

Exhibit 4 to Decl. of Georgiev
182
**SER 1598**

prior to the 2008 financial crisis.[74] Using somewhat similar mechanics, reverse mergers are another non-conventional (and similarly controversial) way to gain public company status.[75] Though largely overlooked in the literature, spin-off transactions in accordance with SEC Staff Legal Bulletin No. 4 are another means of creating a public company. In a spin-off, an already-existing public company carves out business assets, bundles them into a new company, and distributes the shares of this new company as a tax-free dividend to its existing public shareholders.[76]

The final mechanism for going public is very important for purposes of this Article, but it is largely irrelevant for capital market participants; indeed, it is important here precisely because it has grown to be irrelevant. Under Section 12(g) of the Exchange Act, if a private company reaches a certain number of public "shareholders of record" and a certain minimum asset size (jointly, an imperfect proxy for firm size), the company automatically becomes subject to the reporting requirements of the Exchange Act and, thus, a public company. In effect, a business entity could become a public company without taking any affirmative steps to raise capital or improve secondary market liquidity. Congress initially set the registration trigger at 500 shareholders of record in 1964. In 2012, it raised the overall registration trigger to 2000 shareholders of record, added an additional registration trigger at 500 non-accredited investors, and expressly excluded employee-investors from the

---

74. The SPAC trend may be curtailed if litigation filed by law professors John Morley and Robert Jackson in 2021 is successful. Morley and Jackson have argued that SPACs should be regulated as investment funds (and not merely as operating companies), which would result in stricter oversight under the Investment Company Act of 1940. *See, e.g.,* Andrew Ross Sorkin et al., *A SPAC Counterattack,* N.Y. TIMES (Aug. 30, 2021), https://nyti.ms/3lAv61K.

75. *See, e.g.,* Thompson & Langevoort, *supra* note 4, at 1588–98 (discussing the law and economics of reverse mergers). Definitionally, reverse mergers are transactions whereby "a private company directly or indirectly merges into a shell company that has established itself as a public issuer under the [Exchange] Act." *Id.* at 1589.

76. *See* SEC Staff Legal Bulletin No. 4 (CF) (Sept. 16, 1997). On the governance implications of spin-offs, see Young Ran (Christine) Kim & Geeyoung Min, *Insulation by Separation: When Dual-Class Stock Met Corporate Spin-Offs,* 10 U.C. IRVINE L. REV. 1 (2019).

Exhibit 4 to Decl. of Georgiev
183
**SER 1599**

count.[77] (Arguably, the legislative change was initiated to accommodate Facebook, which, at the time, was on course to reach the 500-shareholder threshold before it was ready to go public.[78])

The higher threshold for mandatory registration post-2012, the exclusion of employee-investors from the count, and the evolution of technologies that artificially deflate the count, have rendered this provision essentially meaningless. The original rationale behind it, however, is worth bearing in mind: in 1964, Congress determined that firms of a certain size (and, implicitly, societal footprint) should be subject to federal regulation irrespective of those firms' capital raising needs and irrespective of their preferences regarding public company status.

There are certain other categories of companies that can be described as semi-public: because of various characteristics—most notably small size, infancy, and foreign status—they are subject to a subset of public company regulations, either permanently or, as in the case of emerging growth companies, for up to five years.[79] The level of heterogeneity and complex-

---

77. Section 12(g) of the Exchange Act, as amended by the JOBS Act, requires a company to register its securities under the Exchange Act if it has $10 million or more in total assets and a class of equity securities "held of record" by 2000 or more persons (or 500 or more persons who are not "accredited investors"). *See* Exchange Act § 12(g)(1)(A), 15 U.S.C. § 78l(g)(1)(A) (2012). Importantly, both numbers exclude shareholders who received the securities through an employee compensation plan exempt from registration. *Id.* § 78l(g)(5).

78. *See* Richard Waters, *Effects of the JOBS Act Are Hard to Predict*, FIN. TIMES (Apr. 4, 2012), https://on.ft.com/3E2gsaZ. *See also* Langevoort & Thompson, *supra* note 4, at 355–59 (discussing the issue of Facebook's pre-IPO capital raising in the context of the Exchange Act).

79. For example, "smaller reporting companies," which generally have a public float of less than $250 million, are required to disclose less historical financial information. They also receive exemptions from certain provisions of the Sarbanes–Oxley and Dodd–Frank Acts, and have more time to file their reports. Additionally, the JOBS Act created the category of "emerging growth company" (EGC) for firms with gross annual revenue of less than $1 billion (indexed to inflation and subject to periodic update). EGCs enjoy substantially reduced disclosure requirements, both under the Securities Act as part of the IPO process, and under the Exchange Act for purposes of their ongoing reporting obligations (for up to five years). Regulation A and Regulation CF (Crowdfunding) enable firms to raise small amounts of capital without complying with the full disclosure regime. Foreign companies issuing securities in the United States also benefit from certain exemptions. *See*

Exhibit 4 to Decl. of Georgiev
184
**SER 1600**

ity in the securities laws has expanded considerably as a result of the developments discussed in Section II.B. This Article focuses on the paradigmatic public company, which is subject to all the public company regulations described in Section I.C.

## C.  *Regulatory Means and Ends*

Public company regulation—the public realm of securities law—comprises a set of interwoven SEC rules and regulations,[80] various liability provisions,[81] stock exchange listing rules,[82] and public company accounting standards.[83] Taken together, these are most accurately described as a loosely-coordinated system of federal corporate governance, which sits atop the corporate governance provisions contained in applicable state law statutes.[84] Because of its accretive nature and the absence of a single legislative or administrative instrument containing all relevant provisions, public company regulation is sometimes dismissed as merely a system of investor-oriented disclosure rules and procedural shareholder voting rules that are flawed or, at best, ineffectual. Such descriptions, however, are both reductive and incomplete: certain provisions framed as disclosure rules extend beyond the dissemination of information and shape internal governance arrangements or corporate behavior; other provisions directly impose substantive mandates.

---

George S. Georgiev, *Too Big to Disclose: Firm Size and Materiality Blindspots in Securities Regulation*, 64 UCLA L. Rev. 602, 614–16 (2017) [hereinafter Georgiev, *Too Big to Disclose*].

80.  This includes rules and regulations promulgated by the SEC pursuant to specific mandates in federal legislation, such as the Sarbanes–Oxley and Dodd–Frank Acts, as well as the SEC's broad authority over disclosure.

81.  *See generally* Thomas Lee Hazen, Treatise on the Law of Securities Regulation §§ 7.0–7.17, 12.1–13.2, Westlaw (database updated 2021).

82.  Stock exchange listing rules are commonly viewed as an integral part of public company regulation. Some of these rules stem from the Sarbanes–Oxley and Dodd–Frank Acts, whereas others do not but have the same effect in practice. *See generally* Geeyoung Min & Kwon-Yong Jin, *Relational Enforcement of Stock Exchange Rules*, 47 BYU L. Rev. (2021).

83.  *See, e.g.,* Corporate Accounting Practices: Is There a Credibility GAAP?: Hearing Before the H. Subcomm. on Cap. Mkts., Ins., and Gov't Sponsored Enters., Comm. on Fin. Servs., 107th Cong. 152–64 (2002) (statement of Robert K. Herdman, Chief Accountant, U.S. Sec. & Exch. Comm'n).

84.  *See* Marc I. Steinberg, The Federalization of Corporate Governance 19–20 (2018).

Exhibit 4 to Decl. of Georgiev
185
**SER 1601**

The overview that follows pays special attention to these points because they are vital to appreciating the full range and depth of the regulatory regime. It is also worth emphasizing that this regime represents a significant difference between private companies, which are subject only to state law rules, and public companies, which are subject to the comprehensive federal regulatory scheme described here *in addition to state law rules.* The overview highlights the deeply problematic nature of firms' ability to treat this regime as elective and the resulting public company regulatory paradox described in the Introduction. The question about the goals of the regulatory regime is discussed at the end of this section.

### 1. *The Public Company Regulatory Regime*

The majority of public companies, as well as the paradigmatic public company, are subject to the full range of public company regulation.[85] The requisite information, including, in the case of substantive requirements, confirmations of compliance, is disclosed publicly according to timelines devised by the SEC.[86] The regulatory requirements are backed up by an elaborate liability and enforcement regime, which includes private enforcement by shareholders (and, in certain cases, bondholders), public enforcement by the SEC (and, in certain cases, the DOJ), and a regime of sanctions maintained by the stock exchanges.[87] Enforcement of state law claims often bene-

---

85. Recall, however, that firms that fall in certain categories are exempt from some of the rules, either generally or for a limited time. *See* Georgiev, *Too Big to Disclose, supra* note 79 and accompanying text.

86. Depending on the rule in question, disclosure may be called for periodically (yearly or quarterly), on a current basis (promptly upon the occurrence of significant corporate events), or episodically, in connection with certain major transactions. See Div. Corp. Fin., U.S. Sec. & Exch. Comm'n, Financial Reporting Manual 19, 36 (2008). For example, the SEC's Form 10-K sets out information to be disclosed on an annual basis, Schedule 14A sets out information required to be filed in connection with matters subject to a shareholder vote (usually at the annual general meeting), and Form 10-Q sets out information to be disclosed on a quarterly basis. *Id.* The current reporting requirements are set out in Form 8-K, which must be filed within four business days of the occurrence of the relevant event. *Id.* at 38. As an example of episodic disclosure, a tender offer would necessitate the filing of information required under Schedule TO. *Id.* at 349–50.

87. As part of enforcement proceedings, the SEC routinely enters into one-off settlement agreements with public companies whereby the companies voluntarily undertake to make substantial changes to their governance

Exhibit 4 to Decl. of Georgiev
186
**SER 1602**

2021]        *THE BREAKDOWN OF THE PUBLIC–PRIVATE DIVIDE*        249

fits substantially from information disclosed as a result of regulatory requirements under federal law.[88] The public nature of disclosure also guarantees that firms will be subject to public scrutiny from the media, academics, public interest organizations, politicians, and others.

The most familiar elements of public company regulation require the reporting of historical information about a firm's business activities, financial condition, and results of operations, as well as more forward-looking information about material trends and uncertainties, risks facing the business, and exposure to legal proceedings, among other business and operational issues.[89] The shareholder meeting process is also regulated through a set of requirements that put in place procedural safeguards and mandate disclosure of additional information in connection with matters subject to a shareholder vote. Such matters include the election of board members, amendments to the firm's organizational documents, approval of certain types of transactions, non-binding resolutions contained in shareholder proposals, and non-binding approval of executive compensation arrangements.[90]

Financial reporting is another heavily regulated area. The relevant rules implicate both the nature and format of information required to be disclosed and, importantly, the internal procedures and oversight mechanisms within public companies. As a basic matter, public companies are required to file audited financial statements with the SEC.[91] These statements, which often include lengthy expositions in the form of "notes," provide a wealth of information in a standardized for-

---

practices that go beyond what the law requires. *See* STEINBERG, *supra* note 84, at 142–45.

88. *See, e.g., In re* Clovis Oncology Derivative Litig., No. 2017-0222-JRS, 2019 WL 4850188 at *5, *7, *9 (Del. Ch. Oct. 1, 2019) (relying on required periodic disclosure filings to support review of duty of oversight claim under Delaware law).

89. These requirements are contained, respectively, in the following provisions of SEC Regulation S-K: Item 101, Item 303, Item 503(c), Item 305, and Item 103. *See* 17 C.F.R. § 229 et seq.

90. *See* Schedule 14A, 17 C.F.R. § 240.14a-101 (2020). The votes on shareholder proposals and executive compensation arrangements are advisory to the board. *See* Rule 14a-8, 17 C.F.R. § 240.14a-8 (2020); Regulation S-K Item 402, 17 C.F.R. § 229.402 (2020).

91. *See* Regulation S-K Item 302, 17 C.F.R. § 229.302 (2020); Regulation S-X Rule 10-01, 17 C.F.R. § 210.10-01 (2020).

Exhibit 4 to Decl. of Georgiev
187
**SER 1603**

mat.[92] The process for promulgating accounting standards, administered by the Financial Accounting Standards Board (FASB) and overseen by the SEC, also amounts to a form of public company regulation.[93] A separate regulatory body, the Public Company Accounting Oversight Board (PCAOB), sets and oversees standards for preparing audit reports.[94]

The regulation of public company financial reporting covers not just the outputs but also the process. The CEO and CFOs of public companies are required to certify in periodic reports filed with the SEC that the financial statements and other disclosures contained in such reports are accurate, and fairly and accurately present the company's operations and financial condition.[95] In connection with making this certification, the officers are responsible for establishing and maintaining "disclosure controls and procedures"[96] and "internal control over financial reporting."[97] Guidance on how to meet these mandates is extensive and fairly prescriptive.[98] Relatedly, companies are required to assess and report on the effectiveness of their internal control structure and, if material weaknesses are identified, disclose those to shareholders.[99] The internal controls must also be inspected and reported on by an

92. *See* Regulation S-X Rule 10-01, 17 C.F.R. § 210.10-01.

93. *See Standard-Setting Process*, Fin. Acct. Standards Bd., https://bit.ly/2ZAfqny.

94. Sarbanes–Oxley Act of 2002 § 101, 15 U.S.C. § 7211 (2012); *Public Company Accounting Oversight Board (PCAOB)*, Investor.gov, https://bit.ly/3xzMxVe. While the PCAOB is independent, its members are appointed by the SEC. *Id.*

95. Sarbanes–Oxley Act of 2002 § 302.

96. Exchange Act Rule 13a–15, 17 C.F.R. § 240.13a-15 (2020).

97. Exchange Act 15d–15, 17 C.F.R. § 240.15d-15 (2020). The CEO and CFO certification requirements in respect of these matters are contained in Regulation S-K Items 307 & 308, 17 C.F.R. § 229.307–308 (2020).

98. *See, e.g.*, Protiviti, Guide to the Sarbanes–Oxley Act: Internal Control Reporting Requirements (4th ed. 2007), https://bit.ly/3o0hnTC. On the difference between SOX sections 302 and 404, see Shanna Nasiri, *The Differences Between SOX 302 and 404 Requirements*, Reciprocity (Dec. 5, 2019), https://bit.ly/3pazMwd.

99. Sarbanes–Oxley Act of 2002 § 404(a). The results of the testing must be reviewed by management, and all control testing failures identified must be categorized as a deficiency, significant deficiency, or material weakness. The company is required to report on deficiencies to the Audit Committee and the Board of Directors, and material weaknesses must be disclosed in the company's annual 10-K filing with the SEC. *See* Public Company Accounting Oversight Board, Auditing Standards (AU) Section 325: Com-

Exhibit 4 to Decl. of Georgiev
188
**SER 1604**

2021]        *THE BREAKDOWN OF THE PUBLIC–PRIVATE DIVIDE*        251

external auditor.[100] In short, the provisions related to financial reports and the financial reporting process are complex and extensive.

Certain SEC rules and practices have the effect of imposing higher standards of conduct upon public companies than what is required under state law. For example, an SEC rule requires disclosure of any transactions amounting to more than $120,000 between a public company and any of its executive officers or directors (and their affiliates),[101] which serves to discourage self-dealing and the suboptimal use of corporate resources. Another SEC rule requires a public company that is undertaking a transaction whereby existing public shareholders are cashed-out to disclose whether it "reasonably believes that the [relevant] transaction is fair or unfair" to such shareholders, and the "material factors" upon which this belief is based.[102] Because disclosing that the transaction is "unfair" (or disclosing fairness without an adequate basis) would subject the company to litigation, this rule in effect requires public companies to ensure the fairness of such transactions. To safeguard the economic rights of the shareholders of the acquisition target, the SEC has also engaged in extensive rulemaking in the context of acquisitions via a tender offer.[103]

Public company regulation is particularly expansive in the areas of board structure and composition as well as executive

---

MUNICATIONS ABOUT CONTROL DEFICIENCIES IN AN AUDIT OF FINANCIAL STATEMENTS, https://bit.ly/3d43lKd.

100. Sarbanes–Oxley Act of 2002 § 404(b).

101. Regulation S-K Item 404, 17 C.F.R. § 229.404 (2020). The extension of this rule to affiliates substantially expands its scope due to the broad definition of affiliate under federal law. *See* Vladimir Atanasov, Bernard Black & Conrad S. Ciccotello, *Law and Tunneling*, 37 J. CORP. L. 1, 11 (2011); *see also Statement of Financial Accounting Standards No. 57: Related Party Disclosures*, FIN. ACCT. STANDARDS BD. 10 (1982), https://bit.ly/3E2vygH (defining "affiliate"). On the interaction between state and federal law, see Geeyoung Min, *The SEC and the Courts' Cooperative Policing of Related Party Transactions*, 2014 COLUM. BUS. L. REV. 663 (2014).

102. Regulation M-A Item 1014, 17 C.F.R. § 229.1014 (2020); *see* Rule 13e-3, 17 C.F.R. § 240.13e-3 (2020); Schedule 13E-3 Item 8, 17 C.F.R. § 240.13e-100 (2020).

103. *See Information for Certain Types of Transactions and Filers*, U.S. SEC. & EXCH. COMM'N, https://www.sec.gov/corpfin/omalinks (last visited Oct. 30, 2021); STEINBERG, *supra* note 84, at 140–42. In so doing, the SEC has gone beyond what is strictly required by the relevant federal statute (the Williams Act of 1968). *Id.* at 141 n.150.

Exhibit 4 to Decl. of Georgiev
189
SER 1605

compensation. The relevant provisions are of fairly recent vintage: virtually all stem from Sarbanes–Oxley, Dodd–Frank, stock exchange listing requirements adopted in the early 2000s, and independent (i.e., not congressionally-mandated) SEC rulemaking from the 1990s and 2000s. These provisions have also been subject to the most criticism because they lock in place arrangements in areas that had theretofore been subject to private ordering due to the lack of state law requirements.[104] The net result of the various federal regulatory provisions is a fairly standardized public company governance model, which is described in a stylized fashion below. By contrast, there is no standardized governance model for private companies.[105]

Some of the defining features of the public company governance model pertain to board structure and composition. Public company boards are comprised of a majority of independent directors and usually have three major committees in common: an audit committee (with at least one person who qualifies as a "financial expert"), a compensation committee, and a nominating committee.[106] Each of these committees has specified responsibilities.[107] Public companies are required to provide detailed information about the skills and qualification

---

104. *See, e.g.*, Jill E. Fisch, *Leave It to Delaware: Why Congress Should Stay Out of Corporate Governance*, 37 Del. J. Corp. L. 731 (2013). *See also* sources cited in Section II.A *infra*.

105. *See, e.g.*, Renee M. Jones, *The Unicorn Governance Trap*, 166 U. Pa. L. Rev. Online 165 (2017). Private companies that are seeking to go public, however, would eventually conform to the public company model. *Id.* at 167, 170–71. Some private companies have also adopted elements from the public company governance model in the wake of scandals. *See* Georgiev, *Uber-Sized Wrecks, supra* note 57 (highlighting Uber's voluntary adoption of governance structures that mirror the SEC's corporate governance requirements).

106. *See* Martin Edwards, *Expert Directors*, 90 U. Colo. L. Rev. 1051, 1052, 1060–61 (2019); *see also* Steven M. Bainbridge & M. Todd Henderson, Outsourcing the Board: How Board Service Providers Can Improve Corporate Governance 160–61, 165–66 (2018).

107. The audit committee oversees internal and external financial reporting; the compensation committee determines executive compensation and prepares a compensation discussion and analysis (CD&A) report for inclusion in the company's proxy statement; the nominating committee is tasked with selecting new board members. *See* NYSE Listed Co. Manual, §§ 3.03A.07, 303A.05 & 3.03A.04, https://bit.ly/3xWySre.

Exhibit 4 to Decl. of Georgiev
190
**SER 1606**

of directors,[108] as well as information about individual board members' meeting attendance records.[109] The relevant rules also require information about the board's leadership structure, and, in particular, whether the CEO also serves as the chair of the board.[110] There is also a requirement to disclose whether or not the company has adopted a code of ethics.[111] Again, disclosure is a significant—but by far not the only—way to effectuate public company regulation. In the area of executive compensation, for example, both Sarbanes–Oxley and Dodd–Frank mandated so-called "clawback" provisions in respect of erroneously-awarded incentive-based compensation.[112]

Controversially, the public company regulatory regime also contains disclosure requirements pertaining to various miscellaneous matters. Mainly stemming from the Dodd–Frank Act, these specialized rules require public companies to disclose information about the pay received by their median worker and the ratio between median worker pay and CEO pay;[113] information on the use within their supply chains of "conflict minerals" originating in the Congo and adjoining countries;[114] information about payments made to a foreign government or the U.S. federal government for the purpose of commercial development of oil, natural gas, or minerals

---

108. *See* Proxy Disclosure Enhancements, 74 Fed. Reg. 68,334, 68,343 (Dec. 23, 2009); Regulation S-K Item 401(e), 17 C.F.R. § 229.401(e) (2020).

109. Regulation S-K Item 407(b), 17 C.F.R. § 229.407 (2020).

110. *See* Dodd–Frank Act § 972, 15 U.S.C. § 78n-2 (2010). In the case of CEO/Board Chair duality, the stock exchange rules require the appointment of an executive director and the holding of executive board sessions (without the CEO present). *See* NYSE LISTED CO. MANUAL, § 303A.03 & Commentary, https://bit.ly/31wyggj; *see also* NASDAQ REG., 5605(b)(2), https://bit.ly/3DpL8Sf.

111. Sarbanes–Oxley Act of 2002 § 406. The stock exchange listing rules elevated this provision from a disclosure to a substantive mandate by requiring that listed public companies adopt a code of ethics meeting certain standards.

112. *See* Steven A. Bank & George S. Georgiev, *Paying High for Low Performance*, 100 MINN. L. REV. HEADNOTES 14, 23-27 (2016). The Sarbanes–Oxley clawback rule is in effect but can be enforced only by the SEC; the Dodd–Frank clawback rule has not been finalized as of this writing.

113. Dodd–Frank Act § 953(b).

114. *Id.* § 1502.

Exhibit 4 to Decl. of Georgiev
191
**SER 1607**

(known as "resource extraction payments");[115] information about mine health and safety (if applicable);[116] and information on whether they have engaged in activities covered by the Iran Sanctions Act.[117] These specialized disclosure rules have been subject to criticism among academic commentators and even by individual members of the SEC.[118] Many were targeted for legislative repeal[119] and two were challenged in court,[120] but, with very limited exception, the rules survived and are in force today.[121]

The expansive regulatory framework discussed here has often been described critically as the "federalization of corpo-

---

115. Section 1504 of the Dodd–Frank Act added Section 13(q) to the Securities Exchange Act of 1934. The original rule promulgated by the SEC was invalidated by Congress in 2017 pursuant to the Congressional Review Act. The SEC adopted a revised version of the rule in December 2020. *See* Disclosure of Payments by Resource Extraction Issuers, Exchange Act Release No. 34–90,679, Dec. 16, 2020, https://www.sec.gov/rules/final/2020/34-90679.pdf.

116. Dodd–Frank Act § 1503.

117. *See* Iran Threat Reduction and Syria Human Rights Act of 2012 (ITRA), Pub. L. No. 112-158, 126 Stat. 1214. Section 219 of the ITRA added a new Section13(r) to the Securities Exchange Act of 1934. *Id.*

118. *See, e.g.,* Michael S. Piwowar, Comm'r, U.S. Sec. & Exch. Comm'n, Remarks at the 34th Annual Current Financial Reporting Issues Conference (Nov. 16, 2015), https://www.sec.gov/news/speech/piwowar-current-financial-reporting-issues-conference.html (criticizing the SEC's adoption of congressionally-mandated pay ratio and conflict minerals disclosure rules and arguing that "[t]he focus on non-material, special interest disclosure provisions is a deplorable corruption of our mission to protect investors, to ensure fair, orderly, and efficient markets, and to facilitate capital formation").

119. Between 2011 and 2017, at least five distinct House bills targeted various Dodd–Frank provisions; none of these bills became law. *See* H.R. 10, 115th Cong. (2017); H.R. 5983, 114th Cong. (2016); H.R. 414, 114th Cong. (2015); H.R. 1135, 113th Cong. (2013); H.R. 1062, 112th Cong. (2011).

120. *See* Nat'l Ass'n of Mfrs. v. SEC, 956 F. Supp. 2d 43, 46 (D.D.C. 2013) (ruling on a challenge to the conflict minerals rule on First Amendment and APA grounds by the National Association of Manufacturers, the Chamber of Commerce, and the Business Roundtable); Am. Petroleum Inst. v. SEC, 953 F. Supp. 2d 5, 8 (D.D.C. 2013) (ruling on a challenge to the resource extraction payments rule).

121. The D.C. Circuit struck down part of the conflict minerals rule but upheld most of it. *See* Nat'l Ass'n of Mfrs. v. SEC, 800 F.3d 518, 170 (D.C. Cir. 2015). For the sake of completeness, it should be noted that even though the Dodd–Frank disclosure mandates discussed here ultimately survived, the SEC did suffer a significant loss at the D.C. Circuit in connection with a different Dodd–Frank rule. *See* Bus. Roundtable v. SEC, 647 F.3d 1144, 1146 (D.C. Cir. 2011) (striking down the SEC's proxy access rule).

Exhibit 4 to Decl. of Georgiev
192
**SER 1608**

rate governance."[122] This is true, but only up to a point. Because "public company" has become a truly elective category, a more apt characterization would be "*quasi*-federalization": there is indeed a federal regulatory regime, but firms now have a meaningful choice about whether to opt into federal regulation, with all the attendant obligations, or whether to avoid those obligations and remain subject only to state corporate law. This argument is explored in more detail in Section III.A.

### 2. *Investor Protection, Capital Formation, and Beyond*

After describing the means of public company regulation, it is worth considering its goals. Unfortunately, due to the size and scope of the regulatory framework, as well as its age and the haphazard patterns through which it has evolved, there is no absolute consensus about these goals as a positive matter—and even less so as a normative matter. The original statutes and the extensive lore of securities law focus repeatedly on investor protection. The term, however, is left undefined and open to interpretation.[123] The putative objects of protection—investors—have been growing ever more heterogeneous over time.[124] This suggests that not only do they need different types of protection but also that their interests may be in direct

---

122. STEINBERG, *supra* note 84. *See also* STEPHEN M. BAINBRIDGE, CORPORATE GOVERNANCE AFTER THE FINANCIAL CRISIS 21, 27–28 (2012).

123. *See, e.g.*, Guttentag, *supra* note 55, at 210 (outlining four distinct conceptions of "investor protection" consistent with legislative history and regulatory practice: protecting investors from fraud; protecting investors from informational asymmetries; protecting investors from tunneling of resources; and protecting investors from making irrational or harmful investment decisions). Separately, if investors' interests are taken to encompass non-financial goals, alongside traditional financial ones, then the scope of investor protection expands considerably and approaches total societal welfare. When investors are fully-diversified "universal owners" holding a slice of the broad economy, they would be rationally interested in maximizing the aggregate value of that slice rather than the value of any individual firm within the investment portfolio. For a modern interpretation and a novel normative framework, see Jeffrey N. Gordon, *Systematic Stewardship* (Eur. Corp. Governance Inst., Working Paper No. 566/2021), https://ssrn.com/abstract=3782814.

124. *See, e.g.*, Tom C.W. Lin, *Reasonable Investor(s)*, 95 B.U. L. REV. 461 (2015) (presenting a typology of heterogeneous investors).

Exhibit 4 to Decl. of Georgiev
193
**SER 1609**

conflict.[125] Even after these matters are settled, there is still the difficult question about the effectiveness of particular regulatory interventions in achieving the investor protection goal.

Since 1996, the securities law statutes also include a triad of additional goals: "promot[ing] efficiency, competition, and capital formation."[126] Among these, the SEC, Congress, and the policy community have focused almost exclusively on capital formation, which is often presented as a foil to investor protection.[127] The concept of capital formation, however, is also undefined; far from having any deep meaning that can guide policymaking, in securities law the term is usually used simply as a stand-in for firms' ability to raise capital.[128] For our purposes, we can ponder whether the goal should be capital formation on the *public* markets or the *private* markets, and what is the *efficient level* of capital formation. From a total welfare point of view, one goal of economic regulation should be allocative efficiency—allocating resources, in this case capital, to their most productive use. Unconstrained capital formation can be in direct conflict with this goal.[129]

---

125. *See id.*; *see also* Iman Anabtawi, *Some Skepticism About Increasing Shareholder Power*, 53 UCLA L. REV. 561 (2006) (discussing heterogeneity in investor profiles and interests).

126. *See* Securities Act of 1933, 15 U.S.C. § 77b(b) (2012); Exchange Act of 1934, 15 U.S.C. § 78c(f) (2012). In 1999, the same provision was added to the Investment Company Act of 1940 and applies to rulemaking thereunder. Investment Company Act of 1940, 15 U.S.C. § 80(a)-2(c) (2012).

127. For a discussion of the relevance and importance of competition to the SEC's mission, see Georgiev, *Too Big to Disclose, supra* note 79, at 658–62.

128. Curiously, the term "capital formation" was imported into mainstream securities regulation discourse *as recently as the 1990s*, without any elaboration. The term was embedded into law by the National Securities Markets Improvements Act of 1996 via the amendments cited in note 126 *supra*. In macroeconomics and neoclassical growth theory, the areas of inquiry where the term has been theorized, capital formation refers to long-term investment as a function of intertemporal choices about saving and consumption. A report to Congress from 1980 that discussed "federal actions that could promote capital formation" only lists macroeconomic and public finance policies, such as reducing the size of the federal deficit, changing various aspects of the tax system, stabilizing the regulatory environment and inflation, and assessing the availability of federal credit. *See* U.S. GOV'T ACCOUNTABILITY OFFICE, PAD-80-24, AN ANALYTICAL FRAMEWORK FOR FEDERAL POLICIES AND PROGRAMS INFLUENCING CAPITAL FORMATION IN THE UNITED STATES v (1980), https://www.gao.gov/assets/pad-80-24.pdf.

129. This point is not merely academic. The rise of private capital has led to very significant losses at firms such as Theranos and many unicorns do not

Exhibit 4 to Decl. of Georgiev
194
**SER 1610**

2021]        *THE BREAKDOWN OF THE PUBLIC–PRIVATE DIVIDE*                257

Increasingly, securities law spills over beyond investor protection and capital formation. Some of the specific public company disclosure rules, particularly rules stemming from Sarbanes–Oxley and Dodd–Frank, are difficult to square with traditional notions of investor protection and capital formation, which suggests that Congress may have had in mind other goals, even if it did not clearly articulate them.[130] Writing in 2013, Langevoort & Thompson noted that "the extent to which—purely as a descriptive matter—securities regulation is about social, political, and economic interests, in addition to investor protection and capital formation, has been seriously underestimated" and characterized securities regulation as "a joint project of experimentation in investor protection coupled with a public-driven demand for more transparency, voice, and accountability . . . as to systemically significant business enterprises."[131] Though this trend continues to meet heavy resistance,[132] it is descriptively accurate, and a further complication to the ambiguities that bedevil both investor protection and capital formation.

Based on the foregoing discussion, one way to summarize the goals of securities law is by thinking about a regulatory scheme that enables investors to maximize risk-adjusted returns on invested capital and firms to maximize funding opportunities (including by minimizing the cost of capital). The question of whether securities law should focus on minimizing societal externalities remains subject to debate, as do questions about allocative efficiency and the proper balance among the various goals. As we will see in the following Part, these definitional and conceptual issues have made it easier to justify different types of legislation, thereby contributing to the breakdown of the public–private divide; unless resolved, these same definitional and conceptual issues are also likely to pre-

---

turn a profit. *See infra* note 176 and accompanying text. On the financial performance of unicorns, see *infra* notes 225 & 235 and accompanying text.

130. *See, e.g.*, Ann M. Lipton, *Beyond Internal and External: A Taxonomy of Mechanisms for Regulating Corporate Conduct*, 2020 WIS. L. REV. 657, 658–61 (2020) (noting a tendency to frame regulatory interventions with reference to shareholder/investor protection even when the subject matter does not justify this).

131. Langevoort & Thompson, *supra* note 4, at 372–73.

132. *See, e.g.*, Piwowar, *supra* note 118.

Exhibit 4 to Decl. of Georgiev
195
**SER 1611**

sent a challenge to repairing the public–private divide and securities law more generally.

<div align="center">

II.

THE ROAD TO THE BREAKDOWN OF THE
PUBLIC–PRIVATE DIVIDE

</div>

This Part examines the numerous, often confounding regulatory and market developments related to public companies since the early 2000s. In the aggregate, these developments have led to the breakdown of the public–private divide. This was a gradual process, whose roots can be traced back to the Sarbanes–Oxley Act in 2002; it gained traction due to the decline in the number of public companies in the 2000s, and ultimately culminated with a long series of deregulatory measures between 2012 and 2020. Because those measures have been self-reinforcing, this Article refers to them as a deregulatory cascade. These developments are described thematically in Section II.B and illustrated by two figures in Section II.C. The bottom line is that the capital raising process in 2021 looks nothing like the capital raising process just two decades prior.[133]

<div align="center">

A.   *SOX as Shock . . . and Scapegoat*

</div>

The Sarbanes–Oxley Act of 2002 (known colloquially as "SOX") was the most ambitious federal law pertaining to public companies since the 1930s. It resulted from the financial scandals in the early 2000s that involved accounting fraud at well-known firms such as Enron, WorldCom, Global Crossings, Tyco, Adelphia, and others.[134] The scandals resulted in bankruptcies, the loss of approximately $1.5 trillion in market

---

133. Based on a close reading of the available evidence, this Article makes the case that the most consequential changes that ultimately transformed securities regulation can be traced back to the 2002 Sarbanes–Oxley Act. To be sure, even though securities regulation was more stable during the prior decades, it was certainly not static. There were several developments that expanded private markets and the availability of exemptions in primary offerings, such as the initial adoption of Regulation D in 1982 and subsequent amendments. On this and other points, a different telling of the deregulation story that follows is certainly possible.

134. *See generally* Jonathan R. Macey, *A Pox on Both Your Houses: Enron, Sarbanes–Oxley and the Debate Concerning the Relative Efficacy of Mandatory Versus Enabling Rules,* 81 WASH. U. L. Q. 329 (2003).

Exhibit 4 to Decl. of Georgiev
196
**SER 1612**

2021]       *THE BREAKDOWN OF THE PUBLIC–PRIVATE DIVIDE*       259

value, and hundreds of thousands of jobs.[135] It also contributed to a general unease about the state of U.S. capitalism at the turn of the 21st century. Thus, SOX sought to restore financial disclosure transparency and revitalize investor confidence in the integrity of U.S. financial markets. As described in Section I.C, for example, SOX requires the CEO and CFO to certify the company's financial statements, and to establish and maintain "disclosure controls and procedures" and "internal control over financial reporting."[136] The Act also focused on the boards of directors of public companies, putting in place various provisions related to director independence and requiring that public companies establish audit committees, with certain membership requirements.[137]

In effect, SOX acted as a shock on the regulatory framework and increased the compliance costs of maintaining public company status. There was widespread skepticism about the Act's benefits among practitioners and prominent academics, one of whom notoriously labeled the legislation "quack corporate governance."[138] This epithet stuck and was applied again when the Dodd–Frank Act came around just eight years later.[139]

The Sarbanes–Oxley Act's provisions were not self-executing but, instead, required implementation through lengthy SEC rulemaking. During this process, many of them were debated and heavily contested.[140] The SEC enjoys broad exemptive authority,[141] so it had the power to delay the effectiveness

---

135. *See* Catherine Valenti, *A Year After Enron, What's Changed?*, ABC News (Nov. 27, 2002), https://abcnews.go.com/Business/story?id=86817 (describing the economic toll of Enron's downfall). For an academic analysis, see generally William W. Bratton, *Enron and the Dark Side of Shareholder Value*, 76 Tul. L. Rev. 1275 (2002).

136. *See supra* notes 96–97 and accompanying text.

137. Sarbanes–Oxley Act of 2002 § 301, 18 U.S.C. § 1350.

138. Roberta Romano, *The Sarbanes–Oxley Act and the Making of Quack Corporate Governance*, 114 Yale L.J. 1521, 1523 (2005).

139. *See* Stephen M. Bainbridge, *Dodd–Frank: Quack Federal Corporate Governance Round II*, 95 Minn. L. Rev. 1781, 1821 (2011).

140. *See, e.g.*, Donald C. Langevoort, *The Social Construction of Sarbanes-Oxley*, 105 Mich. L. Rev. 1817, 1818–19 (2007).

141. In 1996, Congress added Section 36 to the Exchange Act (under which the relevant rules fall), providing the SEC with sweeping general exemptive authority in respect of the Act's provisions "to the extent that such exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors." 15 U.S.C. § 78mm(a)(1).

