No. 25-5327

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*,

*Plaintiffs-Appellants,*

v.

LIANE M. RANDOLPH, IN HER OFFICIAL CAPACITY AS CHAIR OF THE CALIFORNIA
AIR RESOURCES BOARD, *et al.*,

*Defendants-Appellees.*

**On Appeal from the United States District Court
for the Central District of California**
No. 2:24-cv-00801-ODW-PVC

## SUPPLEMENTAL EXCERPTS OF RECORD
## VOLUME 9 OF 10

ROB BONTA
  *Attorney General of California*
ANNADEL A. ALMENDRAS
  *Senior Assistant Attorney General*
LAURA ZUCKERMAN
MYUNG J. PARK
  *Supervising Deputy Attorneys
  General*

CAITLAN MCLOON
KATHERINE GAUMOND
EMILY HAJARIZADEH
M. ELAINE MECKENSTOCK
DYLAN REDOR
ELIZABETH SONG
  *Deputy Attorneys General*
CALIFORNIA DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6438
Caitlan.McLoon@doj.ca.gov
*Attorneys for Defendants-Appellees*

October 16, 2025



Exhibit 9 to Decl. of Burton
574

The Task Force on Climate-related Financial Disclosures

# Appendix 1: Task Force Members

## CHAIRMAN AND VICE CHAIRS

**Michael Bloomberg**
Chair
Founder
Bloomberg LP and Bloomberg Philanthropies

**Denise Pavarina**
Vice Chair
Board Member
Banco Bradesco S.A.

**Graeme Pitkethly**
Vice Chair
Chief Financial Officer
Unilever

**Yeo Lian Sim**
Vice Chair
Special Advisor, Diversity
Singapore Exchange

A.
State of Climate-Related
Financial Disclosures

B.
Financial Statement
Considerations

C.
Case Studies on Scope 3
GHG Emissions

D.
TCFD-Aligned Requirements
and Related Initiatives

E.
Types of Financial Impact
and Associated Drivers

F.
Insights Gained and View
on Future Work

Appendices

## MEMBERS

**Jane Ambachtsheer**
Global Head of Sustainability
BNP Paribas Asset Management

**Richard Cantor**
Vice Chair
Moody's Investors Service

**Rosanna Fusco**
Head of Climate Change Strategy and Positioning
Eni

**Imre Guba**
Director and Corporate Reporting Specialist
S&P Global Ratings

**Geraldine Leegwater**
Chief Investment Management and
Member of the Executive Committee
PGGM

**Ruixia Liu**
Chief Expert of Task Force of Climate
Risk Management
Industrial and Commercial Bank of China

**Masaaki Nagamura**
Fellow, International Initiatives
Tokio Marine Holdings, Inc.

**Catherine Saire**
Partner, Sustainability Services
Deloitte

**David Blood**
Senior Partner
Generation Investment Management

**Koushik Chatterjee**
Group Executive Director, Finance and Corporate
Tata Steel Limited

**Alan X. Gómez Hernández**
Co-founder
Mexico TCFD Consortium

**Thomas Kusterer**
Chief Financial Officer
EnBW Energie Baden-Wurttemberg AG

**Mark Lewis**
Head of Climate Research
Andurand Capital Management

**Richard Manley**
Managing Director, Head of Sustainable
Investing Global Leadership Team
CPP Investments

**Mathew Nelson**
Partner, Oceania Chief Sustainability Officer
EY

**Ashley Schulten**
Head of ESG Investment, Global Fixed Income
BlackRock

Exhibit 9 to Decl. of Burton
575
**SER 2110**

The Task Force on Climate-related Financial Disclosures

**Martin Skancke**
Chair, Risk Committee
Storebrand

**Lucy Thomas**
Head of Sustainable Investing and Impact
UBS Asset Management

**Steve Waygood**
Chief Responsible Investment Officer
Aviva Investors

**Martin Weymann**
Head Group Sustainability
Swiss Re

**Jon Williams**
Partner, Sustainability and Climate Change
PwC
(Until June 2023)

**Roslyn Stein**
Group Head of Climate and Biodiversity
AXA
(Until August 2023)

**Sylvain Vanston**
Executive Director, Climate Investment Research
MSCI

**Simon Weaver**
Partner, Co-Head of Climate Risk and Strategy
KPMG

**Fiona Wild**
Group Climate and Sustainability Officer
BHP

A.
State of Climate-Related
Financial Disclosures

B.
Financial Statement
Considerations

C.
Case Studies on Scope 3
GHG Emissions

D.
TCFD-Aligned Requirements
and Related Initiatives

E.
Types of Financial Impact
and Associated Drivers

F.
Insights Gained and View
on Future Work

Appendices

### SPECIAL ADVISOR

**Russell Picot**
Chair, Trustee Board
HSBC Bank (U.K.) Pension Scheme
Former Group Chief Accounting Officer, HSBC

Deputy Chair, Chair of Investment Committee
Universities Superannuation Scheme Limited

### SECRETARIAT

**Mary Schapiro**
Vice Chair for Global Public Policy and
Special Advisor to the Founder and Chair
Bloomberg LP

**Mara Childress**
Director, Global Public Policy
Bloomberg LP

**Stacy Coleman**
TCFD Secretariat

**Curtis Ravenel**
TCFD Secretariat

### FINANCIAL STABILITY
### BOARD OBSERVERS

**Rupert Thorne**
Deputy to the Secretary General

**Jürgen Kirchhof**
Secretariat Member

This report was developed with the support of Bloomberg LP's Tom Coleman and Boston Consulting
Group's Roy Choudhury, Veronica Chau, Lorenzo Fantini, Jesper Nielsen, Arjun Nath, Mahmoud
Raya, Giovanni Covazzi, Alexander Puutio, Sofia Wiklund, Maria Vittoria Maranzano, Roni Grader,
Kristin John, Em Cruz, and Kieran Anderson.

Exhibit 9 to Decl. of Burton
576
**SER 2111**

The Task Force on Climate-related Financial Disclosure

# Appendix 2: Company Selection and AI Review Methodology

As described in Section A.1. TCFD-Aligned Reporting by Public Companies and Section A.2. TCFD-Aligned Reporting by Public Companies by Region, the Task Force used artificial intelligence (AI) technology to review the alignment of information included in companies' public reports with the TCFD recommendations. This appendix describes the Task Force's process for selecting the companies included in the reviews, the types of documents reviewed, and the AI review methodology.

## Companies Included in the AI Reviews

The AI technology was used to review financial filings, annual reports, integrated reports, sustainability reports, and other relevant reports of public companies from five regions in eight industries.[215] Six of the eight industries align with groups highlighted in the Task Force's 2017 report — Banking; Insurance; Energy; Materials and Buildings; Transportation; and Agriculture, Food, and Forest Products. To incorporate other types of companies that may be exposed to climate-related risks, two additional industries — Technology and Media and Consumer Goods — were also included.

For the AI review population used in Section A.1. TCFD-Aligned Reporting by Public Companies, the Task Force sought to maintain as much consistency with the final review population used in the 2020 status report as possible. For the 2020 status report, the Task Force selected companies using the following methodology:

- Identified a set of public companies — companies with public debt or equity — in the eight selected industries using the 29 subindustries listed in Figure A2-1 (p. 123). The 29 sub-industries are adapted from the Global Industry Classification Standard subsectors and industries.

- Removed subsidiaries to avoid double counting of companies. Identified companies that shared the same industry and ultimate parent for capital structure purposes and retained the company with the largest annual revenue (for non-financial industries) or the largest total assets (for financial industries). This approach was followed to avoid, as much as possible, including companies that

published annual reports separate from their parent company.

- Removed smaller companies from the population to maintain focus on larger companies. We retained banks and insurance companies with total assets of at least $10 billion and $1 billion, respectively, and companies in the six non-financial industries with annual revenue of $1 billion or more. This resulted in 4,446 total companies; and the break-down by industry and sub-industry is shown in Figure A2-1 (p. 123).

- Removed companies that did not have reports available in English.

- Removed companies that did not have annual reports available for review for fiscal years 2017, 2018, and 2019. This was done to ensure a consistent population of companies and comparable reporting across all three years.

- This methodology resulted in a final review population of 1,701 companies.

To identify the final review population for the past three status reports — including this one, the Task Force began with the list of companies included in the final review population for the previous year's status report and removed companies that no longer existed or did not have annual reports available for the three relevant fiscal years. For this status report, the Task Force began with an initial review population of 1,434 companies, which was the final review population used in the 2022 status report. Of the 1,434 companies, 69 were removed based on the criteria mentioned above, leading to a final review population of 1,365 for this report.[216]

For this year's report, the Task Force also used the AI technology to review fiscal year 2022 reports for a larger and more geographically diverse set of public companies (around 3,100) to provide AI review results for each of the eight industries by region (Asia Pacific, Europe, Latin America, Middle East and Africa, and North America). The Task Force used the same AI technology and followed the same general approach described above. The one difference related to the scope of public companies included in the review.

A.
State of Climate-Related Financial Disclosures

B.
Financial Statement Considerations

C.
Case Studies on Scope 3 GHG Emissions

D.
TCFD-Aligned Requirements and Related Initiatives

E.
Types of Financial Impact and Associated Drivers

F.
Insights Gained and View on Future Work

Appendices

---

[215]  Other relevant reports include those specifically focused on climate change or the TCFD recommendations.

[216]  In the interest of maintaining a consistent sample of companies, the Task Force did not remove companies from the review population if their total assets or annual revenue fell below the relevant size threshold after the 2020 selection process.

Exhibit 9 to Decl. of Burton
577
SER 2112

The Task Force on Climate-related Financial Disclosures

Figure A2-1
## Industry and Sub-Industry of Companies Selected for Review in 2020

| Industries | Sub-Industries | |
|---|---|---|
| Banking<br>508 Companies | Regional Banks<br>Large, Diversified Banks | Investment and Asset<br>Management Firms |
| Insurance<br>246 Companies | Multi-line Insurance<br>Property and Casualty Insurance | Life and Health Insurance<br>Reinsurance |
| Energy<br>483 Companies | Oil and Gas<br>Coal | Utilities |
| Transportation<br>456 Companies | Air Freight<br>Passenger Air Transportation<br>Maritime Transportation | Rail Transportation<br>Trucking Services<br>Automobiles |
| Materials and Buildings<br>1,500 Companies | Chemicals<br>Construction Materials<br>Capital Goods | Metals and Mining<br>Real Estate Management<br>and Development |
| Agriculture, Food, & Forest<br>325 Companies | Beverages<br>Agriculture | Packaged Foods and Meats<br>Paper and Forest Products |
| Technology and Media<br>292 Companies | Technology Hardware<br>and Equipment | Interactive Media<br>and Services |
| Consumer Goods<br>456 Companies | Consumer Retailing | Textiles and Apparel |

Total: 4,446 Companies

A.
State of Climate-Related
Financial Disclosures

B.
Financial Statement
Considerations

C.
Case Studies on Scope 3
GHG Emissions

D.
TCFD-Aligned Requirements
and Related Initiatives

E.
Types of Financial Impact
and Associated Drivers

F.
Insights Gained and View
on Future Work

Appendices

The Task Force began with the 1,365 companies used in the review of the past three fiscal years of reporting, which was originally identified using specific size thresholds so that only the largest companies were included. To achieve statistically significant AI review results at an industry level for each region, the Task Force supplemented the AI review population with an additional 1,748 companies, which required including companies of all sizes. In addition, because the AI technology cannot process reports in languages other than English, the number of companies that could be included in the reviews for Asia Pacific, Europe, Latin America, and the Middle East and Africa was smaller than it otherwise would be.

To determine the number of companies needed to achieve statistically significant results in a given region, the Task Force began with a confidence level of 95% and then lowered it for regions where many companies reported in languages other than English.[217] The lowest confidence level used was 80%, and, for some industries in Latin America, there were still not enough companies with reports in English to provide AI review results that were statistically significant at this level.[218]

[217]  The confidence level for Asia Pacific and Europe was 90%, 85% for the Middle East and Africa, 80% for Latin America, and 95% for North America.

[218]  Analysis was not feasible due to there not being enough companies with reports in English for Consumer Goods and Technology and Media in Latin America.

Exhibit 9 to Decl. of Burton
578

The Task Force on Climate-related Financial Disclosures

A.
State of Climate-Related
Financial Disclosures

B.
Financial Statement
Considerations

C.
Case Studies on Scope 3
GHG Emissions

D.
TCFD-Aligned Requirements
and Related Initiatives

E.
Types of Financial Impact
and Associated Drivers

F.
Insights Gained and View
on Future Work

Appendices

### Documents Reviewed

The Task Force focused on companies' fiscal year 2020, 2021, and 2022 financial filings, annual reports, integrated reports, sustainability reports, and other relevant reports. These documents were identified using the Bloomberg Terminal.

- **Financial Filings** (including 10-Ks, 20-Fs, annual report and accounts, and registration documents): Reports that describe companies' audited financial results under the corporate, compliance, or securities laws of the jurisdictions in which they operate. While reporting requirements differ internationally, financial filings generally contain financial statements and other information such as governance statements and management commentary.

- **Annual or Integrated Reports:** Reports that describe companies' activities for the preceding year (annual reports) or the broader range of measures that contribute to companies' long-term value and the role they play in society (integrated reports).

- **Sustainability Reports** (including Corporate Social Responsibility and Environmental, Social, and Governance reports): Reports that describe companies' impact on the environment and society as well as their corporate governance.

- **Other Relevant Reports:** Reports that describe how climate change may affect companies' businesses, strategies, or financial planning, including those focused on the TCFD recommendations.

### AI-Based Review Methodology

The AI technology used to review companies' publicly available reports for this report was different from the AI technology used in the Task Force's previous status reports. The goal of the AI review was to automatically identify information in financial filings and other company reports that aligned with one or more of the 11 recommended disclosures (referred to as TCFD-aligned information). One of the challenges in designing an automated AI technology to review company reports for TCFD-aligned information is that the language and semantics used to describe a particular recommended disclosure could differ across countries, sectors, and even between companies in the same sector. To help address these challenges, the AI technology used

language models that can represent whole sentences and paragraphs mathematically and capture meaning in context.[215]

#### Training the AI Model

The AI technology employed a language model that was trained to identify TCFD-aligned information. The model was based on a deep learning-based natural language processing model trained on a large database of text — namely, Robustly Optimized Bidirectional Encoder Representations from Transformers Pretraining Approach (RoBERTa). RoBERTa encodes text into a mathematical representation based on its context. For instance, while other approaches might have encoded the word "cement" in the two phrases "GHG emissions per ton cement" and "cement our approach" in the same way, RoBERTa takes the context into account and provides a different representation for "cement" in the two phrases. This allows RoBERTa models (and other similar architectures) to consider the contextual meaning of words while making classification decisions.

A language model built on the RoBERTa architecture was trained jointly with a proprietary dataset of climate-related text and passages of text or excerpts identified as aligning with the Task Force's 11 recommended disclosures — referred to as labeled data. To create the labeled data, a panel of subject matter experts developed a "definition" for each of the 11 recommended disclosures and trained "annotators" to classify text passages according to these definitions. Once the annotators' performance on identifying TCFD-aligned information was deemed satisfactory, they reviewed a large sample of text passages and labelled them. The annotators' labelling was continuously checked by subject matter experts.

#### Review of Company Reports

As part of the review process, text passages were first extracted from the documents available for review using a separate AI model that incorporated computer vision techniques, which enables identification of paragraphs and allows certain types of information — such as that included in tables — to be evaluated as text. Millions of text passages and tables were identified across the available documents. Given the large number of text passages, a "prefilter" was used to identify text passages and tables containing specific keywords and phrases that could indicate the potential presence of

[215] Liu et al., *RoBERTa: A Robustly Optimized BERT Pretraining Approach*, July 26, 2019.

Exhibit 9 to Decl. of Burton
579
**SER 2114**

A.
State of Climate-Related
Financial Disclosures

B.
Financial Statement
Considerations

C.
Case Studies on Scope 3
GHG Emissions

D.
TCFD-Aligned Requirements
and Related Initiatives

E.
Types of Financial Impact
and Associated Drivers

F.
Insights Gained and View
on Future Work

Appendices

The Task Force on Climate-related Financial Disclosures

TCFD-aligned information.[220] The text passages identified by the prefilter were input into the trained language model, which assessed alignment with the 11 recommended disclosures.

### Performance Validation

The performance of the AI technology was assessed by comparing model predictions with the human-annotated labels on a set of text passages. The set of text passages that was used to evaluate performance was only run once through the model to ensure that the model prediction was unbiased. If the model's determination of whether a passage sufficiently captured a particular recommended disclosure matched the label, it was marked as correctly classified.

Two important measures of model performance are recall and precision. Recall is the proportion of true positives captured by a model, while precision is the proportion of positive model predictions that are true positives. The F1 score is the harmonic mean of precision and recall and hence an indicator of the performance of a model.[221] The F1 score is commonly used in machine learning applications to evaluate performance. The model F1 scores and the human reviewers' F1 scores for the 11 recommended disclosures are shown in Figure A2-2.

There is often a tradeoff between precision and recall — tuning the model to be stricter on classifying a passage as aligning with a recommended disclosure can increase precision at the expense of recall. The model was tuned such that precision matched recall and hence was not biased. One exception was on *Strategy a)* where the prefilter was found — based on a sample of qualitative "manual" reviews — to not identify certain types of disclosures. In order to reduce bias and

#### Figure A2-2
## Paragraph-Level Model Performance

| Recommended Disclosure | F1 Score | |
|---|---|---|
| | Model | Human |
| Governance a) | 0.85 | 0.88 |
| Governance b) | 0.86 | 0.88 |
| Strategy a) | 0.65 | 0.78 |
| Strategy b) | 0.38 | 0.53 |
| Strategy c) | 0.69 | 0.74 |
| Risk Management a) | 0.66 | 0.53 |
| Risk Management b) | 0.53 | 0.46 |
| Risk Management c) | 0.80 | 0.87 |
| Metrics and Targets a) | 0.85 | 0.91 |
| Metrics and Targets b) | 0.88 | 0.94 |
| Metrics and Targets c) | 0.90 | 0.91 |

*Higher F1 scores mean higher accounts to the overall ranking. Model F1 scores and human review performance of recommendations are relevant in comparison to human F1 held to evaluate recommended.*

maintain a balance between precision and recall, the model was tuned to require high recall, which lowered the F1 score for *Strategy a)* to 0.58.

### Outcome

The AI technology was applied to the excerpts from the reports of the reviewed companies. If a company had a text paragraph in any of its reports for a given fiscal year that was classified as aligning with one of the 11 recommended disclosures, the company was classified as reporting in line with that specific recommended disclosure for that year. The results were aggregated for analysis.

---

[220] For instance, "Board of Directors also oversees climate-related issues" was one such phrase used to identify a potential disclosure of *Governance a)*. Many phrases were included to ensure all relevant content was detected. The prefilter was designed with support from the subject matter experts.

[221] The harmonic mean is the reciprocal of the arithmetic mean of the reciprocals of the values.

Exhibit 9 to Decl. of Burton
580
**SER 2115**

The Task Force on Climate-related Financial Disclosures

# Appendix 3: AI Review Results by Industry

As summarized in Section A.1. TCFD-Aligned Reporting by Public Companies, the Task Force developed an approach using artificial intelligence (AI) technology to review the alignment of information included in public companies' fiscal years 2020, 2021, and 2022 reports with the Task Force's 11 recommended disclosures. This appendix provides the AI review results for companies in each of the eight industries covered as follows: Banking; Insurance; Energy; Materials and Buildings; Transportation; Agriculture, Food, and Forest Products; Technology and Media; and Consumer Goods.

## Banking

The AI technology reviewed reports from 235 banks in three sub-industries: investment and asset management firms, large and diversified banks, and regional banks. The 235 banks ranged in size from about $4 billion to $5 trillion in assets, with a mean asset size of nearly $337 billion in assets. The AI review results for banks are shown in Figure A3-1. The largest increase in disclosure between 2020 and 2022 for the banking industry was 35 percentage points for *Strategy a)*.

A.
State of Climate-Related
Financial Disclosures

B.
Financial Statement
Considerations

C.
Case Studies on Scope 3
GHG Emissions

D.
TCFD-Aligned Requirements
and Related Initiatives

E.
Types of Financial Impact
and Associated Drivers

F.
Insights Gained and View
on Future Work

Appendices

Figure A3-1
### Banking Review Results



| Recommendation | Recommended Disclosure | Pt. Change 2020–2022 | Percent of Companies Disclosing |
|---|---|---|---|
| Governance | a) Board Oversight | 22 | 35% / 51% / 57% |
| | b) Management's Role | 18 | 22% / 34% / 40% |
| Strategy | a) Risks and Opportunities | 35 | 34% / 58% / 69% |
| | b) Impact on Organization | 13 | 22% / 27% / 35% |
| | c) Resilience of Strategy | 7 | 2% / 7% / 9% |
| Risk Management | a) Risk ID and Assessment Processes | 24 | 16% / 29% / 40% |
| | b) Risk Management Processes | 26 | 20% / 37% / 46% |
| | c) Integration into Overall Risk Management | 21 | 17% / 28% / 38% |
| Metrics and Targets | a) Climate-Related Metrics | 16 | 45% / 54% / 61% |
| | b) Scope 1,2,3 GHG Emissions | 18 | 40% / 49% / 58% |
| | c) Climate-Related Targets | 19 | 28% / 41% / 47% |

Legend:   ■ FY 2020   ■ FY 2021   ■ FY 2022                                     Base size: 235

Exhibit 9 to Decl. of Burton
581
**SER 2116**

The Task Force on Climate-related Financial Disclosures

### Insurance

The AI technology reviewed reports from 117 insurance companies in four categories: multiline insurance, property and casualty insurance, reinsurance, and life and health insurance. The 117 insurance companies reviewed ranged in size from about $1 billion to $1.6 trillion in assets, with a mean asset size of around $129 billion in assets. The AI review results for these companies are shown in Figure A3-2. In 2022, insurance companies most often disclosed information aligned with *Strategy a)* at 68%. Additionally, between 2020 and 2022, the percent of insurance companies reporting information aligned with *Risk Management a)* increased by 26 percentage points.

A.
State of Climate-Related
Financial Disclosures

B.
Financial Statement
Considerations

C.
Case Studies on Scope 3
GHG Emissions

D.
TCFD-Aligned Requirements
and Related Initiatives

E.
Types of Financial Impact
and Associated Drivers

F.
Insights Gained and View
on Future Work

Appendices



Figure A3-2
**Insurance Review Results**

| Recommendation | Recommended Disclosure | Pt. Change 2020–2022 | Percent of Companies Disclosing |
|---|---|---|---|
| Governance | a) Board Oversight | 16 | 49% / 60% / 65% |
| | b) Management's Role | 13 | 31% / 44% / 44% |
| Strategy | a) Risks and Opportunities | 17 | 51% / 60% / 68% |
| | b) Impact on Organization | 13 | 32% / 38% / 45% |
| | c) Resilience of Strategy | 8 | 5% / 13% / 13% |
| Risk Management | a) Risk ID and Assessment Processes | 26 | 18% / 33% / 44% |
| | b) Risk Management Processes | 17 | 34% / 48% / 51% |
| | c) Integration into Overall Risk Management | 16 | 20% / 36% / 36% |
| Metrics and Targets | a) Climate-Related Metrics | 7 | 49% / 53% / 56% |
| | b) Scope 1,2,3 GHG Emissions | 9 | 44% / 47% / 53% |
| | c) Climate-Related Targets | 18 | 32% / 46% / 50% |

0%   20%   40%   60%   80%   100%

Legend: ■ FY 2020   ■ FY 2021   ■ FY 2022                Base size: 117

Exhibit 9 to Decl. of Burton
582
**SER 2117**

The Task Force on Climate-related Financial Disclosures

### Energy

The AI technology reviewed reports from 205 energy companies in three categories: oil and gas, coal, and utilities. The 205 energy companies ranged in size from about $118 million to $399 billion in annual revenue, with a mean annual revenue of nearly $26 billion. The AI review results for these companies are shown in Figure A3-3. In 2022, energy companies, on average, disclosed information in line with more of the 11 recommended disclosures than companies in other industries (see Figure A3, p. 6). For all three years of reporting reviewed, the energy companies reviewed had the highest percent of disclosure across all industries for information aligned with *Governance a)* and *b)*, *Strategy b)*, and *Metrics and Targets a)*, *b)*, and *c)*.

A.
State of Climate-Related Financial Disclosures

B.
Financial Statement Considerations

C.
Case Studies on Scope 3 GHG Emissions

D.
TCFD-Aligned Requirements and Related Initiatives

E.
Types of Financial Impact and Associated Drivers

F.
Insights Gained and View on Future Work

Appendices



Figure A3-3
**Energy Review Results**

| Recommendation | Recommended Disclosure | Pt. Change 2020–2022 | Percent of Companies Disclosing |
|---|---|---|---|
| Governance | a) Board Oversight | 16 | 60% / 74% / 76% |
| | b) Management's Role | 18 | 39% / 49% / 57% |
| Strategy | a) Risks and Opportunities | 21 | 49% / 71% / 70% |
| | b) Impact on Organization | 17 | 41% / 55% / 58% |
| | c) Resilience of Strategy | 7 | 9% / 14% / 16% |
| Risk Management | a) Risk ID and Assessment Processes | 21 | 21% / 31% / 42% |
| | b) Risk Management Processes | 15 | 30% / 44% / 45% |
| | c) Integration into Overall Risk Management | 14 | 18% / 26% / 32% |
| Metrics and Targets | a) Climate-Related Metrics | 11 | 70% / 78% / 81% |
| | b) Scope 1,2,3 GHG Emissions | 13 | 64% / 71% / 77% |
| | c) Climate-Related Targets | 20 | 60% / 75% / 80% |

Legend: FY 2020  FY 2021  FY 2022          Base size: 205

Exhibit 9 to Decl. of Burton
583
**SER 2118**

The Task Force on Climate-related Financial Disclosures

## Materials and Buildings

The AI technology reviewed reports from 345 materials and buildings companies in five categories: capital goods, chemicals, construction materials, metals and mining, and real estate management and development. The 345 materials and buildings companies ranged in size from about $298 million to $255 billion in annual revenue, with a mean annual revenue of $14 billion. The AI review results for these companies are shown in Figure A3-4. In 2022, the highest level of reporting for materials and buildings companies was on *Metrics and Targets a)* at 81%, followed by *Metrics and Targets c)* at 77%.

A.
State of Climate-Related
Financial Disclosures

B.
Financial Statement
Considerations

C.
Case Studies on Scope 3
GHG Emissions

D.
TCFD-Aligned Requirements
and Related Initiatives

E.
Types of Financial Impact
and Associated Drivers

F.
Insights Gained and View
on Future Work

Appendices



Figure A3-4
### Materials and Buildings Review Results

| Recommendation | Recommended Disclosure | Pt. Change 2020–2022 | Percent of Companies Disclosing |
|---|---|---|---|
| Governance | a) Board Oversight | 29 | 42% / 58% / 71% |
| | b) Management's Role | 21 | 25% / 39% / 46% |
| Strategy | a) Risks and Opportunities | 27 | 39% / 57% / 66% |
| | b) Impact on Organization | 21 | 25% / 40% / 46% |
| | c) Resilience of Strategy | 9 | 3% / 9% / 12% |
| Risk Management | a) Risk ID and Assessment Processes | 26 | 14% / 28% / 40% |
| | b) Risk Management Processes | 20 | 18% / 30% / 38% |
| | c) Integration into Overall Risk Management | 14 | 8% / 19% / 22% |
| Metrics and Targets | a) Climate-Related Metrics | 11 | 70% / 76% / 81% |
| | b) Scope 1,2,3 GHG Emissions | 13 | 62% / 69% / 75% |
| | c) Climate-Related Targets | 30 | 47% / 69% / 77% |

Legend: ■ FY 2020  ■ FY 2021  ■ FY 2022                Base size: 345

Exhibit 9 to Decl. of Burton
584
**SER 2119**

The Task Force on Climate-related Financial Disclosures

### Transportation

The AI technology reviewed reports from 126 transportation companies in six categories: air freight, automobiles, maritime transportation, passenger air transportation, rail transportation, and trucking services. The 126 transportation companies ranged in size from $812 million to $294 billion in annual revenue, with a mean annual revenue of over $19 billion. The AI review results are shown in Figure A3-5. In 2022, transportation companies most often

disclosed information aligned with *Metrics and Targets c)* at 73%. Transportation companies had the largest increase in the average number of recommended disclosures reported per company for any industry, increasing by 2.3 recommended disclosures between 2020 and 2022. In addition, the recommended disclosure with the largest increase in reporting was *Governance a)*, with an increase of 37 percentage points between 2020 and 2022.

A.
State of Climate-Related
Financial Disclosures

B.
Financial Statement
Considerations

C.
Case Studies on Scope 3
GHG Emissions

D.
TCFD-Aligned Requirements
and Related Initiatives

E.
Types of Financial Impact
and Associated Drivers

F.
Insights Gained and View
on Future Work

Appendices



Figure A3-5
**Transportation Review Results**

| Recommendation | Recommended Disclosure | Pt. Change 2020–2022 | Percent of Companies Disclosing |
|---|---|---|---|
| Governance | a) Board Oversight | 37 | 33% / 52% / 70% |
| | b) Management's Role | 23 | 21% / 40% / 44% |
| Strategy | a) Risks and Opportunities | 26 | 29% / 48% / 55% |
| | b) Impact on Organization | 23 | 17% / 35% / 40% |
| | c) Resilience of Strategy | 3 | 3% / 7% / 6% |
| Risk Management | a) Risk ID and Assessment Processes | 20 | 10% / 23% / 30% |
| | b) Risk Management Processes | 24 | 13% / 25% / 37% |
| | c) Integration into Overall Risk Management | 9 | 12% / 18% / 21% |
| Metrics and Targets | a) Climate-Related Metrics | 16 | 54% / 65% / 70% |
| | b) Scope 1,2,3 GHG Emissions | 17 | 47% / 58% / 64% |
| | c) Climate-Related Targets | 31 | 42% / 69% / 73% |

Legend: ■ FY 2020  ■ FY 2021  ■ FY 2022          Base size: 126

Exhibit 9 to Decl. of Burton
585
**SER 2120**

The Task Force on Climate-related Financial Disclosures

### Agriculture, Food, and Forest Products

The AI technology reviewed reports from 115 agriculture, food, and forest products companies in four categories: beverages, packaged foods and meats, agriculture, and paper and forest products. The 115 agriculture, food, and forest products companies ranged in size from about $276 million to $102 billion in annual revenue, with a mean annual revenue

of over $12 billion. The AI review results for these companies are shown in Figure A3-6. In 2022, agriculture, food, and forest products companies most frequently disclosed information on *Metrics and Targets a)*, at 71%, although reporting on the recommended disclosure decreased by one percentage point between 2021 and 2022. Between 2020 and 2022, the largest increase in disclosure — at 30 percentage points — was for *Strategy a)*.



Figure A3-6

**Agriculture, Food, and Forest Products Review Results**

| Recommendation | Recommended Disclosure | Pt. Change 2020–2022 | Percent of Companies Disclosing |
|---|---|---|---|
| Governance | a) Board Oversight | 26 | 31% / 49% / 57% |
| | b) Management's Role | 23 | 16% / 23% / 39% |
| Strategy | a) Risks and Opportunities | 30 | 27% / 50% / 57% |
| | b) Impact on Organization | 22 | 27% / 41% / 49% |
| | c) Resilience of Strategy | 14 | 3% / 10% / 17% |
| Risk Management | a) Risk ID and Assessment Processes | 26 | 10% / 23% / 36% |
| | b) Risk Management Processes | 20 | 15% / 30% / 35% |
| | c) Integration into Overall Risk Management | 11 | 7% / 13% / 18% |
| Metrics and Targets | a) Climate-Related Metrics | 10 | 61% / 72% / 71% |
| | b) Scope 1,2,3 GHG Emissions | 14 | 50% / 62% / 64% |
| | c) Climate-Related Targets | 20 | 49% / 63% / 69% |

Legend: ▪ FY 2020  ▪ FY 2021  ▪ FY 2022          Base size: 115

A.
State of Climate-Related Financial Disclosures

B.
Financial Statement Considerations

C.
Case Studies on Scope 3 GHG Emissions

D.
TCFD-Aligned Requirements and Related Initiatives

E.
Types of Financial Impact and Associated Drivers

F.
Insights Gained and View on Future Work

Appendices

Exhibit 9 to Decl. of Burton
586
**SER 2121**

The Task Force on Climate-related Financial Disclosures

### Technology and Media

The AI technology reviewed reports from 91 technology and media companies in two categories: interactive media and services and technology hardware and equipment. The 91 technology and media companies ranged in size from about $733 million to $394 billion in annual revenue, with a mean annual revenue

of $22 billion. The AI review results for these companies are shown in Figure A3-7. In 2022, reporting on *Risk Management c)* decreased by 6%, making the disclosure the second least reported across all recommended disclosures at 7%. In 2022, technology and media companies, on average, reported on fewer recommended disclosures (3.7) than any of the other industries reviewed (see Figure A3, p. 6).

A.
State of Climate-Related
Financial Disclosures

B.
Financial Statement
Considerations

C.
Case Studies on Scope 3
GHG Emissions

D.
TCFD-Aligned Requirements
and Related Initiatives

E.
Types of Financial Impact
and Associated Drivers

F.
Insights Gained and View
on Future Work

Appendices



Figure A3-7
**Technology and Media Review Results**

| Recommendation | Recommended Disclosure | Pt. Change 2020–2022 | Percent of Companies Disclosing |
|---|---|---|---|
| Governance | a) Board Oversight | 32 | 11% / 40% / 43% |
| | b) Management's Role | 25 | 7% / 26% / 32% |
| Strategy | a) Risks and Opportunities | 20 | 18% / 29% / 38% |
| | b) Impact on Organization | 12 | 15% / 26% / 27% |
| | c) Resilience of Strategy | 4 | 1% / 2% / 5% |
| Risk Management | a) Risk ID and Assessment Processes | 12 | 2% / 8% / 14% |
| | b) Risk Management Processes | 13 | 7% / 18% / 20% |
| | c) Integration into Overall Risk Management | 5 | 2% / 13% / 7% |
| Metrics and Targets | a) Climate-Related Metrics | 26 | 41% / 56% / 67% |
| | b) Scope 1,2,3 GHG Emissions | 30 | 35% / 56% / 65% |
| | c) Climate-Related Targets | 32 | 24% / 44% / 56% |

0%   20%   40%   60%   80%   100%

Legend: ■ FY 2020  ■ FY 2021  ■ FY 2022                              Base size: 91

Exhibit 9 to Decl. of Burton
587
**SER 2122**

*The Task Force on Climate-related Financial Disclosures*

### Consumer Goods

The AI technology reviewed reports from 131 consumer goods companies in two categories: consumer retailing and textiles and apparel. The 131 consumer goods companies ranged in size from $599 million to $611 billion in annual revenue, with a mean annual revenue of more than $26 billion. The AI review results for these companies are shown in Figure A3-8. In 2022, consumer goods companies most often disclosed information aligned with *Metrics and Targets c)* at 63%.

A.
State of Climate-Related
Financial Disclosures

B.
Financial Statement
Considerations

C.
Case Studies on Scope 3
GHG Emissions

D.
TCFD-Aligned Requirements
and Related Initiatives

E.
Types of Financial Impact
and Associated Drivers

F.
Insights Gained and View
on Future Work

Appendices



**Figure A3-8**
**Consumer Goods Review Results**

| Recommendation | Recommended Disclosure | Pt. Change 2020–2022 | Percent of Companies Disclosing |
|---|---|---|---|
| Governance | a) Board Oversight | 34 | 24% / 51% / 58% |
| | b) Management's Role | 19 | 13% / 28% / 32% |
| Strategy | a) Risks and Opportunities | 23 | 23% / 46% / 46% |
| | b) Impact on Organization | 10 | 18% / 27% / 28% |
| | c) Resilience of Strategy | 5 | 3% / 5% / 8% |
| Risk Management | a) Risk ID and Assessment Processes | 14 | 8% / 18% / 22% |
| | b) Risk Management Processes | 17 | 12% / 24% / 29% |
| | c) Integration into Overall Risk Management | 8 | 3% / 9% / 11% |
| Metrics and Targets | a) Climate-Related Metrics | 15 | 47% / 59% / 62% |
| | b) Scope 1,2,3 GHG Emissions | 14 | 40% / 52% / 54% |
| | c) Climate-Related Targets | 24 | 39% / 54% / 63% |

Legend: ■ FY 2020  ■ FY 2021  ■ FY 2022                Base size: 131

133

Exhibit 9 to Decl. of Burton
588

The Task Force on Climate-related Financial Disclosures

# Appendix 4: Additional Information on Financial Impact

As summarized in Section E. Types of Financial Impact and Associated Drivers, the Task Force analyzed responses from the approximately 5,000 companies — or subsets of these companies — that provided public or non-public responses to the CDP Climate Change 2022 Questionnaire (2022 questionnaire).[222]

This appendix provides additional information on this analysis, including the following:

- companies' identification of substantive climate-related issues and estimation of potential financial impacts by sector and

- the types of substantive climate-related risks and opportunities companies identified by sector.

### Climate-Related Issues Identified and Estimated Impact by Sector

The Task Force reviewed companies' identification of substantive climate-related issues and estimation of potential financial impacts by sector, as shown in Figure A4-1. Notably, 95% of the companies in the utilities sector identified substantive climate-related risks, and 72% provided estimated potential financial impacts. In addition, a high percentage of companies in the energy sector and materials sector identified substantive climate-related risks and estimated the potential financial impacts — 94% and 60%, respectively, for the energy sector — and 91% and 67%, respectively, for the materials sector. The percentage of companies that identified substantive climate-related

#### A.
State of Climate-Related Financial Disclosures

#### B.
Financial Statement Considerations

#### C.
Case Studies on Scope 3 GHG Emissions

#### D.
TCFD-Aligned Requirements and Related Initiatives

#### E.
Types of Financial Impact and Associated Drivers

#### F.
Insights Gained and View on Future Work

**Appendices**

Figure A4-1
## Companies Identifying Substantive Issues and Estimating Impacts by Sector
*Percent of Companies*

|  | Total (5,021) | Banks (235) | Insurance (110) | Other Financial (234) | Energy (174) | Utilities (238) | Materials (581) |
|---|---|---|---|---|---|---|---|
| Identified Substantive Risks | 80% | 81% | 84% | 64% | 94% | 95% | 91% |
| Provided Estimated Impact | 55% | 58% | 60% | 36% | 60% | 72% | 67% |

|  | Real Estate (218) | Industrials (1,116) | Consumer Discretionary (634) | Consumer Staples (404) | Health Care (262) | Information Technology (600) | Comm. Services (215) |
|---|---|---|---|---|---|---|---|
| Identified Substantive Risks | 82% | 80% | 82% | 87% | 71% | 66% | 70% |
| Provided Estimated Impact | 63% | 53% | 53% | 60% | 48% | 43% | 50% |

|  | Total (5,021) | Banks (235) | Insurance (110) | Other Financial (234) | Energy (174) | Utilities (238) | Materials (581) |
|---|---|---|---|---|---|---|---|
| Identified Substantive Opp.¹ | 83% | 87% | 87% | 74% | 93% | 96% | 92% |
| Provided Estimated Impact | 53% | 62% | 57% | 35% | 55% | 72% | 63% |

|  | Real Estate (218) | Industrials (1,116) | Consumer Discretionary (634) | Consumer Staples (404) | Health Care (262) | Information Technology (600) | Comm. Services (215) |
|---|---|---|---|---|---|---|---|
| Identified Substantive Opp.¹ | 83% | 85% | 83% | 86% | 73% | 74% | 73% |
| Provided Estimated Impact | 58% | 53% | 52% | 59% | 47% | 40% | 48% |

*1. Identified Substantive Opportunities*
*Source: CDP, Responses to CDP Climate Change 2022 Questionnaire*

Legend: Low to high percentage of companies

²²² CDP, "CDP Climate Change 2022 Questionnaire," Accessed May 1, 2023.

134

Exhibit 9 to Decl. of Burton
589

The Task Force on Climate-related Financial Disclosures

opportunities and estimated the associated potential financial impacts followed a similar pattern.

### Types of Climate-Related Risks and Opportunities Identified by Sector

Figure A4-2 and Figure A4-3 show the percentage of companies in each sector that identified substantive climate-related risks by type (transition or physical) and provided estimates of their potential financial impacts. The most common transition risk companies identified was policy and legal risk at 73%,

with over half of companies that identified substantive risks in every sector selecting at least one substantive policy and legal risk. The least identified transition risk type was technology risk at 14% for companies overall — the range across the sectors was from 6% for insurance companies to 18% for industrials and real estate companies. For physical risks, 56% of companies identified acute physical risks, with a range from 39% for companies in the energy sector to a high of 83% for companies in the insurance sector.

A.
State of Climate-Related Financial Disclosures

B.
Financial Statement Considerations

C.
Case Studies on Scope 3 GHG Emissions

D.
TCFD-Aligned Requirements and Related Initiatives

E.
Types of Financial Impact and Associated Drivers

F.
Insights Gained and View on Future Work

Appendices

**Figure A4-2**
## Types of Substantive Climate-Related Transition Risks by Sector
*Percent of Companies[1]*

| | Total (2,755) | Banks (136) | Insurance (66) | Other Financial Services (85) | Energy (104) | Utilities (172) | Materials (390) |
|---|---|---|---|---|---|---|---|
| Policy & Legal | 73% | 73% | 50% | 74% | 83% | 56% | 81% |
| Market | 33% | 24% | 29% | 24% | 38% | 25% | 34% |
| Reputation | 18% | 21% | 24% | 28% | 22% | 12% | 13% |
| Technology | 14% | 12% | 6% | 7% | 16% | 13% | 13% |

| | Real Estate (137) | Industrials (593) | Consumer Discretionary (339) | Consumer Staples (244) | Health Care (126) | Information Technology (256) | Comm. Services (107) |
|---|---|---|---|---|---|---|---|
| Policy & Legal | 80% | 74% | 73% | 75% | 67% | 72% | 69% |
| Market | 45% | 37% | 33% | 29% | 25% | 33% | 32% |
| Reputation | 27% | 16% | 15% | 17% | 19% | 22% | 24% |
| Technology | 18% | 18% | 14% | 10% | 9% | 15% | 10% |

1. Includes companies that identified substantive climate-related risks and provided estimates of potential financial impacts of these risks.
Source: CDP, Responses to CDP Climate Change 2022 Questionnaire

Legend: Low to high percentage of companies

**Figure A4-3**
## Types of Substantive Climate-Related Physical Risks by Sector
*Percent of Companies[1]*

| | Total (2,755) | Banks (136) | Insurance (66) | Other Financial Services (85) | Energy (104) | Utilities (172) | Materials (390) |
|---|---|---|---|---|---|---|---|
| Acute | 56% | 65% | 83% | 51% | 39% | 66% | 52% |
| Chronic | 30% | 22% | 24% | 25% | 20% | 44% | 29% |

| | Real Estate (137) | Industrials (563) | Consumer Discretionary (339) | Consumer Staples (244) | Health Care (126) | Information Technology (256) | Comm. Services (107) |
|---|---|---|---|---|---|---|---|
| Acute | 49% | 50% | 59% | 53% | 63% | 57% | 64% |
| Chronic | 46% | 25% | 29% | 49% | 26% | 23% | 28% |

1. Includes companies that identified substantive climate-related risks and provided estimates of potential financial impacts of these risks.
Source: CDP, Responses to CDP Climate Change 2022 Questionnaire

Legend: Low to high percentage of companies

Exhibit 9 to Decl. of Burton
590

The Task Force on Climate-related Financial Disclosures

Figure A4-4 shows further detail on the types of substantive climate-related opportunities companies identified by sector. Seventy percent (70%) of companies identified substantive opportunities related to products and services — ranging from 65% to 80% across sectors. Fewer companies identified other climate-related opportunities such as opportunities in new markets (24%) — which ranged from 13% for consumer discretionary companies to 52% for insurance companies — and resilience at 11%, with a range from 3% for companies in the energy sector to 20% for companies in the real estate sector.

A.
State of Climate-Related
Financial Disclosures

B.
Financial Statement
Considerations

C.
Case Studies on Scope 3
GHG Emissions

D.
TCFD-Aligned Requirements
and Related Initiatives

E.
Types of Financial Impact
and Associated Drivers

F.
Insights Gained and View
on Future Work

Appendices

Figure A4-4

## Types of Substantive Climate-Related Opportunities Identified by Sector

Percent of Companies[1]

| | Total (2,675) | Banks (145) | Insurance (63) | Other Financial Services (83) | Energy (96) | Utilities (172) | Materials (366) |
|---|---|---|---|---|---|---|---|
| Resource Efficiency | 38% | 32% | 24% | 30% | 34% | 22% | 34% |
| Energy Source | 35% | 16% | 13% | 20% | 46% | 50% | 36% |
| Products & Services | 70% | 80% | 70% | 67% | 65% | 69% | 72% |
| Markets | 24% | 39% | 52% | 35% | 20% | 27% | 24% |
| Resilience | 11% | 5% | 16% | 14% | 3% | 10% | 10% |

| | Real Estate (127) | Industrials (589) | Consumer Discretionary (327) | Consumer Staples (238) | Health Care (124) | Information Technology (242) | Comm. Services (103) |
|---|---|---|---|---|---|---|---|
| Resource Efficiency | 52% | 34% | 40% | 53% | 60% | 40% | 47% |
| Energy Source | 50% | 29% | 35% | 49% | 49% | 31% | 36% |
| Products & Services | 65% | 74% | 73% | 59% | 40% | 77% | 68% |
| Markets | 31% | 27% | 13% | 17% | 17% | 17% | 19% |
| Resilience | 20% | 8% | 13% | 17% | 14% | 11% | 12% |

1. Includes companies that identified substantive climate-related risks and provided estimates of potential financial impacts of these risks.
Source: CDP. Responses to CDP Climate Change 2022 Questionnaire

Legend:
Low to high percentage of companies

136

Exhibit 9 to Decl. of Burton
591

SER 2126

The Task Force on Climate-related Financial Disclosures

# Appendix 5: Glossary

## Glossary

**ANNUAL OR INTEGRATED REPORTS** refer to reports that describe companies' activities for the preceding year (annual reports) or the broader range of measures that contribute to companies' long-term value and the role they play in society (integrated reports).

**BOARD OF DIRECTORS (OR BOARD)** refers to a body of elected or appointed members who jointly oversee the activities of a company or organization. Some countries use a two-tiered system where "board" refers to the "supervisory board" while "key executives" refers to the "management board."[223]

**CLIMATE-RELATED OPPORTUNITY** refers to the potential positive impacts related to climate change on a company. Efforts to mitigate and adapt to climate change can produce opportunities for companies, such as through resource efficiency and cost savings; the adoption and utilization of low-emission energy sources; the development of new products and services; and building resilience along the supply chain.

**CLIMATE-RELATED RISK** refers to the potential negative impacts of climate change on a company. Physical risks emanating from climate change can be event driven (acute) such as increased severity of extreme weather events (e.g., cyclones, droughts, floods, and fires). They can also relate to longer-term shifts (chronic) in precipitation and temperature and increased variability in weather patterns (e.g., sea level rise). Climate-related risks can also be associated with the transition to a low-carbon global economy, the most common of which relate to policy and legal actions, technology changes, market responses, and reputational considerations.

**FINANCIAL FILINGS** refer to the annual reporting packages in which companies are required to deliver their audited financial results under the corporate, compliance, or securities laws of the jurisdictions in which they operate. While reporting requirements differ internationally, financial filings generally contain financial statements and other information such as governance statements and management commentary.[224]

**FINANCIAL PLANNING** refers to a company's consideration of how it will achieve and fund its objectives and strategic goals. The process of financial planning allows companies to assess future financial positions and determine how resources can be used in pursuit of short and long-term objectives. As part of financial planning, companies often create "financial plans" that outline the specific actions, assets, and resources (including capital) necessary to achieve these objectives over a one-to-five-year period. However, financial planning is broader than the development of a financial plan as it includes long-term capital allocation and other considerations that may extend beyond the typical three-to-five-year financial plan (e.g., investment, research and development, manufacturing, and markets).

**GOVERNANCE** refers to the system by which a company is directed and controlled in the interests of shareholders and other stakeholders.[225] Governance involves a set of relationships between a company's management, its board, its shareholders, and other stakeholders. Governance provides the structure and processes through which the objectives of the company are set, progress against performance is monitored, and results are evaluated.[226]

**GREENHOUSE GAS (GHG) EMISSIONS SCOPE LEVELS**[227]

- Scope 1 refers to all direct GHG emissions.

- Scope 2 refers to indirect GHG emissions from consumption of purchased electricity, heat, or steam.

- Scope 3 refers to other indirect emissions not covered in Scope 2 that occur in the value chain of the reporting company, including both upstream and downstream emissions. Scope 3 GHG emissions could include: the extraction and production of purchased materials and fuels, transport-related activities in vehicles not

A.
State of Climate-Related Financial Disclosures

B.
Financial Statement Considerations

C.
Case Studies on Scope 3 GHG Emissions

D.
TCFD-Aligned Requirements and Related Initiatives

E.
Types of Financial Impact and Associated Drivers

F.
Insights Gained and View on Future Work

Appendices

223  Organization of Economic Cooperation and Development (OECD), G20/OECD Principles of Corporate Governance, November 30, 2015, OECD Publishing, Paris.
224  Based on CDSB, CDSB Framework for Reporting Environmental Information, Natural Capital and Associated Business Impacts, April 1, 2018.
225  Cadbury, A., Report of the Committee on the Financial Aspects of Corporate Governance, December 1, 1992.
226  OECD, G20/OECD Principles of Corporate Governance, November 30, 2015, OECD Publishing, Paris.
227  World Resources Institute (WRI) and World Business Council for Sustainable Development (WBCSD), The Greenhouse Gas Protocol: A Corporate Accounting and Reporting Standard (Revised Edition), March 2004.

Exhibit 9 to Decl. of Burton
592
**SER 2127**

The Task Force on Climate-related Financial Disclosures

A.
State of Climate-Related
Financial Disclosures

B.
Financial Statement
Considerations

C.
Case Studies on Scope 3
GHG Emissions

D.
TCFD-Aligned Requirements
and Related Initiatives

E.
Types of Financial Impact
and Associated Drivers

F.
Insights Gained and View
on Future Work

Appendices

owned or controlled by the reporting entity, electricity-related activities (e.g., transmission and distribution losses), outsourced activities, and waste disposal.[228]

**MANAGEMENT** refers to those positions a company views as executive or senior management positions.

**RISK MANAGEMENT** refers to a set of processes that are carried out by a company's board and management to support the achievement of its objectives by addressing its risks and managing the combined potential impact of those risks.

**SCENARIO ANALYSIS** is a process for identifying and assessing a potential range of outcomes of future events under conditions of uncertainty. In the case of climate change, for example, scenarios allow a company to explore and develop an understanding of how the physical and transition risks of climate change may impact its businesses, strategy, and financial performance over time.

**SECTOR** refers to a segment of companies performing similar business activities in an economy. A sector generally refers to a large segment of the economy or grouping of business types, while "industry" is used to describe more specific groupings of companies within a sector.

**STRATEGY** refers to a company's desired future state. A company's strategy establishes a foundation against which it can monitor and measure its progress in reaching that desired state. Strategy formulation generally involves establishing the purpose and scope of the company's activities and the nature of its businesses, considering the risks and opportunities it faces and the environment in which it operates.

**SUSTAINABILITY REPORT** is a report that describes a company's impact on society, often addressing environmental, social, and governance issues.

**TRANSITION PLAN** refers to an aspect of a company's overall business strategy that lays out a set of targets and actions supporting its transition toward a low-carbon economy, including actions such as reducing its GHG emissions.

[228] WRI and WBCSD, *The Corporate Value Chain (Scope 3) Accounting and Reporting Standard,* April 16, 2013.

Exhibit 9 to Decl. of Burton
593
**SER 2128**

The Task Force on Climate-related Financial Disclosures

# Appendix 6: References

Accounting and Corporate Regulatory Authority. *Turning Climate Ambition into Action in Singapore - Recommendations by the Sustainability Reporting Advisory Committee.* July 6, 2023. https://www.acra.gov.sg/docs/default-source/default-document-library/legislation/listing-of-consultation-papers/pubic-consultation-on-srac's-recommendations/consultation-paper-recommendations-by-srac.pdf.

Anglo American. *Integrated Annual Report.* March 7, 2023. https://www.angloamerican.com/~/media/Files/A/Anglo-American-Group-v5/PLC/investors/annual-reporting/2022/aa-annual-report-full-2022.pdf.

Asia Investor Group on Climate Change, et al. "Letter from Global Investors to Governments of the G20 Nations." July 3, 2017. https://web.archive.org/web/20221230021303/https://www.ceres.org/sites/default/files/Global-Investor-Letter-to-G20-Governments.pdf.

Association of Chartered Certified Accountants. *Climate Action and the Accounting Profession: Building a Sustainable Future.* October 2021. https://www.accaglobal.com/content/dam/ACCA_Global/professional-insights/Climate_action_the_accountancy_profession/PI-CLIMATE-ACTION%20v3.pdf.

Australian Accounting Standards Board and Auditing and Assurance Standards Board. *Climate Related and Other Emerging Risks Disclosures: Assessing Financial Statement Materiality Using AASB Practice Statement 2.* December 2018. https://www.aasb.gov.au/admin/file/content102/c3/AASB_AUASB_Joint_Bulletin_13122018_final.pdf.

Australian Treasury. *Climate-related Financial Disclosure Consultation Paper.* June 27, 2023. https://treasury.gov.au/sites/default/files/2023-06/c2023-402245.pdf.

AXA. *Climate and Biodiversity Report.* June 29, 2023. https://www-axa-com.cdn.axa-contento-118412.eu/www-axa-com/6caad3e0-bf63-48b5-a3c4-78c904b26fbb_axa_climate_and_biodiversity_report_2023_va.pdf.

Banco Bradesco. *Climate Report.* June 2023. https://banco.bradesco/assets/classic/pdf/sustentabilidade/en/bradesco-climate-report.pdf.

Banco Bradesco. *Integrated Report 2021.* June 2022. https://www.bradescori.com.br/wp-content/uploads/sites/541/2022/06/2021-Integrated-Report.pdf.

Banco Bradesco. *Integrated Report 2022.* June 2023. https://api.mziq.com/mzfilemanager/v2/d/80f2e993-0a30-421a-9470-a4d5c8ad5e9f/5a878306-1f11-92ad-e1c2-c1706aee734b?origin=2.

Banco Santander. *2022 Annual Report.* March 7, 2023. https://www.santander.com/content/dam/santander-com/en/documentos/informe-financiero-anual/2022/ifa-2022-consolidated-annual-financial-report-en.pdf.

Bank for International Settlements. *BIS Papers No 103: Pricing of Climate Risks in Financial Markets: A Summary of the Literature.* December 9, 2022. https://www.bis.org/publ/bppdf/bispap130.pdf.

Bank of Mauritius. *Guideline on Climate-related and Environmental Financial Risk Management.* April 1, 2022. https://www.bom.mu/sites/default/files/guideline_on_climate-related_and_environmental_financial_risk_management_01.04.2022.pdf.

Bank of Thailand. *Policy Statement of the Bank of Thailand Re: Internalizing Environmental and Climate Change Aspects into Financial Institution Business.* February 15, 2023. https://www.bot.or.th/content/dam/bot/fipcs/documents/FPG/2566/EngPDF/25660028.pdf.

BHP. *Annual Report 2022.* September 6, 2022. https://www.bhp.com/-/media/documents/investors/annual-reports/2022/220906_bhpannualreport2022.pdf.

BHP. *Climate Change: Portfolio Analysis.* September 29, 2015. https://www.bhp.com/-/media/bhp/documents/investors/reports/2015/bhpbillitonclimatechangeporfolioanalysis2015.pdf.

A.
State of Climate-Related
Financial Disclosures

B.
Financial Statement
Considerations

C.
Case Studies on Scope 3
GHG Emissions

D.
TCFD-Aligned Requirements
and Related Initiatives

E.
Types of Financial Impact
and Associated Drivers

F.
Insights Gained and View
on Future Work

Appendices

Exhibit 9 to Decl. of Burton
594
**SER 2129**

The Task Force on Climate-related Financial Disclosures

A.
State of Climate-Related
Financial Disclosures

B.
Financial Statement
Considerations

C.
Case Studies on Scope 3
GHG Emissions

D.
TCFD-Aligned Requirements
and Related Initiatives

E.
Types of Financial Impact
and Associated Drivers

F.
Insights Gained and View
on Future Work

Appendices

BHP. *Climate Change: Portfolio Analysis – Views after Paris*. October 11, 2016. https://www.bhp.com/-/media/bhp/documents/investors/reports/2016/bhpbillitonclimatechangeporfolioanalysis2016.pdf.

BHP. *Climate Change Report 2020*. February 2020. https://www.bhp.com/-/media/documents/investors/annual-reports/2020/200910_bhpclimatechangereport2020.pdf.

BHP. *Climate Transition Action Plan 2021*. September 14, 2021. https://www.bhp.com/-/media/documents/investors/annual-reports/2021/210914_bhpclimatetransitionactionplan2021.

BHP. *Scope 1, 2 and 3 GHG Emissions Calculation Methodology 2022*. September 6, 2022. https://www.bhp.com/-/media/documents/investors/annual-reports/2022/220906_bhpscope12and3emissionscalculationmethodology2022.pdf.

Boston Consulting Group (BCG). *Directors Can Up Their Games on Environmental, Social and Governance Issues*. March 30, 2022. https://web-assets.bcg.com/7e/71/fc29b62542e6bac1732ebd890bbc/bcg-directors-can-up-their-game-on-environmental-social-and-governance-issues-mar-2022.pdf.

BCG. "From Tailwinds to Turbulence." May 25, 2022. https://www.bcg.com/publications/2022/tailwinds-to-turbulence-for-global-assets-under-management.

Brazil Government. *Resolução CVM 59*. December 22, 2021. https://conteudo.cvm.gov.br/export/sites/cvm/legislacao/resolucoes/anexos/001/resol059consolid.pdf.

Bursa Malaysia. "Bursa Malaysia Enhances Sustainability Reporting Framework with New Climate Change Reporting." September 26, 2022. https://www.bursamalaysia.com/sites/5bb54be15f36ca0af339077a/content_entry5c11a9db758f8d31544574c6/63312a2439fba20d86ba8e16/files/26Sept_2022_Bursa_Malaysia_Enhances_Sustainability_Reporting_Framework_With_New_Climate_Change_Reporting.pdf.

Bursa Malaysia. *Main Market Listing Requirements*. June 1, 2023. https://www.bursamalaysia.com/sites/5bb54be15f36ca0af339077a/content_entry5ce3b50239fba2627b2864be/64e730445b711a1c197fda7f/files/29MainLR_1July2023__1_Edited.pdf.

Cadbury, A. *Report of the Committee on the Financial Aspects of Corporate Governance*. December 1, 1992. https://www.ecgi.global/sites/default/files/codes/documents/cadbury.pdf.

Canadian Office of the Superintendent of Financial Institutions. *Climate Risk Management Guideline*. March 2023. https://www.osfi-bsif.gc.ca/Eng/Docs/b15-dft.pdf.

Canadian Securities Administration. "Canadian Securities Regulators Consider Impact of International Developments on Proposed Climate-Related Disclosure Rule." October 12, 2022. https://www.securities-administrators.ca/news/canadian-securities-regulators-consider-impact-of-international-developments-on-proposed-climate-related-disclosure-rule/.

Canadian Securities Administration. *Proposed National Instrument 51-107 Disclosure of Climate-Related Matters*. October 18, 2021. https://www.osc.ca/sites/default/files/2021-10/csa_20211018_51-107_disclosure-update.pdf.

CDP. "CDP Climate Change 2022 Questionnaire." Accessed May 1, 2023. https://guidance.cdp.net/en/guidance?cid=30&ctype=theme&idtype=ThemeID&incchild=1&microsite=0&otype=Questionnaire&page=1&tags=TAG-646%2CTAG-605%2CTAG-600.

CDP. *CDP Technical Note: Reporting on Climate Transition Plans*. February 16, 2023. https://cdn.cdp.net/cdp-production/cms/guidance_docs/pdfs/000/003/101/original/CDP_technical_note_-_Climate_transition_plans.pdf.

CDP. "How CDP is aligned to the TCFD." Accessed June 26, 2023. https://www.cdp.net/en/guidance/how-cdp-is-aligned-to-the-tcfd.

140

Exhibit 9 to Decl. of Burton
595
**SER 2130**

The Task Force on Climate-related Financial Disclosures

Cemex. *2022 Integrated Report*. March 29, 2023. https://www.cemex.com/documents/d/cemex/integratedreport2022.

Central Bank of Brazil. *New Regulation on Social, Environmental, and Climate-Related Risk Disclosures*. September 15, 2021. https://www.bcb.gov.br/content/about/legislation_norms_docs/BCB_Disclosure-GRSAC-Report.pdf.

Central Bank of Brazil. *Resolution 4,553 of January 30, 2017*. January 30, 2017. https://www.bcb.gov.br/content/financialstability/Brazilian_Prudential_Financial_Regulation_Docs/ResolutionCMN4553.pdf.

Central Bank of Kenya. *Guidance on Climate-Related Risk Management*. October 15, 2021. https://www.centralbank.go.ke/wp-content/uploads/2021/10/Guidance-on-Climate-Related-Risk-Management.pdf.

Climate Disclosure Standards Board (CDSB). *Accounting for Climate: Integrating Climate-Related Matters into Financial Reporting*. December 2020. https://www.cdsb.net/sites/default/files/cdsb_climateaccountingguidance_s_110121.pdf.

CDSB. *CDSB Framework for Reporting Environmental Information, Natural Capital and Associated Business Impacts*. April 1, 2018. https://www.cdsb.net/sites/default/files/cdsb_framework_2.1.pdf.

CDSB. *Framework for Reporting Environmental and Social Information*. January 2022. https://www.cdsb.net/sites/default/files/cdsb_framework_2022.pdf.

Climate Financial Risk Forum. *Climate Financial Risk Forum Guide 2023 Climate Disclosures Dashboard 2.0*. March 2023. https://www.fca.org.uk/publication/corporate/cfrf-guide-2023-climate-disclosures-dashboard.pdf.

Climate Wise. *The ClimateWise Principles Independent Review for 2022*. January 23, 2023. https://www.cisl.cam.ac.uk/files/cisl_climatewise_principles_2022_03-23.pdf.

Coca-Cola FEMSA. *2022 Task Force on Climate-Related Financial Disclosures (TCFD) Report*. August 2023. https://coca-colafemsa.com/wp-content/uploads/2023/08/TCFD-ingles.pdf.

ContourGlobal Limited. *Annual Report and Financial Statements*. April 19, 2023. https://www.contourglobal.com/sites/default/files/2023-04/contourglobal_limited_annual_report_and_financial_statements_-_31_december_2022_signed_pwc.pdf.

Deloitte. *A Closer Look — IAS 36 Impairment of Non-Financial Assets — Reminders and Hot Topics*. May 3, 2023. https://www.iasplus.com/en/publications/global/a-closer-look/reminders/at_download/file/A%20Closer%20Look%20-%20IAS%2036%20reminders.pdf.

Deloitte. *ESG Executive Survey Preparing for High-Quality Disclosures*. March 31, 2022. https://www2.deloitte.com/content/dam/Deloitte/us/Documents/audit/us-esg-preparedness-disclosures-reporting-requirements.pdf.

Deloitte. *The Audit Committee Frontier – Addressing Climate Change*. November 2021. https://www2.deloitte.com/content/dam/Deloitte/cn/Documents/audit/deloitte-cn-the-report-addressing-climate-change-en.pdf.

EFRAG. *Draft European Sustainability Reporting Standards*. April 29, 2022. https://www.efrag.org/Assets/Download?assetUrl=%2Fsites%2Fwebpublishing%2FSiteAssets%2FESRS_CN.pdf.

EFRAG. *Draft European Sustainability Reporting Standards Appendix IV – TCFD Recommendations and ESRS Reconciliation Table*. November 2, 2022. https://www.efrag.org/Assets/Download?assetUrl=%2Fsites%2Fwebpublishing%2FSiteAssets%2F21%2520Appendix%2520IV%2520-%2520TCFD-EFRAG%2520Comparative%2520analysis%2520final.pdf.

EFRAG. *Draft European Sustainability Reporting Standards Cover Letter*. November 2022. https://efrag.org/Assets/Download?assetUrl=%2Fsites%2Fwebpublishing%2FSiteAssets%2F01%2520EFRAG%2527s%2520Cover%2520Letter%2520to%2520the%2520first%2520set%2520of%2520ESRS%252022%2520November%25202022.pdf.

A.
State of Climate-Related Financial Disclosures

B.
Financial Statement Considerations

C.
Case Studies on Scope 3 GHG Emissions

D.
TCFD-Aligned Requirements and Related Initiatives

E.
Types of Financial Impact and Associated Drivers

F.
Insights Gained and View on Future Work

Appendices

141

Exhibit 9 to Decl. of Burton
596
**SER 2131**

A.
State of Climate-Related
Financial Disclosures

B.
Financial Statement
Considerations

C.
Case Studies on Scope 3
GHG Emissions

D.
TCFD-Aligned Requirements
and Related Initiatives

E.
Types of Financial Impact
and Associated Drivers

F.
Insights Gained and View
on Future Work

Appendices

The Task Force on Climate-related Financial Disclosures

Enel Américas. *Integrated Annual Report Enel Américas 2022*. April 11, 2023. https://beyondreporting.enelamericas.com/content/dam/eneldhafcprogram/americas/pdf/memoria-enel-americas-2022-english.pdf.

European Commission (E.C.). *Commission Implementing Regulation (EU) 2022/2453 of 30 November 2022 Amending the Implementing Technical Standards Laid Down in Implementing Regulation (EU) 2021/637 as Regards the Disclosure of Environmental, Social and Governance Risks*. November 30, 2022. http://data.europa.eu/eli/reg_impl/2022/2453/oj.

E.C. "European Sustainability Reporting Standards - First Set." Accessed July 31, 2023. https://ec.europa.eu/info/law/better-regulation/have-your-say/initiatives/13765-European-sustainability-reporting-standards-first-set_en.

E.C. *Guidelines on Climate-Related Information*. June 17, 2019. https://ec.europa.eu/finance/docs/policy/190618-climate-related-information-reporting-guidelines_en.pdf.

E.C. "The Commission Adopts the European Sustainability Reporting Standards." July 31, 2023. https://finance.ec.europa.eu/news/commission-adopts-european-sustainability-reporting-standards-2023-07-31_en.

European Parliament and European Council. *Directive 2013/34/EU of The European Parliament and of the Council of 26 June 2013 on the Annual Financial Statements, Consolidated Financial Statements and Related Reports of Certain Types of Undertakings, Amending Directive 2006/43/EC of the European Parliament and of the Council Directives 78/660/EEC and 83/349.EEC*. June 26, 2013 (as amended January 5, 2023). http://data.europa.eu/eli/dir/2013/34/2023-01-05.

European Parliament and European Council. *Directive 2014/95/EU of the European Parliament and the Council of 22 October 2014 Amending Directive 2013/34/EU as Regards Disclosure of Non-Financial and Diversity Information by Certain Large Undertakings and Groups*. October 22, 2014. http://data.europa.eu/eli/dir/2014/95/oj.

European Parliament and European Council. *Directive (EU) 2022/2464 of the European Parliament and of the Council of 14 December 2022 Amending Regulation (EU) No 537/2014, Directive 2004/109/EC, Directive 2006/43/EC and Directive 2013/34/EU, as Regards Corporate Sustainability Reporting*. December 14, 2022. http://data.europa.eu/eli/dir/2022/2464/oj.

European Parliament and European Council. *Regulation (EU) No 575/2013 of the European Parliament and the Council of 26 June 2013 on Prudential Requirements for Credit Institutions Amending Regulation (EU) No 648/2012*. June 26, 2013 (as amended June 28, 2023). https://eur-lex.europa.eu/eli/reg/2013/575/2023-06-28.

European Securities and Markets Authority. *European Common Enforcement Priorities for 2022 Annual Financial Reports*. October 28, 2022. https://www.esma.europa.eu/sites/default/files/library/esma32-63-1320_esma_statement_on_european_common_enforcement_priorities_for_2022_annual_reports.pdf.

Eversheds Sutherland and KPMG. "Climate Change and Corporate Value: What Companies Really Think." November 11, 2020. https://assets.kpmg.com/content/dam/kpmg/xx/pdf/2021/03/climate-change-and-corporate-value.pdf.

External Reporting Board (XRB). "Aotearoa New Zealand Climate Standards." December 15, 2022. https://www.xrb.govt.nz/standards/climate-related-disclosures/aotearoa-new-zealand-climate-standards/.

XRB. *Aotearoa New Zealand Climate Standard 1: Climate-related Disclosures*. December 2022. https://www.xrb.govt.nz/dmsdocument/4770.

XRB. *Aotearoa New Zealand Climate Standard 2: Adoption of Aotearoa New Zealand Climate Standards*. December 2022. https://www.xrb.govt.nz/dmsdocument/4763.

XRB. *Aotearoa New Zealand Climate Standard 3: General Requirements for Climate-related Disclosures*. December 2022. https://www.xrb.govt.nz/dmsdocument/4764.

14

Exhibit 9 to Decl. of Burton
597
**SER 2132**

The Task Force on Climate-related Financial Disclosures

Exxaro Resources Limited. *Exxaro Resources Limited Integrated Report 2022*. April 14, 2023. https://exxaro-prod.azureedge.net/sitestorage/media/kk2fcz0q/exxaro_ir_2022_singles_hires.pdf.

Falabella. *Annual Report 2022*. April 4, 2023. https://s22.q4cdn.com/351912490/files/doc_financials/annual/2023/Falabella-Annual-Report-2022.pdf.

Financial Accounting Standards Board (FASB). "Accounting Standards Codification Topic 360." Accessed June 14, 2023. https://asc.fasb.org/.

FASB. "Accounting Standards Codification Topic 450." Accessed June 14, 2023. https://asc.fasb.org/.

FASB. *Intersection of Environmental, Social and Governance Matters with Financial Accounting Standards*. March 2021. https://www.fasb.org/Page/ShowPdf?path=FASB_Staff_ESG_Educational_Paper_FINAL.pdf.

FASB. *Statement of Financial Accounting Concepts No. 8*. August 2018. https://d2x0djib3vzbzj.cloudfront.net/Concepts%20Statement%208%20Chapter%203%20As%20Amended.pdf.

Financial Conduct Authority. *Enhancing Climate-Related Disclosures by Asset Managers, Life Insurers and FCA-Regulated Pension Providers*. December 17, 2021. https://www.fca.org.uk/publication/policy/ps21-24.pdf.

Financial Reporting Council (FRC). *CRR Thematic Review of Climate-related Metrics and Targets*. July 26, 2023. https://www.frc.org.uk/getattachment/5ecb5ecf-cb99-4085-918d-8fd767b4e594/CRR_Thematic_review_of_climate-related_metrics_and_targets_2023.pdf.

FRC. *CRR Thematic Review of TCFD Disclosures and Climate in the Financial Statements*. July 2022. https://www.frc.org.uk/getattachment/65fa8b6f-2bed-4a67-8471-ab91c9cd2e85/FRC-TCFD-disclosures-and-climate-in-the-financial-statements_July-2022.pdf.

FRC. *FRC Statement of Intent on Environmental, Social and Governance Challenges*. July 2021. https://www.frc.org.uk/getattachment/691f28fa-4af4-49d7-a4f5-49ad7a2db532/FRC-LAB-ESG-Paper_2021.pdf.

Financial Reporting Council Lab. *Improving ESG Data Production*. August 2022. https://media.frc.org.uk/documents/FRC_Lab_Report_Improving_ESG_Data_Production.pdf.

Financial Stability Board (FSB). "Formation of the Enhanced Disclosure Task Force." May 10, 2012. https://www.fsb.org/wp-content/uploads/pr_120510.pdf.

FSB. "FSB Plenary Meets in Frankfurt." July 6, 2023. https://www.fsb.org/wp-content/uploads/R060723.pdf.

FSB. *FSB Roadmap for Addressing Financial Risks from Climate Change: 2023 Progress Report*. July 13, 2023. https://www.fsb.org/wp-content/uploads/P130723.pdf.

FSB. "FSB to Establish Task Force on Climate-related Financial Disclosures." December 4, 2015. https://assets.bbhub.io/company/sites/60/2015/12/12-4-2015-Climate-change-task-force-press-release.pdf.

FSB. "Proposal for a Disclosure Task Force on Climate-Related Risks." November 9, 2015. https://www.fsb.org/wp-content/uploads/Disclosure-task-force-on-climate-related-risks.pdf.

FSB. *Report on Promoting Climate-Related Disclosures*. July 7, 2021. https://www.fsb.org/wp-content/uploads/P070721-4.pdf.

Financial Superintendent of Colombia. *Annex 2: Disclosure of Information on Social and Environmental Issues, Including Climate Related Issues*. December 2021. https://www.superfinanciera.gov.co/descargas/institucional/pubFile1058634/ance031_21_english.docx.

Financial Superintendent of Colombia. *External Circular 031*. December 22, 2021. https://www.superfinanciera.gov.co/descargas/institucional/pubFile1058633/ce031_21_english.docx.

A.
State of Climate-Related Financial Disclosures

B.
Financial Statement Considerations

C.
Case Studies on Scope 3 GHG Emissions

D.
TCFD-Aligned Requirements and Related Initiatives

E.
Types of Financial Impact and Associated Drivers

F.
Insights Gained and View on Future Work

Appendices

Exhibit 9 to Decl. of Burton
598
**SER 2133**

The Task Force on Climate-related Financial Disclosures

Financial Supervisory Commission (FSC) Republic of China (Taiwan). "Guidelines on Climate-related Financial Disclosures of Insurance Companies." November 30, 2021. https://www.fsc.gov.tw/en/home.jsp?id=54&parentpath=0&mcustomize=multimessage_view.jsp&dataserno=202112140009&dtable=News.

FSC Republic of China (Taiwan). "Guidelines for Domestic Banks' Climate Risk Financial Disclosure." November 30, 2021. https://www.fsc.gov.tw/en/home.jsp?id=54&parentpath=0,2&mcustomize=multimessage_view.jsp&dataserno=202112230005&dtable=News.

Forbes. "The World's Largest Public Companies." Accessed June 8, 2023. https://www.forbes.com/global2000/list/2/#tab:overall.

FORVIA. *Sustainability Report 2021-22*. November 1, 2022. https://www.faurecia.com/sites/groupe/files/documents/FORVIA_Sustainability%20Report%202021-2022.pdf.

FORVIA. *Universal Registration Document 2022*. February 28, 2023. https://www.faurecia.com/sites/groupe/files/documents/FAU2022_FORVIA_URD_EN_MEL_V2_compressed.pdf.

Glasgow Financial Alliance for Net Zero. *Financial Institution Net-Zero Transition Plans: Fundamental, Recommendations, and Guidance*. November 3, 2022. https://assets.bbhub.io/company/sites/63/2022/09/Recommendations-and-Guidance-on-Financial-Institution-Net-zero-Transition-Plans-November-2022.pdf.

Hong Kong Monetary Authority. *Planning for Net-Zero Transition*. August 29, 2023. https://www.hkma.gov.hk/media/eng/doc/key-information/guidelines-and-circular/2023/20230829e1.pdf.

Hong Kong Stock Exchange. *Enhancement of Climate-related Disclosures Under the Environmental, Social and Governance Framework*. April 2023. https://www.hkex.com.hk/-/media/HKEX-Market/News/Market-Consultations/2016-Present/April-2023-Climate-related-Disclosures/Consultation-Paper/cp202304.pdf.

Hubbard, Douglas. *How to Measure Anything: Finding the Value of Intangibles in Business*. July 2007.

International Energy Agency (IEA). *Iron and Steel CCS Study*. April 2013. https://ieaghg.org/publications/technical-reports/reports-list/9-technical-reports/1001-2013-04-iron-and-steel-ccs-study-techno-economics-integrated-steel-mill.

IEA. *Iron and Steel Technology Roadmap*. October 21, 2020. https://iea.blob.core.windows.net/assets/eb0c8ec1-3665-4959-97d0-187ceca189a8/Iron_and_Steel_Technology_Roadmap.pdf.

IEA. *The Sustainability Development Scenario*. December 4, 2019. https://iea.blob.core.windows.net/assets/ebf178cc-b1c9-4de9-a3aa-51a080c0f8c3/SDS-webinar-2019-draft06.pdf.

Intergovernmental Panel on Climate Change (IPCC). *Summary for Policymakers in Climate Change 2023: Synthesis Report*. March 20, 2023. https://www.ipcc.ch/report/ar6/syr/downloads/report/IPCC_AR6_SYR_SPM.pdf.

IPCC. *Synthesis Report of the IPCC Sixth Assessment Report*. March 20, 2023. https://www.ipcc.ch/report/ar6/syr/downloads/report/IPCC_AR6_SYR_LongerReport.pdf.

International Federation of Accountants. *Climate-Related Disclosures Project Brief and Outline*. June 2023. https://ifacweb.blob.core.windows.net/publicfiles/2023-06/Final%20Draft%20Climate-related%20Disclosures%20Project%20Brief%20-%20Clean.pdf.

International Financial Reporting Standards (IFRS) Foundation. "Analysis of the IFRS Accounting Jurisdiction Profiles." Accessed July 24, 2023. https://www.ifrs.org/use-around-the-world/use-of-ifrs-standards-by-jurisdiction/#analysis-of-the-168-profiles.

IFRS Foundation. "Business Combinations — Disclosures, Goodwill and Impairment." Accessed July 12, 2023. https://www.ifrs.org/projects/work-plan/goodwill-and-impairment/.

IFRS Foundation. "Climate-Related and Other Uncertainties in the Financial Statements." Accessed September 27, 2023. https://www.ifrs.org/projects/work-plan/climate-related-risks-in-the-financial-statements/.

A.
State of Climate-Related
Financial Disclosures

B.
Financial Statement
Considerations

C.
Case Studies on Scope 3
GHG Emissions

D.
TCFD-Aligned Requirements
and Related Initiatives

E.
Types of Financial Impact
and Associated Drivers

F.
Insights Gained and View
on Future Work

Appendices

Exhibit 9 to Decl. of Burton
599
**SER 2134**

A.
State of Climate-Related
Financial Disclosures

B.
Financial Statement
Considerations

C.
Case Studies on Scope 3
GHG Emissions

D.
TCFD-Aligned Requirements
and Related Initiatives

E.
Types of Financial Impact
and Associated Drivers

F.
Insights Gained and View
on Future Work

Appendices

The Task Force on Climate-related Financial Disclosures

IFRS Foundation. *Comparison IFRS S2 Climate-related Disclosures with the TCFD Recommendations.* July 2023. https://www.ifrs.org/content/dam/ifrs/supporting-implementation/ifrs-s2/ifrs-s2-comparison-tcfd-july2023.pdf.

IFRS Foundation. "Connectivity in Practice: The IASB's New Project on Climate-Related Risks in the Financial Statements." March 23, 2023. https://www.ifrs.org/news-and-events/news/2023/03/connectivity-in-practice-the-iasbs-new-project-on-climate-related-risks-in-the-financial-statements/.

IFRS Foundation. *Draft IFRS S1 General Requirements for Disclosure of Sustainability-related Financial Information.* March 2022. https://www.ifrs.org/content/dam/ifrs/project/general-sustainability-related-disclosures/exposure-draft-ifrs-s1-general-requirements-for-disclosure-of-sustainability-related-financial-information.pdf.

IFRS Foundation. *Draft IFRS S2 Climate-Related Disclosures.* March 2022. https://www.ifrs.org/content/dam/ifrs/project/climate-related-disclosures/issb-exposure-draft-2022-2-climate-related-disclosures.pdf.

IFRS Foundation. "Effects of Climate-Related Matters on Financial Statements." July 2023. https://www.ifrs.org/content/dam/ifrs/supporting-implementation/documents/effects-of-climate-related-matters-on-financial-statements.pdf.

IFRS Foundation. *Exposure Draft IFRS® Sustainability Disclosure Standard.* March 1, 2022. https://www.ifrs.org/content/dam/ifrs/project/general-sustainability-related-disclosures/exposure-draft-ifrs-s1-general-requirements-for-disclosure-of-sustainability-related-financial-information.pdf.

IFRS Foundation. *IAS 1 Presentation of Financial Statements.* February 2021. https://www.ifrs.org/content/dam/ifrs/publications/pdf-standards/english/2022/issued/part-a/ias-1-presentation-of-financial-statements.pdf?bypass=on.

IFRS Foundation. *IAS 16 Property, Plant and Equipment.* May 2020. https://www.ifrs.org/content/dam/ifrs/publications/pdf-standards/english/2022/issued/part-a/ias-16-property-plant-and-equipment.pdf?bypass=on.

IFRS Foundation. *IAS 36 Impairment of Assets.* May 2013. https://www.ifrs.org/content/dam/ifrs/publications/pdf-standards/english/2021/issued/part-a/ias-36-impairment-of-assets.pdf.

IFRS Foundation. *IAS 37 Provisions, Contingent Liabilities and Contingent Assets.* May 2020. https://www.ifrs.org/content/dam/ifrs/publications/pdf-standards/english/2022/issued/part-a/ias-37-provisions-contingent-liabilities-and-contingent-assets.pdf?bypass=onSee.

IFRS Foundation. *IAS 38 Intangible Assets.* May 2014. https://www.ifrs.org/content/dam/ifrs/publications/pdf-standards/english/2021/issued/part-a/ias-38-intangible-assets.pdf.

IFRS Foundation. *IFRS 13 Fair Value Measurement.* May 2011. https://www.ifrs.org/content/dam/ifrs/publications/pdf-standards/english/2022/issued/part-a/ifrs-13-fair-value-measurement.pdf?bypass=on.

IFRS Foundation. *IFRS for SMEs® Accounting Standard.* May 16, 2023. https://www.ifrs.org/content/dam/ifrs/supporting-implementation/smes/smes-effectsclimaterelatedmatters-may2023.pdf.

IFRS Foundation. "IFRS Foundation Welcomes Culmination of TCFD Work and Transfer of TCFD Monitoring Responsibilities to ISSB from 2024." July 10, 2023. https://www.ifrs.org/news-and-events/news/2023/07/foundation-welcomes-tcfd-responsibilities-from-2024/.

IFRS Foundation. "IFRS Foundation Work Plan." Accessed July 12, 2023. https://www.ifrs.org/projects/work-plan/.

IFRS Foundation. "IFRS - IASB Update March 2023." March 20, 2023. https://www.ifrs.org/news-and-events/updates/iasb/2023/iasb-update-march-2023/#4.

IFRS Foundation. *IFRS Practice Statement 2: Making Materiality Judgements.* September 2, 2017. https://www.ifrs.org/content/dam/ifrs/publications/amendments/english/2017/ifrs-practice-statement-2-making-materiality-judgements.pdf.

Exhibit 9 to Decl. of Burton
600
SER 2135

The Task Force on Climate-related Financial Disclosures

A.
State of Climate-Related
Financial Disclosures

B.
Financial Statement
Considerations

C.
Case Studies on Scope 3
GHG Emissions

D.
TCFD-Aligned Requirements
and Related Initiatives

E.
Types of Financial Impact
and Associated Drivers

F.
Insights Gained and View
on Future Work

Appendices

IFRS Foundation. *IFRS S1 General Requirements for Disclosure of Sustainability-related Financial Information.* June 26, 2023. https://www.ifrs.org/issued-standards/ifrs-sustainability-standards-navigator/ifrs-s1-general-requirements.html/content/dam/ifrs/publications/html-standards-issb/english/2023/issued/issbs1/.

IFRS Foundation. *IFRS S2 Climate-Related Disclosures.* June 26, 2023. https://www.ifrs.org/issued-standards/ifrs-sustainability-standards-navigator/ifrs-s2-climate-related-disclosures.html/content/dam/ifrs/publications/html-standards-issb/english/2023/issued/issbs2/.

IFRS Foundation. "ISSB Issues Inaugural Global Sustainability Disclosure Standards." June 26, 2023. https://www.ifrs.org/news-and-events/news/2023/06/issb-issues-ifrs-s1-ifrs-s2/.

IFRS Foundation. "Ten Things to Know about the First ISSB Standards." June 27, 2023. https://www.ifrs.org/news-and-events/news/2023/06/ten-things-to-know-about-the-first-issb-standards/.

Institutional Investors Group on Climate Change. "Investors Put Audit Committee Chairs on Notice over Continued Omission of Climate Risks in Financial Reporting Ahead of 2022 AGM Season." April 5, 2022. https://web.archive.org/web/20230602193203/https://www.iigcc.org/news/investors-put-audit-committee-chairs-on-notice-over-continued-omission-of-climate-risks-in-financial-reporting-ahead-of-2022-agm-season/.

International Materials Data System. "IMDS." Accessed July 1, 2023. https://www.mdsystem.com/imdsnt/startpage/index.jsp.

International Monetary Fund. "Datamapper, GDP, current prices." Accessed June 14, 2023. https://www.imf.org/external/datamapper/NGDPD@WEO/WEOWORLD.

International Organization of Securities Commissions. *IOSCO Endorses the ISSB's Sustainability-related Financial Disclosure Standards.* July 25, 2023. https://www.iosco.org/news/pdf/IOSCONEWS703.pdf.

International Public Sector Accounting Standards Board (IPSASB). *Consultation Paper: Advancing Public Sector Sustainability Reporting.* May 9, 2022. https://www.ipsasb.org/publications/login/59185.

IPSASB. "IPSASB Begins Development of Climate-Related Disclosures Standard for the Public Sector." June 14, 2023. https://www.ipsasb.org/news-events/2023/06/ipsasb-begins-development-climate-related-disclosures-standard-public-sector.

International Sustainability Standards Board. *Consultation on Agenda Priorities.* May 4, 2023. https://www.ifrs.org/content/dam/ifrs/project/issb-consultation-on-agenda-priorities/issb-rfi-2023-1.pdf.

Invesco Ltd. *2022 Task Force on Climate-Related Financial Disclosures Report.* December 29, 2022. https://www.invesco.com/emea/en/insights/climate-change-report.html.

Japan Financial Services Agency. "Regarding the Results of Public Comments on the Proposed Amendments to the 'Cabinet Office Ordinance on Disclosure of Corporate Information, etc.'" January 31, 2023. https://www.fsa.go.jp/news/r4/sonota/20230131/20230131.html.

Klabin. "ESG Panel: Task Force on Climate-Related Disclosures." Accessed May 11, 2023. https://esg.klabin.com.br/en/tcfd-asg#aumento-temperatura-impacto-negocios.

Klabin. *Sustainability Report.* June 2022. https://rs.klabin.com.br/en/sustainability-report-2021.

Konica Minolta. *Sustainability Report 2022.* August 2022. https://www.konicaminolta.com/about/csr/csr/download/2022/pdf/Konicaminolta_Sustainability_E_2022.pdf.

KPMG. "Can Capital Markets Save the Planet," October 28, 2021. https://kpmg.com/xx/en/home/insights/2021/10/can-capital-markets-save-the-planet.html.

Liu, Y. et al. *RoBERTa: A Robustly Optimized BERT Pretraining Approach.* July 26, 2019. https://arxiv.org/pdf/1907.11692.pdf.

Exhibit 9 to Decl. of Burton
601
**SER 2136**

The Task Force on Climate-related Financial Disclosures

A.
State of Climate-Related
Financial Disclosures

B.
Financial Statement
Considerations

C.
Case Studies on Scope 3
GHG Emissions

D.
TCFD-Aligned Requirements
and Related Initiatives

E.
Types of Financial Impact
and Associated Drivers

F.
Insights Gained and View
on Future Work

Appendices

MGM. *TCFD Report*. May 18, 2023. https://www.mgmresorts.com/content/dam/MGM/corporate/csr/disclosures/mgm-resorts-tcfd-report-2022.pdf.

Mitsubishi UFJ Financial Group (MUFG). *Carbon Neutrality Declaration*. May 2021. https://www.mufg.jp/dam/csr/environment/cnd/cnd_en.pdf.

MUFG. "MUFG Appointed as a Lead for the Net Zero Banking Alliance Financing & Engagement Work Track Group." November 22, 2021. https://www.mufg.jp/dam/pressrelease/2021/pdf/news-20211122-001_en.pdf.

MUFG. *Progress Report 2023*. April 2023. https://www.mufg.jp/dam/csr/report/progress/202304_en.pdf.

MUFG. *Sustainability Report 2022*. September 2022. https://www.mufg.jp/dam/csr/report/2022/sr2022_en.pdf.

MUFG. *TCFD Report 2022*. October 2022. https://www.mufg.jp/dam/csr/report/2022/tcfd2022_en.pdf.

MUFG. *Transition Whitepaper 2022*. October 26, 2022. https://www.mufg.jp/dam/csr/report/transition/wp2022.pdf.

Moody's. *2022 Stakeholder Sustainability Report*. May 3, 2022. https://www.moodys.com/sites/products/ProductAttachments/Sustainability/2022-stakeholder-sustainability.pdf.

Moody's. *2022 TCFD Report*. April 19, 2023. https://www.moodys.com/sites/products/ProductAttachments/Sustainability/2022-tcfd-report.pdf.

Moody's. *Moody's Corporation 2022 CDP Response*. July 28, 2022. https://www.moodys.com/sites/products/ProductAttachments/BX14244_Moody%E2%80%99s%202022%20CDP%20Response.pdf.

New Zealand Government. *Assurance over Climate-Related Disclosures: Occupational Regulation and Expanding the Scope of Assurance*. November 2, 2022. https://www.mbie.govt.nz/dmsdocument/25652-assurance-over-climate-related-disclosures-occupational-regulation-and-expanding-the-scope-of-assurance.

New Zealand Government. *Financial Sector (Climate-Related Disclosures and Other Matters) Amendment Act 2021*. October 27, 2021. https://www.legislation.govt.nz/act/public/2021/0039/latest/LMS479633.html.

Nick Anderson. *IFRS Standards and Climate-Related Disclosures*. November 2019. https://www.ifrs.org/content/dam/ifrs/news/2019/november/in-brief-climate-change-nick-anderson.pdf.

Old Mutual. *Old Mutual Climate Report 2022*. April 14, 2023. https://www.oldmutual.com/v3/assets/blt566c98aeecc1c18b/blt6a0662e7367e63c0/64463cb5d2002548587a26b2/Climate_Report_2022.pdf.

Organization of Economic Cooperation and Development (OECD). *Biodiversity: Finance and the Economic and Business Case for Action*. December 6, 2019. https://www.oecd-ilibrary.org/environment/biodiversity-finance-and-the-economic-and-business-case-for-action_a3147942-en.

OECD. *G20/OECD Principles of Corporate Governance*. November 30, 2015. https://www.oecd.org/corporate/principles-corporate-governance/.

OECD. *OECD Guidance on Transition Finance: Ensuring Credibility of Corporate Climate Transition Plans*. October 3, 2022. https://www.oecd-ilibrary.org/environment/oecd-guidance-on-transition-finance_7c68a1ee-en.

Partnership for Carbon Accounting Financials (PCAF). *The Global GHG Accounting and Reporting Standard Part A: Financed Emissions. Second Edition*. December 19, 2022. https://carbonaccountingfinancials.com/files/downloads/PCAF-Global-GHG-Standard.pdf.

Exhibit 9 to Decl. of Burton
602
**SER 2137**

A.
State of Climate-Related
Financial Disclosures

B.
Financial Statement
Considerations

C.
Case Studies on Scope 3
GHG Emissions

D.
TCFD-Aligned Requirements
and Related Initiatives

E.
Types of Financial Impact
and Associated Drivers

F.
Insights Gained and View
on Future Work

Appendices

The Task Force on Climate-related Financial Disclosures

PCAF. *The Global GHG Accounting and Reporting Standard Part C: Insurance-Associated Emissions*. November 16, 2022. https://carbonaccountingfinancials.com/files/downloads/pcaf-standard-part-c-insurance-associated-emissions-nov-2022.pdf.

Pension Protection Fund. *Pension Protection Fund Climate Change Report 2021/2022*. June 18, 2023. https://www.ppf.co.uk/-/media/PPF-Website/Public/Years/2022-08/P/Pension_Protection_Fund_Climate_Change_Report_2022.pdf.

Pensions and Investments. "The Largest Money Managers." December 31, 2021. https://www.pionline.com/largest-money-managers/2022-full-list.

Philippines Securities and Exchange Commission. *Sustainability Reporting Guidelines for Publicly-Listed Companies*. February 15, 2019. https://www.sec.gov.ph/wp-content/uploads/2019/10/2019MCNo04.pdf.

Prague Stock Exchange. "Prague Stock Exchange Launches Sustainability Reporting Guidelines." March 9, 2023. https://www.pse.cz/en/news/prague-stock-exchange-launches-sustainability-reporting-guidelines.

Prague Stock Exchange. *Sustainability Reporting Guidelines*. March 2023. https://www.pse.cz/userfiles/related_documents/cs/ESG-Guidelines.pdf.

Principles for Responsible Investment (PRI). "Investor Groups Call on Companies to Reflect Climate-Related Risks in Financial Reporting." September 16, 2020. https://www.unpri.org/accounting-for-climate-change/investor-groups-call-on-companies-to-reflect-climate-related-risks-in-financial-reporting/6432.article.

PRI. "Meeting the TCFD Recommendations in the 2018 PRI Reporting Framework." December 18, 2017. https://www.unpri.org/climate-change/meeting-the-tcfd-recommendations-in-the-2018-pri-reporting-framework/763.article.

PwC. *Board Effectiveness: A Survey of the C-Suite*. May 2023. https://www.pwc.com/us/en/services/governance-insights-center/library/assets/board-effectiveness-and-performance-improvement.pdf.

PwC. *PwC's Global Investor Survey 2022*. February 2023. https://www.pwc.com/gx/en/global-investor-survey/PwC-Global-Investor-Survey-2022.pdf.

Quantis. "Scope 3 Evaluation Tool." Accessed July 1, 2023. https://quantis-suite.com/Scope-3-Evaluator/.

Railways Pension Scheme. *Combined TCFD Report 2022*. June 5, 2023. https://cdn.rpmi.co.uk/mp-sitefinity-prod/docs/default-source/tcfd-reports/tcfd-report.pdf.

Riahi, Keywan et al. *RCP 8.5 — A Scenario of Comparatively High Greenhouse Gas Emissions*. August 13, 2011. https://link.springer.com/content/pdf/10.1007/s10584-011-0149-y.pdf.

Rio Tinto. *Annual Report*. February 22, 2023. https://cdn-rio.dataweavers.io/-/media/content/documents/invest/reports/annual-reports/2022/rt-annual-report-2022.pdf.

Rolls Royce. *Annual Report and Audited Financial Statements*. February 23, 2023. https://www.rolls-royce.com/-/media/Files/R/Rolls-Royce/documents/annual-report/2022/rr-plc-annual-report-2022.pdf.

Sanlam. *Climate Change Resilience Report 2021*. August 10, 2022. https://www.sanlam.com/downloads/reporting-suite/2021/Climate-Change-Resilience-Report-2021.pdf.

Sasol. *Climate Change Report 2021*. October 10, 2022. https://sasol.com/sites/default/files/2022-04/Sasol%20Climate%20Change%20Report_2021_22Sep21_0_0.pdf.

Sasol. *Climate Change Report 2022*. January 28, 2023. https://www.sasol.com/sites/default/files/2022-12/SASOL_CC%20Report%202022%20%202.pdf.

Exhibit 9 to Decl. of Burton
603
**SER 2138**

The Task Force on Climate-related Financial Disclosures

A.
State of Climate-Related
Financial Disclosures

B.
Financial Statement
Considerations

C.
Case Studies on Scope 3
GHG Emissions

D.
TCFD-Aligned Requirements
and Related Initiatives

E.
Types of Financial Impact
and Associated Drivers

F.
Insights Gained and View
on Future Work

Appendices

Science Based Targets initiative (SBTi). *Catalyzing Value Chain Decarbonization*. February 2023. https://sciencebasedtargets.org/resources/files/SBTi-The-Scope-3-challenge-survey-results.pdf.

SBTi. *SBTi Financial Sector and TCFD Reporting Guidance*. January 1, 2023. https://sciencebasedtargets.org/resources/files/SBTi-TCFD-reporting-guidance.pdf.

SBTi. "The Corporate Net-Zero Standard." Accessed May 1, 2023. https://sciencebasedtargets.org/net-zero.

Science Based Targets Network. "Our Mission, Science Based Targets Network." Accessed July 24, 2023. https://sciencebasedtargetsnetwork.org/our-mission/.

Sims Limited. *Enabling Decarbonisation*. November 8, 2022. https://sltd.s3.amazonaws.com/2022-climate-report.pdf.

Singapore Exchange (SGX). *Climate and Diversity: The Way Forward*. December 15, 2021. https://api2.sgx.com/sites/default/files/2021-12/Response%20Paper%20on%20Climate%20and%20Diversity%20-%20The%20Way%20Forward_0.pdf.

SGX. *Practice Note 7.6 Sustainability Reporting Guide*. June 20, 2016. https://rulebook.sgx.com/rulebook/practice-note-76-sustainability-reporting-guide.

Sustainability Accounting Standards Board. *TCFD Implementation Guide*. May 1, 2019. https://sasb.org/knowledge-hub/tcfd-implementation-guide/.

Swiss Federal Council. *Ordinance on Climate Disclosures*. November 2022. https://www.newsd.admin.ch/newsd/message/attachments/74006.pdf.

Swiss Financial Market Supervisory Authority. "FINMA Specifies Transparency Obligations for Climate Risks." May 31, 2021. https://www.finma.ch/en/news/2021/05/20210531-mm-transparenzpflichten-zu-klimarisiken/?pk_campaign=News-Service&pk_kwd=FINMA%20specifies%20transparency%20obligations%20for%20climate%20risks.

Swiss Re Institute. "Natural Catastrophes and Inflation In 2022: A Perfect Storm." March 29, 2023. https://www.swissre.com/institute/research/sigma-research/sigma-2023-01/5-charts-losses-natural-catastrophes.html.

Swiss Stock Exchange. *Investor Relations Handbook*. December 2022. https://www.six-group.com/dam/download/sites/exchange-services/investor-relations/investor-relations-handbook-en.pdf.

Task Force on Climate-related Financial Disclosures (TCFD). *2018 Status Report*. September 26, 2018. https://assets.bbhub.io/company/sites/60/2020/10/FINAL-2018-TCFD-Status-Report-092518.pdf.

TCFD. *2019 Status Report*. June 5, 2019. https://assets.bbhub.io/company/sites/60/2020/10/2019-TCFD-Status-Report-FINAL-0531191.pdf.

TCFD. *2020 Status Report*. October 29, 2020. https://assets.bbhub.io/company/sites/60/2020/09/2020-TCFD_Status_Report.pdf.

TCFD. *2021 Status Report*. October 14, 2021. https://assets.bbhub.io/company/sites/60/2022/03/GPP_TCFD_Status_Report_2021_Book_v17.pdf.

TCFD. *2022 Status Report*. October 13, 2022. https://assets.bbhub.io/company/sites/60/2022/10/2022-TCFD-Status-Report.pdf.

TCFD. *Final Report: Recommendations of the Task Force on Climate-related Financial Disclosures*. June 29, 2017. https://assets.bbhub.io/company/sites/60/2021/10/FINAL-2017-TCFD-Report.pdf.

TCFD. *Guidance on Metrics, Targets, and Transition Plans*. October 14, 2021. https://assets.bbhub.io/company/sites/60/2021/07/2021-Metrics_Targets_Guidance-1.pdf.

149

Exhibit 9 to Decl. of Burton
604
**SER 2139**

A.
State of Climate-Related
Financial Disclosures

B.
Financial Statement
Considerations

C.
Case Studies on Scope 3
GHG Emissions

D.
TCFD-Aligned Requirements
and Related Initiatives

E.
Types of Financial Impact
and Associated Drivers

F.
Insights Gained and View
on Future Work

Appendices

The Task Force on Climate-related Financial Disclosures

TCFD. *Guidance on Risk Management Integration and Disclosure*. October 29, 2020. https://assets.bbhub.io/company/sites/60/2020/09/2020-TCFD_Guidance-Risk-Management-Integration-and-Disclosure.pdf.

TCFD. *Guidance on Scenario Analysis for Non-Financial Companies*. October 29, 2020. https://assets.bbhub.io/company/sites/60/2020/09/2020-TCFD_Guidance-Scenario-Analysis-Guidance.pdf.

TCFD. *Implementing the Recommendations of the Task Force on Climate-related Financial Disclosures*. October 14, 2021. https://assets.bbhub.io/company/sites/60/2021/07/2021-TCFD-Implementing_Guidance.pdf.

TCFD Consortium. *Guidance on Climate-related Financial Disclosures 3.0*. October 2022. https://tcfd-consortium.jp/pdf/en/news/22100501/TCFD_Guidance_3.0_e.pdf.

Task Force on Nature-Related Financial Disclosures. "About the Taskforce on Nature-related Financial Disclosures." Accessed July 24, 2023. https://tnfd.global/about/.

Tata Steel. *Integrated Report and Annual Accounts 2021-22*. May 2023. https://www.tatasteel.com/media/15928/tata-steel-ir-2021-22.pdf.

Thai Securities and Exchange Commission. *Guidelines on Management and Disclosure of Climate-related Risk by Asset Managers*. January 10, 2023. https://www.sec.or.th/TH/Documents/CompanyHandbooksandGuidelines/Climate_Risk_Management_Guidelines.pdf.

Thinking Ahead Institute. *The Asset Owner 100 – 2022*. November 30, 2022. https://www.thinkingaheadinstitute.org/content/uploads/2022/11/AO100-2022-report.pdf.

U.K. Parliament. "Companies Act 2006 s414(CA) (as amended) and Limited Liability Partnerships (Accounts and Audit) (Application of Companies Act 2006) Regulations 2008 parts 5 and 5a (as amended)." Accessed June 21, 2023. https://www.legislation.gov.uk/ukpga/2006/46/section/414CA.

U.K. Parliament. *The Companies (Strategic Report) (Climate-related Financial Disclosure) Regulations 2022*. January 2022. https://www.legislation.gov.uk/uksi/2022/31/made/data.pdf.

U.K. Parliament. *The Limited Liability Partnerships (Climate-related Financial Disclosure) Regulations 2022*. January 2022. https://www.legislation.gov.uk/uksi/2022/46/made/data.pdf.

U.K. Parliament, *The Occupational Pension Schemes (Climate Change Governance and Reporting) Regulations 2021*. July 13, 2021. https://www.legislation.gov.uk/uksi/2021/839/data.pdf.

U.K. Transition Plan Taskforce (TPT). *The Transition Plan Taskforce Disclosure Framework*. October 9, 2023. https://transitiontaskforce.net/wp-content/uploads/2023/10/TPT_Disclosure-framework-2023.pdf.

U.K. TPT. *The Transition Plan Taskforce Disclosure Framework Consultation*. November 8, 2022. https://transitiontaskforce.net/wp-content/uploads/2022/11/TPT-Disclosure-Framework.pdf.

U.K. TPT. *The Transition Plan Taskforce Implementation Guidance*. November 8, 2022. https://transitiontaskforce.net/wp-content/uploads/2022/11/TPT-Implementation-Guidance.pdf.

Unilever. *Unilever Annual Report and Accounts 2022*. March 1, 2023. https://www.unilever.com/files/92ui5egz/production/90573b23363da2a620606c0981b0bbd771940a0b.pdf.

United Nations Sustainable Stock Exchanges Initiative. "Egyptian FRA: Mandatory ESG and Climate Disclosure Regulation." July 15, 2021. https://sseinitiative.org/all-news/egyptian-fra-issued-mandatory-esg-and-climate-disclosure/.

Universities Superannuation Scheme. *Universities Superannuation Scheme TCFD Report 2022*. July 25, 2022. https://www.uss.co.uk/-/media/Project/USSMainSite/files/How-we-invest/TCFD-2022.pdf.

Exhibit 9 to Decl. of Burton
605
**SER 2140**

The Task Force on Climate-related Financial Disclosures

A.
State of Climate-Related
Financial Disclosures

B.
Financial Statement
Considerations

C.
Case Studies on Scope 3
GHG Emissions

D.
TCFD-Aligned Requirements
and Related Initiatives

E.
Types of Financial Impact
and Associated Drivers

F.
Insights Gained and View
on Future Work

Appendices

U.S. Securities and Exchange Commission (SEC). "Enforcement Task Force Focused on Climate and ESG Issues." April 11, 2023. https://www.sec.gov/securities-topics/enforcement-task-force-focused-climate-esg-issues.

U.S. SEC. "Press Release: SEC Proposes Rules to Enhance and Standardize Climate-Related Disclosures for Investors." March 21, 2022. https://www.sec.gov/news/press-release/2022-46.

U.S. SEC. *The Enhancement and Standardization of Climate-Related Disclosures for Investors.* March 21, 2022. https://www.sec.gov/rules/proposed/2022/33-11042.pdf.

Vaccaro, James. *The Good Transition Plan: Climate Action Strategy Development Guidance for Banks & Lending Institutions: COP26-version (2021).* October 2021. https://static1.squarespace.com/static/5e0a586857ea746075c561a3/t/61fa7a928bf1444954619fa5/1643805346245/CSLN+Good+Transition+Report+01.22.pdf.

We Mean Business Coalition et al. *Climate Transition Action Plans: Activate Your Journey to Climate Leadership.* October 31, 2022. https://www.wemeanbusinesscoalition.org/wp-content/uploads/2022/10/WMBC-Climate-Transition-Action-Plans.pdf.

Whelan, T. *U.S. Corporate Boards Suffer From Inadequate Expertise in Financially Material ESG Matters.* January 2021. https://www.stern.nyu.edu/sites/default/files/assets/documents/U.S.%20Corporate%20Boards%20Suffer%20From%20Inadequate%20%20Expertise%20in%20Financially%20Material%20ESG%20Matters.docx%20%282.13.21%29.pdf.

World Bank. *Sovereign Climate and Nature Reporting: Proposal for a Risks and Opportunities Disclosure Framework.* January 31, 2022. https://openknowledge.worldbank.org/bitstreams/37c0a591-756e-5716-b0b6-0e1daf5600bb/download.

World Business Council for Sustainable Development (WBCSD). *Climate Scenario Analysis and Application Guide: Food, Agriculture and Forest Products.* November 2022. https://www.wbcsd.org/contentwbc/download/15368/224597/1.

WBCSD. *Climate Scenario Analysis Reference Approach.* February 1, 2023. https://www.wbcsd.org/contentwbc/download/13879/200764/1.

WBCSD. "Climate Scenario Catalogue." Accessed September 1, 2023. https://climatescenariocatalogue.org/.

WBCSD. *Climate-Related Financial Disclosure by Oil and Gas Companies: Implementing the TCFD Recommendations.* July 2018. http://docs.wbcsd.org/2018/07/Climate_related_financial_disclosure_by_oil_and_gas_companies.pdf.

WBCSD. *Transition Planning and Climate Scenario Analysis: Food, Agriculture and Forest Products.* February 13, 2023. https://www.wbcsd.org/contentwbc/download/15700/227592/1.

World Resources Institute (WRI). "Coolfood." Accessed July 1, 2023. https://coolfood/consumer/.

WRI and WBCSD. *Technical Guidance for Calculating Scope 3 Emissions.* April 23, 2013. https://ghgprotocol.org/sites/default/files/standards/Scope3_Calculation_Guidance_0.pdf.

WRI and WBCSD. *Corporate Value Chain (Scope 3) Accounting and Reporting Standard.* April 16, 2013. https://ghgprotocol.org/sites/default/files/standards/Corporate-Value-Chain-Accounting-Reporing-Standard_041613_2.pdf.

WRI and WBCSD. *The Greenhouse Gas Protocol: A Corporate Accounting and Reporting Standard (Revised Edition).* March 2004. https://ghgprotocol.org/sites/default/files/standards/ghg-protocol-revised.pdf.

World Steel Association. *The Steelmaking Process.* January 23, 2022. https://worldsteel.org/wp-content/uploads/steelmaking-process.pdf.

Exhibit 9 to Decl. of Burton
606
**SER 2141**



**For more information, please visit fsb-tcfd.org**

Nothing in this document constitutes an offer or a solicitation of an offer to buy or sell a security or financial instrument or investment advice or recommendation of a security or financial instrument. The Task Force on Climate-related Financial Disclosures believes the information herein was obtained from reliable sources but does not guarantee its accuracy. Copyright 2023 The Task Force on Climate-related Financial Disclosures.

Exhibit 9 to Decl. of Burton
607

# Exhibit 8

# to Declaration of James P. Burton

***The State of Play: Sustainability Disclosure and Assurance 2019-022 Trends & Analysis*, International Federation of Accountants (IFAC), AICPA and CIMA (2024),**

https://ifacweb.blob.core.windows.net/publicfiles/2024-02/IFAC-State-Play-Sustainability-Disclosure-Assurance-2019-2022_0.pdf

Exhibit 8 to Decl. of Burton
397
**SER 2143**



Case 2:24-cv-00888-ODW/FMC Document 95-8 Filed 03/29/2024 Page 3 of 4 Page ID #:2665

# FOREWORD

The *State of Play* is designed to support evidence-based discussion and analysis of current market practice and trends in sustainability disclosure and assurance. We continue this research for the fourth consecutive year— helping to chart a path toward truly high-quality and decision-useful information for capital markets and all users of sustainability disclosure.

While trends in 2022 were positive—more reporting, more assurance, and broader scope reporting/assurance—the need for transition toward mandatory disclosure requirements remains clear. 87% of companies reported in 2022 as the issuance of standards and frameworks for reporting on ESG and it is unclear whether most provided their information "in accordance with" the requirements of well-established standard setters. The application of assurance standards (i.e., ISAE 3000 (Revised) being most frequently used) was also not consistent across all practitioners.

As adoption of International Sustainability Standards Board (ISSB) standards is taking hold and as mandatory reporting and assurance begins in the European Union, the role of corporate governance inside of reporting entities must become a priority. For the first time, we reviewed company documents to understand who has oversight of sustainability strategy, as well sustainability disclosure and assurance. We observe that a global best practice has yet to emerge (see page 7).

## KEY HIGHLIGHTS

**Connectivity in reporting:** In 2022, we saw significant changes in where companies reported on ESG. Only 30% of disclosures reviewed were in stand-alone sustainability reports—a decline from 57% in 2019. Most companies (40%) included sustainability information in the annual report, but ESG disclosures in integrated reports also increased. Coupled with a further decline in the gap between the issuance of the financial audit report and the sustainability assurance report, there is evidence of progress toward better connectivity between sustainability and financial corporate disclosures. These positive trends are lagging in the Americas and some Asia-Pacific jurisdictions.

**Assurance rates climb:** While the number of companies that obtained assurance continues to trail reporting, 2022 saw a 5% increase to 69% of companies reviewed obtaining assurance on at least some of their ESG disclosures. The scope of assurance engagements broadened somewhat with 59% of companies obtaining assurance on disclosure in greenhouse gas (GHG), other environmental, social and governance categories. New this year, we conducted a more detailed review of GHG emissions and observed 60% of companies that obtained assurance over their emissions did so over all three—Scope 1, Scope 2, and Scope 3 (see page 6).

The goal of sustainability disclosure must be information, including the processes in place to prepare it, that is on par with financial reports. We believe professional accountants will play a significant role in enabling comparable, reliable, trustworthy sustainability reporting as well as its assurance. For example, for the third consecutive year, when a company chooses an accountancy firm for a sustainability assurance engagement, it's more likely to be the same firm (73% in 2022) as their statutory auditor. In conducting these engagements, professional accountants use standards set in the public interest—including quality management, ethics, and independence—developed by the International Auditing and Assurance Standards Board (IAASB) and the International Ethics Standards Board for Accountants (IESBA).

Transitioning from voluntary to *mandatory* requirements for reporting and assurance will be a significant change—requiring enhanced rigor in data collection, systems, processes, internal controls, and governance within companies that must prepare to fulfill new legal requirements. This is where our profession will rise to the challenge. We hope this research about global trends and current market practice is helpful for regulators, policy makers, standard setters, and all reporting and assurance practitioners.





Exhibit 8 to Decl. of Burton
389

# MAPPING GLOBAL REPORTING AND ASSURANCE PRACTICES

The fourth annual IFAC and AICPA & CIMA State of Play of global sustainability disclosure and assurance practice shows that nearly all companies reviewed report at least some ESG information and an increasing majority of companies obtained assurance on at least some of that ESG information. But there is still work to do as only three jurisdictions reviewed had assurance rates of 100%.

This study updates understanding based on 2022 reporting of market practice by 1,400 companies across 22 jurisdictions. (see Methodology Section for additional details).

* Including all standards issued by accounting and audit bodies—such as the AICPA's attestation standards and IAASB's ISAE 3410—Firms applied accounting and audit body standards, 96% in 2019, 96% in 2020, 99% in 2021, and 99% in 2022.

**IFAC**   **AICPA & CIMA**

## KEY FINDINGS: 2019 | 2020 | 2021 | 2022

| | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|
| reported some ESG information | 91% | 92% | 95% | 98% | 83% | 82% | 80% | 82% |

*of assurance was limited*

| obtained some level of assurance | 51% | 58% | 64% | 69% | 88% | 94% | 95% | 92% |

*of firms applied ISAE 3000 (Revised)\**

| assurance engagements conducted by firms | 63% | 61% | 57% | 58% | 34% | 39% | 38% | 38% |

*of other service providers applied ISAE 3000 (Revised)*

▶ Link to 2021 State of Play report

Exhibit 8 to Decl. of Burton
400



# MAPPING GLOBAL REPORTING AND ASSURANCE PRACTICES – 2022

**RUSSIA** — 88.0 | 43.2 | 95.0

Switzerland — 97.0 | 46.4 | 55.6

**SOUTH KOREA** — 98.0 | 95.9 | 5.3

**JAPAN** — 99.0 | 81.8 | 43.3

**HONG KONG S.A.R.** — 100 | 52.0 | 32.1

**SINGAPORE** — 100 | 48.0 | 58.6

**INDONESIA** — 100 | 40.0 | 65.0

**AUSTRALIA** — 100 | 70.0 | 89.2

**TURKEY** — 98.0 | 81.2 | 56.8

**INDIA** — 100 | 60.0 | 56.7

**SAUDI ARABIA** — 96.0 | 8.3 | 85.7

**GERMANY** — 100 | 85.0 | 96.6

**ITALY** — 100 | 100 | 100

**SOUTH AFRICA** — 100 | 72.0 | 52.5

**UNITED KINGDOM** — 100 | 84.0 | 42.0

**FRANCE** — 100 | 100 | 100

**SPAIN** — 100 | 100 | 85.2

**BRAZIL** — 100 | 84 | 74.4

**ARGENTINA** — 68.0 | 29.4 | 90.0

**CANADA** — 98.0 | 81.6 | 63.3

**UNITED STATES** — 99.0 | 87.9 | 23.1

**MEXICO** — 100 | 50.0 | 77.8

**ESG Reporting Companies**
0% ——————— 100%

**Rate of ESG Assurance**
0% ——————— 100%

**Assurance Provided by Audit Firms**
0% ——————— 100%

Exhibit 8 to Decl. of Burton
401

**SER 2147**





Case 2:24-cv-00893-ODW/PVC Document 53-8 Filed 07/24/24 Page 8 of 48 Page ID #:2541



# SUSTAINABILITY GOVERNANCE

## SUSTAINABILITY STRATEGY

**83%** Of companies disclosed Board-level oversight of sustainability strategy

| | |
|---|---|
| Audit Committee | 68% |
| Sustainability Committee | 50% |
| Corp Gov Committee | 39% |
| Human Resource Committee | 12% |
| Other Committees | 36% |

**65%** of companies gave sustainability strategy oversight to more than one Committee

## SUSTAINABILITY REPORTING

**56%** Of companies disclosed Board-level oversight of sustainability reporting

| | |
|---|---|
| Sustainability Committee | 45% |
| Audit Committee | 41% |
| Corp Gov Committee | 21% |
| Human Resource Committee | 2% |
| Other Committees | 13% |

**29%** of companies give sustainability reporting oversight to more than one Committee.

## SUSTAINABILITY ASSURANCE

**22%** Of companies disclosed Board-level oversight of sustainability assurance

| | |
|---|---|
| Audit Committee | 79% |
| Sustainability Committee | 19% |
| Corp Gov Committee | 0% |
| Human Resource Committee | 0% |
| Other Committees | 2% |

**5%** of companies gave sustainability assurance oversight to more than one Committee

Percent of companies that disclose Board-level oversight were out of 1,400 companies. Percent of companies that disclosed specific committees were out of the total number of companies with disclosure: strategy (1,165), reporting (785), and assurance (311).

IFAC  AICPA & CIMA

7

Exhibit 8 to Decl. of Burton
404

**SER 2150**



Case 2:24-cv-00801-CKD-PVC   Document 53-9   Filed 07/24/24   Page 9 of 49   Page ID #:2062

Exhibit 8 to Decl. of Burton
405



# SUMMARY CHANGES: REPORTING

**METHOD OF REPORTING.** More companies incorporated sustainability information with financial information in annual and integrated reports. Notable exceptions include the United States, Canada, China, and South Korea, where more than 70% of companies reviewed used a stand-alone sustainability report (see page 10 for more information).

## STANDARDS & FRAMEWORKS.

The use of / reference to the Sustainability Accounting Standards Board (SASB) Standards and the Task Force on Climate-related Financial Disclosure (TCFD) Framework continued to increase from 2021 to 2022. However, companies used a variety of terminology to describe their application of GRI and SASB standards (see page 13).

**1,368** of **1,400** companies reported ESG information in 2022 (compared to **1,283** of **1,350** companies in 2021).

The use of / reference to Global Reporting Initiative (GRI) Standards and the UN Sustainability Development Goals (SDGs) remain high (comparing 2021 to 2022) among the companies that reported on ESG.

**SASB increase of**
**7%**
over 2021

**TCFD increase of**
**13%**
over 2021

increasing from
**74%** to **77%** (GRI)

increasing from
**79%** to **83%** (SDGs)

IFAC

AICPA & CIMA

Case 2:24-cv-00081-OAW-PVC  Document 53-8  Filed 07/24/24  Page 10 of 49  Page ID 2091

Exhibit 8 to Decl. of Burton
406

9



SER 2153



Case 2:24-cv-00865-CDW-PVC  Document 53-8  Filed 07/24/24  Page 13 of 49  Page ID #:2954







ASSURANCE

State of Play series

Case 2:24-cv-00881-CKW-PVC Document 53-8 Filed 07/24/24 Page 15 of 49 Page ID #:2056

Exhibit 8 to Decl. of Burton 411



# SUMMARY CHANGES: ASSURANCE

**ASSURED ESG INFORMATION.**
The percentage of companies that obtained assurance on some of their ESG reporting increased.

| 51% in 2019 | 58% in 2020 | 64% in 2021 | 69% in 2022 |

**WHO PROVIDES ASSURANCE.**
689 of 1,187 (for 950 companies) assurance reports were signed by audit firms in 2022.

| 63% in 2019 | 61% in 2020 | 57% in 2021 | 58% in 2022 |

**ASSURANCE STANDARDS.**
The International Auditing and Assurance Standards Board's (IAASB) International Standard on Assurance Engagements (ISAE) 3000 (Revised) remained the most widely used standard for ESG assurance engagements.

| 68% in 2019 | 72% in 2020 | 70% in 2021 | 72% in 2022 |

**92% of firms*** used ISAE 3000 (Revised), while non-IAASB standards were most commonly used by the other service providers (i.e. only 38% used ISAE 3000 (Revised)) during 2022.

\* Including all standards issued by accounting and audit bodies—such as the AICPA's attestation standards and IAASB's ISAE 3410— Firms applied accounting and audit body standards, **96%** in 2019, **96%** in 2020, **99%** in 2021, and **99%** in 2022.

**IFAC** | **AICPA & CIMA**

15

Exhibit 8 to Decl. of Burton
412











Case 2:24-cv-00091-JDW-PVC  Document 53-8  Filed 07/24/24  Page 22 of 49  Page ID #:2901



# MAPPING ASSURANCE PRACTICE: APPLICATION OF ISAE 3000 (REVISED)

| | AUDIT FIRMS | | OTHER SERVICE PROVIDERS | |
|---|---|---|---|---|
| | 2021 | 2022 | 2021 | 2022 |
| Percent of assurance reports that use ISAE 3000 (Revised) | 95%* | 92%* | 38% | 38% |
| Of assurance that applies ISAE 3000 (Revised), percent of engagements that were performed "in accordance with" | 98% | 97% | 53% | 64% |
| Of assurance that applies ISAE 3000 (Revised), percent of engagements that apply IESBA Code or other recognized ethics code / standards | 93% | 91% | 28% | 33% |
| Of assurance that applies ISAE 3000 (Revised), percent of engagements that apply ISQC 1 or other recognized quality control standards | 91% | 94% | 38% | 43% |

*Including all standards issued by accounting and audit bodies such as the AICPA's attestation standards and IAASB's ISAE 3410 Firms applied accounting and audit body standards. 99% in 2021, and 99% in 2022.

IFAC

AICPA & CIMA

21

Exhibit 8 to Decl. of Burton
418

**SER 2164**



# JURISDICTION PROFILES

*State of Play series*

Case 2:24-cv-00001-CKW-PVC   Document 53-8   Filed 07/24/24   Page 23 of 49   Page ID
#:2064

Exhibit 8 to Decl. of Burton
419

Case 2:24-cv-00063-ODW-PVC   Document 53-8   Filed 07/24/24   Page 24 of 49   Page ID #:2505



Case 2:24-cv-00693-CDW-PVC Document 53-8 Filed 07/24/24 Page 25 of 49 Page ID #:2998





Case 2:24-cv-00863-CKW-PVC   Document 53-8   Filed 07/24/24   Page 26 of 49   Page ID #:2567

Exhibit 8 to Decl. of Burton
422

Case 2:24-cv-00083-ODW-PVC Document 53-8 Filed 07/24/24 Page 27 of 49 Page ID #:7068



Exhibit 8 to Decl. of Burton
423



Case 2:24-cv-00083-ODW-PVC Document 53-8 Filed 07/24/24 Page 29 of 49 Page ID #:2503











SER 2175

Case 2:24-cv-00893-ODW-PVC Document 53-8 Filed 07/24/24 Page 54 of 49 Page ID #:2975









SER 2179



Case 2:24-cv-00663-CKW-PVC Document 53-8 Filed 07/24/24 Page 39 of 49 Page ID #:7550





Case 2:24-cv-00893-ODW-PVC   Document 53-6   Filed 07/24/24   Page 40 of 49   Page ID #:2061

Exhibit 8 to Decl. of Burton
436

Case 2:24-cv-00083-ODW-PVC Document 53-8 Filed 07/24/24 Page 41 of 49 Page ID #:2502





SER 2184

Case 2:24-cv-00083-ODW-PVC   Document 53-8   Filed 07/24/24   Page 43 of 49   Page ID #:2984







Case 2:24-cv-00893-ODW-PVC Document 53-8 Filed 07/24/24 Page 45 of 49 Page ID #:7556

Exhibit 8 to Decl. of Burton
441



# METHODOLOGY

## State of Play series

Case: 2:24-cv-00691-CKW-PVC   Document 53-8   Filed 07/24/24   Page 46 of 49   Page ID #:2067

Exhibit 8 to Decl. of Burton
442

# METHODOLOGY

This study reviewed the largest companies in each jurisdiction by market capitalization as of approximately March 21, 2021, for fiscal years 2019 and 2020, March 21, 2022, for fiscal year 2021, and March 21, 2023, for fiscal year 2022. Company jurisdiction was based on the location of the company's headquarters. The largest 50 companies were reviewed in 16 jurisdictions for fiscal years 2019 and 2020, and 16 jurisdictions for fiscal year 2022. The largest 100 companies were reviewed in the six largest economies (denoted with an asterisk). The jurisdictions that make up the G20, Spain, Hong Kong S.A.R., and Singapore were selected to ensure the jurisdictions had at least 50 listed companies to review. Jurisdictions with 100 companies reviewed were selected based on the largest nominal GDP as of March 21, 2021.

| Americas | Europe, Middle East, and Africa (EMEA) | Asia-Pacific |
|---|---|---|
| • Argentina | • France | • Australia |
| • Brazil | • Germany* | • China's mainland* |
| • Canada | • Italy | • Hong Kong, S.A.R. |
| • Mexico | • Russia | • India* |
| • United States of America* | • Saudi Arabia | • Indonesia |
| | • South Africa | • Japan* |
| | • Spain | • Singapore |
| | • Turkey | • South Korea |
| | • United Kingdom* | |

Russia was excluded for fiscal year 2021 due to issues accessing public company documents and websites.

## DATA COLLECTION METHODOLOGY



Reports were located on a company's website in one of four places:

1. Dedicated sustainability web page for stakeholders
2. Sustainability web page under "About the Company" section
3. Annual reports or downloads section of investor relations web page
4. Sustainability section of investor relations web page

If a report could not be located a company's website, the company name was searched with the term "2020 sustainability report." If a report was still not located, the company was search in the GRI Database of sustainability reports. For Hong Kong Stock Exchange (HKEx) listed companies, the exchange website was used to collect reports if a report could not be found on a company's website. This only impacted companies located in China's mainland and Hong Kong, S.A.R.

Sustainability oversight was determined by reviewing corporate governance documents and documents containing corporate governance disclosures – Board/Committee charters, corporate governance reports, corporate governance web pages, annual reports, and sustainability reports.

A Board or Committee was determined to have oversight of sustainability strategy if their duties included sustainability, ESG, emissions, environmental impacts, employee development, employee diversity, Board diversity, health & safety, and/or anti-corruption activities.

A Board or Committee was determined to have oversight of sustainability reporting if their duties included reviewing and approving a sustainability report, integrated report, TCFD report, or some other ESG specific report.

A Board of Committee was determined to have oversight of sustainability assurance if their duties included engaging and interfacing with an external third-party for assurance, verification, or review of a sustainability report, an integrated report, or an ESG metric.

IFAC INTERNATIONAL FEDERATION OF ACCOUNTANTS    AICPA & CIMA

46

Case 2:24-cv-00001-0DW-PVC  Document 53-8  Filed 07/24/24  Page 47 of 46  Page ID #:2300

Exhibit 8 to Decl. of Burton
443

# METHODOLOGY

## REPORT CLASSIFICATION



Reports were classified into three groups: sustainability reports, annual reports, and integrated reports. Sustainability reports were identified as those published for the sole or main purpose of informing stakeholders of environmental, social, or governance activities and performance. Annual reports were identified as those published for the main purpose of informing stakeholders of financial performance. Annual reports were only collected if they included sustainability or ESG reporting. Integrated reports were identified as those published pursuant to the <IR> framework issued by the International Integrated Reporting Council. For companies that issued more than one report, a hierarchy was used to determine which report to collect. If an integrated report was published, the company was counted as reporting in an integrated report, regardless of any other publications. If a company published both an ESG report and published this ESG information within an annual report, the company was counted as reporting in an annual report.

## REPORTING STANDARDS

Reporting standards were collected from the "About this Report" section. Both reporting standards and reporting frameworks were captured due to inconsistent disclosure regarding their use as standards or frameworks. Next, any standards or frameworks indexed in the appendix were collected. Finally, a text search for the Global Reporting Initiative (GRI), Sustainability Accounting Standards Board (SASB), United Nations Sustainable Development Guidelines (SDG), and Taskforce on Climate-related Financial Disclosures (TCFD) was used to find additional references within the body of the report. Standards and frameworks must have been used to report primary information to stakeholders.

## ASSURANCE

A company was determined to have obtained assurance if an assurance report that covered ESG data was found within a report, on the company's website, or in the CDP database. Verification statements were not counted, nor were references to assurance where a specific assurance report was not available. If a report included more than one assurance report, each report was reviewed separately.

Assurance providers were separated into three categories: statutory audit firms, non-statutory audit firms, and other service providers. Statutory audit firms are organizations that are registered to perform financial statement audits and provide both the ESG assurance and the audit of financial statements for a company. Non-statutory audit firms are organizations that are registered to perform financial statements for a company. Other service providers are organizations that are not authorized to perform financial statement audits, but provide ESG assurance for a company.

IFAC · AICPA & CIMA

47

**SER 2190**

Case 2:24-cv-00681-CKW-PVC Document 53-8 Filed 07/24/24 Page 49 of 49 Page ID #:2060

48

**AICPA & CIMA**

Copyright © 2024 by the International Federation of Accountants (IFAC) and the Association of International Certified Professional Accountants (the Association). All rights reserved. Contact permissions@ifac.org or copyright@aicpa-cima.com for permission to reproduce, store or transmit, or to make other similar uses of this document other than for personal use.

IFAC and IFAC INTERNATIONAL FEDERATION OF ACCOUNTANTS Design are trademarks of the International Federation of Accountants registered in the U.S. and other countries.

ASSOCIATION OF INTERNATIONAL CERTIFIED PROFESSIONAL ACCOUNTANTS and the Globe Design are trademarks of the Association of International Certified Professional Accountants registered in the U.S., the E.U., the U.K. and other countries. AICPA and CIMA are trademarks of the American Institute of CPAs and The Chartered Institute of Management Accountants, respectively, and are registered in the U.S., the E.U., the U.K. and other countries.

The information provided in this publication is general and may not apply in a specific situation. Legal advice should always be sought before taking any legal action based on the information provided. Although the information provided is believed to be correct as of the publication date, be advised that this is a developing area. IFAC, the Association, AICPA, and CIMA cannot accept responsibility for the consequences of its use for other purposes or other contexts. The information and any opinions expressed in this material do not represent official pronouncements of or on behalf of the IFAC, AICPA, CIMA, or the Association of International Certified Professional Accountants. This material is offered with the understanding that it does not constitute legal, accounting, or other professional services or advice. If legal advice or other expert assistance is required, the services of a competent professional should be sought.

The information contained herein is provided to assist the reader in developing a general understanding of the topics discussed but no attempt has been made to cover the subjects or issues exhaustively. While every attempt to verify the timeliness and accuracy of the information herein as of the date of issuance has been made, no guarantee is or can be given regarding the applicability of the information found within to any given set of facts and circumstances.

in **IFAC**

✕ **@IFAC**

f **International Federation of Accountants**

International Federation of Accountants
529 Fifth Avenue
New York, NY 10017
USA
**T** +1 212 286 9344
**www.ifac.org**

Exhibit 8 to Decl. of Burton
445

# Exhibit 7
# to Declaration of James P. Burton

# CDP 2023 disclosure datafactsheet, CDP https://www.cdp.net/en/companies/cdp-2023-disclosure-data-factsheet

Exhibit 7 to Decl. of Burton
377
**SER 2192**

7/22/24, 3:53 PM                                    CDP 2023 disclosure data factsheet - CDP



# CDP 2023 disclosure data factsheet

In 2023, 23,000+ companies - representing a staggering US$67 trillion in market capitalization - disclosed their environmental performance data to CDP. This factsheet presents an overview of the key findings and emerging trends from this data, showcasing CDP's expanding coverage and growth across regions, markets, and the key environmental themes of climate change, forests, water security, biodiversity, and now, plastics.

With the number of companies disclosing environmental information growing annually, CDP's role as an accountability mechanism is strengthened. This factsheet uses the wealth of data that CDP holds to provide transparency and insight into the evolving landscape of environmental disclosures.

**Skip to:**

- State and trends of disclosure in 2023
- Coverage of regions and key market indices
- Environmental performance
- Spotlight: energy
- Environmental risks and opportunities
- Spotlight: financial institution disclosures

State and trends of disclosure in 2023

Exhibit 7 to Decl. of Burton
378
**SER 2193**

7/22/24, 3:53 PM                              CDP 2023 disclosure data factsheet - CDP



CDP introduced a pilot questionnaire for biodiversity in 2022 and plastics in 2023. The disclosure numbers are based on companies reporting against two-thirds of the question set.

For biodiversity, 10,600+ companies (82% out of those that received the biodiversity questions) provided disclosure to at least one question and 22% (2,800 companies) disclosed against all biodiversity questions.



For plastics, 3,162 companies disclosed plastic-related data in 2023 (66% of those that received the plastics questions), with 2,920 companies (61%) responding to at least two thirds of the questions and 50% responded to all questions.

## Disclosure beyond climate

38% of disclosing companies are providing environmental performance information on nature-related issues beyond climate, indicating a growing recognition that providing disclosure on climate alone is not enough.

Exhibit 7 to Decl. of Burton
379
**SER 2194**

7/22/24, 3:53 PM                                    CDP 2023 disclosure data factsheet - CDP

Sign in



\* Nature disclosure covers one or more of water, forest, biodiversity and plastic reporting



## Key messages

- **In 2023, disclosure numbers rose by 24%** from the 18,700+ companies that disclosed through CDP in 2022 – and marked an over 140% increase from disclosure in 2020.

- **~ 8,000 companies started their journey** by disclosing for the first time.

- **A growing number of companies are providing nature-related disclosures beyond climate,** indicating a rise in awareness that companies have impacts and dependencies on nature, with resulting risks and opportunities. While this is positive progress, it needs to be matched by firm action to manage nature-related impacts, risks and opportunities across value chains.

Coverage of regions and key market indices

## Coverage by region

CDP corporate disclosers are based in approximately 130 countries across the world. Each region has experienced a notable increase in the number of companies disclosing.

Exhibit 7 to Decl. of Burton
380
**SER 2195**

7/22/24, 3:53 PM

CDP 2023 disclosure data factsheet - CDP

🔍   ⊙ Sign in   ☰



Source: World Bank Official Boundaries



## Coverage of indices

Companies in key market indices across the globe are disclosing environmental data to CDP.



Exhibit 7 to Decl. of Burton
381

**SER 2196**

7/22/24, 3:53 PM                                    CDP 2023 disclosure data factsheet - CDP

Sign in

| Market Index | Climate change coverage | Forests coverage | Water security coverage |
|---|---|---|---|
| S&P 500 | 86% | 14% | 41% |
| FTSE 100 | 94% | 28% | 43% |
| MSCI ACWI | 61% | 9% | 28% |
| MSCI Small Cap | 40% | 5% | 14% |
| TOPIX 500 | 88% | 15% | 53% |
| FTSE Eurofirst 300 | 91% | 21% | 41% |
| South Africa - FTSE JSE All-Share | 57% | 9% | 30% |
| BSE 200 | 40% | 3% | 21% |
| S&P TSX 60 | 78% | 20% | 30% |
| KOSPI 200 | 54% | 1% | 16% |
| Hang Seng | 54% | 4% | 29% |
| CSI 300 | 18% | 1% | 7% |
| S&P/ASX 300 | 27% | 3% | 7% |

## Key messages

- **Environmental disclosure is becoming a global market norm,** as seen by the increase in disclosures across all regions and the coverage of market indices across developed and emerging markets.

- With many disclosing companies operating in regions anticipating mandatory disclosure, **voluntary disclosure through CDP allows them to gain a competitive edge** and positions them ahead of the trend.

Environmental performance — water, forests, emissions

## Water withdrawal reduction

- 30% of all disclosers (1,458 out of 4,815) are setting water withdrawal reduction targets − a dramatic increase from 14.6% in 2022. The number of companies setting targets relating to pollution and the provision of safe water, sanitation and hygiene (WASH) has also increased, indicating a surge in ambition and action in these important areas.

Exhibit 7 to Decl. of Burton
382
**SER 2197**

7/22/24, 3:53 PM                                CDP 2023 disclosure data factsheet - CDP

 Sign in

Withdrawals: 9,974 million cubic meters of water have been saved by 120 companies, equivalent to 78 times the size of Loch Ness in Scotland.

## Annual water withdrawal volumes by companies reducing their dependency on water
Based on 120 companies who consistently disclose through CDP





## Progress on eradicating deforestation from supply chains

Companies are demonstrating progress on eradicating deforestation from their supply chains.

- About half of the 242 companies (126 companies; 52%) that have disclosed consistently on their management of deforestation between 2020 and 2023 now report that they are close to eradicating deforestation for at least one commodity they source.

- This represents a substantial 40% increase from the number of companies reporting the same in 2020 (90 companies).

- Overall, this still represents only a small group of companies – 35% of all companies disclosing in 2023 claiming to be nearly deforestation-free *1* for at least one commodity (189 companies).

Exhibit 7 to Decl. of Burton
383
**SER 2198**

7/22/24, 3:53 PM                                    CDP 2023 disclosure data factsheet - CDP



The slow rate of action and transition to no-deforestation is leaving companies and financial institutions exposed to risks as a resilient economy cannot be accomplished without progress on deforestation. In 2022, nearly four million hectares of pristine forests were destroyed, releasing 2.5 Gt $CO_2e$ – equivalent to the annual fossil fuel emissions of India[2].

## Emissions disclosure

Exhibit 7 to Decl. of Burton
384
**SER 2199**

7/22/24, 3:53 PM                                         CDP 2023 disclosure data factsheet - CDP



## Key messages

- **In the last nine years, reported reductions in water withdrawal volumes have decreased** among roughly half of the 223 companies that have disclosed consistently on water during this time.

- **While disclosure of emissions is increasingly mainstreamed** as seen in a relatively high disclosure rate of Scope 1 and 2 emissions, this is just the start, as **only 37% of companies disclosed emissions across all three scopes**.

- **In the past three years, there has been a substantial increase in the number of companies reporting they are close to eradicating deforestation** for at least one commodity (40%; 90 companies). However this still only represents a small group of companies. **The rate of action and transition to no-deforestation needs to be accelerated.**

Spotlight: energy

CDP's growing number of energy disclosures indicates that companies and financial institutions are embracing the transition to a low-carbon economy and are aiming for transparency. While leading companies are setting targets to enhance their renewable energy consumption, the majority are still lagging behind in quality disclosures.

Exhibit 7 to Decl. of Burton
385

**SER 2200**

7/22/24, 3:53 PM
CDP 2023 disclosure data factsheet - CDP

🔍  👤 Sign in  ☰

Disclose

Disclosed ene



## Disclosure on energy usage

- 56% of the 23,000+ disclosers in 2023 (13,000+) disclosed how much energy they used.

- 31% of these companies (4,030) disclosed having no energy consumption from renewable sources.

## Disclosure on renewable energy targets

- Only 10% of all disclosing organizations (2,229) have set renewable energy consumption targets.

- About two-thirds of these organizations disclosed that they aim for 90-100% renewable energy consumption. Of these, 70% have a target date of 2030 or earlier.

## Renewable energy, deforestation and biodiversity

While the transition to 100% renewable energy use is crucial to mitigate climate change, the source of renewable energy used matters.

- Some forms of renewable energy could cause more issues than they would solve. For example, biofuel production can be associated with land use changes that can cancel out any emissions benefits as well as having negative impacts on biodiversity and food production.

Exhibit 7 to Decl. of Burton
386
**SER 2201**

7/22/24, 3:53 PM                                    CDP 2023 disclosure data factsheet - CDP

🔍   👤 Sign in   ☰

### The Energy-Water Nexus

- In 2023, 180 companies across the sectors critical to the energy transition – power generation, fossil fuels and metallic mineral mining – disclosed their water risks, impacts and opportunities. However, 637 companies were requested to do so. At 21%, the response rate for companies operating in the fossil fuel sector was staggeringly low, despite the critical impact this sector has on water availability and quantity. Pressures on water availability need to be carefully managed if the world wants to reach zero emissions and adapt to the impacts of extreme weather events.



The good news is that the majority of disclosing companies in these sectors are conducting water-related risk assessments. 80% of companies in the fossil fuel industry did so (compared to 62% across all reporting industries). These assessments are paramount, to enable companies to anticipate and mitigate risks that could have substantive impacts on their operations, as well as surrounding communities and ecosystems.

### Financial institution exposure to fossil fuels

- Almost 50% of the 575 financial institutions that disclosed in 2023 report holding an estimated US$9 trillion in fossil fuel financing across their portfolios – equivalent to the **combined GDP of Japan and Germany**.

Exhibit 7 to Decl. of Burton
387
**SER 2202**

7/22/24, 3:53 PM                                   CDP 2023 disclosure data factsheet - CDP

Sign in

- Most of the 13,000 companies that disclosed on their energy consumption report that they **use renewable energy in their energy mix**.

- However, 44% of the overall number of disclosing companies are **still not reporting on their energy consumption data**. In the transition to a low-carbon economy, **stakeholders – including investors – must encourage comprehensive disclosure from all companies** to improve transparency and a better understanding of corporate environmental impact and risk exposure.

- Although companies have begun embracing the transition to renewable energy, **ambition is still lacking** with only 10% of all disclosers setting targets for renewable energy consumption.

- **It is important for the renewable energy transition to rely on sources of renewable energy which do not have negative impacts on nature and climate.** For example, the use of wood-based biomass can result in an increase in deforestation and worsening of the biodiversity crisis.

- **Greater accountability on water impact disclosure is needed from the energy sector.** Investors must call for increased transparency from companies in this sector in relation to their high impact on water resources.

- **Financial institutions have a significant exposure to carbon-intensive assets across their portfolio.** They must take more ambitious steps towards phasing out fossil fuels across their portfolios to meet targets.

Environmental risks and opportunities

## Climate-related risks and opportunities

Of the total number of companies that disclosed on climate change:

- 52% of disclosing companies (11,998) reported identifying exposure to inherent climate-related risks that potentially posed substantive financial or strategic impact on their business.

- 63% of disclosing companies (14,707) identified climate-related opportunities with the potential for substantive financial or strategic impact on their business.

## Forests-related risks and opportunities

Of the total number of companies that disclosed on forests:

- 65% of disclosing companies (572) identified exposure to inherent forest-related risks that potentially posed substantive financial or strategic impact on their business (for at least one commodity).

- 73% of disclosing companies (647) identified forest-related opportunities with the potential for substantive financial or strategic impact on their business (for at least one commodity).

Exhibit 7 to Decl. of Burton
388

**SER 2203**

7/22/24, 3:53 PM                                         CDP 2023 disclosure data factsheet - CDP

🔍  👤 Sign in  ☰

Of the total number of companies that disclosed on water:

- 44% of disclosing companies (2,096) identified exposure to inherent water-related risks that potentially posed substantial financial or strategic impact on their business.

- 50% of disclosing companies (2,431) identified water-related opportunities with the potential for substantive financial or strategic impact on their business.

**1/6**   ‹  ❯   Click the arrows to cycle through the risk and opportunity breakdowns.

## Reported climate risk types





Exhibit 7 to Decl. of Burton
389
**SER 2204**

7/22/24, 3:53 PM                                         CDP 2023 disclosure data factsheet - CDP

 Sign in ≡

## Financial impact value across themes – disclosers of risk

Financial impact of disclosed risks (in US$)

$5,000,000,000,000

$4,000,000,000,000

$3,000,000,000,000

Due to the complexities of risk reporting, some risks may have been reported and accounted for under more than one theme. Therefore simply adding together the figures for the three themes may result in double-counting.



## Financial impact value across themes – disclosers of opportunities

Financial value of disclosed opportunities (in US$)



Exhibit 7 to Decl. of Burton
390
**SER 2205**

7/22/24, 3:53 PM                                    CDP 2023 disclosure data factsheet - CDP

🔍    👤 Sign in    ☰

- **Most disclosing companies identified risks and opportunities** which potentially posed substantial financial or strategic impact on their business.

- **More companies have identified opportunities than risks**, across all themes.

- **It is less costly for businesses to manage their risks** than bear the potential financial impact of these risks materializing, across all themes.

Spotlight: financial institution disclosures

## Portfolio emissions targets

In 2023, 575 financial institutions (FIs) disclosed to the Financial Services questionnaire.

- Only 37% reported having set a portfolio target – up from 29% (out of 556 institutions) in 2022.

- Meanwhile, 38% reported targets that only cover their operational emissions.

- 25% did not report any targets at all.

## FIs assessing portfolio impacts by theme

Exhibit 7 to Decl. of Burton
391
**SER 2206**

7/22/24, 3:53 PM                                        CDP 2023 disclosure data factsheet - CDP

Measuring portfolio impact    Not measuring portfolio impact



### Key messages

- **An increasing number of FIs are beginning to measure their portfolio impacts across themes**. The number of FIs that disclosed measuring their portfolio impact on climate rose from 66% in 2022 to 72% in 2023.

- **A significant gap remains in forest and water-related metrics** despite this increase in FIs measuring climate-related impact. Only 13% reported that they measure their portfolio impacts on either one or both themes.

- Despite notable improvements since 2022, **FIs are still falling short on the scale of action needed for robust portfolio target-setting**. There is significant ground to cover. As CDP's 2022 Financial Services Disclosure report shows, although portfolio emissions of global FIs are on average over 750x larger than their operational emissions, about 40% of them still only reported operational emissions targets, and 25% reported no targets at all.

---

### Footnotes

1. 'Nearly-deforestation free' is defined as companies that:

- have comprehensive zero deforestation commitments or policies;
- have a system to control, monitor and verify compliance across their supply chain; and
- report that more than 90% of their volumes are compliant.

All analysis is based on reported volumes. Claims have not been verified by CDP.

2. Source: World Resources Institute (2022) Forest Pulse: The Latest on the World's Forests.

Exhibit 7 to Decl. of Burton
392
**SER 2207**

7/22/24, 3:53 PM                                    CDP 2023 disclosure data factsheet - CDP

  <u>Sign in</u> 

## Further resources



Report

**South Africa Snapshot: Environmental disclosure and progress in 2023**

This report provides insights into the disclosure practices and performance of all South African public responses to the three CDP questionnaires submitted during the 2023 reporting period.

↓ **Download**   Middle East & Africa

Exhibit 7 to Decl. of Burton
393
**SER 2208**

7/22/24, 3:53 PM                                    CDP 2023 disclosure data factsheet - CDP



Report
**Global Forests Report 2024 (Spanish)**

CDP's latest forests report looks at how global companies can shift to deforestation-free supply chains.

↓ _Download_   Global

Exhibit 7 to Decl. of Burton
394
**SER 2209**

7/22/24, 3:53 PM                                     CDP 2023 disclosure data factsheet - CDP

Sign in



Policy briefing

**CDP Navigating Troubled Waters**

Read CDP's new briefing for directors of financial institutions on why they need to care about the water crisis.

↓ **Download**      2024-06-20 09:00:00 +0100      Global

Load more



Still need help? Contact us.

© 2024 CDP Worldwide
Registered Charity no. 1122330
VAT registration no: 923257921

A company limited by guarantee registered in England no. 05013650

| Accredited solutions providers | Cookies |
| Offices | Privacy |
| Staff | Terms & Conditions |
| Trustees, board and advisors | Careers |

Exhibit 7 to Decl. of Burton
395
**SER 2210**

7/22/24, 3:53 PM                                    CDP 2023 disclosure data factsheet - CDP

  Sign in

▶ YouTube

ⓥ Vimeo

Exhibit 7 to Decl. of Burton
396
**SER 2211**

# Exhibit 4

# to Declaration of James P. Burton

# Soto, M, *GHG Protocol Scope 2 Guidance,* World Resources Institute (2023),

https://ghgprotocol.org/sites/default/files/2023-03/Scope%202%20Guidance.pdf

Exhibit 4 to Decl. of Burton
157
**SER 2212**

Case 2:24-cv-00801-ODW-PVC Document 53-4 Filed 07/24/24 Page 2 of 121 Page ID #:1803



# *GHG Protocol Scope 2 Guidance*

**An amendment to the GHG Protocol Corporate Standard**





Exhibit 4 to Decl. of Burton
158
**SER 2213**

**AUTHOR**

Mary Sotos

**GHG PROTOCOL TEAM**

Pankaj Bhatia, World Resources Institute

Cynthia Cummis, World Resources Institute

Mark Didden, World Business Council for Sustainable Development

Alex Kovac, World Resources Institute

Josh Ryor, World Resources Institute

Amanda Stevens, World Resources Institute

Exhibit 4 to Decl. of Burton

159

**SER 2214**

## Table of Contents

| 1 | Introduction | 4 |
|---|---|---|
| 2 | Business Goals | 14 |
| 3 | Accounting and Reporting Principles | 20 |
| 4 | Scope 2 Accounting Methods | 24 |
| 5 | Identifying Scope 2 Emissions and Setting the Scope 2 Boundary | 32 |
| 6 | Calculating Emissions | 42 |
| 7 | Accounting and Reporting Requirements | 58 |
| 8 | Recommended Reporting on Instrument Features and Policy Context | 66 |
| 9 | Setting Reduction Targets and Tracking Emissions Over Time | 74 |

### BACKGROUND READING

| 10 | Key Concepts and Background in Energy Attribute Certificates and Claims | 78 |
|---|---|---|
| 11 | How Companies Can Drive Electricity Supply Changes with the Market-Based Method | 88 |

### APPENDICES

| A | Accounting for Steam, Heat, and Cooling | 94 |
|---|---|---|
| B | Accounting for Energy-Related Emissions Throughout the Value Chain | 96 |

| Abbreviations | 98 |
|---|---|
| Glossary | 99 |
| References | 108 |
| Recognitions | 111 |

Exhibit 4 to Decl. of Burton
160
**SER 2215**

# *Detailed Table of Contents*

**1   INTRODUCTION** — 4
1.1   The GHG Protocol — 5
1.2   The *Corporate Standard*'s approach to scope 2 emissions — 5
1.3   Key questions on scope 2 accounting and reporting — 6
1.4   Purpose of this Guidance — 7
1.5   Guidance overview — 7
1.6   Who should use this Guidance? — 8
1.7   How should I use this Guidance? — 9
1.8   How was this Guidance developed? — 10
1.9   Changes from the *Corporate Standard* — 10
1.10  Relationship to the GHG Protocol *Corporate Standard* and *Scope 3 Standard* — 10
1.11  What does this Guidance not address? — 12

**2   BUSINESS GOALS** — 14
2.1   Business goals of scope 2 accounting and reporting — 15
2.2   Identify and understand risks and opportunities associated with emissions from purchased and consumed electricity — 15
2.3   Identify GHG reduction opportunities, set reduction targets, and track performance — 19
2.4   Engage energy suppliers and partners in GHG management — 19
2.5   Enhance stakeholder information and corporate reputation through transparent public reporting — 19

**3   ACCOUNTING AND REPORTING PRINCIPLES** — 20

**4   SCOPE 2 ACCOUNTING METHODS** — 24
4.1   Approaches to accounting scope 2 — 25
4.2   Emission rate approach — 27
4.3   The decision-making value of each method's results — 28

**5   IDENTIFYING SCOPE 2 EMISSIONS AND SETTING THE SCOPE 2 BOUNDARY** — 32
5.1   Organizational boundaries — 33
5.2   Operational boundaries — 33
5.3   Defining scope 2 — 34
5.4   Distinguishing scopes reporting by electricity production/distribution method — 35
5.5   Avoiding double counting in scope 2 — 39
5.6   Avoiding double counting between owned energy generation assets (scope 1) and grid-delivered energy consumption in separate operations (scope 2) — 39

**6   CALCULATING EMISSIONS** — 42
6.1   Identify GHG emissions sources for scope 2 — 43
6.2   Determine whether the market-based method applies for any operations — 43
6.3   Collect activity data — 44
6.4   Identify distribution scenarios and any certificate sales — 44
6.5   Choose emission factors for each method — 45
6.6   Match emission factors to each unit of electricity consumption — 49
6.7   Calculate emissions — 49
6.8   Roll up GHG emissions data to corporate level — 52
6.9   Optional: Calculate any avoided emissions and report separately — 52
6.10  Location-based emission factors — 53
6.11  Market-based emission factors data — 54
6.12  Treatment of biofuel emissions — 57

Exhibit 4 to Decl. of Burton
161

**SER 2216**



*Detailed Table of Contents*

**9    SETTING REDUCTION TARGETS AND TRACKING EMISSIONS OVER TIME**    74
9.1    Setting a base year    75
9.2    Recalculating base-year emissions    75
9.3    Setting GHG targets    76
9.4    Energy targets    76

**10    KEY CONCEPTS AND BACKGROUND IN ENERGY ATTRIBUTE CERTIFICATES AND CLAIMS**    78
10.1    Introduction to energy attribute tracking    79
10.2    Defining energy attribute certificates    80
10.3    Certificate uses    84
10.4    Supplier disclosure    84
10.5    Supplier quotas, for the delivery or sales of specific energy sources    85
10.6    Tracking tax/levy exemptions    86
10.7    Voluntary consumer programs    86
10.8    How jurisdictional policies affect the role and impact of voluntary programs    87

**11    HOW COMPANIES CAN DRIVE ELECTRICITY SUPPLY CHANGES WITH THE MARKET-BASED METHOD**    88
11.1    Energy attribute supply and demand    89
11.2    Relationship between voluntary program impact and scope 2 accounting    90
11.3    The role of "additionality"    90
11.4    How can companies go further?    91

**APPENDICES**    93
A    Accounting for steam, heat, and cooling    94
B    Accounting for energy-related emissions throughout the value chain    96

**7    ACCOUNTING AND REPORTING REQUIREMENTS**    58
7.1    Required information for scope 2    59
7.2    Recommended disclosure    61
7.3    Optional information    61
7.4    Dual reporting    62
7.5    Additional guidance on Scope 2 Quality Criteria    63

**8    RECOMMENDED REPORTING ON INSTRUMENT FEATURES AND POLICY CONTEXT**    66
8.1    Instrument feature disclosure    67
8.2    Reporting on the relationship between voluntary purchases and regulatory policies    69

Exhibit 4 to Decl. of Burton
162
**SER 2217**

Case 2:24-cv-00801-ODW-PVC   Document 53-4   Filed 07/24/24   Page 7 of 121   Page ID #:1808

# 1 *Introduction*



Exhibit 4 to Decl. of Burton
163
**SER 2218**

**T**he Greenhouse Gas (GHG) Protocol is a multistakeholder partnership of businesses, nongovernmental organizations (NGOs), governments, and others convened by the World Resources Institute (WRI) and the World Business Council for Sustainable Development (WBCSD).

Launched in 1998, the GHG Protocol seeks to develop internationally accepted GHG accounting and reporting standards and tools to promote their adoption worldwide. To date, the GHG Protocol has released four standards that address how GHG emissions inventories should be prepared at the corporate, project, and product levels.

### 1.1    The GHG Protocol

- **Corporate-level.** The *GHG Protocol Corporate Accounting and Reporting Standard* (*Corporate Standard*) outlines a standard set of accounting and reporting rules for developing corporate inventories. The *Corporate Standard* identifies and categorizes the emissions from all of the operations that together comprise an organization (the term "company" is used to represent all types of organizations using the *Corporate Standard* and this *Scope 2 Guidance*).

  Building from the *Corporate Standard*, the *GHG Protocol Corporate Value Chain (Scope 3) Accounting and Reporting Standard* provides additional requirements and guidance on developing comprehensive inventories of other indirect (scope 3) emissions.

- **Project-level.** The *GHG Protocol for Project Accounting* (*Project Protocol*) describes how companies can quantify the GHG impacts of specific projects undertaken to reduce emissions, avoid emissions occurring in the future, or sequester carbon.

- **Product-level.** The GHG Protocol *Product Life Cycle Accounting and Reporting Standard* (*Product Standard*) describes how companies can develop GHG emissions inventories, including the entire life cycle of individual products or services—from raw material extraction to product disposal.

These publications, together with supplementary guidance for specific sectors or types of sources, are available from the GHG Protocol website (www.ghgprotocol.org).

### 1.2    The *Corporate Standard*'s approach to scope 2 emissions

The *Corporate Standard* requires organizations to quantify emissions from the generation of acquired and consumed electricity, steam, heat, or cooling (collectively referred to as "electricity"). These emissions are termed "scope 2" and are considered an indirect emissions source (along with scope 3), because the

5

Exhibit 4 to Decl. of Burton
164
**SER 2219**

emissions are a consequence of activities of the reporting organization but actually occur at sources owned or controlled by another organization (here, they are owned or controlled by an electricity generator or utility).

Scope 2 represents one of the largest sources of GHG emissions globally: the generation of electricity and heat now accounts for at least a third[1] of global GHG emissions. Electricity consumers have significant opportunities to reduce those emissions by reducing electricity demand, and increasingly play a role in shifting energy supply to alternative low-carbon resources.

The methods used to calculate and report scope 2 emissions critically impact how a company assesses its performance and what mitigation actions are incentivized. To calculate scope 2 emissions, the *Corporate Standard* recommends multiplying activity data (MWhs of electricity consumption) by source and supplier-specific emission factors to arrive at the total GHG emissions impact of electricity use. It also emphasizes the role of green power programs in reducing emissions from electricity use.[2] Only if these forms of information about electricity supply are unavailable are companies advised to use statistics such as local or national grid emission factors.

### 1.3 Key questions on scope 2 accounting and reporting

Since the publication of the *Corporate Standard* revised edition, companies and their stakeholders identified conceptual and technical challenges with the existing recommendations on scope 2 accounting and reporting, including the fundamental question:

- **How should renewable energy purchases be reflected in scope 2 reporting?** Previously, some companies (particularly in the U.S.) adjusted their scope 2 emissions by using an estimate of the avoided fossil fuel emissions from the grid associated with their purchase of renewable energy certificates (RECs) and deducting this from their scope 2 total calculated by grid-average emission factors. Others treated purchases as an emission factor conveying a "zero emission rate" in scope 2 calculations rather than using avoided grid emissions. Still others treated participation in green

power programs effectively as a donation, with no impact on the GHG inventory. The variety of accounting methods made it difficult for a company to consistently account and report scope 2 emissions across multiple countries.

Underlying this accounting and reporting question were three main types of questions, relating to:

### Instruments

- **What constitutes a renewable energy purchase?** In several countries and energy markets around the world, new instruments have been developed to track energy production information (or its "attributes") separately from actual energy delivery. These instruments—termed here "energy attribute certificates"—typically flow from energy generation facilities to energy suppliers and ultimately energy consumers in order to support consumer claims about the type of energy used and its related attributes—such as GHG emissions—produced at the point of generation.

  Some certificates, such as the Guarantee of Origin (GO) in Europe, were envisioned as a way to support energy supplier disclosure and inform consumer choice as energy markets were liberalized. The renewable energy certificate (REC) in the United States and Canada serves a regulatory role in states with renewable energy supplier quotas, as well as a voluntary role for consumers who want to purchase and support renewables. The *Corporate Standard* did not state which of these types of instruments could be appropriate for a scope 2 consumer claim, or whether other types of contractual instruments—such as direct contracts with a renewable energy generator—could fulfill a similar role.

- **What is included in a supplier-specific emission factor?** Electricity suppliers compile emission rates for a variety of purposes. Some supplier emission rates may reflect only the emissions from utility-owned assets, while others also reflect power purchased by the utility from an independent energy generation facility. Many green power programs have been offered directly by utilities, segmenting different emission rates for different consumer classes. Supplier disclosure requirements and calculation methodology differ, making it difficult for consumers to consistently use this type of information.

Exhibit 4 to Decl. of Burton
165
**SER 2220**

*CHAPTER 1* Introduction

- **How comparable are green power programs?**
Companies operating in multiple countries identified differences in the eligibility criteria used in different green power products—that is, the specifications regarding the age of a generation facility, the type of technology, whether it received public subsidy or was entirely funded by voluntary purchases, etc. While these differences do not impact the actual GHG emission rate from energy production represented in the green power product, they may matter for companies with other environmental or social goals associated with their energy procurement.

## Concept

- **How can a company claim to use only renewable energy if it uses inherently untraceable grid-distributed energy?** Most energy grids provide energy for hundreds of thousands of consumers over the course of a day with a blend of energy generation facilities, including a heavy share of fossil fuel plants in most grids. By design, energy attribute certificates like RECs and GOs are separate from the physical distribution of energy. They act as a tool to convey claims and influence market dynamics by allowing the expression and aggregation of consumer preferences for specific low-carbon energy products, which would not otherwise be possible. Consumers cannot choose what energy is generated on their grid at a given point in time, but contractual instruments allow for energy attributes such as GHG emissions to be allocated along the lines of contractual relationships among producers, suppliers, and consumers.

- **If green power is used by some companies, how does that impact the emissions reported by other consumers?** The *Corporate Standard* does not address potential double counting between consumers of emissions associated with green power instruments. But implementing a credible and robust system for GHG emission rate calculation and claims based on contractual instruments—such as GOs, RECs, or supplier-specific emission rates—would require that only one consumer reports the emissions from a given quantity of generation.

## Impact on global emissions

- **Do green power programs directly or indirectly reduce GHG emissions over time?** Emissions from a grid region decrease over time due to a combination of lowered energy demand and changes in supply to lower-emitting facilities. The *Corporate Standard* acknowledges that linking consumer behavior and choices with a grid system's emissions is complex and nonlinear.[3] When it comes to green power products, a single company's purchase via a supplier or through a direct contract may not itself change overall grid emissions at the time of purchase. This is because most green power products are based on instruments from existing energy generation facilities. Most voluntary green power programs are designed to translate consumer demand for certain types of energy into changes *over time* in the supply of that energy. When demand increases, it pushes up the price of these attributes, therefore creating an incentive to expand the supply of low-carbon generation facilities. Whether a market for attributes actually results in new low-carbon supply depends on several factors, including the level of consumer demand and the supply of attributes available.[4]

The lack of clear and consistent guidance on these questions created uncertainty about emission reduction strategies and prevent company inventories from reflecting a true and fair account of emissions.

## 1.4   Purpose of this Guidance

This guidance acts as an amendment to the *Corporate Standard,* providing updated requirements and best practices on scope 2 accounting and reporting. It aims to answer the questions articulated in section 1.3. The revisions in this guidance should enhance the completeness, consistency, transparency, and accuracy of reported scope 2 totals. Companies can use these reported totals to set targets, reduce GHG emissions, track progress, and inform their stakeholders.

## 1.5   Guidance overview

This guidance codifies two distinct methods for scope 2 accounting, each with a list of appropriate emission factors. Both methods are useful for different purposes; together, they provide a fuller documentation and assessment of risks, opportunities, and changes to emissions from electricity supply over time.

Exhibit 4 to Decl. of Burton
166
**SER 2221**

A *location-based method* reflects the average emissions intensity of grids on which energy consumption occurs (using mostly grid-average emission factor data). A *market-based method* reflects emissions from electricity that companies have purposefully chosen (or their lack of choice). It derives emission factors from contractual instruments, which include any type of contract between two parties for the sale and purchase of energy bundled with attributes about the energy generation, or for unbundled attribute claims. Markets differ as to what contractual instruments are commonly available or used by companies to purchase energy or claim specific attributes about it, but they can include energy attribute certificates (RECs, GOs, etc.), direct contracts (for both low-carbon, renewable, or fossil fuel generation), supplier-specific emission rates, and other default emission factors representing the untracked or unclaimed energy and emissions (termed the "residual mix") if a company does not have other contractual information that meets the Scope 2 Quality Criteria.

See Box 1.1 for an overview of key terms related to scope 2 in this guidance.

### 1.5.1   New reporting requirements

Companies with any operations in markets providing product or supplier-specific data in the form of contractual instruments **shall** report scope 2 emissions in two ways and label each result according to the method: one based on the location-based method, and one based on the market-based method. This is also termed "dual reporting."

Not having contractual data for every site will not cause noncompliance with the GHG Protocol *Corporate Standard* and *Scope 2 Guidance*. As with scope 3, a range of data may be available. Companies should consult the hierarchy of emission factors for both location-based and market-based methods. Any data on those hierarchies (including using location-based emission factors in the absence of contractual information) is acceptable.

### 1.5.2   Scope 2 Quality Criteria for the market-based method data

To make the market-based method globally consistent and capable of producing accurate results, this guidance establishes required Scope 2 Quality Criteria that all contractual instruments must meet. These Scope 2 Quality Criteria are policy-neutral and represent the minimum features necessary for instruments to function together as a complete market-based emission allocation system for consumers. Companies without contractual instruments that meet the Scope 2 Quality Criteria may use other emission factors (listed in Chapter 6).

### 1.5.3   Other disclosure

To encourage transparency and improve comparability of energy and energy attribute purchases from different markets, this guidance also recommends additional reporting disclosure about the energy generation features and policy contexts in which the purchase occurs. Separately disclosing total electricity, steam, heat, and cooling consumed per reporting period (in kWh, MWh, BTU, etc.) can also enhance transparency and clarify changes in consumption vs. changes in supply.

## 1.6   Who should use this Guidance?

This guidance acts as an amendment to the *Corporate Standard*, so all organizations compiling a corporate GHG inventory following the *Corporate Standard*—including companies, governments, NGOs, and other organizations—should use this guidance. The term "companies" is used throughout this document as shorthand for any organization compiling a corporate inventory.

In addition, energy suppliers, utilities, grid operators, and marketers offering voluntary green power programs providing product information to consumers should read this guidance to understand the type of information that customers may be requesting to calculate their scope 2 inventories following the market-based method.

Government entities involved in regulating energy and/or establishing frameworks and rules for consumer electricity choices should be informed about the requirements of this guidance. The relationships between regulatory programs (such as supplier quotas or public subsidies for renewable energy) and voluntary consumer programs are explored in Chapter 10.

Exhibit 4 to Decl. of Burton
167
**SER 2222**

**CHAPTER 1** *Introduction*

**Box 1.1** **Key terms**

Some terms used in this guidance are used for precision but are synonymous with other more familiar terms. For example:

**Contractual instruments:** Any type of contract between two parties for the sale and purchase of energy bundled with attributes about the energy generation, or for unbundled attribute claims. Markets differ as to what contractual instruments are commonly available or used by companies to purchase energy or claim specific attributes about it, but they can include energy attribute certificates (RECs, GOs, etc.), direct contracts (for both low-carbon, renewable, or fossil fuel generation), supplier-specific emission rates, and other default emission factors representing the untracked or unclaimed energy and emissions (termed the residual mix) if a company does not have other contractual information that meets the Scope 2 Quality Criteria.

**Energy attribute certificate:** A category of contractual instrument that represents certain information (or attributes) about the energy generated, but does not represent the energy itself. This category includes a variety of instruments with different names, including certificates, tags, credits, or

generator declarations. For the purpose of this guidance, the term "energy attribute certificates" or just "certificates" will be used as the general term for this category of instruments.

**Energy generation facility:** Any technology or device that generates energy for consumer use, including everything from utility-scale fossil fuel power plants to rooftop solar panels.

**Energy supplier:** Also known as an electric utility, this is the entity that sells energy to consumers and can provide information regarding the GHG intensity of delivered electricity.

**Generators:** Here used to mean the entity that owns or operates an energy generation facility.

**Green power product/green tariff:** A consumer option offered by an energy supplier distinct from the "standard" offering. These are often renewables or other low-carbon energy sources, supported by energy attribute certificates or other contracts.

## 1.7   How should I use this Guidance?

This guidance replaces requirements and guidance on scope 2 in the *Corporate Standard*. It is divided into two parts:

- Chapters 1 through 9 provide requirements and practical recommendations on how to establish accounting boundaries, how to calculate emissions, and how to report emissions totals according to both methods in conformance with the guidance.

- Chapters 10 and 11 are optional background reading that addresses the broader concepts, principles, and examples of how energy markets worldwide have used contractual instruments to convey energy attributes (the basis of the market-based method). These chapters address how consumers can use their voluntary procurement power to accelerate the deployment of low-carbon energy to reduce overall emissions from the electricity system, while retaining the necessary

instruments to make GHG claims in a market-based scope 2 total.

- Readers should also consult a supplemental compilation of case studies describing how a variety of organizations have implemented the new requirements of this Scope 2 Guidance. (Available at: ghgprotocol.org.)

The term "electricity" in this guidance is used to represent all purchased energy, but the guidance is primarily on electricity accounting. Appendix A indicates how these methods apply to heat/steam/cooling accounting as well.

### 1.7.1   Terminology: shall, should, may

This guidance uses precise language to indicate accounting and reporting requirements, recommendations, and allowable options that companies may choose to follow.

- The term **"shall"** is used throughout this document to indicate what is required in order for a GHG inventory to

Exhibit 4 to Decl. of Burton
168
**SER 2223**

be in conformance with the *Scope 2 Guidance* and by extension the GHG Protocol *Corporate Standard*.

- The term **"should"** is used to indicate a recommendation, but not a requirement.

- The term **"may"** is used to indicate an option that is permissible or allowable.

The term "required" is used in the guidance to refer to requirements. "Needs," "can," and "cannot" may be used to provide recommendations on implementing a requirement or to indicate when an action is or is not possible.

## 1.8 How was this Guidance developed?

This guidance represents a policy-neutral, collaborative solution guided by GHG Protocol principles. It was developed over four years of international consultation and discussion with participation from businesses, NGOs, GHG reporting programs, energy utilities and retailers, renewable energy certification programs, government agencies, and scientific and academic institutions from around the world. It included:

- **Scoping Workshops.** From December 2010 to May 2011, WRI and WBCSD launched this process through a series of workshops in Washington, London, and Mexico City using short discussion drafts.

- **A Technical Working Group (TWG).** Formed in summer 2011, the TWG contributed to discussion papers, conference presentations, and draft proposals on accounting and reporting solutions. Discussion papers included topics such as:
  - Defining the principles of market-based systems: attributes, ownership, eligibility (Winter 2011)
  - Identifying objectives, background, and challenges with scope 2 accounting (Summer 2012)
  - Analyzing the relationship between indirect emissions accounting and system-wide reductions (December 2012)

- **Public Comment Period.** Draft guidance was made available for public comment from March 2014–May 2014, including six webinars and three in-person workshops in London, Dusseldorf, and Washington.

## 1.9 Changes from the *Corporate Standard*

This guidance introduces accounting and reporting requirements related to scope 2 that replace and add to those in the *Corporate Standard*. It also sets Scope 2 Quality Criteria that contractual instruments **shall** meet in order to be used in the market-based method. To prepare an inventory in conformance with the *Corporate Standard*, companies **shall** follow all new requirements in this guidance. These changes are summarized in Table 1.1.

## 1.10 Relationship to the GHG Protocol *Corporate Standard* and *Scope 3 Standard*

To prepare an inventory in conformance with the *Corporate Standard*, companies **shall** follow all new requirements in this *Scope 2 Guidance*.

In turn, the *Scope 3 Standard* intersects with scope 2 in several ways:

- The *Scope 2 Guidance* impacts how companies will communicate their scope 2 emissions to other value chain partners downstream and what type of scope 2 data they may receive from its value chain partners.

- The *Scope 2 Guidance* impacts how a company assesses the upstream emissions associated with its energy use (category 3—upstream energy emissions not recorded in scope 1 and 2, scope 3).

In both cases, a company **shall** disclose whether a market-based or location-based scope 2 total is used as the basis for calculating scope 3, category 3 (fuel- and energy-related emissions not included in scope 1 or scope 2).

Exhibit 4 to Decl. of Burton
169
**SER 2224**

*CHAPTER 1 Introduction*

**Table 1.1** Additions to scope 2 accounting introduced by Scope 2 Guidance

| Topic | How addressed in the *Corporate Standard* | How addressed in the *Scope 2 Guidance* |
|---|---|---|
| **Obtaining activity data (kWh)** | Consult utility bills. | No change from *Corporate Standard*, but additional guidance for on-site consumption and sales including net metering programs (see Chapter 5). |
| **Disclosing activity data (kWh)** | No requirement. | Companies should disclose total consumed electricity within inventory boundary. |
| **Emission factors** | Hierarchy presented starting with source and supplier-specific, and then grid average. | Two distinct methods of scope 2 accounting required, each with their own hierarchy of emission factors. |
| **Green power programs—which instruments can count?** | Example of a company, IBM, working with a local electricity supplier, Austin Energy, to purchase renewable energy to reduce scope 2 emissions.[a] Example of a utility, Seattle City Light, providing emission rate information to customers.[b]  Example of a company, Alcoa, purchasing RECs in the U.S. to reduce emissions, based on an avoided emissions estimation and deduction accounting approach.[c] | Market-based method goes beyond just green power programs and recognizes a category of contractual instruments that should be used when calculating a market-based scope 2 result. These instruments may not be for green power or even renewable energy. They include: <br><br> • Energy attribute certificates (GOs, RECs) <br><br> • Direct contracts such as power purchase agreements (PPAs), where other instruments or energy attribute certificates do not exist <br><br> • Supplier-specific emission rates <br><br> • Residual mix (e.g., the emissions rate left after the three other contractual information items are removed from the system) <br><br> Guidance provides global examples of each contractual instrument type provided. |
| **Contractual instrument requirements** | No requirements given. | All contractual instruments shall meet Scope 2 Quality Criteria to be used in the market-based method calculation. If they do not meet the Scope 2 Quality Criteria, then other data (listed in Table 6.3) shall be used as an alternative in the market-based method total. In this way, all companies required to report according to the market-based method will have some type of data option. |
| **Accounting of green power purchases** | No direct requirement, but example of U.S. avoided emissions calculation and deduction approach to RECs.[d] | Any type of energy or energy attribute purchase via a contractual instrument shall be treated in scope 2 like all other product information— an emission rate in tons GHG/unit of output (here, kWh) rather than an avoided emissions estimation and deduction. Companies then apply the emission factor derived from the contractual instrument to a quantity of energy consumption (activity data), consistent with the usage boundaries of that instrument. |

Exhibit 4 to Decl. of Burton
170
**SER 2225**

**Table 1.1** Additions to scope 2 accounting introduced by Scope 2 Guidance (continued)

| Topic | How addressed in *Corporate Standard* | How addressed in Scope 2 Guidance |
|---|---|---|
| **Reporting requirements** | Report one scope 2 result in $CO_2e$, as well as by GHG. | If companies have any operations in markets providing product or supplier-specific data in the form of contractual instruments, then companies shall account and report scope 2 emissions in two ways and label each result according to the method: one based on the location-based method, and one based on the market-based method meeting Scope 2 Quality Criteria are met. If companies only have operations in markets without product or supplier-specific data, then only one scope 2 result shall be reported, based on the location-based method. |
| | | Companies shall specify which method is used for goal-setting, tracking, and goal-achievement claims, and for scope 3 or product-level communication. |
| | | Companies should disclose key features of contractual instruments, including any certification labels, characteristics of the energy generation facilities themselves, and policy context. |

*Notes:*
[a] See *Corporate Standard* (WRI/WBCSD 2004), p. 14.
[b] See *Corporate Standard* (WRI/WBCSD 2004), p. 30.
[c] See *Corporate Standard* (WRI/WBCSD 2004), p. 63.
[d] See *Corporate Standard* (WRI/WBCSD 2004), p. 63.

## 1.11   What does this Guidance not address?

The market-based method codified in this guidance inherently requires systems for tracking and allocating electricity attributes from energy generators to end consumers. Most of these systems are formed by local or national policies, or interact closely with them. This guidance recognizes the role of these systems in providing information that meets the objectives of corporate GHG accounting: that is, reflecting the risks and opportunities associated with acquiring and consuming electricity and informing internal and external decisions to manage those emissions. However, like the *Corporate Standard*, this guidance is designed to be policy neutral. This means that it does not:

• Require the development of markets where none exist

• Make requirements or express preferences about the design of markets

• Address the non-GHG accounting aspects of energy policy or market-based accounting systems for consumers, including (a) social impacts and (b) financial costs or effectiveness relative to other policies at achieving specific climate abatement or other outcomes

• Define what should constitute "green" energy

• Identify "eligibility criteria" that would determine which types of electricity facilities should produce certificates or contractual instruments. The Scope 2 Quality Criteria in this Guidance relate to features required of the instruments themselves in order to support accurate accounting; the Criteria do not address which generation facilities should produce those instruments

• Promote specific energy generation technologies (such as renewable energy), or specific electricity labels or programs.

This guidance also does not list all contractual instruments, energy attribute certificates, or tracking systems used to date.

### Endnotes

1. IPCC (2014), based on global emissions from 2010.

2. See the *Corporate Standard* (WRI/WBCSD 2004), pp. 27–28, 42, and 61.

3. See *Corporate Standard* (WRI/WBCSD 2004), Chapter 8.

4. Some research (Gillenwater et al. 2014) has indicated that the voluntary REC market in the U.S., when evaluated based on the price of RECs as an incentive for project developers, has not itself driven new renewable energy projects.

Exhibit 4 to Decl. of Burton
171
**SER 2226**

*CHAPTER 1* Introduction

**Table 1.2 Which parts of the Guidance should I read?**

| Question | Reference |
|---|---|
| What are the changes this guidance introduces from the *Corporate Standard*? | Ch. 1 |
| What terms should I be familiar with to navigate this document? | Ch. 1, 4, 7, 10 and Glossary |
| What are the business goals for accounting for scope 2 in a corporate GHG inventory? | Ch. 2 |
| What principles should guide my approach to accounting and reporting scope 2 emissions? | Ch. 3 |
| What is the location-based method? | Ch. 4 |
| What is the market-based method? | Ch. 4 |
| What is the decision-making value of the results from each method? | Ch. 4 |
| How do I determine what energy uses should be included in the scope 2 boundary? | Ch. 5 |
| What are the calculation methods I should use for scope 2? | Ch. 6 |
| What kinds of emission factor data can I use for calculating scope 2 according to both methods? | Ch. 6 |
| How do I perform calculations according to both methods? | Ch. 6 |
| What are the criteria that instruments shall meet to be used as emission factors in the market-based method? | Ch. 7 |
| What are the reporting requirements of this guidance? | Ch. 7 |
| What else should I disclose about my purchases? | Ch. 8 |
| How do I show changes over time under both methods? | Ch. 9 |
| How do I set or track goals under one or both methods? | Ch. 9 |
| What is the background on the use of contractual instruments in tracking energy attributes? | Ch. 10 |
| What is the relationship between voluntary purchases and instruments used for mandatory compliance? | Ch. 10 and 11 |
| What is the relationship between offsets and energy attribute instruments? | Ch. 10 |
| How does my contractual purchasing drive change in low-carbon energy supply over time? | Ch. 11 |
| How does this guidance apply to accounting and reporting emissions from purchased heat, steam, and cooling? | Appendix A |
| How does this new scope 2 accounting and reporting requirement affect accounting for energy-related emissions in scope 3? | Appendix B |

13

Exhibit 4 to Decl. of Burton
172
**SER 2227**

Case 2:24-cv-00801-ODW-PVC   Document 53-4   Filed 07/24/24   Page 17 of 121   Page ID #:1818



## 2   *Business Goals*

Exhibit 4 to Decl. of Burton
173



**B**efore accounting for scope 2 emissions, companies should consider which business goal or goals they intend to achieve.

### 2.1  Business goals of scope 2 accounting and reporting

Before accounting for scope 2 emissions, companies should consider which business goal or goals they intend to achieve. Consistent with the *Corporate Standard* and *Scope 3 Standard*, companies consuming electricity may seek to:

- Identify and understand the risks and opportunities associated with emissions from purchased and consumed electricity

- Identify internal GHG reduction opportunities, set reduction targets, and track performance

- Engage energy suppliers and partners in GHG management

- Enhance stakeholder information and corporate reputation through transparent public reporting.

Each of these is elaborated below.

### 2.2  Identify and understand risks and opportunities associated with emissions from purchased and consumed electricity

Electricity is a vital input and resource for most corporate operations, but increasingly poses GHG-related risks. These liabilities arise from climate regulations targeting the energy sector, changing energy technology and fuel costs, tradeoffs between low-carbon sector goals and other environmental objectives (such as country-level policies banning nuclear), and changing consumer preferences for low-carbon products, as well as scrutiny from investors and shareholders over what energy choices a company makes and how it purchases energy. Scope 2 GHG reporting also can introduce reputational risks from GHG claims that are unsubstantiated or unknown.

The results of each scope 2 calculation method highlight different risks and opportunities associated with electricity purchasing and use. Furthermore, the actual contractual instruments claimed in the market-based method will shield or expose companies to different risks associated with the changing cost of energy and related GHG

15

Exhibit 4 to Decl. of Burton
174
**SER 2229**



emissions. Therefore, both methods can improve overall risk assessment and the ability to identify different opportunities to reduce that risk. Likewise, the results of only one scope 2 method may obscure GHG risks associated with energy use and miss mitigation opportunities. Finally, the disclosure of other key information about a company's energy procurement and usage will provide stakeholders insight and context into these risks (see Chapter 8 for a list of these disclosure items).

## Risks

Some of these risks include:

**Regulatory.** Corporate exposure to regulatory risks in the electricity sector depends on regulatory policy design. For instance, $CO_2$ taxes on electricity consumption may be levied equally on all consumers regardless of their supplier or product choice; based on $CO_2$ in a supplier's delivered product; or only to certain consumer classes where exemptions may exist (for example, the UK's

Climate Change Levy for nonresidential consumers, where a levy exemption certificate can be used to avoid the levy). In these circumstances, a contractual instrument for specified power may or may not shield companies from these additional costs. Customers of an electric utility generally bear the cost of environmental compliance for the resources owned by their utility, or the energy purchased by the utility, which would be shown in a utility-specific emission factor in the market-based method. Conversely, these costs and risks are not necessarily shared among all consumers equally on the same grid, which would otherwise be suggested by the location-based method.

**Energy costs and reliability.** Electricity suppliers may pass on to their customers the fluctuating prices of fossil or other fuel. The emissions from this supplier mix may be represented in that supplier's specific emission factor, making the market-based method an aligned representation of emissions and costs. At the same time, certain overall costs related to grid operation and maintenance could be

Exhibit 4 to Decl. of Burton
175
**SER 2230**

*CHAPTER 2 Business Goals*

allocated to all consumers regardless of their individual choice in electricity supplier, electricity product, or tariff. In addition, maintaining regional grid reliability often requires a mix of generation resources. The location-based method incorporates the GHG emissions of this mix into the grid average emissions factor, while the market-based method may allow users to only evaluate the GHG emissions associated with the energy generation represented in their purchased product—thereby missing some of the reliability risks faced by consumers in the entire grid.

Most companies reduce energy cost risks in part by reducing overall energy consumption. Some companies may be concerned that purchasing certificates annually allows for a "zero emissions" market-based total year-on-year, thereby lessening the impetus for companies to reduce their energy consumption. To mitigate this, the guidance recommends the separate reporting of overall energy consumption. Companies should also compare any additional costs associated with premiums for low-carbon energy supply documented in the market-based method, and compare how those can be reduced over time through decreased demand. In addition, purchasing and applying certificates to one year's inventory sets a precedent for continuing purchases in future years in order to report annual reductions, and cost ranges for certificates may vary each year.

**Reputation.** Prior to this guidance, companies may have reported scope 2 without fulfilling the Scope 2 Quality Criteria for the market-based method, leading to misleading claims and potential double counting between scope 2 inventories. Transparent disclosure about a company's energy procurement and its key attributes in the market-based method can help clarify the company's strategy and rationale.

**Product and Technology.** Companies may face decreased consumer demand for products made with high-GHG energy inputs. In turn, a company's competitors using low-GHG energy may see more competitive gains. Being able to compare companies' performances across similar scope 2 methods can help ensure that consumers understand the differences in a company's energy procurement choices.

**Legal.** Prior to this guidance, some companies with access to contractual information may have been only reporting location-based scope 2. However, many contractual instruments convey legally enforceable rights and claims that can affect how a company describes its purchases and its overall environmental performance. Neglecting to report a market-based scope 2 that aligns with those claims can expose companies to legal risks. In addition, if companies claim in scope 2 the use of instruments that do not meet the Scope 2 Quality Criteria (for example, not conveying an exclusive right to convey attribute claims), they may be inadvertently double-claiming emissions conveyed by other instruments to other parties.

### Non-GHG environmental risks

Other environmental risks may be more localized than global GHG emissions affecting the world's climate. A company located in a grid with these types of energy production may also face operational or health/safety risks. A location-based result can help highlight a company's exposure to some of these geographic risks, including (a) air pollution such as sulfur dioxide ($SO_x$) or mercury from coal combustion; (b) the impact of hydropower on local waterways and aquatic life; and (c) the risks from nuclear waste disposal or emergencies.

### Opportunities

Accounting and reporting scope 2 emissions will also highlight opportunities to improve performance and business operations. For many companies, energy use represents a significant cost. Reducing energy use is the "first" choice to reduce impact and costs. In most mixed-resource grids, reducing energy use also correlates with a decreased total in the location-based result (for example, smaller activity data value in the inventory year, while also contributing to lowering grid emissions over time).[1] Companies reducing energy consumption also pay proportionally less for any low-carbon supplier tariffs or premiums, or any unbundled certificates in the market-based method. Some examples of these opportunities are enumerated in Table 2.1.

17

Exhibit 4 to Decl. of Burton
176
**SER 2231**

**Table 2.1** Examples of GHG-related opportunities related to scope 2 emissions

| Example | Description |
|---|---|
| Efficiency and cost savings | A reduction in GHG emissions often corresponds to decreased costs and an increase in companies' operational efficiency. |
| Drive innovation | A comprehensive approach to GHG management provides new incentives for innovation in energy management and procurement. |
| Increase sales and customer loyalty | Low-emissions goods and services are increasingly more valuable to consumers, and demand will continue to grow for products made with low-carbon electricity. |
| Improve stakeholder relations | Improve stakeholder relationships through proactive disclosure and demonstration of environmental stewardship. Examples include demonstrating fiduciary responsibility to shareholders, informing regulators, building trust in the community, improving relationships with customers and suppliers, and increasing employee morale. *However, there may also be risks depending on whether company stakeholders are also invested in fossil fuel or high-GHG emitting resources.* |
| Company differentiation | External parties—including customers, investors, regulators, shareholders, and others—are increasingly interested in documented emissions reductions. Accounting and reporting scope 2 emissions with greater consistency and transparency about contractual instruments demonstrates a best practice that can differentiate companies in an increasingly environmentally conscious marketplace. |



18  *Scope 2 Guidance*

Exhibit 4 to Decl. of Burton

177

**SER 2232**

*CHAPTER 2 Business Goals*

## 2.3 Identify GHG reduction opportunities, set reduction targets, and track performance

Comprehensive scope 2 accounting and reporting should serve as a consistent basis to set reduction targets and measure and track progress toward them over time. Companies should use the boundaries and definitions in scope 2 as a basis for setting GHG reduction targets as well as energy-use targets and renewable energy procurement targets (for example, a 100 percent renewable energy procurement goal). Each method's scope 2 total can provide an important indicator of performance and show the context in which emission totals are changing. For example, regional emission trends (shown in the location-based method) may change over time due to factors outside of a company's direct control, such as electricity supplier quotas for renewable energy, emission policies and regulations, the collective impact of energy efficiency or demand-side management, or voluntary demand for new renewables.

Transparent reporting also allows for a more consistent comparison of performance over time and comparison with other companies. This guidance's framework addresses and reduces double counting between scope 2 inventories when using the same method, improving the accuracy of reported results and ensuring every company can make progress toward its goals.

## 2.4 Engage energy suppliers and partners in GHG management

Reducing emissions from the energy sector requires the participation of all entities in the energy value chain, including energy generators, suppliers, retailers, and consumers. The two methods outlined in this guidance can help consumers engage with their energy value chain on key demand and supply issues. For instance, generators produce energy in response to local or regional aggregate demand, and individual scope 2 inventories (and recommended reporting of energy consumption separately) can help highlight how reductions in energy use can reduce both scope 2 emissions and contribute to reducing grid-wide demand.

On the supply side, new energy generation facilities require a combination of factors to be in place to come online, including siting appropriate for the technology and its capacity or size, financing, and a supplier or consumer to purchase the energy. Scope 2 accounting can provide a motivation for consumers to partner with suppliers offering low-carbon products, and to seek out opportunities to leverage a company's own financial resources to help develop new projects. Energy producers, suppliers, and consumers all account for GHG emissions based on organizational and operational boundaries (e.g. the scopes). Scope 2 accounting and reporting can help energy consumers identify the GHG emissions impact of different energy production and purchasing arrangements.

## 2.5 Enhance stakeholder information and corporate reputation through transparent public reporting

The markets for energy purchasing—as well as markets for energy attribute certificates—may be difficult to explain to stakeholders unfamiliar with attribute tracking, labeling, or claims systems. Reporting scope 2 according to both calculation methods can help describe the different dimensions of the grid more clearly. With the location-based method, consumers can represent that they are served by all the energy resources deployed on their regional grid. By contrast, a company's energy supply choices are shown in the market-based method total. This reflects the market for energy attribute claims which enables a choice of specific resources, and allocates emission attributes based on a company's contractual relationships, or what a company is paying for. Reporting both methods' results provides important information for assessing corporate performance.

### Endnotes

1. For this reduction in a single company's consumption to impact grid generation and resulting emissions, this consumption would need to be significant and could not be offset by increases in energy consumption elsewhere in the grid. Therefore this guidance generally treats scope 2 reductions in energy consumption as part of the *collective* action that reduces emissions.

19

Exhibit 4 to Decl. of Burton
178
**SER 2233**



**3** *Accounting and Reporting Principles*

Exhibit 4 to Decl. of Burton
179
**SER 2234**



**A**s with financial accounting and reporting, generally accepted GHG accounting and reporting principles are intended to underpin and guide GHG accounting and reporting to ensure that the reported information represents a faithful, true, and fair account of a company's GHG emissions.

GHG accounting and reporting **shall** be based on the following principles:

- **Relevance.** Ensure the GHG inventory appropriately reflects the GHG emissions of the company and serves the decision-making needs of users—both internal and external to the company.

- **Completeness.** Account for and report on all GHG emission sources and activities within the inventory boundary. Disclose and justify any specific exclusion.

- **Consistency.** Use consistent methodologies to allow for meaningful performance tracking of emissions over time. Transparently document any changes to the data, inventory boundary, methods, or any other relevant factors in the time series.

- **Transparency.** Address all relevant issues in a factual and coherent manner, based on a clear audit trail. Disclose any relevant assumptions and make appropriate references to the accounting and calculation methodologies and data sources used.

- **Accuracy.** Ensure that the quantification of GHG emissions is systematically neither over nor under actual emissions, as far as can be judged, and that uncertainties are reduced as far as practicable. Achieve sufficient accuracy to enable users to make decisions with reasonable confidence as to the integrity of the reported information.

## Guidance for applying the accounting and reporting principles

These five principles guide the implementation of the GHG Protocol *Scope 2 Guidance*, particularly when application of the guidance in specific situations proves ambiguous. Companies may encounter tradeoffs between principles when completing an inventory and should strike a balance between these principles based on their individual business goals. For instance, a company may find that achieving the most *complete* inventory requires the use of less accurate data, compromising overall accuracy. Over time, as the accuracy and completeness of data increase, the tradeoff between these accounting principles will likely diminish.

21

Exhibit 4 to Decl. of Burton
180
**SER 2235**



Companies should consider these requirements in the light of the overall principles to which they apply, such as:

- **Transparency.** A company may prepare a market-based scope 2 total and may not yet have access to a residual mix emission factor. If the company has contractual instruments such as energy attribute certificates or supplier-specific emission factors to cover all of its consumption, the absence of a residual mix may not impact the accuracy of the company's reported scope 2 total. But it can impact the overall accuracy of the emissions allocation within that market. Therefore, companies are required to disclose this absence transparently.

- **Relevance.** The guidance recommends that companies disclose key features of the contractual instruments they use, in order to enable a clear understanding of the market context of those purchases and a

meaningful assessment of the company's procurement strategy (see Chapter 8). While this disclosure should support the principle of transparency, it should also focus on those purchases and features that are most relevant to the company and its goals, and can support its decision making.

- **Consistency.** The guidance seeks to ensure consistency in GHG reporting by requiring dual reporting, so that users of GHG information can track and compare GHG emissions information over time according to the same method assumptions. This better distinguishes trends and changes in performance. A company that begins reporting market-based method results for the first time may wish to provide additional transparent context for this total by indicating what percentage of their operations actually fall under this approach (based on energy usage) as compared with those where the same location-based method is used as a proxy.

22  *Scope 2 Guidance*

Exhibit 4 to Decl. of Burton
181
**SER 2236**

**CHAPTER 3** *Accounting and Reporting Principles*

- **Accuracy and Completeness.** Companies may identify contractual instruments in the market-based method—such as supplier-specific emission factors or energy purchase contracts—that do not meet the Scope 2 Quality Criteria. To maintain accuracy, companies **shall not** use these data to report a market-based scope 2 total, but should use other eligible data listed in the market-based method hierarchy. Companies may disclose the information separately. Working with electricity suppliers to clarify and ensure alignment of their data with the Scope 2 Quality Criteria will ensure both accuracy and a more complete market-based method result over time.

- **True and Fair.** Some policy makers or stakeholders using corporate GHG information may identify additional objectives for market-based electricity accounting in their national or subnational market. These objectives may reference concepts of social fairness or or equal treatment of different electricity consumer groups in the design of a voluntary low-carbon energy purchasing program. The GHG Protocol references that these five principles should help in developing fair and true inventories. The phrase "fair and true" is not intended to address these types of policies or objectives, but recommends that companies disclose key energy generation features about their contractual instruments in order to transparently disclose how its purchases reflect this policy context.



Exhibit 4 to Decl. of Burton
182
**SER 2237**



**4**   *Scope 2 Accounting Methods*

Exhibit 4 to Decl. of Burton
183
**SER 2238**

Case 2:24-cv-00801-ODW-PVC   Document 53-4   Filed 07/24/24   Page 28 of 121   Page ID #:1829



**T**his chapter provides an overview of the two scope 2 accounting methods required by this guidance. It outlines how these methods' results can inform decisions that contribute to reductions in the electricity sector.

## 4.1    Approaches to accounting scope 2

Calculating scope 2 emissions requires a method of determining the emissions associated with electricity consumption. Primarily two methods have been used by companies, programs, and policy makers to "allocate" the GHG emissions created by electricity generation to the end consumers of a given grid. Consumer GHG accounting in scope 2 completes this allocation process through emission factors applied to each unit of energy consumption. This guidance terms these methods the (a) location-based and (b) market-based methods. In short, the market-based method reflects emissions from electricity that companies have purposefully chosen (or their lack of choice), while the location-based method reflects the average emissions intensity of grids on which energy consumption occurs.

Table 4.1 compares the methods in terms of their objectives and the aspects of corporate purchasing and consuming of electricity that are emphasized. Chapter 6 lists the emission factors associated with each method.

### 4.1.1    Location-based method

This method can apply in all locations since the physics of energy production and distribution functions the same way in almost all grids, with electricity demand causing the need for energy generation and distribution. It emphasizes the connection between collective consumer demand for electricity and the emissions resulting from local electricity production. This includes an overall picture of the mix of resources required to maintain grid stability (see Box 4.1). The location-based method is based on statistical information and electricity output aggregated and averaged within a defined geographic boundary and during a defined time period.[i]

Grid average emission factors should be distinguished from supplier-specific emission factors. While utilities may be the sole energy provider in a region and produce a supplier-specific emission factor that closely resembles the overall regional grid average emissions factor, this utility-specific information should still be categorized as market-based method data due to the wide variation in utility service areas and structures. For instance, the utility service territory may

Exhibit 4 to Decl. of Burton
184
**SER 2239**

**Table 4.1** Comparing market-based and location-based methods

|  | Market-Based Method | Location-Based Method |
|---|---|---|
| Definition | A method to quantify the scope 2 GHG emissions of a reporter based on GHG emissions emitted by the generators from which the reporter contractually purchases electricity bundled with contractual instruments, or contractual instruments on their own | A method to quantify scope 2 GHG emissions based on average energy generation emission factors for defined geographic locations, including local, subnational, or national boundaries |
| How method allocates emissions: | Emission factors derived from the GHG emission rate represented in the contractual instruments that meet Scope 2 Quality Criteria | Emission factors representing average emissions from energy generation occurring within a defined geographic area and a defined time period |
| Where method applies: | To any operations in markets providing consumer choice of differentiated electricity products or supplier-specific data, in the form of contractual instruments | To all electricity grids |
| Most useful for showing: | • Individual corporate procurement actions<br>• Opportunities to influence electricity suppliers and supply<br>• Risks/opportunities conveyed by contractual relationships, including sometimes legally enforceable claims rules | • GHG intensity of grids where operations occur, regardless of market type<br>• The aggregate GHG performance of energy-intensive sectors (for example, comparing electric train transportation with gasoline or diesel vehicle transit)<br>• Risks/opportunities aligned with local grid resources and emissions |
| What the method's results omit: | • Average emissions in the location where electricity use occurs | • Emissions from differentiated electricity purchases or supplier offerings, or other contracts |

be a smaller region than the grid distribution area serving a given site of consumption; conversely, many utilities are in competitive markets where multiple suppliers can compete to serve consumers in the same region. Therefore, this method only looks at the broader energy generation profile for a region, regardless of supplier relationships.

### 4.1.2   Market-based method

The market-based method reflects the GHG emissions associated with the choices a consumer makes regarding its electricity supplier or product. These choices—such as choosing a retail electricity supplier, a specific generator, a differentiated electricity product, or purchasing unbundled

energy attribute certificates—are conveyed through agreements between the purchaser and the provider.

Under the market-based method of scope 2 accounting, an energy consumer uses the GHG emission factor associated with the qualifying contractual instruments it owns. In contrast to the location-based method, this allocation pathway represents contractual information and claims flow, which may be different from underlying energy flows in the grid. The certificate does not necessarily represent the emissions caused by the purchaser's consumption of electricity. One company choosing to switch suppliers does not directly or in the short-term impact the entire operation of the grid and its emissions. Over time, the

Exhibit 4 to Decl. of Burton
185
**SER 2240**

**Box 4.1 How scope 2 methods reflect variable energy**

While renewable energy may be "zero emissions" at the point of generation, dispatchable fossil fuel resources are often required to maintain overall grid reliability when renewable resources like solar and wind are not available. Electricity system operators may be required to maintain "spinning reserves" to provide grid stability in the event of losses of production at major energy generation facilities or to regulate grid frequency. Most studies suggest that a balancing area can absorb up to 30 percent variable resources without special accommodation. Over time increases in variable renewable resources have led to the formation of larger balancing areas supported by expanded T&D infrastructure as well as increased grid flexibility and efficiency improvements. Improved short-term forecasting of variable resources and storage technologies will also minimize these challenges.

The location-based method reflects the role of these "balancing" resources and their emissions through grid average emission factors. These emission factors include emissions from all local energy generation. The market-based method may reflect these emissions in varying degrees: for instance a certificate for variable renewable energy will not likely report or show the GHG impacts of the other resources dispatched on the grid to complement that variability. However some utilities are designing certificates to be issued only from variable energy generated during periods when the "backup" resource is also zero emissions or when no back-up is needed. This requires the utility to be in a position to guarantee they inject at any moment enough zero emissions energy to cover demand (for instance, through hydropower). For example, TUV SUD certifies in their EE02 Standard that energy is supplied simultaneously to consumption.*

*See TUV SUD criteria: http://www.tuev-sued.de/plants-buildings-technical-facilities/fields-of-engineering/environmental-engineering/energy-certification/certification-criteria

collective consumer demand for particular energy types and their resulting attributes (e.g., zero GHG emissions from generation) can send a market signal to support building more of those types of generation facilities, just

as purchasing any product sends the market signals to produce more of that product.

While only a few countries around the world have established markets for certificates that support this method, large electricity consumers in many other markets may find opportunities to purchase a differentiated product or enter into contracts directly. The market-based method has historically been associated with green power purchasing options. However, it is designed to integrate with, and include, existing systems for supplier portfolio disclosure and nonrenewable energy contract types as well. Since no market has instituted comprehensive energy tracking by contractual instruments,[2] this method uses some of the same energy production and emissions data from the location-based method for any energy not tracked by an instrument. The emissions from all untracked and unclaimed energy comprise a residual mix emission factor. Consumers who do not make specified purchases or who do not have access to supplier data should use the residual mix emission factor to calculate their market-based total.

With this method, individual energy consumers have the opportunity to make decisions about their product and supplier, which can then be reflected as a supplier or product-specific emission factor in scope 2.

## 4.2 Emission rate approach

These scope 2 accounting methods have several features in common, including:

- They use generation-only emission factors (e.g. emissions assessed at the point of energy generation), designed to label emissions associated with a quantity of electricity delivered and consumed. The emission factors do not include T&D losses or upstream life-cycle emissions associated with the technology or fuel used in generation. Instead, these other categories of upstream emissions should be quantified and reported in scope 3, category 3 (emissions from fuel- and energy-related activities not included in scope 1 or scope 2). In the case of supplier-specific emission factors, the emission factor should reflect emissions from all delivered energy, not just from generation facilities owned/operated by the utility.

Exhibit 4 to Decl. of Burton
186
**SER 2241**

- They represent emission rates that allocate emissions at generation to end-users. This type of treatment is consistent with corporate inventory approaches across other scopes, particularly with product-specific emission factors or labels. Both methods should be applied comprehensively to ensure all energy generation emissions within a defined region have been accounted for.

- This guidance does not support an "avoided emissions" approach for scope 2 accounting due to several important distinctions between corporate accounting and project-level accounting. However, companies can report avoided grid emissions from energy generation projects separately from the scopes using a project-level accounting methodology.

## 4.3    The decision-making value of each method's results

The *Corporate Standard* notes that reductions in indirect emissions (changes in scope 2 or 3 emissions over time) may not always capture the actual emissions reduction accurately. This is because there is not always a direct cause-effect relationship between the single activity of the reporting company (purchasing and consuming energy) and the resulting GHG emissions on the grid.[3] Generally, as long as the accounting of indirect emissions over time recognizes activities that in aggregate change global emissions, any such concerns over accuracy should not inhibit companies from reporting their indirect emissions.[4]

These two scope 2 accounting methods each provide a different "decision-making value" profile—that is, different indications of performance and risks, revealing different levers to reduce emissions and reduce risks. Ultimately, system-wide emission decreases are necessary over time to stay within safe climate levels. Achieving this requires clarity on what kinds of decisions individual consumers can make to reduce both their own reported emissions as well as contribute to emission reductions in the grid. Working backward from those decisions to the methods used to calculate emissions, there are three types of decisions companies can make that impact overall electricity grid emissions. These decisions include facility siting, the level and timing of demand, and supporting supply shifting.

While companies may make decisions related to these categories for non-GHG considerations, all the decisions carry GHG implications.

**1. Facility and operations-siting decisions**
A company's decisions about where to locate its office buildings, industrial facilities, distribution centers, or data centers carries GHG implications. The physical location of these points of energy consumption impacts what existing, or future, energy resources may be able to be deployed to meet demand. For instance, locating new facilities on a GHG-intensive grid means that in the near term, energy demand will be met with a higher GHG emissions profile, assuming that the energy is consumed locally. By contrast, locating operations in areas with low-carbon natural resources, or additional benefits such as natural ambient cooling or heat, can reduce these GHG emissions risks (as shown in the location-based method).[5] Ambient heat/cooling will also be reflected in lower use of heat/cooling and will be seen in both the location-based and market-based methods. Companies considering electric transportation fleets also need to ensure the availability of charging infrastructure and the GHG-intensity of the grids where that transportation would occur.

The physical location also aligns with a national or subnational set of regulatory rules governing what types of energy product or energy supplier choices a consumer can make. This location highlights different pathways and options for corporate influence over the energy supply mix over time (as shown in the market-based method).

Therefore, a company's shift in facility location will result in changes in scope 2 based on:

- **Location-based.** The use of a different grid average emission factor, and possibly a shift in energy supply overall, if the new location allows for on-site energy generation or is locating near an energy development where a direct line connection can be made.
- **Market-based.** Changes in supplier (new utility service area), changes in other types of contractual instruments, actions of other consumers in the market, or the residual mix used in that location.

Exhibit 4 to Decl. of Burton
187
**SER 2242**

*CHAPTER 4* Scope 2 Accounting Methods



**2. Decisions on the level and timing of demand**

Once a company has established a location for its operations, it can reduce its emissions through energy demand reduction.[6] A company can reduce energy consumption through measures such as choosing an energy-efficient building, carrying out energy-efficient retrofits, using more efficient electronics or lighting, and making behavioral decisions. Increasingly, "smart grid"[7] information and systems are allowing more geographically and temporally precise data to support energy demand management at a consumer level, including end-use equipment timing (e.g., running dishwashers or washing machines during optimal times of day such as low-cost, or non-peak times). Utilities may also provide this type of data to energy-intensive consumers as part of demand-side management (DSM) programs and peak-shaving efforts. The location-based method assumes that local demand impacts local

generation and distribution patterns, which ultimately impact total GHG emissions from the system (taking into account physical energy imports/exports). While demand is met with incremental resources, grid-average emission factors provide more readily available averages calculated over the course of a year.

Therefore, a company's shift in energy demand quantity and timing will entail changes in reported scope 2 primarily through activity data. In both methods, a decrease in electricity consumption can decrease total reported scope 2.

• **Location-based.** Collective changes in consumption contribute to changes in the the grid average emission factor over time. Shifting energy consumption to periods with of low-emissions generation on the grid (often non-peak hours) can further contribute to system-wide reductions. Advanced grid studies

Exhibit 4 to Decl. of Burton
188
**SER 2243**

Case 2:24-cv-00801-ODW-PVC   Document 53-4   Filed 07/24/24   Page 33 of 121   Page ID #:1834



can better highlight the emissions impacts of these individual consumption decisions (see Chapter 6).

- **Market-based.** Reducing electricity demand can minimize the additional costs associated with purchasing contractual instruments at a premium above standard electricity costs. However, the market-based method runs the risk of providing less visibility on energy demand reduction if the price of this premium (and therefore the price of achieving "zero emissions") is low. But efficiency can generally be pursued with financial gain regardless of the specific emissions associated with electricity consumption.

### 3. Decisions to influence grid mix of generation technologies

Many variables impact the mix of generation technologies on a given grid, including the historical regulatory, financial, and physical characteristics of the jurisdiction as well as the current market dynamics of supply/

demand for particular resources. An electricity consumer can pursue a variety of actions to try to influence these factors directly or indirectly, conveying stronger or weaker market signals (see Chapter 11). If consumers want to support low-carbon technologies, they can:

- Create on-site low-carbon energy projects
- Establish contracts, that include certificates, such as PPAs directly with low-carbon generators
- Negotiate with their supplier or utility to supply low-carbon energy to the company
- Switch to a low-carbon electricity supplier or electricity product, where available
- Purchase certificates from low-carbon energy generation.

Substantially changing a grid's resource mix over time generally requires aggregate consumer decisions, or a large-scale corporate consumer representing a significant percentage of a utility's load. But all of these

Exhibit 4 to Decl. of Burton
189
**SER 2244**

*CHAPTER 4 Scope 2 Accounting Methods*

interventions benefit from, and depend on, a contractual instrument (e.g. certificate) that confers specific GHG-emission attribute claims associated with purchases, functioning as a demand-signaling mechanism.

Therefore, efforts to shift grid supply through procurement will entail changes in reported scope 2 based on:

- **Location-based.** Cumulative effect of consumer or supplier choices over time that change the grid average emissions factor. (Other factors such as economics and environmental regulation can also impact this.) But individual corporate choices regarding electricity contracts, supplier choices, or certificate purchases are *not* directly reflected in an individual's scope 2 inventories using the location-based method.
- **Market-based.** Individual corporate choices of electricity product or supplier, or the lack of a differentiated choice, which requires the use of a residual mix. Many market-based tracking systems currently only reflect renewable generation contractual instruments, but the method should reflect any type of contract or supplier-specific emission factor that meets the Scope 2 Quality Criteria. Chapter 11 addresses how companies can use the market-based method to drive supply change.

### Endnotes

1. The International Energy Agency provides grid average data per country and per year. In some countries grid average data are available for much shorter periods. RTE in France provides grid average figures in real time for every 30 minutes period (http://www.rte-france.com/en/eco2mix/eco2mix-co2-en).

2. Only the NEPOOL and PJM regions of the U.S. use all generation certificate tracking.

3. It is assumed here that direct emissions tracked in scope 1 do reflect absolute reductions. However, it should be noted that a company may see its scope 1 emissions change due to outsourcing or acquisition/divestment, activities which do not in themselves "change" global GHG emissions but which simply change what company has responsibility for them.

4. *Corporate Standard* (WRI/WBCSD 2004), p. 59–60.

5. However, emissions associated with the relocation of a facility (building materials, demolition, trucking, etc.) unrelated to the new or old site's purchase of electricity or steam would generally be accounted for in scope 3

6. This is not as relevant for a totally new facility whose energy use would still reflect an increase on the grid. However, efficiency and demand reduction can remain a priority for consumption occurring in established buildings.

7. See EPRI (2008).



Exhibit 4 to Decl. of Burton
190
**SER 2245**

# 5 Identifying Scope 2 Emissions and Setting the Scope 2 Boundary



Exhibit 4 to Decl. of Burton
191
**SER 2246**



**T**his chapter describes the sources of scope 2 emissions and how to establish a boundary for scope 2 accounting under different generation and distribution models and scenarios.

## 5.1    Organizational boundaries

As detailed in the *Corporate Standard,* a company can choose one of three consolidation approaches for defining its organizational boundaries for the entire corporate inventory, including equity share, financial control, and operational control. Companies should use a consistent consolidation approach over time for their entire inventory.

## 5.2    Operational boundaries

After a consolidation approach has been determined to define the organizational boundary, it **shall** be applied consistently across the inventory. Companies can then identify emissions from included sources and categorize them into direct and indirect emissions, and further by "scopes." The *Corporate Standard* divides a company's emissions into direct and indirect emissions:

- **Direct emissions** are emissions from sources that are owned and controlled by the reporting company. These emissions are considered scope 1.

- **Indirect emissions** are emissions that are a consequence of the activities of the reporting company, but occur at sources owned or controlled by another company. These include scope 2 and scope 3 emissions. Scope 2 includes emissions from energy purchased or acquired and consumed by the reporting company (see Section 5.3 for expanded definition). Scope 3 emissions include upstream and downstream value chain emissions and are an optional reporting category in the *Corporate Standard.* The *Corporate Value Chain (Scope 3) Accounting and Reporting Standard* (2011) outlines how to conduct a comprehensive scope 3 inventory.

For many companies, scope 2 and scope 3 represent the largest sources of GHG emissions. By allowing for GHG accounting of direct and indirect emissions by multiple companies in a supply chain, multiple entities can work to reduce emissions where they have influence.

The underlying framework of direct and indirect corporate emissions reporting means that one company's scope 1 is another company's scope 2 and/or 3. This is an inherent part of the reporting framework that enables multiple entities along a value chain to consistently report those

33

Exhibit 4 to Decl. of Burton
192
**SER 2247**



emissions. However, as stated in the *Corporate Standard,* companies should avoid double counting the same emissions in multiple scopes in the same inventory. In addition, double counting the same emissions within the same scope by multiple companies should also be avoided (see Section 5.5).

### 5.2.1    Leased assets

Energy use in leased buildings or from leased electricity generation assets can be a significant emissions source. To determine whether the assets' emissions are included in the inventory boundary and how they should be categorized by scope, companies should determine the entity that owns, operates, or exerts control over certain leased assets.[1]

As noted in the *Corporate Standard* and its supplemental Appendix F (available at ghgprotocol.org), all leases confer operational control to the lessee or tenants, unless otherwise noted.[2] Therefore, if a company is a tenant in a leased space or using a leased asset and applies the operational control approach, any energy purchased or acquired from another entity (or the grid) **shall** be reported in scope 2. On-site heat generation equipment, such as a basement boiler, typically falls under the operational control of the landlord or building management company. Tenants therefore would report consumption of heat generated

on-site as scope 2. If a tenant can demonstrate that they do not exercise operational control in their lease, they **shall** document and justify the exclusion of these emissions.

Emissions from assets a company owns and leases to another entity, but does not operate, can either be included in scope 3 or excluded from the inventory. For more information on organizational boundaries, see The *Corporate Standard,* Chapter 3: Setting Organizational Boundaries, and Appendix F at www.ghgprotocol.org.

## 5.3    Defining scope 2

Scope 2 is an indirect emission category that includes GHG emissions from the generation of purchased or acquired electricity, steam, heat, or cooling consumed by the reporting company.[3] GHG emissions from energy generation occur at discrete sources owned and operated by generators that account for direct emissions from generation in their scope 1 inventory. Scope 2 includes indirect emissions from generation only; other upstream emissions associated with the production and processing of upstream fuels, or transmission or distribution of energy within a grid, are tracked in scope 3, category 3 (fuel- and energy-related emissions not included in scope 1 or scope 2).

Exhibit 4 to Decl. of Burton
193
**SER 2248**

*CHAPTER 5 Identifying Scope 2 Emissions and Setting the Scope 2 Boundary*

### 5.3.1 Forms of energy use tracked in scope 2

Scope 2 accounts for emissions from the generation of energy that is purchased or otherwise brought into the organizational boundary of the company. At least four types of purchased energy are tracked in scope 2, including the following:

**Electricity.** This type of energy is used by almost all companies. It is used to operate machines, lighting, electric vehicle charging, and certain types of heat and cooling systems.

**Steam.** Formed when water boils, steam is a valuable energy source for industrial processes. It is used for mechanical work, heat, or directly as a process medium.

Combined heat and power (CHP) facilities (also called cogeneration or trigeneration) may produce multiple energy outputs from a single combustion process. Reporting companies purchasing either electricity or heat/steam from a CHP plant should check with the CHP supplier to ensure that the allocation of emissions across energy outputs follows best practices, such as the *GHG Protocol Allocation of GHG Emissions from a Combined Heat and Power (CHP) Plant (2006).*

**Heat.** Most commercial or industrial buildings require heat to control interior climates and heat water. Many industrial processes also require heat for specific equipment. That heat may either be produced from electricity or through a non-electrical process such as solar thermal heat or thermal combustion processes (as with a boiler or a thermal power plant) outside the company's operational control.

**Cooling.** Similar to heat, cooling may be produced from electricity or through the distribution of cooled air or water.

This guidance focuses on electricity accounting. Differences in accounting for heat, cooling, and steam are treated in Appendix A.

## 5.4 Distinguishing scopes reporting by electricity production/distribution method

Once energy is generated, it is either consumed on-site, or distributed to another entity by direct line transfer or through the electricity grid. These pathways, along with any contractual and/or certificate sales from electricity generation from owned/operated equipment, determine how the emissions from energy generation are accounted for and reported by different entities in scope 1 and 2. (Scope 3 accounting is addressed in Appendix B.) Scope 2 emissions are accounted for when a company obtains its energy from another entity, or when a company sells an energy attribute certificate from owned and consumed generation. See Chapter 10 for background on energy attribute certificates.

Under all four scenarios identified below, companies should report electricity consumption separately from the scopes as part of reporting the total quantity of energy consumption in kWh, MWhs, TJ, BTUs or other relevant units.

**1. If the consumed electricity comes from owned/operated equipment (Figure 5.1)**

If energy is produced and consumed by the same entity (with no grid connection or exchanges), no scope 2 emissions are reported, as any emissions occurring during the power generation are already reported in scope 1. This scenario may apply to large industrial facilities that generate their own energy on-site in owned/operated equipment.

**Figure 5.1 Energy production and consumption from owned/operated generation**



*Scope 1 emissions*

*Energy generated <u>and entirely consumed</u> by Company A*

35

Exhibit 4 to Decl. of Burton
194
**SER 2249**

**2.  If the consumed electricity comes from
a direct line transfer (Figure 5.2)**

In this example, energy production is fed directly and exclusively to a single entity—here, Company B. This applies to several types of direct line transfers, including:

- An industrial park or collection of facilities, where one facility creates electricity, heat, steam, or cooling and transfers it directly to a facility owned or operated by a different party.

- For energy produced by equipment installed on-site (e.g. on-site solar array or a fuel cell using natural gas) that is owned and operated by a third party.

- For electricity, heat, steam, or cooling produced within a multi-tenant leased building (by a central boiler, or on-site solar) and sold to individual tenants who do not own or operate the building or the equipment. Tenants may pay for this energy as part of a lump rental cost and the tenant may not receive a separate bill.

In any of these scenarios:

- The company with operational or financial control of the energy generation facility would report these emissions in their scope 1, following the operational control approach, while the consumer of the energy reports the emissions in scope 2.

- Any third-party financing institution that owns but does not operate the energy generation unit **would not** account for any scope 1, 2, or 3 emissions from energy generation under the operational control approach, since they do not exercise operational control. Only the equipment operator would report these emissions in their scope 1 following an operational control approach. Equipment owners would account for these generation emissions in scope 1 under a financial control or equity share approach, however.

- If all the energy generation is purchased and consumed, then Company B's scope 2 emissions will be the same as Company A's scope 1 emissions (minus any transmission and distribution losses, though in most cases of direct transfer there will be no losses).[4]

**3.  If the consumed electricity
comes from the grid (Figure 5.3)**

Most consumers purchase or acquire some or all of their electricity through the electric grid, a shared electricity distribution network. Depending on the design of the grid, there may be a small number of central generation facilities providing energy to many consumers, or there may be a large number of generation facilities representing different technology types (thermal power using coal or natural gas inputs, or wind turbines, solar photovoltaic cells, or solar thermal, etc.).

**Figure 5.2 Direct line energy transfer**



Exhibit 4 to Decl. of Burton
195
**SER 2250**

*CHAPTER 5 Identifying Scope 2 Emissions and Setting the Scope 2 Boundary*

**Figure 5.3 Electricity distribution on a grid**



Electricity generators report any emissions from generation in scope 1, but most renewable or nuclear technology would report "zero" emissions from this generation. A grid operator or utility dispatches these generation units throughout the day on the basis of contracts, cost, and other factors. Because it is a shared network as opposed to a direct line, consumers may not be able to identify the specific power plant producing the energy they are using at any given time.[5] Use of specified generation on the grid can only be determined contractually. Energy on the grid moves to the nearest point it can be used, and multiple regions can exchange power depending on the capacity and needs of these regions. Steam, heat, and cooling can also be delivered through a grid,

often called a district energy system. Such systems provide energy to multiple consumers, though they often have only one generation facility and serve a more limited geographic area than electricity grids.

**4. If some consumed electricity comes from owned/operated equipment, and some is purchased from the grid (Figure 5.4).**
Some companies own, operate, or host energy generation sources such as solar panels or fuel cells on the premises of their building or in close proximity to where the energy is consumed. This arrangement is often termed "distributed generation" or "on-site" consumption, as it consists of generation units across decentralized locations (often

Exhibit 4 to Decl. of Burton
196
**SER 2251**

on the site where the energy output will be consumed, as opposed to utility-scale centralized power plants). The company may consume some or all of the energy output from these generation facilities; sell excess energy output back to the grid; and purchase additional grid power to cover any remaining energy demand.

The owners/operator of a distributed generation facility may therefore have both scope 1 emissions from energy generation, as well as scope 2 emissions from any energy purchased from the grid, or consumed from on-site generation where attributes (e.g. certificates) are sold. This arrangement impacts activity data as follows:

**Activity data.** Determining the underlying activity data (in MWh or kWh) in these systems may be challenging given the flux of electricity coming in or flowing out. Many markets utilize "net metering" for these systems, which allows grid purchases to be measured only as

*net* of any energy exported to the grid. This net number may also be the basis for how costs are assessed.

For accurate scope 2 GHG accounting, companies **shall** use the total—or gross—electricity purchases from the grid rather than grid purchases "net" of generation for the scope 2 calculation. A company's total energy consumption would therefore include self-generated energy (any emissions reflected in scope 1) and total electricity purchased from the grid (electricity). It would exclude generation sold back to the grid.

If a company cannot distinguish between its gross and net grid purchases, it should state and justify this in the inventory.

Table 5.1 illustrates the difference between total energy consumption and net energy consumption (if the reporter is a net grid consumer rather than producer). A negative

**Figure 5.4** Facility consuming both energy generated on-site and purchased from the grid



Exhibit 4 to Decl. of Burton
197
**SER 2252**

Case 2:24-cv-00801-ODW-PVC   Document 53-4   Filed 07/24/24   Page 42 of 121   Page ID #:1843

*CHAPTER 5 Identifying Scope 2 Emissions and Setting the Scope 2 Boundary*

**Table 5.1** Comparing gross and net energy consumption

| Total energy production from on-site system | On-site energy consumption from on-site system | Energy exported from the on-site system to the grid | Energy imported from the grid |
|---|---|---|---|
| 100 kWh | 50 kWh | 50 kWh | 70 kWh |

| |
|---|
| Total energy consumption (to be reported separately) = 120 kWh<br>50 kWh consumed from on-site system + 70 kWh imported from grid |
| "Net" grid consumption= 20 kWh<br>(70 kWh imported from grid - 50 kWh exported ) |

consumption number for net energy exporters demonstrates the challenge of using net consumption information as activity data.

Because scope 2 reflects energy purchased from a separate entity outside the inventory boundary, energy consumed from owned/operated facilities may not be reported in scope 2, depending on the sale of attributes.



## 5.5   Avoiding double counting in scope 2

The dual reporting requirement in this guidance can complicate the understanding of whether double counting is occurring and whether it threatens an inventory's accuracy.

Table 5.2 details several scenarios of double counting, along with whether they introduce accuracy errors and how they are, or can be, addressed.

## 5.6   Avoiding double counting between owned energy generation assets (scope 1) and grid-delivered energy consumption in separate operations (scope 2)

Some companies such as electricity utilities or suppliers may own energy generation facilities that sell all their power into the local grid. Emissions from these generation facilities are reported in scope 1 of the utility's inventory. At the same time, the utility may have separate administrative, commercial, or industrial facilities or office buildings (apart from the generation facilities)[6] that consume electricity from the same grid to which the utility is supplying—which would be reported in scope 2. Following the *Corporate Standard* scopes framework, companies should avoid reporting the same emissions in scope 1 and 2 of the same company's inventory; but in the case of utilities, a scope 2 calculation according to *either* the location-based or market-based approach would likely include emissions from the generation assets reported in scope 1. This is because

39

Exhibit 4 to Decl. of Burton
198
**SER 2253**

**Table 5.2** Additions to scope 2 accounting introduced by the *Scope 2 Guidance*

| Type of double counting | Examples | How to prevent double counting |
|---|---|---|
| **Between scope 1 and 2** | | |
| **Between scope 1 and 2 in different inventories** | A company reports emissions from grid-delivered energy use in scope 2, while a generation facility on the grid reports its facility's emissions in scope 1. | No double counting problem—this is an inherent part of the corporate reporting framework. |
| **Between scope 1 and 2 in the same inventory** | A company owns a natural gas fuel cell and consumes the output directly (with no grid transfers). | Depending on the consolidation approach chosen, emissions from owned/operated generation shall be reported under scope 1 (if any emissions occur). The emissions from consumed energy shall not be repeated in scope 2 since they have already been reported in scope 1. |
| **Between multiple companies' scope 2 inventories** | | |
| **Between multiple companies' scope 2 inventories based on different methods** | In aggregate: The energy attribute certificates from a renewable generation facility are sold to a company who claims them and reports their emission rate in scope 2 (market-based). The grid emissions factor for the region will also reflect this facility's emission rate. Consumers using the grid emissions factor (location-based method) will be double counting the emission rate conveyed by the energy attribute certificate (market-based method). | This is an inherent condition of two methods. Each method's results shall not be added or netted. Each method represents a separate way of allocating energy generation emissions, so depending on geographic or market boundaries, each method's scope 2 result can reflect some of the same emissions reflected in the other method. |
| **Between multiple companies' scope 2 inventories of the same method** | May occur in the market-based method if energy attribute certificates are sold from an owned/operated solar panel, but owner also consumes the energy and claims zero emissions rate. | If energy attribute certificates are sold from energy generation, companies shall treat consumed electricity as though it were purchased from the grid—using the hierarchies of emission factors indicated for both methods (Table 6.2 and Table 6.3). Sold energy attribute certificates may be reported separately. Scope 1 reporting shall still reflect any emissions from the generator. |
| | May occur in the location-based method if grid emission factors reflect different geographic boundaries (e.g. local, regional, national).  May occur in the market-based method if instrument claims are unclear (see instrument tracking below), or if residual mix is not available | This is a function of data rather than the accounting framework. Companies shall use the most accurate and appropriate emission factors listed in the emission factor hierarchy for each method (see Chapter 6). |
| | Two different certificate types are generated from a single MWh (one for supplier quotas, one for supplier disclosure). Neither certificate is clear on whether energy attribute claims are included. If users assume they are, different suppliers may count the same attributes in their mix. | This guidance's Scope 2 Quality Criteria require consumers to ensure that only one instrument conveys a GHG emission rate claim to consumers, and that that claim be clearly conveyed with the instrument, or if multiple instruments convey the GHG emission rate claim, that all such instruments be owned and retired to substantiate a usage and scope 2 claim. |

Exhibit 4 to Decl. of Burton
199
**SER 2254**

*CHAPTER 5 Identifying Scope 2 Emissions and Setting the Scope 2 Boundary*

the owned generation facilities will be supplying the same grid region where their electricity consumption occurs.

Therefore, to minimize double counting between scope 1 and 2 within the same inventory, companies in this situation should treat their grid consumption as though it were supplied by their own generation facilities (e.g. as though they were an "on-site" source), with no additional emissions reported in scope 2 (see row 2 of Table 6.1 for this scenario). The grid-consuming facility should secure a contract or other instrument with its own generation unit(s) to convey the claim following the Quality Criteria in the market-based method, including ensuring that there have not been any sales from that production conveying claims to other parties. If possible, utilities should also remove from any supplier-specific emission factor or third-party data collectors the quantity of energy (and its emissions) supplied to or associated with these commercial/industrial operations.

Any energy consumption not covered by contractual arrangements with owned/operated generation units should be treated as grid-consumed energy in scope 2, reported according to both the location-based and market-based method emission factor hierarchies.

### Endnotes

1. See *Corporate Standard* (WRI/WBCSD 2004), p. 31.
2. In some leased building arrangements, tenants do not pay for electricity individually. However, this should not exempt tenants from reporting the emissions from that energy use. As defined in the next section, scope 2 includes energy that is acquired and consumed.
3. *Corporate Standard* (WRI/WBCSD 2004), p. 25. The word "acquired" was added in the *Scope 3 Standard* (p. 28) to reflect circumstances where a company may not directly purchase electricity (e.g., a tenant in a building), but where the energy is brought into the organization's facility for use.
4. Line losses in Figure 5.2 can be separately reported in Company B's scope 3. If Company A owns the line, it does not need to report these line-loss emissions separately since they have already been reported in scope 1.
5. In rare situations, such as islands with a single, small grid, it may be possible to determine which power station was operating and providing power to the grid users.
6. These administrative buildings should be distinguished from auxiliary operations adjacent to generation facilities. Auxiliary operations may use electricity directly from the generation facility even before distribution and sales to the grid.



41

Exhibit 4 to Decl. of Burton
200
**SER 2255**



**6** *Calculating Emissions*

Exhibit 4 to Decl. of Burton
201
**SER 2256**

Case 2:24-cv-00801-ODW-PVC   Document 53-4   Filed 07/24/24   Page 46 of 121   Page ID #:1847



# This chapter outlines key requirements, steps, and procedures involved in calculating scope 2 emissions according to each method.

Once the inventory boundary has been established, companies generally calculate GHG emissions using the following steps:

- Identify GHG emission sources for scope 2 emissions
- Determine whether the market-based approach applies
- Collect activity data and choose emission factors for each method
- Calculate emissions
- Roll up GHG emissions data to corporate level.

Additional guidance on general calculation procedures and GHG Protocol calculation tools can be found in Chapter 6 of the *Corporate Standard.*

## 6.1    Identify GHG emissions sources for scope 2

Scope 2 includes emissions from all purchased/acquired and consumed electricity, heat, steam, or cooling. Companies can identify these energy uses on the basis of utility bills or metered energy consumption at facilities within the inventory boundary.

## 6.2    Determine whether the market-based method applies for any operations

Companies can determine whether the market-based method for scope 2 calculation applies to their inventory by assessing whether differentiated energy products in the form of contractual instruments (including direct contracts, certificates, or supplier-specific information) are available in a given market. Markets are increasingly developing and refining purchasing options, and the list is not exhaustive. Currently this includes EU member states and economic area, the U.S., Australia, most Latin American countries, Japan, India, and many others. Figure 6.1 illustrates this determination.

- The presence of contractual information in any market where a company has operations triggers the requirement to report according to the market-based method. The contractual instruments themselves must be assessed for their conformance with Scope 2 Quality Criteria. If they do not meet the Scope 2 Quality Criteria, then other data (listed in Table 6.3) **shall** be used as an alternative in the market-based method total. In this way, all companies required to report according to the market-based method will have some type of data option.

Exhibit 4 to Decl. of Burton
202
**SER 2257**

- If a multi-regional company has any operations within the corporate inventory where the market-based method applies, then a market-based method total **shall** be calculated for the entire corporate inventory to ensure completeness and consistency. For any individual operations in the corporate inventory where market-based method data on the hierarchy is not applicable or available, data from the location-based method should be used to represent the emissions from the facility (see Table 6.3). For these operations, the calculated scope 2 according to the market-based method will be identical to the location-based.

If no facilities in the entire organizational boundary of the reporting entity are located in markets with contractual claims systems, or where *no* instruments within those systems meet Scope 2 Quality Criteria required by this document, then only the location-based method **shall** be used to calculate scope 2.

### 6.3    Collect activity data

For electricity use disclosure required by this guidance, activity data includes all electricity purchased/acquired and consumed during the reporting period, including from owned/operated generation facilities that may not be included as activity data for scope 2 calculation.

For scope 2 calculation, activity data includes all energy purchased/acquired and consumed from an entity outside of the organization or from owned/operated generation facilities where energy attributes (e.g. certificates) have been sold or transferred. Table 6.1 indicates how different energy distribution methods should be treated.

To determine activity data, metered electricity consumption or utility bills specifying consumption in MWh or kWh units can provide the most precise activity data. In some cases these may not be available, as with consumption occurring in a shared space without energy metering. In these cases, estimations may be used such as allocating an entire building's electricity usage to all tenants on the basis of the reporter's square footage and the building's occupancy rate (called the Area Method).[1]

### 6.4 Identify distribution scenarios and any certificate sales

All of the distribution scenarios identified in Section 5.4 can entail the generation and sale of energy attribute certificates or other contractual instruments. The sale or retention of these instruments impacts the accounting of the consumed energy, as shown in Table 6.1.

The creation of a certificate that conveys an energy generation attribute claim means that the underlying power—sometimes called "null power"—can no longer be considered to contain the energy attributes, including the type of energy (e.g., that it is "renewable") and its GHG emission rate (that it is zero emissions/MWh). By the conveyance of energy attributes or certificates to a third party separate from the electricity, users of the null power electricity cannot claim to be buying or using renewable energy in the absence of owning the certificate. Instead, companies consuming energy from owned/operated facilities or direct-line transfers where certificates are sold off, **shall** calculate that consumption using other market-based method emission factors such as "replacement" certificates, a supplier-specific emission rate, or residual mix (for the market-based method total) and the grid average emission factor (for the location-based total).

#### 6.4.1    How certificate sales affect on-site energy consumption in the location-based method

Companies who are consuming energy directly from a generation facility that has sold certificates (either owned/operated equipment or a direct line) forfeit not only the right to claim those emissions in the market-based method (requiring the use of some other market-based data source such as other "replacement" certificates, a supplier-specific emission factor, or residual mix) but also the right to claim that emissions profile in the location-based method. Overall, the location-based method is designed to show emissions from the production supporting the local consumption without reference to any contractual relationships. However, the attributes contained in certificates usually carry legally enforceable claims, which should take precedence.

For instance, the U.S. Federal Trade Commission Green Guides[2] prevent any kind of claim about using, consuming,

Exhibit 4 to Decl. of Burton
203
**SER 2258**

*CHAPTER 6* Calculating Emissions

**Figure 6.1** Determining which accounting methods to use for scope 2



or hosting renewable energy or its attributes if the REC from that production has been sold off. This includes a claim in the form of location-based calculations of "zero emissions power consumption." Therefore, in the event of certificate sales from owned/operated energy production and consumption, companies should still use the location-based emission factor hierarchy (see Table 6.2).

Taken to its logical conclusion, these kind of legally enforceable rights and claims could call into question the validity of any kind of location-based reporting (since even a grid average will include a mix of power whose RECs have been claimed by someone else). However, for the purposes of a GHG inventory, location-based accounting and reporting are still required in order to improve

comparability across multiple markets over time and to show risks/opportunities that are better evaluated based on average emissions in a grid. Companies should avoid using location-based totals for goal tracking where certificates convey these claims and/or carry legally enforceable claims.

## 6.5   Choose emission factors for each method

Companies should use the most appropriate, accurate, precise, and highest quality emission factors available for each method. Table 6.2 indicates these preferences for the location-based method, and Table 6.3 for the market-based method. Table 6.3 does *not* represent a preferred hierarchy

45

Exhibit 4 to Decl. of Burton
204
**SER 2259**

**Table 6.1 Accounting for scope 2 with and without certificates sales**

| | Scope 2 with location-based method | Scope 2 with market-based method |
|---|---|---|
| **Energy consumed from owned/operated generation  (e.g. a company owns a solar panel and consumes the energy)** | | |
| **No certificates generated or sold** | No scope 2 reported for consumption from owned generation | |
| **Certificates from generation facility retired/retained by the generation facility's owner who consumes the energy** | Should report certificate retention separately, but no scope 2 reported for consumption of on-site generation | |
| **Certificates sold to 3rd party** | Use location-based emission factor hierarchy | Use market-based emission factor hierarchy |
| **Direct line (e.g. a company receives power directly from a generator, with no grid transfers)** | | |
| **No certificates generated or sold** | Use source-specific emission factor from direct line | |
| **Certificates from generation facility purchased and retired/retained by the energy consumer** | Use source-specific emission factor from direct line (same as certificate emission factor) | Use certificate emission factor (same as source- specific emission factor) |
| **Certificates sold to 3rd party** | Use location-based emission factor hierarchy | Use market-based emission factor hierarchy |
| **Grid-distributed** | | |
| **No certificates generated or sold from any generation facilities on the grid** | Use location-based emission factor hierarchy | Use market-based emission factor hierarchy |
| **Certificates purchased from grid generation facilities, or included in a supplier-specific emission factor** | Use location-based emission factor hierarchy | Use market-based emission factor hierarchy |
| **Certificates from grid generation facilities sold to 3rd parties** | Use location-based emission factor hierarchy | Use market-based emission factor hierarchy |

of procurement methods (e.g., purchasing renewable energy from a supplier vs. through a contract with a generator), as these are dependent on local market options and company-specific conditions. Instead, it represents a hierarchy of instruments based on the most precise (e.g., energy attribute certificates issued in units that match consumption units, e.g. MWh) to least precise (averages of attributes representing all unclaimed production in a region).

Companies using the market-based method **shall** ensure that any contractual instrument from which an emission factor is derived meets the Scope 2 Quality Criteria listed in Chapter 7. Where contractual instruments do not meet the Scope 2 Quality Criteria requirements, and no other market-based method data are available, the location-based data should be used.

Exhibit 4 to Decl. of Burton
205
**SER 2260**

*CHAPTER 6 Calculating Emissions*

**Table 6.2 Location-based method emission factor hierarchy**
> Data forms listed here should convey combustion-only (direct) GHG emission rates, expressed in metric tons per MWh or kWh.

| Emission factors | Indicative examples |
|---|---|
| **Regional or subnational emission factors**<br><br>*Average emission factors representing all electricity production occurring in a defined grid distribution region that approximates a geographically precise energy distribution and use area. Emission factors **should** reflect net physical energy imports/exports across the grid boundary.* | eGRID total output emission rates (U.S.)[a]<br><br>Defra annual grid average emission factor (U.K.)[b] |
| **National production emission factors**<br><br>*Average emission factors representing all electricity production information from geographic boundaries that are not necessarily related to dispatch region, such as state or national borders. No adjustment for physical energy imports or exports, not representative of energy consumption area.* | IEA national electricity emission factors[c] |

*Notes:*
a Although eGRID output rates represent a production boundary, in many regions this approximates a consumption or delivery boundary, as eGRID regions are drawn to minimize energy imports/exports. See: http://www.epa.gov/cleanenergy/energy-resources/egrid/index.html.
b See Defra: https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/224437/pb13988-emission-factor-methodology-130719.pdf.
c IEA emission factors do not adjust for imports/exports of energy across national boundaries. See: http://data.iea.org/ieastore/product.asp?dept_id=101&pf_id=304.



47

Exhibit 4 to Decl. of Burton
206
**SER 2261**

**Table 6.3** **Market-based scope 2 data hierarchy examples**

Data forms listed here should convey combustion-only (direct) GHG emission rates, expressed in metric tons per MWh or kWh. Reporting entities should ensure that market-based method data sources meet Scope 2 Quality Criteria. Instruments listed here are not guaranteed to meet Scope 2 Quality Criteria, but are indicative of instrument type.

| Emission factors | Indicative examples | Precision |
|---|---|---|
| **Energy attribute certificates** or equivalent instruments (unbundled, bundled with electricity, conveyed in a contract for electricity, or delivered by a utility) | • Renewable Energy Certificates (U.S., Canada, Australia and others)<br>• Generator Declarations (U.K.) for fuel mix disclosure<br>• Guarantees of Origin (EU)<br>• Electricity contracts (e.g. PPAs) that also convey RECs or GOs<br>• Any other certificate instruments meeting the Scope 2 Quality Criteria | Higher |
| **Contracts** for electricity, such as power purchase agreements (PPAs)[a] and contracts from specified sources, where electricity attribute certificates do not exist or are not required for a usage claim | • In the U.S., contracts for electricity from specified nonrenewable sources like coal in regions other than NEPOOL and PJM<br>• Contracts that convey attributes to the entity consuming the power where certificates do not exist<br>• Contracts for power that are silent on attributes, but where attributes are not otherwise tracked or claimed | |
| **Supplier/Utility emission rates,** such as standard product offer or a different product (e.g. a renewable energy product or tariff), and that are disclosed (preferably publicly) according to best available information | • Emission rate allocated and disclosed to retail electricity users, representing the entire delivered energy product (not only the supplier's owned assets)<br>• Green energy tariffs<br>• Voluntary renewable electricity program or product | |
| **Residual mix** (subnational or national) that uses energy production data and factors out voluntary purchases | • Calculated by EU country under RE-DISS project [b, c] | |
| **Other grid-average emission factors** (subnational or national) – see location-based data | • eGRID total output emission rates (U.S.).[d] In many regions this approximates a consumption-boundary, as eGRID regions are drawn to minimize imports/exports<br>• Defra annual grid average emission factor (UK)<br>• IEA national electricity emission factors[e] | Lower |

*Notes:*

a Because PPAs are the primary example of this type of instrument used in the markets consulted in this TWG process, this class of instrument may be referred to in shorthand as "PPAs" with the recognition that other types of contracts that fulfill a similar function may go by different names.

b See: http://www.reliable-disclosure.org/static/media/docs/RE-DISS_2012_Residual_Mix_Results_v1_0.pdf.

c The Norwegian authority also publishes a residual mix emission factor that can be found here: http://www.nve.no/en/Electricity-market/ Electricity-disclosure-2011/.

d See: http://www.epa.gov/cleanenergy/energy-resources/egrid/index.html.

e See: http://www.epa.gov/cleanenergy/energy-resources/egrid/index.html.

Exhibit 4 to Decl. of Burton
207
**SER 2262**

*CHAPTER 6 Calculating Emissions*

## 6.6 Match emission factors to each unit of electricity consumption

Each unit of electricity consumption should be matched with an emission factor appropriate for that consuming facility's location or market. For the market-based method, this means choosing a contractual instrument or information source for each unit of electricity. For instance, if a company has purchased certificates to apply to half of a given operation's electricity use, it will need to use other instruments or information on the emission factor hierarchy to calculate the emissions for the remaining half.

Companies centrally purchasing energy attribute certificates on behalf of all its operations in a single country or region should indicate how they match these purchases to individual site consumption.

Companies may also use certificates conveyed to them by their supplier, separately from the other supplier mix information. This ensures equivalent treatment of certificates regardless of how they are sourced. For example, a utility delivers 1,000 MWh in total to customers and 200 MWh of that (20 percent) comes from zero-emitting renewables for which the energy attribute certificates have been retired. Any customer of that utility would be able to claim that 20 percent of their electricity is renewable and substantiated with certificates. If Customer A of this utility consumes 2.5 MWh (of the

total 1,000 MWh), they can claim 0.5 MWh of renewable energy (of the 200 MWh total) without double counting, but cannot claim any more than this. To cover all of their electricity consumption with zero-emission certificates, Customer A would only need to purchase 2 MWh of renewables on their own.

## 6.7 Calculate emissions

To calculate scope 2 emissions according to one or both methods, the following procedure applies:

1. Multiply activity data from each operation by the emission factor for that activity for each applicable GHG. Some electricity emission factor sets may include emission rates for $CO_2$, $CH_4$, and $N_2O$; others may only provide $CO_2$ emission rates (see Box 6.1)

2. Multiply global warming potential (GWP) values by the GHG emissions totals to calculate total emissions in $CO_2$ equivalent ($CO_2e$).

3. Report final scope 2 by each method in metric tons of each GHG (where available) and in metric tons of $CO_2e$.

Example calculations are provided for the location-based method and market-based method in Table 6.4 and Table 6.5, respectively.



Exhibit 4 to Decl. of Burton
208
**SER 2263**

**Table 6.4** Example calculation for location-based method

| Activity data per reporting period | | | Emission factors | | | | Calculated emissions | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Facility | Location | Quantity of energy | $CO_2$ emission rate | $CH_4$ emission rate | $N_2O$ emission rate | GHG emission factor source | $CO_2$ (mt) | $CH_4$ (kg) | $N_2O$ (kg) | $CO_2e$ (mt) |
| U.S. facilities | eGRID subregion NYUP | 2,500 MWh | 545.79 lb/MWh | 16.3 lb/GWh | 7.24 lb/GWh | eGRID year 2010 | 618.91 | 18.48 | 8.21 | 621.85 |
| | eGRID subregion RFCE | 2,500 MWh | 1001.72 lbs/MWh | 27.07 lb/GWh | 15.33 lb/GWh | eGRID year 2010 | 1135.93 | 30.70 | 17.38 | 1141.96 |
| EU facilities | Denmark | 3,000 MWh | 0.3152 mtCO₂/MWh | * | * | IEA Denmark, 2011 | 945.63 | * | * | 945.63 |
| | Belgium | 2,000 MWh | 0.1957 mtCO₂/MWh | * | * | IEA Belgium, 2011 | 391.44 | * | * | 391.44 |
| **Total consumption** | | **10,000 MWh** | | | | | | | | |
| **Total scope 2 emissions for location-based method** | | | | | | | 3091.908 | 49.179 | 25.596 | 3100.876 |

\* Non-$CO_2$ emission factors not available for IEA



Exhibit 4 to Decl. of Burton
209
**SER 2264**

*CHAPTER 6 Calculating Emissions*

**Table 6.5 Example calculation for market-based method**

| Activity data per reporting period | | | | | Emission factors | Calculated emissions |
|---|---|---|---|---|---|---|
| Facility | Total energy consumption | Quantity of energy | Contractual instrument type | Meets Scope 2 Quality Criteria? | $CO_2$e emission rate | $CO_2$e (mt) |
| U.S. operations | 5,000 MWh | 1,000 MWh | PPA with REC retention | Yes<br><br>Residual mix not available for U.S. | 0 mt $CO_2$e / MWh | 0 mt $CO_2$e |
| | | 2,000 MWh | REC purchase (bundled with energy) | Yes<br><br>Residual mix not available for U.S. | 0 mt $CO_2$e / MWh | 0 mt $CO_2$e |
| | | 1,000 MWh | REC purchase (not bundled with energy) | Yes<br><br>Residual mix not available for U.S. | 0 mt $CO_2$e / MWh | 0 mt $CO_2$e |
| | | 1,000 MWh (remaining energy without contractual instruments) | Grid Average (eGRID sub-region NYUP) | Yes<br><br>Residual mix not available for U.S. | 0.5 mt $CO_2$e / MWh* | 500 mt $CO_2$e |
| EU operations | 5,000 MWh | 3,000 MWh | Supplier program | Yes | 0.25 mt $CO_2$e / MWh | 750 mt $CO_2$e |
| | | 2,000 MWh | Residual mix (RE-DIS II Belgium 2013) | Yes | 0.5 mt $CO_2$e / MWh | 1,000 mt $CO_2$e |
| **Total energy consumption** | **10,000 MWh** | | | | | |
| **Total scope 2 emissions for market-based method** | | | | | | **2,250 mt $CO_2$e** |

* Emission factors for $CH_4$ and $N_2O$ not listed individually here for space considerations

51

Exhibit 4 to Decl. of Burton
210
**SER 2265**

Case 2:24-cv-00801-ODW-PVC   Document 53-4   Filed 07/24/24   Page 55 of 121   Page ID #:1856



## 6.8   Roll up GHG emissions data to corporate level

To report a corporation's total GHG emissions, companies will usually need to gather and summarize data from multiple facilities, possibly in different countries and business divisions. It is important to plan this process carefully to minimize the reporting burden, reduce the risk of errors that might occur while compiling data, and ensure that all facilities are collecting information on an approved, consistent basis. Ideally, corporations will integrate GHG reporting with their existing reporting tools and processes, and take advantage of any relevant data already collected and reported by facilities to division or corporate offices, regulators, or other stakeholders. The two basic approaches to gather data on GHG emissions from facilities include a centralized and decentralized approach. For more guidance on this process, see Chapter 6 of the *Corporate Standard*.

## 6.9   Optional: Calculate any avoided emissions and report separately

Companies can report the estimated grid emissions avoided by low-carbon energy generation and use, separately from the scopes. This type of analysis reflects the impacts of generation on the rest of the grid: for example, the emissions from fossil-fuel or other generation backed down or avoided due to the low-carbon generation. These avoided emissions estimations inherently represent impacts *outside* the inventory boundary. Avoided emissions estimations are not necessarily equivalent to global emissions reductions from additional projects and should therefore not be used to reduce a company's footprint. However, quantifying avoided emissions provide several technical and strategic benefits, including:

- Identifying where low-carbon energy generation can have the biggest GHG impact on system, based on the operating margin.

- Demonstrating that grid-connected generation provides a system-wide service in addition to conveying a specific emission rate at the point of production.

This estimation should follow project-level methodology; see GHG Protocol *Project Protocol* or *Guidelines for Grid-Connected Electricity Projects.* This may be most beneficial

where a company has taken actions that avoid higher-carbon generation dispatch at the margins. These actions could include:

- Installing a low-carbon energy generation facility on-site that sells energy to the grid (any emissions from owned/operated facilities are reported in scope 1)

- Installing a cogeneration facility providing both heat and electricity outputs, which may increase a company's scope 1 reporting but reduce the electricity it needs to purchase from the grid

- Securing a contract to purchase power from a *new* low-carbon energy generation facility

- Undertaking a significant energy efficiency effort.

However, if the project operates in a jurisdiction with an emissions cap on the power sector, or comes from an energy generation facility also producing verified emission reductions (also termed a GHG offset), the company should not make public claims about avoided emissions. The avoided grid emissions will either be zero, in the case of a cap as regulated entities may emit up to the level of the cap,[5] or already represented in claims by the offset purchaser. Any offsets produced from the project, or any voluntary allowances retired on behalf of the purchase associated with the project, should be reported separately.

Exhibit 4 to Decl. of Burton
211
**SER 2266**

*CHAPTER 6 Calculating Emissions*

## 6.10   Location-based emission factors

The emission factors necessary to estimate location-based scope 2 emissions include GHG emission intensity factors for energy production in a defined local or national region. Where advanced studies or real-time information is available, companies may report scope 2 estimations separately as a comparison to location-based grid average estimation (see Box 6.2). Companies should be aware of the following caveats about location-based emission factors:

- **Location-based is not supplier-specific.**
  The location-based grid average emission factors should be distinguished from supplier-specific information, even if the electricity supplier is the sole energy provider in a region and produces a supplier-specific emission factor that closely resembles the overall regional grid average emission factor. In these cases, the service territory may still be a smaller region than the grid distribution area serving a given site of consumption; conversely, many utilities are in competitive markets where multiple suppliers can compete to serve consumers in the same region. Therefore, this method only looks at a broader grid emissions profile serving the local load, regardless of supplier relationships.

- **Grid average emission factors do not factor out contractual purchases.**
  Grid average emission factors in the location-based method should *not* reflect any adjustments or removals for market-based contractual claims by suppliers or end-users. By contrast, a residual mix in the market-based method should represent all unclaimed energy emissions, which is formulated by removing contractual claims data from energy production data (often the same as grid average data).

- **Grid average emission factors are different from marginal grid emission factors.**
  Grid average emission factors should represent all the emissions from energy generation occurring within a defined geographic region, and thereby best represent the purpose of the location-based method. By contrast, marginal emission factors only represent the emissions from those power plants operating "at the margin," which can be more useful for avoided emissions analyses. Companies **shall not** use marginal emission

### Box 6.2 Advanced grid studies

Companies may have access to detailed studies or software solutions linking their facility's time-of-day energy use patterns to the GHG emissions from local generation dispatching during those times. This emission data could be compiled over the course of a year for a consumer to record, match against temporal usage by location, and calculate scope 2 emissions. To date such studies or analyses have not been widely available or used, and have often been contained in proprietary databases with limited consumer access. However, the root components of this type of GHG emissions data, including facility-specific generation and emissions information, are becoming increasingly common as smart grid applications and distributed generation grow. This data can help inform specific demand-side actions more than grid-average emission factors, which may only incentivize overall demand reduction rather than targeted actions. For instance, while utilities may implement DSM measures in order to mitigate emissions, those consumers' demand-timing choices have not been commonly linked to that consumer's GHG emissions, even as those choices may be linked to pricing.

factors such as those provided by CDM for a location-based scope 2 calculation.

### 6.10.1  Grid average emission factors

The term "grid average" emission factors reflects a short-hand for a broad category of data sets that characterize all the GHG emissions associated with the quantity of electricity generation produced from facilities located within a specified geographic boundary. Many of these data sets have been compiled for purposes other than corporate accounting and can vary in their inclusion of energy-generation emissions (e.g., which GHG gases are included, and how biomass and CHP emissions are treated) and perhaps most significantly, in the spatial facility-inclusion boundaries. Greater consistency in grid average emission factors globally can improve location-based inventory results that encompass multiple global operations parameters. A simplified illustration of the

Exhibit 4 to Decl. of Burton
212
**SER 2267**

type of data aggregation and calculation that contributes to a grid average emission factor is shown in Table 6.6.

- **Spatial boundaries.**
  The most appropriate spatial boundaries for emission factors serving the location-based method are those that approximate regions of energy distribution and use, such as balancing areas. All generation and emissions data within this boundary should be aggregated and any net physical energy imports/exports and their related emissions should be taken into account. For multi-country regions with frequent and significant exchanges of energy throughout a year (as measured by percent of that country's total generation), a multi-country regional grid average may be a better estimate than a production-only national emission factor without energy imports/exports adjustments. In turn, in a country with multiple distribution or balancing areas, these subnational regions would be a more precise spatial boundary for grid average emissions.

- **Other data quality.**
  Companies can evaluate emission factor data based on quality indicators including their reliability, completeness, and geographic, temporal, and technological representativeness. Grid-average emission factors in particular may face challenges with temporal representativeness due to time delays between the year in which energy generation and

resulting emissions occurred, and the year in which the data is published and made available to users. For U.S. eGRID or IEA, these delays can be 2–3 years. This delay can make grid average emissions factors a less relevant indication of corporate performance or risk assessment when analyzed in the inventory year. Companies should take this into account when analyzing location-based scope 2 results.

## 6.11  Market-based emission factors data

Under the market-based method, different contractual instruments become carriers of GHG-emission rate information that function as emission factors for consumers to use to calculate their GHG emissions. To ensure this, instruments **shall** include the GHG emission rate attribute. If companies have access to multiple market-based emission factors for each energy-consuming operation, they should use the most precise for each operation based on the list in Table 6.3.

### 6.11.1  Energy attribute certificates

Certificates form the basis of energy attribute tracking in the market-based method, often being conveyed with contracts for energy and integrating into supplier-specific emission rates. See Chapter 10 for more background on certificate types and treatment.

**Table 6.6** Example of grid average emission factor calculation

| | Emissions from generation | Total generation in MWh |
|---|---|---|
| Energy Facility A (coal) | 50,000 metric tons $CO_2$e | 55,000 |
| Energy Facility B (natural gas) | 10,000 metric tons $CO_2$e | 30,000 |
| Energy Facility C (wind farm) | 0 metric tons $CO_2$e | 15,000 |
| | | |
| **Totals  within defined boundary** | 60,000 metric tons $CO_2$e | 100,000 |
| **Total system emission rate ("grid average")** | 60,000 metric tons $CO_2$e/100,000 | **0.6 mt $CO_2$e /MWh** |

Exhibit 4 to Decl. of Burton
213
**SER 2268**

Case 2:24-cv-00801-ODW-PVC   Document 53-4   Filed 07/24/24   Page 58 of 121   Page ID #:1859

*CHAPTER 6* Calculating Emissions

### 6.11.2 Contracts such as power purchase agreements (PPAs)

These types of contracts allow a consumer, typically larger industrial or commercial entities, to form an agreement with a specific energy generator. The contract itself specifies the commercial terms, including delivery, price, payment, etc. In many markets, these contracts secure a long-term stream of revenue for an energy project.

*Where certificates are issued:* In these cases, the certificates themselves serve as the emission factor for the market-based method. If the certificates are bundled with the contract, the purchaser can claim the certificates. If the certificates are sold separately, the power recipient *cannot* claim the attributes of the specific generator.

*When certificates are not used in the jurisdiction or for the technology/resource:* Where certificates are not issued by a tracking system, a PPA may nevertheless convey generation attributes if the PPA includes language that confers attribute claims to the power recipient. This more explicitly renders the PPA a GHG attribute-claims carrier. Where the PPA is silent on attributes and where attributes are not otherwise conveyed or tracked, the contract for power can be used as a proxy for delivery of attributes. As shown in the Scope 2 Quality Criteria, an audit trail or other mechanism is needed to demonstrate that no other entity is claiming the attributes from this generation.

*When the power received in the PPA is resold:* If the power purchased in a PPA is resold to the wholesale or retail market, then the company receiving-and-reselling the power cannot claim the "use" of the attributes in markets where certificates are not used. In markets with certificates, the company may retain the certificates from the power generation to use for its own claims while it resells the power.

To avoid double counting, companies making claims based on contracts (where no certificate system exists) should report the quantity of MWh and the associated emissions acquired through contracts to the entity that calculates the residual mix, and request that their purchase be excluded from the residual mix. Certain third-party certifications of renewable energy may do this automatically.

### 6.11.3 Supplier-specific emission rate

Electricity suppliers or load-serving entities function differently across markets. In some deregulated markets, there may be retail competition within the group of entities that interface directly with customers. In other regulated monopoly markets, a single utility may supply an entire service territory. In all cases, an energy supplier can provide information to its consumers regarding the GHG intensity of delivered electricity. The utility or supplier-specific emission factor may be a standard product offer or a differentiated product (e.g. a renewable energy product or tariff). When using a supplier-specific emission factor, companies should seek to ensure that:

- The emission rate is disclosed, preferably publicly, according to best available information, and where



Exhibit 4 to Decl. of Burton
214
**SER 2269**

**Box 6.3** **How the UK implements EU supplier disclosure requirements**

In the EU system, the Fuel Mix Disclosure regulations require all suppliers to disclose the emissions associated with the power that they supply. To do so, U.K. suppliers present renewable energy guarantees of origin (REGOs) and Generator Declarations to the regulator for the jurisdiction, the Department for Energy and Climate Change (DECC). DECC then removes all claimed generation from the overall national average, which leads to the production of a 'residual' energy mix—with an associated emissions factor.  This is issued to all suppliers so that they can complete their calculations for any of their supply without certificates.  This combination of verified supplier claims and allocation of the remaining emissions back to suppliers ensures consistency across suppliers and accounting for all generation emissions.

For more on U.K. requirements, see: https://www.ofgem. gov.uk/ofgem-publications/57972/12340-28205.pdf and https://www.gov.uk/government/uploads/system/uploads/ attachment_data/file/82783/Fuelmixdisclosure2013.pdf.

possible using best practice methods such as The Climate Registry Electric Power Sector Protocol. Methods for calculating and disclosing the mix and related attributes may also be specified by regulation.

- That the utility or supplier discloses whether and how certificates are used in the emission factor calculation, unless there is third-party certification of the utility product. In particular, companies should seek to ensure that if the supplier has a differentiated product (e.g. a renewable energy product or tariff), the certificates or other contracts used for that product should be used only for that product and not counted in the standard product offer.

- That the supplier-specific emission factor includes emissions from all the energy delivered by the utility, not just the generation assets owned by the supplier (e.g. what is required by some fuel mix disclosure rules). Many suppliers purchase significant portions of their energy from other generators via contracts, or through the spot market. The emission factor should reflect the emissions from all of these purchases. A supplier-specific emission rate can also reflect certificates retired for compliance purposes (such as U.S. state RPS programs) which also convey attributes for public benefit and claims.

Consumers should not attempt to calculate a supplier-specific emission rate themselves based on a fuel mix disclosure due to the variations in fuel mix disclosure rules, which may reduce the accuracy of the resulting GHG emission factor.

If an electricity supplier purchases offsets on behalf of their customers, the reporting customers should report the offsets separately from the scopes. The supplier-specific emission rate used for scope 2 should reflect supply only, and not purchased offsets.

### 6.11.4  Residual mix

To prevent double counting of GHG emission rate claims tracked through contractual instruments, the market-based method requires an emission factor that characterizes the emission rate of untracked or unclaimed energy. This emission factor creates a complete data set under the market-based method, and represents the regional emissions data that consumers should use if they operate in a market with choice for consumers, differentiated products, and supplier specific data, but did not purchase certificates or a specified product, do not have a contract with a specified source, or do not have supplier-specific information.

Depending on the region and percentage of tracked electricity, this residual mix may closely resemble a "grid average" data set, or may be significantly different. In the U.S. overall, an estimation of the adjusted mix in 2009 did not differ significantly from the location-based grid average data. In fact, according to a paper by the Environmental Tracking Network of North America (ETNNA 2010), the difference is currently less than one half of one percent.[4]

Companies should not attempt to calculate their own residual mix.

- **If a residual mix is not available.** Other unadjusted grid average emission factors such as those used in the location-based method may be used. Companies

Exhibit 4 to Decl. of Burton
215
**SER 2270**

**CHAPTER 6** *Calculating Emissions*



**shall** document in the inventory that a residual mix was not available.

## 6.12   Treatment of biofuel emissions

Biogenic materials—including biomass, biofuels, and biogas—are increasingly used as a resource for energy generation on-site and on the grid. While biomass can produce fewer GHG emissions than fossil fuels and may be grown and used on a shorter time horizon, it still produces GHG emissions and should not be treated with a "zero" emission factor. Based on the *Corporate Standard,* any $CH_4$ or $N_2O$ emissions from biogenic energy sources use **shall** be reported in scope 2, while the $CO_2$ portion of the biofuel combustion **shall** be reported outside the scopes. In practice, this means that any market-based method data that includes biofuels should report the $CO_2$ portion of the biofuel combustion separately from the scopes.

For the location-based approach, most commonly used grid average emission factor—including those issued by EPA eGRID (U.S.), Defra (U.K.), and the International Energy Agency (for all countries worldwide)—do not note the percentage of biomass in the emission factor and do not separately report the biogenic $CO_2$, effectively treating it as "zero" emissions. Companies should document this omission in any grid average emission factors used.

### Endnotes

1. See Chapter 14 of The Climate Registry's General Reporting Protocol.

2. See http://www.ftc.gov/news-events/media-resources/truth-advertising/green-guides.

3. See Chapter 10 on how to report this relationship. Allowance set-aside programs also allocate and retire allowances to restore an avoided emissions claim. In this case, where a set-aside for voluntary renewable energy is in place and where allowances have been retired, purchasers can make claims about avoided emissions.

4. ETNNA (2010). P. 14

Exhibit 4 to Decl. of Burton
216
**SER 2271**

Case 2:24-cv-00801-ODW-PVC   Document 53-4   Filed 07/24/24   Page 61 of 121   Page ID #:1862



# 7 Accounting and Reporting Requirements

Exhibit 4 to Decl. of Burton
217
**SER 2272**

**T**his chapter identifies all the new accounting and reporting requirements introduced by this Guidance. Conformance with this Guidance is required in order to prepare an inventory in conformance with the *Corporate Standard*.

This Guidance provides a new set of requirements applied to the *Corporate Standard* in calculating and reporting scope 2 emissions. Therefore, conformance with this Guidance is required in order to prepare an inventory in conformance with the *Corporate Standard*. In addition to all existing *Corporate Standard* accounting and reporting requirements (see Chapter 9 of the *Corporate Standard*), companies **shall** calculate and report scope 2 in the following ways:

### 7.1   Required information for scope 2

> For companies with operations only in markets that do not provide product or supplier-specific data or other contractual instruments:

- Only one scope 2 result **shall** be reported, based on the location-based method.

> For companies with any operations in markets providing product or supplier-specific data in the form of contractual instruments (Markets are increasingly developing and refining purchasing options, and the list is not exhaustive. Currently this includes the EU Economic Area, the U.S., Australia, most Latin American countries, Japan, and India, among others.)

- Companies **shall** account and report scope 2 emissions in two ways and label each result according to the method: one based on the location-based method, and one based on the market-based method.

- Many companies' GHG inventories will include a mix of operations globally, some where the market-based method applies and some where it does not. Companies **shall** account for and report all operations' scope 2 emissions according to both methods.

  - To do so, emissions from any operations in locations that do *not* support a market-based method approach **shall** be calculated using the location-based method (making such operations' results identical for location-based and market-based

59

Exhibit 4 to Decl. of Burton
218
**SER 2273**

methods). Companies should note what percentage of their overall electricity consumption reported in the market-based method reflects actual markets with contractual information.

**Scope 2 Quality Criteria.** Companies **shall** ensure that any contractual instruments used in the market-based method total meet the Scope 2 Quality Criteria specified in Table 7.1. If instruments do not meet the Criteria, then other data (listed in Table 6.3) **shall** be used as an alternative in the market-based method total. In this way, *all* companies required to report according to the market-based method will have some type of data option.

• Companies **may** provide a reference to an internal or external third-party assurance process, or assurance of conformance provided by a certification program, supplier label, green power program, etc. An attestation

form **may** be used to describe the chain of custody of purchased certificates or other contractual instruments.

• If a residual mix is not currently available, reporters **shall** note that an adjusted emissions factor is not available or has not been estimated to account for voluntary purchases and this may result in double counting between electricity consumers.

**Inventory totals.** For companies adding together scope 1 and scope 2 for a final inventory total, companies **may** either report two corporate inventory totals (one reflecting each scope 2 method), or **may** report a single corporate inventory total reflecting one of the scope 2 methods.

• If reporting a single corporate inventory total, the scope 2 method used should be the same as the one used for goal setting. Companies **shall** disclose which method was chosen for this purpose.

**Table 7.1** Scope 2 Quality Criteria

Further explanation on select Scope 2 Quality Criteria can be found in Section 7.5.

| All contractual instruments used in the market-based method for scope 2 accounting shall: |
|---|
| 1. Convey the direct GHG emission rate attribute associated with the unit of electricity produced. |
| 2. Be the only instruments that carry the GHG emission rate attribute claim associated with that quantity of electricity generation. |
| 3. Be tracked and redeemed, retired, or canceled by or on behalf of the reporting entity. |
| 4. Be issued and redeemed as close as possible to the period of energy consumption to which the instrument is applied. |
| 5. Be sourced from the same market in which the reporting entity's electricity-consuming operations are located and to which the instrument is applied. |

| In addition, utility-specific emission factors shall: |
|---|
| 6. Be calculated based on delivered electricity, incorporating certificates sourced and retired on behalf of its customers. Electricity from renewable facilities for which the attributes have been sold off (via contracts or certificates) shall be characterized as having the GHG attributes of the residual mix in the utility or supplier-specific emission factor. |

| In addition, companies purchasing electricity directly from generators or consuming on-site generation shall: |
|---|
| 7. Ensure all contractual instruments conveying emissions claims be transferred to the reporting entity only. No other instruments that convey this claim to another end user shall be issued for the contracted electricity. The electricity from the facility shall not carry the GHG emission rate claim for use by a utility, for example, for the purpose of delivery and use claims. |

| Finally, to use any contractual instrument in the market-based method requires that: |
|---|
| 8. An adjusted, residual mix characterizing the GHG intensity of unclaimed or publicly shared electricity shall be made available for consumer scope 2 calculations, or its absence shall be disclosed by the reporting entity. |

Exhibit 4 to Decl. of Burton
219
**SER 2274**

*CHAPTER 7 Accounting and Reporting Requirements*

**Methodology disclosure.** Companies **shall** disclose methods used for scope 2 accounting. For the market-based method, companies **shall** disclose the category or categories of instruments from which the emission factors were derived, where possible specifying the energy generation technologies.

**Base-year information.** Companies **shall** disclose the year chosen as the base year; the method used to calculate the base year's scope 2 emissions; whether historic location-based data is used as a proxy for a market-based method; and the context for any significant emission changes that trigger base-year emissions recalculation (acquisitions/ divestitures, outsourcing/insourcing, changes in reporting boundaries or calculation methodologies, etc.)

**Disclose basis for goal setting.** If a company sets a corporate inventory reduction goal and/or a scope 2-specific reduction goal, the company **shall** clarify whether the goal is based on the location-based method total or market-based method total.

## 7.2    Recommended disclosure

**Annual electricity consumption.** Companies **should** report total electricity, steam, heat, and cooling per reporting period separately from the scopes totals (in kWh, MWh, BTU, etc.), which should include all scope 2 activity data as well as the quantity of energy consumed from owned/ operated installations (which may be only reported in scope 1 and not in scope 2.)

**Biogenic emissions.** Companies **should** separately report the biogenic $CO_2$ emissions from electricity use (e.g. from biomass combustion in the electricity value chain) separately from the scopes, while any $CH_4$ and $N_2O$ emissions should be reported in scope 2.

- Companies **should** document if any GHG emissions other than $CO_2$ (particularly $CH_4$ and $N_2O$) are not available for, or excluded from, location-based grid average emissions factors or with the market-based method information.

**Other instrument retirement.** Companies **should** disclose additional certificate or other instrument retirement performed in conjunction with their voluntary claim, such

as with certificate multipliers or any pairing required by regulatory policy.

**Basis for upstream scope 3.** The reporting entity **should** identify which methodology has been used to calculate and report scope 3, category 3—upstream energy emissions not recorded in scope 1 and 2, scope 3.

**Instrument features.** Where relevant, companies **should** disclose key features associated with their contractual instruments claimed, including any instrument certification labels that entail their own set of eligibility criteria, as well as characteristics of the energy generation facility itself and the policy context of the instrument. These features are elaborated in Chapter 8.

**Role of corporate procurement in driving new projects.** Where relevant, companies **should** elaborate in narrative disclosure how any of the contractual instruments claimed in the market-based method reflect a substantive contribution by the company in helping implement new low-carbon projects.

## 7.3    Optional information

**Scope 2 totals disaggregated by country.** This can improve transparency on where market-based method totals differ from location-based.

**Avoided emissions estimation.** Consistent with Chapter 8 of the *Corporate Standard,* companies **may** separately report an estimation of GHG emissions avoided from a project or action (also see Section 6.9). This quantification should be based on project-level accounting, with methodologies and assumptions documented (including to what the reduction is being compared). See the *GHG Project Protocol* and *GHG Protocol Guidelines for Grid-Connected Electricity Projects* for example methodologies.

**Advanced grid study estimations.** Where advanced studies (or real-time information) are available, companies **may** report scope 2 estimations separately as a comparison to location-based grid average estimations, and companies can document where this data specifically informed efficiency decision making or time-of-day operations. Because these studies or analyses may be more difficult to use widely across facilities or to standardize/aggregate

61

Exhibit 4 to Decl. of Burton
220
**SER 2275**



See the *Corporate Standard* Chapter 9 for more information about optional information and how to use ratio indicators and other performance metrics in reporting.

## 7.4   Dual reporting

Dual reporting allows companies to compare their individual purchasing decisions to the overall GHG-intensity of the grids on which they operate. In addition, reporting two separate scope 2 figures using two different methods provides several benefits:

- Distinguishes changes in choices vs. changes in grid emissions intensity

- Provides for a more complete assessment of the GHG impact, risks, and opportunities associated with energy purchasing and consumption

- Provides transparency for stakeholders

- Improves comparability across operations (on location-based method) where the company's GHG inventory includes operations in markets *without* contractual instruments

- Facilitates participation in programs with different reporting requirements.

consistently without double counting, companies should ensure that any data used for this purpose has addressed data sourcing and boundaries consistent with the location-based method.

**Scope 2 results calculated by other methods.** If companies are subject to mandatory corporate reporting requirements for facilities in a particular region/nation that specify methodologies other than the two required for dual reporting, these companies **may** report these results separately from the scopes.

**Disclose purchases that did not meet Scope 2 Quality Criteria.** If a reporting entity's energy purchases did *not* meet all Scope 2 Quality Criteria, the entity **may** note this separately. This note should detail which Criteria have been met, with details of why the remaining Criteria have not. This will provide external stakeholders with the information they require, and allow the reporting entity to disclose the efforts made to adhere to the guidance. (As noted in Chapter 6, location-based method data will be used as proxy emission factors in the market-based method total.)

This guidance's framework addresses and reduces double counting between scope 2 inventories when using the same accounting method, improving the accuracy of reported results and ensuring clear performance tracking toward goals.

The UK represents an example of the differing demands of the various stakeholders, where organizations (especially those trading internationally) have complex demands from their stakeholders. The carbon inventory is often reviewed by investors based in the United States, where there is an expectation to report using the market-based approach. However, the prevailing guidance from the UK government is to report using the locational-based approach, in part due to concerns regarding subsidy levels for renewables and double counting concerns. For these organizations, dual reporting provides disclosure in a way that allows all stakeholders to be satisfied.

Exhibit 4 to Decl. of Burton
221
**SER 2276**

### 7.4.1 Other methods

Some jurisdictions may recommend methods other than the location-based or market-based method as the basis for its consumer claims and scope 2 accounting, in order to achieve specific policy objectives. For instance, Ademe[i] in France has calculated different grid GHG emission rates according to different end uses by consumers. This represents a different emissions allocation approach than the location-based method presented in this guidance, although it is derived from it. It recommends companies reporting to Ademe apply these end-use factors to the different types of energy end uses, in order to better estimate the average GHG impact of specific consumption activities.

Companies required by regulation to use a method other than those listed in this guidance should do so for those required reports. To maintain consistency with the GHG Protocol *Corporate Standard* and this *Scope 2 Guidance,* companies may additionally and separately report any scope 2 totals calculated for other mandatory reporting rules applying to that region/nation's facilities.

### 7.4.2 Gross/net reporting

The two method totals (location-based and market-based) should not be viewed as "gross/net," since a net calculation typically implies that external reductions such as offsets have been applied to the inventory. While many contractual instruments in the market-based method represent a zero emission rate from renewable energy and generally serve to lower the GHG intensity of the reporter's electricity use, the market-based method should also include other contractual instruments representing fossil fuel or mixed-resource emission factors as well. The method is designed to reflect a range of instruments that together allocate overall emissions across the grid. For instance, a supplier-specific emission rate that includes a mix of generation technologies also is a valid market-based method emission factor.

However, companies can report avoided emissions estimations from generation separately from the scopes and indicate if these have been used in program-specific gross/net reporting (such as Defra Corporate guidelines[2]).

## 7.5 Additional guidance on Scope 2 Quality Criteria

The environmental integrity of the market-based method depends on ensuring that contractual instruments reliably and uniquely convey GHG emission rate claims to consumers. Without this, a resulting market-based scope 2 total lacks the accuracy and consistency necessary to drive corporate energy procurement decisions. In addition, the lack of a reliable system for tracking or assuring claims poses risks of inaccurate consumer claims regarding a product's actual attributes, and weakens the ability for consumer decisions to influence market supply.

Therefore, this guidance identifies a set of minimum criteria that relate to the integrity of the contractual instruments as reliable conveyers of GHG emissions rate information and claims, as well as the prevention of double counting. They represent the *minimum* features necessary to implement a market-based method of scope 2 GHG accounting. *Programs or jurisdictions may have additional requirements that reporting entities should consult and follow.*

**Criteria 1.** **Conveying GHG emission rate claims.** Many instruments already include specific language about the ownership or ability to claim specific attributes about the product (energy) being generated. In the U.S., most states (and the Green-e Energy National Standard) define RECs as conveying "all environmental attributes" associated with the MWh of energy generation. This type of claim is considered "fully aggregated," meaning that no other instrument can be generated from that MWh which conveys consumer claims regarding any of the environmental attributes of the energy. (In specific cases of multipliers or issuance of multiple instruments from the same MWh, then all instruments **shall** be retired for a full claim on that MWh.) Tracking systems themselves support only fully aggregated certificates.

In some markets it may be possible for attribute claims about energy generation to be separated out explicitly into different certificates that could be used for different purposes. This guidance does not address program design elements in markets with multiple certificates, but requires that only one instrument (or discrete set of instruments applied all at once) convey attribute claims about the energy type and its GHG emission rate.

63

Exhibit 4 to Decl. of Burton
222
**SER 2277**

*If certificates do not specify attributes:* Certificates that do not currently specify what, if any, energy attribute claims are conveyed, may still convey a claim implicitly through proving the second point: that no consumer is claiming the same energy generation attributes. Evidence of this may be achieved through attestations from each owner in the chain of custody or equivalent procedures providing the same information.

*If the attribute emission rate itself is not specified and the technology is not zero emissions,* the reporting organization should seek from the generating entity a specific emission rate from that generation facility. Otherwise, a default factor from IPCC or other government publications may be used and disclosed.

Biofuel generation facilities producing certificates should specify the $CO_2$, $CH_4$, and $N_2O$ emissions produced at the point of generation. The scope 2 reporter reports the $CH_4$ and $N_2O$ emissions in scope 2, while the $CO_2$ from biofuel is reported separately from the scopes.

**Criteria 2. Unique claims.** If other instruments exist that can be used for attribute claims by other electricity consumers, companies must ensure that the one being used by the reporting entity for a GHG emission rate claim is the only and sole one that does so. Where multiple instruments carry the GHG emission rate attribute claim, some jurisdictions or programs may require acquisition and "pairing" of the multiple certificates to support a voluntary consumer GHG emission rate claim. Companies should check with their electricity supplier or relevant policy-making bodies to ensure that the certificates are claimed, paired, or retired in compliance with applicable jurisdictional or program requirements.

The underlying electricity (or megawatt-hour) minus the instrument, sometimes called "null power," **shall** also not reflect the same GHG emission rate, but should be assigned residual mix emissions for the purpose of delivery and/or use claims in the market-based method.

In some cases, ensuring unique GHG emission rate claims may require arbitration regarding the validity and enforceability of a claim where multiple instruments exist and remain unclear on attribute claims.

**Criteria 3. Retirement for claims.** Ensuring that instruments are retired, redeemed, or claimed to support a consumer claim can be done through a tracking system, an audit of contracts, third-party certification, or may be handled automatically through other disclosure registries, systems, or mechanisms. These practices help guarantee that only consumers make a claim, even as an instrument may change hands through trading.

**Criteria 4. Vintage.** Vintage reflects the date of energy generation from which the contractual instrument is derived. This is different from the age of the facility. In order to ensure temporal accuracy of scope 2 calculations, this criteria seeks to ensure that the generation on which the emission factors are based occurs close in time to the reporting period for which the certificates (or emissions) are claimed. This timing should be consistent with existing standards for the market where the contractual instruments exist. Contractual instruments should clearly display when the underlying electricity was generated.

**Criteria 5. Market boundaries.** The market boundary criteria address the geographic boundary from which certificates can be purchased and claimed for a given operation's scope 2 accounting and reporting.

*Distinguishing other relevant electricity boundaries:* The market for purchasing and selling electricity is typically a regional transmission organization, power pool, or balancing area, with exports and imports often broadening these markets. By definition, certificates are separated from underlying electricity flows, and markets for unbundled certificates have often been less constrained than those for electricity itself. This larger market boundary for certificate use promotes broader areas of consumer choice and the building of renewable energy resources in the most economically viable locations.

*To determine market boundary:* Companies should check whether the regulatory authorities and/or certification/issuing bodies responsible for certificates have established the boundaries in which certificates may be traded and redeemed, retired or canceled, and should follow these market boundaries.

Exhibit 4 to Decl. of Burton
223
**SER 2278**

Case 2:24-cv-00801-ODW-PVC   Document 53-4   Filed 07/24/24   Page 68 of 121   Page ID #:1869



*CHAPTER 7* Accounting and Reporting Requirements

**Criteria 6. Supplier or utility-specific emission factors.** As part of the calculation, the utility or supplier should disclose whether and how certificates are used in the emission factor calculation, unless there is third-party certification of the utility product. The utility or supplier-specific emission factor may be for:

    a.  A standard product offer or
    b.  A differentiated product (e.g., a low-carbon power product or tariff).

The supplier-specific emission factor should be disclosed (preferably publicly) according to best available information. Where possible, this should also follow best practice methods, such as The Climate Registry Electric Power Sector Protocol.

**Criteria 7. Direct contracts or purchasing.** In the absence of energy attribute certificates, the contract and claim associated with it should be verified by a third party to convey a unique or sole ownership right to claim a GHG emission rate.

**Criteria 8. Residual mix.** To ensure unique claims by all electricity users, an adjusted, residual mix characterizing the GHG intensity of unclaimed or publicly shared electricity is necessary. This residual mix should be based on combining national or subnational energy and emissions production data with contractual instrument claims. If a residual mix is not currently available, companies **shall** disclose that an adjusted emissions factor is not available or has not been estimated to account for voluntary purchases and this may result in double counting between electricity consumers. Reporters may provide other information about the magnitude of this error, where it is available and where it puts the scale of the residual mix adjustment into a context of other sources of error in grid emission factor calculation.

*If the market boundary is not specified or not clear:* Markets for certificates are typically determined by political or regulatory boundaries rather than just physical grid interconnection. This means market boundaries can be limited to a single country or group of countries that recognize each other's certificates as fungible and available to any consumers located therein. The United States, for example—despite differences in state law, local regulatory policy, and variation in physical interconnection within these regions—operates under broad federal laws and regulations, and therefore has constituted a single market for use of certificates. The EU represents a multi-country market united by a set of common market rules and a regional connection.

Where multiple countries or jurisdictions form a single market, a consistent means of tracking and retiring certificates, and calculating a residual mix, needs to be present in order to prevent double counting of GHG emission rates among electricity consumers. Accurate residual mixes should take into account the energy and emission mixes of all geopolitical entities engaged in trading certificates.

*Additional geographic sourcing considerations:* In addition, if not already specified by regulation or program, contractual instruments should be sourced from regions reasonably linked to the reporting entity's electricity consumption. These regions may grow over time as more interconnections and larger balancing areas are formed to improve grid reliability and integrate intermittent renewables.

**Endnotes**

1.  See: http://www.basecarbone.fr/data/rapport_methodo_co2_elec_2012.pdf
2.  See: https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/206392/pb13944-env- reporting-guidance.pdf

Exhibit 4 to Decl. of Burton
224
**SER 2279**



## 8 Recommended Reporting on Instrument Features and Policy Context

Exhibit 4 to Decl. of Burton
225
**SER 2280**



**T**his chapter describes additional information that companies should disclose about the features and policy context of their energy purchases. This disclosure can improve transparency and inform stakeholders.

### 8.1  Instrument feature disclosure

Markets currently differ as to what types of energy generation facilities produce instruments that are recognized in the market-based method for corporate GHG inventories. Different programs establish their own *eligibility criteria* that determine what energy generation facilities can produce certificates that are recognized in the program. (See Chapter 10 for background on these differences).

This variation can make it difficult to compare and understand the procurement choices a company has made in different markets. However, when companies disclose information about the energy generation facilities and policy context reflected in their contractual instruments, company decision makers and stakeholders can get a clearer picture about how well the purchase aligns with other company goals. In particular, stakeholders evaluating a company's contribution to mitigating global emissions may be interested in how a company is driving change in supply.

If information on these features or policy context is not made available on or with the certificate, companies can ask the certification program, tracking system, or supplier for further information. Lacking other information, a company may disclose the overall criteria identified by the certificate program (e.g. Green-e Energy certified RECs are from facilities installed in the last fifteen years on a rolling basis).

#### 8.1.1  Instrument feature disclosure formats

Companies can disclose features about their contractual instruments in a variety of formats depending on the intended audience, communication channel (summary report vs. full extended report), etc. Companies may find a checklist approach may help maintain clarity on the features associated with each contractual instrument, depending on the number of energy-consuming facilities and different instruments in the inventory. See Table 8.1 for a list of these features and policy contexts. In cases where companies have undertaken strategic or iconic projects, a more narrative format can be useful to highlight the project's features in the context of a larger history.

67

Exhibit 4 to Decl. of Burton
226
**SER 2281**

**Table 8.1** Example instrument features and policy context

| Instrument labels |
|---|
| **Certification or label name (if applicable)**. This can include certification such as Green-e Energy (U.S.), EcoLogo (Canada), or labels such as EKOenergy and Naturemade in the EU. The certification or label name should also specify what is being certified, e.g. in the U.S. Green-e Energy certifies against a set of requirements described in their National Standard. |
| **Incremental funding programs.** This should specify whether the instrument is associated with a certification label or supplier program that contributes incremental funding to new projects, and if so what quantity of funding is included with the company's contractual purchase. |

| Energy generation facility features |
|---|
| **Energy resource type.** Instruments should clearly identify the resource generating the certificate. For supplier-specific emission rates, the resource type could be "mix" for standard offers, "multiple renewable" for certain green power products, or cite the specific resource used. Residual mix will typically be a "mix." |
| **Facility location.** Depending on the information available from the certificate, supplier, or contract, the generation facility location could be identified at a national or subnational level (either geopolitical such as a U.S. state, and/or a grid region such as a North American Electric Reliability Corporation (NERC) region. |
| **Facility age.** Stakeholders may wish to know whether the purchase consists largely of generation attributes from older facilities or more recently constructed projects.  Companies should note the year the generation facility that created the certificate/contract was first operational or substantially repowered. |

| Policy context |
|---|
| **Supplier quotas.** The contractual instrument claimed will relate differently to instruments used for supplier quotas, depending on the market. Companies should note the relationship between their contractual instruments following the list of options in Table 10.2. |
| • **Cap and Trade.** Is the facility that produced the instruments you claim affected by a cap and trade policy? (Y/N)<br>   • If yes, does the cap and trade program allocate allowances for retirement on behalf of voluntary renewable electricity purchases from this facility? (Y/N)<br>   • If yes, were allowances retired on behalf of your voluntary purchase of instruments from this facility? (Y/N) If so, these allowances should be reported (in metric tons) separately from the scopes. |
| **Funding/Subsidy Receipt.** The funding disclosed here can highlight recent funding or subsidy policies directly and substantially affecting the generation facility. |
| **Offsets.** Is the facility producing offset credits from the same MWh reflected in the contractual instrument? (Not applicable to contractual instruments in most industrialized electricity markets). |
| **Other policy instruments.** This includes any other policy instruments bundled/retired voluntarily by the company itself, a certificate certification program, supplier label, etc. |

Exhibit 4 to Decl. of Burton
227
**SER 2282**

*CHAPTER 8 Recommended Reporting on Instrument Features and Policy Context*

## 8.2 Reporting on the relationship between voluntary purchases and regulatory policies

This guidance does not require contractual instruments claimed in scope 2 to be "in addition to," or independent from, regulatory policies such as subsidies, tax exemptions, or supplier quotas. Due to the design of renewable energy production targets, achieving "regulatory surplus" with voluntary purchases may not always be possible. For transparency, companies should disclose the relationships between instruments claimed in scope 2 and regulatory policies, as part of the disclosure of overall instrument features and policy context to improve transparency and stakeholder understanding of the voluntary purchase. Companies should also disclose additional certificates or other instrument retirement performed in conjunction with their voluntary claim. These relationships and reporting options are elaborated below.

### 8.2.1 Relationship to supplier quotas

Where relevant, companies should state the relationship between the energy claimed in the market-based method and any compliance instruments used for supplier quota regulations. Six example relationships can be found in Table 8.2.

### 8.2.2 Relationship to subsidy receipt

In some countries, renewable energy projects that receive a public subsidy such as a feed-in-tariff (FiT) must have the certificate from that project retired or canceled, preventing any individual consumer claim. For instance, in Germany if a generation facility receives subsidies, then all generation attributes must be either canceled or retired on behalf of all German consumers under the rationale these consumers have paid for the energy through taxes, and should therefore collectively own the attributes. (This is in contrast to other European member states, which allow for individual consumer attribute ownership in addition to national subsidies.) In Japan, once renewable electricity that receives a FiT is sold to utilities, voluntary renewable

**Table 8.2** Relationships between voluntary and supplier quotas

| Reporting Option | Example |
| --- | --- |
| **If there is no supplier energy source quota in contractual instrument's market** | |
| 1. No supplier quota in instrument's market | |
| **If there is a supplier quota in the jurisdiction of the contractual instrument:** | |
| 2. Energy from claimed instrument also used to meet supplier quota | Multiple certificates from same MWh conveying different attributes |
| **If there is a quota and the energy from the claimed instrument is not directly used to meet it:** | |
| 3. Claimed instrument not directly reflecting quota | Fossil contract or residual mix |
| 4. Claimed instrument includes the supplier quota | Supplier-specific emission factor that includes compliance instruments |
| 5. Claimed instrument above and beyond supplier quota | Voluntary U.S. RECs |
| 6. Claimed instrument paired with retired compliance instrument issued from same unit of energy generation | *No applied examples to date |

69

Exhibit 4 to Decl. of Burton
228
**SER 2283**

energy certificates cannot be issued. Accordingly, for the purpose of achieving regional fairness, the value of zero emissions energy generated from FiT-supported renewable electricity is allocated to each utility in accordance with sales amounts because FiT represents a public subsidy. In practice, this leaves subsidized energy a "public good" whose attributes are included in a system mix used for supplier reporting.

**Reporting options:** In jurisdictions where energy supported by recent or substantial renewable energy production subsidies is not excluded from voluntary programs or claims, companies should disclose subsidy receipt (available on GO).

### 8.2.3   Relationship to emissions trading programs

In emissions-capped power programs such as the European Emissions Trading Scheme, low-carbon energy generation is incentivized through creating a limit (cap) on fossil-fuel emissions. But all energy attribute certificates, including voluntary energy attribute certificates and other contractual instruments can still convey emission rate claims under an emissions cap (e.g., renewable energy still produces zero emissions/MWh at the point of generation). The presence of a cap does not directly impact or prevent market-based accounting based on contractual instruments.

However, because the total system's emissions have been predetermined by the cap, these actions may simply "free up" allowances for other emitters to acquire, resulting in no net global GHG reductions. This means consumers cannot claim that the generation purchased resulted in global emission reductions on the grid; only by affecting the allowance cap by retiring or reducing available allowances would electricity consumers be able to support that claim. Voluntary low-carbon energy purchases (as well as other actions such as efficiency upgrades or energy conservation) without allowance retirement could be seen as an essential and expected means of contributing to meeting the system-wide cap, or as "subsidizing" the overall sector's costs for meeting the cap.

**Allowance set-asides.** Many states participating in the U.S. Regional Greenhouse Gas Initiative (RGGI) and the California cap-and-trade program have created an allowance set-aside program. These programs designate that a portion of total emission allowances available in a given compliance period be set aside and retired on behalf of voluntary REC purchases. This combined REC purchase and allowance retirement is designed to preserve or strengthen the global carbon benefits and impacts for voluntary renewable energy purchases. In theory, allowances could be retired by any entity trying to demonstrate environmental commitment, as a reduction in available allowances for emitting entities can create scarcity (and theoretically, behavior change) in the marketplace. Retiring allowances effectively lowers the cap.

**Reporting options.** Companies claiming contractual instruments in an emissions-capped power sector should disclose whether an allowance set-aside program is in place, and whether any allowances have been retired along with the voluntary certificates. The tons of GHG emissions represented in any retired allowances should be reported separately from the scopes.

**Caveats.** This guidance does not recommend treating allowances retired as part of a voluntary renewable energy set-aside as though they were offsets. Conceptually, allowances could be seen to function as offsets in that they represent tons of $CO_2e$ that were avoided compared to what would have happened without the purchase and retirement of the allowance. While the reference case in this analysis would be the emissions cap for the sector, it has not always been clear that this cap inherently represents "what would have happened" and that the allowance retirement is therefore additional. On their own, most emission caps are intended to reduce emissions compared to what would have been occurring in the sector. But in oversupplied allowance markets, where the cap level closely follows or even exceeds what would have been occurring anyway (e.g. during a period of economic downturn), the value of retiring an allowance might be minimized.[1] Further, if allowance retirement becomes common practice and significantly increases the price of allowances, cost containment measures in cap-and-trade policies may be triggered so that regulators increase the total volume of available allowances (and therefore nullify the reduction impacts of the retirement).

Exhibit 4 to Decl. of Burton
229
**SER 2284**

Case 2:24-cv-00801-ODW-PVC   Document 53-4   Filed 07/24/24   Page 74 of 121   Page ID #:1875

*CHAPTER 8 Recommended Reporting on Instrument Features and Policy Context*

### 8.2.4   Relationship to offset credits

Offsets generated from renewable energy facilities remain a popular project type in offset schemes such as the Clean Development Mechanism (CDM), as well as voluntary standards. These programs are designed to provide a revenue stream that enables a project to be built that—in the absence of the offset sales—would be unfeasible. The offset represents a quantity of global GHG emissions reduced or avoided by the project compared to a baseline scenario of what emissions would have occurred in the absence of the offset-funded project.

**Distinguishing attributes and claims.** Offsets, and their global avoided emissions claim, represent a different instrument and claim from the energy attributes associated with energy production.[2] Offsets convey tons of avoided $CO_2$ using project-level accounting, but they do *not* convey information about direct energy generation emissions occurring at the point of production, like contractual instruments do (see Box 4.3). An offset credit does *not* confer any claims about the use of electricity attributes applicable to scope 2. For example, to distinguish avoided emissions and emission rates, a natural gas facility newly established in a largely coal-based grid will *avoid* operating margin emissions as fossil fuel plants with higher

operating costs are backed down. But the natural gas plant still emits at a fixed rate (emissions/MWh), which consumers of that energy can document in scope 2.

**Box 8.1 Attributes and claims from renewable energy offsets**

Offsets are designed to be fungible (or interchangeable) globally, derivable from a variety of project types (forestry, renewable energy, etc.) and should only convey metric tons of avoided GHG emissions to the purchaser. To date, offsets have not conveyed any other attributes about the project generating the offset or about the electricity—including a "renewable energy use" claim. While offset projects through CDM are designed to also provide a variety of social and sustainable development benefits, most offset standard methodologies do not quantify these other characteristics or benefits of the project, or transfer or convey them with the offset credit. Those social benefits are designed to "stay" within the community, even as the avoided carbon is sold globally. Users should not infer from the offset any unquantified, unverified, or unspecified other claims about the project.



71

Exhibit 4 to Decl. of Burton
230
**SER 2285**

**Coexistence of offsets and scope 2 accounting.**
Unless otherwise adjusted by local rules, renewable energy generation facilities producing and selling offsets will inherently still provide energy attribute information—directly and indirectly—to other entities in the local energy supply system, including energy consumers reporting scope 2 emissions. For instance, the energy output from generation facilities producing offsets would still be subject to energy supply contracts between generators and suppliers, and still support the local grid's operation. This means that the zero emission rate from the generation facility will likely be reflected in several emission factors:

- Grid average emission factors (location-based)

- Supplier-specific emission factors (market-based)

- Any PPAs between the generator and consumer of the energy (market-based)

The contractual information such as PPAs and supplier-specific emission factors may meet the Scope 2 Quality Criteria and qualify as conveyers of energy generation emission rates under the market-based method. This can provide accurate scope 2 accounting independent of the fact that certain facilities associated with those contracts will have also produced offsets (reflecting the impact of that generation on the rest of the grid). Therefore, the zero emission rate from the project will likely be reflected in the local grid's data for both the location-based and market-based method for scope 2, as illustrated in Figure 8.1. However, in most industrialized energy markets, a given MWh of renewable energy generation can either produce energy attribute certificates or an offset credit (if certain criteria such as additionality are met), but could not produce both.

**Reporting options:** Companies should disclose whether their contractual instrument used in a market-based method (such as a supplier-specific emission rate or PPA) is generated from, or includes, the energy output of a facility that also produces GHG offsets. This may be most relevant in non-Annex I countries generating CDM offsets.

In turn, following the *Corporate Standard,* companies purchasing and claiming offsets should document these purchases outside of the scopes, ensuring that the offset meets offset quality criteria.



**Caveats:** The coexistence of offsets does not inherently prevent electricity suppliers or companies from reflecting the zero emissions attributes in their scope 2 reported totals. However, local or international regulation may preclude accounting for these emissions, either by:

- Adjusting a grid-average emissions factor to "add back in" the sold offset to the total emissions produced in the region. This increases the GHG intensity of the grid-average emission rate, effectively reflecting the business-as-usual (BAU) scenario of the offset.

Exhibit 4 to Decl. of Burton
231
**SER 2286**

Case 2:24-cv-00801-ODW-PVC   Document 53-4   Filed 07/24/24   Page 76 of 121   Page ID #:1877

**CHAPTER 8** *Recommended Reporting on Instrument Features and Policy Context*

**Figure 8.1** **Offsets and energy attribute certificates on a grid**



- Requiring provisions in energy purchase contracts that the attributes associated with the energy generation, while not contained in the offset, should be retired from usage so that no consumer can use contractual instruments to make market-based scope 2 claims.

Historically, voluntary consumer green power purchasing programs have not been implemented in emerging economies generating offsets. This may change over time as local consumers demand low-carbon energy options from their suppliers. (Generally, offsets from the power sector are not possible where the emission caps or other significant low-carbon policies impact the sector.) Where voluntary green power consumer programs coexist with offset issuance, the offset additionality criteria requires that the offset be the decisive reason a project was developed.

**Endnotes**

1. See Kollmuss and Lazarus (2010).
2. It may appear that the GHG emissions benefit of the offset is "double counted" with any scope 2 allocation procedures for the project's grid, but the differences in methodology and the boundaries for evaluating reductions minimize this possibility.

73

Exhibit 4 to Decl. of Burton
232
**SER 2287**

**9** *Setting Reduction Targets and Tracking Emissions Over Time*



Exhibit 4 to Decl. of Burton
233
**SER 2288**



**T**his chapter provides guidance on setting GHG reduction targets for both methods' reported totals, tracking emissions over time, and how other energy goals can be set as part of a holistic approach to energy.

## 9.1    Setting a base year

A meaningful and consistent comparison of emissions over a GHG reduction goal period requires that companies establish a base year against which to track performance. When companies set a target relative to a base year, companies should specify their reasons for choosing that particular year. Companies reporting according to the market-based method should choose a year in which both market-based data and location-based data are available. Companies that have already set a base year for scope 2 **shall** specify which method was used to calculate it, in order to allow for clearer comparison over time.

For companies calculating a GHG inventory for the first time, the *Corporate Standard* guidance on choosing a base year applies (see Chapter 5 of the *Corporate Standard*).

Once a base year is selected, a reporting entity **shall** set a base-year recalculation policy and clearly articulate the basis and context for any recalculations. Whether base-year emissions are recalculated depends on the significance of the changes. A significance threshold is a qualitative and/or quantitative criterion used to define any significant change to the data, inventory boundaries, methods, or any other relevant factors.

## 9.2    Recalculating base-year emissions

The *Corporate Standard* notes that recalculation may be necessary when changes to base-year emissions would exceed the company's established significance threshold. This may occur when a company restructures its operations (acquisition/divestments/mergers), discovers calculation errors, or identifies changes in calculation methodology or improvements in data accuracy over time. This guidance's new requirement to report scope 2 according to two different methodologies—location-based and market-based—constitutes a change that could trigger base-year recalculation.

Companies should ensure that the base-year inventory includes both a location-based and market-based scope 2 total, if applicable and feasible. This ensures "like with like" comparison over time.

Exhibit 4 to Decl. of Burton
234
**SER 2289**

- If the scope 2 base year chosen was calculated only according to the location-based method, the reporting entity should also recalculate a market-based total if contractual information or residual mix totals are available for the base year. If not, companies should state that the location-based result has been used as a proxy since a market-based result cannot be calculated.

- If the scope 2 base year chosen was calculated only according to the market-based method, companies should ensure that the contractual instruments used in the base year meet the Scope 2 Quality Criteria. If not, this should be disclosed and a location-based total stated in place of the market-based method total. In addition, companies should calculate a location-based method total in the base year using emission factors appropriate for that year.

### 9.3   Setting GHG targets

A key component of effective GHG management is setting a GHG target. Companies are not required to set a scope 2 reduction target, but should consider setting a target in the context of their business goals, the decision-making value for each method's results and how to drive change through supply choices. As noted, reductions in reported scope 2 emissions can occur due to a change in emission factor unrelated to specific corporate action—for example, a reduced grid average emission factor, or reduced residual mix emission factor.

If setting a target, companies shall specify which method is used in the goal calculation and progress tracking, including the method used for the base-year calculation. Where certificates or contractual instruments convey legally enforceable claims, companies setting goals should use the market-based method total for goals. Two targets, one for each method's results, can help prioritize new low-carbon energy projects that will reduce both totals' emissions over time (if contractual instruments are retained from the project).

Several types of targets are possible and require consideration of:

- **Target type.** Whether to set an absolute or intensity target

- **Target completion date.** The duration of the target (e.g., short term or long term target and base year and goal year)

- **Target level.** The numerical value of the reduction target, framed as a change in emissions or absolute level of emissions to be achieved.

Companies seeking to drive change in the overall grid supply in a short period of time should consult the range of procurement options described in Chapter 11.

### 9.4   Energy targets

Some companies have energy use, procurement, or production targets in addition to GHG reduction targets. Energy targets can be useful in maintaining a focus on efficiency and isolating the role of consumption as compared with the changes in emissions resulting from supply changes.

- **Energy intensity goals**. Reducing the amount of energy per square foot of office/building space, or per product or output, can help maintain a focus on efficiency practices and set the overall energy performance of operations.

- **Renewable energy procurement goals**. Some companies have set the goal to be powered or supplied by 100 percent renewable energy. The framework for scope 2 emissions accounting, with a separation by method, can be applied here as well. This would require companies to clarify which method their renewable energy goal is based on: a location-based assessment of production on the grid, or a company's contractual procurement using instruments that convey a claim to consumers regarding the resource identity and use.

### 9.4.1   Achieving 100 percent renewable energy when supplier quotas apply

For utilities under a supplier quota requirement (such as an RPS in the U.S.), structuring a green power product that covers 100 percent of a customer's electricity load may combine voluntary and compliance instruments up to the level of the quota, provided those compliance instruments convey energy use claims. For example, if a utility is required to procure and deliver renewables

Exhibit 4 to Decl. of Burton
235
**SER 2290**

**CHAPTER 9** *Setting Reduction Targets and Tracking Emissions Over Time*

for 20 percent of its total retail load, then voluntary contractual instruments would be required to account for the remaining 80 percent of the delivered energy.

- **Renewable energy production goals**. Companies that own/operate energy generation facilities providing on-site power to their operations may wish to set goals around the amount of energy produced from these facilities (for example, to produce 100 percent renewable energy in X facilities). Emissions from these facilities would be reported in scope 1, but the production and its attributes may or may not be tracked in scope 2 depending on energy sold to the grid, or certificate sales from the energy which would preclude any consumption claims on the generation. Publicly communicated goals about on-site energy production should indicate the distinction between this metric and energy consumption reflected in scope 2.



Exhibit 4 to Decl. of Burton
236
**SER 2291**

# 10 Key Concepts and Background in Energy Attribute Certificates and Claims



Exhibit 4 to Decl. of Burton
237
**SER 2292**

*Background*

**T**his chapter provides an overview of the key concepts, theories, and uses of energy attribute tracking and claims, which underpins the market-based method for scope 2 accounting. It explains the interactions between voluntary consumer programs and policies directly or indirectly supporting low-carbon energy.

## 10.1 Introduction to energy attribute tracking

Consumers of grid-supplied electricity cannot link, force, or otherwise direct a specified unit of electricity from its point of generation to its point of final use. Consumers are reliant on grid operators to make decisions about dispatch throughout the day. In addition, grid-supplied electricity consumers cannot directly or physically distinguish the energy generation facilities that are supplying their consumption at any given point; once energy is generated and distributed in a grid system, it becomes physically indistinguishable. In these types of systems, where attributes are not clear at the point of usage, allocation of energy attribute information is necessary to facilitate product-specific consumer claims. Suppliers and consumers increasingly have demanded information about the sources producing their energy, and "attributes" about that production—that is, characteristics such as the GHG emissions, local air pollutants, nuclear waste quantities, etc.

### 10.1.1 Contractual instruments

Contracts and other contractual instruments have been used historically to transact energy and convey information about energy generation attributes throughout an energy supply system, separately from the underlying energy flows. Depending on the contractual instrument, suppliers or their customers may be able to make claims about the source and attributes of energy they have purchased. These contractual instruments are necessary in order to allocate attributes of production (including GHG emissions) to individual users. By contrast, the "location-based method" indirectly allocates these emissions based on statistical averages, which do not convey attributes or legally enforceable claims about those attributes, or support broader programs for consumer choice.

A range of contractual instruments may be used to convey these attributes directly or indirectly to consumers, including energy attribute certificates, direct contracts such as PPAs, and supplier-specific emission rates. Of all of these, energy attribute certificates underlie most transactions and

79

Exhibit 4 to Decl. of Burton
238
**SER 2293**



attribute claims. They can be used alone or can be bundled with PPAs, contracts, and supplier labels. Once attributes are codified and conveyed in a certificate, the underlying energy generation technically becomes "null power," or without attribute identity. Users of the null power electricity cannot claim to be buying or using renewable energy in the absence of owning the certificate. Instead, null power should be assigned residual mix emissions for the purpose of delivery and/or use claims in the market-based method.

## 10.2    Defining energy attribute certificates

Energy attribute certificates are a category of contractual instrument that represents certain information (or attributes) about the energy generated, but does not represent the energy itself (see Figure 10.1). This category includes instruments which may go by several different names, including certificates, tags, credits, or generator declarations. For the purpose of this guidance, the term "energy attribute certificates" or just "certificates" will be used as the general term for this category of instruments. Historically, most certificates for policies or consumer programs have been

generated from renewable energy resources, driven by demand for these resources in particular, but depending on their intended purpose or usage certificates can be generated from any or all generation technology types. For example, all-generation certificate tracking exists in the northeast U.S.

### 10.2.1    Defining GHG attributes and claims

All energy generation has a GHG emission rate attribute, even if that attribute is "zero emissions/MWh" at the point of generation.

**Attribute aggregation.** It is theoretically possible to disaggregate different energy generation attributes across multiple certificates, where each certificate conveys different information and related claims. For example, one certificate could convey that the energy comes from a "renewable" resource, while another conveys a claim about the GHG emission rate associated with the production, or claims about the emissions of other pollutants like $NO_x$ and $SO_x$ (see Box 10.1). But attribute disaggregation has generally not occurred in the programs surveyed in this guidance. In the U.S., most states define RECs for RPS purposes as encompassing "all environmental attributes," including the attribute of the fuel type/generation technology as well as GHG emission rate, and U.S. tracking systems do not support separating individual attributes. This "all attributes" approach effectively prevents the same MWh being used to create multiple consumer claims from renewable energy projects in the U.S.

**Where no attributes for consumer claims are conveyed.** Some certificates designed for regulatory uses such as supplier quotas do not convey any generation attributes for consumer claims. These are not intended to support consumer claims; instead, they serve only as documentation that a specific quantity of energy has been generated pursuant to the policy's requirements. In this scenario, other certificates could be generated that do convey attributes about the energy generation to characterize consumption.

**Claims about attributes.** Ensuring the validity of consumer claims associated with certificates requires many of the same safeguards as other environmental commodities: accuracy, exclusivity, and enforceability. These form the basis of the Scope 2 Quality Criteria for

Exhibit 4 to Decl. of Burton
239
**SER 2294**

Case 2:24-cv-00801-ODW-PVC   Document 53-4   Filed 07/24/24   Page 84 of 121   Page ID #:1885

*CHAPTER 10* Key Concepts and Background in Energy Attribute Certificates and Claims

**Figure 10.1 Energy attribute certificate pathways**



**Background**

claims regarding GHG emissions in the scope 2 market-based method (see Chapter 7). In many cases, there are independent standards and certifications available to enforce these safeguards. A certificate purchaser can make a claim about attributes when applied to a quantity of actual electricity consumption.

### 10.2.2 Steps in certificate issuance, tracking, and claiming

Most certificates follow the pathway from issuance to claims as follows:

1. **Certificates produced.**

   Certificates are generally produced for one unit of generation (a MWh).

   Energy generators generally produce a certificate directly through registering an account in a registry or other tracking system. Generators report production data (MWh) to the tracking system as well as data about energy

attributes, which should meet whatever measurement and verification protocols are required by that system . In the U.S. a generator actually creates the REC, and it can be conveyed by bilateral contracts. If the generation data is reported to a tracking system, the tracking will formally issue a certificate. Each certificate has a unique tracking number. Entities that wish to participate in the market and trade and own certificates must also register with a tracking system and open one or more accounts. Trading can occur, but each certificate can reside in only one account at a time to avoid double counting.

In some markets, a regulator or independent third party can serve as an "issuing body" that documents the creation of a certificate. See Box 10.1 on energy attribute tracking systems, and Figure 10.2 for an illustration of the different tracking systems in North America. See Box 10.2 for a discussion of the separation of roles in these systems to support independent issuance.

Exhibit 4 to Decl. of Burton
240
**SER 2295**

**Box 10.1** Energy attribute tracking systems

A certificate tracking system or certificate registry is a tool to help execute energy attribute certificate issuance, retirement, and claims. It issues a uniquely numbered certificate for each unit of electricity (usually one MWh) generated by a generation facility registered in the system, tracks the ownership of certificates as they are traded among account holders in the tracking system, and records certificates that are redeemed or retired in order for users to make claims based on the certificate's attributes. Because each MWh has a unique identification number and can only be in one owner's account at any time, this reduces ownership disputes and the potential for double counting. Tracking systems are designed to ensure that no other entity is issuing certificates for the same MWh, and that all the attributes of that unit of generation remain with the certificate and are not sold as a separate instrument or right of ownership. Certificates may be imported to or exported from these tracking systems, and may also be retired within the tracking system on behalf of a purchaser whose corporate offices and facilities are located outside the footprint of the tracking system. They do not operate as exchanges or trading platforms for the certificates they issue, track, and redeem or retire.

**2. Third-party certification and labeling.**

In some markets, a third party may also certify certificates based on an established standard that specifies what energy can produce certificates, an audit procedure to verify retail transactions, and other consumer protection features. Some examples of voluntary certification programs include Green-e (North America) EcoLogo (Canada), and GreenPower accreditation (Australia). Electricity labels such as EKOenergy serve a similar function by specifying a set of criteria that can be applied to determine which certificates can receive the label.

**3. Purchase and retirement by suppliers or consumers.**

Certificates can be combined (or "bundled") with a contract for energy, or may be sold separately.[1] Certificates may be traded several times between the initial buyer and suppliers, or through open exchanges. For most certificates, the final purchaser or claimant will be an energy supplier or utility, or an end-consumer. If a certificate serves a regulatory purpose, the claimant (usually an electricity supplier) will submit and retire the certificate to regulatory authorities to substantiate delivery of specified electricity to its customers as required by law. If the certificate serves a voluntary consumer claims purpose, the claimant will retire the certificate in order to facilitate a claim on behalf of its consumers (if a supplier) or itself (if an energy consumer).

**Box 10.2** Best practices to ensure independent issuance

In order to ensure the fair competition of issuance, redemption, and use of contractual instruments, most markets have established a clear distinction between the management and ownership of the tracking system and the market players and consumers using the instruments. The ability to transfer contractual instruments and redeem the contained attributes should be possible without direct intervention from the certificate issuer or registry owner. The production facility owner is typically in direct control of the creation of the contractual instruments and will be the single owners of the created instruments until they decide to release their ownership to another third party. The owners of the tracking system or contractual instrument registry **should not** also be active in the market for the same contractual instruments. The documentation of the tracking system should be publically available and open to public consultation.

Exhibit 4 to Decl. of Burton
241
**SER 2296**

*CHAPTER 10* *Key Concepts and Background in Energy Attribute Certificates and Claims*

**Figure 10.2** **Energy attribute tracking systems in North America**

Renewable Energy Certificate Tracking Systems in North America



Revised September 23, 2014

*Background*

Exhibit 4 to Decl. of Burton
242
**SER 2297**

## 10.3   Certificate uses

Certificates generally serve four main purposes, including:

- Supplier disclosure

- Supplier quotas, for the delivery or sales of specific energy sources

- Levy exemption

- Voluntary consumer programs

Each program or policy will establish their own eligibility criteria. These criteria specify certain energy generation facility characteristics, such as type of technologies, facility ages, or facility locations. Certificates must come from facilities meeting these criteria in order to be eligible for use in that program. In addition, individual country markets or policy-making bodies (referred to in this guidance as "jurisdictions") may accomplish these different functions using a single certificate system or a multi-certificate system.

- **Single certificate systems**
  In a single certificate system, only one certificate can be issued for each MWh generated and contain attributes associated with that unit of energy generation. This means that a certificate could fulfill multiple purposes— for example, it could be the evidence of supply pursuant to a supplier energy source quota, or be part of standard supplier products as well as voluntary programs or tariff offerings. An example of a single certificate system is the U.S. REC, where a REC may be used for supplier quotas where present (requirements or "eligibility" varies by state), voluntary consumer programs, or in supplier disclosure where supplier quota or voluntary consumer programs or labels are included.

- **Multi-certificate systems**
  A multi-certificate system can have multiple certificates issued for the same unit of energy, each conveying different attributes or claims for each function they serve (see an example of this for the U.K. in Figure 10.3). However, program policies and rules still determine what certificates may be eligible for the program. For the purposes of market-based scope 2 accounting, consumers in multi-certificate systems **shall** identify which certificate, if any, conveys GHG emission attributes to end users, and ensure that only one certificate, or

jurisdictionally defined combination of certificates, does so (following the Scope 2 Quality Criteria in Chapter 7). A system could not, however, have multiple certificates each conveying the same consumer claims attributes; this would constitute double counting.

## 10.4   Supplier disclosure

Energy suppliers may be required to disclose to consumers the fuel mix and related environmental attributes associated with delivered supply. Certificates have been used to track energy from production to the supplier, in order for a supplier to contractually demonstrate the source of the energy that is delivered to customers. Suppliers may disclose an emission rate associated with voluntary programs such as renewable or low-carbon energy products (often termed a green pricing program, green power tariff, or green power label), or other differentiated product offerings. In some countries, all consumers are required to make a choice about their electricity product, and information about the electricity product—including its resource mix, $CO_2$ emissions, and other environmental effects such as radioactive waste—is available on electricity bills.

Some supplier disclosure requirements may not explicitly require the use of certificates. For instance, in Japan power suppliers are obligated to report their supply mix and its associated emission factors to the Japanese government, and the government evaluates and publishes these emission factors.

> **Example of supplier disclosure**
>
> EU electricity market liberalization enabled consumers for the first time to choose their electricity supplier. This prompted the need for more standardized supplier disclosure about their energy supply and its attributes, allowing consumers to compare suppliers on metrics beyond just cost. The EU instituted requirements for all electricity suppliers to disclose their fuel mix to customers, along with the $CO_2$ quantity and radioactive waste. The Guarantee of Origin certificate has been used as the basis for suppliers to calculate and disclose the energy source and attributes associated with supply. It is also used as the basis for voluntary consumer labels.

Exhibit 4 to Decl. of Burton
243
**SER 2298**

*CHAPTER 10* Key Concepts and Background in Energy Attribute Certificates and Claims

**Figure 10.3** UK: Example of multiple certificates for distinct purposes



**Background**

## 10.5  Supplier quotas, for the delivery or sales of specific energy sources

To help incentivize growth in renewable energy resources, some nations or subnational entities have required electricity suppliers to source an increasing portion of their load from specified or "eligible" renewable energy resources by a specific date. Eligibility criteria may specify the age or location of generation facilities, specific technologies, etc. These supplier energy source quotas may require suppliers to obtain and submit energy attribute certificates to cover the specified portion of their overall supply. Suppliers not in compliance often pay a fine or fee. Some of these supplier energy source quota programs are called "support schemes" as they financially support generators who can sell compliance certificates to suppliers. But as a category, supplier energy source quota policies should be distinguished from other types of support policies such as tax credits or feed-in tariffs associated with production. The latter are direct payments to generators as opposed to revenue received

by a generator from the sales of a certificate, and feed-in tariffs do not need to be tracked through certificates. The latter are thus not tied to quotas at a supplier level (for example, there is no "minimum" amount that must be produced). In addition, there is no delivery requirement and thus no need to track generation with certificates.

### 10.5.1  Certificate multipliers

Some jurisdictional compliance programs provide additional incentive for specific energy sources by providing a "credit multiplier" to a certificate when it is redeemed for compliance with program requirements. The multiplier is applied only when the certificate is redeemed for supplier quota compliance. For instance, a credit multiplier of 1.5 means that when a certificate is retired and claimed for compliance, it is counted toward compliance as if it were 1.5 certificates. Suppliers using certificates for disclosure should use the attributes stated in the certificate (per MWh) and not its multiplication for policy compliance.

Exhibit 4 to Decl. of Burton
244
**SER 2299**

**Examples of supplier quotas**

In the United States, states can set renewable energy portfolio (RPS) standards obligating suppliers to source a minimum share of renewable energy certificates (RECs) from qualifying sources that the policy identifies. For example, California requires that 20 percent of retail sales be supplied with renewable energy by 2013, 25 percent by 2016, and 33 percent by 2020. Policies identify what types of generation can achieve compliance. Policies can also identify a portion of the overall goal that must be met with specific resources (called a "carve out").

In the EU, Directive 2009/28 requires that member states meet renewable consumption targets by 2020 (called national targets). According to current EU law, GOs alone cannot be used as compliance instruments for suppliers to demonstrate fulfillment of national targets. Instead, other instruments such as Green Electricity Certificates in Belgium, Certificati Verdi in Italy, the Elcertifikat in Norway-Sweden, or Renewable Obligation Certificates (ROCs) in the UK, may be used by suppliers.

## 10.6   Tracking tax/levy exemptions

Tax credits or reductions for producers of specified energy sources (generally renewable or low-carbon) can improve the cost competitiveness of new projects that would otherwise face financial barriers. In addition, certain energy consumers may also be subject to taxes on their energy use relating to environmental externalities of conventional energy production (e.g., a $CO_2$ tax). Purchasers of renewable or other specified energy may be exempted from these taxes if they can prove their consumption through certificates.

**Example of tracking tax/levy exemptions**

In the UK, non-residential or "non-domestic" users—primarily large commercial or industrial energy users—are taxed for their energy use.  But renewable electricity and electricity produced from coal mine methane are exempt from the tax. Renewable energy generation facilities are issued Levy Exemption Certificates (LECs), which suppliers must acquire on behalf of their non-domestic customers to avoid the tax (with LECs serving as evidence submitted to HM Revenue & Customs).

## 10.7   Voluntary consumer programs

Energy attribute certificates have been used as a means to promote voluntary consumer demand for the attributes of renewable or low-carbon energy and to support the consumer claims around those choices. These voluntary programs may be offered by an electricity supplier as a special tariff or product in addition to their standard offering; or, consumers in some jurisdictions may have competitive choice in their supplier and select a supplier offering exclusively specified energy products, such as an "all renewable" label. Consumers in all jurisdictions may also have the ability to directly purchase certificates (outside of their electricity delivery arrangement with local suppliers) to enable a claim. Voluntary consumer programs generally seek to both enhance consumer product choices and voluntarily leverage demand to increase the share of renewables on the grid over time.

**Examples of voluntary consumer programs**

• In the U.S., voluntary RECs can be obtained directly by a consumer ("unbundled" from energy purchases), or "bundled" through a supplier program or in an electricity contract such as a PPA.

• In the EU, GOs (rooted in disclosure laws) have also been used to support voluntary renewable energy purchases and claims.

• In Australia, the voluntary GreenPower program uses RECs in its accreditation label, which is supported and managed by state governments in Australia.

• Globally, The International REC Standard creates standardized attribute tracking certificates for the purposes of voluntary corporate disclosure. The legislative basis for the certificate issuance may be different in each country where the standard is active.

Exhibit 4 to Decl. of Burton
245
**SER 2300**

**CHAPTER 10** *Key Concepts and Background in Energy Attribute Certificates and Claims*

## 10.8  How jurisdictional policies affect the role and impact of voluntary programs

In most jurisdictions, voluntary consumer purchasing programs (and therefore market-based claims) will reflect attributes from energy generation that interacts with local or federal policies. This is consistent with the fact that in most markets, all energy—be it fossil, renewable, or low-carbon—is regulated to some extent and benefits from direct and indirect financial support. Renewable or low-carbon energy production and consumption in particular may benefit directly or indirectly through subsidies, cap-and-trade programs, supplier energy source quotas, etc.

However, the relationship between voluntary consumer purchasing programs and regulatory policy may be more sensitive or subject to stakeholder scrutiny. For instance, stakeholders may ask whether the purchased energy reflected in the voluntary certificate has "received a subsidy," or "helps lower the emissions cap on the power sector," or represents energy purchased in surplus of the electricity supplier's quota. These objectives can reflect a desire for voluntary consumer programs to ensure equal consumer benefit sharing—that is, that subsidized energy remains a publicly claimed benefit rather than one available for individual consumer claims. They can also reflect a desire for consumer action to have an impact on the market for low-carbon energy that goes beyond the incentives and trends dictated by policy.

Most of the relationships between voluntary programs and regulatory incentives or policies will be determined at the jurisdictional policy-making level, since regulators typically determine what types of certificates are issued for what policy purposes. The decision to use a single-instrument system may automatically address some of these voluntary policy interactions by ensuring the attributes of each unit of energy are only used for one purpose. The single-instrument scenario in the U.S. is sometimes termed "regulatory surplus,"[2] since the renewable energy claimed by voluntary purchasers cannot also be counted toward a state RPS program that delivers renewable energy to customers. Jurisdictions may also choose to:

- **Exclude voluntary claims from policy-supported energy generation.** This means that certificates used for voluntary claims may not also be used for supplier quota compliance targets, for claiming a direct subsidy, or for producing an offset.

- **Require pairing of the voluntary certificate with a regulatory certificate.** This means requiring multiple certificates to be "paired" together in order to enable voluntary consumer claims from certain types of power, even if a single instrument alone may technically convey the attributes necessary for claims. This could entail suppliers being required to retire both the certificate they use for disclosure along with the certificate used for levy exemption. Voluntary allowance set-aside programs in emissions-capped power sectors also serve as a type of "instrument pairing" to fulfill goals beyond scope 2 accounting.

Companies should check with their electricity supplier or relevant policy-making bodies to ensure that voluntary certificates are claimed, paired, or retired in compliance with jurisdictional requirements. Companies should report these relationships separately (see Chapter 8).

### Endnotes

1. For example, the U.S. Federal Trade Commission (FTC) has not recognized a distinction with respect to marketing or consumer claims between purchasing a bundled product or unbundled certificates and electricity separately.

2. This has also been termed "regulatory additionality," though this Guidance distinguishes between the specific use of the term "additionality" in offset accounting and the diverse types of objectives and criteria that can be applied to energy attribute certificates.

**Background**

Exhibit 4 to Decl. of Burton
246
**SER 2301**

Case 2:24-cv-00801-ODW-PVC   Document 53-4   Filed 07/24/24   Page 91 of 121   Page ID #:1892



**11** How Companies Can Drive Electricity Supply Changes with the Market-Based Method

Exhibit 4 to Decl. of Burton
247
**SER 2302**

*Background*

**T**his chapter describes how market-based consumer actions and claims can drive change in electricity generation supply over time, and clarifies why this guidance does not establish requirements on policy relationships or "market impact" criteria. It elaborates how companies can use their procurement power to substantively contribute to new low-carbon energy supply.

## 11.1   Energy attribute supply and demand

The four certificate uses described in Chapter 10, though distinct, are all generally designed to support growth of low-carbon energy by increasing demand for specific attributes. As demand grows, it will push up the price of these attributes, which in turn can stimulate supply. This theory underlies the basis of market-based accounting in scope 2, as it reflects an allocation of consumer preferences (demand) for the GHG attributes from a given supply of attributes available for those claims. Because these energy attributes are finite, a voluntary energy purchase and attribute claim prevents others from making the same claim on those MWh and requires other consumers to source from the remaining unclaimed (and typically more GHG-intensive) energy attributes. In short, if demand for low-carbon energy, which on a shared grid can only be expressed using certificates and contracts, begins to approach existing supply, the pressure or incentive to build

additional supply grows, with certificates also serving as an additional revenue stream to help signal that demand. This is the same theory that underlies all other markets and is also the basis of scope 3 accounting: all individual purchases contribute to overall demand for a product or type of product, and the more purchases are made, the more this demand will drive changes in production.

The market-based method for scope 2 accounting represents an internationally applicable framework allowing suppliers and consumers to express and aggregate demand for specific types of generation. It treats market-based accounting as an allocation procedure, with the understanding that the effect of the market on grid makeup will depend on the level of demand vs. supply of renewable energy, program eligibility, degree of uptake, policy interactions, and other variable factors. It provides several pathways by which corporate procurement can drive new low-carbon energy development.

Exhibit 4 to Decl. of Burton
248
**SER 2303**

## 11.2 Relationship between voluntary program impact and scope 2 accounting

Consumers who voluntarily claim low-carbon attributes in scope 2 may expect their individual purchase or program participation to result in new generation that lowers system-wide GHG emissions. However, like other markets and products, individual voluntary purchases and consumer programs may or may not result in changes in low-carbon supply, depending on supply and demand dynamics. For instance, one paper[1] suggests that the voluntary REC market in the U.S., when evaluated based on the price of RECs as an incentive for project developers, has not itself driven new renewable energy projects.

Another market analysis[2] indicates that the effect of voluntary demand on new renewable energy project development is not based on the price of those RECs so much as it is on the presence of long-term contracts for RECs and energy from projects as yet unbuilt.

Given that voluntary markets for renewable energy aggregate consumer demand in order to affect supply changes, some stakeholders and voluntary programs have incorporated additional specifications or criteria to stimulate growth of low-carbon supply. For example, these criteria could include requiring voluntary consumer claims to be above or in surplus to supplier energy source quotas, or to be independent from the receipt of public funds, or for market-based scope 2 accounting rules to be aligned with offset credit additionality requirements in order to ensure that each voluntary energy purchase claimed in scope 2 represents a unit of "additional" low-carbon generation or emission reductions. This could mean requiring that an individual voluntary purchase and claim, or a voluntary certificate program, be the decisive reason new low-carbon energy projects are built.

Even in the absence of such requirements, the market-based method accurately reflects an allocation of generation attributes among consumers, which is important for reflecting individual actions and purchase decisions as well as for recognizing action to affect demand-side change. In the absence of such requirements, and if there is insufficient demand to drive overall change on the grid, stakeholders may be concerned that the market-

based method results only in a reallocation of attributes between those consumers who care about claiming low-carbon energy, and those who are unaware of or uninterested in the opportunity to make these claims.

## 11.3 The role of "additionality"

This guidance does *not* require that contractual instruments claimed in the market-based method fulfil criteria such as offset "additionality" or prove the overall market impact of individual purchases or supplier programs result in direct and immediate changes in overall supply. This follows the same reasoning applied to purchased products in scope 3 accounting, including that:

- **The market-based method for scope 2 accounting applies to all energy generation in a defined grid**, not just "low-carbon" or renewable energy from projects supported by a specific company's financial support. It concerns the larger allocation process of all energy emissions across all end users. All energy has a direct emissions factor associated with generation, and the use of that emissions factor does not depend on whether the generation facility is existing or new, or why the generation has occurred. This guidance lays out the policy-neutral mechanics of a market-based method for scope 2 accounting, so that regardless of what causes the project to be built, the energy attribute certificate still serves as the instrument conveying claims about the attributes of the underlying energy generation for consumers purchasing that generation.

- **Offset additionality criteria are not fundamental to, or largely compatible with, the underlying rules for market-based scope 2 accounting and allocation.** In GHG accounting, additionality is a term specifically associated with offsets and project-level accounting, which is distinct from corporate GHG accounting. The claim that X metric tons of GHG emissions have been avoided at a global level can only be credible if the offset credit was the "intervention"[3] that made the project happen—and that, without that intervention, that project would not have occurred. Such a claim requires proof of cause-and-effect and is critical to support the integrity of offset credits. However, offsets represent a different claim (avoided GHG emissions

Exhibit 4 to Decl. of Burton
249
**SER 2304**

*CHAPTER 11* How Companies Can Drive Electricity Supply Changes with the Market-Based Method

**Background**

compared to a baseline scenario) than energy generation attributes (X GHG emissions from Y unit of energy generation). Scope 2 reporting is a report of usage and as such is independent of issues associated with additionality.

In short, voluntary programs have been designed in different ways across jurisdictions, and with differing relationships to other policies promoting the growth of low-carbon energy supply. Maximizing the speed and efficacy of voluntary initiatives in driving new low-carbon development is an important, complex, dynamic, and evolving process for program implementers, regulators, and participants. Jurisdictional policy makers, certification programs, supplier labels or tariffs, or consumers are best situated to identify and execute policies in pursuit of these goals. The role of this guidance is to identify the core requirements of accurate market-based accounting (Scope 2 Quality Criteria) that can apply to any jurisdiction's range of contractual instruments, while ensuring sufficient transparency in corporate reports to allow internal and external stakeholders to assess performance and how effectively corporate energy procurement achieves broader company goals—including accelerating the growth of new low-carbon energy in a short period of time.

## 11.4   How can companies go further?

While not a part of criteria for market-based scope 2 accounting, suppliers and companies can make energy procurement choices that can shift a company's impact from "aggregate" to more directly spurring an increase in new, low-carbon energy generation facilities in a short period of time, consistent with the ambition needed to avoid dangerous climate change. Many of these choices are summarized in box 5.1, highlighting both the policy changes and the individual consumer choices that could, in the case of the U.S., strengthen the impact of voluntary REC products.

In effect, these choices can be framed as a range of stronger and weaker market signals, with the strongest signals being for *new* projects where a company can play a *substantive role* in helping a project go through. Companies can identify procurement choices aligned with new projects (helping to decrease system-wide emissions in a shorter period of time) where the company can bring

to bear its financial resources, creditworthiness, scale of consumption, technical knowledge, collaboration, or other approaches in order to help overcome traditional barriers to scaling the development of low-carbon energy. Some of these choices are elaborated below; options for reporting on these efforts are discussed in Chapter 8.

1. **Contract directly with new low-carbon energy projects**
   Long-term power purchase agreements or other contracts for energy procurement often provide the stable revenue structure needed to help attract the additional financing to complete new projects. In order to make a claim on any purchased energy, companies **shall** retain any certificates associated with the energy production because they convey GHG emission rate attributes. In markets without certificates, the contracts themselves may be written to convey these attributes, provided that the energy is not resold to other entities who would make similar claims, and provided that the Scope 2 Quality Criteria are met.

2. **Work with electricity suppliers for new projects**
   Customers of a utility typically have standing in—and thus the ability to influence—proceedings that affect the generation resources owned and/or used by the utility from which they buy power. Consumers can demand low-carbon energy tariffs or purchasing options based on or supporting new low-carbon energy projects that also meet the reporting requirements for scope 2. This model can also allow for collaboration and aggregation of multiple consumers' demand. Customers that individually or collectively represent a large percentage of a utility's load may be most influential in these measures.

3. **Establish "eligibility criteria" for corporate energy procurement, relating to specific energy generation features or policy interactions that align with new low-carbon energy projects.**
   When consumer demand is targeted at a narrower set of criteria, that demand is more likely to meet existing supply and prompt stronger market signals for new facilities meeting specific criteria. For instance, companies can establish their own instrument featuring requirements around criteria such as

Exhibit 4 to Decl. of Burton
250
**SER 2305**

Case 2:24-cv-00801-ODW-PVC   Document 53-4   Filed 07/24/24   Page 95 of 121   Page ID #:1896



### Box 11.1 Strengthening the role of RECs as a standalone product

A 2011 publication by the U.S. National Renewable Energy Laboratory (NREL)* noted that there are several ways that purchasers, marketers, and policy makers could "strengthen the role of RECs in both compliance and voluntary markets." Here, strengthening the role of RECs translates, in practice, to an improved ability of purchasers to, in aggregate, create change in global GHG emissions. Some of these options include:

- Encourage long-term contracts for RECs. Long-term contracts can offer the security and certainty that many projects need to obtain financing.
- Host periodic solicitations for medium- to long-term contracts with smaller projects. Smaller projects need a more standardized market, and auctions also increase REC market liquidity and price transparency.
- Adopt a REC price floor. This would ensure a minimum level of support and reliable revenues for new projects.
- Increase renewable energy targets. Increased demand would lead to stronger REC prices.
- Limit eligibility of supply (e.g. by limiting the eligible project age, project location, etc.). Restricting eligible supply also tends to increase REC prices.
- Support greater price transparency. Price transparency increases confidence in current and future REC prices and could lead to a greater recognition for RECs as a potential revenue stream.
- Contribute funds for project development. Primarily an option for the voluntary market, having incremental costs funded up front would reduce the risk for projects that are above-market price.
- Take an equity position in new projects. Direct investment in itself is strong evidence of making new projects happen and has several other advantages. This approach could work for utility-scale projects or for installation of on-site distributed generation.

Source: *Holt, Sumner, and Bird (2011).

technology type, facility age or facility siting, the energy generation's relationship to supplier quotas, etc.

In addition to the certificate policies established by jurisdictional policy makers, other key actors in the energy supply system can also, through their voluntary choices, impact how claimed energy in voluntary programs interacts with policy instruments, depending on the jurisdiction. These key actors include issuing bodies, voluntary certificate standards, or electricity supplier labels or tariffs, or individual companies (see Figure 5.1).

#### 4. Incremental funding or donations

Some voluntary certificate programs or supplier labels or tariffs may structure their product so that a dedicated portion of the revenue from the program is applied as "incremental funding" for new projects identified by the program. This type of fund model, exemplified by GO2,[4] EKOenergy,[5] and TrackmyElectricity[6] in Europe, can help directly contribute to the growth of new low-carbon energy projects. Companies providing this type of donation can document this separately.

#### Endnotes

1. Gillenwater, Lu, and Fischlein (2014).
2. Holt, Sumner, and Bird (2011).
3. Gillenwater (2012).
4. See GO2 product by ECOHZ at: http://www.ecohz.com/products/products/ecohz-go%C2%B2.
5. See EKOenergy label and criteria at: http://www.ekoenergy.org/our-results/climate-fund/.
6. See Bergen Energi product at: http:// www.trackmyelectricity.com.

Exhibit 4 to Decl. of Burton
251
**SER 2306**



*Appendices*

Exhibit 4 to Decl. of Burton
252
**SER 2307**

# *Appendix A*
# *Accounting for Steam, Heat, and Cooling*

The scope 2 accounting concepts, methods, and examples referenced in this guidance are drawn primarily from, and apply primarily to, electricity purchasing and use. However, steam, heat, and cooling energy systems may also use contractual instruments to convey attributes and claims. For instance, companies may have contracts to receive heat or steam from providers that specify the fuel source and emission rate associated with their received energy. In addition, "green heat" certificates generated from biogenic fuel sources may be issued and traded independently from the energy flows and injection into the distribution grid.

Companies **shall** report emissions from the purchase and use of these energy products the same as for electricity: according to a location-based and market-based method, if the contractual instruments used meet the Scope 2 Quality Criteria as appropriate for gas transactions. These may be the same total where direct line transfers of energy are used.

Companies should follow Table 6.1 accounting for scope 2 with and without certificates sales to determine the treatment of direct line energy transfers (e.g., receiving heat/steam/cooling directly from another facility) or energy used from local steam/heat/cooling distribution systems. A location-based emission factor for such systems should characterize the average GHG intensity of the fuels used to generate the heat/steam/cooling, as well as the efficiency of that generation.[1]

## Steam, heat, and cooling as a "waste" product.

Emissions from steam, heat, or cooling that is received via direct line as "waste" from an industrial process should still be reported based on the underlying emissions from the original generation process. Some companies may wish to account for these as zero emissions because the steam/heat/cooling would have been vented instantaneously if not used. However, accurate emissions accounting requires the actual emissions associated with the production of this waste to be reported.

### Endnotes

1. An emission factor per unit energy for purchased steam or heat is equal to the emission factor per unit energy of the fuel used divided by the thermal efficiency of the generation. An emission factor for purchased cooling that is generated by an electric chiller is equal to the emission factor for the electricity consumed in the chiller divided by the chiller's coefficient of performance (COP).
2. See EPA RFS2 Regulations Final Rule (2010).



Portland General Electric/Flickr

Exhibit 4 to Decl. of Burton
253
**SER 2308**

Case 2:24-cv-00801-ODW-PVC   Document 53-4   Filed 07/24/24   Page 98 of 121   Page ID #:1899



Exhibit 4 to Decl. of Burton
254
**SER 2309**

# Appendix B
# Accounting for Energy-Related Emissions Throughout the Value Chain

## Accounting in a grid-connected electricity value chain

For scope 2 reporting, differences in the regulatory structure of electricity supply chains can impact overall energy procurement options and what emissions are included in a supplier-specific emission factor. They also determine which entity reports which emissions in the energy value chain, as shown below.

The mechanics of electricity distribution on any grid function largely the same way, with the four supply chain phases including: (1) material or fuel extraction and processing; (2) generation; (3) transmission and distribution; and (4) sales to, and consumption by, end users. Different regulatory structures at a regional, national, and subnational level can influence what entities are involved throughout the phases of energy generation, transmission, distribution, and service. For instance:

- In some markets, the utility owns the generation assets, transmission and distribution (also known as T&D) infrastructure, and interfaces with the consumer to deliver energy. These entities would report all generation emissions in scope 1, and no T&D losses would be reported separately since the emissions would be already reported in scope 1.

- In others, power generators may be independent entities from which the utility buys power.

- In fully deregulated or competitive markets, each activity in the supply chain could be conducted by a different company. For instance, a customer may interface with energy retailers or suppliers who only sell electricity but who do not own generation assets or T&D equipment. Because these entities purchase and sell, but do not produce or consume the energy, they do not record either scope 1 or scope 2 emissions from the energy they sell.

Figure B.1 illustrates in which scope each entity in the electricity supply system (depicted in the rows) accounts for the emissions occurring during these different phases of electricity generation, distribution, and use (depicted as phases in the column).

See Appendix A of the *Corporate Standard* for more information on these relationships.

## Accounting for energy-related emissions in scope 3

Scope 2 emissions from different value chain partners form the basis of almost all fifteen scope 3 categories. Therefore, companies obtaining energy emissions data from their suppliers to be used in scope 3 calculation should ask which scope 2 method was used to calculate the results. In turn, companies should be transparent about which scope 2 method total they share with others in their value chain.

## Category 3: Upstream fuel and energy-related activities

For an energy consumer, category 3 includes upstream emissions from fuel extraction and processing prior to its combustion (known as the cradle-to-gate emissions) as well as the energy consumed (e.g. "lost") during transmission and distribution. Because of T&D losses, the actual amount of electricity generated at a power plant will be greater than the total electricity consumed by customers alone.[1] On-site generation does not incur T&D losses, as there is virtually no "line" in which transmission and energy losses occur.

The energy quantity consumed and reported in scope 2 serves as the basis for determining T&D activity data. One example of how this can be calculated is by applying the grid loss factor (ex: 7 percent grid loss rate for 100MWh consumption would mean 7MWh lost in T&D).Companies may also get information on line losses from the entity that controls the lines. Companies would need to apply an emissions factor to that line loss consumption to determine emissions associated with the loss. Companies should disclose which calculation method they are using to calculate and report T&D losses in scope 3 category 3, but do not need to "dual report" this. For instance, if companies, their suppliers, or other value chain partners have purchased energy attribute

Exhibit 4 to Decl. of Burton
255
**SER 2310**

*Appendix B* Accounting for Energy-Related Emissions Throughout the Value Chain

**Figure B.1 Accounting for electricity emissions throughout the supply system**



certificates to cover the quantity of grid losses, they can report this calculation based on the market-based method procedures in this Guidance. If not, companies should use the location-based method emission factors.

Companies should also disclose which scope 2 results—location-based or market-based—they are using as the basis for calculating upstream fuel extraction and processing emissions. For example, a scope 3 category 3 assessment based on the results of a location-based scope 2 report could reflect the upstream profile of the mix of grid resources (natural gas, coal). A category 3 assessment based on the results of a market-based scope 2 report could reflect the upstream emissions associated with producing renewable energy.

**Category 15. Investments.**

Any investments in energy generation facilities or other projects not associated with a contractual arrangement reflected in scope 2 can report emissions from these investments in category 15.

For scope 3 calculation procedures, see GHG Protocol *Value Chain (Scope 3) Standard* and *Scope 3 Calculation Guidance.*

**Endnotes**

1. Companies are not required to account for line losses due to unauthorized connections or energy theft, which make up a significant percent of T&D losses in many jurisdictions.

Exhibit 4 to Decl. of Burton
256
**SER 2311**

# *Abbreviations*

| | |
|---|---|
| $CH_4$ | Methane |
| $CO_2$ | Carbon Dioxide |
| $CO_2e$ | Carbon Dioxide Equivalent |
| GHG | Greenhouse Gas |
| GWP | Global Warming Potential |
| HFCs | Hydrofluorocarbons |
| IAS | International Accounting Standard |
| IPCC | Intergovernmental Panel on Climate Change |
| ISO | International Organization for Standardization |
| kg | Kilogram |
| km | Kilometer |
| kWh | Kilowatt-hour |
| LCA | Life Cycle Assessment |
| LFGTE | Landfill-gas-to-energy |
| MSW | Municipal Solid Waste |
| MWh | Megawatt-hour |
| NGO | Non-Governmental Organization |
| $N_2O$ | Nitrous Oxide |
| PFCs | Perfluorocarbons |
| QA | Quality Assurance |
| QC | Quality Control |
| $SF_6$ | Sulphur Hexafluoride |
| t | Metric tons |
| T&D | Transmission and Distribution |
| UNFCCC | United Nations Framework Convention on Climate Change |
| WBCSD | World Business Council for Sustainable Development |
| WRI | World Resources Institute |

Exhibit 4 to Decl. of Burton
257
**SER 2312**

# *Glossary*

| | |
|---|---|
| **Activity data** | A quantitative measure of a level of activity that results in GHG emissions. Activity data is multiplied by an emissions factor to derive the GHG emissions associated with a process or an operation. Examples of activity data include kilowatt-hours of electricity used, quantity of fuel used, output of a process, hours equipment is operated, distance traveled, and floor area of a building. |
| **Additionality** | A criterion often applied to GHG project activities, stipulating that project-based GHG reductions should only be quantified if the project activity "would not have happened anyway"—i.e., that the project activity (or the same technologies or practices that it employs) would not have been implemented in its baseline scenario. |
| **Allocation** | The process of assigning responsibility for GHG emissions from a specific generating unit or other system (e.g., vehicle, business unit, corporation) among its various users of the product or service. |
| **Allowance** | A commodity issued by an emissions trading program that gives its holder the right to emit a certain quantity of GHG emissions. |
| **Annex 1 countries** | Defined in the International Climate Change Convention as those countries taking on emissions reduction obligations: Australia; Austria; Belgium; Belarus; Bulgaria; Canada; Croatia; Czech Republic; Denmark; Estonia; Finland; France; Germany; Greece; Hungary; Iceland; Ireland; Italy; Japan; Latvia; Liechtenstein; Lithuania; Luxembourg; Monaco; Netherlands; New Zealand; Norway; Poland; Portugal; Romania; Russian Federation; Slovakia; Slovenia; Spain; Sweden; Switzerland; Ukraine; United Kingdom; and the United States. |
| **Attribute** | Descriptive or performance characteristics of a particular generation resource. For scope 2 GHG accounting, the GHG emission rate attribute of the energy generation is required to be included in a contractual instrument in order to make a claim. |
| **Audit trail** | Well-organized and transparent historical records documenting how the GHG inventory was compiled. |
| **Avoided emissions** | An assessment of emissions reduced or avoided compared to a reference case or baseline scenario. |
| **Base year emissions** | GHG emissions in the base year |
| **Base year emissions recalculation** | Recalculation of emissions in the base year to reflect a change in the structure of the company or a change in the accounting methodology used, to ensure data consistency over time. |
| **Baseline scenario** | A hypothetical description of what would have most likely occurred in the absence of any considerations about climate change mitigation. For grid-connected project activities, the baseline scenario is presumed to involve generation from the build margin, the operating margin, or a combination of the two. |
| **Baseload** | A type of power plant that operates continuously (or nearly continuously) to meet base levels of power demand that can be expected regardless of the time of day or year. |

99

Exhibit 4 to Decl. of Burton
258
**SER 2313**



| | |
|---|---|
| **Biofuels** | Fuel made from plant material, such as wood, straw, and ethanol from plant matter. |
| **Biogenic $CO_2$ emissions** | $CO_2$ emissions from the combustion or biodegradation of biomass. |
| **Biogenic gas (biogas)** | Methane that is produced from a biomass resource, such as animal waste, agricultural waste, landfill gas, municipal waste, or digester gas. |
| **Biomass** | Any material or fuel produced by biological processes of living organisms, including organic non-fossil material of biological origin (e.g., plant material), biofuels (e.g., liquid fuels produced from biomass feedstocks), biogenic gas (e.g., landfill gas), and biogenic waste (e.g., municipal solid waste from biogenic sources). |
| **Build margin (BM)** | The incremental new capacity displaced by a project activity. The build margin indicates the alternative type of power plant (or plants) that would have been built to meet demand for new capacity in the baseline scenario. |
| **Bundled** | An energy attribute certificate or other instrument that is traded with the underlying energy produced. |
| **Cap-and-trade system** | A system that sets an overall emissions limit, allocates emissions allowances to participants, and allows them to trade allowances and emission credits with each other. |
| **Certificate** | See energy attribute certificate |
| **Certified Emission Reductions (CERs)** | A unit of emission reduction generated by a CDM project. CERs are tradable commodities that can be used by Annex 1 countries to meet their commitments under the Kyoto Protocol. |

Exhibit 4 to Decl. of Burton
259
**SER 2314**

*Glossary*

| | |
|---|---|
| **Clean Development Mechanism(CDM)** | A mechanism established by Article 12 of the Kyoto Protocol for project-based emission reduction activities in developing countries. The CDM is designed to meet two main objectives: to address the sustainability needs of the host country and to increase the opportunities available to Annex 1 Parties to meet their GHG reduction commitments. The CDM allows for the creation, acquisition, and transfer of CERs from climate change mitigation projects undertaken in non-Annex 1 countries. |
| **$CO_2$ equivalent ($CO_2$e)** | The universal unit of measurement to indicate the global warming potential (GWP) of each greenhouse gas, expressed in terms of the GWP of one unit of carbon dioxide. It is used to evaluate releasing (or avoiding releasing) different greenhouse gases against a common basis. |
| **Cogeneration unit/Combined heat and power (CHP)** | A facility producing both electricity and steam/heat using the same fuel supply. |
| **Company** | The term company is used in this standard as shorthand to refer to the entity developing a GHG inventory, which may include any organization or institution, either public or private, such as businesses, corporations, government agencies, nonprofit organizations, assurers and verifiers, universities, etc. |
| **Consumer** | The end consumer or final user of a product. |
| **Contractual instrument** | Any type of contract between two parties for the sale and purchase of energy bundled with attributes about the energy generation, or for unbundled attribute claims. Markets differ as to what contractual instruments are commonly available or used by companies to purchase energy or claim specific attributes about it, but they can include energy attribute certificates (RECs, GOs, etc), direct contracts (for both low-carbon, renewable or fossil fuel generation), supplier-specific emission rates, and other default emission factors representing the untracked or unclaimed energy and emissions (termed the residual mix) if a company does not have other contractual information that meet the Scope 2 Quality Criteria. |
| **Control** | The ability of a company to direct the policies of another operation. More specifically, it is defined as either operational control (the organization or one of its subsidiaries has the full authority to introduce and implement its operating policies at the operation) or financial control (the organization has the ability to direct the financial and operating policies of the operation with a view to gaining economic benefits from its activities). |
| **Direct emissions** | Emissions from sources that are owned or controlled by the reporting company. |
| **Dispatch** | The coordination of power plant operations in order to meet the load on a grid. A "dispatchable" power plant is one that can be directly called upon by grid operators to produce power, and whose output can be modulated in response to real-time fluctuations in demand for electricity. |
| **Distributed generation** | Decentralized, grid-connected, or off-grid energy facilities located in or near the place where energy is used. |
| **Double counting** | Two or more reporting companies claiming the same emissions or reductions in the same scope, or a single company reporting the same emissions in multiple scopes. |

Exhibit 4 to Decl. of Burton
260
**SER 2315**

| | |
|---|---|
| **Electric utility** | An electric power company whose operations may include generation, transmission, and distribution of electricity for sale. Also called electricity or energy supplier. |
| **Eligibility criteria** | Features or conditions defined by a policy or program that determine which energy generation facilities can participate in the program or whose certificates will fulfill programmatic requirements. |
| **Emission factor** | A factor that converts activity data into GHG emissions data (e.g., kg $CO_2$e emitted per liter of fuel consumed, kg $CO_2$e emitted per kilometer traveled, etc.). |
| **Emissions** | The release of greenhouse gases into the atmosphere. |
| **Energy** | Formally, energy is defined as the amount of work a physical system can do on another. In this Guidance, energy refers to electrical energy generated by power plants and delivered to energy users over a power grid. |
| **Energy attribute certificate** | A category of contractual instruments used in the energy sector to convey information about energy generation to other entities involved in the sale, distribution, consumption, or regulation of electricity. This category includes instruments that may go by several different names, including certificates, tags, credits, etc. |
| **Energy generation facility** | Any technology or device that generates energy for consumer use, including everything from utility-scale fossil fuel power plants to rooftop solar panels. |
| **Equity investment** | A share of equity interest in an entity. The most common form is common stock. Equity entitles the holder to a pro rata ownership in the company. |
| **Equity share approach** | A consolidation approach whereby a company accounts for GHG emissions from operations according to its share of equity in the operation. The equity share reflects economic interest, which is the extent of rights a company has to the risks and rewards flowing from an operation. |
| **Feed-in tariff** | A policy mechanism offering a fixed price to renewable energy producers for output. |
| **Finance lease** | A lease that transfers substantially all the risks and rewards of ownership to the lessee and is accounted for as an asset on the balance sheet of the lessee. Also known as a capital or financial lease. Leases other than capital/financial/finance leases are operating leases. |
| **Financial control** | The ability to direct the financial and operating policies of an entity with a view to gaining economic benefits from its activities. |
| **Financial control approach** | A consolidation approach whereby a company accounts for 100 percent of the GHG emissions over which it has financial control. It does not account for GHG emissions from operations in which it owns an interest but does not have financial control. |
| **Fuel mix disclosure** | A report by energy suppliers to their consumers disclosing the generation resources and associated attributes (such as GHG emissions and nuclear waste quantities) provided by that supplier. Disclosure laws often aim to enable informed customer choice in deregulated or liberalized markets. |
| **Generation** | The electrical energy produced by a power plant or project activity. |

Exhibit 4 to Decl. of Burton
261
**SER 2316**

*Glossary*

| | |
|---|---|
| **GHG program** | A generic term for: (1) any voluntary or mandatory, government or nongovernment initiative, system, or program that registers, certifies, or regulates GHG emissions; or (2) any authorities responsible for developing or administering such initiatives, systems, or programs. |
| **GHG project** | A specific activity or set of activities intended to reduce GHG emissions, increase the storage of carbon, or enhance GHG removals from the atmosphere. A GHG project may be a standalone project or a component of a larger non-GHG project. |
| **Global warming potential** | A factor describing the radiative forcing impact (degree of harm to the atmosphere) of (GWP) one unit of a given GHG relative to one unit of $CO_2$. |
| **Green power** | A generic term for renewable energy sources and specific clean energy technologies that emit fewer GHG emissions relative to other sources of energy that supply the electric grid. Includes solar photovoltaic panels, solar thermal energy, geothermal energy, landfill gas, low-impact hydropower, and wind turbines. Resources included in a given certification, reporting, or recognition program may vary. |
| **Green power product/ green tariff** | A consumer option offered by an energy supplier distinct from the "standard" offering. These are often renewables or other low-carbon energy sources, supported by energy attribute certificates or other contracts. |
| **Greenhouse gas inventory** | A quantified list of an organization's GHG emissions and sources. |
| **Greenhouse gases (GHG)** | For the purposes of this standard, GHGs are the seven gases covered by the UNFCCC: carbon dioxide ($CO_2$); methane ($CH_4$); nitrous oxide ($N_2O$); hydrofluorocarbons (HFCs); perfluorocarbons (PFCs); sulphur hexafluoride ($SF_6$), and nitrogen trifluoride ($NF_3$). |
| **Grid** | A system of power transmission and distribution (T&D) lines under the control of a coordinating entity or "grid operator," which transfers electrical energy generated by power plants to energy users—also called a "power grid." The boundaries of a power grid are determined by technical, economic, and regulatory-jurisdictional factors. |
| **Grid operator** | The entity responsible for implementing procedures to dispatch a set of power plants in a given area to meet demand for electricity in real time. The precise institutional nature of the grid operator will differ from system to system. The grid operator may be alternately referred to as a "system dispatcher," "control area operator," "independent system operator," or "regional transmission organization," etc. |
| **Indirect GHG emissions** | Emissions that are a consequence of the operations of the reporting company, but occur at sources owned or controlled by another company. This includes scope 2 and scope 3. |
| **Intensity target** | A target defined by reduction in the ratio of emissions and a business metric over time e.g., reduce $CO_2$ per metric ton of cement by 12 percent between 2000 and 2008. |
| **Intergovernmental Panel on Climate Change (IPCC)** | An international body of climate change scientists. The role of the IPCC is to assess the scientific, technical, and socioeconomic information relevant to the understanding of the risk of human-induced climate change |
| **Inventory boundary** | An imaginary line that encompasses the direct and indirect emissions included in the inventory. It results from the chosen organizational and operational boundaries. |

103

Exhibit 4 to Decl. of Burton
262
**SER 2317**

| | |
|---|---|
| **Inventory quality** | The extent to which an inventory provides a faithful, true, and fair account of an organization's GHG emissions. |
| **Jurisdiction** | A geopolitical region under a single legal and regulatory authority. For market boundaries for certificate use and trading described in this uidance, jurisdictions are typically countries but may be multi-country regions. |
| **Levy Exemption Certificate (LEC)** | Certificates used in the U.K. to provide energy suppliers with evidence needed to demonstrate to HMRC that electricity supplied to U.K. business customers is exempt from the Climate Change Levy. |
| **Life cycle** | Consecutive and interlinked stages of a product system, from raw material acquisition or generation of natural resources to end of life. |
| **Life cycle assessment (LCA)** | Compilation and evaluation of the inputs, outputs, and the potential environmental impacts of a product system throughout its life cycle. |
| **Location-based method for scope 2 accounting** | A method to quantify scope 2 GHG emissions based on average energy generation emission factors for defined locations, including local, subnational, or national boundaries. |
| **Market-based method for scope 2 accounting** | A method to quantify scope 2 GHG emissions based on GHG emissions emitted by the generators from which the reporter contractually purchases electricity bundled with instruments, or unbundled instruments on their own. |



104 *Scope 2 Guidance*

Exhibit 4 to Decl. of Burton
263
**SER 2318**

*Glossary*

| | |
|---|---|
| **Megawatt (MW)** | A unit of electrical power. One megawatt of power output is equivalent to the transfer of one million joules of electrical energy per second to the grid. |
| **Megawatt-hour (MWh)** | A unit of electrical energy equal to 3.6 billion joules; the amount of energy produced over one hour by a power plant with an output of 1 MW. |
| **Net metering** | A method for energy suppliers to credit customers for electricity that they generate on site in excess of their own electricity consumption and sell back to the grid. Any electricity purchases from the gird are deducted (or "netted") from the generation sent to the grid. The specific financial rules for net metering may vary by country and state. |
| **Null power** | Energy from which energy attribute certificates or other instruments have been separated and sold off, leaving the underlying power without specific attributes. Also called "commodity electricity." |
| **Offset credit** | Offset credits (also called offsets, or verified emission reductions) represent the reduction, removal, or avoidance of GHG emissions from a specific project that is used to compensate for GHG emissions occurring elsewhere, for example to meet a voluntary or mandatory GHG target or cap. Offsets are calculated relative to a baseline that represents a hypothetical scenario for what emissions would have been in the absence of the mitigation project that generates the offsets. To avoid double counting, the reduction giving rise to the offset must occur at sources or sinks not included in the target or cap for which it is used. |
| **On-site generation** | Electricity generated by a generation facility located where some or all of the energy is used. If the generation facility is owned and operated by the consuming company, it can be called "self-generation." On-site generation is a form of distributed energy generation. |
| **Operating lease** | A lease that does not transfer the risks and rewards of ownership to the lessee and is not recorded as an asset in the balance sheet of the lessee. Leases other than operating leases are capital/financial/finance leases. |
| **Operating margin (OM)** | The set of existing power plants whose output is reduced in response to a project activity. These power plants are the last to be switched on-line or first to be switched off-line during times when the project activity is operating, and which therefore would have provided the project activity's generation in the baseline scenario. |
| **Operational boundaries** | The boundaries that determine the direct and indirect emissions associated with operations owned or controlled by the reporting company. |
| **Operational control** | A consolidation approach whereby a company accounts for 100 percent of the GHG emissions over which it has operational control. It does not account for GHG emissions from operations in which it owns an interest but does not have operational control. |
| **Organizational boundaries** | The boundaries that determine the operations owned or controlled by the reporting company, depending on the consolidation approach taken (equity or control approach). |

105

Exhibit 4 to Decl. of Burton
264
**SER 2319**

| **Power purchase agreement (PPA)** | A type of contract that allows a consumer, typically large industrial or commercial entities, to form an agreement with a specific energy generating unit. The contract itself specifies the commercial terms including delivery, price, payment, etc. In many markets, these contracts secure a long-term stream of revenue for an energy project. In order for the consumer to say they are buying the electricity of the specific generator, attributes **shall** be contractually transferred to the consumer with the electricity. |
|---|---|
| **Renewable energy** | Energy taken from sources that are inexhaustible, e.g. wind, water, solar, geothermal energy, and biofuels. |
| **Renewable energy certificate (REC)** | A type of energy attribute certificate, used in the U.S. and Australia. In the U.S., a REC is defined as representing the property rights to the generation, environmental, social, and other non-power attributes of renewable electricity generation. |
| **Renewable Portfolio Standards (RPS)** | A state- or national-level policy that requires that a minimum amount (usually a percentage) of electricity supply provided by each supply company is to come from renewable energy. |
| **Residual mix** | The mix of energy generation resources and associated attributes such as GHG emissions in a defined geographic boundary left after contractual instruments have been claimed/retired/canceled. The residual mix can provide an emission factor for companies without contractual instruments to use in a market-based method calculation. |
| **Retailer (also retail provider)** | The entity selling energy to final consumers, representing final process in the delivery of electricity from generation to the consumer. Also known as electric service provider, competitive power supplier or power marketer depending on the national or subnational regulation. |
| **Scope 1 emissions** | Emissions from operations that are owned or controlled by the reporting company. |
| **Scope 2 emissions** | Indirect emissions from the generation of purchased or acquired electricity, steam, heat or cooling consumed by the reporting company. |
| **Scope 2 Quality Criteria** | A set of requirements that contractual instruments **shall** meet in order to be used in the market-based method for scope 2 accounting. |
| **Scope 3 emissions** | All indirect emissions (not included in scope 2) that occur in the value chain of the reporting company, including both upstream and downstream emissions. |
| **Scope 3 category** | One of the 15 types of scope 3 emissions. |
| **Self-generation** | On-site generation owned or operated by the entity that consumes the power. |
| **Significance threshold** | A qualitative or quantitative criterion used to define a significant structural change. It is the responsibility of the company, GHG program to which the company is reporting, or the company's verifier to determine the "significance threshold" for considering base-year emissions recalculation. In most cases the "significance threshold" depends on the use of the information, the characteristics of the company, and the features of structural changes. |
| **Supplier** | An entity that provides or sells products to another entity (i.e., a customer). For this guidance, refers to electricity supplier. |

Exhibit 4 to Decl. of Burton
265
**SER 2320**

*Glossary*

| | |
|---|---|
| **Supplier quota** | Regulations requiring electricity suppliers to source a percentage of their supply from specified energy sources, e.g. Renewable Portfolio Standards in U.S. states. Regulations generally defined eligibility criteria that energy facilities must fulfill in order to be used to demonstrate compliance. |
| **Supplier-specific emission factor** | An emission rate provided by an electricity supplier to its customers, reflecting the emissions associated with the energy it provides. Suppliers offering differentiated products (e.g. a renewable energy product) should provide specific emission rates for each product and ensure they are not double counted with standard power offers. |
| **Supply chain** | A network of organizations (e.g., manufacturers, wholesalers, distributors and retailers) involved in the production, delivery, and sale of a product to the consumer. |
| **Tracking system** | A database or registry that helps execute energy attribute certificate issuance and cancellation/retirement/claims between account holders in the system. It can track information on certificates or generation occurring throughout the defined system. They are typically tied to geopolitical or grid operational boundaries. |
| **Unbundled** | An energy attribute certificate or other instrument that is separate, and may be traded separately, from the underlying energy produced. |
| **Utility** | See electric utility. |
| **Vintage** | The date that electric generation occurs and/or was measured, from which an energy attribute certificate is issued. This should be distinguished from an energy facility's age (e.g. date that a generating unit commenced operation). |



107

Exhibit 4 to Decl. of Burton
266
**SER 2321**

# *References*

Agnolucci, P. 2007. "The effect of financial constraints, technological progress and long-term contracts on tradable green certificates." *Energy Policy* 35(6): 3347–3359.

Alagappan, L., R. Orans, et al. 2011. "What drives renewable energy development?" *Energy Policy* 39 (9): 5099–5104.

The Aldersgate Group. 2014. "Enable the Label: The Case for electricity labeling in the UK." Accessible at: http://www.aldersgategroup.org.uk/asset/download/1208/Electricity%20 Labelling%20Summary%20for%20Business.pdf. (Accessed December 21, 2014).

Balducci, P., Clint Gerkensmeyer, Srinivas Katipamula, Michael CW Kintner-Meyer, Thomas F. Sanquist, Kevin P. Schneider, and T. J. Secrets. 2010. "The smart grid: An estimation of the energy and $CO_2$ benefits." Washington, DC: U.S. Department of Energy.

Bergen Energi."Track my electricity." Accessible at: http://www.trackmyelectricity.com. (Accessed December 9, 2014).

Bird, Lori, and Jenny Sumner. 2011. "Using renewable energy purchases to achieve institutional carbon goals: A review of current practices and considerations." NREL/TP-6A20-49938: 35. Golden, CO: National Renewable Energy Laboratory.

Bird, Lori, and Michael Milligan. 2012. "Lessons from Large-Scale Renewable Energy Integration Studies." NREL/CP- 6A20-54666. Denver, CO: World Renewable Energy Forum Proceedings.

Bröckl, Marika, Erkka Ryynänen, Iivo Vehviläinen, and Gaia Consulting Oy. 2012. "Residual mix in the Nordic countries." Nordic Council of Ministers.

Center for Resource Solutions. 2012. "Renewable Energy Certificates, Carbon Offsets, and Carbon Claims: Best Practices and Frequently Asked Questions." San Francisco, California.

Center for Resource Solutions. 2014. "Green-e Energy National Standard, Version 2.4, Red-lined version." San Francisco, CA. Accessible at: http://www.green-e.org/docs/energy/Appendix%20D_Green-e%20Energy%20National%20 Standard% 20v2.4% 20redlined.pdf.

The Climate Registry. 2013. *The General Reporting Protocol, Version 2.0.* Accessible at: http://www.theclimateregistry.org/downloads/2013/03/TCR_GRP_Version_2.0.pdf.

ECOHZ. "ECOHZ GO²." Accessible at: <http://www.ecohz.com/products/products/ecohz-go%C2%B2>. (Accessed November 20, 2014)

EKOenergy. "Climate Fund." Accessible at: http://www.ekoenergy.org/our-results/climate-fund/. (Accessed November 20, 2014)

EKOenergy. "The EKOenergy Criteria." Accessible at: http://www.ekoenergy.org/ecolabel/ criteria/. (Accessed November 20, 2014)

Defra. 2013."2013 Government GHG Conversion Factors for Company Reporting: Methodology Paper for Emissions Factors." London: United Kingdom Department for Environment Food & Rural Affairs.

Defra. 2013. "Environmental Reporting Guidelines: Including mandatory greenhouse gas emissions reporting guidance." London: United Kingdom Department for Environment Food & Rural Affairs.

Electric Power Research Institute. 2011. "Impacts of Wind Generation Integration." Palo Alto, California.

Environmental Tracking Network of North America. n.d. "REC Questions and Answers." Accessible at: http://www.etnna.org/images/PDFs/ETNNA-REC-QandA.pdf. (Accessed November 20, 2014)

EPRI (Electric Power Research Institute). 2008. "The Green Grid: Energy Savings and Carbon Emissions Reductions Enabled by a Smart Grid." Palo Alto, CA: EPRI. Accessible at: http://www.smartgridnews.com/artman/uploads/1/SGNR_2009_EPRI_Green_Grid_June_2008.pdf.

ETNNA (Environmental Tracking Network of North America). 2010. "The Intersection between Carbon, RECs, and Tracking: Accounting and Tracking the Carbon Attributes of Renewable Energy." Accessible at: http://etnna.org/images/PDFs/Intersection%20btwn%20Carbon%20RECs%20 and%20Tracking.pdf.

Exhibit 4 to Decl. of Burton
267
**SER 2322**

*References*

European Union. 2003. "Directive 2003/54/EC of the European Parliament and of the Council of 26 June 2003 concerning common rules for the internal market in electricity and repealing Directive 96/92/EC." *Official Journal of the European Union.*

European Union. 2009. "Directive 2009/72/EC of the European Parliament and of the Council of 13 July 2009 concerning common rules for the internal market in electricity and repealing Directive 2003/54/EC." *Official Journal of the European Union.*

FTC (U.S. Federal Trade Commission). 2012. "Guides for the use of environmental marketing claims." (2012 revision) Washington, DC: United States Federal Trade Commission.

Gillenwater, Michael. 2008a. "Redefining RECs (Part 1): Untangling attributes and offsets." *Energy Policy* 36 (6): 2109–2119.

Gillenwater, Michael. 2008b. "Redefining RECs (Part 2): Untangling certificates and emission markets." *Energy Policy* 36 (6): 2120–2129.

Gillenwater, Michael. 2008c. "Taking green power into account." *Environmental Finance: Special Report.*

Gillenwater, Michael. 2012. "What is Additionality? Part 1: A long standing problem." Greenhouse Gas Management Institute Discussion Paper 001. Accessible at : http://ghginstitute.org/wp-content/uploads/content/GHGMI/AdditionalityPaper_Part-1(ver3)FINAL.pdf.

Gillenwater, Michael, Xi Lu, and Miriam Fischlein. 2014. "Additionality of wind energy investments in the U.S. voluntary green power market." *Renewable Energy* 63: 452–457.

Green Energy Supply Certification Scheme. "About the Green Energy Supply Certification Scheme." Accessible at: http://www.greenenergyscheme.org/about-scheme/. *(Accessed November 20, 2014.)*

Harmon, Rob. 2009. "The ABCs of renewable energy, RECs and greenhouse gas offsets." *Voluntary Carbon Markets: An International Business Guide to What They Are and How They Work.* London: Earthscan.

Holt, Edward A., and Lori Bird. 2005. "Emerging Markets for Renewable Energy Certificates: Opportunities and Challenges." NREL/TP-620-37388. Golden, CO: National Renewable Energy Laboratory.

Holt, Edward A., Ryan Wiser, and Mark Bolinger. 2006. "Who owns Renewable Energy Certificates? An Exploration of Policy Options and Practice." LBNL-59965: 53. Berkeley, CA: Lawrence Berkeley National Laboratory.

Holt, Edward A., and Ryan Wiser. 2007. "The Treatment of Renewable Energy Certificates, Emissions Allowances, and Green Power Programs in State Renewables Portfolio Standards." LBNL-62574. Berkeley, CA: Lawrence Berkeley National Laboratory.

Holt, Edward A., Jenny Sumner, and Lori Bird. 2011. "The Role of Renewable Energy Certificates in Developing New Renewable Energy Projects." Golden, CO: National Renewable Energy Laboratory.

International Energy Agency. 2012. "$CO_2$ Emissions from Fuel Combustion Highlights: 2012 edition." *International Energy Agency Statistics.* Paris: International Energy Agency.

International Energy Agency. 2014. "Electricity Information (2014 edition)." Paris: International Energy Agency.

IPCC (Intergovernmental Panel on Climate Change). 2014. "Summary for Policymakers." In O. Edenhofer, R. Pichs-Madruga, Y. Sokona, E. Farahani, S. Kadner, K. Seyboth, A. Adler, I. Baum, S. Brunner, P. Eickemeier, B. Kriemann, J. Savolainen, S. Schlömer, C. von Stechow, T. Zwickel, and J.C. Minx (eds). *Climate Change 2014, Mitigation of Climate Change.* Contribution of Working Group III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change." Accessible at: http://report.mitigation2014.org/spm/ipcc_wg3_ar5_summary-for-policymakers_approved.pdf.

International REC Services. 2014. "The I-REC Code." Version 1.1. Accessible at: http://www.internationalrec.org/downloads/I-REC%20Code_v1.1.pdf. (Accessed December 21, 2014).

Jones, Todd. 2014. "The Legal Basis for Renewable Energy Certificates." San Francisco, California: Center for Resource Solutions.

Exhibit 4 to Decl. of Burton
268
**SER 2323**

Kollmuss, Anja, and Michael Lazarus. "Buying and selling allowances as an alternative to offsets for the voluntary market: a preliminary review of issues and options." OECD and Stockholm Environment Institute, 2010.

Lew, Debra, Greg Brinkman, E. Ibanez, B. M. Hodge, and J. King. 2013. "The Western Wind and Solar Integration Study Phase 2." NREL/TP- 5500 55588. Golden, CO: National Renewable Energy Laboratory.

Norwegian Water Resources and Energy Directorate. "Electricity disclosure 2011." Accessible at: http://www.nve.no/en/Electricity-market/Electricity-disclosure-2011/. (Last modified October 8, 2012)

Putt del Pino, Samantha. 2006. "Switching to Green: A Renewable Energy Guide for Office and Retail Customers." Washington, DC: World Resources Institute.

Raadal, Hanne Lerche, Erik Dotzauer, Ole Jorgen Hanssen, and Hans Petter Kildal. 2012. "The interaction between electricity disclosure and tradable green certificates." *Energy Policy* 42: 419–428.

Reliable Disclosure Systems for Europe (Phase II). 2013. "European Residual Mixes 2012: Results of the calculation of Residual Mixes for purposes of electricity disclosure in Europe for the calendar year 2012, version 1.0." Accessible at: http://www.reliable-disclosure.org/static/media/docs/RE-DISS_2012_Residual_Mix_Results_v1_0.pdf.

Rothschild, Suzy, and Art Diem. 2009. "Total, Non-baseload, eGRID Subregion, State: Guidance on the Use of eGRID Output Emission Rates." U.S. Environmental Protection Agency Emission Inventory Conference, Baltimore, MD, April 15 2009.

RTE. n.d. "CO2 emissions per kWh of electricity generated in France." Accessible at: http://www.rte-france.com/en/eco2mix/eco2mix-co2-en. (Accessed December 9, 2014)

Timpe, Christof, Dominik Seebach, Markus Klimscheffskij, Marko Lehtovaara, Claudia Raimundo, et al. 2012. "Reliable Disclosure Information for European Electricity Consumers." City: Öko-Institut e.V.

U.S. Environmental Protection Agency. 2008. "Climate Leaders Greenhouse Gas Inventory Protocol Optional Modules Methodology for Project Type: Green Power and Renewable Energy Certificates (RECs)." Version 2.1. Washington, DC: Climate Protection Partnerships Division, EPA.

U.S. Environmental Protection Agency. "eGRID FAQ." The Emissions & Generation Resource Integrated Database. Accessible at: http://www.epa.gov/cleanenergy/energy-resources/egrid/faq.html. (Accessed November 20, 2014).

U.S. Environmental Protection Agency. 2008. "EPA's Green Power Partnership: Renewable Energy Certificates." Washington, DC.

U.S. Environmental Protection Agency. 2010. "Regulation of Fuels and Fuel Additives: Changes to Renewable Fuel Standard Program; Final Rule." 40 CFR Part 80. Washington, DC: EPA. Book 2 of 2 Books, Pages 14669–15320. Accessible at: http://www.gpo.gov/fdsys/pkg/FR-2010-03-26/pdf/2010-3851.pdf.

US EPA, DOE, WRI, and CRS (U.S. Environmental Protection Agency, U.S. Department of Energy, World Resources Institute, and The Center for Resource Solutions). 2010. "Guide to Purchasing Green Power: Renewable Electricity, Renewable Energy Certificates, and On-Site Renewable Generation."

WRI/WBCSD GHG Protocol. 2004. *The Greenhouse Gas Protocol: a corporate accounting and reporting standard* (revised edition). Washington DC: WRI.

WRI/WBCSD GHG Protocol. 2007. *The Greenhouse Gas Protocol: Guidelines for Quantifying GHG Reductions from Grid-connected Electricity Projects.* Washington DC: WRI.

WRI/WBCSD GHG Protocol. 2011. *The Value Chain (Scope 3) Standard.* Washington DC: WRI.

WRI/WBCSD GHG Protocol. 2006. *GHG Protocol Allocation of GHG Emissions from a Combined Heat and Power (CHP) Plant.* Washington DC: WRI. Accessible at: http://www.ghgprotocol.org/files/ghgp/tools/CHP_guidance_v1.0.pdf.

Exhibit 4 to Decl. of Burton
269
**SER 2324**

# *Recognitions*

## Technical Working Group members

| | | | |
|---|---|---|---|
| Ian McGowan | 3Degrees | Joel Fleming | Climate Friendly |
| Chrystelle Damar | ACI EUROPE and Airport Carbon Accreditation | Mark Trexler | Climatographers |
| | | Tim Kelly | Conservation Council of South Australia |
| Kenneth Martchek | Alcoa | | |
| Andrew Raingold | Aldersgate Group | Ricky Ashenfelter | Deloitte |
| Kevin DeGroat | Antares Group | Mauren Johnson | Deloitte |
| Craig Simmons | Anthesis Consulting Group | Christopher Porto | Deloitte |
| Ivan Lee | Apple | Matt Sculnick | Deloitte |
| Lars Kvale | APX | Rania Alkhatib | DHL |
| Jeannine Altavilla | Arlington County | Colin Parry | Diageo |
| John Morrill | Arlington County | Bruce Rauhe | Disney |
| Phil Moody | Association of Issuing Bodies | Leslie Wong | Disney |
| Keith Moore | AstraZeneca | Brian Kozlowski | Domtar |
| Richard Sturman | AstraZeneca | Robert Reich | DuPont |
| Anette Gussiaas | Bergen Energi | Caspar Noach | Ecofys |
| Hans Petter Kildal | Bergen Energi | Line Riise Jensen | Ecohz |
| Janu Ramchandani | Bergen Energi | Tom Lindberg | Ecohz |
| Stefan Sanne | Bergen Energi | Preben Munch | Ecohz |
| Roger Kirkpatrick | Bloom Energy | Brian Spak | Ecova |
| Jonathan Powers | Bloom Energy | Edward Holt | Ed Holt & Associates, Inc. |
| Chunjiang Huang | Boeing | Thibaut Brac de la Perriere | EDF |
| Jennifer Dove | BT | | |
| Ron Seftel | Bullfrog Power | Jean-Yves Caneill | EDF |
| Rosa Maria Jimenez | Business Commission for Sustainable Development (CESPEDES) | Guillaume Giroux | EDF |
| | | Paul Bennett | EDF Energy |
| | | Neil Drake | EDF Energy |
| Aude Duquesne | Climate Markets and Investor Association | John Mason | EDF Energy |
| | | Steven Vanholme | EKOenergy |
| Guy Rickard | Carbon Trust | Gustav Beerel | Emission Information, Inc. |
| Andie Stephens | Carbon Trust | Melanie Dickersbach | Exelon |
| Oliver Crouch | CarbonNeutral Company | Phil Dominy | EY |
| Mark LaCroix | CarbonNeutral Company | Harry Manisty | EY |
| Jonathan Shopley | CarbonNeutral Company | Lyrica McTiernan | Facebook |
| Pedro Faria | CDP | Patrick Reaves | Facebook |
| Andrea Smith | CDP | Vincent Van Son | Facebook |
| Roberto Zanchi | CDP | Bill Weihl | Facebook |
| Todd Jones | Center for Resource Solutions | Richard Strate | Fides Treuhand |
| Jennifer Martin | Center for Resource Solutions | Fabian Bamberg | firstclimate |
| Alex Pennock | Center for Resource Solutions | Michael Gillenwater | GHG Management Institute |
| Ally Charlton | Climate Friendly | Joshua Skov | GoodCompany |

111

Exhibit 4 to Decl. of Burton
270
**SER 2325**

| | | | | |
|---|---|---|---|---|
| Jolanka Nickerman | Google | Kazuno Hirofumi | Kansai Electric Power Company |
| Kelsey Vandermeulen | Google | Lorène Schibler | KlimAktiv |
| Roger Ballentine | Green Strategies | Martin Johnson | Kuehne + Nagel |
| Markus Klimscheffskij | Grexel | Nicholas O'Keeffe | Landsvirkjun – (National Power Company of Iceland) |
| Dov Brachfeld | H&M | | |
| Geri Elissa Kantor | Harvard University | Christine Ackerson | LG Electronics |
| Mike Burnett | Hot Sky Consulting | Kevin Rabinovitch | Mars |
| Craig Ebert | ICF International | Esther Julier | MBDC |
| Molly Janis | ICF International | Jay Bolus | MBDC |
| Erika Myers | ICF International | TJ DiCaprio | Microsoft |
| John Harris | IKEA Group | Hogne Larsen | MiSA |
| Jamie Rusby | IKEA Group | Christian Solli | MiSA |
| Stefania Galletti | IMQ | Matt Wood | Mosaic Sustainability |
| Edward Barlow | Institute of Environmental Management and Assessment | Amy Fredregill | M-RETS |
| | | Jules Chuang | Mt Stonegate Asset Management Ltd. |
| Nick Blyth | Institute of Environmental Management and Assessment | Lori Bird | National Renewable Energy Laboratory (NREL) |
| Jed Richardson | Johnson&Johnson | | |



Exhibit 4 to Decl. of Burton
271
**SER 2326**



*Recognitions*

| | |
|---|---|
| Obadiah Bartholomy | Sacramento Municipal Utility District |
| Pedro Grossinho | Sony |
| Trey Gibbs | Sterling Planet |
| Aden Hathaway | Sterling Planet |
| Robert Maddox | Sterling Planet |
| Christina Macken | Sustainable Purchasing Leadership Council |
| Jason Pearson | Sustainable Purchasing Leadership Council |
| Karen Utt | Tennessee Valley Authority |
| David Cockburn | Tetra Pak |
| Mari Ovaskainen | Tetra Pak |
| Peggy Kellen | The Climate Registry |
| Jan Christian Polania Giese | Thema1 |
| Rasmus Priess | Thema1 |
| Carla Hopkins | United Kingdom Department for Environment, Food & Rural Affairs |
| Davinder Lail | United Kingdom Department for Environment, Food & Rural Affairs |
| Rosalind West | United Kingdom Department for Environment, Food & Rural Affairs |
| Matt Clouse | United States Environmental Protection Agency |
| Art Diem | United States Environmental Protection Agency |
| John Sottong | United States Environmental Protection Agency |
| Ronak Bhatt | University of North Carolina Charlotte |
| Meghna Tare | University of Texas Austin |
| Ruth Galligan | Utilyx |
| Miranda Ballentine | Walmart |
| Joby Carlson | Walmart |
| Caroline Conway | Walmart |
| Mieke Lange | Windmade |
| Eric Christensen | WSP |
| Dan Sobrinski | WSP |
| Leonie Dobbie | WSP and Airport Carbon Accreditation |
| Ellen Upton | WSP and Airport Carbon Accreditation |
| Bryn Baker | WWF |
| Susanne Fratzscher | WWF |
| Marty Spitzer | WWF |

| | |
|---|---|
| Jenny Heeter | National Renewable Energy Laboratory (NREL) |
| Otto VanGeet | National Renewable Energy Laboratory (NREL) |
| Tom Stoddard | Native Energy |
| Brian Schoening | Northrup Grumman |
| Christof Timpe | Oeko-Institut |
| Dominik Seebach | Oeko-Institut |
| Hanne Lerche Raadal | Ostfold Research |
| Marty Brown | Pfizer |
| Daniel Gatens | Pfizer |
| Sally Fisk | Pfizer |
| Jared Braslawsky | RECS International |
| Peter Niermeijer | RECS International |
| Quayle Hodek | Renewable Choice Energy |
| Joseph Seymour | Renewable Energy Markets Association |
| Colin High | Resource Systems Group (RSG Inc.) |
| Emelia Holdaway | Ricardo-AEA |
| M. Vijay Kumar | Reliance Infrastructure (Rinfara) |
| Henk Hendrix | SABIC |

Exhibit 4 to Decl. of Burton
272
SER 2327

## Contributors

| | | | |
|---|---|---|---|
| Peter Shuey | ACX Argyle (Australia CO2 Exchange) | Gretchen Hancock | GE |
| Jan Liodden | Agder Energi | Meghan Chapple | George Washington University |
| Karin Sanne | AkzoNobel | Audrey Stewart | Georgetown University |
| Victoria Fleming-Williams | Aldersgate Group | Beatriz Kiss | GHG Protocol Brazil |
| | | Simon Heppner | Good Business |
| Celine Ruben-Salama | American Express | Jennifer Clymer | Green Mountain Energy |
| Chris O'Brien | American University | Gary Cook | Greenpeace |
| Rolf Strassburger | BASF | Jay Dietrich | IBM |
| Andreas Horn | BASF | Chris Bayliss | International Aluminum Institute |
| Fiona Wild | BHP Billiton | Sophy Greenhalgh | International Carbon Reduction and Offset Alliance |
| Asha Kayla | Boots | | |
| Kevin Moss | BT | Veronica Aneris | International Union of Railways |
| Richard Tarboton | BT | Marisa Buchanan | JPMorgan Chase & Co. |
| Jennifer Dudgeon | CA technology | Christopher Reynolds | JPMorgan Chase & Co. |
| Claudia Orlando | California Air Resources Board | Marcy Schaefer | Kohls |
| Jen Derstine | Capstone Turbine Corporation | Denis LeFebvre | L'Oreal |
| Francisco Ascui | Centre for Business and Climate Change, University of Edinburgh Business School | Ben Bezark | MBDC |
| | | Susan Klosterhaus | MBDC |
| | | Yasushi Furushima | Mizuho Information & Research Institute, Inc |
| Doug Huxley | CH2MHill | Justin Soreide | Norsk Hydro |
| Ryan Meinke | Closed Loop Advisors | Akira Shibata | Osaka Gas |
| Virginia Swan | Conservation Council of South Australia | Duncan Noble | PE International (Five Winds Consulting) |
| Wolfgang Berger | DFEG AG | Linda Laszewski | Pepsi |
| Christine Dorgan | Disney | Tim Carey | Pepsi |
| Tim Lee | Disney | Robert Prengel | PWC (Germany) |
| Lisa Shibata | Disney | Melissa Capria | SAIC |
| Joseph Killeen | Dynamic Worldwide | Stephen Allen | Sustain Co |
| Shyam Ramrekha | EcoLogo | Massimo Ciuffini | Sustainable Development Foundation |
| Donna Clarke | Ecometrica | | |
| Richard Tipper | Ecometrica | Raimondo Orsini | Sustainable Development Foundation |
| Kathryn West | EnergyAce | | |
| Uma Rajarathnam | EnzenGlobal | Greg Downing | Target |
| Eddie Liu | ERM | Sarah Martinez | Target |
| Marianne Fernagut | ERM | Nick Facciola | TerraPass |
| Chris Arthers | Essent | Mark Mondik | TerraPass |
| Adam Simpson | EtaGen | Kevin Houston | The Association of Carbon Professionals |
| Jonathan Gromark | EY | | |
| Maxim Luttmer | EY | Masakazu Shinki | The Japan Gas Association |
| Shintaro Yokokawa | Federation of Electric Power Companies in Japan | Rakesh Radhakrishnan | Thompson Reuters |
| | | Takahiro Nagata | Tokyo Gas |
| Bud DeFlaviis | Fuel Cell and Hydrogen Energy Association | Staf Laget | Umicore |

Exhibit 4 to Decl. of Burton
273
**SER 2328**

*Recognitions*



| | | | |
|---|---|---|---|
| Stuart Pyle | United Kingdom Department of Energy and Climate Change | Greg Pool | Walmart |
| Alice Douglas | United Kingdom Department for Environment, Food & Rural Affairs | Greg Trimble | Walmart |
| | | Kerry Kelly | Waste Management |
| Julia Sussams | United Kingdom Department for Environment, Food & Rural Affairs | Paul Pabor | Waste Management |
| | | Matheus Alves de Brito | Way Carbon |
| Sue Whitehead | United Kingdom Department for Environment, Food & Rural Affairs | Line Poinel | WRc |
| Georgina Sitckles | United Nations World Food Program | Maria Mendiluce | World Business Council for Sustainable Development |
| Anne Crawley | United States Department of Energy | Vivek Adhia | World Resources Institute |
| Randall Coleman | US Green Building Council | Kathryn Bacher | World Resources Institute |
| Rukesh Samarasekera | US Green Building Council | Nicholas Bianco | World Resources Institute |
| Sean West | UTC | Ben Buckley | World Resources Institute |
| Jan Cupal | Verbund | Laura Draucker | World Resources Institute |
| Clauda Grill | Verbund | Stacy Kotorac | World Resources Institute |
| Jerry Seager | Verified Carbon Standard | Michael Obeiter | World Resources Institute |
| Advait Apte | Virginia Tech | David Rich | World Resources Institute |
| Juan Carlos Camargo Fernandez | Walmart | Stephen Russell | World Resources Institute |
| Fernando Campos Carmona | Walmart | Joseph Winslow | World Resources Institute |

Exhibit 4 to Decl. of Burton
274
**SER 2329**



### Funders

This standard development process was generously supported by Walmart, H&M, Microsoft, EY, the United Kingdom Department for Environment, Food & Rural Affairs, and the United States Environmental Protection Agency.

### Disclaimer

The GHG Protocol *Scope 2 Guidance* is designed to promote best practice GHG accounting and reporting. It has been developed through an inclusive multistakeholder process involving experts from businesses, governments, nongovernmental organizations, and others convened by the World Resources Institute. While WRI encourages use of the *Scope 2 Guidance* by all relevant organizations, the preparation and publication of reports or program specifications based fully or partially on this guidance is the full responsibility of those producing them. Neither WRI nor other individuals who contributed to this guidance assume responsibility for any consequences or damages resulting directly or indirectly from its use in the preparation of reports or program specifications or the use of reported data based on the guidance.

Exhibit 4 to Decl. of Burton
275
**SER 2330**

## World Resources Institute

WRI is a global research organization that works closely with leaders to turn big ideas into action to sustain a healthy environment—the foundation of economic opportunity and human well-being.

### Our Challenge

Natural resources are at the foundation of economic opportunity and human well-being. But today, we are depleting Earth's resources at rates that are not sustainable, endangering economies and people's lives. People depend on clean water, fertile land, healthy forests, and a stable climate. Livable cities and clean energy are essential for a sustainable planet. We must address these urgent, global challenges this decade.

### Our Vision

We envision an equitable and prosperous planet driven by the wise management of natural resources. We aspire to create a world where the actions of government, business, and communities combine to eliminate poverty and sustain the natural environment for all people.

## World Business Council for Sustainable Development (WBCSD)

The WBCSD is a CEO-led, global coalition of some 200 companies advocating for progress on sustainable development. Its mission is to be a catalyst for innovation and sustainable growth in a world where resources are increasingly limited. The Council provides a platform for companies to share experiences and best practices on sustainable development issues and advocate for their implementation, working with governments, non-governmental and intergovernmental organizations. The membership has annual revenues of USD 7 trillion, spans more than 35 countries and represents 20 major industrial sectors. The Council also benefits from a network of 60 national and regional business councils and partner organizations, a majority of which are based in developing countries.

  

Printed on Chorus Art Silk, an FSC-certified paper with 30% pcw recycled content and with inks that are of soy content.

Stock photography: Shutterstock.com

Design: Alston Taggart, Studio Red Design, with assistance from Elliott Beard and Alex Kovac.

ISBN: 978-1-56973-850-4
Printed in USA

Copyright 2015 World Resources Institute. This work is licensed under the Creative Commons Attribution-NonCommercial-NoDerivative Works 3.0 License. To view a copy of the license, visit http://creativecommons.org/licenses/by-nc-nd/3.0/

Exhibit 4 to Decl. of Burton
276
**SER 2331**



# GREENHOUSE GAS PROTOCOL

*The Greenhouse Gas Protocol provides the foundation for sustainable climate strategies. GHG Protocol standards are the most widely used accounting tools to measure, manage and report greenhouse gas emissions.*

www.wri.org

www.ghgprotocol.org

Exhibit 4 to Decl. of Burton
277
**SER 2332**

# Exhibit 3

# to Declaration of James P. Burton

## *About Us,* Greenhouse Gas Protocol,

## https://ghgprotocol.org/about-us

Exhibit 3 to Decl. of Burton
149
**SER 2333**

7/22/24, 1:46 PM                                        About Us | GHG Protocol

Subscribe to GHG Protocol's email list **HERE**, Access information about the corporate suite of standards update process **HERE**

 GREENHOUSE GAS PROTOCOL

## About Us

Greenhouse Gas Protocol provides standards, guidance, tools and training for business and government to measure and manage climate-warming emissions.

## What is GHG Protocol?

GHG Protocol establishes comprehensive global standardized frameworks to measure and manage greenhouse gas (GHG) emissions from private and public sector operations, value chains and mitigation actions.

Building on a 20-year partnership between World Resources Institute (WRI) and the World Business Council for Sustainable Development (WBCSD), GHG Protocol works with governments, industry associations, NGOs, businesses and other organizations.

We offer online training on our standards and tools, as well as the "Built on GHG Protocol" review service, which recognizes sector guidance, product rules and tools that are in conformance with GHG Protocol standards.



Exhibit 3 to Decl. of Burton
150
**SER 2334**

7/22/24, 1:46 PM                                        About Us | GHG Protocol

## What is GHG Protocol's decision-making process for updating standards and guidance?

GHG Protocol convenes multiple groups that guide the development of its accounting and reporting standards. Our updated multi-stakeholder governance process includes a Steering Committee, an Independent Standards Board and Technical Working Groups. More details on the roles and composition of these groups are provided **here**.

## Who Uses GHG Protocol?

GHG Protocol supplies the world's most widely used greenhouse gas accounting standards. The Corporate Accounting and Reporting Standard provides the accounting platform for virtually every corporate GHG reporting program in the world.

### Companies and Organizations

In 2016, 92% of Fortune 500 companies responding to the CDP used GHG Protocol directly or indirectly through a program based on GHG Protocol.

**Learn more about our work for companies and organizations.**

### Countries and Cities

Through their commitment to the Compact of Mayors, hundreds of cities across the globe have committed to using the GHG Protocol for Cities.

We also work with partners in key countries to develop national GHG emissions programs based on the GHG Protocol.

**Learn more about our work for cities and countries** .

## History of GHG Protocol

GHG Protocol arose when WRI and WBCSD recognized the need for an international standard for corporate GHG accounting and reporting in the late 1990s. Together with large corporate partners such as BP and General Motors, in 1998 WRI published a report called, "Safe Climate, Sound Business." It identified an action agenda to address climate change that included the need for standardized measurement of GHG emissions.

Similar initiatives were being discussed at WBCSD. In late 1997, WRI senior managers met with WBCSD officials and an agreement was reached to launch an NGO-business partnership to address standardized methods for GHG accounting. WRI and WBCSD convened a core steering group comprised of members from environmental groups (such

Exhibit 3 to Decl. of Burton
151
**SER 2335**

7/22/24, 1:46 PM                                        About Us | GHG Protocol

as WWF, Pew Center on Global Climate Change, The Energy Research Institute) and industry (such as Norsk Hydro, Tokyo Electric, Shell) to guide the multi-stakeholder standard development process.

The first edition of the Corporate Standard, published in 2001, has been updated with additional guidance that clarifies how companies can measure emissions from electricity and other energy purchases, and account for emissions from throughout their value chains. GHG Protocol also developed a suite of calculation tools to assist companies in calculating their greenhouse gas emissions and measure the benefits of climate change mitigation projects.

The Paris Agreement, adopted within the United Nations Framework Convention on Climate Change (UNFCC) in December 2015, commits participating all countries to limit global temperature rise, adapt to changes already occurring, and regularly increase efforts over time. GHG Protocol is developing standards, tools and online training that helps countries and cities track progress towards their climate goals.

## About WRI

World Resources Institute is a global research organization that turns big ideas into action at the nexus of environment, economic opportunity and human well-being.



**OUR APPROACH**

**COUNT IT**

We start with data. We conduct independent research and draw on the latest technology to develop new insights and recommendations. Our rigorous analysis identifies risks, unveils opportunities, and informs smart strategies. We focus our efforts on influential and emerging economies where the future of sustainability will be determined.

**CHANGE IT**

We use our research to influence government policies, business strategies, and civil society action. We test projects with communities, companies, and government agencies to build a strong evidence base. Then, we work with partners to deliver change on the ground that alleviates poverty and strengthens society. We hold ourselves accountable to ensure our outcomes will be bold and enduring.

**SCALE IT**

Exhibit 3 to Decl. of Burton
152
**SER 2336**

About Us | GHG Protocol

We don't think small. Once tested, we work with partners to adopt and expand our efforts regionally and globally. We engage with decision-makers to carry out our ideas and elevate our impact. We measure success through government and business actions that improve people's lives and sustain a healthy environment.

## About WBCSD

WBCSD is the premier global, CEO-led community of over 200 of the world's leading sustainable businesses working collectively to accelerate the system transformations needed for a net zero, nature positive, and more equitable future.



We do this by engaging executives and sustainability leaders from business and elsewhere to share practical insights on the obstacles and opportunities we currently face in tackling the integrated climate, nature and inequality sustainability challenge; by co-developing "how-to" CEO-guides from these insights; by providing science-based target guidance including standards and protocols; and by developing tools and platforms to help leading businesses in sustainability drive integrated actions to tackle climate, nature and inequality challenges across sectors and geographical regions.

Our member companies come from all business sectors and all major economies, representing a combined revenue of more than USD $8.5 trillion and 19 million employees. Our global network of almost 70 national business councils gives our members unparalleled reach across the globe. Since 1995, WBCSD has been uniquely positioned to work with member companies along and across value chains to deliver impactful business solutions to the most challenging sustainability issues.

Together, we are the leading voice of business for sustainability, united by our vision of creating a world in which 9+ billion people are living well, within planetary boundaries, by mid-century.

www.wbcsd.org

Follow us on Twitter and LinkedIn

Exhibit 3 to Decl. of Burton
153
**SER 2337**

**For media inquires, please contact:**

Sarah Huckins

Communications Manager, GHG Protocol, Climate Program

World Resources Institute

sarah.huckins@wri.org



WRI/WBCSD Greenhouse Gas Protocol (GHGP)



What is greenhouse gas accounting?...

Exhibit 3 to Decl. of Burton

154

**SER 2338**

7/22/24, 1:46 PM

About Us | GHG Protocol

# LATEST NEWS





### GHG Protocol Newsletter: June 2024

GHG Protocol Newsletter: June 2024

07.03.2024 |

### Land Sector and Removals: Workstream Update

GHG Protocol's Land Sector and Removals team is nearing the completion of the standard development process and is excited to announce that the Land Sector and Removals Standard and accompanying Guidance will be finalized in 2024 and publicly released in Quarter 1 2025.

07.03.2024 |



Exhibit 3 to Decl. of Burton
155
**SER 2339**

7/22/24, 1:46 PM                                                                                      About Us | GHG Protocol

**RELEASE: GHG Protocol Announces Inaugural Chair and Vice-Chair of New Steering Committee**

WASHINGTON DC (June 25, 2024) — GHG Protocol is pleased to announce the appointment of the inaugural Chair and Vice-Chai

06.25.2024 | PRESS RELEASE

**Read more news**




**GREENHOUSE GAS PROTOCOL**

| WRI | WBCSD |
|---|---|
| 10 G STREET NE, SUITE 800 | MAISON DE LA PAIX |
| WASHINGTON, D.C. 20002 | CHEMIN EUGÈNE-RIGOT, 2B |
| U.S.A. | CASE POSTALE 2075 CH-1211, GENEVA 1 |
| | SWITZERLAND |

**SUBSCRIBE FOR UPDATES**

SIGN UP FOR UPDATES

**FOLLOW US**

**PRIVACY POLICY**

**TERMS OF USE**

https://ghgprotocol.org/about-us                                                                        7/7

Exhibit 3 to Decl. of Burton
156
**SER 2340**

1  ROB BONTA
   Attorney General of California
2  GARY E. TAVETIAN (SBN 117135)
   MYUNG J. PARK (SBN 210866)
3  Supervising Deputy Attorneys General
   M. ELAINE MECKENSTOCK (SBN 268861)
4  CAITLAN MCLOON (SBN 302798)
   EMILY HAJARIZADEH (SBN 325246)
5  DYLAN REDOR (SBN 338136)
   KATHERINE GAUMOND (SBN 349453)
6  Deputy Attorneys General
    300 South Spring Street, Suite 1702
7  Los Angeles, CA  90013-1230
   Telephone:  (213) 269-6438
8  Fax:  (916) 731-2128
   E-mail:  Caitlan.McLoon@doj.ca.gov
9  *Attorneys for Defendants Liane M. Randolph,*
   *Steven S. Cliff, and Robert A. Bonta*

10

11            IN THE UNITED STATES DISTRICT COURT

12          FOR THE CENTRAL DISTRICT OF CALIFORNIA

13

14  **CHAMBER OF COMMERCE OF**          2:24-cv-00801-FMO-PVCx
    **THE UNITED STATES OF**
15  **AMERICA, CALIFORNIA**             **DECLARATION OF JAMES P.**
    **CHAMBER OF COMMERCE,**            **BURTON IN SUPPORT OF**
16  **AMERICAN FARM BUREAU**            **DEFENDANTS' OPPOSITION TO**
    **FEDERATION, LOS ANGELES**         **PLAINTIFFS' MOTION FOR**
17  **COUNTY BUSINESS**                 **SUMMARY JUDGMENT ON**
    **FEDERATION, CENTRAL**             **CLAIM I**
18  **VALLEY BUSINESS**
    **FEDERATION, and WESTERN**         Date:        September 9, 2024
19  **GROWERS ASSOCIATION,**            Time:        1:30 PM
                                        Courtroom:   5D
20                      Plaintiffs,     Judge:       The Honorable Otis D.
                                                     Wright, II
21        **v.**                        Trial Date:  Not Set
                                        Action Filed: 1/30/2024
22  **LIANE M. RANDOLPH, in her**
    **official capacity as Chair of the**
23  **California Air Resources Board,**
    **STEVEN S. CLIFF, in his official**
24  **capacity as the Executive Officer of**
    **the California Air Resources Board,**
25  **and ROBERT A. BONTA, in his**
    **official capacity as Attorney General**
26  **of California,**

27                      Defendants.

28

                              1

## DECLARATION OF JAMES P. BURTON

I, James P. Burton, hereby declare:

1.      I have been retained by counsel for Defendants Liane M. Randolph, Steven S. Cliff, and Robert A. Bonta, in their official capacities, as an expert in connection with the above-captioned litigation. I have actual knowledge of the matters stated in this declaration and can truthfully testify to the matters contained in this declaration.

### Qualifications of the Declarant[1]

2.      This declaration was prepared by James P. Burton, a licensed certified public accountant (CPA) in California and Colorado. For 35 years until my retirement from Grant Thornton LLP ("Grant Thornton" or "the Firm")[2] on May 31, 2024, I provided audit and accounting related services to organizations of all sizes and industries. Grant Thornton is the U.S. member firm of Grant Thornton International Limited, a global public accounting network that provides audit, tax, and advisory services. The Firm has been providing services since 1924 and has U.S. revenues in excess of $2 billion annually. I held a variety of roles at Grant Thornton, including 25 years as an audit partner with eight of those years as Chief Auditor, and the final 3.5 years as the Firm's Environmental, Social and Governance ("ESG") & Sustainability services practice lead. In these roles I assisted with many types of corporate reporting, including sustainability reporting, financial statements, and internal controls. I was responsible for developing the Firm's attest and service approach for sustainability related reporting and disclosure. As part of this work, I advised companies on decisions around the type of reporting to publish; how to gather and prepare the data and information necessary for reporting; the systems, processes and controls needed for reporting;

---

[1] A true and correct copy of declarant's CV is attached hereto as Exhibit (Ex.) 1.
[2] From April-October 1997, I was the CFO of a privately-held semiconductor materials and services company from which I resigned to return to my position previously held at Grant Thornton LLP.

2

1  the requirements to comply with reporting principles, standards, and guidelines; and

2  performed audits and attestations of reported information.

3       3.    While leading the ESG & Sustainability practice at Grant Thornton, I

4  participated in or oversaw sustainability reporting and disclosure services delivered

5  to more than 100 entities. These organizations ranged in size from less than $50

6  million to over $100 billion in annual revenue and included both publicly-listed and

7  privately-held entities across more than a dozen industries and market segments.

8  These services included assisting with strategic decision making around when and

9  how to begin reporting sustainability related information; which standards to

10  follow; the regulatory landscape and market activity; and best practices around

11  sustainability reporting. I also assisted organizations with identifying gaps in their

12  reporting processes and controls, improving the reported data and information, and

13  developing disclosures that comply with various reporting standards and

14  frameworks including, among others, the Greenhouse Gas (GHG) Protocol, the

15  Task Force on Climate-Related Financial Disclosure (TCFD) recommendations,

16  and the Sustainability Accounting Standards Board (SASB)[3] standards.

17       4.    I am a member of the Assurance Services Executive Committee

18  (ASEC) of the American Institute of Certified Public Accountants (AICPA) since

19  2016 and held the role of committee chair from August 2018 to May 2024. The

20  ASEC mission is to support the accounting profession in serving the public interest

21  by anticipating, identifying, assessing and addressing evolving market needs and

22  demand for assurance and advisory solutions. ASEC develops relevant thought

23  leadership, guidance, criteria, and other member resources to support a dynamic

24  profession that continuously evolves to provide high quality, value-added,

25  innovative assurance and advisory solutions. ASEC focuses on efforts related to

26  blockchain, artificial intelligence, cybersecurity and sustainability, among others,

27

28      [3] In August 2022, the International Sustainability Standards Board (ISSB) assumed responsibility for the reporting standards developed by SASB.

3

1  and provides strategic direction in identifying and developing innovative new

2  assurance and advisory opportunities.

3  **Methodology**

4      5.    I read and am familiar with California Senate Bills 253 and 261 (S.B.

5  253 and S.B. 261).

6      6.    In developing my opinions for this declaration, I consulted the body of

7  professional standards, guidelines, application material, and other reporting

8  resources available to entities who prepare and report ESG and sustainability

9  related information, including GHG emissions and climate risk information, in the

10  marketplace. I also relied upon the standards, interpretations and application

11  material available to providers of assurance services who issue audit and attest

12  reports over climate risk and GHG information. These collective materials are

13  further referenced in this declaration and are commonly used by reporting entities

14  and auditors when preparing such reports.

15      7.    I relied on information that is customarily reviewed and utilized by

16  experts in my field of sustainability reporting, financial reporting, and audit and

17  attestation services.

18      8.    I also relied on my own personal knowledge, training, and experience

19  in the field of sustainability reporting, financial reporting, and audit and attestation

20  services.

21  **Overview of GHG Emissions and Climate Risk Reporting**

22      9.    Sustainability reporting is generally described as any type of internal

23  or external reporting by an entity that contains information not included in the

24  entity's financial statements; many people refer to sustainability reporting as ESG

25  reporting. Senate Bills 253 and 261 cover two distinct concepts in sustainability

26  reporting.

27      10.    S.B. 253 addresses "GHG emissions reporting," which refers to

28  metrics, targets and/or key performance indicators (KPIs) related to the reporting of

4

1  GHG emissions,[4] as well as the methodologies used to generate qualitative and

2  quantitative disclosures for GHG emissions. These emissions are typically

3  categorized into scopes 1, 2 and 3. The GHG Protocol ("GHG Protocol" or the

4  "Protocol") referenced in S.B. 253 is a globally accepted standard for this type of

5  reporting and in my experience the GHG Protocol is used by nearly all entities

6  when accounting for GHG emissions. The Protocol was developed jointly by the

7  World Resources Institute (WRI) and the World Business Council for Sustainable

8  Development (WBCSD) when the two groups recognized a growing need for an

9  international corporate emissions accounting standard. In 2001 the WRI and

10  WBCSD released the first edition of the Corporate Standard to address this

11  disclosure gap, which is periodically updated as the Protocol matures. The update

12  process involves scoping workshops, technical working groups, and public

13  comment.[5] This declaration refers to "emissions reporting" when referencing

14  information relevant only to S.B. 253.

15       11.    S.B. 261 addresses, "climate risk reporting," which refers to the

16  metrics, targets and/or KPIs related to reporting climate-related risks[6] and climate-

17  related opportunities[7] as well as the methodologies used to generate related

18  qualitative and quantitative disclosures. The recommendations and guidance

---

19  [4] As defined by the Greenhouse Gas Protocol, GHG emissions refers to the six gases listed in the
20  Kyoto Protocol: carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$), hydrofluorocarbons
   (HFCs), perfluorocarbons (PFCs), and sulphur hexafluoride ($SF_6$). World Resources Institute &
21  World Business Council for Sustainable Development, *The GHG Protocol Corporate Accounting
   and Reporting Standard* (2004), https://ghgprotocol.org/sites/default/files/standards/ghg-protocol-
22  revised.pdf, attached hereto as Ex. 2 at 98.
   [5] *About Us,* Greenhouse Gas Protocol, https://ghgprotocol.org/about-us, attached hereto as Ex. 3;
23  Soto, M, *GHG Protocol Scope 2 Guidance,* World Resources Institute (2023),
   https://ghgprotocol.org/sites/default/files/2023-03/Scope%202%20Guidance.pdf, attached hereto
24  as Ex. 4 at 10.
   [6] As defined by the TCFD, climate-related risks refers to potential negative impacts of climate
25  change on an organization. A complete definition can be found at Task Force on Climate-related
   Financial Disclosures, *Task Force on Climate-related Financial Disclosures: Implementing the
26  Recommendations of the Task Force on Climate-related Financial Disclosures* (October 2021),
   https://assets.bbhub.io/company/sites/60/2021/07/2021-TCFD-Implementing_Guidance.pdf,
27  attached hereto at Ex. 5 at 82.
   [7] As defined by the TCFD, climate-related opportunities refers to potential positive impacts
28  related to climate change on an organization. *See id.* (providing a complete definition of climate-
   related opportunity).

5

1  published by the TCFD[8] referenced in S.B. 261 are widely accepted as the

2  foundational framework for climate-related risk and opportunities reporting. TCFD

3  was developed not through a government-originated or mandated framework, but

4  rather was created by marketplace need for a common language to speak about

5  climate risk. This declaration refers to "climate risk reporting" when referencing

6  information relevant only to S.B. 261.

7       12.    When referencing information relevant to both S.B. 253 and 261, this

8  declaration utilizes the term "emissions and climate risk reporting."

### Market Trends Around GHG Emissions and Climate Risk Reporting

13.    Over the past several years, emissions and climate risk reporting has

increased in frequency in the marketplace, with most of this growth attributed to

voluntary disclosures by organizations or from contractual requirements such as

supplier agreements or financing arrangements. With the increased reporting in the

marketplace, it is likely that of the entities who will be required to report under the

two bills, many already have prepared at least some of the data and information

necessary to comply.

14.    As a CPA, I experienced the growth and interest in emissions and

climate-risk reporting in recent years. And this experience is backed up by the data

I have reviewed. In 2023, over 23,000 companies across the globe submitted a

disclosure to the CDP[9] climate survey[10] representing a 140% increase in submitted

disclosures since 2020.[11] CDP reported approximately 4,500 additional submissions

---

[8] The TCFD met its mandate in October 2023. As of November 2023, the International Financial Reporting Standards (IFRS) Foundation has assumed responsibility for monitoring corporate progress on climate-related disclosures.

[9] CDP is a leading global disclosure platform for environmental metrics. CDP reviews submissions to five surveys centered on climate-related information including GHG emissions and climate risk. CDP, https://www.cdp.net/en, attached hereto as Ex. 6.

[10] CDP's Climate Change survey requests information on climate risks and low carbon opportunities.

[11] *CDP 2023 disclosure data factsheet*, CDP, https://www.cdp.net/en/companies/cdp-2023-disclosure-data-factsheet, attached hereto as Ex. 7.

just between 2022 and 2023.[12] Indeed, 86% of companies listed in the S&P 500 reported to CDP.[13] And 92% of Fortune 500 companies that responded to CDP in 2016 were reported to have utilized the GHG Protocol as the basis for calculating reported emissions.[14] The AICPA reported in its 2024 State of Play in Sustainability report ("2024 State of Play report") that throughout the globe, 98% of companies surveyed in 2022 disclosed information about GHG emissions.[15] And these trends are seen as to TCFD climate-risk disclosures as well. 58% of public companies surveyed by the Financial Stability Board (FSB) disclosed against at least five of the TCFD's 11 recommended climate-risk disclosures.[16] And 71% of companies surveyed by the AICPA in 2022 used the TCFD framework for their climate-related reporting.[17]

15.    An additional driver of the increased emissions and climate risk reporting is the growing importance of ESG related matters in business decisions and operational strategies. For example, investment firms are increasingly committing to net zero emissions in their financing portfolios.[18] And climate risk reporting continues to play an increased role for insurance coverage and underwriting decision-making related to property insurance, with insurers identifying a growing number of covered assets under threat from climate-related

---

[12] *Id.*
[13] *Id.*
[14] Burton Decl., Ex. 3.
[15] *The State of Play: Sustainability Disclosure and Assurance 2019-022 Trends & Analysis*, International Federation of Accountants (IFAC), AICPA and CIMA (2024), https://ifacweb.blob.core.windows.net/publicfiles/2024-02/IFAC-State-Play-Sustainability-Disclosure-Assurance-2019-2022_0.pdf, attached hereto as Ex. 8 at 5.
[16] *Task Force on Climate-related Financial Disclosures 2023 Status Report*, Task Force on Climate-related Financial Disclosures (2023), https://www.fsb.org/wp-content/uploads/P121023-2.pdf, attached hereto as Ex. 9 at iv.
[17] Burton Decl., Ex. 8 at 11.
[18] *See, e.g.*, *Sustainability Initiatives,* JPMorgan Chase & Co, https://www.jpmorganchase.com/impact/environmental-sustainability/es-initiatives#:~:text=In%20support%20of%20our%20strategy,%2C%20Aviation%2C%20Shipping%20and%20Aluminum, attached hereto as Ex. 10.

7

risks.[19] Moreover, ESG matters are playing an important role in merger and acquisition activity.[20]

16.     As a result of these market trends, an ever-increasing number of entities are finding it necessary to track ESG and sustainability related data and produce emission and climate risk reporting regardless of regulatory mandates.

### S.B. 253 and 261 Integrate Well-Established Financial Reporting Principles that Companies Have Implemented Successfully

17.     S.B. 253 and 261 call for reporting that is aligned with traditional and well-established financial reporting principles including the evaluation of complex facts and the calculation and presentation of detailed disclosures.

18.     While companies often express concerns when they first approach emissions and climate risk reporting, in most situations, these concerns are easily assuaged.

19.     Companies often highlight their limited experience in preparing such information as a primary hesitancy in developing and delivering emissions and climate risk reporting. However, in my experience, with a moderate amount of focus and coaching, most companies come to understand that the preparation of this type of reporting draws on many of the existing capabilities within the company and that the objectives of emissions and climate risk reporting are similar to all other corporate reporting objectives (e.g., financial, marketing, operations, enterprise risk management, human resources). Existing policies, processes, procedures, and systems can be adapted to meet the requirements necessary for

---

[19] Golnaraghi, Maryam, *Climate Change Risk Assessment for the Insurance Industry: A holistic decision-making framework and key considerations for both sides of the balance sheet*, The Geneva Association - Task Force on Climate Risk Assessment for the Insurance Industry (February 2021), attached hereto as Ex. 11. The Geneva Association is a global think tank created in 1973 that is comprised of CEOs from insurance and reinsurance companies throughout the world. It is focused on identifying trends and risks to the insurance sector and providing a forum for discussion to insurance company leaders.

[20] Corrigan, Sarah and Lightle, Brian, *The increasingly vital role of ESG in M&A*, Deloitte, https://www2.deloitte.com/us/en/pages/mergers-and-acquisitions/articles/role-of-esg-in-deals.html, attached hereto at Ex. 12 ("Across the deal life cycle, better data, improved measurement, and a deeper understanding of ESG are key factors shaping dealmaking for M&A leaders.").

8

1    reliable emissions and climate risk reporting. With a little training, company

2    personnel can comprehend and apply the emissions and climate risk reporting

3    requirements necessary to comply with S.B. 253 and 261. Indeed, traditional

4    financial reporting already requires companies to provide information that meets

5    the assertions of "occurrence, completeness, accuracy, cutoff, classification,

6    presentation, existence, rights and obligations, valuation and allocation."[21]

7    Similarly, the GHG Protocol states: "GHG accounting and reporting shall be based

8    on the following principles: relevance, completeness, consistency, transparency,

9    accuracy."[22]

10       20.    Entities also voice concerns that significant investment would be

11   needed in expert or specialized capabilities to prepare the reporting. However,

12   based on my experience and knowledge, specialized skills are not needed for most

13   entities to prepare emissions and climate risk reporting, and those entities that

14   might need such skills because of complexities in the capture or calculation of data

15   typically have access to such expertise – for example, oil and gas companies are

16   often staffed with (or engage third party) experts on emissions associated with

17   production or gas flaring operations.

18       21.    Some entities initially conveyed concerns about the frameworks,

19   guidance and standards used to prepare emissions and climate risk reporting

20   because the requirements are new, untested, differ between jurisdictions, or are

21   generally unfamiliar to most stakeholders. While it is true emissions and climate

22   risk reporting is relatively new compared to other standards, such as the financial

23   reporting standards established by the Financial Accounting Standards Board

24   (FASB), the reporting standards referenced in S.B. 253 and 261 are established and

25   accepted in the market as standards that are implementable, provide relevant

26   information and are seen as appropriate for the subject matter. Given the frequency

27   [21] *AICPA Auditing Standards AU-C 315*, Understanding the Entity and Its Environment and
Assessing the Risks of Material Misstatement, attached hereto as Ex. 13 at ¶ A133.

28   [22] Burton Decl., Ex. 2 at 7.

9

of use of existing emissions and climate risk reporting standards, it is an increasingly common business practice for most organizations, large and small, to adopt these frameworks and standards. Undoubtedly emissions and climate risk reporting standards will improve over time as more entities gain experience and challenges are addressed, just as traditional financial accounting standards are updated and adapted over time. S.B. 253 and 261 both include provisions to allow entities to prepare any future reporting consistent with updated, evolved or newly issued standards covering emissions and climate risk topics, alleviating concerns that reporting may become duplicative or outdated.

22. Entities initially expressed concern that emissions and climate risk reporting requires them to evaluate and assess the future and make statements regarding matters where outcomes or circumstances are uncertain. However, companies regularly manage ambiguous and uncertain matters in the context of business operations, and are well versed in considering forward-looking information when making business decisions and preparing disclosures. Nearly all entities, regardless of size, implement some form of business planning and enterprise risk management that considers the likelihood of future events to assist with decision making. This information is used to manage the business and implement the company's strategy. Examples include:

    a. Accounting for changing consumer behavior and competitive market dynamics when establishing plans for current or future products and services to sell in the marketplace.

    b. Determining the likelihood of losses from events such as business interruption, catastrophe loss, and general liability when making decisions for insurance coverage.

    c. Choosing business strategies, necessary investments in research and development, and technological changes when marketing the company to customers or potential employees.

10

23.     Entities also claim that the data and information used to prepare emissions and climate risk reporting lacks precision or specificity and is characterized by estimates that may not represent actual results. While estimates are common in emission and climate risk reporting, estimates are also frequently used in financial reporting, such as accounting for excess and obsolete inventories, reserves for uncollectable receivables, customer attrition rates, employee turnover, and income tax liabilities, just to name a few. Regardless of the purpose of any reported estimate, particularly for quantitative items, the same basic principles are applied to establish any estimate: (a) The nature and source of data inputs are identified, and the inputs are assessed for reliability. (b) Assumptions are evaluated and established as reasonable based on observations, familiarity, historical data, and, when necessary, expertise. (c) A method for computing is evaluated for appropriateness and applied.

24.     The resulting output of the estimating process is used by the entity no differently than information that is not estimated (that is, information that is primary source data). Estimates are frequently used to make operational decisions, assess insurance coverage, and for data published in reports to shareholders.

25.     For example, entities frequently use small samples of actual data to project results across larger populations. In financial reporting, a company may take the collection history for all domestic customers within ranges of annual purchases (such as: under $1 million, $1-5 million, $5-10 million, and over $10 million) to develop a default rate for all customers. This rate of uncollectible accounts is used to develop the annual bad debt expense. Similarly, for scope 2 emissions, a company may take the actual electricity usage for a sample of physical locations and project the amount of electricity purchased across the organization.

11

**EMISSIONS REPORTING UNDER S.B. 253 AND THE GHG PROTOCOL**

26.     S.B. 253 categorizes GHG emissions into three categories, consistent with the GHG Protocol. The bill defines each of these categories as follows:[23]

    a.  "Scope 1 emissions": all direct greenhouse gas emissions that stem from sources that a reporting entity owns or directly controls, regardless of location, including, but not limited to, fuel combustion activities.

    b.  "Scope 2 emissions": indirect greenhouse gas emissions from consumed electricity, steam, heating, or cooling purchased or acquired by a reporting entity, regardless of location.

    c.  "Scope 3 emissions": indirect upstream and downstream greenhouse gas emissions, other than scope 2 emissions, from sources that the reporting entity does not own or directly control and may include, but are not limited to, purchased goods and services, business travel, employee commutes, and processing and use of sold products.

    d.  When a company accumulates and computes its emissions, the totality of the collected information is referred to as its GHG emissions inventory.

27.     When preparing a GHG emissions inventory, a company makes various policy and emission accounting decisions such as its organizational[24] and

---

[23] California Health and Safety Code § 38532(b)(3-5).

[24] The GHG protocol describes organizational boundaries as follows: "Business operations vary in their legal and organizational structures; they include wholly owned operations, incorporated and non-incorporated joint ventures, subsidiaries, and others. For the purposes of financial accounting, they are treated according to established rules that depend on the structure of the organization and the relationships among the parties involved. In setting organizational boundaries, a company selects an approach for consolidating GHG emissions and then consistently applies the selected approach to define those businesses and operations that constitute the company for the purpose of accounting and reporting GHG emissions." Burton Decl., Ex. 2 at 16.

1  operational[25] boundaries. The GHG Protocol provides ample guidance on making

2  these decisions and companies are familiar with similar decision-making in the

3  financial reporting process (e.g., the concept of control when applying

4  consolidation accounting), such that the application of the emissions reporting

5  standards is easily administrable and not overly burdensome. While the accounting

6  policy decisions made may differ from company to company, with the available

7  standards and associated guidance, each entity is able to compile GHG emissions

8  information that is accurate and conforms to the GHG Protocol.

9      28.    A GHG emissions inventory may include estimates. *See* ¶ 23.

10  However, as previously noted, companies are well-versed in estimating and because

11  the principles for preparing a GHG inventory are well-established within the GHG

12  Protocol, the resulting information is relevant and reliable.

13      29.    Scope 1 emissions

14          a.  For most entities, scope 1 emissions consist of the emissions

15              resulting from the burning or use of fossil fuels. Due to the

16              operating characteristics of some industries, there can be additional

17              sources of emissions (such as, agriculture, chemical manufacturing,

18              oil and gas production, fuel suppliers) generated through the normal

19              operations of the entity which are also measured and captured

20              within scope 1. Most of these industries are regulated for these

21              operations and are mandated to report the same or similar

22              information requested for scope 1 under S.B. 253 under other

23              existing regulations. Because of this, they often have well-

24              established processes for capturing this data. For example, "under

25              California's Regulation for the Mandatory Reporting of

26  _____

[25] The GHG protocol describes operational boundaries as follows: "After a company has
27  determined its organizational boundaries in terms of the operations that it owns or controls, it then
sets its operational boundaries. This involves identifying emissions associated with its operations,
categorizing them as direct and indirect emissions, and choosing the scope of accounting and
28  reporting for indirect emissions." *Id.* at 24.

13

Greenhouse Gas Emissions (MRR), industrial sources, fuel suppliers, and electricity importers must report their annual GHG emissions to CARB."[26]

b. The data sources for scope 1 emissions are not unique and are common business records available to any organization. Fixed asset listings, lease registers, maintenance records, vehicle and transportation records all contribute to the data needed to compute scope 1 emissions. These records summarize the existence of assets (the quantity) in control of the company that generate emissions when operated and are universally available for any entity that produces financial reporting.

c. Companies also need the operating activity of each asset (the volume) to compute scope 1 emissions. For example, miles driven for motor vehicles, hours flown for airplanes, volume of refrigerant used in cooling operations, amount of natural gas used to heat facilities or operate machinery are all inputs to the scope 1 computation. This information is readily available from company operating records and does not necessitate any significant analysis or manipulation.

d. Once the data on asset existence and usage (quantity and volume) is accumulated, a company computes scope 1 emissions for each asset using readily available computational formulae and conversion factors. Many tools are available free of charge, in open-source formats, intended to assist companies with these computations. For example, the GHG Protocol website states, "[Our] tools enable

---

[26] *Mandatory GHG Reporting - Reported Emissions*, California Air Resources Board, https://ww2.arb.ca.gov/mrr-data#:~:text=Under%20California's%20Regulation%20for%20the,Air%20Resources%20Board%20(CARB), attached hereto as Ex. 14.

14

1  companies...to develop comprehensive and reliable inventories of
2  their GHG emissions. ...Each tool reflects best-practice methods
3  that have been extensively tested by industry experts."[27] In addition
4  to free tools, there are numerous commercially tested tools
5  available for purchase or subscription.

6     30.   Scope 2 emissions

7      a.  "Companies report the emissions from the generation of purchased
8  electricity that is consumed in its owned or controlled equipment or
9  operations as scope 2."[28] Scope 2 can also include the emissions
10  generated through the production of other energy sources, such as
11  heat or steam used by some entities in lieu of electricity.

12      b.  Scope 2 emissions are usually even easier to compute than scope 1
13  emissions given the reduced types and sources of emissions. As
14  defined in S.B. 253, "Scope 2 emissions means indirect greenhouse
15  gas emissions from consumed electricity, steam, heating, or cooling
16  purchased or acquired by a reporting entity, regardless of
17  location."[29] The information needed to determine scope 2 emissions
18  are:

19        i.  Electricity (kilowatt hours (kWh) consumed) and other
20  energy consumption records readily available from
21  accounting records through documents such as electricity
22  invoices, although some entities have installed and rely upon
23  physical devices such as meters to track consumption.
24  Regardless of source, consumption data is not difficult to
25  obtain.

26  
27  [27] *Calculation Tools and Guidance*, GHG Protocol, https://ghgprotocol.org/calculation-tools-and-guidance, attached hereto as Ex. 15.
[28] Burton Decl., Ex. 2 at 27.
28  [29] California Health and Safety Code § 38532(b)(4).

    ii.  A listing of properties and locations, which is readily available from financial reporting and accounting records such as fixed asset records, lease listings, property tax registers, etc., is used to provide information on the completeness of the locations included in the scope 2 calculation.

  c.  Like the computational process for scope 1 emissions, once the energy consumption data is gathered, a company computes the scope 2 emissions for each location using readily available computational formulae and conversion factors, with many tools to assist (both free and for purchase or subscription) available in the market.

  d.  In addition to having the necessary data for scope 2 available from accounting records, many companies measure electricity consumption in the normal course of managing their operations. Understanding the cost of electricity from period to period, as such costs may affect product line margins or overall profitability, is usually a regularly performed analysis. These records also help companies make decisions about electricity sourcing, such as whether to acquire, obtain or construct renewable energy sources (e.g., solar panels, wind turbines, geothermal energy generators).

31.  Scope 3 emissions

  a.  Scope 3 emissions cover 15 categories or types of activities that can generate emissions within an organization's upstream and downstream value chain. Not all categories will be relevant or applicable to every entity. The measurement and reporting of scope 3 emissions is intended to facilitate decision making within a company's value chain. "The primary goal of [the GHG Protocol

16

1    Scope 3] standard is to provide a standardized step-by-step

2    approach to help companies understand their full value chain

3    emissions impact in order to focus company efforts on the greatest

4    GHG reduction opportunities, leading to more sustainable decisions

5    about companies' activities and the products they buy, sell, and

6    produce."[30]

7    b.  The accounting for and reporting of scope 3 emissions is guided by

8    two separate standards within the GHG Protocol. The Corporate

9    Reporting Standard "allows companies flexibility in choosing

10    which, if any, Scope 3 activities to include in the GHG inventory

11    when the company defines its operational boundaries."[31] Once a

12    company determines to report a scope 3 emission category within

13    its operational boundary, the GHG Protocol Scope 3 Standard "is

14    designed to create additional completeness and consistency in

15    Scope 3 accounting and reporting by defining Scope 3 boundary

16    requirements."[32] These two standards work together to help a

17    company produce consistent scope 3 emissions information from

18    period to period.

19    c.  The GHG Protocol Scope 3 Standard and its accompanying

20    "Technical Guidance for Calculating Scope 3 Emissions"[33] provides

21    companies with multiple ways to gather and calculate scope 3

---

[30] *Corporate Value Chain (Scope 3) Accounting and Reporting Standard: Supplement to the GHG Protocol Corporate Accounting and Reporting Standard*, World Resources Institute & World Business Council for Sustainable Development (2013) https://ghgprotocol.org/sites/default/files/standards/Corporate-Value-Chain-Accounting-Reporing-Standard_041613_2.pdf, attached hereto as Ex. 16 at 4.

[31] *Id.* at 59.

[32] *Id.* at 59.

[33] *Technical Guidance for Calculating Scope 3 Emissions (version 1.0): Supplement to the Corporate Value Chain (Scope 3) Accounting and Reporting Standard*, World Resources Institute & World Business Council for Sustainable Development (2023) https://ghgprotocol.org/sites/default/files/2023-03/Scope3_Calculation_Guidance_0%5B1%5D.pdf, attached hereto as Ex. 17.

17

emissions for each category. These options help companies manage data gaps or circumstances where only one type of information is available. For example, within scope 3 category 1 ("Purchased Goods and Services"), there are four acceptable methods for calculating emissions and each method is explained in detail with illustrations to assist preparers.

    i.  Supplier specific method

    ii.  Hybrid method

    iii.  Average data method

    iv.  Spend based method

d.  Similar options are available for all 15 categories within scope 3 and as a result, while there may be some unfamiliarity in the marketplace as companies first set out to calculate and report scope 3 emissions, there is no lack of guidance or authoritative material to assist companies in preparing the disclosures. Companies are not required or expected to develop their own reporting method.

e.  Companies are already comfortable with making decisions regarding the choice of equally acceptable accounting policies, such as the choices available to compute scope 3 emissions within the 15 categories. For example, when preparing accounting records, companies choose between inventory valuation methods and regularly determine the method for depreciating fixed assets, often assigning different depreciation methods to each individual asset, such as using straight line depreciation for one asset and double declining balance or units of production for another.

18

**SER 2358**

f.  Many companies that report to CDP already include information about scope 3 emissions.[34] The guidance and resources available to entities to assist with scope 3 reporting have led companies to increasingly include scope 3 emissions in their GHG emissions inventory. Because of the process undertaken for the reporting of scope 3 emissions information, there is general market consensus that the methods allowed within each category produce meaningful, accurate information.

g.  A concern expressed at the outset of preparing a GHG inventory by many entities is whether obtaining information from their customers, suppliers, or others in the company's value chain is required, particularly for the scope 3 categories. The GHG Protocol allows companies to use primary[35] or secondary data[36] when determining scope 3 emissions.[37]

h.  Within each scope 3 category, there are methods available that utilize primary data from specific activities within a company's value chain,[38] which in some cases is readily available from third parties or internal company records. For example, many shipping and transportation companies regularly provide their customers with the amount of GHG emissions associated with shipments transported on the customer's behalf.

---

[34] According to CDP, 9,642 (42%) of all disclosing companies reported scope 3 (responses where at least one scope 3 category was disclosed with a non-zero figure) and 37% of disclosing companies disclosed all three scopes. Burton Decl., Ex. 7.

[35] Primary data includes data provided by suppliers or others that directly relate to specific activities in the reporting company's value chain. Burton Decl., Ex. 17 at 15.

[36] Secondary data includes industry-average-data (e.g., from published databases, government statistics, literature studies, and industry associations), financial data, proxy data, and other generic data. In certain cases, companies may use specific data from one activity in the value chain to estimate emissions for another activity in the value chain. This type of data (i.e., proxy data) is considered secondary data, since it is not specific to the activity whose emissions are being calculated. *Id.* at 15.

[37] *Id.* at 15.

[38] *Id.* at 15.

19

i.   However, primary data may not be readily available for some types of scope 3 emissions. For instance, a food retailer may not be able to obtain the specific GHG emissions from its agricultural supplier regarding the emissions associated with strawberries purchased by the supplier from a downstream farm. In this situation, the retailer would use secondary data to compute its scope 3 emissions related to the purchased strawberries, such as the emission factors published by the Environmental Protection Agency (EPA). The EPA makes available its U.S. Environmentally-Extended Input-Output (USEEIO)[39] data as a resource for estimating the potential impacts—environmental and economic—associated with the production or consumption of goods and services. USEEIO data is frequently used to develop scope 3 GHG emissions information.[40]

32.   While the Protocol suggests "a corporate GHG emission reduction target is the logical follow-up to developing a GHG inventory,"[41] the Protocol does not mandate that emissions targets and goals be established, "It is not the purpose of this [Protocol] to prescribe what a company's target should be …."[42] As such, because S.B. 253 mandates the measuring and reporting of GHG emissions in conformance with the Protocol, a company would not be required to establish targets or goals to comply.

33.   Assurance of GHG emissions information

---

[39] The U.S. Environmentally-Extended Input-Output (USEEIO) is an Environmental Protection Agency (EPA)-developed "family of models designed to bridge the gap between traditional economic calculations, sustainability, and environmental decision-making." *U.S. Environmentally-Extended Input-Output Models*, EPA https://www.epa.gov/land-research/us-environmentally-extended-input-output-useeio-models, attached hereto as Ex. 18 at 1.
[40] *Id.* At 4, ("General Motors worked with Climate Earth consultants to use USEEIO to calculate their Scope 3 GHG emissions associated with the purchased goods and services in their supply chain.")
[41] Burton Decl., Ex. 2 at 74.
[42] *Id.* at 75.

20

a. S.B. 253 requires a reporting entity to obtain independent third-party assurance of its reported scope 1 and 2 emissions, with the possibility that independent third-party assurance of scope 3 emissions could be necessary beginning in 2030. Most reporting entities are very familiar with third-party assurance processes and understand what is needed to obtain such assurance, as this is a typical activity for annual financial reporting.

b. CPA firms and many other assurance providers are actively providing GHG emissions related assurance in the marketplace. As such, it should not be an excessive burden for reporting companies to obtain the necessary assurance.

c. In its annual survey of sustainability reporting trends, the AICPA's 2024 State of Play report revealed that of the companies it surveyed, 98% sought third-party assurance over GHG emissions data in 2022, more than any other area of ESG disclosure studied in the report. The report additionally found that 100% of companies sought assurance for both scopes 1 and 2, while 60% of companies sought assurance over their scope 3 emissions disclosures.[43] This data shows it is already a common practice in the marketplace to seek assurance for these disclosures.

**CLIMATE RISK REPORTING AND S.B. 261**

34.     S.B. 261 requires a covered entity to prepare and publish a climate-related financial risk report that complies with the TCFD reporting recommendations. A report prepared in accordance with TCFD results in a company disclosing information about four primary topics:[44]

---

[43] Burton Decl., Ex. 8 at 5.
[44] *Final Report: Recommendations of the Task Force on Climate-related Financial Disclosures*, Task Force on Climate-related Financial Disclosures (June 2017), https://assets.bbhub.io/company/sites/60/2021/10/FINAL-2017-TCFD-Report.pdf, attached hereto as Ex. 19 at 14.

21

a. Governance: This is focused on the governance practices around climate-related risks such as the processes and frequency by which a governing body or board is informed about climate-related issues and how the board considers climate-related issues when conducting its other oversight responsibilities (such as guiding strategy, annual budgeting, and monitoring implementation). Other governance disclosures include management's role in the assessment and management of climate-related issues. For companies that fall within the scope of S.B. 261, these aspects of the company's governance are not challenging to capture as they are similar to governance and oversight disclosures found in financial reporting, simply applied to climate risk. Companies often describe their governance practices and activities undertaken to consider climate-related risks, for example with disclosures such as, "Our Board of Directors, specifically the Nominating, Governance and Review Committee as reflected in the Committee's charter, has oversight of our overall corporate responsibility strategy and material ESG risks and opportunities, including environmental and climate-related issues. They receive updates at least once annually and are engaged on specific topics as needed."[45] Should climate risk not be incorporated into existing governance functions, the reporting company would simply need to disclose that is the case.

b. Strategy: This covers actual and potential impacts of climate-related risks on the organization's businesses, strategy, and financial planning, if material. Climate-related strategic planning is akin to other business strategy activities undertaken by most entities

---

[45] *2023 Corporate Responsibility Report*, Ionis Pharmaceuticals, Inc., https://www.ionis.com/wp-content/uploads/2024/04/Ionis-2023-Corporate-Responsibility-Report.pdf, attached hereto as Ex. 20 at 39.

22

1    and in my experience, it would be unusual for companies within the

2    scope of S.B. 261 to not have existing strategic and financial

3    planning programs. Strategy disclosures include describing the

4    climate-related risks and opportunities an organization has

5    identified over various time horizons and the impact of climate-

6    related risks and opportunities on the organization's businesses,

7    strategy, and financial planning. For example, a disclosure may be

8    provided such as, "We are focused on investing thoughtfully to

9    address our identified climate change-related risks and

10   opportunities. Diamondback considers risks as far into the future as

11   practicable given the variability in regulatory, economic and

12   technological circumstances. There is often much speculation

13   around climate-related risks and opportunities, and although we are

14   not always in a position to act on a potential risk or to benefit from

15   a potential opportunity without adequate available information, we

16   take the steps that are prudent."[46] If a company did not include

17   specific attention to climate-related matters in its strategic planning,

18   entities may simply disclose that they do not have such plans, or

19   they could indicate an intent to include such topics in future

20   planning activities.

21       c.  Risk Management: This applies to how the organization identifies,

22           assesses, and manages climate-related risks. Risk management

23           disclosures include the organization's process for identifying and

24           assessing climate-related risks and how such actions are integrated

25           into the organization's overall risk management. In my experience,

26           entities meeting the scope of S.B. 261 (that is, those with revenues

27   _____

28   [46] *Corporate Sustainability Report 2023*, Diamondback Energy, Inc., faf5ab25-5ab5-4404-8c04-c7bd387ae418 (diamondbackenergy.com), attached hereto as Ex. 21 at page 50.

23

**SER 2363**

1         more than $500 million) are companies where it would be

2         commonplace to have existing and active risk management

3         programs, even if the program is not explicitly focused on climate-

4         related risks. A company may make a disclosure such as, "All

5         ServiceNow data centers are sourced and selected through a

6         rigorous site selection process. In terms of risk management, we

7         assess and select our sites based on likelihood for natural disasters

8         or weather events, man-made events, or accidents as well as

9         security. For natural events risk, we select sites that are not located

10         on flood plains, are in areas that are seismologically stable, are not

11         directly situated on coastlines and are not adjacent to areas such as

12         forests that could present a fire risk. For example, to avoid the

13         affects (sic) of climate related events impacting our data centers,

14         ServiceNow implements a policy, where possible, of locating our

15         redundant data center pairs with a minimum radial distance of

16         separation to act as a backup ensuring we can deliver our product to

17         our customer."[47]

18     d. Metrics and Targets: This applies to the metrics and targets used to

19         assess and manage relevant climate-related risks, if material. If an

20         entity uses climate-related metrics and targets to manage its

21         relevant climate-related risks, these disclosures could include

22         metrics such as GHG emissions per dollar of revenue or per unit

23         produced, or capital expenditures for emission reducing activities.

24         And if targets or goals are established, an entity would be expected

25         to disclose the target and its performance against such targets. For

26         example, a company may set a target to reduce its overall emissions

27

28 [47] *ServiceNow Inc CDP Climate Change Questionnaire*, ServiceNow, Inc. (July 28, 2021), attached here as Ex. 22 at 9.

24

1      and its emissions per unit produced by 25% by the year 2030 and

2      would report on its progress each year. However, if a company has

3      not established any targets, that circumstance would be disclosed.

4      35.    Within these four topics, the TCFD recommends 11 disclosures

5  covering the topics in more detail. As related to S.B. 261, TCFD-aligned

6  disclosures would capture how a company has assessed its own circumstances

7  relative to climate-related risks. The law does not ask companies to take any

8  actions, set targets, or conclude on the likelihood of climate-related events

9  occurring (such as weather events, temperature change, or sea-level rise), but rather

10  disclose how it is (or in some cases how it is not) choosing to address such risks

11  and how such risks could or do affect its business.

12      36.    S.B. 261 allows for reporting under any successor reporting program

13  to the TCFD or any other climate-related risk report that is prepared in accordance

14  with any other voluntary, regulatorily required, or internationally accepted standard.

15  This substitute compliance reduces the risk that companies will have to prepare

16  duplicative or repetitive disclosures. Since most companies currently follow the

17  TCFD recommendations when making climate-related risk disclosures, those who

18  already report such information should not have difficulty complying with the

19  scope of the recommendations in S.B. 261. For those entities not currently

20  preparing such reports, there is ample guidance available to help with the reporting,

21  including industry- and sector-specific guidance.

22      37.    I have experienced that most companies are well versed in addressing

23  risks that affect the business. Companies often have risk management strategies

24  around risks such as catastrophe losses, changing consumer behavior, supply chain

25  disruptions, and technology or cybersecurity events, and usually find synergies

26  between existing risk management activities and climate-related risk management.

27  For climate-related risks, a company focuses on "physical risks such as the

28  disruption of operations or the destruction of property and transition risks such as

25

1   policy constraints on emissions, imposition of carbon tax, water restrictions, land

2   use restrictions or incentives, and market demand and supply shifts,"[48] and

3   companies are likely to have existing systems and business processes within the

4   organization where useful data is available for climate-risk reporting.

5       a. For example, companies assess the need for fire insurance each

6          year and using a climate-related risk focus, the entity would

7          continue to assess the risk of damage to property from fire by

8          including other potential causes of fires.

9       b. Another example of where existing risk management processes

10          complement climate-related risk management is a clothing

11          manufacturer who regularly establishes research and development

12          ("R&D") budgets based on the need to address changes in

13          consumer demand. When considering climate-related transition risk

14          when setting R&D budgets, the company may include amounts to

15          develop more breathable fabrics that consumers may prefer in

16          warmer weather.

17       c. And indeed, many companies are already tracking and reporting the

18          kind of information contemplated by the TCFD recommendations.

19          Ernst & Young's 2023 global survey of climate risk reporting

20          indicated that 58% of companies reviewed were using scenario

21          analysis as part of their reporting, up from 49% the previous year.

22          The report also stated "The direction of travel is toward far greater

23          rigor in the reporting of the financial impact of climate risk. ...

24          we're seeing an evolution in the sectors that lead. While energy, oil

25          and gas, and utilities continue to lead on developing detailed and

26          effective scenario planning, we are increasingly seeing the food and

27

28         [48] Burton Decl., Ex. 5 at 11.

26

1                 beverage sector, as well as consumer products, catching up."[49] And

2                 the same survey of climate risk reporting found that 33% of

3                 companies surveyed are already referencing climate-related matters

4                 in their financial statements.[50]

5       38.      Ultimately, the TCFD recommendations do not require any entity to

6 adopt or take any specific action, as the disclosures are focused on a company's

7 actual or planned activities. As such, the disclosures entities provide will vary.

8 Companies that do not evaluate climate-related risks could make disclosures that

9 they do not have any climate-related governance, strategy, risk management, or

10 metrics and targets and would likely disclose their future plans, if any, with respect

11 to climate-related matters. Such disclosures would be different from an entity that

12 undertook a climate-related risk assessment and reports the entity faces no climate-

13 related risks along with descriptions of its considerations aligned with the TCFD

14 recommendations. A third entity might disclose a summary of its most significant

15 climate-related risks and the actions intended to address or mitigate such risks,

16 along with the targets and metrics established. SB 261 will require companies to

17 take good faith measures to comply with the law and provide the required

18 disclosures, but it would not require companies to have any particular climate-

19 related risk management strategy or to take any actions regarding climate-related

20 matters.

21       39.      To complete a TCFD report, an entity is not required to engage with its

22 value chain on any of the disclosure topics but may choose to engage with the value

23 chain if they find it beneficial to the business. It is at the company's discretion the

24 degree to which it engages with its value chain. However, an entity is guided by the

25 TCFD to consider how any climate-related matters within its value chain may affect

26

27 [49] *Global Climate Risk Barometer 2023*, Ernst & Young (2024) https://www.ey.com/en_gl/insights/climate-change-sustainability-services/climate-risk-barometer-survey, attached hereto as Ex. 23 at 22.

28 [50] Burton Decl, Ex. 23 at 21.

1  the company. These types of value chain evaluations are common in enterprise risk

2  management, for example, how technology changes may affect the market demand

3  for a company's products or services. In the case of climate-related risk analysis,

4  the focus might be on how government-imposed carbon emission taxes or

5  limitations would affect the distribution network for the company's products.

6      I declare under penalty of perjury that the foregoing are true and correct.

7  Executed on this day, the 22nd of July, 2024, in Englewood, Colorado.

8

9

10  JAMES P. BURTON

11  CPA

12

13

14  SA2024300503
   66950206.docx

15

16

17

18

19

20

21

22

23

24

25

26

27

28

28

**SER 2368**

# Exhibit 4
# to Declaration of Caitlan McLoon

# Scope of CDP's existing environmental disclosure system in 2024

Exhibit 4 to Decl. of McLoon

38

**SER 2369**

**STATE OF CALIFORNIA**
**Scope of CDP Existing Disclosure as of April 2024**



**In 2023:**

▼ **4,500+ US Companies** disclosed through CDP.

▼ **50% of publicly traded US companies with over $1billion USD** revenues disclose through CDP (SB 253), and of those **80%** reported their Scope 3 emissions in part or full.

▼ **43% of publicly traded US companies with over $500million USD** in revenues disclosed through CDP (SB 261).

▼ **62% of US companies** disclosing with a process for identifying, assessing, and responding to climate-related risks and opportunities.

▼ **30%** of US companies have active emissions reduction targets.

▼ The State of California is a signatory and discloses via CARB.

**California Based Investor Signatories – 29 Firms with over USD $5.5 trillion in assets**

Adasina Social Capital; Aristotle Capital, LLC and Affiliates; Aspiration Partners, Inc.; Atmos Financial; Bailard; Beach Point Capital Management LP; **California Public Employees' Retirement System (CalPERS); California State Teachers' Retirement System (CalSTRS)**; California State University, Northridge Foundation; Capricorn Investment Group; Carbon Collective; GlobeFlex Capital LP; HIP Investor INC.; Langar Holdings, Inc; Los Angeles Capital; Matthews International Capital Management, LLC; Mercator Partners; Orbis Investment Management Limited; Parnassus Investments Payden & Rygel Investment Management; Prologis; RadiantESG Global Investors LLC; Redwood Grove Capital ScopeFour Capital; Swift Foundation; The Capital Group; Vert Asset Management; Wells Fargo & Company; and Welton Investment Partners LLC.

**Cities and Public Authorities in the State of California disclosing to CDP (2022)**

**Cities:** Alameda, Berkeley, Chula Vista, Culver City, Cupertino, Emeryville, Fremont, Hayward, Los Angeles, Manhattan Beach, Menlo Park, Oakland, Palo Alto, Piedmont, Sacramento, San Diego, San Francisco, San Jose, Santa Cruz, Santa Monica, Stockton, and San Rafael.

**Public Authorities:** Los Angeles Department of Water & Power (LADWP), Sacramento Municipal Utility District (SMUD), California Air Resources Board (CARB) – for the State of California disclosure.

**California-based Companies disclosing to CDP**

Adobe, Advanced Micro Devices, AECOM, Alphabet, Amgen, Apple, Applied Materials, Avery Dennison Corp., Blue Shield California, Broadcom, California Resources Corp., Chipotle Mexican Grill, Cisco Systems, Clorox, eBay, Equinix, First American Financial, Franklin Resources, Gap, Gilead Sciences, Guess? Inc., Hewlett Packard Enterprise, Intel Corporation, Intuit, KLA, Lam Research, Lyft, Inc., Mattel, Inc., NetApp, NetGear, NRG Energy, Nvidia, Oracle, Pacific Gas & Electric, PayPal, Public Storage, Reliance Steel & Aluminum Co., Ross Stores, Salesforce, Sanmina, Uber Technologies, Visa, Walt Disney Company, Western Digital, Williams-Sonoma, and more…

Exhibit 4 to Decl. of McLoon
39
**SER 2370**

**STATE OF CALIFORNIA**
**Scope of CDP Existing Disclosure as of April 2024**



### GROWTH IN GLOBAL DISCLOSURE

**CDP is the pioneer of environmental disclosure and has successfully worked to make it a business norm among the largest companies in the world.**

- ◤ CDP has grown from 245 companies responding in 2002, to over **23,000+ companies** with US$67 trillion in market capitalization responding on climate change, water security and forests in 2023, **representing over 64% of global market value.**
- ◤ The rise in corporate disclosures is a response to requests for information from **743 financial institutions with over $136 trillion in assets**, and over **280+ major purchasing organizations** with **over US$6.4 trillion in buying power**, including Airbus, Sainsburys and Nike. This demonstrates the success of the market levers CDP utilizes in driving change.
- ◤ **96% of the FTSE100 & 86% of the S&P 500 companies disclosed through CDP in 2023** − making it an expected business norm among many of the world's biggest companies.
- ◤ The **overall number of disclosures grew by 24% in 2023** and over 140% since 2020 when the Paris Agreement was signed. This included over 8,000 first time disclosers.
- ◤ **37% of disclosing companies disclosed all scopes** (1 through 3) via CDP's Climate Change questionnaire.

### GROWTH IN CDP DISCLOSURE ACROSS ALL QUESTIONNAIRES/THEMES
*(Since inception)*



Exhibit 4 to Decl. of McLoon
40
**SER 2371**

# Exhibit 3
# to Declaration of Caitlan McLoon

# U.S. companies with an annual revenue of at least $1 billion from which CDP received an environmental disclosure in 2023

Exhibit 3 to Decl. of McLoon

27

**SER 2372**

## CDP DISCLOSURES - Coverage Of $1billion+ Revenue US Companies SB 253



| | | |
|---|---|---|
| Walmart | Target | General Electric |
| WMT | TGT | GE |
| Amazon | Bank of America | ConocoPhillips |
| AMZN | BAC | COP |
| Apple | Archer Daniels Midland (ADM) | Bunge |
| AAPL | ADM | BG |
| UnitedHealth | Humana | IBM |
| UNH | HUM | IBM |
| CVS Health | United Parcel Service | Deere & Company |
| CVS | UPS | DE |
| Alphabet (Google) | Johnson & Johnson | Prudential Financial |
| GOOG | JNJ | PRU |
| AmerisourceBergen | Dell | Merck |
| ABC | DELL | MRK |
| Costco | Lowe's Companies | American Express |
| COST | LOW | AXP |
| Microsoft | Pepsico | Cisco |
| MSFT | PEP | CSCO |
| Cardinal Health | FedEx | AbbVie |
| CAH | FDX | ABBV |
| Cigna | Walt Disney | Progressive |
| CI | DIS | PGR |
| Ford | Albertsons | Delta Air Lines |
| F | ACI | DAL |
| General Motors | Procter & Gamble | HP |
| GM | PG | HPQ |
| Elevance Health | Wells Fargo | Allstate |
| ELV | WFC | ALL |
| Valero Energy | T-Mobile US | Intel |
| VLO | TMUS | INTC |
| Marathon Petroleum | Pfizer | Tyson Foods |
| MPC | PFE | TSN |
| Home Depot | Citigroup | American Airlines |
| HD | C | AAL |
| Kroger | Sysco | Nike |
| KR | SYY | NKE |
| JPMorgan Chase | Boeing | TJX Companies |
| JPM | BA | TJX |
| Walgreens Boots Alliance | MetLife | Oracle |
| WBA | MET | ORCL |
| AT&T | Raytheon Technologies | United Airlines Holdings |
| T | RTX | UAL |
| Comcast | Lockheed Martin | American International Group |
| CMCSA | LMT | AIG |

Exhibit 3 to Decl. of McLoon
28
**SER 2373**

## CDP DISCLOSURES - Coverage Of $1billion+ Revenue US Companies SB 253



| | | |
|---|---|---|
| Morgan Stanley | NVIDIA | Constellation Energy |
| MS | NVDA | CEG |
| Dow | Paccar | Southwest Airlines |
| DOW | PCAR | LUV |
| Goldman Sachs | Cummins | EOG Resources |
| GS | CMI | EOG |
| Bristol-Myers Squibb | Occidental Petroleum | Union Pacific Corporation |
| BMY | OXY | UNP |
| Best Buy | Schlumberger | McDonald |
| BBY | SLB | MCD |
| Coca-Cola | CBRE Group | Truist Financial |
| KO | CBRE | TFC |
| Thermo Fisher Scientific | NRG Energy | Rite Aid |
| TMO | NRG | RAD |
| LyondellBasell | Danaher | The Hartford |
| LYB | DHR | HIG |
| General Dynamics | United Natural Foods | Baker Hughes |
| GD | UNFI | BKR |
| Abbott Laboratories | Hewlett Packard Enterprise | Sherwin-Williams |
| ABT | HPE | SHW |
| QUALCOMM | Eli Lilly | Marriott International |
| QCOM | LLY | MAR |
| Northrop Grumman | Lithia Motors | Halliburton |
| NOC | LAD | HAL |
| Honeywell | Dollar Tree | CDW Corporation |
| HON | DLTR | CDW |
| Arrow Electronics | Duke Energy | WESCO International |
| ARW | DUK | WCC |
| Capital One | PayPal | Pacific Gas and Electric |
| COF | PYPL | PCG |
| Starbucks | Gilead Sciences | PNC Financial Services |
| SBUX | GILD | PNC |
| US Foods | Kraft Heinz | Cleveland-Cliffs |
| USFD | KHC | CLF |
| Jabil | Nextera Energy | Freeport-McMoRan |
| JBL | NEE | FCX |
| Mondelez | U.S. Bancorp | AMD |
| MDLZ | USB | AMD |
| Philip Morris | Amgen | Carrier |
| PM | AMGN | CARR |
| Salesforce | Applied Materials | Charles Schwab |
| CRM | AMAT | SCHW |
| 3M | Avnet | Westrock |
| MMM | AVT | WRK |

Exhibit 3 to Decl. of McLoon
29
**SER 2374**

## CDP DISCLOSURES - Coverage Of $1billion+ Revenue US Companies SB 253



| | | |
|---|---|---|
| Jones Lang LaSalle | Quanta Services | DTE Energy |
| JLL | PWR | DTE |
| Steel Dynamics | Dominion Energy | Illinois Tool Works |
| STLD | D | ITW |
| Pioneer Natural Resources | Aramark | W. W. Grainger |
| PXD | ARMK | GWW |
| General Mills | L3Harris Technologies | Jacobs Engineering |
| GIS | LHX | J |
| C. H. Robinson | PPG Industries | Estee Lauder |
| CHRW | PPG | EL |
| Exelon Corporation | Kohl's | Kellogg's |
| EXC | KSS | K |
| American Electric Power | AutoZone | Reliance Steel & Aluminum |
| AEP | AZO | RS |
| Stryker Corporation | Corteva | Lumen |
| SYK | CTVA | LUMN |
| Cognizant Technology Solutions | Lam Research | Consolidated Edison |
| CTSH | LRCX | ED |
| Booking Holdings (Booking.com) | Automatic Data Processing | Micron Technology |
| BKNG | ADP | MU |
| ManpowerGroup | Kinder Morgan | Lincoln National Corporation |
| MAN | KMI | LNC |
| Ross Stores | Devon Energy | O'Reilly Automotive |
| ROST | DVN | ORLY |
| Oneok | Sempra Energy | Gap Inc. |
| OKE | SRE | GPS |
| Whirlpool | Kyndryl | CSX Corporation |
| WHR | KD | CSX |
| Parker-Hannifin | PulteGroup | Baxter |
| PH | PHM | BAX |
| Becton Dickinson | BorgWarner | Leidos |
| BDX | BWA | LDOS |
| U.S. Steel | Reinsurance Group of America | MGM Resorts |
| X | RGA | MGM |
| Adobe | The Mosaic Company | Nordstrom |
| ADBE | MOS | JWN |
| Texas Instruments | Bank of New York Mellon | Ecolab |
| TXN | BK | ECL |
| Aflac | Vistra | Tractor Supply |
| AFL | VST | TSCO |
| Colgate-Palmolive | Emerson | Ameriprise Financial |
| CL | EMR | AMP |
| | Stanley Black & Decker | IQVIA |
| | SWK | IQV |

Exhibit 3 to Decl. of McLoon
30
**SER 2375**

## CDP DISCLOSURES - Coverage Of $1billion+ Revenue US Companies SB 253



| | | |
|---|---|---|
| Fidelity National Information Services | FE | Qurate Retail Group |
| FIS | Analog Devices | QRTEA |
| Keurig Dr Pepper | ADI | Williams Companies |
| KDP | Norfolk Southern | WMB |
| Republic Services | NSC | VF Corporation |
| RSG | Regeneron Pharmaceuticals | VFC |
| Intuit | REGN | Caesars Entertainment |
| INTU | Eversource Energy | CZR |
| Omnicom | ES | Mohawk Industries |
| OMC | Expeditors | MHK |
| AGCO | EXPD | Raymond James |
| AGCO | Dick's Sporting Goods | RJF |
| DXC Technology | DKS | Advance Auto Parts |
| DXC | Henry Schein | AAP |
| Principal | HSIC | Newmont |
| PFG | Amphenol | NEM |
| LabCorp | APH | Molson Coors |
| LH | Dupont De Nemours | TAP |
| AECOM | DD | Thor Industries |
| ACM | Crown Holdings | THO |
| J. B. Hunt | CCK | American Tower |
| JBHT | State Street Corporation | AMT |
| Otis Worldwide | STT | Interpublic Group |
| OTIS | Western Digital | IPG |
| Vmware | WDC | Hess |
| VMW | Expedia Group | HES |
| Boston Scientific | EXPE | ULTA Beauty |
| BSX | Hormel Foods | ULTA |
| Entergy | HRL | Assurant |
| ETR | S&P Global | AIZ |
| Corning | SPGI | Moderna |
| GLW | Royal Caribbean | MRNA |
| United Rentals | RCL | KLA |
| URI | Avis Budget Group | KLAC |
| Textron | CAR | Dana |
| TXT | Ryder | DAN |
| Berry Global | R | Celanese |
| BERY | International Flavors & Fragrances | CE |
| Air Products and Chemicals | IFF | Owens & Minor |
| APD | DaVita | OMI |
| AES | DVA | Biogen |
| AES | Emcor | BIIB |
| FirstEnergy | EME | eBay |
| | | EBAY |

Exhibit 3 to Decl. of McLoon
31
**SER 2376**

## CDP DISCLOSURES - Coverage Of $1billion+ Revenue US Companies SB 253



| | | |
|---|---|---|
| Jetblue Airways | Wabtec | Arconic |
| JBLU | WAB | ARNC |
| Eastman Chemical | EQT Corporation | CMS Energy |
| EMN | EQT | CMS |
| Hilton Worldwide | Oshkosh Corporation | Avangrid |
| HLT | OSK | AGR |
| Owens Corning | Fifth Third Bank | Packaging Corporation of America |
| OC | FITB | PKG |
| Graphic Packaging | Microchip Technology | ServiceNow |
| GPK | MCHP | NOW |
| Booz Allen Hamilton | Activision Blizzard | ABM Industries |
| BAH | ATVI | ABM |
| Albemarle | PPL | Weyerhaeuser |
| ALB | PPL | WY |
| Constellation Brands | Rockwell Automation | Franklin Resources |
| STZ | ROK | BEN |
| Intercontinental Exchange | CommScope | Equinix |
| ICE | COMM | EQIX |
| Vertex Pharmaceuticals | Citizens Financial Group | Regions Financial |
| VRTX | CFG | RF |
| Quest Diagnostics | Newell Brands | Prologis |
| DGX | NWL | PLD |
| UGI Corporation | Avery Dennison | SAIC |
| UGI | AVY | SAIC |
| M&T Bank | Dover | Huntington Bancshares |
| MTB | DOV | HBAN |
| Campbell Soup | J.M. Smucker Company | Vulcan Materials |
| CPB | SJM | VMC |
| Ally | ON Semiconductor | Genworth Financial |
| ALLY | ON | GNW |
| Chipotle Mexican Grill | Foot Locker | Bath & Body Works |
| CMG | FL | BBWI |
| Global Payments | Office Depot | Clorox |
| GPN | ODP | CLX |
| WEC Energy Group | Williams-Sonoma | RPM International |
| WEC | WSM | RPM |
| Arthur J. Gallagher & Co. | Diamondback Energy | Fastenal |
| AJG | FANG | FAST |
| Phillips-Van Heusen | Zoetis | Zimmer Biomet |
| PVH | ZTS | ZBH |
| Burlington Stores | Ingredion | Avantor |
| BURL | INGR | AVTR |
| Sanmina | Ameren | Xerox |
| SANM | AEE | XRX |

Exhibit 3 to Decl. of McLoon
32

**SER 2377**

## CDP DISCLOSURES - Coverage Of $1billion+ Revenue US Companies SB 253



| | | |
|---|---|---|
| XRX | FAF | Fortive |
| Crown Castle | Voya Financial | FTV |
| CCI | VOYA | Hanesbrands |
| Supermicro | Concentrix | HBI |
| SMCI | CNXC | NiSource |
| O-I Glass | McCormick & Company | NI |
| OI | MKC | Evergy |
| Darling Ingredients | Hyatt Hotels | EVRG |
| DAR | H | Roper Technologies |
| Sonoco | Coca-Cola Consolidated | ROP |
| SON | COKE | Invesco |
| Agilent Technologies | Martin Marietta | IVZ |
| A | MLM | Juniper Networks |
| Yum! Brands | ADT | JNPR |
| YUM | ADT | Edwards Lifesciences |
| Amkor Technology | Ralph Lauren | EW |
| AMKR | RL | Church & Dwight |
| Robert Half | Veritiv | CHD |
| RHI | VRTV | Marvell Technology Group |
| Palo Alto Networks | Landstar System | MRVL |
| PANW | LSTR | Keysight |
| KeyCorp (KeyBank) | Chemours | KEYS |
| KEY | CC | Hasbro |
| Huntsman Corporation | Welltower | HAS |
| HUN | WELL | Coty |
| Las Vegas Sands | NetApp | COTY |
| LVS | NTAP | Sealed Air |
| Northern Trust | Howmet Aerospace | SEE |
| NTRS | HWM | Moody's |
| Brunswick Corporation | Organon | MCO |
| BC | OGN | Synopsys |
| Workday | Levi Strauss | SNPS |
| WDAY | LEVI | Zebra Technologies |
| Monster Beverage | Nasdaq | ZBRA |
| MNST | NDAQ | Simon Property Group |
| KBR | Broadridge Financial Solutions | SPG |
| KBR | BR | Greif |
| Intuitive Surgical | Xylem | GEF |
| ISRG | XYL | Spirit AeroSystems |
| Tapestry | Harley-Davidson | SPR |
| TPR | HOG | Fortune Brands Innovations |
| Post Holdings | American Axle & | FBIN |
| POST | Manufacturing | FMC |
| First American | AXL | FMC |

Exhibit 3 to Decl. of McLoon
33

**SER 2378**

**CDP DISCLOSURES - Coverage Of $1billion+ Revenue US Companies SB 253** 

| | | |
|---|---|---|
| Lamb Weston | IAC/InterActiveCorp | Dycom Industries |
| LW | IAC | DY |
| Clean Harbors | Comfort Systems | Visteon |
| CLH | FIX | VC |
| Arista Networks | Worthington Industries | Bread Financial |
| ANET | WOR | BFH |
| Iron Mountain | Liberty Latin America | Lincoln Electric |
| IRM | LILA | LECO |
| Host Hotels & Resorts | Pinnacle West Capital | Dentsply Sirona |
| HST | PNW | XRAY |
| Autodesk | Snap | MillerKnoll |
| ADSK | SNAP | MLKN |
| Hubbell | Illumina | Comerica |
| HUBB | ILMN | CMA |
| Digital Realty | Public Storage | Crocs |
| DLR | PSA | CROX |
| Paychex | Valmont Industries | Splunk |
| PAYX | VMI | SPLK |
| Mattel | Catalent | Cadence Design Systems |
| MAT | CTLT | CDNS |
| Axalta | Ventas | Conduent |
| AXTA | VTR | CNDT |
| American Eagle Outfitters | Brown Forman | Sylvamo |
| AEO | BF-A | SLVM |
| Flowers Foods | RXO | Entegris |
| FLO | RXO | ENTG |
| Fortinet | Ciena | A. O. Smith |
| FTNT | CIEN | AOS |
| Terex | ResMed | Deckers Brands |
| TEX | RMD | DECK |
| Skyworks Solutions | Alliant Energy | ScottsMiracle-Gro |
| SWKS | LNT | SMG |
| Leggett & Platt | Charles River Laboratories | LPL Financial |
| LEG | CRL | LPLA |
| Kelly Services | Tetra Tech | Travel + Leisure |
| KELYA | TTEK | TNL |
| Hub Group | Cabot Corporation | Akamai |
| HUBG | CBT | AKAM |
| Lennox | Middleby | Trimble |
| LII | MIDD | TRMB |
| Weatherford International | Acuity Brands | TreeHouse Foods |
| WFRD | AYI | THS |
| Parsons | American Water Works | H.B. Fuller |
| PSN | AWK | FUL |

Exhibit 3 to Decl. of McLoon
34
**SER 2379**

## CDP DISCLOSURES - Coverage Of $1billion+ Revenue US Companies SB 253



| | | |
|---|---|---|
| MRC Global | WAT | AVB |
| MRC | First Solar | Guess |
| Cooper Companies | FSLR | GES |
| COO | Benchmark Electronics | Etsy |
| Donaldson | BHE | ETSY |
| DCI | Spectrum Brands | ModivCare |
| AptarGroup | SPB | MODV |
| ATR | Masonite | Universal Corporation |
| WeWork | DOOR | UVV |
| WE | Korn Ferry | SM Energy |
| Pitney Bowes | KFY | SM |
| PBI | West Pharmaceutical | First Horizon National |
| Werner Enterprises | WST | FHN |
| WERN | Teradyne | REV Group |
| Avient | TER | REVG |
| AVNT | Caleres | Carpenter Technology |
| California Resources Corporation | CAL | CRS |
| | CNX Resources | Littelfuse |
| CRC | CNX | LFUS |
| Steelcase | EnerSys | CONSOL Energy |
| SCS | ENS | CEIX |
| FTI Consulting | Equity Residential | WEX |
| FCN | EQR | WEX |
| Vontier | Peloton | Trinity Industries |
| VNT | PTON | TRN |
| Boston Properties | Hawaiian Airlines | Modine Manufacturing |
| BXP | HA | MOD |
| DexCom | Gannett | MSCI |
| DXCM | GCI | MSCI |
| Qorvo | Bio-Rad Laboratories | Genesco |
| QRVO | BIO | GCO |
| Kaiser Aluminum | Pure Storage | CoStar Group |
| KALU | PSTG | CSGP |
| Cal-Maine Foods | Louisiana-Pacific | Essential Utilities |
| CALM | LPX | WTRG |
| OGE Energy | Saia | Edgewell Personal Care |
| OGE | SAIA | EPC |
| Rackspace Technology | Alexandria Real Estate Equities | Dun & Bradstreet |
| RXT | ARE | DNB |
| Sun Communities | Stericycle | Veeva Systems |
| SUI | SRCL | VEEV |
| Carter's | Verisk Analytics | HNI Corporation |
| CRI | VRSK | HNI |
| Waters Corporation | AvalonBay Communities | Ansys |

Exhibit 3 to Decl. of McLoon
35

**SER 2380**

## CDP DISCLOSURES - Coverage Of $1billion+ Revenue US Companies SB 253



| | | |
|---|---|---|
| ANSS | MPWR | EXLS |
| Wendy's Company | Kimball Electronics | MongoDB |
| WEN | KE | MDB |
| Affiliated Managers Group | Cirrus Logic | Wyndham Hotels & Resorts |
| AMG | CRUS | WH |
| Minerals Technologies | Forward Air | Talos Energy |
| MTX | FWRD | TALO |
| B&G Foods | Teradata | Corsair Gaming |
| BGS | TDC | CRSR |
| Healthpeak Properties | Hain Celestial | Valvoline |
| PEAK | HAIN | VVV |
| Clearwater Paper | Idacorp | Ceridian |
| CLW | IDA | CDAY |
| Koppers | Lumentum | Hostess Brands |
| KOP | LITE | TWNK |
| FactSet | Ingevity | Equitrans Midstream |
| FDS | NGVT | ETRN |
| Kennametal | National Instruments | Ziff Davis |
| KMT | NATI | ZD |
| Okta | SMART Global Holdings | Ameresco |
| OKTA | SGH | AMRC |
| PTC | AdvanSix | Standard Motor Products |
| PTC | ASIX | (SMP) |
| Boston Beer Company | U.S. Silica | SMP |
| SAM | SLCA | Gibraltar Industries |
| SunCoke Energy | MSA Safety | ROCK |
| SXC | MSA | Astec Industries |
| Sleep Number | DXP Enterprises | ASTE |
| SNBR | DXPE | Triumph Group |
| Extra Space Storage | Infinera | TGI |
| EXR | INFN | Synaptics |
| Unisys | Kosmos Energy | SYNA |
| UIS | KOS | Navient |
| Nextracker | The Children's Place | NAVI |
| NXT | PLCE | Brady |
| HubSpot | Fox Factory Holding | BRC |
| HUBS | FOXF | Alto Ingredients |
| Steve Madden | Zscaler | ALTO |
| SHOO | ZS | Interface |
| Itron | Alamo Group | TILE |
| ITRI | ALG | Dolby |
| SEI Investments | Fossil Group | DLB |
| SEIC | FOSL | The AZEK Company |
| Monolithic Power Systems | EXL Service | AZEK |

Exhibit 3 to Decl. of McLoon
36

**SER 2381**

## CDP DISCLOSURES - Coverage Of $1billion+ Revenue US Companies SB 253



| | | |
|---|---|---|
| Yelp | ENV | Federal Realty Investment |
| YELP | ZoomInfo | Trust |
| Armstrong World Industries | ZI | FRT |
| AWI | Methode Electronics | VIAVI Solutions |
| Regency Centers | MEI | VIAV |
| REG | Tennant Company | Albany International |
| TimkenSteel | TNC | AIN |
| TMST | Bentley Systems | Blackbaud |
| Thoughtworks | BSY | BLKB |
| TWKS | Kilroy Realty | PotlatchDeltic |
| Dynatrace | KRC | PCH |
| DT | Casella Waste Systems | Allegro MicroSystems |
| Compass Minerals | CWST | ALGM |
| CMP | RBC Bearings | Hudson Pacific Properties |
| Envestnet | RBC | |
| HPP | | |

Exhibit 3 to Decl. of McLoon
37
**SER 2382**

# Exhibit 23

## California Senate Judiciary Committee's April 14, 2023 Analysis of S.B. 261

Declaration of Bradley J. Hamburger In Support Of
Plaintiffs' Motion for Summary Judgment on Claim I
May 24, 2024

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.*,
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)

**SENATE JUDICIARY COMMITTEE**
**Senator Thomas Umberg, Chair**
**2023-2024 Regular Session**

SB 261 (Stern)
Version: April 10, 2023
Hearing Date: April 18, 2023
Fiscal: Yes
Urgency: No
AWM

## SUBJECT

Greenhouse gases: climate-related financial risk

## DIGEST

This bill requires companies that do business in California and have gross revenues exceeding $500 million annually, excluding insurance companies, to report on their climate-related financial risk, as specified; and requires the California Air Resources Board (CARB) to contract with a qualified climate reporting organization to review and publish an analysis of those reports, as specified.

## EXECUTIVE SUMMARY

Climate change is here; the question that remains is how catastrophic it will be. As the effects of climate change are felt around the world, businesses and governments increasingly have to account for climate-related financial risks—the uncertainties and threats caused by climate change that may affect decisionmaking.

The Taskforce on Climate-Related Financial Disclosure (TCFD), founded at the behest of the G20, has developed a recommended framework for corporate climate-risk reporting. The TCFD-recommended disclosures include identifying the actual and potential impacts of climate-related risks and opportunities on the organization's businesses, strategy, and financial planning, and disclosing how the organization identifies, assesses, and manages climate-related risks. A number of organizations have voluntarily published reports containing some or all of the TCFD-recommended disclosures, and the United Kingdom requires certain organizations to make TCFD disclosures on annual basis, but there is no domestic requirement for companies to make TCFD-recommended disclosures.

This bill requires companies with over $500 million in annual revenues that do business in California, beginning in 2024, to annually submit a report to the CARB disclosing their climate-related financial risks using the TCFD framework; the report must also be

SB 261 (Stern)
Page 2 of 13

posted to the entity's website. The bill further requires that CARB contract with a qualified climate reporting organization to review the reports and annually publish a report analyzing the information provided and a sector-by-sector breakdown of climate-related financial risks. The bill specifies that, if a similar reporting requirement is enacted at the federal level, a reporting entity can satisfy its obligations under this bill by submitting the federal report. Finally, the bill provides that a reporting entity's violation of the reporting requirements is punishable by a civil penalty of up to $500,000, which may be awarded in a civil action brought by the Attorney General.

This bill is sponsored by Ceres and is supported by over 80 organizations, including groups dedicated to minimizing the effects of climate change, businesses, and faith-based organizations. This bill is opposed by over 50 organizations, including the California Chamber of Commerce and local Chambers of Commerce and a range of organization representing various industries. This bill was passed out of the Senate Environmental Quality Committee with a vote of 4-2.

## PROPOSED CHANGES TO THE LAW

Existing state law:

1) Establishes the California Global Warming Solutions Act of 2006 (AB 32 (Nunez, Ch. 488, Stats. 2006)), which declares that global warming poses a serious threat to the economic well-being, public health, natural resources, and the environment of California, and that action taken by California to reduce emissions of greenhouse gases will have far-reaching effects by encouraging other states, the federal government, and other countries to act. (Health & Saf. Code, div. 25.5, §§ 38500 et seq.)

2) Requires the CARB to monitor compliance with and enforce the requirements of the California Global Warming Solutions Act of 2006, and deems any violation to result in an emission of an air contaminant that may result in criminal and civil penalties. (Health & Saf. Code, § 38580.)

3) Defines "doing business" in California as engaging in any transaction for the purpose of financial gain within California, being organized or commercially domiciled in California, or having California sales, property, or payroll exceed $610,395, $61,040, and $61,040, respectively, as of 2020. (Rev. & Tax. Code, §§17041, 23101.)

4) Requires, until January 31, 2035, California Public Employees' Retirement System (CalPERS) and California State Teachers' Retirement System (CalSTRS) to publicly report on its analysis of the climate-related financial risk in its public market portfolio, as specified. (Gov. Code, § 7510.5.)

SB 261 (Stern)
Page 3 of 13

Existing federal law:

1) Gives Congress the authority to regulate commerce with foreign nations and between states, i.e. the commerce clause. (U.S. Const. art. I, § 8.)

2) Directs specified federal officers and bodies, pursuant to an executive order, to develop a comprehensive, government-wide strategy regarding the measurement, assessment, mitigation, and disclosure of climate-related financial risk to federal government programs, assets, and liabilities in order to increase the long-term stability of federal operations. (Exec. Order No. 14030, 86 Fed.Reg. 27967 (May 20, 2021).)

This bill:

1) Makes findings and declarations regarding, among other things, the importance of climate risk in effective decision-making.

2) Defines the following terms:
    a) "Climate reporting organization" is a nonprofit climate reporting organization contracted by the CARB that (1) currently operates a voluntary climate reporting organization for organizations operating in the United States and (2) has experience with voluntary climate-related disclosure by entities operating in California.
    b) "Climate-related financial risk" is material risk of harm to immediate and long-term financial outcomes due to physical and transition risks, including, but not limited to, risks to corporate operations, provision of goods and services, supply chains, employee health and safety, capital and financial investments, institutional investments, financial standing of loan recipients and borrowers, shareholder value, consumer demand, and financial markets and economic health.
    c) "Climate-related financial risk report" is a report required by 3).
    d) "Covered entity" is a corporation, partnership, limited liability company, or other business entity formed under the laws of this state, the laws of any other state of the United States or the District of Columbia, or under an act of the Congress of the United States with total annual revenues in excess of $500,000,000 and that does business in California; the term does not include business entity that is subject to regulation by the Department of Insurance in this state, or that is in the business of insurance in any other state.

3) Requires a covered entity, on or before December 31, 2024, and annually thereafter, to prepare a climate-related financial risk report disclosing both of the following:
    a) Its climate-related financial risk, in accordance with the recommended framework and disclosures contained in the Final Report of Recommendations of the Task Force on Climate-Related Financial Disclosures

SB 261 (Stern)
Page 4 of 13

(June 2017) published by the Task Force on Climate-Related Financial Disclosures, or any subsequent publication thereto.

b) Its measures adopted to reduce and adapt to climate-related financial risk disclosed pursuant to 3)(a).

4) Requires a covered entity, on or before December 31, 2024, and annually thereafter, to submit to the CARB, and make available to the public on its own website, a copy of the report required by 3); and to submit to the Secretary of State a statement affirming, not under penalty of perjury, that the report prepared and filed pursuant to 3) discloses climate-related financial risk in accordance with the TCFD framework, as required.

5) Provides that, if a federal law or regulation enacted or promulgated after January 1, 2023, requires a covered entity to prepare an annual report disclosing information materially similar to the information described in 3), a report prepared pursuant to the federal requirement satisfies the requirements of 3) and a covered entity may satisfy its obligations under 4) by submitting the federal report to the CARB.

6) Requires the CARB to contract with a climate reporting organization to prepare an annual public report on the climate risk disclosures required under 3) and ensure the required climate risk disclosures remain consistent with current practices.

7) Requires the climate reporting organization contracted under 6) to do all of the following:

a) Annually prepare a report that contains: (1) a review of the disclosure of climate-related financial risk contained in the reports submitted to the CARB; (2) an analysis of the systematic and sector-wide climate-related financial risks facing the state based on the contents of the reports, including, but not limited to, potential impacts one economically vulnerable communities; and (3) identification of inadequate or insufficient reports.

b) Regularly convene representatives of sectors responsible for reporting climate-related financial risks, state agencies responsible for oversight of reporting sectors, investment managers, academic experts, and other stakeholders to offer input on current best practices regarding the disclosure of financial risks resulting from climate change, including, but not limited to, proposals to update the definition of "climate-related financial risk," and the framework or disclosure standard of "climate-related financial risk reports."

c) Monitor federal regulatory actions among agency members of the federal Financial Stability Oversight Council, as well as nonindependent regulators overseen by the White House.

8) Provides that if the Attorney General finds that a reporting entity has violated the requirements above of 3) or 4), or upon a report received from the CARB, the entity shall be liable for a civil penalty not to exceed $500,000 per violation, which may be

SB 261 (Stern)
Page 5 of 13

assessed and recovered in a civil action brought in the name of the people of the
State of California by the Attorney General in a court of competent jurisdiction.

9)  Places 2)-6) within the California Global Warming Solutions Act of 2006.

## COMMENTS

1.  Author's comment

According to the author:

> It is abundantly clear the worsening effects of climate change pose numerous
> environmental risks that include extreme drought, rising sea levels, catastrophic
> wildfires, and extreme weather events. These impacts not only [a]ffect our
> environment but they also [a]ffect how we live, what services we rely upon and
> which investments make the most sense. Major corporations and financial
> institutions face climate related financial risks in their business making decisions,
> so it is important for these businesses and institutions to assess and share the
> risks they have identified, and what efforts they are employing to mitigate them.
> This information is important to provide more transparency to policy makers,
> investors, and shareholders as it will result in improved decision making on
> where to invest private and public dollars. Climate related financial risk
> disclosures are ultimately about good business, partnerships, governance and the
> solutions and planning necessary to navigate the increasing burdens of a
> changing climate.

2.  Background on climate-related financial disclosures

In 2015, the G20 Finance Ministers and Central Bank Governors asked the Financial
Stability Board (FSB) to review how the financial sector could better account for climate-
change-related issues.[1] The FSB formed the TCFD, and in 2017 the TCFD released a
recommended framework for companies on climate-related financial disclosures.[2] The
report explains that "climate change poses significant financial challenges and
opportunities," but "[a]t the same time, the risk-return profile of organizations exposed
to climate-related risks may change significantly as such organizations may be more
affected by physical impacts of climate change, climate policy, and new technologies."[3]
As such, the TCFD recommended that companies make climate disclosures in four key
areas:

---

[1] Task Force on Climate-Related Financial Disclosures, History, https://www.fsb-
tcfd.org/about/#history. All links in this analysis are current as of April 14, 2023.
[2] *See* TCFD, *Recommendations of the Task Force on Climate-related Financial Disclosures* (Jun. 2017), *available at*
https://assets.bbhub.io/company/sites/60/2021/10/FINAL-2017-TCFD-Report.pdf.
[3] *Id*. at p. ii.

**SER 2388**

SB 261 (Stern)
Page 6 of 13

- Governance: disclose the organization's governance around climate-related risks and opportunities.
- Strategy: disclose the actual and potential impacts of the climate-related risks and opportunities on the organization's businesses, strategy, and financial planning where such information is material.
- Risk management: disclose how the organization identifies, assesses, and manages climate-related risks.
- Metrics and targets: disclose the metrics and targets used to assess and manage climate-related risks and opportunities where such information is material.[4]

The United Kingdom adopted the TCFD as a mandatory disclosure framework for publicly traded companies and large private companies in 2021.[5] As of March 2022, CDP—an organization that provides a platform for TCFD-aligned disclosures—reports that over 680 financial institutions with over \$130 trillion in assets had called on nearly 10,400 companies to disclose TCFD climate-related data.[6] Major investment firms, such as BlackRock, have also made TCFD climate-risk reports.

Here in California, the Legislature in 2018 enacted SB 964 (Allen, Ch. 731, Stats. 2018), which requires CalPERS and CalSTRS to make public climate-related financial risk disclosures on a triannual basis.[7] CalSTRS, writing in support of the bill, has noted that the task of determining its own climate-related financial risk would be significantly simplified if companies covered by this bill were also required to make TCFD-aligned disclosures.

3.  This bill requires very large companies doing business in California to disclose their climate-related financial risks beginning in 2024

This bill requires companies who do business in California and whose gross revenues exceed \$500 million annually, excluding insurance companies, to annually disclose their climate-related financial risks under the TCFD framework, beginning in 2024. The report must be submitted to the CARB and posted on the company's own website. Insurance companies are exempted because the National Association of Insurance Commissioners, which includes California's Insurance Commissioner, already require

---

[4] *Id.* at p. 14.

[5] United Kingdom Department for Business, Energy & Industrial Strategy, MD Treasury, Press Release, UK to enshrine mandatory climate disclosures for largest companies in law (Oct. 29, 2021), https://www.gov.uk/government/news/uk-to-enshrine-mandatory-climate-disclosures-for-largest-companies-in-law.

[6] CDP, *More than 680 financial institutions with US\$130+ trillion in assets call on nearly 10,400 companies to disclose environmental data through CDP* (Mar. 14 2022), https://www.cdp.net/en/articles/media/More-than-680-financial-institutions-call-on-nearly-10400-companies-to-disclose-environmental-data-through-CDP.

[7] Gov. Code, § 7510.5. The requirement is set to sunset on January 31, 2035. (Gov. Code, § 7510.5(f).)

SB 261 (Stern)
Page 7 of 13

insurance companies to report their climate-related risks in alignment with TCFD.[8] The bill provides that a company that violates the bill's reporting requirements may be liable for a civil penalty of up to $500,000, which may be recovered in a civil action brought by the Attorney General in the name of the people of the State of California.

The bill also requires the CARB to contract with an experienced climate reporting organization to analyze the reports. The contracted entity must, on an annual basis, prepare a public report that reviews the climate-related financial risk disclosures and provides breakdowns of risk by sector and identify inadequate or insufficient reports.

An earlier version of the bill did not account for the possibility that the federal government may impose a similar climate-related-risk reporting requirement. As the Senate Environmental Quality Committee's analysis notes, the Securities and Exchange Commission (SEC) is considering its own potential climate disclosure rules which may overlap with this bill's disclosures. While the SEC's rules would apply only to publicly traded companies, imposing a dual reporting requirement could unduly burden companies or result in a conflict with federal requirements. The author has accordingly amended the bill to provide that, if federal laws or regulations are enacted to require climate-risk reporting, a covered entity can comply with this bill by submitting the federally required report to the CARB, rather than creating a second report.

4.   This bill does not present a clear dormant interstate commerce clause issue

Section 8 of Article I of the United States Constitution grants the United States Congress the power to regulate interstate commerce.[9] Since the early nineteenth century, the Supreme Court has held that obverse proposition—that states may not usurp Congress's express power to regulate interstate commerce—must also be true.[10] This rule against state interference in interstate commerce, sometimes known as the dormant interstate commerce clause, serves as an absolute bar to regulations that discriminate against interstate commerce, i.e., by favoring in-state businesses or excluding out-of-state businesses.[11] But when a state passes a law that " 'regulat[es] even-handedly [across all in-state and out-of-state businesses] to effectuate a legitimate local public interest,' " that law " 'will be upheld unless the burden imposed upon such commerce is clearly excessive in relation to the putative local benefits.' "[12]

There is no facial dormant Commerce Clause issue here. This bill grants no favoritism for in-state companies—all U.S.-based companies doing business in California with

---

[8] *See* National Association of Insurance Commissioners, U.S. Insurance Commissioners Endorse Internationally Recognized Climate Risk Disclosure Standard for Insurance Companies (Apr. 2, 2022), https://content.naic.org/article/us-insurance-commissioners-endorse-internationally-recognized-climate-risk-disclosure-standard.
[9] U.S. Const., art. I, § 8, cl. 3.
[10] *See Gibbons v. Ogden* (1824) 22 U.S. 1.
[11] *E.g., Dean Milk Co. v. Madison* (1951) 340 U.S. 349, 354.
[12] *South Dakota v. Wayfair, Inc.* (2018) 138 S.Ct. 2080, 2091.

SB 261 (Stern)
Page 8 of 13

annual revenues in excess of $500 million are subject to the bill's reporting requirement. That leaves only the questions of whether the bill's reporting requirement serves a legitimate local interest, and whether the burden imposed by the reporting requirement is clearly excessive in relation to the benefits conferred.

5.   Arguments in support

According to Ceres, the bill's sponsor:

> Climate change poses a significant risk to our long-term economic success, impacts the health and livelihood of the communities in which we operate and live, and disrupts the value chains on which we rely. Consistent, comparable, and reliable information at scale is necessary to fully assess companies' risk exposure and to navigate the path to a net-zero future.

> Companies need to invest in climate disclosure analysis and reporting because ignoring the risks will be very costly, while finding the path towards a net-zero future offers economic stability and growth. The current state of voluntary climate disclosure is inadequate for meeting rapidly accelerating climate risks, and the SEC's climate risk disclosure would only apply to publicly traded US entities. Climate disclosure is needed from non-listed actors as well. SB 261 sets the bar on robust, multi-sector disclosure and holds companies accountable for managing climate risk to ensure a sustainable, resilient, and prosperous future for California.

6.   Arguments in opposition

According to a coalition of over 50 organizations writing in opposition:

> By mandating an annual report in accordance with the Final Recommendations of the Task Force on Climate-Related Financial Disclosures, SB 261 is itself in conflict with the recommendations. The recommendations are designed to be voluntary and to maintain the standard of materiality, the report notes that "any disclosure recommendations by the Task Force would need to be voluntary, would need to incorporate the principle of materiality and would need to weigh the balance of costs and benefits." The recommendations also assert the need for flexibility. Further the report acknowledges the importance of a deliberate transition, noting that "As understanding, data analytics, and modeling of climate-related issues becomes more widespread, disclosures can mature accordingly." Unfortunately, SB 261 was drafted with a degree of rigidity that doesn't allow for flexibility based on the maturation of our understanding of data collection and analytics as noted in the Task Force's own findings.

SB 261 (Stern)
Page 9 of 13

The Task Force's recommendations seem to be designed to offer guidance to those in the business community on how best to mitigate risk, yet the approach taken by SB 261 would actually impose the greatest amount of risk on those most susceptible to financial uncertainty: the small business community. SB 261 takes a one-size fits all approach to the business community and applies a reporting standard that would impact a broad array of businesses here in California. The Task Force's own findings note that there should be a proportional approach to developing disclosure requirements to ensure that smaller organizations are not subject to risk. Risk that the report clearly identifies in the form of "litigation given the high degree of uncertainty around future timing and magnitude of climate-related impacts." While larger institutions might be able to assume that risk, that is often not the case for smaller businesses here in California. And, at an even more granular level, the impact to the small business community will vary based on geographic location, which is not accounted for in this proposal. Unfortunately, SB 261 does not follow the guidance offered in the report and puts the small business community at risk writ large.

## SUPPORT

Ceres (sponsor)
350 Bay Area Action
350 Conejo/San Fernando Valley
350 Humboldt
350 Juneau
350 Marin
350 Sacramento
350 South Bay Los Angeles
350 Southland Legislative Alliance
350 Ventura County Climate Hub
Alter Eco
Americans for Financial Reform
Avocado Green
Ban SUP (Single Use Plastic)
California Environmental Voters
California State Teachers' Retirement System (CalSTRS)
CALPIRG
Catholic Network US (Colorado)
Center for Biological Diversity
Citizens' Climate Lobby, Sacramento/Roseville Chapter
Climate 911
Climate Action California
Climate Action Campaign, Humboldt
Climate Hawks Vote

SB 261 (Stern)
Page 10 of 13

Climate Reality Project, Los Angeles
Climate Reality Project, San Fernando Valley
Coalition for Clean Air
Coastside Jewish Community
Colorado Businesses for a Livable Climate
Community for Sustainable Energy
Conejo Climate Coalition
Cool Planet Group of First Presbyterian Church, Palo Alto
Divest Oregon
DSM North America
E2
East Valley Indivisibles
Environment California
Environmental Defense Fund
Extinction Rebellion San Francisco Bay Area
Fossil Free California
Friends Committee on legislation of California
Friends of the Earth
Giniw Collective
Glendale Environmental Coalition
Greater New Orleans Housing Alliance
Grove Collaborative
Honor the Earth
Indivisible Alta Pasadena
Indivisible Ambassadors (Colorado)
Indivisible California Green Team
Indivisible California: StateStrong
Leading Change Consulting and Coaching
Littleton Business Alliance
Mental Health & Inclusion Ministries
Mind Eye World
Mothers Out Front California
Natural Resources Defense Council
North Range Concerned Citizens
Oil & Gas Action Network
Peninsula Interfaith Climate Action
Public Citizen
RapidShift Network
San Fernando Valley Climate Reality
San Francisco Bay Physicians for Social Responsibility
Santa Cruz Climate Action Network
Save EPA
Sierra Club California

SB 261 (Stern)
Page 11 of 13

Sierra Nevada Brewing Co.
Silicon Valley Youth Climate Action
SoCal 350 Climate Action
SolidarityINFOService
Southwest Organization for Sustainability
Spirit of the Sun, Inc.
Stand.earth
System Change Not Climate Change
The Climate Center
The Phoenix Group
The Vessel Project of Louisiana
Third Act
Transformative Wealth Management, LLC
Trinity Respecting Earth and Environment
Union of Concerned Scientists
Urban Ecology Project

## OPPOSITION

Advanced Medical Technology Association
African American Farmers of California
Agricultural Energy Consumers Association
American Beverage Association
American Composites Manufacturers Association
American Pistachio Growers
Antelope Valley Chambers of Commerce
Auto Care Association
Building Owners and Managers Association
California Advanced Biofuels Alliance
California Apartment Association
California Apple Commission
California Asphalt Pavement Association
California Blueberry Association
California Blueberry Commission
California Building Industry Association
California Business Properties Association
California Chamber of Commerce
California Construction and Industrial Materials Association
California Cotton Ginners and Growers Association
California Credit Union League
California Date Commission
California Fresh Fruit Association
California Fuels and Convenience Alliance
California Hispanic Chamber of Commerce

**SER 2394**

SB 261 (Stern)
Page 12 of 13

California Independent Petroleum Association
California Life Sciences
California Manufacturers & Technology Association
California Poultry Federation
California Retailers Association
California Walnut Commission
Can Manufacturers Institute
Carlsbad Chamber of Commerce
CAWA
Chino Valley Chamber of Commerce
Citrus Heights Chamber
Costa Mesa Chamber of Commerce
Danville Area Chambers of Commerce
Far West Equipment Dealers Association
La Cañada Flintridge Chamber of Commerce
Long Beach Area Chamber of Commerce
Los Angeles Area Chamber of Commerce
National Association of Industrial and Office Properties
Nisei Farmers League
North San Diego Chamber of Commerce
Oceanside Chamber of Commerce
Olive Growers Council of California
Orange County Business Council
Palos Verdes Peninsula Chamber of Commerce
Rancho Cordova Chamber of Commerce
Santa Barbara South Coast Chamber of Commerce
Securities Industry and Financial Markets Association
Southern California Leadership Council
Specialty Equipment Market Association
The Greater High Desert Chamber of Commerce
Torrance Area Chamber of Commerce
Walnut Creek Chamber of Commerce
West Precast Prestressed Concrete Institute
West Ventura County Business Alliance
Western Agricultural Processors Association
Western Growers Association
Western Plant Health Association
Western States Petroleum Association
Wine Institute

SB 261 (Stern)
Page 13 of 13

## RELATED LEGISLATION

Pending Legislation:

SB 253 (Wiener, 2023) requires any partnership, corporation, limited liability company, or other U.S. business entity with total annual revenues in excess of one billion dollars and that does business in California to publicly report their annual greenhouse gas (GHG) emissions, as specified by the CARB. SB 253 is pending before this Committee and is scheduled to be heard on the same date as this bill.

SB 252 (Gonzalez, 2023) prohibits the boards of the Public Employees' Retirement System and the State Teachers' Retirement System from making new investments or renewing existing investments of public employee retirement funds in a fossil fuel company, as defined, and would require the boards to liquidate investments in a fossil fuel company on or before July 1, 2030. SB 252 is pending before the Senate Judiciary Committee.

Prior Legislation:

SB 449 (Stern, 2021) was substantially similar to this bill, in that it would have required certain California-based financial institutions to prepare and disclose climate-related financial risk reports disclosing the institution's climate-related financial risk and its measures to reduce and adapt to those risks and established an entity to review the institutions' reports and prepare analysis of the systemic and sector-wide climate-related financial risk. SB 449 died in the Senate Appropriations Committee.

SB 260 (Wiener, 2021) would have required the CARB to develop regulations to require a reporting entity—defined as a business entity with total annual revenues over one billion dollars that does business in California—to report to an emissions registry, as defined, their Scope 1, Scope 2, and Scope 3 emissions, as defined. The bill also would have required the ARB to prepare a report by January 1, 2026, on those disclosures, and it requires the emissions registry to establish a public data platform to view the disclosures. SB 260 died on the Assembly Floor.

SB 964 (Allen, Ch. 731, Stats. 2018) requires CalPERS and CalSTRS to make public climate-related financial risk disclosures on a triannual basis until January 1, 2035.

## PRIOR VOTES:

Senate Environmental Quality Committee (Ayes 4, Noes 2)

***************

**SER 2396**

# Exhibit 22

## California Senate Rules Committee's September 12, 2023 Analysis of S.B. 261

Declaration of Bradley J. Hamburger In Support Of
Plaintiffs' Motion for Summary Judgment on Claim I
May 24, 2024

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.*,
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)

Case 2:24-cv-00801-ODW-PVC   Document 48-25   Filed 05/24/24   Page 2 of 11   Page ID #:1301

**SENATE RULES COMMITTEE**                                                  SB 261
Office of Senate Floor Analyses
(916) 651-1520   Fax: (916) 327-4478

---

UNFINISHED BUSINESS

---

Bill No:    SB 261
Author:     Stern (D), Becker (D), Gonzalez (D) and Wiener (D), et al.
Amended:    9/8/23
Vote:       21

---

SENATE ENVIRONMENTAL QUALITY COMMITTEE:  4-2, 3/15/23
AYES:  Allen, Gonzalez, Menjivar, Skinner
NOES:  Dahle, Nguyen
NO VOTE RECORDED:  Hurtado

SENATE JUDICIARY COMMITTEE:  9-1, 4/18/23
AYES:  Umberg, Wilk, Allen, Ashby, Durazo, Laird, McGuire, Min, Wiener
NOES:  Niello
NO VOTE RECORDED:  Caballero

SENATE APPROPRIATIONS COMMITTEE:  4-2, 5/18/23
AYES:  Portantino, Ashby, Wahab, Wiener
NOES:  Jones, Seyarto
NO VOTE RECORDED:  Bradford

SENATE FLOOR:  27-8, 5/30/23
AYES:  Allen, Archuleta, Ashby, Atkins, Becker, Blakespear, Bradford, Cortese,
  Durazo, Eggman, Glazer, Gonzalez, Laird, Limón, McGuire, Menjivar, Min,
  Newman, Padilla, Portantino, Rubio, Skinner, Smallwood-Cuevas, Stern,
  Umberg, Wahab, Wiener
NOES:  Alvarado-Gil, Dahle, Grove, Jones, Nguyen, Niello, Ochoa Bogh, Seyarto
NO VOTE RECORDED:  Caballero, Dodd, Hurtado, Roth, Wilk

ASSEMBLY FLOOR:  47-17, 9/12/23 - See last page for vote

---

**SUBJECT:**  Greenhouse gases:  climate-related financial risk

**SOURCE:**  Ceres

---

SB 261
Page  2

**DIGEST:**  This bill requires companies that do business in California and have gross revenues exceeding $500 million annually, excluding insurance companies, to report on their climate-related financial risk, and requires the California Air Resources Board (CARB) to contract with a qualified climate reporting organization to review and publish an analysis of those reports, as specified.

*Assembly Amendments* delay implementation and make reporting biennial, provide for alternative methods of compliance, add the requirement for a filing fee, and direct how CARB may use civil penalties to enforce the bill.

**ANALYSIS:**

Existing law:

1) Establishes the Governor's Office of Planning and Research (OPR) as the State of California's comprehensive planning agency, and tasks it with studying future research and planning needs, fostering goal-driven collaboration, and delivering guidance to state partners and local communities, with a focus on land use and community development, climate risk and resilience, and high road economic development.

2) Provides processes and requirements related to forming business entities, such as corporations, partnerships, and limited liability companies, and requires that specified documents and instruments related to business entities be filed with the Secretary of State. (Corporations Code § 100 et seq)

3) Requires, under SB 964 (Allen, Chapter 731, Statutes of 2017), California Public Employees' Retirement System (CalPERS) and California State Teachers' Retirement System (CalSTRS) to issue financial disclosures utilizing the Taskforce on Climate-Related Financial Disclosure (TCFD) recommendations.

This bill:

1) Makes findings and declarations regarding, among other things, the importance of climate risk in effective decision-making.

2) Defines terms for the purposes of this bill, including but not limited to:

   a) "Climate-related financial risk," to mean material risk of harm to immediate and long-term financial outcomes due to physical and transition risks, including, but not limited to, risks to corporate operations, provision of goods and services, supply chains, employee health and safety, capital and

**SER 2399**

SB 261
Page 3

financial investments, institutional investments, financial standing of loan recipients and borrowers, shareholder value, consumer demand, and financial markets and economic health;

b) "Climate reporting organization," to mean a nonprofit climate reporting organization that currently operates a voluntary climate reporting organization for organizations operating in the United States and that has experience with voluntary climate-related financial risk disclosure in California; and

c) "Covered entity" to mean a corporation, partnership, limited liability company, or other U.S business entity with total annual revenues in excess of five hundred million dollars ($500,000,000) and that does business in California—excluding any business entity that is subject to regulation by the California Department of Insurance or in the business of insurance in any other state.

3) Requires, on or before January 1, 2026, and biennially thereafter, a covered entity to prepare a climate-related financial risk report disclosing its climate-related financial risk, in accordance with the recommended framework and disclosures contained in the Final Report of Recommendations of the Task Force on Climate-related Financial Disclosures (TCFD), and its measures adopted to reduce and adapt to the disclosed climate-related financial risk.

4) Requires, if a covered entity does not complete a report consistent with all required disclosures, the covered entity to provide the recommended disclosures to the best of its ability, provide a detailed explanation for any reporting gaps, and describe steps the covered entity will take to prepare complete disclosure.

5) Authorizes climate-related financial risk reports to be consolidated at the parent company level.

6) Requires CARB to contract with a climate reporting organization to biennially prepare a public report on the climate-risk disclosures required

7) Provides that a covered entity satisfies the disclosure requirements if it prepares a publicly accessible biennial report that includes climate-related financial risk disclosure information by one of the specified methods.

8) Requires, beginning January 1, 2026, and annually thereafter, a covered entity to pay an annual fee, upon filing its disclosure, to CARB for administration and implementation costs.

SB 261
Page  4

9)  Establishes the Climate-Related Financial Risk Disclosure Fund into which all fees are to be deposited.

10)  Requires CARB to adopt regulations that authorize it to seek administrative penalties from a covered entity that fails to make the report publicly available on its internet website or publishes an inadequate or insufficient report. Requires the administrative penalties to be imposed and recovered by CARB in administrative hearings. Prohibits the administrative penalties imposed on a reporting entity from exceeding $50,000 in a reporting year.

## Background

1)  *Financial risks & disclosures*. When investing money into a given asset, an investor lends money with the expectation of earning an additional return sometime in the future. Typically, the expected rate of return is a function of the risk associated with the investment; low-risk investments yield low returns, and greater risk brings greater potential returns. Managing portfolios of assets to yield predictable returns requires an accurate assessment of the risk associated with those assets and appropriate pricing of them. Especially when the scale of assets is so large (for example, BlackRock, the world's largest asset management company, has roughly $10 trillion in assets under management; nearly 10% of the gross world product), accurate risk management is essential. If companies and investors do not have access to sufficient information, they may misprice climate-related assets and create financial instability.

2)  *Task Force on Climate-Related Financial Disclosures (TCFD)*. In 2015, after the G20 summit concluded there was insufficient information for the financial sector surrounding climate risk, the Financial Stability Board (FSB) established the Task Force on Climate-Related Financial Disclosures (TCFD). The TCFD sought to develop recommendations for voluntary climate-related financial disclosures that were consistent, comparable, reliable, clear, efficient, and provide decision-useful information. This report was published in 2017 in order to enable investors and other stakeholders to accurately assess companies' climate-related financial risk.

The disclosure recommendations are structured around four pillars of how organizations operate: governance, strategy, risk management, and metrics and targets. In late 2020, the UK became the first country in the world to mandate economy wide disclosures in line with the TCFD recommendations. The process began in 2021 with the largest pension schemes and financial institutions, and it will gradually expand to include smaller firms and broader entities over the next two years.

SB 261
Page  5

**Comments**

1) *Purpose of Bill.* According to the author, "It is abundantly clear the worsening
effects of climate change pose numerous environmental risks that include
extreme drought, rising sea levels, catastrophic wildfires, and extreme weather
events. These impacts not only affect our environment but they also affect how
we live, what services we rely upon and which investments make the most
sense. Major corporations and financial institutions face climate related
financial risks in their business making decisions, so it is important for these
businesses and institutions to assess and share the risks they have identified, and
what efforts they are employing to mitigate them. This information is important
to provide more transparency to policy makers, investors, and shareholders as it
will result in improved decision making on where to invest private and public
dollars. Climate related financial risk disclosures are ultimately about good
business, partnerships, governance and the solutions and planning necessary to
navigate the increasing burdens of a changing climate."

2) *Who has to report?* Generally, this bill applies to companies who do business in
California and whose gross revenues exceed $500,000,000 annually. The one
notable exemption—insurance companies—is because on April 8, 2022, the
National Association of Insurance Commissioners, which includes California's
Insurance Commissioner, adopted a new standard for insurance companies to
report their climate-related risks, in alignment with TCFD. Thus, the author has
excluded business entities that are subject to regulation by the Department of
Insurance in this state, or that are in the business of insurance in any other state
from the definition of covered entity.

At the federal level, the Securities & Exchange Commission (SEC) has
proposed its own climate disclosure rules for publicly listed companies. That
proposal has yet to be adopted and excludes privately held companies. Among
the over 10,000 companies who do business in California and exceed the
$500,000,000 revenue threshold, only 20% of them are publicly traded. Thus,
there are clear advantages in the completeness and scope of the data that could
be gathered by California in enacting SB 261, regardless of the progress of the
SEC proposal. However, moving forward the author should take care to ensure
that SB 261 does not create an undue reporting burden when taken alongside
the SEC proposal.

Ultimately, the reporting requirements contemplated under SB 261 will indeed
create additional work for covered entities. However, the reports will also bring
benefits, insofar as it allows those businesses and their investors to accurately

SB 261
Page 6

price the associated risks and have a more complete picture of how their future
operations may affect—and be affected by—global climate change.

**FISCAL EFFECT:**   Appropriation:   Yes   Fiscal Com.:   Yes   Local:   No

According to the Assembly Appropriations Committee:

1) Staffing and contracting costs of approximately $5 million in fiscal year (FY)
   2023-24, $7 million in FY 2024-25, and $6.7 million in FY 2025-26 and
   ongoing (Climate-Related Financial Risk Disclosure Fund) to, among other
   tasks, identify covered entities, develop and implement regulations, develop and
   maintain a tool to support collection of covered entities' reports, develop and
   maintain a verification program, and contract with a climate reporting
   organization. This bill requires each reporting entity subject to the bill's
   requirements to pay CARB an annual fee and requires CARB to set the fee at an
   amount sufficient to cover its full costs of administering and implementing this
   bill, including reimbursing any loans made from other funds to finance CARB's
   startup costs.

2) To the extent CARB successfully seeks and recovers administrative penalties
   from a covered entity in violation of this bill, this bill could result in a potential
   increase in General Fund revenue of an unknown amount.

**SUPPORT:** (Verified 9/12/23)

Ceres (source)
1000 Grandmothers for Future Generations
350 Bay Area Action
350 Conejo / San Fernando Valley
350 Humboldt
350 Juneau
350 Marin
350 Sacramento
350 South Bay LA
350 Southland Legislative Alliance
350 Ventura County Climate Hub
Alter Eco
Americans for Financial Reform
Avocado Green Brands
Ban Sup (single Use Plastic)
California Environmental Voters

**SER 2403**

SB 261
Page  7

California Environmental Voters
California State Teachers' Retirement System
CalPIRG
Citizens Climate Lobby Sacramento / Roseville Chapter
Climate 911
Climate Action California
Climate Hawks Vote
Climate Reality Project, San Fernando Valley
Coalition for Clean Air
Coastside Jewish Community
Conejo Climate Coalition
Cool Planet Group of First Presbyterian Church, Palo Alto
Divest Oregon
Dsm North America
E2
East Valley Indivisibles
Elders Climate Action, Norcal and Socal Chapters
Environment California
Environmental Defense Fund
Extinction Rebellion San Francisco Bay Area
Fossil Free California
Friends Committee on Legislation of California
Friends of The Earth
Giniw Collective
Glendale Environmental Coalition
Grove Collaborative
Honor the Earth
Humboldt Unitarian Universalist Fellowship's Climate Action Campaign
Indivisible Alta Pasadena
Indivisible California Green Team
Indivisible California Statestrong
Leading Change Consulting and Coaching
Mothers Out Front California
Natural Resources Defense Council
Nrdc
Oil & Gas Action Network
Peninsula Interfaith Climate Action
Public Citizen, INC
Rapidshift Network
San Francisco Bay Physicians for Social Responsibility

**SER 2404**

SB 261
Page 8

Santa Cruz Climate Action Network
Sierra Club California
Sierra Nevada Brewing Company
Socal 350 Climate Action
Solidarityinfoservice
Stand.Earth
The Climate Center
The Phoenix Group
The Vessel Project of Louisiana
Third ACT
Transformative Wealth Management LLC
Trinity Respecting Earth and Environment
Union of Concerned Scientists
Urban Ecology Project
Working for Racial Equity

**OPPOSITION:** (Verified  9/12/2023)

African American Farmers of California
Agricultural Energy Consumers Association
American Composites Manufacturers Association
American Pistachio Growers
Antelope Valley Chambers of Commerce
Building Owners and Managers Association
California Advanced Biofuels Alliance
California Apartment Association
California Apple Commission
California Asphalt Pavement Association
California Blueberry Association
California Blueberry Commission
California Business Properties Association
California Chamber of Commerce
California Construction & Industrial Materials Association
California Cotton Ginners & Growers Association
California Credit Union League
California Date Commission
California Fresh Fruit Association
California Fuels and Convenience Alliance
California Independent Petroleum Association
California Manufacturers & Technology Association
California Poultry Federation

**SER 2405**

SB 261
Page  9

California Retailers Association
California Walnut Commission
Can Manufacturers Institute
Carlsbad Chamber of Commerce
Chino Valley Chamber of Commerce
Citrus Heights Chamber of Commerce
Costa Mesa Chamber of Commerce
Danville Area Chamber of Commerce
Far West Equipment Dealers Association
Greater High Desert Chamber of Commerce
LA Canada Flintridge Chamber of Commerce
Long Beach Area Chamber of Commerce
Los Angeles Area Chamber of Commerce
NAIOP California
Nisei Farmers League
North San Diego Business Chamber
Oceanside Chamber of Commerce
Olive Growers Council of California
Orange County Business Council
Palos Verdes Peninsula Chamber of Commerce
PCI West-chapter of The Precast/prestressed Concrete Institute
Rancho Cordova Chamber of Commerce
Santa Barbara South Coast Chamber of Commerce
Securities Industry and Financial Markets Association
Southern California Leadership Council
Specialty Equipment Market Association
Torrance Area Chamber of Commerce
Walnut Creek Chamber of Commerce
West Ventura County Business Alliance
Western Agricultural Processors Association
Western Growers Association
Western Plant Health Association
Western States Petroleum Association
Wine Institute

**ARGUMENTS IN SUPPORT:** According to a coalition of groups in support, "The transition to a low-carbon economy, occurring as we grapple with environmental and social harms that can't be mitigated, challenges practically every sector of the economy. Without accurate information about climate-related financial risk and a robust discussion of how to manage that risk, governments, money managers, and companies can only guess at strategies that will carry them

**SER 2406**

SB 261
Page 10

through the changes that are already underway. SB 261 requires risk reporting and public disclosure of the steps financial institutions and businesses are taking to mitigate and adapt to global climate change, and mandates ongoing consideration and study of best policy practices."

**ARGUMENTS IN OPPOSITION:** According to a coalition of groups in opposition, "The measure is premature given the amount of activity happening at the federal and international levels. Both the executive and legislative branches have served notice that changes will be happening soon in this area. The Securities and Exchange Commission is already reviewing their guidance documents on the topic and expects to provide an update shortly. There is a very real risk that compliance with SB 261 will not align with federal or the Task Force's own recommendations. The recommendations also assert that any national level requirements should preempt those at state or local levels, noting that "The Task Force's recommendations were developed to apply broadly across sectors and jurisdictions and should not be seen as superseding national disclosure requirements". The measure not only lacks compliance acknowledgement for entities subject to a federal level requirement, but it also jumps the gun by superseding national disclosure requirements that are imminent."

ASSEMBLY FLOOR:  47-17, 9/12/23
AYES:  Addis, Aguiar-Curry, Alvarez, Arambula, Bauer-Kahan, Bennett, Berman, Boerner, Bonta, Bryan, Calderon, Wendy Carrillo, Connolly, Flora, Mike Fong, Friedman, Gabriel, Garcia, Haney, Hart, Holden, Irwin, Jones-Sawyer, Kalra, Lee, Low, McCarty, McKinnor, Muratsuchi, Ortega, Pacheco, Papan, Pellerin, Petrie-Norris, Quirk-Silva, Rendon, Reyes, Luz Rivas, Santiago, Ting, Ward, Weber, Wicks, Wilson, Wood, Zbur, Robert Rivas
NOES:  Alanis, Chen, Megan Dahle, Davies, Dixon, Essayli, Vince Fong, Gallagher, Hoover, Lackey, Mathis, Jim Patterson, Joe Patterson, Sanchez, Ta, Waldron, Wallis
NO VOTE RECORDED:  Bains, Juan Carrillo, Cervantes, Gipson, Grayson, Jackson, Lowenthal, Maienschein, Stephanie Nguyen, Ramos, Rodriguez, Blanca Rubio, Schiavo, Soria, Valencia, Villapudua

Prepared by:  Eric Walters / E.Q. / (916) 651-4108
9/12/23 19:10:59

**\*\*\*\* END \*\*\*\***

SER 2407