No. 25A___

# In the

# Supreme Court of the United States

———————————

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,
CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION,
LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS
FEDERATION, and WESTERN GROWERS ASSOCIATION,

*Applicants,*

*v.*

LAUREN SANCHEZ, in her official capacity as Chair of the California Air Resources
Board, STEVEN S. CLIFF, in his official capacity as the Executive Officer of the
California Air Resources Board, and ROBERT A. BONTA, in his official capacity as
Attorney General of California,

*Respondents.*

———————————

**EMERGENCY APPLICATION
FOR INJUNCTION PENDING APPEAL
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

———————————

TARA S. MORRISSEY
JENNIFER B. DICKEY
STEPHANIE A. MALONEY
KEVIN R. PALMER
U.S. CHAMBER LITIGATION CENTER
1615 H St., N.W.
Washington, DC 20062
(202) 659-6000

*Counsel for Applicant
Chamber of Commerce of the
United States of America*

EUGENE SCALIA
  *Counsel of Record*
JONATHAN C. BOND
BRIAN A. RICHMAN
GIBSON, DUNN & CRUTCHER LLP
1700 M St., N.W.
Washington, DC 20036
(202) 955-8500
EScalia@gibsondunn.com

BRADLEY J. HAMBURGER
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071
(213) 229-7000

*Counsel for Applicants*

**PARTIES TO THE PROCEEDING AND RULE 29.6 STATEMENT**

1.      All parties to the proceeding are named in the caption.  Applicants are the plaintiffs before the district court and the appellants in the court of appeals.  Respondents are defendants before the district court and appellees in the court of appeals.*

2.      Applicants have no parent corporation, and no publicly held company owns 10% or more of their stock.

---

     *  Former Chair of the California Air Resources Board Liane M. Randolph was originally named as a defendant.  Upon becoming the Chair of the California Air Resources Board on October 1, 2025, Lauren Sanchez was automatically substituted under this Court's Rule 35.3.

## RELATED PROCEEDINGS

United States District Court (C.D. Cal.):

> *Chamber of Commerce of the United States of America* v. *California Air Resources Board*, No. 24-cv-801 (Aug. 13, 2025) (order denying preliminary injunction)

United States Court of Appeals (9th Cir.):

> *United States of America Chamber of Commerce* v. *Randolph*, No. 25-5327 (appeal docketed Aug. 21, 2025)

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................... 2

OPINIONS BELOW ......................................................................... 6

JURISDICTION................................................................................ 7

CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED...................... 7

STATEMENT.................................................................................... 7

      A.     California's "Climate Accountability Package" ................... 7

           1.     Senate Bill 261................................................ 8

           2.     Senate Bill 253................................................ 11

      B.     Procedural History ........................................................ 15

ARGUMENT .................................................................................. 17

I.     Applicants Are Likely To Succeed On The Merits........................ 20

     A.     These Mandates Are Not Commercial Speech .................... 23

     B.     The Laws Fail Under Any Level Of Scrutiny...................... 26

           1.     The Laws Fail Under *Central Hudson* ...................... 26

                  a.     California's "Fraud Prevention" Theory Collapses......... 28

                  b.     The State's Emissions-Reduction Rationale Cannot Justify Its Compelled Climate Reports........................... 31

                  c.     The State's Asserted Interest In "Transparency" Is Not A Legitimate Basis For Compelling Speech ........... 33

           2.     *Zauderer* Cannot Save California's Speech Mandates............. 35

II.    Absent An Immediate Injunction, Applicants Face Irreparable Harm......... 37

III.   The Public Interest and Equities Favor An Injunction................. 39

CONCLUSION................................................................................ 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*44 Liquormart, Inc.* v. *Rhode Island,*
    517 U.S. 484 (1996) ......................................................................... 32

*303 Creative LLC* v. *Elenis,*
    600 U.S. 570 (2023) ....................................................................... 3, 4

*Alabama Association of Realtors* v. *HHS,*
    594 U.S. 758 (2021) ......................................................................... 39

*American Meat Institute* v. *USDA,*
    760 F.3d 18 (D.C. Cir. 2014) ....................................................... 25, 33

*Ardoin* v. *Robinson,*
    142 S. Ct. 2892 (2022) ..................................................................... 6

*Bolger* v. *Youngs Drug Products Corp.,*
    463 U.S. 60 (1983) ....................................................................... 24, 25

*Central Hudson Gas & Electric Corp.* v. *Public Service Commission of
    New York,*
    447 U. S. 557 (1980) ....................................................................... 26

*City of Cincinnati* v. *Discovery Network, Inc.,*
    507 U.S. 410 (1993) ......................................................................... 23

*City of Ladue* v. *Gilleo,*
    512 U.S. 43 (1994) ........................................................................... 34

*City of San Francisco* v. *Coinbase, Inc.,*
    981 F.3d 757 (9th Cir. 2020) ............................................................ 40

*Edenfield* v. *Fane,*
    507 U.S. 761 (1993) ................................................................ 23, 31, 32

*Florida Bar* v. *Went For It, Inc.,*
    515 U.S. 618 (1995) ......................................................................... 23

*Harris* v. *Quinn,*
    573 U.S. 616 (2014) ......................................................................... 23

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*International Dairy Foods Association* v. *Amestoy*,
  92 F.3d 67 (2d Cir. 1996) ........................................................................ 34

*Janus* v. *American Federation of State, County, & Municipal Employees, Council 31*,
  585 U.S. 878 (2018) ................................................................... 3, 22, 35

*Lorillard Tobacco Co.* v. *Reilly*,
  533 U.S. 525 (2001) ................................................................................ 23

*Mahmoud* v. *Taylor*,
  606 U.S. 522 (2025) ................................................................................ 39

*McCullen* v. *Coakley*,
  573 U.S. 464 (2014) ................................................................................ 30

*Moyle* v. *United States*,
  144 S. Ct. 540 (2024) ................................................................................ 6

*National Association of Wheat Growers* v. *Bonta*,
  85 F.4th 1263 (9th Cir. 2023) ............................................................ 30, 32

*National Federation of Independent Business* v. *OSHA*,
  595 U.S. 109 (2022) ................................................................................ 39

*National Institute of Family & Life Advocates* v. *Becerra*,
  585 U.S. 755 (2018) ........................ 3, 4, 20, 21, 22, 23, 26, 27, 28, 30, 31, 34, 35, 36

*National Institutes of Health* v. *American Public Health Association*,
  No. 25A103 (Aug. 21, 2025) .................................................................... 38

*NetChoice, LLC* v. *Bonta*,
  113 F.4th 1114 (9th Cir. 2024) ............................................................ 25

*NFIB* v. *Department of Labor, OSHA*,
  142 S. Ct. 736 (2021) ................................................................................ 6

*Nken* v. *Holder*,
  556 U.S. 418 (2009) ................................................................................ 39

*Ohio* v. *EPA*,
  144 S. Ct. 538 (2023) ................................................................................ 6

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Pacific Frontier* v. *Pleasant Grove City*,
    414 F.3d 1221 (10th Cir. 2005) ........................................................ 39

*Roman Catholic Diocese of Brooklyn* v. *Cuomo*,
    592 U.S. 14 (2020) ........................................................... 18, 37

*Rubin* v. *Coors Brewing Co.*,
    514 U.S. 476 (1995) ............................................................ 23, 32

*Ruckelshaus* v. *Monsanto Co.*,
    463 U.S. 1315 (1983) .............................................................. 40

*Tandon* v. *Newsom*,
    593 U.S. 61 (2021) ................................................................ 18

*Trump* v. *New Jersey*,
    No. 24A886 (Apr. 17, 2025) ......................................................... 6

*United States* v. *Alvarez*,
    567 U.S. 709 (2012) ............................................................... 19

*United States* v. *Stevens*,
    559 U.S. 460 (2010) ............................................................... 26

*Village of Schaumburg* v. *Citizens for a Better Environment*,
    444 U.S. 620 (1980) ............................................................... 30

*Zauderer* v. *Office of Disciplinary Counsel*,
    471 U.S. 626 (1985) ............................................. 3, 16, 23, 26, 31, 35, 36

**Statutes**

28 U.S.C.
    § 1254 ........................................................................... 7
    § 1292 ........................................................................... 7
    § 1651 ......................................................................... 1, 7
    § 2101 ........................................................................... 7

Act of Sept. 27, 2024, ch. 766 (Cal.) ............................................. 40

Cal. Health & Safety Code
    § 38532 .............................................................. 7, 8, 11, 12, 13, 14
    § 38533 ............................................................... 7, 8, 9, 10, 11

vi

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

**Other Authorities**

Sen. Scott Wiener, *Press Release: Senator Wiener's First-in-the-Nation Climate Corporate Carbon Disclosure Bill Heads to the Governor* (Sept. 12, 2023) ........................................................................... 7

Sup. Ct. R. 22 ...................................................................................... 1

# In the
# Supreme Court of the United States

No. 25A___

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,
CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION,
LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS
FEDERATION, and WESTERN GROWERS ASSOCIATION,

*Applicants*,

*v.*

LAUREN SANCHEZ, in her official capacity as Chair of the California Air Resources
Board, STEVEN S. CLIFF, in his official capacity as the Executive Officer of the
California Air Resources Board, and ROBERT A. BONTA, in his official capacity as
Attorney General of California,

*Respondents*.