Exhibit 4 to Decl. of Georgiev
197
**SER 1613**

of some of the Act's provisions and to water down others considerably. As part of the notice-and-comment rulemaking process at the SEC, which lasted for more than half a decade, the Act's opponents focused repeatedly on the high compliance costs imposed by the new rules. This period also saw greater competition from international capital markets; notably, London gained attention by promoting its light-touch regulation approach.[142] Two prominent working groups were formed to examine the competitiveness of U.S. capital markets. The resulting reports highlighted the high compliance costs associated with Sarbanes–Oxley's prescriptive mandates,[143] particularly as contrasted with the well-branded "principles-based regulation"[144] approach in the United Kingdom.[145]

The narrative about compliance costs was bolstered by an easily observable and troubling phenomenon: a substantial decline in new IPOs, which was rationally (though still hastily)

---

142. *See, e.g.*, Roel C. Campos, Comm'r, U.S. Sec. & Exch. Comm'n, SEC Regulation Outside the United States (Mar. 8, 2007), https://www.sec.gov/news/speech/2007/spch030807rcc.htm (criticizing the "light touch" regime in the United Kingdom).

143. A 2007 McKinsey and New York City Economic Development Corporation report, which came to be known as the Bloomberg–Schumer Report, considered New York's and the United States' role within global financial markets. One of its headline findings was that "recent legislative and regulatory actions are hurting America's financial competitiveness." *See* McKinsey & Co. & N.Y.C. Econ. Dev. Corp., Sustaining New York's and the US' Global Financial Services Leadership ii, 86–87 (2007), https://on.nyc.gov/3D6zMSR. A contemporaneous report by the Committee on Capital Markets Regulation concluded that "[b]y any meaningful measure, the competitiveness of the U.S. public equity market has deteriorated significantly in recent years." Comm. on Cap. Mkts. Regul., The Competitive Position of the U.S. Public Equity Market 1 (2007), https://bit.ly/3xEn5Ob.

144. The term "principles-based regulation" in corporate law and financial regulation has long functioned as a means of encouraging deregulation. *See, e.g.*, Lawrence A. Cunningham, *A Prescription to Retire the Rhetoric of 'Principles-Based Systems' in Corporate Law, Securities Regulation and Accounting*, 60 Vand. L. Rev. 1411 (2007).

145. The perception of stagnation in the United States at the time was also driven in part by the significant openness to experimentation in capital markets in other jurisdictions. *See, e.g.*, Ronald J. Gilson, Henry Hansmann & Mariana Pargendler, *Regulatory Dualism as a Development Strategy: Corporate Reform in Brazil, the United States, and the European Union*, 63 Stan. L. Rev. 475 (2011) (discussing capital market innovations in the European Union and Brazil).

Exhibit 4 to Decl. of Georgiev
198
**SER 1614**

2021]        *THE BREAKDOWN OF THE PUBLIC–PRIVATE DIVIDE*        261

attributed to the increased costs of being a public company.[146]
Another element of this narrative was the "going dark" phe-
nomenon, where public companies delisted their securities
and thus exited the public company regulatory sphere.[147] By
the start of the 2010s, the total number of public companies in
the United States had shrunk by half, from a peak of 8,025 in
1996 down to 4,101 in 2012; the U.S. decline ran counter to
international trends and was taken as evidence of a significant
"listings gap."[148] The scale and persistence of this phenome-
non gave further credence to the over-regulation narrative,
which had always appeared intuitive. The business press regu-
larly ran articles about the death or decline of the public com-

---

146. *See, e.g.*, *The Lure of the Private Firm*, ECONOMIST (Nov. 17, 2004),
https://econ.st/3dUF6yy ("The Sarbanes-Oxley legislation . . . has imposed
on public companies much onerous corporate-governance compliance—a
source of constant complaint from bosses in America and beyond."); Russ
Garland, *Fixing Public Markets' "Systemic Dysfunction,"* WALL ST. J. (Nov. 9,
2009), https://on.wsj.com/3I5JUzk (reporting "evidence of a serious and
systemic dysfunction" in public markets and asserting that Sarbanes–Oxley
rules are "the main scapegoat") (internal quotations omitted); *Uncuffing
Capitalism*, ECONOMIST (Mar. 31, 2012), https://econ.st/3xvT439 (noting
that "onerous regulations" such as Sarbanes–Oxley and Dodd–Frank are to
blame for an "IPO drought").

147. The "going dark" phenomenon did not occur spontaneously. Regula-
tory changes from the mid-2000s greatly facilitated the process of delisting,
i.e., the exit of public companies from the regulated public realm. Some of
those changes were overdue and much needed. But they may have been
overbroad in that they created a rush to the exits, which became known as
"going dark." This decreased the overall size of public markets and may have
resulted in the delisting (and thus, deregulation) of firms that should have
remained public. *See* Jesse M. Fried, *Firms Gone Dark*, 76 U. CHI. L. REV. 135,
140–43 (2009) (describing the delisting process); *see also* Elisabeth de
Fontenay, *Private Equity Firms as Gatekeepers*, 33 REV. BANKING & FIN. L. 115,
123 n.33 (2013). This also routinized "going private" transactions, which in-
volve one investor (or a group of investors), such as a private equity fund,
acquiring the publicly held stock of a company, whether through a merger
or tender offer; some firms have used this process—traditionally thought of
as a once-in-lifecycle transaction—with some frequency and in value-destroy-
ing ways. *See, e.g.*, David Scigliuzzo et al., *How Private Equity Works, and Took
Over Everything*, BLOOMBERG BUSINESSWEEK (Oct. 3, 2019), https://
bloom.bg/3p5Urlf.

148. *See* Craig Doidge et al., *The U.S. Listing Gap* 2 (Nat'l Bureau of Econ.
Rsch., Working Paper No. 21,181, 2015) ("The number of U.S. listings fell
from 8,025 in 1996 to 4,101 in 2012, whereas non-U.S. listings increased
from 30,734 to 39,427.").

Exhibit 4 to Decl. of Georgiev
199
**SER 1615**

pany, public capital markets, and IPOs.[149] Commentators and policymakers began to consider measures to reverse these phenomena by decreasing the subset of companies to which Sarbanes–Oxley, and the rest of public company regulation, applies.[150] In short, Sarbanes–Oxley catalyzed the erosion of the public company regulatory sphere and, for a long time, market data provided the oxygen to keep this process going.

Well over a decade after Sarbanes–Oxley's adoption, it turned out that the over-regulation narrative was not just oversimplified but also wrong. High-quality empirical studies found that other factors caused the decline in IPO activity and the number of public companies. One study showed that the decline in small-firm IPOs started in 1998, well before the adoption of Sarbanes–Oxley and Dodd–Frank, and is attributable to a decrease in demand by institutional investors rather than to supply-side factors such as the cost of being a public company.[151] Another study noted that "market forces *independent of regulation*" (including increased M&A activity, greater availability of private capital, and changes in investment patterns) explained the decline in IPOs.[152] The study also highlighted the fact that the decline in IPOs was primarily a de-

---

149. *See, e.g.,* Jason Zweig, *The Demise of the IPO—and Ideas on How to Revive It*, WALL ST. J. (June 25, 2010), https://on.wsj.com/3D39mlc (analyzing various challenges to IPO activity and stating that the IPO market is in "suspended animation"); Alix Stuart, *Missing: Public Companies – Why is the Number of Publicly Traded Companies in the U.S. Declining?*, CFO MAG. (Mar. 22, 2011), https://bit.ly/3xEnCj9 (discussing data on the decrease in the number of public companies and new IPOs and advocating for "a completely different market model" (quoting Edward Kim, capital markets senior advisor at Grant Thornton)); Brad Stone, *Silicon Valley Cashes Out Selling Private Shares*, BLOOMBERG BUSINESSWEEK (Apr. 21, 2011), https://bloom.bg/3E7ep5m (noting that "[o]wing to the Sarbanes-Oxley Act and other regulatory changes to capital markets over the past decade, the IPO is no longer an attractive goal for many companies"); Andrew Ross Sorkin, *C.E.O.s Meet in Secret over the Sorry State of Public Companies*, N.Y. TIMES (July 21, 2016), https://nyti.ms/3xFzf9G (asserting that "[p]ublicly listed companies in the United States have become something of a dying breed").

150. *See supra* note 141 and accompanying text.

151. *See* Robert P. Bartlett III, Paul Rose & Steven Davidoff Solomon, *The Small IPO and the Investing Preferences of Mutual Funds*, 47 J. CORP. FIN. 151, 163, 165 (2017).

152. *See* Paul Rose & Steven Davidoff Solomon, *Where Have All the IPOs Gone: The Hard Life of the Small IPO*, 6 HARV. BUS. L. REV. 83, 87 (2016) (emphasis added).

Exhibit 4 to Decl. of Georgiev
200
**SER 1616**

cline in small-firm IPOs, not IPOs across the board.[153] A third empirical study similarly rejected the "regulatory overreach" hypothesis.[154] Neither the findings of these studies, which never truly penetrated the policymaking community,[155] nor the recovery in the annual number of IPOs during much of the 2010s,[156] were successful in stopping the deregulatory cascade, which at that point was well underway. As we will see, the 2012 JOBS Act and the SEC's concerted push to deregulate capital raising during the tenure of Chairman Jay Clayton scrambled the internal logic of securities regulation and set off a process of regulatory line-drawing, re-drawing, and, ultimately, erasure.

Another point, discussed in more detail in Section III.B, deserves mention here. The high compliance costs of Sarbanes–Oxley and Dodd–Frank were blamed for causing the demise of the "public company" as a type of business entity. Yet, "public company" is merely a regulatory category that captures certain entities if they meet a set of pre-defined characteristics.[157] As we will see, Sarbanes–Oxley and Dodd–Frank may have caused the near-demise of "public company" as a regulatory category by feeding into the over-regulation narrative and instigating the deregulatory cascade of the 2010s.

---

153. *Id.* at 87, 120.

154. *See* Xiaohui Gao, Jay R. Ritter & Zhongyan Zhu, *Where Have All the IPOs Gone?*, 48 J. FIN. & QUANT. ANALYSIS 1663, 1669–71 (2013) (rejecting a "regulatory overreach" hypothesis for the decline in the number of small-firm IPOs in favor of an "economies of scope" hypothesis that focuses on the advantages enjoyed by large firms). As I have discussed in prior work, these large-firm advantages also stem from the application of a key tool of securities regulation—the *TSC Industries* materiality standard embedded in a number of disclosure rules, which does not take into account firm size. *See* Georgiev, *Too Big to Disclose*, *supra* note 79, at 652–62 (suggesting that materiality functions as a "regulatory subsidy for bigness" since it often enables large firms to disclose less information than small firms).

155. Congress continued to hold hearings themed around solving the purported problem of regulatory overreach. *See, e.g., The Cost of Being a Public Company in Light of Sarbanes Oxley and the Federalization of Corporate Governance: Hearing Before the Subcomm. on Cap. Mkts, Sec., & Inv. of the H. Comm. on Fin. Servs.*, 115th Cong. (July 18, 2017).

156. *See infra* Appendix, Figure A–1.

157. *See supra* Section I.B.1.

Exhibit 4 to Decl. of Georgiev
201
SER 1617

264 *NYU JOURNAL OF LAW & BUSINESS* [Vol. 18:221

### B. *The Deregulatory Cascade*

The public model of financing, whereby a growing company needs to go public in order to access additional capital and, as part of this process, commits to public company regulation, was the dominant model for much of the 20th century and at the dawn of the 21st century. Just two decades later, in 2021, this is no longer the case. The transformation of the capital raising ecosystem has been the product of numerous actions taken by Congress and the SEC, mostly during the 2010s, that have touched and altered virtually every aspect of the regulatory system governing firms' capital raising activities: the types of capital, the types of investors, and types of markets that firms of different kinds can access in exchange for undertaking certain legal obligations.

This section starts by analyzing the political economy of the deregulatory cascade and then thematically sets out the many technical deregulatory developments that have occurred, primarily since the passage of the JOBS Act in 2012. The figures in Section II.C provide a schematic illustration of these developments. At the outset, I should note that not every individual development that is part of the deregulatory cascade is problematic as a matter of policy; indeed, some were well-advised and overdue. But their execution—and the combination of sensible changes and changes hastily put in place to serve ideological goals—render the deregulatory cascade a negative development as a whole.

After the Dodd–Frank Act was signed into law in July 2010, many in the media and policy establishment in Washington, D.C. assumed that the mission of preventing a repeat of the 2008 financial crisis had been accomplished and moved on to other hot-button issues. Others immediately shifted their attention to the fraught process of agency rulemaking needed to implement the Act's provisions.[158] But less than two years later (and working in Dodd–Frank's shadow), Congress hastily passed another important piece of financial legislation, which

---

158. *See, e.g.,* Steven A. Bank & George S. Georgiev, *Securities Disclosure As Soundbite: The Case of CEO Pay Ratios,* 60 B.C. L. REV. 1123, 1128–29, 1139 (2019) (discussing the protracted process of implementing the pay ratio disclosure mandate contained in the Dodd–Frank Act).

Exhibit 4 to Decl. of Georgiev
202
**SER 1618**

2021]        *THE BREAKDOWN OF THE PUBLIC–PRIVATE DIVIDE*        265

received relatively little popular attention: the strategically-titled JOBS Act of 2012.[159]

The JOBS Act contained a smorgasbord of provisions related to equity crowdfunding, amendments to various securities offering rules, the creation of a new, time-limited regulatory category—the "emerging growth company" (EGC), and a directive to the SEC to study further changes to the securities disclosure regime. The only broad themes that can be discerned in the JOBS Act are *laissez-faire* capital formation and an attempt to reverse the supposed regulatory overreach of Sarbanes–Oxley and Dodd–Frank.[160] It likely would have been impossible to sell this grand deregulatory design politically if it had been clearly reflected in the JOBS Act. Instead, the JOBS Act proceeded piecemeal through a series of small and easy-to-overlook rule amendments, exemptions, and efforts to "modernize" the regulatory framework.

The political economy of the JOBS Act is worth noting because it challenges the view of securities regulation as a technocratic enterprise—a special and highly-specialized type of economic regulation that is relatively free of interest group lobbying and political influence. The JOBS Act was heavily supported by tech companies in Silicon Valley during an era of unbridled tech optimism among policymakers and the media;[161] shortly after, Amazon, Facebook, Google/Alphabet, Microsoft, and Apple joined the ranks of the world's largest companies, which they hold to this day. The Obama adminis-

---

159. The Act's awkward full title—the Jumpstart Our Business Startups Act—illustrates the linguistic gymnastics its drafters employed to arrive at the palatable acronym "JOBS." Though very little, if anything, in the Act was substantively related to boosting jobs and employment, the JOBS moniker made it more difficult to oppose the bill during a period of high unemployment and the lagging recovery from the 2008 financial crisis.

160. The SEC's approach in implementing congressional mandates and amending its own rules during the 2010s, at least as exemplified by the rhetoric of a number of SEC Commissioners and senior staff, has focused on capital formation, with more always being better. This basic premise is flawed when viewed from the point of view of financial economics and management science. To mention just a few possibilities, firms can easily become overleveraged, capital may be misallocated, and too much capital may lead to corporate waste and inefficiencies.

161. *See* James Freeman, *Kate Mitchell: How Silicon Valley Won in Washington*, WALL ST. J. (Apr. 6, 2012), https://on.wsj.com/3lCsQaz (discussing the role of tech firm lobbying in generating bipartisan political backing for the JOBS Act).

Exhibit 4 to Decl. of Georgiev
203
SER 1619

tration was firm in its support of the JOBS Act,[162] even though investors, other stakeholders, academics, and the Obama-appointed SEC Chair raised a series of concerns.[163] Even the name of the legislation, meant to evoke job creation, was a brilliant stroke of Silicon Valley marketing. A link between the JOBS Act's provisions and actual jobs was never demonstrated and has not materialized. In fact, to the extent the JOBS Act contributed to the rise of the gig economy exemplified by firms such as Uber and DoorDash where workers are independent contractors instead of employees and do not benefit from various worker protections, the JOBS Act may have contributed to the destruction of conventional jobs.

By facilitating the raising of capital on the *private* markets, certain JOBS Act provisions resulted in decreased *public* capital formation. Recall, however, that public capital formation was the problem, whether real or imagined, that the JOBS Act was supposed to solve. When the solutions did not come, Congress doubled down by adding provisions deregulating capital formation (dubbed JOBS Act 2.0) in the infrastructure-focused FAST Act in 2015.[164] The SEC quickly implemented the provisions of the FAST Act, even though the agency still had a back-

---

162. The genesis of many of the specific ideas contained in the JOBS Act can be traced back to a report prepared by the IPO Task Force, an ad hoc group dominated by Silicon Valley entrepreneurs, venture capitalists, and the bankers, lawyers and accountants representing them. *See* IPO TASK FORCE, REBUILDING THE IPO ON-RAMP: PUTTING EMERGING COMPANIES AND THE JOB MARKET BACK ON THE ROAD TO GROWTH (2011), https://www.sec.gov/info/smallbus/acsec/rebuilding_the_ipo_on-ramp.pdf; *see also* Freeman, *supra* note 161 (noting how a Democratic venture capitalist shepherded the JOBS Act); *see also* Pritchard, *supra* note 51, at 1008–09 (noting that President Obama signed the bill into law because he was "anxious to portray himself as 'pro-growth' while facing an economy still plagued by high levels of unemployment").

163. *See* 158 Cong. Rec. 1698–99 (2012) (letter of SEC Chairman Mary L. Schapiro) (expressing the SEC's concern with various provisions in the draft version of the bill, which ultimately became law). Academic commentators also raised concerns. *See* John Coates & Robert Pozen, *Bill to Help Businesses Raise Capital Goes Too Far*, WASH. POST (Mar. 14, 2012), https://wapo.st/3FVm6fv; *Spurring Job Growth Through Capital Formation While Protecting Investors: Hearing Before the S. Comm. on Banking, Housing, & Urb. Affs.*, 112th Cong. 13 (2011) (statement of John C. Coffee, Jr., Professor, Columbia University Law School).

164. *See* Stacy Kanter, *FAST Act: Capital Formation Changes and Reduced Disclosure Burdens*, HARV. L. SCH. F. ON CORP. GOVERNANCE (Dec. 29, 2015), https://bit.ly/3HZ2Yz5. The FAST Act included technical changes, such as

Exhibit 4 to Decl. of Georgiev
204
SER 1620

2021]        *THE BREAKDOWN OF THE PUBLIC–PRIVATE DIVIDE*        267

log of unfinished, congressionally-required rulemakings under the Dodd–Frank Act from five years prior. Thus, the SEC continued to prioritize the deregulation of the *private* markets in the name of *public* capital formation.

The deregulatory cycle was completed just a day before the November 2020 presidential election, with the looming prospect of a new administration, new composition of the SEC, and a policy reversal. On a split 3–2 vote, the agency adopted extensive rule amendments ostensibly seeking to "harmonize and improve" the "patchwork" private offering framework.[165] In reality, however, the SEC retained the "patchwork" and merely increased the size of the constitutive exemption "patches." Among other matters, the amendments changed existing limits on the timing and size of private offerings.[166] In effect, they permitted larger and more frequent private offerings to be offered more widely to the general public. Notably, the SEC was also tasked by Congress with taking some steps that modernized the regulatory framework by updating rather than eroding it. Updating Form D to make it more informative and updating the wealth thresholds under the definition of "accredited investor" are a case in point.[167] The SEC

---

codifying the informal Section 4(a)(1½) exemption for private resales and it also expanded further the accommodations provided to EGCs. *Id.*

165. *See* Press Release, U.S. Sec. & Exch. Comm'n, SEC Harmonizes and Improves "Patchwork" Exempt Offering Framework (Nov. 2, 2020), https://www.sec.gov/news/press-release/2020-273 [hereinafter Summary of November 2020 Amendments]; *see also* Adam Fleisher et al., *SEC Harmonizes Regulation and Improves Access to Capital in Private Markets*, Harv. L. Sch. F. on Corp. Governance (Dec. 8, 2020), https://bit.ly/3rA1HIZ (describing amendments and noting the 3–2 vote).

166. *See* U.S. Sec. & Exch. Comm'n, Facilitating Capital Formation and Expanding Investment Opportunities by Improving Access to Capital in Private Markets, Final Rule, Rel. No. 33-10,884 (adopted Nov. 2, 2020), 86 Fed. Reg. 3496 (Mar. 15, 2021) (including amendments to: raise offering limits for certain exempt offerings; relax investment limitations for certain investors; shorten the integration safe harbor period from six months to 30 days; expand the use of test-the-waters communications across all exempt offerings and for all types of investors; reduce disclosure requirements under Regulation D; and permit the creation of a crowdfunding special purpose vehicle, among other matters).

167. The SEC has failed to finalize its 2013 proposal to amend Form D to enhance investors' ability to evaluate offerings under Regulation D. *See* Amendments to Regulation D, Form D, and Rule 156, 78 Fed. Reg. 61,222 (proposed July 10, 2013). In addition, it has failed to adjust the accredited

Exhibit 4 to Decl. of Georgiev
205
**SER 1621**

placed these low on its priority list and, as of this writing, has not completed the required rulemakings.

The late stages of the deregulatory cascade of the 2010s were also characterized by a curious shift in rhetoric. Previously, lobbyists had used "capital formation" as the primary justification for deregulation; while poorly defined, the term "capital formation" is part of the SEC's mission.[168] In light of the growth of private markets, the rise of unicorns, and the recovery of the IPO market, however, it is becoming increasingly difficult to argue that firms are having a difficult time raising capital. To account for this, lobbying efforts leading up to the November 2020 amendments focused on giving retail investors appropriate investment opportunities, which included giving them access to the unregulated private markets.[169] The SEC enthusiastically picked up on the "investor opportunity" leitmotif in the proposing and adopting releases pertaining to the November 2020 amendments. This was done with little regard for the risks inherent in such opportunities and traditional notions of investor protection.[170] Another way to frame this set of initiatives that similarly conceals their prob-

---

investor wealth thresholds to account for inflation. *See infra* note 183 and accompanying text.

168. *See, e.g., What We Do*, U.S. SEC. & EXCH. COMM'N, https://www.sec.gov/Article/whatwedo.html (last modified Nov. 22, 2021) (stating the SEC's mission as "protecting investors, maintaining fair, orderly, and efficient markets, and facilitating capital formation"). *See also* discussion *infra* Section I.C.2.

169. *See, e.g.*, COMM. ON CAP. MKTS. REGUL., EXPANDING OPPORTUNITIES FOR INVESTORS AND RETIREES: PRIVATE EQUITY (2018), https://bit.ly/3y1mK8C (advocating for a number of deregulatory changes which were subsequently adopted, with reference to "expanding opportunities").

170. *See, e.g.*, Press Release, Allison Herren Lee, Comm'r, U.S. Sec. & Exch. Comm'n, Public Statement on Amendments to the Exempt Offering Framework (Nov. 2, 2020), https://www.sec.gov/news/public-statement/lee-harmonization-2020-11-02. SEC Commissioner Hester Peirce has defined "investor opportunity" as "the chance for investors to try new products and services, to include in their portfolios new types of assets, to use the latest technologies, to get in on the ground floor of new opportunities, to experiment and learn from investment successes and failures." *See* Hester M. Peirce, Comm'r, U.S. Sec. & Exch. Comm'n, Remarks at Meeting of Investor Advisory Committee (Sept. 9, 2021), https://www.sec.gov/news/public-statement/peirce-iac-090921.

Exhibit 4 to Decl. of Georgiev
206
**SER 1622**

2021]        *THE BREAKDOWN OF THE PUBLIC–PRIVATE DIVIDE*        269

lematic nature has been as an effort to "democratize" capital markets.[171]

Zooming out, the developments that made up the deregulatory cascade were not only highly technical but also piecemeal. The discussion that follows organizes these developments around themes. The thematic approach adopted here and in the two figures in Section II.C offers a big-picture overview of how the many individual developments from the 2010s have transformed the legal framework for capital raising. The deregulatory cascade is defined by decisions from Congress, the SEC, and, in one instance, the Department of Labor, along the following six overlapping dimensions: (1) enabling the rise of unicorns; (2) emphasizing private markets over public markets; (3) enabling the dramatic rise of private equity; (4) allowing public capital into private companies; (5) transforming public capital into private capital; and (6) promoting regulation-lite regimes.

*(1) Enabling the Rise of Unicorns:* Perhaps the most visible development in capital markets during the 2010s has been the rise of "unicorns": firms with valuations over $1 billion that have not (yet) conducted an initial public offering and are not public companies. Fast-growing firms like SpaceX (private valuation: $100.3 billion), Stripe ($95 billion), Instacart ($39 billion), Juul Labs ($12 billion), Ripple ($10 billion), Reddit ($10 billion), and MasterClass ($2.75 billion) are just some of the more familiar names that currently fall in this category; Uber, Lyft, Box, Dropbox, Airbnb, Doordash, Spotify, and Robinhood, among many others, are ex-unicorns.[172] As noted in the Introduction, the growth in the number and implied market value of unicorns has been staggering: from 43 unicorns when the term was first coined in 2013 to 473 unicorns

---

171. *See, e.g.*, Anat Alon-Beck, *Alternative Venture Capital: The New Unicorn Investors*, 87 Tenn. L. Rev. 983, 994–1000 (2020) (discussing "democratization" of private markets). The benign-sounding rhetoric of democratizing markets echoes the marketing efforts of ill-fated fintech startups, such as Robinhood. *See, e.g.*, Jared Dillian, *Robinhood Is Not About the Democratization of Markets*, Bloomberg Op. (Aug. 11, 2021), https://bloom.bg/3q592xB (discussing Robinhood's marketing rhetoric and noting that "[r]etail trading of meme stocks is just a massive transfer of wealth from the unsophisticated to the sophisticated").

172. *See The Complete List of Unicorn Companies*, CB Insights, https://www.cbinsights.com/research-unicorn-companies (last visited Dec. 3, 2021).

Exhibit 4 to Decl. of Georgiev
207
**SER 1623**

in early December 2021, reaching an aggregate implied valuation of $1.58 trillion, which is an eleven-fold increase since 2013, and a nearly three-fold increase in 2021 alone.[173] These developments are not limited to the United States, as shown by Figure A–8 in the Appendix, but extend to capital markets in China and the rest of the world.

Though private, unicorns look and behave like public companies in terms of market capitalization, number of employees, global reach, and potential for inflicting externalities. They have been able to raise capital and sustain their growth without tapping the public markets. The previous generation of fast-growing tech companies, such as Google, Amazon, and others, had to conduct an IPO much earlier in their lifecycle and, correspondingly, achieved the bulk of their present-day market capitalization in the public markets (as shown by Figure A–7 in the Appendix). Today, unicorn companies are so ubiquitous in the U.S. economy that the unicorn label seems like a misnomer.

The rise of unicorns was a regulatory development due to the much wider availability of "private capital."[174] In addition, the JOBS Act raised the mandatory registration thresholds contained in Section 12(g) of the Exchange Act, enabling companies to acquire a much larger investor base before mandatory registration (and federal corporate governance regulation) is required.[175] As discussed below, the SEC has also adopted various rules that encourage private placements, which permit unicorns to raise substantial capital without trading unicorn status (and the associated freedom and secrecy) for public company status (and the associated regulatory compliance obligations and transparency). The SEC and Congress failed to anticipate and account for the informational

---

173. *See supra* Figure 1 & notes 13–14 and accompanying text.

174. *See* de Fontenay, *supra* note 22, at 447.

175. Recall that Section 12(g) of the Exchange Act, as amended by the JOBS Act, requires a company to register its securities under the Exchange Act if it has $10 million or more in total assets and a class of equity securities "held of record" by 2000 or more persons (or 500 or more persons who are not "accredited investors"). *See supra* note 77 and accompanying text. The question about the reach of Section 12(g) is not a simple one. Usha Rodrigues, for example, has argued that the rule was irrelevant even before the JOBS Act. *See* Usha R. Rodrigues, *The Once and Future Irrelevancy of Section 12(g)*, 2015 U. Ill. L. Rev. 1529 (2015).

Exhibit 4 to Decl. of Georgiev
208
**SER 1624**

2021]        *THE BREAKDOWN OF THE PUBLIC–PRIVATE DIVIDE*        271

problems raised by unicorns, and these problems quickly morphed into governance problems, as illustrated by the multiple scandals at WeWork, Uber, Theranos, and elsewhere.[176]

*(2) Emphasizing Private Markets Over Public Markets:* The expansion of exemptions from public registration, most prominently under Rule 506,[177] has made it easier and easier for firms to attain scale solely based on the investment of accredited investors. Rule 701 has made it easier for private companies to pay employees in stock and stock options; while the rule has been around since the 1980s, the growth in the number of unicorns and their total employee headcount during the 2010s, as well as the doubling of relevant offering limits in 2018, has amplified the rule's significance.[178] New, creative ways of doing the same have been under consideration;[179] these would, for instance, allow private platform companies, like pre-IPO Uber and Airbnb, to pay non-employee drivers and hosts, respectively, with stock. These private transactions further undermine the need for public markets, from the per-

---

176. *See, e.g.,* Rani Molla & Shirin Ghaffary, *The WeWork Mess, Explained,* Vox (Oct. 22, 2019), https://bit.ly/3rf663J (discussing governance problems at WeWork); Georgiev, *Uber-Sized Wrecks, supra* note 57 (discussing Uber); John Carreyrou, *SEC Charges Theranos CEO Elizabeth Holmes With Fraud,* Wall St. J. (Mar. 14, 2018), https://on.wsj.com/3lgMYyN (discussing Theranos).

177. 17 C.F.R. § 230.506 (2021). Though the availability of aggregate data is limited, the SEC's Concept Release suggests that most private capital is raised using the exemptions provided in Rule 506(b) and Rule 506(c). *See* U.S. Sec. & Exch. Comm'n, Concept Release on Harmonization of Securities Offering Exemptions, 84 Fed. Reg. 30,460, 30,466 (June 26, 2019).

178. SEC Rule 701, adopted in 1988, allows private companies to offer and sell securities as part of compensatory arrangements without the need to register the securities. *See* Compensatory Benefit Plans and Contracts, Securities Act Release No. 33–6768, 53 Fed. Reg. 12,918–19 (Apr. 20, 1988). While this provision is not new, its use increased considerably in the post-JOBS Act capital markets ecosystem. In addition, as directed by the Economic Growth, Regulatory Relief, and Consumer Protection Act of 2018, the SEC increased from $5 million to $10 million the 12-month offering threshold in excess of which firms are required to deliver additional information to employee-investors. *See* U.S. Sec. & Exch. Comm'n, Press Release, SEC Adopts Final Rules and Solicits Public Comment on Ways to Modernize Offerings Pursuant to Compensatory Arrangements (July 18, 2018), https://www.sec.gov/news/press-release/2018-135.

179. *See* Concept Release on Compensatory Securities Offerings and Sales, Exchange Act Release No. 33–10,521, 83 Fed. Reg. 34,958–59 (July 24, 2018).

Exhibit 4 to Decl. of Georgiev
209
**SER 1625**

272                    *NYU JOURNAL OF LAW & BUSINESS*                    [Vol. 18:221

spective of both firms and investors. The so-called Regulation A+ enables firms to raise certain amounts of capital from public investors without becoming subject to public company regulation.[180]

The November 2020 amendments to the securities laws changed existing limits on the timing and size of private offerings. For example, the SEC raised the offering limit in Regulation Crowdfunding from $1.07 million to $5 million, while at the same time removing the cap on the amounts accredited investors can invest in each offering.[181] This affected both the supply and demand sides of these transactions. Similarly, the SEC doubled the limit for offerings under Rule 504 of Regulation D, from $5 million to $10 million.[182]

One notable feature of the November 2010 amendments is that even though the SEC raised the offering limits, presumably, at least in part, to account for inflation, it did not raise the thresholds under the definition of "accredited investor." Recall from Part I that this category seeks to capture certain wealthy investors, who are presumed to be less sensitive to financial losses, and/or more financially-sophisticated investors. Failing to update qualification requirements for inflation has led to a 550% increase in the percentage of households qualifying as accredited investors since 1983 (from 2% of all U.S. households to 13% of all U.S. households).[183] In practice, this means that there has been a 550% increase in the share of households that can be exposed to unregulated (and often risky) financial instruments.

*(3) Enabling the Dramatic Rise of Private Equity:* Private assets under management have grown more than five-fold since

---

180. Adopted in April 2015, the rules referred to as Regulation A+ revise Regulation A to create two separate tiers of exempt securities offerings not exceeding $20 million and $50 million, respectively, in any 12-month period. *See* Amendments for Small and Additional Issues Exemptions Under the Securities Act (Regulation A), Securities Act Release No. 9741, Exchange Act Release No. 74,578, Trust Indenture Act Release No. 2501, 80 Fed. Reg. 21,806 (Apr. 20, 2015). These limits were raised through the November 2020 amendments discussed below. The market performance of firms taking advantage of these provisions has been dismal. *See infra* note 226 and accompanying text.

181. *See* Summary of November 2020 Amendments, *supra* note 165.

182. *Id.*

183. *See* Amending the "Accredited Investor" Definition, Securities Act Release No. 10,824, Exchange Act Release No. 89,669 (Aug. 26, 2020).

Exhibit 4 to Decl. of Georgiev
210
SER 1626

2000: from less than $1 trillion in 2000 to more than $5 trillion in 2017.[184] The existence of this sizeable pool of private capital has gradually undermined the essential nature of public markets to capital raising.[185] The rise of private equity has resulted from a combination of active deregulation and abstention from regulating new types of transactions that are functionally equivalent to transactions that had been regulated in the past.

*(4) Allowing Public Capital into Private Companies:* The SEC permits mutual funds to invest up to 15% of their assets in the stock of private companies.[186] Mutual funds represent trillions in capital that originates from prototypical "public" investors, i.e., unsophisticated investors who should get protection from the securities laws. For example, in 2018, the 12th-largest investment in Fidelity's $25 billion Blue Chip Growth Fund was a $438 million stake in Juul (a private company that does not seem to fit the "blue chip" label in the fund's name); the fund's investment in unicorn Juul was greater than its investment in true "blue chip" firms like MasterCard and Netflix.[187] The investor protection concerns associated with this development are many and varied.[188] The expansion of the offering exemptions discussed under item (2) above represents another mechanism through which more and more public capital can flow into private companies.

*(5) Transforming Public Capital into Private Capital:* In addition to allowing public capital into private companies directly, there are now multiple other, indirect ways for public capital to end up in private companies. A 2020 rule change from the Department of Labor allowed defined contribution plans to

---

184. Frank Partnoy, *The Death of the IPO*, ATLANTIC (Nov. 2018), https://bit.ly/3rf677N.

185. *See id.*; *see also infra* Appendix, Figure A–3 (showing growth in assets under management for the U.S. buyout industry) & Figure A–6 (showing global growth of the private equity industry).

186. *See* U.S. Sec. & Exch. Comm'n, Revisions of Guidelines to Form N-1A, Investment Company Act Release No. 18,612 (Mar. 12, 1992) (setting out 15% limit on holdings of restricted securities or other assets not having readily available market quotations, an increase from the 10% limit previously in effect).

187. *See* Partnoy, *supra* note 184.

188. For a normative analysis of this phenomenon, see Jeff Schwartz, *Should Mutual Funds Invest in Startups? A Case Study of Fidelity Magellan Fund's Investments in Unicorns (and Other Startups) and the Regulatory Implications*, 95 N.C. L. REV. 1341 (2017).

Exhibit 4 to Decl. of Georgiev
211
SER 1627

274                 *NYU JOURNAL OF LAW & BUSINESS*                 [Vol. 18:221

offer private equity as an investment option.[189] In effect, this allows public investors to route retirement savings into private equity funds; those funds can, in turn, invest freely in private companies. This move was endorsed by SEC Chairman Jay Clayton and fit with the agency's broader agenda at the time of allowing "main street" investors to access the private markets.[190] This development was foreshadowed by legal changes from 2006, which narrowed the scope of ERISA restrictions and gave more public pension plans access to private equity.[191]

*(6) Regulation-Lite Regimes:* The JOBS Act also created a new, time-limited category, the Emerging Growth Company, which is subject to what the SEC calls "scaled" regulation, in an effort to induce companies to go public.[192] If they qualify based on certain thresholds, newly-public companies in the first five years of their lifecycle are subject to less regulation.[193] Separately, the "smaller reporting company" category allows certain companies that are publicly traded to avoid public company regulation based on size thresholds related to shares outstanding and revenues.[194] Regulation A+ IPOs, discussed under item (2) above, are another prominent example. The SEC has been raising the applicable qualification thresholds during the 2010s, thereby increasing the number of companies subject to such regulation-lite regimes.