## EMERGENCY APPLICATION
## FOR INJUNCTION PENDING APPEAL
## TO THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

Pursuant to Rule 22 of this Court and the All Writs Act, 28 U.S.C. § 1651(a),

Applicants Chamber of Commerce of the United States of America et al. respectfully

seek an emergency injunction prohibiting enforcement of California Senate Bills 261

and 253 as to Applicants' members pending resolution of their appeal from the denial

of a preliminary injunction and—if the court of appeals affirms the denial of a pre-

liminary injunction—pending the filing and disposition of a petition for certiorari and

any further proceedings in this Court.

1

**INTRODUCTION**

In less than eight weeks, California will compel thousands of companies across the Nation to speak on the deeply controversial topic of climate change. Beginning January 1, 2026, California Senate Bill (SB) 261 will require covered businesses to publish extensive, state-prescribed reports on a wide range of climate-related topics. The reports must be published on each company's website and must evaluate such "climate-related" risks as droughts, cyclones, and rising sea levels. They must also assess the steps governments might take in response to those risks and analyze how those hypothetical governmental responses—and customers' reactions—could affect the company decades into the future. Six months later, a companion statute (SB 253) will pile on still more speech mandates, requiring companies to report emissions generated by their own operations and by the energy they purchase—and eventually the emissions of everyone in their value chain, from suppliers to employees and customers.

Both laws are part of California's open campaign to force companies into the public debate on climate issues and pressure them to alter their behavior. The laws compel businesses to speak on climate change—even if they have said nothing about climate, emissions, or sustainability in the past. SB 261 forces companies to opine on future climate events and policies and the adequacy of their climate-related strategies. SB 253 forces companies to quantify—and attribute to themselves—emissions from their own and their partners' operations. The statutes' overt object, in the words of their sponsors, is to "make sure that the public actually knows who's green and

2

who isn't," with the goal that businesses will be "embarrassed by" the public statements California forces them to make.  D. Ct. Doc. 48-4, at 2; D. Ct. Doc. 48-5, at 3, 30.

These laws violate the First Amendment.  No State may violate First Amendment rights to set climate policy for the Nation.  Compelled-speech laws are presumptively unconstitutional—especially where, as here, they dictate a value-laden script on a "controversial subjec[t] such as climate change." *Janus* v. *American Federation of State, County, & Municipal Employees, Council 31*, 585 U.S. 878, 913 (2018).  The government "may not compel a person to speak its own preferred messages." *303 Creative LLC* v. *Elenis*, 600 U.S. 570, 586 (2023).  Such compulsion is "'presumptively unconstitutional'"—and invalid unless it survives strict scrutiny. *National Institute of Family & Life Advocates* v. *Becerra*, 585 U.S. 755, 766 (2018) (*NIFLA*).

California has never argued that SB 261 or SB 253 can surmount that high bar.  Instead, the State contends that each statute regulates "commercial speech" and so is subject to a less searching First Amendment standard.  But the compelled statements here are nothing like commercial speech as this Court has defined it.  Each law compels extensive, standalone statements on controversial climate matters—untethered to any product, service, or transaction.  And neither law bears any resemblance to the clarifying disclosures this Court has upheld under the limited rule of *Zauderer* v. *Office of Disciplinary Counsel*, 471 U.S. 626 (1985).  What California really seeks is to transform the commercial-speech doctrine—or invent a new category

3

of second-class speech, an incursion which this Court rejected in *NIFLA*, 585 U.S. at 773.

Neither statute, moreover, is tailored to any legitimate end. California first invokes a fraud-prevention rationale, but that is a demonstrable misfit. SB 261 and SB 253 apply regardless of whether a company has ever spoken about climate issues, and the State has no evidence of deception its laws are needed to correct. California next asserts that the mandates will reduce greenhouse-gas emissions. But it has identified no evidence that the speech it compels will produce any measurable effect on emissions. Finally, California cites a generalized interest in "transparency." But that abstract preference is no legitimate ground for compelled speech—particularly where the State has shown no actual investor or consumer need for the breadth of information it has ordered companies to publish. Even California's Governor recognized that the laws were too broad (while signing them nonetheless). These defects—insufficient justification and overbroad means—leave California no basis for "seek[ing] to compel a person to speak its message when he would prefer to remain silent," or "forc[ing] an individual to include other ideas with his own speech that he would prefer not to include." *303 Creative*, 600 U.S. at 586.

Without this Court's immediate intervention, California's unconstitutional efforts to slant public debate through compelled speech will take effect and inflict irreparable harm on thousands of companies across the country. SB 261 reports must be posted by January 1; the State's reporting portal opens December 1. SB 253 is set to take effect six months later. The First Amendment rights of Applicants' members

will be irreparably injured in less than eight weeks, and costly preparations to comply with both laws—already underway—cannot be recovered.

Yet the Ninth Circuit—fully aware of the statutory deadlines, and given ample time to intervene—has chosen not to act. After the district court denied Applicants' motion for an injunction pending appeal, Applicants promptly sought that relief from the court of appeals, requesting a decision by November 3, so that any proceedings in this Court would not be unduly compressed. Yet the court of appeals took no action until Applicants' time-sensitive motion had been fully briefed for three weeks. At that point, the motions panel referred the motion to a merits panel that had yet to be constituted. Applicants then filed an emergency motion to assign the case to a merits panel that could promptly take up their injunction motion—and informed the Ninth Circuit of their intent to seek relief from this Court on November 10. The court of appeals ordered assignment of a merits panel and set oral argument in the appeal for January 9—*after* SB 261's mandate takes effect. As of this filing, the merits panel has not acted on Applicants' motion for an injunction pending appeal.

Relief from this Court is now the only recourse for Applicants' thousands of affected members. Applicants amply satisfy the Court's settled standard. They are very likely to succeed on the merits—and to secure this Court's review if the Ninth Circuit affirms the denial of a preliminary injunction. Their members' loss of First Amendment freedoms is inherently irreparable; the speech, once compelled, cannot be undone. And the balance of equities is lopsided in their favor. California cannot credibly claim an urgent public need to have its challenged laws in operation: Those

5

novel statutes have never been in force; the State has repeatedly delayed (and missed its own deadlines for) their implementation; and it has no evidence of any urgent need.

For all of these reasons, the Court should grant an injunction of SB 261 and SB 253 as to Applicants' members pending appeal of the denial of a preliminary injunction to the Ninth Circuit and, if that court affirms denial of an injunction, pending the filing and disposition of a petition for a writ of certiorari and any further proceedings in this Court. If the Court deems it appropriate, it could set the application for oral argument. See, *e.g.*, Order, *Trump* v. *New Jersey*, No. 24A886 (Apr. 17, 2025) (deferring consideration of stay applications pending oral argument); see also, *e.g.*, *Ohio* v. *EPA*, 144 S. Ct. 538 (2023) (same); *NFIB* v. *Department of Labor, OSHA*, 142 S. Ct. 736 (2021) (same). Alternatively, the Court should construe this application as a petition for a writ of certiorari before judgment to review the denial of a preliminary injunction, grant the petition, and issue an injunction pending its plenary review. See, *e.g.*, *Moyle* v. *United States*, 144 S. Ct. 540 (2024) (granting stay and certiorari before judgment); *Ardoin* v. *Robinson*, 142 S. Ct. 2892 (2022) (same). Either way, the Court should not allow California to conscript thousands of companies across the country to speak against their will even before Applicants' entitlement to a preliminary injunction is fully adjudicated.