---

189. U.S. Dep't. of Labor, Div. of Fiduciary Interpretations, Opinion Letter (June 3, 2020), https://bit.ly/3o1Eflz.

190. *See* Press Release, U.S. Dep't of Lab., U.S. Department of Labor Issues Information Letter on Private Equity Investments (June 3, 2020), https://bit.ly/3xwLncQ. The press release quotes SEC Chairman Jay Clayton praising the move because it would "provide our long-term Main Street investors with a choice of professionally managed funds that more closely match the diversified public and private market asset allocation strategies pursued by many well-managed pension funds as well as the benefit of selection and monitoring by ERISA fiduciaries." *Id.*

191. *See* Pension Protection Act of 2006, Pub. L. No. 109–280, 120 Stat. 780 (codified as amended in scattered sections of 29 U.S.C.).

192. *See Emerging Growth Companies,* U.S. SEC. EXCH. & COMM'N., https://www.sec.gov/smallbusiness/goingpublic/EGC (last modified July 24, 2019). For an academic analysis, see Jeff Schwartz, *The Law and Economics of Scaled Equity Market Regulation,* 39 J. CORP. L. 347 (2014) (discussing the mechanics and effects of scaled securities regulation).

193. *See* 15 U.S.C. § 77g(a)(2) (setting out registration requirements for EGCs); JOBS Act, Pub. L. No. 112–106, 126 Stat. 306, §§ 102–104 (2012).

194. *See Smaller Reporting Companies,* U.S. SEC. & EXCH. COMM'N., https://www.sec.gov/smallbusiness/goingpublic/SRC (last modified Mar. 15, 2021).

Exhibit 4 to Decl. of Georgiev
212
**SER 1628**

2021]          *THE BREAKDOWN OF THE PUBLIC–PRIVATE DIVIDE*          275

### C. *Capital Raising in 2021 vs. 2000: An Illustration*

Taken together, the changes discussed in Section II.B have transformed the capital raising regulatory regime. Figures 2 and 3 provide a graphic illustration by showing the functional changes between the applicable regulatory framework before the 2000s and the applicable regulatory framework in 2021.

FIGURE 2: SIMPLIFIED OVERVIEW OF THE CAPITAL RAISING
REGULATORY REGIME BEFORE THE 2000s



FIGURE 3: SIMPLIFIED OVERVIEW OF THE CAPITAL RAISING
REGULATORY REGIME IN 2021



Exhibit 4 to Decl. of Georgiev
213
**SER 1629**

As illustrated by Figure 2, before the 2000s, public companies sat at the center of the capital markets. Most capital was public capital (invested through the public markets). The public markets were also the primary way public companies financed themselves. The private (i.e., unregulated) markets were small and underdeveloped. Public companies could finance themselves through private capital in very limited circumstances.[195] Moreover, public capital generally could not flow to private companies. Private companies had to finance themselves with private capital, but the smaller size of the private capital pool made this a limited option. If a private company wanted to grow, it had to gain access to public capital by going through the traditional IPO process discussed in Section I.B.2. And, once public, it was virtually impossible for a public company to revert to private company status. As shown in Figure 2, going public was a one way street.

Figure 3, which illustrates today's capital raising regulatory regime, paints an altogether different picture. As a result of the deregulatory cascade of the 2010s discussed in Section II.B, the pool of private capital is substantially expanded, and, in addition, public capital can easily morph into private capital. Private companies can benefit from this expanded pool of private capital and, in addition, can now also receive public capital. This makes the need to go public—and enter the regulated realm—much less urgent and may indeed obviate it. By raising ever-greater amounts of private capital, private companies can take on "unicorn" status and look very similar to public companies, but without the attendant regulatory obligations. When unicorns do decide to go public, they can do so via an IPO (or direct listing), but, importantly, this decision is now much easier to reverse through a delisting: going public is a two-way street. Moreover, the flow of capital between public markets and public companies is also bidirectional because of the buyback phenomenon, whereby significant amounts of capital are returned to shareholders.[196] There is another

---

195. So-called PIPE (Private Investment in Public Equity) transactions represent the most prominent example. For a description of PIPE transactions, see Thompson & Langevoort, *supra* note 4, at 1598–1601.

196. *See* Matt Phillips, *This Stock Market Rally Has Everything, Except Investors,* N.Y. TIMES (Feb. 25, 2019), https://nyti.ms/3o04fOc; *see also infra* Appendix, Figure A–9 (showing the substantial rise in stock buybacks in the United States during the 2010s).

Exhibit 4 to Decl. of Georgiev
214
**SER 1630**

prominent source of capital for private firms, which is not shown in Figure 3: private firms' own equity, which they use to cover more and more of their labor costs. As discussed in Section I.B.1, unicorns pay for human capital by granting employees stock and stock options. Their ability to do so further diminishes the importance of public markets as a source of capital.

Compare the two figures: The streamlined nature of Figure 2 highlights the fact that before the 2000s, there was a divide between public and private capital (even if it was somewhat porous). By contrast, no such divide can be observed in Figure 3. Public capital flows freely into both public and private companies; private capital, which is now greater in size due to deregulatory developments, can also flow freely into both public and private companies. In effect, public and private capital and public and private markets have now become fungible for a large subset of firms seeking financing.

### D.   *The Fungibility of Public and Private Capital*

In response to the changes in capital formation practices in recent years, the widely-followed financial commentator Matt Levine has observed that "the private markets are the new public markets."[197] One way to interpret this statement is that public capital and private capital have become fungible. But recall that the structure of the current public company regulatory regime is premised on the separation, or non-fungibility, of public and private capital.

The regulatory cascade has facilitated the flow of capital among public and private investors, public and private companies, and public and private markets. Functionally, capital is now free-flowing: what used to be hard regulatory prohibitions are now merely compliance items. A private company can enjoy the same access to finance as a public company by hiring bankers and lawyers to structure capital raising transactions in ways that comply with a complex set of exemptions, carve-outs, and capital raising formalities. Problematically, this state of affairs is actually worse than a universe where capital truly flows freely, since the vestigial regulations are mere formalities that can be avoided, but at the cost of hiring investment bankers

---

197. *See* Matt Levine, *Private Markets Might Be Too Nice*, Bloomberg (Oct. 31, 2019), https://bloom.bg/3CVM4O4.

Exhibit 4 to Decl. of Georgiev
215
**SER 1631**

and lawyers. In other words, for a firm determined to avoid public company regulation, the securities laws have come to be little more than transaction costs.

Unsurprisingly, public capital raised on public markets is becoming increasingly irrelevant; instead, public markets are more important for the purpose of providing liquidity and adjusting the investor base than for raising new capital. Consider again the contrast between newer- and older-generation tech companies. The implied valuation of Uber in the private market was significantly higher than the total value created in the IPO.[198] For a long time, the company's actual market capitalization was below what its initial IPO price indicated.[199] In other words, Uber was built on the private markets, and the public markets were not a part of Uber's growth story. By contrast, as of August 2020 virtually none of Amazon's $1.3 trillion in market capitalization was raised in the private markets, and only 3% of the value created by Alphabet/Google, and 17% of the value created by Facebook, was raised in the private markets.[200]

## III.
## CONSEQUENCES OF THE BREAKDOWN OF THE PUBLIC–PRIVATE DIVIDE

In the aggregate, the myriad of legal interventions described in Part II have led to the breakdown of the foundational public–private divide in securities law. But the fact that the transformation of the legal framework for capital raising has been dramatic does not automatically suggest that the resulting regulatory landscape is problematic. This Part makes the case that it is. As we will see, the breakdown of the public–private divide and the resulting public company regulatory paradox have had significant adverse consequences along four dimensions. The first two are primarily conceptual: Securities law has gone from a mandatory regulatory scheme to one that is largely elective and subject to "issuer choice," which, in turn,

---

198. *See* Mike Isaac et al., *How the Promise of a $120 Billion Uber I.P.O. Evaporated*, N.Y. TIMES (May 15, 2019), https://nyti.ms/32IjFP5.

199. *See* Annie Palmer, *Uber Falls to All-Time Low as Investors Grow More Skeptical*, CNBC (Aug. 12, 2019), https://cnb.cx/3xxhmJQ.

200. Matt Levine, *Public Markets Don't Matter Like They Used To*, BLOOMBERG (Aug. 5, 2020), https://bloom.bg/3E4Szzh.

Exhibit 4 to Decl. of Georgiev
216
**SER 1632**

has diminished the federal government's ability to regulate certain types of economic activity through securities law. The third and fourth sets of consequences pertain to important constituencies: The breakdown of the public–private divide has led to the fragmentation of investor protection across the capital markets and, in addition, it has increased the vulnerability of employee-investors. Whereas prior manifestations of the latter two developments have received attention in the academic literature, the first two developments have largely escaped notice.

## A.   *Elective Regulation, Quasi-Federalization, and "Issuer Choice"*

The mandatory nature of securities regulation, particularly following the 1964 expansion of the Exchange Act through the addition of Section 12(g), has long been subject to critical scrutiny in the legal and finance literature. At its core, the classic case in favor of mandatory disclosure is based on a market failure argument: in the absence of a government mandate, firms cannot be expected to reveal the information, *both positive and negative*, that investors need in order to make investment decisions.[201] Law-and-economics scholars have countered by arguing that capital market efficiency obviates the need for the mandatory disclosure regime, since market forces, notably the competition for scarce investor capital, will induce firms to provide the requisite information.[202] Researchers have conducted numerous empirical studies seeking to assess the relative benefits of public company regulation via mandatory disclosure requirements.[203]

Some of the most concerted and well-known arguments against mandatory securities disclosure are associated with

---

201.  *See, e.g.*, John C. Coffee, Jr., *Market Failure and the Economic Case for a Mandatory Disclosure System*, 70 VA. L. REV. 717, 747 (1984).

202.  *See* Jonathan R. Macey, *Administrative Agency Obsolescence and Interest Group Formation: A Case Study of the SEC at Sixty*, 15 CARDOZO L. REV. 909, 928 (1994).

203.  *See, e.g.*, George J. Benston, *An Appraisal of the Costs and Benefits of Government-Required Disclosure: SEC and FTC Requirements*, 41 LAW & CONTEMP. PROBS. 30, 42 (1977) (expressing skepticism about the benefits of mandatory securities disclosure); Christian Leuz & Peter D. Wysocki, *The Economics of Disclosure and Financial Reporting Regulation: Evidence and Suggestions for Future Research*, 54 J. ACCT. RSCH. 525 (2016) (reviewing a large sample of empirical studies of disclosure regulation).

Exhibit 4 to Decl. of Georgiev
217
**SER 1633**

Roberta Romano, who made a forceful case against regulation in a 1998 article. Romano found that "little empirical evidence suggests that the federal [securities regulation] regime has affirmatively benefited investors," which led her to argue in favor of investor empowerment via "issuer choice"—a system whereby there are a variety of different regulatory frameworks on offer and firms decide whether or not to opt into securities regulation.[204] Romano's article gave rise to one of the most prominent academic debates in securities regulation, which in essence was a debate about the very need for such regulation.[205] Even though the vast majority of scholars have been supportive of some form of mandatory securities regulation,[206] this debate was never settled. The issuer choice idea, however, fell by the wayside in the early 2000s as a result of new market developments that were both unexpected and inconvenient: the dot-com crash and the accounting scandals of the early 2000s.

These market developments stymied whatever interest there may have existed in scaling back securities regulation. Instead of regulatory retrenchment, the federal response to

---

204. *See* Roberta Romano, *Empowering Investors: A Market Approach to Securities Regulation*, 107 YALE L.J. 2359, 2372 (1998).

205. For a direct rejoinder to Romano, see Merritt B. Fox, *Retaining Mandatory Securities Disclosure: Why Issuer Choice Is Not Investor Empowerment*, 85 VA. L. REV. 1335 (1999) (arguing in favor of mandatory disclosure and interpreting empirical evidence as supportive of this position). The debate between Romano and Fox continued over the next few years. *See* Roberta Romano, *The Need for Competition in International Securities Regulation*, 2 THEORETICAL INQUIRIES L. 387 (2001); Merritt B. Fox, *The Issuer Choice Debate*, 2 THEORETICAL INQUIRIES L. 563 (2001). Many other scholars wrote about this debate or some aspect of it. *See, e.g.*, Stephen Choi, *Regulating Investors Not Issuers: A Market-Based Proposal*, 88 CAL. L. REV. 279, 282–84 (2000) (proposing a system allowing sophisticated investors to decide what, if any, disclosure they require); Stephen M. Bainbridge, *Mandatory Disclosure: A Behavioral Analysis*, 68 U. CIN. L. REV. 1023, 1034 (2000) (criticizing securities regulation via the mandatory disclosure regime on behavioral grounds); Edward Rock, *Securities Regulation as Lobster Trap: A Credible Commitment Theory of Mandatory Disclosure*, 23 CARDOZO L. REV. 675 (2002) (updating the case in favor of a mandatory securities disclosure regime).

206. *See, e.g.*, Reinier H. Kraakman, *Disclosure and Corporate Governance: An Overview Essay*, *in* REFORMING COMPANY AND TAKEOVER LAW IN EUROPE 95, 96 (Guido Ferrarini et al. eds., 2004) (reporting a "consensus" among most academics and regulators, premised on disclosure's benefits for the efficient pricing of securities, and "practical concerns associated with the governance and regulation of public companies").

Exhibit 4 to Decl. of Georgiev
218
**SER 1634**

2021]       *THE BREAKDOWN OF THE PUBLIC–PRIVATE DIVIDE*       281

the accounting scandals was the Sarbanes–Oxley Act, which represented the most significant expansion of federal securities regulation since the 1930s. The reigning debate in securities law soon became about the new regulatory reality—described as the "federalization" of corporate governance—and its merits and demerits.[207] The passage of another ambitious federal bill, the Dodd–Frank Act, less than a decade later expanded federal corporate governance even further and reinforced these concerns.[208]

Today's regulatory reality, epitomized by the breakdown of the public–private divide, is different and it disrupts the federalization narrative. While it is certainly true that Sarbanes–Oxley and Dodd–Frank "federalized" a number of matters of corporate governance that had previously been within the exclusive purview of state corporate law, it is important to remember that these laws' provisions have always applied *only* to public companies. At the time when public company status (and the access to public capital via the plentiful public markets it provided) was essential to corporate success, the federalization label was accurate as a descriptive matter. With very limited exceptions,[209] the choice to go public was not much of a choice, since access to public capital was a prerequisite for growth.

As described in Section II.B, however, the deregulatory cascade of the 2010s has transformed the funding landscape for U.S. firms. The virtually-unlimited availability of private capital, and the new rules allowing public capital to flow into private firms, renders "going public" truly a *choice* rather than

---

207. *See* Romano, *supra* note 138; Langevoort, *supra* note 140; John C. Coates IV, *The Goals and Promise of the Sarbanes–Oxley Act*, 21 J. ECON. PERSPS. 91 (2007).

208. *See* Bainbridge, *supra* note 139. While the larger point about the federalization effects of Sarbanes–Oxley and Dodd–Frank still stands, it is also useful to remember that most of the provisions in these statutes did not *displace* or *override* already-existing state corporate law rules; rather, the provisions sought to *fill* regulatory gaps in state corporate law.

209. The relevant exceptions are a few large, mostly family-owned firms that never went public, including Cargill, Koch Industries, Albertsons, and Mars. Professional firms, such as Deloitte, PricewaterhouseCoopers, and Ernst & Young have also been private traditionally. *See* Chloe Sorvino, *Silent Giant: America's Biggest Private Company Reveals Its Plan To Get Even Bigger*, FORBES (Oct. 22, 2018), https://bit.ly/3cXfuAH (listing the largest private companies other than unicorns).

Exhibit 4 to Decl. of Georgiev
219
SER 1635

an *imperative*. As private companies, unicorns are not subject to federal corporate governance notwithstanding their size, large investor base (which increasingly includes retail investors), and societal footprint. The federalization label, therefore, is no longer apt. Instead, it is more accurate to speak about Sarbanes–Oxley and Dodd–Frank as causing *partial* or *quasi-federalization*: These laws have added a federal corporate law layer on top of the state law provisions for *some* firms in the economy, but definitely not for *all* firms. What is more, the subset of firms to which the federal layer applies is driven by private ordering, not mandatory regulation.[210] Despite the considerable time and effort Congress and the SEC have devoted to developing the federal corporate governance regime over the course of almost nine decades, the federal government has no means to force a firm into the regime.

The latter observation takes us back, and full circle, to the notion of issuer choice and the academic debates related to it before the advent of Sarbanes–Oxley. Even though the merits of the issuer choice model remain contested in the academic literature, the breakdown of the public–private divide has brought about, quietly but surely, the realization of Roberta Romano's intellectually-ambitious vision for *elective* federal securities regulation. In effect, the provisions of the federal securities laws are *mandatory*, but only after an issuer has *elected* to opt into the regime by taking on public company status. Whether to do so is—to echo Romano's phrase—the issuer's choice.

The suggestion that changes in federal securities law over the past two decades have brought about an issuer choice model is an important but overlooked point in the assessment of securities law's recent trajectory. To be sure, issuer choice is not an implausible model and one can imagine a set of circumstances under which it could garner political support and become formally embedded in law. What is notable here, however, is that issuer choice was never mentioned in debates over the JOBS Act and the initiatives that comprised the deregu-

---

210. Recall that there is only one provision that "forces" a firm into public company status, Section 12(g), which has little practical effect. *See supra* notes 77–78 and accompanying text. As discussed in Section IV.A.3, one of the most clearly fleshed out reform proposals coming out of the SEC focuses on reforming this very provision.

Exhibit 4 to Decl. of Georgiev
220
**SER 1636**

2021]        *THE BREAKDOWN OF THE PUBLIC–PRIVATE DIVIDE*        283

latory cascade detailed in Section II.B. In other words, the issuer choice model was not subjected to democratic scrutiny and did not win a battle of policy ideas. Instead, the issuer choice outcome is simply an unintended consequence of the breakdown of the public–private divide in securities law.

### B.    *Securities Law's Diminished Regulatory Capacity*

As discussed in Section I.C, over the years, securities regulation has come to fulfill important roles in ensuring corporate transparency and accountability, in addition to investor protection and capital formation.[211] Firm-specific information released pursuant to the requirements of the mandatory securities disclosure regime provides a window into corporate activity that is useful not just to investors but also to employees, customers, suppliers, competitors, and society at large.[212]

From the vantage point of federal lawmaking, securities law via disclosure mandates provides a relatively easy channel for adopting general economic regulation: the "public company" regulatory category is already in existence, as is the disclosure regime and the powerful regulator in charge of it, the SEC. Accordingly, and as we saw in Section I.C, Congress has used the securities laws to require disclosure pertaining to various miscellaneous topics, such as conflict minerals, extractive payments, mine safety, corporate pay equity, and corporate activity in countries under economic sanctions, such as Iran.[213] Proposed legislation would use the public company category to impose a variety of disclosure obligations pertaining to ESG topics.[214] Nevertheless, the optimal volume of disclosure obligations and the scope of the disclosure regime are heavily contested,[215] and usually hinge on one's policy preferences.

Irrespective of the policy choices on the latter points, the breakdown of the public–private divide has undermined the

---

211.    *See supra* notes 131–32 and accompanying text.

212.    *See, e.g.*, Georgiev, *Too Big to Disclose*, *supra* note 79, at 652–54.

213.    *See supra* notes 113–17 and accompanying text.

214.    *See* Corporate Governance Improvement and Investor Protection Act, H.R. 1187, 117th Cong. (2021).

215.    *Compare* Jill Fisch, *Making Sustainability Disclosure Sustainable*, 107 GEO. L. J. 923 (2019) (arguing in favor of securities disclosure mandates on sustainability-related topics), *with* Amanda M. Rose, *A Response to Calls for SEC-Mandated ESG Disclosure*, 98 WASH. U. L. REV. 1821 (2021) (arguing against the expansion of the disclosure regime to cover ESG topics).

Exhibit 4 to Decl. of Georgiev
221
SER 1637

284                          *NYU JOURNAL OF LAW & BUSINESS*                          [Vol. 18:221

regulatory capacity of securities law: young firms can now avoid important disclosure and governance mandates by never going public, whereas already-public firms can go private or sell "bad" assets off to a private company. As long as the public company category is elective, the federal government cannot use it to effectively regulate business activities and practices it has deemed undesirable.[216]

Climate change regulation provides a case in point. There has been a powerful push in the Biden administration to mobilize all federal administrative agencies, including the SEC, to address climate change.[217] In the case of the SEC, this will likely entail adopting new disclosure rules concerning firms' activities that might contribute to climate change and the risks firms face due to climate change—rules that are subject to considerable controversy.[218] Importantly, under the current regulatory framework any new SEC disclosure rules would apply *only* to public companies. This fact would not be problematic if all the biggest polluters were public companies, but it turns out that the opposite is the case. According to a recent report, small, non-public oil and gas drilling companies have become the biggest polluters in the United States in terms of methane and other greenhouse gases.[219] The report notes that these firms' pollution is "wildly large relative to their production" and that the firms have escaped the type of public scrutiny leveled on large oil and gas companies, even though in

---

216. The manifestations and implications of this phenomenon deserve more detailed treatment, which I provide in related work. *See* George S. Georgiev, *Is "Public Company" Still a Viable Regulatory Category?*, 13 HARV. BUS. L. REV. 1 (forthcoming 2022) (draft on file with author) [hereinafter Georgiev, *Regulatory Category*].

217. *See* Exec. Order No. 14,030, 86 Fed. Reg. 27,967 (May 25, 2021) (announcing a policy to "advance consistent, clear, intelligible, comparable, and accurate disclosure of climate-related financial risk"); *see also* Exec. Order No. 14,008, 86 Fed. Reg. 7619 (Feb. 1, 2021) (announcing a "government-wide" approach to climate change mitigation).

218. *See, e.g.*, Rose, *supra* note 215 (opposing climate change disclosure rules on materiality and institutional competency grounds). For arguments in favor of climate change disclosure mandates on the grounds that they are consistent with the SEC's mission, including investor protection and the unjustifiably-neglected goal of promoting competition, see George S. Georgiev, Comment Letter to the SEC on Climate Change and Other ESG Disclosure (June 22, 2021), https://ssrn.com/abstract=3874186.

219. *See* Hiroko Tabuchi, *Here Are America's Top Methane Emitters. Some Will Surprise You*, N.Y. TIMES (June 2, 2021), https://nyti.ms/317ur0t.

Exhibit 4 to Decl. of Georgiev
222
SER 1638

many cases the small private polluters have bought their high-polluting assets from larger public companies.[220] This reallocation of high-polluting assets is a win–win proposition for the firms, if not for the public. In effect, the large public companies are "cleaning up" their investor- and public-facing disclosure reports by offloading the problematic assets and freeing up financial capital. The small private companies, in turn, get to exploit the same assets with little public oversight, without incurring reputational harm, and, most likely, without paying a higher cost of capital.

The upshot of this example is that private firms like the smaller high-polluting firms can avoid important climate change disclosure rules at the federal level by simply avoiding the public capital markets and public company status.[221] As we saw in Part II, the deregulatory cascade of the 2010s and the wide availability of private capital make this a feasible option. The negative implications are twofold. First, government regulation by way of SEC disclosure mandates fails to capture a significant segment of entities across the economy. In this regard, the ready opportunities for regulatory arbitrage result in an adverse selection problem—the rules fail to cover precisely the types of firms to which they are most relevant. Second, because a growing number of public investors can now invest in private firms not subject to SEC disclosure obligations, those public investors would not obtain disclosure in respect of their pri-

---

220. *Id.* This trend is projected to continue and intensify over time. The report notes that by the end of the 2020s, "the world's largest oil and gas companies will divest from more than $100 billion of assets as they adjust to the [clean] energy transition." *Id.*

221. To be sure, other federal agencies have the power to require disclosure of all firms, not just public companies. The point here is about the diminished regulatory capacity of securities law, which in recent years has been a preferred vehicle for seeking to impose new economic regulation. During the 116th Congress, between 2019 and 2021, there were 18 unique bills that sought to regulate various aspects of general economic activity via the public company regulatory category. These bills pertained to matters such as employee representation in corporate governance and disclosure concerning diversity in corporate leadership, human capital management, the value of digital assets, corporate political spending, outsourcing practices, internal compensation trends, ESG metrics, cybersecurity risk and internal cybersecurity expertise, financial dealings with firearms manufacturers, measures taken to address illegal activities in the supply chain, and various other topics. *See* Georgiev, *Regulatory Category*, *supra* note 216 (manuscript at 13–17).

Exhibit 4 to Decl. of Georgiev
223
SER 1639

vate company investment and would not reap the investor protection benefits of the rules. The latter point illustrates the fragmentation of investor protection due to the breakdown of the public–private divide, a topic to which we turn next.

### C. *Fragmented Investor Protection*

Perhaps the most immediate question raised by the changes in public and private markets relates to the impact of these changes on investor protection. Accordingly, scholars who have written about the underlying developments have considered their implications for investor protection rigorously and from different perspectives.[222] The analysis that follows builds upon this fine work, but it takes a somewhat different conceptual approach. As a point of departure, I inquire into the systemic impact of the breakdown of the public–private divide on investor protection (rather than the impact of specific private capital developments). I also assess investor protection at the *portfolio level* under the assumption that mainstream investors' portfolios today include a mix of public and private firms as a result of the various deregulatory measures discussed in Part II.

Viewed systemically and at the portfolio level, the impact of the breakdown of the public–private divide on investor protection can be described as the *fragmentation* of investor protection. Fragmentation is an apt label because different components of the portfolio are subject to different degrees of investor protection: whereas public companies (whose securities would still comprise the largest share of a capitalization-weighted fully-diversified portfolio) are subject to the expansive regulatory scheme described in Section I.C.1, private companies (whose securities would comprise a smaller but steadily increasing share of the portfolio) remain unregulated. As noted in Section I.C.2, there are different ways to define investor protection,[223] but, notably, the point about fragmentation applies regardless of the chosen definition. As long as legal interventions applying to public companies offer a degree of protection that has been deemed *necessary* for the protection

---

222. *See, e.g.,* Elizabeth Pollman, *Private Company Lies,* 109 GEO. L.J. 353 (2020); Winship, *supra* note 7; Alon-Beck, *supra* note 171; *see also* sources cited in Section IV.A *infra.*

223. *See supra* notes 123–25 and accompanying text.

Exhibit 4 to Decl. of Georgiev
224
**SER 1640**

of mainstream investors, then exposing these investors to both public and private firms diminishes the overall level of investor protection within the portfolio.

Despite the rhetoric about "investor opportunity" which is usually tied to a quest for higher returns,[224] it is at best unclear that mixing public and private firms in the portfolio contributes to higher returns. Empirical evidence shows that private markets, on average, do not outperform public markets in terms of investor returns.[225] Relatedly, the track record of unregulated IPOs under Regulation A+ has been dismal.[226]

Expanding investor opportunity should not occur at the expense of overriding investor choice, but this may be one unintended consequence of the breakdown of the public–private divide. Because private company securities are finding their way into the diversified funds that comprise a majority of 401(k) retirement savings, it would be very difficult (or, in the very least, it would be burdensome) for an investor to *exclude* private companies from the portfolio even if this were a deliberate strategy based on an informed choice. The entry of private company securities into the investments of "public" investors is not a remote possibility but a reality. The big-three asset managers already invest in private companies and the biggest of them, BlackRock, has recently indicated plans for further expanding its investment in private company equity.[227] (While

---

224. *See supra* note 169.

225. *See* Erik F. Gerding, *The Cost to Retail Investors and Public Markets of "Harmonizing" Securities Offering Exemptions,* Colum. L. Sch. Blue Sky Blog (Oct. 1, 2019), https://bit.ly/3Ix9n4D (providing a detailed overview of relevant studies and concluding that "[t]he best evidence suggests that, on average, *even institutional investors may be doing no better in the private markets than they would investing in a broad index of public securities*") (emphasis in original).

226. *See, e.g.,* Leo Imasuen, *Most Regulation A+ IPOs Are Outright Uninvestable,* Seeking Alpha (Oct. 31, 2017), https://bit.ly/3qlupv5. Crowdfunding represents a relatively similar method of capital raising, but data on profitability is more limited. Because of the relatively modest amounts raised, both Regulation A+ IPOs and crowdfunding fall outside the scope of this Article. Conceptually, crowdfunding also has implications for the public–private divide. *See* Joan MacLeod Heminway, *Crowdfunding and the Public/Private Divide in U.S. Securities Regulation,* 83 U. Cin. L. Rev. 477, 503 (2014) ("An analysis of the regulation of [crowdfunded] offerings of securities . . . exposes new and emerging complexity in distinguishing between public and private offerings . . . and between public and private companies . . . .").

227. *See, e.g.,* Simon Jessop & Ross Kerber, *Insurers Plan to Ramp Up Private Market Investments, BlackRock Says,* Reuters (Nov. 15, 2021), https://reut.rs/

Exhibit 4 to Decl. of Georgiev
225
**SER 1641**

288          *NYU JOURNAL OF LAW & BUSINESS*          [Vol. 18:221

there is an academic case to be made for diversification along related lines, it assumes legitimate variation in legal arrangements rather than what is in effect regulatory arbitrage.[228])

What are the harms of allowing investors who, in the words of the Supreme Court, "cannot fend for themselves," to invest in public firms? The classic story with respect to the merits of public markets as opposed to private markets relates to the advantages of public markets in terms of price discovery, liquidity, and information quality.[229] The harms of holding both private and public company securities are many, but perhaps the most significant one relates to private markets' reduced capacity to value firms accurately compared to public markets. The price at which an investor buys or sells a security is the most important term in a securities transaction, which makes stock price accuracy a key element of investor protection.[230] Private markets are inferior in pricing to public markets. According to Jesse Fried and Jeff Gordon, structural features of private markets, particularly tech startups in Silicon Valley, contribute to valuation and governance bubbles.[231] They note that "[a] market that makes it difficult and costly to express negative sentiments is prone to a bubble and thus an abrupt collapse when negative fundamentals finally become too pervasive to ignore."[232]

---

3EB8JAG; *see also supra* note 187 and accompanying text (discussing Fidelity's investment in Juul).

228. Kelli Alces has made such an argument, though her approach does not call for mixing public and private companies, but, rather companies with different legal arrangements. *See* Kelli A. Alces, *Legal Diversification*, 113 Colum. L. Rev. 1977, 1977 (2013) (explaining that "[l]egal diversification protects investors from the risk that a particular method of minimizing agency costs will prove ineffective").

229. *See, e.g.,* Coffee, *supra* note 201, at 747.

230. *See, e.g.,* Merritt B. Fox et al., *Law, Share Price Accuracy, and Economic Performance: The New Evidence*, 102 Mich. L. Rev. 331, 370–81 (2003); *see also* Allen Ferrell, *Measuring the Effects of Mandated Disclosure*, 1 Berkeley Bus. L.J. 369, 372 (2004) (providing an assessment of the various empirical studies and noting that "[t]he concept of stock price accuracy is well accepted and commonly employed in the accounting and finance literature"); *see also* Marcel Kahan, *Securities Laws and the Social Costs of "Inaccurate" Stock Prices*, 41 Duke L.J. 977 (1992).

231. *See* Jesse M. Fried & Jeffrey N. Gordon, *The Valuation and Governance Bubbles of Silicon Valley*, Colum. L. Sch. Blue Sky Blog (Oct. 10, 2019), https://bit.ly/3rk1glU.

232. *Id.*

Exhibit 4 to Decl. of Georgiev
226
**SER 1642**

Empirical evidence bears this out. According to a Morgan Stanley report, "[v]aluing young companies is an inherently tricky task."[233] The same report notes the results of a 2020 survey of venture capitalists on unicorn valuations: more than 90% of the respondents believed that unicorns were "'significantly' overvalued," even though 40% of them had themselves invested in unicorns.[234] On an aggregate level, the report also notes that in the period between 2011 and 2019, "about one-third of the companies that went public had a valuation below that implied by the final round of private financing."[235]

At a most basic level, accurate asset prices are key to investor protection and without a public listing, asset prices cannot be guaranteed to be accurate.[236] Relatedly, the rise of private markets inhabited by private firms that do not produce public disclosure reduces the overall level of firm-specific information that is available to market participants, which has the potential to affect the accuracy of securities prices for *public* firms.[237] The investor protection harms, in other words, are not limited to investors in private firms, but, rather, extend systemically across all capital markets. As a result, the diminished availability of information about private firms due to the rise of private capital has significant implications for allocative efficiency in the overall economy.

There is also the potential for investor losses due to poor corporate governance, inadequate information, and poor monitoring, as illustrated by the cases of WeWork, Uber, Theranos, and others.[238] At each of these companies, there were

---

233. *See* Michael J. Mauboussin & Dan Callahan, Morgan Stanley, Public to Private Equity in the United States: A Long-Term Look 48 (2020), https://mgstn.ly/31CaMpV.

234. *Id.* at 47–48.

235. *Id.* at 47.

236. *See* James J. Park, *Investor Protection in an Age of Entrepreneurship*, Harv. Bus. L. Rev. (forthcoming 2022), https://ssrn.com/abstract=3911454; Holger Spamann, *Indirect Investor Protection: The Investment Ecosystem and Its Legal Underpinnings* (Eur. Corp. Governance Inst., Working Paper No. 594/2021), https://ssrn.com/abstract=3707249.

237. *See* de Fontenay, *supra* note 22.

238. *See supra* note 176 and accompanying text; *see also* discussion *infra* Section IV.A. For an additional analysis of the investor protection implications, see Ann Lipton, *The Eroding Public/Private Distinction*, Bus. L. Prof. Blog (Feb. 1, 2020), https://bit.ly/3DukFTw. For a contrarian analysis, see Platt, *infra* note 247.

Exhibit 4 to Decl. of Georgiev
227
**SER 1643**

governance failures despite the involvement of sophisticated venture capital and other institutional investors. Contrary to what we might expect by simply analyzing those investors' incentives, they did not bargain for information or exercise oversight in an effective manner. It appears likely that these firms' private status contributed to their governance problems. As is so often the case in corporate law, however, the counterfactual, whether public company status would have prevented the associated scandals, cannot be proven. But on balance, it does appear that, at least for large firms, public company status is more conducive to better governance (with all the associated benefits in terms of mitigating fraud and waste) than private company status.

There are two additional considerations. First, public markets may provide firms with greater resilience in times of crisis. The availability of private capital is more cyclical and private markets remain smaller overall; they are less liquid even during the best of times. Therefore, a regulatory policy that encourages firms to take on public company status may offer systemic benefits in terms of firms' ability to access capital when they experience distress. The second consideration relates to diversification. Diversification is key to maximizing risk-adjusted returns. Yet, it is considerably more difficult for individual investors constructing an individual portfolio to diversity effectively with private securities, because there is significantly less information available about private companies and because of the diminished liquidity of private company securities.

### D.   *Increased Vulnerability of Employee-Investors*

In addition to mainstream investors, the breakdown of the public–private divide compounds the problems faced by a special class of investors—employees of startup companies who usually receive a considerable amount of their total compensation in illiquid and hard-to-value private company stock and who are incapable of mitigating through diversification the firm-specific risk associated with their investment of both financial and human capital.[239] As discussed in Parts I and II, changes to industry practices as well as various economic and

---

239. *See, e.g.,* Yifat Aran, *Making Disclosure Work for Start-Up Employees,* 2019 COLUM. BUS. L. REV. 867 (2019).

Exhibit 4 to Decl. of Georgiev
228
**SER 1644**

regulatory changes from the past two decades have compli-
cated the economic relationship between certain firms and
their employees, giving rise to a hybrid economic actor: the
employee-investor.

In the case of unicorns, stock options are a source of sig-
nificant and well-documented problems relating to valuation,
tax, contracting, lack of liquidity, and other matters.[240] Com-
prehensive data on employee ownership stakes in unicorns is
lacking, but it is generally assumed that in late-stage startups
approximately 15% of the market capitalization is reserved for
employees.[241] An examination of headcount data from the
current cohort of U.S.-based unicorns shows that 112 of them
have 1000 or more employees, and a further 141 have between
500 and 999 employees.[242] Applying the general rule of thumb
that approximately 80% of startup employees receive stock op-
tions, it stands to reason that there are hundreds of thousands
of startup employees who are exposed to the stock of their em-
ployers. From a firm's point of view, trading equity capital for
human capital is an attractive financial proposition, because it
diminishes the need to seek external financing and delays the
going-public decision, as discussed in Section I.B.1. Moreover,
as discussed in Section I.B.2, employee-investors do not count
for purposes of the mandatory registration thresholds under
Section 12(g).

Unlike in the past, these problems are no longer capped
in size or duration, because startups can now raise unlimited
amounts of private capital (larger private startups tend to have
more employee-investors) and because they can remain pri-
vate, and unregulated from an investor-protection point of
view, virtually indefinitely. As a result, the unique problems
faced by employees investing in the stock of their employer are
compounded. In the case of an employee receiving stock op-
tions as part of their compensation, the employee repeatedly
has to make at least three types of difficult and highly conse-

---

240. *See, e.g.,* Anat Alon-Beck, *Unicorn Stock Options—Golden Goose or Trojan
Horse?,* 2019 COLUM. BUS. L. REV. 107 (2019).