## OPINIONS BELOW

The district court's orders denying a preliminary injunction (App. 6a-46a) and an injunction pending appeal (App. 1a-5a) are not published in the Federal Supple-

ment but are available at 2025 WL 2337209 and 2025 WL 2624363, respectively. The Ninth Circuit has not yet issued a decision on the merits of Applicants' appeal or request for an injunction pending appeal.

## JURISDICTION

The district court denied Applicants' motion for a preliminary injunction on August 13, 2025. App. 6a. Applicants timely appealed that order to the United States Court of Appeals for the Ninth Circuit under 28 U.S.C. § 1292(a)(1). The court of appeals has not yet issued a decision in the appeal. The jurisdiction of this Court over a petition for a writ of certiorari to review a decision in that appeal would be invoked under 28 U.S.C. § 1254(1), and the Court's jurisdiction to grant a writ of certiorari before judgment may be invoked under 28 U.S.C. § 2101(e). The Court's jurisdiction to issue an injunction pending appeal is invoked under 28 U.S.C. § 1651(a).

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

The text of the First and Fourteenth Amendments to the United States Constitution is reproduced in the Appendix to this application. App. 239a-241a.

SB 261 is codified (as amended) at § 38533 of the California Health and Safety Code and reproduced at App. 265a-268a. SB 253 is codified (as amended) at § 38532 of the California Health and Safety Code and reproduced at App. 252a-257a.

## STATEMENT

### A.    California's "Climate Accountability Package"

California Senate Bills 253 and 261—collectively described by their sponsors as the State's "Climate Accountability Package" (D. Ct. Doc. 48-4, at 2; Sen. Wiener Sept. 12, 2023 Press Release, https://perma.cc/EBL4-EJCQ)—compel thousands of

companies to speak publicly on climate change, whether or not they have entered (or wish to enter) the public debate, have investors in California, or sell products in the State. The statutes apply to any company with sufficient revenue and minimal contacts with California—defined simply as "do[ing] business in" the State—and contain no de minimis exception. Cal. Health & Safety Code §§ 38532(b)(2), 38533(a)(4). The two statutes operate in tandem: SB 261 compels narrative climate-related statements, while SB 253 mandates quantitative estimates of a company's purported emissions. The legislature's stated purpose in enacting these laws was not to correct deception. Rather, in their sponsors' words, both laws endeavor to "make sure that the public actually knows who's green and who isn't," D. Ct. Doc. 48-5, at 3, and what companies are responsible for "destroying our planet," D. Ct. Doc. 48-10, at 8—providing what the State calls "accountability through transparency," Resp. C.A. Br. 28 (emphasis omitted).

### 1.    Senate Bill 261

SB 261 requires covered companies to publish, biennially, a "climate-related financial risk" report. Cal. Health & Safety Code § 38533(b)(1)(A). The law is expected to cover more than 10,000 companies (D. Ct. Doc. 48-25, at 5; D. Ct. Doc. 48-27, at 6)—specifically, any company with over $500 million in revenue that "does business in California." § 38533(a)(4). There is no de minimis exception. See *ibid.*

The report's contents are dictated by the Task Force on Climate-related Financial Disclosures (Task Force), a private entity, which issued a "Final Report" (Task Force Report) that SB 261 incorporates by reference. See § 38533(b)(1)(A)(1). The

8

Task Force Report was developed by international financial and corporate officials—including from foreign state actors such as the Canada Pension Plan Investment Board and the Industrial and Commercial Bank of China. App. 99a-100a. It was designed as a "voluntary framework" that companies could choose to adopt (or not). D. Ct. Doc. 54-20, at 124. But SB 261 repurposes that voluntary framework as a mandate, § 38533(b)(1)(A)(1), making its roughly 30,000 words of detailed instructions (App. 47a-121a) compulsory for every covered company, regardless of industry, size, or operations.

The Task Force Report's framework directs companies to prepare "comprehensive," "specific," and "complete" "narrative explanations" on a wide range of climate-related topics. App. 107a. It divides the required reports into four categories: governance, strategy, risk management, and "metrics and targets." App. 52a. The framework requires companies to describe physical and environmental conditions associated with climate change—such as "[r]ising sea levels," "droughts," "floods," "fires," "cyclones," and other "extreme weather events"—and discuss long-term "temperature" and "precipitation" trends. App. 65a, 117a. Companies must also address government "[p]olicy actions" and "[t]echnological improvements or innovations" related to climate change, including anticipated carbon taxes, emission caps, electrification, and renewable-energy development. App. 60a-61a.

The framework further requires discussion of social and political developments related to the climate. These include "community perceptions" and "reputational" pressures, and the "opportunities" expected to arise from the shift to low-emission

9

technologies and markets. App. 61a-62a. The Task Force Report labels these "physical and environmental" risks (stemming from environmental change) and "transition" risks (arising from regulatory, technological, and market shifts). App. 60a-61a.

In addition, each company must conduct and publicly report a "scenario analysis"—an exercise requiring it to model and publish predictions about how climate change, and government and market responses to that change, might unfold over the coming decades. App. 80a; see also D. Ct. Doc. 122-2, at 31. The Task Force Report describes this as a way of "identifying and assessing the potential implications of a range of plausible future states under conditions of uncertainty." App. 80a. It acknowledges that these "[s]cenarios are hypothetical constructs and not designed to deliver precise outcomes or forecasts." *Ibid.* The framework directs companies to posit and analyze multiple specified scenarios—for example, one that assumes global warming is limited to two degrees Celsius or less—and to assess how the company's results would change under each set of assumptions. App. 53a, 82a-83a. These assumptions must include predictions about the severity of climate change, future regulatory policies, technological innovation, and the reactions of markets and consumers. See App. 82a-83a. The Task Force Report further acknowledges that most such scenarios "have been developed for global and macro assessments * * * to inform policy makers" and that the supporting data are incomplete. App. 85a.

SB 261 requires every covered company to post these forward-looking narratives "on its own internet website," publicly forecasting the potential effects of climate change, government action, and social or market behavior over future decades. Cal.

10

Health & Safety Code § 38533(c)(1). The State's "reporting portal" opens December 1, 2025, and reports must be published by January 1, 2026. D. Ct. Doc. 122-1, at 4; D. Ct. Doc. 122-3, at 1. Failure to make the required reports is punishable by civil penalties. See § 38533(f)(2).

### 2. Senate Bill 253

Senate Bill 253—titled the Climate Corporate Data Accountability Act, see Cal. Health & Safety Code § 38532(a)—is the second component of California's "Climate Accountability Package." Like SB 261, it is explicitly premised on "accountability through transparency." Resp. C.A. Br. 28 (emphasis omitted). The Legislature declared that Californians "have a right to know" the greenhouse-gas emissions of companies "benefiting from doing business in the state." SB 253 § 1(j) (session law); D. Ct. Doc. 48-16, at 4. The bill's advocates explained that this climate-change reporting regime would allow regulators and the public to "hold [companies] accountable" for their part in causing climate change. D. Ct. Doc. 48-12, at 2.

SB 253 is expected to cover more than 5,000 companies (D. Ct. Doc. 48-17, at 2; D. Ct. Doc. 48-11, at 6)—specifically, any company with more than $1 billion in revenue that "does business in California." Cal. Health & Safety Code § 38532(b)(2). By June 2026, each covered company must report greenhouse-gas emissions in two categories: direct emissions from the company's own operations (Scope 1); and indirect emissions from purchased electricity or energy (Scope 2). See § 38532(b)(3)-(4), (c)(1), (c)(2)(A)(i)(I); D. Ct. Doc. 122-2, at 35; D. Ct. Doc. 122-3, at 4. Beginning in 2027, companies must also "publicly disclose" all other indirect emissions throughout

11

their value chains, including from their suppliers, contractors, and customers (Scope 3). See Cal. Health & Safety Code § 38532(b)(5), (c)(1), (c)(2)(A)(II).

SB 253 directs the California Air Resources Board to require these reports "in conformance with" the Greenhouse Gas Protocol Corporate Accounting and Reporting Standard. Cal. Health & Safety Code § 38532(c)(2)(A)(ii). That international framework, developed by the World Resources Institute and the World Business Council for Sustainable Development (App. 126a), is the same voluntary guide used by multinational environmental organizations such as the World Wildlife Fund to promote global accountability (see App. 128a).