241. *See* Alexander Davis, *IPO Bonanza Leaves Out Some Tech Workers Over
Unexercised Stock Options,* PITCHBOOK (Dec. 17, 2020), https://bit.ly/3dton5h
(quoting an estimate from a compensation expert).

242. Author's calculations based on data from PitchBook as of December
5, 2021. Aggregate data on unicorn headcount and the evolution of unicorn
headcount over time is not available publicly.

Exhibit 4 to Decl. of Georgiev
229
**SER 1645**

quential investment decisions: (1) trading their human capital for stock options (a process which implicitly assigns a net present value to the stock option investment); (2) holding on to the stock options by continuing their employment at the company, or, if they decide to terminate their employment, either forfeiting the stock options or paying an exercise price plus applicable taxes within a limited period post-termination; and (3) deciding whether to exercise the options prior to their expiration date. The more human capital an employee trades in for stock options, the more consequential and risky the latter two decisions become. And, for each of these three types of decisions, an employee needs sufficient information about the firm's long-term prospects, which is not always available or forthcoming.[243]

It is important to keep in mind that all of the harms pertaining to investors discussed in Section III.C apply here as well. Moreover, the issue is not limited to the missed benefits of public company regulation and diversification. To the extent that there is a greater incidence of fraud at private companies, such fraud harms employee-investors disproportionately.[244] In short, employee-investors are exposed to both the harms faced by a firm's employees and the harms faced by a firm's investors.

## IV.

### REFORMS: CONCEPTUAL APPROACHES AND ROADBLOCKS

As documented in Part II, the regulatory system governing firms' capital raising activities—the types of capital, types of investors, and types of markets that different types of firms can access if they undertake certain legal obligations—is in a state of flux. This stands in contrast with the ordered nature of the original system described in Part I: public firms raising public capital from public investors on the public markets, and private firms obtaining private capital from a narrow class of qualified investors through the much-smaller private markets. As we saw in Part III, the implications of this change,

---

243. *See* Abraham J.B. Cable, *Fool's Gold? Equity Compensation & the Mature Startup*, 11 VA. L. & BUS. REV. 613 (2017).

244. *See, e.g.*, Urska Velikonja, *The Cost of Securities Fraud*, 54 WM. & MARY L. REV. 1887 (2013) (discussing the significant and idiosyncratic costs of corporate fraud for non-investor constituencies, including employees).

Exhibit 4 to Decl. of Georgiev
230
**SER 1646**

heretofore largely unacknowledged, are far-reaching and impact multiple constituencies both within and outside the firm.

Regulatory flux and incoherence can be lasting conditions, though hopefully not permanent ones. Even though some observers believe that the capital markets are over-regulated,[245] whereas others believe that they are under-regulated,[246] both groups are likely to agree that capital markets today are mis-regulated.[247] If and when change becomes possible, what might it look like? What are the roadblocks to reform and can they be overcome? The discussion that follows outlines two conceptual approaches—rebuilding the public–private divide and lowering the stakes in capital raising decisions by circumventing the public–private divide and shifting some of the economic regulation that currently operates through securities law to other regulatory domains.

Instead of endorsing a specific proposal or set of proposals, this Article analyzes the preconditions for reform and then argues in favor of new deliberative mechanisms for determining the optimal structure of securities regulation in the wake of the breakdown of the public–private divide.

---

245. *See, e.g.*, Center for Capital Market Competitiveness, Comment Letter on Concept Release on Harmonization of Securities Offering Exemptions (Sept. 24, 2019), https://www.sec.gov/comments/s7-08-19/s70819-6193319-192490.pdf (urging substantial further deregulation consistent with the Chamber of Commerce's "longstanding effort to examine how SEC regulatory burdens may diminish access to capital and to remove those barriers").

246. *See, e.g.*, Elisabeth D. de Fontenay, Erik Gerding, et al., Securities Law Professor Comment Letter on Concept Release on Harmonization of Securities Offering Exemptions (Sept. 24, 2019), https://www.sec.gov/comments/s7-08-19/s70819-6193340-192501.pdf (criticizing the rise of private capital and arguing against further deregulation by way of capital raising exemptions).

247. There is also a case for avoiding reforms in either direction. Some academics have recently pushed back against the prevailing critical views of the rise of private capital, and of unicorns in particular. *See, e.g.*, Alexander I. Platt, *Unicorniphobia*, HARV. BUS. L. REV. (forthcoming 2022), https://ssrn.com/abstract=3915793 (expressing skepticism about arguments that unicorns pose investor protection and other problems, as well as about the expected efficacy of the policy interventions proposed by other scholars); Abraham J.B. Cable, *Time Enough for Counting: A Unicorn Retrospective*, YALE J. ON REG. (BULLETIN), Sept. 21, 2021, https://bit.ly/3D0BCF7 (analyzing the investment outcomes of 32 "original" unicorns and suggesting that "private ordering by founders, employees, and investors is proving an effective alternative to ambitious regulatory reform").

Exhibit 4 to Decl. of Georgiev
231
SER 1647

### A.  *Rebuilding the Public–Private Divide*

While a complete picture of the breakdown of the public–private divide, along with its causes and consequences, is just emerging, a number of observers have analyzed the various changes in capital markets occurring during the 2010s and offered a range of discrete reform recommendations. From the vantage point of the public–private divide, these reform proposals can be classified into two general categories: (1) increasing regulation in the private realm in order to solve various investor-protection problems resulting from the changes in the capital markets ecosystem discussed in Part II; and (2) changing regulation to expand the public realm. One idea in the latter category—the "shareholders of record" solution proposed in October 2021 by SEC Commissioner Allison Herren Lee—deserves special attention both because of its sweeping nature and because the SEC can implement it fairly easily by acting on its existing authority, without the need for additional congressional action.

### 1.  *Regulating the Private Realm*

As a point of departure, the analyses that fall within this rubric do not take a categorical stance against the rise of private capital markets and the expansion of the private realm, along with the key underlying phenomena: the rise of unicorns, the greater equity stakes held by private company employee-investors, and the expanded opportunities for retail investor participation in private company capital raising. Recognizing various problems caused by these phenomena, however, commentators have offered proposals for increasing the regulation of the newly-expanded private realm.

The reforms in respect of regulation of the private realm include the creation of special disclosure regimes for unicorns,[248] requiring additional disclosure for the benefit of em-

---

248. *See* Jennifer Fan, *Regulating Unicorns: Disclosure and the New Private Economy,* 57 B.C. L. Rev. 583, 585 (2016) (arguing that "once a private company reaches unicorn status, it should be subject to some of the same reporting obligations as public companies to provide greater transparency and protect minority stockholders"); *see also* Michael D. Guttentag, *Patching a Hole in the JOBS Act: How and Why to Rewrite the Rules that Require Firms to Make Periodic Disclosures,* 88 Ind. L.J. 151 (2013) (arguing for expanded disclosure requirements for certain large private companies). For an early and prescient analysis of emerging problems in private markets, see Elizabeth Pollman, *Informa-*

Exhibit 4 to Decl. of Georgiev

232

**SER 1648**

ployee-investors in private companies,[249] whistleblower protections for private company employees,[250] more stringent enforcement of the anti-fraud provisions of the securities laws, which apply to private companies,[251] facilitating trading of private company securities in order to improve stock price accuracy,[252] and placing regulatory restrictions on trading in the absence of adequate disclosure.[253]

The key advantage of these proposals is that they offer one or more targeted solutions, which facilitates both assessment and implementation; a potential downside is that they each focus on a subset of the problems caused by the breakdown of the public–private divide and that the suggested interventions, while targeted, are not systemic. These proposals merit careful consideration during future policymaking rounds and should form a core part of the broad deliberative process envisioned by Section IV.C.

## 2. *Expanding the Public Realm*

Instead of regulating the private realm directly, it is also possible to intervene by expanding the size of the public realm, which will, in turn, shrink the private realm. Under this approach, the number of entities subject to the already-existing regime for regulating public companies would increase, while the number of entities that fall in the unregulated private realm would decrease. To achieve this, commentators have suggested, for example, to require or nudge late-stage private companies to take on public company status.[254] Changing the definition of the term "shareholder of record," a pro-

---

*tion Issues on Wall Street 2.0*, 161 U. PA. L. REV. 179, 222 (2012) (discussing the rise of secondary markets for private company securities and arguing that the SEC should require "a specified minimum level of disclosure" for trading in such markets).

249. *See* Aran, *supra* note 239; Alon-Beck, *supra* note 171.

250. *See* Winship, *supra* note 7.

251. *See* Pollman, *supra* note 222; Winship, *supra* note 7.

252. *See* Matthew Wansley, *Taming Unicorns*, 97 IND. L.J. (forthcoming 2021), https://ssrn.com/abstract=3801131.

253. *See* Jones, *supra* note 105, at 186–87 ("Policymakers can act by restricting trading in Unicorn shares in the absence of adequate disclosure.").

254. *See* Donald C. Langevoort & Hillary A. Sale, *Corporate Adolescence: Why Did "We" Not Work?*, 99 TEX. L. REV. 1347, 1382 (2021); Amy Deen Westbrook, *We'(re) Working on Corporate Governance: Stakeholder Vulnerability in Unicorn Companies*, 23 U. PA. J. BUS. L. 505, 570 (2021).

Exhibit 4 to Decl. of Georgiev

233

**SER 1649**

posal discussed in detail in Section IV.A.3 below, offers a blunt and automatic solution to expanding the public realm; these attributes work both in the proposal's favor and against it. Apart from the "shareholders of record" solution, the mechanics associated with expanding the public realm are complex and uncertain. Moreover, implementation would require congressional action, which is highly unlikely absent a crisis (as discussed further in Section IV.C below).

A report from the Global Financial Markets Center at Duke Law School published in February 2021 offers an illustration of various possible ways to expand the public realm.[255] The report suggests that "all large companies [ought to be] public," and lists the following triggers for imposing public company status:

- revenues above a threshold (e.g., $100 million annually);
- a "market cap" above a threshold (e.g., $1 billion) based on private market valuations;
- a "public float" in a private trading venue above a threshold (e.g., $75 million);
- a number of beneficial owners of "securities" above a threshold (e.g., 500), irrespective of "accredited investor" status; [. . .]
- a threshold number of employees (e.g., 250 full-time equivalents); [and]
- receiv[ing] more than a certain dollar amount in revenues directly from government contracts or funds (e.g., $25 million).[256]

The menu of options offered by the report reflects the evolving indicators of what it means to be a public company and deserves careful consideration. While the proposed thresholds are merely indicative, it is worth noting that they are set at relatively low levels and that, as presented, exceeding any one of them would be sufficient to push a firm into public company status. As a practical matter, then, this would subject most firms across the economy, except the smallest firms, to

---

255. *See* TYLER GELLASCH & LEE REINERS, FROM LAGGARD TO LEADER: UPDATING THE SECURITIES REGULATORY FRAMEWORK TO BETTER MEET THE NEEDS OF INVESTORS AND SOCIETY (Glob. Fin. Mkts. Ctr. at Duke L., 2021), https://bit.ly/31cXO1H.

256. *Id.* at 11.

Exhibit 4 to Decl. of Georgiev
234
**SER 1650**

federal corporate law. It is also important to acknowledge again that adopting these recommendations would require congressional action, which appears unlikely as of this writing. By virtue of the way they change the regulatory treatment of private firms, the recommendations themselves will be disruptive to capital market participants, even with a phase-in period. Finally, international regulatory competition is another likely barrier to adoption. Forcing large and medium-sized U.S. private companies into public company status, and the full complement of public company regulation discussed in Section I.C.1, is a significant and costly step that might lead at least some of them to consider changing their domicile of incorporation. The rise of private capital is a global phenomenon and so is the proliferation of unicorns, as illustrated by Figure A–6 and Figure A–9, respectively.

### 3. *The "Shareholders of Record" Solution*

In an October 2021 speech, SEC Commissioner Allison Herren Lee offered an important and relatively easy-to-implement proposal for expanding the public realm.[257] Commissioner Lee focused on the "shareholders of record" trigger for public company status and made the case that the concept should reflect the *actual* number of investors, which would push many now-private firms beyond the threshold for registration and thus "create" a number of new public companies.[258]

Recall that under Section 12(g) of the Exchange Act, issuers of equity securities with at least $10 million in assets and more than 2000 shareholders of record (or more than 500 shareholders of record who are not accredited investors) are required to register the securities under the Exchange Act and thereby become subject to the periodic reporting requirements for public companies.[259] In other words, private compa-

---

257. *See* Allison Herren Lee, Comm'r, U.S. Sec. & Exch. Comm'n, Remarks at The SEC Speaks in 2021, Going Dark: The Growth of Private Markets and the Impact on Investors and the Economy (Oct. 12, 2021), https://www.sec.gov/news/speech/lee-sec-speaks-2021-10-12.

258. *Id.*

259. *See supra* note 77 and accompanying text. Note that the technical term is "equity securities . . . held of record by . . . persons"; in line with other commentators, I refer to "shareholders of record" for the sake of clarity.

Exhibit 4 to Decl. of Georgiev
235
**SER 1651**

nies must become public companies upon exceeding the asset and shareholder-base thresholds. The definition of "shareholders of record," which dates back to the 1960s, does not account for the fact that shares are held predominantly in "street name" accounts, i.e., in the names of the intermediaries through which they were purchased or institutions where they are held, and not in the name of the underlying beneficial owners.[260] The SEC has estimated that "over 85% of the holders of securities in the U.S. markets hold through a broker-dealer or a bank that is a Depository Trust Company participant."[261] For this reason, at public companies and, importantly, at private companies that have gone through several funding rounds, the shareholders of record number *significantly understates* the number of beneficial owners. The SEC's original proposal for Rule 12g5-1 in 1964 contained a "look through" provision (looking through the street name holder to get to, and count, the customers who hold the underlying economic interest), but the final rule opted not to require this.[262] Today, redefining "shareholders of record" to reflect a firm's actual investor base would automatically push many private companies into public company status. According to Commissioner Lee, doing so would be desirable in light of market developments and justifiable in light of the legislative history of Section 12(g).[263]

---

260. *See* Lee, *supra* note 257.

261. *See* U.S. Sec. & Exch. Comm'n, Report on Authority to Enforce Exchange Act Rule 12g5-1 and Subsection (b)(3) 8 n.26 (Oct. 15, 2012), https://www.sec.gov/files/authority-to-enforce-rule-12g5-1.pdf [hereinafter SEC Rule 12g5-1 Study]. The same SEC Staff Report concluded that "issuers with more than 2000 beneficial owners, but less than 2000 holders of record, can be actively traded in the over-the-counter markets or in private secondary markets, without triggering the threshold requirements to report under the Exchange Act." *Id.* at 11.

262. *See* Langevoort & Thompson, *supra* note 4, at 356. The authors also note that even though Rule 12g5-1 does not require look-through, other SEC rules do provide for look-through under various circumstances; in other words, look-through is not outside the norm. *Id.* They explain that "[t]he absence of a look through widens the range of trading that can occur without 1934 Act regulation because beneficial owners can, and do, make individual decisions to sell their stock, so that one broker-dealer as record owner may reflect the reality of hundreds of investors trading." *Id.*

263. *See* Lee, *supra* note 257. (Commissioner Lee's speech appeared as this Article was being finalized and the present analysis is not intended to be comprehensive.)

Exhibit 4 to Decl. of Georgiev
236
**SER 1652**

2021]            *THE BREAKDOWN OF THE PUBLIC–PRIVATE DIVIDE*            299

Even though the notion of "shareholders of record" has long attracted criticism,[264] and even though it was subject to some scrutiny in connection with Congress' consideration of the JOBS Act,[265] all without any resolution, Commissioner Lee's recent focus on this issue is noteworthy. Unlike most of the other proposals for rebuilding the public–private divide, changing the "shareholder of record" definition can be done by the SEC acting on its existing authority and without the need for congressional authorization.[266] Given the need to address problems in the public markets reflected in Commissioner Lee's speech and the very low likelihood of cooperation from Congress, the "shareholders of record" solution is one of the few available avenues for reform.

---

264. *See, e.g.*, Petition from Institutional Investors for Commission Action to Require Exchange Act Registration of Over-the-Counter Equity Securities (July 3, 2003), https://www.sec.gov/rules/petitions/petn4-483.htm (noting, inter alia, that "Rule 12g5-1 fails to properly effectuate the Congressional intent expressed in Section 12 or the policy goals of the Exchange Act" and making a detailed case for reform); GELLASCH & REINERS, *supra* note 255, at 11 (noting that "the SEC's curious definition of 'shareholder of record' permits issuers, executives, and other interested parties to easily avoid the Section 12(g) trigger by simply aggregating owners into ownership vehicles or at a small number of broker-dealers" and arguing for reform).

265. *See* Letter from North American Securities Administrators Association, to Senator Jack Reed (Mar. 22, 2012), https://bit.ly/31csG2l (asserting that "[t]he current 'holder of record' definition creates confusion and threatens investor confidence in the marketplace"); *The Future of Capital Formation: Hearing Before the H. Comm. on Oversight & Gov't Reform*, 112th Cong. 16 (2011) (statement of Mary L. Schapiro, Chair, U.S. Sec. & Exch. Comm'n) (noting that "since the definition of 'held of record' was put into place, a fundamental shift has occurred in how securities are held in the United States"). In addition, Section 504 of the JOBS Act required the SEC to undertake a narrowly-focused study in respect of the anti-evasion provisions applicable to the concept of "shareholders of record"; because most of the problems associated with the concept stem from its underinclusive nature (rather than from active efforts to evade the rules), however, those problems fell outside the study's narrow scope. *See* SEC Rule 12g5-1 Study, *supra* note 261.

266. *See* Lee, *supra* note 257 ("[T]he Commission can and should act now within our existing authority to restore transparency in capital markets. That means, at a minimum, it's time to revisit how we define shareholders of record under [Section] 12(g)."); *see also* GELLASCH & REINERS, *supra* note 255, at 11 (asserting that "adopting a rule revising [the SEC's] interpretation of the 'shareholder of record' to reflect the actual owners of securities" represents a "change [that] can be made without legislation").

Exhibit 4 to Decl. of Georgiev
237
**SER 1653**

The expected impact of any proposal would depend on the nature of the proposal; since no detailed proposal exists at present, specific predictions can easily miss the mark. Nevertheless, we can observe with some certainty that moving the concept of "shareholder of record" closer to the idea of "beneficial owner" would be a highly effective, albeit blunt and controversial, tool for reversing the breakdown of the public–private divide. Doing so will push many, and possibly most, unicorns into public company status. Notably, it would do so not by incentivizing them to undertake an IPO, but by subjecting them to public company regulation automatically and as a result of the size of their investor base.

The "shareholders of record" move is likely to be controversial for at least two reasons. First, the differences between public and private company status and the associated costs and obligations have grown to be very substantial, as illustrated in Section I.C.1; any change in regulatory treatment, therefore, will be highly-consequential for day-to-day operations and regulatory obligations. Second, even though the change to the SEC rulebook would be fairly minor (simply amending the definition of "shareholder of record"), the consequences from it would be profound: the resurrection of a now-forgotten mechanism for forcing emerging companies into public company status, and, correspondingly, the sudden end of the "issuer choice" regime described in Section III.A. Therefore, it should not be a foregone conclusion that the SEC would be willing to take on, or, indeed, be equipped to withstand, the likely pushback from market participants. Whereas the deregulatory cascade described in Section II.B unfolded over the course of almost a decade, piecemeal and with little fanfare, the re-regulation of private companies by amending the "shareholder of record" definition is likely to be abrupt and highly-visible, no matter the implementation approach.

How would the "shareholders of record" solution fare with respect to the four concerns identified in Part III? As noted already, it will eliminate the current "issuer choice" regime under which firms are able to acquire a broad investor base and still avoid public company regulation by raising capital on the private markets. Resurrecting the Section 12(g) triggers for public company status will diminish the relative importance of the markets on which shares are sold, since the size of the investor base, measured by the number of beneficial own-

Exhibit 4 to Decl. of Georgiev
238
**SER 1654**

ers of shares, will push a number of firms into public company status. Like before, special circumstances may still allow a limited number of firms to achieve scale without the need to raise capital from a broad investor base.[267]

Relatedly, the "shareholders of record" solution will also restore most of securities law's diminished regulatory capacity, the second major consequence of the breakdown of the public–private divide. By using the true size of the investor base as a regulatory trigger, public company regulation will capture a larger number of firms, including smaller and younger firms.[268] At the same time, if the goal is to use parts of securities law to regulate firms with a large societal footprint—or firms characterized by "publicness"[269]—the size of a firm's investor base would be a less-than-perfect proxy, since this metric fails to take into account a firm's impact on non-shareholder constituencies, such as employees, customers, suppliers, communities, and the environment. In addition to being imprecise, zeroing in only on a firm's investors when assessing its overall societal footprint is normatively objectionable.[270]

The "shareholders of record" solution is likely to be effective, albeit indirectly, in addressing the fragmented nature of investor protection, which was the third major consequence of the breakdown of the public–private divide discussed in Part III. Forcing private firms to become public companies upon acquiring an investor base of a certain size would do nothing to foreclose the many new mechanisms through which main-

---

267. *See supra* note 209 and accompanying text (noting the existence of a limited number of large private companies that pre-date the rise of unicorns during the 2010s).

268. As discussed in Section I.C.2 and Section III.B, the extent to which securities regulation should be used to advance goals beyond classic investor protection is open to debate. The point here is simply that imposing regulation through the "public company" regulatory category would become much more effective, since the "shareholders of record" solution would cause many more firms to fall within the definition of "public company."

269. *See infra* notes 273–77 and accompanying text.

270. *See, e.g.,* Ann M. Lipton, *Not Everything Is About Investors: The Case for Mandatory Stakeholder Disclosure*, 37 YALE J. ON REG. 499 (2020) (criticizing the use of the investor-focused disclosure regime as a means of supplying important information to non-investor audiences); Daniel Hemel & Dorothy S. Lund, *Sexual Harassment and Corporate Law*, 118 COLUM. L. REV. 1583, 1671–73 (2018) (noting that analyzing the harms caused by sexual harassment through the lens of corporate law can create additional, "discursive harms").

Exhibit 4 to Decl. of Georgiev
239
SER 1655

302                 *NYU JOURNAL OF LAW & BUSINESS*                [Vol. 18:221

stream, non-accredited investors can invest in both *private* and *public* companies, which were discussed in Section II.B; it will, however, reduce the overall supply of private company stock because it will reduce the number of private companies. As a result, the share of private company securities in the portfolios of mainstream investors will decrease, which, in turn, will mitigate the investor protection harms stemming from the breakdown of the public–private divide.

Finally, the "shareholders of record" solution would be unable to address, and may in fact exacerbate, the increased vulnerability of employee-investors—the fourth major consequence discussed in Part III. Recall that pursuant to the JOBS Act, employee-investors are expressly excluded from the "shareholders of record" count.[271] Even though the SEC has the authority to amend the definition of "shareholders of record," it cannot amend it in a way that captures employee-investors, since this will be in direct conflict with congressional intent to exclude employees from the count. Moreover, a world in which investors cannot be bundled together through the existing definition of "shareholders of record" is a world in which *every* individual investor counts for purposes of the 2000 shareholder-of-record threshold *except for* employee-investors. As a result, employee-investors would become the only source of private capital that does not trigger Exchange Act registration and regulation. We can expect that as firms approach the 2000 shareholders-of-record threshold for registration, they would place greater reliance on sourcing capital from employee-investors, with all of the attendant problems discussed in Section III.D.

In sum, the "shareholders of record" solution would not resolve all the consequences from the breakdown of the public–private divide in securities law discussed in this Article. It would, however, represent a bold step toward rebuilding the original public–private divide by making it impossible for firms to acquire a sizeable investor base while maintaining private company status, which, in turn, would automatically increase the number of public companies. The blunt nature of this solution raises questions about its practical feasibility, even if the SEC's authority to pursue it is beyond question. Importantly, the "shareholders of record" solution will not address the

---

271. *See supra* note 77 and accompanying text.

Exhibit 4 to Decl. of Georgiev
240
**SER 1656**

problems faced by employee-investors and may exacerbate them. Ultimately, the limits of the "shareholders of record" solution highlight the difficulties the SEC is likely to encounter if it sets out to rebuild the public–private divide in securities law without comprehensive assistance from Congress. (Whether and when such assistance might be forthcoming is a question I take up in Section IV.C below.)

### B. *Circumventing the Public–Private Divide*

The fact that the breakdown of the original public–private divide has caused a series of problems does not automatically suggest that the only way to solve these problems is by rebuilding the divide. Another conceptual approach to addressing the problems identified in this Article may be to reduce the regulatory stakes of the public–private distinction in securities law. The two approaches are not mutually exclusive—it is possible to both reduce the stakes of the public–private distinction and to rebuild a version of the public–private divide.

Why might lowering the regulatory stakes of the public–private company distinction be desirable? As illustrated by the public company regulatory paradox discussed in the Introduction, otherwise-identical firms can inhabit entirely different regulatory universes depending on their public or private company status. Importantly, the regulatory universe in which a firm finds itself now hinges solely on the firm's capital raising choices. As we saw in Section I.C, public companies are heavily regulated in respect of various disclosure and corporate governance matters, whereas private companies are not. Moreover, the volume of regulation at issue has increased dramatically over the past two decades, as has the range of matters covered by such regulation. This, in turn, has heightened the compliance costs and the overall stakes of being a public company. Many of the deregulatory reforms described in Section II.B can be viewed as reforms aimed at extending to private firms benefits previously available only to public firms.

The difference between the regulatory treatment of public and private companies can be reduced by (1) narrowing the scope of securities regulation to matters most closely related to financial investors' buy/sell and voting decisions, and (2) making aspects of what is now public company regulation applicable to all business entities that meet certain criteria,

Exhibit 4 to Decl. of Georgiev
241
**SER 1657**

without regard to public company status. This approach would represent a substantial expansion of the role of the federal government in the regulation of business entities, but it would also reduce the weight of any individual firm's decision with respect to becoming a "public company" and make it possible to rationalize the regulatory regime for capital raising.

Take disclosure regulation as an example. If all firms, whether public or private, that meet certain pre-defined criteria *unrelated to capital market activity* become subject to a new stakeholder-focused mandatory disclosure regime, then the going-public decision is less likely to be affected by the perceived costs of the existing investor-focused mandatory disclosure regime. Ann Lipton has made the case for just such a new stakeholder-focused mandatory disclosure regime on the grounds of the social utility of providing stakeholders with firm-specific disclosure and the inadequacy of existing investor-focused disclosure for non-investor audiences.[272] Lipton's proposal for a separate stakeholder-focused disclosure regime has the important additional benefit of removing the secrecy advantage enjoyed by private firms vis-à-vis public firms and streamlining the regulatory calculus embedded in the going-public decision.

The insight motivating this conceptual approach is a reaction to the public company regulatory paradox: a firm's capital raising choices should not determine, in a binary fashion, whether or not it is subject to the extensive public company regulatory regime that today covers many matters that are only loosely-related to investor protection and may be better described as regulation in the service of business accountability, transparency, efficiency, and other goals. Relatedly, even if there is a robust public–private line for capital raising purposes, a firm's obligations in respect of general economic regulation should not be determined by the side of this line on which the firm finds itself.

Shifting federal economic regulation that currently operates through the public company category outside the realm of securities regulation would require the creation of new, alternative regulatory categories that are not tied to a firm's access-to-capital choices. Such alternative regulatory categories could encompass metrics such as number of employees, revenues, as-

---

272. *See* Lipton, *supra* note 270.

Exhibit 4 to Decl. of Georgiev
242
**SER 1658**

2021]      *THE BREAKDOWN OF THE PUBLIC–PRIVATE DIVIDE*      305

sets, and other indicators of a firm's societal footprint, i.e., a firm's potential to generate societal externalities that ought to be disclosed and/or regulated regardless of the firm's financing choices. Hillary Sale has developed a theory of "publicness" that links federal economic regulation to a firm's overall societal footprint.[273] Regulating on the basis of publicness can be done with or without reference to a firm's financing activities.[274]

Consider two specific examples, one concerning legislation from outside the United States and one concerning proposed U.S. legislation. The United Kingdom introduced a new regulatory regime in 2018 requiring large private companies to provide certain disclosures and comply with the substantive provisions of its new Corporate Governance Code.[275] While the public–private divide in the United Kingdom was never as pronounced as that in the United States, the new U.K. Corporate Governance Code circumvents the public–private divide entirely and imposes regulation that had previously applied on the basis of a company's status as a stock-exchange listed entity to all companies that meet certain criteria.[276] Contemporaneous amendments to other parts of U.K. corporate law require all companies (both public and private) with more than 250 U.K.-based employees to provide a statement describing any employee empowerment initiatives pursued by the company and summarizing "how the directors have engaged with employees" and "how the directors have had regard to employee interests, and the effect of that regard, including on the princi-

---

273. *See* Hillary A. Sale, *The New "Public" Corporation*, 74 LAW & CONTEMP. PROBS. 137, 137–38 (2011); Hillary A. Sale, Essay, *J.P. Morgan: An Anatomy of Corporate Publicness*, 79 BROOK. L. REV. 1629, 1630–31 (2014); Hillary A. Sale, *The Corporate Purpose of Social License*, Geo. L. Fac. Pubs. No. 2171 (2019), https://scholarship.law.georgetown.edu/facpub/2171.

274. *See, e.g.*, Onnig H. Dombalagian, *Principles for Publicness*, 67 FLA. L. REV. 649 (2016); Guttentag, *supra* note 248.

275. *See Corporate Governance for Private Companies: Restoring Trust in Big Business*, LINKLATERS, https://bit.ly/3o36jFu.

276. The Code's corporate governance reporting requirements apply to non-listed U.K. companies that meet one of two thresholds: (1) have more than 2000 employees globally, or (2) have annual turnover over £200 million and a balance sheet over £2 billion. *Id.*

Exhibit 4 to Decl. of Georgiev
243
**SER 1659**

Case 2:24-cv-00801-ODW-PVC    Document 54-4    Filed 07/24/24    Page 87 of 97    Page ID
#:3318

pal decisions taken by the company during the financial year."[277]

In the United States, the Accountable Capitalism Act proposed by Senator Elizabeth Warren in 2018 constructs a new regulatory category, "large entity," defined as any domestic entity engaged in interstate commerce with more than $1 billion in annual gross receipts.[278] Defined this way, the category captures both public and private companies. Under the Act's proposal, large entities would be subject to a variety of corporate governance regulations; previous proposals in respect of some of these regulations were limited to public companies only.[279]

The purpose of this discussion is to outline an alternative conceptual approach with respect to the future of the public–private divide in securities law rather than to analyze or endorse any of the specific proposals that have been mentioned. The more work the public–private divide is asked to do (and, particularly, work beyond the regulation of capital raising), the more pressure there is on the public–private distinction. If there are new regulatory categories that circumvent the public–private distinction, the effectiveness of the regulations employing those categories would likely be enhanced; such an approach would also make it easier to recalibrate the existing investor protection standards for public capital markets.

---

277. *See* The Companies (Miscellaneous Reporting) Regulations 2018, SI 2018/860 (UK); *see also* Georgiev, *Human Capital Management*, *supra* note 61, at 658–59 and sources cited therein. The same category of companies are also required to disclose the gender pay gap on an annual basis. *See* Aleksandra Wisniewska et al., *Gender Pay Gap: How Women Are Short-Changed in the UK*, Fin. Times (Sept. 25, 2020), https://ig.ft.com/gender-pay-gap-UK.

278. Accountable Capitalism Act, S. 3348, 115th Cong. § 2 (2018). Aggregation rules based on the IRS Code safeguard against evading regulation by splintering entities to fall beneath the $1 billion threshold. *Id.* Large entities would be required to obtain a charter as a "United States corporation" from a newly-created Office of United States Corporations within the Department of Commerce. *Id.*

279. For example, whereas the Accountable Capitalism Act would require that employees of *large entities* (i.e., registered "United States corporations") be given the power to elect at least 40% of the board (*Id.* at § 6(b)(1)), the Reward Work Act, proposed by Senator Tammy Baldwin, would give employees of *public companies* (but not private companies) the power to elect one-third of directors. *See* Press Release, Off. of Sen. Tammy Baldwin, U.S. Senator Tammy Baldwin Reintroduces Legislation to Rein in Stock Buybacks and Give Workers a Voice on Corporate Boards (Mar. 27, 2019), https://bit.ly/3rhFaR7.

Exhibit 4 to Decl. of Georgiev
244
**SER 1660**

### C. *Reform Preconditions and Process*

The reform options discussed above are likely to be difficult and costly to implement. Given historical patterns of regulation,[280] as well as the political and logistical roadblocks to reform,[281] securities law may well need to wait until the next big market crisis before the public company regulatory paradox can be addressed.

What are the preconditions for change? Using a "critical junctures" framework, a recent paper by Steven Bank and Brian Cheffins suggests that a stock market crash may not be a sufficient condition for corporate law change.[282] Bank & Cheffins find that, in addition to a stock market crash, major reforms require "a lengthy period of depressed share prices and a perception amongst contemporaries that business wrongdoing precipitated or was otherwise integrally related to the slump."[283] If these patterns hold, it may well be a long time before there is a window of opportunity to return securities law to a state of conceptual coherence. As significant as they are, the immediate consequences of the breakdown of the public–private divide are not guaranteed to result in a stock market crash, a lengthy bear market, and a turn in public opinion connecting market problems to business wrongdoing. A market calamity of such proportions is much more likely to be caused by macroeconomic imbalances, financial engineer-

---

280. *See* Stuart Banner, *What Causes New Securities Regulation? 300 Years of Evidence*, 75 WASH. U. L. Q. 849, 855 (1997) (asserting that regulatory surges do not occur randomly and that the catalyst is a crash).

281. *See* Lucian Bebchuk & Assaf Hamdani, *Federal Corporate Law: Lessons from History*, 106 COLUM. L. REV. 1793, 1799–1816 (2006); John C. Coffee, Jr., *The Political Economy of Dodd–Frank: Why Financial Reform Tends to be Frustrated and Systemic Risk Perpetuated*, 97 CORNELL L. REV. 1019 (2012).

282. *See* Steven A. Bank & Brian R. Cheffins, *Corporate Law's Critical Junctures*, BUS. LAW. (forthcoming 2022), https://papers.ssrn.com/id=3877329. The authors explain that "[i]n the social sciences context, a critical juncture is an historical moment during which substantially greater change is possible than during the preceding and subsequent periods of stability." *Id.* at 3.

283. *Id.* at 4. The authors further note that "the prolonged downturn and the discrediting of the status quo provide an opening for major change absent under normal circumstances," which includes strong investor and public interest in regulation and, importantly, the inability of "incumbent financial and business interests" to stave off major reform due to their temporarily weakened position. *Id.* at 4–5.

Exhibit 4 to Decl. of Georgiev
245
**SER 1661**

ing gone awry, a natural disaster, or a "black swan"-type event. Of course, none of this can be predicted.

Recognizing that urgent reform may be impossible even if it seems necessary allows the luxury of time to reconsider the institutional design of securities regulation—the allocation of responsibility amongst the SEC, Congress, and courts, as well as the liability structure of securities law.[284] This deliberative approach may resemble the foundational debates around the adoption of the original securities laws during the 1930s. As we saw in Section I.C, both the means and the ends of public company regulation have grown more uncertain and more controversial over time. Questions such as the appropriate scope of the public company regulatory regime, the meaning of the statutory goals of "investor protection" as well as "efficiency, competition, and capital formation," the relevance of unstated-yet-manifested goals such as business transparency and accountability, the allocation of regulatory responsibility between state and federal law, among others, can all benefit from considered examination.

It is often said that "a crisis is a terrible thing to waste"[285]—but so is the time before a crisis. There is a lot that the SEC can do today to ensure that when the next opportunity for change arises, it will be ready to contribute to the legislative process drawing upon its authority and technical expertise. Specifically, the SEC should as soon as possible initiate a broad deliberative process involving multiple stakeholders to come up with a blueprint for capital market regulatory reform to address the breakdown of the public–private divide. Even if this blueprint is not put into immediate use due to congressional inaction, having such a blueprint will help the agency navigate the next occasion when Congress is focused on financial and capital market regulation. It will also make it more difficult for special interests to take over the regulatory process; as we have seen, in the absence of an SEC blueprint, pri-

---

284. Scholars have made the case for examining securities law's institutional design due to a variety of different concerns. *See, e.g.*, Zachary J. Gubler, *Reconsidering the Institutional Design of Federal Securities Regulation*, 56 Wm. & Mary L. Rev. 409 (2014); Mark I. Steinberg, Rethinking Securities Law (2021); Donald C. Langevoort, Selling Hope, Selling Risk: Corporations, Wall Street, and the Dilemmas of Investor Protection (2016).

285. *See* Jack Rosenthal, *A Terrible Thing to Waste*, N.Y. Times Mag. (July 31, 2009), https://nyti.ms/3yreIpG (discussing the history of the quote).