Despite its repeated emphasis on "measur[ing] and report[ing]" greenhouse-gas emissions, SB 253 does not call for actual measurement. Cal. Health & Safety Code § 38532(c)(2)(A)(ii). As the Greenhouse Gas Protocol acknowledges, companies instead "estimat[e]" emissions indirectly, App. 132a—using various assumptions about how different inputs relate to emissions, App. 166a, 177a-178a. The Protocol explains that results depend on numerous choices about methodologies and datasets; that scientific, model, and parameter uncertainty are inherent (App. 178a-179a); and that even "estimates of uncertainty" are "themselves considered highly uncertain" (App. 180a).

As a result, the information that SB 253 requires companies to report is highly subjective. Different companies may produce materially different estimates, even for similar operations. The Protocol itself attributes this consequence to the fact that, "[u]nlike financial accounting," the estimation of corporate greenhouse-gas emissions

12

involves "scientific and engineering complexity"; variation and uncertainty are inherent in companies' choices of models and parameters. App. 173a, 179a. SB 253 nevertheless requires that these estimates be reported as facts. Companies must submit them for third-party "assurance" by a verifier approved by the State, and "publicly disclose" them in an online database maintained by the Board or a Board-approved non-profit. See Cal. Health & Safety Code § 38532(c)(2)(F); (c)(1), (c)(2)(A)(i)-(ii), (e)(1).

The statute requires companies to report their total greenhouse-gas emissions—not emissions per unit of output. See Cal. Health & Safety Code § 38532(b)(3)-(5). And it forbids them from counting "avoided emissions," meaning emissions that would have occurred but for a product's efficiency or innovation. D. Ct. Doc. 48-21, at 80; see also D. Ct. Doc. 78-3, at 6-7; D. Ct. Doc. 90, at 24. The result is that reports reflect a company's overall size, not its efficiency or its actual contribution to reducing emissions. For example, a business that cuts the emissions from *each unit* by half, but sells more units (perhaps even as a result), will appear worse in its SB 253 report than a less efficient competitor that makes and sells fewer units with higher per-unit emissions. The system thus measures scale, not performance; the largest and most productive companies report the largest totals. SB 253 treats those totals as proof of "accountability" (Resp. C.A. Br. 28), even when innovation and efficiency gains have lowered real-world emissions (D. Ct. Doc. 78-3, at 6-7).

SB 253 also requires each company to claim as "*its* emissions" those of other persons and entities. Cal. Health & Safety Code § 38532(c)(2)(A)(ii) (emphasis

13

added). A company's "Scope 2" and "Scope 3" emissions include emissions by others—from power plants that generate the company's purchased energy, and from others throughout its value chain, including suppliers, employees, and customers. See § 38532(b)(4), (5). The State defines those emissions as "the reporting entity's" emissions. § 38532(c)(1). That attribution is intended to address what the law calls the public's "right to know" which companies are responsible for "carbon pollution." SB 253 § 1(j) (session law); D. Ct. Doc. 48-16, at 4.

Companies that fail to publish the required reports—"their carbon footprint," as the bill's sponsor put it, "because they think they're going to be embarrassed by it"—are subject to civil penalties. D. Ct. Doc. 48-5, at 30; see also Cal. Health & Safety Code § 38532(f)(2)(A).

*   *   *

Compliance with these mandates is already imposing substantial costs. The State has instructed companies to "move toward full compliance as quickly as possible." D. Ct. Doc. 78-7, at 6-8. Applicants' members have begun hiring consultants, building emissions-accounting systems, and preparing the required narrative and data reports well in advance of the first filing deadlines. See, *e.g.*, D. Ct. Doc. 78-3, at 5-8; D. Ct. Doc. 78-4, at 2-3; D. Ct. Doc. 122-1, at 2-5; D. Ct. Doc. 122-3, at 1-5. The State itself has acknowledged that compliance will cost each covered company on average hundreds of thousands of dollars each year—"0.025 percent of their annual revenue," D. Ct. Doc. 52-1, at 24 ¶ 23—and the actual costs are expected to be far higher, see, *e.g.*, D. Ct. Doc. 78-3, at 2 (estimating costs "exceeding $3,000,000 per year"). In

14

signing the laws, Governor Newsom warned that the overall financial impact on businesses would be significant. See D. Ct. Doc. 48-15, at 1; D. Ct. Doc. 48-28, at 1. These ongoing costs are unrecoverable, as the State's sovereign immunity bars any damages remedy.

### B. Procedural History

1. Applicants filed this action in the Central District of California on January 30, 2024, challenging Senate Bills 261 and 253 (as relevant here) under the First Amendment. See D. Ct. Doc. 28 (amended complaint). Applicants sought summary judgment on that claim to obtain resolution well before the laws took effect, see D. Ct. Doc. 48-1, at 1-23, but the court declined to rule and ordered discovery at the State's request, D. Ct. Doc. 73, at 12-13. Discovery has been suspended pending appeal. D. Ct. Doc. 126, at 1.

2. Recognizing that the discovery schedule would take many months to complete, and that subsequent adjudication on the merits (whether via summary judgment or trial) would take many months more, Applicants moved for a preliminary injunction to preserve their rights on February 25, 2025. D. Ct. Doc. 78-1, at 1-22. The district court subsequently issued a scheduling order under which summary-judgment proceedings will not be complete until months after public reporting under the statutes had begun. D. Ct. Doc. 93, at 22 (scheduling summary-judgment hearing for June 2026).

On August 13, 2025, the district court denied a preliminary injunction. It concluded that both laws likely survive First Amendment review, under a different the-

15

ory for each law.  For SB 261, the court acknowledged that the statute does not compel "factual" speech (App. 28a), but it applied intermediate scrutiny and held that the State's interest in providing "California investors" with climate-related information was sufficient to sustain the law (App. 44a).  The court relied almost entirely on a declaration from CalPERS—a state-controlled pension fund legally required to consider climate factors—without finding that the information was material to investors or necessary to prevent deception.  See App. 36a (citing Georgiev Declaration).

For SB 253, the court applied *Zauderer* v. *Office of Disciplinary Counsel*, 471 U.S. 626 (1985), concluding that the statute was "reasonably related" both to the State's goal of providing information to California investors (App. 34a-36a) and reducing greenhouse-gas emissions (App. 38a).  It did not address whether California could have achieved its stated aims through less restrictive means, such as publishing its own climate-risk assessments or investor guidance.  See App. 36a-37a, 43a-44a.

3.     Applicants timely appealed, C.A. Doc. 1, and on August 20, moved the district court for an injunction pending appeal, D. Ct. Doc. 116.  The district court denied the motion on September 11, stating that there were not "serious questions going to the merits," and that Applicants had "faile[d] to demonstrate that the balance of hardships" favored an injunction pending appeal; the court did "not address the remaining factors."  App. 4a.

4.     Applicants promptly moved for the same relief from the Ninth Circuit on September 16, requesting a ruling by November 3 so that, if proceedings in this

16

Court were necessary, those proceedings would not be unduly and avoidably compressed. C.A. Doc. 6, at 1-38. The motions panel took no action, however, for three weeks after the motion was fully briefed. On October 23, it issued an order—not deciding Applicants' motion, but referring it to the merits panel, which had yet to be assigned. C.A. Doc 28. No explanation was given.

On October 27, Applicants filed an emergency motion to assign the case to a merits panel so that their motion for an injunction pending appeal could be decided. C.A. Doc. 37. Applicants noted that, absent injunctive relief from the court of appeals, they would seek relief from this Court on November 10. *Id.* at 4. The motions panel granted the motion to assign a panel. C.A. Doc. 38. On October 30, the case was set for argument before a merits panel on January 9, 2026—after SB 261's compliance deadline. C.A. Doc. 39. The merits panel has not ruled on the motion for an injunction pending appeal.

## ARGUMENT

California should not be permitted to compel thousands of companies nationwide to speak against their will on one of the most divisive and complex policy topics in modern public discourse—before any appellate court has determined whether a preliminary injunction is warranted. But by January 1, absent this Court's intervention, Applicants' members must begin publishing extensive, state-prescribed reports on climate risks and responsibility. Once that speech occurs, it cannot be unsaid. In addition to that constitutional harm, Applicants' members will have incurred substantial, unrecoverable costs to prepare those reports. The Court can and should step

17

in to preserve the status quo until Applicants' entitlement to a preliminary injunction is decided by the Ninth Circuit and, if needed, by this Court.

All of the criteria for interim relief pending appeal are satisfied. Parties are "entitled to an injunction pending appeal" from this Court if (1) they "are likely to succeed on the merits," (2) they will be "irreparably harmed" absent relief, and (3) an injunction will not harm the public interest. *Tandon* v. *Newsom*, 593 U.S. 61, 64 (2021) (per curiam) (citing *Roman Catholic Diocese of Brooklyn* v. *Cuomo*, 592 U.S. 14, 16 (2020) (per curiam)). Applicants here satisfy every requirement.