Exhibit 4 to Decl. of Georgiev
246
**SER 1662**

2021]     *THE BREAKDOWN OF THE PUBLIC–PRIVATE DIVIDE*     309

vate actors supply their own blueprints which often turn into a regulatory agenda.[286]

A change of approach on a more procedural level may also be advisable. Notice-and-comment rulemaking in respect of specific proposals is not an effective means of surveying a wide range of regulatory options or considering foundational regulatory questions such as those listed in the preceding paragraphs; the SEC's use of "concept releases" as a step-zero in notice-and-comment rulemaking, which grew more widespread during the 2010s, is a minor improvement at best. The SEC has used special committees comprised of internal and external experts in prior decades and it should renew this practice. Each of the policy proposals discussed in Sections IV.A and IV.B above deserves careful consideration. In addition, the SEC should focus on data gathering and analysis of private capital raising, most of which still occurs in the shadows. Finally, the SEC should use its authority to engage in investor testing in connection with major policy proposals, which Congress reaffirmed in 2010 through Section 912 of the Dodd–Frank Act.[287] Drawing on the outputs of a well-designed deliberative process and armed with adequate evidence, the SEC can steer the policy conversation with respect to the public–private divide at securities law's next critical juncture, whenever it might occur.

## Conclusion

This Article started by identifying a public company regulatory paradox, which motivated the present inquiry: it is possible today for two virtually identical firms to be subject to widely different regulatory obligations, which depend solely on the firms' financing choices. Public companies must comply with

---

286. *See supra* note 161 and accompanying text (noting the wholesale adoption of deregulatory proposals contained in the IPO Task Force Report through the JOBS Act) & *supra* note 169 and accompanying text (noting the wholesale adoption of deregulatory proposals advocated in a 2018 report from the Committee on Capital Markets Regulation).

287. *See* Dodd–Frank Act § 912, 15 U.S.C. § 77s(e) (providing that the SEC may "(1) gather information from and communicate with investors or other members of the public; (2) engage in such temporary investor testing programs as the Commission determines are in the public interest or would protect investors; and (3) consult with academics and consultants, as necessary . . . .").

Exhibit 4 to Decl. of Georgiev
247
**SER 1663**

an extensive and elaborate disclosure and governance framework related to investor protection, transparency, and accountability, whereas private companies are free to operate without disclosure and governance oversight at the federal level. As we saw, the present-day regulatory paradox is a manifestation of the breakdown of the longstanding public–private divide in securities law.

The Article then presented an account of how the public–private divide has lost its descriptive and explanatory power as an organizing principle of securities law. The breakdown of the divide has been a function of numerous, often-incremental deregulatory policies in the service of capital formation during the 2010s, which were, in turn, spurred by significant evolutionary shifts in capital markets and justified with reference to the massive expansion of public company regulation through the Sarbanes–Oxley Act of 2002 and the Dodd–Frank Act of 2010. In addition to highlighting the breakdown of the divide, the Article identified serious systemic and stakeholder-specific consequences: the now-elective nature of public company regulation, the diminished regulatory capacity of securities law, the fragmentation of investor protection, and the increased vulnerability of employee-investors. Addressing these problems, by rebuilding the divide, circumventing it, or through other means, will likely require foundational changes to the regulatory regime. It will also require policymakers and regulators to update the notions of investor protection, capital formation, efficiency, competition, and, more generally, what it means to regulate capital markets in the public interest.

The Article's focus on the public–private divide should not obscure several analytical points. First, private capital certainly has a role to play in the modern economy; *small, early-stage* private companies are often a source of significant innovation, which results in benefits to society. There is, for example, much hope that startups focused on clean energy will help with the transition to a greener economy. Nothing here suggests that securities law should treat such firms in the same way as their mature counterparts; as noted throughout, the focus is on larger private companies, such as unicorns, that have been in existence for some time and that have acquired a substantial footprint in terms of implied valuation, investor base, number of employees, and various other metrics. Second, while the public (regulated) vs. private (unregulated) markets dichot-

Exhibit 4 to Decl. of Georgiev
248
**SER 1664**

omy is helpful, it does not imply that public markets are perfect; certain specific aspects of the regulation of public markets are the subject of lively academic and policy debates, which lie outside the scope of this Article. Finally, as a factual matter, most large private firms do eventually elect to transition to public company status. One could therefore posit that intervention is unnecessary, because the problems identified here resolve themselves over the long run and at the level of individual firms. This Article has shown that the problems that arise over the short- and medium-run, as well as on a systemic level, are serious enough to warrant regulatory attention.

Zooming out, it is worth noting that because financial capital is both highly mobile and highly morphable, regulating it has never been easy. Political, macroeconomic, technological, and even epistemological challenges abound. More so than in other areas, law here plays a dual rule: not only to proscribe harmful activities, but also to actively enable beneficial ones. In 2021, there are various capital market phenomena that straddle the line between harmful and beneficial, including SPACs, stablecoins, other cryptocurrencies, and certain stock trading platforms. There are also various phenomena that are clearly problematic, such as unaccounted for risks (including climate and cybersecurity), asset valuation issues pertaining to human capital, data assets, and other intangibles, and, as always, issues related to fraud, capital market microstructure, and international competition.

The SEC's ability to solve these problems and future ones, as well as the nature of the solutions, will in large part turn on the renegotiation of the public–private divide. The regulatory future is uncertain, but it is safe to say that securities law's most interesting and challenging years lie ahead.

Exhibit 4 to Decl. of Georgiev
249
**SER 1665**

312     *NYU JOURNAL OF LAW & BUSINESS*     [Vol. 18:221

APPENDIX:
SELECTED DATA ON TRENDS IN CAPITAL MARKETS

FIGURE A–1: NUMBER OF U.S. LISTED IPOs (1995–2021)



Note: 2021 data through Nov. 16

Source: Corri Driebusch, *IPOs Keep Jumping Higher. How Long Will the Ride Last*, WALL. ST. J. (Nov. 19, 2021), https://on.wsj.com/3lkKAHj (reporting data from Dealogic).

Exhibit 4 to Decl. of Georgiev
250
**SER 1666**

2021]        *THE BREAKDOWN OF THE PUBLIC–PRIVATE DIVIDE*        313

FIGURE A–2: NUMBER OF U.S. LISTED AND U.S. PRIVATE
EQUITY-OWNED COMPANIES (2000–2017)



Source: *Capital Raising Goes Back to the Future*, NEUBERGER BERMAN, https://
bit.ly/32M3IYc (last visited Nov. 30, 2021) (reporting data from World Bank,
World Federation of Exchanges, PitchBook, Credit Suisse).

FIGURE A–3: ASSETS UNDER MANAGEMENT FOR U.S. BUYOUT
INDUSTRY (1990–2019)



Source: MICHAEL J. MAUBOUSSIN & DAN CALLAHAN, MORGAN STANLEY, PUBLIC
TO PRIVATE EQUITY IN THE UNITED STATES: A LONG-TERM LOOK 34 (2020),
https://mgstn.ly/31CaMpV (reporting data from PitchBook, NVCA, and
Counterpoint Global).

Exhibit 4 to Decl. of Georgiev
251
**SER 1667**

314          NYU JOURNAL OF LAW & BUSINESS          [Vol. 18:221

FIGURE A–4: VOLUME OF CAPITAL RAISED BY U.S. COMPANIES
IN PUBLIC AND PRIVATE MARKETS (2009–2017)



Source: Jean Eaglesham & Coulter Jones, *The Fuel Powering Corporate America:
$2.4 Trillion in Private Fundraising*, WALL. ST. J. (Apr. 3, 2018), https://
on.wsj.com/3xz1B5m (reporting data from Dealogic and an analysis of SEC
filings).

FIGURE A–5: VOLUME OF CAPITAL RAISED BY U.S. COMPANIES
IN EXEMPT AND REGISTERED OFFERINGS (2009–2018)
(SEC)



Source: U.S. Sec. & Exch. Comm'n, Concept Release on Harmonization of
Securities Offering Exemptions, Securities Act Release No. 33–10,649, 84 Fed.
Reg. 30,460, 30,465 (proposed June 26, 2019) (reporting data from the SEC
Division of Economic and Risk Analysis).

Exhibit 4 to Decl. of Georgiev
252
SER 1668

FIGURE A–6: GROWTH OF GLOBAL PRIVATE EQUITY AND PUBLIC EQUITY (%) (2000–2020)



Source: MCKINSEY, MCKINSEY'S PRIVATE MARKETS ANNUAL REVIEW 19 (2021), https://mck.co/3o6olXp (reporting data from World Federation of Exchanges and Preqin).

FIGURE A–7: TIME TO IPO AND MARKET CAPITALIZATION AT IPO: AMAZON, GOOGLE, FACEBOOK, UBER



Source: MICHAEL J. MAUBOUSSIN & DAN CALLAHAN, MORGAN STANLEY, PUBLIC TO PRIVATE EQUITY IN THE UNITED STATES: A LONG-TERM LOOK 49 (2020), https://mgstn.ly/31CaMpV (reporting data from company SEC filings and Counterpoint Global).

Exhibit 4 to Decl. of Georgiev
253
**SER 1669**

FIGURE A–8: NUMBER OF UNICORNS AND TOTAL CAPITAL RAISED BY UNICORNS IN UNITED STATES, CHINA, AND REST OF THE WORLD (2016–2021)



(Data reported on a quarterly basis.)

Source: *Technology Unicorns Are Growing at a Record Clip*, ECONOMIST, Jul. 24, 2021, https://econ.st/3IxkXwT (reporting data from CB Insights).

FIGURE A–9: QUARTERLY STOCK BUYBACKS BY S&P 500 COMPANIES (1998–2019)



(Data shown in billions of U.S. dollars.)

Source: Richard Henderson, *Fall in Share Buybacks Poses Threat to US Stocks*, FIN. TIMES (Aug. 23, 2019), https://on.ft.com/3ox4Ln8 (reporting data from S&P Dow Jones Indices).

Exhibit 4 to Decl. of Georgiev
254
**SER 1670**

1  ROB BONTA
   Attorney General of California
2  GARY E. TAVETIAN (SBN 117135)
   MYUNG J. PARK (SBN 210866)
3  Supervising Deputy Attorneys General
   M. ELAINE MECKENSTOCK (SBN 268861)
4  CAITLAN MCLOON (SBN 302798)
   EMILY HAJARIZADEH (SBN 325246)
5  DYLAN REDOR (SBN 338136)
   KATHERINE GAUMOND (SBN 349453)
6  Deputy Attorneys General
     300 South Spring Street, Suite 1702
7    Los Angeles, CA  90013-1230
     Telephone:  (213) 269-6438
8  Fax:  (213) 897-2802
     E-mail:  Caitlan.McLoon@doj.ca.gov
9  *Attorneys for Defendants Liane M. Randolph,*
   *Steven S. Cliff, and Robert A. Bonta*

10

11          IN THE UNITED STATES DISTRICT COURT

12          FOR THE CENTRAL DISTRICT OF CALIFORNIA

13

14

| | |
|---|---|
| 15 **CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION,**<br><br>Plaintiffs,<br><br>v.<br><br>**LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, and STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California,**<br><br>Defendants. | 2:24-cv-00801-FMO-PVCx<br><br>**DECLARATION OF PROFESSOR GEORGE S. GEORGIEV IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:          September 9, 2024<br>Time:          1:30 p.m.<br>Courtroom:  6D<br>Judge:         The Honorable Otis D. Wright II<br>Trial Date:   Not Set<br>Action Filed: 1/30/2024 |

**SER 1671**

## DECLARATION OF PROFESSOR GEORGE S. GEORGIEV

I, Professor George S. Georgiev, hereby declare:

1.     I have been retained by counsel for Defendants Liane M. Randolph, Steven S. Cliff, and Robert A. Bonta, in their official capacities, (Defendants) in connection with the above captioned litigation. I am over the age of 18 years and reside in Atlanta, Georgia. I know the following facts based on my own personal knowledge, and, if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

### Background and Experience

2.     I hold a J.D. from Yale Law School, an M.A. in Economics from the University of Munich, and a B.A., summa cum laude, in Economics (honors) and International Relations, from Colgate University. I am an active member of the New York bar.

3.     Between 2013 and 2016, I taught at the University of California, Los Angeles School of Law. Since 2016, I have been on the faculty of Emory University School of Law in Atlanta, Georgia, where I teach courses in Contracts, Business Associations, Advanced Corporate Law, Corporate Governance, and related subjects.

4.     My scholarly research spans the fields of corporate governance and securities law, with a particular focus on questions of regulatory design and assessment. I have published a number of articles on corporate reporting and disclosure, climate-related disclosure, and the public-private distinction in securities law, among other topics. These works are directly relevant to the matters covered in my declaration and inform my conclusions.

5.     Methodologically, my research relies on statutory and doctrinal analysis, law-and-economics tools, and historical and comparative perspectives. The normative positions reflected in my overall body of work have not been monolithic but, rather, have turned on the particular facts and underlying evidence. In the context

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

of disclosure rules, for example, I have written articles supportive of certain types of disclosure requirements as well as articles critical of other types of disclosure requirements.[1]

6.     My scholarship has been cited widely by legal and non-legal scholars. It has furthermore been recognized by the Ford Foundation, translated into foreign languages, and selected for inclusion in annual anthologies of leading law review articles. I am frequently invited to speak at academic and policy conferences, and I am an elected member of the executive committees of the Association of American Law Schools Section on Securities Regulation and the Section on Business Associations.

7.     Policymakers, legislators, and the media have also relied on my expertise on questions of disclosure, climate disclosure, and securities law. I have testified about climate disclosure before the U.S. House of Representatives Committee on Financial Services and before the U.S. Senate Climate Change Taskforce. My research has been cited by SEC Commissioners of both political parties, and I have also spoken before the SEC's Investor Advisory Committee. I have provided legal commentary for various media outlets, including the *New York Times*, *Los Angeles Times*, *Washington Post*, *Financial Times*, *The Guardian*, *USA Today*, Bloomberg, Bloomberg Law, Reuters, NPR, ABC, CNN, and the BBC.

8.     Before becoming an academic, I practiced in the area of corporate and securities law at Sullivan & Cromwell LLP and Clifford Chance LLP. A major part of my practice involved advising companies on compliance with U.S. and non-U.S. disclosure requirements, including requirements analogous in kind to S.B. 253 and

---

[1] *See, e.g.*, George S. Georgiev, *The Market-Essential Role of Corporate Climate Disclosure*, 56 U.C. DAVIS L. REV. 2105 (2023) (supporting the SEC's climate-related disclosure proposal on market efficiency grounds); Steven A. Bank & George S. Georgiev, *Securities Disclosure as Soundbite: The Case of CEO Pay Ratios*, 60 B.C. L. REV. 1123 (2019) (critiquing the federal pay ratio disclosure rule due to its inapt design). True and correct copies of these law review articles are attached as **Exhibits 2 and 3**, respectively.

3

S.B. 261. Through this work, I gained real-world insights into firms' compliance capabilities, strategies, and practices, which has complemented my academic study of those matters.

9.    My education, professional background, and publications are described in additional detail in my curriculum vitae, which is attached hereto as **Exhibit 1**.

### Introduction

10.    In 2023, California enacted two bills, S.B. 253 and S.B. 261 (together, the "Disclosure Laws"), which will require certain firms doing business in California to disclose objective climate-related information. The information is to be disclosed in accordance with established and carefully-designed frameworks that have been in use, both in the United States and overseas, for years.[2] Importantly, the Disclosure Laws require only disclosure—without any changes in conduct or strategy—and do not ask companies to take positions on contentious issues.[3] Many firms already collect and report the information in question, either voluntarily or pursuant to existing state and federal laws.[4] The policy environment on climate disclosure is dynamic and California is by no means an outlier: other states, the federal government, and numerous non-U.S. jurisdictions are considering, or have recently adopted, disclosure requirements that mirror California's Disclosure Laws.[5]

11.    This declaration presents several conclusions resulting from my analysis of the Disclosure Laws: (a) in all relevant respects, the Disclosure Laws are comparable to longstanding and well-accepted federal disclosure mandates, which suggests that the information required by the Disclosure Laws is conventional in nature, as are the sources and methods necessary for compliance; (b) the particular tailoring of the Disclosure Laws, including their applicability to certain large privately-held companies doing business in California, is necessary to ensure

---

[2] *See infra* ¶¶ 29-33.
[3] *See id.*; *see also infra* ¶¶ 20-27.
[4] *See infra* ¶¶ 30, 33, 50, 54.
[5] *See infra* ¶ 50.

4

effectiveness; and (c) as the implicit guarantor of California public pension funds' obligations to their beneficiaries, the California state government has a compelling interest in ensuring that public pension funds have the climate-related information relevant to their investment decisions and ultimate solvency.

## Methodology and Research

12.     For purposes of this declaration, I performed a close analysis of the specific provisions of the Disclosure Laws and related legislative materials. In addition, I compared the legislative text against the descriptions of the Disclosure Laws contained in petitioners' submissions for the purpose of identifying specific features of the Disclosure Laws that may have been misunderstood.

13.     In my assessment of the design features of the Disclosure Laws, I have relied upon my review of the principal research studies and academic commentary on disclosure and securities regulation from the fields of law, accounting, and finance,[6] as well as numerous research studies and academic commentaries on climate disclosure. In addition, I have relied on the original research I conducted in connection with my publications and working papers.

14.     I have also relied upon my review of the comment file for the SEC climate-related disclosure proposal,[7] which covered similar subject matter as the Disclosure Laws.[8] The SEC comment file originated through the regular notice-and-

---

[6] I performed this review in 2023-24 in connection with the preparation of a book chapter titled "Disclosure as a Corporate Governance Tool: Channels & Challenges" in *The Oxford Handbook of Corporate Law and Governance* (2d Ed.) (Jeffrey Gordon & Wolf-Georg Ringe, eds., forthcoming 2024), a peer-reviewed, encyclopedic collection presenting the current state of academic learning in corporate law and governance authored by leading subject matter experts selected by the handbook's editors.

[7] *See* U.S. Sec. & Exch. Comm'n, Final Rule: The Enhancement and Standardization of Climate-Related Disclosures for Investors, 89 Fed. Reg. 21,668 (Mar. 28, 2024).

[8] The SEC rule requires disclosure of material climate-related risks and material climate-related impacts as well as Scope 1 and Scope 2 GHG emissions, a transition risk indicator, to the extent such emissions are financially material to the disclosing company. *See* 89 Fed. Reg. at 21670. The SEC rule does not require disclosure of Scope 3 emissions. *See id.* at 21675. Like all SEC disclosure rules, it applies only to
(continued…)

5

comment rulemaking process and contains over 4,500 detailed submissions from companies (both public and private), various investor types (institutional, retail, public pension funds, asset managers, and others), academics, corporate advisors, trade associations, non-governmental organizations, and others. The comment file reflects a broad range of perspectives and considerations pertaining to climate disclosure, including the perspectives of numerous California citizens, California communities, and California investors, which are relevant to the assessment of the Disclosure Laws.

15.    The materials and methods upon which I have relied in forming the opinions and conclusions stated herein are commonly and reasonably relied upon by legal, business, and other experts.

**I.    Federal Securities Regulation Commonly Requires the Disclosure of Business Information Similar in Type to the Information Sought Through the Disclosure Laws**

16.    The federal securities laws, which date back to the 1930s,[9] require companies to disclose business information on a variety of topics and in a variety of different formats. Companies subject to these laws are required to disclose basic financial and operational information about their business, including information about the company's financial condition, descriptions of the company's operations, property, obligations, legal proceedings, and officers' and board members' compensation, among other things.[10]

---

companies that have elected to go public. On April 4, 2024, the SEC stayed the rule in light of litigation that is currently pending in the Eight Circuit. *See* U.S. Sec. & Exch. Comm'n, The Enhancement and Standardization of Climate-Related Disclosures for Investors; Delay of Effective Date, 89 Fed. Reg. 25804 (Apr. 12, 2024).

[9] As is well known, the federal securities disclosure regime traces its origins back to the 1930s and the Securities Act of 1933, passed by Congress in the aftermath of the stock market crash of 1929 and in the midst of the resulting Great Depression.

[10] The core disclosure rules are contained in Regulation S-K (17 C.F.R. § 229 (2024)), which sets out requirements for various financial and non-financial disclosures, and Regulation S-X (17 C.F.R. § 210 (2024)), which together with various accounting pronouncements establishes a common standard for the form

(continued…)

6

17.     Firms are also routinely required to make disclosures that go beyond basic descriptions. For example, each company must disclose information about its corporate governance arrangements; the risks faced by the company or associated with investing in its securities; management's assessment of the factors it believes have affected past performance as well as known trends or uncertainties that are reasonably expected to impact future results in the near and long term; and even more esoteric topics, like "golden parachutes," the use of conflict minerals in the supply chain, mine safety, activities in breach of U.S. sanctions on Iran, and more.[11]

18.     In the context of these federal securities disclosures, companies must frequently make reasoned judgments, and in some cases, rely on estimates, because the subject of the vast majority of corporate disclosure is not susceptible to direct observation. Moreover, companies participating in the securities markets are frequently required to disclose information regarding future risks and contingencies that could affect the company. Disclosures of this kind have long been understood to produce information highly valued by investors, by allowing companies to present a more complete picture of their business and financial condition than if they were limited to statements of readily observable phenomena alone.

### A.   Disclosures of a Company's Assessed Future Risks Are Considered Accurate and Factual in the Federal Securities Context

19.     Federal securities requirements have required companies to assess and disclose perceived risks and uncertainties, according to their business judgment, in a number of different arenas:

---

and substance of financial statement disclosure. The SEC disclosure requirements trace their origins to Schedule A of the Securities Act of 1933, Securities Act of 1933, 48 Stat. 74 (codified as amended at 15 U.S.C. § 77aa).

[11] *See, e.g.*, George S. Georgiev, *The Breakdown of the Public–Private Divide in Securities Law: Causes, Consequences, and Reforms*, 18 N.Y.U. J. L. & BUS. 221, 247-55 (2021) (providing an overview of the SEC disclosure regime). A true and correct copy of this law review article is attached as **Exhibit 4**.

7

a. The Management's Discussion and Analysis (MD&A) section of annual and periodic disclosure reports elicits extensive analysis and disclosure of future risks and uncertainties pertaining to the company's *future financial condition and results of operations*. Management is required to discuss known trends, demands, commitments, events, or uncertainties that are reasonably likely to result in a material future impact on the company's liquidity, capital resources, or results of operations.[12] In practice, the rule requires disclosure about management's perspective on future performance, even if it involves a degree of uncertainty and relies on estimates. The goal is to provide a transparent and comprehensive view of the company's financial prospects, enabling investors to make informed decisions despite the uncertainties inherent in forward-looking information.

b. The SEC has also required disclosure about the impact of highly specific events or trends on the company's future financial condition and results of operation. Relevant recent examples include requirements (issued in the form of a series of guidance documents) to describe the projected future impact of the *Covid-19 pandemic* on a firm's business and results of operations,[13] a May 2022 requirement to describe the projected impact of *Russia's war on Ukraine* on a firm's supply chain,[14] and a series of comment letters from 2023 asking firms to disclose and discuss the projected future impact of *high rates of inflation*.[15] Each of these

---

[12] Item 303, Regulation S-K, 17 C.F.R. § 229.303 (2024).

[13] U.S. Sec. & Exch. Comm'n, COVID-19 (last modified: Jan. 8, 2021), https://www.sec.gov/corpfin/corporation-finance-covid-19 (listing 15 guidance documents, statements, and interpretations by the Commission in connection with the Covid-19 crisis). A true and correct copy of the SEC's webpage regarding Covid-19 guidance documents, statements, and interpretations is attached as **Exhibit 5**.

[14] U.S. Sec. & Exch. Comm'n, Div. of Corp. Fin, Sample Letter to Companies Regarding Disclosures Pertaining to Russia's Invasion of Ukraine and Related Supply Chain Issues (May 3, 2022), https://www.sec.gov/rules-regulations/staff-guidance/disclosure-guidance/sample-letter-companies-regarding-disclosures. A true and correct copy of the SEC webpage displaying the sample letter is attached as **Exhibit 6**.

[15] *See* Cydney Posner, Cooley PubCo, *In Discussions of Inflation, SEC Staff Want the Details* (Aug. 16, 2023), https://cooleypubco.com/2023/08/16/staff-details-
(continued...)

disclosures require firms to look into the future and, to the best of their knowledge and ability, provide investors with relevant information.

      c.     Notably, risk reporting has been required even for highly uncertain future events. Disclosure requirements from 1997 and 1998 pertaining to *Year 2000 ("Y2K") readiness* offer one such example. The SEC acknowledged that "[o]nly one thing is certain about the impact of the Year 2000—it is difficult to predict with certainty what truly will happen after December 31, 1999."[16] In the same breath, however, the SEC proceeded to require companies to make predictive statements about Y2K's impact on their operations. In particular, the SEC required disclosure both by companies that had not completed an assessment of their Y2K issues, and by companies that had completed their assessment and had determined that "the consequences of [their] Year 2000 issues would have a material effect on the company's business, results of operations, or financial condition, without taking into account the company's efforts to avoid those consequences."[17] For the latter, the SEC required disclosure of "(i) the company's state of readiness; (ii) the costs to address the company's Year 2000 issues; (iii) the risks of the company's Year 2000 issues; and (iv) the company's contingency plans."[18]

      d.     The financial accounting rules on *loss contingency accounting and disclosure*, which are incorporated in the disclosure regime through the requirement to disclose financial statements, require firms to estimate, quantify, and disclose information about uncertain future events. The relevant rule, ASC 450, defines a "contingency" as "an existing condition, situation, or set of circumstances

---

inflation; Nicole M. White, Bloomberg, *SEC Urges Inflation Risk Disclosures as Price Increases Persist* (Aug. 14, 2023), https://news.bloombergtax.com/financial-accounting/sec-urges-inflation-risk-disclosures-as-price-increases-persist. True and correct copies of these news articles are attached as **Exhibits 7** and **8**, respectively.
[16] U.S. Sec. & Exch. Comm'n, Statement of the Commission Regarding Disclosure of Year 2000 Issues and Consequences by Public Companies, Investment Advisers, Investment Companies, and Municipal Securities Issuers, 63 Fed. Reg. 41394, 41396 (Aug. 4, 1998).
[17] *Id.* at 41395.
[18] *Id.*

9

involving uncertainty as to possible gain (gain contingency) or loss (loss contingency) to an entity that will ultimately be resolved when one or more future events occur or fail to occur."[19] Pending or threatened litigation is one example of a loss contingency. When it considers the impact of pending or threatened litigation, a firm is required to make predictions about the future, including the likely actions of other parties (e.g., litigation opponents). And if it is unable to estimate the expected loss from a particular contingency, the firm is required to provide a description of the contingency and the analysis that led to the conclusion that estimation is not possible.[20]

20.    In each of these examples, the companies required to issue disclosures were merely required to present *factual information*, not opinions about the underlying contingencies or risks identified by the disclosure requirements themselves.

21.    When firms make disclosures relating to anticipated risks in compliance with applicable federal securities requirements, they are reporting their *business judgments* about the matters in question. The required disclosures are factual to the extent that they accurately report the firm's business judgments. Formulating such business judgments, in turn, requires no more than a reasonable basis predicated upon present information.[21] At core, the relevant questions in the context of disclosure of future risks and contingencies are only two. First, does the firm have a business

---

[19] FINANCIAL ACCOUNTING STANDARDS BOARD, CONTINGENCIES (TOPIC 450): DISCLOSURE OF CERTAIN LOSS CONTINGENCIES (2010). A true and correct copy of ASC 450 is attached as **Exhibit 9**.
[20] *See* George S. Georgiev, *Too Big to Disclose: Firm Size and Materiality Blindspots in Securities Regulation*, 64 UCLA L. REV. 602, 634 (2017). A true and correct copy of this law review article is attached as **Exhibit 10**.
[21] Federal securities litigation has defined the parameters of what is expected of management in the disclosure context. *See, e.g.*, *In re Ikon Office Solutions, Inc.*, 277 F.3d 658, 673 (3d Cir. 2002) ("[T]o give rise to section 10(b) liability for fraud, the mere second-guessing of calculations will not suffice . . . ."); *id.* (noting that "[securities disclosure] law does not expect clairvoyance"); *Polk v. Fritz (In re Fritz Cos. Sec. Litig.)*, No. C96-2712, 1998 U.S. Dist. LEXIS 23063, at *8 (N.D. Cal. Mar. 5, 1998) (noting that to establish securities disclosure violations, plaintiffs cannot use "later events . . . to support the falsity of earlier statements").

10

judgment regarding the impact of a particular future event, risk, or uncertainty on its own business, financial condition, or results of operations? And if so, what is the firm's business judgment? Both of these questions are purely factual.

22.    The government does not hold firms to account when their business judgments about future events turn out to have been incorrect. And management and boards of directors are protected from liability for poor business judgments, even when they result in significant losses, by virtue of the well-established business judgment rule.[22]

### B.    Disclosures Involving Estimates are Considered Factual in the Federal Securities Context

23.    Firms also routinely disclose calculated and estimated information pursuant to federal requirements. Disclosure rules that commonly involve the use of estimates and methodological discretion include:

a.    *Oil and gas reserves*. Since 1978, public companies have been required to disclose information about the volume, value, and attributes of their oil and gas reserves and related matters.[23] This information is an essential aspect of the valuation of any company in the extractive industries and firms routinely have to make estimates and assumptions in order to calculate and report it. In the words of one large oil and gas company, "Nobody can know precisely how much oil exists under the earth's surface or how much it will be possible to produce in the future. All numbers are, at best, informed estimates."[24] Those estimates involve uncertain and

---

[22] According to the business judgment rule (BJR), even in cases where a business decision results in catastrophic losses, there is a presumption that the relevant decisionmakers acted on an informed basis, in good faith, and with the honest belief that the action taken was in the best interests of the corporation. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). When the BJR applies, a court will not substitute its judgment for that of the board as long as the decision has a rational business purpose. *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971).

[23] These disclosure requirements are currently contained in Item 1202 of Regulation S-K. *See* 17 CFR § 229.1202 (2024).

[24] *See* BP, Oil (and/or Gas) Reserve Definitions (2021) https://www.bp.com/content/dam/bp/business-sites/en/global/corporate/pdfs/energy-economics/statistical-review/bp-stats-review-

(continued…)

highly probabilistic judgments. Reserves, for example, are split into three broad categories—including *proven reserves*, *probable reserves*, and *possible reserves*.[25] These classifications and calculations are generally performed in line with the extensive methodological guidance promulgated by the Society of Petroleum Engineers (and associated bodies).[26]

  b. *CEO-to-median-worker pay ratio*. This disclosure requirement, mandated by Congress through the Dodd-Frank Act of 2010 and implemented by the SEC in 2018, afforded companies extensive flexibility to use estimates derived through "statistical sampling and/or other reasonable methods" and to apply a range of methodologies in the various aspects of the calculation process.[27] Instead of requiring the use of a specific methodology or attempting to ensure consistency across companies, the SEC only required firms to maintain a degree of internal consistency and have a reasonable basis for making the relevant methodological choices.[28]

  c. In the area of financial accounting, companies routinely rely on *critical accounting policies and practices* that require management to make judgments "about the effects of matters that are inherently uncertain."[29] Those, in turn, invariably entail *critical accounting estimates*. The use of critical accounting estimates and the development (and disclosure) of critical accounting policies

---

2021-oil-reserve-definitions.pdf. A true and correct copy of the statement posted by BP to its website is attached as **Exhibit 11**.

[25] *See* 17 C.F.R § 229.1202(a)(1) (2024).

[26] *See* Society of Petroleum Engineers, Petroleum Reserves and Resources Definitions (last accessed July 22, 2024), https://www.spe.org/en/industry/reserves. A true and correct copy of the Society of Petroleum Engineers' webpage is attached as **Exhibit 12**.

[27] *See* Regulation S-K, Item 402(u), Instruction 4(2), 17 C.F.R. § 229.402 (2017).

[28] *See* Bank & Georgiev, *supra* note 1, at 1150-63.

[29] PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD, AUDITING STANDARD 1301: COMMUNICATIONS WITH AUDIT COMMITTEES (Appendix A), https://pcaobus.org/oversight/standards/auditing-standards/details/AS1301. A true and correct copy of PCAOB's webpage, which sets out Auditing Standard 1301, is attached as **Exhibit 13**.

12

promote accuracy and verifiability and are generally welcomed by the users of the information.[30]

24.    The accuracy of these disclosures is underwritten through the use of methodologies that involve sampling techniques, statistical methods, machine learning, informed estimates, and expert judgments. These methodologies are subject to ongoing refinement.

25.    The use of estimates and the ability to apply different methodologies promotes accuracy. Estimates allow for companies to present a more complete picture of their business and financial condition than would be possible if they were required to limit disclosure to non-estimates. The availability of different methodologies allows for the tailoring of reporting methods to companies' specific characteristics and their compliance capacity.

26.    The factual nature of information that involves estimates and methodological discretion is illustrated by the fact that both investors and companies *routinely rely* on such information in making investment and business decisions that involve large financial outlays. For example:

a.    In the context of acquisitions, the volume and valuation of a potential target's oil and gas reserves are of paramount importance. Indeed, the oil and gas M&A boom that occurred during the 1980s has been attributed directly to the disclosure of reserve information that resulted from the adoption of an SEC disclosure rule in 1978.[31]

---

[30] *See, e.g.*, CFA Institute & Council of Institutional Investors, Re: Proposed Rule: Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information (Apr. 28, 2020), https://www.cii.org/files/issues_and_advocacy/correspondence/2020/CFA%20and%20CII%20Response%20to%20SEC%20Proposal%20on%20MDA.pdf (stating that "the addition of disclosures regarding Critical Accounting Estimates in the early 2000s was a welcome improvement to the financial statements"). A true and correct copy of this letter is attached as **Exhibit 14**.

[31] *See, e.g.*, Michael Guttentag, *An Argument for Imposing Disclosure Requirements on Public Companies*, 32 Fla. St. U. L. Rev. 123, 135 (2005) (attributing the increase in merger and acquisition activity in the oil and gas sector

(continued…)

13

b.      Investors rely on estimates in their valuation models. In the oil and gas sector, traditional cost accounting, which is backward-looking, does not provide adequate information about the future trajectory of the company, which depends in large part on current estimates of revenue streams, which are directly dependent on the value of oil and gas reserves.[32]

27.    In sum, disclosure is not automatically rendered *inaccurate* or *non-factual* simply by virtue of the fact that it contains estimates and reflects methodological discretion. As long as estimates are presented as estimates and as long as the use of calculation and estimation methodologies is generally accepted, good faith disclosures are considered accurate and factual.

## II.   Evidence Confirms that the Scope of the Disclosure Laws is Appropriate for the Interests Served

28.    A series of standard considerations arise anytime a legislator or a regulator is designing a new disclosure provision. These include: What type of information should be covered? How should the reporting entity source this information and ensure its accuracy, completeness, and comprehensibility? Are there any already existing methodologies for producing and presenting the information and what is their quality?[33] In each of these respects, the choices made by the California legislature in designing the Disclosure Laws were logical, reasonable, and conventional.

---

during the 1980s to the SEC's 1978 rule requiring disclosure of the value of oil and gas assets). A true and correct copy of this law review article is attached as **Exhibit 15**.

[32] *See, e.g.*, Heather Timmons, N.Y. TIMES, *Shell Reduces Estimate of Reserves Again* (Mar. 19, 2004), at C1, available at: https://www.nytimes.com/2004/03/19/business/shell-reduces-estimate-of-reserves-again.html (noting that [r]eserve estimates are an important indicator of an energy company's worth and strength" and that revisions to the company's estimates had "rattled investors"). A true and correct copy of this news article is attached as **Exhibit 16**.

[33] On the desirable attributes of disclosure, see generally George S. Georgiev, Disclosure as a Corporate Governance Tool: Channels and Challenges, in *The Oxford Handbook of Corporate Law and Governance* (2d Ed.) (Jeffrey Gordon & Wolf-Georg Ringe, eds., forthcoming 2024).