First, Applicants are likely to succeed because California's laws unabashedly compel controversial speech for the purpose of shaping debate and pressuring companies to change their behavior. The State has never suggested that its challenged laws can survive strict scrutiny. And its attempts to shoehorn the statutes into the commercial-speech doctrine demonstrate the dangers of allowing lower courts to expand or improvise upon the narrow recognized exceptions to strict scrutiny. Even if a lower level of scrutiny applied, California's laws would fail because none of the State's shifting rationales support the compelled reports: Its laws do not combat fraud, Resp. C.A. Br. 46, 62; their efficacy in "emissions reductions" (Resp. C.A. Br. 41, 61) is at best speculative; and California's claimed interest in "transparency" (Resp. C.A. Br. 1, 36, 59) is as limitless as it is constitutionally illegitimate.

If the Ninth Circuit ultimately affirms the denial of a preliminary injunction, its decision would also amply warrant this Court's review and reversal. California's laws contravene this Court's First Amendment precedents many times over. And

they attempt to set climate-related policy for the entire Nation. The statutes sweep thousands of businesses across the country into their compelled-speech scheme; that is by design, making the statutes closely akin to nationwide federal regulations this Court often reviews. For similar reasons, there would be no basis to defer review for percolation. This litigation presents the kind of fundamental First Amendment question that has warranted plenary review even in the absence of a circuit conflict. See, *e.g.*, *United States* v. *Alvarez*, 567 U.S. 709, 714 (2012). And suits seeking relief from enforcement of California's statutes cannot be brought elsewhere. If this Court grants review, it is very likely to hold both statutes invalid. Applicants are likely to succeed in every sense.

Second, Applicants' members will suffer irreparable harm without an injunction pending appeal. SB 261 and SB 253 require them to speak against their will— per se irreparable harm. And because the Ninth Circuit withheld interim relief and will not hear oral argument in the appeal until *after* SB 261's January 1 compliance deadline, the constitutional injury to Applicants' members is imminent and unavoidable absent this Court's intervention. Meanwhile, affected companies are already incurring substantial and irreparable costs preparing to comply with the laws—diverting significant staff, funds, and infrastructure to speak the State's message. Neither the constitutional injury nor financial harms can ever be undone.

Third, California cannot carry its heavy burden of demonstrating that its unprecedented climate-change reporting mandates must be allowed to take effect to protect an urgent public interest. These novel mandates have never been in force. Their

19

purported benefits are at best highly speculative and abstract; neither statute purports to protect the public from concrete, here-and-now harms, let alone from injuries that could justify overriding the First Amendment. There is nothing to be gained, and much to be lost, from allowing the laws to be enforced while their validity is litigated.

The Court should therefore grant an injunction barring enforcement of SB 261 and SB 253 against Applicants' members pending appeal. The injunction should remain in effect until the Ninth Circuit decides Applicants' appeal from the denial of a preliminary injunction and, if that court affirms, pending the filing and disposition of a petition for a writ of certiorari and any further proceedings in this Court. Alternatively, the Court should construe this application as a petition for a writ of certiorari before judgment to review the denial of a preliminary injunction, grant the petition, and issue an injunction barring enforcement of the laws pending its review. Either way, California should not be allowed to inflict the irreparable First Amendment harms threatened here.

## I.    Applicants Are Likely To Succeed On The Merits

SB 261 and SB 253 violate the First Amendment. Both laws compel thousands of companies to make public statements they would not otherwise make, in the State's own prescribed terms, on matters of intense public and political debate. They require businesses, under threat of penalty, to speak in the government's language—an exercise of compelled expression that is "presumptively unconstitutional" and subject to the strictest scrutiny. *National Institute of Family & Life Advocates* v. *Becerra*,

20

585 U.S. 755, 766 (2018).  California could not plausibly satisfy that standard, and throughout this litigation it has never tried.  See C.A. Doc 14, at 17-19, 24-25.

Worse, these compelled climate-change reports are not neutral.  Like the compelled-speech regime this Court struck down in *NIFLA*, "viewpoint discrimination is inherent in the design and structure" of these laws.  585 U.S. at 779 (Kennedy, J., joined by Roberts, C.J., and Alito and Gorsuch, JJ., concurring).  The compelled speech here is designed to skew public debate by forcing private speakers to read from the State's script.  The statutes' sponsors were explicit: The laws' goal is to "embarras[s]" companies and "make sure that the public actually knows who's green and who isn't," by California's lights.  D. Ct. Doc. 48-5, at 3, 30 (Sen. Wiener).  That is no stray statement; California's *defense* of SB 261 and SB 253 is, in part, that consumers' and investors' hostile reactions to the mandated messages will drive companies to alter their operations and ultimately reduce emissions.  The statutes' baked-in viewpoint bias is fatal under the First Amendment.

The State has nevertheless sought to evade strict scrutiny by rebranding its mandates as "commercial disclosures" subject to lesser review.  See C.A. Doc. 14, at 17-19.  But even setting aside the statutes' prescription of state-favored viewpoints, SB 261 and SB 253 do not compel commercial speech.  They do not involve factual clarifications about products or services by a merchant in the course of proposing or conducting commercial transactions.  Rather, each law compels standalone statements on the "sensitive political topi[c]" of climate change—a quintessentially "controversial subjec[t]" this Court recognized warrants "'special protection'" at the

21

"'highest rung'" of First Amendment values. *Janus* v. *American Federation of State, County, & Municipal Employees, Council 31*, 585 U.S. 878, 913-914 (2018). The reports concern no sale, contract, or advertisement. They force every large company that merely does business in California to publish lengthy narratives about its emissions, operations, and "climate-related financial risks," App. 265a-268a—even if it has never spoken on those topics before. Such freestanding, state-mandated statements on public policy are not commercial speech under any recognized definition.

The State's effort to expand the definition of commercial speech (or to invent a new category of less protected speech) is unavailing in any event, because SB 261 and SB 253 fail even a relaxed standard of review. None of the alternating rationales California has advanced can support its mandates. And its laws are not properly tailored to any of those ends.

Indeed, California made no effort to tailor its reporting regime at all. Its laws are not crafted to address concerns particular to any industry, product, or activity. The State simply took voluntary, international climate-reporting frameworks and copied them wholesale—but made them mandatory for every company meeting a revenue threshold. The result is that every covered business—no matter its size, sector, or operations—must publish the same sweeping reports in the same prescribed terms, regardless of whether it has ever spoken about climate issues or engaged in any misleading conduct. Like the California law this Court held invalid in *NIFLA*—which compelled all clinics to deliver state-scripted notices "no matter what" they said or

22

did, 585 U.S. at 777—the State's one-size-fits-all speech mandate for climate violates the First Amendment.

## A.     These Mandates Are Not Commercial Speech

The State does not dispute that SB 261 and SB 253 would fail strict scrutiny. Instead, it contends that the laws compel only "commercial speech" and thereby are subject to less searching review.  Resp. C.A. Br. 15, 17.  That contention fails at the outset because the prolix speech these laws compel is nothing like commercial speech as this Court's precedents define it.

The Court has long defined commercial speech as "speech that does no more than propose a commercial transaction." *Harris* v. *Quinn*, 573 U.S. 616, 648 (2014). That criterion is not simply a clue or guidepost; it is "*the test* for identifying commercial speech." *City of Cincinnati* v. *Discovery Network, Inc.*, 507 U.S. 410, 423 (1993) (citation omitted).  Indeed, every decision of this Court that has classified expression as commercial speech has involved communications proposing, describing, or accompanying an actual or potential commercial transaction—an advertisement, solicitation, or product-specific warning.  See, *e.g.*, *Zauderer* v. *Office of Disciplinary Counsel*, 471 U.S. 626, 629-631 (1985) (attorney advertisements soliciting clients); *Florida Bar* v. *Went For It, Inc.*, 515 U.S. 618, 620-621 (1995) (targeted direct-mail solicitations by lawyers); *Edenfield* v. *Fane*, 507 U.S. 761, 763-764 (1993) (accountant's in-person solicitations of clients); *Rubin* v. *Coors Brewing Co.*, 514 U.S. 476, 478-479 (1995) (beer labeling information about alcohol content); *Lorillard Tobacco Co.* v. *Reilly*, 533 U.S. 525, 554-555 (2001) (advertising of tobacco products).