14

### A.  S.B. 253

29.    The first disclosure bill, S.B. 253, requires reporting of greenhouse gas (GHG) emissions in line with the GHG Protocol. In existence since 1998, the GHG Protocol is the dominant methodology for emissions accounting. Partnerships with industry groups, including those representing producers of high-emissions products, such as aluminum, pulp and paper, and cement,[34] have allowed for the refinement of the GHG Protocol's methodologies and the development of industry-specific calculation tools and standards for producers and service providers in oil and gas, aluminum, iron and steel, cement, waste removal, pulp and paper mill, real estate, and office-based organizations.[35] Industry-specific standards have considerable advantages.[36]

30.    The best indicator of the GHG Protocol's quality is its widespread *voluntary* uptake by firms. A recent study found that approximately 82% of S&P 500 companies *already* report Scope 1 and Scope 2 figures under GHG Protocol methodologies.[37] This is particularly significant because the disclosures are frequently included in SEC-filed reports subject to securities law liability and, in many cases, subject to CEO and CFO certifications as to the veracity of the information.[38]

### B.  S.B. 261

31.    For purposes of climate risk disclosure in S.B. 261, the California legislature again chose the dominant framework in existence, which has been developed by the Taskforce on Climate-Related Financial Disclosures (TCFD). The

---

[34] Lynn LoPucki, *Corporate Greenhouse Gas Disclosures*, 56 U.C. DAVIS L. REV. 405, 432–34 (2022). A true and correct copy of this law review article is attached as **Exhibit 17**.
[35] *Id.*
[36] *See* U.S. Chamber of Commerce, Comment on SEC Disclosure Rule at 2, https://www.sec.gov/comments/climate-disclosure/cll12-8907271-244249.pdf. A true and correct copy of the U.S. Chamber of Commerce's comment letter is attached as **Exhibit 18**.
[37] LoPucki, *supra* note 34, at 439.
[38] Regulation S-K Items 307 & 308, 17 C.F.R. § 229.307–308 (2020).

15

TCFD framework was established in 2015 through a directive of the Financial Stability Board (FSB)—an intergovernmental organization whose mandate is to promote international financial stability and prevent a repeat of the Global Financial Crisis (2007-2009), which had devastating effects on economies worldwide, including in California. The United States has three governmental representatives on the FSB—senior officials from the Federal Reserve, the Department of the Treasury, and the SEC.[39]

32.     The TCFD framework leaves decisions about the presentation of the underlying information to the reporting entity. This principles-based approach conforms to the preferences expressed by industry groups.[40] As with the GHG Protocol, firms are already familiar with the TCFD framework and use it widely.[41] The TCFD completed its mission in 2023 and transferred its responsibilities with respect to the monitoring of disclosures under the TCFD framework to the International Sustainability Standards Board, which is part of the IFRS Foundation.

33.     The TCFD's leadership and the types of entities represented on the TCFD highlight its status as a mainstream, U.S.-led standard-setter with broad industry buy-in, which, in turn, underwrites the quality and legitimacy of the TCFD disclosure framework embedded in S.B. 261. The TCFD's secretariat was headed by a leader in the financial industry and an American, Mary Schapiro, who holds the unique distinction of having served as an SEC Commissioner, Chair of the SEC, Chair of the CFTC, and CEO of FINRA.[42] Furthermore, the TCFD's working groups included representatives of large investors (including BlackRock and UBS Asset

---

[39] *See* Financial Stability Board, Members of the FSB, https://www.fsb.org/about/organisation-and-governance/members-of-the-financial-stability-board. A true and correct copy of the FSB's webpage listing its members, is attached as **Exhibit 19**.

[40] *See* U.S. Chamber of Commerce, *supra* note 36, at 6.

[41] *See* TASK FORCE ON CLIMATE-RELATED FINANCIAL DISCLOSURES, 2023 STATUS REPORT ii-v (Oct. 12, 2023) https://www.fsb.org/wp-content/uploads/P121023-2.pdf. A true and correct copy of this report is attached as **Exhibit 20**.

[42] *Id*. at 121.

16

Management), banks (JP Morgan, Citibanamex), insurance companies (Aviva, Swiss Re, Axa), giant industrial firms (BHP, Eni, Tata Steel, Unilever), rating agencies (Moody's, S&P), accounting firms (Deloitte, E&Y), and others.[43]

### C.   The Scope of Both Disclosure Laws Is Appropriate

34.    Adequate entity coverage, i.e., tailoring, is essential to the effectiveness of any disclosure rule. If a given rule applies to some but not all relevant entities, it is said to be underbroad and its intended benefits fail to materialize. Underbroad disclosure rules are problematic for several reasons: Most obviously, the rule's beneficiaries would not have at their disposal information from the relevant entities that were not captured. In addition, when relevant entities are not covered, the interpretation of the information provided by the covered entities is distorted because information attains its full meaning only in context. Finally, when a disclosure rule does not cover two entities that are identical in relevant respects (e.g., size or economic impact), this creates a fairness concern that undermines the basic legitimacy of the rule. These problems occur both when regulators set under-inclusive criteria for coverage and also when relevant entities can easily evade the rules.

35.    Overbroad rules—those that capture entities that are not relevant to a rule's purpose—are also problematic because they may create undue compliance burdens.[44] As part of the process of disclosure rule design, therefore, legislators and regulators need to tailor the applicability of disclosure requirements so as to prevent both under- and over- inclusiveness problems.

---

[43] *See* TASK FORCE ON CLIMATE-RELATED FINANCIAL DISCLOSURES, 2021 STATUS REPORT 76-77 (2021), https://www.fsb.org/wp-content/uploads/P141021-1.pdf. A true and correct copy of this report is attached as **Exhibit 21**.

[44] In the area of disclosure, any given rule is more likely to be underbroad than overbroad. In other words, it is more likely that a rule would fail to cover relevant entities rather than that it would cover irrelevant entities. This is so because the benefits of disclosure are invariably diffuse whereas its costs are concentrated. The beneficiaries of disclosure, therefore, face collective action problems in lobbying to correct under-inclusiveness, whereas firms have a financial incentive to lobby against over-inclusiveness.

17

36.     The Disclosure Laws avoid these problems by conditioning compliance on a straightforward, objective, and easily measurable financial metric that does not lend itself to rote manipulation: annual revenues. As noted, S.B. 253 applies to entities with annual revenues exceeding $1 billion, while S.B. 261 applies to entities with annual revenues exceeding $500 million.[45] Moreover, both laws are limited to entities that "do business in California."[46]

37.     The fact that the Disclosure Laws employ revenue thresholds to determine applicability sets them apart from federal securities disclosure requirements, which apply only to "public" companies. California's choice better serves the government's interests here. The public company category increasingly fails to capture economically-significant entities due to a series of recent deregulatory and market developments.

38.     The difference in approach between the Disclosure Laws and federal securities disclosure requirements can be explained by California's interest in (i) capturing all relevant entities (i.e., all economically-significant companies that do business in California), and (ii) avoiding compliance loopholes. Because the effectiveness of any disclosure rule depends on adequate entity coverage, the particular tailoring of the Disclosure Laws is necessary to ensure effectiveness.

39.     The closest available alternative—conditioning the Disclosure Laws' applicability on public company status—is clearly inferior because it would be ineffective and more burdensome. As shown below, under this alternative the disclosure requirements will be *both* underbroad (failing to capture certain economically-significant entities) and overbroad (imposing compliance obligations on entities that are not economically significant).

---

[45] See Cal. Health & Safety Code §§ 38532(a)(2), 38533(a)(4).
[46] The term "doing business in California" is subject to further explication by CARB in implementing regulations required by S.B. 253. *See id.* §§ 38532(c)(1), (c)(3).

18

40.    Moreover, even though disclosure obligations are most often associated with public companies, no overarching rationale exists for confining the applicability of disclosure obligations to public companies. A revenue-based approach that does not distinguish between public and private companies, therefore, is conventional. As illustrated in the Appendix, multiple existing and recently-proposed disclosure requirements, including from California, from the federal government, and from non-U.S. jurisdictions, rely on the same objective annual revenue metric as the Disclosure Laws.[47]

41.    The alternative approach of conditioning compliance on public company status would be clearly underbroad because it would fail to capture all economically-significant entities. Even though both history and logic suggest that there might be a significant degree of overlap between the set of entities that are public companies and those that are economically significant, the two categories have diverged considerably in recent years due to deregulatory changes in federal securities law and the increased availability of private capital.[48] The total implied market valuation—a proxy for size and economic impact—of new U.S.-based private firms rose more than 11-fold between 2013 and 2023, while the absolute number of such firms rose more than 15-fold during the same period.[49]

42.    Achieving annual revenues above $1 billion—the threshold contained in S.B. 253—is a business accomplishment that is both significant and rare. According to a leading management consultancy, reaching such an annual revenue level generally requires "market acceptance" meaning that "[the firm's] product or service appeals to a broad set of customers, and the company has become adept at

---

[47] Item 1 in the Appendix to this declaration compares the California Disclosure Laws to existing disclosure obligations conditioned on annual revenues. Item 2 in the Appendix compares the California Disclosure Laws to proposed disclosure obligations conditioned on annual revenues.

[48] *See* Georgiev, *The Breakdown of the Public-Private Divide in Securities Law*, *supra* note 11, at 258-92.

[49] *See* Appendix, Item 3 (illustrating the rapidly-expanding universe of large private companies and the under-inclusiveness of a public company-only alternative).

19

courting and keeping them."[50] The same source estimates that of the approximately 225,000 companies founded over the past two decades, fewer than 250 were able to pass the $1 billion annual revenue threshold.[51] This means that, on average, any business established during this period had only a 1 in 900 chance of being economically significant enough to fall within the ambit of S.B. 253.

43.     The same is also likely to be true for any business with revenues in excess of $500 million (the threshold set by S.B. 261). In the analogous context of corporate reporting, for example, the SEC rules on "smaller reporting companies" have set *much lower* revenue thresholds. Any company with (i) a public float of $700 million or more and (ii) annual revenues of $100 million or more *does not* qualify for disclosure relief as a "smaller reporting company" and needs to comply with the full suite of federal securities disclosure obligations.[52] Even the most recent legislative proposal seeking to raise the annual revenue threshold required for "smaller reporting company" status suggested a threshold of $250 million,[53] i.e., half of the revenue threshold in S.B. 253 and a quarter of the revenue threshold in S.B. 261.

44.     An alternative approach to entity coverage that conditions compliance on public company status (i.e., only requires compliance of public companies, without regard to any revenue threshold) would be *overbroad* as well—it would have captured many entities that were not economically significant. This conclusion flows from an analysis of historical IPO data from the 10-year period between 2013 and 2022. Since 2012, private companies undertaking an IPO have had the option to take advantage of substantial disclosure exemptions for up to five years, as long as they

---

[50] Bain & Company, *Herd on the Street: So Many Unicorns, So Little Cash* (Nov. 9, 2023), https://www.bain.com/insights/herd-on-the-street-so-many-unicorns-so-little-cash. A true and correct copy of this news article is attached as **Exhibit 22**.
[51] *Id*.
[52] Regulation S-K Item 10(f)(1), 17 C.F.R. § 229.10(f)(1)(ii) (2024).
[53] H.R. 2603, 118th Cong., at 2 (2023), available at: https://www.congress.gov/118/bills/hr2603/BILLS-118hr2603ih.pdf. A true and correct copy of this bill is attached as **Exhibit 23**.

20

qualify as an "emerging growth company" (EGC).[54] Among other things, EGC status is conditioned on having annual revenues *below* $1 billion.[55] Since the EGC definition uses the same metric and the same numerical threshold as S.B. 253, firms that currently qualify as EGCs *would not* be subject to S.B. 253. Under an alternative approach conditioned on public company status, however, EGCs would have had to comply (because, by definition, they are public). In effect, the alternative approach would have captured a number of entities that are public but are not economically significant (i.e., do not have annual revenues above $1 billion). Historical data from 2012-2022 reveals that 89% of the private companies that were mature enough to undertake an IPO did not have the annual revenues that would have required compliance with S.B. 253.[56]

45.    The number of public EGCs in 2022 stood at 1,704.[57] This represents the total number of companies that would have been captured by a public-company-only alternative but that are not captured by the annual revenue threshold in S.B. 253. Moreover, according to federal government data, approximately 94% of EGCs have annual revenue below $400 million.[58] This means that, as tailored and adopted, the

---

[54] Jumpstart Our Business Startups Act, Pub. L. No. 112-106, § 101, 126 Stat. 306, 307 (2012). A true and correct copy of this public law is attached as **Exhibit 24**.

[55] *Id.* § 101(a)(19). The original $1 billion threshold is subject to periodic adjustment for inflation and was increased marginally to $1.07 billion in 2017 and then to $1.23 billion in September 2022, at the very end of the 10-year period under analysis. These variations in the annual revenue threshold do not change the magnitude of the predicted effect (in terms of over-inclusiveness) or the ultimate conclusion.

[56] *See* WILMER HALE, IPO REPORT (2023), https://www.wilmerhale.com/-/media/files/shared_content/editorial/publications/documents/2023-wilmerhale-ipo-report.pdf. A true and correct copy of this report is attached as **Exhibit 25**. The Wilmer Hale Report found that the average number of companies qualifying as an "emerging growth company" at the time of IPO between 2012 and 2022 (inclusive) was 89%. "Emerging growth company" status was available only to companies with annual revenues below $1 billion between 2012 and 2017 and below $1.07 billion between 2017 and 2022. *See* U.S. Sec. & Exch. Comm'n, Securities Act Release 33-11,098, Exchange Act Release 34-95,715, Inflation Adjustments under Titles I and III of the JOBS Act, 87 Fed. Reg. 57,394, 57,395 (Sept. 20, 2022).

[57] 87 Fed. Reg. at 57,397.

[58] PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD, CHARACTERISTICS OF

(continued…)

21

Disclosure Laws do not capture a significant number of the public companies in existence today because those companies are not economically significant enough.

46.    In practice, the scale necessary to achieve annual revenues in excess of $1 billion or $500 million also suggests that any such business would already be subject to other compliance obligations, including various reporting requirements, and will therefore have a compliance function that can handle compliance with the Disclosure Laws.

47.    In terms of financial interconnectedness, any private company that falls within the scope of the Disclosure Laws can be expected to have multiple outside investors (likely both shareholders and bondholders), as well as bank creditors and other contractual counterparties. The reasons are many: The competitive business environment in the United States makes it unlikely that entrepreneurs can attain scale without capital outlays that are beyond the self-financing capabilities of the average entrepreneur. Even if it were possible to self-finance, it would be imprudent because raising capital from outside investors provides a desirable mechanism for risk-sharing and attracting additional expertise to the enterprise.[59] Finally, the effective removal of the restrictions that had previously limited broad-based investment in private companies means that no meaningful regulatory barriers exist to raising capital from outside investors.[60]

48.    The inclusion of private companies does not pose an undue burden for other reasons as well. If a business that falls within the scope of the Disclosure Laws

---

EMERGING GROWTH COMPANIES AS OF NOVEMBER 15, 2022, at 14, https://assets.pcaobus.org/pcaob-dev/docs/default-source/economicandriskanalysis/projectsother/documents/white-paper-on-characteristics-of-emerging-growth-companies-as-of-nov-15-2022.pdf. A true and correct copy of this white paper is attached as **Exhibit 26**.
[59] *See, e.g.*, Patrick Ungashick, Navix, *7 Situations Where Business Owners Should Consider Bringing In Outside Investors*, https://www.navixconsultants.com/the-exit-playbook/7-situations-where-business-owners-should-consider-bringing-in-outside-investors (illustrating conventional wisdom on the issue of outside investors). A true and correct copy of this advisory article is attached as **Exhibit 27**.
[60] *See* Georgiev, *supra* note 11, at 283-84.

22

already collects and reports climate-related information, the relevant inquiry is about the *marginal* burden imposed by the Disclosure Laws and not about their hypothetical overall burden. This is so because a business would need to calculate its GHG emissions and prepare a TCFD-compliant report only once in a given reporting period, *regardless* of whether it is required to share this information with *only one* regulator or with *multiple* parties, including regulators, investors, and contractual counterparties.

49.  In practice, if a private company *already* reports the information required under the Disclosure Laws, the marginal cost of data collection and reporting attributable to California would be zero.[61] And those economically-significant companies that *do not already* collect some or all of the information would likely be required to do so in the near term, irrespective of the California Disclosure Laws, due to the robust interest in climate-related reporting from non-California regulators, from investors, and from contractual counterparties. Put simply, a private company is unlikely to be able to save the expense of collecting and reporting the information required by the Disclosure Laws; at best, it might be able to defer this expense for a limited amount of time.

50.  The following non-exhaustive list of legislation (both adopted and proposed) and other developments on climate-related disclosure support these conclusions:

a.  The European Union's Corporate Sustainability Reporting Directive (CSRD), which entered into force on January 5, 2023, will require a number of U.S. companies, both public and private, with a presence in the European Union

---

[61] It should be noted that, in addition to the cost of data collection and reporting discussed here, the Disclosure Laws also impose filing fees. Those fees are yet to be determined, but it is unlikely that they will be material in the context of the compliance burden of a large and economically-significant entity. It is unlikely that those costs would be passed on to consumers directly, and it is even more unlikely that they would be passed only to California consumers instead of being spread across the entity's entire customer base.

23

to report Scope 1, 2, and 3 GHG emissions (akin to the requirements of S.B. 253) and information on climate-related financial risk (akin to S.B. 261).[62] As it pertains to U.S. companies, the reporting requirement becomes effective in 2029 and covers entities with EU-generated annual revenues above EUR 150 million.[63] Stated in U.S. dollars under current exchange rates, the annual revenue threshold is approximately $163 million, well below the threshold contained in the Disclosure Laws.

      b.    The IFRS Foundation formed the International Sustainability Standards Board (ISSB) to develop sustainability disclosure standards and proposed requirements, which have since been adopted by individual jurisdictions and endorsed by the International Organization of Securities Commissions (IOSCO). The IFRS S2 standards are already operational and available for use in annual reporting cycles starting on or after January 1, 2024. IFRS S2 aims to mandate an organization to reveal details about its climate-associated risks and opportunities. This information

---

[62] Directive (EU) 2022/2464 of the European Parliament and of the Council of 14 December 2022 amending Regulation (EU) No. 537/2014, Directive 2006/4 3/EC and Directive 2013/34/EU, as Regards Corporate Sustainability Reporting ("CSRD"), Ch. 6a, Arts. 19a & Article 29b(2)(a), https://eur-lex.europa.eu/legal-content/EN/TXT/HTML/?uri=CELEX:32022L2464; *see also* European Commission, *Corporate Sustainability Reporting*, https://finance.ec.europa.eu/capital-markets-union-and-financial-markets/company-reporting-and-auditing/company-reporting/corporate-sustainability-reporting_en. True and correct copies of the CSRD and the European Commission webpage discussing the CSRD are attached as **Exhibits 28 and 29**, respectively.
[63] CSRD at Art. 40a(1); European Council, *Council Gives Final Green Light to Corporate Sustainability Reporting Directive* (28 Nov. 2022), https://www.consilium.europa.eu/en/press/press-releases/2022/11/28/council-gives-final-green-light-to-corporate-sustainability-reporting-directive. A true and correct copy of this press release is attached as **Exhibit 30**. The EU CSRD differs from the Disclosure Laws in that it requires disclosure only if the covered entity determines that the underlying information is material. While this may appear to suggest that the EU CSRD is more lenient, the reverse is true because the European Union uses a so-called double materiality approach which, unlike the approach adopted by the SEC, TCFD, and ISSB, must account for an entity's impact on the environment, stakeholders, and communities. As a result, EU-compliant climate risk reports will contain more information and will require more extensive data collection and analysis than the reports required by S.B. 261, which only need to follow the single-materiality approach reflected in the TCFD or ISSB frameworks.

24

is intended to assist users of general-purpose financial reports in making resource allocation decisions concerning the organization.[64]

       c.     The National Association of Insurance Commissioners (NAIC) has endorsed the TCFD reporting framework for use in its annual Climate Risk Disclosure Survey. This is the same TCFD reporting framework that is at the heart of S.B. 261 and the endorsement was at the recommendation of a bipartisan group of state insurance regulators.[65] At present, 21 states (including California) as well as five U.S. territories and the District of Columbia require large insurers domiciled therein to complete NAIC's Climate Risk Disclosure Survey. The covered entities account for more than 80% of the U.S. insurance market and over $2 trillion in premiums written.[66] While on its face this reporting requirement applies only to insurance companies, which are exempt from S.B. 261, it has broader significance because effective compliance requires the covered insurers to collect and analyze climate-related risk information from the companies in their underwriting portfolios.

       d.     Amendments to the Federal Acquisition Regulation, proposed in 2022 by the U.S. Department of Defense, the General Services Administration, and NASA, would require federal contractors with more than $50 million in annual federal contract obligations, whether public or private, to disclose Scope 1, 2, and 3 GHG emissions (akin to the requirements of S.B. 253) and climate-related financial

---

[64] IFRS, PROJECT SUMMARY: IFRS SUSTAINABILITY DISCLOSURE STANDARDS 2 (June 2023), https://www.ifrs.org/content/dam/ifrs/project/general-sustainability-related-disclosures/project-summary.pdf. A true and correct copy of this report is attached as **Exhibit 31**.

[65] *See* NAIC, *U.S. Insurance Commissioners Endorse Internationally Recognized Climate Risk Disclosure Standard for Insurance Companies* (Apr. 8, 2022), https://content.naic.org/article/us-insurance-commissioners-endorse-internationally-recognized-climate-risk-disclosure-standard. A true and correct copy of this press release is attached as **Exhibit 32**.

[66] CERES, CLIMATE RISK MANAGEMENT IN THE U.S. INSURANCE SECTOR: AN ANALYSIS OF CLIMATE RISK DISCLOSURES 9 (July 2023), https://www.ceres.org/resources/reports/climate-risk-management-us-insurance-sector. A true and correct copy of this report is attached as **Exhibit 33**.

25

risk in accordance with TCFD (akin to S.B. 261), and, in addition, set science-based reduction targets.[67]

e.    In addition to direct governmental reporting mandates, companies, including economically-significant private companies, face requests for climate-related information from their contractual counterparties who need to comply with various specialized climate-related reporting requirements of their own. These counterparties include not just insurers, as already discussed, but also California's two largest public pension funds, which are required under state law to report climate-related information about their investment portfolios,[68] EU investment companies, which need to provide similar reports pursuant to the EU's Sustainability Financial Reporting Directive, [69] and banks and other financial institutions which are encouraged by prudential regulators to focus on the management of climate-related risk within their portfolios and activities—a task that by definition requires counterparty data.[70] In each of these cases, the reporting entities simply cannot comply with the applicable disclosure mandates without obtaining information from their clients and counterparties.

51.    The climate disclosure landscape contains multiple overlapping reporting requirements and demands. Virtually all of them, however, entail GHG emissions reporting in line with the GHG Protocol (akin to S.B. 253) and climate-

---

[67] *See* Federal Acquisition Regulation: Disclosure of Greenhouse Gas Emissions and Climate-Related Financial Risk, 87 Fed. Reg. 68,312, 68,312-68,313 (proposed Nov. 14, 2022), https://www.federalregister.gov/documents/2022/11/14/2022-24569/federal-acquisition-regulation-disclosure-of-greenhouse-gas-emissions-and-climate-related-financial.

[68] Cal. Gov't Code § 7510.5.

[69] Regulation (EU) 2019/2088 of the European Parliament and of the Council of 27 November 2019 on Sustainability-Related Disclosures in the Financial Services Sector, Arts. 1-11, https://finance.ec.europa.eu/sustainable-finance/disclosures/sustainability-related-disclosure-financial-services-sector_en. A true and correct copy of this regulation is attached as **Exhibit 34**.

[70] *See* FSOC, CLIMATE-RELATED FINANCIAL RISK: 2023 STAFF PROGRESS REPORT 7-8 (July 28, 2023), https://home.treasury.gov/system/files/261/FSOC-2023-Staff-Report-on-Climate.pdf. A true and correct copy of this report is attached as **Exhibit 35**.

risk reporting in line with the TCFD framework (akin to S.B. 261). By adopting the prevailing frameworks, the Disclosure Laws contribute to standardization and promote compliance synergies, which ultimately redounds to the benefit of both the producers and the users of the information.

52.    Thus, there are compelling reasons for California's decision to cover economically-significant entities regardless of whether they are public or private. If the Disclosure Laws were to apply only to public companies, then a substantial subset of relevant entities would be exempt from reporting, resulting in information gaps and interpretation difficulties. The burden on those private companies that are covered by the Disclosure Laws is not excessive.

### III. California has a compelling interest in ensuring the availability of climate-related information, since it serves as an implicit guarantor of its public pension funds' obligations

53.    Some of the primary beneficiaries of the Disclosure Laws are California investors, including California's public pension funds. By extension, this also includes the 4.6 million California citizens served by those public pension funds—California's current and retired public workers.[71] A number of unique characteristics of California's investor ecosystem illustrate the necessity of the Disclosure Laws.

54.    California's two largest public pension funds are required by law to report on their exposure to climate-related risk, which in effect requires them to consider the effects of climate as part of their investment strategy.[72] California's public pension funds have been particularly vocal with respect to the inadequacy of existing voluntary disclosures, which are not consistent, comparable, or decision useful.

---

[71] Radhika Mehlotra & Patrick Murphy, Pub. Pol'y Inst. of Cal., *Public Pensions in California* (March 2019), https://www.ppic.org/wp-content/uploads/jtf-public-pensions-in-california.pdf. A true and correct copy of this report is attached as **Exhibit 36**.

[72] Cal. Gov't Code § 7510.5.

27

55. California's public pension funds rely on a defined-benefit model, which means that their underlying commitments to plan participants are fixed and, therefore, that their investments need to generate sufficient returns for decades to come in order to meet those commitments and obligations.[73] As a result, California's public pension funds need to employ active investment strategies that depend on adequate information. California's defined-benefit plans are markedly different from the defined-contribution plans prevalent elsewhere, which can afford to invest passively and without regard to return. California's public pension funds invest in both public and private companies and in both domestic and non-U.S. firms. These strategies require adequate information, including climate-related information.

56. Of the 100 public pension funds nationally that manage more than $5 billion in defined-benefit assets, 18 are California-based. The total assets represented by those 18 pension funds amount to $1.07 trillion. The share of California's total assets as a percentage of U.S. total assets is 23%.[74]

57. The California state government has a compelling interest in maintaining the health and solvency of California's public pension funds because it functions as the guarantor of the funds' obligations.

/

/

/

/

---

[73] *See, e.g.,* Mike Enright, Wolters Kluwer Expert Insights, *Understanding Defined Benefit and Defined Contribution Plans* (Feb. 10, 2021), https://www.wolterskluwer.com/en/expert-insights/understanding-defined-benefit-and-defined-contribution-plans (noting, inter alia, that "[s]ince the employer makes a specific promise to pay a certain sum in the future, it is the employer who assumes the risk of fluctuations in the value of the investment pool"). A true and correct coy of this article is attached as **Exhibit 37**.

[74] *See* Appendix, Item 4 (highlighting California's public pension funds in comparative perspective).

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

     I declare under penalty of perjury that the foregoing are true and correct. Executed on this day, the 23rd of July, 2024, in Atlanta, Georgia.

GEORGE S. GEORGIEV

# Appendix: Selected Data, Figures, and Tables

**Item 1.   The California Disclosure Laws Compared to <u>Existing</u> Disclosure Obligations Conditioned on Annual Revenues**

| Name of Bill (Year) | Jurisdiction | Subject Matter | Annual Revenue Threshold[*] | Public & Private Co. Coverage |
|---|---|---|---|---|
| S.B. 253 (2023) | California | climate (GHG emissions/transition risk) | $1 billion | both |
| S.B. 261 (2023) | California | climate-related business risk (TCFD framework) | $500 million | both |
| California Transparency in Supply Chains Act (2010) | California[**] | supply chains | $100 million | both (for retail manufacturers or sellers) |
| Corporate Sustainability & Reporting Directive (2023) | European Union | climate-related business risk; GHG emissions; firm's impact on climate | EU: €50 (~$54) million Non-EU: €150 (~$163) million | both |
| The Companies (Strategic Report) (Climate-related Financial Disclosure) Regulations (2022) | United Kingdom | climate-related business risk (TCFD framework) | £500 million (~$645 million) | both |
| Streamlined Energy and Carbon Reporting (SECR) (2018) | United Kingdom | climate (GHG emissions/transition risk) | £36 million (~$47 million) | both |
| Various Supply Chain Due Diligence Laws (2015-2022) | UK; Canada; various other jurisdictions | supply chains (controlling for issues such as conflict minerals, child labor, "modern slavery", etc. | in each case, lower than the California revenue thresholds | both |

*Notes:*

[*]  Some of the requirements listed here are conditioned on accounting metrics that are very similar but not identical to revenue. These include *proceeds* (California Supply Chains Transparency Act) and *turnover* (EU and UK requirements). In certain cases, applicability is conditioned on meeting another criterion, usually a low-threshold one, in addition to the revenue-based criterion.

[**] Bolded text highlights relevant parallels between the California Disclosure Bills and other disclosure requirements already in existence.

*Source:* Analysis of public laws by Professor George S. Georgiev.

A-1

**SER 1700**

**Item 2.   The California Disclosure Laws Compared to <u>Proposed</u> Disclosure Obligations Conditioned on Annual Revenues**

| Name of Bill (Year) | Jurisdiction | Subject Matter | Annual Revenue Threshold[*] | Public & Private Co. Coverage |
|---|---|---|---|---|
| S.B. 253 (2023) | California | **climate (GHG emissions/ transition risk)** | **$1 billion** | **both** |
| S.B. 261 (2023) | California | **climate-related business risk (TCFD framework)** | **$500 million** | **both** |
| Federal Acquisition Regulation Amendments (2022) | U.S. federal government | **climate-related business risk; GHG emissions** | $50 million | **both** |
| New York Senate Bill S5437 (2023-24) | New York | **climate-related business risk; GHG emissions** | $500 million/ $1 billion | **both** |
| Illinois General Assembly HB4268 (2023-24) | Illinois | **GHG emissions** | $1 billion | **both** |
| Treasury Laws Amendment (Financial Market Infrastructure and Other Measures) Bill 2024 | Australia | **climate-related business risk; GHG emissions** | AU$50 million (~$33 million) | **both** |

*Notes:*

[*]   Some of the requirements listed here are conditioned on accounting metrics that are very similar but not identical to revenue. In certain cases, applicability is conditioned on meeting another criterion, usually a low-threshold one, in addition to the revenue-based criterion.

[**]   Bolded text highlights relevant parallels between the California Disclosure Laws and proposed disclosure requirements.

*Source:* Analysis of publicly available legislative records by Professor George S. Georgiev.

A-2

**SER 1701**

## Item 3.   The Rapidly-Expanding Universe of Large Private Companies and the Under-Inclusiveness of a Public Company-Only Alternative



Number and Aggregate Valuation of U.S.-based Unicorns (2013-2023)

Source: Updated and adapted from George S. Georgiev, *The Breakdown of the Public–Private Divide in Securities Law: Causes, Consequences, and Reforms*, 18 NYU J. L. & Bus. 221 (2021) (data derived from historical CB Insights reports)

A-3

**Item 4.   California's Public Pension Funds in Comparative Perspective
(Defined Benefit Assets)**

| National Rank | Plan Sponsor | Total Defined Benefit Assets |
|---|---|---|
| 1 | California Public Employees | $430.4 billion |
| 2 | California State Teachers | $288.6 billion |
| 18 | California University | $81.0 billion |
| 21 | Los Angeles County Empl. | $67.6 billion |
| 41 | San Francisco City & County | $32.4 billion |
| 44 | Los Angeles Fire & Police | $26.9 billion |
| 51 | Orange County | $19.9 billion |
| 52 | Los Angeles City Employees | $19.8 billion |
| 60 | Los Angeles Water & Power | $17.5 billion |
| 67 | San Diego County | $14.4 billion |
| 69 | San Bernardino County | $13.1 billion |
| 73 | Sacramento County | $11.6 billion |
| 76 | Alameda County | $10.4 billion |
| 78 | San Diego City | $10.0 billion |
| 80 | Contra Costa County | $9.9 billion |
| 91 | Ventura County | $6.8 billion |
| 98 | San Mateo County | $5.3 billion |
| 99 | Fresno County | $5.3 billion |

- Number of California public pension funds with defined-benefit assets above $5 billion: **18 funds**
- Total assets represented by those 18 pension funds: **$1.07 trillion**
- Share of California's defined-benefit assets as a percentage of U.S. states' total defined-benefit assets: **23%**

*Source:* Analysis of 2023 data on U.S. public pension fund assets under management (defined-benefit) from *Pensions & Investments*.

A-4

**SER 1703**

## Data Sources for Appendix

### Item 1:

| California Transparency in Supply Chains Act (2010) | California | https://oag.ca.gov/sites/all/files/agweb/pdfs/cybersafety/sb_657_bill_ch556.pdf |
|---|---|---|
| Corporate Sustainability & Reporting Directive (2023) | European Union | https://eur-lex.europa.eu/legal-content/EN/TXT/HTML/?uri=CELEX:32022L2464 |
| The Companies (Strategic Report) (Climate-related Financial Disclosure) Regulations (2022) | United Kingdom | https://www.legislation.gov.uk/uksi/2022/31/made |
| Streamlined Energy and Carbon Reporting (SECR) (2023) | United Kingdom | https://assets.publishing.service.gov.uk/media/5de6acc4e5274a65dc12a33a/Env-reporting-guidance_inc_SECR_31March.pdf |
| Various Supply Chain Due Diligence Laws (2015-2022) | UK; Canada | https://www.legislation.gov.uk/ukpga/2015/30/contents/enacted; https://laws.justice.gc.ca/eng/acts/F-10.6/; |

### Item 2:

| Federal Acquisition Regulation Amendments (2022) | U.S. federal government | https://www.federalregister.gov/documents/2022/11/14/2022-24569/federal-acquisition-regulation-disclosure-of-greenhouse-gas-emissions-and-climate-related-financial |
|---|---|---|
| New York Senate Bill S5437 (2023-24) | New York | https://www.nysenate.gov/legislation/bills/2023/S5437 |
| Illinois General Assembly HB4268 (2023-24) | Illinois | https://www.ilga.gov/legislation/103/HB/PDF/10300HB4268lv.pdf |
| Treasury Laws Amendment (Financial Market Infrastructure and Other Measures) Bill 2024 | Australia | https://www.aph.gov.au/Parliamentary_Business/Bills_Legislation/Bills_Search_Results/Result?bId=r7176 |

### Item 3:

Periodic editions of the *Complete List of Unicorn Companies*, CB Insights, https://www.cbinsights.com/research-unicorn-companies. Data presented in 2023 dollars.

### Item 4:

Pensions and Investments, *The P&I 1,000 largest U.S. retirement funds: 2023*, https://www.pionline.com/largest-us-retirement-plans/2023-full-list.

# Exhibit 22

# to Declaration of James P. Burton

# *ServiceNow Inc CDP Climate Change Questionnaire*, ServiceNow, Inc. (July 28, 2021)

Exhibit 22 to Decl. of Burton
1261
**SER 1705**

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



# Welcome to your CDP Climate Change Questionnaire 2021

## C0. Introduction

### C0.1

**(C0.1) Give a general description and introduction to your organization.**

ServiceNow's purpose is to make the world of work, work better for people. We believe that people want the technology they use in their work to be more efficient and easier to use. We build applications to meet that demand by automating existing processes and creating efficient, digitized workflows with a consumer grade user experience. Our products and services enable the steps of a job to flow naturally across disparate departments, systems and processes of a business. ServiceNow delivers digital workflows on a single enterprise cloud platform called the Now Platform®. Our product portfolio is currently focused on providing IT, Employee and Customer workflows in standardized product offerings. We also enable our customers to design and build their own custom workflow applications using our Creator workflows, formerly called the Now Platform App Engine, and to integrate those applications with third party systems through our Integration Hub. We have offices globally and operate data centers in Australia, Brazil, Canada, Germany, Hong Kong, Ireland, Japan, South Korea, the Netherlands, Singapore, Switzerland, the United Kingdom, and the United States. We have ~6,900 global enterprise customers, including nearly 80% of the Fortune 500.

### C0.2

**(C0.2) State the start and end date of the year for which you are reporting data.**

| | Start date | End date | Indicate if you are providing emissions data for past reporting years |
|---|---|---|---|
| Reporting year | January 1, 2020 | December 31, 2020 | No |

Exhibit 22 to Decl. of Burton 1262

1

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



## C0.3

**(C0.3) Select the countries/areas for which you will be supplying data.**

Australia
Brazil
Canada
China, Hong Kong Special Administrative Region
Denmark
France
Germany
India
Ireland
Israel
Japan
Netherlands
Republic of Korea
Singapore
Sweden
Switzerland
United Kingdom of Great Britain and Northern Ireland
United States of America

## C0.4

**(C0.4) Select the currency used for all financial information disclosed throughout your response.**

USD

2

Exhibit 22 to Decl. of Burton
1263

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



## C0.5

**(C0.5) Select the option that describes the reporting boundary for which climate-related impacts on your business are being reported. Note that this option should align with your chosen approach for consolidating your GHG inventory.**

Operational control

# C1. Governance

## C1.1

**(C1.1) Is there board-level oversight of climate-related issues within your organization?**

Yes

## C1.1a

**(C1.1a) Identify the position(s) (do not include any names) of the individual(s) on the board with responsibility for climate-related issues.**

| Position of individual(s) | Please explain |
|---|---|
| Board-level committee | ServiceNow will drive oversight of our global impact strategy through a newly established ESG steering committee, under the guidance of our board of directors' nominating and governance committee. The Nominating and Governance Committee, of the Board of Directors, charter includes advising the board on environmental, social responsibility, and corporate governance matters. Climate related issues are the key part of our environmental sustainability strategy. Therefore, the committee has oversight of climate-related issues. The Executive management team is dedicated to incorporating ESG into our vision to become the defining enterprise software company of the 21st century. Our ESG steering committee, including representatives from across the company including Corporate strategy, Customer & partner, Finance, IT, Legal, Marketing, Product, Sales, Talent, oversee ServiceNow's global impact (ESG) strategy, goals, and monitors our progress. |

3

Exhibit 22 to Decl. of Burton 1264

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



The CFO is the ESG executive sponsor and oversees the ESG steering committee which meets quarterly.  The CFO updates the Nominating and Governance committee on our ESG efforts at least twice a year.