23

By that measure, California's statutes do not plausibly address commercial speech. They do not regulate advertising, product labeling, or any other expression offering goods or services for sale. They are not triggered by any prior statement a company made about its products or climate. They instead compel freestanding statements on a contested political subject, addressed to the general public and divorced from any product or service: SB 261 requires narrative projections about various "climate-related" matters, and SB 253 requires highly speculative and value-laden reporting of greenhouse gas emissions. Neither mandate can be described as addressing speech that merely proposes a commercial transaction. They compel public "accountability" statements meant to pressure, not promote.

This Court's decision in *Bolger* v. *Youngs Drug Products Corp.*, 463 U.S. 60 (1983), underscores how narrowly it has drawn the commercial-speech category and how carefully it has policed the category's limits. The *Bolger* Court considered three types of mailings promoting contraceptives: price lists, product flyers, and informational pamphlets discussing prophylactics in general and Youngs's products in particular. *Id.* at 62. The first two fell "within the core notion of commercial speech— 'speech which does no more than propose a commercial transaction.'" *Id.* at 66 (citation omitted). But the third category—pamphlets—"present[ed] a closer question," because they were partly educational in nature. *Ibid.* The Court ultimately held that the pamphlets qualified as commercial speech only after finding that they possessed three key characteristics: They were advertisements, referred to particular products, and were economically motivated. *Id.* at 66-67. The Court emphasized that it had

"examined [the challenged law] carefully to ensure that speech deserving of greater constitutional protection [was] not inadvertently suppressed." *Id.* at 66.

*Bolger*'s criteria for resolving "clos[e] question[s]," 463 U.S. at 66, confirm that SB 261 and SB 253 do not concern commercial speech. The compelled reports share none of the three traits *Bolger* deemed critical. They are not advertisements. They pertain to no product or service. And they are produced out of legal obligation, not economic motivation. See, *e.g.*, *NetChoice, LLC* v. *Bonta*, 113 F.4th 1114, 1120 (9th Cir. 2024) ("businesses do not have a clear economic motivation to provide these opinions"). The commercial-speech question here is not close.

In the courts below, the State contended that the mandated climate-change reports involve commercial speech because the compelled speech will be "[u]seful" to investors or lenders. Resp. C.A. Br. 41, 54. But mere utility to one person of forced expression by another has never been and cannot be the touchstone. If "usefulness" to a commercial audience were enough, a State could compel reporting any fact the public might deem relevant—executives' "political affiliations," or laborers' "citizen[ship] status"—simply by labeling it "commercial." *American Meat Institute* v. *USDA*, 760 F.3d 18, 31-32 (D.C. Cir. 2014) (en banc) (Kavanaugh, J., concurring in the judgment). The First Amendment's guarantees are not so feeble. *Ibid.*

The State's approach effectively invents a new category of compelled speech—divorced from any transaction, product, or service—subject to the diminished scrutiny reserved for commercial advertising. This Court has repeatedly and rightly rejected similar efforts to erode First Amendment protections by expanding the commercial-

25

speech doctrine or creating new analogues. See, *e.g.*, *NIFLA*, 585 U.S. at 767; *United States* v. *Stevens*, 559 U.S. 460, 478-479 (2010). The commercial-speech doctrine remains a narrow exception confined to communications proposing a commercial transaction. The reports compelled here fall far outside that limit.

**B.    The Laws Fail Under Any Level Of Scrutiny**

Even if these laws did concern commercial speech, they would still fail under any arguably applicable First Amendment rubric. The statutes cannot survive intermediate scrutiny under *Central Hudson Gas & Electric Corp.* v. *Public Service Commission of New York*, 447 U. S. 557 (1980), because California has never offered a coherent justification for these unprecedented speech mandates, much less tailored its laws to those ends. And they cannot be sustained under *Zauderer* v. *Office of Disciplinary Counsel*, 471 U.S. 626 (1985), because they mandate freestanding publication of nonfactual, controversial information that is untethered to companies' own products or services and unnecessary to prevent deception.

**1.    The Laws Fail Under *Central Hudson***

In defending SB 261 and SB 253, the State has invoked three different rationales, shifting among them as expedient. A law cannot be reasonably or narrowly drawn when its purpose is so uncertain.

Unsurprisingly, the State also cannot show that either law is tailored to any of its oscillating objectives. Each of the State's justifications—preventing deception, reducing emissions, and enhancing transparency—is a misfit, as explained below. But they share an overarching defect: The statutes are not tailored to anything because

26

California did not try. Rather than design a disclosure framework to achieve any of its purported objectives, California lifted entire, detailed voluntary reporting frameworks—the 74-page Task Force Report and 116-page Greenhouse Gas Protocol—and made them mandatory for every company in the Nation that meets a revenue threshold and does any business in the State. But the frameworks it imported were designed for voluntary use, so that private entities could choose whether and how to apply them, as they deemed appropriate to their business. Copying those flexible, optional frameworks—designed in part by foreign entities with no reason to account for U.S. constitutional constraints—and converting them into binding legal mandates backed by civil penalties is the opposite of narrow tailoring.

The resulting scheme is breathtaking in scope. Every covered company—no matter its size, industry, or degree of connection to California—must issue the same sweeping reports in the same government-prescribed format. Each must adopt the State's vocabulary of "climate accountability" and "financial risk," regardless of its own views or experience on those topics. This one-size-fits-all compulsion mirrors the defect this Court condemned in *NIFLA*: California burdened substantially more speech than necessary by imposing speech mandates "no matter what" the speaker had said or done. 585 U.S. at 777. True tailoring requires "[p]recision," not wholesale adoption of external frameworks. *Id.* at 775 (brackets in original). California has not shown—and cannot show—that conscripting thousands of private entities to publish government-scripted climate narratives is a reasonable means of achieving any legitimate end. The State's own Governor has acknowledged that the laws sweep too

27

broadly, conceding they require future "streamlin[ing]." D. Ct. Doc. 48-15, at 2; D. Ct. Doc. 48-28, at 2. The time to tailor speech mandates is before they become law, not after they irreparably violate First Amendment freedoms.

### a. California's "Fraud Prevention" Theory Collapses

California's principal justification for its mandates—that they compel corrective reports to prevent misleading speech—fails outright. The statutes do not even advance, let alone narrowly target, any legitimate interest in preventing deception.

**i.** The State cannot defend SB 261 or SB 253 as anti-fraud measures because it has no evidence of deception to correct. This Court made clear in *NIFLA* that a speech mandate cannot stand when the government fails to show a "real, not purely hypothetical harm." 585 U.S. at 776. *NIFLA* rejected California's similar claim that it could compel speech while "point[ing] to nothing" showing anyone was misled. *Id.* at 777. The same is true here: The State has identified not a single instance of false or misleading climate-related speech. The legislative record invokes vague notions of "greenwashing" and "accountability," D. Ct. Doc. 48-5, at 2, 33, but cites no deceptive statement by any company. California once again seeks to compel speech not to correct fraud, but to advance its preferred narrative on a contentious topic—a rationale this Court has already rejected as constitutionally insufficient.

The State's reliance in the courts below on the expert declaration of Dr. Angel Hsu underscores the pretextual nature of its asserted anti-fraud interest. See D. Ct. Doc. 89, at 2, 4, 12, 16, 17 (citing Hsu Report, Doc. 89-18). Dr. Hsu did not identify any false or misleading statements. Instead, she claimed that 96% of companies with

28

emissions targets "show[ed] signs of greenwashing." D. Ct. Doc. 89-18, at 6. She defined that term expansively to cover *accurate* statements about a company's practices if the company did not take other steps she favored. In her view, for instance, it was a sign of greenwashing to announce emissions reduction targets if a company did not also announce *interim* targets. *Id.* at 7. Similarly, accurate statements were deemed "greenwashing" if the company engaged in conduct Dr. Hsu *disfavored*—including lobbying against the State's preferred climate legislation. D. Ct. Doc. 112, at 36. That is not evidence of deception; it is thinly veiled viewpoint discrimination. The district court rightly described Dr. Hsu's analysis as "concerning." App. 41a.