In 2021, we're committing to the Science Based Targets initiative (SBTi), which drives ambitious climate action in the private sector by helping companies set science-based reduction targets.  We'll draft and validate a plan in 2021 for our goal of net zero. By committing to SBTi, we're signaling our intent to provide full transparency into our net zero journey.  Our Director of Sustainability provides updates to the CFO and ESG Steering Committee on our path to Net Zero.  In turn, our CFO updates the Nominating and Governance committee on our path to Net Zero.

## C1.1b

(C1.1b) Provide further details on the board's oversight of climate-related issues.

| Frequency with which climate-related issues are a scheduled agenda item | Governance mechanisms into which climate-related issues are integrated | Please explain |
|---|---|---|
| Scheduled – some meetings | Reviewing and guiding major plans of action | ServiceNow will drive oversight of our global impact strategy through a newly established ESG steering committee, under the guidance of our board of directors' nominating and governance committee. The Nominating and Governance Committee, of the Board of Directors, charter includes advising the board on environmental, social responsibility, and corporate governance matters.  Climate related issues are the key part of our environmental sustainability strategy. Therefore, the committee has oversight of climate-related issues. The Executive management team is dedicated to incorporating ESG into our vision to become the defining enterprise software company of the 21st century. Our ESG steering committee, including representatives from across the company including Corporate strategy, Customer & partner, Finance, IT, Legal, Marketing, Product, Sales, Talent, oversee ServiceNow's global impact (ESG) strategy, goals, and monitors our progress.

The CFO is the ESG executive sponsor and oversees the ESG steering committee which meets quarterly.  The CFO updates the Nominating and Governance committee on our ESG efforts at least twice a year. |

Exhibit 22 to Decl. of Burton
1265

4

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



## C1.2

**(C1.2) Provide the highest management-level position(s) or committee(s) with responsibility for climate-related issues.**

| Name of the position(s) and/or committee(s) | Responsibility | Frequency of reporting to the board on climate-related issues |
| --- | --- | --- |
| Chief Financial Officer (CFO) | Both assessing and managing climate-related risks and opportunities | Half-yearly |
| Other committee, please specify<br>ESG Steering Committee | Both assessing and managing climate-related risks and opportunities | Quarterly |
| Other, please specify<br>Director of Environmental Sustainability | Both assessing and managing climate-related risks and opportunities | Quarterly |

In 2021, we're committing to the Science Based Targets initiative (SBTi), which drives ambitious climate action in the private sector by helping companies set science-based reduction targets. We'll draft and validate a plan in 2021 for our goal of net zero. By committing to SBTi, we're signaling our intent to provide full transparency into our net zero journey. Our Director of Sustainability provides updates to the CFO and ESG Steering Committee on our path to Net Zero. In turn, our CFO updates the Nominating and Governance committee on our path to Net Zero.

## C1.2a

**(C1.2a) Describe where in the organizational structure this/these position(s) and/or committees lie, what their associated responsibilities are, and how climate-related issues are monitored (do not include the names of individuals).**

ServiceNow will drive oversight of our global impact strategy through a newly established ESG steering committee, under the guidance of our board of directors' nominating and governance committee. The Nominating and Governance Committee, of the Board of Directors, charter includes advising the board on environmental, social responsibility, and corporate governance matters. Climate related issues are the key part of our environmental

Exhibit 22 to Decl. of Burton<br>1266

5



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

sustainability strategy. Therefore, this committee is responsible for climate-related issues. The ESG steering committee covers all business groups including corporate strategy, IT, legal, marketing, product, sales, talent, and finance. Our CFO incorporates ESG into our vision.

Our ESG steering committee meets quarterly to review our ESG initiatives that both mitigate risks and address opportunities.

The global impact team leads ServiceNow's cross functional global impact/ESG strategy. The head of global impact reports to the CFO and works closely with all members of the Global Impact/ESG Steering Committee as well as plans and facilitates Steering Committee meetings. As the executive sponsor of ESG for ServiceNow, our CFO oversees our ESG Steering Committee and provides regular updates to the Board. Our CFO is informed on environmental progress, risks, and opportunities on average every quarter and is involved in oversight and strategy. Our CFO ensures and facilitates a pathway to setting and meeting our ambitious climate related targets. We have a dedicated budget, overseen by the CFO, to purchase renewable electricity and carbon offsets in order to achieve our short, medium, and longer term goals. We have increased our level of environmental disclosure in public filings such as our Proxy, in addition to the publication of our first annual Global Impact Report. Our CFO is involved in the review and approval of this increased disclosure.

The environmental sustainability (ES) team works closely with the Global Impact team and is dedicated to driving our decarbonisation initiatives. Our director of sustainability leads our overall environmental sustainability program, developing, implementing and executing our strategy to meet our targets.

Our Environmental Sustainability team leads all decarbonisation programs across the organisation including resource efficiency, energy efficiency, renewable energy, carbon offsetting and assessment and management of climate risks.

Our Environmental Sustainability team is responsible for reaching our targets of 100% Renewable Energy and Carbon Neutrality by the end of 2021. The ES team is part of Workplace Services and reports to our Vice President Global Sourcing and Workplace Services, which is part of the Finance organization and reports to the CFO.

## C1.3

**(C1.3) Do you provide incentives for the management of climate-related issues, including the attainment of targets?**

| | Provide incentives for the management of climate-related issues | Comment |
|---|---|---|
| Row 1 | Yes | The environmental sustainability team are tasked to reach to reach 100% Renewable Energy and achieve Carbon Neutrality by 2021. These targets are included in the team's annual KPIs and are considered in their individual performance bonus evaluation. |

Exhibit 22 to Decl. of Burton
1267

6

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



## C1.3a

**(C1.3a) Provide further details on the incentives provided for the management of climate-related issues (do not include the names of individuals).**

| Entitled to incentive | Type of incentive | Activity inventivized | Comment |
|---|---|---|---|
| Other, please specify<br>Director of Environmental Sustainability | Monetary reward | Emissions reduction project | Our Director of Environmental Sustainability is responsible for ensuring we meet our environmental targets.<br>These targets are included in the employee's annual KPI's and are considered in their individual performance bonus evaluation. |
| Environment/Sustainability manager | Monetary reward | Emissions reduction project | Environmental sustainability managers are tasked with ensuring we meet our environmental targets. These targets are included in the employee's annual KPI's and are considered in their individual performance bonus evaluation. |

# C2. Risks and opportunities

## C2.1

**(C2.1) Does your organization have a process for identifying, assessing, and responding to climate-related risks and opportunities?**

Yes

## C2.1a

**(C2.1a) How does your organization define short-, medium- and long-term time horizons?**

| | From (years) | To (years) | Comment |
|---|---|---|---|
| Short-term | 0 | 2 | This is broadly aligned with operational and financial planning. |

Exhibit 22 to Decl. of Burton
1268

7

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



| Medium-term | 2 | 5 | This is broadly aligned with strategic and capital planning. |
| Long-term | 5 | 10 | This enables strategic conside **Provide details of your absolute emissions target(s)** ration of longer-term risks relating to climate risk, while also addressing our roadmap to Net Zero under Science-Based Targets initiative. |

## C2.1b

**(C2.1b) How does your organization define substantive financial or strategic impact on your business?**

ServiceNow defines substantive financial or strategic impact from climate-related risks as an impact that can decrease delivery to customers of our Service Level Agreements (SLAs) or that significantly affects the competitiveness of our business strategies. ServiceNow measures severity of risk in terms of the likelihood and impact of a negative event occurring. Formalized impact assessment ratings, severity descriptions and definitions were defined to help assess its business impact.  (1) Extreme: Significant market-wide operational impact; interruption in providing network services is market wide and for an extended period-of-time.  (2) Major: Serious market-wide operational impact; interruption in providing network services is market wide and for a significant period-of-time.  (3) Moderate: Moderate market-wide operational impact; interruption in providing network services is geographically limited and during peak hours. (4) Minor: Minor market-wide operational impact; interruption in providing network services is geographically limited during off peak hours. (5) Incidental: Minimal impact to operations: interruption in providing network services is geographically limited.

## C2.2

**(C2.2) Describe your process(es) for identifying, assessing and responding to climate-related risks and opportunities.**

---

**Value chain stage(s) covered**
Direct operations
Upstream
Downstream

Exhibit 22 to Decl. of Burton
1269



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

## Risk management process

Integrated into multi-disciplinary company-wide risk management process

## Frequency of assessment

More than once a year

## Time horizon(s) covered

Short-term

Medium-term

Long-term

## Description of process

Direct Operations: We have integrated climate related risk into our risk management procedures and processes. The Enterprise Risk Management leads the Emerging Risks Working Group (ERWG) and includes representation from key leadership across the enterprise to review new or emerging risks. They meet bi-monthly (or ad hoc, if required) and any concerns or escalations are then presented to senior executive management in the Risk & Compliance Steering Committee (RCSC). This Steering committee, meets quarterly, includes representation from key senior executive leadership across the enterprise.

All ServiceNow data centers are sourced and selected through a rigorous site selection process. In terms of risk management, we assess and select our sites based on likelihood for natural disasters or weather events, man-made events, or accidents as well as security.

For natural events risk, we select sites that are not located on flood plains, are in areas that seismologically stable, are not directly situated on coastlines and are not adjacent to areas such as forests that could present a fire risk. For example, to avoid the affects of climate related events impacting out data centers, ServiceNow implements a policy, where possible, of locating our redundant data center pairs with a minimum radial distance of separation to act as a backup ensuring we can deliver out product to our customer. ServiceNow conducts onsite audit as part of the Data center vendors selection process prior to contracting and annually after contracting. The scope of the audits includes Business Continuity and Disaster Recovery controls to ensure the vendor has assessed the risk of natural disasters or weather events, man-made events, or accidents and implemented appropriate controls to address them. ServiceNow works with vendor to ensure risk are addressed. If we have determined a Data Centre cannot/will not address the risk a search is triggered to switch vendors.

Upstream: We spent time in 2020 evaluating our operations to identify the biggest opportunities to drive accountability across our supplier ecosystem. To reduce supplier risk while furthering responsible procurement, we're acquiring data about our suppliers from third party providers and conducting third-party, point in-time risk assessments of our complete supplier ecosystem. This will help us develop a programmatic plan

9

Exhibit 22 to Decl. of Burton 1270

SER 1714



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

for year-over-year improvements. In 2021, we'll establish baselines for measuring our sustainable procurement practices. Downstream: We are aware that our customers wish to embed sustainability practices and environmental (as part of their overall ESG efforts) reporting across their organizations.

Besides investigating opportunities to apply existing ServiceNow products, we are also currently working with several of our customers to better understand how we can help address climate related issues.

An example of a transition opportunity is our Risk management app. It has the potential to address environmental, social, and governance issues, helping our customers manage their suppliers' commitment to environmental sustainability, human rights, security, and data privacy. It also helps our customers ensure business continuity in their processes, technology, facilities, personnel, and supply chain during natural and human-made disasters. Regardless of industry, our risk solutions help businesses easily track their efforts, measure their success, and see the impact of meeting their sustainability goals.

## C2.2a

**(C2.2a) Which risk types are considered in your organization's climate-related risk assessments?**

| | Relevance & inclusion | Please explain |
|---|---|---|
| Current regulation | Relevant, always included | Current regulatory risks are identified, addressed and monitored on an ongoing basis. We work with industry experts to help ensure we are compliant with applicable and relevant legislation globally. Our code of Business Ethics states that we are committed to engaging in responsible and sustainable business practices. Our Environmental policy will help ensure we comply with all relevant environmental legislation, regulations and other obligations applied to our operations. Climate-related regulations are no exception. We consider the current regulation low risk to our business. |
| Emerging regulation | Relevant, always included | Emerging regulatory risks are monitored, identified and addressed on an ongoing basis via Emerging Risk Working Group and Risk and Compliance Sub Commitee. The impacts of climate change on the global economy and our industry are rapidly evolving. We may be subject to increased regulations, reporting requirements, standards or expectations regarding the environmental impacts of our business. We work with industry experts to ensure we are aware of changing legislation globally. Our code of Code of Ethics states that we are committed to engaging in responsible and sustainable business practices. Our Environmental policy will help ensure we |

10

Exhibit 22 to Decl. of Burton
1271

**SER 1715**

Case 2:24-cv-00801-ODW-PVC   Document 53-22   Filed 07/24/24   Page 12 of 123   Page ID #:2917



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

| | | |
|---|---|---|
| | | comply with all relevant environmental legislation, regulations and other obligations applied to our operations. Climate-related regulations are no exception.<br>To address risks associated with our environmental footprint, ServiceNow has set ambitious targets to reach 100% renewable energy across our offices and data centers by the end 2021 and achieve carbon neutrality for our offices, data centers, and business travel by the end of 2021. We consider the emerging regulation low risk to our business. |
| Technology | Relevant, always included | As a technology company, climate-related technology risks are identified, addressed and monitored on an ongoing basis. We consider the climate-related technology risks to be low risk to our business.<br>We do consider the potential we have as a company to provide solutions to mitigate climate related issues for our customers.<br>The power of the Now Platform to address environmental, social, and governance issues are clear. This includes using information about climate, people, security, compliance, and other risks to drive business decisions, as well as powering our customers' global impact efforts and resiliency by identifying high-impact risks. |
| Legal | Relevant, always included | Climate related legal risks are identified, addressed and monitored on an ongoing basis.<br>We endeavor to be transparent in our environmental sustainability reporting. This year we launched our first annual Global Impact report where we disclosed data regarding our environmental impact. To limit our risk, we work with a third party to validate the data and the methodology we are reporting in our annual global impact report. We consider the climate-related legal risks to be low risk to our business. |
| Market | Relevant, always included | Climate related market risks are identified, addressed and monitored on an ongoing basis.<br>We are aware that our customers wish to embed sustainability practices and environmental (as part of their overall ESG efforts) reporting across their organizations. Besides investigating opportunities to apply existing ServiceNow products, we are also currently working with several of our customers to better understand how we can help solve climate related issues. We will always endeavor to be transparent in our climate related issues with our customers. This year we launched our first annual global impact where we disclosed data regarding our environmental impact. The environmental sustainability section describes our efforts to decarbonize our company. We consider the climate-related market risks to be low risk to our business. |
| Reputation | Relevant, always included | Reputational risks are monitored identified and addressed on an ongoing basis.<br>We are aware that many of our customers wish to embed sustainability practices and reporting across their organizations. We are currently collaborating with several of our customer to solve their climate related issues. |

Exhibit 22 to Decl. of Burton 1272

11

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



| | | |
|---|---|---|
| | | We will always endeavor to be transparent in our climate related issues with our entire value chain. This year we publicly launched our first annual Global Impact (ESG) report where we disclosed data regarding our environmental impact. The environmental sustainability section describes our efforts on how we are planning to help accelerate decarbonization, advance the circular economy and how we are planning to use ServiceNow workflow product solutions to help our customers. Negative perceptions of our carbon performance could potentially lead to reduced business and investment opportunities, as carbon and climate action is increasingly considered by our investors and shareholders, customers, and business partners. We also understand that environmental sustainability is of interest to our current and future employees. Our ability to attract and retain top talent can be affected by our environmental strategy, programs and goals.  We consider the climate-related reputational risks to be low risk to our business. |
| Acute physical | Relevant, always included | Acute Physical climate related issues are monitored as part of our office and data center business continuity plan. All ServiceNow data centers are sourced and selected through a rigorous site selection process. In terms of risk management, we assess and select our sites based on likelihood for natural disasters or weather events, man-made events, or accidents as well as security. For natural events risk, we select sites that are not located on flood plains, are in areas that seismologically stable, are not directly situated on coastlines and are not adjacent to areas such as forests that could present a fire risk.<br><br>For example, to avoid the affects of climate related events impacting out data centers, ServiceNow implements a policy, where possible, of locating our redundant data center pairs with a minimum radial distance  of separation to act as a backup to help ensure that we can deliver out product to our customer. ServiceNow conducts onsite audit as part of the Datacenter vendors selection process prior to contracting and annually after contracting.  The scope of the audits includes Business Continuity and Disaster Recovery controls to help ensure the vendor has assessed the risk of natural disasters or weather events, man-made events, or accidents and implemented appropriate controls to address them.  ServiceNow works with vendor to ensure risk are addressed. If we have determined a Data Centre cannot/will not address the risk a search is triggered to switch vendors. |
| Chronic physical | Relevant, always included | Chronic Physical climate related issues are monitored as part of our office and data center business continuity plan. All ServiceNow data centers are sourced and selected through a rigorous site selection process. In terms of risk management, we assess and select our sites based on likelihood for natural disasters or weather events, man-made events, or accidents as well as security. For natural events risk, we select sites that are not located on flood plains, are in areas that seismologically stable, are not directly situated on coastlines and are not adjacent to areas such as forests that could present a fire risk. |

12

Exhibit 22 to Decl. of Burton
1273



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

For example, to avoid the affects of climate related events impacting out data centers, ServiceNow implements a policy, where possible, of locating our redundant data center pairs with a minimum radial distance of separation to act as a backup to help ensure that we can deliver out product to our customer. ServiceNow conducts onsite audit as part of the Datacenter vendors selection process prior to contracting and annually after contracting. The scope of the audits includes Business Continuity and Disaster Recovery controls to help ensure the vendor has assessed the risk of natural disasters or weather events, man-made events, or accidents and implemented appropriate controls to address them.  ServiceNow works with vendor to ensure risk are addressed. If we have determined a Data Centre cannot/will not address the risk a search is triggered to switch vendors.

## C2.3

**(C2.3) Have you identified any inherent climate-related risks with the potential to have a substantive financial or strategic impact on your business?**

No

## C2.3b

**(C2.3b) Why do you not consider your organization to be exposed to climate-related risks with the potential to have a substantive financial or strategic impact on your business?**

| | Primary reason | Please explain |
|---|---|---|
| Row 1 | Risks exist, but none with potential to have a substantive financial or strategic impact on business | Currently, no climate related risks were identified by the Emerging Risks Working Group (ERWG) that would have a substantive financial or strategic impact or that significantly affects the competitiveness of our business strategies.   To complement our internal risk review, we also work with industry experts to help ensure we are compliant with applicable and relevant legislation globally.<br><br>As part of our Business Continuity Management (BCM) program, we conduct business impact analysis for our business functions. Our analysis results indicate that weather-related risks do not currently have a material impact on our business continuity posture. Nevertheless, as part of our Business Continuity Planning (BCP), we have built mitigating controls, recovery procedures, and strategies for weather-related events and scenarios that |

13

Exhibit 22 to Decl. of Burton
1274

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



could impact our business functions. We perform tabletop exercises that activate and test our BCP response and recovery for business-disrupting events that are weather-related.

The Environmental Sustainability (ES) Team works in collaboration with our Risk Team, Workplace services and Data Centre Operations to help ensure we are aware of climate-related risks to the company which could potentially impact our ability to deliver our product successfully to our customer.

## C2.4

**(C2.4) Have you identified any climate-related opportunities with the potential to have a substantive financial or strategic impact on your business?**

Yes

## C2.4a

**(C2.4a) Provide details of opportunities identified with the potential to have a substantive financial or strategic impact on your business.**

**Identifier**
Opp1

**Where in the value chain does the opportunity occur?**
Direct operations

**Opportunity type**
Resource efficiency

**Primary climate-related opportunity driver**
Move to more efficient buildings

14

Exhibit 22 to Decl. of Burton
1275



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

**Primary potential financial impact**
Reduced indirect (operating) costs

**Company-specific description**
Energy efficiency in our Buildings: We're committed to driving resource efficiency wherever possible. We design our workplaces following LEED (Leadership in Energy and Environmental Design) or similar sustainability frameworks, and we achieve certification when practical. In our effort to increase our renewable energy footprint, we sourced renewable energy for our Santa Clara headquarters campus, which covered 100% of our energy consumption. In San Diego, we bought solar power from the panels on our campus roofs, which accounted for approximately 13% of our annual power use.

**Time horizon**
Long-term

**Likelihood**
About as likely as not

**Magnitude of impact**
Unknown

**Are you able to provide a potential financial impact figure?**
No, we do not have this figure

**Potential financial impact figure (currency)**

**Potential financial impact figure – minimum (currency)**

**Potential financial impact figure – maximum (currency)**

**Explanation of financial impact figure**
We currently do not have this level of detail.

15

Exhibit 22 to Decl. of Burton
1276

**SER 1720**



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

**Cost to realize opportunity**

0

**Strategy to realize opportunity and explanation of cost calculation**

We currently do not have this level of detail.

**Comment**

We operate our buildings responsibly by monitoring and controlling for greenhouse gas emissions; self-generating our own power where practical; ensuring efficient use of water; and managing our waste stream to minimize what goes into landfills. We hope that focusing on efficient, "green" operations will reduce our longer-term costs relating to energy.

---

**Identifier**

Opp2

**Where in the value chain does the opportunity occur?**

Direct operations

**Opportunity type**

Resource efficiency

**Primary climate-related opportunity driver**

Move to more efficient buildings

**Primary potential financial impact**

Reduced indirect (operating) costs

**Company-specific description**

Energy Efficient operations: As we provide cloud-based products and services, we are driven to operate with a low carbon footprint. We have successfully decoupled increased energy demand from company growth. Despite increased revenue from 2019 to 2020 of ~30%, the energy required to support our business only increased by 13% (for our offices and data centers). Since the most significant energy footprint across our

16

Exhibit 22 to Decl. of Burton
1277



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

operations is derived from our data center energy demand, we aim to drive energy efficiency programs across our data center footprint. We aim to use our data center resources more efficiently as we increase capacity across our global cloud. We've made lifecycle management improvements throughout our cloud infrastructure to help us optimize power efficiency, reduce our datacenter footprint, and select the most efficient equipment to meet our business requirements. When sourcing our hardware and our co-location providers, our RFPs include a set of environmental criteria to ensure they meet our business requirements. In 2020 the energy used in data centers was 34% sourced from renewable energy. We will achieve 100% renewable electricity at our data centers by the end of 2021.

**Time horizon**
Long-term

**Likelihood**
About as likely as not

**Magnitude of impact**
Unknown

**Are you able to provide a potential financial impact figure?**
No, we do not have this figure

**Potential financial impact figure (currency)**

**Potential financial impact figure – minimum (currency)**

**Potential financial impact figure – maximum (currency)**

**Explanation of financial impact figure**
We currently do not have this level of detail.

**Cost to realize opportunity**
0

17

Exhibit 22 to Decl. of Burton
1278

**Strategy to realize opportunity and explanation of cost calculation**

We currently do not have this level of detail.

**Comment**

We operate our buildings responsibly by monitoring and controlling for greenhouse gas emissions; self-generating our own power where practical; ensuring efficient use of water; and managing our waste stream to minimize what goes into landfills. We hope that focusing on efficient, "green" operations will reduce our longer-term costs relating to energy.

---

**Identifier**

Opp3

**Where in the value chain does the opportunity occur?**

Upstream

**Opportunity type**

Products and services

**Primary climate-related opportunity driver**

Development of climate adaptation, resilience and insurance risk solutions

**Primary potential financial impact**

Other, please specify

Support customer demand for ESG products and services

**Company-specific description**

Products and Services: Risk management is an underlying part of our global impact strategy, especially within governance and ethics. Our Risk Management app has the potential to address environmental, social, and governance issues, helping our customers manage their suppliers' commitment to environmental sustainability, human rights, security, and data privacy. It also helps our customers ensure business continuity in their processes, technology, facilities, personnel, and supply chain during natural and human-made disasters. Regardless of industry, our risk management solution helps businesses easily track their efforts, measure their success, and see the impact of meeting—or not meeting— their



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

sustainability goals.

This app helps optimize resources and staff in critical locations. It also supports operational processes of emergency response and preparedness at the state and local government levels. With the limitations of outdated GRC processes and tools, it's easy to see why enterprises struggle to manage risks, meet compliance mandates, and build resilient programs. Organizations are opening themselves up to unnecessary risk and placing themselves at a competitive disadvantage. These scenarios could be mitigated if enterprises implemented modern risk management and compliance practices embedded into digital workflows to achieve new insights and facilitate better decision-making across the business.

**Time horizon**
Long-term

**Likelihood**
About as likely as not

**Magnitude of impact**
Unknown

**Are you able to provide a potential financial impact figure?**
No, we do not have this figure

**Potential financial impact figure (currency)**

**Potential financial impact figure – minimum (currency)**

**Potential financial impact figure – maximum (currency)**

**Explanation of financial impact figure**
We currently do not have this level of detail.

**Cost to realize opportunity**

19

Exhibit 22 to Decl. of Burton
1280

**SER 1724**



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

0

**Strategy to realize opportunity and explanation of cost calculation**

We currently do not have this level of detail.

**Comment**

We are evaluating how the power of the Now Platform can help us and our customers address environmental, social and governance issues.

---

**Identifier**

Opp4

**Where in the value chain does the opportunity occur?**

Upstream

**Opportunity type**

Products and services

**Primary climate-related opportunity driver**

Development of new products or services through R&D and innovation

**Primary potential financial impact**

Other, please specify

Support customer demand for ESG products and services

**Company-specific description**

Products and Services: Disruptions are a persistent threat to any organization. Severe weather, natural disasters, supply chain disruptions, IT and utility outages all have the potential to bring business operations to a halt. ServiceNow Business Continuity Management (BCM) application enables business and technology operations to plan, exercise, and effectively recover from business disruptions. Unlocking opportunity and enabling people to focus on the meaningful and creative parts of their jobs. This includes using information about climate, people, security, compliance, and other risks to drive business decisions, as well as powering our customers' global impact efforts and resiliency by identifying high-impact risks.

20

Exhibit 22 to Decl. of Burton
1281

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

**Time horizon**
Long-term

**Likelihood**
About as likely as not

**Magnitude of impact**
Unknown

**Are you able to provide a potential financial impact figure?**
No, we do not have this figure

**Potential financial impact figure (currency)**

**Potential financial impact figure – minimum (currency)**

**Potential financial impact figure – maximum (currency)**

**Explanation of financial impact figure**
We currently do not have this level of detail.

**Cost to realize opportunity**
0

**Strategy to realize opportunity and explanation of cost calculation**
We currently do not have this level of detail.

21

Exhibit 22 to Decl. of Burton
1282

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



22

**Comment**

We are evaluating how the power of the Now Platform can help us and our customers address environmental, social and governance issues.

# C3. Business Strategy

## C3.1

**(C3.1) Have climate-related risks and opportunities influenced your organization's strategy and/or financial planning?**

Yes

## C3.1b

**(C3.1b) Does your organization intend to publish a low-carbon transition plan in the next two years?**

| | Intention to publish a low-carbon transition plan | Intention to include the transition plan as a scheduled resolution item at Annual General Meetings (AGMs) | Comment |
|---|---|---|---|
| Row 1 | Yes, in the next two years | No, we do not intend to include it as a scheduled AGM resolution item | In 2020, we confirmed we would be committing to SBTi in 2021, and a pathway to Net Zero before 2050. We report on progress toward our environmental targets annually in our Global Impact Report. |

## C3.2

**(C3.2) Does your organization use climate-related scenario analysis to inform its strategy?**

No, but we anticipate using qualitative and/or quantitative analysis in the next two years

## C3.2b

**(C3.2b) Why does your organization not use climate-related scenario analysis to inform its strategy?**

Exhibit 22 to Decl. of Burton
1283



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

We have not yet taken a climate scenario analysis (CSA) approach to identifying climate related risk. In 2020, we brought together our environmental, social, and governance (ESG) initiatives under one strategy. In 2021, we are growing our environmental sustainability team to provide more resources to climate related issues. In 2021, we are committing to SBTi and we plan to use scenario analysis within the next two years.

## C3.3

**(C3.3) Describe where and how climate-related risks and opportunities have influenced your strategy.**

| | Have climate-related risks and opportunities influenced your strategy in this area? | Description of influence |
|---|---|---|
| Products and services | Yes | In 2020, we set ambitious short-term goals to achieve 100% Renewable energy, and Carbon neutrality (for our Offices Data canters and business travel) by the end of 2021. In 2021 we will commit to Science Based targets, agreeing to medium to long term carbon reduction targets, for our longer-term goals we have committed to be Net Zero before 2050.<br><br>In 2020, 34% of the electricity at our data centres was balanced with renewable energy. We have committed to achieving 100 % renewable energy and carbon neutrality (in our offices, data centres and across our corporate travel) by the end of 2021 providing a low carbon product and service for our customers.<br><br>We also believe our products can help address climate related issues. Where possible we will pursue opportunities where our products and services can help to address issues related to climate change. A number of our products are already available to help address issues arising from climate related risks for example (1) The Now Platform enables our customers to quickly react and build apps that address use cases such as streamlining testing operations and digitizing operational processes for emergency response. (2) Our Governance, Risk and Compliance ("GRC") product suite helps customers manage risk and resilience in real time. Among the GRC's product suite's capabilities are policy and compliance management, risk management, including detection and assessment, business continuity management, vendor risk management and operational risk management. GRC provides a unified data environment, |

23

Exhibit 22 to Decl. of Burton
1284

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



| | | |
|---|---|---|
| Supply chain and/or value chain | Yes | To reinforce our commitment to responsible procurement, we have a strong supplier code of conduct, and we select suppliers who share our values and help us fulfil our purpose. We're currently developing a framework to better understand our suppliers' baselines for diversity, sustainability, and financial health. By assessing where we are today, we can better position ourselves for continuous improvement over time. We spent time in 2020 evaluating our operations to identify the biggest opportunities to drive accountability across our supplier ecosystem. To reduce supplier risk while furthering responsible procurement, we're acquiring data about our suppliers from third party providers and conducting third-party, point in-time risk assessments of our complete supplier ecosystem. This will help us develop a programmatic plan for year-over-year improvements. In 2021, we'll establish baselines for measuring our sustainable procurement practices. We look forward to disclosing more on these efforts in next year's report. |
| | | dashboards, automated workflows and artificial intelligence capabilities to help customers with risk-based decisions and align resilience initiatives across the enterprise. With GRC, customers can also assess risk and make strategic decisions with confidence by being able to continuously monitor and prioritize risks. |
| Investment in R&D | Yes | In 2020, we set ambitious short-term goals to achieve 100% Renewable energy, and Carbon neutrality (for out Offices Data canters and business travel) by the end of 2021. In 2021 we will commit to Science Based targets, agreeing to medium term carbon reduction targets, for our longer-term goals we have committed to be Net Zero before 2050. To meet these targets, ServiceNow is investing in internal opportunities to improve energy efficiency in our data centers. Two of our greatest opportunities are using our datacenter resources more efficiently and increasing capacity across our global cloud. We've made lifecycle management improvements throughout our cloud infrastructure that allow us to optimize power efficiency, reduce our datacenter footprint, and select the most efficient equipment to meet our business requirements. Our RFPs for hardware and our co-location providers include mandatory environmental criteria.

Externally, through the MIT Solve initiative, ServiceNow supports the Resilient Ecosystems Challenge with a prize, and will be part of the selection process, that is open to technology-based solutions that connect communities to develop, share, and replicate best practices for carbon absorption and |

24

Exhibit 22 to Decl. of Burton
1285

**SER 1729**



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

| | | decarbonization. The prize offers $100,000 which will be granted to up to four Solver teams from the Resilient Ecosystems Challenge. |
|---|---|---|
| Operations | Yes | We are committed to driving resource efficiency wherever possible. In 2020, in our effort to increase our renewable energy footprint, we sourced renewable energy for our Santa Clara headquarters campus, which covered 100% of our energy consumption. In San Diego, we bought solar power from the panels on our campus roofs, which accounts for approximately 13% of our annual power use.  In 2020 the energy used in our datacenter's was 34% sourced from renewable energy.<br><br>We've made lifecycle management improvements throughout our cloud infrastructure that allow us to optimize power efficiency, reduce our datacenter footprint, and select the most efficient equipment to meet our business requirements. When sourcing our hardware and our co-location providers, our RFPs include a set of environmental criteria to ensure they meet our business requirements.<br><br>We have also focused on training and education for our Data Center Operators. In 2020 ServiceNow Global Cloud Services made a significant investment to train key Data Center Operations team members globally to become Certified Data Center Sustainability Professionals (CDCSP®). Achievement of this certification recognizes an individual's knowledge and skills and ability to determine the steps required to evaluate, analyze, plan, implement and monitor a strategy to ensure the long-term sustainability of the data center.<br><br>In 2020, we set ambitious short-term goals to achieve 100% Renewable energy, and Carbon neutrality (for out Offices Data canters and business travel) by the end of 2021. In 2021 we will commit to Science Based targets, agreeing to medium term carbon reduction targets, for our longer-term goals we have committed to be Net Zero before 2050. |

## C3.4

**(C3.4) Describe where and how climate-related risks and opportunities have influenced your financial planning.**

| Financial planning elements that have been influenced | Description of influence |
|---|---|

Exhibit 22 to Decl. of Burton
1286

25

Case 2:24-cv-00801-ODW-PVC   Document 53-22   Filed 07/24/24   Page 27 of 123   Page ID
#:2932

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



| Row | Indirect costs |
|-----|----------------|
| 1 | In 2020, we set ambitious short-term goals to achieve 100% Renewable energy, and Carbon neutrality (for our Offices Data centers and business travel) by the end of 2021. In 2021 we will commit to Science Based targets, agreeing to medium term carbon reduction targets, for our longer-term goals we have committed to be Net Zero before 2050. Our CFO ensures and facilitates a pathway to setting and meeting these ambitious climate related targets. We have a dedicated budget, overseen by the CFO, to purchase renewable electricity and carbon offsets in order to achieve our short, medium, and longer term goals. This will affect indirect costs in our business. |

## C3.4a

**(C3.4a) Provide any additional information on how climate-related risks and opportunities have influenced your strategy and financial planning (optional).**

In FY2021, we will begin the process of aligning with the Task Force on Climate-related Financial Disclosures (TCFD).

# C4. Targets and performance

## C4.1

**(C4.1) Did you have an emissions target that was active in the reporting year?**

Absolute target

## C4.1a

**(C4.1a) Provide details of your absolute emissions target(s) and progress made against those targets.**

**Target reference number**
Abs 1

26

Exhibit 22 to Decl. of Burton
1287

**SER 1731**

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



27

**Year target was set**
2020

**Target coverage**
Company-wide

**Scope(s) (or Scope 3 category)**
Other, please specify
100% Renewable Energy by the end of 2021

**Base year**
2019

**Covered emissions in base year (metric tons CO2e)**
18,266

**Covered emissions in base year as % of total base year emissions in selected Scope(s) (or Scope 3 category)**
100

**Target year**
2021

**Targeted reduction from base year (%)**
100

**Covered emissions in target year (metric tons CO2e) [auto-calculated]**
0

**Covered emissions in reporting year (metric tons CO2e)**
20,409

**% of target achieved [auto-calculated]**
-11.7321800066

Exhibit 22 to Decl. of Burton
1288

**SER 1732**

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



28

**Target status in reporting year**
Underway

**Is this a science-based target?**
No, but we are reporting another target that is science-based

**Target ambition**

**Please explain (including target coverage)**
In 2020 we committed to reach 100% renewable energy by the end of 2021 for office and datacenter operations.

---

**Target reference number**
Abs 2

**Year target was set**
2020

**Target coverage**
Company-wide

**Scope(s) (or Scope 3 category)**
Other, please specify
Carbon neutral for our offices, data centers and business travel by the end of 2021

**Base year**
2019

**Covered emissions in base year (metric tons CO2e)**
44,733

Exhibit 22 to Decl. of Burton
1289

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



**Covered emissions in base year as % of total base year emissions in selected Scope(s) (or Scope 3 category)**
100

**Target year**
2021

**Targeted reduction from base year (%)**
100

**Covered emissions in target year (metric tons CO2e) [auto-calculated]**
0

**Covered emissions in reporting year (metric tons CO2e)**
24,337

**% of target achieved [auto-calculated]**
45.5949746272

**Target status in reporting year**
Underway

**Is this a science-based target?**
No, but we are reporting another target that is science-based

**Target ambition**

**Please explain (including target coverage)**
In 2020 we committed to achieve carbon neutrality by the end of 2021 across our office and datacenter operations, and corporate travel.