The only purported example of "misleading" speech the State has marshaled in litigation underscores the emptiness of its claim. When pressed at oral argument for a concrete example of deception, the State pointed to one company's voluntary disclosure of its goal for achieving net-zero emissions. D. Ct. Doc. 106, at 37 (July 1, 2025 Hearing). But that statement was *truthful*. The State argued that the company's goal was "misleading" because its policy "really [was] to maintain 2020 levels [of emissions] by 2030." *Ibid.* But the State knew that because the company explicitly said it. See *ibid.* The State's "example" of "misleading" speech was thus a truthful statement accompanied by clarifying context. As the district court said, "it strains credulity to call a claim misleading when the company explicitly identifies the very metric it is using, even if it is not the State's preferred metric." App. 41a. When pressed further, the State retreated to describing its concern as companies "not backing up their statement with enough information to verify the truthfulness of what

29

they're saying." D. Ct. Doc. 106, at 38 (July 1, 2025 Hearing). That is not proof of deception; it is a concession that the State lacks proof.

      **ii.**    Even if some deception existed, neither SB 261 nor SB 253 is tailored to address it. Both laws sweep more broadly "than reasonably necessary." *NIFLA*, 585 U.S. at 776. They apply to every company above a revenue threshold that does any business in California—whether or not the company has ever spoken about climate issues. That mismatch is independently fatal under the First Amendment.

      The availability of obvious, less restrictive alternatives confirms the constitutional defect. If California truly believed that certain statements were misleading when made without appropriate context, it could address that concern by requiring such statements to be accompanied by appropriate clarifying disclosures at the point of the statement. For example, it might require disclosing an "interim" emissions reduction target when a company discloses an ultimate target. California also could enforce existing fraud statutes, see *Village of Schaumburg* v. *Citizens for a Better Environment*, 444 U.S. 620, 636-637 (1980); target actually misleading claims, see *McCullen* v. *Coakley*, 573 U.S. 464, 494 (2014); or simply publish its own emissions estimates and climate analyses, see *National Association of Wheat Growers* v. *Bonta*, 85 F.4th 1263, 1282 (9th Cir. 2023). Any of those options would advance the State's goals without compelling private speakers to carry its message.

      But California has done none of that. Instead, it has imposed sweeping, standalone reporting mandates requiring thousands of companies to publish lengthy, value-laden narratives on their websites. That approach is "'broader than reasonably

necessary.'" *NIFLA*, 585 U.S. at 776. The First Amendment does not tolerate such "broad prophylactic rules" aimed at hypothetical harms. *Zauderer*, 471 U.S. at 649.

### b. The State's Emissions-Reduction Rationale Cannot Justify Its Compelled Climate Reports

California has also argued that its laws will help combat climate change by reducing greenhouse-gas emissions. That theory unravels, too.

**i.** California's emissions-reduction defense is perplexing. The State cannot lawfully control or regulate greenhouse-gas emissions outside its borders. For that reason, it has denied that Senate Bills 261 and 253 "regulate emissions" at all. Resp. C.A. Br. 43. Yet it has also insisted that the statutes' aim is to "reduce" emissions. *Ibid.* To explain that incongruity, California argues that the laws will achieve that end "indirectly": By forcing companies to publish their emissions data, the State hopes that public pressure, investor campaigns, or market reactions will embarrass companies into cutting emissions somewhere. Resp. C.A. Br. 61. That rationale highlights the viewpoint bias at the heart of both laws. And it fails on its own terms.

There is no evidence that SB 261 and SB 253 will reduce emissions, and the State has cited none. Its own sources describe the evidentiary basis for the emissions-reduction theory as "sketchy and incomplete." D. Ct. Doc. 56-49, at 14. California argues only that the laws "may" have that effect, while urging that "any" reduction is sufficient. But speculation that compelled speech *might* achieve an effect the State desires has never been good enough. The First Amendment requires evidence that a law will materially advance the government's stated goal, not mere conjecture that it could. *Edenfield*, 507 U.S. at 770. This Court demands direct, not indirect or remote,

31

support for a claimed purpose to justify interfering with the freedom to speak or not to speak. *44 Liquormart, Inc.* v. *Rhode Island*, 517 U.S. 484, 504-506 (1996) (plurality opinion); *Edenfield*, 507 U.S. at 770. Yet California conceded below that any reductions would be incidental and insignificant. Resp. C.A. Br. 41, 61.

 **ii.** The State's laws also are not properly (or even logically) tailored to its asserted emissions-reduction objective. Indeed, the way SB 253 measures emissions would be irrational if emissions reductions were truly the goal. The law requires companies to report their total emissions across the entire business, rather than emissions per product or per unit of output. That design produces backwards results: A company that invents cleaner technology and (perhaps for that reason) sells more units will report higher *total* emissions, even though it is polluting less *per unit*. Meanwhile, a company that has less efficient products and is losing market share will report lower total emissions, even though it is not getting cleaner. The system thus punishes success and rewards decline. If its goal is to reduce emissions, SB 253 "makes no rational sense." *Rubin* v. *Coors Brewing Co.*, 514 U.S. 476, 488 (1995).

 California erred, as well, in bypassing readily available, less restrictive avenues. It is undisputed that roughly 90 percent of an individual company's emissions can be calculated from readily observable data—such as a company's industry, size, and earnings growth—without compelling the company to say a word. D. Ct. Doc. 48-22, at 10. California could easily perform those calculations itself and publish the results on its own website, without "'co-opt[ing] [private speakers] to deliver its message for it.'" *Wheat Growers*, 85 F.4th at 1283. Instead, it chose the most intrusive

path: compelling companies to deliver the State's message, and to promote the State's framing of their responsibility for climate-change emissions, in the hope that they will face public opprobrium and alter their behavior.

### c. The State's Asserted Interest In "Transparency" Is Not A Legitimate Basis For Compelling Speech

California's last resort is "transparency." Compelling companies to publish climate information, it has argued, will help investors and consumers decide what to buy or fund. That asserted interest has never been a proper basis for compelling speech, and California's laws are not tailored to it in any event.

**i.** Curiosity is not a constitutional basis to force speech. If "transparency" alone sufficed, the State could mandate reporting of anything politically useful or interesting. *American Meat Institute*, 760 F.3d at 31-32 (Kavanaugh, J., concurring in the judgment). Every democratically enacted compulsion of speech reflects the majority's preference to have the information reported; if that interest sufficed, no compelled-speech law would be unconstitutional.

The State's argument that consumers may be "willing to pay more" for lower-carbon products illustrates the danger. D. Ct. Doc. 90, at 13. If preferences like that justified compulsion, "there is no end to the information" States could demand. *American Meat Institute*, 760 F.3d at 31-32 (Kavanaugh, J., concurring in the judgment). Some consumers may want to know a business owner's politics or her workers' citizenship status; such facts might "play a role" in consumer decisions, yet the First Amendment forbids that "free-wheeling" power to compel speech. *Id.* at 32.

33

**ii.** Even if California could posit a substantial interest, these laws are again overbroad. The State's stated aim—providing "reliable information" so investors and consumers can judge "climate-related risks" (Resp. C.A. Br. 36 (cleaned up))—is indeterminate, and cannot justify the granular, onerous reports required here. SB 261 demands reports about hypothetical future scenarios and "sensitivities to key assumptions." App. 66a, 69a, 83a, 92a. SB 253 layers on multi-scope, global supply-chain reporting. But the State never showed that any investor or consumer needs information of that level of detail. Its lone proof is a declaration from CalPERS—a state-controlled fund that is legally required to consider climate factors. D. Ct. Doc. 52-5, at 1-10. That is not market demand; it is self-corroboration.

If investors wanted this information, the market already lets them get it by demanding that companies provide it and refusing to deal with companies that do not. See *International Dairy Foods Association* v. *Amestoy*, 92 F.3d 67, 74 (2d Cir. 1996). California posits that its reports help companies attract investors. D. Ct. Doc. 89, at 12. That supposition is all the more reason why firms may choose to disclose such information voluntarily. Cf. *City of Ladue* v. *Gilleo*, 512 U.S. 43, 58 (1994).

The State's transparency justification is also underinclusive in one important respect. The State claims a general "informational" interest, yet it singles out climate-related issues for compelled reports of extraordinary (speculative) detail—internal carbon pricing, impacts on executive pay, decades-out scenarios. It does not impose similar mandates for information that investors routinely deem material, such as earnings. That mismatch is exactly what *NIFLA* condemns: a reporting re-

34

gime "wholly disconnected" from the asserted interest, used to advance a favored policy view. 585 U.S. at 777. These laws are not about informing investors; they are about compelling a state-approved message.