**Target reference number**

29

Exhibit 22 to Decl. of Burton
1290



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

Abs 3

**Year target was set**
2020

**Target coverage**
Company-wide

**Scope(s) (or Scope 3 category)**
Other, please specify
Net Zero by 2050

**Base year**
2019

**Covered emissions in base year (metric tons CO2e)**
44,733

**Covered emissions in base year as % of total base year emissions in selected Scope(s) (or Scope 3 category)**
25

**Target year**
2050

**Targeted reduction from base year (%)**
100

**Covered emissions in target year (metric tons CO2e) [auto-calculated]**
0

**Covered emissions in reporting year (metric tons CO2e)**
24,339

30

Exhibit 22 to Decl. of Burton
1291

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

**% of target achieved [auto-calculated]**
45.590503655

**Target status in reporting year**
Underway

**Is this a science-based target?**
Yes, we consider this a science-based target, but it has not been approved by the Science-Based Targets initiative

**Target ambition**
1.5°C aligned

**Please explain (including target coverage)**
In 2021, we'll set our target year to achieve net zero carbon in accordance with SBTi. We'll use 2019 as our baseline year and commit to a much more aggressive schedule than the 2050 timeline set by the Paris Agreement. In 2020, we conducted greenhouse gas (GHG) inventory validation work, including the in-depth Scope 3 baseline assessment, which will inform our future net zero efforts across our value chain. We also began structuring our cross-functional efforts internally to ensure our business is aligned for the long-term success of our net zero efforts.

**C4.2**

**(C4.2) Did you have any other climate-related targets that were active in the reporting year?**
Target(s) to increase low-carbon energy consumption or production

**C4.2a**

**(C4.2a) Provide details of your target(s) to increase low-carbon energy consumption or production.**

**Target reference number**
Low 1

31

Exhibit 22 to Decl. of Burton
1292

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

**CDP**
DISCLOSURE INSIGHT ACTION

32

**Year target was set**
2020

**Target coverage**
Company-wide

**Target type: absolute or intensity**
Absolute

**Target type: energy carrier**
Electricity

**Target type: activity**
Consumption

**Target type: energy source**
Renewable energy source(s) only

**Metric (target numerator if reporting an intensity target)**
Percentage

**Target denominator (intensity targets only)**

**Base year**
2019

**Figure or percentage in base year**
0

**Target year**
2021

Exhibit 22 to Decl. of Burton
1293

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

**Figure or percentage in target year**
100

**Figure or percentage in reporting year**
34

**% of target achieved [auto-calculated]**
34

**Target status in reporting year**
Underway

**Is this target part of an emissions target?**
Internal target, 100% Renewable Electricity as part of our 100% Renewable Energy target, AB1

**Is this target part of an overarching initiative?**
No, it's not part of an overarching initiative

**Please explain  (including target coverage)**
100% Renewable Electricity as part of our 100% Renewable Energy target.

## C4.3

**(C4.3) Did you have emissions reduction initiatives that were active within the reporting year? Note that this can include those in the planning and/or implementation phases.**
Yes

## C4.3a

**(C4.3a) Identify the total number of initiatives at each stage of development, and for those in the implementation stages, the estimated CO2e savings.**

33

Exhibit 22 to Decl. of Burton
1294

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



| | Number of initiatives | Total estimated annual CO2e savings in metric tonnes CO2e (only for rows marked *) |
|---|---|---|
| Under investigation | 0 | 0 |
| To be implemented* | 3 | 4,718 |
| Implementation commenced* | 1 | 870 |
| Implemented* | 0 | 0 |
| Not to be implemented | 0 | 0 |

## C4.3b

**(C4.3b) Provide details on the initiatives implemented in the reporting year in the table below.**

**Initiative category & Initiative type**
Low-carbon energy consumption
Low-carbon electricity mix

**Estimated annual CO2e savings (metric tonnes CO2e)**
1,154

**Scope(s)**
Scope 2 (market-based)

**Voluntary/Mandatory**
Voluntary

**Annual monetary savings (unit currency – as specified in C0.4)**
0

**Investment required (unit currency – as specified in C0.4)**

34

Exhibit 22 to Decl. of Burton
1295

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

**Payback period**
No payback

**Estimated lifetime of the initiative**
Ongoing

**Comment**
We sourced renewable energy for our Santa Clara headquarters campus.  More details in C8.2e

---

**Initiative category & Initiative type**
Low-carbon energy consumption
Solar PV

**Estimated annual CO2e savings (metric tonnes CO2e)**
123

**Scope(s)**
Scope 2 (market-based)

**Voluntary/Mandatory**
Voluntary

**Annual monetary savings (unit currency – as specified in C0.4)**
0

**Investment required (unit currency – as specified in C0.4)**
0

**Payback period**

0

35

Exhibit 22 to Decl. of Burton
1296

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



No payback

**Estimated lifetime of the initiative**
21-30 years

**Comment**
In San Diego, we bought solar power from the panels on our campus roofs, which accounts for approximately 13% of our annual power use.

---

**Initiative category & Initiative type**
Low-carbon energy generation
Solar PV

**Estimated annual CO2e savings (metric tonnes CO2e)**
870

**Scope(s)**
Scope 2 (market-based)

**Voluntary/Mandatory**
Voluntary

**Annual monetary savings (unit currency – as specified in C0.4)**
0

**Investment required (unit currency – as specified in C0.4)**
0

**Payback period**
No payback

**Estimated lifetime of the initiative**

36

Exhibit 22 to Decl. of Burton
1297



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

21-30 years

**Comment**
We are installing solar panels at our head office, with a total capacity of 553.3 KW.  Investment will be through our lease agreement.

**Initiative category & Initiative type**
Low-carbon energy consumption
Other, please specify
Renewable Energy at our Data Centres

**Estimated annual CO2e savings (metric tonnes CO2e)**
3,441

**Scope(s)**
Scope 2 (market-based)

**Voluntary/Mandatory**
Voluntary

**Annual monetary savings (unit currency – as specified in C0.4)**
0

**Investment required (unit currency – as specified in C0.4)**
0

**Payback period**
No payback

**Estimated lifetime of the initiative**
6-10 years

37

Exhibit 22 to Decl. of Burton
1298

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



**Comment**

Renewable energy purchased in our manufacturing and offices mostly from IRECS. In 2020, 34% of the energy used in our datacenter's was sourced from renewable energy. More details in C8.2e

## C4.3c

**(C4.3c) What methods do you use to drive investment in emissions reduction activities?**

| Method | Comment |
|---|---|
| Dedicated budget for energy efficiency | We have a dedicated budget for meeting our corporate sustainability targets by improving our datacenter efficiency. Two of our greatest opportunities to reduce our environmental impact include using our datacenter resources more efficiently and increasing capacity across our global cloud. We've made lifecycle management improvements throughout our cloud infrastructure that allow us to optimize power efficiency, reduce our datacenter footprint, and select the most efficient equipment to meet our business requirements. When sourcing our hardware and our co-location providers, our RFPs include a set of environmental criteria to ensure they meet our business requirements. This year , we'll also expand our datacenter operations team to ensure we create and incorporate global sustainability standards to achieve our net zero aspirations. In 2020 ServiceNow Global Cloud Services invested in training key Data Center Operations team members globally to become Certified Data Center Sustainability Professionals (CDCSP®). Achievement of this certification recognizes an individual's knowledge and skills and ability to determine the steps required to evaluate, analyze, plan, implement and monitor a strategy to ensure the long-term sustainability of the data center. |
| Dedicated budget for other emissions reduction activities | Our CFO ensures and facilitates a pathway to setting and meeting these ambitious climate related targets. We have a dedicated budget, overseen by the CFO, to purchase renewable electricity and carbon offsets in order to achieve our short, medium, and longer term goals. |

## C4.5

**(C4.5) Do you classify any of your existing goods and/or services as low-carbon products or do they enable a third party to avoid GHG emissions?**

No

Exhibit 22 to Decl. of Burton
1299

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



# C5. Emissions methodology

## C5.1

**(C5.1) Provide your base year and base year emissions (Scopes 1 and 2).**

**Scope 1**

**Base year start**
January 1, 2019

**Base year end**
December 31, 2019

**Base year emissions (metric tons CO2e)**
1,323

**Comment**
Scope 1 emissions include GHG emissions associated with sources owned or controlled by the company. ServiceNow reports emissions for stationary combustion.

**Scope 2 (location-based)**

**Base year start**
January 1, 2019

**Base year end**
December 31, 2019

**Base year emissions (metric tons CO2e)**
24,453

39

Exhibit 22 to Decl. of Burton
1300



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

**Comment**

The second scope of emissions under the GHG Protocol is indirect emissions from purchased energy such as electricity and steam. These emissions are classified as indirect because the emissions do not occur at ServiceNow's locations, but rather at the location in which the electricity or steam is generated from a fuel. These emissions are a consequence of ServiceNow's activities; although it does not own or control the sources, the actions of ServiceNow require the generation of electricity.

**Scope 2 (market-based)**

**Base year start**
January 1, 2019

**Base year end**
December 31, 2019

**Base year emissions (metric tons CO2e)**
16,944

**Comment**
Our Market based Scope 2 includes electricity usage in our offices and data centres and also takes into account the Renewable electricity used.

## C5.2

**(C5.2) Select the name of the standard, protocol, or methodology you have used to collect activity data and calculate emissions.**
The Greenhouse Gas Protocol: A Corporate Accounting and Reporting Standard (Revised Edition)

## C6. Emissions data

## C6.1

**(C6.1) What were your organization's gross global Scope 1 emissions in metric tons CO2e?**

40

Exhibit 22 to Decl. of Burton
1301

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

**CDP**
DISCLOSURE INSIGHT ACTION

**Reporting year**

**Gross global Scope 1 emissions (metric tons CO2e)**
1,018

**Comment**

## C6.2

(C6.2) Describe your organization's approach to reporting Scope 2 emissions.

**Row 1**

**Scope 2, location-based**
We are reporting a Scope 2, location-based figure

**Scope 2, market-based**
We are reporting a Scope 2, market-based figure

**Comment**

## C6.3

(C6.3) What were your organization's gross global Scope 2 emissions in metric tons CO2e?

**Reporting year**

**Scope 2, location-based**
28,458

**Scope 2, market-based (if applicable)**

41

Exhibit 22 to Decl. of Burton
1302

**SER 1746**



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

19,392

**Comment**

No comment required

## C6.4

**(C6.4) Are there any sources (e.g. facilities, specific GHGs, activities, geographies, etc.) of Scope 1 and Scope 2 emissions that are within your selected reporting boundary which are not included in your disclosure?**

No

## C6.5

**(C6.5) Account for your organization's gross global Scope 3 emissions, disclosing and explaining any exclusions.**

**Purchased goods and services**

**Evaluation status**
Relevant, not yet calculated

**Please explain**
This is relevant. We are calculating our full corporate carbon footprint in 2021.

**Capital goods**

**Evaluation status**
Relevant, not yet calculated

**Please explain**
This is relevant. We are calculating our full corporate carbon footprint in 2021.

**Fuel-and-energy-related activities (not included in Scope 1 or 2)**

42

Exhibit 22 to Decl. of Burton 1303

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

**CDP**
DISCLOSURE INSIGHT ACTION

**Evaluation status**
Relevant, not yet calculated

**Please explain**
This is relevant. We are calculating our full corporate carbon footprint in 2021.

**Upstream transportation and distribution**

**Evaluation status**
Not relevant, explanation provided

**Please explain**
ServiceNow have no upstream transportation emissions.

**Waste generated in operations**

**Evaluation status**
Relevant, not yet calculated

**Please explain**
This is relevant. We are calculating our full corporate carbon footprint in 2021.

**Business travel**

**Evaluation status**
Relevant, calculated

**Metric tonnes CO2e**
3,928

**Emissions calculation methodology**

43

Exhibit 22 to Decl. of Burton
1304



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

We collect actual activity data from our travel provider. Data collected includes – miles flown (path of every flight taken, distance of flight path); total miles driven on rental cars or totals days rented; total nights spent in hotels aggregated by country. Where actual data is not present, procurement spend data can be used. DEFRA factors were then applied.

**Percentage of emissions calculated using data obtained from suppliers or value chain partners**

100

**Please explain**

This is from actual data.

## Employee commuting

**Evaluation status**

Relevant, not yet calculated

**Please explain**

This is relevant. We are calculating our full corporate carbon footprint in 2021.

## Upstream leased assets

**Evaluation status**

Not relevant, explanation provided

**Please explain**

Not applicable. We do not have any upstream leased assets.

## Downstream transportation and distribution

**Evaluation status**

Not relevant, explanation provided

**Please explain**

ServiceNow have no downstream transportation emissions.

44

Exhibit 22 to Decl. of Burton
1305

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



## Processing of sold products

**Evaluation status**
Not relevant, explanation provided

**Please explain**
ServiceNow does not sell intermediary products and therefore does not have any emissions associated with Processing of Sold Products.

## Use of sold products

**Evaluation status**
Not relevant, explanation provided

**Please explain**
Due to the nature of our business. There are no scope 3 emissions from the use of sold products.

## End of life treatment of sold products

**Evaluation status**
Not relevant, explanation provided

**Please explain**
Due to the nature of our business. There are no scope 3 emissions from end of life of our products.

## Downstream leased assets

**Evaluation status**
Not relevant, explanation provided

**Please explain**
Due to the nature of our business. There are no scope 3 emissions from downstream leased assets.

## Franchises

45

Exhibit 22 to Decl. of Burton
1306

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

**Evaluation status**
Not relevant, explanation provided

**Please explain**
Due to the nature of our business. There are no scope 3 emissions from franchises.

**Investments**

**Evaluation status**
Not relevant, explanation provided

**Please explain**
Due to the nature of our business. There are no scope 3 emissions from the use of sold products.

**Other (upstream)**

**Evaluation status**
Not relevant, explanation provided

**Please explain**
We have no other emissions to report

**Other (downstream)**

**Evaluation status**
Not relevant, explanation provided

**Please explain**
We have no other emissions to report

## C6.7

(C6.7) Are carbon dioxide emissions from biogenic carbon relevant to your organization?

46

Exhibit 22 to Decl. of Burton
1307

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



No

## C6.10

**(C6.10) Describe your gross global combined Scope 1 and 2 emissions for the reporting year in metric tons CO2e per unit currency total revenue and provide any additional intensity metrics that are appropriate to your business operations.**

---

**Intensity figure**
0.0000045159

**Metric numerator (Gross global combined Scope 1 and 2 emissions, metric tons CO2e)**
20,410

**Metric denominator**
unit total revenue

**Metric denominator: Unit total**
4,519,484,000

**Scope 2 figure used**
Market-based

**% change from previous year**
14

**Direction of change**
Increased

**Reason for change**
This is the first year we have reported this metric in CDP . In 2019 the intensity figure for scope 1&2 with a unit revenue denominator was 0.0000052795. In 2020 the energy used in Datacenters was 34% sourced from renewable energy. Since the most significant energy footprint

---

47

Exhibit 22 to Decl. of Burton
1308

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



across our operations is derived from our datacenter energy demand, we aim to drive energy efficiency programs across our datacenter footprint. We have successfully decoupled increased energy demand from company growth. Despite increased revenue from 2019 to 2020 of 30%, the energy required to support our operations, only increased by 13%.

# C7. Emissions breakdowns

## C7.1

**(C7.1) Does your organization break down its Scope 1 emissions by greenhouse gas type?**

Yes

## C7.1a

**(C7.1a) Break down your total gross global Scope 1 emissions by greenhouse gas type and provide the source of each used greenhouse warming potential (GWP).**

| Greenhouse gas | Scope 1 emissions (metric tons of CO2e) | GWP Reference |
|---|---|---|
| CO2 | 1,017.19 | IPCC Fifth Assessment Report (AR5 – 100 year) |
| CH4 | 0.02 | IPCC Fifth Assessment Report (AR5 – 100 year) |
| N2O | 0.002 | IPCC Fifth Assessment Report (AR5 – 100 year) |

## C7.2

**(C7.2) Break down your total gross global Scope 1 emissions by country/region.**

| Country/Region | Scope 1 emissions (metric tons CO2e) |
|---|---|
| Americas | 1,018 |

48

Exhibit 22 to Decl. of Burton
1309

Case 2:24-cv-00801-ODW-PVC   Document 53-22   Filed 07/24/24   Page 50 of 123   Page ID #:2955

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



## C7.3

**(C7.3) Indicate which gross global Scope 1 emissions breakdowns you are able to provide.**

By activity

## C7.3c

**(C7.3c) Break down your total gross global Scope 1 emissions by business activity.**

| Activity | Scope 1 emissions (metric tons CO2e) |
|---|---|
| Natural gas stationary combustion in offices | 1,018 |

## C7.5

**(C7.5) Break down your total gross global Scope 2 emissions by country/region.**

| Country/Region | Scope 2, location-based (metric tons CO2e) | Scope 2, market-based (metric tons CO2e) | Purchased and consumed electricity, heat, steam or cooling (MWh) | Purchased and consumed low-carbon electricity, heat, steam or cooling accounted for in Scope 2 market-based approach (MWh) |
|---|---|---|---|---|
| Americas | 14,605.09 | 9,688.36 | 43,413.35 | 9,105 |
| Eastern Europe, Middle East, and Africa (EEMEA) | 5,846.85 | 2,024.99 | 16,823.63 | 12,997 |
| Asia Pacific (or JAPA) | 8,005.92 | 7,678.16 | 9,159.06 | 753 |

## C7.6

**(C7.6) Indicate which gross global Scope 2 emissions breakdowns you are able to provide.**

By activity

Exhibit 22 to Decl. of Burton
1310

49

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



## C7.6c

**(C7.6c) Break down your total gross global Scope 2 emissions by business activity.**

| Activity | Scope 2, location-based (metric tons CO2e) | Scope 2, market-based (metric tons CO2e) |
|---|---|---|
| Purchased electricity and natural gas (estimated) | 25,477.18 | 16,410.84 |
| Office electricity | 2,023.37 | 2,023.37 |
| Office purchased heat | 957.3 | 957.3 |

## C7.9

**(C7.9) How do your gross global emissions (Scope 1 and 2 combined) for the reporting year compare to those of the previous reporting year?**

Increased

## C7.9a

**(C7.9a) Identify the reasons for any change in your gross global emissions (Scope 1 and 2 combined), and for each of them specify how your emissions compare to the previous year.**

| | Change in emissions (metric tons CO2e) | Direction of change | Emissions value (percentage) | Please explain calculation |
|---|---|---|---|---|
| Change in renewable energy consumption | 2,142 | Increased | 11 | In 2020 the energy used in Datacenters was 34% sourced from renewable energy. Since the most significant energy footprint across our operations is derived from our datacenter energy demand, we aim to drive energy efficiency programs across our datacenter footprint. We have successfully decoupled increased energy demand |

Exhibit 22 to Decl. of Burton
1311

50

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



| | | | from company growth. Despite increased revenue from 2019 to 2020 of 30%, the energy required for our offices and datacenters only increased by 13%. |
|---|---|---|---|
| Other emissions reduction activities | 0 | No change | 0 | Not relevant |
| Divestment | 0 | No change | 0 | Not relevant |
| Acquisitions | 0 | No change | 0 | Not relevant |
| Mergers | 0 | No change | 0 | Not relevant |
| Change in output | 0 | No change | 0 | Not relevant |
| Change in methodology | 0 | No change | 0 | Not relevant |
| Change in boundary | 0 | No change | 0 | Not relevant |
| Change in physical operating conditions | 0 | No change | 0 | Not relevant |
| Unidentified | 0 | No change | 0 | Not relevant |
| Other | 0 | No change | 0 | Not relevant |

## C7.9b

**(C7.9b) Are your emissions performance calculations in C7.9 and C7.9a based on a location-based Scope 2 emissions figure or a market-based Scope 2 emissions figure?**

Market-based

Exhibit 22 to Decl. of Burton 1312

51

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



# C8. Energy

## C8.1

**(C8.1) What percentage of your total operational spend in the reporting year was on energy?**

More than 0% but less than or equal to 5%

## C8.2

**(C8.2) Select which energy-related activities your organization has undertaken.**

| | Indicate whether your organization undertook this energy-related activity in the reporting year |
|---|---|
| Consumption of fuel (excluding feedstocks) | Yes |
| Consumption of purchased or acquired electricity | Yes |
| Consumption of purchased or acquired heat | Yes |
| Consumption of purchased or acquired steam | No |
| Consumption of purchased or acquired cooling | No |
| Generation of electricity, heat, steam, or cooling | No |

## C8.2a

**(C8.2a) Report your organization's energy consumption totals (excluding feedstocks) in MWh.**

| | Heating value | MWh from renewable sources | MWh from non-renewable sources | Total (renewable and non-renewable) MWh |
|---|---|---|---|---|
| Consumption of fuel (excluding feedstock) | HHV (higher heating value) | 0 | 5,477.22 | 5,477.22 |

52

Exhibit 22 to Decl. of Burton 1313

Case 2:24-cv-00801-ODW-PVC   Document 53-22   Filed 07/24/24   Page 54 of 123   Page ID #:2959



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

53

| | | | |
|---|---|---|---|
| Consumption of purchased or acquired electricity | 22,856.06 | 69,396.03 | 46,539.96 |
| Consumption of purchased or acquired heat | 0 | 11,101.64 | 11,101.64 |
| Total energy consumption | 22,856.06 | 85,974.89 | 63,118.83 |

## C8.2b

**(C8.2b) Select the applications of your organization's consumption of fuel.**

| | Indicate whether your organization undertakes this fuel application |
|---|---|
| Consumption of fuel for the generation of electricity | No |
| Consumption of fuel for the generation of heat | Yes |
| Consumption of fuel for the generation of steam | No |
| Consumption of fuel for the generation of cooling | No |
| Consumption of fuel for co-generation or tri-generation | No |

## C8.2c

**(C8.2c) State how much fuel in MWh your organization has consumed (excluding feedstocks) by fuel type.**

**Fuels (excluding feedstocks)**
Natural Gas

**Heating value**
HHV (higher heating value)

Exhibit 22 to Decl. of Burton
1314



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

**Total fuel MWh consumed by the organization**
5,477

**Emission factor**
1.92448

**Unit**
kg CO2e per m3

**Emissions factor source**
US EPA, "Emission Factors for Greenhouse Gas Inventories," Table 1 Stationary Combustion Emission Factors, March 2019

**Comment**

## C8.2e

**(C8.2e) Provide details on the electricity, heat, steam, and/or cooling amounts that were accounted for at a zero emission factor in the market-based Scope 2 figure reported in C6.3.**

**Sourcing method**
Unbundled energy attribute certificates, Renewable Energy Certificates (RECs)

**Low-carbon technology type**
Solar

**Country/area of consumption of low-carbon electricity, heat, steam or cooling**
United States of America

**MWh consumed accounted for at a zero emission factor**

54

Exhibit 22 to Decl. of Burton
1315



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

5,102

**Comment**
RECs 100% solar generated in the Western United States.

**Sourcing method**
Green electricity products (e.g. green tariffs) from an energy supplier, not supported by energy attribute certificates

**Low-carbon technology type**
Biomass

**Country/area of consumption of low-carbon electricity, heat, steam or cooling**
United Kingdom of Great Britain and Northern Ireland

**MWh consumed accounted for at a zero emission factor**
4,247

**Comment**
Green product through supplier (REGO-backed certified renewable energy from in-country biomass)

**Sourcing method**
Green electricity products (e.g. green tariffs) from an energy supplier, not supported by energy attribute certificates

**Low-carbon technology type**
Wind

**Country/area of consumption of low-carbon electricity, heat, steam or cooling**
Netherlands

55

Exhibit 22 to Decl. of Burton
1316



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

56

**MWh consumed accounted for at a zero emission factor**

3,884

**Comment**

Green product through supplier (bundled GoOs from wind)

**Sourcing method**

Unbundled energy attribute certificates, Renewable Energy Certificates (RECs)

**Low-carbon technology type**

Wind

**Country/area of consumption of low-carbon electricity, heat, steam or cooling**

United States of America

**MWh consumed accounted for at a zero emission factor**

1,442

**Comment**

Renewable Energy Certificates (RECs) from wind

**Sourcing method**

Green electricity products (e.g. green tariffs) from an energy supplier, not supported by energy attribute certificates

**Low-carbon technology type**

Hydropower

**Country/area of consumption of low-carbon electricity, heat, steam or cooling**

Germany

Exhibit 22 to Decl. of Burton
1317



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

**MWh consumed accounted for at a zero emission factor**

984

**Comment**

Green product through supplier (bundled GoOs from hydro)

**Sourcing method**

Green electricity products (e.g. green tariffs) from an energy supplier, not supported by energy attribute certificates

**Low-carbon technology type**

Hydropower

**Country/area of consumption of low-carbon electricity, heat, steam or cooling**

Germany

**MWh consumed accounted for at a zero emission factor**

929

**Comment**

Green product through supplier (bundled GoOs from hydro)

**Sourcing method**

Unbundled energy attribute certificates, Renewable Energy Certificates (RECs)

**Low-carbon technology type**

Wind

**Country/area of consumption of low-carbon electricity, heat, steam or cooling**

United States of America

57

Exhibit 22 to Decl. of Burton 1318



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

58

**MWh consumed accounted for at a zero emission factor**
907

**Comment**
Renewable Energy Certificates (RECs) from wind

**Sourcing method**
Unbundled energy attribute certificates, Renewable Energy Certificates (RECs)

**Low-carbon technology type**
Wind

**Country/area of consumption of low-carbon electricity, heat, steam or cooling**
United States of America

**MWh consumed accounted for at a zero emission factor**
886

**Comment**
Renewable Energy Certificates (RECs) from wind

**Sourcing method**
Green electricity products (e.g. green tariffs) from an energy supplier, not supported by energy attribute certificates

**Low-carbon technology type**
Wind

**Country/area of consumption of low-carbon electricity, heat, steam or cooling**
Ireland

Exhibit 22 to Decl. of Burton
1319

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



**MWh consumed accounted for at a zero emission factor**

828

**Comment**

Yes - Energia Group 100% Green Energy supplied through certified renewable portfolio GO (Guarantee of Origin)

**Sourcing method**

Green electricity products (e.g. green tariffs) from an energy supplier, not supported by energy attribute certificates

**Low-carbon technology type**

Hydropower

**Country/area of consumption of low-carbon electricity, heat, steam or cooling**

Switzerland

**MWh consumed accounted for at a zero emission factor**

819

**Comment**

Green product through supplier (local hydro)

**Sourcing method**

Green electricity products (e.g. green tariffs) from an energy supplier, not supported by energy attribute certificates

**Low-carbon technology type**

Hydropower

**Country/area of consumption of low-carbon electricity, heat, steam or cooling**

Switzerland

59

Exhibit 22 to Decl. of Burton
1320



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

**MWh consumed accounted for at a zero emission factor**

809

**Comment**

Green product through supplier (local hydro)

**Sourcing method**

Unbundled energy attribute certificates, International REC Standard (I-RECs)

**Low-carbon technology type**

Hydropower

**Country/area of consumption of low-carbon electricity, heat, steam or cooling**

Singapore

**MWh consumed accounted for at a zero emission factor**

499

**Comment**

100% renewable coverage ; International Renewable Energy Certificates (I-RECs) Mix hydro and wind

**Sourcing method**

Green electricity products (e.g. green tariffs) from an energy supplier, not supported by energy attribute certificates

**Low-carbon technology type**

Wind

**Country/area of consumption of low-carbon electricity, heat, steam or cooling**

Netherlands

60

Exhibit 22 to Decl. of Burton
1321

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



**MWh consumed accounted for at a zero emission factor**

497

**Comment**

Green product through supplier (bundled GoOs from wind)

**Sourcing method**

Other, please specify

**Low-carbon technology type**

Solar

**Country/area of consumption of low-carbon electricity, heat, steam or cooling**

United States of America

**MWh consumed accounted for at a zero emission factor**

360

**Comment**

On site solar power

**Sourcing method**

Unbundled energy attribute certificates, Renewable Energy Certificates (RECs)

**Low-carbon technology type**

Wind

**Country/area of consumption of low-carbon electricity, heat, steam or cooling**

China, Hong Kong Special Administrative Region

61

Exhibit 22 to Decl. of Burton
1322

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

**CDP**
DISCLOSURE INSIGHT ACTION

**MWh consumed accounted for at a zero emission factor**

254

**Comment**

I-RECs from wind

**Sourcing method**

Unbundled energy attribute certificates, Renewable Energy Certificates (RECs)

**Low-carbon technology type**

Wind

**Country/area of consumption of low-carbon electricity, heat, steam or cooling**

United States of America

**MWh consumed accounted for at a zero emission factor**

130

**Comment**

RECs from wind

# C9. Additional metrics

## C9.1

**(C9.1) Provide any additional climate-related metrics relevant to your business.**

62

Exhibit 22 to Decl. of Burton
1323

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



# C10. Verification

## C10.1

**(C10.1) Indicate the verification/assurance status that applies to your reported emissions.**

| | Verification/assurance status |
|---|---|
| Scope 1 | No third-party verification or assurance |
| Scope 2 (location-based or market-based) | No third-party verification or assurance |
| Scope 3 | No third-party verification or assurance |

## C10.2

**(C10.2) Do you verify any climate-related information reported in your CDP disclosure other than the emissions figures reported in C6.1, C6.3, and C6.5?**

No, but we are actively considering verifying within the next two years

# C11. Carbon pricing

## C11.1

**(C11.1) Are any of your operations or activities regulated by a carbon pricing system (i.e. ETS, Cap & Trade or Carbon Tax)?**

No, and we do not anticipate being regulated in the next three years

## C11.2

**(C11.2) Has your organization originated or purchased any project-based carbon credits within the reporting period?**

No

63

Exhibit 22 to Decl. of Burton
1324



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

## C11.3

**(C11.3) Does your organization use an internal price on carbon?**

No, but we anticipate doing so in the next two years

## C12. Engagement

## C12.1

**(C12.1) Do you engage with your value chain on climate-related issues?**

Yes, our suppliers

## C12.1a

**(C12.1a) Provide details of your climate-related supplier engagement strategy.**

**Type of engagement**
Compliance & onboarding

**Details of engagement**
Climate change is integrated into supplier evaluation processes

**% of suppliers by number**
100

**% total procurement spend (direct and indirect)**
100

**% of supplier-related Scope 3 emissions as reported in C6.5**

64

Exhibit 22 to Decl. of Burton
1325

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



0

**Rationale for the coverage of your engagement**

It is mandatory for our suppliers to commit to our Code of Conduct. Our Code of Conduct states that ServiceNow recognizes its social responsibility to protect the environment and suppliers are expected to conduct operations in ways that are environmentally responsible and in compliance with all applicable environmental laws, regulations and standards.

**Impact of engagement, including measures of success**

We're currently developing a framework to better understand our suppliers' baselines for diversity, sustainability, and financial health. By assessing where we are today, we can better position ourselves for continuous improvement over time. We spent time in 2020 evaluating our operations to identify the biggest opportunities to drive accountability across our supplier ecosystem. To reduce supplier risk while furthering responsible procurement, we're acquiring data about our suppliers from third party providers and conducting third-party, point in-time risk assessments of our complete supplier ecosystem. This will help us develop a programmatic plan for year-over-year improvements. In 2021, we'll establish baselines for measuring our sustainable procurement practices. We look forward to disclosing more on these efforts in next year's report.

**Comment**

## C12.3

**(C12.3) Do you engage in activities that could either directly or indirectly influence public policy on climate-related issues through any of the following?**

Trade associations

## C12.3b

**(C12.3b) Are you on the board of any trade associations or do you provide funding beyond membership?**

No

65

Exhibit 22 to Decl. of Burton
1326



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

## C12.3f

**(C12.3f) What processes do you have in place to ensure that all of your direct and indirect activities that influence policy are consistent with your overall climate change strategy?**

ServiceNow will drive oversight, and consistency, of our global impact strategy through a newly established ESG steering committee, under the guidance of our board of directors' nominating and governance committee. The Nominating and Governance Committee, of the Board of Directors, charter includes advising the board on environmental, social responsibility, and corporate governance matters. Climate related issues are the key part of our environmental sustainability strategy.

The Executive management team is dedicated to Incorporating ESG into our vision to become the defining enterprise software company of the 21st century. Our ESG steering committee, including representatives from across the company including Corporate strategy, Customer & partner, Finance, IT, Legal, Marketing, Product, Sales, Talent, oversee ServiceNow's global impact (ESG) strategy, goals, and monitors our progress in a consistent manner.

## C12.4

**(C12.4) Have you published information about your organization's response to climate change and GHG emissions performance for this reporting year in places other than in your CDP response? If so, please attach the publication(s).**

**Publication**
In voluntary sustainability report

**Status**
Complete

**Attach the document**
📎 servicenow-global-impact-report-2021.pdf

**Page/Section reference**

66

Exhibit 22 to Decl. of Burton 1327

**CDP**
DISCLOSURE INSIGHT ACTION

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

Governance, page 43
Sustaining our planet, Page 19
Energy and Carbon Data, Page 57 - 58

**Content elements**

Governance
Strategy
Risks & opportunities
Emissions figures
Emission targets
Other metrics

**Comment**

https://www.servicenow.com/content/dam/servicenow-assets/public/en-us/doc-type/other-document/servicenow-global-impact-report-2021.pdf
https://www.servicenow.com/content/dam/servicenow-assets/public/en-us/doc-type/public-document/servicenow-global-impact-esg-fact-sheet-2021.pdf

**Publication**

Other, please specify
ESG Fact Sheet

**Status**

Complete

**Attach the document**

📎 servicenow-global-impact-esg-fact-sheet-2021.pdf

**Page/Section reference**

67

Exhibit 22 to Decl. of Burton
1328

**SER 1772**

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



Sustaining our planet, Page 1-2
Governance page 4

**Content elements**

    Governance
    Strategy
    Emissions figures
    Emission targets

**Comment**

# C15. Signoff

## C-FI

**(C-FI) Use this field to provide any additional information or context that you feel is relevant to your organization's response. Please note that this field is optional and is not scored.**

## C15.1

**(C15.1) Provide details for the person that has signed off (approved) your CDP climate change response.**

| | Job title | Corresponding job category |
|---|---|---|
| Row 1 | Head of Global Impact | Other, please specify Senior Director, Global Impact |

68

Exhibit 22 to Decl. of Burton
1329

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



# SC. Supply chain module

## SC0.0

(SC0.0) If you would like to do so, please provide a separate introduction to this module.

## SC0.1

(SC0.1) What is your company's annual revenue for the stated reporting period?

| | Annual Revenue |
|---|---|
| Row 1 | 4,519,484,000 |

## SC0.2

(SC0.2) Do you have an ISIN for your company that you would be willing to share with CDP?

No

## SC1.1

(SC1.1) Allocate your emissions to your customers listed below according to the goods or services you have sold them in this reporting period.

**Requesting member**

Accenture

**Scope of emissions**

69

Exhibit 22 to Decl. of Burton
1330

**SER 1774**



ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021

Scope 1

**Allocation level**
Company wide

**Allocation level detail**

**Emissions in metric tonnes of CO2e**
8.4

**Uncertainty (±%)**
5

**Major sources of emissions**
The emissions are those relating to our data centers and offices under our operational control globally. The majority of our scope 1 & 2 emissions are from electricity consumption.

**Verified**
No

**Allocation method**
Other, please specify
We measure the customer usage of our data centers over a year and allocate GHG emissions in relation to the overall usage.

**Please explain how you have identified the GHG source, including major limitations to this process and assumptions made**
ServiceNow identifies and measures all material GHG sources over which we have operational control.   ServiceNow prepared the 2020 GHG Inventories, which covered Scope 1 emissions (natural gas), Scope 2 emissions (purchased electricity, purchased heating and estimated refrigerants) . The emissions were calculated in accordance with the GHG Protocol Corporate Standard and Scope 2 guidance as references, and otherwise assessed alignment with industry best practices. The uncertainty associated with these emissions is estimated to be less than or equal to 5%.

70

Exhibit 22 to Decl. of Burton
1331

ServiceNow Inc CDP Climate Change Questionnaire 2021 Wednesday, July 28, 2021



**Requesting member**
Accenture

**Scope of emissions**
Scope 2

**Allocation level**
Company wide

**Allocation level detail**

**Emissions in metric tonnes of CO2e**
160.06

**Uncertainty (±%)**
5

**Major sources of emissions**
The emissions are those relating to our data centers and offices under our operational control globally. The majority of our scope 1 & 2 emissions are from electricity consumption.

**Verified**
No

**Allocation method**
Other, please specify
We measure the customer usage of our data centers over a year and allocate GHG emissions in relation to the overall usage.

**Please explain how you have identified the GHG source, including major limitations to this process and assumptions made**

71

Exhibit 22 to Decl. of Burton
1332