### 2. *Zauderer* Cannot Save California's Speech Mandates

California has also invoked *Zauderer* to defend the two statutes, asserting that they merely require "purely factual and uncontroversial" disclosures akin to those upheld for attorney advertisements. That contention fails. *Zauderer* has always been a narrow exception to ordinary First Amendment principles. It applies only to disclosures that (1) convey purely factual and uncontroversial information, (2) concern the advertiser's own product or service, and (3) are necessary to prevent consumer deception. *Id.* at 651. None of those conditions is satisfied here by the State's mandatory climate-change reports.

First, the compelled reports are not factual or uncontroversial. *Zauderer* concerned a short, factual notice clarifying that a lawyer advertising his fees as contingent on success might still charge his client for litigation costs. 471 U.S. at 650-651. California's laws are nothing like that. They compel speech on the "controversia[l] subject" and "sensitive political topi[c]" of "climate change." *Janus*, 585 U.S. at 913. SB 261 requires companies to publish speculative and controversial narratives—"scenario analyses"—predicting how "physical and transition risks" from climate change may affect operations decades into the future. SB 253 demands not verifiable data about a company's own conduct, but estimates of greenhouse-gas emissions, including emissions produced by others across a global supply chain. And the State forbids

companies to include "avoided emissions," thereby forcing a one-sided account of climate responsibility.  These are value-laden judgments, not "purely factual" statements.  *NIFLA*, 585 U.S. at 769.

Second, the reports have nothing to do with preventing deception.  *Zauderer* allows limited factual corrections only "to dissipate the possibility of consumer confusion or deception"—in that case, a prospective client's potential confusion that a contingent-*fee* arrangement still required the client to cover *costs*.  471 U.S. at 651.  But the State does not argue that any company misled anyone about climate risks or emissions.  And the record is barren of any evidence of deception.  See pp. 28-30, *supra*.  The statutes apply no matter what a company has said or done.

Third, the reports are not confined to information about a company's own product or service.  The compelled reports concern corporate policies, global supply chains, and future regulatory forecasts—not the "terms" of any sale or the characteristics of any product.  The Court has never upheld compelled speech of this breadth under *Zauderer*.  See *NIFLA*, 585 U.S. at 768 (explaining that *Zauderer* does not apply outside the context of advertising regarding the "terms under which . . . services will be available" (citation omitted)).

Extending *Zauderer* here would transform a narrow, deception-based exception into a general license for the government to compel any information it deems useful to the public.  That distortion of the doctrine has nothing to commend it.

36

## II.    Absent An Immediate Injunction, Applicants Face Irreparable Harm

SB 261 and SB 253 will cause irreversible injury without an injunction.  The constitutional injury is automatic.  These laws conscript companies into California's climate campaign—forcing them to speak when they would rather remain silent and ordering them to adopt the State's preferred framing of one of the most divisive policy issues of our time.  See, *e.g.*, D. Ct. Doc. 78-3, at 5 (member company stating that it will be compelled to make statements that it does not believe are accurate and does not wish to say); D. Ct. Doc. 122-3, at 4-5 (similar); see also, *e.g.*, 122-1, at 4-7 (explaining that "members will be forced to make * * * public statements that they would not otherwise make").  Even the State admits that SB 261 and SB 253 "compel speech" and therefore trigger First Amendment scrutiny.  Resp. C.A. Br. 20.  Unlawfully compelled speech is itself irreparable harm.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn* v. *Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted).  And unlike *restrictions* on speech, which may be lifted to allow future expression, *compelled* speech causes permanent injury:  Once a company is forced to speak, the message is out.  It cannot be unsaid.

The constitutional injury is also imminent.  Absent relief from this Court, SB 261 will take effect and compel speech on January 1—before the court of appeals will even hear oral argument in the preliminary-injunction appeal, and necessarily before it can render decision.  Unless this Court grants an injunction, within weeks thousands of companies must begin publishing the State's mandated climate reports.

Meanwhile, covered companies are already diverting staff, budgets, and infra-structure to prepare for compliance with both statutes. The district court found as a fact that Applicants' members "will need to begin preparing to comply" with the laws now. App. 14a n.4. That finding reflects California's own directive: The State has *instructed* covered companies to "move toward full compliance as quickly as possible" and begin collecting data and building reporting systems immediately. D. Ct. Doc. 78-6, at 6. The record confirms that companies are already necessarily diverting re-sources to build internal reporting systems, renegotiate suppliers contracts, and pre-pare emissions data. See, *e.g.*, D. Ct. Doc. 78-3, at 4, 6, 9 (member company estimat-ing it would need to hire 30 new employees and spend over $3 million annually); see also, *e.g.*, D. Ct. Doc. 78-4, at 2-3 (summary of compliance steps required by covered companies—including building out staff, infrastructure, and protocols months in ad-vance to collect and process information). Indeed, the State itself concedes that com-pliance will impose significant financial impacts, estimating that it could cost up to 0.025% of annual revenue—hundreds of thousands of dollars for a company meeting S.B. 253's revenue threshold. D. Ct. Doc. 52-1, at 114. Those expenditures are not optional, and they are unrecoverable—making them "irreparable" within the mean-ing of this Court's precedents. See *National Institutes of Health* v. *American Public Health Association*, No. 25A103 (Aug. 21, 2025), slip op. 1 ("[W]hile the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be re-couped' and are thus 'irrevocably expended.'"). For all these reasons, only an imme-

38

diate injunction can prevent the constitutional, financial, and operational injuries that will otherwise irreversibly harm Applicants and their members.

## III.    The Public Interest and Equities Favor An Injunction

The other side of the scales is empty.  When the government is the opposing party, the governmental and public interests merge.  *Nken* v. *Holder*, 556 U.S. 418, 435 (2009).  The public has no interest in enforcing an unconstitutional law, and California has no legitimate interest in compelling speech that the Constitution forbids. To the contrary, "[v]indicating First Amendment freedoms is clearly in the public interest." *Pacific Frontier* v. *Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005). Applicants have made a strong showing on the merits, and California has shown no compelling interest.  "An injunction is both equitable and in the public interest." *Mahmoud* v. *Taylor*, 606 U.S. 522, 570 (2025).  At the very least, "preliminary relief" is warranted "while this lawsuit proceeds." *Ibid.*  The status quo should be preserved while California's unprecedented mandates are tested against the Constitution.

California's sole objection—that a temporary injunction would delay enforcement—rings hollow.  The State has no valid interest in pursuing its policy goals through unconstitutional means.  Governments may not "act unlawfully even in pursuit of desirable ends." *Alabama Association of Realtors* v. *HHS*, 594 U.S. 758, 766 (2021); see also *National Federation of Independent Business* v. *OSHA*, 595 U.S. 109, 120 (2022).  And California's "first in the nation" laws (D. Ct. Doc. 48-10, at 14) have never been in force.  Even if the laws were ultimately upheld, an injunction would merely preserve the status quo "previously in effect for decades"—which California

has long deemed adequate. *City of San Francisco* v. *Coinbase, Inc.*, 981 F.3d 757, 762 (9th Cir. 2020).

Nor can California credibly claim urgency. The Legislature extended the Board's rulemaking deadline from January to July 2025, and even then the Board failed to act. See Act of Sept. 27, 2024, ch. 766, § 1(c)(1) (S.B. 219). The State's "failure to act with greater dispatch" "blunt[s]" any newfound "claim of urgency." *Ruckelshaus* v. *Monsanto Co.*, 463 U.S. 1315, 1318 (1983) (Blackmun, J., in chambers). The real urgency lies in preventing compelled speech that, once made, cannot be unsaid.

## CONCLUSION

The Court should grant the application and enjoin enforcement of SB 261 and SB 253 against Applicants' members pending resolution of the appeal of the denial of a preliminary injunction and, if the court of appeals affirms, pending the filing and disposition of a petition for a writ of certiorari and any further proceedings in this Court. Alternatively, the Court should construe the application as a petition for a writ of certiorari before judgment, grant the petition, and issue an injunction pending its resolution of the merits.

Respectfully submitted,

November 10, 2025

Tara S. Morrissey
Jennifer B. Dickey
Stephanie A. Maloney
Kevin R. Palmer
U.S. CHAMBER LITIGATION CENTER
1615 H St., N.W.
Washington, DC 20062
(202) 659-6000

*Counsel for Applicant*
*Chamber of Commerce of the*
*United States of America*

Eugene Scalia
   *Counsel of Record*
Jonathan C. Bond
Brian A. Richman
GIBSON, DUNN & CRUTCHER LLP
1700 M St., N.W.
Washington, DC 20036
(202) 955-8500
EScalia@gibsondunn.com

Bradley J. Hamburger
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071
(213) 229-7000

*Counsel for Applicants*

41